# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, ILLINOIS, | ) | |
| Plaintiff, | ) | Cause No.   3:21-cv-00232-DWD |
| | ) | |
| v. | ) | |
| | ) | |
| MONSANTO CORPORATION, | ) | |
| Defendant. | ) | |

### DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS
### COUNTS II-VI AND VIII-X OF THE FIRST AMENDED COMPLAINT
### AND SUPPORTING MEMORANDUM OF LAW

Defendants Monsanto Company ("Monsanto"), Pharmacia LLC ("Pharmacia"), and Solutia Inc. ("Solutia") (collectively "Defendants") hereby jointly move to dismiss Counts II-VI and Counts VIII-X of Plaintiff's First Amended Complaint (Doc. 29), pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

## INTRODUCTION

Many of Plaintiff's claims against Defendants Monsanto Company ("Monsanto"), Pharmacia, LLC ("Pharmacia") and Solutia Inc. ("Solutia") (collectively, "Defendants"), for alleged contamination of certain unidentified properties in the City of East St. Louis ("Plaintiff" or the "City"), represent an attempt to fit distinct factual allegations into inapplicable legal doctrines. Plaintiff cannot do so. Therefore, this Court should dismiss Counts II – VI and Counts VIII – X of Plaintiff's First Amended Complaint (hereinafter, "Complaint") pursuant to Rule 12(b)(6), for failure to state a claim.[1]

---

[1] Contemporaneously herewith Defendants are filing a Rule 12(e) Motion for More Definite Statement directed at Count I ("public nuisance") and Count VII ("trespass") of Plaintiff's First Amended Complaint.

1

Plaintiff alleges that from 1936 to 1977 Monsanto manufactured PCBs (polychlorinated biphenyls) at its plant in neighboring Sauget, Illinois ("Monsanto Plant"). (Doc. 29, ¶ 2). As a result, PCBs were allegedly emitted "into the atmosphere" and made their way onto East St. Louis property. *Id*. Plaintiff also alleges that PCBs in landfills in Sauget "regularly leached, leaked, and escaped their disposal sites, entering and contaminating vast swaths of land in East St. Louis." (Doc. 29, ¶ 19). Consequently, Plaintiff concludes that "most, if not all, of the PCB contamination found in soil samples within East St. Louis is directly attributable to the Monsanto Plant . . . and there are no other known sources for the East St. Louis PCB contamination . . . ." (Doc. 29, ¶ 7). Despite PCB manufacturing operations at the Monsanto Plant ending in 1977, Plaintiff alleges that it became aware of the presence of PCBs within the City of East St. Louis a few months ago, in December of 2020, when sampling analysis detected PCBs in the soil of certain unidentified properties, measuring in the parts per billion. (Doc. 29, ¶¶ 10, 25).[2]

As a result of these activities, Plaintiff claims Defendants violated various East St. Louis ordinances (Counts II – VI), punishable by fines and other remedies. These ordinance-related claims fail as a matter of law. Plaintiff attempts to effectively re-write its ordinances to apply to the alleged circumstances in this case. The ordinances identified in the Complaint are, on their face, intended to address and deter activities such as dumping dead animal carcasses, littering, and the accumulation of manure, ashes, garbage, and the like on properties within the City of East St. Louis. These ordinances do not apply to the facts alleged in the Complaint. Therefore, Counts II – VI should be dismissed.

---

[2] A way to visualize one part per billion (ppb) in water "is to think of it as one drop in one billion drops of water or about one drop of water in a swimming pool." *See* the following EPA publication online:
https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/display.files/fileid/14285#:~:text=A%20way%20to%20visualize%20one,water%20in%20a%20swimming%20pool.

Plaintiff has also brought product-liability claims against Defendants (Counts VIII – X). These claims fail as a matter of law because the City is not a consumer of, nor did its alleged harm arise from a condition of, a product that was used after being placed into the stream of commerce.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim "may not proceed merely because some set of facts can be imagined that would entitle a plaintiff to relief." *Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020). Thus, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the plaintiff's claims should be dismissed. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 558 (2007).

