UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-232-DWD |
| | ) | |
| MONSANTO COMPANY, | ) | |
| PHARMACIA LLC, and SOLUTIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS COUNTS II-VI AND VIII-X OF THE FIRST AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

Plaintiff, the City of East St. Louis, Illinois ("Plaintiff" or "City") respectfully responds as follows to the motion of Defendants, Monsanto Company, Pharmacia LLC, and Solutia, Inc. (collectively "Defendants" or "Monsanto"), to dismiss all but two of the First Amended Complaint's ten counts.[1] *See* Mot. to Dismiss ("Mot.") [ECF. No. 32]. As detailed below, the City's claim is quite simple. The Defendants contaminated its property and are legally required to clean up the contamination. As such, Defendants' motion should be denied for the reasons more fully stated below.

### I. INTRODUCTION AND FACTUAL BACKGROUND

Polychlorinated biphenyls ("PCBs") are highly toxic manmade chemicals that did not exist in the environment before 1936, when Monsanto began manufacturing them at its W.G. Krummrich Plant ("Plant") located immediately adjacent to the City in Sauget, Illinois. First

---

[1] Defendants separately moved for a more definite statement as to the two remaining counts and the City has filed its response in opposition. *See* ECF Nos. 33 and 37.

Am. Compl. [ECF No. 29], ¶¶ 1-4, 9, 11. From 1936 until their use was finally banned in 1977, Monsanto was the sole producer of PCBs in the United States and produced more than 390,000 metric tons of PCBs at the Plant. *Id.* ¶¶ 2, 8. Monsanto also marketed, sold, and distributed PCBs for use in hundreds of household and industrial applications, including in paints, caulks, inks, dyes, lubricants, sealants, plasticizers, coolants, hydraulic fluids, fireproofing products, and industrial electrical equipment such as capacitors and transformers. *Id.* ¶¶ 3, 18. In addition, although PCBs were designed to be non-flammable and chemically stable, Monsanto attempted to incinerate thousands of metric tons of PCBs at the Plant and dumped PCBs and other hazardous waste in nearby toxic dumps from the 1940s through the 1980s. *Id.* ¶ 3.

During this period, Monsanto knew that PCBs were highly toxic and knew that their activities would result in the PCB contamination of City land. *Id.* at 11, 12, 15, 19, 79, 97, 100, 107. Monsanto's PCBs now grossly contaminate East St. Louis. *Id.* at 20. In December, 2020, the City learned that tests of approximately 200 soil samples collected from a large number of City-owned lots and public rights-of-way[2] all demonstrated high levels of PCB contamination. *Id.* ¶ 10.

PCBs are anthropogenic and they do not biodegrade. There are no other known sources for PCB contamination in the City other than the Plant's manufacturing and waste handling operations. *Id.* ¶ 7. Consequently, the PCB contamination detected in the soil samples is

---

[2] The City understands that a total of 203 samples were taken from 142 City-owned lot locations and 36 public right-of-way locations within East St. Louis and all 203 had PCB concentrations that exceeded the U.S. background average as described in paragraph 10 of the amended complaint.

directly attributable to Plant operations. Without question, as a result of Monsanto's manufacturing operations and waste handling practices, PCBs were emitted into the atmosphere, leached from disposal sites, and deposited into and onto nearby City land over four decades. *Id.* ¶ 2-3, 7, 19. Monsanto also knew that PCBs regularly leach, leak, off-gas, and escape their intended applications, and that their PCBs and PCB-containing products were likely, if not certain, to contaminate City land. *Id.* ¶¶ 5, 97. Monsanto even advised customers to dispose of PCB-containing wastes in landfills knowing that this too would contaminate City land. *Id.* ¶¶ 100-101.

The extent of the contamination revealed by the testing is gravely concerning because PCBs destroy populations of fish, birds, and other animal life and can cause serious health effects in humans, including cancer and injury to the immune system, reproductive system, nervous system, and endocrine system. *Id.* ¶ 6. The PCB contamination adversely affects the public interest and is detrimental to the health, safety, and well-being of the City's residents, soil, environment, and economy. *Id.* ¶ 47. Because of the negative effects the PCB contamination has on residential and commercial property values, the City has lost, and continues to lose, substantial tax revenues over the last four decades and will necessarily incur massive remediation and abatement costs if the PCB-contaminated lands are to ever have any residential or commercial utility and value. *Id.* ¶¶ 20-21, 29, 45-46.

