**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, an Illinois Municipal Home Rule Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:21-cv-00232-DWD |
| v. | ) ) | JURY TRIAL DEMANDED |
| MONSANTO COMPANY, SOLUTIA, INC., PHARMACIA, LLC, and DOES 1-100, | ) ) ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT FOR DAMAGES AND ABATEMENT**

# TABLE OF CONTENTS

I.    NATURE OF THE LAWSUIT ................................................................................ 1

II.   JURISDICTION AND STATUTE OF LIMITATIONS.................................................. 17

III.  PARTIES ...................................................................................................... 19
      A.    PLAINTIFF................................................................................................ 19
      B.    DEFENDANTS ......................................................................................... 20

IV.   CAUSES OF ACTION..................................................................................... 22
      COUNT I – PUBLIC NUISANCE ................................................................................ 22
      COUNT II - VIOLATION OF THE CITY OF EAST ST. LOUIS ......................................... 25
      MUNICIPAL CODE § 50-71 (NUISANCE)................................................................. 25
      COUNT III – ABATEMENT PURSUANT TO THE CITY OF EAST ST. LOUIS ................... 27
      MUNICIPAL CODE  §§ 50-79 AND 62-2.................................................................. 27
      COUNT IV – CONTINUING TRESPASS...................................................................... 29
      COUNT V– DESIGN DEFECT ................................................................................... 31
      COUNT VI – FAILURE TO WARN AND INSTRUCT...................................................... 33
      COUNT VII – NEGLIGENCE ..................................................................................... 36
      JURY DEMAND .................................................................................................... 38

COMES NOW Plaintiff, The City of East St. Louis (hereinafter "Plaintiff," "City," or "East St. Louis"), by and through its undersigned counsel, and for its Second Amended Complaint against the Defendants, Monsanto Company (hereinafter "Monsanto"), Solutia, Inc. (hereinafter "Solutia"), and Pharmacia LLC (hereinafter "Pharmacia") (collectively referred to as "Monsanto" or "Defendants"), states as follows:

## I.   NATURE OF THE LAWSUIT

1.      The City brings this action in its public governmental capacity seeking all legally cognizable fines and damages available to it for the contamination of vast swaths of its lands with polychlorinated biphenyls ("PCBs") manufactured in Defendants' Monsanto Plant in adjacent Sauget, Illinois.[1]

2.      Monsanto manufactured PCBs and other chemical products at the Monsanto Plant from approximately 1936 through 1977. During this time period, Monsanto was the sole producer of PCBs in the United States. By 1970, PCBs had become one of Monsanto's most profitable products. As a byproduct of Monsanto's PCB manufacturing operations and waste handling practices, PCBs were emitted into the atmosphere and into and onto East St. Louis lands.

3.      PCBs are toxic and dangerous synthetic organic chemical compounds. Due to their non-flammability, chemical stability, high boiling point and electrical insulating properties, PCBs were used in hundreds of industrial applications, including in electrical, heat transfer and hydraulic equipment and as plasticizers in paints, plastics, and rubber products. Between 1936 and 1977, approximately 390,000 metric tons of PCBs were *produced* at the Monsanto Plant. In addition,

---

[1] Upon information and belief, 1.1 acres of the Solutia/Monsanto facility is assessed in the corporate limits of the City of East St. Louis. The facility was known as the W.G. Krummrich Plant and will be referred to as the "Monsanto Plant" throughout this Complaint.

thousands of metric tons of PCB-containing wastes were *incinerated* at the Monsanto Plant after 1977. Finally, Monsanto *deposited* various hazardous wastes, including PCBs, in toxic dumps in nearby Sauget from the 1940s through the 1980s.

4.      When Monsanto began manufacturing PCBs in approximately 1936, there were zero background levels of PCBs in the United States. By the late 1970s, PCBs were a worldwide environmental pollutant and part of almost every human being.

5.      PCBs are found in bays, oceans, rivers, streams, soil, and air. They have been detected in the tissues of all living beings, including all forms of marine life, various animals and birds, plants and trees, and humans. PCBs regularly leach, leak, off-gas, and escape their intended applications, thereby dispersing into and onto adjacent lands and waterways.

6.      The extent of toxic environmental PCB contamination is troubling because PCBs cause a variety of adverse health effects. In humans, PCB exposure is associated with cancer and other serious health effects, including effects on the immune system, reproductive system, nervous system, and endocrine system. In addition, PCBs destroy populations of fish, birds, and other animal life.

7.       Between 1936 and 1977, Monsanto was responsible for the manufacture of 99% or more of all PCBs used or sold within the United States. Moreover, most, if not all, of the PCB contamination found in soil samples within East St. Louis is directly attributable to the Monsanto Plant. PCBs are completely anthropogenic, and there are no other known sources for the East St. Louis PCB contamination other than the Monsanto Plant's PCB manufacturing operations and waste handling practices.

8.      Because of PCBs' proven toxicity and persistence in the environment, production and, with limited exceptions, use of PCBs was prohibited in the United States in when the U.S.

Environmental Protection Agency (hereinafter "EPA") promulgated final regulations banning PCBs under the Toxic Substances Control Act (hereinafter "TSCA"), enacted by the U.S. Congress in 1976.

9.      Hundreds of East St. Louis-owned lots and rights-of-way (in teal) are immediately adjacent to the Monsanto Plant PCB-contaminated site and industrial area (in peach)[2]:



10.      According to the EPA, the average concentration of PCBs in U.S. rural soils is approximately 3 parts per billion ("ppb")[3]. In 2020, 203 soil samples were taken from City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant. All samples had

---

[2]     St. Clair County GIS viewer, retrieved June 17, 2020 https://stclairco.maps.arcgis.com/apps/webappviewer/index.html?id=6943a374c91a427b955e242 aceb62fc6&find=01250112007

[3] US EPA, 2007. Pilot Survey of Levels of Polychlorinated Dibenzo-p-dioxins, Polychlorinated Dibenzofurans, Polychlorinated Biphenyls, and Mercury in Rural Soils of the United States, National Center for Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Washington, DC 20460. EPA/600/R-05/048F, April 2007.

PCB concentrations that exceeded the U.S. background average as referenced in a 2007 EPA study.[4] The maximum concentration in a reported sample was 75,300 ppb, or approximately 25,100 times the average concentration in U.S. rural soils. The average concentration of the 200 samples was 3,416 ppb, or 1,138 times the average U.S. soil concentration, with the greatest concentrations reported in the samples closest in proximity to the Monsanto Plant.  Prior to 1936, there was no background PCB level in the United States.

11.     In mid-to-late 2022, additional soil samples were taken from 281 City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant and analyzed using EPA Method 1668C,[5] a technique that quantifies individual PCB congeners in environmental samples using isotope dilution and high-resolution gas chromatography/high-resolution mass spectrometry.  This testing and analysis confirmed that East St. Louis properties are grossly contaminated with Monsanto PCBs – the average concentration was 1,431 ppb and the highest detected concentration was 22,686 ppb – with higher concentrations detected generally downwind and closest to the Monsanto Plant.  In addition, this testing confirmed that the types and concentrations of PCBs present in East St. Louis properties pose a substantial risk to human health and safety.

