IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CITY OF EAST ST. LOUIS,          )
                                 )
          Plaintiff,             )
                                 )
vs.                              )     Case No. 3:21-cv-232-DWD
                                 )
MONSANTO CO., PHARMACIA LLC,     )
and SOLUTIA, INC.,               )
                                 )
          Defendants.            )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court are Defendants' Combined Motion for Sanctions and Motion for a Stay or an Extension of the Case Management Schedule. (Docs. 148 & 149). Plaintiff filed a Memorandum in Opposition to each Motion. (Docs. 150 & 151). The Motions were the subject of a hearing on April 30, 2024. (Docs. 190 & 191). For the reasons explained below, the Combined Motion for Sanctions is **DENIED without prejudice** and the Motion for a Stay or an Extension of the Case Management Schedule is **DENIED**.

## I. BACKGROUND

This case was removed from the Circuit Court of St. Clair County, Illinois. (Doc. 1). Plaintiff filed a Second Amended Complaint for Damages and Abatement ("Second Amended Complaint") (Doc. 129) against Defendants, alleging a public nuisance (Count I), violations of Plaintiff's Municipal Code (§ 50-71 (Nuisance)) (Count II), abatement under Plaintiff's Municipal Code (§§ 50-79 and 62-2) (Count III), a continuing trespass (Count IV), a design defect (Count V), a failure to warn and instruct (Count VI), and

negligence (Count VII). (Doc. 1, generally).[1] Plaintiff's allegations relate to "the contamination of vast swaths of its land with polychlorinated biphenyls…manufactured in Defendants' Monsanto Plant in adjacent Sauget, Illinois." (Doc. 129, pg. 1).

## II. ANALYSIS

In their Combined Motion for Sanctions, Defendants argue "[t]he entire basis of this lawsuit," namely, soil samples collected by Plaintiff in 2020 and 2022 to bring the claims at issue, "was destroyed without notice, depriving Defendants of the opportunity to examine, inspect[,] or test the evidence." (Doc. 148, pgs. 1, 8-9). Defendants discovered the destruction of the 2020 and 2022 samples on October 31, 2023, when Plaintiff responded to their discovery requests. (Doc. 148, pgs. 2, 5). Defendants state Plaintiff "expressly disavowed any reliance on, and disclaimed any relevance of, the 2020 sampling." (Doc. 148, pgs. 2, 5-6). This was despite its reliance on those soil samples throughout the case, including in its First and Second Amended Complaints, initial discovery disclosures, discovery responses, and other submissions. (Doc. 148, pgs. 2-3).

Moreover, Defendants note the soil samples were the subject of the Court's Memorandum & Order denying Plaintiff's Motion to Quash the Subpoenas Duces Tecum issued to I2M Associates, LLC, and ALS Environmental. (Docs. 97; 110; 148, pg. 4). In that Memorandum & Order, the Court noted as follows:

> This is a complex case involving the alleged environmental contamination, over nearly 6 decades, of "large swaths" of Plaintiff's land. (Doc. 29, ¶¶ 2-4, 7, 10, 15, 33). Notably, the work at issue relates to soil testing on property owned by Plaintiff, *i.e.*, approximately 140 parcels of land and 50 rights-of-

---

[1]The Court dismissed Count II of the Second Amended Complaint without prejudice. (Doc. 171). The Court found it lacked subject matter jurisdiction to grant the only relief requested in Count II, namely, fines under § 1-15 of Plaintiff's Municipal Code, which the Court found to be criminal in nature. (Doc. 171).

way. (Doc. 97, ¶ 3). The Court cannot be sure that extensive work, which Plaintiff invoked in the pleadings, is replicable under conditions sufficiently similar to those encountered by Bost, I2M Associates, and ALS Environmental. *See Polyone Corp. v. Lu*, No. 14-10369, 2016 WL 2997904, *2 (N.D. Ill. May 25, 2016) (granting renewed motion to compel documents, communications, and answers to interrogatories, related to the plaintiff's testing of the defendant's product, due to exceptional circumstances under Rule 26(b)(4)(D)(ii), where the consultant's tests and related communications were disputed facts, relevant to the test results, and relevant to the defendant's counterclaim questioning the Plaintiff's motives and knowledge). Defendants suggest a replication would be hindered by changes in subsurface conditions and the impact of the weather. (Doc. 102, pg. 106). This concern is well-taken due to the nature of Plaintiff's allegations. Accordingly, the Court **CONCLUDES** it is impracticable for Defendants to obtain facts or opinions, akin to those known or held by Bost, I2M Associates, and ALS Environmental, by other means. *See* Fed. R. Civ. P 26(b)(4)(D)(ii).

