**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:21-cv-232-DWD |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHARMACIA LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. RANDALL BELL**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

- I. Dr. Bell's Calculation of "Use Effects" Damages ....................................3
- II. Dr. Bell's Calculation of "Risk Effects" Damages ....................................8
- III. Dr. Bell's Calculation of "Cost Effects" Damages ....................................11

ARGUMENT ....................................................................................................11

- II. Dr. Bell's Calculation of Damages Is Unreliable. ....................................16
  - A. Dr. Bell's St. Clair County Control Group Is Unreliable. ....................................16
  - B. Dr. Bell's Use Effects Methodology Is Unreliable. ....................................18
  - C. Dr. Bell's Risk Effects Methodology Is Unreliable. ....................................19
- III. Dr. Bell Is Not Qualified to Calculate Cost Effects. ....................................21
- IV. Dr. Bell's Calculations Are Contrary to Illinois Law. ....................................22
  - A. Illinois Law Limits Recovery. ....................................22
  - B. Illinois Law Bars Prejudgment Interest. ....................................23
- V. Dr. Bell Overcounts Parcels in His Analysis. ....................................23

CONCLUSION ....................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979*,
644 F.2d 633 (7th Cir. 1981) ....................23

*Allgood v. Gen. Motors Corp.*,
2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) ....................18, 21

*Arras v. Columbia Quarry Co.*,
367 N.E.2d 580 (Ill. App. Ct. 1977) ....................22

*Brown v. Burlington N. Santa Fe Ry. Co.*,
765 F.3d 765 (7th Cir. 2014) ....................19

*Cannon v. BP Prod. N. Am., Inc.*,
2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) ....................14

*Coin-Tainer Co., LLC v. Pap-R Prod. Co.*,
2021 WL 4125167 (S.D. Ill. Sept. 9, 2021) ....................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....................1, 12

*DeKoven v. Plaza Assocs.*,
2009 WL 901369 (N.D. Ill. Mar. 31, 2009), *aff'd*, 599 F.3d 578 (7th Cir. 2010) ....................18

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ....................21

*Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*,
602 F. Supp. 2d 928 (N.D. Ill. 2009) ....................23

*Exxon Mobil Corp. v. Albright*,
71 A.3d 30 (Md. 2013) ....................22

*Gayton v. McCoy*,
593 F.3d 610 (7th Cir. 2010) ....................21

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ....................11

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) ....................12, 13, 14, 15, 21

*Marion Healthcare, LLC v. S. Illinois Healthcare*,
2020 WL 1527771 (S.D. Ill. Mar. 31, 2020) ....................20

*McCubbin v. Subach*,
2023 WL 2605409 (Ill. App. Ct. Mar. 22, 2023)....................19

*Myers v. Illinois Cent. R. Co.*,
629 F.3d 639 (7th Cir. 2010)....................12, 14

*Player v. Motiva Enterprises, LLC*,
240 F. App'x 513 (3d Cir. 2007)....................16, 17

*Prantil v. Arkema France S.A.*,
2022 WL 1570022 (S.D. Tex. May 18, 2022)....................16, 17

*Robinson v. Davol Inc.*,
913 F.3d 690 (7th Cir. 2019)....................11

*Tagatz v. Marquette Univ.*,
861 F.2d 1040 (7th Cir. 1988)....................13

*Target Market Publishing, Inc. v. ADVO, Inc.*,
136 F.3d 1139 (7th Cir. 1998)....................18

*Tri-G, Inc. v. Burke, Bosselman & Weaver*,
856 N.E.2d 389 (Ill. 2006)....................23

*Williams v. Ill. Dep't of Corr.*,
2023 WL 1472246 (S.D. Ill. Feb. 2, 2023)....................21

*Williams-Bowman Rubber Co. v. Indus. Maint., Welding & Machining Co.*,
677 F. Supp. 539 (N.D. Ill. 1987)....................22

*Wilson v. City of Chicago*,
6 F.3d 1233 (7th Cir. 1993)....................11

**Rules**

Fed. R. Evid. 702....................1, 11, 13, 21, 24

**Other Authorities**

*The Appraisal Foundation, The Uniform Standards of Appraisal Practice (USPAP)*, 2024 ed., Advisory Opinion 19 (AO-9)....................23

*City History*, East St. Louis....................14

*East St. Louis: One City's Story*, Federal Reserve Bank of St. Louis (Dec. 31, 2022)....................14

Federal Judicial Center, *Reference Manual on Scientific Evidence* 314 (3d ed. 2011)....................14

Jennifer Hamer, *Abandoned in the Heartland: Work, Family and Living in East St. Louis* (2011)....................14

*QuickFacts, East St. Louis city, Illinois*, U.S. Census Bureau....................14

Randall Bell, *Real Estate Damages* (3d. ed. 2016)....................20, 23

## INTRODUCTION

The City of East St. Louis ("City") seeks over $600 million dollars in damages on its claim that polychlorinated biphenyls ("PCBs") emitted from Monsanto's W.G. Krummrich plant contaminated the soil of 147 parcels of land owned by the City at some point since 1955. To support this astronomical figure, the City relies on the opinions of its real estate appraiser, Dr. Randall Bell. Dr. Bell's conclusions, however, are the product of untested assumptions and unreliable methodologies. They should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for the following reasons:

*First*, for purposes of his damages opinion, Dr. Bell assumes, without any investigation or testing, that widespread concern over PCBs within the Rush City and South End neighborhoods in the early 1970s caused occupants to abandon their homes that once sat on the parcels at issue. According to Dr. Bell, those parcels, which the City has owned at some point between 1955 and the present, have sat vacant and worthless since that time as a result of PCB contamination.

In reaching his threshold opinion—that PCBs were the primary reason these properties were abandoned—Dr. Bell failed to test, let alone exclude with reasonable confidence, the well-known issues that have contributed to economic decline in East St. Louis since the City's population peaked in the 1950s. He did not consider or rule out the steady decline of industrial jobs in the region, the historically dilapidated condition of the housing stock, and other alternative causes. His failure to do so is contrary to his own published methodology and runs afoul of Rule 702.

