**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:21-cv-232-DWD |
| | ) | |
| PHARMACIA LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' FIRST AMENDED COUNTERCLAIM, COMBINED WITH MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**


INTRODUCTION ........ 2

STATEMENT OF MATERIAL FACTS ........ 4

- I. The Sauget Plant, PCBs, And This Lawsuit ........ 4
- II. Regulatory Background ........ 6
- III. The City's Enforcement Under The Ordinances ........ 8
- IV. Procedural Background ........ 13

LEGAL STANDARD ........ 14

ARGUMENT ........ 15

- I. The Ordinances Do Not Provide Fair Notice ........ 15
  - A. Properly Construed, The Ordinances Do Not Authorize The City To Abate PCB Contamination ........ 16
  - B. To The Extent The Ordinances Can Be Construed To Apply, They Fail To Provide Fair Notice ........ 19
- II. The Ordinances, As Applied, Are Unconstitutionally Vague Because They Invite Arbitrary Enforcement. ........ 26

Pursuant to Federal Rule of Civil Procedure 56, Defendants/Counterclaim-Plaintiffs Monsanto Company, Pharmacia LLC and Solutia Inc. (collectively, "Defendants") respectfully move for summary judgment on their First Amended Counterclaim [Dkt. 179].

## INTRODUCTION

In this lawsuit, the City of East St. Louis has for the first time attempted to apply local nuisance ordinances, East St. Louis Municipal Code §§ 1-2, 50-79 and 62-2 (the "Ordinances"), to trace levels of polychlorinated biphenyls ("PCBs") on vacant properties. The Ordinances authorize certain city officials to abate certain physically offensive "nuisances" on property within the City, after giving notice to the owner of the property causing the nuisance. *E.g.*, Code § 50-79. But the City misconstrues the Ordinances to give it carte blanche to file a civil lawsuit seeking court-ordered abatement of "anything offensive or obnoxious to the health and welfare of the inhabitants of the city" (*id.* § 1-2); in so doing, the City seeks to impose novel, massive liabilities on Defendants for past conduct the City has never previously deemed or declared a nuisance.

So applied, the Ordinances are unconstitutionally vague and violate due process. As an initial matter, the City misconstrues its authority under the Ordinances, which do not purport to give the City a sweeping power to require companies to abate anything the City later deems offensive or obnoxious to health and welfare. And if such a power existed, it would be unconstitutional – at least as applied to invisible, odorless chemicals like PCBs that are imperceptible to the senses – without any notice to the public of such application. So applied, the Ordinances do not "define the offending conduct with sufficient definiteness for

ordinary people of common intelligence to understand what is prohibited." [Dkt. 223, at 9 (internal citations omitted)]. The City has not issued any public guidance to purportedly regulated parties about what concentration of PCBs (or any other imperceptible chemical) constitutes a nuisance. Indeed, the City failed to even identify an actionable threshold for PCB contamination in its complaint, instead delegating that question to its privately-retained experts in discovery. Where the City itself has not and cannot determine what concentration of PCBs constitutes a nuisance, regulated parties can hardly be faulted for failing to comply with unarticulated standards. Simply put, the Ordinances do not provide "fair warning" of any prohibited conduct in the environmentally complex realm of PCBs. *Id.*

The Ordinances also violate due process because they "invit[e] arbitrary and discriminatory enforcement," *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012) – a danger that materialized here. No person or company has *ever* faced enforcement for PCB or other alleged chemical contamination under the Ordinances. Indeed, it is undisputed that the City targeted Defendants simply because it was prompted to do so by contingency-fee plaintiffs' lawyers. Enforcement by opportunistic counsel retained on contingency removes the moderating influence ordinarily exercised by government actors and reflects textbook arbitrary enforcement.

There is no genuine issue of material fact—the Ordinances are unconstitutionally vague, as applied, as a matter of law. The Court should thus grant Defendants' Motion for Summary Judgment and enjoin the City from applying the Ordinances here.

## STATEMENT OF MATERIAL FACTS

### I. The Sauget Plant, PCBs, And This Lawsuit

1. From 1936 to 1977, the former Monsanto Company ("Old Monsanto") lawfully manufactured PCBs at its W.G. Krummrich Plant ("Sauget Plant") in Sauget, Illinois. Exhibit 1, excerpts from Kurt Herman July 9, 2024, expert report ("Herman Report"), pp. 5, 16-18.

2. PCBs are non-flammable organic chlorine compounds. Exhibit 2, excerpts from Catherine Boston July 9, 2024, expert report ("Boston Report"), pp. 8-9; Exhibit 3, excerpts from Dr. Harri Kytomaa July 9, 2024, expert report ("Kytomaa Report"), p 2. "[D]ue to a variety of beneficial chemical properties," such as low volatility, chemical stability, and nonflammability, PCBs were commercially popular and were widely used in a range of end products, including compressor lubricant, hydraulic fluid, heat transfer fluid, caulk, sealants, paints, and coatings. Exhibit 1, Herman Report, p. 5; Exhibit 3, Kytomaa Report, p. 5; Exhibit 4, excerpts from Dr. Danny Reible July 9, 2024, expert report ("Reible Report"), p 4; Exhibit 5, excerpts from Maureen Reitman July 9, 2024, expert report, pp. 5-6.

3. PCB chemical compounds are invisible to the naked eye, emit no light, and emit no noise. Exhibit 6, transcript excerpts from April 2, 2024, deposition of Michael Wagner as 30(b)(6) representative of the City ("City 30(b)(6) deposition"), 110:2 – 111:9. They do not vibrate the ground, do not cast shadows, and do not discolor the ground. *Id.* at 110:20 – 111:9. Because the presence of PCBs in the soil is imperceptible to unaided human senses, analytical testing is necessary to detect them. *Id.* at 110:2-17.

4. Monsanto ceased all production of PCBs in 1977. Exhibit 1, Herman Report, pp. 16-18; Exhibit 3, Kytomaa Report, p. 113.

