**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:21-cv-232-DWD) |
| | ) | |
| v. | ) | |
| | ) | |
| PHARMACIA LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JAMES OLSON

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 2

    I.     Proposed Remediation Level ................................................................. 2

    II.    Source of PCBs ..................................................................................... 3

    III.   Monsanto's State of Mind ..................................................................... 4

    IV.   "Any Exposure" Theory ....................................................................... 5

    V.    PCBs' Association with Adverse Health Effects ................................... 5

ARGUMENT ............................................................................................................ 9

    I.     Dr. Olson's Remediation Level Opinion Is Unreliable. ...................... 9

    II.    Dr. Olson's Speculation on Monsanto's State of Mind Is Unreliable. ................ 12

    III.   Dr. Olson's Source Opinion Is Unreliable. .......................................... 14

    IV.   Dr. Olson's "Any Exposure" Theory Is Unreliable. ............................ 16

    V.    Dr. Olson's Health Causation Opinions Are Unreliable ...................... 18

CONCLUSION ....................................................................................................... 20

## TABLE OF AUTHORITIES

### Cases

*Abuan v. Gen. Elec. Co.*,
   3 F.3d 329 (9th Cir. 1993) ..................................................................................................16

*Bostic v. Georgia–Pac. Corp.*,
   439 S.W.3d 332 (Tex. 2014)...............................................................................................18

*Braun v. Lorillard Inc.*,
   84 F.3d 230 (7th Cir. 1996) ................................................................................................17

*Brown v. Burlington N. Santa Fe Ry. Co.*,
   765 F.3d 765 (7th Cir. 2014) ..............................................................................................19

*C.W. v. Textron, Inc.*,
   2014 WL 4979211 (N.D. Ind. Oct. 3, 2014), *aff'd*, 807 F.3d 827 .....................................16, 17

*Coleman v. Union Carbide Corp.*,
   2013 WL 5461855 (S.D. W. Va. Sept. 30, 2013)..................................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..............................................................................................1, 9, 18, 19

*Davis v. Lockheed Martin Corp.*,
   705 F. Supp. 3d 1345 (M.D. Fla. 2023)...............................................................................19

*In re Deepwater Horizon BELO Cases*,
   119 F.4th 937 (11th Cir. 2024) ..........................................................................................16, 18

*DePaepe v. Gen. Motors Corp.*,
   141 F.3d 715 (7th Cir. 1998) ..............................................................................................13

*Fischer v. BMW of N. Am., LLC*,
   2020 WL 9259705 (D. Colo. Mar. 10, 2020) .......................................................................13

*Frost v. Teco Barge Line, Inc.*,
   2007 WL 420152 (S.D. Ill. Feb. 5, 2007).............................................................................13

*Gayton v. McCoy*,
   593 F.3d 610 (7th Cir. 2010) ..............................................................................................14

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..............................................................................................9, 12, 15, 20

*George v. Kraft Foods Glob., Inc.*,
   800 F. Supp. 2d 928 (N.D. Ill. 2011) ..................................................................................13

*Gilbert v. Lands' End, Inc.*,
2022 WL 2643514 (W.D. Wis. July 8, 2022)..................................................................19

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) ...........................................................................................16

*Harris Cnty. v. Int'l Paper Co.*,
2016 WL 5851895 (Tex. App. Oct. 6, 2016)...................................................................14

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009).......................................................................18

*Krik v. Exxon Mobil Corp.*,
870 F.3d 669 (7th Cir. 2017) .......................................................................................1, 16

*Lewis v. FMC Corp.*,
786 F. Supp. 2d 690 (W.D.N.Y. 2011)............................................................................11

*Mahler v. Vitamin Shoppe Indus., Inc.*,
2023 WL 6141369 (N.D. Ill. Sept. 20, 2023) .................................................................17

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005) .......................................................................................17

*McEvoy v. EIE Barges Services, Inc.*,
2009 WL 10700262 (N.D. Ill. Sept. 11, 2009) ...............................................................11

*Myers v. Illinois Cent. R. Co.*,
629 F.3d 639 (7th Cir. 2010) ...........................................................................................16

*In re Paraquat Prods. Liability Litig.*,
730 F. Supp. 3d 793 (S.D. Ill. 2024)...............................................................................19

*Rains v. PPG Indus., Inc.*,
361 F. Supp. 2d 829 (S.D. Ill. 2004)...............................................................................16

*Robinson v. Davol Inc.*,
913 F.3d 690 (7th Cir. 2019) .............................................................................................9

*Rutz v. Novartis Pharms. Corp.*,
2012 WL 12842794 (S.D. Ill. Dec. 7, 2012)...................................................................18

*Town of Westport v. Monsanto Co.*,
2017 WL 1347671 (D. Mass. Apr. 7, 2017), *aff'd*, 877 F.3d 58 (1st Cir. 2017).....................14

*United States v. Benson*,
941 F.2d 598 (7th Cir. 1991), *as amended* 957 F.2d 301 (7th Cir. 1992) ..............................13

iii

*United States v. Schultz,*
2016 WL 7409911 (N.D. Ill. Dec. 22, 2016)...............................................................13

*Wilson v. City of Chicago,*
6 F.3d 1233 (7th Cir. 1993) ......................................................................................9

*Wintz ex rel. Wintz v. Northrop Corp.,*
110 F.3d 508 (7th Cir. 1997) ...................................................................................17

**Rules**

Fed. R. Evid. 702 ..............................................................................................1, 9, 14

**Other Authorities**

Bernard Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology*, *in
Federal Judicial Reference Manual on Scientific Evidence* 636 (3d ed. 2011).................16, 17

