**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:21-cv-232-DWD |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHARMACIA LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF**
**KEVIN M. COGHLAN**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................2

    I.     EH&E's Soil Sampling ...............................................................................................3

    II.    Testing of the Soil Samples.......................................................................................6

    III.   Coghlan's Remediation Cost Estimate.......................................................................7

    IV.  PCBs from the Krummrich Plant.............................................................................11

ARGUMENT.................................................................................................................................11

    I.     EH&E's Sampling Did Not Employ Reliable Methods.........................................12

           A.    EH&E's Sampling Did Not Ensure Representativeness and the Collected Samples Were of Questionable Quality.....................................12

           B.    EH&E's Testing Methodology Is Unreliable and Unverifiable. ...............15

    II.    Coghlan's Opinion Regarding the Cost of Remediation Did Not Employ Reliable Methods. ...................................................................................................16

           A.    Coghlan Improperly Relied on EPA's 0.23 ppm Residential Screening Level as a Cleanup Standard Contrary to EPA's Clear Guidance. .............................................................................................17

           B.    Coghlan's Two-Foot Soil Removal Estimate Is Not Based on a Generally Accepted Method of Remediation Estimates...........................19

           C.    Coghlan's Cost Estimate Is Speculative. ...................................................21

    III.   Coghlan's Opinions Regarding the Source of PCBs Is Not Based on Specialized Knowledge or Reliable Methods. .......................................................22

CONCLUSION..............................................................................................................................23

## TABLE OF AUTHORITIES

CASES

*Allgood v. Gen. Motors Corp.*,
  2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) .........................................................12, 13, 15, 21

*Ammons v. Aramark Uniform Servs., Inc.*,
  368 F.3d 809 (7th Cir. 2004) .........................................................................................21

*Ancho v. Penteck Corp.*,
  157 F.3d 512 (7th Cir. 1998) .........................................................................................23

*Buscaglia v. United States*,
  25 F.3d 530 (7th Cir. 1994) ...........................................................................................22

*Caraker v. Zandoz Pharm. Corp.*,
  188 F. Supp. 2d 1026 (N.D. Ill. 2001) ..........................................................................15

*Cent. & S.W. Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) .........................................................................................4

*Chen v. Yellen*,
  2021 WL 4192078 (N.D. Ill. Sept. 15, 2021) ..............................................................22

*Coleman v. Union Carbide Corp.*,
  2013 WL 5461855 (S.D. W. Va. Sept. 30, 2013) ........................................................17

*Competitive Edge, Inc. v. Staples, Inc.*,
  763 F. Supp. 2d 997 (N.D. Ill. 2010) ...........................................................................15

*Cook Cnty. v. Wells Fargo & Co.*,
  2022 WL 17752387 (N.D. Ill. Dec. 19, 2022) .............................................................14

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ..................................................................................................1, 12

*Dhillon v. Crown Controls Corp.*,
  269 F.3d 865 (7th Cir. 2001) .........................................................................................22

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) .........................................................................................14

*Erickson v. Pharmacia LLC*,
  548 P.3d 226 (Wash. Ct. App. 2024) ............................................................................2

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..........................................................................................12, 18, 22

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
   629 F. Supp. 2d 175 (D. Conn. 2009) ..................................................................15, 16

*Lewis v. FMC Corp.*,
   786 F. Supp. 2d 690 (W.D.N.Y. 2011) ......................................................................17

*McEvoy v. EIE Barges Services, Inc.*,
   2009 WL 10700262 (N.D. Ill. Sept. 11, 2009) .....................................................17, 18

*In re Paraquat Prods. Liab. Litig.*,
   2024 WL 1659687 (S.D. Ill. Apr. 17, 2024) ..............................................................15

*In re Paraquat Prods. Liab. Litig.*,
   730 F. Supp. 3d at 839 ..............................................................................................15

*Reeves v. Commonwealth Edison Co.*,
   2008 WL 239030 (N.D. Ill. Jan. 28, 2008) ..........................................................12, 15

*Riach v. Manhattan Design Studio*,
   2001 WL 1143243 (N.D. Ill. Sept. 25, 2001) ............................................................22

*Robinson v. Davol Inc.*,
   913 F.3d 690 (7th Cir. 2019) .....................................................................................11

*Trexler v. City of Belvidere*,
   2023 WL 415184 (N.D. Ill. Jan. 25, 2023) ................................................................23

*United States v. Johnsted*,
   30 F. Supp. 3d 814 (W.D. Wis. 2013) ...................................................................22, 23

*Williams v. Illinois Dep't of Corr.*,
   2023 WL 1472246 (S.D. Ill. Feb. 2, 2023) ................................................................23

*Wilson v. City of Chicago*,
   6 F.3d 1233 (7th Cir. 1993) .......................................................................................11

**STATUTES**

15 U.S.C. § 2605 ................................................................................................................4

**REGULATIONS**

40 C.F.R. § 761 *et seq.* ......................................................................................................4

40 C.F.R. § 761.61 ...............................................................................................4, 12, 13

40 C.F.R. § 761.283 ...................................................................................................4, 13

35 Ill. Adm. Code Part 742 ..............................................................................................12

35 Ill. Adm. Code § 740.415..................................................................................................4, 13

35 Ill. Adm. Code § 742.225............................................................................................4, 13, 20

*Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations*, 88 Fed. Reg. 59,662 (Aug. 29, 2023)........................................................................................4

**RULES**

Fed. R. Evid. 701 ........................................................................................................................22

Fed. R. Evid. 702 ...............................................................................................................1, 11, 22

**OTHER AUTHORITIES**

EPA, Regional Screening Levels (RSLs) - User Guide (Nov. 22, 2024) .......................................7

EPA, Regional Screening Levels (RSLs) (Nov. 13, 2024)............................................................7

**INTRODUCTION**

The City of East St. Louis's (the "City") lawsuit hinges on its theory that polychlorinated biphenyls ("PCBs") produced by Monsanto in its W.G. Krummrich plant ("Krummrich Plant") caused elevated levels of PCBs in the soil of 272 vacant parcels of land.[1]  To support that claim, the City relies on the opinions of its sole contamination expert, Kevin M. Coghlan, whose company Environmental Health & Engineering, Inc. ("EH&E") conducted soil sampling of 272 of the parcels.  Coghlan offers opinions regarding the purported amount of PCB contamination on the 272 parcels, the possible source of that contamination, and estimated costs to remediate PCBs on 100 of those parcels that the City currently owns.[2]  Coghlan's opinions, however, do not meet the basic requirements of reliability and helpfulness under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993), and therefore should be excluded.

