**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CITY OF EAST ST. LOUIS, ILLINOIS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MONSANTO COMPANY, *et al.*,**<br><br>**Defendants.** | **Case No. 3:21-cv-232-DWD** |

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF DEFENDANTS' REAL ESTATE APPRAISERS, JLL VALUATION ADVISORY SERVICES, LLC, MR. RICHARD RODDEWIG, AND MR. CHARLES BRIGDEN**

The City of East St. Louis, Illinois ("the City") respectfully submits this Motion and Memorandum of Law in support of its Motion to Exclude Expert Testimony of Defendants' ("Monsanto's") Real Estate Appraisers, JLL Valuation Advisory Services, LLC, Richard Roddewig, and Charles Brigden (hereinafter "JLL" or "Brigden"), under Federal Rule of Evidence 702 and its jurisprudence.

## I. INTRODUCTION

The City seeks to exclude irrelevant, nonprobative, and unfounded "appraisal review" opinions of Monsanto's real estate appraisal experts, JLL and Brigden, as set forth in their three Reports and the deposition testimony of Charles Brigden.

**First**, JLL does not even address the "matter at hand" in this aspect of the case, namely, the real estate and economic damages incurred by the City as a result of contamination of tested City parcels with PCBs, a toxic contaminant that has been banned worldwide. They did *not* appraise, nor do they have *any* opinions of value as to *any* of the City's tested parcels. They do *not* have any opinions or calculations to counter *any* of the City's cost effect; use effect; or risk

damages numbers as calculated by the City's real estate appraisal expert, Dr. Randall Bell of Landmark Research ("Bell"). Their Reports do not even assess or appraise the very City tested parcels that are at issue in this case. In addition, rather than employing case studies about similarly contaminated properties, JLL studies cases concerning uncontaminated properties adjacent to contaminated properties. As described below, all irrelevant and unreliable JLL opinions not addressing the "matter at hand" in this case should be excluded.

**Second**, JLL's opinions as described below do not comply with applicable real estate appraisal industry standards, guidelines, peer-reviewed literature, or customs and practices. Instead, JLL uses litigation-created theories not part of the real estate appraisal industry to criticize Bell's opinions. In so doing, JLL did not use or apply appropriate methodology within the real estate appraisal industry. Therefore, any JLL opinions derived from this practice are unreliable and should be excluded.

**Third**, JLL demonstrably and knowingly submitted fraudulent and misleading data and information to ostensibly support other criticisms of Bell's opinions in this matter. In its gatekeeping role, these practices should not be allowed or condoned by this Court and any such opinions arising from such practices should be excluded.

## II. BACKGROUND

The City filed this property damage environmental contamination lawsuit against Monsanto for decades of polychlorinated biphenyl ("PCB") emissions vented from Monsanto's W.G. Krummrich Plant ("WGK") onto City property. This aspect of the lawsuit concerns the real estate and economic damages incurred by the City as a result of tested City parcels contaminated with PCBs.[1]

[1] Ex. A, Bell Report, p. 19.

The City's environmental engineering experts, Environmental Health & Engineering, Inc. ("EHEI"), conducted soil sampling around the southern end of East St. Louis in 2022. EHEI tested 273 City land parcels located within a mile of WGK for PCB contamination. It has been determined that the City owned 100 parcels as of 2024, and that it had ownership of another 46 parcels at times between 1955 and 2024. As of the drafting of this Motion, there are 146 City tested parcels which are the subject of the trial in June 2025.[2]

On February 16, 2024, Bell submitted his Report assessing the matter at hand in this case: "[T]he real estate and economic damages, if any, of the subject properties due to the impacts of PCB chemicals."[3] On July 9, 2024, JLL filed its initial Report.[4] Subsequently, on September 3, 2024, and on January 7, 2025, JLL issued what they called Supplemental Reports.[5] On January 28, 2025, Dr. Bell issued his Rebuttal Report.

## III. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides for the admissibility of expert testimony in federal courts, and sets forth the following parameters:

> A witness who is qualified as an expert by knowledge, skill, experience, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based upon sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

[2] Whatever number of City parcels is allowed to be part of the trial concerning the City's non-ordinance-related Counts, the Bell Rebuttal Report and deposition testimony establish that the number of parcels affects only the mathematics involved in Bell's calculations, and not his underlying methodology. Ex. B, Bell Rebuttal Report, p. 6; Ex. C, Randall Bell Deposition, February 7, 2025, 69:21-25--70:1-6.
[3] Ex. A, p. 19.
[4] Ex. D, JLL Report.
[5] Ex. E, JLL Supplemental Report dated September 3, 2024; and Ex. F, JLL Supplemental Report dated January 7, 2025.

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999); see *Kirk v. Clark Equipment Co.*, 992 F.3d 865, 871-72 (7th Cir. 2021). Rule 702 confides to the district court a gatekeeping responsibility to ensure that the proposed testimony is not only relevant, but reliable. In performing this role, the district court must engage in a three-step analysis, evaluating: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony. *Kirk*, 992 F.3d at 872. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). *In re Paraquat Liability Litigation*, 730 F.Supp.3d 793, 806 (S.D. Ill. 2024).

Rule 702 was amended in 2023 to clarify and emphasize that the proponent of expert testimony must demonstrate to the court that it is more likely than not that the Rule's three admissibility requirements are met. The Advisory Committee noted that the expert's knowledge must "help" the trier of fact to understand the evidence or to determine a fact in issue. Rule 702(d) has been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology. (Fed. R. Evid. 702, *Advisory Committee Note*); *In re Paraquat*, 730 F.Supp.3d at 807, fn. 8 (S.D. Ill. 2024).

**<u>Qualifications</u>**

This first step in the analysis addresses the expert's ability to offer something of value to the resolution of a disputed issue in the case. *In re Paraquat*, 730 F.Supp.3d at 806. "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior

knowledge, skill, experience, or education with the subject matter of the witness's testimony. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). "The question ... is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Id.* at 617. *In re Paraquat*, 730 F.Supp.3d at 806.

The most basic and sometimes overlooked requirement of Rule 702, that expert testimony must relate to evidence and facts at issue in the case, is expressed twice in the rule itself. Fed. R. Evid. 702 (a) (requiring that the proffered expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue") and (d) (requiring that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case"). In other words, it is not enough that an expert is well-qualified to testify as an expert in *some* area. Instead, for the expert's testimony to be admissible *in a particular case* it must "assist[] the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.,* 774 F.3d 405, 409 (7th Cir. 2014).

