# EXHIBIT D



# Expert Report: Appraisal Review & Environmental Conditions Impact Analysis

*City of East St. Louis. v. Monsanto Company, et al.*
*269 Vacant Land Parcels and 4 Improved Properties located in East St. Louis, Illinois*



JLL Valuation & Advisory Services, LLC
July 2024

**JLL Valuation & Advisory Services**
**Complex Real Estate Analysis & Litigation Support**

## EXPERT REPORT: APPRAISAL REVIEW & ENVIRONMENTAL CONDITIONS IMPACT ANALYSIS

**RELATED TO 273 PROPERTIES LOCATED IN THE CITY OF EAST ST. LOUIS**

*A REVIEW OF:*

AN APPRAISAL REPORT PREPARED BY RANDALL BELL, MAI
CONCERNING VARIOUS IMPROVED AND UNIMPROVED PROPERTIES LOCATED IN THE
CITY OF EAST ST. LOUIS, ST. CLAIR COUNTY, ILLINOIS

*IN THE MATTER OF:*
CITY OF EAST ST. LOUIS V. MONSANTO COMPANY, ET AL.
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS
**CASE NO. 3:21-CV-00232-DWD**

### PREPARED FOR:

MR. ADAM E. MILLER
SHOOK HARDY & BACON LLP
190 CARONDELET PLAZA, SUITE 1350
ST. LOUIS, MISSOURI 63105

AS COUNSEL FOR:
MONSANTO AND PHARMACIA

MR. CHARLES R. HOBBS, II
LATHROP GPM LLP
190 CARONDELET PLAZA, SUITE 1400
ST. LOUIS, MISSOURI 63105

AS COUNSEL FOR:
SOLUTIA

### EFFECTIVE DATE OF VALUE OF APPRAISAL REVIEW & IMPACT ANALYSIS:

DECEMBER 31, 2023 (VALUE DATE) -- FEBRUARY 16, 2024 (BELL REPORT)

### DATE OF JLL REPORT:

JULY 9, 2024

### SUBMITTED BY:

 JLL VALUATION & ADVISORY SERVICES, LLC
200 EAST RANDOLPH STREET
THE AON CENTER, 44TH FLOOR
CHICAGO, ILLINOIS 60601

## JLL Expert Report Table of Contents

**JLL EXPERT REPORT TABLE OF CONTENTS** ..................................................................................1

**EXECUTIVE SUMMARY OF THIS JLL EXPERT REPORT** ...............................................................6

SUBJECT AND PURPOSE OF THIS EXPERT REPORT ...............................................................................6
USE OF THIS APPRAISAL REVIEW AND JLL EXPERT REPORT ................................................................6
THE ALLEGED PCB CONTAMINATION AND THE PROPERTIES INVOLVED AS CLAIMED IN THE BELL REPORT ......................7
SUMMARY OF THE JLL RESEARCH INTO THE PCB INVESTIGATION IN THE SUBJECT NEIGHBORHOOD.................7
THE MARKET VALUE AND DAMAGES CONCLUSION IN THE BELL REPORT ..........................................................7
PORTIONS OF THE BELL REPORT REVIEWED AND CORRECTED IN THIS APPRAISAL REVIEW AND EXPERT REPORT ...............8
SUMMARY OF THE ERRORS, OMISSIONS, AND MISREPRESENTATIONS IN THE BELL REPORT........................9
CONCLUSIONS FROM REVIEW OF THE BELL REPORT .................................................................................11

**1.    INTRODUCTION** .................................................................................................................13

1.1    SUBJECT AND PURPOSE OF THIS EXPERT REPORT .................................................................13
1.2    USE OF THIS APPRAISAL REVIEW AND JLL EXPERT REPORT.................................................13
1.3    THE SUBJECT PROPERTIES AND NEIGHBORHOOD .................................................................13
1.4    QUALIFICATIONS OF THE APPRAISERS .................................................................................18
1.5    SCOPE OF WORK..................................................................................................................18
1.6    CERTIFICATION AND STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS ....................20
1.7    DATE OF VALUE AND CONTAMINATION SITUATION IMPACT ANALYSIS....................................21
1.8    DEFINITIONS IMPORTANT TO THE ASSIGNMENT ...................................................................21
1.9    DATES OF INSPECTION OF THE EAST ST. LOUIS MARKET AREA AND THE SUBJECT PROPERTIES AND SUBJECT NEIGHBORHOOD..23
1.10    DATE OF SUBMISSION ..........................................................................................................23

**2.    THE STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE AND GENERALLY ACCEPTED METHODS FOR DETERMINING THE EFFECT OF ENVIRONMENTAL CONDITIONS ON PRICES, RENTS AND VALUES..24**

2.1    LICENSED REAL ESTATE APPRAISERS, THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE, AND THE REVIEW APPRAISAL PROCESS ..........................................................................................24
2.2    THE GENERALLY ACCEPTED APPRAISAL METHODS FOR DETERMINING THE IMPACT OF ENVIRONMENTAL CONDITIONS ON REAL ESTATE PRICES AND DIMINUTION IN MARKET VALUE DUE TO CONTAMINATION AND ENVIRONMENTAL RISK........................25
2.3    MARKET EFFECTS, THE DETRIMENTAL CONDITION LIFECYCLE, AND THE REQUIREMENTS TO ANALYZE ACTUAL MARKET DATA AND UNDERTAKE PROPERTY-BY-PROPERTY ANALYSIS AT VARIOUS POINTS IN TIME..............................25

**3.    THE BELL REPORT DAMAGES CLAIM AND METHODS OF ANALYSIS...........................................29**

3.1    THE CLAIMED PURPOSE OF THE BELL APPRAISAL ASSIGNMENT AS STATED IN THE BELL REPORT .......................29
3.2    THE DEFINITION OF DAMAGE RELIED ON IN THE BELL REPORT.................................................29
3.3    THE ELEMENTS OF THE DAMAGES CLAIM AND DAMAGES CONCLUSION IN THE BELL REPORT.........................29
3.4    THE BELL REPORT DAMAGES METHODOLOGY ......................................................................30

**4.    JLL RESEARCH INTO THE ENVIRONMENTAL & PCB SITUATION INVOLVING THE MONSANTO/KRUMMRICH FACILITY AND OTHER SITES IN THE SAUGET INDUSTRIAL CORRIDOR........32**

4.1    HISTORY OF THE MONSANTO FACILITY IN SAUGET, ILLINOIS.................................................32
4.2    RCRA AND CERCLA AND THE HEAVY INDUSTRIES AND CHEMICAL PLANTS IN THE SAUGET INDUSTRIAL CORRIDOR ..............33
4.3    THE SAUGET TASK FORCE AND THE INDUSTRIAL FACILITIES INVESTIGATED BY THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY (IEPA) IN SAUGET, CAHOKIA, AND SOUTHWEST EAST ST. LOUIS ..................................33
4.4    DESIGNATIONS AND INVESTIGATIONS IN SAUGET AREA 1 AND SAUGET AREA 2 ..........................36
4.5    INVESTIGATION AND REMEDIATION OF THE CERRO COPPER PRODUCTS SUPERFUND SITE..............38



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

4.6   INVESTIGATION AND REMEDIATION OF THE MONSANTO/KRUMMRICH SITE ........................................ 38

4.7   INVESTIGATION AND SAMPLING IN NEIGHBORHOODS IN PROXIMITY TO THE MONSANTO/KRUMMRICH SITE ........................ 42

4.8   THE 1976 USEPA OFF-SITE SOIL SAMPLING ............................................................................ 42

4.9   THE 2008 OFF-SITE ATTIC DUST SAMPLING ............................................................................. 43

4.10  THE 2009 AND 2012 USEPA OFF-SITE SOIL SAMPLING ........................................................... 44

4.11  USEPA 2012 SOIL SAMPLING IN THE SUBJECT NEIGHBORHOOD .................................................. 45

4.12  NOTIFICATION PROVIDED BY THE USEPA TO PROPERTY OWNERS IN THE OFFSITE SOIL SAMPLING AREAS ........................... 46

4.13  USEPA FOLLOW UP TO THE 2012 SOIL SAMPLING IN THE SUBJECT NEIGHBORHOOD .......................... 46

4.14  SOIL SAMPLING CONDUCTED BY THE PLAINTIFF IN THE SUBJECT LITIGATION IN THE SUBJECT NEIGHBORHOOD ...................... 48

4.15  TIMELINE OF EVENTS RELATED TO INVESTIGATION AND REMEDIATION OF THE MONSANTO/KRUMMRICH SITE AND NEIGHBORHOOD INVESTIGATION AND NOTICE ....................................................................... 49

**5.    THE SUBJECT PROPERTIES, THE SUBJECT NEIGHBORHOOD, AND THE BELL AWARD OF DAMAGES TO IMAGINARY HOMES THAT NEVER EXISTED AND COULD NOT BE BUILT UNDER CURRENT EAST ST. LOUIS ZONING AND PLANNING POLICIES ................................................................. 51**

5.1   THE BELL REPORT IDENTIFICATION OF A "SUBJECT NEIGHBORHOOD" ............................................ 51

5.2   THE BELL REPORT CLAIM CONCERNING THE NUMBER OF "CITY-OWNED" PROPERTIES THAT HAVE INCURRED DAMAGES ....... 52

5.3   THERE ARE ONLY 100 CITY-OWNED PROPERTIES AND NOT 273 OR 228 PROPERTIES AS CLAIMED IN THE BELL REPORT ....... 53

5.4   THE BELL REPORT AWARDS DAMAGES TO IMAGINARY HOUSES THAT DO NOT EXIST AND MAY NEVER HAVE EXISTED ........... 53

5.5   THE HISTORIC AERIAL PHOTOS INCLUDED IN THE BELL REPORT INDICATE THAT MANY OF THE 269 CURRENTLY VACANT LOTS NEVER HAD IMPROVEMENTS AND DEMOLITION OF HOMES ON MANY OF THE LOTS OCCURRED DECADES AGO .................... 54

5.6   THE HISTORIC AERIAL PHOTO ANALYSIS INDICATES THAT THE 184 HOMES CLAIMED TO HAVE INCURRED A LOSS OF USE AND A 100% LOSS IN MARKET VALUE ARE IMAGINARY PHANTOM HOMES THAT MAY NEVER HAVE EVEN EXISTED ....................... 58

5.7   THE BELL REPORT DOES NOT CONSIDER CITY OF EAST ST. LOUIS ZONING REQUIREMENTS WHEN ASSIGNING A VALUE OF $140,000 TO EACH OF HIS IMAGINARY HOMES ................................................................. 59

**6.    THE BELL REPORT FAILURE TO CONSIDER ANY ACTUAL SALES OF PROPERTIES IN THE CITY OF EAST ST. LOUIS OR IN THE SUBJECT NEIGHBORHOOD DURING THE PAST 20 YEARS ..................................... 61**

6.1   THE BELL REPORT BASES THE DAMAGES ANALYSIS ON SALES OF HOMES AND LAND IN DISTANT AREAS LOCATED AS FAR AS 20 MILES FROM THE SUBJECT NEIGHBORHOOD ................................................................. 61

6.2   THE BELL REPORT IGNORES (WITHOUT EXPLANATION) MORE THAN 1,300 SALES IN THE CITY OF EAST ST. LOUIS AND MORE THAN 3,400 SALES IN CAHOKIA THE COMMUNITY LOCATED ADJACENT AND IMMEDIATELY SOUTH OF THE SUBJECT NEIGHBORHOOD THAT HAVE OCCURRED SINCE 2002 ................................................................. 62

6.3   THE BELL REPORT IGNORES (WITHOUT EXPLANATION) 112 SALES SINCE 2002 IN THE SUBJECT NEIGHBORHOOD ............. 65

6.4   THE NEW CONSTRUCTION (NOT MENTIONED IN THE BELL REPORT) AND HIGHER PRICED HOMES SOLD IN THE SUBJECT NEIGHBORHOOD ARE EVIDENCE THAT THERE HAS NOT BEEN A 100% IMPACT ON PRICES AND VALUES DUE TO PCBS .......... 68

6.5   COMPARISON OF SALE PRICE TRENDS BETWEEN THE SUBJECT NEIGHBORHOOD AND THE REST OF EAST ST. LOUIS ............. 70

6.1   COMPARISON OF SALE PRICE TRENDS BETWEEN THE SUBJECT NEIGHBORHOOD AND CAHOKIA ......................... 71

6.6   CONSIDERATION OF PRICES PAID FOR VACANT LAND PROPERTIES IN THE LOCAL MARKET ........................... 73

6.7   PAIRED SALES ANALYSIS OF SALES IN THE SUBJECT NEIGHBORHOOD COMPARED TO A CONTROL AREA .......................... 73

6.8   SALES OF SUBJECT NEIGHBORHOOD HOMES INVOLVED IN THE 2014 SETTLEMENT ........................... 76

6.9   THE SOIL TESTING AND LITIGATION SETTLEMENT INDICATE WIDESPREAD KNOWLEDGE AND AWARENESS IN THE NEIGHBORHOOD ABOUT THE INVESTIGATION OF PCBS IN THE NEIGHBORHOOD INDICATING THAT SALE PRICES WOULD REFLECT ANY CONCERNS ABOUT COST, USE OR RISK EFFECTS ................................................................. 76

6.10  COMPARISON OF THE BELL AVERAGE MONTHLY RENT TO ACTUAL RENTS IN EAST ST. LOUIS AND IN CAHOKIA LOCATED IMMEDIATELY ADJACENT TO THE SUBJECT NEIGHBORHOOD ................................................. 77

**7.    THE BELL REPORT FAILS TO CONSIDER EAST ST. LOUIS URBAN RENEWAL AND PLANNING POLICIES WHEN CLAIMING THE SUBJECT NEIGHBORHOOD HAS BEEN "BLIGHTED" BY THE PRESENCE OF PCB CONTAMINATION ................................................................. 81**



7.1   The Bell Report Claim about Neighborhood "Blight" Caused by PCB Contamination ......................................81

7.2   East St. Louis Urban Renewal and Planning Efforts in the Subject Neighborhood.........................................81

7.3   The 1966 East St. Louis Housing Study Recommended Demolition of the Many Vacant and Abandoned Homes in the Subject Neighborhood ...................................................................................................................82

7.4   The 1978 Urban Renewal Plan for the Subject Neighborhood Recommended Demolition of All Substandard and Obsolete Houses and Clearance for Urban Renewal ..................................................................................83

7.5   The Bell Report Does Not Consider Condition of the Streets or Sewers in the Subject Neighborhood When Assigning a Value of $140,000 to Each of His Imaginary Homes....................................................................84

7.6   The Dates of the Urban Renewal Demolition Decisions by the City of East St. Louis Confirms that There Is No Connection Between Remediation of PCBs at the Monsanto Plant and "Blight" in the Subject Neighborhood 85

7.7   Long Term Demographic and Economic Trend Data for East St. Louis Indicate that the Bell Report Claim that PCB Caused Neighborhood "Blight" Is Incorrect...............................................................................................87

**8.   CASE STUDY ANALYSIS OF EFFECT OF PROXIMITY TO CONTAMINATED SITES IN OTHER CAHOKIA AND EAST ST. LOUIS NEIGHBORHOODS .............................................................................................89**

8.1   Introduction to Case Study Analysis..............................................................................................................89

8.2   Local Market Area Case Study Analysis of the Neighborhood Adjacent to the Dead Creek Superfund Site in Cahokia ........................................................................................................................................................90

8.3   Paired Sales Analysis of the Dead Creek Area Compared to Cahokia.............................................................92

8.4   There Has Been No Significant Abandonment and Demolition of Homes in the Cahokia Neighborhood Adjacent to the PCB Remediation Project in the Dead Creek Portion of the Sauget Area 1 Superfund Site ....................94

8.5   Local Market Area Case Study Analysis of the Alcoa Superfund Alternative Site and Its Contamination Situation .......................................................................................................................................................96

8.6   The Alcoa Superfund Alternative Site: IEPA and U.S. EPA Investigation and Remediation...............................97

8.7   Timeline Related to Public Notice and Awareness about the Alcoa Superfund Alternative Site and the Contamination and Investigation and Remediation Situation......................................................................100

8.8   The Study Area Adjacent to the Alcoa Superfund Alternative Site ...............................................................102

8.9   Analysis of Sale Prices in the "Study Area" and the "Control Area" ............................................................103

8.10  Conclusion from the Alcoa Superfund Alternative Site Case Study Analysis and Relevance to the Bell Report Conclusion Concerning the PCB Investigation in the Subject Neighborhood ...............................................110

**9.   JLL REVIEW OF THE PCB AND DIOXIN IMPACT LITERATURE RELIED ON IN THE BELL REPORT TO SUPPORT THE CLAIM OF A 100% IMPACT ON VALUE DUE TO "RISK EFFECT" ...................................111**

9.1   Introduction to the Literature and Case Studies Relied on in the Bell Report ...............................................111

9.2   The PCB and Dioxin Literature Relied on in the Bell Report.........................................................................112

9.3   The Bell Report Omissions and Misrepresentations Related to the Mathews (2008) Article ..........................113

9.4   The Bell Report Omissions and Misrepresentations Related to the Simons (2002) Article.............................113

9.5   The Bell Report Omissions and Misrepresentations Related to the Roddewig & Frey (2006) Article..............115

9.6   The Bell Report Omissions and Misrepresentations Related to the Dorchester (1991) Article .......................116

9.7   The Bell Report Omissions and Misrepresentations Related to the Decker, Nielsen & Sindt (2005) Article.....117

9.8   The Bell Report Omissions and Misrepresentations Related to the Campanella (1984) Article ......................118

9.9   The Bell Report Omissions and Misrepresentations Related to the Lusvardi (2000) Article ..........................119

9.10  Additional JLL Research into Published Articles Relating to PCB Not Referenced in the Bell Report..............121

9.11  Conclusion from Review of the PCB and Dioxin Literature Cited in the Bell Report .......................................122

**10.  JLL REVIEW OF THE "CONTAMINATED NEIGHBORHOOD" CASE STUDIES IN THE BELL REPORT INDICATE THEY DO NOT SUPPORT THE BELL CLAIM OF A 100% IMPACT ON VALUE DUE TO "RISK EFFECT" 124**

10.1  Introduction to the JLL Review of the Case Studies in the Bell Report..........................................................124

10.2  Summary of the Significant Errors and Omissions in the Case Study Analysis in the Bell Report ...................125

 

10.3 BELL CASE STUDY NO. 1: ANNISTON, ALABAMA – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS ...................................................................................126

10.4 BELL CASE STUDY NO. 2: TIMES BEACH, MISSOURI – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS ...................................................................................134

10.5 BELL CASE STUDY NO. 3: PENSACOLA ESCAMBIA WOOD TREATING FACILITY – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS.......................................................136

10.6 BELL CASE STUDY NO. 4: CARVER TERRACE, PORT ARTHUR, TEXAS – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS.................................................143

10.7 BELL CASE STUDY NO. 5: AGRICULTURE STREET LANDFILL, NEW ORLEANS – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS.......................................150

10.8 BELL CASE STUDY NO. 6: MOSSVILLE, LOUISIANA – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS ..................................................................................155

10.9 BELL CASE STUDY NO. 7: HERCULANEUM, MISSOURI – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS ..................................................................................166

10.10 BELL CASE STUDY NO. 8: LOVE CANAL, NEW YORK – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS ..................................................................................177

10.11 BELL CASE STUDY NO. 9: HINKLEY, CALIFORNIA – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS ..................................................................................181

10.12 BELL CASE STUDY NO. 10: FLINT, MICHIGAN – BELL REPORT ERRORS, OMISSIONS, MISREPRESENTATIONS, IMPROPER COMPARISONS, AND NECESSARY CORRECTIONS ..................................................................................188

10.13 CONCLUSION FROM REVIEW OF THE BELL CASE STUDIES: THE BELL "CASE STUDIES" DO NOT COMPLY WITH THE REQUIREMENTS OF GUIDE NOTE 4 OF THE STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE.........................................................190

10.14 CONCLUSION: THE BELL "CONTAMINATED NEIGHBORHOOD" CASE STUDIES DO NOT SUPPORT THE BELL CLAIM OF A 100% "RISK EFFECT" IMPACT ON VALUE FROM THE PRESENCE OF PCBS IN THE SUBJECT EAST ST. LOUIS NEIGHBORHOOD....................192

**11. COMBINED RESULTS OF THE JLL PCB IMPACT CASE STUDIES, THE CORRECTED BELL CASE STUDIES, AND THE JLL CASE STUDIES INVOLVING THE SUBJECT NEIGHBORHOOD ...........................................195**

11.1 PCB CASE STUDIES CONDUCTED BY JLL STAFF OVER THE PAST THREE DECADES INDICATE WIDE VARIABILITY IN THE EFFECTS OF PCB CONTAMINATION ON PRICES AND VALUES ......................................................................................195

11.2 THE JLL PCB CASE STUDIES AND SUBJECT NEIGHBORHOOD CASE STUDIES WHEN COMBINED WITH THE CORRECTED BELL CASE STUDIES DO NOT SUPPORT THE BELL REPORT CLAIM OF A 100% "RISK EFFECT" IMPACT ON VALUE IN THE SUBJECT EAST ST. LOUIS NEIGHBORHOOD ..........................................................................................197

**12. THE BELL REPORT RELIANCE ON THE COGHLAN REPORT TO SUPPORT A "COST EFFECT" ESTIMATE OF $50.2 MILLION IS NOT CREDIBLE.................................................................................201**

**13. THE BELL REPORT CONCLUSION OF ALMOST $990 MILLION IN "USE EFFECT" DAMAGES IS NOT CREDIBLE ................................................................................................................206**

13.1 THE "USE EFFECT" METHOD OF ANALYSIS IN THE BELL REPORT .............................................................206

13.2 SUMMARY OF THE PROBLEMS IN THE BELL "USE EFFECT" METHOD OF CALCULATING CLAIMED DAMAGES .......................206

13.3 THE "USE EFFECT" DAMAGE CLAIM IN THE BELL REPORT ASSUMES HYPOTHETICAL "IMAGINARY" LEASES OF CITY OWNED PROPERTIES AND IS NOT A CONCEPT RECOGNIZED IN THE STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE.................208

13.4 CONCLUSION: THE ALMOST $900 MILLION "USE EFFECT" CLAIM FOR DAMAGES IN THE BELL REPORT RELATED TO THE 273 PROPERTIES IS NOT SUPPORTABLE OR CREDIBLE.......................................................................................211

**14. THE BELL REPORT INAPPROPRIATELY COMPARES THE SUBJECT NEIGHBORHOOD TO DISTANT ST. CLAIR COUNTY OUTLYING AREAS IN ARRIVING AT THE DAMAGES CONCLUSION.............................212**

14.1 INTRODUCTION: THE REASONS GIVEN BY DR. BELL FOR IGNORING THOUSANDS OF SALES AND RENTS IN EAST ST. LOUIS AND COMMUNITIES IMMEDIATELY ADJACENT TO THE SUBJECT NEIGHBORHOOD .............................................................212



14.2 THERE IS NO SUPPORT IN THE PUBLISHED APPRAISAL PROFESSION TEXTBOOKS OR IN THE STANDARDS OF PROFESSIONAL PRACTICE FOR BELL'S FAILURE TO CONSIDER THOUSANDS OF SALE PRICES AND RENTAL RATES IN EAST ST. LOUIS AND OTHER COMMUNITIES IMMEDIATELY ADJACENT TO THE SUBJECT NEIGHBORHOOD ..................................................................213

**15.  ADDENDA ITEMS.......................................................................................216**

15.1 ASSUMPTIONS AND LIMITING CONDITIONS..................................................................216
15.2 APPRAISAL CERTIFICATION ...................................................................................219
15.3 GENERAL QUALIFICATIONS AND COMPETENCY OF RICHARD J. RODDEWIG, MAI, CRE, FRICS .......................................220
15.4 GENERAL QUALIFICATIONS AND COMPETENCY OF CHARLES T. BRIGDEN, MAI, CRE, FRICS..........................................231
15.5 FOCUSED QUALIFICATIONS OF MR. BRIGDEN AND MR. RODDEWIG RELATED TO COMPETENCY TO UNDERTAKE AN ANALYSIS OF EFFECTS OF ENVIRONMENTAL ISSUES ON PRICES, VALUES AND REAL ESTATE MARKETS.................................................234
15.6 APPRAISAL LICENSES ...........................................................................................237
15.7 LICENSED APPRAISERS, SOURCES FOR DETERMINING THE GENERALLY ACCEPTED METHODS FOR DETERMINING IMPACT OF ENVIRONMENTAL CONDITIONS ON PRICES AND VALUES, THE SCOPE OF WORK RULE, AND ADVISORY OPINION 9 (AO-9) ....238
15.8 USPAP ADVISORY OPINION 9 (AO-9).....................................................................241
15.9 SUMMARY OF ECONOMIC HISTORY OF EAST ST. LOUIS AND FACTORS AFFECTING THE EAST ST. LOUIS LOCAL ECONOMY......246
15.10 JLL ANALYSIS OF THE REAL ESTATE MARKET IN EAST ST. LOUIS AND THE SUBJECT NEIGHBORHOOD ...............................255
15.11 LOCAL MARKET VACANT LAND SALE TRANSACTIONS ....................................................267
15.12 SUBJECT NEIGHBORHOOD AND CAHOKIA PAIRED SALES ANALYSIS ADJUSTMENT GRIDS ................................................270
15.13 DEAD CREEK PAIRED SALES ANALYSIS ADJUSTMENT GRIDS.............................................276
15.14 JLL PCB CASE STUDIES ......................................................................................278
15.15 2022 SUMMARY RESULTS PCB TESTING AT THE 273 SUBJECT PROPERTIES.........................357
15.1 MONSANTO/KRUMMRICH/SOLUTIA PLANT LOCATION AND OTHER SOLUTIA-OWNED PROPERTIES.................................361
15.16 JLL HOURLY RATE SCHEDULE.................................................................................362
15.17 DOCUMENTS CONSIDERED AND RELIED UPON ............................................................363



## Executive Summary of this JLL Expert Report

### Subject and Purpose of this Expert Report

The subject of this Appraisal Review and JLL Report (the "JLL Expert Report") is an Expert Report and Appraisal submitted by Landmark Research Group, LLC, and signed by Randall Bell, PhD, MAI (the "Bell Report") and dated February 16, 2024.

The subjects of the Bell Report are 273 properties[1] located in the City of East St. Louis (the "subject properties")[2] and located in a neighborhood in the western section of the city. The date of value in the Bell Report is December 31, 2023.

The Bell Report (p. 19) states its purpose as follows:

> "The purpose of this report is to determine the real estate and economic damages, if any, of the subject properties due to the impacts of PCB chemicals."

The purpose of this Appraisal Review and JLL Report is to determine the accuracy and reliability of the Bell Report by reference to the Uniform Standards of Professional Appraisal Practice (USPAP). As part of that review, this JLL Expert Report also considers the effect, if any, on the market value of the subject properties due to PCB contamination as of the date of the Bell Report.

### Use of this Appraisal Review and JLL Expert Report

This JLL Expert Report is being filed on behalf of the Defendants in *City of East St. Louis v. Monsanto Company, et al.*, United States District Court for the Southern District of Illinois, Cause No. 3:21-cv-00232-DWD and addresses the claims for "loss of property values" and "loss of municipal income and tax revenue" due to claimed "PCB contamination of East St. Louis lands" as alleged by the City of East St. Louis in the Second Amended Complaint (Paragraph 100) filed on January 15, 2023.

The intended users of this JLL Expert Report are the court hearing the case as well as attorneys for both the Plaintiffs and the Defendants.

Our clients are the defendant parties to this litigation.

---

[1] The Bell Report (pages 14 and 68) states that as of 2023, the City of East St. Louis had a "recorded ownership" of 228 of the 273 properties. However, our analysis of publicly available information, including recorded deeds and property records, reveals evidence of ownership by the City of East St. Louis for only 100 of the 273 properties, or roughly 37%.

[2] In earlier filings in this litigation (opposing counsel production file ESTL0000117964) indicated 281 total unique "city" parcels had been tested for PCB contamination. In that production, nine test samples were from properties without PIN or designated right of way, and 272 unique parcel city owned sample sites were identified. The Bell Report deals with 273 of those previously identified properties. As noted above, the Bell Report erroneously states that as of 2023, the City of East St. Louis had a "recorded ownership" of only 228 of the 273 properties, a number that a review of recorded deeds and property records indicates is not accurate.



### *The Alleged PCB Contamination and the Properties Involved as Claimed in the Bell Report*

The Bell Report (p. 7) describes the complaint filed by the City of East St. Louis as "seeking fines and damages for the contamination of its lands with polychlorinated biphenyls ('PCBs')." However, the Bell Report contains only limited information concerning the investigation and testing of the PCB contamination affecting the 273 subject properties. The statements in the Bell Report are as follows:

- "In June 2022, 273 lots were tested, and soil samples were taken from lots located north and northeast of the Monsanto Plant." (p. 2)

- "The subject properties are currently in the assessment stage, as no remediation has commenced. "(p. 62)

No specific test results for any of the subject properties are discussed or summarized in the Bell Report. Instead, the Bell Report (p. 21) includes the following "Extraordinary Assumption" related to testing:

"It is an extraordinary assumption that the environmental testing, including the identification of the subject properties, is accurate and correct. This data was presented by Kevin Coghlan, M.S., C.I.H. of Environmental Health & Engineering, Inc. Furthermore, PCBs were present on the subject properties prior to July 1, 1973. Other experts will be presenting evidence on this matter."

The Bell Report (p. 33) then states that an analysis of the cost of remediating the 273 subject properties has been estimated by Environmental Health & Engineering, Inc. The Bell Report says the following about those estimated remediation costs:

"Cost effects were estimated by Environmental Health & Engineering, Inc. They set forth an estimated cost of remediation that is expected to exceed $50,200,000 and estimated that the remediation effort will take approximately 24months."

### *Summary of the JLL Research into the PCB Investigation in the Subject Neighborhood*

We conducted on-line research into environmental reports prepared by the Illinois Environmental Protection Agency (IEPA) and by the United States Environmental Protection Agency (US EPA) as well as other publicly available information related to the various investigations of contamination at various facilities in the Sauget area where the Monsanto/Krummrich facility is located as well as related to investigations in the subject neighborhood. We also reviewed information provided by the Plaintiffs in their filings related to this litigation.

### *The Market Value and Damages Conclusion in the Bell Report*

The Bell Report does not estimate either the unimpaired or impaired market value of any specific property in the subject neighborhood. Instead, it reviews sales in outer suburban areas of St. Clair County and arrives at a "one size fits all" market value of $140,000 for every improved property and $40,000 for every unimproved lot in the subject neighborhood. It then includes additional calculations for alleged "cost effects," "use effects," and "risk effects" as shown in the table below from the Bell Report (p. 14 and p. 68).



| CITY OF EAST ST. LOUIS Damage Summary (Landmark File: 155-1-21) | | | | |
|---|---|---|---|---|
| | Market Rate Improved | Market Rate Land | Time | Total |
| Ordinance Fines | $500 per Day $750 per Day | $500 per Day $750 per Day | Pre 6/12/2003 Post 6/12/2003 | -$3,111,449,250 |
| Cost Effect | Environmental Health & Engineering, Inc. | Environmental Health & Engineering, Inc. | 24 Months | More than -$50,200,000 |
| Use Effect* (See Schedule) | $1,400 per Month $46.00 per Day | $233.33 per Month $7.67 per Day | 53.59 Years @ 9% Interest | -$989,632,338 |
| Risk Effect** ("As-is" Unrepaired) | $140,000 @ -100% 184 Subject Properties | $40,000 @ -100% 38 Subject Properties | Current | -$27,280,000 |
| Risk Effect** ("As-if" Repaired) | None noted | Unrepaired Risk + $40,000 222 Subject Properties | Current | -$18,400,000 |

*There are 273 subject properies; however, ownership has varied over time. Ownership was accounted for in he use effect calculations.
**Risk effects were applied to the subject properties that the City of East St. Louis and government agency held recorded ownership of in 2023, which was a total of 228. There were 6 subject properies with lot sizes less han 1,000 SqFt, these were not included in the Use or Risk Effect calculations.

Figure 7: Damage Summary

The Bell Report does not indicate whether those alleged damage calculations are alternative measures of damage or are to be summed to arrive at a total damage number. The ordinance fines have been removed from the Plaintiffs' damages claim in the case by a court order.[3]

### *Portions of the Bell Report Reviewed and Corrected in this Appraisal Review and Expert Report*

This Appraisal Review and JLL Expert Report involves a review of the following portions of the Bell Report:

- The Bell Report description of the alleged PCB contamination in the subject neighborhood and the Bell Report claim that PCB contamination has affected the 273 subject properties.

- The Bell Report reliance on the report by Environmental Health & Engineering related to testing of the subject properties and the cost of remediation, including an analysis of the 273 subject properties and their respective PCB testing results.

- The Bell Report statements that the past "abandonment, decay, and demolition" (Bell Report, p. 12) of homes and claimed "blight" in the neighborhood where the 273 subject properties are located is due to the "presence of PCBs."

- The PCB and Dioxin literature described and summarized in the Bell Report.

- The "case studies" included in the Bell Report to arrive at a "risk effect" damages conclusion.

- The "loss of use" and market rent and ground rent analysis utilized in the Bell Report to calculate an alleged loss of use and "damages."

- The "as-is unrepaired" and "as-if repaired" damages analysis in the Bell Report.

---

[3] That was acknowledge by Dr. Bell at his deposition on May 3, 2024, at page 177 of the "Rough, Unedited Transcript" provided to us.



*JLL Expert Report and*                                                              *City of East St. Louis v. Monsanto, et al.*
*Review of a Bell Appraisal Report*                                                  *East St. Louis, Illinois*

- The Bell claim that the damages analysis in the Bell Report is based on the generally accepted methods of the appraisal profession for analyzing the effect of a contamination situation on prices and values.

*This Appraisal Review Report does not include the reviewers' own opinions of unimpaired market value of any of the 273 subject properties, but does include the appraiser's opinion concerning the impact on market value of due to the environmental situation related to proximity of those properties and their neighborhood to the Monsanto Solutia plant in Sauget, Illinois, alleged in the litigation to be the source of the PCB contamination and the cause of the claimed impact of the PCB situation on prices and values. This Appraisal Review Report does also include, however, our conclusions concerning the effect of correcting the misrepresentations, errors and omissions and the conclusions in that reviewed Bell Report.*

*Moreover, the Bell Report erroneously claims that the City of East St. Louis is the owner of the 273 subject properties. Our analysis has determined that the City of East St. Louis is the owner of just 100 properties that are the subject of this litigation.*

### Summary of the Errors, Omissions, and Misrepresentations in the Bell Report

The Bell Report contains significant errors, omissions and misrepresentations that cause it to be unreliable and its conclusions related to the damages due to the alleged impact of PCBs on the subject properties to be inaccurate and unreliable.

Those errors and omissions can be summarized as follows:

- Assuming that the city owned all 273 properties as of December of 2023 and failing to do the research that into publicly available information that indicates the city owned only 100 of the properties.

- Assuming that unimproved properties as of 2023 are "improved" properties for purposes of a damages analysis resulting in damages conclusions on "imaginary" homes.

- Assuming based on an instruction from attorneys for the Plaintiffs[4] that all 273 properties are city-owned in December of 2023 when in fact public records indicate that only 100 properties are owned by the city.

- Failure to consider, analyze or use in the damages analysis any of the 1,315 transactions in the City of East St. Louis between 2002 and 2024 and an additional 3,400 transactions that occurred between September 2002 and May 2024 in Cahokia, the community that abuts the subject neighborhood to the south.  The Bell Report ignores those sales and provides no explanation for why such sales were excluded from his analysis.

- Failure to consider, analyze or use in the report any of the 112 sales in the subject neighborhood that occurred between 2002 and 2024. The Bell Report ignores those sales as well as construction of 43 new homes in the subject neighborhood since 2000 and provides no explanation for why such sales and facts were excluded from his analysis.

- The use of sales up to 18 miles distant from the subject neighborhood and located in distant parts of the counties outside East St. Louis to arrive at an "average" value that is applied to all 273 subject properties.

---

[4] The Bell Report at page 21 states the following: "At counsel's request, any ownership noted by a government agency was included in the damage calculations. In addition, there were not ownership records for 2024 or beyond; however, we were instructed by counsel to mirror the ownership data from 2023, as ownership has been relatively consistent over the years."



- The improper use of an "average" value and "average" rent when claiming to provide an opinion of market value of improved and unimproved properties.

- Failure to research or review City of East St. Louis planning and urban renewal documents and history indicating significant numbers of homes without running water or separate bathrooms and in deteriorated condition that required demolition as part of urban renewal plans in the 1960s and 1970s. As a result, the Bell Report inappropriately concludes that the subject properties have suffered "blight" as a result of PCBs related to the Monsanto/Krummrich facility.

- Assuming that no renovations or improvements to existing (or imaginary) residential property would be required in order to support the damages model advanced in the Bell Report.

- Failure to consider that basic infrastructure such as water and sewers, drainage, streets, sidewalks, public ways and lighting in parts of the subject neighborhood are either not in existence or severely deteriorated and simply assuming that the imaginary homes have appropriate infrastructure in place.

- Failure to note that replacing such improvements through a large capital improvements program would be a critical necessity before a functioning real estate marketplace capable of achieving market rents and prices could exist in much of the subject neighborhood.

- Failure to consider the size and dimensions of the lots in the subject neighborhood when making assumptions about imaginary homes that could be constructed.

- Misrepresentation of and improper reliance on published literature to arrive at opinions related to impacts on value without undertaking the necessary "due diligence" to determine the accuracy and reliability of the articles. When the literature reviewed in the Bell Report is properly considered, it does not support a 100% impact on value as claimed in the Bell Report.

- Improper reliance on the opinions of other experts without undertaking the required "due diligence" related to the accuracy and reliability of those opinions.

- Omitting and misrepresenting facts and misrepresenting results when describing case studies involving PCB investigation and remediation in other locations in the United States.

- Assuming that purchases of properties in "buyout" programs indicate a 100% impact on values from an environmental situation without first analyzing sale prices in the neighborhoods where the buyouts occurred either before or after the buyout program began and failing to study prices in other neighborhoods similarly affected by the same environmental situation.

- Making erroneous and unsupported comparisons between environmental situations in case studies and the environmental situation in the subject neighborhood.

- Assuming that all 273 properties require soil remediation when soil testing indicates many if not most of the properties are under the regulatory threshold for soil remediation and none of the properties are currently in any type of IEPA or U.S. EPA program that would require remediation.

- Use of an inappropriate discount rate based on the CPI and a reinvestment rate based on S&P 500 returns when analyzing the claimed "use effect" damages.

- Ignoring the "actual use" of the 273 properties while claiming that publications and standards of the appraisal profession recognize a hypothetical "conventional use" or



"normal use" that can be substituted for an consideration of the "actual use" of properties in a "use effect" analysis

- Failure to explain whether the five categories of damages in the Damage Summary are mutually exclusive measures of damage or should be combined together to create a cumulative total measure of alleged damages.

### *Conclusions from Review of the Bell Report*

The cost, use, and risk effect damages conclusions in the Bell Report are not supportable.

JLL case study analysis in East St. Louis, Cahokia and elsewhere indicates that residential properties adjacent or near sites being investigated or remediated for PCB contamination or in neighborhoods in the "assessment stage" of the remediation lifecycle do not automatically experience an adverse impact on prices and values, and when there are impacts, they are significantly less than the 100% conclusion of impacts in the Bell Report.

When the errors, omissions, and misrepresentations in the Bell Report review of the literature and "risk effect" case studies are corrected, it supports the conclusion that the "risk effect" to values from the PCB investigation in the subject neighborhood as of December 2023 was no more than -5%.

In addition, our analysis of actual prices paid in the subject neighborhood compared to prices and price trends in both East St. Louis and the adjacent community of Cahokia since 2002 indicates no "risk effect" impact on prices in the subject neighborhood from the PCB investigation in the neighborhood or from the remediation at the Monsanto/Krummrich facility site. Our local market study case analysis of the Alcoa Superfund site indicated no impact in the adjacent neighborhood during the "assessment stage" of the remediation lifecycle between 2003 and 2012 when the U.S. EPA was investigating the situation and testing soils on the main portion of the site. Our other local market case study of property prices in the neighborhood adjacent to the Dead Creek portion of the Sauget Area 1 Superfund site indicates that during the active remediation of Dead Creek, the impact on prices in the adjacent neighborhood that included soil testing at some homes was no greater than about -11%, and upon remediation there was no permanent or lingering impact observed. When all three of those analyses of actual sale transactions are considered, and when considering the out of market case studies from other locations under different circumstances and at different time periods, the collective analysis and information indicate an impact on prices of between 0% and no more than -5%.

The Bell Report "cost effect" conclusion of $52.5 million is not reliable because information in the Coghlan Report relied on by Bell, as well as statements made in the Coghlan deposition, demonstrate such reliance by Bell is not credible. The fact that only 54 of the 100 city-owned properties tested above 1 ppm in the Coghlan sampling is further indication of the unreliability of reliance by Bell on the Coghlan Report. Those may be the only city-owned properties where some type of remediation may be necessary in the future depending on the use to which they are eventually put.

The Bell Report almost $900 million "use effect" damages calculation is not credible. The Bell Report fails to look at any actual sales or leases in the subject neighborhood to determine if there was any type of actual effect on use. The actual sales and leases in the subject neighborhood indicate that the prices and rental rates used in the Bell Report to calculate "use effect" damages are not supportable.

The Bell Report "use effect" analysis also does not include any research to determine if the city has actually leased or sold any of its properties even though there is information in the Bell Report

11



that ownership of the city's properties has varied substantially over the years.  The Bell Report fails to provide any support for using a CPI discount factor or a rate of return based on the S&P 500. Finally, there is no support in the principal treatises of the appraisal profession (including Bell's own *Real Estate Damages* book) to support the Bell decision to ignore "actual use" of the city's properties and instead to rely on a hypothetical concept called "conventional use" or "normal use" to support a claim that all use and enjoyment of the city's properties has been affected for the past 50 years and measure it based on hypothetical leases and rents.

All of the issues we have raised related to the Bell Report indicate that it violates the standards of professional appraisal practice and that the damages analysis and conclusions within it do not comply with generally accepted methods of the real estate appraisal profession. For example, Standards Rule 1-3 of the Uniform Standards of Professional Appraisal Practice (USPAP) states that an appraiser, "when developing a market value opinion, must: (a) analyze the effect on use and value of (i) existing land use regulations; (2) reasonably probably modifications of such land use regulations; (iii) economic supply and demand; (iv) the physical adaptability of the real estate; and (v). market area trends; and (b) develop an opinion of the highest and best use of the real estate.

The Comment to that rule states "An appraiser must avoid making an unsupported assumption or premise about market area trends . . ."

Because the Bell Report ignores all sales that have occurred in the subject neighborhood and in the City of East St. Louis over the past 25 years and because it contains no highest and best use analysis and no consideration of the physically possible and legally permissible uses of the 273 subject properties in his report, it does not meet the requirements of Standards Rule 1-3.

The Scope of Work Rule in USPAP[5] states that "an appraiser must . . . determine and perform the scope of work necessary to develop credible assignment results." It also states that the scope of work "must include the research and analyses that are necessary to develop credible assignment results." As indicated above in our Summary of the Errors, Omissions and Misrepresentations in the Bell Report, the Bell Report fails to contain the research and analysis necessary for credible assignment results.

---

[5] The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice*, 2024 Edition, pages 15-16.



# 1. Introduction

## 1.1   Subject and Purpose of this Expert Report

The subject of this Appraisal Review and JLL Report (the "JLL Expert Report") is an Expert Report and Appraisal submitted by Landmark Research Group, LLC, and signed by Randall Bell, PhD, MAI (the "Bell Report") and dated February 16, 2024.

The subjects of the Bell Report are 273 properties described by the Bell Report as being owned by the City of East St. Louis (the "subject properties")[6] and located in a neighborhood in the western section of the city. The date of value in the Bell Report is December 31, 2023.

The Bell Report (p. 19) states its purpose as follows: "The purpose of this report is to determine the real estate and economic damages, if any, of the subject properties due to the impacts of PCB chemicals."

The purpose of this Appraisal Review and JLL Report is to determine the accuracy and reliability of the Bell Report by reference to the *Uniform Standards of Professional Appraisal Practice* (USPAP). As part of that review, this JLL Expert Report also considers the effect, if any, on the market value of the subject properties due to PCB contamination as of the date of the Bell Report.

## 1.2   Use of this Appraisal Review and JLL Expert Report

This JLL Expert Report is being filed on behalf of the Defendants in *City of East St. Louis v. Monsanto Company, et al*., United States District Court for the Southern District of Illinois, Cause No. 3:21-cv-00232-DWD and addresses the claims for "loss of property values" and "loss of municipal income and tax revenue" due to claimed "PCB contamination of East St. Louis lands" as alleged by the City of East St. Louis in the Second Amended Complaint (Paragraph 100) filed on January 15, 2023.

The intended users of this JLL Expert Report are the court hearing the case as well as attorneys for both the Plaintiff and the Defendants.

## 1.3   The Subject Properties and Neighborhood

The Second Amended Complaint (Paragraph 9) states that the case involves "hundreds of East St. Louis-owned lots and rights-of-way located immediately to the north and northeast of the Monsanto plant." The Second Amended Complaint (Paragraph 11), then goes on to state that the case involves "281 City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant" that were tested for PCB in mid-to-late 2022.

The Bell Report addresses 273 vacant and improved properties. A list of these properties is provided in a table below. Our research indicates ownership by the City of East St. Louis for only 100 of the 273 subject properties, or 37% of the total.

---

[6] In earlier filings in this litigation (opposing counsel production file ESTL0000117964) indicated 281 total unique "city" parcels had been tested for PCB contamination. In that production, nine test samples were from properties without PIN or designated right of way, and 272 unique parcel city owned sample sites were identified. The Bell Report deals with 273 of those previously identified properties. However, the Bell Report (pages 14 and 68) also erroneously states that as of 2023, the City of East St. Louis had a "recorded ownership" of only 228 of the properties.



Subject Property Summary (273 Properties)

| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01230205005 | St. Clair Co. Trustee | 1200 MISSISSIPPI A | 0.03 | 1,300 | 3.12 | X | | | | | |
| 2 | 01230205006 | St. Clair Co. Trustee | 1200 MISSISSIPPI A | 0.06 | 2,500 | 0.40 | | | | | | |
| 3 | 01230205012 | St. Clair Co. Trustee | 1015 PARADISE AVE | 0.06 | 2,500 | 2.34 | X | | | | | |
| 4 | 01230205033 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 2.46 | X | | | | | |
| 5 | 01230205036 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 1.87 | X | | | | | |
| 6 | 01230205037 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 1.75 | X | | | | | |
| 7 | 01230205038 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 1.28 | X | | | | | |
| 8 | 01230205039 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 2.28 | X | | | | | |
| 9 | 01230205040 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 0.84 | | | | | | |
| 10 | 01230205043 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 3.09 | X | | | | | |
| 11 | 01230206004 | St. Clair Co. Trustee | 1314 MISSISSIPPI A | 0.14 | 6,234 | 0.64 | | | X | 1582 | 1954 | SFR |
| 12 | 01230206006 | St. Clair Co. Trustee | 1320 MISSISSIPPI A | 0.10 | 4,248 | 0.25 | | | | | | |
| 13 | 01230206007 | St. Clair Co. Trustee | 1322 MISSISSIPPI A | 0.10 | 4,248 | 1.48 | X | | | | | |
| 14 | 01230206009 | St. Clair Co. Trustee | 1326 MISSISSIPPI A | 0.11 | 4,821 | 2.60 | X | | | | | |
| 15 | 01230206011 | St. Clair Co. Trustee | 1016 PARADISE AVE | 0.25 | 10,974 | 2.05 | X | | | | | |
| 16 | 01230206020 | St. Clair Co. Trustee | 1048 PARADISE AVE | 0.25 | 10,974 | 0.04 | | | | | | |
| 17 | 01230206021 | St. Clair Co. Trustee | 1050 PARADISE AVE | 0.12 | 5,413 | 1.14 | X | | | | | |
| 18 | 01230206022 | St. Clair Co. Trustee | 1052 PARADISE AVE | 0.13 | 5,560 | 0.48 | | | | | | |
| 19 | 01230206031 | St. Clair Co. Trustee | LIBERTY ST | 0.13 | 5,571 | 1.59 | X | | X | 2400 | 1950 | Commercial |
| 20 | 01230206034 | St. Clair Co. Trustee | 1027 LIBERTY ST | 0.13 | 5,571 | 0.76 | | | | | | |
| 21 | 01230206036 | St. Clair Co. Trustee | 1031 LIBERTY ST | 0.13 | 5,571 | 0.76 | | | | | | |
| 22 | 01230206037 | St. Clair Co. Trustee | 1031 LIBERTY ST | 0.13 | 5,571 | 7.59 | X | | | | | |
| 23 | 01230206057 | St. Clair Co. Trustee | 1045 LIBERTY ST | 0.26 | 11,143 | 2.26 | X | | | | | |
| 24 | 01230401008 | St. Clair Co. Trustee | 1022 LIBERTY ST | 0.13 | 5,573 | 0.53 | | | | | | |
| 25 | 01230401009 | St. Clair Co. Trustee | 1022 LIBERTY ST | 0.13 | 5,571 | 0.86 | | | | | | |
| 26 | 01230401010 | St. Clair Co. Trustee | 1028 LIBERTY ST | 0.13 | 5,573 | 0.59 | | | | | | |
| 27 | 01230401013 | St. Clair Co. Trustee | 1036 LIBERTY ST | 0.13 | 5,573 | 0.53 | | | | | | |
| 28 | 01230401022 | St. Clair Co. Trustee | 1056 LIBERTY ST | 0.13 | 5,573 | 0.09 | | | | | | |
| 29 | 01230401089 | Private/Non-City | 1042 LIBERTY ST | 0.38 | 16,718 | 0.78 | | | | | | |
| 30 | 01230402005 | Private/Non-City | 917 COOK ST | 0.06 | 2,500 | 0.30 | | | | | | |
| 31 | 01230402006 | Private/Non-City | 917 COOK ST | 0.06 | 2,500 | 0.10 | | | | | | |
| 32 | 01230402007 | Private/Non-City | 917 COOK ST | 0.06 | 2,500 | 0.03 | | | | | | |
| 33 | 01230403031 | St. Clair Co. Trustee | 1012 COOK ST | 0.06 | 2,500 | 4.69 | X | | | | | |
| 34 | 01240121021 | St. Clair Co. Trustee | TUDOR AV | 0.04 | 1,692 | 0.32 | | | | | | |
| 35 | 01240121022 | St. Clair Co. Trustee | TUDOR AV | 0.02 | 999 | 0.17 | | | | | | |
| 36 | 01240121023 | St. Clair Co. Trustee | TUDOR AV | 0.03 | 1,444 | 0.13 | | | | | | |
| 37 | 01240121024 | St. Clair Co. Trustee | TUDOR AVE | 0.01 | 342 | 0.37 | | | | | | |
| 38 | 01240121025 | St. Clair Co. Trustee | TUDOR AVE | 0.03 | 1,173 | 0.14 | | | | | | |
| 39 | 01240121026 | St. Clair Co. Trustee | TUDOR AV | 0.03 | 1,460 | 0.27 | | | | | | |
| 40 | 01240121027 | St. Clair Co. Trustee | TUDOR AV | 0.01 | 295 | 0.13 | | | | | | |
| 41 | 01240121028 | St. Clair Co. Trustee | TUDOR AV | 0.05 | 1,999 | 0.31 | | | | | | |
| 42 | 01240121031 | St. Clair Co. Trustee | TUDOR AV | 0.04 | 1,560 | 0.96 | | | | | | |
| 43 | 01240121032 | St. Clair Co. Trustee | TUDOR AV | 0.01 | 315 | 0.42 | | | | | | |
| 44 | 01240121033 | St. Clair Co. Trustee | TUDOR AV | 0.03 | 1,149 | 0.58 | | | | | | |
| 45 | 01240121035 | St. Clair Co. Trustee | TUDOR AV | 0.02 | 774 | 0.28 | | | | | | |
| 46 | 01240130019 | Private/Non-City | 1307 BAKER AVE | 0.13 | 5,544 | 0.33 | | | | | | |
| 47 | 01240135017 | Private/Non-City | BAKER AVE | 0.11 | 4,851 | 0.33 | | | | | | |
| 48 | 01240135025 | Private/Non-City | 913 S 13TH ST | 0.25 | 10,931 | 0.78 | | | | | | |
| 49 | 01240136001 | St. Clair Co. Trustee | 1300 BAKER AVE | 0.12 | 5,064 | 0.83 | | | | | | |
| 50 | 01240136011 | Private/Non-City | BAKER AVE | 0.01 | 637 | 0.51 | | | | | | |
| 51 | 01240136018 | Private/Non-City | 1332 BAKER AVE | 0.15 | 6,397 | 0.24 | | | | | | |
| 52 | 01240136019 | Private/Non-City | 1334 BAKER AVE | 0.15 | 6,407 | 0.30 | | | | | | |
| 53 | 01240136021 | Private/Non-City | 1301 BOISMENUE A | 0.15 | 6,327 | 0.30 | | | | | | |
| 54 | 01240136022 | Private/Non-City | 1305 BOISMENUE A | 0.07 | 3,164 | 0.56 | | | | | | |
| 55 | 01240136030 | Private/Non-City | 1321 BOISMENUE A | 0.10 | 4,556 | 0.81 | | | | | | |
| 56 | 01240136040 | Private/Non-City | 1318 BAKER AVE | 0.28 | 12,112 | 1.13 | X | | | | | |
| 57 | 01240136043 | Private/Non-City | 1314 BAKER AVE | 0.13 | 5,725 | 0.13 | | | | | | |
| 58 | 01240137020 | E St Louis Housing Auth. | 1401 BOISMENUE A | 0.09 | 3,797 | 0.44 | | | | | | |
| 59 | 01240137021 | E St Louis Housing Auth. | 1405 BOISMENUE A | 0.12 | 5,039 | 0.86 | | | | | | |
| 60 | 01240137022 | E St Louis Housing Auth. | 1405 BOISMENUE A | 0.03 | 1,265 | 0.20 | | | | | | |
| 61 | 01240139007 | Private/Non-City | 1326 BOISMENUE A | 0.05 | 2,190 | 0.36 | | | | | | |
| 62 | 01240139011 | Private/Non-City | 1324 BOISMENUE A | 0.09 | 4,012 | 0.56 | | | | | | |
| 63 | 01240139012 | Private/Non-City | 1320 BOISMENUE A | 0.05 | 2,187 | 0.11 | | | | | | |
| 64 | 01240142006 | Private/Non-City | RUSSELL AVE | 0.07 | 3,011 | 2.19 | X | | | | | |
| 65 | 01240142007 | Private/Non-City | RUSSELL AVE | 0.07 | 3,011 | 0.59 | | | | | | |
| 66 | 01240142008 | Private/Non-City | RUSSELL AVE | 0.07 | 3,011 | 1.46 | X | | | | | |
| 67 | 01240142011 | St. Clair Co. Trustee | 1202 RUSSELL AVE | 0.07 | 3,010 | 1.36 | X | | | | | |
| 68 | 01240142018 | St. Clair Co. Trustee | 1216 RUSSELL AVE | 0.07 | 3,011 | 1.22 | X | | | | | |
| 69 | 01240304003 | St. Clair Co. Trustee | 1004 S 14TH ST | 0.11 | 4,581 | 3.28 | X | | | | | |
| 70 | 01240312045 | E St Louis Housing Auth. | 14 GAY AVE | 0.07 | 2,855 | 0.23 | | | | | | |



| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 71 | 01240312046 | E St Louis Housing Auth. | 14 GAY AVE | 0.07 | 2,856 | 0.15 | | | | | | |
| 72 | 01240312047 | E St Louis Housing Auth. | 1427 GAY AVE | 0.07 | 2,856 | 0.19 | | | | | | |
| 73 | 01240312048 | E St Louis Housing Auth. | 14 GAY AVE | 0.07 | 2,856 | 0.56 | | | | | | |
| 74 | 01240312057 | E St Louis Housing Auth. | 1501 GAY AVE | 0.07 | 2,856 | 0.44 | | | | | | |
| 75 | 01240312058 | E St Louis Housing Auth. | 1503 GAY AVE | 0.07 | 2,856 | 0.46 | | | | | | |
| 76 | 01240312096 | E St Louis Housing Auth. | 1419 GAY AVE | 0.17 | 7,402 | 0.07 | | | X | 1200 | 1970 E | SFR |
| 77 | 01240312104 | City of E St Louis | 1505 GAY AVE | 0.04 | 1,856 | 0.29 | | | | | | |
| 78 | 01240312112 | City of E St Louis | 1125 S 16TH ST | 0.04 | 1,716 | 0.08 | | | | | | |
| 79 | 01240312117 | City of E St Louis | 1112 S 14TH ST | 0.28 | 12,219 | 0.01 | | | | | | |
| 80 | 01240312118 | St. Clair Co. Trustee | 1405 GAY AVE | 0.22 | 9,706 | 0.01 | | | | | | |
| 81 | 01240312119 | City of E St Louis | 1413 GAY AVE | 0.21 | 9,143 | 0.06 | | | | | | |
| 82 | 01240314016 | City of E St Louis | GAY AVE | 0.12 | 5,126 | 0.63 | | | | | | |
| 83 | 01240314032 | Private/Non-City | 1720 RUSSELL AVE | 0.17 | 7,337 | 0.61 | | | | | | |
| 84 | 01240314034 | Private/Non-City | 1728 RUSSELL AVE | 0.17 | 7,335 | 0.14 | | | | | | |
| 85 | 01240314035 | E St Louis Housing Auth. | 1732 RUSSELL AVE | 0.21 | 9,191 | 0.25 | | | | | | |
| 86 | 01240315001 | Private/Non-City | FALLING SPRINGS RI | 0.07 | 2,989 | 0.69 | | | | | | |
| 87 | 01240315002 | Private/Non-City | FALLING SPRINGS RI | 0.07 | 2,850 | 2.36 | X | | | | | |
| 88 | 01240315003 | Private/Non-City | 1206 FALLING SPRIN | 0.07 | 2,847 | 0.89 | | | | | | |
| 89 | 01240315004 | Private/Non-City | 1206 FALLING SPRIN | 0.07 | 2,845 | 0.34 | | | | | | |
| 90 | 01240315005 | Private/Non-City | 1206 FALLING SPRIN | 0.07 | 2,843 | 1.44 | X | | | | | |
| 91 | 01240315006 | Private/Non-City | FALLING SPRINGS RI | 0.07 | 2,841 | 1.39 | X | | | | | |
| 92 | 01240315007 | Private/Non-City | FALLING SPRINGS RI | 0.07 | 2,838 | 2.30 | X | | | | | |
| 93 | 01240315008 | Private/Non-City | FALLING SPRINGS RI | 0.07 | 2,836 | 1.89 | X | | | | | |
| 94 | 01240315009 | Private/Non-City | 1212 FALLING SPRIN | 0.07 | 2,834 | 4.13 | X | | | | | |
| 95 | 01240315010 | Private/Non-City | 1222 FALLING SPRIN | 0.13 | 5,594 | 0.54 | | | | | | |
| 96 | 01240315012 | Private/Non-City | FALLING SPRINGS RI | 0.11 | 4,624 | 0.49 | | | | | | |
| 97 | 01240315014 | Private/Non-City | 1218 GAY AVE | 0.05 | 2,368 | 0.59 | | | | | | |
| 98 | 01240315015 | Private/Non-City | 1220 GAY AVE | 0.08 | 3,494 | 0.89 | | | | | | |
| 99 | 01240315016 | Private/Non-City | 1222 GAY AVE | 0.09 | 4,137 | 0.25 | | | | | | |
| 100 | 01240315017 | Private/Non-City | 1226 GAY AVE | 0.11 | 4,755 | 0.08 | | | | | | |
| 101 | 01240315028 | Private/Non-City | 1221 S 13TH ST | 0.07 | 3,226 | 0.73 | | | | | | |
| 102 | 01240316027 | City of E St Louis | FALLING SPRINGS RI | 1.68 | 73,307 | 1.24 | X | X | | | | |
| 103 | 01240317038 | City of E St Louis | 0 CENTRAL AVE | 0.07 | 2,836 | 0.66 | | | | | | |
| 104 | 01240317039 | E St Louis Housing Auth. | 0 CENTRAL AVE | 0.07 | 2,836 | 0.19 | | | | | | |
| 105 | 01240317044 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.07 | 2,836 | 0.29 | | | | | | |
| 106 | 01240317045 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.07 | 2,837 | 0.85 | | | | | | |
| 107 | 01240317046 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.07 | 2,836 | 0.28 | | | | | | |
| 108 | 01240317064 | City of E St Louis | 15 GAY AVE | 0.07 | 3,065 | 0.46 | | | | | | |
| 109 | 01240317065 | E St Louis Housing Auth. | 15 GAY AVE | 0.07 | 3,065 | 0.95 | | | | | | |
| 110 | 01240317094 | City of E St Louis | 0 CENTRAL AVE | 0.04 | 1,673 | 0.03 | | | | | | |
| 111 | 01240317095 | E St Louis Housing Auth. | 1405 CENTRAL AVE | 0.17 | 7,494 | 0.08 | | | X | 1200 | 1975 E | SFR |
| 112 | 01240317096 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.05 | 2,176 | 0.20 | | | | | | |
| 113 | 01240317102 | City of E St Louis | 1213 S 16TH ST | 0.21 | 9,156 | 0.21 | | | | | | |
| 114 | 01240319103 | E St Louis Housing Auth. | 1805 CENTRAL AVE | 0.17 | 7,292 | 0.01 | | | | | | |
| 115 | 01240319111 | E St Louis Housing Auth. | 1713 CENTRAL AVE | 0.17 | 7,366 | 1.47 | X | | | | | |
| 116 | 01240319112 | E St Louis Housing Auth. | 1717 CENTRAL AVE | 0.17 | 7,365 | 0.23 | | | | | | |
| 117 | 01240319113 | E St Louis Housing Auth. | 1721 CENTRAL AVE | 0.17 | 7,363 | 0.88 | | | | | | |
| 118 | 01240319114 | E St Louis Housing Auth. | 1725 CENTRAL AVE | 0.17 | 7,361 | 0.02 | | | | | | |
| 119 | 01240319115 | E St Louis Housing Auth. | 1733 CENTRAL AVE | 0.17 | 7,418 | 0.17 | | | | | | |
| 120 | 01240319116 | E St Louis Housing Auth. | 1737 CENTRAL AVE | 0.17 | 7,416 | 0.26 | | | | | | |
| 121 | 01240319117 | E St Louis Housing Auth. | 1809 CENTRAL AVE | 0.17 | 7,245 | 0.03 | | | | | | |
| 122 | 01240320010 | E St Louis Housing Auth. | 0 CENTRAL AVE | 0.07 | 2,840 | 0.83 | | | | | | |
| 123 | 01240320011 | Private/Non-City | 0 CENTRAL AVE | 0.07 | 2,838 | 0.61 | | | | | | |
| 124 | 01240320074 | E St Louis Housing Auth. | 1406 CENTRAL AVE | 0.16 | 6,844 | 0.17 | | | | | | |
| 125 | 01240320086 | City of E St Louis | 1401 LAWRENCE AV | 0.32 | 13,849 | 1.97 | X | X | | | | |
| 126 | 01240320087 | City of E St Louis | 0 CENTRAL AVE | 0.04 | 1,547 | 0.71 | | | | | | |
| 127 | 01240320088 | City of E St Louis | 1404 CENTRAL AVE | 0.17 | 7,486 | 0.21 | | | | | | |
| 128 | 01240324017 | City of E St Louis | 1415 D ST | 0.11 | 4,583 | 0.27 | | | | | | |
| 129 | 01240325007 | City of E St Louis | 1416 D ST | 0.06 | 2,401 | 0.92 | | | | | | |
| 130 | 01240325008 | City of E St Louis | 1416 D ST | 0.06 | 2,400 | 0.55 | | | | | | |
| 131 | 01240332016 | City of E St Louis | 1536 S 16TH ST | 0.07 | 3,001 | 2.25 | X | X | | | | |
| 132 | 01240332017 | City of E St Louis | 1536 S 16TH ST | 0.07 | 3,000 | 2.99 | X | X | | | | |
| 133 | 01240332018 | City of E St Louis | 1538 S 16TH ST | 0.07 | 3,000 | 2.92 | X | X | | | | |
| 134 | 01240332019 | City of E St Louis | S 16TH ST | 0.09 | 3,863 | 2.36 | X | X | | | | |
| 135 | 01240332035 | City of E St Louis | 1531 D ST | 0.07 | 2,999 | 1.47 | X | X | | | | |
| 136 | 01240332036 | City of E St Louis | 1531 D ST | 0.07 | 2,999 | 3.80 | X | X | | | | |
| 137 | 01240332037 | City of E St Louis | 1535 D ST | 0.07 | 2,999 | 5.45 | X | X | | | | |
| 138 | 01240332038 | City of E St Louis | 1535 D ST | 0.07 | 2,976 | 1.90 | X | X | | | | |
| 139 | 01240332039 | City of E St Louis | D ST | 0.07 | 2,997 | 9.56 | X | X | | | | |
| 140 | 01240332040 | City of E St Louis | 1551 D ST | 0.05 | 2,087 | 3.48 | X | X | | | | |



| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 141 | 01240332044 | St. Clair Co. Trustee | 1514 S 16TH ST | 0.17 | 7,499 | 0.95 | | | | | | |
| 142 | 01240332045 | St. Clair Co. Trustee | 1518 S 16TH ST | 0.17 | 7,498 | 3.44 | X | | | | | |
| 143 | 01240332046 | St. Clair Co. Trustee | 1522 & 1526 S 16TH | 0.34 | 15,008 | 2.49 | X | | | | | |
| 144 | 01240332049 | St. Clair Co. Trustee | 1513 D ST | 0.17 | 7,496 | 1.98 | X | | | | | |
| 145 | 01240332050 | Private/Non-City | 1517 D ST | 0.17 | 7,495 | 2.60 | X | | | | | |
| 146 | 01240332051 | St. Clair Co. Trustee | 1521 & 1525 D ST | 0.34 | 15,002 | 3.04 | X | | | | | |
| 147 | 01240333011 | St. Clair Co. Trustee | 1522 D ST | 0.07 | 3,000 | 1.96 | X | | | | | |
| 148 | 01240333012 | St. Clair Co. Trustee | 1524 D ST | 0.07 | 3,001 | 1.70 | X | | | | | |
| 149 | 01240333013 | Private/Non-City | D ST | 0.07 | 3,000 | 1.05 | X | | | | | |
| 150 | 01240333014 | Private/Non-City | D ST | 0.07 | 3,000 | 1.58 | X | | | | | |
| 151 | 01240333015 | St. Clair Co. Trustee | 1530 D ST | 0.07 | 3,000 | 1.31 | X | | | | | |
| 152 | 01240333016 | City of E St Louis | 1530 D ST | 0.07 | 3,000 | 2.11 | X | X | | | | |
| 153 | 01240333017 | City of E St Louis | 1530 D ST | 0.07 | 3,001 | 1.69 | X | X | | | | |
| 154 | 01240333018 | City of E St Louis | 1530 D ST | 0.07 | 3,000 | 2.40 | X | X | | | | |
| 155 | 01240333019 | City of E St Louis | D ST | 0.07 | 3,000 | 3.15 | X | X | | | | |
| 156 | 01240333020 | City of E St Louis | 1536 D ST | 0.14 | 6,001 | 2.31 | X | X | | | | |
| 157 | 01240333038 | City of E St Louis | 1529 S 17TH ST | 0.07 | 3,000 | 1.26 | X | X | | | | |
| 158 | 01240333039 | City of E St Louis | 1533 S 17TH ST | 0.07 | 3,001 | 1.53 | X | X | | | | |
| 159 | 01240333040 | City of E St Louis | 1533 S 17TH ST | 0.07 | 3,001 | 1.68 | X | X | | | | |
| 160 | 01240333041 | City of E St Louis | 1535 S 17TH ST | 0.07 | 3,000 | 1.79 | X | X | | | | |
| 161 | 01240333042 | City of E St Louis | 1537 S 17TH ST | 0.07 | 3,000 | 1.98 | X | X | | | | |
| 162 | 01240333049 | St. Clair Co. Trustee | 1516 D ST | 0.17 | 7,501 | 0.66 | | | | | | |
| 163 | 01240333055 | St. Clair Co. Trustee | 1519 DR MR LEMON | 0.17 | 7,500 | 1.17 | X | | | | | |
| 164 | 01240333056 | St. Clair Co. Trustee | 1523 DR MR LEMON | 0.17 | 7,501 | 4.45 | X | | | | | |
| 165 | 01240334017 | City of E St Louis | 1532 S 17TH ST | 0.07 | 2,995 | 0.73 | | | | | | |
| 166 | 01240334018 | City of E St Louis | 1534 S 17TH ST | 0.07 | 2,993 | 1.09 | X | X | | | | |
| 167 | 01240334019 | City of E St Louis | 1534 S 17TH ST | 0.07 | 2,994 | 0.86 | | | | | | |
| 168 | 01240334020 | City of E St Louis | 1534 S 17TH ST | 0.07 | 2,994 | 1.85 | X | X | | | | |
| 169 | 01240334021 | City of E St Louis | S 17TH ST | 0.07 | 2,993 | 0.84 | | | | | | |
| 170 | 01240334022 | City of E St Louis | 1540 S 17TH ST | 0.07 | 2,996 | 2.75 | X | X | | | | |
| 171 | 01240334038 | City of E St Louis | E ST | 0.07 | 2,994 | 0.34 | | | | | | |
| 172 | 01240334039 | City of E St Louis | 1537 E ST | 0.07 | 2,994 | 1.23 | X | X | | | | |
| 173 | 01240334040 | City of E St Louis | 1537 E ST | 0.07 | 2,993 | 0.57 | | | | | | |
| 174 | 01240334041 | City of E St Louis | 1537 E ST | 0.07 | 2,994 | 0.53 | | | | | | |
| 175 | 01240334042 | City of E St Louis | 1539 E ST | 0.07 | 2,994 | 0.56 | | | | | | |
| 176 | 01240334043 | City of E St Louis | 1543 E ST | 0.07 | 2,994 | 0.61 | | | | | | |
| 177 | 01240334044 | City of E St Louis | 1541 S 17TH ST | 0.07 | 3,054 | 0.34 | | | | | | |
| 178 | 01240334052 | St. Clair Co. Trustee | 1524 DR MR LEMON | 0.17 | 7,484 | 1.36 | X | | | | | |
| 179 | 01240334053 | City of E St Louis | DR MR LEMONS | 0.07 | 2,995 | 0.88 | | | | | | |
| 180 | 01240334058 | St. Clair Co. Trustee | 1521 & 1525 E ST | 0.34 | 14,968 | 0.67 | | | | | | |
| 181 | 01240421010 | Private/Non-City | 1918 PIGGOTT AVE | 0.09 | 3,821 | 0.26 | | | | | | |
| 182 | 01240421011 | Private/Non-City | 1920 PIGGOTT AVE | 0.13 | 5,773 | 0.19 | | | | | | |
| 183 | 01240421012 | Private/Non-City | 1924 PIGGOTT AVE | 0.08 | 3,361 | 0.27 | | | | | | |
| 184 | 01240421013 | Private/Non-City | 1926 PIGGOTT AVE | 0.06 | 2,412 | 0.37 | | | | | | |
| 185 | 01240421023 | Private/Non-City | 1942 PIGGOTT AVE | 0.07 | 2,871 | 0.05 | | | | | | |
| 186 | 01240421024 | Private/Non-City | 2000 PIGGOTT AVE | 0.13 | 5,773 | 0.22 | | | | | | |
| 187 | 01240421057 | Private/Non-City | 1934 PIGGOTT AVE | 0.37 | 15,914 | 0.14 | | | | | | |
| 188 | 01240433001 | City of E St Louis | 1800 RUSSELL AVE | 0.11 | 4,662 | 0.12 | | | | | | |
| 189 | 01240433002 | City of E St Louis | 1800 RUSSELL AVE | 0.07 | 2,849 | 0.05 | | | | | | |
| 190 | 01240433023 | City of E St Louis | GAY AVE | 0.11 | 4,967 | 0.95 | | | | | | |
| 191 | 01240433047 | E St Louis Housing Auth. | 1812 RUSSELL AVE | 0.16 | 6,841 | 0.03 | | | | | | |
| 192 | 01240433051 | E St Louis Housing Auth. | 1824 RUSSELL AVE | 0.16 | 6,840 | 0.30 | | | | | | |
| 193 | 01240433067 | E St Louis Housing Auth. | 1828 RUSSELL AVE | 0.16 | 6,841 | 0.29 | | | | | | |
| 194 | 01240434013 | Private/Non-City | 1922 RUSSELL AVE | 0.06 | 2,824 | 0.10 | | | | | | |
| 195 | 01240434014 | Private/Non-City | 1924 RUSSELL AVE | 0.06 | 2,823 | 0.12 | | | | | | |
| 196 | 01240434015 | Private/Non-City | 1926 RUSSELL AVE | 0.06 | 2,824 | 0.35 | | | | | | |
| 197 | 01240434016 | Private/Non-City | 1928 RUSSELL AVE | 0.06 | 2,823 | 0.15 | | | | | | |
| 198 | 01240434017 | Private/Non-City | 1930 RUSSELL AVE | 0.06 | 2,823 | 0.19 | | | | | | |
| 199 | 01240434074 | Private/Non-City | 1932 RUSSELL AVE | 0.13 | 5,648 | 0.36 | | | | | | |
| 200 | 01250101018 | City of E St Louis | F ST | 0.07 | 2,979 | 0.98 | | | | | | |
| 201 | 01250101019 | City of E St Louis | F ST | 0.07 | 2,978 | 1.19 | X | X | | | | |
| 202 | 01250101020 | City of E St Louis | F ST | 0.07 | 2,979 | 1.16 | X | X | | | | |
| 203 | 01250101021 | City of E St Louis | 1544 F ST | 0.07 | 2,978 | 1.14 | X | X | | | | |
| 204 | 01250101022 | City of E St Louis | 1546 F ST | 0.08 | 3,292 | 2.03 | X | X | | | | |
| 205 | 01250101039 | City of E St Louis | 1533 G ST | 0.07 | 2,975 | 1.22 | X | X | | | | |
| 206 | 01250101040 | City of E St Louis | 1535 G ST | 0.07 | 2,975 | 1.69 | X | X | | | | |
| 207 | 01250101041 | City of E St Louis | 1535 G ST | 0.07 | 2,976 | 1.49 | X | X | | | | |
| 208 | 01250101042 | City of E St Louis | 1535 G ST | 0.07 | 2,974 | 1.31 | X | X | | | | |
| 209 | 01250101043 | City of E St Louis | 1541 G ST | 0.07 | 2,974 | 1.35 | X | X | | | | |
| 210 | 01250101044 | City of E St Louis | G ST | 0.07 | 2,976 | 1.03 | X | X | | | | |

16



| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 211 | 01250101045 | City of E St Louis | 1545 G ST | 0.08 | 3,354 | 1.16 | X | X | | | | |
| 212 | 01250101047 | City of E St Louis | 1530 F ST | 0.14 | 5,957 | 0.82 | | | | | | |
| 213 | 01250101048 | St. Clair Co. Trustee | 1520 & 1524 F ST | 0.27 | 11,913 | 0.28 | | | | | | |
| 214 | 01250101049 | St. Clair Co. Trustee | 1521 & 1525 G ST | 0.27 | 11,900 | 1.39 | X | | | | | |
| 215 | 01250102011 | City of E St Louis | LAWRENCE AVE | 0.07 | 2,952 | 0.18 | | | | | | |
| 216 | 01250102016 | City of E St Louis | 1817 WILFORD AVE | 0.10 | 4,181 | 0.08 | | | | | | |
| 217 | 01250102017 | City of E St Louis | 1817 WILFORD AVE | 0.07 | 2,944 | 0.15 | | | | | | |
| 218 | 01250102018 | City of E St Louis | 1833 WILFORD AVE | 0.07 | 2,944 | 0.20 | | | | | | |
| 219 | 01250102019 | City of E St Louis | 1833 WILFORD AVE | 0.07 | 2,944 | 0.19 | | | | | | |
| 220 | 01250102031 | City of E St Louis | 1413 S 19TH ST | 0.14 | 6,227 | 0.19 | | | | | | |
| 221 | 01250103016 | City of E St Louis | G ST | 0.06 | 2,629 | 0.73 | | | | | | |
| 222 | 01250103017 | City of E St Louis | G ST | 0.06 | 2,629 | 0.66 | | | | | | |
| 223 | 01250103018 | City of E St Louis | 1500 G ST | 0.06 | 2,629 | 0.86 | | | | | | |
| 224 | 01250103019 | City of E St Louis | 1542 G ST | 0.12 | 5,258 | 1.34 | X | X | | | | |
| 225 | 01250103021 | City of E St Louis | 1544 G ST | 0.06 | 2,629 | 0.80 | | | | | | |
| 226 | 01250103022 | City of E St Louis | 1544 G ST | 0.07 | 3,043 | 1.18 | X | X | | | | |
| 227 | 01250103027 | City of E St Louis | 1513 S 19TH ST | 0.08 | 3,292 | 15.45 | X | X | | | | |
| 228 | 01250103028 | City of E St Louis | 1513 S 19TH ST | 0.06 | 2,479 | 5.69 | X | X | | | | |
| 229 | 01250103029 | City of E St Louis | 1515 S 19TH ST | 0.06 | 2,479 | 7.66 | X | X | | | | |
| 230 | 01250103030 | City of E St Louis | 1517 S 19TH ST | 0.06 | 2,478 | 1.73 | X | X | | | | |
| 231 | 01250103031 | City of E St Louis | 15 S 19TH ST | 0.06 | 2,479 | 22.60 | X | X | | | | |
| 232 | 01250103032 | City of E St Louis | S 19TH ST | 0.06 | 2,478 | 2.78 | X | X | | | | |
| 233 | 01250103033 | City of E St Louis | 1525 S 19TH ST | 0.06 | 2,479 | 2.49 | X | X | | | | |
| 234 | 01250103034 | City of E St Louis | 1525 S 19TH ST | 0.06 | 2,479 | 1.39 | X | X | | | | |
| 235 | 01250103035 | City of E St Louis | 1527 S 19TH ST | 0.06 | 2,479 | 1.83 | X | X | | | | |
| 236 | 01250103036 | City of E St Louis | 1527 S 19TH ST | 0.06 | 2,479 | 10.59 | X | X | | | | |
| 237 | 01250103037 | City of E St Louis | 1530 S 19TH ST | 0.06 | 2,478 | 4.10 | X | X | | | | |
| 238 | 01250103038 | City of E St Louis | 1530 S 19TH ST | 0.06 | 2,479 | 3.11 | X | X | | | | |
| 239 | 01250103039 | City of E St Louis | 1533 S 19TH ST | 0.06 | 2,478 | 6.02 | X | X | | | | |
| 240 | 01250103040 | City of E St Louis | 1533 S 19TH ST | 0.06 | 2,479 | 20.09 | X | X | | | | |
| 241 | 01250103041 | City of E St Louis | 1535 S 19TH ST | 0.06 | 2,478 | 2.16 | X | X | | | | |
| 242 | 01250103042 | E St Louis Township | G ST | 0.06 | 2,480 | 1.51 | X | | | | | |
| 243 | 01250103043 | E St Louis Township | G ST | 0.07 | 2,928 | 1.44 | X | | | | | |
| 244 | 01250106001 | City of E St Louis | I ST | 0.07 | 3,000 | 0.34 | | | | | | |
| 245 | 01250106002 | City of E St Louis | I ST | 0.07 | 3,000 | 0.07 | | | | | | |
| 246 | 01250106003 | City of E St Louis | I ST | 0.07 | 3,000 | 0.05 | | | | | | |
| 247 | 01250106004 | City of E St Louis | I ST | 0.07 | 3,000 | 0.08 | | | | | | |
| 248 | 01250106009 | St. Clair Co. Trustee | 1401 S J ST | 0.07 | 3,000 | 1.27 | X | | | | | |
| 249 | 01250106010 | St. Clair Co. Trustee | 1403 S J ST | 0.07 | 3,000 | 0.68 | | | | | | |
| 250 | 01250106011 | St. Clair Co. Trustee | 1405 S J ST | 0.07 | 3,000 | 0.34 | | | | | | |
| 251 | 01250106012 | St. Clair Co. Trustee | 1405 S J ST | 0.07 | 3,000 | 0.46 | | | | | | |
| 252 | 01250106019 | City of E St Louis | I ST | 0.07 | 2,998 | 0.38 | | | | | | |
| 253 | 01250106021 | City of E St Louis | 1945 WILFORD AVE | 0.14 | 5,995 | 0.23 | | | | | | |
| 254 | 01250106030 | St. Clair Co. Trustee | 1418 S I ST | 0.12 | 5,395 | 0.27 | | | | | | |
| 255 | 01250110001 | St. Clair Co. Trustee | 1972 WILFORD AVE | 0.07 | 3,000 | 0.25 | | | | | | |
| 256 | 01250110005 | Private/Non-City | 1980 WILFORD AVE | 0.07 | 3,000 | 0.12 | | | | | | |
| 257 | 01250110008 | St. Clair Co. Trustee | 1984 WILFORD AVE | 0.07 | 3,000 | 0.08 | | | | | | |
| 258 | 01250110029 | Private/Non-City | 1976 WILFORD AVE | 0.14 | 6,001 | 0.28 | | | | | | |
| 259 | 01250110031 | Private/Non-City | 1503 S 20TH ST | 0.15 | 6,476 | 0.23 | | | | | | |
| 260 | 01250116005 | City of E St Louis | 1530 E ST | 0.97 | 42,092 | 0.68 | | | | | | |
| 261 | 01250200005 | St. Clair Co. Trustee | GAY AVE | 0.06 | 2,757 | 0.23 | | | | | | |
| 262 | 01250200008 | Private/Non-City | 1922 GAY AVE | 0.05 | 2,207 | 0.19 | | | | | | |
| 263 | 01250200028 | St. Clair Co. Trustee | CENTRAL AVE | 0.24 | 10,525 | 0.10 | | | | | | |
| 264 | 01250201059 | St. Clair Co. Trustee | 1311 S 20TH ST | 0.10 | 4,371 | 0.11 | | | | | | |
| 265 | 01250201060 | St. Clair Co. Trustee | 1313 S 20TH ST | 0.06 | 2,795 | 0.12 | | | | | | |
| 266 | 01250201061 | St. Clair Co. Trustee | S 20TH ST | 0.07 | 2,922 | 0.42 | | | | | | |
| 267 | 01250202001 | Private/Non-City | 1400 S J ST | 0.07 | 3,002 | 0.25 | | | | | | |
| 268 | 01250202002 | Private/Non-City | 1400 S J ST | 0.07 | 3,001 | 0.16 | | | | | | |
| 269 | 01250202005 | Private/Non-City | 1408 J ST | 0.07 | 3,001 | 0.92 | | | | | | |
| 270 | 01250202009 | Private/Non-City | S 20TH ST | 0.08 | 3,269 | 0.95 | | | | | | |
| 271 | 01250202010 | Private/Non-City | S 20TH ST | 0.08 | 3,398 | 0.12 | | | | | | |
| 272 | 01250202011 | Private/Non-City | S 20TH ST | 0.08 | 3,526 | 0.20 | | | | | | |
| 273 | 01250202030 | Private/Non-City | J ST | 0.14 | 6,002 | 0.25 | | | | | | |

| | | | **Average Lot Size** | **0.11** | **4,645** | **Over 1.0 ppm** | **100** | **54** | | | | |

| | | | **Qty Vacant** | **269** | | | | | | | | |
| | | | **Qty Improved** | **4** | | | | | | | | |



### 1.4   Qualifications of the Appraisers

The appraisers preparing this Expert Report are Charles T. Brigden, MAI, CRE, FRICS, and Richard J. Roddewig, MAI, CRE, FRICS.  The appraisers are with JLL Valuation & Advisory Services, LLC which is part of Jones Lang LaSalle, one of the largest full-service real estate firms in the world with offices in more than 80 countries.  Both are currently certified general real estate appraisers in Illinois and in many other states.

Mr. Brigden and Mr. Roddewig have extensive experience in the analysis of the effect of environmental contamination on prices and values (including analysis of soil, air and groundwater contamination issues) and are therefore competent to undertake this assignment under the Uniform Standards of Professional Appraisal Practice. They have published articles in The Appraisal Journal on methods and techniques for the analysis of the effect of contamination and environmental risk on real estate prices and values and presented at seminars and panels sponsored by the Appraisal Institute and the American Bar Association.

Additional information related to the qualifications of the appraisers is contained in the Addenda.

### 1.5   Scope of Work

USPAP defines scope of work as "the type and extent of research and analyses in an appraisal or appraisal review assignment."[7] Additionally, *The Appraisal of Real Estate* includes the following discussion of the importance of the scope of work to an appraisal assignment:

> "Scope of work for an assignment is acceptable if it leads to credible assignment results, is consistent with the expectations of parties who are regularly intended users for similar assignments and is consistent with what the actions of the appraiser's peers would be in the same or similar assignment."[8]

*Summary of Scope of Work Conducted*: In addition to reading and evaluating the Bell Report, we have performed the following as part of our scope of work:

- Reviewed the Second Amended Complaint and documents filed in the litigation;
- Inspected the neighborhood area located north and northeast of the Monsanto Plant where City-owned properties tested for PCB contamination are located (the "subject neighborhood") and inspected adjacent and nearby areas outside that neighborhood in the City of East St. Louis as well as in other, adjacent municipalities;
- Undertook GIS mapping of the subject neighborhood and adjacent and nearby market areas and sales and rental data;
- Inspected the exteriors of the 273 properties (vacant and improved) and the area comprising the subject neighborhood identified in the Bell Report;
- Undertook on-line research into county records related to the various subject properties;
- Reviewed various State of Illinois and U.S. EPA reports (IEPA and U.S. EPA) concerning the contamination investigation and remediation situation at the Monsanto Solutia facility and at other properties in the vicinity of the subject neighborhood;
- Reviewed newspaper and other reports and information concerning the PCB contamination investigation and remediation situation at the Monsanto Solutia facility;

---

[7] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., p. 5, line 161.
[8] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago: Appraisal Institute, 2020), p. 75.



- Undertook internet research and review of local and national news stories as well as professional real estate publications related to the real estate market in the City of East St. Louis;

- Collected and analyzed real estate transaction data in East St. Louis and nearby communities from the Mid-American Regional Information Systems (MARIS) MLS database and undertook an analysis of sale prices both inside the neighborhood where the subject properties are located as well as in adjacent and nearby areas;

- Reviewed U.S. Census data from 1950 to 2020 and researched demographics and manufacturing and employment history of the East St. Louis market area;

- Reviewed St. Clair County Assessor data;

- Read the expert reports produced by Randall Bell and Kevin M. Coghlan;

- Consulted with Ms. Donna Howard of DJ Howard and Associates, Inc. an Illinois licensed real estate appraiser, concerning the subject property, the East St. Louis real estate market, the subject neighborhood, and sales and rental data related to the determination of the unimpaired and impaired (as is) values of the subject properties;

- Reviewed and analyzed sales and rental from the multiple listing service (MLS) for the East St. Louis area;

- Reviewed environmental reports related to the Monsanto Solutia facility as well as related to other industrial facilities and sites in East St. Louis and adjacent areas undergoing environmental investigation and remediation;

- Reviewed information provided by the Plaintiff related to soil testing in the subject neighborhood;

- Reviewed various other expert reports and documents produced by the Plaintiff and Defendants in the litigation;

- Reviewed articles published in *The Appraisal Journal* and in other recognized publications that deal with the effect on prices and values due to contamination;

- Reviewed USPAP Advisory Opinion AO-9 "The Appraisal of Real Property That May Be Impacted by Environmental Contamination;"

- Reviewed our prior investigations and case studies related to the effect of PCBs, dioxins, soil contamination, and proximity to Superfund sites on property prices and values in other locations around the United States;

- Reviewed and analyzed the case studies in the Bell Report and, in some cases, inspected the Bell Report case study areas and conducted follow up research into some of those case studies;

- Reviewed the 2020-2021 and 2024 editions of the *Uniform Standards of Professional Appraisal Practice (USPAP);*

- Reviewed the 15th edition of *The Appraisal of Real Estate* and the 7th edition of *The Dictionary of Real Estate Appraisal*, both published by the Appraisal Institute;

- Reviewed various seminars and publications of the Appraisal Institute related to the analysis of the effect of various types of environmental conditions on real estate prices and values;

- Reviewed the deposition transcripts of: Dr. Randall Bell, PhD of Landmark Research; Kevin Coghlan, MS, CIH President of Environmental Health & Engineering, Inc; Doreen



Hoosman, City Clerk; and Michael Wagner, City of East St. Louis corporate representative.

- Analyzed facts and circumstances surrounding the investigation and testing of PCB contamination in the neighborhood where the subject properties are located as it relates to the on-site and off-site testing and remediation involving the Monsanto property alleged to be the cause of an impact on prices and values of City-owned properties.

We conducted our analysis based on the generally accepted techniques and methods of the appraisal profession for determining the impact of environmental conditions on prices and market value of real property as set out in the following sources:

- The 2024 edition of the *Uniform Standards of Professional Appraisal Practice* (USPAP);

- The *Code of Professional Ethics and Standards of Professional Appraisal Practice* of the Appraisal Institute;

- The 15th Edition of *The Appraisal of Real Estate* and the 7th Edition of *The Dictionary of Real Estate Appraisal*, both published by the Appraisal Institute; and

- Courses, seminars, and publications of the appraisal profession that set forth what our appraiser peers would do in similar assignments involving determining the effect of environmental conditions on prices and values.

The assignment began in July of 2022 and was completed in July of 2024.

Significant professional assistance was provided by Dr. Thomas W. Hamilton, PhD, MAI, CRE, FRICS; Ms. Anne S. Baxendale, Mr. Alexander C. Argianas, Mr. Adam H. Stulgin, Mr. Zachary C. Munn, Mr. Corbin M. Stulgin, Ms. Haley A. Scheid, and Mr. Shane M. Briscoe of JLL Valuation & Advisory Services, LLC, who researched and organized sales and property data in East St. Louis and the surrounding area, and who assisted in preparing maps, charts, tables, and collection of historical demographic and economic data for this report. Dr. Hamilton and Mr. Argianas also undertook exterior inspections of the properties that are the subject of this Appraisal Review and JLL Report. Dr. Hamilton assisted in the reviewing of published literature included in the Bell Report.[9]

Additional supporting documentation not included herein is retained in our file.

### 1.6  Certification and Statement of Assumptions and Limiting Conditions

The Appraisal Review that is a part of this JLL Expert Report is specifically made subject to the Statement of Assumptions and Limiting Conditions for this appraisal review report, as well as the Certification signed by the appraisers, included in the Addenda.

We have not employed any hypothetical conditions.  Among the limiting conditions in the Addenda are the following:

---

[9] The 2024 Edition of USPAP (P. 338: FAQ 265) states the following: "USPAP does not include a definition of significant appraisal assistance." According to this FAQ, "significant means that the contribution must be of substance to the development of the assignment results" and "must contribute to the valuation analysis in a noteworthy way. An individual who merely collects or provides data for use in the analysis does not provide significant appraisal assistance." USPAP FAQ 265 further states, "the term appraisal assistance means that the contribution is related to the appraisal process or requires appraiser competency."



> *Limiting Condition: However, the review appraiser has reviewed information contained in the expert reports produced for the Plaintiff in the litigation and may also review information contained in any environmental reports prepared for the Defendants and provided to us. We have also reviewed publicly available information concerning environmental issues related to various industrial facilities in the vicinity of the subject properties and in East St. Louis. The review appraiser is qualified to review that information from the point of view of the real estate marketplace in the East St. Louis area.*

> *Limiting Condition: This Appraisal Review Report does not include the reviewers' own opinions of market value or rental value of any specific property included in the Bell Report. This Appraisal Review Report does include, however, our conclusions concerning the unreliability of the Bell Report damages analysis after correcting the misrepresentations, errors and omissions in that reviewed Bell Report.*

All assumptions and limiting conditions related to this this report are contained in the Addenda.

If the facts and circumstances on which those assumptions and limiting conditions are based change, it may have an effect on the assignment results.

## 1.7   Date of Value and Contamination Situation Impact Analysis

The date of value in the Bell Report is December 31, 2023, which is also the date of value and analysis of the impact of the contamination situation for purposes of our analysis.

## 1.8   Definitions Important to the Assignment

The Appraisal Institute states that the definition of market value that "incorporates the most widely accepted concepts" is as follows:

> "The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress."[10]

This appraisal assignment does not include the appraiser's opinion of the market value of any specific City-owned or privately-owned properties.

The Illinois General Assembly defines "appraisal" and "appraisal report" as follows:

> "Appraisal" means (noun) the act or process of developing an opinion of value; an opinion of value (adjective) of or pertaining to appraising and related functions.

> "Appraisal report" means a written appraisal by an appraiser to a client.[11]

We have assumed for purposes of this assignment that the definition from the Appraisal Institute and the definitions in Illinois law have essentially the same meaning.

---

[10] Appraisal Institute. 2020. *The Appraisal of Real Estate*, 15th ed. Chicago: Appraisal Institute, p. 58.

[11] Illinois General Assembly (225 ILCS 459/10), Sec. 10, *Definitions In this Act*. Per email correspondence on Tuesday, January 30, 2024, with Tamarcus Page, Chief Deputy of the St. Clair County Assessor's Office.



Advisory Opinion 9 (AO-9) published by the Appraisal Standards Board contains a number of important definitions, including the following, that are specifically applicable to this assignment:

**"Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination**: Adverse environmental conditions resulting from the release of hazardous substances[12] into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies.

**Impaired Value**: The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as is" value of a contaminated property.

**Remediation Lifecycle**: A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property."[13]

**Unimpaired Value**. The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated." (7th Edition of *The Dictionary of Real Estate Appraisal*, p. 329, as taken from Advisory Opinion 9, 2020-2021 ed., and USPAP 2024 ed. p. 20, line 100-101)

The State of Illinois has adopted USPAP and its definitions.

---

[12] AO-9 does not contain a definition of the term "hazardous substance." However, the Appraisal Institute's book entitled *Real Estate Damages: An Analysis of Detrimental Conditions* contains the following definition of the term "hazardous substance": "A material that is determined by qualified engineers to be poisonous, reactive, flammable, corrosive, toxic, or that has been designed (sp.) as such by a governmental or regulatory agency."

[13] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., Advisory Opinion 9 (AO9), p. 106-110.



### 1.9   Dates of Inspection of the East St. Louis Market Area and the Subject Properties and Subject Neighborhood

The area located north and northeast of the Monsanto property that is shown on a map in the Bell Report and referenced in the Second Amended Complaint as the location of the City-owned (and non-City-owned) properties tested for PCB contamination (the "subject neighborhood") was inspected by Thomas W. Hamilton, Richard J. Roddewig, and Alex C. Argianas of JLL on February 16, 2023, and again on January 17, 2024, by Dr. Hamilton and Mr. Argianas. Additional inspections of the exterior of a sample of the subject properties and of the neighborhood and surrounding environs was conducted by Mr. Brigden on June 27, 2024.

### 1.10   Date of Submission

This Appraisal Review and JLL Expert Report is being submitted on July 9, 2024.



## 2. The Standards of Professional Appraisal Practice and Generally Accepted Methods for Determining the Effect of Environmental Conditions on Prices, Rents and Values

### 2.1 Licensed Real Estate Appraisers, the Uniform Standards of Professional Appraisal Practice, and the Review Appraisal Process

Licensed real estate appraisers such as Randall Bell who signed the Bell Report are required by the (USPAP) to apply recognized methods and techniques of the appraisal profession.

The USPAP "Scope of Work Rule" as well as USPAP Standard 1 and Standard 2 require an appraiser to produce "credible" results that are based on generally accepted methods of the appraisal profession. The "Scope of Work Rule" in the 2024 edition of USPAP (p. 15, Line 421) states that "credible assignment results require support by relevant evidence and logic." Standards Rule 1-1 of the 2024 edition of USPAP (p. 18) states that an appraiser must "correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal."  Standards Rule 1-4 of that 2024 edition of USPAP (p. 20) then goes on to add the following: "In developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results."[14]

Standard 3 of USPAP deals with review appraisals such as that conducted as part of this JLL Expert Report.  The Comment to Standards 3-2(c) of the 2024 version of USPAP[15] (p. 28) says the following about a reviewer's responsibilities:

> "Comment: The purpose of an appraisal review assignment relates to the reviewer's objective; examples include, without limitation, to determine if the results of the work under review are credible for the intended user's intended use, or to evaluate compliance with relevant USPAP requirements, client requirements, or applicable regulations.
>
> In the review of an appraisal assignment, the reviewer may provide an opinion of value for the property that is the subject of the work under review.
>
> In the review of an appraisal review assignment, the reviewer may provide an opinion of quality of the work that is the subject of the appraisal review assignment."

Standards Rule 3-3 of the 2024 version of USPAP (p. 29) then goes on to state that the review appraisal must "develop an opinion as to whether the opinions and conclusions [in the appraisal being reviewed] are credible" and "develop the reasons for any disagreement" with the report being reviewed.  The Comment to that Standards Rule 3-3 that says the following:

> "Comment: Consistent with the reviewer's scope of work, the reviewer is required to develop an opinion as to the completeness, accuracy, adequacy, relevance, and

---

[14] Although the Bell Report (page 22) states that the Dates of Value for the subject properties was December 31, 2023, the date of the Bell Report is February 16, 2024.  Therefore, the Bell Report is required to comply with the 2024 edition of the Uniform Standards of Professional Appraisal Practice which have an effective date of January 1, 2024.

[15] Although the date of value in the Bell Report is December 31, 2023, the Bell Report is being reviewed by us in 2024.  Therefore, for purposes of standards applicable to this JLL review assignment, this report references the 2024 version of USPAP.



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

reasonableness of the analysis in the work under review, given law, regulations, or intended user requirements applicable to the work under review."

## 2.2 The Generally Accepted Appraisal Methods for Determining the Impact of Environmental Conditions on Real Estate Prices and Diminution in Market Value Due to Contamination and Environmental Risk

The appraisal profession has developed generally recognized methods and techniques for determining the impact of various types of environmental situations — including the effect of soil contamination — on property prices and values. These methods are contained in the peer-reviewed books, publications, seminars, and courses of the appraisal profession as well as in Advisory Opinion 9 (AO-9) promulgated by the Appraisal Standards Board in Washington, D.C.

Licensed real estate appraisers are required by USPAP to apply those generally accepted methods and techniques.

Those standards and the generally recognized methods of the appraisal profession related to assignments involving properties potentially affected by contamination issues are described in more detail in the Addenda to this JLL Expert Report.

USPAP Advisory Opinion AO-9 defines "Diminution in Value (Property Value Diminution)" as "The difference between the unimpaired and impaired values of the property being appraised."[16] The methods generally accepted by the appraisal profession to determine the difference between the unimpaired market value and market value as impacted by environmental conditions including contamination (the "impaired value") and resulting diminution in value are as follows:

1. Paired sales analysis of potentially impacted properties

2. Analysis of environmental case studies

3. Multiple regression analysis of potentially impacted neighborhood areas or properties in proximity to a contamination source

4. Adjustment of income and yield capitalization rates to reflect environmental risk premiums in an income capitalization analysis.[17]

AO-9 also states that the appraiser should analyze potential cost, use, and risk effects that may affect prices and values.[18]

## 2.3 Market Effects, the Detrimental Condition Lifecycle, and the Requirements to Analyze Actual Market Data and Undertake Property-by-Property Analysis at Various Points in Time

Three of the most important recognitions by the appraisal profession as found in its published professional standards and published professional research relevant to the issues in this assignment may be summarized as follows:

---

[16] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., Advisory Opinion 9 (AO9), p. 107, Lines 70-72.

[17] Appraisal Institute, *Analyzing the Effects of Environmental Contamination on Real Property*, Instructor Handbook (2010), Part 4, P. 4-33.

[18] That is set out in the section in AO-9 with the heading "Satisfying Standards Rule 1-4 Requirements." The full text of AO-9 is contained in the Addenda to this report.



- Adverse environmental conditions including soil contamination concerns do not automatically decrease market prices and values.

- Analysis of actual market data such as sale prices actually paid, rental income and expenses, marketing times, and sale-to-list price ratios, either in the area actually impacted or, in the absence of sufficient sales or other market data, in other similar situations (case study analysis) must be undertaken to determine the impact, if any, of such environmental situations.

- Standards of professional appraisal practice and the peer-reviewed professional appraisal literature recognize that the effect of changes in environmental conditions, including changes in levels of soil contamination resulting from remediation, on real estate prices and values can change over time in response to the "detrimental conditions lifecycle."

As investigation, remediation, and cleanup goes on following an environmental event, impacts on prices and values, if any, typically decrease and prices and values rebound. That sequence of events has been recognized for more than 30 years and a 1992 *Appraisal Journal* article included the diagram below to demonstrate the typical pattern of an initial impact on prices and values in the immediate aftermath of initial public awareness of a situation followed by recovery to full market value.[19]



---

[19] Bill Mundy, MAI, PhD. 1992. "The Impact of Hazardous Materials on Property Value." *The Appraisal Journal*, April 1992. Chicago: Appraisal Institute, p. 159. The six time periods are described in a legend below the chart in the Mundy, 1992 article as follows: "1=Loss in value as a result of diminished marketability. Public becomes aware of the problem. How buyers and intermediaries perceive risk (unknown & dread factors). 2= Duration. Time to understand relationship between hazard and risk. 3=Amount of improvement in value resulting from knowledge (scientific) of hazard and effect knowledge has on perceived risk. 4=Duration as hazard remains. Value may change as perceived risk changes. 5=Increased value caused by removal of hazard (i.e., cost to cure). 6=Stigma remaining after hazard removed. A period of uncertainty related to uncontrollable, involuntary, unknown, unobservable character of the hazard."



As a result, when impacts on real estate prices and values do occur, they are typically temporary rather than permanent. In such instances, the marketability effect may last from only a few days to a few weeks, months or years.

This marketability effect lifecycle has been recognized in Advisory Opinion 9 (AO-9) of USPAP which has as its subject "The Appraisal of Real Property That May Be Impacted by Environmental Contamination."[20] That advisory opinion recognizes a "remediation lifecycle" and that the effects of a contamination situation on prices and value can change over time as a property moves through the investigation, remediation, and post-remediation phases of that lifecycle. At each stage, cost, use and risk factors can vary depending upon the "case-by-case" circumstances at play. As a result, impacts on real estate prices and values can change over time depending upon the stage in the interplay between cost, use and risk factors.

Given the manner in which effects, if any, can change over time, the 15th edition of *The Appraisal of Real Estate* (p. 188) published in 2020 stresses the importance analyzing possible effects as of a particular date of value: "Given the remediation lifecycle recognized by AO-9, gathering and analyzing market data that matches up well with the appraised property's remediation lifecycle stage on the date of value is critical because the effect of the contamination situation on prices and values can change as the investigation, remediation, and post-remediation monitoring move forward."

Any such impacts also typically vary from property-to-property depending on such factors as proximity to the source of contamination; type and number of contaminants or potentially hazardous substances; investigation, response and remediation status; type of use (residential, commercial, industrial, vacant land, etc.); effect of the situation on income and expenses; date of sale, date of valuation, or date of measurement of the impact, if any, on prices and values, and more.

As a result, actual market data involving potentially affected properties must be analyzed. That has been recognized in the e 2016 Appraisal Institute book, *Real Estate Damages, 3rd Edition* authored by Dr. Bell recognizes at page 1 the importance of analyzing actual market data involving properties affected by the remediation lifecycle situation:

> "To accurately analyze real estate, one must be able to monitor and interpret the actions of the participants in the market. After all, properties do not deal with one another, but people do. When carefully considered, all the factors that have an influence on a property's desirability, and therefore its value, are traced back to the market's perceptions. To truly understand real estate valuation, one must conscientiously focus on and measure these perceptions.
>
> \*          \*          \*
>
> To understand perceptions within the real estate market, market data must be used to measure how the market actually reacts. A property is considered 'innocent' until a negative impact is demonstrated through an analysis of relevant market data. ***The simple assumption that an incident caused a diminution in value is one of the most common errors in the field***. These are sometimes called *ipse dixit* opinions of value. *Ipse dixit* is a Latin term essentially meaning 'it is because I said so,' or 'It is just the way it is" without the benefit of any actual support or critical thinking. ***It is the antithesis of any position that has timely, reasoned support or evidence.'"***(emphasis added)

---

[20] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., Advisory Opinion 9 (AO9), p. 109, line 151.



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

The *Real Estate Damages* book goes on at page 27 to state the following:

> "The most important consideration in evaluating potential risk, stigma, or market resistance is to support opinions with relevant market data. The discovery or disclosure of a current or prior detrimental condition does not automatically result in value diminution, and it is incumbent upon the appraiser or analyst to provide proper support for any opinions related to market resistance."



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

# 3. The Bell Report Damages Claim and Methods of Analysis

### 3.1  The Claimed Purpose of the Bell Appraisal Assignment as Stated in the Bell Report

The Bell Report (p. 19) states the purpose of the report to be as follows:

> "The purpose of this report is to determine the real estate and economic damages, if any, of the subject properties due to the impacts of PCB chemicals."

### 3.2  The Definition of Damage Relied on in the Bell Report

The Bell Report (p. 8) references Rule 30.17 issued by the Illinois Supreme Court Committee on Jury Instructions in Civil Cases.  The Bell Report summarizes the rule as follows:

> "The damage to real property, determined by the reasonable expense of necessary repairs to the property which was damaged [and the value of loss of the use of the (building) (improvements) for the time reasonably required for the repair] [and the difference between the fair market value of the real property immediately before the occurrence and its fair market value immediately after the repairs]."

The footnote citation given in the Bell Report for the source of that rule is as follows: Illinois Pattern Civil Jury Instructions, Damage Instructions Rule 30.17 Measure of Damages —Damage to Real Property — Repairable Damage."

### 3.3  The Elements of the Damages Claim and Damages Conclusion in the Bell Report

The Bell Report includes five elements to his claimed "real estate and economic damages" due to "the PCB contamination situation." The components of the Bell damages analysis and the conclusions concerning the amount of those damages are set forth in the table below in the Bell Report (p. 68).  The Plaintiffs' claim for damages related to fines has been dropped from the case as a result of a court order.

**CITY OF EAST ST. LOUIS**
**Damage Summary**
**(Landmark File: 155-1-21)**

|  | Market Rate Improved | Market Rate Land | Time | Total |
|---|---|---|---|---|
| Ordinance Fines | $500 per Day<br>$750 per Day | $500 per Day<br>$750 per Day | Pre 6/12/2003<br>Post 6/12/2003 | -$3,111,449,250 |
| Cost Effect | Environmental Health & Engineering, Inc. | Environmental Health & Engineering, Inc. | 24 Months | More than -$50,200,000 |
| Use Effect*<br>(See Schedule) | $1,400 per Month<br>$46.00 per Day | $233.33 per Month<br>$7.67 per Day | 53.59 Years @ 9% Interest | -$989,632,338 |
| Risk Effect**<br>("As-is" Unrepaired) | $140,000 @ -100%<br>184 Subject Properties | $40,000 @ -100%<br>38 Subject Properties | Current | -$27,280,000 |
| Risk Effect**<br>("As-if" Repaired) | None noted | Unrepaired Risk + $40,000<br>222 Subject Properties | Current | -$18,400,000 |

*There are 273 subject properies; however, ownership has varied over time. Ownership was accounted for in he use effect calculations.
**Risk effects were applied to the subject properties that the City of East St. Louis and government agency held recorded ownership of in 2023, which was a total of 228. There were 6 subject properies with lot sizes less han 1,000 SqFt, these were not included in the Use or Risk Effect calculations.


Figure 39: Damage Summary



### 3.4   The Bell Report Damages Methodology

The four elements[21] in the Bell Report conclusion about alleged damages are based on the following methods or calculations:

- *Cost Effect* – The Bell Report simply relies on the "more than $50,200,000" estimate of costs to remediate the 273 properties contained in the report produced by Environmental Health & Engineering, Inc.  The Bell Report makes no attempt to analyze those costs or determine their appropriateness as applied to any of the 273 properties in the subject neighborhood.

- *Use Effect* – The Bell Report arrives at the claim of almost $990 million in "use effect" damages through a series of steps.

  First, an average loss of monthly rent of $1,400 for homes is first calculated for the 273 properties based on an analysis of 51 leases of homes in distant St. Clair County communities outside the City of East St. Louis. For unimproved subject properties, an annual ground rent of 7% is applied to a claimed market value of $40,000 per lot based on distant suburban St. Clair lot prices is used in the calculations.

  The Bell Report discounts the average 2023 annual rental amounts for land and for improved properties using the Consumer Price Index (CPI) to derive annual rental rates for each type of property in each year all the way back to 1973.

  Then a claimed 100% loss in monthly rent on all 273 properties is calculated over a claimed rental loss period starting on July 1, 1973 and ending on the future date of February 1, 2027, for a total of claimed loss of use for 53.59 years.[22]  The Bell Report claims to consider only those months in the past when the city actually owned the properties.

  The final step is a calculation of a claimed loss of 9% per year interest on the hypothetical rents of city-owned properties. The claimed lost rental income and claimed lost interest on those hypothetical rents are then added together to arrive at the claimed "use effect" damages of almost $990 million.[23]

- *Risk Effect ("As Is" Unrepaired)* – The Bell Report (p. 12) used a two-step process to arrive at the -$27,280,000 claimed "Risk Effect 'As If' Unrepaired." First, damages an "average" value of $140,000 for improved properties and $40,000 "average" value for vacant lots and multiplied it by the respective number of claimed improved homes and vacant lots.[24]

---

[21] A fifth damage claim in the Bell Report related to fines has been removed from the damages claim in the case by a court order.  That was acknowledge by Dr. Bell at his deposition on May 3, 2024, at page 177 of the "Rough, Unedited Transcript" provided to us.

[22] The Bell Report (page 11) states that February 1, 2027, was used as the "use effect" based on "the scheduled start of trial [date] February 1, 2025 plus 24 months to conduct remediation efforts to February 1, 2027.aiend date because the scheduled , It appears from the Bell Report,

[23] The Bell Report (page 41) claims that "while all subject properties were negatively impacted by PCBs, subject properties with a lot size less than 1,000 SqFt were not included in the damage calculations, [and] this is consistent with the low end of the lot sizes observed in the comparable sales data."

[24] The Bell Report arrives at only 222  properties in the final calculation of damages to the original 273 properties owned by the City of East St. Louis and involved in the claim for damages based on the following: first, only the 228 properties that the Bell Report erroneously claims "had recorded ownership in 2023" by "the City of East St. Louis and government agency" were included in the damages analysis; and second, six properties with lot sizes less than 1,000 square feet were not included.  Bell Report, notes on p. 14 under Figure 7: Damage Summary.



The "average" values were based on sale prices involving suburban homes and lots located miles away in suburban areas outside East St. Louis. In the second step, the Bell Report then simply claims the risk effect was -100% based on a "literature review" and "case study" analysis and concludes that the damages equal the entirety of the $27,280,000 total of the average values. The Bell Report does not analyze any sales either in the subject neighborhood, in East St. Louis, or in communities adjacent to the subject neighborhood in arriving at the -100% "risk effect" conclusion.

- *Risk Effect ("As Is" Repaired)* – To arrive at the conclusion of damages related to the (p. 13) "Risk Effect 'As If' Repaired", the Bell Report first multiplies the "average" vacant lot value of $40,000 derived from the suburban sales to all 222 "subject properties." That amount ($8,800,000) is then deducted from the $27,280,000 damage conclusion in his prior "Risk Effect ('As Is' Unrepaired)" calculation to arrive at a damages conclusion of $18,400,000. As support for that method, the Bell Report (p. 13) simply says "when an environmental contaminant is remediated, the risk effects can be lower and states that after remediation each of the 222 "lots" has an average value of $40,000.



# 4. JLL Research into the Environmental & PCB Situation Involving the Monsanto/Krummrich Facility and Other Sites in the Sauget Industrial Corridor

## 4.1 History of the Monsanto Facility in Sauget, Illinois

The Monsanto Chemical Company was founded in 1901 in St. Louis, across the Mississippi River from what is now the Village of Sauget and the City of East St. Louis. Initially, the company produced food additives such as artificial sweeteners, caffeine, and vanillin extracted from vanilla beans. Following World War I, the company expanded into production of industrial chemicals. In the 1940s it became a leading manufacturer of plastics and synthetic fabrics and in the 1960s established an agricultural chemicals division with a focus on herbicides. Later in the 1990s, the company expanded its agricultural division to include production of biotech crops.

Chemical manufacturing at the Monsanto site across the Mississippi River from St. Louis began in 1907 "when the Commercial Acids Company constructed facilities to manufacture commodity chemicals including Sulfuric, Muriatic, and Nitric Acids."[25] In 1917, the Monsanto Chemical Company purchased the Commercial Acids Company manufacturing plant and initially named it Plant B.[26] The plant was later renamed the W.G. Krummrich Plant after a former plant manager.

In 1926, the 1.65 square mile area where the Monsanto plant was located containing about 230 residents was incorporated as the Village of Monsanto. That remained the name of the village until 1968 when the town was renamed Sauget in honor of the family that had been involved in incorporation and political life since its earliest days.

The village focused its development on attracting heavy industry. Among the other industrial companies that located manufacturing facilities in Monsanto/Sauget were Cerro Copper, Amax Zinc, Exxon Mobil, and Clayton Chemicals. Many of those companies, including Monsanto, used heavy metals and various chemicals in their production processes.

In 1936, the Monsanto/Krummrich plant became one of the earliest facilities in the United States to commercially produce Polychlorinated Biphenyls (or PCBs). PCBs were industrially favored for their non-flammability, chemical stability, high boiling point and electrical insulating properties. PCB production in Sauget ended with the closure of the Monsanto plant in 1977 as part of a corporate restructuring and consolidation of operations towards more profitable business lines.

In 1943, during World War II, the United States government opened a Chemical Warfare Services plant adjacent to the Monsanto/Krummrich plant. The plant was operated in conjunction with Monsanto until 1960 when it was closed.

An analysis of property ownership related to the Monsanto/Krummrich plant operations in Sauget as well as those purchased in neighboring municipalities for buffer purposes by Monsanto or Solutia is included in the Addenda to this report.

---

[25] Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 2-1.

[26] Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 2-1.



### 4.2 RCRA and CERCLA and the Heavy Industries and Chemical Plants in the Sauget Industrial Corridor

In the 1970s and early 1980s, the U.S. Congress enacted a series of laws designed to investigate and cleanup contamination at current and former industrial facilities. These included the Resource Conservation and Recovery Act (RCRA) enacted in 1976, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (also known as the Superfund Act)[27] enacted in 1980, and the "brownfield" cleanup initiatives of the U.S. Environmental Protection Agency (USEPA) and some state environmental agencies.  As a result of these and other legislation from the early 1970s including the Clean Water Act, heavy industrial and chemical facilities such as those in Sauget began to be investigated and remediated.

The RCRA legislation and implementing regulations dealt primarily with active industrial sites where portions of the site had been (or were being) used for disposal of hazardous wastes and industrial byproducts or where uncontrolled leaks or other practices had resulted in a portion of the site having contamination issues. The Superfund program was developed to deal with the nation's most heavily contaminated source sites.  Many of the sites had been abandoned and there was more difficulty in identifying the parties responsible for causing the contamination than there had been in implementing the RCRA legislation that primarily involved active sites. The USEPA brownfield initiative was launched in 1995 in response to congressional concerns about how to get many contaminated inner city former industrial sites back into productive use through redevelopment.[28]  Typically, brownfield sites are less heavily contaminated than Superfund sites and are not also designated as Superfund or RCRA sites, although some brownfield redevelopments have occurred in conjunction with RCRA or Superfund site cleanups.

As a result of these various governmental cleanup initiatives, the heavy industrial and chemical manufacturing sites in what became known as the Sauget Industrial Corridor began to be investigated and remediated.

### 4.3 The Sauget Task Force and the Industrial Facilities Investigated by the Illinois Environmental Protection Agency (IEPA) in Sauget, Cahokia, and Southwest East St. Louis

In September of 1981, the Illinois Environmental Protection Agency (IEPA) "formed a Sauget Task Force to investigate past and present waste disposal activities in the area."[29]

Among the areas, facilities and sites in Sauget, the adjoining community of Cahokia, and the southwestern edge of East St. Louis that have been investigated and placed under some type of remediation program include the following:

---

[27] The U. S. Environmental Protection Agency has succinctly summarized the purpose of CERCLA as follows: "To address the dangers of abandoned or uncontrolled hazardous waste dumps by developing a nationwide program for: emergency response; information gathering and analysis; liability for responsible parties; and site cleanup. CERCLA also creates a Trust Fund (or 'Superfund') to finance emergency responses and cleanups." U.S. EPA, *Superfund History – Printable Version*. Available at: https://epa.gov/superfund/superfund-history.

[28] The USEPA defines a "brownfield" as "a property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant United States Environmental Protection Agency, *Overview of EPA's Brownfields Program*, Source: https://www.epa.gov/brownfields/overview-epas-brownfields-program.

[29] U.S. Environmental Protection Agency, "Community Involvement Plan: Sauget Area 1 and Area 2 Superfund Sites," May 2010, at page



- The former Monsanto/Krummrich Site – This site has been investigated and remediated as a result of its inclusion as a site under the Resource Conservation and Recovery Act (RCRA) enacted by Congress in 1976.  Monsanto first filed for a RCRA permit in November of 1980 and filed for an additional permit in June of 1985.[30]

- The Cerro Copper Products (Cerro Flow)[31] Site -- Cerro Copper Products (now Cerro Flow Products, LLC) was an industrial facility engaged in the production of copper tubing, pipes, and other copper-related products. The site was designated as a Superfund site by the U.S. Environmental Protection Agency (EPA) in the 1990s, marking it for cleanup and remediation activities.

- The Resource Recovery Group Site (aka Clayton Chemical Company Site) – This 7.35-acre site had been used "as a railroad repair yard, a crude oil topping facility, and a solvent reclamation facility until 1998." [32] It was investigated by the Illinois Environmental Protection Agency and put into the RCRA program. Investigation and remediation of the site occurred in the early 2000s.

- Various former waste disposal and borrow pits.

- Dead Creek – a waterway that reportedly begins at the Alton & Southern Railroad line that borders the subject neighborhood and flows south through the Village of Sauget and Cahokia and into a borrow pit lake before joining with another creek and emptying into the Mississippi River.

Between 1985 and 1987, the IEPA investigated 11 waste disposal sites in Sauget and Cahokia and at various locations along Dead Creek.  The initial focus was on Dead Creek and its water quality and sources of contamination found in the creek but as the IEPA investigation went on, it expanded its scope in August of 1986 to include other areas in Sauget as well. The areas covered in the "Expanded Site Investigation Report" published in 1988 are shown in the maps below.[33] The Monsanto/Krummrich site is not one of the lettered sites investigated in that initial 1985 to 1987 IEPA investigation since it was at that time already being investigated as a RCRA site.

---

[30]  Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 2-7.

[31] Gvillo, H. I. (2021, October 19). St. Clair County jurors award Sauget plaintiffs $72 million in verdict against Cerro Flow. Madison - St. Clair Record. https://madisonrecord.com/stories/609565504-st-clair-county-jurors-award-sauget-plaintiffs-72-million-in-verdict-against-cerro-flow

[32] US Fish and Wildlife Service, Sauget Industrial Corridor Sites Natural Resource Damage Assessment, July 15, 2016, p. 11.

[33] The map is from the following report: Illinois Environmental Protection Agency, Sauget Sites/Dead Creek Fact Sheet #3, July 1988.





The results of that investigation were released in June of 1988.  The IEPA concluded that the "potential site solutions" would exceed the entire Illinois budget for statewide cleanup and that "Federal funding would be needed."[34]  As a result, Illinois turned to the Superfund program for assistance in the ongoing investigation and remediation.

---

[34] Illinois Environmental Protection Agency, Sauget Sites/Dead Creek Fact Sheet #3, July 1988.

((( JLL

### 4.4   Designations and Investigations in Sauget Area 1 and Sauget Area 2

By the early 1990s, the USEPA was involved and was investigating both the Area 1 and Area 2 identified by the IEPA in its final 1988 report as shown on the maps above.  The boundaries of the two investigation areas were expanded and modified and they were re-designated as Sauget Area 1 and Sauget Area 2 by the USEPA.  The map below shows the expanded and relabeled areas in relation to the Monsanto/Krummrich property.[35]



The various lettered locations in Area 1 and Area 2 on the map are the locations of active investigation and remediation. Those specific investigation sites are better shown in the maps below.

---

[35] Source for the map is US Fish and Wildlife Service, Sauget Industrial Corridor Sites Natural Resource Damage Assessment, July 15, 2016, Exhibit 1, at p. 3.



 

**Investigation Sites in Area 1**          **Investigation Sites in Area 2**

The combined locations of the Area 1 and Area 2 investigation sites are shown in the map below. A portion of the subject neighborhood is at the far upper right corner in the map below.





The USEPA describes Sauget Area 1 and Sauget Area 2 as follows:[36]

> "The Sauget Area 1 site is located in the Village of Sauget and the city of Cahokia Heights in St. Clair County, Illinois.  It consists of three closed waste disposal areas (Sites G, H, and I), a closed construction debris disposal area (Site N), a backfilled impoundment (Site L), an inactive borrow pit (Site M), and about 3.5 miles of Dead Creek.  A borrow pit is an excavated area where material has been dug as fill material at another location."

> "Sauget Area 2 is located in Sauget.  The 312-acre area includes five inactive disposal areas including three closed landfills (Sites P, Q, and R), four closed sludge dewatering lagoons (Site O), and an abandoned solvent reclamation facility waste disposal site (Site S)."

### 4.5   Investigation and Remediation of the Cerro Copper Products Superfund Site

The Cerro Copper Products[37] site is located immediately southeast of the Monsanto/Krummrich Plant. Cerro Copper Products (now Cerro Flow Products, LLC) was an industrial facility engaged in the production of copper tubing, pipes, and other copper-related products. Over the years, storage of production wastes containing hazardous substances led to contamination of soil and groundwater as well as contamination of Dead Creek which bisected the Cerro property. In the 1980s, the IEPA and the U.S. EPA began investigating the section of Dead Creek that ran through the Cerro Copper property as well as landfills on the Cerro site itself.  The section of the creek on the Cerro property was designated as Dead Creek Segment A. Sediment sampling in Dead Creek in 1986 and in 1990 found high levels of various contaminants including heavy metals and PCBs that led to removal of 27,000 tons of sediments from the creek in 1990 to 1991.[38] Investigation of soil samples at the location of the former landfill on the Cerro site also found high concentrations of various contaminants including heavy metals.  included taking sediment. The Cerro site is part of Sauget Area 1 investigation and remediation program.

### 4.6   Investigation and Remediation of the Monsanto/Krummrich Site

From 1917 until the 1950s, Monsanto disposed of various industrial wastes generated by its manufacturing processes at locations both on the Krummrich Plant site and off-site. The waste disposal locations were described as follows in a report submitted to the USEPA in 2000:

> "On-site disposal occurred in landfills located mostly on the western side of the plant process area just east of Route 3 (Mississippi Avenue). Between 1957 and 1977, Monsanto disposed of plant wastes in the Rivers Edge Landfill (Sauget Area 2 Site R).  Monsanto also operate a waste incinerator from 1971 to 1977 and stored wastes in the adjacent PCB warehouse until 1981/1982.  On-site waste disposal and treatment stopped in 1977 and off-site contract facilities were then used for waste disposal."[39]

---

[36] USEPA, "Update on Next Cleanup Steps: Sauget Areas 1 and 2, Sauget and Cahokia, Illinois," March2022, at p. 2 and 3.

[37] Gvillo, H. I. (2021, October 19). St. Clair County jurors award Sauget plaintiffs $72 million in verdict against Cerro Flow. Madison - St. Clair Record. https://madisonrecord.com/stories/609565504-st-clair-county-jurors-award-sauget-plaintiffs-72-million-in-verdict-against-cerro-flow

[38] Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 3-3.

[39] Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 2-6.



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

Following Congressional enactment of the Resource Conservation and Recovery Act (RCRA) in 1976, the Monsanto/Krummrich Plant became subject to the law's coverage.  Monsanto first filed for a RCRA permit in November of 1980 and filed for an additional permit in June of 1985. [40] The permit applications identified Hazardous Waste Management Units (HWMUs) on the plant site. Those applications started a multi-year process involving the Illinois Environmental Protection Agency investigation of the environmental situation on the Krummrich plant site that also resulted in on-site and off-site groundwater and soil contamination testing. The investigation resulted in corrective action plans for various locations on the Monsanto property.

Starting in 1983 as a result of the RCRA permit process, Monsanto began installing groundwater monitoring wells "to evaluate soil and groundwater conditions" at its Sauget sites.[41] The investigation indicated that the groundwater flow is generally from east to west towards the Mississippi River. [42]   Groundwater is not a source of public drinking water in the vicinity and "no public water supply wells are located within one mile of the plant" and the closest public water supply well "is located greater than two miles to the north." [43]

In 1998 and 2000, a total of 104 soil samples were taken on the Monsanto/Krummrich site and "analyzed for VOCs, SVOCs, PCBs, Dioxins/Furans and Mercury" and an additional 15 soil samples were collected by the Illinois EPA in May of 1999 and analyzed "for VOCs, SVOCs, Pesticides, PCBs, Metals, and Cyanide."[44] As to PCBs, the 2000 IEPA report stated that PCBs and Dioxin/Furans were "detected at concentrations higher than the TACO Tier 1 Industrial Criteria."[45] As a result, the IEPA recommended additional soil sampling before it could reach any conclusions concerning health risks. The proposed location of the additional sampling on-site and off-site recommended in the 2000 report by the IEPA to the USEPA is shown on the map below.

---

[40]  Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 2-7.

[41]  Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 2-15.

[42]  Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 3-14.

[43]  Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 3-15.

[44]  Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 5-1.

[45]  Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 5-1.





In February 2008, the USEPA issued a "Final Decision" related to actions needed to be taken to clean up the Monsanto/Krummrich site. The actions were to be taken over many years[46] with regular reports to the U.S. EPA every six months and ongoing U.S. EPA monitoring. The overall goal of the remediation plan is to protect human health and the environment, to confine source control of the contaminants, and to remediate the site.

An October of 2012 USEPA report summarized the actions taken in accord with the 2008 Final Decision as follow:

- March 2009 – removal of soil contaminated with mercury and containment of on-site soil contaminated with lead to protect workers.

- December 2009 - partial removal of on-site soils contaminated with PCBs in various areas and paving of the areas with asphalt to further protect workers.

- May 2011- removal of an area of soil contaminated with PCBs off-site along the Route 3 (Mississippi Ave) right-of-way.

- Summer 2012 – initiation of operation of remediation systems to extract benzene and chlorobenzene from on-site soils and groundwater. The work was expected to take four or more years to properly cleanup five former production and storage areas.[47]

---

[46] Within three years of the final decision, the remediation systems for groundwater source and groundwater migration control must be completed and an operation and maintenance plan must be presented to the USEPA. Additionally, within three years for the PCB production plant and within one year for sites external to the production plant, an operation and maintenance plan must be presented to the USEPA for soil cleanup at the designated affected areas.

[47] United States Environmental Protection Agency, *Environmental Cleanup at Solutia Krummrich Plant*, EPA RCRA Corrective Action, Sauget, East St. Louis, and Cahokia, Illinois, October 2012.



The location of the Monsanto/Krummrich site in relation to the other sites in the Sauget Industrial Corridor (including the Sauget Area 1 and Sauget Area 2 Superfund sites) is shown in the map below.[48]



The 40-acre Kerr-McGee Chemical Corporation facility (former Moss-American site on the map above) treated wood products, such as railroad ties, with creosote and pentachlorophenal between the 1920's and 1969 when the plant closed. The site was purchased by Kerr-McGee in 1963 and half of the site sold in 1973 to Lofton Corporation, but Lofton never used the plant. Around 1984 the site was deemed suitable to be investigated by the IEPA after testing was done by the USEPA. The site was closed with barbed wire in 1985 and asbestos was removed from pipes and boilers in the plant in 1986.[49]

---

[48] The is from: ""Incorporated to Be a Sewer": A Historical Analysis of Industrial Pollution in Sauget, Illinois. Center for the Humanities, Washington University in St. Louis Arts and Sciences, by Fiona Eckert, 5/13/2020. https://humanities.wustl.edu/news/%E2%80%9Cincorporated-be-sewer%E2%80%9D-historical-analysis-industrial-pollution-sauget-illinois

[49] Source: St. Louis Post-Dispatch, February 16, 1987, downloaded on June 5, 2024. See also the Office of the Illinois State Fire Marshal website: https://webapps.sfm.illinois.gov/ustsearch/Facility.aspx?ID=6042835.



The Former Sauget Terminal, 2000 South 20th Street in Sauget, IL, is a former Exxon-Mobil petroleum storage facility that had gasoline and diesel fuel storage tanks removed between December 1990 and November 1994.[50]

## 4.7 Investigation and Sampling in Neighborhoods in Proximity to the Monsanto/Krummrich Site

## 4.8 The 1976 USEPA Off-Site Soil Sampling

In 1975 the USEPA initiated a field sampling program related to PCB contamination and in 1976, the USEPA reportedly collected 15 off-site soil samples "from areas in the vicinity of the Monsanto W.G. Krummrich plant."[51] The sampling locations were "from the plant boundary and to a distance of 1,450 meters in four directions"[52] as shown in the map below.



The note that accompanies this map states that it shows "locations of Soil Samples Collected Near Monsanto Facility by U.S. EPA in 1976" but then adds that the map has been "modified from the original figure presented in the 1976 report by U.S. EPA."[53] Only soil sampling sites S1, S2

---

[50] Source: https://webapps.sfm.illinois.gov/ustsearch/Ownership.aspx?ID=6021953 and https://webapps.sfm.illinois.gov/ustsearch/Facility.aspx?ID=6021953

[51] Jorge Gonzalez, Lydia Feng, Anders Sutherland, Chris Waller, Helen Sok, Rob Hesse, and Paul Rosenfeld, "PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL," Science Direct, Procedia Environmental Sciences 4 (2011), 113-125, at p. 116.

[52] Jorge Gonzalez, Lydia Feng, Anders Sutherland, Chris Waller, Helen Sok, Rob Hesse, and Paul Rosenfeld, "PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL," Science Direct, Procedia Environmental Sciences 4 (2011), 113-125, at p. 116.

[53] Jorge Gonzalez, Lydia Feng, Anders Sutherland, Chris Waller, Helen Sok, Rob Hesse, and Paul Rosenfeld, "PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL," Science Direct, Procedia Environmental Sciences 4 (2011), 113-125, at p. 116. The source of the map is indicated in



and S3 as shown in the map above were located within the City of East St. Louis. There are no individual property addresses identified in the study; however, if the map is generally accurate, the location of sample S3 appears to be south of the railroad tracks that form the southern boundary of the subject neighborhood and sample location S1 and S2 appear to be approximately at Wilford Street and E S Street at the southern end of the subject neighborhood. There is also no indication in the study whether any properties were sampled for attic dust.

The article containing the map does not discuss whether the 1976 sampling results in the subject were generally available to the public or referenced in any type of news or fact releases to the general public.

### 4.9 The 2008 Off-Site Attic Dust Sampling

In 2008, a law firm based in Birmingham, Alabama provided funds for a collection of dust samples from attics in neighborhoods in Cahokia and East St. Louis.[54]

The 2008 attic dust sampling has been summarized as follows: [55]

> "In April and June of 2008, fourteen samples of indoor attic dust were collected from seven residential dwellings and seven churches located in Cahokia and East St. Louis, Illinois, at locations within two miles of the Monsanto and Cerro Copper facilities. Church buildings initially selected for attic dust sampling were determined based on their geographic spatial distribution and telephone interviews with owners/occupants. The completed sampling locations, including residential homes, were based on obtaining access to the structures from willing participants at the time of the field work. Houses were also sampled based on interviews with property occupants and information concerning the age of structure, improvements and renovation history and attic usage. Funding for collection and analysis of attic dust samples was provided by Environmental Litigation Group, P.C., based in Birmingham, Alabama.

The locations of the fourteen attic dust sampling sites are shown on the map below.[56]

the article as "United States Environmental Protection Agency. *Review of PCB Levels in the Environment*. EPA-560/7-76-001. January 1976."

[54] This was undertaken as part of the numerous lawsuits filed and claims made against Monsanto and others in Circuit Court (20th Judicial Circuit, St. Clair County, Illinois) that were ultimately resolved in a settlement agreement dated November 21, 2014. The 2014 settlement included nearly 16,600 names of persons located in or near to the City of East St. Louis and also addressed exactly 4,000 properties in the area. Plaintiffs (and claimants) that participated in the 2014 settlement included numerous individuals with addresses from within the subject neighborhood. We have performed an analysis that cross-references the settlement list (property claims) to sales records and identified seven individuals from the subject neighborhood that subsequently sold their house. The results of this analysis are presented later in this report.

[55] Jorge Gonzalez, Lydia Feng, Anders Sutherland, Chris Waller, Helen Sok, Rob Hesse, and Paul Rosenfeld, "PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL," Science Direct, Procedia Environmental Sciences 4 (2011), 113-125, at p. 120.

[56] Jorge Gonzalez, Lydia Feng, Anders Sutherland, Chris Waller, Helen Sok, Rob Hesse, and Paul Rosenfeld, "PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL," Science Direct, Procedia Environmental Sciences 4 (2011), 113-125, at p. 121., Figure 3.





1. Single-story church, built 1944.
2. Single-story church, built 1960s.
3. Two-story church, built 1987.
4. Two-story church, built 1955.
5. Single-story residence, built 1950s.
6. Single-story residence, built 1950s.
7. Single-story church, built 1965.
8. Single-story residence, built 1950s.
9. Single-story church, built 1982.
10. Single-story residence, built 1950s.
11. Two-story residence, built 1955s.
12. Single-story residence, built 1950s.
13. Single-story church, built 1935.
14. Two-story residence, built 1960s.

Sites No. 4, No. 6, No. 7, No. 9, No. 10, No. 12, and No. 14 appear to be located in the subject neighborhood as defined by the Plaintiff in the subject litigation.

### 4.10 The 2009 and 2012 USEPA Off-Site Soil Sampling

The 2012 USEPA report on the investigation and remediation at the Monsanto/Krummrich facility said the following about sampling of surface soil at residential properties in East St. Louis and Sauget:

> **Residential Soil Sampling Work in East St. Louis and Sauget**
>
> In 2009 and 2012, EPA sampled surface soil for PCBs at over 40 residences and some parks in East St. Louis and Sauget. Exposure to PCBs at elevated levels has been shown to cause a variety of adverse health effects in people and animals. Exposure in soil would be expected to occur mainly through direct contact with skin or by incidental swallowing of dirt particles. [57]

A published journal article describes the 2009 sampling as follows:

> "In late 2009, U.S. EPA responded to concerns in the community abut contamination and as a follow-up to their 1975 sampling of soils for PCBs in the area of Sauget.  U.S. EPA Region 5 sampled surface soil at seventeen residences and a park in Sauget and fifteen residences, one church yard, and one playground in the Rush City neighborhood of East St. Louis in November 2009." [58]

---

[57] United States Environmental Protection Agency, *Environmental Cleanup at Solutia Krummrich Plant*, EPA RCRA Corrective Action, Sauget, East St. Louis, and Cahokia, Illinois, October 2012.

[58] Jorge Gonzalez, Lydia Feng, Anders Sutherland, Chris Waller, Helen Sok, Rob Hesse, and Paul Rosenfeld, "PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL,"



In the 2009 off-site soil sampling, the USEPA found that PCBs were "present at some residential properties and parks in East St. Louis and Sauget."[59]

In October of 2012, the USEPA issued a report related to the results of the additional surface soil sampling in August of 2012 at nine residences in East St. Louis as well as at seven locations "within the former Dead Creek area that extends north of the Village of Sauget into the Rush City community of East St. Louis."[60]  The USEPA indicated that it selected the residential properties in the 2012 sampling based on "air modeling that suggest PCB contamination could be present in soil from former industrial activities near these neighborhoods." [61]

The former Dead Creek area in Rush City is described in the October 2012 report as "filled and dry" as a result of a cleanup completed in 2009 "for the portion of Dead Creek present in the villages of Sauget and Cahokia."[62]

The EPA summarized the results of the 2012 soil sampling in the residential yards as follows:

> "8 of the 9 residential properties sampled were at or above screening levels used by EPA to assess health risks to the public. Six of the properties had PCB levels that slightly exceeded the EPA screening level but do not indicate an acute health risk. Two of the properties had PCB levels that somewhat exceeded the EPA screening level . . . (and) Levels of PCBs at 2 of 7 Dead Creek locations were slightly above the screening levels."[63]

### 4.11  USEPA 2012 Soil Sampling in the Subject Neighborhood

Some of the soil sampling by the U.S. EPA in 2012 was in the subject neighborhood.  A letter from the U.S. EPA Project Manager to the Mayor of East St. Louis described five soil samples taken at "four residences along Wilford Avenue done in August of 2012.[64]  The reason the sampling was conducted and the results of that August 2012 sampling was described as follows:

> "The sampling was conducted based on information obtained by EPA that suggests that the far southern and western areas of East St. Louis could be impacted from historical industrial operations to the south.

---

Science Direct, Procedia Environmental Sciences 4 (2011), 113-125, at p. 116.  The source of that information is given as follows in the article: "United States Environmental Protection Agency. *Results Released for Home, Park Soil Sampling – Sauget Area Soil Sampling Project*. March 2010."

[59] United States Environmental Protection Agency, *Results Released for Homes and Former Dead Creek Area*, East St. Louis Soil Sampling Project, East St. Louis, October 2012.

[60] United States Environmental Protection Agency, *Results Released for Homes and Former Dead Creek Area*, East St. Louis Soil Sampling Project, East St. Louis, October 2012.

[61] United States Environmental Protection Agency, *Results Released for Homes and Former Dead Creek Area*, East St. Louis Soil Sampling Project, East St. Louis, October 2012.

[62] United States Environmental Protection Agency, *Results Released for Homes and Former Dead Creek Area*, East St. Louis Soil Sampling Project, East St. Louis, October 2012.

[63] United States Environmental Protection Agency, *Results Released for Homes and Former Dead Creek Area*, East St. Louis Soil Sampling Project, East St. Louis, October 2012. That report went on to state that "The 9 residential yards in East St. Louis contained PCBs from 0.6 to 7 ppm. Soil within the former Dead Creek area in East St. Louis contained PCBs from 0.1 to 1.9 ppm and lead was present at three locations above the EPA screening level of 400 ppm for residential areas."

[64] Undated Letter from Ken Bardo, EPA Project Manager to Honorable Alvin Parks.  The letter is Exhibit 18 to the Deposition of Michael Wagner, April 2, 2024.



> The level of PCBs found in backyard soil at the four homes typically exceeded the EPA health screening level of 1 part per million (ppm) for residential soils recommended by EPA.  The level of PCBs ranged from 0.6 to 7 parts per million."[65]

That letter then went on to describe the area in the subject neighborhood where the testing was done and make the following recommendations for further testing:

> "The City of East St. Louis and CDC Development Corporation own various lots just south of Wilford Avenue, located between D Street and South 19th Street. These lots are mostly undeveloped and located in the TIF 3C Redevelopment Project Area.  EPA recommends that investigation be performed in this area to assess the PCB levels in soils at these lots and how the levels may need to be addressed during future development.  EPA would be glad to meet and discuss the options for these investigations and share the information we have." [66]

## 4.12  Notification Provided by the USEPA to Property Owners in the Offsite Soil Sampling Areas

Following the 2012 sampling event, the USEPA "notified property owners of the sample results" and recommended that residents "who live on land with contamination levels of PCBs above EPA's health screening level follow the advice of the Illinois Department of Public Health to reduce exposure to soil contaminants" and a fact sheet about the results of the soil sampling and was mailed to "area property owners."[67] The USEPA then concluded its 2012 report by stating its next steps would be to determine if additional sampling or a formal "health risk evaluation are needed to see if levels of PCBs in soil are safe for residents."

## 4.13  USEPA Follow Up to the 2012 Soil Sampling in the Subject Neighborhood

In April of 2015, the U.S. EPA did additional soil sampling in the subject neighborhood. In a September 9, 2016, letter from the U.S. EPA to the Mayor of East St. Louis, the sampling was described as follows:

> "The sampled soil was in an area zoned for residential use near the City's western boundary adjacent to the Solutia, Inc., W.G. Krummrich facility in Sauget, IL. Sampling occurred from April 29-30, 2015, and included the collection of 20 (composite) soil samples from mainly undeveloped properties located between the facility boundary and residential locations sampled in 2012. Please refer to the enclosed figure.  The properties, which are primarily owned by the City of East St. Louis and the CDC Development Corporation, are located in the TIF 3C Redevelopment Project Area."

The figure referenced in the letter is shown below.

---

[65] Undated Letter from Ken Bardo, EPA Project Manager to Honorable Alvin Parks.  The letter is Exhibit 18 to the Deposition of Michael Wagner, April 2, 2024.

[66] Undated Letter from Ken Bardo, EPA Project Manager to Honorable Alvin Parks.  The letter is Exhibit 18 to the Deposition of Michael Wagner, April 2, 2024.

[67] United States Environmental Protection Agency, *Results Released for Homes and Former Dead Creek Area*, East St. Louis Soil Sampling Project, East St. Louis, October 2012. That report went on to state that "The 9 residential yards in East St. Louis contained PCBs from 0.6 to 7 ppm. Soil within the former Dead Creek area in East St. Louis contained PCBs from 0.1 to 1.9 ppm and lead was present at three locations above the EPA screening level of 400 ppm for residential areas."





The September 2016 letter also stated that "a number of the sample results exceeded the EPA health screening-level for residential soils of one part per million (ppm) for total PCBS" and that "[t]he levels of PCBS ranged from 0.2 to 17 parts per million PCB." From the figure above, it appears sampling at only nine of the 20 parcels where sampling occurred indicated a PCB level above 1 ppm.

The September 2016 letter then went on to state that it was "evaluating the samples from 2009, 2012, and 2015 to determine whether the sampled area qualifies for removal actions or whether mor information is needed to make that determination" and recommended "additional investigation be performed in this area to assess how contamination levels should be considered during future development."[68]

---

[68] Letter from Jose Cisneros, Chief, Remediation and Re-use Branch, United States Environmental Protection Agency, to Honorable Emeka Jackson-Hicks, September 9, 2016. The Letter is Exhibit 17 to the Deposition of Michael Wagner, April 2, 2024.



### 4.14 Soil Sampling Conducted by the Plaintiff in the Subject Litigation in the Subject Neighborhood

Paragraph 10 in the Second Amended Complaint states that "203 soil samples were taken from City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant" in 2020.

However, the Bell Report (p. 2) states the following: "In June 2022, 273 lots were tested, and soil samples were taken from lots located north and northeast of the Monsanto Plant."

The Bell Report does not undertake an analysis of



2022 Property Sampling

the PCB soil sampling in 2020 and 2022 conducted by experts retained by the Plaintiff in the subject neighborhood.[69] We have examined the Coghlan report which details the neighborhood soil sampling and provides PCB concentrations across 273 locations. According to the EPA's Toxic Substances Control Act (TSCA) regulations[70], the cleanup threshold for PCB-contaminated soil in residential areas, schools, and daycare centers is equal to 1 part per million (ppm).[71]

Our review of the sampling data indicates that out of the 273 tested properties, 100 parcels had test results (total PCB concentration) exceeding 1 ppm. This amount represents approximately 37% of the 273 properties tested. When we cross-referenced these properties to ownership records, we find that there were just 54 properties (or 23% of the 273 total subject properties) owned by the City of East St. Louis with total PCB concentrations exceeding 1 ppm.

We have provided a table of the 273 subject properties with summary level test results from 2022 sampling event in the Addenda.

---

[69] It is our understanding that the samples collected in 2020 and 2022 have been reported as missing or no longer available.

[70] See 40 CFR Part 761.61.

[71] The 0.23 ppm threshold utilized in the Bell Report is based on the USEPA's Regional Screening Level, which, as the USEPA states, is not a cleanup standard and should not be used as a cleanup level. See the U.S. EPA website for more information. https://www.epa.gov/risk/regional-screening-levels-rsls. Therefore, with respect to evaluating the soil testing/sampling results relied upon in the Bell Report, we have evaluated those results with reference to the U.S. EPA's TSCA cleanup threshold of 1 part per million.



**4.15 Timeline of Events Related to Investigation and Remediation of the Monsanto/Krummrich Site and Neighborhood Investigation and Notice**

| Date | *Condensed Summary Timeline for Monsanto Environmental Investigation & Remediation Related to PCB Contamination at Monsanto Site in East St. Louis and Immediate Surrounding Areas, IL* |
|---|---|
| | Condensed Summary of Relevant Industrial Events Related to the East St. Louis, Illinois Area Marketplace |
| 1971 | Cahokia Health Department received complaints from area residents concerning chemical discharges into Dead Creek. |
| 1976 | In 1975 and 1976, the USEPA reportedly collected 15 off-site soil samples "from areas in the vicinity of the Monsanto W.G. Krummrich plant." The sampling locations were from the plant boundary to a distance of 1,450 meters in four directions. |
| 1976 | In 1975 and 1976 the USEPA initiated a field sampling program related to PCB contamination and in 1976, the USEPA reportedly collected 15 off-site soil samples "from areas in the vicinity of the Monsanto W.G. Krummrich plant |
| 1977 | Monsanto voluntarily ceased PCB production and disposal operations at Site R and began closure proceedings. |
| 1985 | The first U.S. EPA legal actions are filed in Sauget. WGK Plant filed for a RCRA Part B permit in June. |
| 1996 | In June, the Sauget Area Sites 1 and 2 are proposed for listing on the National Priorities List. |
| 1997 | Solutia submitted a closure plan for the six HWMUs. |
| 1998 | IEPA issued a closure plan approval letter in February and the RCRA Closure Plan was implemented for the WGK Plant. |
| 2000 | U.S. EPA removed riverbank drums at Site Q Central and removed drums and soil at Site Q South. U.S. EPA entered into an Administrative Order on Consent (AOC) with the PRPs to conduct a RI/FS at the five waste disposal Sites. |
| 2000-2006 | Pharmacia and Solutia removed approximately 58,000 cubic yards of contaminated sediment and creek bottom soil from Dead Creek and Site M (between Queeny Avenue in Sauget and the Borrow Pit Lake in Cahokia) under the direction of the U.S. EPA. |
| 2001 | A containment cell was constructed at Judith Lane. |
| 2003 | The start of Remedial Design for OU2 began in February. |
| 2005 | Construction of the Groundwater Mitigation Containment System (GMCS) at Sauget Area 2 was completed. Remedial Action construction for OU2 was completed. |
| 2008 | The cleanup of Dead Creek and Borrow Pit Lake in Sauget Area 1 was completed. Fourteen samples of indoor attic dust were collected from seven residential dwellings and seven churches located in Cahokia and East St. Louis (at locations within two miles of the Monsanto and Cerro Copper facilities). |
| 2008 | In April and June of 2008, fourteen samples of indoor attic dust were collected from seven residential dwellings and seven churches located in Cahokia and East St. Louis, Illinois, at locations within two miles of the Monsanto and Cerro Copper facilities. |
| 2009 | Solutia partially removed on-site soils contaminated with PCBs at various areas and paved the areas with asphalt. |
| 2009 | The first major citizen suits were filed with 1,022 plaintiffs. |
| 2009 | As a follow up to their 1975 and 1976 sampling in Sauget, the U.S. EPA sampled surface soil at seventeen residences and a park in Sauget and fifteen residences, one church yard, and one playground in the Rush City neighborhood of East St. Louis. This was in response to concerns in the community abut contamination. |
| 2010 | In December, the U.S. EPA delivered a Community Involvement Plan for Sauget Areas 1 & 2. |
| 2010 | The U.S. EPA announces that the Dead Creek cleanup has been completed. |
| 2011 | In May, Solutia partially removed on-site soils contaminated with mercury PCBs off-site along Route 3 (Mississippi Ave) right-of-way. |



| | |
|---|---|
| **2012** | Solutia started remediation systems that extract benzene and chlorobenzene from on-site soils and groundwater. |
| **2012** | In October of 2012, the USEPA issued a report related to the results of the additional surface soil sampling in August of 2012 at nine residences in East St. Louis as well as at seven locations "within the former Dead Creek area that extends north of the Village of Sauget into the Rush City community of East St. Louis." |
| **2013** | The U.S. EPA approved the Sauget Area 1 ROD for OU1 which outlines the EPA's plan for cleaning up remaining contamination at the Sauget Area 2 site. A Groundwater Migration and Control System Operation and a Maintenance Plan Approved. |
| **2014** | A settlement is reached in various lawsuits in St. Clair Count Circuit Court against Monsanto and others. The 2014 settlement included nearly 16,600 names of persons located in or near to the City of East St. Louis and also addressed 4,000 properties in the area. Plaintiffs (and claimants) that participated in the 2014 settlement included numerous individuals with addresses from within the subject neighborhood. |
| **2015** | In April of 2015, the U.S. EPA conducts soil sampling on mainly undeveloped properties located between the Monsanto/Krummrich facility boundary and residential locations sampled in 2012. |
| **2016** | A September 2016 letter from the U.S. EPA to the Mayor of East St. Louis indicates the EPA was evaluating the 2009, 2012, and 2015 sampling to determine whether it indicated the need for any soil removal actions or whether more information is needed to make that determination. It recommended additional investigation be done in the subject neighborhood to assess how contamination levels should be considered during future development. |
| **2017** | The US DOJ and U.S. EPA announced that Pharmacia LLC, Solutia Inc., ExxonMobil Oil Corp. and Cerro Flow Products have agreed to clean up six former waste disposal sites that comprise the Sauget Area 1 Superfund Site. |
| **2019** | The U.S. EPA and US DOJ entered into an agreement with the PRPs to carry out the cleanup plan for Site P. |
| **2020** | Soil sampling is done in the subject neighborhood on behalf of the Plaintiffs. |
| **2020** | East St. Louis states that it became aware of "severely elevated PCB levels" in the community in December when it received tests from soil samples. |
| **2021** | The U.S. EPA signed a Consent Decree with the PRPs to implement the cleanup plan for the rest of Sites O, Q, R and S. <br><br> The PRPs completed remedial design and construction of the cap for Site P, and Monsanto successor companies agree to clean up remaining surface contamination at Sites O, Q, R, and S and will complete the cleanup of four former landfills and waste lagoons. |
| **2022** | Additional soil sampling is reportedly done on behalf of the Plaintiffs. |



## 5. The Subject Properties, the Subject Neighborhood, and the Bell Award of Damages to Imaginary Homes that Never Existed and Could Not Be Built Under Current East St. Louis Zoning and Planning Policies

### 5.1 The Bell Report Identification of a "Subject Neighborhood"

The Bell Report (p. 32) includes the map below that defines the neighborhood and purports to identify the properties that are the subject of the litigation and the Bell Report damages analysis.

The legend at the bottom of the map below from the Bell Report states that there are 228 "Publicly Owned Parcels" (shaded red) and 45 "Non Publicly Owned" parcels (shaded orange) shown on the map.



**CITY OF EAST ST. LOUIS**
**Subject Neighborhood Map**
**(Landmark File: 155-1-21)**

Source: Maris MLS and Realist

Ownership as of 2023
- Publicly Owned Parcels: 228
- Non Publicly Owned: 45
- Subject Neighborhood

© Landmark Research Group 2024

### 5.2 The Bell Report Claim Concerning the Number of "City-Owned" Properties that Have Incurred Damages

The Second Amended Complaint (Paragraph 9) filed on January 15, 2023, states that the case involves "hundreds of East St. Louis-owned lots and rights-of-way located immediately to the north and northeast of the Monsanto plant." The Second Amended Complaint (Paragraph 11), then goes on to state that "281 City-owned lots and rights-of-ways located to the north and northeast of the Monsanto Plant" were tested for PCB in mid-to-late 2022.

The Bell Report differs from the Second Amended Complaint as to the number of properties involved in the damages analysis. The Bell Report (p. 2) states that the case involves "273 subject properties impacted by the polychlorinated biphenyl ('PCB') contaminants in East St. Louis, Illinois." The Addenda to the Bell Report (pages 140-153) includes a table showing 273 separate parcel numbers.

Dr. Bell was instructed by the attorneys for the Plaintiffs to assume that 273 properties were city-owned. The Bell Report at page 21 states the following:

> "At counsel's request, any ownership noted by a government agency was included in the damage calculations. In addition, there were not ownership records for 2024 or beyond; however, we were instructed by counsel to mirror the ownership data from 2023, as ownership has been relatively consistent over the years."

However, the Bell Report arrives at only 222 properties in the final calculation of damages by making the following adjustments:

- First, only the 228 properties that the Bell Report (erroneously) claims "had recorded ownership in 2023" by "the City of East St. Louis and government agency" are included in the damages analysis; and

- Second, six properties with lot sizes less than 1,000 square feet are excluded, resulting in 222 properties in the final Bell damages calculations. (Bell Report, notes on p. 14 under Figure 7: Damage Summary).

The Bell Report claims that all 228 properties in his final damages calculations were owned by the City of East St. Louis in 2023. The Bell Report (p. 14) includes the following statement below Figure 7:

> "*There are 273 subject properties; however, ownership has varied over time. Ownership was accounted for in the use effect calculations.
>
> ** Risk effects were applied to the subject properties that the City of East St. Louis and government agency held recorded ownership of in 2023, which was a total of 228. There were 6 subject properties with lot sizes less than 1,000 SqFt, these were not included in the Use or Risk Effect calculations."



### 5.3 There Are Only 100 City-Owned Properties and Not 273 or 228 Properties as Claimed in the Bell Report

Our review of recorded property deeds indicates that the Bell Report does not accurately estimate the number of properties owned by the City of East St. Louis. Our research findings based on review of recorded deeds is presented below**.**

| Ownership Category (JLL) | Qty | % of Total |
|---|---|---|
| City of E St Louis | 100 | 37% |
| St. Clair Co. Trustee | 73 | 27% |
| Private/Non-City | 67 | 25% |
| E St Louis Housing Auth. | 27 | 10% |
| E St Louis School Dist 189 | 4 | 1% |
| E St Louis Township | 2 | 1% |
| | **273** | **100%** |

As indicated in the table above, according to recorded property records with St. Clair County, only 100 of the 273 properties are actually owned by the City of East St. Louis. This represents 37% of the total number of properties addressed in the Bell Report.

### 5.4 The Bell Report Awards Damages to Imaginary Houses That Do Not Exist and May Never Have Existed

The Bell Report (p. 67) claims that there are 190 "improved" properties among the 273 properties involved in the damages analysis and Bell claims "As-is Risk Effect" damages should be awarded to 184 of those "improved" properties.[72]

However, our research indicates that as of the in fact, as of December 2023, there were only three properties improved with residential dwellings and one property with commercial improvements. Based on our analysis, 269 of the 273 properties were vacant, unimproved vacant land properties.[73]

All 100 of the city-owned properties are unimproved vacant parcels.

The Bell Report appears to label as "improved" any property Dr. Bell believes once had improvements but that were subsequently demolished before his date of analysis. The table of 273 parcel identification numbers in the Addenda to the Bell Report includes 42 properties shown as not having "historical improvements" which would indicate 231 properties claimed in the Bell Report to be "improved."

The Bell Report (page 67, Figure 38) then focuses on the 228 properties claimed in the Bell Report to be "city owned" and indicates that 184 of those properties are indicated to be improved and 38 labeled as "land," meaning unimproved lots.

---

[72] The Bell Report excludes six properties with a lot area less than 1,000 square feet from his damage calculations. Bell Report, page 67, notes to Figure 38.

[73] The four improved properties are owned by the St. Clair County Trustee or the East St. Louis Housing Authority.



**5.5    The Historic Aerial Photos Included in the Bell Report Indicate that Many of the 269 Currently Vacant Lots Never Had Improvements and Demolition of Homes on Many of the Lots Occurred Decades Ago**

Our review of documents produced in the litigation (including review of historical aerial images included in the Bell Report Addenda and the Bell Deposition, Ex. 12) and additional research indicates that only four of the 273 properties were improved with a residential dwelling as of the December 31, 2023, date of value. The remaining 269 properties were vacant land parcels as of December 2023.

The Bell Report included aerial photos of the subject neighborhood between the years of 1952 and 2017 spanning 12 separate time periods. Reduced-size versions of these aerials are presented below.

| 1952 Aerial | 1968 Aerial | 1973 Aerial |
|:---:|:---:|:---:|
| | | |

| 1980 Aerial | 1988 Aerial | 1992 Aerial |
|:---:|:---:|:---:|
| | | |



| 1996 Aerial | 1998 Aerial | 2009 Aerial |
|---|---|---|
| | | |
| 2011 Aerial | 2014 Aerial | 2017 Aerial |
| | | |

We reviewed in detail the historical aerial photography to determine the physical improvements present at each of the subject properties over this time period.

The table below summarizes the results of this analysis. Based on this analysis, it is evident that the majority of the subject properties *were not improved* with physical improvements (residential dwelling, etc.) as of the 1940/1952 earliest date of the aerial photos included in the Bell Report, workfile, and deposition.



The following analysis presents "net" demolition data, that takes into consideration new construction. [74]

| List of Subject Properties -- Status of Improvements (demolition) | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Time Period (ending)*** **1940** | **1952** | **1968** | **1973** | **1974** | **1980** | **1988** | **1992** | **1996** | **1998** | **2009** | **2011** | **2014** | **2015** | **2017** | **2022** |
| Period duration    - | 12-yrs | 16-yrs | 5-yrs | 1-yrs | 6-yrs | 8-yrs | 4-yrs | 4-yrs | 2-yrs | 11-yrs | 2-yrs | 3-yrs | 1-yrs | 2-yrs | 5-yrs |
| Parcels    273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 |
| with residence    111 | 100 | 82 | 63 | 51 | 49 | 45 | 41 | 40 | 41 | 22 | 21 | 20 | 14 | 9 | 4 |
| vacant land    157 | 172 | 191 | 210 | 222 | 224 | 228 | 232 | 233 | 232 | 251 | 252 | 253 | 259 | 264 | 269 |
| demolished (net)    n/a | 11 | 18 | 19 | 0 | 14 | 4 | 4 | 1 | -1 | 19 | 1 | 1 | 0 | 11 | 0 |

*Based on historical aerial imagry included in the Bell Report and workfile.

Our review of the historical aerial photos indicates the following:

- Of the 273 properties claimed in the Bell Report to be "city-owned," only 155 (or 56.8%) contained improvements in any of the years since 1940.

- The highest number of improvements dates to the 1940 aerial, when there were 111 improved residences.

- Our review of the 1968 aerial photo found only 82 dwellings (or structures). That represents 30% of the 273 properties.

- There was significant demolition activity in the 1950s, 1960s, 1970s and 1980s.

- A comparison of the 1968 and 1973 aerial photos indicates that 19 (or 23%) of the 82 dwellings or structures on lots in 1969 had been demolished.

- Demolition continued in later years but at a lower rate than in the earlier decades.

The table below shows the results of our analysis of the number of demolitions during the 16 time periods based on the historical imagery provided in the Bell Report and workfile, and Bell deposition Ex. 12. The table collapses the 16 periods into six groupings.

---

[74] This number is net of any new construction activity. So if there were 12 demolitions and two new homes constructed in a given time period, the net amount would be ten demolitions.



| Time Period | Demolished | |
|---|---|---|
| Period of 1941 to 1973 (33 years) | 48 | 47% |
| Period of 1974 to 1988 (15 years) | 18 | 18% |
| Period of 1989 to 1998 (10 years) | 4 | 4% |
| Period of 1999 to 2011 (13 years) | 20 | 20% |
| Period of 2012 to 2015 (4 years) | 1 | 1% |
| Period of 2016 to 2022 (7 years) | <u>11</u> | <u>11%</u> |
| | **102** | **100%** |

The table indicates a total of 102 demolitions between 1941 and 2022. The table also indicates that he majority of the demolitions occurred in the years between 1941 and 1980, a time period when 62 demolitions, or 61% of the total, occurred.

The graph below compares the number of demolitions involving the 273 subject properties between various points in time since 1941.[75] The 16 time periods in the table above have been collapsed into six periods to allow for ease of viewing and understanding the data.



---

[75] Our review of the historical aerial imagery indicates additional demolition activity within the subject neighborhood during this time period.



The chart below documents the number of improved properties over the past number of decades. Beginning with a high of 111 homes present in the aerial photograph from 1940, the number of homes declines substantially over the next several years. As recently as the early 1990s, only about 40 (or less than 15%) of the 273 properties contained dwellings. That number continued to fall into the single digits in 2017, and as of 2022 there were only four structures in existence.



This investigation into the history (since 1940) of the improvements and demolitions indicates the following:

- The majority of the properties were never improved, at least as of 1940. As of that date, only 111, or 41% of the 273 properties were improved with homes or other structures.

- In 1980 there were 49 homes, or only 18% of the 273 properties.

The demolition calculations, however, demonstrate that the vast majority of the imaginary homes assumed by Bell to exist had actually been demolished (or simply did not exist) during the years between 1941 and 1973.

### 5.6 The Historic Aerial Photo Analysis Indicates that the 184 Homes Claimed to Have Incurred a Loss of Use and a 100% Loss in Market Value Are Imaginary Phantom Homes that May Never Have Even Existed

The aerial photos in the Bell Report provide no support for a claim that 184 of the claimed "city-owned" properties had a home on them at some point in time since 1973. For that to have occurred, there would need to have been well over 200 new homes constructed on the 273 lots since 1940 to offset the loss of 102 homes due to demolition.

As a result, since there were only four improved properties as of the December 2023 date of the Bell analysis, and none of those four were City-owned, the Bell Report is awarding damages to homes that were demolished decades ago and to imaginary homes that never existed.



### 5.7    The Bell Report Does Not Consider City of East St. Louis Zoning Requirements When Assigning a Value of $140,000 to Each of His Imaginary Homes

The current minimum lot size in the City of East St. Louis R1 residential zoning classification is 6,000 square feet and in an R1-A residential zoning classification is 5,000 square feet.[76]  The average size of the 273 lots as indicated in our table in the Addenda is 4,645 square feet, which is less than the minimum lot size requirement for single-family homes in East St. Louis.

The City of East St. Louis zoning code, however, does contain an exemption for construction on non-conforming lots that were lots of record on February 13, 1961.  That provision is shown below

> **Sec. 122-111. - Erection of certain dwellings permitted on existing nonconforming lots of record.**
>
> In any R district only, a single-family detached dwelling may be erected on a nonconforming lot of official record on February 13, 1961, irrespective of the lot's area or width, the owner of which lot does not own any adjoining property, provided that no side yard shall be less than five feet, nor shall any side yard adjoining a side street be less than ten feet; provided, further, that the rear yard of any such lot shall in no case be less than ten feet, and the front yard shall be as required in section 122-164.
>
> (Code 1975, § 68-21)

As indicated in that exemption language for non-conforming lots, a side yard on each side of the house of five feet and a rear yard of at least 10 feet must be provided. Section 122-164 referenced for the front yard requirement stipulates a minimum front yard of ten feet in portions of the subject neighborhood where the hypothetical new homes imagined by the Bell Report might be conceivably built.[77]

The list of lot sizes for the 273 subject properties indicates that at least 50 of the 273 parcels contain 2,500 square feet or less of lot area. The dimensions of a typical lot of less than 2,500 square feet in the subject neighborhood are roughly 20 to 25 feet in width and 75 to 100 feet in depth and the median dimensions are 25 feet by 100 feet.

Given the zoning requirements, on a non-conforming platted lot pre-dating 1961 containing 2,500 square feet with a 25-foot width and a 100-foot depth, the side yard, rear yard, and front yard requirements would reduce the maximum potential home size to 1,200 square feet (15 feet in width and 80 feet in depth).[78]

The $140,000 value ascribed by Bell to the imaginary homes on the subject lots are based on sale prices in distant suburban and exurban areas of St. Clair County.  The average lot size and home size for the properties in the sales data base utilized by Bell to arrive at his "average" value of $140,000 are shown in the table below.

---

[76] Chapter 122, Municipal Code of East St. Louis, Sec. 122-72

[77] Sec. 122-164. – Reduction of depths of certain front yards.  When an unimproved lot is situated between two improved lots, each having a principal building within 25 feet of the side lot line of such improved lot, the front yard may be reduced to the greatest depth of the front yare of the two adjoining improved lots, but in no case shall the front yard be less than ten feet.

[78] That does not consider the portion of the lot area that would be devoted to a garage or surface parking area that would reduce the livable area below even 1,200 square feet.



| City | Avg. Lot Size | Avg. Home Size |
|---|---|---|
| Caseyville | 16,051 | 1,169 |
| Fairview Heights | 14,974 | 1,449 |
| Belleville | 11,790 | 1,403 |
| Fairmont City | 11,326 | 1,052 |
| Avg. (of above) | 13,535 | 1,268 |
| **Average (all sales)** | **12,523** | **1,399** |

The table indicates that the average lot size in the Bell St. Clair County sales data is 400% larger than the average subject property lot size and the average home size is 20% larger.  The Bell Report makes no attempt to "adjust" his average property value for the huge difference in lot size and the significant difference in home size.



## 6. The Bell Report Failure to Consider Any Actual Sales of Properties in the City of East St. Louis or in the Subject Neighborhood During the Past 20 Years

### 6.1 The Bell Report Bases the Damages Analysis on Sales of Homes and Land in Distant Areas Located as Far as 20 Miles from the Subject Neighborhood

The Bell Report (p. 65, Figure 35) includes the exhibit below to identify the sales of homes considered in arriving at an average value of improved properties in the subject neighborhood.[79]





---

[79] Including properties known to be non-existent as of December 2023.



The Bell Report (p. 63) states there are a total of 948 sales in the four distant communities shown on the map.[80]  The average and median home prices paid is reported by Bell to be $148,177 and $135,675, and then says "but for" the presence of PCBs in the subject neighborhood, the improved value of a home in the subject neighborhood would be $140,000.

A similar map is included in the Bell Report (p. 66) showing 19 lot sales in the same distant areas with an average and median price of $43,587 and $37,500, and then concludes that "but for" the presence of PCBs in the subject neighborhood, the value of a lot in the subject neighborhood would be $40,000.

### 6.2 The Bell Report Ignores (without Explanation) More than 1,300 Sales in the City of East St. Louis and More than 3,400 Sales in Cahokia the Community Located Adjacent and Immediately South of the Subject Neighborhood That Have Occurred Since 2002

Our research in the local Mid-America Regional Information Systems (MARIS) Multiple Listing Service (MLS) data found over 1,315 transactions in the City of East St. Louis between 2002 and 2024 and an additional 3,400 transactions that occurred between September 2002 and May 2024 in Cahokia, the community that abuts the subject neighborhood to the south.  The Bell Report ignores those sales and provides no explanation for why such sales were excluded from his analysis.

The Addenda contains a detailed summary of the MLS research conducted by us. The table to the right summarizes information related to the 1,252 transactions[81] of homes sold in the City of East St. Louis between 2002 and 2023.

The average price per year since 2021 has varied between approximately $41,000 and $48,500, almost $100,000 less than the average price of $140,000 per used in the Bell Report to calculate damages.

The chart below takes the above data but displays it graphically. Additional charts in the Addenda analyze the same sales data based on a building (house) size and price paid per sq. ft. basis.

**East St Louis**

| Year | Qty | Sale Price | Home Sq. Ft. | Price per Sq. Ft. | Year Built | DOM | Sale to List Ratio |
|---|---|---|---|---|---|---|---|
| 2002 | 22 | 25,467 | 1,018 | 24.49 | 1939 | 327 | 0.810 |
| 2003 | 118 | 23,109 | 1,125 | 19.17 | 1942 | 211 | 0.876 |
| 2004 | 105 | 24,505 | 1,166 | 20.87 | 1942 | 323 | 0.868 |
| 2005 | 122 | 28,819 | 1,144 | 25.10 | 1941 | 115 | 0.887 |
| 2006 | 124 | 31,596 | 1,174 | 27.13 | 1942 | 143 | 0.887 |
| 2007 | 127 | 29,212 | 1,164 | 25.04 | 1941 | 77 | 0.880 |
| 2008 | 75 | 24,132 | 1,211 | 19.55 | 1951 | 76 | 0.826 |
| 2009 | 70 | 11,075 | 1,132 | 9.61 | 1947 | 152 | 0.791 |
| 2010 | 38 | 12,864 | 1,224 | 10.37 | 1942 | 51 | 0.941 |
| 2011 | 35 | 19,451 | 1,186 | 16.03 | 1950 | 114 | 0.960 |
| 2012 | 38 | 10,825 | 1,192 | 9.04 | 1951 | 42 | 0.963 |
| 2013 | 41 | 13,577 | 1,099 | 13.14 | 1944 | 69 | 0.847 |
| 2014 | 32 | 15,623 | 1,243 | 12.88 | 1947 | 59 | 0.941 |
| 2015 | 33 | 27,374 | 1,330 | 20.21 | 1957 | 97 | 0.932 |
| 2016 | 32 | 16,039 | 1,343 | 12.92 | 1936 | 57 | 0.969 |
| 2017 | 28 | 20,461 | 1,170 | 18.96 | 1943 | 64 | 0.908 |
| 2018 | 37 | 30,282 | 1,324 | 23.20 | 1949 | 106 | 0.911 |
| 2019 | 27 | 28,635 | 1,345 | 21.01 | 1950 | 150 | 0.850 |
| 2020 | 39 | 22,921 | 1,202 | 18.46 | 1942 | 107 | 0.993 |
| 2021 | 39 | 46,849 | 1,287 | 35.60 | 1944 | 107 | 0.931 |
| 2022 | 27 | 48,474 | 1,211 | 42.76 | 1935 | 52 | 0.935 |
| 2023 | 43 | 41,228 | 1,286 | 32.44 | 1939 | 58 | 0.926 |
| | **1,252** | | | | | | |

---

[80] The number of sales by community are as follows: Caseyville (46); Fairview Heights (157); Belleville (744); and Fairmont City (1).

[81] Although there were 1,315 sales in total, we removed duplicate sales, transactions involving no price, transactions of less than $500 and less than $2.00 per square foot of improved area.





As shown in the above chart, the average price (nominal) paid during the 20-plus years of data analyzed is equal to approximately $25,500, and with a median price paid of $15,000. The average home size was approximately 1,190 square feet. The red line represents the "best fit" trendline (polynomial) across the entire time period that shows the significant upturn in home prices in East St. Louis in recent years. Again, that is significantly lower than the $140,000 average price used in the Bell Report based on sales from distant communities.



Located immediately south of the subject neighborhood (and the industrial corridor that includes the Monsanto/Krummrich plant) is community known as Cahokia.[82] The community of Cahokia has a housing market with similar physical characteristics and market price levels to the East St. Louis market. Between September 2002 and December 2023, there more than 3,400 sales in Cahokia with an average price of $34,500 and an average home size of 1,100 square feet.



---

[82] The Village of Cahokia existed until May 2021, when it officially merged with the neighboring villages of Cahokia and Alorton and the city of Centreville. For purposes of this report we will refer to Cahokia and its historical geographic boundaries used in the Bell Report.



### 6.3 The Bell Report Ignores (without Explanation) 112 Sales Since 2002 in the Subject Neighborhood

**Subject Neighborhood**

| Year | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|------|-----|-----------|-------------------|------------|--------------|-----|--------------------|
| 2002 | 2 | 36,250 | 29.23 | 1963 | 1,372 | 138 | 0.922 |
| 2003 | 8 | 42,250 | 33.68 | 1981 | 1,219 | 81 | 0.906 |
| 2004 | 7 | 43,657 | 36.40 | 1980 | 1,197 | 644 | 0.874 |
| 2005 | 9 | 48,481 | 48.26 | 1972 | 1,103 | 47 | 0.894 |
| 2006 | 10 | 49,490 | 39.91 | 1979 | 1,344 | 65 | 0.952 |
| 2007 | 13 | 42,419 | 34.96 | 1973 | 1,178 | 59 | 0.956 |
| 2008 | 7 | 37,129 | 31.50 | 1988 | 1,131 | 51 | 0.933 |
| 2009 | 10 | 25,005 | 19.57 | 1991 | 1,220 | 280 | 0.774 |
| 2010 | 1 | 22,000 | 14.67 | 2005 | 1,500 | 150 | 0.884 |
| 2011 | 6 | 18,017 | 15.92 | 1983 | 1,110 | 29 | 0.915 |
| 2012 | 5 | 17,720 | 11.79 | 1980 | 1,573 | 48 | 0.950 |
| 2013 | 3 | 15,967 | 12.33 | 1997 | 1,319 | 70 | 0.935 |
| 2014 | 5 | 22,304 | 15.26 | 1980 | 1,270 | 35 | 0.973 |
| 2015 | 7 | 19,707 | 17.76 | 1981 | 1,087 | 65 | 0.948 |
| 2016 | 2 | 44,250 | 37.16 | 1999 | 1,193 | 12 | 0.970 |
| 2017 | 3 | 14,333 | 10.59 | 1955 | 1,265 | 26 | 0.988 |
| 2018 | 6 | 58,625 | 34.22 | 1992 | 1,679 | 74 | 0.833 |
| 2019 | 3 | 42,667 | 31.92 | 1979 | 1,255 | 98 | 0.873 |
| 2020 | 2 | 34,563 | 16.83 | 1986 | 1,906 | 31 | 1.310 |
| 2021 | 1 | 32,500 | 34.72 | 1975 | 936 | 3 | 1.000 |
| 2022 | 1 | 43,500 | 44.48 | 1975 | 978 | 2 | 0.967 |
| 2023 | 1 | 25,000 | 27.41 | 1970 | 912 | 19 | 1.389 |
| | **112** | | | | | | |

Our research has found 112 sales of homes in the subject neighborhood since 2002. The Bell Report ignores those sales and provides no explanation for why such sales were excluded from his analysis even though the Bell Report (p. 31) states that sales transactions in the neighborhood were investigated:

". . . data of other improved non-subject property residences in the neighborhood were analyzed. The public property records in the surrounding neighborhood were examined and the data was tabulated. For any properties that transacted, the corresponding MLS records were examined as an additional source of confirmation."

| 2 Year Period | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|---------------|-----|-----------|-------------------|------------|--------------|-----|--------------------|
| 2002-2003 | 10 | 41,050 | 32.79 | 1978 | 1,249 | 92 | 0.909 |
| 2004-2005 | 16 | 46,370 | 43.07 | 1975 | 1,144 | 308 | 0.885 |
| 2006-2007 | 23 | 45,493 | 37.11 | 1975 | 1,250 | 61 | 0.954 |
| 2008-2009 | 17 | 29,997 | 24.48 | 1990 | 1,183 | 186 | 0.840 |
| 2010-2011 | 7 | 18,586 | 15.74 | 1986 | 1,166 | 46 | 0.911 |
| 2012-2013 | 8 | 17,063 | 11.99 | 1987 | 1,478 | 57 | 0.945 |
| 2014-2015 | 12 | 20,789 | 16.72 | 1980 | 1,163 | 53 | 0.958 |
| 2016-2017 | 5 | 26,300 | 21.22 | 1977 | 1,236 | 21 | 0.981 |
| 2018-2019 | 9 | 53,306 | 33.45 | 1988 | 1,538 | 80 | 0.847 |
| 2020-2021 | 3 | 33,875 | 22.80 | 1982 | 1,582 | 22 | 1.207 |
| 2022-2023 | 2 | 34,250 | 35.95 | 1973 | 945 | 11 | 1.178 |
| | **112** | | | | | | |

The table to the right presents a list by year of the 112 sales in the subject neighborhood between 2002 and 2023. The table includes the number sold per year, the average selling price, building size, price paid per square foot, year built, days on market (DOM), and sale to list price ratio.

The number of sales varies from a low of one sale to a high of 13 in 2007. There are several years where there was just one or two sales (per year) from within the subject neighborhood. This is not surprising given the relatively small size of the area, and with consideration given to the continuation of demolition activity in the area.

Given the limited number of sales in some years, the data has also been analyzed in two-year intervals, as shown in the table to the right.

Both East St. Louis as a whole and the subject neighborhood felt the effects of the Great Recession that dramatically affected home prices across the United States between 2007 and 2009 and had lingering effects on prices in subsequent years as markets recovered.



For example, during the period leading up to the Recession, the average home in East St. Louis sold for approximately $27,500 or $23 per square foot. During the five-year period of 2010 to 2014, East St. Louis remained in the shadow of lingering effects from the collapse of the housing market, with prices averaging half of their prior levels ($14,500 and $12 per square foot).

In recent years, prices for all of East St. Louis have largely rebounded but the number of transactions remain low.

A similar trend occurred in the subject neighborhood "study area" as well. While prices dropped substantially during the downturn and have rebounded substantially, the pace of sales follows the pattern from the broader East St. Louis market.

**East St Louis**

| Year | Qty | Sale Price | Price per Sq. Ft. |
|---|---|---|---|
| 2003 to 2007 | 119.2 | 27,448 | 23.46 |
| 2010 to 2014 | 36.8 | 14,468 | 12.29 |
| 2019 to 2023 | 35.0 | 37,621 | 30.05 |

During the pre-Recession years of 2003 and 2007, the number of sales of homes (per year) in the subject neighborhood averaged 9.4 per year. During the post-recession period of 2010 to 2014 that number dropped to 4.0 sales per year and in the most recent five-year time period the figure is 1.6 sales per year.

**Subject Neighborhood**

| Year | Qty | Sale Price | Price per Sq. Ft. |
|---|---|---|---|
| 2003 to 2007 | 9.4 | 45,259 | 38.64 |
| 2010 to 2014 | 4.0 | 19,202 | 13.99 |
| 2019 to 2023 | 1.6 | 35,646 | 31.07 |

The most recent five-year period average price paid ($35,600 and $31 per square foot) for homes in the subject neighborhood is comparable to those for the City as a whole ($37,600 and $30 per square foot) as shown in the table to the left.



The chart below displays the 112 prices paid since 2002 in a "best fit" trendline (polynomial) across the entire time period.



The average price (nominal) paid during the 20-plus years of data analyzed in the subject neighborhood is approximately $35,800, and the median price paid has been $26,800.



### 6.4 The New Construction (Not Mentioned in the Bell Report) and Higher Priced Homes Sold in the Subject Neighborhood Are Evidence that There Has Not Been a 100% Impact on Prices and Values Due to PCBs

Our research found 43 sales of homes built since 2000 in the subject neighborhood. The list of sales to the left display the location and sale date of 43 homes that were built in the year 2000 or later.

**Newer Construction Homes in the Subject Neighborhood (sold)**

| Address | Year Built | Sale Date |
|---|---|---|
| 1720 Wilford Ave | 2006 | Nov-19 |
| 1720 Wilford Ave | 2006 | Jul-15 |
| 1720 Wilford Ave | 2006 | May-19 |
| 1402 Russell Ave | 2005 | Aug-07 |
| 1632 Wilford Ave | 2005 | Aug-18 |
| 1632 Wilford | 2005 | Aug-15 |
| 1950 Gay Ave | 2005 | May-14 |
| 1704 Wilford | 2005 | Aug-09 |
| 1639 Lawrence Ave | 2005 | Oct-12 |
| 1816 Wilford | 2005 | Sep-10 |
| 1620 Wilford Ave | 2004 | Nov-14 |
| 1624 Wilford Ave | 2004 | Nov-18 |
| 1620 Wilford Ave | 2004 | Dec-13 |
| 1414 Russell | 2003 | Nov-20 |
| 1635 Central | 2003 | May-09 |
| 1635 Central | 2002 | Nov-03 |
| 1411 Dr M R Lemons Blvd | 2002 | May-06 |
| 1619 Wilford Ave | 2001 | Apr-08 |
| 1405 Dr M R Lemons Blvd | 2001 | Apr-06 |
| 1604 Lawrence Ave | 2001 | Jan-07 |
| 1639 Lawrence Ave | 2001 | Oct-06 |
| 1619 Wilford Ave | 2001 | Jun-07 |
| 1604 Lawrence | 2001 | Jul-11 |
| 1602 Lawrence | 2001 | Oct-09 |
| 1401 Dr Mr Lemons Blvd | 2001 | Oct-11 |
| 1405 E St | 2000 | Dec-04 |
| 1630 Lawrence Dr | 2000 | Dec-08 |
| 1405 E St | 2000 | Nov-06 |
| 1806 Lawrence | 2000 | Nov-03 |
| 1707 Wilford | 2000 | Jun-05 |
| 1703 Wilford Ave | 2000 | Nov-04 |
| 1630 Lawrence Ave | 2000 | May-06 |
| 1402 Dr M R Lemons Blvd | 2000 | Dec-07 |
| 1705 Wilford | 2000 | Dec-04 |
| 1400 Dr M R Lemons Blvd | 2000 | Jan-05 |
| 1409 Dr M R Lemons Blvd | 2000 | Dec-03 |
| 1609 Wilford Ave | 2000 | Jul-06 |
| 1806 Lawrence | 2000 | Dec-09 |
| 1705 Wilford | 2000 | Sep-11 |
| 1620 Lawrence Ave | 2000 | Dec-16 |
| 1634 Lawrence Ave | 2000 | Jan-13 |
| 1709 Wilford Ave | 2000 | Apr-12 |
| 1703 Wilford Ave | 2000 | Apr-11 |

Some of the more recent construction has occurred along Wilford Avenue. The table below shows seven sales of homes built since 2000 along Wilford at prices ranging from $52,500 to $90,000.



1703 Wilford
Built in 2000
Sold Nov. 2004
$62,100



1705 Wilford
Built in 2000
Sold Dec. 2004
$52,500



1707 Wilford
Built in 2000
Sold June 2005
$63,000



1619 Wilford
Built in 2001
Sold Apr. 2008
$76,900



1620 Wilford
Built in 2004
Sold Nov. 2014
$52,000



1632 Wilford
Built in 2005
Sold Aug. 2018
$77,250



1720 Wilford
Built in 2006
Sold Nov. 2019
$90,000



There have been other homes that have sold in the subject neighborhood at relatively high prices for the East St. Louis market.

**Most Expensive Homes in the Subject Neighborhood (sold)**

| Address | Sale Price | Sale Date |
|---|---|---|
| 1402 Russell Ave | $97,500 | Aug-07 |
| 1635 Central | $97,000 | Nov-03 |
| 1720 Wilford Ave | $90,000 | Nov-19 |
| 1546 Russell | $90,000 | Jan-05 |
| 1405 E St | $87,000 | Dec-04 |
| 1630 Lawrence Dr | $80,000 | Dec-08 |
| 1405 E St | $80,000 | Nov-06 |
| 1632 Wilford Ave | $77,250 | Aug-18 |
| 1619 Wilford Ave | $76,900 | Apr-08 |
| 1610 Central Ave | $75,000 | Mar-18 |
| 1624 Central Ave | $73,500 | Aug-18 |
| 1427 Lawrence Ave | $71,000 | May-07 |
| 1806 Lawrence | $69,000 | Nov-03 |
| 1709 Central | $67,000 | Jan-07 |
| 1827 Lawrence | $65,000 | May-16 |
| 1411 Dr M R Lemons Blvd | $64,900 | May-06 |
| 1608 Central Ave | $64,000 | Jun-18 |

The table to the left shows 17 sales between 2003 and 2020 of homes at prices between $60,000 and $100,000, with an average price paid of $77,944.

There have also been at least eight sales of homes greater than 1,850 square feet, considerably larger than the typical home in East St. Louis. Those addresses and the home sizes are shown in the table below.

**Examples of Large Homes in the Subject Neighborhood (sold)**

| Address | Size (sq. ft.) | Sale Date |
|---|---|---|
| 1544 Russell Ave | 2,860 | Oct-12 |
| 1414 Russell | 2,590 | Nov-20 |
| 1812 Piggott Ave | 2,350 | Apr-06 |
| 1610 Central Ave | 2,208 | Mar-18 |
| 1608 Central Ave | 2,088 | Jun-18 |
| 1411 Dr MR Lemons Blvd | 1,960 | May-06 |
| 1950 Gay Ave | 1,866 | May-14 |
| 1700 Market | 1,860 | Apr-07 |

We have also conducted the following additional analysis of sales in the subject neighborhood:

- A comparison of sale prices in the subject neighborhood compared to the rest of the City of East St. Louis.

- A comparison of the sale prices in the subject neighborhood compared to prices in the immediately adjacent community of Cahokia.

This analysis is presented on the following pages.



### 6.5 Comparison of Sale Price Trends between the Subject Neighborhood and the Rest of East St. Louis

The chart below includes a comparison of the 112 sales in the subject neighborhood to the 1,252 sales in the City of East St. Louis during the 20-year period of September 2002 to December 2023. The overall comparability of the price is evident. During this time period, the average price paid for homes in the subject neighborhood of $35,800 was actually slightly higher than the average for East St. Louis as a whole ($25,500). The relative similarity between the two trendlines is also visible. The prices paid for homes in the subject neighborhood have historically exceeded (albeit slightly) the average prices paid for home in the City of East St. Louis as a whole.





*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

### 6.1  Comparison of Sale Price Trends between the Subject Neighborhood and Cahokia

The chart below includes a comparison of the 112 sales in the subject neighborhood to the 3,422 sales in the adjacent community of Cahokia during the 20-year period.

Here, the comparability price trends is even more compelling. Between 2002 and 2023, the average price paid for homes in the subject neighborhood of $35,800 was remarkably similar to the prices paid in Cahokia ($34,500 average).

We note the tight similarity between the two trendlines. The prices paid for homes in the subject neighborhood have been very consistent with the average prices paid for home in Cahokia.





The tables below present summary figures by year for subject neighborhood and for Cahokia

**Subject Neighborhood**

| 2 Year Period | Qty | Sale Price | Home Sq. Ft. | Price per Sq. Ft. | Year Built | DOM | Sale to List Ratio |
|---|---|---|---|---|---|---|---|
| 2002-2003 | 10 | 41,050 | 1,249 | 32.79 | 1978 | 92 | 0.909 |
| 2004-2005 | 16 | 46,370 | 1,144 | 43.07 | 1975 | 308 | 0.885 |
| 2006-2007 | 23 | 45,493 | 1,250 | 37.11 | 1975 | 61 | 0.954 |
| 2008-2009 | 17 | 29,997 | 1,183 | 24.48 | 1990 | 186 | 0.840 |
| 2010-2011 | 7 | 18,586 | 1,166 | 15.74 | 1986 | 46 | 0.911 |
| 2012-2013 | 8 | 17,063 | 1,478 | 11.99 | 1987 | 57 | 0.945 |
| 2014-2015 | 12 | 20,789 | 1,163 | 16.72 | 1980 | 53 | 0.958 |
| 2016-2017 | 5 | 26,300 | 1,236 | 21.22 | 1977 | 21 | 0.981 |
| 2018-2019 | 9 | 53,306 | 1,538 | 33.45 | 1988 | 80 | 0.847 |
| 2020-2021 | 3 | 33,875 | 1,582 | 22.80 | 1982 | 22 | 1.207 |
| 2022-2023 | 2 | 34,250 | 945 | 35.95 | 1973 | 11 | 1.178 |
| **112** | | | | | | | |

**Cahokia**

| 2 Year Period | Qty | Sale Price | Home Sq. Ft. | Price per Sq. Ft. | Year Built | DOM | Sale to List Ratio |
|---|---|---|---|---|---|---|---|
| 2002-2003 | 263 | 35,675 | 1,066 | 33.22 | 1958 | 157 | 0.920 |
| 2004-2005 | 503 | 43,022 | 1,090 | 39.40 | 1958 | 442 | 0.934 |
| 2006-2007 | 476 | 45,538 | 1,070 | 42.27 | 1958 | 91 | 0.929 |
| 2008-2009 | 298 | 31,006 | 1,112 | 27.94 | 1960 | 98 | 0.871 |
| 2010-2011 | 240 | 19,087 | 1,114 | 17.19 | 1960 | 102 | 0.862 |
| 2012-2013 | 331 | 18,787 | 1,083 | 17.78 | 1959 | 89 | 0.833 |
| 2014-2015 | 190 | 20,658 | 1,143 | 18.31 | 1961 | 88 | 0.871 |
| 2016-2017 | 221 | 29,021 | 1,110 | 26.72 | 1960 | 61 | 0.912 |
| 2018-2019 | 255 | 29,704 | 1,099 | 27.58 | 1959 | 79 | 0.901 |
| 2020-2021 | 340 | 36,977 | 1,117 | 33.91 | 1959 | 63 | 0.919 |
| 2022-2023 | 305 | 48,985 | 1,088 | 45.44 | 1958 | 52 | 0.914 |
| **3,422** | | | | | | | |

The following chart presents the average home price for the two communities compared.



Residential Sales, Average Price (2-year periods)
Subject Neighborhood vs. Cahokia, 2002 to 2023



The chart below presents the same sales, but this time we display the results on a price paid per square foot of living area basis.



## 6.6   Consideration of Prices Paid for Vacant Land Properties in the Local Market

As noted within this report, the Bell Report fails to analyze local market real estate transactions. While the majority of our report address sales of improved residential property, because 269 of the 273 subject properties were vacant land or lots as of December 2023, we have also researched sales of vacant land in the local market. Please refer to the addenda to this report for an analysis of sales of vacant land properties in the City of East St. Louis.

## 6.7   Paired Sales Analysis of Sales in the Subject Neighborhood Compared to a Control Area

Paired sales analysis, also known as matched pairs analysis, is one of the generally recognized methods of the appraisal profession for determining the effect of an environmental situation.

To evaluate the potential impact of the PCB investigation on prices and values in the subject neighborhood we performed a matched pairs analysis using three of the four improved residential properties among the 273 subject properties. We are unaware of sales of any of the subject improved properties that can be used either in a "pure pairings" (sale/resale of the same property) or in a paired sales analysis.

So sales of other improved properties in the subject neighborhood were investigated and adjusted to account for differences between each of the subject properties and the other properties in the neighborhood.



We selected the three subject properties (1405 Central Ave., 1314 Mississippi Ave., and 1419 Gay Ave.) improved with a residential dwelling as of December 2023.

Next, we identified three comparable properties located in the subject neighborhood that had sold and adjusted them for date of sale and differences in physical characteristics to arrive at a reasonable approximation of the price that a subject property might have sold for in December of 2023.[83]

Based on analysis of the MARIS MLS database and discussions with local area market participants (including local appraiser Donna Howard) on the reasonability of adjustments, we determined appropriate adjustments for these pairings as follows.

- Market timing adjustments (annual rate of inflation of 2% or 0.167% per month)
- Full bathroom adjustment of $1,000 per bathroom
- Half bathroom adjustments of $500 per bathroom
- Physical condition adjustments of $2,000 for below average vs. average condition
- Basement adjustment of $2,000
- Garage adjustment of $1,000 per parking space
- Exterior feature adjustment of $500 per feature (e.g. fence, patio, shed)
- Landscaping adjustment of $500
- Air conditioning adjustment of $2,500

Each of the three "inside" sales were compared to like-kind "outside" sales in a control area. This is referenced as the "inside/outside" paired sales analysis.

If the PCB investigation in the subject neighborhood has actually affected property prices, the difference between the adjusted "inside" and "outside" price comparisons would reflect the difference between an "impaired" and an "unimpaired" price for each house.

Next, we followed the same process with sales from a comparable area (Cahokia) that would not be subject to any potential property value impact from the PCB investigation in the subject neighborhood.[84]

Our adjustment grids for the comparable properties within East St. Louis and in Cahokia are located in the Addenda.

The results of our paired sales analysis using Cahokia as a control area are shown in the table below.

---

[83] The sales dataset included recent sales between May 2019 to May 2024. To ensure valid comparisons we excluded distressed sales such as foreclosures, auctions, short sales, and REOs. Additionally, sales described as "value in land" and as new construction were not considered. To identify comparable homes we examined property characteristics such as the condition of the property at time of sale, number of bedrooms, number of bathrooms, square footage, year built, as well as other features such as air conditioning and features such as garage, shed, and patio structures.

[84] To assure sales selected in Cahokia were not potentially impacted by the Sauget OU-1 and OU-2 investigation and remediation areas, we excluded sales in the neighborhood on either side of Dead Creek described in our Dead Creek case study analysis.



### Matched Pairs Analysis No. 1: 1405 Central Avenue, East St. Louis

| | Adjusted Price | Cahokia Adjusted Price | % Difference |
|---|---|---|---|
| **Inside Comparable No. 1** | $30,593 | | |
| Control No. 1 | | $29,573 | 3.4% |
| Control No. 2 | | $37,195 | -17.8% |
| Control No. 3 | | $24,421 | 25.3% |
| **Inside Comparable No. 2** | $42,197 | | |
| Control No. 1 | | $29,573 | 42.7% |
| Control No. 2 | | $37,195 | 13.4% |
| Control No. 3 | | $24,421 | 72.8% |
| **Inside Comparable No. 3** | $31,200 | | |
| Control No. 1 | | $29,573 | 5.5% |
| Control No. 2 | | $37,195 | -16.1% |
| Control No. 3 | | $24,421 | 27.8% |

### Matched Pairs Analysis No. 2: 1314 Mississippi Avenue, East St. Louis

| | Adjusted Price | Cahokia Adjusted Price | % Difference |
|---|---|---|---|
| **Inside Comparable No. 1** | $31,790 | | |
| Control No. 1 | | $27,858 | 14.1% |
| Control No. 2 | | $38,660 | -17.8% |
| Control No. 3 | | $29,200 | 8.9% |
| **Inside Comparable No. 2** | $29,920 | | |
| Control No. 1 | | $27,858 | 7.4% |
| Control No. 2 | | $38,660 | -22.6% |
| Control No. 3 | | $29,200 | 2.5% |
| **Inside Comparable No. 3** | $33,700 | | |
| Control No. 1 | | $27,858 | 21.0% |
| Control No. 2 | | $38,660 | -12.8% |
| Control No. 3 | | $29,200 | 15.4% |

### Matched Pairs Analysis No. 3: 1419 Gay Avenue, East St. Louis

| | Adjusted Price | Cahokia Adjusted Price | % Difference |
|---|---|---|---|
| **Inside Comparable No. 1** | $30,593 | | |
| Control No. 1 | | $31,073 | -1.5% |
| Control No. 2 | | $37,195 | -17.8% |
| Control No. 3 | | $29,390 | 4.1% |
| **Inside Comparable No. 2** | $42,197 | | |
| Control No. 1 | | $31,073 | 35.8% |
| Control No. 2 | | $37,195 | 13.4% |
| Control No. 3 | | $29,390 | 43.6% |
| **Inside Comparable No. 3** | $30,200 | | |
| Control No. 1 | | $31,073 | -2.8% |
| Control No. 2 | | $37,195 | -18.8% |
| Control No. 3 | | $29,390 | 2.8% |
| **Average: 27 Pairings** | | | **8.6%** |
| **Median: 27 Pairings** | | | **5.5%** |

Both the average and the median from the 27 pairings as shown in the table above are positive. That indicates that the adjusted prices of the nine sales inside the subject neighborhood are between 5.5% and 8.6% higher than the adjusted prices for the 27 sales in the Cahokia control area.



That is an indication that PCBs are not adversely impacting prices for the 273 subject properties. The analysis of sale prices in the subject neighborhood confirms that there is no automatic decrease in prices and values of homes during the "assessment" stage of the remediation lifecycle.

### 6.8   Sales of Subject Neighborhood Homes Involved in the 2014 Settlement

As discussed earlier in this report, the numerous lawsuits previously filed against Monsanto and others in Circuit Court were ultimately resolved in a settlement agreement dated November 21, 2014. Plaintiffs (and claimants) that participated in the 2014 settlement included numerous individuals with addresses from within the subject neighborhood.[85]

We cross-referenced the settlement list (property claims) to sales records and identified seven individuals from the subject neighborhood that subsequently sold their house. The table below provides information related to the seven sales of residential property located in the subject neighborhood that occurred after the 2014 settlement. The average price paid was $22,732. Two of the sales occurred within nine months of the settlement, including the highest price paid ($35,000) of the seven sales.

| Plaintiff Name (Ref. Number) | Address | Sale Date | Price | MLS Listing Number | Parcel Number |
|---|---|---|---|---|---|
| Baker (#481) | 1945 Russell Ave. | 1/30/2015 | $5,500 | 4317289 | 01-24.0-432-049 |
| Hazzard (#3801, #3246) | 1632 Wilford Ave. | 8/4/2015 | $35,000 | 4402271 | 01-24.0-334-001 |
| Archer (#2337) | 1624 Central Ave. | 8/29/2017 | $15,000 | 17060151 | 01-24.0-321-054 |
| Crumble (#1541) | 1624 Wilford Ave. | 11/26/2018 | $30,000 | 18064157 | 01-24.0-333-047 |
| McClatchery (#1782) | 1646 Gay Ave. | 2/28/2020 | $16,125 | 19089029 | 01-24.0-318-071 |
| Goree (#6085) | 1620 Gay Ave. | 7/15/2021 | $32,500 | 21045344 | 01-24.0-318-066 |
| Anderson (#618) | 1627 Central Ave. | 6/28/2023 | $25,000 | 23028423 | 01-24.0-318-079 |
| **Average (7 sales)** | | | **$22,732** | | |

These seven sales from within the subject neighborhood involving properties that were part of the 2014 settlement provides meaningful evidence of the widespread awareness of the PCB contamination situation. These transactions fail to offer any support for the Bell Report claim that there has been a 100% impact on prices, values and rents on the subject properties.

### 6.9   The Soil Testing and Litigation Settlement Indicate Widespread Knowledge and Awareness in the Neighborhood about the Investigation of PCBs in the Neighborhood Indicating that Sale Prices Would Reflect Any Concerns about Cost, Use or Risk Effects

As discussed above, there has been soil testing in the neighborhood at many points since 1976 including in 2012, 2015 and 2020. There has also been indoor attic dust sampling.  In addition, there have been lawsuits against Monsanto and others that resulted in a 2014 settlement that included nearly 16,600 persons located in or near the City of East St. Louis and also addressed

---

[85] The 2014 Settlement included more than 160 persons with addresses from within the subject neighborhood. For example, there were five persons from Boismenue Avenue, 28 from Russell Avenue, 56 from Gay Avenue, 28 from Central Avenue, 23 from Lawrence Avenue and 12 from Wilford Avenue.



4,000 properties in the area. Among the Plaintiffs were 160 persons with addresses in the neighborhood. In addition, some of the Plaintiffs in that settlement subsequently sold their properties.

All of that indicates widespread general awareness and knowledge about the investigation of PCBs in the subject neighborhood. That also indicates that the typical buyer and seller of properties in the neighborhood would be aware of the environmental issues.

### 6.10 Comparison of the Bell Average Monthly Rent to Actual Rents in East St. Louis and in Cahokia Located Immediately Adjacent to the Subject Neighborhood

The foundation of the Bell Report loss of "use" calculations is market rent. The Bell Report includes the following discussion of its analysis and research into identifying and supporting its conclusions of market rent for the 273 subject properties.

> "In this analysis, unimpaired monthly rental rates on the MLS were analyzed and indicated a rate of $1,400 per month per improved subject property." (p. 11)

> "In a use effect analysis, market rent is calculated on the unimpaired rent rate, in other words, the market rent but for the detrimental condition. In other words, the rental rate reflects the market value for the right to use a property, one example would be the right to use the subject properties for the storage of PCBs. In this analysis, monthly rental rates on the MLS were analyzed and indicated a rate of $1,400 per month per improved subject property." (p. 38)

The Bell Report then presents the following table of summary rental data from suburban communities within St. Clair County, Illinois.

| No. | City | Number of Leases | Low Lease Rate | High Lease Rate | Average Lease Rate | Median Lease Rate |
|---|---|---|---|---|---|---|
| SP | East St. Louis | NA | NA | NA | NA | NA |
| 1 | Caseyville | 4 | $900 | $1,850 | $1,444 | $1,513 |
| 2 | Fairview Heights | 12 | $975 | $2,300 | $1,495 | $1,350 |
| 3 | Belleville | 39 | $850 | $2,100 | $1,293 | $1,200 |
| 4 | Fairmont City | 0 | - | - | - | - |

*CITY OF EAST ST. LOUIS — Improved Lease Matrix (Landmark File 155-1-21)*



| | | | | | | |
|---|---|---|---|---|---|---|
| 5 | Washington Park | 0 | - | - | - | - |
| 6 | Sauget* | - | - | - | - | - |
| 7 | Centreville* | - | - | - | - | - |
| 8 | Alorton* | - | - | - | - | - |
| | **Overall Average** | | $908 | $2,083 | $1,411 | $1,354 |

*Contamination Issues

Figure 17: Lease Matrix

That table includes average monthly rent for single-family residences in Caseyville ($1,444 per month), Fairview Heights ($1,495 per month), and Belleville ($1,293 per month). The Bell Report applies a simple average from these three communities with a result of $1,411 per month. From this analysis, the Bell Report concludes $1,400 per month as the market rent appropriate for the residential properties (improved or not as of December 2023).

The Bell Report fails to analyze rents in either East St. Louis or in Cahokia, the community adjacent to the subject neighborhood.

**Market Rent from the Local Market (East St. Louis)**

We researched closed listings (completed rental agreements) for residential rental properties (single-family homes) in the City of East St. Louis. We were able to identify four rentals in 2023 and Q1 2024. The average monthly rental amount was equal to $993 per month, and the median rent was $935 per month. The lease data from the City of East St. Louis is presented in summary form below.[86]

**Closed Residential Leases in East St. Louis, IL (2023-2024)**

| Address | Lease Date | Year Built | Bd / Ba | Lease Rate | Sq. Ft. | Price per Sq. Ft. |
|---|---|---|---|---|---|---|
| 632 N. 75th St. | 6/1/2023 | 1940 | 2 Bd / 1 Ba | $800 | 900 | $0.89 |
| 8210 Saint Phillips Dr. | 9/16/2023 | 1948 | 3 Bd / 1 Ba | $895 | 844 | $1.06 |
| 618 Tulane Dr. | 2/16/2024 | 1957 | 3 Bd / 1 Ba | $975 | 864 | $1.13 |
| 8206 Carol Dr. | 12/15/2023 | 1950 | 4 Bd / 2 Ba | $1,300 | 1,200 | $1.08 |
| | | | **Average** | **$993** | | **$1.04** |
| | | | **Median** | **$935** | | **$1.07** |

The highest rental rate was for a four-bedroom property. When this is removed the average was $890 per month and the median was $895 per month. Based on recent rental data from within

---

[86] It is noted that the lease data from East St. Louis are from locations generally east of the subject property neighborhood.



the City of East St. Louis, a monthly average East St. Louis rental rate of $900 per month is indicated.

The Bell Report average rent of $1,400 per month is $500 per month, or 55%, higher than the average actual rents in East St. Louis.

**Market Rent from the Adjacent Cahokia Community**

From the MLS we identified 23 closed listings for residential rental properties (single-family homes) in the community of Cahokia located immediately south and east of the subject neighborhood. These 23 rental transactions occurred between June 2019 and May 2024. The average monthly rental amount was equal to $903 per month, and the median rent was $895 per month.

The lease data for the 23 leases from Cahokia is presented in summary form below.

Closed Residential Leases in Cahokia, IL (2019 - 2024)

| Address | Lease Date | Year Built | Bd / Ba | Lease Rate | Sq. Ft. | Price per Sq. Ft. |
|---|---|---|---|---|---|---|
| 434 Chaudet Ave | 6/11/2019 | 1940 | Bd 3 /Ba 2 | $895 | 1,624 | $0.55 |
| 434 Chaudet Ave | 3/24/2020 | 1940 | Bd 3 /Ba 1 | $850 | 1,624 | $0.52 |
| 526 Saint Paul Dr | 4/8/2020 | -- | Bd 3 /Ba 1 | $750 | 925 | $0.81 |
| 1 Dora Dr | 5/21/2020 | -- | Bd 3 /Ba 1 | $750 | 816 | $0.92 |
| 7 Delores | 5/21/2020 | 1955 | Bd 3 /Ba 1 | $795 | 850 | $0.94 |
| 101 West5Th St | 2/16/2022 | -- | Bd 2 /Ba 1 | $650 | 770 | $0.84 |
| 3 Lazercheff Dr | 4/14/2022 | -- | Bd 3 /Ba 1 | $1,110 | 936 | $1.19 |
| 1156 Jones St | 11/16/2022 | 1958 | Bd 3 /Ba 1 | $1,250 | 1,036 | $1.21 |
| 763 Leon St | 3/6/2023 | 1979 | Bd 4 /Ba 3 | $1,400 | 1,136 | $1.23 |
| 1327 Julie Ave | 3/29/2023 | 1986 | Bd 2 /Ba 2 | $900 | 1,025 | $0.88 |
| 317 Sauget Ave | 3/29/2023 | 1976 | Bd 3 /Ba 2 | $1,250 | 1,076 | $1.16 |
| 101 West5Th St | 3/31/2023 | -- | Bd 2 /Ba 1 | $675 | 770 | $0.88 |
| 1700 Theodore Lane | 5/1/2023 | 1956 | Bd 3 /Ba 1 | $925 | 1,216 | $0.76 |
| 739 Saint Nicholas Dr | 5/1/2023 | 1985 | Bd 3 /Ba 1 | $925 | 988 | $0.94 |
| 1409 Richard Dr | 5/3/2023 | 1961 | Bd 3 /Ba 1 | $950 | 936 | $1.01 |
| 1326 Saint Zita Lane | 5/15/2023 | 1956 | Bd 3 /Ba 1 | $900 | 864 | $1.04 |
| 1128 Saint Margaret Dr | 8/14/2023 | 1959 | Bd 3 /Ba 1 | $900 | 864 | $1.04 |
| 101 West5Th St | 10/12/2023 | -- | Bd 2 /Ba 1 | $700 | 770 | $0.91 |
| 1227 Williams St | 12/8/2023 | -- | Bd 3 /Ba 1 | $850 | 960 | $0.89 |
| 101 West5Th St | 3/21/2024 | -- | Bd 2 /Ba 1 | $700 | 770 | $0.91 |
| 122 Lazercheff Dr | 4/19/2024 | -- | Bd 3 /Ba 1 | $800 | 936 | $0.85 |
| 1227 Williams St | 4/19/2024 | -- | Bd 3 /Ba 1 | $850 | 960 | $0.89 |
| 2054 Sandy Ridge Rd | 5/1/2024 | 1950 | Bd 2 /Ba 1 | $1,000 | 904 | $1.11 |
| | | | **Average** | **$903** | | **$0.93** |
| | | | **Median** | **$895** | | **$0.91** |

All but one involved homes with either two or three bedrooms. There was one rental of a four-bedroom house, which also was the highest rental amount ($1,400 per month).

Because the timeframe (2019 to 2024) extends further back in time than the East St. Louis data, we have also limited the data to a comparable time period of 2023 to 2024. The data includes 14



rentals in 2023 and 2024. Excluding the four-bedroom rental rate ($1,400 per month), the resulting average monthly rent for Cahokia $880 per month and the median is $900 per month.

**Conclusion from Analysis of the Market Rents in the Bell Report**

The Bell Report average market rent of $1,400 per month based on rents in St. Clair County is not supported. Recent rental data from East St. Louis and the adjacent community of Cahokia indicates the following: average rents would be approximately $900 per month, or 36% less than the rents utilized in the Bell Report.



# 7. The Bell Report Fails to Consider East St. Louis Urban Renewal and Planning Policies When Claiming the Subject Neighborhood Has Been "Blighted" by the Presence of PCB Contamination

## 7.1  The Bell Report Claim about Neighborhood "Blight" Caused by PCB Contamination

The Bell Report (p. 67) states that "when properties and their neighborhoods are impacted by PCB contaminants, they can become stigmatized and blighted." It then states that "indicators of blight" are "abandonment, decay, demolition, signage, barricades, and fencing" and concludes that the 273 properties in the subject East St. Louis neighborhood identified in the Bell Report (p. 63) have been "blighted" by PCBs: "The subject properties were developed residential homes; however, as a result of the presence of PCBs, the subject properties have been blighted and are now vacant land."

As discussed in the rest of this section of the JLL Expert Report, the Bell conclusion that the subject neighborhood has been "blighted" by the presence of PCBs ignores East St. Louis urban renewal and planning policies that resulted in the demolition of substandard homes in the neighborhood during the past 50 or more years.

## 7.2  East St. Louis Urban Renewal and Planning Efforts in the Subject Neighborhood

### *The 1960 Master Plan for East St. Louis Described the Substandard Dilapidated Housing in the Subject Neighborhood*

A number of documents related to urban renewal efforts in East St. Louis were submitted as exhibits at the deposition of Randall Bell, PhD taken on May 3, 2024 (the "Bell Deposition"). Exhibit 15 submitted by Defendants at the Bell Deposition is the *Master Plan/East St. Louis* prepared by a planning firm in New Jersey and dated September, 1960. That document describes the deteriorated and substandard condition of much of the housing in East St. Louis, and especially the substandard condition of the housing in the "subject neighborhood" which comprises a large part of the planning area described as the South End in that document.[87] That report found that as of 1950, 40% of all housing units in East St. Louis were "deficit" – a deficient unit was described as a unit that was either "dilapidated" or "lacking in adequate plumbing facilities."[88] A dilapidated unit was a dwelling that had "no running water" and more than 21% of all housing units in the city lacked running water. In addition, almost 19% of the "non-dilapidated" housing had no private bathroom. [89]

The South End of East St. Louis, comprising the "subject neighborhood", had the worst housing conditions and was described in the Master Plan as "presenting the greatest problems." Table 22 in that 1960 *Master Plan/East St. Louis* indicated that approximately 50% of all the housing units in the South End planning area were dilapidated – in other words, had no running water --

---

[87] The boundaries of the South End planning area as described in that document are as follows: "The largest of the ten planning districts in East St. Louis, South End also contains overs 1/5 of the City's dwelling units. This planning district – several neighborhoods in the popular sense are included in this district – includes the area bounded by the city limits on the south, the Southern Railroad right-of-way on the north, Main Street to the west and 21st Street on the east." *Master Plan/East St. Louis*, September, 1960, at page 67.

[88] *Master Plan/East St. Louis*, September, 1960, at page 4.

[89] *Master Plan/East St. Louis*, September, 1960, at page 4.



and 29% did not have a private bathroom. That meant that 77% of the homes were "deficient units."

The 1960 *Master Plan/East St. Louis* then said that as a result of the poor condition of the housing, "much of the neighborhood will require complete clearance and redevelopment." [90]

### 7.3   The 1966 East St. Louis Housing Study Recommended Demolition of the Many Vacant and Abandoned Homes in the Subject Neighborhood

In June of 1966, Southern Illinois University completed a housing study for the City of East St. Louis. It is Exhibit 18 submitted by the Defendants at the Bell Deposition.  It commented that due to the "proposed urban renewal" project, "it will soon be necessary to relocate citizens"[91] and because of that urban renewal plan, "the many vacant and abandoned buildings to be torn down can be acquired for nominal amounts."[92]  It described the "substandard housing" in the city as "beyond the point of repair or rehabilitation"[93] and described the South End as "a neighborhood needing redevelopment."[94]



It discussed in some detail one urban redevelopment project underway in the portion of the South End bounded by 16th on the west, 17th street on the east (later rename Dr. M.R. Lemons Boulevard), Gay Avenue on the south, and Boismenue Street on the north. That one project would demolish "most of" the 39 houses on those blocks while leaving a church and school in place. It was being undertaken by a group named the Denverside Improvement Association, Inc.

As shown on the Google satellite map to the left, all 39 of the homes on those blocks were eventually demolished and a new low income housing project containing approximately 55 to 60 units was constructed on the portion of that project area located between Boismenue Street and Russell Avenue. The 1966 Southern Illinois University study also indicated that the Denverside Improvement Association, Inc. hoped to expand its redevelopment efforts to additional blocks in the South End.

---

[90] *Master Plan/East St. Louis*, September, 1960, at page 77.
[91] Robert F. Mendelson, "Housing – An East St. Louis Challenge!", Public Administration and Metropolitan Affairs Program, Southern Illinois University, Edwardsville, Illinois, June, 1966, at page 8.
[92] Robert F. Mendelson, "Housing – An East St. Louis Challenge!", Public Administration and Metropolitan Affairs Program, Southern Illinois University, Edwardsville, Illinois, June, 1966, at page 8.
[93] Robert F. Mendelson, "Housing – An East St. Louis Challenge!", Public Administration and Metropolitan Affairs Program, Southern Illinois University, Edwardsville, Illinois, June, 1966, at page 1.
[94] Robert F. Mendelson, "Housing – An East St. Louis Challenge!", Public Administration and Metropolitan Affairs Program, Southern Illinois University, Edwardsville, Illinois, June, 1966, at page 7.



### 7.4 The 1978 Urban Renewal Plan for the Subject Neighborhood Recommended Demolition of All Substandard and Obsolete Houses and Clearance for Urban Renewal

Exhibit 19 submitted at the Bell Deposition are various documents related to an East St. Louis City Council Resolution related to an expanded 126.3-acre urban renewal project in the South End and encompassing much of the "subject neighborhood" identified as "Denverside Area 'A'". The project area map is shown below.



The map shows an expansion of the smaller project area initially proposed by the Denverside Improvement Association, Inc. and discussed in the 1966 Southern Illinois housing study. The 1978 City Council Resolution stated that the "Project Area" on the map has been determined to a "slum, blighted and decadent area and it is detrimental and a menace to the safety, health, and welfare of the inhabitants and users thereof and of the Locality at large . . ."

The first four stated objectives of the plan were the following:

"(1) Removal of all structurally substandard buildings.

(2) Elimination of improperly located buildings, including those fronting on alleys and on excessively narrow lots.

(3) Elimination of 'shot-gun' houses and other obsolete building types."

(4) Provision of cleared land for low and medium housing."[95]

---

[95] Redevelopment Guidelines and Information and Denverside (R-104) Urban Renewal Area, page 2.



It then stated that the plan would be accomplished as follows: "Land will be acquired and cleared of substandard and blighting buildings, replatted where sound development is inhibited by parcels of inadequate size, and sold for reuse for private redevelopment and public facilities." [96]

Exhibit 20 submitted at the Bell Deposition is a June 1980 story in the *News-Democrat* (Belleville, Illinois) entitled "Abandoned buildings razed" that confirmed that the demolition of homes in the South End in accordance with the urban renewal plans was underway. It stated that "through a county program, abandoned buildings the county has taken a tax deed to for non-payment of taxes are being demolished." . . . "another 30 eyesores in the Lansdowne section of the city will be cleared by the end of July.

### 7.5   The Bell Report Does Not Consider Condition of the Streets or Sewers in the Subject Neighborhood When Assigning a Value of $140,000 to Each of His Imaginary Homes

The 1978 Urban Renewal Plan recognized the need to construct new streets and sewer infrastructure in the subject neighborhood.[97]

The terrible condition of the streets and sewers in the subject neighborhood was confirmed by the testimony of Doreen Hoosman at her deposition.  When asked about the condition of the streets in that neighborhood between 1952 and 1968 when she was living there, she had the following comments:

- "You have to realize during that time – excuse me – roads wasn't constructed like they are constructed now.  If they got anything, they got, like tar and rocks.  So I don't know if you consider that a natural street or a development of a street." Hoosman Deposition, page 85, lines 14-18)

- When the Denverside apartment development was constructed in the 1970s, "they started doing what you call streets because they had to do a lot of sewer lines to develop those apartments out there." (Hoosman Deposition, page 86, lines 3-5)

- "Q. Okay.  And so what you're saying is when those apartments were put in, they put proper streets down?

  A. O, yeah.

  Q. All through the neighborhood?

  A. (Witness nods head.)

  Q. When I was a kid it was chat and rock. When they start developing, you've got to realize they did a whole development in the south end.  They took down all those shotgun houses and built real houses.  You know, a house used to be just one, two, three.  But they tore them all down and did a development out there.  So new streets came.  New sewers came. Everything came in the south end." (Hoosman Deposition, page 86, lines 13-24, page 87, Lines 1-2)

- "Sewer work had to be done on that and for those new homes.  Because you have to realize, there was a lot of cesspools in the south end.  There wasn't hookup to the sewer line.

---

[96] Redevelopment Guidelines and Information and Denverside (R-104) Urban Renewal Area, page 3.
[97] Section II of the urban renewal plan stated one "objective" of the plan was "[p]rovision of standard public works, including streets, gutters, curbs, sidewalks, sewers, and street lights."



Q. So they had an underground tank?

A. Yes

Q. All throughout that neighborhood?

A. Yes

Q. And those were dug up?

A. Yes.

Q. Okay.  All right.  So, basically, the whole neighborhood – the whole area was reconstructed sometime in the 1970s?

A. And the late 1960s." (Hoosman Deposition, page 88, lines 2-14)

Despite the work done in the late 1960s and 1970s to improve streets in some portions of the subject neighborhood, streets in other portions of the neighborhood were left to decay and deteriorate once the city acquired parcels in those areas.   As a result, many of the 273 subject properties are no longer served by serviceable roads, as Dr. Bell admitted at his deposition:

"Q. Now, with respect so some of these properties, we talked about those such as the one on the South End of the South End –

A. Correct.

Q. – that are no longer served by serviceable roads. In order for these parcel to be serving the purpose of supporting a single-family home, wouldn't the City have to rebuild these streets?

A. On the northern – the ones up north or south?

Q. South.

A. Well, we have talked about that.  There are streets there.  And today, they – they have been taken over by vegetation." (Bell Deposition, page 187, lines 20-25, p. 188, lines 1-8)

At his deposition (Bell Deposition, page 190, lines 4-13) Dr. Bell then stated that he was aware that the City of East St. Louis has estimated it would cost $500 million to rebuild the infrastructure of the neighborhood. He then said it is "reasonable" to conclude that the alleged PCB contamination in the subject neighborhood claimed to be associated with the Monsanto/Krummrich facility was the cause of the abandoned and deteriorated streets:

"The issue is that that area used to have streets, used to have infrastructure.  And but for the PCB contamination, it is a reasonable point of view that they would still have homes and still have infrastructure based upon the tax base of productive homes." (Bell Deposition, page 188, lines 20-25)

### 7.6  The Dates of the Urban Renewal Demolition Decisions by the City of East St. Louis Confirms that There Is No Connection Between Remediation of PCBs at the Monsanto Plant and "Blight" in the Subject Neighborhood

None of the urban renewal planning documents discussed include any type of mention of environmental issues related to the Monsanto plant or any of the other nearby industries that were later involved in investigation and remediation actions.



As indicated by the prior review of historic aerial photos, a large number of homes in the neighborhood had already been demolished by the 1950s and early 1960s. We estimated that there were only 100 homes on the 273 subject properties referenced in the Bell study as of 1952. During the 1960s and 1970s, more than 50 homes had been demolished, and as of late 1980s, only approximately 40 homes remained.

Our earlier discussion of the history of the Monsanto/Krummrich facility indicates the initial investigation of contamination issues at the plant began significantly later than the dates of the 1960 master plan and 1966 study describing the substandard housing conditions and the need for a major urban renewal project that would demolish large sections of the subject neighborhood. Among the important dates related to the Monsanto environmental investigation referenced earlier in this report are the following:

- The former Monsanto/Krummrich Site was not required to be investigated for contamination issues until after the enactment by Congress of the Resource Conservation and Recovery Act (RCRA) in 1976.

- In 1976, the USEPA reportedly collected 15 off-site soil samples from areas in the vicinity of the plant."[98] Our review of the maps included earlier in this report indicated that only three soil sampling sites were located within the City of East St. Louis and only two were within the far southern end of the subject neighborhood.

- The 1976 sampling results in the subject neighborhood were generally available to the public or referenced in any news or fact releases to the general public about the sampling.

- The next off-site soil sampling related to the Monsanto site did not occur until 2000 and appears from U.S. EPA maps to have been immediately south of the railroad tracks forming the southern end of the subject neighborhood and the attic dust sampling in the neighborhood was not done until 2008.

- In September of 1981, the Illinois Environmental Protection Agency (IEPA) "formed a Sauget Task Force to investigate past and present waste disposal activities in the area."[99]

- Monsanto first filed for a RCRA permit in November of 1980 and filed for an additional permit in June of 1985.[100]

- Between 1985 and 1987, the IEPA investigated 11 waste disposal sites in Sauget and Cahokia and at various locations along Dead Creek. The Monsanto/Krummrich site is not one of the lettered sites investigated in that initial 1985 to 1987 IEPA investigation since it was at that time already being investigated as a RCRA site.

All of that indicates that the demolition of homes in the 1940s, 1950s, 1960s, and 1970s was not related to PCB investigation and remediation involving the Monsanto/Krummrich site.

---

[98] Jorge Gonzalez, Lydia Feng, Anders Sutherland, Chris Waller, Helen Sok, Rob Hesse, and Paul Rosenfeld, "PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL," Science Direct, Procedia Environmental Sciences 4 (2011), 113-125, at p. 116.

[99] U.S. Environmental Protection Agency, "Community Involvement Plan: Sauget Area 1 and Area 2 Superfund Sites," May 2010, at page

[100] Description of Current Conditions, W.G. Krummrich Plant, Sauget, Illinois, DRAFT, August 1, 2000, submitted by Solutia to the United States Environmental Protection Agency, Region V, at p. 2-7.



### 7.7 Long Term Demographic and Economic Trend Data for East St. Louis Indicate that the Bell Report Claim that PCB Caused Neighborhood "Blight" Is Incorrect

The Addenda contains a timeline of economic events affecting the history of East St. Louis and various charts and graphs demonstrating a long-term loss of jobs and population in the City of East St. Louis as a whole. As indicated below, the population of East St. Louis began to decline in the 1950s long before there was any investigation of environmental issues associated with the Monsanto/Krummrich facility or any of the other industrial facilities in the Sauget area.



Similarly, employment and household income trends show that East St. Louis has suffered a long-term loss of jobs and income, especially when compared to the St. Louis metro area as a whole and St. Clair and Madison counties.







All of that is further evidence that the Bell Report claim that PCBs associated with the Monsanto/Krummrich plant has caused "blight" in the subject neighborhood is incorrect.



## 8. Case Study Analysis of Effect of Proximity to Contaminated Sites in Other Cahokia and East St. Louis Neighborhoods

### 8.1 Introduction to Case Study Analysis

"Case study" analysis is one of the generally accepted methods for determining the effect of contamination and environmental risks on property prices and values. The real estate appraiser looks to what has happened in other locations involving similar properties and similar environmental contamination and remediation situations to understand what has happened, or could happen, in the particular market in which the appraiser is working.

According to an article in *The Appraisal Journal*:

> "Generally, case studies are utilized when there is a lack of direct market data or where analyses of direct market data need additional support. For example, if the impact of a landfill on surrounding properties were being studied, the most pertinent approach would involve actual sales of the surrounding properties. In the event that no direct market data is available, the case studies approach utilizing market data derived of other landfill-proximate sales would become relevant. Although case studies are useful any time there is available and relevant data, they have a secondary role if there is direct market data available at the subject site."[101]

The 15th Edition, 2020, of *The Appraisal of Real Estate* published by the Appraisal Institute summarizes the importance of using "case studies" as part of an analysis of the possible effects of environmental contamination on prices and values as follows:

> "Environmental case studies are typically useful when a source site is being appraised or in a situation involving an impacted neighborhood or area where there are insufficient sales to understand the effect of the environmental issue on prices and values. Sales in another case study location involving a similar environmental situation are studied to estimate how the marketplace there responded to similar environmental issues. Typically that involves comparing sale prices in the impacted case study area to sale prices in a nearby similar, but unaffected, control area. The case study environmental situation is then compared to that of the impacted area using the relevant property characteristics identified in Advisory Opinion 9. Great care must be exercised when using paired data, case studies, and interviews because of the special conditions and characteristics of contaminated properties. Also, surveys need to be properly developed." (p. 188)

Although "analysis of environmental case studies" is one of the generally accepted techniques, it requires independent research and analysis rather than reliance on case studies developed by others. The real estate appraiser looks to what has happened in other locations involving similar properties and similar environmental situations in order to understand what has happened, or could happen, in the particular market in which the appraiser is working.

---

[101] Thomas Jackson, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal*, January 2002, as cited in Richard J. Roddewig, Editor, *Valuing Contaminated Property: An Appraisal Institute Anthology*, The Appraisal Institute, 2002, p. 275. See also, Randall Bell, *Real Estate Damages*, second edition, supra, pp. 32.



The following section contains two environmental case studies investigating sale prices in two other areas in East St. Louis and Cahokia in proximity to Superfund sites.

The two areas are as follows:

- The portion of Cahokia adjacent to Dead Creek in the Sauget Area 1 Superfund Site.

- The area surrounding the North Alcoa Superfund Alternative Site in East St. Louis.

### 8.2  Local Market Area Case Study Analysis of the Neighborhood Adjacent to the Dead Creek Superfund Site in Cahokia

Areas along Dead Creek, an approximately 3.5-mile stream beginning at the southern edge of the subject neighborhood and then running southwest towards the Mississippi River, began to be investigated by the Illinois Environmental Protection Agency in 1985 to 1987. Six Creek Segments along Dead Creek were included as part of the Sauget Area 1 Superfund Site investigation and remediation, as indicated in the map below.[102]



*This map shows the segments of Dead Creek where contaminated sediment was removed.*

The U.S. EPA investigation of the contamination situation affecting Dead Creek began in 1990 and the cleanup at the six locations along a 3.22-stretch of the creek from Queeny Avenue in Sauget to Cargill Road in Cahokia began in 1999 and was completed by 2008. The investigation and testing along Dead Creek found "higher concentrations of pollutants such as metals, volatile organic compounds (VOCs), semivolatile organic compounds and PCBs."[103] The remediation involved removal of contaminated soil and creek sediments at various locations and a

---

[102] United States Environmental Protection Agency, Dead Creek Cleanup Done; EPA Issues Final Report, Sauget Area 1 Superfund Site, Sauget, Illinois, January 2010.

[103] United States Environmental Protection Agency, Dead Creek Cleanup Done; EPA Issues Final Report, Sauget Area 1 Superfund Site, Sauget, Illinois, January 2010.



"containment cell was constructed in Sauget Area 1, next to Judith Lane, to hold the contaminated sediment."[104]

As part of the process of cleaning up Dead Creek, "soil samples were taken in the yards of a number of homes next to the creek and in the creek floodplain."[105]  Through a community outreach program, "in August 2001, residents were assured by the EPA that, based on the results of this [yard] sampling, the soil at area homes posed no risk to human health or the environment from flooding in the creek."[106]

Work was also done to improve surface water drainage into and out of Dead Creek. Sampling of water in Dead Creek as of 2010 indicated the creek was "safe for wading."[107] Groundwater beneath Segments A and B at the north end of the creek continued to be contaminated as of 2010 due to proximity to nearby landfills that were part of the Sauget Area 1 Superfund site.

In 2010, the USEPA declared the Dead Creek cleanup program completed but "an inspection, maintenance and ground water monitoring program" related to the containment cell at Judith Lane was to remain in effect indefinitely.[108]  The photo below is a Google map image screen capture dated June of 2022 showing the containment area at Judith Land and Dead Creek.



The photo below is from the 2010 USEPA report detailing the completion of the Dead Creek cleanup program.

---

[104] United States Environmental Protection Agency, *Dead Creek Cleanup Done; EPA Issues Final Report*, Sauget Area 1 Superfund Site, Sauget, Illinois, January 2010, at p. 2.
[105] United States Environmental Protection Agency, *Dead Creek Cleanup Done; EPA Issues Final Report*, Sauget Area 1 Superfund Site, Sauget, Illinois, January 2010, at p. 3.
[106] United States Environmental Protection Agency, *Dead Creek Cleanup Done; EPA Issues Final Report*, Sauget Area 1 Superfund Site, Sauget, Illinois, January 2010, at p. 3.
[107] United States Environmental Protection Agency, *Dead Creek Cleanup Done; EPA Issues Final Report*, Sauget Area 1 Superfund Site, Sauget, Illinois, January 2010, at p. 3.
[108] United States Environmental Protection Agency, *Dead Creek Cleanup Done; EPA Issues Final Report*, Sauget Area 1 Superfund Site, Sauget, Illinois, January 2010, at p. 4.





*A view of Dead Creek Segment C between Judith Lane and Cahokia Street in Cahokia.*

### 8.3   Paired Sales Analysis of the Dead Creek Area Compared to Cahokia

The map below shows the neighborhood on either side of the Dead Creek portion of the Sauget Area 1 Superfund Site where we have investigated home prices that occurred between 2002 and 2023.



The dates in time and the status of the Dead Creek investigation and remediation were as follows:

- **2003** – This was two years after soil sampling had been done in yards in the Dead Creek area but was during the time of "active remediation."



- **2010** – Remediation activities along Dead Creek were completed in 2008 and in 2010 the U.S. EPA issued a report indicating cleanup had been completed. An inspection and monitoring program was going to continue, however, related to the dredge spoil containment cell at Judith Lane.
- **2017** -- This date is nine years after the completion of the Dead Creek cleanup, and after seven years of ongoing monitoring, a sufficient time period to determine if there was any ongoing effect on prices in the neighborhood on either side of the creek.

We compared the three sales of properties in the Dead Creek neighborhood with pairings of comparables in Cahokia not located in close proximity to Dead Creek. Adjustments were made to the Cahokia sales to account for differences in such factors: (1) date of sale; (2) date of construction; (3) living area; (4) lot area; (5) number of bathrooms; (6) number of garage spaces; and (7) presence of a basement.

The results of the comparisons are summarized below. The adjustment grids are included in the report addenda.

| Dead Creek Property Address | Pairing No. | Result of Matched Pairs Analysis | | |
|---|---|---|---|---|
| Sale No. 2: 33 School Street | Pairing No. 2A | | -0.30% | **2003** |
| | Pairing No. 2B | | -19.41% | **2003** |
| | Pairing No. 2C | | -14.05% | **2003** |
| | | **Average** | **-11.25%** | |
| | | **Median** | **-14.05%** | |
| | | | | |
| Sale No. 3: 15 Gloria Street | Pairing No. 3A | | -18.55% | **2010** |
| | Pairing No. 3B | | 13.73% | **2010** |
| | Pairing No. 3C | | 7.95% | **2010** |
| | | **Average** | **1.04%** | |
| | | **Median** | **7.95%** | |
| Sale No. 1: 3401 Barber Street | Pairing No. 1A | | -11.16% | **2017** |
| | Pairing No. 1B | | 10.68% | **2017** |
| | Pairing No. 1C | | 14.51% | **2017** |
| | Pairing No. 1D | | 14.56% | **2017** |
| | Pairing No. 1E | | 13.72% | **2017** |
| | | **Average** | **8.46%** | |
| | | **Median** | **13.72%** | |

The matched pairs analysis indicates that in 2003 during investigation and remediation of Dead Creek there was an impact on the price of the property at 33 School Street in the Dead Creek neighborhood. The impact on price indicated by the pairings was between less than -1.0% and -14% with an average of approximately -11%. By 2010, however, after completion of the remediation, only one of the three pairings indicated an impact on price from location in the neighborhood adjacent to Dead Creek. When all three 2010 pairings are considered, however, there was no adverse impact, indicating that the temporary impact during active remediation had ended. The third paired sales comparison indicates no adverse impact during the seven years of ongoing monitoring of the Dead Creek contamination situation by the U.S. EPA after the 2010 announcement that remediation had been completed.



### 8.4 There Has Been No Significant Abandonment and Demolition of Homes in the Cahokia Neighborhood Adjacent to the PCB Remediation Project in the Dead Creek Portion of the Sauget Area 1 Superfund Site

Despite the "presence of PCBs" in the neighborhood adjacent to the Dead Creek portion of Sauget Area 1 Superfund Site there are only a limited number of vacant lots in the neighborhood. For example, the Google satellite map below shows 71 properties along David Street, School Street, and Barber Street in the neighborhood immediately adjacent to Dead Creek and located closest to Dead Creek Segment C.  Despite the Dead Creek investigation and remediation, the Google satellite view map indicates only five vacant lots.



Other portions of the neighborhood adjacent to Dead Creek have similar overall ratios of vacant to improved lots.[109]  For example, the map below shows the neighborhood encompassing Judith Lane and Walnut Street.  It is located immediately to the east of the containment for contaminated sediments and the most actively remediated and channelized portion of Dead Creek.  Of the total of 45 properties along those streets, there are only four or five vacant lots.

---

[109] Some of the neighborhoods in our Dead Creek case study area, for example along Edwards Street and Kinder Street on the east side of Dead Creek, have higher numbers of vacant lots as a percentage of total properties along the streets while other streets, such as Gloria, Hissrich, and Edgar streets have fewer vacant lots as a percentage of the total properties.  The higher number of vacant lots on Edwards Street could be due to the junk yard located behind the homes on the north side of the street. We did not include the mobile/manufactured home park on Circle Lane in our neighborhood analysis.





If the presence of PCB contamination in or adjacent to a neighborhood was a cause of "blight", we would have expected to see a higher percentage of vacant lots in our Dead Creek case study area.



### 8.5 Local Market Area Case Study Analysis of the Alcoa Superfund Alternative Site and Its Contamination Situation

The approximately 400-acre Alcoa Properties Superfund site in East St. Louis is located on an irregularly shaped site bounded by North 29th Street on the west; Louisiana Boulevard/Lake Drive on the north; A&S Railway property and tracks on the east; and Missouri Avenue on the south. The ALCOA site is approximately two miles east/northeast of the Bell subject neighborhood.

The map below provides an overview of the North Alcoa Superfund Alternative Site and surrounding area.



The former Alcoa aluminum production (refinery) facility was in operation for more than 50 years, starting in the early 1900s. The U.S. EPA website for Superfund sites in Illinois indicates the following information about the site:[110]

- Aluminum refinery (smelting) operations involving bauxite ore began at the site in 1902.

- The plant operated until the late 1950s but by the mid-1950s, most production facilities had been demolished and the property sold.

- The plant ceased all operations by 1963.[111]

---

[110] Source: U.S. EPA website summarizing Superfund (or Superfund alternative) sites located in Illinois. https://www.epa.gov/superfund-redevelopment/superfund-sites-reuse-illinois

[111] *CERCLA Redevelopment Assessment* (LPC# 1630450035). (1997). State of Illinois Environmental Protection Agency.



- The residue remaining after the extraction process (known as "red mud" and after further processing, known as "brown mud") was disposed at the edges of the former Pittsburgh Lake, north of Missouri Avenue.

- Later, Alcoa developed residue disposal areas (RDAs) at the site that were contained within gypsum berms, to prevent the red and brown mud from migrating away from the disposal areas.[112]

## 8.6 The Alcoa Superfund Alternative Site: IEPA and U.S. EPA Investigation and Remediation

The IEPA and City of East St. Louis began conducting a variety of site inspections and investigations in 1979 at the Alcoa site when many drums were documented to be located at the site (formerly part of United Steel Drum recycling facility). By 1987, after investigations, inspections, and legal proceedings were conducted, a Consent Agreement between the Illinois Attorney General's Office and United Steel Drum was signed, requiring them to remove the drums from the site and conduct soil sampling. In the late 1990s, a portion of the former Alcoa property was covered with soil.

In the beginning of 1996, the IEPA in cooperation with the U.S. EPA, began efforts on a CERCLA Redevelopment Assessment of the Alcoa Site to identify potential areas of concern and provide information to current and prospective market participants. In field investigations, the IEPA collected 118 soil and 9 groundwater samples resulting in identifying six potential areas of contamination on the site.[113]

Between 1996 and 2000, the Illinois Environmental Protection Agency (IEPA) in cooperation with the U.S. Army Corps of Engineers investigated portions of the former Alcoa site. Soil and groundwater samples were taken and multiple hazardous materials on the site were found including lead, chromium, cadmium, cyanide, and arsenic and raised concerns about releases into the air, water, and soil.

Environmental investigation of the site by the U.S. EPA in cooperation with the IEPA reportedly began in 2001 and continued through 2003 when the U.S. EPA announced the beginning of its formal remedial investigation and feasibility study process at a public meeting at the East St. Louis City Hall in September 2003.  The site has not been formally added to the NPL (Superfund Site) list but is being investigated and remediated through the EPA's Superfund Alternative Approach

---

[112] REVISED - Supplemental Remedial Investigation Work Plan. (2015). In *Operable Unit No.2 North Alcoa Site East St. Louis, Illinois*. Tetra Tech. https://semspub.epa.gov/work/05/950559.pdf

[113] *CERCLA Redevelopment Assessment* (LPC# 1630450035). (1997). State of Illinois Environmental Protection Agency.



(SAA) program.[114]  Key components of the ongoing investigation and remediation as described by the U.S. EPA are as follows:[115]

- The U.S. EPA divided the site into three operable units (OUs). Cleanup at OU-1 addressed smelting waste and soil.

- Operable Unit 1, or OU-1 contains about 200 acres and encompasses the main portion of the site where bauxite residue processing waste was disposed.

- Cleanup of OU2 involved soil contamination and groundwater water contamination was the principal focus of the cleanup at OU3.

- Following the initial involvement of the U.S. EPA in in 2001, testing and formation of environmental remedial action plans continued for several years with announcement of the first of three remedial action plans in 2012.

- Following a period of design (2013) implementation of the first phase (OU-1) of cleanup started in February 2014[116] with cleanup completed in September 2016.[117] [118]

- The OU-1 remediation included capping the former residue waste disposal area with two feet of clean fill to contain the contamination and regrading the area to create slopes that would direct stormwater drainage to basins.

- Portions of the North Alcoa site are considered for installation of a solar farm installation in late 2014/early 2015.[119]

- Following completion of the OU-1 cleanup in 2016, a remedial plan for OU-2 was designed during the years between 2017 and 2022.

- Operable Unit 2, or OU-2, includes the remaining 200 acres which consists of a mixture of commercial properties along Missouri Avenue and commercial properties and former ball field recreational areas located along 29th Street. A church and several residential properties located along the northwest boundary of OU-2 along Louisiana Drive were also involved in the investigation and remediation of OU-2.

---

[114] U.S. EPA website summarizing Superfund (or Superfund alternative) sites located in Illinois. https://www.epa.gov/superfund-redevelopment/superfund-sites-reuse-illinois   The SAA approach is described by the U.S. EPA as follows: "Beginning in the 1990s, situations arose where PRPs, communities, or States preferred that a site be addressed without listing it on the NPL. At some of these sites that were eligible for the NPL, but not listed, PRPs were willing to enter into CERCLA agreements to perform site cleanup with EPA oversight. EPA determined that, as a policy matter, such agreements would be appropriate in circumstances where specific criteria are met." Initially known as the "NPL-equivalent approach," the name was changed to the Superfund Alternative Approach (SAA) in 2002.  The goal is to reach agreements with responsible parties for remediations "that meet the same cleanup standards as if the siter were listed on the NPL and for timely and enforceable action." https://www.epa.gov/sites/default/files/documents/rev-saa-2012-mem.pdf

[115] U.S. EPA website summarizing Superfund (or Superfund alternative) sites located in Illinois. https://www.epa.gov/superfund-redevelopment/superfund-sites-reuse-illinois

[116] A consent decree governing the OU-1 cleanup was approved in February 2014 by the U.S. District Court requiring remediation work costing $24.9 million to address 3 million cubic yards of contamination soil at that location.

[117] Under EPA oversight, Alcoa, the City of East St. Louis and the Alton and Southern Railroad completed construction of the OU1 selected remedy on September 27, 2016. This represented the first of several phases of cleanup.

[118] https://www.epa.gov/enforcement/consent-decree-north-alcoa-superfund-site-rdra-cd

[119]https://www.stlpr.org/economy-business/2015-03-18/solar-farm-in-east-st-louis-would-require-state-legislation



- Contaminants of concern in OU-2 include "arsenic, aluminum, lead, and radium isotopes 226 and 228." [120]

- In December of 2016, Alcoa conducted radon gas testing at four residences located in the IB-5a section of OU-2 located along Louisiana Boulevard. The testing was undertaken because "of the presence of bauxite waste material, which contains radium, within on-Site residential property subsurface soils." One residence had a radon measurement at a level in an unfinished basement and was offered a radon mitigation system "but the homeowner declined the offer." [121]

- The Record of Decision plan approved for OU-2 in June of 2020 includes soil excavation, installation of a soil cover, reassessment of existing stormwater runoff controls, revegetation, institutional controls and continued monitoring of indoor radon levels for homes along Louisiana Boulevard. The homes along Louisiana Boulevard inside OU-2 would have their soil tested and, depending on test results, have two feet of soil removed and the properties backfilled with clean soil. [122]

- The OU2 remedy construction began in fall 2022 and, although initially anticipated to be completed in fall 2023, the remediation of OU-2 is ongoing and is now estimated to be finished in the fall of 2026.[123] In late 2023, the Second Five Year Report states, the residential properties on Louisiana Boulevard have had soil excavated, removing bauxite waste from the properties in IB-5a and consolidated in IB-4a. However, one residential property has refused access to the property. EPA plans to monitor the circumstances of the property for the next two years.

- OU-3 involves groundwater contamination and "EPA plans to issue a Proposed Plan for the final remedial action for OU3 in 2026."

The location of operable units OU-1 and OU-2 are indicated on the map below.

---

[120] https://semspub.epa.gov/work/05/958367.pdf
[121] https://semspub.epa.gov/work/05/958367.pdf
[122] https://semspub.epa.gov/work/05/958367.pdf
[123] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.schedule&id=0508010



**NORTH ALCOA SITE MAP**



### 8.7  Timeline Related to Public Notice and Awareness about the Alcoa Superfund Alternative Site and the Contamination and Investigation and Remediation Situation

Notable events concerning general public awareness surrounding the North Alcoa Superfund Alternative Site may be summarized as follows:

| Timeline Related to Alcoa Superfund Alternative Site Investigation & Remediation | |
|---|---|
| **1997** | Site investigation by the IEPA begins and continues through 2003. |
| **September 2003** | U.S. EPA announces beginning of its formal remedial investigation and feasibility study process at a public meeting at the East St. Louis City Hall. |
| **April 17, 2012** | The U.S. EPA holds a public meeting is held at the East St. Louis City Hall to present the Proposed Plan for remediation of OU-1 and to solicit community input. |
| **Mid-2012** | Initial remediation plans and documents pertaining to OU-1 were made available to the public. The notice of availability for these documents were published in the *Belleville New Democrat* and *East Saint Louis Monitor*.[124] |
| **April to June 2012** | Extensive public comment is received on the Proposed Plan and the 30-day period for public comment is extended to June of 2012.[125] |
| **June 7, 2012** | A follow-up public/community meeting is held at the East St. Louis Public Library. |

---

[124] https://semspub.epa.gov/work/05/410969.pdf
[125] https://semspub.epa.gov/work/05/410969.pdf



| | |
|---|---|
| **2012** | The U.S. EPA conducts a "door to door neighborhood outreach" and compiled a list of approximately 20 neighborhood churches and community organizations that is used by the U.S. EPA for additional outreach to the public related to the ongoing investigation and remediation.[126] |
| **December 2016** | Alcoa conducts radon gas testing at four residences located in the IB-5a section of OU-2 located along Louisiana Boulevard. Alcoa offers to install a radon mitigation system in one home but the homeowner declines the offer. Alcoa announces it will continue to monitor those homes for radon subject to obtaining access agreements with the homeowners. [127] |
| **2019** | Prior to a December public meeting on the Proposed Plan for OU-2, the U.S. EPA "updated the OU1 community outreach efforts placing additional area residents on the Site mailing list." [128] |
| **December 2, 2019** | U.S. EPA releases the Proposed Plan for OU-2 to the public. |
| **December 12, 2019** | The IEPA holds afternoon and evening public meetings at St. Matthew Baptist Church in East St. Louis related to the proposed plan for OU-2. The church is located along Louisiana Boulevard at the edge of OU-2 and is one of the sites that will be investigated as part of the proposed OU-2 remedy.  Approximately 30 people attend the afternoon session and 50 people attend the evening public meeting and hearing. [129] |
| **December 2019** | The additional U.S. EPA efforts in 2019 related to community outreach efforts "did not go unnoticed by the community, as attendees at the December 2019 Proposed Plan public meeting acknowledged the significant increase in attendance from previous public meetings and expressed support for EPA's efforts." [130] |
| **December 2019** | All documents related to the Proposed Plan for OU-2 are made available at the East St. Louis City Hall and the Public Library.  A notice of availability of the plan documents is published in the *Belleville News Democrat* and the *East St. Louis Monitor*.[131] |
| **January 5, 2020** | The 30-day comment period on the Proposed Plan for OU-2 is extended for another 60 days to March 5, 2020. |
| **March to June 2020** | One of the comments to the Proposed Plan asks if the homes along Louisiana Boulevard in OU-2 with soil contamination issues could be acquired by Alcoa in order to avoid future exposure to contamination issues.  The U.S. EPA responded in the published Record of Decision that consideration of the possible need to acquire properties "is premature" but that nothing "precludes the PRPs [potentially responsible parties] and impacted property owners from discussing at any time, buyouts and relocation" and that it is the EPA's "understanding that Alcoa is already engaged in some of these discussions." [132] |
| **June 26, 2020** | The U.S. EPA releases its "Record of Decision" for OU-2. It recommends investigation of the soils at the homes located along Louisiana Boulevard inside OU-2 and, if necessary as a result of the investigation, removal of soils to a depth of two feet and replacement with clean soil.[133] |
| **2021 to 2022** | Investigation of the soil situation related to the homes on Louisiana Boulevard in OU-2 results in Alcoa purchasing and demolishing two of the homes. |

[126] https://semspub.epa.gov/work/05/958367.pdf
[127] https://semspub.epa.gov/work/05/958367.pdf
[128] https://semspub.epa.gov/work/05/958367.pdf
[129] https://semspub.epa.gov/work/05/958367.pdf
[130] https://semspub.epa.gov/work/05/958367.pdf
[131] https://semspub.epa.gov/work/05/958367.pdf
[132] https://semspub.epa.gov/work/05/958367.pdf
[133] https://semspub.epa.gov/work/05/958367.pdf



## 8.8   The Study Area Adjacent to the Alcoa Superfund Alternative Site

JLL analyzed sales between mid-2002 and 2023 of homes in the residential neighborhood located immediately north and west of the Alcoa Superfund Alternative Site. The map below includes approximate locations for the North Alcoa site, the adjacent residential neighborhood area studied and the Bell subject neighborhood. That area was selected, in part, because it is closest to the OU-2 portion of the Alcoa Superfund Alternative Site where some homes along Louisiana Boulevard were tested for soil and radon contamination and where community concerns about potential offsite contamination was the greatest as indicated by comments at the public meetings.



Sales prices in a "study area" portion of the neighborhood located in closest proximity to the Superfund Site were compared to sales in the same neighborhood located a few blocks further from the Superfund Site.



The map below shows the boundaries of the study area and control area.



The "study area" is located within approximately one-half mile from the northern boundary of the Alcoa Superfund Alternative Site.  The northern boundary of the study area is Belmont Avenue, and the study area is bounded on the west by N. 25th Street and on the east by the railroad corridor.

Size of the houses in the study area ranged from 616 square feet to 2,900 square feet. The homes are typically of mix of wood-frame construction with full or partial brick veneer, wood or vinyl/aluminum siding.  Construction dates ranged from 1893 to 2006. Condition was highly variable, ranging from fair condition for most homes to poor condition of several older structures of marginal construction quality.

The "control area" includes homes located immediately north and west of the study area and surrounds the study area. Control area boundaries are St. Clair Avenue on the north and the Illinois Subdivision Transfer railroad tracks on the west.

Home sizes in the control area sales ranged from 625 square feet to 2,084 square feet. Construction dates ranged from 1900 to 1997 and were of similar construction to those in the study area. Likewise, there was considerable variability in conditions of the homes in the control area, ranging from fair condition of newer homes to several older structures of marginal construction quality and very poor condition

### 8.9   Analysis of Sale Prices in the "Study Area" and the "Control Area"

JLL staff reviewed and analyzed the database of sales in the study and control area. were downloaded from the MARIS MLS database.  Sale transactions between 2002 and 2023 were analyzed and comparisons made between volume of sales, sale price, price per square foot of building area, time on the market, and other factors.

A total of 267 sales were available for analysis.  We identified 108 sales within the study area and 151 sales in the control area.



Maps showing the location of the sales within their respective areas are shown below.

**Study Area Sales**                    **Control Area Sales**



The table below compares the physical characteristics of the homes, the average number of sales per year, average home price, and average price per square foot.  sold in the two areas studied. As indicated in that table, homes sold in the two areas are similar in both physical traits as well as market pricing, as observed during the five-year timeframe (2003 to 2007 time period) preceding the Great Recession.

<span style="color:red">Local Market Case Study -- Alcoa Superfund Site</span>

**A Comparison of Housing Market Characteristics**

|  | Alcoa Superfund - *Study* Area | Alcoa Superfund - *Control* Area |
|---|---|---|
| Home size (avg. sq. ft.) | 1,209 | 1,126 |
| Year built (avg.) | 1932 | 1929 |
| Bedrooms (avg.) | 2.6 | 2.5 |
| Bathrooms (avg.) | 1.4 | 1.3 |
| No. of sales per year | 4.9 | 6.9 |
| Total no. sales in case study analysis | 108 | 151 |
| Avg. home price (2003-2007) | $27,100 | $24,400 |
| Avg. home price per sq. ft. (2003-2007) | $23.70 | $22.20 |

*For clarity, the displayed sales prices are rounded to nearest hundreds and tenths positions, respectively.

As indicated in the table above, during this pre-recession time period of 2003 to 2007, prices paid for houses in the study area averaged $27,100 and $23.70 per square foot, very similar to those recorded for sales in the control area that averaged $24,400 on a nominal basis, and $22.20 per square foot.



The table to the right presents the 108 sales in the study area by year, and includes the number sold per year, the average selling price, building size, price paid per square foot, year built, days on market (DOM), and sale to list price ratio.

In the years 2012 through 2015 there were a total of only two sales. Perhaps relatedly, this time period corresponds with the period of general public awareness and implementation of the initial remedial efforts.

The number of sales varies from a low of zero to a high of 15 in 2007. To account for this, we have also considered two-year interval periods.

The table below takes this same group of study area sales and collapses the data into two-year periods.

**Alcoa Superfund - Study Area**

| Year | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|---|---|---|---|---|---|---|---|
| 2002 | 4 | 24,388 | 20.24 | 1935 | 1,193 | 27 | 0.839 |
| 2003 | 6 | 15,642 | 12.92 | 1936 | 1,121 | 123 | 0.892 |
| 2004 | 9 | 22,254 | 21.38 | 1926 | 1,009 | 562 | 0.896 |
| 2005 | 11 | 35,164 | 31.40 | 1932 | 1,118 | 115 | 0.878 |
| 2006 | 14 | 34,408 | 31.04 | 1936 | 1,137 | 106 | 0.917 |
| 2007 | 15 | 21,893 | 16.90 | 1931 | 1,185 | 62 | 0.852 |
| 2008 | 8 | 32,038 | 17.84 | 1946 | 1,600 | 98 | 0.839 |
| 2009 | 6 | 13,683 | 12.16 | 1920 | 1,098 | 97 | 0.790 |
| 2010 | 4 | 11,125 | 8.49 | 1933 | 1,309 | 9 | 1.084 |
| 2011 | 5 | 17,120 | 14.18 | 1932 | 1,270 | 70 | 0.857 |
| 2012 | 1 | 8,000 | 6.14 | 1923 | 1,302 | 32 | 0.808 |
| 2013 | 0 | - | - | - | - | - | - |
| 2014 | 1 | 6,800 | 3.40 | 1962 | 1,998 | 139 | 0.907 |
| 2015 | 0 | - | - | - | - | - | - |
| 2016 | 4 | 16,850 | 13.57 | 1913 | 1,095 | 93 | 1.010 |
| 2017 | 3 | 7,802 | 7.66 | 1939 | 1,014 | 28 | 1.038 |
| 2018 | 4 | 18,600 | 18.09 | 1937 | 1,658 | 62 | 0.967 |
| 2019 | 2 | 33,000 | 27.45 | 1944 | 1,209 | 189 | 1.002 |
| 2020 | 3 | 16,333 | 13.31 | 1928 | 1,229 | 15 | 0.904 |
| 2021 | 2 | 62,250 | 42.04 | 1960 | 1,651 | 87 | 0.859 |
| 2022 | 2 | 19,250 | 22.47 | 1923 | 928 | 12 | 0.972 |
| 2023 | 4 | 39,250 | 32.27 | 1918 | 1,208 | 97 | 0.915 |

**108**

**Alcoa Superfund - Study Area**

| 2 Year Period | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|---|---|---|---|---|---|---|---|
| 2002-2003 | 10 | 19,140 | 15.85 | 1936 | 1,150 | 84 | 0.871 |
| 2004-2005 | 20 | 29,354 | 26.89 | 1929 | 1,069 | 316 | 0.886 |
| 2006-2007 | 29 | 27,935 | 23.73 | 1933 | 1,161 | 83 | 0.883 |
| 2008-2009 | 14 | 24,171 | 15.41 | 1935 | 1,385 | 97 | 0.818 |
| 2010-2011 | 9 | 14,456 | 11.65 | 1933 | 1,287 | 43 | 0.958 |
| 2012-2013 | 1 | 8,000 | 6.14 | 1923 | 1,302 | 32 | 0.808 |
| 2014-2015 | 1 | 6,800 | 3.40 | 1962 | 1,998 | 139 | 0.907 |
| 2016-2017 | 7 | 12,972 | 11.04 | 1924 | 1,060 | 65 | 1.022 |
| 2018-2019 | 6 | 23,400 | 21.83 | 1939 | 1,479 | 104 | 0.978 |
| 2020-2021 | 5 | 34,700 | 24.80 | 1941 | 1,397 | 44 | 0.886 |
| 2022-2023 | 6 | 32,583 | 29.00 | 1920 | 1,115 | 69 | 0.934 |

**108**



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

**Alcoa Superfund - Control Area**

| Year | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|------|-----|-----------|-------------------|-----------|--------------|-----|--------------------|
| 2002 | 5 | 16,780 | 17.78 | 1941 | 939 | 1,143 | 0.799 |
| 2003 | 13 | 23,023 | 21.55 | 1930 | 1,109 | 75 | 0.881 |
| 2004 | 13 | 19,254 | 18.84 | 1931 | 1,049 | 60 | 0.874 |
| 2005 | 14 | 23,120 | 22.18 | 1923 | 1,049 | 101 | 0.828 |
| 2006 | 16 | 32,394 | 26.71 | 1932 | 1,187 | 59 | 0.851 |
| 2007 | 11 | 22,245 | 20.69 | 1924 | 1,018 | 136 | 0.876 |
| 2008 | 7 | 27,800 | 21.46 | 1932 | 1,208 | 71 | 0.858 |
| 2009 | 6 | 11,055 | 7.71 | 1925 | 1,303 | 68 | 0.888 |
| 2010 | 9 | 12,117 | 9.33 | 1927 | 1,266 | 63 | 0.839 |
| 2011 | 6 | 13,750 | 12.87 | 1939 | 1,070 | 86 | 0.687 |
| 2012 | 4 | 10,350 | 8.78 | 1941 | 1,137 | 52 | 0.881 |
| 2013 | 9 | 7,625 | 6.75 | 1928 | 1,095 | 60 | 0.785 |
| 2014 | 7 | 7,218 | 7.69 | 1921 | 1,145 | 43 | 1.055 |
| 2015 | 1 | 45,000 | 25.52 | 1907 | 1,763 | 46 | 0.902 |
| 2016 | 6 | 10,883 | 9.36 | 1928 | 1,168 | 53 | 1.006 |
| 2017 | 1 | 6,000 | 9.60 | 1951 | 625 | 56 | 1.000 |
| 2018 | 5 | 19,756 | 16.60 | 1930 | 1,117 | 138 | 0.940 |
| 2019 | 1 | 19,000 | 17.84 | 1915 | 1,065 | 466 | 0.974 |
| 2020 | 3 | 5,544 | 6.08 | 1934 | 884 | 86 | 0.865 |
| 2021 | 5 | 31,200 | 26.87 | 1924 | 1,219 | 98 | 0.957 |
| 2022 | 5 | 29,400 | 27.55 | 1929 | 1,077 | 59 | 0.884 |
| 2023 | 4 | 31,863 | 22.14 | 1940 | 1,411 | 27 | 0.998 |

**151**

The table shown on the left presents the 151 sales in the control area by year, and includes the number sold per year, the average selling price, building size, price paid per square foot, year built, days on market (DOM), and sale to list price ratio.

The number of sales in the control area varies from a low of one sale (2015, 2017, 2019) to a high of 16 in 2006.

Similar to the study area, we also consider the control area data on a two-year basis.

The table below takes this group of sales and collapses the data into two-year periods.

**Alcoa Superfund - Control Area**

| 2 Year Period | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|---------------|-----|-----------|-------------------|-----------|--------------|-----|--------------------|
| 2002-2003 | 18 | 21,289 | 20.50 | 1933 | 1,062 | 372 | 0.859 |
| 2004-2005 | 27 | 21,259 | 20.57 | 1927 | 1,049 | 81 | 0.850 |
| 2006-2007 | 27 | 28,259 | 24.26 | 1929 | 1,119 | 91 | 0.861 |
| 2008-2009 | 13 | 20,071 | 15.12 | 1929 | 1,252 | 70 | 0.872 |
| 2010-2011 | 15 | 12,770 | 10.74 | 1932 | 1,188 | 73 | 0.778 |
| 2012-2013 | 13 | 8,463 | 7.37 | 1932 | 1,108 | 57 | 0.815 |
| 2014-2015 | 8 | 11,941 | 9.92 | 1919 | 1,222 | 43 | 1.035 |
| 2016-2017 | 7 | 10,186 | 9.40 | 1931 | 1,091 | 54 | 1.005 |
| 2018-2019 | 6 | 19,630 | 16.80 | 1927 | 1,109 | 192 | 0.945 |
| 2020-2021 | 8 | 21,579 | 19.07 | 1928 | 1,094 | 93 | 0.922 |
| 2022-2023 | 9 | 30,494 | 25.14 | 1934 | 1,226 | 45 | 0.935 |

**151**



The first graph below presents a time-series relationship between the *nominal prices* paid in the two comparative areas between 2002 and 2023, displayed on a two-year period interval. The second graph below presents the time-series relationship between the prices paid *per square foot of house area* in the two areas.





The years between 2003 and 2012, the Alcoa site was in the initial "assessment" stage of the remediation lifecycle.  An initial public meeting was held in 2003 to inform the public generally concerning the investigation and possible remediation that would be needed at the site.



As the graphs indicated, prices went up in 2003 and 2004 in the study area immediately adjacent to the site compared to the control area. Both the study area and the control area were affected by the Great Recession that began in 2007 and lasted until 2009. Both areas were hard hit by the Great Recession that devastated home prices nationally.

However, the bi-yearly tables and graphs also show that prices between the control and study areas tracked closely with each during the eight year "assessment stage" when the U.S EPA was investigating the contamination the situation and developing a remediation plan. There appears to have been no adverse impact on study area prices between 2003 and 2012.

However, in 2012 through 2015, prices in the study area closest to the Alcoa Superfund Alternative Site temporarily dropped below prices in the control area. The significant differential in price that began in 2012 corresponds with the year when the U.S. EPA has two public meetings related to the OU-1 remediation plan. Operable Unit 1, or OU-1 contained about 200 acres and encompassed the main portion of the site where bauxite residue processing waste was disposed.

The EPA took extra effort to notify the public about the investigation and remediation of OU-1, even engaging in "door to door neighborhood outreach" in the neighborhoods closest to the Superfund Site. The Proposed Plan is covered in both the *Belleville New Democrat* and *East Saint Louis Monitor* as indicated in the earlier timeline.

While the significant differential in prices between 2012 and 2015 could be evidence of an impact from proximity to the Superfund Site, there were only two sales in the study area during those four years and, in two of the years (2013 and 2015) no sales.[134] That is a small set of sales from which to draw any significant conclusion concerning any impact on prices.

By 2016, when implementation of the OU-1 plan was completed, prices in the "study area" had rebounded and average prices in the study area began to consistently outperform the average price in the control area each two-year period.

The years between 2016 and 2023 are the most significant for determining the effect of the environmental situation in the subject neighborhood as of 2023. Those are the years following completion of the OU-1 cleanup in 2016 when a remedial plan for OU-2 was designed during the years between 2017 and 2022. Operable Unit 2, or OU-2, includes the remaining 200 acres which consists of a mixture of commercial properties along Missouri Avenue and commercial properties and former ball field recreational areas located along 29th Street. A church and several residential properties located along the northwest boundary of OU-2 along Louisiana Drive were also involved in the investigation and remediation of OU-2.

In 2023, as part of the OU-2 remediation implementation, the residential properties on Louisiana Boulevard had soil excavated, removing bauxite waste from the properties in IB-5a and consolidated in IB-4a. It might be expected that remediation of homes on Louisiana Boulevard would create a "risk effect" for homes in the adjacent neighborhood and result in lower prices in the study area.  That did not happen, however. Prices in the study area were 46% higher than in the control area when measured on a price paid per square foot basis and were 44% higher than in 2022 in the control area.  By comparison, prices in the control area actually decreased by 20% between 2022 and 2023 when measured on a price paid per square foot basis.

---

[134] During 2012 and 2014, there were only two sales of homes in the study area, one for $8,000 ($6.14/SF) and another for $6,800 (or $3.40/SF). These two sales account for the significant "dip" in the average prices paid in the study area during this time period. The small number of sales could have been due to the ongoing remediation efforts, however. The lingering effects of the Great Recession would have likely also played a role.



The table below is another way of comparing prices in the study and control areas.

| Year | Study Area ($ per sq. ft.) | Control Area ($ per sq. ft.) | Study Area Compared to Control Area (% diff.) |
|---|---|---|---|
| 2002-2003 | $15.85 | $20.50 | -22.7% |
| 2004-2005 | $26.89 | $20.57 | 30.7% |
| 2006-2007 | $23.73 | $24.26 | -2.2% |
| 2008-2009 | $15.41 | $15.12 | 1.9% |
| 2010-2011 | $11.65 | $10.74 | 8.4% |
| 2012-2013 | $6.14 | $7.37 | -16.7% |
| 2014-2015 | $3.40 | $9.92 | -65.7% |
| 2016-2017 | $11.04 | $9.40 | 17.5% |
| 2018-2019 | $21.83 | $16.80 | 29.9% |
| 2020-2021 | $24.80 | $19.07 | 30.0% |
| 2022-2023 | $29.00 | $25.14 | 15.3% |

| Year | Study Area Compared to Control Area (% diff.) | |
|---|---|---|
| 2002-2003 | -22.7% | |
| 2004-2005 | 30.7% | |
| 2006-2007 | -2.2% | |
| 2008-2009 | 1.9% | |
| 2010-2011 | 8.4% | 3.2% |
| 2012-2013 | -16.7% | |
| 2014-2015 | -65.7% | |
| 2016-2017 | 17.5% | |
| 2018-2019 | 29.9% | |
| 2020-2021 | 30.0% | |
| 2022-2023 | 15.3% | 5.4% |

During the first grouping, average difference between the study area and the control areas was +3.2% per period. In the second grouping of periods following the 2012 announcement of the OU-

109



1 remediation plan the average difference was slightly larger at +5.4% per period. When just looking at the four periods spanning 2016 through 2023, the average difference is +23.2%.

### 8.10 Conclusion from the Alcoa Superfund Alternative Site Case Study Analysis and Relevance to the Bell Report Conclusion Concerning the PCB Investigation in the Subject Neighborhood

Our case study analysis of the Alcoa Superfund Alternative environmental situation indicates there was no impact during the "assessment stage" of the remediation lifecycle between 2003 and 2012 when the U.S. EPA was investigating the situation and testing soils on the main portion of the site.

There was a temporary impact on prices in the neighborhood located closest to the site starting in 2012 and continuing through 2015, the years when the primary remediation efforts at the main Alcoa OU-1 site were being implemented. By 2016, that temporary impact had ended, and in the years following 2016, when the OU-2 site remediation plan involving investigation and soil remediation of single-family homes on Louisiana Boulevard was underway, there was no impact on prices in the adjacent neighborhood.

Following this temporary period of intensive investigation and design and implementation of an approved remedial approach, the relationship between average home prices in the study area adjacent to the Alcoa Superfund Site and the control area returned to their typical relationship prior to 2012. In fact, with the exception of one year (2022) when actual demolition of homes due to soil contamination was occurring across the street from the study area, prices in the study area adjacent to the homes on Louisiana Boulevard outperformed prices in the control area.

The Alcoa case study indicates that proximity to a Superfund Site does not necessarily have an adverse impact on home prices in an adjacent neighborhood.  The Alcoa case study indicates that there is no automatic decrease in prices and values of homes in an adjacent neighborhood during the "assessment" stage of the remediation lifecycle.  When "risk effects" do occur, the case study confirms that they are typically temporary and may be related to public meetings and publicity and not necessarily related to the actual contamination situation itself.  The case study also indicates that even when active remediation is underway, there is no automatic impact on prices of homes in an adjacent neighborhood across the street from homes being actively remediated. correspond to the time period when active remediation of an adjacent site is announced and actually begins.

As a result, the Alcoa case study does not support the Bell Report claim that homes in the subject neighborhood incurred damages equal to 100% of their value due to the presence of PCBs.

The Alcoa Superfund Alternative Site case study also indicates that contrary to the contention in the Bell Report, demolition and abandonment of homes in East St. Louis does not necessarily follow designation and remediation of a Superfund Site in the vicinity of a neighborhood.



## 9. JLL Review of the PCB and Dioxin Impact Literature Relied on in the Bell Report to Support the Claim of a 100% Impact on Value Due to "Risk Effect"

### 9.1  Introduction to the Literature and Case Studies Relied on in the Bell Report

In the section of the Bell Report (p. 67) with the heading "Conclusion of Risk Effects", the Bell Report includes the following statement:

> "The literature and case studies indicated that when properties and their neighborhoods are impacted by PCB contaminants, they can become stigmatized and blighted. Inherently, properties impacted by environmental contamination that have incurred a loss in value are known as being 'stigmatized,' 'blighted,' or 'tainted.' Furthermore, detrimental cues including but not limited to abandonment, decay, demolition, signage, barricades, and fencing can be indicators of blight. Accordingly, contaminated neighborhoods, such as the subject properties, commonly experience neighborhood blight.
>
> The risk effect data indicates that properties impacted by environmental contaminants, such as PCBs, incur risk effects up to -100%."

Our research during the past three decades into the published literature indicates there have been relatively few studies that attempt to quantify the effects of PCB or Dioxin contamination based on analysis of actual real estate prices. Others who have studied the published literature have come to the same conclusion. In fact, in one of the articles cited in the Bell Report, Professor Robert Simons states "there is no available direct evidence in the peer-review literature of the effect of PCBs on property value."[135]

Reviewing the published appraisal literature related to price or value impacts resulting from a particular type of contamination or environmental situation is an appropriate starting point for research.  However, standards of professional appraisal practice do not allow an appraiser to simply adopt opinions of value impact in such articles in the absence of undertaking due diligence to determine the reliability of the data and analysis in the article.

Guide Note 4 to the *Standards of Professional Appraisal of the Appraisal Institute* is entitled "Reliance on Reports Prepared by Others." Guide Note 4 sets out a clear series of steps that an appraiser must follow before relying on the opinion of another appraiser. This includes the requirement to verify the conclusions in the relied-upon report: 'The scope of review or verification required depends on…the relevance of the information to the opinions and judgments rendered.'

The Guide Note also includes the following warning: 'An appraiser who accepts the projections or assumptions of others without some assurance of the accuracy or reasonableness of the calculations or information provided may violate the aforementioned Standards Rules.''

The Bell Report simply accepts the analysis and conclusions in the eight PCB related articles and four Dioxin articles it references without in any way testing the accuracy of the data and the reliability of the techniques used and conclusions reached in the articles.  An Appraisal Institute

---

[135] Robert A. Simons, PhD, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market:  A Multiple Techniques Approach," *The Appraisal Journal*, October 2002, 388, at p. 390.



book on the analysis of the effect of environmental conditions on prices and values says reviewing articles authored by others is a form of "case study analysis" but before relying on such an article, an "appraiser has an obligation under USPAP to confirm or verify the accuracy of the sales information and analysis conducted by the person or source" and unexamined reliance on reports of others is "inappropriate under USPAP [Uniform Standards of Professional Appraisal Practice]."[136]

### 9.2   The PCB and Dioxin Literature Relied on in the Bell Report

The Bell Report (pages 44 to 50) discusses eight articles mentioning PCBs that have appeared in *The Appraisal Journal* published by the Appraisal Institute. Four of the articles (Bell PCB Articles No. 5, No. 6, No. 7, and No. 8) discuss one particular piece of litigation in Kentucky in which various courts dealt with the admissibility of a subjective opinion of a real estate appraiser about the effect of PCB contamination on prices and values.  The testimony was unsupported by any empirical data and the various appellate courts involved ruled that the testimony was inadmissible.

The other four PCB related articles relied on in the Bell Report are as follows:

1. Kristy E. Mathews, "Under the Microscope: Dissection of a Contingent Valuation Survey," *The Appraisal Journal*, (Summer 2008), pages 259-269.

2. Robert A. Simons, PhD, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal*, (October 2002), pages 388-400.

3. Richard J. Roddewig and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Market place," *The Appraisal Journal* (Summer 2006), pages 267-280.

    John D. Dorchester, Jr., MAI, CRE "Environmental Pollution: Valuation in a Changing World," *The Appraisal Journal*, (July 1991), pages 289-302.

The four dioxin related articles relied on in the Bell Report are as follows:

1. Christopher S. Decker, PhD, Donald A. Nielsen, PhD, and Roger P. Sindt, PhD, "Is *Pollution* a Homogeneous Determinant of Value?," *The Appraisal Journal* (Spring 2005), pages 183-197.

2. John D. Dorchester, Jr., MAI, CRE, "Environmental Pollution: Valuation in a Changing World," *The Appraisal Journal* (July 1991), pages 289-302.

3. Joseph A. Campanella, "Valuing Partial Losses in Contamination Cases," *The Appraisal Journal* (April 1984), pages 301-304.

4. Wayne C. Lusvardi, "'The Dose Makes the Poison:' Environmental Phobia or Regulatory Stigma?," *The Appraisal Journal* (April 2000), pages 183-194.

The Dorchester (1991) article is the same article referenced by Bell as a PCB impact article.

---

[136] Appraisal Institute, *Valuing Contaminated Properties: An Appraisal Institute Anthology: Vol II*, p. 112 and p. 114, footnote 4.



### 9.3   The Bell Report Omissions and Misrepresentations Related to the Mathews (2008) Article

The Bell Report (p. 45) claims that the Mathews (2008) article includes "Findings" indicating a -30% to -95% impact on residential property due to PCB contamination.  However, the Mathews (2008) article simply references the Simons (2002) article and the contingent valuation (CV) survey on which the Simons (2002) article was based.  The Mathews (2008) article contains no independent analysis of the impact of PCB contamination on prices or values.

The principal focus of the Mathews (2008) article is the unreliability of the contingent valuation survey method relied on in the Simons (2002) article. The Mathews (2008) article (p. 259) describes the Simons survey method as follows:

> Contingent valuation is a survey-based approach that attempts to create a hypothetical market for a good or service by constructing a scenario in which survey respondents indicate the amount of money they would pay to hypothetically acquire the good or service described in the questionnaire. Policy makers and economists developed CV almost 50 years ago to measure the value of natural resource services for public policy decisions. These services, such as a day of recreational fishing on a public river, are not bought and sold in a market. As a result, the value of these nonmarket services cannot be directly observed by looking at the behaviors of buyers and sellers

The contingent valuation survey referenced in the Simons (2002) article indicated a -20% to -83% impact. Contingent valuation, however, is not an accepted methodology for valuation of property in markets in which there are actual sales transactions that can be analyzed.  The Mathews (2008) article (p. 259) puts the central problem with reliance on a survey as follows: "The hypothetical nature of CV, called hypothetical bias, has long been recognized as one of its biggest limitations

Others have also found contingent valuation to be an unreliable predictor of actual market prices. See, for example, Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53-61; and Richard J. Roddewig, MAI, and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace" *The Appraisal Journal* (Summer 2006): 267-280.  The Roddewig & Frey (2006) is another article cited but summarized improperly in the Bell Report as described later in this section.

As a result, the Mathews (2008) article does not support the Bell Report claim that the Matthews (2008) article "findings" were a -30% to -95% impact on value due to PCB contamination is a misrepresentation.

### 9.4   The Bell Report Omissions and Misrepresentations Related to the Simons (2002) Article

The Bell Report claims that the Simons (2002) article[137] indicates a -30% to -95% impact on residential property due to PCB contamination.  That is the same article that is critiqued in the Mathews (2008) article discussed above. The West Anniston situation is also one of the Bell Report "case studies" included later in the Bell Report.

The Simons (2002) article in the *Appraisal Journal* article involved a study of the real estate market in West Anniston, Alabama.  The research was done as part of a litigation related assignment.

---

[137]   Robert A. Simons, PhD, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market:  A Multiple Techniques Approach," *The Appraisal Journal*, October 2002, 388.



The neighborhood studied was located just east of a plant that had once manufactured PCBs. The PCBs had been documented to have entered the neighborhood by air and surface water, and testing found PCBs in the soils.

In the Simons (2002) study, prices and market trends within the study neighborhood were compared to the overall Calhoun County marketplace. Prices and trends within a smaller "impact area" in the West Anniston neighborhood were also compared to the West Anniston submarket as a whole using various techniques. The years studied were generally 1991 through 2000.

The Simons (2002) article claims that the market trends and sales price analysis "showed that properties in the areas directly impacted by the plant were reduced in value by 60% and that this reduction was attributable to the effects of the plant." The Simons, 2002 article concluded that there had been a loss in value of 60-90%.[138]

As indicated in our critique of the Bell Report's West Anniston case study, JLL staff investigated the Anniston litigation in which Professor Simons was an expert and found that there had been at least three other reports filed by real estate experts in the various pieces of litigation filed in Anniston and seeking damages for alleged impacts to property values resulting from the environmental situation.

While we have not been able to obtain copies of all of the other expert reports that may have been submitted in the Anniston litigation, we have been able to obtain expert testimony and reports of two additional real estate experts in the case in Anniston in which Simons filed the report on which he based his *Appraisal Journal* article.

Contrary to Simons, both William E. Bliss, SAR, ARA and James A. Chalmers, PhD concluded that the PCB issues at the Solutia plant in Anniston had not had a significant impact on properties within the immediate market area. Chalmers concluded that there was no market-based evidence to suggest that properties within the Subject Area were materially impacted by the PCB issues.

The Bell Report fails to mention the other experts who testified in the litigation related to the Anniston situation. That error is particularly striking since Dr. Chalmers, one of the experts who found no impact on prices and values in West Anniston, was a partner of Randall Bell at PricewaterhouseCoopers in the 1990s and Dr. Bell admitted in a May 2024 deposition in another case that Bell worked against Dr. Chalmers in the Anniston, Alabama litigation.[139]

Also, as indicated in our Anniston case study contained in the Addenda to this JLL Expert Report, Simons appears to have ignored the market conditions in the West Anniston market area that impacted properties before the contamination issues became well known and continued to impact those properties as of the date of our investigation in 2003. From the reports filed by other experts, it appears that other factors related to the local economy, disregarding the PCB situation,

---

[138] As indicated in the Mathews (2008) article, the Simons study also involved a "contingent valuation survey" in addition to actual sales analysis. Simons, supra, at 399. The survey indicated a 20% to 83% impact.

[139] "Q. I mentioned Dr. Chalmers earlier. Did you work on any assignments with him when you worked at PriceWaterhouse or PriceWaterhouseCoopers? A. As I sit here I don't recall ever signing a report with him or working at any significant level with him on his assignments. He – I don't recall him working on any significant level on my cases. Q. Do you recall working on a case with him in Alabama? A. I worked against him on – in Alabama on the – you're testing my memory this morning – the Anniston case. I had left Pricewaterhouse when I worked against him in Alabama." Remote Video-Recorded Deposition of Randall Bell, PhD, May 14, 2024, Thomas Fire and Debris Flow Cases Related to: *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. page 40, lines 13-25.



have in the past, and will continue in the future, to have an impact on property values in this market area.

### 9.5 The Bell Report Omissions and Misrepresentations Related to the Roddewig & Frey (2006) Article

The Bell Report (p. 47) references the Roddewig & Frey (2006) article that deals with the investigation by the two authors of PCB contamination in Crystal Springs, Mississippi. The Bell Report provides the following quotes from that article:

> "In Crystal Springs, PCBs from a manufacturing facility had migrated off-site and been found in a creek and the soil at some single-family homes in the neighborhood adjacent to the plant."

> "On the date of the contingent valuation study, only some of the properties had been remediated. Four different types of survey-based research studies were conducted. The median predicted negative impacts ranged from 25% to 100%.[45]"

> "To test the contingent valuation results, the asking prices set by admittedly knowledgeable sellers, and the prices offered or paid by actual fully informed buyers, were examined. The results of the analysis indicate that the survey was highly inaccurate in predicting the prices that would be set and paid by fully informed knowledgeable sellers and buyers."

The Bell Report then says the -25% to -100% impact referenced in the Roddewig & Frey (2006) article was contained in a "source article" listed in the Bell Report as "Mundy Associates, LLC, 'Appraisal of Twelve Properties Located in Crystal Springs, Mississippi, Kellum, et al. vs. Kuhlman Electric Corporation, et al.' (April 4, 2003), 97, 110."

Based on those quotes, the "Findings" from the Roddewig & Frey (2006) article as stated in the Bell Report are that the Mundy Associates impact from the PCB situation was -25% to -100% as found in the Mundy Associates report and that Roddewig & Frey only did a "Qualitative" analysis.

That is a misrepresentation as it relates to the Roddewig & Frey analysis. Those authors critically analyzed the accuracy of the -25% to -100% impact on value in the Mundy Associates report by reference to sales prices actually paid by those involved in the Mundy Associates survey that indicated sellers would incur a -25% to -100% impact on price. When it came time to actually sell their homes, those involved in the survey did not experience that large a discount in price. On one home where the survey predicted a -59% impact on price, the seller rejected an offer that was only -5.8% less than the unimpaired value of the property and eventually sold the house (after changing brokers) at a price that was about -13.5% less than the unimpaired value. Others in the survey who had purchased their homes with full awareness of the contamination situation "indicated in the survey form that despite the PCB contamination situation in the neighborhood, they would have paid about the same price as they actually did."[140]

The Bell Report should have represented the Roddewig & Frey (2006) report as indicating a 0% to -13.5% impact from the PCB situation on actual prices paid.

---

[140] Richard J. Roddewig and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Market place," *The Appraisal Journal* (Summer 2006), at 277.



In addition, the Addenda to this JLL Expert Report contains a detailed case study of the Crystal Springs, Mississippi PCB contamination situation.

### 9.6 The Bell Report Omissions and Misrepresentations Related to the Dorchester (1991) Article

The Dorchester (1991) article is referenced by Bell both as a PCB impact article and a Dioxin impact article.

The Bell Report (p. 47) includes various quotations from the Dorchester (1991) article. The references include Dorchester's discussion of the Times Beach, Missouri PCB contamination situation as well the article's discussion of an electrical transformer fire in an office building in New York State. The Times Beach PCB situation is the same one discussed in the Bell Report (page 47). Our Times Beach case study is located in the Addenda and our critique of the Bell Report Times Beach case study is contained later in this JLL Expert Report. As indicated in our analysis of the Times Beach situation, the levels and extent of PCB contamination was significantly greater at Times Beach than indicated by the testing done by the Plaintiff in the subject neighborhood in East St. Louis.

Similarly, the office building in Binghamton, New York referenced in the Dorchester (1991) article also had PCB contamination issues significantly different from the soil contamination issue in the subject East St. Louis neighborhood. A *New York Times* story related to the Binghamton, New York office building transformer explosion and file quoted a scientific expert in organic chemistry as stating that the Binghamton accident was a "'severe disaster for that building' [and] probably the worst such contamination resulting from an electrical fire yet."[141] Although cleanup was in process in 1983, the *New York Times* reported that the cleanup was particularly difficult because of "soot lodged in inaccessible vents and walls and other hidden spaces, from which it may eventually escape" and the scientific expert quoted believed "the building should not be reopened unless it was thoroughly 'gutted' and cleaned some more." [142]

The Bell Report failed to include any follow up research related to the Binghamton office building remediation, and the Bell Report, based on the Dorchester (1991) article, leaves the impression that the building continues to be abandoned even today. That is incorrect. The building was closed during the remediation but eventually reopened in October of 1994 after a $53.0 million remediation project.[143]

As a result of the significant differences between the Times Beach and Binghamton office building situations, the Dorchester (1991) article is not particularly relevant to the situation in the subject neighborhood in East St. Louis. More relevant is our Times Beach case study analysis in the Addenda and what it indicates about the effect on home prices from proximity to a PCB contamination site undergoing remediation.

---

[141] Philip M. Boffey, "PCB's in Buildings Called Wide Peril," *The New York Times*, September 1, 1983. Source: https://www.nytimes.com/1983/09/01/us/pcb-s-in-buildings-called-wide-peril.html

[142] Philip M. Boffey, "PCB's in Buildings Called Wide Peril," *The New York Times*, September 1, 1983. Source: https://www.nytimes.com/1983/09/01/us/pcb-s-in-buildings-called-wide-peril.html

[143] Jacques Steinberg, "The 13-Year Cleaning Job; After $53 Million, a $17 Million State Building Finally Is Declared Safe from Toxins", The New York Times, October 11, 1994. Source: https://www.nytimes.com/1994/10/11/nyregion/13-year-cleaning-job-after-53-million-17-million-state-building-finally-declared.html?pagewanted=1 See also, Bob Joseph, "40 Years Later: Binghamton State Office Building's $53 Million Toxic Fire," WNBF News Radio, February 5, 2011. Source: https://wnbf.com/40-years-later-binghamton-state-office-buildings-53-million-toxic-fire/



### 9.7  The Bell Report Omissions and Misrepresentations Related to the Decker, Nielsen & Sindt (2005) Article

The findings in the Decker, Nielsen, and Sindt 2005 *Appraisal Journal* article are mathematically flawed, and the Bell Report's reliance on them is therefore also flawed. The third citation from the Decker, et. al. (2005) article states the following:

> "A 10% increase in TRI (toxic release inventory) releases per square mile reduces a home's price by 0.015% (0.0015 * 10). Relative to the mean value of a home in the sample, such an increase translates into a $2,207 reduction in price ($147,167 * 0.015)."

The math here does not match the reported results in the article's tables or how it is explained in its text. The decimal equivalent of 0.015% is 0.00015. That means the price reduction for a $147,167 mean valued home would be $147,167 * 0.00015 = $22.07 (which is the same result when $147,167 is multiplied by 0.015%). The authors of the report failed to place a % sign after their 0.015 figure in their parenthetical which should have been written as "($147,167 * 0.015%)."

This mathematical error carries through every calculation in Table 4 on page 194, and this means that every dollar impact shown in Table 4 (on page 194 of the article) is wrong by a factor of 100. In other words, each dollar impact shown in Table 4 needs to have the decimal point moved to the left two places to account for the fact that 0.0015% is not the same as 0.0015. Correcting this math error for every Zip Code in Table 4 means that the maximum dollar impact from a 10% increase in *TRI/AREA* still occurs in Zip Code 68130, but the dollar impact from the hypothetical 10% increase in this Zip Code is only $29.63 (not the $2,962.73 amount shown in Table 4).

As support for this math correction, the two regression models shown in Table 3 (columns 2 and 3) on page 193 indicate that the marginal impact from a 1% increase in TRI releases per square mile is a negative 0.0015%. The value -0.0015% is found by multiplying the arithmetic mean of the variable *TRI/AREA* (indicated by a value of 1.71 as shown in Table 1 on page 188) by the regression coefficient for *TRI/AREA* from Table 2 (-0.0009). In other words, the multiplication is 1.71 * -0.0009 = -0.0015, and this represents the marginal ***percentage impact on price*** by increasing the variable *TRI/AREA* by 1%. The value 0.0015 in Table 3 for *TRI/AREA* is a marginal percentage impact, not a marginal numerical impact.

The authors attempt to explain the marginal impact on price when there is a 10% increase in *TRI/AREA*.[144] To find this result, the marginal price contribution for *TRI/AREA* can be multiplied by a factor of 10, but the resulting contribution is still in percentage terms. This is perfectly fine to do, but the math—and conversion from percentages—needs to be correctly applied. The percentage conversion mathematics, however, were not correctly applied in this article relied on by Dr. Bell.

Furthermore, the Decker, et. al. (2005) *Appraisal Journal* article misstates the statistical significance of the *TRI/AREA* variable. According to Table 3 on page 193, the *TRI/AREA* variable for both regression models has a single asterisk indicating a statistical significance at the 10% level (see footnote c in Table 3 which describes statistical significance levels as indicated by the number of asterisks). A single asterisk is a 10% significance level, two asterisks is a 5% significance level, and three asterisks is a 1% significance level. The authors incorrectly state on

---

[144] The regression model coefficient for TRI/AREA represents a change in price given a 1% change in the variable *TRI/AREA*, so to find the result of a 10% increase in *TRI/AREA*, the regression model coefficient is multiplied by a factor of 10. This rate of house price responsiveness indicated by the *TRI/AREA* regression coefficient is termed elasticity in economics.



the bottom of page 192, "the coefficient on *TRI/AREA* is negative, as expected, and significant at the 1% level." Given that the coefficient for the *TRI/AREA* variable in Table 3 is -0.0009 and its corresponding standard error is 0.0003, the authors' Table 3 indication that the coefficient is significant at the much lower 10% level (as indicated by only one asterisk) is correct, but the statement on page 192—that the significance is at the 1% level—is incorrect.[145]

As a result, when rectifying that incorrect statement at page 192, the statistical significance of the authors' finding for the *TRI/AREA* variable is much less robust than how it is explained in the article. In other words, the price effect of the *TRI/AREA* variable is only one-one hundredth the reported magnitude indicated in the report, and its statistical significance is much less than the misreported 1% level in the article. For example, Table 4 shows the average property in Zip Code 68137 has a value of $120,380.85, and the incorrectly reported dollar impact from a 10% increase in *TRI/AREA* from that table is -$1,805.71 which is 1.5% of the average price in this Zip Code. The corrected dollar impact for a 10% increase in *TRI/AREA* on an average property in Zip Code 68137 is -$18.06, and that is only 0.015% of the average value of $120,380.85. From an appraisal perspective, such a small amount (either -$18.06 in value or 0.015% of price) is inconsequential when valuing a property worth over $120,000, and an amount so small would disappear in the appraisal rounding process in a final value opinion.

One important finding in the article's two regression models is not mentioned in the Bell Report. The variable isolating carcinogenic compounds (*TRI_CANS/AREA*) is found to be statistically insignificant, with the article indicating, "the degree of harm caused by certain releases (i.e., those deemed to be carcinogenic) has no additional adverse impact on value." (parenthetical added for clarity). Even if one ignores the statistical significance of the carcinogenic compound variable, the magnitude of the additional negative price effect on an average valued home assuming a 10% increase in carcinogenic compounds is only -$13.25 (-0.009% * $147,167), which would be within "rounding error" for a typical residential appraisal opinion.

In effect, when the errors in the article are corrected, the article indicates an impact so small as to be meaningless and therefore would indicate no impact from either dioxin or the other contaminants in involved in the toxic release inventory in Omaha.

### 9.8 The Bell Report Omissions and Misrepresentations Related to the Campanella (1984) Article

The Bell Report fails to note that the Campanella (1984) article was the first article published in *The Appraisal Journal* specifically discussing issues related to the appraisal of properties affected by contamination as was noted in the 2002 compendium of Appraisal Journal articles in the Appraisal Institute's book entitled *Valuing Contaminated Properties: An Appraisal Institute Anthology*.

While the Campanella (1984) article includes the word "dioxin" it does so simply in the following question: "Is the loss in value for a farm contaminated with dioxin similar to the loss in value sustained by residences whose private wells test too high in iron and phosphates?"  The article contains no sales data and analysis of the effect of dioxin contamination (or any other type of contaminants) on actual prices or values.

---

[145] The 10%, 5%, and 1% figures are so-called p-values. The 0.0003 and -0.0009 values are the standard error and the coefficient in percentages from the regression. Percentages are used because the model dependent variable is in log form. This is called a semi-log model regression because only one side of the equation is log (left) and the independent variable is not in log form. A one unit increase in the variable TRI/AREA results in a -0.0009% decrease in the price.



The Bell Report quotes the section of the article that notes that "contaminated properties sell very rarely" but does not mention that the lack of sales in 1984 was due to the fact that the appraisal profession at that date was typically only asked to provide only estimates of the "unimpaired" value when undertaking appraisal assignments.  The Bell Report case study also quotes the language in the Campanella (1984) article referencing the appropriateness of using a "flat percentage" when estimating "cost-to-cure."

But that reference to a "flat percentage" was in the context of the date of the article, a time when there was a scarcity of actual sales data that could be analyzed.

The Bell summary of the Campanella (1984) article fails to note that it concludes with the following recognition that sales data will emerge for appraisers to analyze and when that happens, appraiser "subjectivity" in analysis will not be acceptable:

> As the public becomes more aware of various contaminants they will become more aware of the threats and solutions associated with various types of contamination. Their preferences will become more predictable as buyers and sellers. Technically sophisticated, contaminant-specific solutions will be more readily available. Regulators will eventually begin to form guidelines concerning the acceptability of specific solutions and the appraisal community will not be able to argue for the "broad brush" discounts that tend to be more subjective.

### 9.9  The Bell Report Omissions and Misrepresentations Related to the Lusvardi (2000) Article

Like the Campanella (1984) article, the Lusvardi (2000) article includes the word "dioxin" but contains no analysis of actual sales prices in any situation where dioxin was a concern.  It simply references the Times Beach, Missouri, Superfund Site situation in which the community was evacuated and relocated in order to remediate the dioxin contaminated soil.

The Bell case study summary also includes the following quote as the "Findings" in the Lusvardi (2000) article: "Some real estate appraisers assert that market value is entirely subjective, including the market's assessment of environmental risks."   That was only one of eight "implications" that the Lusvardi (2000) article highlighted in many paragraphs of text and the Bell case study quote leaves out the rest of the paragraph in which that sentence is contained. The entire paragraph reads as follows:



> Critics of the rational scientific approach to environmental risk assessment, state that risk is associated with perception more than substance. Some real estate appraisers assert that market value is entirely subjective, including the market's assessment of environmental risks. Although the legal definition of market value contains a subjective (perceptual) element, it precludes an irrational element. Many notorious risks associated with trace environmental substances or emissions are not only infinitesimally small but are often likely to be zero.[50] Assessing the mere presence of trace environmental substances embedded in or proximate to real estate as representing a substantial health risk is irrational. To meet new legal evidentiary standards for expert witnesses (i.e., *Daubert* tests), appraisers need to distinguish between risks that are really high and those that are highly discussed.

The actual "finding" in the article as it relates to the real estate appraisal process is perhaps more accurately contained in the third and fourth of the "implications" that the author finds from his "review of summaries of the scientific literature" related to various types of contamination situations.  The language in those paragraphs is as follows:

> 3. Real estate markets typically look to real estate appraisers to have a more accurate assessment of environmental risks than a real estate broker or the market participants themselves. Real estate brokers only must disclose the presence or absence of environmental conditions affecting real estate. However, to conduct accurate assessments of environmental risks impacting real estate value, appraisers must be knowledgeable of the magnitude of such risks. This presumes a minimum of scientific literacy by appraisers as to the true risks of environmental conditions associated with real estate.
>
> 4. Appraisers cannot rely on the exaggerated response of media or the overregulation by government environmental protection agencies as substitutes for assessment of the true risks of environmental conditions on real estate. In particular, environmental risk studies or experts using "zero dose," "no threshold," or "extremely low" threshold scientific standards do not meet rigorous scientific standards and thus should not be relied upon by appraisers.[48]



### 9.10 Additional JLL Research into Published Articles Relating to PCB Not Referenced in the Bell Report

Our research on Google Scholar into the published literature has found two additional articles related to measurement of the specific empirical impact of PCB contamination on real property prices and values.

The two additional articles we have found may be summarized as follows:

- *Mendelsohn, et al. 1992*[146] – This study involved the effect of proximity to PCBs in harbor bottom sediments in New Bedford, Massachusetts on single-family home prices. The PCB situation in the harbor involved restrictions prohibiting swimming, fishing and lobstering in the inner harbor and the outer harbor where there were restrictions on bottom fishing and lobstering only.

  More than 1,900 sale prices between 1969 and 1988 for 780 properties within two miles of the harbor were analyzed. Properties within two miles of the harbor sold for $7,000-$10,000 less than what would have been expected, and the authors note that equated to percentage impacts of between -3% and -7% depending upon the portion of the harbor nearest the homes.

- *Erickson, 2001*[147] – This thesis paper submitted by a Williams College undergraduate student evaluated home prices in Pittsfield, Massachusetts, the location of a 254-acre General Electric manufacturing facility that produced electrical capacitors and transformers. PCBs were used in the manufacturing process. Some of the PCBs leaked from pipelines and storage tanks at the facility, entered the soil and groundwater which eventually flowed into the Housatonic River. Some PCBs cleaned up during manufacturing processes were disposed of in landfills both on and off the GE site. Some PCBs were reportedly also used as fill at various locations in the Pittsfield area. Approximately 360 properties off-site were sampled in 2000 for PCB contamination levels.

  Home prices in Pittsfield between February of 1996 and October of 2001 were involved in the study. The study compared prices at various distances from the GE plant site before and after announcement of the proposed listing of the site on the Superfund list.

  Before the Superfund announcement, there was a -1.0% impact from proximity to the plant site on the value of an average house that increased to a -3.6% impact after the announcement for homes within 750 meters of the plant. At a distance of 2.2 km, however, the change was from -0.3% to only -1.2% after the Superfund site announcement.

  The study also analyzed home prices along the contaminated portions of the Housatonic River but could find no impact on home prices due to proximity to the contaminated sections of the river.

---

[146] Robert Mendelsohn, Daniel Hellerstein, Michael Huguenin, Robert Unsworth, and Richard Brazee, "Measuring Hazardous Waste Damages with Panel Models," *Journal of Environmental Economics and Management*, Vol. 22, Issue 3, May 1992, pages 259-271.

[147] Jessica Erickson, "Information Flows and the Impact of PCB Contamination on Property Values," a Thesis submitted in partial fulfillment of the requirement for the Degree of Bachelor of Arts with Honors in Economics, Williams College, May 7, 2001.



The percentage impacts from the two articles can be summarized below.

| Summary of PCB Literature | | | |
|---|---|---|---|
| Article | Dates Analyzed | Indicated % Impact | Comments |
| **Mendelsohn, et al. 1992** | 1969-1988 | -3.0% to -7.0% | Sales w/in 2.0 miles of harbor. Impacts varied with level of harbor contamination nearest homes |
| **Erickson, 2001** | 1996-2001 | -1.2% to -3.6% No impact on riverfront homes | Impacts were generally within 2.2 km in distance to the Superfund site. No impact for properties along PCB contaminated Housatonic River. |

It is improper, as indicated earlier in this JLL Expert Report discussing Guide Note 4 to the *Standards of Professional Appraisal of the Appraisal Institute*, to rely on the results of published articles in the absence undertaking due diligence to determine the reliability of the data and analysis in the article. So the reliability of the analysis and conclusions in those papers cannot be accepted without further analysis. However, those two papers were not referenced in the Bell Report summary of the literature and they indicate much smaller impacts on value than the papers referenced in the Bell Report.

### 9.11   Conclusion from Review of the PCB and Dioxin Literature Cited in the Bell Report

The Bell Report has either misrepresented or failed to include important facts and conclusions from the literature he claims support a -100% impact from PCBs in the subject neighborhood.

- The Matthews (2008) article -- The Bell Report (p. 45) claims that the Mathews (2008) article includes "Findings" indicating a -30% to -95% impact on residential property due to PCB contamination. However, the Mathews (2008) article simply references the Simons (2002) article and the contingent valuation (CV) survey on which the Simons (2002) article was based. The Mathews (2008) article contains no independent analysis of the impact of PCB contamination on prices or values.

  In fact, the principal focus of the Mathews (2008) article is the unreliability of the contingent valuation survey method relied on in the Simons (2002) article.

- The Simons (2002) article – The Bell Report claims that the article indicates a -30% to -95% impact on residential property due to PCB contamination. That is the same article that is critiqued in the Mathews (2008) article discussed above. The Bell Report fails to mention that other experts were on the opposite side of the case from Robert Simons concluded that the PCB issues at the Solutia plant in Anniston had not adversely impacted prices.

  That is a particularly glaring omission by Bell since one of the experts who found no impact, had previously worked with Randall Bell at PricewaterhouseCoopers and Dr. Bell admitted in a May 2024 deposition in another case that Bell worked against Dr. Chalmers in the Anniston, Alabama litigation so would have been aware of the Chalmers opinion that there had been no impact.



- The Roddewig & Frey (2006) article -- The Bell Report says the "Findings" from the Roddewig & Frey (2006) article are that the Mundy Associates impact from the PCB situation was -25% to -100% as found in the Mundy Associates report and that Roddewig & Frey only did a "Qualitative" analysis. That is incorrect. The article actually references the data researched by Roddewig & Frey and includes the authors' conclusion that the data only indicates an impact on prices from the PCB situation between 0% (no impact) and -13.5%.

- The Dorchester (1991) article – That article discusses the Times Beach Superfund site contamination situation as well an electrical transformer fire in an office building in New York State resulting in PCB contamination in the building. As discussed later in our critique of the Bell Times Beach case study, the levels of contamination at Times Beach were so high that it was a Superfund site and residents needed to be relocated. There has been no such relocation. The Bell Report failed to include any follow up research related to the Binghamton office building remediation, and the Bell Report, based on the Dorchester (1991) article, leaves the impression that the building continues to be abandoned even today. That is incorrect. The building was closed during the remediation but eventually reopened in October of 1994 after a $53.0 million remediation project.[148]

  As a result of the significant differences between the Times Beach and Binghamton office building situations, the Dorchester (1991) article is not particularly relevant to the situation in the subject neighborhood in East St. Louis. More relevant is our Times Beach case study analysis in the Addenda and what it indicates about the effect on home prices from proximity to a PCB contamination site undergoing remediation.

- Decker, Nielsen, and Sindt (2005) article -- The findings in the Decker, Nielsen, and Sindt 2005 *Appraisal Journal* article are mathematically flawed, and the Bell Report's reliance on them is therefore also flawed. In effect, when the errors in the article are corrected, the article indicates an impact so small as to be meaningless and therefore would indicate no impact from either dioxin or the other contaminants in involved in the toxic release inventory in Omaha.

- Campanella (1984) article – That was the first article to appear in *The Appraisal Journal* discussing the appraisal of contaminated properties. It contains no analytical data related to impacts of PCBs but instead forecasts that sales prices involving contaminated properties will become common in future years and appraisers will be able to look at those prices to determine the impact of contamination on prices and values.

- Lusvardi (2000) article -- Like the Campanella (1984) article, the Lusvardi (2000) article does not analyze specific sales prices. The Bell Report only references one of the many "findings" in the article related to methods of analysis.

The Bell Report also ignores other published articles analyzing the effects of PCBs on prices and values. The two additional articles uncovered by our research found impacts from PCB contamination ranging from only -1.2% to -7.0%.

---

[148] Jacques Steinberg, "The 13-Year Cleaning Job; After $53 Million, a $17 Million State Building Finally Is Declared Safe from Toxins", The New York Times, October 11, 1994. Source: https://www.nytimes.com/1994/10/11/nyregion/13-year-cleaning-job-after-53-million-17-million-state-building-finally-declared.html?pagewanted=1 See also, Bob Joseph, "40 Years Later: Binghamton State Office Building's $53 Million Toxic Fire," WNBF News Radio, February 5, 2011. Source: https://wnbf.com/40-years-later-binghamton-state-office-buildings-53-million-toxic-fire/



# 10.  JLL Review of the "Contaminated Neighborhood" Case Studies in the Bell Report Indicate They Do Not Support the Bell Claim of a 100% Impact on Value Due to "Risk Effect"

### 10.1  Introduction to the JLL Review of the Case Studies in the Bell Report

As indicated earlier in this JLL Expert Report, "case study" analysis is one of the generally accepted methods for determining the effect of contamination and environmental risks on property prices and values.  The real estate appraiser looks to what has happened in other locations involving similar properties and similar environmental contamination and remediation situations to understand what has happened, or could happen, in the particular market in which the appraiser is working.

Case study analysis is especially important in situations in which the number of sales directly comparable to the property or properties being appraised and in a similar position in the remediation lifecycle are limited. [149]

As also indicated earlier in this JLL Expert Report, the analysis of the effect of a contamination situation on prices and values includes analysis of cost, use, and risk effects as discussed in Advisory Opinion 9.  The Bell Report (p. 36) references five "examples of use impacts."  The five examples are summarized as follows on that page:

> "Examples of use impacts include:
>
> - Anniston, Alabama. Air, waters, and soil were contaminated, the local school was shut down and many properties were abandoned.
>
> - Herculaneum, Missouri. Air and soil were contaminated, many homes were bulldozed.
>
> - Porter Ranch, California. Air was contaminated, homeowners were offered the option to evacuate and many did.
>
> - Hinckley, California. Water was contaminated, many of the homes were bulldozed.
>
> - Love Canal, New York. Soil, the estimated temporary relocation costs exceeded the estimated costs of a permanent buyout."

However, a later section of the Bell Report beginning at page 53 presents a case study analysis. Ten case studies are summarized as part of a "Risk Effects" analysis.  Those ten Bell "Risk Effect" case studies include four of the five "examples of use impacts" previously listed in the Bell Report at page 36 plus six additional case studies.[150]  The six additional case studies not included on page 36 as use effect examples but included later in the Bell Report involve the following locations: (1) Times Beach, Missouri; (2) the Escambia Wood Treating facility in Pensacola,

---

[149] Thomas Jackson, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal*, January 2002, as cited in Richard J. Roddewig, Editor, *Valuing Contaminated Property:  An Appraisal Institute Anthology*, The Appraisal Institute, 2002, p. 275.  See also, Randall Bell, *Real Estate Damages*, second edition, supra, p. 32.

[150] The Porter Ranch situation cited as an "example" at p. 35 is not included as a case study later in the report and no explanation is given for its exclusion.



Florida;[151] (3) Carver Terrace in Port Arthur, Texas; (4) the Agriculture Street Landfill in New Orleans; (5) Mossville, Louisiana; and (6) Flint, Michigan.

The Addenda to this JLL Expert Report includes our detailed review and analysis of some of the ten Bell case study situations that have been studied by us previously in assignments involving determining the effect of contamination on prices and values.[152]  As part of our review of the Bell Report in this assignment, we have updated some of the research in our previous case studies and researched and analyzed the additional Bell Report contamination situations not previously researched by us. Information related to our additional research into those case study situations is included in this section of this Appraisal Review and JLL Report.

The Bell Report (p. 13) claims that the case studies, together with the literature review, are part of the "risk effect data" that "indicates that properties impacted by environmental contaminants, such as PCBs, incur risk effects up to -100%."  The Bell Report then references six of his case studies[153] as evidence of "neighborhoods that have been abandoned and demolished" and concludes as follows:

> "The subject properties share many similarities with those comparable neighborhoods that have been blighted, abandoned, and demolished. Accordingly, the indicated risk effects for the subject properties in this case are -100% in their 'as-is' unrepaired condition.

### 10.2  Summary of the Significant Errors and Omissions in the Case Study Analysis in the Bell Report

Our review and analysis of the case studies in the Bell Report have found significant errors, omissions and misrepresentations in the Bell Report case study presentation and analysis, and in the Bell comparison of his case studies to the East St. Louis situation. The errors, omissions, misrepresentations, and improper comparisons to the East St. Louis situation can be generally summarized as follows:

- Errors in researching and reporting the data in some of the Bell case studies;

- Improper reliance on published articles as appropriate environmental case studies without conducting any independent analysis of the accuracy and reliability of the articles;

- Misrepresentation of the results of published articles and omission of key facts from news stories and state and federal environmental agency reports;

- Failure to follow generally accepted procedures for researching relevant market data in a particular market area before claiming that an entire market has been adversely affected in price/value by an environmental situation.

---

[151] The Bell Report refers to this case study as "Mount Dioxin."

[152] Those five are as follows: Bell Case Study No. 1: Anniston, Alabama; Bell Case Study No. 2: Times Beach, Missouri; Bell Case Study No. 3: Mount Dioxin (the Escambia Wood Treating Facility in Pensacola, Florida); Bell Case Study No. 5: the Agriculture Street Landfill, New Orleans, Louisiana; and Bell Case Study No. 8: Love Canal, Niagara Falls, New York.

[153] The six Bell case studies referenced are listed by Bell as "Anniston, Alabama, Times Beach, Missouri, Mount Dioxin, Florida, Carver Terrace, Texas, Agricultural Street Landfill, Louisiana, and Mossville, Louisiana."



- Reliance on unsupported opinions concerning the effects of an environmental event or contamination situation without following recognized procedures for determining the reliability of those opinions;

- Failure to analyze whether the effects on prices and values in each of the case studies were temporary rather than permanent and failure to compare the remediation life cycle stage indicated in each case study to the environmental situation in East St. Louis;

- Claiming that there were 100% impacts on prices and values when the actual market data indicates much smaller impacts and, in some of the case studies, no impacts on prices and values;

- Claiming that the environmental situation in a case study is "similar" to that existing in the East St. Louis area that is the subject of the Bell Report when in fact the situation is in fact quite different.

The following section presents the necessary corrections to the errors and omissions in the Bell Report case studies.

### 10.3 Bell Case Study No. 1: Anniston, Alabama – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

***The Bell Claims Concerning the Anniston, Alabama, Situation***: Bell Case Study No. 1 involves soil contamination in neighborhoods adjacent to a Monsanto facility in Anniston, Alabama. The Bell Report (p. 55) describes the contamination situation as follows: "Between 1999 and 2000, the EPA discovered PCBs in residential soil around the Monsanto Facility" and then summarizes the result of Case Study No. 1 as follows: "In recent years, Monsanto has bought and demolished around 100 PCB-contaminated houses and businesses in the area, turning the neighborhood into a virtual ghost town." That summary is a quotation in the Bell Report and the indicated source is given as "2014-09-15 Feature Shoot."[154]

The Addenda to the Bell Report at page 199 contains a one-page summary of the Anniston case study. Among the claimed aspects of the Anniston situation described in that one-page summary are the following:

> "By 2014, a Remedial Investigation (RI) identified that approximately 7,600 properties had been sampled for contamination. Of the 7,600 sampled properties, PCBs were detected in 4,322 properties.
>
> The EPA announced a Record of Decision (ROD) in 2017. The ROD identified remedial plans for Operable Unit 1 (residential areas) and Operable Unit 2 (nonresidential areas). Cleanup included the complete removal of contaminated soil from residential properties, removing dredge spoil piles, capping unapproved waste disposal areas, removing contaminated soil in nonresidential areas, and more.
>
> Many properties were abandoned. Market resistance showed a discount of 15% for surrounding homes compared to areas with less environmental concern. Market resistance ranged from -15% to -60%, typically -55%. Total settlements

---

[154] According to its website, "Feature Shoot showcases the work of international emerging and established photographers who are transforming the medium through compelling, cutting-edge projects. . . We believe that photography is a powerful mode of storytelling, and share works that have a strong narrative vision." Source: https://www.featureshoot.com/about-2/



were $700 million. Additionally, Richard Maloy a real estate expert testified that by 'the most conservative estimates' 'homes and land in West Anniston were valued at 50 percent below the appropriate figure.' (Baptized in PCBs, 2014, pg. 254)

'In recent years, Monsanto has bought and demolished around 100 PCB-contaminated houses and businesses in the area, turning the neighborhood into a virtual ghost town.' (Feature Shoot, 2014)"

Based on those statements, the Bell Report (p. 199) arrives at the following conclusion:

> **"Case Findings:**
>
> Cost: Not determined
>
> Use: Not determined
>
> Risk: -15% to -60% (typically -55%)

In the "Case Study Adjustment Grid" at page 59, the Bell Report indicates the "effective date" of the case study is 1999-2000. It also indicates that the Anniston site was in the "Ongoing" stage of the remediation life cycle. That "adjustment grid" table also claims that the "cost and timing" of the remediation and the "liabilities" for the contamination and remediation have not been determined.

***The JLL Research into the Anniston, Alabama, Contamination Situation****:* Our JLL Anniston Case Study contained in the Addenda to this JLL Expert Report was undertaken by JLL staff in 2003. Additional information related to the contamination situation as of 2023 is included below.

We have updated that prior research for purposes of this review of the Bell Report by undertaking the following activities:

- Reviewed our prior file related to the earlier 2003 investigation and research.

- Reviewed documents in the Bell production related to Anniston.

- Inspected the exterior of the Solutia site (now owned by Eastman) and the adjacent and nearby neighborhoods in West Anniston, and Oxford, Alabama on May 20th and May 21st. This included inspection of neighborhoods where soil testing was done and homes had been acquired and demolished by Solutia.

- Undertook online research to update information from the U.S. EPA related to the investigation and remediation of the Anniston Solutia site.[155]

- Undertook online research related to Agency for Toxic Substances and Disease Registry (ATSDR) investigations of health issues related to the Anniston site and the nearby neighborhoods.

- Undertook additional online research related to news media coverage of the contamination situation.

---

[155] According to the U.S. EPA website," EPA has not listed this site on its NPL (National Priorities List), but EPA does consider it to be an NPL- caliber site. It is being addressed through the Superfund Alternative Approach. The Superfund Alternative Approach uses the same process and cleanup standards that are used for sites listed on the NPL." Source:
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0400123#bkground



- Obtained copies of expert testimony related to real estate appraisal experts in the litigation involving property damage claims by West Anniston residents.

***The Errors, Omissions, and Misrepresentations in the Bell Case Study No. 1 Involving Anniston, Alabama***: Among the more significant errors, omissions and misrepresentations in the Bell Report Case Study No. 1 involving Anniston, Alabama, are the following:

- The quotation from the "2014-09-15 Feature Shoot"[156] article stating that demolition of 100 houses by Monsanto has turned the neighborhood into a "ghost town" is not correct. Our inspection of neighborhoods adjoining and near the facility indicates many houses remain. The Google satellite maps below show locations of some of the homes that remain in the neighborhood indicating that while there are vacant lots, the area is not a "ghost town" as claimed in the Bell Report.



  The Google aerial to the right shows homes in the neighborhood immediately west of the Solutia/Eastman facility on Calhoun, Jefferson, Griffis, Emby, and 3rd Avenue. The image shows a date of 2024.

Below is the Google street view photo dated March 2014 of homes on the 2400 block of Calhoun Street immediately west of the Solutia/Eastman facility.



  Below is the Google street view photo dated June 2008 for the same location on Calhoun Street  immediately west of Solutia/Eastman facility.

---

[156] The full citation to the "Feature Shoot" story referenced in the Bell Anniston case study is as follows: Ellyn Kail, "Compelling Photos Reveal the Legacy of America's Most Hated Corporation, September 15, 2004. Source: featureshoot.com/2014/09/compelling-photos-reveal=legacy-americas-hated-corporation.



*JLL Expert Report and*  
*Review of a Bell Appraisal Report*  
*City of East St. Louis v. Monsanto, et al.*  
*East St. Louis, Illinois*



Below is the Google street view photo dated March 2014 showing four homes at the corner of 1st Avenue & Jefferson Street immediately adjacent to the west fence line of the west of Solutia/Eastman facility along 1st Avenue. A fifth home is located behind the home in the foreground left.



Google Satellite Photo below shows Pipes Street and Bancroft Avenue at Duncan Avenue, the closest street to the north of the Solutia/Eastman facility.



The Google street view photo below dated March 2014 is the view down Pipes Street at Duncan Avenue (the first street north of the Solutia/Eastman facility) showing nine homes.





- The Bell Report (p. 199) never describes the boundaries of the area of Anniston where the demolition of 100 homes and businesses by Monsanto resulted in "turning the neighborhood into a virtual ghost town."

- The Bell Report and production provides no data collected by Dr. Bell or his staff to support the claim that there has been a "-15% to -60%" and "typically" a -55% impact on value of properties.

- The Bell Report references a study by a Mr. Richard Maloy described by Bell as a "real estate expert" who "testified that by 'the most conservative estimates' 'homes and land in West Anniston were valued at 50 percent below the appropriate figure.'" The Bell Report indicates the source for the quotation about Maloy's testimony is "Baptized in PCBs, 2014." The Bell production does not include a copy of that source. Our research indicates the source of the quotation is a book published by the University of North Carolina Press.[157] The Bell Report provides a quote about Maloy testimony as reported in the book, but the Bell Report makes no effort to independently confirm the accuracy of the claimed Maloy finding of a value "50% below the appropriate figure.

- The Bell Report contains no further detail about the "testimony" of Richard Maloy. The footnote citation in the *Baptized in PCBs* book as the source of the statement by Richard Maloy is to a transcript of Mr. Maloy's testimony in the *Abernathy* litigation involving claims against Monsanto by 16 plaintiffs related to "lost property value and emotional distress.[158]

- Our research confirms that Richard Maloy did testify in the *Abernathy* case[159] involving property damage claims by 16 or 17 plaintiffs. The case was tried in Etowah County, Alabama, in January and February of 2002 after a change in venue from Calhoun County where West Anniston is located. Our review of the trial transcript, however, indicates that Mr. Maloy based his opinion of a -50% impact on value due to "market resistance" on only four sales of properties.[160]

- Mr. Maloy selected the four sales from a larger data set of 15 or 20 sales but discarded all but four sales to arrive at his opinion of a -50% impact based on interviews he conducted that lasted only "a couple of minutes"[161] with buyers or sellers. He considered only the four

---

[157] Ellen Griffith Spears, *Baptized in Blood: Race, Pollution, and Justice in an All-American Town*, University of North Carolina Press, April 2014.

[158] Ellen Griffith Spears, *Baptized in Blood: Race, Pollution, and Justice in an All-American Town*, University of North Carolina Press, April 2014, at p. 254, and footnote 61.

[159] *In re Sabrina Abernathy et al. v. Monsanto Company et al*.

[160] 2002_02_05 Trial Transcript in ABERNATHY, p. 3885, lines 6-17.

[161] 2002_02_05 Trial Transcript in ABERNATHY, p. 3879, lines 17-18.



"sales of properties that the buyer was verifying as knowing about environmental conditions in West Anniston."[162]

- The file produced by Dr. Bell related to the opinion of Richard Maloy contains 12 residential appraisal reports in in West Anniston in a file labeled by Dr. Bell as "Richard Maloy Research." The appraisals appear to have something to do with Mr. Maloy's work related to the Anniston property damage litigation because the reports indicate the client was "Donald Stewart, Esq."  Mr. Stewart was one of the attorneys for the plaintiffs in the *Abernathy* case. on litigation. The appraisals are for 12 residential properties and one church property.  The appraisals include a "before and after" value for each of the 12 residential properties.[163] The indicated difference between the "before and after" values is not between "-15% to -60%" or "typically -55%" as indicated in the Bell Report.  Instead, the range in differences between the "before and after" values is between -8% and -44% with an average of -21% and a median of -19%.

- The Maloy appraisals appear to be part of his work in the *Abernathy* case. However, the relationship of those appraisals to the *Abernathy* case, if at all, is not clear from the appraisal reports themselves. Although the appraisals include a "before and after value for each of the 12 properties, the index to words contained in the transcript of Mr. Maloy's testimony in the *Abernathy* case does not contain either the word "before" nor the word "after. As a result, the precise relationship between the 12 appraisals produced by Dr. Bell and the Anniston litigation cannot be determined.

- The Bell Report does not reference the testimony presented by the attorneys for the Defendants in the *Abernathy* case that countered the testimony of Richard Maloy. As indicated in our JLL Anniston case study in the Addenda, William E. Bliss, SRA, ARA. testified in the *Abernathy* case on behalf of Monsanto. Mr. Bliss undertook retrospective appraisals on 20 properties involved in the *Abernathy* litigation. In each case, the appraisals involved properties that had sold within a specified period of time, and consisted of those sales which were considered most proximate to the Solutia facility. They were appraised by selecting comparable sales data from "control" areas more removed from the immediate plant area, but which were considered to be comparable in most other aspects. Mr. Bliss then compared the appraised value using "control area" sales outside any area potentially impacted by proximity to the Solutia site to the actual sale prices of the 20 properties involved in the *Abernathy* litigation.  Of the 20 retrospective appraisals undertaken by Mr. Bliss in the *Abernathy* case, 16 indicated that the properties sold at or above indicated market value, while four sold slightly below the indicated market value.

- The Bell Report summary of only the opinion of the real estate appraisal expert for the Plaintiffs in the *Abernathy* case and failure to discuss the contrasting testimony of the real estate appraisal expert for Monsanto in the same case demonstrates impermissible "bias" as that term is defined in the Uniform Standards of Professional Appraisal Practice (USPAP).

- The Bell Report Anniston case study states that "[t]otal settlements were $700 million" but provides no information related to the purpose of the settlements.  The case study implies that the settlement related to the property damage claims.  However, the *New York Times*

---

[162] 2002_02_05 Trial Transcript in ABERNATHY, p. 3886, lines 6-21.
[163] The analysis for one church property is not in the form of an appraisal.  There is also an appraisal of a property located elsewhere in Alabama.



article dated August 21, 2003, produced by Dr. Bell states that the settlement agreement involved 20,000 Anniston resident and "includes payments to homeowners" but also many other items including: "cash to finance a PCB laboratory . . . [c]osts for cleanup, prescription drug and other programs."[164] The *Baptized in PCBs* book referenced in the Bell Report, but not produced by Dr. Bell, indicates that the $700 million settlement involved not only the *Abernathy* case but also the larger *Tolbert* case involving 18,000 plaintiffs. While the testimony of Richard Maloy was given in the first set of 16 plaintiffs cases tried in the *Abernathy* litigation, the *Baptized in PCBs* book states that there were a total of 3,500 *Abernathy* plaintiffs and that only $300 million of the global $700 million settlement amount were to go to the *Abernathy* plaintiffs.[165]

- Since the *Abernathy* plaintiffs sought damages for both emotional distress and for property value diminution, the $300 million allocation of the $700 million global settlement to the 3,500 *Abernathy* plaintiffs was not simply related to property value impacts.

- The Bell Report Anniston case study statement that the 2014 Remedial Investigation (RI) "identified that approximately 7,600 properties had been sampled for contamination" and that "[o]f the 7,600 sampled properties, PCBs were detected in 4,322 properties." The Bell Anniston case study fails to discuss the investigation and soil contamination remediation that had been completed on many properties by 2014. A March of 2017 U.S. EPA report (not produced by Dr. Bell) indicated the following about past residential soil investigation and removal:

  > **"Residential Properties**. PCB samples were collected in soils on more than 7,600 residential properties. PCB concentrations were detected in soils at concentrations greater than or equal to 1.0 milligram per kilogram (mg/kg) on 783 residential properties and removals were conducted on 719 properties."[166]

  That March of 2017 U.S. EPA report then says the following about remaining residential investigation and remediation:

  > "Sixty-four (64) residential properties with PCB concentrations greater than 1mg/kg in surface soils have not been cleaned up: 43 are wooded lots where no exposure is currently occurring; and 21 are properties where access has been denied. Residual contamination between 1 mg/kg and 10 mg/kg remains on 104 properties below the 1-ft thicklayer of clean backfill installed during the removal action. Four hundred thirty-three (433) properties have the potential to have PCBs greater than 1 mg/kg under structures. These residual PCBs were evaluated in the feasibility study." [167]

- The Bell Report (p. 59) "Case Study Adjustment Grid" states that the "Effective Date" of the Bell Anniston case study is "1999-2000" yet the one-page summary of the Anniston

---

[164]    "$700 Million Settlement in Alabama PCB Lawsuit," August 21, 2003. Source cited: nytimes.com/2003/08/21business/700-million-settlement-in-alabama-lawsuit.html

[165]  Ellen Griffith Spears, *Baptized in Blood: Race, Pollution, and Justice in an All-American Town*, University of North Carolina Press, April 2014, at p. 273, and footnote 61.

[166] U.S. EPA, "Proposed Plan Fact Sheet OU-1/OU-2 of the Anniston PCB Superfund Site: Residential and Commercial Properties, Parks and Schools, Industrial Parks, Drainage Corridors and Floodplains in Anniston, Oxford, Hobson City, and parts of Calhoun County, Alabama." March 2017, p. 5.

[167] U.S. EPA, "Proposed Plan Fact Sheet OU-1/OU-2 of the Anniston PCB Superfund Site: Residential and Commercial Properties, Parks and Schools, Industrial Parks, Drainage Corridors and Floodplains in Anniston, Oxford, Hobson City, and parts of Calhoun County, Alabama." March 2017, p. 5.



case study in the Bell Report (p. 199) contains information from various later dates in 2014 and 2017. Neither the Bell one page Anniston case study nor the Bell Report itself explains why information from Anniston in 2014 and 2017 is relevant if the "Effective Date" from the case study for comparison of the Anniston situation to the situation in the subject East St. Louis neighborhood is "1999-2000".

***The Improper Comparisons Made in the Bell Report Between the Anniston Situation and the East St. Louis Situation:*** The Bell Report (p. 59) claims that its overall comparison of the Anniston case study to the situation involving the situation affecting the 273 properties in the East St. Louis "study area" indicates that the situations are "Similar." In fact, they are significantly different, as indicated by the following:

- The 273 properties in the "study area" neighborhood in East St. Louis are not part of a designated Superfund site but portions of the neighborhood surrounding the Solutia site in West Anniston was actually part of the OU-1 operating unit of the Monsanto/Krummrich site that was being investigated and remediated according to protocols for a designated Superfund site.

- In Anniston, some properties had been purchased by Monsanto through a buyout program and residents relocated as of the "effective date" of 1999-2000 in the Bell Report Anniston case study.[168] There is no proposal or plan to relocate any of the residents who own properties in the subject neighborhood in East St. Louis.

- The acquisitions and demolitions that occurred in the neighborhoods affected by PCB contamination from the Monsanto/Solution site in Anniston were the result of U.S. EPA investigations and soil testing. The past acquisitions of properties and demolition of improvements in the subject East St. Louis neighborhood were done as part of urban renewal planning and not due to investigation or remediation of contamination.

***JLL Conclusion from Review of the Bell Report Case Study No. 1 Involving Anniston, Alabama***: The Anniston case study in the Bell Report is "biased" because it reports only the analysis of the appraisal expert for the Plaintiffs in the *Abernathy* case and does not report the contrasting opinion of the appraisal expert for the Defendants. Given the significant differences between the Anniston case study situation and the East St. Louis "study area" situation, the Anniston case study does not support a conclusion that there has been a 100% impact (or even a -55% impact) on the value of the 273 properties in the subject neighborhood.

---

[168] According to the Baptized in PCBs book, the buyouts occurred in 1995. Ellen Griffith Spears, *Baptized in Blood: Race, Pollution, and Justice in an All-American Town*, University of North Carolina Press, April 2014, at p. 215.



**10.4 Bell Case Study No. 2: Times Beach, Missouri – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections**

***The Bell Claims Concerning the Times Beach, Missouri, Situation***: The Bell Report (Addenda, p. 200) contains a one-page summary of the Times Beach situation that includes the following statements about the Times Beach, Missouri contamination situation:

- "Starting in the early 1970s, Times Beach used waste oil as a dust control measure for unpaved roads in the town.  An investigation by the EPA in 1982 discovered that the town used dioxin-contaminated oil.  Shortly after, the Meramec River flooded the town and residents evacuated."

- "In response to a health advisory issued by the Center for Disease Control, the EPA announced in February 1983 the permanent relocation of 800 residential properties and 30 businesses in Times Beach due to contamination."

- "The EPA funded the remediation of the town.  The remediation involved demolishing and incinerating hazardous materials and constructing a ring levee to protect against future floods.  The cleanup was completed in 1997."

- As of 1999, the area is now Route 66 State Park."

The Bell Report (p. 55) also states that the Times Beach area "was placed on the National Priorities List (NPL) in 1983 and removed in 2001."  The NPL is the list of "Superfund" sites.

The Bell Report (p. 55 and p. 200) concludes that the Times Beach case study demonstrates a -100% impact on value as of 1982 because the homes and businesses were demolished.

***The JLL Research into the Times Beach, Missouri, Contamination Situation***:  JLL staff members while previously working at Clarion Associates investigated the Times Beach contamination situation in 2003 as part of a litigation assignment involving another appraiser's case study involving the same situation. Our Times Beach Case Study is contained in the Addenda to this JLL Expert Report.

***The Errors, Omissions, and Misrepresentations in Bell Case Study No. 2 Involving Times Beach, Missouri***: Among the more significant errors, omissions and misrepresentations in the Bell Report Case Study No. 2 involving Times Beach, Missouri, are the following:

- The Bell Report (p. 59) states that the "cost and Timing of remediation" at Times Beach is "not determined."  In fact, the remediation of the site was completed by the end of 1997 and the site was removed from the Superfund list in 2001. The total cost of the remediation project is estimated to have been approximately $200 million.[169]

- The incinerator placed on the Times Beach site during the remediation was used not only to incinerate soil from the Times Beach site itself but also incinerated contaminated soils from 27 other sites.  The plan for the incinerator created significant concerns in nearby neighborhoods surrounding the former Times Beach community.

- The Bell Times Beach case study does not include any investigation or analysis of sales activity in the neighborhoods adjacent to the Times Beach Superfund site.  The East St.

---

[169]  Wikipedia entry for Times Beach Missouri.  Source: https://en.wikipedia.org/wiki/Times_Beach,_Missouri  citing the following:  Hernan, Robert (2010). *This Borrowed Earth: Lessons from the 15 Worst Environmental Disasters around the World*. New York: Palgrave Macmillan. ISBN 9780230619838; and Allen, Robert (2004). *Dioxin War: Truth and Lies About a Perfect Poison*. London: Pluto Press.



Louis "study area" neighborhood identified in the Bell Report is adjacent to and in proximity to a number of Superfund sites.  As a result, to understand the potential effect of proximity to Superfund sites, the Bell Times Beach case study should have looked at sale prices in the area surrounding the Times Beach site.

***The Improper Comparisons Made in the Bell Report Between the Times Beach Situation and the East St. Louis Situation****:* The Bell Report (p. 59) "Case Study Adjustment Gird" claims that its overall comparison of the Times Beach situation to the situation affecting the 273 properties in the Bell East St. Louis "study area" indicates that the situations are "Similar."  In fact, the situations are quite different, as indicated by the following:

- Times Beach was a designated U.S. EPA Superfund Site.  The subject neighborhood in East St. Louis has not been investigated as a potential site for any type of U.S. EPA investigation or remediation.

- The Bell Report claims that both his East St. Louis "study area" and the Times Beach area are examples of non-source sites of contamination.  In fact, the Times Beach area where all the homes were removed was a "source site" the dioxin contamination was the waste oil that was used to control dust on the roads in the town.

- The Center for Disease Control issued a public health advisory for Times Beach in December of 1982.  There has been no ATSDR public health advisory issued for the Bell "study area" neighborhood in East St. Louis.

- The health advisory issued in Times Beach warned all residents to leave the town and FEMA provided temporary residences for the residents.  There has been no such warning or emergency evacuation of residents of the Bell "study area" subject neighborhood in East St. Louis.

- The levels of contamination found in Times Beach soils were so high that the entire town was placed on the National Priority List (NPL) as a Superfund site. The subject neighborhood is not on the NPL.

- The Bell Report claims that its Times Beach case study indicates a permanent 100% impact on values of property in his East St. Louis "study area" neighborhood.  However, the Bell Report case study included no actual analysis of prices within Times Beach immediately prior to the decision to evacuate the town, so the Bell Report does not compare actual prices to market values to determine an impact.  However, as the JLL case study in the Addenda to this JLL Expert Report demonstrates, when actual sale prices in neighborhoods adjacent to or in proximity to the Times Beach Superfund site are investigated, only temporary impacts on prices and values occurred and the impacts ended once the contamination at the Superfund site had been controlled and remediated.

***JLL Conclusion from Review of the Bell Report Case Study No. 2 Involving Times Beach, Missouri****:* Given the significant differences between the Times Beach case study situation and the East St. Louis "study area" situation, the Times Beach case study does not support a conclusion that there has been a 100% impact on the value of the 273 properties in the subject neighborhood.



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

### 10.5 Bell Case Study No. 3: Pensacola Escambia Wood Treating Facility – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

***The Bell Claims Concerning the Pensacola, Florida, Escambia Wood Treating Facility Situation****:* The Bell Report (p. 201) contains a one-page summary that includes the following statements about the Pensacola Escambia Wood Treating Facility contamination situation:

> "In 1995, soil samples from neighboring properties to the Escambia Wood Treating Facility revealed dioxin, arsenic, and lead contamination. The Escambia Wood Treating Facility was placed on the National Priorities List in 1994.
>
> By 1992, the EPA evacuated and stockpiled approximately 225,000 cubic yards of contaminated materials with a liner cap. The mound of contaminated material became known as 'Mt. Dioxin'
>
> In 1997 the EPA released a Record of Decision (ROD) to permanently relocate 358 residents from the Rosewood Terrace, Oak Park, Herman & Pearl/Goulding subdivision, and Escambia Arms Apartments. In 2006, the EPA included the permanent relocation of the Clarinda Triangle Neighborhood.
>
> Relocation and demolition of the former residential neighborhoods ended in 2008 and included more than 400 households. Land use of the former residential homes was restricted to commercial and industrial uses."

Based on those statements, the Bell Report (p. 201) arrives at the following conclusion:

> **"Case Findings:**
>
> Cost & Use: Not determined
>
> Risk: -100% (Demolished)"

In the "Case Study Adjustment Grid" at p. 59, the Bell Report indicates the "effective date" of the case study is 1995.  It also indicates that the Escambia Superfund Site was in the "Ongoing" stage of the remediation life cycle.

***The JLL Research into the Pensacola Escambia Wood Treating Facility Contamination Situation****:*  JLL staff members while previously working at Clarion Associates investigated the Escambia Wood Treating Facility contamination situation in 2000 and 2001 as part of a litigation assignment involving another appraiser's case study involving the same situation.

Our JLL Pensacola Escambia Case Study prepared in the early 2000s is contained in the Addenda to this JLL Expert Report. Additional information related to the contamination situation as of 2023 is included below.

We have updated that prior research for purposes of this review of the Bell Report by undertaking the following activities:

- Reviewed our prior Clarion file related to the earlier investigation and research.

- Inspected the Escambia Wood Treating Facility site, the nearby Agrico Chemical Superfund site, and the adjacent and nearby neighborhoods, including the subdivisions where residents were relocated and homes acquired and demolished.

- Undertook online research to update information from the U.S. EPA related to the investigation and remediation of the Escambia Wood Treating Facility Superfund site.



- Undertook online research related to Agency for Toxic Substances and Disease Registry (ATSDR) investigations of health issues related to the Escambia Wood Treating Facility Superfund site and the nearby neighborhoods.

- Undertook additional online research related to news media coverage of the contamination situation.

***The Errors, Omissions, and Misrepresentations in the Bell Case Study No. 3 Involving the Pensacola, Florida, Escambia Wood Treating Facility***:   Among the more significant errors, omissions and misrepresentations related to the Escambia Wood Treating Facility case study in the Bell Report are the following:

- Even though the Bell Report (p. 9) states that the "effective date" of the case study is 1995, the Bell Report (p. 201) contains information related to 1998, 2006 and 2008. However, the Bell Report fails to include some of the important information related to the contamination situation and the nearby neighborhoods in those later years.

- The "Case Study Adjustment Grid" at page 59 of the Bell Report claims the Escambia Wood Treating Superfund site was in the "ongoing" stage of the "remediation life cycle." The Bell Report (p. 62) defines the term "ongoing stage" as "meaning that they have been through the assessment and remediation stage."  As of the 1995 "effective date" of the Bell case study, however, the Escambia Superfund site was in the "active remediation" stage not the "ongoing" stage and the adjacent neighborhoods were in the "assessment" stage and had not been remediated.

- The situation surrounding the Escambia Superfund Site was described by the USEPA in 1996 as "unique" due to the "extensive removal actions already performed which resulted in the excavation and stockpiling on-site of 255,000 cubic yards of dioxin contaminated soil, coupled with the health concerns raised by the community."[170]

- Sampling of soils in July of 1995 in both the Oak Park and Rosewood Terrace residential neighborhoods did not indicate levels of contamination above standards that would require either relocation of residents or demolition of homes.[171]

- The principal contamination concern related to the adjacent and nearby neighborhoods was that the onsite remediation of the Superfund site would result in wind-blown dust entering the adjacent and nearby residential neighborhoods.[172]

---

[170] United States Environmental Protection Agency, "Addendum to the April 1996 Superfund Proposed Plan Addendum to April, 1996 Superfund Proposed Plan Fact Sheet Escambia Treating Company Interim Action," August 1996, p. 3.

[171] The U.S. EPA Addendum to the April 1996 Superfund Proposed Plan Fact Sheet for the "Escambia Treating Company Interim Action" stated that soil testing in the residential neighborhoods indicate that only 21 of the 66 properties in the Rosewood Terrace subdivision and "approximately 10 of the 35 properties of the Oak Park subdivision" had a "reasonable maximum exposure" to dioxin that would require cleanup of the residential properties.

[172] "Future remediation activities could create contaminated dust and release volatile chemicals from soil that could expose remediation workers and nearby residents." Florida Department of Health and Rehabilitative Services Under Cooperative Agreement with the Agency for Toxic Substances and Disease Registry, "Public Health Assessment: Escambia Wood – Pensacola (A.K.A. Escambia Treating Company), Pensacola, Florida, CERCLIS No. FLD008168346, November 2, 1994," at p. 30.



- Initially, in April of 1996, the USEPA proposed relocating only the 66 households in the Rosewood Terrace subdivision located on the north side of the Superfund site downwind from the site and therefore potentially affected by wind-blown dust as the remediation would proceed.

- In August of 1996, however, and again despite the test results in the neighborhood, the USEPA proposed relocation of the additional 35 homes in the entire Oak Park subdivision as well. The reason given by the EPA was not related to contamination on the properties but rather to the effect on the Oak Park neighborhood from removal and relocation of the Rosewood Terrace subdivision as described by the USEPA as follows:

  > "The net effect of the [Rosewood Terrace removal] action proposed in April to the single-family households in the Oak Park neighborhood would be to leave Oak Park as an isolate single-family residential area consisting of only 35 houses. Rosewood Terrace and Oak Park are part of the same neighborhood . . . they are adjacent, separated only by a narrow residential lane (Hickory Street). If the Rosewood Terrace households were relocated, Oak Park would be surrounded on all sides by areas without the characteristics of a single- family residential neighborhood. To the South would be empty land (formerly Rosewood Terrace). To the East would be industrial/commercial property. To the North would be a wooded area, and to the West would be multifamily housing. The effect of this change would not only be psychologically isolating, but would also have the probable consequence of reducing property values as a consequence of EPA's action to relocate the 66 Rosewood Terrace households and resulting land use changes. It is also believed that the social cohesion of the community would be negatively affected, since the population of the single-family neighborhood would be cut by more than two thirds."[173]

- The U.S. EPA originally concluded in 1996 that neither the Escambia Arms Apartment complex nor the Goulding subdivision (a.k.a Pearl Street and Herman Avenue Neighborhood) located 1,400 feet south (up wind) of Escambia Treating Company site required relocation.

- In October 1996, an unexpected decision was announced whereby all 358 households, including those that lived in the Escambia Arms apartment complex and those in Goulding subdivision on Pearl Street and Herman Avenue, would be relocated. The decision was made by the U.S. EPA Region 4 Administrator, John Hankinson, Jr.[174]

---

[173] United States Environmental Protection Agency, "Addendum to the April 1996 Superfund Proposed Plan Addendum to April, 1996 Superfund Proposed Plan Fact Sheet Escambia Treating Company Interim Action," August 1996, p. 3.

[174] "The U.S. EPA has decided to relocate all of the residents living around the Escambia Treating Company Superfund site. This decision was based on the best scientific information available on the community's unique environmental, health and safety factors. It is also based on the community's concerns, as well as EPA's goal to protect the neighborhood's health, welfare and well-being." U.S. Environmental Protection Agency Region 4: Superfund Update: Escambia Treating Company Superfund Site, Pensacola, Escambia County, Florida. Volume 1, Issue 4. October 1996, at p. 1. In the Herman and Pearl neighborhood, dioxins levels on three of 30 samples measured above maximum levels for industrial use, and 22 of 30 exceeded residential levels. The Herman/Pearl samples documented extensive lead contamination apparently related to the nearby Agrico Superfund site



- The underlying political reason for the abrupt change from a plan to relocate only 101 households to the relocation of 358 households was summarized in a *U.S. News and World Report*, April 21, 1997 story as follows:

  > "Lois Gibbs, a veteran activist who had helped force the government to clean up Love Canal in the late 1970's, ran a full page ad in the October 1, 1996 Florida edition of USA Today. It reminded President Clinton of his campaign speech in which he said that no child should have to live near a hazardous-waste site."

  > "Two days later, EPA Regional Administrator John Hankinson overruled his staff and announced that all 358 families would be moved. The capitulation, says EPA insiders, was ordered by agency chief Carol Browner."

- The 1996 decision indicates that the decision related to relocation of residents from some of the neighborhoods in the vicinity of the Superfund site was made for political reasons rather than based on either health studies or documented soil contamination above remediation standards.

- The relocation of the residents in the 358 properties took six years to complete and ended in 2003.

- One of the concerns related to the Escambia Wood Treating site was the lack of security and inadequate fencing around the site when it contained the pile of excavated materials. A *Pensacola News Journal* story on January 25, 1995, with the headline "Dirt pile at toxic cleanup site becomes giant slide for kids," included a photo of children from the Escambia Arms apartment complex climbing on the tarpaulin covered pile.

- There was also significant on-site and off-site groundwater contamination related to the Superfund site that added to the complexity of the remediation project and contributed to concerns of nearby residents.

- A second Superfund site, the Agrico Chemical site, was also located in the neighborhood and a larger area that included both Superfund sites as well as the residential areas and other sites in the vicinity were part of a larger Brownfield designation area.

- The 2006 relocation of residents from the Clarinda Triangle neighborhood was based upon a March 2004 investigation of possible soil contamination in that neighborhood. Soil samples at 52 locations in the neighborhood were collected and analyzed. Only some of the samples showed levels of contaminants above state of Florida Soil Cleanup Target Levels.[175] Based on the sampling, an ATSDR public health assessment determined that there was "No Apparent Public Health Hazard." The map below shows the location of the sampling in the Clarinda Triangle neighborhood.

---

[175] According to a soil evaluation as part of a 2005 Clarinda Triangle Health Consultation conducted by the ATSDR, two of the 52 samples tested for dioxins higher than the DEP's Soil Cleanup Target Levels for industrial use, while 33 of 52 exceeded the levels for residential uses.





Figure 4: All values plotted have the units of nanograms per kilogram, or parts per trillion (ppt). One part per trillion is analogous to about 1 second in 320 centuries. Locations plotted had soil dioxin TEQs higher than DEP's residential Soil Cleanup Target Level (7 ppt). Circled value is the only sample with a dioxin TEQ value above ATSDR's screening value for children (50 ppt). None are above the ATSDR adult screening value (700 ppt).

Florida Department of *Health*

- The voluntary relocation of residents from 46 properties in the Clarinda Triangle neighborhood began in December of 2006 and was completed in August of 2008. Apparently, some owners in Clarinda Triangle chose not to relocate – the 2019 Federal Register statements related to the partial de-listing of the site from the Superfund program states that 38 properties in the Clarinda Triangle area were involved in the relocation.[176]

- The impact on value due to the Pensacola Escambia Superfund site contamination situation was not 100% -- the homeowners were paid 100% of the market value of their properties plus up to an additional $22,500 if the replacement home cost exceeded the typical $30,000 to $50,000 value in those neighborhoods.  Once the land was acquired, improvements demolished, and any necessary soil remediation completed, the land was rezoned with institutional controls imposed for non-residential commercial, industrial and manufacturing use and offered for sale. The Bell Report includes no data related to actual prices paid for properties in the neighborhoods before the relocation project began so the actual effect from the situation on market values cannot be determined from the Bell Report.

- The Bell Report fails to mention that there were other homes and neighborhoods in relatively close proximity to the Escambia Superfund site that did not require relocation and demolition and were not affected by the Superfund site remediation project.  Those homes not taken included a few homes located between the Goulding subdivision and the Superfund site.

- Prices paid for land zoned for commercial, industrial and manufacturing use in Pensacola in the early 2000s as well as today is typically higher than residentially zoned land in mixed use residential/commercial/industrial neighborhoods such as the ones in proximity to the Escambia Superfund site when the investigation began and when the remediation was completed.[177]

---

[176]   Federal Register / Vol. 84, No. 140 / Monday, July 22, 2019, at page 35061.

[177] The residential homes and apartments involved in the Escambia Wood Treating Site case study were surrounded by various industrial, manufacturing, warehousing, and small scale local commercial businesses.  They were also in close proximity to railroad tracks, a busy commercial highway, and a sand and gravel operation.  As indicated in our



- The remediation of the Superfund site and the areas from which residents were relocated was accompanied by a 2013 rezoning of the areas and the recording of "institutional controls" (restrictive covenants) that limit future uses of the sites to non-residential commercial, industrial and manufacturing uses only as shown on the map below. However, the value of the former residential areas for commercial, industrial and manufacturing use exceeds their value when considered for their former residential use

- As a result of the purchase and remediation of soil in the former residential area and rezoning for non-residential use, the impact on value has been "temporary" and not permanent.  It is possible that the result may be an increase in value of the property acquired.



Exhibit 3: Land Covered by Institutional Control Requirements

- As of the date of our most recent inspection on May 22, 2024, the former pile of contaminated soil had been removed.  The Google street view photos below show the Escambia Wood Treating Superfund site from Palafox Street.  The first street view photo is from May 2022 and the second is from March 2011 and indicate that the pile of contaminated soil had been removed at least by 2011.

---

case study in the Addenda, industrial land prices in the Pensacola area in 2001 were between $1.50 and $2.50 per square foot.  Three residential land sales researched in 2001 were at prices of $0.14 per sq. ft.; $0.74 per sq.ft.; and $0.90 per sq. ft.  Our preliminary research into land prices Q3 of 2021 and mid-2024 $4.58 and $12.69 per sq. ft. in closed sales and asking prices between $3.54 and $17.39 in offerings.



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*





***The Improper Comparisons Made in the Bell Report Between the Pensacola Escambia Situation and the East St. Louis Situation****: The Bell Report (p. 59) claims that its overall comparison of the Pensacola case study to the situation involving the situation affecting the 273 properties in the East St. Louis "study area" indicates that the situations are "Similar." In fact, they are significantly different, as indicated by the following:

- The 273 properties in the "study area" neighborhood in East St. Louis are not part of a designated Superfund site but some of the properties that were affected in Pensacola were actually part of a designated Superfund site.

- IEPA and U.S. EPA investigation into the subject neighborhoods in East St. Louis and the standards they apply would not currently require remediation of the subject properties.

- In the Escambia Superfund site situation, more than 400 properties were acquired and the owners relocated. There is no proposal or plan to relocate any of the residents who own properties in the subject neighborhood.

- The acquisitions and demolitions that occurred in the neighborhoods affected by PCB contamination from the Escambia Superfund site in Pensacola were the result of U.S. EPA investigations and soil testing. The past acquisitions of properties and demolition of improvements in the subject neighborhood in East St. Louis was done as part of urban renewal planning and not due to investigation or remediation of contamination.



***JLL Conclusion from Review of the Bell Report Case Study No. 3 Involving the Pensacola Escambia Wood Treating Facility****:* Given the significant differences between the Pensacola case study situation and the East St. Louis "study area" situation, the Pensacola case study does not support a conclusion that there has been a 100% impact on the value of the 273 properties in the subject neighborhood.

### 10.6 Bell Case Study No. 4: Carver Terrace, Port Arthur, Texas – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

***The Bell Claims Concerning the Carver Terrace Situation****:* The Bell Report (p. 202) contains a one-page summary that includes the following statements about the Carver Terrace situation:

> In 2013, Carver Terrace was selected by the Port Arthur Housing Authority (PAHA) for the Housing Mobility Program, which intended to demolish 204 public housing units and assisted in finding relocation housing.

> The Port Arthur Housing Authority received approval from HUD for $20 million in disaster relief money to help facilitate new replacement housing for Carver Terrace residents.

> Between 2015 and 2016, the Carver Terrace housing units were demolished.

Based on those statements, the Bell Report (p. 201) arrives at the following conclusion:

> **"Case Findings:**
>
> Cost & Use: Not determined
>
> Risk: -100% (Demolished)"

In the "Case Study Adjustment Grid" at page 59, the Bell Report indicates the "effective date" of the case study is 2013. It also indicates that Carver Terrace was in the "Ongoing" stage of the remediation life cycle and that the "contamination constituents" are "sulfur dioxin, benzene, hydrogen sulfide, and butadiene."

***The JLL Research into the Carver Terrace Situation***: Our review of the Bell Report Carver Terrace case study has involved the following investigation and research activities:

- Inspection of the location of the former Carver Terrace public housing project, the surrounding neighborhood, downtown Port Arthur, and other neighborhoods in Port Arthur.

- Exterior inspection of the various chemical facilities in Port Arthur, including the Motiva Enterprises chemical facility, the Valero refinery, and the Chevron Port Arthur facility.

- Inspection of the newly developed Park Central development to which the majority of the Carver Terrace residents were relocated.

- Inspection of the adjacent and nearby communities in Jefferson County, including Nederland and Groves.

- Online research on the U.S. EPA and other websites to gather information related to the environmental issues related to the Motiva oil refinery and other industrial/chemical facilities in the vicinity of the former Carver Terrace housing project.



- Analysis of residential property sales in the neighborhood around the former Carver Terrace public housing project utilizing the Jefferson County GIS system and the Houston and Beaumont area MLS system.

- Online research related to news media coverage of the environmental issues related to the Carver Terrace public housing project, the Motiva oil refinery, and other manufacturing/chemical facilities.

***The Errors, Omissions, and Misrepresentations in the Bell Case Study No. 4 Involving Carver Terrace in Port Arthur, Texas***: Among the more significant errors, omissions and misrepresentations in the Bell Report Case Study No. 4 involving Carver Terrace in Port Arthur, Texas, are the following:

- The Bell Report (p. 59) states that the Carver Terrace project was in the "Ongoing" stage of the remediation lifecycle. In fact, there was no investigation or remediation at the Carver Terrace project so it was not even in the "Assessment" stage of the remediation lifecycle.

- The documents in the Bell file production related to the Carver Terrace do not support a specific connection between the Carver Terrace demolition and relocation of its residents and any specific contamination investigation at Carver Terrace related to the claimed emissions from "smoke stacks" at the Motiva refinery facility that produced "elevated levels of benzene, sulfur dioxide, hydrogen sulfide, [and] 1, 2 butadiene."

- The Bell production includes a series of Google aerial maps with various dates, three news articles,[178] three pages plus the cover from a book,[179] and an April 2014 report related to implementing a fair housing related "housing mobility program" for residents of the Carver Terrace and Lincoln Square public housing projects.

- Two of the three news stories,[180] as well as the excerpt from the book, discuss in general terms air quality issues related to chemical facilities in Port Arthur but no specific connection between air quality issues in general and the decision to demolish Carver Terrace.

  The March 2016 NRDC news story includes the following statements:

  > "Carver Terrace is the "oldest and closest" of Port Arthur public housing complexes to the two refineries in Port Arthur and Carver Terrace was constructed in the 1952 "directly on the refineries' fence."

  > "West Port Arthur's enormous refineries have spewed forth benzene, carbon monoxide, sulfur dioxide, and other pollutants – permitted or unpermitted – for more than six decades."

---

[178] The three news stories are as follows: "Port Arthur, Texas: American Sacrifice Zone" dated November 12, 2014 and apparently sourced by Bell from the National Resource Defense Council website; a March 8, 2016 story from the *Port Arthur News* website entitled "Carver Terrace comes down amid former councilman's concerns"; and "Residents look forward to possible demolition," which appears to be the text of a news story that ran on a local Port Arthur area television network.

[179] The book is entitled *Sacrifice Zones: The Front Lines of Toxic Chemical Exposure in the United States*. The author is Steve Lerner and it was published in 2010 by MIT Press.

[180] The text of the local television story makes no mention of environmental or air quality issues at all when discussing the proposed demolition and relocation of Carver Terrace residents.



> "For residents of Carver Terrace, all aspects of daily life take place in the shadow of industry."

The 2016 *Port Arthur News* story makes the closest connection between air quality and the location of Carver Terrace "in the shadow of refineries." The article claims that the location "prompted U.S. Housing and Urban Development Agency officials to decide the facility should not be rebuilt at the same location following hurricane damage." The article provides no citation to a specific HUD document, however.

- The only specific reference to contamination events from the Motiva facility are in the Lerner (2010) book that discusses total emissions from the Motiva refinery in 2003 as well as the emissions on four days in 2003 when there were "unscheduled releases of multiple chemicals on a single day." Lerner (2010) at 74.  The book goes on to quote a former Carver Terrace resident who, the book states, "breathed air laced with elevated levels of benzene, sulfur dioxide, hydrogen sulfide, and 1,3-butadiene" and remembered that "the air smelled like rotten eggs." Lerner (2010) at 74.  The excerpt from the book contained no specific data related to air quality testing or measurements at Carver Terrace, or, in fact in the neighborhood near the Motiva refinery.

- The Bell case study fails to include any information related to other reasons why the Port Arthur Public Housing Authority decided to demolish Carver Terrace, including damage caused by Hurricane *Rita* (2005) and Hurricane *Ike* (2008), the danger from crime, and the age and condition of the project.

- Information related to the other reasons why Carver Terrace was demolished include the following:

  o The March 2016 news story in the Bell production says hurricane damage was "significant" and residents had to relocate.

  o "Hurricanes Rita (2005) and Ike (2008) did a great deal of damage to Port Arthur and the surrounding gulf communities."[181]

  o "In 2007, the Carver Terrace public housing complex had recently been damaged by hurricane-force winds and was patched with huge blue tarpaulins tied over the roofs."[182]

  o Following the hurricanes, several redevelopment efforts, funded by HUD Community Development Block Grant Disaster (CDBG) relief money, were implemented to rebuild parts of the community.

  o The Port Arthur Housing Authority ("PAHA") applied for and received approval from HUD for $20 million in CDBG disaster relief money related to Hurricane *Ike* to develop new replacement housing for Carver Terrace residents.[183]

  o The new Park Central Apartments were built in 2016 with $8 million of hurricane recovery funds to replace the old Carver Terrace low-income housing in the city's

---

[181] Christine Klepper, Executive Director – Housing Choice Partners; Final Housing Mobility Program; April 10, 2014
[182] Lerner, Steve; Sacrifice Zones: The Front Lines of Toxic Chemical Exposure in the United States; MIT Press 2010
[183] Christine Klepper, Executive Director – Housing Choice Partners; Final Housing Mobility Program; April 10, 2014



Westside after Hurricane Ike significantly damaged it.[184] Of the $8 million provided for the Park Central Apartments, $564,857 was dedicated to the Carver Terrace demo.[185]

- o In 2012 the local Housing Authority said the age of the buildings was "the driving force behind the planned demolition" and that "[t]he age of the units and the density is a challenge."[186]

- o Residents were concerned about crime in the housing project. One resident is quoted in a 2012 article as saying "danger" is another reason to relocate the project and that her son is afraid to "go outside." [187]

- o The Carver Terrace units were smaller than appropriate modern standards for family units.[188]

- o Carver Terrace was not conveniently located in relation to grocery stores and other neighborhood service needs.[189] The Park Central Apartments, that were built as a new housing development for the Carver Terrace and Lincoln Square residents, were specifically located closer to services, the local hospital complex, retail shopping, restaurants, and employment opportunities.[190]

- The Bell Carver Terrace case study does not include any information related to sales of single-family homes in the neighborhoods adjacent to the Motiva refinery.

- Our research into the local Multiple Listing Service found 78 sales of single-family homes between 2014 and 2024 (after the 2013 date of incident indicated by Bell) that feature a similar proximity to the refineries as that of Carver Terrace. The two maps below show the locations of those sales in close proximity to the Motiva refinery and actually closer to the refinery than the location of Carver Terrace. Prices for the homes range between $5,500 and $305,000.

  The Prince Hall Apartments, also identified on the map below, is another apartment complex in close proximity to the Motiva refinery complex from which residents have not been relocated and that has not been demolished.

---

[184] https://www.panews.com/2016/05/04/park-central-feted-with-open-house-wednesday/; Sherry Sturdivant; May 4, 2016

[185] https://www.panews.com/2016/03/08/carver-terrace-comes-down-amid-former-councilmans-concerns/; Sherry Sturdivant; March 8, 2016

[186] https://www.12newsnow.com/article/news/residents-look-forward-to-possible-demolition/502-270201977; kjac: July 21, 2012

[187] https://www.12newsnow.com/article/news/residents-look-forward-to-possible-demolition/502-270201977; kjac: July 21, 2012

[188] https://www.beaumontenterprise.com/news/article/2-port-arthur-housing-complexes-marked-for-3697090.php; Amy Moore; July 10, 2012

[189] Christine Klepper, Executive Director – Housing Choice Partners; Final Housing Mobility Program pg. 3; April 10, 2014.

[190] https://www.panews.com/2016/05/04/park-central-feted-with-open-house-wednesday/; Sherry Sturdivant; May 4, 2016







- The homes on the maps above were not demolished following the 2005 and 2008 hurricanes and were sold/purchased following the decision to demolish Carver Terrace, indicating that there was not a 100% "risk" effect in the adjacent neighborhoods due to proximity to the Motiva refinery.

- Three of the sales included homes that were built within four blocks of the Motiva refinery after the 2013 "effective date" in the Bell case study: 501 17th Street (2022); 1048 15th



Street (2014); 635 19th Street (2014); and 509 Gulfway Drive (2021).  Google street view photos of those homes are shown below.



**501 17th Street (Aug. 2022)**



**635 19th Street (Oct. 2016)**



**509 Gulfway Drive (Dec. 2021)**



***The Improper Comparisons Made in the Bell Report Between the Carver Terrace Situation and the East St. Louis Situation****: The Bell Report (p. 59) "Case Study Adjustment Gird" claims that its overall comparison of the Carver Terrace situation to the situation affecting the 273 properties in the Bell East St. Louis "study area" indicates that the situations are "Similar." In fact, the situations are quite different, as indicated by the following:

- Carver Terrace was an outdated public housing project and the principal reason it was demolished was due to its age, condition, and unsuitability for large families.

- The 273 properties involved in the Bell East St. Louis report do not include a public housing project.

- The Carver Terrace that had been damaged by hurricanes, contributing to its condition that required demolition.

***JLL Conclusion from Review of the Bell Report Case Study No. 4 Involving Carver Terrace in Port Arthur, Texas****: Given the differences between the Carver Terrace case study situation and the East St. Louis "study area" situation, the Carver Terrace case study does not support a conclusion that there has been a 100% impact on the value of the 273 properties in the subject neighborhood.



**10.7  Bell Case Study No. 5: Agriculture Street Landfill, New Orleans – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections**

***The Bell Claims Concerning the Agriculture Street Landfill Situation***: The Bell Report (p. 203) contains a one-page summary of the Agriculture Street Landfill situation that includes the following statements about the contamination situation:

> The Agriculture Street Landfill was in use between 1909 and the 1950s but was reopened "in 1965 to burn disposal debris created from Hurricane Betsy."

> Single-family homes, townhomes, apartments, an elementary school and community center, and a few retail businesses were developed on 47 acres on and adjacent to the landfill in the 1970s and 1980s.[191]

> In 1994, the landfill site was placed on the National Priorities List as part of the Superfund program.  The Bell Report (p. 203) then states that the landfill "was partially deleted from the NPL in 2000 with some sites in the process of removal."

The Bell Report one-page case study summary then provides the following detail about the cleanup process, the impact of Hurricane *Katrina* on the neighborhood, and the status of the landfill neighborhood as of the date of the Bell Report:

> "The cleanup process involved 179 Housing Authority of New Orleans townhomes, 128 Gordon Plaza apartments, 7 retail business, and 58 of 67 single-family homes in the Gordon Plaza Subdivision.  A Record of Decision was signed in 2002, determining no further action.

> In 2005, Hurricane Katrina hit the area, destroying most structures except single-family homes and the electrical substation.  The remaining structures await demolition and redevelopment, leaving the community largely 'vacant and abandoned.'  According to a 2022 Washington Post article, residents' disaster insurance would not cover homes built on contaminated ground.  Residents have requested relocation assistance for over 30 years.

> In 2022, a civil court judge ordered the city of New Orleans to pay $75 million in property damage, relocation costs, and emotional stress."

Based on those statements, the Bell Report (p. 203) arrives at the following conclusion:

> **"Case Findings:**
>
> Cost & Use: Not determined
>
> Risk: -100% (Abandoned and Demolished)"

In the "Case Study Adjustment Grid" at page 59, the Bell Report indicates the "effective date" of the case study is 1997.  It also indicates that the Agriculture Street Landfill was in the "Ongoing" stage of the remediation life cycle.

***The JLL Research into the Agriculture Street Landfill Contamination Situation***:  JLL staff members while previously working at Clarion Associates were retained by the Orleans Parish School Board in 2010 to analyze sale prices in the Agriculture Street Landfill neighborhood as of

---

[191]  JLL research indicates that the Press Park town homes were constructed on a portion of the former landfill between 1969 and 1971. The 67 Gordon Plaza single family homes were constructed between 1979 and 1981 on another portion of the former landfill.



August 2005 immediately before Hurricane *Katrina* and then again as of April of 2011. That work also involved review of an appraisal report prepared by a local New Orleans appraiser and a commentary on the accuracy of a ruling related to the impact of the contamination on market value entered by a judge in one of the cases involving the landfill.

The purpose of the work was to determine the level of environmental "stigma" (in other words, the "risk effect") from the contamination situation as of those dates. Our JLL Agriculture Street Landfill Case Study is contained in the Addenda to this JLL Expert Report.

For purposes of this follow up review of the Bell Report Agriculture Street Landfill Case study, we have undertaken the following additional activities:

- Conducted online research into court decisions and news stories related to the Agriculture Street Landfill neighborhood since the completion of our 2011 research.

- Updated information from the U.S. EPA related to the investigation and remediation of the Agriculture Street Superfund site.

***The Errors, Omissions, and Misrepresentations in the Bell Case Study No. 5 Involving the Agriculture Street Landfill in New Orleans***: Among the errors, omissions and misrepresentations in the Bell Report are the following:

- The Bell case study summary fails to discuss the actual soil contamination remediation process that occurred. Between 1997 and 2001 approximately two feet of soil at all but nine of the homes on Gordon Plaza was removed, an engineered barrier installed to cap the landfill, and clean soil brought in and backfilled to replace the excavated soil that had been removed, and then new landscaping and sidewalks and driveways installed. The cost of the soil remediation project was approximately $20.0 million.

- The Bell case study fails to distinguish between the situations affecting each of the three residential components of the development on the landfill. The three components are the single-family homes in the Gordon Plaza subdivision, the Press Park townhomes, and the Gordon Plaza apartments.



- All three of the residential components are within the Agriculture Street Landfill Superfund Site. The homes on Gordon Plaza are within the OU-2 operating unit of the Superfund Site as shown on the site plan image to the right.[192]

---

[192] Source: Halle Parker, "Their houses were built on a landfill; finally New Orleans asks their interest in a buyout", NOLA, April 6, 2021. That article was included in the Bell production file.



- Following Hurricane *Katrina*, the U.S. EPA inspected the engineered barrier and the prior soil replacement remediation work at the homes on Gordon Plaza and concluded that although the hurricane may have severely damaged many homes and buildings, the engineered barrier had not been compromised.



- Additional inspections of the engineered barrier and the soil replacement work in 2009-2011 also indicated that the engineered barrier was continuing to function properly to protect the homes from contamination from the landfill.

- The Bell Report claim that the entire Agriculture Street neighborhood is "abandoned and demolished" is inaccurate.

- The townhomes, apartments, a community center, and the neighborhood school were so severely damaged by Hurricane *Katrina*, that they could not be rebuilt and remained empty and abandoned more than a decade after *Katrina*,[193] creating neighborhood blight.

- Although the severe damage caused by Hurricane *Katrina* in some portions of the neighborhood resulted in demolition and abandonment, the homes in the Gordon Plaza portion of the neighborhood constituting the OU-2 unit of the Superfund Site where contaminated soils had been replaced were repaired following *Katrina* and homes continued to be bought and sold. The Google satellite image to the left shows the Gordon Plaza neighborhood as of the date of this JLL Expert Report. The photo below shows the Google street view on Gordon Plaza Drive.



- The Bell Report misrepresents the 2022 court decision awarding $75 million to class action plaintiffs for a combination of "property damage, relocation costs, and emotional stress."

---

[193] The application to demolish the Press Park townhomes and apartments was not made until 2012. Bell production document with the heading Agriculture Street Landfill: EPA Region 6. Congressional District 02. Site Summary, August 2015. EPA Publication Date: September 17, 2015. Page 2. According to an April 2021 news story included in the Bell production, 154 of the 221 townhouses in the Press Park development were demolished in 2014. The remaining 67 abandoned townhouses had not been demolished as of April of 2021. Halle Parker, "Their houses were built on a landfill; finally New Orleans asks their interest in a buyout", NOLA, April 6, 2021.



It did not, as implied by the wording of the Bell case study, conclude that there had been a -100% impact on value due to "risk" related to contamination.

- The Bell Report fails to mention that the 2022 decision was one phase in a much longer series of decisions involving properties in the neighborhood.  For example, the Bell case study does not mention that in a 2013 trial in one phase of the litigation involving 65 properties constructed on the contaminate Agriculture Street landfill, the judge ruled that the homes in Gordon Plaza "were determined to have suffered a 20% loss in the present-day value" and properties adjacent to the landfill were awarded 10% of their value.[194] That verdict was affirmed on appeal.[195]

- The Bell Report also fails to mention that in another phase of the litigation, a special master was appointed to oversee possible settlement negotiations with the assistance of an accounting firm and a real estate appraisal firm.  The court appointed appraiser prepared an appraisal report on 261 properties involved in the claim for property damages. The appraiser determined that there was a 20% "stigma impact" on value to the homes located directly above the contaminated landfill and a 10% impact on value to homes adjacent to the landfill site.  Both the special master and the district court hearing the case accepted and approved the appraisal reports and that district court decision was affirmed by an appellate court.[196]

- The result of the litigation, the special master's report, and the affirmation of the 20% "stigma impact" was to overturn a 2005 trial court decision that had found a 100% stigma impact on homes constructed directly above the contaminated landfill.[197]

- The Bell Report contains no sale data to support the claimed 100% impact on value as of 1997.

- As our Agriculture Street Superfund Site case study in the Addenda indicates, our research found 16 home sales between 2001 and 2010 involving homes built directly above the former landfill and involved in the contaminated soil excavation and replacement project.

- Our paired sales analysis in the Addenda in which prices paid in the ten arms-length transactions in the Gordon Plaza subdivision between 2001 and 2010 were compared to prices paid for similar homes in a neighborhood not affected by the landfill situation indicated an impact on value of between about -6.0% and -12.0%, not -100%, with an average of about -9.0% impact due to the landfill contamination situation.

- Our analysis in the Addenda also indicates that some of the -6.0% to -12% impact was due to both the presence of abandoned buildings (including an abandoned community center and school) that had not been demolished more than five years after *Katrina* as well as due to the neighborhood action campaign by some residents that discouraged potential purchasers from buying homes in Gordon Plaza.

---

[194] *Johnson v. Orleans Parish School Board*, Case No. 2022-CA-0639.  Decided May 31, 2023. Page 7.

[195] *Johnson v. Orleans Parish School Board*, Case No. 2022-CA-0639.  Decided May 31, 2023. Page 7 citing *Johnson v. Orleans Parish School Board*, 14-0277, (La. App. 4th Cir. 4/26/17) 219 So.3d. 452.

[196] *Johnson v. Orleans Parish School Board*, Case No. 2022-CA-0639.  Decided May 31, 2023. Page 36.

[197] *Johnson v. Orleans Parish School Board*, Case No. 2022-CA-0639.  Decided May 31, 2023. P. 30.



***The Improper Comparisons Made in the Bell Report Between the Agriculture Street Landfill Situation and the East St. Louis Situation****:* The Bell Report (p. 59) claims that its overall comparison of the Agriculture Street Landfill case study to the situation involving the 273 properties in the East St. Louis "study area" indicates that the situations are "Similar." In fact, they are significantly different, as indicated by the following:

- The residential properties in New Orleans were actually built above a contaminated landfill that was declared a Superfund Site. The subject neighborhood "study area" in East St. Louis is not a Superfund Site.

- In New Orleans, the U.S. EPA removed two feet of contaminated soil around the homes on Gordon Terrace and backfilled with new soil and then relandscaped and installed new driveways and sidewalks. No remediation in the subject "study area" neighborhood has been necessary and under IEPA and U.S. EPA standards no remediation is currently required.

- Hurricane Katrina devastated the neighborhood built on the Agriculture Street Landfill. Townhomes, an apartment complex, and a community center were so severely damaged that they had to be abandoned. It took nine years following Katrina for some of the abandoned buildings to be demolished and many other abandoned buildings continue to sit empty even today.

***JLL Conclusion from Review of the Bell Report Case Study No. 5 Involving the Agriculture Street Landfill Situation in New Orleans****:* The Bell Report claim that the Agriculture Street Landfill situation indicates a -100% impact on value is incorrect. The litigation involving property damage claims related to the contamination situation concluded that there was no more than -20% impact on value of the homes built directly on the landfill and only a -10% impact on homes built adjacent to the landfill.

Our JLL analysis of sales data in 2010 and 2011 indicated an even lower impact on value of between -6.0% and -12.0% and some of that impact was due to both the presence of abandoned buildings (including an abandoned community center and school) that had not been demolished more than five years after *Katrina* as well as due to the neighborhood action campaign by some residents that discouraged potential purchasers from buying homes in Gordon Plaza.



### 10.8 Bell Case Study No. 6: Mossville, Louisiana – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

***The Bell Claims Concerning the Mossville Situation****:*

The Bell Report (p. 201) contains a one-page summary that includes the following statements about the Mossville, Louisiana contamination situation:

> "In 1994, one million pounds of ethylene dichloride spilled, contaminating well water in the area (Condea Vista Spill). Residents engaged in a class action lawsuit against Condea Vista alleging that the company allowed carcinogen ethylene dichloride to seep into the town's soil. Residents won relocation opportunities and Condea Vista purchased properties between 1998 and 2004.
>
> In 2013, Sasol announced a voluntary buyout program for Mossville residents to make room for Sasol to expand its facility. According to Sasol, 584 homes were purchased and 195 offers were rejected as of July 2020.
>
> In 2016 Sasol offered an additional buyout program to the whole town of Mossville to create a buffer zone for its industrial complex. Homeowners were offered $100,000 plus 60% of the appraised value of the house. Of the approximately 750 property owners who applied to the buyout program Sasol made offers to approximately 550. In Mossville 229 homeowners and 134 vacant land owners accepted.
>
> 'Every three or four days, another house disappears from the streets around the church. Concrete slabs and mailboxes mark the departed.' (Nola, 2017).
>
> 'Mossville is now a shadow of what it once was, with many remaining houses surrounded by empty lots and bare slabs.' (Advocate, 2021)"

Based on those statements, the Bell Report (p. 201) arrives at the following conclusion:

> **"Case Findings:**
>   Cost & Use: Not determined
>   Risk: -100% (Demolished)"

In the "Case Study Adjustment Grid" at page 59, the Bell Report indicates the "effective date" of the case study is 2013. It also indicates that the Mossville area was in the "Ongoing" stage of the remediation life cycle.

***The JLL Research into the Mossville Situation***

Our review of the Bell Report Mossville case study has involved the following investigation and research activities:

- Inspection of the Mossville (and Brentwood) case study area including the subdivisions from which residents were relocated and where homes were acquired and demolished.

- Inspection of the adjacent and nearby communities of Sulphur and Westlake.

- Online research on the U.S. EPA and other websites to gather information related to the investigation and remediation of the Mossville area.



- Online research related to Agency for Toxic Substances and Disease Registry (ATSDR) investigations of health issues related to the Mossville area and the other neighborhoods adjacent to the Sasol facility.

- Analysis of residential property sales utilizing the Calcasieu Parish GIS system and Parish Clerk services.

- Online research related to news media coverage of the environmental situation related to the Sasol facility.

***The Errors, Omissions, and Misrepresentations in the Bell Case Study No. 6 Involving Mossville, Louisiana***: The errors, omissions and misrepresentations related to the Mossville, Louisiana case study in the Bell Report include the following:

- The Bell Report misrepresents the 1995 litigation. By using the words "seep into the town's soil," the Bell Report makes it sound as if the 1994 litigation related to soil contamination in the neighborhood.  It did not.  It related to groundwater contamination underneath the neighborhood.  That is corroborated by newspaper articles reporting on the 1997 and 1998 class-action settlements with Condea Vista and Conoco, both of which refer directly to groundwater contamination, not soil. In addition, EPA and ATSDR studies both stated that soil dioxin levels were not at levels of concern and that "(a) plume of contaminated groundwater originating from the Sasol North America facility underlies a portion of the Mossville AOI," and was under active remediation.[198] As a result, the Bell Report statement at page 60 that there is both soil and groundwater contamination in the Mossville neighborhood is not correct.

- By using the word "won relocation benefits" in relation to the 1995 class action litigation, the Bell Report makes it sound as if the case was tried to a conclusion. Instead, there was a 1998 settlement agreement that was structured to "give (Mossville residents) an opportunity to sell their property at a premium value, if they choose to, so that they can move."[199]

- The Bell Report fails to state that the 2013 voluntary buyout program resulted from a plan for expansion of the plant and not from any additional soil or groundwater investigation or remediation.

- In early 2011, Louisiana's Economic Business Development Business Expansion and Retention Group (BERG), the Southwest Louisiana Economic Development Alliance, and the Port of Lake Charles, assisted in locating a viable site for Sasol's planned expansion of its chemical manufacturing facility to include an ethylene cracker and a gas-to-liquids facility.

- By September 2011, the 650-acre site to the west and northwest of the plant had been identified as the optimal location for the expansion. The proposed site included the previously acquired residential lots from the 1998 settlement as well as the southern portion of the Brentwood community immediately north of the plant as shown on the map below.

---

[198] "Public Health Assessment: Review of Data from the 2010 EPA Mossville Site Investigation; Mossville, Calcasieu Parish, Louisiana," Louisiana Department of Health and Hospitals, prepared under a cooperative agreement with the US Department of Health and Human Services ATSDR Division of Community Health Investigations, July 9, 2013

[199] "Company agrees to settle contamination case," Daily World, Tuesday, March 17, 1998





- Contrary to the Bell Report, the proposed expansion site did not include any additional homes in Mossville. The portions of the Mossville community that had not participated in the earlier 1998 voluntary purchase program following the settlement of the class action litigation were not included in the proposed 2011 expansion area.

- Bell omits the important fact that the residents of Mossville had long been requesting to have their homes relocated as a result of their proximity to the many petrochemical and manufacturing plants constructed since the 1940s.

- When the Sasol plant expansion was announced, Mossville property owners outside the proposed expansion area approached Sasol about creating a new voluntary purchase program to acquire their properties. According to a press release issued by Sasol in September of 2022, "Mossville residents had asked nearby industry to purchase their property so they could move . . .[a]nd for many years they were largely ignored" but "that changed when Sasol agreed to spend over $75 million to buy property we neither needed nor wanted – at prices significantly above market value – simply because our neighbors asked us to."[200]

- That indicates that, contrary to the claim in the Bell Report, the buyout program was not created "to make room for Sasol to expand its facility."

- The map below from the 2013 Sasol buyout program brochure[201] shows the streets initially involved in the buyout program area.

---

[200] Public inquiry response. Organization: Business & Human Rights Resource Center. Date: September 22, 2022.
[201] Sasol North America Inc., Voluntary Property Purchase Program, July 18, 2013, p. 8.





- The purpose of the 2013 program was not, as claimed in the Bell Report "to create a buffer zone for its industrial complex." As shown on the map below, areas to the east of the Sasol facility in the community of Westlake that was as close, and in some cases closer, to the proposed new facility than areas in Mossville, were not involved in the voluntary purchase program. If the purpose had been to create a buffer zone, residences on the east side of the expansion area would also have been purchased.



- The southern portion of the Brentwood neighborhood located at the north end of the proposed expansion area was to be acquired.  The northern portion of the Brentwood neighborhood was part of the voluntary purchase program.  The Bell Report does not mention the Brentwood neighborhood.



- Mossville residents requested the initial buyout program to be expanded to cover a larger area of Mossville.  Sasol did so at their request even though the properties were not needed for the expansion of the plant.  The expanded buyout program area is outlined on the map below as included in the 2019 documentary about Mossville entitled "Mossville: When Great Trees Fall.".



- The Bell case study contains inconsistent and inaccurate numbers of properties involved in the buyout program.  The Bell Report says that the as a result of the 2013 buyout program, "584 homes were purchased and 195 offers were rejected as of July 2020." The case study then says in the "additional buyout program" in 2016, 750 property owners "applied to the buyout program" and Sasol "made offers to 550" but not all of those were in Mossville.  The Bell case study says "in Mossville 229 homeowners and 134 vacant landowners accepted" the buyout offers.  The reported Bell buyout numbers are somewhat different from the information in a press release from Sasol North America that indicates that as of 2017, 788 offers had been extended with 597 accepted, 157 rejected, and 34 pending, inclusive of the 229 homeowners and 134 vacant landowners in Mossville. As of 2022, Sasol stated the VPPP achieved a participation rate of approximately 85%.

- Again, as with the original 2013 buyout proposal, the expanded buyout program did not include any areas in Westlake located immediately east of the original facility and east of the expanded facility even though the Westlake area was subject to many of the same environmental concerns as Mossville.

- The Bell Report does not mention the proximity of Westlake to the Sasol facility and the expansion area.  As a Sasol 2022 press release states:

  "*While Sasol and other industrial facilities are near Mossville, Sasol is in fact immediately adjacent to Westlake, LA, which is a thriving community of about 5,000 where many industry employees and their families reside…*" "*The employees of these facilities, who have direct knowledge of safety and operations procedures, choose to live near the facilities (and in many cases closer than Mossville homes) …*"



| Westlake Facility-Adjacent Residential Sales | | |
|---|---|---|
| **Address** | **Sale Date** | **Sale Price** |
| 1104 Guillory St | 2/25/2013 | $ 60,000 |
| 1005 Guidry St | 4/16/2013 | $ 21,000 |
| 900 Harrison St | 3/19/2015 | $ 16,500 |
| 1728 St John Bosco St | 4/20/2015 | $ 75,000 |
| 1305 Guillory St | 7/21/2015 | $ 114,100 |
| 2232 Janelle Ave | 5/19/2016 | $ 172,500 |
| 1116 Guillory St | 7/11/2016 | $ 48,000 |
| 1126-1132 McKinley St | 9/8/2016 | $ 94,000 |
| 2000 Henry St | 8/18/2017 | $ 45,000 |
| 1508 Ann Dr | 10/30/2018 | $ 125,000 |
| 2224 Janelle Ave | 3/25/2020 | $ 172,000 |
| 1009 Carroll St | 6/12/2020 | $ 90,000 |
| 1112 Guillory St | 6/18/2020 | $ 40,000 |
| 1100 Field St | 11/2/2020 | $ 155,000 |
| 1600 Houston River Rd | 4/15/2021 | $ 37,500 |
| 2215 Janelle Ave | 4/16/2021 | $ 195,000 |
| 2004 Henry St | 5/4/2021 | $ 45,000 |
| 2008 Henry St | 5/4/2021 | $ 45,000 |
| 1220 Guillory St | 8/11/2021 | $ 100,000 |
| 2213 Janelle Ave | 9/3/2021 | $ 216,400 |
| 1708 St John Bosco St | 7/11/2022 | $ 165,000 |
| 1301 Guillory St | 9/30/2022 | $ 149,900 |
| 2218 Janelle Ave | 5/24/2023 | $ 76,468 |
| 1917 Henry St | 6/2/2023 | $ 88,000 |
| 1216 Guillory St | 1/3/2024 | $ 80,000 |
| 2101 Myrtle Springs Rd | 1/12/2024 | $ 180,000 |
| 1620 Houston River Rd | 3/22/2024 | $ 15,500 |

- The Bell Report makes no mention of Westlake in the Mossville case study even though Bell produced a 2015 article from *The Intercept* which refers to Westlake. The article states that Sasol did not extend Voluntary Buyout offers to Westlake because "the people from Westlake did not express a desire to leave whereas Mossville residents did."[202]

- Our MLS research found 27 properties in Westlake that have sold since Bell's 2013 date of incident and located in areas adjacent to the Sasol facility as close or closer in proximity the Sasol facility than Mossville. When resales are included, the number of transactions increases to 50. Home prices ranged from $15,500 to $216,400. The table to the right shows the addresses and prices of the sales indicated in the map below. That information by itself indicates there was not a 100% impact on prices and values of adjacent or proximate properties.

---

[202] Heather Rogers, "How Pollution Killed a Louisiana Town, The Intercept, November 4, 2015. Source cited as: theintercept.com/2015/11/04/erasing-mossville-how-pollution-killed-a-louisiana-town.





- There has been new construction involving both multi-family and single-family residences in Westlake on streets since the 2013 announcement of the expansion of the Sasol facility. in proximity to the Sasol plant in recent years.  Below are Google street views of the properties at 2224-2232 Janelle Avenue showing the new construction since 2013.



**2224-2232 Janelle Avenue (April 2014)**



**2224-2232 Janelle Avenue (April 2022)**



- The location of 2224-32 Janelle Avenue in proximity to the Sasol plant is indicated on the Google satellite map below.



- We compared year-by-year average prices for homes located in the portion of Westlake closest to the Sasol facility with average year-by-year prices paid for homes at a greater distance.203  The years compared were 2010 to 2023.  The results of that comparison are shown in the table below.

| Year | All Radius Sales | | Outer Radius | | Facility Proximate | | |
|---|---|---|---|---|---|---|---|
| | Sale Count | Average Price | Sale Count | Average Price | Sale Count | Average Price | % Difference vs. Outer Radius |
| 2010 | 44 | $107,481 | 30 | $121,459 | 14 | $77,528 | -36.17% |
| 2011 | 33 | $103,903 | 23 | $110,513 | 10 | $88,700 | -19.74% |
| 2012 | 53 | $102,787 | 28 | $111,339 | 25 | $93,208 | -16.28% |
| 2013 | 66 | $108,207 | 34 | $119,788 | 32 | $95,902 | -19.94% |
| 2014 | 53 | $106,066 | 29 | $112,831 | 24 | $97,892 | -13.24% |
| 2015 | 94 | $117,014 | 52 | $130,995 | 42 | $99,706 | -23.89% |
| 2016 | 77 | $124,637 | 38 | $137,247 | 39 | $112,350 | -18.14% |
| 2017 | 78 | $121,656 | 43 | $135,091 | 35 | $105,149 | -22.16% |
| 2018 | 85 | $125,353 | 56 | $134,473 | 29 | $107,742 | -19.88% |
| 2019 | 53 | $136,449 | 36 | $143,953 | 17 | $120,559 | -16.25% |
| 2020 | 67 | $131,311 | 43 | $133,287 | 24 | $127,772 | -4.14% |
| 2021 | 76 | $117,340 | 48 | $118,279 | 28 | $115,730 | -2.16% |
| 2022 | 81 | $132,741 | 50 | $135,080 | 31 | $128,969 | -4.52% |
| 2023 | 66 | $145,276 | 49 | $150,209 | 17 | $131,057 | -12.75% |

---

[203] The facility proximate sales are within six to eight blocks (approximately 0.33 miles) from the Sasol facility.  The outer boundary of the "outer radius" sales area analyzed was Myrtle Springs Road, John Stine Road, Sampson Road, and the western bank of the Calcasieu River.  At its farthest point, the outer boundary was approximately one mile from the facility.



The comparison in the table indicates that the average differential in yearly price paid for homes within 0.33 miles and homes between 0.33 miles and 1.0 mile from the Sasol facility was about -16%.  The three years immediately before the 2013 announcement of the location of the plant expansion to the north and northwest, when it was generally known that the plant wanted to expand but how and where was not known, the average differential in price between Westlake homes sold within 0.33 miles and between 0.33 miles 1.0 miles was about -24%.  That would be the indication of the likely effect from proximity to the plant and the proposed plant expansion on prices.  However, once the 2013 plant expansion decision was made, the average differential in price between homes near and far from the plant decreased to an average of only about -14%.  Those years (2014 to 2023) were also the years of the expanded voluntary purchase program involving Mossville properties.  Between 2020 and 2022, the average differential in price was only -3.5%.

- Some of the differential in price in our Westlake analysis is due to age and condition of the homes.  Although the MLS data we reviewed does not include date of construction of a home, our review of Google street views indicates that the homes in the 0.33 mile to 1.0 mile area generally are slightly newer than the homes closer to the Sasol plant.

- Although Dr. Bell produced documents discussing the various health studies done by the ATSDR and others in Mossville over the years, the Bell case study does not discuss the health studies or tests indicating the levels of various toxins (especially dioxins) in the blood of Mossville residents.  Those health concerns and the test results were the primary issues that had long motivated Mossville residents to seek to have their properties purchased by Sasol and the plant's prior corporate owners.

- There continue to be sales of properties in Mossville.  These involve the homes that did not participate in the buyout.  We have found 4 sales as recent as January 2024, ranging in price from $17,000 to $86,000, which directly contradicts Bell's 100% impact on value.

- The Bell Report claim that properties in Mossville had a 100% impact on value due to risk effect is misleading.  During the voluntary purchase program, homeowners were offered the average of two appraisals but no less than $100,000 plus an additional "premium" equal to 60% of the average appraised value of the home. Owners of unimproved properties were offered the average of two appraisals but no less than $5,000 plus a 40% premium.  Rental property owners were offered the average of the two appraisals but no less than $75,000 plus an additional 50% of appraised value premium.  Appraisal fees were to be paid by Sasol and additional compensation to the property owners included reimbursement of expenses and closing costs related to the sale.[204]  The Bell Report contains no analysis of actual sales prices that were occurring in Mossville prior to the voluntary purchase program announcement.

- In addition to investigating sales in Westlake immediately adjacent to the east of the Sasol facility and expansion area, we also investigated sales on Isabella Street and Magdalena Street located immediately adjacent to the west of the expanded Mossville buy out area.  Those two streets are also located immediately west of the Mossville area involved in the 2009 health study by the ATSDR.  The map of the Mossville Area of Interest (AOI) studied by the ATSDR in 2009 is shown below as are photos from Google Street View.

---

[204] Sasol North America Inc., Voluntary Property Purchase Program, July 18, 2013, p. 16.





- The two maps below show the location of Isabella Street and Magdalena Street in relationship to the western edge of the Area of Interest in the 2009 ATSDR study.

 

**2009 ATSDR Map Showing Isabella & Magdalena Streets Immediately West of Shaded Area of Interest**

**Google Aerial Map Showing Isabella & Magdalena Streets**



**Google Street View Photo Shows Homes on Isabella Street (April 2014)**





**Google Street View Photo Showing Home Under Construction on Magdalena Street (April 2014)**

- Our MLS research found 56 sales of homes on Isabella and Magdalena streets immediately adjacent to the Mossville buy out area since 2013, the date of the Bell Report's claimed 100% impact on value. Home prices ranged from $158,000 to $359,500.

***The Improper Comparisons Made in the Bell Report Between the Mossville Situation and the East St. Louis Situation***: The Bell Report (p. 60) claims that its overall comparison of the Mossville case study to the situation affecting the 273 properties in the East St. Louis "study area" indicates that the situations are "Similar." In fact, they are significantly different, as indicated by the following:

- In Mossville, there was an ASTDR study related to possible health effects that included testing to determine levels of various toxins in the blood of Mossville residents. The results of the studies caused concern among the Mossville residents that was the impetus for their desire to be relocated. There has been no similar ASTDR study in the subject neighborhood in East St. Louis.

- In the Mossville situation, more than 300 properties were acquired and the owners relocated. Between 1998 and 2004, 206 homes were acquired as part of the Condea Vista buyout settlement. Later, as part of Sasol's Voluntary Property Purchase Program, another 229 homeowners and 134 vacant landowners in the Mossville community agreed to sell. There is no proposal or plan to relocate any of the residents who own properties in the subject neighborhood.

- The acquisitions and demolitions that occurred in Mossville were the result of a voluntary buyout program related to health concerns. The past acquisitions of properties and demolition of improvements in the subject neighborhood in East St. Louis were done as part of urban renewal planning and not due to investigation or remediation of contamination.

***JLL Conclusion from Review of the Bell Report Case Study No. 6 Involving Mossville, Louisiana***: Given the significant differences between the Mossville case study situation and the East St. Louis "study area" situation, the Mossville case study does not support a conclusion that there has been a 100% impact on the value of the 273 properties in the subject neighborhood. In addition, the Bell Report fails to discuss the significant number of sales in the Westlake community that are located as close if not closer than many of the properties in Mossville. The JLL Westlake study indicates no more than a -12% to -24% average impact on price due to proximity to the Sasol plant. Those sales do not support the Bell Report conclusion that proximity to the Sasol facility caused a 100% impact on the value of adjacent and nearby homes.



## 10.9 Bell Case Study No. 7: Herculaneum, Missouri – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

**Background**

The Herculaneum lead smelter was an active facility that was in operation in this community since 1892 until closing in December 2013. The facility was located at 881 Main Street in Herculaneum, Missouri, approximately 25 miles south of St. Louis, Missouri, on the Mississippi River.  A lead ore concentrate, consisting of approximately 80% lead sulfide, was processed at the smelter.  The ore was transported by truck from eight lead mines operated by the company near Viburnum, Missouri, approximately 75 miles south-southwest of Herculaneum.  The 52-acre Herculaneum facility consisted of a smelter plant, 24-acre waste slag storage pile, and an onsite sulfuric acid plant.[205]  Refer to the Addenda for a detailed timeline regarding the Doe Run Smelter.

**The Bell Claims concerning the Herculaneum/Doe Run Situation:**  The Bell Report (Page 205) contains a one-page summary that includes the following statements regarding the Doe Run/Herculaneum contamination situation:

- "From 1892 to 2013, Doe Run Herculaneum Smelter processed lead and heavy metals. During operations, pollutants emitted in the form of stack emissions were deposited in the surrounding area."

- In 2001, an Administrative Order involving the EPA, Missouri Department of Health and Doe Run required Doe Run to cleanup lead-contaminated residential soils in the community.

- By April 2002, the MDNR entered a settlement agreement with Doe Run, establishing a Voluntary Property Purchase Plan.  Approximately 160 homes received purchase options. Homes purchased in the plan were demolished.

- In addition, a separate study included 474 properties analyzed, of which 53 were vacant lots or improved with mobile homes, and 401 were single family residential.  The total unimpaired value of the 474 properties was $46,495,033. The total remediation costs were reported to be $62,304,040 and the total risk was estimated to be 50% of the unimpaired value.

**Case Study Findings by Bell:**

Effective Date of August 2001

2001 EPA clean up order.

2002- Voluntary Purchase Plan

Cost: $652,304,040

Use: Not developed

Stage: Ongoing

**Bell Claimed Environmental Risk:**

50% (based on demolition)

---

[205] Public Health Implications from Attending or Working at Herculaneum Schools, June 4, 2012 (U.S. Dept. Health & Human Services)



**JLL Research into the Doe Run/Herculaneum Situation:**

- Reviewed information in the Bell Appraisal report dated February 16, 2024.

- Inspected the Doe Run/Herculaneum affected area on June 27, 2024.

- Undertook online research for documents from the U.S. EPA and Missouri DNR related to the investigation and remediation of the Doe Run/Herculaneum area.

- Reviewed pertinent documents including the Herculaneum Voluntary Purchase Plan.

- Researched area residential property sales utilizing the Mid-America/St. Louis Multiple Listing Service (Year 1998 through 2023).  Researched and analyzed sale trends within a 0.50 mile and a 1-mile radius surrounding the Doe Run plant.

- Undertook online research regarding news article/media coverage of the Doe Run Herculaneum plant between January 2002 and December 2013.

**Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons and Necessary Corrections.**  Among the more significant errors, omissions, misrepresentations in the Bell Report Case Study #7 involving the Doe Run/Herculaneum situation are the following:

- The Bell Doe Run Case Study selected Year 2001 as the incident date.  We question why 2001 was selected, given that Doe Run officials were aware from testing in 1984 and 1992 that children living near the Doe Run Smelter had elevated blood lead levels. Additionally, air quality readings at the Broad Street Monitor (closest to the smelter) were showing elevated lead levels that were far above national EPA Standards for every quarter (except one) between 1978 and 2000. In January 1993, the Missouri Department of Health concluded there "is a long-term threat to public health around the Doe Run Smelter."[206]

- The Bell Case Study said that Doe Run's pollutants are "emitted in the form of stack emissions deposited in the surrounding area." This is not completely accurate, as Bell fails to mention a major source of pollution from the Doe Run plant that relates to the trucks exiting the Doe Run plant that were depositing blackened dust along the truck routes. The typical haul route included portions of Station Street, Brown Street, and Joachim Avenue as well as Main Street in Herculaneum.

  In August 2001, local resident Jack Warden met with state officials to investigate the blackened dust along the streets near the smelter plant. The State Health Department discovered that the blackened dust along the streets near the plant was 30% pure lead.[207] Higher levels of lead were found along residential yards along the haul route from the blackened dust.[208] Elevated lead levels were found in surface soil samples in all of the schools in Herculaneum in playground areas.[209] As such, the state mandated that all Herculaneum parks install signs to warn parents to keep their children away from playgrounds.[210] Additionally, State Officials found levels of arsenic, cadmium and concentrations of lead equal to what one would find in a lead mine—300,000 parts per

---

[206] The Story of a 20-Year Lawsuit- The Hannon Law Firm
[207]  November 2006 edition of Mother Jones "Lead Astray"
[208] January 2012 EPA-Doe Run Administrative Order
[209] Public Health Implications from Attending or Working at Herculaneum Schools, June 4, 2012 (U.S. Dept. Health & Human Services)
[210] A Diet of Lead- CBS 60 Minutes, July 2023



million (or 750 time the hazardous level)[211]   As a result, the EPA required Doe Run to submit a Transportation Plan subject to their approval. The EPA approved Doe Run's Transportation Plan in June of 2002. Doe Run completed a $12 million plan to improve/reduce emissions from the smelter including constructing additional building enclosures on the smelter facility, perform daily cleaning of local streets and washing trucks that exit the Doe Run smelter facility.[212]

- Bell states that "In 2001, an Administrative Order involving the EPA, Missouri Department of Health and Doe Run required Doe Run to cleanup lead-contaminated residential soils in the community."  This does not tell the whole story, as the EPA Order also included extensive EPA Oversight for the continued monitoring of lead-laden air pollution from stack emissions, in addition to Doe Run's mandate for the clean-up of ground contamination.[213]

- The Bell Case Study states that "approximately 160 homes received purchase options. Homes purchased in the plan were demolished." To be accurate, Doe Run was ***required*** to offer buyouts of 160 homes sited within a 3/8th mile radius of the Doe Run Smelter Plant, only after reaching an agreement with state and local officials.[214]  As of January 2006, 29 homeowners within the buyout area chose not to accept Doe Run's purchase offers and those remained occupied by those residents.[215] One of the remaining property owners, Lisa Price stated that they refused Doe Run's offer as it was not sufficient.[216] Although Doe Run eventually demolished the residences they purchased, a total of 14 privately owned houses sited within/adjacent to the buyout area remain as of June 2024 (JLL Research), as summarized below:

### Buyout Area- Herculaneum
### Properties not bought out by Doe Run

| Address | Type | Available Sales Data? |
| --- | --- | --- |
| 827 Cross Street | House | none |
| 817 Cross Street | House | none |
| 807 Cross Street | House | none |
| W-Side Brown St. at Station St. | Pole Barn | 2/12/2007 sale, price not listed |
| 686 Joachim Ave. | Garage | Sold in 2019 for $10,700. Listed in 2016 originally at $110k and droping listing to $85k with the listing expiring in 2017 |
| 695 Joachim Ave | Vacant Land | none |
| 783 Joachim Ave. * | House | none |
| 836 Brown Street | House | none |
| 809 Brown Street | House | none |
| 357 Curved Street | House | none |
| 372 Mott Drive | House | This property was bought by Doe Run in 2004 but later sold in 2008 for an undisclosed price. |

[211] A Diet of Lead- CBS 60 Minutes, July 2003
[212] St. Louis Business Journal, June 28, 2022
[213] April 2002 EPA Enforcement Action Memorandum
[214] St. Louis Business Journal, March 22, 2022.
[215] January 2012 EPA- Doe Run Administrative Order
[216] Deseret.com news, December 11, 2020



| | | |
|---|---|---|
| 908 Dale Street | House | Sold 4/02/2003 for $39,500 & 10/3/2002 for $90,604 |
| 554 Main Street | House | Sold in 2016 for an undisclosd price |
| 560 Main Street | House | none |
| 287 Broadway | House | none |
| 562 Reservoir Street | House | Sold on 9/2/2003 for $105,000 |
| 561 Reservoir Street | House | none |
| 558 Reservoir Street * | House | Sold on 7/15/2013 for an undisclosed price |
| 552 Reservoir Street * | House | Sold on 11/9/2023 for $180,000 |
| 555 Reservoir Street * | House | Sold on 11/13/2014 for $ 94,900 |

- The buyout area (not defined by Bell in his case study) is depicted as follows:



The Buyout Zone is outlined in yellow (per EPA)

- **Separate Study**-- Bell alludes to "a separate study included 474 properties analyzed, of which 53 were vacant lots or improved with mobile homes, and 401 were improved with single-family residential." …What Bell does not mention regarding this "separate study" relates to a lawsuit known as *Doyle et al v. The Fluor Corp. et al Allocation Plan* (Case Number 22012-08641) that was decided in the St. Louis Circuit Court on April 4, 2012. Bell represented the plaintiffs in this case. (The Fluor Corp. was a previous owner of the Doe Run facility). [217]

---

[217] Missouri Lawyers Weekly, dated April 30, 2012



- Regarding the "separate study" - (Doyle et al v. The Fluor Corp. case), Bell states: "The total unimpaired value for the 474 properties was $46,495,033. The total remediation costs were reported to be $62,493,033. The total risk was estimated to be -50% of unimpaired value." The awarded $55,000,000 settlement amount related to 474 properties located near the Doe Run Smelter (including 453 property owners who had not relocated and the property owners who had already moved); however, what Bell is **not** saying that the total damages attributable to real estate/property damages only amounted to **$13,176,110**, while the remainder of the settlement was allocated at $26,356,175 for "annoyance and discomfort" with the remaining $15,467,000 of the settlement was allocated to attorney's fees, contingency fund and litigation costs.

  We are not privy to how the unimpaired value was derived for the 474 properties nor are we privy to the total remediation cost estimate. Based on the case's settlement allocation, the property loss damages/attributable to the ***real estate*** ($13,176,110) equated to only 28% of the court's unimpaired value, far less than Bell's -50% risk conclusion. One questions if Bell concluded the -50% risk factor based upon the Doyle court decision.[218]

**Commentary Regarding the Bell Case Study No. 7- Adjustment Grid (Found on Page 60 of Bell Report)**

The Bell Report Grid on Page 60 is as follows:

| | Subject Property | Case Study 6 | | Case Study 7 | | Case Study 8 | | Case Study 9 | | Case Study 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | PG & E Hinkley Compressor Station | | | |
| Address / Name | East St. Louis | Mossville Mossville, Louisiana | | Doe Run Herculaneum, Misso | | Love Canal Niagara Falls, New York | | Hinkley California | | Flint Flint, Michigan | |
| Effective Date | 2023 | 2013 | | 2001 | | 1978 | | 1993-2019 | | 2015 | |
| Property Land Use | Multiple | Residential | | Residential | | Residential, school | | Residential | | Residential | |
| Element | | Observation | Comparison | Observation | Comparison | Observation | Comparison | Observation | Comparison | Observation | Comparison |
| Accidental / Permitted | To be determined | Accidental | Similar | Accidental | Similar | Permitted | Similar | Accidental | Similar | Accidental | Similar |
| Status of the property with regard to regulatory compliance | Not determined | In compliance | Similar | In compliance | Similar | In compliance | Similar | In compliance | Similar | In compliance | Similar |
| Remediation lifecycle stage | Assessment | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior |
| Contamination constituents | PCBs | Dioxin, polycyclic aromatic hydrocarbons, xyiene and toluene, ethylene dichloride, and heavy metals | Similar | Lead, arsenic, cadmium, and other metals | Similar | PAHs, halogenated organics, pesticides, chlorobenzenes and trichlorophenols (dioxin) | Similar | Hexavalent Chromium | Similar | Lead | Similar |
| Conveyance | Air, Soil | Soil, Groundwater | Similar | Soil | Similar | Soil | Similar | Household water | Similar | Household water | Similar |
| SNAP | Non-source | Non-source | Similar | Non-source | Similar | Source, Non-source, Adjacent, Proximate | Similar | Non-source | Similar | Non-source | Similar |
| Cost and timing of remediation | Not applicable | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar |
| Liabilities | To be determined | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar |
| Limitations on use | To be determined | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar |
| Off-site / migration from Source Site | Yes | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar |
| Risk Effects | | -100% (Demolished) | | -50% | | -20% (Adjacent/Proximate) to -100% (Source/Non-source) | | Up to -100% | | -27% to -39% | |
| Overall Comparison to Subject | | Similar | | Similar | | Similar | | Similar | | Similar | |

CITY OF EAST ST. LOUIS
Case Study Adjustment Grid
(Landmark File 155-1-2)

---

[218] Same as above.



| Category | Bell's Answer- Doe Run Case Study #7 | JLL Response |
|---|---|---|
| **Accidental/ Permitted** | Accidental/ Similar to subject (East St. Louis) situation | *Incorrect.*<br><br>The smokestack emissions, while permitted, were not accidental and were not within allowable EPA Ambient Air Standards[219]<br><br>Thus, Doe Run would not be rated "similar" to the subject (East St. Louis) situation in this category. |
| **Status of the property regarding regulatory compliance** | In compliance/ Similar to subject (East St. Louis) situation | *Incorrect.*<br><br>Doe Run was subject to EPA Administrative Orders as of the effective date of the Bell Case Study (8/2001), including EPA AO RCRA-7-2000-0029 that was effective May 2001.<br><br>Doe Run was not in compliance with EPA's Ambient Air Quality Standards for several years (commencing in 1991 until Q3 2002).[220]<br><br>After several years of non-attainment, the Missouri Department of Natural Resources issued an operating air permit to Doe Run Co. for its smelter facility in April 2006 (subject to EPA approval).[221]<br><br>As a result, the Doe Run property would not be similar to the subject (East St. Louis) situation with regards to regulatory compliance. |
| **Conveyance** | Soil/ Similar subject (East St. Louis) situation | *Incorrect.*<br><br>The Conveyances are via Soil and Air.<br><br>Doe Run's pollutants are emitted via air (smokestack) and via soil from the lead/black dust from trucks (*See Page 2 of this critique).* |
| **Liabilities** | Not Determined/ Similar | *Incorrect.*<br><br>On Bell's one-page summary, he listed Doe Run as a Potentially Responsible Party (PRP), which conflicts with his adjustment grid.<br><br>The U.S. EPA has identified the Doe Run property subject to Potential Responsible Party ("PRP") Oversight. [222] |

**Commentary Re: Bell Case Study No. 7 Grid Adjustments**

Based upon these four categories that were incorrectly determined within the Bell case study grid (analysis) as being similar to the East St. Louis situation, the Doe Run Case Study situation is therefore not similar overall when compared to the East St. Louis situation.

---

[219] EPA January 2012 Administrative Order, Page 11

[220] St. Louis Business Journal, April12, 2006

[221] St. Louis Business Journal, April 12, 2006

[222] EPA Enforcement Action Memorandum, April 11, 2002



**Market Research: Residential Real Estate Market**

We analyzed sales of three homes located in close proximity to the Doe Run facility and the original buyout area. The address, dates of sale and price paid for the three proximate sales are as follows:

- 555 Reservoir St. (Nov. 2014 for $94,900)
- 359 Station St. (June 2015 for $95,000)
- 552 Reservoir St. (Nov. 2023 for $180,000)

To evaluate the potential impact of the contamination situation included in the Bell Report case study we performed a matched pairs analysis using these three proximate sales and compared them two sales of comparable homes located more than 0.5 mile away from the facility and outside of the buyout area.

Our analysis involved the following adjustments for differences between the sales compared.

- Market timing adjustments (annual rate of inflation of 3% or 0.25% per month)
- Full bathroom adjustment of $1,000 per bathroom
- Half bathroom adjustments of $500 per bathroom
- Basement adjustment of $2,000
- Garage adjustment of $1,000 per parking space
- Exterior feature adjustment of $500 per feature (e.g. fence, patio, shed)
- Landscaping adjustment of $500
- Air conditioning adjustment of $2,500

Each of the three proximate or "inside" sales were compared to sales of comparable properties locate "outside" of the buyout area and more than 0.5 mile from the Doe Roe facility.

The adjustment grids for each of these three sales and the two control sales (for each pairing) are presented on the following pages.



## Inside/Outside Matched Pairs Analysis: 555 Reservoir St.

  

*Nov. 13, 2014 Date of Value*

| | Proximate Sale No. 2 | Control Neighborhood Comp. No. 2A | Adj. | Control Neighborhood Comp. No. 2B | Adj. |
|---|---|---|---|---|---|
| Address | 555 Reservoir St. | 441 Joachim Ave. | | 1040 Scenic Dr. | |
| Location | Proximate to Herculaneum Site | > 0.5 mile from Site | | > 0.5 mile from Site | |
| Sale price | $94,900 | $89,000 | | $105,000 | |
| Date of sale (value) | 11/13/2014 | 10/30/2014 | | 4/28/2015 | |
| Time adjusted price | n/a | $89,089 | $89 | $103,530 | ($1,470) |
| Time adjusted price/GLA | n/a | $59.71 | | $73.74 | |
| Data source (MARIS MLS) | **14056015** | *14049142* | | *14040392* | |

| | Proximate Sale No. 2 | Control Neighborhood Comp. No. 2A | Adj. | Control Neighborhood Comp. No. 2B | Adj. |
|---|---|---|---|---|---|
| Location | Proximate to Herculaneum Site | > 0.5 mile from Site | -- | > 0.5 mile from Site | -- |
| Site description | 7,000 SF (75' X 102') | 16,553 SF (103' X 151' X 105' X 176') | -- | 32,409 SF (160' X 190') | -- |
| Bed / Bath (above grade) | 3 bd / 2 ba | 3 bd / 2 ba | -- | 4 bd / 1 ba | -- |
| Design / appeal | One story -- average | One story -- average | -- | One story -- average | -- |
| Physical condition | average | average | -- | average | -- |
| Year built | 1943 | 1956 | -- | 1962 | -- |
| Exterior | Vinyl siding | Vinyl siding | -- | Vinyl siding | -- |
| Gross living area (above grade) | 1,422 | 1,492 | -- | 1,404 | -- |
| Foundation type | Basement | Basement | -- | Basement | -- |
| Basement -- finish | Unfinished | Partial finish | ($500) | Partial finish | ($500) |
| Garage | n/a (driveway) | n/a (driveway w/ carport) | -- | 1-car (attached) | ($1,000) |
| Exterior features | Driveway, porch | Driveway, Shed, fence | -- | Shed | -- |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- |
| Air conditioning | Yes - central air | Yes - central air | -- | Yes - central air | -- |
| **Total Net Adjustment** | | | **($500)** | | **($1,500)** |
| **Sale Price/ Adj. Price** | **$94,900** | | **$88,589** | | **$102,030** |
| **Percentage difference** | | | **7.1%** | | **-7.0%** |

173



## Inside/Outside Matched Pairs Analysis: 359 Station St.

*June 23, 2015 Date of Value*

  

| | Proximate Sale No. 3 | Control Neighborhood Comp. No. 3A | Adj. | Control Neighborhood Comp. No. 3B | Adj. |
|---|---|---|---|---|---|
| Address | 359 Station St. | 441 Joachim Ave. | | 318 Main St. | |
| Location | Proximate to Herculaneum Site | > 0.5 mile from Site | | > 0.5 mile from Site | |
| Sale price | $95,000 | $89,000 | | $119,000 | |
| Date of sale (value) | 6/23/2015 | 10/30/2014 | | 5/11/2016 | |
| Time adjusted price | n/a | $90,780 | $1,780 | $115,787 | ($3,213) |
| Time adjusted price/GLA | n/a | $60.84 | | $60.94 | |
| Data source (MARIS MLS) | 15029964 | 14049142 | | 16010960 | |

| | Proximate Sale No. 3 | Control Neighborhood Comp. No. 3A | Adj. | Control Neighborhood Comp. No. 3B | Adj. |
|---|---|---|---|---|---|
| Location | Proximate to Herculaneum Site | > 0.5 mile from Site | -- | > 0.5 mile from Site | -- |
| Site description | 14,810 SF (±100' X 130') | 16,553 SF (103' X 151' X 105' X 176') | -- | 27,007 SF (95' X 290') | -- |
| Bed / Bath (above grade) | 3 bd / 1 ba | 3 bd / 2 ba | ($1,000) | 3 bd / 2 ba | ($1,000) |
| Design / appeal | One story -- average | One story -- average | -- | One story -- average | -- |
| Physical condition | Average/typical | Average/typical | -- | Average/typical | -- |
| Year built | 1963 | 1956 | -- | 1966 | -- |
| Exterior | Brick | Vinyl siding | $1,500 | Brick | -- |
| Gross living area (above grade) | 1,339 | 1,492 | -- | 1,900 | ($10,000) |
| Foundation type | Slab | Basement | ($2,000) | Basement | ($2,000) |
| Basement -- finish | n/a (slab) | Partial finish | -- | Unfinished | -- |
| Garage | 1-car (attached) | n/a (driveway) | $1,000 | 2-car (attached) | ($1,000) |
| Exterior features | Driveway | Driveway, shed, fence | -- | Driveway | -- |
| Landscaping/natural | n/a | Mature trees | ($500) | n/a | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- |
| Air conditioning | Yes - central air | Yes - central air | -- | Yes - central air | -- |
| **Total Net Adjustment** | | | **($1,000)** | | **($14,000)** |
| **Sale Price/ Adj. Price** | **$95,000** | | **$89,780** | | **$101,787** |
| **Percentage difference** | | | **5.8%** | | **-6.7%** |



## Inside/Outside Matched Pairs Analysis: 552 Reservoir St.

  

***Nov. 29, 2023 Date of Sale***

| | Proximate Sale No. 1 | Control Neighborhood Comp. No. 1A | Adj. | Control Neighborhood Comp. No. 1B | Adj. |
|---|---|---|---|---|---|
| Address | 552 Reservoir St. | 601 Wall St. | | 439 Lincoln St. | |
| Location | Proximate to Herculaneum Site | > 0.5 mile from Site | | > 0.5 mile from Site | |
| Sale price | $180,000 | $164,500 | | $195,000 | |
| Date of sale (value) | 11/29/2023 | 1/11/2023 | | 4/26/2023 | |
| Time adjusted price | n/a | $168,942 | $4,442 | $198,510 | $3,510 |
| Time adjusted price/GLA | n/a | $118.64 | | $159.06 | |
| Data source (MARIS MLS) | **23042612** | 22072726 | | 23003452 | |

| | Proximate Sale No. 1 | Control Neighborhood Comp. No. 1A | Adj. | Control Neighborhood Comp. No. 1B | Adj. |
|---|---|---|---|---|---|
| Location | Proximate to Herculaneum Site | > 0.5 mile from Site | -- | > 0.5 mile from Site | -- |
| Site description | 17,424 SF (100' X 208') | 11,164 SF (125' X 70') | -- | 12,000 SF (78' x 150' x 78' x 150') | -- |
| Bed / Bath (above grade) | 3 bd / 2 ba | 3 bd / 1 ba | $1,000 | 3 bd / 2 ba | -- |
| Design / appeal | One 1/2 story - average | One 1/2 story -- average | | One story -- average | |
| Physical condition | Average/typical | Average/typical | -- | Average/typical | -- |
| Year built | 1950 (est.) | 1925 | | 1966 | |
| Exterior | Vinyl siding | Vinyl siding | -- | Brick | ($1,500) |
| Gross living area (above grade) | 1,277 | 1,424 | -- | 1,248 | -- |
| Foundation type | Basement | Basement | -- | Basement | -- |
| Basement -- finish | Unfinished | Unfinished | -- | n/a (slab) | -- |
| Garage | n/a (street parking) | 2-car (attached) | ($2,000) | 1-car (attached) | ($1,000) |
| Exterior features | Shed | Deck, shed, fence | $1,000 | Patio, shed, fence | $1,000 |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- |
| Air conditioning | Yes - central air | Yes - central air | -- | Yes - central air | -- |
| **Total Net Adjustment** | | | $0 | | ($1,500) |
| **Sale Price/ Adj. Price** | $180,000 | $168,942 | | $197,010 | |
| **Percentage difference** | | 6.5% | | -8.6% | |



A summary of the comparisons of the Doe Run (Herculaneum) case study utilizing three sales close to the Doe Run facility (proximate) and compared to sales from the control area is shown below.

### Matched Pairs Analysis No. 1: 552 Reservoir St., Herculaneum, MO

|  | Adjusted Price | Herculaneum Control Adjusted Price | % Difference |
|---|---|---|---|
| **Proximate Sale (Inside) No. 1** | $180,000 |  |  |
| Control No. 1A |  | $168,942 | 6.5% |
| Control No. 1B |  | $197,010 | -8.6% |

### Matched Pairs Analysis No. 2: 555 Reservoir St., Herculaneum, MO

|  | Adjusted Price | Herculaneum Control Adjusted Price | % Difference |
|---|---|---|---|
| **Proximate Sale (Inside) No. 2** | $94,900 |  |  |
| Control No. 2A |  | $88,589 | 7.1% |
| Control No. 2B |  | $102,030 | -7.0% |

### Matched Pairs Analysis No. 3: 359 Station St., Herculaneum, MO

|  | Adjusted Price | Herculaneum Control Adjusted Price | % Difference |
|---|---|---|---|
| **Proximate Sale (Inside) No. 3** | $95,000 |  |  |
| Control No. 3A |  | $89,780 | 5.8% |
| Control No. 3B |  | $101,787 | -6.7% |

| | |
|---|---|
| **Average: 6 Pairings** | **-0.5%** |
| **Median: 6 Pairings** | **-0.4%** |

For each of the three sale pairings (one "inside" sale paired with two "outside" sales) the results were consistent, with one pairing slightly above the proximate sale price, and the other slightly higher. In total, there were six pairings or comparisons, with average being equal to -0.5% and the median difference being -0.4%.

**Conclusion from the Doe Run Case Study**

Based on an analysis of three sales of homes located in close proximity to the Doe Run facility there was no significant measurable permanent or lingering long-term impact on residential market prices and values in the surrounding area attributable to the Doe Run environmental situation.

Our analysis of sales data does not support the Bell Report conclusion of 50% attributable to an environmental "risk effect.".



### 10.10   Bell Case Study No. 8: Love Canal, New York – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

***The Bell Claims Concerning the Love Canal Situation****:*

The Bell Report (p. 206) contains a one-page summary that includes the following statements about the Love Canal, New York contamination situation:

> "From 1942 to 1953, Hooker Chemical Company used Love Canal to dispose of approximately 21,000 tons of chemical waste.  Constituents included: polycyclic aromatic hydrocarbons (PAHs), halogenated organics, pesticides, chlorobenzenes and trichlorophenols, containing 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD or dioxin).

> In 1953 after covering the landfill with soil, Hooker Chemicals deeded the Love Canal to the Niagara Falls Board of Education, which developed the land with residential homes and a school.

> After the discovery of contamination in the soil, an Emergency Declaration was issued in 1978 that allowed residences on 97th and 99th streets (Rings I and II) to evacuate.  In 1980, President Carter issued $20 million in federal funds to purchase homes and assist in relocation.  By 1982, Ring I and II homes and the 99th Street School were demolished.

> Many homes were bought and demolished, and some area remain vacant today. Homes in the northern Black Cree area were bought out but were later found to be environmentally unaffected.  Yet, these homes sustained a -20% discount due to market resistance.  Over time, this discount gradually reduced, and today sell for full value.  Market resistance generally ranged from -20% to -100%.

Based on those statements, the Bell Report (p. 206) arrives at the following conclusion:

> **"Case Findings:**
> Cost: Not determined
> Use: Not determined
> Risk: -20% (Adjacent/Proximate) to -100% (Source/Non-source)"

In the "Case Study Adjustment Grid" at page 60, the Bell Report indicates the "effective date" of the case study is 1978.  It also indicates that the Love Canal area was in the "Ongoing" stage of the remediation life cycle.

***The JLL Research into the Love Canal Situation***

Our review of the Bell Report Love Canal case study has involved the following investigation and research activities:

- Review of the Bell production related to Love Canal.

- Summary of the Love Canal article in Volume 1 of the Appraisal Institute book entitled *Valuing Contaminated Properties: An Appraisal Institute Anthology*.

- Review of aerial photos and site map related to the Love Canal investigation and remediation by the U.S. EPA.



***The Errors, Omissions, and Misrepresentations in the Bell Case Study No. 8 Involving Love Canal***: The errors, omissions, and misrepresentations in the Bell Report Case Study No. 8 involving Love Canal include the following:

- None of the documents produced by Dr. Bell to support his Love Canal case study contain any sales data related to prices in the community nor do the news story or U.S. EPA reports produce contain any information related to the effect of the Love Canal situation on prices and values.

- As a result, there is no support in the Bell production file for the Bell conclusion that "homes sustained a -20% discount due to market resistance."

- There is also no support in the Bell production file for the Bell conclusion that "over time, the discount gradually reduced, and today [homes] sell for full value." There is also no news story or document in the production indicating how long it took for prices to reach "full value" and which neighborhoods or areas involved in the Love Canal investigation and remediation were the ones that reached "full value."

- While documents in the production do discuss the home purchase program, there is no detail in those documents related to prices paid that would support the Bell conclusion that there was a 100% impact in value at some point in the history of Love Canal and on some of the properties involved.

- The Bell production does not include an article that appeared in *Valuation Insights & Perspectives* in 1999. That was a publication of The Appraisal Institute of which Dr. Bell is a member. The article also was contained in the Appraisal Institute book entitled *Valuing Contaminated Properties: An Appraisal Institute Anthology* published in 2002.

- The 1999 *Valuation Insights & Perspectives* authored by Anthony P. Girasole summarizes additional details about the Love Canal situation not discussed in the Bell Love Canal case study. Among the important pieces of information in the Girasole (1999) article not referenced in the Bell case study is the following:

  "On September 27, 1988, Dr. David Axelrod, New York Commissioner of Health, issued the 'Habitability Decision, Report on Habitability, Love Canal Emergency Declaration Area.' In the report, Axelrod, concluded that the government had been overly cautious and included an excessively large are in the evacuation. He indicated that the area to the east of the canal was not fit for residential uses, but the area to the north and west were clean and suitable for redevelopment. To the south of the canal is a highway."[223]

- Mr. Girasole is an appraiser and his company was retained by the Love Canal Area Revitalization Agency (LCARA) "to complete a preliminary investigation regarding the sale of the homes deemed habitable" and he "conducted a study of the housing market in Niagara Falls and gave LCARA suggestions regarding the marketing, timing and pricing of the homes in what is now known as Black Creek Village."[224]

---

[223] Anthony P. Girasole, Jr., "The Lesson of Love Canal," Valuation Insights & Perspectives (First Quarter, 1999), as reproduced in Richard J. Roddewig, MAI, editor, *Valuing Contaminated Properties: An Appraisal Institute Anthology*, The Appraisal Institute, 2002, 488-492, at page 489.
[224] Ibid, at p. 490.

JLL

- The 253 homes in the Black Creek Village were sold after extensive rehabilitation by LCARA because many of the homes purchased by the government had been abandoned and vandalized. [225]

- "In 1978, when the government decided that there was truly a problem and funded the relocation of the residents, the homes in this area had no value." [226]

- However, "although there was an overall stigma from being located in the Love Canal area . . . there was a more localized stigma due to the appearance of the neighborhood." The Girasole (1999) article describes that neighborhood stigma as follows:

  "All but a few of the homes had been abandoned for over 10 years; they were obviously vacant. The landscaping was not maintained, many had been vandalized, windows were broken or boarded up and paint was peeling.  To drive through the area was like driving through a war zone." [227]

- By 1998, 10 years after the program began, all 253 renovated homes in the Black Creek neighborhood had sold. Initially, in 1989, the prices paid for the totally renovated was about "80 percent of unaffected areas" [228] indicating a -20% stigma impact.

- As of 1998, at the end of the resale process involving the 253 homes, the prices were "approximately 90 percent of market value."

- "After a majority of the homes had been sold, the nature of the neighborhood changed" and Mr. Girasole's appraisal firm "eliminated the obsolescence factor for the neighborhood character" and over time it also "became obvious that the market reluctance had diminished and we lessened the overall obsolescence factor gradually." [229]

- The vacant land to the west of the Love Canal site was purchased by a developer who broke ground for a senior assisted living center in December of 1998. [230]

***The Improper Comparisons Made in the Bell Report Between the Love Canal Situation and the East St. Louis Situation***: The Bell Report (p. 60) claims that its overall comparison of the Love Canal case study to the situation affecting the 273 properties in the East St. Louis "study area" indicates that the situations are "Similar." In fact, they are significantly different, as indicated by the following:

- The 273 properties in the "study area" neighborhood in East St. Louis are not part of a designated Superfund site. Love Canal was the site that led to the creation of the Superfund program and was investigated and remediated under the protocols for a designated Superfund site.

- Many of the homes purchased and demolished in the Love Canal situation had been constructed above the former landfill Superfund source site itself. The 273 subject property homes in East St. Louis are in an adjacent and proximate area and not located on the source site.

---

[225] Ibid, at p. 490.
[226] Ibid, at p. 491.
[227] Ibid, at p. 491.
[228] Ibid, at p. 491.
[229] Ibid, at p. 491.
[230] Ibid, at p. 491.



- In the Love Canal situation, there were extensive government studies related to possible health effects that included testing to determine levels of various toxins in the blood of Love Canal area residents.  The results of the studies caused concern among the residents that was the impetus for their desire to be relocated.  There have been no similar ATSDR health studies in the subject neighborhood in East St. Louis.

- In the Love Canal situation, hundreds of properties were acquired and the owners relocated. There is no proposal or plan to relocate any of the residents who own properties in the subject neighborhood in East St. Louis.

***JLL Conclusion from Review of the Bell Report Case Study No. 8 Involving Love Canal****:* In terms of a timeline comparison between the situation in the subject neighborhood in East St. Louis and the Love Canal situation, the subject neighborhood should be compared to the marketplace reaction to the Love Canal situation in 1998 as referenced in the Girasole (1999) article.

As that article indicates, some of the effect on prices and values at that date in the Love Canal history was due to the conditions in the neighborhood where there were abandoned and vandalized buildings.  According to the Girasole (1999) article, when that factor related to the appearance of the neighborhood was considered, the impact on value 20 years after the investigation of the Love Canal contamination situation had begun, the "risk effect" was only approximately -10%.  It has been more than 30 years since investigation and remediation of the Monsanto/Krummrich facility began.  And, as discussed earlier in this report, City of St. Louis urban renewal policies have resulted in demolitions and vacant lots in the subject neighborhood. As a result, if there is a proper comparison to be made from the Love Canal situation, the Girasole (1999) article indicates the current "risk effect" would be no greater than -10% and not 100% as claimed in the Bell Report.



*JLL Expert Report and*                                             *City of East St. Louis v. Monsanto, et al.*
*Review of a Bell Appraisal Report*                                             *East St. Louis, Illinois*

## 10.11 Bell Case Study No. 9: Hinkley, California – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

***The Bell Claims Concerning the Hinkley, California Situation****:* The Bell Report (page 207) contains a one-page summary that includes the following statements about the Mossville, Louisiana contamination situation:

> "The contamination site is approximately 2 miles southeast of Hinkley and 12 miles west of Barstow in southern California.

> Contaminated wastewater from the cooling towers was discharged to unlined ponds at the site, which then percolated to the groundwater, affecting an area approximately 2 miles long and nearly a mile wide. The contaminated water was also used as irrigation water by local farmers. PG&E was under orders from the Lahontan Water Board to stop plume expansion and clean up the plume.

> PG&E purchased numerous properties located above the plume, razing the improvements and leaving properties vacant. The contaminated area in Hinkley is virtually a ghost town. The sites are now largely vacant.

Based on those statements, the Bell Report (page 207) arrives at the following conclusion:

> **"Case Findings:**
> Cost & Use: Not determined
> Risk: - Up to -100%"

In the "Case Study Adjustment Grid" at page 59, the Bell Report indicates the "effective date" of the case study is 2013.  It also indicates that the Hinkley area was in the "Ongoing" stage of the remediation life cycle.

***The JLL Research into the Hinkley Situation***

- Inspected the Hinkley area including the subdivisions from where residents were relocated and homes acquired and demolished, and the adjacent and nearby communities of Sulphur and Westlake.

- Undertook online research with the USGS and California State Water Resources Control Board related to the investigation and remediation of the Hinkley area.

- Researched area residential property sales utilizing the local multiple listing service.

- Undertook additional online research related to news media coverage of the contamination situation.

- Reviewed the maps below related to the groundwater contamination situation.



## Plume Map-August 2010



**Study Area from Final Environmental Impact Report dated May 2013, prepared by ICF International**



Figure ES-2
Expansion of 3.1/4.0 ppb Maximum
Background Plume Area Contours

**The Errors, Omissions, and Misrepresentations in the Bell Case Study No. 9 Involving Hinkley, California**: Among the more significant errors, omissions and misrepresentations in the Bell Report Case Study No. 9 involving Hinkley, California, are the following:

- The Bell Hinkley Case Study confuses events related to the dates of the incident. PG&E first notified the state in 1987 that chromium and Hexavalent chromium levels exceeded the state's drinking water standards, with an abatement order on 1987 (No. 6-87-160) and approval for applying extracted water to crop fields (converting Cr(VI) to Cr3. Remediation started in 1992.

   The Bell Report indicated the affected area is "*approximately 2 miles long and nearly a mile wide.*" In 2008 the plume had expanded and as of 2012 the plume was approximately 7 miles in length and 2 to 2.5 miles wide.

- As of May 2024, 89% of the chromium was removed from the groundwater, and the plume's footprint was shrinking according to John Glass, Chromium Technical Remediation Principal (PG&E).

- The Bell Report describes the properties purchased and demolished as "numerous." Actually, between 2010 and October 2014 PG&E purchased approximately 300 properties through a buyout program.

- The Bell Report (p. 59) indicated that the cost and timing of remediation was not determined. That is not accurate because there have been estimates of cost and duration of cleanup.  For example, in 2010 site cleanup was projected to require 10 to 95 years for 80% chromium mass removal using alternative's 2 (Containment-95 years) & 3 (Plume-Wide In-Situ Treatment 10 years) and cost between $36 and $176 million (Haley and Aldrich, Inc., 2010). In September 2011 (Addendum #3 to the Feasibility Study, Table included below) enhancements using Alternative 4 (Core In-Situ Treatment) has reduced the estimated cleanup duration from 150 years to under 50 years to reach the maximum background level of 3.1 ug/L. As of 2013 PG&E had spent over $750 million on remediation.



| Alternative | MCL Cr(T) 50 ug/L | | | Estimated Time to 80% Chromium Mass Removal | Maximum Background Cr(VI) 3.1 ug/L | | | Average Background Cr(VI) 1.2 ug/L | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Years* | Non-Discounted Cost* | NPV Cost* | Years* | Years* | Non-Discounted Cost* | NPV Cost* | Years** | Non-Discounted Cost* | NPV Cost* |
| 1: No Further Action | 750-1000 | $0M | $0M | >780 | >1000 | $0M | $0M | >1000 | $0M | $0M |
| 2: Containment | 120 | $123M | $35.3M | 95 | 260 | $258M | $36.0M | 320 | $316M | $36.0M |
| 3: Plume-Wide In-Situ Treatment | 8 | $58.1M | $50.7M | 10 | 110 | $399M | $130M | 180 | $634M | $133M |
| 4: Core In-Situ Treatment and Beneficial Agricultural Use | 6 | $28.9M | $27.2M | 13 | 150 | $154M | $50.2M | 220 | $215M | $50.4M |
| 5: Plume-Wide Pump and Treat | 50 | $334M | $180M | 37 | 140 | $882M | $218M | 210 | $1.31B | $221M |
| 4A: Aggressive In-Situ Treatment and Beneficial Agricultural Use | 6 | $36.1M | $34.0M | 10 | 75 | $142M | $76.7M | 130 | $203M | $81.5M |
| Combined Alternative | 28 | $173M | $121M | 18 | 90 | $295M | $151M | 130 | $340M | $153M |
| 4B: Aggressive In-Situ Treatment and Beneficial Agricultural Use with Targeted Pumping | 6 | $36.1M | $34.0M | 10 | 40 | $109M | $75.9M | 95 | $176M | $84.9M |
| 4C-1: In-Situ and Enhanced Agricultural Treatment - 1 crop | 6 | $53.2M | $50.2M | 8 | 40 | $148M | $106M | 95 | $221M | $116M |
| 4C-2: In-Situ and Enhanced Agricultural Treatment - 2 crops | 6 | $54.0M | $50.9M | 7 | 39 | $150M | $108M | 90 | $220M | $119M |
| 4C-3: In-Situ and Enhanced Agricultural Treatment & Winter Ex-Situ Treatment - Continuous Pumping | 4 | $82.0M | $79.1M | 6 | 36 | $335M | $226M | 85 | $638M | $276M |
| 4C-4: In-Situ and Enhanced Agricultural Treatment - Continuous Pumping | 3 | $64.3M | $63.2M | 6 | 29 | $193M | $148M | 75 | $314M | $173M |

- The Bell Report states the area is "virtually a ghost town". That implies that there are a large number of empty and abandoned homes. However, while there are some scattered abandoned structures, our inspection of the area revealed there continue to be many occupied homes in the immediate area of the Hinkley compressor plant.

- There has been new construction since the 1987 notification. This includes the home located along Serra Road (Parcel 049-403-1320-000) approximately 1.1 miles northwest of the Hinkley compressor plant constructed in 2009 and the house at the NEC of Camino & Catskill Road (Parcel 049-403-1770-000) that is approximately 1.3 miles northwest of the plant and was constructed in 2006.

- The Bell Report does not analyze the non-PGE buyout related sales that have occurred within the past 20+ years within the Hinkley area. The graph below compares home prices in Hinkley with home sales data from Barstow (outside the affected area). The graph indicates that the difference between prices in Hinkley and in Barstow was fairly constant between 1987 and 2009 (the year before the buyout program began) when the investigation and groundwater remediation program was most intense.





The annual prices per square foot are shown in the table below.

| | Average Home Price Per Square Foot | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Barstow Price per Sq. Ft. | Hinkley Price per Sq. Ft. | Percent Change | Year | Barstow Price per Sq. Ft. | Hinkley Price per Sq. Ft. | Percent Change |
| 1980 | 31.06 | 24.51 | -21% | 2002 | 53.67 | 58.03 | 8% |
| 1981 | 28.18 | 32.47 | 15% | 2003 | 56.12 | 49.57 | -12% |
| 1982 | 34.75 | 33.17 | -5% | 2004 | 77.71 | 63.04 | -19% |
| 1983 | 31.42 | 6.14 | -80% | 2005 | 110.11 | 78.53 | -29% |
| 1984 | 47.17 | 15.18 | -68% | 2006 | 141.02 | 105.03 | -26% |
| 1985 | 45.00 | 25.30 | -44% | 2007 | 135.12 | 105.75 | -22% |
| 1986 | 44.52 | 36.12 | -19% | 2008 | 92.37 | 62.51 | -32% |
| 1987 | 47.41 | 31.32 | -34% | 2009 | 56.80 | 36.06 | -37% |
| 1988 | 61.22 | 29.44 | -52% | 2010 | 55.54 | 37.21 | -33% |
| 1989 | 51.03 | 26.29 | -48% | 2011 | 47.27 | 36.24 | -23% |
| 1990 | 45.17 | 86.28 | 91% | 2012 | 53.64 | 24.14 | -55% |
| 1991 | 48.46 | 25.20 | -48% | 2013 | 63.69 | 23.46 | -63% |
| 1992 | 52.73 | 19.67 | -63% | 2014 | 64.48 | 25.14 | -61% |
| 1993 | 51.17 | 49.03 | -4% | 2015 | 72.19 | 37.60 | -48% |
| 1994 | 52.39 | 37.67 | -28% | 2016 | 82.90 | 29.22 | -65% |
| 1995 | 48.24 | 29.69 | -38% | 2017 | 96.67 | 99.63 | 3% |
| 1996 | 46.33 | 28.44 | -39% | 2018 | 107.36 | 57.37 | -47% |
| 1997 | 46.41 | 28.03 | -40% | 2019 | 110.37 | 31.21 | -72% |
| 1998 | 46.64 | 32.78 | -30% | 2020 | 122.72 | 72.67 | -41% |
| 1999 | 43.76 | 33.78 | -23% | 2021 | 163.93 | 83.23 | -49% |
| 2000 | 43.50 | 39.68 | -9% | 2022 | 198.86 | 95.20 | -52% |
| 2001 | 51.05 | 30.85 | -40% | 2023 | 203.36 | 55.84 | -73% |



***JLL Conclusion from Review of the Bell Report Case Study No. 9 Involving Hinkley, California****: The Hinkley case study conclusion of a -100% impact on prices in the Bell Report is not accurate.  There are adequate sales including sales-resales data within the Hinkley area and outside the area to determine a "risk effect", if any.

Analysis of actual sale prices by comparison to Barstow home prices indicates an average differential of -33% in prices paid per square foot and a median of -37% impact on nominal prices over the entire 1980 to 2023 time period. During the decade between 1987 and 1997, the years when investigation and remediation of the Hinkley groundwater situation was most intense, the average differential in prices was -28%, slightly lower than the average over the entire 44-year period of price comparisons.

To understand the "before and after" impact, however, the years "before" the public announcement of the groundwater contamination situation in 1987 must be compared to the years "after" the public announcement.  In 1980 through 1986, "before" the announcement, the average differential between Barstow and Hinkley prices was -32%.  The "after" average differential since 1987 is -34% essentially indicating no more than a -2.0% impact on prices in Hinkley compared to Barstow.

Given the lack of supporting data to determine an appropriate impact, the Hinkley case study in the Bell Report does not support a conclusion that there has been up to -100% impact on the value of the 273 properties in the subject neighborhood.



### 10.12 Bell Case Study No. 10: Flint, Michigan – Bell Report Errors, Omissions, Misrepresentations, Improper Comparisons, and Necessary Corrections

***The Bell Claims Concerning the Flint Situation****:* The Bell Report (p. 208) contains a one-page summary that includes the following statements about the Flint, Michigan water system contamination situation:

> "On April 26, 2014, the City of Flint began sourcing their water from the Flint River. The water pipes corroded, and the drinking water in Flint became contaminated with lead and other pollutants."

> "A study in the American Economic Journal estimated that Flint's housing stock fell by at least $520 million from 2015-2019. The study estimated the decline in average home values to be between -27% and -39% after switching the source of drinking water to the Flint River. Prices remained depressed 16 months after drinking water in Flint was declared safe for consumption."

> In its remediation efforts, the City of Flint reported 95% of its lead service lines were replaced by September 2022. Flint signed a $17.9 million contract with Lakeshore Global Corporation to complete the final phase of the project."

Based on those statements, the Bell Report (page 208) arrives at the following conclusion:

> **"Case Findings:**
> Cost: Not determined
> Use: Not determined
> Risk: - 27% to -39%"

In the "Case Study Adjustment Grid" at page 60, the Bell Report indicates the "effective date" of the case study is 2015. It also indicates that the Flint area was in the "Ongoing" stage of the remediation life cycle.

***JLL Conclusion from Review of the Bell Report Case Study No. 10 Involving Flint, Michigan****:* For the following reasons, we have concluded that Bell Case Study No. 10 was not an appropriate case study for Dr. Bell to use when analyzing the environmental situation in the subject neighborhood in East St. Louis as indicated by reference to his own writings:

- The 3rd Edition of Bell's book entitled *Real Estate Damages* at page 40 emphasizes the importance of selecting case studies that create an "apples to apples" comparison. The book then says that "means that the case studies being used must have similar property, market, and detrimental condition characteristics as the subject property."

- The *Real Estate Damages* book (page 40) then goes on to state that "there should be similarities in certain key characteristics in order for the resulting inferences to be reliable, valid, and not misleading."

- The *Real Estate Damages* book (page 213) states that "the type of contaminant should ideally be the same for both the subject and the case study because different contaminants may invoke different responses from the marketplace."

- As an example of the requirement that the type of contaminant should ideally be the same, the book says the following: "it would be improper, for example, to compare a case study involving the effects of petroleum hydrocarbon contamination from a leaking underground storage tank to a subject property impacted by asbestos or radon."



- Leaking underground storage tanks typically result in soil contamination, similar to the claimed contamination situation in the subject neighborhood. Radon or asbestos contamination inside a house is similar to the domestic drinking water contamination situation in Flint. Based on the example in the Bell book, Flint would not be an appropriate case study to use in understanding the situation in the subject neighborhood.

- A 2002 article in *The Appraisal Journal* entitled "The Analysis of Environmental Case Studies," co-authored by Randall Bell, sets out another reason why the Flint public water case study is not appropriate to use when analyzing the situation in the subject neighborhood.

- That 2002 article states that the "area bioavailability/risk exposure" level is very important to selecting an appropriate case study. It states there are six areas of a property that may become contaminated and "[t]hese are air, water, building improvements, surface/shallow soils, ground water aquifer, and deep soils."[231] That article then says those are elements of the "bioavailability" of a contaminant and are important distinctions because each is "regarded quite differently by regulatory agencies due to their differing levels of health risk exposure."

- As a result, that article states that "the risk levels, the level of market concern, and the resulting effects on property values are much different" for each of those types of bioavailability.

- The lead contamination in the water in Flint would be in the "building improvements" category of "bioavailability/risk exposure" while the claimed soil contamination in the subject neighborhood would be in the "surface/shallow soils" category.

- As a result, the 2002 Bell article posits, the bioavailability and "risk exposure for the case study properties and the subject property should be similar for a valid case study analysis."[232]

As a result, the Flint case study does not involve an "apples to apples" comparison and is not an appropriate case study because Flint involves lead contamination in centrally supplied public drinking water while the claimed contaminants in the subject neighborhood are PCBs in soil that were perhaps deposited through the air.

---

[231] Thomas Jackson, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002), 86, at 91.
[232] Thomas Jackson, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002), 86, at 91.



### 10.13    Conclusion from Review of the Bell Case Studies: The Bell "Case Studies" Do Not Comply with the Requirements of Guide Note 4 of the Standards of Professional Appraisal Practice

The Appraisal Institute's *Guide Note 4: Reliance on Reports Prepared by Others* provides a framework for the due diligence required when a real estate appraiser relies upon a report prepared by another professional.[233]

The basis for proper evaluation formulated in *Guide Note 4* requires that before relying upon reports prepared by others the appraiser must:

- have a reasonable basis for believing the individuals preparing the report(s) are competent;

- have no reason to doubt the credibility of the work of the work preparer(s);

- consider the criteria under which the reports were prepared;

- consider the source and extent of the instructions given to the preparer of the reports;

- determine how the appraiser might rely on this information in making decisions and preparing his or her report; and

- determine the process and procedures used to evaluate the reports prepared by others.

Guide Note 4 is very specific about the type of due diligence necessary before accepting a market value opinion of another person:

> "Market value opinions should be supported by market-derived data and assumptions made should be specific to both the market and the property.  An appraiser who accepts the projections or assumptions of others without some assurance of the accuracy or reasonableness of the calculations of information provided may violate the aforementioned USPAP Standards Rules." [234]

We have reviewed the case study summaries in the Addenda to the Bell Report and also reviewed his production materials that support his report.  Our review indicates that in all the case studies, with one exception, Bell simply relied on news stories or articles authored by others and did no independent collection and analysis of data to check the accuracy of the claims made in those sources.  The one exception is Bell Case Study No. 1, involving Anniston, Alabama.  The Bell production includes some data from a local appraiser but the Bell case study does not reference it or analyze it and instead relies on a news story related to that appraiser's opinion.

As a result, the Bell Report's reliance on these case studies violates the standards of professional practice requirement found in Guide Note 4.  That guide note clearly specifies a series of steps to verify the accuracy and reliability of any report, including published articles, relied upon in an appraisal assignment.  The Bell Report does not include any of the steps necessary for proper reliance on such reports or articles.

The Appraisal Institute's book entitled *Valuing Contaminated Properties: An Appraisal Institute Anthology* (p. 112, footnote 4) describes the appraiser's professional responsibility in undertaking case study analysis or relying on the work of others as follows:

---

[233] Appraisal Institute, *Guide Note 4: Reliance on Reports Prepared by Others*. (Chicago: Appraisal Institute, 2017)
[234] Appraisal Institute, *Guide Note 4: Reliance on Reports Prepared by Others*. (Chicago: Appraisal Institute, 2017)



> "The standards of professional appraisal practice, however, prescribe clear procedures for relying on the reports or opinions of others. These are contained in Guide Note 4 to the *Standards of Professional Appraisal Practice of the Appraisal Institute* entitled 'Reliance on Reports Prepared by Others.'" Guide Note 4 sets out a clear series of steps that an appraiser must follow before relying on the opinion of another appraiser. This includes the requirement to verify the conclusions in the relied-upon report: 'The scope of review or verification required depends on…the relevance of the information to the opinions and judgments rendered.' The Guide Note also includes the following warning: 'An appraiser who accepts the projections or assumptions of others without some assurance of the accuracy or reasonableness of the calculations or information provided may violate the aforementioned Standards Rules.''[235]

As the last sentence of the quote above from *Valuing Contaminated Properties: An Appraisal Institute Anthology* indicates, the accuracy of a "case study" prepared by another appraiser must be reviewed and tested for accuracy and reliability before relying on its analysis and conclusions. That is required by standards of professional appraisal practice.

The Bell Report simply accepts the analysis and conclusions in the published articles or news stories it relies on without in any way testing the accuracy of the data and the reliability of the conclusions in those sources.  As a result, according to *Valuing Contaminated Properties: An Appraisal Institute Anthology* (p. 112), that is "inappropriate under USPAP [Uniform Standards of Professional Appraisal Practice]" and ignores the "fifth critical element of an acceptable environmental case study" that "the case study data must be gathered and analyzed by the appraiser."  The Appraisal Institute book then goes on to say the following: "That means, for example, that simply relying on a published article as a 'case study' is inappropriate without some attempt to verify and confirm the accuracy of the data and analysis in the published article."

---

[235] Some of the wording from Guide Note 4 quoted in the *Valuing Contaminated Properties: An Appraisal Institute Anthology* is from earlier versions of Guide Note 4.



### 10.14   Conclusion: The Bell "Contaminated Neighborhood" Case Studies Do Not Support the Bell Claim of a 100% "Risk Effect" Impact on Value from the Presence of PCBs in the Subject East St. Louis Neighborhood

The table below shows the Bell Report conclusions concerning the "contaminated neighborhood" case studies and the corrected results from the JLL analysis of those case study situations.

| Bell Case Study Findings & JLL Analysis & Conclusion | | |
|---|---|---|
| **Bell Case Study** | **Bell "Risk Effect" Conclusion** | **JLL Analysis & Conclusion** |
| **Bell Case Study No. 1: Anniston** | -15% to -60% (typically -55%) | Litigation appraisals produced by Bell actually indicate a range between -8% and -44% with an average of -21% and a median of -19%.  Other experts in the same case, however, found no impact on prices and values. |
| **Bell Case Study No. 2: Times Beach, MO** | -100% impact (demolished) | There was a temporary impact of between -5% and -15% on prices of homes in the closest adjacent neighborhood to Times Beach during years when Times Beach residents were being relocated.  There also was a temporary impact on prices in response to announcement of installation of an incinerator to destroy contaminated soils.  No permanent impact on prices. |
| **Bell Case Study No. 3: Pensacola, FL** | -100% impact (demolished) | Soil sampling did not indicate contamination levels above standards that would require relocation & demolition on most of the homes. A partial relocation of 35 homes was proposed due to concerns about wind-blown contaminants.  Most of the remainder of the relocations and demolitions were due to concerns about the "psychological isolation" on the homeowners that would remain and in response to a political action campaign rather than contamination levels. Bell did not investigate any actual prices when arriving at a 100% impact on value conclusion. |
| **Bell Case Study No. 4: Carver Terrace, Port Arthur, TX** | -100% impact (demolished) | Carver Terrace public housing project was demolished due primarily to hurricane damage and age, condition, and unsuitability of the units for large families.  JLL research found 78 sales of homes since the Bell Report 2013 "date of incident" at prices between $5,500 and $305,000 located as close or closer to the facility than Carver Terrace. The Bell claim of a 100% impact on value is not supportable. |
| **Bell Case Study No. 5: Agriculture Street Landfill, New Orleans** | -100% impact (abandoned & demolished) | Litigation involving property damage claims related to the contamination situation concluded that there was no more than -20% impact on value of the homes built directly on the landfill and only a -10% impact on homes built adjacent to the landfill. JLL analysis of sales data in |



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

| | | |
|---|---|---|
| | | 2010 and 2011 indicated an even lower impact on value of between -6.0% and -12.0% and some of that impact was due to the presence of abandoned buildings (including an abandoned community center and school) due to Hurricane *Katrina*. |
| **Bell Case Study No. 6: Mossville, LA** | -100% Impact on prices | Bell studied only one adjacent neighborhood where a buyout program was put in place. There have been sales in that buyout area on homes that did not participate at prices between $17,000 and $86,000. On streets adjacent to the Mossville buyout area, MLS research found 56 home sales at prices between $158,000 and $359,000 since the 2013 Bell "date of incident." In Westlake, a neighborhood adjacent to the Sasol facility, JLL research found 50 sales involving 27 properties located within two blocks of the facility since Bell's 2013 "date of incident" at prices ranging from $15,500 to $216,400. New construction has also occurred in the adjacent Westlake neighborhood within a few blocks of the facility. A detailed study of Westlake found no more than a -12 to -24% impact on prices of homes located within 0.33 miles of the Sasol facility. |
| **Bell Case Study No. 7: Herculaneum, MO** | -50% Impact on prices | No measurable impact on prices. Based on an analysis of three sales of homes located in close proximity to the Doe Run facility there was no significant measurable permanent or lingering long-term impact on residential market prices and values in the surrounding area attributable to the Doe Run environmental situation. Our analysis of sales data fails to offer evidence of support for the Bell Report conclusion of 50% attributable to environmental risk. |
| **Bell Case Study No. 8: Love Canal, NY** | -20% (Adjacent/Proximate) to -100% (Source/Non-source) | The Bell production includes no data or even articles supporting the claimed "risk effect." The 100% impact was on properties located on the Love Canal Superfund Site landfill. Review of a 1999 article published by the Appraisal Institute (and not included in the Bell production) indicates the then current "risk effect" for adjacent neighborhoods such as the subject neighborhood would be no greater than -10% and not even the -20% as claimed in the Bell Report. |
| **Bell Case Study No. 9: Hinkley, CA** | Up to -100% impact on prices | Based on a comparison with Barstow prices, an average differential in price of -33% since public announcement. However, when price differential in years "before" the announcement are compared to years "after" the announcement the average impact is only -2.0% impact over the 44-year period analyzed. |



| Bell Case Study No. 10: Flint, MI | -27% to -39% risk effect impact | The Bell Flint case study does not involve an "apples to apples" comparison and is not an appropriate case study because Flint involves lead contamination in centrally supplied public drinking water while the claimed contaminants in the subject neighborhood are PCBs in soil that were perhaps deposited through the air. |
|---|---|---|

In none of the Bell case studies claiming to show a 100% impact on value did Dr. Bell actually investigate prices paid in the neighborhoods affected before the buyouts occurred. He also did not compare the actual prices paid to prices paid in "control" neighborhoods not affected by the contamination situation. As a result, it was inappropriate for the Bell Report to conclude that there had been a 100% impact on value simply due to the fact that properties were being acquired in a buyout program and then the homes demolished.

The JLL research into the Agriculture Street Landfill situation is an example of the type of research that Bell should have done but did not. There were actual appraisals submitted in the litigation involved in that situation. The court appointed appraiser prepared an appraisal report on 261 properties involved in the claim for property damages. The appraiser determined that there was a -20% "stigma impact" on value to the homes located directly above the contaminated landfill and a -10% impact on value to homes adjacent to the Superfund landfill site. Both the special master and the district court hearing the case accepted and approved the appraisal reports and that district court decision was affirmed by an appellate court.[236] Our JLL review of that situation indicated an even lower impact of -6% to -12% for homes built directly on the Superfund site.

There were political rather than environmental reasons for some of the 100% buyout programs referenced. For example, in the Pensacola situation, additional properties that were not in the path of potential wind-blown contamination were included in the buyout program because of the "psychological isolation" of remaining residents. Similarly, in the Mossville situation, the buyout program was motivated by long-standing neighborhood health concerns and was expanded to an additional area of Mossville based on community relation concerns on the part of the company that owned the facility.

---

[236] *Johnson v. Orleans Parish School Board*, Case No. 2022-CA-0639. Decided May 31, 2023. Page 36.



# 11.   Combined Results of the JLL PCB Impact Case Studies, the Corrected Bell Case Studies, and the JLL Case Studies Involving the Subject Neighborhood

### 11.1 PCB Case Studies Conducted by JLL Staff Over the Past Three Decades Indicate Wide Variability in the Effects of PCB Contamination on Prices and Values

JLL staff over the past 30 years have studied various locations where PCB contamination has been involved.

The Addenda to this JLL Expert Report contains eight detailed case studies involving analysis of the effect of PCB contamination on prices and values.  Four of the PCB contamination case studies also involved Superfund sites. Information about those case studies is summarized below.

| JLL PCB CASE STUDIES | | | |
|---|---|---|---|
| No. | Dates Researched | Location | Indicated Temporary Impact & Duration |
| 1 | 1995-1998 | Stamford, CT | Case Study 1A: Possible impact on price of less than -5.0% for remediated land development site; no impact on prices/values of homes constructed on the development site<br><br>Case Study 1B: No impact on price or on mortgage lending.<br><br>Case Study 1C: Impact on price equal to less than -5.0% due to additional construction costs & design/planning delay |
| 2 | 1995-2003 | Crystal Springs, MS | No impact on prices & value in adjacent or surrounding area with no documented on-site PCB contamination; temporary impacts on six unremediated properties containing PCB contaminated soils of between -2.1% & -28.3% during on-site remediation process |
| 3 | 1986-2006 | Lewistown, MT | No impact on prices or on marketing times or sale-to-list price ratios. |
| 4 (Superfund Site Case Study) | 1984-2001 | Columbia, MS | Temporary impacts on prices & values of no more than -10% to -15% on properties immediately adjacent to the source site during period of initial Superfund designation & investigation. Prices rebounded & any temporary impacts ended as the remediation program was implemented. |
| 5 (Superfund Site Case Study) | 1982-2003 | Times Beach, MO | Time Period A (12/82- 7/90 from initial investigation until approval of final remediation design): Temporary impacts on home prices in neighborhoods adjacent to source site.<br><br>Time Period B (mid-1990- 12/1997 during active incinerator remediation): No area wide impact on prices or values; temporary impact of -5.0% to -15% in one adjacent neighborhood that ended with completion of active remediation.<br><br>Time Period C (6/1997 – 4/2003 post-remediation of source site): No impact on home prices or values |



| | | | |
|---|---|---|---|
| **6**<br>**(Superfund Site Case Study)** | 2010-2022 | St. Lawrence County, NY | Little, if any, statistically meaningful effect on prices of land and single-family homes in an area adjacent to a river undergoing active dredging to remove contaminated sediments accompanied by river bottom caping and on-shore processing and landfill disposal of PCB contaminated sediments. |
| **7**<br>**(Superfund Site Case Study)** | 1992-2003 | Anniston, AL | Studies by Bliss and Chalmers in the same litigation involving Simons reports concluded there was no impact on prices due to proximity to the Solutia plant. The Simons 60% to 95% loss in value estimate did not consider other factors that may have been affecting prices and used a control area that was too distant from the plant. Given the differences between the expert reports, it is unlikely that there was a 60% to 95% "value loss" as indicated by the Simons article. Simons is also contradicted by the Maloy appraisals produced by Dr. Bell that seem to indicate no more than an average of -21% and a median of -19% impact on prices in neighborhoods in close proximity to the plant. |
| **8**<br>**(Superfund Site Case Study)** | 1995 to 2001 | Pensacola, FL | The buyout program involved some properties that were not affected by the risk of contamination. Most of the remainder of the relocations and demolitions were due to concerns about the "psychological isolation" on the homeowners that would remain and in response to a political action campaign rather than contamination levels. |

The most important points from the PCB case studies conducted by JLL staff members are as follows:

- The potential impact of PCB contamination on prices and values is very fact specific and can vary from one situation to the next.

- Some neighborhoods in proximity to sources of PCB contamination experience no adverse impact on land or home prices even during investigation and remediation of the environmental condition that created concerns.

- Once investigation and/or remediation of the source site has been completed in compliance with state or federal standards, any temporary impacts on prices and values end and, there typically is no ongoing impact on prices or markets. In other words, there is no permanent environmental stigma.

There can be impacts on properties with documented PCB contamination on-site post-remediation. However, those impacts are typically small and can be due to delays related to design or additional new construction costs.



### 11.2 The JLL PCB Case Studies and Subject Neighborhood Case Studies When Combined with the Corrected Bell Case Studies Do Not Support the Bell Report Claim of a 100% "Risk Effect" Impact on Value in the Subject East St. Louis Neighborhood

In our final consideration of all the case studies, the following points are guiding our conclusion:

- First, the -100% impact conclusions in the "buyout" case studies in the Bell Report do not mean there was actually a 100% impact on price. Dr. Bell did no research to understand what the actual market values of the properties involved in the buyouts were immediately before the decision was made to offer buyouts and then demolish the homes.

- Second, in some of the buyout case studies, some property owners did not participate. As a result, there have been sales in those neighborhoods subsequent to the buyout and demolition of purchased homes. Hinkley, California is one such example and our analysis of sales subsequent to the buyout process does not show an adverse impact when compared to a control area.

- Third, the Bell claim that "buyouts" indicate a -100% impact on value is contradicted by the Agriculture Street Landfill situation. The Bell claim of a 100% impact in the Agriculture Street Landfill case study ignores the actual appraisal reports prepared for the Special Master indicating only a -20% impact on prices located directly on the contaminated Superfund Site. That -20% impact was accepted by the trial judge and confirmed on appeal. The appraisals of adjacent properties accepted by the Special Master found only a -10% impact on adjacent properties and the JLL analysis in this report found only a -6% to -12% impact.

- Fourth, the subject neighborhood during most of the 50 years involved in the Bell Report claim should be considered to be an "adjacent" area rather than a source site, non-source site, or proximate area under the categories utilized by the appraisal profession in the analysis of the effect of an environmental situation on prices and values.

- Fifth, given the recent investigation of soil contamination, however, portions of the neighborhood could be considered a non-source site since 2015. Therefore, both "adjacent" and "non-source site" area case studies should be considered when applying the results of the case studies to understand the effect of the PCB situation associated with the Monsanto/Krummrich site on prices and values. However, the Agriculture Street landfill "non-source site" case study is especially important to consider since it is the one in which JLL has been able to undertake an analysis of actual sale prices.

- Fifth, because some of the case studies do not include an actual analysis of prices but rather "qualitative" judgments, they should not be considered in our final analysis.



As a result, our final summary of the case study conclusion is shown below.

| FINAL COMBINED CASE STUDY RESULTS | | | |
|---|---|---|---|
| **Case Study** | **Dates Researched** | **Location** | **Indicated Temporary Impact & Duration** |
| **JLL East St. Louis "Inside/Outside" Paired Sales Case Study** | Prices Adjusted to Dec. 2023 | Subject Neighborhood & Cahokia | No impact on prices. Average of 27 comparisons is a premium averaging +8.6% when analyzing 27 pairings. |
| **JLL Dead Creek & Cahokia Paired Sales Case Study** | Prices Adjusted to Dec. 2023 | Dead Creek Neighborhood & Cahokia | Impact on price between less than -1.0% and -14% with an average of approximately -11% during active investigation and remediation in 2003. By 2010, however, after completion of the remediation, only one of the three pairings indicated an impact on price. When all three 2010 pairings are considered, however, there was no adverse impact, indicating that the temporary impact during active remediation had ended. |
| **JLL Alcoa Superfund Alternative Site Paired Sales Case Study** | 2002 to 2023 | East St. Louis | No impact on prices during a nine-year assessment period. Temporary impact on prices for about three years during intensive neighborhood outreach. No impact on adjacent neighborhood during active remediation of adjacent homes. |
| **JLL PCB Case Study No. 1** | 1995 to 1998 | Stamford, CT | No impact to less than -5% impact on prices |
| **JLL PCB Case Study No. 2** | 1995 to 2003 | Crystal Springs, MS | No impact on prices on properties with no documented on-site PCB contamination; temporary impacts on six unremediated properties containing PCB contaminated soils of between -2.1% & -28.3% during on-site remediation |
| **JLL PCB Case Study No. 3** | 1986 to 2006 | Lewistown, MT | No impact on prices |
| **JLL PCB Case Study No. 4 (Superfund Site Case Study)** | 1984 to 2001 | Columbia, MS | Temporary impacts on prices & values of no more than -10% to -15% on properties immediately adjacent to the source site during period of initial Superfund designation & investigation. Prices rebounded & any temporary impacts ended as the remediation program was implemented. |
| **JLL PCB Case Study No. 5 (Superfund Site Case Study)** | 1982 to 2003 | Times Beach, MO | Small temporary impact lasting only one or two years during initial investigation. Temporary impact of -5.0% to -15% in one adjacent neighborhood during remediation that ended with completion of active remediation.<br><br>No impact on home prices after completion of remediation. |



| | | | |
|---|---|---|---|
| **JLL PCB Case Study No. 6 (Superfund Site Case Study)** | 2010 to 2022 | St. Lawrence County, NY | No statistically meaningful impact on prices. |
| **JLL PCB Case Study No. 7 (Superfund Site Case Study)** | 1992 to 2003 | Anniston, AL | Two trial experts found no impact on prices or values. One expert found -60% to -95% loss in value but did not consider all factors affecting prices and used an inappropriate control area. A fourth trial expert in appraisal produced by Bell indicate an average of -21% and a median of -19% impact on prices. |
| **Corrected Bell Case Study No. 1** | 1999 to 2000 (Bell Effective Date) | Anniston, AL | No impact to -44% impact |
| **Corrected Bell Case Study No. 5** | | Agriculture Street Landfill | -10% impact on adjacent properties and a -6% to -20% impact on properties constructed on the source site itself. |
| **Corrected Bell Case Study No. 6** | | Mossville, LA | A -16% impact based on Westlake sales but following expanded buyout in Mossville, impacts in some years as low as -2.0%. Does not take into account differences in age of houses sold. |
| **Corrected Bell Case Study No. 7** | | Herculaneum, MO | No impact on prices |
| **Corrected Bell Case Study No. 8** | | Love Canal, NY | -10% according to an *Appraisal Journal* article by a local appraiser involved in the buyout program |
| **Corrected Bell Case Study No. 9** | | Hinkley, CA | -2.0% on average over 44 years |

The results from the adjacent case studies can be aggregated as follows:

- Eight of the results of the case studies show <u>no impact</u> on prices during assessment or remediation – this would count each of the two experts in the Anniston litigation who found no impact as a separate case study and also include both the nine-year assessment period in the Alcoa case study when we could find no impact and the time period when active investigation and remediation of the OU-2 area homes was underway.

- One shows a -2.0% impact on prices.

- One shows less than a -5% impact on prices.

- Two show a -10% impact on prices.

- One shows a range of -5% to -15% -- mid-point would be -7.5%

- One shows a -10% to -15% -- midpoint would be -12.5%



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

- One shows a range of -2.1% to -28.3% -- mid-point would be -13%

- One (Westlake) shows an average impact of -16%.

- One (Maloy production) indicated a -20% impact (mid-point between average and median)

- One shows a range of no impact to -44% -- mid-point would be -22%.

- One trial expert result shows a range of -60% to -95% -- mid-point would be -77.5%

When all of those results are considered, the average impact (using the mid-point of ranges) would be -9.76%. If the extremely high outlier of -77.5% is excluded, the indicate impact would be only about -6.0%.

Significantly more weight would need to be given to the three case studies involving properties in East St. Louis, two of which indicate no impact and one (Alcoa) indicates no impact during a nine-year assessment period and then again no impact during an investigation and remediation of adjacent homes. In the analysis actual prices in the subject neighborhood compared to adjusted prices paid for similar properties in Cahokia, 18 of the 27 comparisons showed no impact on price and there was an average price premium of about +8.6% for properties in the subject neighborhood compared to prices in Cahokia. During the nine- year assessment period between 2003 and 2011 in the Alcoa case study, there was no impact on prices in the adjacent neighborhood.  The Dead Creek case study indicates an average impact of -11% during active remediation of the creek immediately behind homes in the neighborhood studied.

Also to be considered is the fact that given that currently vacant properties do not need to be remediated under U.S. EPA standards and none of the 100 city-owned properties are improved.

Based on that, we have concluded that any impact on value of the 100 city-owned properties as of December of 2023 would be between 0% (no impact) and no greater than -5%.  However, in order to estimate the potential damages related to a potential -5% impact on value, each of the 100 city-owned properties would need to be appraised taking into account their physical condition, lot width and dimensions, status of sewer, water, and streets serving those properties, and soil contamination investigation situation.



## 12.   The Bell Report Reliance on the Coghlan Report to Support a "Cost Effect" Estimate of $50.2 Million is Not Credible

The Bell Report relies on a report prepared by Kevin Coghlan, M.S., C.I.H. of Environmental Health & Engineering, Inc. (the "Coghlan Report) that estimates the remediation costs of the 273 subject properties to be $50.2 million and will take only 24 months to complete.

In order to rely on the Coghlan Report, the Bell Report (page 21) had to include the following Extraordinary Assumption:

- It is an extraordinary assumption that the environmental testing, including the identification of the subject properties, is accurate and correct. This data was presented by Kevin Coghlan, M.S., C.I.H. of Environmental Health & Engineering, Inc. Furthermore, PCBs were present on the subject properties prior to July 1, 1973. Other experts will be presenting evidence on this matter.

The Bell Report (page 98) includes the following definition of an "extraordinary assumption" from the Uniform Standards of Professional Appraisal Practice:

> "'Extraordinary Assumptions
>
> An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021)'"

The comment to that definition in USPAP goes on to state: "Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis."

Randall Bell holds the MAI designation from the Appraisal Institute and therefore must also comply with the supplemental standards of practice of that organization.  Guide Note 4 issued by the Appraisal Institute is entitled *Reliance on Reports Prepared by Others*.  As indicated in our earlier discussion of the Bell reliance on published articles and the Bell "risk effect" case studies, Guide Note 4 provides a framework for the due diligence required when a real estate appraiser relies upon a report prepared by another professional.[237]  Guide Note 4 states that "an appraiser who accepts the projections or assumptions of others without some assurance of the accuracy or reasonableness of the calculations or information provided may violate" the standards of professional appraisal practice. Appraisers have an obligation to undertake some due diligence before relying on reports such as the Coghlan Report.

Guide Note 4 then goes on to state that "the basis for all assumptions and projections employed by the individual who prepared the report [relied upon] must be understood and properly utilized by the appraiser."  Guide Note 4 then goes on to state that the appraiser must be certain that any market-related opinions in the relied upon report are supported by market-derived data.

---

[237] Appraisal Institute, *Guide Note 4: Reliance on Reports Prepared by Others*. Chicago: Appraisal Institute, 2013, pages 10-13.



The Bell Report does not reference or even mention Guide Note 4, but says the following at page 33 about checking on the "credibility" of opinions of other experts before relying on them:

> "'Cost effects primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser and should include consideration of any increased operating costs due to property remediation. The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value.'[238]

> Under these conditions, a licensed real estate appraiser relies on the costs from outside sources and other professional experts, which is allowed under USPAP *provided there is a reasonable expectation that those completing the estimates are competent, and there is no reason to doubt the credibility of the work.*" (emphasis added)

We can find no discussion in the Bell Report of any attempt to determine the credibility of the data and analysis in the Coghlan Report, or the process or procedures used by Kevin Coghlan, to arrive at a $50.2 million cost, although Bell did state at his deposition that he had reviewed the Coghlan Report and production and supplement.[239]

Moreover, there were ample reasons to believe that the Coghlan Report was not reliable. Among the statements in the Coghlan Report dated February 16, 2024, that should have been a warning sign to Dr. Bell that additional investigation of the Coghlan Report reliability and credibility should have been done are the following:

- The Coghlan sampling found that only 210 of the 272 properties sampled "had a total PCB concentration greater than 0.23 ppm and 95 parcels (36%) had a total PCB concentration greater than 1 ppm" (Coghlan Report, page 14) and then estimates soil "excavation and off-site disposal costs" for all 210 properties with sample results above 0.23 ppm.

  - Dr. Bell should have been aware of the September 2016 letter from the U.S. EPA to the Mayor of East St. Louis. That letter indicated that the EPA health screening level for residential soils was 1.0 ppm and that the 0.23 ppm level was not a level necessarily mandating remediation of the soils.[240]

  - The September 2016 letter to the Mayor discussed the U.S. EPA soil testing in 2009, 2012, and 2015 and stated that it was "evaluating the samples from 2009, 2012, and 2015 to determine whether the sampled area qualifies for removal actions or whether mor information is needed to make that determination" and recommended "additional investigation be performed in this area to assess how contamination levels should be considered during future development."[241]

---

[238] The Bell Report quotes this first paragraph from Advisory Opinion 9 (AO-9) of the 2024 edition of the Uniform Standards of Professional Appraisal Practice.

[239] Bell Deposition, page 14, page, 16, and pages 39-40.

[240] Kevin Coghlan was asked at his deposition about the September 9, 2016, letter from the EPA to the Mayor of East St. Louis related to EPA soil testing in 2015 south of Wilford Avenue. According to the deposition transcript, portions of the letter were read to Mr. Coghlan including the a section that was read as stating that a number of the sample results "'exceeded the EPA health screening level for residential soils of one part per million PPM for total PCBs.'" Coghlan confirmed that is what the letter stated. (Deposition of Kevin Coghlan, April 23, 2024, page 144, lines 7-12)

[241] Letter from Jose Cisneros, Chief, Remediation and Re-use Branch, United States Environmental Protection Agency, to Honorable Emeka Jackson-Hicks, September 9, 2016. The Letter is Exhibit 17 to the Deposition of Michael Wagner, April 2, 2024.



- o Dr. Bell should have been aware from his prior work in Anniston, Alabama that the cleanup level set by the U.S EPA in the PCB situation involving residential properties in neighborhoods adjacent to the Solutia facility there was set at 1 ppm and not at 0.23 ppm.

- The Coghlan Report (page 26) states that the "desired outcome of any remediation of the East St. Louis neighborhood is to return it to unrestricted reuse amenable to residential occupancy."

  - o Dr. Bell should have been aware that the location of many of the properties sampled by Coghlan were in portions of the subject neighborhood where the City of East St. Louis planning policies had contemplated non-residential use. However, the Bell Report contains no highest and best use analysis and no discussion of City of East St. Louis planning policies related to the subject neighborhood.

- The Coghlan Report (page 26) "identified excavation and off-site disposal of impacted soils as the most reliable and straightforward remedial option" and rejected less expensive alternatives such as "capping or barrier systems and/or institutional controls."

  - o Dr. Bell should have been aware from his prior work in contaminated property assignments that capping is often an appropriate remedy, especially in areas where complete redevelopment is necessary such as the southern and western portions of the subject neighborhood located closest to the Monsanto/Krummrich facility where infrastructure such as streets and sewers need to be rebuilt and substandard lots need to be combined to create buildable sites.

- The Coghlan Report (page 26) states that "onsite treatment is limited by siting issues in a residential neighborhood and more complex and costly engineering requirements."

  - o Dr. Bell should have been aware from in areas where complete redevelopment is necessary such as the southern and western portions of the subject neighborhood located closest to the Monsanto/Krummrich facility where infrastructure such as streets and sewers need to be rebuilt and substandard lots need to be combined to create buildable sites, that on-site treatment may be a viable alternative.

- The Coghlan Report (page 27) states that two feet of soil would need to be removed at each of the properties that tested above 0.23 ppm.

  - o Dr. Bell should have been aware from his prior work in Anniston, Alabama that the cleanup level set by the U.S EPA in the PCB situation involving residential properties in neighborhoods adjacent to the Solutia facility there was set at 1 ppm and not at 0.23 ppm and that less than two feet of soil was removed on many of the residential properties involved in the Anniston investigation and remediation.

The transcript of the Coghlan deposition given on April 23, 2024 demonstrates that there are other issues related to the credibility of the Coghlan Report statement that all properties testing above 0.23 ppm need to be remediated, as indicated by the following:

- Coghlan acknowledged that the Illinois Administrative Code references 1 ppm as a threshold standard. (Coghlan Deposition, page 63, line 11-19)

- Coghlan acknowledged that the U.S. EPA has a criteria for corrective actions for PCBs "using a concept of whether or not a cleanup will result in protection to human health and the environment" and that the acceptable risk range "for cancers under TOSCA" is 1 in a



million. (Coghlan Deposition, page 112, lines 1-13) and that as long as the subject property parcels remain vacant, the risk of cancer from PCBs is "very low." (Coghlan Deposition, page 116, lines 20-24)

- Coghlan acknowledged that the "type of corrective action" he proposed would require U.S. EPA approval and that has not happened as yet. (Coghlan Deposition, page122, lines1-21)

- Coghlan acknowledged that his sampling and report was never intended to "provide a remediation plan for the EPA." (Coghlan Deposition, page 125, lines 1-25, page 126, lines 1-12).

- Coghlan acknowledged that "as they are used today", the 272 subject parcels "would not require any sort of cleanup because they are all [testing] less than 25 parts per million, at least under TOSCA." (Coghlan Deposition, page 134, lines 4-19)

- Coghlan acknowledged that his report and cleanup cost estimates "assumes the redevelopment of these parcels for some use other than how they are currently being used today" but he has no "information that suggests that the City of East St. Louis currently has plans to redevelop the parcels for residential use" or even redevelop them in general for any type of use (Coghlan Deposition, page 135, lines 1-11) nor has he seen any plans for redevelopment for any purpose. (Coghlan Deposition, page 136, lines 12-22)

- Coghlan acknowledged that the 0.23 ppm and 1.0 ppm levels he describes in his report "are not cleanup standards" and "should not be used as cleanup levels." (Coghlan Deposition, page 155, lines 23-25, and page 156, lines 1-15)

- Coghlan acknowledged that the cleanup threshold level determined by the U.S. EPA for the Anniston, Alabama PCB remediation on residential properties was not 0.23 ppm (Coghlan Deposition, page 162, lines 22-25, page 163, lines 1-12) but rather it was 1.0 ppm in Anniston. (Coghlan Deposition, page 165, lines 15-25)

- Coghlan acknowledged that even though he is assuming that two feet of soil must be excavated, the Anniston, Alabama PCB situation only required the excavation of only 12 inches of soil was necessary on residential properties that exceeded 1.0 ppm (Coghlan Deposition, page 176, lines 19-25) and there may be properties in the subject neighborhood that would require less than two feet of excavation. (Coghlan Deposition, page 177, line 25, page 178, lines 1-14)

These acknowledgments by Coghlan that not all the 273 properties may need to be remediated under the various standards applied by the IEPA and U.S. EPA are additional support for the conclusion that the Bell Report reliance on the cost estimates by Coghlan to determine the "use effect" is not credible because AO-9 defines "environmental contamination" in terms of regulatory standards as stated in the following definition:

> **Environmental Contamination**: Adverse environmental conditions resulting from the release of hazardous substances[242] into the air, surface water, groundwater or

---

[242] AO-9 does not contain a definition of the term "hazardous substance." However, the Appraisal Institute's book entitled *Real Estate Damages: An Analysis of Detrimental Conditions* contains the following definition of the term "hazardous substance": "A material that is determined by qualified engineers to be poisonous, reactive, flammable, corrosive, toxic, or that has been designed (sp.) as such by a governmental or regulatory agency."



soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies.

All of that indicates that there was a reason for Bell to doubt the credibility of the Coghlan estimate of a $50.2 million remediation cost and reasons not to rely on that estimate as the "Cost Effect" conclusion in the Bell Report.



## 13.   The Bell Report Conclusion of Almost $990 Million in "Use Effect" Damages Is Not Credible

### 13.1  The "Use Effect" Method of Analysis in the Bell Report

As indicated earlier in the Jll Expert Report, the following steps are involved in the calculation in the Bell Report of claimed "use effect" damages of almost $990 million:

- First, an average loss of monthly rent of $1,400 for homes is first calculated for the 273 properties based on an analysis of 51 leases of homes in distant St. Clair County communities outside the City of East St. Louis.

- Second, for unimproved subject properties, an annual ground rent of 7% is applied to a claimed market value of $40,000 per lot based on distant suburban St. Clair lot prices.

- Third, the Bell Report discounts the average 2023 annual rental amounts for land and for improved properties using the Consumer Price Index (CPI) to derive annual rental rates for each type of property in each year all the way back to 1973.

- Fourth, a claimed 100% loss in monthly rent on all 273 properties is calculated over a claimed rental loss period starting on July 1, 1973 and ending on the future date of February 1, 2027, for a total of claimed loss of use for 53.59 years.[243]  The Bell Report claims to consider only those months in the past when the city actually owned the properties.

- Fifth, the final step is a calculation of a claimed loss of 9% per year interest on the hypothetical rents of city-owned properties. The claimed lost rental income and claimed lost interest on those hypothetical rents are then added together to arrive at the claimed "use effect" damages of almost $990 million.[244]

### 13.2  Summary of the Problems in the Bell "Use Effect" Method of Calculating Claimed Damages

The problems in that method may be summarized as follows:

- As indicated earlier in this JLL Expert report, the Bell Report disregards all sales and leases that have incurred in the City of East St. Louis and in the subject neighborhood. Those sale prices and rental rates indicate significantly lower prices and rents than those for distant St. Clair County communities in the Bell calculations.

- The Bell Report states that the 7% discount rate used to adjust values and lease rates back to 1973 is based on the Consumer Price Index (CPI). The Bell Report (page 41, footnote 66) claims use of the CPI to adjust real estate prices and rents is supported by a statement in the 15th Edition of *The Appraisal of Real Estate* at page 485 that "the CPI is used to measure changes in costs, such as building costs, and can be used as a

---

[243] The Bell Report (page 11) states that February 1, 2027, was used as the "use effect" based on "the scheduled start of trial [date] February 1, 2025 plus 24 months to conduct remediation efforts to February 1, 2027.aiend date because the scheduled , It appears from the Bell Report,

[244] The Bell Report (page 41) claims that "while all subject properties were negatively impacted by PCBs, subject properties with a lot size less than 1,000 SqFt were not included in the damage calculations, [and] this is consistent with the low end of the lot sizes observed in the comparable sales data."



barometer for determining changes in lease rates." However, that quoted language does not appear in the 15th Edition of *The Appraisal of Real Estate*. Furthermore, the CPI does not account for local market supply and demand influences on residential real estate rental prices given that it is an index for prices of a "basket" of consumer goods, not just real estate rental prices

- The Bell Report (page 41) provides no support for taking the improperly discounted rental rates and then using an average S&P 500 Index annual return of 9% as "a reasonable approximation of the City's expected return on such an investment," and was "based on the average annual return of the SP 500 Index from 1973 to 2024.

- Putting aside the discussion below that there is no evidence that the city ever actually leased properties they owned in the subject neighborhood, the Bell Report fails to discuss or even consider whether a risk-free rate of 2% or 3% or a historical municipal bond rate rather than S&P 500 return rate should be used.

- There is no explanation as to why a municipality would expect, or even earn, a compounded market return on investment over such a long timeframe. In addition, compounding over a long period of time (such as 53.59 years as shown in Figure 19 on page 42) will cause an amount to exponentially grow to extraordinarily high amounts when using a risky rate of return.[245]

- Although the Bell Report claims it took into consideration the fact that during many of the years between 1973 and 2023 the city did not own some of the properties and includes a chart at page 42 indicating the claimed number of properties owned by the city each year, there is no explanation in the Bell Report for how the claimed number of properties owned by the city each year was determined.  For example, the Bell Report does not attempt to explain how the City owned 212 improved properties in 1980, then the City owned only eight improved properties in 1994, and then the City owned 109 improved properties in 1996 none of the changes in property ownership are analyzed in the Bell Report to support property value or real estate rental rate opinions in the Report. A similar, large variation in property ownership numbers occurs for land parcels claimed to be owned by the City in the Bell Report chart on page 42.

- It appears that the number of properties owned each year by the city was simply a number provided by attorneys for the Plaintiffs since the Bell Report (page 21) states the following: "It is an extraordinary assumption that the City of East St. Louis ownership history is accurate and correct, as provided by counsel" and "[a]t counsel's request, any ownership noted by a government agency was included in the damage calculations."

- Our analysis of the number of properties actually owned by the city in December of 2023 is significantly lower than the number in the Bell Report chart.  As indicated earlier in this report, our analysis of publicly available information indicates that the city owned only 100 properties as of that date, not the 185 improved properties and 38 unimproved properties shown in the Bell Report table.  That indicates other yearly entries in the Bell Report table at page 42 may also have wrong numbers of city-owned properties and that the Bell Report

---

[245] As an example of the effects of compounding at high interest rates, consider what happens at a lower interest rate.  Compounding at a more moderate risk-free rate of 3% instead of a risky 9% rate reduces the "use effect" computation to less than 5% of the nearly $1 billion amount stated in the Bell Report and using a risk free rate of $2% reduces the claimed "use effect" damages to less than 3% of the Bell damage calculation.



reliance on the "extraordinary assumption" that the numbers provided by the city's attorneys was not supportable.

- The Bell Report in Table 19 extends the Use Effect through February 2027, but the date of value in Bell is December 2023 (38 months of additional compounding and inconsistent with the report scope of work for a report that has a December 31, 2023 date of value). Extending the Use Effect analysis into the future (which is unknown) requires the Bell Report to include a hypothetical condition for that extension, but the Report does not contain this required USPAP item.

- Correcting the compounding rate from 9% to 3%, limiting compounding only through December 2023 AND only applying to the 54 city-owned properties, the Bell Report Use Effect turns out to be less than 1% of the stated $989 million.

### 13.3 The "Use Effect" Damage Claim in the Bell Report Assumes Hypothetical "Imaginary" Leases of City Owned Properties and Is Not a Concept Recognized in the Standards of Professional Appraisal Practice

There is no evidence presented in the Bell Report that the city ever attempted to lease any of the properties it owned between 1973 and 2023. The Bell Report ignores that fact and couches its claim for "use effect" damages on the following statements about alleged loss of "conventional" or "normal" use as indicated by the following:

- "Use effects were determined, as there were impacts to the bundle of rights and to the *conventional use* of the subject properties." (Bell Report, page 10, emphasis added)

   "In this case, the subject properties *conventional use* has been impacted because of the PCB contaminants." (Bell Report, page 36, emphasis added)

- "The *conventional use* of property generally assumes the enjoyment of safe air, soils, and water." (Bell Report, page 36, emphasis added)

- "Measurement of temporary use effects generally centers on market rents. It is not centered on whether there has been an impact to market rental rates or whether a property is used, but rather on whether there is an impact to the *conventional use* and enjoyment of the property or its rights or whether the bundle of rights has been impaired. In this context, "*conventional*" relates to a customary or traditional usage or custom." (Bell Report, pages 35-36, emphasis added)

- "The loss of *normal use and enjoyment* is a standard component of real estate and computing damages." (Bell Report, page 35, emphasis added)

- "[T]he Use Effect represents . . . the City's loss of the *normal use and enjoyment* of the subject properties . . . " (Bell Report, page 41, emphasis added)

- "*Normal use* of the subject properties has been impacted and is addressed in the Use Effect analysis." (Bell Report, page 134, emphasis added)

As support for those claims, the Bell Report cites an article in *The Appraisal Journal* written by Michael Tachovsky, a colleague of his at Landmark Research Group, LLC. The Tachovsky article includes the following statement:

   "When calculating a temporary use effect, questions may arise regarding what a property owner or renter does at the property during the time of impairment;



however, from a real estate valuation perspective, the pertinent question is in regard to the effects on real estate and property rights. In other words, it is not a real estate valuation professional's duty to value people—it is their duty to value real estate. For example, if a property owner is on vacation and their house becomes the site of an environmental spill, that does not automatically mean that they did not incur a real estate damage because they were absent at the time of the spill. In a situation where a sudden disaster strikes and property owners remain bunkered down in their home, this is not necessarily evidence that there was no loss of use. Although the homeowners remained in their home, *a use effect can still exist as this does not constitute conventional use and enjoyment of a property or its rights.* Ultimately it comes down to if a property or its rights are impacted, not necessarily how the property owner reacts."[246] (emphasis added)

The Tachovsky article cites no references to support those statements.[247]  While the article is partially correct that real estate appraisers value real estate and not "people," [248] it is the actions of these "people" and their perceptions – "how the marketplace of buyers and sellers reacts" – to factors affecting prices that determine rents and prices.  That is why market data, such as the actual use by the City of East St. Louis of its properties and actual rents and prices in the subject neighborhood during the years of the claimed impact of PCBs on prices and rents, is critical to determining any damages due to "loss of use."  That has been specifically recognized in Bell's book entitled *Real Estate Damages* at page 1:

> "To accurately analyze real estate, one must be able to monitor and interpret the actions of the participants in the market.  After all, properties do not deal with one another, but people do.  When carefully considered, all the factors that have an influence on a property's desirability, and therefore its value, are traced back to the market's perceptions.  To truly understand real estate valuation, one must conscientiously focus on and measure these perceptions.
>
> *         *         *
>
> To understand perceptions within the real estate market, market data must be used to measure how the market actually reacts. A property is considered 'innocent' until a negative impact is demonstrated through an analysis of relevant market data. ***The simple assumption that an incident caused a diminution in value is one of the most common errors in the field***. These are sometimes called *ipse dixit* opinions of value. *Ipse dixit* is a Latin term essentially meaning 'it is because I said so,' or 'It is just the way it is" without the benefit of any actual support or critical thinking. ***It is the antithesis of any position that has timely, reasoned support or evidence.****" (emphasis added)*

The *Real Estate Damages* book goes on at page 27 to state the following:

> "The most important consideration in evaluating potential risk, stigma, or market resistance is to support opinions with relevant market data. The discovery or

---

[246] Michael Tachovsky, PhD, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal*, Spring 2002, at 111.

[247] We could find no corroborative references in the appraisal profession's body of knowledge, including the recognized treatises of the Appraisal Institute, regarding Dr. Tachovsky's opinions regarding "conventional use and enjoyment."

[248] Real estate is appraised by real property appraisers that value the real property rights associated with the ownership of physical real estate.



disclosure of a current or prior detrimental condition does not automatically result in value diminution, and it is incumbent upon the appraiser or analyst to provide proper support for any opinions related to market resistance."

The two Tachovsky papers cited in the Bell Report also do not address the same kind of claimed "conventional" loss of use that is described in the Bell Report. On page 105 of *Environmental Dead Zones: The Evaluation of Contaminated Properties*, Tachovsky states, "Land use restrictions are limitations to the conventional use of land." However, land use restrictions are legal permissibility issues and therefore are a highest and best use concept that would be addressed in the selection of rent comparables to a subject property in a valuation assignment. There is no highest and best use analysis in the Bell Report and no discussion of the urban planning by the city in relation to the subject neighborhood. On page 109 of the same article, Tachovsky describes an example of an impacted area as a "fenced off exclusion zone where conventional occupancy and access to property are fully restricted." This too would be a legal restriction and therefore a highest and best use consideration and there is no contention that portion of the subject properties have been fenced off due to PCB concerns.

The "market rent × time = use effect" equation (on page 116) in the Tachovsky article describes a long-term, total loss of use of property due to the detonation of an above-ground thermonuclear device at the Bikini Atoll atomic bomb testing site in March 1954. The radioactive fallout created a physical restriction on the land that precluded both access to and use of property. There was no physical restrictions in place on properties in the subject neighborhood in December of 2023 related to concerns about PCBs.

The second Tachovsky paper, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," is also not directly applicable to the Bell Report. On page 111 of that article, Tachovsky states, "An impairment to the **conventional** use and enjoyment of a property or its rights is typically reflected as a temporary use effect, and highest and best use issues typically reflect ongoing use effects." (emphasis added). The term "conventional use and enjoyment" appears eight times in the Tachovsky paper, but the term is never cited to an authoritative source. On page 112, the paper describes the word "conventional" as "customary or traditional usage or custom" while referencing Black's Law Dictionary as the source. In other words, conventional is appended to the appraisal application of the use and enjoyment property right.

What the Tachovsky paper does not describe, nor does the Bell Report consider, is that what is "customary or traditional usage" for one property owner may not be "customary or traditional usage" for any other property owner. The only way to answer this question as to what would be "customary use and enjoyment" for any individual property is to investigate that question on a property-by-property basis. Also, without knowing what is "customary" for any one property owner, it is not possible to use the equation "market rent × time = use effect" because each property's market rent would need to incorporate what is "customary use and enjoyment" for that property.

Finally, two other comments on the Tachovsky article and the Bell Report reliance on it are necessary. First, the phrases "normal use and enjoyment" or "conventional use and enjoyment" that the Bell Report claims the city lost and the Tachovsky article claims to exist do not appear in the 15th Edition of *The Appraisal of Real Estate*, do not appear in the 7th Edition of *The Dictionary of Real Estate Appraisal*,[249] and do not appear in the Uniform Standards of Professional Appraisal Practice (USPAP). Second, the phrase "conventional use" does not appear in the third edition of Bell's book entitled *Real Estate Damages* and while the tern "normal use" does appear twice in

---

[249] Both *The Appraisal of Real Estate*, 15th Edition, and *The Dictionary of Real Estate Appraisal*, 7th Edition are part of the appraisal profession's recognized body of knowledge and are considered accepted treatises of the profession along with USPAP.



the Bell book, it does so in the context of a house in which a murder occurred and a house where a physical obstruction such as a tree blocking a gate has interfered with the "normal" use of that gate.

### 13.4 Conclusion: The Almost $900 Million "Use Effect" Claim for Damages in the Bell Report Related to the 273 Properties Is Not Supportable or Credible

For the reasons stated above, the almost $900 million "use effect" damages claim in the Bell Report is not credible. The Bell Report includes no research to check the accuracy of the city claim to own all 273 properties in 2023 and accepts the city's attorneys list of dates and properties owned by the city over the past 50 years.

The Bell Report fails to look at any actual sales or leases in the subject neighborhood to determine if there was any type of actual effect on use. Those sales and leases indicate that the market values and rental rates used by Bell to calculate "use effect" damages are not supportable.

The Bell Report also does not include any research to determine if the city has actually leased or sold any of its properties even though there is information in the Bell Report that ownership of the city's properties has varied substantially over the years.

The Bell Report fails to provide any support for using a CPI discount factor or a rate of return based the S&P 500.

Finally, there is no support in the principal treatises of the appraisal profession (including Bell's own *Real Estate Damages* book) to support ignoring "actual use" of the city's properties and instead rely on a hypothetical concept called "conventional use" or "normal use" to support a claim that all use and enjoyment of the city's properties has been affected for the past 50 years and measure it based on hypothetical leases and rents.



## 14.   The Bell Report Inappropriately Compares the Subject Neighborhood to Distant St. Clair County Outlying Areas in Arriving at the Damages Conclusion

### 14.1 Introduction: The Reasons Given by Dr. Bell for Ignoring Thousands of Sales and Rents in East St. Louis and Communities Immediately Adjacent to the Subject Neighborhood

As indicated earlier in this JLL Expert Report, the Bell Report ignores over 1,315 transactions in the City of East St. Louis between 2002 and 2024, ignores an additional 3,400 transactions that occurred between September 2002 and May 2024 in Cahokia, the community that abuts the subject neighborhood to the south, and also disregards 112 sales of homes in the subject neighborhood since 2002. The Bell Report ignores those sales and provides no explanation for why such sales were excluded from his analysis even though the Bell Report (p. 31) states that sales transactions in the neighborhood were investigated.

At his deposition on May 3, 2024, on pages 179-183, Dr. Bell explains why he chose to use sales in St. Clair County outside the City of East St. Louis and outside the communities adjacent to the subject neighborhood.  He claimed that Sauget, Centerville, and Alorton were "excluded because they have other environmental issues."[250]  The Bell Report does not explain these "environmental issues, nor does it contain any descriptions of these claimed environmental issues. Neither the Bell Report nor the Bell deposition indicate why market data from Cahokia was also excluded from his analysis.

When asked at his deposition (page 180, lines 20-24) why he did not look at any East St. Louis sales data, he claimed he excluded East St. Louis data outside the subject neighborhood because he wanted to create a "buffer" between his "test area" (meaning the subject neighborhood) and a "control area."

> "Q: Okay. Did you look for parcels - - parcels – homes for lease in unaffected areas of East St. Louis?
>
> A: No. We used – we used East St. Louis as a buffer. It is common to use a test area and then put a buffer in between and go to a control area."

Bell was asked at his deposition (page 242, lines 8-12) why he included a "buffer area," and he responded as follows:

> "Q. And why do you do that? Why do you have a buffer area?
>
> A. Well, because you don't know how far the PCBs went.  As far as I know, there hasn't been testing."

He followed that response with a further explanation (page 242, line 23 and page 243, lines 1-2) as to why properties "nearby" were excluded from consideration as to sale prices or rental rates:

> "So the properties nearby that, you don't know if they're contaminated or not because they haven't been tested . . . So you want to avoid the adjacent and

---

[250] Bell Deposition, page 180, lines 10-11.



proximal[251] properties and, if you will, leapfrog over that, pass by the buffer area, and get into areas thar are free from – from what all the knowledge is, they're clean and similar size."

However, some of the sales in St. Clair County chosen by Bell to support his conclusion of a $140,000 average home value in the subject neighborhood are located closer to the Monsanto/Krummrich facility than are homes in East St. Louis itself, as shown on the enlarged view of a portion of Figure 35 at page 64 of the Bell Report to the right. Some of the green and orange dots representing sales of homes are located very close to the boundary of East St. Louis and actually closer to the Monsanto/Krummrich facility than the far eastern neighborhoods in East St. Louis where sales have been ignored by Dr. Bell.



The Bell Report does not explain why a "buffer area" boundary should be based on a political boundary rather than based on distance from the Monsanto/Krummrich facility.

As to how the homes in St. Clair County outside the City of East St. Louis were selected as comparables, Dr. Bell at his deposition (page 181, lines 4 to 11) stated "on visual inspection . . . the homes look comparable" and "this, to me, seemed like a very fair way of establishing a rental rate for a home in East St. Louis . . . "

### 14.2 There Is No Support in the Published Appraisal Profession Textbooks or in the Standards of Professional Practice for Bell's Failure to Consider Thousands of Sale Prices and Rental Rates in East St. Louis and Other Communities Immediately Adjacent to the Subject Neighborhood

The Bell decision to ignore thousands of sales in the City of East St. Louis and communities immediately adjacent to the subject neighborhood violates standards of professional appraisal practice.  Appraisers are required to use generally accepted methods that their peers would use in similar assignments and the methods their peers would use are set forth in the books, publications, seminars, and courses of the appraisal profession.[252]  The Bell Report is in violation of that requirement to use generally accepted methods as indicated by the following:

- There is nothing in the *Real Estate Damages* book, 3rd Edition, the 15th Edition of The Appraisal of Real Estate, or in USPAP AO-9 that describes using a "buffer" between a control area and a test area.[253]

- There is also nothing in those sources to support Bell's ignoring sales in "adjacent" and "proximate" portions of East St. Louis and communities adjacent to the subject

---

[251] The word "proximal" may be a typo by the court reporter.  The word used in the 15th Edition of *The Appraisal of Real Estate* and the 3rd edition of *Real Estate Damages* published by the Appraisal Institute is "proximate."

[252] See USPAP 2024 Edition, FAQ 170. Judging The Actions of An Appraiser's Peers, page 300.

[253] The word "buffer" appears once in the 15th Edition of The Appraisal of Real Estate (page 149) in the following sentence: "Sometimes a river, lake, hill, park, or other natural feature may act as a buffer between a residential district and commercial or industrial areas and thereby reinforce the residential area's identify."



neighborhood based on an assumption unsupported by any data or evidence that they may be contaminated by PCBs.

- Using only a visual inspection for comparability is not consistent with the recognized methods and techniques of the appraisal profession, as required by USPAP.[254]

Among the statements in the 15th Edition of *The Appraisal of Real Estate* that indicate the Bell report refusal to consider nearby sales while relying on sales and leases as far as 18 miles away are the following;

- P. 108, "When comparable sales data is scarce in the subject property's immediate area, appraisers may need to extend the data search to adjacent market areas and similar communities. An appraiser must establish the comparability of the alternative market before using data from that market.

  . . .

  Appraisers have a special responsibility to scrutinize the comparability of all data used in a valuation assignment. They must fully understand the concept of comparability and should avoid comparing properties with different highest and best uses, limiting their search for comparables, or selecting inappropriate factors for comparison."

- P. 355, "If a transaction does not reflect the actions of a buyer who would also be attracted to the subject property, an appraiser should be concerned about comparability and the wisdom of relying on that comparable as a basis for comparison."

- P.356-357, "As another example, an appraiser may find little comparable data for a property that is the first to be renovated in an area of deteriorated buildings or for the only property of a given type in a market area. In this situation, the appraiser must establish the comparability of other areas and the competitiveness of the properties located in these areas with the subject property."

The Bell Report therefore does not establish reasonableness for the comparability of these other St. Clair County areas that are distant from the subject properties nor how these distant comparable properties are economically competitive with the subject properties.

At his deposition (page 182, lines 12-25 and page 183, lines 1-2), Dr. Bell admitted he did no statistical analysis to support the average prices or rental rates he used to estimate damages to the subject properties:

> Q: Okay. Do you have any statistical analysis that would show price per – lease rate per square foot in Caseyville, Fairview Heights, Belleville that would confirm for you that the price per square foot or lease rate per square foot was comparable?

> A: That frankly doesn't make sense. Because some of these homes we don't know what the square footage was. They were bulldozed, and we have incomplete records. So we're doing our best to – well, we are complying with USPAP. We are

---

[254] See USPAP 2024 Edition, Standards Rule 1-1(a), page 18, line 498.



> complying with the methodology under USPAP 809 (sic)[255]. But we're making a best efforts approximation of lease rates, granted with homes that don't exist anymore and the records don't fully exist either. So I don't know that you could even do a price per square foot with those parameters.

Because no structures existed, he states that he was complying with USPAP and the methodology under USPAP Advisory Opinion 9 (USPAP AO-9). However, USPAP AO-9 says nothing about using hypothetical improvements to property (i.e., imaginary or phantom structures). In fact, to base values on such hypothetical "imaginary" improvements in an appraisal assignment requires an appraiser to include a statement in the appraisal report that the values are being determined under a "hypothetical condition." A "hypothetical condition" is defined in USPAP as "a condition, directly related to a specific assignment, which is contrary to what is know by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The Comment to that definition goes on to state the following:

> "Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."[256]

The Bell Report claims his analysis does not involve any hypothetical conditions.

---

[255] This appears to be a court report transcription error. Bell was likely referring to Advisory Opinion 9, typically referred to as "AO-9."
[256] USPAP, 2024 Edition, page 4, Lines 116 to 121.



## 15.   Addenda Items

### 15.1 Assumptions and Limiting Conditions

The opinions in the appraisal review report are expressly subject to the following assumptions and limiting conditions:

1.    This appraisal review assumes no responsibility for matters of a legal nature. It is assumed that title to the properties is marketable and any legal description provided is correct. No separate review of legal descriptions has been undertaken in this review process. It is also assumed that title to the properties involved in any sales considered in this appraisal was also marketable and that any legal description furnished is correct.

2.    This appraisal review assumes that the properties involved in the assignment are under responsible ownership and competent and efficient management, and free and clear of all liens and encumbrances unless otherwise noted in this report.

3.    This appraisal review assumes that there are no hidden or non-apparent physical conditions affecting value. No liability is assumed for the soundness of structural members or equipment or suitability of soil conditions for construction, since no engineering tests were made other than those conducted by others for purposes of revealing environmental conditions of properties in the proposed Class Areas.

4.    Improvements, if any, are considered to be within lot lines and in accordance with local zoning and building ordinances, unless otherwise stated. We have also assumed that any plats, diagrams or drawings provided are not meant to be used as references in matters of survey, as no survey was made by the appraiser, and no responsibility was assumed by the appraiser regarding questions of survey. The same caveats apply to any additional maps, plans, sketches and GIS information in this review report.

5.    This appraisal review also assumes that all applicable zoning and use regulations and restrictions have been complied with except any planning and zoning permits not yet obtained and discussed in this appraisal report.

6.    This appraisal review assumes that utilization of the land and improvements of any properties involved in the appraisal assignment are within lot lines or boundaries of the property described.

7.    Any information and data received from others in the course of this assignment (other than from the appraiser whose report is being reviewed) is believed to be reliable; however, no warranty is given for its accuracy.

8.    Any plot plans and illustrative material in this report are included only to assist the reader in visualizing the properties. Maps and exhibits found in this report are provided for reader reference purposes only. No guarantee as to accuracy is expressed or implied unless otherwise stated in this report.

9.    It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in this report.

10.    Other than in the litigation for which this appraisal review is being submitted, the authors of this appraisal review shall not be required to give further consultation or testimony, or appear in court, by reason of this report with reference to the properties that are the subject of the appraisal unless previous arrangements have been made to that effect.

13.    Disclosure of the contents of this appraisal review is governed by the By-Laws and Regulations of the Appraisal Institute. Possession of this report, or a copy thereof, or any



part thereof, does not carry with it the right of publication, nor may it be used by anyone but the party for whom it has been prepared or in the legal proceedings for which it has been produced, without the previous written consent of the review appraisers. Any use of the report outside of the legal proceedings for which the report has been produced must be undertaken with proper written qualification and the report must be used only in its entirety.

14. Neither all nor any part of the contents of this appraisal report (especially the identity of the appraisers) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser, except by the client and its counsel for whom this appraisal has been prepared as part of the legal proceedings for which it has been produced.

15. This appraisal review report is intended to be read and to be used as a whole and not in parts. Separation of any section or page from the main body of the report, in the absence of specific authorization from the signers, is expressly forbidden and will be considered as invalidating the report.

16. The professional fees paid for preparing this appraisal review report were not based in whole or in part on the amount of the appraised value of the underlying properties or upon the outcome of the legal proceedings for which it has been produced. Rather, professional fees have been based upon an hourly reimbursement basis at our hourly rates in effect on the date the work was performed plus reimbursements for costs and expenses associated with research, travel and report production.

17. Effective January 26, 1992, the Americans with Disabilities Act (ADA) established requirements intended to make most privately operated, non-residential buildings accessible to and usable by disabled persons. We have not undertaken a specific compliance survey and analysis of any of the properties that are the subject of the assignment to determine whether or not or to what extent those properties conform to the provisions of the ADA. Such a survey and detailed analysis of ADA requirements could reveal that some properties do not comply with the act in one or more respects. We have assumed that the properties either are in compliance or that measures can be taken to remove architectural barriers or otherwise achieve compliance at minimal cost.

18. *Limiting Condition: Unless otherwise noted in this report, no responsibility is assumed for detecting the existence of any structural, mechanical or utility defects or deficiencies, or the presence of hazardous substances such as but not limited to radon gas, asbestos, natural or artificial radiation, or toxic substances of any description, whether on or off the premises, other than those readily apparent from a visual inspection of the property. The appraiser is not qualified to test for the presence of such factors and does not assume responsibility for the engineering or scientific knowledge or expertise required to discover them. However, the review appraiser has reviewed information contained in the expert reports produced for the Plaintiffs in the litigation and may also review information contained in any environmental reports prepared for the Defendants and provided to us. We have also reviewed publicly available information concerning environmental issues related to various industrial facilities in the vicinity of the subject properties and in East St. Louis. The review appraiser is qualified to review that information from the point of view of the real estate marketplace in the East St. Louis area.*

19. *Limiting Condition: This Appraisal Review Report does not include the reviewers' own opinions of market value or rental value of any specific property included in the Bell Report. This Appraisal Review Report does not include the reviewers' own opinions of unimpaired market value of any of the 273 subject properties, but does include the appraiser's opinion concerning the impact on market value due to the investigation into the environmental situation related to proximity of those properties and their neighborhood to the Monsanto*



*Solutia plant in Sauget, Illinois, alleged in the litigation to be the source of the PCB contamination and the cause of the claimed cost, use, and risk effects discussed in the Bell Report on value. This Appraisal Review Report does also include, however, our conclusions concerning the effect of correcting the misrepresentations, errors and omissions and the conclusions in that reviewed Bell Report.*

20. *Limiting Condition: The appraisal review report is intended to comply with the reporting requirements set forth under Standards Rules 3-4, 3-5 and 3-6 of the Uniform Standards of Professional Appraisal Practice for an Appraisal Review. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The review appraisers are not responsible for unauthorized use of this report*

21. *Limiting Condition: We reserve the right to supplement this appraisal review report based on any new or additional data, and to respond to testimony of others. In addition, we reserve the right to use graphics or other exhibits to further address the matters discussed in this report.*

.



## 15.2 Appraisal Certification

We certify that, to the best of our knowledge and belief:

-the facts and data reported by the appraisers signing this appraisal review report ("this report") and used in the appraisal review process are true and correct;

-the analyses, opinions, and conclusions in this report are limited only by the assumptions and limiting conditions stated in this report and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions;

-that we have no present or prospective interest in the property that is the subject of this report;

-that we have no personal interest or bias with respect to the parties involved or the property that is the subject of this report and assignment;

-that our engagement in this assignment was not contingent upon developing or reporting predetermined results;

-that our compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in this report or from its use;

-that the reported analyses, opinions, and conclusions were developed and this report was prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice;

-that we have performed no other services, as an appraiser or in any other capacity, related to the specific properties that are the subject of this appraisal assignment within the three years prior to beginning our appraisal work;

-that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives;

-that no one other than the undersigned prepared the analyses, conclusions and opinions concerning the real estate that are set forth in this appraisal report.

-that Richard J. Roddewig and Charles T. Brigden undertook exterior inspections of the properties that are the subject of the appraisal report;

-that the Appraisal Institute conducts a continuing education program for its members. As of the date of this report, we have completed requirements of the continuing education program of the Appraisal Institute;

-that Richard J. Roddewig and Charles T. Brigden are both licensed as real estate appraisers in Illinois and other states; and

-that professional assistance in the preparation of this appraisal review was provided by the following: Dr. Thomas W. Hamilton, PhD, MAI, CRE, FRICS, Ms. Anne S. Baxendale, Mr. Alexander C. Argianas, Ms. Margo LaClair, Mr. Zachary C. Munn, Ms. Claire E. Williams, Ms. Haley A. Scheid, and Mr. Shane M. Briscoe of JLL Valuation & Advisory Services, LLC.

Respectfully submitted,

**JLL Valuation & Advisory Services, LLC**

**Date: July 9, 2024**

| | |
|---|---|
| *Richard J. Roddewig* | *Charles T. Brigden* |
| Richard J. Roddewig, MAI, CRE, FRICS | Charles T. Brigden, MAI, CRE, FRICS |
| **Managing Director** | **Managing Director** |
| Illinois Certified General Appraiser | Illinois Certified General Appraiser |
| License #553.000129  Expiration Date: 9-30-2025 | License #553.003041  Expiration Date: 9-30-2025 |



## 15.3  General Qualifications and Competency of Richard J. Roddewig, MAI, CRE, FRICS



### JLL Biography

# Richard J. Roddewig, MAI, CRE, FRICS



**Managing Director – JLL Valuation Advisory**

**Overview**

Richard J. Roddewig, MAI, CRE, FRICS, is Managing Director of JLL Valuation Advisory, which is part of Jones Lang LaSalle (JLL), one of the largest full service real estate firms in the world with offices in more than 90 countries.  Mr. Roddewig is both a real estate economist and an appraiser, as well as an attorney, with extensive experience in the valuation of many types of complex properties and less-than-fee interests, including conservation and historic preservation easements. Between 1988 and 2017, Mr. Roddewig was President of Clarion Associates, Inc., one of the most experienced firms in the United States in the valuation of complex real estate assets with a focus on litigation-related assignments. Mr. Roddewig has more than more than 40 years of real estate appraisal experience and more than 35 years of experience with conservation and preservation easements and in assignments involving properties affected by various types of environmental issues.

**Experience**

Mr. Roddewig directs a national real estate appraisal and consulting practice focused on expert testimony in complex litigation and administrative review proceedings.  He has worked on assignments in more than 40 states and a number of foreign countries, and currently holds appraisal licenses in 10 or more states.  He has testified as an expert witness in a variety of federal district courts, in U.S. Bankruptcy Court, in U.S. Tax Court, and in state courts all across the United States.  Much of his litigation related work involves determining the impact of contamination and environmental risk on property prices and even entire markets.  Among his more notable assignments was expert testimony for Exxon in the Alaska state trial to determine the impact of the *Exxon Valdez* oil tanker spill on the market value of 1,300 miles of Alaska coastline, and preparation of an expert report for four New Orleans levy districts on the appropriate appraisal techniques to determine the impact of Hurricane Katrina on the value of more than 150,000 properties in New Orleans.

*Head of JLL's Valuation Advisory Litigation Support Group, providing expert testimony in assignments across the United States.*

*Certified General Real Estate Appraiser with more than 40 years' experience.*

*Prolific author and recognized thought leader in complex valuation matters.*

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

A prolific author, Mr. Roddewig has authored or co-authored 19 books and more than 65 articles in professional journals. Three of his articles and one of his books have won awards from The Appraisal Institute and The Counselors of Real Estate. He has also developed a wide variety of seminars, courses and programs for The Appraisal Institute as well as for many other organizations including the American Bar Association, The John Marshall Law School, the University of Denver Law School, and Columbia University. He has been an adjunct lecturer at DePaul University, the University of Illinois at Chicago, Governors State University, and Northeastern Illinois University.

### Education and Affiliations
- Designated Member (MAI), Appraisal Institute
- Designated Member (CRE), Counselors of Real Estate
- Designated Member (FRICS), Royal Institute of Chartered Surveyors
- Certified General Real Estate Appraiser in Illinois and many other states
- Bachelor of Arts (Summa cum Laude) – University of Notre Dame
- Master of Arts – University of Chicago
- Juris Doctor – University of Chicago

### Prior Experience
President – Clarion Associates, Inc., 1988 to 2017, Chicago, Illinois

Senior Principal – Pannell Kerr Forster, 1987 to 1988, Chicago, Illinois

Senior Vice President – Shlaes & Co., Real Estate Counselors and Appraisers, 1986 to 1987, Chicago, Illinois

Vice President and General Counsel – Shlaes & Young Information Systems, 1982 to 1986, Chicago, Illinois

Consultant – Shlaes & Co., 1978 to 1986, Chicago, Illinois

Attorney at law – Roddewig and Associates, 1976 to 1977; 1978 to1987; 1988 to 1992, Chicago, Illinois

Research Attorney – Northeastern Illinois Planning Commission, 1977 to 1978, Chicago, Illinois

Associate and Attorney – Ross & Hardies, Chicago, 1973 to 1976, Chicago, Illinois

Staff Attorney and Consultant in Australia – International Comparative Land Use Project - The Conservation Foundation, Washington, D.C., 1974 to 1975

Adjunct lecturer – Governors State University, Park Forest South, Illinois, 1978; Northeastern Illinois University, Chicago, Illinois, 1979; School of Urban Sciences, University of Illinois at Chicago Circle, 1979 to 1987; School of History of Art and Architecture, University of Illinois at Chicago Circle, 1985 to 1989; Department of Finance, DePaul University, Chicago, Illinois, 1990 to 2010.

### Areas of Special Competence
Real estate consulting practice concentrated on appraisals, feasibility studies, and market studies of larger residential, retail, commercial office, industrial, hotel and motel properties and vacant sites. Special concentration in valuation of historic structures, properties affected by environmental issues, and special purpose properties. Legal experience in real estate, income tax, land use and zoning, and historic preservation.

### Representative Major Projects
Real estate appraisal and consulting assignments on projects in more than 50 cities and 40 states.

Qualified as an expert witness before arbitration panels and in federal and state courts in Arizona, Colorado, Alaska, Minnesota, Wisconsin, Illinois, Maryland, West Virginia, Tennessee, Mississippi, Louisiana, Texas, Florida and Pennsylvania.

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved

2



Directed appraisal of 1300 miles of railroad right-of-way for federal bankruptcy trustee.

Consultant to City of Chicago Department of Planning on revisions to the Chicago Zoning Ordinance.

Valuation of more than 200 conservation and historic preservation easement donations for private developers and the Internal Revenue Service and the Department of Justice.

Valuation consultant and expert witness for $20.0 million township open space acquisition program.

Analysis of impacts of contamination and environmental risks on neighborhoods, markets and properties in cities, towns and rural areas in approximately 25 states including Alaska, Hawaii, California, Washington, Montana, Wyoming, Colorado, Missouri, Minnesota, Wisconsin, Illinois, Michigan, Indiana, Ohio, Pennsylvania, West Virginia, Maryland, New Jersey, New York, Connecticut, Massachusetts, South Carolina, Georgia, Florida, Louisiana and Mississippi.

Analysis of appropriate methodology for determining impact of *Hurricane Katrina* on property prices and values in New Orleans, Louisiana.

Consulting and expert testimony for Exxon concerning impact of *Exxon Valdez* oil spill on land markets and property values in Alaska.

Valuation of landfills in Colorado and Pennsylvania.

Valuation of water storage and irrigation district properties in Colorado and Alberta, Canada.

Valuation of all privately-owned real estate at the South Rim of Grand Canyon National Park.

**Professional Memberships**
Member, Appraisal Institute (designated MAI).

Chair, Government Affairs Committee, Illinois Chapter, Appraisal Institute, 1991 to 1992.

Past Member, Regional Ethics and Counseling Panel, Appraisal Institute.

Member, Appraisal Institute Special Task Group for the Development of Standards for Determining the Acceptability of Applications of Statistical and Market Survey Techniques to the Valuation of Real Property, 2000.

Member, Appraisal Institute Special Task Group on Conservation and Historic Preservation Easement Valuation, 2005 to 2006.

Member, Editorial Review Board, *Real Estate Issues*, 2014 to 2017

Currently licensed as a Certified General Real Estate Appraiser in the following states: Illinois, California, Colorado, Florida, Georgia, Indiana, Michigan, New York, and Wisconsin. Previously permanently licensed in Alaska, Hawaii, Kansas, Louisiana, Minnesota, Mississippi, Nebraska, Oklahoma, Pennsylvania, South Carolina, Virginia, Washington, Wyoming, and West Virginia. Currently temporarily licensed in Missouri, and previously temporarily licensed in many other states including Connecticut, the District of Columbia, New Jersey, New Mexico, Nevada, North Carolina, and Texas.

Currently licensed as a Managing Real Estate Broker in Illinois.

Member, Counselors of Real Estate (designated CRE). Chair, Midwest Chapter, 1991; Vice Chair, Midwest Chapter, 1992.

Awarded FRICS designation by the Royal Institute of Chartered Surveyors.

Member of the Illinois Bar and American Bar Association.

American Bar Association: Chairman, Historic Preservation and Architectural Controls Subcommittee, 1984 to 1988; Vice Chairman, Land Use Law Committee, 1985 to 1987; Chairman, Land Use Law Committee, 1987 to 1990; Co-Chair, Waste Disposal and Land Use Law

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved

3

222



Subcommittee, 1991 to 1998; Member, Real Estate Damages Subcommittee of the American Bar Association Environmental Litigation Committee, 2004 to present.

Past member, Ely Chapter, Lambda Alpha International; Treasurer, 1987 to 1988; Vice President, 1988 to 1989; President, 1990.

**Awards and Honors**
Elected to Phi Beta Kappa, University of Notre Dame (1970).

Second Annual Richard Nickel Award, Professional Preservationist of the Year (1985), Landmarks Preservation Council of Illinois.

Sanders A. Kahn Award (1996) as the author who develops the best example of a thought-provoking presentation on concepts and practical problems facing the appraisal and real estate industries, for article in *The Appraisal Journal*, published by the Appraisal Institute.

Regular contributing columnist (Environment and the Appraiser Department), *The Appraisal Journal* (1996 to 2002).

George L. Schmutz Award (2012) from the Appraisal Institute for the "most outstanding Appraisal Institute Publication of 2011" for the book entitled *Appraising Conservation and Historic Preservation Easements*.

Co-recipient of the William S. Ballard Award (2013) from The Counselors of Real Estate as the "author whose work best "exemplifies the high standards of content maintained by Real Estate Issues, the professional journal published by the Counselors of Real Estate."

Armstrong/Kahn Award (2021) from The Appraisal Institute for "the most outstanding original article published in *The Appraisal Journal* during the previous year.

**Civic Involvement**
Member, Advisory Board, John Marshall Law Center for Real Estate Law, 2010 to 2017.

Member, Board of Governors, Landmarks Preservation Council of Illinois, 1976-1979 and 1982-1985; Vice President, 1978-1979 and 1983-1984; Emeritus Board, 2016 to 2018.

Member, Illinois Historic Sites Advisory Council, 1979-1982.

Member, Illinois Governor's Advisory Task Force on Historic Preservation, 1985.

Member, Board of Trustees, Illinois Historic Preservation Agency, 1985-1991.

Member, Illinois Governor's Tourism Task Force, 1986-1987 (Chairman, Financing Subcommittee).

Board of Directors, Preservation Action, Washington D.C., 1988-1990.

Board of Directors, Frederick Law Olmsted Society of Riverside, Illinois, 1986-1988.

Contact
T: +1 312 228 3329
E: richard.roddewig@am.jll.com

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved

4



## Publications

### Books (author, co-author, editor or contributor)

The Dictionary of Real Estate Appraisal (7th Edition), (Chicago: The Appraisal Institute, 2022) (contributor).

The Appraisal of Real Estate, 15th Edition (Chicago: The Appraisal Institute, 2020) (contributor).

Appraising Conservation and Historic Preservation Easements, 2nd Edition (Chicago: The Appraisal Institute, 2020) (co-author).

Corridor Valuation: An Overview and New Alternatives, (Chicago: The Appraisal Institute, 2019) (co-author).

Real Property Valuation in Condemnation, (Chicago: The Appraisal Institute, 2018) (contributor).

The Dictionary of Real Estate Appraisal (6th Edition), (Chicago: The Appraisal Institute, 2015) (contributor).

Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II, (Chicago: The Appraisal Institute, 2014).

The Appraisal of Real Estate, 14th Edition (Chicago: The Appraisal Institute, 2013).

Appraising Conservation and Historic Preservation Easements (Chicago: The Appraisal Institute, 2011).

Valuing Contaminated Properties: An Appraisal Institute Anthology, (Chicago: The Appraisal Institute, 2002).

"The EPA's Brownfields Initiative: Will It Improve the Market for Contaminated Properties?" and "Mortgage Lenders and the Institutionalization and Normalization of Environmental Risk Analysis," with Allen C. Keiter, in Thomas A. Jaconetty, (ed.). Issues Confronting Properties Affected by Contamination or Environmental Problems, (Chicago: International Association of Assessing Officers, 2002).

"Appraising Theme Parks," with Gary R. Papke and Steven Schiltz, Chapter 36 in David C. Lennhoff (ed.), A Business Enterprise Value Anthology, (Chicago: The Appraisal Institute, 2001).

"Inverse Condemnation in Regulatory Takings," with Christopher J. Duerksen, Chapter 14E in Nichols on Eminent Domain, (New York: Matthew Bender & Company, Inc., updated release, 1996).

"The Office Building as an Economic Generator and Contributor," Chapter 3 in The Office Building: From Concept to Investment Reality, (Chicago: Counselors of Real Estate, the Appraisal Institute, and the Society of Industrial and Office REALTORS, 1993).

The Conservation Easement Handbook: Managing Land Conservation and Historic Preservation Easement Programs, with Cheryl A. Inghram et al., (San Francisco: Trust for Public Land and the Land Trust Exchange, 1988).

Rehab for Profit: New Opportunities in Real Estate, with Jared Shlaes, (Chicago: National Association of Realtors, 1984).

"Preservation Law and Economics," Chapter 7 in A Handbook on Historic Preservation Law, (Washington, D.C.: The Conservation Foundation and the National Center for Preservation Law, 1983).

Green Bans: The Birth of Australian Environmental Politics, (New York, N.Y.: Allanheld Osmun & Co./Universe Books, in conjunction with The Conservation Foundation, 1978).

"Australia: Land Banking as an Emerging Policy," in Neal Roberts (ed.), The Government Land Developers, (Lexington: D.C. Heath and Company, 1977).

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved



## Monographs

Historic Preservation (Façade) Easements: Appraisal Techniques and Valuation Issues (Seminar Workbook) (Chicago: The Appraisal Institute, 2021)

Appraising Historic Preservation Easements: Seminar Workbook (Chicago: The Appraisal Institute, 2008).

Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma: Seminar Workbook, (Chicago: The Appraisal Institute, 2001).

Special Purpose Properties: The Challenges of Real Estate Appraising in Limited Markets: Seminar Workbook, with Gary R. Papke, (Chicago: The Appraisal Institute, 1995).

Environmental Risk and the Real Estate Appraisal Process: Seminar Workbook, with Gary R. Papke, (Chicago: The Appraisal Institute, 1994).

Preparing a Historic Preservation Plan, with Bradford J. White, Planning Advisory Service Report Number 450, (Chicago: American Planning Association and National Trust for Historic Preservation, 1994).

Takings Law in Plain English, with Christopher J. Duerksen, produced for the American Resources Information Network, 1994.

Economic Incentives for Historic Preservation, A Critical Issues Fund Report, (Washington, D.C.: National Trust for Historic Preservation, 1989).

"Compensation for Temporary Takings After First English: Has a Taking Occurred and What Is the Measure of Damages?," in Section 1983 and Land Use, (Clifton, N.J.: Prentice Hall Law and Business, 1989, p. 153).

Responding to the Takings Challenge: A Guide for Officials and Planners, with Christopher J. Duerksen, Planning Advisory Service Report Number 416, (Chicago: American Planning Association, 1989).

Transferable Development Rights Programs: TDRs and the Real Estate Marketplace, with Cheryl A. Inghram, Planning Advisory Service Report Number 401, (Chicago: American Planning Association, 1987).

Economic Benefits from Rehabilitation of Historic Buildings in Illinois, (Springfield, Illinois: Illinois Historic Preservation Agency, 1984).

Analyzing the Economic Feasibility of a Development Project: A Guide for Planners, Planning Advisory Service Report Number 380, (Chicago: American Planning Association, 1983).

Preparing a Historic Preservation Ordinance, Planning Advisory Service Report Number 374, (Chicago: American Planning Association, 1983).

"The Uniform Condominium Act and Illinois Condominium Ordinances: A Comparison," ORER Report No. 1, (Urbana, Illinois: University of Illinois Office of Real Estate Research, 1982).

Preservation Ordinances and Financial Incentives: How They Guide Design, (Washington, D.C.: National League of Cities, 1982).

Preservation Easements in Illinois, (Chicago: Landmarks Preservation Council of Illinois, 1982).

Loft Conversions: Planning Issues, Problems and Prospects, Planning Advisory Service Report Number 362, (Chicago: American Planning Association, 1981).

Condominium Conversion Legislation: Separating Myth From Reality, (Washington, D.C.: National Association of Realtors, 1980).

"Components of a Good Historic Preservation Ordinance," (Chicago: Landmarks Preservation Council of Illinois, 1980).

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved

6

JLL

## Articles

"Applying the Case Study Method to Measure Possible Impact of Proximity to Fracking Transmission Line Facilities on Home Prices." With Michael J. Samuels, MAI, Anne S. Baxendale, and Joseph R. De Marinis, MAI, The Appraisal Journal, Winter 2023.

"National Park Concessions: Valuation Concepts, Issues, and Controversies." The Appraisal Journal, Summer 2021.

"Is the Eiffel Tower Worth More Than the Statue of Liberty? Techniques for Determining the Value of Iconic National Landmarks—Part 2." With Anne S. Baxendale and J. Andrew Stables, The Appraisal Journal, Summer 2020.

"Is the Eiffel Tower Worth More Than the Statue of Liberty? Techniques for Determining the Value of Iconic National Landmarks—Part 1." With Anne S. Baxendale and J. Andrew Stables, The Appraisal Journal, Spring 2020.

"Measuring Post-Remediation Stigma in Construction-Defect and Environmental Contamination Class Actions." With Charles T. Brigden, DRI For the Defense, June 2020.

"Timeshares, Market Value, and the Real Estate Appraisal Process," with Charles T. Brigden, The Appraisal Journal, Spring 2019.

"A Pipeline Spill Revisited: How Long Do Temporary Impacts on Home Prices Last?," with Charles T. Brigden and Anne S. Baxendale, The Appraisal Journal, Winter 2018.

"Underbalanced Drilling: Can It Solve the Economic, Environmental and Regulatory Taking Problems Associated with Fracking?," with W. James Hughes, in The John Marshall Law Review, Volume 49, Issue 2, Winter 2015, p. 511.

"An Alternative to Fracking," with James Hughes, in Land Journal, (London: Royal Institution of Chartered Surveyors, June/July 2016, p. 18).

"Real Estate Value Impacts from Fracking: Industry Response and Proper Analytical Techniques," with Rebel A. Cole, PhD, in Real Estate Issues, Volume 39, Number 3 (Chicago: The Counselors of Real Estate, December 2014, p. 6).

"Power Lines and Property Prices," with Charles T. Brigden, in Real Estate Issues, Volume 39, Number 2 (Chicago: The Counselors of Real Estate, October 2014, p. 15).

Analyzing Effects of Environmental Contamination on Real Property: Seminar Workbook, (Chicago, Appraisal Institute, 2010). Prepared by Professor Thomas Jackson. Includes cases studies previously prepared by Richard J. Roddewig.

"Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina," with Gary R. Papke and Charles T. Brigden, in Real Estate Issues, Volume 37, Issues 2 and 3 (Chicago: The Counselors of Real Estate, December 2012, p. 77).

"Law as Hidden Architecture: Law, Politics, and Implementation of the Burnham Plan of Chicago Since 1909," in The John Marshall Law Review, Volume 43, Number 2 (Chicago: John Marshall Law School, Winter 2010, p. 375).

"Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," with James D. Frey, CRE, FRICS, in The Appraisal Journal, Volume LXXIV, Number 3 (Chicago: The Appraisal Institute, Summer 2006, p. 267).

"Environment and the Appraiser: Mortgage Lenders and the Institutionalization and Normalization of Environmental Risk Analysis," in The Appraisal Journal, Volume LXIX, Number 2 (Chicago: The Appraisal Institute, April, 2001, p. 119).

"Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," in The Appraisal Journal, Volume LXVII, Number 4, (Chicago: The Appraisal Institute, October 1999, p. 447).

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved

7



"Environment and the Appraiser: Adjusting Environmental Case Study Comparables by Using an Environmental Risk Scoring System," in The Appraisal Journal, Volume LXVIII, Number 4 (Chicago: The Appraisal Institute, October, 2000, p. 371).

"Environment and the Appraiser: Classifying the Level of Stigma and Risk Affecting Contaminated Property," in The Appraisal Journal, Volume LXVII, Number 1 (Chicago: The Appraisal Institute, January, 1999, p. 98).

"Environment and the Appraiser: Choosing the Right Analytical Tool for the Job," in The Appraisal Journal, Volume LXVI, Number 3 (Chicago: The Appraisal Institute, July, 1998, p. 320).

"Environment and the Appraiser: Contaminated Properties and Guide Note 8: Questions, Answers, and Suggestions for Reform," in The Appraisal Journal, Volume LXVI, Number 1 (Chicago: The Appraisal Institute, January, 1998, p. 99).

"EPA's Brownfields Initiative: Will It Improve the Market for Contaminated Properties?" in Valuation Insights & Perspectives, Volume 2, Number 3 (Chicago: Appraisal Institute, Third Quarter 1997, p. 46).

"Environment and the Appraiser: Using the Cost of Environmental Insurance to Measure Contaminated Property Stigma," in The Appraisal Journal, Volume LXV, Number 3 (Chicago: The Appraisal Institute, July 1997, p. 304).

"Environment and the Appraiser: Temporary Stigma: Lessons from the Exxon Valdez Litigation," in The Appraisal Journal, Volume LXV, Number 1 (Chicago: The Appraisal Institute, January 1997, p. 96-101).

"Stigma, Environmental Risk and Property Values: 10 Critical Inquiries," in The Appraisal Journal, Volume LXIV, Number 4 (Chicago: The Appraisal Institute, October 1996, p. 375).

"Reduce Income Taxes with a Preservation Easement," with Victoria L. Allan, in Innkeeping, Vol. 14, No. 4, (Santa Barbara, Professional Association of Innkeepers International, April 1996, p. 1).

"Municipal Solid Waste: The Uncertain Future of Flow Control – A Municipal Perspective," with Glenn C. Sechen, in The Urban Lawyer, Vol. 26, No. 4, (Chicago: American Bar Association, Fall 1994, p. 801).

"Historic Preservation and the Constitution: Dispelling the Thirteen Myths," Historic Preservation Forum, July/August 1993, p. 11.

"Recent Developments with RCRA Subtitle D and Commerce Clause Cases After the Hunt and Fort Gratiot Decisions," with Glenn C. Sechen, in The Urban Lawyer, Vol. 25, No. 4, (Chicago, American Bar Association, Fall 1993, p. 797).

"A Better Way to Plan Airports," with Christopher J. Duerksen and Raymond L. Reaves, in Urban Land, Vol. 52, No. 3, (Washington, D.C.: Urban Land Institute, March 1993, p. 35).

"Market Value and Public Value: An Exploratory Essay," with Gary Papke, in The Appraisal Journal, Volume LXI, Number 1, (Chicago: Appraisal Institute, January 1993).

"Ready for Takeoff: Developing the 21st Century Airport," with Christopher J. Duerksen, in Urban Land, Volume 51, No. 11, (Washington, D.C.: Urban Land Institute, November 1992, p. 26).

"The Commerce Clause and Waste Disposal Management Plans," with Richard V. Houpt and Glenn C. Sechen, in The Urban Lawyer, Vol. 24, No. 4, (Chicago, American Bar Association, Fall 1992, p. 907).

"Measuring the Damages in Takings Cases: The Next Frontier," with Christopher J. Duerksen, in Zoning and Planning Law Report, Volume 15, Number 7, (New York: Clark Boardman Callaghan, July-August 1992, p. 49).

"Report of the Subcommittee on Land Use and Solid Waste," with Richard V. Houpt and Glenn C. Sechen, in The Urban Lawyer, Volume 23, Number 4, (Chicago: American Bar Association, Fall 1991, p. 753).

"Recent Developments in Land Use, Planning and Zoning," in The Urban Lawyer, Volume 22, Number 4, (Chicago: American Bar Association, Fall 1990, p. 719).

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved

8



"Recent Developments in Land Use, Planning and Zoning," in The Urban Lawyer, Volume 21, Number 4, (Chicago: American Bar Association, Fall 1989, p. 769).

"Measuring Regulatory Hardship," with Christopher J. Duerksen, in Valuation, Volume 34, Number II, (Washington, D.C.: American Society of Appraisers, June 1989, p. 48).

"Measuring Regulatory Hardship: Are California Elephants Pink?," with Christopher J. Duerksen, in Urban Land, Volume 48, No. 5, (Washington, D.C.: Urban Land Institute, January 1989, p. 15).

"Measuring Regulatory Hardship: Dealing with Real Estate Questions in Takings Cases," with Christopher J. Duerksen, in Urban Land, Volume 48, No. 1, (Washington, D.C.: Urban Land Institute, January 1989, p. 21).

"Selling America's Heritage . . . Without Selling Out," in Preservation Forum, Volume 2, Number 3, (Washington, D.C.: National Trust for Historic Preservation, Fall 1988, p. 2).

"Essential Elements of a Statewide Legislative Program for Historic Preservation," in Preservation Forum, Volume 2, Number 2, (Washington, D.C.: National Trust for Historic Preservation, Summer 1988, p. 11).

"Landmark Preservation: The New Chicago Ordinance," in Preservation Law Reporter, Volume 6, Nos. 1 and 2, (Washington, D.C.: National Trust for Historic Preservation, Spring/Summer 1987, 6 PLR 2017).

"Supreme Court Rules for Landowners," with Jared Shlaes, in The Inland Architect, (Chicago: The Inland Architect Press, September/October 1986, p. 4).

"Preservation Easement Law: An Overview of Recent Developments," in The Urban Lawyer, Volume 18, Number 1, (Kansas City: University of Missouri at Kansas City School of Law, Winter 1986, p. 229).

"Appraising Theme Parks," with Steven P. Schiltz and Gary Papke, in The Appraisal Journal, Volume LIV, Number 1, (Chicago: American Society of Real Estate Appraisers, January 1986, p. 85).

"Preservation Easements Reconsidered: An Alternative Approach to Value," with Jared Shlaes, in The Appraisal Journal, Volume LII, Number 3, (Chicago: American Society of Real Estate Appraisers, July 1984, p. 325).

"'Certified' Rehabilitation of Historic Buildings: Are the Tax Benefits Worth the Extra Cost?," in Real Estate Review, Volume 12, Number 3, (Boston: Warren, Gorham & Lamont, Autumn 1982, p. 67).

"Appraising the Best Tax Shelter in History," with Jared Shlaes, in The Appraisal Journal, Volume L, Number 1, (Chicago: American Society of Real Estate Appraisers, January 1982, p. 25) .

"Preservation Rulings Foster Development and Economic Growth," in Design, December 14, 1981.

"The Changing Character of Chicago's Condominium Market," in Condominium: Chicagoland's Condominium Guide, First Edition, Summer-Fall 1981.

"Building on the Past," in Real Estate Today, (Chicago: National Association of Realtors, October 1980).

"Creating a Workable Historic Preservation Ordinance," in American Planning Association, Illinois Chapter, Newsletter, May 1980.

"Real Estate Tax Impact of Condominium Conversions: A Chicago Perspective," with Michael S. Young, in The Appraisal Journal, January 1980.

"Neighborhood Revitalization and the Historic Preservation Incentives of the Tax Reform Act of 1976: Lessons from the Bottom Line of a Chicago Red Brick Three Flat," in The Urban Lawyer, Volume 11, Number 1, (Kansas City: University of Missouri at Kansas City School of Law, Winter 1979, p. 35).

"In Australia, Unions Strike for Environment," with John S. Rosenberg, in The Conservation Foundation Letter, November 1975.

"The 2nd Circuit Defines the Limits of Carbone," with Glenn C. Sechen, in The Urban Lawyer, Vol. 28, pp. 847-855 (1996).

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved



in Valuation Insights & Perspectives, Volume 2, Number 3 (Chicago: The Appraisal Institute, Third Quarter 1997, p. 46).

"Condomania or Condophobia?," in Real Estate Issues, Volume 5, Number 1, (Chicago: American Society of Real Estate Counselors, Summer 1980, p. 16).

"New Shelters in Old Properties: The Tax Reform Act of 1976," with Michael S. Young, in Real Estate Issues, Volume 3, Number 2, (Chicago: American Society of Real Estate Counselors, Winter 1978, p. 9).

**Book Reviews**

Environmental Engineering Dictionary, 3d ed., compiled and edited by C.C. Lee, PhD., in *The Appraisal Journal*, Volume LXVII, Number 2, (Chicago: The Appraisal Institute, April 1999, p. 224).

Icons and Aliens, John Costonis, in Inland Architect, Volume 34, No. 1, (Chicago: January/February 1990, p. 81).

Landmark Justice: The Influence of William J. Brennan on America's Communities, Charles M. Haar and Jerold S. Kayden, in The Urban Lawyer, Volume 21, Number 2, (Kansas City, Missouri: University of Missouri at Kansas City School of Law, Spring 1989, p. 399).

Federal Historic Preservation Case Law, Charlotte R. Bell, in The Appraisal Journal, Volume LIV, Number 2, (Chicago: American Society of Real Estate Appraisers, April 1986, p. 306).

COPYRIGHT © JONES LANG LASALLE IP, INC. 2023. All Rights Reserved



**JLL Valuation Advisory**

**Richard J. Roddewig**
**Depositions and Trial Testimony**
**2018-2024**

United States v. 400 Acres of Land, more or less situate in Lincoln County, State of Nevada; and Jessie J. Cox, et al., United States District Court for the District of Nevada, Case No. 2:15-cv-01743-MMD-NJK (Deposition given January 24-26, 2018).

Amorin, et al. v. Taishan Gypsum Co. Ltd. et al., United States District Court – Southern District of Florida, Case No. 11-22408-Civ-COOKE (Deposition given April 4, 2019).

Cotromano, et al. v. United Technologies Corporation, et al., United States District Court – Southern District of Florida, Case No. 9:13-cv-80928 MARRA - Consolidated Action: Lead Case (Deposition given August 28, 2019).

Don Strong, et al. v. Republic Services, et al., Circuit Court of St. Louis County, State of Missouri, Case No. 17SL-CC01632-01 (Deposition given December 13, 2019).

Palmolive Building Investors LLC v. Commissioner, U.S. Tax Court, Docket No. 23444-14 (Trial Testimony given December 19, 2019).

Arrabelle at Vail Square LLC v. Board of Equalization of Eagle County, Colorado, District Court Eagle County, Case No. 2019CV03023 (Deposition given September 9, 2020).

Michele Baker, et al. v. Saint-Gobain, et al., U.S. District Court for the Northern District of New York, Case No. 1:16-CV-917 (Deposition given December 3, 2020).

David Back, et al. v. Bayer Cropscience, LP, et al. Missouri Circuit Court for the Twenty-First Judicial Circuit (Saint Louis County), Case No. 18SL-CC03530 (Division 18) (Deposition given August 18, 2022).

In the matter of Jimmy Edwards, et al. v. CSX Transportation, Inc.; Antoinette Moore v. CSX Transportation, Inc., and West Lumberton Baptist Church, et al. v. CSX Transportation, Inc., United States District Court for the Eastern District of North Carolina, Consolidated Cases No. 7:1-cv-177; No. 7:18-cv-177-BO; and No. 7:18-cv-178-BO (Deposition given November 14, 2022).

Grey Fox LLC, et al. v. Plains All American Pipeline, L.P., et al., United States District t Court for the Central District of California, Case No. 2:16-cv-03157-PSG-JEM (Deposition given September 28, 2023).

Thornton Development Authority v. Thornton, LLC, et al., District Court, Adams County, Colorado, Case No. 2022 CV 031024 (Deposition given January 23, 2024; trial testimony given March 21, 2024).



### 15.4 General Qualifications and Competency of Charles T. Brigden, MAI, CRE, FRICS



JLL Biography

# Charles T. Brigden, MAI, CRE, FRICS

**Managing Director**

**Overview**
Charles T. Brigden, MAI, CRE, FRICS is Managing Director of JLL Valuation & Advisory Services, LLC (VAS), which is part of Jones Lang LaSalle, one of the largest full service real estate firms in the world with offices in more than 80 countries. Between 2002 and 2017, Mr. Brigden was Vice President of Clarion Associates, Inc., one of the most experienced firms in the United States in the valuation of complex real estate assets with a focus on litigation-related assignments. Mr. Brigden has more than 20 years of experience in complex valuation assignments including historic and special purpose properties and the evaluation of the impact of environmental contamination situations on real estate prices, markets and values.

**Experience**
Mr. Brigden works nationally out of the Chicago office of JLL VAS and directs all large valuation and litigation assignments. He is currently a certified general real estate appraiser in Wisconsin and many other states. Mr. Brigden specializes in complex real estate assignments typically involving litigation or the threat of litigation. The valuation of special purpose and historic properties and the analysis of properties potentially affected by environmental contamination make up the majority of his practice.

Among the notable assignments performed by Mr. Brigden include:

* expert witness testimony and litigation support for lawsuits involving the major environmental disasters following Hurricane Katrina, the Enbridge pipeline rupture in Michigan and the Gulf Oil spill;

* the valuation of more than 27,000 homebuilder assets as part of the TOUSA, Inc. bankruptcy proceeding;

* the valuation of more than 4,000 timeshare assets in more than 25 states and at least 10 foreign countries, and

* the valuation of the only private landholding located within the secret military facility known as Area 51.

Additionally, Mr. Brigden has extensive experience appraising conservation and historic preservation easements.

*Directs JLL Valuation Advisory's complex valuation and litigation assignments across the United States.*

*Certified General Real Estate Appraiser with more than 20 years of experience.*

COPYRIGHT © JONES LANG LASALLE IP, INC. 2022. All Rights Reserved



**Education and Affiliations**
- Designated Member (MAI), Appraisal Institute
- Designated Member (CRE), Counselors of Real Estate
- Midwest Chapter of the Counselors of Real Estate, Chairman, 2016 to Present
- Counselors of Real Estate, Board of Directors, 2019 to 2021
- Designated Member (FRICS), Royal Institute of Chartered Surveyors
- Current Certified General Real Estate Appraiser in more than 25 states
- Master of Real Estate – University of Wisconsin-Madison
- Bachelor of Architecture – University of Wisconsin-Milwaukee
- Board of Trustees – Hinsdale, Illinois Historical Society, 2016 to 2022

**Prior Experience**
Vice President – Clarion Associates, Inc., 2002 to 2017, Chicago, Illinois

Senior Financial Analyst – MarketPlace Development, 1998 to 2002, Boston, Massachusetts

Development Associate – The Fiore Companies, 1996 to 1998, Madison, Wisconsin

Project Assistant – The Johnson Controls Institute for Environmental Quality in Architecture, 1995 to 1996, Milwaukee, Wisconsin

**Publications and Articles**
The Appraisal of Real Estate, (15th Edition) Chicago: Appraisal Institute, 2020, (contributor)

"Measuring Post-Remediation Stigma in Construction-Defect and Environmental Contamination Class Actions." With Richard J. Roddewig, DRI For the Defense, June 2020.

Appraising Conservation and Historic Preservation Easements, (2nd Edition) Chicago: Appraisal Institute, April 2020, (co-author).

Corridor Valuation: An Overview and New Alternatives, (Chicago: Appraisal Institute, the International Right of Way Association, and the Appraisal Institute of Canada, 2019) (co-author).

"Timeshare, Market Value, and the Real Estate Appraisal Process," with Richard J. Roddewig, in *The Appraisal Journal*, Spring 2019, Volume LXXXVII, Number 2 (Chicago: Appraisal Institute, 2019, p. 95).

"A Pipeline Spill Revisited: How Long Do Impacts on Home Prices Last?," with Richard J. Roddewig and Anne S. Baxendale, in *The Appraisal Journal*, Winter 2018, Volume LXXXVI, Number 1 (Chicago: Appraisal Institute, 2018, p. 23).

"Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina," with Richard J. Roddewig and Gary R. Papke, in *Real Estate Issues*, Volume 37, Issues 2 and 3 (Chicago: The Counselors of Real Estate, December 2012, p. 77).

"Power Lines and Property Prices," with Richard J. Roddewig, in *Real Estate Issues*, Volume 39, Number 2 (Chicago: The Counselors of Real Estate, 2014, p. 15).

**Awards and Honors**
Recipient (2016) of James Schroeder Award given by the Appraisal Institute (Chicago Chapter).

Recipient (2015) of the Roland J. Rives Award given by the Appraisal Institute (Chicago Chapter).

Co-recipient (2013) of the William S. Ballard Award as the "author whose work best exemplifies the high standards of content maintained by *Real Estate Issues*, the professional journal published by The Counselors of Real Estate."

**Contact**
T: +1 312 228 3331
M: +1 773 655 9584
E: charles.brigden@am.jll.com

COPYRIGHT © JONES LANG LASALLE IP, INC. 2022. All Rights Reserved



## Charles T. Brigden, MAI -- Trial & Deposition History (2018 - 2024)

| Case Name | Case Number | Court | Case Location | Date | Testimony Given |
|---|---|---|---|---|---|
| United States v. 400 Acres of Land, more or less situate in Lincoln County, State of Nevada; and Jessie J. Cox, et al. | 2:15-cv-01743-MMD-NJK | United States District Court for the District of Nevada | Lincoln County, NV | 1/26/2018 | Deposition |
| Brocksopp v. Insulation Technologies Inc., et al. | 2017CV001580 | State of Wisconsin Circuit Court – Racine County | Racine, WI | 9/10/2019 | Deposition |
| Michele Baker, et al. v. Saint-Gobain, et al. | 1:16-CV-917 | United States District Court for the Northern District of New York | Hoosick Falls, NY | 11/13/2020 | Deposition |
| Grande Vista of Orlando Condo Association, Inc., v. Rick Singh, et al. | 2018-CA-013570-O | Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida | Orlando, FL | 11/9/2022 | Deposition |
| Citgo Petroleum Corporation and U.S. Venture, Inc., v. City of Milwaukee | 16-CV-5638 | State of Wisconsin Circuit Court – Milwaukee County | Milwaukee, WI | 11/11/2022 | Deposition |
| Luther Bond, et al. v. Waste Management of Pennsylvania, et al. | C-48-CV-2019-02017 | Court of Common Pleas, Northampton County, Pennsylvania | Pen Argyl, PA | 12/5/2022 | Class Certification Hearing (Bench Trial) |
| Corning Place Ohio, LLC v. Commissioner | Docket No. 12428-20 | United States Tax Court, Cleveland, OH | Cleveland, OH | 3/23/2023 | Trial Testimony |
| Savannah Shoals, LLC, Green Creek Resources, LLC, Tax Matters Partner v. Commissioner | Docket No. 3412-22 | United States Tax Court, Atlanta, GA | Hart County, GA | 5/16/2023 | Trial Testimony |
| Kimberly Road Fulton 25, LLC, Kimberly Road Manager, LLC, Tax Matters Partner v. Commissioner | Docket No. 17852-21 | United States Tax Court, Atlanta, GA | Fulton County, GA | 6/7/2023 | Trial Testimony |
| South Fulton Parkway 58, LLC, South Fulton 58 Manager, LLC, Tax Matters Partner v. Commissioner | Docket No. 23934-21 | United States Tax Court, Atlanta, GA | Fulton County, GA | 6/7/2023 | Trial Testimony |
| Tony D. Townley And Elizabeth A. Townley V. United States of America | Docket No. 3:22CV107 (CDL) | United States District Court, Middle District of Georgia | Warren, Wilkes, and Taliaferro Counties, GA | 9/7/2023 | Deposition |
| Green Valley Investors, LLC, Bobby A. Branch, Tax Matters Partner v. Commissioner | Docket No. 17379-19 | United States Tax Court, Atlanta, GA | Chatham County, NC | 11/17/2023 | Trial Testimony |
| Continental Downtown Properties, LLC, Historic Preservation Fund 2016 LLC, Tax Matters Partner v. Commissioner | Docket No. 6084-21 | United States Tax Court, Cleveland, OH | Columbus, OH | 2/8/2024 2/9/2024 3/4/2024 | Trial Testimony |
| Del Monte LLC, Dev X Investment 2015, LLC, Tax Matters Partner, Et Al. v. Commissioner | Docket No. 3411-21 | United States Tax Court, Cleveland, OH | Columbus, OH | 2/8/2024 2/9/2024 3/4/2024 | Trial Testimony |

Version: March 2024



### 15.5 Focused Qualifications of Mr. Brigden and Mr. Roddewig Related to Competency to Undertake an Analysis of Effects of Environmental Issues on Prices, Values and Real Estate Markets

***Focused Qualifications of Richard J. Roddewig, MAI, CRE, FRICS***

In 1993, the Appraisal Institute selected Mr. Roddewig to develop its first educational seminar and course materials on valuation of contaminated properties, entitled *Environmental Risk and the Real Estate Appraisal Process*. Mr. Roddewig has taught the course across the country. In 2001 he updated that Appraisal Institute seminar, now renamed *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma*, and once again taught the course around the United States. The latest 2010 environmental seminar on that topic from the Appraisal Institute incorporates much of the earlier 2001 seminar developed by Mr. Roddewig.

Mr. Roddewig has also been the regular environmental columnist in *The Appraisal Journal*, and for his 1996 article entitled "Stigma, Environmental Risk and Property Values: 10 Critical Inquiries," the Appraisal Institute awarded Mr. Roddewig the annual Sanders A. Kahn Award as "the author who develops the best example of a thought-provoking presentation on concepts and practical problems facing the appraisal and real estate industries."

Mr. Roddewig has determined market values and analyzed real estate prices and markets for a wide variety of environmental situations and environmental risks resulting from both on-site and off-site sources. Among the states in which he has worked on such assignments are the following: Tennessee, Alaska, Hawaii, Washington, California, New Mexico, Colorado, Wyoming, Montana, Texas, Kansas, Arkansas, Louisiana, Mississippi, Florida, Georgia, South Carolina, North Carolina, Maryland, Pennsylvania, Ohio, West Virginia, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Maine, Michigan, Indiana, Illinois, Wisconsin, Minnesota, and Missouri. He has investigated the real estate impacts of such environmentally sensitive events, actions and facilities as oil spills, industrial emissions and contamination, sanitary landfills, hazardous waste disposal sites, quarries, power plants, electrical transmission lines, gas and petroleum products pipelines, and airports. He has analyzed property values associated with groundwater contamination, soil contamination, river contamination, vapor intrusions, and air emissions. Among the types of hazardous or toxic materials potentially affecting the market values of properties analyzed by Mr. Roddewig to determine their real estate market impacts have been the following: lead, heavy metals, chlorinated solvents, PCBs, furans and dioxins, crude oil, fuel oil, diesel fuel, TCE/PCE, radon, PFAS, and various polyaromatic hydrocarbons (PAHs) and volatile organic compounds (VOCs) including MTBE.

The types of properties Mr. Roddewig has analyzed or appraised in relationship to environmental contamination or environmental risks potentially affecting their marketability or value include the following: single-family homes, apartment buildings, townhouses, hotels, nursing homes, office buildings, industrial plants, warehouses, gas stations, shopping centers, radio broadcasting facilities, restaurants and night clubs, landfills, and undeveloped land (residential, commercial, retail, industrial and agricultural).

In 2000, Mr. Roddewig served on the Appraisal Institute *Special Task Group for the Development of Standards for Determining the Acceptability of Applications for Statistical and Market Survey Techniques to the Valuation of Real Property*.

In 2002, Mr. Roddewig was asked by the Appraisal Institute to edit an anthology of *Appraisal Journal* articles published by the Appraisal Institute in book form and titled *Valuing Contaminated Properties: An Appraisal Institute Anthology*. In 2014, the Appraisal Institute published an updated



Volume II of that anthology, also edited by Mr. Roddewig, that included the published appraisal literature related to various types of environmental situations published since 2002.

Mr. Roddewig has also been a designated expert in cases involving analysis and determination of environmental risks or contamination as related to property prices, values and markets.

Mr. Roddewig holds the MAI designation from the Appraisal Institute (the largest organization of professional real estate appraisers in the United States) and the CRE designation from The Counselors of Real Estate. Mr. Roddewig has more than 40 years of experience as a real estate appraiser. He has also been designated as a Fellow with the Royal Institution of Chartered Surveyors (FRICS) headquartered in London.

### *Focused Qualifications of Charles T. Brigden, MAI, CRE, FRICS*

Charles T. Brigden, CRE, FRICS is a Managing Director of JLL Valuation & Advisory Services, LLC, which is part of Jones Lang LaSalle, one of the largest full service real estate firms in the world with offices in more than 80 countries. Between 2002 and 2017, Mr. Brigden was Vice President of Clarion Associates, Inc., one of the most experienced firms in the United States in evaluating the relationship between sources of environmental contamination and environmental risks and real estate prices, values, and marketability. Mr. Brigden has over 20 years of experience in the evaluation of the impact of various types of environmental situations and environmental risk on real estate prices, markets, and values. Mr. Brigden and Clarion Associates, Inc. merged into Jones Lang LaSalle in November of 2017.

Mr. Brigden works nationally out of the Chicago office of JLL Valuation & Advisory Services, LLC. He is currently a certified general real estate appraiser in Indiana and many other states.

Mr. Brigden has determined the impact on market value and real estate markets of a wide variety of environmental situations and environmental risks resulting from both on-site and off-site sources. Among the states in which he has worked on such assignments are the following: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Virginia, Washington, Wisconsin, and Wyoming. He has investigated the real estate impacts of such environmentally sensitive events, actions and facilities as oil spills, industrial emissions and contamination, sanitary landfills, hazardous waste disposal sites, animal hide tanneries, power plants, electrical transmission lines, gas and petroleum products pipelines, and airports. He has analyzed the impact on property values resulting from groundwater contamination, soil contamination, vapor intrusions, and air emissions. Among the types of hazardous or toxic materials potentially affecting the market values of properties analyzed by Mr. Brigden to determine their real estate market impacts have been the following: PFCs, lead, heavy metals, chlorinated solvents, PCBs, furans and dioxins, crude oil, fuel oil, diesel fuel, TCE/PCE, radon, and various polyaromatic hydrocarbons (PAHs), per- and polyfluoroalkyl substances (PFAS) and volatile organic compounds (VOCs).

The types of properties Mr. Brigden has analyzed or appraised in relationship to environmental contamination or environmental risks potentially affecting their marketability or value include the following: single-family homes, apartment buildings, townhouses, hotels, office buildings, industrial plants, warehouses, gas stations, shopping centers, restaurants and night clubs, landfills, and undeveloped land (residential, commercial, retail, industrial and agricultural).



Mr. Brigden has been designated as an expert in cases involving determination of the impact of environmental risks or contamination on property values and markets.

Mr. Brigden has written a number of articles on the appraisal of properties impacted by contamination and other environmental conditions that have been published in *The Appraisal Journal* and other professional publications. In 2018, he co-authored a peer-reviewed study of the effects of off-site contamination on the prices and values of residential property, a study that was the feature article of *The Appraisal Journal* in early 2018. In 2013, together with colleague Richard J. Roddewig, MAI, CRE, FRICS, he prepared and taught a special one-day seminar on the same subject for staff and contract appraisers of the Minnesota Department of Transportation. He has presented at national seminars concerning the valuation or residential properties potentially affected by contamination and other environmental conditions.

Mr. Brigden regularly conducts appraisal assignments for a wide variety of clients including financial institutions, public entities, and attorneys in litigation.

Mr. Brigden holds the MAI designation from the Appraisal Institute (the largest organization of professional real estate appraisers in the United States) and has more than 20 years of experience as a real estate appraiser and consultant. He also holds the CRE designation from The Counselors of Real Estate and has been designated as a Fellow with the Royal Institution of Chartered Surveyors (FRICS) headquartered in London.

Mr. Brigden earned a Bachelor of Science degree in Architecture and a Master of Science degree in Real Estate, from the University of Wisconsin-Milwaukee and the University of Wisconsin-Madison campuses, respectively.



## 15.6  Appraisal Licenses







**15.7 Licensed Appraisers, Sources for Determining the Generally Accepted Methods for Determining Impact of Environmental Conditions on Prices and Values, the Scope of Work Rule, and Advisory Opinion 9 (AO-9)**

***Licensed Appraisers and Sources for Determining the Generally Recognized Methods***

Licensed real estate appraisers are required by USPAP to apply recognized and generally accepted methods. The appraisal profession has developed recognized and generally accepted methods for determining the impact of various types of environmental situations, including river and soil contamination, on property prices, markets and values. These methods are contained in the peer-reviewed books, publications, seminars and courses of the appraisal profession as well as in Advisory Opinion 9 (AO-9) promulgated by the Appraisal Standards Board in Washington, D.C.

Sources of this generally recognized methodology include:

- Books and publications of the Appraisal Institute including articles in *The Appraisal Journal*, the book entitled *Real Estate Damages: An Analysis of Detrimental Conditions*,257 and the first and second volumes of the book entitled *Valuing Contaminated Properties: An Appraisal Institute Anthology.*[258]

- Advisory Opinion AO-9 from The Appraisal Standards Board entitled "The Appraisal of Property that May Be Impacted by Environmental Contamination."

- Courses and seminars of the Appraisal Institute including the most recent 2010 national seminar, *Analyzing the Effects of Contamination on Real Estate* and the two earlier seminars *Environmental Risk and the Real Estate Appraisal Process* and *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma.*

Three of the most important recognitions by the appraisal profession as found in its published professional standards and published professional research relevant to the issues in this assignment may be summarized as follows:

- Adverse environmental conditions do not automatically decrease market prices and values.

- Analysis of actual market data such as sale prices actually paid, rental income and expenses, marketing times, and sale to list price ratios, either in the area actually impacted or, in the absence of sufficient sales or other market data, in other similar situations (case study analysis) must be undertaken to determine the impact, if any, of such environmental situations.

- The effect of changes in environmental conditions on real estate prices and values can change over time in response to the "detrimental conditions lifecycle" described in Advisory Opinion 9 (AO-9) which has as its subject "The Appraisal of Real Property That May Be Impacted by Environmental Contamination."[259]

---

[257] Randall Bell, MAI, *Real Estate Damages: An Analysis of Detrimental Conditions*, Appraisal Institute, 1999 and later editions.

[258] Richard J. Roddewig, MAI, CRE, Editor, *Valuing Contaminated Properties: An Appraisal Institute Anthology*, Appraisal Institute, 2002; and Richard J. Roddewig, MAI, CRE, Editor, *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Appraisal Institute, 2015.

[259] See USPAP 2024 Edition, Advisory Opinion 9 (AO-9), page 106, line 4



### The Scope of Work Rule and the Requirement to Use Credible Methods Found in Professional Appraisal Courses, Seminars and Publications

The Scope of Work Rule in USPAP requires that all licensed real estate appraisers in appraisal assignments undertake "the research and analyses that are necessary to develop credible assignment results"[260] and that an appraiser "must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use."[261]

Appraisers are required by USPAP to determine the appropriate and credible scope of work by looking at "what an appraiser's peers' actions would be in performing the same or a similar assignment."[262]

The term "appraiser's peers" is defined in USPAP as "other appraisers who have expertise and competency in a similar type of assignment."[263]

USPAP Frequently Asked Question (FAQ) Number 170 is entitled "Judging the Actions of an Appraiser's Peers."  The question is stated as follows: "In the SCOPE OF WORK RULE, one of the two tests regarding the acceptability of an appraiser's scope of work is what the appraiser's peers would do.  There are many appraisers that do things differently, so how would I know what they would do in an assignment?"

The answer to FAQ 170 first references the definition of "appraiser's peers" and then states the following:

> Knowledge about what an appraiser's peers would do in a similar assignment comes through being a participant in the profession.  Typical forums that allow appraisal professionals to share information about practice include appraisal journals and publications, professional meetings and conferences, education through courses and seminars, and appraisal discussion groups.[264]

As a result of the requirements of FAQ 170, the courses and publications of the appraisal profession referenced above define what "an appraiser's peers' actions would be in performing the same or a similar assignment"[265] related to the analysis of the effect of a contamination situation on prices and values.

### Advisory Opinion 9 (AO-9), the Remediation Lifecycle, and Analysis of Cost, Use, and Risk Effects

Advisory Opinions are issued by The Appraisal Standards Board to illustrate the applicability of appraisal standards in specific situations.  The "Subject" of AO-9 is stated as "The Appraisal of Real Property That May Be Impacted by Environmental Contamination."[266]   The "Issue"

---

[260] See USPAP 2024 Edition, Scope of Work Rule, Scope of Work Acceptability, page 28, lines 445-447.

[261] See USPAP 2024 Edition, Scope of Work Rule, Scope of Work Acceptability, page 28, lines 455-456.

[262] See USPAP 2024 Edition, Scope of Work Rule, Scope of Work Acceptability, page 28, line 450.

[263] See USPAP 2024 Edition, Definitions, Appraiser's Peers, page 15, line 81.

[264] See USPAP 2024 FAQs, FAQ 170. Judging The Actions of An Appraiser's Peers, p.300.

[265] See USPAP 2024 FAQs, FAQ 170. Judging The Actions of An Appraiser's Peers, p.300.

[266] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., Advisory Opinion 9 (AO9), p. 106, Lines 4-5.



addressed by AO-9 is stated as follows: "How does an appraiser comply with USPAP when appraising properties that may be impacted by environmental contamination?"[267]

The definition of "environmental stigma" in AO-9 is as follows: "An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (See Environmental Risk)"[268]

AO-9 then defines "environmental risk" as follows:

> **Environmental Risk**: The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition.  This risk is derived from perceived uncertainties concerning:
>
> 1) the nature and extent of contamination;
>
> 2) estimates of future remediation costs and their timing;
>
> 3) potential for changes in regulatory requirements;
>
> 4) liabilities for cleanup (buyer, seller, third party);
>
> 5) potential for off-site impacts; and
>
> 6) other environmental risk factors, as may be relevant.[269]

Elements of AO-9 particularly relevant to this type of appraisal assignment include the following:[270]

- The requirement to consider the stage in the "remediation lifecycle" of the property as of the date of valuation.  The delineation of "three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation."  The definition of "remediation lifecycle" goes on to state that "environmental risk can be expected to vary with the remediation lifecycle stage of the property."

- The classification of the properties being considered as either "Source, Non-source, Adjacent and Proximate Sites."

- The requirement that "cost, use and risk effects" be considered.

- The recognition that "the value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of value as if unaffected (unimpaired value)."

- The statement that "[t]he appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value."

- The recognition that "risk effects" are "derived from the market's perception of increased environmental risk and uncertainty" and that "the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment."

- The statement that "estimating the effects of contamination on real property value usually involves the application of one or more specialized valuation methods."

---

[267] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., Advisory Opinion 9 (AO9), p. 106, Lines 13-14.

[268] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., Advisory Opinion 9 (AO9), p. 108, Lines 84-85.

[269] The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed., Advisory Opinion 9 (AO9), p. 108, Lines 76-83.

[270] See generally, USPAP, 2024 Edition, Advisory Opinion 9 (AO-9), pages 106 to 110.



## 15.8  USPAP Advisory Opinion 9 (AO-9)



**DEFINITIONS**  **STANDARDS**  **OPINIONS**  **FAQs**  **REFERENCE INDEX**  ◀▶

# ADVISORY OPINION 9 (AO-9)

*This communication by the Appraisal Standards Board (ASB) does not establish new standards or interpret existing standards. Advisory Opinions are issued to illustrate the applicability of appraisal standards in specific situations and to offer advice from the ASB for the resolution of appraisal issues and problems.*

**SUBJECT: The Appraisal of Real Property That May Be Impacted by Environmental Contamination**
**APPLICATION: Real Property**

### THE ISSUE:

Appraisals of contaminated properties, or properties suspected of being contaminated, are sometimes developed using either a hypothetical condition or an extraordinary assumption that the property is free of the contamination. While this is acceptable practice under certain conditions and for certain intended uses, there are assignments that require an appraisal of the "as-is" condition of the property, with full consideration of the effects of environmental contamination. In these assignments, the appraiser is asked to analyze the effects of known environmental contamination on the value of the subject property.

How does an appraiser comply with USPAP when appraising properties that may be impacted by environmental contamination?

### ADVICE FROM THE ASB ON THE ISSUE:

**Relevant USPAP & Advisory References**

- DEFINITIONS, specifically the definitions of

  - *Extraordinary Assumption: an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.*

    *Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis.*

  - *Hypothetical Condition: a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.*

    *Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.*

- ETHICS RULE, particularly:

  *Conduct: An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests .... An appraiser must not communicate assignment results with the intent to mislead or to defraud.*

- COMPETENCY RULE:

  *An appraiser must: (1) be competent to perform the assignment; (2) acquire the necessary competency to perform the assignment; or (3) decline or withdraw from the assignment. In all cases, the appraiser must perform competently when completing the assignment.*

---

18

 **GO BACK**

USPAP Guidance: Advisory Opinions
© The Appraisal Foundation



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

| DEFINITIONS | STANDARDS | OPINIONS | FAQs | REFERENCE INDEX | ◀▷ |

**ADVISORY OPINION 9**

- Standards Rule 1-1(a):

  *In developing a real property appraisal, an appraiser must: (a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal;*

- Standards Rule 1-2(e):

  *In developing a real property appraisal, an appraiser must: (e) identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal....*

- Standards Rule 1-2(f) and (g):

  *In developing a real property appraisal, an appraiser must: (f) identify any extraordinary assumptions necessary in the assignment; and (g) identify any hypothetical conditions necessary in the assignment.*

- Standards Rule 1-3(b):

  *When necessary for credible assignment results in developing a market value opinion, an appraiser must: (b) develop an opinion of the highest and best use of the real estate.*

- Standards Rule 1-4:

  *In developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results.*

**Competency and Related Issues**
Consistent with Standards Rule 1-1(a): in the appraisal of a property as impacted by environmental contamination, an appraiser must *be aware of, understand, and correctly employ those recognized methods and techniques necessary to produce a credible appraisal.* Accordingly, an appraiser must have the requisite knowledge about appropriate methods, and be able to assemble the required information. An appraiser who lacks knowledge and experience in analyzing the impact of environmental contamination on the value of real property must take the steps necessary to complete the assignment competently, as required by the COMPETENCY RULE. However, an appraiser need not be an expert on the scientific aspects of environmental contamination, and in most situations the appraiser will utilize scientific and other technical data prepared by others, such as environmental engineers. In these situations, the appraiser should utilize an extraordinary assumption regarding the information obtained from other experts that is used in the appraisal.[1] Examples of such information include items (1) to (10) under the header titled "Relevant Property Characteristics" later in this Advisory Opinion. This is especially important in situations where there is conflicting information about such information.

**Specialized Terms and Definitions**
The appraisal of properties that may be impacted by environmental contamination involves specialized terms and definitions that might not be used in an appraisal assignment in which the effect of the property's environmental condition is not analyzed, or when the property is not contaminated. Though it is recognized that there are other valid definitions of these and similar terms, for purposes of this Advisory Opinion, the following definitions apply:

**Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination:** Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies.

---

1   In USPAP publication see Standards Rule 1-2(f).

---

242



**DEFINITIONS**   **STANDARDS**   **OPINIONS**   **FAQs**   **REFERENCE INDEX**   ◄►

**ADVISORY OPINION 9**

**Environmental Risk:** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning:

1) the nature and extent of the contamination;

2) estimates of future remediation costs and their timing;

3) potential for changes in regulatory requirements;

4) liabilities for cleanup (buyer, seller, third party);

5) potential for off-site impacts; and

6) other environmental risk factors, as may be relevant.

**Environmental Stigma:** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (See Environmental Risk.)

**Impaired Value:** The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

**Remediation Cost:** The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

**Remediation Lifecycle:** A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

**Source, Non-source, Adjacent and Proximate Sites:** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

**Unimpaired Value:** The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

**Relevant Property Characteristics**

The appraisal of a property that includes the effects of environmental contamination on its value usually requires data not typically used in an appraisal of an otherwise similar but uncontaminated property or an appraisal of a potentially impacted property using either a hypothetical condition or an extraordinary assumption that it is uncontaminated or not impacted. The inclusion of these additional relevant property characteristics is consistent with Standards Rule 1-2(e). The relevant property characteristics may include, but are not limited to:

1) whether the contamination discharge was accidental or permitted;

2) the status of the property with respect to regulatory compliance requirements;

3) the remediation lifecycle stage (before, during or after cleanup) of the property as of the appraisal date;

4) the contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.);

5) the contamination conveyance (air, groundwater, soil, etc.);

6) whether the property is a source, non-source, adjacent or proximate site;

7) the cost and timing of any site remediation plans;

8) liabilities and potential liabilities for site cleanup;

---

20



USPAP Guidance: Advisory Opinions
© The Appraisal Foundation



| DEFINITIONS | STANDARDS | OPINIONS | FAQs | REFERENCE INDEX |  |

**ADVISORY OPINION 9**

9) potential limitations on the use of the property due to the contamination and its remediation; and

10) potential or actual off-site impacts due to contaminant migration (for source sites).

Since the appraiser is usually not an expert on the scientific aspects of contamination, experts from other fields will typically provide this information. Appropriate regulatory authorities should also be consulted to confirm the presence or absence of contamination. The appraiser should consider the use of extraordinary assumptions when this information serves as a basis for an opinion of value. The appraiser should also collect similar data for any comparable sales used in the analysis.

**Valuation Issues – As If Unimpaired**
In some assignments, the appraiser may be asked to appraise a property known to be contaminated under the hypothetical condition that the real estate is free of contamination. In these assignments, an appraiser may appraise interests in real estate that is known to be contaminated under the hypothetical condition that the real estate is free of contamination when:

1) the resulting appraisal report is not misleading,

2) the client has been advised of the limitation, and

3) all the requirements of the ETHICS RULE have been satisfied.

To avoid confusion in the marketplace, the appraiser should disclose available information about the contamination problem, explain the purpose of the *hypothetical condition* that the real estate is not contaminated, and state that the use of the hypothetical condition might have affected the assignment results in accordance with Standards Rule 2-2(a)(xiii) and (b)(xv).

In other situations, the appraiser may be asked to appraise a property believed to be free of contamination or for which the environmental status is uncertain due to the lack of information or conflicting information. For these assignments, the property may be appraised under the *extraordinary assumption* concerning assumed factual information about its environmental condition and status. Indeed, since an appraiser is usually not an expert in detecting contamination, or confirming its absence, extraordinary assumptions regarding environmental condition may be necessary in many assignments.

**Valuation Issues - As Impaired**
Highest and Best Use Issues: The appraisal of properties that may be impacted by environmental contamination usually involves extensive highest and best use analysis. In accordance with Standards Rules 1-2(e) and 1-3(b), the appraiser must consider relevant factors in developing an opinion of the highest and best use of the property in its impaired condition. The valuation of properties impacted by environmental contamination usually involves the estimate of two values: the unimpaired value and the impaired. As such, two highest and best use analyses are typically required. The first does not consider any limitations on the property due to the environmental contamination. The second does consider any limitations due to the contamination, its remediation, and any legal use restrictions associated with the cleanup of the contamination source. Environmental contamination and its remediation to appropriate regulatory standards may affect the feasibility of site development or redevelopment, use of the site during remediation, use of the site after remediation, marketability of the site, and other economic and physical characteristics of a contaminated property. The appraiser should consider the possibility that site remediation and any remaining limitations on the use of the site following remediation may alter or limit its highest and best use in the impaired condition. In addition, excessive environmental risk and stigma may deter site development or redevelopment and thereby limit the highest and best use until the property's environmental risk is reduced to levels acceptable to the relevant market participants.

 
244



**DEFINITIONS** | **STANDARDS** | **OPINIONS** | **FAQs** | **REFERENCE INDEX** ◄▷

**ADVISORY OPINION 9**

Satisfying Standards Rule 1-4 Requirements: When the appraiser addresses the diminution in value of a contaminated property and/or its impaired value, the appraiser must recognize that the value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of the value as if unaffected (unimpaired value). Rather, *cost, use* and *risk* effects can potentially impact the value of contaminated property. *Cost effects* primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser, and should include consideration of any increased operating costs due to property remediation. The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value. *Use effects* reflect impacts on the utility of the site as a result of the contamination. If the contamination and/or its cleanup rendered a portion of the site unusable, or limited the future highest and best use of the property, then there could be a use effect on value. *Risk effects* are typically estimated by the appraiser and often represent the most challenging part of the appraisal assignment. These effects are derived from the market's perception of increased environmental risk and uncertainty. The analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment.

In general, an opinion of the subject property's unimpaired value can be developed using the sales comparison approach [Standards Rule 1-4(a)], cost approach [Standards Rule 1-4(b)], and income approach [Standards Rule 1-4(c)]. Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods. These methods should be consistent with the requirements related to the valuation approaches in USPAP.

22

**GO BACK**

USPAP Guidance: Advisory Opinions
© The Appraisal Foundation



### 15.9  Summary of Economic History of East St. Louis and Factors Affecting the East St. Louis Local Economy

The city of East St. Louis was once a thriving industrial center. Its centralized location made the city a logical transportation hub for numerous industries. In the mid-1800s, the city was 2nd only to Chicago as a rail center. By the early 20th century, industrial growth exploded in the city. The city was host to a great many of manufacturing establishments that included production in trucks, steel cars, locomotives, aluminum, breweries, fertilizer, chemicals, stockyards, and meat packing.[271] Around 1920, the city ranked number one in the country in the sale of horses and mules and was home to the largest aluminum processing center in the world. It ranked number two in the sale of hogs; led the country in the manufacture of paint pigments, baking powder, and roofing materials; had the cheapest coal in the world, and was the third largest primary grain market in the nation.[272]

With the growth of the East St. Louis industrial market, an increase in demand for labor followed. The population growth in East St. Louis was exponential. In 1870 the population of East St. Louis was about 5,600; in 1892 it was approximately 25,000; and by 1910 it had soared to over 58,500. The population reached its peak of over 82,000 in the late 1940s.[273]

Although the city had become home to many industries, most of these companies located their establishments outside of the city limits, limiting the amount of taxes collected. The influx of labor demand had its effects on the city as well. When the Great Depression hit and industry greatly subsided, the city was left with a substantial unskilled workforce, that included an increase in unemployment and crime. Self-serving politicians with no regard for the city's residents or quality of life would have a great impact on the decline of East St. Louis.

**Factory Closures/Unemployment/Population Decline**

Beginning during the Depression, the decline of East St. Louis was dramatic. The 1930s saw an avalanche of factory closings and the closures went through the 1960s. In the 1930s, there were approximately 200 industries located in East St. Louis, employing 12,000 workers. In the years from 1950 to 1970 alone, 25,000 jobs were lost. This sudden change in fortunes had various reasons beyond the general effect of national economic depression.

Reasons for the decline included loss of locational advantage, a switch of transportation focus from rail to truck, the switch away from coal as a source of energy, and the abandonment of obsolete facilities.[274] Factories in the area that closed included the following: 1959: Armour Meat Packing Plant is closed; 1960: Alcoa begins a three-year phase out; 1966: Emerson Electric begins a one-year phase out; 1967: Swift and Co. begins its phase out; 1975: Hunter Packing (formerly East Side Packing) begins a five year phase out. Between 1960 and 1970, the city lost

---

[271] Shafiq, I. 1992. Economic Development in East St. Louis, as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]

[272] Baldwin, C. 1977. The East St. Louis That Was, as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]

[273] Baldwin 1977; Saleh 1992; as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]

[274] Baldwin 1977; Officer 1990; Saleh 1992; Shafiq 1992; as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]



nearly 70% of its businesses.[275] From 1967 to 1972, the number of retail businesses declined from 860 to 462. From 1960 to 1974, total retail sales declined by 31% while sales within Illinois grew by 75%.[276]

With the closures and loss of business and industries in and around East St. Louis, unemployment numbers soared. In 1967, the unemployment rate was 21%, compared to 2.9% for Illinois.[277]

Given the loss of jobs in the workforce, unemployment rates skyrocketed while population numbers plummeted. The following tables taken from U.S. Decennial Census data provide details to the historical population numbers and unemployment rates within East St. Louis.

As indicated, the population of East St. Louis peaked at 82,366 in 1950. By 1980, the population was 55,239, a 33% decrease. Overall, the population of East St. Louis has decreased every decade since 1950.

Along with the population decline, the unemployment rate for East St. Louis has consistently been well above the county and St. Louis MSA levels, as shown below.

| Date | East St. Louis, IL |
|---|---|
| Jan-00 | 29,734 |
| Jan-10 | 58,540 |
| Jan-20 | 66,785 |
| Jan-30 | 74,397 |
| Jan-40 | 75,603 |
| Jan-50 | 82,366 |
| Jan-60 | 81,728 |
| Jan-70 | 70,029 |
| Jan-80 | 55,239 |
| Jan-90 | 40,921 |
| Jan-00 | 31,542 |
| Jan-10 | 27,006 |
| Jan-11 | 26727 |
| Jan-12 | 26629 |
| Jan-13 | 26573 |
| Jan-14 | 26655 |
| Jan-15 | 26771 |
| Jan-16 | 26862 |
| Jan-17 | 26680 |
| Jan-18 | 26410 |
| Jan-19 | 26067 |
| Jan-20 | 18,423 |
| Jan-21 | 18195 |
| Jan-22 | 17,919 |

| Date | STL IL-MO MSA | Madison County | St. Clair County | East St. Louis |
|---|---|---|---|---|
| Jan-60 | 6.1 | 5.04 | 5.6 | 10.5 |
| Jan-70 | 4.49 | 5.17 | 5.79 | 10.13 |
| Jan-80 | 7.5 | 8.7 | 10.3 | 21.1 |
| Jan-90 | 6.1 | 6.1 | 7 | 24.71 |
| Jan-00 | 3.4 | 4.1 | 4.9 | 17 |
| Jan-10 | 10.4 | 11.3 | 11.6 | 18.9 |
| Jan-11 | 9.4 | 9.4 | 9.9 | 16 |
| Jan-12 | 8.2 | 9.6 | 10 | 15.7 |
| Jan-13 | 8 | 9.8 | 10.7 | 17.5 |
| Jan-14 | 7.4 | 8.8 | 9.8 | 15.5 |
| Jan-15 | 5.9 | 6.6 | 7.3 | 11.6 |
| Jan-16 | 5.1 | 6.7 | 7 | 10.8 |
| Jan-17 | 4.5 | 6 | 6.1 | 10.4 |
| Jan-18 | 3.9 | 4.7 | 5.2 | 7.1 |
| Jan-19 | 4 | 5.2 | 5.8 | 9.7 |
| Jan-20 | 3.5 | 3.4 | 3.8 | 5.6 |
| Jan-21 | 5.7 | 6.3 | 7.7 | 11.9 |
| Jan-22 | 3.7 | 4.5 | 5.3 | 8.5 |
| Jan-23 | 3 | 3.8 | 4.3 | 5.9 |

In 1950 median income in East St. Louis was over 98% of the county wide median, by 1980 it was 48%. In 1989 43.9% of residents lived below the poverty line.[278] The table below provides

---

[275] East St. Louis: One City's Story. Federal Reserve Bank of St. Louis. December 2002

[276] Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]

[277] Mendelson and Rainey 1967; as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]

[278] Saleh 1992; Shafiq 1992; Bureau of the Census 1993; as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]



statistics detailing the gap between the median income of East St. Louis compared to that of the St. Louis MSA and surrounding counties:

| Date | STL MSA | Madison County | St. Clair County | East St. Louis, IL |
|---|---|---|---|---|
| Jan-50 | $3,476 | $3,239 | $2,631 | $2,592 |
| Jan-60 | $6,275 | $6,348 | $5,840 | $5,388 |
| Jan-70 | $8,831 | $9,023 | $8,030 | $4,686 |
| Jan-80 | $18,452 | $18,364 | $16,119 | $7,710 |
| Jan-90 | $41,454 | $28,737 | $25,890 | $12,581 |
| Jan-00 | $44,437 | $41,922 | $38,765 | $21,324 |
| Jan-10 | $53,227 | $51,706 | $47,027 | $27,506 |
| Jan-11 | $54,149 | $50,462 | $49,634 | $26,065 |
| Jan-12 | $54,109 | $51,736 | $46,921 | $24,691 |
| Jan-13 | $54,449 | $53,864 | $48,343 | $24,175 |
| Jan-14 | $54,463 | $54,375 | $50,155 | $24,642 |
| Jan-15 | $55,066 | $52,969 | $50,416 | $24,183 |
| Jan-16 | $56,726 | $56,297 | $50,598 | $24,395 |
| Jan-17 | $59,046 | $58,077 | $51,937 | $24,741 |
| Jan-18 | $61,317 | $60,121 | $58,222 | $26,973 |
| Jan-19 | $63,705 | $66,591 | $57,726 | $27,951 |
| Jan-20 | $65,725 | $63,903 | $61,863 | $27,206 |
| Jan-21 | $69,635 | $65,886 | $66,422 | $28,116 |
| Jan-22 | $75,316 | $67,441 | $67,185 | $28,519 |

## Fiscal Problems

By the 1960s, financial crisis and disaster forced the city to borrow money just to operate on a daily basis. Property taxes were used to service the large debt. By 1966, over 35% of such taxes were so used, but pressure mounted as assessed value dropped from $187.6 million in 1960 to less than $58.1 million in 1980. [279]

As businesses left and the local government struggled, the tax base shrunk. As the tax base shrunk, the local government struggled more.[280] The city eventually had to eliminate all but basic city services, and even those were cut. The city couldn't pay its light bill or pay for its garbage collection. Streetlights and stoplights were turned off, and abandoned lots became dumping grounds for trash. Police and fire protection was spotty, at best. Buildings began falling down. Crime and unemployment rose.[281]

The legacy of an insufficient tax base remains; between 1987 and 1992 the city could not even provide garbage collection.[282] East St. Louis has had the highest tax rate in Illinois for the last three decades (1970s-1990s), insurance costs are high, and delinquent taxes are an increasing problem. East St. Louis public debt obligations continue to be extremely high; $43.8 million in

---

[279] Washnis 1968; Shafiq 1992; as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]

[280] East St. Louis: One City's Story. Federal Reserve Bank of St. Louis. December 2002

[281] East St. Louis: One City's Story. Federal Reserve Bank of St. Louis. December 2002

[282] ESLARP 1997; as cited in Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]



1989. The city has managed to avoid bankruptcy only due to various infusions of state and federal money.[283]

In a June 3, 2016, Belleville *News Democrat* article, the East St. Louis Landlords Association stated that in some cases, their property tax bills have increased 200 to 400 percent. The association says it has noticed that the tax rate in East St. Louis and neighboring communities is between 17 and 21 percent while the rate in Swansea and Belleville is between 6.72 and 8 percent.

In 2017, property owners in East St. Louis paid more than 4.5% of the value of their homes in taxes last year. That is nearly four times the national average of 1.19%.[284]

The table below lists some of the key dates related to the economic base and population of East St. Louis, Illinois.

---

[283] Shaw, W. 1998. A Tale of Two Cities: The Best of Times, the Worst of Times. Inequality in St. Louis' Metro East. Bulletin of the Illinois Geographical Society, XL (2): 3-18 Fall. [print date March 1999]
[284] Local Government Information Services. Metro Sun East. September 3, 2018.



| Economic Timeline for East St. Louis, IL | |
|---|---|
| **Date** | **Summary of Events Related to East St. Louis Market Area** |
| **1950s** | East St. Louis population peaks at 82,366. |
| **1957** | Alcoa closed its aluminum plant. Jobs in East St. Louis started to become less plentiful. |
| **1959** | Armour meat packing plant closes. |
| **1960** | Alcoa (formerly Aluminum Ore Co.) begins three-year phase out. |
| **1966** | Emerson electric begins one year phase out. |
| **1967** | Swift and Co. begins its phase out. |
| **1973** | Obear Nester Glass Botting Company begins closing and ultimately closed in December 1978 with 600 workers laid off. |
| **1975** | Hunter Packing (formerly East Side Packing) begins five-year phase out, ultimately closing in 1981 with 750 workers removed from the workforce. |
| **1989** | At this time, the local tax base was reduced to less than $50 million, down substantially from a reported $175 Million tax base in 1965. Estimates of City debt is as high as $40 million during this time. A task force by Illinois Governor James Thompson proposed emergency state loans to pay for garbage collection and to keep police and fire departments operating. |
| **1990** | East St. Louis Population is 40,921.<br><br>State of Illinois passed The Financially Distressed City Law, providing $34 million in loans to East St. Louis, with the stipulation that an appointed five-member board. |
| **2000** | East St. Louis Population declines to 31,542. |
| **2010** | East St. Louis Population declines further to 27,006. |
| **2020** | East St. Louis Population is 18,423.<br><br>It is reported that the economy of East St. Louis employs 9,650 people. |

## Timeline Overview

The timeline in the table indicates that East St. Louis has been systematically losing its manufacturing employment since the 1960's and that decline in manufacturing has been accompanied by a significant decline in population. The historical background and some of the causes of those changes are summarized below:

- In the early 1900s, East St. Louis was a major railroad hub and East St. Louis became a major stockyard and meat packing center.  At its peak, the Armour Plant employed as many as 4,500 for their slaughterhouse operations. The trains were used to transport the product to the east and west. But the emergence of refrigerated plants resulted in making the older plants obsolete.

- Commencing in the late 1970's/early 1980's, major industries in the Midwest U.S. (including Missouri and Illinois) became outdated/obsolete, particularly for buildings constructed in the first half of the 20th Century, due to improvements in technology and the further development of highway infrastructure.



- Industries such as OBear-Nester Glass Company, a manufacturer of glass bottles became obsolete with the emergence of plastic bottling.

- Some analysts familiar with ESL opine that when ESL's Alcoa plant was closed in 1960 that other industries that deal in aluminum have since relocated south to Mississippi or Texas where the raw product (Bauxite) is imported from South America.

- The ESL area was also impacted by cutbacks in railroad operations that resulted in the loss of an estimated 2,000 jobs due to plant closings by A&P Warehouse, W.T. Grant Company, Walworth Value Company, among others.

- As several of the major industrial users that built their plants in the early 1900's but were not modernized to meet the modern-day technologies instead elected to relocate to markets with less expensive labor costs.

- The construction of elevated major highways near East Saint Louis resulted in a) local neighborhoods were broken up due to the acquisition of land for highway development; and b) upon completion of the highways, travelers were able to bypass East Saint Louis, rather than previously traveling through the city, which ultimately resulted in reduced local business revenues.

- Industries that remained in the East Saint Louis area in the 1980's began purchasing property adjacent to their plants for purposes of establishing "buffer zones."  One result was the relocation of residents such as those in the Rush City neighborhood and in portions of the Subject Neighborhood north and northeast of the Monsanto property.

- The above factors, including the closure/relocation of the major industries has contributed substantially to the area's population decrease, depicted as follows:



Source: U.S. Census

Despite the major population decline and the significant loss of industry, attempts are being made to revitalize the East St. Louis economy, such as the following:

- The area is now accessible via public transportation to the Lambert/St. Louis International Airport via the Metrolink



- A riverboat casino known as the Casino Queen was opened in 1993 and a 157-room casino hotel was later opened in January 2000. The casino has an estimated 38,000 SF of gaming space. In 2020, the casino struck a deal with Draftkings to rebrand their operations into a full sportsbook operation.

- $44 million redevelopment of the Broadview Hotel broke ground in March 2023 including community services for veterans and elderly, 110 apartments, 20,0000 retail and commercial space, via Advocacy Consulting & Engagement "200 plus jobs and 100 million in construction revenue."

- A nonprofit group, Lansdowne UP, broke ground in 2022 for a 20-home subdivision to be located on Gross Avenue at 25th Street near Interstate 64, with homes with offering prices at $300,000-$350,000.

- Multi-Phase – Multi-billion dollar investment and planning circa 2013 of "The City of East Saint Louis Full RITE Plan" from a nonprofit real estate developer "RITE Plan Initiative" with the goal of revitalizing impoverished urban and rural communities.

## Demographics

As evidenced in the graph below, population growth in East St. Louis slowed drastically after 1910 while the surrounding areas of Madison, St. Clair and the St. Louis metro area continued to grow. From 1900 to 1910, population jumped from 29,734 to 58,540, a 96.88% increase. From that point on, population growth never surpasses 15% and begins to yield negative growth beginning in 1960 until approximately 2011 before beginning to stabilize.



The number of households in East St. Louis began to decline sharply in the 1960s while household number grew significantly in St. Clair and Madison counties as well as in the St. Louis metro area between 1950 and 2010 when household numbers stabilized.





Since 1990, population loss in East St. Louis as a whole has been significantly greater than in St. Clair and Madison counties and in the St. Louis metro area as a whole.

| | POPULATION TRENDS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | MSA | % Change | Madison Co. | % Change | St. Clair Co. | % Change | ESL | % Change |
| Jan-90 | 2,580,897 | 3.09% | 249,738 | 0.84% | 262,628 | -1.83% | 40,921 | -25.92% |
| Jan-00 | 2,701,634 | 4.68% | 259,198 | 3.79% | 256,298 | -2.41% | 31,542 | -22.92% |
| Jan-10 | 2,790,104 | 3.27% | 269,315 | 3.90% | 270,368 | 5.49% | 27,006 | -14.38% |
| Jan-20 | 2,819,023 | 1.04% | 265,610 | -1.38% | 256,823 | -5.01% | 18,423 | -31.78% |
| Jan-22 | 2,801,319 | -0.63% | 263,864 | -0.66% | 252,671 | -1.62% | 17,919 | -2.74% |
| % Change 1990-2022 | 8.54% | | 5.66% | | -3.79% | | -56.21% | |

## Employment Sectors

A comparison of unemployment rates is another way of gauging an area's economic health, where a higher unemployment rate is a negative indicator. East Saint Louis' unemployment rates from 2008 to 2023 the past several years are depicted as follows:







As of year-end 2022, ESL's unemployment rate stood at 6.0%, which dramatically lower than the covid-impacted peak unemployment rate of 19.9% in June 2020, or the 18.9% rate indicated during a recessionary period in January 2010.

**Household Income**

The graph below demonstrates that from 1960 onward East St. Louis, IL has consistently had a lower median household income as compared to the St. Louis MSA or to St. Clair or Madison counties.





### 15.10 JLL Analysis of the Real Estate Market in East St. Louis and the Subject Neighborhood

**The Properties Under Consideration**

Our analysis of the subject properties reveals that as of the Bell Report date of value of December 31, 2023, the 273 included four improved properties, three of which consist of residential dwellings, and one neighborhood commercial property. The remaining 269 properties are understood to be vacant land parcels formerly associated with residential use.

The applicable zoning per the 2022 City of East St. Louis Zoning Map is residential Multi-Family (R3). This zoning applies to most, if not all, of the subject properties in the East St. Louis market location. Lower-density uses such as single-unit residential is also allowed within this zoning classification.

The properties located within the subject neighborhood identified in the Bell Report are likely impacted by changing economic conditions and community disinvestment witnessed in the East St. Louis market, as described elsewhere in this report. Although limited, there has been interest in real estate development in downtown East St. Louis.

**The Active Real Estate Market in East St. Louis**

In order to better understand the real estate marketplace at work in the subject properties' local area, JLL undertook an analysis of all available sales (during the years 2002 to 2024) of residential property in East St. Louis and its surrounding communities. The search began with a discussion with local market participants including residential appraiser Ms. Donna J. Howard of DJ Howard and Associates, Inc. and a download of sales transactions from the online MLS service MARIS.[285]

Using the online information from the local MLS website, we were able to identify over 1,300 transactions in the City of East St. Louis, Illinois. An additional 6,100 sales from surrounding municipalities (on the Illinois side of the Mississippi River) were also collected. After mapping the transactional data, we evaluated the Bell Report's selection and identification of plaintiff properties' subject neighborhood and East St. Louis, together with its surrounding areas, including Alorton, Cahokia, Centreville, Fairmont City, Sauget and Washington Park.

We were able to determine that there were over 5,300 transactions that occurred between September 2002 and May 2024 within those nearby communities.

- Within the City of East St. Louis itself, there were more than 1,315 sale transactions.

- Within the Bell-determined boundaries of the "subject neighborhood" there were 115 transactions in the MLS database.

- Within the City of Cahokia – an adjacent residential community located immediately south of the subject neighborhood, and determined by JLL to be comparable to the East St. Louis community being studied and as described and documented elsewhere in this report – there were more than 3,400 sales during this time period.

We have inspected the Bell subject neighborhood, the locations of the 273 plaintiff properties that are located within that neighborhood, the greater East St. Louis environs, and the surrounding

---

[285] https://maris.clareityiam.net/idp/login Online sales were available from this online source beginning with the date September 16, 2002. Some of our analyses use sales beginning in Sept. 2002 and extending into the early months of 2024, while others utilize whole-year periods from 2003 to 2023.



communities and municipalities, and have determined that an ample quantity of residential sales transaction data exist with which to analyze.

Moreover, we generally concur with the Bell Report determinations for the local boundaries comprising the general location for the neighborhood that the vast majority of plaintiff properties (improved and vacant) are located. (p. 32)



This area – identified within the Bell Report – is referenced throughout our report as the "Bell Report subject neighborhood" (or sometimes the "Bell subject neighborhood" or the "subject neighborhood"). Based upon our multiple physical inspections of the local market and after consulting with the local appraiser (Ms. Donna Howard) we have determined that the 273 plaintiff properties participate in a *competitive market area* that includes the nearby residential communities surrounding East St. Louis, including Alorton, Cahokia, Centreville, Fairmont City, Sauget and Washington Park.

Our analysis of more than 5,300 nearby transactions involving these nearby communities is discussed below.



### *Overview of Sales Data Available*

We researched these transactions and removed duplicate sales, transactions involving no price, transactions of less than $500 and less than $2.00 per square foot of improved area,[286] sales involving commercial use or apartment use, duplex residential properties, and those with mobile home structures.

The resulting effort involved a total of 5,234 transactions involving (improved) residential properties that sold between September 2002 and May 2024 located in East St. Louis, and the surrounding communities of Alorton, Cahokia, Centreville, Fairmont City, Sauget and Washington Park. As of December 31, 2023 there were 5,154 sales (between 9/2002 and 12/2023).

After adjusting the more than 5,300 sales for the factors above, the remaining 5,154 sales in the East St. Louis and immediate surrounding area (between 9/2002 and 12/2023) had the following characteristics:

- Price range from $1,505 (low) to $192,000 (high) with an average of $31,000

- Range of $2 per square foot (low) to $153 per square foot (high) with an average of $28 per square foot

- Within the City of East. St. Louis there were 1,252 sales of homes with an average price paid of $25,490 and $21 per square foot. The average year built was 1944 and the average size was 1,189 square feet.

- Within the adjacent City of Cahokia there were 3,422 sales of homes with an average sale price of $34,500 and $32 per square foot. The average year built was 1959 and the average size was 1,096 square feet.

- Within the Bell subject neighborhood there were 112 sales of homes with an average sale price of $35,800 and $29 per square foot. The average year built was 1981[287] and the average size was 1,252 square feet.

The charts below present summary information for the 1,252 sales in the City of East St. Louis between 2002 and 2023.

---

[286] Of the 5,300+ sales, there were 27 sales less than $500 and 52 sales less than $2.00 per square foot.

[287] The relatively recent construction date of 1981 (average) for the 112 sales of homes within the Bell subject neighborhood is understood to be largely a result of the demolition activity of older homes in this area, as documented in this report.



### *Residential Market – The City of East St. Louis*

The table to the right presents the 1,252 sales in the City of East St. Louis listed by year, and includes the number sold per year, the average selling price, building size, price paid per square foot, year built, days on market (DOM), and sale to list price ratio.

The number of East St. Louis sale transactions exceeded 100 per year in the years 2003 through 2007[288] and then declined sharply following the Great Recession. Although sales transactions have not returned to their pre-recession levels, the number of sales in 2023 represents the highest number (43) of sales in last 15 years.

As we have done elsewhere in this report, and owing to the variability of sales levels, we have also considered two-year interval periods.

**East St Louis**

| Year | Qty | Sale Price | Home Sq. Ft. | Price per Sq. Ft. | Year Built | DOM | Sale to List Ratio |
|------|-----|-----------|--------------|-------------------|-----------|-----|--------------------|
| 2002 | 22 | 25,467 | 1,018 | 24.49 | 1939 | 327 | 0.810 |
| 2003 | 118 | 23,109 | 1,125 | 19.17 | 1942 | 211 | 0.876 |
| 2004 | 105 | 24,505 | 1,166 | 20.87 | 1942 | 323 | 0.868 |
| 2005 | 122 | 28,819 | 1,144 | 25.10 | 1941 | 115 | 0.887 |
| 2006 | 124 | 31,596 | 1,174 | 27.13 | 1942 | 143 | 0.887 |
| 2007 | 127 | 29,212 | 1,164 | 25.04 | 1941 | 77 | 0.880 |
| 2008 | 75 | 24,132 | 1,211 | 19.55 | 1951 | 76 | 0.826 |
| 2009 | 70 | 11,075 | 1,132 | 9.61 | 1947 | 152 | 0.791 |
| 2010 | 38 | 12,864 | 1,224 | 10.37 | 1942 | 51 | 0.941 |
| 2011 | 35 | 19,451 | 1,186 | 16.03 | 1950 | 114 | 0.960 |
| 2012 | 38 | 10,825 | 1,192 | 9.04 | 1951 | 42 | 0.963 |
| 2013 | 41 | 13,577 | 1,099 | 13.14 | 1944 | 69 | 0.847 |
| 2014 | 32 | 15,623 | 1,243 | 12.88 | 1947 | 59 | 0.941 |
| 2015 | 33 | 27,374 | 1,330 | 20.21 | 1957 | 97 | 0.932 |
| 2016 | 32 | 16,039 | 1,343 | 12.92 | 1936 | 57 | 0.969 |
| 2017 | 28 | 20,461 | 1,170 | 18.96 | 1943 | 64 | 0.908 |
| 2018 | 37 | 30,282 | 1,324 | 23.20 | 1949 | 106 | 0.911 |
| 2019 | 27 | 28,635 | 1,345 | 21.01 | 1950 | 150 | 0.850 |
| 2020 | 39 | 22,921 | 1,202 | 18.46 | 1942 | 107 | 0.993 |
| 2021 | 39 | 46,849 | 1,287 | 35.60 | 1944 | 107 | 0.931 |
| 2022 | 27 | 48,474 | 1,211 | 42.76 | 1935 | 52 | 0.935 |
| 2023 | 43 | 41,228 | 1,286 | 32.44 | 1939 | 58 | 0.926 |
| **1,252** | | | | | | | |

| 2 Year Period | Qty | Sale Price | Home Sq. Ft. | Price per Sq. Ft. | Year Built | DOM | Sale to List Ratio |
|---------------|-----|-----------|--------------|-------------------|-----------|-----|--------------------|
| 2002-2003 | 140 | 23,479 | 1,108 | 20.00 | 1941 | 228 | 0.866 |
| 2004-2005 | 227 | 26,823 | 1,154 | 23.15 | 1941 | 209 | 0.878 |
| 2006-2007 | 251 | 30,390 | 1,169 | 26.07 | 1941 | 110 | 0.884 |
| 2008-2009 | 145 | 17,828 | 1,173 | 14.75 | 1949 | 113 | 0.809 |
| 2010-2011 | 73 | 16,022 | 1,206 | 13.09 | 1946 | 82 | 0.950 |
| 2012-2013 | 79 | 12,253 | 1,144 | 11.17 | 1947 | 54 | 0.903 |
| 2014-2015 | 65 | 21,588 | 1,287 | 16.60 | 1952 | 78 | 0.936 |
| 2016-2017 | 60 | 18,103 | 1,262 | 15.74 | 1939 | 60 | 0.941 |
| 2018-2019 | 64 | 29,587 | 1,333 | 22.27 | 1950 | 125 | 0.885 |
| 2020-2021 | 78 | 34,885 | 1,245 | 27.03 | 1943 | 107 | 0.962 |
| 2022-2023 | 70 | 44,023 | 1,257 | 36.42 | 1937 | 55 | 0.930 |
| **1,252** | | | | | | | |

The table to the left takes this same group of 1,252 sales in East St. Louis and collapses the data into two-year periods.

---

[288] 2002 was a partial year. Sales data available beginning September 16, 2002.



The chart below takes the above data but displays it graphically. It summarizes, in chart form, the results of our investigation into sales of improved residential property in the City of East St. Louis. Subsequent charts analyze the same sales data but display the results according to building (house) size, or on a price paid per square foot basis.



As shown in the above chart, the average price (nominal) paid during the 20-plus years of data analyzed is equal to approximately $25,500, and with a median price paid of $15,000. The red line represents a trendline (polynomial) across the entire time period.



Next, we array the same sales data based on the relative price paid according to size of building (house) area. The unit of comparison is the price paid per square foot of above-grade living area. The 1,252 sales average approximately 1,190 square feet in size and ranged in price from a low of $2.07 per square foot to as much as $145 per square foot, with an average price paid of $21 per square foot and a median price paid of $14 per square foot.

The chart below summarizes the results of our investigation into the 1,252 sales of residential properties (improved) in the City of East St. Louis market, as expressed on a price per square foot basis.  The red line represents a trendline (polynomial) across the entire time period.



For the 1,252 sales analyzed between 2002 to 2023, the average price paid for homes in East St. Louis is equal to approximately $21 per square foot, and the median price paid is approximately $14 per square foot.

Next we turn our attention to the subject neighborhood as outlined in the Bell Report.



## Residential Market – The Bell Report Subject Neighborhood

The table below presents a list by year of the 112 sales in the subject neighborhood between 2002 and 2023. The table includes the number sold per year, the average selling price, building size, price paid per square foot, year built, days on market (DOM), and sale to list price ratio.

### Subject Neighborhood

| Year | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|------|-----|-----------|-------------------|-----------|--------------|-----|--------------------|
| 2002 | 2 | 36,250 | 29.23 | 1963 | 1,372 | 138 | 0.922 |
| 2003 | 8 | 42,250 | 33.68 | 1981 | 1,219 | 81 | 0.906 |
| 2004 | 7 | 43,657 | 36.40 | 1980 | 1,197 | 644 | 0.874 |
| 2005 | 9 | 48,481 | 48.26 | 1972 | 1,103 | 47 | 0.894 |
| 2006 | 10 | 49,490 | 39.91 | 1979 | 1,344 | 65 | 0.952 |
| 2007 | 13 | 42,419 | 34.96 | 1973 | 1,178 | 59 | 0.956 |
| 2008 | 7 | 37,129 | 31.50 | 1988 | 1,131 | 51 | 0.933 |
| 2009 | 10 | 25,005 | 19.57 | 1991 | 1,220 | 280 | 0.774 |
| 2010 | 1 | 22,000 | 14.67 | 2005 | 1,500 | 150 | 0.884 |
| 2011 | 6 | 18,017 | 15.92 | 1983 | 1,110 | 29 | 0.915 |
| 2012 | 5 | 17,720 | 11.79 | 1980 | 1,573 | 48 | 0.950 |
| 2013 | 3 | 15,967 | 12.33 | 1997 | 1,319 | 70 | 0.935 |
| 2014 | 5 | 22,304 | 15.26 | 1980 | 1,270 | 35 | 0.973 |
| 2015 | 7 | 19,707 | 17.76 | 1981 | 1,087 | 65 | 0.948 |
| 2016 | 2 | 44,250 | 37.16 | 1999 | 1,193 | 12 | 0.970 |
| 2017 | 3 | 14,333 | 10.59 | 1955 | 1,265 | 26 | 0.988 |
| 2018 | 6 | 58,625 | 34.22 | 1992 | 1,679 | 74 | 0.833 |
| 2019 | 3 | 42,667 | 31.92 | 1979 | 1,255 | 98 | 0.873 |
| 2020 | 2 | 34,563 | 16.83 | 1986 | 1,906 | 31 | 1.310 |
| 2021 | 1 | 32,500 | 34.72 | 1975 | 936 | 3 | 1.000 |
| 2022 | 1 | 43,500 | 44.48 | 1975 | 978 | 2 | 0.967 |
| 2023 | 1 | 25,000 | 27.41 | 1970 | 912 | 19 | 1.389 |
| **112** | | | | | | | |

The number of sales varies from a low of one sale to a high of 13 in 2007. There are several years where there was just one or two sales (per year) from within the subject neighborhood. This is not surprising given the relatively small size of the area, and with consideration given to the continuation of demolition activity in the area.

In acknowledgement of this we have expressed the data in two-year interval periods.

The table below takes this same group of 112 sales from subject neighborhood and collapses the data into two-year periods.

Whether we look at annual periods or two-year periods, the impact of the Great Recession on the housing market in East St. Louis and in the Bell Report subject neighborhood is evident.

| 2 Year Period | Qty | Sale Price | Price per Sq. Ft. | Year Built | Home Sq. Ft. | DOM | Sale to List Ratio |
|---------------|-----|-----------|-------------------|-----------|--------------|-----|--------------------|
| 2002-2003 | 10 | 41,050 | 32.79 | 1978 | 1,249 | 92 | 0.909 |
| 2004-2005 | 16 | 46,370 | 43.07 | 1975 | 1,144 | 308 | 0.885 |
| 2006-2007 | 23 | 45,493 | 37.11 | 1975 | 1,250 | 61 | 0.954 |
| 2008-2009 | 17 | 29,997 | 24.48 | 1990 | 1,183 | 186 | 0.840 |
| 2010-2011 | 7 | 18,586 | 15.74 | 1986 | 1,166 | 46 | 0.911 |
| 2012-2013 | 8 | 17,063 | 11.99 | 1987 | 1,478 | 57 | 0.945 |
| 2014-2015 | 12 | 20,789 | 16.72 | 1980 | 1,163 | 53 | 0.958 |
| 2016-2017 | 5 | 26,300 | 21.22 | 1977 | 1,236 | 21 | 0.981 |
| 2018-2019 | 9 | 53,306 | 33.45 | 1988 | 1,538 | 80 | 0.847 |
| 2020-2021 | 3 | 33,875 | 22.80 | 1982 | 1,582 | 22 | 1.207 |
| 2022-2023 | 2 | 34,250 | 35.95 | 1973 | 945 | 11 | 1.178 |
| **112** | | | | | | | |



For example, during the period leading up to the Recession, the average home in East St. Louis sold for approximately $27,500 or $23 per square foot. During the five-year period of 2010 to 2014, East St. Louis remained in the shadow of lingering effects from the collapse of the housing market, with prices averaging half of their prior levels ($14,500 and $12 per square foot).

In recent years, prices for all of East St. Louis have largely rebounded. However, of note is the quantity of sales transactions taking place.

**East St Louis**

| Year | Qty | Sale Price | Price per Sq. Ft. |
|---|---|---|---|
| 2003 to 2007 | 119.2 | 27,448 | 23.46 |
| 2010 to 2014 | 36.8 | 14,468 | 12.29 |
| 2019 to 2023 | 35.0 | 37,621 | 30.05 |

Between 2003 and 2007, the number of sales of homes in East St. Louis averaged 119 per year. During the post-recession fallout period of 2010 to 2014 that number dropped to just 37 sales per year across the entire city.

The most recent five-year period shows an even lower quantity of sales per year (35.0).

The lingering impacts from the collapse of the housing market can be shown in the Bell subject neighborhood as well. While prices dropped substantially during the downturn and have rebounded substantially, the pace of sales follows the pattern from the broader East St. Louis market.

**Subject Neighborhood**

| Year | Qty | Sale Price | Price per Sq. Ft. |
|---|---|---|---|
| 2003 to 2007 | 9.4 | 45,259 | 38.64 |
| 2010 to 2014 | 4.0 | 19,202 | 13.99 |
| 2019 to 2023 | 1.6 | 35,646 | 31.07 |

During the pre-Recession years of 2003 and 2007, the number of sales of homes (per year) in the subject neighborhood averaged 9.4 per year. During the post-recession period of 2010 to 2014 that number dropped to 4.0 sales per year and in the most recent five-year time period the figure is 1.6 sales per year.

However, as we discuss earlier, this reduction in pace of sales is believed to be a function of the declining inventory of available homes due to continuous demolition activity in the area. The most recent five-year period average price paid ($35,600 and $31 per square foot) for homes in the subject neighborhood is comparable to those for the City as a whole ($37,600 and $30 per square foot).



The chart below takes the above data but displays it graphically. It summarizes, in chart form, the results of our investigation into the 112 sales of improved residential property in the subject neighborhood. The blue line represents a trendline (polynomial) across the entire time period.



For the subject neighborhood, the average price (nominal) paid during the 20-plus years of data analyzed is equal to approximately $35,800, and with a median price paid of $26,800. The blue line represents a trendline (polynomial) across the entire time period.



The next chart presents the 112 sales of residential properties (improved) in the subject neighborhood expressed on a price per square foot basis. Again, the blue line represents a trendline (polynomial) across the entire time period.



For the 112 sales in the Bell subject neighborhood analyzed between 2002 to 2023, the average price paid for homes is equal to approximately $29 per square foot, and the median price paid is approximately $23 per square foot.



### *Examples of Market Activity in the Subject Neighborhood*

With 1,252 sales over the last 20 years, the East St. Louis residential real estate market is large and has adequate sales data for study and analysis. Likewise, the subject neighborhood, with its more than 110 sales has adequate sales transaction data to permit real estate appraisal analysis. Some examples of the availability of sales data and the variety of information available, even in the relatively small subject neighborhood, are provided below.

These tangible examples of real estate transaction data – available to real estate appraisers for study and analysis – are present in the backdrop within a community known to be subject to active demolition efforts over the past decades.

**Examples of Large Homes in the Subject Neighborhood (sold)**

| Address | Size (sq. ft.) | Sale Date |
|---|---|---|
| 1544 Russell Ave | 2,860 | Oct-12 |
| 1414 Russell | 2,590 | Nov-20 |
| 1812 Piggott Ave | 2,350 | Apr-06 |
| 1610 Central Ave | 2,208 | Mar-18 |
| 1608 Central Ave | 2,088 | Jun-18 |
| 1411 Dr MR Lemons Blvd | 1,960 | May-06 |
| 1950 Gay Ave | 1,866 | May-14 |
| 1700 Market | 1,860 | Apr-07 |

There were eight sales of homes greater than 1,850 square feet, considerably larger than the typical home in this area.

**Most Expensive Homes in the Subject Neighborhood (sold)**

| Address | Sale Price | Sale Date |
|---|---|---|
| 1402 Russell Ave | $97,500 | Aug-07 |
| 1635 Central | $97,000 | Nov-03 |
| 1720 Wilford Ave | $90,000 | Nov-19 |
| 1546 Russell | $90,000 | Jan-05 |
| 1405 E St | $87,000 | Dec-04 |
| 1630 Lawrence Dr | $80,000 | Dec-08 |
| 1405 E St | $80,000 | Nov-06 |
| 1632 Wilford Ave | $77,250 | Aug-18 |
| 1619 Wilford Ave | $76,900 | Apr-08 |
| 1610 Central Ave | $75,000 | Mar-18 |
| 1624 Central Ave | $73,500 | Aug-18 |
| 1427 Lawrence Ave | $71,000 | May-07 |
| 1806 Lawrence | $69,000 | Nov-03 |
| 1709 Central | $67,000 | Jan-07 |
| 1827 Lawrence | $65,000 | May-16 |
| 1411 Dr M R Lemons Blvd | $64,900 | May-06 |
| 1608 Central Ave | $64,000 | Jun-18 |

There have 17 sales of homes between $60,000 and $100,000 between 2003 and 2020, with an average price paid of $77,944.



**Newer Construction Homes in the Subject Neighborhood (sold)**

| Address | Year Built | Sale Date |
|---|---|---|
| 1720 Wilford Ave | 2006 | Nov-19 |
| 1720 Wilford Ave | 2006 | Jul-15 |
| 1720 Wilford Ave | 2006 | May-19 |
| 1402 Russell Ave | 2005 | Aug-07 |
| 1632 Wilford Ave | 2005 | Aug-18 |
| 1632 Wilford | 2005 | Aug-15 |
| 1950 Gay Ave | 2005 | May-14 |
| 1704 Wilford | 2005 | Aug-09 |
| 1639 Lawrence Ave | 2005 | Oct-12 |
| 1816 Wilford | 2005 | Sep-10 |
| 1620 Wilford Ave | 2004 | Nov-14 |
| 1624 Wilford Ave | 2004 | Nov-18 |
| 1620 Wilford Ave | 2004 | Dec-13 |
| 1414 Russell | 2003 | Nov-20 |
| 1635 Central | 2003 | May-09 |
| 1635 Central | 2002 | Nov-03 |
| 1411 Dr M R Lemons Blvd | 2002 | May-06 |
| 1619 Wilford Ave | 2001 | Apr-08 |
| 1405 Dr M R Lemons Blvd | 2001 | Apr-06 |
| 1604 Lawrence Ave | 2001 | Jan-07 |
| 1639 Lawrence Ave | 2001 | Oct-06 |
| 1619 Wilford Ave | 2001 | Jun-07 |
| 1604 Lawrence | 2001 | Jul-11 |
| 1602 Lawrence | 2001 | Oct-09 |
| 1401 Dr Mr Lemons Blvd | 2001 | Oct-11 |
| 1405 E St | 2000 | Dec-04 |
| 1630 Lawrence Dr | 2000 | Dec-08 |
| 1405 E St | 2000 | Nov-06 |
| 1806 Lawrence | 2000 | Nov-03 |
| 1707 Wilford | 2000 | Jun-05 |
| 1703 Wilford Ave | 2000 | Nov-04 |
| 1630 Lawrence Ave | 2000 | May-06 |
| 1402 Dr M R Lemons Blvd | 2000 | Dec-07 |
| 1705 Wilford | 2000 | Dec-04 |
| 1400 Dr M R Lemons Blvd | 2000 | Jan-05 |
| 1409 Dr M R Lemons Blvd | 2000 | Dec-03 |
| 1609 Wilford Ave | 2000 | Jul-06 |
| 1806 Lawrence | 2000 | Dec-09 |
| 1705 Wilford | 2000 | Sep-11 |
| 1620 Lawrence Ave | 2000 | Dec-16 |
| 1634 Lawrence Ave | 2000 | Jan-13 |
| 1709 Wilford Ave | 2000 | Apr-12 |
| 1703 Wilford Ave | 2000 | Apr-11 |

There have been 43 sales of homes that have recently been constructed within the Bell subject neighborhood. The list of sales to the left display the location and sale date of 43 homes that were built in the year 2000 or later.

Some of the more recent construction has occurred along Wilford Ave. The table below includes seven sales of homes along Wilford with each sale exceeding $50,000.



**1703 Wilford**

Built in 2000
Sold Nov. 2004
$62,100



**1705 Wilford**

Built in 2000
Sold Dec. 2004
$52,500



**1707 Wilford**

Built in 2000
Sold June 2005
$63,000



**1619 Wilford**

Built in 2001
Sold Apr. 2008
$76,900



**1620 Wilford**

Built in 2004
Sold Nov. 2014
$52,000



**1632 Wilford**

Built in 2005
Sold Aug. 2018
$77,250



**1720 Wilford**

Built in 2006
Sold Nov. 2019
$90,000

266



### 15.11   Local Market Vacant Land Sale Transactions

As noted within this report, the Bell Report fails to analyze local market transactions. While the majority of our report address sales of improved residential property, because 269 of the 273 subject properties were vacant land or lots as of December 2023, we have also researched sales of vacant land in the local market. We searched the local MLS for sales of land in the East St. Louis market, with a total of 28 closed transactions between November 2002 and March 2024.

| Address | MLS Ref. No. | Ownership (at sale) | Selling Date | Selling Price | Price per Sq. Ft. | Site Size (sq. ft.) | Site Size (acres) | Size Category |
|---|---|---|---|---|---|---|---|---|
| 432 56th | 2110491 | HUD | Nov-02 | $700 | $0.09 | 7,405 | 0.17 | Regular |
| 767 52nd | 2212297 | HUD | Feb-03 | $450 | $0.07 | 6,534 | 0.15 | Regular |
| 5438 Adelaide | 2310756 | HUD | Oct-03 | $300 | $0.05 | 6,534 | 0.15 | Regular |
| 631 80th | 2400032 | HUD | May-04 | $1,750 | $0.15 | 11,761 | 0.27 | Regular |
| 8515 Bellview | 2402735 | | Feb-05 | $500 | $0.07 | 7,405 | 0.17 | Regular |
| 539 Washington | 2416153 | | Feb-05 | $700 | $0.13 | 5,227 | 0.12 | Regular |
| 2212 St Clair | 2510978 | | Nov-05 | $3,500 | $0.57 | 6,098 | 0.14 | Regular |
| 1026 Gaty | 2506718 | | Dec-05 | $999 | $0.29 | 3,485 | 0.08 | Small |
| 1457 46th | 2512288 | HUD | Aug-06 | $450 | $0.07 | 6,534 | 0.15 | Regular |
| 838 84th | 2720505 | | Jan-08 | $2,250 | $0.30 | 7,405 | 0.17 | Regular |
| 7511 Old Missouri | 2800735 | | Mar-08 | $15,000 | $0.51 | 29,621 | 0.68 | Large |
| 8331 Saint Phillips | 2816646 | | May-09 | $800 | $0.09 | 9,148 | 0.21 | Regular |
| 1233 Freeman | 4014094 | | Apr-12 | $200 | | 13,939 | 0.32 | Regular |
| 4030 Park | 4114680 | Bank | Dec-12 | $4,000 | $0.66 | 6,098 | 0.14 | Regular |
| 830 84th | 4113061 | Bank | Mar-13 | $200 | | 871 | 0.02 | Small |
| 2107 Baker | 4302034 | Bank | Apr-14 | $285 | $0.06 | 4,792 | 0.11 | Regular |
| 2115 Broadway | 4309212 | | Aug-14 | $1,000 | $0.26 | 3,920 | 0.09 | Small |
| 1122 Market | 4401472 | Bank | Feb-15 | $350 | $0.06 | 5,663 | 0.13 | Regular |
| 611 23rd | 4413420 | Bank | Oct-15 | $1 | | 4,792 | 0.11 | Regular |
| 307 82nd | 4414531 | Bank | Jan-16 | $1 | | 8,276 | 0.19 | Regular |
| 642 80th | 4501477 | Bank | Mar-16 | $100 | | 3,049 | 0.07 | Small |
| 2559 Waverly | 16039427 | Bank | Apr-17 | $1,001 | $0.21 | 4,792 | 0.11 | Regular |
| 3047 Waverly | 19056552 | Bank | Aug-19 | $200 | | 6,970 | 0.16 | Regular |
| 2510 45th | 19042638 | | Mar-20 | $25,000 | $0.32 | 77,537 | 1.78 | Large |
| 5708 Church Road | 21043189 | | Jan-22 | $7,000 | $0.09 | 82,134 | 1.89 | Large |
| 42nd | 22030821 | | Aug-22 | $13,000 | $1.08 | 12,000 | 0.28 | Regular |
| 3005 Forest | 23039674 | | Aug-23 | $10,000 | $0.28 | 35,284 | 0.81 | Large |
| 42nd | 23058601 | | Mar-24 | $15,000 | $1.25 | 12,000 | 0.28 | Regular |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Average** | | | | **$3,741** | **$0.30** | **13,903** | **0.32** |
| **Median** | | | | **$750** | **$0.18** | **6,752** | **0.16** |

| | | | |
|---|---|---|---|
| **Qty** | | **28** | |

However, it is noted that the 28 sales included several sales for a nominal amount ($200 or less) and a significant number represented bank (or HUD) foreclosure dispositions. To account for this we have also analyzed the land sales with these transactions excluded.



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

The table below <u>removes</u> six sales where the transaction <u>price was $200 or less</u>.

| Address | MLS Ref. No. | Ownership (at sale) | Selling Date | Selling Price | Price per Sq. Ft. | Site Size (sq. ft.) | Site Size (acres) | Size Category |
|---|---|---|---|---|---|---|---|---|
| 432 56th | 2110491 | HUD | Nov-02 | $700 | $0.09 | 7,405 | 0.17 | Regular |
| 767 52nd | 2212297 | HUD | Feb-03 | $450 | $0.07 | 6,534 | 0.15 | Regular |
| 5438 Adelaide | 2310756 | HUD | Oct-03 | $300 | $0.05 | 6,534 | 0.15 | Regular |
| 631 80th | 2400032 | HUD | May-04 | $1,750 | $0.15 | 11,761 | 0.27 | Regular |
| 8515 Bellview | 2402735 | | Feb-05 | $500 | $0.07 | 7,405 | 0.17 | Regular |
| 539 Washington | 2416153 | | Feb-05 | $700 | $0.13 | 5,227 | 0.12 | Regular |
| 2212 St Clair | 2510978 | | Nov-05 | $3,500 | $0.57 | 6,098 | 0.14 | Regular |
| 1026 Gaty | 2506718 | | Dec-05 | $999 | $0.29 | 3,485 | 0.08 | Small |
| 1457 46th | 2512288 | HUD | Aug-06 | $450 | $0.07 | 6,534 | 0.15 | Regular |
| 838 84th | 2720505 | | Jan-08 | $2,250 | $0.30 | 7,405 | 0.17 | Regular |
| 7511 Old Missouri | 2800735 | | Mar-08 | $15,000 | $0.51 | 29,621 | 0.68 | Large |
| 8331 Saint Phillips | 2816646 | | May-09 | $800 | $0.09 | 9,148 | 0.21 | Regular |
| 4030 Park | 4114680 | Bank | Dec-12 | $4,000 | $0.66 | 6,098 | 0.14 | Regular |
| 2107 Baker | 4302034 | Bank | Apr-14 | $285 | $0.06 | 4,792 | 0.11 | Regular |
| 2115 Broadway | 4309212 | | Aug-14 | $1,000 | $0.26 | 3,920 | 0.09 | Small |
| 1122 Market | 4401472 | Bank | Feb-15 | $350 | $0.06 | 5,663 | 0.13 | Regular |
| 2559 Waverly | 16039427 | Bank | Apr-17 | $1,001 | $0.21 | 4,792 | 0.11 | Regular |
| 2510 45th | 19042638 | | Mar-20 | $25,000 | $0.32 | 77,537 | 1.78 | Large |
| 5708 Church Road | 21043189 | | Jan-22 | $7,000 | $0.09 | 82,134 | 1.89 | Large |
| 42nd | 22030821 | | Aug-22 | $13,000 | $1.08 | 12,000 | 0.28 | Regular |
| 3005 Forest | 23039674 | | Aug-23 | $10,000 | $0.28 | 35,284 | 0.81 | Large |
| 42nd | 23058601 | | Mar-24 | $15,000 | $1.25 | 12,000 | 0.28 | Regular |

| | Selling Price | Price per Sq. Ft. | Site Size (sq. ft.) | Site Size (acres) |
|---|---|---|---|---|
| **Average** | **$4,729** | **$0.30** | **15,972** | **0.37** |
| **Median** | **$1,001** | **$0.18** | **6,970** | **0.16** |

**Qty**      **22**



The next table <u>removes</u> nine transactions involving a <u>bank (or HUD) disposition</u>.

| Map No. | Address | MLS Ref. No. | Ownership (at sale) | Selling Date | Selling Price | Price per Sq. Ft. | Site Size (sq. ft.) | Site Size (acres) | Size Category |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 8515 Bellview | 2402735 | | Feb-05 | $500 | $0.07 | 7,405 | 0.17 | Regular |
| 2 | 539 Washington | 2416153 | | Feb-05 | $700 | $0.13 | 5,227 | 0.12 | Regular |
| 3 | 2212 St Clair | 2510978 | | Nov-05 | $3,500 | $0.57 | 6,098 | 0.14 | Regular |
| 4 | 1026 Gaty | 2506718 | | Dec-05 | $999 | $0.29 | 3,485 | 0.08 | Small |
| 5 | 838 84th | 2720505 | | Jan-08 | $2,250 | $0.30 | 7,405 | 0.17 | Regular |
| 6 | 7511 Old Missouri | 2800735 | | Mar-08 | $15,000 | $0.51 | 29,621 | 0.68 | Large |
| 7 | 8331 Saint Phillips | 2816646 | | May-09 | $800 | $0.09 | 9,148 | 0.21 | Regular |
| 8 | 2115 Broadway | 4309212 | | Aug-14 | $1,000 | $0.26 | 3,920 | 0.09 | Small |
| 9 | 2510 45th | 19042638 | | Mar-20 | $25,000 | $0.32 | 77,537 | 1.78 | Large |
| 10 | 5708 Church Road | 21043189 | | Jan-22 | $7,000 | $0.09 | 82,134 | 1.89 | Large |
| 11 | 42nd | 22030821 | | Aug-22 | $13,000 | $1.08 | 12,000 | 0.28 | Regular |
| 12 | 3005 Forest | 23039674 | | Aug-23 | $10,000 | $0.28 | 35,284 | 0.81 | Large |
| 13 | 42nd | 23058601 | | Mar-24 | $15,000 | $1.25 | 12,000 | 0.28 | Regular |

| | Average | $7,288 | $0.40 | 22,405 | 0.51 |
|---|---|---|---|---|---|
| | Median | $3,500 | $0.29 | 9,148 | 0.21 |

| | Qty | 13 |
|---|---|---|

The sales were also classified according to size: Small (less than 4,000 SF), Regular (4,000 to 0.5-acre), Large (more than 0.5-acre). A summary table presented the average price and price per square foot is shown below.

| | Qty | 13 |
|---|---|---|

| | | | |
|---|---|---|---|
| Small | $1,000 | $0.27 | per sq. ft |
| Regular | $5,107 | $0.50 | per sq. ft |
| Large | $14,250 | $0.30 | per sq. ft |

Small land parcels (small lots), those 4,000 square feet or less in size, sold for an average $1,000 and $0.27 per square foot.

Regular land parcels, large enough to accommodate construction of a single-family residence with issues related to modern building requirements and setbacks, were grouped based on a size of between 4,000 square feet and larger, up to a maximum of 0.5 acres.

These land sale transactions $5,107 in price and $0.50 per square foot.

The largest category of land sales exceeded 0.5-acre in size, and averaged $14,250 and $0.30 per square foot of site size.



## 15.12   Subject Neighborhood and Cahokia Paired Sales Analysis Adjustment Grids

**Inside/Outside Matched Pairs Analysis: 1405 Central Ave.**

*Dec. 31, 2023 Date of Value*

"Inside" Area Sales



| | Subject | Inside Neighborhood Area Comp. # 1 | Adj. | Inside Neighborhood Area Comp. # 2 | Adj. | Inside Neighborhood Area Comp. # 3 | Adj. |
|---|---|---|---|---|---|---|---|
| Address | 1405 Central Ave. | 1620 Gay Ave. | | 1635 Lawrence Ave. | | 1913 Central Ave. | |
| Proximity | n/a | 1 block east | | 1 block east | | 3.5 blocks east | |
| Location | Subject Neighborhood | Subject Neighborhood | | Subject Neighborhood | | Subject Neighborhood | |
| Sale price | n/a | $32,500 | | $43,500 | | $30,000 | |
| Date of sale (value) | 12/31/2023 | 7/15/2021 | | 1/28/2022 | | 4/22/2024 | |
| Time adjusted price | n/a | $34,093 | $1,593 | $45,197 | $1,697 | $29,700 | ($300) |
| Time adjusted price/GLA | n/a | $36.42 | | $46.21 | | $25.08 | |
| Data source (MARIS MLS) | | 21045344 | | 21084579 | | 24015595 | |

**Inside Testing Area Matched Pairs Grid**

| | Subject | | Adj. | | Adj. | | Adj. |
|---|---|---|---|---|---|---|---|
| Location | Subject Neighborhood | Subject Neighborhood | -- | Subject Neighborhood | -- | Subject Neighborhood | -- |
| Site description | 7,405 SF (64' X 115') | 7,200 SF (120' X 60') | -- | 8,027 SF (123.5' X 65') | -- | 10,454 SF (90' X 115') | -- |
| Bed / Bath (above grade) | 3 bd / 1 ba | 3 bd / 1 ba | -- | 3 bd / 1.5 ba | ($500) | 3 bd / 2 ba | ($1,000) |
| Design / appeal | One story -- average | One story -- average | | One story -- average | | One story -- average | |
| Physical condition | Average/typical | Average/typical | -- | Average/typical | -- | Below average | $2,000 |
| Year built | 1975 (est.) | 1975 | | 1975 | | 1998 | |
| Exterior | Brick | Brick | -- | Vinyl siding | $1,500 | Vinyl siding | $1,500 |
| Gross living area (above grade) | 1,200 | 936 | -- | 978 | -- | 1,184 | -- |
| Foundation type | Slab | Slab | -- | Slab | -- | Slab | -- |
| Basement -- finish | n/a (slab) | n/a (slab) | -- | n/a (slab) | -- | n/a (slab) | -- |
| Garage | n/a (1 pad spot) | n/a (1 pad spot) | -- | 1-car (attached) | ($500) | 2-car (attached) | ($1,000) |
| Exterior features | Rear sidewalk | Patio, fenced yard, shed | ($1,000) | Covered patio, fenced yard | ($1,000) | Fence | -- |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- | Mature Trees | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- | Municipal | -- |
| Air conditioning | n/a | Yes - central air | ($2,500) | Yes - central air | ($2,500) | None | -- |
| **Total Net Adjustment** | | | **($3,500)** | | **($3,000)** | | **$1,500** |
| **Adjusted Sales Price** | | | **$30,593** | | **$42,197** | | **$31,200** |

JLL

*JLL Expert Report and Review of a Bell Appraisal Report*  

*City of East St. Louis v. Monsanto, et al. East St. Louis, Illinois*

   

**"Outside" Area Sales**

| | Subject | Outside Neighborhood Area Comp. # 1 | Adj. | Outside Neighborhood Area Comp. # 2 | Adj. | Outside Neighborhood Area Comp. # 3 | Adj. |
|---|---|---|---|---|---|---|---|
| Address | 1405 Central Ave. | 1104 Saint Benedict Dr., Cahokia | | 113 St. Thomas Ln., Cahokia | | 824 Saint Monica Dr. Cahokia | |
| Proximity | n/a | 3.8 miles (south) | | 3.9 miles (south) | | 5.4 miles (southwest) | |
| Location | Subject Neighborhood | Cahokia | | Cahokia | | Cahokia | |
| Sale price | n/a | $31,000 | | $39,000 | | $26,500 | |
| Date of sale (value) | 12/31/2023 | 11/15/2019 | | 10/4/2023 | | 2/29/2024 | |
| Time adjusted price | n/a | $33,573 | $2,573 | $39,195 | $195 | $26,421 | ($80) |
| Time adjusted price/GLA | n/a | $35.08 | | $45.36 | | $26.21 | |
| Data source | | 19033220 | | 23050759 | | 23047133 | |

**Outside Testing Area Matched Pairs Grid**

| | Subject | | | | | | |
|---|---|---|---|---|---|---|---|
| Location | Subject Neighborhood | Cahokia | -- | Cahokia | -- | Cahokia | -- |
| Site description | 7,405 SF (64' X 115') | 8,265 SF (57' X 145') | -- | 6,600 SF (55' X 120') | -- | 5,227 SF (60' X 111' X 60 X 12 X 73) | -- |
| Bed / Bath (above grade) | 3 bd / 1 ba | 3 bd / 1 ba | -- | 3 bd / 1 ba | -- | 3 bd / 1 ba | -- |
| Design / appeal | One story -- average | One story -- average | -- | One story -- average | -- | One story -- average | -- |
| Physical condition | Average/typical | Average/typical | -- | Average/typical | -- | Average/typical | -- |
| Year built | 1975 | 1960 | -- | 1946 | -- | 1959 | -- |
| Exterior | Brick | Brick | -- | Vinyl siding | $1,500 | Vinyl siding | $1,500 |
| Gross living area (above grade) | 1,331 | 957 | -- | 864 | -- | 1,008 | -- |
| Foundation type | Slab | Slab | -- | Slab | -- | Slab | -- |
| Basement -- finish | n/a (slab) | n/a (slab) | -- | n/a (slab) | -- | n/a (slab) | -- |
| Garage | n/a (1 pad spot) | 1-car (attached) | ($500) | n/a (driveway) | -- | 1-car (attached) | ($500) |
| Exterior features | Rear sidewalk | Patio, fenced yard | ($1,000) | fenced yard, shed | ($1,000) | Fence | ($500) |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- | Mature trees | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- | Municipal | -- |
| Air conditioning | n/a | Yes - central air | ($2,500) | Yes - central air | ($2,500) | Yes - central air | ($2,500) |
| **Total Net Adjustment** | | | **($4,000)** | | **($2,000)** | | **($2,000)** |
| **Adjusted Sales Price** | | | **$29,573** | | **$37,195** | | **$24,421** |



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

## Inside/Outside Matched Pairs Analysis: 1314 Mississippi Ave.

**Dec. 31, 2023 Date of Value**

**"Inside" Area Sales**

| | Subject | Inside Neighborhood Area Comp. # 1 | Adj. | Inside Neighborhood Area Comp. # 2 | Adj. | Inside Neighborhood Area Comp. # 3 | Adj. |
|---|---|---|---|---|---|---|---|
| Address | 1314 Mississippi Ave. | 1709 Henrietta Ave. | | 2217 State St. | | 1913 Central Ave. | |
| Proximity | n/a | 1.7 miles northeast | | 2.9 miles east | | 1.8 miles east | |
| Location | Subject Neighborhood | Subject Neighborhood | | Subject Neighborhood | | Subject Neighborhood | |
| Sale price | n/a | $30,000 | | $30,000 | | $30,000 | |
| Date of sale (value) | 12/31/2023 | 5/16/2019 | | 4/12/2023 | | 4/22/2024 | |
| Time adjusted price | n/a | $32,790 | $2,790 | $30,420 | $420 | $29,700 | ($300) |
| Time adjusted price/GLA | n/a | $19.11 | | $23.31 | | $25.08 | |
| Data source (MARIS MLS) | | 19022261 | | 23019678 | | 24015595 | |

**Inside Testing Area Matched Pairs Grid**

| | Subject | Inside Comp. #1 | Adj. | Inside Comp. #2 | Adj. | Inside Comp. #3 | Adj. |
|---|---|---|---|---|---|---|---|
| Location | Subject Neighborhood | Subject Neighborhood | -- | Subject Neighborhood | -- | Subject Neighborhood | -- |
| Site description | 10,549 SF (137' X 77') | 20,698 SF (158' X 131) | -- | 5,400 SF (45' X 120') | -- | 10,454 SF (90' X 115') | -- |
| Bed / Bath (above grade) | 3 bd / 3 ba | 3 bd / 2.5 ba | $500 | 3 bd / 2 ba | $1,000 | 3 bd / 2 ba | $1,000 |
| Design / appeal | One story -- average | One story -- average | -- | One story -- average | -- | One story -- average | -- |
| Physical condition | below average | average | ($2,000) | below average | -- | below average | -- |
| Year built | 1954 | 20001 | -- | 1922 | -- | 1998 | -- |
| Exterior | Brick | Vinyl siding | $1,500 | Brick | -- | Vinyl siding | $1,500 |
| Gross living area (above grade) | 1,582 | 1,716 | -- | 1,305 | -- | 1,184 | -- |
| Foundation type | Basement | Basement | -- | Basement | -- | Slab | $2,000 |
| Basement -- finish | full basement (source: property card) | full basement (source: MLS listing) | -- | full basement (source: property card) | -- | n/a (slab) | -- |
| Garage | Garage (attached) | n/a (street parking) | $2,000 | n/a (street parking) | $2,000 | 2-car (attached) | -- |
| Exterior features | Driveway | Porch | ($500) | Porch, fenced yard | ($1,000) | Fence | ($500) |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- | Mature trees | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- | Municipal | -- |
| Air conditioning | n/a | Yes - central air | ($2,500) | Yes - central air | ($2,500) | None | -- |
| **Total Net Adjustment** | | | **($1,000)** | | **($500)** | | **$4,000** |
| **Adjusted Sales Price** | | | **$31,790** | | **$29,920** | | **$33,700** |



   

**"Outside" Area Sales**

| | Subject | Outside Neighborhood Area Comp. # 1 | Adj. | Outside Neighborhood Area Comp. # 2 | Adj. | Outside Neighborhood Area Comp. # 3 | Adj. |
|---|---|---|---|---|---|---|---|
| Address | 1314 Mississippi Ave. | 1168 Price St. Cahokia | | 782 Jerome Ln., Cahokia | | 1202 Julie Ave. Cahokia | |
| Proximity | n/a | 4.7 miles (south) | | 3.1 miles (south) | | 3.7 miles (south) | |
| Location | Subject Neighborhood | Cahokia | | Cahokia | | Cahokia | |
| Sale price | n/a | $22,000 | | $36,000 | | $25,000 | |
| Date of sale (value) | 12/31/2023 | 1/14/2022 | | 1/5/2021 | | 8/15/2022 | |
| Time adjusted price | n/a | $22,858 | $858 | $38,160 | $2,160 | $25,700 | $700 |
| Time adjusted price/GLA | n/a | $23.89 | | $22.24 | | $18.77 | |
| Data source | | 21084364 | | 20084262 | | 22039853 | |

**Outside Testing Area Matched Pairs Grid**

| | Subject | | Adj. | | Adj. | | Adj. |
|---|---|---|---|---|---|---|---|
| Location | Subject Neighborhood | Cahokia | -- | Cahokia | -- | Cahokia | -- |
| Site description | 10,549 SF (137' X 77') | 7,400 SF (60' X 116' X 70' X 117') | -- | 9,000 SF (80' X 112.5') | -- | 6,325 SF (55' X 115') | -- |
| Bed / Bath (above grade) | 3 bd / 3 ba | 3 bd / 1.5 ba | $1,500 | 3 bd / 2 ba | $1,000 | 3 bd / 2 ba | $1,000 |
| Design / appeal | One story -- below average | One story -- average | -- | One story -- average | -- | One story -- average | -- |
| Physical condition | Below average | Average/typical | ($2,000) | Average/typical | ($2,000) | Average/typical | ($2,000) |
| Year built | 1954 | 1960 | -- | 1957 | -- | 1957 | -- |
| Exterior | Brick | Vinyl | $1,500 | Vinyl | $1,500 | Vinyl siding | $1,500 |
| Gross living area (above grad | 1,582 | 957 | -- | 1,716 | -- | 1,369 | -- |
| Foundation type | Basement | Slab | -- | Slab | -- | Slab | -- |
| Basement -- finish | Full basement (source: property card) | n/a (slab) | $2,000 | n/a (slab) | $2,000 | n/a (slab) | $2,000 |
| Garage | Garage (attached) | n/a (driveway) | $2,000 | Garage (attached) | -- | n/a (driveway) | $2,000 |
| Exterior features | Driveway | driveway | -- | fenced yard, In ground pool, Hot tub, Gazebo, Shed | ($2,000) | Driveway, patio, shed | ($1,000) |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- | Mature trees | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- | Municipal | -- |
| Air conditioning | Yes - central air | Yes - central air | -- | Yes - central air | -- | Yes - central air | -- |
| **Total Net Adjustment** | | | $5,000 | | $500 | | $3,500 |
| **Adjusted Sales Price** | | | $27,858 | | $38,660 | | $29,200 |

273



### Inside/Outside Matched Pairs Analysis: 1419 Gay Ave.

   

**Dec. 31, 2023 Date of Value**

**"Inside" Area Sales**

| | Subject | Inside Neighborhood Area Comp. # 1 | Adj. | Inside Neighborhood Area Comp. # 2 | Adj. | Inside Neighborhood Area Comp. # 3 | Adj. |
|---|---|---|---|---|---|---|---|
| Address | 1419 Gay Ave. | 1620 Gay Ave. | | 1635 Lawrence Ave. | | 1913 Central Ave. | |
| Proximity | n/a | 0.1 miles southeast | | 0.2 miles south | | 0.5 miles southeast | |
| Location | Subject Neighborhood | Subject Neighborhood | | Subject Neighborhood | | Subject Neighborhood | |
| Sale price | n/a | $32,500 | | $43,500 | | $30,000 | |
| Date of sale (value) | 12/31/2023 | 7/15/2021 | | 1/28/2022 | | 4/22/2024 | |
| Time adjusted price | n/a | $34,093 | $1,593 | $45,197 | $1,697 | $29,700 | ($300) |
| Time adjusted price/GLA | n/a | $36.42 | | $46.21 | | $25.08 | |
| Data source (MARIS MLS) | | 21045344 | | 21084579 | | 24015595 | |

**Inside Testing Area Matched Pairs Grid**

| | Subject | Comp. # 1 | Adj. | Comp. # 2 | Adj. | Comp. # 3 | Adj. |
|---|---|---|---|---|---|---|---|
| Location | Subject Neighborhood | Subject Neighborhood | -- | Subject Neighborhood | -- | Subject Neighborhood | -- |
| Site description | 8,683 SF (75.5' X 115') | 7,200 SF (120' X 60') | -- | 8,027 SF (123.5' X 65') | -- | 10,454 SF (90' X 115') | -- |
| Bed / Bath (above grade) | 3 bd / 1 ba | 3 bd / 1 ba | -- | 3 bd / 1.5 ba | ($500) | 3 bd / 2 ba | ($1,000) |
| Design / appeal | One story -- average | One story -- average | -- | One story -- average | -- | One story -- average | -- |
| Physical condition | Average/typical | Average/typical | -- | Average/typical | -- | Inferior | $2,000 |
| Year built | 1975 (est.) | 1975 | -- | 1975 | -- | 1998 | -- |
| Exterior | Brick | Brick | -- | Vinyl siding | $1,500 | Vinyl siding | $1,500 |
| Gross living area (above grade) | 1,315 | 936 | -- | 978 | -- | 1,184 | -- |
| Foundation type | Slab | Slab | -- | Slab | -- | Slab | -- |
| Basement -- finish | n/a (slab) | n/a (slab) | -- | n/a (slab) | -- | n/a (slab) | -- |
| Garage | n/a (1 pad spot) | n/a (1 pad spot) | -- | 1-car (attached) | ($500) | 2-car (attached) | ($2,000) |
| Exterior features | n/a | Patio, fenced yard, shed | ($1,000) | Covered patio, fenced yard | ($1,000) | Fence | ($500) |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- | n/a | $500 |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- | Municipal | -- |
| Air conditioning | n/a | Yes - central air | ($2,500) | Yes - central air | ($2,500) | None | -- |
| **Total Net Adjustment** | | | **($3,500)** | | **($3,000)** | | **$500** |
| **Adjusted Sales Price** | | | **$30,593** | | **$42,197** | | **$30,200** |



   

**" Outside" Area Sales**

| | Subject | Outside Neighborhood Area Comp. # 1 | Adj. | Outside Neighborhood Area Comp. # 2 | Adj. | Outside Neighborhood Area Comp. # 3 | Adj. |
|---|---|---|---|---|---|---|---|
| Address | 1419 Gay Ave. | 1104 Saint Benedict Dr., Cahokia | | 113 St. Thomas Ln., Cahokia | | 1131 Saint Helena Dr. Cahokia | |
| Proximity | n/a | 3.7 miles south | | 3.8 miles south | | 4.2 miles (southwest) | |
| Location | Subject Neighborhood | Cahokia | | Cahokia | | Cahokia | |
| Sale price | n/a | $31,000 | | $39,000 | | $30,000 | |
| Date of sale (value) | 12/31/2023 | 11/15/2019 | | 10/4/2023 | | 5/1/2023 | |
| Time adjusted price | n/a | $33,573 | $2,573 | $39,195 | $195 | $30,390 | $390 |
| Time adjusted price/GLA | n/a | $35.08 | | $45.36 | | $24.81 | |
| Data source | | 19033220 | | 23050759 | | 23015163 | |

**Inside Testing Area Matched Pairs Grid**

| | Subject | | Adj. | | Adj. | | Adj. |
|---|---|---|---|---|---|---|---|
| Location | Subject Neighborhood | Cahokia | -- | Cahokia | -- | Cahokia | -- |
| Site description | 8,683 SF (75.5' X 115') | 8,265 SF (57' X 145') | -- | 6,600 SF (55' X 120') | -- | 7,840 SF (111' X 72' X 117') | -- |
| Bed / Bath (above grade) | 3 bd / 1 ba | 3 bd / 1 ba | -- | 3 bd / 1 ba | -- | 3 bd / 1 ba | -- |
| Design / appeal | One story -- average | One story -- average | -- | One story -- average | -- | One story -- average | -- |
| Physical condition | Average/typical | Average/typical | -- | Average/typical | -- | Average/typical | -- |
| Year built | 1970s est. | 1960 | -- | 1946 | -- | 1955 | -- |
| Exterior | Brick | Vinyl siding | $1,500 | Vinyl siding | $1,500 | Vinyl siding | $1,500 |
| Gross living area (above grade) | 1,200 | 957 | -- | 864 | -- | 1,225 | -- |
| Foundation type | Slab | Slab | -- | Slab | -- | Slab | -- |
| Basement -- finish | n/a (slab) | n/a (slab) | -- | n/a (slab) | -- | n/a (slab) | -- |
| Garage | driveway | 1-car (attached) | ($500) | n/a (driveway) | -- | n/a (driveway) | -- |
| Exterior features | n/a | Patio, fenced yard | ($1,000) | fenced yard, shed | ($1,000) | n/a | -- |
| Landscaping/natural | Mature trees | Mature trees | -- | Mature trees | -- | Mature trees | -- |
| Utilities (water/sewer) | Municipal | Municipal | -- | Municipal | -- | Municipal | -- |
| Air conditioning | n/a | Yes - central air | ($2,500) | Yes - central air | ($2,500) | Yes - central air | ($2,500) |
| **Total Net Adjustment** | | | **($2,500)** | | **($2,000)** | | **($1,000)** |
| **Adjusted Sales Price** | | | **$31,073** | | **$37,195** | | **$29,390** |

275



## 15.13  Dead Creek Paired Sales Analysis Adjustment Grids

| 2017 Pairing No & Address | | Year Built | Bedrooms | Full Baths | Half Baths | List Price | | Sale Price | Sale to List Ratio | Contract/ Sold Date | DOM | Total Finished Area (SF) | Unadj. Price per SF | Lot Size (SF) | Garage Spaces | Seller Concessions | | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dead Creek Impaired Sale | 3401 Barber Street | 1957 | 3 | 1 | 0 | $ 46,500 | $ 46,000 | 0.989 | 1/5/2017 | 53 | 864 | $53.24 | 5,706 | 0 | $ - | | vinyl siding |
| Cahokia Unimpaired No.1A | 1422 Andrews Drive | 1960 | 4 | 1 | 0 | $ 60,000 | $ 58,000 | 0.967 | 11/25/2016 | 21 | 925 | $62.70 | 15,000 | 1 | $ - | | aluminum siding |
| Cahokia Unimpaired No. 1B | 30 Drexel Drive | 1957 | 3 | 1 | 1 | $ 44,000 | $ 44,000 | 1.000 | 2/17/2017 | 116 | 925 | $47.57 | 7,623 | 0 | $ - | | vinyl siding |
| Cahokia Unimpaired No. 1C | 607 Saint Monica | 1958 | 3 | 2 | 0 | $ 46,500 | $ 43,500 | 0.935 | 2/27/2017 | 95 | 888 | $48.99 | 7,144 | 0 | $ - | | newly renovated; aluminum siding, frame, vinyl siding |
| Cahokia Unimpaired No. 1D | 88 West Adams Drive | 1959 | 3 | 1 | 0 | $ 40,500 | $ 44,000 | 1.086 | 2/27/2017 | 82 | 925 | $47.57 | 6,926 | 1 | $ - | | renovated; rented; frame, vinyl siding |
| Cahokia Unimpaired No. 1E | 142 St. Robert Drive | 1958 | 3 | 1 | 0 | $ 44,000 | $ 44,000 | 1.000 | 3/7/2017 | 94 | 864 | $50.93 | 7,013 | 1 | $ - | | newly remodeled |

| Adjustment Grid | | | No. 1A -- 1422 Andrews Dr. | No.1B -- 30 Drexel Dr. | No. 1C -- 607 Saint Monica | No. 1D -- 88 West Adams | No.1E -- 142 St. Robert |
|---|---|---|---|---|---|---|---|
| | | Sale Price | $ 58,000 | $ 44,000 | $ 43,500 | $ 44,000 | $ 44,000 |
| | | Sales Price per S.F. | $ 62.70 | $ 47.57 | $ 48.99 | $ 47.57 | $ 50.93 |
| | | Sale Date | 11/25/2016 | 2/17/2017 | 2/27/2017 | 2/27/2017 | 3/7/2017 |
| | | Market Conditions | $ 1.57 | $ (0.79) | $ (1.23) | $ (1.19) | $ (1.7009) |
| | | Adjusted Price per S.F. | $ 64.27 | $ 46.77 | $ 47.76 | $ 46.34 | $ 49.23 |
| | | Adjusted Price (Nominal) | $ 59,453 | $ 43,265 | $ 42,410 | $ 42,865 | $ 42,530 |
| | | Full Bath Adjustment | | | $ (1,000) | | |
| | | Half Bath Adjustment | | $ (500) | $ - | $ - | $ - |
| | | Living Area (S.F.) Adjustment | $ (244) | $ (244) | $ (96) | $ (244) | $ - |
| | | Basement Adjustment | | | | | |
| | | Garage Space Adjustment | $ (1,000) | | | $ (1,000) | $ (1,000) |
| | | Lot Size Adjustment | $ (4,647) | $ (959) | $ (719) | $ (610) | $ (654) |
| | | Age & Condition Adjustment | $ (1,784) | $ - | $ (424) | $ (857) | $ (425) |
| | | Seller Concessions Adjustment | | $ - | $ - | $ - | $ - |
| | | Total Adjustments | $ (7,675) | $ (1,703) | $ (2,239) | $ (2,711) | $ (2,079) |
| | | Adjustments per SF | | | | | |
| | | Adjusted Price | $ 51,778 | $ 41,563 | $ 40,171 | $ 40,154 | $ 40,452 |
| | | Indicated % Impact | -11.16% | 10.68% | 14.51% | 14.56% | 13.72% |

| 2003 Pairing No. & Address | | Year Built | Bedrooms | Full Baths | Half Baths | List Price | | Sale Price | Sale to List Ratio | Contract/ Sold Date | DOM | Total Finished Area (SF) | Unadj. Price per SF | Lot Size (SF) | Garage Spaces | Seller Concessions | | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dead Creek Impaired Sale | 33 School Street | 1959 | 3 | 1 | 0 | $ 41,000 | $ 41,000 | 1.000 | 10/7/2003 | 124 | 864 | $47.45 | 6,534 | 1 | $ - | | Has basement |
| Cahokia Unimpaired No.2A | 703 East Fifth | 1958 | 3 | 1 | 0 | $ 39,900 | $ 38,000 | 0.952 | 10/17/2003 | 370 | 888 | $42.79 | 6,098 | 0 | | | Aluminum siding |
| Cahokia Unimpaired No.2B | 304 St. Kevin | 1956 | 3 | 1 | 0 | $ 44,500 | $ 46,000 | 1.034 | 10/2/2003 | 117 | 900 | $51.11 | 6,500 | 1 | $ 1,000.00 | | Vinly siding |
| Cahokia Unimpaired No. 2C | 131 St. Robert Drive | 1956 | 3 | 1 | 0 | $ 44,500 | $ 42,000 | 0.944 | 9/12/2003 | 35 | 880 | $47.73 | 6,400 | 0 | $ - | | Aluminum |

| Adjustment Grid | | | No. 2A -- 703 East Fifth | No. 2B -- 304 St. Kevin | No. 2C -- 131 St. Robert Drive |
|---|---|---|---|---|---|
| | | Sale Price | $ 38,000 | $ 46,000 | $ 42,000 |
| | | Sales Price per S.F. | $ 42.79 | $ 51.11 | $ 47.73 |
| | | Sale Date | 10/17/2003 | 10/2/2003 | 9/12/2003 |
| | | Market Conditions | | | $ 0.797 |
| | | Adjusted Price per S.F. | $ 42.79 | $ 51.11 | $ 48.52 |
| | | Adjusted Price (Nominal) | $ 38,000 | $ 46,000 | $ 42,701 |
| | | Full Bath Adjustment | | | |
| | | Half Bath Adjustment | | | |
| | | Living Area Adjustment | $ (96) | $ (144) | $ (64) |
| | | Basement Adjustment | $ 1,000 | $ 1,000 | $ 1,000 |
| | | Garage Space Adjustment | $ 1,000 | | $ 1,000 |
| | | Lot Size Adjustment | $ 218 | $ 17 | $ 67 |
| | | Age & Condition Adjustment | $ 1,000 | $ 3,000 | $ 3,000 |
| | | Seller Concessions Adjustment | | $ 1,000 | $ - |
| | | Total Adjustments | $ 3,122 | $ 4,873 | $ 5,003 |
| | | Adjustments per SF | $ 3.52 | $ 5.41 | $ 5.69 |
| | | Adjusted Price | $ 41,122 | $ 50,873 | $ 47,704 |
| | | Indicated % Impact | -0.30% | -19.41% | -14.05% |



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

| 2010 Pairing No. & Address | | Year Built | Bedrooms | Full Baths | Half Baths | List Price | | Sale Price | Sale to List Ratio | Contract/ Sold Date | DOM | Total Finished Area (SF) | Unadj. Price per SF | Lot Size (SF) | Garage Spaces | Seller Concessions | | Total Living Area (SF) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dead Creek Impaired Sale | 15 Gloria Street | 1958 | 3 | 2 | 0 | $ | 85,500 | $ 81,500 | 0.953 | 11/15/2010 | 176 | 1,024 | $79.59 | 9,100 | 0 | $ | - | 2,024 | Has basement; vinyl siding |
| Cahokia Unimpaired No.3A | 2028 Jerome Lane | 1956 | 3 | 1 | 0 | $ | 89,900 | $ 86,000 | 0.957 | 3/31/2010 | 216 | 1,152 | $74.65 | 9,500 | 1 | | | 1,152 | No basement; vinyl siding |
| Cahokia Unimpaired No. 3B | 122 Miskell Boulevard | 1960 | 2 | 2 | 0 | $ | 69,900 | $ 67,500 | 0.966 | 6/18/2010 | 55 | 1,300 | $51.92 | 7,840 | 1 | $ | - | 1,300 | No basement |
| Cahokia Unimpaired No. 3C | 817 Joliet Drive | 1950 | 3 | 1 | 0 | $ | 59,900 | $ 59,900 | 1.000 | 4/29/2010 | 149 | 1,300 | $46.08 | 8,700 | 1 | | | 1,300 | No basement; vinyl siding |

| Adjustment Grid | | No. 3A -- 2028 Jerome Lane | | No. 3B -- 122 Miskell Boulevard | | No. 3C -- 817 Joliet Drive | |
|---|---|---|---|---|---|---|---|
| | Sale Price | $ | 86,000 | $ | 67,500 | $ | 59,900 |
| | Sales Price per S.F. | $ | 74.65 | $ | 51.92 | $ | 46.08 |
| | Sale Date | | 3/31/2010 | | 6/18/2010 | | 4/29/2010 |
| | Market Conditions | $ | 9.35 | $ | 4.34 | $ | 5.00 |
| | Adjusted Price per S.F. | $ | 84.00 | $ | 56.26 | $ | 51.08 |
| | Adjusted Price (Nominal) | $ | 96,772 | $ | 73,136 | $ | 66,402 |
| | Full Bath Adjustment | $ | 1,000 | $ | - | $ | 1,000 |
| | Half Bath Adjustment | $ | - | $ | - | $ | - |
| | Living Area | $ | (512) | $ | (1,104) | $ | (1,104) |
| | Basement Adjustment | $ | 2,000 | $ | 2,000 | $ | 2,000 |
| | Fireplace Adjustment | $ | - | $ | - | $ | - |
| | Garage Space Adjustment | $ | (1,000) | $ | (1,000) | $ | (1,000) |
| | Lot Size Adjustment | $ | (200) | $ | 630 | $ | 200 |
| | Age & Condition Adjustment | $ | 2,000 | $ | (2,000) | $ | 8,000 |
| | Seller Concessions Adjustme | $ | - | $ | - | $ | - |
| | Total Adjustments | $ | 3,288 | $ | (1,474) | $ | 9,096 |
| | Adjustments per SF | $ | 2.85 | $ | (1.13) | $ | 7.00 |
| | Adjusted Price | $ | 100,060 | $ | 71,662 | $ | 75,498 |
| | **Indicated % Impact** | | **-18.55%** | | **13.73%** | | **7.95%** |

| Adjustments Notes Based on Prior Appraisals in Cahokia Marketplace & JLL Experience | |
|---|---|
| Full Bath | $1,000 |
| Half Bath | $500 |
| Year Built | $1,000 per year |
| Site Size | $0.50 per s.f. of lot area |
| Seller Concessions | Adjust down for any difference in dollar amount of concessions |

| Dead Creek Property Address | Pairing No. | Result of Matched Pairs Analysis | | | | | Overall | |
|---|---|---|---|---|---|---|---|---|
| **Sale No. 1: 3401 Barber Street** | Pairing No. 1A | | -11.16% | **2017** | | | -11.16% | |
| | Pairing No. 1B | | 10.68% | **2017** | | | 10.68% | |
| | Pairing No. 1C | | 14.51% | **2017** | | | 14.51% | |
| | Pairing No. 1D | | 14.56% | **2017** | | | 14.56% | |
| | Pairing No. 1E | | 13.72% | **2017** | | | 13.72% | |
| | | **Average** | **8.46%** | | | | -0.30% | |
| | | **Median** | **13.72%** | | | | -19.41% | |
| | | | | | | | -14.05% | |
| **Sale No. 2: 33 School Street** | Pairing No. 2A | | -0.30% | **2003** | | | -18.55% | |
| | Pairing No. 2B | | -19.41% | **2003** | | | 13.73% | |
| | Pairing No. 2C | | -14.05% | **2003** | | | 7.95% | |
| | | **Average** | **-11.25%** | | **Average** | | **1.06%** | |
| | | **Median** | **-14.05%** | | **Median** | | **7.95%** | |
| **Sale No. 3: 15 Gloria Street** | Pairing No. 3A | | -18.55% | **2010** | | | | |
| | Pairing No. 3B | | 13.73% | **2010** | | | | |
| | Pairing No. 3C | | 7.95% | **2010** | | | | |
| | | **Average** | **1.04%** | | | | | |
| | | **Median** | **7.95%** | | | | | |

277



### 15.14   JLL PCB Case Studies

*PCB Contamination Case Study No. 1:*                    **Former Raytheon Facility
                                                          Stamford, Connecticut**

**The PCB Contamination Situation**

A former Raytheon manufacturing facility in Stamford, Connecticut, has been redeveloped for a variety of uses.   The facility produced x-ray tubes and equipment until 1989, when it was abandoned, and contained contamination of various types, including fuel oil, other petroleum products, heavy metals, chlorinated solvents, and PCBs.   As part of the redevelopment, demolition of the existing improvements was undertaken, and the property was subdivided for resale to various potential users.  Some remediation was done prior to resale, including a total of $3.0 million in remediation on the three resale parcels described below:

*PCB Contamination Case Study No. 1A*

*Riverwood Condominium*
*Stamford, Connecticut*
*September 1995*

Approximately 2.55 acres sold in September of 1995 for $1,580,000 contingent on rezoning for residential development.  Remediation was completed on this portion of the property prior to resale.  Purchaser constructed 24 residential units which sold for prices between $190,000 and $237,000 over a one-year absorption period despite the prior contamination and the proximity of this site to adjacent unremediated portions of the former Raytheon plant.  Individual home buyers were able to obtain mortgage financing.

**Impact on Prices: Possible impact of between 0% and 5% on development site sold for residential construction; no impact on sale prices of homes adjacent built on the site and despite proximity to unremediated portion of source site.**

*PCB Contamination Case Study No. 1B*

*New York Sports Club*
*Stamford, Connecticut*
*December 1995*

Approximately 2.98 acres sold (including the old Raytheon industrial buildings containing 210,000 s.f.) in December of 1995 for $1,750,000.  Most of the former industrial facility was subsequently demolished, and a new skating and health club constructed.  Contamination on this portion of the property included chlorinated solvents, PCBs, heavy metals and petroleum products.  Heavily contaminated soils were removed from the site prior to sale.  However, not all of the remediation was completed prior to the resale.  Areas with remaining low levels of contamination were left unremediated but covered by concrete slabs or paving.  The Seller accepted responsibility for all remediation work.  The Buyer indicated that market value disregarding contamination was paid.  There was no delay in development due to the remediation.  Despite the previous (and remaining) contamination, an acquisition and construction loan in the amount of $3,500,000 was obtained from First Fidelity Bank at a variable interest rate at 1% over the bank's base lending rate.

**Impact on Prices: No impact on prices; no impact on mortgage financing**



<u>*PCB Contamination Case Study No. 1C*</u>

*Springdale Branch, U.S. Post Office*
*Stamford, Connecticut*
*Mid-1997 to 1998*

A 6.58-acre portion of the former Raytheon site was sold to the postal service after a government selection process that involved approximately 40 sites.  The purchase agreement was reached in mid-1997. The closing date was scheduled in December 1998. Although some remediation was done prior to sale (including removal of soils contaminated by metals, solvents and petroleum products, as well as removal of old asphalt paving used as fill), the post office design utilized the new building and paved areas as a cap on contaminated soils.  The remaining contamination on-site included low-levels of petroleum products, PCBs, and metals.  The postal service paid market value disregarding the contamination.  The Seller agreed to reimburse the postal service for any additional construction costs associated with the contamination.  Some minor delay was encountered by the postal service as a result of the additional design and planning time (approximately three to six months) necessary to analyze techniques for handling construction over contaminated areas.

**Impact on Prices: Low -- between 0% and 5% due to some additional construction costs and some design and planning delay.**



*PCB Contamination Case Study No. 2:*       **Kuhlman Electric**
**Crystal Springs, Mississippi**

**The PCB Contamination Situation**

The Kuhlman Electric Corporation facility in downtown Crystal Springs, Mississippi, is located on an irregularly-shaped site which occupies major portions of a block bounded by East Railroad Avenue and an active railroad corridor on the west; Fulgham Avenue on the north; Jackson Street on the east; and Lee Avenue on the south.

The site was occupied by the Kuhlman Electric transformer manufacturing facility reported to have begun operations in the 1950s. The improvements included a single story manufacturing structure; a single story office building located near the northeast corner of East Railroad Avenue and Lee Street; and various employee parking, truck parking, and outside storage areas located to the south, east, and north of the manufacturing building.

The property is generally level and at street grade. However, a drainage ditch extends from the northwest corner of the property, moving in a northwesterly direction through a nearby residential neighborhood toward Lake Chautauqua.

Since its construction in the 1950s, the Kuhlman facility in Crystal Springs had manufactured electrical transformers. Those transformers were filled with dielectric oils, and a small proportion of that oil contained polychlorinated biphenyls (PCBs). As few as 5% of the transformers manufactured by Kuhlman may have contained PCBs during the period of time when it was available to the industry. In the 1970s, the USEPA banned the manufacture of PCBs.

According to reports prepared by various environmental consultants, a number of practices at the Kuhlman facility may have led to the release of PCBs and other contaminants into the soils on the Kuhlman property and onto some neighboring or downstream properties as a result of drainage from the site. These included:

- Storage and dispensing of PCB-containing dielectric oils from a 3,000 gallon tanker truck placed on the north side of the site.

- Storage of old transformers, some with open tops, in the northeast quadrant of the site, exposed to rain.

- Drum storage on the east side of the plant.

- Spraying used transformer oil on unpaved parking areas on the Kuhlman property, as a means of suppressing dust.

- Storage and use of other process chemicals, used in plating and other manufacturing processes.

- A wood treating facility, owned by others, was reportedly once located on the northwest portion of the current Kuhlman property.

**JLL Staff Research and Investigation**

In Crystal Springs, JLL staff formerly part of Clarion Associates that merged into JLL in 2017, studied the impact on nearby residential property values from PCB contamination emanating from the Kuhlman Electric Corporation manufacturing facility.

The investigation and research work involved the following activities:



- Site visits to Crystal Springs between January and July of 2003.  During the site visits, the on-site remediation activity underway on the Kuhlman Electric Corporation site in Crystal Springs, Mississippi was inspected.

- Inspection of the neighborhoods surrounding the Kuhlman facility.

- Interior inspection of a number of individual residential properties in the surrounding neighborhood.

- Review of various technical reports and documents related to the Kuhlman Electric operation and environmental contamination, control, and remediation situation.

- Telephone conversations with Mr. Robert Martin, L.G. of Martin & Slagle, an environmental consultant working for Kuhlman Electric on the remediation.

- Review of local newspaper accounts concerning actual or alleged environmental contamination associated with the Kuhlman facility.

- Collection and analysis of information on population and economic conditions and trends in the Crystal Springs, Mississippi area.

- Collection and analysis of information on the Crystal Springs, Mississippi real estate market.

- Collection and analysis of information on the social and economic characteristics of various neighborhoods in the City of Crystal Springs, as that information related to real estate market comparability.

- Collection and analysis of sales of residential real estate in the market area between 1995 and July of 2003.

- Collection and analysis of both sales and rental information on residential rental properties.

- Review of appraisals of individual residential properties prepared by local appraisers, Mr. Hugh Hogue, MAI and Mr. Philip Thiac, SRA, both Mississippi state licensed real estate appraisers.

- Meetings and telephone conversations with the local appraisers.

- Inspection of comparable sales.

**Chronology of Events Related to the Environmental Situation**

From our research and review of documents, we assembled the following chronology of key events related to the Kuhlman Electric environmental situation.

**1950:**  Transformer manufacturing plant is constructed in Crystal Springs, Mississippi.

**1951:**  Kuhlman Electric Corporation (KEC) purchases the facility.  PCBs are used in the manufacturing process.

**Late 1950s – 1973:**  Area on the north side of the plant is used to park a 3,000 gallon tanker truck used to store and dispense a dielectric fluid into transformers.  Prior to using the tanker truck, transformers were filled from 55-gallon drums.  The fluid stored in the drums and the truck contains approximately 60% PCBs and 40% chlorinated benzenes.



**1973:**   The plant, like others in the electrical equipment industry, ceases to use PCBs when manufacturing of PCBs is banned nationwide.

**May 24, 1995:**   The Mississippi Department of Environmental Quality (MDEQ) produces a *Preliminary Assessment Report for the Kuhlman Electric Corporation facility in Crystal Springs, Mississippi*.   The report is produced under the authority of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and the Superfund Amendments and Reauthorization Actor of 1986 (SARA), because the facility is a large quantity generator of hazardous wastes.   The report defines the work product and the type of wastes being produced and the manner in which the waste is removed. The MDEQ concludes that no further action is warranted for the facility.

**August 25, 1999:**   A *Phase I Environmental Site Assessment* is completed to determine if any environmental conditions exist at the Kuhlman facility in Crystal Springs.    The assessment reveals no evidence of "recognized environmental conditions," as defined by the American Society for Testing and Materials.

**March 2000:**   Site grading operations for plant expansion uncover soils on the north side of the property with contamination.   Sampling results indicate the presence of PCBs, Aroclor 1268 along with various chlorinated benzenes.   Construction activities cease and construction equipment is left on-site for future decontamination.

**April 2000:**    Testing of additional soil samples detect Aroclor 1268 (PCBs). Representatives of current and past owners meet with the Mississippi Department of Environmental Quality (MDEQ) to discuss the testing results.   As a result of the testing and the meeting, the public first becomes aware of possible PCB contamination the Kuhlman facility.

**May 2000:**   KEC notifies MDEQ that, prior to the discovery of the contamination, some soils were removed from the KEC plant, that the location of the contaminated soil has been identified and the potentially contaminated soils are to be recovered and brought back to the Kuhlman site.

**May 3, 2000:**    During decontamination of earth-moving equipment, it is learned that employees had removed soil and gravel from the plant location to five off-site areas. Testing of the off-site soils that were removed is done between May 9, 2000 and May 18, 2000.   The soil is removed and sent back to the Kuhlman site.   Further testing reveals no further action is required at any of the five off premises sites.

**May-June 2000:**    Actions taken during the first assessment include placement of ultraviolet-resistant plastic sheeting over the 4.6 acres of the KEC site that was disturbed during construction activities and placement of silt fences around the periphery of the plastic cover.   Samples are taken from the KEC property, along a drainage channel, and along the shoreline at the headwaters of Chautauqua Lake.   Based on analytical results from the areas sampled, no off-site contamination is suspected.

**May-November 2000:**   Two site assessments are conducted on and around the KEC property. The purposes of the assessments are to determine the sources of PCBs contamination, the horizontal and vertical extent of soil contamination, and the potential for off-site migration of PCBs via stormwater runoff from the site and wind erosion of soils.

**Early June 2000:**   The Mayor of Crystal Springs is notified by the MDEQ that PCBs have been detected at the Lee Avenue swimming pool and along the drainage ditch under Fulgham Avenue, which eventually drains into Lake Chautauqua.   Completed tests show



that no contamination of the city's drinking water has been detected and further tests are to be conducted.  As a precaution, the city closes the Lee Avenue swimming pool.

**June 9, 2000:**   The MDEQ announces that the drinking water supply in Crystal Springs is safe for consumption.

**June 16, 2000:**   The MDEQ releases a press release announcing preliminary results from water and fish samples from Lake Chautauqua in Crystal Springs.  The results indicate no contamination in the lake water.   However, three of four fish samples contained measurable levels of PCBs.  The MDEQ advises that the consumption of fish from Lake Chautauqua be limited until more definitive results are available.  The press release also states that testing conducted at the City of Crystal Springs swimming pool had determined that there was no contamination in the water.

**June 21, 2000:**   The city conducts a public meeting with MDEQ and cleanup contractors for Kuhlman/BorgWarner.

**June 28, 2000:**   Further tests reveal no trace of PCBs in the city water supply or the Lee Avenue pool.  As a result, the pool is reopened.

**July 31, 2000:** A *Preliminary Site Characterization Report* is submitted to the MDEQ.

**August 2000:**   The second assessment, conducted in August and September 2000, involves the analysis of soil samples collected from 19 residential properties located immediately adjacent to the KEC plant.  The purpose of this assessment is to determine if PCBs are present on these properties, and to develop an analytical and regulatory basis for performing remediation of the contaminated soils.  Seven properties are found to have PCB concentrations in excess of 1 mg/kg, the limit set by the MDEQ.

**August 2000:**   Results from testing of ten residential properties near the Kuhlman plant are completed.  Of those tested, two sites will require some remediation according to preliminary test results.

**August 7, 2000:**   The environmental consultant for the City of Crystal Springs, delivers a letter to MDEQ outlining questions regarding further testing and remediation in the Crystal Springs area.

**August 8, 2000:**   The PRPs enter into an *Indemnification and Access Agreement*.  Within the agreement allowing independent contractors to access the Crystal Springs property for remediation efforts.

**August 23, 2000:**   Representatives from an environmental consultant on the remediation and MDEQ meet with residents on Jackson Street to give them results of sampling.

**September 21, 2000:**   MDEQ and the Department of Health hold a public meeting in Crystal Springs to provide information and to listen to the concerns of citizens.

**October 19, 2000:**  The City of Crystal Springs endorses a letter by the Mayor requesting a speed up of the remediation of PCB contamination in areas off-site of the KEC site, after a meeting with Martin & Slagle and city officials.

**October 19, 2000**   The Mississippi Department of Health holds private meetings to discuss health related concerns or questions regarding PCB contaminate exposure.

**November 2000:**   Additional sampling of nine residential properties located along the drainageway northwest of the Kuhlman plant is conducted.  The purpose of this portion of



the investigation is to determine if PCBs have been transported down the drainageway by stormwater and deposited on residential properties during flood events.  Six of the nine properties are found to have been impacted by PCBs.  The soil concentrations of PCBs detected range from less than 1 ppm to greater than 50 ppm.  The MDEQ default cleanup standard for PCBs in soil for unrestricted residential land use is 1.0 part per million (ppm) The results of the two assessments conducted from May through November 2000 indicate that the plant site is the primary source of PCB contamination on-site, on adjacent properties, and on properties along the drainageway.

**November 2, 2000:**   A *Preliminary Site Characterization Report* is submitted to the U.S. Environmental Protection Agency.

 **November 16, 2000:**   An environmental consultant for nearby property owners in litigation claiming property damage submits a report entitled *Environmental Testing of Private Residences*.

**December 20 -- 23, 2000:**   Environmental consultants for nearby property owners conduct field sampling of surface soil, subsurface soil and groundwater.

**January 12, 2001:**   Environmental consultants for the PRPs submit a package to MDEQ that includes analytical results and maps and a draft *Plan of Action* for remediation of properties located along the drainage way down-gradient of the Kuhlman plant.

**January 17, 2001:**   At a monthly meeting held by the MDEQ in which officials share information concerning the cleanup of PCB contamination, it is noted that twelve residential lots on McPherson Street have been tested for PCB contamination and six of these have levels high enough to require mediation.

**January 23 -- 25, 2001:**   Environmental consultants for the plaintiffs in the property damage litigation conduct field sampling of surface soil, subsurface soil and groundwater.

**February 14, 2001:**   Environmental consultants for the plaintiffs in the property damage litigation submit a report entitled *Phase II Summary Report*.  The report summarizes site characterization activities conducted during December 20-23, 2000 and January 23-25, 2001 testing at areas surrounding the Kuhlman Electric facility in Crystal Springs, Mississippi.  The Phase II report includes the collection of surface soil, subsurface soil, and groundwater samples at 11 addresses, assessing the nature and extent of soil and groundwater contamination.

**May 2001:**   A number of residents file a lawsuit in the Copiah County Circuit Court alleging a health impact from the PCB situation. The lawsuit also names MDEQ as a co-defendant, claiming the agency was negligent in failing to discover the problem and expedite the cleanup.

**Late May 2001:** The City of Crystal Springs publicly announces that they may join the lawsuit against Kuhlman because of dissatisfaction with the cleanup efforts.

**July 31, 2001:**  Environmental consultants submit a *Drainage Channel PCB Assessment Work Plan* to the Mississippi Department of Environmental Quality (MDEQ).  The purpose of the Work Plan is to provide a description of assessment activities to be performed to determine the potential impact to soil of PCBs on properties along the drainage channel.

**November 2001 -- November 2002:**   Additional soil and groundwater sampling is done along and adjacent to the drainage canal extending from the north property boundary of the KEC plant to the culvert under US Highway 51 that discharges into the headwater of



Lake Chautauqua.  Samples are taken from 24 individual properties located along and within the drainage channel.

**July 23, 2002:**   Kuhlman Electric Corporation (KEC) is issued an order to remediate contaminated properties via Mississippi Commission on Environmental Quality Order No. 4449-02.

**September 25, 2002:**   Environmental consultants submit a *Groundwater Assessment Plan* to MDEQ.   The work plan describes the processes and procedures to be implemented to determine if regulated substances have impacted groundwater beneath the KEC plant site, and to determine the nature and extent of the impacted groundwater. The assessment is slated to include soil samples conducted over approximately 12 acres of open and paved land on the Kuhlman property.

**April 2003:**   Environmental consultants complete a *Remediation Work Plan* for the north drainage channel under the direction of the MDEQ and the U.S. EPA in response to Mississippi Commission on Environmental Quality Order No. 4449-02 issued on July 23, 2002.   The remediation work plan addresses those properties identified to have PCB concentrations in the soil at levels above 1.0 part-per-million.   The properties to be remediated, adjacent to and within the drainage channel total approximately 10.5 acres in size.   Specific properties that are included in the pending litigation include: 311 W. Railroad, 111 McPherson, 107 Forrest and 108 Tucker.  Work is projected to begin July 1, 2003.

**April 3, 2003:**   Environmental consultants to the property owners in the litigation submit a report titled *Summary Report of the Presence of Dioxins/Furans on KEC Plant Site and Off-Site Residential and Public Areas*.  The report includes the tests at the Kuhlman Plant and on off-site residents.

**April 4, 2003:**   Environmental consultants to the property owners in the litigation submit a report titled *Environmental Site Assessment – The Fate and Transport of PCBs from the KEC Plant Site to Off-Site* to David Nutt & Associates.  The report includes: sampling of surface soil, sediment, subsurface soil, groundwater, and indoor dust.

**May 16, 2003:**   A supplemental report is submitted by environmental consultants to the plaintiffs to supplement, supersede, and /or add to other reports previously prepared in conjunction with the PCB litigation for Crystal Springs, Mississippi.

As of the date of the completion of the JLL/Clarion case study analysis in July of 2003, the environmental situation was as follows:

- *Ground Water Contamination*:  There was no reported contamination of the ground water under the Kuhlman property, or under nearby properties that could be attributed to the Kuhlman operation.  The nearby residential properties and properties on the drainage ditch were served by public water systems, rather than individual wells.

- *Soil Contamination*:  Contaminated soil on the Kuhlman Electric property had been, or was being removed/remediated, in a manner consistent with MDEQ requirements and standards. Thus the potential for recontamination from sources on the site was eliminated.  Sampling of soil on various other residential and non-residential properties along the drainage ditch had been completed.  This sampling showed that some adjacent properties and properties along the drainage ditch had been contaminated in selected areas by PCBs attributable to the Kuhlman facility.  The off-site same sampling program indicated contamination in the soils in



the ditch.

- *Airborne Contaminants*:  Although dust sampling had been conducted by the parties, there was no general impression of widespread PCB contamination in excess of standards from airborne dust from the Kuhlman site.

- *Waterborne Contaminants*:  Although PCB contamination had apparently been carried off the Kuhlman site by water flows through the ditch, there were no reports of persistent contamination of the water.  Removal of the source of contamination in the soil on the Kuhlman site and in the ditch was expected to prevent future dispersion of contamination off-site via water runoff.

- *Drainage Ditch and Off-Site PCB Remediation Program*:  A remediation program had been developed, which would entail removal and disposal of soils contaminated with PCBs in excess of MDEQ standards of 1mg/kg.  These soils would be replaced with clean soils. Work would proceed down the drainage ditch in a south to north/northwest direction. Adjacent properties with contamination would be remediated in conjunction with the ditch remediation.  MDEQ approved this plan in April 2003.  The ditch remediation program was expected to start later in 2003 and completion of all work was expected within 18 to 24 months from initiation.

**Results of the JLL/Clarion Market Investigation and Analysis**

***General Development Trends***:  The City of Crystal Springs with a population of about 6,000 is located in southwestern Mississippi, approximately twenty miles south of Jackson, the state capitol.  Crystal Springs has been an important agricultural center, particularly know for the production of tomatoes and other market commodities.  Crystal Springs has also been an historical center of gravel quarrying.   The Illinois Central Railroad connected Crystal Springs to markets between New Orleans and Chicago and beyond.

Kuhlman Electric was the most significant modern industrial business in the community and is located just north of downtown Crystal Springs.

As of the date of the research in 2003, Crystal Springs retained the basic features of a small, full-service city.  It was beginning, however, to serve as a residential alternative to people in the southern portions of the moderately expanding Jackson metropolitan area, located 15 to 20 miles to the north.

***Neighborhoods in Proximity to Kuhlman Electric***:   There were numerous single-family residences in the blocks surrounding the Kuhlman Electric Corporation facility.  Some on west side of North Jackson Street and the north side of Lee Avenue back up to the Kuhlman property.

Additional residential development was located on the south side of Lee (between Kuhlman and the heart of the CBD to the south); on the west side of the railroad corridor; and extending west, northwest, and southwest in a more or less continuous pattern to the city limits.  Most of this residential development appeared to have occurred as either smaller-scaled residential subdivisions or individual home projects.  Continuing this development pattern – and evidence of the continuing interest in residential opportunities in the heart of Crystal Springs -- two new homes were under construction within a block or two of the Kuhlman property at the time of the final inspections in July, 2003.  There were also houses in the vicinity that appeared to be well over a century old, perhaps even Antebellum.

The typical structure in the central area of Crystal Springs, whether built in the 1890s or the 1990s,



was relatively small in size, with economical wood-frame construction, sometimes with a brick veneer, but rarely with significant architectural detailing. Lot sizes were generally small, particularly in older areas to the east, south, and southwest. There were, however, exceptions, and some larger residential sites were found along streets such as West Railroad and McPherson to the northwest.

Scattered throughout the neighborhoods of Crystal Springs were various smaller-scaled commercial and retail properties supporting residential uses. Most of these uses were located in older buildings.

***Publicity and News Media Coverage***: Since about April 2000, PCB contamination on the Kuhlman property and the potential for off-site contamination had been publicly debated and reported in local news media as indicated by the chronology of events summarized earlier in this case study.

***Market Research***: Sales of single-family residential properties in Crystal Springs that occurred between 1995 and 2003 were investigated. Sales data in Crystal Springs that occurred both before and after the discovery of PCB contamination at the Kuhlman site in early 2000 was collected and analyzed. MLS information from 1997 to early 2003 was downloaded from the electronic system. MLS information on completed sales prior to 1997 was not included in the electronic service but was copied from printed books obtained from a local appraiser. The residential transaction data from these various sources was compiled into a single database, reconciling field names and removing duplications where necessary.

The resulting database of single-family residential transactions included approximately 197 sales in the general Crystal Springs area, and approximately 148 sales within the City limits during the more than eight-year period between 1995 and early 2003. Since there were sufficient sales in Crystal Springs on which to base an analysis, it was determined that it was unnecessary to extend the collection process to other nearby market areas, such as Hazlehurst, the nearest city to the south of Crystal Springs.

After eliminating duplicate records, Geographic Information System (GIS) software was used to "geo-code" the transactions that had occurred in and around the City of Crystal Springs.[289]

With each transaction located geographically, it became possible to group, sort, and analyze the residential market data by geographic area. Both a potentially impacted area (the "Subject Area") and an unimpacted area (the "Control Area") were identified.[290] Sales were also grouped according to distance from the perimeter of the Kuhlman Electric property.

Of the 148 sales identified in the City of Crystal Springs between 1995 and early 1993, 66 occurred in the Subject Area and 82 occurred in the Control Area. The number of sales in the Subject Area by comparison to the Control Area was particularly noteworthy since a review of housing statistics showed that there were more than three times as many housing units in the combined Control Area census block groups as there were in the Subject Area.

---

[289] The software was ArcView, an industry standard program developed by Environmental Systems Research Institute, Inc. Geo-coding is a process through which the computer matches the address of each sale property with a point on an electronic map. The map used was the TIGER file map for Copiah County, obtained from the U.S. Bureau of the Census. This is the same technology the Census Bureau uses in its own compilation of census data.

[290] The potentially affected area had been selected by plaintiffs in litigation seeking property impact damages. A review of the boundaries of the district indicated that it was an appropriate area to utilize for purposes of analysis of sales compared to a control area. As a control area, both the rest of Crystal Springs as well as an area within 3,000 feet of the Kuhlman plant were analyzed.



Sales identified within the City limits of Crystal Springs are shown on the map below. This map also indicates the location of the Kuhlman Electric property relative to these sales, as well as the eastern and western parts of the Subject Area. The western part of the potentially affected Subject Area contained the drainage ditch with the PCB contamination.



JLL/Clarion staff reviewed and analyzed the pool of sales in Crystal Springs between 1995 and 2003, comparing and contrasting trends in the volume of sales, price per square foot of building area, time on the market, and other factors.

In addition, the variations between the two sets of sales do not appear to have been modified by the disclosures in 2000 of the environmental situation at Kuhlman Electric Corporation. There was an active market for residential properties throughout central and northwest Crystal Springs before April 2000, and that activity has continued, regardless of proximity to the Kuhlman facility.

*Results of the Market Research*: From these analyses it was apparent that sales of properties relatively closer to the facility had followed patterns of price and marketability that were comparable to those for areas not in proximity.[291] There was no change in areawide Subject Area marketability or price indicators.

Specific analysis was applied to the 13 off-site residential properties that were being remediated

---

[291] One of the analyses compared prices paid for properties within 3,000 feet of the Kuhlman facility to prices paid for those greater than 3,000 feet from the facility.



or involved claims of PCB contamination impacts.

Lot sizes of those 13 single-family homes ranged from 5,000 square feet to 153,331 square feet and they contained between 792 square feet and 2,691 square feet. All of the houses were of wood-frame construction, and a few had a full or partial brick veneer. Condition was highly variable, from a relatively new structure in good condition, to several older structures of marginal construction quality and very poor condition.

On-site inspections, review of MDEQ file documents, and review of reports prepared by technical and appraisal consultants indicated that, as of the date of completion of field investigation, six of the 13 properties contained PCB contamination in soils on their lots at specific, identified locations that would require remediation. The PRPs had announced a commitment to remove those contaminated soils and replace them with clean soils at no expense to the property owner, and the Mississippi Department of Environmental Quality (MDEQ) had reportedly approved this remediation plan, but the work had not yet been initiated as of the date of the JLL/Clarion investigation.

Pending completion of remediation, the owners or occupants of those six properties would suffer some temporary loss of use and impairment of marketability. The amount of the loss of use and marketability depended upon the percentage of the lot area of each property that had to be remediated, the length of the delay until the date of completion of remediation, and the number of days or weeks that crews would be on-site undertaking the remediation. The estimated impact of those temporary losses as a percentage of the market value of each property was as follows:

| Properties | Temporary Impact |
|---|---|
| 501 Camp Street | 9.5% |
| 107 Forrest Street | 28.3% |
| 403 Jackson | 2.1% |
| 111 McPherson Street | 25.5% |
| 311 W. Railroad Ave. N. | 5.0% |
| 106 & 108 Tucker Street | 16.7% |

The remaining properties either never had on-site PCB contamination requiring cleanup; or had already been cleaned up by the party responsible for the Kuhlman cleanup.

**Conclusion from the Crystal Springs, Mississippi Case Study**

There was no impact on residential market prices and values in the surrounding area attributable to the Kuhlman Electric environmental situation. Prices and marketing trends for properties within an allegedly affected area in close proximity to the Kuhlman facility were comparable to those in a control area.

However, a few properties with documented PCB contamination had not yet been remediated. During the scheduled on-site remediation, the owners would suffer some loss of use and delayed ability to sell their properties. The amount of that temporary impact ranged between -2.1% and -.3% of the market value of the six properties affected.



*PCB Contamination Case Study No. 3:*                    **Big Spring Creek**
                                                          **Lewistown, Montana**

## The PCB Contamination Situation

During the 1960s and early 1970s, the Montana Fish, Wildlife & Parks Department (FWP) painted the raceways at the Big Springs Trout Hatchery near Lewistown, Montana. The hatchery is the largest in Montana and was producing about 2.0 to 3.0 million fingerlings each year.

In 1981, polychlorinated biphenyls (PCBs) (in the form of Aroclor 1254) were found in two wild trout caught north (downstream) of Lewistown. The PCB concentrations were at only 0.07 and 0.08 ppm, relatively low levels well below the FDA's action level of 3.0 ppm. According to an article in the *Great Falls Tribune* (4/18/04), "Scientists were beginning to find PCBs at low levels in fisheries across the state, and the discovery didn't prompt much action."

In 1986 and 1992, further testing by FWP around the state continued to find "Aroclor 1254, the type of PCB in Big Spring Creek, in all fish sampled. However, the levels were well below 3 parts per million, the federal Food and Drug Administration's action level for PCBs in fish." (*Great Falls Tribune*, 4/18/04)

On April 12, 1987, the *Lewistown News-Argus* reported on the results of the 1986 testing that found PCBs in Big Spring Creek. It reported that the levels found were up to 0.5 ppm and the federal FDA action level is 2.0 ppm. The story noted that "According to the Montana Department of Fish, Wildlife and Parks, trace amounts of PCBs similar to those found in Big Spring trout have been found in fish from a number of Montana water sources including the Missouri River near Carter Ferry, Clark Fork near Plains, Boulder River near Boulder and Flathead Lake." The *Great Falls Tribune* reported a similar story on April 14, 1987. Both stories reported that the source of the PCBs was unknown.

During 1993 and 1994, the State Department of Health and Environmental Sciences internally discussed drafts of a fish consumption advisory plan related to fisheries with either PCBs or methylmercury. In addition to Big Spring Creek, the other PCB affected areas mentioned in the draft advisory included the Clark Fork River near Plains, Flathead Lake, the Flathead River near Creston, the Marias River below Timber Dam, Bighorn Lake near Hardin, the Boulder River near Great Falls, the Missouri River below Canyon Ferry, and the Yellowstone River near Sidney. The advisory stated that it "is not intended to discourage anglers from eating their catch and we believe should not be cause for undue alarm."

In May of 1994, the FWP issued a report to the U.S. EPA on contaminants found in Montana fisheries. It reported that "of the twenty-two waterbodies sampled, none had detectable levels of PCB's in sediments. . . Only walleye from Holter Lake, rainbow trout from Big Spring Creek and Seeley Lake, and lake trout from Flathead Lake had detectable concentrations of PCB's in muscle tissue." This report was not released to the public until January of 1995.

In 1995, the FWP and Montana Department of Health and Hunan Services issued a Fish Consumption Advisory for Big Spring Creek. A table in the advisory showed that testing of fish in Big Spring Creek had found PCB levels between 0.07 ppm and 0.24 ppm. Anglers were advised to eat no more than one fish per month.

In 1996, Montana issued a fish advisory to the public. Again, Big Spring Creek was listed.

In 1997, sediment testing was conducted by Lewistown residents in conjunction with the Montana Bureau of Mines at 13 sites in the Brewery Flats area of Big Spring Creek just above Lewistown. This was the site of a former railroad roundhouse, refinery, brewery, and feedlot. Four of the samples tested positive for PCBs at levels ranging from 0.0193 to 0.052 ppm, below the EPA's



0.189 ppm level at which plants and animals might have "probable effects."  Arsenic, lead and other contaminants were also found on the site.  The results of this testing prompted further testing by the state.  The results of this testing effort were reported in the local press.

In 1998, Montana DEQ in conjunction with the U.S. EPA tested sediments along 2900 feet of Big Spring Creek at Brewery Flats and also found evidence of PCB contamination as well as many other contaminants.  Test results were between 0.0025 ppm and 0.221 ppm.  The testing was reported in the local press.

Following the 1997 and 1998 testing, state officials began efforts to find the source of the PCB contamination.  Initially, Brewery Flats itself was considered the prime candidate.  However, EPA testing of Brewery Flats for a variety of contaminants in the Spring of 2000 reportedly found no evidence of PCBs in the soils of the former industrial site itself, indicating that the source of the PCB contamination in the creek bed and fish must be elsewhere.  These efforts were reported in the local press.

In 2000, Montana issued a fish advisory to the public.  Again, Big Spring Creek was listed due to PCBs.

In May and June of 2000, the U.S. EPA did additional testing of soils, groundwater, surface water, and sediments at the former roundhouse area of Brewery Flats, the area suspected of being the source of the PCBs.  However, all testing for Aroclor 1254 was negative, effectively ruling out the roundhouse as the source.

In 2001, Montana issued a fish advisory to the public.  Again, Big Spring Creek was listed due to PCBs.

In 2002, Montana issued a fish advisory to the public.  Again, Big Spring Creek was listed due to PCBs.

In April of 2003, additional sampling of Big Spring Creek sediments was done upstream from Brewery Flats to a point just above the state fish hatchery.  Six sampling sites showed concentrations of Aroclor 1254 resulting in a focus on the hatchery itself as a possible source for the PCBs.

In August of 2003, paint used in the raceways at the hatchery tested positive for Aroclor 1254.  One type of paint used at the hatchery was found to contain PCBs in concentrations of 86,500 ppm while another paint tested at 674 ppm.  The paints used in the 1960s on the raceways at the hatchery to control algae growth had PCBs as an additive.  In repainting the raceways over the years, the old paint would be scraped before repainting.  The PCB contaminated paint chips worked their way downstream from the hatchery and settled in the creek sediments.

Also in August of 2003, DFW began new procedures at the hatchery to assure that scrubbing and repainting did not result in additional paint chips leaving the site.

In September of 2003, various state agencies began to discuss a remediation plan and program for removal of the PCBs at the fish hatchery.

In October of 2003, tests of brown trout in the creek showed PCBs at concentrations of 21.9 ppm, the highest levels yet recorded on Big Spring Creek.

In December of 2003, the State of Montana issued a catch-and-release order for approximately seven miles of Big Spring Creek from the hatchery north (downstream) to the U.S. Highway 191 bridge just north of Lewistown. The catch and release order and consumption advisories were posted at fishing access sites on Big Spring Creek.  The catch-and-release order was widely



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

reported in the local press.  According to the Great Falls Tribune (4/18/04), "all the fish tested from Big Spring Creek still were below the state's do-not-eat limit for PCBs of 0.47 ppm, which is six times more conservative than the EPA's guideline of 3 ppm."  Downstream from the Highway 191 bridge, testing of fish had indicated PCB levels either just above or just below the state limit.  The advisory for this section of the creek, therefore, warned against eating more than one fish per month.  According to a story in the *News-Argus* on December 11, 2003, an FWP fisheries biologist indicated that "fish in the creek do not frequently migrate downstream so it is though PCB-contaminated fish are not being caught below the Ash Street Bridge."

In March of 2004, an advisory committee consisting of state and local government officials, landowners, and fishing representatives was formed to assist FWP in selecting a cleanup program for Big Spring Creek.

In April of 2004, a remediation plan for the fish hatchery spillways prepared by Olympus Technical Services, Inc. was submitted to Montana Fish, Wildlife & Parks.  The plan recommended removal of the old paint, sand blasting, and sealing of the surfaces to prevent further leaching of PCBs that had penetrated the concrete.

On May 15, 2004, the *Great Falls Tribune* reported on plans to remediate the source of the PCBs at the hatchery.  The story indicated that "Lewistown's water is not contaminated" since the city taps into the underground spring "well above the hatchery."  The story also indicated that the EPA had favorably approved the plan to encapsulate the PCBs that remained in the raceway walls, and said officials expected the remediation to cost between $250,000 and $500,000 and be completed by the end of the year.

In June of 2004, the *Great Falls Tribune* reported that a study had found that tubing in Big Springs Creek, a popular Lewistown summer activity, was safe.

In July of 2004, Plaintiffs in the *Paulson, et al. v. Monsanto, et al.* litigation filed a motion for class action certification related to 325 properties claimed to be located on Big Spring Creek in an area both above, below, and in the City of Lewistown. The approximately 325 properties were of various types, including undeveloped agricultural land, agricultural land with improvements, unimproved homesites of various sizes, single-family homes, and mobile homes.

In June of 2005, a District Court order certified the class as follows: "All real property owners and all persons who reside on real property that abuts Big Spring Creek downstream from the lower fish hatchery raceways of the fish hatchery owned by Montana Fish, Wildlife & Parks to the place where Big Spring Creek flows into the Judith River, a distance of approximately thirty-two (32) miles, excluding commercial properties."

In August of 2005, the DEQ approved the City of Lewistown voluntary cleanup plan for Brewery Flats.  This included stream relocation and restoration.

In January 2006, the Brewery Flats stream relocation and restoration project was finished.  Brewery Flats continued to be classified as "cleanup underway" under the Montana voluntary cleanup program.

### The Lewistown and Fergus County Market Area

***Fergus County*:**  Fergus County is located in central Montana.  It was established in 1885 and named for James Fergus, a pioneer, miner, cattleman and territorial legislator.  Lewistown is the largest city in the county and is the county seat.  Fergus County is the state's 15th most populous county with approximately 11,600 residents in 2005-2006.  Its land area of 4,339 square miles represents 3.0 percent of the state's total.  Its population in 2005 was estimated at 1.23 percent



of the state's which was down from 1.32 percent at the time of the 2000 national census.  Montana had shown steady population growth since 1930 but Fergus County's population had been stable-to-modest decline for over 50 years.  That was a reflection of its reliance on agriculture which had become more mechanized and less people-intensive.



Agriculture remained the heart of the county's economy in the early 2000s and Fergus County had 830 farms and ranches in 2002.  It ranked third in the state for number of beef cattle farms and ranches and eighth in the state for the number of total farms and ranches.  In 2002 the county ranked first in Montana and ninth out of 3,059 counties in the nation for acres used for hay, haylage, grass silage and greenchop.  With an inventory of 96,825 cattle and calves in 2002, Fergus County ranked third largest in the state and 142nd in the nation.  In 1999 43 percent of basic industry employment in the county was in agriculture and related industries.  The second largest category of employment in the county was in various governmental jobs.  State and local government accounted for 20.2 percent of employment in the county with federal government employment accounting for an additional 4.1 percent.  Health care followed as the next most significant sector, accounting for 15.5 percent of employment in the county.

According to the US Census Bureau, median income for Fergus County households in 2002 was $31,097 compared to the state median of $34,105.  Regional trade centers nearby included Billings (115 miles south) and Great Falls (105 miles west).  Retail sales in the county totaled $102.4 million in 2002 or 1.01 percent of state sales.  That share was significantly below the county's 1.23 percent of the state population.  A portion of this difference was the result of lower family incomes in Fergus County vs. the state.  Another reason was "leakage" of sales to larger regional trade centers such as Billings and Great Falls that offered broader variety and selections of goods and services.

***Lewistown:*** Lewistown is the county seat and the largest city in Fergus County.  The population of the city and surrounding area was approximately 6,100 in 2005-2006 which accounted for over half of the total county population.  Its retail, banking, business and governmental support functions served as the largest economic draw in the county.  Lewistown contained the county's only new-car dealerships, golf courses and movie theaters.  Lewistown Municipal Airport offered facilities for general aviation plus twice-daily commuter flights on Big Sky Airlines to Billings and Havre. Central Montana Medical Center in Lewistown was the county's only acute care hospital.



It provided a 47-bed acute care hospital with intensive care and cardiac care units, a 24-hour emergency room service plus an 85-bed skilled nursing center.

Unemployment rates in Fergus County had generally been slightly higher than the state's average for over a decade as illustrated on the graph below.



The housing stock of Lewistown ranged from modern newly constructed homes in the suburbs to a number almost a century old in the city center. City water and sewer systems were available to city homes while those in outlying areas typically relied on private wells and septic systems. The local homeownership rate in 2000 was 73.5 percent, above the state's rate of 69.5 percent. Local schools enrolled approximately 1,500 students. Fergus High School was the largest with enrollment of almost 500.

### Big Spring Creek and Area Fishing and Recreation

Big Spring Creek is the source of the city's municipal water supply. Near its headwaters the Big Springs Trout Hatchery is operated by Montana Fish, Wildlife & Parks. The hatchery annually stocks about 2 million trout and kakanee salmon. It accounts for about half of the total weight of the state's cold water fish-stocking regimen, with the state's other eight hatcheries responsible for the remainder.

The following map shows the location of Big Spring Creek both above and below Lewistown.





Recreation was and is an important part of the daily life of residents. Fishing in the area's numerous creeks and lakes offers a variety of fishing, including trout, bass, pike and other types. Hiking and camping are common in nearby mountains including the Little Belts, Judiths, and Snowies. Hunting in Central Montana also offers variety. Deer, antelope, elk, pheasant, grouse and other species are typically hunted. In Lewistown, the city operated baseball and softball programs and had a number of tennis courts. The Lewistown City Pool offered an Olympic size pool with two water slides and was open in the summer months. Two public golf courses in Lewistown offered 27 holes of competition.

**Scope of JLL/Clarion Staff Investigation**

Staff of JLL at their previous firm, Clarion Associates, that merged into JLL in 2017 undertook research related to the Big Spring Creek PCB situation.

Their research activities were conducted in the first half of 2006 and included the following:

- Review of documents and data produced by Plaintiffs and Defendants in the class action litigation;

- Review of environmental reports, newspaper stories, and other information concerning environmental conditions associated with the PCB contamination situation in Big Spring Creek, including information from the Montana Department of Public Health and Human Services, the Montana Department of Health, the Montana Department of Environmental Quality, the Montana Department of Fish, Wildlife and Parks (FWP), and the City of Lewistown and reports prepared by various technical consultants to both Plaintiffs and Defendants;

- Exterior inspection of properties along Big Spring Creek and in the surrounding area including other creeks and areas in Fergus County and Lewistown;



- Consideration and analysis of development trends and neighborhood trends in Lewistown and Fergus County;

- Review of 2000 census data and other demographic information related to Fergus County, Lewistown, and Montana;

- Review and analysis of sales data compiled from the files of the Greater Montana Land Company from data provided by various brokers in Lewistown;

- Review and analysis of data from the Fergus County Clerk & Recorder's Office and the Fergus County office of the Montana Department of Revenue;

- Conversations with Mr. Joe Irish, a broker/owner of the Greater Montana Land Company concerning the real estate market, market trends, and individual sales in Fergus County;

- Conversations with Mr. William A. Ferro, MAI, and Mr. Darwin R. Ernst, both licensed real estate appraisers in Montana, and review of market data provided by them.

## Critical Dates in the Analysis of Possible Real Estate Impairment Damages along Big Spring Creek

At the date of the JLL/Clarion staff research into the PCB contamination situation, the presence of PCBs in fish in Big Spring Creek had been generally known for about 25 years. PCBs had been found in fish in Big Spring Creek and other lakes and streams in Montana as early as 1981. Additional testing in 1986 also found PCBs in fish in Big Spring Creek and elsewhere in Montana, and this was reported in both the Lewistown and Great Falls newspapers in April of 1987.

Fish consumption advisories issued by the State of Montana between 1995 and 2002 listed Big Spring Creek due to the presence of PCBs. Therefore, information about the PCB problem in Big Spring Creek had been generally available to the marketplace for many years prior to 2003.

However, testing in 2003 traced the source of the contamination to the hatchery, and in December of 2003, a "catch and release only" order for Upper Big Spring Creek was issued by the State of Montana. Starting in the fall of 2003, and continuing through 2004, there was heightened publicity about the PCB situation and the catch and release regulation for Upper Big Spring Creek.

Therefore, JLL/Clarion staff researched the Fergus County and Lewistown real estate market before and after December of 2003 in order to see if the heightened publicity about the PCB situation and catch and release order for Upper Big Spring Creek had any effect on the marketplace.

## Analytical Methods Used

The JLL/Clarion analysis included the following:

- Analysis of price trends along Big Spring Creek compared to price trends for properties not on the creek – this included years both "before" and "after" the announcement of the catch and release regulation in December of 2003;

- Analysis of prices paid for individual properties along Big Spring Creek compared to prices paid for properties not on Big Spring Creek – this included years both "before" and "after" the announcement in December of 2003;



- Analysis of sale/resale of properties along Big Spring Creek compared to sale/resale of properties not on Big Spring Creek -- this included years both "before" and "after" the December 2003 announcement;

- Analysis of marketing time (days on the market) trends for properties on the creek compared to marketing times for properties not on the creek -- this included years both "before" and "after" the December 2003 announcement; and

- Analysis of sale-to-list price ratios for properties on the creek compared to sale-to-list price ratios for properties not on the creek -- this included years both "before" and "after" the December 2003 announcement.

**Analysis of Sale/Resale Trends Along Big Spring Creek Compared to Fergus County and Lewistown**

Given the limited number of sales along Big Spring Creek both before as well as after 2003, JLL/Clarion staff undertook a paired sales analysis using both primary pairings and secondary pairings.[292]

***Primary Pairing -- Sale/Resale Analysis No. 1***: JLL/Clarion staff research found the following sale and resale of the same undeveloped property on Big Spring Creek:

*Sale/Resale No. 1:  Lots 66-68, Spring Creek Tracts*

| | |
|---|---|
| Type of Property: | Vacant Land |
| Land Area: | 33.7 Acres |
| Date of First Sale: | 11/97 |
| Price: | $80,000 |
| Price per Acre: | $2,374 |
| | |
| Date of Second Sale: | 5/04 |
| Price: | $113,500 |
| Price per Acre: | $3,368 |
| | |
| Interval: | 6.5 years |
| Annual Appreciation: | 5.53% |

The indicated appreciation rate can be compared to the rate of appreciation for land transactions in general in Fergus County between 1997 and 2004, disregarding the Spring Creek Tracts sale/resale.

| | |
|---|---|
| Type of Property: | Vacant Land |
| Date of First Sales: | 1997 |
| Number of Sales: | 9 |
| Average Land Area: | 223.0 Acres |
| Average Price: | $2,132 |

---

[292] A primary pairing involves a sale and resale of the same property.  Secondary pairings involve a comparison of sale prices of similar properties that have sold on or about the same data and for which adjustments for differences between the properties are either minimal or can be made.



Date of Second Sales: 2004
Number of Sales:     18
Average Land Area:   76.8 acres
Average Price:       $3,381

Interval:            7 years
Annual Appreciation: 6.81%

The 6.81% annual average rate of increase is higher than the 5.53% annual rate of increase indicated by the sale/resale of the 33.7 acres in the Spring Creek Tracts.

However, as indicated above the average land transaction size in 2004 was only 76.8 acres, which significantly skewed the average price higher in 2004. When only sales comparable in size to the 33.7-acre sale/resale parcel are considered, the following comparison between 1997 and 2004 land prices can be made.

Type of Property:    Vacant Land – 20 acres to 60.4 acres in size
Date of First Sales: 1997
Number of Sales:     5
Average Land Area:   31.5 Acres
Average Price:       $1,596

Date of Second Sales: 2004
Number of Sales:     5
Average Land Area:   40.4 acres
Average Price:       $2,217

Interval:            7 years
Annual Appreciation: 4.81%

When land parcels comparable in size to the Spring Creek Tracts sale/resale property are analyzed, the annual average rate of appreciation for the county as a whole is only 4.81% compared to 5.53% for the sale/resale parcel on Spring Creek. That indicates that Spring Creek land was appreciating at a slightly faster rate than comparably sized vacant land in the country as a whole between 1997 and 2004.

The appreciation rate on the 33.7 acres in Spring Creek Tracts was also compared to the following sale/resale of another vacant land parcel over approximately the same time period:

Sale/Resale Location:  Casino Creek Road

Type of Property:    Vacant Residential (40 Acres)
Date of First Sale:  7/96
Price:               $100,000
Price per acre:      $2,500

Date of Second Sale: 5/05
Price:               $165,000
Price per acre:      $4,125

Interval:            8.83 years

JLL

Annual Appreciation:  5.84%

***Primary Pairing -- Sale/Resale Analysis No. 2***: The following sale/resale is of an improved property on Big Spring Creek:

*Sale/Resale No. 2:  1107 3rd Avenue South*

| | |
|---|---|
| Type of Property: | Single-Family Residential |
| Date of First Sale: | 7/98 |
| Price: | $35,000 |
| Price per s.f: | $46.79 |

| | |
|---|---|
| Date of Second Sale: | 6/06 |
| Price: | $49,000 |
| Price per s.f.: | $65.51 |

| | |
|---|---|
| Interval: | 7.9 years |
| Annual Appreciation: | 4.34% |

For the 1107 3rd Avenue South property (Sale/Resale No. 2), the indicated appreciation rate can be compared to the rate of appreciation between 1998 and 2006 for single-family homes in the same neighborhood in which the 1107 3rd Avenue South property is located,[293] as shown below.

| | |
|---|---|
| Type of Property: | Single-Family Residential |
| Date of First Sales: | 1998 |
| Number of Sales: | 85 |
| Average Price per s.f.: | $50.35 |

| | |
|---|---|
| Date of Second Sales: | 2006 |
| Number of Sales: | 26 |
| Average Price per s.f.: | $69.83 |

| | |
|---|---|
| Interval: | 8 years |
| Annual Appreciation: | 4.19% |

The 4.34% annual average rate of increase for the 1107 3rd Avenue South property is slightly higher than the 4.19% annual rate of increase between 1998 and 2006 for all houses in the neighborhood.

The sale/resale of the 1107 3rd Avenue South property was also compared to five other sale/resales in the neighborhood that occurred during approximately the same period of time. Those five sale/resale pairings were as follows:

| Address: | 612 W. Brassey | 411 5th Avenue South |
|---|---|---|
| Type of Property: | Single-Family Residential | Single-Family Residential |
| Date of First Sale: | 7/98 | 7/98 |
| Price: | $80,000 | $59,000 |

---

[293]  The area studied was bounded by 2nd Avenue South on the northeast, Water Street on the northwest, 7th Avenue South on the southwest, and Belden Street on the southeast.



| Date of Second Sale: 7/05 | | 3/04 |
|---|---|---|
| Price: | $110,000 | $61,000 |
| Interval: | 7.0 years | 5.7 years |
| Annual Appreciation: 4.65% | | 0.59% |

| Address: | 509 Bebb Street | 301 Pine Street |
|---|---|---|
| Type of Property: | Single-Family Residential | Single-Family Residential |
| Date of First Sale: | 10/98 | 8/96 |
| Price: | $90,000 | $57,500 |

| Date of Second Sale: 8/04 | | 6/05 |
|---|---|---|
| Price: | $102,000 | $86,000 |
| Interval: | 5.83 years | 8.83 years |
| Annual Appreciation: 2.17% | | 4.67% |

| Address: | 606 W. Shields |
|---|---|
| Type of Property: | Single-Family Residential |
| Date of First Sale: | 4/96 |
| Price: | $65,000 |

| Date of Second Sale: 10/04 | |
|---|---|
| Price: | $130,000 |
| Interval: | 8.5 years |
| Annual Appreciation: 3.44% | |

Price appreciations in the five comparisons ranged from 0.59% per year to 4.65% per year.  The average price appreciation was 3.1%, significantly lower than the rate of price appreciation for the 1107 3rd Avenue South property located on Spring Creek.

***Primary Pairing -- Sale/Resale Analysis No. 3***: The following sale/resale of an improved property on Big Spring Creek was also analyzed:

*Sale/Resale Analysis No. 3:  506 Upper Spring Creek Rd*

| Type of Property: | Single-Family Residential |
|---|---|
| Date of First Sale: | 9/95 |
| Price: | $83,000 |
| Price per s.f: | $50.36 |

| Date of Second Sale: 6/05 | |
|---|---|
| Price: | $104,000 |
| Price per s.f.: | $63.11 |

| Interval: | 9.75 years |
|---|---|
| Annual Appreciation: 2.34% | |

However, between the time of the first sale and the date of the second sale of the 506 Upper Spring Creek Road property, the owner had started a major remodeling of the house, but as of the date of the second sale in June of 2005, the renovation had not been completed.  Although



the house was "livable", it was ripped apart and needed considerable work.  According to the realtor involved in the sale, the original listing price of $140,000 had been set with consideration of the considerable additional time, money and effort it would take a buyer to finish the remodeling work.  However, there was considerable market resistance from potential buyers to purchasing a house that was in the middle of a remodeling project.  The listing price was dropped to $119,000, and the house finally sold for $104,000 after being on the market for 300 days.

The low appreciation rate between 1995 and 2005 was due to the condition of the house at the date of the second sale.  Based on the original listing price of $140,000 and the typical sale to list price ratio in Fergus County of 93% to 95%,[294] the sale price would have been $130,200 to $133,000.  At such a price, the condition adjusted rate of appreciation would have been between 4.73% and 4.96%.

For Sale/Resale No. 3 (506 Upper Spring Creek Road), the indicated appreciation rate was compared to the rate of appreciation between 1995 and 2005 for all single-family homes on lots, as shown below.

| | |
|---|---|
| Type of Property: | S.F. on Lots |
| Date of First Sales: | 1995 |
| Number of Sales: | 94 |
| Average Price per s.f.: | $50.08 |
| | |
| Date of Second Sales: | 2005 |
| Number of Sales: | 125 |
| Average Price per s.f.: | $71.75 |
| | |
| Interval: | 10 years |
| Annual Appreciation: | 3.66% |

The unadjusted 506 Upper Spring Creek rate of appreciation of 2.34% was less than the annual appreciation rate for single-family homes between 1995 and 2005.  The condition adjusted rate of 4.73% to 4.96% was above the 1995 to 2005 average appreciation rate for single-family homes

***Secondary Pairing – Sale/Resale Analysis No. 4***: Two adjacent agricultural parcels on Hanover Road and lower Big Spring Creek sold in April of 2002 and January of 2006.  The significant information about the properties is as follows:

*Sale/Resale No. 4:  Hanover Road and Lower Big Spring Creek*

| | |
|---|---|
| Sale No. 4A | |
| Date: | 4/02 |
| Seller: | Ohlson |
| Buyer: | Dunavant Enterprises |
| Size: | 475 acres (non-irrigated) |
| Price: | $750,000 |
| $/Acre: | $1,579 |
| Improvements: | None |
| Value of Improvements: | $0 |
| Adjusted Price per Acre: | $1,579 |

---

[294] In 1995, the 506 Upper Spring Creek property was listed for $89,500 and sold for $83,000, indicating a sale to list price ratio of 93.3%.



Sale No. 4B
Date:                1/06
Seller:              Andersen
Buyer:               Saralee Visscher Living Trust
Size:                354 acres (non-irrigated)
Price:               $1,600,000
$/Acre:              $4,520

Improvements: Improvements consisted of a 1,356 sq. ft. house constructed in 1920 and remodeled in 1976. In addition, there were several outbuildings and bins. Condition of the majority of the improvements was reportedly average to poor. The Montana Department of Revenue valued the improvements at only $83,830. The realtor reported that the improvements were only a minor consideration in the price paid.

Value of Improvements:       $83,830 (Montana Department of Revenue)
Adjusted Price per Acre:     $4,283

Based on the allocation of value to the improvements by the Montana Department of Revenue, the annualized rate of price appreciation is 30.5% per year. Even at an ascribed value of $200,000 for the improvements, the indicated annual appreciation rate is 27.74%.

By contrast, as discussed earlier, the annualized annual rate of increase for all land transactions in Fergus County between 1997 and 2004 was 6.81%. The average price for land parcels in excess of 5.0 acres in Fergus County in 2002 (11 transactions) was $3,553, and in 2005 (17 transactions) was $4,270, indicating an annual appreciation rate of 6.32%. So for 2006 as of the July date of analysis, the average price for vacant land in excess of 5.0 acres was $3,641, only slightly higher than the $3,553 average price per acre paid in 2002. However, one of the 2006 transactions involved a 1,478.73-acre property that sold for only $704 per acre. When only land sales in excess of 5.0 acres but less than 1,000 acres are considered, the average 2006 price to the mid-year date was $3,967, indicating an appreciation rate since 2002 of 2.79%.

***Secondary Pairing – Sale/Resale Analysis No. 5***: This involves a comparison of the appraised value of 98 Willow Lane and the sale price of 74 Willow Lane.

The Plaintiffs in the class action litigation submitted an appraisal of 98 Willow Lane located on upper Big Spring Creek. The appraised value was $240,000, as of 11/1/03.

A house on the same street (74 Willow Lane) and also located on Big Spring Creek sold in July of 2005 for $260,000. The 74 Willow Lane home was located on a smaller lot (0.55 acres compared to 1.188 acres) and was somewhat smaller (1,824 sq. ft. compared to 2,349 sq. ft.). Although the houses were built in the same year (1958) and both had reportedly been recently remodeled, the 98 Willow Lane house had superior construction characteristics and was in better condition. Both houses had two bedrooms, but the 74 Willow Lane house had 2.0 baths compared to 1.5 baths at 98 Willow Lane.

Adjusting the 74 Willow Lane price for the differences in lot size, home size, number of baths, and condition and quality resulted in an adjusted sale price of $279,125, compared to an appraised value of $240,000 for the 98 Willow Lane home. The indicated appreciation rate between November of 2003 and July of 2005 was therefore 9.47% per year.

Both of the homes were built in 1958. The average appreciation in price for homes built between the late 1940s and the mid-1960s that sold in 2003 and 2005 was 8.94%, slightly lower than the



indicated rate of increase from the comparison of 98 Willow Lane and 74 Willow Lane.

***Secondary Pairing – Sale/Resale Analysis No. 6***: This involves a comparison of the appreciation rate on 3rd Avenue South compared to the sale/resale of the house at 509 Bebb Street.

In July of 1998, the property at 1107 3rd Avenue South in Lewistown on Big Spring Creek sold for $35,000, or about $46.79 per square foot.  In May of 2004, the property at 809 3rd Avenue South, also on Big Spring Creek, sold for $54,500, or about $52.81 per square foot.  These two sales on 3rd Avenue South can be compared to the 1998 sale and 2004 resale of the property at 509 Bebb Street in the same neighborhood.

Both of the 3rd Avenue homes were built in 1920 and were in similar condition, although the 809 3rd home was larger and reportedly had central air conditioning.  Adjusting the 809 3rd Avenue price for the differences in home size, number of baths, basement area, and central air conditioning when compared to the 1107 3rd Avenue home results in an adjusted sale price of $47,560 for 809 3rd, compared to a prior sale price of $35,000 for the 1107 3rd Avenue home. The indicated appreciation rate between July 1998 and May of 2004 was therefore 5.4% per year.

By comparison, the 509 Bebb Street house sold in October of 1998 for $90,000 and resold in August of 2004 for $102,000.  The indicated appreciation rate was only 2.17% per year, significantly less than the rate of appreciation during the same years for the house on Big Spring Creek.

 ***Secondary Pairing – Sale/Resale Analysis No. 7***: This involves a comparison of appreciation on 3rd Avenue South on Big Spring Creek to appreciation on Park Avenue on Casino Creek.

Our comparison of the July 1998 sale price for 1107 3rd Avenue South and adjusted May 2004 sale price for 809 3rd Avenue South indicated an annual appreciation rate of 5.4% per year.

That rate of appreciation can be compared to the appreciation indicated from prices paid for two quite similar houses on Park Avenue that abut Casino Creek.  The property at 211 Park Avenue in Lewistown on Casino Creek sold for $65,000, or about $45.14 per square foot in March of 1999. In November of 2003, the property at 317 Park, also on Casino Creek, sold for $75,000, or about $52.08 per square foot.

The Park Avenue homes were built in 1959 and 1960 and were in similar condition and similar in size, although one had 3 bedrooms and 1 bath while the other had 2 bedrooms and 2 baths.  One had a garage and the other did not, and one had a wood stove and the other did not.  Adjusting the 317 Park Avenue price for the differences in number of baths, garage, and wood stove when compared to the 211 Park Avenue home resulted in an adjusted sale price of $80,000 for 317 Park, compared to a prior sale price of $65,000 for the 211 Park Avenue home.  The indicated appreciation rate between March 1999 and November of 2003 was therefore 4.47% per year, slightly less than the 5.4% rate of appreciation on 3rd Avenue abutting Big Spring Creek between July of 1998 and May of 2004.

***Secondary Pairing – Sale/Resale Analysis No. 8***: This involves a comparison of the price differential on and off Big Spring Creek in 1998 on 3rd Avenue to the price differential in 2004.

If the PCB contamination situation was adversely affecting prices, it would be expected to be reflected in a price differential between the price paid for a Big Spring Creek home and the price paid for an off-creek but similar home in the same neighborhood.

In July of 1998, the property at 1107 3rd Avenue South in Lewistown on Big Spring Creek sold for $35,000, or about $46.79 per square foot.  In November of 1998, the property at 1012 3rd



Avenue South, located across the street from, but not directly on Big Spring Creek, sold for $24,000, or about $42.86 per square foot.

Both of the homes were built in 1920 but the 1107 3rd Avenue house was larger and in better condition and reportedly had central air conditioning. Adjusting the 1012 3rd Avenue price for the differences in home size, basement area, presence of a fireplace, lack of central air conditioning, and inferior condition when compared to the 1107 3rd Avenue home resulted in an adjusted sale price of $31,780 for 1012 3rd, compared to a price of $35,000 for the 1107 3rd Avenue home. The indicated price premium for a house on Big Spring Creek as of 1998 was approximately 10.1%.

In May of 2004, the house at 809 3rd Avenue on Big Spring Creek sold for $54,500. Although no other sales could be found on 3rd Avenue across from the creek in 2004, there were two sales of comparable houses on Brassey (510 Brassey and 419 Brassey) that sold in 2004. Adjusting the two sales on Brassey for differences in size, number of baths, number of fireplaces, central air conditioning, and basement finish, the adjusted prices of the two Brassey sales were $52,040 and $48,015, or an average adjusted price of $50,027. Compared to the $54,500 price paid for the 809 3rd Avenue house on Big Spring Creek, the price differential was approximately 8.9%.

The 1998 differential of plus 10.1% for a house on Big Spring Creek is only slightly higher than the 8.9% price differential in 2004. The announcement in December of 2003 of the source of the contamination and the imposition of the catch and release order had no apparent adverse impact on the price differential paid for a home abutting Big Spring Creek in the 3rd Avenue neighborhood by comparison to the price differential in 1998.

### Analysis of Results of the Primary and Secondary Pairings

The results of the various primary and secondary pairings are summarized in the following table:

| Sale/Resale Comparisons | |
|---|---|
| **Primary Sale/Resale No. 1** | Rate of Appreciation |
| Subject Property | 5.53% |
| Comparison 1A | 6.81% |
| Comparison 1B | 4.81% |
| Comparison 1C | 5.84% |
| | |
| **Primary Sale/Resale No. 2** | Rate of Appreciation |
| Subject Property | 4.34% |
| Comparison 2A | 4.19% |
| Comparison 2B | 4.65% |
| Comparison 2C | 0.59% |
| Comparison 2D | 2.17% |
| Comparison 2E | 4.67% |
| Comparison 2F | 3.44% |
| Comparison 2G | 3.10% (average of B-F) |
| | |
| **Primary Sale/Resale No. 3** | Rate of Appreciation |
| Subject Property | 2.34% (unadjusted) |
| Subject Property | 4.73% to 4.96% |
| Comparison | 3.66% |
| | |
| **Secondary Sale/Resale No. 4** | Rate of Appreciation |
| Subject Property | 27.74% to 30.5% |



| | |
|---|---|
| Comparison 4A | 6.81% |
| Comparison 4B | 6.32% |
| Comparison 4C | 2.79% |
| | |
| Secondary Sale/Resale No. 5 | Rate of Appreciation |
| Subject Property | 9.47% |
| Comparison | 8.94% |
| | |
| Secondary Sale/Resale No. 6 | Rate of Appreciation |
| Subject Property | 5.40% |
| Comparison | 2.17% |
| | |
| Secondary Sale/Resale No. 7 | Rate of Appreciation |
| Subject Property | 5.40% |
| Comparison | 4.47% |
| | |
| Secondary Sale/Resale No. 8 | On Creek Price Differential |
| 1998 | 10.1% |
| 2004 | 8.9% |

Of the 19 comparisons, 12 indicate that the price appreciation on Big Spring Creek exceeded that of the properties not on Big Spring Creek. The other seven comparisons indicate a price appreciation on Big Spring Creek less than for properties not on the creek. With the exception of Sale/Resale No. 4 and Sale/Resale No. 6, the appreciation rates – whether higher or lower on the creek – were relatively close.

Overall, the results sale/resale comparisons are evidence that there was no adverse impairment to prices or values of properties along Big Spring Creek from the PCB contamination situation.

The price appreciation rate on the Spring Creek Tracts parcel (Sale/Resale No. 1) on upper Big Spring Creek was 5.53% per year, very close to the 5.84% annual appreciation rate on Casino Creek (Comparison 1C) during approximately the same time period, and higher than the 4.81% appreciation rate (Comparison 1B) for similarly sized vacant parcels during the same time frame.

The rate of appreciation for the 1107 3rd Avenue property between 1998 and 2006 (Sale/Resale No. 2) was 4.34% per year, slightly higher than the 4.19% average appreciation rate (Comparison 2A) for all single-family homes in the same neighborhood and the 3.10% average rate of increase (Comparison 2G) in five sale/resale transactions in the same neighborhood.

The 2.34% rate of appreciation (Sale/Resale No. 3) on the 506 Upper Spring Creek Road transaction between 1995 and 2005 was less than the 3.66% annual rate of appreciation for single-family homes on standard lots during the same time period. However, when adjusted for the condition of the home, the rate of appreciation for 506 Upper Spring Creek is between 4.73% and 4.96%, higher than the 3.66% appreciation rate for all single-family homes.

In the first of the secondary pairings, the 27.74% to 30.5% appreciation rate on agricultural land (Sale/Resale No. 4) on lower Spring Creek, was dramatically higher than the 6.81% rate of appreciation rate on all land transactions in Fergus County between 1997 and 2004. Even when the focus of the comparison is land in excess of 5.0 acres, the increase in price paid in Sale/Resale No. 4 is significantly higher than the average price appreciation between 2002 and



2005, or 2002 and 2006.

The various other secondary pairings also showed results similar to the primary pairings – the rates of appreciation for properties on and off Big Spring Creek were generally quite similar, with the exception of Sale/Resale No. 6 which showed a significant price appreciation advantage for property abutting the creek.

The results of the sale/resale comparisons indicate that the announcement in December of 2003 of the source of the PCB contamination and the imposition of the catch and release order had no apparent adverse impact on the real estate market.   Information about the presence of PCB contamination in Big Spring Creek had been available in the real estate market since the 1980s, and fish consumption advisories had been in effect since 1995.  Therefore, there was information in the marketplace about PCB in Big Spring Creek during the entire time periods studied.

**Analysis of Marketing Time and Sale-to-List Price Trends**

The following table shows the average days-on-the-market (DOM) for home sales on Big Spring Creek compared to the Lewistown/Fergus County single-family residential market as a whole for the years between January 1995 and June 2006.

| | | | | | *Marketing Time Analysis* |
|---|---|---|---|---|---|
| Year | Total SF Residential No. of Sales (with data) | Single- Family Residential Median DOM | Spring Creek Single-Family Residential No. of Sales | Spring Creek Single- Family Residential DOM | Spring Creek Compared to Total Market Sales |
| 1995 | 90 | 70 | 1 | 180 | +110 days |
| 1996 | 66 | 67 | 0 | NA | NA |
| 1997 | 103 | 75 | 0 | NA | NA |
| 1998 | 82 | 124 | 1 | 64 | - 60 days |
| 1999 | 93 | 128 | 0 | NA | NA |
| 2000 | 108 | 60 | 1 | 130 | +70 days |
| 2001 | 104 | 91 | 1 | 3 | -88 days |
| 2002 | 107 | 80 | 0 | NA | NA |
| 2003 | 102 | 91 | 2 | 10 | -81 days |
| 2004 | 126 | 83 | 1 | 43 | -40 days |
| 2005 | 125 | 60 | 1 | 300 | +240 days |
| 2006 (thru June) | 27 | 61 | 0 | NA | NA |

In two of the four years prior to 2003, it took somewhat longer to sell a home on Big Spring Creek than it did to sell a typical home.  In the other two years, it took longer.

In two of the years after 2003, it again took less time to sell a home on Big Spring Creek than it did in the market as a whole.  The one house that sold in 2005 took 300 days to sell because of its condition.  The seller has started a remodeling project but had not completed it.  Although the house was "livable", it was in considerable disarray.  According to the realtor involved in the sale, this seriously lengthened the marketing time because most potential buyers did not want to take on the task of completing the remodeling.

The marketing time data shows no evidence of any adverse impact from the additional 2003 publicity related to the PCB contamination situation and the subsequent imposition of the catch and release fishing advisory in Upper Big Spring Creek.

The following table shows the sales-to-list price ratio for home sales on Big Spring Creek



compared to the Lewistown/Fergus County single-family residential market as a whole for the years between 1995 and 2006.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Sale to List Price Ratio Analysis** | | | | | | |
| Year | Total SF Residential No. of Sales (with data) | SF Residential Median Sale to List Price Ratio | Spring Creek Single-Family Residential No. of Sales | Spring Creek Single-Family Residential Sale to List Price Ratio | Spring Creek Compared to Total Market Sales |
| **1995** | 104 | 95.5% | 1 | 100% | +4.5% |
| **1996** | 88 | 95.5% | 0 | NA | NA |
| **1997** | 112 | 94.4% | 0 | NA | NA |
| **1998** | 90 | 93.4% | 1 | 100% | +6.6% |
| **1999** | 101 | 94.3% | 0 | NA | NA |
| **2000** | 116 | 94.8% | 1 | 80.0% | -14.8% |
| **2001** | 119 | 95.8% | 1 | 100% | +4.2% |
| **2002** | 102 | 95.0% | 0 | NA | NA |
| **2003** | 102 | 95.0% | 2 | 93.3% | -1.7% |
| **2004** | 133 | 96.3% | 1 | 97.3% | +1.0% |
| **2005** | 127 | 96.1% | 3 | 87.2% | -8.9% |
| **2006 (thru June)** | 27 | 96.1% | 1 | 84.5% | -11.6% |

In two of the four years prior to 2003, the sale-to-list price ratio on Spring Creek was higher, and in two it was lower.  In one year, 2000, it was significantly lower – 80% compared to 94.8%.

In two of the four years after 2003, the sale-to-list price ratio for homes on Big Spring Creek was been quite close to the median for the area as a whole.  In 2005, the ratio for the sales on Big Spring Creek was significantly impacted by the 506 Upper Spring Creek sale.  That was the property that was "ripped apart" at date of listing because the owner had started, but not finished, an interior remodeling.  There was considerable market resistance to the purchase of a home that needed significant work to complete the project.  The sale-to-list price ratios for the other two sales in 2005 were at or above the ratio for other single-family homes that sold that year.  The sale-to-list price ratio for 2006 was low because the one home that had sold so far in that year on Big Spring Creek did so at a sale to list price ratio of only 84.5%.  However, even this ratio is higher than the ratio experienced in 2000, when the one home that sold on the creek had a sale to list price ratio of only 80%.

### *Analysis of Results of the Home Price and Marketing Trends Research*

Marketing times and sale-to-list price ratios were in some years higher and in some years lower with no general pattern evident.  One home sale on the creek in 2005 took an unusually long time to sell (300 days) and had an unusually low sale price to original list price ratio (74.3%) because it was being sold in the middle of a remodeling project.

Home price and marketing trends for homes on Big Spring Creek compared to those not on the creek show no evidence of any adverse impact from the PCB situation.   From this we have also concluded that there has been no adverse temporary or permanent impact from the December 2003 announcement of the catch and release order for Upper Big Spring Creek.

### **Conclusion from Big Spring Creek (Lewistown, Montana) PCB Case Study Conclusion**

Sale/resale analysis using both primary and secondary pairings indicate that there was no adverse impairment to prices or values of properties along Big Spring Creek from the PCB



contamination situation. The results of the sale/resale comparisons indicate that the announcement in December of 2003 of the source of the PCB contamination and the imposition of the catch and release order had no apparent adverse impact on the real estate market. Information about the presence of PCB contamination in Big Spring Creek had been available in the real estate market since the 1980s, and fish consumption advisories had been in effect since 1995. Therefore, there was information in the marketplace about PCB in Big Spring Creek during the entire time periods studied.

Home price and marketing trends for homes on Big Spring Creek compared to those not on the creek also show no evidence of any adverse impact from the PCB situation.

There was no adverse temporary or permanent impact on prices, values or marketing times resulting from the December 2003 announcement of the catch and release order for Upper Big Spring Creek.



*PCB Contamination Case Study No. 4:*
*Superfund Site*

**Reichold Chemical Neighborhood**
**Columbia, Mississippi**

### The Superfund Site and PCB Contamination Situation

The Reichhold Chemical/Newson Brothers Superfund site is located in Columbia, Mississippi, located approximately 30 miles west of Hattiesburg and 75 miles north of New Orleans in southeast Mississippi.

The site contains about 80 acres and is surrounded by both residential and commercial neighborhoods. Used as a sawmill site until 1943, the site was later used for the production of various types of wood products and naval stores that involved utilization (and production) of various types of chemicals. Starting in 1975, one product produced on the site involved the mixing of PCP (pentachlorophenol) with diesel oil.

In March of 1977 there was a significant fire that destroyed portions of the facility. During the fire, nearby residents had to be evacuated. Following the fire, Reichhold Chemical, the then current owner, closed the site.

Investigations by state and federal and state authorities beginning in 1976 found both on-site and off-site contaminants in soils, stream sediments, and surface water. In January of 1984, however, an area resident wrote to the Mississippi Bureau of Pollution Control warning of possible contamination to Columbia's water supply system supplied from four ground-water wells located 1,200 feet northeast of the Reichhold site boundary. In February of 1984, the State took samples from city wells, the city distribution system, and from the Reichhold/Newsom site itself. Volatile organic compounds are found in the city wells, and the state tried to determine the source of well contamination. The State eventually concluded that Reichhold/Newsom was not the source because groundwater flows away from the wells towards the site. In March of 1984, the State of Mississippi and the EPA sampled wells on the Reichhold/Newsom site as well as other private wells south of the site. No significant contamination was found in the wells.

In 1984, the U.S EPA initiated a removal action to excavate and remove more than 600 drums found on the Reichhold property. Additional investigation begins on the site, and throughout 1984, "(a)ccording to local officials, testing and removal activities conducted at the site by EPA and BPC in 1984 seemed to increase community awareness and fears about the site."[295]

Early in 1985 the State of Mississippi installed nine monitoring wells in the area around the city's water treatment plant. In June of 1985 State sampling of the monitoring wells found some volatile organic compounds in only one city well.

Further site investigation resulted in inclusion of the Reichhold Chemical site in the Superfund program in 1986 and further removal of almost 4,000 drums buried on the site, as well as the removal of 1,920 tons of contaminated soil. Principal contaminants found on the site included PCBs, PCPs, PAHs, and heavy metals.

The site was proposed for NPL Superfund listing in October of 1984 and officially listed in June of 1986. Once remediation was completed, the site was deleted from the Superfund list effective September 27, 2000 as published in the Federal Register.

Unlike the Brio refinery situation also investigated, Reichhold Chemical remediation did not involve any *on-site* thermal destruction (incineration). The EPA proposed thermal destruction the 1989 Record of Decision (ROD) as a possible remedy. The Remedial Alternative finally selected,

---

[295] "Final Community Relations Plan: Newsom Brothers Site, Columbia, Mississippi," U.S. EPA, April 1987, p. 7.



however, involved transport of contaminated soil to an off-site incinerator outside of Columbia. Following deletion of the site from the Superfund list, the EPA described the successful remediation as follows:

> "Cleanup activities have been completed.  After EPA's initial investigation, EPA removed the drums and filled the two ponds.  Cleanup actions . . . included: removal of asbestos-containing materials; removal of above-ground and underground storage tanks; excavation of contaminated soils; excavation of black tar-like waste material; drainage of on-site ponds; disposal of contaminated sediments; and groundwater monitoring. . . However, continued groundwater monitoring is being conducted at the site to confirm the protectiveness of the selected remedy."

## Publicity and Concerns of Nearby Residents

Concerns about possible impact of contamination on property values first surfaced in January of 1984 when an area resident who had been a former federal OSHA inspector wrote to the Mississippi Bureau of Pollution Control and warned of possible contamination of the City of Columbia water supply system resulting from pollution emanating from the Reichhold Chemical/Newsom Brothers site.

Publicity and public awareness about the environmental situation surrounding the Reichhold environmental situation was intensive, especially during the period between 1986 and about 1992. The  EPA's "Final Community Relations Plan" published in April of 1987 called mid-1986 the beginning of the "current period of high concern about the Newsom  Brothers site."[296]  In the summer of 1986, testing done by experts for the property owner found benzene, toluene, and xylene and other pollutants in drums still buried on site.  Once the EPA became involved, it held a series of public meetings at the site and in the surrounding neighborhood that were well attended.

The Reichhold environmental situation became nationally known as well.  In August of 1987, consumer activist Ralph Nader wrote the both the Mississippi State Board of Health and the US EPA claiming contamination left behind at the Reichhold site posed "a substantial health threat to the surrounding community" and Nader urged a joint state and federal probe, voluntary testing of residents, and temporary or permanent relocation of people living around the site.  Nader's letter was reported by Gannett New Service and published on front page of local Columbia and Hattiesburg newspapers.

In September of 1987, Columbia's mayor was quoted in Jackson newspapers as stating that the city was "suffering from 'massive hysteria' fueled by ignorance, fear and a maddeningly slow federal bureaucracy (and) (h)e fears negative publicity will send shoppers elsewhere and discourage industry from locating in Columbia."[297]  Later in November of 1987, when official cleanup began, the EPA evacuated about 700 residents living within 1,500 feet of Reichhold/Newsom site for three days while it excavated and removed drums from the north pond area of the site.

Between 1995 and 1997, the EPA conducted a three-year groundwater monitoring program that resulted in regularly published reports of groundwater quality on the site and in the area around it.

## Scope of JLL/Clarion Staff Investigation and Research

---

[296]  Id., p. 8.
[297]  *Clarion-Ledger/Jackson Daily News*, Sunday, September 13, 1987, 13A.



Staff of JLL at their previous firm, Clarion Associates, that merged into JLL in 2017 undertook research related to the PCB contamination situation. The scope of work to understand the situation and the impact of the environmental situation on nearby residential neighborhoods included the following activities:

- Review of reports and documents produced by other appraisers who had studied the impacts on residential neighborhoods;

- Physical inspection of the neighborhood and area in June of 2001;

- Review of Assessor's maps to determine streets and properties immediately adjacent to the Reichhold/Newsom site;

- Investigation of court records related to litigation seeking payment for alleged damages to property values;

- Collection and review of the appraisal reports filed by the local Columbia appraisers in the litigation to determine the impact of the Reichhold/Newsom situation on nearby property values;

- Collection and review of appraisal reports filed by the local Columbia appraisers following the litigation;

- Investigation of actual marketplace sale prices paid on streets and for properties on which damage claims were made;

- On-line research into federal and state environmental reports;

- Research into newspaper stories concerning the Reichhold Chemical situation and the property impact litigation;

- Interviews with a knowledgeable local appraiser and attorney involved in the litigation filed by the property owners;

- Interview with a lender who makes loans in Columbia;

- Interview with the tax assessor; and

- Collection of market information and sales data, including inspection of deeds and mortgages at office of recorder of deeds, and collection of actual deeds and mortgages.

**Litigation Related to Alleged Impacts on Adjacent and Nearby Property Prices and Values**

As a result of the environmental situation, there were a variety of lawsuits filed.  Some involved claims for health effects.  One involved claims for damages to real property only.  Others involved claims for both.  Neighboring homeowners commenced litigation in the early 1990s to recover damages for alleged impacts on property values. Allegations that the mortgage and real estate markets adjacent to the Reichhold facility shut down were made by homeowners and appraisers in some of the litigation in which the Reichhold Chemical situation was either directly or indirectly involved.  An outside appraisal firm that studied the situation in March and April 2001 alleged that impacts on property values were 100% and mortgage lenders refused to make loans in nearby neighborhoods.



One purpose of our research in Columbia was to compare the claims made by the Plaintiffs in the litigation to what actually happened in the local real estate and mortgage markets.

Research into the litigation involving the Reichhold Chemical Superfund site uncovered the following:

- In the only case with an exclusive real property damage claim that was actually tried, the jury concluded there was no adverse impact to real property.  The judge therefore ordered that the plaintiffs were to "recover nothing" from the defendant Reichhold Chemical. (As reported in The Columbian-Progress, Thursday, January 19, 1995, p. 1A.[298]

- There were settlements in some of the other cases involving real estate damage claims.  There was no relationship between the settlement amount and alleged impacts on property values.  As stated in a letter from Mr. Richard F. Yarborough, Jr., who represented defendant Reichhold Chemical in the various cases, and negotiated the settlements:

  > "The vast majority of the cases filed against Reichhold were resolved through settlement proceeds paid by Reichhold.  This decision was made for a number of reasons, including fear of imposition of a large punitive damages award, together with insurance coverage issues, litigation costs, etc.

  > While it is true that many of the adjoining residents did receive a monetary settlement, Reichhold did not settle these cases based upon payment of the 'market value' of their property.  In most instances, Reichhold had no role in allocating specific amounts to specific residents, but simply reached an agreement with plaintiffs' counsel for a lump sum payment in multi-plaintiff cases.  Amounts paid plaintiffs were determined by their counsel.

  > In any event, there was never a determination made by the Court, or any parties to the litigation, that the residents were to be paid the 'market value of their property.'

- In the toxic tort case involving 103 plaintiffs, a Marion County Circuit Judge dismissed both the claim for property diminution as well as a claim for damages for physical personal injury, emotional distress and fear, and loss of wages allegedly caused by exposure to chemicals from the Superfund site.  The Mississippi Supreme Court upheld the dismissal. Brewton v. Reichhold Chemicals, Inc., 707 So. 2d 618 (Miss 1998).

---

[298] See also, letter dated July 12, 2001, from Mr. Richard F. Yarborough (attorney for the defendants in the two cases dealing with property damage claims) to Richard J. Roddewig of Clarion Associates, retained in our files.  As Mr. Yarborough states, in reviewing a summary of the litigation result prepared by another appraisal firm indicating litigation resulted in determinations by juries of real estate value impacts: "To the contrary, I personally handled two cases filed against Reichhold which included claims for property diminution.  One of these cases resulted in an award of summary judgment in favor of Reichhold and the second case resulted in a unanimous jury verdict in favor of Reichhold – the only issue in that case was whether two landowners had sustained diminution to real property located adjacent to the Reichhold site.  The jury concluded, after considering all of the evidence, that the landowners had suffered no damage."



**Results of JLL/Clarion Staff Research into Prices, Values and the Mortgage Market**

The research into the real estate market in Columbia found that the real estate market in the neighborhoods adjacent to the Reichhold Chemical/Newsom Brothers site was active in 2001 and had been functioning normally for many years, even during the cleanup and remediation of the Reichhold facility.  Home prices were comparable in 2001 to other similar neighborhoods when proper adjustments are made for differences due to locational factors (other than Reichhold proximity) and condition of housing.

There was no impact on home values in 2001 and that had been true at least since the end of the property damage litigation in January of 1995 in which the jury verdict was no damage to real estate values.  Dates of value in the appraisal evidence submitted to the jury were in 1989, so it is likely that there had been no damage to residential property values since 1989.  The impact, if any, resulting from the Reichhold Chemical environmental situation on prices and values of adjacent single-family homes was temporary and most likely ended in 1989 but certainly no later than 1990 or 1991.

There appears to have been no impact on home prices despite the recession of 1990-1991 which we have found in some other communities we have studied to have increased the adverse impact of environmental situations similar to Reichhold Chemical.

Loans were being made on properties in the residential neighborhoods around the site including loans on immediately adjacent properties.  This was not only true as of March and April of 2001,[299] but had been true for many years, even during the height of the controversy over the discovery of the contamination and designation as a Superfund site.  A table that we have retained in our files documents the many mortgage deeds that have been recorded on streets adjacent to the Reichhold/Newsom Superfund site.

On Chinaberry Street alone,[300] a small subdivision located immediately abutting the Reichhold site and containing only 18 houses, there were 18 mortgages recorded between 1989 and mid-2001, and there were 14 recorded sales transactions between 1988 and 2001.  In the year 2000, there were two recorded deeds of sale and one recorded mortgage.  Complete information about the Chinaberry sales and mortgages is retained in our files.

In addition to checking sales and mortgages on Chinaberry, we also checked sales and mortgages on Bullis, Pearl, and Park streets adjacent to the Reichhold site.  On those streets too we found many mortgages and sale deeds between 1988 and 2001, including 13 mortgages and 18 deeds on Bullis, 27 mortgages and 13 deeds on Park, and one mortgage and two deeds on Pearl between 1988 and 2001.

We also checked on sales activity related to commercial properties adjacent to the Reichold site.  A new bank headquarters building had recently been constructed immediately south of the Reichold facility as of the date of our investigation.   An interview with a vice president of the bank

---

[299]  See also a letter in our files dated July 12, 2001, from Mr. Richard F. Yarborough, Jr., to Richard J. Roddewig of Clarion stating: "My law office is located approximately three blocks from the Reichhold site in Columbia and I am familiar with this area and its environs.  Since the conclusion of the litigation, there have been numerous market transactions in properties adjacent to the site.  These transactions are easily facilitated due (to) the presence of several local lenders who will readily make loans collateralized by properties adjacent to the site."

[300]  Chinaberry is also significant because a property owner on Chinaberry alleged in March and April of 2001 that mortgages were not available and sales were not occurring on her street.



revealed that the bank had paid market value for the land on which the bank facility was constructed, and that proximity to the Reichold site had no impact on the price paid.

**Conclusions from the JLL/Clarion Reichold Chemical Superfund Site (Columbia, Mississippi) Case Study**

When the entire history of the Reichhold/Newsom Superfund situation between 1984 and 2001 is considered, the following conclusions can be reached:

- A number of studies from around the country have found that the market value of residential properties affected either directly or indirectly by contamination can decline more during periods of economic decline and housing over-supply (a buyer's market). Buyers have many other choices in housing in such an economy.  The Columbia economy was sluggish during the late 1980s and first two years of the 1990s, the time period that corresponds with the discovery of the Reichhold/Newsom contamination and the most urgent neighborhood concern.  However, it appears that the Columbia, Mississippi, situation may be an exception to the rule we have found elsewhere that severe recessions in the housing market can increase the price impact of environmental situations on single-family homes.  In Columbia, the recession continued into the early-1990s, but the real estate market impacts of the Reichhold environmental situation apparently did not.

- As mortgages and sales[301] on Chinaberry Street and the other information about mortgages on other adjacent streets retained in our files makes clear, homes were selling and mortgages were being made even during the height of the neighborhood concern about the contamination on the Reichhold/Newsom site.

- Our analysis of Chinaberry sales and mortgages also indicates that claims of damages to prices from proximity to the Reichhold site made in some of the litigation were overstated.[302]

- An interview with a vice president of one of the largest local banks indicated that banks continued to make home mortgage loans to qualified homeowners and purchasers during the entire history of the Reichhold investigation and remediation.  That same bank also built its new headquarters building on a commercial site adjacent to the southeast corner of the Reichhold site.

- Property values of adjacent property in close proximity were most likely temporarily affected by the discovery of the contamination and the process that led to Superfund designation.  The temporary impact probably started no earlier than 1984, and no later than mid-1986, and continued through the EPA's publication of its Record of Decision in September of 1989, and *at most* extended no later than sometime in 1990 to 1991 after the Record of Decision was approved.

---

[301] Mississippi is a non-disclosure state.  Recorded deeds do not show the actual consideration paid for a property. Therefore, it is not possible to obtain the sale price of a transaction from the recorded deed.  However, typically, mortgages (deeds of trusts in Mississippi) do indicate the amount of the secured loan, so we have included the loan amount as shown in the public record.

[302] The value after considering "damages and depreciation" from proximity to the Reichhold/Newsom site is taken from appraisal reports filed by the appraiser for the homeowners in the litigation seeking damages from Reichhold Chemical, Inc.



- The analysis by one of the two local appraisers who studied the situation and testified in some of the litigation is more supportable than that of the other. Mr. Shelton Ball, a local appraiser, testified that in 1989 the diminution in value to homes immediately adjacent to the Reichhold/Newsom site was no more than 10% to 15%. That is more supported by the data than the conclusion of the Plaintiff's appraiser in the Reichhold Chemical litigation who claimed homes had depreciated in value by 70% to 85%. The most significant support for our conclusion comes from the four sales on Park, Bullis, Pearl, and Mississippi streets during 1988-1990. That sales information contradicts the opinions of the appraiser for the Plaintiffs in the Reichhold litigation who's estimate of values on those streets during that period were significantly lower on average.

- Property values then rebounded in the early 1990s to normal market levels comparable to other neighborhoods not in proximity to the Superfund site even though there was continuing remediation and monitoring of the contamination on the Reichhold/Newsom site.

- Prices increased sharply for residential properties located adjacent to the Superfund site. For example, the Plaintiff's appraiser in the Reichhold Chemical litigation valued 511 Bullis at only $10,050 as of 5/89 after he considered the "damages and depreciation" alleged to have occurred to property values. In 12/96, 511 Bullis sold for $33,000, and in 12/99, a mortgage for $45,175 was placed on the property. Similarly, 415 Park, a house located adjacent to the Reichhold/Newsom site, sold in 6/95 for $26,000 and then again in 10/99 for $38,000, a 46% increase in price in just over four years.

- The continued monitoring of the Reichhold/Newsom site was having no impact on property values or mortgage lending in neighborhoods around it as of 2001 when we completed our investigation.

- Based upon actual market data, the temporary proximity impact associated with the Reichhold/Newsom environmental situation at its peak was no more than 10% to 15%, and was limited to immediately adjacent properties.

- As the remediation program progressed at the Reichhold/Newsom site, any impact on nearby property values decreased and eventually ended.

- By the early 1990s, Columbia prices were no longer adversely affected by the on-going contamination and remediation situation.

- To the extent the Reichhold Chemical litigation settlement involved payments for alleged permanent impacts on property values, the residents were over-compensated.



*PCB Contamination Case Study No. 5:*                    **Times Beach Superfund Site**
                                                                                    **Times Beach, Missouri**

**The Superfund Site and PCB Contamination Situation**

The town of Times Beach, Missouri, a community of about 2,000 located about 20 miles west of St. Louis, experienced one of the most serious cases of contamination by dioxins, a chemical similar in many respects to PCBs in its persistence and toxicity, and sometimes a bi-product of the chemical breakdown of PCBs.

Between 1972 and 1976, hired a contractor to spray its 16 miles of gravel roads sprayed with oil during dry, dusty summer conditions.  The contractor selected to spray the roads also had a waste chemical and oil business as well.  One of his waste disposal clients was a company that produced hexachlorophene, a product once used in soaps and toothpaste.  Dioxin is one of the byproducts of hexachlorophene production.  The dioxins collected by the contractor became mixed with the oil sprayed by the contractor on Times Beach roads.

EPA sampling for dioxins in Times Beach in November of 1982.  In December of 1982, the Meramec River flooded the town.  About the same time, dioxin sampling results were released indicating levels ranging from less than 1 ppb to 127 ppb. On December 23, The Centers for Disease Control issued a health advisory residents warning all residents to leave the town.   FEMA provided temporary residences for the residents.

In 1983, the community was added to the NPL Superfund site list.  In order to remediate the site, all residents had to be relocated. In total, about 800 homes (including mobile homes) and 40 businesses were purchased and the improvements demolished.  The 2,000 residents were permanently relocated.  The EPA utilized $33.1 million to purchase all the properties in Times Beach and to permanently relocate the citizens.  The last remaining residents were relocated from Times Beach by the end of 1986.

Because the area to be remediated was so extensive (410 acres) and Times Beach was found to contain dioxins in the soil, the remediation solution agreed upon by the EPA, State of Missouri and other regulatory agencies was the use of a temporary incinerator as determined by a Record of Decision (ROD), signed in September 1988.  The proposal (and eventual approval) of an incinerator at the Times Beach site created a considerable public outcry in Eureka and other surrounding neighborhoods.

The final determination that an incinerator would be used at the Times Beach site came in July of 1990 when Syntex Agribusiness agreed to build the incinerator and finance a portion of the remediation as they assume responsibility for the cleanup in order to settle a lawsuit between Syntex Agribusiness and the EPA and the State of Missouri.  The proposed incinerator would consist of a rotary kiln and secondary combustion chamber that would destroy the dioxins to a level of 99.9999% as required by the Resource Conservation and Recovery Act (RCRA).

The incinerator would not only treat the soil at the Times Beach site, but also treat contaminated soil hauled in from 26 other sites around eastern Missouri.

Following the announcement of the plan to construct an incinerator on the Times Beach site, several organizations were formed to voice concern about the use of an incinerator in Times Beach.  Some of these groups included: Gateway Green Alliance (GGA), Dioxin Incineration Response Group (DIRG), Times Beach Action Group (T-Bag), and Citizens Against Dioxin Incineration (CADI).  Many of these groups worked in concert with politicians to either stop the incinerator from being built or to impose restrictions as to the use of the incinerator.  These groups proposed a contract with the EPA to protect their neighborhoods.  The proposed contract included



such provisions as agreeing to a time-limit on burning, the type of trucks to be used to move the contaminated soil and clarification on the disposal of the ash left from the burning.  The EPA refused to enter into a contract.

There was significant press coverage of the public outcry concerning incineration in the local press, especially *The St. Louis Post – Dispatch* and the *Riverfront Times*.  The press reported the significant concern of opponents that the incineration process would spew dioxins into the air, despite the EPA and other agencies insistence that incineration would be safe.

After Syntex Agribusiness assumed responsibility for the cleanup, the EPA began to work on a "risk assessment" on the use of an incinerator at the Times Beach site.  The risk assessment, completed in November 1994, found that there were minimal health risks to the surrounding populations from the use of the incinerator.  Soon after the risk assessment was completed, permits were issued and construction began on the incinerator and the supporting facilities.  In 1995, a stack test determined that the incinerator was fit for use.

In March of 1996 the incinerator began burning soil.  Following 16 months of use, the incinerator was dismantled and taken down after treating over 265,000 tons of material from 27 sites.  The resulting ash was buried on site. Surrounding communities and concerned citizens voiced their concern about several incidents, including the 1995 stack tests and several mishaps during the incineration process that resulted in the release of untreated discharge into the air.

Final cleanup and remediation was completed by the end of 1997 and the land was transferred to the State of Missouri for use as the Route 66 State Park officially designated in September of 1999.

In September 2001, after more than 18 years, Times Beach was removed from the Superfund National Priorities List of hazardous wastes although there has been ongoing monitoring of the cap on the site.

**Scope of JLL/Clarion Staff Investigation and Research**

The scope of the JLL/Clarion investigation of the Times Beach environmental situation was as follows:

- Review of reports and documents produced by other appraisers;

- On-site inspection of the Times Beach site, the surrounding west St. Louis County area, including Eureka and Wildwood in May and July of 2003;

- Inspection of public records at the EPA repository in St. Louis County public library;

- Investigation of St. Louis County Assessor's office sales, building data and maps;

- On-line research into federal and state environmental reports;

- On-line research into newspaper accounts and other sources of data regarding the site; and

- Interviews with local brokers and county assessor's office staff.

The research and analysis included investigation into surrounding residential neighborhoods to determine how the real estate market was affected by the Times Beach PCB and dioxin contamination and remediation including the use of a temporary incinerator from March of 1996 to June of 1997.  The areas included in the study are in closest proximity to the Times Beach site.



Although the research focused primarily on residential properties, information related to other pertinent land sales, regardless of use, was also collected. The boundaries of the analysis are loosely defined as areas located north of Route 44 and properties and subdivisions within approximately 1.5 miles of the Times Beach site. This included both downwind and upwind areas identified in the 1994 EPA risk assessment.

Data utilized in this analysis was collected from conversations with local real estate brokers and the St. Louis County Assessor's office database. Based upon maps showing every property in the study area provided by the St. Louis County Assessor's office, we researched the sales history of parcels. The parcels were both vacant and improved. Parcels on these maps have been assigned individual property identification numbers by the St. Louis County Assessor's office. The individual parcels (lots) were investigated to determine if there was any type of development on the lot, the year the structures (if any) were built, and the sales history, including price and date.

Once the data was collected and mapped, we analyzed it to determine dates of construction of improvements and dates of any sales transactions. Further, if a property sold multiple times, we analyzed the change in sales price over time.

***Study Areas Analyzed***: Once the data was collected it was sorted into one of the following seven study areas.

- *Lewis Road*: The Lewis Road area is located directly adjacent to the Times Beach site, on the north side of the Meramec River. This particular study area was the most directly affected by the on-site incinerator, according to the 1994 risk assessment produced by the EPA. The study area is also elevated above the Times Beach site and several of the parcels in the Lewis Road study area not only are in close proximity to Times Beach but also have views of the site.

- *Pevely Farms Golf Club*: Directly to the north of the Lewis Road area is the Pevely Farms Golf Club that opened to the public in the spring of 1999. The Pevely Farms Golf Club and the associated single-family residences are located approximately 0.25 miles from the Times Beach site. Construction began on the project in 1996 during the testing and use of the incinerator.

- *North of the Meramec River, West of the Burlington Northern Railroad Right-of-Way*: This study area is located west of the Pevely Farms Golf Club. The area is west of the Burlington Northern right-of-way and north of the Meramec River and is approximately 0.20 miles northwest of the Times Beach site.

- *Allen Road*: The Allen Road area is located adjacent to the Times Beach site, on the opposite side of the Burlington Northern railroad right-of-way. The area is bounded by the Burlington Northern right-of-way to the east, the Meramec River to the north, Interstate 44 to the south and the Missouri Pacific railroad right-of-way to the west.

- *Elk Run Subdivision*: The Elk Run subdivision is located directly to the west of the Allen Road study area. The subdivision is located approximately 0.25 miles to the west of the Times Beach site and was primarily developed in the late 1970s.

- *Acacia Road*: Located north of the Elk Run subdivision, west of the Allen Road study area, south of the Meramec River and east of Highway 109 is the Acacia Road study area. It is approximately 0.50 miles to the west of the Times Beach site.



- *Emerald Forest Subdivision*:  The Emerald Forest subdivision is located directly west of the Acacia Road study area, on the west side of Highway 109.  The study area is located approximately 1.0 mile to the northwest of the Times Beach site and was constructed beginning in 1997.

***Time Frames for the Analysis***: Once this data was collected it was inserted into one of three times frames.  These time frames include the following:

**Time Period A**

December 2, 1982 – July 19, 1990:      This time period extends from the first verification of dioxins in the soil within Times Beach until the date Syntex Agribusiness assumed responsibility for the cleanup in an agreement with the EPA and the State of Missouri and agreed to build the incinerator.

**Time Period B**

July 20, 1990 – Dec. 31, 1997:      This period includes the time span from the date Syntex Agribusiness declared responsibility until the end of 1997.  During this time the incinerator was designed, constructed, utilized and dismantled.  Final remediation of the site was complete at the end of 1997, although onsite monitoring is ongoing.  It overlaps with the period of maximum public concern about potential off-site impacts of the Times Beach remediation.

**Time Period C**

January 1, 1998 – April 2003:      This period spans the time between remediation completion and date of our site visit in 2003.

The three time frames were chosen to help understand the market activity in relation to specific events involving discovery and remediation of the contamination at Times Beach.

The first period (Time Period A) spans the years between discovery of contamination and the determination that an incinerator would be built at the Times Beach site.  It is also the time period when remediation of heavily contaminated sites was coming to the forefront of U.S. domestic environmental policy.  In the early 1980s, there was not a significant amount of information about the long term effects of dioxins and now well accepted methods to remediate soil contamination were only first being dismissed.  During the first time frame of our analysis, the residents of Times Beach were permanently relocated.

The second period (Time Period B) covers the permitting, construction, operation and eventual dismantling of the incinerator.  Although the incinerator was discontinued in late June of 1997, cleanup of the site and final remediation was not complete until the end of 1997.

The final time period (Time Period C) begins after completion of the remediation and ends in April 2003.  During this period, the Times Beach area is renamed Route 66 State Park and opens to the public.  Some site monitoring continues at the site.

**Results of JLL/Clarion Staff Research and Analysis**

***New Construction Trends During the Time Frames:***  Complete construction data for the Times Beach surrounding areas, the indicated time period, and the study area is retained in our file.



Between December 2, 1982 and April 4, 2003 a total of 185 residential structures were constructed within the study areas, according to data from the St. Louis County Assessor's office. Of the 544 properties mapped in the seven study areas, approximately 34 percent had been developed with residential structures during the course of the discovery and the subsequent remediation at Times Beach.

The vast majority of this new development occurred between January 1, 1997 and the end of our analysis period, April 4, 2003. During Time Period A, only four residential structures were constructed. A total of only 10 homes were constructed from 1982 through 1996.

One home was built in 1995, during the controversy over the proposed incinerator. The home was constructed north of the Meramec River, west of the Burlington Northern right-of-way study area, on Allen Road. Despite the public outcry, a large number of new homes were constructed during the remediation. A total of 40 homes were built in 1997 alone. Since the remediation has been completed, 135 homes have been constructed.

A majority of the new homes built during the planning and operation of the incinerator were in the Emerald Forest Subdivision. This subdivision is located approximately 1.0 mile to the northwest of the Times Beach area, on the west side of Missouri State Highway 109. The original planning of this subdivision began in the winter of 1995, at a time when the on-site incinerator was being constructed and approved and before it began operation in March 1996.

Other projects that began the planning stages of development during remediation at Times Beach include the Pevely Farms Golf Club. In the summer of 1992, Arthur Kerckhoff announced that he planned to build an upscale, daily-fee golf course on a 700-acre piece of property located approximately 0.25 miles north of the Times Beach site. Construction of the golf course began in 1996 and opened to the public in the spring of 1999. Construction of homes on the Pevely Farms Golf Club began in 2002 and continued at a brisk pace during the spring of 2003. The majority of the homes being constructed were being marketed at prices from $500,000 to well over $1,000,000 in the spring of 2003. Although not within our study area, another golf course development that is located immediately to the north of the Pevely Farms Golf Club is the private Players Club Golf Course, which opened for business during the early stages of the Times Beach situation in 1986.

Perhaps the most significant construction in proximity to Times Beach was the development of new homes within the Lewis Road study area directly adjacent to the Times Beach site, on the north side of the Meramec River. Because the Lewis Road area is elevated above the low lying Times Beach site, some home sites in the area have a clear view of Times Beach, including the temporary incinerator that was dismantled in 1997. During Time Period B from 1990 to 1997, homes were constructed in the Lewis Road area. New homes began construction in 1993 and 1994, with nine homes constructed in 1997 alone.

One significant non-residential development that occurred within one of the study areas is the Byerly Trailer sales facility that was constructed in 1999 at 295 E. 5th Street within the Allen Road study area. The development is located directly northwest of Interstate 44 and the Missouri Pacific railroad right-of-way, approximately 0.25 miles west of Times Beach. The 11.07-acre lot was purchased for $1,000,000 in October of 1998.

***Property Sales and Trends:*** The research indicates that existing homes continued to change hands during the entire remediation process. We researched the market to identify sale/resale transactions in order to determine the annual appreciation rate for homes around the Times Beach site and the length of time between sales. Once again, we have separated the sales data into the three time periods (Time Periods A, B, and C).



During the initial discovery of the toxins and the following years until Syntex Agribusiness assumed responsibility for the cleanup in July of 1990 (Time Period A), there was activity occurring in the study areas. We found a total of 15 sale/resale transactions during this time period. The average time between sales was 4.28 years, while the homes appreciated at an annual rate of 5.79%. All of these sale/resales were located in the Elk Run Subdivision, which is located approximately 0.25 miles to the west of Times Beach. It should be noted that at this point in time, the Pevely Farms Golf Club and the Emerald Forest Subdivision had not yet been developed.

Data collected from Time Period B, which includes the construction, use and dismantling of the incinerator, includes a total of 24 sale/resale transactions. On average, the time between sales for the sale/resale homes was 5.73 years and the average annual appreciation rate was 3.49%. Once again, most of the sales were located within the Elk Run Subdivision. There were two sales located within the Acacia Road study area.

The final time period (Time Period C) begins at the beginning of 1998, after the final remediation was completed at the Times Beach site. We found a total of 42 sale/resale transactions. The average time span between sales for properties that sold during Time Period C was 5.38 years. The annual appreciation rate for these sales was 6.69%. A majority of the sales occurred in Elk Run Subdivision, Emerald Forest Subdivision and the Lewis Road study areas. The Emerald Forest Subdivision began construction in early 1997. There were also sales located in the Acacia Road study area.

The table below displays the sale/resale data collected from sales transactions in each of the three Time Periods that were utilized for this study, including the annual real estate appreciation percentage of home resales in the study area versus the annual growth rate of homes throughout all of St. Louis over the same periods of time. As can be noted from the sale/resale table shown below, the annual appreciation rates of homes in the study area outpaced the annual appreciation rates of homes throughout St. Louis during each of the three time periods.

**Property Sales History in Times Beach Study Areas**

| Time Period | Number of Properties Involved in Sales Transactions* | Time Span Between Transactions (Years)* | Annual Appreciation Perecentage* | Annual Growth Rate of Homes** St. Louis, MO |
|---|---|---|---|---|
| Time Period A (12/2/82 - 7/19/90) | 15 | 4.28 | 5.79% | 5.12% |
| Time Period B (7/20/90 - 12/31/97) | 24 | 5.73 | 3.49% | 2.98% |
| Time Period C (1/1/98 - 4/4/03) | 42 | 5.38 | 6.69% | 4.96% |

\* St. Louis County Assessors Office
\*\* Office of Housing Enterprise Oversight

## Results of the JLL/Clarion Investigation and Analysis

The real estate market in the study areas surrounding the Times Beach Superfund site continued to be active during the discovery and completion of remediation. Our analysis of the construction and sales data history of the seven study areas surrounding the Times Beach, Missouri, Superfund Site indicates the following:



*Time Period A – Discovery of Dioxin Contamination to Approval of Final Remediation*

- In the wake of the initial investigation of the Times Beach dioxin contamination situation by the U.S. EPA in late 1982, the home construction market in surrounding neighborhoods appears to have been adversely affected.  Only four homes were constructed in surrounding neighborhoods between the discovery of the contamination and the issuance of the EPA advisory in late 1982 warning Times Beach residents to leave their homes and not return, and the date in July of 1990 when agreement is reached to build an incinerator to remediate soils at Times Beach and elsewhere in Missouri.  During this time period, an emergency relocation plan for 2000 Times Beach residents is approved (2/22/83), Times Beach is placed on the Superfund list (9/8/83), and relocation of existing residents and purchase of all Times Beach residences is completed (end of 1986), and public controversy over a proposal to incinerate dioxin tainted Times Beach soils first appears (3/10/88).

- However, during this initial time period from late 1982 to mid-1990, there appears to have been little if any permanent adverse impact on the market for existing homes in neighborhoods around Times Beach.  We found 15 sale/resales of the same property during this time period, and they indicated an average annual appreciation rate of 5.79% per year during a time when the countywide home price appreciation rate was only 5.12%.  That would indicate no permanent impact on home prices in the surrounding neighborhoods.

- The sales pattern in the Elk Run Subdivision (the closest major subdivision to the west of Times Beach), however, may indicate some temporary impact on prices from 1981 prior to discovery of the dioxin contamination at Times Beach to 1984.  Prices during 1982, 1983 and 1984 in Elk Run stay at or below 1981 pre-discovery prices.  And in 1984, there are no sales in Elk Run.  This was the time of greatest uncertainty concerning the implications of the Times Beach contamination situation.  However, by 1985, prices in Elk Run are increasing rapidly, and the average home price in 1987 is about 28.7% higher than in 1983/1984.

- In 1988, the average Elk Run sales price temporarily drops slightly, possibly in response to the public outcry concerning the EPA proposal announced in early 1988 to build a dioxin incinerator at the Times Beach site.  In 1989, however, the average price of an Elk Run home increases by 11.7%, indicating perhaps that the market is now starting to assimilate the proposed incinerator project, or possibly indicating that the marketplace does not believe that the incinerator will actually be built.

- The average sale price in Elk Run in 1989 shows an annualized appreciation rate of 5.51% during a period of time when the average home price appreciation in St. Louis County as a whole was about 5.12%.  This indicates that any impacts in Elk Run on home prices during this time period were temporary, not permanent, and that by the end of the time period, home prices in Elk Run were at or above where they should have been expected to be based on countywide data.

*Time Period B – Approval of Final Incinerator Plan to Completion of Remediation Project*

- The significant events during this time period between mid-1990 and the end of 1997 include court approval of a funding plan for the incinerator project (12/31/90); awarding of



the incineration contract (1/93); release of the EPA remediation risk assessment report (11/22/94); issuance of the permit to construct the incinerator (4/14/95); testing of the incinerator (11/95); GAO approval of the incinerator plan (1/24/96); initiation of operation of the incinerator (3/17/96); and completion of the incineration project (6/97).

- New construction activity appears to have been adversely affected during the initial years of this time period, but not as significantly as during Time Period A. However, once the incinerator is up and running, the residential construction market appears to have become comfortable with the remediation project. Although only a total of six homes are built between 1990 and the end of 1996, a total of 40 homes are built in 1997 alone, the last year of the operation of the incinerator. Significantly also, in 1995, a single-family home is built on Lewis Road immediately northeast of the incinerator site on high ground above the Meramec River.

- Two major new development projects are announced and get under way during this time period. The first is Pevely Farms, an upscale golf course community on 700 acres north and east of Times Beach. The second is Emerald Forest, a single-family residential development less than a mile northwest of Times Beach which receives planning approval in the winter of 1995, and sells its first 10 homes in 1997 during and immediately after the final stages of incinerator operation at prices averaging about $205,000.

- However, during this time period from mid-1990 to the end of 1997, evidence from the overall market around Times Beach indicates little if any permanent adverse impact on the market for existing homes in neighborhoods around Times Beach. We found 24 sale/resales of the same property during this time period, and they indicated an average annual appreciation rate of 3.49% per year during a time when the countywide home price appreciation rate was only 2.98%. That would indicate no permanent impact on home prices in the surrounding neighborhoods.

- Sales evidence from the Elk Run neighborhood, however, indicates a possible temporary impact on home prices that ended as soon as the remediation was completed. From 1989 to 1997, the average home price in Elk Run increased on average only 2.0% per year, less than the average annual increase for the entire area around Times Beach (3.49%) and less than the countywide average rate of increase (2.98%). However, in 1998, the first full year after removal of the incinerator, home prices in Elk Run jumped 15.5% from an average price of $84,688 to $97,817. When the entire period from 1989 to 1998 is considered, the average annual price appreciation in Elk Run is 3.42%, almost the same as the area wide Times Beach average for 1990 to 1997, and slightly higher than the countywide average.

*Time Period C – Completion of Remediation Project to April 2003*

- Significant events during this time period include completion of soil incineration (6/1997); dismantling of the incinerator (Fall 1997); dedication of the former Times Beach as Route 66 State Park (9/99); and removal of Times Beach from the Superfund list (9/25/01).

- Our analysis of construction trends in surrounding neighborhoods indicates no post-remediation adverse impact on home prices. The Emerald Forest Subdivision that started selling homes during the final stages of operation of the incinerator sees an increase in home sales in 1998 to 40 sales from 10 in 1997, and by early 2003 had sold all of the



available 143 home sites.  Pevely Farms Golf Club opened to the public in 1999, and sale of homes at prices between $500,000 and $1,000,000 begins in 2002 and continues briskly into 2003.  A total of 135 homes are constructed in the areas surrounding the former Times Beach site.

- Our analysis of home price trends also indicates no post-remediation adverse impact on home prices and the single-family home resale marketplace.  Average home prices in Emerald Forest increase annually at an average rate of 5.30% between 1997 and early 2003 and in Elk Run by an average annual rate of 8.45%.  The average appreciation rate in all seven study areas surrounding the former Times Beach site is 6.69% at a time (as measured by 42 sale/resale transactions) when the county wide rate of home price appreciation is only 4.96%.

**Conclusions from the JLL/Clarion Times Beach Superfund Site Investigation and Analysis**

When the entire history of the Times Beach, Missouri situation from early-1980s to 2003 is considered, the Times Beach case study supports the following conclusions:

- Any impacts in neighborhoods around the Times Beach site were temporary.

- There was a possible temporary impact of between 5% and 15% on prices in Elk Run, the closest major subdivision to the west of Times Beach during 1981 to 1984, a time period when an emergency relocation plan for 2000 Times Beach residents is approved (2/22/83), Times Beach is placed on the Superfund list (9/8/83), and relocation of existing residents and purchase of all Times Beach residences begins.  However, this impact ends before the purchase of all Times Beach residences and abandonment of the town is completed (end of 1986).

- There may also have been a brief temporary impact on prices in that same Elk Run subdivision in 1988 in response to the announcement of the on-site incinerator construction plan. There may have also been a slow down in construction of homes in some subdivisions during the initial years following announcement of the incinerator plan.

- Other nearby neighborhoods appear not to have been adversely impacted in price, however, during the years when Elk Run prices were temporarily impacted and during the years when some subdivisions may have shown a slow down in sales numbers.

- Times Beach, Missouri was one of the most publicized investigation and remediation situations in U.S. EPA history.  However, review and analysis of the market data and sales transactions during the time line of events that chronicled Times Beach indicates surrounding property values were not permanently affected.

- Once remediation at Times Beach was completed, any temporary real estate impacts ended.



*PCB Contamination Case Study No. 6*                    *St. Lawrence & Grasse River*
*Superfund Sites*                                    *Massena, New York*

### The Superfund Sites and PCB Contamination Situation

JLL investigated the effect of PCB contamination associated with three Superfund sites on the St. Lawrence River and Grasse River in upstate New York State. The investigation by the State of New York of the PCB environmental situation in this part of New York State along the St. Lawrence River began in the 1980s.

### Location of the Case Study and the Three Superfund Sites Involved

The map below shows the location of the three sites, typically identified as the GM Superfund Site, the Reynolds Metal Superfund Site, and the Grasse River Superfund Site Remediation Area.



***The GM Superfund Site***: The 217-acre General Motors site was used between 1959 and 1980 to produce aluminum cylinder heads for Chevrolet cars and "polychlorinated biphenyls (PCBs) were a component of hydraulic fluids used in die-casting machines at the facility."[303]  It was added to the Superfund National Priorities List in 1984. According to a Spring 2016 U.S. EPA report, cleanup of the GM site has involved the following staged activities:

- "installation of a cap on the Industrial Landfill at the site in the late 1980's to prevent immediate exposure from contaminants;

- long-term cleanup phases focusing on the cleanup of sediment from the St. Lawrence and Raquette River systems;

- excavation and removal of contaminated on-site soil;

---

[303] U.S. Environmental Protection Agency, "General Motors (Central Foundry Division) Cleanup Progress Update, Massena, St. Lawrence County, NY, Spring 2016, at page 3.



- removal of contaminated soil and sediment on St. Regis Mohawk Tribal properties (including Turtle Cove); and

- treatment of contaminated groundwater."[304]

Work in 2015 at the GM site included replacement of the engineered cap on the Industrial Landfill and East Disposal Area. At that time, additional work was planned for 2016 and 2017 to install a permanent groundwater treatment system, completion of the new engineered cap on the landfill, cleanup of a lagoon "and removal of contaminated soil and sediment from a Tribal property."[305]

***The Reynolds Metal Superfund Site***: The 1,500-acre Reynold's Metal facility is located approximately eight miles east of Massena, New York. The plant was constructed in 1958 and produced aluminum.

U.S. EPA later became involved as a result of the site's Superfund designation. Some of the approved remediation activities included dredging of adjacent portions of the St. Lawrence River and off-site disposal of dredged soils as well as capping and monitoring of waste disposal area on-site. According to the U.S. EPA, the dredging "removed 99 percent of the PCB-contaminated sediment in the St. Lawrence River."[306] The site is now in post-remediation with continued monitoring of capped areas and on-going sampling of sediments and fish.[307]

***The Grasse River (aka ALCOA Aggregation) Superfund Site and New York State Designated "Area of Concern"***: In 1989, the US EPA also issued an Administrative Order to Reynolds Metal requiring investigation of the Grasse River environmental situation. In 1995, Reynolds Metal removed contaminated sediments (that included PCB contamination) from an area near an outfall from the facility.[308] As it relates to the Grasse River PCB situation, a 2013 EPA cleanup plan requires dredging and capping of the contaminated river bottom sediment in a 7.2-mile stretch of the river. Dredged material would be disposed of at an appropriately permitted landfill site. Once the dredging is completed, habitat would be resorted, portions of the river channel would be capped. Following the capping, there will be "long-term monitoring of the capped areas to ensure that the caps remain in place."[309]

Dredging began in 2019 and continued into 2020 and 2021. The dredging and capping project on the Grasse River was completed in November of 2021. On-going monitoring will continue.

A fish consumption advisory for the lower Grasse River was first issued by the State of New York in 1990 and has been extended annually.[310] The EPA report says the following about potential

---

[304] Ibid., p. 1.

[305] Ibid., p. 1.

[306] U.S. Environmental Protection Agency, "Hazardous Waste Cleanup: ALCOA Incorporated in Massena, New York https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-reynolds-metals-company-massena-new-york

[307] U.S. EPA, Region 2, New York, NY, "Fourth Five-Year Review Report for the Reynolds Metals Superfund Site, St. Lawrence County, Town of Massena, New York," June 25, 2021, pages 7-8. Accessed at https://www.srmt-nsn.gov/_uploads/environment/FourthFiveYearReviewReport_ReynoldsMetalsSuperfund_June2021.pdf

[308] U.S. EPA "ALCOA Aggregation Site, Massena, NY: Cleanup Activities," https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0201690#Done

[309] U.S. EPA, "Case Summary: Alcoa, Inc. to conduct $243 million cleanup at Grasse River Superfund Site in New York," dated September 2013, accessed at https://www.epa.gov/enforcement/case-summary-alcoa-inc-conduct-243-million-cleanup-grasse-river-superfund-site-new-york

[310] U.S. Environmental Protection Agency, "First Five-Year Review Report for Grasse River (aka Alcoa Aggregation) Superfund Site, St. Lawrence County, New York," April 14, 2022, page 2.



lifting of the fishing advisories: "The fish consumption advisories established by New York State Department of Health will remain in effect until PCB concentrations in fish are reduced to the point where they can be relaxed or lifted by the state."[311]

An August 2021 graphic in a US EPA presentation[312] summarized the status of the Grasse River project as of that date as shown below:

**Grasse River Project Update August 2021**

**Capping**

Capping resumed in April and is ongoing downstream of the Route 131 bridge to the Grasse River mouth (see the figure below). Capping includes placing sand and carbon materials on the river bottom. These cap materials are stored and managed at the staging areas near Route 131 and Haverstock Road. Additional cap materials will be placed over portions of the 2020 armored cap areas, upstream of Route 131. Truck traffic has increased in the area, especially near these staging areas due to trucks delivering cap materials to the site. Truck routes are provided on the figure below. Drivers should exercise caution when driving in the vicinity of the project and staging areas.

**Dredging**

Dredging was performed May to June in a small area just downstream of Snug Harbor in coordination with the St. Lawrence Seaway Development Corp. to support use of the new tugboat. Dredged materials were processed at the staging area near Route 131 and disposed in the Secure Landfill. Placement of backfill material over portions of Snug Harbor dredged areas is ongoing.

**2021 by the numbers** (as of July 17, 2021)

- 170 acres covered with 300,000 cy of capping material
- 6,200 cy of material dredged and placed in the secure landfill
- 3.7 acres of dredge area covered with 5,800 cy of backfill

In November of 2021, the EPA updated the summary of the work on the Grasse River in the graphic below:

---

[311] Ibid.

[312] Available at http://www.thegrasseriver.com/docs/Grasse%20Community%20Mailer%20-%20Summer%202021.pdf



## Grasse River Project Update
### November 2021

Major construction activities for the Grasse River are complete! Arconic has completed the in-river construction work to implement the U.S. EPA-selected remedy for a 7.2-mile stretch of the lower Grasse River. Beginning in 2019, dredging and capping of sediment containing PCBs was performed to reduce PCB levels in fish and other organisms for the long-term protection of human health and the environment. Below are details about this important milestone.

**✔ Dredging is complete!**

Material was dredged from the river in the near shore, floodplain, and Snug Harbor areas. Materials were processed at the staging area near Route 131, then disposed in the Secure Landfill. Clean backfill was placed over the dredged areas. Dredging equipment was removed from the river.

**✔ Capping is complete!**

Capping materials were placed on the river bottom from the Alcoa Road Bridge to the mouth of the Grasse River. The capping materials primarily included sand and activated carbon, with some gravel and armor stone. Capping equipment and materials staged near the river were removed and staging areas were restored.

**✔ Monitoring performed!**

Over 10,000 samples were collected from 2019 to 2021 (click here for monitoring results):

*   6,400+ air samples for PCBs
*   550+ days of dust and VOC air monitoring
*   2,200+ water samples for PCBs
*   2,000+ water samples for TSS
*   1,400+ readings for turbidity

**By the numbers**

| ARMORED CAPPING (2020) | SAND CAPPING (2021) | DREDGING (2019 Near Shore/Floodplain and 2020-2021 Snug Harbor) |
|---|---|---|
| 59 acres covered | 200 acres covered | 48 acres dredged |
| 288,000 cy of capping material placed | 524,000 cy of capping material placed | 220,000 cy dredged |
| | | 125,000 cy backfill |

Map labels: SNUG HARBOR REMOVAL; SAND CAP (SAND & CARBON); NEAR SHORE AND FLOODPLAIN REMOVAL; HAVERSTOCK ROAD STAGING AREA; ARMORED CAP (SAND, CARBON, GRAVEL, ARMOR STONE, & SAND HABITAT LAYER); ROUTE 131 STAGING AREA; SECURE LANDFILL

***The ALCOA West RCRA Site:*** The 2,700-acre ALCOA site in Massena bounded by the St. Lawrence River on the north, the Power Canal on the southwest, and the Grasse River on the southeast has been the location of an aluminum production facility since 1903.

Over the years, industrial and hazardous wastes were disposed of at various locations on the site. A 1985 Consent Decree between the State of New York and ALCOA required the company to investigate and remediate the site. During the investigation, "18 solid waste management units and areas of concern were identified, including landfills, lagoons, spent potlining piles, areas affected by stormwater, etc."[313]  Some of the contaminants found on-site included PCBs.

In 2019, the State of New York began to investigate a 1.34-acre portion of the larger site that contains the former Continuous Mill (Building 140) under the state's Superfund program.

**Timeline Related to the Investigation and Remediation of the Three Sites**

---

[313] U.S. Environmental Protection Agency, "Hazardous Waste Cleanup: ALCOA Incorporated in Massena, New York, https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-alcoa-incorporated-massena-new-york



The timeline below presents some of the key dates and events related to investigation and remediation of the GM, Reynolds Metal (ALCOA) sites and the related Grasse River and St. Lawrence River PCB investigation and control/remediation.

| Brief Timeline of Superfund Site and PCB Investigation at Massena/Akwesasne | |
|---|---|
| **Date** | **Summary of Event** |
| **1903** | Arconic opens an aluminum product manufacturing facility in Massena, New York.[314] |
| **1958** | The Reynolds Metals Company facility (Alcoa-East) is constructed.[315] |
| **1959** | The General Motors Corporation (GM) opens an aluminum die-casting plant in Massena, New York.[316] |
| **1977** | The EPA bans the use of PCBs.[317] |
| **1980** | The GM plant ceases use of PCBs, which up until this point were a component of the hydraulic fluids used in the facility.[318] |
| **1983** | The GM plant is placed on the Superfund National Priorities List by the EPA.[319] |
| **Sept. 28, 1989** | The EPA issues an Administrative Order to Arconic, which required the company to investigate the contamination in the Grasse River and to assess remedial cleanup alternatives.[320] |
| **1990** | The New York State Department of Health issues a fishing advisory recommending that no fish are consumed from the Grasse River from the mouth to the Massena Power Canal.[321] |
| **June-Nov. 1995** | GM dredges around 10 acres in the St. Lawrence River, removing 13,000 cubic yards of sediment. A multilayer cap is placed over a two-acre area, reducing the surface concentration of PCBs.[322] |
| **2001** | The EPA begins dredging contaminated sediments from the bottom of the St. Lawrence River, with 20,200 pounds of PCBs removed from the riverbed adjacent to the Alcoa East facility.[323] |
| **July-Oct. 2001** | A capping pilot study was performed in a seven-acre area of the Grasse River to evaluate water capping.[324] |
| **June 2002-May 2003** | The remediation effort on the Raquette River results in 10,000 cubic yards of soil removed from the bank, and 1,440 cubic yards of sediment dredged from the river. |
| **April-Dec. 2005** | Arconic, with oversight from the EPA, New York State Department of Environmental Conservation, and the St. Regis Mohawk tribe, conducts a Remedial Options Pilot Study to provide information to potential alternatives for addressing contaminated sediments in Grasse River. The study includes sediment removal by dredging, capping, and thin-layer capping.[325] |
| **2009** | The EPA completes the dredging and capping of contaminated sediments in the riverbed adjacent to the Alcoa East facility.[326] |

---

[314] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201690#bkground
[315] https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-reynolds-metals-company-massena-new-york
[316] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201644#bkground
[317] https://semspub.epa.gov/work/02/372872.pdf
[318] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201644#bkground
[319] https://semspub.epa.gov/work/02/372872.pdf
[320] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201690#bkground
[321] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201690#bkground
[322] https://semspub.epa.gov/work/02/372872.pdf
[323] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201465#bkground
[324] http://www.thegrasseriver.com/historyRemedOptionsStudy.html
[325] http://www.thegrasseriver.com/historyRemedOptionsStudy.html
[326] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201465#bkground



| | |
|---|---|
| **July 2009** | The GM plant ceases operations.[327] |
| **Sept. 28, 2012** | The EPA releases a Proposed Pan for cleaning up the Grasse River Superfund Site.[328] |
| **April 5, 2013** | EPA finalizes the Proposed Plan for the Grasse River with a Record of Decision. The cleanup plan for the site calls for dredging and capping of the PCB contaminated sediment in a 7.2 mile stretch of the Grasse River.[329] |
| **April-June 2014** | The EPA maps the Grasse River bottom, as well as takes several hundred samples to determine PCB concentrations in both the river and in the adjacent shoreline.[330] |
| **Nov. 2, 2015** | Alcoa permanently closes the Alcoa-East facility, which had been left idle since 2014.[331] |
| **Spring, 2017** | Arconic begins constructing a staging area for sediments and capping materials upstream of the Route 131 Bridge.[332] |
| **March 20, 2019** | The New York State Department of Health extends the geographic area of the fishing advisory on the Grasse River from the mouth of the river downstream to the north end of Raquette Point at Navigation Light No. 11. |
| **2019** | The EPA begins removal of the sediments from near shore areas in lower Grasse River, reducing PCB levels by removing sediment, placing a sand cap in the main channel of the river, and excavating floodplain soil and backfilling with clean soil.[333] |
| **April 14, 2020** | The EPA has called for the removal of an additional 90,000 cubic yards of sediment near Snug Harbor, rather than capping it per the original 2013 cleanup plan.[334] |
| **Dec. 2020** | Dredged material from the Grasse River is processed at the Route 131 staging area and transported to landfill for disposal. Extensive air and water quality monitoring and results indicate the work was done in a manner of human health. All sample results were below the PCB criteria.[335] |
| **2020** | 54 acres on the Grasse River were capped, and dredging in the Snub Harbor is complete, with over 110,000 cubic yards of sediment remove from 20 acres. [336] |
| **March 30, 2021** | The EPA announces that in-river work will resume next month to address the issues at Grasse River Superfund site. The 2021 work will include placing a 12-inch cap over 200 acres of the Grasse River, sand backfilling in areas dredged in 2020, and habitat reconstruction.[337] |
| **November 18, 2021** | The EPA announces that dredging and capping work has been completed at the Grasse River Superfund site.  "Nearly a quarter million cubic yards of sediment contaminated with polychlorinated biphenyls (PCBs) have been removed from the Grasse River and over 200 acres of river bottom have been capped."[338] |
| **April 14, 2022** | First five-year review by the EPA of the Alcoa Aggregation Superfund Site states the following about the status of the remediation and control project on the lower Grasse River: "Given that |

---

[327] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0201644#bkground

[328] https://semspub.epa.gov/work/02/145560.pdf

[329] https://www.dredgingtoday.com/2021/03/31/grasse-river-dredging-resumes-next-month/

[330] http://www.thegrasseriver.com/history2014work.html

[331]  https://www.nny360.com/news/alcoa-will-permanently-close-massena-east-end-smelting-at-west-plant-and-lay-off-up/article_b60fe687-7baf-5724-b19b-80a7523d7444.html

[332] https://archive.epa.gov/epa/ny/grasse-river-superfund-site-massena-ny.html

[333] http://www.thegrasseriver.com/history2019pluswork.html

[334] https://www.epa.gov/newsreleases/epa-modifies-cleanup-plan-grasse-river-superfund-site-massena-new-york

[335] https://www.youtube.com/watch?v=izifGwrLg_Q

[336] http://www.thegrasseriver.com/docs/Grasse%20Community%20Mailer%20-%20December%202020.pdf

[337]  https://www.epa.gov/newsreleases/cleanup-work-resume-next-month-grasse-river-superfund-site-massena-new-york

[338] https://www.epa.gov/newsreleases/dredging-and-capping-work-completed-grasse-river-superfund-site-massena-ny



the remedy removed the contaminated materials from the Site or isolated the contamination by main channel capping, the exposure pathways associated surface soil, subsurface soil, and sediment have been eliminated" and "[u]pon completion of the cleanup, the Site is expected to function as designed and protect human health and the environment, and in the interim, exposure pathways that could result in unacceptable risks are being addressed." [339]

In addition, there has been investigation and remediation at the 2,700-acre ALCOA West RCRA Site that involves the following activities:[340]

- 18 areas of concern (including landfills, lagoons, areas affected by stormwater runoff, and river outfalls) on the site were identified and remediated between the mid-1980s and the early 2000s.

- Work included capping of landfills, groundwater flow control, and excavation of some PCB contaminated sediments.

- The corrective actions on the entire site have been completed and the site is under post-remediation monitoring.

- A 1.34-acre portion of the larger site that contains the former Continuous Mill (Building 140) continues to be the subject of a New York State investigation under the state's Superfund program.[341]

**Scope of JLL Investigation and Research**

The scope of the JLL/Clarion investigation involved various types of analysis including sale/resale analysis of land and home transactions as well as trend line analysis. Sales data was gathered from the Multiple Listing Services for both St. Lawrence County and Franklin County, New York.

That real estate data that was available go back to 2010, so included in the analysis were all MLS sales between 2010 and July of 2022. The JLL study analyzed vacant land sale/resale data pairs of properties in an area within 0.5 mile of the Grasse River (i.e., those sales potentially affected by the designation by New York State as properties located in an "Area of Concern") and vacant land sale/resale data pairs of properties not within this "Area of Concern" to identify whether any systematic pricing differences occurred between the two groups of land sales. The study then separately analyzed price changes for improved residential properties both inside and outside the designated "Area of Concern." The price changes in the land sale/resale pairings and the improved residential property sale/resale pairings were then compared to separate "baseline indexes" of changing land sale prices and improved residential properties in St. Lawrence and Franklin counties as a whole.

**Land Sale/Resale Paired Sales Analysis**

The table below shows the results of the analysis:

---

[339] U.S. Environmental Protection Agency, "First Five-Year Review Report for Grasse River (aka Alcoa Aggregation) Superfund Site, St. Lawrence County, New York," April 14, 2022, page 2.
[340] U.S. EPA. "Hazardous Waste Cleanup: ALCOA Incorporated in Massena, New York." Accessed from: https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-alcoa-incorporated-massena-new-york
[341] https://www.dec.ny.gov/data/der/factsheet/645030riwp.pdf



| Land Sale/ Resale Pair No. | River | Address | Municipality | Date of Sale | Price | Annual Change in Price | Baseline Index Annual Price Change |
|---|---|---|---|---|---|---|---|
| **Grasse River Superfund Site -- Riverfront Land Sale/Resales** | | | | | | | |
| No. L1 | Grasse | 326 Haverstock Rd. | Massena | 6/30/2011 | $150,000 | | |
| | | 326 Haverstock Rd. | Massena | 7/31/2017 | $195,000 | 4.93% | 2.21% |
| | | | | | **Average** | **4.93%** | **2.21%** |
| **Grasse River Superfund Site – Within 0.5 Mile but Not Directly on the Grasse River** | | | | | | | |
| No. L2 | | 2787 State Route 95 | Hogansburg | 5/24/2013 | $30,000 | | |
| | | 2787 State Route 95 | Hogansburg | 5/15/2015 | $32,000 | 3.38% | -0.34% |
| No. L3 | | 290 Frye Road | Fort Covington | 1/4/2012 | $65,000 | | |
| | | 290 Frye Road | Fort Covington | 7/25/2014 | $80,000 | 9.03% | -0.34% |
| | | | | | **Average: L2 & L3** | **6.21%** | **-0.34%** |
| | | | | | **Average: L1 thru L3** | **5.78%** | **0.51%** |
| | | | | | **Median: L1 thru L3** | **4.93%** | **-0.34%** |
| **Riverfront Land Sale/Resales – Outside Designated Grasse River Superfund Site or on Other Rivers** | | | | | | | |
| No. L4 | Grasse | 2121 SH 310 | Madrid | 6/23/2015 | $168,000 | | |
| | | 2121 SH 310 | Madrid | 5/3/2021 | $166,240 | -0.18% | 3.66% |
| No. L5 | Grasse | Tallman Rd | Canton | 10/11/2016 | $25,000 | | |
| | | Tallman Rd. | Canton | 12/23/2020 | $35,000 | 9.52% | 1.52% |
| No. L6 | Grasse | 124 Willard Rd. | Massena | 10/13/2015 | $31,000 | | |
| | | 124 Willard Rd. | Massena | 7/23/2019 | $51,000 | 17.09% | 4.91% |
| No. L7 | Raquette | 0 River Rd | Potsdam | 4/20/2011 | $51,500 | | |
| | | 0 River Rd | Potsdam | 1/22/2021 | $20,000 | -6.27% | 1.98% |
| No. L8 | Racquette | North Racquette River Rd | Massena | 10/1/2013 | $17,750 | | |
| | | North Racquette River Rd | Massena | 5/20/2020 | $10,500 | -6.16% | 2.88% |
| No. L9 | Racquette | 0 County Route 40 | Massena | 12/1/2011 | $49,500 | | |
| | | 0 County Route 40 | Massena | 2/9/2021 | $32,500 | -3.74% | 2.13% |
| No. L10 | Racquette | 168 River Rd. | Potsdam | 12/6/2013 | $30,000 | | |
| | | 168 River Rd. | Potsdam | 4/13/2016 | $31,500 | 2.13% | 5.16% |



| No. | Owner | Address | City | Date | Price | | |
|-----|-------|---------|------|------|-------|---|---|
| No. L11 | St. Regis | 0 Route 37C | Bombay | 12/21/2011 | $52,500 | | |
| | | 0 Route 37C | Bombay | 5/4/2021 | $56,700 | 0.85% | 2.14% |
| No. L12 | St. Regis | North Rd. | Helena | 11/24/2014 | $13,600 | | |
| | | North R. | Helena | 6/7/2016 | $16,500 | 13.88% | 8.32% |
| No. L13 | St. Regis | 176 East Part Rd. | Winthrop | 12/11/2015 | $21,500 | | |
| | | 176 East Part Rd. | Winthrop | 7/16/2020 | $17,550 | -4.00% | 4.41% |
| No. L14 | St. Lawrence | 1 Franklin Street | Ogdensburg | 6/24/2013 | $149,000 | | |
| | | 1 Franklin Street | Ogdensburg | 5/12/2021 | $150,000 | 0.09% | 2.63% |
| No. L15 | St. Lawrence | 542 State Hwy 131 | Massena | 9/3/2010 | $43,000 | | |
| | | 542 State Hwy 131 | Massena | 9/20/2013 | $53,000 | 7.63% | -0.34% |
| No. L16 | Grasse | 4 South Ave. | Massena | 7/29/2012 | $8,000 | | |
| | | 4 South Ave. | Massena | 5/26/2022 | $12,000 | 5.09% | 2.25% |
| | | | | | **Average** | **2.77%** | **3.20%** |
| | | | | | **Median** | **0.85%** | **2.63%** |

As indicated by the table, the average appreciation rate for the one riverfront land sale/resale property located directly on the Grasse River in the designated Superfund site "Area of Concern" exceeded both the rate of appreciation over the same period of time for land sales in St. Lawrence and Franklin counties as a whole. The median 4.93% per year appreciation rate was also higher than the 2.77% rate of appreciation for the riverfront sale/resale pairings involving land not located in the stretch of river designated as the Superfund site "Area of Concern." The two sale/resales involving land within 0.5 mile of the Grasse River Superfund site "Area of Concern" but not directly on the river showed an average rate of price appreciation of 6.2% which is also higher than the 2.77% rate of appreciation for riverfront land outside the designated Superfund site "Area of Concern." The median prices for the sale/resales in the area affected by the Superfund investigation/remediation were also higher than the median prices for the riverfront land sale/resale pairings outside the designated Superfund site investigation/remediation area.

That analysis also indicates that prices for land in the land along the Grasse River Superfund site "Area of Concern" shoreline since 2010 have increased at a faster rate than land prices in St. Lawrence and Franklin counties as a whole.  By contrast, riverfront land prices not affected by the Superfund site investigation/remediation have increased at a rate lower than for land prices in St. Lawrence and Franklin counties as a whole since 2010.

**Single-Family Home Sale/Resale Analysis**

The table below shows the results of the single-family sale/resale pairings analysis involving homes within 0.5-mile of the river Superfund site "Area of Concern" (i.e., "No. AOC1", "No. AOC2", etc.) along either side of the Grasse River.



     

| SF Home Sale/Resale Pair No. | Address | Municipality | Date of Sale | Price | Annual Change in Price | Baseline Index Annual Price Change |
|---|---|---|---|---|---|---|
| **Grasse River Sale/Resales** | | | | | | |
| No. AOC1 | 15 Shoreline Drive | Massena | 11/12/2010 | $360,000 | | |
| | 15 Shoreline Drive | Massena | 5/30/2013 | $289,000 | -7.75% | 3.81% |
| No. AOC2 | 3 River Lane | Massena | 9/24/2010 | $41,000 | | |
| | 3 River Lane | Massena | 8/26/2016 | $50,000 | 3.71% | 1.88% |
| No. AOC3 | 4 Meadow View Lane | Massena | 2/13/2019 | $161,000 | | |
| | 4 Meadow View Lane | Massena | 8/3/2020 | $175,000 | 5.91% | 5.85% |
| No. AOC4 | 10 Randall Drive | Massena | 5/4/2011 | $72,100 | | |
| | 10 Randall Drive | Massena | 4/1/2019 | $76,320 | 0.74% | 1.54% |
| No. AOC5 | 14 Cummings Street | Massena | 8/20/2013 | $109,000 | | |
| | 14 Cummings Street | Massena | 4/29/2016 | $92,000 | -5.80% | 0.01% |
| No. AOC6 | 19 Williams Street | Massena | 6/9/2015 | $72,000 | | |
| | 19 Williams Street | Massena | 3/11/2020 | $78,000 | 1.75% | 2.18% |
| No. AOC7 | 81 Liberty Avenue | Massena | 12/4/2013 | $25,000 | | |
| | 81 Liberty Avenue | Massena | 9/30/2014 | $20,000 | -24.35% | 0.16% |
| No. AOC8 | 51 Liberty Avenue | Massena | 12/13/2013 | $42,000 | | |
| | 51 Liberty Avenue | Massena | 7/24/2020 | $32,000 | -3.60% | 1.99% |
| No. AOC9 | 30 Bishop Avenue | Massena | 5/29/2015 | $79,900 | | |
| | 30 Bishop Avenue | Massena | 6/5/2020 | $89,900 | 2.49% | 2.41% |
| No. AOC10 | 42 Cornell Avenue | Massena | 5/3/2012 | $74,500 | | |
| | 42 Cornell Avenue | Massena | 7/17/2015 | $76,000 | 0.63% | 0.78% |
| No. AOC11 | 39 Somerset Avenue | Massena | 11/2/2012 | $70,500 | | |
| | 39 Somerset Avenue | Massena | 9/5/2014 | $55,000 | -11.95% | 0.77% |
| No. AOC12 | 74 Cornell Avenue | Massena | 4/26/2011 | $86,000 | | |
| | 74 Cornell Avenue | Massena | 11/13/2020 | $27,000 | -7.18% | 2.51% |
| No. AOC13 | 58 Bishop Avenue | Massena | 12/16/2015 | $11,350 | | |
| | 58 Bishop Avenue | Massena | 4/11/2019 | $14,000 | 7.04% | 1.58% |
| No. AOC14 | 9 Somerset Avenue | Massena | 2/25/2010 | $60,000 | | |
| | 9 Somerset Avenue | Massena | 2/22/2011 | $79,000 | 31.95% | 8.45% |



| No. | Address | | Date | Price | | |
|---|---|---|---|---|---|---|
| No. AOC15 | 89 Water Street | Massena | 12/28/2011 | $19,900 | | |
| | 89 Water Street | Massena | 5/6/2021 | $16,000 | -2.09% | 2.69% |
| No. AOC16 | 59 Parker Avenue | Massena | 10/1/2010 | $54,500 | | |
| | 59 Parker Avenue | Massena | 8/7/2015 | $53,000 | -0.57% | 2.28% |
| No. AOC17 | 15 Talcott Street | Massena | 11/17/2011 | $80,000 | | |
| | 15 Talcott Street | Massena | 10/18/2019 | $57,000 | -3.63% | 1.55% |
| No. AOC18 | 12 Brighton Street | Massena | 5/14/2010 | $79,900 | | |
| | 12 Brighton Street | Massena | 7/17/2015 | $65,000 | -3.60% | 2.84% |
| No. AOC19 | 51 Malby Avenue | Massena | 1/29/2010 | $81,620 | | |
| | 51 Malby Avenue | Massena | 6/28/2016 | $73,000 | -1.65% | 2.79% |
| No. AOC20 | 35 Malby Avenue | Massena | 6/21/2010 | $48,230 | | |
| | 35 Malby Avenue | Massena | 7/30/2018 | $36,000 | -3.13% | 2.04% |
| No. AOC21 | 15 Tracy Street | Massena | 10/5/2012 | $83,500 | | |
| | 15 Tracy Street | Massena | 10/29/2021 | $113,500 | 3.96% | 3.12% |
| No. AOC22 | 6 Maiden Lane | Massena | 11/13/2019 | $70,000 | | |
| | 6 Maiden Lane | Massena | 1/6/2022 | $90,000 | 13.29% | 8.92% |
| No. AOC23 | 30 Forest Place | Massena | 12/22/2010 | $137,500 | | |
| | 30 Forest Place | Massena | 1/14/2022 | $170,000 | 2.14% | 3.73% |
| No. AOC24 | 77 Cornell Ave. | Massena | 10/26/2018 | $42,500 | | |
| | 77 Cornell Ave. | Massena | 1/28/2022 | $72,000 | 21.30% | 7.88% |
| No. AOC25 | 35 Park Avenue | Massena | 8/9/2018 | $50,000 | | |
| | 35 Park Avenue | Massena | 4/5/2022 | $62,000 | 6.57% | 7.96% |
| No. AOC26 | 245 Trippany Road | Massena | 5/19/2017 | $122,000 | | |
| | 245 Trippany Road | Massena | 4/13/2022 | $145,000 | 3.85% | 6.61% |
| No. AOC27 | 10 Tamarack Street | Massena | 11/12/2013 | $48,500 | | |
| | 10 Tamarack Street | Massena | 5/17/2022 | $65,000 | 4.00% | 4.02% |
| No. AOC28 | 4 Forest Place | Massena | 8/3/2020 | $75,000 | | |
| | 4 Forest Place | Massena | 5/25/2022 | $110,000 | 25.83% | 10.30% |
| No. AOC29 | 16 Talcott Street | Massena | 12/20/2013 | $95,000 | | |
| | 16 Talcott Street | Massena | 6/30/2022 | $152,000 | 7.04% | 4.23% |
| | | | | **Average** | **2.31%** | **3.62%** |
| | | | | **Median** | **1.75%** | **2.69%** |
| | | | | **Differential: Average** | | **1.31%** |
| | | | | **Differential: Median** | | **.94%** |



As the table above indicates, single-family home prices along the Grasse River increased on average by an amount equal to about 2.31%. By comparison, prices for single-family homes in St. Lawrence County increased by about 3.62% on average over the same time frames.

However, that differential spread in the average sale/resale price comparisons – approximately 1.3 percentage points -- between homes within 0.5 mile of the Grasse River by comparison to single-family homes in the larger St. Lawrence County market area as a whole is very close to the 1.55 percentage point spread for homes along other rivers in the same general market area but not affected by the PCB contamination investigation and remediation. The riverfront sale/resale comparisons on those other rivers (i.e., "No. RF1", "No. RF2", etc.) are summarized in the table below:

| SF Home Sale/Resale Pair No. | River | Address | Municipality | Date of Sale | Price | Annual Change in Price | Baseline Index Annual Price Change |
|---|---|---|---|---|---|---|---|
| **Riverfront Sales Outside Grasse River Superfund Investigation Area** | | | | | | | |
| No. RF1 | St. Regis | 3520 George | Parishville | 9/26/2014 | $135,000 | | |
| | | 3520 George | Parishville | 9/15/2016 | $125,000 | -3.76% | -0.12% |
| No. RF2 | St. Regis | 30 Stewart Lane | Brasher Falls | 8/31/2011 | $106,000 | | |
| | | 30 Stewart Lane | Brasher Falls | 9/4/2020 | $112,500 | 0.68% | 2.22% |
| No. RF3 | St. Regis | 345 Benton Road | Potsdam | 2/14/2014 | $324,500 | | |
| | | 345 Benton Road | Potsdam | 12/3/2021 | $380,000 | 2.19% | 3.54% |
| No. RF4 | Racquette | 172 River Road | Potsdam | 2/7/2011 | $300,000 | | |
| | | 172 River Road | Potsdam | 6/19/2019 | $292,500 | -0.30% | 1.78% |
| No. RF5 | Racquette | 16-18 Riverside Dr. | Potsdam | 1/29/2018 | $122,000 | | |
| | | 16-18 Riverside Dr. | Potsdam | 1/7/2021 | $145,000 | 6.41% | 5.37% |
| No. RF6 | Racquette | 7 Hillcrest Drive | Potsdam | 9/6/2013 | $425,000 | | |
| | | 7 Hillcrest Drive | Potsdam | 7/24/2017 | $432,500 | 0.45% | 0.17% |
| No. RF7 | Racquette | 6459B State Hwy 56 | Potsdam | 7/9/2015 | $375,000 | | |
| | | 6459B State Hwy 56 | Potsdam | 8/23/2019 | $350,000 | -1.62% | 1.69% |



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| No. RF8 | Racquette | 520 North Racquette River Rd. | Massena | 10/3/2011 | $244,450 | | |
| | | 520 North Racquette River Rd. | Massena | 12/20/2021 | $342,000 | 3.91% | 3.37% |
| No. RF9 | Racquette | 629 River Road | Norfolk | 11/8/2012 | $93,000 | | |
| | | 629 River Road | Norfolk | 3/14/2022 | $145,000 | 5.98% | 3.55% |
| No. RF10 | Racquette | 656 North Racquette River Rd. | Massena | 8/5/2015 | $305,000 | | |
| | | 656 North Racquette River Rd. | Massena | 7/1/2022 | $392,000 | 4.13% | 5.24% |
| No. RF11 | Grasse | 10 Tallman Road | Canton | 2/12/2013 | $317,000 | | |
| | | 10 Tallman Road | Canton | 5/29/2014 | $286,000 | -7.58% | 0.71% |
| No. RF12 | Grasse | 16 Buck Street | Canton | 3/29/2013 | $140,980 | | |
| | | 16 Buck Street | Canton | 4/13/2021 | $165,000 | 2.12% | 2.58% |
| No. RF13 | Grasse | 6161 County Rte 27 | Canton | 5/27/2016 | 5/27/2016 | | |
| | | 6161 County Rte 27 | Canton | 11/19/2020 | 11/19/2020 | 0.86% | 3.61% |
| No. RF14 | Grasse | 85 Riverside Drive | Canton | 10/5/2018 | $365,000 | | |
| | | 85 Riverside Drive | Canton | 9/24/2020 | $425,000 | 8.34% | 5.67% |
| No. RF15 | Grasse | 25 Riverside Pkwy | Massena | 11/17/2014 | $230,000 | | |
| | | 25 Riverside Pkwy | Massena | 6/13/2019 | $250,000 | 1.90% | 1.27% |
| No. RF16 | Grasse | 18 Riverview Drive | Massena | 12/30/2019 | $260,000 | | |
| | | 18 Riverview Drive | Massena | 5/6/2021 | $265,000 | 1.42% | 7.92% |
| No. RF17 | St. Lawrence | 5 Bell Lane | Hammond | 12/14/2016 | $150,000 | | |
| | | 5 Bell Lane | Hammond | 12/23/2019 | $165,000 | 3.31% | 2.95% |



*JLL Expert Report and
Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.
East St. Louis, Illinois*

| No. RF18 | St. Lawrence | 9 St. Lawrence Crescent | Waddington | 8/24/2011 | $322,564 | | |
| | | 9 St. Lawrence Crescent | Waddington | 10/29/2015 | $270,000 | -3.90% | 1.23% |
| No. RF19 | St. Lawrence | 147 St. Lawrence Ave | Waddington | 2/5/2010 | $185,000 | | |
| | | 147 St. Lawrence Ave | Waddington | 10/16/2015 | $200,000 | 1.42% | 3.12% |
| No. RF20 | St. Lawrence | 4 Five Mile Line Road | Ogdensburg | 6/24/2015 | $170,000 | | |
| | | 4 Five Mile Line Road | Ogdensburg | 6/9/2017 | $160,000 | -3.00% | 0.19% |
| No. RF21 | St. Lawrence | 132 Proctor Avenue | Ogdensburg | 7/18/2016 | $275,000 | | |
| | | 132 Proctor Avenue | Ogdensburg | 12/22/2020 | $210,000 | -5.34% | 3.85% |
| No. RF22 | St. Lawrence | 22 Lord Drive | Ogdensburg | 11/7/2012 | $338,000 | | |
| | | 22 Lord Drive | Ogdensburg | 9/9/2019 | $298,000 | -1.73% | 1.25% |
| No. RF23 | St. Lawrence | 1 Pine Point Drive | Morristown | 9/10/2018 | $285,000 | | |
| | | 1 Pine Point Drive | Morristown | 7/1/2021 | $345,000 | 7.50% | 6.77% |
| No. RF24 | St. Lawrence | 461 B River Rd East | Morristown | 7/10/2018 | $160,000 | | |
| | | 461 B River Rd East | Morristown | 8/16/2021 | $230,000 | 14.10% | 6.79% |
| | | | | | **Average** | **1.56%** | **3.11%** |
| | | | | | **Median** | **1.42%** | **3.03%** |
| | | | | **Differential: Average** | | | **1.55%** |
| | | | | **Differential: Median** | | | **1.61%** |

To understand the potential effect of proximity to the Grasse River "Area of Concern" on home prices, the differential shown in the table above serves as a "control" differential indicating the general difference between price appreciation rates for riverfront homes and other single-family homes not on rivers in St. Lawrence County.

When the "control" differentials (an average of 1.55 percentage points and a median of 1.61 percentage points) are deducted from the differential for Grasse River home prices (1.33 average and .94 median), the indicated potential impact on prices from proximity to the Grasse River "Area

338



of Concern" is between -0.24 percentage points (average) and -0.67 percentage points (median), a statistically meaningless differential.

**Conclusion from the Land and Home Sale/Resale Analysis**

The percentage point differentials from the single-family home sale/resale comparisons are so small as to be within the normal range of statistical error when comparing smaller data sets such as those involved in the sale/resale comparisons.

The overall conclusion from the land sale/resale analysis is that there is no overall evidence of any statistically meaningful effect on prices along the Grasse River "Area of Concern" due to the PCB environmental situation since 2010.

**Land and Home Price Trend Line Analysis**

As a final check on the results of the sale/resale analysis of land and home prices, we have also looked at the overall price trends for land and homes in the market area to understand if actions related to the investigation and remediation of the "Area of Concern" along the Grasse River may have affected market prices.

The graph below compares the price trends that emerge from our MLS data related to land sales. It indicates that land prices in general were declining between 2010 and 2015 in the entire market area and that land sales along the Grasse River "Area of Concern" were, as a whole, trending down at a slightly higher rate than all land prices. However, land prices outside the "Area of Concern" and not on a river (the blue line in the graph) declined at a rate that exceeded that for land in general in the market area.



Beginning in late 2015, coinciding with the announcement that New York State would provide aid to ALCOA to continue operations at its plant employing about 600 workers, the general price trend line indicates that land prices in the "Area of Concern" began to increase at a rate that was



essentially equal to the land sales price trend and therefore better than in the pre-2016 time frame for land prices outside the "Area of Concern." The graph below indicates that the beginning of the river bottom capping operation on the Grasse River portion of the "Area of Concern" did not have an effect on overall price trends.



The JLL analysis of home prices over the same time period reveals some similarities and some differences with the land sale data. First, home prices on a per square foot basis were recovering from the Great Recession from January 2010 and continuing through 2012. Starting in 2013 the recovery slowed and by early 2014, prices remained relatively constant through about December 2015 when prices slowly started to rise. By mid-2017, prices were rising at an increasing rate and continued throughout our data analysis period that ends in July 2022.

These price index changes are consistent regardless of whether properties are in the "Area of Concern" or along rivers. In fact, the index for properties in the "Area of Concern" and on rivers (part of the "All Sales Index") show a higher general index level than do other properties.[342]   This is evident by the fact that the "gold" index line in the graph above for all single-family sales, as well as the "green" index line (property prices per square foot for properties not in the "Area of Concern"), are both higher than those properties that are both not in the "Area of Concern" and not on a river (the "blue" index line).

As shown by the curvilinear polynomial trend lines in the graph below, a comparison of the three indexes indicates that by the end of the first quarter of 2013 the rates of change for all three indexes begin to parallel each other. This means that market pricing changes are undifferentiated after this time period, regardless of whether the properties are on a river or in the "Area of

---

[342] Given the limited number of land sale transactions in the claimed "traditional use area" in the years under analysis, a sufficiently detailed index for "traditional use area" land transactions cannot be constructed.



Concern." This change in differential pricing changes for single-family housing also corresponds to the April 2013 EPA's Grasse River cleanup plan.



The more rapid, recent, and parallel increases in these three indexes as shown in the polynomial graph above also correspond to the time when construction for the dredging and capping plan for the Grasse River began in early- to mid-2017, indicating that the beginning of the dredging and capping operation does not appear from the price trend line comparisons to have adversely affected prices.[343]

**Conclusion from the Massena, New York Superfund Sites Case Study Analysis**

Both the sale/resale analysis and the price trend analysis indicate little, if any, impact on prices and values of land and single-family homes in the portions of the shoreline along the Grasse River involved in the PCB environmental situation.  The price trend index analysis indicates no apparent impact on prices or values even following the announcement and 2017 initiation of the Grasse River "Area of Concern" sediment capping project.

---

[343] Similar to the land index limitation, there are an insufficient number of "Area of Concern" single-family home sales in the years under analysis to develop a detailed stand-alone index.



*PCB Contamination Case Study No. 7*

*Solutia/Eastman Facility*
*Anniston, Alabama*

## Introduction and Scope of the JLL Staff Research

In 2003, current JLL staff members formerly associated with Clarion Associates, an appraisal firm headquartered in Chicago, conducted case study research analysis into the Anniston environmental situation. The purpose of the work was to investigate the environmental situation, and then collect, summarize and analyze the various reports concerning potential real estate impairment damages filed in the various pieces of litigation involving the Anniston soil contamination situation, and compare the conclusions in these other expert reports to the conclusions in an article published by Robert A. Simons, PhD, entitled "Estimating Proximate Property Damage From PCB Contamination in a Rural Market: A Multiple Techniques Approach," and published in *The Appraisal Journal*, October 2002, at p. 388.

Professor Simons in his *Appraisal Journal* article applied various analytical techniques including analysis of sale price trends, paired sales, sale-to-list price ratios, and results of a contingent valuation survey. His results indicated a range in potential impacts on prices and values between 60% and 95%, and he concluded the impact of the "value loss" due to PCB contamination was 90%.

The investigation and research by JLL/Clarion staff involved the following activities:

- Review of reports and documents received from other appraisers related to the Anniston situation;

- Exterior inspection of the Solutia site, the surrounding West Anniston area, and other portions of the greater Anniston and Oxford, Alabama areas on May 14 and 15, 2003. The inspection was conducted by Mr. Ronald W. Casper, MAI, of the Chicago office of Clarion Associates;

- Site visit to the EPA repository in the local EPA office and the Anniston public library. Personnel at both locations indicated that the document repository was in the process of being relocated to a new location. Neither the local EPA office nor library personnel knew where the documents were or when they would again be made available for public inspection. Therefore, the research could not involve inspection of repository materials during the site visit to Anniston;

- Investigation of court records related to litigation seeking payment for alleged damages to property values, and review of documents produced in those cases;

- On-line research into federal and state environmental reports;

- On-line research into newspaper accounts and other sources of data regarding the site; and

- Conversations with attorneys, brokers, and real estate appraisers involved in the Anniston research in the various pieces of litigation.



### The Environmental Situation

The plant that was the source of the PCB contamination occupied about 70 acres of land about one mile west of downtown Anniston, Alabama. PCBs and other chemicals were produced at the site starting in 1917. PCB production stopped in the early 1970s, prior to the U.S. EPA ban on PCB production in 1979.

During operations of the plant, hazardous and nonhazardous waste was disposed of at two landfills located adjacent to the plant.[344] According to the U.S. EPA:

> "PCBs were released from the Aroclor manufacturing process into surface soil and water that made their way to ditches and runoff paths which flowed into Snow Creek and downstream waterways. More recently, it has become clear through sampling that PCBs are present in the environmental media of residential, commercial, and agricultural portions of Anniston and environs."[345]

Also according to the U.S. EPA:

> "Sampling by EPA, Solutia Inc., ADEM, and other parties has indicated that sediments in drainage ditches leading away from the plant, Snow Creek, and Choccolocco Creek, as well as sedimentary material in the floodplains of these waterways, contain varying levels of PCBs and other contaminants."[346]

Problems were noted in the area of the plant as early as 1966, when two biologists from the Alabama Department of Conservation noted a number of distressed fish in nearby Choccolocco Creek., an event which eventually killed numerous fish and other wildlife in and adjacent to the creek.

As a result of the 1966 event, nearby streams were tested which led to the discovery of various chemicals in the water.

In 1980, during investigation of one of the two landfills at the site, pesticides were found in groundwater and catch basins adjacent to the landfill.

In 1986, a lab specialist from the U.S. Department of Agriculture discovered PCB in fish taken from the Coosa River, of which Choccolocco Creek is a tributary, and a ban on commercial fish sales was instituted.

In 1989, two cells of the South Landfill which were used for the disposal of hazardous waste were capped. Also in 1989, the Alabama Department of Environmental Management issued a fish advisory due to high levels of PCB in the fish from these waterways, and in 1991, the State instituted a fish collection program for Alabama rivers and streams, with Choccolocco Creek scheduled for sampling in 1993.

The discovery of deformed fish prior to the scheduled testing led to an investigation which resulted

---

[344] U.S. EPA Fact Sheet: Anniston Site, Anniston, Calhoun County, Alabama, February 13, 2001, p. 2.

[345] Office of Technical Services, Waste Management Division, USEPA, Region 4, Atlanta, Georgia, "Streamlined Risk Evaluation for Residential Areas: Anniston PCB Site," at 2

[346] "Alabama NPL/NPL Caliber Cleanup Site Summaries," found on the internet at, http://www.epa.gov/region4/waste/npl/nplal/annpcbal.htm.



in a fish advisory, as well as the discovery of leaks at the subject landfills.   In 1993, the Alabama Department of Public Health issued a no- consumption PCB fish advisory for both Lake Logan Martin and Choccolocco Creek.

The events of 1993 triggered significant public attention.   However, contamination of local waterways had occurred, and was documented, well before 1993.   While the level of public knowledge was not as significant prior to 1993, the 1986 commercial ban on fishing and subsequent fish advisories was public knowledge.   Therefore, there was general public knowledge of problems in the nearby waterways stemming from the plant well prior to 1993.

Beginning in June of 1999, the U.S. EPA tested the soil for PCBs at hundreds of properties in Anniston.

In October of 2000, Solutia, Inc., and the U.S. EPA entered into an Administrative Order of Consent (AOC) to sample properties in West Anniston for PCB contamination.   In October of 2001, the AOC was amended to expand the area covered by the original agreement, and expand sampling requirements.

In March of 2002, the U.S. EPA and Solutia reached an agreement for remedial investigation and feasibility studies.   The agreement was later amended in October of 2002.

By April of 2003, just before Clarion Associates conducted its field investigation, 25 properties had been identified for a removal action, and 12 cleanups had been completed.[347]

### The Litigation Situation

Various lawsuits involving property owners in Anniston were filed as a result of the soil contamination situation.   One lawsuit, involving a class of 5,000 plaintiffs, settled in 1999.   Another in federal court involving approximately 1,600 plaintiffs was settled in April of 2001.     A third lawsuit on behalf of 3,500 plaintiffs was filed in 1996 and was tried in February of 2002.   A fourth lawsuit filed in May of 2001 involving about 15,000 plaintiffs was scheduled for trial in July 2003.   There were a total of approximately 20 lawsuits involving as many as 25,000 plaintiffs combined.

The Simons article in *The Appraisal Journal* was based on his work as an expert witness in the second lawsuit (the *Owens* case) referenced above that settled in 2001.  Professor Simons served as an expert for the plaintiffs in that case.

### Investigation into Other Expert Reports in Anniston Litigation

Our investigation of the Anniston litigation found that there have been at least three other reports (in addition to the report of Professor Simons) filed by real estate experts in the various pieces of litigation filed in Anniston seeking damages for alleged impacts to property values resulting from the environmental situation.

In the *Owens* case, expert testimony regarding real estate values was also provided by William E. Bliss, SRA, ARA.  Mr. Bliss performed a market study to analyze real estate market conditions in the study area, and prepared retrospective appraisals of 10 properties within the study area.  Further, Mr. Bliss included an additional 20 retrospective appraisals within his report which were prepared in regard to another Anniston related lawsuit, the *Abernathy* case.

---

[347] http://www.epa.gov/cgi-bin/epaprintonly.cgi



A more comprehensive study of market conditions in the Anniston area was performed by James A. Chalmers, PhD, of PricewaterhouseCoopers LLP in the *Abernathy* case.

***The Bliss Expert Reports***:  In his real estate market analysis, Mr. Bliss relied on information obtained from the Calhoun County Multiple Listing Service (MLS), as well as a private database maintained by a local real estate appraiser, Mr. Bill Kreh.  This data was supplemented by the Calhoun County Tax Assessor records and tax maps.  Since all of the sales in the Anniston market area are not recorded by the local MLS, the data considered by Mr. Bliss included sales which were not part of the data considered in the Simon report.  The analysis of the sales data included a study of the number of sales per year; the average annual sale price; the average days on the market; an analysis of sale/re-sale properties; the availability of financing; and an analysis of the health of the market based on the amount of new development.  Mr. Bliss considered data from the West Anniston market area only for his real estate market analysis.  In the market study portion of his analysis, he did not segregate the data by location in regard to the Solutia plant.  He concluded that "the market has been stable over the timeframe analyzed".

In the valuation analysis Mr. Bliss undertook in the *Owens* case, he prepared retrospective appraisals on 10 properties within the study area that had been sold during 1999 or 2000.  His criteria for selection, beyond the sale date period, were as follows: (1) the property had to be located in the West Anniston study area; (2) the property had to be a single family residence; (3) complete data regarding the property and the sale had to be available; (4) the sale had to be an arms-length transaction; and (5) comparable sales data had to be available.

Mr. Bliss also undertook retrospective appraisals on 20 properties in the *Abernathy* litigation.

In each case, the appraisals involved properties that had sold within a specified period, and consisted of those sales which were considered most proximate to the Solutia plant.  They were appraised by selecting comparable sales data from "control" areas more removed from the immediate plant area, but which were considered to be comparable in most other aspects.

The result of Mr. Bliss's retrospective appraisals indicated that, of the 10 properties appraised for the *Owens* litigation, eight sold at or above market value, while two sold somewhat below the indicated market value.  Of the 20 retrospective appraisals performed for the *Abernathy* case, 16 sold at or above indicated market value, while four sold slightly below the indicated market value. Therefore, of 30 retrospective appraisals performed, 24 indicated an actual sale price at or above the appraised market value.  Mr. Bliss concluded that the retrospectively appraised properties sold at market value.

***The Chalmers Expert Report***:  Dr. Chalmers prepared an analysis of residential properties surrounding the Solutia Anniston plant.  The purpose of his assignment "was to analyze the impact, if any, of the PCB issues associated with the Plant ("PCB Issues") on: i) sale price of improved residential properties surrounding the Plant ("Subject Area Properties") and on, ii) the market value of plaintiff properties ("Plaintiff Properties")".  The effective date of the analysis was June 30, 2001, and the analysis was considered to be an update of a previous report dated January 12, 1999.

The Chalmers investigation consisted of the following activities:

- Assemblage of a set of residential property sales for the period between January 1, 1992 and June 30, 2001 in the Subject Area;



- Identification of a Control Area with similar market characteristics to the Subject Area and assemblage of a set of Control Area sales for the same time period as in the Subject Area;

- Analysis of the sets of data in order to extract sale price trends;

- Review of a set of 40 retrospective appraisals for properties that sold within the Subject Area and a comparison of the appraised value conclusions to actual prices at which the properties sold;

- Interviews with knowledgeable local lenders, appraisers, and brokers;

- Identification of plaintiff properties and review of testing history; and

- Reconciliation of "the findings of these analyses into a set of final conclusions with respect to the impact, if any of the PCB issues on the sale prices of Subject Area Properties and on the market value of the Plaintiff Properties".

The Subject Area as defined by Chalmers consisted essentially of the irregularly shaped area immediately surrounding the Solutia Plant, typically encompassing properties located within approximately ½ to 2/3 of a mile of the plant. The Control Area consisted of an irregularly shaped section which lies farther north and east of the plant, consisting of the northeast quadrant of the area known as West Anniston, but lying within the northwest portion of the town of Anniston. According to the Chalmers report:

> "The Control Area is similar to the Subject Area in terms of land use, development patterns and the type and value of residential structures. We are aware, however, that certain properties in the control Area have been tested for the presence of PCBs. Our review of the testing results indicates that PCB levels vary from non-detect on some properties to levels in excess of 1.0 ppm on others. As is discussed in Section 7.2.1, we removed all Control Area sales involving properties sampled for the presence of PCBs prior to analyzing the sales data."

In analyzing the potential impact of the PCB issues on residential sale prices, Chalmers considered the level of market awareness and actual market response. To determine market awareness, Chalmers conducted a media study of the local newspaper, *The Anniston Star*. A total of 433 articles were considered. Of those, 178 or 41% specifically mentioned the plant and PCBs or the plant and lawsuits, and 44 or 10% were editorials specifically related to the plant and PCB issues. In terms of timing, limited publicity was noted from 1992 to 1995, with a substantial increase in 1996. Coverage declined again in 1997, then rose again sharply in 1998-2000. This information was considered to provide insight into the level of public awareness and concern regarding the PCB issue.

As noted, Chalmers analysis of sale price trends included the assemblage of a database of sales within the Subject Area and within a selected Control Area. The data for this analysis was obtained from the "Area Wide Appraisal Service" sales database. This database provides residential sales data as provided by several Anniston appraisers. Additional information was gathered from the Calhoun County MLS, as well as from Calhoun County public records. The data was analyzed based upon an Average Price per Square Foot of Gross Living Area basis, as well as a Multivariate Statistical analysis, which represents a more refined approach and "controls statistically for price differences due to specified property characteristics (e.g. square foot of gross



living area, lot size, lot square footage, age, etc.).”

In the Average Price per Square Foot of Gross Living Area analysis, the average home price per square foot during each year between 1992 and 2001 was calculated for properties in the Subject and Control areas and was plotted on a graph.  The graph indicated that the average Price per Square Foot (PpSF) for the Subject and Control Areas were essentially parallel during 1992-1994.  In 1995, the Subject Area indicated an increase, while the Control Area showed a decline.  PpSF was similar again in 1996-1997.  Following 1997, the Control Area began a steady decline in PpSF which continued through 2001.  Conversely, the Subject Area showed a rather sharp decline in 1998, but then increased steadily after that point to the end of the Chalmers study period, and exceeded the Control Area by a significant margin by 2001.

While the PpSF trends were somewhat divergent after 1997, Chalmers believed that there did not appear to be evidence of a negative impact form the PCB issues on property values in the Subject area.  He stated in fact that the decline noted in the Control Area may have been attributable to a general market weakness in the West Anniston employment market as evidenced by a March 2000 layoff of 200 of 300 employees at the Barbour Thread plant in the Blue Mountain neighborhood of West Anniston, following which the plant was sold, with the new owner anticipating maintaining only 85 employees.

In the Mulitvariate Analysis, the sales were adjusted for a series of property characteristics, and a regression analysis was performed.  In this analysis, the annual sale prices of homes with “average characteristics” were compared for the Subject and Control Areas.  The data indicated that from 1992 to 1994, the average price in the Subject Area was slightly below that of the Control Area.  In 1995, that trend reversed, and the average price in the Subject Area exceeded that of the Control Area through 1997.  In 1998, the Control Area average price was again higher, but in 1999 through 2001, the Subject Area average price was again higher than the Control Area.  Chalmers concluded that given the amount of media attention that occurred from 1998 through June of 2001, it would be expected that property values in the Subject Area would sell at lesser levels than in the Control Area; would depreciate at a greater rate than in the Control Area; or appreciate at a lower rate than in the Control Area.  As indicated by the data, none of these scenarios occurred.

Chalmers also utilized an analysis of Subject Area sales for the period 1992 through June 2001.  In this analysis, he considered the sales of 40 properties within the Subject Area and performed retrospective appraisals on those properties.  In this portion of the analysis, Chalmers relied on the previously mentioned William E. Bliss, SRA in the preparation of these appraisals.  The properties were appraised by selecting sales that occurred within the Subject Area and valuing those properties as of their sales dates by using comparable sales data from the Control Area.  Since the sales within the Control Area would be presumed to be substantially less impacted, if at all, by the PCB issues, the indicated appraised values would reflect this lack of impact.  Of the 40 properties appraised, 30 were considered to have sold at or above market value, while ten sold at somewhat less than the appraised market value.  Chalmers concluded that, if an adverse impact associated with the PCB issues existed, negative deviations would predominate.  In fact, the opposite was true.  Further, there was no obvious change in the pattern over time, even when the media coverage was at its peak, indicating that the PCB issues did not negatively impact the retrospectively appraised values.

Dr. Chalmers also interviewed several individuals active in real estate appraisals, sales, lending, planning, and economic development within the local market area.  Lenders indicated that, while the market was aware of the environmental situation, these issues did not affect the cost or



availability of mortgage funds.  The real estate agents and brokers indicated that the West Anniston market was flat in terms of volume and appreciation.  One broker expressed concern that prices may be discounted due to the PCB issues.  Others felt that the market had reached bottom and was in the process of turning around.  Another broker indicated that there were other negative issues that had contributed to the area prior to the PCB issues, including loss of job base, the ensuing outward migration, poor schools, and inadequate infrastructure.  The economic developer and the planner noted the large inventory of substandard homes in Anniston, the majority of which lie in West Anniston.  All felt that the redevelopment of the recently closed Army Base, Ft. McClellan, and the construction of the new Honda plant in Lincoln would eventually help the local economy.  They also felt that the market was well aware of the PCB issues, and that recent negative press regarding the incinerator project at the Anniston Ordinance Depot, at which chemical weapons would be incinerated, had contributed negatively to areas west of the Solutia plant.

Finally, Chalmers cited a case study in the Town of Paoli, in Pennsylvania.  This case study involved a rail yard in which PCBs, found in high levels on the property, had migrated to a nearby residential neighborhood.  An analysis of sales transactions in this neighborhood indicated a high degree of disclosure, buyer awareness and acceptance, marketability, and home pricing reflective of the area market.  The issue of the PCBs in and around the Paoli area was widely known throughout the region, and lenders, brokers, and other market participants had been subject to stringent disclosure laws in recent years.  Yet, there was no evidence that the higher disclosure had an impact on the price or marketability of the impacted properties.  The study found no instances of an applicant being denied home financing due to proximity to the Paoli site, and of the ten sales analyzed, eight were prepared on forms adequate for loan re-sale, which requires the disclosure of nearby environmental hazards.

Based on the data considered and study results, Chalmers concluded that there was no market-based evidence to suggest that properties within the Subject Area were materially impacted by the PCB issues.

William A. Bliss, in addition to providing the retrospective valuations utilized by Chalmers in the PricewaterhouseCoopers LLP report for the *Abernathy* case, also prepared a separate summary real estate consulting report regarding properties within the defined Subject Area.  It contained the aforementioned 40 retrospective appraisal results, along with an analysis of the general health of the real estate market in that area.  It was essentially the same analysis prepared for the *Owens* case, and Mr. Bliss concluded that there was no indicated negative impact on home values or on the health of the local real estate market resulting from the Monsanto plant situation.

### *Results of JLL Staff Research and Analysis of the Anniston Situation*

While it was not possible to obtain copies of all other expert reports that may have been submitted in the Anniston litigation, JLL staff was able to obtain expert testimony and reports of two additional real estate experts in the case in Anniston in which Professor Simons filed the report on which he based his *Appraisal Journal* article.

Contrary to Simons, both William E. Bliss, SAR, ARA and James A. Chalmers, PhD concluded that the PCB issues at the Solutia plant had not had a significant impact on properties within the immediate market area.

Simons appears to have ignored the market conditions in the West Anniston market area that impacted properties before the contamination issues became well known and continued to impact



those properties as of the date of our investigation in 2003. Other factors related to the local economy, disregarding of the PCB situation, have in the past, and will continue in the future, to have an impact on property values in this market area.

The Anniston area had been suffering from a significant decline in the number and quality of available jobs through the several decades that preceded the EPA investigation and remediation of the soil contamination situation. Anniston had once been known as the "world's greatest producer of soil pipe." However, that industry began to suffer in the 1950's. Many of the large employers began to close in the late 1960's, and throughout the 1970's. By 1977, no cast iron pipe was being produced in Anniston. Hundreds of jobs were lost when the foundries producing the iron pipe began closing in the period between the mid 1950's and late 1970's. Other jobs were also lost in the years during the EPA investigation and remediation. Among the more significant plant closings in the years prior to 2003 that adversely affected the Anniston economy were the following:

- Classe Ribbon employed some 200 people at the time it closed in 1982.

- The Anchor Metals plant (formerly Kilby Car) which employed 300 during its peak in the 1920's closed in 1992.

- The Chalkline Plant (formerly Anniston Manufacturing) employed approximately 580 people when it closed in 1994.

- Anniston Cordage employed 100 people when it closed in 1994.

Several other plants in Anniston were no longer producing the same product, or employed a smaller number of people than in the past. Among those situations were the following:

- The Anniston foundry that had employed 350 people at its peak in the 1940's was operated by Huron Valley Steel in 2003 and the number of employees had been reduced to only 60 people.

- U.S. Pipe and Foundry that later became United Defense employed 700 people in the 1940's but only 300 in 2003.

- Union Foundry employed 500 people in the 1940's but only 360 in 2003.

- The Solutia plant itself employed 700 people at its height in the 1940's but only approximately 100 in 2003.

Over the years, Anniston had lost more than 5,000 jobs to changing market conditions. Employment was relatively level during the period between 1992 and 1996. According to U.S. Department of Labor statistics for the Anniston SMA, the January 1996 employment figure of 48,033 people was quite similar to the 48,312 people employed in January 1992. A significant increase in employment began in early 1996, with employment reaching a peak in April of 1998 at 52,774 people. However, a steady decline began in late 1998, falling to 48,468 by January of 2002. The net result was a significant loss of jobs from the peak levels indicated in 1998, and the subsequent migration of workers to areas with new employment opportunities.

These job losses, and the accompanying decline in population, had a continuing impact on local property values not related to environmental issues. Since West Anniston is primarily a working



class neighborhood, it felt the impacts of these problems to a greater degree than some other portions of Anniston and Calhoun County.

Another factor having a negative impact on property values in this area was the closing of the Fort McClellan Army Base. The fort in the 1980s and 1990s had an average military population of about 10,000 and also employed approximately 1,500 civilians.[348] That made it one of the largest employers in the area but the base was closed in October of 1999 as part of the Base Realignment and Closure Commission. It was expected that redevelopment of the base, which was in progress in 2003, would eventually have a positive effect on the area.

The controversial incinerator at the U.S. Army Anniston Ordinance Depot, just west of Anniston, may also have been having an impact on the local real estate market. The incinerator is intended for the disposal of chemical weapons and other hazardous materials. There had been a great deal of negative public reaction to this project, due mainly to the concern about the potential release of chemical weapons into the atmosphere. Given the significant amount of exposure in the local press, the public was well informed about the proposed incinerator, and it is possible that the real estate market had been impacted, at least on a temporary basis, by the public concern about the weapons disposal project at the time that Professor Simons did his study.

Also noted by Chalmers was the highway improvement program on Route 202, which runs along the south side of the Solutia plant site. This project, which was completed in late August, 1998, had a significant impact on the neighborhoods in close proximity to the Solutia plant. For many years, 10th Street, which runs just north of the plant, was a main thoroughfare through this area. The commercial uses in the vicinity of the intersection of 10th Street and Clydesdale Avenue relied on the traffic flow present on those streets. After the improvements to Route 202, east-west traffic was now channeled to the south. With the loss of traffic, the commercial uses suffered and many eventually closed. Simons in his report blamed the loss of commercial entities on the PCB issues and related loss of housing units. There was nothing in his report that discusses the change in traffic patterns and their impact on those commercial ventures. As such, his analysis, does not address all of the issues that likely contributed to the diminution of prices in this area.

The Simons report compared sales in West Anniston to the rest of Calhoun County as part of the analysis which determined the diminution in value resulting from the Solutia PCB issues. By using sales data from such a large area, it failed to consider the impact of several other factors which have had a significant impact on values in the West Anniston market area. To indicate that properties values near the Solutia plant are lower than properties values in other portions of Anniston and Calhoun County primarily due to the PCB issue does not reflect other factors that may be adversely affecting prices and values in this market.

Rather, the Chalmers comparison of sales of properties in the immediate vicinity of the plant (those which would be expected to have the greatest impact from the PCB issues if present) to sales of properties within West Anniston, which therefore share the general market impact factors, but are more removed from the Solutia plant and less likely to have been impacted by the PCB issues, is considered to more accurately reflect the situation in this location.

In addition to the Simons, Bliss, and Chalmers studies, there may be other expert reports related to the Solutia situation in West Anniston. Since the EPA repository and data base was in the

---

[348] Source: Wikipedia. https://en.wikipedia.org/wiki/Fort_McClellan citing in footnote 18 the following: Transition Force – U.S. Army Garrison, Fort McClellan, Alabama, "http://www.mcclellan.army.mil/info.asp?article_id=11 as the source.



process of being relocated, we were not able to review all of the documents that may be available.

### *Conclusions from JLL Analysis of the Anniston Contamination Situation*

There are many other factors at work in the Anniston marketplace in addition to the Solutia PCB situation. Those additional factors have not been accounted for in the Simons article.

The Simons article indicated a value impact of between 60% and 95%, and he concluded the impact of the "value loss" due to PCB contamination was 90%.

Mr. Bliss did 30 retrospective appraisals of properties that had sold in the affected areas of Anniston, and in 24 of the appraisals the results indicated a sale price that was at or above the market value using unaffected comparable sales. Mr. Bliss could therefore find no adverse impact on value from the PCB contamination situation.

Dr. Chalmers compared sales during the years 1992 through mid-2001 in a control area and in the affected area of Anniston. Chalmers too could find no adverse impact on value from proximity to the source of the PCB contamination.

The Bliss and Chalmers studies both indicated no impact resulting from the PCB situation in West Anniston. Given the differences between the expert reports, it is unlikely that the impact, if any, extends to the 60%-95% "value loss" indicated by the Simons article.

The general decline in the employment situation in the Anniston area, including the closing of Fort McClellan and various other manufacturing facilities was part of a general decline in the number of jobs in the market and a switch over from higher paying manufacturing jobs to lower paying jobs.



*PCB Contamination Case Study No. 8*
*Superfund Site*

*Escambia Wood Treating Facility*
*Pensacola, Florida*

### Introduction and Scope of the Past Clarion/JLL Staff Research

In 2001, Richard Roddewig of JLL while at Clarion Associates collaborated with Allen Keiter, MAI, Senior Analyst in the Chicago office of Clarion Associates and a Florida Certified General Real Estate Appraiser, to research and analyze the contamination situation involving the former Escambia Wood Treating Facility in Pensacola, Florida. Clarion staff inspected the Escambia Treating Company site and surrounding neighborhoods, collected data and interviewed knowledgeable persons on August 9 and 10, 2001. A local appraiser, Mr. Terry Hoffman, MAI, was retained to provide market data.  Mr. Keiter inspected the property and the surrounding market area.  Richard J. Roddewig of Clarion Associates, now with JLL, undertook additional research, reviewed and analyzed all data collected and collaborated with Mr. Keiter in preparing the Escambia Wood Treating Facility case study.

JLL/Clarion staff undertook the following investigative activities:

- Physical inspection of the neighborhood and area;

- Inspection of public records at the Superfund site repository at local library;

- Inspection of the Escambia Treating Company site remediation facilities and interview with on-site personnel;

- On-line research of federal environmental reports;

- Research of newspaper articles;

- Interview with knowledgeable local market participants and public officials;

- Collection of market information and sales data; and

- Inspection of sales of property both within the nearby residential areas including Rosewood Terrace, Oak Park, and Goulding (a/k/a Herman's) subdivisions.

- Inspection of other nearby neighborhoods including some located above the groundwater plume emanating from the Escambia site.

### The Environmental Situation

Escambia Treating Company operated from 1942 to 1982 treating wooden utility poles and foundation pilings.  During that time creosote and PCP-laden waste was discharged into unlined holding ponds on-site contaminating both soil and ground water.

In 1991 the Escambia Treating Company filed for bankruptcy.  That same year, EPA sampled the groundwater and found it contaminated with PAHs, PCP, and dioxins/furans. [349]

In October 1991, to reduce the imminent threat to groundwater and risk public exposure to contaminated soils from Escambia Treating Company site, the EPA excavated 250,000 cubic yards of contaminated soils and sludge.  Excavation was 48 feet deep covering about five acres. The contaminated soil was placed in a lined vault resulting in a mound some 30 feet high.

---

[349] Health Consultation, Escambia Wood-Pensacola/Residential Soil Samples, final report, prepared by Florida HRS.



Nearby residents became concerned about the cleanup process and the risk for exposure to airborne contaminants. The only significant threat was from windborne contamination from the proposed remediation of the site itself. During the proposed remediation of the 255,000 cubic yards of contaminated soil stockpiled on the Superfund site, windborne dust would likely drift into adjacent residential neighborhoods. Prevailing winds are from the south and southwest.

In 1994, the site was put on the Superfund list.

In May 1996, Florida's Department of Health and Rehabilitative Service (HRS) released their final report which stated the following:

 "Based upon the information reviewed, Florida HRS concludes that, except for dioxin, exposure to contaminates in the surface soil from the neighborhood near Escambia site are (sic) unlikely to cause adverse health effects. Dioxin in a few surface soil samples is at a level that may cause adverse non-carcinogenic health effects in children or adults, such as immune system impairment or liver damage. Lead and dioxin are both possible human carcinogens. However, we do not have enough toxicological information to determine what the cancer risk there may be from exposure to lead and dioxin. If additional information becomes available indicating exposure at levels of concern, Florida HRS will evaluate that information to determine what actions, if any, are necessary.

> Recommendations: Florida HRS recommends that EPA limit exposure of residents to surface soil containing elevated levels of dioxin. We also recommend that ATSDR continue efforts to develop guidance for assessment of health risks to humans from exposure to dioxin and lead."

## The Adjacent Neighborhoods

The residential neighborhoods north of Escambia Treating Company site are:

- Rosewood Terrace adjoins the north side of the contaminated site. It contains 66 lots.

- Oak Park is 600 feet north of the contaminated site. It contains 35 lots.

- Escambia Arms apartment complex is located north of Rosewood Terrace and west of Oak Point. It contains about 200 apartments.

- Goulding (a/k/a Herman's) subdivision located 1,400 feet south of the contaminated site with industrial buildings between it and the contaminated site. Also, the Goulding subdivision is upwind of the contaminated site. It contains about 58 lots.

The Pensacola industrial district developed around these neighborhoods in much the same way as many other industrial districts in Florida. Palafox Highway (US 29), prior to the expressway system, was the main road into Pensacola. The industrial district developed on both sides of Palafox Highway, several miles outside of the main part of town. The industrial district is used for warehousing, light manufacturing, repair shops, building supply businesses and service providers to the residents of Pensacola.

In Florida it was common for low-cost housing to develop adjacent to industrial districts so that workers could live close to their places of employment. Rosewood, Oak Park and Goulding (a/k/a Herman's) are surrounded by industrial uses; typically, in Florida, the adjacent residential neighborhoods adjoin the industrial district, but are not surrounded by it.

The residential neighborhoods within the industrial district were developed in 1958 and 1959 with homes generally from 800 to 1,000 square feet without carports or garages. Most were wood



frame and are clad with asbestos shingles, wood or vinyl siding.

### *The EPA's Relocation Plan*

In April 1996, U.S. EPA issued a proposed plan to permanently relocate the 66 households living in Rosewood Terrace subdivision, which is located on the northeast side of the site. Prevailing winds from the south and southwest result in these homes having direct exposure to any windborne contaminates.

In August 1996, EPA issued an Amendment to add to the relocation the 35 households in the Oak Park subdivision for two reasons:

- "EPA evaluated the impacts of the proposed relocation of the Rosewood Terrace subdivision and its associated construction activities including demolition of the homes and the soil cleanup. These activities, combined with the soil dioxin concentration found in Oak Park, have led EPA to propose permanent relocation for the Oak Park residents, similar to the proposal made for the Rosewood Terrace residents."

- "The net effect of the action proposed in April [relocating Rosewood subdivision] to the single family households in the Oak Park neighborhood would be to leave Oak Park as an isolated single-family residential area consisting of only 35 homes. Rosewood Terrace and Oak Park are part of the same neighborhood. Although they are referred to by different names, they are adjacent, separated only by a narrow residential lane (Hickory Street). If Rosewood Terrace households were relocated, Oak Park would be surrounded on all sides by areas without characteristics of a single-family residential neighborhood. … The effect of this change would not only be psychologically isolating, but would also have the probable consequence of reducing property values as a consequence of EPA's action to relocate the 66 Rosewood Terrace households and resulting land use changes. It is believed that the social cohesion of the community would be negatively affected, since the population of the single family neighborhood would be cut by more than two thirds."

EPA also concluded in 1996 that neither the Escambia Arms Apartment complex nor the Goulding (a/k/a Herman's) subdivision located 1,400 feet south (up wind) of Escambia Treating Company site required relocation.

In October 1996, an unexpected decision was announced whereby all 358 households, including those that lived in the apartment complex and those in Goulding subdivision, would be relocated. The decision was made by the U.S. EPA Region 4 Administrator, John Hankinson, Jr.

The underlying political reason for the abrupt change from a plan to relocate only 110 households to the relocation of 358 households was summarized in a *U.S. News and World Report*, April 21, 1997:

"Lois Gibbs, a veteran activist who had helped force the government to clean up Love Canal in the late 1970's, ran a full page ad in the October 1, 1996 Florida edition of USA Today. It reminded President Clinton of his campaign speech in which he said that no child should have to live near a hazardous-waste site."

"Two days later, EPA Regional Administrator John Hankinson overruled his staff and announced that all 358 families would be moved. The capitulation, says EPA insiders, was ordered by agency chief Carol Browner."

The United States government purchased most homes in 1998.



Only the residents in the Rosewood subdivision (about 110 homes), which adjoins Escambia Company site on the north side, were considered threatened by the proposed remediation of the soil. Several months later the Oak Park subdivision was added as having a potential for risk and because of the loss of community and neighborhood. Rosewood and Oak Park contain a total of 101 homes.

The remaining 257 homes and apartment units were never considered to be threatened. The apartments were never considered to be in any danger from windborne contamination. Goulding (a/k/a Herman's) subdivision is 1,400 feet *up wind* (south) of Escambia Treating Company site and has never been considered to be threatened by windborne contamination. In fact, there are residential buildings that were not taken located between Goulding's and the Superfund site.

The relocation program was extended to include the larger number of residents because the neighborhood was small and was surrounded by industrial development. Once some of the houses were taken, the remaining residents believed they did not have a viable remaining neighborhood.

This program involved the third largest relocation in Superfund history, exceeded in size only by the Love Canal relocation near Buffalo, New York, and the Times Beach relocation in Missouri.

### Compensation Paid to the Residents

The homeowners were paid 100% of the market value of their homes -- therefore, the homeowners did not suffer a loss. The purchased homes tended to range in value from $30,000 to $50,000. In addition, the Replacement Housing Payment program compensated the homeowner up to $22,500 if the replacement home cost more than the original home settlement.

The program required that the homes be comparable, but Army Corps of Engineers representatives have stated that most homeowners have bettered themselves due to this program. Also, the U.S. government reimbursed the homeowners for moving expenses.

### Value and Resale Potential of the Acquired Property

The United States government will not sustain a 100% loss in acquiring the properties, but instead will recoup prices paid for the homes by selling the land for industrial and commercial development.

Plans are to convert the land to industrial use consistent with surrounding land uses. Industrial land values in the Pensacola area are $1.50 to $2.50 per square foot, which will offset the cost of the home purchases.

In our research into residential land prices, we have found three recent sales with the following prices: $0.14 per sq. ft.; $0.74 per sq.ft.; and $0.90 per sq. ft. The value of industrial land is much greater than the value of this neighborhood residential land.

### Impact of the Contamination Situation on Other Nearby Property Markets

Our research indicated that the real estate market in the surrounding industrial district had not been adversely affected even though many of the industrial buildings are located in the path of the windborne contaminants or are immediately adjacent to the Superfund site. Nearby industrial buildings were in good condition and had few vacancies and market rents on the date of our inspection.

Groundwater contamination extends to a depth of 48 feet. Contamination has resulted in a large plume that flows eastward towards the environmentally sensitive Texar Bayou located 1.5 miles east. The plume passes under residential neighborhoods with home values ranging from $75,000



to $1,000,000 along the river.  All homes above the contaminated plume are on municipal water systems.  Our research did not find any evidence that the groundwater plume had diminished the value of any homes above it.  The plume does not extend into the Rosewood, Oak Park and Goulding (a/k/a Herman's) subdivision, which contain the homes that were bought by the U.S. government.

***Conclusions from Clarion/JLL Staff 2001 Analysis of Escambia Treating Company Site Situation***

In 2001, we arrived at the following general conclusions based on our analysis of the Escambia, Pensacola situation:

- Not all the homes taken for the cleanup were directly affected by the contaminants that might emanate from the cleanup project.  The number of homes acquired was increased based on political rather than environmental factors.  The relocation project itself hurt the viability of the neighborhood and resulted in the taking of additional properties.

- The impact on value of the residential property taken for the Escambia is not permanent. Following completion of site investigation and enough of the remediation so that windborne dust no longer poses a threat, the former industrial land will be developed for industrial use

- Based upon industrial land values around the site, it is possible that the value of the land taken for the cleanup will exceed the prices paid for the homes.  It is therefore possible that the cleanup program will enhance the value of the land taken.

- Our research in 2001 indicated home values above the extended contaminated groundwater plume had not been affected. The Escambia County Property Assessor reports they have not observed a value reduction in the neighborhoods with the underground plume.



### 15.15    2022 Summary Results PCB Testing at the 273 Subject Properties

| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01230205005 | St. Clair Co. Trustee | 1200 MISSISSIPPI A | 0.03 | 1,300 | 3.12 | X | | | | | |
| 2 | 01230205006 | St. Clair Co. Trustee | 1200 MISSISSIPPI A | 0.06 | 2,500 | 0.40 | | | | | | |
| 3 | 01230205012 | St. Clair Co. Trustee | 1015 PARADISE AVE | 0.06 | 2,500 | 2.34 | X | | | | | |
| 4 | 01230205033 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 2.46 | X | | | | | |
| 5 | 01230205036 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 1.87 | X | | | | | |
| 6 | 01230205037 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 1.75 | X | | | | | |
| 7 | 01230205038 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 1.28 | X | | | | | |
| 8 | 01230205039 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 2.28 | X | | | | | |
| 9 | 01230205040 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 0.84 | | | | | | |
| 10 | 01230205043 | St. Clair Co. Trustee | PARADISE AVE | 0.06 | 2,500 | 3.09 | X | | | | | |
| 11 | 01230206004 | St. Clair Co. Trustee | 1314 MISSISSIPPI A | 0.14 | 6,234 | 0.64 | | | X | 1582 | 1954 | SFR |
| 12 | 01230206006 | St. Clair Co. Trustee | 1320 MISSISSIPPI A | 0.10 | 4,248 | 0.25 | | | | | | |
| 13 | 01230206007 | St. Clair Co. Trustee | 1322 MISSISSIPPI A | 0.10 | 4,248 | 1.48 | X | | | | | |
| 14 | 01230206009 | St. Clair Co. Trustee | 1326 MISSISSIPPI A | 0.11 | 4,821 | 2.60 | X | | | | | |
| 15 | 01230206011 | St. Clair Co. Trustee | 1016 PARADISE AVE | 0.25 | 10,974 | 2.05 | X | | | | | |
| 16 | 01230206020 | St. Clair Co. Trustee | 1048 PARADISE AVE | 0.25 | 10,974 | 0.04 | | | | | | |
| 17 | 01230206021 | St. Clair Co. Trustee | 1050 PARADISE AVE | 0.12 | 5,413 | 1.14 | X | | | | | |
| 18 | 01230206022 | St. Clair Co. Trustee | 1052 PARADISE AVE | 0.13 | 5,560 | 0.48 | | | | | | |
| 19 | 01230206031 | St. Clair Co. Trustee | LIBERTY ST | 0.13 | 5,571 | 1.59 | X | | X | 2400 | 1950 | Commercial |
| 20 | 01230206034 | St. Clair Co. Trustee | 1027 LIBERTY ST | 0.13 | 5,571 | 0.76 | | | | | | |
| 21 | 01230206036 | St. Clair Co. Trustee | 1031 LIBERTY ST | 0.13 | 5,571 | 0.76 | | | | | | |
| 22 | 01230206037 | St. Clair Co. Trustee | 1031 LIBERTY ST | 0.13 | 5,571 | 7.59 | X | | | | | |
| 23 | 01230206057 | St. Clair Co. Trustee | 1045 LIBERTY ST | 0.26 | 11,143 | 2.26 | X | | | | | |
| 24 | 01230401008 | St. Clair Co. Trustee | 1022 LIBERTY ST | 0.13 | 5,573 | 0.53 | | | | | | |
| 25 | 01230401009 | St. Clair Co. Trustee | 1022 LIBERTY ST | 0.13 | 5,571 | 0.86 | | | | | | |
| 26 | 01230401010 | St. Clair Co. Trustee | 1028 LIBERTY ST | 0.13 | 5,573 | 0.59 | | | | | | |
| 27 | 01230401013 | St. Clair Co. Trustee | 1036 LIBERTY ST | 0.13 | 5,573 | 0.53 | | | | | | |
| 28 | 01230401022 | St. Clair Co. Trustee | 1056 LIBERTY ST | 0.13 | 5,573 | 0.09 | | | | | | |
| 29 | 01230401089 | Private/Non-City | 1042 LIBERTY ST | 0.38 | 16,718 | 0.78 | | | | | | |
| 30 | 01230402005 | Private/Non-City | 917 COOK ST | 0.06 | 2,500 | 0.30 | | | | | | |
| 31 | 01230402006 | Private/Non-City | 917 COOK ST | 0.06 | 2,500 | 0.10 | | | | | | |
| 32 | 01230402007 | Private/Non-City | 917 COOK ST | 0.06 | 2,500 | 0.03 | | | | | | |
| 33 | 01230403031 | St. Clair Co. Trustee | 1012 COOK ST | 0.06 | 2,500 | 4.69 | X | | | | | |
| 34 | 01240121021 | St. Clair Co. Trustee | TUDOR AV | 0.04 | 1,692 | 0.32 | | | | | | |
| 35 | 01240121022 | St. Clair Co. Trustee | TUDOR AV | 0.02 | 999 | 0.17 | | | | | | |
| 36 | 01240121023 | St. Clair Co. Trustee | TUDOR AV | 0.03 | 1,444 | 0.13 | | | | | | |
| 37 | 01240121024 | St. Clair Co. Trustee | TUDOR AVE | 0.01 | 342 | 0.37 | | | | | | |
| 38 | 01240121025 | St. Clair Co. Trustee | TUDOR AVE | 0.03 | 1,173 | 0.14 | | | | | | |
| 39 | 01240121026 | St. Clair Co. Trustee | TUDOR AV | 0.03 | 1,460 | 0.27 | | | | | | |
| 40 | 01240121027 | St. Clair Co. Trustee | TUDOR AV | 0.01 | 295 | 0.13 | | | | | | |
| 41 | 01240121028 | St. Clair Co. Trustee | TUDOR AV | 0.05 | 1,999 | 0.31 | | | | | | |
| 42 | 01240121031 | St. Clair Co. Trustee | TUDOR AV | 0.04 | 1,560 | 0.96 | | | | | | |
| 43 | 01240121032 | St. Clair Co. Trustee | TUDOR AV | 0.01 | 315 | 0.42 | | | | | | |
| 44 | 01240121033 | St. Clair Co. Trustee | TUDOR AV | 0.03 | 1,149 | 0.58 | | | | | | |
| 45 | 01240121035 | St. Clair Co. Trustee | TUDOR AV | 0.02 | 774 | 0.28 | | | | | | |
| 46 | 01240130019 | Private/Non-City | 1307 BAKER AVE | 0.13 | 5,544 | 0.33 | | | | | | |
| 47 | 01240135017 | Private/Non-City | BAKER AVE | 0.11 | 4,851 | 0.33 | | | | | | |
| 48 | 01240135025 | Private/Non-City | 913 S 13TH ST | 0.25 | 10,931 | 0.78 | | | | | | |
| 49 | 01240136001 | St. Clair Co. Trustee | 1300 BAKER AVE | 0.12 | 5,064 | 0.83 | | | | | | |
| 50 | 01240136011 | Private/Non-City | BAKER AVE | 0.01 | 637 | 0.51 | | | | | | |
| 51 | 01240136018 | Private/Non-City | 1332 BAKER AVE | 0.15 | 6,397 | 0.24 | | | | | | |
| 52 | 01240136019 | Private/Non-City | 1334 BAKER AVE | 0.15 | 6,407 | 0.30 | | | | | | |
| 53 | 01240136021 | Private/Non-City | 1301 BOISMENUE A | 0.15 | 6,327 | 0.30 | | | | | | |
| 54 | 01240136022 | Private/Non-City | 1305 BOISMENUE A | 0.07 | 3,164 | 0.56 | | | | | | |
| 55 | 01240136030 | Private/Non-City | 1321 BOISMENUE A | 0.10 | 4,556 | 0.81 | | | | | | |
| 56 | 01240136040 | Private/Non-City | 1318 BAKER AVE | 0.28 | 12,112 | 1.13 | X | | | | | |
| 57 | 01240136043 | Private/Non-City | 1314 BAKER AVE | 0.13 | 5,725 | 0.13 | | | | | | |
| 58 | 01240137020 | E St Louis Housing Auth. | 1401 BOISMENUE A | 0.09 | 3,797 | 0.44 | | | | | | |
| 59 | 01240137021 | E St Louis Housing Auth. | 1405 BOISMENUE A | 0.12 | 5,039 | 0.86 | | | | | | |
| 60 | 01240137022 | E St Louis Housing Auth. | 1405 BOISMENUE A | 0.03 | 1,265 | 0.20 | | | | | | |
| 61 | 01240139007 | Private/Non-City | 1326 BOISMENUE A | 0.05 | 2,190 | 0.36 | | | | | | |
| 62 | 01240139011 | Private/Non-City | 1324 BOISMENUE A | 0.09 | 4,012 | 0.56 | | | | | | |
| 63 | 01240139012 | Private/Non-City | 1320 BOISMENUE A | 0.05 | 2,187 | 0.11 | | | | | | |
| 64 | 01240142006 | Private/Non-City | RUSSELL AVE | 0.07 | 3,011 | 2.19 | X | | | | | |
| 65 | 01240142007 | Private/Non-City | RUSSELL AVE | 0.07 | 3,011 | 0.59 | | | | | | |
| 66 | 01240142008 | Private/Non-City | RUSSELL AVE | 0.07 | 3,011 | 1.46 | X | | | | | |
| 67 | 01240142011 | St. Clair Co. Trustee | 1202 RUSSELL AVE | 0.07 | 3,010 | 1.36 | X | | | | | |
| 68 | 01240142018 | St. Clair Co. Trustee | 1216 RUSSELL AVE | 0.07 | 3,011 | 1.22 | X | | | | | |
| 69 | 01240304003 | St. Clair Co. Trustee | 1004 S 14TH ST | 0.11 | 4,581 | 3.28 | X | | | | | |
| 70 | 01240312045 | E St Louis Housing Auth. | 14 GAY AVE | 0.07 | 2,855 | 0.23 | | | | | | |

357



| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 71 | 01240312046 | E St Louis Housing Auth. | 14 GAY AVE | 0.07 | 2,856 | 0.15 | | | | | | |
| 72 | 01240312047 | E St Louis Housing Auth. | 1427 GAY AVE | 0.07 | 2,856 | 0.19 | | | | | | |
| 73 | 01240312048 | E St Louis Housing Auth. | 14 GAY AVE | 0.07 | 2,856 | 0.56 | | | | | | |
| 74 | 01240312057 | E St Louis Housing Auth. | 1501 GAY AVE | 0.07 | 2,856 | 0.44 | | | | | | |
| 75 | 01240312058 | E St Louis Housing Auth. | 1503 GAY AVE | 0.07 | 2,856 | 0.46 | | | | | | |
| 76 | 01240312096 | E St Louis Housing Auth. | 1419 GAY AVE | 0.17 | 7,402 | 0.07 | | | X | 1200 | 1970 E | SFR |
| 77 | 01240312104 | City of E St Louis | 1505 GAY AVE | 0.04 | 1,856 | 0.29 | | | | | | |
| 78 | 01240312112 | City of E St Louis | 1125 S 16TH ST | 0.04 | 1,716 | 0.08 | | | | | | |
| 79 | 01240312117 | City of E St Louis | 1112 S 14TH ST | 0.28 | 12,219 | 0.01 | | | | | | |
| 80 | 01240312118 | St. Clair Co. Trustee | 1405 GAY AVE | 0.22 | 9,706 | 0.01 | | | | | | |
| 81 | 01240312119 | City of E St Louis | 1413 GAY AVE | 0.21 | 9,143 | 0.06 | | | | | | |
| 82 | 01240314016 | City of E St Louis | GAY AVE | 0.12 | 5,126 | 0.63 | | | | | | |
| 83 | 01240314032 | Private/Non-City | 1720 RUSSELL AVE | 0.17 | 7,337 | 0.61 | | | | | | |
| 84 | 01240314034 | Private/Non-City | 1728 RUSSELL AVE | 0.17 | 7,335 | 0.14 | | | | | | |
| 85 | 01240314035 | E St Louis Housing Auth. | 1732 RUSSELL AVE | 0.21 | 9,191 | 0.25 | | | | | | |
| 86 | 01240315001 | Private/Non-City | FALLING SPRINGS RD | 0.07 | 2,989 | 0.69 | | | | | | |
| 87 | 01240315002 | Private/Non-City | FALLING SPRINGS RD | 0.07 | 2,850 | 2.36 | X | | | | | |
| 88 | 01240315003 | Private/Non-City | 1206 FALLING SPRIN | 0.07 | 2,847 | 0.89 | | | | | | |
| 89 | 01240315004 | Private/Non-City | 1206 FALLING SPRIN | 0.07 | 2,845 | 0.34 | | | | | | |
| 90 | 01240315005 | Private/Non-City | 1206 FALLING SPRIN | 0.07 | 2,843 | 1.44 | X | | | | | |
| 91 | 01240315006 | Private/Non-City | FALLING SPRINGS RD | 0.07 | 2,841 | 1.39 | X | | | | | |
| 92 | 01240315007 | Private/Non-City | FALLING SPRINGS RD | 0.07 | 2,838 | 2.30 | X | | | | | |
| 93 | 01240315008 | Private/Non-City | FALLING SPRINGS RD | 0.07 | 2,836 | 1.89 | X | | | | | |
| 94 | 01240315009 | Private/Non-City | 1212 FALLING SPRIN | 0.07 | 2,834 | 4.13 | X | | | | | |
| 95 | 01240315010 | Private/Non-City | 1222 FALLING SPRIN | 0.13 | 5,594 | 0.54 | | | | | | |
| 96 | 01240315012 | Private/Non-City | FALLING SPRINGS RD | 0.11 | 4,624 | 0.49 | | | | | | |
| 97 | 01240315014 | Private/Non-City | 1218 GAY AVE | 0.05 | 2,368 | 0.59 | | | | | | |
| 98 | 01240315015 | Private/Non-City | 1220 GAY AVE | 0.08 | 3,494 | 0.89 | | | | | | |
| 99 | 01240315016 | Private/Non-City | 1222 GAY AVE | 0.09 | 4,137 | 0.25 | | | | | | |
| 100 | 01240315017 | Private/Non-City | 1226 GAY AVE | 0.11 | 4,755 | 0.08 | | | | | | |
| 101 | 01240315028 | Private/Non-City | 1221 S 13TH ST | 0.07 | 3,226 | 0.73 | | | | | | |
| 102 | 01240316027 | City of E St Louis | FALLING SPRINGS RD | 1.68 | 73,307 | 1.24 | X | X | | | | |
| 103 | 01240317038 | City of E St Louis | 0 CENTRAL AVE | 0.07 | 2,836 | 0.66 | | | | | | |
| 104 | 01240317039 | E St Louis Housing Auth. | 0 CENTRAL AVE | 0.07 | 2,836 | 0.19 | | | | | | |
| 105 | 01240317044 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.07 | 2,836 | 0.29 | | | | | | |
| 106 | 01240317045 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.07 | 2,837 | 0.85 | | | | | | |
| 107 | 01240317046 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.07 | 2,836 | 0.28 | | | | | | |
| 108 | 01240317064 | City of E St Louis | 15 GAY AVE | 0.07 | 3,065 | 0.46 | | | | | | |
| 109 | 01240317065 | E St Louis Housing Auth. | 15 GAY AVE | 0.07 | 3,065 | 0.95 | | | | | | |
| 110 | 01240317094 | City of E St Louis | 0 CENTRAL AVE | 0.04 | 1,673 | 0.03 | | | | | | |
| 111 | 01240317095 | E St Louis Housing Auth. | 1405 CENTRAL AVE | 0.17 | 7,494 | 0.08 | | | X | 1200 | 1975 E | SFR |
| 112 | 01240317096 | E St Louis School Dist 189 | 1409 CENTRAL AVE | 0.05 | 2,176 | 0.20 | | | | | | |
| 113 | 01240317102 | City of E St Louis | 1213 S 16TH ST | 0.21 | 9,156 | 0.21 | | | | | | |
| 114 | 01240319103 | E St Louis Housing Auth. | 1805 CENTRAL AVE | 0.17 | 7,292 | 0.01 | | | | | | |
| 115 | 01240319111 | E St Louis Housing Auth. | 1713 CENTRAL AVE | 0.17 | 7,366 | 1.47 | X | | | | | |
| 116 | 01240319112 | E St Louis Housing Auth. | 1717 CENTRAL AVE | 0.17 | 7,365 | 0.23 | | | | | | |
| 117 | 01240319113 | E St Louis Housing Auth. | 1721 CENTRAL AVE | 0.17 | 7,363 | 0.88 | | | | | | |
| 118 | 01240319114 | E St Louis Housing Auth. | 1725 CENTRAL AVE | 0.17 | 7,361 | 0.02 | | | | | | |
| 119 | 01240319115 | E St Louis Housing Auth. | 1733 CENTRAL AVE | 0.17 | 7,418 | 0.17 | | | | | | |
| 120 | 01240319116 | E St Louis Housing Auth. | 1737 CENTRAL AVE | 0.17 | 7,416 | 0.26 | | | | | | |
| 121 | 01240319117 | E St Louis Housing Auth. | 1809 CENTRAL AVE | 0.17 | 7,245 | 0.03 | | | | | | |
| 122 | 01240320010 | E St Louis Housing Auth. | 0 CENTRAL AVE | 0.07 | 2,840 | 0.83 | | | | | | |
| 123 | 01240320011 | Private/Non-City | 0 CENTRAL AVE | 0.07 | 2,838 | 0.61 | | | | | | |
| 124 | 01240320074 | E St Louis Housing Auth. | 1406 CENTRAL AVE | 0.16 | 6,844 | 0.17 | | | | | | |
| 125 | 01240320086 | City of E St Louis | 1401 LAWRENCE AV | 0.32 | 13,849 | 1.97 | X | X | | | | |
| 126 | 01240320087 | City of E St Louis | 0 CENTRAL AVE | 0.04 | 1,547 | 0.71 | | | | | | |
| 127 | 01240320088 | City of E St Louis | 1404 CENTRAL AVE | 0.17 | 7,486 | 0.21 | | | | | | |
| 128 | 01240324017 | City of E St Louis | 1415 D ST | 0.11 | 4,583 | 0.27 | | | | | | |
| 129 | 01240325007 | City of E St Louis | 1416 D ST | 0.06 | 2,401 | 0.92 | | | | | | |
| 130 | 01240325008 | City of E St Louis | 1416 D ST | 0.06 | 2,400 | 0.55 | | | | | | |
| 131 | 01240332016 | City of E St Louis | 1536 S 16TH ST | 0.07 | 3,001 | 2.25 | X | X | | | | |
| 132 | 01240332017 | City of E St Louis | 1536 S 16TH ST | 0.07 | 3,000 | 2.99 | X | X | | | | |
| 133 | 01240332018 | City of E St Louis | 1538 S 16TH ST | 0.07 | 3,000 | 2.92 | X | X | | | | |
| 134 | 01240332019 | City of E St Louis | S 16TH ST | 0.09 | 3,863 | 2.36 | X | X | | | | |
| 135 | 01240332035 | City of E St Louis | 1531 D ST | 0.07 | 2,999 | 1.47 | X | X | | | | |
| 136 | 01240332036 | City of E St Louis | 1531 D ST | 0.07 | 2,999 | 3.80 | X | X | | | | |
| 137 | 01240332037 | City of E St Louis | 1535 D ST | 0.07 | 2,999 | 5.45 | X | X | | | | |
| 138 | 01240332038 | City of E St Louis | 1535 D ST | 0.07 | 2,976 | 1.90 | X | X | | | | |
| 139 | 01240332039 | City of E St Louis | D ST | 0.07 | 2,997 | 9.56 | X | X | | | | |
| 140 | 01240332040 | City of E St Louis | 1551 D ST | 0.05 | 2,087 | 3.48 | X | X | | | | |

358



| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 141 | 01240332044 | St. Clair Co. Trustee | 1514 S 16TH ST | 0.17 | 7,499 | 0.95 | | | | | | |
| 142 | 01240332045 | St. Clair Co. Trustee | 1518 S 16TH ST | 0.17 | 7,498 | 3.44 | X | | | | | |
| 143 | 01240332046 | St. Clair Co. Trustee | 1522 & 1526 S 16TH | 0.34 | 15,008 | 2.49 | X | | | | | |
| 144 | 01240332049 | St. Clair Co. Trustee | 1513 D ST | 0.17 | 7,496 | 1.98 | X | | | | | |
| 145 | 01240332050 | Private/Non-City | 1517 D ST | 0.17 | 7,495 | 2.60 | X | | | | | |
| 146 | 01240332051 | St. Clair Co. Trustee | 1521 & 1525 D ST | 0.34 | 15,002 | 3.04 | X | | | | | |
| 147 | 01240333011 | St. Clair Co. Trustee | 1522 D ST | 0.07 | 3,000 | 1.96 | X | | | | | |
| 148 | 01240333012 | St. Clair Co. Trustee | 1524 D ST | 0.07 | 3,001 | 1.70 | X | | | | | |
| 149 | 01240333013 | Private/Non-City | D ST | 0.07 | 3,000 | 1.05 | X | | | | | |
| 150 | 01240333014 | Private/Non-City | D ST | 0.07 | 3,000 | 1.58 | X | | | | | |
| 151 | 01240333015 | St. Clair Co. Trustee | 1530 D ST | 0.07 | 3,000 | 1.31 | X | | | | | |
| 152 | 01240333016 | City of E St Louis | 1530 D ST | 0.07 | 3,000 | 2.11 | X | X | | | | |
| 153 | 01240333017 | City of E St Louis | 1530 D ST | 0.07 | 3,001 | 1.69 | X | X | | | | |
| 154 | 01240333018 | City of E St Louis | 1530 D ST | 0.07 | 3,000 | 2.40 | X | X | | | | |
| 155 | 01240333019 | City of E St Louis | D ST | 0.07 | 3,000 | 3.15 | X | X | | | | |
| 156 | 01240333020 | City of E St Louis | 1536 D ST | 0.14 | 6,001 | 2.31 | X | X | | | | |
| 157 | 01240333038 | City of E St Louis | 1529 S 17TH ST | 0.07 | 3,000 | 1.26 | X | X | | | | |
| 158 | 01240333039 | City of E St Louis | 1533 S 17TH ST | 0.07 | 3,001 | 1.53 | X | X | | | | |
| 159 | 01240333040 | City of E St Louis | 1533 S 17TH ST | 0.07 | 3,001 | 1.68 | X | X | | | | |
| 160 | 01240333041 | City of E St Louis | 1535 S 17TH ST | 0.07 | 3,000 | 1.79 | X | X | | | | |
| 161 | 01240333042 | City of E St Louis | 1537 S 17TH ST | 0.07 | 3,000 | 1.98 | X | X | | | | |
| 162 | 01240333049 | St. Clair Co. Trustee | 1516 D ST | 0.17 | 7,501 | 0.66 | | | | | | |
| 163 | 01240333055 | St. Clair Co. Trustee | 1519 DR MR LEMON | 0.17 | 7,500 | 1.17 | X | | | | | |
| 164 | 01240333056 | St. Clair Co. Trustee | 1523 DR MR LEMON | 0.17 | 7,501 | 4.45 | X | | | | | |
| 165 | 01240334017 | City of E St Louis | 1532 S 17TH ST | 0.07 | 2,995 | 0.73 | | | | | | |
| 166 | 01240334018 | City of E St Louis | 1534 S 17TH ST | 0.07 | 2,993 | 1.09 | X | X | | | | |
| 167 | 01240334019 | City of E St Louis | 1534 S 17TH ST | 0.07 | 2,994 | 0.86 | | | | | | |
| 168 | 01240334020 | City of E St Louis | 1534 S 17TH ST | 0.07 | 2,994 | 1.85 | X | X | | | | |
| 169 | 01240334021 | City of E St Louis | S 17TH ST | 0.07 | 2,993 | 0.84 | | | | | | |
| 170 | 01240334022 | City of E St Louis | 1540 S 17TH ST | 0.07 | 2,996 | 2.75 | X | X | | | | |
| 171 | 01240334038 | City of E St Louis | E ST | 0.07 | 2,994 | 0.34 | | | | | | |
| 172 | 01240334039 | City of E St Louis | 1537 E ST | 0.07 | 2,994 | 1.23 | X | X | | | | |
| 173 | 01240334040 | City of E St Louis | 1537 E ST | 0.07 | 2,993 | 0.57 | | | | | | |
| 174 | 01240334041 | City of E St Louis | 1537 E ST | 0.07 | 2,994 | 0.53 | | | | | | |
| 175 | 01240334042 | City of E St Louis | 1539 E ST | 0.07 | 2,994 | 0.56 | | | | | | |
| 176 | 01240334043 | City of E St Louis | 1543 E ST | 0.07 | 2,994 | 0.61 | | | | | | |
| 177 | 01240334044 | City of E St Louis | 1541 S 17TH ST | 0.07 | 3,054 | 0.34 | | | | | | |
| 178 | 01240334052 | St. Clair Co. Trustee | 1524 DR MR LEMON | 0.17 | 7,484 | 1.36 | X | | | | | |
| 179 | 01240334053 | City of E St Louis | DR MR LEMONS | 0.07 | 2,995 | 0.88 | | | | | | |
| 180 | 01240334058 | St. Clair Co. Trustee | 1521 & 1525 E ST | 0.34 | 14,968 | 0.67 | | | | | | |
| 181 | 01240421010 | Private/Non-City | 1918 PIGGOTT AVE | 0.09 | 3,821 | 0.26 | | | | | | |
| 182 | 01240421011 | Private/Non-City | 1920 PIGGOTT AVE | 0.13 | 5,773 | 0.19 | | | | | | |
| 183 | 01240421012 | Private/Non-City | 1924 PIGGOTT AVE | 0.08 | 3,361 | 0.27 | | | | | | |
| 184 | 01240421013 | Private/Non-City | 1926 PIGGOTT AVE | 0.06 | 2,412 | 0.37 | | | | | | |
| 185 | 01240421023 | Private/Non-City | 1942 PIGGOTT AVE | 0.07 | 2,871 | 0.05 | | | | | | |
| 186 | 01240421024 | Private/Non-City | 2000 PIGGOTT AVE | 0.13 | 5,773 | 0.22 | | | | | | |
| 187 | 01240421057 | Private/Non-City | 1934 PIGGOTT AVE | 0.37 | 15,914 | 0.14 | | | | | | |
| 188 | 01240433001 | City of E St Louis | 1800 RUSSELL AVE | 0.11 | 4,662 | 0.12 | | | | | | |
| 189 | 01240433002 | City of E St Louis | 1800 RUSSELL AVE | 0.07 | 2,849 | 0.05 | | | | | | |
| 190 | 01240433023 | City of E St Louis | GAY AVE | 0.11 | 4,967 | 0.95 | | | | | | |
| 191 | 01240433047 | E St Louis Housing Auth. | 1812 RUSSELL AVE | 0.16 | 6,841 | 0.03 | | | | | | |
| 192 | 01240433051 | E St Louis Housing Auth. | 1824 RUSSELL AVE | 0.16 | 6,840 | 0.30 | | | | | | |
| 193 | 01240433067 | E St Louis Housing Auth. | 1828 RUSSELL AVE | 0.16 | 6,841 | 0.29 | | | | | | |
| 194 | 01240434013 | Private/Non-City | 1922 RUSSELL AVE | 0.06 | 2,824 | 0.10 | | | | | | |
| 195 | 01240434014 | Private/Non-City | 1924 RUSSELL AVE | 0.06 | 2,823 | 0.12 | | | | | | |
| 196 | 01240434015 | Private/Non-City | 1926 RUSSELL AVE | 0.06 | 2,824 | 0.35 | | | | | | |
| 197 | 01240434016 | Private/Non-City | 1928 RUSSELL AVE | 0.06 | 2,823 | 0.15 | | | | | | |
| 198 | 01240434017 | Private/Non-City | 1930 RUSSELL AVE | 0.06 | 2,823 | 0.19 | | | | | | |
| 199 | 01240434074 | Private/Non-City | 1932 RUSSELL AVE | 0.13 | 5,648 | 0.36 | | | | | | |
| 200 | 01250101018 | City of E St Louis | F ST | 0.07 | 2,979 | 0.98 | | | | | | |
| 201 | 01250101019 | City of E St Louis | F ST | 0.07 | 2,978 | 1.19 | X | X | | | | |
| 202 | 01250101020 | City of E St Louis | F ST | 0.07 | 2,979 | 1.16 | X | X | | | | |
| 203 | 01250101021 | City of E St Louis | 1544 F ST | 0.07 | 2,978 | 1.14 | X | X | | | | |
| 204 | 01250101022 | City of E St Louis | 1546 F ST | 0.08 | 3,292 | 2.03 | X | X | | | | |
| 205 | 01250101039 | City of E St Louis | 1533 G ST | 0.07 | 2,975 | 1.22 | X | X | | | | |
| 206 | 01250101040 | City of E St Louis | 1535 G ST | 0.07 | 2,975 | 1.69 | X | X | | | | |
| 207 | 01250101041 | City of E St Louis | 1535 G ST | 0.07 | 2,976 | 1.49 | X | X | | | | |
| 208 | 01250101042 | City of E St Louis | 1535 G ST | 0.07 | 2,974 | 1.31 | X | X | | | | |
| 209 | 01250101043 | City of E St Louis | 1541 G ST | 0.07 | 2,974 | 1.35 | X | X | | | | |
| 210 | 01250101044 | City of E St Louis | G ST | 0.07 | 2,976 | 1.03 | X | X | | | | |



| Bell ID | Parcel Number | Ownership Category (JLL: most recent deed) | Address | Acres | Lot Size (sq. ft.) | 2022 Sampling - Total PCBs | Over 1.0 ppm | City Owned & Over 1.0 ppm | Improved (2023) | Improved (sq. ft.) | Year Built | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 211 | 01250101045 | City of E St Louis | 1545 G ST | 0.08 | 3,354 | 1.16 | X | X | | | | |
| 212 | 01250101047 | City of E St Louis | 1530 F ST | 0.14 | 5,957 | 0.82 | | | | | | |
| 213 | 01250101048 | St. Clair Co. Trustee | 1520 & 1524 F ST | 0.27 | 11,913 | 0.28 | | | | | | |
| 214 | 01250101049 | St. Clair Co. Trustee | 1521 & 1525 G ST | 0.27 | 11,900 | 1.39 | X | | | | | |
| 215 | 01250102011 | City of E St Louis | LAWRENCE AVE | 0.07 | 2,952 | 0.18 | | | | | | |
| 216 | 01250102016 | City of E St Louis | 1817 WILFORD AVE | 0.10 | 4,181 | 0.08 | | | | | | |
| 217 | 01250102017 | City of E St Louis | 1817 WILFORD AVE | 0.07 | 2,944 | 0.15 | | | | | | |
| 218 | 01250102018 | City of E St Louis | 1833 WILFORD AVE | 0.07 | 2,944 | 0.20 | | | | | | |
| 219 | 01250102019 | City of E St Louis | 1833 WILFORD AVE | 0.07 | 2,944 | 0.19 | | | | | | |
| 220 | 01250102031 | City of E St Louis | 1413 S 19TH ST | 0.14 | 6,227 | 0.19 | | | | | | |
| 221 | 01250103016 | City of E St Louis | G ST | 0.06 | 2,629 | 0.73 | | | | | | |
| 222 | 01250103017 | City of E St Louis | G ST | 0.06 | 2,629 | 0.66 | | | | | | |
| 223 | 01250103018 | City of E St Louis | 1500 G ST | 0.06 | 2,629 | 0.86 | | | | | | |
| 224 | 01250103019 | City of E St Louis | 1542 G ST | 0.12 | 5,258 | 1.34 | X | X | | | | |
| 225 | 01250103021 | City of E St Louis | 1544 G ST | 0.06 | 2,629 | 0.80 | | | | | | |
| 226 | 01250103022 | City of E St Louis | 1544 G ST | 0.07 | 3,043 | 1.18 | X | X | | | | |
| 227 | 01250103027 | City of E St Louis | 1513 S 19TH ST | 0.08 | 3,292 | 15.45 | X | X | | | | |
| 228 | 01250103028 | City of E St Louis | 1513 S 19TH ST | 0.06 | 2,479 | 5.69 | X | X | | | | |
| 229 | 01250103029 | City of E St Louis | 1515 S 19TH ST | 0.06 | 2,479 | 7.66 | X | X | | | | |
| 230 | 01250103030 | City of E St Louis | 1517 S 19TH ST | 0.06 | 2,478 | 1.73 | X | X | | | | |
| 231 | 01250103031 | City of E St Louis | 15 S 19TH ST | 0.06 | 2,479 | 22.60 | X | X | | | | |
| 232 | 01250103032 | City of E St Louis | S 19TH ST | 0.06 | 2,478 | 2.78 | X | X | | | | |
| 233 | 01250103033 | City of E St Louis | 1525 S 19TH ST | 0.06 | 2,479 | 2.49 | X | X | | | | |
| 234 | 01250103034 | City of E St Louis | 1525 S 19TH ST | 0.06 | 2,479 | 1.39 | X | X | | | | |
| 235 | 01250103035 | City of E St Louis | 1527 S 19TH ST | 0.06 | 2,479 | 1.83 | X | X | | | | |
| 236 | 01250103036 | City of E St Louis | 1527 S 19TH ST | 0.06 | 2,479 | 10.59 | X | X | | | | |
| 237 | 01250103037 | City of E St Louis | 1530 S 19TH ST | 0.06 | 2,478 | 4.10 | X | X | | | | |
| 238 | 01250103038 | City of E St Louis | 1530 S 19TH ST | 0.06 | 2,479 | 3.11 | X | X | | | | |
| 239 | 01250103039 | City of E St Louis | 1533 S 19TH ST | 0.06 | 2,478 | 6.02 | X | X | | | | |
| 240 | 01250103040 | City of E St Louis | 1533 S 19TH ST | 0.06 | 2,479 | 20.09 | X | X | | | | |
| 241 | 01250103041 | City of E St Louis | 1535 S 19TH ST | 0.06 | 2,478 | 2.16 | X | X | | | | |
| 242 | 01250103042 | E St Louis Township | G ST | 0.06 | 2,480 | 1.51 | X | | | | | |
| 243 | 01250103043 | E St Louis Township | G ST | 0.07 | 2,928 | 1.44 | X | | | | | |
| 244 | 01250106001 | City of E St Louis | I ST | 0.07 | 3,000 | 0.34 | | | | | | |
| 245 | 01250106002 | City of E St Louis | I ST | 0.07 | 3,000 | 0.07 | | | | | | |
| 246 | 01250106003 | City of E St Louis | I ST | 0.07 | 3,000 | 0.05 | | | | | | |
| 247 | 01250106004 | City of E St Louis | I ST | 0.07 | 3,000 | 0.08 | | | | | | |
| 248 | 01250106009 | St. Clair Co. Trustee | 1401 S J ST | 0.07 | 3,000 | 1.27 | X | | | | | |
| 249 | 01250106010 | St. Clair Co. Trustee | 1403 S J ST | 0.07 | 3,000 | 0.68 | | | | | | |
| 250 | 01250106011 | St. Clair Co. Trustee | 1405 S J ST | 0.07 | 3,000 | 0.34 | | | | | | |
| 251 | 01250106012 | St. Clair Co. Trustee | 1405 S J ST | 0.07 | 3,000 | 0.46 | | | | | | |
| 252 | 01250106019 | City of E St Louis | I ST | 0.07 | 2,998 | 0.38 | | | | | | |
| 253 | 01250106021 | City of E St Louis | 1945 WILFORD AVE | 0.14 | 5,995 | 0.23 | | | | | | |
| 254 | 01250106030 | St. Clair Co. Trustee | 1418 S I ST | 0.12 | 5,395 | 0.27 | | | | | | |
| 255 | 01250110001 | St. Clair Co. Trustee | 1972 WILFORD AVE | 0.07 | 3,000 | 0.25 | | | | | | |
| 256 | 01250110005 | Private/Non-City | 1980 WILFORD AVE | 0.07 | 3,000 | 0.12 | | | | | | |
| 257 | 01250110008 | St. Clair Co. Trustee | 1984 WILFORD AVE | 0.07 | 3,000 | 0.08 | | | | | | |
| 258 | 01250110029 | Private/Non-City | 1976 WILFORD AVE | 0.14 | 6,001 | 0.28 | | | | | | |
| 259 | 01250110031 | Private/Non-City | 1503 S 20TH ST | 0.15 | 6,476 | 0.23 | | | | | | |
| 260 | 01250116005 | City of E St Louis | 1530 E ST | 0.97 | 42,092 | 0.68 | | | | | | |
| 261 | 01250200005 | St. Clair Co. Trustee | GAY AVE | 0.06 | 2,757 | 0.23 | | | | | | |
| 262 | 01250200008 | Private/Non-City | 1922 GAY AVE | 0.05 | 2,207 | 0.19 | | | | | | |
| 263 | 01250200028 | St. Clair Co. Trustee | CENTRAL AVE | 0.24 | 10,525 | 0.10 | | | | | | |
| 264 | 01250201059 | St. Clair Co. Trustee | 1311 S 20TH ST | 0.10 | 4,371 | 0.11 | | | | | | |
| 265 | 01250201060 | St. Clair Co. Trustee | 1313 S 20TH ST | 0.06 | 2,795 | 0.12 | | | | | | |
| 266 | 01250201061 | St. Clair Co. Trustee | S 20TH ST | 0.07 | 2,922 | 0.42 | | | | | | |
| 267 | 01250202001 | Private/Non-City | 1400 S J ST | 0.07 | 3,002 | 0.25 | | | | | | |
| 268 | 01250202002 | Private/Non-City | 1400 S J ST | 0.07 | 3,001 | 0.16 | | | | | | |
| 269 | 01250202005 | Private/Non-City | 1408 J ST | 0.07 | 3,001 | 0.92 | | | | | | |
| 270 | 01250202009 | Private/Non-City | S 20TH ST | 0.08 | 3,269 | 0.95 | | | | | | |
| 271 | 01250202010 | Private/Non-City | S 20TH ST | 0.08 | 3,398 | 0.12 | | | | | | |
| 272 | 01250202011 | Private/Non-City | S 20TH ST | 0.08 | 3,526 | 0.20 | | | | | | |
| 273 | 01250202030 | Private/Non-City | J ST | 0.14 | 6,002 | 0.25 | | | | | | |

|  | Average Lot Size | **0.11** | **4,645** | **Over 1.0 ppm** | **100** | **54** |
|---|---|---|---|---|---|---|

|  |  |
|---|---|
| **Qty Vacant** | **269** |
| **Qty Improved** | **4** |



### 15.1  Monsanto/Krummrich/Solutia Plant Location and other Solutia-Owned Properties

The map below shows the locations of property related to the Monsanto/Krummrich plant and those that were purchased by Solutia, or predecessor entities. As shown below, the plant is located within the Village of Sauget.



Solutia Inc. Parcel Research

There are 23 parcels – 22 residential lots and 1 vacant parcel purchased in recent decades by Solutia - located within the City of East St. Louis. However, representatives from Monsanto/Solutia have indicated to us that none of these East St. Louis parcels are related to historical plant operations, nor do they appear to be based on historical records and aerial photos that we have reviewed. In addition to the 15 Sauget parcels associated with plant operations, there are seven parcels located in Cahokia. The total acreage and division by municipality is summarized below.

|  | Qty | Parcel Size (acres) | Avg. Size (acres) | Avg. Size (sq. ft.) |
|---|---|---|---|---|
| City of East St. Louis | 23 | 6.7 | 0.3 | 12,742 |
| Village of Sauget | 15 | 253.0 | 16.9 | 734,612 |
| Village of Cahokia (former) | 7 | 17.6 | 2.5 | 109,445 |



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

**15.16    JLL Hourly Rate Schedule**

<span style="color:red">**Jones Lang LaSalle — Valuation & Advisory Services, LLC**
**Complex Real Estate Analysis and Litigation Support**</span>

**Hourly Rates – 2024**

| Name | Position/Title | Hourly Rate |
|---|---|---|
| Richard J. Roddewig | Managing Director | $895 |
| Gary R. Papke | Executive Vice President | $745 |
| Charles T. Brigden | Managing Director | $615 |
| Thomas W. Hamilton | Executive Vice President | $605 |
| Charles G. Argianas | Executive Vice President | $465 |
| Robert S. Wells | Senior Vice President | $450 |
| Evan Mudd | Contracted Senior Appraiser / Mining Engineer | $450 |
| Anne S. Baxendale | Senior Vice President | $425 |
| Michael P. Roth | Senior Vice President | $385 |
| Robert S. Trapp | Senior Vice President | $360 |
| Margo E. La Clair | Associate | $335 |
| Alexander C. Argianas | Associate | $325 |
| Adam H. Stulgin | Associate | $310 |
| Sierra E. Hamilton | Senior Analyst | $310 |
| Corbin M. Stulgin | Real Estate Analyst II | $275 |
| Hayley A. Scheid | Real Estate Analyst II | $265 |
| Claire E. Williams | Real Estate Analyst I | $245 |
| Shane M. Briscoe | Real Estate Analyst I | $235 |
| Micah J. Brittain | Real Estate Analyst I | $235 |
| Gina Calagos | Project Coordinator | $205 |

*Rates effective as of January 1, 2024*



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

### 15.17   Documents Considered and Relied Upon

Documents Considered and Relied Upon

| Source No. | Document Name / Source Citation |
|---|---|
| 001 | Appraisal Institute, *Analyzing the Effects of Environmental Contamination on Real Property*, 2010, Part 4., Instructor Notes |
| 002 | Appraisal Institute, *Guide Note 4: Reliance on Reports Prepared by Others*. Chicago: Appraisal Institute, 2017. |
| 003 | Appraisal Institute, *The Appraisal of Real Estate*, 13th ed. Chicago: Appraisal Institute, 2008 |
| 004 | Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. Chicago: Appraisal Institute, 2020 |
| 005 | Articles, data, and publications related to the Agriculture Street Landfill area and environmental situation |
| 006 | Articles, data, and publications related to the Alcoa site |
| 007 | Articles, data, and publications related to the Anniston, Alabama area and environmental situation |
| 008 | Articles, data, and publications related to the Carver Terrace area and environmental situation |
| 009 | Articles, data, and publications related to the Columbia, MS area and environmental situation |
| 010 | Articles, data, and publications related to the Crystal Springs, MS area and environmental situation |
| 011 | Articles, data, and publications related to the Dead Creek area and environmental situation |
| 012 | Articles, data, and publications related to the Flint, MI area and environmental situation |
| 013 | Articles, data, and publications related to the Herculaneum, MO area and environmental situation |
| 014 | Articles, data, and publications related to the Hinkley, CA area and environmental situation |
| 015 | Articles, data, and publications related to the Lewiston, MT area and environmental situation |
| 016 | Articles, data, and publications related to the Love Canal, NY area and environmental situation |
| 017 | Articles, data, and publications related to the Mossville area and environmental situation |
| 018 | Articles, data, and publications related to the Pensacola Escambia Woods area and environmental situation |
| 019 | Articles, data, and publications related to the Stamford, CT area and environmental situation |
| 020 | Articles, data, and publications related to the Times Beach, MO area and environmental situation |
| 021 | Bell, Randall, MAI. *Real Estate Damages, 1st Edition.* Chicago: Appraisal Institute. |
| 022 | Bell, Randall, MAI. *Real Estate Damages, 2rd Edition.* Chicago: Appraisal Institute. |
| 023 | Bell, Randall, MAI. *Real Estate Damages, 3rd Edition.* Chicago: Appraisal Institute. |
| 024 | Boffey, Philip M. "PCB's in Buildings Called Wide Peril," *The New York Times*, September 1, 1983. |
| 025 | Campanella, Joseph A., "Valuing Partial Losses in Contamination Cases," *The Appraisal Journal* (April 1984). |
| 026 | *Code of Professional Ethics and Standards of Professional Appraisal Practice* of the Appraisal Institute |
| 027 | Communication with the St. Clair County Assessor Office |
| 028 | Data obtained from the U.S. Census Bureau |
| 029 | Decker, Christopher S., PhD, Donald A. Nielsen, PhD, and Roger P. Sindt, PhD, "Is Pollution a Homogeneous Determinant of Value?," *The Appraisal Journal* (Spring 2005). |
| 030 | Deposition of Dr. Randall Bell, taken on May 3, 2024 |
| 031 | Documents obtained from the St. Clair County Recorder of Deeds |
| 032 | Dorchester, John D. Jr., MAI, CRE, "Environmental Pollution: Valuation in a Changing World," *The Appraisal Journal*, (July 1991), pages 289-302 |
| 033 | Echert, Fiona, "Incorporated to Be a Sewer: A Historical Analysis of Industrial Pollution in Sauget, Illinois." Center for the Humanities, Washington University in St. Louis Arts and Sciences, 5/13/2020. |
| 034 | Email correspondence with Tamarcus Page, Chief Deputy of the St. Clair County Assessor's Office |
| 035 | Environmental Reports from the Illinois EPA |
| 036 | Erickson, Jessica, "Information Flows and the Impact of PCB Contamination on Property Values," a Thesis submitted in partial fulfillment of the requirement for the Degree of Bachelor of Arts with Honors in Economics, Williams College, May 7, 2001. |
| 037 | Expert Report submitted by Brian Hitchens |



038    Expert Report submitted by Kevin M. Coghlan, MS, CIH dated February 16, 2024

039    Expert Report submitted by Randall Bell, PhD, MAI of Landmark Research Group, LLC, February 16, 2024

040    GIS Shapefile Data

041    Historical aerial imagery provided in the Bell production file, as well as those included in Exhibit 12 at his deposition

042    Illinois General Assembly (225 ILCS 459/10), Sec. 10. Definitions In this Act

043    Illinois Pattern Civil Jury Instructions, Damage Instructions Rule 30.17 Measure of Damages —Damage to Real Property — Repairable Damage

044    Jackson, Thomas O., PhD, MAI, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* October 2003.

045    Jackson, Thomas, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal*, January 2002.

046    Joseph, Bob, "40 Years Later: Binghamton State Office Building's $53 Million Toxic Fire," WNBF News Radio, February 5, 2011.

047    Lusvardi, Wayne C., "'The Dose Makes the Poison:' Environmental Phobia or Regulatory Stigma?," *The Appraisal Journal* (April 2000).

048    Master Plan/East St Louis 1960.

049    Mathews, Kristy E., "Under the Microscope: Dissection of a Contingent Valuation Survey," *The Appraisal Journal*, (Summer 2008).

050    Mendelsohn, Robert, Daniel Hellerstein, Michael Huguenin, Robert Unsworth, and Richard Brazee, "Measuring Hazardous Waste Damages with Panel Models," *Journal of Environmental Economics and Management*, Vol. 22, Issue 3, May 1992.

051    Mendelson, Robert F., "Housing – An East St. Louis Challenge!", Public Administration and Metropolitan Affairs Program, Southern Illinois University, Edwardsville, Illinois, June, 1966

052    Mid-America Regional Information Systems (MARIS) Multiple Listing Service (MLS) data

053    Mundy, Bill, MAI, PhD., "The Impact of Hazardous Materials on Property Value." *The Appraisal Journal*, April 1992. Chicago: Appraisal Institute.

054    *Municipal Code of East St. Louis*

055    Production File ESTL0000117964

056    Property information obtained from the St. Clair County Assessor Office

057    Redevelopment Guidelines and Information and Denverside (R-104) Urban Renewal Area

058    Roddewig, Richard J., and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Market place," *The Appraisal Journal* (Summer 2006).

059    Roddewig, Richard J., Editor, *Valuing Contaminated Property:  An Appraisal Institute Anthology*, The Appraisal Institute.

060    Roddewig, Richard J., Editor, *Valuing Contaminated Property:  An Appraisal Institute Anthology*, Vol. 2, The Appraisal Institute.

061    Sampling data taken on the subject property parcels

062    *Second Amended Complaint, City of East St. Louis v. Monsanto Company, et al*., United States District Court for the Southern District of Illinois, Cause No. 3:21-cv-00232-DWD

063    Settlement Documents from numerous lawsuits filed against Monsanto and others in Circuit Court, 2014 (20th Judicial Circuit, St. Clair County, Illinois)

064    Simons, Robert A., PhD, "Estimating Proximate Property Damage From PCB Contamination in a Rural Market:  A Multiple Techniques Approach," *The Appraisal Journal*, October 2002.

065    Steinberg, Jacques, "The 13-Year Cleaning Job; After $53 Million, a $17 Million State Building Finally Is Declared Safe from Toxins", The New York Times, October 11, 1994.

066    The Appraisal Institute. *The Dictionary of Real Estate Appraisal, 7th Edition.* Chicago:  Appraisal Institute, 2022.

067    The Appraisal Standards Board of The Appraisal Foundation. *Uniform Standards of Professional Appraisal Practice (USPAP), 2024 Edition.*

068    The production file of Dr. Randall Bell



*JLL Expert Report and*
*Review of a Bell Appraisal Report*

*City of East St. Louis v. Monsanto, et al.*
*East St. Louis, Illinois*

069    *The Uniform Standards of Professional Appraisal Practice (USPAP),* 2024 ed

070    United States Environmental Protection Agency documents related to the former Monsanto/Krummrich Site

071    United States Environmental Protection Agency, *Overview of EPA's Brownfields Program*, Source: https://www.epa.gov/brownfields/overview-epas-brownfields-program.

072    United States Environmental Protection Agency, *Superfund History.* https://epa.gov/superfund/superfund-history.

073    United States Fish & Wildlife documents related to the former Monsanto/Krummrich Site

074    Various articles and publications related the history of the Monsanto/Krummrich Plant

075    Various depositions of fact witnesses and 30b6 witnesses and their exhibits

076    Wilson, Albert R., "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006).