The tenet that a court "must accept as true all of the allegations contained in a complaint" is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678, citing *Twombly* at 555. Further, determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

## ARGUMENT

I. **The Allegations in the Complaint Do Not Support a Cause of Action under East St. Louis Ordinances.**

This Court should dismiss Counts II – VI, all of which allege violations of East St. Louis ordinances, because the ordinances do not apply to the facts alleged in the City's Complaint. The Seventh Circuit recognizes that "[u]nder Illinois law, municipal ordinances are interpreted according to the traditional rules of statutory construction." *Pro's Sports Bar & Grill, Inc. v.*

3

*City of Country Club Hills*, 589 F.3d 865, 871 (7th Cir. 2009).  The cardinal rule of statutory interpretation is to "presume that [the] legislature says in a statute what it means and means in a statute what it says." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).  Accordingly, courts must "first look to the language of the statute and assume that its plain meaning 'accurately expresses the legislative purpose.'" *United States v. Shriver*, 989 F.2d 898, 901 (7th Cir. 1992) (citation omitted).  When the statute does not expressly provide a definition, "[the] words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).  Similarly, under Illinois law, the courts are directed "to ascertain and give effect to the intent of the enacting body, the clearest indicator of which is the language of the ordinance itself." *Pro's Sports Bar*, 589 F.3d at 871.

Defendants deny the claims made against them in the Complaint.  Nevertheless, Plaintiff's allegations – that PCB molecules passively migrated from the Monsanto Plant and from unidentified impoundments in Sauget onto certain City-owned properties in East St. Louis – do not constitute violations punishable under East St. Louis ordinances.  The ordinances at issue, which deal with topics like dumping litter (Section 94-91), throwing raw sewage, trash, or dead animals onto vacant properties (Section 62-45), and intentionally bringing nuisance-causing materials into the city, or storing such materials in the city (Section 50-78), do not apply to the facts alleged in the Complaint. Accordingly, this Court should dismiss Counts II - VI of Plaintiff's Complaint.

### A.     Section 94-91 (Count II)[3]

Count II of the Complaint alleges Defendants violated Section 94-91 of the East St. Louis City Code (hereinafter, "the Code"). Section 94-91 is within Chapter 94 of the Code, the chapter titled "Solid Waste." Specifically, Section 94-91 falls under Article IV of Chapter 94, which addresses "litter."

The title of Section 94-91 is "Dumping unlawful; exceptions; penalty for violation." The section states that "[n]o person shall dump, deposit, drop, throw, discard or leave, or cause or permit the dumping, depositing, dropping, throwing, discarding or leaving of, litter upon any public or private property."

The factual allegations of the Complaint do not support a violation for littering or for unlawful "dumping" under Section 94-91. Plaintiff alleges that PCBs – detected on certain properties in East St. Louis at the parts-per-billion level – "leached, leaked, and escaped" from unidentified landfills in neighboring Sauget, Illinois, and were "emitted into the atmosphere," and were thereby "dispersed into and onto the lands of East St. Louis" at some unidentified point or points in time. (Doc. 29, ¶¶ 2, 17 and 19). These allegations do not equate to the type of conduct prohibited under Section 94-91. To the contrary, Section 94-91 uses *active verbs* and describes *intentional* conduct: "dump, deposit, drop, throw, discard or leave" and "or cause or permit the dumping, depositing, dropping, throwing, discarding or leaving of, litter . . . ." The definition of "dump," found in Section 94-2, uses similar language, describing deliberate acts:

> Dump means to *discard* or *place* refuse, demolition materials or inert matter other than in a refuse container for storage before collection. Such term does

---

[3] Copies of the ordinances at issue were attached to the Complaint and are also attached hereto, as an exhibit, for the Court's convenience. *See* Exhibit 1.

>   not mean the delivery of inert matter for construction purposes to a construction site for which a building permit has been issued by the city.

(emphasis added).

Plaintiff does not allege Defendants came into East St. Louis and actively dumped PCBs there. Rather, Plaintiff alleges PCBs "leaked" and "escaped" from the plant and landfills in Sauget. Further, the act of "dumping," by any definition, requires some quantity of material that can be collected and physically discarded. The term does not apply to quantities measured in the parts per billion, as alleged in the Complaint, which by Plaintiff's own allegations could be detected only through sampling and analysis of soil.