As an Illinois home-rule municipal corporation, the City "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare…." Ill. Const. art. VII, § 6(a). This constitutional provision "was written with the intention to give home rule units the broadest powers possible." *Palm v. 2800 Lake Shore Drive Condo. Ass'n,* 2013 IL

110505, ¶¶ 29-30, 988 N.E.2d 75, 80–81.  In addition, the City "may define, prevent, and abate nuisances."  65 ILCS 5/11-60-2.  Consistent with this broad authority, the City enacted the various ordinances at issue and later initiated this action by filing complaints in St. Clair County, Illinois alleging Defendants' violations of its municipal code.  *See* ECF Nos. 1-1 and 15.  After Defendants removed the complaints to this Court, the Court ordered the individual actions consolidated and the City filed an amended complaint which asserted ordinance violations and causes of action including public nuisance, continuing trespass, product liability, and negligence.  *See* ECF Nos. 1, 17, 24, 29.  Defendants have moved for dismissal of the ordinance violation, product liability, and negligence counts.  *See* ECF No. 32.  For the reasons discussed below, Defendants' motion should be denied.

## II.  LEGAL STANDARD

The purpose of a Rule 12(b)(6) motion to dismiss is to evaluate the adequacy of the complaint, not to determine the merits.  *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  Thus, to survive a Rule 12(b)(6) motion, a complaint must allege "only enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545, 570 (2007).  A plaintiff need not plead detailed factual allegations, but must provide "more than labels and conclusions… and a formulaic recitation of the elements[.]"  *Id.* at 545.  In other words, the complaint's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (internal citations omitted).  Therefore, in deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Burke v. 401 N. Wabash Venture,*

4

*LLC,* 714 F.3d 501, 504 (7th Cir. 2013); *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 (7th Cir. 2012).

## III. ARGUMENT

A. **The Complaint States Claims for Each Ordinance Violation Alleged (Counts II – VI).**

Defendants maintain generally that the ordinance violation counts do not state a claim because the language of the City's ordinances does not precisely describe Monsanto's conduct as alleged in the Complaint. *See, e.g.,* Mot. at 2 (accusing the City of attempting to "effectively re-write its ordinances to apply to the alleged circumstances in this case."). It is true that the City does not have an ordinance that states, "No person or corporation shall, over a period of four decades, manufacture, emit, dump, incinerate, distribute, and/or sell polychlorinated biphenyls produced in a plant located directly adjacent to the City such that the PCBs grossly contaminate land within the City." This level of specificity, however, has never been required of Illinois municipalities. Monsanto's arguments simply misapprehend the nature of municipal ordinances and the standards by which they are measured.

First, municipal ordinances are interpreted using the same general rules of statutory interpretation as those which govern the construction of statutes. *Landis v. Marc Realty, L.L.C.,* 235 Ill. 2d 1, 7, 919 N.E.2d 300, 303 (2009); *Application of Cty. Collector of Kane Cty.,* 132 Ill. 2d 64, 72, 547 N.E.2d 107, 110 (1989). "The fundamental rule is to give effect to the intent of the legislature." *DTCT, Inc. v. City of Chicago Dep't of Revenue,* 407 Ill. App. 3d 945, 949, 944 N.E.2d 449, 453 (2011). The best indicator of the municipality's intent is the plain and ordinary language of the ordinance. *Landis,* 235 Ill. 2d at 6; *DTCT,* 407 Ill. App. 3d at 949.

However, mathematical certainty can never be expected from an enactment and it need only convey sufficient definite warning as to the proscribed conduct when

5

measured by common understanding and practice. In construing [an] ordinance, then, it is axiomatic that impossible standards of specificity are not required and its words and terms will be given their ordinary and popularly understood meaning, with due consideration of the objectives and the evil sought to be remedied.

*Cook Cty. v. Chicago Magnet Wire Corp.,* 152 Ill. App. 3d 726, 729, 504 N.E.2d 904, 906 (1987) (internal citation omitted) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972); *People v. Schwartz,* 64 Ill. 2d 275, 280, 356 N.E.2d 8, 10 (1976)). *See also McArdle v. Rodriguez,* 277 Ill. App. 3d 365, 373, 659 N.E.2d 1356, 1362 (1995) (When construing a municipal ordinance, "courts give effect to the intention of the municipality as it is evidenced by the ordinance's terminology, its goals and purposes, the structure of the ordinance, the setting in which the words are used and the common and accepted usage of the words.").