## MONSANTO AND PCBS

12.     At the time Monsanto manufactured PCBs and PCB-containing products, and during the time periods it attempted to dispose of the byproducts of the manufacturing process at

---

[4] *Id.*
[5] US EPA, 2010. Method 1668C, Chlorinated Biphenyl Congeners in Water, Soil, Sediment, Biosolids, and Tissue by HRGC/HRMS, U.S. Environmental Protection Agency, Office of Water, Office of Science and Technology, Engineering and Analysis Division (4303T), U.S. Environmental Protection Agency, Washington, DC 20460. EPA-820-R-10-005, April 2010. *See* https://www.epa.gov/sites/default/files/2015-09/documents/method_1668c_2010.pdf.

its Monsanto Plant, Monsanto knew PCBs were highly toxic, harmful to human and animal health, and environmentally ruinous to nearby municipalities.

13. Even in the 1930s, it was understood within the chemical manufacturing industry that manufacturers should not haphazardly release chemicals into the stream of commerce without knowing how they might affect human health or the environment. A statement of legal principles distributed by the Manufacturing Chemists' Association no later than July 1939 advised that "[t]he manufacturer . . . must know the qualities of his product and he cannot escape liability on the ground that he did not know it to be dangerous." Monsanto admits that at some time after 1930, it was a member of the Manufacturing Chemists' Association.

14. By this time, Monsanto knew or should have known that PCBs substantially persist in the natural environment rather than break down over time. The environmental persistence of PCBs and their resistance to breaking down is highly correlated with their chlorine content: the higher the chlorine content in a given PCB formulation, the more environmentally persistent it is.

15. Based on its knowledge of the environmental risks associated with related chlorinated hydrocarbons like DDT (which Monsanto also manufactured), Monsanto also knew or should have known, that its PCB formulations would inevitably volatilize and leach, leak, and escape their intended applications, contaminating sediment, soils, and plants, thereby destroying the utility of vast swaths of lands in East St. Louis.

16. Nevertheless, Monsanto sold many high-chlorination PCB formulations for uncontrolled uses knowing that their manufacture at the Monsanto Plant would cause PCB waste to be dispersed into and onto the lands of East St. Louis.

17. During the entire time Monsanto manufactured PCBs at its Krummrich Plant it also knew or should have known that PCBs were highly toxic and likely to cause cancer and other

diseases.

18.     By the early 1930s, published studies found that hydrocarbons, like PCBs, which have a benzene-based structure are highly toxic and carcinogenic.

19.     In addition, Monsanto knew by the mid-1930s that workers exposed to PCBs had developed liver disease and unusual acne-like skin lesions called chloracne.  Several workers also developed jaundice and died of liver disease.  In 1936, a U.S. Public Health Service official, Louis Schwartz, M.D., published a study describing a case in which family members of a man exposed to PCBs at work also developed the skin condition.

20.     Beginning in approximately 1938, multiple published studies found that PCBs are toxic, case severe liver damage, and have tell-tale characteristics of compounds that cause cancer.

21.     For example, studies by Bennett, Drinker, *et al.* and Miller in 1938 and 1944 found that animals exposed to PCBs developed organ and blood cell pathologies that are characteristic of the early stages of cancer.  The exposed animals often died due to liver disease.

22.     In addition, studies reported that PCB exposure caused chloracne, jaundice, and liver damage and failure in humans.

23.     Monsanto was aware of these studies and even obtained a report from one of the principal investigators, Harvard's Cecil K. Drinker, M.D., about the toxicity of various chemical compounds, including PCBs, in 1938.  The report Dr. Drinker prepared for Monsanto stated that one PCB mixture "proved so definitely toxic" in "such low concentration[s]" that "whenever [it] is used in industry, great care be taken to keep concentrations in the air at an extremely low level."

24.     In 1944, the U.S. Public Health Service published a study that found that Aroclors caused severe damage to the organs of different animal species.

25.     By that time, Monsanto was also producing DDT, a remarkably similar compound

which shares many of the same properties as PCBs (the chemicals are so similar that they often could not be distinguished in laboratory analysis available at the time), including lipid solubility.

26.     Monsanto also knew or should have known that compounds, like DDT and PCBs, with high lipid solubility bioaccumulate in fatty tissues and can grow to highly toxic levels over time.

27.     By the late 1940s, DDT had been detected in humans and FDA scientists and other researchers published studies finding that DDT was extremely toxic and carcinogenic.  In addition, in a 1949 publication which discussed why bioaccumulating compounds are especially dangerous, the FDA observed that while "carbolic acid (phenol) is practically synonymous with the term 'poison,' … DDT when consumed for long periods of time is at least 1000 times more poisonous…."  Based on this information, Monsanto knew or should have known that PCBs, like DDT, are lipid soluble, bioaccumulate in animal and human tissue, and are highly toxic. Nevertheless, Monsanto kept manufacturing and selling its Aroclors and would not perform toxicity studies for another 20 years.

28.     In a well-publicized 1968 incident in Yusho Japan, thousands of people consumed rice oil that had been inadvertently contaminated with PCBs.  Hundreds of people died, and thousands of others suffered numerous toxic effects including skin and eye lesions, irregular menstrual cycles, lowered immune response, fatigue, headaches, unusual skin sores, and decreased cognitive development in children.  Nevertheless, Monsanto continued to tell its customers and the public that PCBs are not toxic and would not perform toxicity studies for more than another decade.

29.     In the ensuing decades, multiple additional studies determined that PCBs are toxic and carcinogenic.  Nevertheless, Monsanto did not initiate any toxicity testing until 1969, after

PCBs were already discovered to be worldwide contaminants. By the mid-1970s multiple studies confirmed that Aroclors are carcinogenic.

30.     Although Monsanto denied to regulators, its customers, and the public that PCBs were dangerous, it privately acknowledged the opposite.

31.     Internally, Monsanto acknowledged as early as 1937 that PCBs (often sold under the trade name "Aroclor") produce systemic toxic effects upon extended exposure.

32.     Monsanto's October 1944 Aroclor Salesmen's Manual directed, "The foremen of all departments where this material is handled should be apprised of the toxic nature of the material and instructed in safe handling procedures."

33.     In addition, a September 1953 memorandum from Monsanto's Medical Department on the subject of "AROCLORS: TOXICITY" stated, "As I am sure you know, Aroclors cannot be considered nontoxic." The memo also recommended against the use of Aroclors in certain paints due to the risk exposure might cause to painters.

34.     By 1955, Monsanto knew that Aroclors were toxic—particularly for the liver—and that "toxicity increased with chlorination." In a September 1955 memorandum, Monsanto's Medical Director, Dr. R. Emmett Kelly, stated, "We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrations]."

35.     In November of 1955, Monsanto's Medical Department recommended "that the eating of lunches should not be allowed in [the department in which Aroclors were manufactured]" because "Aroclor vapors and other process vapors could contaminate the lunches unless they were

properly protected" and "early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation."  The Department further advised that "[i]n any case where a workman claimed physical harm from any contaminated food, it would be extremely difficult on the basis of past literature reports to counter such claims."