(Doc. 110, pgs. 8-9).[2]

Defendants argue Plaintiff was under a duty to preserve the samples, which, based on its prior filings and the Court's Memorandum & Order quoted above, it must have understood were relevant and material to the claims and defenses in this case. (Doc. 148, pg. 6). Defendants argue this duty to preserve evidence existed notwithstanding any recommendations of the Environmental Protection Agency (EPA) related to the recommended time for testing the samples or the timing of Defendants' request for the

---

[2]The Court understands the issues discussed in the briefing on the Combined Motion for Sanctions are of critical importance. However, the Court would be remiss if it failed to note certain statements made by Defendants in relation to its prior Memorandum & Order. Defendants state: "The evidence that formed the very basis of the City's original ordinance citations and subsequent complaints, and the evidence the City uses to show the physical presence of PCBs on its property—the 2020 and 2022 soil samples—no longer exists. This evidence, *which the Court previously recognized is irreplicable*, was destroyed despite the fact that the City was under a duty to preserve the samples and no doubt understood its relevance and materiality to the claims and defenses in this case." (Doc. 148, pg. 6) (Emphasis added and in original.). The Court will not belabor its point, as the issue was also discussed on the record at the hearing, but a plain reading of the above-quoted Memorandum & Order reveals that this statement by Defendants misrepresents or exaggerates the Court's prior ruling. (Doc. 110, pgs. 8-9; 191, pgs. 7-8).

samples. (Doc. 153, pg. 4). In other words, Defendants distinguish between the duty to preserve evidence and the EPA's recommended time for testing the samples, arguing the "destruction of the soil samples was not mandated by the EPA." (Doc. 153, pg. 4). Regardless, Defendants argue they timely requested the samples. (Doc. 153, pg. 5).

Absent the samples, Defendants argue they cannot independently analyze or critique Plaintiff's test results. (Doc. 148, pg. 6). That is, "Defendants have no other means to acquire contemporaneous data from the time these samples were collected, and Defendants were not given an opportunity to participate in or duplicate the tests when they occurred." (Doc. 148, pg. 12). In Defendants' view, such duplications are now impossible due to the ever-changing nature of subsurface conditions, the impact of the weather, and other spoliation concerns. (Doc. 148, pg. 12). For these reasons, Defendants seek an order dismissing the case, with prejudice, or an order excluding any use of the 2020 and 2022 soil samples in evidence or expert discovery. (Doc. 148, pgs. 2, 7). Defendants also seek fees and costs related to wasted resources. (Doc. 148, pg. 2).

Without denying the samples were destroyed, Plaintiff responds that Defendants point to no order that was violated for purposes of Federal Rule of Civil Procedure 37 and it cannot show bad faith in relation to the Court's inherent authority. (Doc. 150, pgs. 3-4, 11-15). Further, Plaintiff states "[i]t is well understood that, under EPA guidelines, PCB samples cannot validly be analyzed more than one year after their collection." (Doc. 150, pgs. 3, 8, 16). Plaintiff argues Defendants knew of this recommendation but failed to request the samples sooner, such that they are at fault. (Doc. 150, pgs. 3, 15, 17).

4

Further, Plaintiff suggests Defendants misrepresent the Court's Memorandum & Order on its Motion to Quash, stating it was "a ruling that [Defendants] w[ere] entitled to discover *facts and opinions* about the soil samples…[but not] an order that the samples themselves ha[d] to be preserved indefinitely." (Doc. 150, pg. 3) (Emphasis in original.). Plaintiff seeks to distinguish requests for the samples from requests for the actual results of the sampling, the latter of which were produced after the denial of its Motion to Quash. (Doc. 150, pgs. 6-7). As suggested above, though, the parties disagree on the timeline of Defendants' requests and whether they were within the 1-year testing window.