*Second*, Dr. Bell employs faulty methodologies to calculate damages. Rather than calculate the purported diminution in each parcel's value due to alleged PCB contamination (the difference in the value of each parcel without PCBs and with PCBs), he instead attempts to estimate what rent the City could have collected had each parcel been leased with a single-family home.

To do so, Dr. Bell purports to calculate what market rents for homes in the subject communities would be by looking to purportedly similar parcels located deep in the suburbs—such as Belleville and Fairview Heights. But Dr. Bell's analysis does not account for any factors that distinguish these communities, nor did Dr. Bell adjust for such differences. In other words, he borrowed rental values for properties from more expensive communities as if their values in East St. Louis would be identical. And his calculation of hypothetical lost rents for these parcels assumes that each parcel had, since the time the City acquired them, a habitable single-family home, even though the City itself demolished homes in the 1970s because they were dilapidated or condemned. Dr. Bell's analysis further fails to account for any costs the City might have incurred to construct new homes, maintain streets (that have disappeared) or other infrastructure, or modernize or remodel homes that by now would be up to seventy years old. Finally, Dr. Bell ignores admittedly relevant market data and makes unsupported assumptions about post-remediation risks.

*Third*, Dr. Bell is not qualified to opine on the costs of remediation. He merely repeats the conclusion of another expert, which is impermissible under Rule 702.

*Fourth*, Dr. Bell's calculations are contrary to Illinois law. Dr. Bell purports to compute damages as equal to the sum of (1) remediation costs, (2) lost use prior to remediation, and (3) the reduced value of the parcels. Illinois law, however, does not permit the City to collect three distinct forms of damages on top of each other. Additionally, Dr. Bell's calculations include prejudgment interest, which is unavailable in Illinois tort actions.

*Fifth*, Dr. Bell overstates the amount of damages by including all 147 parcels that the City has owned or currently owns because the alleged PCB presence on some of these parcels falls below even the City's proposed action level, and neither Dr. Bell nor the Appraisal Standards

Board regards parcels with the presence of a chemical below an action level to be "contaminated" for the purpose of assessing property damages.

This Court should therefore exclude Dr. Bell's opinions in their entirety as unreliable.

## BACKGROUND

Dr. Bell is a real estate economist and appraiser whom the City retained to provide a damages opinion on 273 vacant parcels of land in East St. Louis. Ex. 1 (Expert Report of Randall Bell ("First Report")) at 2, 23. Dr. Bell opines that the City suffered over six hundred million dollars in damages by summing three categories of damages: cost effects, use effects, and risk effects. *Id.*; Ex. 3 (Expert Report of Randall Bell - Rebuttal of JLL Report ("Third Report")) at 8, 47.[1] He claims that calculating damages by summing these components is consistent with the Uniform Standards of Professional Appraisal Practice ("USPAP"), the Appraisal Standards Board, and his interpretation (as a non-lawyer) of Illinois real estate damages law. First Report at 10, 28. His report charts these components' individual totals but does not explain how they should be added together. *Id.* at 68.

### I. Dr. Bell's Calculation of "Use Effects" Damages

According to Dr. Bell, "use effects" reflect the "opportunity cost that the subject property could have enjoyed but for the detrimental condition." First Report at 36. Dr. Bell assumes that alleged PCB contamination of the parcels caused them to be vacant. He then purports to calculate use effects for the relevant parcels by estimating what the City hypothetically could have earned by renting each of the parcels out at what he claims is market value.

**Causation.** Dr. Bell opines that PCBs are a "detrimental condition," First Report at 36,

[1] Dr. Bell previously calculated more than three billion dollars in damages for a fourth category, ordinance violation fines, which are not available following the Court's order dismissing Count II. Dkt. 171 at 18; Ex. 4 (Deposition of Randall Bell ("Dep.")) 177:1-9.

and that Monsanto "actually occupied and used the subject properties for the storage of PCBs," Third Report at 17. Dr. Bell therefore claims "use effects" damages are warranted based on: (1) his observation that, at one time or another, almost all of the now-vacant parcels had a single-family home on them, Dep. 172:8-13; and (2) the assumption that the parcels are blighted because of PCB contamination, First Report at 63.

Dr. Bell believes it is "pretty clear" and "self-evident" that PCBs caused the parcels to become vacant because, in his telling, "there is a clear connection between the PCBs and the fact that they're being produced, the fact that the government banned their production, right across the street from the neighbors and the neighborhood where people left." Dep. 130:6-14. Dr. Bell claims this causal assumption is "straightforward" because "literature … supports the idea that people avoid" environmental risk, and therefore, an "exodus" occurred. *Id.* at 50:24, 125:23-126:7.

But Dr. Bell did not consider possible alternative explanations for why the parcels in East St. Louis are now vacant, even though he concedes that the scientific method requires "development of tests designed to falsify the null hypothesis" and that it "would not be the scientific method" to simply ignore data that could test the null hypothesis. Dep. 126:15-18, 127:13-128:1.[2] He did not consider "factors such as decline in employment, the level of funding in local schools, [and] levels of crime over time," because in his view, "[t]here is really no need to." *Id.* at 130:24-131:21. He did not attempt to speak to former residents to understand why people left the neighborhood. *Id.* at 140:4-12. Nor did he conduct any individual surveys to determine the area's awareness of and attitudes toward PCBs. *Id.* at 49:9-14. Dr. Bell also did not bother to ask any real estate appraiser about whether they identified alleged PCB contamination as

[2] When asked what he had done "to take into account … other factors that over the same period of time could have resulted in people choosing not to live in this particular area," Dr. Bell responded "[t]hat's a fair question" but did not provide any alternative causal explanation that he tested. Dep. 128:2-10.

a "detrimental condition in their appraisal reports" for properties in the subject neighborhood. *Id.* at 76:8-77:18. Dr. Bell further acknowledged that properties in East St. Louis "surrounding the subject properties" include "vacant lots," "dilapidated" properties, and "properties that were once developed that are vacant today," *id.* at 220:14-17, but he made no effort to investigate the cause of those conditions or to compare the vacancy rates of those neighborhoods outside the subject neighborhood to the vacancy rates of the subject neighborhood, *id.* at 20:10-22:25.