5. More than four decades after Monsanto ceased PCB production, the City filed suit against Defendants on February 3, 2021, in the Circuit Court of St. Clair County, Illinois, citing Defendants for allegedly violating certain ordinances.

6. After the action was removed to this Court, the City filed a Second Amended Complaint on April 24, 2023.[1] That operative complaint alleges that Old Monsanto's manufacture of PCBs at the Sauget Plant resulted in the passive transport of PCBs to various parcels of land within the City, and that the Ordinances require, among other things, Defendants to abate (or pay for the abatement of) PCBs found in soils on City-owned property. Second Amended Complaint [Dkt. 129] ¶¶ 2, 10-11, 18-19. The City's complaint did not identify an actionable level of PCB contamination that it claimed rendered the presence of PCBs a nuisance triggering the City's purported abatement authority.

7. Although the operative complaint does not specifically identify the properties at issue, during discovery the City produced a list of 273 properties in the southern part of East St. Louis that it claims have been contaminated by Old Monsanto's operations in Sauget. Exhibit 7, excerpts from spreadsheet bates-labeled ESTL0000117963.

8. In January 2020, the City engaged counsel at the Driscoll Firm, LLC; Sanders Phillips Grossman, LLC; and Chatham & Baricevic, LLC, on a

---

[1] The City's First Amended Complaint [Dkt. 29] sought enforcement of a different slate of ordinances, namely §§ 1-15, 50-71, 50-78, 50-79, 62-2, 62-45 and 94-91.

contingency-fee basis, to pursue litigation in this matter.[2] Exhibit 8, City resolution and Contingency Fee Engagement Agreement.

9. The City's counsel raised the idea of testing the City's parcels for PCBs in 2020; the City's counsel then funded two samplings of the parcels – in 2020 and 2022 – which were conducted by outside consulting firms. Exhibit 6, City 30(b)(6) deposition, 50:23 – 53:25, 58:2 – 59:15, 59:21 – 63:12, 231:16-21. The City's counsel provided "money and … a level of expertise that the city just doesn't have"; without this, the City would have been unable to even "detec[t]" PCBs because "those are not things that are observable." *Id.* at 230:13-23.

10. The initial round of sampling in 2020 was undertaken "to help determine whether or not there was a threshold level of PCB contamination that would support a lawsuit," with testing financed "on behalf of counsel" and not involving any "city funds." Exhibit 6, City 30(b)(6) deposition, 58:2 – 59:15. The 2022 sampling likewise was funded entirely by lawyers and conducted by an outside consulting firm (*id.* at 231:16-21), Environmental Health & Engineering. Kevin Coghlan, the City's soil-sampling expert, is a principal scientist at Environmental Health & Engineering.

## II. Regulatory Background

11. Federal and state agencies regulate PCBs in different contexts. *See Learn about Polychlorinated Biphenyls*, EPA, https://www.epa.gov/pcbs/learn-

[2] The City's contingency fee agreement for this litigation was produced in discovery. The agreement was signed by John Baricevic, City Attorney and member of the firm Chatham & Baricevic, LLC. Exhibit 8. Under its terms, Mr. Baricevic and his firm would recover as a fee a portion of any sum awarded or negotiated by the City. *Id.* The agreement further retained additional outside counsel, John J. Driscoll and The Driscoll Law Firm, LLC, and Sanders Phillips Grossman, LLC. *Id.*

about-polychlorinated-biphenyls#lawsandregs (last updated Feb. 4, 2025).

12. For example, the federal Occupational Safety and Health Administration (OSHA) and Illinois OSHA mandate that "safe" levels for PCBs for an 8-hour workday over a lifetime is 1 million ng/m$^3$ for certain types of PCBs and 500,000 ng/m$^3$ for others. 29 C.F.R. § 1910.1000 Table Z-1.

13. The National Institute for Occupational Safety and Health (NIOSH) mandates that "safe" levels for PCBs for an 8-hour workday over a lifetime is 1,000 ng/m$^3$. *Polychlorinated Biphenyls (PCB's): Current Intelligence Bulletin 45*, NIOSH, tinyurl.com/4bykn5sy.

14. EPA evaluation levels for PCBs in indoor school air for teachers, staff, and students, range from 300 ng/m$^3$ to 900 ng/m$^3$ for, in the case of teachers, an entire lifetime. *PCBs in Build Materials—Questions & Answers*, EPA (July 28, 2015), https://www.epa.gov/sites/default/files/2016-03/documents/pcbs_in_building_materials_questions_and_answers.pdf.

15. The Food & Drug Administration (FDA) tolerances for PCBs in food products include 1.5 ppm in milk; 3 ppm in poultry; 0.3 ppm in eggs; and 2 ppm in fish and shellfish. 21 C.F.R. § 109.30 (1979).

16. The Toxic Substances Control Act (TSCA) also provides specific standards for the cleanup and disposal of PCB waste based on the intended use of the site and the type of PCB waste present. For instance, "[u]nder TSCA the cleanup goal for PCBs in low occupancy areas, such as vacant lots, is 25 [ppm]." Exhibit 1, Herman Report, p. 30. The City's soil-sampling expert, Kevin Coghlan, agreed that all properties at issue here are "low occupancy" under TSCA. Exhibit 9, transcript excerpts from April 23, 2024, deposition of Kevin Coghlan ("Coghlan

deposition"), 132:12-18.

17. Under the Comprehensive Environmental Response, Compensation, and Liability Act, the EPA provides "Regional Screening Levels" (RSL) that apply to all U.S. regions and are intended to provide a uniform screening standard for chemical exposure levels at Superfund sites. The presence of a chemical in excess of an RSL simply means that additional work should be undertaken to determine whether remediation is needed. Exhibit 2, Boston Report, pp. 16, 50-51. The RSL for total PCBs is 0.23 ppm; EPA has made clear that these screening levels "are not cleanup standards and should not be used as cleanup levels." Exhibit 1, Herman Report, pp. 10, 29 (quoting EPA, *Regional Screening Levels* (2023), https://www.epa.gov/risk/regional-screening-levels-rsls). The question whether remediation is needed – and, if so, what kind of remediation – depends on the chemical levels and the nature of the particular location. Exhibit 1, Herman Report, p. 29; Exhibit 4, Reible Report, p. 14; Exhibit 10, excerpts from Brian Hitchens July 9, 2024, expert report pp. 37, 49.