*Environmental Fate and Transport*, Agency for Toxic Substances and Disease
Registry (Jan. 14, 2025)........................................................................................3

EPA, Regional Screening Levels (RSLs) ..........................................................................10

EPA, Regional Screening Levels (RSLs) - User Guide....................................................10

Gonzalez et al., *PCBs and dioxins/furans in attic dust collected near former PCB
production and secondary copper facilities in Sauget, IL*, 2011 Procedia Env't
Sci. 113 .....................................................................................................................15

Hermanson et al., *Polychlorinated Biphenyls in Tree Bark near Former
Manufacturing and Incineration Facilities in Sauget, Illinois, United* States,
2016 Env't Sci. & Tech. 6207 ...................................................................................15

## INTRODUCTION

The City of East St. Louis' (the "City") lawsuit hinges on its theory that polychlorinated biphenyls ("PCBs") produced by Monsanto in its W.G. Krummrich plant caused harm to the City and that Monsanto must remediate the City's parcels to a certain level. The City attempts to substantiate these claims through testimony by Plaintiffs' toxicology expert Dr. James R. Olson. Dr. Olson's opinions are unreliable and should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for the following reasons:

*First*, Dr. Olson lacks a scientific basis to propose a 0.23 ppm remediation level. Olson admits that his preferred cleanup level is not supported by EPA and that he is not aware of any authority that has required a cleanup level of 0.23 ppm.

*Second*, Dr. Olson, a toxicologist, is unqualified to opine that the PCBs in the City's parcels came from the Krummrich plant. Even if he were qualified, the studies he primarily relies on do not examine PCBs on soil. And Dr. Olson assumed—rather than tested—his hypothesis that the PCBs in the parcels' soil came from the Krummrich facility, and not some other source.

*Third*, Dr. Olson's opinion on Monsanto's state of mind is pure speculation and inappropriate expert testimony by an expert witness, let alone a toxicologist.

*Fourth*, Dr. Olson opines that *any* exposure to PCBs is harmful, but this theory has been rejected for decades. It is a fundamental tenet of toxicology that toxins cause illnesses only at sufficient dosages, and "more than thirty" federal and state courts have rejected an "any exposure" theory of causation as unreliable. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677-78 (7th Cir. 2017).

*Fifth*, Dr. Olson provides no basis for his opinion that PCBs *cause* cancer and other diseases. The bulk of Dr. Olson's opinion summarizes scientific studies that identify *associational*

1

relationships between PCBs and a given disease.  Dr. Olson does not apply the Bradford Hill factors, or any other methodology, to reach his conclusion that PCBs *cause* each of the diseases he mentions.

For all of these reasons, the Court should exclude Dr. Olson's testimony.

## **BACKGROUND**

Dr. Olson is a toxicologist retained by the City.  Ex. 1 (Expert Report of James R. Olson ("Report")) at 2-3.  Although the bulk of Dr. Olson's report summarizes studies concerning the associational relationship between PCBs and cancer and other diseases, Dr. Olson also opines on other subjects.  Dr. Olson's opinions fall into five categories:  (1) the appropriate remediation level to clean up the alleged contamination in the soils; (2) the source of the PCBs in the parcels' soil; (3) Monsanto's knowledge with respect to PCBs; (4) the "any exposure" theory of PCBs; and (5) the relationship between PCBs and cancer and other diseases.

## I.      Proposed Remediation Level

Dr. Olson opines that "0.23 ppm (mg/kg) is a recommended remediation action level for PCB contaminated residential soil in East St Louis, Illinois, that will be protective of human health."  Report at 76.  Dr. Olson admits, however, that 0.23 ppm is EPA's screening level, not its cleanup standard, and that EPA has expressly recommended that screening levels "should not be used as cleanup levels."  Ex. 2 (Deposition of James R. Olson ("Dep.")) 62:19-63:4.  Dr. Olson further admits that the Toxic Substances Control Act of 1979 ("TSCA") sets PCB remediation level at 1 ppm for residential areas, and that EPA recommends this 1 ppm remediation standard as "protective of human health."  Report at 74-75.

Dr. Olson is unaware of "any instance" where either EPA or the Illinois EPA required a cleanup level of 0.23 ppm.  Dep. 66:5-17, 67:10-13; 98:21-100:1 (remediation near Monsanto's

2

other primary PCB manufacturing plant in Anniston, Alabama had cleanup standards of 1.0 ppm). Dr. Olson claims that North Carolina, New Jersey, and California use a 0.23 ppm cleanup level, but when questioned, Dr. Olson explained he obtained this information from "websites" and was unaware of "any site where those states have actually required cleanup down to .23 part per million PCBs in soil." *Id.* at 67:2-13.

Dr. Olson could not justify using the 0.23 ppm level for *residential use* for all of the relevant parcels. As another of the City's experts has acknowledge, the EPA's RSL is based on various assumptions of land use, including, for exposure to children, child soil ingestion rates of 200 mg per day for 350 days per year for 6 years plus 20 years of exposure to the parcel as an adult, and for carcinogenic risks, that a resident spends 70 years on the parcel. Ex. 3 (Deposition of Kevin Coghlan ("Coghlan Dep.")) 157:1-160:22, 161:1-4. Dr. Olson, however, was not able to confirm that those assumptions hold true for the parcels at issue. Rather, he admitted that "I don't know what plans the city has" concerning the vacant parcels and "I don't know what their intended use is to zone the property for." Dep. 61:8-12. Dr. Olson acknowledged that the EPA's RSL for industrial soil is multiples higher than 0.23 ppm. *Id.* at 60:10-19.