*First*, EH&E's sampling—on which Coghlan's opinions are predicated—contains several significant methodological errors that compel exclusion of test results associated with the samples, as well as Coghlan's opinions derived from those results.

---

[1] Coghlan omits one of the 273 parcels—parcel 01-24.0-333-015—which is elsewhere included by the City and its other experts.  *See* Ex. 7 (Expert Report of Brian Hitchens) at 6 & n.4.

[2] In his initial February 16, 2024 report, Coghlan estimated remediation costs for all 272 parcels. Expert Report of Kevin M. Coghlan ("First Report") at 26-28.  Subsequently, evidence in the case—including that the purported assignment from the St. Clair County Trustee was revealed to be null and void, *see* Ex. 8 (Gomric Opinion Letter)—revealed that the City owns only 100 of the parcels at issue.  As part of discovery on that issue, the Court authorized Coghlan to file a supplemental report.  *See* Ex. 4 (Supplement to Rebuttal Report of Kevin M. Coghlan (Jan. 24, 2025) ("Fourth Report")).  In his Fourth Report, Coghlan reduced his remediation cost estimate to focus on the 100 parcels "[t]he City of East St. Louis currently owns."  Fourth Report at 1.  Coghlan, however, "reaffirm[ed] all previous opinions offered in [his] expert and rebuttal reports."  *Id.*  To the extent that Plaintiffs seek to offer Coghlan's opinions on remediation costs for parcels other than the 100 that the City owns, his opinions should be excluded for the reasons below *and* separately because the City has no standing to seek remediation costs for parcels it does not own.

1

*Second*, Coghlan's opinion that remediation of the contaminated soil on the parcels would likely cost more than $22 million rests on flawed assumptions, including: (1) every parcel with a PCB concentration greater than 0.23 parts-per-million (ppm) requires remediation, (2) remediation requires removal of two feet of soil, and (3) removal will involve costly disposal of soil with PCB concentrations exceeding 50 ppm.

*Third*, Coghlan's opinion that the PCB contamination on the 272 parcels originated from the Krummrich Plant was not developed with reference to any specialized or technical knowledge, but instead is based on what Coghlan deems "common sense" and "obvious" conclusions.

Because all of Coghlan's opinions are unreliable and unhelpful, this Court should preclude him from testifying.

## **BACKGROUND**

The East St. Louis parcels at issue are all currently vacant.  Ex. 5 (Deposition of Kevin M. Coghlan ("Dep.")) 74:15-18, 82:9-24, 105:3-16, 115:6-20.  Some of the parcels were on railroad rights of way that cannot be developed, and there is no evidence that the City has plans to redevelop the parcels.  *Id.* at 135:5-8, 181:5-23.

The City nonetheless retained Coghlan to testify about PCB levels in the soil and the estimated cost of remediation.  *See* Ex. 1 (Expert Report of Kevin M. Coghlan (Feb. 16, 2024) ("First Report")) at 29.  Coghlan is a frequent plaintiff-side expert in PCB cases.  *E.g.*, *Erickson v. Pharmacia LLC*, 548 P.3d 226, 235-36 (Wash. Ct. App. 2024) (excluding two of Coghlan's three methodologies for calculating historical, pre-remediation PCB levels at a school), *review granted*, 556 P.3d 1098 (Wash. 2024).  In this case, he offers three core conclusions: (1) "PCBs found in the samples from the East St. Louis community are attributable to the Krummrich Plant"; (2) 210

2

of the 272 parcels at issue "had PCB levels that exceeded 0.23 ppm"; and (3) the cost to remediate the 100 parcels the City owns is $22,285,792. First Report at 29; Fourth Report at 1.

## I.        EH&E's Soil Sampling

Coghlan's reports are principally devoted to detailing (and defending) soil sampling conducted by EH&E and the associated results of testing for PCB concentration levels. *See* First Report at 8-25; Ex. 2 (Rebuttal Report of Kevin M. Coghlan (Sept. 10, 2024) ("Second Report")) at 1-2; Ex. 3 (Second Rebuttal Report of Kevin M. Coghlan (Sept. 27, 2024) ("Third Report")) at 1-3; Fourth Report at 1-7. Despite Coghlan's wholesale reliance on the samples, Coghlan was "not involved" with the sampling itself. Dep. 12:16-21, 14:7-11.

As described in Coghlan's report, EH&E generally collected between two and five soil samples for each of the 272 parcels. First Report at 8-9. These samples were then "composited into a single sample" for each parcel. *Id.* at 8. According to Coghlan, the samples were "[i]deally … collected from locations across the parcel" and taken "from locations that represent relatively undisturbed soil." *Id.* at 9. Samples "were collected just below the root zone in vegetated areas or from approximately 0-6" in depth." *Id.* at 11. EH&E did not conduct any three-dimensional mapping to estimate PCB concentrations below six inches. *See* Dep. 176:9-12.

The EH&E sampling did not comply with federal and state regulations that provide guidance on how to collect soil samples, such as "the preparation and use of relevant planning documents, including a field sampling plan (FSP), sampling and analysis plan (SAP), and Quality Assurance Project Plan (QAPP), that set forth the objectives and approach of the sampling program, and intended use of the results." Ex. 9 (Expert Report of Kurt Herman ("Herman Report")) at 27. These regulations include, for example, Subpart N of the Environmental Protection Agency's ("EPA") regulations under the Toxic Substances Control Act ("TSCA") and Part 742 Subpart D of the Illinois Administrative Code, Site Remediation Program. *Id.* at 11-12

3

(citing 40 C.F.R. §§ 761.61, 761.283; 35 Ill. Adm. Code §§ 740.415, 742.225).[3]  The EH&E sampling did not comply with TSCA or Illinois state regulations because, as Coghlan admitted in his deposition, the sampling "was never intended to comply with subpart N as a – as a site remediation effort."  Dep. 124:17-126:5.  EH&E therefore did not do the "additional work" the EPA would have required under the TSCA regulations "[b]ecause we weren't – we weren't preparing a plan to submit to the EPA.  We were trying to identify what the existing concentrations of PCBs were on all the parcels."  *Id.* at 124:17-23, 126:6-12.  Coghlan nonetheless admitted that the "type of corrective action … prescribed in [his] expert witness report" would "[l]ikely" "require EPA notification and approval."  *Id.* at 122:1-5.  And rightly so—TSCA regulations require that EPA must be notified before any corrective action for PCBs may be taken.  *See* 40 C.F.R. § 761.61(a)(3)(i) ("At least 30 days prior to the date that the cleanup of a site begins, the person in charge of the cleanup or the owner of the property where the PCB remediation waste is located shall notify, in writing, the EPA Regional Administrator[.]").