This means "the expert must have something 'useful to say' about the particular circumstances at issue." *Downing v. Abbott Lab'ys,* 48 F.4th 793, 810 (7th Cir. 2022) (quoting *Kunz v. DeFelice,* 538 F.3d 667, 676 (7th Cir. 2008)). This standard is not met by "generalized testimony" that does not bear on "the particular facts in dispute." *Id.* Instead, to be relevant and admissible, the expert's opinion must "line[ ] up with the basic facts of the case." *Owens v. Auxilium Pharms., Inc.,* 895 F.3d 971, 973 (7th Cir. 2018). *See also Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 345 (7th Cir.1995) (to be admissible, the testimony must "'fit' the issue to which the expert is testifying to the extent that it is tied to the facts of the case and will aid the jury in resolving a factual dispute.").

**Reliability**

To implement this evidentiary standard, the district court acts as a "gatekeeper" to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *In re Paraquat,* 730 F.Supp.3d at 806, citing *Daubert*, 509 U.S. at 589. *Daubert* provides four non-exhaustive considerations that bear on this inquiry:

(1) whether a "theory or technique ... can be (and has been) tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the technique's "known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation;" and

(4) whether the theory or technique has found "general acceptance" within the scientific community.

*Id.* at 593-94. *Id.*, at 806, citing *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017).

The Seventh Circuit also has endorsed six additional factors, taken from the advisory notes of the 2000 amendment to Rule 702, that bear on the reliability of an expert's testimony:

(1) whether maintenance standards and controls exist;

(2) whether the testimony relates to matters growing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying;

(3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(4) whether the expert has adequately accounted for obvious alternative explanations;

(5) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and

> (6) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Gopalratnam*, 877 F.3d at 779-80 (cleaned up); *In re Paraquat,* 730 F.Supp.3d at 806.

**<u>Relevance</u>**

The third step of the admissibility analysis—relevance—determines whether the expert's proffered testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). *Daubert* requires the proffered testimony to "fit" with a disputed issue in the case because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591. Stated differently, there must be a "valid scientific connection to the pertinent inquiry." *Id.* at 592. *In re Paraquat,* 730 F.Supp.3d at 807.

This standard applies to all forms of expert evidence, including land valuation, *Kumho Tire*, 526 U.S. 137, 150 (1999), and the proponent of the evidence bears the burden of demonstrating that it satisfies *Daubert* by a preponderance of the evidence. Although there is an inexact nature to commercial real estate appraisal and it is not a branch of social science, appraisers' opinions are still subject to Rule 702. *Buchanan Energy, LLC v. Lake Bluff Holdings, LLC*, No.: 15-cv-3851, 2017 WL 1232973, at *5 (Apr. 4, 2017 N.D. Ill.). Ultimately, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). *In re Paraquat*, 730 F.Supp.3d at 805-806.

District courts have the responsibility "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir.1998). This same responsibility requires that expert testimony includes facts at issue as a baseline for the relevance of the testimony. "[T]he

whole point of *Daubert* is that experts cannot "speculate." They need analytically sound bases for their opinions." *Id*.

## IV. THE BELL REPORT AND REBUTTAL

A real estate damages analysis is measured by cost, use, and risk effects. **Cost effects** essentially measure the expense of repairs or clean-up ("remediation"); **use effects** measure damages due to the historical and continued presence (or occupancy) of PCBs on the tested City properties until they are cleaned up; and **risk effects** measure the forward-thinking perception that a potential buyer would have when determining what price he would pay for a property knowing that it has (or had) PCBs.[6] Charles Brigden, JLL's testifying expert in this case, readily agreed.[7]

Environmental contamination issues are considered Class VIII detrimental conditions that may impact the market value of a property. When there may be an impairment to market value, the professional industry guidance and standards make clear that impairments are analyzed by considering cost, use, and risk effects.[8] The Uniform Standards of Professional Appraisal Practice ("USPAP") and the Appraisal Institute set forth that cost, use, and risk effects are considered to determine any impacts to market value from a detrimental condition.[9] The following calculations are appropriate for determining real estate damages, as they illustrate the methodology applied to a real estate damages assessment:

---

[6] Ex. A, p. 9; Ex. B, p. 4.
[7] Ex. G. Brigden Deposition, January 17, 2025, pp.186-188 (risk effect is by definition prospective in nature from the time of a contaminating event); 204:22-25--205:1-3; 217 (a use effect can go back in time historically).
[8] Ex. H, Appraisal Standards Board of The Appraisal Foundation, 2024 *Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), pp. 18-22; Ex. I, The Appraisal Institute, Guide Note 6: *Consideration of Hazardous Substances in the Appraisal Process* (Chicago, IL: Appraisal Institute, 2021); Ex. J, Randall Bell, *Real Estate Damages*, 3rd ed. (Chicago: Appraisal Institute, 2016); and Ex. K, Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 186-189.
[9] Ex. H, pp. 18-22; Exhibit I; Exhibit J; Ex. K; Ex. L, Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116 (Exhibit L).

**Impaired Value = Unimpaired Value - Cost Effects (Remediation and Related Costs) - Use Effects (Effects on Site Usability) - Risk Effects (Environmental Risk/Stigma)**

**Property Value Diminution = Cost Effects (Remediation and Related Costs) + Use Effects (Effects on Site Usability) + Risk Effects (Environmental Risk/Stigma)**

**Impaired Value = Unimpaired Value - Property Value Diminution[10]**

**Cost effects** were estimated by EHEI, which estimated the cost of remediation to exceed $22,000,000.00 and that the remediation effort will take approximately 24 months.[11] Cost effects primarily represent deductions for costs to remediate contaminated property. These costs are usually estimated by someone other than the appraiser.[12]

**Use effects** were determined, as there were impacts to the City's bundle of rights[13] and because Monsanto has used and occupied the City's tested parcels for over 70 years by storing its now-worldwide-banned PCBs on them. Use effect calculations in the Bell Rebuttal were revised to only include parcels during the years in which title was held by the City. The use effect damages were calculated back to December 1, 1955.[14]

In real estate, property rights are referred to as the bundle of rights because ownership of a parcel of real estate embraces a great many rights, such as the right: to its occupancy and use; to exclude; to sell it in whole or in part; to bequeath; the right to transfer, to contract, for specified periods of time, the benefit to be derived by occupancy and use of the real estate.[15] Real estate transactions do not require that the entire bundle of rights be transferred; the right of occupancy