It is clear that Section 94-91 is intended to deter people from littering in East St. Louis, a term which means dumping trash on the ground or tossing beer cans, plastic bags, candy bar wrappers, or the like, in places where they do not belong. This is the commonly-understood meaning of the term "littering," as is confirmed by Chapter 94's definition of "litter":

>   Litter means any discarded, used or unconsumed substance or waste. Such term may include, but is not limited to, any garbage, trash, refuse, debris, rubbish, grass clippings or other lawn or garden waste, newspaper, magazine, glass, metal, plastic or paper container or other packaging, construction material, abandoned vehicle (as defined in the Illinois Vehicle Code), motor vehicle part, furniture, oil, carcass of a dead animal, nauseous or offensive matter of any kind, any object likely to injure any person or create a traffic hazard, or anything else of an unsightly or unsanitary nature which has been discarded, abandoned or otherwise disposed of improperly.

Section 94-2.

There are no allegations in the Complaint to suggest that Defendants "littered" in East St. Louis by "dumping" quantities of any garbage, trash, refuse, debris, rubbish or other "waste" in East St. Louis. Section 94-91 is therefore inapplicable and Count II should be dismissed.

B.       Section 62-45 (Count IV)

Plaintiff alleges Defendants violated Section 62-45 of the Code. However, Chapter 62 of the Code, which relates to public health, grants administrative authority to the city *health department* to determine and abate any "nuisances" regulated under this Chapter. There is no alleged health department involvement in this case and, in any event, Section 62-45 is inapplicable to the facts alleged in the Complaint.

Section 62-1 (the first section in Chapter 62) establishes a city health department ("There is hereby established a department of the city government which shall be known as the health department …."). The next section, Section 62-2, is titled "Abatement or removal of nuisances; regulations for prevention of disease." This section provides that "[t]he *health department shall* cause all nuisances to be abated *which it may deem* prejudicial or obnoxious to public health." (emphasis added). Section 62-3 then grants the health department administrative authority to issue "orders and sanitary regulations," provides that "any member of such departments may order the abatement of any nuisance which may be prejudicial to the public health," and states that any person who disobeys an order of the health department is guilty of a misdemeanor. Finally, Sections 62-4 through 62-10 establish the position of health and safety officer and grant various powers to that officer.

It is clear from the structure and content of Chapter 62 of the Code it is intended to grant the health department administrative power to deal with public health issues, and that the health department is the entity designated to address any "nuisances" under Chapter 62. Section 62-45 ("Vacant lots and places"), which forms the basis of Count IV of the Complaint, is part of the overall scheme of Chapter 62. There has been no health department involvement in this matter,

7

and none is alleged in the Complaint. Therefore Section 62-45, along with all of Chapter 62, is inapplicable.

Moreover, the language of Section 62-45 does not apply to the facts alleged in the Complaint. Section 62-45 provides that "[n]o part of any *sink, privy or cesspool*," or "any *manure, ashes, garbage, offal, rubbish, dirt, refuse*, [or] *waste*," or a "*thing* which, by its *decomposition*, could or would become offensive to human beings, detrimental to health or create, or tend to create, a nuisance shall be *thrown, deposited or placed* by any person upon any *vacant lot of land or vacant place upon the surface of any lot* of land *within the city*." (emphasis added).

Similar to Section 94-91, Section 62-45 on its face prohibits residents and visitors from actively dumping or discarding garbage or waste materials onto vacant lots. The Complaint, on the other hand, alleges that chemical compounds were dispersed through a process carried out by wind, water and other elements of nature. Further, the materials at issue in Section 62-45 are: those that belong in a sewer and which came from a sink, bathroom, latrine, or the like; other unwanted materials, such as ashes from a fireplace, manure from cattle, or trash; and, dead plants and animals which can decompose.[4] The Complaint does not allege that Defendants emptied sewage in East St. Louis, nor that they deposited in the city any manure, ashes, dirt, trash or dead plants or animals on vacant lots. No facts are pleaded which would fall under Section 62-45, and therefore Count IV must also be dismissed.

---

[4] There is no allegation in the Complaint that PCBs "decompose," or that they caused a nuisance by decomposing. In fact, the Complaint alleges the opposite – that PCB are chemically "stable" and persist in the environment. (Doc. 29, ¶¶ 3, 8).