Second, consistent with the objective of interpreting an ordinance in light of its goals and purposes, courts construe an ordinance liberally in a way that affords its terms the fullest possible meaning to which they are susceptible, not the narrow construction Defendants suggest. *See Collins v. Bd. of Trustees of Firemen's Annuity & Ben. Fund of Chicago,* 155 Ill. 2d 103, 111, 610 N.E.2d 1250, 1253 (1993) ("such language is to be given its plain or ordinary and popularly understood meaning and the fullest rather than narrowest possible meaning to which it is susceptible"); *Harrison v. People ex rel. Boetter,* 195 Ill. 466, 471, 63 N.E. 191, 192 (1902) ("In construing ordinances, no less than statutes, all general provisions, terms, phrases, and expressions should be liberally construed, in order that their true intent and meaning may be fully carried out…."). Under these standards, the complaint manifestly states a claim for each ordinance violation alleged.

## Count II: §94-91

Section 94-91 of the East St. Louis Municipal Code provides, in pertinent part:

> No person[3] shall dump, deposit, drop, throw, discard or leave, or cause or permit the dumping, depositing, dropping, throwing, discarding or leaving of, litter upon any public or private property in the state, or upon or into any river, lake, pond or other stream or body of water in the state….

Some terms are broadly defined. For example:

> ***Litter means any discarded, used or unconsumed substance or waste. Such term may include, but is not limited to,*** any garbage, trash, refuse, debris, rubbish, grass clippings or other lawn or garden waste, newspaper, magazine, glass, metal, plastic or paper container or other packaging, construction material, abandoned vehicle (as defined in the Illinois Vehicle Code), motor vehicle part, furniture, oil, carcass of a dead animal, nauseous or offensive matter of any kind, any object likely to injure any person or create a traffic hazard, or anything else of an unsightly or unsanitary nature which has been discarded, abandoned or otherwise disposed of improperly.

East St. Louis, Illinois, Municipal Code ("Code") § 94-2 (emphasis supplied). Regarding other terms, "[i]t is entirely appropriate to employ the dictionary as a resource to ascertain the meaning of undefined terms," *People v. Beachem,* 229 Ill. 2d 237, 244, 890 N.E.2d 515, 520 (2008), and

---

[3] "Person" is defined as follows in the statute: "The term 'person,' as well as terms referring to or importing persons, may extend and be applied to bodies politic and corporate, as well as to individuals." Code § 1-2.

7

where a term is undefined, "the term must be given its full meaning, not the narrowest meaning of which it is susceptible." *Lake Cty. Bd. of Rev. v. Prop. Tax Appeal Bd. of State of Ill.,* 119 Ill. 2d 419, 423, 519 N.E.2d 459, 461 (1988).

By its plain terms, a person violates this ordinance not only by actively depositing litter but also if he should "cause or permit the dumping, depositing, dropping, throwing, discarding or leaving of, litter upon any public or private property…." Code § 94-91. Common definitions of the verb "deposit" include "to let fall (something, such as sediment)." MERRIAM-WEBSTER'S ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/deposit (last visited June 23, 2021). Similarly, "litter" is broadly defined as "any discarded, used or unconsumed substance" which "may include, but is not limited to … offensive matter of any kind … or anything else of an unsightly or unsanitary nature which has been discarded, abandoned or otherwise disposed of improperly." Code § 94-2.

The City alleges, among other things, that PCBs are highly toxic chemicals which destroy populations of fish, birds, and other animal life and are associated with serious health effects in humans, including cancer; (2) PCB contamination adversely affects the public interest and is detrimental to the health, safety, and well-being of the City's residents, land, environment, and economy; (3) during the relevant time period, Monsanto was the sole producer of PCBs in the United States; (4) PCBs are anthropogenic, and there are no other known sources for PCB contamination in the City other than Monsanto's Plant; (5) as a result of Monsanto's operations at the Plant, PCBs were emitted into the atmosphere, leached from disposal sites, and deposited into and onto City land over four decades; (6) Monsanto sold PCBs and PCB-containing products for decades knowing that PCBs regularly leach, leak, off-gas, and escape their intended applications; (7) Monsanto incinerated thousands of metric tons of PCBs at the Plant, which sent

tons of ash into the air over the City that ultimately settled onto the City's property, and dumped PCBs and other hazardous waste in nearby toxic dumps; (8) Monsanto advised customers to dispose of PCB-containing wastes in landfills; (9) Monsanto did all of these acts knowing that PCBs were likely if not certain to contaminate City land; and (10) Monsanto's PCBs now grossly contaminate East St. Louis. *See supra* Part I.