36.    By the late 1950s, the U.S. government was concerned enough about PCB toxicity that it refused to use one of Monsanto's PCB-containing products. A January 1957 memo from Monsanto's Dr. Kelly reflects that he met with the U.S. Navy to discuss the use in submarines of the PCB-containing product Pydraul 150. The Navy informed Monsanto that its own toxicity testing of Pydraul 150 "caused death in all of the rabbits tested," and led it to conclude that a certain degree of exposure to the product caused "definite liver damage." Kelly apparently urged the Navy to give it a try anyway but was unsuccessful: "no matter how we discussed the situation," Kelly wrote, "it was impossible to change [the Navy's] thinking that 'Pydraul 150' is just too toxic for use in a submarine."

37.    After its meeting with the Navy, Monsanto's greatest concern was not whether it should continue to sell PCB-containing products, but that the Navy might publish its research on its Pydraul 150 Aroclor.  In a September 1957 memo, Monsanto employee S. Robert Sido wrote that he discussed the issue with Navy personnel, who agreed they "could avoid all reference to trade names, hydraulic fluid or Monsanto."

38.    Meanwhile, in communications with other customers, Monsanto said nothing about the Navy studies while continuing to insist its PCB-containing products were perfectly safe. In an April 1957 memo to the Standard Oil Company, Monsanto employee Elmer P. Wheeler wrote that "[t]he toxicity report on Pydraul 150 indicates that it is practically innocuous when fed orally to rats," and "apparently is not absorbed through the unbroke skin of rabbits."

9

39.     In the late 1950s, Monsanto learned that millions of chickens had been dying from a disease called Chick Edema Syndrome ("CES"), which caused fluid buildup around the heart that resulted in death from cardiac arrest.  During this period, the U.S. FDA advised Monsanto that it had determined that exposure to Monsanto's Aroclor 1242 was positively correlated with development of CES.  In addition, in 1961 researchers from the University of Missouri advised Monsanto that they had tested paint in chicken coops in which birds had become ill and found that it contained Monsanto's Aroclor 1242.  They described the incident in a subsequent journal article in which they concluded, "It is clear from these results that the major toxic agent was the chlorinated biphenyl."  Monsanto ignored these and other warnings and took no action in response.

40.     In 1969, researchers working for the Bureau of Commercial Fisheries of the U.S. Department of Interior advised Monsanto that PCBs released from its facility in Florida had caused mass killings of marine wildlife in Pensacola Bay.  Newspaper accounts relayed to Monsanto officials reported that "there was virtually no shrimp being caught and the largest catch to date was five pounds."  Again, Monsanto took no action and continued to profess that its Aroclors were non-toxic.

41.     In fact, as more data became available on PCB toxicity, Monsanto resisted the notion that it was responsible for ensuring that its products did not cause harm. In a May 1964 memo, Monsanto employee Elmer P. Wheeler noted that Monsanto now had "several indications that the Aroclors are more toxic when in an oil solution than when administered undiluted to animals." But Wheeler saw this as someone else's problem to deal with. "The ultimate responsibility for the proper labeling of a formulation," Wheeler wrote, "remains with the customer since we cannot be expected to get animal data on every possible formulation containing a Monsanto product."

42.     Yet Monsanto's customers were relying on Monsanto for information on the potential harms of its products, and at least one worried that those harms were being understated. In a September 1965 memo, Monsanto employee Elmer P. Wheeler wrote about his discussions with a customer. The customer was "quite disturbed" about a letter he received from Wheeler regarding the potential toxicity of Aroclor 1242 at elevated temperatures, as the customer felt "the Monsanto literature furnished him had been more reassuring in terms of what problems might arise in [the Aroclor's] application." The customer explained that "in his own plant hot Aroclors spills on the floor were common and that his own employees had complained of discomfort." Wheeler was "brutally frank" and told the customer that "this had to stop before he killed somebody with liver or kidney damage," as "8-hour daily exposures of this type would be completely unsafe." At no point in Wheeler's memo does he suggest that Monsanto had previously advised the customer that such uses of Aroclors would be unsafe, or that other customers now should be given similar advice.

43.     In fact, despite its early knowledge of the dangers associated with PCBs, Monsanto embarked on a decades-long campaign of disinformation and deception in order to prolong the manufacture, incineration, and disposal of PCBs in East St. Louis and thereby preserve the considerable profits PCBs generated for the company.

44.     In public statements and in statements to its customers, Monsanto vigorously denied that PCBs were harmful to human and environmental health despite knowledge to the contrary.  As late as the early 1980s, Monsanto officials continued to tell customers and the public that PCBs do not cause cancer and have "a toxicity roughly equivalent to that of table salt."

45.     Monsanto also knew for decades that PCBs distributed into the environment would remain there for decades, if not longer. An April 1969 memo from Monsanto employee Elmer P.

Wheeler reflects that in 1939, Monsanto had applied several Aroclor compounds to soil test plots to determine whether they could be used for termite control. In June 1963, the memo states, it was discovered that "some of these sample plots . . . still [showed] visual evidence of the presence of Aroclor."

46.     Monsanto also knew that the qualities of PCBs made them a potential environmental contaminant. In an August 1960 letter to Chicago Pneumatic Tool Company, Monsanto employee Jack T. Garrett explained that PCB-containing Pydraul fluids "are insoluble in water" and "heavier than water," so unless "strongly emuslified," the fluids "will sink to the bottom of any receiving stream and as such will not give rise to the typical picture of oil pollution." Moreover, if "discharged in large concentrations," the PCB-containing fluids would "adversely effect [sic] the organisms in the bottom of the receiving stream [and] effect the aquatic life in the stream." Nevertheless, Garrett admitted, Monsanto had done "no tests" of PCBs' toxicity "on aquatic animals."

47.     In 1966, scientists in Sweden published a landmark study that first made PCBs a subject of widespread public concern. Monsanto soon realized that the study would bring increased scrutiny to its practices regarding PCBs, including their disposal. In December 1966, a Monsanto Europe employee wrote several American colleagues, noting that "[i]n the U.K. many companies have been burying material in drums" which was then "absorbed into vermiculite or similar porous material." The European employee wondered: "Has any entirely safe method been developed for the disposal of waste Aroclor?" Apparently, no answer was readily forthcoming. In a follow-up memo the same employee wrote in January 1967, he reiterated that "one of the major points that is made is the difficulty in disposing of waste chlorinated diphenyls" (another term for PCBs) and

urged that "constructive recommendations for the safe disposal of our materials would be most helpful."

48.     Monsanto realized that the Swedish study would prompt questions about other subjects that it did not have good answers for. In a February 1967 memo, Monsanto's Dr. Kelly acknowledged that "while Monsanto would like to keep in the background, we don't see how we will be able to . . . . We feel our customers . . . may ask us for some sort of data concerning the safety of these residues in humans. This obviously might be opening the door to an extensive and quite expensive toxicological/pharmaceutical investigation. Before starting this, we certainly want to find out what is going on and not duplicate any of the work."

49.     Monsanto sold PCBs for a variety of uses, including household uses, without any warnings or instructions concerning their safe use or disposal. PCBs were sold for use in paints, caulks, inks, dyes, lubricants, sealants, plasticizers, coolants, hydraulic fluids, fireproofing, and industrial electrical equipment such as capacitors and transformers, among other applications.