Relatedly, Plaintiff argues "the samples are not essential because the primary evidence of the City's claims—the contaminated land—remains available for…further analysis." (Doc. 150, pgs. 4, 15, 18-20). Plaintiff explains, "[i]t is not clear what further analysis is required, though, because [Defendants] never explain[] why the City's [analysis] is deficient." (Doc. 150, pgs. 4, 21). Defendants also purportedly failed to identify what further analyses from the samples are necessary. (Doc. 150, pg. 21).

Defendants have taken inconsistent positions on the source of their Combined Motion for Sanctions. In that Combined Motion, Defendants state at the outset that, "[b]y this motion, Defendants seek appropriate sanctions pursuant to Rule 37." (Doc. 148, pg. 1). Defendants go on to cite Rule 37(b)(2)(A)(i) to (vii) while also accurately acknowledging that "[i]t is well-settled that the Court has discretion to impose sanctions under Rule 37 and pursuant to its inherent authority." (Doc. 148, pgs. 7, 10, 14). In their Reply, Defendants take the position that they "seek sanctions under the framework of both Rule 37 and the Court's inherent authority," inaccurately stating the two sources of

5

sanctions present "a distinction without [a] difference." (Doc. 153, pgs. 2-3). At the hearing on the Combined Motion for Sanctions, when pressed by the Court on whether Defendants were "moving under Rule 37 for this sanction, and if so, what provision of 37," Defendants answered in the negative, stating "[w]e are moving under the Court's inherent power to sanction a party." (Doc. 191, pg. 10). At a later point in the hearing, Defendants attorney stated, "as I mentioned, we are not moving under solely a Rule 37 sanctions analysis," noting the references in the Combined Motion for Sanctions to both Rule 37 and the Court's inherent authority. (Doc. 191, pg. 13).

Plaintiff, for its part, notes these inconsistencies and asserts that Defendants have waived the prospect of sanctions under the Court's inherent authority. (Doc. 191, pg. 25). However, the Court's inherent authority would be quite lame if its exercise could be dictated by such an argument. Indeed, it would not be inherent authority at all. Therefore, if the legal standards for an exercise of its inherent authority are satisfied, the Court sees no reason why Defendants' inconsistent arguments should bar it from acting.

As a result, the Court will briefly discuss each distinct source for the imposition of sanctions, namely, Rule 37 and the Court's inherent authority, before determining their applicability to the conduct alleged in this case. *See In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, MDL No. 2385, 12-md-2385, 2013 WL 5377164, *5 (S.D. Ill. Sept. 25, 2023) (discussing Rule 37 and the Court's inherent authority as the primary sources for the imposition of sanctions for the failure to preserve evidence).

Initially, the Court notes the District Courts in the Seventh Circuit are not necessarily speaking in unison when it comes to the level of culpability required for the

imposition of sanctions for spoliation under Rule 37 and the Court's inherent authority. As discussed below, though, the Court takes the position that Rule 37 permits sanctions when the destruction of evidence violates a discovery order and represents willfulness, bad faith, *or* fault, while the Court's inherent authority permits spoliation sanctions *only* when there is a duty to preserve the evidence and its destruction represents bad faith.

First, under Rule 37(b)(2)(A), sanctions may be imposed as follows:

If a party or a party's officer, director, or managing agent…fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

As the language of Rule 37(b)(2)(A) shows, sanctions are only proper if a discovery order or ruling is violated. *See, e.g., Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994) ("The rule's plain language limits its applicability to situations where a court order has

7

been violated. Moreover, the caselaw reveals that Rule 37(b)(2) has been invoked only against parties who have disobeyed a discovery ruling of some sort."); *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011) ("Federal Rule of Civil Procedure 37(b)(2)(A) grants the district courts the power to impose appropriate sanctions for violations of discovery orders."); *In re Pradaxa*, 2013 WL 5377164 at *6 ("While a court may sanction a party pursuant to Rule 37 for discovery violations, such sanctions are limited to circumstances in which a party violates a court order or discovery ruling.").

Further, the Seventh Circuit has recognized, when discussing a Supreme Court case proceeding under Rule 37, "sanctions may be appropriate in any one of three instances—where the noncomplying party acted either with willfulness, bad faith[,] or fault." *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (discussing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976)) (Emphasis in original omitted.); *see also Fed. Nat'l Mortg. Ass'n v. Chicago Title Ins. Co.*, No. 11-cv-768, 2019 WL 5298728, *3 (S.D. Ind. Sept. 20, 2019) ("Rule 37 sanctions are appropriate where a party displays willfulness, bad faith, or fault in violating discovery obligations.") (Emphasis in original omitted.); *Malibu Media, LLC v. Harrison*, No. 12-cv-1117, 2014 WL 7366624, *9 (S.D. Ind. Dec. 24, 2014) (noting *Marrocco* involved sanctions for a violation of a protective order, not for spoliation, and the standard was derived from *National Hockey League*, where the Supreme Court addressed when a court may sanction a party under Rule 37).