**Calculation.** Based on the assumption that the properties are blighted because of PCB contamination, Dr. Bell calculates use effects to equal market rent multiplied by the alleged period of impairment ("**Market Rent x Period of Time = Use Effect**"). First Report at 36.

*Market Rent.* Dr. Bell estimates the market rent for a parcel as either (1) the rent a single-family home could have generated for parcels with "historical improvements,"[3] or (2) the land rent for parcels without historical improvements. First Report at 38. To calculate market rent, Dr. Bell creates a "control" group of properties. *Id.* at 30. Dr. Bell declines to use neighborhoods bordering his subject neighborhood, including East St. Louis itself, Sauget, Alorton, and Centerville, rejecting these areas because of unspecified "contamination issues." *Id.*; Ex. 2 (Expert Rebuttal Report of Randall Bell ("Second Report")) at 7. He does not explain what "contamination issues" these areas faced, when they purportedly occurred, or whether these areas' property values are still affected by those alleged issues. First Report at 30. Dr. Bell also declines to use other areas within East St. Louis as a control group. *Id.* He explains that he uses East St. Louis as a "buffer" zone because he is uncertain how far PCB contamination has reached in the area. Dep. 242:5-12.

---

[3] Dr. Bell identifies 184 parcels as "[s]ubject [p]roperties with [h]istorical [i]mprovements," apparently referring to a parcel that at some point in time (he does not say when) had a single-family home on it. First Report at 42; Dep. 50:19-20, 172:10-12. Dr. Bell claims he identified which parcels were historically improved by examining public records and historical aerial imagery (from 1952-2017) of the parcels' surrounding neighborhood. First Report at 13 & n.27.

Instead, Dr. Bell picks the St. Clair County suburbs such as Belleville and Fairview Heights—as far as twenty miles away from the parcels—as the control group. First Report at 38-39. He selects these properties based "on visual inspection" and contends "they look comparable" to "what would be a typical home on these … now vacant sites" and "[t]his, to [him], seemed like a very fair way of establishing a rental rate for a home in East St. Louis of that size." Dep. 181:3-9, 184:16-18. But when asked what a typical home on a parcel looked like, he said, "I don't know" and "nobody would know because their homes are demolished." *Id.* at 185:16. Dr. Bell did not step foot inside any home in either the subject neighborhood or in East St. Louis at large, nor did he attempt to learn more information from local residents because "appraisers don't do that." *Id.* at 185:13-16.

Dr. Bell takes the average of the St. Clair County control group's single-family home rent to arrive at a rate of $1,400/month. First Report at 38. He assigns this value to each "historically improved" parcel. *Id.* at 42. For parcels that have never been improved (*i.e.*, there is no record that a home was ever built on the property), Dr. Bell assigns a market rent of $233.33/month. *Id.* at 11. Dr. Bell calculates this by taking 7% (a figure he asserts is within the "genera[l] rang[e]" of "ground lease data") of $40,000, what he claims to be the average value of a lot of land sold in the St. Clair County control group area. *Id.*

*Time*. For the second half of his use effects equation, Dr. Bell initially set a time period of 54 years from July 1, 1973 (what he calls the start of the "ordinance violation") to February 1, 2027 (the date Dr. Bell anticipated trial would start, plus two additional years for assumed remediation efforts commencing at the end of trial). First Report at 40. After this Court dismissed the "ordinance violation" damages claimed in Dr. Bell's first report, Dkt. 171 at 18, private plaintiffs' counsel for the City gave Dr. Bell "a directive" to augment his loss-of-use damages calculation by

expanding the timeframe to date back to 1955. Ex. 5 (Rebuttal Deposition of Randall Bell ("Rebuttal Dep.")) 25:22-26:24; 35:21-36:9. Based on that directive, Dr. Bell now calculates use effects for the period from December 1, 1955 to June 31, 2027 (a revised end date Dr. Bell does not explain). Third Report at 5-6, 47-48.[4]

*Adjustments*. After calculating "market rent" and "time," Dr. Bell makes two adjustments to his estimate, one for inflation and the other for interest. To account for the fact that the market values he calculates are in present dollars, he looks to the Consumer Price Index ("CPI") associated with each year going backward in time to 1955 and adjusts these artificially constructed past market rents downward for each year in proportion to the CPI. First Report at 41-42. With respect to interest, Dr. Bell applies a 9% annual rate based on the reasoning that the City would have invested the entirety of its purported lost rental income in an S&P 500 index fund, and Dr. Bell multiplies this interest rate by the City's purported rental income each year and compounds it over 72 years. *Id.* at 41; Third Report at 8.

*Application to Parcels*. Dr. Bell originally conducted a use effects analysis for all 273 parcels, which he then claimed "have all been owned by the City … for at least one point in time since 1973." First Report at 27; *see* Dep. 52:25-53:1. But Dr. Bell reduced the number of parcels to which he applied his use effects analysis after evidence in the case revealed that the City never owned many of the parcels at issue.[5] Dr. Bell now purports to apply his use effects analysis to 147 parcels, *i.e.* the subset of the 273 parcels that were actually owned at some point by the City "during the years in which title was held by the" City. Third Report at 5, 47-48.[6]

[4] Dr. Bell's new damages opinion is subject to a pending motion to strike. Dkt. No. 242.
[5] Among other things, discovery revealed that the purported assignment from the St. Clair County Trustee to the City was null and void. *See* Ex. 6 (Gomric Opinion Letter).
[6] These parcels are listed in the Appendix attached to Defendants' Motion for Summary Judgment on Plaintiffs' Claims and Memorandum in Support ("Appendix to Defs.' MSJ") filed concurrently herewith.

*Result*. Dr. Bell calculates $602,999,849 in alleged use effects. Third Report at 47-48.

## II. Dr. Bell's Calculation of "Risk Effects" Damages

Dr. Bell defines "risk effects" as "the difference in market value before and after a detrimental condition (or with and without)." First Report at 9. According to Dr. Bell, risk effects capture "the market's perception of increased risk" such as stigma associated with a contaminated property. *Id.* at 43, 67. To calculate risk effects for the relevant parcels, Dr. Bell purports to estimate the market value for the properties if they had not been contaminated by looking to the same St. Clair County control group and assigning a percentage loss of the value of the property as a result of contamination. Dr. Bell then calculates two types of risk effects damages: "as-is unrepaired risk effects" and "as-if repaired risk effects." *Id.* at 67.