## III. <u>The City's Enforcement Under The Ordinances</u>

18. The City never notified Old Monsanto or Defendants of any alleged PCB contamination within the City, or that Old Monsanto's PCB processes or the PCBs created by those processes purportedly violated any ordinances, until it issued citations to Defendants in February of 2021. Exhibit 11, transcript excerpts from April 10, 2024, deposition of Michael Pierle as 30(b)(6) representative of Monsanto Company, 703:11-25.

19. The City's police chief, Kendall Perry, signed the citations issued to Defendants, but he had no experience with City Code enforcement. Exhibit 12,

transcript excerpts from March 22, 2024, deposition of Kendall Perry ("Perry deposition"), 18:6 – 22:11. Although Perry signed the citations, it was the City's lawyers who determined the citations were warranted. *Id.* at 23:6-11.

20. The City's lawyers gave Perry no information about why the citations were being issued before Perry signed his name to them. Exhibit 12, Perry deposition, 23:6-15. Perry was not aware of what PCBs were when he signed the citations issued to Defendants. *Id.* at 24:2-3.

21. The City is unaware of any guidance that the City developed on when PCBs could be considered "obnoxious to public health or comfort." Exhibit 13, transcript excerpts from March 19, 2024, fact witness deposition of Michael Wagner, 111:14 – 112:8; Exhibit 14, transcript excerpts from March 15, 2024, deposition of Jason Blackmon ("Blackmon deposition"), 35:4-22.

22. Jason Blackmon, the City's former Director of Regulatory Affairs and former Interim City Manager, testified that he was never called upon to evaluate what circumstances constituted an "obnoxious" nuisance to the public health. Exhibit 14, Blackmon deposition, 35:4-13. Ordinarily, "the code enforcers would go out when they do their tour of duty," "see things" that appeared to be nuisances, and "report back" with their "determination of what would be derelict ... what would be a nuisance." *Id.* at 35:23 – 36:24. It was within the City code enforcers' "discretion to make that determination" based on their observations. *Id.* at 36:22-24.

23. The City's current Director of Regulatory Affairs, DeJuan Byrd, testified that, when out in the field, code enforcers look for things like "open burning, trash, high vegetation ... vacant and abandoned buildings ... [and]

derelict vehicles." Exhibit 15, transcript excerpts from March 25, 2024, deposition of DeJuan Byrd ("Byrd deposition"), 61:3-9.

24. When asked whether the City provided guidelines for code enforcers to follow in identifying nuisances, Blackmon testified: "There are some in the muni code. Grass, if it was over a certain length. How many cars you can have—derelict cars you can have in your yard. So it's in the muni code, I believe." Exhibit 14, Blackmon deposition, 37:1-9.

25. When asked what the City's code enforcers were relying upon to determine what constitutes a nuisance, Byrd offered the following testimony:

> Q: Okay. When your guys are out in the field, what are they relying on to figure out what is a code violation and what isn't a code violation? Is it just some sort of training? Is it just common sense? Is it a document? What guides them in the field to make those determinations?
>
> A: Yeah, just kind of training and general knowledge, you know, just kind of training that's passed down, just what to look for. Like I guess you just spoke to that in the question, the previous question of, you another, a blatant nuisance, a blatant violation of the code, you know, trash, you know, or a derelict vehicle or, you know, the property being in disarray. And then, you know, with that being said, are you having a repeat offenders, are you having somewhat a chronic nuisance, you know, just -
>
> Q: So after they've done this for a while, is it sort of a you-know-it-when-you-see-it sort of thing?
>
> A: Yeah, I guess that's safe to say, kind of you should know it when you see it, or just I guess I'll follow you, common sense. You know, if you passing by somebody front yard and there's trash brought everywhere, you know, that's pretty much a nuisance. That's pretty much a violation.

Exhibit 15, Byrd deposition, 62:3 – 63:2.

26. There was no one within the City's government that a code enforcer or the Director of Regulatory Affairs could have gone to for assistance in evaluating whether there was an environmental condition that might pose a risk to human health. Exhibit 14, Blackmon deposition, 37:10-19.

27. The City agrees that PCBs potentially pose a threat to public health only when the PCB concentration in soil is "over a particular threshold." Exhibit 6, City 30(b)(6) deposition, 106:14 – 107:20.

28. The City Code does not contain a numeric quantification of the amount of any substance, including PCBs, that constitutes a "nuisance." A full copy of the Code is located at: https://library.municode.com/il/east_st._louis/codes/code_of_ordinances

29. Prior to this litigation, the City did not provide the level, dose, or concentration of PCBs in soils that it believes poses a threat to human health or otherwise constitutes a "nuisance" under any provision of the City Code.

30. Outside of this litigation, the City has never pursued enforcement actions under the Ordinances for the presence of substances that are imperceptible to human sight and smell. Exhibit 16, Plaintiff's Answers to Solutia's Third Interrogatories, No. 18. Thus, outside of this litigation, the City has never pursued ordinance violations for the presence of PCBs within the City or for any other alleged conduct in the context of PCBs. *Id.*

31. The City "has not proposed or passed any specific-to-PCBs ordinance, regulation, or policy at any time." Exhibit 17, Plaintiff's Second Supplemental Objections and Responses to Defendants' First Set of Requests for Production (excerpts), at RFP 33.

32. Michael Wagner, the City's 30(b)(6) representative, conceded that the City and the enforcers of the City Code have not established a level of PCB contamination threshold at which they would consider it to be a nuisance. Exhibit 6, City 30(b)(6) deposition, 108:14 – 109:20, 112:24 – 113:11.