## II.     Source of PCBs

Dr. Olson is not a "fate and transport expert." Dep. 116:15-22.[1] He nonetheless opines that "PCB production at the Krummrich Plant was the source of the PCB contamination in the soil of residential parcels in East St. Louis, Illinois." Report at 74. Dr. Olson concedes that "looking

---

[1] "'Fate and transport' refers to how the nature of contaminants might change (chemically, physically, or biologically) and where they go as they move through the environment." *Element 2: Environmental Fate and Transport*, Agency for Toxic Substances and Disease Registry (Jan. 14, 2025), https://www.atsdr.cdc.gov/pha-guidance/conducting_scientific_evaluations/exposure_pathways/environmental_fate_and_transport.html. An expert on fate and transport might be able to opine on "how likely it is that … contaminants have moved or will move beyond the source area." *Id.*

3

at actual distribution in soil and determining whether or not that's consistent with airborne emission from a particular source" is an area of expertise, but not his. Dep. 136:10-18. Dr. Olson explains that his opinion concerning the source of PCBs "is really based on what I've read in the published literature." *Id.* at115:8-19.

Dr. Olson admits he did not conduct "any analysis . . . of the specific congener levels found in the soil to compare it to the specific congeners that were actually manufactured at the Krummrich plant." Dep. 132:5-11. Nor did he analyze any of the "other industries in East St. Louis to see whether they could be a source of PCB 209 [deca]," the "most prevalent congener detected … in the samples that were tested." *Id.* at 128:17-23, 131:14-17, 132:20-133:8. Dr. Olson also did not determine "whether any foreign manufacturers of deca may have sold deca to industries in the area of East St. Louis." *Id.* at 135:10-13.

### III.    Monsanto's State of Mind

Dr. Olson opines on "Monsanto's [k]nowledge of the [p]ersistence and [t]oxicity of PCBs." Report at 10. He claims that "during the 1930s and 1940s," Monsanto "became informed regarding the hazard that PCBs pose to the human health ..." Report at 8-9. Dr. Olson states that Monsanto asked Bio-Test Laboratories ("IBT") to conduct toxicity tests on PCBs given "growing national concern about the universal presence of PCBs in the environment." *Id.* at 10. But he goes on to state—as fact—that "uncovering" the "corruption of these studies led to the indictment, conviction, and imprisonment of IBT and Monsanto employees which was detailed by Rosner and Markowitz (2023)." *Id.* at 10-11. Dr. Olson testified that "by 1937 Monsanto knew that PCBs were – were toxic chemicals." Dep. 194:9-10. Dr. Olson does not explain how he arrived at the conclusion of what Monsanto knew about PCBs, beyond seemingly taking historians Rosner and Markowitz as gospel.

4

## IV.    "Any Exposure" Theory

Dr. Olson opines that "any exposure [to PCBs] can be associated with harmful effects." Dep. 201:16-17.  In reaching that opinion, he claims to have reviewed "experimental studies conducted during the 1930s through the 1960s" and found that none "identif[ied] a dose or exposure to PCBs that was safe or without toxicity."  Report at 2; *id.* at 9 ("At no point did experimental studies report a safe level of PCB exposure."); Dep. 196:13-20 (explaining that in experiments conducted in the 1930s, scientists "were seeing adverse effects of the lowest doses that they tested").  But Dr. Olson does not point to any scientific literature, whether old or recent, that affirmatively concludes there is no safe level of PCB exposure.  To the contrary, he concedes that in EPA animal studies "oftentimes" there is "a dose that does not show an adverse effect." Dep. 113:4-14.  When asked whether this contradicted his "any exposure" theory, he replied, "it cannot be really determined one way or another."  *Id.* at 114:1-7.

## V.    PCBs' Association with Adverse Health Effects

Dr. Olson did not analyze any health outcomes of East St. Louis residents, nor is he aware of any studies or data concerning the health outcomes of East St. Louis residents.  Dep. 52:14-53:20.  Instead, Dr. Olson reviews and summarizes scientific studies on the relationship between PCBs and certain diseases, both cancerous and noncancerous.  He prefaces his summary with the following statement: "Adverse health effects that have been ***associated*** with exposure to PCBs in humans include, but are not limited to, cancer, developmental effects, diabetes, liver injury, immune system dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system impairment, cardiovascular disease and chloracne."  Report at 21 (emphasis added).  As highlighted below, Dr. Olson's summary of PCBs' relationship to each of these alleged adverse health effects is replete with references to "association," not "causation."

5

**Cancer**

- "PCBs have been associated with a statistically significant increased risk of cancer" (Report at 53)

- "analysis supports a significant association between general background, environmental levels of PCBs and NHL" (Report at 64)

- "many studies found that PCB exposure was associated with the risk of breast cancer" (Report at 66)

- "studies support the association of gastrointestinal cancers with occupational and general background environmental PCB exposures" (Report at 68)

- "recent case-control studies show consistent positive associations of PCB exposure and risk of prostate cancer" (Report at 68)

- "Among participants in the youngest birth cohort (1943-1957), they observed positive associations with thyroid cancer for total PCBs" (Report at 70)

- "The study concluded that PCBs are associated with risk of lung cancer in the general population" (Report at 71)

- "the top tertile of PCBs … was significantly associated with elevated odds of liver cancer" (Report at 71)

**Developmental effects**

- "low-level exposures to PCBs are associated with reduced fetal growth" (Report at 22)

- "developmental exposures to PCBs are associated with neuropsychological deficits in children" (Report at 24)