A separate analysis of the sample-location data shows that more than one hundred subsamples collected by EH&E were not actually taken from the target parcels.  Herman Report at 28.  In fact, "177 of the 272 parcels sampled included discrete borings that were collected from outside of the parcel boundaries."  *Id.*  Coghlan insists that EH&E's manual determination of sample locations—for example, using measuring tapes to calculate distances from fixed object—

---

[3] The TSCA is "a comprehensive national scheme to protect humans and the environment from the dangers of toxic substances."  *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 686 (5th Cir. 2000) (citation omitted).  TSCA authorizes the EPA to regulate chemicals that pose risks to human or environmental health, including PCBs.  *See* 15 U.S.C. § 2605(a), (e)(1)(A), (2)(B) (authorizing EPA to promulgate rules regarding the "disposal," "manufacture, processing, distribution in commerce or use . . . of any [PCB]").  Since the Act's passage, the EPA has used its expertise to develop a complex, detailed regulatory scheme governing the manufacturing, processing, distribution in commerce, storage, and disposal of PCBs.  *See* 40 C.F.R. § 761 *et seq.*; *Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations*, 88 Fed. Reg. 59,662 (Aug. 29, 2023).

were largely accurate and that GPS data showing samples taken from outside the target parcels may have a variance of 50 feet. *See* Second Report at 2; Fourth Report at 4-6. But Coghlan himself was not present when the field work was being performed, Dep. 12:16-21, 14:7-11, and none of the individuals who did the field work has submitted a declaration or other evidence describing any steps they took to ensure that they collected subsamples only from within parcel boundaries. Ultimately, Coghlan is unable to confirm that the sample locations were on the target parcels. Instead, he opines only that "*nearly* all samples were collected on target parcels, *adjacent target, parcels, or rights-of-way (ROW) in close proximity to target parcels*." Fourth Report at 5 (emphases added).

Coghlan insists notwithstanding this irregularity in the sampling locations, the sampling results are "sufficiently accurate" because sampling near the target parcels "can reasonably be expected to be representative of the soil contamination in the surrounding area, regardless of property boundaries." Second Report at 1-2; Fourth Report at 4-5. When confronted, however, Coghlan admitted that in some cases, EH&E's sampling reported significant variance in PCB levels from adjacent parcels, including instances where EH&E's sampling measured one parcel as having "a total PCB concentration that's nearly 20 times higher" than an adjacent parcel. Ex. 6 (Rebuttal Deposition of Kevin M. Coghlan ("Rebuttal Dep.")) 23:19-24:19.

Additionally, the parcels—including those with all discrete borings taken within the parcel boundaries—"includ[ed] unequal distributions of discrete samples within the parcel boundary," which renders the composite sample "unrepresentative of the entire parcel" by "fail[ing] to take into account variations across the parcel." Herman Report at 28. Coghlan does not address this flaw in the sampling other than his general assertion that EH&E's sampling was "sufficiently accurate." Second Report at 1; Fourth Report at 4-5.

5

## II.    Testing of the Soil Samples

After collecting the soil samples and creating composite samples for each of the 272 parcels, EH&E transmitted the composite samples to two labs—Alpha Analytical Laboratories and Cape Fear Analytical—for PCB testing.  First Report at 12.  EH&E included "splits" of the composite samples on which further tests could be run.  Dep. 90:3-4.  However, the labs were not provided with "quality control samples" required by EPA Quality Assurance Project Plans (referred to as "field blanks," First Report at 13) to "verify that proper field sampling techniques and decontamination procedures between samples are being used," Herman Report at 28.  EH&E had the labs conduct the testing using laboratory blanks.  First Report at 22.

Prior to October 31, 2023, approximately a year after collection, EH&E destroyed the soil samples.  This destruction occurred before Defendants had the opportunity to conduct their own testing.  Dep. 89:19-90:7.  Although this Court previously held that the City "was at least negligent and certainly at fault for the destruction of the … soil samples," ECF No. 192 at 18,[4] Coghlan attempted to justify the destruction:  the "splits were held for a year in accordance with the EPA guidelines on sampling and analysis, and after a year they were then disposed of because they were past their time period."  Dep. 90:2-8.  But other than citing the EPA's guidelines, Coghlan could not provide any scientific reason why the splits could not have been reliably used for testing after one year.  *Id.* at 90:9-91:23 ("I haven't looked at EPA rationale for the holding time, so it's hard for me to say.").  To the contrary, that PCB levels in the soil remain constant over time is a fundamental premise of the City's case.  *See* Ex. 10 (Declaration of Court D. Sandau, Ph.D.) ¶¶ 4-7.

---

[4] The Court previously addressed the City's conduct in its order on Defendants' motion for sanctions.  *Id.*

Based on the results of the testing, Coghlan opines that of the 272 parcels sampled, 62 had PCB concentrations less than 0.23 ppm, 115 had concentrations greater than 0.23 ppm but less than 1.0 ppm, and 95 had concentrations greater than 1.0 ppm. First Report at 14, Table 4.1. The highest sample registered a concentration of 22.6 ppm. *Id.* at 14, Table 4.2.

### III.    Coghlan's Remediation Cost Estimate

Coghlan opines that remediation costs will be $22,285,792. Fourth Report at 1. Coghlan reaches this estimate by including, among other things: (1) costs for those of the 100 parcels the City owns where testing of the collected samples indicated PCB concentrations *above 0.23 ppm*; (2) costs of $9 million for removing and backfilling a full two feet of soil from each of those parcels; and (3) an additional $1.3 million to remove soil (if ever discovered) that contains over 50 ppm of PCBs. *Id.*, App. A, at A-1.