[10] Ex. A, pp. 9-10; Ex. I, p. 13; Ex. L, p. 116; In addition, in Ex. T, JLL Report co-author, Richard Roddewig, published the exact formula twice in *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Chapter 1: USPAP and the Appraisal of Properties Impacted by Contamination of Environmental Risk (Appraisal Institute 2015), 14 and 18.
[11] Ex. B, p. 8; EHEI estimated the costs of remediating the 100 parcels which were owned by the City as of 2024.
[12] Ex. A, p. 8; Ex. H, pp. 18-22.
[13] Ex. K, a foundational source in the real estate appraisal industry, states that the total range of ownership rights in real property is called "the bundle of rights." Each "stick" in the bundle represents a distinct and separate right or interest. The bundle of rights contains all the interests in real property. Ex. K, p. 4.
[14] Ex. B, pp. 7-8.
[15] JD Eaton, *Real Estate Valuation in Litigation, 2nd Edition* (Chicago, IL: Appraisal Institute, 1995), 45 (Ex. M).

and use of real estate is transacted every day and paid for as a rental rate, which is why utilizing a market rental rate is the appropriate measure when a use effect exists.[16] *See also*, *Kimball Laundry Co. v. U.S.*, 338 U.S. 1, 7 (1949) ("[T]he proper measure of compensation [in a temporary taking] is the rental that properly could have been obtained...."); *U.S. v. 883.89 Acres of Land*, 442 F.2d 262, 267 (8th Cir. 1971) ("the comparable sales of other leaseholds in the immediate area were adequate and substantial evidence of the market value of the leasehold").

Furthermore, the bundle of rights is the right to do any of these, whether or not they have been exercised. For example, "the right to refuse to exercise any property rights," as the absence of compulsion to use any right merely rounds out and makes complete the freedom of will in the enjoyment of property ownership.[17] It is also generally recognized that property encompasses the entire bundle of rights inherent in real estate ownership and that the taking or infringement on these rights often constitutes a taking, even if no part of the physical real estate is taken.[18]

For example, when a condemnor exercises the right to use a property, "[t]he most common measure of damages accepted by courts is the rental value of the easement area for the period of occupancy by the condemnor."[19] The basic premise is that an owner must be compensated for the taking of the land (i.e., the value of the land and any damages accrued as a result of the taking), as opposed to being compensated just for the land taken.[20]

In measuring use effects of a property, Bell and JLL agreed that a common valuation methodology is to use the rental rate of the property[21] and that the general calculation of any use

---

[16] Ex. B, pp. 7-8.
[17] Ex. N, Leonard C. Smith, "The Bundle of Property Rights," *The Appraisal Journal* (October 1956): 487.
[18] Ex. B, p. 7; Ex N, p. 16.
[19] Ex. O, The Appraisal Institute, *Real Property Valuation in Condemnation* (Chicago: 2018), 218.
[20] Ex. B, pp. 5-7; Ex. O, p. 13.
[21] Ex. J, p. 85; Exhibit G, Brigden Deposition, 220:17-19 ("The application of rental as a proxy for a loss of use can be and is used and is required to be using the appropriate rental rate…")

effect is: Market Rent x Period of Time = Use Effect.[22] "Market rent" can be derived from different sources, such as standard monthly rates on the Multiple Listing Service ("MLS"). In a use effect analysis, market rental is calculated on the unimpaired (uncontaminated) rental rate, in other words, the market rental rate but for the detrimental condition. In other words, the rental rate reflects the market value for the right to use a property, one example being the right to use the subject properties for the storage of PCBs.[23]

The establishment of an appropriate market rental rate control area is illustrated below:




Techniques are employed that compare properties impaired by a detrimental condition (test properties) to properties unimpaired by a detrimental condition (control properties).[24] The basic premise is that a "test" property is one impacted by a detrimental condition and a "control" property is similar, but it is not impacted by a detrimental condition. Test and control analyses are

[22] Ex. A, p.10; Ex. L, p. 116; and Ex. P, Randall Bell, "Project Delay Economics," *The Appraisal Journal* (Fall 2011): 296; Exhibit G, Brigden Deposition, 217:1-6 (Q/ Do you agree that the generally recognized use effect equation or formula…is market rate rental times time period equals use effect damages, generally? A/ It is an approach that I have used and absolutely has a role in this area.")
[23] Ex. A, pp. 8-10; Ex. B, pp. 4-5; 7; 9; 17; 19.
[24] Ex. J, pp. 33 and 44.

fundamental to the appraisal profession.[25] And JLL and Brigden readily agreed with this axiomatic principle of real estate appraisal as well.[26]

The appropriate market rental rates to set for a use effect analysis are rates "but for" the detrimental condition (contamination). The appraiser is *not* looking for other contaminated properties at all, such as within the tested parcels area or immediately nearby. If Monsanto had approached City landowners in the south end at the beginning of the contamination period at WGK, 1936, and negotiated a rental price for the storage of its PCBs on the owners' parcels, that market rental rate would be a noncontaminated, nonimpacted rate.[27] In this analysis, Bell assessed that the unimpaired (uncontaminated) monthly rental rates were $1,400 per month per improved subject property, and $233.33 per month per unimproved subject property.[28] Rents were discounted using the consumer price index (CPI).[29] Interest for the Use Effect component was calculated utilizing a 9% rate.

"Time" can be the period when there is an impact to the bundle of rights. A key component in the bundle of rights includes the "right to use"[30] or right to exclude[31] which transacts regularly in the real estate market and is reflected as a rental rate. It can also be the period in which use and enjoyment of the property is impaired or delayed, whether in part or in whole. In Bell's revised

[25] Ex. A, p. 29.
[26] When read the paragraph above and asked whether he agreed with it, Brigden stated: "I don't have a problem with it…It is a restating of a very simple, well understood process of analysis." Ex. G, Brigden Deposition, 291:12-25--292: 1-15.
[27] Ex. B, pp. 8-9.
[28] Ex. A, pp. 10-11; Ex. B, pp. 8-9. The JLL Report determined that properties in East St. Louis were renting for $900 per month, Ex. D, p. 80. Brigden testified as to this number: "[W]hen consideration of proper local rents is performed $900 (per month) is the result." Ex. Q, Brigden Deposition, January 21, 2025, 287: 20-21. The Bell Report noted that JLL's utilization of the City's and Cahokia data is improper due to the various contamination issues in both. (Bell, pp.10; 29-30; and 38).
[29] In the real estate profession, "CPI is used to measure changes in costs, such as building costs, and can be used as a barometer for determining changes in lease rates." Ex. K, p. 485.
[30] Ex. M, p. 45; and Exhibit K, p. 4.
[31] *People v. Farr*, 2020 IL App (1st) 171514-U, at ¶ 42 ("Although every stick in the bundle is potentially important in assessing a takings claim, the right to exclude others…is frequently described as the most 'fundamental' and 'treasured' of all property rights").

use effect calculations, the use effect analysis starting date of assessment was determined by City counsel to be 1955, even though there was clear evidence that PCB contamination began shortly after WGK PCB production began in 1936.[32]