### C.   Sections 50-71 and 50-78 (Counts III, V and VI)

In Counts III, V, and VI of the Complaint Plaintiff splits up, into different counts, several Sections from Chapter 50, Article III of the Code. This appears to be an attempt to maximize the number of counts, claims and potential ordinance violations against Defendants. However, Chapter 50, Article III, which is titled "Nuisance," contains Sections 50-71 through 50-80, all of which are related provisions designed to be read together.

Count V and VI allege violations of Section 50-71, which is the introductory section for Article III titled, "Generally." This section makes the general pronouncement that nuisances will not be permitted ("No person shall create, commit, permit or continue a nuisance of any kind or description in, upon or about any private property or public place within the city …."). *See* Section 50-71(a). It is Sections 50-72 through 50-78, which follow 50-71, that establish and define the types of nuisances prohibited by Article III. *See*, *e.g.*, Sec. 50-72 ("Offensive premises"); Sec. 50-73 ("Offensive animal pens, stables, *etc*."); Sec. 50-74 ("Lots containing standing water"). Then, at the end of the Article, Sections 50-79 and 50-80 establish the remedy of abatement (Section 50-79)[5] and explain required notice procedures (Section 50-80).

Of the specific nuisance provisions contained in Article III, Plaintiff focuses (in Count III) on Section 50-78. The section states:

> Sec. 50-78. - Keeping or bringing into the city substances occasioning a nuisance.
>
> No person shall *bring into* or *keep within* the city for sale or otherwise, either for food or any other purpose whatsoever, any animal, dead or alive, matter, substance or thing which shall be or occasion a nuisance within the city or which may or shall be dangerous or detrimental to the public health.

(emphasis added).

---

[5] Count VI of the Complaint alleges violations of §§ 50-71, 50-79 and 62-2 of the Code, however §§ 50-79 and 62-2 simply discuss the remedy of abatement; those are not provisions which can be "violated."

As with the Code sections above, 50-78 does not apply to the conduct alleged in the Complaint. Molecules of PCBs which, according to the Complaint, were detected only recently in the parts-per-billion range, do not fit the description contained in 50-78 of "any animal, dead or alive, matter, substance or thing," particularly when that description is combined with the phrase "bring into or keep within the city." There is no allegation in the Complaint that Defendants actively "brought" PCBs into East St. Louis or actively "kept" PCBs in East St. Louis, "for sale or otherwise." Again, Plaintiffs allege that PCBs leached, leaked and were carried through the atmosphere, from the Monsanto Plant and from landfills in Sauget. Such allegations are not covered by the language of Section 50-78.

To further underscore the inapplicability of 50-78, it is important to point out that "[t]he Illinois Supreme Court has repeatedly described a nuisance as something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable." *Schweihs v. Chase Home Finance, LLC*, 2015 IL App (1st) 140683 (2015) at ¶ 40 (internal quotes omitted), citing *In re Chicago Flood Litigation*, 176 Ill.2d 179, 205 (1997); *see also Avery v. GRI Fox Run, LLC*, 2020 IL App (2d) 190382 (2020) at ¶ 44 (citing *In re Chicago Flood Litigation* for the proposition that a nuisance is "*something perceptible to*" and "*offensive*" to the senses) (emphasis added). "Typical examples" of a nuisance include "noise, smoke, vibration, dust, fumes, and odors." *Schweihs* at ¶ 40, citing *In re Chicago Flood Litigation* at 205-06. None of these descriptions of a nuisance, under Illinois law, match the allegations in the Complaint. PCBs, at the levels alleged to be on East St. Louis property, are imperceptible – they are invisible, emit no light, sound, vibration or odor.

In sum, the facts alleged in the Complaint does not fit within the language or contemplation of Section 50-78. Neither this section, nor any of the Chapter 50, Article III ordinances are applicable and therefore Counts III, V and VI should all be dismissed.

> D. **Any attempt to pursue code violations beyond the narrow language of the ordinances would violate due process.**

To the extent Plaintiff tries to effectively re-write any of the above-referenced ordinances, contrary to their plain language, Plaintiff violates Defendants' due process rights. As explained in *City of Aurora v. Navar*, 210 Ill.App.3d 126, 133 (2nd Dist. 1991), "[t]he language of an ordinance must convey sufficiently definite warning and fair notice of what conduct is proscribed." Due process is violated "if a law is so vague and devoid of standards as to leave the public unsure of what is and is not prohibited, or if it fails to supply adequate guidelines to the administrative body which must enforce it." *Id*. at 132 (citations omitted).