It would be inconsistent with the plain language and the applicable rules of statutory construction to narrowly interpret this ordinance, enacted pursuant to the City's power to promote the public health, safety, and welfare, to prohibit a person from dropping a bubble gum wrapper on City land, but not decades of toxic pollution. Monsanto's conduct, as alleged in the complaint and summarized above, obviously falls within the ordinance's prohibitions.

### *Count III, V and VI: §§ 50-71, 50-78, 50-79, 62-2, and 62-45*

Illinois statutes broadly authorize the City to "define, prevent, and abate nuisances[,]" 65 ILCS 5/11-60-2, and the ordinances cited in these counts represent the City's actions in doing so, as applicable here. In pertinent part,[4] these ordinances provide that:

> No person shall create, commit, permit or continue a nuisance of any kind or description in, upon or about any private property or public place within the city which **may** affect the health, comfort or convenience of persons residing or doing business in the vicinity.

---

[4] These sections were reproduced and attached as exhibits to the First Amended Complaint. *See* ECF Nos. 29-1 – 29-7.

Code § 50-71(a).[5]

> No person shall bring into or keep with the city for sale or otherwise, either for food or any other purpose whatsoever, any … matter, substance or thing which shall be or occasion a nuisance within the city or which **may** or shall be dangerous or detrimental to the public health.

Code § 50-78 (emphasis added).

> No part of the contents of, or substances from, any … refuse, waste or thing which, by its decomposition, **could** or would become offensive to human beings, detrimental to health or create, or tend to create, a nuisance shall be thrown, deposited or placed by any person upon any vacant lot of land or vacant place upon the surface of any lot of land within the city, whether such lot is enclosed or otherwise; nor shall any of such substances be allowed by any person to run or drop from the premises occupied by such person upon any vacant lot of land or vacant place upon the surface of any lot of land within the city.

Code § 62-45 (emphasis added). The remaining ordinances cited in the complaint authorize the City to abate or remove any such nuisances as appropriate, including "all nuisances … which **it may** deem prejudicial or obnoxious to the public health or comfort[.]" Code §§ 50-79, 62-2 (emphasis added).

Moreover, while all of the rules of construction discussed previously apply with equal force here, it is difficult to comprehend Monsanto's arguments that the conduct alleged in the

---

[5] This section further declares that nuisances known to and provided for by state statute are to be deemed nuisances under this section. Code § 50-71(b).

complaint somehow does not fall squarely within these provisions. "Nuisance" is defined as "anything offensive or obnoxious to the health and welfare of the inhabitants of the city; or any act or thing or creating a hazard to, or having a detrimental effect on, the property of another person." Code § 1-2. "The term 'person,' as well as terms referring to or importing persons, may extend and be applied to bodies politic and corporate, as well as to individuals." *Id.* The complaint alleges violations of these ordinances under their plain terms. *See supra* Parts I and III.

### B. There is No Requirement of Physical Offensiveness.

Monsanto attempts to argue that *only* something that is physically offensive to the senses may constitute a nuisance. *See* Mot. at 10. This is not correct: First, the Code broadly defines "nuisance" as "anything offensive or obnoxious to the health and welfare of the inhabitants of the city; or any act or thing or creating a hazard to, or having a detrimental effect on, the property of another person." Code § 1-2. There is nothing unusual about this definition. Under Illinois law, any unreasonable interference with a right common to the general public may constitute a nuisance. *City of Chicago v. Beretta U.S.A. Corp.,* 213 Ill. 2d 351, 366-67, 821 N.E.2d 1099, 1111 (2004). *See also Vill. of Wilsonville v. SCA Servs., Inc.,* 86 Ill. 2d 1, 21–22, 426 N.E.2d 824, 834 (1981) (contrasting a private nuisance as a civil wrong, based on a disturbance of rights in land, with a public nuisance, which involves doing or failing to do something that injuriously affects the safety, health or morals of the public, or causes substantial annoyance, inconvenience or injury to the public); *City of Chicago v. Latronica Asphalt & Grading, Inc.,* 346 Ill. App. 3d 264, 270–71, 805 N.E.2d 281, 287 (2004) (a public nuisance is an act or failure to act which injures the safety, health or morals of the public or which causes substantial public annoyance, inconvenience or injury); *City of Chicago v. Festival Theatre Corp.,* 91 Ill. 2d 295, 303, 438

N.E.2d 159, 162 (1982) (holding that "obscene stage shows may be enjoined as common law public nuisances").