50.     Monsanto knew by the 1960's that large amounts of PCBs were escaping from its W.G. Krummrich Plant and entering the nearby environment, as documented in multiple internal documents.  Nevertheless, the company continued to manufacture and sell its PCBs without warning Plaintiff or the public of this fact or the dangers of PCB contamination.

51.     For example, in a November 1967 "Aroclor and Aroclor Blends Improvement Plan" section entitled "Stream and Air Pollution," Monsanto determined that PCB releases from its Krummrich Plant totaled in the hundreds of pounds per day.  Despite this knowledge, the company took no immediate action to address this problem.

52.     In fact, in the minutes of the September 5, 1969 meeting of its Aroclor Ad Hoc Committee, the Committee noted that "[a]ir pollution reduction has not been considered by the

plants to date…" and that "[u]ntil the problem of gross environmental contamination by our customers have been alleviated, there is little object to going to expensive extremes in limiting discharge from the plants."  The Committee concluded, "It was agreed that a comprehensive air sampling and testing program would be very expensive and is probably not justified at this stage of the problem…."

53.     Monsanto also knew or should have known that PCBs disposed of in landfills, incinerators, and other types of waste facilities in or near East St. Louis regularly leached, leaked, and escaped their disposal sites, entering and contaminating vast swaths of land in East St. Louis.

54.     Incredibly, it was not until 1969, after scientists had found PCBs to be a worldwide environmental contaminant, when Monsanto first initiated a long-term evaluation of PCBs.  These studies confirmed that PCBs were highly toxic and carcinogenic; however, Monsanto went to great lengths to conceal this information from regulators, its customers, and the general public in order to protect its highly lucrative Aroclor business.

55.     In fact, when the toxicity testing was finally performed, the data and results were deliberately falsified and Monsanto instructed the laboratory to modify its initial findings in order to conceal the true carcinogenicity of PCBs.  Monsanto then nevertheless submitted the falsified study results to government agencies and heralded their supposedly positive results in communications with its customers.

56.     Monsanto had a very close relationship with Industrial Bio-Test Laboratories ("IBT"), the firm it retained to conduct Aroclor toxicity testing and had hired IBT to prepare toxicity reports on many other products, many of which Monsanto had submitted to government regulators.

57.     In fact, IBT employed former Monsanto toxicologist, Dr. Paul Wright, from approximately March of 1971 through approximately November of 1972, during the time IBT  was performing purportedly independent testing of Monsanto's Aroclor products, and various other Monsanto representatives visited IBT's offices during this period.  In Approximately November of 1972, after the testing was completed, Dr. Paul Wright returned to Monsanto as its Manager of Toxicology.

58.     Monsanto management insisted that Monsanto be allowed to review the results of the IBT Aroclor tests before they were published and, in early 1970, Elmer P. Wheeler, Monsanto's Environmental Health Manager, wrote IBT's president to express that Monsanto was "surprised (and disappointed?) at the apparent toxicity at the levels studied" in the Aroclor test data developed to date.

59.     In addition, after reviewing draft study reports in 1975 that indicated IBT had detected tumors in lab animals exposed to Aroclors, Monsanto asked IBT to change its Aroclor carcinogenicity determination from "slightly tumorigenic" to "does not appear to be carcinogenic." IBT dutifully complied.

60.     Monsanto ultimately tapped Dr. Wright to interact with government regulators considering regulation of Aroclors.  Monsanto was so pleased with his work that, in 1977, Monsanto awarded him $1,000.00 for "forestalling EPA's promulgation of unrealistic regulations to limit discharges of polychlorinated biphenyls."

61.     It was later revealed that IBT and Dr. Wright had deliberately falsified data in the Monsanto Aroclor studies.  In fact, the IBT employee who signed off on the Monsanto PCB test reports later testified that IBT had made up data reported in the Aroclor studies and that he was ashamed of the work he had done on the studies.

62.     In addition, the employee testified that the vast majority of rodents involved in the Monsanto Aroclor studies died during the studies and were so badly decomposed that researchers could not determine a cause of death or conduct pathology examinations.

63.     After an extensive audit, the U.S. FDA ultimately invalidated 618 of 867 (71%) of IBT studies upon finding "numerous discrepancies between the study conduct and data."  The U.S. EPA ordered that multiple chemicals would be pulled from the market unless manufacturers provided additional, valid, safety data within 90 days.

64.     In May of 1981, Dr. Wright and two other IBT officials were indicted by a federal grand jury in the Northern District of Illinois.  Two years later, he and the other officials were convicted of mail fraud, wire fraud, and making false statements associated with the falsification of scientific data at IBT.  His conviction was later affirmed on appeal by the United State Court of Appeals for the Seventh Circuit.  Monsanto paid Dr. Wright's legal fees in the criminal case.

65.     In a later civil suit, Dr. Wright invoked his rights under the Fifth Amendment when asked, "You knew at the time you were a manager of toxicology at Monsanto that Monsanto was continuing to use the Industrial Bio-Test test results that pertained to Monsanto's Aroclor products in an effort by Monsanto to forestall various government regulations designed to limit the discharge of PCBs into the environment?"

66.     Dr. Wright also invoked his rights under the Fifth Amendment when asked, "Dr. Wright, when you had an interchange with the EPA about causing them to forestall their regulations limiting the discharge of PCBs into the environment, you knew at that time that the Industrial Bio-Test Aroclor studies both understated and misrepresented the toxic effects of PCBs on rodents; isn't that true?"

67.     Monsanto's PCBs now grossly contaminate East St. Louis. Upon information and belief, this toxic PCB contamination will cost East St. Louis millions and millions of dollars because it is forced to attempt to clean up PCBs from its lands if they are to ever have any residential or commercial utility and value. These costs must be borne by Monsanto.

68.     In short, and upon information and belief, East St. Louis will incur massive remediation and abatement costs caused by Monsanto's toxic PCB contamination of vast swaths of its land.

## II.   JURISDICTION AND STATUTE OF LIMITATIONS

69.     This Court has jurisdiction over this action in accordance with 28 USC § 1332(a) (diversity of citizenship) because the Plaintiff is an Illinois Home Rule Municipal Corporation and, as detailed below, the named Defendants are citizens of states other than Illinois. The amount in controversy exceeds $75,000, exclusive of interest and costs.

70.     Further, this Court has personal jurisdiction over Defendants because, as further detailed below, Defendants conduct business in Illinois, purposefully direct or directed their actions toward Illinois, manufactured and sold their products in Illinois, own or possess real estate in Illinois, consented to be sued in Illinois by registering agents for service of process, committed the torts and ordinance violations alleged herein in Illinois, and thereby damaged the Plaintiff, an Illinois political subdivision, and because they have the requisite minimum contacts with Illinois to permit the Court to exercise jurisdiction.

71.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §6972(a), because all of the events or omissions giving rise to the claims herein occurred in this judicial district and the properties that are the subject of this action are also situated in this judicial district.

72.     The City became aware of PCB contamination of its lands when it received testing samples indicating highly elevated PCB levels in December of 2020.

73.     No statute of limitations or repose can be pleaded against East St. Louis as the allegations and ordinance violations herein are continuous, wrongful, and ongoing, and East St. Louis is a Home Rule Municipal Corporation.