Second, the district courts' inherent authority to impose sanctions "emanates from the nature of the institution and the need to 'impose silence, respect, and decorum, in their presence, and submission to their lawful mandates…so as to achieve the orderly

and expeditious disposition of cases.' " *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). As a general matter, the inherent authority to impose sanctions may be used against "those who show 'willful disobedience of a court order,' act in 'bad faith, vexatiously, wantonly, or for oppressive reasons,' for fraud on the court, delay, disruption, or 'hampering enforcement of a court's order.' " *Id*. (quoting *Chambers*, 501 U.S. at 45-46). Sanctions are proper under a district court's "inherent authority 'where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith.' " *Id*. (quoting *Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012)). As a result, "[t]he court must first make a finding of 'bad faith, designed to obstruct the judicial process, or a violation of a court order.' " *Id*. at 463-64. (quoting *Tucker*, 682 F.3d at 662). The impact or effect of the allegedly wrongful conduct on the case is considered, but there is no standalone requirement of prejudice. *Id*. at 464.

Of particular importance here, the Seventh Circuit has specifically noted that "a showing [of bad faith] is a prerequisite to imposing sanctions for the destruction of evidence." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (citing *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001); *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)); *accord Malibu Media, LLC*, 2014 WL 7366624 at *3. In this context, "bad faith" means the evidence was destroyed for the purpose of hiding adverse information. *Bracey v. Grondin*, 712 F.3d 1012, 1019-20 (7th Cir. 2013); *accord Malibu Media, LLC*, 2014 WL 7366624 at *3, 5; *see also Mathis*, 136 F.3d at 1155 (discussing how a motion for Rule 37(b)(2) spoliation sanctions, due to a violation of a court order, provides "access to the substantial weaponry in the district court's arsenal,"

9

whereas a motion for spoliation sanctions under a district court's inherent authority requires a showing of bad faith). In this way, the focus is on the reason for the destruction of the evidence and not merely the fact that the evidence was destroyed. *Bracey*, 712 F.3d at 1019 (quoting *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002); citing *Norman-Nunnery v. Madison Area Technical College*, 625 F.3d 422, 428 (7th Cir. 2010)); *accord Malibu Media, LLC*, 2014 WL 7366624 at *9. Absent bad faith, it is not enough that a party had a duty to preserve evidence but intentionally or negligently destroyed it. *Bracey*, 712 F.3d at 1019-20; *accord Boutilier v. Menard Inc.*, 606 F. Supp. 3d 860, 865 (C.D. Ill. 2022). Finally, a spoliation sanction is proper "only where a party has a duty to preserve [the] evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton*, 534 F.3d at 681-82 (citing *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1032 (10th Cir. 2007); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001)); *accord Vander Pas v. Bd. of Regents of Univ. of Wisconsin Sys.*, 664 F. Supp. 3d 893, 905 (E.D. Wisc. 2023).

Whether imposed under Rule 37 or its inherent authority, a sanction must be proportional to the offense. *Houston v. C.G. Sec. Services, Inc.*, 302 F.R.D. 268, 281 (S.D. Ind. 2014) (citing *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003); *Maynard v. Nygren*, 372 F.3d 890, 893 (7th Cir. 2004)). The Court does not have "unfettered" discretion to sanction a party, especially where "the draconian sanction" of a dismissal with prejudice is imposed. *Marrocco*, 966 F.2d at 223-24 (citing *Godlove v. Bamberger*, 903 F.2d 1145, 1148 (7th Cir. 1990); *Schilling v. Walworth County Park & Planning Comm'n*, 805 F.2d 272, 275 (7th Cir. 1986)). The Seventh Circuit has "pointed out on several occasions [that] '[a] dismissal with prejudice is a harsh sanction which should usually be employed only