**Control Group.** Dr. Bell again sets a control group for risk effects using properties in the St. Clair County suburbs Belleville and Fairview Heights, which he characterizes as in "close proximity" to East St. Louis but actually "less desirable" because they are a longer commute to St. Louis. Dep. 147:10-12. Based on the St. Clair County control group Dr. Bell assigns a market value of $140,000 to each parcel that he identified had a house on it at some point in time after December 1, 1955 (the so-called "historically improved" parcels) and $40,000 to each nonimproved parcel. First Report at 63; Third Report at 5-6.

Dr. Bell does not make "any adjustments whatsoever" to the market value, absent alleged contamination, for potential differences between the St. Clair County control group and the parcels. Dep. 145:8-13. Nor did he ask any local real estate appraisers or professionals whether the control group properties are comparable to properties in East St. Louis or the subject neighborhood. *Id.* at 146:16-22. Dr. Bell agrees factors like quality of school systems, access to amenities, quality of neighborhood, crime statistics, levels of city services, unemployment rate,

and presence of curbs, gutters, and sidewalks could all affect property values. *Id.* at 147:1-8. Yet, he takes none of these factors into account when comparing the parcels and the St. Clair County control group. *Id.* at 204:1-205:16.

**Risk Effects As A Percentage.** To estimate purported loss in market value resulting from alleged contamination, Dr. Bell turns to what he terms "literature review" and "case studies" to evaluate the degree of risk effects as a percentage. First Report at 44-62. According to Dr. Bell's interpretation of the articles he reviewed, risk effects ranged from negative 30% to negative 95% in two articles and negative 25% to negative 100% in a third article. *Id.* at 45-47. Dr. Bell then turns to "case studies," where he reports risk effects of negative 27% to negative 39% in one study, negative 15% to negative 60% in another study, and negative 100% in several studies. *Id.* at 55-58.[7]

Based on these materials, Dr. Bell concludes that properties impacted by environmental conditions "incur risk effects up to -100%." First Report at 67. Without any analysis, Dr. Bell then concludes: "the indicated risk effects for the subject properties in this case are -100%." *Id.* In other words, Dr. Bell opines that a contaminated property is a total "loss" and worth $0. Dep. 233:15-16. When confronted, Dr. Bell admitted "[a] hundred percent loss … sound[s] extreme." Dep. 233:16-19. Nonetheless, he claimed that his "case studies" and "literature" "all tell[] a consistent story": "exactly what you see here in East St. Louis, where the number of the properties and certainly all of the subject properties are vacant." *Id.* at 129:19-130:3. He renders these "100% loss" opinions without taking into account the fact that *over a hundred homes* in the subject neighborhood have sold in the past two decades and that dozens of them are new construction. *See*

[7] Dr. Bell also reviews literature on dioxin (a different chemical that is supposedly "in a close family" with PCBs, First Report at 4), none of which found risk effects of negative 100%. *Id.* at 51-52.

Ex. 7 (JLL Expert Rebuttal Report) at 65-69.

**Calculating "As-Is Unrepaired Risk Effects."** Dr. Bell sorts his risk effects into two subcategories. For "as-is unrepaired risk effects," Dr. Bell multiplies $140,000 (reflecting an alleged 100% loss of value in historically improved parcels) by 184 (the number of historically improved parcels the City maintained it owned as of the date of his initial report). First Report at 68. He then adds this figure to the total of $40,000 (reflecting an alleged 100% loss of value in unimproved parcels) multiplied by 38 (the number of unimproved properties as of the date of his initial report). *Id.* Using that calculation, Dr. Bell estimated $27,280,000 in damages for "as-is unrepaired risk effects." Dr. Bell's most recent report—while now recognizing that the City does not own all 273 properties—is silent on Dr. Bell's "as-is unrepaired" risk effects estimate. *See* Third Report at 5, 8-9. It is unclear from his most recent report whether Plaintiffs continue to seek damages under this theory.

**Calculating "As-If Repaired Risk Effects."** In his successive reports, Dr. Bell offers competing opinions on what he terms "as-if repaired risk effects." While Dr. Bell does not define this term, he suggests in his first report that the value of the parcels may be impaired even after remediation because of lingering stigma from historical contamination. First Report at 67. In that report, Dr. Bell calculates "as-if repaired risk effects" by multiplying $40,000 by 222, and then subtracts that total from $27,280,000 (the "as-is unrepaired risk effects"). *Id.* This results in a damages calculation of $18,400,000 for "as-if repaired risk effects." Dr. Bell's original report does not explain the reasoning behind this calculation. *Id.*

It now appears that Dr. Bell has disclaimed the theory underpinning this damages calculation. In his latest report, Dr. Bell suggests that "as-if repaired risk effects" would be "0% because they assume that full remediation has been carried out, and the 'stigma' therefore has been

removed." Third Report at 9 ("Cleaning up the PCBs … eliminates the Risk Effect.").

To the extent Dr. Bell has not abandoned his theory of "as-if repaired risk effects," Dr. Bell also does not explain how "as-is unrepaired risk effects" and "as-if repaired risk effects" interact with each other or which one should be included in his total damages calculation.

### III. Dr. Bell's Calculation of "Cost Effects" Damages

According to Dr. Bell, cost effects represent "costs to remediate a contaminated property." First Report at 33. USPAP guidance states "[t]hese costs are usually estimated by someone other than the appraiser" such as "outside sources and other professional experts." *Id.* Dr. Bell does not calculate cost effects; instead, he relies on the report of another of the City's experts, Kevin Coghlan, who calculates a purported $22,285,792 in remediation costs. *Id.* Dr. Bell assumes PCB testing of parcels described in Coghlan's report was "accurate and correct." *Id.* at 21.[8]

## ARGUMENT

Rule 702 calls on district courts to serve as "vigorous gatekeeper[s]" of expert testimony to ensure its reliability. *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993). Rule 702(a) requires the proponent to demonstrate it is more likely than not that the proposed testimony (a) is based on "scientific, technical, or other specialized knowledge" that will help the trier of fact "understand the evidence" or "determine a fact in issue"; (b) is "based on sufficient facts or data"; (c) is "the product of reliable principles and methods"; and (d) reflects a "reliable application" of those principles and methods "to the facts of the case." Fed. R. Evid. 702. A reviewing court should exclude testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[8] Coghlan's opinions regarding parcel sampling and remediation costs are the subject of a separate motion to exclude.