33. One of the Ordinances the City seeks to enforce here – Code § 62-2 – is located in an Article of the City Code establishing a "health department" of the city government, which is delegated authority to enforce § 62-2. The "health department" established under this section no longer exists and has not existed for over 25 years. Exhibit 6, City 30(b)(6) deposition, 202:7-15.

34. The City has maintained that the actionable concentration of PCBs in soil may be determined only through expert testimony. The City's 30(b)(6) representative testified that "the city would rely on its experts for that information" and "rely on their experts to tell them what the thresholds are." Exhibit 6, City 30(b)(6) deposition, 106:14 – 107:20. He added: "I don't think they [*i.e.*, City officials] have an independent knowledge of what those thresholds would be." *Id.* The City further agreed it: (a) "does not have an opinion as to the concentration of PCBs in soil that post a threat to human health"; (b) is unaware of ever having such an opinion; and (c) is unaware that it ever studied the effects of PCBs on human health before this lawsuit. *Id.* at 108:12 – 109:2.

35. On February 16, 2024, the City disclosed its experts in this action and, through its expert Kevin Coghlan, opined that "remediation of PCB-impacted soil includes removal to an estimated depth of 2 feet at all parcels where the total concentration of PCB congeners exceeds 0.23 [ppm]." Exhibit 18, excerpts from Kevin Coghlan February 16, 2024, expert report ("Coghlan Report"), p. 26.

36. Coghlan testified that he selected this cleanup level based on EPA's "regional screening level for PCBs." Exhibit 9, Coghlan deposition, 109:3-20.

37. Another of the City's experts, Dr. Mitchell D. Erickson, suggested in his report that a different standard might apply: "remediation of residential soils

will require excavation of any soil contaminated above one part PCB per million parts soil … and replacement with clean soil." Exhibit 19, excerpts from Dr. Mitchell D. Erickson February 15, 2024, expert report, pp. 115-116.

38. The City's expert reports represented the first point during this litigation – more than three years after the initial complaint was filed – at which the City disclosed the level of PCB concentration it considers a nuisance and that would require remediation and thus trigger the Ordinances. Exhibit 6, City 30(b)(6) deposition, 106:14 – 107:20; Exhibit 18, Coghlan Report, p. 26.

39. Mr. Coghlan also recently testified that, despite his providing a level of PCBs that triggered abatement under the Ordinances, the City could "remediate at *any* level PCBs." Exhibit 20, transcript excerpts from February 6, 2025, second deposition of Kevin Coghlan, 38:3-9.

40. Discovery revealed "more than 100 possible sources that could have handled or released PCBs … located in the vicinity of ESTL." Exhibit 1, Herman Report, p. 39-42.

## IV. <u>Procedural Background</u>

41. The City's operative complaint – the Second Amended Complaint – alleges a public nuisance (Count I), violations of the Municipal Code (§ 50-71 (Nuisance)) (Count II), abatement under the Municipal Code (§§ 50-79 and 62-2) (Count III), a continuing trespass (Count IV), a design defect (Count V), a failure to warn and instruct (Count VI), and negligence (Count VII). [Dkt. 129].

42. Defendants moved to dismiss Count II for lack of subject-matter jurisdiction on the ground that the City was impermissibly seeking criminal penalties in federal court under a local ordinance. [Dkt. 145].

43. Defendants also filed a counterclaim under 42 U.S.C. § 1983, contending that, as applied to Defendants, the Municipal Code provisions the City sought to enforce violated due process, equal protection, the Ex Post Facto Clause, and the Excessive Fines Clause. [Dkt. 130]. Plaintiffs moved to dismiss the counterclaim.

44. In ruling on these motions to dismiss, the Court dismissed Count II of the operative complaint for lack of subject-matter jurisdiction. At the same time, the Court dismissed the counterclaim without prejudice as potentially moot, given the Court's dismissal of Count II of the Complaint. [Dkt. 171].

45. Defendants filed an Amended Counterclaim on April 2, 2024. [Dkt. 179]. The Amended Counterclaim contended that the City's application of the remaining ordinances still violated due process because the Ordinances did not provide fair notice of the alleged violations and invited arbitrary enforcement in cases like this one. [Dkt. 179].

46. The City again moved to dismiss, but this Court denied the motion. [Dkt. 223]. The Court held that Defendants' Amended Counterclaim satisfied federal pleading standards and that "Defendants may present evidence the Abatement Ordinances either fail to provide adequate notice of the proscribed behavior or invite arbitrary or discriminatory enforcement by Plaintiff." [Dkt. 223 at 11.]

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). An as-applied due-process challenge is "properly considered on a motion for summary judgment." *Mustfov v. Rice*, 663 F.Supp. 1255, 1270-71 (N.D. Ill. 1987).

## ARGUMENT

"To satisfy due process, the statute or ordinance must define the offending conduct with sufficient definiteness for ordinary people of common intelligence to understand what is prohibited, and it must do so in a manner that will not encourage arbitrary and discriminatory enforcement." [Dkt. 223 at 9]. The undisputed facts show that the Ordinances, as applied here, do neither.

### I. The Ordinances Do Not Provide Fair Notice.

To comport with due process, an ordinance must give "fair notice" of the conduct it proscribes. *Johnson v. United States*, 576 U.S. 591, 595 (2015). "It is a fundamental precept … that a [law] which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987) (citation omitted). Thus, due process is violated "if a law is so vague and devoid of standards as to leave the public unsure of what is and is not prohibited[.]" *City of Aurora v. Navar,* 210 Ill.App.3d 126, 132 (2nd Dist. 1991) (citation omitted).

Properly construed, the Ordinances do not apply to PCBs at all. But even if the Ordinances *could* be construed to cover PCBs in soil, they certainly do not provide fair notice of the level of prohibited PCB contamination or the type of conduct they forbid.