- "a growing literature showing associations between PCBs and children with behavioral problems and/or ADHD-related behavior" (Report at 29)

- "studies demonstrate the association of PCB exposures with deficits in hearing in children" (Report at 31)

**Diabetes**

- "In both cross-sectional and prospective studies, serum PCB concentrations (including different PCB congeners) were significantly associated with higher risk of type 2 diabetes." (Report at 40)

**Liver injury**

- "Liver injury has been associated with PCB exposure" (Report at 38)

**Immune system dysfunction**

- "PCB exposure in neonates is associated with a smaller thymic volume, leading to the possibility of impaired immunologic development" (Report at 45)

**Neurobehavioral effects**

- "increased levels of PCBs … correlated with reduced fine motor function" (Report at 32)

- "depressive symptoms associated with PCB exposures" (Report at 33)

**Impaired thyroid function**

- PCBs "ha[ve] been associated with thyroid abnormalities in adults" (Report at 44)

- "The investigators found consistent inverse associations between maternal serum and breast milk PCB levels and cord blood T3RU after covariate adjustments" (Report at 44)

**Reproductive system impairment**

- "Exposure to PCBs has long been associated with reproductive dysfunction" (Report at 34)

- "PCBs … were significantly and positively associated with earlier pubertal development in boys" (Report at 38)

**Cardiovascular disease**

- "background levels of exposure to PCBs are associated with elevated risk of hypertension and cardiovascular disease" (Report at 51)

**Chloracne**

- "Adverse effects associated with Yusho [accidental consumption of rice bran oil containing PCB] include: chloracne" (Report at 14)

Having summarized these studies, Dr. Olson concludes with the following bottom-line opinion: "PCBs *cause* an increased risk of a number of adverse health effects, including cancer, developmental effects, diabetes, liver injury, immune system dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system impairment, cardiovascular disease, and chloracne." Report at 72 (emphasis added); *id.* at 2 (same). Dr. Olson does not acknowledge or explain his shift from identifying associations to drawing causal conclusions. Nor does Dr. Olson explain what methodology, if any, he used to reach his causal conclusion.

7

In the rare instances in which Dr. Olson discusses causation in his summaries, he generally qualifies his causal conclusions with some uncertainty. *See* Report at 32 ("The findings *suggest* that PCB neurotoxicity *may* contribute to cognitive deficits in older persons at low levels found in the general U.S. population." (emphases added)); *id.* at 40 ("The consistency of these studies is noteworthy and *suggests* that PCBs contribute to liver injury in the general population." (emphasis added)); *id.* at 42 ("The associations found with PCB levels and prediabetes are also *suggestive* of a causal relationship with diabetes." (emphasis added)); *id.* at 67 ("The trend and magnitude of the association, as well as the observation of a molecular fingerprint in tumors, raise the *possibility* that this finding [gastrointestinal cancer and PCBs] *may* be causal." (emphases added)). Dr. Olson makes no effort to reconcile these tentative conclusions with his unqualified, bottom-line opinion that "PCBs cause an increased risk" of these diseases. *Id.* at 72.

Dr. Olson's rare unqualified causal claims unravel based on studies cited in his own report. *First*, he claims "the peer reviewed articles … support the conclusion in IARC (2016) that PCBs cause malignant melanoma in humans." Report at 57. But Dr. Olson identifies at least three studies—Magonia (2018), Boffetta (2018), and Zani (2017)—that do not support PCB's causal relationship with malignant melanoma. *Id.* at 56-57. *Second*, Dr. Olson claims that "studies provide support for the conclusion that background, environmental PCB exposures cause an increase in the risk of NHL [non-Hodgkin's lymphoma]." *Id.* at 65. But he acknowledges that the IARC Working Group—which he claims established the "carcinogenicity of PCBs in humans for malignant melanoma"—*also* concluded that there was "limited evidence" concerning PCB's relationship with "NHL" and thus did not reach a causal conclusion with respect to NHL. *Id.* at 53. Dr. Olson also recognizes that "a recent nested case control study found no additional support for the previously observed role of PCBs … as risk factors for NHL." *Id.* at 62. And another study

8

he cites "suggested a lack of association between dietary exposure to DL PCB and NDL PCB and NHL risk." *Id.* at 64. Dr. Olson does not explain why he accepts the IARC conclusion for one disease but rejects it for another.

## ARGUMENT

Dr. Olson's testimony is inadmissible and should be excluded. Rule 702 calls on district courts to serve as "vigorous gatekeeper[s]" of expert testimony to ensure its reliability and keep out "junk science." *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993).

Admissible expert opinion must (a) be based on "scientific, technical, or other specialized knowledge" that will help the trier of fact "understand the evidence" or "determine a fact in issue"; (b) be "based on sufficient facts or data"; (c) be "the product of reliable principles and methods"; and (d) reflect a "reliable application" of those principles and methods "to the facts of the case." Fed. R. Evid. 702. Reliability is assessed by whether an expert's theory has been or can be tested; has been subjected to peer-review or academic publication; has a known rate of error; and is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. An expert's opinion is also unreliable if there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Dr. Olson's faulty assumptions and analysis reflect the failure to apply reliable methods to the facts of this case and therefore would be unhelpful to jury. His testimony must be excluded.

## I. Dr. Olson's Remediation Level Opinion Is Unreliable.

Dr. Olson opines that "0.23 ppm (mg/kg) is a recommended remediation action level for PCB contaminated residential soil in East St Louis, Illinois, that will be protective of human health." Report at 76. Dr. Olson's 0.23 ppm cleanup level, however, is not scientifically supported.