***The Cleanup Value of 0.23 ppm*** – Coghlan's remediation cost estimate starts from the premise that all parcels with PCB concentrations above 0.23 ppm require remediation. Coghlan adopts a remediation threshold of 0.23 ppm based on the report of another of the City's experts, Dr. James R. Olson.[5] Dep. 108:17-20. Coghlan recognizes that Dr. Olson derives the 0.23 ppm cleanup value from the EPA's regional screening level ("RSL") for PCBs. *Id.* at 108:15-109:7. These screening thresholds reflect the PCB concentration levels at which the EPA estimates that the background risk of cancer increases by one in a million. *See* Ex. 11 (EPA, Regional Screening Levels (RSLs) – User Guide ("User Guide") § 5.14 (Nov. 22, 2024)). As the EPA makes clear— in bolded language on its website—"**RSLs are not cleanup standards and should not be used as cleanup levels**." Ex. 12 (EPA, Regional Screening Levels (RSLs) (Nov. 13, 2024)); *accord* User Guide § 1 ("It should be emphasized that SLs are not cleanup standards and should not be

---

[5] Dr. Olson's testimony is the subject of a separate motion to exclude, filed concurrently.

used as cleanup levels."). Coghlan argues it is necessary to use the RSL for PCBs to fully remediate the soil for residential use as "one of the more sensitive occupancies you could have on those parcels." Dep. 156:2-15. Coghlan therefore opines that the 210 parcels with measured PCB levels above 0.23 ppm require remediation. *Id.* at 203:2-9.

Coghlan, however, acknowledges that there is "no immediate need … to do a corrective action for PCBs on [unoccupied] parcels" under governing regulations, such as the TSCA. Dep. 147:13-21; *see also* Second Report at 1. That is because the TSCA does not require corrective action on low-occupancy properties when PCB levels are at 25 ppm or lower. Dep. 129:23-134:19, 147:13-21. Here, none of the parcels at issue has PCB concentrations exceeding 25 ppm, and Coghlan admits that all of them are currently low-occupancy properties. *Id.* at 105:3-16 ("Many of [the parcels] are vacant and quite overgrown, so I would say at the moment, there's probably very limited occupancy on these lots."); *see also id.* at 74:15-18, 82:9-24, 115:6-20. Coghlan also testified that he had "not seen any plans on redevelopment for that area," noting only that the City's mayor had once expressed to him a general "desire to do some redevelopment and … for some housing." *Id.* at 137:5-11, 138:23-139:7.[6]

Even if the parcels at issue could be considered high-occupancy areas, Coghlan concedes that the cleanup level under the TSCA is 1.0 ppm—more than four times higher than the remediation threshold Coghlan adopts. Dep. 35:24-36:9; 36:15-20 (conceding that "typically, the residential cleanup value for PCBs in soil is one part per million under [the TSCA]"). Coghlan acknowledges the PCB remediation near Monsanto's other PCB plant at Anniston, Alabama used

---

[6] In fact, the City's corporate representative, Michael Wagner, conceded that redeveloping the parcels for residential use would require "essentially rebuild[ing] the residential sewer system and the residential street system from scratch." Ex. 14 (Deposition of Michael Wagner) 91:19-22. The City has not taken concrete steps toward residential redevelopment, including by obtaining an estimate. *See id.* at 92:3-6.

the 1.0 ppm threshold to evaluate which affected sites required remediation. *Id.* at 162:20-24.  And when asked, Coghlan was unable to identify any other PCB remediation effort that had used 0.23 ppm as the standard:

> Q.   And having had essentially the whole day to
>       think about it, can you name for me one
>       corrective action regarding PCBs in residential
>       soils that requires a cleanup down to 0.23 parts
>       per million?
> A.   I can't offhand, no.
> Q.   And you've not been involved in one, correct?
> A.   No, I haven't. Not that I can recall.

*Id.* at 109:16-110:1, 232:7-20; *see also id.* at 163:12-20.

Coghlan also does not justify use of the 0.23 ppm RSL for *residential use*.[7]  The 0.23 ppm RSL is based on various assumptions on land use.  For example, for exposure to children, the RSL assumes child soil ingestion rates of 200 mg per day for 350 days per year for 6 years plus 20 years of exposure to the parcel as an adult.  Dep. 157:1-160:22.  And for carcinogenic risks, the RSL assumes a resident spends 70 years on the parcel.  *Id*. at 161:1-161:4.  Coghlan does not offer any findings that the parcels would be used consistent with those assumptions.  In fact, Coghlan admits he has no "information that suggests that the City of East St. Louis currently has plans to redevelop the parcels for residential use," and that some of the parcels were on railroad rights of way with no apparent future residential use.  *Id.* at 135:5-8, 181:5-23.

*Removal of Two Feet of Soil* – For each of the parcels where testing of the collected samples indicated PCB levels in excess of 0.23 ppm, Coghlan estimates costs for removing a *full two feet of soil* from each of the parcels.  First Report 26; Fourth Report, App. A, at A-1.  In

---

[7] Coghlan's insistence on using the 0.23 ppm residential cleanup level led him to rule out less expensive options like "capping." Dep. 222:5-10. "Capping" covers PCB-contaminated soil with higher concentrations (from 1.0 to 10 mg/kg) with more than ten inches of fresh soil so that high-occupancy use is safe—and it is far less expensive than removing two feet of earth. Herman Report at 30.

assuming two feet of soil removal for purposes of calculating remediation costs, Coghlan and EH&E admittedly failed to conduct any three-dimensional mapping or otherwise analyze samples from greater than six inches in depth to support a finding that two feet of soil need to be removed. Dep. 176:9-12 ("[W]e don't know about vertical transfer of the PCBs in the soil that we're measuring up top …."). Coghlan concedes that he does not have "data to indicate one way or the other," and he cannot say "to a reasonable degree of scientific certainty," whether two feet of soil must be removed from the site to bring PCB levels below 0.23 ppm. *Id.* at 176:1-178:22.

Without meaningful explanation, Coghlan disregards that remediation efforts near Monsanto's Anniston plant was only 12 inches, Dep. 176:19-177:3, and that Coghlan's own contractor submitted estimates using a targeted depth of 12 inches, *id.* at 205:10-25. Coghlan admits that he does not know "whether excavating more than 12 inches of soil is necessary." *Id.* at 177:4-7. Instead, he claims that he will need a "second phase of work" to further analyze whether two feet of soil removal is appropriate. *Id.* at 177:20-178:6.