**Risk effects** or "market resistance" were determined by developing literature reviews on the effects of PCBs on properties, researching case studies involving comparable environmentally contaminated neighborhoods, and conducting a sales comparison analysis.[33]

## V. ARGUMENT

At the outset, it is important to note that, in its "appraisal review,"[34] JLL offered no opinions of value on the market or rental value of *any* of the City's tested properties. They offered no damages calculations or analyses of cost; use; or risk effect damages. They did not appraise any of the City's tested properties. They did not address the real estate and economic damages incurred by the City as a result of the contamination of PCBs on the City's tested properties.[35] They did not assess Monsanto's unconsented use of the City's tested parcels for over 70 years of storage of its toxic, now-outlawed PCBs. They did not assess various impairments to the City's "bundle of rights" caused by Monsanto's longstanding trespass onto City lands and taking of its rights, including most notably the right to exclude others from using one's property without consent, permission, and payment.[36]

Instead of addressing this matter at hand, JLL's "appraisal review" criticized the Bell Report, but in so doing disregarded real estate industry protocols, guidelines, and customs and

---

[32] Ex. B, p. 9, citing Ex. R, Danny Reible Deposition, August 16, 2024, 25:21--27:15; and Ex. S, Mitchell D. Erickson Rebuttal Report, pp. 24-26, September 10, 2024.
[33] Exhibit A, pp. 12-13.
[34] According to Ex. H, Definitions, p. 3, an "appraisal review is "the act or process of developing an opinion about the quality of another appraiser's work (i.e., a report, part of a report, a workfile, or some combination of these), that was performed as part of an appraisal or appraisal review assignment.
[35] Ex. A, p. 19.
[36] Ex. B, pp. 4-5; 7; 14.

practices. Given these failures as detailed fully below, JLL's opinions are unreliable, irrelevant, and produce nonprobative, inflammatory conclusions which cannot be traced back to real estate appraisal industry norms. The JLL Report has nothing "useful to say about the particular circumstances at issue." *Downing v. Abbott Lab'ys,* 48 F.4th 793, 810 (7th Cir. 2022).

**A. JLL's Manufactured-for-Litigation and Fabricated "Actual Use" Assessment**

In stark contrast to the Bell use effect analysis described above, JLL completely ignored any use effect analysis,[37] did not project a use effect damages amount,[38] and instead postulated a fabricated term, "actual use," as its standard for its appraisal review criticizing the Bell Report. JLL claimed that "[t]here is no support in the principal treatises of the appraisal profession (including Bell's *Real Estate Damages* book) to support the Bell decision to ignore "actual use" of the City's properties and instead to rely on a hypothetical concept called "conventional use or "normal use" has been affected for the past 50 years and measure it based on hypothetical leases and rents."[39]

First, JLL's rhetoric on "hypothetical leases and rents" is false, as it contradicts appraisal methodology and practice. The profession *requires* that appraisals "presume a hypothetical sale [or rent] of the asset being valued."[40] Moreover, USPAP's Advisory Opinion 9 ("AO9") specifically states in its "Relevant Property Characteristics" section:

> "[T]he appraisal of a property that includes the effects of environmental contamination on its value usually requires data not typically used in an appraisal of an otherwise similar but uncontaminated property or an appraisal of a potentially impacted property **using either a hypothetical**

[37] Incredibly, when asked about Monsanto's use/occupation of the City's tested parcels in emitting PCBs on them since soon after PCB production began in 1936, Brigden stated: "That is outside the scope of my assignment in this case." Ex. G, Brigden Deposition, 281:5-13.
[38] The JLL Reports and work files do not contain any Use Effect analysis or calculations. In addition, Brigden confirmed that one was not conducted. Ex. G, Brigden Deposition, 263:3-25—264:1-8; 115:2-14.
[39] Ex. D, JLL Report, p.12.
[40] Ex. K, p. 664. ("For example, market value *presumes* a hypothetical sale of the asset being valued under certain stated conditions.")

**condition or an extraordinary assumption** that it is uncontaminated or not impacted."[41] (**emphasis added**)

The JLL criticism here is not only false but misrepresents the standards of care for assessing environmentally contaminated properties in the real estate appraisal industry as set forth by the Appraisal Foundation's Appraisal Standards Board.[42] Using JLL logic, the only way a property could be valued is if it actually sells or leases, which is obviously not true; properties have value whether or not they are for sale or lease, as Mr. Brigden acknowledged under oath.[43]

Secondly, "actual use" is not a term of art utilized in the real estate appraisal industry literature addressing the valuation of impaired, contaminated, or damaged properties.[44] It is a term coined by JLL to assist its litigation reports and testimony needs. Or as JLL's Executive Vice President, Thomas Hamilton put it: "[Actual use] is not a specific real estate term."[45] While the JLL Report is critical that the Bell Report ignored principal treatises of the appraisal profession on "actual use," this criticism is wholly improper. When pressed under oath to stand up for JLL's "actual use" theory as a standard in the appraisal industry, Mr. Brigden refused to answer the question and stated that he did not have an opinion:

> Q. (By Mr. Johnson) Would you agree with me that **actual use is not the standard in the appraisal industry** to assess contaminated real estate, and never has been, isn't that true, Mr. Brigden?
> A. **I don't have an opinion on that**.[46] **(emphasis added)**

---

[41]Ex. H, p. 20.
[42] Ex. H provides in its preface that "the Appraisal Foundation is the nation's foremost authority on the valuation profession. The organization sets the congressionally authorized standards and qualifications for real estate appraisers and provides voluntary guidance on recognized valuation methods and techniques for all valuation professionals."
[43] Ex. Q, Brigden Deposition, 19:5-10.
[44] Ex. U. In *Park v. Southern California Edison Co.*, Los Angeles County Superior Court, State of California, Case No. JCCP 4965 (cited in Ex. D, JLL Report, p. 114, fn. 139), JLL's Thomas Hamilton testified at his November 5, 2023, deposition that the term "actual use" was added by JLL as "just a modifier of that term [use] to distinguish from hypothetical use of a property." Ex. U, Hamilton Depo,15:12-19). See also Ex. G, Brigden Deposition, 280:6-19.
[45] Ex. V, Hamilton Declaration, *Parks v. Southern California Edison Co.*, January 28, 2025, p. 36.
[46] Ex. G, Brigden Deposition, 279:5-13.