The ordinances in Chapter 50, Article III of the Code, for example, should be construed consistent with the plain meaning of the terms used therein. It should be noted that, while Sections 50-72 to 50-78 define the specific nuisances at issue in this portion of the Code, Section 50-71(b) is written as a catchall, purporting to extend the City's enforcement authority to any nuisance defined anywhere within the Code or anywhere within any statute of the State of Illinois. If, in fact, Plaintiff's action against Defendants is relying on 50-71(b) as a catchall provision, such provision is unenforceable under due process principles. In *Village of Worth v. Watson*, 233 Ill.App.3d 974, 976 (1st Dist. 1992) the ordinance at issue prohibited the storage of "junk" on a person's property. A section of the ordinance provided that any terms not specifically defined therein were to be construed by their generally accepted meanings "as defined in the most recent publication of Webster's Dictionary." *Id*. at 981 The court noted that the name "Webster's" is used with more than one dictionary, and dictionary definitions of "junk"

vary. *Id*. at 982. It held the ordinance section at issue was "indefinite and therefore void." *Id*. In a similar way, there is no "definitive warning" or "fair notice" (*City of Aurora*, 210 Ill.App.3d at 133) under an ordinance provision that adopts, by reference, any "nuisance" mentioned or described within any Illinois statute; the City's ordinances cannot be enforced in such a broad, vague and indefinite way.

**II.     The Allegations in the Complaint Do Not Support a Cause of Action for Product Liability.**

A claim for product liability under Illinois law requires that the alleged harm to the plaintiff arise from the *use* of a product that had been placed into the stream of commerce. This Court should dismiss Plaintiff's product-liability claims (Counts VIII – X)[6] because Plaintiff's alleged injuries, according to the Complaint, were not caused by Plaintiff's or by anyone else's use of PCB products that had been placed into the stream of commerce.

The Illinois Supreme Court has adopted the strict liability doctrine set forth in section 402A of the Second Restatement of Torts. *See Calles v. Scripto-Tokai Corp.*, 224 Ill.2d 247, 254 (2007). The Restatement provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property *is subject to liability for physical harm thereby caused to the ultimate user or consumer*, *or to his property*, if
>
>> (a) the seller is engaged in the business of selling such a product, and
>>
>> (b) it is expected to and does *reach the user or consumer* without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although

---

[6] Counts VIII and IX of the City's Complaint allege Defendants' PCB mixtures and PCB-containing products were unsafe and unreasonably dangerous as designed (Count VIII – Design Defect) and that Defendants failed to warn or instruct consumers about the dangers and hazards associated with PCBs (Count IX – Failure to Warn and Instruct), *see* Doc. 29 at ¶¶ 84-104. Count X is addressed below.

>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>>
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (emphasis added); *see also Calles* at 254 (quoting the italicized language above); *Mikolajczjk v. Ford Motor Co.*, 231 Ill.2d 516, 524 (2008) ("[T]his court recognized a cause of action for strict liability in tort against the manufacturer of a product whose defective condition made it unreasonably dangerous *to the user or consumer*. This court noted that its conclusion 'coincided with the position taken in section 402A of the . . . Restatement of the Law of Torts,' which had recently been approved.") (emphasis added) (citation and internal quotations omitted). Indeed, many of the policy considerations embodied by strict liability focus on "the protection of consumers, with their unequal bargaining power and lack of access to information, from accidental injuries." *Chicago Heights Venture v. Dynamit Nobel of America, Inc.*, 575 F.Supp. 214, 217 (N.D. Ill., 1983)

      Here, the alleged harm to Plaintiff in Counts VIII and IX (and throughout the entire Complaint) is not alleged to be the result of Defendants placing PCBs or PCB-containing products into the stream of commerce, or the result of PCB products being used by Plaintiff or by anyone else. Rather, Plaintiff asserts that PCBs were allegedly emitted into the atmosphere from the Monsanto Plant and escaped landfills in Sauget, Illinois, to properties in East St. Louis. (Doc. 29, ¶¶ 2 and 19). These alleged facts do not support strict product liability claims, as a matter of law.