Second, it is dubious to suggest, as Defendants do, that the conduct alleged here did not create a nuisance because a highly toxic chemical that can cause cancer and other serious health effects in humans is not "something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable." *See* Mot. at 10 (quoting *Schweihs v. Chase Home Fin., LLC,* 2015 IL App (1st) 140683, ¶ 40, 41 N.E.3d 1011, 1023 (2015)). Indeed, the risks associated with toxic substances including PCBs have been the subject of previous litigation in Illinois and its courts have determined that conduct similar to that alleged here constitutes a nuisance sufficient to justify a permanent injunction barring operation of the site. *See, e.g., Vill. of Wilsonville,* 86 Ill. 2d 1, 9, 14, 20-21, 26-27 (holding that a landfill in which hazardous chemicals were stored – including PCBs and "other substances deposited at the site [that] are extremely toxic to human beings" – constituted a nuisance because, among other things, hazardous materials were transported through the village enroute to the site and it was likely that the chemical waste disposal site could bring about substantial injury).

### C. This Court has Found an Ordinance Violation on Similar Facts in a Prior Case.

Judge Murphy's decision on a motion to dismiss a previous case further supports these conclusions. In that case, the Village of Roxanna brought an action to enforce an ordinance against a petroleum refinery which had allegedly polluted village soil and groundwater with refinery byproducts. *Vill. of Roxana,* 2013 WL 4510164, at *1. The village charged the refinery with 230 separate violations of an ordinance which made it unlawful "to place, deposit, throw, leave or permit to remain, or to cause or permit to flow, any liquid, slops, animal or vegetable matter, filth, dirt or rubbish, or substance of any kind likely to become rotten, foul, nauseous,

putrid or offensive on any property or water in Roxana." *Id.* (quotations omitted). Like Monsanto here, the refinery argued that its actions, as alleged in the complaint, did not fall within the claimed narrow scope of the ordinance. *Id.* at *2. Noting the applicable principles of construction, however, Judge Murphy quickly dispatched the refinery's argument, finding that "[t]he ordinance applies to the facts as alleged." *Id.*

### D. The Record Supports no Claim for any Due Process Violation.

Defendants argue briefly that any attempt by the City to allege their violations of the ordinances at issue would somehow violate due process. *See* Mot. at 11-12. They provide no clear example of how any finding of liability under the ordinances would allegedly violate the Illinois or United States Constitution, but instead make blanket claims such as, "[t]o the extent Plaintiff tries to effectively re-write any of the above-referenced ordinances, contrary to their plain language, Plaintiff violates Defendants' due process rights." Mot. at 11. Defendants' argument fails for at least two reasons.

First, Monsanto's argument misapprehends the applicable burden. "Like statutes, municipal code provisions are presumed constitutional, and the burden of rebutting that presumption rests with the challenging party, who must demonstrate **a clear constitutional violation**." *Labell v. City of Chicago,* 2019 IL App (1st) 181379, ¶ 19, 147 N.E.3d 732, 740, *appeal denied,* 144 N.E.3d 1175 (Ill. 2020) (emphasis added). Defense arguments at the pleadings stage such as, "[t]o the extent Plaintiff tries to effectively re-write any of the above-referenced ordinances, contrary to their plain language, Plaintiff violates Defendants' due process rights" do not come close to satisfying this burden.

Second, Monsanto's conduct as alleged in the First Amended Complaint falls squarely within the plain meaning of the ordinances, as explained at some length above. This fact is fatal

to any due process vagueness challenge because the basic question raised by such a challenge, whether the ordinance fails to provide a person of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, is answered the same way the ordinance itself is construed:

> In construing the validity of the ordinance, we begin by applying the same rules that govern the construction of a statute. Thus, as with a statute, the first step in a vagueness inquiry is to examine the plain language of the ordinance in light of its common understanding and practice. If the plain text of the ordinance sets forth clearly perceived boundaries, our inquiry is ended.

*Wilson v. Cty. of Cook,* 2012 IL 112026, ¶ 21, 968 N.E.2d 641, 649 (citations omitted). In other words, if, as here, the conduct at issue is prohibited by the plain language of the ordinance, no due process vagueness challenge exists.