74.     Additionally, under the common law, neither the statute of limitations nor statute of repose may be asserted against Illinois municipalities as plaintiffs in actions involving 'public rights.' *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill. 2d 457, 459, 451 N.E.2d 874 (1983).  The doctrine emerges from the Latin maxim "*nullum tempus occurit regi*" (hereinafter *nullum tempus*), which translates to "time does not run against the King." *Shelbyville*, 96 Ill. 2d at 460.

75.     In prosecuting this litigation, the City is acting in its public capacity and exercising public rights.  The locations at which PCBs have been detected at levels that pose a risk to public health and safety are spread out throughout the City and include properties that are part of, or in the vicinity of public parks, schools, roadways, sidewalks, bus stops, offices, and other public areas and facilities.  As a result, the contamination affects the public's collective right to safely access and use the City's public areas and facilities.  In addition, because PCBs are volatile, the zone of risk created by the contamination is not limited to the physical area of the contaminated properties themselves.  PCBs can become airborne and move throughout the City, posing a risk to the health and safety of people anywhere within East St. Louis who might come into contact with the chemicals.

76.     The City's ordinances require City officials to "[e]nforce all laws and ordinances of the city," East St. Louis, Ill., Municipal Code § 2-133(9), and to "cause all nuisances to be

abated or removed which [they] may deem prejudicial or obnoxious to the public health or comfort," *id.* § 62-2.

77.     The City lacks the financial resources to pay for PCB remediation through its traditional revenue sources.  It has been designated as a "Financially Distressed City" under Illinois law since 1990, the year that the Financially Distressed City Law[6] was enacted.  Its budgets in recent years have generally totaled approximately $30-$40 million, with $14-20 million designated for the General Fund.  The costs of remediating Monsanto's PCB contamination would total in the millions of dollars.

78.     Monsanto's PCB contamination harms the City and its residents in many other ways.  For example, the City cannot sell or rent PCB-contaminated properties at their true market value (*i.e.,* market value without PCB contamination) and must bear the costs of maintaining those properties it cannot sell or rent.  In addition, the City cannot realize the full taxable revenue (*i.e.,* taxable revenue without PCB contamination) of privately-owned PCB-contaminated properties. Finally, the City's inability to make PCB-contaminated properties available for public use and recreation diminishes the quality of life for its residents and visitors and otherwise affects the interests of the community at large.

### III.     PARTIES

#### A.     PLAINTIFF

79.     The City of East St. Louis is a Home Rule Municipal Corporation located in St. Clair County, Illinois. Under the Illinois Municipal Code, 65 ILCS 5/11-60-2 (West 2008), only the corporate authorities of East St. Louis can define, prevent and abate public nuisances such as the public nuisance ordinance violations described herein. East St. Louis brings this action solely

---

[6] *See* 65 ILCS 5/8-12-1, *et seq.*

in its public governmental capacity as an Illinois Home Rule Municipal Corporation under the Illinois Constitution, charged with the "power to regulate for the protection of the public health, safety, morals and welfare" of its citizenry.[7]

80.     East St. Louis has a public governmental interest in its natural resources and lands. Its constitutional obligation to ensure the health and well-being of the public, its environment, and its economy are essential public functions and rights to be vindicated in this litigation. Moreover, upon information and belief, East St. Louis will incur massive costs to pay for this litigation and for the abatement and remediation of Monsanto's toxic PCB contamination.

**B.     DEFENDANTS**

81.     Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its principal place of business in St. Louis, Missouri. Following a merger transaction that closed in 2018, Monsanto is a wholly-owned subsidiary of Bayer AG.

82.     Defendant, Solutia, Inc. ("Solutia"), is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a wholly-owned subsidiary of Eastman Chemical Company.

83.     Defendant, Pharmacia LLC ("Pharmacia"), formerly known as Pharmacia Corporation, is the successor to the original Monsanto Company (hereinafter "Original Monsanto"). Pharmacia LLC is a Delaware company with its principal place of business in Peapack, New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

84.     Original Monsanto operated an agricultural products business, a pharmaceutical

---

[7] Ill. Const. 1970, Art. VII, §6(a).

and nutrition business, and a chemical products business. Original Monsanto began manufacturing PCBs in 1935 after acquiring Swann Chemical Company. Original Monsanto manufactured PCBs within or immediately adjacent to East St. Louis from approximately 1936 to until 1977.

85.     Through a series of transactions beginning in approximately 1997, Original Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto Company operates Original Monsanto's agricultural products business. Original Monsanto's chemical products business is now operated by Solutia. Original Monsanto's pharmaceuticals business is now operated by Pharmacia.

86.     Solutia was organized by Original Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Original Monsanto's chemical business.

87.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have also entered into agreements to share or apportion liabilities, and/or to indemnify one or more entities, for claims arising from Original Monsanto's chemical business, including the manufacture and sale of PCBs.

88.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemicals business.

89.     Eastman Chemical Co. reported in its 2019 Form 10-K that it "has been named as a defendant in several [legacy tort] proceedings, and has submitted the matters to Monsanto, which

was acquired by Bayer AG in June 2018, as Legacy Tort Claims [as defined in a settlement agreement with Monsanto arising out of Solutia, Inc.'s bankruptcy proceedings]. To the extent these matters are not within the meaning of Legacy Tort Claims, Solutia is potentially liable thereunder. In connection with the completion of its acquisition of Solutia, Eastman guaranteed the obligations of Solutia and Eastman was added as an indemnified party under the Monsanto Settlement Agreement."

90.     In its Form 10-K for the period ending August 31, 2017, filed with the U.S. Securities and Exchange Commission (the last such filing before Bayer AG acquired Monsanto), Monsanto represented: "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is a party in its own name and proceedings to which its former parent, Pharmacia LLC or its former subsidiary, Solutia, Inc. is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements."

## IV.     CAUSES OF ACTION

### COUNT I – PUBLIC NUISANCE
### (ALL DEFENDANTS)

91.     Plaintiff restates, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

92.     The Defendants manufactured, distributed, marketed, promoted, and attempted the disposal of commercial PCBs and PCB-containing products in a manner that created or contributed to the creation of public nuisances that unreasonably obstruct the free use and enjoyment of East St. Louis' lands.

93.     The Defendants' actions and omissions, including the release and migration of PCBs and PCB-containing products and wastes into and onto the lands of East St. Louis, constitute past and continuing public nuisances.

94.     An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs in and on East St. Louis lands.

95.     The seriousness of the environmental harm, human health risks, and economic devastation from PCBs far outweighs any social utility of the Defendants' conduct in manufacturing their commercial PCBs and PCB-containing products at the Monsanto Plant.

96.     The Defendants' conduct caused and continues to cause permanent harm and seriously damages the property values and utility of the residential and commercial properties in East St. Louis, thereby causing East St. Louis to, upon information and belief, lose millions of dollars in tax revenue over the last four decades.

97.     Upon information and belief, East St. Louis will incur massive costs to investigate, monitor, analyze, abate, and remediate the Defendants' PCB toxic contamination of East St. Louis lands.

98.     As a result of the Defendants' conduct, East St. Louis has suffered, is suffering, and will continue to suffer injuries to the public interest and to the health, safety, and well-being of its residents, land, environment, and economy.