10

in extreme situations[] where there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailable.' " *Id*. at 224 (quoting *Pyramid Energy, Ltd. v. Heyl and Patterson, Inc.*, 869 F.2d 1058, 1061 (7th Cir. 1989) (Emphasis in original omitted.)). Where the sanction of a dismissal with prejudice has been ordered, however, the cases involved, *inter alia*, the alteration, destruction, or failure to produce relevant evidence. *Chamberlain Group, Inc. v. Lear Corp.*, 270 F.R.D. 392, 397 (N.D. Ill. 2010) (citing *Rhodes v. LaSalle Bank, N.A.*, No. 2-cv-2059, 2005 WL 281221, *3 (N.D. Ill. Feb. 1, 2005) (collecting cases)). Finally, the Court addresses the breadth of its authority to impose sanctions in order to highlight that, generally, "a court should not rely on its inherent sanctioning powers unless other rules or statutes provide an insufficient basis to issue sanctions." *Pable v. Chicago Transit Auth.*, No. 19-cv-7868, 2023 WL 2333414, *18 (N.D. Ill. March 2, 2023); *see also Dal Pozzo v. Basic Machinery Co.*, Inc., 463 F.3d 609, 614 (7th Cir. 2006) ("[T]he inherent power of the court 'is a residual authority, to be exercised sparingly' and only when other rules do not provide [a] sufficient basis for sanctions.").

Here, the Court initially finds its inherent authority is the only potential source for sanctions in this case. Assuming Defendants properly invoked Rule 37(b)(2)(A), notwithstanding their inconsistent positions, the Court agrees with Plaintiff that Defendants have not identified a discovery order or ruling that was violated, as necessary for the imposition of sanctions under Rule 37(b)(2)(A). *See* Fed. R. Civ. P. 37(b)(2)(A); *Brandt*, 30 F.3d at 756; *e360 Insight, Inc.*, 658 F.3d at 642; *In re Pradaxa*, 2013 WL 5377164 at *6. And, notably, Defendants do not dispute that such a discovery order or ruling is a prerequisite to sanctions. (Doc. 191, pg. 15). As to one such discovery order or ruling, the

11

Memorandum & Order denying Plaintiff's Motion to Quash the subpoenas issued to I2M Associates, LLC, and ALS Environmental, Defendants affirmatively state as follows in their Reply: "The City's focus on the Order denying its motion to quash is due to its assumption that Defendants' Motion is based solely on Rule 37. To be clear, Defendants **do not** claim that Order leads to a Rule 37(b) analysis." (Docs. 110; 153, pg. 3 n. 1) (Emphasis in original). At the hearing on these issues, Defendants indicated: "I think the City may have interpreted our motion in a way that it viewed us seeking a Rule 37 analysis based on the Court's order on the motion to quash. That is not the case." (Doc. 191, pg. 14). In light of these representations, as well as the fact that Defendants have failed to identify any other discovery order or ruling that was allegedly violated by Plaintiff, the Court will not proceed further in the Rule 37(b)(2)(A) analysis. *See Malibu Media, LLC*, 2014 WL 7366624, *9 (finding it would be "inappropriate" to apply the standard stated in *Marrocco* because the plaintiff did not invoke Rule 37 or otherwise identify a court order that the defendant disobeyed; instead, "Plaintiff's motion apparently relie[d]…on the Court's 'inherent power to sanction parties for misconduct such as spoliation of evidence…'[,] [which] requires a showing of bad faith.").

As to its inherent authority to impose sanctions, the Court stresses that it shares many of Defendants' concerns about the destruction of the 2020 and 2022 soil samples. While Plaintiff argues the soil samples were not in its custody or control, and it did not direct the destruction of the soil samples, Plaintiff did hire the professional firms tasked with collecting and analyzing the soil samples. (Doc. 191, pgs. 26-27, 32, 36-37). Also, contrary to Plaintiff's position in this case, there is an obvious distinction between the

EPA's recommendation to test a soil sample within 1 year of its collection and the need to actually destroy the soil sample after 1 year. It does not appear to the Court that the latter occurrence in any way facilitates the objectives of the former occurrence. Indeed, at least one professional firm that handled the soil samples indicated: "It is our policy to hold samples for a minimum of thirty days after invoicing and before disposal, unless otherwise specified by contract or if the sample is part of litigation. If the sample is part of litigation, disposal of the physical sample shall occur only with concurrence of the affected legal authority, sample data user, and/or client." (Doc. 153-4, pg. 8).