Here, Dr. Bell's opinion testimony is inadmissible under Rule 702 and *Daubert* because Dr. Bell failed to test causation, uses an unreliable control group, is not qualified to provide opinions regarding remediation costs, uses unsound methodologies, and overcounts the number of parcels in his analysis.

**I. Dr. Bell Failed to Test Causation.**

"[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593. The Supreme Court has underscored that the "scientific methodology today is based on generating hypotheses and ***testing them to see if they can be falsified***; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id.* (citation omitted) (emphasis added); *see also* Dep. 126:15-18 (admitting that scientific method "requires the development of tests designed to falsify the null hypothesis"). Dr. Bell's analysis is unreliable because he assumed—without any testing—that PCB contamination ***caused*** the City's parcels to lose value.

The Seventh Circuit has consistently found that speculative testimony regarding causation warrants exclusion. In *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639 (7th Cir. 2010), for example, the plaintiff sued his former employer for injuries allegedly resulting from years of labor in a physically demanding job. *Id.* at 640. The plaintiff's experts opined that the company's failure to provide the plaintiff with a reasonably safe workplace caused his physical injuries. *Id.* at 640-41. The district court excluded the testimony, and the Seventh Circuit affirmed, explaining the experts' opinions were unreliable because "they did not rule in any causes of [the plaintiff's] ailment, nor did they rule out anything." *Id.* at 644. Their opinions impermissibly offered merely "a hunch or an informed guess" that the plaintiff's working conditions caused his injuries. *Id.* at 645.

Similarly, in *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017), the

plaintiff brought a lawsuit against manufacturers for allegedly causing a house fire by producing a defective battery that short-circuited. *Id.* at 775. The plaintiff's expert concluded a manufacturing defect in the battery caused the fire. *Id.* at 777. The district court excluded the testimony, and the Seventh Circuit affirmed, reasoning that the expert's conclusion—"because several manufacturing processes *can* cause an internal short circuit, such must have occurred here"—was "simply too speculative to pass muster under *Daubert* and Rule 702." *Id.* at 787-88 (quotation marks omitted) (emphasis in original). The expert's opinion was also unreliable because he "failed to account for other possible explanations in arriving at his conclusion." *Id.* at 787.

Here, Dr. Bell's opinion on causation suffers from the same fatal flaws. *First*, Dr. Bell did not adequately test his hypothesis that PCBs caused the parcels to lose value. He contends there is a "clear connection" between PCBs and people leaving the neighborhood but: (1) this alleged "connection" is based entirely on assumption, not investigation; and (2) he does not explain why this "connection" indicates causation. Dep. 130:6-14. *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988) ("Correlation is not causation."). He also claims "[t]here are numerous case studies of neighborhoods that have been abandoned and demolished" due to environmental contaminants such as PCBs. First Report at 13. Assuming for the sake of argument that those studies show PCBs "*can* cause" people to leave a community, they do not establish this "must have occurred here." *Gopalratnam*, 877 F.3d at 788 (emphasis in original).

*Second*, Dr. Bell did not test *any* alternative causal explanations to rule them out. Dep. 128:2-10. Despite agreeing that the area "*surrounding* the subject properties" also includes "vacant lots," "dilapidated" properties, and "properties that were once developed that are vacant today," Dr. Bell did not attempt to determine the cause. *Id.* at 220:14-17 (emphasis added). Like

the experts in *Myers*, Dr. Bell's causal theory may "seem[] natural" to him or comport with his "common sense," but it reflects nothing more than "a hunch or an informed guess" because Dr. Bell did not "rule out any potential causes." *Myers*, 629 F.3d at 644-45 (quotation marks omitted); *see Gopalratnam*, 877 F.3d at 787; *Cannon v. BP Prod. N. Am., Inc.*, 2013 WL 5514284, at *10 (S.D. Tex. Sept. 30, 2013) ("failure to include a major explanatory variable … may cause an included variable to be credited with an effect that actually is caused by the excluded variable" (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 314 (3d ed. 2011)).

One obvious alternative causal explanation Dr. Bell ignored is that the City's rapid industrial decline—including business closure and the abandonment of railways—caused people to leave the area. *See* Jennifer Hamer, *Abandoned in the Heartland: Work, Family and Living in East St. Louis* 45 (2011) ("In 1959, Armour Company relocated, and fourteen hundred jobs were lost. Between 1950 and 1964, eight other major industries and employers … left the area …. Fifty-five miles of railway existed in the city, but the national trend of conversion from coal to gas as a fuel source drastically cut rail traffic."); *East St. Louis: One City's Story*, Federal Reserve Bank of St. Louis (Dec. 31, 2022), https://www.stlouisfed.org/publications/bridges/winter-20022003/east-st-louis-one-citys-story; *City History*, East St. Louis, https://www.cesl.us/246/City-History (last visited March 5, 2025) ("[T]he once heavily industrialized City has been a victim of an industrial decline and subsequent resident flight for many years."); *see also* Ex. 8 (Deposition of Michael Wagner) 81:10-83:8 (City's corporate representative acknowledging lost jobs, reduced tax revenue, and increasing unemployment and poverty as a result of industrial decline in East St. Louis). The population of East St. Louis dropped from over 80,000 people in the 1950s to under 20,000 today. *See City History*, East St. Louis, https://www.cesl.us/246/City-History (last visited March 5, 2025); *QuickFacts, East St. Louis city, Illinois*, U.S. Census Bureau,

https://www.census.gov/quickfacts/fact/table/eaststlouiscityillinois/LND110210 (last visited March 5, 2025). The City's decline began *before* alleged public awareness about the potential risks of PCBs, so population flight could not merely have been another effect of PCBs.[9] *See* Dep. 50:23-51:1, 122:16-123:6, 125:25-126:5, 128:21-22.