### A. <u>**Properly Construed, The Ordinances Do Not Authorize The City To Abate PCB Contamination.**</u>

The City asserts that §§ 50-79 and 62-2 of the City Code – coupled with a generic "nuisance" definition (§ 1-2) defining nuisance as "anything offensive or obnoxious to the health and welfare of the inhabitants of the city" – empowers it to abate PCB contamination on city soils at any level above 0.23 ppm, at Defendants' expense. The City has never before claimed such authority, and none exists.

The City's interpretation flouts the plain text and structure of the Ordinances. "Under Illinois law, municipal ordinances are interpreted according to the traditional rules of statutory construction." *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills,* 589 F.3d 865, 871 (7th Cir. 2009). And "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (internal quotation marks omitted). Here, both operative provisions – §§ 50-79 and 62-2 – are narrowly tailored authorizations located in carefully reticulated schemes, belying the City's effort to claim a general abatement authority over any chemical that, at some concentration, may be offensive to human health or welfare.

Section 50-79 authorizes the City to abate physically offensive nuisances when the property owner fails to do so. In particular, § 50-79 is located in an "Article" of the Code titled "Nuisances" and consisting of ten sections. The first section generally prohibits "nuisances" (§ 50-71), and the following seven sections enumerate particular nuisances, all of which are physically offensive – including

offensive, dangerous, or prejudicial premises (§ 50-72); offensive or nauseous animal pens/stables (§ 50-73); lots with standing water (§ 50-74); disposal of dead animals and other offensive matter (§ 50-75); possession of decaying animal matter (§ 50-76); depositing offal, ashes, and garbage in vaults, sinks, privies, catchbasins and cesspools (§ 50-77); and keeping or bringing into the city substances occasioning a nuisance (§ 50-78); Only after prohibiting those physically offensive nuisances does the Code authorize officials to "abat[e]" "such nuisance[s]" (§ 50-79), upon notice to the property owner and opportunity to cure (§ 50-80).

PCBs do not fall within any of the Nuisances Article's enumerated nuisances. Instead, the City claims a sweeping authority to regulate PCB contamination by coupling Section 50-79's specific authorization to abate the nuisances specified in Chapter 50, Article III with a *general* definition of "nuisance" located in Chapter 1 (§ 1-2) of the Code. Part of the Code's "General Provisions," this provision defines as a nuisance "anything obnoxious or offensive" to human health and welfare. But § 1-2 does not purport to expand the kinds of nuisances the City has the authority to abate under § 50-79. The City's contrary interpretation would render the specifically prohibited nuisances in the Nuisances Article superfluous. *See TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").[3]

[3] Where "a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions …. [t]his maxim of statutory construction, known as *expressio unius est exclusio alterius*, is based on logic and common sense. It expresses the learning of common experience that when people say

It is no answer that § 50-71 defines "nuisance" to include any nuisance "defined by or provided for in this article or other ordinances of the city." That reference to "other ordinances" may sweep in other nuisances provided for in the Code – such as § 50-31's prohibition on "loud, unnecessary or unusual noise or any noise which either annoys, disturbs, injures or endanger the comfort, repose, health, peace or safety of others within the city." But, it cannot plausibly be construed to have rendered the Nuisances Article's delineation of specific nuisances pointless by incorporating an unbounded, catchall definition that (according to the City) purports to cover imperceptible nuisances. It is well-established that "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932).

Section 62-2 – the other ordinance the City claims empowers it to pursue abatement at Defendants' expense – is similar. That provision is part of Chapter 62 ("Health and Sanitation") of the Code, which established the health department and specifically empowered it to regulate the health-related nuisances specifically described in the following articles of Chapter 62. Those include "Dead Animals" (Article III), "Rat Control" (Article IV), and "Food Establishments" (Article V) – not PCBs. Today, the health department no longer even exists; it has been gone since the 1990s. See Statement of Material Facts ("SMF") 33.

---

one thing they do not mean something else." *Anderson v. America General Life Ins. Co.*, 19 F.Supp.3d 785, 790 (N.D. Ill. 2013) (internal citations and quotations omitted).

In short, the City does not have the general power it claims to abate "anything" it deems "offensive or obnoxious" to human health or welfare.[4]

**B. <u>To The Extent The Ordinances Can Be Construed To Apply, They Fail To Provide Fair Notice.</u>**

To the extent the Ordinances can be construed empower the City to require abatement of any condition it deems "offensive or obnoxious" to public health, the City's effort to apply such a general power to alleged PCB soil contamination, for the first time in this lawsuit, violates due process. As applied to PCBs, the "term[s]" of the Ordinances offer Defendants no fair notice and simply "d[o] not identify what nuisances" they prohibit. *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012). That is so for three reasons.

*First*, the adjectives "offensive" and "obnoxious," as used in the context of Code § 1-2, offer no "ascertainable standard" or "core" of meaning (*i.e.*, a central, clearly understood core that is not disputed) relevant to trace levels of PCBs in soil. *Smith v. Goguen,* 415 U.S. 566, 578 (1974) (finding statute prohibiting "publicly treat[ing] contemptuously the flag of the United States" void for vagueness); *see Lifchez v. Hartigan,* 735 F.Supp. 1361, 1366 (N.D. Ill. 1990). The City has never disputed that the mere *presence* of PCBs in soil is not "offensive or obnoxious" to public health – it agrees the Ordinances apply to PCBs only when they are present at levels "*above the dose* sufficient to cause health effects." [Dkt. 189, at 19] (emphasis added). But the Ordinances do not specify that "dose." Nor has the City issued other guidance or even alleged, in its complaints, a threshold concentration

[4] For reasons explained in Defendants' Motion for Summary Judgment, the Ordinances also do not authorize civil actions like the City's.

of PCBs that would implicate the Ordinances. The City first disclosed the thresholds at which it would argue that PCB contamination purportedly constitutes a nuisance three years after it filed its initial complaint, based on expert reports. SMF 6, 29, 32, 34, 35, 38. In short, the City has maintained that PCBs become offensive or obnoxious to health when they pass some unascertainable level left to the after-the-fact, subjective determinations of City officials and their private lawyers and litigation experts.