9

Dr. Olson cites EPA's Regional Screen Levels ("RSLs") for PCBs to support his 0.23 ppm cleanup standard. Report at 75. These screening levels are the concentration at which EPA estimates that the background risk of cancer increases by one in a million. *See* Ex. 4 (EPA, Regional Screening Levels (RSLs) – User Guide ("User Guide") § 5.14 (last updated Nov. 22, 2024)), https://www.epa.gov/risk/regional-screening-levels-rsls-users-guide. Dr. Olson contends that "soil contaminated with 0.23 ppm PCBs would produce a *generally acceptable* life-time cancer risk of one excess cancer case in one million." Report at 75 (emphasis added). From this premise, Dr. Olson reasons that "[h]igher soil PCB levels would produce a greater, *unacceptable* cancer risk." *Id.* (emphasis added). Because an allegedly greater risk is "unacceptable"—to Dr. Olson, that is—he concludes "[t]herefore, 0.23 ppm is a recommended remediation action level for PCB contaminated residential soil in East St Louis, Illinois." *Id.* at 75.

Dr. Olson's opinion is grounded in his personal opinion, not science. EPA has emphasized—in bolded language on its website—"**RSLs are not cleanup standards and should not be used as cleanup levels**." Ex. 5 (EPA, Regional Screening Levels (RSLs) (last updated Nov. 13, 2024)), https://www.epa.gov/risk/regional-screening-levels-rsls; *accord* User Guide § 1 ("It should be emphasized that SLs are not cleanup standards and should not be used as cleanup levels."); Dep. 62:19-63:4 (acknowledging EPA's position that RSLs are not cleanup standards). In fact, Dr. Olson admits that the Toxic Substances Control Act of 1979 ("TSCA") sets PCB remediation level at 1 ppm for residential areas, and that EPA recommends this 1 ppm remediation standard as "protective of human health." Report at 74-75. Dr. Olson's reliance on 0.23 ppm as a cleanup standard is also unsupported by the record. Even Plaintiff's expert, Dr. Carpenter, agreed that 0.23 ppm is not "the boundary between safe and unsafe." Ex. 6 (Deposition of David Carpenter ("Carpenter Dep.")) 42:10-44:1.

10

Courts routinely recognize that screening levels are not cleanup levels. For example, the court in *Coleman v. Union Carbide Corp.*, 2013 WL 5461855 (S.D. W. Va. Sept. 30, 2013), excluded the testimony of plaintiffs' expert because he relied on "voluntary regulatory soil screening levels to conclude that significant concentrations of toxins were found" and to "impl[y] that a level in excess of the risk-based level is a cause for concern." *Id.* at \*35. The court instead found that concentrations in excess of "regulatory soil screening levels" merely "allow parties to assess whether to voluntarily remediate an area impacted by a chemical" and "d[o] not mean that a particular area is in fact a toxicological hazard." *Id.* Similarly, in *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690 (W.D.N.Y. 2011), plaintiffs' expert cited a report providing screening levels to support his proposed cleanup standard. *Id.* at 702. The court, however, observed that "health risk-based screening level[s]" do "not provide cleanup standards" and instead "assist in the identification of areas for which [corrective measures] may be appropriate." *Id.* n.8. Applying the same rationale, one court excluded the testimony of an expert who opined that because "the amount of materials at plaintiffs' properties" exceeded state screening levels, they "pose[d] a health risk." *McEvoy v. EIE Barges Services, Inc.*, 2009 WL 10700262, at \*15 (N.D. Ill. Sept. 11, 2009). The court explained that the screening levels were merely "advisory" and did not indicate the "actual health risk of a site." *Id.* (quotation marks omitted).

In addition, Dr. Olson conceded that he was unaware of "any instance" where either EPA or the Illinois EPA—or any other state authority—required a cleanup level of 0.23 ppm. Dep. 66:5-17, 67:10-13; 98:21-100:1 (remediation near Monsanto's other primary PCB manufacturing plant in Anniston, Alabama had cleanup standards of 1.0 ppm); *see also* Coghlan Dep. 61:15-20, 163:13-20, 232:7-20 (Coghlan could not identify a single instance in which the EPA or any other agency remediated PCBs down to 0.23 ppm). Dr. Olson's report claimed that North Carolina,

11

New Jersey, and California use a 0.23 ppm cleanup level, but when questioned, Dr. Olson explained he obtained this information from "websites" and was unaware of "any site where those states have actually required cleanup down to .23 part per million PCBs in soil." Dep. 67:2-13. Consequently, Dr. Olson cannot show any scientific basis for his use of 0.23 ppm as a cleanup level.

Even assuming EPA's RSL for PCBs could be used as a cleanup level (it cannot), Dr. Olson did not justify using the 0.23 ppm level for *residential use* for all of the relevant parcels. Dr. Olson admitted "I don't know what plans the city has" concerning the vacant parcels and "I don't know what their intended use is to zone the property for." Dep. 61:8-12. Without any evidence of residential use for the parcels, the various assumptions of land use included in the RSL are simply inapplicable, including, for exposure to children, child soil ingestion rates of 200 mg per day for 350 days per year for 6 years plus 20 years of exposure to the parcel as an adult, and for carcinogenic risks, that a resident spends 70 years on the parcel. Coghlan Dep. 157:1-160:22, 161:1-4. Dr. Olson acknowledged that the EPA's RSL for non-residential soil is multiples higher than 0.23 ppm. Dep. 60:10-19. Dr. Olson's "*ipse dixit*" that residential cleanup values are appropriate for the parcels does not survive Rule 702. *Joiner*, 522 U.S. at 146.