***Removal of Soil with PCB Concentrations Exceeding 50 PPM*** – On top of the costs associated with removing two feet of soil, Coghlan adds $1.3 million to remove 4,358 tons of soil that contain over 50 ppm of PCBs. Fourth Report, App. A, at A-1. Soil with this level of PCB concentration has "a different level of disposal requirement" under the TSCA, making removal and disposal more expensive. Dep. 53:15-20. But Coghlan acknowledges that EH&E "didn't measure a single parcel to be above 50 parts per million" for "the first six inches of soil." *Id.* at 206:4-7. Instead, Coghlan simply "assume[s]" the high-concentration soil would be 10% of total soil removal while the final figures would need "to be determined by future testing." Fourth Report, App. A, at A-1.

### IV.    PCBs from the Krummrich Plant

Coghlan also opines that PCBs found in the soil near East St. Louis were sourced from the Krummrich Plant.    First Report at 3-7.    For support, Coghlan primarily cites Monsanto's production of PCB-containing products as well as the plant's general proximity to East St. Louis. *See id.*  In particular, Coghlan relies on the fact that: (1) "[t]he impacted neighborhood is located less than 500 feet from" the plant; (2) the "most impacted areas and parcels are generally downwind of" the plant; (3) PCB levels in the soil near East St. Louis are "significantly higher" than elsewhere in the United States; and (4) the "pattern of PCB congeners and homologs is not consistent with the pattern typically found in urban soils without known local sources of PCBs." *Id.* at 6.  Coghlan, however, confirms that his opinion about the source of PCBs on the disputed parcels is not the subject of any expert analysis, but rather supposedly "common sense" connections "point[ing] out the obvious."  Dep. 41:12-42:5; *see id.* at 100:1-6 (Coghlan admitting he has "not done a specific source apportionment"); *see also id.* at 42:21-43:3, 66:5-10.

### ARGUMENT

Coghlan's testimony is inadmissible and should be excluded.  Rule 702 calls on district courts to serve as "vigorous gatekeeper[s]" of expert testimony to ensure its reliability and keep out "junk science."  *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993).

Admissible expert opinion must be (a) be based on "scientific, technical, or other specialized knowledge" that will help the trier of fact "understand the evidence" or "determine a fact in issue"; (b) be "based on sufficient facts or data"; (c) be "the product of reliable principles and methods"; and (d) reflect a "reliable application" of those principles and methods "to the facts of the case."  Fed. R. Evid. 702.  Courts assess reliability by considering whether an expert's theory has been or can be tested; has been subjected to peer-review or academic publication; has a known

11

rate of error; and is generally accepted in the scientific community. *Daubert* , 509 U.S. at 593-94.

A reviewing court should not accept "the *ipse dixit* of the expert" and should reject testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Coghlan failed to apply reliable principles and methods to the facts of this case, and his testimony must therefore be excluded.

## I.      EH&E's Sampling Did Not Employ Reliable Methods.

Here, EH&E's approach to sampling the soil on the 272 parcels—a process in which Coghlan was not involved—introduced flaws that are fatal to the reliability of the test results.

### A.      EH&E's Sampling Did Not Ensure Representativeness and the Collected Samples Were of Questionable Quality.

A fundamental requirement for any reliable sampling is that it be "statistically representative." *Reeves v. Commonwealth Edison Co.*, 2008 WL 239030, at *6 (N.D. Ill. Jan. 28, 2008) (finding expert's sampling unreliable when it could not be shown that it was "statistically representative").  In particular, "samples must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured." *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) (collecting cases).  Deficiencies in supporting an expert's sampling choices "is an issue of methodology" that can warrant exclusion. *Id.*

The methodological standards for sampling conducted as part of a remediation effort are well-established and subject to multiple federal and state regulatory requirements.  These include strict requirements for compositing (*i.e.*, combining) discrete samples and the requirement to prepare agency-approved plans based on a site-specific evaluation. *See* 40 C.F.R. § 761.61; 35 Ill. Adm. Code Part 742; Herman Report at 12.  EH&E, however, admittedly did not prepare the usual planning documents under federal and Illinois guidelines such as a quality assurance plan, field

sampling document, and analysis. Herman Report at 11-14, 27 (citing 40 C.F.R. §§ 761.61, 761.283; 35 Ill. Adm. Code §§ 740.415, 742.225). To the contrary, Coghlan stated, for example, that the EH&E sampling "was never intended to comply with subpart N [of EPA regulations] as a … site remediation effort." Dep. 124:17-126:5. Coghlan explained that EH&E was not "preparing a plan to submit to the EPA." *Id.* at 126:9-12. Coghlan does not explain how departure from established regulatory methodologies is consistent with generally accepted sampling practices. And the failure to follow EPA guidelines is particularly glaring because Coghlan concedes that the "type of corrective action … prescribed in [his] expert witness report" would "[l]ikely" "require EPA notification and approval." *Id.* at 122:1-5.

The consequences of failing to abide by these established methodologies are apparent here. In particular, Coghlan and EH&E are unable to show that they took the necessary steps to ensure the samples taken on each of the parcels were "representative of the larger entity or population being measured"—*i.e.*, the parcel. *Allgood*, 2006 WL 2669337, at *11. In *Allgood*, the court excluded an expert's testimony regarding PCB exposure because of errors in his sampling methodology. *Id.* In particular, the expert relied on "only a limited number of the available samples" that tended "to magnify greatly the risk calculation." *Id.* The court reasoned that the expert's failure "to offer any scientific justification for his sample selection choices" was "central to the reliability of his methodology" and therefore rendered it inadmissible. *Id.* The same is true here. Although Coghlan represented that EH&E generated composite samples for each parcel based on based on distributed sampling within each parcel, First Report at 8, the evidence shows otherwise, including that the vast majority of parcels either contained subsamples collected outside the parcel boundaries or subsamples collected from in a small area, leading to biased samples that failed to be representative of the entire parcel. Herman Report at 28.