When challenged to cite or find *any* real estate appraisal industry peer-reviewed literature that used the term "actual use" for a use effect analysis, not surprisingly none was identified or cited.[47] And none exist. "Actual use" is simply not part of the real estate appraisal industry lexicon insofar as use effect analyses are concerned. It is not part of USPAP, AO9, Guide Note 6, or other standards in industry describing the valuation of environmentally contaminated properties.[48] It is not peer-reviewed, not presented in industry journals, or discussed at real estate appraisal conferences or the like. Indeed, there are but three real estate appraisers in the industry who use the term in litigation reports only, and they all work at Jones Lang Lasalle.[49]

In its gatekeeping role, this Court should exclude JLL's conclusions emanating from its "actual use" litigation term. It is not reliable as not being an appropriate or accepted methodology in the real estate appraisal industry. The "actual use" concept is: not part of the real estate appraisal lexicon; not peer-reviewed, published, or generally accepted in the industry; a bogus concept developed exclusively for testimony; and is not a concept used by anyone in the industry but JLL, and even then for litigation purposes only. Having agreed with the City: on the appropriateness of assessing use effect damages; the equation for such assessing use effect damages; the use of market rental rates for use effect assessments; and having even calculated what it considers an "appropriate" market rental rate for City use effect damages in its Report, JLL's "actual use" approach to attacking the City's real estate appraisal expert should be excluded.

**B. JLL's and Brigden's Proffered Testimony Regarding Cost Effect Has No Foundation Because It Is Beyond The Scope Of Their Expertise.**

[47] Ex. G, Brigden Deposition, 271-280.
[48] Exs. H, Advisory Opinion 9, p. 18; and I.
[49] Ex. C, Bell Deposition, 204:20-25--205:1-23.

Rule 702 requires that expert testimony be within an expert's specialized knowledge, training, and education. JLL and Brigden are Illinois Certified General Appraisers.[50] Neither have any education, training, or job experience related to environmental science, engineering, or pollution remediation. By contrast, EHEI's Kevin Coghlan ("Coghlan") holds a Bachelor of Science Degree in Biology from Fairfield University and a Master of Science in Industrial Hygiene from University of Massachusetts, Lowell. Since 1987, Coghlan has served in a variety of positions related to environmental science, engineering, and remediation. Currently, Coghlan is the President, Chief Operating Officer, and Principal Scientist of EHEI.[51]

Despite not having the necessary qualifications, JLL's appraisal review contains opinions on the purported need, or not, for remediation, as well as the levels of contamination required under various federal statutes and regulations to warrant remediation. Thus, it is far beyond the scope of JLL's specialized knowledge, and such opinions should be excluded. Consequently, their testimony and proclaimed expertise regarding the reasonableness and accuracy of environmental information provided by EHEI, as relied upon by Bell to determine cost effect damages, is fruit of that same poisonous tree, and should be excluded.

Neither JLL nor Brigden have any training, education, or experience as an environmental scientist or engineer. Specifically, Brigden admitted not only that he had no expertise in environmental science, but that he lacked expertise in the specific environmental data and standards discussed in this case:

> Q. Would you acknowledge just for the record here [that] you are not an environmental scientist, correct?
> A. **That's correct**.
> Q. And you are not qualified to give an opinion within a reasonable degree of environmental scientific certainty as to thresholds of a given

[50] Ex. D, JLL Report, pp. 219-237.
[51] Ex. W, Kevin Coghlan curriculum vitae (2024).

> contaminant on a piece of property as requiring cleanup or requiring remediation. Fair enough?
> A. **Yeah.** The vague part of it is **I'm not an environmental engineer or scientist and I don't, I'm not attempting to come off as one,** however, appraisers do from time to time evaluate some data prepared or analyzed by others where we do have to understand what our appropriate state, local, or federal standards on testing limits, that sort of thing, and so we do have to have some understanding of that, **but I'm not an expert in that**.[52] **(emphasis added)**

Despite their professed lack of expertise in environmental science, JLL and Brigden made a slew of judgments as to the conclusions of a bona fide environmental scientist, Coghlan, under the façade of criticizing Bell's reliance on Coghlan's conclusions. JLL and Brigden use Bell's appraisal as a conduit to make environmental conclusions without proper expertise.

On numerous occasions, JLL and Brigden independently critique the environmental conclusions of Coghlan, while couching it in the language of Bell's "reliance" on his expert conclusions. JLL and Brigden directly claim that the Coghlan report was "unreliable."[53] To support this conclusion, JLL and Brigden point out that EHEI's sampling found that only 210 of the 272 properties sampled had PCB concentrations greater than 0.23 ppm, and that only 36% of the parcels had PCB concentrations greater than 1 ppm. JLL and Brigden then attack Coghlan's conclusion that the subject properties require remediation because, according to JLL and Brigden, EPA standards do not mandate remediation for properties that have below a 1.0 ppm concentration of PCBs, the EPA has not recommended remediation of the properties in the past, and that in previous, unrelated, situations of PCB contamination, the threshold for mandatory remediation was set at 1.0 ppm.[54] As licensed real estate appraisers in the state of Illinois, neither JLL nor

[52] Exhibit G, Brigden Deposition, pp. 100-101
[53] Ex. D, JLL Report, p. 202.
[54] *Id.* at pp. 202-203.

Brigden are qualified to opine on the proper standards for mandatory remediation of PCB contamination.

Next, JLL and Brigden directly attack the manner of remediation recommended in the EHEI Report. EHEI "identified excavation and off-site disposal of impacted soils as the most reliable and straightforward remedial option" to remove contamination from the identified properties in his report.[55] In response, JLL and Brigden identified their own preferred method of remediation, claiming that "capping is often an appropriate remedy" for PCB contamination, and that Bell should have considered alternative methods of remediation.[56] Neither JLL or Brigden, or Bell for that matter, are qualified to determine what methods of PCB remediation are required for the properties at issue in this case. It is inappropriate for JLL and Brigden to insert their own opinion on which remediation method is required.

JLL and Brigden then seek to comment on EHEI's assessment as to how much soil must be removed from the relevant properties for proper remediation. EHEI's Report stated that two feet of soil would need to be removed from each property that tested above 0.23 ppm.[57] In response, JLL and Brigden claim that this is not necessary, citing an unrelated case of PCB contamination where "less than two feet of soil was removed," and concluding that this fact makes the EHEI Report unreliable.[58] JLL and Brigden both lack any relevant qualifications to determine what amount of soil must be removed from a property to effectively remediate PCB contamination.

JLL and Brigden also seek to comment on Coghlan's testimony on environmental matters as stated in Coghlan's deposition. Specifically, they point to several statements made by Coghlan where he indicates that the recommendations of his report, that each contaminated property must

---

[55] Ex. X, EHEI Report, p. 26.
[56] Ex. D, JLL Report, p. 203.
[57] Ex. X, EHEI Report, p. 27.
[58] Ex. D, JLL Report, p. 203.

be remediated, are not exclusively based on standards for remediation applied by the IEPA and the EPA. JLL and Brigden seek to use these admissions to claim that because "Coghlan [acknowledged] that not all the 273 properties may need to be remediated under the various standard applied by the IEPA and U.S. EPA," Bell should not have relied on his environmental data to make his "Cost Effect" conclusion.[59] First, this case is not a regulatory action, and while IEPA and EPA standards may be informative in certain cases, they are not relevant to this case. Next, given their abject lack of education, training, or experience in environmental science, neither JLL nor Brigden are qualified to draw conclusions about IEPA or EPA regulatory standards concerning PCB contamination.