      Further, in design-defect actions (Count VIII), Illinois courts recognize two tests that a plaintiff may use to demonstrate a defect: the "consumer-expectation test" and the "risk utility test." *Calles*, 224 Ill.2d at 255. The rationale for utilizing these tests is that, "at a minimum a

13

product must meet ordinary consumer expectations as to safety to avoid being found defective." *Id.* at 256. Moreover, under a failure to warn theory (Counts IX and X), Illinois courts require a plaintiff to demonstrate "that the manufacturer did not disclose an unreasonably dangerous condition or instruct on the proper use of the product as to which the average consumer would not be aware." *Hakim v. Safariland*, LLC, 410 F.Supp.3d 862, 870 (N.D. Ill. 2019) (internal citation omitted). The warning's purpose "is to inform the consumer about a danger of which [he] is not aware, thus enabling [him] to take appropriate measures to protect [himself]." *Winkler v. Madix, Inc.*, 2018 WL 4286197, *9 (N.D. Ill. Sept. 7, 2018) (internal citation omitted). Thus, the tests employed by Illinois courts to analyze strict product liability claims all have a common theme – ***protecting a consumer of the product***. Again, Plaintiff does not claim that the alleged harms at issue in this case resulted from use by Plaintiff, or by any other consumer, of any PCB or PCB-containing product placed into the stream of commerce by Defendants. Thus, Plaintiffs strict products liability claims (design defect and failure to warn) must fail.

Finally, Plaintiff asserts a third claim for product liability (Count X – Failure to Warn); this one sounding in negligence. (Doc. 29, ¶ 111) (The City "has suffered, is suffering, and will continue to suffer into the indeterminable future injuries to its lands, and damages to its public treasury ***as a result of Defendants' failure to warn and instruct***.") (emphasis added). "In order to prove a negligent failure to warn claim, a plaintiff must show that the manufacturer negligently failed to instruct or warn of a danger of the product and that failure proximately caused the plaintiff's injuries." *Norabuena v. Medtronic, Inc.*, 2017 IL. App. (1st) 162928, 86 N.E.3d 1198, 1207, 416 Ill. Dec. 913, 922 (2017). Plaintiff has failed to adequately plead that its injuries were proximately caused by Defendants negligently failing to instruct or warn the City of the danger of PCB products. Indeed, as discussed at length above, Plaintiff has not alleged

14

that it (or anyone) has ever been a consumer or user of PCB products to whom Defendants had a duty to warn.  Consequently, whether under the guise of strict liability or negligence, Plaintiff's allegations that Defendants failed to warn the City equally fail.

## CONCLUSION

The allegations of Plaintiff's First Amended Complaint – which describe alleged leaking, leaching, escape, release and migration of PCBs from the Monsanto Plant and unidentified landfills in Sauget, Illinois – do not support any cause of action for violation of, and penalties under, East St. Louis ordinances, or for product liability under Illinois law.  Accordingly, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court should dismiss Counts II – VI and Counts VIII – X of Plaintiff's First Amended Complaint, and grant such other relief as the Court deems just and proper.

Dated:  May 28, 2021.                                  Respectfully submitted,

**LATHROP GPM LLP**

By:  */s/ Charles R. Hobbs, II*
Charles R. Hobbs, II (625917)
Ron.Hobbs@lathropgpm.com
Mitchell A. Martin (631425)
Mitchell.Martin@lathropgpm.com
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri 63105
Telephone:  314.613.2800
Fax:  314.613.2801

*Attorneys for Defendant Solutia Inc.*

**YSURSA LAW OFFICES, LLC**

By: */s/ Bernard J. Ysursa (by consent)*
Bernard J. Ysursa (3095754)
bjy@cbsclaw.com
12 W. Lincoln Street
Belleville, IL 62220
Telephone: 618.235.3500
Fax: 618.235.7286

*Attorneys for Defendant Solutia Inc.*

**CAPES SOKOL GOODMAN & SARACHAN, PC**

By: */s/ Adam E. Miller (by consent)*
Adam E. Miller (6206249)
miller@capessokol.com
8182 Maryland Avenue, 15th Floor
St. Louis, MO 63105
Telephone: 314.721.7701
Fax: 314.754.4811

*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on this 28th day of May, 2021, the foregoing document was filed electronically with the Clerk of Court and served upon all counsel of record via the Court's CM/ECF filing system.

                                                 ____*/s/ Charles R. Hobbs*, II_____