### E. The Complaint States Claims for Product Liability (Counts VIII and IX) and Negligence (Count X).

Finally, Monsanto argues that the City's product liability and negligence counts fail to state a claim because the City was not a consumer of Monsanto's products and any alleged injuries caused by Monsanto's PCB contamination are not alleged to have been caused by use of Monsanto's products placed into the stream of commerce. Mot. at 12 – 14. This argument is both legally and factually incorrect.

Monsanto's claim that "Plaintiff's alleged injuries, according to the Complaint, were not caused by Plaintiff's or by anyone else's use of PCB products that had been placed into the stream of commerce," Mot. at 12, ignores many of the City's complaint allegations. For example, the City alleges that Monsanto was the sole source of PCB contamination within East St. Louis and that several of Monsanto's activities resulted in the contamination, including

Monsanto's manufacturing and waste disposal operations at the Plant; Monsanto's incineration of thousands of metric tons of PCBs at the Plant and the dumping of PCBs in nearby toxic dumps; Monsanto's sale of PCBs for use in hundreds of household and industrial applications despite knowledge that PCBs regularly leach, leak, off-gas, and escape their intended applications and thereby contaminate the land; and Monsanto's advice to its commercial customers to dispose of PCB-containing wastes in landfills knowing that this too would contaminate City land. *See, e.g.,* First Am. Compl. ¶¶ 2-3, 5, 7, 15, 18-19, 41, 97-101.

Furthermore, Monsanto's argument mischaracterizes Illinois law. "In the products liability context, a legal duty is imposed upon those involved in the original production and marketing chain of a product to the benefit of those individuals to whom injury from a defective product may reasonably be foreseen." *Ct. v. Grzelinski,* 72 Ill. 2d 141, 146, 379 N.E.2d 281, 283 (1978) (quotations omitted) (holding that car dealer and manufacturer could be held liable for injuries a firefighter sustained while fighting a car fire even though the firefighter did not purchase the car). "[S]uch individuals are not only those within classes of users and consumers, but may include persons (such as the innocent bystander) outside the purchasing chain of the product." *Id. See also Winnett v. Winnett,* 57 Ill. 2d 7, 10-13, 310 N.E.2d 1, 3-5 (1974) (discussing product liability claims by those other than intended consumers). The plain facts are that Defendants dumped their dangerous, non-biodegradable chemical waste on the City's property because it was cheap and expedient. Such questions of foreseeability of injury or damages resulting from those acts are for the jury, not the Court, to resolve. *Id.* at 13.

Finally, Monsanto mentions the negligence count only in passing, claiming that it does not state a claim because the City has not alleged that anyone has ever been a user of Monsanto's PCB products. Mot. at 15. This argument is factually false, as explained above, and further

ignores the fact that the City alleged Monsanto's breach of numerous duties other than those involving product liability. *See, e.g.,* First Am. Compl. ¶¶ 106-109.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: June 28, 2021  Respectfully Submitted,

**THE DRISCOLL FIRM, LLC**

By: */s/ John J. Driscoll*
John J. Driscoll, #6276464
1311 Avenida Ponce de Leon, 6th Floor
San Juan, PR 00907
Phone: (618) 444-6049
Fax: (314) 932-3233
john@jjlegal.com

**THE DRISCOLL FIRM, P.C.**
Paul W. Johnson, #6193774
Christopher J. Quinn, #6310758
211 N. Broadway, Suite 4050
St. Louis, MO 63102
Phone: (314) 932-3232
Fax: (314) 932-3233
paul@thedriscollfirm.com
chris@thedriscollfirm.com

**CHATHAM & BARICEVIC**
John Baricevic, #3121537
Grey Chatham, #6312518
107 W. Main Street
Belleville, IL 62220
Phone: (618) 233-2200
Fax: (618) 233-1589
john@chathamlaw.org
greyjr@chathamlaw.org

**SANDERS PHILLIPS GROSSMAN, LLC**
Melissa K. Sims, #6231297
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Phone: (516) 741-5600, ext. 8201
Fax: (516) 741-0128
msims@thesandersfirm.com

**SMOUSE & MASON, LLC**
Roy L. Mason, #938118
Zachary E. Howerton, #151215033
233 Duke of Gloucester Street
Annapolis, MD 21401
Phone: (410) 269-6620
Fax: (410) 269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on June 28, 2021 the foregoing document was electronically filed with the Clerk of Court and will be served by operation of the Court's CM/ECF system upon all registered parties.

<em>/s/ John J. Driscoll</em>