99.     The Defendants are under a continuing duty to act to correct, abate, and remediate the public nuisances their toxic PCB contamination has caused, and each day on which they fail to do so constitutes a new injury to East St. Louis.

100.     As a direct and proximate result of Monsanto's creation of public nuisances, East St. Louis has suffered, continues to suffer, and will into the indeterminable future suffer monetary damages, including loss of property values, loss of utility of East St. Louis lands and natural resources, and loss of municipal income and tax revenue, and will incur significant costs to monitor, abate, and remediate Monsanto's toxic PCB contamination of East St. Louis lands.

101.    Defendants' reprehensible conduct and outrageous wrongful acts and omissions described herein constitute fraud, actual malice, and deliberate violence or oppression and Defendants acted willfully or with such gross negligence as to indicate a wanton disregard of the rights of others, warranting the imposition of punitive damages.

WHEREFORE, Plaintiff, the City of East St. Louis, prays for Judgment in its favor and against Defendants, jointly and severally, as follows:

A.    Damages for injury to East St. Louis' land and natural resources, including the economic impact to the City from the loss of ecological health or other losses resulting from the conduct alleged herein, including but not limited to the loss of value in the City's properties; and the loss of revenue to the City resulting from Monsanto's actions and omissions;

B.    An award of past, present, and future costs to abate and remediate the Monsanto PCB toxic contamination;

C.    Punitive damages in an amount which will punish Defendants and discourage them and others from similar conduct in the future;

D.    A judicial determination that each Defendant is liable for all future costs related to the investigation, abatement, remediation and removal of the Monsanto PCB toxic contamination;

E.    An order requiring Defendants to return all monies by which they were unjustly enriched as a result of spending nothing to prevent the toxic PCB contamination of East St. Louis's lands and natural resources;

F.    Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

G.    Such other and further relief as the Court deems just and proper.

## COUNT II - VIOLATION OF THE CITY OF EAST ST. LOUIS
## MUNICIPAL CODE § 50-71 (NUISANCE)

## (ALL DEFENDANTS)

102.    Plaintiff restates, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

103.    At all times since Defendants began their PCB manufacturing activities at the Monsanto Plant in approximately 1936, the East St. Louis Municipal Code has prohibited creating, committing, permitting, or continuing a nuisance on any private property or public place within the City.

104.    The East St. Louis Municipal Code states:

> No person shall create, commit, permit or continue a nuisance of any kind or description in, upon or about any private property or public place within the city which may affect the health, comfort or convenience of persons residing or doing business in the vicinity.

East St. Louis, Ill., Municipal Code § 50-71(a).  The Code defines "person" to include "bodies politic and corporate," as well as individuals.  *Id.* § 1-2.  In addition, the Code defines "nuisance" as:

> anything offensive or obnoxious to the health and welfare of the inhabitants of the city; or any act or thing or creating a hazard to, or having a detrimental effect on, the property of another person.

*Id.*

105.    From July 1, 1973 through June 11, 2003, the East St. Louis Municipal Code provided:

> No person shall create, commit, permit or continue a nuisance of any kind or description in, upon or about any private property or public place within the city, which may affect the health, comfort or convenience of persons residing or doing business in the vicinity thereof.

East St. Louis, Ill., Municipal Code § 43-2 (1973). The Code defined "person" to include "any individual, partnership, corporation, joint stock association or any city or state or any subdivision thereof." *Id.* § 1-3.

106.    From January 1, 1944 through June 31, 1973, the East St. Louis Municipal Code provided:

> Whoever shall create, commit, permit, or continue a nuisance of any kind or description in, upon or about any private property, or in any public place, within the City, which may affect the health, comfort or convenience of persons residing or doing business in the vicinity thereof, shall, upon conviction, be fined . . . .

East St. Louis, Ill., Municipal Code § 60-16 (1944).

107.    From 1908 through December 31, 1943, the East St. Louis Municipal Code provided:

> Whoever shall create, commit, permit or continue a nuisance of any kind or description in, upon or about any private property, or in any public place, within the city, which may affect the health, comfort or convenience of persons residing or doing business in the vicinity thereof, shall, upon conviction, be fined . . . .

East St. Louis, Ill., Municipal Code § 738 (1908).

108.    The Defendants' actions and omissions described herein, including causing the release and migration of PCBs and PCB-containing products into and onto the lands of East St. Louis and allowing the PCB contamination to remain in and on the lands of East St. Louis constituted creating, committing, permitting, or continuing a nuisance, in violation of the East St. Louis Municipal Code.

109.    The East St. Louis Municipal Code further provides, in pertinent part, that each violation of East St. Louis, Ill., Municipal Code § 50-71(a) "shall be punished by a fine not exceeding $750.00" and that "[e]ach day any violation of any provision of this Code or of any ordinance shall constitute a separate offense." East St. Louis, Ill., Municipal Code § 1-15(a).

110.     By their acts and omissions described herein, Defendants have continuously violated the East St. Louis Municipal Code on each parcel of property in the City on which they have created, committed, permitted, or continued a nuisance since they began their PCB manufacturing activities at the Monsanto Plant in approximately 1936.  Defendants are therefore subject to a daily fine, to be determined by the trier of fact but not to exceed $750.00, for each parcel of property on which they have created, committed, permitted, or continued a nuisance during this time.

111.     Defendants' unlawful acts and omissions resulting in toxic PCB contamination of East St. Louis lands, and the leaving of that toxic PCB contamination on East St. Louis lands, have violated, are currently violating, and will continue into the indeterminable future to violate the East St. Louis Municipal Code as described herein and Defendants are subject to daily fines for each past, present, and future ordinance violation.

WHEREFORE, Plaintiff, the City of East St. Louis, prays for Judgment in its favor and against Defendants, jointly and severally, as follows:

A.     Fines consistent with the City of East St. Louis Municipal Code for each and every separate offense;

B.     Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

C.     Such other and further relief as the Court deems just and proper.

## COUNT III – ABATEMENT PURSUANT TO THE CITY OF EAST ST. LOUIS MUNICIPAL CODE  §§ 50-79 AND 62-2

### (ALL DEFENDANTS)

112.     Plaintiff restates, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

113.   The East St. Louis Municipal Code states:

Whenever any nuisance shall be found on any premises within the city, the officials are authorized to cause such nuisance to be summarily abated in such a manner as may be directed.

East St. Louis, Ill., Municipal Code § 50-79.

114.   The Code further states:

The health department shall cause all nuisances to be abated or removed which it may deem prejudicial or obnoxious to the public health or comfort . . . .

*Id.* § 62-2.

115.   The Code defines "nuisance" as:

anything offensive or obnoxious to the health and welfare of the inhabitants of the city; or any act or thing or creating a hazard to, or having a detrimental effect on, the property of another person.

*Id.* § 1-2.

116.   The presence of Defendants' PCBs in and on the lands of East St. Louis constitutes a nuisance, as defined by the East St. Louis Municipal Code, thus giving rise to a demand for abatement and remediation of all PCB contamination.

117.   Notice is here given to Defendants that East St. Louis demands full abatement and remediation of all PCB contamination caused by the Defendants' business activities in and around the W. G. Krummrich Plant and at Defendants' unilateral expense.  East St. Louis reserves the right to supplement the lists of properties, soils, waterways, and natural resources which may be found to be also PCB-contaminated and for which remediation is required.