Therefore, although Plaintiff may have no expertise in handling PCBs, as was argued at the hearing, Plaintiff's attorneys undoubtedly have expertise in preparing for and proceeding through litigation. (Doc. 191, pgs. 26-27). And, in terms of preserving the soil samples for use in this case, the proverbial buck undoubtedly stopped with those experienced attorneys. Yet the record suggests that they did not take affirmative steps to preserve the evidence, even though it was likely, perhaps even a certainty, that Defendants would seek the soil samples and related information. After all, as shown by the events discussed below, Plaintiff relied on the soil samples throughout the case and Defendants explicitly requested soil samples in discovery.

Specifically, in both the First and Second Amended Complaints for Damages and Abatement, filed on April 23, 2021, and April 24, 2023, respectively, Plaintiff alleged the following in relation to the 2020 soil samples:

> In 2020, 200 [or 203] separate soil samples were taken from City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant. All samples had PCB concentrations that exceeded the U.S.

background average as referenced in a 2007 EPA study. The maximum concentration in a reported sample was 75,300 ppb, or approximately 25,100 times the average concentration in U.S. rural soils. The average concentration of the 200 samples was 3,416 ppb, or 1,138 times the average U.S. soil concentration, with the greatest concentrations reported in the samples closest in proximity to the Monsanto Plant.

(Docs. 29, pgs. 5-6; 129, pgs. 5-6).

Despite this reliance, Plaintiff allegedly allowed the 2020 soil samples to be destroyed on or about October 15, 2021, before the parties began discovery. (Doc. 153, pg. 6). Nevertheless, in its Initial Disclosures under Federal Rule of Civil Procedure 26(a)(1), dated December 14, 2021, Plaintiff identified individuals, documents, and information or evidence associated with I2M Associates, LLC, and ALS Environmental, which collected and analyzed the 2020 soil samples, as supportive of its claims. (Doc. 148-1, pgs. 2-4).

On January 14, 2022, Defendants served their First Set of Requests for Production. (Doc. 153-5). Again, as of that date, Defendants allege the 2020 soil samples were already destroyed. However, Defendants' First Set of Requests for Production nevertheless provided a comprehensive definition of "documents" that included "samples." (Doc. 153-5, pg. 5). Defendants also requested "[a]ll DOCUMENTS CONCERNING any sampling, testing and/or analysis of the soil of any property within the CITY, including the samples referenced in Paragraph 10 of the COMPLAINT, that YOU allege is contaminated with PCBS or PCB-CONTAINING PRODUCTS." (Doc. 153-5, pg. 14). Similarly, Defendants sought "[a]ll DOCUMENTS YOU intend to refer to, rely on, present, enter as an exhibit, or otherwise use in connection with the LAWSUIT including,

but not limited to, in any deposition, in support of or in opposition to any motion, or at trial." (Doc. 153-5, pg. 25).

Plaintiff again referenced the 2020 soil samples on April 29, 2022, in its Objections and Answers to Defendants' First Set of Interrogatories. (Docs. 148-2; 148-3; 148-4). On July 13 and 14, 2023, Defendants issued subpoenas to I2M Associates, LLC, and ALS Environmental in relation to the 2020 soil samples. (Docs. 97-4; 97-5). Those subpoenas became the subject of Plaintiff's Motion to Quash, Defendant's Response to the Motion to Quash, and the Court's Memorandum & Order denying the Motion to Quash. (Docs. 97; 102; 110). Even though the 2020 soil samples were allegedly destroyed by that time, the Court notes Plaintiff's suggestion that "[t]he subpoenas each sought twenty-three discrete categories of materials related to the I2M Samples (*but not the samples themselves*)" is absurd. (Doc. 150, pg. 6) (Emphasis added.). Indeed, to prove that statement is patently false, the Court need only take the simplest of steps and actually read the subpoenas. The first sentence of Exhibit A to each subpoena requested "[a]ny and all records, documents, emails, photographs, protocols, samples, or data." (Docs. 97-4, pg. 6; 97-5, pg. 6). Likewise, the subpoenas sought "[c]opies of instrumental output (chromatographs, mass spectra, etc.) for analyses in question, including…Samples." (Docs. 97-4, pg. 6; 97-5, pg. 6). Relatedly, it defies logic for Plaintiff to suggest Defendants, in their Response to the Motion to Quash, "sought no relief with respect to I2M Samples." (Doc. 150, pg. 7). Even if that were true, it is no saving grace, as Plaintiff sought to quash the subpoenas in their entirety and that was the relief denied by the Court. (Docs. 97, pg. 7; 110).