The deteriorating conditions of the South End neighborhood—which contains the parcels at issue—were especially apparent: a 1960 report issued by the City's planning consultants indicated that in the decade prior about 50% of the housing units in South End were *already* deemed "dilapidated" and nearly a third of housing units in that neighborhood lacked a private indoor bathroom. Dep. 19:8-13, 80:15-81:19. The authors to the same report observed that "much of this neighborhood *will require complete clearance and redevelopment*." *Id.* at 89:12-90:6 (emphasis added). Dr. Bell does not mention, much less grapple with, any of this non-PCB evidence that could explain the cause(s) of neighborhood flight.

In all events, when evaluating the admissibility of expert testimony, it is irrelevant to the *Daubert* analysis what caused neighborhood flight (whether the City's economic decline or something else); the point is Dr. Bell "failed to account for other possible explanations in arriving at his conclusion." *Gopalratnam*, 877 F.3d at 787 ("Of course, the actual explanation of how Cell A came to rest in the debris pile is irrelevant to our *Daubert* analysis.").

Dr. Bell's untested theory on causation incurably infects both his use and risks effects analysis. In both instances, Dr. Bell assumes historically improved parcels would still have had homes on them but for the PCB contamination, and accordingly assigned lost rent of $1,400 per month and property values of $140,000. Dep. 188:19-21; First Report at 38, 63. But if something

[9] That alternative explanation is also more consistent with Dr. Bell's damages calculations, which reach back to 1955, even though Dr. Bell concedes that the general public did not begin to become aware of PCBs until the 1970s. *Id.*

else (like industrial and economic decline) caused the City's improved parcels to become vacant, then regardless of the alleged PCB contamination, those parcels would *still* be vacant. Further, Dr. Bell has not undertaken any testing to reliably establish the City could have generated rent revenue with vacant parcels in an abandoned neighborhood or that the parcels were worth anything in the market. The Court should exclude Dr. Bell's use and risk effects calculations as unreliable.

## II. Dr. Bell's Calculation of Damages Is Unreliable.

Dr. Bell's damages calculations fail for independent reasons, including that his control group and use and risk effects methodologies are unreliable.

### A. Dr. Bell's St. Clair County Control Group Is Unreliable.

Bell's calculation of use and risk effects makes apples-to-oranges comparisons between the parcels and his control group. According to Dr. Bell, the "basic premise" of a valid control group is that it shares "similar" characteristics to the test group except for the characteristic being tested. First Report at 29. When an expert fails to provide sufficient information about a control group's and test group's characteristics to show that they are similar, courts routinely respond to this "fatal error" by precluding the expert's opinions based on comparisons between the two groups. *Prantil v. Arkema France S.A.*, 2022 WL 1570022, at *11 (S.D. Tex. May 18, 2022); *Player v. Motiva Enterprises, LLC*, 240 F. App'x 513 (3d Cir. 2007).

Here, Dr. Bell committed this fatal error when he selected his control group based exclusively on the alleged appearance of the properties with no attempt to compare the actual characteristics between the subject parcels and the control group. *See* Dep. 186:18-21. Dr. Bell conceded that quality of school systems, access to amenities, quality of neighborhood, crime statistics, levels of city services, unemployment rate, and the presence of curbs, gutters, and sidewalks could all affect property value—but he did not compare *any* of these factors between the parcels and the St. Clair County control group (Belleville, Fairview Heights, etc.) or make "any

adjustments" for those differences. *Id.* at 145:8-13, 147:1-8, 204:1-205:16.

The conclusions that Dr. Bell draws from his St. Clair control group are therefore as unreliable as the experts in *Prantil* and *Player*. In *Prantil*, to calculate diminution in property value allegedly caused by a chemical leak, plaintiffs' expert compared properties within the radius of the leak against a control group of properties outside the radius of the leak. 2022 WL 1570022, at *9. The court excluded plaintiffs' expert because he "d[id] not show that the Outside properties resemble the Inside properties" and "provide[d] no information on the characteristics of the control area and no comparison of characteristics between areas inside and outside of the Proposed Class Area." *Id.* at *10. Likewise, in *Player*, the Third Circuit affirmed exclusion of plaintiff's expert for using a comparator group that was insufficiently similar to the area in question to measure the effects of contamination. 240 F. App'x at 520. The Third Circuit explained that the expert "had no evidence indicating that the contamination in [the comparator group] was similar to the contamination at issue in this case." *Id.*

Dr. Bell's treatment of the control group in this case is similarly deficient. As in *Prantil* and *Player*, Dr. Bell provides "no information" or "evidence" indicating that the St. Clair County control group is similar to the parcels other than what he saw with his eyes. *Prantil*, 2022 WL 1570022, at *10; *Player*, 240 F. App'x at 520. "Without evidence that the two areas are similar, it is impossible reliably to conclude" that the parcels would have been worth the same value as the control group but for PCB contamination. *Prantil*, 2022 WL 1570022, at *10. *Prantil* recognized that "complex factors … influence home pricing trends" and "important individual variables that typically influence home values" include "age, size, condition or property uses." *Id.* at *11. Dr. Bell's "failure to control for (or even address) differences between the class and control areas" with respect to these "important individual variables" is thus "a fatal error." *Id.* Dr. Bell's opinion

based on the control group should be excluded. *See DeKoven v. Plaza Assocs.*, 2009 WL 901369, at *7 n.1 (N.D. Ill. Mar. 31, 2009) (excluding expert because of "control group problem" in expert's survey), *aff'd*, 599 F.3d 578 (7th Cir. 2010).

**B. Dr. Bell's Use Effects Methodology Is Unreliable.**

Dr. Bell's use effects analysis—in which he calculates decades worth of hypothetical lost rental income—is unreliable because: (1) it rests on implausible assumptions about lost rent and is therefore too speculative; and (2) he did not employ any reliable way of counting the period when a parcel had a hypothetical home on it.