Regulated parties can hardly be faulted for not knowing the relevant threshold when the City itself has pleaded ignorance. The City's 30(b)(6) representative, Michael Wagner, acknowledged the City never determined a PCB threshold that would constitute a nuisance prior to, or separate from, consultation with experts hired for this litigation; he testified that City officials "would rely on their experts to tell them what the thresholds are. I don't think they [*i.e.*, City officials] have an independent knowledge of what those thresholds would be." SMF 34. Wagner further agreed that "the [C]ity does not have an opinion as to the concentration of PCBs in soil that post a threat to human health," that he was unaware of the City "ever" having such an opinion, and that he was unaware of the City ever studying the effects of PCBs on human health before this lawsuit. SMF 34.

Courts routinely find due process violations under such circumstances. In *Bell*, for instance, the Seventh Circuit held an ordinance prohibiting acts likely to cause "annoyance" was unconstitutionally vague. Such a prohibition, the court explained, "predicates penalty on an inscrutable standard, which is no standard at all." 697 F.3d at 462. Because "reasonable people may disagree about what

actions evoke" annoyance, "individuals of common intelligence must necessarily guess at what it means to annoy," flouting the demands of due process. *Id.*; *see Coates v. City of Cincinnati*, 402 U.S. 611, 612-15 (1971) (finding ordinance prohibiting "annoying conduct" unconstitutionally vague).

So too here. The adjectives "obnoxious" and "offensive," when modifying "health" and "welfare," and when applied to PCBs in soil, offer no more definitive standard than "annoying." Simply put, "those to be regulated by [the law] are entitled to far more certainty than is now provided by the City's [] ordinance." *Coates*, 402 U.S. at 614.

*Second*, the Ordinances likewise "fai[l] to supply adequate guidelines to the administrative body which must enforce it." *Goguen*, 415 U.S. at 574 (requiring "minimal guidelines to govern law enforcement"); *Navar*, 210 Ill.App.3d at 132. Because PCBs cannot be detected by the senses, analytical testing and scientific instrumentation is necessary to reveal them. SMF 3. The use, disposal, and clean-up of PCBs are extensively regulated by both federal and state entities. SMF 11-17. These PCB regulations are crafted with objective tolerances, screening levels, and/or exposure limits that serve as benchmarks against which samples and measurements can be compared. *Id.* PCBs implicate complex environmental issues requiring exacting regulatory standards – ones that differ from one context to another. *See Granite City Div. of Nat. Steel Co. v. Illinois Pollution Control Bd.*, 155 Ill.2d 149 (1993) (addressing the validity of detailed water quality standards promulgated by the Illinois Pollution Control Board).

Against this backdrop of complex, extensive and varied federal and state regulatory schemes, the City cannot credibly argue that the generic, catchall

definition of "nuisance" in its Code, alone, is sufficiently specific to govern the enforcement discretion of City officials. That argument is particularly implausible in light of the City's concession that PCBs pose a threat to public health only when the PCB concentration in soil is "*over a particular threshold.*" SMF 27, 34. Again, the Ordinances do not address the question of threshold, nor do they address the type of exposure, length of exposure, location, or other circumstances relevant to determining what concentration of PCBs in soil may constitute a nuisance. The blunderbuss terms "offensive" and "obnoxious" are no substitute for the highly reticulated regulation that typically governs allowable PCB levels.

Rather than apply ascertainable standards to PCBs, the City's expert has testified that the City could use (and has used) *any* standard to deem PCBs a nuisance. SMF 39. Further, it is undisputed that the City's code enforcers simply used "general knowledge" and "common sense" observations to determine what is, and what is not, a nuisance, and were trained to look for "blatant" nuisances on a "you-know-it-when-you-see-it" basis. SMF 21-26. Code enforcers had unfettered discretion to determine whether something constitutes a "nuisance," and there was no one within City government to turn to for more specific guidance. *Id.* Interpretation is impermissibly left to the discretion of City officials or enforcement officers. *See Mosley v. City of Wickliffe*, 2015 WL 9304733, at *3-4 (N.D. Ohio 2015) (ordinance was unconstitutionally vague where it allowed "the Mayor [to] ascertain[] that *in his opinion* a nuisance affecting or endangering the public health or welfare exist[ed] on any premises"). Nor has the City ever before enforced the Ordinances in the PCB context, and the City has not pointed to any comparable actions, administrative guidelines, regulations, or Illinois court decisions (and

Defendants have found none) identifying a specific standard for what constitutes a concentration of PCBs that is "offensive or obnoxious" to health and welfare under the Ordinances. SMF 28-32.

As this litigation proceeded, the City's lawyers finally announced their view of an actionable threshold – 0.23 ppm, a standard they derived from experts hired for this litigation. SMF 35. But that newly-minted enforcement threshold only underscores the fundamental fairness concerns with the government "announc[ing] its interpretations for the first time in an enforcement proceeding." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012). Even the City's own experts do not agree on a single standard. SMF 35-37. And the EPA has emphasized that regional screening levels – from which the City's counsel derived the 0.23 ppm standard – should *not* be used as a cleanup level. SMF 17. "If the experts cannot agree, it is beyond comprehension that the ordinary citizen" could be held liable "for failing to understand" what was purportedly required. *Queenwood E. Sheltered Care Home, Ltd. v. Vill. of Morton*, 94 Ill.App.3d 51, 55 (1981).