In sum, Dr. Olson did not use generally accepted methods to choose his 0.23 ppm cleanup standard, warranting exclusion of his testimony.

## II.    Dr. Olson's Speculation on Monsanto's State of Mind Is Unreliable.

Dr. Olson purports to opine on "Monsanto's [k]nowledge of the [p]ersistence and [t]oxicity of PCBs," Report at 10, specifically that "by 1937 Monsanto knew that PCBs were – were toxic chemicals." Dep. 194:9-10. Dr. Olson bases this opinion at least in part on the expert report by historians Dr. Gerald Markowitz and Dr. David Rosner. *See* Report at 10-11 (citing Dr. Markowitz and Dr. Rosner as sole authority for opinions related to Monsanto's knowledge). But neither Dr.

12

Markowitz, Dr. Rosner, nor Dr. Olson has any business providing expert testimony on a company's state of mind.[2]  Indeed, no expert does; that is for the jury.

Dr. Olson's opinions (and the historians' opinions on which Dr. Olson relies) are inadmissible because they improperly speculate on Monsanto's state of mind.  Their attempts to discern the knowledge and motives of Monsanto during and after its PCB production are unhelpful to the jury because experts are "no more qualified than the jury" to guess at Monsanto's state of mind.  *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991), *as amended* 957 F.2d 301 (7th Cir. 1992).  Expert testimony as to intent or state of mind is "well outside the bounds of permissible expert testimony."  *United States v. Schultz*, 2016 WL 7409911, at \*3 (N.D. Ill. Dec. 22, 2016) (collecting cases).  This prohibition has particular force when a witness—like Dr. Olson—"directly attempts to state a corporate defendant's state of mind."  *Fischer v. BMW of N. Am., LLC*, 2020 WL 9259705, at \*6 (D. Colo. Mar. 10, 2020) (internal quotations and citations omitted).  Judge Easterbrook has made clear that experts cannot testify about "motive or purpose" because "the whole point of *Daubert* is that experts can't 'speculate.'"  *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (reasoning that an engineer "lack[s] any scientific basis for an opinion about the motives" of corporate actors and cannot "testify as an expert" on those motives (emphasis removed)).  Thus, claims that a company "acted with a particular state of mind" are "speculation" and, "of course, inadmissible."  *George v. Kraft Foods Glob., Inc.*, 800 F. Supp. 2d 928, 933 (N.D. Ill. 2011).

Even if testimony on a corporation's state of mind could be admissible (it cannot), it would not be here, where Dr. Olson's expertise is in toxicology.  *Cf. Frost v. Teco Barge Line, Inc.*, 2007 WL 420152, at \*3 (S.D. Ill. Feb. 5, 2007) (excluding testimony because the purported expert did

---

[2] Monsanto simultaneously files a motion to exclude the expert testimony of Dr. Rosner.

"not possess the requisite qualifications as a psychologist, psychiatrist or other medical background that would allow him to opine regarding Plaintiff's mental state"). Dr. Olson's speculative opinions about Monsanto's state of mind are unreliable.

## III. Dr. Olson's Source Opinion Is Unreliable.

Dr. Olson opines that the PCBs in the parcels came from "atmospheric transport" from the Krummrich facility. Report at 73-74. For starters, Dr. Olson, a toxicologist, is not qualified to opine on the physics of PCB airborne emissions. In any event, Dr. Olson did not reliably extrapolate from studies or test his hypothesis to reach this conclusion.

Rule 702 permits only "qualified" experts to testify. Fed. R. Evid. 702. The question is not whether Dr. Olson is "qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (cleaned up). This can be determined by "comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Id.* at 616.

Dr. Olson's report touts his decades of "research … on the pharmacokinetics and toxicology" of PCBs, not their emission. Report at 1; *see also Town of Westport v. Monsanto Co.*, 2017 WL 1347671, at *3 (D. Mass. Apr. 7, 2017) (describing Dr. Olson as a toxicologist), *aff'd*, 877 F.3d 58 (1st Cir. 2017); *Harris Cnty. v. Int'l Paper Co.*, 2016 WL 5851895, at *14 (Tex. App. Oct. 6, 2016) (same). Although Dr. Olson suggested—for the first time in his deposition—that he has "working knowledge and years of experience" with how PCBs are "transported in the environment," he conceded that he is not a "fate and transport expert," Dep. at 116:4-22, nor is he experienced in "looking at actual distribution in soil and determining whether or not that's consistent with airborne emission from a particular source"—which he acknowledged is "an area of expertise" in which he is *not* an expert, *id.* at 136:10-18; 140:4-14. Dr. Olson did not inspect

14

any of the City's parcels in question and was not involved in the soil sampling. *Id.* at 38:12-39:13. Dr. Olson explained that his opinion concerning the source of PCBs "is really based on what I read in the published literature[.]" *Id.* at 115:8-19.

Even if Dr. Olson were qualified, his opinion would still be unreliable. *First*, the two studies he primarily relies on did not analyze the origins of PCBs in soil.[3] According to Dr. Olson, Gonzalez (2011) "looked at levels of PCB in attic dust in homes that were in this region near the Krummrich facility," and Hermanson (2016) "looked at tree bark as [ ] a marker of airborne release of PCBs from the . . . plant." Dep. 137:11-18. Dr. Olson made no effort to explain why these studies support his conclusion that PCBs in the parcels' *soil* came from the Krummrich facility. *See Joiner*, 522 U.S. at 144-45 (it was appropriate for district court to reject expert's reliance on studies that were "dissimilar to the facts" of the case).