13

Coghlan attempts to explain away the variability in sample location based on his belief that surveyors on site—not Coghlan himself, who was not present—used physical markers to select sampling locations. *See supra* at 4-5. But Coghlan's blind reliance on the say-so of unidentified EH&E surveyors is impermissible. While an expert "is permitted to use assistants," the admissibility of his testimony comes into question where "assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612-13 (7th Cir. 2002); *see Cook Cnty. v. Wells Fargo & Co.*, 2022 WL 17752387, at *4 (N.D. Ill. Dec. 19, 2022) (similar). Here, the surveyors exercised considerable professional judgment in determining parcel boundaries outside of Coghlan's supervision or expertise, and Coghlan's rebuttal report includes descriptions of their work based on secondhand accounts as an appendix to his rebuttal report. Fourth Report at B-8 to B-17 (Table B.1); *see id.* at B-1. This Court should not permit Coghlan to substitute second-hand testimony regarding third parties' work for Coghlan's own previous testimony—that he did not know if his sampling team "geocoded every individual sample" and that he did not "believe there were premarked grids." Dep. 78:7-9, 80:9-13. As it stands, Coghlan's revised testimony on this point "rest[s] on air," *Dura*, 285 F.3d at 615, and is inadmissible.

In any event, Coghlan cannot confirm that all samples were taken from the target properties; he states only that "*nearly* all samples were collected on target parcels, *adjacent target parcels, or rights-of-way (ROW) in close proximity to target parcels*." Fourth Report at 5 (emphases added). And contrary to his assertion that samples taken from near the target parcels are sufficiently "representative of the soil contamination in the surrounding areas, regardless of property boundaries," Fourth Report at 4-5, Coghlan concedes that adjacent parcels can have significantly different measured PCB concentrations. *See supra* at 5.

14

Ultimately, without any regulatorily approved planning documents demonstrating the appropriateness of EH&E's sampling location, Coghlan is unable to "offer any scientific justification for his sample selection choices" directly undermining the "reliability of his methodology." *Allgood*, 2006 WL 2669337, at *11. Coghlan's and EH&E's "close-enough" approach to sampling calls into question whether the PCB levels measured on the parcels were actually "statistically representative," *Reeves*, 2008 WL 239030, at *6. That fundamental methodological error requires exclusion.

## B.    EH&E's Testing Methodology Is Unreliable and Unverifiable.

EH&E's testing of the composite samples was also defective. A central requirement for any methodology to be considered reliable "is the scientific method, *i.e.*, the generation of testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication." *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 190 (D. Conn. 2009) (quoting *Caraker v. Zandoz Pharm. Corp.*, 188 F. Supp. 2d 1026, 1030 (N.D. Ill. 2001)). Methodologies that are "virtually non-falsifiable" violate "one of the most basic requirements of the scientific method." *In re Paraquat Prods. Liab. Litig.*, 2024 WL 1659687, at *35 (S.D. Ill. Apr. 17, 2024).

Here, there were irregularities in the testing of the samples collected by EH&E that render the results unreliable. For example, EH&E used only laboratory "blanks" instead of collecting field blanks, as is industry standard and consistent with EPA guidance. Herman Report at 28. This quality-control failure calls EH&E's data into question: equipment could be improperly measuring higher than zero PCBs from samples with no contamination. *Id.*; *see In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d at 839 (excluding expert opinion in part for failure to properly apply "quality criteria"); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1009 (N.D. Ill. 2010)

15

(excluding expert in part because "the reliability" of survey results was "gravely diminished by …
collection and recording irregularities").

That departure from industry standards is particularly problematic here because it is
impossible for Defendants to verify the results of EH&E's sampling. As Coghlan concedes,
EH&E disposed of the sample "splits" (*i.e.*, copies) a year after they were collected instead of
retaining them to allow for repeat testing. Dep. 90:2-7.

Considering a similar situation, the court in *Innis Arden Golf Club* excluded the testimony
of plaintiff's expert regarding soil sampling under *Daubert*. 629 F. Supp. 2d at 190. There, the
"soil samples and full data packages" had been destroyed, so the defendants "could not attempt to
validate [the expert's] methods." *Id.* The court concluded that the expert's "results could not be
replicated or verified" and therefore found them inadmissible for "lacking" "this hallmark of
reliability." *Id.* For the same reasons, EH&E's sample splits have since been destroyed,
preventing Defendants from verifying the results of the testing. With this "hallmark of reliability
lacking," the results of the EH&E sampling—and Coghlan's conclusions about the levels of PCBs
found on the 272 parcels—should be excluded.

## II.    Coghlan's Opinion Regarding the Cost of Remediation Did Not Employ Reliable Methods.

Coghlan's opinion that remediation costs are $22,285,792, Fourth Report at 1, rests on
three fundamental errors that render his opinion unreliable and unhelpful to the jury: (1) he
mistakenly relied on the EPA residential screening level ("RSL") for PCBs, (2) he estimated costs
based on removing two feet of soil without scientific justification, and (3) he included costs that
were not supported by the underlying data. His opinion on remediation costs should therefore be
excluded.

16

A.    **Coghlan Improperly Relied on EPA's 0.23 ppm Residential Screening Level as a Cleanup Standard Contrary to EPA's Clear Guidance.**

In calculating remediation costs, Coghlan expressly relies on a PCB cleanup level of 0.23 ppm.  First Report at 26.  That is, Coghlan opines that any parcel sample that returned purported level of PCBs above 0.23 ppm must be remediated.  *Id.*  Coghlan's 0.23 ppm cleanup level, however, is scientifically unsupported.

*First*, the only source Coghlan cites for the 0.23 ppm cleanup standard is the EPA's RSL for PCBs.  Dep. 109:6-7.  But as the EPA makes clear, "**RSLs are not cleanup standards and should not be used as cleanup levels**." Ex. 12.  Instead, these levels are intended to be the PCB limits below which action need not be taken to remediate.  Ex. 13 (Expert Report of Danny Reible) at 14.