In his deposition, Brigden was asked why he found Coghlan's environmental report to be unreliable, and again, he decided to draw his own conclusions regarding matters of environmental science presented by Coghlan in Bell's report. Specifically, when asked why he could not accept Bell's reliance on Coghlan's environmental recommendations, he stated:

> "273 properties, somebody hands me a report that says every one of these has to be dug up and it's X amount of dollars. Also, I'm looking at the same report and that those, the level, the measured levels of total PCB amounts are all over the place, including some that are below certain standards."[60]

Amazingly, in the same breath, Brigden qualified his statement by claiming that he was "not an environmental engineer, and [he's] not offering opinions on that matter."[61] JLL and Brigden cannot have it both ways, where they are willing to make independent judgments as to the reliability of Coghlan's scientific data, but then hide behind the pretense of not offering an expert opinion on that data. In their own terms, JLL and Brigden attack Bell's cost effect calculations on

[59] Ex. D, JLL Report, pp. 204-205.
[60] Ex. G, Brigden Deposition, p. 213.
[61] *Id.* at 213.

the basis that the environmental data relied upon by Bell is unreliable. But each of their assertions presupposes an expertise in environmental engineering that both JLL and Brigden lack, and they cannot be allowed to opine on these matters that are beyond their expertise without consulting with a genuine expert in environmental science.

When confronted with the fact that he was testifying far beyond his expertise in environmental matters, Brigden justified his testimony through a misguided application of real estate appraisal industry standards. Brigden testified that it is correct to say the Appraisal Institute's Guide Note 4 requires an appraiser to refrain from "blindly" accepting the conclusions of an outside expert when evaluating a fellow appraiser's report.[62] Guide Note 4 provides that, before relying on a report prepared by an outside expert, an appraiser must:

> 1) [H]ave a reasonable basis for believing the individuals preparing the report(s) are competent;
> 2) have no reason to doubt the credibility of the work of the work preparer(s);
> 3) consider the criteria under which the reports were prepared;
> 4) consider the source and extent of the instructions given to the preparer of the reports;
> 5) determine how the appraiser might rely on this information in making decisions and preparing his or her report; and
> 6) determine the process and procedures used to evaluate the reports prepared by others.[63]

When determining the credibility of an outside expert's report in the determination of a value opinion, the standard in the appraisal industry is to rely on subject matter experts to determine the reliability of another expert's report. Guide Note 4 explicitly indicates that these conclusions usually "represent informed matters beyond the appraiser's expertise," and therefore are "prepared

[62] Ex. G, Brigden Deposition, p. 210.
[63] Ex. I, Appraisal Institute, *Guide Note 4: Reliance on Reports Prepared by Others*. Chicago: Appraisal Institute, 2021, p. 7.

by recognized professionals."[64] In addition, USPAP Advisory Opinion 9 ("AO9") specifically cautions that:

> Since the appraiser is usually not an expert on the scientific aspects of contamination, experts from other fields will typically provide this information. Appropriate regulatory authorities should also be consulted to confirm the presence or absence of contamination.[65]

JLL agreed that USPAP's AO9 applies to situations where there is an appraisal of real property that may be impacted by environmental contamination.[66]

Furthermore, AO9 recommends that appraisers employ "Extraordinary Assumptions" when relying on scientific conclusions made by an outside expert. An Extraordinary Assumption is "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions."[67] The purpose of these recommendations is to ensure that the underlying information concerning, for example, environmental conditions, comes from reliable and accredited sources, and that information is clearly demarcated as originating from outside the appraiser's own analysis.[68]

Rather than adhere to these standard procedures, JLL and Brigden embarked on their own analysis of EHEI's environmental conclusions and found that they were unreliable. This is in stark contrast to above industry standards, which indicate that an appraiser should refer to subject matter experts when evaluating an appraisal that contains information beyond their expertise. Notably,

---

[64] *Id.* at 8.
[65] Ex. H, AO9 at 21.
[66] Ex. G, Brigden Deposition, 27:3-8 ("Q/ …[G]enerally…is one of the authoritative source materials for real estate appraisers in your industry that address how to evaluate environmentally contaminated real estate the so-called Advisory Opinion 9? A/ Yes."); 238:12 ("…I would defer to AO 9."); 251:19-20 ("I would rather say let's just stick with AO9."); 254:20 ("I'll stick with AO9…").
[67] Ex. H, AO9, p. 18.
[68] Ex. H, AO9, p. 20.

when preparing his appraisal, Bell not only relied on an outside expert for environmental information, but also included the following Extraordinary Assumption:

> It is an extraordinary assumption that the environmental testing, including the identification of the subject properties, is accurate and correct. This data was presented by Kevin Coghlan, M.S., C.I.H. of [EHEI]. Furthermore, PCBs were present on the subject properties prior to July 1, 1973. Other experts will be presenting evidence on this matter.[69]

Rather than perform the same level of due diligence, in contravention of industry standards, JLL and Brigden simply swapped their own opinions for that of a subject matter expert.

In sum, the USPAP and Appraisal Institute require real estate appraisers to consider and evaluate technical information from outside their expertise when producing reports, but they do not empower appraisers to substitute their judgment for that of subject matter experts. JLL and Brigden have no more training or education in matters of environmental science or engineering than a layman, and yet time and time again, they make independent assertions about the veracity and substance of environmental data and scientific standards related to PCB pollution. It is not helpful to a factfinder for a layman's opinion on environmental science to be presented as expert testimony on real estate appraisal, and for this reason JLL's and Brigden's testimony on these matters should be excluded.

**C. JLL's and Brigden's Proffered Testimony Regarding Risk Effect Fails To Address the Matter at Hand Because Their Testimony is Based on Irrelevant Case Study Properties and Undermined by Auction Sales.**

AO9 specifies that "the appraisal of properties that may be impacted by environmental contamination involves specialized terms and definitions." Included in these are the definitions of **S**ource; **N**on-Source; **A**djacent; and **P**roximate Sites, or "SNAP." AO9's Relevant Property

[69] Ex. A, p. 32.