118.   Defendants' unlawful acts and omissions resulting in toxic PCB contamination of East St. Louis lands, and the leaving of that toxic PCB contamination on East St. Louis lands, has violated, is currently violating, and will continue into the indeterminable future to violate the East St. Louis Municipal Code as described herein.  Defendants are subject to daily fines for each past,

28

present, and future ordinance violation and are under a continuing obligation to fully abate and remediate all contamination caused by their PCBs.

WHEREFORE, Plaintiff, the City of East St. Louis, prays for Judgment in its favor and against Defendants, jointly and severally, as follows:

A.     Fines consistent with the City of East St. Louis Municipal Code for each and every separate offense;

B.     Injunctive relief in the form of Court Orders mandating the immediate and complete abatement and remediation of all East St. Louis lands caused by the Defendants' PCB contamination;

C.     Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

D.     Such other and further relief as the Court deems just and proper.

## COUNT IV – CONTINUING TRESPASS
## (ALL DEFENDANTS)

119.   Plaintiff restates, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

120.   The Defendants knew with substantial certainty at the time of their manufacture and sale of PCBs and PCB-containing products, and then with their incineration and disposal of PCB-containing products and wastes, that such activities were likely if not certainly to result in contamination of the lands of East St. Louis.

121.   The Defendants' conduct as described constitutes a continuing trespass upon East St. Louis property, that is, a continuing invasion in and of the exclusive possession and control of its lands.

122.    The Defendants' conduct caused and continues to cause permanent harm to and seriously damages the property values and utility of the residential and commercial properties in East St. Louis, thereby causing East St. Louis to, upon information and belief, lose millions of dollars in tax revenue over the last four decades.

123.    Upon information and belief, East St. Louis will incur massive costs to investigate, monitor, analyze, abate, and remediate Defendants' toxic PCB contamination.

124.    As a result of the Defendants' conduct, East St. Louis has suffered, is suffering, and will continue to suffer injuries to the public interest and to the health and well-being of its residents, lands, and economy.

WHEREFORE, Plaintiff, the City of East St. Louis, prays for Judgment in its favor and against Defendants, jointly and severally, as follows:

A.    Damages for injury to East St. Louis's lands, including the economic impact to the City; the loss of ecological health or other losses resulting from the conduct alleged herein; the loss of value in the City's properties; and the loss of revenue to the City resulting from Defendants' actions and omissions;

B.    An award of past, present, and future costs to investigate, assess, analyze, monitor, abate and remediate the toxic PCB contamination;

C.    A judicial determination that each Defendant is liable for all future costs related to the investigation, abatement, remediation and removal of the toxic PCB contamination;

D.    An order requiring Defendants to return all monies by which Defendants were unjustly enriched as a result of spending nothing to prevent the destruction of East St. Louis's lands;

E.    Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

F.    Such other and further relief as the Court deems just and proper.

## COUNT V – DESIGN DEFECT
## (ALL DEFENDANTS)

125.    Plaintiff restates, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

126.    Defendants' PCBs mixtures and PCB-containing products as described herein constituted an unreasonably dangerous design of such products in that they contained PCBs, a known toxic substance and carcinogen, at the time they left their control.

127.    Defendants' PCB mixtures and PCB-containing products' toxicity, ability to bio-accumulate, inability to be contained, and environmental persistence rendered them defective and unreasonably dangerous at all times.

128.    Defendants' PCB mixtures and PCB-containing products were unsafe as designed.

129.    The risk of danger inherent in the design of the Defendants' PCB mixtures and PCB-containing products drastically outweighed any perceived benefits of the design of such products when such products were put to reasonably foreseeable uses.

130.    Alternatively, Defendants knew their PCB mixtures and PCB-containing products were unsafe to an extent beyond that which would be contemplated by an ordinary person.

131.    Practical and feasible alternative designs for Defendants' PCB mixtures and PCB-containing products capable of reducing East St. Louis's injuries, damages, and financial losses were commercially available, including mineral oils, silicone fluids, vegetable oils, and nonfluid insulating chemicals, as well as alternative chemical formulations and/or additional chemical processing measures.

132.   The PCB mixtures and PCB-containing products reached the East St. Louis lands without any substantial change in condition from when they left the control of the Defendants.

133.   The Defendants' unreasonably dangerous PCB formulas and PCB-containing products caused the permanent presence of PCBs in East St. Louis and injury to the public interest, including threats to the physical and economic health and well-being of East St. Louis's citizens.

134.   Defendants owed a legal duty to the City because they manufactured and marketed PCBs and PCB-containing products and the City's injury due to Defendants' operations at their W.G. Krummrich plant adjacent to East St. Louis could be reasonably foreseen.

135.   East St. Louis has suffered, is suffering, and will continue to suffer into the indeterminable future damage to its lands, and damages to its public treasury as a result of Defendants' unreasonably dangerous PCB formulas and PCB-containing products and the presence of PCBs within East St. Louis.

136.   Defendants' reprehensible conduct and outrageous wrongful acts and omissions described herein constitute fraud, actual malice, and deliberate violence or oppression and Defendants acted willfully or with such gross negligence as to indicate a wanton disregard of the rights of others, warranting the imposition of punitive damages.

137.   The Defendants are strictly liable for all damages arising out of their defectively designed PCB formulas, mixtures, and PCB-containing products.

WHEREFORE, Plaintiff, the City of East St. Louis, prays for Judgment in its favor and against Defendants, jointly and severally, as follows:

A.   Damages for injury to East St. Louis's lands, including the economic impact to the City; the loss of ecological health or other losses resulting from the conduct alleged herein; the

loss of value in the City's properties; and the loss of revenue to the City resulting from Defendants' actions and omissions;

      B.     An award of past, present, and future costs to investigate, assess, analyze, monitor, abate, and remediate the toxic PCB contamination;

      C.     Punitive damages in an amount which will punish Defendants and discourage them and others from similar conduct in the future;

      D.     A judicial determination that each Defendant is liable for all future costs related to the investigation, abatement, remediation and removal of PCBs from, in, and around East St. Louis;

      E.     An order requiring Defendants to return all monies by which Defendants were unjustly enriched as a result of spending nothing to prevent the destruction of East St. Louis's lands;

      F.     Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

      G.     Such other and further relief as the Court deems just and proper.

**COUNT VI – FAILURE TO WARN AND INSTRUCT**

**(ALL DEFENDANTS)**

138.     Plaintiff restates, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

139.     Defendants' PCBs and PCB-containing products were not reasonably safe at the time they left their control because they lacked adequate warnings and/or instructions concerning the dangers and hazards associated with PCBs.

140.    At the time the Defendants manufactured, distributed, marketed, promoted, and sold PCBs and PCB-containing products, they knew their products were not safe and were likely if not certain to cause toxic PCB contamination of lands in East St. Louis.

141.    Despite the Defendants' knowledge, they failed to provide adequate warnings and/or instructions that their PCBs and PCB-containing products were toxic, carcinogenic, and would contaminate East St. Louis's lands.

142.    Defendants could have warned of and instructed about these dangers but failed to do so and intentionally concealed information in order to maximize profits for decades.