In the Second Amended Complaint for Damages and Abatement filed on April 24, 2023, Plaintiff purportedly referenced the 2022 soil samples for the first time, alleging:

> In mid-to-late 2022, additional soil samples were taken from 281 City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant and analyzed using EPA Method 1668C5, a technique that quantifies individual PCB congeners in environmental samples using isotope dilution and high-resolution gas chromatography/high-resolution mass spectrometry. This testing and analysis confirmed that East St. Louis properties are grossly contaminated with Monsanto PCBs the average concentration was 1,431 ppb and the highest detected concentration was 22,686 ppb with higher concentrations detected generally downwind and closest to the Monsanto Plant. In addition, this testing confirmed that the types and concentrations of PCBs present in East St. Louis properties pose a substantial risk to human health and safety.

(Doc. 129, pg. 6).

One month later, on May 25, 2023, Plaintiff allegedly produced reports related to the 2022 soil samples to Defendants. (Doc. 153, pg. 5). However, according to Defendants, Plaintiff "redacted the identity of the entities involved." (Doc. 153, pg. 5). Due to missed redactions, though, Defendants indicate they were able to subpoena the third-party entities, namely, Alpha Analytical and Cape Fear Analytical, LLC, on July 20, 2023. (Doc. 153-6). The subpoenas, like the prior subpoenas to I2M Associates, LLC, and ALS Environmental, requested "[a]ny and all records, documents, emails, photographs, protocols, samples, or data" in the first sentence of Exhibit A. (Doc. 153-6, pg. 8). The subpoenas also requested "[c]opies of instrumental output (chromatographs, mass spectra, etc.) for analyses in question, including…Samples." (Doc. 153-6, pg. 8). As with the prior subpoenas, Plaintiff cannot argue Defendants failed to seek the physical

samples. Unbeknownst to Defendants, however, the 2022 soil samples were destroyed on July 18, 2023, two days before the subpoenas were issued. (Doc. 153, pg. 5).

On October 16, 2023, in their Fifth Set of Requests for Production, Defendants sought, *inter alia*, "[a]ll samples from any media…including all residual sampling material, from any sampling performed by YOU or on YOUR behalf for purposes of determining the presence and/or concentration of PCBs…whether or not the samples were analyzed, and whether or not the analytical results were reported." (Doc. 148-6, pg. 5). They also specifically sought "[a]ll samples, including all residual sampling material from each of the '203 soil samples…taken from City-owned lots and rights-of-way located to the north and northwest of the Monsanto Plant' in 2020." (Doc. 148-6, pg. 5). Defendants also expressly sought "[a]ll samples, including all residual sampling material from each of the soil samples taken from '281 City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant' in 2022." (Doc. 148-6, pg. 5).

In its Amended Initial Disclosures under Rule 26(a)(1), dated October 31, 2023, Plaintiff removed the individuals, documents, and information or tangible evidence related to the entities that collected and analyzed the 2020 soil samples, namely, I2M Associates, LLC, and ALS Environmental, that were previously disclosed as supportive of its claims. (Docs. 148-1, pgs. 2-4; 148-5). Defendants maintain that Plaintiff disavowed all reliance on and relevance of the evidence related to the 2020 soil samples by stating: "To the extent East St. Louis previously listed [ESTL0000000001-0000001360] as documents it may use to support its claims in this matter, it now states that these

17

documents will not be used in support of its claims nor as reliance materials supporting any expert witness testimony or report in this matter." (Doc. 148-5, pg. 5).

As to the 2022 soil samples, the Amended Initial Disclosures stated:

> The following are entities with persons with knowledge: [an as yet unidentified environmental company and two analytical companies which generated and then analyzed the 2022 ESTL soil sampling]. There are as yet unidentified persons with knowledge from the environmental company and two analytical companies who are agents of ESTL FRCP 26 retained testifying experts. Their identities will be disclosed on or before the current Scheduling Order deadline of February 16, 2024. In the meantime, ESTL has produced the 2022 soil sampling data to defense counsel.

(Doc. 148-5, pg. 4).