*First*, Dr. Bell's use effects analysis is too speculative under *Daubert*. "An opinion becomes speculative when too wide an analytical gap exists between the data and the opinion provided." *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *3 (S.D. Ind. Sept. 18, 2006) (citing *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir. 1998)). Courts thus routinely exclude expert opinion regarding lost profits based on "optimistic" assumptions that are not "plausible." *Target Market Publishing*, 136 F.3d at 1144. Dr. Bell's conclusions heap optimism upon speculation: that imaginary homes on the City's parcels would be collecting imaginary rent equal to the rents of a control group twenty miles out in the St. Clair County suburbs (whose characteristics he did not compare, much less adjust for); that the City's unimproved parcels would also collect imaginary rent equal to an arbitrary percentage rate taken from land sales in the same distant control group; that the City had zero opportunities to offset its lost opportunity costs; that the City incurred no costs to maintain "the roadways, the streets, the gutters, and the home[s]," Rebuttal Dep. 226:20-227:23; and that all of this continued year after year for 72 years. Dr. Bell's assumptions are not "plausible," and therefore his calculations should be rejected as speculative. *Target Market Publishing*, 136 F.3d at 1144.

Instead of attempting to demonstrate that these hypothetical rents would have been

collected but for PCBs on the property, Dr. Bell claims that "how owners or renters used their property" is irrelevant because Monsanto "actually occupied and used the subject properties for the storage of PCBs" and that Defendants "need to pay" for "us[ing] someone else's property." Third Report at 17, 19. To the extent that Dr. Bell's opinion rests solely on a trespass theory, it cannot support his use effects analysis because—absent proof of "material damage" such as actual impairment to the use and enjoyment of the property—a trespass plaintiff may recover "only nominal damages." *McCubbin v. Subach*, 2023 WL 2605409, at *4 (Ill. App. Ct. Mar. 22, 2023).

*Second*, Dr. Bell's use effects calculation is methodologically flawed because he does not consider *when* a historically improved parcel featured the improvement. His calculations appear to assume that so long as a parcel had a historical improvement at some point in his 72-year damages period, it would have generated property rent for all 72 years (minus the years the city did not own the parcel). But that assumes the parcel had improvements on it by 1955, the starting year in Dr. Bell's 72-year period. If, for example, a parcel did not have improvements until 1990, then Dr. Bell would have improperly awarded it property rent for thirty-five additional years. Despite the potential variation and differences in parcels' dates of improvement, Dr. Bell makes no effort to ensure that he is not over-awarding rent to the City. This renders his methodology unreliable. *See Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) (affirming exclusion of plaintiff's expert because "it is impossible to put an error rate on his guesswork").

### C. Dr. Bell's Risk Effects Methodology Is Unreliable.

Based on Dr. Bell's successive reports, it appears Plaintiffs have disclaimed so-call "risk effects"—*i.e.* "the difference in market value before and after a detrimental condition (or with and without)"—as a theory supporting their damages claim. First Report at 9. In his most recent report—prepared after the City jettisoned its claims predicated on alleged contamination to 173

parcels it does not own—Dr. Bell does not calculate a revised "as-is unrepaired risk effects" damages number for the parcels now at issue. Third Report at 8. And he concedes that "as-if repaired risk effects" are zero. *Compare* First Report at 67 ($18,400,000 in "as-if repaired risk effects"), *with* Third Report at 9 (zero "as-if repaired risk effects"). But to the extent Plaintiffs still intend to pursue this theory of damages, Dr. Bell's risks effects analysis should be excluded because: (1) he ignores market data; (2) he improperly extrapolates from case studies; and (3) the "as-if repaired risk effects" analysis is speculative.

*First*, Dr. Bell's risk effects analysis suffers from a fundamental methodological flaw: he relies exclusively on what he calls "literature review" and "case studies" despite the availability of market data. This contradicts his own published advice: "[t]o understand perceptions within the real estate market, ***market data must be used to measure how the market actually reacts***." Randall Bell, *Real Estate Damages* 1 (3d. ed. 2016) (emphasis added); *accord* First Report at 116. Because Dr. Bell goes against "his own advice," his resort to so-called literature review and case studies to establish risk effects is unreliable. *See Marion Healthcare, LLC v. S. Illinois Healthcare*, 2020 WL 1527771, at *6-7 (S.D. Ill. Mar. 31, 2020) (excluding expert's opinion developed "us[ing] a model for damages he himself said was *not* the standard model" (emphasis in original)). This defect alone is fatal to Dr. Bell's risk effects calculation.

*Second*, Dr. Bell compounds the flaws in his risk effects analysis by improperly extrapolating from his case studies. Dr. Bell claims that his case studies show that properties impacted by environmental contaminants "incur risk effects ***up to*** -100%." First Report at 67 (emphasis added). The basis for this "extreme" claim, Dep. 233:16, appears to be a single article from Dr. Bell's literature review (providing a risk effects range of -25% to -100%) and a handful of cherry-picked case studies. *Id.* at 47, 55-58. Dr. Bell takes his shaky extrapolation of "up to -

100%" risk effects one step further by declaring, without any analysis, "the indicated risk effects for the subject properties in this case ***are*** -100%." *Id.* (emphasis added). Dr. Bell's leaps in logic are conclusory and unreliable, and therefore his risk effects calculation must be excluded. *See Gopalratnam*, 877 F.3d at 788 (it is "simply too speculative … under *Daubert* and Rule 702" to opine that because something "*can*" happen, it "must have occurred").

*Third*, Dr. Bell no longer contends that the "as-if repaired risk effects" analysis in his is original report is reliable. To the contrary, in his most recent report, Dr. Bell suggests that "as-if repaired risk effects" is "0%" because "[c]leaning up the PCBs … eliminates the Risk Effect." Third Report at 9. And in any event, Dr. Bell's opinions on "as-if repaired risk effects" included in his original report should be excluded because they are "sheer guesswork." *Allgood*, 2006 WL 2669337, at *36 (excluding damages expert because "there is no direct evidence about the post-remediation values of plaintiffs' properties because the remediation is not complete.").