*Third*, the lack of certainty is exacerbated by the fact that the City is relying on a new definition of nuisance that is not "commonly understood." *Navar*, 210 Ill.App.3d at 133. Common-law nuisance covers "something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable." *Id.* (quoting *Rosehill Cemetery Co. v. City of Chicago*, 352 Ill. 11, 30, (1933)); *Schweihs v. Chase Home Finance*, 2015 IL App (1st) 140683 (2015) at ¶ 40 (similar); *Avery v. GRI Fox Run, LLC,* 2020 IL App (2d) 190382 (2020) at ¶ 44 (a nuisance is "something perceptible to" and "offensive" to the senses). A person seeking to

conform behavior to a statutory prohibition on nuisance would naturally rely on that background, accepted meaning of nuisance. But as applied by the City, the Ordinances cover purported nuisances that are *not* "physically" offensive – rendering any reliance on traditional understandings misplaced.

The Illinois Appellate Court's decision in *Navar* is illustrative. There, the court enjoined a city ordinance stipulating that "[a]ny commercial activity audible from adjacent premises, or conducted out-of-doors, after 9 p.m. is declared a nuisance." 210 Ill.App.3d at 131. The ordinance did not "define or delineate any sort of measurement as to when commercial activity is or becomes 'audible.'" *Id.* at 132. The court held that this lack of guidance rendered the ordinance void for vagueness. *Id.* at 134. In so holding, the court underscored that vagueness concerns were compounded by the ordinance's departure from the common-law definition of nuisance: Many noises created by businesses after 9 p.m. – such as the harmless sounds of trucks driving on roads or customers walking to their cars in a parking lot – clearly would not qualify as common-law nuisances. *Id* at 133-34.

The same reasoning applies here. The Ordinances not only fail to define when trace levels of an invisible, imperceptible chemical in the soil cross the line to "offensive" or "obnoxious" to health but, as applied here, starkly depart from the common-law definition by encompassing imperceptible nuisances. Decoupling the Ordinances from the common law to cover any imperceptible activity that the City deems "offensive" or "obnoxious" to health and welfare could have profound, unintended consequences. The Ordinances certainly do not give fair notice that they apply so broadly.

The Eighth Circuit's recent decision in *Sanimax USA, LLC v. City of South St. Paul,* 95 F.4th 551 (8th Cir. 2024) (cited at Dkt. 223, at 11-12 & n.4), is not to the contrary. Although the ordinance in *Saminax* pertained to "offensive" or "obnoxious" odors, it raised none of the red flags present here. The limitation to "odors" provided the ordinance with a fundamental, ascertainable core of meaning. Further, "odors" is a traditionaal nuisance; and, while the terms "obnoxious" and "offensive" were not defined there, they "were widely used in traditional nuisance statutes and were well understood" in the context of defining foul odors. [Dkt. 223 at 12 n.4]. The terms, in other words, were "narrow[ed]" by context and "settled legal meanings." 95 F.4th at 570. Here, by contrast, neither the City Code, nor any statutory definitions, secondary sources, regulations, regulatory history, or other narrowing context exists to inform ordinary persons that trace levels of PCBs in soil are "offensive" or "obnoxious" to health or welfare and thus proscribed under the Ordinances.[5]

The defendant in *Saminax*, moreover, operated an animal-rendering plant, had "received 20 administrative citations," and had "been the subject of numerous odor complaints lodged by disgruntled residents" before the relevant citations were issued. *Id.* at 555-57. Even so, the city provided extensive guidance to the defendant on its alleged violations of the odor nuisance ordinance and sent a warning letter with "instructions regarding what is needed to bring the property

---

[5] Even if there were some core of meaning, the Ordinances have no narrow purpose, no fixed time or location where they apply, no demonstrated causality between the activity and resulting harm, and no *mens rea* requirement that the conduct be willfully done. *See Grayned v. City of Rockford*, 408 U.S. 104, 107-114 (1972) (outlining the above factors as relevant to the constitutional vagueness analysis).

into compliance to avoid administrative citations." *Id.* at 570-71. The city even provided the defendant with a numerical measurement of odor that would not violate the ordinance (under 7 odor units as measured by a Nasal Ranger). *Id.* at 557, 570. The court held that "[t]hese extra-statutory communications" sufficed to give the defendant "'fair warning' that it was emitting odors in violation of the City Code." *Id.* at 571; *see Oregon Ass'n of Hosps. & Health Sys. v. Oregon,* 734 F.Supp.3d 1139, 1163 (D. Or. 2024) (similar). No such guidance was provided here. The City failed to provide *any* notice, let alone fair notice, before it issued citations or filed this lawsuit.

In sum, there are endless actions (and inactions) that could be deemed "offensive" or "obnoxious" to health or welfare, including the sale of fatty fast foods or sugary soft drinks, emitting exhaust from cars and trucks, and emitting benzene fumes from gas station pumps; thus the City must provide "fair notice" of what is and what is not proscribed. The City failed to do so. In addition, the vague language of the Ordinances cannot be backfilled with regulations, case law, or legislative history because none exist. Thus, there was no fair warning to Defendants (or the public) that the Ordinances apply here.

## II. The Ordinances, As Applied, Are Unconstitutionally Vague Because They Invite Arbitrary Enforcement.

A law is also unconstitutionally vague when it is "so standardless that it invites arbitrary enforcement." *Johnson,* 576 U.S. at 595; *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (noting "discrete" due process concerns in ensuring (1) "regulated parties should know what is required of them so they may act accordingly," and (2) "those enforcing the law do not act in an arbitrary or

discriminatory way"). "[L]aws must provide explicit standards for those who apply them"; a law that "delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis" is impermissibly vague. *Grayned*, 408 U.S. at 108-09. In short, "[t]o satisfy due process, the statute or ordinance must define the offending conduct … in a manner that will not encourage arbitrary and discriminatory enforcement." *Bell*, 697 F.3d at 455, 461 (*citing Skilling v. U.S.*, 561 U.S. 358, 402-03 (2010)).