*Second*, Dr. Olson assumed—rather than tested—his hypothesis that the PCBs in the parcels' soil came from the Krummrich facility, and not some other source. Dr. Olson admitted he did not conduct "any analysis … of the specific congener levels found in the soil to compare it to the specific congeners that were actually manufactured at the Krummrich plant." Dep. 132:5-11. Nor did he analyze any of the "other industries in East St. Louis to see whether they could be a source of PCB 209 [deca]." *Id.* at 131:14-17, 133:4-8. Dr. Olson also did not determine "whether any foreign manufacturers of deca may have sold deca to industries in the area of East St. Louis." *Id.* at 135:10-13. Because Dr. Olson's opinion rests on an untested hypothesis, it should be

---

[3] Gonzalez et al., *PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL*, 2011 Procedia Env't Sci. 113, https://www.sciencedirect.com/science/article/pii/S1878029611000405; Hermanson et al., *Polychlorinated Biphenyls in Tree Bark near Former Manufacturing and Incineration Facilities in Sauget, Illinois, United* States, 2016 Env't Sci. & Tech. 6207, https://pubs.acs.org/doi/abs/ 10.1021/acs.est.6b01053.

excluded.  *See Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 787 (7th Cir. 2017).

## IV.     Dr. Olson's "Any Exposure" Theory Is Unreliable.

Dr. Olson opines that "any exposure [of PCBs] can be associated with harmful effects." Dep. 201:16-17.  Courts across the country, including the Seventh Circuit, have rejected this well-worn theory as inconsistent with plaintiff's burden to identify a harmful level.

The "any exposure" theory "[r]equir[es] a defendant to exclude a potential cause of the illness," which "improperly shifts the burden to the defendants to disprove causation."  *Krik*, 870 F.3d at 677.  The *Krik* expert had testified, in the context of asbestos related diseases, "[e]ither it's zero or it's substantial; there is no such thing as not substantial."  *Id.* at 675.  The Seventh Circuit affirmed the exclusion of the expert's testimony, noting that "more than thirty" federal and state courts have rejected an "any exposure" theory of causation as unreliable.  *Id.* at 677-78.  This has been settled law for decades.  *See, e.g.*, *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 946 (11th Cir. 2024) (requiring a plaintiff to show "a harmful level of the toxin" *and* "exposure to the threshold dose of a toxin"); *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 330, 322-33 (9th Cir. 1993) (rejecting the "any exposure" theory as it relates to PCBs, explaining that "a substantial body of legal authority" in the context of "toxic tort jurisprudence" established that "it is essential that the plaintiff demonstrate that she was, in fact, *exposed to harmful levels* of such substances").

For an expert's opinion on causation to be reliable, he must provide "insight," grounded in "relevant and reliable science," "into what particular dose of [the chemical] is required in order to cause harm."  *Rains v. PPG Indus., Inc.*, 361 F. Supp. 2d 829, 837-38 (S.D. Ill. 2004).  After all, "all chemical agents are intrinsically hazardous"; "[e]ven water, if consumed in large quantities, can be toxic."  *C.W. v. Textron, Inc.*, 2014 WL 4979211, at *3 (N.D. Ind. Oct. 3, 2014) (quoting Bernard Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology*, *in Federal Judicial*

16

*Reference Manual on Scientific Evidence* 636 (3d ed. 2011)), *aff'd*, 807 F.3d 827 (7th Cir. 2015).

What matters for assessing the dangerousness of a chemical is whether "the dose to which the

plaintiff was exposed [was] sufficient to cause the disease." *Wintz ex rel. Wintz v. Northrop Corp.*,

110 F.3d 508, 513 (7th Cir. 1997) (quoting Goldstein & Henifin, *supra*, at 661). And courts in this

Circuit and elsewhere routinely exclude expert testimony that fails to account for the fundamental

premise that "dosage matters with respect to causation in toxic tort cases." *Mahler v. Vitamin

Shoppe Indus., Inc.*, 2023 WL 6141369, at *7 (N.D. Ill. Sept. 20, 2023) (collecting cases).

Dr. Olson's decision to "avoi[d]" and "neglec[t]" this key "principle of toxic torts without

justification casts suspicion on the reliability of his methodology." *McClain v. Metabolife Int'l,

Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005); *see also Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th

Cir. 1996) (expert testimony that "depart[s] from the generally accepted methodology of [the]

field" is inadmissible without rigorous evidentiary support). Dr. Olson's sole support for his "any

exposure" theory is that "[p]eer reviewed experimental studies conducted during the 1930s through

the 1960s did not identify a dose or exposure to PCBs that was safe or without toxicity." Report

at 2; *see also* Dep. 196:13-20 (basing his opinion on studies from the 1930s). But Dr. Olson

conflates the failure of these studies (conducted over half a century ago) to identify a safe dose

with a scientific finding that there is no safe level of PCB exposure. Dr. Olson does not provide

any studies that affirmatively conclude there is no safe level of PCB exposure. To the contrary, he

conceded that EPA animal studies "oftentimes" indicate "a dose that does not show an adverse

effect." Dep. 113:4-14. When asked whether this contradicted the "any exposure" theory, he

replied "it cannot be really determined one way or another." *Id.* at 114:1-7. His reliance on the

"any exposure" theory "effectively accepts that a failure of science to determine the maximum safe

dose of a toxin necessarily means that every exposure, regardless of amount, is a substantial factor

in causing the plaintiff's illness. This approach negates the plaintiff's burden to prove causation by a preponderance of the evidence." *Bostic v. Georgia–Pac. Corp.*, 439 S.W.3d 332, 340 (Tex. 2014).