Courts routinely recognize that screening levels are not cleanup levels.  For example, the court in *Coleman v. Union Carbide Corp.*, 2013 WL 5461855 (S.D. W. Va. Sept. 30, 2013), excluded the testimony of plaintiffs' expert because he relied on "voluntary regulatory soil screening levels to conclude that significant concentrations of toxins were found" and to "impl[y] that a level in excess of the risk-based level is a cause for concern."  *Id.* at *35.  The court instead found that concentrations in excess of "regulatory soil screening levels" merely "allow parties to assess whether to voluntarily remediate an area impacted by a chemical" and "d[o] not mean that a particular area is in fact a toxicological hazard."  *Id.*  Similarly, in *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690 (W.D.N.Y. 2011), plaintiffs' expert cited a report providing screening levels to support his proposed cleanup standard.  *Id.* at 702.  The court, however, observed that "health risk-based screening level[s]" do "not provide cleanup standards" and instead "assist in the identification of areas for which [corrective measures] may be appropriate."  *Id.* n.8.  Applying the same rationale, the court in *McEvoy v. EIE Barges Services, Inc.*, excluded the testimony of an

17

expert who opined that because "the amount of materials at plaintiffs' properties" exceeded state screening levels, they "pose[d] a health risk."  2009 WL 10700262, at *15 (N.D. Ill. Sept. 11, 2009).  The court explained that the screening levels were merely "advisory" and did not indicate the "actual health risk of a site."  *Id.* (quotation marks omitted).

Coghlan's similar reliance on EPA screening levels to provide cleanup values therefore renders his resulting conclusions unreliable and inadmissible.  Indeed, that the EPA's 0.23 ppm screening level is not an appropriate cleanup value is proven by past PCB remediations.  Coghlan does not point to a single instance in the United States in which the EPA or any other agency has used 0.23 ppm as a cleanup level for PCBs.  Dep. 61:15-20, 163:13-20, 232:7-20.  And remediation near Monsanto's other primary PCB manufacturing plant in Anniston, Alabama had cleanup standards of 1.0 ppm for surrounding areas*.  Id.* at 162:20-163:7.  Consequently, Coghlan cannot show any scientific basis for his use of 0.23 ppm as a cleanup level.

*Second*, even assuming EPA's RSL for PCBs could be used as a cleanup level, Coghlan failed to justify using the 0.23 ppm level for *residential use* for all of the relevant parcels.  Given the "vacant and overgrown" condition of the parcels, Dep. 74:15-18, 82:9-24, 105:3-16, 115:6-20, and the City's admitted lack of plans to redevelop the parcels for residential use, *id.* at 135:5-8, the 0.23 ppm threshold for remediation should not apply.  Coghlan's "*ipse dixit*" that residential cleanup values are appropriate for all 100 parcels the City owns does not survive Rule 702. *Joiner*, 522 U.S. at 146.

*Third*, current regulatory requirements do not require remediation based on the parcels' current levels.  For vacant lots like the parcels at issue, the TSCA does not require corrective action on low-occupancy properties when PCB levels are 25 ppm or lower, as Coghlan admits.  Dep. 129:23-134:19, 147:13-21.  Even for a high-occupancy area—where a person spends an average

18

of 16.8 hours per week without protective clothing, *id.* at 131:4-9—the cleanup level under the TSCA is 1.0 ppm, or over quadruple Coghlan's 0.23 ppm. *Id.* at 35:24-36:9.

In sum, Coghlan did not use generally accepted methods to choose his 0.23 ppm cleanup standard. That decision resulted in an inflated estimate of over $20 million for vacant parcels that simply do not require remediation. Even assuming a cleanup level of 1.0 ppm, Coghlan's estimates included tens of parcels that were below that threshold.[8] By inflating the number of parcels at issue, Coghlan impermissibly exaggerates the cost of remediation that the City claims as damages. Those methodological errors warrant excluding Coghlan's testimony.

### B.    Coghlan's Two-Foot Soil Removal Estimate Is Not Based on a Generally Accepted Method of Remediation Estimates.

Coghlan's remediation costs include estimates for removing two feet of soil from parcels with PCB levels over 0.23 ppm. In addition to the glaring deficiencies in the threshold for remediation addressed above, Coghlan's proposed remedy is premised on unreliable assumptions and therefore should be excluded under Rule 702.

It is undisputed that EH&E's samples taken from the parcels came from within the first six inches of topsoil. First Report at 9. However, Coghlan opines that remediation required removal of a full two feet of soil—at least four times the depth of the samples collected by EH&E. *Id.* at 26. When confronted, Coghlan admitted he does not have "data to indicate one way or the other," and that he cannot say "to a reasonable degree of scientific certainty," whether two feet of soil must be physically removed from the site to restore it to 0.23 ppm PCB levels. Dep. 176:1-178:22. While Coghlan claims to rest his estimate on "experience and professional judgment," he admits that he does not know "whether excavating more than 12 inches of soil is necessary." *Id.* To make

---

[8] These parcels are listed in the Appendix attached to Defendants' Motion for Summary Judgment on Plaintiffs' Claims and Memorandum in Support filed concurrently herewith.

that determination, he attests that he will need a "second phase of work" to further analyze whether two feet of soil removal is appropriate—or whether he might want to remove more. *Id.* Put simply, Coghlan has no scientific or data-based justification for assuming that remediation requires removal of two feet of soil.[9]

Coghlan's assumption is inconsistent with generally accepted practices. Experts typically create a "three-dimensional delineation of contaminants of concern"—or three-dimensional mapping of how deep the PCB chemicals are present in the soil. Herman Report at 28. That practice is supported by regulatory guidance. The Illinois Administrative Code requires that persons collecting composite soil samples, as EH&E did, will do so "at every two feet of depth, *beginning at six inches below the ground surface* for surface contamination," in order to demonstrate compliance with remediation objectives. Ill. Admin. Code § 742.225(c)(1) (emphasis added). In other words, regulatory guidance suggests that sampling should *begin* at six inches and go deeper to provide an accurate view of contamination below the surface. EH&E admittedly failed to conduct any three-dimensional mapping or otherwise analyze samples from greater than six inches in depth to support a finding that two feet of soil need to be removed. Dep. 176:9-12 ("[W]e don't know about vertical transfer of the PCBs in the soil that we're measuring up top ….").

Even setting aside the lack of three-dimensional mapping, Coghlan has not pointed to any other remediation effort that required two feet of soil removal. That is because remediation efforts regularly target 12 inches of soil removal. For example, the cleanup of the areas near Monsanto's Anniston plant was only 12 inches. Dep. 176:19-177:3. And Coghlan's own contractor submitted estimates using a targeted depth of 12 inches. *Id.* at 205:10-25.