Characteristics section states that such circumstances usually require data not involved in a typical appraisal scenario, including the "SNAP" categorization of the subject properties.[70]

USPAP defines the status of a property's relationship to environmental contamination as follows:

> **Source, Non-source, Adjacent and Proximate Sites (SNAP):** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site but are in close proximity to the source site.[71]

Even the co-author of the JLL Report, Richard Roddewig, has written in real estate appraisal literature about the vitalness of the "SNAP" procedure in the appraisal process:

> The distinction between source sites, non-source sites, adjacent sites, and proximate sites is also one of the 10 "relevant property characteristics" referenced in the 2002 AO-9 **as important to the appraisal process.** According to the 2003 Jackson article, understanding this distinction is important because "**different types of sites have significantly different risks and costs due to contamination**."[72] **(emphasis added)**

In this case, by definition, the "Source Site" is WGK, or the site on which [PCB] contamination is, or has been, generated. The City's tested land parcels are by definition "Non-Source Sites," or sites onto which WGK PCBs have migrated.[73] There are no adjacent or proximate properties.[74] When confronted with the SNAP categories, Brigden testified: "It was not something we arrived at a determination of and I'm not sure that I really thought about that."[75]

---

[70] Ex. H, pp. 19-20.
[71] Ex. H, 20.
[72] Ex. T, Richard Roddewig (Editor), *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Chapter 1: USPAP and the Appraisal of Properties Impacted by Contamination of Environmental Risk (Appraisal Institute 2015), 4.
[73] Ex. A, pp. 4; 133.
[74] Ex. A, p. 133.
[75] Ex. G, Brigden Deposition, 293:20-22.

JLL omitted this simple but necessary real estate appraisal exercise. Instead, from the beginning, JLL has attempted to dodge the issue at hand by measuring the impact to "properties adjacent or near sites being investigated or remediated."[76] The sites being investigated are the City subject tested parcels. Properties adjacent or near the subject City tested parcels are not properties owned or controlled by the City, and not the subject of this lawsuit. Thus, they are not relevant to a determination of the risk effect damages incurred by the City as a result of the contamination of the City's tested parcels. JLL is being deceptive and misleading and intentionally moving the goalposts.

JLL's deception is also born out in its submission of misleading data and information to ostensibly support criticisms of Bell's opinions in this matter. In particular, JLL employed case studies that evaluate uncontaminated adjacent or proximate properties, as opposed to non-source contaminated properties, like the City subject property. Additionally, JLL employed contaminated Cahokia sales in their local market sales analysis, as opposed to appropriate uncontaminated control properties. Finally, in their Supplemental Report, JLL and Brigden employed auction sales data that they excluded in their original Report because auction sales do not reflect market value.

**a. JLL and Mr. Bridgen employed misleading case study properties.**

While Bell analyzed contaminated non-source properties akin to the City subject properties, JLL evaluated uncontaminated, adjacent, and proximate properties, which contradict the standards of care in the real estate appraisal industry for an appraiser conducting a review.[77] As a result, their assertions about Bell's conclusions on the risk effect of the City's contaminated parcels are non-probative, unreliable, and irrelevant.

---

[76] Ex. D, JLL Report, p. 11
[77] *Id.*

Bell examined numerous case studies, all of which involved communities, like the City, with non-source PCB or other chemical contamination of the soil on residential properties.[78] For example, Bell studied Anniston, Alabama, where, from 1929 to 1971, Monsanto produced PCBs at its Anniston facility, and where, as in the City, Monsanto released PCBs into the air which led to substantial environmental contamination of the soils in residential communities.[79] Bell also studied Times Beach, Missouri, where in 1982, the CDC recommended permanently relocating residents after dioxin contamination was discovered to have spread across the town in a flood.[80] Bell also studied Carver Terrace, Texas, where Motiva Oil Refinery released elevated levels of benzene, sulfur dioxide, hydrogen sulfide, and butadiene from its smoke stacks leading to substantial environmental contamination of the soils in that community.[81] Bell also studied Mossville, Louisiana, where industrial plants released an estimated four million pounds of toxic chemicals, including dioxin, which contaminated the soils of the residential community.[82]

By contrast, all JLL's studies are irrelevant to the matter at hand because they involve uncontaminated residential properties (adjacent, proximate, or cleaned) or industrial properties. Specifically, while Bell studied Times Beach, where homes were demolished and remain vacant to this day, JLL studied the uncontaminated neighborhood of Elk Run over a mile from Times Beach.[83] Indeed, the JLL Report states that "[a]ny impacts in **neighborhoods around the Times Beach site** were temporary. There was a **possible temporary impact of between 5% and 15% on prices in Elk Run**."[84] As studied by JLL, the "neighborhoods around the Times Beach site" are all uncontaminated "adjacent and proximate sites," according to the SNAP, as defined in

[78] *Id.* at pp. 54-60.
[79] *Id.*
[80] *Id*.
[81] *Id.*
[82] Ex. B, Bell Rebuttal, p. 30.
[83] *Id.*; Ex. D, JLL Report, pp. 317-319.
[84] Ex. D, JLL Report, p. 324 (emphasis added).

USPAP. And, according to JLL's Roddewig, adjacent or proximate uncontaminated sites are where "liabilities and potential liabilities for site cleanup **would not apply…"**[85]

Thus, JLL failed to analyze the properties and place them into SNAP categories. This directly contradicts USPAP's guidance on evaluating contaminated properties. The omission of SNAP resulted in the improper application of AO9 and the analysis of contaminated properties. Thus, the JLL Report does not comply with the accepted industry standards as defined by USPAP, AO9, and JLL's own co-author of its Report, Roddewig.

**b. JLL and Brigden speciously employed contaminated control properties, such as Cahokia, in their local market sales analysis.**

Distinct from case studies, which require identifying comparable environmentally contaminated neighborhoods, conducting a sales comparison analysis requires comparing contaminated test properties (the City) with uncontaminated control properties.[86] The Bell Report excluded Cahokia as an uncontaminated control property because Bell found evidence of contamination, which he included in his work file produced to JLL and Brigden.[87] Bell did so because, in order to properly conduct the test-control comparison, the appraiser must verify that those properties are indeed uncontaminated before employing them as control properties. By contrast, despite having that information, and without verifying that Cahokia is uncontaminated and thus suitable for use as a control,[88] JLL and Brigden employed sales in Cahokia as the primary basis of their local market sales analysis,[89] in violation of industry standards. Without verification,

[85] Exhibit T, p. 5.
[86] Ex. A, Bell Report, p. 29.
[87] Ex. A, Bell Report, p. 30.
[88] Ex. G, Brigden Depo, 308:16-24.
[89] Ex. D, JLL Report, pp. 61-77, et seq.

those properties cannot be used to conduct a sales analysis and thus cannot form the basis for the opinions JLL and Brigden have provided concerning risk effect.