143.    In addition, the Defendants advised their commercial customers to dispose of PCBs and PCB-containing wastes in landfills, and they themselves did the same, when they knew that this method of disposal would lead to contamination of East St. Louis's lands.

144.    Defendants continued to conceal the dangers of PCBs after they manufactured, distributed, marketed, promoted, and sold PCBs and PCB-containing products.

145.    Defendants' PCBs and PCB-containing products in East St. Louis caused and continue to cause injury and damage to the physical and economic health and well-being of East St. Louis, including but not limited to the loss of value to and the utility of the City's properties; the lost revenue to the City resulting from Defendants' actions and omissions; and the costs of the City's efforts to abate and remediate its toxic PCB contamination.

146.    Defendants owed a legal duty to the City because they manufactured and marketed PCBs and PCB-containing products and the City's injury due to Defendants' operations at their W.G. Krummrich plant adjacent to East St. Louis could be reasonably foreseen.

147.    East St. Louis has suffered, is suffering, and will continue to suffer into the indeterminable future injuries to its lands and damages to its public treasury as a result of Defendants' failure to warn and instruct.

148.    Defendants' reprehensible conduct and outrageous wrongful acts and omissions described herein constitute fraud, actual malice, and deliberate violence or oppression and Defendants acted willfully or with such gross negligence as to indicate a wanton disregard of the rights of others, warranting the imposition of punitive damages.

149.    Defendants are strictly liable for all damages to the City of East St. Louis arising out of their failure to provide adequate warnings and instructions regarding their unreasonably dangerous PCBs and PCB-containing products.

WHEREFORE, Plaintiff, the City of East St. Louis, prays for Judgment in its favor and against Defendants, jointly and severally, as follows:

A.    Damages for injury to East St. Louis's lands, including the economic impact to the City; the loss of ecological health or other losses resulting from the conduct alleged herein; the loss of value in the City's properties; and the loss of revenue to the City resulting from Defendants' actions and omissions;

B.    An award of past, present, and future costs to investigate, assess, analyze, monitor, abate, and remediate the toxic PCB contamination;

C.    Punitive damages in an amount which will punish Defendants and discourage them and others from similar conduct in the future;

D.    A judicial determination that each Defendant is liable for all future costs related to the investigation, abatement, remediation and removal of PCBs from, in and around East St. Louis;

E.    An order requiring Defendants to return all monies by which Defendants were unjustly enriched as a result of spending nothing to prevent the destruction of East St. Louis's lands;

F.    Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

G.    Such other and further relief as the Court deems just and proper.

**COUNT VII – NEGLIGENCE**

**(ALL DEFENDANTS)**

150.    Plaintiff restates, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

151.    The Defendants owed a duty of reasonable care to protect East St. Louis and its public and lands against the unreasonable health and safety risks resulting from the production, use, and disposal of PCBs and PCB-containing products at their Monsanto Plant.

152.    The Defendants failed to exercise ordinary care because a reasonably careful company would have performed valid long-term toxicity testing before manufacturing and selling vast quantities of PCBs.

153.    The Defendants failed to exercise ordinary care because a reasonably careful company that knew of its PCBs' toxicity, carcinogenicity, danger to humans, and destruction of the lands would not manufacture or distribute those products, would warn of their toxic and environmentally hazardous properties, or would take steps to enhance the safety and/or reduce the toxicity and environmental persistence of the products.

154.    The Defendants failed to exercise ordinary care because reasonably careful companies that knew that PCBs could not be contained during normal production, use, and

disposal efforts would not continue to manufacture, distribute, and attempt to dispose of PCBs in a way that allowed the discharge of PCBs into and onto East St. Louis lands.

155.   The Defendants failed to exercise ordinary care because reasonably careful companies would not continue to manufacture and dispose of PCBs in mass quantities and to the extent and in the applications that Defendants manufactured and attempted to dispose of them.

156.   Defendants' PCBs and PCB-containing products in East St. Louis caused and continue to cause injury and damage to the physical and economic health and well-being of East St. Louis, including but not limited to the loss of value to and the utility of the City's properties; the lost revenue to the City resulting from Defendants' actions and omissions; and the costs of the City's efforts to abate and remediate its toxic PCB contamination.

157.   East St. Louis has suffered, is suffering, and will continue to suffer into the indeterminable future injuries to its lands, and damages to its public treasury as a result of Defendants' failure to warn and instruct.

158.   Defendants' reprehensible conduct and outrageous wrongful acts and omissions described herein constitute fraud, actual malice, and deliberate violence or oppression and Defendants acted willfully or with such gross negligence as to indicate a wanton disregard of the rights of others, warranting the imposition of punitive damages.

WHEREFORE, Plaintiff, the City of East St. Louis, prays for Judgment in its favor and against Defendants, jointly and severally, as follows:

A.      Damages for injury to East St. Louis's lands, including the economic impact to the City; the loss of ecological health or other losses resulting from the conduct alleged herein; the loss of value in the City's properties; and the loss of revenue to the City resulting from Defendants' actions and omissions;

B.      An award of past, present, and future costs to investigate, assess, analyze, monitor, abate, and remediate the toxic PCB contamination;

C.      Punitive damages in an amount which will punish Defendants and discourage them and others from similar conduct in the future;

D.      A judicial determination that each Defendant is liable for all future costs related to the investigation, abatement, and remediation and removal of PCBs from, in and around East St. Louis;

E.      An order requiring Defendants to return all monies by which Defendants were unjustly enriched as a result of spending nothing to prevent the destruction of East St. Louis's lands;

F.      Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

G.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, the City of East St. Louis, respectfully requests trial by jury on all claims so triable.

Dated: April 24, 2023                    Respectfully Submitted,

**THE DRISCOLL FIRM, LLC**

By:    */s/ John J. Driscoll*_____
       John J. Driscoll, #6276464
       1311 Avenida Ponce de Leon, 6th Floor
       San Juan, PR 00907
       Phone: (618) 444-6049
       Fax: (314) 932-3233
       john@jjlegal.com

**THE DRISCOLL FIRM, P.C.**
Paul W. Johnson, #6193774
Christopher J. Quinn, #6310758
Matthew Limoli, #6328051
211 N. Broadway, Suite 4050
St. Louis, MO 63102
Phone: (314) 932-3232
Fax: (314) 932-3233
paul@thedriscollfirm.com
chris@thedriscollfirm.com
matthew@thedriscollfirm.com

**CHATHAM & BARICEVIC**
John Baricevic, #3121537
Grey Chatham, #6312518
107 W. Main Street
Belleville, IL 62220
Phone: (618) 233-2200
Fax: (618) 233-1589
john@chathamlaw.org
greyjr@chathamlaw.org

**SANDERS PHILLIPS GROSSMAN, LLC**
Melissa K. Sims, #6231297
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Phone: (516) 741-5600, ext. 8201
Fax: (516) 741-0128
msims@thesandersfirm.com

**SMOUSE & MASON, LLC**
Roy L. Mason, #938118
Zachary E. Howerton, #151215033
233 Duke of Gloucester Street
Annapolis, MD 21401
Phone: (410) 269-6620
Fax: (410) 269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 24, 2023, the foregoing document was electronically filed with the Clerk of Court and will be served by operation of the Court's CM/ECF system upon all registered parties.

*/s/ John J. Driscoll*