Also on October 31, 2023, in its Responses to Defendants' Fifth Requests for Productions of Documents, Plaintiff stated it "has no tangible things responsive to the[] Request[s] as of this date. The 2020 and 2022 soil samples no longer exist." (Doc. 148-7).

Now, to be clear, these factual circumstances arguably demonstrate that Plaintiff was at least negligent and certainly at fault for the destruction of the 2020 and 2022 soil samples. If not for that negligence or fault, which seemingly could have been avoided with closer coordination between Plaintiff and the third-party professional firms that collected and analyzed the soil samples, Defendants would likely be in possession of that evidence. Regardless, the Court cannot find at present that Plaintiff acted in bad faith in relation to the destruction of those soil samples, as necessary to impose a spoliation sanction under its inherent authority. *See Fuery*, 900 F.3d at 463-64; *Trask-Morton*, 534 F.3d at 681; *Malibu Media, LLC*, 2014 WL 7366624 at *3, 5, 9; *Bracey*, 712 F.3d at 1019-20; *Boutilier*, 606 F. Supp. 3d at 865.

18

As each party appears to concede, Plaintiff is no longer relying upon the 2020 soil samples. (Docs. 148, pgs. 2, 5-6; 148-5). Plaintiff, who claims to have learned of the destruction of the 2020 and 2022 soil samples around the same time as Defendants, disclaimed evidence related to the 2020 soil samples in its Amended Initial Disclosures under Rule 26(a)(1). (Docs. 148-5; 191, pg. 27). In any event, it is not altogether clear that "[t]he entire basis of this lawsuit" has been destroyed, so as to deprive Defendants of an opportunity to examine, inspect, and test the soils that are at issue in this case. (Doc. 148, pgs. 1, 8-9). At present, there is nothing in the record to suggest that the samplings captured in 2020 or 2022 are so unique or lacking in homogeneity with still-existing soils that sampling of soils adjacent or proximate to the original samplings will not permit adequate testing. Defendants could test the soils at issue in the case as Plaintiff did in 2020 and 2022. Therefore, it remains to be seen whether the results of such soil samplings would be similar to or different from the results of the soil samplings done by Plaintiff in 2020 and 2022.  As such, the Court is not prepared to find duplications of the results of the 2020 and 2022 soil samplings are impossible due to the nature of the subsurface conditions, the impact of the weather, and other spoliation concerns, as suggested by Defendants. (Doc. 148, pg. 12). It is at least conceivable that the opposite is true.

For these reasons, Defendants' Combined Motion for Sanctions is **DENIED without prejudice**. The Court stresses, though, that any subsequent motion for sanctions should not rehash arguments addressed in this Memorandum & Order. This ruling is without prejudice only because Defendants could elect to conduct the soil sampling contemplated above and the possibility that evidence of Plaintiff's bad faith could be

revealed in discovery, which remains ongoing. On the current record, however, Defendants have failed to make that showing, as required for the requested sanctions.

### C. Defendants' Motion for a Stay
### or for an Extension of the Case Management Schedule

Defendants request that the Court stay or extend the discovery and scheduling deadlines while it considers the Combined Motion for Sanctions. (Doc. 149, pg. 1). A grant of that Combined Motion will allegedly simplify the issues and conserve resources. (Doc. 149, pgs. 4-5). Defendants also state no party will be prejudiced by such a ruling, but each party will be prejudiced by proceeding to expert discovery without knowing if the requested relief will be granted. (Doc. 149, pg. 6). Plaintiff opposes the request. (Doc. 151).

Here, in light of its ruling on the Combined Motion for Sanctions, the Court **FINDS** it is no longer necessary to grant a stay or an extension of the scheduling and discovery deadlines for the reasons articulated by Defendants. The Combined Motion for Sanctions has been denied, without prejudice, and the parties can proceed according to the Amended Scheduling and Discovery Order (Doc. 167) that was entered by agreement of the parties while the instant Motions were pending before the Court. Accordingly, the Motion for a Stay or an Extension of the Case Management Schedule is **DENIED**.

### III. CONCLUSION

For the reasons explained above, Defendants' Combined Motion for Sanctions is **DENIED without prejudice** and the Motion for a Stay or an Extension of the Case Management Schedule is **DENIED**.

**SO ORDERED.**

Dated: May 9, 2024

_____
DAVID W. DUGAN
United States District Judge