**III. Dr. Bell Is Not Qualified to Calculate Cost Effects.**

Only "qualified" experts may testify. Fed. R. Evid. 702. The question is not whether Dr. Bell is "qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (cleaned up). Here, Dr. Bell is not qualified to conclude that cost effects are $22,285,792. Third Report at 8. The City's contamination expert, Kevin Coghlan, calculated this figure. Dep. 227:14-19. Dr. Bell, a real estate appraiser, did not perform an independent assessment of it. *Id.* at 60:3-7. To the contrary, he admitted that "a lot of [Coghlan's report] was technical and kind of over my head," and that he could not "offer environmental engineering opinions" "[i]n terms of remediation." *Id.* at 16:17-21, 57:24-58:2. Dr. Bell's cost effects opinion should therefore be excluded. *See Williams v. Ill. Dep't of Corr.*, 2023 WL 1472246, at *13 (S.D. Ill. Feb. 2, 2023) (experts cannot "parrot[] the opinions of other experts … without independent analysis"); *accord Dura Auto. Sys. of Ind., Inc.*

*v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002).

## IV. Dr. Bell's Calculations Are Contrary to Illinois Law.

Dr. Bell's calculations must also be excluded because: (1) Illinois law does not allow the City triple recovery in property damages; and (2) Illinois law prohibits prejudgment interest.

### A. Illinois Law Limits Recovery.

Dr. Bell claims that calculating damages as the sum of cost effects, use effects, and risk effects mirrors Illinois practice. But this approach misinterprets Illinois law.

Illinois law classifies real estate injuries in a "dichotomy": they are either permanent or temporary. *See Arras v. Columbia Quarry Co.*, 367 N.E.2d 580, 583-84 (Ill. App. Ct. 1977). Damages for temporary injuries are measured by cost of repair, whereas damages for permanent injuries are measured by diminution in value, that is, the difference in market value before and after the injury. *Id.* at 584; *Williams-Bowman Rubber Co. v. Indus. Maint., Welding & Machining Co.*, 677 F. Supp. 539, 544-45 (N.D. Ill. 1987). Thus, depending on the nature of the injury, the City can recover *either* the cost of repair *or* the diminution of value of its property, not both, and certainly not in conjunction with purported use effects.[10] Other jurisdictions also recognize that a single injury provides at most a single mode of recovery. *See, e.g.*, *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 92 (Md. 2013) ("Appellees may not recover twice for the same injury. Testimony by Appellees reveals that their claims for loss of use and enjoyment revolve largely around their inability to use their well water …. We fail to see, however, how the injury alleged is distinguishable from the injury constituting the diminution in value."). Dr. Bell's opinion that the City should recover three types of damages simultaneously therefore conflicts with Illinois law.

---

[10] Defendants reserve the right to argue that any damages owed to the City should be limited to diminution in value because repair of the City's parcels is impracticable. *See Williams-Bowman Rubber Co.*, 677 F. Supp. at 545 n.6.

### B. Illinois Law Bars Prejudgment Interest.

Dr. Bell applies an annual compound interest of 9% to use effects to reflect the amount that the City would have received had it (hypothetically) collected rents on the parcels and (hypothetically) invested them continuously in the S&P 500. First Report at 11; Dep. 229:25-230:3. Illinois law, however, "does not permit prejudgment interest in lawsuits based upon tort claims." *Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*, 602 F. Supp. 2d 928, 940 (N.D. Ill. 2009). According to the Illinois Supreme Court, "[i]t is well settled that interest is not recoverable absent a statute or agreement providing for it." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 412 (Ill. 2006) (citation omitted); *In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979*, 644 F.2d 633, 638 (7th Cir. 1981). This rule applies even though the injured party could have used the money during the prejudgment period. *Tri-G*, 856 N.E.2d at 412 (citation omitted). Dr. Bell's 9% interest calculation is therefore inadmissible. *See Euroholdings*, 602 F. Supp. 2d at 943 (excluding expert testimony on "any evidence concerning prejudgment interest alleged to be due").

## V. Dr. Bell Overcounts Parcels in His Analysis.

Finally, Dr. Bell's analysis is unreliable because his damages calculation includes all of the City's currently or historically owned 147 parcels despite the fact, even under the City's proposed 0.23 ppm action level standard (which Defendants contest), only 113 of those parcels contain PCB levels allegedly exceeding the 0.23 ppm threshold. *See* Appendix to Defs.' MSJ. Dr. Bell himself agrees that the presence of a chemical on a parcel does not necessarily mean that parcel is "impaired": [An environmental study] may find no contamination or concentrations that are below regulatory action limits. These are usually seen as positive findings because the property is then deemed to be unimpaired by contamination." Randall Bell, *Real Estate Damages* 230 (3d. ed. 2016); *see also The Appraisal Foundation, The Uniform Standards of Appraisal Practice*

*(USPAP)*, 2024 ed., Advisory Opinion 19 (AO-9) (defining environmental contamination where "concentrations of [hazardous substances] would exceed regulatory limits established by the appropriate federal, state, and/or local agencies."). Because Defendants are not liable as a matter of law for the City's parcels with alleged PCB contamination below the action level, Dr. Bell's calculations at least with respect to those parcels must be excluded. *See* Fed. R. Evid. 702(a); *Coin-Tainer Co., LLC v. Pap-R Prod. Co.*, 2021 WL 4125167, at *3 (S.D. Ill. Sept. 9, 2021) (Dugan, J.) (excluding expert opinion because his damages calculation incorrectly assumed that all of the plaintiff's claims would survive).

## CONCLUSION

The Court should exclude Dr. Bell's opinions under *Daubert* and Rule 702.

Dated: March 5, 2025

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

*/s/ Adam E. Miller*

Adam E. Miller (6206249)
amiller@shb.com
Tyler W. Schwettman (6333327)
tschwettman@shb.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Telephone: 314.690.0200
*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

**LATHROP GPM LLP**

*/s/ Charles R. Hobbs (by consent)*

Charles R. Hobbs II (625917)
Ron.Hobbs@lathropgpm.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, MO 63105
Telephone: 314.613.2800

*Attorneys for Defendant Solutia Inc*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 5th day of March, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Adam E. Miller*
Adam E. Miller

*Attorney for Defendants Monsanto Company and Pharmacia LLC*