Here, the Ordinances' standardless terms invite arbitrary enforcement not only by the City, by also by its contingency-fee counsel. Like the "annoyance" ordinance in *Bell*, the City's interpretation of the Ordinances "allows an unrestricted delegation of power, which, in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement." 697 F.3d at 463. As applied to substances like PCBs, the Ordinances "permi[t] law enforcement too much discretion in determining when" conduct is offensive or obnoxious to health or welfare. *Id.* "Absent guidelines within the ordinance itself," regulated parties are left to rely "on the unbridled discretion of administrative officials," "foster[ing] the arbitrary and discriminatory enforcement" that due process prohibits. *Navar*, 210 Ill.App.3d at 134.

An even greater danger materialized here. This is the first case in which the City has *ever* sought to enforce the Ordinances based on alleged PCB contamination, or for the presence of *any* substances within the City that are imperceptible to human sight and smell, SMF 30, and it is being brought by counsel retained on contingency. Even on its own, a contingency-fee relationship

between a municipality and outside counsel can raise due-process concerns related to the prosecuting counsel's financial interest in the case. *City of Chicago v. DoorDash, Inc.*, 2024 WL 4252797, at *12 (N.D. Ill. 2024). Here, contingency-fee counsel's financial stake in the case is unrestrained by any specific PCB-related limitations in the Ordinances, encouraging arbitrary enforcement. Indeed, it was the City's contingency-fee counsel who encouraged the City to test for PCBs on City property. SMF 9-10. It was these lawyers who funded and managed the PCB testing of various City properties, with specialized equipment and paid consultants in the field. *Id.* Neither the City nor any code enforcer established any level of PCBs in soil that they would consider a nuisance *before* this litigation commenced. SMF 28-32. And while the City's police chief, Kendall Perry, signed and issued the citations to Defendants, he had no experience with Code enforcement and explained it was the City's lawyers that determined citations were warranted. SMF 19-20. Perry was not even aware of what PCBs were, let alone that the citations arose from PCB sampling. *Id.*

These undisputed facts show the City was not objectively enforcing the Ordinances in the context of PCBs. Discovery revealed "more than 100 possible sources that could have handled or released PCBs … located in the vicinity of ESTL." SMF 40. Yet the City has never previously enforced the Ordinances against other alleged PCB polluters. SMF 30. And the City brought *this* case only because of contingency-fee counsel, who were able to provide "money and … a level of expertise that the city just doesn't have," SMF 9. Without these lawyers' assistance (by granting them a financial stake in the outcome), the City was unable to even "detec[t]" PCBs because "those are not things that are observable." *Id.* The City

certainly did not have objective PCB enforcement standards.

Enforcement based on such "a high degree of subjectivity" is a textbook violation of due process. *People v. McPherson*, 65 Ill.App.3d 772, 775 (1978). Ordinarily, "unlike with private plaintiffs," the government must pursue the public good, not merely "maximiz[e] recovery against the defendant." *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1288 (11th Cir. 2017), *abrogated on other grounds by United States ex. rel Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023). And the dangers of arbitrary enforcement are heightened when, as here, defendants are subject to enforcement under vague statutes for the sole purpose of "maximizing recovery," without the usual constraint of "limited prosecutorial resources." *Id.*

The City cannot point to its newly invented enforcement standard to avoid these problems. When "fundamentally legislative decisions" are left "to be made on a subjective basis *at the point of enforcement* rather than enactment," due process is violated. *Rec. Head Corp. v. Sachen*, 682 F.2d 672, 674 (7th Cir. 1982) (emphasis added). Here, three years after it brought suit, the City relied on paid litigation experts to determine the concentration of PCBs in soil that, in the City's view, constitutes a health risk. SMF 34. Not even the City's experts could necessarily agree on the applicability of a 0.23 ppm standard; the City's retained expert Dr. Mitchell Erickson tied remediation of residential soils to PCB concentrations above 1.0 ppm.[6] SMF 37.

---

[6] Although the parties may disagree about what concentration of PCBs in soil might require remediation, that is not a dispute that forecloses summary judgment on the Amended Counterclaim – regardless of the proper remediation standard, due process requires that the Ordinances (or the City enforcing them) must "be clear enough so that

Ultimately, "[i]t is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression." *Lanzetta v. State of N.J.,* 306 U.S. 451, 453-56 (1939). And the City's after-the-fact proposal for an enforcement threshold exemplifies the dangers in empowering enforcement personnel "to pursue their personal predilections" rather than constraining them with *ex ante* legislative standards. *Goguen*, 415 U.S. at 575.

As applied here, the Ordinances lack the ascertainable, objective standards required both to afford regulated parties fair notice and to forestall arbitrary and discriminatory enforcement.

## **CONCLUSION**

The Court should grant summary judgment to Defendants on the Amended Counterclaim.

---

every citizen may know how the ordinance will operate to affect their rights when it is utilized." *City of Wheaton v. Sandberg*, 215 Ill.App.3d 220, 227 (2d Dist. 1991).

Dated: March 5, 2025

Respectfully submitted,

**LATHROP GPM LLP**

*/s/ Charles R. Hobbs II*
Charles R. Hobbs II (625917)
ron.Hobbs@lathropgpm.com
The Plaza in Clayton
190 Carondelet Plaza
Suite 1400
St. Louis, MO 63105
Telephone: 314.613.2800

**YSURSA LAW OFFICES LLC**

Bernard J. Ysursa (3095754)
bjy@cbsclaw.com
1856 Stafford Way
Swansea, Illinois 62226
Telephone: 618.558.7564

*Attorneys for Defendant Solutia Inc.*

**SHOOK, HARDY & BACON L.L.P.**

*/s/ Adam E. Miller*
Adam E. Miller (6206249)
amiller@shb.com
Tyler W. Schwettman
(6333327)
tschwettman@shb.com
The Plaza in Clayton
190 Carondelet Plaza,
Suite 1350
St. Louis, MO 63105
Telephone: 314.690.0200

*Attorneys for Defendants*
*Monsanto Company and*
*Pharmacia LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 5th day of March, 2025, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Charles R. Hobbs II*
Charles R. Hobbs II

*Attorney for Defendant Solutia*