Dr. Olson's testimony flunks several criteria of reliability mentioned in *Daubert*. *See* 509 U.S. at 593-94. His "any exposure" theory cannot be falsified or validated, since it is impossible to ascertain the effects of a chemical at infinitesimally low levels; it has "no known or potential rate of error," for the same reasons; and it "has been rejected by the overwhelming majority of the scientific community," which seeks to determine particular doses of a chemical that increase the risk of disease to a statistically significant degree. *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1165-66 (E.D. Wash. 2009) (citation omitted). Dr. Olson's testimony is "neither reliable nor helpful" and should be excluded. *Deepwater Horizon*, 2022 WL 17721595, at *15.

## V.    Dr. Olson's Health Causation Opinions Are Unreliable.

Dr. Olson opines that "[a]n increase in human exposure to PCBs results in an increased risk of developing cancer and other adverse health effects." Report at 2. Dr. Olson supports this conclusion by summarizing several scientific studies which examine the *association* between PCBs and a particular disease. By Dr. Olson's own summary of these studies, the vast majority do not draw causal conclusions. Yet Dr. Olson concludes, without any explanation, that these studies establish that PCBs *cause*: "cancer, developmental effects, diabetes, liver injury, immune system dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system impairment, cardiovascular disease, and chloracne." *Id.* at 72.

Dr. Olson does not rely on the well-established Bradford Hill factors or reliably apply any other methodology to reach this unsupported conclusion, dooming the reliability of his testimony. "The Bradford Hill criteria are used to assess whether a statistically-significant association between two variables actually reflects a causal relationship." *Rutz v. Novartis Pharms. Corp.*,

2012 WL 12842794, at *10 (S.D. Ill. Dec. 7, 2012).  "Experts in toxic tort actions commonly employ this methodology to answer complex epidemiological causation questions."  *In re Paraquat Prods. Liability Litig.*, 730 F. Supp. 3d 793, 840 (S.D. Ill. 2024) (excluding expert testimony for improper application of Bradford Hill factors).  Ironically, Plaintiff's expert David Carpenter dooms Dr. Olson's reliability:  "It is now standard practice in epidemiology to consider each of these nine [Bradford Hill] criteria before drawing a conclusion of causation."  Ex. 7 (Expert Report of David O. Carpenter) at 6; Carpenter Dep. 102:13-17 (same).  Because "[a]n association does not prove a cause-effect relationship," scientists "assess whether the association creates a causal relationship by applying the nine-part 'Bradford Hill' criteria[:]  (1) plausibility; (2) strength of association; (3) consistency; (4) biological gradient (dose-response relationship); (5) specificity of the association; (6) analogy; (7) temporality; (8) experiment (cessation of exposure); and [9] coherence."  *Gilbert v. Lands' End, Inc.*, 2022 WL 2643514, at *6 (W.D. Wis. July 8, 2022).

Here, Dr. Olson failed to apply the Bradford Hill factors in reaching his conclusion that PCBs cause specific diseases.  His report makes only one passing reference to the Bradford Hill factors in summarizing how *other authors* in one study applied these factors to reach a causal conclusion.  Report at 63.  Dr. Olson, however, never explained whether he considered the Bradford Hill factors or why he chose not to apply them in his analysis.  *Cf. Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) ("[A]n expert must do more than just state that [he] is applying a respected methodology; [he] must follow through with it.").  His failure to apply any methodology, let alone one that has gained "[w]idespread acceptance," renders his opinion unreliable.  *Daubert*, 509 U.S. at 594.  *See Davis v. Lockheed Martin Corp.*, 705 F. Supp. 3d 1345, 1350 (M.D. Fla. 2023) (excluding causation expert as unreliable because "Bradford Hill is not even mentioned in his report, nor were the factors themselves analyzed in the report").

19

Even if Dr. Olson's failure to apply the Bradford Hill factors were not fatal to his opinion, Dr. Olson's causal conclusion is unreliable for the independent reason that he did not reliably apply any other methodology to reach his conclusion. Dr. Olson explained that his methodology involved "search[ing] … the more recent cancer studies on PCB" and reviewing "metaanalyses, because they have done a more systematic review of the literature." Dep. 172:22-174:16. But most of the studies Dr. Olson examined did not reach a causal conclusion, based on his own summaries of them. Dr. Olson fails to justify his logical leap from the *associations* discussed in these studies to his bottom-line conclusion that PCBs *cause*: "cancer, developmental effects, diabetes, liver injury, immune system dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system impairment, cardiovascular disease, and chloracne." Report at 72. An expert's opinion is unreliable if there is "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. The "analytical gap" between most of the literature Dr. Olson reviewed (association) and Dr. Olson's conclusion (causation) is striking. Because the only thing connecting these studies and Dr. Olson's conclusion is the "*ipse dixit* of the expert," Dr. Olson's opinion should be excluded. *Id.*

## CONCLUSION

The Court should exclude Dr. Olson's opinion under *Daubert* and Rule 702.

20

Dated:  March 5, 2025

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

*/s/ Adam E. Miller*
Adam E. Miller (6206249)
amiller@shb.com
Tyler W. Schwettman (6333327)
tschwettman@shb.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Telephone:  314.690.0200

*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

**LATHROP GPM LLP**

*/s/ Charles R. Hobbs (by consent)*
Charles R. Hobbs II (625917)
Ron.Hobbs@lathropgpm.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, MO 63105
Telephone:  314.613.2800

*Attorneys for Defendant Solutia Inc*

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 5th day of March, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Adam E. Miller_____

Adam E. Miller

*Attorney for Defendants Monsanto Company and Pharmacia LLC*