---

[9] Coghlan claims that his "[a]dditional review of the peer reviewed scientific literature, data from similar projects, and guidance documentation further supports the two-foot excavation depth." Second Report at 2. Coghlan, however, does not identify that supposed support.

20

The Court need not accept Coghlan's opinion based on "experience and professional judgment."  To the contrary, the court in *Allgood* addressing a similar situation excluded an expert's proposed remediation of one-foot of soil where "the soil samples [were] collected at a 4-inch depth."  2006 WL 2669337, at \*16.  As the court explained, "there is no evidence as to why excavation is appropriate to a depth of one foot," and there is therefore "no explanation for establishing a one-foot excavation level other than to maximize plaintiffs' claims."  *Id.*  Here, Coghlan and the City ask the Court to take an even larger inferential leap that samples taken from with the first six inches of soil to justify soil removal twice as deep as the proposal rejected in *Allgood*.  This Court should not accept Coghlan's *ipse dixit* and should instead excluded his inflated remediation cost testimony.

### C.    Coghlan's Cost Estimate Is Speculative.

The report includes $1.3 million to remove 4,358 tons of soil that contain over 50 ppm of PCBs.[10]  Fourth Report, App. A, at A-1.  But Coghlan admits that ***EH&E did not identify any samples with PCB concentrations above 50 ppm.***  Dep. 206:4-7.  Instead, Coghlan postulates that he might find some beyond the "first six inches of soil."  *Id.* at 206:1-17 ("We don't know the certainty of that yet.").  This speculation does not rest on any three-dimensional modeling or any other evidence showing that PCBs moved vertically in the soil column.

Under Rule 702, a "court is expected to reject any subjective belief or speculation." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (internal quotation marks omitted).  Without any suggestion based in fact or analysis that there are 50 ppm samples anywhere in the parcels, Coghlan's estimate of $1.3 million for 4,358 tons of soil with greater than

---

[10] Soil with levels that high requires specialized, more expensive disposal under the TSCA.  Dep. 53:15-20.

21

50 ppm PCB levels presents an "analytical gap" between Coghlan's cost estimate and his data sampling that requires exclusion of Coghlan's cost estimate. *Joiner*, 522 U.S. at 146.

### III.   Coghlan's Opinions Regarding the Source of PCBs Is Not Based on Specialized Knowledge or Reliable Methods.

The defining characteristic of expert testimony under Rule 702 is that the testimony is based on "scientific, technical, or other specialized knowledge." *Compare* Fed. R. Evid. 701(c) (lay testimony), *with* Fed. R. Evid. 702 (expert testimony).   An expert's claims that are "conclusory, without any discussion of the[ir] underlying bases," necessarily fail to provide a court with any "baseline confidence" that the expert based his testimony on "sufficient facts or data." *United States v. Johnsted*, 30 F. Supp. 3d 814, 820 (W.D. Wis. 2013) (quoting Fed. R. Evid. 702(b)); *accord, e.g.*, *Chen v. Yellen*, 2021 WL 4192078, at *3 (N.D. Ill. Sept. 15, 2021) (noting that expert testimony must be excluded if it is "based upon speculation, unsupported assumptions, or conclusory allegations" (quoting *Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994)); *Riach v. Manhattan Design Studio*, 2001 WL 1143243, at *4 (N.D. Ill. Sept. 25, 2001) (excluding expert's "conclusory medical and scientific opinions").

These principles preclude Coghlan's opinion about the source of the PCBs on the parcels. Coghlan opines that the "PCBs found in the samples from the East St. Louis community are attributable to the Krummrich Plant." First Report at 29.  But when pressed on that opinion during his deposition, Coghlan conceded that he had "not done a specific source apportionment" for the PCBs on the parcels. Dep. 100:5-6.  Rather, Coghlan's sole analysis is to "point out the obvious" of the Krummrich Plant's proximity to the 272 parcels and to reason as a purported "matter of common sense" where the PCB on those parcels came from. *Id.* at 41:12-42:2.  Where an expert admits he brings to bear nothing more than his supposed common sense, he necessarily invades the province of the jury, and those opinions should be excluded. *Dhillon v. Crown Controls Corp.*,

22

269 F.3d 865, 871 (7th Cir. 2001) (quoting *Ancho v. Penteck Corp.*, 157 F.3d 512, 519 (7th Cir. 1998)); *Trexler v. City of Belvidere*, 2023 WL 415184, at *5 (N.D. Ill. Jan. 25, 2023).

Coghlan ultimately admitted his "role was not specifically to apportion the PCB sources," *id.* at 40:25-41:1, and he deferred to the opinion of another of the City's experts, Dr. Mitchell D. Erickson, on the source of the PCBs on the parcels, *id.* at 42:3-5. *Williams v. Illinois Dep't of Corr.*, 2023 WL 1472246, at *13 (S.D. Ill. Feb. 2, 2023) (explaining that experts cannot "parrot[] the opinions of other experts or wholesale adopt[] other experts' opinions without independent analysis"). Coghlan's opinion as to the source of the PCBs on the parcels should therefore be excluded as conclusory and lacking "sufficient facts or data" to satisfy Rule 702. *Johnsted*, 30 F. Supp. 3d at 820.

## CONCLUSION

This Court should exclude Coghlan's testimony as inadmissible under Rule 702.

Dated: March 5, 2025                          Respectfully submitted,

                                             **SHOOK, HARDY & BACON L.L.P.**

                                             */s/ Adam E. Miller*
                                             Adam E. Miller (6206249)
                                             amiller@shb.com
                                             Tyler W. Schwettman (6333327)
                                             tschwettman@shb.com
                                             The Plaza in Clayton
                                             190 Carondelet Plaza, Suite 1350
                                             St. Louis, MO 63105
                                             Telephone: 314.690.0200

                                             *Attorneys for Defendants Monsanto Company and Pharmacia LLC*

23

**LATHROP GPM LLP**

*/s/ Charles R. Hobbs (by consent)*____
Charles R. Hobbs II (625917)
Ron.Hobbs@lathropgpm.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, MO 63105
Telephone:  314.613.2800

*Attorneys for Defendant Solutia Inc*

24

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 5th day of March, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Adam E. Miller
Adam E. Miller

*Attorney for Defendants Monsanto Company and Pharmacia LLC*

25