**c. JLL and Bridgen speciously employed auction sales that are not suitable for determining market value.**

On September 3, 2024, and on January 7, 2025, JLL issued what they called Supplemental Reports.[90] JLL's January 7, 2025 Supplemental Report replaces the initial Supplement issued on September 3, 2024.[91] JLL's Supplemental Reports entirely focus on risk.[92] In the Supplement, JLL and Brigden purported to review public records and found that "75 of the 273 subject properties (or 27%) actually exchanged hands to willing buyers (from the County Trustee) in recent years, in spite of the Bell Report claim of -100% impact on price/value."[93] Their information, as explained in the Supplemental Report, was "acquired through a property auction of tax-delinquent properties in St. Clair County."[94] In other words, JLL and Brigden analyzed auction sales.

The problem with the use of auction sales, as admitted in the original JLL Report, is that they do not allow for valid comparisons. Indeed, in the JLL Report, Roddewig and Brigden state that, "[t]o ensure valid comparisons **we excluded distressed sales** such as foreclosures, **auctions**, short sales, and REOs."[95] The JLL Supplemental Report is thus improper because JLL and Brigden utilize auction sales despite their earlier admission that such sales must be excluded.

The reason that auction sales do not serve as valid comparisons, as explained by Bell in his Rebuttal Report, is that they do not involve knowledge of the contamination and thus do not reflect

[90] Exhibits E and F.
[91] Exhibit F, p. 2.
[92] *Id*. at 13 ("The Bell Report Conclusion Concerning the 'Risk Effect' Impact on Prices and Values of the Subject Properties").
[93] *Id.*
[94] *Id.*, p. 2.
[95] Ex. 4, JLL Report, page 74, footnote 83.

market value.[96] Indeed, as Bell explained: "[A] fundamental aspect of real estate valuation is that the buyer and seller are 'knowledgeable' of the relevant property characteristics." Bell further explained that "the JLL Report purports to analyze sales of the subject properties; however, these were actually auction sales where the contamination was not known to be disclosed to the buyers."[97] Thus, he explained, "the buyers were not 'knowledgeable' as to the environmental condition of the subject properties and so these 'sales' could not reflect 'market value.'"[98] Sales that do not reflect market value must not be employed as comparisons, as JLL originally admitted, and thus cannot support JLL's contradictory use in their Supplemental Report. JLL's and Brigden's opinions about the auction sales of these properties as reflected in JLL's Supplemental Report must be excluded, as JLL originally recognized they should have been. All opinions expressed in the JLL Supplemental Report are based on the use of the auction sales, are thus the fruit of that same poisonous tree, and should be excluded.

## VI. CONCLUSION

For the foregoing reasons, JLL's and Brigden's opinions should be excluded, *ab initio*, by Rule 702 of the Federal Rules of Evidence and its jurisprudence. JLL's and Brigden's qualifications and experience do not provide the foundation for their cost effect opinions. JLL and Brigden admittedly used an unreliable, made-for-litigation concept, "actual use," for their use effect criticisms of the Bell Report. Finally, the irrelevant and inappropriate bases for their risk effect opinions make them non-probative, unreliable, and irrelevant. As such, JLL and Brigden will not assist the trier of fact and their opinions and would-be testimony should be excluded as indicated below.

---

[96] Ex. B, Bell Rebuttal, p. 24.
[97] *Id.*
[98] *Id.*

WHEREFORE, Plaintiff moves to exclude the JLL/Brigden opinions as follows:

1. All reference to the coined litigation term "actual use" and the opinions expressed on the basis thereof concerning use effects, as stated in Exhibit D, JLL Report, pp. 10-12 and 208-211.
2. All opinions concerning remediation, as stated in Exhibit D, JLL Report, pp. 201-205, and Exhibit G, Brigden Deposition, pp. 210-213.
3. All references to misleading case studies about uncontaminated adjacent or proximate properties, as stated in Exhibit D, JLL Report, pp. 317-356.
4. All opinions employing contaminated properties, such as Cahokia, as uncontaminated control properties in their local market sales analysis, as stated in Ex. D, JLL Report, pp. 61-77, et seq.
5. All opinions expressed in the JLL Supplemental Report, Exhibit F, pp. 1-18, based on auction sales.

Dated: March 5, 2025

Respectfully Submitted,

**THE DRISCOLL FIRM, P.C.**

By: */s/ Paul W. Johnson*
Paul W. Johnson, #6193774
Christopher J. Quinn, #6310758
211 N. Broadway, Suite 4050
St. Louis, MO 63102
Phone: (314) 932-3232
Fax: (314) 932-3233
paul@thedriscollfirm.com
chris@thedriscollfirm.com

**SMOUSE & MASON, LLC**
Roy L. Mason, #938118
Zachary E. Howerton, #151215033
233 Duke of Gloucester Street

**THE DRISCOLL FIRM, LLC**
John J. Driscoll, #6276464
1311 Avenida Ponce de
Leon, 5th Floor

Annapolis, MD 21401
Phone: (410) 269-6620
Fax: (410) 269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

1825 San Juan, PR 00907
Phone: (618) 444-6049
Fax: (314) 932-3233
john@jjlegal.com

**THE DRISCOLL FIRM, P.C.**
Matthew J. Limoli, #6328051
434 Fayetteville Street, Ste. 560
Raleigh, NC 27601
Phone: (919) 582-6516
matthew@thedriscollfirm.com

**MILBERG, COLEMAN, BRYSON, PHILLIPS, GROSSMAN, PLLC** Paul
Andrew A. Lemmon (#18302)
5301 Canal Boulevard
New Orleans, LA 70124
Phone: (985) 783-6789
Fax: (202) 318-5306
alemmon@milberg.com

**CHATHAM & BARICEVIC**
John Baricevic, #3121537
Grey Chatham, #6312518
107 W. Main Street, Suite 1
Belleville, IL 62220
Phone: (618) 233-2200
Fax: (618) 233-1589
john@chathamlaw.org
greyjr@chathamlaw.org

**MILBERG, COLEMAN, BRYSON, PHILLIPS, GROSSMAN, PLLC**
Melissa Sims, #6231297
800 S. Gay Street Suite 1100
Knoxville, TN 37929
Phone: 815-878-4674
Fax: 865-522-0049
msims@milberg.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 5, 2025, the foregoing document was electronically filed with the Clerk of Court and will be served by operation of the Court's CM/ECF system upon all registered parties. The foregoing document also was served via electronic mail upon:

Philip Rice
Rice Law Offices
110 E. Lincoln Street
Belleville, Illinois 62220
price@ricelawoffices.com

*/s/ Paul W. Johnson*