# EXHIBIT K



Appraisal
Institute®

*Professionals Providing
Real Estate Solutions*

# The Appraisal of Real Estate

## Fifteenth Edition



BACK_DEFEXP-RR-002407

# The Appraisal of Real Estate

## Fifteenth Edition

BACK_DEFEXP-RR-002408

Readers of this text may be interested in the following publications from the Appraisal Institute:

- *The Dictionary of Real Estate Appraisal*
- *Market Analysis for Real Estate*
- *Residential Property Appraisal*
- *Rural Property Valuation*
- *Scope of Work*
- *The Student Handbook to* THE APPRAISAL OF REAL ESTATE

BACK_DEFEXP-RR-002409



Appraisal
Institute®

*Professionals Providing
Real Estate Solutions*

# The Appraisal of Real Estate

### Fifteenth Edition

Appraisal Institute • 200 W. Madison • Suite 1500 • Chicago, IL 60606 • www.appraisalinstitute.org

The Appraisal Institute advances global standards, methodologies, and practices through the professional development of property economics worldwide.

BACK_DEFEXP-RR-002410

*Chief Executive Officer:* Jim Amorin, MAI, SRA, AI-GRS, CAE

*Director of Professional Services and Resources:* Evan R. Williams, CAE, IOM

*Senior Manager, Publications:* Stephanie Shea-Joyce

*Senior Book Editor/Technical Writer:* Michael McKinley

*Senior Technical Book Editor:* Emily Ruzich

*Manager, Book Design/Production:* Michael Landis

**For Educational Purposes Only**

*The Appraisal of Real Estate*, 15th edition, peer-reviewed by Appraisal Institute members is, at the time of its publication, an authoritative source of recognized methods and techniques for valuation practitioners. No representation or warranty is made that the data and information contained in this publication apply to any specific assignment or set of facts. Neither the authors, reviewers, nor the Appraisal Institute accepts any liability arising from the application of the materials in this publication to any specific assignment or set of facts. Any views or opinions presented in this publication are subject to future court decisions and to local, state and federal laws and regulations and any revisions to such laws and regulations. This publication has been prepared for educational and informational purposes with the explicit understanding that the Appraisal Institute is not engaged in rendering legal, accounting or other professional services, and nothing in this publication is to be construed as offering such services. The reader should obtain specific services from appropriate professionals as the need arises.

24    23    22    21    20              1    2    3    4    5

**Nondiscrimination Policy**

The Appraisal Institute advocates equal opportunity and nondiscrimination in the appraisal profession and conducts its activities in accordance with applicable federal, state, and local laws.

© 2020 by the Appraisal Institute, an Illinois not for profit corporation. All rights reserved. No part of this publication may be reproduced, modified, rewritten, or distributed, either electronically or by any other means, without the express written permission of the Appraisal Institute.

Cover photo credits:
"Sparks, Nevada" and "Warehouse District, Sparks, Nevada" © Ken Lund / Flickr / CC BY-SA 2.0
"10 Universal City From A Helicopter" © User Vicente A. / Flickr /CC BY-SA 2.0
"Walz Vineyard, Manheim, PA" © U.S. Department of Agriculture

**Library of Congress Cataloging-in-Publication Data**
Names: Appraisal Institute (U.S.)
Title: The appraisal of real estate / Appraisal Institute.
Description: 15th edition. | Chicago: Appraisal Institute, 2020. | Revised
    edition of The appraisal of real estate, [2014] | Includes
    bibliographical references and index.
Identifiers: LCCN 2019031830 | ISBN 9781935328780 (hardcover)
Subjects: LCSH: Real property--Valuation. | Personal property--Valuation.
Classification: LCC HD1387 .A663 2020 | DDC 333.33/2--dc23
LC record available at https://lccn.loc.gov/2019031830

BACK_DEFEXP-RR-002411

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Table of Contents

Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ix

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xi

| PART I | Real Estate and Its Appraisal | |
| --- | --- | --- |
| Chapter 1 | Introduction to Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| Chapter 2 | Land, Real Estate, and Ownership of Real Property . . . . . . . . . . . . . . | 9 |
| Chapter 3 | The Nature of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| Chapter 4 | The Valuation Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |

| PART II | Identification of the Problem | |
| --- | --- | --- |
| Chapter 5 | Elements of the Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 |
| Chapter 6 | Identifying the Type of Value and Its Definition . . . . . . . . . . . . . . . . . | 47 |
| Chapter 7 | Identifying the Rights to Be Appraised. . . . . . . . . . . . . . . . . . . . . . . . | 59 |

| PART III | Scope of Work Determination | |
| --- | --- | --- |
| Chapter 8 | Scope of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75 |

BACK_DEFEXP-RR-002412

| PART IV | Data Collection and Property Description | |
|---|---|---|
| Chapter 9 | Data Collection | 81 |
| Chapter 10 | Economic Trends in Real Estate Markets and Capital Markets | 111 |
| Chapter 11 | Neighborhoods, Districts, and Market Areas | 137 |
| Chapter 12 | Land and Site Description | 165 |
| Chapter 13 | Building Description | 193 |

| PART V | Data Analysis | |
|---|---|---|
| Chapter 14 | Statistical Analysis in Appraisal | 249 |
| Chapter 15 | Market Analysis | 273 |
| Chapter 16 | Applications of Market Analysis | 289 |
| Chapter 17 | Highest and Best Use Analysis | 305 |
| Chapter 18 | The Application of Highest and Best Use Analysis | 317 |

| PART VI | Land Value Opinion | |
|---|---|---|
| Chapter 19 | Land and Site Valuation | 335 |

| Part VII | Application of the Approaches to Value | |
|---|---|---|
| Chapter 20 | The Sales Comparison Approach | 351 |
| Chapter 21 | Comparative Analysis | 371 |
| Chapter 22 | Applications of the Sales Comparison Approach | 397 |
| Chapter 23 | The Income Capitalization Approach | 413 |
| Chapter 24 | Income and Expense Analysis | 435 |
| Chapter 25 | Direct Capitalization | 459 |
| Chapter 26 | Yield Capitalization | 475 |
| Chapter 27 | Discounted Cash Flow Analysis and Investment Analysis | 493 |
| Chapter 28 | Applications of the Income Capitalization Approach | 505 |
| Chapter 29 | The Cost Approach | 525 |
| Chapter 30 | Building Cost Estimates | 543 |
| Chapter 31 | Depreciation Estimates | 559 |

BACK_DEFEXP-RR-002413

Copyrighted material licensed by Charles Brigden on September 17, 2020

**PART VIII**       **Reconciliation of the Value Indications and Final Opinion of Value**

**Chapter 32**      Reconciling Value Indications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .599

**PART IX**       **Report of Defined Value**

**Chapter 33**      The Appraisal Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .605

**PART X**       **Appraisal Practice Specialties**

**Chapter 34**      Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .627

**Chapter 35**      Consulting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .645

**Chapter 36**      Valuation for Financial Reporting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .651

**Chapter 37**      Valuation of Real Property with Related Non-realty Items. . . . . . . . .663

**ADDENDA**

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .681

Supplementary content is available online at
**www.appraisalinstitute.org/15th-edition-appendices/**

**Appendix A**      Professional Practice and Law

**Appendix B**      Regression Analysis and Statistical Applications

**Appendix C**      Financial Formulas

                   Bibliography

BACK_DEFEXP-RR-002414

BACK_DEFEXP-RR-002415

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Foreword

In 2008, when the thirteenth edition of *The Appraisal of Real Estate* was published, the global economy was on the verge of a startling decline and the ensuing economic distress affected most economic sectors, especially real estate. The cause of that decline was man-made, and, in retrospect, it was likely avoidable. When the fourteenth edition of *The Appraisal of Real Estate* was published in 2013, real estate markets were still recovering from that economic downtown. By then, many real estate professionals had taken heed of the problem and learned that true value is based on fundamentals, not market speculation. As the economy rebounded, the real estate community of the last decade continued to thrive and assert itself in a stronger, more accountable environment.

We find ourselves in a situation much like 2008 today, with a global pandemic and social justice concerns affecting all areas of the economy—and many other aspects of daily life—in the United States and around the world.

Today, appraisers and users of appraisal services do not know what the future will look like. Will the changes we have made and will make to our lives and our businesses be permanent or temporary? Will the effects of these dramatic events change the shape of our cities and towns forever or simply force us to move forward in new directions? Although we know that "business as usual" is no longer possible, we do not know much more. At this juncture, the best we can do is accept the current reality and have faith in knowing that we have the expertise to handle the challenges that lie ahead and that they will be addressed in our usual unbiased manner and with patience, flexibility, and a respect for market fundamentals.

This fifteenth edition of *The Appraisal of Real Estate* is a book that fits the times. It reflects a renewed commitment to the essential principles of appraisal and the sound application of recognized valuation methodology. Longtime readers of *The Appraisal of Real Estate* will notice significant changes in this text. Like the previous edition, the new book is structured to mirror the organization of the valuation process, moving from the identification of the problem through to the report of defined value. Diving deeper, the most noticeable change they will find in this edition is the expanded discussion of market analysis and highest and best use, with new chapters clarifying

BACK_DEFEXP-RR-002416

these important concepts and demonstrating procedures for their application. For the first time, the relationship between market analysis and highest and best use is made explicit and described in a step-by-step analytic procedure. Another major development in this new edition is the emphasis on the necessity of definitively describing the property rights to be appraised in an appraisal assignment to ensure that all the necessary steps are taken to produce a credible value conclusion.

History confirms that the applicability and importance of different valuation techniques may rise and fall as real estate markets expand and change and as society continues to evolve. Nevertheless, the basic principles of valuation that are at the core of this book, and fundamental to the appraiser's skills set, remain unchanged.

Finally, *The Appraisal of Real Estate*, fifteenth edition, would not have been possible without the contributions of dozens of volunteers, who are identified in the Acknowledgments. Their dedicated efforts to improve the textbook over the course of an arduous two-year development process are a testament to the profession's thought leaders and their commitment to move the body of knowledge forward and to ensure that *The Appraisal of Real Estate* retains its central role in professional valuation literature.

Jefferson L. Sherman, MAI, AI-GRS
2020 President
Appraisal Institute

x    *The Appraisal of Real Estate*

BACK_DEFEXP-RR-002417

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Acknowledgments

The development of the fifteenth edition of *The Appraisal of Real Estate* would not have been possible without contributions from a long list of valuation professionals active in advancing the Appraisal Institute's education, publications, and other endeavors. The Appraisal Institute would like to acknowledge the generous assistance of the following content reviewers and consultants: Gregory J. Accetta, MAI, AI-GRS, Sandra K. Adomatis, SRA, Marius Andreasen, MAI, Randall Bell, PhD, MAI, Charles T. Brigden, MAI, Stephanie C. Coleman, MAI, SRA, AI-GRS, AI-RRS, M. Lance Coyle, MAI, SRA, Stephen T. Crosson, MAI, SRA, Douglas S. Defoor, MAI, AI-GRS, Dennis J. Duffy, MAI, Larry O. Dybvig, Don M. Emerson, Jr., MAI, SRA, Stephen F. Fanning, MAI, AI-GRS, Brian J. Flynn, MAI, AI-GRS, Kenneth G. Foltz, MAI, SRA, AI-GRS, Mark R. Freitag, SRA, Daniel M. Fries, SRA, Justin R. Glasser, MAI, Craig M. Harrington, SRA, AI-RRS, Frank E. Harrison, MAI, SRA, Steven J. Herzog, MAI, AI-GRS, Thomas O. Jackson, PhD, MAI, Jeffrey A. Johnson, Kerry M. Jorgensen, MAI, Paula K. Konikoff, JD, MAI, AI-GRS, Cheryl A. Kunzler, SRA, AI-RRS, David C. Lennhoff, MAI, SRA, AI-GRS, Mark R. Linné, MAI, SRA, AI-GRS, Micheal R. Lohmeier, MAI, SRA, George R. Mann, MAI, SRA, AI-GRS, Richard Marchitelli, MAI, Maureen Mastroieni, MAI, Dan P. Mueller, MAI, James L. Murrett, MAI, SRA, Mark Ratterman, MAI, SRA, Stephen D. Roach, MAI, SRA, AI-GRS, Scott Robinson, MAI, SRA, AI-GRS, AI-RRS Richard J. Roddewig, MAI, Timothy P. Runde, MAI, Michael V. Sanders, MAI, SRA, Scott M. Schafer, MAI, John A. Schwartz, MAI, Benjamin R. Sellers, MAI, Leslie P. Sellers, MAI, SRA, AI-GRS, Tony Sevelka, MAI, SRA, AI-GRS, Justin Slack, MAI, Michael V. Tankersley, MAI, SRA, AI-GRS, AI-RRS, John H. Urubek, MAI, AI-GRS, Stephen Wagner, MAI, AI-GRS, Joshua Wood, MAI, AI-GRS, and Larry T. Wright, MAI, SRA, AI-GRS.

The following contributors deserve additional recognition for reviewing the entire manuscript of this edition of the textbook: Stephanie Coleman, Stephen Roach, and Leslie Sellers. Their contribution to the book's development—and patience with the process—are greatly appreciated.

BACK_DEFEXP-RR-002419

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Introduction to Appraisal   1

A real estate developer visits a plot of vacant land near a suburban highway interchange and makes some rough calculations about the feasibility of building and leasing an office building on the site in the next two years. A residential real estate broker with the listing for a three-bedroom, two-bathroom house in an active urban market researches the prices paid recently for homes of a similar size with similar physical characteristics before suggesting a listing price to the seller. Another broker looks through the multiple listing service before showing a young couple homes for sale in nearby suburban neighborhoods that are within the couple's price range. What do these situations have in common? They all involve decisions about real estate and its value.

A county tax assessor runs data for hundreds of properties through a battery of statistical models as part of the three-year reassessment of commercial real estate in the municipality. A loan officer at a branch of a regional bank looks over a loan application and several supporting documents as part of the due diligence in making a recommendation on construction financing for the expansion of a local manufacturing company's office-warehouse. An attorney represents the owner of farmland adjacent to a county road in a dispute with the county department of transportation over the amount of just compensation due for land taken as part of a road improvement project.

Clearly, all the individuals in these scenarios are making decisions about real estate based on their perceptions of the value of an individual property or a group of properties in a specific market. However, none of these key participants in the real estate marketplace is performing an *appraisal*.

## What Is an Appraisal?

In simplest terms, an appraisal is "the act or process of developing an opinion of value" of an asset.[1] The asset in question could be anything—fine art, machinery and

---

1.   As a technical term, *appraisal* is defined similarly in professional standards and regulations such as the Appraisal Foundation's *Uniform Standards of Professional Appraisal Practice* and the Appraisal Institute's *Code of Professional Ethics* and *Standards of Valuation Practice*.

BACK_DEFEXP-RR-002420

equipment, or even a specific type of business. The focus of this book, however, is the appraisal of real property, i.e., rights in real estate.

The value developed in an appraisal is a measure of the relative worth of the asset, expressed in terms of money. In other words, the property appraisal quantifies to a certain level of precision what buyers and sellers would consider the relative worth of an identified interest in a parcel of land and any improvements to that land.

Implicit in the traditional definition of *appraisal* is the idea that an appraisal is someone's opinion, rather than a fact. A useful way to think about what an appraisal is would be to look more closely at the people who develop those opinions of value. While anyone can have an opinion of value, appraisers are professionals with training and expertise in accepted valuation methods and techniques who have an ethical obligation to remain disinterested and unbiased while performing an appraisal. That professional expertise gives the value opinion of an appraiser credibility in the marketplace, which the opinions of other market participants do not have. And what makes the appraiser's opinion more valuable to clients is knowledge and experience, combined with an unbiased analytical process, supported by relevant evidence and logic, and resulting in credible value conclusions.

In the United States, licensed and certified real estate appraisers meet educational, experience, and testing requirements set by states and can perform appraisals in the jurisdiction covered by their licensing credentials. The federal government has mandated that all states establish licensing and certification programs to regulate appraisals for federally related transactions (i.e., certain real estate–related financial transactions involving federally insured depository institutions). Some states have established laws requiring licensing or certification only for appraisals performed for these purposes, while other states require licensing or certification for appraisals performed for any (or almost any) purpose. In general, the courts do not require an appraiser to be licensed or certified. However, possession of a state-issued license or certification has become a basic indication of appraiser competency. Outside the United States, appraisers are commonly known as *valuers*. Unsurprisingly, the professional qualifications of valuers vary from country to country, often depending on the nature of the economic system and the history and development of the valuation profession within a particular country.[2]

Professional standards, such as the Appraisal Institute's Standards of Valuation Practice (SVP), the Uniform Standards of Professional Appraisal Practice (USPAP), and the International Valuation Standards (IVS), highlight the ethical codes that valuation professionals must follow. For example, USPAP defines an appraiser as "one who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective." By that definition, any potential client of an appraiser should be able to expect a certain level of professionalism from anyone representing himself or herself as an appraiser. Similarly, the International Valuation Standards outline the expected objectivity of valuers as follows:

> The process of valuation requires the *valuer* to make impartial judgements as to the reliability of inputs and assumptions. For a valuation to be credible, it is important that those judgements are made in a way that promotes transparency and minimises the influence of any subjective factors on the process. Judgement used in a valuation *must* be applied objectively to avoid biased analyses, opinions and conclusions.[3]

---

2. For a discussion of licensing criteria in specific countries, see Howard C. Gelbtuch with Eunice H. Park, *Real Estate Valuation in Global Markets*, 2nd ed. (Chicago: Appraisal Institute, 2011).

3. *International Valuation Standards 2017* (London: International Valuation Standards Council, 2017), 6.

BACK_DEFEXP-RR-002421

Copyrighted material licensed by Charles Brigden on September 17, 2020

The Code of Professional Ethics of the Appraisal Institute echoes those other standards documents, defining a *valuer* as "[o]ne who is expected to provide [s]ervices in an unbiased and competent manner."

Real property appraisers have extensive training and experience and are committed to the profession. Appraisers are bound to strict compliance with regulatory requirements, and many are members of appraisal organizations that encourage participation in professional activities and educational development. Members agree to peer review of their ethical conduct and work performance, which reflects their strong commitment to professionalism. Like many other professions, the appraisal profession encompasses specific areas of expertise, and some areas of appraisal work require significant training and experience. Competency is a key factor in every appraisal assignment.

Continuing education is the cornerstone of professional development. By pursuing continuing education, appraisers demonstrate their commitment to maintaining their skills at a level far above the bare minimum required to satisfy state credentialing requirements. Individuals who complete a rigorous educational program and earn recognized professional designations find that their employment and business prospects are considerably enhanced. A commitment to professionalism helps regulate the industry and ensures quality appraisal work.

Services relating to the value of property are provided by a variety of professionals and others. The services provided by appraisers (valuers) are known as "appraisal practice" or "valuation practice." These services include appraisal and review, as well as a wide range of activities such as measuring the size of buildings and developing detailed market studies. When performed by an appraiser, the client can expect these services to be provided competently and in a manner that is independent, impartial, and objective—as these are the characteristics that define an appraiser.

## What Is Real Property?

Precisely what does a real estate appraiser value? In simplest terms, real property rights are valued, not the real estate itself. In real estate appraisal, an important distinction is made between the terms *real estate* and *real property*. Although some laws and court decisions treat the terms synonymously for legal purposes, in appraisal practice the terms *real estate* and *real property* are distinctly different.

Real estate is the physical land and appurtenances affixed to the land—e.g., structures. Real estate is immobile and tangible. Real estate includes the following tangible components:

- Land
- All things that are a natural part of land, such as trees and minerals
- All things that are attached to land by people, such as buildings and site improvements

In addition, all permanent building attachments (for example, plumbing, electrical wiring, and heating systems) as well as built-in items (such as cabinets and elevators) are usually considered part of the real estate. Real estate includes all attachments, both above and below the ground.

Real property includes the interests, benefits, and rights inherent in the ownership of physical real estate. In an appraisal, a particular set of real property inter-

BACK_DEFEXP-RR-002422

> The distinction between *real estate* and *real property* is fundamental to appraisal:
>
> **real estate**
>
> An identified parcel or tract of land, including improvements, if any.
>
> **real property**
>
> The interests, benefits, and rights inherent in the ownership of real estate.

ests—not the real estate—is what is valued. Real estate in and of itself has no value. The rights, or interests, in real estate are what have value.

The terms *estate* and *interest* may be used differently depending on the jurisdiction or the discipline. In valuation practice, an *estate* is what is owned, including the right of possession and the power to exclude others. *Interests* are rights in real property; they can benefit or burden the land and affect the value of an estate. What is usually valued is an estate subject to specified interests. Therefore, the appraiser's task is to identify not only the estate (fee simple estate, leasehold estate, life estate) but also the interests associated with the real estate, such as leases, easements, restrictions, encumbrances, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of a similar nature. In some assignments, interests alone are valued. For example, the subject of the appraisal may be an easement.

## The Bundle of Rights

The total range of private ownership interests in real property is called the *bundle of rights*. Imagine a bundle of sticks in which each "stick" represents a distinct and separate right or interest. The bundle of rights contains all the interests in real property, including the right to use the real estate, sell it, lease it, enter it, and give it away. Constitutional, statutory and common law provides for the private enjoyment of these rights, subject to certain limitations and restrictions.

### Public Restrictions on Ownership

In the United States, private ownership of real property rights is guaranteed by the US Constitution but is subject to certain government restrictions, known as the four powers of government:

- Taxation
- Eminent domain
- Police power
- Escheat

Taxation is the right of government to raise revenue through assessments on goods, products, and rights. The US Constitution effectively precludes the federal government from taxing real property directly, although the income and proceeds from the sale of real property may be subject to federal income taxation. The right to tax property is reserved for state and local governments.

Eminent domain is the right of government to take private property for public use upon the payment of just compensation. This right can be exercised by a government agency or by an entity acting under governmental authority such as a housing authority, school district, park district, or right of way agency. Condemnation is the act or process of enforcing the right of eminent domain.

Police power is the right of government through which property is regulated to protect public safety, health, and general welfare. Examples of police power include

BACK_DEFEXP-RR-002423

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

zoning ordinances, use restrictions, building codes, air and land traffic regulations, health codes, and environmental regulations.

Escheat is the right of government that gives the state or a local government (e.g., township or county) titular ownership of a property when the owner dies without a will or any statutory heirs. That is, the government does not take the property but becomes the recipient of the real property if there are no other heirs to be found.

### Private Restrictions on Ownership

Private restrictions on property ownership can limit the use or development of a property and might limit the manner in which ownership can be conveyed. The purchaser of a property may be obligated to use the property subject to a private restriction such as right of way or a party-wall agreement. Deed restrictions and subdivision covenants and restrictions can often be found in deeds recorded at the county courthouse, which are often available online. Alternatively, information on those restrictions might be provided by a property owner. Restrictions such as easements and rights of way may be more difficult to uncover. They may be found in title reports or through a diligent search of public records. Sometimes the owner, client, broker, or neighbors can provide this information. Discovering other restrictions such as an unrecorded agreement relative to water rights may be a more daunting task.

**taxation**
The right of government to raise revenue through assessments on valuable goods, products, and rights.

**eminent domain**
The right of government to take private property for public use upon the payment of just compensation. The Fifth Amendment of the US Constitution, also known as the *takings clause*, guarantees payment of just compensation upon appropriation of private property.

**police power**
The inherent power of government to regulate property in order to protect public health, safety, and general welfare.

**escheat**
The right of government that gives the state titular ownership of a property when its owner dies without a will or any ascertainable heirs.

## Non-realty Assets

Appraisers not only recognize the distinction between real estate and real property, they also identify any non-realty items that are included in the valuation. Non-realty items include tangible and intangible personal property and, in some cases, financial assets. The identification of these items is part of the first step in the valuation process. (See Chapter 4.) Valuation standards do not require the separate valuation of non-realty items, but the assignment may call for these items to be valued separately. The appraisal report must identify any non-realty items and address their effect on value, even when those items are not valued separately. If an assignment calls for non-realty items to be valued separately, an appraiser must (a) ascertain whether he or she possesses the requisite competency, (b) follow the applicable valuation standards, and (c) properly identify the type of value developed. The valuation of non-realty assets is a specialized assignment requiring additional competency, which is discussed in more detail in Chapter 37.

Sometimes an appraisal assignment involves just the real property, e.g., interests in the land, building, and fixtures such as plumbing, lighting, heating, and air-conditioning systems. At other times, the appraisal may include non-realty items such as personal property or financial assets either instead of or in addition to the real prop-

BACK_DEFEXP-RR-002424

erty. For example, an appraisal assignment involving a service station might include the valuation of the real property and personal property such as trade fixtures (e.g., fuel pumps installed by the tenant that will be removed at the expiration of the lease).

## Why Appraisals Are Needed

Appraisals are requested for as many different reasons as there are clients. (Figure 1.1 does not reflect all possible uses for appraisals, but it does provide a broad sampling of professional appraisal activities.) All the scenarios outlined at the beginning of the chapter involve significant financial decisions that might require an appraisal and therefore an appraiser. Appraisals are often required by law, such as in many lending situations. Traditionally, appraisals for mortgage lending have been the bulk of work for appraisers of residential property, although the advent of automated valuation models (AVMs) in the 1990s has created competition in that market segment.[4]

Changes in governmental regulations relating to mortgage lending can have a significant effect on the amount of work appraisers have. As another example, a condemning authority typically must retain an appraiser to value a property that is taken through the exercise of the governmental power of eminent domain as support for the amount of just compensation payable to the property owner. Indeed, in most situations in which the value of real property is contested in court, appraisals serve as primary support and appraisers are commonly summoned to testify as expert witnesses on matters relating to the value of real property.

When an appraisal is not required by law, it may be desired by a client because the appraiser's opinion is objective and unbiased and the information about the value of real property will be useful in a financial decision. For example, a property owner might order an appraisal to set an offering price for the property that will attract buyers and would likely be competitive in the market without a significant marketing period.

Just as appraisers must be aware of the differences between types of property, they must also be able to identify which type of value is appropriate for the client's needs. Like the interest to be appraised, the type of value sought must be identified and defined at the outset of an appraisal assignment. The most common appraisal assignments involve developing an opinion of market value, but many other types of value might be the focus of an appraisal such as

- Use value
- Investment value
- Disposition value and liquidation value
- Assessed value
- Insurable value
- Fair value

The type and definition of value appropriate for a particular assignment will often be clear to experienced appraisers. Technical distinctions among the types and definitions of value listed above are discussed in Chapter 6.

---

4. See Chapter 14 for more discussion of automated valuation models.

BACK_DEFEXP-RR-002425

Copyrighted material licensed by Charles Brigden on September 17, 2020

| **Figure 1.1** | Range of Uses of Appraisals |
|---|---|

**Transfer of Ownership**
- To help prospective buyers set offering prices
- To help prospective sellers agree on acceptable selling prices
- To establish a basis for real property exchanges
- To establish a basis for reorganizing or merging the ownership of multiple properties
- To determine the terms of a sale price for a proposed transaction

**Financing and Credit**
- To develop an opinion of the value of the real property offered as collateral for a proposed mortgage loan
- To provide an investor with a sound basis for deciding whether to purchase real estate mortgages, bonds, or other types of securities
- To establish a basis for a decision to insure or underwrite a loan on real property

**Litigation**

Eminent domain proceedings
- To develop an opinion of the market value of a property as a whole—i.e., before an acquisition
- To develop an opinion of the market value of the remainder after a partial taking
- To estimate the damages to a property created by a taking

Property divisions
- To develop an opinion of the market value of a property in contract disputes
- To develop an opinion of the market value of real estate as part of a portfolio
- To develop an opinion of the market value of partnership interests

Real estate litigation
- To estimate damages created by violations of environmental laws
- To estimate damages created by environmental accidents
- To estimate damages due to construction defects or defects in title
- To determine professional liability (of a broker, attorney, appraiser, or other professional)
- To help settle bankruptcy cases and the dissolution of business partnerships and marriages

Tax matters
- To develop an opinion of assessed value or another type of value
- To separate assets into depreciable (or capital recapture) items such as buildings and nondepreciable items such as land, and to estimate applicable depreciation (or capital recapture) rates
- To develop an opinion of the value of the real estate component of an estate plan that represents the foundation for future capital gains and inheritance taxes
- To develop an opinion of value used in determining gift or inheritance taxes
- To develop an opinion of value of conservation easements

**Investment Counseling, Decision Making, and Accounting**
- To develop an opinion of fair value for financial reporting
- To set rent schedules and lease provisions
- To determine the feasibility of a construction or renovation program
- To help an investor trade an interest in a corporation that holds real property
- To help corporations or third parties purchase homes for transferred employees
- To serve the needs of insurers, adjusters, and policyholders
- To facilitate corporate mergers, the issuance of stock, or the revision of book value
- To develop an opinion of liquidation value for forced sale or auction proceedings
- To counsel clients by considering their investment goals, alternatives, resources, constraints, and the timing of their activities
- To advise zoning boards, courts, and planners, among others, on the probable effects of proposed actions
- To assist in arbitrating valuation issues
- To analyze supply and demand trends in a market
- To identify the current status of real estate markets
- To value fixed assets and assist in asset value allocations

BACK_DEFEXP-RR-002426

BACK_DEFEXP-RR-002427

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Land, Real Estate, and Ownership of Real Property    2

According to an old saying, "Under all is the land." Land provides the foundation for the social and economic activities of people. It is both a tangible physical commodity and a source of wealth. Because land is essential to life and society, it is the subject of many disciplines, including law, economics, finance, sociology, and geography. Within the vast domain of the law, issues relating to the ownership and the use of land are considered. In economics, land is regarded as one of the four agents of production, along with labor, capital, and entrepreneurial coordination, and land provides the natural elements that contribute to a nation's wealth. Finance applies the principles of economics within a market economy that furnishes capital for the exchange of property, and financial considerations help market participants act knowledgeably and prudently. From a sociological perspective, land is a resource to be shared by all people, and land is also a commodity that can be owned, traded, and used by individuals, corporations, partnerships, and other entities. Geography focuses on describing the physical elements of land and the activities of the people who use it.

Lawyers, economists, sociologists, and geographers have a common understanding of the attributes of land:

- Each parcel of land is unique in its location and composition.
- Land is physically immobile.
- Land is durable.
- The supply of land is finite.
- Land is useful to people.

Real estate appraisers recognize the attributes that form the basis for real property value. In contrast to the physical character of land, land value is an economic concept. Appraisers recognize the concepts of land used in other disciplines but are most concerned with how the market measures land value. Markets reflect

> Land is investigated and analyzed in a variety of disciplines—government, the law, economics, geography, environmental studies, engineering, and land planning.

BACK_DEFEXP-RR-002428

the attitudes and actions of people in response to social and economic forces and the constraints of law and legal encumbrances.

## Concepts of Land

Although land and improvements on and to land can be viewed in a physical sense, there are other concepts of land that are less obvious. These concepts help to characterize the importance of land and provide the foundation for land value systems.

### Geographic and Environmental

The study of land includes consideration of its diverse physical characteristics and how these characteristics combine in a particular area. Each land parcel is unique, and a fixed location is a prominent characteristic of all real estate. The utility of land and the highest and best use to which land can be put are significantly affected by the physical and locational characteristics of the land and other related considerations, broadly referred to as geography.

Land is affected by a number of processes. Ongoing physical processes modify the land's surface, biological processes determine the distribution of life forms, and socioeconomic processes affect human habitation and activity on the land. Together, these processes influence the characteristics of land use.

Land can be used for many purposes such as

- Agriculture
- Commerce
- Industry
- Residence
- Recreation
- Transportation and infrastructure

And land use decisions may be influenced by many factors including

- Climate
- Topography
- The distribution and density of natural resources, population centers, and industry
- Trends in economics, population, technology, and culture

The influence of each of these factors on a particular parcel of land varies.

Geographic considerations are particularly significant to appraisers. The importance of physical characteristics such as topography, soils, water, and vegetation is obvious, but the distribution of population, facilities, and services and the movement of people and goods are important as well. The geographic concept of land, which emphasizes natural resources, the location of industry, and actual and potential markets, provides much of the background knowledge required in real estate appraisal.

### Legal

Land use reflects the needs and values of organized society. To understand how the various forces affecting land operate, the basic role of law must be recognized. The cultural, political, governmental, and economic attitudes of a society are reflected in its laws. The law does not focus on the physical characteristics of land but on the

BACK_DEFEXP-RR-002429

Copyrighted material licensed by Charles Brigden on September 17, 2020

rights and obligations associated with various interests in land. In the United States, the right of individuals to own and use land for material gain is maintained, while the right of all people to use the land is protected. In other words, the law recognizes the possible conflict between private ownership and public use.

"Whose is the land, his it is, to the sky and the depths." This ancient maxim is the basis of the following legal definition:



**Land "to the Sky and the Depths"**



> Land . . . includes not only the ground, or soil, but everything that is attached to the earth, whether by course of nature, as are trees and herbage, or by the hand of man, as are houses and other buildings. It includes not only the surface of the earth but everything under it and over it. Thus in legal theory, the surface of the earth is just part of an inverted pyramid having its tip, or apex, at the center of the earth, extending outward through the surface of the earth at the boundary lines of the tract, and continuing on upward to the heavens.[1]

This definition suggests that land ownership includes complete possession of land from the center of the earth to the ends of the universe. In practice, however, the rights available to private ownership are legally limited due to governmental controls.

The US Congress has declared that the federal government has exclusive sovereignty over the nation's airspace and that every citizen has a public right of transit through the navigable airspace in the United States.[2] Many states restrict ownership and use of subsurface areas such as underground aquifers and oil and gas reserves. Because land ownership can be limited, ownership rights are the subject of law. For example, state laws will determine if it is permissible for the owners of a parcel of land to drill a well on their property that draws water from an aquifer located under neighboring land. The lawful entitlement to access underground water resources in this example is a valuable ownership right in land. These types of rights are the focus of real property appraisal.

The laws that govern the use and development of land in the United States give landowners great freedom in deciding how to use their land. However, this freedom is not without restrictions. The basic concept of private ownership calls for unrestricted use so long as that use does not unreasonably harm the rights of others. In the past, the test of harm focused on owners of adjacent properties. The concept of harm has been expanded to encompass broader social and geographic concerns. The definition of reasonable use has been argued in many court cases.

Legal matters of particular concern to appraisers include the following:

- Easements
- Access regulations
- Water and mineral rights
- Zoning, environmental laws, building codes, and other use restrictions
- The recording and conveyance of titles

---

1.   Raymond J. Werner and Robert Kratovil, *Real Estate Law*, 10th ed. (Englewood Cliffs, NJ: Prentice-Hall, 1993), 4.

2.   49 USC §40103. Sovereignty and Use of Airspace.

BACK_DEFEXP-RR-002430

Appraisers should be familiar with local and state laws, which have primary jurisdiction over land. Most communities have zoning laws, and specific districts within that community may be part of overlay zones where some properties have another layer of restrictions.

### Economic

Land is a physical entity with inherent ownership rights that can be legally limited for the good of society. Land is also a major source of wealth, which, in economic terms, can be measured in money or exchange value. Land and its products have economic value only when they are converted into goods or services that are useful, desirable, paid for by consumers, and limited in supply. (A product with an essentially unlimited supply such as oxygen will have a low value.) The economic concept of land as a source of wealth and an object of value is central to appraisal theory. There is a long history of thought on the sources and bases of value, which is referred to as value theory.

Value is a reflection of the amount of income that land can generate for a property owner or how much benefit a combination of land and improvements can provide. Many commercial properties produce income for their owners. Commercial properties that are owner-occupied remove or restrict the potential for rental income flowing to the owner, but an owner-occupied property has value in how it is used. That use may exceed the cost of leasing similar space for the owner's business needs. Economic concepts contribute to the value definitions used in appraisals, and they are an important part of the literature on which professional appraisal practice is founded. One facet of value is the present net worth of future benefits, and those benefits can often be quantified in terms of rental income.

### Social

Modern society has become increasingly concerned with how land is used and how rights are distributed. The supply of land is fixed, so increased demand for land creates the need for land to be used more intensively. Conflicts often arise between groups that hold different views on proper land use. Some believe that land is a resource to be shared by all. Some want to preserve the land's scenic beauty and important ecological functions. Others view land primarily as a marketable commodity; they believe society is best served by private, unrestricted ownership. For example, the developer of a proposed shopping center or business park may view the development of a particular parcel of land in a desirable and affordable location as serving a definable market area. On the other hand, local residents may argue that, as the site of a significant Civil War battle, the parcel deserves government protection (if taxpayers can be persuaded to support such a public investment in historical preservation). These conflicting views reflect controversies that arise between the property rights of the individual and those of society. As a resource, land may be protected for the good of society. As a marketable commodity, the ownership, use, and transfer of land are regulated so that individual rights are not violated.[3]

Throughout American history, land ownership has been recognized as a foundation of the country's democratic institutions. John Adams wrote, "If the multitude is

---

3.  See also Charles E. Roe, "Land Use: The Second Battle of Gettysburg," *The Appraisal Journal* (October 2000): 441-449.

BACK_DEFEXP-RR-002431

Copyrighted material licensed by Charles Brigden on September 17, 2020

possessed of real estate, the multitude will take care of the liberty, virtue, and interest of the multitude in all acts of government."[4]

All laws and operations of government are intended to benefit the public. Thus, in the public interest, society may impose building restrictions, zoning and building ordinances, development and subdivision regulations, and other land use controls. These controls affect what may be developed, where development may occur, and what activities may be permitted subsequent to development. Since the 1960s, the federal government, in cooperation with the states, has increased its efforts to regulate the air and water emissions from manufacturing processes and to reduce pollution caused by dirt, chemicals, and noise. Land use regulations have been expanded to wetlands, beaches, and navigable waters and to preserve the habitats of endangered species.[5]

As the nature and extent of land use controls change, so do the nature and extent of private land ownership. Land use regulations vary. In more densely populated areas, there is a greater need to control land uses. Changes in land use regulations affect markets and ultimately real estate values. Consequently, real estate appraisers must be familiar with the regulations and restrictions that apply to land use and understand how these regulations affect a specific property.

## Public and Private Forms of Real Property Ownership

One major distinction in real property ownership is the difference between private ownership and public ownership. Public ownership of real property takes many forms. Streets and roads, municipal utility systems, and other public facilities such as city halls, prisons, and public works facilities are usually owned by governmental bodies for the benefit of all citizens in a jurisdiction. School districts own land on which school buildings, athletic fields, and other facilities are maintained. Library districts create public libraries. Park, recreation, and conservation districts acquire land for recreation, conservation, and preservation.

Most public ownership is created in response to public necessity or public demand. For example, in one community it might be necessary to acquire land for a school using the power of eminent domain. In another community, there might be sufficient demand by residents for the municipality to acquire land for the development of soccer fields using money generated by real estate taxes. Rather than being concerned with the economic issues that are of importance to private owners of real property, a governmental entity often is more concerned with how publicly owned real property, which is usually not subject to real estate taxation, can be used in the best interests of the public.

Police power also regulates land use, and often its application can reflect the difference in a property viewed from the perspective of public ownership versus private ownership. For example, a large municipal park might be an ideal location for industrial development, but the zoning imposed through the application of police power will ensure that the park continues to be used for recreational purposes. Also, government regulations will dictate how property acquired by a governmental entity through the process of escheat will best benefit the general public.

---

4.   94 U.S. 113. Quoted in "Land as a Commodity" by Babcock and Feurer in Andrews, *Land in America*, 31.

5.   For more information on the government's control of land use, see *Real Property Valuation in Condemnation* (Chicago: Appraisal Institute, 2018).

BACK_DEFEXP-RR-002432

Although many appraisal assignments involve the valuation of publicly owned real property, most involve the valuation of private ownership interests. As discussed in this chapter, ownership of property can take many forms. How title to a property is held is usually selected based on the needs of the owner or owners. For example, title to a one-unit residence might be held by two spouses in joint tenancy with the right of survivorship. For a chain of food stores, however, title might be held as a beneficial interest in a land trust or a limited liability corporation.

Professional appraisal standards require appraisers to identify the interest to be valued in an assignment, but the interest valued need not reflect what is currently held by any particular entity. For example, an appraiser can value a fee simple interest even though the property is leased. The interest appraised depends on the intended use of the appraisal and what interest the client needs to have valued. Chapter 7 covers the forms of ownership entities in more detail.

BACK_DEFEXP-RR-002433

Copyrighted material licensed by Charles Brigden on September 17, 2020



# The Nature of Value  3

## The History of Value Theory

The development of modern value theory began in the eighteenth and nineteenth centuries when economic thinkers of the classical school first identified the four agents of production—labor, capital, coordination, and land—and examined the relationships between the basic factors that create value and supply and demand, i.e., utility, scarcity, desire, and effective purchasing power. Classical theory was largely based on the contributions of the physiocrats, whose ideas were put forth in reaction to the mercantilist doctrines that dominated earlier economic thought.

Mercantilism focused on wealth as a means of enhancing a nation's power. National wealth was equated with an influx of bullion into the national treasury. Mercantilists sought to maintain a favorable balance of trade by selling goods to accumulate gold, the chief medium of exchange. Between the fifteenth and eighteenth centuries, economic activity in western Europe was associated with overseas exploration, colonization, and commerce. Mercantilist doctrine promoted strong, central economic controls to maintain monopolies in foreign trade and ensure the economic dependency of colonies.

Physiocratic thinkers of the mid-eighteenth century objected to the commercial and national emphasis of mercantilism. They stressed other considerations in formulating a theory of value. Agricultural productivity, not gold, was identified as the source of wealth, and land was cited as the fundamental productive agent. The physiocrats also identified the importance of factors such as utility and scarcity in determining value.

## The Classical School

The classical school expanded and refined the tenets of physiocratic thought, formulating a value theory that attributed value to the cost of production. The Scottish economic thinker Adam Smith (1721-1790) suggested that capital, in addition to land and labor, constituted a primary agent of production. Smith acknowledged the role of coordination in production but did not study its function as a primary agent. He be-

BACK_DEFEXP-RR-002434

lieved that value was created when the agents of production were brought together to produce a useful item.

In *The Wealth of Nations* (1776), the first systematic treatment of economics, Smith considered value as an objective phenomenon. By virtue of its existence, an item was assumed to possess utility. Scarcity also added exchange value to goods. The "natural price" of an object generally reflected how much the item cost to produce. In contemporary appraisal practice, the classical theory of value is evidenced in the cost approach. For example, if the cost of a new housing unit plus the price of the land is more than the market will pay for the property, few new units will be produced.

Later economic thinkers  of the classical school offered theoretical refinements on the cost of production theory of value, but none contested its basic premises. David Ricardo (1772-1823) in *On the Principles of Political Economy and Taxation* (1817) developed a theory of rent based on the concept of marginal land and the law of diminishing returns. Land residual returns were referred to as "rent." Ricardo's theory has contributed significantly to the concept of highest and best use and the land residual technique used in the income capitalization approach to value.

John Stuart Mill (1806-1873) reworked Adam Smith's ideas in *The Principles of Political Economy* (1848), which became the leading economic text of its time. Mill defined the relationship between interest and value in use, which he referred to as "capital value"; the role of risk in determining interest; and the inequities of "unearned increments" accruing to land. Confident in his analysis of the cost of production theory, Mill asserted, "Happily, nothing in the laws of value remains for the present or any future writer to clear up; the theory of the subject is complete."

## Challenges to Classical Value Theory

In the second half of the nineteenth century, two serious challenges to classical value theory were put forward. One was the labor theory of value, an extreme position advocated by Karl Marx (1818-1883). Marx claimed that all value is the direct result of labor and that increased wages to labor would lower capitalistic profits. Marx envisioned an inevitable struggle between the social classes that would eventually result in a violent political upheaval.

The other challenge was presented by the marginal utility, or Austrian, school, which was critical of both the classical and Marxian theories. The central concept of marginal utility links value to the utility of and demand for the marginal, or additional, unit of an item. Thus, if one more unit than is needed or demanded appears in a given market, the market becomes diluted and the cost of production becomes irrelevant. Value is regarded as a function of demand, with utility as its fundamental precept.[1] Marginal utility is the theoretical basis for the concept of contribution.

## The Neoclassical Synthesis

These formidable challenges to the classical theory of value inspired economists to reconsider the issue. In the late nineteenth and early twentieth centuries, the neoclassical school successfully merged the supply-cost considerations of the classicists with

---

1. Eugen von Boehm-Bawerk (1835-1882) defined value as "the significance a good acquires by contributing utility toward the well-being of an individual." William Stanley Jevons (1835-1882), a founder of modern statistics and a principal proponent of marginal utility, wrote, "Labor once spent has no influence on the future value of any article: it is gone and lost forever." W. Stanley Jevons, *The Theory of Political Economy*, 5th ed. (New York: Augustus M. Kelley, 1965).

BACK_DEFEXP-RR-002435

Copyrighted material licensed by Charles Brigden on September 17, 2020

the demand-price theory of marginal utility. Alfred Marshall (1842-1924) is credited with this synthesis, which forms the basis for contemporary value theory.[2]

Marshall compared supply and demand to the blades of a pair of scissors because neither concept could ever be separated from the determination of value. He stressed the importance of time in working out an adjustment between the two principles. Marshall maintained that market forces tend toward an equilibrium where prices and production costs meet. Utility-demand considerations operate in the limited span of a given market. In the short term, supply is relatively fixed and value is a function of demand. Cost-supply considerations, however, extend over a broader period, during which production flows and patterns are subject to change. Marshall believed that a perfect economic market would eventually result, and that price, cost, and value would all be equal.

Marshall was the first major economist to consider the techniques of valuation, specifically the valuation of real estate. In this regard, his writings and the writings of those who built upon his work are the source of the distinction between value theory and valuation theory—i.e., the method of estimating, measuring, or forecasting a defined value. Marshall anticipated and developed many of the concepts employed in contemporary appraisal practice. These concepts include the development of an opinion of site value through capitalization of income, the impact of depreciation on buildings, and the influence of different building types and land uses on land value.

Marshall is also credited with identifying the three traditional approaches to value: market (sales) comparison, reproduction or replacement cost, and capitalization of income. Irving Fisher (1867-1947), an influential American economist associated with the neoclassical school, fully developed the income theory of value, which is the basis for the income capitalization approach used by modern appraisers.

### Modern Appraisal Theory

The writings of Marshall, Fisher, and other economists of the late nineteenth and early twentieth centuries were read by scholars and business professionals interested in economic thought. At the same time, the field of real estate appraisal was emerging and a few practitioners were gaining experience estimating market value and other kinds of value for properties of various types. In the 1920s and 1930s, several events helped to establish appraisal as a young, but viable, profession.

One motivating force was the introduction of land economics as an academic discipline. Land economics developed from the interrelationship of several disciplines and attracted scholars and students who contributed significantly to real estate and appraisal literature over the next 40 years.[3]

A significant event in appraisal history was the publication of *Real Estate Appraising* by Arthur J. Mertzke in 1927, which adapted Alfred Marshall's ideas to develop a tangible link between value theory and valuation theory. Mertzke translated economic theory into a working appraisal theory, helped establish a clear emphasis on

---

2. In 1890, Marshall published *Principles of Economics*, which succeeded Mill's *Principles of Political Economy* as the authoritative text on economic thought. In this book, Marshall advocated a dynamic theory of value to explain real world events. See Alfred Marshall, *Principles of Economics*, 8th ed. (London: MacMillan and Company, 1920); reprint (Philadelphia: Porcupine Press, 1982), 288-290, 664-669.

3. This influential group included Richard T. Ely (1854-1943), the founder of land economics as an academic subject, Frederick Morrison Babcock (1898-1983), Ernest McKinley Fisher (1893-1981), and Arthur J. Mertzke (1890-1970). Ely, Babcock, and Fisher contributed to the Land Economics series published by the National Association of Real Estate Boards (now the National Association of Realtors), which was the first major publication effort designed to provide real estate professionals with current technical information. The first texts in this series were Fisher's *Principles of Real Estate* (1923), Ely and Moorehouse's *Elements of Land Economics* (1924), and Babcock's *The Appraisal of Real Estate* (1924).

BACK_DEFEXP-RR-002436

the three approaches to value, and explained the use of capitalization rates as indexes of security. The preeminence of the three approaches to value in the appraisal process was underscored in publications by K. Lee Hyder, Harry Grant Atkinson, and George L. Schmutz.[4] Their works set forth systematic procedures for applying the sales comparison, cost, and income capitalization approaches. Schmutz presented a model in which appraisal activity leads to a conclusion of value, which was later incorporated into *The Appraisal of Real Estate*, first published by the American Institute of Real Estate Appraisers in 1951.

Appraisal theory and the language used to describe that theory have continued to evolve. Today's education requirements are stringent, and appraisers make use of many analytical methods and techniques.

## Agents of Production

The production of goods, services, and income depends on the combined effects of four essential economic ingredients, which are referred to as the *four agents of production*:

1. Land
2. Labor
3. Capital
4. Entrepreneurial coordination

The four agents of production contribute to the creation of real estate, and the sum of the costs to develop a property is one of the basic measures of real property value available to appraisers. In other words, a finished real estate product is created by combining land, labor, capital, and entrepreneurial coordination. A well-supported opinion of value can be derived through systematic analysis of each of these components, their interrelationships, and their relationship to the property as a whole.

### Land

The first thing an entrepreneur generally considers in developing a property is the cost of acquiring the land. Market participants anticipate that improvements may be added to land and that the property may be marketed to tenants or end users. Before the land can be developed, it may need to be improved physically (e.g., by filling, shaping, draining, servicing) and legally (e.g., by rezoning or by securing necessary development and building approvals), which will require labor, capital, and entrepreneurial effort.

### Labor

The labor component is the physical and intellectual contribution of workers to the production process. Along with land, labor is considered a *primary factor of production* because neither is the result of the economic process. The quality of the physical and mental work involved in producing goods and services is a result of the skills, education, and motivation of the workforce. The productivity of labor as an agent of production increases with the quality of that labor.

---

4. K. Lee Hyder, "The Appraisal Process," *The Appraisal Journal* (January 1936); Harry Grant Atkinson, "The Process of Appraising Single-Family Homes," *The Appraisal Journal* (April 1936); and George L. Schmutz, *The Appraisal Process* (North Hollywood, CA: the author, 1941).

BACK_DEFEXP-RR-002437

### Capital

Real estate development requires physical capital such as equipment (machinery and tools), buildings (and all building components), and infrastructure (that is, capital goods). The category of capital goods represents *produced* goods that can be used as factor inputs for further production. As such, capital exists as a result of the economic process.

> **entrepreneurial coordination**
> The ability of an entrepreneur to combine land, labor, and capital in the development of real estate; a component of real property value that represents the investment of time and expertise in the development of a property.

### Entrepreneurial Coordination

No prudent real estate developer will undertake to construct and market a property without anticipating a profit in addition to the return of the equity investment. A property buyer who continues an existing land use is not creating value, only maintaining value through proper management of the property. A developer, on the other hand, invests not only equity in a development but also time and expertise. Accordingly, an entrepreneur expects a reward—known as *entrepreneurial incentive* and measured in the marketplace as entrepreneurial profit—for creating and marketing a real estate product through the coordination of land, labor, and capital and for taking on the risk inherent in the undertaking. More precisely, entrepreneurial incentive is a forecast of the amount the developer expects to receive. This forecast is developed before construction is complete. Entrepreneurial profit is the actual amount received after the property is complete. The fourth agent of production, entrepreneurial coordination, accounts for that investment of time and expertise. (Entrepreneurial incentive and entrepreneurial profit are discussed in greater detail in Chapter 29.)

## Factors of Value

The economic concept of value is not intrinsic in the commodity, good, or service to which it is ascribed. Rather, it is created in the minds of the individuals who make up the market. The interplay of relationships that create value is complex. Values change when the factors that influence value change.

Typically, four interdependent economic factors create value:

- Utility
- Scarcity
- Desire
- Effective purchasing power

All four factors must be present for a property to have value. The four factors interact in the marketplace to influence the relationship of supply and demand. A market's perception of value can affect real estate prices swiftly and significantly. For example, when mortgage interest rates rise, the number of potential buyers who can afford the higher rates declines, so effective demand declines.

### Utility

Utility is the ability of a product to satisfy a human want, need, or desire. To have value, properties must have utility to tenants, owner-investors, or owner-occupants. In general, residential properties satisfy the need for shelter, and commercial prop-

BACK_DEFEXP-RR-002438

erties house business activities. Both may have design features that enhance their attractiveness. These features are called *amenities*. The value of amenities is related to their desirability and utility to an owner-occupant or tenant-occupant. The value of ownership may be measured from the prices paid for residences. The value of the right to occupy space can be measured as the rent paid. The benefits derived from in-come-producing properties can usually be measured in terms of rental revenue. The influence of utility on value depends on the characteristics of the property. The utility, or usefulness, of a property may relate to its size, design, location, and other specific characteristics. Time-distance relationships clearly affect the value of property. These different forms of utility can significantly influence property value.

The benefits of real property ownership are derived from the bundle of rights that an owner possesses. Restrictions on ownership rights may limit benefits and, therefore, lower the value of those rights. A property can only achieve its highest value if it can legally perform its most useful function. Environmental regulations, zoning regulations, deed restrictions, and other limitations on the rights of owner-ship can enhance or detract from a property's utility and value.

### Scarcity

Scarcity is the present or anticipated supply of an item relative to the demand for it. In general, if demand is constant, the scarcity of a commodity makes it more valu-able. Land, for example, is still generally abundant. However, useful, desirable land is relatively scarce and, therefore, has greater value. No asset, including real property, can have value unless scarcity is coupled with utility. Air, which has a high level of utility, has no definable economic value because it is abundant, but to a scuba diver who is 100 feet underwater with a tank that is almost empty, air is extremely valu-able. The question again becomes one of supply and demand. Because of scarcity, many types of commercial land adjacent to a busy street with good access will com-mand a higher price than land that is not next to a busy street. Commercial land buy-ers seek out parcels near busy streets that have reasonably good access and visibility. Some commercial land users, like car dealers, can accept parcels with good visibility but inadequate access, but businesses such as drug stores, fast food restaurants, and gas stations generally require good visibility and access. Corner lots of commercial land—which are of limited supply and offer greater utility—often sell for much more than lots that are not on a corner.

### Desire

Desire is the wish of a user for an item to satisfy needs (e.g., shelter, clothing, food, companionship) or individual wants beyond the essentials required to support life. A desire for shelter, comfort, and sometimes prestige supports the development of a variety of residential property types, from starter homes to mansions. Desire could also include a business purpose such as the need for a place to sell or manufacture products. This type of desire supports commercial real estate development.

### Effective Purchasing Power

Effective purchasing power is the ability of an individual or group to participate in a market—that is, to acquire goods and services with cash or its equivalent. A valid opinion of the value of a property includes an accurate assessment of the market's ability to pay for the property.

BACK_DEFEXP-RR-002439

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Supply and Demand

The complex interaction of the four factors that create value is reflected in the basic economic principle of supply and demand. The utility of a commodity, its scarcity or abundance, the intensity of the human desire to acquire it, and the effective power to purchase it all affect the supply of and demand for the commodity in any given situation.

Demand for a commodity is created by its utility and affordability. Demand is also influenced by desire and the forces that create and stimulate desire. Although human longing for things may be unlimited, desire is restrained by effective purchasing power. Thus, the inability to buy expensive things affects demand.

Similarly, the supply of a commodity can be influenced by its utility and limited by its scarcity. The availability of a commodity is affected by its desirability. Land is a limited commodity, and the land in an area that is suitable for a specific use will be in especially short supply if the perceived need for it is great. Sluggish purchasing power tends to keep supply in check. If purchasing power expands, the supply of a relatively fixed commodity will dwindle and create a market-driven demand to increase the supply for which there is latent or pent-up demand.

## Distinctions Among Price, Cost, and Value

Appraisal practice makes careful distinctions among the related terms *price*, *cost*, and *value*. The term *price* refers to the amount a particular purchaser agrees (or has agreed) to pay and a particular seller agrees (or has agreed) to accept under the circumstances surrounding their transaction. A price, once finalized, refers to a transaction price and implies an exchange. The exchange can be temporary (as in a lease) or permanent (as in a sale). But in all cases, price is a fact.

Some people use *cost* and *value* synonymously, but appraisal practice requires more precise definitions. The term *cost* is used by appraisers in relation to production, not exchange. Cost may be either an accomplished fact or an estimate.

The construction cost of components or of an entire building normally includes the direct costs of labor and materials as well as indirect costs such as administrative fees, professional fees, and financing costs. Development cost is the cost to create a property, including the land, and bring it to an efficient operating state. Development cost includes acquisition costs, actual expenditures, and the profit required to compensate the developer or entrepreneur for the time and risk involved in creating the project.

Real estate-related expenditures for labor and capital are directly linked to the price of goods and services in competitive markets. For example, the costs of roofing materials, masonry, architectural plans, and rented scaffolding are determined by the interaction of supply and demand in specific areas. Thus, they are subject to the influence of social, economic, governmental, and environmental forces.

*Value* can have many meanings in real estate appraisal. The applicable definition depends on the context and usage. Value is commonly perceived as the anticipation of future benefits. Because value changes over time, an appraisal reflects value at a particular point in time. Because value is an economic concept, the monetary worth of property, goods, or services to buyers and sellers is an expression of value. In an appraiser's identification of the objective of an appraisal, the term *value* is not used alone. Rather, it is accompanied by some form of modifier. To avoid

> The terms *price*, *cost*, and *value* are used and defined carefully in appraisal practice.

BACK_DEFEXP-RR-002440

> The principles of anticipation, change, supply and demand, competition, and substitution are fundamental to understanding the dynamics of value.

confusion, appraisers do not use the word *value* alone. Instead they refer to *market value*, *fair value*, *use value*, *investment value*, *assessed value*, and other specific kinds of value. Market value is the focus of most real property appraisal assignments.

## Anticipation and Change

The human actions that collectively shape market activities reflect the pursuit of economic goals. The fundamental principles of anticipation and change must be addressed to effectively analyze the many dynamic and interactive factors that influence people's attitudes and beliefs about value.

### Anticipation

Value is created by the anticipation of benefits to be derived in the future. In real estate markets, the current value of a property may not be based on its historical prices or the cost of its creation. While these may provide indications of a property's value, the market participants' perceptions of the benefits that acquisition of the property will bring is the basis of a property's current value.

The value of owner-occupied residential property is based primarily on expected future advantages, amenities, and the opportunity cost of ownership and occupancy. Prior to the property's sale, the primary investment return is measured in these amenities and the economic benefit of owning rather than renting property, not in the receipt of income. The value of income-producing real estate is based on the economic benefits (income and appreciation) it is expected to produce in the future. Therefore, real property appraisers must be aware of local, regional, national, and international real estate trends that affect the perceptions of buyers and sellers and their expectations of the future. Historical data on a property or a market is relevant only insofar as it helps interpret current market anticipations.

> *All values are anticipations of the future.*
> —Justice Oliver Wendell Holmes, Jr.

> **anticipation**
> The perception that value is created by the expectation of benefits to be derived in the future.

### Change

The dynamic nature of the social, economic, governmental, and environmental forces that influence real property value accounts for change. Although change is inevitable and continuous, the process may be gradual and not easily discernible. In active markets, change may occur rapidly. Abrupt changes may be precipitated by plant or military base closures, tax law revisions, the start of new construction, or natural disasters. The pervasiveness of change is evident in the real estate market, where the social, economic, governmental, and environmental forces that affect real estate are in constant transition. Changes in these forces influence the demand for and supply of real estate and, therefore, individual property values. Appraisers attempt to identify current and anticipated changes in the market that could affect current property values, but, because change is not always predictable, opinions of value are said to be valid only as of the specified date of valuation. An appraiser's analyses and conclu-

BACK_DEFEXP-RR-002441

Copyrighted material licensed by Charles Brigden on September 17, 2020

sions reflect what the market anticipates, rather than what the appraiser or the owner anticipates.

> **change**
> The result of the cause and effect relationship among the forces that influence real property value.

Shifts in market preferences also provide evidence of change. Real estate is not readily adaptable to new consumer preferences and thus often suffers obsolescence, i.e., an impairment of desirability and usefulness. The physical, functional, and external impairments observed in buildings as they age result in depreciation, which is defined as a loss in the value of an improvement from any cause. Depreciation may be seen as the difference between the cost to reproduce or replace an improvement and its present value. In general, losses in the value of improvements are caused by deterioration or obsolescence. Because obsolescence can begin in the design phase and deterioration may start while a building or improvement is still being constructed, the different types of deterioration and obsolescence found in a property have unique implications in appraisal. (A detailed discussion of deterioration and obsolescence is presented in Chapter 31.)

## Supply and Demand, Substitution, Balance, and Externalities

The appraisal principles of supply and demand, substitution, balance, and externalities can be applied to the unique physical and legal characteristics of a particular parcel of real estate. When these basic economic principles are in proper accord, they indicate highest and best use, which has great significance in real property appraisal. (Highest and best use is discussed in detail in Chapters 17 and 18.)

### Supply and Demand

In keeping with the principle of supply and demand, an increase in the supply of an item or a decrease in the demand for an item tends to reduce its price (or value). The opposite conditions produce an opposite effect. The relationship between supply and demand may not be directly proportional, but the interaction of these forces is fundamental to economic theory. The interaction of suppliers and demanders, whether sellers and buyers or landlords and tenants, constitutes a market.

Usually property values vary directly with changes in demand and inversely with changes in supply. If properties for a particular use become more abundant relative to demand, their value declines. By contrast, if properties become relatively more scarce (supply declines relative to demand), the value of the properties increases. The supply of and demand for commodities always tend to move toward equilibrium.

> **supply and demand**
> In economic theory, the principle that states that the price of a commodity, good, or service varies directly, but not necessarily proportionately, with demand, and inversely, but not necessarily proportionately, with supply. In a real estate appraisal context, the principle of supply and demand states that the value of real property varies directly, but not necessarily proportionately, with demand and inversely, but not necessarily proportionately, with supply.

Typically, more of an item will be supplied at a higher price and less at a lower price. Therefore, the supply of an item at a particular price, at a particular time, and in a particular place indicates that item's relative scarcity, which is a basic factor of value. When demand for real estate in a particular market increases, property values rise and the quantity of new proper-

BACK_DEFEXP-RR-002442

ties offered for sale generally increases. When the supply of the real estate declines, property values again tend to rise. On the other hand, increases in the productivity of labor, greater technological efficiency, improvements in capital goods, and more capital goods per worker can all reduce development costs. A building boom set in motion by the rising expectations of profit among developers may result in an oversupply of properties.

Generally the quantity of space supplied for a given use is slow to adjust to changes in price levels. The length of time needed to build new structures, the large amount of capital required, and government regulations often hamper a supplier's ability to meet changes in the market. The quality of space, however, can change more rapidly because suppliers can convert nonproductive space to alternative uses, cure deferred maintenance, or reconfigure space into more desirable units.

Demand is the desire and ability to acquire goods and services, through purchase or lease. Typically, less of an item will be demanded at a higher price, and more will be demanded at a lower price. Because it is difficult to augment the supply of real property for a specific use in a short time, values are strongly affected by current demand. Demand, like supply, can be characterized in terms of both quantity and quality. For example, demand in a residential market may be measured by the number of households in the market area and households seeking to reside in that market. Demand is affected by household incomes, the size and characteristics of the households, and specific housing preferences. Demand that is supported by purchasing power results in effective demand, which is the type of demand considered by the market. Appraisers must interpret market behavior to ascertain the existing relationship between the supply of and the demand for the type of property being appraised.

Competition between buyers or tenants represents the interactive efforts of two or more potential buyers or tenants to make a purchase or secure a lease. Between sellers or landlords, competition represents the interactive efforts of two or more potential sellers or landlords to effect a sale or lease. Competition is fundamental to the dynamics of supply and demand in a free enterprise, profit-maximizing economic system.

Buyers and sellers of real property operate in a competitive market setting. In essence, each property competes with all other properties suitable for the same use in a particular market segment and often with properties from other market segments. For example, existing residential subdivisions compete with new subdivisions, and downtown retail properties compete with suburban shopping centers. Over time, competitive market forces tend to reduce unusually high profits. Profit encourages competition, but excess profits tend to breed ruinous competition. For example, the first retail store to open in a new and expanding area may generate more profit than is considered typical for that type of enterprise. If no barriers to entry exist, owners of similar retail enterprises will likely gravitate to the area to compete for the surplus profits. Eventually there may not be enough business to support all the retailers. A few stores may profit, but others will fail. The effects of competition and market

**effective demand**

The desire to buy coupled with the ability to pay. When the term *demand* is used in economics or real estate analysis, effective demand is usually presumed.

**competition (among properties)**

The level of productivity and amenities or benefits of a characteristic of each property considering the advantageous or disadvantageous position of the property relative to the competitors.

BACK_DEFEXP-RR-002443

Copyrighted material licensed by Charles Brigden on September 17, 2020

trends on profit levels are especially evident to appraisers making income and occupancy projections as part of the income capitalization approach to value. This pattern of market activity is also evident in residential markets. The first developer may find significant demand for finished houses. When too many other home builders enter the market, the market can become overbuilt, and profits decline.

## Substitution

The principle of substitution states that when several similar or commensurate commodities, goods, or services are available, the one with the lowest price attracts the greatest demand and widest distribution. This principle assumes rational, prudent market behavior with no undue cost due to delay. According to the principle of substitution, a buyer will not pay more for one property than for another that is equally desirable.

Property values tend to be set by the cost of acquiring an equally desirable substitute property. The principle of substitution recognizes that buyers and sellers of real property have options, i.e., other properties are available for similar uses. The substitution of one property for another may be considered in terms of use, structural design, or earnings. The cost of acquisition may be viewed as the cost to purchase a similar site and construct a building of equivalent utility, assuming no undue cost due to delay. This is the basis of the cost approach. On the other hand, the cost of acquisition may be the price of acquiring an existing property of equal utility, again assuming no undue cost due to delay. This is the basis of the sales comparison approach.

The principle of substitution is equally applicable to properties such as houses, which are purchased for their amenity-producing attributes, and properties purchased for their income-producing capabilities. The amenity-producing attributes of residential properties may include excellence of design, quality of workmanship, or superior construction materials. For an income-producing property, an equally desirable substitute might be an alternative investment property that produces equivalent investment returns with equivalent risk. The limits of property prices, rents, and rates tend to be set by the prevailing prices, rents, and rates of equally desirable substitutes. The principle of substitution is fundamental to all three traditional approaches to value—sales comparison, cost, and income capitalization.

Although the principle of substitution applies in most situations, sometimes the characteristics of a product are perceived by the market to be unique. The demand generated for such products may result in unique pricing. For example, a market may not have ready substitutes for special-purpose properties like a historic residence, a medical office building, or a high-tech manufacturing plant. In those situations, the appraiser may have to research substitute properties in a broader market or employ analytical techniques appropriate for limited-market properties.

## Balance

The principle of balance holds that real property value is created and sustained when contrasting, opposing, or interacting elements are in a state of equilibrium. This principle applies to relationships among various property components as well as the relationship between the costs of production and the property's productivity. Land, labor, capital, and entrepreneurial coordination are the agents of production, but for most real property the critical combination is the land and improvements. Economic balance is achieved when the combination of land and improvements is optimal.

BACK_DEFEXP-RR-002444

> The principles of balance, decreasing marginal utility, contribution, surplus productivity, and conformity explain how the integration of property components affects property value.

The principle of balance governs the related principles of diminishing returns, contribution, surplus productivity, and conformity. The law of diminishing returns holds that increments in the agents of production added to a parcel of property produce greater net income up to a certain point. At this point—the point of decreasing or diminishing returns—any additional expenditures will not produce a return commensurate with the additional investment. When the point of decreasing returns is reached, further increments in the agents of production will cause productivity to decline proportionally.

The fertilization of farmland provides a simple example. Applying fertilizer to a land parcel increases crop yield only up to a point. Beyond that point the additional fertilizer will produce no further increase in the output of the acreage. The optimum amount of fertilization is achieved when the yield resulting from the fertilizer equals the appropriate expenditure on fertilizer. This is the point of balance.

As a further illustration, consider a developer who is deciding how many bedrooms to include in a dwelling being developed for sale in a residential market. The typical dwelling in this residential market has three bedrooms. It may be uneconomic to include a fourth bedroom if the cost to build it exceeds the value added to the property.

The principle of balance also applies to the relationship between a property and its environment. A proper mix of various types and locations of land uses in an area creates and sustains value. A residence near other residences has much more market appeal than a residence next to a landfill.

The principle of balance and the principles of contribution, surplus productivity, and conformity are interdependent and crucial in highest and best use analyses and market value estimation. These concepts form the theoretical foundation for estimating all forms of depreciation in the cost approach, making adjustments in the sales comparison approach, and calculating expected earnings in the income capitalization approach.

The principle of contribution states that the value of a particular component is measured in terms of its contribution to the value of the whole property or as the amount that its absence would detract from the value of the whole. The cost of an item does not necessarily equal its value. A swimming pool that costs $30,000 to install does not necessarily increase the value of a residential property by $30,000. Rather, the pool's dollar contribution to value is measured in terms of its benefit or utility in the market. The swimming pool's contribution to value may be

- Higher than its cost (if properties with swimming pools are in very high demand in the market).
- Equal to its cost.
- Lower than its cost, though still contributing positively to value. This is the most common situation, i.e., more than zero but less than its cost.
- No contribution to value. Adding a swimming pool could have no effect on the value of that property in that market at that time.
- A negative contribution to value. The swimming pool may need to be removed at an additional cost for the property to reach its highest and best use.

BACK_DEFEXP-RR-002445

Copyrighted material licensed by Charles Brigden on September 17, 2020

The contribution of the existing improvements may not be in proper balance with the total property. Especially in transitional areas, a property's present use may not use the land to its full potential. In other words, a potential buyer may be more likely to base an investment decision on the risk and reward associated with a future use of the property rather than the current use, which is called an *interim use*.[5] Nevertheless, an interim use will continue until it is economically feasible to absorb the costs of converting the property, either by razing and replacing the existing improvements or by rehabilitating them. The principle of contribution is also applicable in the assemblage of land parcels. The contributory value of property as part of an assemblage may be greater than its market value alone. In other words, the value of the whole may be more or less than the sum of the parts.

> **increasing and decreasing returns**
>
> The concept that successive increments of one or more agents of production added to fixed amounts of the other agents will enhance income or value (in dollars, benefits, or amenities) at an increasing rate until a maximum return is reached. Beyond a certain point, each additional unit will add less income or value than the unit before it. Also called the *law of increasing returns* or *law of decreasing returns*.

Surplus productivity is the net income to the land remaining after the costs of the other agents of production have been paid. The classical economists of the eighteenth and nineteenth centuries identified the surplus as land rent, which they understood to account for land value. Traditionally, the principle of surplus productivity has provided the basis for the residual concept of land returns and residual valuation techniques. (See Chapter 25.) The principles of surplus productivity and residual returns to the land are useful in establishing the highest and best use of land and in analyzing which option among alternative land use options will yield the highest value. Some contemporary economists argue that surplus productivity should be ascribed to a different agent of production, i.e., the entrepreneurial coordination required to combine the land, labor, and capital into a complete real estate product.

The principle of conformity holds that real property value is created and sustained when the characteristics of a property conform to the demands of its market. The styles and uses of the properties in a given area may conform for several reasons, including economic pressures and the shared preferences of owners for certain types of structures, amenities, and services. The imposition and enforcement of zoning ordinances and plans by local governments to regulate land use may also contribute to conformity. Standards of conformity set by the market are subject to change. Local building codes and private restrictions, which tend to establish conformity in basic property characteristics such as size, style, and design, are often difficult to change and may hasten the pace of obsolescence.

A particular market also sets standards of conformity, especially in terms of price. According to the principle of regression, the value of an overimproved property will decline toward the value level of surrounding, conforming properties. Under the principle of progression, the value of an underimproved property may increase toward the prevailing market standard. Of course, there are exceptions to these principles. For example, the seasonal cottages found among the luxurious vacation homes

---

5. Interim uses are discussed in more detail in Chapters 17 and 18.

BACK_DEFEXP-RR-002446

lining a popular recreational lake may exert no effect, either positive or negative, on the value of one another because the market accepts the diversity, thereby mitigating the principle of conformity.

### Externalities

The principle of externalities states that factors external to a property can have either a positive or negative effect on its value. Bridges and highways, police and fire protection, and a host of other essential structures and services are generally positive externalities and are provided most efficiently through common purchase by the government. Even so, these essential structures can have a negative effect on an individual property, such as the case of a residence located adjacent to a busy highway or fire station. Negative externalities may also be observed when inconveniences are imposed on property owners by the actions of others. As an example, a firm that violated environmental law by releasing contaminants into a public waterway would most likely affect neighboring properties, and, if the negligent firm went bankrupt, the general community may need to address the cleanup costs.

Because it is physically immobile, real estate is affected by external influences more strongly than most other economic goods, services, or commodities. Externalities may refer to the use or physical attributes of properties located near the subject property or to the economic conditions that affect the market in which the subject property competes. For example, an increase in the purchasing power of the households that constitute the trade area for a retail facility will likely have a positive effect on the sales potential of the property (i.e., its ability to produce income).

On a broad level, international economic conditions can influence real estate values through externalities such as the availability of foreign capital or the effect of increasing or decreasing foreign trade on the health of the national economy. In the United States, the effects of foreign trade are particularly strong in states bordering Mexico and on the West Coast, which have economies subject to shifts in trade volume with Latin American and Pacific Rim countries.

National fiscal policy also plays a vital role in the economy and, consequently, in real estate markets. The Tax Reform Act of 1986 eliminated many of the tax advantages of investing in income-producing property, changing the after-tax returns for investors and then their before-tax return requirements. This change had a far-reaching effect on the value of investment properties.

At the community and neighborhood levels, property values are affected by factors such as local laws, local government policies and administration, property taxes, economic growth, and social attitudes. Different property value trends can be found in communities in the same region and among neighborhoods in the same community. Appraisers should be familiar with external events at all levels that can influence property values.

BACK_DEFEXP-RR-002447

Copyrighted material licensed by Charles Brigden on September 17, 2020



# The Valuation Process 4

The valuation process is a systematic procedure an appraiser follows to provide answers to a client's questions about real property value. It is a model that can be adapted to a wide variety of questions that relate to value. It can also be used—perhaps with some modification—to answer questions not directly related to value, as in the case of review and other assignments.

The objective of most appraisal assignments is to develop an opinion of market value. The valuation process contains all the steps appropriate for this type of assignment. The model also provides the framework for developing an opinion of other defined values.

In assignments to develop an opinion of market value, the ultimate goal of the valuation process is a well-supported value conclusion that reflects all of the pertinent factors that influence the market value of the property being appraised. To achieve this goal, an appraiser uses three different *approaches to value*.

1. In the cost approach, value is indicated by the current cost of reproducing or replacing the improvements (including indirect costs and entrepreneurial incentive), less depreciation, plus land value.
2. In the sales comparison approach, value is indicated by analysis of sales of comparable properties appropriately adjusted for differences from the subject property.
3. In the income capitalization approach, value is indicated by the present value of a property's earning power, based on the capitalization of income.

Traditionally, specific appraisal techniques are applied within the three approaches to derive indications of real property value. One or more approaches to value may be used depending on which approaches are necessary to produce credible assignment results, given the intended use.

The three approaches are interrelated.[1] Each requires the gathering and analysis of data that pertains to the property being appraised. Each approach is outlined

---

1. The sales comparison approach was once known as the "market approach." However, all three approaches to value are "market" approaches in that they rely on market data.

BACK_DEFEXP-RR-002448

briefly in this chapter and discussed in detail in subsequent sections of this book. From the approaches applied, the appraiser develops separate indications of value for the property being appraised. To complete the valuation process, the appraiser integrates the information drawn from market research, data analysis, and the application of the approaches to reach a value conclusion. This conclusion may be presented as a single point estimate of value or, if the assignment permits, as a range within which the value may fall (or as a relationship to a point referenced from a benchmark amount). The effective integration of all the elements in the process depends on the appraiser's skill, experience, and judgment.

The components of the valuation process are shown in Figure 4.1.

## Identification of the Appraisal Problem

The first step in the valuation process is the development of a clear understanding of the problem to be solved. This sets the parameters for the assignment. To solve any problem, the problem must first be identified, and only then can the appropriate solution to the problem be determined. In appraisal practice, problem identification logically precedes the scope of work determination.

Identification of the appraisal problem involves identifying each of the following:

- Client
- Intended use of the assignment results
- Intended users of the appraisal report in addition to the client
- Type of value and its definition
- Effective date of the opinions and conclusions
- Identification of the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal (including its location, the property rights to be valued, and other features)
- Assignment conditions, including extraordinary or special assumptions, hypothetical conditions, laws and regulations, jurisdictional exceptions, and other conditions that affect the scope of work

Before identifying the initial characteristics of the property and any assignment conditions that are relevant to the purpose of the assignment, an appraiser must identify the client, intended users, intended use, the type and definition of value, and the effective date of the opinion of value. Once the appraisal problem has been identified, the appraiser can determine the appropriate scope of work for the assignment.

## Scope of Work Determination

Scope of work is one of the most critical decisions an appraiser will make in performing an assignment. (The topic is discussed in more detail in Chapter 8.[2]) Solving an appraisal problem involves three steps:

1. Identify the appraisal problem
2. Determine the scope of work necessary to solve the client's problem
3. Apply the scope of work necessary to solve the problem

---

2. Scope of work is also discussed more fully in Stephanie Coleman, *Scope of Work*, 2nd ed. (Chicago: Appraisal Institute, 2016).

BACK_DEFEXP-RR-002449

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Figure 4.1**    The Components of the Valuation Process

| Identification of the Problem | | | | | |
|---|---|---|---|---|---|
| Identify the client and intended users | Identify the intended use | Identify the type and definition of value | Identify the effective date of the opinion | Identify the relevant characteristics of the property | Identify any assignment conditions |

| Scope of Work Determination |
|---|

| Data Collection and Property Description | | |
|---|---|---|
| *Market Area Data* | *Subject Property Data* | *Comparable Property Data* |
| General characteristics of region, city, and neighborhood | Subject characteristics of land use and improvements, personal property, business assets, etc. | Sales, listings, offers, vacancies, cost and depreciation, income and expenses, capitalization rates, etc. |

| Data Analysis | |
|---|---|
| *Market Analysis* | *Highest and Best Use Analysis* |
| Demand studies<br>Supply studies<br>Marketability studies | Land as though vacant<br>Ideal improvement<br>Property as improved |

| Land Value Opinion |
|---|

| Application of the Approaches to Value | | |
|---|---|---|
| Sales Comparison Approach | Income Capitalization Approach | Cost Approach |

| Reconciliation of Value Indications and Final Opinion of Value |
|---|

| Report of Defined Value |
|---|

BACK_DEFEXP-RR-002450

None of the three steps can be omitted, and each must be performed in order.

Scope of work encompasses all development aspects of the valuation process, including

- which approaches to value will be used,
- how much data is to be gathered, from what sources, from which geographic area, and over what time period,
- the extent of the data verification process,
- and the extent of property inspection, if any.

The scope of work decision is acceptable when it allows the appraiser to arrive at credible assignment results and is consistent with the expectations of intended users of similar assignments and the work that would be performed by the appraiser's peers in a similar assignment.

### Planning the Appraisal

To complete an assignment efficiently, each step in the valuation process should be planned and scheduled. Time requirements will vary with the amount and complexity of the work. Some assignments may be completed in less than a day. For more complex appraisal problems, weeks or months may be spent gathering, analyzing, and applying all pertinent data.

Some assignments can be performed by one appraiser, while others require the assistance of other staff members or appraisal specialists. Sometimes the assistance of specialists in other fields is needed. For example, in valuing a proposed building renovation, an appraiser's findings may be augmented by the professional opinion of a building contractor on renovation costs. Recognizing when work can or must be delegated improves efficiency and enhances accuracy, but appraisers should also be aware of the responsibilities inherent in the use of reports prepared by others. (These types of concerns are addressed in the Appraisal Institute's Guide Note 4 and Standards Rule 2-3 of the Uniform Standards of Professional Appraisal Practice.) If an appraiser signs any part of a report, that individual must sign the certification and thus will have to take full responsibility for the entire assignment. With a comprehensive view of the assignment, an appraiser can recognize the type and volume of work to be done and schedule and delegate that work properly.

An appraiser's work plan usually includes an outline of the proposed appraisal report. The major parts of the report are delineated, and the data and procedures involved in each section are noted. Using this outline, data can be assembled logically and the appropriate amount of time can be allocated to each step in the valuation process.

### Data Collection and Property Description

Following the initial analysis (i.e., the identification of the appraisal problem and determination of the scope of work), the appraiser gathers data on the market area, the subject property, and comparable properties in the market. The data needed by appraisers can be divided into general data and specific data.

General data includes information about trends in the social, economic, governmental, and environmental forces that affect property value in the defined market area. A trend is a momentum or tendency in a general direction brought about by a series of interrelated changes. Trends such as population shifts, declining office build-

BACK_DEFEXP-RR-002451

Copyrighted material licensed by Charles Brigden on September 17, 2020

ing occupancy rates, and increased housing starts in a market area are identified by analyzing general data. General data can contribute significantly to an appraiser's understanding of the marketplace.

Specific data relates to the property being appraised and to comparable properties. This data includes legal, physical, locational, cost, and income and expense information about the properties and the details of comparable sales. Financial arrangements that could affect selling prices are also considered.

Data on comparable properties can be either general data that an appraiser has on file or specific data that must be gathered for a particular assignment. More often, comparable property data is specific supply and demand data that relates to the competitive position of properties similar to the subject. Supply data includes inventories of existing and proposed competitive properties as well as vacancy rates. Demand data may relate to absorption, population, income, employment, and potential property users. From this data an estimate of future demand for the present or prospective use or uses of the subject property is developed.

The amount and type of data collected for an appraisal depends on the approaches used to develop an opinion of value and on the defined scope of work. In a given valuation assignment, more than one approach to value is often appropriate for the development of a value opinion. Depending on the problem or problems to be addressed, one approach may be given greater emphasis in deriving the final opinion of value. In conducting a particular assignment, the appraiser's judgment and experience and the quantity and quality of data available for analysis may determine which approach or approaches are used. In some assignments, a valuation technique may be appropriate but not necessary for credible assignment results. In other assignments, the same technique may be deemed necessary (indeed, critical) for the assignment results to be credible.

The data collected should be as meaningful and relevant as possible. All pertinent value influences, facts, and conclusions about trends should be clearly indicated in the report and related specifically to the property being appraised. Because the data selected forms the basis for the appraiser's judgments, a thorough explanation of the significance of the data reported ensures that the reader will understand these judgments.

Irrelevant data should be excluded because the inclusion of that data may detract from the credibility of the appraiser's analyses and conclusions. Recent prior sales of the subject property are almost always relevant, as are listings, options, or agreements of sale current as of the date of value. It is not sufficient to simply report the subject property's sales history. Itemizing the sales or other agreements is only a start. The identification and analysis of current listings and options should connect to the appraiser's analysis of the subject property. This information must be analyzed and compared to the value opinion, and a discussion of this analysis must generally be included in the appraisal report.

## Data Analysis

Once the appropriate data has been collected and reviewed for accuracy, an appraiser begins the process of data analysis, which has two components: (1) market analysis and (2) highest and best use analysis. Even the simplest appraisal assignments involving the development of an opinion of market value must be based on a solid understanding of prevalent market conditions and the highest and best use of the

BACK_DEFEXP-RR-002452

real estate. The two forms of analysis are related. In fact, an appraiser's investigation into trends affecting the economic base of the market area leads directly to the determination of highest and best use.

## Market Analysis

Market analysis is a study of market conditions for a specific type of property. A description of prevalent market conditions helps an intended user of an appraisal report understand the motivations of participants in the market for the subject property. Broad market conditions provide the background for local and neighborhood market influences that have direct bearing on the value of the subject property.

> Analyses of market conditions and highest and best use are crucial to the valuation process when a market value opinion is the objective of the assignment.

Market analysis, which is discussed in detail in Chapters 15 and 16, serves two important functions. First, it provides a background against which local developments are considered. Second, a knowledge of the broad changes that affect supply and demand gives an appraiser an indication of how values change over time.

The data and conclusions generated through market analysis are essential components in other portions of the valuation process. Market analysis yields information needed for each of the three traditional approaches to value. In the cost approach, market analysis provides the basis for adjusting the cost of the subject property for depreciation, i.e., physical deterioration and functional and external obsolescence. In the income capitalization approach, all the necessary income, expense, and rate data is evaluated in light of the market forces of supply and demand. In the sales comparison approach, the conclusions of market analysis are used to delineate the market and thereby identify comparable properties and the marketable amenities within those comparable properties.

The extent of market analysis and the level of detail appropriate in the report depend on the appraisal problem under examination. When the appraisal assignment is complex—e.g., an analysis of the feasibility of a proposed development—a more detailed market analysis will be required. Regardless of the assignment's complexity, the logic of the market analysis should be communicated clearly to the reader in the appraisal report. The level of detail provided may depend on the needs of the client and intended users of the report and on the intended use of the assignment.

## Highest and Best Use Analysis

Whenever a market value opinion is developed, highest and best use analysis is necessary. Through highest and best use analysis, an appraiser interprets the market forces that affect the subject property and identifies the use or uses on which the final opinion of value is based. (Highest and best use analysis is discussed in detail in Chapters 17 and 18.) If highest and best use is not adequately addressed, appraisers may inappropriately analyze the property being appraised.

When an assignment objective is to develop an opinion of market value, the appraiser must address the question of the highest and best use for whatever is being valued. In valuing an improved property, the appraiser must address the question of the highest and best use *as currently improved*. In valuing a vacant site, the appraiser must address highest and best use *as though vacant*. In valuing a site as if vacant (for

BACK_DEFEXP-RR-002453

Copyrighted material licensed by Charles Brigden on September 17, 2020

example, in applying the cost approach to an improved property), an appraiser must address the question of the highest and best use *as if vacant*.

Analyzing the highest and best use of the land as though vacant helps the appraiser identify comparable properties. Whenever possible, the property being appraised should be compared with similar properties that have been sold recently in the same market. Potentially comparable properties that do not have the same highest and best use are usually eliminated from further analysis. Estimating the land's highest and best use as though vacant is a necessary part of deriving an opinion of land value.

## Land Value Opinion

Appraisers often develop an opinion of land value separately, even when valuing properties with extensive building improvements. Land value and building value may change at different rates over time. Improvements are almost always subject to depreciation with age, while land value is reported as of the date of valuation without any consideration of depreciation. While land value may fluctuate over time, land itself does not depreciate.

Developing an opinion of land value can be considered a separate step in the valuation model or an essential technique for applying certain approaches to value, depending on the defined appraisal problem and on the highest and best use analysis. The relationship between highest and best use and land value[3] may indicate whether an existing use is the highest and best use of the land. The valuation of land often is required in appraisals in which an opinion of market value is developed because all market value appraisals require highest and best use analysis and that process in turn requires comparing the land value and the value of the improved property.

An appraiser can use several techniques to obtain an indication of land value:

- Sales comparison
- Extraction
- Allocation
- Subdivision development
- Land residual
- Ground rent capitalization

The most common way to develop an opinion of land value is by sales comparison. When few sales are available, however, or when the value indications produced through sales comparison need additional support, procedures like extraction or allocation may be applied. The other methods of land valuation, which all involve income capitalization techniques, are subject to more limitations. They are generally used only to support the results of other valuation methods. The subdivision development technique is a specialized valuation method useful in specific land use situations.[4] The land residual technique is used more often in highest and best use analysis to test the feasibility of various uses than to estimate land value as part of

---

3.  Appraisers distinguish between land (the earth's surface, both land and water, and anything that is attached to it, whether by the course of nature or by human hands) and a site (land that is improved so that it is ready to be used for a specific purpose). The distinctions between the two terms are discussed more fully in Chapter 12.

4.  The valuation of subdivisions is discussed more fully in Don M. Emerson, Jr., *Subdivision Valuation*, 2nd ed. (Chicago: Appraisal Institute, 2017).

BACK_DEFEXP-RR-002454

one of the traditional approaches to value. Ground rent capitalization can be used when land rents and land capitalization rates are readily available. (These land valuation techniques are discussed in detail in Chapter 19.)

## Application of the Approaches to Value

The valuation process is applied to develop a credible opinion of a defined value based on an analysis of pertinent general and specific data. One or more of the three approaches to value are used in deriving all opinions of value. The approaches employed depend on the type of property, the intended use of the appraisal, and the quality and quantity of data available for analysis. All three approaches are applicable to many appraisal problems, but one or more of the approaches may have greater significance in a given assignment.

### Sales Comparison Approach

The sales comparison approach is most useful when a number of similar properties have recently been sold or are currently for sale in the subject property's market. Using this approach, an appraiser produces a value indication by comparing the subject property with similar (i.e., comparable) properties. The sale prices of the properties that are judged to be most comparable tend to indicate a range in which the value indication for the subject property will fall.

### Income Capitalization Approach

In the income capitalization approach, the present value of the anticipated future benefits of property ownership is measured. Income capitalization converts periodic future income expectations into a lump-sum capital amount. The future income expectations include both a property's income and resale value. There are two methods of income capitalization: (1) direct capitalization and (2) yield capitalization. In direct capitalization, the relationship between one year's income and value is reflected in either a capitalization rate or an income multiplier. In yield capitalization, several years' income and a reversionary value, if any, at the end of a designated period are forecasted and converted to present value using a yield rate. The most common application of yield capitalization is discounted cash flow analysis. Given the significant differences in how and when properties generate income, there are many variations of both direct and yield capitalization procedures, which are addressed in Chapter 22.

Like the sales comparison and cost approaches, the income capitalization approach requires extensive market research. Data collection and analysis for this approach are conducted against a background of supply and demand relationships, which provide information about trends and market anticipation.

### Cost Approach

The cost approach is based on the understanding that market participants relate value to cost. In the cost approach, the value of a property is derived by adding the appraiser's opinion of the value of the land to an estimated current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes. This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market. Cost approach

BACK_DEFEXP-RR-002455

techniques can also be employed to derive information needed in the sales compari-son and income capitalization approaches to value, such as cost-related adjustments to account for specific building features and cost-to-cure adjustments to address deferred maintenance.

## Final Reconciliation of Value Indications

The final analytical step in the valuation process is the reconciliation of the value indications derived into a value conclusion. Reconciliation occurs within each approach to value, but the final reconciliation occurs at the end of the valuation process. The value conclu-sion can be expressed as a single number, as a range of numbers, or as a number greater than or less than a specified benchmark amount. The nature of reconciliation depends on the appraisal problem, the approaches that have been used, and the reliability and adequacy of the data used.

> **final reconciliation**
> The last phase in the devel-opment of a value opinion in which two or more value indications derived from market data are resolved into a final value opinion.

When all three approaches have been used, the appraiser examines the three separate indications and considers the relative reliability and applicability of each approach (i.e., the strengths and weaknesses of each approach). In the reconcilia-tion section of the report, the appraiser can explain variations among the indications produced by the different approaches and account for differences between the value conclusions and methods applied.

## Report of Defined Value

An appraisal report is the expression of the appraiser's work, and it is what the client sees as the culmination of the appraiser's research and analysis. The prepara-tion and delivery of the appraisal report is generally the last step in the valuation process, although many appraisers write their report during the development process. The report may be communicated to the client in writing or orally. Chapter 33 describes the require-ments for appraisal reports and the circumstances under which they are prepared and submitted.

> **final opinion of value**
> The opinion of value that is derived from the final reconcil-iation of value indications and stated in the appraisal report; may be expressed as a single point, as a range, or in relation to a benchmark amount.

The report of the value opinion or conclusion addresses the data analyzed, the methods applied, and the reasoning that led to the value conclusion and does so in a manner that enables the intended users to properly understand the appraiser's findings and conclusions. The objective of the appraisal report is to communicate the valuation process with sufficient supporting evidence and logic to ensure that the as-signment results are credible for the intended use.

BACK_DEFEXP-RR-002456

BACK_DEFEXP-RR-002457

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Elements of the Assignment    5

In the first step of the valuation process, an appraiser identifies all the elements that are relevant to the assignment:

- The client
- The intended users of the report
- The intended use of the report
- The type and definition of value (with source)
- The effective date of the opinion of value
- The relevant characteristics of the property
- Any assignment conditions such as extraordinary assumptions or hypothetical conditions

The process of identifying the appraisal problem that was discussed in the previous chapter is built on the combination of these assignment elements. If one of those assignment element changes, a different appraisal problem is created.

This chapter examines each of the assignment elements. The following chapters in this section of the textbook delve deeper into two of the more complex elements: (1) the type and definition of value and (2) the property rights being appraised in the assignment.

## Client

In valuation standards, the term *client* has a special meaning that is different from the way the term is used in other disciplines. For example, in law, a client is the paying party, which is not true with the definition of the term in appraisal practice. In an appraisal, the client is the party (or parties) who engages the appraiser. The client can be one person (such as an individual investor), one entity (such as a bank), or a number of people or entities acting together. The client is always considered to be an intended user—another classification specific to appraisal practice—even in cases in which the client does not actually use the appraisal, such as when a client engages

BACK_DEFEXP-RR-002458

an appraiser on behalf of another party. In assignments involving appraisal management companies, the appraisal management company may act as an agent of a lender and engage the appraiser, but the lender is the client.

## Intended Users

Intended users are those who an appraiser intends will use the appraisal or review report. In other words, appraisers acknowledge at the outset of the assignment that they are developing their expert opinions for the use of the intended users they identify. Although the client provides information about the parties who may be intended users, ultimately it is the appraiser who decides who they are. This is an important point to be clear about: The client does not tell the appraiser who the intended users will be. Rather, the client tells the appraiser who the client needs the report to be speaking to, and given that information, the appraiser identifies the intended user or users.

It is important to identify intended users because an appraiser's primary responsibility regarding the use of the report's opinions and conclusions is to those users. Intended users are those parties to whom an appraiser is responsible for communicating the findings in a clear and understandable manner. They are the audience.

It is important to understand that parties who receive, or who might receive, a copy of the report are not automatically intended users. A party becomes an intended user only because the appraiser identifies that party as such. Just because an appraiser knows that a party will receive a copy of the report does not mean that the appraiser is required to identify that party as an intended user. For example, just because the borrower will receive a copy of the report does not mean that the borrower must be an intended user. And just because the "other side" in a litigation matter will receive a copy of the report does not mean that this "other side" must be named as an intended user.

## Intended Use

Intended use is the valuer's understanding of why the client and other intended users (if any) need the service. It is the use (or uses) to which the appraiser intends the opinions and conclusions to be put. Some possible intended uses relate to:

- Financing
- Litigation support
- Condemnation
- Divorce settlements
- Buy/sell decisions
- Tax reporting
- Portfolio evaluation
- Arbitration
- Partnership buyouts
- Estate planning
- Charitable donations
- Valuations for financial reporting
- Other scenarios

BACK_DEFEXP-RR-002459

Copyrighted material licensed by Charles Brigden on September 17, 2020

Intended use is the most important factor in determining the appropriate scope of work. It is the key driver in making that decision.

Appraisers have not traditionally been in the habit of asking a client *why* when asked to provide an appraisal or review. Yet this is a critical question to ask because, without answering that question, an appraiser cannot begin to make the appropriate scope of work determination.

## Type of Value and Its Definition

The type of value (market value, investment value, use value, or other) appropriate for a specific assignment depends on the nature of the appraisal problem. That is, what type of value does the client need to know about—market value, use value, or some other type of value? Furthermore, the definition of the type of value used in an assignment may depend on the intended use and user. As with the other assignment elements, the type of value and its definition are identified by the appraiser based on communication with the client at the time of the assignment.

For many real estate appraisals, the type of value being investigated is market value. Note that clients, intended users, controlling jurisdictions, and the users of appraisal services might define *market value* differently, so a clear statement of the definition of the type of value being appraised (with source) helps the intended user of the appraisal better understand the appraiser's conclusions. (Identifying the type of value and its definition are discussed in Chapter 6.)

## Effective Date of the Value Opinion

The appraiser's value opinions and conclusions relate to a specific point in time. Given the client's needs and the nature of the assignment, the appraiser must identify the exact date that the value opinion would be in effect. The effective date of the opinion of value—sometimes called simply the *date of value*—can be a current date, a retrospective (historical) date, or a prospective (future) date. For a current appraisal, the effective date is often the date of inspection, if an inspection was included in the appraiser's scope of work.

The date of the value opinion (i.e., the effective date) should not be confused with the date of the appraisal report, which is the date the report is transmitted to the client. For most appraisal assignments, the effective date and the date of the appraisal report will differ. The effective date of the appraisal refers to the point in time as of which the analyses and conclusions are relevant, not the date on which the report is delivered to the client.

## Relevant Property Characteristics

The subject of an appraisal, i.e., what is being appraised, is an interest in an asset. The interest may be a fee simple, leased fee, leasehold, or other type of interest. In the case of a real property appraisal, the asset is the real estate. The analysis of the subject property must account for the location and the physical, economic, and legal attributes that affect the property's value.

Some of the most important characteristics relating to value include

• The real property rights being appraised, i.e., "what is to be valued" (see Chapter 7)

BACK_DEFEXP-RR-002460

- Location (see Chapters 11 and 12)
- Other physical characteristics such as size, layout, and quality of construction (see Chapter 13)
- Economic characteristics such as rent levels and financing terms (see Chapter 10)
- Legal characteristics such as land use and zoning restrictions

Some of the relevant information will be provided by the client, and some will be researched by the appraiser through interviews with property owners and market participants, firsthand observation of the subject property, and other activities. Public records are an obvious source of data on certain property characteristics. A complete legal description is commonly used to identify a subject property, although other information can be useful as well such as a simple street address or an annotated map. Many local governments have digital GIS mapping that appraisers can access.

In some cases, "what is to be valued"—particularly the interest to be appraised and the definition of that interest—is dictated by applicable law or regulation. Appraisers are responsible for knowing which laws or regulations apply and for complying with those laws and regulations. "What is to be valued" affects the market analysis, highest best use analysis, and application of the approaches to value.

## Valuation Premises

In many appraisal assignments, it is not adequate to simply state or define the type of value being sought, e.g., market value, use value, investment value, or disposition value. It is also necessary to fully describe the valuation premises, which are the circumstances in which the hypothetical sale of a property is assumed to take place. Examples of valuation premises include

- In subdivision appraisals, the bulk sale, gross retail proceeds, or aggregate of the retail sales premise
- For proposed project valuation, the current value, the prospective value on the anticipated completion date (special assumption), the prospective value on the anticipated occupancy stabilization date (special assumption), the value as if complete on the current date (hypothetical condition), and the value as if complete and stabilized on the current date (hypothetical condition)
- For condemnation valuation, value before the taking under the hypothetical condition that the project had not been announced, value after the taking under the hypothetical condition that the public project has been completed, and value after the taking under the extraordinary assumption that the public project will be constructed according to the condemnor's plans
- For valuation for mortgage lending purposes, FIRREA's "as is" valuation premise

## Assignment Conditions

Almost all appraisal assignments are subject to some conditions that affect the scope of work and must be communicated to the client to put the appraiser's analysis in the proper context. Assignment conditions include

- General assumptions
- Special (or "extraordinary") assumptions
- Hypothetical conditions
- Laws and regulations
- Jurisdictional exceptions
- Other conditions that affect the scope of work for an assignment

BACK_DEFEXP-RR-002461

### Exposure Time

The concept of *exposure time* is an important assignment condition for appraisers to understand. *The Dictionary of Real Estate Appraisal*, 6th edition, defines *exposure time* as follows:

> The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market.

Guide Note 14 of the Standards of Professional Practice of the Appraisal Institute: Concept of Exposure Time notes that exposure time is not an opinion of the appraiser when it is specified by the client. Rather, the exposure time is a condition of the assignment. The guide note further points out that the definition of *disposition value* includes the idea of "future exposure time," which is often interpreted as a contradiction in terms. Suppose an appraiser is developing an opinion of value subject to the condition that a sale would occur within, say, five months from now as defined by the client. The appraisal assignment would be a prospective valuation, and the exposure time would be in the future relative to the date of the appraisal report. The opinion of value is in the future relative to the date of the report but still predates the effective date of value as described in the definition of *exposure time*.

Note that appraisers must not permit assignment conditions to limit the scope of work to such an extent that the assignment results are not credible in the context of the intended use. General assumptions and applicable laws and regulations are generally straightforward.[1] Special or extraordinary assumptions, hypothetical conditions, and jurisdictional exceptions—which are typically treated as separate components of appraisal reports—are discussed in detail below.

An appraiser might not be able to identify special assumptions and hypothetical conditions that affect an appraisal until the analysis has actually begun. However, an effort should be made to identify possible (or probable) special assumptions and hypothetical conditions affecting the assignment during the initial communication with the client.

*Extraordinary assumption* and *hypothetical condition* are terms that appear in USPAP, but those valuation standards do not require these labels. An extraordinary assumption or hypothetical condition may be identified in other ways (e.g., as a "special condition") as long as the substitute label is not misleading.

Any special or extraordinary assumption or hypothetical condition should be communicated to the client in a clear and conspicuous manner, along with a statement relating how the use of that assignment condition might have affected the assignment results. Handling special assumptions and hypothetical conditions in a prominent manner in appraisal reports is imperative because they can significantly affect an appraisal.

### Special or Extraordinary Assumptions

A special or extraordinary assumption is something that is believed to be true on the effective date of the appraisal for the sake of the appraisal but that may or may not in fact be true as of the effective date of the appraisal. Unlike general assumptions, which often apply to many appraisal assignments (and are sometimes treated as boilerplate), special assumptions are specific to the assignment at hand. An appraisal assignment may be subject to more than one special assumption.

---

1. Examples of general assumptions that are often used in appraisal assignments can be found in the sample engagement letters that are available to Appraisal Institute professionals at www.appraisalinstitute.org.

BACK_DEFEXP-RR-002462

> In the Standards of Valuation Practice, the term *special assumption* is used to describe the same concept as *extraordinary assumption* in the Uniform Standards of Professional Appraisal Practice.

The decision to base an appraisal on a special assumption must be reasonable. The use of the special assumption must be appropriate for the intended use of the appraisal. Furthermore, a special assumption must be clearly described in the appraisal report so that the intended users are not misled.

As an example of the appropriate use of a special assumption, consider a property located in an old industrial district where several nearby sites have been identified with soil contamination from past manufacturing operations. There is no evidence that the site of the subject property has soil contamination, and there has been no recent professional testing of the soil. Therefore, the potential for soil contamination is an unknown condition for this property on the effective date of value. In this assignment, the appraiser would be able to analyze the land as if not contaminated using a special assumption.

If a special assumption ends up not being true, the results of the assignment might be affected. Suppose now that the soil at the site described above is indeed contaminated. Under the special assumption that the site was free from contamination, the appraiser would not have considered the cost to remediate any contamination. If, after learning of the soil contamination, the client wanted an appraisal that accounted for the existence of the contamination, the appraiser and the client would need to agree on a new appraisal assignment that is not subject to the special assumption.

## Hypothetical Conditions

In contrast to an extraordinary assumption, which may or may not be true, a hypothetical condition—according to professional valuation standards such as the Uniform Standards of Professional Appraisal Practice (USPAP) and the Standards of Valuation Practice (SVP)—is something that is known to be contrary to fact as of the effective date of the appraisal but that is taken to be true for the purposes of the appraisal.[2] For example, if a client wanted to know the value of a proposed development as if it were complete at the current time, the appraisal assignment could be performed using a value premise subject to the hypothetical condition that the nonexistent improvements were already in place and ready for use as proposed. Returning to the example of the property located in an old industrial area, the appraiser would use a value premise subject to a hypothetical condition if it was already known that the property was affected by soil contamination but the appraiser was developing an opinion of the value for the property as if it were not affected by that contamination. Such a value might be sought to determine the feasibility of cleanup options.

Describing an opinion of value developed subject to a hypothetical condition as a "hypothetical value" is a misnomer. The value itself is not hypothetical. As described earlier in this chapter, the type and definition of value are identified on their own as a distinct portion of the seven significant elements of the assignment, separately from the determination of assignment conditions such as a hypothetical condition.

---

2.  *International Valuation Standards 2017* defines a *special assumption* similarly: "Where assumed facts differ from those existing at the date of valuation, it is referred to as a 'special assumption'." (p. 27) Note that although the IVS and the Standards of Valuation Practice both use the term *special assumption*, the meanings of the terms are not the same.

BACK_DEFEXP-RR-002463

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Jurisdictional Exceptions

Jurisdictional exceptions are rare but may affect an appraisal assignment when a relevant law or regulation precludes compliance with the relevant professional valuation standards. The requirements of federal, state, or local laws and regulations, such as the Uniform Appraisal Standards for Federal Land Acquisitions, may preclude an appraiser from complying with a part or parts of a set of professional valuation standards, such as the Uniform Standards of Professional Appraisal Practice. Only the part or parts of the professional valuation standards that contradict the superseding regulation are affected by the jurisdictional exception. The balance of the professional standards remains in force.

Instructions from a client or an attorney alone would not create a jurisdictional exception. Also, a jurisdictional exception must be an explicit exception to professional valuation standards. If a governmental regulation prescribes a particular methodology for a specific situation but valuation standards do not discuss specific methodologies for that type of situation, a jurisdictional exception is not appropriately invoked. Rather, the prescribed methodology is likely a recognized technique used in appraisals in which the regulation is relevant, and an appraiser needs to use all the appraisal techniques that would be applied by the appraiser's peers and would result in a credible appraisal for the intended use. In this case, the regulation adds to, rather than subtracts from, the requirements of the professional valuation standards.

Because of their potential for affecting the development and results of an appraisal, jurisdictional exceptions need to be identified at the beginning of an assignment rather than after the fact. The appraisal report must disclose the part or parts of the valuation standards that are voided by the law or regulation, and the appraisal report must cite the law or regulation that precludes compliance with the valuation standards.

BACK_DEFEXP-RR-002464

BACK_DEFEXP-RR-002465

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Identifying the Type of Value and Its Definition

**6**

The type of value and its definition constitute important assignment elements that must be determined as part of problem identification, i.e., the first step of the valuation process. The type of value—and the specifications set out for it in its definition—to a large degree dictate the nature of the data collected and the analyses performed in the remaining steps of the valuation process. In any appraisal assignment in which an opinion of value is a component of the scope of work, the type of value and its specific definition are established by the appraiser based on communication with the client at the time of engagement.

The definition of value typically has precise wording that is cited from an authoritative source. The source may vary depending on the client and intended user. For example, the lending industry has a specific definition of *market value* established by federal regulation. A litigation valuation assignment may have a different definition of *market value* established by state law. It is imperative that appraisers describe the type of value and specify certain conditions that must be met for assignment results to be credible and meaningful. In an appraisal report, the definition of value provides the client with a formal explanation of the type of value being developed and thus the objective of the appraisal. In fact, professional valuation standards require that the definition of value being used in an assignment be included in an appraisal report.[1]

In appraisal practice, the use of the term *value* alone is often incomplete and is a potentially misleading description of an opinion of the relative worth of an asset. In an appraisal, the term *value* is always accompanied by a modifier, e.g., *market* value, *investment* value, *insurable* value. Appraisers typically refer to a particular type of value rather than use the word *value* on its own. The different value types clarify whose opinion is relevant, under what specific circumstances, or for what purpose. For example, market value is the opinion of a "market" collectively under specific conditions set forth in the relevant definition relating to the relationship, knowledge, and motivation of the parties, the terms of sale, and the conditions of sale.

---

1. Note that under USPAP rules for a restricted report, the appraisal report only has to state the type of value and cite the source. In other words, the definition itself does not have to be in the report.

BACK_DEFEXP-RR-002466

## Market Value

The concept of market value is of paramount importance to real estate communities. Vast sums of debt and equity capital are committed each year to real estate investments and mortgage loans that are based on opinions of market value. Real estate taxation, litigation, and legislation also reflect an ongoing, active concern with market value issues. In virtually every aspect of the real estate industry and its regulation at local, state, and federal levels, market value considerations are essential to economic stability.

A number of different definitions of *market value* can be found in a variety of sources, including appraisal texts, real estate dictionaries, professional valuation standards, federal and state regulations, laws, and court decisions. Despite differing opinions on individual aspects of the market value definition, it is generally agreed that market value results from the collective value judgments of market participants. An opinion of market value is based on objective observation of the collective actions of the market. Because the standard measure of these activities is usually cash, the increases or diminutions in the sale price caused by financing and other terms of sale are measured against an all-cash value.

The definition that follows represents the concept of value in exchange, and it incorporates the concepts that are most widely accepted, such as willing, able, and knowledgeable buyers and sellers who act prudently as of a specific date, with three possible bases: (1) all cash, (2) terms equivalent to cash, or (3) other precisely revealed terms. The definition also requires variation from the all-cash market value to be quantified in terms of cash or cash equivalency.

**Market Value**
The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

Some appraisers cite this definition verbatim in their appraisal reports and state separately that the value is stated in cash, in terms equivalent to cash, or in other terms. Other appraisers reword relevant phrases in the value definition—e.g., they might substitute "in cash" with "in terms arithmetically equivalent to cash" or "in terms precisely revealed below" as appropriate.

> Market value is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined, although a multiplicity of sometimes conflicting market value definitions used for different purposes can present potential problems in appraisal assignments.

The definition of *market value* developed by the International Valuation Standards Council and used in the International Valuation Standards (IVS) explicitly references an "exchange" of property. In those standards, *market value* is defined as

[T]he estimated amount for which an *asset* or liability *should* exchange on the valuation date between a willing buyer and a willing seller in an arm's-length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion.[2]

The general valuation framework guiding the International Valuation Standards reiterates the concept

---

2.  International Valuation Standards Council, *International Valuation Standards*, Effective 31 January 2020 (London: IVSC, 2019), 18.

BACK_DEFEXP-RR-002467

Copyrighted material licensed by Charles Brigden on September 17, 2020

that the willingness to trade and the views attributed to market participants are "typical of those of buyers and sellers, or prospective buyers and sellers, active in a market on the valuation date, not to those of any particular individual or entity." The market value basis of valuation described in the International Valuation Standards is consistent with other discussions of market value in professional valuation standards.

> Various definitions of *market value* have been developed by the Appraisal Institute, the federal government, the International Valuation Standards Council, and others.

The Uniform Standards of Professional Appraisal Practice (USPAP) defines *market value* conceptually as

> [A] type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the value definition that is identified by the appraiser as applicable in an appraisal.[3]

It is important to note that USPAP does not provide a citable definition of *market value*. Instead, USPAP states that "appraisers are cautioned to identify the exact definition of market value, and its authority, applicable in each appraisal completed for the purpose of market value." Therefore, an appraiser may not cite USPAP as the source for a definition of *market value*.

Citable definitions of *market value* can be found in state and federal regulations, laws, or publications. For example, the following definition[4] of *market value* is used by agencies that regulate federally insured financial institutions in the United States:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> - buyer and seller are typically motivated;
> - both parties are well informed or well advised, and acting in what they consider their own best interests;
> - a reasonable time is allowed for exposure in the open market;
> - payment is made in terms of cash in US dollars or in terms of financial arrangements comparable thereto; and
> - the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions[5] granted by anyone associated with the sale.

The definition of *market value* used by Fannie Mae and Freddie Mac includes additional discussion of financing and sales concessions:

> Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs that are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable because the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third-party institutional lender that is not already involved in the property or transaction. Any adjustment

---

3. *Uniform Standards of Professional Appraisal Practice*, 2020-2021 ed. (Washington, DC: The Appraisal Foundation, 2020), 5.
4. Section 323.2 amended at 57 Fed. Reg. 9049, March 16, 1992; 59 Fed. Reg. 29501, June 7, 1994; 83 Fed. Reg. 15036, April 9, 2018.
5. See Uniform Residential Appraisal Report Freddie Mac Form 70/Fannie Mae Form 1004 (March 2005), p. 4; also Fannie Mae Single Family 2017 Selling Guide, Definition of Market Value, B4-1.1-01. The Fannie Mae/Freddie Mac definition requires that the effect on property value of any special or creative financing or sales concessions be determined and that the opinion of value reflect cash-equivalent terms. Special financing or sales concessions often characterize transactions in depressed markets.

BACK_DEFEXP-RR-002468

should not be calculated on a mechanical dollar-for-dollar cost of the financing or concession, but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.[6]

The *Uniform Appraisal Standards for Federal Land Acquisitions* (which at one time was referred to informally as "the Yellow Book") includes the following definition of *market value*, which must be used in appraisals performed subject to these standards:

> Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property.[7]

Government and regulatory agencies may redefine or reinterpret *market value* for specific types of assignments, so individuals performing appraisal services for these agencies or for institutions under their control must be sure to use the applicable definition.

Client wishes or instructions do not change the basic requirement that appraisers must identify the intended use of the assignment results and use an appropriate definition of *market value* for the intended use. Appraisers must understand why the particular definition of *market value* should be used in an assignment, apply that definition according to established standards and recognized practice, and communicate the requirements of the assignment clearly to the clients they serve.

## Other Types of Value

Appraisals of the market value of real property are the most common types of assignments, but appraisers are also called upon by clients to develop opinions of a variety of other types of value such as the following:

• Fair value
• Use value
• Investment value
• Assessed value
• Insurable value
• Liquidation value
• Disposition value

---

6.  Note that the definition of *market value* given in the Fannie Mae Selling Guide (May 15, 2014) is worded slightly differently:

    Market value is the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

    ·   buyer and seller are typically motivated;
    ·   both parties are well informed or well advised, and each acting in what he or she considers his/her own best interest;
    ·   a reasonable time is allowed for exposure in the open market;
    ·   payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
    ·   the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

7.  Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, DC: The Appraisal Foundation, 2016), §1.2.4. Elsewhere in the standards document (§4.2.1), *market value* is defined as follows: "Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither compelled to buy or sell, giving due consideration to all available economic uses of the property."

BACK_DEFEXP-RR-002469

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Differences between Market Value and Contributory Value

The contributory value of a property or a component of a property to the whole is often a consideration in the development of an opinion of market value, although the distinction between the two types of values should be observed. *The Dictionary of Real Estate Appraisal*, 6th edition, provides two definitions of *contributory value*:

1. A type of value that reflects the amount a property or component of a property contributes to the value of another asset or to the property as a whole.
2. The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called *deprival value* in some countries.

Contributory value answers the question, "How much does a specific component add to the value of the property as a whole?" Examples include the following:

· How much do the improvements contribute to the property value?
· How much does the land contribute to the property value?
· How much do the non-realty items (personal property or intangible items) contribute to the property value?
· How much does Parcel A contribute to the value of Parcels A, B, and C if sold together in one transaction?
· How much does a portion of Parcel A contribute to the value of Parcel A?

A property component might be said to have "market value" of a certain amount, but a stricter use of terminology would be to describe the "contributory value" of the component in relation to the "market value" of the whole.

The adjustments made in the application of the sales comparison approach for the presence or absence of a property component in a comparable property are examples of the development of an opinion of contributory value. Likewise, the cost approach to value is based on the analysis of the contributory value of individual building components to develop an opinion of market value of the whole property.

In practice, contributory value is most often analyzed as the effect of the value of a part on the value of the whole. The clearest example is the application of the cost approach in which the contributory value of individual components of an improved property are tabulated to develop an indication of the market value of the property as a whole. The inclusion of an estimate of entrepreneurial incentive in cost approach calculations illustrates that the market value of the property as a whole is often more than simply the sum of the costs to build a certain set of improvements on a certain site. As another example, consider a parcel of land with limited value on the open market but with significant contributory value to the owner of the adjacent parcel. A common misconception is that the contributory value of the parcel would be equivalent to its market value because the owner of the adjacent parcel is the most probable buyer. (The concept of assemblage and its effect on highest and best use is discussed in more detail in Chapters 17 and 18.)

Similarly, a single property can constitute the whole with component parts that provide contributory value to the market value of the whole. The adjustments made in the application of the sales comparison approach for the presence or absence of a property component in a comparable property is an example of contributory value. Likewise, the cost approach to value is based on the analysis of the contributory value of individual building components to develop an indication of market value of the whole property.

## Fair Value

Historically, the accounting profession in the United States has used the depreciated purchase price to report the value of corporate assets for tax purposes and in financial statements. In the wake of the auditing scandals that gave rise to the Sarbanes-Oxley Act of 2002, the International Accounting Standards Board (IASB) and the US Financial Accounting Standards Board (FASB) changed the generally accepted accounting principles (GAAP) to recognize that fair value is a more accurate measurement. In 2007, FASB defined *fair value* as follows:

> [T]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.[8]

---

8. Originally defined in Financial Accounting Standard 157, which has been superseded by Financial Accounting Standards Board Accounting Standards Codification Topic 820: Fair Value Measurements and Disclosures. This definition is identical to the definitions of *fair value* in International Financial Reporting Standards (IFRS) 13, *Fair Value Measurement*, and International Accounting Standards (IAS) 16, *Property, Plant, and Equipment*.

BACK_DEFEXP-RR-002470

This definition is more akin to an opinion of *market value* as appraisers have long defined the term. Like market value, fair value measurement assumes that the asset or liability is exchanged in an orderly transaction between market participants to sell the asset or transfer the liability at the measurement date. An orderly transaction is a transaction that assumes exposure to the market for a period prior to the measurement date to allow for marketing activities that are usual and customary for transactions involving such assets or liabilities. It is not a forced transaction such as a forced liquidation or distress sale. The transaction to sell the asset or transfer the liability is a hypothetical transaction at the measurement date, considered from the perspective of a market participant who holds the asset or owes the liability. Therefore, the objective of a fair value measurement is to determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (i.e., an exit price).

Market participants are buyers and sellers in the principal (or most advantageous) market for the asset or liability who are

1. Independent of the reporting entity (i.e., they are not related parties)
2. Knowledgeable, having a reasonable understanding about the asset or liability and the transaction based on all available information, including information that might be obtained through due diligence efforts that are usual and customary
3. Able to transact for the asset or liability
4. Willing to transact for the asset or liability (i.e., they are motivated but not forced or otherwise compelled to do so)

The fair value of the asset or liability should be determined based on the assumptions that market participants would use in pricing the asset or liability.

A fair value measurement assumes the highest and best use of the asset by market participants, considering the use of the asset that is physically possible, legally permissible, and financially feasible at the measurement date. The highest and best use of the asset establishes the valuation premise used to measure the fair value of the asset, specifically:

> The market value concept is sometimes also called *fair market* value, though it could be argued (as stated in a 1943 United States Supreme Court decision) that the term "fair" adds little to the phrase "market value." *The Dictionary of Real Estate Appraisal*, 6th edition, indicates fair market value to be "equivalent" to market value in nontechnical usage and "similar in concept" with respect to technical usage in condemnation, litigation, and tax situations.

1. In use. The highest and best use of the asset in use would provide maximum value to market participants principally through its use in combination with other assets as a group.
2. In exchange. The highest and best use of the asset is in exchange if the asset would provide maximum value to market participants principally on a stand-alone basis.

The real estate appraiser may need to report both values so that the user of the report can make an informed decision.

## Use Value

Market value opinions are based on the highest and best use of a property. In contrast, use value is the value that a specific property has for a specific use,

BACK_DEFEXP-RR-002471

Copyrighted material licensed by Charles Brigden on September 17, 2020

which may or may not be the highest and best use of the property.

Use value has very limited application. However, court decisions and specific statutes may create the need for use value appraisals. For instance, many states require agricultural use appraisals of farmland for property tax purposes (i.e., value based on soil productivity) rather than opinions of value based on highest and best use. The current IRS regulation on estate taxes allows land under an interim agricultural use to be valued according to this alternative use even though

> **use value**
> The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Use value may or may not be equal to market value but is different conceptually.

the land has development potential.[9] Also, a seminal ruling in California, which has been cited in other jurisdictions, involved the appraisal of properties subject to title claims. In *Overholtzer v. Northern Counties Title Insurance Company*, the value diminution caused by a defect in title was measured by the use of the property when the defect was discovered, not the highest and best use of the property.[10]

### Use Value, Value in Use, and Investment Value in the IVS

The term *value in use* has often been used by real estate appraisers synonymously with *use value*, but value in use is a different concept. In the IVS, *value in use* is the value the real estate (or any asset) contributes to the enterprise of which it is a part—i.e., what was called *contributory value* earlier in this chapter. It is the amount the property would add to the sale price of the enterprise. For example, assume a specialty manufacturer has a new building constructed at a cost of $5 million including an appropriate developer fee. Assume also that the building perfectly suits the manufacturer's needs and that profits from the manufacturing operation are in excess of the amount necessary to justify the cost of the building. It would be reasonable to conclude that, if the enterprise sold, the building would contribute $5 million to its price. Therefore, its value in use would be $5 million. On the other hand, an appraiser might conclude that if the building was sold separate and apart from the business or any other asset, it would sell for only $3.5 million because the specialized building features do not add utility for other tenants. In that case, the value in exchange is $3.5 million, but the value in use is $5 million.

The International Financial Reporting Standards defines *value in use* as "the discounted present value of estimated future cash flows expected to arise from the continuing use of an asset and from its disposal at the end of its useful life." This definition is paraphrased in the International Valuation Standards application related to valuation for financial reporting. In the case of real estate, the cash flows from use of the asset are the net amount of rent that is saved by owning the property. In the example in the previous paragraph, the specialty manufacturer has two options: (1) spend $5 million to have a building constructed or (2) bid the project out to a developer who would invest the $5 million and lease the property to the manufacturer at an appropriate rent. If the manufacturer owns the building, value in use can be calcu-

---

9. The section on special-use valuation in United States Estate (and Generation-Skipping Transfer) Tax Return (IRS Instructions for Form 706) states: "Under section 2032A, you may elect to value certain farm and closely held business real property at its farm or business use value rather than its fair market value (FMV). Both special-use valuation and alternate valuation may be elected."

10. *Overholtzer v. Northern Counties Title Insurance Company*, 116 Cal.App.2d 113 (Calif. 1953).

BACK_DEFEXP-RR-002472

lated by discounting back the rent savings and the reversion at an appropriate rate. Theoretically, if a lease was competitively bid, the value in use by discounted cash flow analysis should be similar to the depreciated replacement cost of the property.

Earlier editions of the International Valuation Standards included a definition of *value in use* as part of International Valuation Standard 2: Bases Other Than Market Value, but that definition was eventually deleted, eliminating the possible confusion between *value in use* and *investment value*. In the IVS, the current definition of *investment value* is not specifically related to financial reporting as *value in use* now is.

## Investment Value

As used in appraisal assignments, *investment value* is the value of a property to a particular investor based on that person's (or entity's) investment requirements, rather than market norms. In contrast to market value, investment value reflects the subjective relationship between a particular investor and a given investment. In other words, investment value is the price an investor would pay for an investment in light of its perceived capacity to satisfy that investor's desires, needs, or investment goals.

The concepts of investment value and market value are fundamentally different, but indications of investment value and market value may sometimes be similar. If the investor's requirements are typical of the market, investment value in this case will be the same as market value.

> **investment value**
>
> The value of a property to a particular investor or class of investors based on the investor's specific requirements; may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market.

> **Public Interest Value**
>
> Historically, *public interest value* has been used as a general term covering a family of value concepts that relate the highest and best use of property to noneconomic uses. (Other terms for similar concepts include *aesthetic value*, *scenic value*, *preservation value*, and *social value*.) The analysis of public interest value tends to be driven by social, political, and public policy goals rather than economic principles.

To render an opinion of investment value, an appraiser must research the specific investment criteria of the party in question. As an example, suppose that a real estate investment trust (REIT) is aggressively buying Class A apartments that meet its specific criteria. For properties that meet the criteria, the REIT is willing to base the acquisition on a 7% discount rate, even though the typical market discount rate for comparable investments is 8%. To assist in the REIT's purchasing decisions, an appraiser might be engaged to provide opinions of investment value for each potential acquisition target using discounted cash flow analysis at a 7% discount rate over a specified holding period. In this example, investment value is different than market value because the 7% discount rate is not typical of the market. If other investors begin making offers based on a 7% discount rate, that discount rate would become the market rate, and investment value to the REIT would become equal to market value.

As another example, suppose a real estate developer who owns both an office building and a hotel sees an opportunity to acquire the vacant land parcel situated between the two existing properties. By developing the vacant land parcel as a retail center, the developer can potentially enhance the value of both the office building and the hotel. Therefore, the developer can afford to pay more for the vacant land than other market par-

BACK_DEFEXP-RR-002473

Copyrighted material licensed by Charles Brigden on September 17, 2020

ticipants could. An appraiser is asked to provide an opinion of investment value that includes not only the underlying value of the land but also the value enhancement to the adjoining properties.

### Assessed Value

In ad valorem taxation, *assessed value* refers to the value of a property according to the tax rolls. The International Association of Assessing Officers provides two definitions of *assessed value*:

1.  A value set on real estate and personal property by a government as a basis for levying taxes.
2.  The monetary amount for a property as officially entered on the assessment roll for purposes of computing the tax levy. Assessed values differ from the assessor's estimate of actual (market) value for three major reasons: fractional assessment ratios, partial exemptions, and decisions by assessing officials to override market value. The process of gathering and interpreting economic data to provide information that can be used by policymakers to formulate tax policy.[11]

Assessed value is usually calculated in relation to a market value basis. Some municipalities estimate both an assessed value and a market value. Appraisers of real property are generally not asked to develop an opinion of assessed value, although in property tax disputes appraisers are often asked by property owners to provide an opinion of market value for comparison with the assessed value. Appraisers are also often asked to determine the fairness or uniformity of the assessed value of properties.

### Insurable Value

Traditionally, the value of an asset or assets covered by an insurance policy has been known as the *insurable value*, even though the amount is more accurately an indication of cost. The maximum reimbursement for direct physical damage or loss of property is limited to the amount shown on the contract. This value is often controlled by state law and varies from state to state.

The objective of an insurance policy is to compensate the insured party for the loss. Insurable value may be based on the replacement or reproduction cost of physical items that are subject to loss from hazards. Land value is not included in the insurable value, and items such as underground piping and below-grade foundations are typically excluded as well.

When asked to provide insurable value, an appraiser must identify and report the definition used and ensure that the analyses and conclusions are consistent with that definition.

### Disposition Value and Liquidation Value

Sales of properties in distressed markets often do not meet the conditions specified in the definition of *market value*. Other types of value might be more appropriate for properties when a forced sale or some other form of distress is influencing the decisions of the buyer or seller. In 1992, the Special Task Force on Value Definitions of the Appraisal Institute developed definitions of *disposition value* and *liquidation value*,

---

11.  International Association of Assessing Officers, *Glossary for Property Appraisal and Assessment*, 2nd ed. (Kansas City: IAAO, 2013), s.v. "assessed value."

BACK_DEFEXP-RR-002474

and with minor changes to the wording over the years those value definitions remain relevant for certain appraisal assignments.

The definition of *disposition value* is

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. An adequate marketing effort will be made during the exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

The definition of *liquidation value* is

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

The definitions of *disposition value* and *liquidation value* are similar except for the wording of the numbered elements 1, 4, and 7. The differences are largely matters of degree, e.g., "under compulsion to sell" in the definition of *liquidation value* as opposed to "under extreme compulsion to sell" in the definition of *disposition value*.

According to Guide Note 11 of the Standards of Professional Practice of the Appraisal Institute: Comparable Selection in a Declining Market, *market value* assignments address the following question:

What would the property likely sell for on the date of value after a typical exposure period on the open market?

In contrast, a *disposition value* assignment answers a different question:

What will the property likely sell for after a limited exposure on the market given the seller is compelled to sell?

BACK_DEFEXP-RR-002475

Copyrighted material licensed by Charles Brigden on September 17, 2020

A *liquidation value* assignment answers yet another question:

> What will the property likely sell for after a severely limited exposure on the market given the seller is extremely compelled to sell?[12]

In the case of both disposition value and liquidation value, the limited or severely limited exposure time on the market is specified by the client. If that time period is the same as what is typical in the current market, disposition value could be equal to market value.

---

12. Guide Notes to the Standards of Professional Practice of the Appraisal Institute: Guide Note 11: Comparable Selection in a Declining Market (Chicago: Appraisal Institute, 2017), www.appraisalinstitute.org.

*Identifying the Type of Value and Its Definition*    **57**

BACK_DEFEXP-RR-002476

BACK_DEFEXP-RR-002477

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Identifying the Rights to Be Appraised

**7**

In the first step of the valuation process, an appraiser identifies the rights to be appraised, which is a practical application of the bundle of rights theory in a real property appraisal assignment. The real property rights to be appraised are singled out among the relevant characteristics of the property because, like the appropriate type and definition of value for the assignment, the property rights to be appraised are a fundamental assignment element.

Real property appraisal involves not only the identification and valuation of a variety of different rights, but also analysis of the many limitations on those rights and the effect of those limitations on the valuation. Some limitations, such as eminent domain, are public, while others, such as deed restrictions, are private. These limitations are rights that are not held by the property owner. For example, the government holds the right of eminent domain, and the property owner gives up the right to use and occupy the condemned portions of the property in the event that the government exercises its right.

The terms of art *title*, *estate*, and *interest* may be defined differently in different jurisdictions and by different professions. At the same time, the terms—particularly, *estate* and *interest*—might be used so loosely by market participants that they effectively function as synonyms. In simplest terms, *title* is proof of ownership. An *estate* is what is owned, including the right of possession and the power to exclude others. And *interests* are rights in real property that can benefit or burden the land and affect the value of an estate.

What is valued in a real property appraisal is an estate subject to specified interests. Therefore, an appraiser's task is to identify not only the estate (e.g., the fee simple estate, the leasehold estate, the leased fee estate, the life estate) but also the interests associated with the real estate, such as leases, easements, restrictions, encumbrances, reservations, covenants, contracts, declarations, special assessments, ordinances, or other interests of a similar nature. In valuation practice, it is not necessary to label estates and interests in a prescriptive manner as long as all relevant property rights are identified in a manner that the intended users can understand.

BACK_DEFEXP-RR-002478

## The Fee Simple Estate

The most complete form of ownership is the fee simple estate—i.e., absolute owner-ship unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. Of course, an appraiser may be asked to value something other than the fee simple estate—i.e., a partial interest or a fractional interest.

Sometimes described as an *absolute* property right, a fee simple estate is not, in fact, absolute because it is subject to the four powers of government (i.e., taxation, eminent domain, police power, and escheat). Nevertheless, an owner of a fee simple estate has broad rights. The complete bundle of rights includes, but is not limited to, the following:

- The right to sell an interest
- The right to transfer an interest
- The right to lease an interest
- The right to occupy the property[1]
- The right to mortgage an interest
- The right to give an interest away

According to *The Dictionary of Real Estate Appraisal*, 6th ed., the term *fee simple estate* is defined as

> Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

By this definition, a fee simple estate includes the full "bundle of rights" with no ex-ceptions other than the four specified governmental powers. Strictly interpreted, even minor encumbrances like public utility easements or reciprocal access agreements would result in something less than a fee simple estate. This full bundle of rights concept is a helpful valuation theory because it establishes a benchmark to which the rights being valued can be compared. However, by this measure, few properties and few sales transactions involve a fee simple estate. Nevertheless, as a practical matter, most appraisers refer to all fee interests in real property as fee simple, regardless of the encumbrances, unless one of those encumbrances is a lease. This practice does not im-ply that appraisers ignore encumbrances other than leases but rather that those factors are implicitly accounted for under the fee simple classification in common usage.

The legal profession defines the term *fee simple* slightly differently than the valu-ation profession does because legal definitions generally serve a different purpose. Whereas definitions of *fee simple* used by the appraisers highlight the encumbrances on property, legal definitions tend to focus on duration. That is, legal definitions of the term generally do not mention the four powers of government or encumbrances. Instead, in a legal setting, the fee simple estate is one that endures for an indefinite pe-riod, as opposed to an estate of a shorter duration like a life estate or term of years. For example, in *Black's Law Dictionary*, 11th ed., the term *fee simple* is defined as follows:

> An interest in land that, being the broadest property interest allowed by law, endures until the current holder dies without heirs, esp. a fee simple absolute.

---

1. The right to occupy a property is subject to government entitlements such as zoning and occupancy permits that require certain conditions on site such as curb cut permits, access, drainage, and utilities.

BACK_DEFEXP-RR-002479

Copyrighted material licensed by Charles Brigden on September 17, 2020

This definition contains several key concepts: the concept that fee simple is a possessory interest in the land (i.e., it is the "broadest" form of ownership) and the concept of inheritability (i.e., permanence). According to this definition, a significant characteristic of a fee simple estate is that it is unlimited as to duration, transferability, and inheritability, in contrast to leaseholds (which are limited to the lease term), life estates (limited to the life of a specific person), and other limited estates. A lender requesting a valuation of the fee simple estate likely intends to refer to an unencumbered interest, whereas a deed that conveys fee simple title would generally be understood to mean an interest that will endure indefinitely, including all encumbrances.

> **The Concept of Possession**
>
> As a legal concept, *possession* is the power to exclude others, and it is what makes an estate different from an interest in property. To be an estate in land, the legal right or interest must allow possession—now or in the future—and specify duration. Possession (the power to exclude) is not identical to occupancy (the actual physical use of the property), and more than one party may have possessory rights at any given time. For example, a landlord and a tenant both have possessory rights to exclude others. Because each party has a possessory right, each has an estate. Specifically, the landlord has the fee simple estate and the tenant has the leasehold estate. In contrast, the holders of other types of interests in a property (such as a mortgagee or the beneficiary of an easement) have no possessory right and hence no power to exclude others.

Appraisers must clearly identify—and appraisal reports must clearly convey—the property rights that are the subject of an appraisal. In the case of a fee simple estate, a definition on its own may not be adequate. The appraisal report should clearly state any encumbrances affecting the property. The underlying premises of the valuation, including any expectations about occupancy, must be identified by the appraiser and clearly stated in the appraisal report. The methods applied to arrive at the value opinion must reflect the presumed conditions.

In some cases, "what is to be valued"—particularly the interest to be appraised and the definition of that interest—is dictated by applicable law or regulation. Appraisers are responsible for knowing which laws or regulations apply and for complying with those laws and regulations.

A partial interest is any interest or group of interests that makes up less than the entire bundle of rights. Partial interests can be created in several ways:

- Economically
- Legally
- Physically
- Financially

The remainder of this chapter examines how to identify and categorize property rights that are less than the complete bundle of rights.

## Economic Interests

The most common type of economic interest in property is created by a lease. In this arrangement, a lessor and a lessee each hold partial interests, which are stipulated in contract form and are subject to contract law. In the case of subleases, additional leasehold interests are created. In those cases, an occupant's interest is commonly

BACK_DEFEXP-RR-002480

> Leases specify the rights of the lessor (e.g., to collect rent, to get the property back when the lease expires, to dispose of the property through sale or transfer) and the rights of the lessee (e.g., to use, occupy, and, in some cases, to improve or to sublease the property).

referred to a *subleasehold*. The intervening leasehold interest is commonly referred to as a *sandwich leasehold* because the holder of the sandwich leasehold is the tenant on one lease and the landlord on another.

Terms such as *fee simple*, *leased fee*, and *leasehold* should be used with care. Appraisers should recognize that these terms may have different meanings outside appraisal practice and in different jurisdictions, and that the terms used alone may be inadequate to convey the meaning of what is being valued, i.e., both the estate and the interests as well as the premises of the valuation.

## Leasehold

The leasehold is the lessee's, or tenant's, estate. When a lease is created, the tenant usually acquires the rights to possess the property for the lease period, to sublease the property (if this is allowed by the lease), and perhaps to improve the property under the restrictions specified in the lease. In return, the tenant is obligated to pay rent, to give the property back at the end of the lease term, to remove any improvements that the lessee has modified or constructed (if specified), and to abide by the lease provisions. The most important obligation of a tenant is to pay rent.

The relationship between contract rent and market rent greatly affects the value of a leasehold. A leasehold may have value if contract rent is less than market rent, creating a rental advantage for the tenant. However, the contract advantage of the leasehold may not be marketable. For example, the original lease contract may prohibit subletting or assigning, or the remaining lease term may be too short to be marketable to potential sublease tenants or assignees. This relationship, in turn, is likely to affect the value of the leased fee. The value of a leased fee encumbered with a fixed rent that is below market rates may be less than the value of the fee simple or the leased fee with rent at market levels. When contract rent exceeds market rent, the leasehold is said to have negative value. Even in such circumstances, the tenant still has the right to occupy the premises and, despite the contractual disadvantage, may have other benefits that warrant continued occupancy. It is also possible that the contract disadvantage hurts the tenant's business and increases the risk of continued occupancy.

## Leased Fee

In appraisal practice, the lessor's, or landlord's, position is referred to as the *leased fee*. The rights of the lessor and the lessee are specified by contract terms contained in the lease. Although the specific details of leases vary, a lease generally provides the lessor with the following:

- Rent to be paid by the lessee under stipulated terms
- The right of repossession at the termination of the lease
- Default provisions

In appraisal practice, the lessor's interest in a property is considered a leased fee regardless of the duration of the lease, the specified rent, the parties to the lease, or any of the terms in the lease contract.

BACK_DEFEXP-RR-002481

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Subleasehold or Sandwich Interests

A lease contract may allow a tenant to sublease all or part of a property, but many leases require that the landlord's consent be obtained. A sublease is an agreement in which the tenant in an existing lease conveys to a third party the interest that the lessee enjoys (the right of use and occupancy of part or all of the property) for part or all of the remaining term of the lease. In a sublease, the original lessee is "sandwiched" between a lessor and a sublessee (see Figure 7.1). The original lessee's interest has value if the contract rent is less than the rent collected from the sublessee or if the lease conveys other economic advantages. (For example, a lease might have a beneficial purchase option.) Subleasing does not release the lessee from the obligations to the lessor defined in the lease agreement. A sublease may affect all the parties, including the leased fee position.



**Figure 7.1**    Sandwich Position in a Sublease Transaction



As an example, consider a developer who builds a five-story building on land that is leased for 99 years and who then leases parts of the buildings to others. The vacant land owner is the lessor, the developer is the lessee (and sublessor), and the tenants in the building are sublessees.

A lease contract may contain a provision that explicitly forbids subletting. Without either the right to sublet or a term that is long enough to be marketable, a leasehold position may have no market value. (Only when a lease is assignable can the leasehold have market value because market value is based on a hypothetical exchange.) Furthermore, the value of the leased fee estate would likely be diminished in this case because a lessee who no longer has need of the leased premises and is not allowed to sublease the space is more likely to default on the lease, thus increasing the riskiness of the income stream to be received by the lessor.

*Identifying the Rights to Be Appraised*    **63**

BACK_DEFEXP-RR-002482

## Legal Interests

Virtually every property is subject to some kind of easement or other legal restriction on use. Some are permanent easements, while others may only exist for a short period of time. Often appraisers have to either value the property subject to an easement or value the easement itself. In certain situations, a life estate may be created, which in turn creates several partial interests. Transferable development rights are another type of partial interest created by legal circumstances.

### Life Estates

A life estate is defined as the rights of use, occupancy, and control of a specified property limited to the lifetime of a designated party. The designated party is generally known as the life tenant and is obligated to maintain the property in good condition and pay all applicable taxes during the term of the life estate. Two interests are created by a life estate, and both may need to be valued by an appraiser. The first interest is that of the life tenant. The second is the remainder interest, i.e., the possessory interest in the property upon the death of the life tenant. Life estates can be created in several ways:

- By operations of law
- By wills
- By deeds of conveyance

For example, a fee owner may leave a will that gives land to his widow for her remaining lifetime and, at her death, the land is passed on to their children. Thus, the widow acquires a life estate and functions as life tenant with the children becoming the holders of the remainder interest. A living fee owner may deed his property to a family member as the holder of the remainder interest and, by the terms of the conveyance, retain a life estate. This practice might eliminate the expense of probating the will after the owner dies, but it may also call for the assessment of a gift tax.

A related property interest that an appraiser may be asked to value is known as a "springing executory interest." Like a life estate, a springing (or "shifting") interest transfers certain rights of ownership to a designated party under certain contractual conditions such as the occurrence of a specific event. An example of a springing interest would be the right of use of a property assigned to a parent that is extinguished in the future when that person's child reaches a certain age—say, 21—at which point the rights of ownership are transferred to the child.

### Easements

An easement is an interest in real estate that transfers use, but not ownership, of a portion of an owner's property. Easements usually permit a specific portion of a property to be used for identified purposes, such as access to an adjoining property or as the location of a certain underground utility. Although surface easements are the most common, subterranean and overhead easements are used for public utilities, fiber-optic cables, subways, and bridges. Other types of easements such as scenic easements and facade easements may prohibit the owner of the underlying fee simple estate from certain uses of the property without giving the holder of the easement any possessory interest in the real estate.

Clearly a property that enjoys the benefit of an easement gains additional rights, while a property that is subject to an easement is burdened. The easement attaches

BACK_DEFEXP-RR-002483

Copyrighted material licensed by Charles Brigden on September 17, 2020

to the property benefitted and is referred to as an *easement appurtenant*. The property that is benefitted by an appurtenant easement is known as the *dominant tenement*. The property that is subject to the easement is called the *servient tenement*.

Easement rights can be transferred in perpetuity or for a limited time period. An easement can be created in several ways:

- By a contract between private parties
- By prescription or implication
- By governmental entities or public utilities through the exercise of eminent domain

A conservation easement is a typical example of a contract between private parties, in which case a landowner enters into an agreement with a qualified conservation group that limits the future use of a portion of the owner's property, often to ensure that some natural environment will not be developed.[2] The property owner hands over certain specified rights of use and receives a tax deduction. In exchange, the conservation group may or may not pay compensation (and offer ongoing property tax savings). An example of an easement created by prescription might be a right of access granted to the public who for many years have used a trail as a shortcut through a parcel of privately owned land. Public utilities often have certain limited powers of eminent domain that they may use to impose a temporary construction easement and an access easement on private property to install and maintain equipment such as a natural gas pipeline or electrical lines and towers.

### Transferable Development Rights

Transferable development rights (TDRs)—sometimes referred to as *severable use rights* (SURs) and often associated with air rights—emerged in the real estate industry during the 1970s. A transferable development right is a development right that is separated from a landowner's bundle of rights and transferred, generally by sale, to another landowner in another location. Some TDRs preserve property uses for agricultural production, open space, or historic buildings. In this arrangement, a preservation, or sending, district and a development, or receiving, district are identified. Landowners in the preservation district are assigned development rights, which they cannot use to develop their own land but can sell to landowners in the development district. The landowners in the development district can use the transferred rights to build at higher densities than zoning laws in the development district would normally permit.

Another situation in which development rights are transferred results from the constrained capacity of an existing utility. For example, consider a community that decides to impose a construction moratorium pending the expansion of its present sewage plant or the building of a new plant. Before the moratorium, a landowner was granted the right to hook up 100 projected single-unit residences to the existing plant. A second landowner, however, did not obtain the right to link up 50 proposed single-unit residences to the sewage treatment plant and will have to wait for expansion of the plant's capacity. The second landowner risks financial loss if that individual cannot develop the land immediately, so the second landowner eagerly purchases the right to link up 50 residential units to the plant from the first landowner.

---

2. Internal Revenue Code §170A 14(c)(1) describes the qualified organizations eligible to be considered an eligible donee, which include certain governmental units, charitable organizations that meet the public support test, and other charitable organizations that are controlled by organizations described in that section of the IRC.

BACK_DEFEXP-RR-002484

Although transferable development rights may vary from state to state, these rights are generally real property only as long as they are attached to the land. When they are sold, they become personal property, only becoming real property again when they are attached to another tract of land. TDRs can often be banked to facilitate the timing of the transfer of rights.

## Physical Interests

Physical interests in real property can be separated either horizontally or vertically. The most common methods of creating horizontal divisions of real property are through subdivision and assemblage. In subdivision, a large tract of land is broken down into smaller units, which are then marketed individually. In assemblage, two or more parcels of real estate are combined into one parcel. When the value of the assembled parcel is greater than the sum of the values of the individual parcels, the incremental value created by the assemblage is known as *plottage value*. Consider two adjacent, half-acre office sites in a central business district where one-acre sites are more desirable. The value of each half-acre site is $500,000, but when assembled the one-acre site has a value of $1,200,000. Conversely, when potential buyers prefer smaller sites, the unit values of larger sites will likely be lower.

The most common vertical interests in real property are (a) subsurface rights and (b) air rights. A subsurface right is the right to the use of and profits from the underground portion of a designated property. The term usually refers to the right to extract minerals from below the earth's surface and to construct tunnels for railroads, motor vehicles, and public utilities. Air rights are the property rights associated with the use, control, and regulation of air space over a parcel of real estate.

The vertical division of real property is significant because engineering advances have dramatically affected land use and, therefore, highest and best use considerations. The development of steel-framed building construction, the passenger elevator, deep tunnel excavation techniques, and innovations in communications technology have all helped to shape the modern urban landscape. As the density of building in urban areas increases, fewer sites are available for new construction and land values escalate, increasing the demand for opportunities to develop air rights.

Air rights can be sold or leased, with the seller retaining one or more easements for a specialized use such as the operation of a railroad line on the land beneath the improvements developed in the vertical space above the parcel. Air rights may be subdivided as well, as when the owner of the fee simple interest sells or leases only the land and air that are to be occupied by a particular improvement.

Air rights can also be transferred in various ways. Often the air rights to one property are shifted to another property within the same building zone under legal planning regulations. The transfer of air rights can allow developers to adjust the density of land use without putting adverse pressure on owners, neighborhoods, or districts. This practice underscores the importance of local zoning authorities, which regulate building heights, building functions, setbacks, and other variables involved in the development of air rights. As an example, a common form of air rights transfer in New York City involves merging two lots. A developer will buy adjacent lots so that the larger combined lot area will be used in calculations of floor area ratio (FAR), i.e., the measure in the local zoning code that dictates how large a building can be. If the area of the combined parcel is twice that of the original site of the new building,

BACK_DEFEXP-RR-002485

Copyrighted material licensed by Charles Brigden on September 17, 2020

the allowable aboveground area of the new building could be doubled by building higher without violating the maximum floor area ratio. In effect, the allowable use of the airspace above one of the original parcels (say, an existing low-rise commercial building) is transferred to the other parcel (a new high-rise residential building).

## Financial Interests

The financial aspects of property interests have a major effect on real estate investment practices. The analysis of mortgage and equity components is of particular importance. Mortgage funds are secured debt positions, while equity investments are venture capital. Fee simple, leased fee, and leasehold interests can all be mortgaged, thereby subdividing these interests into mortgage and equity components.

### Equity Interests

The equity in real property is the owner's interest after all claims and liens have been satisfied. An equity interest, like a mortgage loan, represents a financial interest in real property. Equity ownership in real property can be legally accomplished in many ways—e.g., as an individual owner, joint owner, partner, or shareholder in a corporation.

> In the analysis of partial interests, appraisers should keep in mind that the value of a partial interest is not necessarily a pro rata share of the value of the whole. For example, if the value of the fee simple interest is $1 million, a 40% interest is not necessarily worth $400,000. Partial interests are often valued at less than their pro rata share of ownership, especially if the holder of the partial interest does not have any voice in the management or control of the asset.

The legal form of equity ownership does not affect property value in most appraisal assignments. However, an appraiser is sometimes called upon to render an opinion of the value of a specific legal form of equity interest. For example, an appraiser may be asked to value an equity interest for estate tax purposes or for sale or purchase decisions.

### Mortgage Interests

A mortgage instrument creates mortgagor and mortgagee positions. In investment analysis assignments and other assignments, appraisers are often asked to research the value of mortgage interests. Mortgage-equity analysis has a long history in appraisal literature (see Chapter 25), and techniques for comparing the value of mortgages with different terms are well established (see Chapter 21).

Mortgage interests trade regularly in the secondary market, with varying degrees of governmental intervention to promote liquidity and competition. Conditions in the mortgage market can have a tremendous effect on property value, as was seen in the economic downturn that followed the housing crisis beginning in 2007. Economic trends involving the mortgage and capital markets are discussed more fully in Chapter 10.

## Forms of Ownership

The various property interests described earlier in this chapter can be owned by individuals, by a group, or by various legal entities that are defined by state law in the United States. Identifying the relevant form of ownership of the assets involved in an assignment is part of an appraiser's investigation into the rights to be appraised. In

BACK_DEFEXP-RR-002486

effect, the forms of ownership discussed in this final section of the chapter identify who owns the interests discussed previously (i.e., what is owned).

## Concurrent Ownership of Real Property

Individual ownership is legally known as *ownership in severalty*. However, individuals can hold ownership under certain legal entities, such as 100% ownership of the beneficial interest in a land trust or 100% ownership of the stock of a corporation that owns real estate. *Tenancy* is defined as the holding of property by any form of title.

Concurrent ownership includes joint tenancy, tenancy by the entirety, and tenancy in common. Joint tenancy is joint ownership by two or more persons with the right of survivorship. Under this arrangement, each party has an identical interest and right of possession. Upon the death of one joint tenant, ownership is automatically vested in the remaining joint tenant or tenants. In states that allow tenancy by the entirety, ownership is held by spouses in which neither has a disposable interest in the property during the lifetime of the other, except through joint action. It has the same survivorship provision as a joint tenancy, but tenancy by the entirety applies only to spouses. Tenancy in common is an estate held by two or more persons, each of whom has an undivided interest. In this estate the undivided interests may or may not be equally shared by the holders and there is no right of survivorship. One tenant in common may sell off an undivided interest without the approval or knowledge of the other tenant or tenants in common.

## Legal Entity Ownership of Real Property

In addition to individual ownership, real property can be owned by a variety of different legal entities such as

- Land trusts
- Partnerships
- Corporations and companies
- Syndications

Like individuals, these entities can own a fee simple interest or partial interests in real property.

A group of real estate investors often choose one form of ownership over another to take advantage of tax savings offered by a particular ownership structure, to limit personal liability through a different form of ownership, or to avoid corporate reporting. The legal framework for all these ownership structures can vary by state, so investors may favor certain structures in different states or may even incorporate in another state after comparing the advantages and disadvantages of the relevant laws in different states.

### Land Trusts

Trusts are sometimes used as legal vehicles to create partial ownership interests in real property. In a land trust, one or more properties are conveyed by special deed to a trustee, which then conditionally owns the real property. Either the original owners or some other designated individual or persons become the owners of the beneficial interest in the trust. A trust agreement is established to outline the duties and functions of the trustee.

A trustee can take no actions other than those specified and allowed in the trust agreement without written permission of the owner or owners of the beneficial interest. For example, in one trust agreement a trustee may be required to manage a

BACK_DEFEXP-RR-002487

Copyrighted material licensed by Charles Brigden on September 17, 2020

property actively and collect rents. However, in another trust agreement regarding a different property, the same trustee might be prohibited from managing the property and collecting rents. One important legal aspect of a trust arrangement is that a judgment against a beneficiary is not a lien against the real estate.

### Partnerships

A partnership is a business arrangement in which two or more persons jointly own a business and share in its profits and losses. Partnerships are used extensively in real estate acquisition because they pool individual funds for property ownership and operation. Two types of partnerships are prevalent in the ownership of real property: (1) general partnerships and (2) limited partnerships.

In a general partnership, all partners share in business gains and each is personally responsible for all liabilities of the partnership. Limited partnerships have both general partners and limited partners. All partners participate by pooling funds. However, unlike general partnerships in which all partners actively participate in the business of the partnership, in a limited partnership the partners can be either active or passive. General partners are active members of the partnership who manage the business and assume full liability for partnership obligations. Limited partners, on the other hand, are passive members of the partnership. They are not actively involved in the business of the partnership, and their liability is restricted to the amount of their capital contribution. Through a limited partnership, a group of investors can jointly acquire real property that they might be unable to acquire as individuals.

### Stock Corporations

Like partnerships, stock corporations allow many investors to pool funds to purchase and own real property. However, unlike partnerships, the individual investors in a stock corporation do not hold an interest in the real property. Rather, they own shares of stock, usually recognized as personal property, that can be private or publicly traded. The owner of the real property is the legal entity, the corporation.

A stock corporation may be organized to hold title to a single asset, such as a parcel of real estate, or multiple assets, such as a portfolio of property investments.

---

### Real Estate Investment Trusts and Real Estate Operating Companies

Real estate investment trusts (REITs) have been successful in pooling the funds of small investors to acquire real estate investment positions that could not be handled by these investors individually. Buying shares of REIT stock is not the same as direct investment in a given property. REITs offer shareholders freedom from personal liability, the benefit of expert management, and readily transferable shares. To qualify for a tax pass-through, a REIT must pay dividends of at least 90% of its taxable income. With complicated income-measuring practices, these trusts attempt to pay out almost all their net income and, therefore, are substantially restricted in establishing reserves for possible losses. The liquidity of these securities is an attractive feature to investors.

While the stock market establishes the value of REITs, the income performance of these assets tracks the performance of real estate markets. REIT prices tend to be less volatile than the Standard & Poor's 500, and the correlation between large cap stocks and REITs has been declining since 1990.

The key difference between a REIT and a land trust is that the latter has no restrictions on the amount it must distribute to its unit holders. Land trusts are free to reinvest their money in any way they wish.

A real estate operating company (REOC) is similar to a real estate investment trust (REIT) except that an REOC can reinvest its earnings into the business rather than distribute them to unit holders the way REITs do. REOCs are also more flexible than REITs in terms of what types of real estate investments they can make.

---

*Identifying the Rights to Be Appraised*    **69**

Ownership of the corporate entity is divided into partial interests by selling shares to an investment group. Any specific stock holding represents a percentage of total corporate ownership. For example, if a particular investor owns 250 shares out of 10,000 total shares issued by the corporation, that investor owns 2.5% of the corporation. This percentage is an ownership share in the corporation, not a percentage of any real property held by the corporation.

### Limited Liability Companies

A limited liability company (LLC) incorporates features of both a corporation and a partnership. The "limited liability" of an LLC is similar to that of a corporation, in which the members of the LLC do not risk their personal assets. On the other hand, an LLC—like a partnership—can function as a pass-through entity with earnings taxed only at the level of the interest holder, not at the corporate level as well. By 1997, all US states had adopted legislation authorizing the establishment of LLCs.

The owners of a limited liability company are members, rather than shareholders or partners, and thus are not subject to some of the restrictions imposed on ownership under a corporate or partnership structure. Unless otherwise specified, management is generally vested in the members of an LLC in proportion to their contributions of capital. Members may separate their right to a share of the company profits from the right to participate in management or to vote on matters affecting the company. These separated rights can then be assigned to a transferee without disrupting the operation of the company. The transfer of ownership interests in a limited liability company is generally simpler than the transfer of shares in a corporation or partnership.

### Syndications

Syndications are another means for selling interests or rights in real property. A syndication creates a private or public partnership to pool funds for the acquisition, development, holding, management, or disposition of real estate. Syndications are established when an individual or group purchases interests in real property for the purpose of transferring them to a limited partnership, which in turn sells the interests to investors.

At one time, syndications were popular because the investment value of syndicate shares usually included income tax shelter benefits. These investments offered small income returns during the early years, when the value of the investment was perceived to rest largely in its income tax benefits (e.g., tax deductions and tax deferrals). However, the Tax Reform Act of 1986 significantly reduced the use of real estate investments as income shelters.

Although syndications usually involve some sort of partnership, they differ from partnerships insofar as the rights of investors in a syndication are different than the rights of general or limited partners in a partnership. Syndication arrangements may be simple in theory, but in practice they are often complex because syndications frequently purchase more than real estate (e.g., management services).

### Special Forms of Ownership

In addition to concurrent ownership and ownership by legal entities, there are several special forms of ownership that involve a combination of individual and joint property rights, including

- Condominium ownership

BACK_DEFEXP-RR-002489

Copyrighted material licensed by Charles Brigden on September 17, 2020

- Cooperative ownership
- Timesharing

### Condominium Ownership

A condominium is a form of ownership of separate units or portions of multiunit buildings with undivided ownership of common elements. While residential and retail properties were once the main types of property held in condominium ownership, condominium interests can now be found in most property types, including hotels, offices, industrial buildings, retail structures, and even garden plots, marina slips, and undeveloped land where the access roads and utilities are the common property. In land condominiums—which are land subdivisions in all but name—the use of the condominium form of ownership allows the declarant to avoid certain zoning restrictions pertaining to the subdivided lots. For example, the floor area ratio (FAR) limits that would have applied to each lot in a traditional subdivision of individually owned lots instead would apply only to the undivided parcel. In real estate markets outside the United States, variants of condominium ownership can be the most common type of ownership. For example, in Colombia condominium ownership is widely used in residential and commercial development.[3]

A condominium unit is a separate ownership interest, and title is held by an individual owner. The unit may be separately leased, sold, or mortgaged. While there are various forms in a traditional condominium, the owner holds title to an individual unit and an undivided partial interest in the common areas of the total condominium project—e.g., the land, the public portions of the building, the foundation, the outer walls, and the spaces provided for parking and recreation. Thus, the unit owner possesses a three-dimensional space within the outer walls, roof or ceiling, and floors and has an undivided interest in common areas along with the other owners. The master deed or condominium plan for a condominium typically describes the boundaries of the property using the length and width of the space just like a deed for a conventional property, but the condominium master deed also describes the property in three dimensions (i.e., the vertical boundaries of the unit). A condominium owner usually receives a short deed referring to the master deed and identifying the individual unit by a unit number.

Limited common elements also exist in certain condominium projects. In this arrangement, certain common elements, such as parking stalls, storage units, or plots of surrounding land, are reserved for the use of some but not all of the condominium owners. The owners of units in a condominium project usually form an association to manage the project in accordance with adopted bylaws. The expenses of management and maintenance are divided proportionately among the owners, who pay a monthly fee.

The master deed or other legal arrangement usually provides for the establishment of a condominium owners association, and the bylaws of that organization generally set forth any rules such as the responsibilities of unit owners for assessments and maintenance fees and any restrictions such as restrictions on pets or color choices.

Condominium development can be sensitive to real estate market fundamentals. For example, consider a condominium project in which a substantial number of units remain unsold and the owners of some other units are experiencing bankruptcy

---

3. Howard C. Gelbtuch with Eunice H. Park, *Real Estate Valuation in Global Markets*, 2nd ed. (Chicago: Appraisal Institute, 2011), 109.

BACK_DEFEXP-RR-002490

or foreclosure. If the developer is no longer in business, the few solvent owners of units must assume financial responsibility for the upkeep of the common areas even though they were only responsible for a fraction of these expenses under their initial homeowner agreements. Situations like this are common in some overbuilt areas, and they are one reason that the recovery of condominium and townhouse developments can lag behind the recovery of the market for detached single-unit homes.

### Cooperative Ownership

For a cooperatively owned apartment property, a stock corporation is organized, and that corporation acquires title to an apartment building, prices the various apartments, and issues an authorized number of shares at a specified par value. Individual owners purchase shares of stock, with the price per unit determining the number of shares that an occupant of an apartment unit must purchase. In cooperative ownership—commonly shortened to *co-op*—each owner of stock receives a proprietary lease on a specific apartment and is obligated to make a monthly payment that represents the proportionate share of operating expenses and debt service on the underlying mortgage, which is paid by the corporation. The lease obligates the occupant to pay a monthly maintenance fee, which may be adjusted at times by the corporation's board of directors. The fee covers the expenses of management, operations, and maintenance of public areas. Because the shareholders can vote their shares in electing directors, they have some control over property conditions.

An alternative method for financing cooperatives has emerged in some areas. In the past, cooperative corporations arranged mortgages on entire apartment properties. Cooperative shareholders had to fund their purchases with 100% equity or borrow the money from commercial banks using short-term, personal notes. Now, however, a cooperative corporation can arrange a mortgage on the total property, and individual apartment shareholders can mortgage their stock for a portion of its value.

Historically, the complicated financing structure of cooperatively owned property—with the owner of a cooperative apartment typically paying both for a loan on the individual unit and for a share of the blanket mortgage on the entire building—has been seen as a disadvantage of cooperative ownership as compared to condominium ownership. Buyers of units in a cooperatively owned building would have to take into account the greater risk inherent in the underlying mortgage for the entire property. Co-op restrictions may not allow subletting, which would be seen as a negative influence on value by someone who viewed the unit as an investment and might want to rent out the unit based on the income potential of similar units in the market. The perceived social exclusivity of a cooperative building, where a board of directors often has more influence on whether a unit can be bought and sold than a condominium association does, and the greater power of a co-op board to punish rule-breakers can be both disadvantageous or advantageous depending on the perspective of particular buyers and sellers.

### Timesharing

Timesharing involves the sale of limited ownership interests in, or rights to use and occupy, residential apartments or hotel rooms. There are four general categories of timeshare interests, and it is imperative that appraisers distinguish between them when valuing timeshare projects or analyzing timeshare comparables. There are two types of deeded interests in timeshares and two types of non-deeded interests.

BACK_DEFEXP-RR-002491

Copyrighted material licensed by Charles Brigden on September 17, 2020

The first category of deeded interests involves designated periods of time on a recurring basis at specific timeshare resorts. The second type of deeded interest involves a "floating" period of time during a specific portion of the entire year at a specific resort or group of resorts. Non-deeded interests can be right-to-use interests for a specific period of time at a specific resort or network of resorts, or, alternatively, can be "points only" interests that can be used at various resorts in a proprietary network or in a vacation club system. In the first form of deeded interests, known as *fee timesharing*, the purchaser of the deeded timeshare interest obtains a deed that conveys title to a unit for a specific part of a year, thereby limiting the ownership. The purchaser has the right to sell, lease, or bequeath the timeshare interest. The interest can be mortgaged, and title can be recorded. The seller of a non-deeded timeshare interest does not convey a legal title in the property. Typically, a purchaser receives only the right to use a timeshare unit and related premises or to use the "points" involved in the purchase. In many projects, fifty one-week intervals are created. The remaining two weeks of each year are reserved for maintenance and major repairs.

Deeded timeshare interests can be further classified as timeshare ownership or interval ownership. In timeshare ownership a purchaser receives a deed to a particular unit as a tenant in common. Each purchaser agrees to use the unit only during the time period stipulated in the deed. In interval ownership, the ownership period may only last for the duration of the project. At the end of the specified time period, the ownership reverts to the interval owners as tenants in common. They then have the option of selling the property and dividing the proceeds, or continuing as tenants in common and renewing the interval estate. Timeshare owners and interval owners pay operating expenses, including a proportionate share of taxes, insurance, and other costs, and a fee for common area maintenance (CAM) and management.

Non-deeded timeshare interests can also be put into various subcategories such as a leasehold interest, a vacation license, or a club membership.[4] The leasehold interest type of timesharing is essentially a prepaid lease arrangement. A vacation license involves the transfer of a license from the developer to the purchaser, giving the latter the right to use a given type of unit for specified time periods over the life of the vacation license contract. In the club membership form of ownership, timeshare patrons purchase membership for a specified number of years in a club that owns, leases, or operates the timeshare property. The purchaser receives the right to use a particular type of unit for a specified period during each year of membership.

There is a two-tiered market in the timeshare industry:

1. An original (primary) marketplace consisting of sales by resort developers and owners to individual buyers
2. The resale (secondary) marketplace consisting of resales by individuals who have purchased from the resort developers (or in the secondary marketplace)

The market participants in each market and the process by which timeshare interests are sold—as well as the prices—are quite different in each of those markets. Appraisers must take care to use only sale prices from the particular market in which the appraised interest would be sold. For example, it would typically be improper to use sales from the primary resort developer marketplace to value a timeshare interest that is reselling in the secondary market. Purchases from resort developers in the

---

4.    Under the laws of some states, vacation licenses and club memberships are not considered interests in real property but rather personal property.

BACK_DEFEXP-RR-002492

primary marketplace typically include concession and financing packages such as interest-free deferred payments, cash or resort credits, packages of points in a vacation club system, or other inducements that cannot be transferred or resold in the secondary marketplace.

BACK_DEFEXP-RR-002493

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Scope of Work

# 8

In the valuation process, the identification of the assignment elements leads directly into the determination of the scope of work of an assignment, i.e., the type and extent of research needed to solve an appraisal problem. Professional valuation standards place the responsibility for determining the appropriate scope of work in an appraisal assignment squarely on the shoulders of the appraiser.[1] The scope of work for an assignment is acceptable if it leads to credible assignment results, is consistent with the expectations of parties who are regularly intended users for similar assignments, and is consistent with what the actions of an appraiser's peers would be in the same or a similar assignment.

Developing a scope of work is a bottom-up process: an appraiser starts with the valuation practices that are essential in all assignments and then considers the applicability of the professional standards and practices to the problem at hand. The ideal solution is arrived at not by reducing a standardized procedure to meet specific required components, but rather by building a logical framework for the assignment from the ground up.

In effect, scope of work provides appraisers with the flexibility to perform the level of analysis that is appropriate for a specific appraisal assignment. However, with that flexibility comes the responsibility to determine what the appropriate level of analysis is and to communicate that to the client. As a result, ready-made solutions are not appropriate for all assignments. Instead, an appraisal in which an appraiser demonstrates a clear understanding of the problem to be solved for the client and provides the precise amount of analysis and detail desired will likely be seen as the most credible. In fact, the demand from clients for appraisals tailored to their specific needs prompted the shift in the profession from a one-size-fits-all process to the current emphasis

> **scope of work**
> The type and extent of research and analyses in an appraisal or appraisal review assignment.

---

1. See also Stephanie Coleman, *Scope of Work*, 2nd ed. (Chicago: Appraisal Institute, 2016).

BACK_DEFEXP-RR-002494

on a scope of work tailored to the particular assignment. The valuation profession is likely to follow other professions in increasing the customization of services to meet specific needs in the marketplace, which will make the determination of scope of work more important than ever.

> The development of the scope of work of an assignment applies to the appraisal review process as well as the valuation process. The scope of work of a review assignment is discussed in Chapter 34.

## Problem Solving

An appraisal assignment is a problem to be solved. In solving any problem, there are three major steps to the process:

1. Identify the problem.
2. Determine the solution (i.e., scope of work).
3. Apply the solution.

None of the three steps may be omitted, and each must be carried out in this logical order.

### Identifying the Problem

Seven significant elements of a valuation assignment were discussed in the preceding chapters: client, intended user, intended use, type of opinion, effective date of opinion, relevant characteristics of the subject property, and assignment conditions. Identifying these elements is, in effect, the process of identifying the appraisal problem. Only after the elements of the assignment are understood can an appraiser move on to the second step, determining the scope of work necessary to solve the problem.

The problems that appraisers are asked to solve can be small or large, simple or complex. For example, in a typical appraisal for residential mortgage lending, the problem is relatively straightforward. The client—a lender—needs an independent opinion of market value from an appraiser as part of the institution's due diligence

---

### Scope of Work in Valuation Standards

Valuation standards usually provide for the possibility of exceptions from some portion of the standards when certain conditions are met. Conceptually, scope of work is not about making exceptions, i.e., it focuses on what an appraiser does to solve the appraisal problem rather than what an appraiser does not do.

Relevant references in the Standards of Valuation Practice include

- SR A-3: Scope of Work (appraisal)
- SR B-3: Scope of Work (review)
- SR C-2(a)(xii) and C-2(b)(x): Sufficient Report Content (scope of work reporting)

Relevant references in the Uniform Standards of Professional Appraisal Practice include

- Scope of Work Rule
- Advisory Opinion 22: Scope of Work in Market Value Appraisal Assignments for Real Property
- Advisory Opinion 28: Scope of Work Decision, Performance, and Disclosure
- Advisory Opinion 29: An Acceptable Scope of Work

In the International Valuation Standards, relevant references include

- General Standards: IVS 101 Scope of Work

Standards clearly require consideration and disclosure of the scope of work in any appraisal or appraisal review assignment.

---

BACK_DEFEXP-RR-002495

Copyrighted material licensed by Charles Brigden on September 17, 2020

before approving (or not approving) a home loan. Contrast this with an appraisal of vacant land on the edge of a suburban area experiencing an economic downturn; the land might (or might not) be ready for new development. The client—a property owner—wants to know if developing a new facility is currently feasible (or when it will likely be feasible). This problem is more complex. More than one opinion of value might be necessary in this case: (1) the current market value of the vacant land and (2) the forecast market value of the improved land at various points in the future (e.g., upon completion of construction, upon stabilization). As a third example, consider an appraisal of an existing office building that is the subject of a property tax dispute. The property itself might not pose a complex problem, but the intended use of the results of the analysis can complicate the scope of work. The client—the owner of the office building—wants an appraiser to develop an opinion of the market value of the property that the client can compare with the assessed value estimated by the county assessor. Later, the client's attorney may ask the appraiser to testify at a hearing, where the appraiser's analysis and opinion of value could be under the scrutiny of an opposing party.

In the examples above, all the information collected and analyzed in an appraiser's consultation with the client and preliminary investigation of the property characteristics and assignment conditions helps the appraiser answer the questions *who*, *what*, *when*, *where*, and *why*. An appraiser answers the question *how* by determining the scope of work.

### Determining the Solution

The scope of work that would solve a particular problem must not only meet the expectations of the client and parties who are regularly intended users of similar assignments, but also must be consistent with the actions of an appraiser's peers in similar situations. Determining the scope of work that meets the expectations of the client and other intended users fulfills the business needs of both the appraiser and the client, i.e., the appraiser is providing the client with the service that the client needs. An understanding of what accepted techniques and data other appraisers would consider as the basis of an appropriate solution to the client's problem is a prerequisite for professional competency.

Tables 8.1, 8.2, and 8.3 illustrate the types of activities conducted in valuation assignments that fall along the spectrum from least-intensive scope of work to most-intensive scope of work. Similar analyses can be performed on any step in the valuation process to help determine the appropriate scope of work for a particular activity.

In the appraisal for a residential mortgage loan described earlier, the problem was identified as developing an opinion of the market value of a residential property for use in a lending institution's decision making. For this assignment, the scope of work for the application of the sales comparison approach would likely be relatively intensive, with supportable adjustments to recent comparable data providing the most credible indication of market value. The typical client for this type of assignment might not expect an appraiser to apply the cost approach in this assignment, and the appraiser's peers would likely agree, as long as the reason for omitting the approach is explained in the appraisal report. Similarly, the income capitalization approach would likely be of little relevance in an appraisal of owner-occupied housing. As a result, the scope of work for the cost and income capitalization approaches in

BACK_DEFEXP-RR-002496

| Table 8.1 | Identification of Relevant Real Property Characteristics | | |
|---|---|---|---|
| **Process** | **Physical** | **Legal (e.g., zoning)** | **Economic (e.g., actual gross income)** |
| Less Intensive | No site visit* | No research* | Obtain from owner* |
| | Drive-by visit* | Examine zoning maps* | Read leases |
| | Drive-by, exterior-only* site visit with exterior measurements | Talk to planning/zoning department* | · Read leases<br>· Verify with management company |
| More Intensive | Site visit including examination of interior with interior measuretments | · Talk to planning/zoning department<br>· Obtain and read zoning ordinance | · Read leases<br>· Verify with management company and tenants |

\* Special/extraordinary assumptions will need to be stated about information taken to be true when it is uncertain.

| Table 8.2 | Application of the Three Approaches to Value | | |
|---|---|---|---|
| **Process** | **Cost Approach** | **Sales Comparison Approach** | **Income Capitalization Approach** |
| Less Intensive | Not necessary, omitted | Not necessary, omitted | Not necessary, omitted |
| | · Land valuation via extraction<br>· Comparable cost data from readily available sources | · Comparable data from files<br>· No adjustments to comparables in analysis | · Comparable rental, expense, and vacancy data from files<br>· Capitalization rates from readily available sources |
| | Verified comparable cost data from cost manual | Comparable data from readily available sources, confirmed with one or more parties to the transaction | Comparable data, including capitalization rates from readily available sources, confirmed with one or more parties to the transaction |
| More Intensive | · Land valuation via sales comparison approach with complete verification of sales data<br>· Comparable cost data obtained from local contractors | · Thorough search of all available data sources<br>· Confirmation with one or more parties to the transaction<br>· Adjustments via paired sales analysis | · Thorough search of all available data sources<br>· Confirmation with one or more parties to the transaction<br>· Local vacancy survey |

| Table 8.3 | Development of a Highest and Best Use Opinion (Market Value Appraisal) |
|---|---|
| **Process** | |
| Less Intensive | Inferred; based on readily observed evidence, such as surrounding land uses, age and condition of existing improvements, and known market demand for property type* |
| | Application of four tests (physically possible, legally permissible, financially feasible, maximally productive) but based on readily observed evidence* |
| | Application of four tests (physically possible, legally permissible, financially feasible, maximally productive) with research into each factor, testing for feasibility |
| More Intensive | Application of four tests (physically possible, legally permissible, financially feasible, maximally productive) with complete market analysis and feasibility study |

\* Special/extraordinary assumptions may need to be stated about information taken to be true when it is uncertain.

Source: Stephanie Coleman, *Scope of Work*, 2nd ed. (Chicago: Appraisal Institute, 2016), 56-57.

BACK_DEFEXP-RR-002497

Copyrighted material licensed by Charles Brigden on September 17, 2020

this assignment would likely be on the least-intensive side of the spectrum or per-haps omitted altogether as unnecessary, assuming such omissions do not negatively impact the credibility of the valuation.

In contrast, consider an assignment to appraise proposed improvements on a site that is currently vacant. This assignment might involve a feasibility study of potential development on the subject site, with opinions of market value needed at different points along the development timeline. The analysis of market conditions and the highest and best use of the subject site would undoubtedly be at the more-intensive end of the spectrum for this assignment. This assignment would call for extraordi-nary assumptions relating to the completion of construction at a future date and the stabilization of occupancy within the as-yet-unbuilt improvements at some other date in the future. Current and future market conditions to support rent projections and the absorption of new space would likely require significant research and market support to be credible, so the application of the income capitalization approach in this assignment would probably be toward the most-intensive end of the scale.

Another example would be an appraisal of an existing office building for a property tax appeal. To remain an unbiased professional, an appraiser cannot let the nature of the assignment dictate the results. In this situation, the intended use of the appraisal may legitimately influence the scope of work in certain ways. For example, data collection and verification might need to be more intensive because the apprais-al may be scrutinized in a potentially contentious hearing. The representatives of the assessor's office would likely use any errors or inconsistencies in the data supporting the appraiser's opinion of value to impugn his or her testimony.

### Applying the Solution

An appraiser who has determined the scope of work has a plan in place to complete the assignment. However, the initial determination of the scope of work of the as-signment may not be what an appraiser must ultimately apply to solve the problem. As an appraiser gathers and analyzes data and comes to conclusions, the scope of work necessary to arrive at a solution to the client's problem may change. The appli-cation of the solution to the problem is an ongoing process of revisiting the scope of work as new information comes to light.

In some cases, more work than is initially anticipated may be required for an appraisal to be credible. Suppose the appraiser of the vacant land discussed earlier discovers at the time of inspection that the parcel benefits from exquisite views of the ocean, far superior to the views afforded by any other parcel in the area and far su-perior to what the appraiser expected. The appraiser's scope of work will now need to be expanded to include a careful analysis of the impact of the views on the subject property. The appraiser may need to analyze less recent sales or sales in other areas to properly evaluate the effect on value of the views.

### Disclosure of Scope of Work

The appraisal must clearly disclose the scope of work that was applied to develop the opinions and conclusions reported to the client. The disclosure of the scope of work in the appraisal report must be sufficient so that the intended users understand the scope of work that was performed. The scope of work discussion should address the following topic areas:

BACK_DEFEXP-RR-002498

- The extent to which the property was identified
- The extent to which the property was inspected
- The type and extent of data researched
- The type and extent of analyses applied

The scope of work discussion must address what was done and what was not done if an intended user might expect that a certain component of the valuation process had been performed. In an appraisal assignment, if any of the three approaches to value was excluded, the exclusion must be explained. In addition, if one or more persons provided significant real property appraisal assistance but did not sign the report, their contributions must be explained in the appraisal report and they must be named in the report certification.

In the appraisal of the house for lending purposes, the client would most likely expect (and perhaps require) the appraisal report to be submitted on a standardized form like the Uniform Residential Appraisal Report (Fannie Mae Form 1004/Freddie Mac Form 70). The appraiser would then have to determine whether the scope of work discussion included on the form provided enough detail to disclose the scope of work necessary to develop a credible appraisal and, if not, supplement the form. The appraisal of the office building would likely need to be communicated in an extensively documented narrative report so that the appraiser would be able to disclose what activities were performed in applying each of the approaches to value.

A separate section devoted to the scope of work in a written report provides the reader of the report with a clear picture of what the appraiser did, but the disclosure of the scope of work can be handled at various relevant points along the way, e.g., disclosure of the scope of work for the application of the sales comparison approach in the section of the report covering that approach. And a combination of these two methods works as well, providing a general disclosure of the scope of work in the introductory section of the report and more detailed discussions of scope of work at appropriate points later in the report.

> Avoid "boilerplate" scope of work discussions in appraisal reports. The scope of work actually performed in the particular assignment should be reported.

BACK_DEFEXP-RR-002499

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Data Collection 9

In real estate appraisal, the quality and quantity of information available for analysis are as important as the methods and techniques used to process the data and complete the assignment. Therefore, the ability to determine the amount and type of data needed to answer the client's question, to distinguish between different kinds of data, to research reliable data sources, and to manage information is essential to effective appraisal practice.

Identifying comparable properties and collecting other market data for use in the valuation process was once a time-consuming and expensive process. The growth of data vendors and the increasing accessibility of market data through electronic sources have shifted the historical emphasis of appraisal practice from data collection to data analysis. Still, collecting accurate, reliable data remains an essential task because the conclusions of the analyses of appraisers are only as good as the data that supports those conclusions.

The process of finding, filtering, and organizing data has been improved exponentially by the internet and the wide availability of sophisticated information technology. To that end, appraisers need new skills, refined judgment, and improved research techniques to gather and manage information efficiently in the rapidly evolving data universe.

## Data Fundamentals

Data is increasingly omnipresent, almost overwhelming. In early 2012, it was estimated that 90% of the world's data had been generated in the preceding two years, with little expectation of the rate slowing. However, data is formatted and cataloged primarily for use by the system that generated it. The challenge for appraisers in the twenty-first century is no longer simply finding data (although in declining or inactive real estate markets, transactional data can still be scarce) and passing that data along to their clients. Rather, filtering and reconciling relevant and meaningful information from the glut of growing sources and using that data to support the

BACK_DEFEXP-RR-002500

conclusions of the appraisal analysis are more important than ever. Today clients are more sophisticated and demand more detailed evidence that an appraiser previously identified and analyzed what was considered the best and most relevant data.

In most appraisal analyses, appraisers will need to gather and examine more than one type of data. The description of the architectural style of the subject property, an appraiser's judgment of the current condition of the improvements, and historical and forecast rent levels of competitive properties in the subject property's market area are all examples of the wide variety of information that appraisers routinely collect. The types of data needed in any appraisal assignment can be as diverse as the many influences on value in the marketplace.

An important distinction can be made between data that is available and applicable to the analysis in enough detail for an appraiser to properly formulate and support an opinion of value and the data provided to a client in a report. Successful analysis depends on the depth, quantity, and quality of the data that an appraiser can synthesize. By contrast, the appraisal reporting process is concerned with communicating the specific conclusions of the analysis to the client. An appraiser makes preliminary decisions about the relevance and usefulness of different types of data in a given assignment as part of the development of the scope of work of the assignment.

## Data Collection in the Scope of Work

The scope of work of an appraisal assignment includes consideration of the extent of the data collection process. For a complex assignment, the data collection process may be much more difficult than for a straightforward assignment in which the macro-level data about the market and the micro-level data about the subject and comparable properties are readily available from standard sources.

The data collection process can differ from state to state. Many states have open property records available to appraisers, but others are nondisclosure states where sales data can only be confirmed with the actual parties to the sale. Also, government programs can require different levels of data collection and documentation. For example, certain specific data is required to complete the Uniform Residential Appraisal Report (URAR) for a government-backed loan program.

Before beginning the process of data collection, an appraiser determines which types of data will be needed to answer the client's question about value. Thus, the nature of the data collected is greatly dependent on the scope of the assignment, the property type being appraised, and the market conditions within the market area identified by the appraiser. In the appraisal report, an appraiser communicates the type of data chosen for analysis to the client with the analyses. An appraiser may also communicate what data was *not* chosen for analysis and the reasons for the exclusion of any investigation, information, method, or technique that could be viewed as potentially relevant to the assignment by the client, another intended user, or the appraiser's peers.

Different types of data are useful in the different portions of the valuation process. First, an appraiser may collect macro-level data on the demographics of the market area and competitive supply and demand data on competitive properties to perform market analysis. Then additional data is gathered for highest and best use analysis, which requires micro-level data such as information on the physical characteristics of the subject property, zoning restrictions, and the income anticipated from alternative uses. The analysis undertaken in the application of the three approaches

BACK_DEFEXP-RR-002501

Copyrighted material licensed by Charles Brigden on September 17, 2020

to value generally requires physical information about the subject for the development of the cost, income capitalization, and sales comparison approaches. This also makes comparisons with comparable properties more valid and reliable.

Understanding the content and sources of macro-level and micro-level data facilitates data analysis in valuation and consulting assignments. Before analyzing the data, however, an appraiser should organize all the data accumulated in the investigation. Market data grids, like the cost survey worksheet used in the cost approach, the adjustment grid used in the sales comparison approach, and the reconstructed operating statement used in the income capitalization approach, are carefully prepared spreadsheets that provide a tabular representation of market data organized into useful, measurable categories (see Table 9.1). If the information to be analyzed is complex, an appraiser may need to design several different types of market data grids to isolate and study specific data.

Once the data has been collected and organized, it can be analyzed to solve the problem posed by the appraisal assignment. Market analysis and highest and best use analysis are the most obvious forms of data analysis, but each of the three approaches to value is also a form of analysis that relies on market data gathered through an inferred or fundamental market analysis and presented as support for the value conclusions derived. The validity of each approach's conclusions and, ultimately, the final opinion of market value depend on how well the market data presented supports those conclusions.

In the appraisal report, the analysis must answer the implied question, "Why is this information relevant?" The analysis should tie the economic and financial data to the real estate market in general and to the particular market in which the real estate being appraised is located. For example, if an appraiser's economic data shows that the rate of employment growth is decreasing, then the appraisal report should illustrate how this will affect the market in general in addition to the type of property and individual property being appraised in particular.

**Table 9.1**  Sample Market Data Grid

| Sales Adjustment Grid—Subdivision Lot Sales | | | |
|---|---|---|---|
| | **Sale 1** | **Sale 2** | **Sale 3** |
| Unadjusted price/lot | $65,000 | $55,000 | $60,000 |
| Property rights conveyed | × 1.00 | × 1.00 | × 1.00 |
| *Intermediate adjusted price* | *$65,000* | *$55,000* | *$60,000* |
| Financing terms | × 1.00 | × 0.95 | × 1.00 |
| *Intermediate adjusted price* | *$65,000* | *$52,250* | *$60,000* |
| Conditions of sale | × 1.00 | × 1.10 | × 1.00 |
| *Intermediate adjusted price* | *$65,000* | *$57,475* | *$60,000* |
| Market conditions (-2%/mo.) | × 0.86 | × 0.96 | × 0.88 |
| *Intermediate adjusted price* | *$55,900* | *$55,176* | *$52,800* |
| Location adjustment | ($4,000) | – | – |
| Average lot size adjustment | ($4,000) | – | ($4,000) |
| Lot premiums adjustment | – | – | – |
| Number of lots adjustment | – | ($7,000) | – |
| Subject by comparison | $47,900 | $48,176 | $48,800 |

BACK_DEFEXP-RR-002502

### How Much Data Is Enough?

Most appraisal assignments begin without full knowledge of how much data is needed. One school of thought would suggest that appraisers collect only as much data as needed to achieve the desired results. Subscribing to this theory requires an appraiser to be clear on that objective. In real estate appraisal, the objective is most commonly credible assignment results, and while appraisers understand the concept, at the beginning of an assignment they can be unclear about what will be needed to achieve that outcome.

Determining the appropriate amount of data for an assignment hinges on the concept of credible assignment results. Professional standards make it clear that credibility is always measured in the context of intended use. For example, the Scope of Work Rule of USPAP requires that an appraiser must "gather and analyze information about those assignment elements that are necessary to properly identify the appraisal, or appraisal review problem to be solved." Likewise, Standard 1 requires an appraiser to "correctly complete research and analyses necessary to produce a credible appraisal." Ultimately, the intended use of the assignment results is the key driver for nearly every decision an appraiser will make in the course of the assignment, which includes deciding how much data is enough.

Gathering data is not a one-time event. No one foray into the available sources will satisfy all the data requirements for a typical assignment. In many cases, a certain amount of basic data will be furnished by the client at the beginning of the assignment. Then the appraiser will perform research and gather initial data to form the foundation of the assignment. At this point, the appraiser still may not know where the assignment is ultimately going to lead, so the first round of data acquisition might have the primary benefit of informing subsequent research.

Appraisers should pause to assess the results of their research as they move from one round of research to another so they can understand the strengths and weaknesses of the data already in hand. At each phase of data research, appraisers should be asking questions such as

· What decisions are we trying to make with the data?
· What is the minimum amount of data needed to support those decisions?
· How much uncertainty in the resulting analysis of that data is acceptable?
· How much might the addition of one or two data points to an existing population of data change the results?

The more precision required in the analysis, the more likely that additional data will result in more reliable results. To make inferences about trends and patterns from data, it is almost always best to use the largest populations of data that can be assembled practically. However, an appraiser needs to balance the amount of work required to acquire additional data with the probable benefit to the analysis of that data.

The ultimate determination of how much data is enough becomes self-evident when an appraiser concludes an assignment with the confidence that the client, intended users of the assignment results, and the appraiser's peers will view the work as competently and professionally prepared and worthy of belief.

### Data Sampling

Appraisers rarely have access to all available information for use in their analyses. Even when an appraiser has conducted extensive research, sample information frequently must be used. Therefore, the principles and implications of sampling should be understood.

Appraisers frequently must deal with incomplete information. Research involves the collection of both specific data and sample data for analytical purposes. The data used by appraisers is seldom a random sample. To establish a framework for selecting and drawing a random sampling, strict requirements must be met. More often, appraisers deal with judgment samples, i.e., sample data that is selected on the basis of personal judgment and is thought to constitute a representative group. While certain statistical tests used with random samples cannot be applied to judgment samples, in many circumstances judgment samples can produce superior results. For example, data selected from five shopping centers by an experienced analyst may

BACK_DEFEXP-RR-002503

Copyrighted material licensed by Charles Brigden on September 17, 2020

be more comparable to the subject shopping center than a random sampling of data from a broader array of shopping centers.

The use of sample data has both strengths and weaknesses:

| Strengths | Weaknesses |
|---|---|
| · Samples are generally less expensive and more readily obtained than complete data. | · Sampling must be conducted carefully, and the data must be properly interpreted. If this is not done, the results can be inaccurate and misleading, cost more than they are worth, and be less reliable than they appear. |
| · Selected samples are sometimes more indicative than a broader survey. | |
| · Samples are easily tabulated, lend themselves to cross-referencing, and provide a foundation for statistical inference, including probability studies. | · Sampling requires special training and understanding. |
| · Often samples may be the only source of data available. | · Many people misunderstand or mistrust samples for a variety of reasons. |

Whether or not an appraiser conducts formal sampling, the extent to which sample data has been used should be considered in the analytical process. The risks associated with identified sample data and the uncertainties associated with other potential data must be considered.

Data samples may be particularly important when other data is scarce or when the available data is less applicable due to market changes. Sampling may be the only way to obtain some types of data. Samples are particularly important in

- Quantifying market demand
- Defining market characteristics
- Identifying market attitudes, perceptions, and motivations
- Analyzing market behavior
- Interpreting market activities and intentions

### Data Standards

As a rule, good quality data makes good analysis possible. The availability of standardized data makes more robust analysis possible and enhances research opportunities in a data-rich real estate environment. Data standards are essential for sharing quality data and ensuring that the data can be put to various uses by the many users of data within the broader real estate community. Furthermore, mundane tasks relating to the standardization of data sets are easily handled using the XML format that has become a de facto internet standard for passing data between systems. After industry standards organizations agree on semantic definitions and policies for their application, XML allows those definitions to become a common representation of the same data from different systems.

The standardization of property and transaction data across heterogeneous real estate markets and their respective information systems has lagged behind the implementation of data standards in many other industries. In recent years, the clients of appraisers have spearheaded the movement toward uniform data standards by demanding more consistency, efficiency, and transparency within the appraisal process. For example, in 2011 residential appraisers had to adapt to the new, standardized reporting requirements of the Uniform Appraisal Dataset (UAD), which was introduced for use in appraisals performed for conventional mortgage loans that will be sold to government-sponsored enterprises (GSEs) such as Fannie Mae and Freddie

BACK_DEFEXP-RR-002504

Mac. These requirements have also been adopted by the Federal Housing Administration (FHA) and the Veterans Administration (VA).

Although the GSEs have had long-established appraisal policies and requirements, the responsibility for ensuring compliance rested almost entirely with the loan seller (i.e., the lender). Upon delivery of a mortgage loan to either GSE, the lender "represented and warranted" to Fannie Mae or Freddie Mac that the lender had manufactured the loan in accordance with the respective GSE's requirements. However, almost no information about the collateral for that loan was transmitted—only the borrower name, property address, and loan-to-value ratio were delivered with the loan package. Under the "rep and warrant" model, if the loan subsequently went into default, Fannie Mae or Freddie Mac would then receive access to the full loan file for investigation. If it was determined at that point that the appraisal was faulty, the lender might be forced to buy back the loan from Fannie Mae or Freddie Mac and undertake the foreclosure process itself. In effect, the GSEs did not have access to any appraisal data at loan origination, and they only received appraisal data on defaulted loans.

Following the housing crisis in 2007, Fannie Mae began developing a new electronic appraisal delivery system that would require lenders to deliver the entire appraisal report in electronic form to Fannie Mae before the loan could be sold. When the Federal Housing Finance Agency became the conservator to both Fannie Mae and Freddie Mac, a larger data standards initiative for both GSEs was developed that led to the implementation of the Uniform Collateral Data Portal and the UAD requirements.

Two major standards groups have been involved in the development and dissemination of broader appraisal data standards predating the lending crisis that spurred the implementation of the UAD:

- The Mortgage Industry Standards Maintenance Organization (MISMO)
- OSCRE International (formerly the Open Standards Consortium for Real Estate)

The mortgage industry, an important driver in the broader real estate industry, has been working toward data standardization through the Mortgage Industry Standards Maintenance Organization, formed in 1999 as a nonprofit subsidiary of the Mortgage Bankers Association. In late 2009, the GSEs selected the MISMO Version 2.6 Valuation Response XML format as the basis for the UAD. The Open Standards Consortium for Real Estate brings together data standards from every sector of real estate. OSCRE International is different from MISMO in that MISMO's core focus is data standards specific to mortgage-related and real property reporting information, whereas OSCRE International goes beyond data standards into business process standards. MISMO and OSCRE International are working to establish common data terms so that, throughout the life cycle of a building, all parties are able to use terms consistently.

The state of data standards continues to mature with a primary goal of allowing for more appraisal content (i.e., property, improvement, and site data) to be addressed in a standard structure. The forthcoming MISMO Reference Model is expected to accommodate private appraisals, jumbo lending, GSEs, and government appraisals. While the current Version 2.6 of the MISMO Reference Model is centered on forms, the forthcoming Version 3.5 is expected to allow for more flexibility.

The release of Version 3.5 of the MISMO Reference Model is expected to be a significant milestone. GSEs plan to help appraisal software vendors make their software more comprehensive and normalize the existing boilerplate language to be more

BACK_DEFEXP-RR-002505

flexible to cover all intended uses. HUD/FHA and Fannie Mae are working with appraisers to develop a more secure appraiser signature and to prevent signature tampering. The UAD and appraisal forms are currently being redesigned.

Also, the Appraisal Institute has developed the Property Use Classification System (PUCS), a uniform classification system for the potential uses of real estate. PUCS supports a wide range of applications throughout the real estate industry and global economy, including software programs and database management systems used by real estate appraisers and appraisal firms.[1] National firms are also currently pursuing efforts to create their own databases to compete with CoStar, which is currently the dominant data source for certain property types in certain market areas.

Fannie Mae and Freddie Mac currently employ the Uniform Collaborative Data Portal (UCDP), through which lenders electronically submit residential appraisal reports for conventional mortgages. Using the UCDP, lenders can upload appraisal data and view edits and submission details.

## Types of Data Used in Real Estate Appraisal

Appraisers gathers data directly (primary data) and use data that has been gathered by outside sources (secondary data). The data that appraisers use in the valuation process can be characterized in two ways related to the function of the data:

- Macro-level data
- Micro-level data

Macro-level data consists of information about the social, economic, governmental, and environmental forces that affect property value in broad terms. This information is part of the background knowledge that appraisers bring to their practices. In contrast, micro-level data includes details about the specific property being appraised, sales and lease transactions of comparable properties, and local market characteristics relevant to the analysis of the subject property.

### Macro-Level Data

An appraiser working in a specific market on a daily basis will often have general data on file. All macro-level data is ultimately understood in terms of how it affects the economic climate in which real property transactions occur. Macro-level data is most frequently used in the analysis of a region or city and to a lesser degree in the analysis of a smaller market area. In analyzing macro-level data, appraisers observe the operation of appraisal principles by studying the interaction of the four forces that affect an area's property values. Although the four forces provide convenient categories for examining macro-level data, it is the interaction of those forces that creates trends and ultimately influences property value.

#### Economic Trends

Appraisers must recognize and understand the economic trends that affect the value of real property. It is not enough to know that economic changes have occurred. The probable direction, extent, impact, and cause of these changes must also be studied to identify and forecast trends.

---

1.  PUCS Version 1.0 is available on the "Professional Practice" section of the Appraisal Institute's website at www.appraisalinstitute.org.

BACK_DEFEXP-RR-002506

The particular trends considered by an appraiser vary with the appraisal problem and the type of real estate being appraised. (Table 9.2 lists useful economic indicators appraisers often track to analyze trends in the marketplace.) For example, to develop an opinion of the market value of a shopping center with the income capitalization approach to value, an appraiser must forecast the base rent and overage rent under a percentage lease.[2] The shopping center's total potential gross income depends on trends in the number of households in the trade area, the income of these households, and their typical expenditures on the goods and services supplied by the center's tenants. The availability of alternative shopping facilities in competitive markets also must be considered.

The national economy reflects the economic condition of the various geographic regions of the United States. The economic health of a region depends on the status of its economic activity, which in turn encompasses the economic activities in individual areas and communities within the region's geographic boundaries. Minor disruptions in the economic growth of one community may not appreciably affect the entire region if the regional and national economies are strong.

The extent to which an appraiser is concerned with the national or regional economy and the economy of the city or market area depends on the size and type of property being appraised. For example, a large regional shopping center that serves a trade area of 500,000 people and an automobile assembly plant that employs 5,000 workers may be more sensitive to the general state of the economy than medical-dental office buildings or retail service operations in suburban residential areas.

In the global economy, the economic well-being of one nation may directly and indirectly affect other nations. There is much foreign investment in US real estate, partly because the stability of the US government gives foreign investors some measure of protection. As a result, political instability in other countries can influence the demand for, and value of, real estate in the United States.

International economic trends can have significant effects on local economies and specific real estate markets. For example, the status of the Asian economy can affect the level of international trade, which in turn has a major impact on the economy of Pacific Rim port cities (and perhaps the demand for warehouse space). Increasingly, trends in international financing can influence local real estate markets as well. In the 1980s, using financing techniques unavailable to American investors, Japanese investors could pay inflated prices for prestigious properties in Hawaii and California, including most of the luxury hotel rooms in Hawaii. At the time, real estate appraisers in Hawaii had to provide two different values reflecting the influence of Japanese investment practices (often without the benefit of a pro forma statement, lease analysis, or market study) and traditional US lending practices. The collapse of the Japanese economy, due in part to bad loans made by Japanese banks, eventually caused prices in the Hawaiian real estate market to plunge, with Japanese investors losing billions of dollars on their investments.

The state of the national economy is basic to any real estate appraisal. Financial institutions must compete for funds to lend, not only with one another but also with money market mutual funds and other investments. Lending rates reflect this ongoing competition, and demand in the market adjusts itself accordingly.

Federal programs and tax policies can affect the value of real estate. The Tax Reform Act of 1986 eliminated many of the tax advantages of owning property by

---

2.   See Chapter 23 for the definitions of *percentage lease*, *base rent*, and *overage rent*.

BACK_DEFEXP-RR-002507

| Table 9.2 | Economic Trends and Useful Economic Indicators |
| --- | --- |
| **Trends** | **Useful Economic Indicators** |
| International economic trends | Changes in: <br>· Balance of foreign trade <br>· Rates of foreign exchange <br>· Commodity price levels <br>· Wage levels <br>· Interest rates <br>· Industrial production levels <br>· Volume of retail sales |
| National and regional economic trends | Changes in: <br>· Gross national product <br>· Gross domestic product <br>· National income <br>· The balance of payments to other nations <br>· Price level indexes <br>· Interest rates <br>· Aggregate employment and unemployment statistics <br>· The number of housing starts and building permits issued <br>· Other macro-level data <br><br>Note: A time series of economic indicators, which describes and measures changes or movements over a period of time, may reveal fluctuations in long-term trends and help put current statistics in perspective—i.e., help determine the current position of the economic cycle. |
| Local economic trends | Changes in: <br>· Population <br>· Net household formation <br>· The diversity of the economic base of the community <br>· The level and stability of employment <br>· Wage rates <br>· Household or family income |
| Economic trends affecting rural land | Changes in: <br>· Size and complexity of business operations in farming, ranching, timber harvesting, drilling, or mining <br>· Level of mechanization or labor intensiveness <br>· Degree of dependence on government subsidies or government leased land <br>· Prospective competition from imports |

modifying the Accelerated Cost Recovery System, which often allowed a property to contribute more value as a tax shelter than as an operating business. Along with modification of Section 1031 of the Internal Revenue Code in 1984, the Tax Reform Act encouraged "like-kind" exchanges.[3] The 1031 exchange program allows a property owner to defer capital gains taxes if real property is exchanged for other real property, within certain limitations as defined in the code. The sale price of a compa-

3.   See also Jack P. Friedman and Jack C. Harris, "Tax Reform Encourages 1031 Exchanges: What the Appraiser Should Know About Section 1031," *The Appraisal Journal* (January 1987): 79-93, and Joel Rosenfeld, "Section 1031—Tax-Deferred Exchanges: Real Estate's Best-Kept Secret for Tax Relief," *Real Estate Issues* (Winter 2000/2001): 12-16.

BACK_DEFEXP-RR-002508

rable property involved in a 1031 exchange may have to be adjusted to reflect the tax savings of that transaction as compared to a traditional sale.

To understand how national and even international economic trends influence property value, an appraiser studies how the region and community where the subject property is located may respond to these trends. The appraiser should examine the economic structure of the region and the community, the comparative advantages that each possesses, and the attitudes of local government and residents toward growth and change. For example, the increasing number of elderly households in the United States is less significant to property values in Minnesota than to values in Sunbelt states, which attract more retirees. A community with a no-growth policy may have substantially different local demographics and economic potential than one that does not discourage growth.

Regional economies influence local market conditions, but local markets do not necessarily parallel regional markets. Macroeconomic studies, which are concerned with broad areas such as cities and regions, are important to understanding real estate and real estate trends. These studies should not be confused with microeconomic studies, which appraisers perform to evaluate the factors influencing the market value of a particular real estate parcel. For example, regional trends may suggest an expected increase in population, but the local data available to the appraiser may indicate that the particular area will not benefit from this trend. While both studies are important, local trends are more likely to influence property values directly.

Appraisers of rural land should understand the links between the local rural economy, the regional economic base (agricultural, extractive, or recreational), and the national economy as well as the encroachment of suburban and urban land uses on rural land. The subject property should be analyzed in relation to comparable properties in the immediate agricultural, mining/drilling, or recreational district.

Climatic data can be important in analyzing many rural land uses. A drought in a grain-producing area or icy conditions in a citrus-growing region can have economic repercussions beyond disrupting local agricultural production. Tourism and recreational uses of rural land may be affected by the severe weather, and restaurants and hotels in the region may be forced to raise prices to keep up with the rising cost of food.[4]

### Demographics

The population of a market and its geographic distribution are basic determinants of the need for real estate. Real estate improvements are provided in response to the demand generated by a population with effective purchasing power. A household—i.e., persons who occupy a group of rooms or a single room that constitutes one housing unit—imposes a basic demand for housing units. In analyzing a local housing market, knowledge of trends in the formation of households and household characteristics is crucial. The age, size, income, and other characteristics of households must be considered to determine the demand for housing.

Two demographic categories generate demand for two different types of space:

1. Households generate demand for space designed to fulfill basic human needs such as the need for housing and retail and medical services.
2. Employment generates demand for warehouse, industrial, office, and retail space used in producing goods and services.

---

4. For further discussion of trends affecting rural property, see *Rural Property Valuation* (Chicago: Appraisal Institute, 2017).

BACK_DEFEXP-RR-002509

Copyrighted material licensed by Charles Brigden on September 17, 2020

Often households and employees generate demand for the same type of space, such as medical research and development space.

The demand for commercial and industrial real estate is created by a population's demand for the goods and services to be produced or distributed at these sites. Appraisers must be aware of changes in the characteristics and distribution of the population that consumes goods and services as well as changes in the workforce that produces them. A changing population, coupled with technological advances, can rapidly alter the demand for the services provided by property, which can affect property value. (See Chapters 15 and 16 for more discussion of economic base analysis and how appraisers use employment data in estimating supply and demand.)

> **household**
> A number of related or unrelated persons who live in one housing unit; all the persons occupying a group of rooms or a single room that constitutes one housing unit. A single person, a couple, or more than one family living in a single housing unit may make up a household.

### Government Regulations

To develop an opinion of value properly, an appraiser should understand the government regulations and actions that affect the subject property. The comparable properties selected for analysis should be similar to the subject property in terms of zoning and other characteristics.

In response to social attitudes, the government establishes land use regulations and provides public services such as transportation systems and municipal utilities. Information on zoning, master plans, environmental impacts, transportation systems, local annexation policies, and other regulations reveals governmental and social attitudes toward real estate.

### Trends in Building Activity

A property's value as of a specific date may rise or fall due to fluctuations in building activity. Housing starts and the construction of commercial and industrial properties fluctuate in response to business cycles, political events, and the cost and availability of financing. These fluctuations follow the long-term trend of new construction. Short-term fluctuations result in temporary misallocations of supply, which can depress rents and prices.

The standing stock of housing units at any point in time consists of all units, occupied and vacant. The stock is continually altered by the construction or conversion of units in response to developers' perceptions of the demand for new housing and by the need to replace existing units.

Many months or even several years may pass between the time a developer decides to supply units and the time those units enter the market. During this period, changing conditions may reduce demand, and the units coming on the market may remain unrented and unsold, thus increasing vacancy rates. Developers may continue to produce additional units for some time, even in the face of rising vacancies. Once these excess units are produced, they remain on the market and can depress rents or prices until demand increases to remove the surplus. When the market tightens, the supply of units lags behind the increase in demand, resulting in abnormally low vacancy rates and upward pressure on rents and prices. Ultimately, supply increases as developers respond to increased demand.

BACK_DEFEXP-RR-002510

Fluctuations in the local supply of and demand for real estate (i.e., the life cycle of the market area) are influenced by regional and national conditions. Therefore, an appraiser looks for regional and national trends that may indicate a positive or negative change in property values at the local level. Although all regions may not experience the same slump in construction, tight monetary policy affects the cost and availability of mortgage credit and exerts a moderating influence on supply, even in a rapidly growing region.

Commercial real estate is affected by business conditions and the cost and availability of financing. Because business firms pass their high financing costs on to consumers, residential construction may be restricted. If the demand for the goods and services produced or supplied by a business remains strong, the firm can raise prices and continue to expand even when credit is tight and interest rates are high.

### Building Costs

The cost of replacing a building tends to follow the general price levels established over a long period, but these price levels vary from time to time and from place to place. Building costs generally decline or stabilize in periods of deflation and increase in periods of inflation. These costs are affected by material and labor costs, construction technology, architect and legal fees, financing costs, building codes, and public regulations such as zoning ordinances, environmental requirements, and subdivision regulations.

Construction costs can alter the quantity and character of demand and, therefore, the relative prices of property in real estate submarkets. The high cost of new buildings increases the demand for, and prices of, existing structures. When the cost of new structures increases, rehabilitation of existing buildings may become economically feasible. High building costs increase prices in single-unit residential submarkets, which can influence the demand for rental units and their prices. The size and quality of the dwelling units demanded decrease when building costs increase more rapidly than purchasing power.

Cost services such as Marshall & Swift/CoreLogic, RS Means, and others are the primary sources of information on building costs. Appraisers can also collect information on building costs from properties that have been developed in a market area. (Chapter 30 covers building cost estimates in more detail.) Primary data collected by an appraiser qualifies as micro-level data about a property rather than macro-level data about the market.

### Taxes

Real estate taxes are levied by municipalities (cities, townships, or counties) and taxing districts (i.e., school, fire, water, and local improvement districts). The taxing body reviews the annual budget to determine the amount of money that needs to be raised. After revenues from other sources (such as sales or income taxes, state or federal revenue sharing, and interest on investments) are deducted, the remaining funds must come from property taxes. Assessing officers estimate the value of each parcel of real estate in the jurisdiction periodically. Real estate taxes are based on the assessed value of real property, hence the term *ad valorem* ("according to value") *taxes*. The assessed value of property is normally based on, but not necessarily equivalent to, its market value. The objective of tax assessment is the equitable distribution of the tax burden based on real property value, but tax assessors do not attempt to develop opinions of value for specific parcels of property for use outside of ad valorem taxation.

BACK_DEFEXP-RR-002511

Copyrighted material licensed by Charles Brigden on September 17, 2020

The ratio of assessed value to market value is called the *common level ratio* or *assessment ratio*. (The *millage rate* refers to the taxes as a percentage of assessed value.) If, for example, the tax rate is $60 per $1,000 of assessed value and the assessment ratio is 50% of market value, then the annual real estate tax (or effective tax rate) equals 3% of market value:

$$\$60/\$1,000 \times 50\% = 3\%$$

If assessed value is not based on market value, the formula is modified to reflect the difference. An effective tax rate can also be calculated by dividing the total amount of taxes by the market value of the property. Effective tax rates can be used to compare the tax burden on properties.

In jurisdictions where ad valorem real estate tax assessments have an established or implied relationship to market value, appraisal services may be required to resolve tax appeals. In some communities, the trend in real estate taxes is an important consideration. In cities where public expenditures for schools and municipal services have increased, a heavy tax burden can cause real estate values to decline. Under these circumstances, new construction may be discouraged. There may be several tax districts in a metropolitan area, each with a different policy. Understanding the system of ad valorem taxation in an area facilitates an appraiser's analysis of how taxes affect value.

Different levels of sales taxes, personal property taxes, and taxes on earnings can also affect the relative desirability of properties. Although these taxes may be uniform within a state, properties in different states often compete with one another. To attract new residents and industries, a state may impose taxes that are lower than those of surrounding states. This may increase demand and enhance property values in the state relative to values in bordering states. For example, consider two adjacent states competing for the location of a commercial printing operation. The printing company owns machinery and equipment worth millions of dollars that may be taxed as personal property rather than real property, which is more often the case for industrial operations than for commercial operations. The state that does not have a personal property tax would be a more attractive location than the state that levies a personal property tax.

In many areas there are legal provisions that allow a municipality or other government entity to provide assistance to developers who develop certain properties in tax increment financing, or TIF, districts. The government or developer is allowed to borrow money for infrastructure improvements and use the future real estate taxes from the new building(s) to make loan payments. This allows the government to promote development in areas that are considered disadvantaged or "blighted" and would not otherwise be developed. The taxes from the new buildings are transferred to pay off the debt rather than being used for schools, police, parks, and libraries. The assumption is that if it were not for the TIF incentive, development would not occur.

### Financing

The cost of financing includes the interest rate and any points, discounts, equity participations, or other charges that the lender requires to increase the effective yield on the loan. Financing depends on the borrower's ability to qualify for a loan, which may be determined based on the loan-to-value ratio, the housing expense-to-income ratio allowed for loans on single-unit homes, and the debt coverage and break-even

BACK_DEFEXP-RR-002512

ratios required for loans on income-producing properties. (These ratios are discussed in Chapter 25.) The cost and availability of financing typically have an inverse relationship. High interest rates and other costs usually result in a decrease in the demand for credit and the number of borrowers able to qualify.

The cost and availability of credit for real estate financing influence both the quantity and quality of the real estate demanded and supplied. When interest rates are high or mortgage funds are limited, households that would have been in the home ownership market find that their incomes cannot support the required expenses. Purchases are delayed and smaller homes with fewer amenities are bought. The cost of financing for land development and construction is reflected in the higher prices asked for new single-unit homes, and higher prices reduce the quantity of homes demanded.

The rental market is affected by the demand pressure of households that continue to rent and by the high cost of supplying new units, which results in part from financing costs. Occupancy rates and rents rise. Businesses try to pass on their higher occupancy costs to customers by increasing the prices of their products or services. If they cannot fully recover the increased occupancy cost, the value of these properties will decline or the quantity of commercial and individual space supplied will be reduced.

In 2019, Fannie Mae and Freddie Mac launched the Uniform Mortgage-Backed Security (UMBS) in an effort to improve the US housing finance system and to lower mortgage rates. This initiative unifies Fannie Mae and Freddie Mac's separate mortgage-backed securities and requires the GSEs to align their policies, programs, and practices that influence cash flows to the holders of these securities. This is expected to have a far-reaching impact on the mortgage market.

## Micro-Level Data

In appraisals, micro-level data is used to determine highest and best use and to make the specific comparisons and analyses required to develop an opinion of value. The micro-level data about a subject property provided in land and building descriptions helps an appraiser select other micro-level data pertaining to comparable sales, rentals, construction costs, and specific characteristics of the local market that influence the value of the subject and comparable properties.

At the conclusion of the analysis of macro-level data, appraisers need to clearly spell out what this data and analysis means or implies for the specific market and property being valued. The same process is used in gathering comparable sales data, analyzing the data, and indicating what it means in relation to an opinion of value for the subject property. From relevant comparable sales, an appraiser extracts specific sale prices, rental terms, income and expense figures, rates of return on investment, construction costs, estimates of the economic life of improvements, and rates of depreciation. These figures are used in calculations that lead to an indication of value for the subject property.

An appraiser needs micro-level data to develop each of the three approaches to value. An appraiser uses the data to derive adjustments for value-influencing property characteristics, to isolate meaningful units of comparison, to develop capitalization rates, and to measure depreciation. By extracting relevant data from the largest quantity of data available, an appraiser develops a sense of the market. This perception is an essential component of appraisal judgment, which is applied in the valuation process and in the final reconciliation of value indications.

BACK_DEFEXP-RR-002513

Copyrighted material licensed by Charles Brigden on September 17, 2020

Micro-level data is analyzed through comparison. In each approach to value, certain items of information must be extracted from market data to make comparisons. Micro-level data is studied to determine if these items are present or absent and if they can be used to make reliable comparisons with the subject property. This sort of data can include information about properties that have sold as well as properties that have not sold or are under contract for sale but have not yet closed. If, for example, the subject property is an apartment building, an appraiser could use sales of other apartment buildings to support adjustments for changes in market conditions, locational differences, or the contribution of various physical characteristics. Apartment buildings that have not sold can also be used to obtain information on rental rates and expenses.

An appraiser's analysis of the highest and best use of the land as though vacant and the property as improved determines what comparable micro-level data is collected and analyzed. The comparable properties should have the same or a similar highest and best use as the subject property. The nature and amount of research needed for a specific assignment depend on the property type, the purpose of the appraisal, and the complexity of the required analysis—in other words, the scope of work of the assignment.

Of particular significance to the analysis are the supply of competitive properties, the future demand for the property being appraised, and its highest and best use. After inspecting the subject property and gathering property-specific data, appraisers inventory the supply of properties that constitute the major competition for the subject property in its defined market.

### Competitive Supply Inventory

The supply inventory includes all competitive properties, whether the market in question involves rental units (i.e., properties that meet the needs of space users) or properties that have been sold or are being offered for sale (i.e., properties that meet the needs of investors or owner-users). The subject property will also have to be able to compete in a future market. Therefore, an appraiser's investigation of the supply inventory often must cover not only existing competition but also prospective projects that will compete with the subject property.

### Measures of Demand

Along with the supply inventory of major competitive properties, appraisers analyze the prospective demand for the subject property. An appraiser cannot assume the current use is necessarily the use for which the most demand will exist in the future. Even in the most stable markets, subtle shifts in the market appeal or utility of a category of properties can put some properties at a competitive disadvantage and benefit others. Even in volatile markets characterized by rapid changes due to factors such as accelerating growth, precipitous decline, or an upturn in proposed construction, appraisers need to quantify demand in some manner.

The specific techniques applied to study market demand can be highly sophisticated and may fall outside the scope of normal appraisal practice. In some cases an appraiser might use data compiled by special market research firms (proprietary data) to supplement the appraisal. All appraisers should, however, develop an understanding of market research techniques and acquire the skills needed to conduct basic demand studies. (For further discussion of market research and analysis techniques,

BACK_DEFEXP-RR-002514

see Chapters 15 and 16.) Of course, the data included in an appraisal report should be directly relevant to the property being appraised and the market in which the property competes. Appraisers should take care to include relevant data in the report and leave out irrelevant information. For example, a client would be understandably annoyed with a report prepared to value an apartment property that includes a detailed market analysis of retail and office properties but only a cursory analysis of the market for apartment properties. Similarly, a single-tenant, owner-occupied property should not be valued using multitenant comparable properties. Great care should be exercised when importing data into a report from the workfile of a previous assignment to make sure that the imported information is relevant to the current assignment.

## Data Sources and Verification

While many sources for macro- and micro-level data remain largely unchanged, the manner in which appraisers go about gathering and organizing data has been transformed by the digital age. The time and effort appraisers once spent locating property and transaction data and managing that data in various formats is now more often devoted to ordering data and eliminating unnecessary or irrelevant data from the readily accessible pools. In many ways, the current availability of certain data poses a greater challenge and requires sharper skills than the skills required to find similar data prior to the internet. Finding relevant data in small data sets is considerably easier than eliminating irrelevant data from seemingly endless data sets.

> The terms of use stipulated by data sources may vary, so appraisers should be aware of any limitations a specific vendor may place on the use of data. Likewise, appraisers who purchase data should be aware of any disclaimers related to the accuracy of the data and responsibility for errors resulting from the use of the data.

Computing power has also been growing at exponential rates. Software solutions and computers powerful enough to run them were previously only available to major companies with big budgets, but now they are affordable and ubiquitous. Organizing, summarizing, and describing large quantities of data is required to remain competitive in the current marketplace, and fortunately the tools needed are available, affordable, and relatively easy to use.

### Sources of Macro-Level Data

The macro-level data needed to appraise real property is available from a wide variety of sources. A substantial amount of information is compiled and disseminated by federal, state, and local agencies. Trade associations and private business enterprises may also provide data. Table 9.3 lists some common sources of macro-level data.

Macro-level data is an integral part of an appraiser's office files. Data obtained from various sources can be cataloged and cross-indexed. Macro-level data such as multiple listing information and census data can be accessed by computer. Many local and regional planning and development agencies computerize the following information by geographic area:

- Housing inventory and vacancies
- Demolitions and conversions
- Commercial construction
- Household incomes

BACK_DEFEXP-RR-002515

| **Table 9.3** | **Commonly Used Sources of Macro-Level Data** |
|---|---|

**Council of Economic Advisors**

| | |
|---|---|
| Publication | *The Economic Report of the President* |
| Information Available | Information on |
| | · The labor force, employment, and industrial production |
| | · Tax policy |
| | · Technology |
| | · Government regulation |
| | · Income |
| Where To Find It | www.whitehouse.gov/wp-content/uploads/2019/03/ERP-2019.pdf |

**Federal Reserve Board**

| | |
|---|---|
| Publication | *Federal Reserve Bulletin* |
| Information Available | Information on |
| | · Gross national product |
| | · Gross domestic product |
| | · National income |
| | · Mortgage markets |
| | · Interest rates |
| | · Installment credit |
| | · Sources of funds |
| | · Business activity |
| | · The labor force, employment, and industrial production |
| | · Housing and construction |
| | · International finance |
| Where To Find It | www.federalreserve.gov/publications.htm |

**Federal Housing Finance Agency**

| | |
|---|---|
| Information Available | Information on residential market conditions |
| Where To Find It | www.fhfa.gov |

**National Vital Statistics System**

| | |
|---|---|
| Publications | *National Vital Statistics Reports* |
| Information Available | Statistics on birth and death rates |
| Where To Find It | www.cdc.gov/nchs/nvss/index.htm |

**US Department of Commerce, Census Bureau**

| | |
|---|---|
| Publications | *American Community Survey Data Briefs* |
| | *American Community Survey Reports* |
| | *Census of Agriculture* |
| | *Census of Population and Housing* |
| | *Consumer Income* |
| | *Household Economic Studies* |
| | *Population Characteristics* |
| | *Population Estimates and Projections* |
| Information Available | · Current population |
| | · Population estimates |
| | · Population projections |
| | · Consumer income |
| | · Housing completions |
| | · Housing permits |
| | · Other housing statistics |
| | · Operational and performance data for American businesses |
| Where To Find It | www.census.gov/library/publications/time-series.html |

**US Department of Commerce, Bureau of Economic Analysis**

| | |
|---|---|
| Publication | *Survey of Current Business* |
| Information Available | · Consumer Price Index |
| | · Wholesale price index |
| | · Data on mortgage debt |
| | · Value of new construction |
| Where To Find It | https://apps.bea.gov/scb/index.htm |

**US Department of Housing and Urban Development**

| | |
|---|---|
| Information Available | · Reports on FHA building starts, financing, and housing programs administered by the department |
| | · FHA vacancy surveys for selected metropolitan areas |
| Where To Find It | www.hud.gov |

BACK_DEFEXP-RR-002516

| Table 9.3 | Commonly Used Sources of Macro-Level Data *(continued)* |
|---|---|

**US Department of Labor, Bureau of Labor Statistics**

| | |
|---|---|
| Publication | *Monthly Labor Review* |
| Information Available | · Consumer Price Index |
| | · Wholesale prices |
| | · Monthly and annual employment and earnings figures |
| Where To Find It | http://stats.bls.gov/opub/mlr/mlrhome.htm |

**State and local departments of development, local and regional planning agencies, the state demographer, and regional or metropolitan transportation authorities**

| | |
|---|---|
| Publications | Often these agencies publish directories of manufacturers that list, by county, the names of firms, their products, and their employment figures as well as other reports. |
| Information Available | Information on |
| | · Population |
| | · Households |
| | · Employment |
| | · Master plans |
| | · Present and future utility |
| | · Transportation systems |
| Where To Find It | Use online search engines to search for relevant terms such as "economic development," formal names of various local agencies, or national associations of applicable agencies such as the National Association of Regional Councils (www.narc.org) and the Association of Metropolitan Planning Organizations (www.ampo.org). |

**State bureaus of employment service or state bureaus of labor**

| | |
|---|---|
| Publications | Research reports on various topics, such as Workforce Analysis by Jobs (published by Ohio Labor Market Information) and PA Quarterly Workstats (published by the Pennsylvania Center for Workforce Information and Analysis) |
| Information Available | County data on |
| | · Employment |
| | · Unemployment |
| | · Wage rates |
| Where To Find It | Use online search engines to search for relevant terms such as "economic development" or formal names of state bureau of employment or labor. |

**Chambers of commerce**

| | |
|---|---|
| Publications | Publications related to local business and demographics, e.g., the *Monthly Economic Indicators* reports (published by the Austin Chamber of Commerce) |
| Information Available | Information, often obtained from secondary sources such as the census, on |
| | · Local population |
| | · Households |
| | · Employment |
| | · Industry |
| Where To Find It | Use online search engines to search for relevant terms such as "population statistics" or formal names of local chamber. |

**Real estate associations such as the American Real Estate Society (ARES), the American Society of Appraisers (ASA), the American Society of Farm Managers and Rural Appraisers (ASFMRA), the Appraisal Institute, Building Owners and Managers Association (BOMA) International, The Counselors of Real Estate (CRE), the International Association of Assessing Officers (IAAO), the Mortgage Bankers Association (MBA), the National Association of Realtors (NAR) and its affiliates, and the Urban Land Institute (ULI)**

| | |
|---|---|
| Publications | Many publications with data useful to appraisers |
| | · *Journal of Real Estate Research* |
| | · *Valuation* |
| | · *BOMA Industrial Experience Exchange Report* |
| | · *BOMA Office Experience Exchange Report* |
| | · *Real Estate Issues* |
| | · *Assessing Info* |
| | · *Urban Land Magazine* |
| | · *Realtor Magazine* |

BACK_DEFEXP-RR-002517

Copyrighted material licensed by Charles Brigden on September 17, 2020

| Table 9.3 | Commonly Used Sources of Macro-Level Data *(continued)* |
|---|---|
| Information Available | Information on<br>· National and regional economic indicators<br>· Existing home sales for the nation as a whole and for individual regions<br>· Office vacancy rates |
| Where To Find It | www.aresnet.org<br>www.appraisers.org<br>www.asfmra.org<br>www.appraisalinstitute.org<br>www.boma.org<br>www.cre.org<br>www.iaao.org<br>www.mba.org<br>www.nar.realtor<br>www.houselogic.com<br>www.uli.org |
| **National Association of Home Builders** | |
| Publications | *Best in American Living*<br>*Eye on Housing*<br>*Eye on the Economy* |
| Information Available | Information, by county and for selected cities, on<br>· New housing starts<br>· Prices<br>· Construction costs<br>· Financing<br>· Households<br>· Income distribution<br>· Retail sales |
| Where To Find It | www.nahb.org |
| **Private sources such as banks, utility companies, university research centers, private advisory firms, multiple listing services, and cost data services** | |
| Publications | White papers and research reports |
| Information Available | Information on<br>· Bank debt<br>· Department store sales<br>· Employment indicators<br>· Land prices<br>· Corporate business indicators<br>· Mortgage money costs<br>· Wage rates<br>· Construction costs<br>· Deeds<br>· Mortgage recordings<br>· The installation of utility meters |
| Where To Find It | Utilities<br>· www.utilityconnection.com<br>University research centers<br>· https://robinson.gsu.edu/research/<br>· www.lincolninst.edu/research-data/data-toolkits<br>· https://wsb.wisc.edu/faculty-research/academic-departments/real-estate/featured publications |

- New land use by zoning classification
- Population and demographics
- Housing forecasts

In recent years, many databases have been developed for online access to information. Such databases cover a broad range of topics and offer many options to

BACK_DEFEXP-RR-002518

appraisers performing general or specialized research. The information available is virtually unlimited and includes topics such as

- Current and historical news
- Industry analyses and reports
- Corporate earnings and analyses
- Local, regional, and national Yellow Pages listings
- Publication indexes and articles

Developments in computer software and hardware have resulted in low-cost, high-performance database combinations for appraisers. Some databases are contained in a single computer, while others are shared by several computers through local networks or are stored in and accessed through cloud storage services (i.e., virtual data storage space usually through a third party). Ongoing improvements in telecommunication programs and facilities, word processing, and electronic spreadsheets have facilitated appraisal analysis and report writing, as has convenient, stable, and secure access to database information.

### Sources of Micro-Level Data

Like sources of macro-level data, sources of micro-level data are diverse. Real property appraisal assignments almost invariably begin with a web search (e.g., using Google, Bing, Yahoo, or another search engine) for the subject property by address, tax parcel number, or building name, if applicable. The advent of single-property websites for residential and commercial real estate marketing and building websites directed at tenants and the communities served by the building's tenants can by themselves provide a tremendous amount of micro-level data. These sites are useful places to launch a larger search for micro-level data.

In addition to the data obtained from public records and published sources, personal contact with developers, builders, brokers, financial and legal specialists, property managers, local planners, and other real estate professionals can provide useful information. Practicing appraisers need communication skills as well as analytical techniques to research sales, improvement costs, and income and expense data thoroughly in performing appraisal assignments. Table 9.4 lists some commonly used sources of micro-level data.

### Public Records

Appraisers search public records for a copy of the property deed to the subject or comparable properties as needed. In most jurisdictions, public property records can now be searched electronically. The deed provides important information about the property and the sales transaction, including the full names of the parties involved, the transaction date, and a legal description of the property. The property rights included in the transaction and any outstanding liens on the title may also be indicated in some areas. Note that an appraiser who develops an opinion of market value must report and *analyze* all sales of the subject property that occurred in the three years prior to the date of value.[5] Any agreements of sale (contracts), options, or listings that

---

5. The emphasis in Standard 1 of the Uniform Standards of Professional Appraisal Practice is to "correctly complete research and analyses necessary to produce a credible appraisal." The requirement in that standard to research and analyze sales within the three years prior to the effective date of the appraisal is a minimum period. In some situations, researching, analyzing, and reporting a longer history will be necessary to produce credible assignment results.

BACK_DEFEXP-RR-002519

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 115 of 722    Page
ID #16339

**Table 9.4**    Sources of Micro-Level Data

| | |
|---|---|
| CBRE<br>www.cbre.us | Corporate real estate services site with listing information as well as local market research reports |
| Colliers International<br>www2.colliers.com/en | Corporate real estate services site with listing information as well as local market research reports |
| CoStar<br>www.costar.com | Database of researched information including properties for sale, properties for lease, verified comparable sales transactions, and tenant information. Subscription basis. |
| Cushman & Wakefield<br>www.cushmanwakefield.com | Corporate real estate services site with listing information as well as local market research reports |
| Jones Lang LaSalle (JLL)<br>www.us.jll.com/en | Corporate real estate services site with listing information as well as local market research reports |
| LoopNet<br>www.loopnet.com | Site with listing and sales information. Some free; some subscription based. |
| Marcus & Millichap Real Estate Investment Services<br>www.marcusmillichap.com | Corporate real estate services site with listing information as well as local market research reports |
| NAI Global<br>www.naiglobal.com | Corporate real estate services site with listing information as well as local market research reports |
| RealtyRates.com<br>www.realtyrates.com | Commercial real estate investment, financial and market rates and returns for properties across the United States. Some free survey data and some by subscription only. |
| Reis, Inc. (Real Estate Solutions by Moody's Analytics)<br>www.reis.com | Commercial real estate performance information and analysis at the metro (city), submarket (neighborhood), and property level. Includes some sales data, rental data, new construction data, real estate market information, and other data. Subscriptions for a fee. Appraisal Institute members get a discount. |
| Site to Do Business<br>www.stdb.com | Demographic data with robust reporting and analytical tools. The company has different subscription levels with one free for Appraisal Institute members and a more complete use of the site for a fee. |
| Transwestern<br>www.transwestern.net | Corporate real estate services site with listing information as well as local market research reports |

are current as of the date of appraisal also must be analyzed. Of course, listing the sales or other agreements is just a start. Analyzing this data will be explored in depth in the discussion of the sales comparison approach in subsequent chapters.

Occasionally the names of the parties may raise a concern that unusual motivations were involved in the sale. For example, a sale from John Smith to Mary Smith Jones may be a transfer from a father to a daughter. A sale from John Smith, William Jones, and Harold Long to the SJL Corporation may be a change of ownership in name only, not an arm's-length transaction arrived at by unrelated parties under no duress.

In some states the law requires that the consideration paid upon transfer of title be shown on the deed. However, this consideration does not always reflect the actual sale price. Although some states require that the actual consideration be listed on the deed, other states—i.e., nondisclosure states—allow the consideration to be reported as "$10 and other valuable consideration."

The local tax assessor's records may include property data for the subject property and comparable properties, with land and building sketches, area measurements, sale prices, and other information. In some locations, legal or private publishing

BACK_DEFEXP-RR-002520

**listing**

A written contract in which an owner employs a broker to sell his or her real property.

**offer**

A set of terms presented by the bidder or prospective buyer or tenant that are subject to negotiation. If the other party, a seller or landlord, accepts these terms, the offer will result in a contract.

services issue information about revenue stamps and other facts pertaining to current property transfers.

### Listings and Offerings

Whenever possible, an appraiser should gather information about properties offered for sale. An appraiser can request to be added to the mailing lists of banks, brokers, and others who offer properties for sale. Advertisements of listed properties suggest the strength or weakness of the local market for a particular type of property and the sales activity in a particular area. Information on purchase offers may also be obtained from brokers or managers. Listings usually reflect the upper limit of value, while offers commonly set the lower limit of value.

Listings and offerings can be useful indicators of the values anticipated by sellers and buyers and reflect the likely turnover of competitive properties. Listings are usually set at a level that will excite market interest and therefore may be employed to test market activity. They are relevant market phenomena that appraisers consider in analyzing competitive supply and demand. An appraiser may find that tabulating information about competitive properties in a market data grid facilitates comparing the market position of the subject property to that of the competition.

Every major market in the United States is served by a multiple listing service (MLS). In this digital age, all MLS data is published electronically. An MLS primarily contains data on residential properties listed for sale during the calendar year or fiscal quarter and cites their listing prices. The service will contain fairly complete information about these properties, including descriptions and brokers' names. However, details about a property's square footage, basement area, or exact age may be inaccurate or excluded. In certain areas, access to the multiple listing service or electronic databases can be purchased. Multiple listing services sometimes publish the sale prices of properties that have been sold. In the past, only a small percentage of commercial, industrial, or special-purpose properties were included in traditional MLS databases, but more recently commercial MLS systems have proliferated through the efforts of commercial boards of Realtors.

There have been some limited mergers of MLS organizations that overlap or share members, but the impetus for large-scale mergers in this area has been limited by competitive concerns and potential issues cited by the US Department of Justice. Large national brokerage companies such as Realogy and Re/Max have aggregated a variety of disparate data on a national level and made this information available to consumers. In 2008, the National Association of Realtors established the Realtors Property Resource, a national database of property information available only to members of the organization. Unfortunately, competition among aggregators to amass the largest number of listings may lead to poor quality data, i.e., institutional emphasis on quantity over quality control increases the likelihood of duplicates, dated information, and incorrect information in the databases.

The potential for misuse of pooled data is a concern. Ensuring the confidentiality of certain information in real property transactions is a continuously evolving issue. Both the Uniform Standards of Professional Appraisal Practice and federal legislation

BACK_DEFEXP-RR-002521

Copyrighted material licensed by Charles Brigden on September 17, 2020

such as the Gramm-Leach-Bliley Act of 1999 set forth privacy requirements regarding confidential information. Certain shared databases allow for restricted access to certain fields within data records deemed confidential by the contributor of the data; other databases only pool data that is not considered confidential.

Currently, the dominant trend in this area is the increased exposure of data to the public. Zillow, Trulia, Redfin, and Realtor.com (among others) are increasingly making data that was formerly guarded by companies such as Re/Max and Realogy available to consumers. This empowerment of consumers is expected to continue to drive a move toward less restricted data access.

Advances in artificial intelligence (AI), blockchain databases, and automated valuation models (AVMs) have the potential to transform real estate appraisal. Blockchain databases allow for data sharing in a decentralized "peer-to-peer" network. Advances in AI and AVMs will increase the amount of available data, the speed at which the data can be accessed, and the ways that the data can be sorted and narrowed down by specifications. General technological advances will also make accessing this data easier on more compact and lightweight devices. In general, appraisers can look ahead to more data being more widely available.

### Published News

Most city newspapers feature real estate news, and many business trade publications cover real estate activity on a local, regional, or national basis. Although some of the news may be incomplete or inaccurate, an appraiser can use this secondary source to confirm details because the names of the negotiating brokers and the parties to transactions are usually published.

### Market Participants

Other real estate professionals such as brokers, appraisers, managers, and bankers can often provide information about transactions and suggest valuable leads. Individual sources may be definitive, but if the information obtained from real estate professionals is third-party data, an appraiser should look for separate verification. Personal verification, particularly relating to confirmation of comparable rentals and sales, is an essential part of the appraisal process.

### The Real Estate Transaction Standard (RETS) and RESO Web API

The Real Estate Transactions Standard (RETS) was created in 1999 as a collaborative effort between real estate brokers, franchises, associations, and technology vendors with the goals of simplifying the transfer of real estate information from system to system and providing brokers with efficient control over their listing data. The adoption of this standard across the industry allowed brokers to enter listings once and deliver them when and where as needed, including to national property databases. However, as more real estate activity moved online, duplication of property listing databases across the web resulted.

In 2018, the Real Estate Standards Organization (RESO) announced its plan to retire the Real Estate Transactions Standard and replace it with RESO Web API. RESO Web API is expected to provide a more simplified and streamlined process, more coordination with the industry, and more accelerated technological developments. The goal of this standard is to provide a more open data approach using the representation state transfer technology that is widely used by many industries and to encourage and promote access to real estate data directly from a variety of web-based and mobile applications. Multiple listing services, brokers, and technology partners are required to transition to the new platform.

BACK_DEFEXP-RR-002522

## Sources of Competitive Supply and Demand Data

A competitive supply inventory is compiled in several steps:

1.  An appraiser first conducts a field inspection to inventory competitive properties in the subject market area and competitive market areas.

2.  The appraiser then can interview owners, managers, and brokers of competitive properties in the area as well as developers and city planners. Field inspection and interviews are especially important because investors rely heavily on local competitive supply and demand analyses.

3.  An examination of building permits (both issued and acted upon), plat maps, and surveys of competitive sites provides insight into prospective supply.

4.  Data on available space, as well as vacancy, absorption, and turnover rates in specific property markets, can be obtained from electronic databases and reports prepared by real estate research firms.

Demand can be estimated using demographic data (population and vital statistics) and economic data (employment and income statistics) for the market area. The Bureau of the Census (Department of Commerce) and Bureau of Labor Statistics compile and publish statistical data, which is often also available in electronic form. Other private and public sources provide historical data and projections based on small area populations. Appraisers who rely on projections prepared by market research firms should have a clear understanding of the methodology used to make the projection. Otherwise the data may represent little more than a blind data set. To test the reasonableness of small area projections, comparisons should be made between the demo-

### Geographic Information Systems and TIGER Data

The Topographically Integrated Geographic Encoding and Referencing (TIGER) system created by the US Bureau of the Census in the 1980s is of special relevance to appraisals of sites being considered for development. TIGER files contain the geographic base information used to create maps based on the most recent census and are essential ingredients in a geographic information system (GIS). A geographic information system using TIGER/Line data allows an appraiser to analyze information on traffic analysis zones, acreage available for development, zone densities, and other physical characteristics and geographical relationships in a market area. Other GIS databases contain information about local taxes (e.g., property assessments, school levies) and infrastructure (e.g., gas lines).[*]

Geographic information system technology facilitates the addition of geographic reference data to individual items in real estate databases. Personal computers and larger, networked computer workstations can draw on this information to map or model the spatial referents and show the spatial relationships among the data points. Equally important, spreadsheets or tabular grids can be produced in written formats, which can help the user better understand these relationships.[†]

Data from public sources at local, state, and national levels is available and, in most cases, less expensive than the cost of undertaking primary research. A combination of public data and other data available from proprietary sources allows an appraiser to assemble and map information and then analyze that information in ways previously regarded as technically infeasible or too costly. Initially, real estate professionals were most interested in the mapping capabilities of GIS, but new technology is helping expand opportunities for data analysis and promoting greater understanding of the results of that analysis.

---

[*]  See also Gilbert H. Castle III, editor, *GIS in Real Estate: Integrating, Analyzing, and Presenting Locational Information* (Chicago: Appraisal Institute, 1998).

[†]  See also Mark R. Linné and Michelle M. Thompson, editors, *Visual Valuation: Implementing Valuation Modeling and Geographic Information Solutions* (Chicago: Appraisal Institute, 2010).

BACK_DEFEXP-RR-002523

Copyrighted material licensed by Charles Brigden on September 17, 2020

GIS can integrate digital maps with point-specific or area-specific data to answer basic questions such as

· What is found in a specific location?
· Where within a given area is a specific feature, activity, or event located?
· What changes have occurred in an area over a given period of time?
· What spatial patterns characterize a given area?
· What impact will a specific change have on the area?

The data used to generate these maps is typically found in computer databases that include referents to a specific point on the earth's surface (i.e., latitude and longitude) or a specific area (e.g., city, zip code area, census tract).

## GIS as a Valuation Tool

A geographic information system (GIS) is a tool that allows users to analyze, interpret, and display data that is associated with a specific location on the earth. It begins with a blank model of earth that provides a space to store, display, and compare two or more types of data on the same plane. It can be used to understand how data is distributed, to display geospatial data, and to identify data based on spatial characteristics, among other capabilities. These tools are becoming increasingly important to appraisers as they engage in mass appraisal assignments.

GIS data represents features of the real world in two ways—as a vector or as a raster. Vectors are files of data that exist in discrete dimensions, whereas rasters are files that contain continuous data, existing in all areas that the data represents. Rasters usually look like an image because the data does not stop as vectors do. Each pixel in a raster contains a value that is itself a data point. An example of a raster is a digital elevation model (DEM). DEMs often look like a grayscale aerial image because each pixel in the file has a value that is represented by the median elevation of the location represented by the raster.

Vectors can be in the form of points, lines, or polygons. Points are associated with one specific latitude and longitude and have no dimension. Lines are one dimensional data, and polygons are data of two dimensions. An example of a feature represented by a point is the source of a leak. Examples of lines are roads or rivers, and examples of polygons are land parcels or lakes. Additionally, nonspatial data in the form of a table can be joined to spatial data to add information to the features represented in the GIS project.

A GIS allows its user to spatially compare data from different sources. Data is sourced from various reliable agencies. For example, sales data could be obtained from a multiple listing service (MLS), parcel data in the form of polygon vectors from the county tax assessor, contaminated zones from an environmental scientist, and population data from the US Census Bureau. When a table of sales data is joined to parcel vectors, the researcher is able to identify the locations of all sales in the study and compare their spatial relationship to the source of the detrimental condition.

GIS software allows the user to analyze spatial relationships, determine distances between two types of data, display these relationships as they relate to each other, and communicate data in a way that is easy to understand visually. Additionally, GIS software is used to verify that the data used is where it is expected to be.

Given sufficient information, the system can quickly pinpoint properties with specific characteristics. For example, the system can identify the locations of all parcels of vacant land in a given county that have the following characteristics:

· Contain 40 or more acres
· Meet specific soil suitability standards
· Are equipped with municipal water and sewer lines
· Are zoned for residential use
· Have an elementary school within a one-half mile radius and are adjacent to residential neighborhoods where the median home value exceeds $250,000

The dramatic increase in the use of GIS equipment is the result of three factors:

· The decline in the price of high-powered personal computers
· Improvements in GIS software
· Expansion of commercially available geocoded data

BACK_DEFEXP-RR-002524



In addition to commercially available TIGER data, accurate digital base maps for most areas of the United States are available at reasonable prices from the United States Geological Survey (USGS). (See Chapter 12 for more discussion of topography and land or site analysis.) Many local governments sell geocoded digital data on individual parcels that is compiled from assessment data and public record information. In the future, data vendors will continue to expand the amount of commercially available data compatible with GIS.

BACK_DEFEXP-RR-002525

Copyrighted material licensed by Charles Brigden on September 17, 2020

graphic data and the supply data collected in the specified market. Supply data may include building permits and market sales or absorption rates kept by public agencies such as building inspection, city planning, and public works departments.

Personal observation is also useful in estimating local demand. For example, the planned closing of an army base should be considered in analyzing the future demand for adjacent commercial properties such as dry cleaners, motels, bars, and restaurants. An appraiser who has observed development near highway interchanges will be able to anticipate that a proposed freeway interchange will generate future demand for shops, service stations, and motels catering to the needs of motorists and tourists.

### Selecting Comparable Data and Establishing Comparability

Descriptions and classifications of the characteristics and components of comparable properties are assembled in land and improvement analyses. An appraiser selects data from these analyses and analyzes it in the sales comparison, cost, and income capitalization approaches. The data used for comparison in the three approaches should come from properties that are similar to the property being appraised. A good comparable sale is a competitive alternative—i.e., a property that the buyer of the subject property would also consider. The selection of comparables is directed to some extent by the availability of data. Investigation of an active market usually reveals an adequate and representative number of transactions within a restricted area and time period.

An appraiser gathers broad information about a market from its pattern of sales. Important market characteristics can be revealed by significant factors such as

- Number of sales
- Period of time covered by the sales
- Availability of property for sale
- Rate of absorption
- Rate of turnover—i.e., volume of sales and level of activity
- Characteristics and motivations of buyers and sellers
- Terms and conditions of sale
- Use of property before and after its sale

While analyzing data to establish comparability and select sales, an appraiser begins to form certain conclusions about the general market, the subject property, and the possible relationships between the data and the subject property. The appraiser identifies the following:

- Market strengths and weaknesses
- The probable supply of, demand for, and marketability of properties similar to the property being appraised
- The variations and characteristics likely to have the greatest impact on the value of properties in the market

Thus, an appraiser analyzes data against a background of information about the particular area and the specific type of property.

The information needed to apply the cost and income capitalization approaches must often be obtained from market sources other than sales. This information may

BACK_DEFEXP-RR-002526

also be used to refine adjustments made in the sales comparison approach. In the investigation of general and market area data, an appraiser learns about trends in

- Construction costs
- Lease terms
- Operating expenses
- Vacancy rates

Examining trends in the market where the subject property is located provides additional specific data that can be used to derive value indications and successfully complete valuation assignments.

The geographic area from which comparable sales can be selected depends on the property type. In valuing certain types of retail property, only properties with main street frontage may be pertinent. For many large industrial properties and most investment properties, the entire community should be studied. For larger properties, regional or national markets may be relevant. For residential appraisals, adequate data can sometimes be found within a block of the subject property. Even in these cases, however, an appraiser should consider the broader market to place the subject property and the comparables in a general market context.

When comparable sales data is scarce in the subject property's immediate area, appraisers may need to extend the data search to adjacent market areas and similar communities. An appraiser must establish the comparability of the alternative market before using data from that market. When the selection of data is limited to an unacceptably narrow sample of current market activity, an appraiser may decide to use sales that are less current or to interview brokers, buyers, sellers, owners, and tenants of similar properties in the area to obtain evidence of potential market activity such as listing prices or offers to purchase.

With computer analysis, a large number of properties can be studied in the course of a single assignment, which may generate a deeper understanding of each property's contribution to, and influence on, a given market. Appraisers should pay attention to several factors to judge if data is useful:

1. The degree of comparability
2. The quantity of information available
3. The authenticity and reliability of the data

Appraisers must not assume that all data pertinent to an assignment is completely reliable. Sales figures, costs, and other information subject to misrepresentation should be scrutinized for authenticity.

Appraisers seek data that will facilitate accurate comparisons, but every real estate parcel is unique. The comparability of properties varies, and an appraiser may find it necessary to place less confidence on a given comparable. Nevertheless, an appraiser may want to consider this comparable for its evidence of, and effect on, the marketplace.

Appraisers have a special responsibility to scrutinize the comparability of all data used in a valuation assignment. They must fully understand the concept of comparability and should avoid comparing properties with different highest and best uses, limiting their search for comparables, or selecting inappropriate factors for comparison.

BACK_DEFEXP-RR-002527

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

## Verification

A primary purpose of verifying a sale of real property is to make sure that the sale occurred under conditions that meet the definition of value used in the appraisal. The verification process also provides an appraiser with an opportunity to obtain accurate information about the property and to better understand the attitudes and motivations of the buyer and seller. An appraiser asks a few essential questions when verifying data:

- Is the data correct?
- Is the data complete?
- Was the sale or rental an arm's-length transaction?
- Were there any contingencies?
- Were any concessions involved?
- Does the data conform to relevant standards or regulatory requirements?
- Did any special or unusual conditions affect the sale or rental?

The Uniform Standards of Professional Appraisal Practice require that appraisers "collect, verify, and analyze all information necessary for credible assignment results."[6] Appraisers investigate how much verification of data will be necessary for a specific assignment in the determination of scope of work. Many users of appraisal services permit the use of secondary data that has not been directly verified, whereas others require confirmation with more than one party to the transaction and stipulate who must perform the verification task. For example, an appraisal of a single-unit home for mortgage lending purposes is likely to require more verification of specific property data than a mass appraisal assignment involving the statistical analysis of a large database of property information purchased from a data vendor. Likewise, the Uniform Appraisal Standards for Federal Land Acquisitions require an appraiser to talk directly to a party to the transaction to verify data used in an appraisal assignment subject to the UASFLA standards, which is a higher level of verification than is usually necessary in the aforementioned appraisal for mortgage lending purposes.

In addition to the scope of work of the assignment, the reliability of the original data source also has an effect on the scope of data verification. By its nature, the primary data an appraiser collected himself or herself has already been verified, whereas secondary data such as comparable sales and rental data purchased from a vendor is unverified. Market data from informal sources (newspapers, real estate trade magazines, websites) is likely to be less reliable than data from a vendor and therefore may need to be verified before being used in an appraisal.

The most common verification technique is interviewing market participants. Effective interviewing techniques are a matter of personal style.

## Data Organization

Data can be aggregated and analyzed in numerous ways. Market data tables are the most common tool used to organize data. They can be as detailed as required for meaningful analysis. In a basic table, an appraiser lists significant characteristics of the subject and comparable properties that have been isolated. This type of table sum-

---

6.    Standards Rule 1-4 of *Uniform Standards of Professional Appraisal Practice*, 2020-2021 ed. (Washington, DC: The Appraisal Foundation, 2020), 18.

BACK_DEFEXP-RR-002528

**primary data**

Information that is gathered in its original form by the analyst.

**secondary data**

Information that is not gathered in its original form by the analyst.

marizes the data presented and allows the appraiser to identify those factors that may account for differences in value and those that probably do not. The data array table only presents data. It allows the reader to view the relevant data in a format that facilitates easy comparisons of relevant features. It is not an adjustment grid but can be used for comparing the properties qualitatively. In an adjustment grid, the sale properties are compared to the subject and specific adjustments are made to their prices.

A market data table should include the total sale price of each comparable property and the date of each sale, which can be expressed in relation to the subject property's date of valuation (e.g., one month ago or 16 months ago). The table also includes information about the property rights conveyed, the financial arrangements of the sale, and any unusual motivations of the buyer or seller that may have resulted in a negotiating advantage, such as a desire to liquidate a property for inheritance tax or to acquire a particular property for expansion.

The market data table can include characteristics of the subject and comparable properties, information on sales transactions, and pertinent market data from other sources. An appraiser may choose to use two or more market data tables, i.e., one table for comparable sales data and other tables for information derived from other sources. Isolating micro-level data may indicate the type of information an appraiser will be able to derive from the collected data and identify variations among properties that may be significant to their value.

In examining the market data table, an appraiser may find that certain data is not pertinent and will not be useful in applying the approaches to value. For example, if an appraiser who is valuing an industrial property finds that the subject and the comparables all occupy one-acre sites, site size will probably not account for differences in the sale or unit prices of the properties. If the percentages of office space in the properties vary, however, the difference may have an effect on value.

Analysis of the data array table may indicate that additional data is required and that the appraiser needs to create other tables to include more information or to isolate the data required for specific approaches. Appraisers should see data analysis as a process and the market data table as a tool that facilitates this process and the derivation of valid indications of property value. Although many market data tables may be prepared in the development of an appraisal, not all tables are necessary for the appraisal report. Only those that will help to explain the significance of the data to the client need to be included in the appraisal report. (Further discussion and examples of the use of adjustment grids for data analysis are provided in Chapter 21.)

BACK_DEFEXP-RR-002529

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Economic Trends in Real Estate Markets and Capital Markets

**10**

Value is affected by the interplay of social, governmental, physical, and economic forces, which are continually changing, often in a cyclical pattern. Although the value of real estate may seem relatively stable in comparison to the value of stocks or commodities, it is still subject to the multitude of pressures and influences created by this interplay.

Appraisers collect data that illustrates the direction of the changes in markets as well as their probable extent and influence to identify and to reasonably project trends. A trend may be defined as a series of related changes brought about by a chain of causes and effects. For example, an economic trend being projected in an appraisal analysis may be rooted in social or governmental causes and effects like demographic shifts in an area or changes in federal tax laws. The direction, speed, duration, strength, and limits of these economic trends are forecast through economic base analysis, statistical analysis, market analysis, and analysis of economic indicators and surveys. Table 10.1 shows some of the specific market characteristics and other general data that appraisers investigate to gain insight into economic trends.

The social forces studied by appraisers primarily relate to population characteristics. The demographic composition of the population reveals the potential demand for real estate, which makes the proper analysis and interpretation of demographic trends important to an appraiser's analysis.

Political and legal activities at all levels of government can have a great effect on property values. Federal, state, and local governments provide many facilities and services that affect land use patterns. In fact, public sector activities at a particular time or in a particular place may overshadow the natural market forces of supply and demand. For example, changes to federal banking regulations have a tendency to reverberate throughout the capital markets, alternately loosening and tightening the supply of funds available for investment in real estate. More direct governmental action like the decision to bail out major car manufacturers in 2008-2009 can have a major effect on the economies of cities and states with an economic base dominated by the automobile industry, like Detroit and the surrounding areas in Michigan.

BACK_DEFEXP-RR-002530

Although many real estate professionals associate the word *environmental* predominantly with the conservation of natural resources (e.g., wildlife, timberlands, wetlands) and the regulation of man-made pollution, appraisers understand the environmental forces that affect the value of a specific real property in relation to the property's location. (Note that the treatment of hazardous substances in real estate appraisal is discussed in Chapter 12.) Location analysis considers the time-distance relationships, or *linkages*, between a property or neighborhood and all probable origins and destinations of residents coming to or going from the property or neighborhood. Location has both an environmental and an economic character. Time and distance are measures of relative access, which may be considered in terms of site ingress and egress, the characteristics of the areas through which traffic to and from the site passes, and transportation costs to and from the site.

To determine the influence of economic forces on value, appraisers analyze the relationships between current and anticipated supply and demand and the economic ability of the population to satisfy its wants, needs, and demands through its purchasing power. Economic trends and considerations may be studied in greater detail as an appraiser's analysis focuses on successively smaller geographic areas, as shown in the later chapters in this section of the text.

The economic trends that affect the value of real property can be seen in the money supply, the capital markets, and the overall real estate marketplace itself. To keep abreast of the relative health of the marketplace in which real property trades, appraisers continuously gather data on the changes in those markets, which are the focus of the remainder of this chapter.

## Real Estate Markets

The essential appraisal activity of real estate market analysis focuses on the motivations, attitudes, and interaction of market participants as they respond to the particular characteristics of real estate and to external influences that affect its value. (Real estate market analysis is discussed in detail in Chapters 15 and 16.) This focus underscores the need for objective real estate appraisal in a free market economy and the responsibility of appraisers to the communities they serve.

Real estate markets can be analyzed from two perspectives:

1. As a market of investors buying and selling assets
2. As a "fundamental" market of space users

> **Labels for Two Types of Real Estate Markets**
>
> A variety of paired labels are used in the professional literature to describe the **asset market** and the **fundamental market**:
>
> - The *property market* and the *space market*
> - The *transaction market* and the *physical market*
> - The *capital market* and the *fundamental market*
>
> For more discussion of the distinction between the asset market and the fundamental market, see Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014), Chapter 10.

Both of these distinct, but related, market segments operate within the context of the overall real estate market. The participants in the asset market are the buyers and sellers of real estate assets that compete with other investments in the larger capital market such as stocks, mutual funds,

BACK_DEFEXP-RR-002531

Copyrighted material licensed by Charles Brigden on September 17, 2020

| **Table 10.1** | Forces that Influence Value in Real Estate Markets and Relevant General Data |
|---|---|
| Social forces | · Total population<br>· Population composition by age and gender<br>· Rate of household formation and dissolution<br>· Attitudes toward education, law and order, and lifestyle options |
| Governmental forces | · National, state, and local tax laws and policies<br>· Public services such as fire and police protection, utilities, refuse collection, and transportation networks<br>· Local zoning, building codes, and health codes, especially those that obstruct or support land use<br>· Special legislation that influences general property values:<br>  - Rent control laws<br>  - Statutory redemption laws<br>  - Restrictions on forms of ownership such as those imposed on condominiums and timeshare arrangements<br>  - Homestead exemption laws<br>  - Environmental legislation regulating new developments and wetlands as well as the control of hazardous or toxic materials<br>  - Legislation affecting the types of loans, loan terms, and investment powers of mortgage lending institutions |
| Environmental forces | · Climatic conditions<br>· Topography and soil<br>· Toxic contaminants such as asbestos, radon, and PCBs<br>· Natural barriers to future development such as rivers, mountains, lakes, and oceans<br>· Primary transportation systems, including federal and state highway systems, railroads, airports, and navigable waterways<br>· The nature and desirability of the immediate area surrounding a property |
| Economic forces | · Employment<br>· Wage levels<br>· Business expansion<br>· Economic base of the region and community<br>· Price levels<br>· Cost and availability of mortgage and equity capital<br>· Inventory of available vacant and improved properties<br>· Factors limiting additions to inventory<br>· New development under construction or in the planning stage<br>· Occupancy rates<br>· Rental and price patterns of existing properties<br>· Construction costs |

REITs, bonds, hedge funds, private equity, mortgages, venture debt, and mortgage-backed securities. In contrast, the participants in the fundamental market are space users who are concerned with the use of the physical space of real estate for a specific purpose (e.g., as a residence, as a place to house business operations).

For example, in the asset market a multitenant office building would compete with similar properties for potential purchasers, whose financial decision-making process would involve comparing the projected income-producing capability of the

BACK_DEFEXP-RR-002532

property with the potential returns from other capital investments. The fundamental market for the same property would more likely consist of potential occupants of the property, who would base their financial decision to rent or buy space in the building on the suitability of the property as office space (e.g., location and amenities) and the affordability of that option to the potential user.

The financial return in the asset market is often driven by short-term resale expectations rather than the sustainable, long-term income potential of the property. The primary determinants of short-term demand in the asset market for real estate are the availability of cash or credit for investment and the level of interest rates. In contrast, the market cycle of the fundamental market, sometimes called the "long-term real estate cycle," is primarily a function of changes in employment, population, and income.

### The Relative Efficiency of Markets

The efficiency of a market is tied to the behavior of buyers and sellers (or lessors and lessees) as well as the characteristics of the products traded in the market. Real estate markets can differ significantly from the markets for other goods and services, and real estate markets have historically been considered less efficient than many other types of markets (see Table 10.2). Real estate products are heterogeneous, and information about real estate is often incomplete due to the confidentiality of transactions. Also, changes in supply lag behind changes in demand for a specific real estate product (e.g., office/warehouse space) because of the time needed to bring a new building to market. In a more efficient market, like a stock exchange, supply quickly reacts to changes in demand.

Real estate markets vary in terms of efficiency. For example, the highly competitive market for existing homes is much more efficient than the market for special-purpose properties. Since the 1990s, the securitization of real estate and increased access to published property and transaction information, along with other changes in the larger economy, have made some real estate markets relatively more efficient than they once were, although significant peaks and troughs continue to exist as illustrated by the speculative bubble of 2007-2008. Nevertheless, efficiency in the real estate marketplace has a direct bearing on rate of return requirements. Consequently, a purchaser who understands the inefficiencies of the real estate market can usually gain benefits in terms of rates of return, relatively stable income, inflation protection, and other factors.

However, in more recent years, some of the benefits of real estate as an asset class have eroded. The increased access to data and new tools for data analysis likely contributed to the destructive competition among lenders that led to the severe downturn in real estate markets that started in 2007. The market forces that increased the efficiency of real estate markets and the liquidity of real estate investments also reduced the transparency of the assets pooled in heavily traded securitized mortgage instruments, obscuring from investors the risk involved in holding the loans that backed those securities.

### Market Cycles

In the years following World War II (1946–1966), distinct patterns emerged in real estate and general business cycles in the United States. As businesses prospered, the demand for capital intensified, inflation accelerated, and an oversupply of goods and services was produced. Federal Reserve monetary policy and other economic con-

BACK_DEFEXP-RR-002533

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 10.2**  Comparison of "Efficient" Markets and Real Estate Markets

| Efficient Markets | Real Estate Markets |
|---|---|
| Goods and services are essentially homogeneous items that are readily substituted for one another. | No two parcels of real estate are physically identical. |
| A large number of market participants creates a competitive, free market, and none of these participants has a large enough share of the market to have a direct and measurable influence on price. | There are usually only a few buyers and sellers interested in a particular type of property at one time, in one price range, and in one location. An individual buyer or seller can influence price through exertion of control on supply or demand or both. |
| Supply and demand are never far out of balance. The market returns to equilibrium quickly through the effects of competition. | In stable real estate markets, supply and demand are considered causal factors, and price is the result of their interaction. Price changes are usually preceded by changes in market activity. Supply or demand often shifts suddenly during periods of no activity or increased activity or when properties are in transition. |
| Buyers and sellers are knowledgeable and fully informed about market conditions, the behavior of other market participants, past market activity, product quality, and product substitutability. Any information needed on bids, offers, and sales is readily available. | Buyers and sellers of real estate may not be well informed. |
| Buyers and sellers are brought together by an organized market mechanism, such as the New York Stock Exchange. Sellers can easily enter and exit the market in response to demand. | Buyers and sellers are not brought together formally. |
| Goods are readily consumed, quickly supplied, and easily transported from place to place. | Real estate is a durable product and, as an investment, it may be relatively unmarketable and illiquid. |
| Market efficiencies lead to low transaction costs. | Market inefficiencies lead to high transaction costs, e.g., broker's fees and commissions, closing costs. |
| Market participants can act on new information quickly to take advantage of opportunities to increase supply to meet demand. | Market participants are not able to act quickly on new information, e.g., an increase in market demand will be followed by a lag as developers attempt to increase supply but are hampered by the long development times for new real estate products. |

trols would then be used to slow the pace of the economy and keep inflation in check. If the economy slowed too much, a recession would ensue.

When Congress wanted to revive the US economy, the industry invariably selected to provide economic stimulation was real estate, particularly home building. Programs were developed to provide abundant, moderately priced mortgage money. These programs usually involved loan insurance or guarantees to induce capital managers to participate. Because there was a substantial demand for housing, the programs were well received and residential development expanded, increasing employment in all economic sectors. The economy finally revived, inflation started to accelerate, and the cycle was repeated. When loan insurance and guarantee programs supplied inexpensive long-term capital, real estate prospered and the general economy expanded.

The situation today is very different from the conditions prevailing in the last quarter of the twentieth century. The economic downturn that began in the United States in 2007 affected all sectors of the US and global economies, especially real es-

BACK_DEFEXP-RR-002534

tate. Since the real estate bubble burst, debate has continued about what governments can do—or should do—to ease the financial risk to both lenders and property owners.

In a market economy, the larger economic cycle (see Figure 10.1) influences the real estate cycle. As the economy expands, competition for capital intensifies, the costs of goods and services increase, and inflation escalates. The central banking system (e.g., the US Federal Reserve System) then seeks to combat inflation by tightening money and credit until the economy slows down. The demand for funds subsides, interest rates decline, and economic conditions become stable enough for businesses to expand. When the frequency of the economic cycle accelerates and its range increases, business and monetary conditions change drastically and rapidly. This creates an unattractive economic environment for long-term investments such as real property.

## Capital Markets

Activity in the capital markets illustrates the interaction of buyers and sellers trading long- or intermediate-term money instruments. Traditional real estate investment

**Figure 10.1**   Real Estate Cycles and Economic Cycles



Sources: National Council of Real Estate Investment Fiduciaries (NCREIF), National Association of Real Estate Investment Trusts (Nareit), Bureau of Economic Analysis/US Department of Commerce, *ULI Real Estate Economic Forecast*.

\*   NCREIF, Nareit, and GDP data for 2017 and 2018 are based on forecasts for these indicators in the *ULI Real Estate Economic Forecast* (October 2017).

Source: PwC and the Urban Land Institute, *Emerging Trends in Real Estate 2018* (Washington, DC: PwC and the Urban Land Institute, 2017), 3.

BACK_DEFEXP-RR-002535

Copyrighted material licensed by Charles Brigden on September 17, 2020

practices involve the use of two types of capital—debt and equity—and a typical venture is structured with a substantial mortgage amount and a smaller equity contribution. The most common capital market instruments are stocks, bonds, mortgages (including junior liens and home equity loans), and deeds of trust and contracts for deeds. Although stocks are capital market items, they are equity investments with no fixed maturities.

## Mortgages

A mortgage is a legal instrument for pledging a described property interest as collateral or security for the repayment of a loan under certain terms and conditions. A mortgage operates in conjunction with a promissory note, which specifies the interest rate

### Signs of a Changing Market

A real estate bubble may be evidenced by

- The rates of return associated with a property type and the economic characteristics of tenants or users are not typical and tend to be very low. For example, capitalization rates may be very low or indicate negative leverage, which is often a sign of speculation.
- Prices increase at a faster rate than rents.
- Rates of return decrease below long-term trends.
- Prices rise while rents and net incomes remain stable or are declining.
- Traditional buyers are replaced by new ones. "Everyone" starts to invest in real estate.
- The number of transactions increases.
- Marketing times are shorter.
- Average days-on-market decreases.
- There are very few expired listings.
- The number of properties remaining vacant after purchase increases.
- Condominium conversions become more common.
- The number of persons employed in the real estate sector (real estate sales, mortgage lending) increases significantly.
- Rents increase faster than the ability of tenants to pay.
- Sale prices are beyond the affordability of users.

A bust market may be evidenced by

- Sales are few, at least initially, because sellers are reluctant to sell and realize losses.
- The rate of foreclosures increases.
- Seller concessions increase, both in terms of frequency and magnitude.
- Credit markets tighten. Traditional financing becomes more difficult to obtain.
- The use of "creative" financing, generally seller financing, increases. These arrangements serve to keep nominal prices from falling, at least in the initial stages of a bust.
- Marketing times are longer.
- Average days-on-market increases.
- The number of expired listings increases.
- The number of persons employed in the real estate sector declines.
- Job growth is declining.
- Rents are not rising at the same rate as the last few years.
- Vacancy is increasing.

BACK_DEFEXP-RR-002536

> **mortgage**
> A pledge of a described property interest as collateral or security for the repayment of a loan under certain terms and conditions.

and other important loan terms. Mortgage loans supply most of the capital employed in real estate investments.

The parties to a mortgage are usually free to contract in any fashion they desire, subject only to limitations of usury and public policy. Traditionally, mortgage loans have been made for terms of 20 to 30 years at fixed interest rates. Mortgages with different payment arrangements and schedules are available— e.g., variable-rate and balloon mortgages. Types of mortgages categorized by their repayment characteristics are shown in Table 10.3.

A borrower may pledge a real property interest to more than one lender, thereby creating several liens. In these cases, the time sequence or order of the liens is important:

- The first loan contract executed and recorded is the *first mortgage*, which has priority over all subsequent transactions.
- Second and subsequent mortgages are sometimes referred to as *junior liens*. Because they involve more lending risk than first mortgages, higher rates of interest are charged for second and third mortgages, which typically have shorter terms.
- *Home equity loans* are another common type of junior lien. Home equity loans generally run for terms of about five years, shorter than second or third mortgages and, if the payments made cover only the interest on the loan, the principal is repaid in a lump sum at the end of the loan term.
- *Home equity lines of credit* are similar to home equity loans, except that the borrower can access this type of loan at any time up to the loan amount without further loan approval. In terms of priority of repayment, a home equity line of credit is similar to a home equity loan, but some lines of credit are recourse loans for which borrowers are personally liable.

Mortgages can also be categorized based on how they are protected against the risk of default. The three major categories are

1. Guaranteed—e.g., Veterans Administration (VA) home mortgages
2. Insured—e.g., Federal Housing Administration (FHA) mortgages
3. Conventional

FHA mortgages are the most common type of insured mortgages, but other government bodies and private insurance companies offer loan insurance as well. Conventional mortgages are neither insured nor guaranteed.

In the event of default, a borrower may have personal liability if the mortgage was a recourse debt, whereas the lender is only entitled to the proceeds of the foreclosure sale of the property if the mortgage was a nonrecourse loan. A personal guarantee from a borrower generally lowers the cost of financing because the risk to the lender is reduced.

### Deeds of Trust and Contracts for Deeds

A mortgage is a contract between a borrower (the mortgagor) and a lender (the mortgagee), but a deed of trust involves a third party. A *deed of trust* is defined as a legal instrument similar to a mortgage that, when executed and delivered, conveys or transfers property title to a trustee. In such an arrangement, a borrower conveys

BACK_DEFEXP-RR-002537

**Table 10.3**  Repayment Characteristics of Mortgages

| Type | Repayment Characteristics |
| --- | --- |
| Interest-only mortgage | Nonamortizing loan in which the lender receives interest only during the term of the loan and recovers the principal in a lump sum at the time of maturity. |
| Self-amortizing mortgage | A mortgage repaid in periodic, usually equal, installments that include repayment of part of the principal and the interest due on the unpaid balance. Although the payments are level, the amount of principal and interest varies with each payment. In the most common type of direct reduction mortgage, the interest component decreases with each payment while the principal or amortization component increases. |
| Adjustable variable-rate mortgage | Mortgage with an interest rate that may move up or down following a specified schedule or in accordance with the movements of a standard or index to which the interest rate is tied. |
| Wraparound mortgage | A mortgage subordinate to, but inclusive of, any existing mortgage on a property. Usually, a third-party lender refinances the property, assuming the existing mortgage and its debt service, which are wrapped around a new, junior mortgage. A wraparound lender gives the borrower the difference between the outstanding balance on the existing mortgage and the face amount of the new mortgage. Wraparound mortgages became widespread in periods of high mortgage rates and appreciating property values, but they have generally fallen into disuse with declining mortgage rates. |
| Participation mortgage | The lender receives a share of the income and sometimes the reversion from a property on which the lender has made a loan. Lenders may opt for this type of arrangement either as a hedge against inflation or as a means of increasing their total yield on the loan. |
| Shared appreciation mortgage | The borrower receives assistance in the form of capital when buying the real property in return for a portion of the property's future appreciation in value. |
| Convertible mortgage | The lender may choose to take an equity interest in the real estate in lieu of cash amortization payments by the borrower. In this way the mortgage interests of the lender may be converted into equity ownership at specified times during the life of the mortgage. |
| Graduated-payment mortgage | Designed to aid borrowers by matching mortgage payments to projected increases in income, this type of mortgage has periodic payments that start out low and gradually increase. Because the borrower's payments in the early years of the loan are not sufficient to pay the entire interest due or to amortize the mortgage, the borrower actually borrows the difference between the payments and the current interest due. |
| Zero-coupon mortgage | Debt secured by real estate with interest payments accruing rather than being paid by the borrower. In some circumstances, a rate of interest may be ascribed—e.g., for income taxation. |
| Reverse annuity mortgage (RAM) | A negative amortization mortgage that allows owners to use some or all of the equity they have accumulated in their property as retirement income while retaining ownership of the property. Typically, the loan increases as more money is borrowed and unpaid interest on the outstanding balance accumulates up to an agreed-upon amount, which is generally scheduled to coincide with the sale of the property. |
| Mezzanine loan | A form of secondary financing at a higher risk with a higher interest rate applicable to the secondary position; often supplementary financing for a real estate development project where stock in the development company serves as collateral rather than the property itself. |

BACK_DEFEXP-RR-002538

**nonrecourse loan**

Debt agreement secured by real property that provides that the lender has no claim against the debtor in the event of default, but can only recover the property.

**recourse debt**

A debt agreement secured by real property that gives the lender legal rights against the debtor beyond the right to property value; equivalent to a general obligation of the debtor.

**deed of trust**

A legal instrument similar to a mortgage document, except that three parties are involved in securing the debt: the borrower, a lender, and a trustee who holds property title when the deed of trust is executed and delivered. The trustee transfers title to the lender if the borrower defaults and to the borrower if the note is repaid.

**contract for deed**

A contract in which a purchaser of real estate agrees to pay a small portion of the purchase price when the contract is signed and additional sums, at intervals and in amounts specified in the contract, until the total purchase price is paid and the seller delivers the deed; used primarily to protect the seller's interest in the unpaid balance because default can be exercised more quickly than it could be under a mortgage.

or transfers property to a trustee for the benefit of a lender. The borrower conveys title to the trustee but retains the right to use and occupy the property, which often streamlines the process of foreclosure, allowing a lender to foreclose without going to court if the trust deed contains a power of sale clause. In some states, deeds of trust are used in place of mortgage contracts.

A contract for deed, frequently called an *installment sale contract* or *land contract*, is an instrument that provides for the future delivery of a property deed to a buyer after certain conditions are met. A seller finances the sale of a property by permitting the buyer to pay for it over a period of time, but the title is delivered only after all payments are made. In the event of default, the buyer normally forfeits all payments made and the seller may also elect to hold the buyer to the contract.

## Monetary Policy

The US Federal Reserve System influences daily trading activity in the money market and the cost (i.e., interest rates) of money market funds by regulating the money supply as a key component of its application of monetary policy. The money market, in turn, greatly affects the real estate industry because its short-term financing vehicles are needed to fund real estate construction and development. This is one of many ways in which the availability and cost of money regulates the volume and pace of activity in the real estate industry. The distinction between the money market and capital markets is not sharply defined because both involve trading in funds for varying terms and both are sources of capital for all economic activities, including real estate.

There is a difference between money and other commodities on the supply side of the pricing formula. The demand for money is a product of the operation of economic forces. The supply of money available for lending is a function of the level of savings, which reflects personal, corporate, and governmental accumulation, both domestic and foreign.

Economics determines the amount of savings, but the quantity of US currency is subject to regulation by the Fed. The Fed has the power to regulate general interest rate levels, which strongly influence the discount rates and overall capitalization rates used in real estate valuation.[1] Housing affordability is greatly influenced by prevailing mortgage rates. For example, an increase of a single percentage point in the interest rate, from 6% to 7%,

---

1. In other countries, various central banks perform the same functions as the Fed, and they generally have the same powers.

BACK_DEFEXP-RR-002539

on a $200,000 fully amortized, 30-year mortgage would increase the monthly mortgage payment by $131, which may cause a significant number of households with a certain level of purchasing power to be priced out of the market for homeownership.

While the Fed determines monetary policy, the Treasury Department manages the government's financial activities by raising funds and paying bills. When income matches spending, the federal budget is balanced. When the outflow of funds exceeds collections, a federal deficit results. Spending that is not covered by tax funds produces deficits, which are financed by the sale of public debt instruments such as government bonds, bills, and notes issued by the Treasury. When deficits are monetized by selling large amounts of debt, the Fed is expected, though not mandated, to cooperate by supplying the banking system with sufficient reserves to accommodate the debt sales program and still leave enough credit for the private sector.

### Central Banking Systems and Credit Regulation

The supply of any currency and the stability of a country's fiscal policy are regulated by the relevant central banking system. For example, the Bank of Canada, headquartered in Ottawa, monitors and manages the rate of money growth in Canada. The Banco de Mexico performs a similar function in that country. The central banking system in the European Union functions differently in that the European Central Bank in Germany establishes monetary policy for the Eurozone, while the central banks of the member states are responsible for fiscal policy in their individual countries. (Countries in the European Union that have not adopted the Euro as their unit of currency have their own national central banks to administer monetary policy.) The mechanisms that central banks use to influence the supply of money generally consist of raising and lowering interest rates as well as more direct involvement in the market to ensure price stability and access to credit.

The US Federal Reserve System is independent of the US Congress and the president. This independence distinguishes it from central banks in most other countries, which are government entities. Although the Fed is independent, it functions within the general structure of the US Government, operating in accordance with national economic policies.

The Federal Reserve regulates money and credit, which are the lifeblood of the real estate industry. Therefore, appraisers should be familiar with the Fed's day-to-day activities as they affect the supply of money and the level of interest rates. Because of the global nature of financial markets, the prevalence of instantaneous communications, and the securitization of realty interests, the monetary activities of the central bank can have an impact on real estate markets, just as they affect the markets for stocks and bonds.

The Fed uses three principal credit-regulation devices to accomplish the duties assigned to it by Congress:

1. Reserve requirements
2. The discount rate
3. The Federal Open Market Committee

Within statutory limits, the Federal Reserve Board can fix the amount of reserves that member banks must maintain. If the Fed wants to restrict the money supply, it increases deposit reserve obligations. If it wants to increase the supply, it lowers the obligations.

BACK_DEFEXP-RR-002540

Banks in the Federal Reserve System can borrow from the Fed to meet reserve requirements and obtain funds for their customers even in periods of great demand. To get these loans, member banks agree to pay the Federal Reserve interest at its established discount rate. The Fed can deny loan requests when it believes that borrowing is not in the best interests of the national or regional economy.

The borrowing privilege is a vehicle for expanding the monetary supply. Curtailing that privilege limits or contracts credit. The federal discount rate helps determine the prime rate, the interest rate that a commercial bank charges for short-term loans to borrowers with high credit ratings. The federal discount rate is generally about two percentage points below the prime rate.

The Federal Open Market Committee (FOMC) is probably the most extensively used and most potent of the Federal Reserve's credit-regulating devices. The FOMC buys and sells US Government securities in the open market, thereby exerting a powerful influence on the supply of money and the interest rate. In fact, through its daily operations, the FOMC maintains short-term money rates at selected target levels. In periods of economic crisis, the Fed supplies financial markets with necessary liquidity.

Financial market participants may be guided by the opinions of experts, called *Fed watchers*, who often correctly interpret and predict Fed policy by analyzing the committee's activities. Real estate investors and appraisers, whose success may also depend on interpreting and forecasting financial markets, may profit from the extensive information provided by Fed watchers.

## Rate Relationships

Observable relationships between various instruments in the financial markets stem from the differing interest rates, maturities, and investment risks of the various

**Figure 10.2**   Federal Reserve Districts



Source: www.federalreserve.gov/aboutthefed/federal-reserve-system.htm

BACK_DEFEXP-RR-002541

Copyrighted material licensed by Charles Brigden on September 17, 2020

instruments. Normally an investor in a long-term instrument is believed to assume greater risk than an investor in a short-term instrument. Therefore, long-term instruments usually offer higher yields. This situation is graphically portrayed in what has come to be known as the *normal yield curve* (see Figure 10.3).

Sometimes the relationship is reversed. For example, if investors expect the economy to slow or even decline in the long term, the yield of long-term debt instruments (say, 30-year Treasuries) is lower than that of short-term debt instruments of similar credit quality (say, 5- or 10-year Treasuries). An inverse (or "inverted") yield curve typically precedes a recession. In periods of high inflation, investors may be reluctant to take long-term positions. They fear that escalating interest rates will erode their capital, so they try to keep their money in short-term instruments. The Federal Reserve, however, wants to combat inflation, so it causes short-term interest rates to rise. This action is intended to be temporary, lasting just long enough to dampen the inflationary expectations of investors. Consequently, in inflationary times short-term yields may be greater than long-term yields, and the yield curve is said to be inverted. On the other hand, if investors anticipate long-term interest rates to continue to fall in a weak economy, they would expect long-term yield rates to be lower than short-term yield rates, again resulting in an inverted yield curve.

Understanding rate relationships can help appraisers correlate real estate investment risk with the risks associated with actively traded capital market instruments, providing support for market-derived discount and capitalization rates. The financial press contains abundant pricing and yield information to facilitate this process.

## Sources of Capital for Real Estate

Equity and debt investors reveal their different aspirations through their market actions. The debt investor participates in bonds or mortgages, usually pursuing conservative paths in search of certain income and the repayment of principal. This type of investor expects a priority claim on investment earnings and often looks for security in the form of a lien on the assets involved. While a debt investor is relatively pas-



**Figure 10.3** Normal Yield Curve

*Economic Trends in Real Estate Markets and Capital Markets* **123**

BACK_DEFEXP-RR-002542

## Inflation

Inflation occurs when the general level of prices rises. The inflation rate is the rate of change in the price level as reflected in Consumer Price Indices (CPIs). Other useful measures of inflation include the wholesale price index and the GDP implicit price deflator.

Inflation and appreciation have similar effects on future dollars but different effects on yield rates. Inflation tends to increase yield rates (and most rates of return) because investors require a higher nominal rate of return to offset the loss in purchasing power due to inflation. Appreciation in property values will not affect the yield rate unless the risk associated with the property has changed.

In oversupplied markets, real estate value may not always keep up with inflation. In an inflationary environment, the value of real estate may tend to increase with the value of other investments such as stocks and bonds. Rents under annual leases can be adjusted upward periodically, while the interest and dividends paid on longer-term securities are more fixed. In undersupplied commercial markets, rent spikes are sometimes observed. These spikes allow market rents to catch up to levels that would have otherwise been achieved by annual inflationary increases in rents. Rent spikes are generally a function of demand.

---

**real interest rate**

A nominal interest rate that has been adjusted for expected inflation.

$$\text{Real Interest Rate} = \frac{1 + \text{Nominal Interest Rate}}{1 + \text{Expected Inflation Rate}} - 1$$

or

$$\text{Nominal Rate} - \text{Real Interest Rate} = \text{Inflation Premium}$$

---

The economic importance of inflation can be seen in the concept of "real" interest rates. Nominal interest rates, which are reported daily in the financial press, are said to be composites of the "real" cost of funds, or the real interest rate, and the premiums that investors demand to protect their currency value from being eroded by inflation. Thus, the nominal rate equals the real interest rate plus a premium for expected inflation. Economists suggest that the real interest rate has historically remained steady at 3% to 4%. Therefore, if the capital market were to show a nominal rate of 6% for 10-year US Treasury notes, the real interest rate concept would indicate an inflation premium of 2%.

$$\text{Nominal Rate} - \text{Real Interest Rate} = \text{Inflation Premium*}$$
$$6\% - 4\% = 2\%.$$

An appraiser can account for the effects of inflation in capitalization by expressing future benefits in constant dollars, which are adjusted to reflect constant purchasing power, as opposed to changing dollars, which are not adjusted. An appraiser can also express the yield rate as a real, uninflated rate of return on capital. In practice, however, appraisers usually project income and expenses in unadjusted, inflated dollars and express the discount rate as a nominal, or apparent, rate of return on capital that includes an allowance for inflation.

---

\* In countries with low inflation like the United States, this formula is an adequate approximation. A more precise formula for computing the real interest rate is

$$\frac{1 + \text{Nominal Rate}}{1 + \text{Inflation Rate}} = 1 + \text{Real Interest Rate}$$

$$\frac{1 + 0.06}{1 + 0.02} = 1.03921, \text{ rounded to } 1.04, \text{ or a real interest rate of } 4\%$$

BACK_DEFEXP-RR-002543

Copyrighted material licensed by Charles Brigden on September 17, 2020

sive, an equity investor is active. An equity investor is more willing to assume risk, and the funds used for equity investment are known as *venture capital*.

Homeowners and other owner-occupants of single-unit residential property are also major sources of capital. Homeowners invest equity, but their investment criteria differ from those of investors in income-producing property. An owner-occupant trades the potential of receiving rental income for the enjoyment of the amenities and tax benefits provided by the property during the ownership period and the financial benefit of the equity reversion, if any, when the house is eventually sold.

> **equity**
> An ownership claim on property. Property value is the total of debt and equity. Equity investors assume greater risk and their earnings are subordinate to operating expenses and debt service. They are compensated with dividends (cash flows) and possible appreciation in the value of their investments. Equity includes the residual claim to the assets, which is solely possessed by the owners.

## Equity

Equity investors realize that their earnings are subordinate to a project's operating expenses and debt service requirements. Equity income earnings are called *dividends*. One year's worth of income from an equity investment is an equity dividend. But equity dividends are only one part of the total return that the investor anticipates. Investors may also expect the value of their original investment to increase, remain stable, or decrease, depending on the type of property and market conditions. The total return the investor anticipates is called the *equity yield*. An equity dividend represents the cash flow component of the equity yield.

### Real Estate Investment Trusts

Real estate investment trusts (REITs) have been successful in pooling the funds of small investors to acquire real estate investment positions that could not be handled by these investors individually. Buying shares of REIT stock is not the same as direct investment in a given property. REITs offer shareholders freedom from personal liability, the benefit of expert management, and readily transferable shares. To qualify for a tax pass-through, a REIT must pay dividends of at least 90% of its taxable income.[2] With complicated income-measuring practices, these trusts attempt to pay out almost all their net income and, therefore, are substantially restricted in establishing reserves for possible losses. The liquidity of these securities is an attractive feature.

When analyzing comparable sales, appraisers should consider whether a REIT paid a premium to add the property to its portfolio. REITs tend to purchase properties with the following characteristics:

- Superior locations in superior markets
- Limited lease expiration exposure in any given year
- Improvements with minimal incurable obsolescence
- Considerable value
- Favorable management characteristics
- Long-term leases to credit tenants

---

2. The requirements for REITs to maintain their tax advantages are subject to change. The National Association of Real Estate Investment Trusts provides up-to-date information on REIT regulations and trends through its website at www.nareit.org. See also Joseph L. Ferst and James R. MacCrate, "NAREIT and Tax Law Changes Will Foster Consistency in Accounting Practice and Disclosure Among REITs," *The Appraisal Journal* (January 2000): 14-19.

BACK_DEFEXP-RR-002544

While the stock market establishes the value of REITs, the income performance of these assets tracks that of real estate markets. REIT prices tend to be less volatile than the Standard & Poor's 500, and the correlation between large cap stocks and REITs has been declining since 1990. As a result, analysts and money managers have pointed to REITs as major diversification tools. Figure 10.4 illustrates the recent performance of REITs in comparison to other investments.

**Figure 10.4**    Comparison of Performance of REITs and Other Investments



Source: Nareit

### Partnerships

A partnership is a common vehicle for pooling real estate equity funds. It is a business arrangement in which two or more persons jointly own a business and share in its profits and losses.

A general partnership is an ownership arrangement in which all partners share in investment gains and losses and each is fully responsible for all liabilities. A general partner has complete liability for the acts of the other partners and is responsible for debts incurred by them. This is one major disadvantage of this type of business arrangement. The most attractive feature of a general partnership in a real estate investment is the ability to pass the tax-shelter benefits of depreciation, interest, and real estate taxes through to partners.

A limited partnership is an ownership arrangement consisting of general and limited partners. General partners manage the business and assume full liability for part-

BACK_DEFEXP-RR-002545

nership debt, while limited partners are passive and liable only to the extent of their own capital contributions. Limited partnerships are popular because they permit an uneven distribution of tax-shelter benefits. Although limited partners' financial liability is restricted to their capital contributions, they may receive tax benefits in excess of that amount. Limited partners may also receive a preferential return ahead of general partners as an incentive if their participation is required to secure financing.

### Joint Ventures

A joint venture is a combination of two or more entities that join to undertake a specific project. Although a joint venture often takes the form of a general or limited partnership, it differs from a partnership in that it is intended to be temporary and project-specific. The parties may later embark on other ventures, but each venture is the subject of a separate contractual agreement.

A joint venture arrangement is frequently used in large real estate projects. One party, usually a financial institution, supplies most of the required capital and the other party provides construction or management expertise. Life insurance companies and pension trusts have joined with entrepreneurial building organizations in joint ventures to develop large offices, shopping malls, and other major real estate projects.

### Opportunity Zones

Opportunity zones are designed to spur economic development by providing tax benefits to investors by allowing them to defer taxes on any prior gains invested in a qualified opportunity fund (QOF) until (a) the date on which the investment is sold or exchanged or (b) until Dec. 31, 2026, whichever comes first. There is a 10% exclusion of the deferred gain for QOF investments held for more than five years. When the investment is held for more than seven years, the exclusion is 15%, and when the investment is held for ten or more years, the investor is eligible for a permanent exclusion from taxable income of capital gains from the sale or exchange of that investment.

The rules and regulations for this economic development tool are evolving, and valuation-related questions are materializing as market activity within opportunity zones begins. One issue could involve the use of a sale from outside an opportunity zone as a comparable for one inside an opportunity zone and vice versa. Additionally, data lags may necessitate fully informed market condition adjustments. Appraisers will also likely be asked to segregate building value and land value for tax planning purposes.

The IRS provides information on opportunity zones at www.irs.gov/newsroom/opportunity-zones-frequently-asked-questions.

### Pension Funds

Private and government-operated pension funds are a huge source of investment capital. Usually the pension contributions of employers and employees are placed with a trustee, who is obliged to invest and reinvest the money prudently, accumulate funds, and pay designated plan benefits to retirees. The trustee may be a government body, a trust company, an insurance company, or an individual. In performing these duties, an individual trustee may employ the trust departments of commercial banks, insurance companies, and other financial institutions.[3]

Traditionally, pension funds have been involved primarily in securities investments such as stocks and bonds. The development of pass-through securities by Gin-

---

3.  To protect American workers covered by pension and other benefit plans, Congress adopted the Employee Retirement Income Security Act (ERISA) in 1974 and later the Pension Protection Act of 2006. ERISA and its subsequent amendments establish a comprehensive legislative framework governing the investment, management, and administration of employee pension plans, profit-sharing plans, and welfare plans. ERISA also empowers government agencies to conduct audit programs in performing their duties. After more than three decades, the administrative structure and doctrine of ERISA continue to evolve as the courts and regulatory agencies make judgments concerning compliance by plan administrators and the claims due beneficiaries.

BACK_DEFEXP-RR-002546

nie Mae, however, has made it easier for pension funds to invest in mortgages, and they have made sizable investments. Pension trusts have also shown a willingness to invest in real estate equities by purchasing or participating in the real estate investments created by life insurance companies and commercial banks. Banks and life insurance companies acquire high-quality real estate equities, pool the investments in separate accounts, and supply the necessary portfolio management for a fee. Pension trusts commit funds to these accounts and share in all earnings, which consist of both income returns and sales profits. The real property holdings of a pension fund may be in a separate account or in a commingled fund with other investments.

### Life Insurance Companies

Life insurance companies have always invested heavily in real estate. Their activities include both mortgage lending (debt) and property ownership (equity investment). Life insurance companies usually acquire real estate positions that are long-term and relate well to their regular business, in which policy premiums are collected over extended periods. Their investment officers regard equities as attractive earning situations that offer growth potential and reasonable protection against the capital erosion caused by inflation.

### Hedge Funds

A hedge fund is a type of private investment fund with a controlled pool of investors that is usually structured as a limited partnership or limited liability company and is managed privately. In contrast to conventional equity funds such as mutual funds, hedge funds are not subject to official banking rules. Traditionally, hedge funds have sought out short-term, often high-risk and high-leverage investment opportunities that public funds cannot pursue. Hedge funds entered the real estate marketplace prior to the financial crisis by targeting retailers with undervalued real estate assets that can be sold or leased back to the retailer. Since then, hedge funds have emerged as an alternative to the traditional capital sources, which have tightened risk management controls since the financial crisis. Distressed properties with a potential financial upside and below-investment-grade real estate securities are the sorts of high-risk real estate investments that hedge funds are able to invest in.

### International Equity Capital

Although foreign investors represent only a very small fraction of the total direct real estate investment in the United States, they supply needed equity capital to realty ventures when traditional sources of capital are reluctant to invest. The globalization of financial markets has eliminated some of the obstacles to foreign investment, although international exchange rates still have a significant effect on the relative purchasing power of different currencies.

International capital comes from a variety of sources, such as foreign individuals, financial institutions, and pension funds. Sovereign wealth funds have emerged as significant equity investors. A sovereign wealth fund is a state-owned public investment agency that manages a portfolio of foreign assets to improve the return on traditional foreign exchange reserves. Resource-rich countries have sought opportunities to protect their wealth from fluctuations in the prices of commodities like oil by investing in assets like real estate with more stable long-term financial prospects. In the past, sovereign wealth funds were known to pursue trophy properties, but

BACK_DEFEXP-RR-002547

Copyrighted material licensed by Charles Brigden on September 17, 2020

since the financial crisis they have concentrated on distressed real estate assets, often investing through other funds rather than directly.

Overall, foreign investment in US businesses and housing declined in the early days of the recession but bounced back over the course of the next decade. In 2018, the roughly $95 billion in foreign investment in US real estate approached the 2015 peak of $100 billion, despite a 60% drop in Chinese investment due to changes in government controls of outward-bound capital. Both European and Asian buyers perceived the United States as a safe place to invest, although an increase in hedging costs to guard against potential fluctuations in the value of the dollar have affected the capital flow into the country. Some international investors have sought higher-yield investments outside the traditional central business district (CBD) target markets to make up for these hedging costs.

## Debt

Because mortgage money is so important in real estate, investors, appraisers, and analysts must be familiar with the sources and costs of debt capital. The primary market of direct investors includes the traditional real estate lenders: commercial banks, community banks, life insurances companies, and others. The secondary mortgage market has historically been dominated by government-sponsored enterprises (GSEs) like Fannie Mae and Freddie Mac, although private entities have increased their participation through the purchase of securitized real estate debt.

> **debt**
> One of two characteristic types of capital, the other being equity. The debt investor expects a priority claim on investment earnings and looks for security in the form of a lien on the assets involved and the promise to repay. Debt investors may participate in bonds or mortgages and receive fixed or variable interest on the investment with repayment of the principal upon maturity. In amortizing loans, some principal is paid periodically as well.

### Commercial Banks

Commercial banks are privately owned institutions that offer a variety of financial services to businesses and individuals. In keeping with their role as short-term lenders, commercial banks have traditionally supplied construction and development loans. For short-term, interim financing, developers are usually required to obtain commitments from long-term, permanent lenders, whereby the lenders agree to "take out" the "end loan" with the developer once the project has been completed. Large commercial banks have also become a principal source of takeout financing, i.e., long-term permanent mortgage loans and end loans, usually for commercial and industrial properties. In small communities, commercial banks such as Wells Fargo and Bank of America are also expected to supply their customers with home loans.

### Community Banks

Community-based financial institutions are generally smaller than commercial banks (i.e., community banks have less than $1 billion in assets), but community banks hold a larger proportion of commercial real estate loans as a percentage of their balance sheets, often as much as 50%. Prior to the financial crisis, community banks were able to reduce their risk by selling much of their mortgage portfolios to government-sponsored entities in the secondary mortgage market or to larger, commercial banks. With consumer lending being dominated by commercial banks in recent years, community

BACK_DEFEXP-RR-002548

banks have tended to focus on lending for construction and development and loans secured by multifamily properties, farmland, and nonresidential nonfarm properties.

Even though community banks did not hold the sort of securities associated with the financial crisis, they were still hard hit by the poor performance of commercial real estate loans in the following years. From 2008 to 2011, 85% of bank failures involved institutions with less than $1 billion in assets, which often concentrated on small business lending and were associated with local community development.[4]

Commercial banks are more prevalent in metropolitan areas than community banks. As a result, community banks have not been able to take advantage of the relatively stronger economic growth of metropolitan areas to grow as quickly as banks headquartered in those areas. However, structural changes in the US economy, which are shifting economic output from the areas that experienced high growth prior to the financial crisis, may allow community banks to grow at a similar rate as commercial banks in the near future.

### Life Insurance Companies

The mortgage investments of life insurance companies cover the full range of realty types—e.g., residences, apartments, offices, shopping malls, hotels, and industrial properties. Because many life insurance companies have great financial resources, they have been important in mortgaging large, income-producing properties. Large companies prefer loans on commercial properties.

### Mutual Savings Banks

Mutual savings banks are very similar to mutual savings and loan associations, promoting thrift and investing substantial amounts of savings in real estate mortgages. Generally, they have broader investment powers than savings and loan associations. Savings banks concentrate on mortgages, but they also invest in government bonds, corporate bonds, and, to a lesser degree, real estate and stock equity investments.

### Junior Mortgage Originators

Junior mortgages can be used to raise substantial amounts of mortgage funds and to achieve various investment goals, such as creating additional leverage and facilitating sales of properties with first mortgages that cannot be refinanced. Junior mortgages involve greater risk than senior liens do and therefore command higher interest rates.

### Hard Money Lenders

Hard money loans are most often used as bridge loans or in distressed financial situations. They are commonly made by private companies or individuals, who focus almost exclusively on the security interest in the property as opposed to the credit worthiness of the borrower. This market is typically unregulated, offering flexibility and a streamlined approval process. Hard money loans generally have relatively short terms and carry higher interest rates to accommodate increased risk. The market for hard money loans has increased since passage of the Dodd-Frank Act in 2009, which increased the regulation of conventional lenders. Because underwriting is primarily focused on the security interest in the underlying asset, valuation of the property is of major importance.

---

4.  US Government Accountability Office, "Causes and Consequences of Recent Bank Failures," *Report to Congressional Committees* GAO-13-71 (January 2013).

BACK_DEFEXP-RR-002549

## Secondary Mortgage Market

Government and private organizations stimulate home building through the secondary mortgage market (Figure 10.5). In this market, mortgagees sell packages of mortgages at prices consistent with existing money market rates. Selling mortgages frees up capital, creates liquidity, and permits mortgagees to lend when they might otherwise lack funds.



**Figure 10.5**   The Primary and Secondary Mortgage Markets

Although most secondary mortgage market activity is generated by Fannie Mae, Freddie Mac, and Ginnie Mae, the private sector has also played a role. Banks and insurance companies with mortgage-originating capability often sell loan portfolios, or mortgage participations, to private or institutional investors. Some REITs have purchased mortgages from institutions, thereby supplying the sellers with the liquidity needed to continue their lending programs.

## Securitization of Real Estate Investment Markets

Securities are investment instruments that convey ownership in certificates backed by mortgage payments of properties in the securitized mortgage pool. The pools are divided into tranches of varying levels of risk, as determined by rating agencies.

The emergence of collateralized mortgage obligations (CMOs) as a major investment banking instrument was prompted by Ginnie Mae guarantee arrangements. CMOs are bonds issued and sold in the capital markets. They are attractive to investors because the debt involved is usually collateralized by Ginnie Mae certificates covering pools of residential mortgages. Prior to the financial crisis, this vehicle was a huge source of liquidity for the mortgage industry and helped monetize the mortgage element in real estate investment. (See Figure 10.6.)

The real estate mortgage investment conduit is a variation in the CMO field. A real estate mortgage investment conduit (REMIC) transforms the CMO from a pure debt (bond) vehicle into an equity-type investment. In a REMIC arrangement, the certificate represents a proportionate share of ownership in a pool of mortgages. The issuing organization, often an investment bank, avoids adding debt to its balance sheet by using the REMIC. The investor in a REMIC enjoys the benefit of a tax pass-through similar to that of a REIT, and thereby avoids the double taxation incurred by investors in corporations. CMOs of all types brought enormous amounts of capital into the mortgage field.

Collateralized debt obligations (CDOs) differ from CMOs in that the assets used as security are not mortgages. The collateral usually consists of loans and debt instruments, sometimes a mixed portfolio, divided into tranches of different risk levels and a decreasing priority of claims. Since the 1990s, CDOs have been a primary driver of the growth in the securitization of real estate globally, and they are often identified as

BACK_DEFEXP-RR-002550

**Figure 10.6**    United States CMBS Issuance by Year



Source: http://www.crefc.org/CREFC/Resources/Compendium_of_Statistics/CMBS_Issuance.aspx

a prime culprit in the subprime mortgage crisis. The vilified credit default swap is a credit derivative in which the buyer makes periodic payments to the seller and, in return, receives payment if an underlying financial instrument (often a CDO) defaults. Although considered a form of insurance, credit default swaps were mostly unregulated prior to the financial crisis. Subsequent reforms have increased transparency, but credit default swaps are still subject to considerable speculation.

## Debt and Equity Relationships

In the capital markets, when the risks associated with different investments are comparable, funds flow to the investment that offers the best prospective yield. Risks are related to rewards. If capital is to be attracted, competitive yields must be offered.

---

**Security vs. Real Estate**

Although public market pricing has some advantages, investor-driven pricing does not necessarily reflect the value of the underlying real estate asset. There is wide variation among real estate securities, depending on the structure of the particular investment vehicle. For example, REITs are subject to stringent requirements as to the dividends paid to investors (expectations of higher or lower dividends can influence pricing) or to legal restrictions limiting the amount of property that can be sold in any given year. REITs can also employ investment leverage, which increases the potential return on the investment but can create difficulties for the investment in market downturns.

In the 1990s, the first property derivatives were developed as financial instruments that allowed owners to hedge risk in property portfolios and investors to participate in the real estate market without direct investment in specific properties. The pricing mechanism for derivatives is an underlying property index. During the financial crisis of 2008, the complexity and lack of transparency of the property derivative structure was criticized as obscuring the risks involved for individual investors and for the health of the market as a whole.

---

BACK_DEFEXP-RR-002551

## Principal Operators in the Secondary Mortgage Market

In the United States, activity in the secondary mortgage market has historically been dominated by a handful of government and quasi-governmental agencies. Government-sponsored enterprises (GSEs) like Fannie Mae, Freddie Mac, and the other participants in the secondary mortgage market are regulated by the federal government. The various GSEs have different investment strategies and levels of governmental involvement, but all help to make funds available for home buyers and renters.

### Fannie Mae and Freddie Mac

The Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are quasi-governmental corporations that engage in certain business activities to ensure liquidity in the mortgage market:

· Purchasing existing mortgages from banks, trust companies, mortgage companies, savings and loan associations, and insurance companies
· Guaranteeing that the mortgages it holds will be paid on time
· Pooling the mortgages into mortgage-backed securities
· Either holding or selling the securities to other investors

In 2008, the federal government took conservatorship of Fannie Mae and Freddie Mac in an effort to stabilize the secondary mortgage market during the financial crisis. In a 2011 white paper on mortgage finance reform, the Obama administration proposed the eventual dissolution of the government-sponsored enterprises. The proposal would shift support of mortgage credit from government to private markets through increased guarantee-fee pricing as well as larger down payment requirements. The two GSEs and the Federal Housing Administration support more than 90% of new American home loans. The Treasury report proposed that the government's main roles should be consumer protection, "robust oversight" of lenders, and assistance to low- and middle-income American homeowners and renters. The proposal called for replacing Fannie and Freddie with a federal guarantee in one of three ways:

1. The FHA, Department of Agriculture, and the Department of Veterans Affairs would be the only agencies offering such guarantees.

2. The FHA and a federal government backstop would offer guarantees only in the event of economic stress.

3. The federal backstop would remain in place at all times, regardless of market conditions.

Various options remain for any eventual restructuring of the GSEs, such as taking the organizations out of conservatorship and back into private ownership as stockholder-owned corporations, splitting the two large GSEs into a larger number of smaller entities, absorbing the GSEs into the government again, and others.[*]

In 2013, the Federal Housing Financing Agency (FHFA) announced plans to form a new company that would consolidate back-office functions of the two GSEs. The long-term goals for Fannie Mae and Freddie Mac expressed by the FHFA leadership are to gradually contract the dominant presence of the GSEs in the marketplace and shrink their operations, to build a new infrastructure for the secondary mortgage market, and to maintain current activities that promote market stability and liquidity and help prevent foreclosure.[†]

### Ginnie Mae

The Government National Mortgage Association (GNMA) is a federally owned and financed corporation under the Department of Housing and Urban Development that subsidizes mortgages through its secondary mortgage market operations and issues mortgage-backed, federally insured securities. Its most important program is the mortgage-backed security program in which Ginnie Mae guarantees securities covered by pools of loans collected by mortgage originators. Ginnie Mae deals only with FHA, VA, and Rural Housing Administration loans.

### Farmer Mac

The Federal Agricultural Mortgage Corporation is a federally chartered, but privately owned, corporation that serves the same function for rural properties as Fannie Mae and Freddie Mac do for urban and suburban properties. Its most important programs are the secondary mortgage market programs for agricultural real estate and rural housing.

---

[*] See also N. Eric Weiss, *Fannie Mae's and Freddie Mac's Financial Status: Frequently Asked Questions*, CRS Report for Congress (Washington, DC: Congressional Research Service, 2012).

[†] Edward J. DeMarco, "FHFA's Conservatorship Priorities for 2013," Remarks as Prepared for Delivery, National Association for Business Economics 29th Annual Economic Policy Conference, Washington, DC (March 4, 2013).

BACK_DEFEXP-RR-002552

The most persuasive indicators of competitive yield levels are found in money markets where billions of dollars of capital are traded daily, traders are sophisticated and well informed, and investments are often professionally rated for risk.[5]

In an unstable economic climate, appraisers are well advised to collect data on the capital markets to support the conclusions they have developed from real estate market data. The transactions in the financial markets reflect the discounting of economic futures by well-informed investors and provide useful insights for investment analysts.

The largest equity market is the trading of common stocks. Transactions are reported daily, and share prices and current dividend rates are revealed. Financial publications and online sources offer abundant information about corporate earnings and general conditions in commercial and industrial enterprises. This data provides the basis for risk rating of the securities issued by businesses. In the field of debt investments (bonds and debentures), the rating task is often performed by professionals such as Standard & Poor's, Moody's, Duff & Phelps, and Fitch Ratings. Their opinions are widely published. Other information is furnished by the securities analysts of major banking institutions, brokerage companies, and the investment banking industry. Their opinions are readily available to investors.

---

### Types of Risk

Every real estate transaction contains an element of risk. A lender accepts the risk that a borrower may default on a loan. A landlord accepts the risk that tenants will not renew at the termination of a lease. Home buyers accept risks related to the quality and condition of unseen building elements and, on a larger level, the likelihood that property values in the neighborhood will go up or down in the future. Risk increases as the range of possible outcomes grows. The rate of return necessary to attract investment increases along with risk levels.

Various types of risk can affect an investment:

#### Market risk
Definition:      Risk that net operating income will be affected by changes in the market—e.g., shifts in demand or supply or both

Influenced by:   · Type of property
                 · Location of property
                 · Stage in cycle

#### Financial risk
Definition:      Risk related to the use of debt to finance an investment (e.g., default, prepayment, contractual financing terms that cannot respond to interest rate changes)

Influenced by:   · Amount of debt
                 · Type of debt

#### Capital market risk
Definition:      Risk that market value will be affected by changes in capital markets—e.g., mortgage yield rates, equity yield rates, overall yield rates (due to the changes in mortgage or equity yield rates), or overall and terminal capitalization rates (due to changes in overall yield rates)

Influenced by:   · Changes in levels of interest rates
                 · Changes in availability of capital (both mortgage and equity)
                 · Rate of return for alternative investment opportunities

---

5.   For publications and research from the ratings agencies on the performance of stocks and bonds, see www.standardandpoors.com, www.moodys.com, www.duffandphelps.com, and www.fitchratings.com.

BACK_DEFEXP-RR-002553

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Investment Yields

There are differences in the investment yields produced by debt and equity instruments. With a debt instrument, the original lender is entitled to interest at a specified rate, either fixed or variable, and full payment of the loan amount at maturity. The arrangement may call for periodic payments of interest only and full repayment of the principal at maturity, as in the case of bonds, or it may require periodic payments that combine interest and debt reduction, as in most mortgage loans.

An equity investment has none of the contractual certainty or specificity of a debt position. The income or dividend earnings are simply the amount of a venture's income, if any, after operating expenses and debt service are paid. This cash flow can be positive or negative, depending on whether there is an excess or deficiency of income after all expenses. The reversion is simply the venture's market value at the end of the investment holding period—i.e., a future value. When entering into an investment, an investor considers the forecast dividend earnings and reversion in relation to the acquisition price. This relationship reflects the prospective equity yield. Upon

### Types of Risk *(continued)*

**Inflation (purchasing power risk)**

Definition: Risk that unexpected inflation will cause cash flow from operations and reversion to lose purchasing power

Influenced by: · Lease provisions that provide inflation protection

**Liquidity (marketability) risk**

Definition: Difficulty of converting a real estate investment into cash at market value in a reasonable time

Influenced by: · Inefficiency of real estate market

· Strength or weakness of the market

**Environmental risk**

Definition: Risk that the market value of a property will be affected by its physical environment

Influenced by: · Perceived health hazards

· Costs associated with dealing with potential environmental problems

· Acts of nature such as earthquakes and weather conditions

**Legislative risk**

Definition: Risk that legal factors will affect the market value of a property

Influenced by: · Tax law changes

· Environmental regulations

· Change in land use regulations (zoning)

· Ability to navigate permitting process

**Management risk**

Definition: Risk that the management cannot ensure that the property meets defined goals

Influenced by: · Competency of management

· Type of property (e.g., regional malls require more intensive management than warehouses)

Each of these types of risk can influence a property separately or in combinations. For example, a change in federal tax laws (legislative risk) may lead to changes in the required equity yield rate (capital market risk), or unexpected inflation (inflation risk) can cause mortgage interest rates to rise (capital market risk).

Comparable properties in the income capitalization approach should have the same degree of risk as the subject property because risk is a consideration in the selection of overall capitalization and yield rates.

BACK_DEFEXP-RR-002554

termination of the investment, the dividends and reversion realized are related to the original amount of the investment to reflect the historic equity yield.

## Leverage

The term *leverage* refers to how borrowed funds increase or decrease the equity return. The leverage an investor obtains by using borrowed funds to finance an investment is accompanied by risk. The investor seeks compensation for this risk by requiring a higher equity yield rate. In analyzing cash flows, positive leverage is indicated when the overall capitalization rate is greater than the mortgage capitalization rate. The difference between the two rates directly benefits the equity owner, so the equity capitalization rate is higher than it would be if there were no mortgage. The same relationships hold for overall, equity, and mortgage yield rates. (See Table 10.4.)

The analysis of leverage is important because positive or negative leverage can affect the level of risk associated with a real property investment and the yield required to satisfy an investor willing to assume the risk. The use of leverage magnifies fluctuations in cash flow, and enhanced variability translates into risk. If property performance falls below expectations and periods of insufficient cash flow are protracted, the investor may become strapped for cash to service the debt on the property, a situation many real estate investors encountered as prices of highly leveraged properties dropped following the financial crisis of 2008. If market conditions become illiquid, investors may be unable to command a price for property that allows for repayment of the debt.

| Table 10.4 | Types of Leverage | |
|---|---|---|
| **Leverage Is** | **Using Equity Capitalization Rates** | **Using Equity Yield Rates** |
| Positive | If the overall capitalization rate is greater than the mortgage capitalization rate, then the equity capitalization rate is greater than the overall capitalization rate | If the overall yield rate is greater than the mortgage yield rate, then the equity yield rate is greater than the overall yield rate. |
| Neutral | If the overall capitalization rate is equal to the mortgage capitalization rate, then the equity capitalization rate is equal to the overall capitalization rate. | If the overall yield rate is equal to the mortgage yield rate, then the equity yield rate is equal to the overall yield rate. |
| Negative | If the overall capitalization rate is less than the mortgage capitalization rate, then the equity capitalization rate is less than the overall capitalization rate. | If the overall yield rate is less than the mortgage yield rate, then the equity yield rate is less than the overall yield rate. |

BACK_DEFEXP-RR-002555

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Neighborhoods, Districts, and Market Areas

**11**

Buyers and sellers of different property types interact in different areas for various reasons. Real estate markets are divided into categories based on property types and their appeal to different market participants. The markets for various categories of real estate are further divided into submarkets, which correspond to the preferences of buyers and users. Differentiating real estate markets into market segments facilitates their study.

All real estate markets are influenced by the attitudes, motivations, and interactions of buyers and sellers of real property, which in turn are subject to many social, economic, governmental, and environmental influences. Property values are also affected by the four factors of value: utility, scarcity, desire, and effective purchasing power. Real estate markets may be studied in terms of their geographic, competitive, and supply-and-demand characteristics, which relate to overall real estate market conditions.

The identification and interpretation of real estate markets are analytical processes. To answer questions about real estate markets and market segments, appraisers analyze the utility and scarcity of property as well as the desires and effective purchasing power of those who seek to acquire property rights. For example, the many lender-owned residential properties that became available after 2008 could not be purchased by typical owner-users because they were not able to get the financing needed to improve the properties and make them habitable.

## Characteristics of Real Estate Markets

A real estate market consists of a group of individuals or firms that are in contact with one another for the purpose of conducting real estate transactions. Possible market participants include the following:

- Buyers
- Sellers
- Landlords (lessors)
- Tenants (lessees)

**submarket**
A division of a total market that reflects the preferences of a particular set of buyers and sellers.

**market segmentation**
The process by which submarkets within a larger market are identified and analyzed.

**disaggregation**
Grouping the subject and competitive properties together based on similar attributes or characteristics.

Specific real estate markets can be identified by property type, property features, market area, substitute properties, and complementary properties.

- Lenders (mortgagees)
- Borrowers (mortgagors)
- Developers
- Builders
- Property managers
- Owners
- Investors
- Brokers
- Attorneys

Each market participant does not have to be in contact with every other participant. A person or firm is part of the market if that person or firm is in contact with another subset of market participants.

The actions of market participants are prompted by their expectations about the uses of a property and the benefits that property will offer its users. Market segmentation, therefore, differentiates the most probable users of a property from the general population by their consumer characteristics. The activity of individual market participants in a real estate market focuses on a real estate product and the service it provides. Product disaggregation, therefore, differentiates the subject property and competitive properties from other types of properties on the basis of their attributes or characteristics.

A market segment is delineated by identifying the market participants likely to be interested in the subject real estate and the type of real estate product or service it provides. Product disaggregation includes both the subject property and competitive and complementary properties. Thus, market analysis combines market segmentation and product disaggregation. The characteristics of a subject property and its market area that are investigated in the process of delineating the market are illustrated in Figure 11.1.

An appraiser should include only relevant data in analyzing the market and preparing the appraisal report. For example, an appraisal report for an apartment property should not include a detailed market analysis of the retail and office property markets and fail to provide a thorough analysis of the apartment market. An appraisal report should identify whether the market for the property is local, regional, or national.

## Market Areas, Neighborhoods, and Districts

Social, economic, governmental, and environmental forces influence property values in the vicinity of a subject property. As a result, they affect the value of that property. Therefore, to conduct a thorough analysis, appraisers must delineate the boundaries of the area of influence. Although physical boundaries may be drawn, the most important boundaries are those that identify factors influencing property values.

The area of influence, commonly called a *neighborhood*, can be defined as a group of complementary land uses. A residential neighborhood, for example, may contain

BACK_DEFEXP-RR-002557

**Figure 11.1**  Market Delineation Process

To identify a specific real estate market, an appraiser investigates the following factors:

1. Property type (e.g., single-unit residence, retail shopping center, office building).

2. Property features such as occupancy, customer base, quality of construction, and design and amenities.

   a. Occupancy—single-tenant or multitenant (residential, apartment, office, retail).

   b. Customer base—the most probable users. Data on population, employment, income, and activity patterns is analyzed. For residential markets, data is broken down according to the profile of the likely property owner or tenant. For commercial markets, data is segmented according to the likely users of the space. For retail markets, the clientele that the prospective tenants will draw represents the customer base. For office markets, the customer base reflects the space needs of prospective companies leasing office units.

   c. Quality of construction (class of building).

   d. Design and amenity features.

3. Market area—defined geographically or locationally. A market area may be local, regional, national, or international in scope. It may be urban, suburban, or rural. It may correspond to a district or neighborhood of a city. Retail and residential market areas are often delineated by specific time-distance relationships.

4. Available substitute properties—i.e., equally desirable properties competing with the subject in its market area, which may be local, regional, national, or international.

5. Complementary properties—i.e., other properties or property types that are complementary to the subject. The users of the subject property need to have access to complementary properties, which are also referred to as *support facilities*.

single-unit homes and commercial properties that provide services for local residents. A *district*, on the other hand, has one predominant land use. Districts are commonly composed of apartments, commercial, industrial, or agricultural properties. In broader terms, appraisers analyze the *market area* within which a subject property competes for the attentions of buyers and sellers. A market area can encompass one or more neighborhoods or districts or both.

The term *market area* may be more relevant to the valuation process than either *neighborhood* or *district* for several reasons:

- Using the umbrella term *market area* avoids the confusing and possibly negative implications of the other terms.
- A market area can include neighborhoods, districts, and combinations of both.
- Appraisers focus on market area when analyzing value influences. A market area is defined in terms of the market for a specific category of real estate and thus is the area in which alternative, similar properties effectively compete with the subject property in the minds of probable, potential purchasers and users.

To identify a market area's boundaries, an appraiser examines the subject property's surroundings. The investigation begins with the subject property and proceeds outward, identifying all relevant actual and potential influences on the property's value that can be attributed to the property's location. The appraiser extends the search far enough to encompass all of the influences the market indicates will affect a property's value. When no more factors that would affect the value of the subject property and of surrounding properties are found, the boundaries for analysis are set. An appraiser's conclusions regarding the market area's impact on a property's value are meaningful only if area boundaries have been properly drawn.

Analyzing the market area helps to provide a framework, or context, in which the opinion of property value is developed. The analysis identifies the area of influ-

BACK_DEFEXP-RR-002558

ence and establishes potential limits within which an appraiser searches for data that can be used to apply the approaches to value. Analyzing the market area also helps an appraiser determine an area's stability and may indicate future land uses and value trends.[1]

### The Life Cycle of Real Estate Markets

Real estate markets are dynamic, and appraisers describe this quality as a market's life cycle. The complementary land uses that make up neighborhoods and the homogeneous land uses within districts typically evolve through four stages:

1. Growth—a period during which the market area gains public favor and acceptance
2. Stability—a period of equilibrium without marked gains or losses
3. Decline—a period of diminishing demand
4. Revitalization—a period of renewal, redevelopment, modernization, and increasing demand

Transition often occurs in the revitalization stage, when a land use that is no longer financially feasible is discontinued in favor of a more productive use.

Although these stages can describe the life cycle of market areas in a general way, they should not be used as specific guides to market trends. No set number of years may be assigned to any stage in the cycle. Many real estate markets remain stable for a long time, and decline is not necessarily imminent in all older areas. Unless decline is caused by a specific external influence—e.g., natural disaster, major economic event—it may proceed at an imperceptible rate and can be interrupted by a change in use or a revival of demand. A market has no set life expectancy, and the life cycle

**Figure 11.2**  The Real Estate Market Cycle



---

1. What has traditionally been called *neighborhood analysis* is referred to in this text as *market area analysis*, in part to distinguish that concept from market analysis, which is covered in Chapters 15 and 16. Market area analysis focuses on the identification of a market area's boundaries and the social, economic, governmental, and environmental influences that affect the value of real property within those boundaries. In conducting market analysis, appraisers address the competitive supply and demand for the subject property more directly.

BACK_DEFEXP-RR-002559

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

is not an inevitable progression. At any point in the cycle, a major change can interrupt the order of the stages. For example, a strong negative influence such as a major employer suddenly pulling out of a community or the closing of a military base can cause a real estate market that is growing to decline rather than stabilize.

After a period of decline, a real estate market may undergo a transition to other land uses, or its life cycle may begin again due to revitalization. Revitalization often results from organized rebuilding or restoration undertaken to preserve the architecture of significant structures. It may also be caused by a natural resurgence of demand. The rebirth of an older, inner-city neighborhood, for example, may simply be due to changing preferences and lifestyles.

### Defining Geographical Boundaries

The boundaries of market areas, neighborhoods, and districts identify the areas that influence a subject property's value. These boundaries may coincide with observable changes in land use or demographic characteristics. Physical features such as structure types, street patterns, terrain, vegetation, and lot sizes help to identify land use districts. Transportation arteries (highways, major streets, and railroads), bodies of water (rivers, lakes, and streams), and changing elevation (hills, mountains, cliffs, and valleys) can also be significant boundaries.

To identify the boundaries of a market area, an appraiser

1.  Examines the subject property. The process of defining a market area's boundaries must start with an analysis of the subject property.

---

#### Change and Transition in Real Estate Markets

In the analysis of a real estate market, appraisers recognize the potential for change and try to determine how an area may be changing. Appraisers consider trends in market growth and composition when analyzing patterns of change. They also investigate whether a market is in a state of transition from one type of land use to another, which, although related to the principle of change, is a separate concept.

In essence, transition is the result of change. For example, the arrival of a major new employer in a market may cause a change in demand for residential property, and that change in market conditions may then lead to the transition of formerly undeveloped land within the market to a more intensive use as the site of new homes or apartments.

Transition is often indicated by variations within the neighborhood or market area. New uses may indicate potential increases or decreases in property values. For example, a residential neighborhood in which some homes are well maintained and others are not well maintained may be undergoing either decline or revitalization. The introduction of different uses, such as residential apartments or offices, into a single-unit residential neighborhood may also indicate potential transition to a more intensive use.

Changes in one market area are usually influenced by changes in other, competing areas and in the larger region of influence. The growth of one market area may lead to the downfall of a competing market area. Suburban business centers may interfere with the success of a city's central business district. Newer residential areas may affect older areas. The added supply of new homes may cause residents to shift from old homes to new ones and place older homes on the market. This increase in supply may affect the market values of all homes in the area. If an area's location makes it attractive for conversion to more intensive land uses, the existing improvements in that area may be remodeled or torn down to make way for redevelopment.

Guide Note 12 to the Standards of Professional Practice of the Appraisal Institute includes discussion of market evidence of changing markets. For example, signs of a bubble market include prices increasing more quickly than rents, shorter marketing times, and an increase in the number of properties remaining vacant after purchase. Evidence of a bust market includes an increase in the rate of foreclosures and a tightening of credit markets.

---

BACK_DEFEXP-RR-002560

2. Examines the area's physical characteristics. An appraiser should drive or walk around the area to develop a sense of place, noting the degree of similarity in land uses, structure types, architectural styles, and maintenance and upkeep. Using a map, an appraiser can identify points where these characteristics change and note any physical barriers—e.g., major streets, hills, rivers, railroad tracks—that coincide with these points.

3. Determines preliminary boundaries on a map. An appraiser determines geospatially the area to connect the points where physical characteristics change.

4. Determines how well the preliminary boundaries correspond to the demographic data. The market area boundaries are often overlaid on a map of geographical areas (e.g., zip codes, census tracts, block groups). An appraiser's observed market area and the areas for which data is available seldom match up perfectly. The information available for census tracts, zip code regions, and counties must be segmented to delineate pertinent submarkets.[2] Reliable data may also be available from local chambers of commerce, universities, and research organizations, often through online sources.

An appraiser might consider surveying area residents to identify relevant characteristics. Appraisers may also interview business people, brokers, and community representatives to establish how far they think the market area extends. Through experience, an appraiser learns to observe changes and recognize how market areas are perceived by their inhabitants.

> **Defining Districts**
>
> In defining a *district*, variations in the relevant characteristics of properties may indicate that more limited boundaries should be established than for a market area. For example, consider an urban area where many high-rise apartment buildings are constructed along a natural lakeshore and separated from other land uses by major transportation arteries. In this type of district, there may be great variations in apartment prices, sizes, views, parking availability, proximity to public transportation, and building ages. These variations suggest limited district boundaries that must be identified to reveal market and submarket characteristics.

Legal, political, and economic organizations collect data for standardized or statistically defined areas such as cities, counties, tax districts, census tracts, and special enumeration districts. Although this data may be relevant, it rarely conforms to the market area boundaries identified for property valuation.

If such secondary data is used to help identify market area boundaries, an appraiser should verify and supplement the data with primary research.

## Value Influences in Real Estate Markets

As mentioned previously, the four forces that influence value (i.e., social, economic, governmental, and environmental forces) interact in the marketplace, creating unique combinations of factors. Careful study of general data related to a real estate market's character is a prerequisite to the more formal application of market analysis, highest and best use analysis, and the approaches to value.

---

2. Every 10 years the Bureau of the Census of the US Department of Commerce collects data on population and housing characteristics, employment, and earnings. For information on applying US census and other data to the analysis of market areas, see Stephen F. Fanning, *Market Analysis for Real Estate: Concepts and Applications in Valuation and Highest and Best Use*, 2nd ed. (Chicago: Appraisal Institute, 2014), Chapters 7 and 8.

BACK_DEFEXP-RR-002561

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

## Social Influences

An appraiser identifies relevant social characteristics and influences, focusing on the demographic characteristics that tend to influence property values most in a community. Comparing price levels in one market with prices in competing areas serves as an indication of the overall desirability of the areas.

Although an appraiser can compile extensive demographic information, it is difficult, if not impossible, to identify the specific social preferences of the individuals who make up a given market and to measure how these preferences affect property value. From an appraiser's viewpoint, the social characteristics of a neighborhood are significant only when they are considered by the buying public and can be objectively and accurately analyzed. Although race, religion, and national origin are social characteristics, they have no relationship to real estate values. Appraisers must perform unbiased analyses of neighborhoods, districts, and market areas. The Ethics Rule of the Uniform Standards of Professional Appraisal Practice states, "An appraiser must not use or rely on unsupported conclusions relating to characteristics such as race, color, religion, national origin, gender, marital status, familial status, age, receipt of public assistance income, handicap, or an unsupported conclusion that homogeneity of such characteristics is necessary to maximize value."

## Economic Influences

Economic influences and government policy have a major effect on both the residential and commercial real estate in a market area. The general decline in the US economy in 2006 severely lessened the demand for many types of real estate, while tightened lending requirements restricted the ability of potential home buyers and investors to qualify for loans. Since then, the regulatory environment shows signs of loosening, but the importance of regulations and the availability of financing cannot be overstated.

On a local level, economic considerations relate to the financial capacity of a market area's occupants and their ability to rent or own property, to maintain it in an attractive and desirable condition, and to renovate or rehabilitate it when needed.

The economic characteristics that an appraiser may consider include the following:

- Mean and median household income levels
- Per capita income
- Income distribution for households
- Consumer activity
- Extent of owner occupancy
- Property rent levels and trends
- Property value levels and trends
- Vacancy rates for various types of property
- Amount of development and construction

The physical characteristics of the area and of individual properties may indicate the relative financial strength of area occupants and how this strength is reflected in local development and upkeep. Ownership and rental data can also provide clues to the financial capability of residents. The income levels revealed by recent census information, media surveys, and private studies may indicate the prices at which occupants can afford to rent or purchase property.

BACK_DEFEXP-RR-002562

The presence of vacant lots or acreage suitable for development in an area may indicate future development or a lack of demand. Current construction trends affect the value of existing improvements. A careful study of these trends can help an appraiser forecast the future desirability of an area. Block-by-block information helps identify the direction of growth. A trend may be a local phenomenon or it may affect the entire metropolitan area. A change in the economic base on which a community depends (e.g., the addition or loss of a major employer) is frequently reflected in the rate of population growth or decline.

To analyze the economic characteristics of a market area, an appraiser expands the analysis to include economic trends over a multiyear period. Then the appraiser decides which economic variables contribute most to value differences among locations and compares the economic characteristics of competing market areas.

## Governmental Influences

As mentioned previously, government action affects the economic climate for real estate investment. One significant legislative action on the national level was passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act in July 2010. The act was created to regulate credit cards, financial instruments, loans, and mortgages and to increase the supervision of Wall Street investment firms, banks, hedge funds, insurance companies, and the Federal Reserve. The ramifications of the Dodd-Frank act are still playing out and will continue to affect the economy and real estate markets in the foreseeable future.

On the local level, governmental considerations relate to the laws, regulations, and property taxes that affect properties in the local market and the administration and enforcement of these constraints, such as zoning laws and building codes. The property tax burden associated with the benefits provided in one location and the taxes charged for similar benefits in other areas may be significantly different.

The governmental characteristics an appraiser considers in the analysis of a market area include the following:

- Property tax burden (including special assessments) relative to services provided, compared with other areas in the community
- Policies regarding developmental growth
- Local government development levies (impact fees)
- Zoning, building, and housing codes
- Quality of public services, such as fire and police protection, schools, and other governmental services
- Environmental regulations

Divergent tax rates or impact fees may affect market value. Local taxes may favor or penalize certain property types. By examining the local structure of assessed values and tax rates, an appraiser can compare the tax burdens created by various forms of taxation and ascertain their apparent effect on the values of different types of real estate.

Local zoning ordinances regulate land use and the density of development. With varying degrees of success, communities regulate zoning to halt or slow growth. To encourage new development, they may expand capital improvement programs and construct sewage treatment facilities, fire stations, streets, and public recreational

BACK_DEFEXP-RR-002563

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

facilities. In the absence of zoning, an appraiser should determine if any private restrictions are in place that would protect long-term property values.[3]

Zoning may also be used to enforce a community's land use plan or comprehensive plan, which is usually based on growth projections and influenced by political considerations. Appraisers should be aware of the assumptions on which the land use plan is based and of the potential for revision. An appraiser also must consider the date that the plan was adopted and the plan's projection term. The more recently the land use plan was adopted, the more meaningful it may be.

Environmental concerns have prompted increased regulation of land development at state and local levels. Zoning ordinances and building codes impose additional costs on developers. To preserve environmental quality, developers are required to consider the impact large developments will have on an area's ecology and on the larger environmental system. Developers may be required to improve public roads, construct sewage treatment facilities, preserve natural terrain, or take other actions to conform to the recommendations of local, regional, or state planning agencies. These regulations can significantly increase the time required to complete a development and hence increase its final cost. The value of subdivision land is influenced by environmental regulations, which can affect costs and the amount of time required to develop and sell the sites.

The creation or modification of the transportation system and the provision of services are government actions. An improvement in the transportation system can affect a site's accessibility and, thus, its value. Improved transportation routes often cause new areas to be developed. A municipality's willingness to provide public services to outlying areas can also affect the direction and amount of development. Similarly, a lack of transportation routes and limitations on the expansion of sewer service can restrict local growth.

### Environmental Influences

Environmental considerations consist of any natural or man-made features that are contained in or affect the property's location, including the following:

- Topographical features (terrain and vegetation)
- Environmental features important to wildlife habitat
- Navigable waterways
- Open space
- Nuisances and hazards emanating from nearby facilities such as shopping centers, factories, and schools—e.g., odors, noises, litter, vibrations, fog, smoke, and smog
- The adequacy of public utilities such as streetlights, water, sewers, and electricity
- General maintenance
- Effective ages of properties
- Changes in property use and land use patterns
- Traffic flow and traffic patterns
- Environmental liabilities—e.g., threat of landslides or flooding

---

3. Private restrictions on land use may be established by private owners through provisions in deeds or plat recordings. These restrictions may specify lot and building sizes in a subdivision, permitted architectural styles, and property uses. Condominium bylaws also restrict property use. An appraiser should make certain that private restrictions do not limit property uses inordinately.

BACK_DEFEXP-RR-002564

- Access to public transportation (and type of system, e.g., bus, rail), schools (and quality of schools), stores and service establishments, parks and recreational facilities, houses of worship, and workplaces

A market area's environmental characteristics cannot be judged on an absolute scale. Instead, they must be compared with the characteristics of competing areas.

Topographical features can have positive or negative effects on property values. The presence of a lake, river, or hill nearby can provide a scenic advantage, while excessive traffic, odors, smoke, dust, or noise from commercial or manufacturing enterprises can make a neighborhood less desirable for some property types. Environmental features important to wildlife habitat can cause regulators to restrict development. For example, the presence of spotted owls, an endangered species, in forested areas in the Northwest has led to bans on logging and development.

Gas, electricity, water, telephone, cable and internet service, and storm and sanitary sewers are essential to meeting the accepted standard of living in most municipal areas. A deficiency in any of these services tends to decrease property values in a market area. The availability of utilities also affects the direction and timing of growth or development.

Location may refer to the siting of a property and the effect of siting on accessibility—e.g., the ease of access to a corner lot compared to an interior lot. It can also refer to the time-distance relationships, or linkages, between a property or market area and all other possible origins and destinations of people going to or coming from the property or market area. Usually all the properties in a well-defined market area have the same or similar locational relationships.

### City Origins and Growth Patterns

Appraisers of urban and suburban property recognize that growth and change in a community can affect neighborhoods, districts, and other market areas differently. An appraiser must understand the factors that contribute to urban and suburban growth patterns to analyze the market area where the subject property is located and to determine how the area affects the quantity, quality, and durability of the subject property's future income or the amenities that create value.

The structure of land uses in an urban community usually reflects the settlement's origin. This is known as the *siting factor*. Some US cities were established at transportation centers such as seaports, river crossings, or the intersection of trade routes. Other cities were founded near power sources useful to manufacturing, and still others were located for defensive, commercial, or political reasons. As the national standard of living improved, climate and other natural advantages became siting factors responsible for the development of retirement areas, recreational resorts, and other specialized communities. From its initial site, a community grows outward in a pattern dictated by the nature and availability of developable land, the evolution of technology, and the government's ability and willingness to provide essential public services.*

Where land is scarce, communities often experience an increase in land use density. Development corridors channel new construction to usable land. New technology, building materials, and construction methods make it possible to construct high-rise buildings in cities without bedrock and those subject to earth tremors.

Transportation improvements and the proliferation of automobiles have also shaped modern cities. Improved transportation allows urban settlements to expand and serve larger markets. The pattern of city growth is influenced by the local transportation network. Growth usually radiates from the central business district along major transportation routes. Major freeway systems can cause widespread migration from the city's core.

---

* Various conceptual models of urban growth are used to describe land use patterns. These "social ecology" models include the concentric zone theory, the sector (wedge) theory, the multiple nuclei theory, and the radial (axial) corridor theory. For a more complete discussion of urban growth patterns, see Stephen F. Fanning, *Market Analysis for Real Estate: Concepts and Applications in Valuation and Highest and Best Use*, 2nd ed. (Chicago: Appraisal Institute, 2014), Chapter 5.

BACK_DEFEXP-RR-002565

Copyrighted material licensed by Charles Brigden on September 17, 2020

When current zoning does not restrict changes from the present land use or when a change in land use is evident, appraisers may need to examine linkages in terms of both the current land use and the anticipated land use in the market area.

A market participant's idea of what makes an area desirable can be studied by analyzing comparable sales. The dollar and percentage differences among the sale prices of similar properties in different locations can provide the basis for this analysis.

## Characteristics of Real Estate Districts

The value influences that affect different types of districts—e.g., residential districts, commercial districts, industrial districts—are the same as those affecting larger, more diverse market areas, but the emphasis and relative importance of the factors change with the type of district being analyzed.

The availability of public utilities, including sanitary sewers and municipal or well water, is one important factor that affects land value in all districts. Prevailing levels of real estate and personal property taxes also influence the desirability of districts and may be reflected in real estate values. Of course, the four forces that influence all real estate demand—utility, scarcity, desire, and effective purchasing power—affect districts.

### One-Unit Residential Districts

Homeownership has long symbolized economic prosperity, and the residents of an area dominated by owner-occupied single-unit homes often take an active role in maintaining or enhancing the value of their properties. Through formal homeowners associations, which often enforce conditions, covenants, and restrictions in a development, or voluntary associations such as crime watch groups and neighborhood block clubs, property owners attempt to ensure conformity of land uses within a residential district and thus safeguard the character, appeal, and value of neighboring homes.

Community spirit, which is evidenced in activities such as block parties and street fairs, and activist efforts, such as lobbying against undesirable rezoning or development, can make a residential area more stable or even reverse a trend toward declining property values.

In built-up urban areas, single-unit homes will usually be integrated into the complementary land uses that make up a residential neighborhood. In suburban areas where developable land has historically been relatively cheap, single-unit residential districts can cover large amounts of land. Recently, however, higher density projects have been developed in many areas with more common elements and integrated or nearby conveniences such as commercial properties, schools, libraries, parks, and religious facilities. In some metropolitan areas, suburban sprawl has become as much of a social problem as flight from central cities was in the 1960s and 1970s. The influence of commuting time on the value of residential districts is significant, whether workers are traveling to a central business district or suburban offices.

Just as the availability of labor and consumer purchasing power is essential to the economic health of commercial and industrial districts, proximity to employment opportunities significantly influences property values in a residential district. As employers relocate from central cities to areas closer to their employees' homes, former bedroom communities can develop thriving commercial districts. These districts can rival the central business district of the larger metropolitan area and may serve as

BACK_DEFEXP-RR-002566

**Figure 11.3**    Characteristics of One-Unit Residential Districts



| | | |
|---|---|---|
| **Defining characteristic** | · | Predominance of owner-occupied homes |
| **Examples of subdistricts** | · | Custom-built subdivisions |
| | · | Attached housing, e.g., condominiums, townhouses |
| | · | Senior housing: congregate care and living |
| | · | Rural housing |
| **Value influences** | · | Access to workplaces |
| | · | Transportation service |
| | · | Access to shopping centers and cultural facilities |
| | · | Proximity to an quality of schools |
| | · | Reputation of area |
| | · | Residential atmosphere and appearance |
| | · | Protection from unwanted commercial and industrial intrusion |
| | · | Proximity to open space, parks, lakes, rivers, and other natural features and to recreational facilities |
| | · | Presence of vacant land likely to be developed to uses that could make the area more or less desirable |
| | · | Private land use restrictions, e.g., covenants, conditions, and restrictions (CC&Rs) |
| | · | Public land use restrictions, e.g., zoning restrictions |

BACK_DEFEXP-RR-002567

an economic base for surrounding residential areas. Long-term migratory patterns within a metropolitan area can be analyzed to forecast possible growth trends.

The topographical and climatic features of land in a residential district are generally analyzed as possible amenities or potential hazards. Access to a body of water can increase a home's value if the location provides a scenic view, but the same lake or stream may reduce value if flooding occurs frequently. Sometimes a river, lake, hill, park, or other natural feature may act as a buffer between a residential district and commercial or industrial areas and thereby reinforce the residential area's identity.

In recent years, the growth of the telecommuting workforce has made rural and exurban areas far from urban and suburban employment centers into feasible residential communities by eliminating the commute. On a national level, the combination of telecommuters and self-employed individuals working at home makes up a small percentage of the total workforce, but, according to a 2017 report, the number of home workers increased 115% between 2005 and  2017.[4] The influence of telecommuting on the supply of and demand for housing in a residential district can be significant, depending on the demographics of the area. For example, the 2017 report revealed that telecommuting currently exceeds public transportation as the preferred commuting option in the top US metropolitan areas.

### Multifamily Residential Districts

In large cities, multifamily residential districts usually cover an extensive area. In smaller cities, such districts may be dispersed or limited in size. Units may be rented (i.e., apartments) or privately owned as cooperatives and condominiums. Multifamily districts are subject to many of the same influences that single-unit residential areas are, but certain influences may be more important in multifamily districts because of their higher density.

In some cities, publicly or privately published statistics on the supply of apartments, vacancy rates, and rent levels are available. When published statistics are not readily available, appraisers will have to gather data through primary research and analyze the data appropriately.

Appraisers must be familiar with the zoning requirements for the areas in which they are providing valuation services and be aware of building codes and requirements. What may be legal in a high-density, multi-unit district may not be legal in a low density, single-unit residential district.

### Commercial Districts

A commercial district is a group of offices or stores. Included in this category are

- Highway commercial districts—i.e., enterprises along a local business street or freeway service road and developments adjacent to a traffic intersection
- Retail districts—e.g., regional, super-regional, and neighborhood shopping centers
- Downtown central business districts (CBDs)

To analyze a commercial district, an appraiser identifies its trade area—i.e., the area the businesses serve. Because a commercial district's economic health depends on the

---

4. See "Census Bureau Releases Information on Home Workers" press release and detailed tables (October 20, 2004), available at www.census. gov/acs/www, and Brian McKenzie and Melanie Rapino, *Commuting in the United States: 2009* (Washington, DC: American Community Survey Reports, issued September 2011). See also the *2017 State of Telecommuting in the U.S. Workforce Report* available at www.workflexibility.org/ state-of-telecommuting-us-2017.

BACK_DEFEXP-RR-002568

**Figure 11.4**    Characteristics of Multifamily Residential Districts



| Defining characteristic | · | Generally a predominance of renter occupancy and higher density than single-unit residential districts |
|---|---|---|
| **Examples of subdistricts** | · | Multistory/high-rise buildings |
| | · | Garden apartments |
| | · | Row houses |
| | · | Townhouses |
| | · | Cooperative apartments |
| | · | Condominium apartments |
| | · | Master-planned communities |
| | · | Mixed-use buildings |
| **Value influences** | · | Access to workplaces |
| | · | Transportation service |
| | · | Access to shopping centers, cultural facilities, and entertainment |
| | · | Reputation of area |
| | · | Residential atmosphere and appearance |
| | · | Protection against unwanted commercial and industrial intrusion |
| | · | Proximity to employment |
| | · | Proximity to open space, parks, lakes, rivers, or other natural features |
| | · | Supply of vacant sites that may potentially be developed, which could make present accommodations more or less desirable |
| | · | Parking for tenants and guests |
| | · | Vacancy and tenant turnover rate |
| | · | Proximity to public transportation |
| | · | Proximity to linkages, including arterial roads, highways, and interstates |
| | · | School districts |
| | · | Inventory levels |
| | · | Foreclosures and short sales |
| | · | Frequency of weather-related problems, such as flooding, tornadoes, and fires |

vibrancy of the surrounding trade area, property values in a commercial district are affected by the type and character of nearby land uses and other factors that influence the values of surrounding properties.

### Office Districts

Office districts can contain combinations of buildings ranging from small, low-rise structures to large, multistory buildings. The buildings in an office district may be owner-occupied structures or serve a variety of tenants. The offices may serve multinational corporations, local corporations, small service companies, and professionals.

BACK_DEFEXP-RR-002569

Office districts include planned office parks and strip developments on or near major traffic arteries. Office parks, which are sometimes known as *business parks* or *business centers*, often have industrial users among their tenants because the parks offer good locations, easy access, attractive surroundings, and utility without the congestion and high rents of the CBD. Office parks increasingly provide facilities for service industries as well as retailers, restaurants, computer stores, branch banks, day care centers, and other businesses. Because office parks and industrial parks rely on surrounding areas to supply the labor force, they are often located near residential districts and their park-like appearance may be an advantage in the eyes of nearby residents.

**Figure 11.5**  Characteristics of Office Districts



| Defining characteristic | · Office uses with supporting retail services and other related services |
|---|---|
| Examples of subdistricts | · Central business districts |
| | · Suburban office parks |
| | · Concentration of office properties of a particular class, as defined by the market |
| | · Office condominiums |
| Value influences | · Significant locational considerations such as the time-distance from potential labor force, access, highway medians, and traffic signals |
| | · Building configuration (floorplate size, ceiling height, etc.) |
| | · Physical characteristics such as the visibility, attractiveness, quality of construction, and condition of properties |
| | · Direction of observable growth |
| | · Character and location of existing or anticipated competition |
| | · Availability of land for expansion |
| | · Pedestrian or vehicular traffic count |
| | · Vacancy and rental rates |

## Retail Districts

More than any other type of real estate, retail properties rely on the local trade area for their economic base. The customers for all but the largest destination shopping centers are drawn from the surrounding areas. The common types of retail property can be classified by the sizes of the trade areas they serve:

- Regional shopping centers and super-regional centers can serve hundreds of thousands of people in many communities along major transportation routes.
- Community shopping centers serve a neighborhood or group of neighborhoods within a defined radius.

BACK_DEFEXP-RR-002570

**Figure 11.6**  Characteristics of Retail Districts



| Defining characteristics | · Concentration of competing retail locations, often along a major street |
|---|---|
| | · Outlots for banks, fast food restaurants, and other uses |
| **Examples of subdistricts** | · Regional and super-regional shopping centers |
| | · Community shopping centers |
| | · Neighborhood shopping centers |
| | · Specialty centers |
| | · Mixed-use centers, e.g., retail and office space |
| | · Strip retail centers |
| **Value influences** | · Quantity and quality of the purchasing power of the population likely to patronize a shopping area and any trends affecting that purchasing power (e.g., job growth) |
| | · Significant locational considerations such as the time-distance from potential customers, access, highway medians, and traffic signals |
| | · Physical characteristics such as the visibility, attractiveness, quality of construction, and condition of properties |
| | · Direction of observable growth |
| | · Character and location of existing or anticipated competition |
| | · Retailers' inventory, investments, leasehold improvements, and enterprise |
| | · Availability of land for expansion and customer parking |
| | · Pedestrian or vehicular traffic count |
| | · Availability of business financing, e.g., focused redevelopment plans (such as TIF districts), minority business support, other public or private programs |
| | · Availability of labor to work in stores and offices |
| | · Location within a city or town or proximity to anchors and core groupings |
| | · Vacancy and rental rates |

BACK_DEFEXP-RR-002571

**Table 11.1**    Characteristics of Shopping Centers

**Neighborhood Shopping Center**

| | |
|---|---|
| Typical size | 30,000 to 100,000 sq. ft. |
| Typical trade area | · Immediate neighborhood |
| | · Population of 3,000 to 40,000 |
| | · Radius of 3 miles |
| | · Driving time of 5 to 10 minutes |
| Leading tenant | Supermarket |

**Community Shopping Center**

| | |
|---|---|
| Typical size | 100,000 to 400,000 sq. ft. |
| Typical trade area | · Population of 40,000 to 150,000 |
| | · Radius of 3 to 6 miles |
| | · Driving time of 10 to 20 minutes |
| Leading tenant | Junior department store, large variety, discount, or department store |

**Regional Shopping Center**

| | |
|---|---|
| Typical size | 300,000 to 900,000 sq. ft. (one or more department stores of around 200,000 sq. ft. each plus small tenant space) |
| Typical trade area | · May include several neighborhood centers |
| | · Minimum population of 150,000 |
| | · Radius of 5 to 15 miles |
| | · Driving time of 20 minutes |
| Leading tenant | One or two full-line department stores |

**Super-Regional Center**

| | |
|---|---|
| Typical size | 600,000 to 2.0 million sq. ft. or more |
| Typical trade area | Trade areas are also extended by major transportation arteries and linkages, so the trade areas for some super-regional centers transcend state boundaries. |
| | · Minimum population of 300,000 |
| | · Radius of 5-25 miles |
| | · Driving time of 30 minutes or more |
| Leading tenant | Three or more full-line department stores |

**Specialty Centers**

| | |
|---|---|
| Outlet center | · An aggregation of factory outlet stores |
| | · No specific anchor tenant |
| Off-price center | · Typically between the size of community centers and regional centers |
| | · Specializing in name-brand merchandise sold significantly below the price at full-line department stores |
| | · Formerly known as *discount center* |
| Power center | · Large community shopping center (more than 250,000 sq. ft.) with at least one super anchor store (e.g., discount department store, home improvement store) with more than 100,000 sq. ft. |
| | · Several smaller, category-specific anchor tenants (20,000 to 25,000 sq. ft.) |
| | · Small shop space not more than 10% to 15% of total gross leasable area |
| | · Trade area similar in size to regional shopping center |
| Off-price megamall | · Up to 2 million sq. ft. in size |
| | · Usually located on a major highway on the exurban fringe of a metropolitan area |
| | · Trade area of more than 25 miles |
| Urban entertainment center | · Combination of entertainment, dining, and retail uses in a pedestrian-oriented environment |
| Fashion center | · Concentration of fashion retailers |
| | · Usually no specific anchor tenant |
| | · Wide range of trade areas, i.e., similar to neighborhood, community, or regional shopping center depending on the target market sector as defined by quality, taste, and price |
| | · Often higher-quality finishes and materials, lower parking ratios, higher sales per customer |
| Festival center | · Tourist-oriented center in a large city; forerunner of urban entertainment center |
| | · Large proportion of specialty restaurants and food vendors |
| Lifestyle center | · National chain specialty stores plus upscale leisure amenities |
| | · Open-air centers of 150,000 to 500,000 square feet |
| | · Upscale projects near affluent areas |

Sources: Anita Kramer, *Retail Development Handbook*, 4th ed. (Washington, DC: Urban Land Institute, 2008); *Dollars and Cents of Shopping Centers/The Score 2008* (Urban Land Institute and International Council of Shopping Centers, 2008); James D. Vernor, Michael F. Amundson, Jeffrey A. Johnson, and Joseph S. Rabianski, *Shopping Center Appraisal and Analysis*, 2nd ed. (Chicago: Appraisal Institute, 2009).

BACK_DEFEXP-RR-002572

**trade area**

The geographic area from which a retail property consistently draws most of its customers; also called *market area*.

- Neighborhood and strip retail centers serve their immediate neighborhoods.

Specialty shopping centers, such as outlet malls, warehouse clubs, and power centers, serve a wide range of trade areas depending on the tenant makeup and demographic and psychographic target markets.

Although an appraiser focuses on the sales potential of a given retail trade area, various other considerations can complicate the analysis of value influences. Like certain central business districts, some retail districts may contain a destination shopping attraction. Multiplex movie theaters often anchor regional shopping centers in urban or suburban areas and serve as destinations for consumers from a wider trade area than a similar-sized shopping center would normally attract. On the other hand, the growth of online shopping, to 9.3% of total retail sales in 2016, has clearly weakened the sales potential of existing shopping centers.[5] Another 1.3% of retail sales were attributable to online purchases fulfilled at a store.

When analyzing a group of local retail enterprises that are not located in a shopping center, an appraiser also examines the zoning policies that govern the supply of competing sites, the reasons for vacancies and business failures, and the level of rents compared with rent levels in new buildings.

### Central Business Districts

A central business district (CBD) is traditionally the core, or downtown area, of a city where the major retail, financial, governmental, professional, recreational, and service activities of the community are concentrated. Over the past quarter of a century, some CBDs have not experienced the same level of growth and redevelopment that other commercial districts have, often because of a lack of developable land and restrictions on redevelopment by some types of local historic preservation codes and overlay districts. Historically, the development of suburban commercial centers has resulted in the corresponding decline of urban CBDs. Even in smaller cities and exurban towns, the development of commercial districts centered on a category-killer retailer outside the town center can have a negative impact on the economic viability of the area's traditional business core and the value of aging properties there.

Appraisers should be aware of this trend but should also recognize that some CBDs have brighter prospects than others, possibly as a result of economic development efforts or a concentration of companies in strong business sectors. The economic life cycle of CBDs is often scrutinized closely by analysts. Transportation facilities in most cities are oriented to the CBD. Through downtown development associations, many merchants have made efforts to revitalize CBDs with improved public transportation, larger parking areas, better access, and coordinated sales promotion programs.

**central business district (CBD)**

The core, or downtown area, of a city where the major retail, financial, governmental, professional, recreational, and service activities of the community are concentrated.

The diverse enterprises located in CBDs usually reflect several types of land use, e.g., housing, retail stores, offices, financial institutions, and entertainment

5.   PwC and Urban Land Institute, *Emerging Trends in Real Estate 2018* (September 2017): 15.

BACK_DEFEXP-RR-002573

facilities. Housing has not always been considered an essential land use within a central business district, but the New Urbanism movement has long held that housing is a key driver in revitalizing or maintaining an area's viability.[6] Coffee shops and food vendors may primarily serve office employees, and other retail establishments tend to locate where large numbers of people work, shop, and live. Financial institutions are often found in areas with other financial institutions. In major cities, entertainment and cultural facilities usually operate in or near CBDs to serve the greatest number of residents and out-of-town visitors. Different parts of the CBD attract different users, and the enterprises within a single general use category may be diverse. For example, office buildings in different parts of a CBD may house a wide variety of business and professional firms.

**Figure 11.7**  Characteristics of Central Business Districts



| Defining characteristic | · | Located in a concentration of major retail, financial, governmental, professional, recreational, and service activities of a city |
|---|---|---|
| **Examples of subdistricts** | · | Broad range of uses—office, hotel, retail, housing, and entertainment |
| **Value influences** | · | Local population (residents and workers) |
| | · | Transportation linkages |
| | · | Pedestrian traffic |
| | · | Municipal land use policies (e.g., density, ground coverage, parking, loading and unloading, signage ordinances) |
| | · | Density and mix of uses |
| | · | Vacancy and rental rates |

6.   Sheri Faircloth, Brian Kaiser, and Frederick A. Steinmann, "Residential Adaptive Reuse and In-fill Development," *Economic Development Journal* (Spring 2009): 40-47.

BACK_DEFEXP-RR-002574

Appraisers should recognize that shifting functions within CBDs can lead to changes in land use and potential increases in real estate values. For example, the addition of entertainment uses to an area dominated by office uses may attract more restaurants, art galleries, and specialty shops to a downtown area.

To assess the viability of a CBD, an appraiser must consider the sales potential of various commercial products and services and determine whether establishments in the CBD can attract a share of the market. To evaluate the utility of a particular location within a CBD, an appraiser considers which use or mix of uses—e.g., office, hotel, retail, housing, entertainment—is most appropriate.

### Entertainment Districts

Entertainment districts are a special type of mixed-use development that typically relies on one or more live entertainment venues, such as a sporting facility, to anchor a variety of entertainment, leisure, and related land uses. These districts tend to be unique, often incorporating a theme or reflecting specific characteristics of the local area.  Entertainment districts are typically large-scale developments that often, but not always, involve multiple ownerships and may include the public sector.  They can be found in both urban and suburban locations. In either location, they tend to be relatively high-density developments that emphasize walkability.

While there is no formula or fixed mix of uses, these districts tend to include a mix of live entertainment venues, such as sports arenas, ballparks, or stadiums, combined with live theater and performing arts venues, concert halls, and small venues suitable for live entertainment and recorded entertainment (e.g., movie theaters). Bars, restaurants, cafes, and other food-related uses are an important element. Entertainment districts typically offer a wide variety of price points and styles, from casual and relaxed restaurants to formal fine dining.  Other ground floor uses may include art galleries and retail shops. Upper floors are often devoted to hotel, office, and multi-unit residential uses.

The nature of public sector involvement in entertainment districts varies in both scope and magnitude. In some cases, the streetscape improvements are used to create an identity for the area. Public agencies may also participate by providing parking or other forms of direct investment.

### Industrial Districts

Industry is often the engine of economic growth in a community. Governmental and public-private economic development efforts are often targeted at manufacturing and other industrial concerns that may bring high-paying jobs to an area. Since the 1980s, major manufacturers have sought to control inventory costs by implementing just-in-time production (also known as *lean manufacturing*) techniques, and the suppliers who serve those companies have tended to cluster around their headquarters.

Industrial districts range from those that contain heavy industry, such as steel plants, foundries, and chemical companies, to those that contain assembly, distribution, and other "clean" operations. In most urban areas, heavy industry and light industry districts are established by zoning ordinances, which may limit uses and place controls on air pollution, noise levels, and outdoor operations. Most manufacturing districts and industrial parks consist of one-story buildings with greater ceiling heights than were typical previously. Each industrial district has a value pattern that reflects the market's reaction to its location and the characteristics of its sites and improvements.

BACK_DEFEXP-RR-002575

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Figure 11.8**    Characteristics of Industrial Districts



| Defining characteristic | · | Cluster of related industrial concerns, e.g., a manufacturer and its suppliers |
|---|---|---|
| Examples of subdistricts | · | Manufacturing facilities |
| | · | Research and development facilities/science parks |
| | · | Warehouse/distribution facilities |
| Value influences | · | Nature of the district (distribution, manufacturing, R&D, etc.) |
| | · | Availability of labor and competitiveness of labor pool with offshore sites |
| | · | Transportation facilities |
| | · | Availability of raw materials |
| | · | Distribution facilities |
| | · | Political climate |
| | · | Availability of utilities and energy |
| | · | Effect of environmental controls |
| | · | Governmental land use restrictions or lack of such restrictions |
| | · | Vacancy and rental rates |

Many small towns, suburbs, and rural areas may have only one industrial park that contains a variety of industrial buildings, which may provide employment for a substantial part of the population. Often support services such as copy centers, delivery services, stores, restaurants, print shops, fitness centers, and day care centers can be found in modern industrial parks.

The environmental liabilities incurred by heavy industry are considerably more complex than those that affect other property types. Industrial properties may con-

BACK_DEFEXP-RR-002576

tain underground or aboveground storage tanks or silos for a broad range of chemicals, and the presence of asbestos and PCBs may be widespread. Long-term contamination tends to be more severe in industrial districts than in commercial and residential districts, and cleanup costs can be high. (Environmental liabilities are discussed more fully in Chapter 12.)

### Agricultural Districts

Agricultural districts can be as small as a portion of a township or as large as several counties. Most important value influences relate to individual properties rather than to entire agricultural districts because the individual properties may be far apart. Nevertheless, an agricultural district's physical features are usually representative of the individual farms within it and contribute to their desirability.

**Figure 11.9**    Characteristics of Agricultural Districts



| Defining characteristic | · Undeveloped land use for production of crops, timber, livestock, and other agricultural products |
|---|---|
| Examples of subdistricts | · Row crops |
| | · Orchards, groves, and nurseries |
| | · Grasslands |
| | · Livestock facilities |
| | · Dairies |
| | · Agribusiness |
| | · Timberland and sod farms |
| | · Natural resource land, e.g., mining facilities |
| Value influences | · Climate |
| | · Location |
| | · Topography |
| | · Soil types |
| | · Water rights |
| | · Conforming land uses in the market area |
| | · Size of agricultural operation |
| | · Transportation |
| | · Availability of farm labor, which is often captured in the analysis of conforming land uses |
| | · Conservation easements |

BACK_DEFEXP-RR-002577

Copyrighted material licensed by Charles Brigden on September 17, 2020

The importance of different value influences in an agricultural district depends on what is produced there. Agricultural production areas are served by thoroughfares that lead to marketing centers where farm products are sold, and proximity to other forms of transportation such as rivers and railroad lines can be even more important in some areas. Like an urban neighborhood, the farm community depends on government services such as roads and schools and on the availability of power sources (e.g., electricity, natural gas).

Infrastructure to support the particular land use dominant in a district is important in all districts, but it is particularly important in agricultural districts. The infrastructure for agriculture includes land uses such as

- Equipment sales and repair
- Livestock auctions
- Outlets for seed, feed, fertilizer, herbicides, and similar products
- Processors or intermediaries to buy, sell, or transport farm products
- Government offices—e.g., Farm Service Agency, Soil Conservation Service
- Colleges and universities with agricultural studies programs

For many years, urban encroachment into agricultural districts and the erosion of the agricultural infrastructure have been concerns of property owners in rural areas because urban land uses generally do not complement agricultural uses. Governmental attempts to preserve agricultural land have had limited effectiveness because the causes of encroachment are so complex.

Environmental liabilities on agricultural properties may include dump sites, cattle vats, waste lagoons for confined feeding operations, fertilizers, pesticides, and underground storage tanks.

## Specialty Districts

Individual properties are sometimes appropriate only for an existing special-purpose use. Similarly, if some specialized land use is predominant in a market area, that area may qualify as a specialty district, such as the following:

- Medical district
- Research and development park
- Technology park
- Life science and biotechnology parks
- Education district
- Historic district

The value influences at work in these specialty districts may be similar to those affecting areas where traditional land uses dominate (in particular, office districts), but the emphasis may change depending on the activity that characterizes the specialty district. Also, most specialty districts have specific land use approval from local governments, either by a zoning designation or an overlay.

### Medical Districts

A medical district typically is centered around one or more regional acute care hospitals that have spawned a heavy concentration of allied healthcare uses, potentially including other specialty hospitals, ambulatory surgical centers, clinics, long-term

BACK_DEFEXP-RR-002578

**Table 11.2**    **Characteristics of Specialty Districts**

| Type | Characteristics/Value Influences |
|---|---|
| Medical district | · Potential for functional obsolescence of improvements |
| | · Proximity to hospitals and other medical offices |
| | · Quality of professional personnel |
| | · Availability of modern equipment |
| | · Demographics (i.e., proximity to residential districts with many seniors who are the primary consumers of medical services) |
| | · Linkages (e.g., public transportation) |
| | · Reliability of power sources/backup power systems |
| | · Waste disposal, particularly infectious materials |
| Research and development park | · Mix of office, laboratory, and industrial uses |
| | · Closely tied to nearby research universities, which may also provide parking |
| | · University provides ongoing supply of intellectual talent and qualified workers |
| High-technology park | · Clustered around high-tech companies and near fiber optic cable corridors and highly skilled labor and universities |
| | · Sometimes receive favorable financing packages from local government and economic development corporations |
| | · Typically focused on later-stage development and marketing of new technologies |
| | · Benefit from proximity to educated workforce |
| Education district | · May contribute economically as well as socially and culturally to the surrounding community |
| | · Should be accessible to surrounding residential neighborhoods if student housing is needed |
| | · Access to public transportation important for institutions that appeal to commuters |
| Historic district | · May include residential, commercial, industrial, or other types of property alone or in combination with one another |
| | · Designated by federal, state, or local governments to preserve an area's architectural character |
| | · Federally certified only after stringent requirements have been met, including substantial compliance with the criteria of the National Register of Historic Places |
| | · Private preservation restrictions, such as preservation easements and historic facade easements, can limit future uses within the district |
| | · Level of protection varies, but highest and best use and possible redevelopment may be restricted by specific zoning or historic overlay provisions |

care facilities, medical offices, educational facilities, and substantial parking facilities to support these high-use structures in a campus setting. The creation of synergies through the concentration of physicians and other medical specialists is a chief reason why medical districts have evolved.

Medical districts can be found in densely populated urban areas and in spacious, park-like settings, although the general trend of suburbanization may be causing medical uses to spread out. Close proximity to regional highways is critical for fast access in emergencies and for many of the same reasons regional shopping and office districts desire these locations. In urban and mature suburban medical districts, and where there is a very strong hospital operation, demand for land may be extraordinary, and nonmedical use may no longer represent the highest and best use of properties improved for nonmedical use.

BACK_DEFEXP-RR-002579

Copyrighted material licensed by Charles Brigden on September 17, 2020

The financial health and condition of the physical plant of the hospital driving the demand for other medical land uses in the district are important to assess. Hospitals that are expanding create further demand on land in their vicinity. Should the hospital build a replacement facility elsewhere in the community, or simply cease operation, demand for the surrounding health care-related properties will be affected. To assess these risks, an appraiser can examine a hospital's financial condition using various public sources, including state health departments and hospital associations, and commercial sources such as the American Hospital Directory online service. In many states, hospital and other medical facilities (nursing facilities, ambulatory surgical centers) are required to have a certificate of need (CON) or determination of need (DON) prior to construction or acquisition of major medical equipment. As these state agencies often use analytics for long-range planning, they may offer insights into the future of a hospital district.

The desirability and value of medical properties are generally influenced by the same forces as other commercial and residential real estate, but there are unique factors affecting health care property values. Population changes, general economic and employment conditions, and political factors warrant examination. A large portion of the nation's health care expense is covered through the federal Medicare and federal and state Medicaid programs. Many other expenses are covered through employer-sponsored medical insurance. Sudden changes in these programs can have a significant impact on the viability of health care providers. Medicare is a social equalizer in some respects, as the payments to a hospital, physician, or other provider will be the same for that service within a given region regardless of the value of the property in which the service was performed. Also, many states regulate the supply of hospitals, nursing facilities, and ambulatory surgical centers.

Demographic factors are important. Seniors consume more health care services than other demographic groups, and many elderly Americans have adequate health insurance through Medicare or commercial alternatives. Low-paying Medicaid and uninsured populations are closely tied to low-income households, and areas with large concentrations of these households often have fewer medical services. The services that are available tend to be housed in older, less functional buildings. The quality of professional personnel and the availability of modern equipment are also important considerations.

Utilities are a particular concern in medical districts because power outages can have disastrous effects on hospitals. To increase reliability, most hospitals augment the electrical service available from the power grid with backup systems. The disposal of medical waste and potentially infectious materials has become highly controversial. Many hospitals incinerate their waste, while others have it shipped offshore.

### Research and Development Parks

Characterized by a mix of office and industrial uses, research and development (R&D) parks, also known as *science parks*, may contain the research and development departments of large drug, chemical, or computer companies, or they may cater to firms specializing in research activities. Research firms are usually small and specialize in identifying and developing new products, which are sold to other firms. Occasionally a small research firm will create, develop, and market a new product with considerable success, but then the nature of the firm must shift from research to marketing.

Research and development parks are often located near one or more research universities and, in some cases, may be sponsored and promoted by universities.

BACK_DEFEXP-RR-002580

This proximity provides a convenient source of technical expertise and qualified employees. Universities may sponsor a park to sell excess land, provide employment for students and faculty, and raise an area's level of economic activity.

Buildings in research and development parks have evolved from one-story, on-grade warehouses with a comparatively high percentage of office build-out (i.e., 20%-35% office space) built in the 1970s and 1980s to multistory office (lab) buildings with a loading dock. These buildings now look more like office buildings than industrial buildings. The interior build-out often includes a mix of traditional office space, laboratory/workshop space, and some unfinished warehouse space. The precise build-out varies with the user and it can be difficult to determine the build-out from the exterior alone. Some facilities may contain highly specialized build-outs that include clean rooms, fabrication facilities, and specialized manufacturing improvements. Required parking ratios depend on the level of occupancy and are often determined by the level of build-out of the various space types.

### High-Technology Parks

Firms engaged in high-tech activities often locate near one another or in parks where technical expertise may be available from a nearby university or research facility. Electronics and computer firms initially dominated technology parks and remain a mainstay of modern technology parks. However, today's high-tech parks are now likely to include a wide range of technology firms related to aerospace, defense, pharmaceuticals, and life sciences as well as data centers and robotics and software developers. While similar in many respects to research parks, high-tech parks tend to attract firms that are less research-oriented and more focused on product development and marketing a technological solution. R&D and high-tech parks share many of the same characteristics and have become indistinguishable in many cases. They often share a campus-like style with low-rise, low-density, stand-alone buildings surrounded by surface parking and well-landscaped grounds.

Recent development trends show the incorporation of outdoor amenity space in high-tech parks, including recreation areas with fire pits, sports courts, and similar site improvements, which encourage social and collaborative interaction among employees. To incorporate natural elements in the built environment—a concept known as *biophilia*—some park structures include plants, natural light, and views of nature to encourage psychological well-being and productivity. Wellness-based design elements that support the physical and psychological needs of employees are also increasingly being incorporated into high-tech office and R&D environments.

Sometimes local governments and economic development corporations will create designated technology corridors to attract high-tech companies. Real estate developments in technology incubator areas may benefit from favorable financing packages and receive subsidies or tax breaks.

### Life Science and Biotechnology Parks

Life science and biotechnology parks combine aspects of both R&D and high-tech parks. Occupants in these parks are firms focused on developing drug therapies to address human illnesses. These facilities typically include wet lab space for chemistry and biological research, combined with conventional office space. Due to the physical and mechanical requirements of wet labs regarding ventilation, air purification, and

BACK_DEFEXP-RR-002581

plumbing, the facilities typically require above-standard slab-to-slab floor heights to accommodate the mechanical equipment. Build-outs typically include intense plumbing and process lines for various gases and liquids. Some life science facilities include specialized improvements such as pilot plants that serve as protypes for larger manufacturing facilities or vivariums that maintain animals for drug testing purposes. Life science facilities are often less densely occupied by humans than other types of office and R&D facilities, and thus parking ratios may be lower.

### Education Districts

Local schools, colleges, and universities may constitute a district if they have several buildings or facilities and are considered an integral part of the surrounding residential neighborhood. Education districts may contribute economically as well as socially and culturally to the surrounding community.

Colleges and universities often attract students from far away who bring income to the community and thus contribute to its economic base. In some towns and smaller cities, universities and colleges may provide most of the economic base.

Important land use linkages for education districts include

- Access to the surrounding residential neighborhood, particularly high-density housing like apartments or single-family housing with zoning that allows multiple students per house
- Access to nearby convenience shopping such as grocery stores, drug stores, and fast food restaurants
- Access to public transportation for educational institutions that appeal to commuters

### Historic Districts

Since 1931, when the first historic district zoning ordinance was passed in the United States, interest in preserving historically and architecturally significant properties has grown and given rise to a unique type of district.[7] There are more than 11,900 historic districts listed in the National Register of Historic Places. In addition, there are more than 2,300 locally enacted historic preservation ordinances in the United States, many (if not most) of which provide some form of protection to locally designated historic districts. Some local historic districts are actual zoning districts, while others are historic or conservation overlay districts that preserve an area's architectural or historic character.

Locally designated historic districts are federally certified only after stringent requirements have been met, including substantial compliance with the criteria of the National Register of Historic Places.[8] Once a district has been added to the National Register or a local district has been federally certified, developers, investors, and renovation specialists can qualify for tax incentives such as the tax credits allowed under the Economic Recovery Tax Act of 1981 (which were subsequently reduced by the Tax Reform Act of 1986). Many states and even local tax assessment jurisdictions also provide incentives such as tax credits or property tax assessment relief to owners of contributing historic properties in designated historic districts.

---

7. Russell V. Keune, ed., *The Historic Preservation Yearbook* (Bethesda, MD: Adler & Adler, 1984), 461. See also Judith Reynolds, *Historic Properties: Preservation and the Valuation Process*, 3rd ed. (Chicago: Appraisal Institute, 2006); Paul K. Asabere and Forrest E. Huffman, "Historic Designation and Residential Market Value," *The Appraisal Journal* (July 1994): 396–410; Patrick Haughey and Victoria Basolo, "The Effect of Dual Local and National Register Historic District Designations on Single-Family Housing Prices in New Orleans," *The Appraisal Journal* (July 2000): 283-289; Emma Brandt Vignalli, "Preserving the Old with the Compatible New," 59 *Wm. & Mary L. Review* 345 (2017), and Richard J. Roddewig and Charles T. Brigden, *Appraising Conservation and Historic Preservation Easements*, 2nd ed. (Chicago: Appraisal Institute, 2020).

8. Keune, 328.

BACK_DEFEXP-RR-002582

Historic districts may include residential, commercial, industrial, or other types of property alone or in combination with one another. While listing in the National Register by itself provides only limited protections to historic districts, many local historic preservation ordinances require prior review of proposed alterations and demolitions in historic districts. Appraisers of historic property must become thoroughly familiar with the criteria applicable to each district's designation status, the types of reviewable actions and review criteria, and how these criteria or available tax incentives are, or may be, applied to properties within district boundaries. Privately imposed historic restrictions such as preservation easements and historic façade easements can limit the future uses of a property and thereby influence value in a manner different from the impact of the federal, state, or local government designation of a historic district.

BACK_DEFEXP-RR-002583

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Land and Site Description  **12**

Appraisal assignments may be undertaken to develop an opinion of the value of land only or the value of both land and improvements. In either case an appraiser must provide a description and analysis of the land. Land can be raw or improved. Land may be located in rural, suburban, or urban areas and may have the potential to be developed for residential, commercial, industrial, agricultural, or special-purpose use.

This chapter focuses on the description and analysis of the land component of real property. Because appraisers typically deal with land that has been improved to some degree, the term *site* is often more precise than *land*, and *site* is used predominantly in this chapter. The information needed to complete a full site description and analysis is noted and explained here, and sources of this information are presented. Although this discussion relates primarily to the property being appraised, the same type of data is collected and examined in analyzing the comparable properties used in the appraisal.

A parcel of land can have various site improvements that enable the vacant parcel to support a specific purpose. A site can have both on-site and off-site improvements that make it suitable for its intended use or development. Off-site improvements may include utility lines, access to roads, and water, drainage, and sewer systems. On-site improvements may include landscaping, site grading, access driveways, drainage improvements, accessory buildings, and support facilities.

In valuing any type of property, an appraiser must describe and analyze the site. Site description consists of comprehensive factual data, information on land use restrictions, a legal description, other title and record data, and information on pertinent physical characteristics. Site analysis goes further. It is a careful study of factual data in relation to the market area characteristics that create, enhance, or detract from the utility and marketability of specific land or a given site as compared with other sites that it competes with.

> **raw land**
>
> Land that is undeveloped; land in its natural state before grading, draining, subdivision, or the installation of utilities.
>
> **site**
>
> Land that is improved so that it is ready to be used for a specific purpose.

One primary objective of site analysis is to gather data that will indicate the highest and best use of the site as though vacant so that land value for a specific use can be estimated. (See Chapters 17 and 18 for a complete discussion of highest and best use.) Whether a site or raw land is being valued, an appraiser must determine and evaluate its highest and best use. When the highest and best use of land is for agriculture, the appraiser usually analyzes and values the land using sales comparison. If the land is to be developed for urban use, the appraiser may use a more sophisticated technique such as subdivision development analysis.

## Legal Descriptions of Land

Land boundaries differentiate separate ownerships, and the land within one set of boundaries may be referred to as a *parcel*, *lot*, *plot*, or *tract*. These terms may be applied to all types of improved and unimproved land, and they are often used interchangeably by market participants. An appraiser, however, should use the terms consistently in the appraisal report to avoid confusing the client.

A *parcel* of land generally refers to a piece of land that can be identified by a common description and is held in one ownership. Every parcel of real estate is unique. To identify individual parcels, appraisers rely on legal descriptions, surveys, or other descriptive information typically provided by the client or found in public records. A legal description identifies a property in such a way that it cannot be confused with any other property. A legal description, though not required, is usually included or referenced in an appraisal report.

In the United States, three methods are commonly used in legal descriptions of real property:

- The metes and bounds system
- The rectangular survey system
- The lot and block system

An appraiser should be familiar with these forms of legal description and know which form or forms are common in the area where the appraisal is being conducted.

### Metes and Bounds

The oldest known method of surveying land is the metes and bounds system, in which land is measured and identified by describing its boundaries. A metes and bounds description of a parcel of real property describes the property's boundaries in terms of precise reference points. A metes and bounds description starts at the point of beginning (POB), a primary survey reference point that is tied to a benchmark or adjoining surveys, and moves along past several intermediate reference points before finally returning to the POB. The return to the POB is called *closing* and is necessary to ensure the survey's accuracy.

Surveyors in the field increasingly rely on modern "total stations" to collect data in digital form. The familiar surveyor's measuring instrument mounted on a tripod uses infrared technology and today is augmented by portable computer technology. The data is downloaded into the surveyor's office computer for plotting the property boundaries and computing the land area. Coordinate geometry software and global positioning system (GPS) technology allow for more accurate determinations of directions, distances, and areas. GPS technology is only limited by physical obstruc-

BACK_DEFEXP-RR-002585

Copyrighted material licensed by Charles Brigden on September 17, 2020



**Figure 12.1**   Metes and Bounds System



tions that prohibit receiving satellite transmissions, and its use in surveying will probably increase.

The metes and bounds system is the primary method for describing real property in 21 states. It is often used in other states as a corollary to the rectangular survey system, especially in describing unusual or odd-shaped parcels of land.

### Rectangular Survey System

The rectangular survey system, which is also known as the *government survey system*, was established by the Land Ordinance of May 20, 1785. The rectangular survey system became the principal method of land description for most land north of the Ohio River or west of the Mississippi River.

The initial reference points for government surveys were established in the late eighteenth century. From each point specified, true east-west and north-south lines were drawn. The east-west lines are called *base lines* and the north-south lines are called *principal meridians*. In this system, each parcel of land is identified in terms of its relationship to a single base line and a single principal meridian.

### Lot and Block System

The lot and block system was developed as an outgrowth of the rectangular survey system and can be used to simplify the locational descriptions of small parcels. The system was established when developers subdivided land in the rectangular survey system and assigned lot numbers to individual sites within blocks. The maps of these subdivisions were then filed with the local government to establish a public record of their locations. Each block was identified precisely using a ground survey or established monuments.

*Land and Site Description*   **167**

BACK_DEFEXP-RR-002586



**Figure 12.2**  Rectangular Survey System



**Figure 12.3**  Lot and Block System

Applying the lot and block system to old, unsurveyed communities helped to identify each owner's site or parcel of land. Typically a surveyor located the boundaries of streets on the ground and drew maps outlining the blocks. Then lot lines were established by agreement among property owners. A precise, measured description was established for each lot and each was given a number or letter that could be referred to in routine transactions. This information was recorded in public records and was known as a *recorded plat* of the defined area or subdivision. All this information is necessary to support the legal ownership of real property and its sale and financing.

BACK_DEFEXP-RR-002587

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Title and Record Data

Before making an on-site inspection, an appraiser should obtain an appropriate legal description and other property data from the client or from published sources and public documents. Most jurisdictions have a public office or depository for deeds where transactions are documented and made public. The accessibility of public records, which is legally known as *constructive notice*, ensures that interested individuals are able to research and, if necessary, contest deed transfers.

Sometimes public records do not contain all relevant information about a particular property. Although official documents are dependable sources of information, they may be incomplete or not suited to an appraiser's purposes. Useful support data can be found in land registration systems, land data banks, and assessors' maps.

> ### WHERE TO FIND
>
> **Title and Record Data**
>
> Most county recorders' offices keep index books for land deeds and land mortgages from which the book and page number of a recorded deed may be found. In addition, official municipal plat books may be examined in the auditor's office. Much of this data is now available online.

## Ownership Information

If a partial interest in a property is to be appraised rather than the fee simple interest, the elements of title that are to be excluded should be indicated and carefully analyzed. An appraiser who is asked to develop an opinion of the value of a fractional ownership interest must understand the exact type of legal ownership to define the property rights to be appraised.

After defining the property rights being appraised, appraisers must identify any excluded rights that may affect value. Appraisers should also investigate the ownership of surface and subsurface rights through a title report, an abstract of title, or other documentary evidence of the property rights to be appraised. Title data indicates easements and restrictions, which may limit the use of the property, as well as special rights such as air rights, water rights, mineral rights, obligations for lateral support, and easements for common walls. Appraisers are typically not experts in title information but must rely on legal opinions, title research reports, and title data provided by other professionals. Easements, rights of way, and private and public restrictions often affect property value.

Easements may provide for overhead and underground electrical transmission lines, underground sewers or tunnels, flowage, aviation routes, roads, walkways, and open space. Some easements or rights of way acquired by utility companies or public agencies may not have been used for many years, and an appraiser's physical inspection of the property may not disclose any evidence of such use. In certain jurisdictions, easements that are not used for a finite period of time may be automatically terminated. Use of a property for access without the owner's written permission may give the user a prescriptive easement across the property. This type of easement usually must be used for several years without being contested or challenged by the property owner. Title insurance companies often overlook this easement unless it has

BACK_DEFEXP-RR-002588

been perfected in court. Nevertheless, appraisers should search diligently for information pertaining to any limitations on ownership rights.

Private restrictions may have a material impact upon the value of property. Restrictions cited in the deed may limit the type of building or business that may be conducted on the property. A typical example is a restriction that prohibits the sale of alcohol or gasoline in a certain place. Others may limit further subdivision of a tract while others may proscribe certain uses (e.g., commercial or multifamily). Appraisers may occasionally encounter unusual restrictions driven by the eccentricities of prior owners. Restrictions can apply for a specified number of years and generally run with the land. Appraisers should carefully consider the value impact, if any, of such restrictions.

---

**WHERE TO FIND**

**Ownership Information**

A property's legal owner and type of ownership can be found in the public records maintained by the local clerk and recorder. Local title or abstract companies may also provide useful information.

---

## Zoning and Land Use Information

Land use and development are usually regulated by city or county government, but they are often subject to regional, state, and federal controls as well. In analyzing zoning and building codes, an appraiser considers all current regulations and the likelihood of a change in the code. Usually a zone calls for a general use (such as residential, commercial, or industrial) and then specifies a type or density of use. Zoning and other land use regulations often control the following:

- Height and size of buildings
- Lot coverage or floor area ratio (FAR)
- Required landscaping or open space
- Number of units allowed
- Parking requirements
- Sign requirements or limitations
- Building setbacks
- Plan lines for future street widenings
- Other factors of importance to the highest and best use of the site

Most zoning ordinances identify and define the uses to which a property may be put without reservation or recourse to legal intervention. This is referred to as a *use by right*. They also describe the process for obtaining nonconforming use permits, variances, and zoning changes, if permitted. In areas subject to floods, earthquakes, and other natural hazards, special zoning and building regulations may impose restrictions on construction. Zoning, planning, and land use restrictions may govern building location and design in coastal and historic districts.

Although the term *legally nonconforming land use* is often used to describe properties that do not conform to zoning and building codes, the term should only be

BACK_DEFEXP-RR-002589

Copyrighted material licensed by Charles Brigden on September 17, 2020

applied to properties that do not conform to allowable land uses. Some properties include improvements that conform to land use regulations but do not meet building or developmental standards. For example, consider a property with a 30-foot setback in an area where the new zoning code specifies a minimum 40-foot setback. The land use is conforming, but the property does not conform to development standards. This is an important distinction because some lenders have rules about legally non-conforming uses.

Potential changes in government regulations must also be considered. If, for example, a building moratorium or cessation of land use applications is in effect for a stated period, a property's prospective highest and best use may have to be delayed. The appropriateness of the current zoning and the reasonable probability of a zoning change must be considered. Highest and best use recommendations may rely on the probability of a zoning change. One of the criteria for the highest and best use conclusion is that the use must be legally permissible. If the highest and best use of a site is predicated on a zoning change, an appraiser must investigate the probability that such a change will occur. The appraiser may interview planning and zoning staff and study patterns of zoning change to assess the likelihood of a change. After reviewing available public and private land use information, the appraiser may also prepare a forecast of land development for the area. If the zoning of the subject site is not compatible with the probable forecast uses, the probability of a change in the zoning is especially high. Appraisers should recognize, however, that a zoning change is rarely 100% certain and should alert the client to that fact if it is relevant to the purpose of the appraisal.

### WHERE TO FIND

**Zoning and Land Use Information**

Although zoning ordinances and maps are public records that are available at zoning offices and online, an appraiser may need help from planning and zoning staff to understand the impact of zoning regulations. Often an appraiser must contact several agencies. Zoning and land use restrictions are not usually listed in the recorded title to a property, so confirmation from controlling agencies is necessary.

## Assessment and Tax Information

Real property taxes in all jurisdictions are based on ad valorem assessments, at least in part. (Many areas have parcel taxes as well, which are not a function of assessed value.) Taxation levels are significant in considering a property's potential uses. From the present assessment, the current tax rate, and a review of previous tax rates, an appraiser can form a conclusion about future trends in property taxation. Assessed values may not be good indicators of the market value of individual properties because mass appraisals based on statistical methodology tend to equalize the application of taxes to achieve parity among assessment levels in a given district. Nevertheless, in some areas and for some property types, assessed value may approximate market value. The reliability of local assessments as indicators of market value varies from district to district.

BACK_DEFEXP-RR-002590

WHERE TO FIND

**Assessment and Tax Information**
The records of the local assessor or tax collector can provide details concerning a property's assessed value and annual tax burden. Often, an appraiser obtains property information from the local assessor before conducting a physical inspection of the property.

## Physical Characteristics of Land

In site description and analysis, an appraiser describes and interprets how the physical characteristics of the site influence value and how the physical improvements relate to the site and to neighboring properties. Important physical characteristics include

- Site size and shape
- Corner influence
- Plottage potential
- Excess land and surplus land
- Topography
- Utilities
- Site improvements
- Accessibility
- Environment

### Size and Shape

A size and shape analysis describes a site's dimensions (street frontage, width, and depth) and lists any advantages or disadvantages caused by these physical characteristics. An appraiser describes the site and analyzes how its size and shape affect property value. Special attention is given to any characteristics that are unusual for the neighborhood. The effects of the size and shape of a property vary with its probable use. For example, an odd-shaped parcel may be appropriate for a dwelling but unacceptable for certain types of commercial or industrial use. A triangular lot may not have the same utility as a rectangular lot due to its size and shape.

The size of a parcel of land is measured and expressed in different units, depending on local custom and land use. Large tracts of land are usually measured in acres. Smaller parcels are usually measured in square feet, although acreage may also be used. Dimensions are expressed in feet and tenths of feet, rather than inches, for easy calculation.

Frontage is the measured footage of a site that abuts a street, lake or river, railroad, or other feature recognized by the market. The frontage may or may not be the same as the width of the property because a property may be irregularly shaped or have frontage on more than one side.

Size differences can affect value and are considered in site analysis. Reducing sale prices to consistent units of comparison facilitates the analysis of comparable sites and can help identify trends in market behavior. Generally, as size increases, unit prices decrease. Conversely, as size decreases, unit prices increase. The functional utility or desirability of a site often varies depending on the types of uses to be placed on the parcel. Different prospective uses have ideal size and depth characteristics

BACK_DEFEXP-RR-002591

Copyrighted material licensed by Charles Brigden on September 17, 2020

that influence value and highest and best use. An appraiser should recognize this fact when appraising sites of unusual size or shape. Value tendencies can be observed by studying market sales of lots of various sizes and their ability to support specific uses or intensities of development. In residential appraisal, a large triangular lot may not have any greater value because only one dwelling unit can be built on it according to zoning and subdivision regulations. The large undeveloped remainder would be surplus land, which is discussed below.

### Corner Influence

Properties with frontage on two or more streets may have a higher or lower unit value than neighboring properties with frontage on only one street. The advantage of easier access to corner sites may be diminished by a loss of privacy or a loss of utility due to setback requirements. An appraiser must determine whether the local market considers a corner location to be favorable or unfavorable. This determination can change depending on the use (or uses) anticipated for the site.

In the layout of building improvements and the subdivision of large plots, corner lots have more flexibility and higher visibility than interior properties. A store on a corner may have the advantage of direct access from both streets and prominent corner visibility and exposure. Corner exposure may provide advantageous ingress and egress for a drive-in business. As examples, the best corner sites for gas stations, branch bank buildings, and drug stores are near the intersections of major thoroughfares with good exposure to traffic in all directions where the intersection is controlled by traffic lights in all directions. Secondary corner locations can be less desirable for those commercial uses because of the lack of traffic lights or access limitations such as right-in, right-out entrance configurations. The intersections of two local roads or a local road and a highway may not enjoy the competitive advantage that a corner lot at the intersection of more heavily trafficked thoroughfares would.

For residential properties, corner locations may have negative implications. Quiet, cul-de-sac sites in the interior of a subdivision may be more desirable and command higher prices. Residences on corner sites are exposed to more traffic noise and provide less security. Owners of corner sites may pay higher costs for front-footage sidewalks and assessments, and the side street setback may affect the permitted size of the building. Usually owners of residences on corner lots have to maintain a larger landscaped area which may, in fact, be public property.

### Plottage Potential

Plottage is an increment of value that results when two or more sites are combined to produce a larger site with greater utility and probably a different highest and best use. When the unit value of two or more parcels is greater if they are combined than if they are separate, plottage value is created. For example, there may be great demand for one-acre lots in an industrial park where most of the platted lots are of one-half acre. By itself, a half-acre lot has a value of $1.00 per square foot. When combined with an adjacent half-acre lot, however, the value may increase to $1.50 per square foot. The value difference may be offset by the premium a developer often has to pay to combine adjacent properties. Sometimes the reverse may occur if the lots are very large and assemblage yields a lower value per square foot in the marketplace due to negative economies of scale. Plottage value may also apply to an

*Land and Site Description* **173**

BACK_DEFEXP-RR-002592

existing site of a special size or shape that has greater utility than more conventional, smaller lots.

Plottage is significant in appraising agricultural land. Properties of less-than-optimum size have lower unit values because they cannot support the modern equipment needed to produce maximum profits. In an urban area, plottage of commercial office and retail sites and of residential apartment sites may increase the unit values of the lots assembled.

Although the assemblage of land into a size that permits a higher and better use may increase the land's unit value (dollars per square foot or acre), the reverse may also occur. Land that must be divided or subdivided to achieve a higher and better use is commonly sold in bulk at a price less than the sum of the retail prices of its components. The lower unit price for the bulk sale reflects market allowances for risk, time, management, development costs, sales costs, profit, and other considerations associated with dividing and marketing the land.

## Excess Land and Surplus Land

A given land use has an optimum parcel size, configuration, and land-to-building ratio. Any extra or remaining land not needed to support the specific use may have a different value than the land area needed to support that use. The portion of the property that represents an optimal site for the existing improvements will reflect a typical land-to-building ratio. Land area needed to support the existing use or ideal improvement can be identified and quantified. Any remaining land area is either excess or surplus land.

As an example, consider a residential property that consists of one single-unit home and two standard-size lots in a fully developed subdivision. If the house is situated within the boundaries of a single lot and the normal land area for properties in the neighborhood is a single lot, then the second, vacant lot would most likely be considered excess land. This excess land could be separated from the lot of the existing structure and the separated parcel could be developed with a new home. If land values in the neighborhood are $20.00 per square foot, then the excess land in this situation would probably add the full $20.00 per square foot to the value of the subject property (i.e., the house and the two lots). If, however, the typical land area for properties in the neighborhood is a double lot, then the same property would have neither excess land nor surplus land regardless of building placement.

Now consider an industrial park where land-to-building ratios for warehouse properties range from 2.8-to-1 to 3.5-to-1 and land value is $5.00 per square foot. The subject property is a 20,000-sq.-ft. warehouse on a 100,000-sq.-ft. site, which results in a land-to-building ratio of 5-to-1, well above the market area norm. If the additional land not needed to support the highest and best use of the existing property is in the back portion of the site, lacking access to the street, that land would probably be considered surplus land because it could not be separated from the site and does not have an independent highest and best use. In this situation, the surplus land may still contribute positively to the value of the subject property (because the existing improvements could be expanded onto the surplus land or this additional area might be usable for parking or storage), but it may be worth less than the $5.00 per square foot price commanded by vacant land elsewhere in the industrial park.

Excess land is often confused with surplus land in appraisal assignments. It is too often lumped in with the value of the entire property or ignored altogether. While

BACK_DEFEXP-RR-002593

Copyrighted material licensed by Charles Brigden on September 17, 2020

both surplus land and excess land are not needed to support the main site and improvements, surplus land cannot be sold as an independent  highest and best use and excess land can be sold for its own highest and best use. Excess land may be sold off separately from the rest of the property so that the subject property in effect becomes two or more properties. Excess land must be addressed in the highest and best use analysis. In contrast, surplus land cannot be sold off separately and does not have an independent highest and best use.

Furthermore, excess land must be treated separately in the valuation process with consideration of the cost in time and money to legally separate the parcels if they are not already separated. An entirely different set of comparable data may be required. Appraisers must exercise caution when adding the value of the excess land to the value of the rest of the property because the sum of the value of the parts may or may not equal the value of the whole. The appraisal report should display the value of the excess land, the value of the rest of the property, and the value of the two together as though sold in a single transaction.

**Figure 12.4**    **Excess Land and Surplus Land**



### Topography

Topographical studies provide information about land's contour, grading, natural drainage, geological characteristics, view, and general physical usefulness. Sites may differ in value due to these physical characteristics. Steep slopes often impede building construction. Natural drainage can be advantageous or, if a site is downstream from other

BACK_DEFEXP-RR-002594

> Topographical characteristics, grade, drainage, and the bearing capacity of the soil determine the suitability of a land parcel for an agricultural use or a proposed improvement.

properties or is a natural drainage basin for the area, it may have very limited usefulness. Adequate drainage systems can be developed at some cost to offset the topographic and drainage problems that would otherwise inhibit the development of such a site. Upland land area (i.e., land above the mean high water line) and land with good drainage can typically support more intensive uses.

In describing topography, an appraiser must employ the terminology used in the area. What is described as a *steep hill* in one part of the country may be considered a *moderate slope* in another. In some instances, descriptions of a property's topography may be taken from published sources such as topographic maps.

### Geodetic Survey Program

Topographic maps prepared under the direction of the US Geological Survey are referred to as *quadrangles* or *quads*. They provide information that is useful in land descriptions. Base lines, principal meridians, range lines, and township lines are shown along with topographic and man-made features. The topographic features commonly depicted on these maps include land elevations (represented by contour lines at specified intervals), rivers, lakes, intermittent streams and other bodies of water, poorly drained areas, and forest. The man-made features identified include improved and unimproved roads, highways, bridges, power transmission lines, underground pipelines, levees, railroads, airports, houses of worship, schools, and other buildings. Quadrangle maps also show National Forest and Bureau of Land Management (BLM) boundaries.

---

#### WHERE TO FIND

**Topographic Maps**

The US Geological Survey's US topographical maps are available for free online at the USGS Store. Historical quadrangle maps can also be purchased from the USGS Store. For more information, visit www.usgs.gov/products/maps/overview.

---

### Geology and Soil Analysis

The geological conditions of a site—i.e., the composition of surface soil and subsoil—are important for both improved properties and agricultural land. A soil's suitability for building or for accommodating a septic system is important for all types of improved property, and it is a major consideration when the construction of large, heavy buildings is being contemplated. The need for special pilings or floating foundations has a major impact on the adaptability of a site for a particular use. Soil conditions affect the cost of development and therefore the property value.

Agronomists and soil scientists measure the agricultural qualities of soil and the capacity of soil for specific agricultural uses. Engineers trained in soil mechanics test for soil consistency and load-bearing capacity. Subsoil conditions are frequently known to local builders, developers, and others, but if there is any doubt about the soil's bearing capacity, the client should be informed of the need for soil studies. All doubts must be resolved before the land's highest and best use can be successfully

BACK_DEFEXP-RR-002595

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Figure 12.5**   Soil Triangle



Source: US Department of Agriculture

analyzed. A description of any general or extraordinary assumptions relating to un-known soil conditions must be included in the appraisal report.

Structural distress in improvements such as cracks in walls or the foundation may be evidence of geotechnical or soils problems. Estimating the cost to repair damage caused by a geotechnical issue like subsidence or slope creep will usually require the assistance of a geologist or structural engineer.[1] The perceived potential for sub-

---

1.   See Randall Bell, *Real Estate Damages*, 3rd ed. (Chicago: Appraisal Institute, 2016), 185-198, for more on geotechnical issues.

*Land and Site Description*   **177**

BACK_DEFEXP-RR-002596

sidence or a more dramatic geological event such as a landslide can have an effect on the marketability of a site, i.e., the phenomenon of stigma discussed later in this chapter. Governmental geological surveys may indicate the location of past landslides.

As discussed in Chapter 7, the appraisal of mineral rights (i.e., the right to extract natural resources found on a site) is a highly specialized appraisal assignment, and appraisers often must work with a geologist or other expert in the mining industry. An accurate assessment of the physical characteristics of a deposit of natural resources is critical in estimating the economic potential of the land. Note that the economic potential of land used for agricultural purposes may be adversely affected by an extractive industry such as oil or gas drilling on or near the site. An appraisal of subsurface rights requires an understanding of the geological characteristics of the land as well as the workings of the relevant extractive industry and the investment market for properties with natural resources.

| **Figure 12.6** | Soil Profile |
|---|---|



In a soil profile, the three major horizons (i.e., layers of soil with characteristics produced by soil-forming processes) are

· **A:** the surface horizon
· **B:** the subsoil, i.e., the part of the soil that lies below plow depth
· **C:** the substratum

Additional layers may include

· **O:** an organic horizon on the surface
· **E:** a master horizon, usually between the A and B horizons, for soil with a significant loss of minerals
· **R:** hard bedrock, which is not soil

Source: http://pdfcast.net/soil-horizons-diagram.html

---

**WHERE TO FIND**

**Soils Data**

Soils surveys conducted by the US Department of Agriculture, along with state agricultural experiment stations and other federal and state agencies, are used to create soil maps for farmers and ranchers. For more information, visit the Web Soil Survey at https://websoilsurvey.nrcs.usda.gov/app/.

**Floodplain and Wetlands Analysis**

Appraisers should check floodplain maps prepared by local governments and review any available surveys or topographical data provided by the client. Proximity to any flood zones may be determined by studying maps published by the Federal Emergency Management Agency (FEMA). Each map panel is identified by a FEMA number and shows properties within the 100-year floodplain, floodways, or other districts (see Figure 12.9). These maps also provide base data for flood insurance rate maps (FIRMs).

BACK_DEFEXP-RR-002597

**Figure 12.7**  Floodplain Map



Source: https://www.exeternh.gov/sites/default/files/fileattachments/river_advisory_committee/page/42581/fema_flood_map_25.jpg

*Land and Site Description*  **179**

**Figure 12.8**  Components of a Floodplain



**Figure 12.9**  Wetlands Map



Detail from National Wetlands Mapper Website (http://www.fws.gov/wetlands/Data/Mapper.html)

The definition of what constitutes a wetland varies. Most laws describe wetlands in terms of three possible characteristics:

1.  Soils
2.  Hydrology
3.  Vegetation

Section 404 of the Clean Water Act, the major federal environmental legislation regulating activities in wetlands, defines a wetland as land that is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas, but classification may differ in various jurisdictions.

BACK_DEFEXP-RR-002599

Copyrighted material licensed by Charles Brigden on September 17, 2020

Swamps, bogs, fens, marshes, and estuaries are subject to varying degrees of influence from local, state, and federal governments. In 2001, the US Supreme Court curtailed the power of the US Army Corps of Engineers (and, by extension, other federal authorities such as the US Environmental Protection Agency) to claim jurisdiction over certain wetlands using the Clean Water Act.[2] The court ruled that the act does not give the federal government jurisdiction over inland bodies of water that do not flow to the sea, such as landlocked ponds, wetlands, or mud flats, only navigable waterways or marshes that drain into navigable waters.

To value wetlands, appraisers must understand the unique features of the land, the evolving laws protecting these areas, the niche market for such properties, and the proper application of the approaches to value. Any uncertainty associated with such matters should be incorporated into the appraisal.

Appraisers should look to soils and hydrology experts when necessary for credible conclusions. Knowing in advance (i.e., before committing to a fee and timing for a specific assignment) that there is or may be a wetland issue to deal with will allow an appraiser to communicate with the client about what other experts may be required for credible and supportable conclusions. Who is to engage, and pay for, these experts should be clear from the beginning. The intended use of the appraisal is a driver for whether or not experts will be required or whether extraordinary assumptions will suffice.

Appraisers also need to address threatened and endangered species that can be present during only portions of the year. In 2018, the US Supreme Court ruled in favor of the Weyerhaeuser company, one of the world's largest owners of timberland, in a challenge to the government's designation of private land as "critical habitat" under the Endangered Species Act.[3] The case concerned whether the government could designate private land in Louisiana as critical habitat for an endangered species even though the land was not currently habitat for the species and apparently could not be habitat without significant alteration. Valuing land that may serve as habitat for a threatened or endangered species can be a complex assignment, and the untrained eye may miss something that could have a large effect on value. As in valuation assignments involving wetlands, either appropriate research or engaging another expert may be required.

---

#### WHERE TO FIND

**Floodplain Maps**
To obtain FEMA floodplain maps, contact the Federal Emergency Management Agency Map Service Center at https://msc.fema.gov/portal/home. To order state kits and for customer service, contact the Map Service Center at 1-877-FEMA-MAP (336-2627).

---

## Utilities

An appraiser investigates all the utilities and services available to a site. Off-site utilities may be publicly or privately operated, or there may be a need for on-site utility systems such as septic tanks and private water wells. The major utilities to be considered are

- Sanitary sewers

---

2. *Solid Waste Agency of Northern Cook County v. US Army Corps of Engineers*, 531 U.S. 159 (2001).

3. *Weyerhaeuser Company v. United States Fish and Wildlife Service*, 586 U.S. ___ (2018).

BACK_DEFEXP-RR-002600

> The cost of installing utilities is considered in the highest and best use conclusion and may be reflected directly or indirectly in the analysis, depending on the selection of comparable sales used in the valuation.

- Domestic water (i.e., potable water, for human consumption)
- Types of raw or recycled water for commercial, industrial, and agricultural uses
- Natural gas
- Electricity
- Storm drainage
- Telephone service
- Cable television
- Internet service

Although market analysis describes the utility systems that are available in an area in general terms, a site analysis can provide a detailed description of the utilities that are available to the appraised site. In a detailed site analysis, the location and capacity of the utilities should be determined and any unusually high connection fees should be noted. Atypically high or low service costs may need to be identified and analyzed. It is not sufficient simply to establish which utilities are available. Any limitations resulting from a lack of utilities are important in highest and best use analysis, and all available, alternative sources of utility service should be investigated.

The rates for utility service and the burden of any bonded indebtedness or other special utility costs should also be considered. Of particular concern to residential, commercial, and industrial users are

- Quality and quantity of water and its cost
- Costs and dependability of energy sources (public or private)
- Adequacy of sewer facilities
- Any special utility costs or surcharges that might apply to certain businesses
- Effect of special improvement districts (SIDs) on tax rate and repayment methods (special assessment)

---

**WHERE TO FIND**

**Data on Utilities**

Accurate information on public utilities can be obtained from

- Local utility companies or agencies
- Local public works departments
- Providers of on-site water and sewage disposal systems
- City and county planning departments

---

## Site Improvements

In a site description, an appraiser describes off-site and on-site improvements. Then the appraiser analyzes how the site improvements affect value. On-site improvements include grading, landscaping, fences, curbs, gutters, paving, drainage and irrigation systems, walks, and other improvements to the land. Off-site improvements include access roads, utility hookups, remote water retention ponds, and sewer and

BACK_DEFEXP-RR-002601

Copyrighted material licensed by Charles Brigden on September 17, 2020

drainage lines. The value of off-site improvements is typically considered in the site valuation process.

The location of existing buildings on a site must also be described and analyzed. Many appraisers make approximate plot plan drawings that show the placement of major buildings in relation to lot lines, access points, and parking or driveway areas. The land-to-building ratio and overall site configuration are usually important to a site's appeal and ability to support specific uses. The space allotted for parking influences a site's value for business and commercial use, so the parking space-to-building ratio in a commercial and industrial property must be analyzed. Zoning codes or planned unit developments (PUDs) will specify the minimum number of spaces required, but the market ultimately decides how much parking is needed.

An appraiser considers any on-site improvements that add to or detract from a property's optimal use or highest and best use. For example, a lot zoned for multi-family residential use may be improved with an 18-unit apartment building that is too valuable to demolish. If the site as though vacant could accommodate a 24-unit building but the location of the present structure blocks the ability to add additional units, the appraiser may conclude that the site is underimproved and not developed to its highest and best use as if vacant.

## Accessibility

Site analysis focuses on the time-distance relationships, or linkages, between the subject site and other sites that serve as common origins and destinations. An appraiser describes and analyzes all forms of access to and from the property and the neighborhood. In most cases, adequate parking area and the location and condition of streets, alleys, connector roads, freeways, and highways are important to land use. Industrial properties are influenced by rail and freeway access and the location of docking facilities. Industrial, commercial, and residential areas are all affected by the location of airports, freeways, public transportation, and railroad service.

Traffic volume may be either advantageous or disadvantageous to a site, depending on other conditions that affect its highest and best use. High-volume local traffic in commercial areas is usually an asset. Heavy through traffic may hurt retail stores, except those that serve regional travelers. Heavy traffic within residential areas is usually detrimental for single-unit residential neighborhoods, but high-traffic streets that provide access to a subdivision or development are advantageous.

The noise, dust, and fumes that come from a heavily traveled artery or freeway are not desirable for most low-density residential lots. On the other hand, the advertising value of locations on major arteries can benefit offices and shopping centers, unless congestion restricts the free flow of traffic. The visibility of a commercial

---

**WHERE TO FIND**

**Traffic Volume Data**

The volume of traffic passing a property is determined by a traffic count, which can usually be obtained from local or state departments of transportation. Traffic counts indicate average daily traffic, peak hours, and direction. Observing the speed and turning movements of actual vehicles helps an appraiser judge how traffic affects a property's highest and best use.

---

*Land and Site Description*    **183**

BACK_DEFEXP-RR-002602

property from the street is an advertising asset. This asset is most valuable when the driving customer can easily exit the flow of traffic and enter the property.

Median strips, turning restrictions, one-way streets, and access restrictions can limit the potential uses of a parcel. In site analysis an appraiser should test the probable uses of the site in relation to the flow of traffic. Planned changes in access should be verified with the appropriate authority and considered in the appraisal.

## Environment

Appraisers also analyze land use in light of environmental conditions. Environmental considerations include factors such as

- Local climate
- Availability of adequate and satisfactory water supply
- Patterns of drainage
- Quality of air
- Presence of wildlife or endangered species habitats
- Location of earthquake faults and known slide or avalanche zones
- Proximity to streams, wetlands, rivers, lakes, or oceans

Air and water pollution are by-products of increased population and urbanization. Public concern over pollution has prompted political action and legislation to protect the environment. In areas subject to extreme air pollution, regulations may exclude certain industries and limit the volume of traffic. In locations near natural water sources, industrial uses may be prohibited while recreational uses are promoted. Environmen-

### Stigma

Stigma is an adverse public effect on property value produced by the market's perception regarding a property, commonly the identification of increased risk. This risk is derived from perceived uncertainties surrounding a detrimental condition such as environmental contamination or a violent crime, which penalizes the marketability of the property and may also result in a diminution in value. The negative perception of a particular site may be short-term or long-term, depending on the source of the stigma and changing market reactions to the nature of the event. Marketing times for properties affected by stigma may be longer than comparable properties without stigma. The three significant factors in the analysis of stigma are

- The real or imagined cause of the stigma
- The duration of the effect of the stigma
- The geographical extent of the influence of the stigma

Environmental contamination such as a leaking underground storage tank is one of the most common causes of stigma, but many other physical, economic, and legal characteristics of a site have the potential to create a market perception that lowers value. In recent years, the effect of foreclosures in a market area on the marketability and market value of foreclosed properties and similar area properties has been examined as a source of stigma.

Measuring the effect of stigma on value can be difficult because the damage caused by stigma is not simply the cost to repair a defect. Focus groups, surveys, statistical analyses, case study comparisons, and other tools have been used in this analysis. Specialized techniques are often required to estimate the effect of stigma on property value. All of these specialized methods are based on the three traditional approaches to value (sales comparison approach, income capitalization approach, and cost approach). Numerous studies have been conducted, and extensive appraisal literature exists, indicating that stigma may be temporary in nature and the effects of stigma dissipate over time. Stigma has been defined in many ways in court decisions, in professional standards, and in appraisal literature.

BACK_DEFEXP-RR-002603

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

tal and climatic advantages and constraints must be analyzed to determine the proper land use for a site. Future land uses must be compatible with the local environment.

A site in a specific location may be influenced by its exposure to sun, wind, or other environmental factors. A very windy location can be disastrous to a resort but beneficial to a wind farm. The sunny side of the street is not always the most desirable for retail shops. In hot climates, the shady side of the street often receives more pedestrian traffic and greater sales, thus producing higher rents and higher land values. Ski resorts almost always have slopes facing north for snow retention and buildings facing south to receive the sun.

Analysis of a site's environment focuses on the interrelationships between the appraised site and neighboring properties. The effects of any hazards or nuisances caused by neighboring properties must be considered. Of particular importance are safety concerns—e.g., the safety of employees and customers, of occupants and visitors, or of children going to and from school.

A site's value is also influenced by nearby amenities and developments on adjoining sites, such as parks, landmark buildings, and compatible commercial buildings. The types of structures surrounding the property being appraised and the activities of those who use them can greatly influence site value.

Some types of sites located in or near critical environmental features such as wetlands, groundwater recharge areas, or habitat for rare or endangered species may be subject to special land use or environmental regulations that can affect values.

### Contamination and Environmental Risk Issues

The presence of various types of contaminants on, adjacent to, or simply near a site that raise environmental issues is more commonly encountered in the appraisal process now than in the past. Some situations that can affect the value of land and improved properties include

- Soil contamination due to an abandoned industrial plant,
- Groundwater contamination due to a leaking underground storage tank (LUST) at a gas station or dry cleaner in a neighborhood shopping center
- Pesticide runoff from farmland into rivers and streams
- Air contamination from smoke, vapors, or odors

Contaminants and hazardous substances such as asbestos, PCBs, dioxin, TCEs, radon, petroleum hydrocarborns, arsenic, lead, and other heavy metals, when present in amounts that exceed federal or state regulatory limits, can create cost, use, and risk issues that may reduce the market value of an unimproved or improved property.

Appraisers are not expected to have the knowledge or experience needed to detect the presence of contaminants or to measure their quantities or remediation costs. That is a job for environmental engineers and remediation specialists. But appraisers can gain the competence and skills needed to provide an opinion of the effect of the contamination on prices and market values by properly considering and relying on the reports and data prepared by environmental specialists.

The consideration of environmental contamination in the appraisal process has been specifically addressed in Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process and in Advisory Opinion 9: The Appraisal of Real Property That May Be Impacted by Environmental Contamination, as revised by the Appraisal

BACK_DEFEXP-RR-002604

Standards Board in 2002. In addition to defining key terms, definitions, and concepts, AO-9 establishes a framework for dealing with the cost, use, and risk issues raised, including consideration of ten important property characteristics to be considered during an appraisal assignment.

The framework in AO-9 identifies five key steps in an appraisal assignment involving contamination. First, an appraiser determines if the property is a source site, a non-source site, an adjacent site, or a proximate site. That distinction is especially

---

### Specialized Terms and Definitions Related to Environmental Contamination

Advisory Opinion 9, originally adopted in 1992 and substantially revised in 2002, includes the following definitions of key terms used by appraisers who may be involved in the valuation of properties affected by environmental issues. These definitions are also referenced in the Appraisal Institute's Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process.

| | |
|---|---|
| **diminution in value (property value diminution)** | The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition. |
| **environmental contamination** | Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater, or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, or local agencies. |
| **environmental risk** | The additional or incremental risk of investing in, financing, buying, or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning: (1) the nature and extent of the contamination, (2) estimates of future remediation costs and their timing, (3) potential for changes in regulatory requirements, (4) liabilities for cleanup (buyer, seller, third party), (5) potential for off-site impacts, and (6) other environmental risk factors, as may be relevant. |
| **environmental stigma** | An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (See environmental risk.) |
| **impaired value** | The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property. |
| **remediation cost** | The cost to clean up (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination. |

---

BACK_DEFEXP-RR-002605

important to a determination of who is responsible for investigation and remediation costs and whether that responsibility accompanies ownership of the property being appraised. A complex network of regulations defines the environmental responsibilities and potential liabilities of source site owners, investors, and tenants, and these responsibilities and liabilities can adversely affect the value of real property interests. Second, the appraiser considers the type of contaminant and applicable regulatory requirements (e.g, permitted or accidental discharge, level of required cleanup), migration (e.g., soil

| | |
|---|---|
| **remediation lifecycle** | A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup, during remediation, and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property. |
| **source, non-source, adjacent, and proximate sites** | Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site. |
| **unimpaired value** | The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated. |

### Environmental Exposure Pathways



Source: Landmark Research

BACK_DEFEXP-RR-002606

### Specialized Methods and Techniques for Determining the Effects of Environmental Contamination on Prices and Values

Over the past 25 years, the appraisal profession has developed a set of recognized and generally accepted specialized techniques for estimating the effect of contamination and environmental risks on prices, markets, and values as discussed in the peer-reviewed appraisal literature and courses of the appraisal profession. All of these specialized methods are based on the three traditional approaches to value (sales comparison approach, income capitalization approach, and cost approach). Great care must be exercised when using these specialized methods because of the special conditions and characteristics of contaminated properties. These methods involve one or more of the following:

1. Paired data analysis of sales of impacted or potentially impacted properties
2. Analysis of environmental case studies
3. Multiple regression analysis of property sales in a potentially impacted area or in proximity to a source site
4. Adjustment of income and yield capitalization rates on income-producing properties to reflect environmental risk premiums estimated through market research

In paired data analysis, prices paid for properties that sold in an impacted area are compared to prices paid for otherwise similar properties that sold outside the impacted area in order to estimate the effect of the location on the sale price. Of course, no two properties are exactly alike, so market-supported adjustments may have to be made for differences between the properties other than location. More than one pairing is typically necessary to understand the effect of the location in the impacted area on the prices paid.

Environmental case studies are typically useful when a source site is being appraised or in a situation involving an impacted neighborhood or area where there are insufficient sales to understand the effect of the environmental issue on prices and values. Sales in another case study location involving a similar environmental situation are studied to estimate how the marketplace there responded to similar environmental issues. Typically that involves comparing sale prices in the impacted case study area to sale prices in a nearby similar, but unaffected, control area. The case study environmental situation is then compared to that of the impacted area using the relevant property characteristics identified in Advisory Opinion 9. Great care must be exercised when using paired data, case studies, and interviews because of the special conditions and characteristics of contaminated properties. Also, surveys need to be properly developed.

When properly specified and developed, a multiple regression model can be used to determine if the environmental situation is affecting sale prices. The model can be designed to interpret the effect of issues such as remediation status, location in a contaminated area, distance from a source site, and other factors. Of course, model specification must also include the nonenvironmental independent variable factors (e.g., site size, age of improvements, date of sale, zoning, school district) that influence sale prices. Having a database that includes a sufficient number of sales to make the outcome of the model statistically significant is especially important. If the regression modeling is done as part of a mass appraisal assignment, the regression modeling must comply with Standard 5 of USPAP.

Sale prices for income-producing properties can be studied to estimate if their direct capitalization or yield capitalization rates have been affected by the contamination investigation, remediation, or post-remediation circumstances, and any appropriate upward adjustment can be made to the unimpaired rate for the property being appraised.

Given the remediation lifecycle recognized by AO-9, gathering and analyzing market data that matches up well with the appraised property's remediation lifecycle stage on the date of value is critical because the effect of the contamination situation on prices and values can change as the investigation, remediation, and post-remediation monitoring move forward.

Paired data analysis, case studies, or market studies of capitalization and yield rates developed by others and found in published appraisal literature can be a useful starting point in such an analysis. However, relying on published articles as a basis for a value opinion is not a recognized appraisal technique in the absence of independent investigation and verification of the accuracy of the market data and conclusions.

Informal or formal surveys of buyers, sellers, lenders, brokers, appraisers, and others involved in actual sales of property affected by contamination and environmental risk may also provide useful information.

For further information, see Richard J. Roddewig, editor, *Valuing Contaminated Properties: An Appraisal Institute Anthology*, Vol. II (Chicago: Appraisal Institute, 2014).

BACK_DEFEXP-RR-002607

Copyrighted material licensed by Charles Brigden on September 17, 2020

contamination confined to a source site, groundwater contamination spreading off site), and remediation (e.g., soil removal, installation of a cap, groundwater pumping, vapor removal) characteristics. Third, the appraiser must determine the status of the property in the "remediation lifecycle" as of the date of value. The effect of contamination and environmental risk on property prices and values changes over time; it typically decreases as a site works its way through the discovery and investigation, remediation, and post-remediation stages. Contamination may also be mitigated by natural attenuation even in cases where no actual remediation efforts have been undertaken. Fourth, the appraiser must consider the cost, use, and risk effects as of the relevant date and point in that remediation lifecycle as they relate to the type of property (source, non-source, adjacent, or proximate sites). Fifth, and finally, the appraiser estimates the impaired ("as is") value. In most assignments, appraisers are also asked to compare the impaired value to the unimpaired value under the hypothetical condition that the contamination is not present.

The initial focus in the 1980s and 1990s was on techniques for appraising source sites, for example, contaminated or remediated former steel mills or manufacturing plants with on-site contamination and actual or potential off-site migration due to surface water runoff, contaminated groundwater, or even windblown dust and vapor. Finding comparable sales of such source properties (sometimes called *brownfields*) was often difficult because many significantly contaminated source sites did not sell until investigation had been completed, parties legally responsible for remediation costs had been identified, remediation plans had been approved by environmental agencies, and cleanup costs had been determined with some degree of accuracy. Today, sales of source sites can be found and analyzed more readily. There may also be indemnification obligations by one or more parties.

In recent years, attention has turned to techniques for estimating the value of non-source, adjacent, and proximate sites. Sales of these types of properties can be found in large numbers by researching markets around sites involved in documented state or federal environmental investigations and approved remediation programs. These transactions will usually provide sufficient basis for valuing or analyzing a site that may be affected by environmental contamination. The details of the sales transaction will require a great deal of confirmation.

There are well established and generally recognized and accepted analytical techniques and methods to determine how the cost, use, and risk factors referenced in AO-9 affect property prices, values, and markets. Appraisers must avoid substituting their judgment for that of the marketplace. All of the techniques require consideration of market data in arriving at the impaired values. Contamination does not always have an adverse effect on value. The influence of environmental impairment on real property must always be found in the marketplace.

## Special Characteristics of Rural, Agricultural, or Resource Land

Rural or agricultural resource lands have specific characteristics that appraisers should investigate to describe these properties adequately.

### Soil

Precise soil surveys that indicate the soils found on properties, appropriate crops, and expected production are often available (Figure 12.10). These surveys are useful in comparing agricultural properties.

BACK_DEFEXP-RR-002608

**Figure 12.10**  Soil Survey Map



Source: https://websoilsurvey.sc.egov.usda.gov/App/WebSoilSurvey.asp

### Water Rights, Drainage, and Irrigation

The legal right to water is as important to the value of a property as the physical source of the water. Although water rights vary greatly throughout the United States, state laws, as administered by the state department of natural resources or another government agency, have the greatest influence on access to water. Evidence of water rights may be in the form of a contract with the US Bureau of Reclamation or a public utility water distributor. Water rights may also be given by an individual state certificate or decree, by shares of stock in an irrigation company, or by location in an organized irrigation district. The long-term dependability and cost of adequate drainage and water supplies should be analyzed. (Evaluating on-site drainage and irrigation may require special expertise.) For an appraisal of irrigated properties, it is always necessary to know whether the water rights are appurtenant to the land or transferable separately from the land. If water rights do not transfer with the land, the property's value may decline significantly and its highest and best use may be changed.

### Climate

General climatic conditions and growing seasons can affect crop production and selection and, therefore, land value. Microclimates within a local area can also affect the productivity of a property as compared to nearby, competitive properties.

### Potential Crops

The crops grown on a property are related not only to climate, soil, and irrigation, but also to the availability of labor, transportation, and access to the markets that make, transport, and sell the products produced from crops.

BACK_DEFEXP-RR-002609

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Environmental Controls

Cropping patterns are influenced by regulations on herbicides, insecticides, fertilizers, air and water pollution, and wildlife protection. Lead-based paint, underground storage tanks, asbestos in farm buildings, and cattle vats are common environmental liabilities.

### Mineral Rights

The presence of precious metals, oil and gas, sand and gravel, quarry red rock such as building stone, clay deposits, or gemstones on a plot of land can affect its value. As with water rights, the legal right to extract all minerals contained in or below the surface of a property is as important as ownership of the land itself. Mineral rights may be granted with surface rights or without surface entry because the mineral estate is the dominant tenant in most states. Various lease and ownership relationships may be in effect and should be investigated. These considerations are often complicated by advances in technology and directional drilling techniques.

Because subsurface minerals can never be fully and absolutely quantified until they are extracted, and their extent and quality are subject to many variations, appraisers should recognize the risks and uncertainties associated with mineral properties. It is also important to remember that the activity of mineral extraction is a business activity and that real property interests must be separated from those of a business.

### Unapparent Environmental Hazards

Although the environmental liabilities associated with industrial plants are well known, many of the same liabilities may be present in other properties. Investors and analysts cannot assume that green rural properties that appear clean are actually free of environmental liabilities. In the 1940s and 1950s, farmers commonly used cattle vats—i.e., trenches filled with fuel oil through which cattle were led to rid them of mites and small insects. The fuel oil was often treated with DDT and other pesticides. When this practice fell into disuse, the trenches were simply filled in. Farms often have aging underground storage tanks that held gasoline used to fuel farm vehicles. Farmland may also be contaminated by the accumulation of fertilizers and pesticides. Old railroad beds can constitute an environmental hazard because railroad ties were commonly soaked in creosote-filled trenches dug on site when tracks were laid. Timberlands are not free of contaminants either. Old turpentine stills are often found in areas where forests were once harvested.

### Other Considerations

The location of wildlife habitats, the distances from populated areas, and the potential for recreational land uses are among the many other considerations to be analyzed in appraising agricultural land. Special tax provisions, such as reduced taxes on agricultural or resource properties, should also be studied.[4]

---

4. For a thorough discussion of the methods used to describe and analyze the significant characteristics of land used for agricultural production, see *Rural Property Valuation* (Chicago: Appraisal Institute, 2017).

BACK_DEFEXP-RR-002610

BACK_DEFEXP-RR-002611

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Building Description    **13**

An important part of every appraisal is the analysis of the type, quality, and condition of the building or buildings on the site and the analysis of the structure's design. In the valuation process, appraisers gather much of the information needed to describe and analyze the improvements by personally visiting the site of the real estate. Careless or inadequate inspection of the physical characteristics and features of the subject and comparable properties can create difficulties for an appraiser in later phases of the appraisal. For example, if a structural problem or a performance feature that exceeds typical building requirements is overlooked, the conclusions of the three approaches to value could be meaningless. The goal of the site visit is identifying the site and building characteristics that create or detract from value.

Accurate building analyses are essential to all valuation assignments, even in cases where the existing improvements do not represent the property's highest and best use. In the description and analysis of the site and improvements, an appraiser should address all pertinent property strengths and weaknesses, expand on any problem areas, and interpret the significance of the data to lay a foundation for the discussion of highest and best use. The appraiser needs a thorough understanding of the physical characteristics of the subject property to identify and select suitable comparables. A thorough building analysis helps an appraiser identify the extent and quality of building improvements, calculate their cost, and identify physical deterioration and functional obsolescence. Therefore, the accuracy of building analyses directly affects the opinion of value produced by applying the three approaches to value. If the scope of work of the assignment does not require a site visit or calls for an exterior-only inspection, the site and building description may not be accurate, so the appraisal report must clearly and conspicuously disclose the extraordinary assumption that the site and building characteristics are as described even though the appraiser has not personally viewed or measured the property.

Architectural style and functional utility are interrelated, and their combined effect on property value must be analyzed by appraisers. Architectural style is the character of a building's form and ornamentation. Functional utility is the ability of a

BACK_DEFEXP-RR-002612

property or building to be useful and to perform the function for which it is intended, according to current market tastes and standards. Functional utility also relates to the efficiency of a building's use in terms of architectural style, design and layout, traffic patterns, performance features, and the size and type of rooms. Both architectural style and functional utility influence the lives of individuals by providing or withholding beauty, comfort, security, convenience, light, and air. Building improvements may also support reasonable maintenance expenditures, preserve valuable traditions, or indicate the need for change.

Considerations of style and functional utility are integral to an appraisal because they relate directly to the utility and desirability of the property in the marketplace. They are noted along with other physical characteristics during a site visit. By using comparable data, an appraiser can analyze how style and function influence a property's market value. Style and functional utility are examined in terms of (1) the use for which a particular improvement was designed, (2) its actual or contemplated use, and (3) its most productive use. These three uses may or may not be the same.

The ultimate goals of the analysis of the improvements are

- Proper identification of the important building components for the appraisal analysis, i.e., what site and building characteristics influence value
- Sound judgment of the quality and condition of improvements and components
- Convincing support for conclusions in market analysis, highest and best use analysis, and the application of the approaches to value

This chapter focuses on the structural elements and features that an appraiser will rate in the quality and condition survey, which lays the groundwork for the analyses that follow the building description in the valuation process.

## Site Visit

Sometimes consumers equate an appraisal with the act of physically inspecting the subject real estate, but visiting the site is just one of the many tasks that may be performed during an appraisal assignment. An appraiser's site visit, sometimes referred to as a site inspection, differs from a property inspection conducted by a professional property inspector and often performed prior to a sale transaction. Professional property inspectors are specialized contractors with expertise in uncovering defects in the structure and materials of various types of properties. They are not trained or licensed to render an opinion as to the impact on market value of any identified flaws, defects, or deficiencies. Although appraisers must be familiar with the property inspection process and may review and rely on property inspection reports, appraisers observe the components and characteristics of a subject property to identify their influence on property value in the market.

Although not every assignment requires a site visit, the importance of a site visit should not be underestimated. Much of the primary data that an appraiser collects comes from the process of visiting the site and observing the site and improvements. The real estate being appraised must be understood in the context of its immediate surroundings and the effect of other nearby improvements and land uses. Comparison of the subject and comparables is crucial for the sales comparison and income capitalization approaches, and estimating building costs in the cost approach depends on an accurate inventory of the building components in the subject. In addi-

BACK_DEFEXP-RR-002613

Copyrighted material licensed by Charles Brigden on September 17, 2020

tion, comparing the quality, condition, and performance of building components can be essential in making market-derived adjustments.

In some situations, the improvements may have been demolished by natural forces, as a result of demolition, or due to eminent domain actions. In these instances, appraisers must ensure that they have an adequate understanding of the condition of the improvements as they existed on the effective date of valuation. When an appraiser does not know with an adequate degree of certainty the condition of a property as of the effective date, the value is subject to an extraordinary assumption that the property condition on that date was as it was described it in the appraisal report.

Sometimes an appraiser will not have the expertise necessary to judge the quality and condition of specialized equipment or atypical building materials and may have to rely on the judgment of other professionals.[1] For a complex property, such as a manufacturing plant containing sophisticated equipment and mechanical systems, blueprints provided by the developer or owner can be helpful.

In addition to obvious property defects, appraisers should identify any new building components such as energy-efficient upgrades and on-site energy generation facilities.

## Building Description

In the valuation process, an appraiser analyzes the design, layout, and construction details of the subject improvements, which include the structural components, materials, energy and water efficiency, and mechanical systems of each building under investigation. The appraiser also determines the size and the function, condition, and serviceability of each building element described.

It is also important that appraisers identify items that are not building improvements, but may be important to the functionality or appeal of the real property appraised. Personal property items such as window treatments and appliances may or may not be included in an appraisal. Usually, only real property is valued, but sometimes a lender client may consider items of personal property part of the collateral for a loan and ask appraisers to allocate a value to these items. In some instances, special analysis may be required to determine whether items of machinery and equipment are personal property or fixtures. The site visit offers appraisers a prime opportunity to assess whether fixtures or other personal property are, in fact, attached to the real estate and if they are essential to its function or marketability.

The building description provides the basis for comparing the subject property's improvements with improvements that are considered typical in the subject property's market and with the ideal improvements as determined in highest and best use analysis.

To analyze the quality and condition of improvements, appraisers need a general understanding of the building construction process and the operation of essential building systems.[2] The typical construction materials and techniques used in a region can change over time for a variety of reasons:

- New building technologies evolve.
- The prices of materials fluctuate significantly.

---

1. The Competency Rule of the Uniform Standards of Professional Appraisal Practice may apply to certain complex property inspection situations. Advisory Opinion 2 discusses what constitutes a minimum inspection of the subject property. See also Guide Note 4: Reliance on Reports Prepared by Others in the Guide Notes to the Standards of Professional Practice of the Appraisal Institute.

2. For an up-to-date and easy-to-read guide to construction materials and techniques, see Francis D.K. Ching, *Building Construction Illustrated*, 5th ed. (Hoboken, NJ: John Wiley & Sons, 2014).

BACK_DEFEXP-RR-002614

- Rising or falling energy prices make a particular building material or construction technique more desirable.
- The dictates of fashion affect the demand for a certain building material or feature.

With experience and through observation of market trends, appraisers gain insight into how building components are perceived and valued in a particular market. The growth of "green," or high-performance, buildings is a good example of the changes that occur in all types of building uses.

### Elements of a Building Description

An appraiser prepares a building description by considering a variety of specific information in sequence. Primary concerns include

1. The type of use represented by the existing building
2. The codes and regulations affecting this use
3. Building size, plan, and construction
4. Details of the building's exterior and interior and its equipment and mechanical systems (both those included in the original construction and in subsequent improvements)

An appraiser must view a building objectively and analytically, paying careful attention to all components that ultimately contribute to the determination of the building's highest and best use as improved and any alternative uses to be considered in the assignment. The sheer number of components listed in a comprehensive building description should not be a factor in the application of the approaches to value. The market's reaction to the presence or absence of specific components in a property is a more important consideration than the simple fact that those components do or do not exist.

Green and high-performance buildings offer a challenge to appraisers because their unique features may result in lower energy and water costs, differing operating costs, and improved marketability. There may also be special tax advantages or incentives that offset the gross cost of these features. The market's reaction to green features may not be supportable in the sales comparison approach because of limited sales in a given market. In these cases, the income capitalization and cost approaches may produce a more credible value conclusion.

Some improvements feature unique or specialized design, materials, or construction features that distinguish them and may limit their marketability. A chemical plant or a wharf facility, for example, may have special locational characteristics that complement the unique features of the improvements. Property improvements with features that differ from the features of other properties with broader marketability are not necessarily without value, but more specialized analyses may be necessary. Furthermore, some properties may have special importance or value to their owners or users (use value) that does not reflect the value the property may have in its market (market value).

> **green building**
> The practice of creating structures and using processes that are environmentally responsible and resource-efficient throughout a building's life cycle from siting to design, construction, operation, maintenance, renovation, and deconstruction. This practice expands and complements the classical building design concerns of economy, utility, durability, and comfort. Also known as *sustainable* or *high-performance building*.

BACK_DEFEXP-RR-002615

## Use Classification

Land uses can be divided into any number of types, depending on market norms and personal preferences. Traditionally, most appraisers have divided land uses into these major groups:

- Residential
- Office
- Retail
- Industrial
- Mixed use
- Agricultural
- Other specialized uses

Each of these groups can be broken down into increasingly specific subgroups.

Systems of use classification may vary from market to market. For example, in some markets hotels and motels are considered a major property classification, whereas in other markets they are considered a subset of commercial properties. Appraisers should be familiar with the types of property defined by the market they are working in and employ a system of use classification that their clients will understand.

Zoning regulations establish the permitted uses of real estate. Existing and potential land uses must be checked against zoning regulations to determine if they are conforming or nonconforming uses. When the present use does not conform to current zoning regulations, an appraiser should consider how this fact might affect property value.

## Building Codes and Ordinances

In addition to any use restrictions imposed by zoning, the planning and construction of buildings are restricted by various laws, codes, and regulations enacted at all levels of government to protect the health, safety, and welfare of the public. Many states have codes that control the kinds of buildings that are built there. Federal regulations are established to ensure occupational health and safety, accessibility, environmental protection, pollution control, and consumer protection. Municipal building codes establish requirements for the construction and occupancy of buildings and may contain specifications for building materials, methods of construction, and mechanical systems. These codes also establish standards of performance and address considerations such as structural strength, fire resistance, energy and water usage, and adequate light and ventilation.

Many newer building codes are incorporating green and high-performance features, particularly relating to energy and water use, as well as resilience features to better prepare buildings to withstand natural disasters including hurricanes, floods, and wildfires. Since building codes are periodically updated, as frequently as every three years, building performance for new and significantly renovated buildings may change over a relatively short time period, even for conventional structures.

> ### Market Perceptions of Green Features
>
> According to an April 2019 *Realtors and Sustainability Report*, nearly 70% of residential and commercial realtors indicated that the listing of energy-efficient building components was somewhat or very valuable. A majority of home buyers were reported to be interested in sustainability, and 36% said solar panels increased the perceived value of homes. The same report stated that both residential and commercial properties with green certifications experienced typical marketing times.

*Building Description*    **197**

BACK_DEFEXP-RR-002616

> ### Benchmarking
>
> Benchmarking is the practice of comparing the measured performance of a device, process, facility, or organization to itself, its peers, or established norms, with the goal of informing and motivating performance improvement. When applied to building energy use, benchmarking serves as a mechanism to measure the energy performance of a single building over time, relative to other similar buildings, or to modeled simulations of a reference building built to a specific standard (such as an energy code). For more information, see www.energy.gov/eere/slsc/building-energy-use-benchmarking.

Buildings built to a green standard should exceed the local building code and should have a paper trail to provide the details of the building standard. Some government jurisdictions require buildings to report their annual energy use, which is referenced as energy benchmarking. Some benchmarking databases are open to the public, providing valuable information to appraisers and real estate agents.

Building codes establish one form of standard, but the ordinances enacted for their application often vary from the codes themselves or place special terms or conditions on how the codes will be applied in a given jurisdiction. Note that national building codes do not always translate into local ordinances.

### Size

The methods and techniques used to calculate building size vary regionally, differ among property types, and may reflect biases that significantly affect opinions of value. An appraiser must know the measurement techniques used in the area where the building is located as well as those used to describe properties elsewhere. Measurement techniques applied in the assignment  should reflect market norms for the property type in its market area.

The relevant type of measurement varies depending on the property type and, more specifically, how market participants treat the measurement of that property type. For example, net rentable area is commonly used for office buildings, while gross living area is commonly used for one-unit residential properties.

Distinctions between gross building area, gross living area, usable area, and rentable or leasable area need to be clearly understood. Because the measurement of these areas varies based on local market practices, knowledge of such practices is important.

An appraiser uses the system of measurement commonly employed in the area and includes a description of the system in the appraisal report. Gross building area is usually calculated. Measurements taken from plans should be checked against actual building measurements because alterations and additions are often made after the plans are prepared. The areas of attached porches, freestanding garages, and other minor buildings are always calculated separately.

Standards for measuring residential property have been developed by several federal agencies, including the FHA, the VA, Fannie Mae, and Freddie Mac (see Table 13.1). Because there is a close relationship between these agencies and the mortgage market industry, these standards have been used in millions of appraisals. Another widely accepted measurement standard for residential properties is *Square Footage—Method for Calculating: ANSI Z765-2002*, developed by the National Association of Home Builders (NAHB) Research Center with the American National Standards Institute (ANSI).

BACK_DEFEXP-RR-002617

| Table 13.1 | Building Measurement Standards |
|---|---|
| **Gross living area (GLA)** | |
| Definition | Total area of finished, above-grade residential space; calculated by measuring the outside perimeter of the structure and includes only finished, habitable, above-grade living space. (Finished basements and attic areas are not generally included in total gross living area. Local practices, however, may differ.) |
| Use | Used by federal agencies to measure one-unit residential properties. |
| **Gross building area (GBA)** | |
| Definition | Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls; includes both the superstructure floor area and the substructure or basement area. |
| Use | Used by federal agencies to measure multifamily properties; also the common standard of measurement for industrial buildings. |
| **Gross leasable area (GLA)** | |
| Definition | Total floor area designed for the occupancy and exclusive use of tenants, including basements and mezzanines; measured from the center of joint partitioning to the outside wall surfaces. |
| Use | Commonly used to measure shopping centers. |

Note that the acronym *GLA* can stand for two different area measurements. Residential appraisers use GLA for *gross living area*; nonresidential appraisers use it to refer to *gross leasable area*.

Office buildings present special problems for appraisers because they are measured differently in different regions. The Building Owners and Managers Association International (BOMA) has established a method for measuring office building floor area. This widely used method is described in BOMA's publication *Office Buildings: Standard Methods of Measurement* (ANSI/BOMA Z65.1—2017), which was most recently updated in 2017 as part of a major revision to BOMA's suite of standards.[3] The description of an office building should include measurements of

> Appraisers should not accept statements about the size of a subject or comparable property without knowing the basis for the calculation. Unverified size information can cause the resulting opinion of value to be erroneous or misleading.

- Gross building area
- Finished building area
- Leasable building area

Some methods of office measurement allocate a pro rata portion of the restrooms, elevator lobbies, and corridors to each tenant. One variation also includes a pro rata portion of the ground floor main lobby in each tenant's leased area. Office building management may measure single-tenant and multitenant floors in the same building in different ways. Because these measurements vary with occupancy, appraisers must apply a consistent method in calculating the floor-by-floor leasable area of a building.

## Format

A complete building description includes information about the details and condition of a building's exterior, interior, equipment, and mechanical systems. If the building

---

3. The BOMA suite of measurement standards includes *Industrial Buildings: Standard Methods of Measurement* (ANSI/BOMA Z65.2—2012), *Gross Areas of a Building: Standard Methods of Measurement* (ANSI/BOMA Z65.3—2018), *Multi-Unit Residential Buildings: Standard Methods of Measurement* (ANSI/BOMA Z65.4—2010), *Retail Buildings: Standard Methods of Measurement* (ANSI/BOMA Z65.5—2010), and *Mixed-Use Properties: Standard Methods of Measurement* (ANSI/BOMA Z65.6—2012). BOMA is also a founding member of the International Property Measurement Standards Coalition (IPMSC), which was founded in 2013 to develop and implement consistent measurement guidelines for all building types, regardless of geography. The International Property Measurement Standards (IPMS) for Office Buildings was published in 2014, standards for residential buildings were published in 2016, and standards for industrial buildings were published in 2017. International measurement standards for retail buildings are the latest in the IMPSC's set of standards to be developed and are forthcoming.

BACK_DEFEXP-RR-002618

is commissioned or certified green or energy-efficient, the details of the certification should be described and the efficiencies analyzed. Certified green or energy-efficient buildings usually have energy reports that provide an understanding of the performance of the building and estimated energy savings.

Although there is no prescribed method for describing all buildings, the outline in Figure 13.1 may be used to establish a format for building descriptions and can be adapted to the special needs of particular assignments. For green or energy-efficient residential buildings, the Residential Green and Energy Efficient Addendum (Figure 13.2) is an optional addendum for the URAR form widely used for mortgage lending purposes and for the AI 820.05 Appraisal Addendum. For commercial or industrial properties, the Commercial Green and Energy Efficient Addendum (Figure 13.3) is the tool to use when inspecting these special buildings.

Other formats can be useful in different circumstances, depending on the type of property concerned and the nature of the appraisal assignment. The level of detail required in the building description varies according to the assignment's scope of work.

## Description of Exterior Materials and Design

An exterior description provides information on the following:

- Substructure—foundation
- Framing
- Insulation
- Ventilation
- Exterior walls, doors, and windows
- Roofs and drains
- Chimneys
- Special features

### Building Envelope

*Building envelope* refers to the walls, foundation, roof, doors, and windows or those components that separate the interior conditioned space from the exterior unconditioned space. Green or energy-efficient buildings may have a rating for the tightness of the envelope. Most high-performance buildings will have a tighter envelope than required by the local code. The lower the number, the tighter the envelope. A very tight envelope requires a mechanical air exchange.

### Substructure

Substructure usually refers to a building's entire foundational structure, which is below grade and includes such foundation supports as footings, slabs, piles, columns, piers, and beams. To evaluate the quality and condition of footings (and other items of concealed construction throughout a building), which are visible only when a building is under construction, an appraiser must look for evidence of structural problems. Footings that are improperly designed and constructed often cause settling and wall cracks.

### Superstructure

Superstructure usually refers to the portion of the building above grade. In multipurpose buildings, however, components such as parking garages that are above grade but not used for habitable space are often considered part of the substructure.

BACK_DEFEXP-RR-002619

**Figure 13.1**    Elements of a Building Description

A. Substructure
  1. Footings
  2. Slabs
  3. Piles
  4. Columns
  5. Piers
  6. Beams
  7. Foundation walls

B. Superstructure
  1. Framing
  2. Insulation
    a. Home energy rating system (HERS), noting above-standard insulation
    b. Other third-party rating system
  3. Ventilation—mechanical air exchange (heat recovery ventilator [HRV] or energy recovery ventilator [ERV])
  4. Exterior walls
  5. Exterior doors
  6. Windows, storm windows, and screens
  7. Facade
  8. Roof and drain system
  9. Chimneys, stacks, and vents
  10. Special features

C. Interior description
  1. Interior walls, partitions, and doors
  2. Division of space
    a. Storage areas
    b. Stairs, ramps, elevators, escalators, and hoists
  3. Interior supports
    a. Beams, columns, and trusses
    b. Flooring system (subflooring)
    c. Ceilings
  4. Painting, decorating, and finishing
    a. Basements
    b. Floor coverings
    c. Walls, partitions, and ceilings
    d. Molding and baseboards
    e. Fireplaces

  5. Protection against decay and insect damage
  6. Miscellaneous and special features
  7. Personal property
    a. Furniture
    b. Fixtures
    c. Trade fixtures
    d. Equipment

D. Mechanical systems
  1. Plumbing system
    a. Piping
    b. Fixtures
    c. Hot water system
      1) Solar thermal water heating
      2) Hybrid water heating
  2. Heating, ventilation, and air-conditioning systems
    a. Heating systems
      1) Warm or hot air
      2) Hot water
      3) Steam
      4) Electric
    b. Air-conditioning and ventilation systems
  3. Electrical systems
    a. Solar photovoltaic systems (solar PV)
    b. Geothermal heating and cooling (ground source heat pumps)
  4. Miscellaneous equipment
    a. Fire protection
    b. Elevators, escalators, and speed ramps
    c. Signals, alarms, and call systems, energy dashboards
    d. Loading facilities
    e. Attached equipment (process-related)
      1) On-site energy generation (e.g., solar photovoltaics)
      2) On-site energy storage (batteries)
      3) Resilience features such as on-site bioswales and storm water retention and management (ponds, cisterns, permeable pavement)

BACK_DEFEXP-RR-002620

**Figure 13.2**  Page One of the Residential Green and Energy Efficient Addendum

BACK_DEFEXP-RR-002621

**Figure 13.3**  Page One of the Commercial Green and Energy Efficient Addendum



BACK_DEFEXP-RR-002622

**Substructure:**   A building's entire foundational structure, which is below grade and provides a support base or footings on which the superstructure rests.

**Footings**

| | |
|---|---|
| Type | Perimetric base |
| Materials | Concrete |
| Characteristics/Use | Most common type of footing; a concrete base rests on undisturbed earth below the frost line and distributes the load of the walls over the subgrade. |

| | |
|---|---|
| Type | Plain footing |
| Materials | Concrete |
| Characteristics/Use | Unreinforced and designed to carry light loads. |

| | |
|---|---|
| Type | Reinforced footing |
| Materials | Concrete and steel |
| Characteristics/Use | Contain steel to increase their strength. |

| | |
|---|---|
| Type | Column |
| Materials | Concrete |
| Characteristics/Use | Long, relatively slender pillars. |

| | |
|---|---|
| Type | Spread footing |
| Materials | Concrete |
| Characteristics/Use | Frequently used where the soil has poor load-bearing capacity. |

**Foundations**

| | |
|---|---|
| Type | Slab on ground |
| Materials | Poured concrete |
| | Concrete or cinder block walls on concrete footings |
| | Cut stone or stone and brick (in older buildings) |
| Characteristics/Use | Most common type of foundation. |

| | |
|---|---|
| Type | Mat and raft (floating foundation) |
| Materials | Concrete slab heavily reinforced with steel |
| Characteristics/Use | Used over soils that have poor load-bearing capacity. Steel reinforcing makes the entire foundation function as a unit. |

**Piles**

| | |
|---|---|
| Type | Columnar units |
| Materials | Concrete |
| | Metal |
| | Wood |
| Characteristics/Use | Piles serve as substitutes for footings, transmitting loads through soil with poor load-bearing capacity to lower levels where the soil's load-bearing capacity is adequate. |

**Columns, Piers, and Beams**

| | |
|---|---|
| Materials | Concrete |
| | Steel |
| Characteristics/Use | Foundation supports that can be used separately or in combination. |

BACK_DEFEXP-RR-002623

**Superstructure:** The portion of a building that is above grade.

**Framing**

| | |
|---|---|
| Type | Platform |
| Materials | Wood |
| Characteristics/Use | Vertical framing members (studs) are cut to the ceiling height of one floor, horizontal plates are laid on top, then more studs are cut for the next floor. |

| | |
|---|---|
| Type | Post-and-beam |
| Materials | Wood |
| Characteristics/Use | Heavier and larger framing members support widely spaced beams. Fewer interior load-bearing walls. |

| | |
|---|---|
| Type | Precast concrete |
| Characteristics/Use | Prefabricated walls and floors are "tilted up" at the construction site. |

| | |
|---|---|
| Type | Steel framing |
| Characteristics/Use | For functional, single-story industrial plants with large bays between columns. Usually less expensive than precast or reinforced concrete and easier and faster to erect. |

| | |
|---|---|
| Type | Solid masonry exterior walls with steel beam or reinforced concrete interior framing (newer buildings) or interior framing of wood beams and posts (older buildings) |

**Insulation**

| | |
|---|---|
| Type | Loose-fill |
| Materials | Mineral wool (rock, slag, or glass wool) or cellulosic fiber (recycled newsprint, wood chips, or other organic fibers), spray foam |
| Characteristics/Use | Poured or blown by a machine into a building's structural cavities. |
| Type | Flexible |
| Characteristics/Use | Generally used where it is not practical to install loose-fill insulation or where the foil or kraft paper facing is needed as a vapor barrier. |

| | |
|---|---|
| Type | Rigid |
| Materials | Structural wall insulation |
| | Fiberboard |
| | Structural deck insulation |
| | Rigid board insulation |

| | |
|---|---|
| Type | Reflective |
| Materials | Foil |
| Characteristics/Use | Used to reflect heat transferred by radiation. |

| | |
|---|---|
| Type | Foamed-in-place |
| Materials | Polyurethane |

BACK_DEFEXP-RR-002624

### Framing

The structural frame is the load-bearing skeleton of a building to which the exterior and interior walls are attached. The structural frames of most houses in the United States are made of wood. Many commercial and industrial buildings have steel or concrete frames.

A wood framing system that is defective can cause walls to crack, exterior walls to bulge, windows to stick, and doors to open or close improperly. Steel framing is usually less expensive than precast or reinforced concrete, and it is easier and faster to erect. Steel framing has one major disadvantage, however. Unless it is encased in heat-resistant, fireproof material such as plaster or concrete, the steel may buckle and bend in a fire, pulling adjacent structural members out of position and greatly increasing fire damage to the building. Reinforced and precast concrete framing is the most expensive and difficult to construct, but it is highly resistant to fire damage.

### Insulation

Insulation not only helps economize on fuel and ensure the comfort of occupants in both warm and cold climates, but it also reduces noise transmission and impedes the spread of fire. The ability of an insulation material to resist the flow of heat is measured in R values. R value is derived by measuring the British thermal units (Btus) that are transmitted in one hour through one layer of the insulation. The higher the R value, the better the insulation. There is no universal standard for the amount of insulation required in a structure because the amount varies with the climate zone and the type of building. For example, over-ceiling or under-roof insulation with an R value of 13 might be satisfactory in a mild climate if there is gas or oil heat and no air-conditioning. In cold or hot climates and in structures with electric heat or air-conditioning, insulation with an R value of 24 might be necessary. There has been a growing trend to superinsulate structures using insulation with much higher R values. High-performance or energy-efficient buildings may have ratings supplied by a third-party certifier. Residential properties may have a HERS Index that provides the energy efficiency of the structure; the lower the rating, the more energy efficient the home. The standard code-built house built to the 2006 International Energy Code (IECC) has a HERS Index of 100. Appraisers can research the local building code to find the HERS Index for the community at www.resnet.us.[4] HERS ratings are most often established for new construction but can be established for existing homes. Green or energy-efficient homes will have an index much lower than the standard 100.

Existing housing may have a home energy score (HES) on a scale of 1 to 10, with 10 representing the house that uses the least amount of energy compared to other similar homes.[5]

### Ventilation

All buildings need ventilation to reduce heat buildup beyond tolerances in closed-off areas such as attics and spaces behind walls. Ventilation also prevents the condensation of water, which collects in unventilated spaces and causes building materials to rot and decay. When condensation seeps into insulation, it reduces its R rating. Ventilation can be accomplished with holes that range from one inch to several feet

---

4. The RESNET website has a database of houses with HERS scores that is open to the public. Appraisal Institute members have free access to a more comprehensive HERS database, RESNET Appraisers Portal at https://portal.resnet.us.

5. More information on the home energy score standard is available at www.energy.gov/eere/buildings/downloads/home-energy-score.

BACK_DEFEXP-RR-002625

in diameter. These holes should be covered with screening to keep out vermin. Also, ventilation can be increased by using fans.

In green and high-performance houses and commercial buildings, energy recovery ventilators (ERVs) or heat recovery ventilators (HRVs) are commonly used to provide needed ventilation for tightly sealed building envelopes. ERVs and HRVs exchange (without mixing) the excess energy in the exhaust air with the intake air, or vice versa, depending on whether the interior is being heated or cooled.

Construction professionals can improve indoor air quality in green buildings by improving ventilation and minimizing off-gassing products. These goals can be achieved by using no- and low-VOC (volatile organic compound) products and finishes and by installing simple ventilation methods, linked fan systems, or whole-building ventilation systems. Air filtration systems, such as high-efficiency particulate air (HEPA) filters, are effective in removing impurities from the air. Many air filtration devices can also be added to existing forced-air heating and cooling systems. For green or energy-efficient buildings, reviewing the building documentation will provide details on the indoor air quality.

### Mold and Sick Building Syndrome

Many building materials—wood, drywall, insulation, carpet, textiles—contain the cellulose that various species of fungi, commonly known as *mold*, feed on. The long-term effects of mold on the integrity of these building materials can cause physical deterioration. In past years the potential toxicity of the byproducts of mold growth had been exaggerated. Nevertheless, this remains a concern and may affect value even if it does not affect occupants' health. This perceived problem has generated lawsuits, mainstream media coverage, and governmental scrutiny like the attention once associated with asbestos-containing materials.

Repairing degraded building materials is usually straightforward, but the remediation of mold infestations affecting indoor air quality can be a complex process, involving specialized enclosure and removal operations. The Environmental Protection Agency has drafted voluntary guidelines for indoor air quality and remediation standards, but because of the geographical diversity of mold species, specific national regulations defining acceptable levels of mold exposure are not practical.

A more broadly defined problem than the presence of mold is sick building syndrome, which is most often the result of poor air circulation and is not necessarily associated with mold. In cases of sick building syndrome, 20% or more of a building's occupants suffer persistent physical irritation such as headaches or respiratory problems when in the building but not when outside the building, according to the Environmental Protection Agency. The rise of sick building syndrome is commonly attributed to the energy crisis of the 1970s. The tighter building envelopes used at that time increased energy efficiency by reducing heating and cooling costs, but an unintended side effect was a lack of air exchange, keeping possible contaminants circulating inside the building longer. Modern building practices address this shortfall with enhanced attention to building ventilation rates and moisture control, both in the building interior and within the structure itself.

The American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE) has taken the lead in developing standards that are now followed by most construction professionals. Diagnosing poor ventilation and implementing a remediation plan are difficult tasks generally performed by engineering professionals rather than appraisers.

### Exterior Walls and Doors

Exterior walls are either load-bearing or nonload-bearing. When the quality of the exterior walls is below the standard for buildings in the same market, the property may suffer a loss in value. The presence or absence of energy-conserving material such as weatherstripping around doors should also be noted. Door shoes, weatherproof thresholds, and sweeps will prevent air from leaking.

BACK_DEFEXP-RR-002626

### Exterior Walls

| | |
|---|---|
| Type | Load-bearing |
| Materials | Solid masonry (cement block, brick, or a combination) |
| | Poured concrete |
| | Pre-stressed concrete |
| | Steel beams covered with siding material |
| | Wood framing |
| Characteristics/Use | May be strengthened with masonry pilasters attached to the exterior of the wall. |
| Type | Nonload-bearing |
| Materials | Porcelain enamel |
| | Steel |
| | Aluminum |
| | Precast aggregate concrete |
| | Glass |
| | Corrugated iron, tilt-up precast concrete asbestos board, fiberglass and metal sandwich panels for industrial buildings |
| Characteristics/Use | Commonly used in larger buildings; attached to the framing system. |

### Windows, Storm Windows, and Screens

In describing a building, an appraiser notes the type of window, its material or manufacturer, and any energy-saving features. Because windows are a major source of heat and cooling loss, their design and installation is important. In commercial and industrial buildings, double- or triple-glazed windows are generally installed, and occasionally casement windows may be used.

### Facade

Many houses, stores, office buildings, and industrial buildings have a facade, or front, that differs from the design and construction of the rest of the building. Special facades may cost extra and could therefore affect the property's value.

### Roof and Drainage System

A roof is designed and constructed to support its own weight and the pressure of snow, ice, wind, and rain. The roof covering prevents moisture from entering the structure. The water that falls on a roof must be directed to the ground or into a drainage system. Even so-called "flat" roofs may be slightly pitched to direct water to drains and gutters.

Most roof coverings need to be replaced several times during a building's life, so a roof's condition and age are investigated to determine its remaining useful life.

### Chimneys, Stacks, and Vents

Exhaust systems range from simple metal vents and flues to complex masonry fireplaces, industrial chimneys, and ventilation systems. The efficiency of any fuel-burning heating system depends on its chimney, stack, or vent. Chimneys and stacks with cracked bricks, loose mortar joints, or other leaks may be serious fire and health hazards.

BACK_DEFEXP-RR-002627

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Exterior Doors

| | |
|---|---|
| Type | Standard |
| Materials | Wood |
| | Metal |
| | Glass |
| Characteristics/Use | Exterior doors are usually solid. Hollow exterior doors are generally a sign of poor-quality construction. |
| Type | Large truck doors (commercial and industrial buildings) |
| Materials | Steel |
| Types/Components | Special-purpose doors with automatic door openers |
| Materials | Wood |
| | Metal |
| | Glass |

## Windows

| | |
|---|---|
| Types | Single- and double-hung |
| | Casement |
| | Horizontal sliding |
| | Clerestory |
| | Fixed |
| | Awning |
| | Center pivot |
| | Jalousie |
| Materials | Glass with wood or vinyl framing (usually for houses) or aluminum or steel framing (often in residential, commercial, and industrial buildings) |
| Characteristics/Use | Windows should be tightly sealed, with caulking at the joints and between the wall and the window. The use of insulated glass, multiple glazing, low-E, and storm sashes helps keep cold air out and heat in. |
| | In most parts of the country, screens are needed for all windows that open. Most screens have aluminum frames, and in residences screens are often combined with storm windows. |

## Facade

| | |
|---|---|
| Types | Multifamily |
| | Retail |
| | Industrial, office, etc. |
| Materials | Masonry veneer or contrasting siding |
| | Glass or other decorative material |
| | More elaborate facade than exterior of walls |
| Characteristics/Use | In modern industry and commerce, public image is important. An attractive store, warehouse, industrial plant, or office building has both |

advertising and public relations value to the occupant. Ornamentation, identifying signs, lighting, and landscaping all contribute to a building's aesthetics.

By Tim1965 (Own work) [CC-BY-SA-3.0 (http://creativecommons.org/licenses/by-sa/3.0) or GFDL (www.gnu.org/copyleft/fdl.html)], via Wikimedia Commons

BACK_DEFEXP-RR-002628

**Roof**

| Types | Flat |
| | Lean-to (saltbox) |
| | Gable |
| | Gambrel |
| | Hip |
| | Mansard |
| | Monitor |
| | Sawtooth |
| Materials | Wood trusses, joists or horizontal beams, joists and rafters, or posts and beams in residential construction. |
| | Steel or wood trusses, glued wood beams, or steel or concrete frame with wood joists or purlins or with steel bar joists in commercial and industrial construction. |
| Characteristics/Use | Flat roofs are used extensively in industrial and commercial buildings but are less common in residences. Lean-to roofs, often called *shed roofs*, are used on saltbox houses, and gambrel roofs are popular for barns and Cape Ann and Dutch Colonial houses. Monitor and sawtooth roofs are sometimes used in industrial construction. |

**Drain System**

| Components | Gutters and downspouts |
| Materials | Galvanized steel |
| | Aluminum |
| | Copper |
| | Vinyl or PVC |
| Characteristics/Use | Channel water from roofs to prevent damage and protect the appearance of walls when roof overhangs are not provided. |

| Components | Gutters or eave troughs |
| Materials | Galvanized steel |
| | Aluminum |
| | Copper |
| Characteristics/Use | Catch rainwater at the edge of the roof and carry it to downspouts or leaders. |

| Components | Downspouts or leaders |
| Materials | Galvanized steel |
| | Aluminum |
| | Copper |
| Characteristics/Use | Vertical pipes that carry the water to the ground or into sewers, dry wells, drain tiles, or splash pans. |

| Components | Roof drains (in large buildings) |
| Materials | Galvanized steel |
| | Aluminum |
| | Copper |
| Characteristics/Use | Connected to storm drains by pipes in the building. |

BACK_DEFEXP-RR-002629

**Roof Covering**

| | |
|---|---|
| Materials | Asphalt shingles (prevalent in residential construction) |
| | Wood, asbestos, fiberglass, or cement shingles or shakes |
| | Metal |
| | Clay tile |
| | Slate |
| | Built-up layers of felt or composition material covered with tar and then gravel or another surfacing material (most common on flat roofs of commercial and industrial buildings) |
| | Single-membrane roof assembly |
| | Green roof system or solar system that is also the roof covering |
| Characteristics/Use | Joints in roofs are created where two different roof slopes meet or where the roof meets adjoining walls or projections such as chimneys, pipes, and ventilation ducts. All joints must be flashed. Flashing is usually accomplished by nailing strips of galvanized metal, aluminum, or tin across or under the point, applying a waterproofing compound or cement, and securing the roofing material over the edges to hold it permanently in place. |

**Roof Sheathing**

| | |
|---|---|
| Materials | Plywood |
| | Steel roof deck |
| | Lightweight precast concrete slabs |
| | Reinforced concrete slabs |
| | Insulated sheathing in large sheets |

**Chimneys, Stacks, and Vents**

| | |
|---|---|
| Materials | Brick |
| | Metal |
| Characteristics/Use | Should be structurally safe, durable, and smoke-tight; should also be able to withstand the action of flue gases. |

### Special Features

Special features that must be carefully described and considered in the valuation process might include

- Artwork that is attached to the real estate and is not personal property
- Ornamentation
- Exterior elevators
- Solar and wind equipment
- Unique window installation
- Special masonry work and exterior materials
- Items required for the commercial or industrial use of buildings

Unique building features can present a valuation problem. An appraiser must determine if the items increase the property's market value or are valuable only to the current user. In the latter case, the items may add use value but little or no market value. If such items are expensive to remove, they may not appeal to a prospective buyer and the property could therefore lose value.

BACK_DEFEXP-RR-002630

## Green Building and Sustainability

In the twenty-first century, widespread public concern over the environment and the use of natural resources has focused attention on the built environment and the products of industry. The concept of sustainability has different meanings for different constituencies. Sustainability has particular resonance in the real estate industry because of the size and impact of the industry on national and global economies. The United Nation's definition of sustainability is "a development that meets the needs of the present without compromising the ability of future generations to meet their own needs." Green building is the most widely recognized method for creating and fostering sustainable real estate. The terms *green*



A green roof can help reduce heating and cooling costs and absorbs rainwater. Wayne Senville, *Planning Commissioners Journal*, www.plannersweb.com.

and *high-performance* are used interchangeably in many markets. Because the term *green* is defined differently, appraisers must ensure they understand how the term is being used to avoid making incorrect assumptions.

Many high-performance buildings have a paper trail that can be invaluable to appraisers in adequately describing the subject and choosing appropriate comparable sales. A commissioned building will have a checklist used by the rater. The checklist is extremely useful in documenting the subject property details.

Not all green properties will try to obtain a certification such as LEED, Green Globes, or another third-party certification, but if the building being valued is seeking certification, an appraiser can ask for the checklist. As noted, it provides a framework from which an appraiser can identify distinctions between the subject and its competition.

If the building has a certification from another organization, details of the certification process should be available. Research the details of the organization to understand the rating system used. This information will be useful in investigating comparables later in the analysis. Some certifying organizations have open databases that can be used to research and verify the standards a property has met.

Green building encompasses a wide range of renewable construction materials, energy- and resource-efficient building techniques, and an overriding philosophy of sustainable development. The most significant green building practices, commonly referred to as the "six elements of green building," relate to site, water, energy efficiency, indoor air quality, materials, and operations and maintenance.

| | |
|---|---|
| Site | The sustainability of land (e.g., development density, stormwater management, brownfield redevelopment). Site planning occurs during the design phase of the construction project and encompasses two overarching ideas behind green site planning and development: (1) to protect or restore habitat and (2) to maximize open space, providing societal and environmental benefits. In addition, the location, solar access, shading, landscaping, and wind are considered. |
| Water | Water efficiency (e.g., water use reduction, landscaping). This element considers the consumed water as well as stormwater and wastewater management. |
| Energy | Energy and atmosphere (e.g., renewable sources, ozone depletion). By design, green building considers the conservation of energy in the building's design by closing the building envelope, integrating energy-efficient mechanicals and fixtures, landscaping to assist in shade or solar access, or using renewable energy sources such as solar, wind, or geothermal alternatives. The AI Residential and Commercial Green Addenda offer a solar page that presents useful information on describing a solar photovoltaic or solar thermal system. The information provided on the solar page will allow an appraiser to quickly and accurately establish a value for the energy produced by using Ei Value.* |
| Indoor air quality | Indoor environmental quality (e.g., air quality, emissions, passive heating). Green building design focuses on mitigating the negative effects of off-gassing, combustion-based appliances, and moisture. A tightly sealed envelope requires mechanical ventilation to achieve good indoor air quality. |
| Materials | Materials and resources (e.g., reuse, recycling, renewable materials). The materials used can have a significant effect on indoor air quality. Green buildings use materi- |

BACK_DEFEXP-RR-002631

| | als that are less toxic than their conventional counterparts and thus do not off-gas as much. Additional considerations include durability, material reuse and recycling, and the use of recycled and rapidly renewable resources as well as where and how the materials are manufactured. |
|---|---|
| Operations and maintenance | Innovation and sustainable design includes measures to control water and energy consumption along with the use of durable materials and designs that are meant to lower maintenance costs while lengthening the lives of building components. |

Measuring the effectiveness of green building efforts is difficult. Sustainability is not always easy to measure at the property level, and many experimental materials and methods have not proven to be physically or economically sustainable. Many local governments have created sustainability plans with incentive programs to reward owners and developers of green buildings. A useful website for researching incentives and rebates available at the federal and local levels is www.dsireusa.org.  A recognized professional standard is the Leadership in Energy and Environmental Design (LEED) standard for sustainable development. Possible impacts on the valuation process include the following:

· The financial feasibility and productivity of sustainable construction and design elements could affect highest and best use analysis. As a market moves toward green building standards, the highest and best use should discuss the financial feasibility of incorporating these features.

· The higher cost (perceived or actual) of sustainable building materials and more efficient equipment and systems can add to the cost of construction indicated in the cost approach. RS Means currently publishes a green building project planning and cost estimating manual (see http://rsmeans.reedconstructiondata.com). The distinction between cost and value becomes a critical consideration when green building materials and systems are involved. In the debate over the benefits of green building, the essential question is: Is the added expense worth the perceived additional cost to a typical property owner or investor in the marketplace? The use of the terms *gross cost* and *net cost* should be analyzed. Gross cost is affected by incentives and tax credits attributed to green building, which often offset a portion of the added costs and result in a lower net cost of green building. Furthermore, an argument could be made that a lack of sustainable features in a new building is a functionally obsolete design in a market that expects green building features. Likewise, the perceived lifespan of sustainable building components may need to be accounted for in cost estimates if the market participants expect the sustainable features to last longer than traditional components.

· In the income capitalization approach, the reduced operating expenses of a building with energy- and water-efficient, low-maintenance features may have a positive impact on effective gross income, and thereby value. Overall operations and maintenance expenses should be less than the expenses of a code-built structure. Care must be taken to select income and expense comparables that have similar features.

· As green building becomes accepted and then expected in a market, the presence or lack of green building features in a subject or comparable property could affect the selection of comparable properties, adjustment for physical characteristics, and other aspects of the application of the sales comparison approach.

In a market value appraisal assignment, appraisers have a professional obligation to provide an independent and objective opinion of value and so must distinguish the social and governmental influences on the value of sustainable improvements from the value the market ascribes to those improvements. The sales comparison approach may not provide a credible value opinion until the market has sufficient sales data.

**Additional Resources**

US Green Building Council (www.usgbc.org)

Green Building Initiative (www.thegbi.org)

Energy Star (www.energystar.gov)

Energy Benchmarking (www.buildingrating.org/graphic/us-commercial-building-policy-comparison-matrix)

New Building Institute (https://newbuildings.org/)

Sandra K. Adomatis, *Residential Green Valuation Tools* (Chicago: Appraisal Institute, 2014)

Timothy P. Runde and Stacey L. Thoyre, *The Valuation of Green Commercial Real Estate* (Chicago: Appraisal Institute, 2017)

\*   For more information on Ei Value, see www.eivalue.com.

BACK_DEFEXP-RR-002632

## Description of Interior Materials and Design

An interior description provides information about

- Interior walls, partitions, demountable walls, and doors (including how the space is divided)
- Interior supports
- Stairways
- Painting, decorating, and finishing (including floor and ceiling coverings)
- Protection against decay and pests

### Interior Walls, Partitions, and Doors

Like exterior walls, interior walls and partitions can be either load-bearing or non-load-bearing. In general, having fewer load-bearing interior walls allows for greater flexibility in the division of space within the structure.

### Interior Supports

A building description includes consideration of the building's internal supports, which include

- Beams, columns, and trusses
- The flooring system

---

### Division of Space

A building description provides a complete list of the number of rooms in the structure and their uses. Room sizes may also be stated. The number of bedrooms and bathrooms in a residential property usually influences the market for the property and its value. The number of units in an apartment building and the types and sizes of the rooms within the units significantly influence the property's income-producing potential. Similarly, the amount of office space in an industrial property and the partitioning of office suites may affect property value if the office percentages or location are not suitable to market participants.

In certain parts of the United States, many types of buildings have basements. Basement areas can be finished or unfinished, and in many markets the value is equal to the depreciated cost. However, there are places where the market does not recognize the value of basements as equal to their physically depreciated cost, and the values are diminished. Usually, if an analysis of similar properties shows an overwhelming percentage of the buildings have basements, the buyers in that market were willing to pay to add that feature. If nothing has changed, the basements should be worth what they cost less physical depreciation.

In a residential condominium building, the condominium declaration will identify the unit, the limited common elements, and the common elements. The condominium declaration will also identify the percentage of ownership in the common elements of the association.

#### Storage Areas

Homeowners often complain about a lack of adequate storage space, especially in kitchens. Ample cabinets, closets, and other storage areas are important, particularly in homes without basements. Storage is particularly important in multifamily residential buildings. The value of apartment and condominium projects is often enhanced by the availability of storage space. Frequently, mini-storage facilities are located near apartment complexes because apartment units often have inadequate storage space. Storage problems can also exist in commercial and industrial buildings.

One of the most important things to remember about storage or closet space is that it takes away area from the rest of the structure. For example, if an 1,800-sq.-ft. house has a great deal of closet space, then the room sizes must be smaller to fit within the same area. In other words, big closets take away from the room sizes if the gross living area is the same.

---

BACK_DEFEXP-RR-002633

- Ceilings

### Beams, Columns, and Trusses

Beams and columns are used in many residential, commercial, and industrial buildings with basements or crawl spaces that are too wide for the first-floor joists or subfloor systems and cannot be supported by the foundation walls alone. As interior support systems, traditional joist construction is being replaced by both roof and floor truss systems.

### Flooring System

Subflooring provides safe support for floor loads without excessive deflection and an adequate base for the support and attachment of finished floor material. Bridging stiffens the joists and prevents them from deflecting.

### Ceilings

In some structures, the underside of the upper story is an adequate ceiling. Appraisers typically measure and consider ceiling height.

## Stairs, Ramps, Elevators, Escalators, and Hoists

Designing and constructing even the simplest staircase is complicated. Local building codes dictate the minimum and maximum tread and rise of stairs, which should be consistent within a building. The Americans with Disabilities Act of 1990 (ADA) established accessibility guidelines, and buildings accessed by the public that do not meet those regulations may suffer a value penalty based on the cost of necessary changes.

In multistory buildings, appraisers must evaluate how efficiently the elevators and escalators in the building move people and freight. The elevators and escalators in many multistory buildings are inadequate and fall short of current market standards. Curing these deficiencies is often expensive or impossible. Hydraulic elevators usually have lift posts with oil lines and cylinders in the ground, and leaks can go undetected into the ground.

### Americans with Disabilities Act

An appraiser cannot assume that improvements comply with the requirements of the Americans with Disabilities Act (ADA) of 1990. Enforcement of the requirements can be triggered by a change in use or a title transfer. Owners of older properties may have to add ramps, elevators, or other special equipment to comply with ADA regulations, which can affect value greatly.

Along with related legislation such as the Fair Housing Amendments Act of 1988 and the Uniform Federal Accessibility Standards, ADA extends protection under civil rights laws to people with disabilities. Among other provisions directed toward employment opportunities, the legislation guarantees access to places of public accommodation to persons with disabilities. Specifically, Title III of the act, which deals with "places of public accommodations" and "commercial facilities," is of particular importance to appraisers. Government publications regarding ADA are available online at www.usdoj.gov/crt/ada/publicat.htm, and the ADA information line is 800-514-0301 (voice) or 800-514-0383 (TDD).

A real estate appraiser is not required to become an expert in the field of ADA requirements, but the Competency Rule of the Uniform Standards of Professional Appraisal Practice requires appraisers to have the knowledge and experience necessary to complete a specific assignment competently or to disclose the lack of knowledge and experience to the client, take all steps necessary to complete the assignment competently, and describe their lack of knowledge or experience and the steps taken to competently complete the assignment in the report.

For an overview of specific requirements of ADA in building design, see the ADA website(www.ada.gov).

BACK_DEFEXP-RR-002634

Special elevators and hoists are often considered part of a building, although they may be studied under the equipment category.

---

## Interior Description

**Walls**

| | |
|---|---|
| Type | Residential buildings |
| Materials | Wood studs covered with drywall materials (gypsum board, wood panels, ceramic tile, plywood, hardboard) |
| | Plaster (less popular now) |
| | Masonry (in masonry houses) |
| | Structural insulated panels (SIPs) |
| | Insulated concrete forms (ICFs) |
| Characteristics/Use | Interior walls can be painted, papered, or decorated in other ways. |
| Type | Commercial buildings |
| Materials | Wire partitions |
| | Glass |
| | Wood |
| | Plywood |
| | Hardboard |
| | Metals |
| | Tile |
| | Concrete |
| | Solid masonry walls for fire protection |
| Characteristics/Use | Interior walls can be painted, papered, or decorated in other ways. |

**Partitions**

| | |
|---|---|
| Materials | Various materials |
| Characteristics/Use | Generally non-load-bearing and movable. |

**Doors**

| | |
|---|---|
| Types | Simple hollow-core doors in most residential construction |
| | Solid-core doors in older buildings and office buildings |
| | Complex, self-closing, fire-resistant doors in commercial and industrial buildings |
| | Specialty, self-opening and -closing doors in offices and commercial buildings |
| | Special-purpose doors (e.g., doors to bank vaults) |
| Characteristics/Use | Hanging a door is complicated and often done improperly. Most poorly hung doors close improperly or fail to touch an edge of the frame when closed. |

**Interior Supports**

| | |
|---|---|
| Types | Beams |
| | Columns |
| | Trusses |
| Materials | Wood, masonry, concrete, or steel |
| Characteristics/Use | Designed to support heavy loads. Cracked or sagging beams may be an early indication of more serious problems in the future. |

BACK_DEFEXP-RR-002635

| Type | Flooring system |
|---|---|
| Materials | Generally wood or concrete |
| Characteristics/Use | Serves as a base for floor covering. |
| Type | Ceiling |
| Materials | Same material as interior walls (e.g., gypsum), tile, or underside of upper floor |
| Characteristics/Use | Ceilings that are too high or low for the property's current highest and best use as improved may be considered items of functional obsolescence and decrease the property's value. |

**Stairs and Ramps**

| Type | Residential buildings |
|---|---|
| Characteristics | Provides for safe ascent and descent, with adequate headroom and space for moving furniture and equipment. Railings should be installed on the sides of all interior stairways, including stairways in attics and basements, where they are often omitted. |
| Type | Public buildings |
| Characteristics | Codes often regulate where stairs are located, how they are designed and constructed, and how they are enclosed for fire protection. Public buildings may also have to be barrier-free to provide access for handicapped people as mandated by the Americans with Disabilities Act of 1990 (ADA), which may require that ramps be installed both inside and outside the structure. |

## Painting, Decorating, and Finishing

Most buildings are decorated many times during their useful lives. An appraiser reports the condition of the painting and decorating in a structure and notes when they will need to be redone. The attractiveness of painting and decorating is subjective. Many new owners and tenants will redecorate to suit their personal tastes. Unusual decorations and colors may have limited appeal and, therefore, may detract from a building's value. The quality of decoration is sometimes an important consideration in valuing a restaurant, store, or other commercial building.

Some considerations of interior finishes and decorating include the following:

- If finished basements are used for purposes other than storage and these uses are accepted and typical in the area, they can add significantly to the property's value.
- The types and finishes of various wall and ceiling components should be differentiated.
- A wide variety of flooring is available, and some flooring materials are selected primarily for their low cost and durability. An appraiser should consider whether floor coverings can endure wear and tear and how they conform to a building's design and decoration. Green buildings may use floor coverings that have low volatile organic compound (VOC) concentrations, are more durable than conventional materials, are made from recycled materials, or are recyclable.
- Green buildings use low- or no-VOC paint to provide better indoor air quality.
- Unique, restored molding can add value to older houses, but the use of moldings is decreasing.
- Most fireplaces in homes and commercial buildings, such as restaurants, inns, and specialty stores, do not provide the building's primary source of heat. In fact,

BACK_DEFEXP-RR-002636

because of their design, many have little heating power. Because fireplaces are difficult to construct, many are badly made and function poorly. One common problem is downdraft, whereby smoke is blown into the building by the wind outside. This can happen if the chimney does not extend at least 2 feet above any part of the roof within 10 feet of the chimney.

## Interior Painting, Decorating, and Finishing

### Basement Finishes

| | |
|---|---|
| Types | Unfinished, used for storage |
| | Finished (in residences and some commercial buildings), used for storage and other purposes |
| Characteristics | Dampness, which is often a problem in basements, may be caused by poor foundation wall construction, excess groundwater that is not properly drained by ground tiles, poorly fitted windows or hatches, poor venting of equipment, or poorly constructed or operating roof drains that allow water to enter. Signs that may indicate a wet basement include a powdery white mineral deposit a few inches off the floor, stains near the bottom of walls and columns or equipment that rests close to the floor, and the smell of mildew. |

### Flooring and Floor Coverings

| | |
|---|---|
| Components | Sand, compressed dirt, bituminous paving, brick, stone gravel, concrete, and similar products |
| Characteristics | Suitable for many industrial buildings, warehouses, garages, and basements. In many commercial and industrial buildings, floors must be especially thick or reinforced to support heavy equipment. |
| Components | Terrazzo flooring |
| Characteristics | Made of colored marble chips that are mixed into cement and ground smooth; used for high traffic areas such as the lobbies of public buildings. |
| Components | Wood in various forms |
| Characteristics | Continues to be a popular material for floors. Planks and blocks are used for industrial floors, and many commercial buildings use wood floors to conform with the design and overall decoration. Wood planks and hardwood strips are found in many residences. |
| Components | Resilient, ceramic, stone, and quarry tiles. |
| Characteristics | Used in all types of buildings. |
| Components | Resilient flooring |
| Characteristics | Usually a combination of vinyl and asphalt or laminate produced as sheet goods. |
| Components | Carpeting |
| Characteristics | Once considered a luxury in residences, offices, stores, and commercial buildings, but today is widely used in all types of buildings. |

### Interior Wall Coverings and Ceilings

| | |
|---|---|
| Types | Walls and partitions |
| Characteristics | May be painted, papered, or paneled. Supplemental finishes include ceramic tile and wainscot paneling. |
| Types | Ceilings |
| Characteristics | Can be drywall, plaster, or suspended panel (drop ceilings). |
| Types | Partitions |
| Characteristics | Can be wood or metal. |

BACK_DEFEXP-RR-002637

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Protection Against Decay and Insect Damage

All wood is susceptible to decay and insect damage. When wood is consistently exposed to moisture and water, destructive organisms propagate on or beneath its surface. Insects damage wood more rapidly and visibly than decay does. Although several species of insects destroy wood, termites are by far the most destructive to both damp and dry wood. They colonize in moist soil or in dry wood and create infestations that are extremely difficult to eradicate.

Builders employ various techniques to protect against decay and insect damage:

- Sloping the ground away from foundations for good drainage and putting vapor barriers on the interior sides of exposed walls
- Using polyethylene as a soil cover in crawl spaces
- Flashing, gutters, downspouts, and splash blocks to carry water away from foundation walls
- Using poured concrete foundation walls, concrete caps over unit masonry foundations, wood treatments, soil treatments, or metal termite shields

Building with dry, naturally durable woods and conducting regular maintenance inspections can also help prevent insect infestation and damage. Poorly aimed lawn irrigation systems can be a serious problem for improvements if the water collects against the foundation or is directed at exterior walls or windows. An improperly installed irrigation system can rot a window assembly or cause a mold problem in only a few years.

## Miscellaneous and Special Features

In valuing industrial and commercial properties, an appraiser may find it helpful to distinguish between two categories of equipment:

- Equipment and mechanical systems that provide for human comfort—e.g., plumbing, heating, air-conditioning, and lighting
- Fixed building equipment that is process-related—e.g., air hoses, process piping, craneways, bus ducts, heavy electrical lines, and freezer equipment

Because different users of structures and related improvements frequently adapt them for their own particular needs, some elements may not be suited for other users and therefore will not contribute to market value. Limited-market properties may require additional research because less data is available to support the utility and market acceptance of extra or unusual elements of the improvements.

Some properties with specialized functions and design features that may require additional research include

- Steel mills
- Oil refineries and ethanol plants
- Chemical plants
- Concrete factories
- Mines
- Commercial establishments with unique design features (e.g., drive-in restaurants) or special facilities (e.g., the cooling room in a furrier's shop)
- Amusement parks

BACK_DEFEXP-RR-002638

- Sports complexes
- Wharves and docks
- Transportation terminals
- Television and radio transmission towers, studios, and theaters

## Personal Property

During a site visit, an appraiser may also find personal property, sometimes referred to as "furniture, fixtures, and equipment (FF&E)." Certain types of real property include a substantial amount of personal property. Examples include the following:

- Hotel properties include guest room and common area furnishings, pool and fitness equipment, and other items.
- Convenience stores and retail fuel properties have gas pumps, canopy, signage, and lighting outside as well as shelving and food service equipment inside.
- Nursing homes include furniture, medical equipment, specialized bathing equipment, physical therapy apparatus, walkers and wheelchairs, hospital carts, and other equipment.
- Apartments include dishwashers, stoves, refrigerators, washer and dryers, and sometimes window coverings.
- Residential properties may have leased solar photovoltaic systems, power purchase agreements, or owned systems that are financed through a solar loan that holds the system as collateral. Such systems have a Uniform Commercial Code (UCC) filing and are personal property so they should not be included in the real estate value. In fact, the existence of a long-term lease or power purchase agreement requires an analysis to understand the terms of the agreement and how it may affect the real estate.

These non-realty components should be identified and the appraisal report should indicate if they are or are not included in the ownership interest of the subject property.

In appraisals prepared for certain types of litigation, such as eminent domain and property tax appeals, appraisers must be familiar with case and statutory law related to fixtures and other non-realty-related property.

## Equipment and Mechanical Systems

Most buildings cannot perform the functions for which they were designed and constructed unless their equipment and mechanical systems are in working order. Major equipment and mechanical systems include

- The plumbing system
- The heating, ventilation, and air-conditioning (HVAC) system
- The electrical system

### Plumbing System

Plumbing is an integral part of most buildings. It consists of supply, waste, and vent piping (which is usually covered or hidden except in industrial buildings) and fixtures and fittings (which are visible). Laundries, laundromats, and certain industrial buildings have elaborate plumbing systems.

BACK_DEFEXP-RR-002639

## Plumbing System

### Piping

| | |
|---|---|
| Types | Supply pipes |
| | Waste pipes |
| | Vent pipes |
| Materials | Copper, cast iron, or plastic |
| Characteristics/Use | Galvanized steel, lead, or brass pipes in older buildings may need to be replaced. |

### Bathroom Fixtures

| | |
|---|---|
| Types | Lavatories (or washbasins) |
| | Bathtubs |
| | Showers |
| | Toilets (or water closets) |
| | Bidets |
| | Urinals |
| Materials | Cast iron covered with acid-resistant vitreous enamel, or porcelain (fiberglass or other materials are also used in lower-quality fixtures) |
| Types | Sinks (or double sinks) |
| Materials | Porcelain, metal, stainless steel, enameled steel, or cast iron covered with acid-resistant enamel |

### Kitchen Fixtures

| | |
|---|---|
| Types | Sinks (or double sinks) |
| | Garbage disposals |
| | Dishwashers |
| Materials | Monel metal, stainless steel, enameled steel, cast iron covered with acid-resistant enamel, or porcelain |

### Other Fixtures

| | |
|---|---|
| Types | Instant hot water units |
| | Laundry tubs |
| | Wet bars |
| | Swimming pools or saunas |
| | Janitor sinks |
| | Drinking fountains |
| | Handwashing and eye-washing fountains |

### Fittings

| | |
|---|---|
| Types | Faucets |
| | Spigots |
| | Drains |
| | Shower heads |
| | Spray tubes |
| | Floor drains in industrial buildings |
| Characteristics/Use | The water in an area may be hard—i.e., it may contain minerals that react unfavorably with soap and make it difficult to rinse from clothing, hair, and skin. Often hard water cannot be used until it is treated, either with simple equipment or with automatic, complex, multistage systems. |
| | Recycled water systems convert gray water (wastewater) into recycled water for use in landscaping. Cisterns and rain barrels are another form of water catchment for reuse on site. |

*Building Description*    221

BACK_DEFEXP-RR-002640

### Piping

Much of the cost of a plumbing system is due to piping. The quality of the materials used, the way the pipes were installed, and how easily they can be serviced are significant considerations in estimating how long the pipes will last and how much they will cost to maintain. In many areas and for many building types, a high-quality piping system will last as long as the building.

### Fixtures and Fittings

Appraisers must decide which building fixtures are part of the real estate and which are personal property. The design of bathroom fixtures can change substantially over time, and old fixtures may become obsolete during a building's economic life. An appraiser should report the need for modernization, but old fixtures of good quality, such as porcelain pedestal basins and footed tubs, are often rehabilitated and valuable.

### Hot Water System

All homes and most commercial and industrial buildings need an adequate supply of hot water. Buildings with inadequate hot water systems suffer from functional obsolescence. The size of the hot water storage tank needed is determined by the number of occupants and their water-using habits and by the recovery rate of the tank. The size and recovery rate of a storage tank may be limited to what the market will pay for. Many new and remodeled homes have tankless hot water systems. Commercial and industrial buildings often require much more hot water than homes.

---

### Hot Water System

| | |
|---|---|
| Types | Self-standing heater (in residential buildings) |
| | Large cast iron or steel boiler and storage tanks (in commercial and industrial buildings) |
| | Tankless systems, hybrid water heating systems, solar thermal water heating systems |
| Characteristics/Use | Generally powered by electricity, gas, or oil. |

---

## Heating Systems

Most heating systems use warm or hot air, hot water, or steam and are powered by fuel oil, natural gas, electricity, or coal. The heating capacity required relates to the cubic content, exposure, design, and insulation level of the structure to be heated and appropriate standards for the local market area. Appraisers cannot assume that a building's heating system is adequate. A heating system installed at the time of construction may not be acceptable to potential buyers today. New technology continues to reduce energy consumption for large heating systems. Many industrial users who once depended on gas alone now install more efficient oil or electric systems to provide heat when the gas supply is curtailed. Electric heat has become so expensive in some areas that buildings using it sell for substantially less than similar properties using other types of fuel. Cogeneration, the simultaneous production of electrical energy and low-grade heat from the same fuel, is also being used in some parts of the country.

Property buyers and users are sensitive to energy costs and are becoming more aware of energy ratings and energy modeling reports. In some markets, apartments in which the owner supplies heat and hot water will sell for less than similar proper-

BACK_DEFEXP-RR-002641

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Heating Fuels:** The type of fuel used in a building's heating system should be explained in the building description. Depending on the area and the type of building, one type of fuel may be more desirable than another. Nevertheless, many building heating systems do not use the most economical fuel. For any specific use, different fuels have different advantages and disadvantages, which are subject to change.

| Type | Characteristics |
|---|---|
| Fuel oil | Despite its high cost, fuel oil is a popular energy source that is easy to transport and store. On-site, 275-gallon tanks are used in millions of houses, and tanks that hold thousands of gallons of fuel oil are buried on industrial and commercial sites. |
| Natural gas | Natural gas is a convenient type of fuel because it is continuously delivered by pipelines; no storage tank is needed. In many parts of the United States, natural gas is the most economical fuel. Liquid petroleum gas, such as butane and propane, is used in many rural areas. It requires on-site storage tanks and is usually more expensive, but in other respects it is similar to natural gas. |
| Electricity | Like oil, gas, or coal, electricity can be used to produce heat in a furnace or to heat water in a boiler. In most areas electrical heating costs are high, but good insulation and control can eliminate waste. |
| Coal | In the past coal was the most popular fuel for heating. It is still used in electrical generating plants and to generate power for some industrial and commercial uses. Coal is also used in residences for stoves and fireplaces, but the burning of certain types of coal creates environmental pollution. |

ties in which tenants pay for utilities. Buildings that have high ceilings, many openings, and poor insulation may be at a disadvantage in the market.

## Air-Conditioning and Ventilation Systems

The most common type of air-conditioning system consists of an electrically powered compressor that compresses a coolant from gas into liquid outside the area being cooled. The heat released in this process is either blown away or carried away by water. Air-conditioners range from small, portable units to units that provide many tons of cooling capacity.

Commercial and industrial air-conditioning and ventilation systems are more complex. Some simply bring in fresh air from the outside and distribute it throughout the building. Others merely remove foul air. Still others combine these two functions, but do not have any cooling or heating capacity. More complex systems wash, filter, and add or remove humidity from the air. The most complex systems perform all of these functions and also heat and cool air through a complex system of ducts and fans. In larger systems that use less electricity, water cools the pipes in which the gas has been compressed. The water is then conserved in towers that cool it for reuse.

## Electrical Systems

In an electrical system, power is distributed from the electrical service station through branch circuits, which are wires located throughout the building, to electrical outlets. Each branch circuit starts at a distribution box, where it is separated from the main service by a protection device such as a fuse or circuit breaker.

In commercial and industrial buildings, the wiring between the distribution boxes and the outlets is usually a rigid or flexible conduit. In most houses BX or armored cable is used. Plastic-coated wire is used in certain areas, and the old knob-and-tube wiring is still found in rural areas and older buildings, although it is considered obsolete.

BACK_DEFEXP-RR-002642

### HVAC System

**Heating System**  Heating is rated in British thermal units (Btu).

Types  Warm or hot air

Characteristics/Use  Air heated in a furnace and circulated by a pressure blower or relying on the force of gravity. May include thermostats, filters, humidifiers, air cleaners, and air purification devices.

Types  Hot water (or hydronic systems)

Characteristics/Use  Hot water pumped by a circulator through pipes to radiators and cold water is returned to the boiler to be reheated. In radiant heating systems, hot water is pumped through narrow pipes embedded in floors, walls, and ceilings rather than through radiators.

Types  Steam

Characteristics/Use  Produced by a boiler, distributed through a one-pipe gravity system (identical to the piping used in hot water systems), and transferred through radiators. More complex and expensive two-pipe systems are found in larger, high-quality structures. In many states, licenses are required for certain classes of steam boilers. Appraisers must be familiar with local boiler license laws and ascertain whether boilers have current, valid licenses.

Types  Electric

Characteristics/Use  Includes heat pumps, wall heaters, baseboard units, duct heating units, heating units installed in air-conditioning ducts, and radiant heat produced by electric heating elements embedded in floors, walls, and ceilings. The automatic regulation of a heating system helps it operate efficiently. A multiple-zone system with separate thermostats is more efficient than a single zone system with one thermostat. Complex systems provide an individual temperature control for each room. The efficiency of certain systems can be increased by putting a thermostat on the outside of the building. This helps building operators anticipate how much heat the system will need to produce.

### Air-Conditioning and Ventilation System

Types  Electrically powered compressor and non-ozone-depleting refrigerant

Gas-powered compressor and ammonia as coolant

Combination with water-cooled pipes in which gas is compressed

Characteristics/Use  Standards depend on climate. Capacity is rated in tons of refrigeration. In some buildings the central air-conditioning equipment uses the same ducts as the hot air heating system. This is not always possible, however, because the air-conditioning may require ducts of a different size. Furthermore, heating registers should be placed low on the walls, while air-conditioning registers should be higher up or in the ceiling.

Large-capacity power wiring may contribute to the value of an industrial improvement. However, if the wiring is an uncommon type and adds to a building's operating costs or will be expensive to remove, it may result in functional obsolescence. Similarly, any building with insufficient electrical service or wiring suffers from functional obsolescence.

BACK_DEFEXP-RR-002643

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Electrical System

| Components | Rigid or flexible conduit |
|---|---|
| | BX or armored cable |
| Characteristics/Use | Most electrical wire is copper. A typical residential electrical system is a single-phase, three-wire system that provides a minimum of 100 amperes of electricity. Ampere services of 150, 200, 300, and 400 are needed when electric heating and air-conditioning are used. Most of these services can provide up to 220 volts by connecting three wires to the outlet. |
| Components | Power wiring |
| Characteristics/Use | Used in commercial and industrial buildings to operate utility systems, appliances, and machinery. The electrical power is generally carried at higher voltages (e.g., 240, 480, 600 volts or more) and higher amperages (e.g., 400, 800, 1,200 amperes or more). Power wiring is usually three-phase or three-phase-four-wire, which allows both lighting and three-phase power loads to be delivered by the same supply. It is carried in conduit or by means of plug-in bus ducts. Overhead bus ducts are frequently found in manufacturing plants where flexible service is needed. |
| Components | Switches and lighting fixtures |
| Characteristics/Use | Because lighting fixtures are stylized and styles change, they are often obsolete before they wear out. Fluorescent lighting, which may be suspended, surface-mounted, or recessed, is used extensively in commercial and industrial buildings. Often continuous rows are used in large spaces. Incandescent fixtures may be used for smaller rooms, accents, or special purposes. Sodium, mercury vapor, halogen, and halide lights are often installed in industrial buildings. |
| Components | Outside, yard, and parking lot lighting |
| Characteristics/Use | Usually downlighting of some kind; often mercury vapor, halogen, or halide lights. |
| Components | Floor outlets or floor duct systems |
| Characteristics/Use | Used extensively in commercial and office buildings; provide convenient electrical outlets for office machines and telephone outlets at desks using a minimum number of cords. |
| Components | Low-voltage switching systems |
| Characteristics/Use | In some houses and commercial buildings; allow many outlets and lights to be controlled from one place. |

## Miscellaneous Equipment

In the building description, an appraiser must also consider miscellaneous equipment, such as

- Fire protection
- Elevators, escalators, and speed ramps
- Signals, alarms, and communication systems
- Loading facilities
- Attached equipment
- Reclaimed water systems
- Solar photovoltaic (PV) systems (see Figure 13.4)
- Energy storage (batteries)

BACK_DEFEXP-RR-002644

## Miscellaneous Equipment

### Fire Protection

| | |
|---|---|
| Components | Fire escapes |
| | Standpipes and hose cabinets |
| | Alarm services |
| | Automatic sprinklers |
| Characteristics/Use | A wet sprinkler system must have adequate water pressure to ensure that the pipes are always filled. A dry system has pressurized air in the pipes. When a sprinkler head opens, the pressure is relieved and water enters. Dry systems are used on loading docks, in unheated buildings where there is a danger of water freezing, and in areas where there is no city water (usually because a well cannot supply sufficient pressure to operate a wet system). |

### Elevators

| | |
|---|---|
| Type | Passenger |
| Characteristics/Use | Generally electric. Most modern elevators are high-speed and completely automatic. |
| Type | Freight |
| Characteristics/Use | Electric or hydraulic. Hydraulic elevators are suitable for low-speed, low-rise operations. |

### Escalators and Speed Ramps

| | |
|---|---|
| Type | Passenger |
| Characteristics/Use | Used to move large numbers of people up and down or along horizontal or gradual slopes; must be adequate to accommodate those who use the building. |

### Signals, Alarms, and Communication Systems

| | |
|---|---|
| Components | Smoke and carbon monoxide (CO) detectors |
| Characteristics/Use | Required by law in many areas. |
| Components | Security alarm systems |
| Characteristics/Use | Available for residential, commercial, and industrial use to warn occupants of forced entry, fire, or both. |
| Components | Clocks, pneumatic tube systems, mail chutes, and incinerators |
| Components | Telephone wiring |
| Characteristics/Use | In small buildings the telephone company supplies the wiring and equipment. Larger buildings may have extensive systems of built-in cabinets, conduits, and floor ducts for telephone service. The telephone service in a building may be suitable for the current occupant but unsuitable for a potential buyer. |
| Components | Fiber-optic cable connections and wireless networks |
| Characteristics/Use | Internet access capabilities for telephone, computer, and cable television |

### Loading Facilities

| | |
|---|---|
| Type | Open loading docks |
| Characteristics/Use | May be important in commercial and industrial buildings. Off-street loading docks are usually required by zoning ordinances. Many older buildings have loading doors only or substandard loading facilities. The floor of an efficient, one-story industrial building may be built above grade at freight car or truck-bed level. |
| Type | Covered loading docks |
| Characteristics/Use | In some buildings, docks are enclosed for trucks and freight cars, and leveling devices are provided to assist in loading or unloading. A properly designed industrial building has space in front of truck docks so that vehicles can maneuver. |

BACK_DEFEXP-RR-002645

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Attached Equipment**

| | |
|---|---|
| Components | Air hoses |
| | Process piping |
| | Industrial wiring for heavy electrical capacity |
| | Bus ducts |
| | Freezer equipment |
| Characteristics/Use | Often considered in terms of use value. |

## Intelligent Buildings

An intelligent, or smart, building is designed with automated systems that detect and adjust heating and cooling equipment in response to changing environmental conditions to increase energy efficiency and ensure the comfort of occupants. The building may also include centralized control over fire safety, security access, and telecommunications systems and the use of other technologies that help address the changing needs of building occupants while controlling costs. These systems are designed to improve end-user security, control, and accessibility, with the aim of increasing worker productivity and occupant comfort levels.

The occupants of the building often use prominently displayed real-time information about energy costs (e.g., on an easy-to-read digital control panel) to train themselves to use energy more efficiently in the building.

 

The commonly accepted definition of a building automation system (BAS) includes the comprehensive automatic control of one or more major building system functions, such as heating, ventilating, and air-conditioning systems. Since the 1960s, automation has increased in complexity, from simple systems like lighting that turns itself on as daylight fades outside and doors that open automatically (first installed in buildings before 1970) to fire alarm systems that monitor the position of fire and its path within a building (which appeared after 1980).

More recently, intelligent building design has also included the idea of connecting to a smart grid, an electricity distribution network based on digital technology that is used to supply electricity to consumers through two-way digital communication. Smart grids were introduced to overcome the weaknesses of conventional electrical grids by using smart net meters. By connecting to a smart grid and using a demand response (DR) system, a building can determine automatically through its building management system how much electricity it needs at various times of day. A DR system manages a building's consumption of electricity in response to supply conditions and responds to a utility company's demand event (such as rolling blackouts) by automatically reducing the amount of power being used or starting on-site power generation.

BACK_DEFEXP-RR-002646

**Figure 13.4**  Commercial Green and Energy Efficient Addendum: Solar Worksheet

| Client: | | Client File #: | |
|---|---|---|---|
| Subject Property: | | Appraisal File #: | |

### Commercial/Industrial Solar Worksheet

| Property Address or ID: | | Date of value: | | Appraiser: |
|---|---|---|---|---|
| Zip Code: | | | | |

The worksheet inputs accommodate the PV Value® tool.    http://pvvalue.com

| Solar Electric (PV) | | PV Array #1 | PV Array #2 | PV Array #3 | PV Array #4 | PV Array #5 | PV Array #6 |
|---|---|---|---|---|---|---|---|
| Leased or owned * | | | | | | | |
| Years remaining on lease | | | | | | | |
| Initial net cost if owned | | Provide total cost for all arrays | | | | | |
| Current net cost | | Provide total cost for all arrays | | | | | |
| RECs (Renewable Energy Credits) | $ per megawatt hr.: | | | | | | |
| Real property tax for solar PV system | | Solar PV is exempt from real property taxes in some states | | | | | |
| System size in watts (DC watts @STC) | | | | | | | |
| Array type | | | | | | | |
| Array tilt | | | | | | | |
| Array Azimuth | | | | | | | |
|   Azimuth tool can be found at the following link: | | http://tools.solmetric.com/Tools/roofazimuthtool | | | | | |
| Age of panels | | | | | | | |
| Energy production kWh per array or total in first cell | Total production for all arrays     kWh | | | | | | |
| Source for production | | | | | | | |
| Location (roof, ground, etc.) | | | | | | | |
| Type of mount | | | | | | | |
| Warranty term on PV | | | | | | | |
| PV panel brand name | | | | | | | |
| Is PV company still in business? | | | | | | | |
| Number of inverters | | | | | | | |
| Age of inverter(s) | | | | | | | |
| Warranty term on inverter | Years total: | | | Years remaining: | | | |
| Is inverter company still in business? | | Company name: | | | | | |
| Utility company name | | kWh $/charged by utility company: | | | $0.00 | | |
| Evidence of shading | | | | | | | |
| Evidence of deterioration | | | | | | | |
| Is there a battery backup system? | | | | | | | |
| Does the system include lightning protection on both sides of the inverter? | | | | | | | |

| Documents Reviewed | | Reviewed? | In Workfile? |
|---|---|---|---|
| Load analysis | | | |
| Shade analysis | | | |
| Commissioning form | | | |
| Solar installer financial payback analysis | | | |
| Warranty terms for inverter | | | |
| Warranty terms for solar PV including parts and labor | | | |
| Solar PV output monitoring, alert, response, and repair process timing | | | |
| If leased, obtain copy of lease and provide terms in comment section  below | | | |

**Comments:**

**Roof considerations:**    Was the roof warranty voided by the PV installation?  If the PV installer does not work with the roofing company to ensure that the roof warranty is not voided, additional risk may apply.
**Remaining roof life considerations:**    If the remaining roof life is less than the remaining panel warranty, then an adjustment may need to be made to account for removal and re-installation of the rooftop system.

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product provided by the individual appraiser(s) in the specific contents of the AI Reports®. AI Reports® AI-821 Commercial Green and Energy Efficient Addendum © Appraisal Institute 2014, All Rights Reserved    October 2014

BACK_DEFEXP-RR-002647

## Whole Building Approach

For a building to function for its intended use, all the building mechanical systems (plumbing, HVAC, electrical, etc.) must work together. In traditional building design, however, these systems are installed and operate separately. Green building has popularized the "whole building approach" to building design.

The whole building approach is elementary to green building. This approach views all of a building's parts as an integrated system. The goal of the whole building approach is to ensure that the different parts of a building work with, rather than against, one another. Examples of whole-systems thinking include

- The use of native landscaping to reduce required maintenance (mowing and irrigation) and to preserve and enhance groundwater and wildlife habitat
- "Daylighting" to reduce the need for artificial lighting and energy consumption and to improve worker comfort and productivity
- Convenient access to public transportation to reduce the amount of space allocated for parking and to foster reductions in vehicle miles traveled (VMT) and carbon usage

### Design Concepts in the Whole Building Approach

**front-end loading**

An approach to development that includes the examination of site factors, engineering definition, and a project execution plan before construction. Factors examined in the front-loaded design process include possible process simplification (value engineering), a constructability review process, customized standards and specifications, predictive maintenance, and design-to-capacity considerations.

**end-use/least-cost considerations**

A focus on designing an end product that provides the user with what they actually want and need, at the least cost to both the owner (or developer) *and* the environment. (Source: www.rmi.org/buildings)

### Teamwork

Collaboration among key professionals is fundamental to planning and designing successful green developments, redevelopments, and building retrofits. Appraisers should be part of the process, providing market and financial analysis. Using the whole building approach, design is no longer a linear process, with one step taken and then the next. Also, front-loaded design focuses on up-front solutions with the right team considering all aspects of the project. Finally, significant savings can be achieved by thinking through and analyzing how the building will be used and considering how performance can be optimized before potentially flawed and costly decisions are made.

The whole building approach can have two important, but differing, effects in the application of the cost approach. The first effect is the potential shift from operational costs to initial capital costs, and from hard or direct costs to soft costs. The second important implication is that, due to the synergies achievable with this approach, the overall cost premium for green building may be reduced or eliminated through the use of a whole building, integrated design approach. For green buildings constructed without this approach, the cost may be higher and the function of the systems may not be optimal relative to a comparable building constructed using a whole building design approach.

BACK_DEFEXP-RR-002648

## Analysis of Architectural Style and Functional Utility

A building may have functional utility but lack architectural style, such as a multipurpose precast concrete warehouse near an interstate interchange, or it may have admirable style but little utility, such as a cavernous 1920s-vintage movie palace in a declining urban neighborhood. Form and function work together to create successful architecture. Functional utility is not necessarily exemplified by minimal space or form. People's desire for comfort and pleasure must also be considered in the design of offices, stores, hospitals, and houses. An appraiser must recognize and rank market preferences regarding style and functional utility and then relate these preferences to market value. The ability of improvements to provide utility and the desirability of specific land uses in the marketplace are the sources of value and the focus of an appraiser's investigation of architectural style and functional utility.

Good design meets the following criteria:

- Functions well—fitness of intended use
- Looks good—appeals to aesthetic sense
- Feels good—carries meaning, recreates feeling from another time or place
- Balance—sense of correct proportion, compatibility
- Affordable—consistent with market expectations for price range
- Minimizes adverse impacts on the natural environment, the users of the space, and the surrounding community

Social and economic issues have the greatest effect on residential design. Governmental issues have a greater effect on nonresidential design through zoning and building codes. Environmental issues affect the site more than the improvements, although topography and other factors may influence the placement of the improvements on the site.

## Architectural Style

Architecture is the art and science of building design and construction. Architectural style affects the market value of property, so an understanding of its nature is important to appraisers. Two basic types of styles are distinguished in American architecture: formal architecture and vernacular architecture. Figures 13.5 and 13.6 illustrate formal and vernacular architectural styles.

Formal architecture refers to the art and science of designing and building structures that meet the aesthetic and functional criteria of those trained in architectural history. Formal architectural styles are identified by common attributes of expression and are frequently named in reference to a geographic region, cultural group, or time period—e.g., the Italianate, Second Empire, and Prairie School styles.

**Figure 13.5**   Formal Architecture

  

BACK_DEFEXP-RR-002649

**Figure 13.6**  Vernacular Architecture

  

To a degree, the distinction between formal and vernacular architecture is analogous to the difference between fine art and folk art. Vernacular architecture identifies structures designed and built without reference to the aesthetic and functional criteria of architectural history, often buildings with an emphasis on function over form. Vernacular architecture reflects custom and responds to the environment and contemporary lifestyles. Vernacular styles share common attributes and may be technologically simple or sophisticated. These styles are usually unnamed because they are not formally studied by architectural historians. The traditional barn, the mass-produced homes constructed in modern subdivisions, and multitenant industrial park buildings are examples of vernacular styles.

Good architecture is a blend of aesthetics and function. Many historic buildings are architecturally superior, with great aesthetics but poor functionality for some uses. A modern vernacular building is more likely to offer better functionality and poor aesthetics.

Architectural style is influenced by market standards and tastes, which are influenced both by the desire to preserve tradition and by the desire for change, variety, and efficiency. The market's desire for change provides the impetus for developing new elements of architectural design. Changes in architectural trends are caused by the market's reaction to current styles. When a style becomes too extreme, a shift to elements of past styles frequently occurs. A reactive shift, then, provides contrast to the preceding, dominant architectural style. These changes also produce avant-garde or experimental building styles, which are tested in the market and ultimately accepted or discarded.

Changes in architecture can also be generated by external forces. For example, in the 1970s rising energy costs prompted new developments in the heating, ventilation, and air-conditioning systems used in office buildings. These developments include the trend toward stand-alone HVAC systems and the use of new exterior materials that conserve energy.

Architectural styles are modified over periods that are loosely related to the economic life cycles of buildings. Newly constructed buildings usually contrast in style with buildings of the previous period. New buildings of all architec-

Literature on American architectural history is abundant and includes Virginia Savage McAlester, *A Field Guide to American Houses*, revised and expanded 2nd ed. (New York: Alfred A. Knopf, 2017) and Carole Rifkind, *A Field Guide to American Architecture* (New York: Dutton, 1980). For a description of architectural styles in a real estate appraisal context, see Judith Reynolds, *Historic Properties: Preservation and the Valuation Process*, 3rd ed. (Chicago: Appraisal Institute, 2006) and Marc P. Nadeau, *Identifying Residential Architectural Styles* (Chicago: Appraisal Institute, 2016). Additional sources are cited in the bibliography.

BACK_DEFEXP-RR-002650

tural styles enjoy broad market appeal, whether they are professionally designed or not. When a building is no longer new, however, it is compared with other buildings in terms of the quality and usefulness of its architectural style. Form and structure, the most basic components of architectural style, limit and define a building's potential uses (and changes in use). These factors become more influential as time passes.

For residential appraisals that require compliance with the Uniform Appraisal Dataset (UAD) established by Fannie Mae and Freddie Mac, the Uniform Collateral Data Portal (UCDP) contains a field for architectural design. Ideally, this field would be filled with the name of a formal architectural style rather than a generic descriptor such as "two stories" or "typical." The UCDP compliance check reviews the architectural design field as if it were required, even though it is not identified as a required field in the UAD instructions. Properly identifying the architectural style in this field could improve the efficiency of the review process and avoid a callback for corrections.

## Functional Utility

To be functional an item must work and be useful. The definition of functional utility, however, is subject to changing expectations and standards. Optimal functional utility implies that the design and engineering of a building are considered to best meet perceived needs at a given time.

Functional inutility is an impairment of the functional capacity of a property or building according to market tastes and standards. It qualifies as functional obsolescence when ongoing change, caused by technological advances or economic and aesthetic trends, renders building layouts and features obsolete to the extent that value is impaired. (The concept of functional obsolescence is discussed in detail in Chapter 31.) Functional inutility must be judged in light of market standards of acceptability, specifically the standards of buyers who make up the market for a particular type of building within a particular period of time. Certain design elements of "smart" office buildings, such as extra cooling capability, more flexible cabling systems, and additional power to run more sophisticated computer systems, may have been superadequate when they were originally constructed, but changing market desires have made some of these items standard.

Standards of functional utility vary with the type and use of property. Specific considerations for different types of property are discussed in the remainder of this chapter. Some general standards of functional utility considered by appraisers include

- Compatibility
- Suitability or appropriateness
- Comfort
- Efficiency
- Safety
- Security
- Accessibility
- Ease and cost of maintenance
- Market standards
- Attractiveness
- Economic productivity

BACK_DEFEXP-RR-002651

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Design and Functional Utility by Property Type

Marketability is the ultimate test of functional utility and is a central concern in market analysis, as discussed in Chapters 15 and 16. Generally, a building is functional if it successfully serves the purpose for which it was designed or adapted. Specific design considerations that affect the functional utility of residential, commercial, industrial, agricultural, and special-purpose buildings are discussed below.

### Residential

Trends in single-unit properties—including single-unit homes, condominiums, cooperatives, and rental apartments—change, and building components such as porches, balconies, roof decks, raised or walk-out basements, fireplaces, dining rooms, large kitchens, entry halls, and family rooms may be included or excluded. Housing standards vary widely for different income levels and in different regions. Historic houses are often less functional, but they may be in great demand due to their historic character and architectural appeal. To evaluate the functional utility of residential buildings, appraisers should identify and analyze standard market expectations. The functional utility of a single-unit or multifamily dwelling results primarily from its layout, accommodation of specific activities, adequacy, and ease and cost of maintenance.[6] In general, more people have better housing today than they had in the past. Many amenities are now considered necessities and their inclusion is taken for granted. Even in periods of high construction and financing costs when average houses are smaller, the tendency is to retain extra bathrooms, labor-saving devices, and fireplaces.

The designs and features desired in the market change all the time and can be somewhat generational. People of different ages may follow what their contemporaries like, and that causes buyers in the same age group to ask for similar features. Appraisers observe new model homes to identify the design elements and features currently desired by home buyers when those consumers have a menu of possibilities to choose from. The design of existing homes may not provide a reliable indication of current tastes.

In condominium, cooperative, and rental apartment buildings, amenities may be more important than space. Occupants may prefer a fireplace or an extra bathroom to an additional 200 square feet of area unless the amount of heated and cooled space is the single most important factor. Smaller kitchens and bathrooms tend to be more acceptable in the market for condominiums, cooperatives, and rental apartments than in the market for single-family houses, but this preference may depend on household size.

A breakfast bar between the living room and kitchen that replaces the formal dining room is generally acceptable in most apartment markets, but a formal dining room may be a necessity in the luxury market. Family rooms and living rooms may be spacious to offset the smallness of other rooms, and plentiful closet space is important in many markets.

There is also a trend to convert older commercial and industrial buildings into apartments. These buildings are often brick or concrete structures with apartments

---

6.   For further discussion of single-unit home design and functional utility, see Henry S. Harrison, *Houses—The Illustrated Guide to Construction, Design & Systems*, 3rd ed. (Chicago: Real Estate Education Company, a division of Dearborn Financial, 1998) and *Appraising Residential Properties*, 4th ed. (Chicago: Appraisal Institute, 2007). The most complete source for information on residential architecture is *A Field Guide to American Houses*, 2nd ed., by Virginia Savage McAlster (New York: Alfred A. Knopf, 2013). For discussion of apartment properties, see Arlen C. Mills, Richard L. Parli, and Anthony Reynolds, *The Valuation of Apartment Properties*, 2nd ed. (Chicago: Appraisal Institute, 2007) and Daniel J. O'Connell, *The Appraisal of Apartment Buildings* (New York: John Wiley & Sons, 1990).

BACK_DEFEXP-RR-002652

## Emerging Trends in Residential Design

| | |
|---|---|
| **Closets:** | Walk-in closets with built-in drawers and added shelves becoming standard in bedrooms. |
| **Bathrooms:** | Multiple fixture bathrooms are standard, particularly in master/owner suites. |
| **Remodeling/renovation:** | As common as new construction. |
| **Great room:** | Increasingly important to the functions of the residence; may replace the traditional living room. |
| **Floors:** | Wood or simulated wood floors gaining popularity. |
| **Countertops:** | Granite, quartz, or other solid-surface countertops are the market standard but other types are growing in popularity. |
| **Windows:** | Often retrofitted with vinyl coverings on frames for ease of maintenance and thermo pane for insulation. |
| **Recessed ceiling lights:** | High ceilings are currently popular despite the energy costs, and recessed lighting increases the feeling of space. |
| **Electrical, plumbing, and heating systems:** | Often replaced with more efficient systems in homes for resale. |
| **Cabinet finishes:** | Subject to the whims of fashion. |
| **Doors:** | Heavy, solid-core doors are replacing standard, hollow-core doors. |
| **Daylight, view-out, and walk-out basements:** | New basement design creates an environment similar to above-grade living areas. |
| **Water heaters:** | Tankless water heaters are replacing traditional multi-gallon tanks. |

built into the space, so the configuration of those units may be very different from apartments that were designed and built from the ground up. In these units, it is common to see the HVAC ductwork, the conduits for wiring, and other semi-industrial finishes. Some converted units have loft areas built over a low ceiling area and 15-foot ceilings in the living room and kitchen. Converted loft apartments tend to be a separate residential market.

The layout of a residential property relates to traffic patterns—i.e., where kitchens and bathrooms should be located for convenience and how private and non-private areas should be separated (see Figure 13.7). A layout has functional inutility if it causes awkward traffic patterns. For example, inutility may result if people have to cross the living room to get to a bedroom, if the dining area is not next to the kitchen, or if groceries have to be brought through the living room to the kitchen.

Standards of adequacy vary. Often, the market will not accept a one-bedroom house, although one-bedroom apartments and condominium units remain popular. New kitchens and baths are larger, better equipped, and more expensively finished than the small, utilitarian kitchens and baths of the recent past. Dishwashers, garbage disposals, and microwave ovens are usually standard in new construction, and their absence may create a value penalty. Stone, tile, glass panels, or glazed brick in baths and more elegant fixtures are becoming commonplace. The master bedroom frequently has its own compartmentalized bath with a spa tub and shower and a separate dressing area with built-in drawers and shelves. Some examples of functional obsolescence in residential property are listed in Figure 13.8. Preferences change, so there is only one sure thing in residential design: next year will be different from this year.

BACK_DEFEXP-RR-002653

**Figure 13.7**   Residential Layout Considerations

Poor floor plans are easily recognized by those who make up the market for houses, but standards often vary with current trends in a region and neighborhood. The location of various rooms in relation to the site can increase or diminish a dwelling's privacy and comfort.

**Single-Unit Homes**

· Bedrooms and living rooms are increasingly found in the rear of residences, often accessible to the garden, backyard, or deck. Formerly it was considered desirable for the living room and largest bedroom to be at the front of the house, oriented to the street. The master bedroom is frequently separated from the other bedrooms for privacy. If the house is multiple stories, the master bedroom may be on the ground level, with additional bedrooms on the second story. This design may be undesirable to families with small children, however, and could cause functional obsolescence in some communities.

· Kitchens, which were once relegated to the rear, are now just as likely to be on one side of a hall in the middle or at the front of a residence.

· Full bathrooms are most convenient, accessible, and private when they are near or attached to the bedrooms. They should be accessed directly or through a hall, not through another bedroom. Powder rooms should be located off a hall and near, but not too near, the living room or dining room.

· Below-grade space typically includes additional rooms, such as a recreation room, and additional bedrooms. The kitchen and living room should be above grade, typically on the ground level. Access to an attached garage should not be through a bedroom.

**Multifamily Units**

· Two-story, two-unit residences with vertical access from within the unit, rather than from public space, have strong market appeal.

· Multiunit housing is also built in stacked configurations with access on more than one level to minimize stair climbing.

· Low-rise, multifamily housing projects can be designed in a great many ways.

· Condominium, cooperative, and rental apartment buildings with elevators tend to have more standardized, predictable floor plans to make the best use of space within a simple rectangular configuration.

· Structures designed for other uses are now being converted to residential uses. Silos, breweries, warehouses, churches, and schools have been successfully converted into single-unit homes and multiunit residential loft projects.

**Figure 13.8**   Examples of Functional Obsolescence in Residential Improvements

· Interior and exterior finishes that require extensive maintenance can make a structure less competitive.

· In most markets a house that wastes fuel and electricity suffers major functional obsolescence. Energy-conserving features such as well-insulated windows and efficient heating and cooling systems are particularly important in multifamily dwellings and often make the difference between a profitable operation and an unprofitable one. Green building may be the wave of the future for new multifamily dwellings to improve profitability and take advantage of incentives including special financing for green multifamily buildings.

· The mix of units in an apartment project (e.g., two-bedroom units and three-bedroom units) should meet market demands. An improper unit mix may indicate functional inutility.

· Not having a master bedroom and master bath when there are two or more bedrooms in the property.

· Insufficient parking. A house with a one-car garage may have functional obsolescence when the surrounding houses have two-car garages.

· Lack of storage. Today's building standards require closets in bedrooms. In properties built before World War I, closets in bedrooms were not typical. Lack of closets is a form of functional obsolescence.

BACK_DEFEXP-RR-002654

## Commercial

Commercial buildings are used for offices, stores, hotels, banks, restaurants, and service outlets. Frequently, two or more commercial uses are combined in a single building, e.g., a high-rise office building with ground-level retail space or a hotel with a retail arcade off the lobby. The structural and design features of commercial buildings are constantly changing. Developers want the most competitive building possible, within the cost constraints imposed by economic pressures, so they incorporate technological changes to meet the demand for innovation whenever practical.

The efficiency of commercial construction today is much greater than it was in the past. Greater utility can be observed both in the portion of the total area enclosed by the structure, which produces direct income in the form of rent, and in the structural improvements that have evolved from new materials and construction methods. No single method of commercial building construction predominates. Methods vie with one another, and one may surpass others in a given area at a particular time.

Important considerations of functional utility in commercial properties include

- Column spacing
- Bay depth
- Live-load floor capacity
- Ceiling height
- Module width
- Elevator speed, capacity, number, and safety
- Level of finish
- Energy and water efficiency
- Parking and public transportation (walk score/transit score)

Functional utility can be extremely significant in shopping centers. Trends in shopping centers change so rapidly that many structures become functionally obsolete before they deteriorate physically. Because retail space is relatively easy to renovate, many centers are streamlined and modernized when they lose their market appeal. Some enclosed malls developed in the 1980s have been adapted to other uses or have been torn down and redeveloped as big-box power centers for value-oriented shoppers or lifestyle-oriented centers for high-end consumers. Others have been reconfigured to include a larger proportion of anchors and junior anchors, and to turn the store entries outward to the parking lot rather than inward facing a mall.

Many modern community shopping centers are designed with the power center concept, incorporating a larger number of smaller anchors and a higher ratio of anchor space to minimize risk. As consumers have migrated toward e-commerce, demand for "brick and mortar" stores has generally declined, creating opportunities to redevelop older malls, community centers, and neighborhood shopping centers with multifamily and mixed-used developments.

Visibility and access are primary considerations in the analysis of retail improvements. Other building amenities that can contribute to the functional utility of shopping centers include

- Attractive public areas
- Well-kept grounds
- Adequate, well-located restroom facilities

BACK_DEFEXP-RR-002655

Copyrighted material licensed by Charles Brigden on September 17, 2020

> ## Emerging Trends in Shopping Center Design
>
> **Individuality:** Although products are branded to promote consumer loyalty, shopping center developers are now emphasizing regional differences in architectural style to avoid homogeneity. Strong brand names within a shopping center are still desirable, but the shopping center itself should not be seen as a carbon copy of another property in a chain.
>
> **Entertainment retailing:** Entertainment functions—movie theaters, restaurants, themed retailers—are becoming increasingly common in "destination" shopping centers. Research has yet to demonstrate conclusively that the presence of movie theaters increases overall sales within a shopping center, but properties that lack entertainment options may be at a competitive disadvantage in the investment market.
>
> **Themed districts within a shopping center:** In the past, the tenant mix was often adjusted so that competitors would be in different areas of a shopping center. To foster convenience, comfort, and control for consumers with limited time, shopping center owners are starting to cluster related retailers—e.g., wings of a mall focusing on fashion boutiques, sports-oriented retailers, goods by price point, and family-oriented stores. The effectiveness of the tenant mix of a shopping center remains a good indicator of the competency of leasing and management staff.
>
> **New anchors and more food:** New shopping centers may be anchored by a big box store or grocery store and incorporate a food hall with more options and comfortable seating to encourage customers to visit for more than shopping.
>
> **Urban amenities:** Some centers emphasize a community experience, with pop-up stores, classes and activities, more amenities, walkability, and even links to mass transit.

- Suitable traffic patterns for shoppers
- Adequate column spacing
- Sufficient number of escalators and elevators
- Durable and easily maintained surface and finish elements
- Areas for shoppers and workers to rest
- Strong lighting and attractive, coordinated signs

Modern office buildings are often able to fulfill their primary function—accommodating the activities of office workers—longer than any other property type, with the possible exception of residential property. Although trends in office construction move more slowly than trends in retail and hotel design, the flexibility of office space is increasingly important to an office building's viability. Older office buildings that cannot be retrofitted to contemporary standards for wiring, HVAC capacity, and other essential systems will suffer in competition with more functional office space.

Office tenants are more likely to pay higher rents for space in an attractively designed building or for a prestigious address, but tenants are unlikely to renew their leases if the office space is unable to adapt to their changing needs. Even if a developer plans to rent full floors of a new office building, there may come a time when the owner must subdivide floors and rent space to smaller tenants.

Functional considerations for office buildings include

- Appropriate density (low-, medium-, or high-rise structure) for market area
- Building shape and size

BACK_DEFEXP-RR-002656

### Emerging Trends in Office Building Design

| | |
|---|---|
| **Office-hotel concept:** | As an alternative to negotiating 10- to 20-year office leases, some office building owners are experimenting with providing short-term or temporary space and services as needed by tenants. |
| **Panel systems:** | Panel systems for separating workspaces are replacing traditional methods of dividing space in offices for several reasons:<br>1. The cost of the technology needed for the average office worker is rising.<br>2. More diverse work teams need flexible, adaptable meeting space.<br>3. Private office spaces can be arranged with new panel systems. |
| **Data and power infrastructure:** | Raised floors and carpet tile allow greater access to data and power cabling as well as denser bundling. (Carpet tile helps muffle the hollow sound of raised floors.) Sufficient space for telecommunications closets is important for long-term flexibility. |
| **Indoor air quality:** | The Environmental Protection Agency has ranked indoor air pollution among the top five environmental risks to public health. Poor indoor air quality can be reduced with proper ventilation and air exchange rates and by using no- and low-VOC products and finishes in construction. |
| **High density, open-plan "free-address" layouts:** | Workers choose a work station within "neighborhoods" usually organized by department. |
| **Amenities included:** | Areas are provided for food preparation/consumption, indoor and outdoor recreation, and socializing. Quiet/restorative areas are provided for rest, lactating, and meditating. |
| **Building performance:** | Measured by the occupants' productivity, emotional and physical health, satisfaction, and well-being. |

- Flexible and efficient use of space (larger floor plates are often desirable but market preferences vary)
- Expansion capabilities, including potential vertical expansion (i.e., adding a floor)
- Heating, ventilation, and air-conditioning (HVAC)
- Plumbing, electrical, security, and communications systems
- Floor-to-floor heights
- Facade and interior and exterior signage
- Access to lobbies and public space
- Vertical transportation
- Amenities, e.g., retail and restaurants, fitness centers, day care facilities
- Parking

Access to retail and support services is an important amenity in suburban office parks because such services may not be within easy driving distance as they are in urban office districts with a concentration of diverse uses.

Hotels range from tiny inns with fewer than a dozen rooms to huge convention hotels with more than a thousand rooms.[7] Hotels and motels were once measured against standard, current designs. This tendency continues for medium-priced hotels and the various extended-stay and limited-service categories, but in appraising older facilities and luxury hotels, variation in architectural styles and interior finish must be considered.

---

7. For a thorough discussion of hotels, see Stephen Rushmore, John W. O'Neill, and Stephen Rushmore Jr., *Hotel Market Analysis and Valuation* (Chicago: Appraisal Institute, 2012) and Stephen Rushmore, Dana Michael Ciraldo, and John Tarras, *Hotel Investments Handbook* (Boston: Warren, Gorham & Lamont, 1997).

BACK_DEFEXP-RR-002657

The physical configuration of a lodging facility is determined by the type of patrons it serves. A limited service lodging property must be oriented to the needs of guests who wish to spend a minimum amount of time on the premises. A resort hotel, on the other hand, must provide a variety of recreational and entertainment facilities for its guests who will spend a lot of time there.

The amount of hotel space devoted to guest rooms varies. A hotel that is a major meeting and entertainment center has a much lower proportion of guest rooms to public areas than an extended-stay hotel. Many extended-stay hotels consist entirely of suites with small equipped kitchens, living rooms, and separate bedrooms. These hotels usually have small lobbies and limited food service facilities. Because fewer hotels contain just guest rooms, appraisers must often consider multiple, mixed uses when analyzing the functional utility of the improvements.

### Emerging Trends in Hotel Design

| | |
|---|---|
| **Needs of the business traveler:** | Access to communications technology (high-speed internet connectivity in all areas of the hotel, smart speakers such as Alexa, charging stations, in-room printers, and video communication devices) is increasingly important to business travelers. |
| **Product types:** | Full-service, select service, all-suite, extended-stay, convention, and resort hotels are still popular lodging concepts. More recently, boutique hotels have gained in popularity, offering unique, stylish accommodations and consistent service standards. Large lodging chains have developed their own boutique hotels to attract guests looking for a modern, stylish experience. With the rise of collaborative work space, new hotels are incorporating larger lobbies for co-working and socializing areas. Another trend, particularly for limited service hotels, is to provide breakfast for all guests. This can be as simple as a continental breakfast or as elaborate as a full American breakfast. |

## Industrial

The most flexible design for industrial buildings, and the one with the greatest appeal on the open market, is a one-story, square or nearly square structure that complies with all local building codes. Even for the simplest industrial buildings, though, the factors listed in Table 13.2 must be considered.

The combination of old and new industrial space may create substantial functional obsolescence if the new construction contributes less than its cost to the value of the whole. The layout of industrial space should allow operations to be carried out with maximum efficiency. Typically, receiving functions are performed on one side of the building, shipping functions on the other, and processing or storage functions in the middle.

Some industrial buildings include special features such as sprinkler systems, scales, loading dock levelers, cranes and craneways, refrigeration areas, conveyor systems, process piping (for compressed air, water, and gas), power wiring, and employee lockers and lunchrooms. These features may be standard equipment for certain industrial operations but not standard for the local real estate market.

Manufacturing plants and other buildings used for industries that involve bulky or volatile materials and products have specialized equipment and building designs, so they have few potential users. Facilities for industries such as food processing or manu-

BACK_DEFEXP-RR-002658

**Table 13.2**    Functional Utility of Industrial Improvements

| | |
|---|---|
| Surplus land* | In new construction surplus land on the site is frequently allocated for future expansion. |
| Clear span | Anywhere from 21 to 35 feet. Many smaller warehouses can be operated with a clear span of 12 to 20 feet or more, but higher ceilings may be standard in the market. |
| Percentage of office space | Varies widely depending on specific operation. If potential alternate uses of an existing property do not require as much finished office space, the excess may be an overimprovement. |
| Loading facilities | Multiple load facilities can reduce delays in incoming deliveries and outgoing orders. Overhead doors are less efficient loading facilities than loading docks, dock-high floors, and truck wells. Rail sidings are common for certain types of industrial properties. |
| Floor thickness and loading capacity | Typically, 5 to 8 inches of reinforced concrete. Live-load capacity—the ability to support moving or movable objects in the building at a certain weight—is a minimum 125 pounds per square foot for light warehouse space and manufacturing buildings and 250 pounds per square foot for heavy warehouses. |
| Power service | Manufacturing plants generally require more electrical service than warehouses. |
| Insulation and climate control | Warm climates may dictate cool (white) roofs and ceiling insulation and, in some cases, HVAC to maintain stable interior temperatures. |
| Fire sprinklers | Wet or dry fire suppression systems may not have been required when older structures were built, but may now be the norm in the market or required for certain types of uses. |
| Land-to-building ratio or floor area ratio | Typically, a ratio of land area-to-building area of 2.5 to 3.5. Many older facilities have ratios from 1.3 to 2.5. The land-to-building ratio must allow plenty of space for parking, truck maneuvering, yard storage, and expansion. Floor area ratio (FAR) is also known as building-to-land ratio. |
| Size relative to typical building size | Big-box warehouses can be significantly larger than competitive buildings in the market. |
| | The cost of reconfiguring a large industrial building for multitenant use is a measure of functional inutility. |
| Slope of access to the site | Steep inclines can reduce loading efficiency. |

\*    See the discussion of excess land and surplus land in Chapter 12.

facturing computer chips must maintain prescribed levels of cleanliness. For example, the "clean rooms" needed for silicon wafer production may not contribute as much value as they cost to construct if used for alternative industrial uses. Buildings used for light manufacturing and processing have fewer limitations and broader appeal in the market.

Storage and distribution facilities range from simple cubicles, known as mini-warehouses, to huge regional warehouses with more than a million square feet. For optimal functional utility, warehouses should have adequate access, open areas, ceiling height, floor load capacity, humidity and temperature controls, shipping and receiving facilities, fire protection, and protection from the elements.

The primary consideration in a warehouse's location is good access. Just-in-time inventory practices require a distribution facility to be accessible to a greater variety of vehicles and cargo containers, making more frequent and often smaller pick-ups and deliveries. As a result, docks and dock areas must be designed with greater flexibility. Trucking is the most common means of transporting goods, but certain warehouse operations also need access to rail, water, and air transportation. If electric trucks are

BACK_DEFEXP-RR-002659

Copyrighted material licensed by Charles Brigden on September 17, 2020

used, a battery-charging area should be included. In the future, the use of "driverless" trucks may have a significant impact on trucking and industrial uses of property.

Forklifts, conveyor belts, and automatically guided vehicle conveyor systems are used to move materials inside warehouses. Pallets, or portable platforms, are used for moving and storing materials in most distribution operations. Therefore, ceiling heights in warehouses should accommodate the stacking of an ideal number of pallets. Newly constructed high-cube warehouses may be more efficient than older buildings with larger footprints and fewer automated systems for moving materials. Because wide spans provide maximum flexibility, a square structure generally is the most cost-effective.

Sprinkler systems are needed in most warehouses, especially those where flammable goods are stored. The nature of the stored material determines whether the system should be wet or dry, using water or chemicals.

| **Emerging Trends in Industrial Building Design** | |
|---|---|
| **Automation:** | Industrial operations are less labor-intensive and more equipment-intensive than they once were, and the buildings that house these operations can devote more space to machinery and systems than to break rooms, locker rooms, etc. For example, telecom hotels, internet switching centers, and data centers often consist of bare storage space for computer equipment and are rarely visited by the people who own the equipment. Also, automated inventory operations increase efficiency, particularly when dealing with small electronic components or other products that are difficult to distinguish by the naked eye. |
| **Just-in-time manufacturing and inventory practices:** | Manufacturers do not want to be burdened with the cost of storing large quantities of the products they produce, so their suppliers—and the warehouse operators who serve them—focus less on the long-term storage of inventory and more on the movement of inventory. |

## Buildings on Agricultural Properties

As the small, family farm has given way to fewer, larger farms, the contribution of farm buildings to the total value of farm real estate has been steadily decreasing. The number of farm buildings per acre of farmland has also decreased. Farms are increasingly operated by large, specialized business concerns, and the equipment and management needed to run agricultural operations have become increasingly specialized.[8]

Farm buildings must accommodate the type of machinery and equipment currently used in farming (see Table 13.3). To be useful, each farm building must contribute to the operating efficiency of the entire farm. Each building's usefulness relates to the type and size of the farm. Functional obsolescence can result from having too many farm buildings when fewer would be more efficient.

## Special-purpose Buildings

Although most buildings can be converted to other uses, the conversion of special-purpose buildings generally involves extra expense and design expertise. This conversion process may not be economically feasible or practical in many situations

---

8. For additional information on improvements to rural land, see *Rural Property Valuation* (Chicago: Appraisal Institute, 2017).

BACK_DEFEXP-RR-002660

**Table 13.3** Characteristics of Improvements on Agricultural Land

| Type of Building | Characteristics |
| --- | --- |
| Barns | · Some barns have traditionally been multifunctional, providing animal shelter, grain storage, and a threshing floor. Other structures, such as tobacco barns and modern farm buildings, serve a single, specialized purpose. |
| | · Most barns are built of wood or metal, but some are made of stone, logs, or brick, depending on the region. |
| | · Old barns are suitable for modern, general-purpose farming if they are sufficiently adaptable. Virtually all newer barns have pre-engineered pole construction, which is less expensive and can accommodate more farming activities than older, multistory barns can. |
| Silos | · Silos have become more prevalent and larger. The use of baled, rather than loose, hay and the increased use of ensilage have lessened the need for barn storage. |
| Animal shelters | · Animal shelters should be dry and clean, provide protection from the wind and sun, and be adaptable to equipment storage. |
| Machine sheds | · Sheds are needed to house tractors, combines, discs, plows, harrows, cultivators, pickers, trucks, and other equipment. |
| Shop | · Most farms have an area for maintenance of mechanical equipment. Often the shop is a pole barn or prefab metal building with concrete floors that has been modified. In winter, this may be the most important building on the property. |
| | · Usually heated, cooled, and insulated. |
| Dairy production facilities | · Modern dairy facilities are built using concrete tilt-up, concrete block, or metal prefab construction. Double parallel and rotary milk stalls are standard. Old flat barns and herringbone style stalls are still in use but are being phased out. |

depending on a building's design and special construction features. Special-purpose structures include

- Houses of worship
- Theaters
- Greenhouses
- Schools
- Rail and transportation facilities
- Sports arenas
- Other specially designed and constructed buildings

The functional utility of a special-purpose building depends on whether or not the building conforms to competitive standards. For example, the design of movie theaters has changed over time due to high maintenance and utility costs. Older, ornate movie theaters still exist, but newly constructed theaters are generally simple, unembellished, functional structures containing a larger number of smaller screens with stadium-style seating. In the vast majority of markets, large and ornate theaters are not being built.

The design and materials used in houses of worship are simpler today to keep maintenance and utility costs down. The functional utility of these structures, like sports and concert arenas, is primarily related to seating capacity. The structure's support facilities, general attractiveness, and appeal must also be considered.[9]

---

9. For more information on houses of worship, see Martin H. Aaron and John H. Wright Jr., *The Appraisal of Religious Facilities* (Chicago: Appraisal Institute, 1997).

BACK_DEFEXP-RR-002661

> ### Evaluating Functional Utility in Special-purpose Buildings
>
> To investigate the functional utility and value of building components designed specifically to serve the use of a special-purpose property, appraisers can employ several strategies:
>
> · Review appraisal literature pertaining to properties in a similar product category
> · Search for market data on similar—i.e., not directly comparable—or related facilities
> · Interview the current or recent occupant and other operators in that particular field
> · Interview brokers or other appraisers specializing in that product or with experience in that segment of the market
> · Interview the project architects and engineers
> · Review building plans with a cost estimator or with architects or engineers experienced in that product type
> · Review taxation case studies for pertinent precedents
>
> Appraisers should also analyze the Competency Rule of the Uniform Standards of Professional Appraisal Practice in assignments relating to special-purpose property.
>
> Source: David Paul Rothermich, "Special-Design Properties: Identifying the 'Market' in Market Value," *The Appraisal Journal* (October 1998): 410-415.

The adaptive-use movement has generated public interest in the conversion of special-purpose buildings to preserve architecturally significant structures that have outlived their function. Railroad stations, schools, firehouses, and grist mills are popular structures for conversion. The functional utility of these buildings relates to how much they deviate from building codes and how the cost of rehabilitation compares with the potential economic return. A typical item of functional inutility in adaptive-use projects is an insufficient number of staircases to meet building codes. By contrast, a high ceiling in a specialty property does not indicate functional inutility if it is considered a desirable architectural feature. Compliance with the Americans with Disabilities Act is an additional consideration in evaluating the adaptive use of older buildings.

## Mixed-use Buildings

Many buildings successfully combine two or more revenue-producing uses:

- Residential units are often found above ground-floor retail space.
- Research and development facilities often combine office, laboratory, and industrial space within a single structure.
- Office buildings often contain ground-level retail space and restaurants.
- Hotels can be combined with retail, office, or residential uses.

In mixed-use buildings, each type of use reflects a number of design criteria, which must be analyzed separately. The structure must also be considered as a whole to determine how successfully it combines uses. The uses that are combined should be compatible, but minor incompatibilities can be alleviated with separate entrances, elevators, and equipment. In a mixed-use building without separate entrances and elevators, for example, the residential units on upper floors and the office units below would both suffer. Only in a rather large building can the extra expense of separate features be justified. A hotel located in an office building should have its own entrance and elevators. Security and privacy should characterize a building's residential area, while a professional, prestigious image is desirable for the office portion of the structure.

BACK_DEFEXP-RR-002662

Mixed-use developments (MUDs) are characterized by the physical and functional integration of their components. They are often sprawling structures built around centrally located shopping galleries or hotel courtyards. Walkways, plazas, escalators, and elevators provide an interconnecting pedestrian thoroughfare with easy access to parking facilities located underground, at street level, or above-ground. Because mixed-use developments bring together diverse participants, they require extensive, extraordinarily coherent planning.

## Quality and Condition Survey

The building description and analysis of architectural style and functional utility culminate in the quality and condition survey. A structure can have a functional layout and an attractive design but be built with inferior materials and poor workmanship. These deficiencies increase maintenance and utility costs and adversely affect the property's marketability. Conversely, a building can be built too well or at a cost that cannot be justified by its utility. Most purchasers will not pay for these excess costs, and only part of the original investment can be recaptured by the original owner through reduced maintenance expenses.

Practical or reasonable economy of construction results in an improvement that will produce rental income or value commensurate with its cost. Maintenance and operating expenses for an economically constructed building may be slightly higher than minimum expenses, but it is usually better to pay those expenses than to invest in a building of superior construction that will have higher taxes. This tradeoff may be noted in an appraiser's analysis. To achieve the desired level of construction quality and cost, building materials and construction methods must be chosen and used properly. An appropriate combination of elements results in a building that is adequate for its intended purpose.

The character, quality, and appearance of building construction are reflected in each of the three approaches to value. The quality and condition of building components greatly influence the cost estimate, the depreciation estimate, the ability of the property to produce rental income, and the property's comparability with other properties. Analysis of the quality of construction and the methods and materials used complements an appraiser's analysis of the building's structural design and architecture.

When a contractor takes shortcuts and fails to meet the advertised or contracted quality level of new construction, property owners and lenders can find themselves embroiled in litigation with aggrieved occupants. Because of the growing complexity of building design and construction, the quality of building components and construction is often best judged by a consulting engineer. The engineer can monitor the construction process to ensure that the work conforms to approved drawings and that the workmanship is satisfactory. An experienced appraiser may be able to relate evidence of construction problems—sag-

In the condition component of a quality and condition survey, appraisers distinguish among items in need of immediate repair (deferred maintenance items), short-lived items that can be replaced at a later date, and long-lived items expected to last for the remaining economic life of the building. Researching incentives and rebates at www.dsireusa.org may provide resources for reducing the cost to cure for all types of property components.

BACK_DEFEXP-RR-002663

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

ging floors, leaks, drafts, etc.—gathered in the property inspection to materials of poor quality or shoddy workmanship.

In the condition component of a quality and condition survey, appraisers generally distinguish among two types of building components:

1. Items that may be repaired or replaced at a later time (i.e., short-lived items with remaining useful lives)
2. Items that are expected to last the full economic life of the building (i.e., long-lived items)

Examples of each type of building component are shown in Figure 13.9.

### Short-lived Items

During the building inspection, an appraiser usually encounters items that show signs of wear and tear but would not be economical to repair or replace on the date of the appraisal. The economic life of a building is the period over which the improvements contribute to property value. Many building components have to be repaired at some time during the economic life of the building. If the remaining life of the component is shorter than the remaining economic life of the structure as a whole, the component is identified as a *short-lived item*. (Age-life concepts such as economic life and remaining economic life are discussed in more detail in Chapter 31.)

> **short-lived item**
> A building component with an expected remaining economic life that is shorter than the remaining economic life of the entire structure.

An appraiser must decide if an item needs immediate repair or replacement or whether this work can be done later. If the repair or replacement will add less to the value of the property than it will cost, the maintenance should usually be delayed. For example, a building with a sound, 10-year-old roof may hold up well for at least another five years. Although the roof has suffered some deterioration, replacing it probably would not add more value to the property than the cost of a new roof.

An appraiser should consider whether repairing an item is necessary to preserve other components. For example, sometimes the roof cover must be replaced or the economic life of the other components will be reduced. The appraiser should note whether the condition of the short-lived item is better or worse than the overall condition of the building.

### Long-lived Items

The final step in a quality and condition survey is to describe the condition of those items that are not expected to require repair or replacement during the economic life of the building, assuming they are not subject to abnormal wear and tear or accidental damage. A building component with an expected economic life that is the same as the remaining economic life of the structure is called a *long-lived item*. Repair may not be required because the component has been built to last and has been well maintained. All the long-lived components of a building are rarely in the same condition. The items that are not in the same condition as the rest of the building are the important ones in the appraisal analysis.

> **long-lived item**
> A building component or site improvement expected to have the same useful life as the entire structure.

BACK_DEFEXP-RR-002664

**Figure 13.9**    Sample Items Considered in the Quality and Condition Survey

**Deferred Maintenance Items**
· Touch-up exterior paint needed
· Minor carpentry repairs on stairs, molding, trim, floors, and porches
· Redecorating interior rooms
· Fixing leaky or noisy plumbing
· Loosening stuck doors and windows
· Repairing torn screens and broken windows
· Rehanging loose or damaged gutters and leaders
· Replacing missing shingles, tiles, and slates and repairing leaky roofs
· Fixing cracked sidewalks, driveways, and parking areas
· Doing minor electrical repairs
· Replacing rotten floor boards
· Exterminating vermin
· Fixing cracked or loose tiles in bathrooms and kitchens
· Repairing septic systems
· Eliminating safety hazards such as windows that have been nailed shut
· Eliminating fire hazards such as paint-soaked rags in a storage area

**Short-lived Items**
· Interior paint and wallpaper
· Exterior paint
· Floor finishes
· Shades, screens, and blinds (often considered personal property)
· Waterproofing and weatherstripping
· Gutters and leaders
· Roof covering and flashing
· Water heater
· Furnace
· Air-conditioning equipment
· Carpeting
· Kitchen appliances (considered short-lived items only if built-in)
· Sump pump
· Water softener system (often rented, not owned)
· Washers and dryers (often considered personal property)
· Ventilating fans

**Long-lived Items**
· Hot and cold water pipes
· Plumbing fixtures
· Electric service connection
· Electric wiring
· Electric fixtures
· Ducts and radiators
· Walls, foundation, roof structure

BACK_DEFEXP-RR-002665

Copyrighted material licensed by Charles Brigden on September 17, 2020

Some defective long-lived items are not considered in need of repair because the cost of their replacement or repair is greater than the amount these items contribute to the value of the property. A serious crack in a foundation wall, for example, would probably be considered incurable physical deterioration. Incurable depreciation that results from problems in the original design of a structure is considered incurable functional obsolescence.

---

### Green Building Documentation

In valuation analyses of sustainable, high-performance green properties, appraisers may want to incorporate the following types of documentation:

- Third-party certifications and ratings and accompanying reports (e.g., LEED, EPA's National Energy Performance Rating, and ENERGY STAR)
- Modeled operating data for proposed buildings (e.g., DOE energy models, USGBC water models, lighting models, transportation demand studies)
- Commissioning reports
- Post-occupancy evaluations (POEs) for properties at least one year old
- Indoor air quality assessments
- Technical specifications of systems in existing or proposed buildings (e.g., narrative, construction drawings, engineering reports) demonstrating their benefits (e.g., natural ventilation system or interior vegetation)
- Estimates from cost estimators based on these technical specifications showing cost differentials relative to standard systems
- Site evaluations providing an assessment of ecosystem health, functionality, and the provision of ecosystem services
- Lease agreements and other documents demonstrating specific income adjustments based on environmental or social costs and benefits (e.g., a proposed building may qualify for storm water fee reductions based on meeting certain criteria)
- Documented incentives, which may include tax abatements that will affect the net income analysis. Current incentives for building green can be found at a national website (www.dsireusa.org). These incentives may offset the additional cost to build green.

BACK_DEFEXP-RR-002666

BACK_DEFEXP-RR-002667

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Statistical Analysis in Appraisal

# 14

In the valuation process, data analysis naturally follows the various data collection activities discussed in the previous section of this book. A variety of analyses inform an appraiser's conclusions about value: market analysis, highest and best use analysis, and the application of the approaches to value. Each of those forms of analysis deals directly with different sets of data about the subject property, competitive properties, and the larger market. However, all of those traditional appraisal analyses are increasingly influenced by the discipline of statistics.

Computer technology and data availability have made statistical analysis increasingly usable and appropriate for real estate professionals. Statistical analysis provides the tools to take advantage of large amounts of data. Mortgage lenders use statistical analysis extensively, and tax assessors frequently use statistical models.

In today's world of abundant data, reliance on direct appraisal experience in place of looking for facts from data to support conclusions is outmoded. Although the study of data has always been at the core of the valuation process, the availability of tools for more rigorous analysis and interpretation of numerical data has raised expectations for more "statistical" support for value conclusions. As a result, a more formal understanding of basic statistical terminology and techniques has become a prerequisite for professional competency. Statistical techniques like regression analysis have become accepted tools in the application of the approaches to value. In fact, the application of regression analysis to comparable sales data is a natural and obvious extension of the traditional analysis of differences in the sale prices of comparable properties in the adjustment process. A simple linear regression model can be used to estimate the influence of a particular characteristic with significant statistical reliability when

**statistics**

A body of principles and methods concerned with extracting useful information from numerical data.

**statistical analysis**

Quantitative techniques used, for example, to estimate value and identify and measure adjustments to the sale prices of comparable properties; techniques include statistical inference and linear and multiple regression analyses.

BACK_DEFEXP-RR-002668

**descriptive statistics**

A branch of statistics concerned only with characterizing, or describing, a set of numbers. The measures used to characterize a set of data (e.g., average, maximum, coefficient of dispersion) or charts and tables depicting the data.

**inferential statistics**

The process of drawing conclusions about population characteristics through analysis of sample data.

an adequate supply of data is available. Historically, assessors have used similar statistical techniques as part of the mass appraisal of large pools of properties. For years traditional appraisal techniques have been steeped in statistical analysis, even if the formal vocabulary of statistics has not always been used to describe the application of statistical techniques in the context of appraisal.

Statistical applications are generally divided into two types—descriptive statistics and inferential statistics. The category of descriptive statistics includes summary measures, charts, and tables used to describe a sample or population. Inferential statistics involves the use of sample data to support opinions (i.e., inferences) concerning a population represented by the sample. Statistical inferences can include, among other things, estimates of actual but unknown population central tendency and dispersion, outcome predictions, and the underlying structure of cause-and-effect relationships.

The effective use of descriptive statistical tools such as tables, charts, and graphs is an important skill. Appraisal reports that include relevant, helpful data visualizations are often easier for the intended users to read and are perceived as more credible. (The effective use of tables, charts, and other illustrations in appraisal reports is discussed in Chapter 33.) The competent use of inferential statistical analysis is more complicated, generally requiring study of a separate body of knowledge. Because the field of statistics is a discipline unto itself, appraisers should identify the extent to which statistical methods will be used in their practices and determine the education and training they will need to be able to accurately use statistics to provide credible appraisal services. This chapter introduces the foundational terms and concepts of statistics and describes the use of statistical analysis in appraisal.[1]

## What Is Data?

In the valuation process, *data* is classified in terms of its use in the appraisal, i.e., general data, specific data, or competitive supply and demand data as discussed in Chapter 9. In the broader context of statistics, *data* is any set of facts such as numbers, measurements, or terms. Applying the statistical sense of the word to the activities of real estate appraisers, *data* is simply unprocessed observations and descriptions about real property and the markets in which real property is bought and sold. These raw observations and descriptions fall into two general categories: (1) qualitative data, which is descriptive in nature, and (2) quantitative data, which has to do with numbers.

Every appraisal assignment begins with the receipt of raw data from a client in the form of an address, legal description, parcel number, or other narratively descrip-

---

1.  Appendix B , which is available online at www.appraisalinstitute.org/15th-edition-appendices/, discusses more complex concepts and considerations in the use of statistical applications like multiple regression analysis. In the professional appraisal literature, much has been written about statistical tools and how they relate to appraisal, and this material is readily accessible in publications such as *The Appraisal Journal*. See, for example, a series of three articles by Bryan L. Goddard in *The Appraisal Journal*: "Graphics Improve the Analysis of Income Data" (October 2000): 388-394; "The Power of Computer Graphics for Comparative Analysis" (April 2000): 134-141; and "The Role of Graphic Analysis in Appraisals" (October 1999): 429-435. See also the regular "Cool Tools" and "Maps & Comps" columns in *Valuation* magazine.

BACK_DEFEXP-RR-002669

Copyrighted material licensed by Charles Brigden on September 17, 2020

tive information that identifies the subject property. This type of data is referred to as *qualitative data*. Addresses and parcel numbers contain numbers, but that data does not serve a quantitative function. In contrast, *quantitative data* is numerical information, such as the square footage of the improvements, the lot size, the age of the property, or the number of listings in the relevant market area.

Qualitative data can also be separated into two categories: (1) discrete data, which is data that will always have a specific value and for which there are a finite number of possible values (e.g., the number of pending sales in a given zip code or the number of rental units in an apartment building), and (2) continuous data, which is basically all other numerical data. Continuous data is usually associated with some sort of physical measurement (e.g., the square footage of a building or its remaining economic life).

> **qualitative data**
>
> Data that is based on subjective measures, where the data tends to fall into nominal or ordinal categories; usually represented in the form of words. For example, a characteristic like curb appeal may indeed affect market value but may be difficult to quantify numerically. Also referred to as *categorical data*.
>
> **quantitative data**
>
> Variables that can be objectively measured or counted and expressed in numerical form. For example, square footage, length, age, number of rooms, and ceiling height are all quantitative variables.

## Levels of Data

There are generally four levels of data measurement or data classification:

1. Nominal
2. Ordinal
3. Interval
4. Ratio

Nominal level data is data that does not have any standard means of order. Nominal data is distinguished only by its name. For example, architectural style is a type of qualitative data that does not lend itself to ranking or order. A Tudor style house cannot be correctly or incorrectly placed in a list above or below a Victorian, colonial, or brownstone. Simply put, there is no right or wrong way to order a list of architectural styles.

Ordinal level data is also distinguished by name but differs from nominal data because it can fall into an ordering scheme. For example, the condition ratings in the Uniform Appraisal Dataset, C1 to C6, are a series of data that follows a specific, meaningful order. Similarly, a more traditional set of condition ratings might flow from *poor* to *excellent*. While there are differences between the rankings (that is, *fair* is better than *poor*), the rankings alone do not indicate a finite measurement that can be applied to identify that difference.

Interval level data is similar to ordinal level data because it also has a specific ordering scheme, but interval data is distinguished from ordinal data in that the difference between one data point and the next is measurable. However, interval data does lack a zero starting point or a baseline. For example, a review of historic sales data might call for a measurement of price changes during the period of, say, 2012 to 2017. Although 2017 is clearly five years after 2012 (i.e., the difference is measurable), there is no absolute beginning year prior to which analysis can no longer take place.

BACK_DEFEXP-RR-002670

The final level of data is ratio level data, which is just like interval level data except that ratios now make sense. For example, an appraiser might be asked to determine the rentable area for a suite in an office building. Suppose the building has 100,000 square feet of gross rentable area, the total amount of common area in the building is 10,000 square feet, and the usable area of the office suite is 18,000 square feet. First, this data can be ordered:

$$10,000 < 18,000 < 100,000$$

The differences between the data values are also meaningful. Ratios of the various area amounts can be calculated because there is a base point of zero below which there is no building at all:

$$\frac{\text{Gross Rentable Area}}{\text{Usable Area}} = \text{Rentable/Usable Ratio} = \frac{100,000}{90,000} = 1.11$$

$$\text{Load Factor (Load)} = \text{Rentable/Usable Ratio} - 1 = 1.11 - 1 = 0.11\%$$

$$\text{Usable Area} \times \text{Rentable/Usable Ratio} = \text{Rentable Area} = 18,000 \times 1.11 = 20,000$$

$$\frac{\text{Rentable Area}}{\text{Rentable/Usable Ratio}} = \text{Usable Area} = \frac{20,000}{1.11} = 18,000$$

Figures are rounded.

In this case, the rentable area calculated from the supplied data is 20,000 square feet.

## Populations and Samples

Pools of data of all levels can be arranged into various sets and subsets. At the broadest end of the spectrum, a *population* consists of all of the items under consideration, such as all of the rental units located in garden-level apartment developments in a given market area. A *parameter* is a factually known or determinable summary measure that describes a characteristic of a population (i.e., a variable). The mean size of all of the units in garden-level apartment developments in a given market area is an example of a parameter. (Size is the variable and the population mean is the parameter.) In contrast, a *sample* is a subset of a population that has been selected for analysis. A *statistic* is a summary measure derived from sample data. The mean size of all of the apartment units in a sample selected from garden-level apartment developments in a given market area is an example of a statistic. Sample statistics are used to estimate population parameters. That is, population parameters are inferred through the analysis of sample statistics.

As stated earlier, descriptive statistics is concerned with data collection, presentation, and quantification. For example, the descriptive statistics on a sample might include the sample size, the collection method, and the date. Descriptive statistics might also include numerically quantifying the dispersion and central tendencies of the sample variables by reporting minimum and maximum values, ranges, quartiles, standard deviations, means, medians, or modes. Specific examples of descriptive charts, graphs, and tables include histograms, pie charts, bar charts, line graphs, scatter plots,

**sample**
In statistics, a subset of a population selected for analysis.

**parameter**
1. A constant or value used to index a function, such as use of degrees of freedom to derive an appropriate $t$-statistic or $F$-statistic function.
2. A number that describes a characteristic of a population.

BACK_DEFEXP-RR-002671

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 267 of 722    Page
ID #16491

ordered arrays, relative frequency distributions, and percentage distributions. Descriptive statistical methods are applicable to population data as well as sample data.

Fundamentally, inferential statistics involves estimating a population parameter using sample data or reaching a conclusion concerning one or more populations based on sample data. For example, the National Association of Realtors (NAR) publishes monthly median home price statistics for various markets throughout the United States. (See Figure 14.1.) Changes in the price level of the underlying population of homes are generally inferred from this sample statistic. The reliability and validity of this inference—i.e., how accurate the inference is—depend on a number of factors including sample size and how well the sample represents the population.

**Figure 14.1**   Sample Data from the National Association of Realtors



Copyright ©2019 "Median Price of Existing Home Sales." *NATIONAL ASSOCIATION OF REALTORS®*. All rights reserved. Reprinted with permission. July 12, 2019, https://www.nar.realtor/sites/default/files/documents/ehs-05-2019-summary-2019-06-21.pdf

A measure of accuracy (e.g. margin of error) is usually reported along with an inference. The measure of accuracy states the degree of uncertainty associated with the inference. For example, polling data usually includes an inference and its associated margin of error, which describes a confidence interval at some preselected confidence level (generally 90%, 95%, or occasionally 99%).

Uncertainty cannot, however, be quantified when the sample is a nonprobability sample. (With a nonprobability sample, the probability of any given sample item being chosen from the underlying population is unknown. Examples of nonprobability samples include convenience samples, intact groups, and self-selection.) Median home price statistics reported by NAR are derived from nonprobability samples, so a degree of uncertainty is not reported and cannot be calculated due to the manner in which the data is collected.

BACK_DEFEXP-RR-002672

These terms and concepts are important in all types of real estate appraisals. To provide meaningful and credible results, appropriate terminology and concepts must be used. When appraisers gather comparable sales, they should recognize that only some of the properties in the population of which the sales are a part will have sold in a given time period. Thus, the sales may or may not represent that population and would not constitute a random or unbiased sample. To report that "the mean sale price of the properties sold in the subject property's market area between 2017 and 2018 was $175,000" would be more accurate than "the average price for properties in the neighborhood in 2017 was $175,000." The latter statement implies that all properties were sold.

## Measures of Central Tendency

*Central tendency* refers to a typical value that describes a sample or population variable. The three most frequently used measures of central tendency are the median, mean, and mode. The widely accepted definitions of *market value* all use language that relates to the measures of central tendency (e.g., the "most probable price" is the mode, the "expected price" is the median or mean).

### Median

The median is the middle value in an ordered array—i.e., a data set arranged numerically from lowest to highest or highest to lowest. The median is unaffected by extreme values in sample data. As a result, it is often reported when one or more extreme values distort the ability of the mean to accurately depict central tendency.

If a data set contains an odd number of observations, the median value is the observation at the $(n + 1)/2$ position in the ordered array, where $n$ is the sample size. If the data set has an even number of observations, then the median is the value halfway between the two middle observation values. For example, if the data set has 15 observations, the median is the eighth data point in an ordered array of the data. If the data set contains 14 observations, then the median would be the midpoint between the seventh and eighth data points in the ordered array.

| Measure | Location |
|---|---|
| **median** <br><br> A measure of central tendency identified as the middle value in an ordered array of numerical values, e.g., 7 is the median of (1, 4, 6, 6, 7, 9, 11, 22, 41). If the ordered array contains an even number of values, then the median is the mean of the two values on either side of the middle. | $(n + 1)/2$ ordered observation <br><br> where <br><br> $n$ = odd-numbered sample size <br><br> mean of $(n/2)$ and $(n + 1)/2$ ordered observations <br><br> where <br><br> $n$ = even-numbered sample size |

### Arithmetic Mean

The arithmetic mean is the most commonly reported measure of central tendency. It is often referred to as the *sample mean*, or *population mean*, or simply as the *mean*. Sample mean is represented by the symbol $\bar{x}$. Population mean is symbolized as the

BACK_DEFEXP-RR-002673

Copyrighted material licensed by Charles Brigden on September 17, 2020

Greek letter $\mu$ ("mew"). The sample mean is calculated by summing the values of all observations on a variable and dividing the sum by the sample size ($n$). Similarly, the population mean is calculated by summing the values of all items in a population and dividing by the population size ($N$). Because the arithmetic mean includes all observations on a variable, its calculation is affected by any extreme values, which may distort its depiction of central tendency. When this occurs, the population mean is not the best representation of central tendency.

The mean is very amenable to statistical inference when the population distribution is known or can be reliably approximated or when the sample is large enough. The Student's $t$ distribution (also known as simply the *t-test*) is the most frequently used measure to assess the degree of uncertainty associated with statistical inferences of the true population mean parameter based on the sample mean.

| Measure | Calculation |
|---|---|
| **mean**<br>A measure of central tendency. The sum of values for a variable in a sample or population divided by the number of items in the sample or population. The arithmetic average. | **Sample Mean ($\bar{x}$)**<br>$$\bar{x} = \frac{\sum_{i=1}^{n} x_i}{n}$$<br>where<br>$n$ = sample size<br>**Population Mean ($\mu$)**<br>$$\mu = \frac{\sum_{i=1}^{N} x_i}{N}$$<br>where<br>$N$ = population size |

## Geometric Mean

Central tendency for compound financial returns over time can be measured by the geometric mean. The geometric mean is an important financial concept.

| Measure | Calculation |
|---|---|
| **geometric mean**<br>The $n$th root of the product of $n$ items. A geometric mean represents the central tendency rate of change for a phenomenon that grows in a compound fashion over time, such as many financial returns. | $\bar{x} = [x_1 \times x_2 \times \ldots \times x_n]^{1/n}$<br>where<br>$n$ = number of compounding periods |

## Mode

The mode is the most frequently occurring observation in a sample data set. It is not affected by extreme values, but it is more variable from sample to sample. If more than one mode occurs, the data set is multimodal. For example, a data set with two modes is referred to as *bimodal*. The mode is undefined for some data distributions

BACK_DEFEXP-RR-002674

(e.g., the uniform distribution), and, unlike the mean and median, there are no statistical tools useful for making inferences based on the mode.

| Measure | Location |
|---|---|
| **mode**<br>A measure of central tendency consisting of the numerical value or categorial characteristic that occurs most frequently in a sample or population. For example, the mode of a data set (2, 4, 5, 6, 6, 7, 7, 8, 8, 8, 8, 10, 12) is 8, and the mode of (poor, poor, below average, average, average, average, average, good, good, excellent) is *average*. | Most frequently occurring observation in a data set. |

## Numerical Example

Table 14.1 shows an ordered array (in ascending order) of a 36-item random sample of garden-level apartment rents. The data set illustrates the sample mean, median, and mode. The same data is used later to illustrate measures of dispersion and shape.

Because the sample has an even number of observations, the median is the midpoint between the 18th and 19th ordered observations, which is $825. The most frequently occurring rent is $850, which occurs six times and is the mode of the data set. Since the observations in the sample were randomly selected, the measures of central tendency can be used to infer the corresponding population central tendency.

Often inference can be improved by use of a stratified random sample. For example, if garden apartment units exist in one-bedroom and two-bedroom configurations in a given market, and it is known that one-bedroom units represent 35% of the garden apartment population, then a stratified random sample consisting of 35% one-bedroom garden apartment units and 65% two-bedroom garden apartment units would provide improved inferences on population parameters by ensuring that the unit type variability within the sample is consistent with the underlying population.

## Measures of Dispersion

Measures of dispersion indicate how much variation occurs in a given variable. These measures are useful because they can be compared to the characteristics of a known distribution—such as the normal distribution—to determine whether a particular set of parametric inferential statistics can be used. For example, if the data is sufficiently close to being normally distributed, then statistical methods based on the normal distribution can be employed to make inferences about the parameters of the underlying population. Measures of dispersion also facilitate comparison of two data sets to determine which is more variable.

### Standard Deviation and Variance

The two fundamental measures of dispersion—standard deviation and variance—take into account how all of the data is distributed. In addition, the standard deviation lends itself to further statistical treatment, allowing inferences to be drawn and statements to be made regarding the degree of uncertainty associated with an inference. For this reason, the standard deviation is a commonly calculated and reported sample statistic. The population standard deviation is denoted by the Greek letter $\sigma$ ("sigma"), and the sample standard deviation is denoted by the letter $S$.

BACK_DEFEXP-RR-002675

**Table 14.1**    Garden-Level Apartment Rents

| Monthly Rent | Monthly Rent | Monthly Rent | Monthly Rent |
|---|---|---|---|
| $600 | 760 | 825 | 860 |
| 650 | 785 | 825 | 860 |
| 695 | 800 | 825 | 890 |
| 710 | 800 | 850 | 890 |
| 715 | 805 | 850 | 920 |
| 730 | 815 | 850 | 920 |
| 735 | 820 | 850 | 930 |
| 735 | 820 | 850 | 970 |
| 760 | 825 | 850 | 995 |

$$\Sigma_x = \$29{,}370$$

$$\text{Simple Mean} = \bar{x} = \frac{\sum_{i=1}^{n} x_i}{n} = \frac{\$29{,}370}{36} = \$815.83$$

| Measure | Calclulation |
|---|---|
| **standard deviation**<br><br>The square root of the variance. The sample standard deviation is the square root of the sample variance, and the population standard deviation is the square root of the population variance, i.e., the square root of the sum of the squared deviations from the mean divided by either the population size or by the sample size minus 1. | **Population Standard Deviation ($\sigma$)**<br>$$\sigma = \sqrt{\frac{\Sigma(x_i - \mu)^2}{N}}$$<br>where<br>$\mu$ = population mean<br>$N$ = population size<br>**Sample Standard Deviation (S)**<br>$$S = \sqrt{\frac{\Sigma(x_i - \bar{x})^2}{n-1}}$$<br>where<br>$\bar{x}$ = sample mean<br>$n$ = sample size |
| **variance**<br><br>In statistics, a measure of the degree of dispersion of a variable's values; a measure of the extent to which observation values vary from the mean value. | **Population Variance**<br>$\sigma^2$<br>**Sample Variance**<br>$S^2$ |

Variance is simply the square of the standard deviation. Sample variance equals $S^2$, and population variance equals $\sigma^2$. The sample standard deviation for the sample of 36 apartment unit rents is calculated in Table 14.2.

When data is normally distributed, approximately 68% of the observations are expected to lie within ± 1 standard deviation of the mean, 80% within ± 1.28 standard

BACK_DEFEXP-RR-002676

**Table 14.2**    Sample Standard Deviation (*S*) Calculation

| Rent ($x_i$) | Sample Mean ($\bar{x}$) | ($x_i - \bar{x}$) | ($x_i - \bar{x}$)² |
|---|---|---|---|
| 600 | 815.8333 | -215.8333 | 46,584.01 |
| 650 | 815.8333 | -165.8333 | 27,500.68 |
| 695 | 815.8333 | -120.8333 | 14,600.69 |
| 710 | 815.8333 | -105.8333 | 11,200.69 |
| 715 | 815.8333 | -100.8333 | 10,167.35 |
| 730 | 815.8333 | -85.8333 | 7,367.36 |
| 735 | 815.8333 | -80.8333 | 6,534.02 |
| 735 | 815.8333 | -80.8333 | 6,534.02 |
| 760 | 815.8333 | -55.8333 | 3,117.36 |
| 760 | 815.8333 | -55.8333 | 3,117.36 |
| 785 | 815.8333 | -30.8333 | 950.69 |
| 800 | 815.8333 | -15.8333 | 250.69 |
| 800 | 815.8333 | -15.8333 | 250.69 |
| 805 | 815.8333 | -10.8333 | 117.36 |
| 815 | 815.8333 | -0.8333 | 0.69 |
| 820 | 815.8333 | 4.1667 | 17.36 |
| 820 | 815.8333 | 4.1667 | 17.36 |
| 825 | 815.8333 | 9.1667 | 84.03 |
| 825 | 815.8333 | 9.1667 | 84.03 |
| 825 | 815.8333 | 9.1667 | 84.03 |
| 825 | 815.8333 | 9.1667 | 84.03 |
| 850 | 815.8333 | 34.1667 | 1,167.36 |
| 850 | 815.8333 | 34.1667 | 1,167.36 |
| 850 | 815.8333 | 34.1667 | 1,167.36 |
| 850 | 815.8333 | 34.1667 | 1,167.36 |
| 850 | 815.8333 | 34.1667 | 1,167.36 |
| 850 | 815.8333 | 34.1667 | 1,167.36 |
| 860 | 815.8333 | 44.1667 | 1,950.70 |
| 860 | 815.8333 | 44.1667 | 1,950.70 |
| 890 | 815.8333 | 74.1667 | 5,500.70 |
| 890 | 815.8333 | 74.1667 | 5,500.70 |
| 920 | 815.8333 | 104.1667 | 10,850.70 |
| 920 | 815.8333 | 104.1667 | 10,850.70 |
| 930 | 815.8333 | 114.1667 | 13,034.04 |
| 970 | 815.8333 | 154.1667 | 23,767.37 |
| 995 | 815.8333 | 179.1667 | 32,100.71 |
| | | | $\Sigma(x_i - \bar{x})^2 = 251,175.00$ |

$$S = \sqrt{\frac{\Sigma(x_i - \bar{x})^2}{n-1}} = \sqrt{\frac{251,175.00}{36-1}} = \$84.71$$

deviations of the mean, and 95% within ± 2 standard deviations of the mean. For this data set, 25 observations (69%) lie within ± 1 standard deviation of the mean, 30 observations (83%) lie within ± 1.28 standard deviations of the mean, and 34 observations (94%) lie within ± 2 standard deviations of the mean. Based on these measures, the data appears to be approximately normally distributed.

### Coefficient of Variation

**coefficient of variation**

The ratio, expressed as a percentage, of a variable's standard deviation to its arithmetic mean.

The coefficient of variation (*CV*) is useful for relative comparisons of dispersion among multiple sets of data because dispersion is standardized to each sample's mean. This is done by stating standard deviation as a percentage of the sample mean as follows:

$$CV = \frac{S \times 100}{\bar{x}}$$

BACK_DEFEXP-RR-002677

### Parametric and Nonparametric Statistics

A *parametric statistic* is a statistic whose interpretation and validity is determined by understanding the distribution of the underlying population data from which a representative sample has been drawn. Many parametric statistics rely on an assumption that the population is normally distributed.

In contrast, a *nonparametric statistic* is a statistic whose interpretation and validity do not rely on knowing the distribution of the underlying population data from which a representative sample has been drawn. Nonparametric statistics involves the use of inferential methods that are valid regardless of the underlying population data distribution.

Inferences on medians (as opposed to inferences on means) derived from nonparametric statistics are useful for analyzing small samples when the underlying population distribution is unknown and the sample is so small that the central limit theorem cannot be relied upon to ensure approximate normality of the sampling distribution of the mean.

Although nonparametric median tests are beyond the scope of this chapter, note that many software packages provide a number of nonparametric tests that are appropriate for making inferences about central tendency and distribution from a single sample and comparing the central tendencies of two or more small samples. For example, the SPSS and Minitab software packages include several nonparametric single-sample analysis tools as well as independent-sample comparison tests and related-sample comparison tests.

Because real property data sets often consist of small-sized samples, it is useful to be able to apply a nonparametric test. Many introductory statistics textbooks include chapters dealing with nonparametric statistics, providing a level of understanding sufficient for most real estate applications.

The sample having the greatest coefficient of variation has the most widely dispersed data.

For the apartment rent data set, the coefficient of variation is

$$CV = \frac{\$84.71}{\$815.83} \times 100\% = 10.38\%$$

## Range

The range is a simple measure of the spread of the data. It is the difference between the values of the largest observation and the smallest observation. When data is normally distributed, the range will be approximately equal to 6 standard deviations (+3$S$ to –3$S$), and 99.7% of a normal distribution falls within this 6$S$ range. The range for the apartment rent data is $600 – $995, or $395. This range equates to 4.66 standard deviations, i.e., less dispersion than would be expected for a normally distributed data set.

**range**
In statistics, the difference between the highest and lowest values in a set of numbers.

### Interquartile Range

A data set's ordered array can be divided into four subsets of identical size by identifying quartiles. Quartiles are useful for analyzing the shape of the data distribution, which will be illustrated in the next section of this chapter.

Quartile 1 (*Q1*) ends at the midpoint between the lowest value and the median. Quartile 2 (*Q2*) ends at the median, and Quartile 3 (*Q3*) ends at the midpoint between the highest value and the median. Fifty percent of the ordered array of data falls between *Q1* and *Q3* in this interquartile range.

The following decision rules also apply:

BACK_DEFEXP-RR-002678

1. If the position point calculation is an integer, then the ordered observation occupying that position point is the quartile boundary.
2. If the position point is halfway between two integers, then the midpoint between the next-largest and next-smallest ordered observation is the quartile boundary.
3. If the position point is neither an integer nor halfway between two integers, then the position point is rounded to the nearest integer and the corresponding ordered observation is the quartile boundary.

For a more precise (and advanced) analysis, linear interpolation is used to find quartiles. *Q1* equals one-fourth of the total distance between the first and second quarters of data, *Q2* equals two-fourths (or one-half) of the total distance between the second and third quartiles, and *Q3* equals three-fourths of the total distance between the third and fourth quarters of data.

For the apartment rent data (36 observations), the position for *Q1* is 9.25 (37 ÷ 4) rounded down to the ninth ordered observation in accordance with the third decision rule above. Position 9 in the ordered array corresponds to $760, which is *Q1*. *Q2* is the median, which is $825. The position for *Q3* is 27.75 (111 ÷ 4) rounded up to the 28th ordered observation in accordance with the third decision rule above. Position 28 in the ordered array corresponds to $860.

The interquartile range is *Q3 – Q1*, or $860 – $760 = $100. When data is normally distributed, the interquartile range should be approximately equal to 1.33 standard deviations. For the apartment rent data, the interquartile range is 1.18 standard deviations ($100 ÷ $84.71). For a more precise analysis, linear interpolation could be used to find quartiles, as explained in the previous example.

## Measures of Shape

Measures of shape are essential for determining how close to normal a data distribution is and the extent to which extreme values are distorting the difference between the median and the mean. The normal distribution, which is the basis for many statistical inferences, is symmetrical—i.e., its median and mean are equal. Figure 14.2 shows a normal distribution with a mean of $815.83 and a standard deviation of $84.71. This plot, generated using Minitab statistical software, illustrates how the apartment rent data set would have been distributed if it were perfectly normal. The mean and median would both have been $815.83, and the distribution would have been symmetrical.

A useful graphic illustration of shape is the box and whisker plot, which helps illustrate the extent of skewness, or lack of skewness, in the data distribution. (Skewness will be discussed shortly.) A box and whisker plot is based on what is referred to as a *five-number summary*. The summary includes

1. The lowest value
2. *Q1*
3. The median
4. *Q3*
5. The highest value

**normal curve**

A symmetrical, bell-shaped curve that represents the distribution of a population of certain types of measurements or the frequency distribution of all possible means in large samples that may have been drawn from an unknown population distribution. Also known as a *normal distribution* or *normal probability distribution*.

BACK_DEFEXP-RR-002679

Copyrighted material licensed by Charles Brigden on September 17, 2020

The five-number summary for the sample apartment rent data is $600, $760, $825, $860, and $995. The corresponding box and whisker plot, a graphic representation of the five-number summary, along with the sample mean, is shown in Figure 14.3.

### Skewness

The apartment rent data is not perfectly normal. Figure 14.3 shows that the sample data is skewed (i.e., concentrated more densely) to the left, both in terms of the interquartile

**Figure 14.2**    The Normal Curve



| Measure | Location |
|---|---|
| **interquartile range**<br><br>A measure of dispersion. The interquartile range indicates the "distance" between the value dividing the first and second quartile from the value dividing the third and fourth quartile.<br><br>  Note that a *quartile* is a descriptive statistic referring to one of three values that divides arrayed sample or population variable values into four equal parts. For example, the first quartile separates the lower 25% from the upper 75%. The second quartile (median) divides the data in half. | **Quartile 1 ($Q1$)**<br><br>$Q1 = \dfrac{n + 1}{4}$<br><br>ordered observation<br><br>**Quartile 2 ($Q2$)**<br><br>$Q2 = \text{median}$<br><br>**Quartile 3 ($Q3$)**<br><br>$Q3 = \dfrac{3(n + 1)}{4}$<br><br>ordered observation<br><br>Note that Excel calculates quartiles in a different manner. |

BACK_DEFEXP-RR-002680

**Figure 14.3**  Box and Whisker Plot



range ($825 − $760 > $860 − $825) and in terms of the tails ($760 − $600 > $995 − $860). Another indication of skewness is the relationship between the median and the mean. When data is left-skewed, the mean will be less than the median. When the data is right-skewed, the mean will be greater than the median. The mean is included in Figure 14.3 to further illustrate the degree of left skewness.

Skewness can also be captured through a graphic depiction of a frequency or percentage distribution. These graphic displays are called *histograms*. Figure 14.4 illustrates a combination frequency and percentage distribution for the apartment rent data and the related percentage histogram.

The percentage histogram is derived from conversion of the *numerical* price data (monthly rent) to *categorical* data (rent category) reflecting percentages of the sample items within each class. If the rent data was symmetrical, the distributions to the right and left of center would be mirror images. Instead, the left side extends farther from the center (i.e., left skewness).

Spreadsheet programs and statistical software packages such as Excel, Minitab, and SPSS provide more quantitative assessments of skewness within their descriptive statistics measures. In the formula for calculating the measure of skewness, if a data distribution is symmetrical, the value in the parentheses following the summation sign is zero and the measure of skewness is zero. If the data distribution is left-skewed, the value in the parentheses following the summation sign is negative and

| Measure | Calculation |
|---|---|
| **skewness**<br>The degree of deviation from symmetry in a statistical distribution. | **Skewness**<br><br>$Skewness = \dfrac{n}{(n-1)(n-2)}\left(\Sigma \dfrac{x_i - \bar{x}}{S}\right)^3$<br><br>where<br>$\bar{x}$ = sample mean<br>$n$ = sample size<br>$S$ = sample standard deviation |

BACK_DEFEXP-RR-002681

**Figure 14.4**  Frequency and Percentage Distributions with Percentage Histogram

| Rent Category | Frequency (Count) | Percentage of Total |
|---|---|---|
| Less than $650 | 1 | 2.8% |
| $650 to $699 | 2 | 5.6% |
| $700 to $749 | 5 | 13.9% |
| $750 to $799 | 3 | 8.3% |
| $800 to $849 | 10 | 27.8% |
| $850 to $899 | 10 | 27.8% |
| $900 to $949 | 3 | 8.3% |
| $950 or more | 2 | 5.6% |

Percentage Histogram

the measure of skewness is negative. If it is right-skewed, the value in the parentheses following the summation sign is positive and the measure of skewness is positive. Skewness for the apartment rent data is -0.312, indicating left skewness as depicted in the box and whisker plot and the percentage histogram.

## Kurtosis

The statistical term *kurtosis* refers to the degree of "peakedness" in a data distribution—that is, the height of the probability distribution and thickness of its tails. Curves with kurtosis of 3 are called *mesokurtic*. (Kurtosis values are most often calculated using Excel, Minitab, SPSS, or other statistical software. They are seldom calculated by hand.) The normal distribution has kurtosis equal to 3. More peaked curves (*leptokurtic*) have values larger than 3 and less peaked curves (*platykurtic*) have values less than 3. (See illustrations of various degrees of kurtosis in Figure 14.5.) The apartment rent data set is less peaked (kurtosis = 0.42) than a normal distribution.

## Normality

The apartment rent data appears to be approximately normal based on a menu of measures, including the proportions of observations lying within the mean plus or minus 1, 1.28, and 2 standard deviations and the number of standard deviations encompassed by the range and the interquartile range. However, as these statistics show, the fit to normality is seldom perfect. The rent data is slightly left-skewed and,

BACK_DEFEXP-RR-002682

**Figure 14.5**  Kurtosis



Leptokurtic          Mesokurtic (normal distribution)          Platykurtic

as mentioned previously, the range is 4.66 standard deviations, slightly less than the normal expectation of 6 standard deviations.

Quantitative tests for normality and normal probability plots are useful for assessing the degree of departure from normality. Data points that are perfectly normal will line up along a straight-line normal probability plot, whereas data points that depart from normal will depart from a straight line that is representative of a perfectly normal distribution. The normal probability plot shown in Figure 14.6 confirms the prior assessment that the apartment rent data is not perfectly normal, but the plot does provide a reasonably close fit. The normal probability plot was generated in Minitab, and the output includes other useful information such as the mean, the standard deviation, and the results of a Komolgorov-Smirnov test (KS test) for normality. The $p$-value from the KS test indicates that the hypothesis that the data was drawn from a normally distributed population cannot be rejected.

The $p$-value represents the probability of something occurring if the assumption underlying the analysis is true. For example, in this test the analyst asks, "If the population is normal, what is the probability of drawing a sample that departs from normal to the extent this one does?" The $p$-value of 15% indicates that the analyst could expect a sample derived from a normal population to depart from normal to the extent this one does 15% of the time. Generally, a $p$-value of 5% or less would provide convincing evidence of a sample drawn from a non-normal population.[2]

---

2.  Minitab provides two additional normality tests (Anderson-Darling and Ryan-Joiner tests), which also fail to reject the normality hypothesis. Normality tests are also available in SPSS.

BACK_DEFEXP-RR-002683

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Figure 14.6**    Normal Probability Plot of Rent



To reiterate the importance of the measures of shape, these metrics are helpful in assessing the extent to which a data distribution conforms to the normal distribution and determining if extreme values are distorting the difference between the median and the mean. If the data distribution is too far from normal, then inferential tests based on assumptions of normality (e.g., *t*-tests and *F*-tests) may not be applicable to small samples. In addition, if extreme values in the data are distorting the arithmetic mean, then the median is likely to be a better indicator of central tendency.

## Central Limit Theorem and Inference

Although the most popular and user-friendly inference tests are based on the assumption that a sample has been derived from a normally distributed population (i.e., the so-called "bell curve" with skewness = 0 and kurtosis = 3), normality-based inferences concerning non-normally distributed populations can be made if the sample size is large enough. The adequacy of the sample size depends on the underlying population distribution.

Generally, the sampling distribution of a mean drawn from the population—regardless of the shape of the underlying population distribution—will be approximately normal with a sample size of at least 30, according to the central limit theorem. The *sampling*

> **central limit theorem**
>
> A statistical principle that identifies the tendency of the sampling distribution of the mean to become approximately normal as the size of the sample increases, without regard to the shape of the distribution of the underlying population.

BACK_DEFEXP-RR-002684

*distribution of the mean* refers to the distribution of the sample mean. Creation of a distribution of a sample mean entails taking numerous random samples from a given population, calculating the mean of each random sample, and then examining the distribution of those means.

When sampling from a nonsymmetrical population, a sample size of at least 30 is required to ensure approximate normality of the sampling distribution of the mean. If the underlying population is fairly symmetrical (like the apartment rent data), the sampling distribution of the mean will be approximately normal with a sample size of at least 15. If the underlying population is normally distributed, then the sampling distribution of the mean is also normal, regardless of sample size.[3] The central limit theorem's importance is that it allows inferences to be drawn without knowing the actual distribution of the underlying population.

The apartment rent data sample consists of 36 observations. It can be used to make inferences about the mean of the underlying population rent because the size of the sample meets the criteria of the central limit theorem. The rent data has been drawn from a population with an unknown mean and standard deviation. Population standard deviation is rarely known when making inferences about the true population mean because $\mu$ must be known in order to calculate $\sigma$. Logically, if $\mu$ is known, then there is no need to infer it. However, in rare cases a population has been studied so many times that many estimates on $S$ have been previously published, and they can be relied upon as estimators of $\sigma$ rather than using $S$ from a sample.

The sample data can be used to infer the underlying population mean because a probability sample (e.g., a simple random sample) was drawn. The sample mean ($\bar{x}$) is \$815.83 and the sample standard deviation ($S$) is \$84.71.

A confidence interval reflects the degree of uncertainty associated with an inference. It is a range accompanied with a statement of probability or confidence that the range contains the parameter being estimated. *Any inference should be accompanied by this type of statement*. The confidence interval for the mean, when the population standard deviation is unknown, can be derived from the Student's *t* distribution when the sample size is sufficient to invoke the central limit theorem or when the population is known to be normally distributed. When $n = 36$, values of $t_{35}$ are 1.6896 for a 90% confidence interval, 2.0301 for a 95% confidence interval, and 2.7238 for a 99% confidence interval.

These *t* values can either be looked up in a statistical table or calculated using statistical software. Excel, Minitab, and SPSS will calculate a confidence interval from a data set, given input on the level of confidence sought. The associated confidence intervals on the true population mean price for the apartment rent data are

| | |
|---|---|
| 90% confidence | $791.98 \leq \mu \leq \$839.68$ |
| 95% confidence | $787.17 \leq \mu \leq \$844.49$ |
| 99% confidence | $777.37 \leq \mu \leq \$854.29$ |

With 90% confidence, the degree of uncertainty concerning the value of the true mean is 10%. Uncertainty reduces to 5% and 1% as confidence rises, but the associated "cost of less uncertainty" is a wider confidence interval. The level of uncertainty is referred to as "alpha" ($\alpha$) in statistics, and the confidence level is $1 - \alpha$. Alpha is the probability of making a "Type I Error"—inferring $\mu$ to be within a confidence interval

---

3.  See David M. Levine, Timothy C. Krehbiel, and Mark L. Berenson, *Business Statistics: A First Course*, 3rd ed. (Upper Saddle River, NJ: Prentice Hall, 2003), 237-239.

BACK_DEFEXP-RR-002685

Copyrighted material licensed by Charles Brigden on September 17, 2020

| Measure | Calculation |
|---|---|
| **confidence interval**<br>In statistics, the specification of a zone within a population, based on a sample mean and its standard error, within which the true mean most probably lies. | **Confidence Interval**<br>Confidence interval on $\mu$ ($\sigma$ unknown)<br><br>$\bar{x} \pm t_{n-1}\dfrac{S}{\sqrt{n}}$<br><br>where<br>$\bar{x}$ = sample mean<br>$n$ = sample size<br>$S$ = sample standard deviation<br>$t$ = Student's $t$ distribution |

when it is not. "Type II Errors" are referred to as "beta" ($\beta$)—inferring $\mu$ to be outside of the confidence interval when it is actually within the interval.

## Sample Size

Suppose a client requires a narrower confidence interval without increasing $\alpha$. Notice that the width of the confidence interval is reduced when $n$ is increased due to division by the square root of $n$. In addition, the value of $t$ becomes smaller at a given confidence level as sample size increases. As a result, narrower confidence intervals can be achieved by collecting a larger sample.

A requisite sample size can be estimated to accommodate a predetermined amount of sampling error ($e$). The equation for sample size is

$$n = \frac{Z^2 \sigma^2}{e^2}$$

The standard normal distribution $Z$ is used in this calculation because the value of $t$ cannot be determined until a sample size has been selected. Consequently, this calculation yields an approximate sample size. Furthermore, it is not unusual for some proportion of collected data to be unusable due to missing variables or "nonresponse." It is good practice to attempt to collect a sample that is comfortably larger than indicated by the sample size calculation. As calculated here, sample size is an estimate of the number of usable observations needed to control the size of sampling error at a given level of confidence.

The sampling error from the 36-unit rent sample for the 95% confidence interval on true mean monthly apartment rent is $28.66 [($844.49 – $787.17) ÷ 2]. Suppose, however, that the needs of the client dictate that a sampling error no larger than $15 is acceptable at a 95% confidence level. In order to calculate a revised sample size, $Z$ is derived from the standard normal distribution and is equal to 1.96 at a 95% confidence level. The population standard deviation ($\sigma$) is unknown but can be estimated as $84.71 based on the previous calculation of $S$. (The population standard deviation is usually unknown and must be estimated based on prior research, a pilot sample, or other bases used to support an assumption.) On this basis, the sample size would have to be increased to at least 123 observations, computed as follows:

$$n = \frac{1.96^2 \times 84.71^2}{15^2} = 122.5$$

BACK_DEFEXP-RR-002686

Sample size is always rounded up. Furthermore, because $t_{122}$ is approximately 1.9799, the sample size could be increased to 126 based on the difference between the standard normal $Z$ and $t_{122}$, as follows:

$$123 \times \frac{1.9799^2}{1.96^2} = 125.5$$

As this example demonstrates, increased inference precision can add to the expense of data collection. Here an approximately 48% reduction in sampling error from $28.66 to $15 results in a need to increase sample size by almost 250%. Obviously, mean apartment rent could be known with certainty by analyzing a census of all apartments in a market. In many cases, however, it simply is not possible or is too costly to collect data on each item in a population.

## Regression Analysis

Regression analysis is a statistical technique in which a mathematical equation can be derived to quantify the relationship between a dependent (outcome) variable and one or more independent (input) variables. In appraisal, the dependent variable is usually price or rent. The independent variables are usually broadly derived from the four forces that affect value (social, economic, governmental, and environmental) and the physical characteristics of the land and improvements. Often, data collection protocols control for the four forces that affect value by focusing on property sales or rents that are subject to common social, economic, governmental, and environmental influences. The relevant physical characteristics of comparable property data (site and improvement information) should be included as independent variables, unless all of the comparable properties and the subject property are identical in some physical aspect (e.g., all are stucco, all have two-car attached garages, or all are located on interior lots of identical size). In some instances, it is also necessary to include a date of sale variable (or variable set) to account for economic change over time. In addition, it is not uncommon to include an environmental variable or variables when investigating the effects of an external environmental factor such as traffic noise or factory odor.

**regression analysis**

A statistical method that examines the relationship between one or more independent variables and a dependent variable. Regression models can be used to examine the structure of a relationship or to forecast dependent variable values. Simple linear regression has one independent variable, whereas multiple linear regression includes more than one independent variable.

Regression models have been used for mass appraisal by property tax assessors for many years, especially in highly developed residential markets, because regression modeling is more resource-efficient than performing a traditional appraisal for each property in a large assessment district with an active real property market. Regression modeling is often the logical choice for tax assessment, when the alternative is to appraise each property individually and resource constraints prohibit doing so as often as would be necessary to ensure equitable taxation.

Regression models (along with expert systems and neural networks, which are discussed briefly below) also form the basis for many automated valuation models (AVMs), of which mass appraisal models are a subset. AVMs initially became important in the 1990s

BACK_DEFEXP-RR-002687

as residential lenders began to concentrate on shortening loan approval turnaround time to compete more intensely on transaction fees.

## Statistical Applications in Appraisal Practice

The widespread use of personal computers, spreadsheet programs, and statistical software has allowed appraisers to incorporate statistics into their analyses and appraisal reports easily and accurately. In the early years of personal computing for business, statistical analysis was generally limited to providing descriptive statistics and accompanying charts, tables, and graphs. As graphical user interfaces became more prevalent in operating systems, statistical programs such as SPSS, Minitab, and SAS became more user-friendly, largely because the user no longer had to write programming code.

As computer users have become more sophisticated, spreadsheet programs have added statistical tools to meet the needs of customers. Currently, Microsoft Excel includes a statistical tool pack that will generate statistical output such as correlation matrices, *F*-tests of variances, *t*-tests of means, and linear regression models. However, Excel provides very little in the way of diagnostics to accompany its inferential tools. Excel's statistical strength continues to be in its charting capabilities.

### Automated Valuation Models

The automated valuation models used by appraisers today originated with the tax assessment mass appraisal techniques and tools that existed long before the advent of AVMs. Property tax assessors developed mass appraisal models to improve productivity and fairness in non-rural locations where manpower was insufficient to carry out the function of estimating assessed value. In addition, in the early years of mass appraisal, tax assessors were in a unique position to take advantage of large amounts of data that had been converted into a computer-readable format. Assessors continue to use AVMs as a means of automating assessment and making use of the large amounts of digitally coded data they possess. Internet access to more reliable data from taxing authorities and third-party data sources has enabled most appraisers to access the large data resources required for statistical analyses.

The initial research on AVMs pitted neural networks and expert systems against regression-based models. In essence, neural networks "learn" the relationships among variables to develop and continually update an internal and unknowable algorithm for estimating price. Neural networks can be considered "atheoretical" in that their algorithms can only be tested by comparing estimation results to a known standard. Because of their "black box" decision model, neural networks have not developed a large practical following. Professional standards do not require that appraisers know or be able to explain an AVM's algorithm, but appraisers should be able to explain the overall estimation process and verify that the AVM consistently produces results that accurately reflect market behavior.[4] Unlike neural networks, expert

> **automated valuation model (AVM)**
>
> Computer software that queries property and market data, analyzes comparable property and market information to assign a value or range of values to a particular property, or generates metrics applicable to assessing the credibility of valuation-related statements or conclusions.

---

4.    See Advisory Opinion 18 of the Uniform Standards of Professional Appraisal Practice: Use of an Automated Valuation Model (AVM).

BACK_DEFEXP-RR-002688

> ### Professional Standards and the Use of an AVM
>
> According to Advisory Opinion 18 of the Uniform Standards of Professional Appraisal Practice: Use of an Automated Valuation Model (AVM), an appraiser should be able to answer affirmatively to the following questions before deciding to use an AVM in an appraisal or appraisal review assignment:
>
> 1. Does the appraiser have a basic understanding of how the AVM works?
> 2. Can the appraiser use the AVM properly?
> 3. Are the AVM and the data it uses appropriate given the intended use of assignment results?
> 4. Is the AVM output credible?
> 5. Is the AVM output sufficiently reliable for use in the assignment?

systems develop decision models that attempt to mimic expert (i.e., appraiser) behavior. They essentially automate the human problem-solving process. For example, some AVMs employ an expert systems layer for such tasks as selecting comparable sales or comparable rents.

Regression-based AVMs apply multiple regression models at some level within the valuation product to produce a value-estimation equation, a value estimate, adjustment coefficients for automatically selected comparable sales or rents, or some combination of these outputs. Many AVMs now include other features that enable appraisers, appraisal reviewers, and underwriters to produce and review descriptive statistics by user-defined property characteristics, market area, subdivision, zip code, city, or county. These features provide scales of reasonableness against which the contentions, assumptions, and conclusions of appraisers can be measured. In addition to this quality control function, AVMs also enhance a lender's ability to prequalify borrowers, conduct audits, mitigate loss, assess portfolios of loans, provide home equity loans, and engage in numerous other functions.

Although AVMs were initially perceived as a means of replacing human appraisers with machines, they have developed more recently into underwriting devices and tools designed to assist appraisers and appraisal reviewers. Professional standards note that "the output of an AVM is not, by itself, an appraisal."[5] According to the Uniform Standards of Professional Appraisal Practice, the output of an AVM may be used as a basis for opinions and conclusions in an appraisal or appraisal review assignment if the appraiser believes that the output is credible for use in a specific assignment. Today, practicing real estate appraisers are working to gain an understanding of AVM technology and shifting markets for appraisal services to determine how best to take advantage of new business opportunities resulting from AVMs.

Currently a variety of AVM products are offered nationally, and new products emerge constantly. As the lending industry works through issues and problems related to data reporting, data transfer, data accuracy, and modeling, AVM standards are continually being refined by professional organizations such as the Mortgage Bankers Association, the Mortgage Industry Standards Maintenance Organization, and others.

Custom valuation models represent another opportunity for appraisers to incorporate statistical applications into their practices. Given access to adequate amounts of data, which are generally more readily available in single-unit residential and rental apartment markets than in most commercial markets, appraisers with ade-

---

5.  See Advisory Opinion 18 of USPAP.

BACK_DEFEXP-RR-002689

quate statistical modeling skills and appropriate software can apply statistical models to customized, unique valuation questions. Applications vary widely and include

- Property tax assessment and equity studies
- Price or rent trend analysis
- Augmentation of traditional valuation approaches
- Impact studies addressing the effects of nuisances or environmental hazards
- Preparation of value estimates for litigation

Some custom applications are straightforward and easily modeled, and others are complex and difficult to model. Production of a credible work product is of paramount importance. Appraisers should not attempt to build a statistical model that is beyond the limits of their education and experience. As with any appraisal specialty, the ability to address complex statistical problems grows with experience. Experience is best gained by collaboration with a more qualified statistical analyst and participation in continuing education to build skill sets.

BACK_DEFEXP-RR-002690

BACK_DEFEXP-RR-002691

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Market Analysis 15

The term *market analysis* is used broadly in economics to describe the identification and study of the market for a particular economic good or service. However, the term has a more specific meaning within the discipline of real property appraisal. For appraisers of real property, *market analysis* is a study of the supply of and demand for a specific type of property in a specific market area.

Depending on the nature of the market and the intended use and intended user of the appraisal report, an analysis of real estate markets can range from simple and straightforward to complex, particularly if a large amount of primary research is required. Most market analysis assignments can be performed using a six-step process, which is illustrated in Figure 15.1. Note that the six-step process includes marketability analysis as the final step.

As outlined in Chapter 10, real estate markets can be analyzed from the perspectives of two different categories of market participants:

1. Buyers and sellers of real estate assets as part of the capital investment market, i.e., the "transactional" asset market
2. Users of space, i.e., the "fundamental" market of users of the physical space provided by the real estate in a market area[1]

---

**Figure 15.1**   The Six-Step Process

**Step 1.**   Property productivity analysis: analyze competitive characteristics of the subject property

**Step 2.**   Market delineation: identify demand sources and competitive area

**Step 3.**   Demand analysis: estimate current demand and predict future demand

**Step 4.**   Supply analysis: survey existing supply and predict future changes

**Step 5.**   Residual demand analysis: analyze the interaction of supply and demand

**Step 6.**   Subject capture analysis: determine conclusions of marketability analysis, i.e., predict performance of the subject property

---

1. For more in-depth discussion of the distinction between asset markets and fundamental markets, see Chapter 10 and Stephen F. Fanning, *Market Analysis for Real Estate: Concepts and Applications in Valuation and Highest and Best Use*, 2nd ed. (Chicago: Appraisal Institute, 2014), 5, 177-189.

Analyses of both real estate market segments are important in the valuation process, but the characteristics of those two separate market segments and their relevance in market analysis, highest and best use analysis, and the application of the three approaches to value need to be recognized. Real estate prices are a function of both of these markets. The fundamental market determines how much income an income-producing property will generate because it determines the occupancy rate and rental rates. When there is an oversupply, vacancy increases and rents decline. When there is an undersupply, vacancy rates decrease and rents increase. The capital market is made up of investment capital (i.e., debt and equity) representing demand and properties available for purchase representing supply. When there is an increase in capital (i.e., investors) and fewer properties are available for purchase, capitalization rates and discount rates decline. When there is a decrease in the number of investors looking for investments, capitalization rates and discount rates increase.

The fundamental market determines how much income a property makes, and the capital market determines the cap rate, multiplier, or discount rate that should be applied to that income. Both forms of market analysis discussed in this chapter—fundamental analysis and inferred analysis—study the space user market. The analysis of capital markets is a separate step that is not generally addressed in the market analysis section of an appraisal report. Instead, appraisers tend to leave analysis of the capital market to the valuation sections of the report.

## Distinguishing *Marketability Analysis* from *Market Analysis*

The label *marketability analysis* has traditionally been used when the scope of the analysis extends beyond general market analysis to investigate how a specific property is expected to perform in its market. However, in strictest usage, *marketability analysis* most precisely describes the final step in the formal six-step process. Marketability analysis is an essential step in the process of developing an opinion of market value and should not be confused with the analysis of general demographic or economic information for an area.

In an appraisal of a specific property, the main purpose of marketability analysis is to show how the interaction of supply and demand affects the property's future benefits to the owner in terms of the use of the property over time. To complete a marketability analysis (in the sixth step of the six-step process), an appraiser must first complete a market analysis (i.e., the preceding steps of the six-step process). For example, consider the appraisal of a neighborhood shopping center. A market analysis would measure the demand and competition for all neighborhood shopping centers in a specified market, which may cover a two-mile area. A marketability analysis would then compare how a particular property (e.g., the property being appraised) will perform in that market given the relevant demand and competition. The conclusions of the marketability analysis then become the basis for determining the value implications for the property.

Marketability analysis may perform several functions: (1) to determine the market outlook and trends for marketing a property, (2) to address the desired type, design, and locational characteristics of a development, (3) to provide estimates of the share of the market that the property is likely to capture during its economic life and its probable absorption rate, or (4) to suggest alternative uses in a market in which the existing use of a specific property is oversupplied or outdated.

Marketability analysis also provides a basis for determining the highest and best use of a specific property in a defined market. In short, the market determines the appropriate use, and the use drives the value. An existing or proposed use may be put to the test of maximum productivity in highest and best use analysis only after it has been demonstrated that an appropriate level of market support exists for that use. In-depth marketability analyses specify the character of that support. For example, if current market conditions do not indicate that adequate demand for a proposed development exists, marketability analysis may identify the point in time when there will be adequate demand for that land use. Thus, marketability analysis helps appraisers forecast the timing of a proposed improvement and the amount of demand anticipated in a particular period of time.

BACK_DEFEXP-RR-002693

The market value of a particular property use is largely determined by the demand for that use in the market and the competitive position of that property in its market. Analysis of the characteristics and attributes of a property (generally called *property productivity analysis*) enhances an appraiser's ability to identify competitive properties (i.e., supply) and to understand the comparative advantages and disadvantages that the subject property offers potential buyers or renters (i.e., demand). An understanding of economic conditions, their effect on real estate markets, and the momentum of these markets helps appraisers appreciate the externalities affecting a property. In its broadest sense, therefore, market analysis provides vital information needed to determine highest and best use and then measure value using the three approaches to value, as shown in Table 15.1.

| Table 15.1 | Market Analysis and Marketability Analysis in the Approaches to Value |
|---|---|
| **Approach to Value** | **Uses of Market Analysis and Marketability Analysis** |
| Cost | Market analysis can provide appraisers with information about trends in land prices and construction costs, current building costs, and market conditions. The conclusions of marketability analysis help appraisers estimate the profit an entrepreneur can expect and any economic advantage or obsolescence. |
| Sales comparison | Market analysis provides appraisers with a thorough understanding of current market conditions, the future market outlook, and the subject property's ability to compete in this market. The conclusions of marketability analysis provide support for many of the adjustments in the sales comparison approach such as adjustments for location and market conditions. Marketability analysis is also helpful in the analysis of the risk factor in capitalization rates generated from the sales that have occurred. |
| Income capitalization | Market analysis provides appraisers with important information used to forecast income and to select appropriate capitalization rates. Marketability analysis allows appraisers to predict a property's sell-out rate and to estimate how the sell-out rate and lot or unit prices will change over time. For income properties, marketability analysis can provide an estimate of lease-up and includes a conclusion of current and future occupancy for the subject property. Market analysis allows an appraiser to predict the change in rent or revenue over time. Marketability analysis is also helpful in analyzing the risk characteristics of a property, which is necessary to select the appropriate direct capitalization rates and discount rates. |

In addition to its use in the application of the approaches to value, market analysis is relevant to the final reconciliation of the value indications of the various approaches applied in an appraisal. Market analysis helps appraisers determine the relevance and reliability of each of the approaches to value and establishes confidence in the final value opinion.

## Foundations of Market Analysis for Real Estate

The discipline of market analysis for real estate has been built on the basic concepts of valuation and the long tradition of economic analysis of market supply and demand. The integral processes that all serve as the underpinnings of the formal six-step process are

- Delineating a market
- Assessing demand for a product
- Surveying the competitive supply

BACK_DEFEXP-RR-002694

- Studying the interplay of supply and demand around a theoretical point of equilibrium
- Tracking market trends

## Market Definition and Delineation

At the outset of the six-step process, two things must be clearly identified:

1. The real estate product or service provided by the subject property
2. The real estate market in which the subject property competes

These two tasks can be complementary. That is, the identification and analysis of the real estate product provide a portion of the information needed in the next step—identifying the market area in which the property competes.

In the first step of the market analysis process—property productivity analysis—appraisers identify the relevant characteristics of the property to be appraised and then analyze the physical, legal, and locational characteristics that affect that property's ability to serve the uses for which it is designed. (This analysis includes a projection of how long the property design will meet the needs of the space users in the market.)

Analyzing the characteristics and attributes of that real estate product also helps appraisers identify the demand sources, which is called *market delineation* (Step 2). The purpose of market delineation is to determine: (1) where demand comes from and (2) which properties compete for this demand and serve the applicable market.

In the market delineation step of the six-step process, the geographic boundaries of the real estate market area for the subject property are determined through an appraiser's examination of the location and characteristics of competitive properties. Appraisers can further break down a specific real estate market into market segments and can separate the properties in those market segments by characteristics such as occupancy type, competitive class of property, location, or economic segment.

The concept of market delineation in the market analysis process should not be confused with the establishment of a market area that comparable sales can be selected from in the application of the sales comparison approach, as discussed in Chapter 22. In fundamental market analysis, the market consists of properties that would compete for the same set of tenants or space users. In the sales comparison approach, the best comparable sales are those that would attract the same set of potential buyers. The best comparable sales might not be found in the same geographic area as the market area relevant to potential users of the subject property as discussed here.

## Demand

In the broadest sense of the term's usage in economics, *demand* serves as a measure of the needs, material desires, and purchasing power of consumers. In market analysis for real estate, demand analysis—the third step in the market analysis process—focuses on identifying the potential users of a subject property such as the owner-occupants, renters, clientele, or customers that a property will attract. For each particular type of property, demand analysis focuses on the end product or service that the real estate provides. For example, demand analysis for retail space would attempt to determine the demand for retail services generated by potential customers in the market area. A demand analysis for office space would attempt to identify businesses in the area that occupy office space and their space or staffing needs. (Figure 15.2 illustrates the important factors studied in demand analysis for various property types.)

BACK_DEFEXP-RR-002695

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

**Figure 15.2**  Demand-Side Factors

**Residential Market**
· Population of the market area—size and number of households, rate of increase or decrease in household formation
· Income (mean or median per household and per capita)
· Employment types and unemployment rate
· Percentage of owners and renters
· Financial considerations such as savings levels and lending requirements (e.g., interest rates on mortgages, points charged, loan-to-value ratios)
· Factors affecting the physical appeal of the neighborhood, e.g., geography and geology (climate, topography, drainage, bedrock, and natural or man-made barriers)
· Local tax structure and administration, assessed values, taxes, and special assessments
· Availability of support facilities and community services (cultural institutions, educational facilities, health and medical facilities, fire and police protection, access to technology)
· Externalities (noise, odors, etc.)

**Retail Market**
· Population of trade areas—size and number of households, rate of increase or decrease in household formation, composition and age distribution of households
· Per capita and household income (mean and median)
· Percentage of household income spent on all retail purchases and percentage of disposable income (effective purchasing power) spent on various specific retail categories
· Rate of sales retention in the trade area (i.e., the net leakage out of the subject market area to sources such as highly superior retail centers outside the subject market area and e-commerce, etc.)
· Existing sales volume per square foot
· Retail vacancy rate and trends in the market
· Percentage of retail purchases captured from outside the trade area (e.g., population outside the trade area, daytime population in the trade area such as office workers)
· Accessibility (transportation facilities and highway systems) and cost of transportation
· Factors that affect the appeal of the retail center (image, quality of goods, and tenant reputation)

**Office Market**
· Area employers who use office space; current and estimated future staffing needs
· Average square foot area of office space required by an office worker—requirements vary according to the category of work, the rank of the office worker, and the location of the office (e.g., in the suburbs or the central business district)
· Vacancy rate for the specific class of office building
· Move-up demand for space in Class A and Class B buildings or fall-out demand for space in Class B and Class C buildings
· Land use patterns and directions of city growth and development
· Accessibility (transportation facilities and highway systems) and cost of transportation
· Factors that affect the appeal of office buildings (quality of construction, management, high-performance features, and mix of tenants) and the availability of support facilities (shops, restaurants, recreational centers) in the market

**Industrial Market**
· Presence of raw materials
· Exchange capability (currency values and trade barriers)
· Area employers who use industrial space; current and estimated availability of skilled and unskilled labor
· Land use patterns and directions of city growth and development
· Accessibility (transportation facilities and highway systems) and cost of transportation
· Employment in manufacturing, wholesale, retail, transportation, communications, or public utilities
· National and regional economic growth that affects local demand
· Retail sales (applicable in market analysis for retail storage and wholesale distribution properties)

BACK_DEFEXP-RR-002696

Forecasts of change in demand are typically tied to three primary drivers of demand:

1. Employment
2. Population
3. Income

Demand for office space is typically based on employment in office-using industries. Demand for industrial space is often based on industrial employment or on population or economic factors that contribute to industrial demand. Residential demand is typically based on the current number of households and forecasted change in that number. Retail demand is primarily a function of disposable household income.

Employment is a primary predictor of real estate demand for all property types because changes in employment start a chain reaction, as shown in Figure 15.3. Employment growth leads to growth in demand for both office space and industrial space, which in turn leads to an increase in demand for housing (especially in close proximity to the new office and industrial jobs). And the growth in housing leads to growth in demand for retail space close to the housing.

Demand analyses for residential and retail markets specifically investigate the households in the subject property's market area. (A *household* is defined as a number of related or unrelated people who live in one housing unit. Thus, a single individual may constitute a household, and familial status is not a consideration.) In addition to providing an estimate of the number of households in the market area, these analyses focus on the disposable income—or effective purchasing power—of the households and the ages, gender, and consumption preferences and behavioral patterns of household members.

## Competitive Supply

In the context of market analysis for real estate, *supply* refers to the production and availability of a real estate product. To analyze current supply—the fourth step in the market analysis process—appraisers can compile an inventory of properties that compete with the property being appraised, including known future competition and even unknown but likely future competition that might become available during the market cycle being studied. This can be estimated by analyzing competitive projects under construction as well as projects in the planning and approval stage. Appraisers also consider the availability of development sites that could become competitive.

Data on supply in a market may be gathered in various ways:

- Field inspection
- Review of building permits (issued and acted upon), plat maps, and surveys of competitive sites



**Figure 15.3    Real Estate Demand Hierarchy**

Employment Growth

Growth in Office Space          Growth in Industrial Space

Growth in Housing

Growth in Retail Space

BACK_DEFEXP-RR-002697

- Interviews with developers and city planners

Figure 15.4 lists some factors appraisers study in analyzing the supply of competing properties.

Care should be exercised in the development and analysis of data on proposed or announced projects because ultimately the construction of some projects will not be completed. One technique used to estimate the likely addition of supply through new construction involves assigning probabilities of completion to proposed projects. Appraisers should also determine the amount of space likely to be lost to demolition and the amount of space added or removed through conversion.

---

**Figure 15.4**    Supply-Side Factors

- Quantity and quality of available competition
- Volume of new construction—competitive and complementary projects in planning and under construction
- Availability and price of vacant land
- Availability of construction loans and financing
- Costs of construction and development
- Currently offered properties (existing and newly built)
- Owner occupancy versus tenant occupancy
- Causes and number of vacancies
- Conversions to alternative uses
- Special economic conditions and circumstances
- Effect of building codes, zoning ordinances, and other regulations on construction volume and cost (e.g., energy-efficiency standards that can increase building costs)

---

## Market Equilibrium

Over the short term, the supply of real estate is relatively fixed, and prices are responsive to demand. If demand is unusually high, prices and rents will start to rise before new construction can begin. The completion of new supply may lag considerably behind the shift in demand. Thus, disequilibrium generally characterizes real estate markets over the short term.

Theoretically, the supply of and demand for real estate move toward equilibrium over the long term. However, this point of equilibrium is seldom achieved or maintained. In some real estate markets, such as those characterized by a specialized economy, supply responds slowly to changes in demand. Real estate development is a time-, capital-, and labor-intensive process including land use approval, design, financing, and construction. Because projects can take months or years to complete, there is a lag between when market participants recognize a need for new space and the completion of new projects to meet that demand. If demand continues increasing during that lag, the undersupply can become worse. Often, when new supply finally does come online, the amount of new construction exceeds the excess demand, and the market moves into an oversupply. A decline in demand is often caused by a change in the economy while new real estate product is being constructed, further exacerbating the oversupply.

## Trends in Market Conditions

Appraisers investigate the interaction of current supply and demand to determine current market conditions, and then future supply and demand are compared to predict

BACK_DEFEXP-RR-002698

the change in market conditions. Occupancy rates are an indication of the balance of supply and demand. Occupancy rates below the equilibrium level signify an oversupplied market, which can result in declining rents. Occupancy rates above the equilibrium level imply an undersupplied market, which can result in increasing rents.

Appraisers and market participants describe the activity of real estate markets in a variety of ways. An *active market* is primarily characterized by numerous transactions. Market observers might see growing demand, a corresponding lag in supply, and an increase in prices. A *depressed market* is a market in which a drop in demand is accompanied by a relative oversupply and a decline in prices.

Descriptive terms applied to markets are subject to interpretation. For example, markets are sometimes characterized as *strong* or *weak*. *Strong* markets may reflect either high demand and increasing price levels or a large volume of transactions. Weak, or *soft*, markets may be identified by low demand, declining price levels, or a reduced volume of transactions. Other loosely defined terms include *broad* and *narrow markets*, *loose* and *tight markets*, and *balanced* and *unbalanced markets*.

All markets cannot be described with simple characterizations. Sometimes supply and demand do not act as expected. For example, supply may fail to respond to increasing demand because the rate of demolition or change of use exceeds the rate of new construction. In this case, prices will continue to rise.

As shown in Chapter 10, the activity of the real estate market is cyclical. Like the business cycle, the real estate cycle is characterized by successive periods of expansion, contraction, recession, and recovery. The real estate cycle is, however, not necessarily synchronized with the business cycle. Real estate activity responds to both long-term and short-term stimuli. The long-term cycle is a function of changes in the characteristics of existing employment, population, and income and shifts in consumer preferences. The short-term asset market cycle is largely a function of the availability of credit and the condition of the overall economy.

## Levels of Market Analysis

The essential process of determining the appropriate level of market analysis to adequately support the results of an appraisal echoes the process of determining the scope of work of an appraisal assignment. Depending on the intensity of the research and analysis necessary to address the appraisal problem, market analysis can focus on general market information about a property type or a defined area, or, with the addition of marketability analysis, it can focus on a specific property in a defined area.

The manner in which subject demand is analyzed is the simplest way to characterize a market analysis assignment because estimates of demand are formulated differently depending on the level of analysis required by the appraisal problem. In some cases, demand may simply be *inferred* from published data and from current and historical market conditions. In other cases, appraisers must gather and segment extensive data and apply sound judgment to make detailed forecasts.

Both inferred analysis and fundamental analysis deal with the expected future demand of users of the space over time. The term *inferred* demand analysis is used when the analysis does not directly quantify the demand for a specific property. Instead, the demand is inferred from general data and historical trends in the market. A more detailed study of demand is identified as a *fundamental* analysis because it quantifies the current and forecasted demand of potential users for the subject property.

BACK_DEFEXP-RR-002699

Copyrighted material licensed by Charles Brigden on September 17, 2020

Inferred analysis, which is sometimes called *trend analysis*, is descriptive and relies on historical data to support future projections. The focus of inferred analysis can be general, with selected comparable properties representing the larger market, or more specific and include area-wide market data and subject-specific conclusions. Whether the inferred analysis deals with the market in general or the marketability of a specific property, the demand analysis rests on the baseline expectation that future trends will replicate historical and current trends. Inferred analysis may also conclude that the future will be better or worse.

In the analysis of fundamental demand, appraisers identify the present demand and forecast future demand based on a segmentation of broad demographic and economic data to analyze the subject property's specific market. Fundamental demand analysis focuses on the economic forces that generate demand—what are known as the *fundamental forces of demand*. The relationship of employment, population, and income can be studied in inferred analysis, but an understanding of the relationships among those forces is essential for fundamental analysis.

The occupancy of existing properties in the market is a good starting point as an indicator of the total current demand. And, likewise, the performance of the property being appraised can be a reliable indicator of current demand for existing properties in the market in the estimation of subject capture potential if the property has been properly managed and has experienced stabilized occupancy. However, current occupancy is not always equal to current demand in the market. In some cases, government incentives or other influences may temporarily induce artificial demand, which must be investigated to account for proposed properties and vacant land. For example, if the current market has inadequate supply or the supply does not have the real estate product with the features most desired by users of space, the amount that actual demand exceeds the amount of occupied space in that market can be called *pent-up demand*. The time frame of market analysis is not just the present market, it is also is future-oriented. The future market can and will probably change, and, likewise, the occupancy forecast of the property being appraised is not automatically set at the current occupancy level of that property or of its market. Table 15.2 lists the indicators of demand relevant in both inferred analysis and fundamental analysis.

In inferred analysis, the reliability and relevance of market data for a specific property tend to decrease as the geographic area examined in the demand analysis is broadened. Clearly, current data on change in employment levels for the state has less relevance than employment figures for a property's immediately surrounding area. Likewise, data on a related, but distinct, property type is not a reliable indicator of demand for the property being appraised. For example, the analysis of inferred demand for space in neighborhood shopping centers would not rely on the occupancy levels in regional malls in the area as an indicator of demand.

Currently occupied space serves as an appropriate indicator of inferred demand as long as there is no pent-up demand or artificially induced occupancy. Current net absorption of new and vacant space on the market is the key consideration.

The levels of market analysis that can be performed cover a spectrum of increasingly detailed methodologies.[2] The practice of market analysis is commonly segmented into four levels of progressive depth and complexity:

---

2. For a comprehensive discussion of the various levels of market analysis, see Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014).

BACK_DEFEXP-RR-002700

- Level A
- Level B
- Level C
- Level D

In this organizational scheme, Level A and Level B studies typically involve inferred demand analysis while Level C and Level D analyses look at fundamental demand. Table 15.3 summarizes the distinctions between inferred analysis and fundamental demand analysis and indicates the levels of analysis associated with each.

Determining the level of market analysis appropriate to a specific appraisal assignment is a scope of work issue. The length of the forecast required is not the major criterion involved in the decision. Rather, the primary issues in determining the level of study are the prevailing market conditions at the time of the appraisal and the future expectations of the market, the current and expected future competition, and the complexity of the property being appraised. For example, a stable market that has a history of not fluctuating greatly is easier to analyze than a volatile market. In a stable market with no overbuilding or shortage of supply evident, an inferred market analysis might be acceptable. Similarly, a large or complex property often requires a higher level of market analysis no matter what the overall market conditions have been. For instance, a market analysis for a large property that combines multiple uses would generally require a fundamental analysis. Note that the level of study criteria is not based on current conditions as much as what is expected in the future. For example, a fully leased office building in an unstable market might require a Level C study due to future uncertainties, while the same type of fully leased office building in a stable market might only require a Level A or B study.

In general, a Level A, B, or C market analysis is an adequate scope of work for most appraisal assignments. Labor-intensive Level D market analyses—which, like

**Table 15.2**  Indicators of Demand for Proposed Properties and Vacant Land

| Area Examined | Indicators of Demand |
|---|---|
| Competitive properties | Current and historical vacancy rates |
| | Trends in current and historical rental rates |
| Market area | Current and historical vacancy rates for existing competitive space |
| | Trends in current and historical rental rates for existing competitive space |
| | Construction activity—competitive space |
| | Preleasing of planned space and space under construction |
| | Current condition and historical changes in fundamental forces of demand (employment, population, and income) |
| Macroeconomic area | Current and historical vacancy rates for existing property types |
| | Trends in current and historical rental rates for existing property types |
| | Construction activity—property type |
| | Preleasing of planned space and space under construction |
| | Current condition and historical changes in fundamental forces: |
| | · Employment levels and foreclosure rates |
| | · Residential occupancy and foreclosure rates |
| | · Income levels and consumer spending |

BACK_DEFEXP-RR-002701

**Table 15.3**    Levels of Market Analysis in Appraisal

| | Inferred Demand Analysis | | Fundamental Demand Analysis | |
|---|---|---|---|---|
| **Level of Analysis** | **A** | **B** | **C** | **D** |
| Inferred subject attributes | | | Quantified subject attributes | |
| Inferred locational determinants of use and marketability by macro analysis | | | Quantified and graphic analysis of location determinants of use and marketability by macro and micro analysis | |
| Inferred demand from general economic base analysis conducted by others | | | Inferred demand derived through original economic base analysis | |
| Demand inferred from selected comparable sales or leased properties and demographic data | | | Forecast demand by subject-specific market segment | |
| Supply inferred from selected comparable listings | | | Supply quantified by inventorying existing and forecasting planned competition | |
| Inferred market equilibrium, highest and best use, and capture conclusions | | | Quantified<br>· Market equilibrium<br>· Highest and best use<br>· Timing—quantified capture forecast | |
| **Emphasis is on** | | | **Emphasis is on** | |
| · Instinctive knowledge | | | · Quantifiable data | |
| · Trend analysis of historical data and selected comparable properties | | | · Forecast specific subject data | |
| · Judgment within data parameters | | | · Judgment within data parameters | |

Source: Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014), 21.

Level C analyses, include the marketability analysis step—typically focus on the individuals behind the economic and demographic characteristics studied. Although appraisers do not usually need to perform a Level D market analysis in assignments for valuation purposes, they may use some techniques associated with Level D analysis in a Level C market analysis. Table 15.4 illustrates the tasks involved in the various levels of market analysis, and Table 15.5 summarizes the distinctions between levels.

Figure 15.5 illustrates the spectrum of market studies in typical appraisal assignments. A Level A inferred demand analysis would only be appropriate when the subject property is relatively simple and small for the market and the market itself is stable. In other words, the conditions fit all the criteria for Level A analyses. A single factor listed under the Level B criteria would raise the level of analysis necessary, and two or more of those factors would likely increase the level of analysis to Level C. The scope of work may be even higher for the market analysis of speculative development or of improved properties in transition because of the significant complexity of the properties involved and the uncertainty inherent in a particular market scenario (i.e., the volatility of a market in transition).

Other factors considered in the determination of the appropriate level of market analysis include the needs of the client and any requirements of professional standards for the specific assignment. A client's informational needs and tolerance of risk can influence the depth of market analysis desired, which could be well beyond what might be required by professional standards for the particular appraisal assignment.

BACK_DEFEXP-RR-002702

**Table 15.4**  Partial List of Examples of Work Items in Various Levels of Market Analysis

| Work Item | A | B | C | D |
|---|---|---|---|---|
| **Property Analysis** | | | | |
| General description | ✓ | ✓ | ✓ | ✓ |
| Comparison to comparable properties | | ✓ | ✓ | ✓ |
| Rating compared to industry standards | | | ✓ | ✓ |
| **Location Analysis** | | | | |
| General description—city and neighborhood | ✓ | ✓ | ✓ | ✓ |
| Specific analysis of site linkages | | ✓ | ✓ | ✓ |
| Specific analysis of urban growth determinants | | ✓ | ✓ | ✓ |
| Detailed competitive location rating | | | ✓ | ✓ |
| Detailed probable future land use analysis | | | | ✓ |
| **Demand Analysis** | | | | |
| General evidence of demand by sales/leasing activity | ✓ | ✓ | ✓ | ✓ |
| General city growth trends | ✓ | ✓ | ✓ | ✓ |
| Analysis of overall market absorption from secondary data | | ✓ | ✓ | ✓ |
| Demand forecast by specific projections of population, employment, and income | | | ✓ | ✓ |
| Demand forecast for subject market segment | | | ✓ | ✓ |
| Direct attitudinal survey of target market | | | | ✓ |
| **Competitive Supply Analysis** | | | | |
| Vacancy rates for selected comparable properties | ✓ | ✓ | ✓ | ✓ |
| Vacancy rate from secondary data—broad market surveys | | ✓ | ✓ | ✓ |
| Field research on all competitive properties | | | ✓ | ✓ |
| Research on proposed properties—field inspection, building permit analysis, Identification of potential sites | | | ✓ | ✓ |
| Detailed competitive amenities rating | | | ✓ | ✓ |
| Direct interview structural survey of developers | | | | ✓ |
| **Market Condition Analysis** | | | | |
| General inference from broad data | ✓ | ✓ | ✓ | ✓ |
| Secondary data analysis of occupancy and rent trends | | ✓ | ✓ | ✓ |
| Specific submarket calculations of demand and supply | | | ✓ | ✓ |
| **Capture Analysis** | | | | |
| General inference from select comparable properties | ✓ | ✓ | ✓ | ✓ |
| Inference from survey of all competition | | ✓ | ✓ | ✓ |
| Quantifiable capture potential rating of competition | | | ✓ | ✓ |
| **Highest and Best Use Conclusion and Marketability or Timing** | | | | |
| Vacant Land | | | | |
| Probable use and timing but no specific timetable for development | ✓ | | | |
| Generalized land use plan | | | | |
| Probable use supported by present value analysis | | ✓ | | |
| Timing supported by secondary data | | ✓ | ✓ | ✓ |
| Specific land use plan | | | | |
| Probable use supported by present value analysis | | ✓ | ✓ | ✓ |
| Land plan drawn to site | | | ✓ | ✓ |
| Timing based on residual demand, feasibility rent, and competitive rating analysis | | | ✓ | ✓ |
| Cost estimate for subject development | | | | ✓ |
| Value impact analysis of alternative marketing/development strategies | | | | ✓ |
| **Improved Properties** | | | | |
| General ad hoc judgments | ✓ | | | |
| *NOI* projection supported by performance of selected comparable properties | ✓ | ✓ | ✓ | ✓ |
| Use, timing, *NOI* projection supported by analysis of secondary data | | ✓ | ✓ | ✓ |
| Capture rate/*NOI* projection supported by residual demand of market segment and competitive ratings | | | ✓ | ✓ |
| Risk analysis of *NOI* forecast | | | | ✓ |
| Value impact analysis of alternative marketing and development strategies | | | | ✓ |

Source: Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed., 26.

BACK_DEFEXP-RR-002703

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 15.5**  Summary of Levels of Market Analysis in Appraisal

| Category | Level A | Level B | Level C |
|---|---|---|---|
| Property analysis | Descriptive | Descriptive plus comparison | Quantify marketability factors |
| Location analysis | Generic description | Description and analysis of subject specific linkages/ urban growth, etc. | Quantify location factors in relationship to growth trends impacting subject and its completion |
| Legal | Descriptive | Subject specific analysis | Quantify impact and probability for change |
| Market delineation | Macro general | Subject specific identified | Subject specific identified on map, and consumer characteristics quantified |
| Economic demand | Generic description of broad market area and selected comparable properties | Inferred by competitive set and subject submarket area trends | Quantify demand sources |
| Competitive supply | Generic description | Submarket specific overall amount | Inventory all competition |
| Market condition | Generic city-wide | Specific trend analysis | Quantify specific demand with subject specific competition |
| Marketability analysis (subject capture) | General inference from selected comparable properties | Pro rata share and competitive set analysis | Quantify competitive rating with all competition |

*The studies are cumulative. For example, a Level C study includes Level A and B studies.*

Source: Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed., 32.

**Figure 15.5**  Reliability Continuum

| Level A | Level B | Level C |
|---|---|---|
| Simple property | Complex property | Complex property |
| Small property  } 3 of 3 | Large property  } 1 of 3 | Large property  } 2+ of 3 |
| Stable market | Volatile market | Volatile market |
| Timing is now. | Timing is probably now. | Timing is an issue. |

Source: Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed., 31.

## Economic Base Analysis

As defined in Chapter 9, the economic base of a community is the economic activity (or activities) that allows local businesses to generate income from markets outside the community's borders. Economic base analysis is a survey of the industries and businesses that generate employment and income in a community as well as a study of functions of employment such as the rate of population growth and levels of income, which—as mentioned earlier—are drivers of demand.

Economic base analysis is used to forecast the level and composition of future economic activity and to test the reasonableness of the forecasts of others. In Level D market analysis, the relationship between basic employment (which brings income into a community) and nonbasic employment (which provides services for workers in the basic employment sector) is studied to predict population, income, or other variables that affect real estate values or land use.

BACK_DEFEXP-RR-002704

Employment figures serve as a proxy for income in economic base analysis. Basic employment industries provide the economic foundation for a community by producing goods and services that can be exported to bring money into the local economy. Although some segments of the service sector can be considered basic economic activities, most service industries are nonbasic because the service provided and the income generated remain within the community's borders. Growth in basic employment can serve as evidence of changes in population levels, household income, or other economic factors influencing land use and real estate value.

Often the structure of a community's business sector is discussed using the North American Industry Classification System (NAICS) developed and used by the US Bureau of the Census. Government publications such as the *Census of Retail Trade* use NAICS codes in describing the composition of trade in a metropolitan statistical area. A sample from the NAICS codes is shown below.

### 2017 NAICS Definition

† = Canadian, Mexican, and United States industries are comparable.

Search results for: 31

**Number of records found: 652**

| | |
|---|---|
| 31-33 | Manufacturing† |
| 311 | Food Manufacturing† |
| 3111 | Animal Food Manufacturing† |
| 31111 | Animal Food Manufacturing† |
| 311111 | Dog and Cat Food Manufacturing |
| 311119 | Other Animal Food Manufacturing |
| 3112 | Grain and Oilseed Milling† |
| 31121 | Flour Milling and Malt Manufacturing† |
| 311211 | Flour Milling |
| 311212 | Rice Milling |
| 311213 | Malt Manufacturing |
| 31122 | Starch and Vegetable Fats and Oils Manufacturing† |
| 311221 | Wet Corn Milling |
| 311224 | Soybean and Other Oilseed Processing |
| 311225 | Fats and Oils Refining and Blending |
| 31123 | Breakfast Cereal Manufacturing† |
| 311230 | Breakfast Cereal Manufacturing |
| 3113 | Sugar and Confectionery Product Manufacturing† |
| 31131 | Sugar Manufacturing† |
| 311313 | Beet Sugar Manufacturing |
| 311314 | Cane Sugar Manufacturing |
| 31134 | Nonchocolate Confectionery Manufacturing† |
| 311340 | Nonchocolate Confectionery Manufacturing |
| 31135 | Chocolate and Confectionery Manufacturing† |
| 311351 | Chocolate and Confectionery Manufacturing from Cacao Beans |

Source: 2017 NAICS, available online at www.census.gov

In practice, the process of economic base analysis is straightforward:

1. Identify the geographic extent of the local economy.
2. Identify the basic industries in the local economy.

BACK_DEFEXP-RR-002705

3. Estimate total basic employment for the community.

4. Calculate the economic base multiplier and other ratios linked to employment.

5. Forecast future basic employment.

6. Forecast future total employment and any other factors linked to employment.

Established techniques for identifying basic industries in a particular local economy include the judgment approach, the direct survey approach, the location quotient (LQ) approach, and the minimum requirements approach.*

Surveys and other data-gathering techniques employed in economic base analysis generate primary data that can be used in other types of market analysis.

---

*   Examples of the application of economic base analysis can be found in Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014), 105-128.

BACK_DEFEXP-RR-002706

BACK_DEFEXP-RR-002707

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Applications of Market Analysis

**16**

Level B and Level C market analyses are the processes most commonly used by appraisers in the valuation process. The choice of Level B or Level C analysis depends on whether inferred analysis or fundamental analysis better suits the scope of work of the assignment. For example, a Level B marketability analysis may not be appropriate for a volatile market because the results of historical trend analysis may not be reliable if the market is changing quickly and without a discernible pattern. In that situation, an appraiser would need to perform a more extensive Level C analysis of the fundamental forces of demand (including marketability analysis) in order to be able to provide the client with credible results. Figure 16.1 illustrates the framework of the six-step process in detail, enumerating the interim steps in the application of the technique.

As a review, in property productivity analysis (Step 1), the characteristics of the subject property are analyzed to determine the competitive strengths and weaknesses of that property. In Step 2, the competitive market area is delineated, based on the geographic area where the subject property's competitors are located. In Step 3, current demand for space of the subject property's type is estimated, and predictions are made regarding future changes in demand. In Step 4, the existing supply of the property type is identified, and predictions are made regarding the likely change in supply.

In Step 5, supply and demand are compared both now and in the future, and conclusions are drawn regarding current market conditions and the likely change in market conditions going forward. In a fundamental demand analysis, residual demand is typically calculated, which is an estimate of the net amount (positive or negative) of new supply that the market can support. In an inferred analysis, supply and demand are not quantified, so Steps 3, 4, and 5 of the six-step process are sometimes completed more or less simultaneously. Current and future market conditions are inferred from other data rather than calculated directly. For example, historical construction trends may be used as an indication of supply in the market rather than a forecast of new construction.

Finally, in Step 6—the marketability analysis step—appraisers can judge the likely performance of the property being studied by (a) comparing productive attributes of the subject property to those of competitive properties and (b) considering

BACK_DEFEXP-RR-002708

**Figure 16.1**   The Six-Step Market Analysis Process

**Step 1.   PROPERTY PRODUCTIVITY ANALYSIS (Determine the Product)**
 A. Physical attributes
 B. Legal and regulatory attributes
  1. Private
  2. Public
 C. Location attributes
  1. Identification of economic attributes - the association between land uses and their linkages
  2. Identification of the movement of demand in relation to the direction of urban growth

**Step 2.   DELINEATE THE MARKET (Determine the Market)**
 A. Market area delineation concepts
  1. Identification of demand sources and their location
  2. Area over which substitute properties tend to compete with the subject
 B. Consumer profile concepts
  1. Identification of characteristics of most probable user
  2. Segmentation of consumer groups

**Step 3.   DEMAND ANALYSIS (Measure Demand)**
 A. Inferred demand projection
  Make a projection of demand based on historical growth and absorption data
 B. Fundamental demand forecast
  Submarket-specific demand forecast
  Major demand drivers
  1. Population creates households.
  2. Income creates retail buying power.
  3. Employment creates office and industrial users.

**Step 4.   SUPPLY ANALYSIS (Measure Competition)**
 A. Existing stock of competitive properties
 B. Properties under construction
 C. Potential competition
  1. Proposed construction
  2. Probable additional construction
 D. Attributes and characteristics of competitive properties
  1. Economic and financial
  2. Locational
  3. Site
  4. Structure

**Step 5.   RESIDUAL DEMAND ANALYSIS (Compare Supply and Demand)**
 A. Residual demand analysis* (compare supply to demand over time)
 B. Ratio of supply to demand (potential market occupancy)
 C  Market cycle concepts (analyze the interaction of supply and demand)

**Step 6.   SUBJECT CAPTURE ANALYSIS (Marketability Analysis Conclusions)**
 A. Inferred capture methods
  Comparison of subject to general market indicators
  · Comparable property data
  · Secondary data surveys and forecasts
  · Subject historical performance
  · Local economic analysis
  · Other
 B. Fundamental capture methods
  Estimate subject capture potential of fundamental demand forecast by methods such as
  · Share of market
  · Adjust by quantifiable rating techniques
  · Subject historical capture rate
  · Other
 C. Reconcile subject capture indications derived by analysis of inferred and fundamental methods (market penetration concepts)

**USE OF STUDY PROCESS (SIX-STEP) CONCLUSIONS**
 · Economic demand data for financial testing of highest and best use alternatives
 · Economic demand data for the valuation models

---

\*   In economics, the term *marginal demand* refers to the change in demand for a product or service in response to a specific change in its price. In that context, a marginal demand analysis could study, for example, how much demand for apartment units would increase in response to a specific reduction in rent. That is a different analysis than described here. To avoid confusion, this text uses only the term *residual demand analysis*, although appraisers sometimes use the term *marginal demand analysis* to mean the same thing.

Source: Stephen Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014), 15.

BACK_DEFEXP-RR-002709

the changes in market conditions, demand, and competitive supply at the present time and in the future. A property's most probable uses are determined on the basis of the physical, legal, and locational attributes (Step 1). If multiple uses are probable, then Steps 2 to 6 would have to be repeated for each alternative use as input into the financial analysis of alternatives in highest and best use analysis.

The examples of Level B and Level C market studies in this chapter illustrate the interim steps appropriate for specific situations and provide information about considerations relating to other property types at each step of the market analysis process.

## Level B Inferred Demand Analysis

Real estate developers often want to know how many homes they can build in a subdivision, what prices they could expect to receive for those properties, and the timing of sales over an anticipated absorption period. A Level B marketability analysis would be appropriate for a relatively large and simple property in a stable and predictable market.

For example, consider a proposed subdivision of one-unit homes in a suburban location. In the years prior to financial crisis of 2008, many US markets saw a dramatic increase in the number of lots being developed, which was a sign of market instability. The following years were marked by severely overbuilt and relatively inactive residential markets and precipitous declines in prices, which were partly the result of inadequate marketability analysis when the subdivisions were being planned and funded. Throughout this cycle, Level C fundamental demand analysis was often necessary to make a reliable absorption forecast for a subdivision. In a more typical and stable market, however, absorption of proposed residential subdivisions is more predictable, and a Level B market analysis may be adequate in many cases.

A proposed subdivision of one-unit homes located in a stable market will be used as an illustrative example in this discussion of Level B market analysis.

### Property Productivity

In all market studies, appraisers analyze the physical, legal, and locational characteristics of the property being studied. In the case of a proposed suburban residential subdivision, linkages to major employers and amenities and what is known as *residential situs* would be major locational considerations.[1] Other physical characteristics include the size and shape of the lots, topography, soil quality, orientation, stage of development, and features of the improvements. Legal characteristics that might affect value would include local zoning ordinances, building codes (e.g., local changes to higher energy efficiency standards), the influence of a homeowners association, property taxes, and any local codes, covenants, and restrictions.

### Market Area Delineation

In the marketability analysis of the proposed subdivision, an appraiser would define and delineate the market area of the property being studied as well as the competitive market area based on the location of housing that would appeal to the same consumers as the subject property. Also, the profile of the most likely users, either renters or buyers in the market area, would be determined.

---

1. The concept of *situs* relates to the movement between centers of economic activity and the accessibility of those locations. For a detailed discussion of situs, see Stephen Fanning, *Market Analysis for Real Estate*, 2nd ed., and Richard B. Andrews, *Urban Land Economics and Public Policy* (New York: The Free Press, 1971).

BACK_DEFEXP-RR-002710

**Property Productivity Analysis for Other Property Types**

| Property Type | Considerations in Property Productivity Analysis |
|---|---|
| Existing apartment complex | · Design and appearance of the property |
| | · Number, size, and mix of units |
| | · Site improvements and amenities (in units and for complex as a whole) |
| | · Parking |
| | · Complex amenity features such as workout rooms, wifi, meeting rooms, etc. |
| | · Zoning (particularly the possibility of a zoning change for potential condominium conversion) |
| | · Infrastructure |
| | · Public planning for growth |
| | · Natural features and land use trends |
| | · Linkages to major employers and amenities |
| | · Externalities (busy street, noise, etc.) |
| Office building | · Building design and construction materials |
| | · Signage |
| | · Exterior lighting |
| | · Street layout |
| | · Utilities |
| | · Parking |
| | · Lot and building lines |
| | · Landscaping and grading |
| | · Office space layout |
| | · Tenant finish |
| | · Floor sizes |
| | · Stairways, corridors, and elevators |
| | · Electrical system and Internet connectivity |
| | · Heating, ventilation, and air-conditioning |
| | · Amenities |
| | · Security |
| | · Building management and tenant mix |

To analyze the characteristics of likely users of the specified housing units, a consumer profile describing income levels, household size, age, and preferences would be developed. The market area of potential users could be defined in terms of

- Time-distance relationships, e.g., the commuting time to employment centers and support facilities
- Social or political boundaries (cities and neighborhoods, school districts, voting precincts)
- Man-made or natural boundaries (major thoroughfares, physical barriers such as rivers, lakes, and mountains)
- The location of competitive housing

Market area boundaries are typically the perimeter of a geographic area within which (a) similar dwelling-unit styles are present, (b) dwellings of similar age, size,

BACK_DEFEXP-RR-002711

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Property Productivity Analysis for Other Property Types** *(continued)*

| Property Type | Considerations in Property Productivity Analysis |
|---|---|
| Hotel | · Size |
| | · Room rate structure |
| | · Overall decor and physical appearance |
| | · Quality of management |
| | · Chain affiliation |
| | · Quality and character of the market area |
| | · Facilities and amenities offered |
| | · Revenue per available room (RevPAR), which is a common unit of comparison used in the lodging industry to compare the income of competing facilities |
| | **Specific Locational Considerations** |
| | · Airport hotels and highway-oriented hotels cater to transient guests. |
| | · Center city hotels draw both tourists and business travelers. |
| | · Hotels in suburban locations often rely on adjacent commercial or industrial businesses. |
| | · Convention center hotels or resort properties are themselves the destination rather than any nearby land use. |
| Industrial property | · Size (and land-to-building ratio or floor area ratio) |
| | · Ceiling height |
| | · Loading capacity (docks and doors) |
| | · Circulation and parking |
| | · Climate control |
| | · Percentage of office space |
| | · Automated operations (including the use of robotics and other evolving technologies) |
| | · Utilities |
| | · Security |
| | · Building management and tenant mix |
| | · Environmental regulations |

and general condition are present, (c) a generally similar price range for housing exists, (d) the incomes of the resident households are somewhat similar, and (e) land use is relatively similar. However, the area may contain noncompetitive properties as well.

### Inferred Demand Projection

In an inferred analysis, demand might not be quantified as a specific number of square feet or units. Instead, demand conditions are inferred from available data sources. Any published studies relating to the pertinent market can be important considerations. For a residential subdivision, major housing markets often have quite detailed reports available that provide construction and sales statistics subdivision by subdivision, along with summary statistics by unit size and type, price range, and geographic submarket. In smaller markets, published studies are less detailed or nonexistent, so appraisers must look to other sources to analyze demand. It is not adequate to simply quote statistics. A Level B marketability analysis should include an analysis of trends and a projection of changes in market conditions. If economists

BACK_DEFEXP-RR-002712

## Market Delineation for Other Property Types

| Property Type | Considerations |
| --- | --- |
| Existing apartment complex | The boundaries of the market area for an existing apartment are based on<br>· time-distance relationships—the commuting time to employment centers and support facilities<br>· social or political boundaries—school districts, voting precincts<br>· man-made or natural boundaries—major thoroughfares, physical barriers<br>· the location of competitive housing |
| Office space demand | The market area for an office building is generally diffused into submarkets over a broad metropolitan area, with law firms and financial institutions often seeking space in prestigious, centrally located buildings, while businesses providing other types of services may prefer suburban offices with ample parking facilities and reasonable rents. |
| Hotel demand | The market area for a hotel does not necessarily rely on households in nearby communities to generate demand. Instead, linkages to sources of visitations in the area can be more significant than the characteristics of the surrounding neighborhood. Hotel development often occurs in clusters, and the emergence of a new cluster nearby can have an impact on the competitiveness of existing properties. |
| Industrial property | Established trade routes can define the boundaries of the competitive market for multitenant industrial space. Because warehouses and distribution centers must be close to major highways or railroad lines, industrial development will tend to cluster around those features, especially major freeway interchanges in centrally located states where a large percentage of the region's or even the country's population can be within a day's drive. |

or other experts have made predictions regarding household formation or housing demand, those should be referenced and summarized. (If the data points to a substantial change in market conditions, it may be necessary to complete a Level C fundamental analysis, to better predict future market conditions.)

The resale market for comparable properties in the competitive market can serve as an indication of market demand for units in the subject property. Comparing the resale market for the entire community with the strength of the competitive market can indicate whether a Level B analysis will be adequate. If the competitive market area is weak while the number of households in the entire community is growing, or the household location is shifting in the community, then a more detailed analysis might be necessary. Data analyzed in Level B analyses is largely obtained from secondary sources, e.g., the local multiple listing service, published reports, or local real estate agents.

The general analysis of subdivisions competitive with the subject property leads into an investigation of the performance of the subject property's primary competition. The absorption of competitive properties is an important indicator used in Level B marketability studies. Unlike most data in the other interim steps in the analysis of inferred demand, the data used in the identification of the performance of the subject property's primary competition is primary data compiled by the appraiser. Information about competing properties that may be gathered includes

• Reputation and track record of the project developer
• Total number of lots

BACK_DEFEXP-RR-002713

- Type of project (e.g., infill or new growth area)
- Age of project
- Identification of finished product
- Absorption summary
- Special amenities and advantages or disadvantages

The measurement of current demand in a Level C marketability analysis would differ from this Level B analysis in that this step in a Level C analysis would include quantified forecasts of demand (lot or unit sales) based on employment, income, and households. Nevertheless, a Level B marketability analysis could include inferences drawn from employment, income, and population statistics. A change in employment or a change in the rate of household formation likely implies a change in housing demand. A change in household income could imply a shift in demand from one housing type or economic segment to another.

### Inferred Demand Forecast for Other Property Types

| Property Type | Considerations in Analysis of Inferred Demand |
|---|---|
| Existing apartment complex | · General growth trends |
| | · Apartment construction trends (note that significant construction can indicate demand or could indicate a current or approaching oversupply) |
| | · Historical vacancy rate and absorption figures |
| | · Trends in effective market rental rates |
| Hotel demand | · Travel and tourism data |
| | · Hotel employment data and convention center activity |
| | · Office space absorption and employment statistics—particularly regarding wholesale and retail trade, services, and the financial, insurance, and real estate (FIRE) sector |
| | · Occupancy rates at competitive lodging facilities in the subject property's class and market area |

### Competitive Supply Analysis

Market supply can decrease as a result of demolitions or conversions to other uses. Market supply can increase as a result of conversions or, most typically, from new construction. In an inferred analysis, supply might not be quantified as a specific number of square feet or units. Still, a credible Level B marketability analysis must include consideration of the likely trend in supply. In the case of a residential subdivision, if the rate of home construction increases without a corresponding increase in demand, market conditions will decline. If demand remains constant but the rate of construction slows, for example, due to a decline in finished lots or development land, the market will become tight and prices will increase.

For an inferred analysis of a residential subdivision, the sources of supply data are similar to the sources of demand data. In major housing markets, published studies may include excellent information regarding the amount of new construction broken down by unit size and type, price range, and geographic submarket. Municipalities can generally provide up-to-date permit data, although that information may

BACK_DEFEXP-RR-002714

not be adequately disaggregated to allow for a refined analysis of a particular market segment. Most inferred analyses include a compilation of construction data from the most directly comparable and competitive subdivisions.

Some other factors that may influence potential supply include

- Availability and price of vacant land
- Cost and availability of construction materials
- Availability of desired product features
- Availability of construction loans and financing
- Effect of building codes, zoning ordinances, and other regulations on construction

This step in the analysis process also includes consideration of the timing and competitive position of the future competition. In distressed markets, such as the many overbuilt residential markets created by the subprime mortgage crisis, the amount of competitive supply may be so far out of equilibrium that many years would be required to absorb the existing excess supply at historical rates, barring some external influence like the demolition of existing houses for redevelopment to some other use. In those cases, the market may be stable but not considered predictable enough for inferred demand analysis to be meaningful. Therefore, a Level C market analysis might be necessary to provide credible assignment results.

---

### Competitive Supply Analysis for Other Property Types

| Property Type | Considerations in Analysis of Competitive Supply |
|---|---|
| Office building | Important characteristics of competing properties: |
| | · Size (gross building area or rental area) |
| | · Age |
| | · Vacancy level |
| | · Access |
| | · Parking |
| | · Tenant quality |
| | · Building management |
| | · Building quality and condition |
| | · Amenities |
| | · Support facilities |
| Industrial property | Important characteristics of competing properties: |
| | · Size, particularly in relation to other industrial buildings |
| | · Age and condition |
| | · Vacancy level |
| | · Access |
| | · Building management and tenant quality |
| | · Building quality |

---

### Residual Demand Analysis (Market Conditions)

In a fundamental analysis, the estimate of quantified demand is compared to quantified supply, either as a ratio or as a residual demand calculation. That refined calcu-

BACK_DEFEXP-RR-002715

Copyrighted material licensed by Charles Brigden on September 17, 2020

lation is not typical in an inferred analysis. Nevertheless, a Level B market analysis does include a comparison of demand conditions (Step 3) to supply conditions (Step 4) and a conclusion regarding current overall market conditions and a projection of future market conditions. Inferred analysis works best when market conditions are expected to remain relatively stable. If supply, demand, or both are expected to change substantially, a Level C market analysis might be necessary to provide credible assignment results. As mentioned, the demand analysis (Step 3), the supply analysis (Step 4), and the conclusion of market conditions (Step 5) are sometimes completed more or less simultaneously in an inferred analysis. The conclusions generally include a statement about where the market is in relation to theoretical equilibrium, and often include a statement identifying the current stage of the market cycle (e.g., expansion, contraction, recession, recovery).

### Subject Capture Analysis (Marketability Conclusions)

In the final step of the marketability analysis process, appraisers consider current and anticipated market conditions (Step 5) and the subject property's relative competitive strength (Step 1) to make conclusions regarding the performance of the subject property. For a residential subdivision, those conclusions would include the rate of sales over the sell-out period and the trend in lot or home prices. Those conclusions are necessary for the highest and best use analysis and are an important component of the three approaches to value.

Consider an appraiser who is analyzing a proposed residential subdivision and finds three competitive subdivisions in the subject property's market area. Over the past year, these subdivisions have had average sales rates of three lots per month, five lots per month, and seven lots per month. Simply using the average sales rate for the three competitive subdivisions of five lots per month as the estimated absorption rate for the subject property would most likely be incorrect unless the market is stable and the competitive strength of the subject property is entirely average. The conclusions of the inferred analysis would be that historical absorption by competing subdivisions is three to seven lots per month and that supply is increasing.

## Level C Fundamental Demand Analysis

The distinguishing characteristic of fundamental analysis is a quantified estimate of demand, supply, and residual demand. In Level C market analyses, current and future demand estimates are tied to analysis of the fundamental forces of demand (employment, population and income). It should also be recognized that Level C analysis is a cumulative study, building on the results of Level A and B analyses with the addition of more detailed data gathering and analysis.

The following example outlines the six-step process, including a forecast of fundamental demand for the Level C market analysis of a community shopping center at a specific site over a given period.

### Property Productivity Analysis

Analysis of the physical, legal, and locational attributes of the property being studied and the competitive shopping centers in or near the subject property's trade area focuses on current industry (or market) standards. Retail properties can become out-

BACK_DEFEXP-RR-002716

dated quickly as industry norms change. Particular attention is given to the following attributes of the subject site and improvements:

- Land-to-building area ratio and availability of expansion land
- Building area
- Parking adequacy
- Frontage, visibility, and depth
- Topography
- Utilities
- Landscaping
- Site design and layout
- Accessibility
- Amenities
- Gross building area and gross leasable area
- Store sizes
- Store width and depth
- Building design and layout
- Signage
- Service facilities and space

Tenant mix and related characteristics influence market appeal as well.

Relevant legal characteristics of the subject property would include zoning and use restrictions, long-term store leases that affect the marketability of the property, and ground leases in place.

Unsurprisingly, locational factors are important for retail properties. The locational attributes that should be investigated include

- Land uses and linkages with the surrounding community
- Site location in relation to patterns of urban growth
- Proximity to competitive supply

The culmination of the location analysis is rating the macroeconomic location of the subject property in comparison with the competition. Analysis of the macroeconomic location would include consideration of the following:

- Proximity to households in the market area
- Proximity to new retail development
- Location in the path of growth, e.g., new or projected residential development
- Proximity to major roads, in terms of access and visibility
- Relative traffic counts
- Proximity to the market
- Size and drawing appeal of anchor stores
- Tenant mix and compatibility in the trade area
- Effective age and reputation of the properties in the retail cluster
- Special amenity features

BACK_DEFEXP-RR-002717

Copyrighted material licensed by Charles Brigden on September 17, 2020

In a Level C market analysis, the physical and legal characteristics of the subject property and competitive nodes are rated against the market standard. The market standard is the characteristic that space users consider to be typical or appropriate. The use of rating grids formalizes the comparison process and helps appraisers identify functional obsolescence, select comparable sales, and identify influences on rent and occupancy. In a rating table, scores and weights are assigned to various characteristics, with the middle of the possible scores representing the market standard. The difference between a property characteristic and the market standard is referred to as *competitive differential*. The total of the weighted scores can be used to conclude the relative competitive strength of the subject property.

A Level C market analysis might also include the use of mapping and other graphic analysis tools to illustrate linkages (e.g., roads and utilities that influence the movement of people, goods, services, and communication to and from the property site) and patterns of urban growth that might affect the boundary of a market area.

### Market Delineation

The geographic market area relevant in a Level C marketability analysis may differ from the market area defined for a Level B analysis because the analysis of fundamental demand often requires a market area that aligns with the sources of specific data.

Effective analytical tools for defining the primary and secondary trade areas of a shopping center have been objects of study for many years. The most commonly used techniques include

- Trade area circles or drive-time maps, in which preliminary trade area boundaries are adjusted for the specific geographic, demographic, and economic characteristics of the community
- Gravitational models, a variation of trade area circles that takes into account the effects of competition
- Customer spotting, a more detailed form of trade area circles in which actual customer addresses are surveyed to determine distances and linkages

### Forecast of Fundamental Demand

The estimate of current and future demand in a Level C marketability analysis is the step of the process that departs the most from the scope of work of a Level B analysis. A Level C marketability analysis forecasts an actual calculation of competitive demand for the users of the space in the subject property. The Level C analysis is then reconciled with the Level A and Level B analyses into a final demand forecast range. For example, analysis of inferred demand for retail space may include study of the following:

- Economic base and city growth trends
- Citywide retail center occupancy
- Competitive center occupancy

Estimation of fundamental demand for retail space requires analysis of additional market data, including the following:

- Number and size of households in the market area
- Average household income

*Applications of Market Analysis*    **299**

BACK_DEFEXP-RR-002718

- Percentage of average household income spent on retail purchases
- Percentage of retail purchases typically made at shopping centers of the subject property's type
- Percentage of purchases made at shopping centers of the subject property's type that is retained by centers in the primary trade area and leakage out to the secondary trade area
- Volume of sales per square foot of retail area required to support development of a shopping center of the subject property's type
- Normal (equilibrium) vacancy rate in the market

A step-by-step analysis of this data allows an appraiser to estimate the square footage of demand for retail space in the primary market area, based on household incomes.

Other techniques can also be used to quantify demand, such as a ratio analysis of the trade area in which the current amount of occupied retail square footage per capita is compared to the future population forecast. The estimates of fundamental demand from the various techniques are then reconciled with demand from inferred analysis to provide final estimates of demand.

## Competitive Supply Analysis

The measure of current competitive supply is based on a survey of shopping centers that compete with the subject. The forecast of future competitive supply could be compiled by identifying the amount of

- Existing square feet in competitive centers
- New square feet currently under construction
- Proposed properties in the planning and approval process and in the next anticipated market cycle
- Vacant sites available for development

The total forecast of competitive space is often based on assigning probabilities to space under construction or in the planning and approval process. The probabilities can be estimated by studying the proportion of historical proposals that resulted in a completed project.

The supply of existing and anticipated competitive space would be rated according to the following characteristics:

- Size
- Access and location
- Quality of merchandise
- Project amenities
- Reputation
- Rental rates
- Vacancy
- Tenant mix (with emphasis on anchor occupants)

This analysis of competitive supply should yield estimates of the square footage of specific competition and a comparative ranking of the subject property.

BACK_DEFEXP-RR-002719

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Fundamental Demand Forecast for Other Property Types (Over and Above Analysis of Inferred Demand)

| Property Type | Considerations in Analysis of Fundamental Demand |
|---|---|
| Single-unit residential subdivision | · Current and projected population and households within the defined market area<br>· Current and forecasted future ratio of owner-occupied households<br>· Household income and affordability limits to segment demand by price range<br>· Housing-type preferences for segment households (ratio of households who choose detached housing versus townhouses, stacked condominiums, or other) |
| Apartment complex | · Current and projected population and households within the defined market area<br>· Current and forecasted future ratio of renter-occupied households<br>· Household income and affordability limits to segment demand by rent range<br>· Housing-type preferences for segment households (ratio of households who choose apartment units over other types of rental units) |
| Office building | · Size of the workforce occupying office space<br>· Proportion of demand in the subject property's competitive class (e.g., Class A, Class B, Class C)<br>· Requisite space per worker<br>· Normal (equilibrium) vacancy rate |
| Hotel | · Current demand (e.g., number of room nights)<br>· Segmentation of demand (commercial, meetings and groups, leisure, etc.)<br>· Statistics and forecasts for drivers of each demand segment (e.g., business statistics for commercial, tourism and travel statistics for leisure<br>· Segmentation of demand by property type (e.g., full service, limited service, extended-stay.)<br>· Segmentation of demand by room rates |
| Industrial property | · Employment in sectors using industrial space (e.g., manufacturing, wholesale, retail, transportation, communications, or public utilities)<br>· Requisite space per worker<br>· Patterns and directions of industrial growth and development, which often cluster along major highways and around intersections<br>· Statistics and forecasts for other drivers of demand; for example, population growth and retail activity for warehouse demand |

## Residual Demand Analysis

In a Level C market analysis, the analysis of market conditions is facilitated by calculating residual demand, i.e., the demand that is not satisfied by available supply. In other words, residual demand is the amount of undersupply (i.e., a negative number in an oversupplied market). Residual demand is calculated by adjusting demand for equilibrium vacancy and then deducting supply:

$$Adjusted\ or\ Supportable\ Demand = \frac{(Measured\ Demand)}{(1 - Equilibrium\ Vacancy\ Rate)}$$

BACK_DEFEXP-RR-002720

This adjustment accounts for the fact that a market needs a certain amount of vacant space to operate in an orderly fashion.

The residual demand calculation in a fundamental analysis can be condensed to five lines as illustrated in Table 16.1. In the calculation of residual demand, existing and forecasted demand over the market cycle is compared with current and anticipated competitive supply to predict the amount of oversupply or undersupply at various points in time. Analysis of residual demand patterns allows appraisers to forecast the pattern of changes in the market cycle, to estimate when additional space will be needed in the market, and to determine the likely pattern of market rent. For example, the figures in Table 16.1 relate to a market with a current supply of 712,400 square feet and a current occupancy rate of 90.2%. A new shopping center of 90,000 square feet is expected to be completed within the next five years, which will significantly oversupply the market and push the market occupancy rate down to about 86% by Year 5. Due to a forecasted increase in demand, however, the oversupply will be filled by about Year 9 and the market will have a small undersupply by Year 10. With these calculations, an appraiser could reasonably conclude that market rents are likely to be flat or decreasing in the first five years but trend upward at some point in Years 5 to 10. Residual demand (the difference between supportable demand and the supply of existing and anticipated retail space) would be the estimate of additional space needed in the market.

Another useful calculation in Step 5 of the six-step process is the ratio of demand to supply, which is calculated simply as unadjusted demand divided by supply. When there is no pent-up demand and no artificial demand, the ratio of demand to supply is a measure of market occupancy.

**Table 16.1**    Residual Demand Calculations (Step 5)

| Line | | Current | Year 5 | Year 10 |
|---|---|---|---|---|
| 1 | Current and forecasted demand (sq. ft.) | 642,300 | 689,200 | 749,600 |
| 2 | Adjustment for equilibrium vacancy [1 minus equilibrium vacancy rate] ÷ | 0.92 ÷ | 0.92 ÷ | 0.92 |
| 3 | Adjusted (supportable) demand [Line 1 ÷ Line 2] | 698,152 | 749,130 | 814,783 |
| 4 | Current and forecasted supply (sq. ft.) | 712,400 | 802,400 | 802,400 |
| 5 | Residual demand [Line 3 − Line 4] | -14,248 | -53,270 | 12,383 |
| 6 | Ratio of demand to supply [Line 1 ÷ Line 4] | 90.2% | 85.9% | 93.4% |

Other inferred market condition tools include rent trend analysis, feasibility rent analysis, and analysis of sales per square foot for individual stores. Rent trend analysis investigates the direction of change in rent levels. For example, rents may be rising at similar amounts as previous years, or rents may be increasing but not at the same rate. Some real estate professionals believe that an increase in rent at a declining rate is a sign of the peak of the market.

Sales per square foot in individual retail stores may indicate the performance level of an existing shopping center, the center's share of the market, and whether there is opportunity for expansion. This data may be used to check the reasonableness of the estimate of additional space demanded.

BACK_DEFEXP-RR-002721

> ### Vacancy in Residual Demand Studies
>
> All real estate markets need some vacant space to allow space users to move in and move out and to accommodate anticipated increases in demand in the short term. Equilibrium vacancy is the vacancy rate when a market is at equilibrium, with no upward or downward pressure on rents. The equilibrium vacancy rate, also known as *normal vacancy* or *natural vacancy*, varies from market to market based on construction costs, land availability, the rate of growth in demand, and other factors. If there is an undersupply in the market, residual demand is the amount of new construction that can be supported. If there is an oversupply, an analysis of residual demand at various points in time can provide a prediction of when the market will return to equilibrium.

## Subject Capture Analysis (Marketability Analysis Conclusions)

Subject capture is the amount or ratio of market demand a subject property is expected to capture. Subject capture analysis generally begins with an estimate of pro rata share, which is then adjusted to account for the competitive strength of the subject property relative to competitive retail centers. For example, suppose that the subject property is a 90,000-square-foot retail center in the market outlined in Table 16.2.

Because the subject property represents 11.22% of market supply in Year 5—90,000 sq. ft. in the subject property/802,400 sq. ft. in the market—its pro rata share of demand in that year is also 11.22%. Suppose also that property productivity analysis (Step 1) and supply analysis (Step 4) show that the competitive characteristics of the subject property are above average, and the appraiser concludes that the property's appropriate capture rate is 3% above the property's pro rata share, or 11.56% (11.22% pro rata share × 1.03). The subject property's occupancy rate in Year 5 could therefore be forecast as indicated in Figure 16.1. Although the forecast of market occupancy in Year 5 was just 85.9%, the forecast of occupancy for the subject property specifically in Year 5 is 88.5% because of its superior competitive characteristics.

Because retail concepts can change quickly, subject capture is especially difficult to forecast for retail properties. Therefore, it is often appropriate for good marketability studies to include high-, mid-, and low-range forecasts to report the full range of likely outcomes.

| Table 16.2 | Subject Capture |
|---|---:|
| Forecasted market demand in Year 5 | 689,200 |
| Subject capture rate (103% of pro rata share) | 11.56% |
| Subject capture (occupied sq. ft.) | 79,672 |
| Subject leaseable sq. ft. | 90,000 |
| Subject occupancy ratio | 88.5% |

*Applications of Market Analysis*    **303**

BACK_DEFEXP-RR-002722

BACK_DEFEXP-RR-002723

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Highest and Best Use Analysis  17

The analysis of highest and best use can be thought of as the logical end of a spectrum of market analysis procedures, running from the study of a property's market area, through more detailed marketability studies into the financial analysis of alternatives to determine the most profitable use, and finally to the reconciliation and formal conclusion of highest and best use, the timing of that use, and the most probable buyer. All these forms of analysis are interrelated processes that measure the economic potential of alternative uses of real estate.

The essential components of the analysis of *highest and best use* are contained in the following definition of the term:

> The reasonably probable use of property that results in the highest value.

This simple definition will serve as a point of departure for examining the concept in the rest of this chapter.

To be *reasonably probable*, traditionally a use must meet certain conditions:

- The use must be *physically possible* (or it is reasonably probable to render it so).
- The use must be *legally permissible* (or it is reasonably probable to render it so).
- The use must be *financially feasible*.

Uses that meet the three criteria of reasonably probable uses are tested for economic *productivity*, and the reasonably probable use with the highest value is the highest and best use.

Conceptually, the criteria of highest and best use are self-explanatory. That is, *physically possible* uses are land uses that are not unworkable because of some limiting physical characteristic of the land such as inadequate site size, odd shape, irregular topography, or poor soil quality. For example, a steeply sloped site may limit the use of the land to only a few possible alternatives. In contrast, a level plot of land with good drainage, soil with adequate bearing capacity, and other physical characteristics conducive to the construction of improvements would likely allow a developer to build many different types of facilities.

Based on similar logic, *legally permissible* uses would conform to the land's zoning classification and local building codes along with any other relevant regulatory or contractual restrictions on land use. The requirement for legally permissible uses eliminates many possible uses because they would not be allowed with the zoning laws, subdivision covenants, deed restrictions, leases, or other contractual obligations of the property owner. For example, the highest and best use of a site for development as a fast food restaurant with dine-in facilities might be eliminated because the site is smaller than the minimum size to meet the parking requirements of that use set by local regula-

---

### The Difficulty of Defining *Highest and Best Use*

The definition of *highest and best use* has evolved over time to address the common understanding of the topic. Traditionally, the explanation of the term has been more elaborate than the definition introduced in the 14th edition of *The Appraisal of Real Estate*. For example, earlier definitions of the term included ambiguous language that has often been commented on but never defined, as seen in the entry for the term in the fifth edition of *The Dictionary of Real Estate Appraisal*:

**highest and best use**
The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property—specific with respect to the user and timing of the use—that is adequately supported and results in the highest present value.

The precise meaning of "appropriately supported" has been debated in the appraisal literature almost since the basic template of this definition of *highest and best use* was developed in the mid-1970s.

A streamlined definition was later developed for the Appraisal Institute course *General Appraiser Market Analysis and Highest & Best Use* (2008), reducing the ambiguous language while eliminating direct reference to the four traditional tests of highest and best use:

**highest and best use**
The reasonably probable use that produces the most benefits and highest land value at any given time.

In early editions, the International Valuation Standards had defined *highest and best use* in a similar fashion as *The Dictionary of Real Estate Appraisal*, fifth edition. However, the 2017 edition of the standards removed the definition and instead described highest and best use as "the use of an *asset* that maximises its potential and that is possible, legally permissible and financially feasible" in the standards document's discussion of bases of value. (Section 30.4, General Standards—IVS 104)

The *Uniform Appraisal Standards for Federal Land Acquisitions* (most recently updated in 2016) defines *highest and best use* as the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future," citing federal case law as a source. (Section 4.3)

Historically, other concepts have been championed as alternatives to the term *highest and best use* as a description of what use of vacant or improved land should be analyzed, depending on the nature of the appraisal assignment:

**most probable use**
1. The use to which a property will most likely be put based on market analysis and the highest and best use conclusion. The most probable use is the basis for the most probable selling price of the property.
2. Highest and best use in the context of market value.

(*The Dictionary of Real Estate Appraisal*, 6th ed.)

**most profitable use**
Highest and best use in the context of investment value.

(*Real Estate Appraisal Terminology*, rev. ed.)

Usage of *most probable use* in the appraisal literature has dropped significantly in the last 20 years, while the alternative related to investment value, *most profitable use*, is now largely used in the context of valuation for litigation purposes.

---

BACK_DEFEXP-RR-002725

Copyrighted material licensed by Charles Brigden on September 17, 2020

tions. However, as discussed later in this chapter, the reasonable probability of a zoning change can be a consideration of potential land uses not allowed by current zoning.

The analysis of *financial feasibility* narrows the number of legally permissible and physically possible uses down further through analysis of the economic characteristics of the potential alternative uses. Economic demand for the subject property is a requisite to the financial testing of alternative uses. Any uses that are not worth at least what they cost to produce would be eliminated in the test of financial feasibility.

The remaining options are candidates for the test of *maximum productivity*, which is the final—and deciding—criteria for the highest and best use of both the land as though vacant and the property as improved.

Traditionally, to test alternative uses of a property in highest and best use analysis, appraisers have analyzed the four criteria in the following order:

1. Legal permissibility
2. Physical possibility
3. Financial feasibility
4. Maximum productivity

The criteria of physical possibility and legal permissibility could be analyzed in either order, but as a practical matter they both must be analyzed before the criteria of financial feasibility and maximum productivity. A use may be financially feasible, but this is irrelevant if the land use is legally prohibited or physically impossible. Likewise, the analysis of financial feasibility filters out uses that lack enough demand in the marketplace to compete for consideration as the use with the highest value, and therefore the analysis of financial feasibility necessarily precedes the analysis of maximum productivity.

## Land as Though Vacant and as Improved

A fundamental concept of highest and best use is the idea that highest and best use is viewed from two perspectives:

- The use of the real estate based on the presumption that the parcel of land is vacant or can be made vacant by demolishing any improvements (i.e., as vacant or as if vacant)
- The use that should be made of the real estate as it exists (i.e., as currently improved or as if improved as proposed)

The highest and best use of land as though vacant and the highest and best use of the real estate as improved are connected but distinctly different concepts.

The analysis of land as though vacant focuses on alternative uses of the land, with appraisers analyzing each reasonably probable use. In the analysis of highest and best use of land as though vacant, appraisers seek the answers to several questions:

- Should the land be developed or left vacant?
- If left vacant, when would future development be financially feasible?
- If developed, what kind of improvements should be built?

In contrast, when appraisers analyze the highest and best use of the real estate as improved, the focus on alternative uses considers three possible actions related to the current improvements:

BACK_DEFEXP-RR-002726

1. Retain the improvements.
2. Modify the improvements in some way, such as conversion, renovation, or alteration.
3. Demolish the improvements and redevelop the land.

The analysis of the highest and best use of the real estate as improved answers a different question than the analysis of the land as though vacant:

- Should the existing improvements on the property be maintained in their current state, should they be altered in some manner to make them more functionally efficient, or should they be demolished to create a vacant site for a different use?
- If renovation or redevelopment is warranted, when should the renovations or redevelopment occur?

In some situations, a property may be subject to restrictions (e.g., historic preservation) that prevent the improvements from being demolished. In this case, the highest and best use is limited by the restriction. A lease of the property may also restrict highest and best use alternatives because the lease will allow the tenant to control the land use for the term of the lease.

### Legally Permissible Uses of Land as Though Vacant

Zoning, building codes, private restrictions, historic district controls, and environmental regulations govern the uses to which land can be put, and those restrictions may preclude many potential land uses. To analyze legal permissibility, an appraiser determines which uses are permitted by current zoning, which uses could be permitted if a zoning change were reasonably probable, and which uses are precluded by private restrictions on the site, depending on the intended use of the appraisal.

Private restrictions and deed restrictions such as conservation and historic preservation easements as well as long-term leases are typically registered on the title, and those legal characteristics of the property may prohibit certain uses or specify building setbacks, heights, and types of materials. If deed restrictions conflict with zoning laws or building codes, the more restrictive guidelines usually prevail, but this may pose a legal question that must be obtained from a professional with the appropriate legal expertise.

A long-term land lease may affect the highest and best use because lease provisions can limit the type and duration of use over the remaining term of the lease. For example, if a property is subject to a land lease that has twelve years remaining on the term, it may not be economically feasible for the lessee to demolish the existing building and then construct and move into a new building with a longer remaining economic life because the right of possession of the building reverts to the lessor at the end of the lease. In that case, the determination of highest and best use of the property as leased is influenced by the lease's effect on the utility of the land over the remaining lease term. As another example, some medical office buildings that are built on hospital campuses have covenants that state that owners of the property are restricted to only doctors who have privileges at that hospital. This sort of private restriction can reduce the pool of possible buyers of this sort of property to a few or none. That is, the current owners may be the only possible users. In contrast, some legal issues can be positive influences that enhance a property. For example, a cross easement for access or parking may increase the marketability of some alternative use options of a given site.

In addition to analyzing zoning and private restrictions as part of the test of the legal permissibility of a land use, appraisers should investigate other applicable

BACK_DEFEXP-RR-002727

Copyrighted material licensed by Charles Brigden on September 17, 2020

codes and ordinances, such as building codes, historic district ordinances, and environmental regulations. Building codes can prevent land from being developed to what would otherwise be its highest and best use by imposing burdensome restrictions that increase the cost of construction. For example, the additional cost of a water retention pond with excess capacity that is required by a local ordinance could affect the size of a proposed community shopping center. Less restrictive codes typically result in lower development costs and thereby encourage development, while more restrictive codes tend to increase development costs and discourage development. In some areas, restrictive building codes are used to slow new construction and limit

## Probability of a Zoning Change

In investigating the reasonable probability of a zoning change, appraisers consider zoning trends and the history of rezoning requests in the market area as well as documents such as the community's comprehensive plan (or master plan). Appraisers can usually eliminate the following from consideration as potential highest and best uses:

· Uses that are not compatible with the existing land uses in the area, such as a gas station in the middle of an exclusive single-unit residential subdivision
· Uses for which zoning changes have been requested but denied in the past, such as an industrial use in an area where several industrial zoning changes have been turned down in the past two years

On the other hand, a zoning change from residential use to commercial use may be reasonable if other properties in the market area have received a similar zoning change recently or if a community's comprehensive plan designates the property for a use other than its current use. For example, consider a site zoned for single-unit residential use in a transitional neighborhood where the zoning on several similar sites has been changed recently to commercial. Also, the city's comprehensive plan designates the property as lying within a future commercial corridor. Both of these factors may support an appraiser's conclusion that there is a reasonable probability of rezoning the subject site for commercial use.

Market evidence supporting the possibility of new zoning can include rezoning applications, zoning hearings, actions by municipalities, and interviews with planning and zoning officials. Even if there is no current market evidence of a zoning change, documented interviews with officials and discussions of zoning practices and histories can be helpful in evaluating the possibility of a zoning change. These interviews, like any other market evidence, may, however, not be "proof" of a likely change or the denial of a change in zoning but rather only support the estimate of the probability of a change in zoning. Decisions on zoning ordinances are made by elected officials, and the processes are often heavily contested, costly, and time-consuming. The outcomes are not known for certain until official actions are taken.

The probability of a zoning change is never 100%, which presents appraisers with two challenges in highest and best use analysis:

· To determine if the economic demand for an alternative use of the property being appraised under a potential zoning change is greater than the economic demand for the real estate under the current zoning
· To provide market support for that conclusion

To manage their risk, most developers contract to buy property "subject to" rezoning approval rather than "as is." Many pending sales never close because they are subject to rezoning that could not be obtained within the developer's desired time frame or could not be obtained at all.

If appropriate for the intended use of the appraisal, a current opinion of market value may be based on the hypothetical condition that the property has already been rezoned as of the current date of value. (However, as stated earlier, some clients will not accept appraisals subject to that sort of hypothetical condition, instead requiring that the property be valued "as is" with the existing zoning and, if appropriate, reflecting any additional value due to the likelihood of a zoning change.) If the date of value is prospective, the opinion of value could be based on the extraordinary assumption that the rezoning will have occurred by the prospective date of value. A current opinion of market value that reflects the existing zoning but also reflects any premium that market participants would pay because of the likelihood of a future zoning change would be the "as is" value. This value would not be based on a hypothetical condition or extraordinary assumption relating to the zoning status.

BACK_DEFEXP-RR-002728

growth. Historic ordinances and overlay districts may be so restrictive that they can significantly restrict new development.

Concerns over the long-range effects of certain land uses sometimes result in increased environmental regulation and stricter development controls. Appraisers should be familiar with environmental regulations pertaining to clean air, clean water, and wetlands, and they should be sensitive to the public's reaction to proposed development projects. When resistance from local residents and the general public (sometimes called *NIMBYism*, for "not in my backyard") occurs, it can pressure elected officials to stop or limit certain real estate developments or change the density or character of a specific plan.

Marketability analysis helps appraisers compare the maximum development potential of a site that is legally permissible with market norms. For example, legal restrictions and the size of a specific site may indicate a maximum of 100,000 square feet of building area for that site, but if buildings on sites with similar legal and physical characteristics are being developed with buildings of 60,000 to 80,000 square feet, the difference may need to be accounted for in the analysis of the maximum productivity of the site as though vacant and reconciled in the analysis of the highest and best use of the property as improved. When the market norms are more restrictive than the legal restrictions, the market norms prevail in market analysis and highest and best use analysis. For example, a local ordinance may require 4.5 parking spaces per 1,000 square feet of office space, but the developers in the market may all use 6.0 spaces per 1,000 square feet as a minimum.

Market norms can also influence a site's potential for division as a legally permissible option, i.e., the site could be used as is or subdivided. For example, the analysis of the highest and best use of a 20-acre industrial site might start with an investigation of any legal restrictions on development of the entirety or on division and development of smaller parcels.

As with zoning ordinances, if there are land use limitations inherent in any applicable codes, ordinances, and regulations, an appraiser should investigate whether there is a reasonable probability of a change relative to the subject property along with economic demand for change and any timing and cost considerations related to a potential change.

### Physically Possible Uses of Land as Though Vacant

A parcel of vacant land (or an improved site analyzed as though vacant) is the blank canvas on which a real estate developer paints any number of pictures. The physical possibilities of the vacant land are quickly constrained by factors such as site size, shape, frontage, availability of utilities and other support services, topography, soil composition, and other site conditions and environmental and locational factors. As a simple example, an irregularly shaped parcel can cost more to develop and, after development, may have less utility than a regularly shaped parcel of the same size. In addition, if the irregular shape affects ease of access, certain land uses might not be probable or even physically possible. For some developers of commercial real estate, ease of access (e.g., number and placement of curb cuts) is the most important site factor, but others may consider visibility to be paramount. It is also possible to have too much traffic in front of a commercial site because that may cause too many cars backing up at an automatic signal, which prevents crossover traffic from accessing

BACK_DEFEXP-RR-002729

Copyrighted material licensed by Charles Brigden on September 17, 2020

the site. For developers of industrial property, the access of the site for large trucks may be the most significant physical attribute.

The information that appraisers use to analyze the physical possibility of a land use is often collected in the property productivity analysis step of the market analysis process, which also covers the legal and locational characteristics that connect the property with sources of economic demand and set it apart from its competition. These interconnected forces shape the use potential of the property. For a parcel of land analyzed as though vacant, the uses that are both legally permissible and physically possible make up the pool of alternative uses that can be analyzed for financial feasibility.

The location of real estate determines the type of land uses with the greatest economic demand in an area. For example, a housing development for seniors might be a permissible use for a specific site but, if most residents of the market area that such a facility would serve are under 40 years old, this use is most likely not reasonably probable and would not be analyzed further for financial feasibility. Because the attributes of a location changes over time, those dynamic features, such as land use growth patterns and the direction and rate of this growth, also need to be addressed. Location analysis addresses these major questions regarding the use potential and competitive position of the property:

- Where does the subject property fit in the overall growth pattern?
- Where does the market for the subject property come from (i.e., linkages to demand)?
- How does the location of the subject property compare to the competition at the present time and in the future, and what are the future implications for the marketability of the subject property?

### Distinguishing the Physical Use of Real Estate from the Motivations of Users

The concept of highest and best use relates to what is done physically with real estate, and use of physical land should not be confused with the motivations of owners or users. For example, conservation and preservation are not uses of land. Rather, they are the motivations of individuals or groups for acquiring certain properties. The physical uses in these cases could generally be characterized as "leave the land vacant" or "do not change the historic improvements." A parcel of land encumbered by a conservation easement would have legal limits on use, leaving "continue the existing use unchanged" or "development to some limited degree as agreed upon by contract" as the only legally permissible use of the land.

Similarly, "assemblage with an adjacent parcel" is not a meaningful description of a property's highest and best use. While the process of assembling a site with other sites might make the most sense financially for the entity who would benefit from the combination of multiple parcels, assemblage is a motivation for acquiring a property, not a use of the real estate. In other words, an entity might be motivated to purchase a site so that it can be assembled with surrounding parcels to create one large parcel, for which the highest and best use might be, for example, development of a multistory residential condominium building. If the property being appraised is a single site, not a site whose use depends on assemblage with other sites, the highest and best use of the site alone is usually analyzed as it currently exists by itself. If the property being appraised consists of multiple sites as though sold in one transaction, the highest and best use analysis considers them as one large site.

Land that is held primarily for future sale, with or without an interim use, may be regarded as a speculative investment. (The concept of an interim use is discussed in Chapter 18.) In general usage, *speculation* may carry a negative implication of high risk or uncertainty, but in the language of real estate appraisal *speculation* refers to the acquisition of property motivated by the expectations of realizing a profit from a rise in price. That is, the term *speculation* describes a motivation rather than a use.

BACK_DEFEXP-RR-002730

### Financial Analysis of Alternative Uses of Land as Though Vacant

As mentioned earlier, appraisers eliminate uses that are not legally permissible and physically possible. As shown in more detail in Chapter 18, the financial analysis of the remaining alternatives builds on the analysis of physical, legal, and locational characteristics of a property, providing the estimates of economic demand and timing that support the highest and best use conclusion.

In the analysis of financial feasibility, the alternative uses that have a positive present residual land value for current development can proceed to the next step of highest and best use analysis. Timing of use is a critical consideration. Some alternative uses might not currently have a positive land residual value but could still have a land residual value in the future that is high enough to support an investor's decision to hold the land for that future use. For example, consider a plot of land with a current residual land value for apartment use of $6 per square foot. Currently, the area lacks economic demand to support development of a retail property at that location, but, if the land were held vacant for seven years for a future retail use, the land value in seven years would be $20 per square foot, according to marketability analysis conducted for the property. At a discount rate of 10% considering the forecast risk and holding costs among other factors, the present value of the land as if held for future retail use is $10.26, i.e., higher than the value of immediate development for apartment use. The possible future use for retail development might have been overlooked because of the lack of current demand for retail use, illustrating the importance of timing concerns in the development of highest and best use conclusions.

### Maximum Productivity of Land as Though Vacant

Of the financially feasible uses of the land as though vacant, the highest and best use is the use that produces the highest residual land value. The comparison of the values of the financially feasible uses is usually straightforward.

To determine the highest and best use of land as though vacant, for each alternative use being tested, the cost to develop the requisite improvements is deducted from the value of the property as if complete to calculate the residual land value. The use that produces the highest land value on the effective date of the appraisal is the highest and best use.

As an alternative, rates of return that reflect the associated risks of alternative uses are often used to capitalize the residual income to the land from those uses into their respective values. The rates are developed from previous research (i.e., market and marketability analysis) and reflect the rates of return that are applied to the range of alternative uses being considered in the market.

As another alternative, land sales can be used to test which alternative is maximally productive when the comparable plots of land have the same or similar highest and best use conclusions as the subject property. For example, suppose a site is currently in demand for apartment use, and demand for retail space is estimated to arise five years in the future with projected population and income growth in the area. The highest and best use of the site can be tested by applying comparable sales data. Apartment land is currently selling for $3.50 per square foot, and retail land that is ready for development is forecast to sell for $7.50 per square foot in five years. If the retail land is held for five years at a discount rate of 20%, the present value of the retail land is $3.01 per square foot, which suggests that the highest and best use today is to develop apartments on the site.

BACK_DEFEXP-RR-002731

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 327 of 722    Page
ID #16551

## Conclusion of Highest and Best Use of Land as Though Vacant

If an appraiser concludes that a building improvement is appropriate for the highest and best use of a parcel of vacant land, the appraiser then determines and describes the type and characteristics of the ideal improvement to be constructed. The use that is considered the *ideal improvement* should meet the following criteria:

- It is supported by market and marketability analysis and the financial analysis of alternative uses.
- It takes maximum advantage of the potential market demand for the site's highest and best use.
- It conforms to current market standards and the character of the market area.

If a new improvement is considered capable of supporting the highest and best use of the land as though vacant, it presumably will have no physical deterioration or functional obsolescence. The ideal improvement identified in highest and best use analysis helps appraisers estimate the effect of certain forms of depreciation in the application of the cost approach because any differences represent inconsistencies with market demands.

An appraiser's conclusion of the ideal improvement should be as specific as the market suggests through market analysis, e.g., to the level of the number of stories or number of units built. The first step—property productivity analysis—of the six-step process of market and marketability analysis determines the market segment that the subject property could serve based on its features. The market might recognize the use of the ideal improvement of a particular site as "community retail" or as "neighborhood shopping center." The specificity of the ideal improvement can test the reasonableness of the highest and best use conclusion and affects the comparable properties that might be analyzed in the application of the approaches to value.

## Alternative Uses of the Real Estate as Improved

The theoretical focus of highest and best use analysis is on the potential uses of the land as though vacant. In practice, however, the contributory value of the existing improvements and any possible alteration of those improvements are just as important as the land as if vacant in determining highest and best use and, by extension, in developing an opinion of the market value of the property.

The concept of highest and best use of real estate as improved pertains to the use that should be made of an improved property in light of the existing improvements and the ideal improvement described at the conclusion of the analysis of highest and best use as though vacant. In market value appraisals of improved property, appraisers consider a number of alternative uses of the existing improvements:

- Retain the existing improvements and continue the current use as the highest and best use.
- Convert, renovate, or alter the existing improvements to enhance the current use or change the use of the property to a more productive use.
- Retain the existing improvements and continue the current use as an interim use.
- Demolish the existing improvements and redevelop the site.

In the case of continuing the current use as an interim use, the ongoing use of the existing improvements would be an interim use that helps defray the cost of carrying

*Highest and Best Use Analysis*   **313**

BACK_DEFEXP-RR-002732

the property and demolition costs until all approvals have been obtained and actual construction on a new use should begin.

All four criteria of highest and best use are relevant to the analysis of the property as improved and any alternative uses considered. It is generally self-evident that the current use of a property as improved is physically possible. That is, the existence of the improvements proves that they can be built on that site. Likewise, the legal permissibility of the current use is often nearly as obvious and easy to confirm. But an appraiser needs to test whether the existing improvements contribute value, rather than simply assume that the current use is the highest and best use because the improvements are already in place. In fact, the most persuasive analysis of the highest and best use of the property as improved often first tests whether the existing improvements should be demolished and the site redeveloped to the highest and best use as though vacant, instead of starting from the assumption that the current use will continue.

Demolition of the improvements can be considered the most extreme form of modification to the current use of the property as improved. If the value of the property as improved is greater than the value of the site as though vacant less demolition costs, then the existing improvements contribute value to the property's highest and best use and should not be demolished at that time. When the improvements no longer contribute positively to value net of demolition costs, then demolition and redevelopment of the ideal improvement would be economically supportable. Many buildings are torn down and their sites left vacant or left as improved for a variety of reasons, e.g., property taxes, liabilities, or avoidance of vandalism and criticism that the unused improvements are an "eyesore." In these cases, the land is worth more as vacant than as improved. (Interim uses will be discussed more fully in Chapter 18.) If demolition is ruled out, then changes to the existing improvements—which may include a change of use—should be tested. The recognized forms of modification are

- Conversion of the property to an alternative use
- Renovation of the improvements
- Alteration of the property

For any of these options to be financially feasible, the change must add at least as much value to the property as it costs. In other words, the value after conversion, renovation, or alteration less the costs of the modification (including entrepreneurial incentive) must be greater than or equal to the value of the property as is. The costs involved in any form of modification must include an appropriate estimate of entrepreneurial incentive.

Testing the feasibility of modification is a straightforward comparison of the contributory value of the change with the cost of making the change. However, any modification of the existing improvements must still meet all four tests of highest and best use for the modification to be considered the highest and best use. The study of property productivity in the market analysis process is likely to show what changes to the existing improvements are physically possible and legally permissible.

If all the alternative uses are eliminated and the current use remains financially feasible without modification of the improvements or redevelopment of the site and retains the highest value of the alternative uses, then the current use is the highest and best use of the property as improved. Deferred maintenance of the improvements may need to be addressed in the analysis of the financial feasibility of the current use.

BACK_DEFEXP-RR-002733

Copyrighted material licensed by Charles Brigden on September 17, 2020

Repairs may need to be made to the existing improvements for the current use to achieve the best competitive position in the marketplace. The costs of curing physical deterioration or functional obsolescence, redesigning a building, or converting the existing improvements into an alternative use (including a provision for entrepreneurial incentive) should be analyzed in light of the value created in the market. The effect on value of implementing any changes is more important than simply how much the changes will cost. If the changes will not be economically feasible, the expenditures would not be made—a point that an appraiser should incorporate into the highest and best use analysis.

## Consistent Use

The principle of consistent use holds that land cannot be valued based on one use while improvements are valued based on another use. A site with existing improvements is valued as though vacant and available for its highest and best use. Existing improvements that do not conform with the ideal improvement may contribute some value or no value or even reduces value if the costs to remove the improvements are substantial. In the application of the cost approach, an adjustment for functional obsolescence may be needed for an improvement that is not consistent with the highest and best use as though vacant. In other words, if the improvements are not the highest and best use, any reduction or increase in value they create would be attributed to the improvements, not the land.

Consider a single-unit residence on a valuable site rezoned for commercial use. This house, if zoned for residential only, would be worth $450,000 and the land value with residential zoning would be $75,000. But the site is zoned for retail use, and the land value is $500,000 with the current zoning. It is incorrect to add the land value of $500,000 for use as a commercial site to the value of the building as a residence ($375,000) because the residence is in the way of commercial development and would be demolished by a commercial developer.

Even though a property was developed with one use in mind, alternative uses are almost always physically possible, just not always financially feasible or maximally productive. In the analysis of the highest and best use of a property as improved, an appraiser considers the alternative uses by applying the same tests applied in the analysis of the highest and best use of the land as though vacant. The future economic performance of the existing improvements is the core concern in analyzing the alternative uses of the property as improved.

BACK_DEFEXP-RR-002734

BACK_DEFEXP-RR-002735

Copyrighted material licensed by Charles Brigden on September 17, 2020



# The Application of Highest and Best Use Analysis

# 18

Traditionally, highest and best use analysis has been described in terms of four "tests." And those tests are theoretically applied to the subject property considered from two perspectives: (a) the land as though vacant and (b) the property as improved. In practice, however, the process of highest and best use analysis is more effectively organized into eight steps that echo and amplify the process of market and marketability analysis. Figure 18.1 lays out the eight steps in highest and best use analysis as its own sequential process and illustrates how those steps map onto the four fundamental criteria for the analysis of highest and best use.

The essential components of highest and best use analysis are

1. A specific property's physical, legal, and locational attributes that determine use
2. The economic demand for the potential alternative uses of that property
3. Estimates of the financial rewards for each alternative use

Those first two components are generated through market and marketability analysis. The conclusion of that process provides the basis for the financial analysis of alternative uses—the third component. That screening process then leads to reconciliation and the final conclusion of highest and best use—i.e., the maximally productive use.

At its core, highest and best use analysis is an examination of alternative uses of a property, each use having its own characteristics related to the value-influencing factors of utility, demand, effective purchasing power, and scarcity. The goal of highest and best use analysis is to determine which use produces the highest present value of the future benefits. To accomplish that, the eight steps in highest and best use analysis are used as a screening process, and alternatives are run through this screening process until the highest and best use is determined.

Each alternative use of the property should be studied in sufficient detail to allow an appraiser to make a logical, supportable decision about the alternatives in terms of use, timing (of the demand for each use), and identification of market participants. The same criteria for levels of study in market and marketability analysis apply to the

BACK_DEFEXP-RR-002736

**Figure 18.1**    Eight Steps of the Highest and Best Use Analysis Process

| | | |
|---|---|---|
| **Step 1.** Property productivity analysis | Analyze property productivity attributes (site, legal, and location) to eliminate uses and determine most probable uses | · Physical possibility<br>· Legal permissibility |
| **Step 2.** Delineate the market<br>**Step 3.** Demand analysis<br>**Step 4.** Supply analysis<br>**Step 5.** Residual demand analysis | Perform market studies to determine the economic demand and timing for probable alternative uses | Data required for analysis of financial feasibility |
| **Step 6.** Subject capture analysis | Perform marketability analysis | |
| **Step 7.** Financial analysis of alternative uses | Complete a financial analysis of alternative land uses to determine which use has the highest residual land value | Financial feasibility |
| **Step 8.** Highest and best use conclusions | Perform highest and best use reconciliation and draw conclusions:<br>· Use<br>· Timing<br>· Market participants<br>  - Users of space<br>  - Most probable buyer type | Maximum productivity |

eight-step process of highest and best use analysis. If the property is a small, simple property in a stable market and it is obvious that there is current demand, then the highest and best use analysis would usually be simple (i.e., analogous to a Level A market analysis). For example, for a single-family house in good condition in a stable market with a consistent sales history in a neighborhood with a good long-term out-look, the eight steps of the highest and best use analysis process can usually be completed in a short time, with inspection of the subject property and neighborhood and review of the zoning and MLS records of sales trends. At the other end of the scale, if a property is large, complex, or in a volatile market and if the timing of demand is an issue, then the application of the eight-step process might be detailed and extensive. (i.e., like a Level C market analysis) with quantifiable support for each step.

## Alternative Use Scoping

The level of study applied to alternative uses may not always be the same for the land as though vacant and for the property as improved. If the market value of the land is less than the market value of the property as improved, then a significant factor in the market value of the subject property is the future economic life of the improvements. In that case, more focus of the highest and best use analysis would be on the property as improved. This might mean that the level of study for the land might be a Level A market analysis, while the highest and best use analysis for the property as improved might involve a Level C market analysis.

The testing of alternative uses starts with the possibility of demolishing the existing improvements and then, if the existing improvements should be retained, continues with an examination of the possibilities of conversion, renovation, or alteration of the improvements. In the first case, the value of the land as thought vacant is compared with the value of the property as improved less the cost of demolition. In

BACK_DEFEXP-RR-002737

the case of possible conversion, renovation, or alteration, the cost and timing of those options are compared to the potential increase in value.

## Step 1. Property Productivity Analysis

The first step of the application of highest and best use analysis determines what market segment the property features are designed to serve. Appraisers usually limit the number of potential property uses to a few choices through the initial analysis of the market and of the subject property's site, improvements, land use regulations, and location—i.e., property productivity analysis.

Often a ranking analysis of the features of the subject property places the property in a competitive position in relation to the market standard for a particular use. As an example, the location of an office property being appraised may be ranked against competitive nodes for its quality of

- Linkages
- Ease of access
- Reputation
- Visibility
- Availability of support facilities

The success of a retail center depends on different characteristics of the subject property such as

- Location
- Tenant mix
- Amenities
- The number of households in the trade area
- Proximity to new retail development
- Proximity to the path of growth (e.g., new or projected residential development)
- Household income
- Proximity to major roads

Also, the ranking of a retail center considers the characteristics of the retail node such as

- Traffic counts by each shopping center
- Complementary land uses
- The size and drawing power of the anchors
- Tenant mix and compatibility in the retail node
- The effective age and reputation of the centers in the retail node

Each of the factors relevant to a particular property type is ranked as part of the analysis of location in the property productivity analysis.

Factors relevant to the property analysis of an apartment building include

- Proximity to existing development
- Public planning/development support for apartments
- Location in path of new residential growth
- Proximity to major roads (existing or approved ease of access and visibility)

BACK_DEFEXP-RR-002738

- The reputation or prestige of the area (e.g., social reputation)
- Proximity and ease of access to shopping centers (convenience and shopper goods)
- Proximity and ease of access to employment centers
- Aesthetics of natural features in the area
- Proximity to entertainment and cultural areas (theaters, parks, golf, restaurants)
- Proximity and reputation of schools in the area

The property productivity analysis delineates the alternative uses of the property that are analyzed in the next steps of highest and best use analysis. The demand for each probable use is studied through market analysis to determine the market demand and market conditions for each alternative use. The marketability analysis component of the process determines the timing of the use of the subject property such as the future start date for construction or a forecast of occupancy.

## Steps 2 to 6. Market Analysis and Marketability Analysis

The central portion of highest and best use analysis is an iterative process that provides support for the forecast of economic demand for the subject property. The processes of market analysis and marketability analysis are repeated for all the reasonably probable alternative uses being considered. Specifically, the second through sixth steps are applied to each alternative use, as shown in Figure 18.2. In Step 1, highest and best use analysis examines the subject property's competitive position based on the property characteristics and legal and location factors. The iterative process of Steps 2-6 extends the analysis to address the amount of supply and demand for the land uses that are most probable at the site of the subject property.

In market analysis, the task of delineating the market for a particular land use involves identifying the typical users of a property that is put to a particular use. The various alternative uses often have different market areas relevant to the particular use, which the second step of highest and best use analysis addresses.

Demand analysis measures the need for a specific land use. In the context of highest and best use analysis, the study of demand for an alternative use answers the question of whether a specific alternative use is needed. The supply analysis step of highest and best use analysis determines what the competition for each alternative use is and how much competition exists.

The fifth step of highest and best use analysis is critical in determining the timing of new construction for each alternative use. That is, the comparison of supply and demand leads to an estimate of when the market would support new construction of a particular use or the future outlook of occupancy of existing properties.

The marketability analysis conclusion for each alternative use completes the iterative process at the heart of highest and best use analysis. The subject capture analysis determines the competitive position of the property's location and physical attributes, ultimately providing support for an estimate of the timing of new construction on the subject site or of the future occupancy outlook of existing improvements on the subject property over the typical market cycles in the user market. This study of economic demand sets the stage by providing data input for the next step—the financial testing of alternatives.

The subject capture potential that is estimated in highest and best use analysis must consider competitive properties, whether they are vacant sites or improved

BACK_DEFEXP-RR-002739

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Figure 18.2**  The Iterative Analysis of Alternative Uses

**Problem Definition of Highest and Best Use Analysis**

The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity

**Economic Overview and Alternative Use Scoping**

Site, improvement, legal, and locational determinants of most probable uses

| Alternative Use 1 | Alternative Use 2 | ... | Alternative Use *n* |
|---|---|---|---|
| **Market Analysis and Marketability Analysis** | **Market Analysis and Marketability Analysis** | **Market Analysis and Marketability Analysis** | **Market Analysis and Marketability Analysis** |
| **Step 2.** Delineate the market | **Step 2.** Delineate the market | **Step 2.** Delineate the market | **Step 2.** Delineate the market |
| **Step 3.** Demand analysis | **Step 3.** Demand analysis | **Step 3.** Demand analysis | **Step 3.** Demand analysis |
| **Step 4.** Supply analysis | **Step 4.** Supply analysis | **Step 4.** Supply analysis | **Step 4.** Supply analysis |
| **Step 5.** Residual demand analysis | **Step 5.** Residual demand analysis | **Step 5.** Residual demand analysis | **Step 5.** Residual demand analysis |
| **Step 6.** Subject capture analysis | **Step 6.** Subject capture analysis | **Step 6.** Subject capture analysis | **Step 6.** Subject capture analysis |
| **Financial Analysis of Alternative Use 1** | **Financial Analysis of Alternative Use 2** | **Financial Analysis of Alternative Uses** | **Financial Analysis of Alternative Use *n*** |

**Highest and Best Use Conclusions**

Specified in terms of
- Use
- Timing
- Market participants
  - Users of space
  - Most probable buyer type

BACK_DEFEXP-RR-002740

properties. There may be significant demand for a use in the subject property's market area and the subject property may indeed be suited for this particular use, but a number of other sites may be equally well suited or more appropriate.

Appraisers should also consider the competition among various uses for a specific site. For example, competition for available sites along a commercial strip development may be intense. Developers of community retail facilities, garden office space, and fast food restaurants may bid against one another, and the prices they pay for these sites will reflect the competition between buyers. However, market demand is not infinite. Even though the subject property may be physically and locationally suited for a particular use, better-located sites may satisfy the market demand for that use completely before the subject property can realize its development potential.

## Step 7. Financial Testing of Highest and Best Use Alternatives

The financial testing of each alternative use provides the framework for analyzing which alternative use has the highest value. The desire for a particular use in a particular location is essential. Clues that supply and demand may not support a particular use include vacancy throughout the market area or no new construction when land is available. The results of market analysis can lead to the potential consideration of the presence of obsolescence.

For income-producing properties, the income analysis should be supported with market and marketability analysis. The financial analysis of alternatives will often focus on which potential uses are likely to produce an income (or return) equal to or greater than the amount needed to satisfy operating expenses, financial obligations, and capital amortization of each investment. However, supply and demand are still essential considerations even if cash flow is positive, i.e., the financial analysis of alternative uses does not necessarily end with cash flow analysis.

Some economic uses of land, such as housing, may not be income-producing in the sense of a commercial property, and economic feasibility is weighed by considering prices and price trends. If the uses are not income-producing, the financial analysis will determine which uses are likely to create a value or result in a profit equal to or greater than the amount needed to develop and market the property under those uses—and of those uses, the use that produces the highest value.

The timing of alternative uses is a key consideration in highest and best use analysis because highest and best use is subject to change. In particular, the financial analysis of alternative uses is sensitive to the market acceptance of that use at the present time or at a future time. As an example, consider a ten-year-old, single-unit residence located next to a street that was just widened and where traffic increased 300% from the previous year. After the road widening, the area was rezoned from residential use to commercial use. The value of the improved residential property is $500,000, and the land value as though vacant with commercial zoning is $475,000. The contributory value of this ten-year-old residential structure is $25,000. If land prices increase slightly, the building will be removed. In the application of the cost approach to value, the building would be considered almost worthless, although it is only ten years old. The residential structure is the wrong improvement for this commercial site and would pay the penalty in the form of obsolescence for misuse of the site.

Uses that are not currently financially feasible for new construction can be analyzed to forecast when they would be financially feasible at some point in the future, i.e.,

BACK_DEFEXP-RR-002741

Copyrighted material licensed by Charles Brigden on September 17, 2020

when market rent rises above feasibility rent. The residual demand analysis that is part of the market analysis process provides the information needed to help forecast when a use will become financially feasible. Holding a property for future use may produce a higher present value than current development of a different use on the property.

Alternative uses that are currently financially feasible and those that are forecast to be financially feasible can be compared with discounted cash flow analysis, which is discussed in detail in Chapter 27, or with other methods such as the analysis of the present value of end-user sales to owner-developers, which is discussed later in this chapter.

The financial feasibility of a potential alternative use may not be the reason it is not currently the highest and best use. Sometimes the problem is revealed earlier in the testing process, e.g., property productivity analysis. A piece of land can be stripped of any viable economic use as a stand-alone entity by legal and physical constraints such as

- An inability to obtain a building permit
- Restrictive covenants that preclude any economic use or structure
- The presence of easements
- An inability to comply with lot area, lot dimension, or setback requirements
- No legal means of access
- Lack of accessibility (isolated location or abutting an unopened road allowance)
- Unfavorable topographical features
- Unfavorable soil conditions, including environmental contamination
- An irregular configuration
- An inability to secure essential services (water supply and sewage disposal either on site or off site)
- Development rights that were previously sold

Also, the immediate development of a financially feasible use may not be the current highest and best use because of delays in the development process such as a protracted permitting period. That sort of delay becomes part of the timing element of the highest and best use conclusion.

The demand for a location may suggest that a parcel is a prime retail corner at some point in time, but if the retail potential is some years in the future, another use—for example, apartments—that can be developed immediately could make the land more valuable today. For an existing property subject to a lease that is near expiration, the demand for the continued use of the property or conversion to another use may be a timing issue. Timing is a central issue in the analysis because the highest and best use is the use with the highest present value.

Prices and price trends can be important indicators of economic performance. Recent sales to owner-users could indicate that the economic performance of certain uses of real estate has recently reached the level of financial feasibility, or it could indicate that the market is becoming overdeveloped. If market conditions have changed since the last sales occurred, economic performance in the current market might be affected. Sales to speculative investors are more likely to indicate a market in transition, in which case current or proposed uses are not likely to be financially feasible. Other possible market indicators of economic performance include current and historical vacancy rates, current and historical rental rates, recent construction activity, and recent space absorption.

BACK_DEFEXP-RR-002742

## Financial Analysis of Alternative Uses

Many different techniques can be used to help guide the final highest and best use conclusion of which alternative use produces the highest present value. All the techniques commonly used by appraisers have certain factors in common.

First, the analysis should consider the amount and timing of all cash flows until the property reaches its peak income performance. In most properties, the peak performance is not typically sustained over the long term. Rather, economic performance usually rises and falls with market cycles.

Second, the model used should take into account the appropriate risk attributed to each of the cash flow forecasts for each use considered. In general, more support for the cash flow forecast from market analysis means less risk than a forecasted cash flow based only on general data. If different alternatives have different forecast expectations, then (a) the discount rate could be adjusted for this risk, (b) the forecast could be adjusted to match the alternative use's forecast expectation, or (c) the different risk could be explicitly addressed in the reconciliation of the highest and best use.

Finally, the analytical technique applied should be able to consistently select the alternative use that will produce the highest financial reward, assuming that all alternatives have the same probability for realizing the forecasted cash flows.

The five techniques used most commonly in financial analysis are

- Land residual analysis
- Discounted cash flow analysis
- Feasibility rent analysis
- Analysis of profitability index
- Analysis of the present value of end-user sales to owner-developers

Multiple methods may be needed to analyze alternatives depending on the reliability of the techniques used.

### Land Residual Analysis

For any alternative use of vacant land, the cost of construction (including an estimate of entrepreneurial coordination), the forecasted timing for the use, and the expected value of the specific property use should be known. The difference between the present value of the benefits of developing the property and the cost to develop it is the land residual, which is a primary indicator of financial feasibility. The land residual analysis provides the land value required for new construction to be economically justified. If the land residual is positive, the use is considered financially feasible, assuming that the land can be acquired for the residual amount or less.

The land residual model should be repeated for each alternative being considered. The development cost of each alternatives use will probably be different and should be reflected in the financial model. The different timing expectations (e.g., start date, construction time, and lease-up time) should also be reflected in the model, which is usually a discounted cash flow analysis.

As an example, suppose that a 25,000-sq.-ft. office building is deemed a reasonably probable use of the site as though vacant. If construction costs (including leasing commissions and rent loss during lease-up) for office buildings of a similar class in the market area are $125 per square foot and entrepreneurial incentive in the market has consistently equaled 10% of building costs, the total cost to construct the im-

BACK_DEFEXP-RR-002743

Copyrighted material licensed by Charles Brigden on September 17, 2020

provements would be $3,437,500. Similar improved properties would be expected to sell for $150 per square foot in the current market, so the expected value of the completed and leased-up property would be $3,750,000. The residual site value of the leased-up building would then be $312,500:

| Cost to Construct Improvements | 25,000 sq. ft. × $125 per sq. ft. × 1.1 | $3,437,500 |
|---|---|---|
| Sale Price of Property | 25,000 sq. ft. × $150 per sq. ft. | $3,750,000 |
| Residual Site Value | $3,750,000 − $3,437,500 | $312,500 |

The office building would be considered financially feasible if the contributory value of the land was competitive in the market.

### Discounted Cash Flow (DCF) Analysis

When improvements need to be considered (such as new construction, remodeling existing buildings, or continued operation of existing buildings) in highest and best use analysis, a discounted cash flow analysis is usually required to estimate the contributory value of the real estate. DCF analysis is also an appropriate tool when rezoning costs or anticipated changes in market conditions have to be accounted for in the analysis of the present value of alternate uses. The application of discounted cash flow analysis is illustrated in detail in Chapter 27.

### Feasibility Rent Analysis

Feasibility rent is the rent necessary to justify new construction. In a balanced market, feasibility rents are equal to market rents. The concept of feasibility rent helps appraisers determine the timing of development, i.e., when current rent levels in the market are expected to rise to the feasibility rent level.[1]

A carefully developed comparison of market rent with feasibility rent also serves as a quantitative indicator of financial feasibility. Market rent can be seen as an estimate of market demand (and affordability) for the current use, and feasibility rent is the rent necessary to justify new construction. Market rent is often estimated in the property productivity step of market analysis to compare locations. Feasibility rent is calculated by reversing the cash flow format used in the income capitalization approach—starting with net operating income, adding expenses, and adding the vacancy allowance to arrive at gross income.

As an example, suppose that the ideal improvement for a site is a small industrial facility that would cost $1,750,000 to construct, including entrepreneurial incentive and all other indirect costs based on an estimate of the sale prices of comparable sites, the cost of preparing the site, and the estimated cost of building the 50,000-sq.-ft. facility. Market research supports an overall capitalization rate of 6.75%.[2] The required net operating income could be calculated using this information, i.e., $1,750,000 \times 6.75\% = \$118,125$. Feasibility rent is then calculated by (1) adding operating expenses, (2) adjusting for vacancy and collection loss, and (3) converting the potential gross income to the standard unit of comparison, in this case, feasibility rent per square foot:

---

1. In addition to its use in the financial analysis of alternative uses, the analysis of feasibility rent is a powerful tool in the estimation of depreciation because the capitalized difference between feasibility rent and market rent represents total depreciation (if market rent is less than feasibility rent).

2. If the sales market is at a critical inflection point in the market cycle, a more sustainable overall rate adjusted for the sales market cycle or a rate based on the fundamental user market for alternative investments should be used.

BACK_DEFEXP-RR-002744

| | | |
|---|---|---|
| Net Operating Income | ($1,750,000 × 6.75%) | $118,125 |
| Operating Expenses | ($2 per square foot × 50,000 square feet) | + $100,000 |
| Effective Gross Income | | $218,125 |
| Plus Stabilized Vacancy and Collection Loss (5%) | | ÷ (1 − 5%) |
| Potential Gross Income | | $229,605 |
| Feasibility Rent per Square Foot | ($229,605/50,000) | $4.59 |

The calculated feasibility rent can be compared directly to market rent to determine financial feasibility. In this case, if a marketability study indicated that industrial facilities of the same type would be expected to have a market rent of $5 per square foot, the proposed development would be financially feasible. If the market rent were lower than the feasibility rent of $4.59, the proposed development would not be financially feasible.

### Analysis of Profitability Index

Analysis of the profitability index, which is similar in concept to the net present value of an investment, directly compares the value contribution of some action such as developing a proposed property on a particular site with the cost of that action. Analysis of the profitability index of a land use is most useful in the analysis of the financial feasibility of conversion, renovation, or alteration of an improved property, although it can be used to measure the feasibility of establishing alternative uses on vacant land. (Further explanation and examples of the use of the profitability index are covered in Chapter 27.)

### Analysis of the Present Value of End-User Sales

The defining characteristic of sales of property made to "end users" is that the buyer will make the property available to the user of the space for immediate occupancy. The values of alternative uses can be discounted to compare differences in market timing and ultimately to determine which alternative provides the highest present value.

The discount rate can be adjusted for holding costs and any appreciation expected in sale prices, or the actual cost and appreciation can be accounted for in a discounted cash flow analysis. Note that any appreciation in the prices of end-user sales is not necessarily an inflation adjustment in a fundamental analysis. That is, the price appreciation could include some expected change in future buying power such as disposable income after inflation. Some appraisers use an inflation-adjusted discount rate.

Consider a two-acre commercial site on a major thoroughfare. Four uses were forecasted through marketability analysis to be in demand for the site:

- branch bank
- pharmacy
- service station
- fast food restaurant

However, the timing of the demand for each use varied, as illustrated in Table 18.1.

All of the forecasts of timing were judged to have equivalent reliability, and a constant discount rate of 20% was considered reasonable. The land value is estimated to be stable for the next few years in the market of end users. Ultimately, the alternative that produces the highest present value is use of the site for the development of a fast food restaurant, as indicated in Table 18.2.

BACK_DEFEXP-RR-002745

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 18.1** Timing of Demand

| Use | User Price per Sq. Ft. | Date of Most Recent Sale to End User | Estimated Mid-Range Forecast of Timing for Demand for End User |
|---|---|---|---|
| Branch bank | $23 | 2 years ago | 3 years from now |
| Fast food restaurant | $19 | 3 years ago | 1 year from now |
| Pharmacy | $25 | current | 4 years from now |
| Convenience store | $16 | 1 year ago | 1 year from now |

**Table 18.2** Discounted Value

| | Bank | Fast Food Restaurant | Pharmacy | Convenience Store |
|---|---|---|---|---|
| User price per square foot | $23 | $19 | $25 | $16 |
| Future timing for use (years) | 3 | 1 | 4 | 1 |
| PV @ 20% | $13.31 | **$15.83** | $12.06 | $13.33 |

## Step 8. Reconciliation and Conclusions

In the reconciliation of highest and best use analysis, the various inputs in the data analyses from earlier steps in the process are reviewed. The resulting financial analyses by various methods are also analyzed and the methods considered most reliable form the basis of the highest and best use conclusion. In addition, the results of the analysis of inferred demand are reconciled with the calculated financial analyses.

The resulting reconciliation conclusions of highest and best use for both the land as though vacant and the property as improved (or as if improved as proposed) should be presented in terms of

- Use
- Timing
- Market participants

Traditionally, appraisers have emphasized the physical use in the conclusion of highest and best use, but all three considerations are important in identifying the highest and best use fully.

The development of those conclusions in the market analysis process is integral to highest and best use analysis, which in turn is integral to the valuation of the property. The most probable buyer is a critical conclusion used in choosing comparable sales in the sales comparison approach. The probable space user is critical in choosing comparable leases in the income capitalization approach.

In any report of a highest and best use conclusion, an appraiser should provide market evidence that leads the reader of the appraisal report to an understanding of the use and the timing (or future occupancy) for the use. The property type, size, and market conditions provide an indication of how detailed the fundamental data needed will be, which will dictate to a large extent how specific the conclusion of the highest and best use of a property should be. However, all three parts of the highest and best use conclusion are needed at some level to reliably apply the approaches to value. For example, the selection of comparable sales is based on properties with a similar high-

BACK_DEFEXP-RR-002746

est and best use as the subject property, so that requires some basis to determine if the comparable properties have a similar use, timing for use, and market participants as the subject property.

### Reporting Highest and Best Use Conclusions

In an appraisal report that includes an opinion of market value, a discussion of, or reference to, a separate marketability study (of either inferred demand or fundamental demand) may need to precede the discussion of the highest and best use determination to provide context for the highest and best use conclusions. A marketability study is particularly important in the appraisal of vacant land, of new or proposed construction, and in transitional or complex markets.

In addition, highest and best use analysis often incorporates techniques and data from the application of all three approaches to value. In many appraisal assignments, the financial analysis of alternatives and the test of maximum productivity require information that is obtained from the application and development of the approaches to value. Therefore, even though the discussion of highest and best use traditionally precedes the approaches to value in an appraisal report, the conclusion of highest and best use often can be finalized only after a preliminary analysis of alternative land uses has been performed. The conclusions of use, timing, and market participants reported in the highest and best use section of a report should be consistent with conclusions and applications in the other parts of the report.

## Special Situations in Highest and Best Use Analysis

In the identification and testing of highest and best use, special considerations are required to address the following situations:

- Excess land and surplus land
- Proposed construction
- Legally nonconforming uses
- Illegal uses
- A use that is not currently the highest and best use
- Mixed uses
- Special-purpose properties

### Excess Land and Surplus Land

The related but distinct concepts of surplus land and excess land were introduced in Chapter 12. The proper treatment of unused land on an improved site can be an important consideration in highest and best use analysis. Both excess land and surplus land have a common characteristic in that they are not needed to serve or support the existing improvement. However, only excess land has the potential to be separated from the rest of the improved property and to be used at its own highest and best use. Also, the highest and best use of the excess land may or may not be the same as the highest and best use of the main parcel. In contrast, surplus land cannot be separated from the improved property and sold with an independent highest and best use.

A site with excess land may be able to support two separate highest and best uses: (1) the highest and best use of the land used to support the existing improve-

BACK_DEFEXP-RR-002747

Copyrighted material licensed by Charles Brigden on September 17, 2020

ments and (2) the highest and best use of the excess land. Surplus land, meanwhile, is currently unused land that might at best be used for the expansion of the existing improvements, i.e., a modification of the current use, if legally permissible and financially feasible. Surplus land is sometimes used in improvement density calculations for zoning requirements, which may be a factor in deciding if that area is needed to support the existing improvements.

A variety of physical, legal, and other factors can affect whether unused land can be classified as excess land. For example, a lease that covers all of the land of an underimproved property can postpone or delay development or separate use of excess land until the lease expires.

When the appraised property includes excess land, the excess portion and the improved portion are valued separately, each based on its own highest and best use. If an appraisal assignment includes valuing an improved parcel and an accompanying parcel of excess land together as though the two were sold in one transaction, the appraiser must consider the cost of splitting the entire parcel (including entrepreneurial incentive), which may be so significant that the separation of the excess land may not be economically feasible. The sum of the values of the improved parcel and the excess land may equal the value of the whole, or an adjustment may be needed to that sum to reflect a combined sale. If two separate value conclusions are provided—one for the improved parcel and one for the excess parcel—but the parcels are not legally separated, the values are based on the hypothetical condition that the parcels are legally separated.

## Proposed Construction

Analysis of the highest and best use of the land as though vacant can often involve an analysis of proposed construction. For example, consider an assignment in which the land is vacant at the time the appraisal is prepared, and the assignment calls for the appraiser to develop an opinion of market value that is either

- A current value, subject to the hypothetical condition that the proposed improvements are built as of the current date, or
- A prospective value, subject to the special or extraordinary assumption that the proposed improvements will be built as of the future date of value

In either case, an appraiser analyzes the highest and best use of the property *as if improved as proposed*. These sorts of extraordinary assumptions and hypothetical conditions are based on a conclusion developed from the appraiser's research and data, i.e., that the improvements will be completed at a certain time in the future when the market would accept that use.

The specific improvements that are proposed may or may not represent the highest and best use of the real estate if improved as proposed. The highest and best use analysis process is applied just as it is for any improved property to support an appraiser's conclusion as to which use is most desired in the market. Proposed construction may involve all completely new construction or a modification of the existing improvements, but in either case the eight-step process is applied to the proposed improvements and reported with a clear presentation of an appraiser's projection of the timing of the proposed use. Even though the improvements are not yet constructed, they may suffer value loss by obsolescence if they are not similar to the ideal improvement.

BACK_DEFEXP-RR-002748

## Legally Nonconforming Uses

A legally nonconforming use is a use that was lawfully established and maintained but no longer conforms to the current land use regulations of the zone in which it is located.[3] Some legal nonconformities can be created by governmental action such as a partial taking in an eminent domain proceeding. Consider a gas station property with 20,000 square feet of land, which is the minimum amount of land area required by local zoning for gas station use. If the city acquired 1,000 square feet of the land for an intersection improvement, the site would then contain 19,000 square feet and would no longer conform to the zoning requirements for site size. Other legally nonconforming use situations can be created when codes and ordinances are changed. For example, suppose a one-unit residence on a 7,500-sq.-ft. site in the core residential district of a community zoned R-1 requires at least 7,500 square feet of land area. If the city adopts a new zoning ordinance in which the minimum site size for a lot zoned R-1 is increased to 10,000 square feet, the existing property will no longer conform. In both instances, the property uses are considered legally nonconforming uses because they were caused by an action of a governmental body. Changes in building codes, which happen regularly in cities, can also make a property legally nonconforming.

For properties with legally nonconforming uses or properties with improvements that differ significantly from the ideal improvement, an appraiser should determine whether the property can continue to operate as its current use and alternatively whether applicable codes, ordinances, or private restrictions allow modification of the improvements that would bring them into conformity. This may involve analyzing the reasonable probability of a change in zoning as conducted in testing the highest and best use of the land as though vacant. Again, an appraiser should report any evidence supporting a reasonable probability that a change could be made to bring the improvements into conformity with a particular code, ordinance, or restriction. Such evidence could include trends in the market area, historical changes to codes or ordinances in the area, or a community's master plan.

Some communities also differentiate between (1) legally nonconforming uses and (2) properties that are legal land uses but do not conform to current development norms. In the former case, the use is nonconforming. In the latter, the property is still being used in accordance with the zoning even though the site (or the improvements) may be too small or otherwise inconsistent with development norms. The ideal improvement will meet both the legal requirements and the market norms. Most zoning ordinances have special sections that deal with nonconforming use situations, and appraisers should be familiar with them.

Zoning changes may create underimproved or overimproved properties. A one-unit residence located in an area that is subsequently zoned for commercial use may be an underimproved property. In this case, if there is demand for commercial use, then the residence may be removed so that the site can be improved to its highest and best use. On the other hand, if there is adequate current demand but there is demand forecast in the future, the residence will be considered an interim use until conversion to commercial use is financially feasible. In this case, the conclusion of highest and best use would be to leave the property devoted to its interim use until

---

3.  The traditional term *legally nonconforming use* has many synonyms constructed with similar words, e.g., *legal nonconforming use* and *legal but nonconforming use*. However, neither the words *legal* or *legally* are necessary modifiers. In plainest terms, a use that can continue is *nonconforming*, and a use that cannot continue is *illegal*.

BACK_DEFEXP-RR-002749

the forecast date when redevelopment is financially feasible. A legally nonconforming property can be an overimprovement when zoning changes reduce the permitted intensity of property use. For example, the site of an older apartment building with eight units in a fully built-up neighborhood might be downzoned to a less intense use. That is, if the vacant site were developed now, the new zoning restrictions would only allow six units to be built. Nonconforming uses also commonly result from changes in development standards that affect features such as landscaping, parking, setbacks, and access.

Zoning ordinances usually permit a preexisting use to continue but may prohibit expansion or major alterations of any structures that support the nonconforming use. This is especially true in the case of flood hazard rules of the federal flood insurance program. Some jurisdictions specify a time period for phasing out legally nonconforming uses. In some jurisdictions, a nonconforming use that is discontinued cannot be reestablished, whereas in other jurisdictions, a nonconforming use must be eliminated if the property suffers major damage or if the property is abandoned for a statutory period of time. In some instances, a nonconforming use can be rebuilt to the same intensity of use that it had prior to its destruction, provided it has no more impact on the market area (e.g., a detrimental effect on neighboring properties) than it did before.

A zoning variance can create a legally nonconforming use. An area variance (less commonly known as a *use variance*) may be allowed due to special circumstances applicable to a specific property, when strict application of the provisions of a development code deprives the property of privileges commonly held by other property in the vicinity that is under the same zoning. When a variance is granted, the legally nonconforming use usually can be rebuilt without taking any unusual steps, in contrast to an existing use that is legally nonconforming. Appraisers should be careful to research if a variance is only for the current owner and the current use. If the variance is issued to the current owner for that specific use and it expires when the property is transferred to a new owner, the use allowed by the variance will not be permitted for the new owner.

When valuing land with a legally nonconforming use, an appraiser should recognize that the current use may be producing more income, and thus have more value, than the property could produce with a conforming use. The legally nonconforming use may also produce more income and have a higher value than comparable properties that conform to the zoning. Therefore, when an opinion of the value of a property with a legally nonconforming use is developed in the sales comparison approach, an appraiser should consider the demand for the higher intensity of use allowed for the subject property and also consider the risks and limitations associated with the nonconformity. If the improvements could not be replaced if destroyed (for example, by fire or flood), there is the risk that the income produced by the property will cease, and this risk must be reflected in the valuation to the degree that it is acknowledged by market participants.

In the case of the eight-unit apartment building in an area downzoned to six-unit developments, for example, the capitalization or discount rates in the income capitalization approach may need to reflect any increased risk associated with the nonconforming use, specifically the risk that the improvements could not be rebuilt if destroyed. In the sales comparison approach, the subject property would be treated

*The Application of Highest and Best Use Analysis*    **331**

BACK_DEFEXP-RR-002750

as an eight-unit apartment, but to reflect this risk, adjustments would need to be made to comparable properties unless they too are similarly legally nonconforming uses. An appraiser will have to determine whether sales of properties with six units are appropriate comparable transactions in applying the sales comparison and income capitalization approaches or whether the sales should be of properties with eight units. In the cost approach, any increment in value due to the legally nonconforming use is attributed to the improvements, not to the land, if the improvements could not be rebuilt.[4]

A zoning ordinance does not control the economic demand for a property, but rather the market does. For example, a property rezoned from residential use to commercial use does not necessarily increase in value. There may still be demand for residential improvements in the market area but not for commercial improvements at this location. In this example, the zoning change would not increase the value of the land. In addition, if high economic demand is found for the current use, then the current, legally nonconforming use may be producing more income than the rezoned, conforming use would.

In some cases, a legally nonconforming use designation may affect the value of a property negatively. Appraisers must understand enough about the legal requirements affecting properties in the area to be able to identify when there are further issues to consider. For example, in many municipalities a nonconforming use cannot be rebuilt if it is completely or partially destroyed. Some lenders consider the restriction on rebuilding a risk, and lending practices or parameters for conforming and nonconforming properties may differ. As a result, some lenders require insurance against loss due to the nonconforming use, thus reducing net income to the property and therefore value.

It is often easy to recognize a legally nonconforming use that corresponds to the highest and best of the property as improved. Sometimes, however, it is not clear whether a legally nonconforming use is the highest and best use of the site as though vacant. Answering that question usually requires careful analysis of (a) the selling price or income produced by the legally nonconforming use and (b) the selling prices or income levels that would be produced by alternative uses of the land if the property were brought into conformity with existing regulations. In most cases when a legally nonconforming use is allowed to continue for the remaining economic life of the improvements, the market will probably not distinguish between a legal use and a legally nonconforming use. But a legally nonconforming use can create a problem in the application of the cost approach, where the value of the land and the value of the improvements are summed to develop an indication of value of the property as a whole. When the land is valued as though vacant, that estimate of value can be severely diminished by the existence of zoning or land use regulations, but the market for the improved property may view the property as if the improved use were legal, i.e., without an impairment to the land value.

### Illegal Uses

Sometimes a property being appraised includes improvements that were constructed without permits. Often in these cases the client will instruct the appraiser to "just ig-

---

4.  If legally nonconforming uses could be rebuilt, any incremental value due to those uses would be attributed to the land. This is because legally permissible uses of the land as though vacant would include the legally nonconforming use in this case.

BACK_DEFEXP-RR-002751

Copyrighted material licensed by Charles Brigden on September 17, 2020

nore" the illegal portions, but this is inappropriate. If the appraiser does "ignore" the illegal improvements, the appraisal is premised on the hypothetical condition that the illegal improvements do not exist when in fact they do exist, and the hypothetical condition must be clearly disclosed in the appraisal report.

To value a property with illegal improvements in its "as is" state, the appraisal must reflect the cost to remedy the illegality—i.e., to either remove the illegal improvements or obtain legal permissibility. Obtaining legal permissibility might include upgrading the improvements so they conform to building codes and the payment of fees or fines.

## Use That Is Not Currently the Highest and Best Use

The timing of alternative uses is a consideration in the conclusion of highest and best use because highest and best use is subject to change. In particular, the financial feasibility of an alternative use can be sensitive to the market acceptance of that alternative use now or at a future time. When no alternative uses are currently financially feasible, an appraiser should analyze when an alternative use will, if ever in the foreseeable future, become financially feasible and therefore become a candidate for the maximally productive use. If the maximally productive use of a property is delayed for legal or financial reasons, then the highest and best use of the property would be to leave the property as is until that prospective use can be achieved, e.g., when land value rises to the level that modification of the current use is legally permissible, financially feasible, and maximally productive.

The current use that the property is put to until it is ready for a more valuable use has traditionally been known as an *interim use*. When it is not financially feasible on the date of value to put the property to a more valuable use, the appropriate highest and best use to be analyzed includes both the future use and the interim use. In other words, when developing a market value opinion for such a property, an appraiser must take into account the anticipated change in use in the future. The interim use may contribute to the value of the property up to the point at which it becomes feasible to change the use.

Interim use improvements may or may not contribute much, if anything, to the value of the land as though vacant. If they cannot produce gross revenues that exceed reasonable operating expenses, the improvements do not contribute to property value. Indeed, the value of the property as improved may be less than the value of the land as though vacant when demolition costs and real estate taxes are considered. However, many outmoded improvements that clearly do not resemble the ideal improvement do create an increment of value over the value of the land as though vacant. Also, the interim use may have value to the property user to the extent that the income generated by the improvements defrays the costs of carrying the property, the cost of demolishing the improvements, or both.

Uses that are not currently financially feasible must be analyzed to forecast when they would be financially feasible at some point in the future, such as when market rent reaches feasibility rent (i.e., the rent level necessary to justify new construction). The residual demand analysis that is part of the market analysis process provides the information needed to forecast when a use will become financially feasible. (This is another example of the importance of market analysis throughout the valuation process.) Alternative uses that are currently financially feasible and those that are

*The Application of Highest and Best Use Analysis*    **333**

BACK_DEFEXP-RR-002752

forecast to be financially feasible can be compared through discounted cash flow analysis, which is discussed in detail in Chapter 27.

### Mixed Uses

Highest and best use often comprises more than one use for a parcel of land or an improved property. A large tract of land might be suitable for a planned unit development with a shopping center in front, condominium units around a golf course, and one-unit residential sites on the remainder of the land. Business parks often have sites for retail stores in front and warehouse or light manufacturing structures in the rear. In these cases, different portions of the tract will have different highest and best uses.

One parcel of land may serve many functions. Timberland or pastureland may also be used for hunting, recreation, and mineral exploration. Land that serves as a right of way for power lines can double as open space or a park or may be used for agricultural purposes. Public streets with railroad sidings can also be considered mixed-use land.

A single building can have a mix of uses as well. A hotel may include a restaurant, a bar, and retail shops in addition to its guest rooms. A multistory building may contain offices, apartments, and retail stores. A "single-family," owner-occupied home may, where permitted, have an upstairs or basement apartment.

If the highest and best use of a property is for more than one use on the same parcel or in the same building, the appraiser must analyze the contributory value of each use. This testing can be accomplished by repeating the steps of marketability analysis for each use to determine the timing and economic contribution of each use and thereby be reconciled into a conclusion of the best economic mix of uses for the property.[5]

### Special-purpose Properties

All properties are built for a specific use, but some properties are labeled *special-purpose properties* when the features of the improved property are appropriate for only a specific use or a limited number of uses, which may be costly to modify to another use. The highest and best use of a special-purpose property as improved is probably the continuation of its current use if that use remains viable and there is sufficient market demand for that use. The highest and best use analysis would likely include some forecast of continued economic demand.

If the current use of a special-purpose property is physically, functionally, or economically obsolete and no alternative uses are feasible, the highest and best use of the land might be realized by demolishing the structure and selling the remains for their scrap or salvage value, if possible. This may be true even if the improvements are relatively new and they were costly to build. For example, a ten-year-old fire station would have been designed for one use, and the owner of the property is the only user of the real estate put to that use.

---

5.   For an example of the process of highest and best use analysis for a mixed-use property, see Stephen Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014), 547-552. The example illustrates a mixed-use site, but the analysis of a mixed-use building would follow similar procedures.

BACK_DEFEXP-RR-002753

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Land and Site Valuation  19

Land has value because it provides potential utility as the site for a structure, recreational facility, agricultural tract, right of way for transportation routes, water storage, or other use. Land may also have value when valuable minerals (e.g., oil, coal, gravel, sand, iron ore) can be extracted from it. In some locales, the ability to extract water from a site is very valuable, and the legal right for its use may dwarf all other forms of utility. In other areas, the ability to build in the air space above a parcel of land may have as much or more value than the potential uses of the surface or subsurface of the land. In sum, if land has utility for a specific use and there is demand for that use, then the land has value to a particular category of users. Use characteristics and demand are not static and will vary over time and under changing economic conditions. Beyond the basic utility of land, however, many principles and factors must be considered in the process of land valuation.

## Relation to Appraisal Principles

The appraisal principles of anticipation, change, supply and demand, substitution, and balance all influence land value. Anticipation means that value is created by the expectation of benefits to be derived in the future. For example, if buyers anticipate that land in a certain location will be in demand for office use within the next five years, they may be motivated to acquire land for future development even though the development of office space is not presently feasible. The competition among the buyers in the market for land creates a price level for the land that may have little to do with the current use.

In comparison to most commodities, the supply of land is relatively stable. Although vast changes have occurred in the earth's surface over the ages and slight modifications in the supply and quality of land may occur over time, these changes usually occur over such a long term that their effects are imperceptible in real estate markets. There are, however, a few notable exceptions to the permanence of land, such as the accretion or erosion of land along a shoreline, the pollution of land with

harmful wastes, the exhaustion of agricultural land through improper farming methods, and the transformation of arable land into arid land due to ecological imbalances or climate change. Earthquakes may change the surface of the earth, faults beneath the surface can create vast sinkholes, and old underground mines can cause subsidence.

The principle of substitution, which holds that a buyer will not pay more for one property than for an equivalent property, applies to raw land and developable sites just as it does to improved property. The principle of substitution indicates that the greatest demand will be generated for the lowest-priced site with similar utility.

The principle of balance is also applicable to the value of land. When the various elements of a particular economic mix or a specific environment are in a state of equilibrium, the demand for land is sustained. When the balance is upset, demand may decrease and values change. For example, if an industrial district has too much industrially zoned land and a declining number of industrial users, then the demand for industrial land will probably fall. On the other hand, if the industrial district is in transition to other, more profitable uses and there is a reasonable probability of a zoning change, the value of a particular site could be higher than the value for continued industrial use.

## Property Rights and Public Controls

The analysis of the value of a parcel of land focuses on the physical parcel and the accompanying property rights. These rights may include the right to

- Develop the land to its highest and best use
- Lease the land to others
- Farm the land
- Mine the land
- Alter the land's topography
- Subdivide the land
- Assemble the parcel of land with other parcels
- Hold the land for future use
- Construct or alter building improvements
- Reserve the land in perpetuity via an easement, donation, or sale to a nonprofit or government entity

Whenever possible, appraisers consult title reports, public records, or available land survey information to identify easements, rights of way, and private or public restrictions that affect the subject property.

In an effort to encourage planned growth and compatibility among different land uses, governments regulate how land can be used. Most municipalities and counties have some form of land use regulations that specify how a parcel of land can be developed. In addition to land use regulation, many jurisdictions have master plans or comprehensive land use plans that specify long-term development goals. Frequently, real estate developers must have amenities such as open space, streets, and off-site public improvements in place or dedicated before a proposed development receives approval from the appropriate public agency. Development can proceed only after detailed development plans have been submitted and zoning and building department approvals have been obtained. In many areas, citizen groups will protest a development that they do not like, and their objections can influence the type of

BACK_DEFEXP-RR-002755

development that is finally approved and the cost and time required to get approvals. In some jurisdictions, the time, effort, and costs to obtain approvals are significant. Typically, the value of the land increases after formal site plan approval has been achieved and permits have been obtained for a development. At that point, the site has full entitlements and is ready for development.

Through the power of eminent domain, the government can acquire land from the private sector to be used for public and sometimes non-public projects, to augment the supply of public land, and to encourage economic development or eliminate blight in a specific area.[1]

In some jurisdictions, transferable development rights can greatly affect the value of land. In urban areas, development rights can be valuable, and discrete markets have formed in which these rights are traded. In some rural areas, government agencies compensate farmers for retaining land in agricultural use, and the agencies then shift or sell the benefit of those development rights to other locations. Lower ad valorem taxes on agricultural land also affect rural land use. This form of tax subsidy tends to extend the duration of agricultural uses.

A trend in the United States has been the acquisition of land through open space or conservation easements that are held in perpetuity by qualified agencies. These permanent encumbrances limit or prohibit the development potential of land. The potential uses of land subject to perpetual open space or conservation easements are usually restricted, as specified in the deed of easement, and thus the value of the land is affected. Open space can also be preserved through the qualified donation of specified easement rights to a qualified recipient such as a land trust.

Water, mineral, and air rights are also important considerations in land valuation. Water rights cover the flow of water, usually for stated times and in stated quantities, for irrigation and hydroelectric power generation. Water rights also can take the form of riparian rights which, under common law, grant a landowner the ownership of waters that share a border with the owner's parcel of land. Mineral rights cover the underground portion of the land and usually refer to the right to extract underground minerals or to use underground caverns or reefs for storage. The valuation of mineral rights usually requires specialized research, but appraisers need to understand if mineral rights are to be included or excluded from the valuation. Real estate developments established on air rights, often over railways, can be found in older urban areas, particularly where the density of the built environment is already high and little land is available for new construction.

### Physical Characteristics and Site Improvements

In the common parlance of valuation, land becomes a *site* when the parcel of land is improved and ready to be used for a specific purpose. The physical characteristics of a site, the utilities available, and any site improvements affect the use and value of the land. The physical characteristics of a parcel of land that an appraiser must consider include

- Size
- Shape

---

1. The taking of private land through condemnation for economic development, and particularly for private sector development, has come under greater public scrutiny since 2005 when the US Supreme Court issued its decision in *Kelo v. City of New London*.

BACK_DEFEXP-RR-002756

- Frontage
- Soils
- Location
- View
- Topographical characteristics such as contour, grade, and drainage

A site may have both on-site and off-site improvements that make it suitable for its intended use or for new construction. The availability of water, sewers, electricity, natural gas, and telephone and data lines also influences the use and development potential of a parcel of land. (See Chapter 12.) On-site improvements are subject to physical deterioration and functional obsolescence like buildings and other structures when the site is valued as improved. Off-site improvements may have an effect on the value of a site, even though they are not a part of the site.

## Highest and Best Use

The valuation of land draws directly from the conclusions of highest and best use analysis. Even if a site is already improved, the site is valued as though vacant and available for development to its highest and best use. Consideration of the site as though vacant facilitates the orderly analysis and solution of appraisal problems that require land to be valued separately. The highest and best use of a competitive site on the date of sale is the basis of the comparability of that site to the property being appraised. Regardless of how physically similar a potentially comparable site is to the subject site, the most comparable sales would have the same or a similar highest and best use. Markets without recent sales of comparable sites are problematic and may require analysis of competing sites where sufficient data are available or alternative land valuation methods may be considered.

The highest and best use of the property as improved is affected by how much the existing improvements contribute to the value of the property as a whole. The value contribution of the improvements can be estimated by subtracting the market value of the site from the market value of the property as improved. Site value may be equal to or greater than the value of the property as improved even when substantial improvements are located on the site. Any penalty for the misuse of the site is applied to the improvements. Demolition of existing improvements is usually appropriate when those improvements do not contribute to the overall property value. In that situation, the cost of converting the property into vacant land is deducted from the value indication for the site.

Sometimes the highest and best use of a property is to keep the land vacant until land values rise to support new development. In that situation, the most appropriate comparable properties would be other vacant sites being held for future development for similar uses.

### Excess and Surplus Land

As first discussed in Chapter 12, excess land is land that is not needed to support the improvements and may be sold off separately from the rest of the property at its own highest and best use. An area of excess land may have a different highest and best use from the rest of the site, which must be addressed in the highest and best use analysis by testing alternate uses of the excess land for physical possibility, legal permissibility, financial feasibility, and maximum productivity in the market. Further-

BACK_DEFEXP-RR-002757

Copyrighted material licensed by Charles Brigden on September 17, 2020

more, excess land has to be treated separately in the valuation process. An entirely different set of comparable data may be required to analyze the value influences on the excess land, and the appraiser must consider and report the contributory value of the excess land to the value of the whole. Adding the value indication of the excess land to the value indication of the rest of the property may or may not be appropriate because the sum of the parts may or may not equal the value of the whole.

In contrast, surplus land does not have a separate value from the rest of the site because it cannot be sold separately. It is extra land that may or may not contribute value to the overall property. Both surplus and excess land are extra meaning they are not needed to support the improvements. However, excess can be sold off with its own highest and best use whereas surplus land cannot. Surplus land may or may not have the same value per unit of comparison (e.g., value per square foot, value per acre) as the rest of the site.

## Applicability and Limitations of Valuation Techniques

Sales comparison is usually the preferred method for developing an opinion of site value. When this method is used, most of the techniques for selecting comparable sales and making adjustments that are described in Chapter 20 can be applied to site valuation. When there are not enough sales of similar parcels for the application of sales comparison, alternative methods such as market extraction, allocation, land residual analysis, and various income capitalization techniques may be used.

### Sales Comparison

Sales comparison may be used to value land that is actually vacant or land that is being considered as though vacant for valuation purposes. Sales comparison is the most common technique for valuing land, and it is the preferred method when comparable sales are available. To apply this method, data on sales of similar parcels of land is collected, analyzed, compared, and adjusted to provide a value indication for the site being appraised. In the comparison process, the similarity or dissimilarity of the parcels is considered.

Appraisers perform several tasks in developing an opinion of site value:

- Identify the highest and best use and other characteristics of each potential comparable sale and then choose the appropriate properties for analysis.
- Gather data on actual sales as well as listings, offers, and options.
- Identify the similarities and differences in the data.
- Identify units of comparison that explain market behavior.
- Adjust the appropriate unit prices of the comparable sales to account for the dissimilar characteristics of the land being appraised.
- Form a conclusion as to the value of the subject site.

The objective of sales comparison is to select the most comparable sales and then adjust the comparable sales for differences that cannot be eliminated within the selection process. Elements of comparison may include property rights, financing terms, conditions of sale (motivation), expenditures immediately after purchase, market conditions (changes over time), location, physical characteristics, economic characteristics, available utilities, and zoning. The physical characteristics of a parcel of land include, but are not limited to, its size, shape, frontage, topography, soil conditions, location, and

BACK_DEFEXP-RR-002758

| Table 19.1 | Applicability and Limitations of Land Valuation Methods |
|---|---|

**Sales Comparison**

| | |
|---|---|
| Procedure | Sales of similar, vacant parcels are analyzed, compared, and adjusted to provide a value indication for the land being appraised. |
| Applicability | Sales comparison is the most common technique for valuing sites, and it is the preferred method when comparable sales are available. |
| Limitations | A lack of sales and the comparability of the available data may weaken support for the value estimate. |

**Market Extraction**

| | |
|---|---|
| Procedure | An estimate of the contributory value of improvements is deducted from the total sale price of a property to arrive at an indicated land value for the comparable. The indicated land values of the comparables are then compared to provide a value indication for the land being appraised. |
| Applicability | This technique is most applicable when the contribution of the improvements to total property value is generally small and relatively easy to identify. (The technique is frequently used in rural areas.) |
| Limitations | The appraiser must be able to determine the value contribution of the improvements. |

**Allocation**

| | |
|---|---|
| Procedure | A ratio of site value to property value is extracted from comparable sales in competitive locations and applied to the value of the improved subject property or comparable properties to develop the site value. |
| Applicability | This technique is applicable when<br>· Valuing one-unit residential lots where ample sales of improved properties are available and the ratio of site value to improved property value can be supported. This method tends to be less accurate for commercial properties, especially when the number of vacant land sales is inadequate.<br>· For commercial properties or where relatively few sales are available, allocation can provide a test of reasonableness rather than a formal opinion of site value. |
| Limitations | The allocation method does not produce conclusive value indications unless ample sales data is available. The method is rarely used as the primary land valuation technique for properties other than residential subdivision lots. Also, land-to-property value ratios can be difficult to support. |

**Land Residual Analysis**

| | |
|---|---|
| Procedure | The net operating income attributable to the land is capitalized or the cost to construct an improvement is deducted from the value as if completed to produce an indication of the land's contribution to the total property. |
| Applicability | This technique is applicable in the financial analysis of alternative uses of a particular site in highest and best use analysis and when land sales are not available. |
| Limitations | When used as an income capitalization technique, the following conditions must be met:<br>1. Building value is known or can be accurately estimated.<br>2. Net operating income to the property is known or can be estimated.<br>3. Both building and land capitalization rates are available from the market.<br>When using a cost-based technique, the appraiser must be able to determine the value contribution of the improvements, estimated at their depreciated cost |

**Ground Rent Capitalization**

| | |
|---|---|
| Procedure | A market-derived capitalization rate is applied to the ground rent of the subject property. |
| Applicability | This method is useful when comparable rents, rates, and factors can be developed from an analysis of sales of leased land or sales of unleased land for which the market rent can be credibly determined. |
| Limitations | An adjustment to the value indication for property rights may be necessary. |

**Subdivision Development Analysis (Discounted Cash Flow Analysis)**

| | |
|---|---|
| Procedure | Direct and indirect costs and entrepreneurial incentive are deducted from an estimate of the anticipated gross sales price of the finished lots or units, and the net sales proceeds are discounted to present value at a market-derived rate over the development and absorption period. If entrepreneurial incentive is not deducted as a line-item expense, then the discount rate must reflect the full effect of any profit. |
| Applicability | This technique is applicable when subdivision development is the highest and best use of the land and there is market support for immediate absorption. |
| Limitations | Discounted cash flow analysis requires significant amounts of data such as development costs, profit margins, sales projections, and the pricing of developed lots or units, together with a supportable forecast of market absorption. |

Note: Certain US states do not recognize subdivision development analysis as an acceptable valuation method for purposes of litigation valuation.

BACK_DEFEXP-RR-002759

Copyrighted material licensed by Charles Brigden on September 17, 2020

view. (For a detailed discussion of elements of comparison, see Chapter 21.) Unit prices may be expressed as price per square foot, front foot, acre, lot, dwelling unit, floor area ratio (FAR), or other unit used in the market.

> Sales comparison is the most commonly used method of valuing land. Data on sales of similar parcels of land is collected, analyzed, compared, and adjusted to reflect the similarity or dissimilarity of those parcels to the subject property.

If sale prices have been changing rapidly over the past several years and an adequate amount of sales data is available, the sales selected for comparison should take place as close as possible to the effective appraisal date. When current data on local sales is not available, appraisers may need to expand the search to another market area, which may call for an adjustment for location, or extend the search back in time in the same market area, which usually calls for an adjustment for market conditions. The decision to use sales from other market areas or older sales should be based on which adjustment has more support—the location adjustment or the market conditions adjustment.

Among generally similar sales, size may be less important as an element of comparison than date and location. Most land uses have an optimal site size. If the site is too large, the value per unit of comparison for the surplus land tends to decline at an accelerating rate. Because sales of different sizes may have different unit prices, ordinarily more weight is given to sales of comparable properties that are approximately the same size as the subject property.

Zoning is a basic criterion in selecting comparable sites. Sites zoned the same as the subject property generally have the same or a similar highest and best use and may be the most appropriate comparable properties. However, zoning can be less important than utility or highest and best use in areas that are in transition or targeted for redevelopment. If sufficient sales in the same zoning category are not available, data from similar zoning categories can be used and adjustments may be necessary.

In addition to recorded sales and signed contracts, appraisers may consider offers to sell (listings) and offers to purchase. However, offers generally provide less reliable data than signed contracts and completed sales because they represent what a buyer was willing to pay rather than the price both a buyer and seller were willing to agree to consummate a sale. Also, appraisers may choose to use a recent sale of the subject property as a comparable sale. For example, if the subject site sold 18 months ago for $545,000 in a market that is increasing at 3% per year (on a straight-line basis, i.e., not compounded), an appraiser could derive an indication of market value by adjusting the prior sale for the changes in the market:

$$\$545,000 \times [1 + (1.5 \times 0.03)] = \$569,525$$

This assumes that the property has not changed physically since the prior sale, the prior sale meets all the requirements of a market sale, and the prior sale occurred within a reasonable period from the effective date of value. It also assumes that, during the intervening period, the applicable zoning and land use regulations did not change.

Data on land sales is available from sources such as data services, online and print publications, and deed and assessment records. Interviews with the parties involved in transactions—i.e., the buyers, sellers, lawyers, and brokers—provide more direct information and may reveal adjustments that should be made for conditions of sale or sale concessions. The interviews should identify the buyer motivations and planned use as well as the status of any approvals and entitlements.

BACK_DEFEXP-RR-002760

After comparable data is collected and categorized, and the comparable properties are examined and described, sales data can be assembled in an organized, logical manner. Sales are commonly arrayed in a market data grid that identifies the elements of comparison that may require adjustments. Appropriately developed adjustments for significant differences between the subject property and the comparable properties may be made to the sale or unit prices of the comparable properties using a variety of techniques. (Techniques for making adjustments in sales comparison analysis are discussed in Chapter 21.)

Generally, separate adjustments are made to the comparable sales for each element of comparison. The magnitude of each adjustment is indicated by the data and the judgment of the appraiser. If the data selected is not sufficient to support the required adjustments, the appraiser should gather and analyze additional comparable data.

A sale price adjustment may be a precise dollar amount or percentage developed from market evidence. Either way, the adjustments are the appraiser's approximations of the market's reaction to the element of comparison. Adjustments can be totaled and factored into the comparable sale prices as part of the initial data gathering process. Typically, adjustments are made in a preferred order—i.e., transactional adjustments for property rights, financing, and sale and market conditions are made before property adjustments for location and physical characteristics. All adjustments should be presented in the appraisal report in a logical and understandable manner. If specific adjustments cannot be supported by market evidence, the comparative analysis of sale prices can still help appraisers analyze a comparable property's relative superiority or inferiority to the subject property. This fine tuning can take place in the reconciliation.

## Market Extraction

Market extraction is a valuation technique in which land value is estimated by deducting the contributory value of the improvements from the sale price of an improved comparable property. The remainder represents an indication of the value of the land. Improved sales in rural areas are frequently analyzed in this way because the building and site improvements may contribute little value in comparison to the underlying land value. The improvement contribution is typically small and relatively easy to quantify.

As an example, consider a vacant subject site in an area where few sales of comparable sites have occurred recently. The sales summarized in Table 19.2 involve sites that are similar to the subject property except for the improvements. The contributory value of the improvements is subtracted from each sale price to calculate value indications for the sites of the comparable properties (Table 19.3). Those value indications can, in turn, be analyzed using sales comparison techniques and reconciled into a value indication for the subject site. In this case, the value indications range from $407,000 to $435,000.

## Allocation

The allocation technique is based on the principle of balance and the related concept of contribution. Both affirm that there is a normal or typical ratio of land value to property value for specific categories of real estate in specific locations. Meaningful support for an allocation ratio may be derived from a variety of sources such as observed patterns over time in an area and consultation with developers who sell improved properties and can allocate sale prices between the land and the improvements based on their costs.

BACK_DEFEXP-RR-002761

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 19.2**  Comparable Sales for Market Extraction

| Sale | Sale Price | Description |
|------|-----------|-------------|
| 1 | $450,000 | Includes storage building that contributes $15,000 |
| 2 | $465,000 | Includes 1,500-sq.-ft. building with a contributory value of $32 per square foot |
| 3 | $432,000 | Includes permits and entitlements for construction that contribute $25,000 in value |
| 4 | $448,000 | Includes a temporary sales building that contributes $32,000 |

**Table 19.3**  Market Extraction of Site Value

| | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|--------|--------|--------|--------|
| Sale price | $450,000 | $465,000 | $432,000 | $448,000 |
| Less contribution of improvements | − $15,000 | − (1,500 × $32) | − $25,000 | − $32,000 |
| Site value indication | $435,000 | $417,000 | $407,000 | $416,000 |

In situations where there is limited sales data, the allocation technique can be used to establish approximate land value when the number of vacant land sales is inadequate. For example, an appraiser could use allocation to value the site for a new one-unit home in a large, newly developed subdivision where few sales of vacant land have occurred but credible data from several recent sales of improved properties is available. The sale prices of new homes in the development range from $275,000 to $315,000, and the developer reports that site values within the subdivision range from 15% to 20% of sale prices. Based on these figures, the indicated range of value for the sites would be from $41,250 to $63,000.

The most common application of allocation is in the analysis of sales of residential subdivision lots, where the appraiser can directly measure the ratio of site value to total property value. Allocation is rarely used as the primary method of site valuation for commercial properties because of the relatively large number of sales needed to support a credible value opinion when many adjustments for transactional and property differences are necessary. In addition, commercial properties may vary widely in parcel size and intensity of use. Parcels that have more land than is necessary for the existing improvements are also difficult to value using allocation.

The allocation technique, and sometimes the market extraction technique, can be difficult to use in markets where the highest and best use and land value ratios of comparable parcels are not similar to the subject property. For example, consider a subject site that is zoned for commercial use but is improved with a residence. The commercial land value is $500,000 and the improved property value is $550,000. In this case, if the comparable sites did not have similarly high ratios of land value to improvement value, the allocation and extraction techniques would give misleading indications of value.

## Land Residual Analysis

Land residual analysis involves producing an indication of the land's contribution to the total property by either (a) capitalizing the net operating income attributable to the land or (b) deducting the cost to construct an improvement from the value of the subject property as if improved. By isolating the value contribution of the land, the land

BACK_DEFEXP-RR-002762

residual technique serves as an essential tool in highest and best use analysis to test the economic productivity of alternate uses of the site as though vacant. (See Chapter 18.)

As an income capitalization technique, land residual analysis requires that the following conditions be met:

1. The building value of the subject property is known or can be accurately estimated.
2. Net operating income to the property is known or can be estimated.
3. Both building and land capitalization rates can be extracted from the market.

Small variations in any of these variables can result in a dramatic change in the land value indication. (Chapter 30 discusses procedures for estimating building costs, Chapter 24 discusses the development of income and expense estimates, and Chapter 25 discusses the extraction of land and building capitalization rates.)

To apply the land residual technique as an income approach analysis, the appraiser first determines what actual or hypothetical improvements represent the highest and best use of the site as though vacant. Then the net operating income (*NOI* or $I_O$) of the property is estimated from market rents and operating expenses as of the date of the appraisal. Next, the appraiser calculates how much of the income is attributable to the building and subtracts this amount from the net operating income. The remainder is the residual income attributable to the land, which is capitalized at a market-derived land capitalization rate to provide an estimate of site value.

As a simple example, suppose the subject property's net operating income is $150,000, the land capitalization rate is 5.5%, the capitalization rate for the building is 7.5%, and the value of the improvements is $900,000. The calculations of the residual land value would be as follows:

$$\text{Net Operating Income } (I_O) = \$150{,}000$$

$$\text{Income to the Building } (I_B) = \text{Building Value } (V_B) \times \text{Building Capitalization Rate } (R_B)$$

$$\text{Income to the Land } (I_L) = I_O - I_B = \$150{,}000 - \$67{,}500 = \$82{,}500$$

$$\text{Site Value} = \frac{\text{Income to the Land}}{\text{Land Capitalization Rate}} = I_L / R_L = \frac{\$82{,}500}{0.055} = \$1{,}500{,}000$$

As a cost-based technique, land residual analysis shares characteristics with market extraction in that land value is estimated as the difference between the value of an entire property and the value of the improvements on the property. However, the extraction technique involves analysis of comparable sites, while land residual analysis is focused on the subject property. That is, in the market extraction technique, land values of comparable properties are calculated by subtracting the estimated value of the improvements from the value of the land and improvements, with the resulting indications of land values adjusted and applied to the subject property.

In contrast, in land residual analysis, a similar process is employed, although rather than analyzing comparable properties, the subject property is analyzed on its own. Specifically, the valuation of the project upon completion is estimated using both income capitalization and sales comparison techniques, as appropriate, and those value indications are reconciled. Then, the costs related to constructing the improvements are deducted to arrive at an indication of the land value.

## Income Capitalization Techniques

The various income capitalization procedures used to estimate land values rely on information that can be difficult to obtain. Therefore, these techniques are generally not

BACK_DEFEXP-RR-002763

Copyrighted material licensed by Charles Brigden on September 17, 2020

used as primary valuation techniques except in special situations such as subdivision development analysis. Direct capitalization and yield capitalization techniques are discussed in more detail in Chapters 25, 26, and 27, and examples of land valuation using discounted cash flow analysis are shown in Chapter 28.

### Ground Rent Capitalization

Ground rent is the amount paid for the right to use and occupy the land according to the terms of a ground lease. Market-derived capitalization rates are used to convert ground rent into market value. The basic calculations are straightforward, as shown in the following example of a 1-acre plot leased for $2.25 per square foot with a market-derived land capitalization rate of 5.5%:

$$\text{Income to the Land } (I_L) = \text{Ground Rent} \times \text{Land Area}$$

$$\text{Income to the Land } (I_L) = \$2.25 \text{ per sq.ft.} \times 43{,}560 \text{ sq.ft.} = \$98{,}010$$

$$\text{Site Value} = \frac{\text{Income to the Land}}{\text{Land Capitalization Rate}} = I_L / R_L = \frac{\$98{,}000}{0.055} = \$1{,}782{,}000$$

The ground rent capitalization procedure is useful when an analysis of comparable parcels of leased land indicates a range of rents and land capitalization rates. However, it must be recognized that if the capitalization rate used in this analysis is derived from sales of leased properties, the value indication resulting from this analysis is a leased fee value, not a fee simple value. In order for this leased fee value to be useful as an indication of the value of the fee simple interest in the land, an adjustment for property rights may be necessary.

If the current rent and terms of a leased parcel corresponds to market rent and terms for comparable leased parcels with similar highest and best uses then only a property rights adjustment would be necessary. If the ground rent paid under the terms of an existing contract on the subject property does not correspond to the prevailing terms and market rent, the value estimate given the current ground rent must also be adjusted for the difference in these terms to obtain an indication of the market value of the fee simple estate. Ground leases can have different terms and escalation clauses that affect the income stream, so appraisers should consider all the benefits to the lessor during the term of a lease and any option periods and forecast when the reversion of the property will take place.

If the capitalization rate used in the ground rent capitalization analysis is derived from fee simple sales instead of leased fee sales, then the value indication would be for the fee simple, and no property rights adjustment would be required to the indicated value. For example, consider a parcel of land that sold six months ago for $1 million. Shortly after the sale, the buyer found a tenant for a ground lease of the property at a market rate of $65,000 per year, and the property was then sold to an investor for $1.3 million. The indicated capitalization rate for the leased fee interest in the property is 5.0% ($65,000/$1,300,000). Application of this capitalization rate to the subject property would result in an indication of the leased fee value. However, this information can also be used to extract an implied capitalization rate for the fee simple interest—6.5% ($65,000/$1,000,000). This capitalization rate inherently reflects the time, cost, risk, and entrepreneurial incentive involved in acquiring an unleased parcel of land and getting it leased. In this case, applying the 6.5% capitalization rate to the market rent of the subject property would result in a value indication for the fee simple interest in the property. This example can also be used to illustrate the

BACK_DEFEXP-RR-002764

magnitude of the property rights adjustment that would be applicable if the sale of a leased fee site was used to assist in valuing a fee simple interest in land. In this case, the indicated property rights adjustment would be -23% (1 – $1,000,000/$1,300,000).

### Subdivision Development Analysis (Discounted Cash Flow Analysis)

Subdivision development analysis may involve tracts of residential, commercial, or industrial land (or a mix of land uses) that are large enough to be subdivided into smaller lots or parcels and sold to builders or end users.[2] A planned subdivision can create a more intense use of the property when zoning, available utilities, access, and other influential elements are favorably combined.

As a tool in land valuation, subdivision development analysis is primarily used to provide a bulk sale value for a group of subdivision lots, either proposed or existing.[3] The technique can also be used to estimate the value of vacant land or finished lots in a proposed subdivision development scenario. Subdivision development analysis relies on discounted cash flow analysis and requires that the property have a highest and best use for development consistent with the proposed development plan in order to reflect the current value of the vacant land. The technique may also be used to test several potential development scenarios in determining the highest and best use of the site as though vacant.

Subdivision development analysis is most useful in developing a current opinion of land value when the highest and best use of the land is for immediate development at the time of the appraisal or when there is evidence of market demand to support financially feasible subdivision development. Market analysis provides the evidence necessary to support absorption estimates, retail proceeds, and other components required to calculate land value using subdivision development analysis.

Valuing finished lots or units in a subdivision is a common assignment for real estate appraisers, but subdivision development analysis is a complex procedure. When there is sufficient, reliable market data, the subdivision development method provides credible results. The technique is most useful for developing the bulk market value of a group of subdivision lots or units, whether existing or proposed. The method uses what is known as a *bulk sale scenario* to develop the value of all the lots to one purchaser. The value indication is most persuasive when the sales comparison method of estimating land value provides additional support.

In essence, the subdivision development method uses the yield capitalization techniques of the income capitalization approach to perform a discounted cash flow analysis. To use discounted cash flow analysis to estimate raw land value, appraisers must thoroughly understand the land development process and all the factors influencing the subject property's market area.

The development of any project involves three phases:

- The permitting stage
- The construction stage
- The absorption stage

---

2. Subdivision development analysis can be applied to completed homes within a subdivision, condominiums, super pads, and other property types, but in this chapter the focus is on finished lots or units within a subdivision.

3. For an in-depth discussion of subdivision development analysis, see Don M. Emerson Jr., *Subdivision Valuation*, 2nd ed. (Chicago: Appraisal Institute, 2017).

BACK_DEFEXP-RR-002765

**Figure 19.1** Sample Income Capitalization Approach Timeline



Source: Don M. Emerson Jr., *Subdivision Valuation*, 2nd ed. (Chicago: Appraisal Institute, 2017), 103.

Data on sales and costs for the finished lots or units must be available. The real estate developer usually provides the necessary project information, including the subdivision plat, the costs of development, a feasibility, marketability, or absorption study, and a schedule of retail lot prices. When the developer supplies the information, an appraiser has a responsibility to compare this information with other relevant market data. The market data and all conclusions in the analysis are the responsibility of the appraiser.

Adequately supported development cost estimates and an adequate investigation of the available market demand needed to support the absorption of lots over time are critical elements of subdivision analysis. In markets that are oversupplied or experiencing an economic downturn, appraisers must not simply assume that market demand will stabilize at some arbitrary point in the future. Future market conditions and demand forecasts must be supported by relevant market data.

To estimate raw land value using the subdivision development technique for a proposed development, an appraiser performs the following steps:

- Assess the highest and best use of the site (e.g., the mix and intensity of uses).
- Create or affirm a supportable subdivision development plan.
- Determine the timing and cost for approval and development (including all costs and conditions of obtaining development entitlements during the permitting stage).
- Forecast a schedule of retail lot prices or values over the absorption stage.
- Critically review available data as necessary to forecast the lot absorption and price mix using inferred or fundamental demand and supply analysis (including properly supported projections of community or market growth over the absorption period).
- Estimate a market-supported timeline for the permitting, construction, and absorption phases.
- Forecast holding costs as well as marketing and related sales expenses over the permitting, construction, and absorption period.
- Estimate the annual real estate taxes and any other miscellaneous expenses over the three stages of development.
- Consider management supervision or administrative costs as part of development expenses.
- Choose an appropriate, market-supported discount rate.

BACK_DEFEXP-RR-002766

This process can be modified to account for a date of valuation after the preliminary permitting phase of the development process even further along the timeline (see Figure 19.2).

In simplified form, an appraiser begins the analysis of a subdivision development by determining the number and size of the lots that can be created on the appraised parcel of land physically, legally, and economically. The proposed lots must conform to jurisdictional and zoning requirements with regard to size, frontage, topography, soil quality, and off-site improvements (e.g., water facilities, drainage, sewage, streets, curbs, and gutters). The lots must also meet the demands of the market in which the property is located. Without surveys and engineering studies, an appraiser cannot know exactly how many lots can be created from a particular parcel of land. Simply multiplying the allowed density by the site size will not necessarily indicate the number of lots that will be approved on the site, due to setback requirements and other restrictions. The extent of analysis performed may relate to the scope of work of the appraisal assignment. A reasonable estimate of the number of potential lots can often be deduced from zoning information, subdivision ordinances, and the number of lots or typical unit density reflected in similar subdivision developments in the subject's market area. Allowances must also be made to account for the land needed for streets, green space, water retention facilities, and any common areas.

If available, a preliminary development plan for the hypothetical subdivision of the vacant land being appraised will specify much of the data an appraiser needs:

- Number and size of the lots
- Land development or construction work to be accomplished
- Direct (hard) and indirect (soft) construction costs

**Figure 19.2**    Sample Value Pattern of a Proposed Project



Source: Don M. Emerson Jr., *Subdivision Valuation*, 2nd ed. (Chicago: Appraisal Institute, 2017), 105.

BACK_DEFEXP-RR-002767

Copyrighted material licensed by Charles Brigden on September 17, 2020

- Probable time required to subdivide the land and construct the on-site and off-site infrastructure
- Expenses and holding costs that will be incurred during the relevant stages of development

The appraiser then undertakes a marketability study to assess the supply and demand situation and the probable capture and absorption rates to produce a supportable absorption forecast for the lot inventory. Well-supported forecasts of product demand and competitive supply can increase the credibility of the absorption forecast. They are critical to the analysis because the raw land value can vary widely depending on the rate at which finished lots will be absorbed over time. The appraiser estimates the projected retail prices of the lots by applying the sales comparison method.

The next step in subdivision development analysis requires a forecast of income and expenses associated with the permitting, construction, and eventual sellout or absorption of the finished lots over time. The time period used for the analysis ends when the last lot is sold. Depending project size, sales velocity, and derivation of the discount rate, annual, semiannual, or quarterly discounting periods are commonly used. The projection period begins with the property in its current condition and, if permitting is required, will include the time frame needed to achieve permitting, construction, and the absorption of all lots. If permitting is already in place as of the date of valuation, then the time period considered in the discounting calculation consists of the construction and absorption phases only. The net cash flows from each period are discounted to time period zero to arrive at a present value of the net proceeds, which is an indication of the value of the property at that point in time.

Banking regulators and examiners like subdivision development analysis because it provides transparency on the inputs used as the basis of the valuation. In economic downturns, the number of sales of bulk finished lots are limited and regulators may require lenders (as appraisal clients) to instruct appraisers as an assignment condition to include a discounted cash flow analysis for the bulk lot holding.

BACK_DEFEXP-RR-002768

BACK_DEFEXP-RR-002769

Copyrighted material licensed by Charles Brigden on September 17, 2020



# The Sales Comparison Approach  **20**

In the sales comparison approach, appraisers develop opinions of value by analyzing closed sales, pending sales, active listings, and cancelled or expired listings of properties that are similar to the property being appraised. The comparative techniques of analysis applied in the sales comparison approach are fundamental to the valuation process. Estimates of market rent, expenses, land value, construction cost, depreciation, and other value parameters may be derived in the other approaches to value using comparative techniques. Similarly, in applying the sales comparison approach appraisers often analyze conclusions derived in the other approaches to determine the adjustments to be made to the sale or listing prices of comparable properties.

In the sales comparison approach, an opinion of market value is developed by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract (i.e., for which purchase offers and a deposit have been recently submitted). A major premise of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties.

Comparative analysis of properties and transactions focuses on similarities and differences that affect value, called *elements of comparison*, which may include variations in property rights, financing terms, conditions of sale, market conditions, locational influences, and physical characteristics, among others. Appraisers examine market evidence using paired data analysis, trend analysis, statistics, and other recognized and accepted techniques to identify which elements of comparison within the data set of comparable sales are responsible for value differences.

This chapter focuses on the theory and concepts underlying the sales comparison approach. Chapters 21 and 22 further the discussion with a deeper examination of the methodologies employed by appraisers to analyze comparable sales and sample applications of sales comparison techniques.

## Relation to Appraisal Principles

The concepts of anticipation and change—which underlie the principles of supply and demand, substitution, balance, and externalities—are basic to the sales comparison approach. Guided by these principles, appraisers consider all issues relevant to the valuation problem in a manner that is consistent and reflects local market conditions.

### Supply and Demand

Property prices result from negotiations between buyers and sellers. In a market with many buyers and sellers, buyers make up the market demand and the properties offered for sale or lease currently or in the foreseeable future make up the supply.[1] To estimate demand, appraisers consider the number of potential users of a particular type of property, their purchasing power, and their tastes and preferences. To analyze supply, appraisers focus on existing properties that are available on the market as well as properties that are being constructed, converted, or planned.

Shifts in any of these factors may cause the prices of properties in the market area to vary. The financial markets, government policies, and lenders also influence sales activity because many real estate purchases involve some form of financing, which affects purchasing power. When interest rates drop, market activity tends to accelerate and prices tend to rise because buyers qualify for higher mortgage amounts. When interest rates rise, market activity tends to slow down and prices tend to fall because buyers do not qualify for loans at the previous levels. When mortgage money becomes scarce, either due to higher interest rates or restrictive underwriting standards, market activity can be severely reduced. The inability of buyers to obtain affordable financing is an impediment to additional demand in most markets.

### Substitution

The principle of substitution holds that the value of property tends to be set by the cost of acquiring a substitute or alternative property of similar utility and desirability within a reasonable amount of time.

### Balance

The forces of supply and demand tend toward equilibrium, or balance, in the market, but absolute equilibrium is almost never attained. Due to shifts in population, purchasing power, consumer tastes and preferences, and many other factors, demand varies greatly over time. The construction of new buildings, conversion of existing buildings to other uses, and demolition of old buildings cause supply to vary as well.

The principle of balance also holds that both the relationship between land and improvements and the relationship between a property and its environment must be in balance for a property to achieve its optimum market value. For example, a residential property with a one-car garage in a market that expects similar homes to have a two-car garage (known as an *underimprovement*) or too many expensive amenities for its location (known as an *overimprovement* or *superadequacy*) is out of balance. Appraisers must watch for imbalances in the market and within specific properties because those imbalances can

---

1. Market value is based on conventional economic theory, which predicts a unique market-driven price at the point where supply equals demand in a competitive market. Even in a *monopoly*, with only one seller, or a *monopsony*, with only one buyer, a unique price is predictable. But as soon as the market consists of only one seller and one buyer, called *bilateral monopoly*, economic theory can no longer predict a unique price. Bilateral monopoly theory predicts a minimum sale price and a maximum sale price, but no unique price, and suggests that any observed transaction price depends not on supply and demand but on the negotiating or bargaining skills of the buyer and the seller.

BACK_DEFEXP-RR-002771

Copyrighted material licensed by Charles Brigden on September 17, 2020

cause the market to ascribe different prices to otherwise comparable properties. Overimprovements and underimprovements can lead to functional obsolescence that may need to be accounted for in sales comparison, income capitalization, and cost approach analyses. They also can be a key factor in determining which sales are the most comparable.

## Externalities

External forces affect all types of property in positive or negative ways. Periods of economic growth and economic decline influence property values. Appraisers analyze the market area of the subject property to identify all significant external influences. To a great extent, the adjustments made to the sale prices of comparable properties for differences in location reflect these external forces. That is, two competitive properties with identical physical characteristics may have quite different market values if one of the properties has less attractive surroundings. The condition and lighting of streets, the convenience of transportation facilities, the adequacy of police protection, the enforcement of municipal regulations, real estate tax burdens, and the proximity to shopping and restaurant facilities can all vary with location, making one location more or less attractive than another.

## Market Analysis and Highest and Best Use

The conclusions of market analysis and highest and best use analysis are fundamental to the sales comparison approach. Analyzing the subject property's highest and best use and market area helps appraisers identify and analyze the competitive supply and demand factors that influence value in the market. In addition, an adequately supported determination of the subject property's highest and best use provides the basis for the research and analysis of comparable sales, answering questions such as

- Which comparable properties have the most similar highest and best use to the subject property?
- Do the improvements contribute value to the comparable property?
- Is the comparable property as improved an interim or transitional use?
- How much time must pass before development (or redevelopment to an alternative use) is feasible on the unimproved subject and comparable properties?
- Who is the likely user of the comparable property?

## Applicability and Limitations

The sales comparison approach is applicable to most types of real property interests when there are sufficient recent, reliable transactions to indicate value patterns or trends in the market. For property types that are bought and sold regularly, the sales comparison approach often provides a credible indication of market value. When data is available, sales comparison can be the most straightforward and simple way to explain and support an opinion of market value.

If the appraisal assignment is to develop an opinion of market value but no sales are available, appraisers must question what type of market actually exists for the subject property. The common definitions of *market value* all presume a sale of the subject property, which implies the existence of a market. The market for a specific property may not be for the property as it is currently improved or configured or was originally intended to be used. For example, in most markets a parcel of land

BACK_DEFEXP-RR-002772

> The sales comparison approach is applicable when sufficient data on recent market transactions is available. If no sales are found, appraisers may have to use other approaches to value but only after they are convinced that there actually is a market for the property. Information derived through sales comparison may be used in the income capitalization and cost approaches.

improved with a building that formerly served as the county jail is unlikely to attract a buyer as presently improved, so the market value would be what a typical buyer would pay for the land (less demolition costs) or for any economic use to which the building could be converted. The existence of a market should be considered with many special-purpose properties.

Typically, the sales comparison approach provides a credible indication of value for commercial and industrial properties suited for owner occupancy, i.e., properties that are not purchased primarily for their income-producing characteristics. These types of properties are generally suitable for application of sales comparison because similar properties are commonly bought and sold in the same market.

Buyers of income-producing properties usually concentrate on a property's economic characteristics and typically put more emphasis on the conclusions of the income capitalization approach. Thoroughly analyzing the leased fee in comparable sales of large, complex, income-producing properties can be difficult because information on the economic factors influencing the decisions of market participants may not be readily available from public records or interviews with buyers and sellers. For example, an appraiser may not have sufficient knowledge of all the existing leases applicable to a neighborhood shopping center that is potentially comparable to the subject property. The sale of a property encumbered by a lease involves rights other than the complete fee simple estate, and valuation of those rights requires knowledge of the terms of all leases and an understanding of the tenant or tenants occupying the premises. In most cases, when real estate sells with leases in place, the new owner inherits the leases. If the leases are set at rental rates and terms below what the current market rental rate and terms are, the value to investors would be less than the value of a similar property that has higher net income with similar upside potential. Any difference must be compensated for if it exists. If the lease with submarket rents has a term with only a few months remaining, that difference may be negligible.

Some transactions may include the transfer of other physical assets or business interests in the sale. In each instance, if the sale is to be useful for comparison purposes, it must be dissected into its various components. One of the most reliable methods for identifying the components of value is to interview the buyer. Even when the components of value can be allocated, the sale may be less reliable as an indicator of the market value of the real property because of the complexity of the mix of factors involved.

At times the use of the sales comparison approach may be limited, but the analysis of comparable sales, pending sales, active listings, and cancelled or expired listings can still be a significant and essential part of the valuation process. Although appraisers cannot always specifically identify and quantify how the factors affecting property value are different, they can still analyze comparable sales to assist in supporting the conclusions of the other approaches, i.e., to develop a bracket for the value indications derived from the cost and income capitalization approaches. In addition, the analysis of comparable sales can provide information used in the other approaches such as overall capitalization rates for the income capitalization approach

354   *The Appraisal of Real Estate*

or depreciation estimates for the cost approach. Income multipliers, capitalization rates, and yield rates are applied in the income capitalization approach to value, but these rates and factors are often extracted from comparable properties.

## Procedure

To apply the sales comparison approach, appraisers follow a systematic procedure:

1.  Research the competitive market for information on properties that are similar to the property being appraised and that have been sold recently, or were listed for sale, or are under contract. Information on agreements of sale, options, listings, and bona fide offers may also be collected. The characteristics of the properties such as property type, date of sale, size, physical condition, location, and land use constraints should be considered. The goal is to find a set of comparable sales or other evidence such as property listings or contracts as similar as possible to the subject property to ensure they reflect the actions of similar buyers. Market analysis and highest and best use analysis set the stage for the selection of appropriate comparable sales.

2.  Verify the information by confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations. Verification should elicit additional information about the properties such as buyer and seller motivations, economic characteristics (if the property is income-producing), value component allocations, and other significant factors as well as information about the market to ensure that comparisons are credible.

3.  Select the most relevant units of comparison used by participants in the market (e.g., price per acre, price per square foot, price per front foot, price per dwelling unit, price per lot or proposed lot, price per room) and develop a comparative analysis for each unit. The goal is to define and identify a unit of comparison that explains or mirrors market behavior.

4.  Look for differences between the comparables being considered and the subject property using all appropriate elements of comparison. Then adjust the price of each comparable, reflecting how it differs to equate it to the subject property or eliminate that property as a comparable. This step typically involves using the most similar properties and then adjusting for any remaining differences. If a transaction does not reflect the actions of a buyer who would also be attracted to the subject property, an appraiser should be concerned about comparability and the wisdom of relying on that comparable as a basis for comparison.

5.  Reconcile the various value indicators produced from the analysis of comparables into a value indication from the sales comparison approach. A value can be expressed as a single point estimate, as a range of values, or in terms of a relationship (e.g., more or less than a given amount).

### Researching Transactional Data

In the first step of the sales comparison approach, appraisers gather data on sales, listings, contracts, offers, refusals, and options relating to properties considered competitive with, and comparable to, the subject property. Appraisers must thoroughly research the prices, real property rights conveyed, financing terms, motivations of buyers and sellers, expenditures made immediately after purchase, and dates (i.e., the market conditions) of the property transactions or contracts. Appraisers must also consider each property's lo-

BACK_DEFEXP-RR-002774

cation, physical condition, functional utility, economic characteristics, use, and non-realty components. Appraisers should not select comparables based strictly on price, as other factors must be considered when assessing comparability. Because conclusions must be market-derived, appraisers will rely heavily on interviews, personal contacts, and proprietary research. Personal verification with a party to the transaction is an important step in the sales comparison approach and it may be a client requirement, depending on the type of assignment. Verifying data is discussed in a later section of this chapter.

Regardless of the number of properties analyzed, appraisers must understand each comparable property used for comparison to draw credible conclusions. For example, the conditions of sale in a transaction of real property between family members may not be consistent with the definition of market value. In another sale of a comparable property, the buyer may have had motivations that resulted in paying more than market value. It may be possible to determine the relationship between the reported sale price and market value only after research into the characteristics of the sale, the property, and the market for that property. Properties that cannot be effectively used for direct comparison are still part of the market at large and can be used for understanding general market activity and other analytical purposes. Thus, market data is classified and weighted for its importance, relevance, and reliability.

Changing market conditions may reduce the applicability of older sales that do not reflect the current market. Trends indicated by changing market conditions can be useful, but appraisers must be careful not to project trends without current, reliable market support specific to the subject property or property type (e.g. residential condominiums, new construction, office, retail, hospitality). Historical sales are valuable in retrospective valuations and may assist in time series analysis. However, significant changes in market conditions make the use of historical sales less reliable for current valuations unless a supportable conclusion regarding the changes between the time periods is applied. Appraisers must look for possible changes that may be imposed on the market, thus changing the applicability of historical data. Also, some sales may reflect the anticipation of change and may be evidence of market attitudes in advance of the actual change. The availability and terms of financing are also important in the analysis of comparable sale properties in the market.

As explained in Guide Note 11 of the Guide Notes to the Standards of Professional Practice of the Appraisal Institute, it may be necessary to expand the geographic search area for comparable sales in markets where there have been few sales or to research sales further back in time. It is also important to determine a class or subclass of sales that dominate the market. For example, during periods of severe economic downturns, REO sales or foreclosures may dominate the market.

The geographic limits of an appraiser's search for sales data depend on the nature and type of real estate being valued and the available sales information. Certain types of properties have regional, national, and even international markets. For example, a Class A, high-rise office building in a central business district that would appeal to a real estate investment trust may sell in a regional or national market, but a six-unit apartment building in a typical neighborhood would not. These properties would need to be compared to completely different properties and using the two as comparable properties is inappropriate. As another example, an appraiser may find little comparable data for a property that is the first to be renovated in an area of deteriorated buildings or for the only property of a given type in a market area. In this situation, the appraiser must

BACK_DEFEXP-RR-002775

Copyrighted material licensed by Charles Brigden on September 17, 2020

establish the comparability of other areas and the competitiveness of the properties located in these areas with the subject property. Similarly, appraisers may gather data from a wide geographic area to find competitive properties for a regional shopping mall, large office building, resort hotel, large multiuse complex, or large industrial property.

In addition to sales of competitive properties, prior sales of the subject property must be considered in market value appraisals. The Uniform Standards of Professional Appraisal Practice (USPAP) require appraisers to analyze and report all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal and to analyze all sales of the subject property that occurred within the three years prior to the effective date of the appraisal. Other valuation standards such as the Uniform Appraisal Standards for Federal Land Acquisitions require that appraisers report an even longer sales history. However, it is not sufficient to simply report the subject property's sales history. In fact, simply reporting prior sales does not meet the USPAP requirements on this issue. When an opinion of market value is to be developed, appraisers must *analyze* all sales of the subject property that occurred in the three years prior to the date of value. Appraisers must also analyze any agreements of sale (contracts), options, and listings that are current as of the effective date of appraisal.[2]

The sales history required by various sets of valuation standards is a minimum requirement. Ideally, appraisers would consider all relevant historical sales data from which market conditions could be analyzed. If the information is not available, an appraiser must explain the efforts taken to uncover it. This analysis is particularly significant when the comparable sales are limited and are either vastly superior or inferior to the subject property. When the information is available, an appraiser may want to present a chart of the subject property's sales, contracts, listings, and offers in the sales comparison analysis alongside information on the comparable sales.

USPAP has no requirement to analyze the sales history of each comparable sale. However, Fannie Mae and certain other government bodies require comparable sales histories. This regulation is applicable to lenders, and it is reflected on the standard residential appraisal report form. These requirements are assignment conditions based on the intended use and intended user.

### Data Independence

Appraisers strive to collect information about the sales that best reflect the market demand for the subject property because a pool of the most representative data will yield the most accurate insights into the value of a property and the magnitude of property adjustments. When appraisers derive all adjustments using a limited data set, a single erroneous sale price or figure in that data set can cause errors in the adjusted sale prices of all the comparable sales, leading to an erroneous indication of value for the subject property. In this situation, the independence of the sales data is lost.

Verifying data will help eliminate the erroneous data that can have an injurious effect on adjustment amounts and ultimately the value indication. A practical technique for retaining the independence of the data is to develop adjustment amounts using data from outside the data set, which may require additional market research.

The larger the number of adjustments made within a small data set, the greater the probability that the results of the analysis will be affected by data collection errors. Of course, transactional and property data should be checked for errors that could affect the conclusions of the sales comparison approach.

---

2.    See Standards Rule 1-5, the reporting requirements in Standards Rule 2-2, and Advisory Opinion 1: Sales History in the Uniform Standards of Professional Appraisal Practice. Note that USPAP requirements apply to US appraisers. Market and regulatory requirements exist in other countries as well. For valuations outside the United States, practitioners should research local requirements and expectations.

BACK_DEFEXP-RR-002776

It is imperative that appraisers identify and analyze the strengths and weaknesses of the quantity and quality of the data compiled and the extent of the comparative analyses undertaken in the sales comparison approach. Appraisers must consider all relevant facts in their analyses and report them in the amount of detail required given the intended use of the appraisal as identified in the scope of work.

### Data Sources

Primary sources of sales data include

- Public records (e.g., courthouse records, government sales tax records, assessors' records)
- Commercially available data from multiple listing and subscription services
- Published articles in local newspapers, real estate periodicals, online newsletters, or other credible online sources
- Interviews with market participants (e.g., the parties to transactions, attorneys, appraisers, counselors, brokers, property managers, lenders)

All raw data obtained from a general source (e.g., assessors' records, data services) will need further research and verification.

Appraisers should exercise caution when someone who is not a party to the transaction provides sales data because the motivation of the parties to the transaction is an important consideration. Sometimes brokers will be able to provide more reliable information than the buyer or seller. Similarly, errors can result if anticipated income and expense schedules are inaccurate or if potential changes in use that buyers are planning are not considered.

A great deal of property and transaction information is available online and in easily accessed public records, but experienced appraisers often maintain data files with the details of important and unique market transactions and add information as new transactions occur.

### Verifying Transactional Data

Appraisers verify information with a party to the transaction to ensure its accuracy and to gain insight into the motivation behind each transaction. The buyer's and seller's views of precisely what was being purchased at the time of sale are important. Sales that are not arm's-length market transactions (in accordance with the definition of *market value* used in the appraisal) should be identified and rarely, if ever, relied on. As discussed in Chapter 9, to verify sales data appraisers can confirm statements of fact with the principals to the transaction, if possible, or with the brokers, closing agents, or lenders involved. Owners and tenants of neighboring properties may also provide helpful information.

Sometimes income and expense data for income-producing properties is unobtainable. If data on a particular sale is unavailable, assigning rents and expenses "based on market parameters" may not lead to credible results, especially for properties with existing leases.

Referencing public records and data services does not verify a sales transaction. It simply confirms that a transaction was recorded. Similarly, referencing the source of secondary data only confirms its existence and does not verify the transaction. Generally, secondary sources do not provide adequate information about sale conces-

BACK_DEFEXP-RR-002777

sions, whether the sale was an arm's-length transaction, if multiple properties were involved in the sale, if personal property was included, and other factors influencing price. This underscores the importance of personal verification with persons knowledgeable about the details of the transaction.

## Selecting Units of Comparison

After sales data has been gathered and verified, systematic analysis begins. Like units must be compared, so in many cases the sale price should be stated in terms of appropriate units of comparison. The units of comparison selected depend primarily on the nature of the property, as illustrated in Table 20.1.

**Table 20.1**    Typical Units of Comparison

| Property Type | Typical Units of Comparison |
|---|---|
| Apartment properties | Price per apartment unit |
| | Price per room or per bedroom |
| | Price per square foot of gross building area |
| | Price per finished square foot of building area |
| | Price per net square foot of building area |
| Warehouses | Price per cubic foot of gross building volume |
| | Price per truck door |
| | Price per square foot of gross building area |
| Factories | Price per square foot of gross building area |
| Office properties | Price per square foot of gross building area |
| | Price per square foot of rentable area |
| | Price per square foot of usable area |
| Hotels and motels | Price per guest room |
| Restaurants, theaters, and auditoriums | Price per seat |
| | Price per square foot |
| Hospitals | Price per square foot of gross building area |
| | Price per bed |
| Golf courses | Price per round (annual number of rounds played) |
| | Price per membership |
| | Price per hole |
| Tennis and racquetball facilities | Price per playing court |
| Mobile home parks | Price per parking pad |
| Marinas | Price per slip |
| | Price per linear foot |
| Automobile repair facilities | Price per bay |
| | Price per square foot of gross building area |
| Agricultural properties | Price per acre |
| | Price per tillable acre |
| | Price per animal unit (for pastureland) |
| | Price per board foot (for timberland) |
| Vacant land | Price per front foot |
| | Price per square foot |
| | Price per FAR foot |
| | Price per acre |
| | Price per buildable square foot |
| | Price per buildable unit |
| Water reserves | Price per acre foot of water |

BACK_DEFEXP-RR-002778

Units of comparison are not applied to all property types, with single-unit residential properties being the most common example. While it is possible to calculate a price per square foot of gross living area for a house, most residential appraisers do not focus on that unit of comparison but instead base the analysis on the total price. This is also true in markets where the participants do not think in terms of a unit of comparison. The units of comparison applied to a given property type are not just considered by appraisers. They will also be considered by the market participants and by brokers and other real estate professionals.

Appraisers use units of comparison to facilitate comparison of the subject and comparable properties. The sales should be analyzed to determine which units of comparison indicate the least amount of variance when applied to the comparable sales. This analysis will identify the proper unit of comparison to be used, such as price per acre or price per square foot, which is especially important for properties located in markets that are in transition.

As a simple example, suppose the subject of an appraisal is a 90,000-sq.-ft. distribution center with ten loading docks. The four properties shown below have been sold in the last year:

| Property | Sale Price | Building Area (Sq. Ft.) | Building Area (Cu. Ft.) | Site Area (Acres) | Number of Loading Docks |
|---|---|---|---|---|---|
| 125 W. Afton Road | $8,500,000 | 100,000 | 2,200,000 | 5.00 | 10 |
| Burberry Glen Commerce Center | $10,200,000 | 150,000 | 3,000,000 | 6.80 | 12 |
| 6700 Northwest Highway | $9,625,000 | 125,000 | 2,000,000 | 5.00 | 11 |
| Northwest Crossing Business Center | $8,600,000 | 86,000 | 2,150,000 | 4.30 | 10 |

Converting the sale prices to unit prices gives appraisers a better picture of what unit of comparison the market is likely to use to compare these transactions:

| Property | Sale Price | Building Area (Sq. Ft.) | Building Area (Cu. Ft.) | Site Area (Acres) | Number of Loading Docks |
|---|---|---|---|---|---|
| 125 W. Afton Road | $8,500,000 | $85.00 | $3.86 | $1,700,000 | $850,000 |
| Burberry Glen Commerce Center | $10,200,000 | $68.00 | $3.40 | $1,500,000 | $850,000 |
| 6700 Northwest Highway | $9,625,000 | $77.00 | $4.81 | $1,925,000 | $875,000 |
| Northwest Crossing Business Center | $8,600,000 | $100.00 | $4.00 | $2,000,000 | $860,000 |

In this example, the narrow range indicated for price per loading dock ($850,000-$875,000) suggests that buyers and sellers in this market would be likely to analyze competitive distribution centers based on their price per loading dock. Developing the individual unit of comparison's mean and standard deviation allows an appraiser to identify a best unit of comparison for the data set, using its coefficient of variation.

| Property | Indicated Mean | Indicated Standard Deviation | Indicated Coefficient of Variation |
|---|---|---|---|
| Sale price per square foot | $82.50 | $13.58 | 16.5% |
| Sale price per cubic foot | $4.02 | $0.59 | 14.6% |
| Sale price per acre | $1,781,250 | $226,729 | 12.7% |
| Sale price per dock | $858,750 | $11,815 | 1.4% |

BACK_DEFEXP-RR-002779

The coefficient of variation from the sample of sales suggests that the price per load-ing dock is the most appropriate unit of comparison for the property in the market being studied.[3]

If more comparable data were available, more statistical testing could be run on each variable to analyze the variation among the unit prices. The variable with the least variation would be a likely candidate for the best unit of comparison. Any final decisions regarding units of comparison, however, should only be made after person-al verification has confirmed that market participants use those units of comparison. If personal verification is not possible, appraisers may want to review the marketing materials for similar properties.

Sometimes the use of units of comparison can replicate another approach to value and, in effect, tie the value indications together. For example, if an appraiser develops a ratio of sale price to the net operating income (*NOI*) per square foot in the sales compari-son approach, that analysis is now tied to the income approach. A value indication devel-oped using net operating income per square foot (*NOI* per sq. ft.) as a unit of comparison is not an independent indication of value but a restatement of the income approach.

Appraisers should consider why the income per unit varies among the sale prop-erties. Sensitivity and trend analyses may be performed to gain an understanding of this variance for use in the income capitalization approach. For example, appraisers may analyze sales of income-producing properties to derive potential and effective gross income multipliers, overall and equity capitalization rates, and even total antici-pated property yield rates. These factors are not adjusted quantitatively except for any necessary transactional adjustments when atypical financing or the transfer of certain property rights affects a sale price. Instead, appraisers consider the range of multipliers and rates and the similarities and differences between the subject and comparable sale properties that cause the multipliers and rates to vary. They then conclude the most ap-propriate rate indicated for the property being appraised based on its similarity to those in the data sample.

## Analyzing and Adjusting Comparable Sales

If all comparable properties are identical to the subject property, no adjustments to sale prices will be required. However, this is rarely the case. After researching and verifying transactional data and selecting the appropriate unit or units of comparison, appraisers adjust for any differences that affect the sale prices of the comparables.

After sales information has been collected and confirmed, it can be organized in a variety of ways. One convenient and commonly used method is to arrange the data on a market data adjustment grid. Each important difference between the comparable properties and the subject property that could affect property value is considered an ele-ment of comparison. Each element of comparison that is found to affect sale prices in the market is assigned a row on an adjustment grid, and total property prices or unit prices of the comparable properties are adjusted to reflect the value impact of these differences. The use of the grid is a way for appraisers to model typical buyer actions and to analyze sales data to quantify the influence of certain characteristics on value. While not required by valuation standards, when included in appraisal reports grids are a good way for appraisers to communicate their logic clearly and efficiently to readers. The adjustment

---

3. This example is included to illustrate the application of statistical methods. The larger the sample size (in this case, the number of comparable sales analyzed), the more meaningful the results of the statistical analysis would be.

BACK_DEFEXP-RR-002780

grid shown in Table 20.3 only provides space for the calculations. Appraisal reports typically include narrative descriptions of how and why the adjustments were made.

## Identification and Measurement of Adjustments

A sale price reflects many different elements that affect a property's value in varying degrees. Quantitative and qualitative techniques are employed to estimate the relative significance of these factors. Both are recognized and accepted techniques and appropriate in certain circumstances.

Quantitative adjustments are developed as either dollar or percentage amounts. What some practitioners call "qualitative adjustments" are not actually numerically adjusted. The analysis of a qualitative difference simply provides an upward or downward indication of the effect of the element. Examples of the techniques used in quantitative adjustments and qualitative analyses are shown in Table 20.2 and are discussed more fully in Chapter 21.

Adjustments can be made either to total property prices or to appropriate units of comparison. Often the transactional adjustments—property rights conveyed, financing, conditions of sale (motivation), expenditures made immediately after purchase, and market conditions (date of sale)—are made to the total sale price. The adjusted price is then converted into a unit price and adjusted for property-related elements of comparison such as physical and legal characteristics.

---

**Table 20.2**  Techniques Used in Quantitative and Qualitative Analysis

| Quantitative Analysis | Qualitative Analysis |
|---|---|
| · Paired data analysis (sales and resales of the same or similar properties) | · Relative comparison analysis |
| · Grouped data analysis | · Ranking analysis |
| · Secondary data analysis | · Personal interviews |
| · Statistical analysis including graphic analysis and scenario analysis | |
| · Cost-related adjustments (cost to cure, depreciated cost) | |
| · Capitalization of income differences | |
| · Trend analysis | |

---

## Elements of Comparison

Elements of comparison are the characteristics of properties and transactions that help explain the variances in the prices paid for real property. An appraiser determines the elements of comparison for a given appraisal assignment through market research and supports those conclusions with market evidence. When properly identified, the elements of comparison describe the factors that are associated with the prices paid for competing properties. The market data, if analyzed properly, will identify the elements of comparison within the comparable sales that are market-sensitive.

The basic elements of comparison that should be considered in sales comparison analysis are as follows:

- Real property rights conveyed (e.g., fee simple estate, leased fee, leasehold)
- Financing terms (e.g., all cash, market financing, seller financing, special or atypical terms)

BACK_DEFEXP-RR-002781

**Table 20.3**   Sample Adjustment Grid: Comparison and Adjustment of Market Data

| Element | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|
| Sale price | unknown | _____ | _____ | _____ | _____ |
| *Transactional Adjustments* | | | | | |
| Real property rights conveyed adjustment | _____ | _____ | _____ | _____ | _____ |
| Adjusted price* | _____ | _____ | _____ | _____ | _____ |
| Financing adjustment | _____ | _____ | _____ | _____ | _____ |
| Adjusted price† | _____ | _____ | _____ | _____ | _____ |
| Conditions of sale adjustment | _____ | _____ | _____ | _____ | _____ |
| Adjusted price‡ | _____ | _____ | _____ | _____ | _____ |
| Expenditures made immediately after purchase | _____ | _____ | _____ | _____ | _____ |
| Adjusted price§ | _____ | _____ | _____ | _____ | _____ |
| Market conditions adjustment | _____ | _____ | _____ | _____ | _____ |
| Adjusted price** | _____ | _____ | _____ | _____ | _____ |
| *Property Adjustments* | | | | | |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| Subtotal | _____ | _____ | _____ | _____ | _____ |
| Final adjusted sale price | _____ | _____ | _____ | _____ | _____ |
| For reconciliation purposes: | | | | | |
| Net adjustment†† | _____ | _____ | _____ | _____ | _____ |
| Net adjustment as % of sale price | _____ | _____ | _____ | _____ | _____ |
| Gross adjustment†† | _____ | _____ | _____ | _____ | _____ |
| Gross adjustment as % of sale price | _____ | _____ | _____ | _____ | _____ |

\*   Sale price adjusted for property rights conveyed

†   Sale price further adjusted for financing

‡   Sale price further adjusted for conditions of sale

§   Sale price further adjusted for expenditures made immediately after purchase

\*\*  Sale price further adjusted for market conditions

††  Net and gross adjustments include all transactional and property adjustments

- Conditions of sale (e.g., short sale, bank-owned real estate [REO], private estate, relocation, 1031 tax-free exchange, or other atypical motivations)
- Expenditures made immediately after purchase (e.g., new roof, renovation costs)
- Market conditions (e.g., changes in supply and demand or other causes of price changes)
- Location (e.g., neighborhood, interior lot, waterfront, arterial street)
- Physical characteristics (e.g., size, shape, soils, access, construction quality, condition)
- Economic characteristics (e.g., expense ratios, lease provisions, management, tenant mix)
- Legal characteristics (e.g., zoning/use requirements, environmental regulations, building codes, flood zones, differences in highest and best use)

BACK_DEFEXP-RR-002782

- Non-realty components of value (e.g., personal property, furniture, trade fixtures, and equipment [FF&E], franchises, trademarks)

Other possible elements of comparison include governmental restrictions and off-site improvements required for the development of a vacant site. The differences in some of these elements of comparison can be so large or so significant that the property is no longer comparable.

Often a basic element of comparison is broken down into subcategories that specifically address the property factor being analyzed. For example, physical characteristics may be broken down into subcategories for age, condition, size, and so on. (Adjustment techniques for each of the standard elements of comparison are illustrated in Chapter 21.) There is no limit to the number of elements of comparison that may be found in a market, so it is important to remember that another line can always be added to an adjustment grid for an additional item recognized in the market. For example, appraisers may need to add "deck" as an element of comparison if the market makes distinctions in sale price based on the presence or absence of a deck. However, note that adding elements of comparison for adjustment may lead to multiple adjustments for the same factor, an error that is discussed in Chapter 21.

The sample adjustment shown in Table 20.3 reflects the initial elements of comparison in a typical sequence. Blank lines are provided for additional property-related adjustments. The first five adjustments (for real property rights conveyed, financing terms, conditions of sale, expenditures made immediately after purchase, and market conditions) are considered transactional adjustments. The last five (for location, physical characteristics, economic characteristics, legal characteristics, and non-realty components) are considered property adjustments. If the comparable properties are similar to the subject property in regard to a specific element of comparison, no adjustment is required for that element. The sample grid includes separate lines for each element of comparison and adjustment to ensure that adjustments are made in a consistent manner. It is important to make adjustments only for those factors that materially influence the decision-making process of market participants. In addition, appraisers should exercise care to ensure that adjustments are not being made twice for the same factor and that all material influences have been considered.

Actual adjustment grids will vary depending on the nature and type of property and the units and elements of comparison used by market participants. Adjustments may be made in terms of percentage or dollar amounts.

The section labeled "For reconciliation purposes" is provided to help the appraiser analyze the comparability of each sale, which indicates the relative reliability of the separate value indications derived. The final adjusted sale price of each transaction is a potential value indication for the subject property. Together the adjusted sale prices of the comparable properties suggest a range of values within which the value of the subject property should fall. Each adjusted sale price can be analyzed to show the total, or absolute, adjustment made to the sale price of the comparable property and the percentage or dollar amount of the sale price that is reflected by this total adjustment. With these value estimates, the appraiser can rank the comparability of the sales to the subject and select an appropriate opinion of value, assuming the value conclusion is to be reported as a point estimate. The sale that requires the least significant or lowest total adjustment (i.e., the absolute adjustment based on the sum of the adjustments regardless of sign) is often the most comparable and is frequently

BACK_DEFEXP-RR-002783

given the most weight in reconciling the value indications from the sales comparison approach. Simply averaging the results of the adjustment process to develop an averaged value fails to recognize the relative comparability of the individual transactions as indicated by the size of the total adjustments and the reliability of the data and methods used to support the adjustments. Final conclusions are always contingent on the quality and availability of data.

### Sequence of Adjustments

The sequence in which adjustments are applied to the comparable sales is determined by the market data and an appraiser's analysis of that data. As mentioned earlier, the first five elements of comparison in the list are considered transactional adjustments, while the latter five (and any additional items) are considered property adjustments (see Figure 20.1). The transactional adjustments are generally applied in the order listed. The property adjustments are usually applied after the transactional adjustments, but in no particular order. The categories of property adjustments—location, physical characteristics, economic characteristics, legal characteristics (use), and non-realty components—correspond to the criteria of highest and best use:

- Physical possibility—location and physical characteristics
- Legal permissibility—legal characteristics such as zoning
- Financial feasibility—economic characteristics and non-realty components that influence the value of the real property



**Figure 20.1**   Transactional and Property Adjustments

1. Real property rights conveyed
2. Financing terms
3. Conditions of sale
4. Expenditures made immediately after purchase
5. Market conditions
— Transactional adjustments

6. Location
7. Physical characteristics
8. Economic characteristics
9. Legal characteristics
10. Non-realty components of value
— Property adjustments

The sequence of adjustments presented in Table 20.4 is provided for purposes of illustration only. The sequence of adjustments shown in Figure 20.1 is not the only order in which quantitative adjustments can be made. Adjustments may be applied in other sequences if the market and the appraiser's analysis of the data so indicate. Using the adjustment sequence, appraisers apply successive adjustments to the prices of comparable properties.

Most property types are adjusted on a unit price basis. Property adjustments for location, physical characteristics, economic characteristics, legal characteristics (use), and non-realty components are typically applied to a unit price.

BACK_DEFEXP-RR-002784

| Table 20.4 | Sequence of Adjustments | | |
|---|---|---|---|

| | Market-Derived Adjustment | Adjustment Applied to Sale Price of Comparable Property |
|---|---|---|
| Sale price of comparable property* | | $400,000 |
| **Element of Comparison** | | |
| *Transactional adjustments* | | |
| Adjustment for property rights conveyed | + 5% | +    20,000 |
| Adjusted price | | $420,000 |
| Adjustment for financing terms | − 2% | −    8,400 |
| Adjusted price | | $411,600 |
| Adjustment for conditions of sale† | + 5% | +    20,580 |
| Adjusted price | | $432,180 |
| Adjustment for expenditures immediately after purchase | + $20,000 | +  $20,000 |
| Adjusted price | | $452,180 |
| Adjustment for market conditions | + 5% | +    22,609 |
| Adjusted price | | $474,789 |
| *Property adjustments* | | |
| Adjustment for | | |
|    Location | | +    14,250 |
|    Physical characteristics | | −    23,750 |
|    Economic characteristics | | −    24,000 |
|    Legal characteristics | | +     9,500 |
|    Non-realty components | | −    12,000 |
| Indication of value | | $438,789 |

\* In the market data grid, the sale price could be converted into a unit price, such as price per square foot of leasable area, and adjustments made to the unit price rather than the sale price.

† Although in this case the adjustment for conditions of sale is independent of the adjustment for financing terms, sometimes the adjustment amount for financing terms can reflect some of the influence of a difference in conditions of sale. Chapter 19 includes discussion of how to avoid double-counting for the effect of these two elements of comparison.

## Reconciling Value Indications in the Sales Comparison Approach

Reconciliation is the process that converts an estimate into an opinion or conclusion and is necessary in nearly all applications of the sales comparison approach because the adjusted sales prices usually provide various value indications.[4] These value indications are resolved into a range of value or a single value indication (i.e., a point estimate). It is important that appraisers consider the strengths and weaknesses of each comparable sale, examining the reliability and appropriateness of the market data compiled and the analytical techniques applied in the comparative analysis. The appraisal report should clearly communicate how the appraiser arrived at the value indication using the sales comparison approach:

- What does the data show and how did the appraiser come to the value conclusion?
- What data was good, bad, missing?
- How and why did the appraiser come to the conclusion made in the sales comparison approach?

4. In addition to reconciliation within the sales comparison approach, reconciliation is also required when value indications are derived using two or more approaches to value. At that point in the valuation process, reconciliation results in the opinion of value identified in the definition of the appraisal problem. Reconciliation of the final opinion of value is discussed in Chapter 32.

BACK_DEFEXP-RR-002785

Copyrighted material licensed by Charles Brigden on September 17, 2020

In reconciling value indications in the sales comparison approach, appraisers evaluate the number and magnitude of adjustments and the importance of the individual elements of comparison in the market to judge the relative weight a particular comparable sale should have in the comparative analysis. For example, location is the most important element of comparison for some properties and other factors are of lesser importance. For such a property, comparable sales that require less adjustment for differences in location are likely to be given more weight in the reconciliation.

The *gross adjustment percentage* is the percentage of total adjustments (absolute values) divided by the sale price. This means a $10,000 upward adjustment and a $10,000 downward adjustment on a $100,000 sale would be $20,000 / $100,000 = 20%.

The *net adjustment percentage* is the percentage of adjustment to the sales based on the total net adjustment divided by the sale price. This means a $100,000 sale with $10,000 upward adjustment and $5,000 downward adjustment would have a net adjustment percentage of $5,000 / $100,000 or 5.0%. Both percentages are recognized by users of appraisal services as indications of the comparability of the sales to the subject.

If a comparable transaction requires fewer adjustments than the other comparable transactions and the magnitude of the adjustments is approximately the same, appraisers may give more weight to the value indications obtained from the transaction with the fewest adjustments. Similarly, the gross adjustment amount can be a significant factor in the reconciliation of various value indications. Even though the number of adjustments made to the sale prices of the comparable properties may be similar, the total gross adjustment as a percentage of each respective sale price might vary considerably. For example, suppose an appraiser analyzes five comparable properties, each of which require several adjustments. However, the gross dollar amount of adjustments for one comparable property totals 15% of the sale price, while the gross dollar adjustment for each of the other four properties is less than 5% of the sale price. If the sales are similar otherwise, less accuracy may be attributable to the comparable property that required the larger adjustment as a percentage of the sale price.

The size of a gross adjustment percentage may indicate the possibility of an error in the analysis, but more likely it is due to the variances in buyer behavior or the dis-

### Reconciliation Checklist

In the reconciliation process, appraisers often ask questions about the data and techniques used in the sales comparison approach including, but not limited to, the following:

·  Is the comparable property similar in terms of physical characteristics and location?
·  Does the comparable property have the same highest and best use?
·  Was this property developed, rented, or sold in the same market as the subject property?
·  Are the characteristics of the transaction similar to those expected for the subject property?
·  Would a potential buyer of the subject property consider the comparable property as a reasonable alternative to the subject?
·  Is one method preferred over another given the data available for each analysis?

In some cases, appraisers may ask additional questions:

·  Are the expenses of the comparable properties appropriate indicators of the expenses of the appraised property?
·  Are the estimates of depreciation in the subject improvements justified?

BACK_DEFEXP-RR-002786

similarity of the comparable sales presented. Care should be exercised not to dismiss a gross adjustment entirely just because of its size. A comparable with a large gross adjustment may be given weight when all other items of adjustment for the other comparable properties have been given consideration and the item(s) leading to the large gross adjustment has greater reliability. For example, a $1,000,000 property sale may have required only a $150,000 adjustment for expenditures immediately after purchase made to reflect the buyer's recognition of deferred maintenance in the building's roofing, HVAC, and other items. Although this represents a 15% adjustment, the amount of adjustment might be considered well-reasoned and supported and given greater consideration over other adjustments that are smaller.

The net adjustment is calculated by totaling the positive and negative adjustments and this adjustment figure may be misleading. For example, if a comparable property is adjusted downward by 20% for one element of comparison and upward by 20% for another element of comparison, the net adjustment is 0% but the gross adjustment is 40%. Another comparable sale may require several adjustments, all positive or all negative, resulting in a gross and net adjustment of 30%. This property may well be a more accurate indicator of the subject's value than the comparable sale with the 0% net adjustment, which had large positive and negative adjustments that cancel each other out mathematically.

It is also good practice in the reconciliation process to reexamine the major elements of comparison for which no adjustments were made and to explain why these elements of comparison did not require any adjustments.

Even when adjustments are supported by comparable data, the adjustment process and the indicated values should reflect good judgment. Small inaccuracies can be compounded when several adjustments are added or multiplied, and thus seemingly precise arithmetic conclusions derived from adjusted data might contradict the appraiser's judgment. The sales comparison approach is not formulaic. It does not lend itself to detailed mathematical precision. Rather, it is based on judgment and experience as much as quantitative analysis.

### Units of Comparison and Real Property Interests in the Reconciliation Process

Two related points should be stressed in any discussion of the reconciliation process. In arriving at a final value indication in the sales comparison approach, appraisers must ensure that the value concluded is consistent with the value indications derived from the other approaches to value. This is especially important in regard to the date of an opinion of market value. For example, an appraiser may seek an opinion of the market value of a proposed income-producing property at two different points in the future—e.g., when the project is completed and when occupancy reaches a point of stabilization. The only market data available, however, may pertain to comparable properties at or near stabilized occupancy. Typically, this data is appropriate only for an analysis of the market value of the subject property at the point of stabilized occupancy. As a result, the appraiser will need to reconcile the market value indication based on this data with value indications derived from the other approaches for the corresponding date of stabilized occupancy. In these cases, care must be exercised in the reconciliation process.

Appraisers must also consider any differences in the property rights appraised between the comparable properties and the subject property because the comparable sales may include the transfer of a leased fee. If the data is not properly analyzed in the sales comparison approach, the value indication concluded for the leased fee of

BACK_DEFEXP-RR-002787

Copyrighted material licensed by Charles Brigden on September 17, 2020

the subject property upon the achievement of stabilized occupancy might be lower or higher than the value for the fee simple estate. This value indication would not be compatible with the corresponding value indications derived from the cost and income capitalization approaches for the fee simple estate of the subject property unless adjustments have been made. Failure to recognize that the value indications may apply to different property rights would likely result in an inaccurate value conclusion.

BACK_DEFEXP-RR-002788

BACK_DEFEXP-RR-002789

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Comparative Analysis  21

*Comparative analysis* is the general term used to identify the process in the sales comparison approach in which quantitative and qualitative techniques are applied to comparable sales data to derive a value indication.[1] Appraisers may use both quantitative adjustments and qualitative analysis in comparative analysis.

The process of researching and applying adjustments involves a thorough analysis of the comparable sales to identify the elements of comparison that affect the value of the type of property being appraised. Quantitative adjustments derived in comparative analysis and applied to the sale prices of the comparable properties may be expressed in numerical amounts (e.g., dollars, percentages). The conclusions of qualitative analysis may be described in terms that clearly convey the relative difference between the comparable property and the subject property in regard to each element of comparison (e.g., inferior, superior, similar). When quantitative differences cannot be identified for a specific element of comparison, qualitative analysis is used to determine which comparable sales are inferior, similar, or superior to the subject property for that element of comparison. In applying quantitative adjustments, qualitative analysis, or both, appraisers must ensure that their reasoning is clear and adequately explained in the appraisal report. The extent of narrative explanation required also depends on the complexity of the property being appraised. The more complex the property, the more factors that must be considered in the analysis and then explained to intended users of the appraisal.

## Quantitative Adjustments

Several techniques are available to quantify adjustments to the sale prices of comparable properties:

- Data analysis techniques such as paired data analysis, grouped data analysis, and secondary data analysis

---

1. Market rent can also be developed using comparative analysis.

- Statistical analysis, including graphic analysis and scenario analysis
- Cost-related adjustments (cost to cure, depreciated cost)
- Capitalization of income differences

Appraisers can usually find some logic to support most quantitative adjustments given the number of tools available to them. Of course, the value indication supported by quantitative adjustments may differ from the results of cost or income capitalization analysis, and appraisers will have to reconcile the results of the sales adjustment process with the results of the other approaches to value in the final reconciliation. Above all, mathematical adjustments should reflect the reactions of market participants.

## Data Analysis Techniques

Paired data analysis is based on the premise that when two properties are equivalent in all respects but one, the value of the single difference can be measured by the difference in price between the two properties. For example, two residential properties are similar in all respects except for location—one property has a corner lot while the other is on an interior lot. If both properties sell at a similar time so that there is no difference in market conditions, the difference in sale price can be attributed to the different locations of the properties, and that identifiable difference can be used in the adjustment process. If the home on the corner lot sold for $30,000 more than the home on the interior lot, that difference, either as a dollar amount or a percentage, could be used to adjust the sale prices of other comparable sales in the market for location on a corner lot or an interior lot.

Paired data analysis should be developed with extreme care to ensure that the properties are truly comparable and that other differences do not exist. Using only one such pairing to draw conclusions can lead to a false impression, since there may be significant factors unknown to the researcher that may impact the value. This is why appraisers try to use several paired sales to support the adjustments and prevent an unknown factor from contributing to a misleading conclusion.

A related technique, grouped data analysis, involves grouping data by an independent variable such as date of sale and calculating equivalent typical values. The grouped sales are studied in pairs to identify the effect on a dependent variable such as the unit price of comparable properties. To apply this technique to the market used in the example described above, an appraiser would compare a group of comparable homes all on interior lots to a different group of residences all on corner lots, rather than comparing just one property of each type. The sales would be used to develop a range and then reconcile the value indications.

These techniques can be time-consuming and sometimes difficult to apply with a high level of mathematic precision. Nevertheless, they can be useful analytical tools if their weaknesses are appropriately recognized and they are applied in combination with other methods.

Paired data and grouped data analysis are variants of sensitivity analysis, which is a method used to isolate the effect of individual variables on value. Often associated with risk analysis, sensitivity analysis studies the effect of variables on different measures of return.

Although paired data analysis of sales or rents is a theoretically sound method, it may be impractical and could produce unreliable results when only a narrow sam-

BACK_DEFEXP-RR-002791

pling of sufficiently similar properties is available. This is particularly true for commercial and industrial properties and properties that do not sell or lease frequently in a market. A lack of data can make quantifying the adjustments attributable to all the variables a difficult process. An adjustment derived from a single pair of sales is not necessarily indicative, just as a single sale does not necessarily reflect market value.

Special care must be taken when relying on pairs of adjusted prices because the difference measured may not represent the actual difference in value attributable to the characteristic being studied. The difference may include other aspects of the property, not just the one characteristic being studied. Pure pairings may be analyzed first. For example, data on a sale and resale of the same property may be compared to derive a market conditions adjustment. Pairings of adjusted sales should only be used as an analytical tool when truly pure pairings are unavailable. When more than one element of comparison is involved, additional pairs can be studied to isolate and extract the differing elements of comparison. However, in these cases care must be exercised to ensure that the process accurately reflects differences considered by market participants.

Comparable properties that contain different unit or inventory mixes—e.g., apartment buildings with one-, two-, and three-bedroom units or agricultural lands with different types of soil—should be adjusted for that difference before pairing analysis is conducted. A unit or inventory mix adjustment is required to ensure that pairings of comparable properties and the subject property are made on the same basis. An appraiser may be able to extract this adjustment through an investigation of the value relationships among the different classes of properties within the same property type.

Grouped data analysis extends the logic of paired data analysis to larger data sets. In this technique, comparable sales are grouped by an independent variable such as date of sale and then the groups are studied as pairs. For example, sales of units in an industrial park that occurred in 2018 are grouped together, and the mean sale price for that year is compared to the mean sale price of another group of sales that occurred in 2019. Analyzing the pairs of mean sale prices gives a measure of the change in sale prices from 2018 to 2019.

Another form of data analysis—secondary data analysis—is used to support adjustments derived by other methods. This technique makes use of data that does not directly pertain to the subject or comparable properties. This secondary data describes the general real estate market and is usually collected by a data vendor research firm or government agency like the county assessor. Secondary data may need verification.

> Examples of applications of paired data analysis in this chapter include
> · The comparison of sales and resales of homes to determine a market conditions adjustment
> · The analysis of incremental rent in Table 21.4

## Statistical Analysis

Statistical methods may also be applied to calculate adjustments to comparable sales. To use any form of statistical analysis, an appraiser must understand (and properly apply) fundamental statistical concepts as well as the particular methodology selected.[2]

---

2. Full discussion of the statistical methods applicable to the sales comparison approach is beyond the scope of this text. Chapter 14 provides a review of basic statistical concepts and applications. In addition, *The Appraisal Journal*, *Journal of Property Tax Assessment & Administration*, *The Journal of Real Estate Research*, *Real Estate Economics*, and other scholarly journals have published many articles on advanced statistical applications.

BACK_DEFEXP-RR-002792

In applying statistical analysis, an appraiser must be careful not to develop a result that is mathematically precise yet logically meaningless or inappropriate for the particular appraisal. As with other adjustment techniques, statistical analysis must reflect the thought processes and conclusions of market participants to serve as a useful, persuasive valuation tool.

In one common application, appraisers can develop a series of adjustment factors to control for different tract sizes by creating a simple linear regression model and then use the results of the regression analysis as a means of inferring the size adjustment for properties within the range of the data. If a reasonable pattern emerges, the model can be applied to a group of sales with differing land sizes to test its accuracy, although the process might also demonstrate that the indicated adjustments are incorrect.

Appraisers should recognize the differences between statistical processes in the collection and description of data and should be able to distinguish between descriptive and inferential statistics. Without an understanding of these basic issues, any use of statistical calculations is dangerous or ill-advised.

Scenario analysis is a form of modeling in which the conditions created by future events are forecast to test the probability or correlation of alternative outcomes. In the adjustment process, alternative scenarios can be created and then modeled to test the influence of changes in various elements of comparison on sale price. The technique allows appraisers to forecast best, most-likely, and worst-case scenarios (such as the potential performance of proposed improvements) or to create other scenarios testing a range of values rather than a single point estimate. Scenario analysis is often used to measure the risk associated with certain market events and investment decisions.

> Examples of applications of graphic analysis in this chapter include
> - The analysis of a sale price trend shown in Figure 21.1
> - The comparison of property locations shown in Figure 21.3

## Graphic Analysis

A simple graphic display of grouped data may illustrate how the market reacts to variations in the elements of comparison or may reveal submarket trends. In curve fit analysis, different formulas may be employed to determine the best fit for the market data being analyzed. The most reliable equation for the best-fitting curve can be plotted, or the most appropriate equation of those commonly used to solve for an adjustment can be identified.

## Trend Analysis

Trend analysis is applicable when a large amount of market data is available. Such analyses are often useful in a variety of applications. They are especially useful when there is a limited number of closely comparable sales but a large number of properties with less similar characteristics. The various elements of comparison influencing a sale price can be tested to determine their market sensitivity. Once appraisers have determined which elements of comparison show market sensitivity, price patterns can be analyzed to support other analyses.

In the application of market analysis, the term *trend analysis* refers specifically to inferred demand analysis, i.e., using historical data and statistics to draw inferences about the future, assuming that a property or property type will perform in the

BACK_DEFEXP-RR-002793

Copyrighted material licensed by Charles Brigden on September 17, 2020

future as it has in the past. In the context of statistical theory, *trend analysis* is often defined as analysis of a time series. In the context of sales comparison, the term simply refers to the use of statistical techniques to make comparisons of variables other than time.

## Cost Analysis and Cost-related Adjustments

In cost analysis, adjustments are based on cost indicators such as depreciated building cost, cost to cure, or permit fees. Cost-related adjustments are most often used in markets with limited sales activity or for properties where isolating a feature is difficult to do, e.g., a porch on a residential property or a grain bin on an agricultural property that has 12 other outbuildings.

> An example of the application of cost analysis in this chapter is the adjustment for expenditures made immediately after purchase in the valuation of an industrial building.

Buyers are clearly conscious of the cost of repairs, additions, or conversions, as can be seen in the application of the cost approach (Chapters 29, 30, and 31). However, the cost of an improvement does not always result in an equal increase in value for the property as a whole. For example, adding a swimming pool to a residential property at a cost of $50,000 may only add $25,000 to the value of the property in one market, but it may add value commensurate with the pool's physically depreciated cost in a market where that recreational amenity is expected or demanded by buyers. As another example, a potential buyer of a refrigerated warehouse may also look at buildings without refrigeration that can be converted into refrigerated space and factor into an offer the cost of conversion (as well as other cost considerations such as the time the building would be unavailable for use during the conversion).

## Capitalization of Income Differences

Differences in net operating income can be capitalized to derive an adjustment when the income loss or gain incurred by a comparable property reflects a specific deficiency or benefit to the property. Examples of scenarios in which an income loss could be capitalized to derive an adjustment to account for a deficiency would include the lack of an elevator in a low-rise office building and inadequate parking for a convenience store. In contrast, a comparable property may enjoy a competitive advantage over the subject property, in which case the adjustment to the sale price of the comparable property would reflect the income premium the property enjoys. For example, an investor may decide to purchase a building with an elevator or one without an elevator based on the difference in potential rental rates.

Deriving an adjustment by capitalizing differences in net income is a useful technique, but it can diminish the independence of the sales comparison and income capitalization approaches. In theory, the approaches to value are independent. In practice, the integration of the sales comparison, cost, and income capitalization approaches may offer the best support for a value conclusion. However, too much integration can negatively affect the independence of the approaches and introduces the risk of double-counting (as discussed later in the chapter).

Capitalization of income differences is easier to support than many other methods of quantifying adjustment

> Examples of applications of capitalization of income differences in this chapter include
> - The adjustment for real property rights conveyed in the sale of an office building
> - The adjustment for income loss due to the physical characteristics of an apartment building

BACK_DEFEXP-RR-002794

amounts, and the technique is recognized by investors as a valid method of comparison. Sufficient data must be available and carefully verified. It is commonly used in eminent domain assignments to illustrate a loss in value, e.g., the difference between the rental income a property generates before and after an event such as a government taking of a portion of the property. Capitalization of rent differences can also be used in the valuation of residential property through the application of a gross rent multiplier if there is adequate information on rents and rent differences.

## Qualitative Analysis

Qualitative analysis recognizes the inefficiencies of real estate markets and the difficulty of expressing adjustments with mathematical precision. It is essential, therefore, that appraisers explain the analytical process and logic applied in reconciling value indications using qualitative analysis techniques such as

- Relative comparison analysis
- Ranking analysis
- Personal interviews

Statistical analysis and graphic analysis may serve as qualitative techniques when the results of those analyses do not support a precise adjustment amount but do support qualitative conclusions about value trends. Graphical analysis is used in cases when less data is available. Likewise, when trend analysis yields enough evidence to support a precise adjustment amount, the technique could be considered a quantitative adjustment technique. The nature of the data analyzed with the various statistical techniques will dictate how the results of the analysis can be used, either as an adjustment or as a qualitative indicator.

### Relative Comparison Analysis

Relative comparison analysis is the study of the relationships indicated by market data without recourse to quantification, i.e., the data reveals an ordinal relationship between elements of a data set. Many appraisers use this technique because it reflects the imperfect nature of real estate markets. To apply the technique, appraisers analyze comparable sales and identify whether the characteristics of the comparable properties are inferior, superior, or similar to those of the subject property.

Reliable results can usually be obtained by bracketing the subject property between comparable properties that are superior and inferior to it. It is improper to select comparable properties based solely on price. A proper bracketing technique is typically based on property features (such as size) rather than price. It is unrealistic to expect that the value indication will always be supported by at least one sale at a price above and one at a price below. For example, if the comparable properties are either all superior or all inferior, only an upper or lower limit of values is set and no range (or bracket) of possible values for the subject property can be defined. If all the comparable properties are inferior in terms of qualitative factors, the only conclusion that can be drawn is that the value of the subject property

> Examples of applications of relative comparison analysis in this chapter include
> - The comparison of ranges of lot sizes shown in Table 21.3
> - The analysis of varying maximum buildable areas for office properties shown in Table 21.6

BACK_DEFEXP-RR-002795

is higher than the highest value indication from the comparable properties.

Qualitative factors are the primary focus of bracketing. If the available comparable sales do not bracket the subject property's value, appraisers should consider employing other analytical techniques to establish a bracket. Quantitative adjustments to the comparable sales can often serve this purpose.

### Ranking Analysis

Ranking analysis is used to sort the comparable data for differences in specific elements of comparison, e.g., size, corner or interior lot, or frontage. The technique can be used to test the specific elements of comparison for their market sensitivities. The comparable sales are ranked according to overall comparability or by some other element of comparison so that the relative position of each comparable sale to the subject property is clear. Specific value trends can thereby be established for elements of comparison that are market-sensitive, and those that show no discernible or reasonable trends will be discarded.

## Elements of Comparison

As indicated in Chapter 20, elements of comparison are the characteristics of properties and transactions that help explain the variances in the prices paid for real property. Basic elements of comparison usually include the following:

- Real property rights conveyed
- Financing terms
- Conditions of sale
- Expenditures made immediately after purchase
- Market conditions
- Location
- Physical characteristics
- Economic characteristics
- Legal characteristics (use)
- Non-realty components of value

Each of the basic elements of comparison should be analyzed to determine whether an adjustment is required. If sufficient information is available, a quantitative adjustment may be made. If there is insufficient support for a quantitative adjustment, the element of comparison may be better addressed using qualitative analysis.

Adjustments for differences in the elements of comparison are made to the price of each comparable property. Adjustments may be made to the total property price, to a common unit price, or to a mix of both, but the unit prices used must be applied con-

> An example of the application of ranking analysis in this chapter is the analysis of corner and interior lot locations shown in Table 21.1.

> **Personal Interviews**
>
> Personal interviews are an important part of the foundation of the adjustment process. That is, they can reveal the opinions of knowledgeable individuals participating in the subject's market such as trends in sale prices, rents, or capitalization rates. Although data gathered through personal interviews is primary data, the opinions of market participants (however valuable) should not be used as the sole criterion for estimating adjustments or reconciling value ranges if an alternative method that relies on direct evidence of market transactions can be applied.

BACK_DEFEXP-RR-002796

sistently to the comparable properties at the appropriate points in the adjustment process. The magnitude of the adjustment made for each element of comparison depends on how much that characteristic of the comparable property differs from the subject property. The adjustment amount is based on the contribution to value difference.

Appraisers should consider all appropriate elements of comparison and avoid double-counting adjustments for the same difference reflected in multiple elements of comparison. This requires an awareness of situations in which the influence of differences in one element of comparison may have an effect on an adjustment derived for a different element of comparison. (This relationship, called *multicollinearity*, was discussed in Chapter 14.) For example, an adjustment made to the sale of a comparable residential property for the number of bedrooms in the house might be related to or be duplicative of an adjustment that has already been made for the size of the house. The size difference may be reflected in both elements of comparison—a classic multicollinearity problem.

## Transactional Adjustments

The transactional adjustments are generally applied in a specific sequence:

1. Real property rights conveyed
2. Financing terms
3. Conditions of sale
4. Expenditures made immediately after purchase
5. Market conditions

Mathematical operations of multiplication and addition are commutative. This means if the adjustments are based in either multiplication or addition, the order does not matter unless some are multiplied and others are added. The reason to put the transactional adjustments in a particular order is to allow extraction of capitalization rates at a certain level. In most cases, the real property rights conveyed, financing terms, conditions of sale, and expenditures made immediately after sale adjustments are made before extracting the capitalization rate. However, the market conditions adjustment is not made before extracting the capitalization rate because the income and price should both be as of the date of sale.

### Real Property Rights Conveyed

When real property rights are sold, they may be the sole subject of a contract, or the contract may include other rights, less than all of the real property rights, or even rights to another property or properties. Before a comparable sale property can be used in sales comparison analysis, an appraiser must first ensure that the sale price of the comparable property applies to property rights that are similar to those being appraised. This may require one or more adjustments to the price of the comparable property before specific differences in the physical real estate can be compared. And, in some cases, it may eliminate the use of that sale as a possible comparable altogether.

For example, the rights conveyed by a quitclaim deed for real property may or may not include the complete bundle of rights that make up the fee simple estate.[3] If a comparable sale involves a quitclaim deed, appraisers must determine if the buyer and seller considered the transaction to be equivalent to a fee simple transaction or

---

3. A quitclaim deed is a method of conveying title to real property in which any interest the grantor possesses in the property described in the deed is conveyed to the grantee without warranty of title.

BACK_DEFEXP-RR-002797

Copyrighted material licensed by Charles Brigden on September 17, 2020

must seek other supporting evidence before using the transaction for the appraisal of the fee simple estate in the subject property. It is possible that the transaction cannot be used for direct comparison purposes at all because there is such a limited amount of data to support an adjustment for the difference in rights or the quitclaim deed may be for purposes of clearing the title.

Some sale contracts call for the sale of real property rights but add deed restrictions or other forms of limitation on the purchaser or on future users of the property. That sort of title or use limitation, which causes the real property rights conveyed to be less than fee simple, must be addressed in the analysis. If it is not possible to analyze its effect on value, the transaction may be less useful for direct market comparison.

Income-producing real estate is often subject to an existing lease or leases encumbering the title. Leases may either increase or decrease the market value of the full bundle of rights, depending on how the contract rent rates and terms compare with market rent and terms. If the sale of a leased property (i.e., the leased fee) is to be used as a comparable sale in the valuation of another interest in real property, the comparable sale can only be used if reasonable and supportable market adjustments for the differences in real property rights can be made. For example, consider the appraisal of the fee simple estate in a property that is improved with a multitenant office building. A similar improved property was fully leased at the time of sale, the leases were long-term, and the credit ratings of the tenants were good. To compare the value of the leased fee of the comparable property to the value of the fee simple estate of the subject property, an appraiser must determine if the contract rent of the comparable property was above, below, or equal to market rent. The appraiser must also determine whether contract rent represents income attributable to increases in rent under existing leases resulting from stated escalations in the leases or tenant reimbursement of expenses. If the market rent for office space is $25 per square foot net and the average contract rent for the comparable property is $20 per square foot net, then the difference between market and contract rent is $5 per square foot.

Calculating an adjustment for differences in real property rights is also necessary when the subject property involves the fee simple and the comparable sale involves the leasehold or vice versa. Although it is usually not recommended that the sale of a leasehold be compared with a fee simple or leased fee, the limited availability of sales of directly comparable interests may make this necessary. Careful analysis of the leases of the subject property and comparable properties is required.

The prices that buyers and sellers negotiate can be affected by many factors related to the income projections for a subject property and comparable properties. For example, suppose a land owner leases a commercial site to a fast food restaurant company for $5,000 per month ($60,000 per year) for 40 years. The restaurant company builds a building with a cost of $2 million on the leased land. If the capitalization rate for the leased fee is 5.0%, the market value of the leased fee would be $1.2 million ($60,000/0.05). Now suppose that the same property had been leased for only $2,000 per month ($24,000). In that case, the market value of the leased fee would be $480,000 ($24,000/0.05).[4] That amount is the market value of the leased fee interest, not the fee simple land value, which cannot be either $1.2 million or $480,000.

In a comparison of properties that are encumbered by long-term leases or are essentially fully leased with quality tenants, appraisers must recognize that these

---

4.   A different capitalization rate may be appropriate when the rent is below market.

BACK_DEFEXP-RR-002798

leased properties may have significantly less risk than a competitive property that has shorter-term tenants at market rental rates. On the other hand, the reverse may be true in expanding markets. The ability to demand higher rental rates and the ready availability of tenants may favor the shorter-term lease strategy. The market position of a fully leased building is clearly different from that of a building with no leases at all. The buyer of a multitenant property that has a good cash flow in place may not be the same buyer who is interested in a property that is only one-third occupied. In the case of the property with two-thirds vacancy, the buyer may need a higher down payment and another portion of the purchase price to cover the shortfalls created by the lease-up period. It is quite common for buyers of nearly empty buildings to have to invest capital for many years until the properties reach stabilized occupancy. The period over which the property leases up to a stabilized level is easily reflected in the income capitalization approach, but often needs to be adjusted for in the sales comparison approach. The adjustment applied to the sale of a partially leased property would be different if users favor unleased buildings over those encumbered by leases.

Another issue in some markets is the difference between the owner-user market and the investor market. This difference can be significant in markets like office building markets where one buyer may want the building to be completely empty so they can move their business into it while the next buyer may want occupancy as close to 100% as possible to ensure an income stream. In some cases, it is possible for a single tenant with a long-term lease to prevent the redevelopment of a site.

Calculations of appropriate adjustments for differences in property rights may be difficult to develop and support. Properly developed adjustments require significant research and diligence, which may be provided by a well-developed market analysis. Ideally, the comparable transactions selected for analysis include the same types of property rights as the subject property so that adjustments are not needed or minimized.

## Financing Terms

The market value of a clearly identified property interest may be reported in a number of ways: (1) in terms of cash, (2) in terms of financial arrangements equivalent to cash, or (3) in other precisely defined terms. An example of the third scenario is the cash value of the equity interest subject to existing or proposed financing. The transaction price of one property may differ from the price of an identical property due to financing arrangements, and prices paid with advantageous financing must be adjusted to account for an additional increment caused by the advantage before using those prices as an indicator of market value for the subject property. For example, the purchaser of a property may have assumed an existing mortgage at a favorable interest rate. In another case, the seller rather than the buyer may have paid the buyer's closing costs. In both cases, the buyers probably paid higher prices for the properties to obtain favorable financing. The general availability of financing and the loan-to-value ratio can be significant factors that influence property value, and the specific financing terms in a transaction can also affect the price.

Components of financing include the amount of a mortgage loan, its interest rate, its schedule of debt repayment, required fees for placing the loan, and required restrictions or fees for early termination of the loan. Any of these components can affect the cost of financing to the buyer. Typically, nonmarket financing arrangements include installment sale contracts, in which the buyer pays periodic installments to the seller and obtains legal title only after the contract is fulfilled, purchase money

BACK_DEFEXP-RR-002799

Copyrighted material licensed by Charles Brigden on September 17, 2020

mortgages where the seller becomes the mortgage lender, assumptions in which the new buyer assumes the terms of the previous mortgage loan, and wraparound loans, which are a combination of assumptions of old mortgage debt with new money added (a blended rate). Below-market rates are sometimes extended to individuals who have substantial net worth and are therefore especially creditworthy. This is important because it means that the cost of financing is not entirely tied to the property and will be impacted by the applicant.

In cash equivalency analysis, each comparable transaction with financing that differs from the presumed financing of the property being appraised should be adjusted for parity. Appraisers investigate the sale prices of comparable properties that appear to have been sold with nonmarket financing to determine whether adjustments are needed to reflect cash equivalent terms at the time of sale. Using paired sales analysis, sales with nonmarket financing are compared to other sales transacted with market financing to determine whether an adjustment for cash equivalency is being recognized in the market.

The typical definition of *market value* recognizes cash-equivalent terms, which means a sale price that equals the amount paid by a cash buyer who did not need any assistance or advantages from the seller. Conditions of sale may reveal other interests on the part of buyers or sellers that are not related to financing terms. Confirmation of the intent of buyers and sellers is one way to verify a cash equivalency adjustment.

Cash equivalency calculations vary depending on the kind of financing arrangement that requires adjustment. Appraisers may calculate adjustments for atypical financing by analyzing paired data sets or by discounting the cash flows (e.g., payments and balloons) created by the mortgage contract at market interest rates. If discounting is used, appraisers should not assume that the buyer will always hold the property for the life of the mortgage. Market evidence often indicates otherwise. A mortgage is often discounted for a shorter term, but the balloon payment must still be included. In addition, the benefit of a lower interest rate loan may not be as significant in future years as it is now. That is, buyers who obtain favorable financing only benefit until mortgage rates come back down.

Calculating a cash equivalency adjustment by discounting cash flows can be accomplished in different ways. When a seller finances a mortgage at a below-market interest rate, appraisers can estimate the present value of the mortgage by applying a present value factor to the monthly mortgage payment at the market interest rate for the stated term of the mortgage.[5] For example, an appraiser finds a comparable sale of a one-unit residence that was sold for $250,000 with a down payment of $50,000 and a seller-financed mortgage of $200,000 for a 20-year term payable monthly at 3.0% interest. Homes in the market area are typically held for the full 20-year term, and the market rate is 3.5%. The cash equivalency adjustment is calculated as follows:

| | |
|---|---:|
| Mortgage | $200,000, 20 years payable monthly, 3% |
| Monthly payment | $1,109.20 |
| Present value of $1,109.20 per month for 20 years @ market rate of 3.5% | $191,254 |
| Indicated adjustment for cash equivalency | $8,746 |
| $200,000 − $191,254 = $8,746 | |

---

5.  See the discussion of concessions later in this chapter for more detail on the effect of seller financing (and other forms of seller participation in the lending process) on value.

BACK_DEFEXP-RR-002800

Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 396 of 722    Page ID #16620

The cash-equivalent sale price would then be $241,254 ($250,000 – $8,746). A common criticism of this calculation is that while the mortgage term may run 20 years, the advantage of the discounted rate would be much shorter. That is, the 3.5% to 3.0 % advantage would be gone if the market rate comes down to the lower level some date in the future.

Discounting cash flows to calculate a cash equivalency adjustment may also take into account the expectation of a balloon payment. For example, consider a house that sells for $250,000 with a down payment of $50,000 and a seller-financed $200,000 mortgage at an interest rate of 3.5% when the market rate is at 6.0%. The mortgage is amortized over 25 years with a balloon payment due at the end of 8 years. The present value of the mortgage is computed as the sum of two components:

1.  The present value of the mortgage payments at the market interest rate for the expected life of the mortgage
2.  The present value of the future mortgage balance at the market interest rate

The calculations are as follows:

| | |
|---|---:|
| Mortgage | $200,000, 25 years payable monthly, 3.5% |
| Monthly payment | $1,001 |
| Present value of $1,001 per month for 8 years @ 6.0% | $76,190 |
| Mortgage balance in 8 years | $153,777 |
| *PV* of mortgage balance in 8 years @ 6.0% | $95,269 |
| *PV* of mortgage | $171,459 |
| $76,190 + $95,269 = $171,459 | |
| Indicated adjustment for cash equivalency | $28,541 |
| $200,000 − $171,459 | |

The cash-equivalent sale price would then be $221,459 ($250,000 – $28,541).

Transactions involving mortgage assumptions can be adjusted to cash equivalency with the same method applied to seller-financed transactions. Other atypical mortgage terms include mortgages that call for interest-only payments followed by payments that include the repayment of the principal. This type of mortgage can also be adjusted to its cash-equivalent value using the adjustment procedure described here. The present values of the payments (monthly, quarterly, semiannual, or annual) at the market rate, year by year, are derived using present value factors. If balloon payments are involved, present value factors may be applied to isolate the contributory market value of the unpaid balance of the mortgage.

Financing adjustments derived from precise, mathematical calculations of cash equivalency must be tested against market evidence. Strict mathematical calculations may not reflect market behavior. It is necessary for appraisers to talk with the buyers and sellers to determine if the financing terms affected the price. Market evidence must support the adjustment made. If the cash discount indicated by the calculations is not recognized by buyers and sellers, the adjustment is not justified.

Appraisers should also recognize that in some situations financing and conditions of sale are interdependent, and they should be careful not to double-count the influence of these factors when making quantitative adjustments.

### Conditions of Sale

The definition of *market value* used in most assignments requires "typical motivations of buyers and sellers" with no incentives or pressure on either party to consummate

**382**  *The Appraisal of Real Estate*

BACK_DEFEXP-RR-002801

Copyrighted material licensed by Charles Brigden on September 17, 2020

the sale. An adjustment for conditions of sale usually reflects the motivation of either a buyer or a seller who is under undue duress to complete the transaction. In many situations the conditions of sale can significantly affect transaction prices. These are atypically motivated sales transactions. For example, a developer may pay more than market value for lots needed in a site assemblage because of the plottage value or any enhanced development economies expected to result from the greater utility of the larger site. A sale may be transacted at a below-market price if the seller needs to complete a transaction before a certain date (e.g., marriage dissolution). A financial, business, or family relationship between the parties to a sale may also affect the price of property. Interlocking corporate entities may record a sale at a nonmarket price to serve their business interests. One member of a family can sell a property to another member of the family at a reduced price, or a buyer may pay a higher price for a property because it was built by his or her ancestors.

When nonmarket conditions of sale are detected in a transaction, the sale can be used as a comparable, but care is needed. The circumstances of the sale must be thoroughly researched before an adjustment is made, and the conditions must be adequately disclosed in the appraisal report. Any adjustment should be well supported with data. If the adjustment cannot be supported, the sale probably should be discarded or, at the very least, sufficient commentary should be provided to explain the situation so that the reader understands what has occurred and why the sale is being used.

Although conditions of sale are often perceived as applying only to sales that are not arm's-length transactions, some arm's-length sales may reflect atypical motiva-

---

## Like-kind Exchanges

Section 1031 of the Internal Revenue Code allows for the exchange of real estate free from the recognition of the taxable gains or losses that would result from the transfer. Certain conditions must be met for a transfer of property to qualify:

· There must be an actual exchange and not a sale.
· The properties exchanged must be of like kind.
· The property transferred and the property received must be held for productive use in a trade or business or for investment.
· The taxpayer must meet the specified timing requirements.*

In other words, a property owner can in essence defer taxation on any gains realized by the disposal of real estate if a similar property can be acquired within the window allowed by the tax code. The use of this tax-defferal strategy by owners of business and income property is perennially subject to legal interpretations of the current wording of the tax code, most recently in 2018 when all asset types other than real estate were dropped from eligibility.

Property that is transferred in a like-kind exchange does not necessarily sell for more (or less) than its market value, but these transactions can be complex and transaction costs are often higher than normal. Buyers in 1031 property exchanges may pay more for a property because they lose the ability to defer taxes on the gain if they do not meet the timing requirements of the code. For a property involved in a like-kind exchange to be used as a comparable sale in the valuation of a property that would not be transferred in a like-kind exchange, an adjustment of the sale price relating to the difference in conditions of sale or a cash-equivalency adjustment may be necessary. Sale verification is the best way to find market support for this type of adjustment if one is needed.

---

* John R. Leavins and Samuel Penkar, "An Overview of Real Estate Like-Kind Exchanges," *The Appraisal Journal* (July 2003): 266.

BACK_DEFEXP-RR-002802

tions or sale conditions for several reasons, including but not limited to unusual tax considerations, lack of exposure on the open market, or the complexity of eminent domain proceedings. If the sales used in the sales comparison approach reflect unusual situations, an appropriate adjustment (supported by market evidence) should be made for motivation or conditions of sale. Again, the circumstances of the sale must be explained in the appraisal report.

In some markets with limited data, appraisers cannot discard any sales and must use comparable sales with unusual conditions of sale. Too much competition or a poorly performing market could cause a similar situation. (See Guide Note 11: Comparable Selection in a Declining Market in the Guide Notes to the Standards of Professional Practice of the Appraisal Institute for further information.)

---

### Concessions

A concession is a financial payment, special benefit, arrangement, or non-realty item included in a sale contract or rental agreement as an incentive to the sale or lease. Concessions occur when the seller or lessor agrees to pay an inducement or to give some special credit or property to a buyer or lessee, who agrees to pay a higher price than would normally be paid in return for the inducement or credit. Concessions often allow financing that would otherwise not be possible, and they usually result in artificially inflated sale prices or lease rates. Concessions may be disclosed as part of the sale or lease, but they are often not disclosed.

For example, a seller may give some sort of financial incentive to induce a buyer to make an offer on their property rather than on a competitor's property. Some appraisers will identify this sort of financial "concession" as an adjustment to be made under the "conditions of sale" element of comparison, but other appraisers will label concessions as "financing terms." The label itself is less important than recognizing the effect of concessions on the sale price of a comparable sale, compensating for that effect, and not double-counting the effect of the concession. Note that the Uniform Residential Appraisal Report form includes a note that instructs users of the form that concessions should not be automatically based on "a mechanical, dollar-for-dollar basis."

Additional examples of concessions include the following:

- A sale that includes personal property items such as automobiles, motorcycles, cruise tickets, or furnishings.
- A sale in which the seller contributes to the buyer's portion of the closing costs. This lowers the amount of money the buyer needs at closing. The parties usually raise the selling price by the amount of the extra cost in order to net the same amount they would with a typical buyer.
- A transaction in which the seller of the real property purchases a piece of personal property from the buyer at an inflated price. For example, the buyer has a used car worth $2,000, but the seller buys it for $20,000 (as part of the real property transaction), in effect giving the buyer a down payment. The price (but not the value) of the real property is artificially increased by $18,000.
- A sale in which the seller subsidizes the buyer's mortgage, e.g., buys down the interest rate, pays the buyer's mortgage payments for a stated number of months, or provides some other arrangement. If the interest rate of the new loan is lower, some lenders will underwrite the loan at the discounted rate, which allows the buyer to take out a larger loan.
- A seller-financed sale in which the seller takes back a mortgage at a below-market rate, which will give the buyer lower payments unless the seller raises the sale price to compensate.
- A free month's rent as part of a one-year apartment lease.
- A new lease in which the landlord pays the tenant's moving costs.
- Points paid by the seller.
- Personal property, furniture, fixtures, and equipment (FF&E), or other non-realty items included in the sale.

Verification is key to assessing the influence of concessions. Appraisers should adjust for these items because a value indication that includes the effect of concessions is usually not in compliance with commonly used definitions of *market value*.

---

BACK_DEFEXP-RR-002803

Copyrighted material licensed by Charles Brigden on September 17, 2020

Making direct comparisons is more difficult when the motivations of market participants are atypical. If the buyer is related to the seller, the sale price paid may not reflect the price that would be paid on the open market. Likewise, if a seller needs the proceeds of the sale quickly to avoid bankruptcy, a shrewd buyer may be able to purchase the property for less than what it would bring if it were on the market for a reasonable exposure time, allowing more potential buyers to participate in negotiations.

Interviewing the participants involved in the transaction usually provides an indication of the magnitude of the adjustment, but sometimes the direction of an adjustment for conditions of sale may be all that can be determined. In the case of a distressed seller, an upward adjustment may be necessary to reflect the value the seller is not recapturing by accepting a below-market offer. The direction of a conditions of sale adjustment in transactions involving related parties may be more difficult to determine. If the details of the transaction are too difficult to verify, an adjustment for conditions of sale may not be usable but it can still be discussed and may be useful in reconciliation.

### Expenditures Made Immediately After Purchase

A knowledgeable buyer considers expenditures that will have to be made upon purchase of a salable property because these costs affect the price that the buyer agrees to pay. These expenditures may include

- Costs to cure deferred maintenance
- Costs to demolish and remove a portion of the improvements
- Costs for additions or improvements to the property
- Costs to petition for a zoning change, which also changes the use of the property
- Costs to remediate environmental contamination

These costs are often quantified in price negotiations and, like concessions, can be discovered through verification of the sale transaction data. The relevant figure is not the actual cost that was incurred but the cost that was anticipated by both the buyer and seller at the time of purchase.

Generally, an adjustment for expenditures made immediately after purchase is simple to quantify when transaction data is being verified with the market participants. For example, consider a 15,000-sq.-ft. warehouse that is comparable to the property being appraised and was recently sold for $850,000. The new owner-occupant expected to spend $65,000 to install an overhead door and loading dock, which was a market-driven decision because nearly all industrial buildings in this market have at least one door and dock. In an interview with the new owner of this comparable property, the appraiser learns that the proposed changes actually cost $105,000. The adjusted price for that comparable property would be $915,000 ($850,000 + $65,000) rather than $955,000 ($850,000 + $105,000) because the $65,000 expenditure anticipated by the buyer was deducted from the price the property would command in the market if no expenditures were necessary.

Adjustments for deferred maintenance can be handled similarly, but appraisers should make sure that both the buyer and seller were aware of any items needing immediate repair. If the seller was not required to disclose or did not necessarily know that the roof of the warehouse had a leak and needed repairs, the buyer may not have anticipated those expenditures after the purchase, and there would be no adjustment

BACK_DEFEXP-RR-002804

to the recorded sale price for that item of deferred maintenance. These factors are always determined through the personal interviews that are part of the verification process. Other items that a buyer may need to budget for as expenses immediately after purchase include

- Cost of obtaining entitlements (permissions)
- Demolition and removal costs
- Environmental remediation costs (unless the buyer is indemnified by the seller or a third party or the remediation costs are being paid by another party)
- Large capital improvements needed at the time of sale

In sales comparison analysis, costs incurred by the new owners of comparable properties are reflected as positive adjustments to the sale prices of those properties. If the subject property requires some expenditure immediately after the purchase to reach its full utility, the adjustment amount is subtracted from the sale prices of all comparable sales that do not require a similar expenditure to adjust those transactions for differences from the subject property.

An adjustment for expenditures made immediately after purchase is distinct from an adjustment for the physical condition of a property. The expenditures adjustment is included among the transactional adjustments because it reflects those items that a buyer would have considered part of the price at the time of the sale. For example, a buyer bought a property that included a 6.75-acre site improved with a 122,000-sq.-ft. industrial building with many environmental problems. The buyer told the appraiser that the cost of removing the building and the environmental problems was $750,000. The sale price of the property was only $225,000. The appraiser is considering using this as a comparable land sale, but the buyer actually has $975,000 ($750,000 + $225,000) invested in the property, not just the $225,000 sale price. In the sequence of adjustments, an adjustment for expenditures made immediately after purchase is shown above the market conditions line, which means the market conditions adjustment would be made on the $975,000 price, not the $225,000 price. Often a buyer will want to negotiate an even lower price factoring in an entrepreneurial incentive for doing the work.

Another application of this adjustment is for items that would affect the sale price but not necessarily the rental income. For example, the subject property is a 55,000-sq.-ft., three-story office building that has a new roof covering and three new HVAC units. The cost of these items is $252,000. A nearly identical comparable property just sold for $5 million, but this property needed a new roof covering and three new HVAC units. The rental rates of both buildings are the same, but the maintenance expense for the comparable property is much higher. The adjustment for the deferred maintenance items found in the comparable property could be made on the condition line of the adjustment grid or on the expenditures made immediately after purchase line. An adjustment made on the condition line would affect the capitalization rate that might be extracted from this sale. In other words, the capitalization rate would be a reflection of a sale with good income levels but deferred maintenance. If this adjustment is made prior to extracting the capitalization rate, the result would be an "apples to apples" comparison rather than the skewed amount that would result if the capitalization rate were extracted from a sale with the needed repairs.

BACK_DEFEXP-RR-002805

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Market Conditions

Comparable sales that occurred under market conditions different from those applicable to the subject on the effective date of appraisal require adjustment for any differences that affect their values. An adjustment for market conditions is made if general property values have increased or decreased since the transaction dates. The value of one segment or type of property may change at a certain rate, but this does not mean that others also change at the same rate. For example, land values may have increased at a rate of 10% per year for the past 14 months, but this does not mean that the values of the improved properties have also increased at the same rate over the same period of time.

Although the adjustment for market conditions is often referred to as a "time" adjustment, time is not the cause of the adjustment. Market conditions that change over time create the need for an adjustment, not time itself. In other words, increases or decreases in property values in the market over time are the cause of the adjustment and time is the basis of the adjustment. If market conditions have not changed, no adjustment is required even though considerable time may have elapsed.

The timing of comparable sales can provide the basis for a market conditions adjustment. For example, the highest and best use analyses of vacant land parcels provide information that can be used to estimate an adjustment for changes in market conditions. Comparable tracts of vacant land may have been sold under market conditions different from those on the date of the appraisal. The best sales data available is often historical sales to purchasers who bought the land with a specific use in mind. These sales provide an indication of the anticipated land value under the specific use.

Changes in market conditions may also result from changes in income tax laws, building moratoriums, the availability of financing, employment, interest rates, and fluctuations in supply and demand. Sometimes several economic factors work in concert to cause a change in market conditions. A recession tends to deflate all real estate values, but specific property types or submarkets may be affected differently. A decline in demand may affect only one category of real estate. If the demand for a specific type of property falls during a period of inflation, sales transacted during that period may not provide a reliable indication of the market value of a similar property in a different period unless appropriate adjustments are made. In a depressed economy, recent nondistressed sales are often difficult to find. Older sales, occurring prior to the onset of the depressed economy, should be used with great caution because they may not reflect the problems associated with the depressed economy. In some instances when current sales of improved properties do not exist, upward or downward shifts in rent and rent terms or land values may help appraisers identify the direction of market activity.

Appraisers must also recognize that the sale of a property may be negotiated months or even years before the sale closes. The buyer and the seller make an agreement as of the contract date, but the agreement does not become effective until the closing date, and changes to the agreement are often made in the interim. An adjustment for changes in market conditions between the date the contract is signed and the effective date of value may be appropriate. Also, sometimes appraisers are called on to develop an retrospective or prospective opinion of market value, which requires a close study of changes in market conditions.[6]

---

6. For USPAP guidance retrospective and prospective value opinions, see Advisory Opinion 34 of the Uniform Standards of Professional Appraisal Practice, 2020-2021 ed. (Washington, DC: Appraisal Foundation, 2020), 156-157.

*Comparative Analysis*   **387**

BACK_DEFEXP-RR-002806

An adjustment for changes in market conditions is usually measured as a percentage of previous prices. While change is continuous, it is typically measured and quoted in specific intervals because markets move in cycles rather than in one constant direction. If the physical and economic characteristics of a property remain unchanged, analyzing two or more sales of the same property over a period of time will indicate the percentage of price change. In other words, appraisers can measure the difference in sale prices of the same or similar properties over time to extract the rate of change, which can then be used as the basis for adjustment in the sales comparison analysis. Appraisers should always attempt to examine several sets of sales to arrive at an appropriate adjustment.

Sales and resales of the same properties may provide a good indication of the change in market conditions over time. However, such an analysis must be approached with caution because it is possible that a resale of a property involved nonmarket conditions. For example, if similar properties are typically held for seven years and the resale occurred after only two years, is it possible that the seller was compelled to sell? Consider a three-bedroom house that sold three years ago for $250,000 and then sold again recently for $242,500. The indicated average annual decline in value of the house would be 1% ([($250,000 – $242,500)/$250,000]/3). In the same market area, another three-bedroom home with similar characteristics sold for $260,000 two years ago and then sold again last year for $250,000. The average annual change for that comparable property is 1.92% per year ([($260,000 – $250,000)/$260,000]/2). The results of additional calculations made using sale and resale data and paired sales of comparable properties can be reconciled to support an estimated market conditions adjustment. The transactions used in these additional calculations should be similar in terms of markets, land-to-building value ratios, and other elements of comparability.

If there is a change in the price of a property between one period and another, any changes to the condition of the property during that time need to be accounted for. Say, for example, that a property sold for $250,000 and then for $300,000 two years later. During that time, improvements were made to the property that contributed $25,000 to the value of the property, so the actual change due to market conditions was only $25,000 rather than $50,000. Now consider a scenario that was common in the last down cycle. A property sold for $300,000 and then, four years later, sold for $250,000. In that time period, nothing was done to maintain the property, so all or a portion of the $50,000 decline is likely a result of physical depreciation or deterioration rather than simply a change in market conditions.

Appraisers must remember that supply and demand are dynamic forces, and periods of decline are just as probable as periods of growth in real estate markets. For example, in downward economic cycles, prices fall, and negative market conditions adjustments are needed in sales comparison analysis involving sales data from those periods of market decline. Also, in volatile markets an adjustment for market conditions may be needed to account for periods of time in which sale prices fluctuate. For example, appraisers studying mid-rise office building sales in a metropolitan market find that steadily rising prices between 2016 and 2017 were followed by a period of volatility in 2018, then a sharp decline in 2019, then a slow rise to 2016 levels by late 2020, and then another period of stability. Comparable sales that occurred between 2018 and 2020 will require scrutiny because of the changing market conditions dur-

BACK_DEFEXP-RR-002807

Copyrighted material licensed by Charles Brigden on September 17, 2020

ing that period, whereas comparable sales occurring before and after the dramatic dip in the market may not require a significant market conditions adjustment.

The appreciation or depreciation in average sale prices in a market does not necessarily follow a linear pattern. Changes in sale price can also be irregular or stepped, they can increase or decrease on a compounded basis, or they may require identifying inflection points or dates on which changes in trends occurred. Statistical tools such as regression analysis and extrapolation are useful in determining precise mathematical relationships. However, any statistical model generated from the available data must reflect market thinking to be useful in the adjustment process.

Sorting and plotting sale and resale data or paired sales data on a graph is another way to determine patterns of change. The reliability of such analyses is affected by the number of market transactions studied. With sufficient data, unit prices can be graphed over time to indicate the trend in the market (Figure 21.1). Rents can also be plotted on scatter diagrams to show differences over time.

If sales of comparable properties are not available, other evidence of shifting market conditions may include changes in

- The ratio between sale prices and listing prices or between lease contracts and asking lease rates
- Exposure time
- Listing prices
- Trends in rents
- The number of offers a seller receives and the frequency of backup offers
- The proportion of accepted offers that actually close
- The number of foreclosures
- The number of available properties
- The number of building permits issued and their aggregate value
- Terms of available institutional financing

**Figure 21.1**  Scatter Diagram with Trendline



BACK_DEFEXP-RR-002808

- Use of seller financing
- Market demographic and retail sales patterns
- Demolition and new construction

## Property Adjustments

Property adjustments do not need to be applied in a specific sequence. The typical property adjustments include

- Location
- Physical characteristics
- Economic characteristics
- Legal characteristics (use/zoning)
- Non-realty components of value

### Location

An adjustment for location within a market area may be required when the locational characteristics of a comparable property are different from those of the subject property. Excessive or extreme locational differences may disqualify a property from use as a comparable sale.

Most comparable properties in the same market area have similar locational characteristics, but variations may exist within that area of analysis. Consider, for example, the difference between a residential property with a pleasant view of a park and one located two blocks away with a less attractive view. Adjustments for location may also be needed to reflect the difference in demand for various office suites within a single building, the retail advantage of a corner location, the privacy of the end unit in a residential condominium project, or the value contribution of an ocean view. The comparison can also be shown with statistical and graphical analysis. For example, consider the 21 industrial sales shown in Figure 21.2 as a scatter plot and in Figure



**Figure 21.2**  Scatter Plot

BACK_DEFEXP-RR-002809

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 405 of 722    Page
ID #16629

21.3 as a set of linear regression lines sorted by location within the metropolitan area. The regression lines in Figure 21.3 are more descriptive and clearly show trends in sale price over time for each of the four locations. The vertical intercepts along the regression lines also illustrate differences in sale price attributable to locational differences that can be used to support adjustments for location.



**Figure 21.3**  Data Grouped by Location

As another example of the analysis of locational differences, consider the data in Table 21.1, which illustrates a definite value trend difference between the interior and corner locations of comparable convenience stores in a market. The ranking analysis shows that the market is reacting differently than expected. The common perception is that, for retail establishments, corner locations are superior to interior locations. However, the table shows otherwise, and appraisers must investigate why the data contradicts conventional wisdom. In this case, intersection congestion seems to be restricting access to corner locations. The

**Table 21.1**  Ranking Analysis of Location

| Sale No. | Location | |
| --- | --- | --- |
| | Interior | Corner |
| 1 | $150.00 | |
| 2 | | $100.00 |
| 3 | $130.00 | |
| 4 | $140.00 | |
| 5 | | $120.00 |
| 6 | | $110.00 |
| 7 | | $125.00 |
| 8 | $130.00 | |
| **Mean** | **$137.50** | **$113.80** |
| Subject property | Interior | |
| Comparison | Similar | Inferior |

*Comparative Analysis*  **391**

BACK_DEFEXP-RR-002810

**Table 21.2**  Lot Size of Comparable Properties

| Sale No. | Size (Square Feet) | Unit Price |
|---|---|---|
| 1 | 11,000 | $150.00 |
| 2 | 43,000 | $100.00 |
| 3 | 19,000 | $130.00 |
| 4 | 13,000 | $140.00 |
| 5 | 30,000 | $120.00 |
| 6 | 41,000 | $110.00 |
| 7 | 27,000 | $125.00 |
| 8 | 26,000 | $130.00 |

**Table 21.3**  Relative Comparison Analysis of Lot Size

| | Size | | |
|---|---|---|---|
| Sale No. | 10,000–20,000 sq. ft. | 25,000–30,000 sq. ft. | 41,000–43,000 sq. ft. |
| 1 | $150.00 | | |
| 2 | | | $100.00 |
| 3 | $130.00 | | |
| 4 | $140.00 | | |
| 5 | | $120.00 | |
| 6 | | | $110.00 |
| 7 | | $125.00 | |
| 8 | | $130.00 | |
| Mean | $140.00 | $125.00 | $105.00 |
| Subject property | | 26,000 sq. ft. | |
| Relative comparison | Superior | Similar | Inferior |

**Table 21.4**  Comparable Apartment Properties

| Comparable Property | One-Bedroom Unit | Two-Bedroom Unit | Incremental Rent for Second Bedroom |
|---|---|---|---|
| A | $1,300 | $1,400 | $100 |
| B | $1,350 | $1,456 | $106 |
| C | $1,400 | $1,504 | $104 |
| D | $1,420 | $1,520 | $100 |
| E | $1,428 | $1,532 | $104 |
| F | $,1440 | $1,542 | $102 |

property being appraised has an interior location, so comparable sales with corner locations would require upward adjustments. Comparable sales with interior locations would require no location adjustment.

To take the analysis further, suppose the unit sale prices in Table 21.1 are also affected by other elements of comparison that could not be measured by quantitative analysis. Qualitative analysis does not measure those differences but does identify discernible value trends for different elements. The same comparable sales are tested for value differences attributable to lot size in Table 21.2.

As shown in Table 21.3, the properties with 10,000 to 20,000 square feet require downward adjustment to the subject property, while the properties with 41,000 to 43,000 square feet require upward adjustment. The sales with 25,000 to 30,000 square feet require no adjustment.

**Physical Characteristics**
If the physical characteristics of a comparable property and the subject property differ, each of the differences may require comparison and adjustment. Physical differences include differences in size, soils, site access, topography, quality of construction, architectural style, building materials, age, condition, functional utility, attractiveness, amenities, and other characteristics.

The value added or lost by the presence or absence of an item in a comparable property may not equal the cost of installing or removing the item. The market dic-

BACK_DEFEXP-RR-002811

tates the value contribution of individual components to the value of the whole. Buyers may be unwilling to pay a higher sale price that includes the extra cost of adding an amenity. Conversely, the addition of an amenity sometimes adds more value to a property than its cost. In other cases, there may be no adjustment to value for the existence or absence of an item. For example, an extra bathroom in an apartment unit may contribute an additional $45 per month to market rent, and this amount could be capitalized to reflect the value attributable to the extra bathroom and to estimate an appropriate adjustment to comparable sales without an extra bathroom. However, the cost of adding a new bathroom to an existing apartment unit could be quite different from this.

As another example, consider an apartment complex with both one-bedroom and two-bedroom units. Average monthly rents for competitive apartment properties are shown in Table 21.4. If the apartment buildings are otherwise comparable, the incremental rent attributable to a second bedroom could be reconciled at approximately $102 per month. Given a 5% annual vacancy and collection loss, operating expenses of 35% of rent collections, and a market-derived overall capitalization rate of 6%, the value of a second bedroom can be calculated as follows:

| | |
|---|---:|
| Rent per month | $102 |
| Gross income per year ($102 × 12) | $1,224 |
| Less 5% vacancy and collection loss | − 61 |
| Subtotal | $1,163 |
| Less operating expenses (35%) | − 407 |
| Annual net operating income attributable to second bedroom | $756 |
| Capitalized @ 6% | $12,600 |

Based on this analysis, an adjustment could be applied to sales of comparable properties with unit mixes that differ from the subject property. Note that an extra bedroom also increases the overall size of a unit. Appraisers often adjust for the size of the unit, which may be all that is needed to compensate for the extra bedroom. Adjusting for both size and configuration may be appropriate, but adjusting for the size of the unit and then also for the extra area included in an extra room would likely be double-counting the influence of the larger unit.

Double-counting the influence of physical characteristics such as the age and condition of improvements can be a concern for appraisers. For example, appraisers would expect to need to adjust the sale price of a comparable property that is notably older than the subject property for the difference in age of the improvements. A potential buyer would logically expect to pay less for an older, dated property because of its shorter remaining useful life. But, if the improvements of the comparable property are judged to be in inferior condition to the newer improvements of the subject property, a separate adjustment for the inferior condition of the improvements of the comparable property may overlap with the effects of age already accounted for in the adjustment for age.

### Economic Characteristics

Differences in the economic characteristics of a comparable property such as the operating expenses or quality of management of that property may require adjustment. This element of comparison is usually applied to income-producing properties where the differences in economic characteristics affects the income (and thereby the

BACK_DEFEXP-RR-002812

value) of the properties being compared. Relevant economic characteristics include operating expenses, quality of management, tenant mix (or credit worthiness of the tenants), rent concessions, lease terms, lease expiration dates, renewal options, and lease provisions such as expense recovery clauses. Appraisers must take care not to attribute differences in the economic characteristics of properties being compared to differences in real property rights conveyed or changes in market conditions.

Paired data analysis may provide the only persuasive support for adjustments for differences in the attributes of a property that affect its income such as operating expenses, management quality, tenant mix, rent concessions, and other characteristics. Some of these characteristics may already be reflected in the adjustment for location. For example, a warehouse in a municipality with low property tax rates may have a higher value than a comparable warehouse in a neighboring community with higher tax rates, but the difference in value attributable to the tax rates may already be reflected in the adjustment for location.

Given the problems associated with net income multiplier analysis and the possibility of double-counting for value influences reflected in other elements of comparison, appraisers must take great care in estimating and supporting adjustments for economic characteristics.

### Legal Characteristics

The most comparable properties are the ones with the same or a similar highest and best use. If comparable sales are scarce, less comparable properties with a different use or highest and best use may be analyzed and the sale prices may be adjusted accordingly. Quantitative adjustments for differences in highest and best use are difficult to support.

In the valuation of vacant land, zoning is one of the primary determinants of the highest and best use of the property because it serves as the test of legal permissibility. Thus, zoning or the reasonable probability of a zoning change is typically a primary criterion in the selection of market data. When comparable properties with the same zoning as the subject are lacking or scarce, parcels with slightly different zoning but a highest and best use similar to that of the subject may be used as comparable sales. These sales may have to be adjusted for differences in utility if the market indicates that this is appropriate. On the other hand, a difference in the uses permitted under two zoning classifications does not necessarily require an adjustment if the parcels have similar potential. It is important for appraisers to consider all known restrictions imposed on development, which may include not only zoning but other land use restrictions as well.

Sometimes, differences in the sale prices of properties with similar, but not identical, uses can be reduced to compatible units—e.g., price of land per square foot of permissible building area—and the difference can be attributed to the different zoning classification requirements. For example, because of differences in parking requirements or landscaping requirements, site development costs for two parcels under different zoning classifications may differ even if the parcels have the same highest and best use. These dissimilarities will be considered by potential buyers and therefore should be considered by appraisers. Other legal considerations that could affect value may include environmental requirements, water rights, access, restrictive covenants, easements, and flood zones.

In many situations, it may be impossible to support a quantitative adjustment for the different highest and best uses of otherwise comparable sites. In these cases, market

BACK_DEFEXP-RR-002813

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 21.5**   Recent Land Sales

| Sale | Sale Price | Size (Sq. Ft.) | Price per Sq. Ft. | Maximum FAR | Maximum Building Area | Price per Sq. Ft. of Maximum Building Area |
|---|---|---|---|---|---|---|
| A | $738,000 | 33,541 | $22.00 | 1.00 | 33,541 | $22.00 |
| B | $450,000 | 41,382 | $10.87 | 0.50 | 20,691 | $21.75 |
| C | $690,000 | 60,984 | $11.31 | 0.50 | 30,492 | $22.63 |
| D | $2,100,000 | 100,188 | $20.96 | 1.00 | 100,188 | $20.96 |
| E | $2,810,000 | 140,699 | $19.97 | 1.00 | 140,699 | $19.97 |
| Subject Property | | 130,680 | | 0.77 | 100,000 | |
| Standard deviation | | | 5.46473 | | | 1.025757581 |

data can be used to support qualitative analysis of the different intensities of use allowed by zoning. For example, consider a 100,000-sq.-ft. office building on a 3.0-acre site where the current zoning allows for a maximum floor area ratio (FAR) of 0.50. The existing improvements predate a zoning change. The zoning regulations allow for improvements of equal size to be built if the existing improvements are razed or destroyed. Most of the comparable properties are in areas zoned for a maximum FAR of 1.0. A quantitative adjustment may be difficult to calculate using paired data analysis, but if a strong relationship between the zoning and sale price can be determined, the comparable sales can still be analyzed and considered. The recent land sales in the subject property's market area listed in Table 21.5 are already adjusted for other elements of comparison.

The price per square foot of potential building area has a smaller standard deviation (1.03) and coefficient of variation than the price per square foot of site area (5.47). The market evidence supports use of the price per square foot of potential building area as the unit of comparison. The primary remaining difference is size. The relative comparison analysis shown in Table 21.6 illustrates a value difference attributable to size. The analysis supports a value estimate similar to the value of Sale D, or $20.96 per square foot of buildable area.

**Table 21.6**   Relative Comparison Analysis for Office Building

| Sale | Size 20,691–30,492 sq. ft. | 100,188 sq. ft. | 140,699 sq. ft. |
|---|---|---|---|
| A | $22.00 | | |
| B | $21.75 | | |
| C | $22.63 | | |
| D | | $20.96 | |
| E | | | $19.97 |
| Mean | $22.13 | $20.96 | $19.97 |
| Subject property | | 100,000 sq. ft. | |
| Comparison | Superior | Similar | Inferior |

### Non-realty Items

Non-realty items include business concerns and other items that do not constitute real property. In most cases, the economic lives, associated investment risks, rate

*Comparative Analysis*   **395**

BACK_DEFEXP-RR-002814

of return criteria, and collateral security for the non-realty components differ from those of the real property. When such items are included in the value opinion for the subject property, they must be separately identified, and their effect on value must be analyzed. For some assignments, these items will need to be valued separately. When these items are valued separately, they are generally valued at their contributory value to the whole. When analyzing comparable properties, consideration must be given to whether non-realty items were included in the sale price.

Furniture, fixtures, and equipment in a hotel or restaurant are typical examples of personal property that may be included in a comparable sale. In appraisals of properties in which the business operation is essential to the use of the real property, the contributing value of the non-realty component must be analyzed. If the contributing value of the non-realty component cannot be separated from the value of the real property as a whole, an appraiser should make clear that the value indication using the sales comparison approach reflects both the contributing value of the real estate and the value of the business operation. Properties such as hotels and timeshare condominium units, which have higher expense ratios attributable to the business operation, may include a significant business value component.

BACK_DEFEXP-RR-002815

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Applications of the Sales Comparison Approach

**22**

Chapters 20 and 21 described the basic theory and procedures of the sales comparison approach and introduced a number of specific techniques. The examples presented in this chapter illustrate the most commonly used techniques of sales comparison. Quantitative and qualitative techniques may both be employed in the application of the sales comparison approach. If adjustments can be derived by quantitative techniques, they are generally applied first. Differences in specific elements of comparison that elude precise mathematical adjustment are then considered in qualitative analysis. The two methods are complementary and are often used in combination.

Other techniques can also be used to identify and estimate adjustments. Appraisers should consider all applicable techniques to determine which ones are most appropriate to the appraisal.

## Residential Property Example

The following appraisal problem illustrates the application of quantitative adjustment techniques, qualitative analysis, and an appropriate sequence of adjustments in the sales comparison approach. The problem solution is presented as it might appear in an appraisal report.

The subject property is improved with a 25-year-old, single-unit residence on a single lot. It has the original kitchen, a one-car garage, and no air-conditioning. It contains 1,200 square feet of gross living area. The construction quality of the structure is average, and the site enjoys a lake view, which is considered an amenity by the market.

Sale A is a current cash sale of a property that was sold for $274,500. The house is on a double lot and has a modern kitchen, a one-car garage, and no air-conditioning. The 25-year-old property contains 1,100 square feet of gross living area. The structure is of average construction quality, but the site does not have the view amenity of the subject property.

Sale B was sold a year ago for $230,000 with market financing. The 25-year-old house is on a single lot and has an old kitchen, a one-car garage, and no air-condi-

BACK_DEFEXP-RR-002816

tioning. It contains 1,150 square feet of gross living area. The house features a similar view of the lake as the subject property, and the construction quality of the structure is good.

Sale C is a current cash sale of a property that was sold for $246,000. The 27-year-old house is on a single lot and has an old kitchen, a two-car garage, and central air-conditioning. It contains 1,300 square feet of gross living area. The structure is only of fair construction quality, and the site does not enjoy the same view of the lake as the subject property. The property was sold two years ago for $223,650.

Sale D is a current sale of a property that was sold for $240,000 with a 90% FHA loan requiring the seller to pay three points. The improvement is a 29-year-old house on a single lot with a view of the lake. It has an old kitchen, a one-car garage, and central air-conditioning. It contains 1,200 square feet of gross living area. The construction quality of the structure is average.

Additional market data includes these facts:

- Sites in this area have a contributory value of $30,000.
- The cost to modernize a kitchen in the subject neighborhood averages $22,500. However, the appraiser's study of subsequent sales of homes with modern kitchens indicates that the market is willing to pay $30,000 more for a home with a modern kitchen.
- Central air-conditioning is currently available in a new development of similar homes at a cost of $4,500. Many purchasers elect to have central air-conditioning installed as an upgrade feature. Although some homes in the subject neighborhood have central air-conditioning, due to a lack of data paired data analysis cannot be used to derive an adjustment for this feature.
- Most existing homes in the area have one-car garages. A comparison of sales of houses in the market with two-car garages and the more predominant design of one-car garages indicates that buyers regularly pay $10,000 more for an existing home with a two-car garage.
- The average depreciation for homes in the subject property's neighborhood is approximately 33.33%.

The first step toward solving the appraisal problem is to array the data by identifying both typical elements of comparison and those that are apparent from the problem statement. This type of data array helps an appraiser determine which adjustments will not have to be made.

Analysis of the array (Table 22.1) indicates that three characteristics—property rights conveyed, conditions of sale, and expenditures made immediately after purchase—are similar for all the sales and for the subject property. Since these features are the same for all properties, they cannot account for differences in value and therefore no adjustments are needed for them on the adjustment grid. Many of the required adjustments can be derived from information given in the problem statement.

The financing adjustment for Sale D is calculated by multiplying the amount of the mortgage, $216,000 (90% of a sale price of $240,000), by 0.03 (i.e., the three points). Thus, the price of Sale D is adjusted downward by $6,480 and the cash-equivalent price becomes $233,520.

The adjustment to Sale B for market conditions is derived by analyzing the sale price and resale price of Sale C, which sold two years prior to the current sale for

BACK_DEFEXP-RR-002817

| Table 22.1 | Market Data Grid: Elements of Comparison | | | | |
|---|---|---|---|---|---|
| | **Subject Property** | **Sale A** | **Sale B** | **Sale C** | **Sale D** |
| Property rights | Fee simple | Fee simple | Fee simple | Fee simple | Fee simple |
| Financing | Market | Cash | Market | Cash | 3 points |
| Conditions of sale | Arm's-length | Arm's-length | Arm's-length | Arm's-length | Arm's-length |
| Expenditures made immediately after purchase | None | None | None | None | None |
| Date of sale | Current | Current | 1 year ago | Current | Current |
| Improvement age | 25 years | 25 years | 25 years | 27 years | 29 years |
| Lot | Single | Double | Single | Single | Single |
| Kitchen | Old | Modern | Old | Old | Old |
| Garage | 1-car | 1-car | 1-car | 2-car | 1-car |
| Air-conditioning | No | No | No | Yes | Yes |
| View amenity | Lake | None | Lake | None | Lake |
| Construction quality | Average | Average | Good | Fair | Average |
| Size (GLA) | 1,200 sq. ft. | 1,100 sq. ft. | 1,150 sq. ft. | 1,300 sq. ft. | 1,200 sq. ft. |

$223,650. The total change over the two-year period was approximately 10.0% or 5.0% per year. Since Sale B sold one year ago, it is adjusted upward by 5%, or $11,500. After the adjustment for market conditions, the sale price of Sale B becomes $241,500. The adjustment for the double lot in Sale A is $30,000, derived from the market data provided.

The adjustment for the modern kitchen in Sale A is $30,000, also derived from the market data. In this instance the adjustment is based on the contributory value of the modern kitchen, not the cost of modernization.

The contributory value of the central air-conditioning in Sales C and D is estimated to be $3,000. The cost of this feature in new construction is $4,500. Properties in the subject neighborhood are depreciated by approximately 33.33%. Since property components suffer similar depreciation, an air-conditioning system installed in a home in the subject neighborhood would reflect the overall depreciation of the property. Thus, the basis of the adjustment is the depreciated cost of the air-conditioning.

Like the adjustment for the modern kitchen, an adjustment to Sale C for the effect on value of a two-car garage is estimated in this market through analysis of the contributory value of the larger garage, i.e., the competitive advantage in the market of houses with two-car garages over houses with one-car garages. The market analysis supports an adjustment of $10,000. After all the other adjustments have been estimated, a market data grid (Table 22.2) can be used to help derive the remaining adjustment for the difference in garage size.

Adjustments for the last three elements of comparison listed in Table 22.2 cannot be determined from the available market data, though they should contribute to differences in value. The value influence of those elements of comparison will be addressed later in qualitative analysis. At this point, the quantitative adjustments are applied to generate adjusted sale prices in Table 22.3.

In this example, the range of value opinions is still somewhat broad. Newer homes generally sell for more than older homes. Sales C and D, which are older than the subject property, are probably inferior to the subject property, while Sales A and B are similar.

BACK_DEFEXP-RR-002818

**Table 22.2**  Market Data Grid: Quantitative Adjustments

| | Subject Property | Sale A | | Sale B | | Sale C | | Sale D | |
|---|---|---|---|---|---|---|---|---|---|
| Sale price | ? | | $274,500 | | $230,000 | | $246,000 | | $240,000 |
| Financing | Market | Cash | 0 | Market | 0 | Cash | 0 | 3 points | -6,480 |
| Cash-equivalent price | | | $274,500 | | $230,000 | | $246,000 | | $233,520 |
| Date of sale | Current | Current | 0 | 1 year ago | +11,500 | Current | 0 | Current | 0 |
| Current cash-equivalent price | | | $274,500 | | $241,500 | | $246,000 | | $233,520 |
| Lot | Single | Double | -30,000 | Single | 0 | Single | 0 | Single | 0 |
| Kitchen | Old | Modern | -30,000 | Old | 0 | Old | 0 | Old | 0 |
| Air-conditioning | No | No | 0 | No | 0 | Yes | -3,000 | Yes | -3,000 |
| Garage | 1-car | 1-car | 0 | 1-car | 0 | 2-car | -10,000 | 1-car | 0 |
| Improvement age | 25 years | 25 years | 0 | 25 years | 0 | 27 years | ? | 29 years | ? |
| View amenity | Lake | None | ? | Lake | 0 | None | ? | Lake | 0 |
| Construction quality | Average | Average | 0 | Good | ? | Fair | ? | Average | 0 |

**Table 22.3**  Market Data Grid

| | Subject Property | Sale A | | Sale B | | Sale C | | Sale D | |
|---|---|---|---|---|---|---|---|---|---|
| Sale price | ? | | $274,500 | | $230,000 | | $246,000 | | $240,000 |
| Financing | Market | Cash | 0 | Market | 0 | Cash | 0 | 3 points | -6,480 |
| Cash-equivalent price | | | $274,500 | | $230,000 | | $246,000 | | $233,520 |
| Date of sale | Current | Current | 0 | 1 year ago | +11,500 | Current | 0 | Current | 0 |
| Current cash-equivalent price | | | $274,500 | | $241,500 | | $246,000 | | $233,520 |
| Lot | Single | Double | -30,000 | Single | 0 | Single | 0 | Single | 0 |
| Kitchen | Old | Modern | -30,000 | Old | 0 | Old | 0 | Old | 0 |
| Air-conditioning | No | No | 0 | No | 0 | Yes | -3,000 | Yes | -3,000 |
| Garage | 1-car | 1-car | 0 | 1-car | 0 | 2-car | -10,000 | 1-car | 0 |
| Net adjustments (for kitchen, air-conditioning, and lot) | | | -60,000 | | 0 | | -13,000 | | -3,000 |
| Adjusted sale price | | | $214,500 | | $241,500 | | $233,000 | | $230,520 |

The view of the lake is desirable in this market and should increase property value. Sales B and D share a similar view as the subject property, but Sales A and C do not and therefore are probably slightly inferior to the subject property.

The construction quality of the subject property is average, which is similar to the quality of the structures of Sales A and D. The construction quality of Sale B is

BACK_DEFEXP-RR-002819

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 415 of 722    Page
ID #16639

considered good though, which is superior to the subject property, and the quality of construction of Sale C is only fair, which is inferior to the subject property.

Qualitative analysis of all the attributes of the comparable properties that cannot be quantified is shown in Table 22.4. The data are then arrayed in descending order in Table 22.5, bracketing the subject property. The ranking analysis also shows the overall comparability of each individual comparable to the subject property.

**Table 22.4    Qualitative Analysis**

| | Subject Property | Sale A | | Sale B | | Sale C | | Sale D | |
|---|---|---|---|---|---|---|---|---|---|
| Sale price | ? | $214,500 | | $241,500 | | $233,000 | | $230,520 | |
| Gross living area | 1,200 sq. ft. | 1,100 sq. ft. | | 1,150 sq. ft. | | 1,300 sq. ft. | | 1,200 sq. ft. | |
| Improvement age | 25 years | 25 years | Similar | 25 years | Similar | 27 years | Inferior | 29 years | Inferior |
| View amenity | Lake | None | Inferior | Lake | Similar | None | Inferior | Lake | Similar |
| Construction quality | Average | Average | Similar | Good | Superior | Fair | Inferior | Average | Similar |
| Overall comparability | | | Inferior | | Slightly superior | | Inferior | | Inferior |

**Table 22.5    Ranking Analysis**

| Sale | Adjusted Sale Price | Overall Comparability |
|---|---|---|
| B | $241,500 | Slightly superior |
| Subject property | | |
| C | $233,000 | Inferior |
| D | $230,520 | Inferior |
| A | $214,500 | Inferior |

The adjusted price of Sale C serves as the lower boundary of the bracket derived from qualitative analysis. Sale B is more similar to the subject property than Sale C with respect to gross living area, improvement age, and view amenity. Sale B is superior with respect to construction quality while Sale C is inferior in this respect. Thus, with more weight given to the indication from Sale B, the value of the subject property is estimated to be $240,000.

## Office Building Example

The property being appraised is a five-year-old, mid-rise, multitenant office building with 36,000 square feet of gross building area (GBA) and 31,800 square feet of rentable area (88% of GBA). Its occupancy rate is 90%, which is considered stable in the subject market area. The amount of space occupied by individual tenants ranges from 2,500 square feet to 7,000 square feet. The building is of average construction quality and is in average condition as compared to competing buildings. The ratio of

BACK_DEFEXP-RR-002820

rentable area to gross building area (88%) is low in comparison to the average ratio in the subject market area, which is approximately 91%. The site is appropriately landscaped. The open-space parking provided is both adequate and in compliance with the zoning code (6.0 spaces per 1,000 gross square feet). The location, which may also be considered average, is an interior site accessed from a major arterial highway.

Current base rents range from $24.00 to $26.00 per square foot of rentable area per year. Rent for the overall building averages $25.20 per square foot and the quality of the tenants is good. With the exception of telephone service, the landlord pays all expenses, including janitorial and electrical service. Operating expenses are typical for the market. The leases have three- and four-year terms and contain an option to renew for three more years at the then-current market rent. All leases were signed less than 18 months ago, and the rents and terms reflect the current market.

Five comparable sales are used in the analysis. All the comparable properties are mid-rise, multitenant office properties located in the subject property's market area, and all were financed at market rates with conventional loan-to-value ratios. The unit of comparison employed in this analysis is price per square foot of rentable area. The five comparable sales are described below (as of the date of sale), and the analysis is summarized in Table 22.6:

- Sale A sold nine months ago for $5,860,000. The improvements are six years old and in average condition. The building contains 40,000 square feet of gross building area and 37,600 square feet of rentable area (94% of GBA). The indicated price per square foot of rentable area is $155.85. Average rent is $25.60 per square foot of rentable area. The landlord pays all expenses, and occupancy is 87%. The rents, lease terms, and expenses of the property are at market levels. The site is located at the intersection of a major arterial highway and a collector road. Parking is adequate, at a rate of 6.0 spaces per 1,000 square feet of gross building area.
- Sale B sold four months ago for $4,240,000. The building is four years old and contains 32,000 square feet of gross building area and 29,700 square feet of rentable area (93% of GBA). Its unit price is $142.76 per square foot of rentable area. Site improvements are average, and the ratio of parking spaces to rentable area is similar to that of the subject property. The property is in average condition. The leases provide tenants with full services. Occupancy is 85% and the average rent is $23.60 per square foot of rentable area, which is below the market rate. The lengths of the leases are considered to be at market terms. The total expenses for the building are slightly higher than is typical for the market because two tenants who occupy 15% of the total space use excessive electricity and do not pay additional rent to compensate for the extra expense. The property is located on an interior site accessed from a collector street. Parking is adequate.
- Sale C was sold five months ago for $4,900,000. The building contains 35,000 square feet of gross building area and 32,200 square feet of rentable area (92% of GBA). Its unit price is $152.17 per square foot of rentable area. The improvements were constructed five years ago and are in average condition. Rent averages $25.20 per square foot of rentable area. All tenant services are provided by the landlord. The building has an occupancy rate of 90%, and all rents, lease terms, and expense categories are considered to be at market levels. The property's location is at the intersection of a collector road and a major arterial highway. The property has a parking ratio (zoning minimums) equal to that of the subject property.

BACK_DEFEXP-RR-002821

Copyrighted material licensed by Charles Brieden on September 17, 2000

ID #16641

BACK_DEFEXP-RR-002822

**Table 22.6**  Market Data Grid

| | Subject Property | Sale A | | Sale B | | Sale C | | Sale D | | Sale E | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sale price/unit price (rentable area) | – | $5,860,000 | $155.85 | $4,240,000 | $142.76 | $4,900,000 | $152.17 | $4,000,000 | $149.81 | $4,940,000 | $146.15 |
| Real property interest conveyed | Leased fee | Leased fee | | Leased fee | | Leased fee | | Leased fee | | Leased fee | |
| Age | 5 years | 6 years | | 4 years | | 5 years | | 6 years | | 4 years | |
| Gross building area | 36,000 sq.ft. | 40,000 sq.ft. | | 32,000 sq.ft. | | 35,000 sq.ft. | | 30,000 sq.ft. | | 38,000 sq.ft. | |
| Rentable area | 31,800 sq.ft. | 37,600 sq.ft. | | 29,700 sq.ft. | | 32,200 sq.ft. | | 26,700 sq.ft. | | 33,800 sq.ft. | |
| Rental area ratio | 88% | 94% | | 93% | | 92% | | 89% | | 89% | |
| Occupancy rate | 90% | 87% | | 85% | | 90% | | 95% | | 90% | |
| Avg. rent per sq. ft. rentable area | $25.20 | $25.60 | | $23.60 | | $25.20 | | $25.20 | | $21.50 | |
| **Elements of Comparison** | | | | | | | | | | | |
| Real property rights conveyed—differences in rental rate | Market rate | Above-market rate | -$0.23 | Below-market rate | $0.91 | Market rate | $0.00 | Market rate | $0.00 | Below-market rate | $2.11 |
| Rent-up adjustment | 90% occupancy | 87% occupancy | $0.87 | 85% occupancy | $1.45 | 90% occupancy | $0.00 | 95% occupancy | -$1.45 | 90% occupancy | $0.00 |
| Adjusted unit price | | | $156.49 | | $145.12 | | $152.17 | | $148.36 | | $148.26 |
| Financing terms | Conventional | Conventional | – | Conventional | – | Conventional | – | Conventional | – | Conventional | – |
| Conditions of sale | Arm's-length sale | Arm's-length sale | – | Arm's-length sale | – | Arm's-length sale | – | Arm's-length sale | – | Arm's-length sale | – |
| Expenditures immediately after purchase | – | None | – | None | – | None | – | $100,000 in deferred maintenance | $3.75 | None | – |
| Adjusted unit price | – | | $156.49 | | $145.12 | | $152.17 | | $152.11 | | $148.26 |
| Date of sale | 4.0% | 9 months ago | 3.00% | 4 months ago | 1.33% | 5 months ago | 1.67% | 2 months ago | 0.67% | 6 months ago | 2.00% |
| Adjusted unit price | – | | $161.19 | | $147.06 | | $154.71 | | $153.13 | | $151.23 |
| Construction quality and condition | Average | Average | | Average | | Average | | Average | | Average | |
| Ratio of parking spaces to rental area | Adequate | Similar | | Similar | | Similar | | Inferior | | Similar | |
| Location | Average | Superior | | Inferior | | Superior | | Superior | | Inferior | |
| Expense ratio | Market norm | Similar | | Inferior | | Similar | | Similar | | Similar | |
| Overall comparability | – | Superior | | Inferior | | Superior | | Superior | | Inferior | |
| Value indication | – | Less than | $161.19 | More than | $147.06 | Less than | $154.71 | Less than | $153.13 | More than | $151.23 |
| Market rental rate | $25.20 | | $25.20 | | $25.20 | | $25.20 | | $25.20 | | $25.20 |
| Comparable sales rate | | | $25.60 | | $23.60 | | $25.20 | | $25.20 | | $21.50 |
| Difference | | | -$0.40 | | $1.60 | | $0.00 | | $0.00 | | $3.70 |
| 1 – Expense ratio | 43% | | 0.57 | | 0.57 | | 0.57 | | 0.57 | | 0.57 |
| Adjustment amount | | | -$0.23 | | $0.91 | | $0.00 | | $0.00 | | $2.11 |
| Occupancy rate | 90% | | 87% | | 85% | | 90% | | 95% | | 90% |
| Difference | | | 3% | | 5% | | 0% | | -5% | | 0% |
| Difference in rentable area to equal occupancy of subject property | | | 1,128 sq.ft. | | 1,485 sq.ft. | | 0 sq.ft. | | -1,335 sq.ft. | | 0 sq.ft. |
| Average TI and broker fees per rentable sq. ft. | | | $29.00 | | $29.00 | | $29.00 | | $29.00 | | $29.00 |
| Cost for TI and broker fees | | | $32,712 | | $43,065 | | $0 | | -$38,715 | | $0 |
| Unit cost for TI and broker fees (per rentable sq. ft.) | | | $0.87 | | $1.45 | | $0.00 | | -$1.45 | | $0.00 |
| Adjustment amount | | | $0.87 | | $1.45 | | $0.00 | | -$1.45 | | $0.00 |

- Sale D was sold two months ago for $4,000,000. The building is six years old and in average condition, but it needed a new HVAC system at the time of sale. This was estimated to cost $100,000. Sale D contains 30,000 square feet of gross building area and 26,700 square feet of rentable area (89% of GBA). The unit price is $149.81 per square foot of rentable area. The rent averages $25.20 per square foot of rentable area, and the lease terms and building expenses are at market levels. The occupancy rate is 95%. The site is located in a superior location, next to the intersection of two major arterial highways. The owner got a building permit for this property by dedicating part of an adjacent site that she owned as part of the parking lot for this building. Since she shifted some of the adjacent land to this property, both properties now have below-minimum parking ratios and the tenants are always complaining about it. Sale D now has a parking ratio of only 4.0 spaces per 1,000 square feet of gross building area.
- Sale E was sold six months ago for $4,940,000. The building was constructed four years ago and is in average condition. It contains 38,000 square feet of gross building area and 33,800 square feet of rentable area (89% of GBA). Its unit price is $146.15 per square foot of rentable area. The location is an interior site accessed by a collector street. The occupancy rate for the building is 90%. Rents average $21.50 per square foot of rentable area. Full tenant services are provided by the landlord. Rents, lease terms, and property expenses are at market levels. The property has adequate parking, and the parking ratio is similar to that of the subject property.

In this case, the appraiser first analyzes the market data and determines that all of the office building sales involved the transfer of a fee simple estate subject to existing leases. Adjustments must be made, however, to account for the below-market rents of Sales B and E and the above-market rate of Sale A. These adjustments account for the lost net income because the lease rates are lower than the subject property's on average, giving certain comparable properties positive and negative leaseholds.

Because the comparable properties have differences in both occupancy and rental rates, the adjustment grid includes adjustments for real property rights conveyed and a separate rent-up adjustment. The second adjustment is for the differences in the occupancy and is intended to account for the cost of paying for real estate broker services to bring in a new tenant. This also includes the tenant improvement expense that is often required as part of the lease terms. Because the lease-up process affects the net income—and thereby the value of the leased fee interest—some appraisers make rent-up adjustments as part of the adjustment for real property rights conveyed. Others devote a separate line-item in an adjustment grid to differences in occupancy to avoid confusion with other property rights issues. The rate of adjustment is based on an average expense for tenant improvements (TIs) and broker fees of $29.00 per square foot. Note that the calculation of the adjustments for nonmarket rental rates and differences in occupancy are shown below the value indications in the table.

All of the comparable properties were sold with conventional market financing, so no adjustments for this element of comparison are required. All of the transactions were conducted at arm's length and no adjustments for conditions of sale are necessary.

The buyer of Sale D invested an additional $100,000 in repairs immediately after the sale for deferred maintenance on the building's HVAC system. The appraiser confirmed with both the buyer and the seller in the transaction that both parties

BACK_DEFEXP-RR-002823

Copyrighted material licensed by Charles Brigden on September 17, 2020

considered the $100,000 cost of those repairs in their negotiations. As a result, the appraiser adjusted the reported unit price by $3.75 per square foot ($100,000/26,700 rentable square feet). The other sales required no adjustments for expenditures made immediately after purchase.

According to the appraiser's market analysis, prices in the local office property market had been stable for several years as the market absorbed excess supply. Two years ago, sale prices began to rise as demand for office space increased. Market research revealed that the sale prices of similar properties rose 3% over the first year and that rate jumped up to a 4% increase over the course of the current year. Although the comparable sales used were generally recent transactions, all occurring within nine months of the date of valuation, this time period saw active market growth.

The appraiser examined the physical elements of comparison to determine if market evidence supported additional quantitative adjustments. Additional information on the sale of comparable properties revealed general value trends but did not support quantitative adjustments for these elements.

A relative comparison analysis of the physical elements of comparison is described below.

- Sale A has an adjusted unit price of $161.19 per square foot of rentable area. Its location at the intersection of a major arterial highway and a collector road is superior to the location of the subject property. The building occupancy rate for the leased building in Sale A is slightly lower than the subject's and lower than the rate considered typical for stabilized occupancy in the market. In short, Sale A has more superior than inferior attributes and these attributes are considered more significant. This sale indicates a unit value for the subject property of less than $161.19 per square foot of rentable area.

- Sale B has an adjusted unit price of $147.06 per square foot of rentable area. Effective contract rent is slightly lower than market rent. The location of this property on a collector street is inferior to the subject property's location on a major arterial highway. The occupancy rate for the comparable property is below the market rate for stabilized occupancy, and the expense ratio for the property is slightly higher than typical, resulting in a lower net income. In all, more of the attributes of Sale B are inferior than superior and these inferior factors are also considered more significant. Therefore, the analysis of Sale B indicates that the subject should have a unit value greater than $147.06 per square foot of rentable area.

- Sale C has an adjusted unit price of $154.71 per square foot of rentable area. The location of the property is superior to that of the subject. Sale C is superior to the subject overall, and the value for the subject should be less than $154.71 per square foot of rentable area.

- Sale D has an adjusted unit price of $153.13 per square foot of rentable area. Because it is situated at the intersection of two major arterial highways, the property has a significantly superior location compared to that of the subject. The availability of parking is limited, which is inferior. Sale D has a higher occupancy rate than the stabilized occupancy rate that characterizes the market for this type of property. The superior location and higher occupancy outweigh the limited parking. Overall, this property is superior to the subject property, and an appropriate value for the subject would be less than $153.13 per square foot of rentable area.

BACK_DEFEXP-RR-002824

- Sale E has an adjusted unit price of $151.23 per square foot of rentable area. The location of the property on a collector street is inferior to that of the subject. The property is similar to the subject in all other elements of comparison. Since Sale E has an inferior location, the price of the subject should be greater than $151.23 per square foot of rentable area.

| Table 22.7 | Bracketing the Subject Property's Value | |
|---|---|---|
| **Sale** | **Inferior** | **Superior** |
| A | | $161.19 |
| C | | $154.71 |
| D | | $153.13 |
| E | $151.23 | |
| B | $147.06 | |

The value indications derived from the comparable sales are reconciled into a value bracket by arranging the five sales in an array relative to the subject (Table 22.7). The range of the adjusted sales is $161.19 to $147.06 and the bracket for the subject is $151.23 to $153.13 per square foot of rentable area. Sale C is the property most similar to the subject and therefore is given the greatest weight.

## Reconciliation

Based on the indicated range of value and the weight placed on Sale C, the market evidence supports a value estimate of $153.00 per square foot of rentable area, which is in the upper range of the value bracket. The market value of the subject property would then be calculated as follows:

$$\$153.00 \times 31{,}800 = \$4{,}865{,}400$$

Note that $4,865,400 implies precision that is beyond the limits of this analysis with this data, so appraisers could round this opinion of value to $4.9 million to reflect the precision of the market. (Different appraisers and different clients may use different rounding conventions.) Rounding indications of value to a final opinion requires logic and cannot be used as a way to manipulate a value opinion.

## Industrial Building Example

The property being appraised is a 30-year-old, owner-occupied warehouse containing 25,000 square feet of gross building area and 2,500 square feet of finished office area. The ceiling height is 18 feet. The quality of construction is good and the building's condition is average. The fee simple estate of the subject is being valued.

Sales of five comparable properties were found in the subject property's market area. All of the properties are warehouses with building-to-land ratios similar to the subject property.

- Sale A was sold one year ago to an owner-occupant for $1,244,000. The seller provided advantageous financing that resulted in the buyer paying 10% more than if the buyer had paid cash (i.e., a purchase-money mortgage). This adjustment is not exactly 10% of the gross price, since the gross price was increased by the financing. The calculation would be $\$X \times 110\% = \$1{,}244{,}000$, which means that the price without the financing benefit would be $1,244,000/1.10 = $1,130,909. The difference in price is $113,091. The property is a 28,000-sq.-ft. warehouse with an

BACK_DEFEXP-RR-002825

Copyrighted material licensed by Charles Brigden on September 17, 2020

18-ft. ceiling height and 2,750 square feet of finished office area. It was 25 years old at the time of sale. The quality of construction is good, but at the time of sale the warehouse exhibited deferred maintenance. When the appraiser verified the details of the transaction with the parties in the sale, the buyer reported budgeting for costs of $35,000 to repair the deferred maintenance, which the buyer considered in determining the price.

- Sale B was sold six months ago to an owner-occupant for $1,060,000 in a cash payment to the seller. This 27,000-sq.-ft. warehouse has 18-ft. ceilings and 2,200 square feet of finished office area. It was 23 years old. The quality of construction and condition are average.

- Sale C is a current sale transacted for $990,000. The buyer assumed an existing loan at below-market rates. This favorable financing resulted in the buyer paying $9,000 more than if the buyer had obtained financing at market terms. This 22,000-sq.-ft. warehouse has 17-ft. ceilings and 3,000 square feet of finished office area. The property is 20 years old. The quality of construction is good and its condition is average. This warehouse is subject to a long-term lease at a below-market rate, which resulted in the price being 5% less. The adjustment to the sale price of Sale C would be calculated as $990,000/0.95 = $1,042, 105. The adjustment amount is, therefore, $52,100 (i.e., $1,042,100 – $990,000).

- Sale D sold three months ago to an owner-occupant for $1,108,000. This 25,000-sq.-ft. warehouse has a 19-ft. ceiling height and 2,500 square feet of finished office area. It is 35 years old. The quality of construction is good and the condition is average due to regular maintenance and upkeep.

- Sale E is a current sale for $1,252,000 paid in cash to the seller. This 26,000-sq.-ft. warehouse has 18-ft. ceilings and 2,100 square feet of finished office area. The building is 35 years old. The quality of construction is good, and the condition is average. The property is subject to a long-term lease that is above market levels. This lease also caused an adjustment equal to the increase in price due to the fact that it is above market and long term. The other terms of the lease are similar to the terms that would be expected in the market. The increase is 10%, so the calculation would be $X × 1.10 = $1,252,000. The price without the increase would be $1,252,000/1.10 = $1,138,182. The price was increased by $113,818.

## Quantitative Adjustments

The quantitative adjustment procedure is summarized in Table 22.8 and described below. Notice that in Table 22.8 the sale price was subtotaled after each transactional adjustment. There is a suggested order of adjustment, but the order of the adjustments does not matter as long as they are added together or multiplied as in this example. Table 22.8 shows quantitative adjustments for the transactional adjustments but qualitative analysis for the physical elements of comparison. In this analysis, other attributes such as rail siding, site size, docks, and overhead doors are assumed to be the same.

### Property Rights Conveyed

Sales C and E were sold subject to long-term leases, so both require an adjustment for property rights conveyed. Sale C was adjusted upward for the below-market lease, and Sale E was adjusted down for the above-market lease.

*Applications of the Sales Comparison Approach*   **407**

BACK_DEFEXP-RR-002826

408

*The Appraisal of Real Estate*

BACK_DEFEXP-RR-002827

**Table 22.8**   Quantitative Adjustments

| | Subject Property | Sale A | | Sale B | | Sale C | | Sale D | | Sale E | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Price | – | $1,244,000 | | $1,060,000 | | $990,000 | | $1,108,000 | | $1,252,000 | |
| Area in square feet | 25,000 sq. ft. | 27,000 sq. ft. | | 27,000 sq. ft. | | 22,000 sq. ft. | | 25,500 sq. ft. | | 26,000 sq. ft. | |
| Ceiling height | 18 ft. | 18 feet | | 18 feet | | 17 feet | | 19 feet | | 18 feet | |
| Age | 30 years old | 25 years old | | 23 years old | | 20 years old | | 35 years old | | 35 years old | |
| Construction quality | Good | Good | | Average | | Good | | Good | | Good | |
| Office area | 2,500 sq. ft. | 2,750 sq. ft. | | 2,200 sq. ft. | | 3,000 sq. ft. | | 2,500 sq. ft. | | 2,100 sq. ft. | |
| **Elements of comparison** | | | | | | | | | | | |
| Property rights conveyed | Fee simple | Fee simple | 0.0% | Fee simple | 0.0% | Leased fee | 5.0% | Fee simple | 0.0% | Leased fee | -10.0% |
| Adjusted sale price | | $1,244,000 | | $1,060,000 | | $1,042,100 | | $1,108,000 | | $1,138,200 | |
| Financing terms | Cash | Private mortgage | -10.00% | Cash to seller | 0.00% | Loan assumption | -$9,000 | Cash to seller | 0% | Cash | 0% |
| Adjusted sale price | | $1,119,600 | | $1,060,000 | | $1,033,100 | | $1,108,000 | | $1,138,200 | |
| Conditions of sale | Arm's length | Arm's length | 0.0% | Arm's length | 0.0% | Arm's length | 0.0% | Arm's length | 0% | Arm's length | 0% |
| Adjusted sale price | | $1,119,600 | | $1,060,000 | | $1,033,100 | | $1,108,000 | | $1,138,200 | |
| Expenditures made immediately after purchase | None | Deferred maintenance | $35,000 | None | 0.0% | None | 0.0% | None | 0.0% | None | 0.0% |
| Adjusted sale price | | $1,154,600 | | $1,060,000 | | $1,033,100 | | $1,108,000 | | $1,138,200 | |
| Market conditions | Current | 12 months | 4.00% | 6 months | 2.00% | 0 months | 0.00% | 3 months | 1.00% | 0 | 0.00% |
| Adjusted sale price | | $1,200,784 | | $1,081,200 | | $1,033,100 | | $1,119,080 | | $1,138,200 | |
| Condition of improvements (after repairs) | Average | Average | 0.00% | Average | 0.00% | Average | 0.00% | Average | 0.00% | Average | 0.00% |
| Adjusted sale price | | $1,200,784 | | $1,081,200 | | $1,033,100 | | $1,119,080 | | $1,138,200 | |
| Adjusted price per sq. ft. | | $44.47 | | $40.04 | | $46.96 | | $43.89 | | $43.78 | |

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Financing Terms

Sales A and C require adjustment for financing terms. The seller of Sale A provided advantageous financing that resulted in the buyer paying 10% more than the buyer would have paid in a cash transaction. Therefore, a downward adjustment of $124,400 is made to Sale A. The buyer of Sale C assumed an existing loan, with a below-market interest rate. The buyer paid a $9,000 premium above the price that would have been paid under market terms, so a downward adjustment of $9,000 is made to Sale C.

### Conditions of Sale

All the comparable sales were arm's-length transactions and none require an adjustment for conditions of sale.

### Expenditures Made Immediately After Purchase

Sale A suffered from deferred maintenance. At the time of sale, the buyer anticipated spending $35,000 to upgrade the building to average condition.

### Market Conditions

The sales occurred over a 12-month period. Market analysis shows that properties in this market have been appreciating at 4% annually. Sales A, B, and D require upward adjustments for change in market conditions.

### Condition of Improvements

The subject property is in average condition. Recall that Sale A was adjusted upward by $35,000 for expenditures made immediately after purchase to bring it in line with the subject property's condition. Another adjustment would not be made for the property's condition at the time of sale because, after correcting for deferred maintenance, the property was considered to be in average condition. Appraisers must be careful to not adjust for the same item twice, since expenditures immediately after purchase and condition of the improvements may be closely related.

### Adjusted Unit Prices

After applying all known quantitative adjustments, the comparable sales indicate a value range from $40.04 to $46.96 per square foot. Once quantitative adjustments are made, the sales may be analyzed for qualitative differences that will help in the reconciliation process.

## Qualitative Analysis

Using qualitative analysis, the sales information can be reviewed in the sales comparison grid with reasonable confidence. There are several tools available to extract more adjustments from the market, but that can be a problem with this limited amount of data. Many factors unknown to appraisers can impact the price, so the extraction of precision adjustments from this limited data is often difficult, if not impossible.

Table 22.9 shows a value trend for the ratio of office area to total building area within the comparable properties. The properties with a higher percentage of office space had a higher average unit price than the properties with a smaller percentage of office space.

After relative comparison analysis, the value bracket was $40.04 to $46.96 per square foot, with Sales A and D ($44.47 and $43.89 per square foot, respectively) most

BACK_DEFEXP-RR-002828

| Table 22.9 | Relative Comparison: Ratio of Office Area to Total Building Area | | |
|---|---|---|---|
| | **8%** | **10%** | **14%** |
| Sale A | | $44.47 | |
| Sale B | $40.04 | | |
| Sale C | | | $46.96 |
| Sale D | | $43.89 | |
| Sale E | $43.78 | | |
| Subject property | | 10% | |
| Relative comparison | Inferior | Similar | Superior |

| Table 22.10 | Relative Comparison: Construction Quality | | | |
|---|---|---|---|---|
| | **Poor** | **Average** | **Good** | **Excellent** |
| Sale A | | | $44.47 | |
| Sale B | | $40.04 | | |
| Sale C | | | $46.96 | |
| Sale D | | | $43.89 | |
| Sale E | | | $43.78 | |
| Subject property | | | Good | |
| Relative comparison | Inferior | Inferior | Similar | Superior |

| Table 22.11 | Relative Comparison: Age of Improvements | | |
|---|---|---|---|
| | **20–25** | **30** | **35** |
| Sale A | $44.47 | | |
| Sale B | $40.04 | | |
| Sale C | $46.96 | | |
| Sale D | | | $43.89 |
| Sale E | | | $43.78 |
| Subject property | | 30 | |
| Relative comparison | Superior | Similar | Inferior |

| Table 22.12 | Relative Comparison: Ceiling Height | | |
|---|---|---|---|
| | **17 feet** | **18 feet** | **19 feet** |
| Sale A | | $44.47 | |
| Sale B | | $40.04 | |
| Sale C | $46.96 | | |
| Sale D | | | $43.89 |
| Sale E | | $43.78 | |
| Subject property | | 18 feet | |
| Relative comparison | Inferior | Similar | Superior |

similar to the subject property. If the bracket of values were broader—for example, if the adjusted unit prices of Sales A and D ranged from $35.00 to $50.00—appraisers could analyze the comparable sales further to determine if the subject is more similar to the sales in the upper or lower ends of the bracket.

Other elements of comparison may affect the adjusted unit prices of comparable sales to some degree. Apprais-ers can prepare data arrays for each of the other physical charac-teristics that may have an effect on unit price (Tables 22.10, 22.11, and 22.12), but if the market evidence does not show discernible trends for these elements of com-parison individually or as a group, then no ad-ditional analysis would be necessary.

The range of adjusted unit prices for inferior or superior sales may over-lap the range set by sales of different overall com-parability (Table 22.13). For example, suppose Sale D had an adjusted unit price of $42.75 per square foot, which is less than the unit price of Sale E, an "inferior" property. In that situation, apprais-ers need to address the causes for the overlap and

BACK_DEFEXP-RR-002829

refine the value bracket. Comparing the ranges of inferior, similar, and superior properties can help appraisers identify statistical outliers—i.e., observations that are extreme and often evidence of an error. An outlier may have an inordinate effect on a statistical model if the reason for its departure from the typical range cannot be explained.

A ranking analysis of the comparable sales by their overall comparability (Table 22.14) illustrates how an estimate of the price per square foot of the subject property could be bracketed by the adjusted unit prices of the comparable sales.

**Table 22.13**  Overall Comparability

|  | Sale A | Sale B | Sale C | Sale D | Sale E |
|---|---|---|---|---|---|
| Percentage of office space | Similar | Inferior | Superior | Similar | Inferior |
| Construction quality | Similar | Inferior | Similar | Similar | Similar |
| Age of improvements | Superior | Superior | Superior | Inferior | Inferior |
| Ceiling height | Similar | Similar | Inferior | Superior | Similar |
| Overall comparability | Superior | Inferior | Superior | Similar | Inferior |
| Adjusted unit price | $44.47 | $40.04 | $46.76 | $43.89 | $43.78 |

**Table 22.14**  Ranking Analysis

| Comparable | Price per Square Foot | Overall Comparability |
|---|---|---|
| C | $44.76 | Superior |
| A | $44.47 | Superior |
| Subject property |  |  |
| D | $43.89 | Similar |
| E | $43.78 | Inferior |
| B | $40.04 | Inferior |

## Reconciliation

The quantitative adjustments and qualitative analysis in the table give an indication of value that will allow an appraiser to weigh the reliability and comparability of the sales in relation to the subject. This data does not give an indication to the nearest $0.25 per square foot, but it does indicate that a value opinion in the low $40s per square foot is reasonable. Based on the array of adjusted prices, the subject tends to fall within the $43.89 to $44.47 adjusted prices of Sale D and A. The bracket supports a value of about $44.00.

$$25,000 \text{ square feet @ } \$44.00 = \$1,100,000$$

While there is plenty of room for discussion and disagreement with this conclusion, it is not an unreasonable conclusion since appraisers seldom know every detail about the comparable sales. There are also considerations that may not be reflected in this analysis, such as buyer confidence in the market, jobs and employment numbers, interest rates, and even lending/credit ratios and federal fiscal policy.

Note that the examples in this chapter use a combination of quantitative and qualitative adjustments. Many appraisers, particularly in the residential lending world, only use quantitative adjustments.

BACK_DEFEXP-RR-002830

BACK_DEFEXP-RR-002831

Copyrighted material licensed by Charles Brigden on September 17, 2020



# The Income Capitalization Approach

# 23

Income-producing real estate is typically purchased as an investment, and from an investor's point of view earning power is the critical element affecting property value. A basic investment premise holds that the higher the earnings, the higher the value, provided the risk remains constant. An investor purchasing income-producing real estate is essentially trading present dollars for the expectation of receiving future dollars. The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of periodic income and reversion from a future sale) and convert these benefits into an indication of present value.

The analysis of cost and sales data is often an integral part of the income capitalization approach, and capitalization techniques are frequently employed in the cost and sales comparison approaches as well. Capitalization techniques can be used to analyze and adjust sales data in the sales comparison approach. In the cost approach, obsolescence is often measured by capitalizing anticipated shortfalls. The income capitalization approach is part of the overall systematic valuation process, and its methods, techniques, and procedures have broad applicability in the analysis and valuation of income-producing properties.

This chapter provides a broad overview of the income capitalization approach and discusses the principles and rationale on which it is based. Chapters 24 through 27 continue this discussion with detailed explanations of the specific methods, techniques, and procedures used to project and capitalize future benefits.

> In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach. Techniques and procedures from this approach are also used to analyze comparable sales data in the sales comparison approach and to measure obsolescence in the cost approach.

## Relation to Appraisal Principles

### Anticipation and Change

Anticipation is fundamental to the income capitalization approach. All income capitalization methods, techniques, and procedures forecast anticipated future market benefits and analyze their present value. This may involve explicitly forecasting and discounting anticipated future income from a property (yield analysis) or determining a capitalization rate that implicitly values the anticipated pattern of income over time (direct capitalization).

The approach must also reflect how changes in the amounts and timing of income affect the value of income-producing properties. To provide sound value indications, appraisers must carefully research and forecast market expectations of change in income and the expenses required to sustain income over time as well as market-anticipated increases or decreases in property value from the present time to reversion. The defined income of a real estate investment may differ according to the type of investor. Securitization and globalization of real estate investments has brought new participants into the market and exhibit influence on market value. For example, real estate investment trusts (REITs) and pension funds may forecast net operating income differently than traditional investors.[1] Furthermore, foreign investors may have distinctly different yield expectations and anticipated holding periods.

The capitalization process must reflect the possibility that the actual future income, expenses, and value at reversion may differ from those originally anticipated. Less forecast certainty means a riskier investment. Investors expect to earn higher rates of return as perceived investment risk increases. This is reflected in variations in discount and capitalization rates.

### Supply and Demand

The principles of supply and demand and the related concept of competition are particularly useful in forecasting future benefits and estimating rates of return in the income capitalization approach. Both anticipated net operating income and rates of return are drawn from the market.

If the demand for a particular type of space exceeds the existing supply, owners may be able to increase rents, vacancy rates may fall, and construction may become profitable. Property values may increase until supply and demand approach equilibrium. On the other hand, if the demand for space is less than the existing supply, rents may decline and vacancy rates may increase. Therefore, to forecast future benefits and estimate rates of return, appraisers consider present and future anticipated demand as well as the interaction of supply and demand.

## Applicability and Limitations

Any property or property interest that has the potential to generate income can be valued using the income capitalization approach. When more than one approach is used to develop an opinion of value for an income-producing property, the value indication produced by the income capitalization approach might be given greater

---

1. For a discussion of how pension fund managers and other institutional investors analyze income and cash flow to property, see the discussion of the securitization of real estate markets in Chapter 10.

BACK_DEFEXP-RR-002833

Copyrighted material licensed by Charles Brigden on September 17, 2020

weight than that of the other approaches in the final reconciliation of value indications. The usefulness of the approach will depend on the property type, the property rights appraised, the quantity and quality of the available data, and the typical investor profile.

Valuation techniques involving the income generated by the property are intended to reflect investor behavior. For example, investors in small residential income properties might typically purchase on the basis of gross income multipliers (*GIM*s) or effective gross income multipliers (*EGIM*s). Thus, an appraiser could develop an opinion of the value of a subject property using the appropriate multiplier. Similarly, investors in large office buildings with numerous tenants might project future cash flows by analyzing each lease and considering the effect of lease renewals or lease extensions and the anticipated sale of the property at the end of a projection period. An appraiser may simulate this process by conducting a discounted cash flow analysis for the subject property.

### Interests To Be Valued

Income-producing real estate is usually leased. Once a lease is created the fee simple estate is split into two partial interests: the landlord's interest (i.e., the leased fee) and the tenant's interest (i.e., the leasehold). The interest to be valued depends on the intended use and intended user of the appraisal. Federal or state law often requires appraisers to value leased properties as fee simple estates, not leased fee estates, for eminent domain and ad valorem taxation. When the fee simple interest is valued, the presumption is that the property is available to be leased at market rates. When an appraisal assignment involves the valuation of the fee simple interest in a leased property, the valuation of the entire bundle of rights applies. The value of a leasehold estate may be positive, zero, or negative, depending on the relationship between market rent and contract rent, the remaining term of the lease, and other factors, as explained in Chapter 7. The difference between the market rent and contract rent may be capitalized at an appropriate rate or discounted to present value to produce an indication of the leasehold value, if any, without consideration of the value of the leased fee estate.

Appraisers should not assume that the sum of the values of the two partial interests equals the value of the fee simple as this is often not the case. In some instances, the sum of the values of the partial interests may equal the value of the fee simple, but each partial interest represents a different ownership interest that must be valued on its own merit (i.e., the present value of the future benefits of each partial interest). This comparison is particularly important when contract benefits or detriments are substantial. Detrimental aspects of a lease may result in a situation in which either or both of the parties to the lease, and their corresponding value positions, may be diminished.

It is possible that in some cases both the leaseholder and the leased fee owner are at an advantage or disadvantage because of the terms of the lease. In other cases, there may be an apparent advantage of one party over the other when compared with other leases. For example, tenants who signed leases when rent rates were high may be at a disadvantage and pay more than the current market rent if the economy is now poor and market rates have fallen.

Like all contracts, a real estate lease depends on the actual performance of all parties to the contract. A weak tenant with the best of intentions may still be a high risk to the lessor. The same is true of a financially capable tenant who is litigious and willing to ignore lease terms, break a lease, and defy lawsuits. If the tenant defaults or does not renew a lease, the value of the leased fee may be seriously affected.

Because a leasehold or a leased fee interest is based on contract rights, appraisers differentiate between lease provisions that are generally representative of the market and other elements of a contract that are not typical of the market. An understanding of the risks associated with the parties to the lease and the lease arrangement is also required. A lease never increases the market value of real property rights to the fee simple. Any potential value increment in excess of a fee simple estate is attributable to the particular lease contract, and even though the rights may legally "run with the land," they constitute contract rather than real property rights.

*The Income Capitalization Approach*    **415**

BACK_DEFEXP-RR-002834

Income capitalization techniques include direct capitalization and yield capitalization. In direct capitalization, changes in future property value are implicit in the rates exhibited by actual market transactions. Yield capitalization anticipates changes in property income and value over a holding period. Changes in the property's income stream or future value are reflected by specific inputs.

## Definitions

The income capitalization approach employs more specialized terminology than any of the other approaches to value, and the meanings of the various terms sometimes overlap. Table 23.1 shows the relationships between different rates used in the approach and the real property interests that can be valued. Table 23.2 lists synonymous terms and symbols commonly used in income capitalization.

**Table 23.1**   Rates, Ratios, and Relationships

| Property Interest | Net Income or Cash Flow | Forecast Reversion | Capitalization Rate | Yield Rate |
|---|---|---|---|---|
| Total property ($V_O$) | Net operating income ($NOI$ or $I_O$) | Proceeds of resale ($PR$ or $V_N$), property reversion | Overall capitalization rate ($R_O$) | Risk rate, discount rate ($Y_O$) |
| Mortgage loan ($V_M$) | Debt service ($I_M$), monthly—DS, annual—ADS | Balance, balloon, book value ($b$) | Mortgage capitalization rate ($R_M$) | Yield rate to mortgage ($Y_M$), interest rate |
| Equity ($V_E$) | Equity income ($I_E$) | Equity reversion ($ER$) | Equity capitalization rate ($R_E$) | Equity yield rate ($Y_E$) |
| Land ($V_L$) | $NOI$ to land ($NOI_L$ or $I_L$) | Land reversion ($LR$) | Land capitalization rate ($R_L$) | Land yield rate ($Y_L$) |
| Building, improvements ($V_B$) | $NOI$ to building ($NOI_B$ or $I_B$) | Building reversion ($BR$) | Building capitalization rate ($R_B$) | Building yield rate ($Y_B$) |
| Leased fee ($V_{LF}$) | $NOI$ to lessor ($NOI_{LF}$ or $I_{LF}$) | Property reversion ($PR$ or $V_N$) or proceeds of resale | Leased fee capitalization rate ($R_{LF}$) | Leased fee yield rate ($Y_{LF}$) |
| Leasehold ($V_{LH}$) | $NOI$ to lessee ($NOI_{LH}$ or $I_{LH}$) | None or proceeds of resale of leasehold estate | Leasehold capitalization rate ($R_{LH}$) | Leasehold yield rate ($Y_{LH}$) |

### Market Value and Investment Value

An important distinction is made between market value and investment value. Investment value is the value of a property to a particular investor (or class of investors) based on the investor's specific requirements. Investment value may coincide with market value, which was defined in Chapter 6, if the client's investment criteria are typical of buyers in the market. In this case, the two opinions of value may be the same number, but the two types of value and their concepts are not interchangeable.

To develop an opinion of market value with the income capitalization approach, an appraiser must be certain that all the data and forecasts used are market-oriented and reflect the motivations of a typical investor who would be willing to purchase the property as of the effective date of the appraisal. A particular investor may be willing to pay a price different from market value, if necessary, to acquire a property that satisfies other investment objectives unique to that investor.

BACK_DEFEXP-RR-002835

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

**Table 23.2**  Terms and Synonyms Used in the Income Capitalization Approach

| Category | Term | Synonym/Symbol |
|---|---|---|
| Lease | Flat rental lease | Level payment lease |
| | Variable rental lease | Index lease |
| | Step-up or step-down lease | Graduated rental lease |
| | Revaluation lease | |
| | Lease with an annual increase | |
| | Percentage lease | |
| | Net lease | |
| | Triple net lease | |
| | Absolute net lease | |
| Rent | Market rent | |
| | Contract rent | |
| | Scheduled rent | |
| | Pro forma rent | |
| | Effective rent | |
| | Excess rent | |
| | Deficit rent | |
| | Base rent | |
| | Percentage rent | |
| | Overage rent | |
| Future benefits | Potential gross income | $PGI$ |
| | Effective gross income | $EGI$ |
| | Net operating income | $NOI$ or $I_o$* |
| | Equity income | Income to equity, $I_E$ |
| | Reversion | Reversionary benefits, resale value, property reversion, $V_N$ |
| Operating expenses ($OE$) | Fixed expense | |
| | Variable expense | |
| | Replacement allowance | Replacement reserve |
| Rates of return | Overall capitalization rate | $R_O$ |
| | Equity capitalization rate | Cash flow rate, cash-on-cash return, cash throw-off rate, pretax capitalization rate, equity dividend rate, $R_E$ |
| | Terminal capitalization rate | Residual capitalization rate, exit capitalization rate, $R_N$ |
| | Land capitalization rate | Land rate, $R_L$ |
| | Building capitalization rate | Building rate, $R_B$ |
| | Discount rate | Yield rate, risk rate |
| | Safe rate | Riskless rate, relatively riskless rate |
| | Internal rate of return | $IRR$ |
| | Overall yield rate | Property yield rate, $Y_O$ |
| | Equity yield rate | $Y_E$ |
| | Mortgage capitalization rate | Mortgage constant, annual loan constant, $R_M$ |
| | Going-in capitalization rate | |
| Income multipliers | Potential gross income multiplier | $PGIM$ |
| | Effective gross income multiplier | $EGIM$ |
| | Net income multiplier | $NIM$ |
| Vacancy | Vacancy and collection loss | |
| Stabilization | Stabilized occupancy | |
| | Stabilized income | |

* The traditional abbreviation *NOI* is commonly used in accounting, finance, economics, and other professional disciplines. The symbol $I_o$ is used in Appraisal Institute educational materials to maintain a consistent set of variables and subscripts throughout income capitalization calculations. The terms can be used interchangeably.

*The Income Capitalization Approach*    **417**

BACK_DEFEXP-RR-002836

## Leases

The income to various interests transferred by the landlord to the tenant is generally derived through the conveyance and operation of a lease. A lease is a written contract in which the rights to use and occupy land, space, structures, or combinations thereof are transferred by the owner to another for a specified period of time in return for a specified rent.[2] An appraiser begins the income capitalization approach by analyzing existing and proposed leases that apply to the subject property. These leases provide information on the base rent, any other income, and the division of expenses between the landlord and the tenant.

Although a lease can be drawn to fit any situation, most leases[3] fall into one of several broad classifications for calculating rent:

- Flat rental leases
- Variable rental leases
- Step-up or step-down leases
- Revaluation leases
- Annual increase leases
- Percentage leases

### Leases and Expenses

The terms *gross lease*, *modified gross lease*, and *net lease* do not always mean the same thing in different markets. The terms reflect the expenses that are included in each type of rent, and their meanings vary from market to market. In general, the following distinctions can be made:

· Gross lease—tenant pays rent and landlord pays expenses.

· Modified gross lease—tenant and landlord share expenses.

· Net lease—landlord passes on all expenses to tenant.

Sometimes real estate professionals will refer to a *triple net lease*, in which the tenant pays utilities, taxes, insurance, and maintenance and the landlord pays for structural repairs only.

To analyze income and expenses based on market observation, an appraiser must understand how these terms are used in the relevant market and clearly communicate that information to the intended user in the appraisal report. Furthermore, the appraiser must consistently account for the same expenses in the analysis of the income generated by a certain type of lease. For example, assume the available market data for five comparable office properties supports an estimate of market rent in the range of $27.50 to $31.00 per square foot per year, all quoted on a "net" rental basis. The rents for four of the properties range from $27.50 to $29.00 per square foot, and the tenants in those buildings pay for all expenses. The owner of the fifth comparable property, for which "net" rents are quoted at $31.00 per square foot, actually pays for insurance—i.e., that owner defines "net" rent differently than the other property owners. Consequently, the rent specified in the "net" lease of the fifth property, which would be equivalent to a "modified" lease in the other buildings, is noticeably higher.

An extreme form of net lease is sometimes referred to as a *bondable lease* (or sometimes as an *absolute net lease* or a type of *triple net lease*). In this type of lease, the tenant is responsible for all expenses and structural repairs for the entire duration of the lease term and is even obligated to continue to pay rent after a casualty or condemnation. The shifting of risk from landlord to tenant creates a lease with the obligations similar to a bond. Bondable leases are most often used in credit tenant leases.

---

2.  Most states require a written lease only when the term is greater than one year. According to the statute of frauds, which applies in most states, any contract may be valid but certain contracts must made in writing in order to be enforced by the courts.

3.  Other lease types are defined in accounting practice, e.g., capital or financing leases and operating or service leases. These leases often involve equipment.

BACK_DEFEXP-RR-002837

Copyrighted material licensed by Charles Brigden on September 17, 2020

Generally, leases are negotiated on a gross rental basis (with the lessor paying most or all operating expenses of the real estate), on a net rental basis (with the tenant paying all expenses), or on a modified gross rental basis (in which expenses are divided between the lessor and the lessee.) Leases can also be categorized by their terms of occupancy:

- Month-to-month (renews automatically until properly terminated)
- Short-term (of, for example, five years or less)
- Long-term (of more than five years)

### Flat Rental Lease

A flat rental lease specifies a level of rent that continues throughout the duration of the lease. In a stable market, this type of lease may be typical and acceptable. Flat rental leases may also be prevalent in net rent situations where changes in expenses are the responsibility of the tenant (or tenants). In a rising market, however, lessors would prefer long-term leases that are more responsive to changing market conditions, whereas in that situation lessees would prefer a flat rental lease. Similarly, lessors would prefer flat leases when rents are falling. When flat rental leases are executed in inflationary periods, they tend to be short-term such as is typical with apartment leases. Flat leases do not allow for the increasing costs of the landlord unless there is a provision for expense pass-throughs. Some valuation assignments for the federal government require appraisers to express the estimate of market rent on a "leveled" basis. This requires forecasting any change in market rent over a projection period and converting the total income generated by that lease over the projection period into an annual level equivalent.

### Variable Rental Lease

Variable rental leases are quite common, particularly when an owner anticipates periodic changes in market rent. This type of lease may specify a periodic monetary increase or periodic percentage change, or the change may be tied into a specific index, such as a nationally published consumer price index. (Often those leases are called *index leases*.) Sometimes the lease may specify that the rent change will be tied to the higher or lower of the two—the periodic percentage or the index. This is particularly prevalent in gross and modified gross leases where an owner needs periodic income adjustments to offset increases in expenses.

### Step-up or Step-down Rental Lease

Step-up or step-down leases (also known as *graduated rental leases*) provide for specified changes in the amount of rent at one or more points during the lease term or in certain build-to-suit arrangements. A step-up lease, which allows for smaller rent payments in the early years, can be advantageous to a tenant establishing a business in a new location. This type of lease can also be used to recognize tenant expenditures on a property that are effectively amortized during the early years of the lease. Long-term ground leases may include provisions for increasing the rent to reflect the expectation of future increases in property value and protect the purchasing power of the landlord's investment.

Step-down leases are less common than step-up leases. They are generally used to reflect unusual circumstances associated with a particular property such as the likelihood of reduced tenant appeal in the future or capital recapture of landlord-funded improvements during the early years of a long-term lease. They may be used in certain build-to-suit arrangements.

BACK_DEFEXP-RR-002838

### Lease With an Annual Increase

One of the most common types of leases simply increases the rent annually by a dollar amount or set percentage specified in the lease.

### Revaluation Lease

Revaluation leases provide for periodic rent adjustments based on revaluation of the rental rate of the space, land, or structures under the prevailing market conditions. The revaluation of the rent rate may involve a stated percentage applied to a determined market value, which may or may not result in market rent. Or the revaluation process may call for a valuation of the market rent. The terms of the lease must be read carefully because the valuations may be based on (a) the property's highest and best use, (b) the current use, or (c) some other basis. Although revaluation leases tend to be long-term, some are short-term with renewal option rents based on revaluation of market rent when the option is exercised. When the parties to a lease cannot agree on the value or rent, revaluation through appraisal, arbitration, or mediation may be stipulated in the lease.

### Percentage Lease

In percentage leases, some or all of the gross income is based on a specified percentage of the volume of business or sales, productivity, or use achieved by the tenant. Percentage leases may be short- or long-term. A straight percentage lease may have no minimum rent, but most specify a guaranteed minimum rent and an overage rent, which is defined in the next section. Percentage leases are commonly used for retail and restaurant space.

## Rent

The income to investment properties consists primarily of rent. Different types of rent affect the quality of property income. Several categories are used by appraisers to analyze rental income:

- Market rent
- Contract rent
- Effective rent
- Excess rent
- Deficit rent
- Base rent
- Percentage rent
- Overage rent

### Market Rent

Market rent is the rental income a property would have commanded had it been exposed to the market prior to the date of appraisal.[4] It is indicated by the current rents that are either paid or asked for comparable space with the same treatment of expenses as of the date of value. Market rents vary with economic conditions, so estimating market rent is not always simple.

---

4. Market rent is sometimes referred to as *economic rent*. However, the term *economic rent* has been used in various ways other than as a synonym for *market rent*. For example, in the broader field of economics, *economic rent* means an excess payment made to a unit of production above and beyond what is necessary to bring that unit into production. Also, *economic rent* may be used to mean contract rent derived from a negotiated rate of return applied to development cost for a build-to-suit property, which may or may not be equivalent to market rent.

BACK_DEFEXP-RR-002839

Copyrighted material licensed by Charles Brigden on September 17, 2020

In more formal terms, the term *market rent* is defined as follows:

> The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby:
>
> - Lessee and lessor are typically motivated;
> - Both parties are well informed or well advised, and acting in what they consider their best interests;
> - Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and
> - The rent reflects specified terms and conditions, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, and tenant improvements (TIs).

Rent for vacant or owner-occupied space is usually estimated at market rent levels and distinguished from contract rent in the income analysis. In fee simple valuations, all rentable space is estimated at market rent levels and market terms. In such valuations, adjustments may be necessary to account for lease-up costs and the time involved in a lease-up. Any rent attributed to specific leases is disregarded in the income analysis except to the extent that these leases may be indicative of market rent. In a leased fee analysis, current contract rents defined by any existing leases are applied to leased space, structures, or land, and income for unoccupied space, structures, or land is estimated at market rent. When estimating market rent and expenses, appraisers should assume that property management is competent.

Market data provides evidence of a range of market rents. For example, if the market for industrial space shows a rent range of $4.00 to $5.00 per square foot of gross building area per year on a gross rental basis and the subject property is leased for $3.00 per square foot of gross building area, an appraiser could conclude that the actual rent is below market levels. However, if the actual subject rents were $4.00, $4.50, or $5.00 per square foot of gross building area, it may be reasonable to conclude that those rents are consistent with market rents. If market rents are on a gross rental basis and the subject is leased on a net rental basis, it is inappropriate to compare market and contract rent unless adjustments are made to account for differences in the responsibility for expenses. Moreover, the rents charged for the subject and comparable space cannot be effectively compared without considering the size and other physical characteristics of the demised spaces in the properties.

Market rent may be applied as the primary focus of an appraisal intended for the development of an opinion of market rent or as part of a more in-depth appraisal in developing an opinion of market value for a property

### Contract Rent

Contract rent is the actual rental income specified in a lease. It is the rent agreed on by the landlord and the tenant and may be higher than, less than, or equal to market rent. Also, it is important to compare rents of properties with a similar treatment of expenses, similar lease terms, and a similar level of finished space.

### Effective Rent

In markets where concessions take the form of free rent, above-market tenant improvements, or atypical allowances, the effective rent must be quantified. Effective rent is an analytical tool used to compare leases with different provisions and

BACK_DEFEXP-RR-002840

develop an estimate of market rent. *Effective rent* may be defined as the total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions—e.g., free rent, excessive tenant improvements, moving allowances, lease buyouts, cash allowances, and other leasing incentives.

Effective rent may be calculated in several different ways. It may be estimated based on rental income from existing leases at contract rates and terms or rental income from leases at market rates and terms, depending on the intended use of the appraisal. In calculating effective rent, allowances must be made for rent concessions in effect at the time of the appraisal, any discounts, or other benefits that may have prompted a prospective tenant to enter into a lease.

The timing of the rent concessions may make analysis of effective rent a moot point. For example, consider a 10,000-sq.-ft. industrial property with a five-year lease at $4,000 per month, four months of rent concessions (the first two months of each of the first two years), and a date of value at the beginning of the third year of the lease. The concessions granted in the first two years of the lease are not an issue in the analysis of the income generated in the third year, and the actual and effective rent would be the same on the date of value.

Effective rent can be calculated as (1) the average, annual rent net of rent concessions, (2) as the same average, annual rent but with tenant improvements amortized over the lease term, or (3) as an annual rent that produces the same present value as the actual annual rents net of rent concessions. The first method is a mathematical average, whereas the last is a discounting procedure in which the rent concessions are accounted for in the years that they actually occur. The second method combines the analytical techniques of the other two. Any of the multiple techniques available are appropriate as long as the effective rent is applied in a manner consistent with how the effective rent was calculated.

As a simple example of effective rent calculations, consider a lease on another 10,000-sq.-ft. industrial building in which the rent is specified as $4,000 per month (or $48,000 per year) for a five-year term with level income throughout the lease term. When the lease was negotiated, the tenant received free rent for the first month of each year as a concession. The contract rent is $4.80 per square foot. However, the effective rent is only $4.40 per square foot:

| | |
|---|---:|
| $4,000 per month × 11 months = | $44,000 |
| $44,000 / 10,000 square feet = | $4.40 per square foot |

There are different ways to treat tenant improvement costs. The appraisal problem will dictate whether it is appropriate to deduct all tenant improvements or only deduct the additional actual tenant improvement costs over a market standard.

### Excess Rent and Deficit Rent

Excess rent is the amount by which contract rent exceeds market rent at the time of the appraisal. Excess rent is created by a lease that is favorable to the lessor and may reflect superior management, a lease that was negotiated in a stronger rental market, a lease that was a build-to-suit or sale-leaseback at above market rents, or a lease in which the rent also included a return on fixtures or personal property. Excess rent may be expected to continue for the remainder of the lease (if the relationship of contract rent and market rent is expected to remain the same for the duration of the lease). However, due to the higher risk associated with the receipt of excess rent, it may be calculated separately and capitalized or discounted at a higher rate. Excess rent is the result of a lease

BACK_DEFEXP-RR-002841

contract rather than the income potential of the underlying real property on the valuation date. The incremental value created by a lease premium can result in a leased fee value that exceeds the fee simple. The situation where contract rent and terms exceed market rent and terms is known as a *negative leasehold*.

Tenants of a local nature paying excess rent may have their businesses fail because of the rental disadvantage and possibly compel the landlord to renegotiate a lower rent. Higher risk may also be attributable to the excess rent paid by a financially capable company with the power to contest the lease.

Deficit rent is the amount by which market rent exceeds contract rent at the time of the appraisal. It is created by a lease favorable to the tenant and may reflect uninformed or unusually motivated parties, inferior management, or a lease executed in a weaker rental market. When contract rent is less than market rent, a positive leasehold interest accrues to the tenant. However, the leasehold advantage may be nonmarketable, particularly when the remaining lease term is short, the spread between contract and market rent is not significant, or a combination of both factors exists. It may also be unmarketable if the lease prohibits subleasing where any gain could be monetized. Even so, it would accrue to the tenant in the form of a benefit. When there is a positive leasehold interest for a financially credible tenant, there is often reduced risk for the landlord (owner of the leased fee estate). This may reduce the capitalization rate or discount rate that is appropriate for the leased fee position.[5]

### Percentage Rent

Percentage rent is rental income received in accordance with the terms of a percentage rent clause in a lease. Percentage rent is typically derived from retail and restaurant tenants and is based on a certain percentage of their sales revenue. Depending on the tenant, percentage rent may involve more risk than other forms of rent and may be capitalized or discounted separately and at a different rate. The risk generally is in the variability of the income, more than in the likelihood that rent collection will be difficult.

The emergence of new competition in the area or the anchor tenant departing from a shopping center may reduce or eliminate anticipated percentage rent. Also, as is true for excess rent, the conditions that create percentage rent may not extend for the duration of the lease. Furthermore, calculation of a store's sales revenue can be affected by transactions involving a "virtual" or internet component.

### Overage Rent

Overage rent is percentage rent paid over and above the guaranteed minimum rent or base rent. The level of sales at which a percentage clause is activated is specified in a lease and called a *breakpoint*. The natural breakpoint is the level of sales at which the percentage rent exactly equals the base rent.

The breakpoint in a percentage lease does not necessarily have to be the natural breakpoint. For example, if the annual base rent is set in the lease at $400,000 and the percentage of retail sales specified in the lease is 20%, then the natural breakpoint for sales volume is $2 million—i.e., $400,000 / 0.20 = $2 million. The breakpoint specified in the lease could be set at a sales volume of $2.25 million. In this case, the tenant would pay the base rent of $400,000 until sales reached $2.25 million and the percent-

---

5. See Richard L. Parli and Jeffrey D. Fisher, "Risk and Reasonableness for Nonmarket Occupancy," *The Appraisal Journal* (April 2003): 136-144, and "Risk and Reasonableness for Nonmarket Occupancy—A Second Look During a Recession," *The Appraisal Journal* (Winter 2010): 94-103.

BACK_DEFEXP-RR-002842

age rent clause would be activated so that the rent jumps to $450,000 ($2,250,000 × 0.20 = $450,000). The breakpoint could also be set lower than the natural breakpoint—say, at a sales volume of $1.75 million—but the actual rent paid will be higher than the base rent if overage rent is earned. That is, the tenant would pay the base rent of $400,000 until sales reached the natural breakpoint of $2 million, at which point the percentage rent attributed to overage rent would start to rise above the level of the base rent.

Overage rent should not be confused with excess rent. The combination of base rent and overage rent may be market rent, less than market rent, or more than market rent. In the latter case, there would be excess rent.

## Future Benefits

The benefits of owning specific rights in income-producing real estate include the right to receive all cash flows accruing to the real property over the holding or projection period (i.e., the term of ownership) plus any proceeds from disposition of the property at the termination of the investment.[6] While actual disposition might not occur, it is presumed in order to quantify the reversion, just as market value presumes a sale as of the effective date of value.

Various measures of future benefits are considered in the income capitalization approach. Commonly used measures include

- Potential gross income
- Effective gross income
- Net operating income
- Equity income
- Reversionary benefits

### Potential Gross Income

Potential gross income (*PGI*) is the total potential income attributable to the real property at full occupancy before vacancy and operating expenses are deducted. It may refer to the level of rental income prevailing as of the effective date of the appraisal or expected during the first full month or year of operation, or to the periodic income anticipated during the projection period.

### Effective Gross Income

Effective gross income (*EGI*) is the anticipated rental income and other income from the real property adjusted for vacancy and collection losses. This adjustment covers losses expected to be incurred due to unoccupied space, turnover, and nonpayment of rent by tenants.

### Net Operating Income

Net operating income (*NOI* or $I_O$) is the actual or anticipated net income remaining after all operating expenses are deducted from effective gross income. Net operating income is customarily expressed as an annual amount. In certain income capitalization applications, a single year's net operating income may represent a steady stream of fixed income that is expected to continue for a number of years. In other applications, the income may represent the starting level of income that is expected to change in

---

6. The *holding period* is a market-oriented measure of how long investors typically retain ownership of real property. The *projection period* is used in investment analysis to forecast the term of ownership given the reasonable expectations of certain market events.

BACK_DEFEXP-RR-002843

Copyrighted material licensed by Charles Brigden on September 17, 2020

a regular or irregular pattern over time. Still other applications may require that net operating income be estimated for each income period of the analysis. Net operating income is often calculated after a deduction is made for replacement reserves but, in some markets, reserves are deducted after the calculation of net operating income.

### Equity Income

Equity income ($I_E$) is the portion of net operating income that remains after debt service is paid. Like net operating income, a single year's equity income may represent a steady stream of fixed income, the starting level of a changing income stream, or the equity income for a particular period of the analysis. Equity income is sometimes called *equity cash flow*, *equity dividend*, *cash throw-off*, *pre-tax cash flow*, or *cash on cash*.

### Reversion

Reversion is a lump-sum benefit an investor receives, or expects to receive, upon termination of an investment or at an intermediate analysis period during the term of an investment. The reversionary benefit may be calculated before or after the mortgage balance is deducted. For example, the reversionary benefits for fee simple and leased fee estates are the net proceeds expected to result from resale of the property at the end of the investment projection period. For a mortgagee or lender, reversion consists of the balance of the mortgage when it is paid off or forecast to be paid off. Table 23.3 shows several possible investment positions in an income-producing property and identifies the income streams and reversions associated with each interest.

Reversionary benefits are usually estimated as anticipated dollar amounts or as relative changes in value over the selected projection period. A dollar estimate of the reversion might be based on a lessee's option to purchase the property at the end of the lease. Alternatively, the value of the reversion at the end of the projection period might be estimated by applying a capitalization rate to the income that a buyer expects to receive at the time of resale (or expected resale). Reversionary benefits may or may not require separate measurement, depending on the purpose of the analysis and the method of capitalization used. The reversionary benefits derived from

---

**Table 23.3**   **Summary of Incomes and Reversions Associated with Various Real Property Interests in Income-Producing Property**

**Fee Simple**

| | |
|---|---|
| Income | Net operating income based on market rents (*NOI* or $I_O$) (may require adjustment for lease-up) |
| Reversion | Net proceeds of disposition ($V_N$) |

**Mortgagee (Lender's Position)**

| | |
|---|---|
| Income | Mortgage debt service ($I_M$) |
| Reversion | Balance if paid prior to maturity or balloon payment if paid at maturity; none if loan amortizes fully ($V_{MN}$) |

**Leased Fee**

| | |
|---|---|
| Income | Net operating income based on contract rents for leased space and market rent for vacant space (may require adjustment for lease-up) |
| Reversion | Property reversion or net proceeds of disposition of leased fee estate |

**Leasehold**

| | |
|---|---|
| Income | Rental advantage when contract rent is below market rent; rental disadvantage when contract rent is above market rent |
| Reversion | None or proceeds of resale of leasehold estate |

---

*The Income Capitalization Approach*   **425**

BACK_DEFEXP-RR-002844

an investment may be particularly uncertain in depressed markets, but a reversion amount is still a consideration.

## Operating Expenses

In the income capitalization approach, a comprehensive analysis of the annual expenses of property operation is essential, whether the value indication is derived from estimated net operating income or equity income. Operating expenses are the periodic expenditures necessary to maintain the real property and continue the production of revenue.

An operating statement that conforms to this definition of *operating expenses* is used for appraisal purposes. This reconstructed operating statement may differ from statements prepared for an owner or by an accountant because the latter often include mortgage interest or non-cash expenses such as depreciation. Operating statements are prepared on either a cash or accrual basis, and appraisers must know the accounting basis used in the operating statements for the property being appraised. Operating statements provide valuable factual data and can be used to identify trends in operating expenses.

Operating expenses comprise three categories:

- Fixed expenses
- Variable expenses
- Replacement allowance

These classifications have been used for a long time, but there are other valid classification systems that can be employed, and different property types may require different classifications.

### Fixed Expenses

Fixed expenses are operating expenses that generally do not vary with occupancy and have to be paid whether the property is occupied or vacant. Real estate taxes and building insurance costs are typically considered fixed expenses. Although these expenses rarely remain constant, they generally do not fluctuate widely over the short term from year to year, do not vary in response to changing occupancy levels over the short term, and are not subject to management control. Therefore, an appraiser can usually identify a trend and accurately estimate these expense items.

### Variable Expenses

Variable expenses are operating expenses for utilities, maintenance, janitorial, and other services that generally vary with the level of occupancy or the extent of services provided, though most variable expenses have some minimal fixed component regardless of occupancy. Specific expense items of this type may vary greatly from year to year, but similar types of property often reflect a reasonably consistent pattern of variable expenses in relation to gross income. Because fewer services are provided to the tenants of freestanding retail and industrial properties or unenclosed structures or buildings, these properties usually have a much lower ratio of expenses to gross income than apartment and office buildings.

### Replacement Allowance

A replacement allowance provides for the periodic replacement of building components that wear out more rapidly than the building itself and must be replaced periodically during the building's useful life (i.e., capital items). Market participants may

BACK_DEFEXP-RR-002845

view replacement allowances differently from market to market—e.g., accounting for a replacement allowance as a line item or implicitly in the capitalization or discount rate. Appraisers must deal with replacement allowances in a manner that is consistent with the method used in the relevant market for comparable properties and the manner in which the capitalization or discount rate was extracted from market data.

> An investor's total expected return includes the return of capital (recapture of capital) and a return on capital (compensation for use of capital until recapture). Rates of return may be income rates (ratios of annual income to value that are used to convert income into value) or yield rates (rates of return on capital).

## Rates of Return

A prudent investor ultimately seeks a total return greater than or equal to the amount invested. Therefore, the investor's expected return consists of two components:

- Full recovery of the amount invested, i.e., the return of capital
- A reward for the assumption of risk, i.e., a return on invested capital

Because the returns from real estate may take a variety of forms, many rates, or measures of return, are used in capitalization. All measures of return can be categorized as either

- income rates, such as an overall capitalization rate ($R_O$) or equity capitalization rate ($R_E$), or
- yield rates, such as an effective interest rate (the rate of return on debt capital), discount rate (the rate used to convert future cash flows into present value, $Y_O$), or internal rate of return (*IRR*).

The term *discount rate* describes any rate used to convert future cash flows over time into a present value. Because investors expect their total return to exceed the amount invested, the present value of a prospective benefit is less than the total income over the ownership term—thus the "discount."[7] A yield rate is the rate of return on capital. The discount rate is a pure rate of return on the investment and the return of the investment is in the cash flows themselves.

Under certain conditions, the yield rate ($Y_O$) for a property may be numerically equivalent to the corresponding income rate ($R_O$) in a zero-growth discounted cash flow analysis. Nevertheless, the rates and their related concepts are not the same, nor are they interchangeable. An income rate is the ratio of one year's income to value.[8] A discount rate is applied to a series of individual cash flows to obtain the present value.

In the income capitalization approach, both income rates and yield rates can be derived for, and applied to, any component of real property rights or the underlying physical real estate. For example, an appraiser may analyze total property income in terms of income to the mortgage and equity interests in the property. Similarly, an appraiser may seek the total investment yield or analyze the separate yields to the mortgage and the equity interests. Finally, an appraiser may want to analyze the value of the unencumbered fee simple, the leased fee, or the leasehold interest. (Practical

---

7. For a thorough discussion of discounting, see Charles B. Akerson and David C. Lennhoff, editor, *Capitalization Theory and Techniques: Study Guide*, 3rd ed. (Chicago: Appraisal Institute, 2009).

8. The rate is usually calculated with the income for the first year, although the income for the previous year may be used. In rare cases, the incomes for several years might be averaged to obtain a representative income figure.

BACK_DEFEXP-RR-002846

examples of these applications and the relevant symbols, formulas, and procedures are presented in Chapter 28.)

### Return on and Return of Capital

The notion that an investor anticipates a complete recovery of invested capital—plus a payment for the use of capital—prevails in the real estate market just as it does in other markets. The term *return of capital* refers to the recovery of invested capital. The term *return on capital* refers to the additional amount received as compensation for use of the investor's capital until it is recaptured. Investors are concerned with both types of return. The rate of return on capital is analogous to the yield rate or the interest rate earned or expected. A typical example is the mortgage loan calculation in which the return of and the return on capital are considered in the level mortgage payment over time.

> **return of capital**
> The recovery of invested capital through periodic income or reversion or both.
>
> **return on capital**
> The additional amount received as compensation (profit or reward) for use of an investor's capital until it is recaptured. The rate of return on capital is the yield rate or the interest rate earned or expected.

In real estate investments, capital may be recaptured in many ways.[9] Investment capital may be recaptured through periodic income, or it may be recaptured all or in part through disposition of the property at the termination of the investment. It may also be recaptured through a combination of both. If the property value does not change between the time the initial investment is made and the time the property is sold, the investor can recapture all the initial capital invested at property resale at the end of the holding period. Thus, when initial value is equivalent to resale value, the annual income can all be attributed to the return on capital. If the income has remained level (or constant), the indicated income rate (i.e., the overall capitalization rate) will equal the return on capital.

In yield capitalization the distinction between the return on and the return of capital is more explicit. The yield rate estimated for cash flows determines a specified return on capital. Direct capitalization, on the other hand, uses income rates such as overall capitalization rates, which must implicitly allow for both the return on and return of capital. When the capitalization rate is applied to the subject property's income, the indicated value must represent a price that would allow the investor to earn a market rate of return on the capital invested along with the recapture of the capital. Thus, the capitalization rate estimated and applied to value property must reflect or consider a market level of return of and return on the initial investment in one calculation.

### Income Rates

An income rate expresses the relationship between one year's income and the corresponding capital value of a property. An overall capitalization rate ($R_O$) is an income rate for a total property that reflects the relationship between a single year's net operating income and the total property price or value. It is used to convert net operating income into an indication of overall property value. An overall capitalization rate is a ratio between the first year's income and the value. It includes both the return of and return

---

9. The term *recapture* was coined at a time when investors assumed that property values could only decline due to depreciation from physical or functional causes. Today appraisers use the term when some income provision must be made to compensate for the loss of invested capital.

BACK_DEFEXP-RR-002847

Copyrighted material licensed by Charles Brigden on September 17, 2020

on capital with consideration of the percieved risk and anticipation of future income or value changes by the investor. It may be more than, less than, or equal to the expected yield on the capital invested, depending on projected income and value changes.

An equity capitalization rate ($R_E$) is an income rate that reflects the relationship between a single year's equity income expectancy and the equity investment. When used to capitalize the subject property's cash flow after debt service into equity value, the equity capitalization rate is often referred to in the real estate market as the *cash flow rate*, *cash-on-cash rate*, *cash-on-cash return*, or *equity dividend rate*. Like the overall capitalization rate, the equity capitalization rate may be more than, less than, or equal to the expected equity yield rate, depending on projected changes in income, value, and amortization of the loan.

### Discount Rates

Different discount rates are used to discount cash flows applicable to a specific position or interest in defined real estate. Discount rates are different from capitalization rates. With a discount rate, any anticipated changes in income or value are explicit in the cash flows. With capitalization rates, the changes are implicitly accounted for in the rate.

A yield rate is a rate of return on capital. It is usually expressed as a compound annual percentage rate. The yield rate considers all expected property benefits (both positive and negative over time), including the proceeds from disposition at the termination of the investment, if any. The term *interest rate* usually refers to the yield rate for debt capital, not equity capital.

An internal rate of return (*IRR*) is the yield rate that is earned for a given capital investment over the period of ownership. The internal rate of return for an investment is the yield rate that equates the present value of the future benefits of the investment to the amount of capital invested. The internal rate of return applies to all expected benefits, including all periodic cash flows and the net proceeds from disposition at the investment's termination. It can be used to measure the return on any capital investment, before or after income taxes.

An overall yield rate ($Y_O$), or property yield rate, is a rate of return on the total capital invested. It considers all changes in income over the investment projection period as well as the reversion at the end of the projection period. It does not, however, consider the effect of debt financing. Rather, it is calculated as if the property were purchased with no debt capital and thus is sometimes called an *unleveraged rate* or an *unlevered rate*. The overall yield rate can be viewed as the combined yield on both the debt and equity capital.

An equity yield rate ($Y_E$) is a rate of return on equity capital. It may be distinguished from a rate of return on debt capital, which is usually referred to as an *effective mortgage interest rate* or *mortgage yield rate* ($Y_M$). The equity yield rate is the equity investor's internal rate of return. It is affected by the amount of financial leverage employed in securing mortgage debt and thus is known as a *leveraged rate* or *levered rate*.

### Estimating Rates

Whether an income rate or a yield rate is applied, the conversion of income into property value should reflect the annual rate of return the market indicates is necessary to attract investment capital. This rate is influenced by many factors:

- The degree of perceived risk
- Market expectations regarding future inflation

BACK_DEFEXP-RR-002848

The rate of return on investment combines a safe rate with a premium to compensate the investor for risk, the illiquidity of invested capital, and management involvement. The rate of return on capital may incorporate inflationary expectations and should reflect the competition for capital among alternative investments of comparable risk.

**time value of money**

The concept underlying compound interest that holds that economic benefits received today are worth more than economic benefits received in the future due to opportunity cost, inflation, and the certainty of payment.

- The prospective rates of return for alternative investments (i.e., opportunity costs)
- The rates of return earned by comparable properties in the past
- The availability of debt financing
- The prevailing tax law

Because the rates of return used in the income capitalization approach represent prospective rates, not historical rates, the market's perception of risk and changes in purchasing power are particularly important. Generally, lower capitalization rates are associated with properties that have different characteristics—higher-quality tenants, lower perceived risk, greater potential for increases in income and value, and broader market appeal—than properties that have higher capitalization rates. General market conditions, prevailing interest rates, and the availability of equity and debt capital are a few of the factors that cause changes in capitalization rates over time.

The suitability of a particular rate of return cannot be proven with market evidence, but the rate estimated should be consistent with the data available. Estimating rates requires appraisal judgment and knowledge of prevailing market attitudes and economic indicators.

Typically, investors expect to receive a return on capital that represents the time value of money with an appropriate adjustment for perceived risk. The minimum rate of return for invested capital is sometimes referred to as the *safe*, *riskless*, or *relatively riskless rate*—e.g., the prevailing rate on insured savings accounts or guaranteed government securities.[10] Theoretically, the difference between the total rate of return on capital and the safe rate may be considered a premium to compensate the investor for risk, the illiquidity of invested capital, and other investment considerations.

A discount rate reflects the relationship between income and the value that a market will attribute to that income. The financial and economic concepts implicit in a discount rate are complex and have been the subject of significant analysis for more than a century. Although four key components can be identified within a discount rate—the safe rate plus considerations of illiquidity, management, and various risks—a discount rate that is constructed by adding allowances for these components can be inappropriate. The band-of-investment concept can be helpful in understanding these components, especially in differentiating marginal risk considerations. While they can be used to approximate market-extracted rates, they should not be represented as market-extracted rates.

### Risk

The anticipation of receiving future economic benefits creates value, but the possibility of not receiving or losing future benefits reduces value and creates risk. Higher rewards are required in return for accepting higher risk. To a real estate investor,

---

10. For example, federal statutes prescribe certain US securities rates as a means of compensating for the time value of money on an essentially risk-free basis while accounting for inflation. See 40 USC §1961 and the amendment contained in Public Law No. 106-554, effective December 21, 2000.

BACK_DEFEXP-RR-002849

Copyrighted material licensed by Charles Brigden on September 17, 2020

risk is the uncertainty of realizing projected future economic benefits and the chance of incurring a financial loss. Most investors try to avoid excessive risk. They prefer certainty to uncertainty and expect a reward for taking a risk. Appraisers must recognize investors' attitudes in analyzing market evidence, projecting future benefits, and applying capitalization procedures. An appraiser must be satisfied that the income rate or yield rate used in capitalization is consistent with market evidence and reflects the level of risk associated with receiving the anticipated economic benefits.

### Inflation and Value

Appraisers should be aware of the difference between inflation and appreciation in real value. Inflation is an increase in the volume of money and credit, a rise in the general level of prices, and the erosion of purchasing power. Appreciation in real value results from an excess of demand over supply, which increases property values beyond the level of inflation.

The amount of inflation expected affects the forecast of future benefits and the estimation of an appropriate income or yield rate. If inflation is anticipated, the desired nominal rate of return on invested capital will likely increase to compensate for lost purchasing power. The required nominal rate, then, will increase to offset the expected inflation. Most investors try to protect the real rate of return over time.

A distinction must be made between expected inflation and unexpected inflation. Expected inflation refers to changes in price levels that are expected at the time the investment is made or when the property is being appraised. However, actual inflation may differ from what was anticipated at the time the investment was made. Depending on how the investment responds to the actual change in price levels, its value may fluctuate over time at a different rate than originally anticipated. If the return on the investment does not increase with unexpected inflation, the investor's real rate of return will be less than originally projected.

The converse of inflation—deflation—is a decrease in the general price level of commodities. In a deflationary period, the purchasing power of money rises because general price levels are falling. Historically, deflation has not been a significant problem in the United States since the beginning of World War II. The -0.4% change in the annual average of the consumer price index in 2009 was only the third year of negative change in that indicator since the 1930s and the only negative change from 1955 to 2019. Theoretically, deflation should affect the return on an investment in the opposite manner of inflation. That is, because of expected deflation, the nominal rate of return on an investment in real property would likely decrease to account for the greater purchasing power of the cash. In a deflationary period with asset prices falling, the value of cash in hand may be perceived as greater than the potential appreciation of property, which could decrease investment and lending.

## Procedure

The income capitalization approach supports two basic methods: direct capitalization, which uses the relationship of one year's income to conclude a value, and yield capitalization, which considers a series of cash flows over time together with any reversion value or resale proceeds.

Both methods require an initial comprehensive study of historical income and expenses for the subject property. This study is combined with an analysis of typical

BACK_DEFEXP-RR-002850

The two methods of income capitalization are direct capitalization, in which a single year's income is divided by an income rate or multiplied by an income factor to reach an indication of value, and yield capitalization, in which future economic benefits are converted into a value indication by discounting them at an appropriate yield rate (DCF analysis) or applying an overall capitalization rate that reflects the investment's income pattern, value change, and yield rate.

income and expense levels for comparable properties. A reconstructed operating statement is developed for the subject property. This reconstructed operating statement must reflect the intended use of the appraisal, especially with respect to the property interest being appraised. Leased fee value will reflect current leases and the associated expense structure, while fee simple value starts with an income projection based on market rent.

Yield capitalization will require a consideration of probable income and expenses over the designated projection period, which is determined based on observations of typical holding periods for similar property types. When this method is used, an appraiser must forecast income and expenses over time together with the eventual reversion or resale value of the property. Direct capitalization, on the other hand, typically uses a one-year cash flow estimate (usually 12 months from the date of value) and application of an overall rate to estimate value. This method often relies on sales of properties with income characteristics and future expectations similar to the subject's, although alternate methods for developing the appropriate rate are available.

Although there are various income capitalization techniques available to appraisers, certain steps are essential in applying the income capitalization approach. Before applying most capitalization techniques, an appraiser works down from potential gross income to net operating income. To do this, the appraiser will

1. Research the income and expense data for the subject property and comparables.
2. Estimate the potential gross income of the property by adding the rental income and any other potential income.
3. Estimate the vacancy and collection loss.
4. Subtract vacancy and collection loss from total potential gross income to arrive at the effective gross income of the subject property. (If the potential income is estimated net of the impact of vacancy, then it must be added after the deduction for vacancy and collection loss, not before.)
5. Estimate the total operating expenses for the subject by adding fixed expenses, variable expenses, and a replacement allowance (where applicable).
6. Subtract the estimate of total operating expenses from the estimate of effective gross income to arrive at net operating income. (Deductions for capital items may also be necessary at various points in time through the projection period to calculate the cash flow used in discounted cash flow analysis.)
7. Apply one or more of the direct or yield capitalization techniques to this data to generate an estimate of value via the income capitalization approach.
8. If necessary, calculate a rent-up adjustment for the value indication that accounts for the cost of leasing up the property or for needed capital improvements (including an appropriate estimate of entrepreneurial incentive).

BACK_DEFEXP-RR-002851

Some capitalization techniques involve the use of a potential gross income multiplier or effective gross income multiplier. In those cases, appraisers do not work down to net operating income but stop at potential or effective gross income.

## Direct Capitalization, Yield Capitalization, and Discounting

Direct capitalization makes use of a single year's income and a market-derived factor or overall capitalization rate. Initially, the process appears rather simple. The practitioner need only estimate the income and the factor or overall capitalization rate. In contrast, yield capitalization requires the practitioner to make explicit forecasts of income, expenses, and changes in vacancy levels and expenses over the projection period. The net sale price of the property at the end of the projection period must also be estimated. The concluded yield rate is then applied to convert anticipated economic benefits into present value.

Practitioners who use direct capitalization must recognize that, while an overall capitalization rate is only applied to one characteristic of the property (i.e., to a single period's income), the overall capitalization rate is valid only if it accounts for all the other characteristics of the property.[11] For example, suppose that annual increases of 3% are forecast in the net rent of a comparable sale property and an overall capitalization rate of 10% for the comparable property is extracted from the market data. Furthermore, suppose that annual increases of 2% are forecast in the net rent of the subject property. Applying the overall capitalization rate of 10% extracted from the sale property to the income stream of the subject property is a misapplication of the approach and would overstate the subject property's value.

In yield capitalization, specific conclusions must be drawn about changes in net income, cash flow, and property value over the projection period. These conclusions are set forth in forecasts of future income and property reversion.

Also, specific investment goals for the return on and of invested capital can be considered in yield capitalization. The property's projected income and reversion are discounted to a present value by applying the market's anticipated yield rate in the present value procedure. Yield rates can be derived (from comparable sales, interviews, etc.) with formulas and factors obtained from financial tables or calculated and applied with financial calculators or personal computers. Various software programs can also be used to discount cash flows.

Both direct capitalization and yield capitalization are market-derived techniques, and when applied correctly they should result in similar value indications for a subject property. In applying the income capitalization approach, appraisers do not need to limit the analysis to a single capitalization method. With adequate information and proper use, direct and yield capitalization methods should produce similar results. If differences arise, an appraiser should check that the various techniques have been applied correctly and consistently and that the analysis reflects the actions of market participants. The results derived from the application of different capitalization techniques should be reconciled within the income capitalization approach and may be considered again in final reconciliation.

---

11. See David C. Lennhoff, "Direct Capitalization: It Might Be Simple But It Isn't That Easy," *The Appraisal Journal* (Winter 2011): 66-73.

BACK_DEFEXP-RR-002852

BACK_DEFEXP-RR-002853

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Income and Expense Analysis  **24**

To apply any capitalization procedure, a reliable estimate of income expectancy must be developed. Although an appraiser may consider the actual income of the subject property at the time of the appraisal, valuation is based on a projection of future income. Among other things, an appraiser should consider the future outlook both in estimating income and expenses and in selecting the appropriate capitalization methodology to use. The consideration of future income is consistent with the principle of anticipation, which holds that value is the present worth of future benefits.

Historical income and current income are significant, but the ultimate concern is the future. The earning history of a property is important to the degree that as it is accepted by buyers as an indication of the future, and the prior year's income should be analyzed as a good basis for projection and reasons for variance understood and explained. Current income is a good starting point, but the direction and expected pattern of income change are critical to the capitalization process.

Many types of first-year income can be converted into value estimates for different property interests using direct capitalization. Some examples are

- Net operating income ($NOI$ or $I_O$)
- Equity income ($I_E$)

In yield capitalization, periodic cash flows and appropriate reversion values can be used to estimate the value of different property interests, including:

- Annual $I_O$ and property reversion, when applicable, over a projection period for a leased fee ($V_{LF}$), fee simple ($V_O$), or leasehold value ($V_{LH}$)
- Annual income to equity ($I_E$) and equity reversion over a projection period for an equity value ($V_E$)
- Property cash flow considering tenant improvements (TIs) and leasing commissions, and property reversion over the projection period for a leased fee or fee simple value

BACK_DEFEXP-RR-002854

When applying either direct or yield capitalization, reliable projections of income are critical to credible assignment results. Significant value differences can result when the same capitalization rate or potential gross income multiplier is used to convert different income estimates into value. For example, a gross income multiplier of 11.0% applied to potential income estimates of $50,000 and $55,000 results in value estimates of $550,000 and $605,000. A $5,000 difference in potential gross income produces a $55,000 difference in value. Similarly, applying an overall capitalization rate of 6.0% to net operating income estimates of $35,000 and $40,000 results in value estimates of $583,333 and $666,667. In this example, a $5,000 difference in net operating income results in a $83,334 value difference. Income forecasting is a sensitive and crucial part of income capitalization because income projections have a significant effect on value.

An appraiser may estimate income for a single year or series of years depending on the property type, the data available, and the capitalization method employed. The analysis can be based on

- A reconstructed income/expense statement
- A forecast of income for the first year of the investment
- Stabilized income for the first year
- A forecast of income over a specified projection period
- A level-equivalent annual income over a specific projection period

If an opinion of market value is sought, the income forecast should reflect the expectations of market participants, i.e., the space users competing in the fundamental market. In an assignment to develop an opinion of investment value, an appraiser may base the income forecasts on the specific ownership or management requirements of that market segment.

If a partial interest is being valued, the equity income may be used as the basis of the analysis. In this case, annual mortgage debt service is deducted from net operating income to calculate the equity income. Sometimes debt service is based on an existing mortgage and the amount is specified. In other cases, debt service must be estimated based on the typical mortgage terms indicated by current market activity and the property type being appraised.

Table 24.1 lists the key elements to investigate in developing income and expense estimates for various property types. The specific line items involved in the generation of income and the allocation of expenses may vary for different property types.

## Estimating Market Rent

An investigation of market rent levels starts with the subject property and the property attributes. An appraiser can verify the subject property's current rent schedule by examining financial statements, tenant files, and executed and pending leases as well as interviewing selected tenants during property inspection. Further verification may be necessary if the owner's or manager's information is in doubt or if it is required based on the scope of work. The sum of current rents may be compared with previous totals using operating statements for the past several years. Statements of rents, including the rent paid under percentage leases or escalation clauses, should be examined for all building tenants. After analyzing the existing rent schedule for the subject

BACK_DEFEXP-RR-002855

Copyrighted material licensed by Charles Brigden on September 17, 2020

| Table 24.1 | Characteristic Income and Expenses of Principal Property Types |
|---|---|

**Industrial Buildings**

| | |
|---|---|
| Lease and income | Medium- to long-term net or modified gross lease. |
| Expenses | Tenants pay most operating expenses and sometimes prorated property taxes, insurance, and exterior maintenance; landlord pays management expenses; tenant improvement allowance sometimes provided by landlord; leasing commissions paid by landlord to agent or broker. |

**Retail Properties**

*Major (anchor) tenants*

| | |
|---|---|
| Lease and income | Long-term net lease; base and percentage (overage) rent. |
| Expenses | Tenants pay utilities, interior maintenance, and common area maintenance (such expense recoveries are prorated); tenants may share in advertising and management expenses; tenant improvement allowance provided by landlord; anchor tenant's common area maintenance and realty taxes may be subsidized by the non-anchor tenants that benefit from customer traffic generated by the anchor; leasing commissions paid by landlord to agent or broker; tenant improvements and leasing commissions are typically treated as below-the-line items (i.e., not deducted before derivation of net operating income). |

*Smaller (local) tenants*

| | |
|---|---|
| Lease and income | Short- to medium-term net lease; base and percentage (overage) rent. |
| Expenses | Tenants pay utilities, interior maintenance, and common area maintenance (these expense recoveries are prorated); tenants may share in advertising and management expenses; tenant improvement allowance provided by landlord; leasing commissions paid by landlord to agent or broker; tenant improvements and leasing commissions are typically treated as below-the-line items. |

**Multifamily Residential Properties**

| | |
|---|---|
| Lease and income | Lease for one year or less; modified gross lease. |
| Expenses | Tenants often pay own utility expenses; landlord pays property taxes, insurance, management, and maintenance; replacement allowance may be treated as an above-the-line item; no tenant improvement allowance. |

**Office Buildings**

| | |
|---|---|
| Lease and income | Medium- to long-term lease; base rent may be adjusted upward on an escalation basis according to an index. |
| Expenses | Under a gross lease, landlord pays all operating expenses; under a net lease, tenants pay all expenses; leases may contain provisions to pass through any increase in certain expenses over a specified base amount and customarily on a per-square-foot basis. Tenant improvement allowance provided by landlord; leasing commissions paid by landlord to agent or broker. Both are treated as below-the-line expenses. |

Note: The treatment of expenses described here is typical in many, but not all, markets.

property, an appraiser converts all rents to a unit basis (e.g., per square foot) for comparison. All differences in rents within the property are described and explained. Then rental data for comparable space in the market is assembled so that equivalent market rents can be estimated and reduced to an appropriate unit of comparison.

When a market rent estimate for the subject property is required, comparable rental data is gathered, compared, and adjusted. The parties to each lease should be identified to ensure that those held responsible for rent payments are actually parties to the leases or, by endorsement, the guarantors. It is also important to ascertain that the lease represents a freely negotiated, arm's-length transaction. A lease that does not meet these criteria—such as a lease between related entities (e.g., the landlord and the tenant have common ownership or common interests)—often does not provide a reliable indication

BACK_DEFEXP-RR-002856

of market rent. Sale-leaseback transactions must be used with caution because the lease is usually negotiated as part of the sale rather than as an independent, market-based lease negotiation. Sale-leasebacks that are negotiated as financing vehicles may reflect motivations of the tenant and landlord that are not typical of the market.

The rents of comparable properties can provide a basis for estimating market rent for a subject property once they have been reduced to the same unit basis applied to the subject property. Comparable rents may be adjusted just as the transaction prices of comparable properties are adjusted in the sales comparison approach. Recently executed and pending leases for the subject property may be a good indication of market rent, but lease renewals or extensions negotiated with existing tenants should be analyzed with caution. Existing tenants may be willing to pay higher rents to avoid the cost of relocating. Alternatively, a landlord may offer existing tenants lower rent to avoid vacancies and the expense of obtaining new tenants.

The elements of comparison considered in rental analysis are

| | |
|---|---|
| Real property rights being leased and conditions of rental | Rentals that do not reflect arm's-length negotiations will generally not provide meaningful information as comparables. |
| Market conditions | Economic conditions change, so leases negotiated in the past may not reflect current prevailing rents |
| Location | Time-distance linkages and unit-specific locations in project |
| Physical characteristics | Size, height, width, depth, interior finish, functional layout, site amenities, etc. |
| Division of expenses stipulated in the lease and other lease terms | Were concessions made? Who pays operating expenses? What are the provisions regarding changing the rent during the term of the lease? |
| Use of the property | Market rents might have to be adjusted for the use or level of build-out of the subject property when it differs from that of the comparable. |
| Non-realty components | Are furniture, fixtures, and equipment included? For example, if a land owner agrees to a build-to-suit lease in which all the cost of construction, as well as the cost of interior shelving units, counters, glass enclosures, refrigerators, and security systems are converted to a rental payment, the lease rate will reflect more than the income to the real property. The lease rate could also include the value of a business franchise or a business operation or the cost of other business licenses or property. Leases can include real property, personal property, or intangible property. |

The amount of data needed to support a market rent estimate for a subject property depends on the complexity of the appraisal problem and the availability of directly comparable rentals. When sufficient, closely comparable rental data is not available, an appraiser should include other data, preferably data that can be adjusted. When analyzed properly, a reasonably clear pattern of market rents should emerge.

## Income and Expense Data

To derive pertinent income and expense data, an appraiser investigates comparable sales and rentals of competitive income-producing properties in the same market

BACK_DEFEXP-RR-002857

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Interests

To a certain extent, the interest being appraised determines how rents are analyzed and estimated. The valuation of fee simple interests in income-producing real estate begins with an estimate of the market rent the property is capable of generating. Therefore, to value proposed projects without actual leases, properties with unleased space, and owner-occupied properties, market rent estimates are used in the income capitalization approach.

To value the leased fee, appraisers consider contract rent for leased space, which may or may not be at market levels, and market rent for vacant and owner-occupied space. When discounted cash flow analysis is used, future market rent forecasts are required to estimate income after existing leases expire. It should be emphasized that the discounting of contract rents does not result in an opinion of the market value of the fee simple. It results in an opinion of the market value of the leased fee.

To value a leased fee in a recently completed, income-producing property that has not achieved stabilized occupancy, an appropriate vacancy and collection loss must be forecast over an appropriate absorption or lease-up period. Appraisals of proposed properties for lending purposes often require value estimates at different stages in the property's development:

- As is
- When completed
- At stabilization

The value as is of a proposed development is typically the current value of the vacant land. The other two values are prospective values as of the completion of construction (value considering lease-up of space at that time) and when the property actually achieves stabilized occupancy.

or competing markets. For investment properties, current and recent incomes are reviewed, and vacancy and collection losses and typical operating expenses are studied. Interviews with owners, tenants, and brokers in the area can provide lease and expense data.

Appraisers try to obtain all income and expense data from the income-producing properties used as comparables. This data is tabulated in a reconstructed operating statement and filed by property type. (A suggested format for reconstructed operating statements is illustrated later in this chapter.)

Like expense data, rental information is difficult to obtain. Therefore, appraisers should take every opportunity to add rents to their rental databases. Appraisers should keep their own records because leases are rarely in public records. A separate county index may cite the parties to recorded leases and the volume and page where leases are recorded. Sometimes this information is listed with deeds and mortgages, but it is not usually coded for easy identification. In certain cities, abstracts of recorded leases are printed by private publishing services. In the majority of cases, however, leases are not publicly recorded. Classified ads may also provide rental information and can be found using various online sources. Many appraisers periodically check advertised rentals and recorded rental information by property type or area. It is convenient to file rental data under the same property use classifications used for sales data.

Income and expense figures should be converted to appropriate units of comparison for analysis. For example, income may be reported in terms of rent per apartment unit, per room, per hospital bed, or per square foot. Expenses for insurance, taxes, painting, decorating, and other required maintenance can be expressed in the same units of comparison used for income, or they can be expressed as a percentage of the effective gross income. The unit of comparison selected must be used consistently throughout the analysis of the subject property and in the rental database information.

BACK_DEFEXP-RR-002858

Rental property data may show vacancy rates as a percentage of potential gross income and operating expenses as a percentage of effective gross income. This data is essential in valuing income-producing property.

### Lease Data

If written executed leases exist and the income estimate is based on the continuation of lease income, an appraiser examines leases for provisions that could affect the quantity, quality, and durability of property income. The appraiser may either read the leases or rely on the client or another authorized party to disclose all pertinent lease provisions through lease summaries or briefs. In any case, the source of information and level of verification should be described in the scope of work section of the appraisal report. The appraiser also analyzes the leases of competitive properties to estimate market rent and other forms of income applicable to the market for competitive space.

Typical lease data includes

- Date of the lease
- Reference information, if the lease is recorded
- Legal description or other identification of the leased premises
- Name of lessor—i.e., owner or landlord
- Name of lessee—i.e., tenant
- Lease term
- Occupancy date
- Commencement date for rent payment
- Rent amount, including any percentage clause, graduation, and payment terms
- Rent concessions, including any discounts or benefits
- Landlord's covenants—i.e., items such as taxes, insurance, and maintenance for which the owner or landlord is responsible
- Tenant's covenants—i.e., items such as taxes, insurance, maintenance, utilities, and cleaning expenses for which the tenant is responsible
- Right of assignment or right to sublet—i.e., whether the leasehold, or tenant's interest, may be assigned or sublet, under what conditions, and whether assignment relieves the initial tenant of future liability
- Option (or options) to renew or extend the lease, including the date of required notice, term of renewal, rent, and other renewal provisions
- Option to purchase
- Expense caps and expense stops, escalation rent, and expense recoveries
- Options to purchase and any accompanying conditions
- Escape clauses, termination clauses, cancellation clauses, kick-out clauses, and most-favored-tenant clauses
- Continued occupancy contingency
- Security deposits, including advance rent, bond, or expenditures by the tenant for items such as leasehold improvements
- Casualty loss—i.e., whether the lease continues after a fire or other disaster and on what basis

BACK_DEFEXP-RR-002859

Copyrighted material licensed by Charles Brigden on September 17, 2020

- Lessee's improvements, including whether they can be removed when the lease expires and to whom they belong
- Use clause
- Noncompete and exclusive use clauses
- Condemnation, including the respective rights of the lessor and the lessee if all or any part of the property is appropriated by a public agency
- Revaluation clauses
- Dispute resolution clauses
- Special provisions (e.g., the landlord's right to relocate a tenant at the landlord's expense)

Special attention should be paid to lease data on rent, rent concessions, the division of expenses, renewal options, escalation clauses, purchase options, escape clauses, and tenant improvements.

A sample form for analyzing a typical office lease is shown in Figure 24.1.

### Rent
The amount of rent to be paid by the tenant is basic lease data. An appraiser considers rent from all sources, which may include base or minimum rent, percentage rent, and escalation rent. The sources of rental income should be clearly identified.

### Rent Concessions
In some real estate markets, landlords may give tenants concessions such as free rent for a specified period of time or extra tenant improvements. In shopping center leases, retail store tenants are sometimes given rent credit for interior store improvements. Rent concessions often result from imbalanced market conditions and the relative negotiating strengths of the landlord and the tenant. For example, anchor tenants in retail complexes are generally able to negotiate leases on favorable terms and conditions. Concessions are also used as a marketing tool in lease negotiations, such as when the owner specifies an above-market rent with a rent concession bringing it down to the market rate. Landlords offer concessions when demand is weak and there is increased competition among landlords to attract new tenants. It is not unusual for free rent concessions to be given outside of the lease term so that the concessions do not appear on the written lease contract. In these situations, appraisers must still consider the lease concessions when calculating the effective rent being paid. Concessions together with tenant improvement allowances influence market rent estimates.

### Division of Expenses between the Lessor and Lessee
Most leases outline the obligations of the lessor and the lessee, specifying who must pay for taxes, insurance, utilities, heat, janitorial service (if any), repairs, unit owner's or common area maintenance (CAM) expenses, and other expenses required to maintain and operate the leased property. Appraisers should identify the division of expenses in each lease analyzed and compare the rents and estimated rental value of the subject space to those of the comparables. Any required adjustments for the division of expenses in comparable properties should reflect the same lease terms and division of expenses as the subject property.

BACK_DEFEXP-RR-002860

**Figure 24.1**   Office Space Rental Worksheet

Building _____

Suite No./Identifier _____   Floor _____

Lessor _____

Lessee _____   Guarantor _____

Rentable area _____   Usable area _____   Rentable/usable area ratio _____

Lease date _____   Commencement _____   Expiration _____

Base rent _____   CPI escalation ❏ Yes   ❏ No   ❏ Floor or cap

Graduations _____

_____

Tenant improvements (by owner) _____

Tenant improvements (by tenant) _____

Special provisions _____

_____

| Who pays | Lessor | Lessee | Stop | Stop Amount per Sq. Ft. | Cap | Cap Amount per Sq. Ft. |
|---|---|---|---|---|---|---|
| Fixed expenses | | | | | | |
|   Real estate taxes | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|   Property insurance (fire, storm, vandalism) | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|   Variable expenses | | | | | | |
|     Tenant space utilities | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|     Common area utilities | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|     Tenant space HVAC | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|     Common area HVAC | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|   Tenant space cleaning (janitorial service) | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|   Common area cleaning | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|   Repairs and maintenance | | | | | | |
|     Exterior | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|     Interior | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|   Management | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
|   Other expenses (if any) | ❏ | ❏ | ❏ | _____ | ❏ | _____ |
| _____ | ❏ | ❏ | ❏ | _____ | ❏ | _____ |

**Renewal options**

How many _____   Years each _____

New rent _____

New escalation (and base year) _____

New tenant improvements _____

Concessions _____

Comments _____

_____

_____

BACK_DEFEXP-RR-002861

### Renewal Options

Renewal options that allow a tenant to extend the lease term for one or more prescribed periods of time are frequently included in leases. A typical renewal option requires that the tenant provide advance notice of the intention to renew. The lease also must identify the length of the renewal period or periods and the rent or method of determining the rent to be paid. The extension period rent may be set at the original rent or at a level determined when the lease was negotiated, or it may be calculated with a procedure or formula specified in the lease. Renewal options are binding on the landlord but allow the tenant to make a decision based on the circumstances at the time of renewal. Thus, renewal options tend to favor the tenant.

If the terms of the renewal option are favorable to a tenant, this fact should be noted in the appraisal report, and in this case an appraiser may be justified in concluding that the tenant would exercise the option to renew. If the terms of the renewal option are not favorable to the tenant, this fact should still be pointed out, and the appraiser may conclude that the tenant would not exercise the option to renew. This is particularly important in discounted cash flow analysis, where it might have a significant effect on an appraiser's selection of a projection period as well as projections of outlays for downtime between leases, tenant improvements, and leasing commissions.

### Expense Stop and Expense Cap Clauses

Leases often include clauses that limit the expenses that either the landlord or the tenant will pay. With an expense stop, the landlord meets defined operating expenses to a specified level, with expenses above this amount being the responsibility of the tenant. This allows the landlord to pass through any increases above the specified level over time and protects the landlord against unforeseen increases in expenses. Often the level of expenses incurred during the first year of the lease is specified as the level of the stop, although a stated amount per square foot is sometimes used. With an expense cap, operating expenses are borne by the tenant to a specified level above which the landlord picks up the expenses. The cap defines the tenant's maximum obligations and limits the tenant's exposure to the risk of increasing expenses.

Expense stop clauses are often added to traditional gross or flat rental leases. In multitenant office buildings, increased expenses are sometimes prorated among the tenants in proportion to the area they occupy or on some other equitable basis. The prorated shares are then added to the tenants' rents. The expenses allocated to vacant space are normally paid by the owner.

Sometimes a single stop provision is used to cover all the expenses to be passed through to the tenants. Alternatively, an expense stop might be specified for individual expense items. For example, tax stop clauses provide that any increases in taxes over a specified level be passed on to the tenant.

### Escalation Clauses and Expense Recovery Clauses

An escalation clause helps a landlord offset increases in operating expenses in non-net lease situations, with expense increases passed on to tenants on a pro rata basis through an adjustment to rent.

An expense recovery clause stipulates that some or all operating expenses paid by the landlord are recoverable from the tenant. In different parts of the country, expense recoveries are known as *reimbursables*, *billables*, or *pass-throughs*. Some of these items (e.g., common area maintenance charges) may be considered under operating

BACK_DEFEXP-RR-002862

expenses, while others may be considered under replacement allowances. Expense recoveries are usually treated as separate revenue items, and recoverable expenses are usually deducted as expenses in income and expense statements. This methodology allows for the consideration of landlord exposure to tenant-paid expenses on vacant space. The analysis should consider whether the recoverable items have historically been recovered and the probability of recovery in the future.

### Purchase Options

Certain leases include a clause granting the lessee (tenant) an option to purchase the leased property or to match any offer to purchase. The relationship of contract to market rent and other factors will influence the likelihood of a tenant exercising such an option. In some cases, this option must be exercised on the lease termination date or at some point or points during the lease term. In other cases, this option may be available at any time. The option price may be fixed or it may change periodically based on an empirical formula, depreciated book value, or revaluation of the property. A purchase option may only give the lessee the right to purchase the property or make an offer if an offer to purchase is made by a third party. This provision is referred to as a *right of first refusal*. A purchase option can restrict marketability and the price a third-party buyer will pay for the property. The option price, if stated, may represent a limit on the market value of the leased fee estate.

### Escape, Kick-Out, Cotenancy, and Buyout Clauses

Landlords and tenants may have reasons for terminating a lease prior to the end of a lease term, and a lease agreement often includes language that protects both parties in case of a default or other form of termination. For example, an escape clause may permit a tenant to cancel a lease under circumstances that would not ordinarily be considered justification for lease cancellation. A condemnation or casualty clause might allow the tenant to cancel the lease if a condemnation or casualty loss hinders operations. A casualty clause may stipulate that the landlord be allowed a reasonable amount of time to make necessary repairs and provide for appropriate abatement of rent in the interim. A landlord might include a demolition clause in a lease to preserve the prospects for sale or redevelopment of the site. This type of escape clause can affect rent levels and market value.

A kick-out clause written into a lease allows a landlord to cancel a lease upon the occurrence of a specific event, e.g., if sales have not achieved a predetermined level after a certain period of time. Kick-out clauses may create risk and warrant adjustments to discount rates or capitalization rates used in direct capitalization.

Co-tenancy clauses in retail leases permit tenants to reduce the rent or terminate a lease if the landlord has not replaced an anchor tenant or other specified tenant or tenant types within a predetermined period. For a tenant, the purpose of a cotenancy clause is typically to ensure a certain level of traffic within a shopping center through the continuous operation of other tenants. Cotenancy clauses may have a significant effect on property performance if they are exercised.

In the event of bankruptcy of either the landlord or tenant, the US Bankruptcy Code (last revised in 2019) is generally agreed to supersede any lease provisions relating to the bankruptcy of one of the parties. The bankruptcy of a tenant can have a significant effect on the value of commercial properties because of the length of typical leases. However, section 365 of the Bankruptcy Code caps the damages a landlord can

BACK_DEFEXP-RR-002863

Copyrighted material licensed by Charles Brigden on September 17, 2020

claim from the rejection of a long-term lease contract by a party in Chapter 11 bank-ruptcy proceedings, although the courts have interpreted the language differently.

Buyout clauses provide for a payment by either a landlord or a tenant to the other to induce the cancellation of a lease. The amount of the payment may be set by the lease or be negotiated at the time of the cancellation.

Termination clauses in leases permit the tenant to terminate the lease within a specified period after giving notice.

Most-favored-tenant clauses are sometimes found in leases to major tenants. The terms of these leases require the landlord to reduce the lease rate per square foot for this tenant to equal a lower lease rate subsequently executed with another tenant.

### Continued Occupancy Clauses

Multitenant properties may be subject to leases that condition the continued occu-pancy of one tenant on the occupancy of another tenant. An anchor tenant's decision to vacate during the lease term can precipitate the departure of other tenants as well. In appraising shopping centers, the probability of an anchor tenant leaving at or before expiration of the current lease must be carefully analyzed. This is true whether or not the satellite (i.e., non-anchor) stores have leases conditioning their occupancy on the continued occupancy of the anchor tenant. Small stores are often unable to continue operation if the anchor leaves the center.

When capital expenditures that are not accounted for in the asking rent are made by the lessor, reimbursement may be accomplished through marginally higher rent that amortizes the lessor's expenditures over all or part of the lease period. If capital expenditures are made by the tenant, the lessor may reduce the tenant's rent for all or part of the lease term as compensation for such tenant expenditures. In many retail environments, the rents vary directly with the level of build-out provided to the ten-ant. When using these leases as comparable data, the level of build-out supplied with the rent is an important element of comparison.

Tenant improvements are driven by the market—i.e., they are only done if the market dictates it. Also, tenant improvements are dictated by the particular lease agree-ment and do not apply to all property types. The standard maintenance and upkeep of an apartment unit before renting the unit to a new tenant is not usually considered a tenant improvement, unless the cleaning and refurbishment exceed the typical levels needed to maintain the property's competitiveness in the market. If the tenant improve-ments directly affect net operating income and are recorded above the *NOI* line in a reconstructed operating statement, they are considered above-the-line expenses. More often, they are treated as below-the-line expenses.

A developer or owner may be responsible for a certain level of build-out or tenant improvements, and that will be reflected in the rent as defined in a tenant workletter. Improvements in excess of that level are the responsibility of tenants and are not reflected in the rent, or they may be provided by the landlord and amortized over time. The level of build-out may be different for new space versus retrofitting existing space, and the level of tenant improvements may be different for a new ten-ant and a renewal tenant.

### Noncompete, Dark Store, and Exclusive Use Clauses

Leases may contain a provision that prohibits tenants from operating a business in a nearby, competing shopping center. For example, a tenant who sells sporting goods

BACK_DEFEXP-RR-002864

may agree not to open another, competing sporting goods facility near the shopping center. This type of non-compete clause is known as a radius restriction.

In some jurisdictions, a lease may include a clause stating that the tenant must continue to occupy the property throughout the term of the lease and is barred from opening a competitive store within a certain period after the expiration date of the lease. A dark store clause protects a landlord, whose property could be put in a poor releasing position if a tenant moves out and opens another store within the same trade area. A dark store clause may be especially important in a percentage lease involving an anchor or other major tenant. A dark store clause may sometimes be referred to as a *go dark clause*, which is also sometimes used to describe the kick-out clause discussed previously. Alternatively, what is described as a go dark clause may allow a tenant to take a leased space out of service while continuing to pay rent.

An exclusive use clause may be written into a lease to control the retail mix of the shopping center. Such a clause may also be sought by a tenant who wants to achieve some degree of monopoly status (e.g., a fast food chain that wants to have the only restaurant of its type in the shopping center).

## Developing Reconstructed Operating Statements

Assessing the earning power of a property means reaching a conclusion regarding its net operating income expectancy. Appraisers estimate income and expenses after researching and analyzing the following:

- The income and expense history of the subject property
- Income and expense histories of competitive properties
- Recently signed leases, proposed leases, rejected lease proposals, and asking rents for the subject and competitive properties
- Actual vacancy levels for the subject and competitive properties
- Management expenses for the subject and competitive properties
- Operating expense data and operating expenses at the subject and competitive properties
- Forecast changes in taxes, energy costs, and other operating expenses

Appraisers often present this information in tabular form to assist the reader of the report. Income and expenses are generally reported in annual or monthly dollar amounts and analyzed in terms of nominal dollar amounts per unit of rentable area or another unit of comparison. To show how historical and forecast data on operating expenses is commonly arrayed, Table 24.2 summarizes the operating expense history of a downtown office building with 60,000 square feet of rentable space. Table 24.3 summarizes the operating expenses of five comparable properties in the same market area and allows for easy comparison of the subject property and the comparables. It is obvious that the total operating expenses of the subject, at $15.82 per square foot for the year being studied, are significantly higher than those of the comparables, which range from $13.73 to $15.07 per square foot. For most of the operating expenses listed, the per-unit expenses for the subject fall within the ranges set by the comparable properties; but the expenses for electricity, at $4.14 per square foot, and cleaning, at $2.28 per square foot, are higher than for any of the comparables. In this

BACK_DEFEXP-RR-002865

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 24.2**  Subject Property Operating Expense History

|  | Three Years Ago | | Two Years Ago | | One Year Ago | | Current Year Budget | |
|---|---|---|---|---|---|---|---|---|
|  | Dollars | Per Square Foot | Dollars | Per Square Foot | Dollars | Per Square Foot | Dollars | Per Square Foot |
| **Fixed expenses** | | | | | | | | |
| Real estate taxes | $232,812 | $3.88 | $272,378 | $4.54 | $314,433 | $5.24 | $323,400 | $5.39 |
| Insurance | 7,134 | 0.12 | 7,050 | 0.12 | 19,875 | 0.33 | 20,100 | 0.34 |
| **Variable expenses** | | | | | | | | |
| Electricity | $200,390 | $3.34 | $216,632 | $3.61 | $211,789 | $3.53 | $248,350 | $4.14 |
| Steam heat | 79,211 | 1.32 | 71,390 | 1.19 | 72,675 | 1.21 | 85,250 | 1.42 |
| Cleaning | 117,102 | 1.95 | 109,775 | 1.83 | 128,987 | 2.15 | 136,750 | 2.28 |
| Payroll | 8,432 | 0.14 | 10,208 | 0.17 | 11,386 | 0.19 | 12,600 | 0.21 |
| Repairs and maintenance | 17,388 | 0.29 | 30,688 | 0.51 | 38,875 | 0.65 | 52,825 | 0.88 |
| Water and sewer | 3,010 | 0.05 | 3,030 | 0.05 | 2,412 | 0.04 | 4,800 | 0.08 |
| Administrative, legal, and accounting | 1,180 | 0.02 | 1,778 | 0.03 | 10,856 | 0.18 | 10,850 | 0.18 |
| Management fees | 47,570 | 0.79 | 49,300 | 0.82 | 50,100 | 0.84 | 53,500 | 0.89 |
| Miscellaneous | 3,031 | 0.05 | 88 | 0.001 | 610 | 0.01 | 600 | 0.01 |
| Total operating expenses | $717,260 | $11.95 | $772,317 | $12.87 | $861,998 | $14.37 | $949,025 | $15.82 |

Note: Figures have been rounded.

**Table 24.3**  Analysis of Operating Expenses of Comparable Properties

|  |  | Comparable Properties | | | | |
|---|---|---|---|---|---|---|
|  |  | A | B | C | D | E |
|  | Subject Property Pro Forma | 130 Main Street | 110 Second Avenue | 717 Fourth Avenue | 133 Third Avenue | One Commerce Plaza |
| Operating year | Current | 1 year ago | 1 year ago | 1 year ago | 1 year ago | 1 year ago |
| Year built | 7 years ago | 7 years ago | 18 years ago | 25 years ago | 22 years ago | 8 years ago |
| Rentable area in square feet | 60,000 | 75,000 | 49,411 | 56,411 | 52,000 | 66,000 |
| **Operating Expenses*** | | | | | | |
| **Fixed expenses** | | | | | | |
| Real estate taxes | $5.39 | $5.51 | $5.48 | $5.01 | $5.47 | $5.35 |
| Insurance | 0.34 | 0.18 | 0.27 | 0.30 | 0.51 | 0.27 |
| **Variable expenses** | | | | | | |
| Electricity | $4.14 | $4.03 | $3.47 | $3.31 | $3.25 | $3.45 |
| Steam heat | 1.42 | 1.25 | 1.60 | 1.35 | 1.75 | 1.55 |
| Cleaning | 2.28 | 1.61 | 1.38 | 1.27 | 1.28 | 1.30 |
| Payroll | 0.21 | 0.25 | 0.32 | 0.78 | 0.73 | 0.21 |
| Repairs and maintenance | 0.88 | 0.45 | 0.63 | 0.98 | 0.99 | 0.38 |
| Water and sewer | 0.08 | 0.08 | 0.08 | 0.08 | 0.09 | 0.10 |
| Administrative, legal, and accounting | 0.18 | 0.19 | 0.19 | 0.26 | 0.08 | 0.11 |
| Management fees | 0.89 | 0.80 | 0.80 | 0.80 | 0.90 | 1.00 |
| Miscellaneous | 0.01 | 0.02 | 0.01 | 0.02 | 0.02 | 0.01 |
| Total operating expenses | $15.82 | $14.37 | $14.23 | $14.16 | $15.07 | $13.73 |

* Per square foot

BACK_DEFEXP-RR-002866

case, the appraiser will have to investigate the reasons for the higher costs of electricity and cleaning for the subject property.

After thoroughly analyzing property and lease data for the subject and comparable properties, an appraiser develops a net operating income estimate for the subject property. If the appraiser is focusing on the benefits accruing to the equity investment, the equity income is also estimated.

## Potential Gross Income

Appraisers usually analyze potential gross income on an annual basis. Potential gross income comprises

- Rent for all space in the property—e.g., contract rent for current leases (when appraising the lease fee interest), market rent for vacant or owner-occupied space, percentage and overage rent for retail properties
- Rent from escalation clauses
- Reimbursement income
- All other forms of income to the real property—e.g., income from services supplied to the tenants, such as secretarial service, switchboard service, antenna connections, storage and garage space, and income from coin-operated equipment and parking fees

Because service-derived income may or may not be attributable to the real property, an appraiser might find it inappropriate to include this income in the property's potential gross income. An appraiser may treat such income as business income or as personal property income, depending on its source. If a form of income is subject to vacancy and collection loss, it should be incorporated into potential gross income, and the appropriate vacancy and collection charge should be made to reflect effective gross income.

## Vacancy and Collection Loss

Vacancy and collection loss is an allowance for reductions in potential gross income attributable to vacancies, tenant turnover, and nonpayment of rent or other income over the projection period. This line item considers two components:

- Physical vacancy as a loss in income
- Collection loss due to default by tenants

The rents collected each year are typically less than annual potential gross income, so an allowance for vacancy and collection loss is usually included in the appraisal of income-producing property. The allowance is usually estimated as a percentage of potential gross income, which varies depending on the type and characteristics of the property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions.

An appraiser should survey the local market to support the vacancy estimate. Published surveys of similar properties under similar conditions may be helpful but should be used with caution as they are not necessarily indicative of current, local market conditions. The conclusion in the income capitalization approach may differ from the current vacancy level indicated by primary or secondary data because the

BACK_DEFEXP-RR-002867

estimate reflects typical investor expectations for the subject property only over the projection period.

## Effective Gross Income

Effective gross income is calculated as the potential gross income minus the vacancy and collection loss allowance.

## Operating Expenses

Operating expenses may be recorded in categories selected by the property owner. The records also may follow a standard system of accounting established by an association of owners or by accounting firms that serve a particular segment of the real estate market. Generally, operating expenses are divided into three categories:

- Fixed expenses
- Variable expenses
- Replacement allowance

However operating expenses are organized, an appraiser analyzes and reconstructs expense statements to develop an estimate of the typical operating expense forecast for the property on an annual cash basis.

### Fixed Expenses

Most reconstructed operating statements contain line items for real estate taxes and insurance costs. Because the concept of market value presumes a sale, the real estate tax projection should consider the impact of the presumed sale on the anticipated assessed value and taxes. Tax data can be found in public records, and the assessor's office may provide information about projected changes in assessments or rates and their probable effect on future taxes. In some jurisdictions, a property is reassessed to reflect its market value upon sale. When this is the case, the real estate taxes will need to reflect the reassessment. If a property is assessed unfairly, the real estate tax expense may need to be adjusted in the reconstructed operating statement. If the subject property has an unusually low assessment compared to similar properties or appears to deviate from the general pattern of taxation in the jurisdiction, the most probable amount and trend of future taxes must be considered. Any past changes in the assessment of the subject property should be studied. If the assessment is low, the assessor may be required by law to raise it. If the figure is high, however, a reduction may not be easy to get. In projecting real estate taxes, an appraiser tries to anticipate tax assessments based on jurisdictional laws and regulations, past tax trends, present taxes, the municipality's future expenditures, the perceptions of market, and local assessment practices.

For proposed properties, properties that are not currently assessed, or properties that will be reassessed to reflect market value upon sale, appraisers can develop operating statement projections without including real estate taxes. The resulting estimate is net operating income before real estate taxes, and a provision for real estate taxes is included in the capitalization rate used to convert this net income into property value. For example, suppose that real estate taxes are typically 2% of market value and net operating income after real estate taxes would normally be capitalized at 8% to derive an opinion of market value for the subject property. In this case, the estimated net operating income before real estate taxes could be capitalized at 10%

BACK_DEFEXP-RR-002868

(8% + 2%) to derive a property value indication. (This is known as a *loaded capitalization rate*. Note that the tax load should represent the landlord's portion and may need to be adjusted for vacancy.)

Alternatively, real estate taxes for a proposed project might be based on building costs or the taxes paid by recently constructed, competitive properties. Appraisers should exercise care to determine applicable procedures in the jurisdiction in which the property is located. Any unusual, unpaid special assessments or other mandatory, one-time expenses should be addressed as a lump-sum adjustment at the end of the analysis, if that is what market participants would do.

An owner's operating expense statement may show the insurance premiums paid on a cash basis. If the premiums are not paid annually, they must be adjusted to an annual expense before they are included in the reconstructed operating statement. Fire, extended coverage, and owner's liability insurance are typical insurance items. Elevators, boilers, plate glass, or other items may also be insured, depending on the property type. An appraiser must determine the amount of insurance and, if it is inadequate or superadequate, adjust the annual cost to indicate appropriate coverage for the property. As with all projected expenses, the insurance expense estimate must reflect dynamic changes in the market such as the increase in insurance costs following an event like a catastrophic hurricane.

Insurance on business inventory, business liability, and other business property is the occupant's responsibility and therefore should not be charged to the operation of the real estate. When questions concerning coinsurance or terms of coverage arise, an appraiser might need to obtain professional insurance counsel. It is common for large real estate investors to obtain insurance premium discounts through blanket insurance policies on groups of properties. As these discounts apply to the particular business interest of that particular owner, these discounts should be analyzed by the appraiser to apply the most appropriate insurance premium for the subject property without consideration of any blanket policy discounts.

### Variable Expenses

Operating statements for large properties frequently list many types of variable expenses such as the following:

- Management
- Utilities—e.g., electricity, gas, water, and sewer
- Heat
- General payroll
- Cleaning
- Maintenance and repair of structure
- Decorating
- Grounds and parking area maintenance
- Miscellaneous—e.g., administrative, security, supplies, rubbish removal, and exterminating
- Leasing commissions

Management services may be contracted or provided by the property owner. The management expense may have two components: a professional property manage-

BACK_DEFEXP-RR-002869

ment fee and other expenses related to the operations of the asset. The property management fee is usually expressed as a percentage of effective gross income, which conforms to the local pattern of such charges for typical management.[1] For some property types there may be additional management expenses such as on-site supervision and the cost of maintaining and operating on-site facilities such as offices or managers' apartments. These additional management expenses, in conjunction with other management expenses such as the cost of telephone service, clerical help, legal or accounting services, printing and postage, and advertising and promotion, may be accounted for elsewhere in the expense statement. Management expenses may be included among recoverable operating expenses in certain markets for some property types. For some property types (such as multi-family properties), the use of a unit may be a part of the local manager's compensation. The appraiser may need to analyze the total in-kind payment to make sure it is consistent with market trends.

In some markets, standard retail leases contain a provision for levying administrative charges as a percentage of common area maintenance charges. These charges are typically treated as a mark-up to tenant reimbursements and may replace or be added to the management fee.

Utility expenses for an existing property are usually projected based on an analysis of past charges and current trends. The subject property's utility requirements can be compared with known utility expenses per unit of measure—e.g., per square foot, per room, per apartment unit—for similar properties to estimate probable future utility expenses. Hours of tenant operation may prove to be significant in the analysis. For example, the number of nights per week that a shopping center is open and the hours of after-dark operation will directly affect electricity consumption and may also affect expenses for maintenance and garbage removal. In analyzing utility expenses, appraisers recognize local circumstances and the current and expected future cost of all applicable utilities. The presence of "green," or energy-efficient building features such as solar panels can have a significant effect in reducing utility costs. Utilities may be paid entirely by the property owner or entirely by the tenant, or they may be shared. These expenses may be recouped as part of common area reimbursements or through a different utility reimbursement plan, e.g., a ratio utility billing system (RUBS) in a multifamily property.

Although the cost of electricity for leased space is frequently a tenant expense, and therefore not included in the operating expense statement, the owner may be responsible for lighting public areas, for the power needed to run elevators and other common building equipment, and for the cost of vacant space during the tenant turnover periods. Some regional shopping centers purchase electricity on a wholesale basis and resell it to the tenants on a retail basis, keeping the difference as profit. If this is the case, an appraiser should consider whether the profit component represents income to the business or income to the real property and whether this activity is legal in that particular jurisdiction.

When used for heating and air-conditioning, gas can be a major expense item that is either paid by the tenant or paid by the property owner and reflected in the rent.

---

1. Actual property management should be distinguished from asset management. Large, investment-grade properties are often held as part of a portfolio that includes both securities and real estate. The managers of these portfolios make critical decisions concerning when to acquire and sell a real estate asset, how to finance or when to refinance, and when to reposition a property in the market. Though their roles are distinct, the functions of a property manager and an asset manager may sometimes be intertwined. Asset management fees should not be included among the items enumerated as operating expenses for real property.

BACK_DEFEXP-RR-002870

The cost of water is a major consideration for industrial plants that use processes that depend on water and for multifamily projects in which the cost of sewer service is usually tied to the amount of water used. It is also an important consideration for laundries, restaurants, taverns, hotels, and similar operations. The leases for these properties may stipulate that the tenant pay this expense. If the owner typically pays for water, this charge should be included in the expense statement.

In municipalities with sewerage systems, a separate charge for use of the system may be paid by the tenant or the owner of the real estate. This total expense may be substantial, particularly for properties with high personal use, such as hotels, motels, recreational facilities, apartments, and office buildings.

The cost of heat is generally a tenant expense in single-tenant properties, industrial and retail properties, and apartment and office projects with individual heating units. It is a major expense item shown in operating statements for centrally heated apartment and office properties. The fuel consumed may be oil, gas, electricity, or public steam. Heating supplies, maintenance, and workers' wages are included in this expense category under certain accounting methods.

Public steam suppliers and gas companies maintain records of fuel consumption and corresponding degree days from year to year. (One degree day is equal to the number of degrees, during a 24-hour day, that the mean temperature falls below 65° Fahrenheit, which is the base temperature in the United States.) An appraiser can use these records and fuel cost data to compare the property's heating expense for the most recent years with a typical year. Probable changes in the cost of the fuel used should be reflected in the projection.

Air-conditioning expenses may be charged under the individual categories of electricity, gas, water, payroll, and repairs, or heating and air-conditioning may be combined under the category of heating, ventilation, and air-conditioning (HVAC). The cost of air-conditioning varies with local climatic conditions and the type of system installed. A projection of this expense may be based on typical unit charges for the community or the property type. Many office and apartment have central HVAC systems, and operating expenses are included in their annual statements. Most retail properties and some apartment buildings have individual heating and air-conditioning units that are operated by the tenants. The maintenance and repair of these units, particularly in apartments, may continue to be the property owner's obligation.

General payroll expenses include payments to all employees whose services are essential to property operation and management but whose salaries are not included in other specific expense categories. In some areas the cost of custodial or janitorial service is based on union wage schedules. In others the charge is negotiated based on local custom and practice. If a custodian or manager occupies an apartment as partial payment for his or her services, the apartment's rental value may be included as income and an identical amount deducted as an expense. In certain properties additional expenses are incurred to pay the salaries of security personnel, porters, and elevator operators. Unemployment and social security taxes for employees may be included under general payroll expenses or listed in a separate expense category.

In office buildings the cost of cleaning or janitorial services is a major expense and usually includes two elements: cleaning costs and cleaning supplies. It is usually estimated in terms of cost per square foot of rentable area, whether the work is done by payroll personnel or by an outside cleaning firm. This expense is equivalent to

BACK_DEFEXP-RR-002871

Copyrighted material licensed by Charles Brigden on September 17, 2020

maid service or housekeeping in hotels and furnished apartments. In hotels and motels, cleaning expenses are attributed to the rooms department and may be estimated as a percentage of the department's gross income. The percentage established reflects the property's previous experience and industry standards. Cleaning may be an owner or tenant expense, depending on the property type and lease provisions.

Maintenance and repair expenses are incurred during the year to maintain the structure and its major components, keep them in good working order, and maintain rent levels. These expenses may cover roof repair, window caulking, tuckpointing, exterior painting, and the repair of heating, lighting, and plumbing equipment. Maintenance costs may be paid by the tenants and repair costs by the owners. There may be a contract for elevator maintenance and repair, and often owners are still responsible for maintenance of the roof, HVAC system, and general structure. However, the coverage of these contracts varies, and appraisers must determine any additional operating expenses not covered by the maintenance contract. A contract covering air-conditioning equipment, for example, would probably be included in the air-conditioning expense category.

Alterations, including major replacements, modernization, and renovation, may be considered capital expenditures and therefore are not included as a periodic expense under repair and maintenance. If the lessor makes alterations in the rented space, the expense may or may not be amortized by additional rent. In some cases, the tenant may pay for alterations.

The total expense for property maintenance and repair is affected by the extent to which building components and equipment replacements are covered in the replacement allowance as well as the age, condition, and functional utility of the property. If an extensive replacement allowance is included in the reconstructed operating statement, annual maintenance and repair expenses may be reduced. Similarly, if an owner cures items of deferred maintenance, the annual maintenance and repair expenses may be reduced.

For some properties, historical expense records may include typical repairs and even capital expenses in an overall category called "repairs and maintenance." If this is the case, the reconstructed operating statement will need to show an adjustment to the historical data, especially where separate replacement allowances are included. The goal of the analysis is to consider all appropriate expenses over time as well as a replacement allowance to ensure the ongoing repair of major building components. (If revenue is based on total assets of the business, replacements for tangible personal property may be involved.) Also, there may be some crossover in the tenant improvement category and the replacement allowance or repair category. The same method should be applied to any comparable sales information to ensure consistency when the various rates and ratios are extracted and then applied to the subject property.

Decorating expenses may include the cost of interior painting, wallpapering, or wall cleaning in tenant or public areas. Decorating expenditures may vary with local practice and the supply and demand for space.

The cost of maintaining grounds and parking areas can vary widely depending on the type of property and its total site area. The cost of snow removal may be substantial in northern states, particularly for properties with outdoor parking in addition to sidewalks and driveways. Hard-surfaced public parking areas with drains, lights, and marked car spaces are subject to intensive wear and can be expensive to maintain. These expenses may be entirely or partly reimbursed through an increment

BACK_DEFEXP-RR-002872

added to the rents of tenants served by the facility. In this case both the added income and the added expenses are included in the reconstructed operating statement. Landscaping and lawn maintenance are also covered by this expense category.

Certain types of buildings in some areas may require security provisions, the cost of which will vary according to the number of employees needed to control entry and exit and to circulate through the property. Maintenance and energy expenses may also be incurred if security provisions include electric alarm systems, closed circuit television, or flood lighting.

The cost of cleaning materials, office supplies, and miscellaneous items not covered elsewhere may be included under supplies. Garbage and pest control services are usually contracted and their cost is included in the expense statement.

Expenses for miscellaneous items vary with property type. If this expense category represents a significant percentage of effective gross income, however, it may be wise to explain individual expense items or reallocate them to specific categories.

## Replacement Allowance

A replacement allowance provides for the periodic replacement of building components that wear out more rapidly than the building itself and must be replaced during the building's economic life. Depending on local practice, the replacement allowance may be reflected explicitly as an expense or implicitly in the capitalization or discount rate.

If shown specifically, the annual replacement allowance for each component of a property is usually estimated as the anticipated cost of its replacement prorated over its total economic life, provided this does not exceed the total economic life of the structure. Some appraisers use simple averaging (with or without calculating a sinking fund payment), while others prefer to show the actual cost and timing of these replacements. There are various ways to calculate a replacement allowance. The calculation method used should be consistent with the manner in which replacement allowances were treated for purposes of extracting capitalization rates from the comparable sales or discount rates from market data. New elevators or other components that are expected to have useful lives that equal or exceed the remaining economic life of the structure do not require an allowance for replacement, unless making replacements or installing new equipment increases the remaining economic life of the structure beyond that of the long-lived items. Examples of building components that may require a replacement allowance include

- Roof covering
- Carpeting
- Kitchen, bath, and laundry equipment
- HVAC compressors, elevators, and boilers
- Specific structural items and equipment that have limited economic life expectancies
- Sidewalks
- Driveways
- Parking areas
- Exterior painting and weatherproofing for windows

The scope of items to be covered in a replacement allowance is a matter of appraisal judgment based on market evidence. However, the magnitude and coverage

BACK_DEFEXP-RR-002873

### Leasing Commissions

Leasing commissions are fees paid to an agent for leasing tenant space. In direct capitalization, leasing commissions are either treated as a normalized annual expense or included below the line in the reconstructed operating statement, depending on local market convention. In discounted cash flow analysis, leasing commissions are typically included in the time period when they are expected to occur. Leasing commissions may or may not be reflected in the operating statements provided by the owner. Initial leasing commissions, which may be extensive in a new development, are usually treated as part of the capital expenditure for developing the project. These initial leasing commissions are not included as ongoing periodic expenses.

A blended rate can be developed to reflect leasing commission costs for both existing leases and new leases. For example, if the tenant renewal ratio for a property is 70%, the leasing commission for existing tenants is 2.5%, and the leasing commission for new tenants is 6%, a blended rate can be developed as follows:

$$0.70 \times 0.025 = 0.0175$$
$$0.30 \times 0.060 = + \; 0.0180$$
$$\text{Blended rate} = 0.0355 \; (3.55\%)$$

This blended rate is then applied to existing tenant leases as they expire.

of the replacement allowance is related to the annual repair and maintenance expenses of the property for the specific components considered in the allowance. Historical operating statements prepared on a cash basis may include periodic replacement expenses under repair and maintenance. If comprehensive provisions for replacements are made in the reconstructed operating statement, these charges may be duplicated unless the annual maintenance expense estimate is reduced.

In certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made. If this work is performed at the landlord's expense and is required to achieve the estimated rent, the expense of these improvements may be included in the reconstructed operating statement as part of the replacement allowance in a separate "tenant improvements" or "capital expenditure" category, depending on local practice.

A total expense estimate that provides for all items of repair, maintenance, and replacement may exceed the actual expenditures shown in the owner's operating statements for recent years. This is particularly common when the building being appraised is relatively new and the owner has not incurred many capital or repair expenses. In preparing a reconstructed operating statement for a typical year, an appraiser recognizes that replacements must be made eventually and that replacement costs affect operating expenses. These costs can be reflected in increased annual maintenance costs or, on an accrual basis, in an annual replacement allowance.

An appraiser must know whether or not a replacement allowance is included in any operating statement used to derive a market capitalization rate for use in the income capitalization approach. It is essential that the income statements of comparable properties be consistent. Otherwise, adjustments will be required. A capitalization rate derived from a comparable sale property is valid only if it is applied to the subject property on an equivalent basis. Consequently, a rate derived from a sale with an expense estimate that does not provide for a replacement allowance should not be applied to an income estimate for a subject property that includes such an allowance without an adjustment that reflects the difference. Investor survey rates may or may not include deductions for replacement allowances, and appraisers must exercise caution in apply-

BACK_DEFEXP-RR-002874

## Exclusions from Reconstructed Operating Statements

The operating statements prepared for real estate owners typically list all expenditures made during a specific year. An owner's statement may include nonrecurring items that should not be included in an expense estimate intended to reflect typical annual expenses. Such a statement may also include items of business expense or costs associated with the specific circumstances of ownership.

A reconstructed operating statement represents an opinion of the probable future net operating income of an investment.* Certain items included in operating statements prepared for property owners should be omitted in reconstructed operating statements prepared for appraisal purposes. These items include book depreciation, depletion allowances or other special tax considerations, income tax, special corporation costs, additions to capital, and loan payments.

### Book Depreciation

The book depreciation for the improvements on a parcel of real estate is based on historical cost or another previously established figure that may be unrelated to current market value. Moreover, book depreciation is based on a formula designed for tax purposes. The capitalization method and procedure selected provide for the recapture of invested capital, so including depreciation in the operating expense statement is redundant.

### Depletion Allowances or Other Special Tax Considerations

A depletion allowance is an accounting process that allows for lower taxation of the revenue generated by extracting natural resources from a property because there is less oil, coal, natural gas, or other minerals left in the ground. The concept of depletion is similar to the depreciation of assets, and including the depletion allowance in the operating expenses would be redundant for the same reasons given for book depreciation.

### Income Tax

The amount of income tax varies with the type of property ownership—i.e., the property may be held by a corporation, a partnership, a public utility, or an individual. The expected or average income tax of the owner is not an operating expense of the property. It is an expense of ownership.

### Special Corporation Costs

The expenses attributable to corporate operations also pertain to the type of ownership. Corporate expenses are not part of a reconstructed operating statement developed for appraisal purposes.

### Additions to Capital

Expenditures for capital improvements usually do not recur annually and therefore should not be included in an estimate reflecting the typical annual expenses of operation. Capital improvements may enhance value by increasing the annual net operating income or economic life of the property, but the capital expenditure is not a periodic operating expense.

The exclusion of capital expenditures is specific to reconstructed operating statements, which are used to calculate net operating income. An average annual expectation may be included in the replacement reserve. When cash flows are estimated for a discounted cash flow analysis, capital expenditures may be deducted from the net operating income in the year the expenditure is expected to occur and not averaged on an annual basis. This is particularly important when the property's future net operating income is based on the assumption that the capital expenditure will be made. In this case, failure to account for the capital expenditure could result in an overstatement of value. Similarly, value may be understated if capital improvements are presumed to have been "written off" without appropriately considering their contribution to value or their additions to the total capital invested.

### Loan Payments

Operating statements prepared by owners often reflect loan payments in the form of periodic debt service and may include a loan payoff. These payments are not included in the reconstructed operating statement because net operating income is defined to exclude mortgage debt service.

---

* Some practitioners use the term *pro forma* synonymously with *reconstructed operating statement*. Technically, a pro forma is a financial statement—e.g., a balance sheet or income statement used by a business developed "according to form." In appraisal practice, a reconstructed operating statement is developed to conform to the definition of *net operating income* used by appraisers, which generally differs from the definition of *income* used by accountants. Thus, a reconstructed operating statement drawn up by an appraiser will usually differ from a typical pro forma income statement prepared by an accountant.

BACK_DEFEXP-RR-002875

ing capitalization and discount rates from surveys. Most surveys explain the basis for their rates. If they do not, an appraiser may contact the survey's author for clarification.

### Total Operating Expenses

Total operating expenses are the sum of fixed and variable expenses and the replacement allowance in the reconstructed expense estimate.

## Net Operating Income

After total operating expenses are deducted from effective gross income, the remainder is the net operating income.

## Additional Calculations

After an appraiser calculates net operating income, further calculations may be needed to determine

- Mortgage debt service
- Equity income
- Expense and income ratios

### Mortgage Debt Service

Mortgage debt service is the annual sum of all mortgage payments. Mortgage debt service is deducted from net operating income to derive equity income, which is used in certain capitalization procedures. The definition of *market value* is based on financing terms compatible with those found in the market. Thus, in estimating market value, the mortgage debt service to be deducted from the net operating income must be based on market terms. In some cases, an appraiser may be asked to develop an opinion of the value of the equity investor's position based on existing or specified financing. In this case the debt service would reflect the specific terms in the existing or specified mortgage (or mortgages).

### Equity Income

Equity income ($I_M$) is the income that remains after all mortgage debt service is deducted from net operating income $(I_O - I_M) = I_M$.

### Expense and Income Ratios

The ratio of total operating expenses to effective gross income is the operating expense ratio (*OER*). The complement of this ratio is the net income ratio (*NIR*), which is the ratio of net operating income to effective gross income. These ratios tend to fall within certain ranges for specific categories of property. Experienced appraisers recognize appropriate ratios, so they can identify statements that deviate from typical patterns and require further analysis. They understand that risk varies inversely with the net income ratio because, for properties with low *NOI* ratios, small changes in effective gross income will have an inordinately large effect on net income.

Nationwide studies of apartment, office building, and shopping center properties conducted by the Institute of Real Estate Management (IREM), the Building Owners and Managers Association International (BOMA), and the Urban Land Institute (ULI) can often be used as general guides in assessing the reasonableness of operating expense ratios. Similar studies are also available for hotels, industrial properties, and self-storage properties. Sometimes local IREM or BOMA chapters or real estate

BACK_DEFEXP-RR-002876

appraisal organizations and their chapters conduct and publish studies of operating expenses that can be used as market indicators. Published studies are useful, but appraisers must still develop operating expense ratios from comparable properties in the subject property's market or verify that published ratios are applicable to this market. Appraisers must also consider the applicability of the survey data to the physical characteristics of the subject property. For example, an appraiser should probably not use an IREM survey of buildings with an average building size of 400 units in the analysis of a 30-unit apartment building.

BACK_DEFEXP-RR-002877

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Direct Capitalization **25**

Direct capitalization is a method used in the income capitalization approach to convert a single year's income expectancy into a value indication. This conversion is accomplished in one step, either by dividing the net operating income estimate by an appropriate income rate or by multiplying the income estimate by an appropriate factor.[1]

Direct capitalization is widely used when properties are already operating on a stabilized basis, or those that are being valued under the assumption that they are stabilized. Direct capitalization can also be used when there is a sufficient supply of comparable sales with similar risk levels, incomes, expenses, physical and locational characteristics, and future expectations from which to extract capitalization rates or when there are alternate methods for deriving capitalization rates. The direct capitalization method may be less useful for properties going through an initial lease-up period and for properties with income or expenses that are expected to change in an irregular pattern over time. Investors often have minimum first-year capitalization rate requirements. In these cases, comparables with similar future expectations may not be available and a yield capitalization technique may be more appropriate.

The advantages of direct capitalization are (1) it is simple to use and easy to explain, (2) it often expresses market thinking, and (3) it provides strong market evidence of value when adequate sales are available.



The basic formulas for direct capitalization are

$$I = R \times V \qquad R = \frac{I}{V} \qquad V = \frac{I}{R}$$

$$V = I \times F \qquad I = \frac{V}{F} \qquad F = \frac{V}{I}$$

where $I$ is income, $R$ is capitalization rate, $V$ is value, and $F$ is factor.

---

1. David C. Lennhoff, "Direct Capitalization: It Might Be Simple But It Isn't That Easy," *The Appraisal Journal* (Winter 2011): 66-73.

Direct capitalization is applied using one of two basic methods:

- Applying an overall capitalization rate or multiplier to relate value to the entire property income (e.g., net operating income)
- Using residual techniques that consider components of a property's income and then applying market-derived capitalization rates to each income component analyzed ($R_L$, $R_B$, etc.)

Direct capitalization is distinct from yield capitalization (which is discussed in Chapters 26 and 27) in that it does not explicitly consider individual cash flows beyond one year. Yield capitalization explicitly calculates the year-by-year effects of potentially changing income patterns, changes in the original investment's value, and other considerations. In contrast, direct capitalization processes a single year's income into an indication of value. Either direct capitalization or yield capitalization can be used to produce a supportable indication of value when based on relevant market information derived from comparable properties. These comparable properties should have similar property rights, income-expense ratios, land value-to-building value ratios, risk characteristics, occupancy or vacancy levels, and future expectations of income and value changes over a typical projection period. The choice of capitalization method does not affect the indication of value.

## Derivation of Overall Capitalization Rates

The overall interest in real estate that is capable of generating income can be valued using direct capitalization. The direct capitalization formula is

$$\text{Value} = \frac{\text{Net Operating Income}}{\text{Overall Capitalization Rate}}$$

Overall capitalization rates can be estimated with various techniques. The techniques used depend on the quantity and quality of data available. When supported by appropriate market data, accepted techniques include

- Derivation from comparable sales
- Band of investment—mortgage and equity components
- Band of investment—land and building components
- Debt coverage analysis
- Analysis of yield capitalization rates (the property model)
- Surveys

### Derivation of $R_O$ from Comparable Sales

Deriving capitalization rates from comparable sales is the preferred technique when sufficient information about sales of similar, competitive properties is available. Data on each property's sale price, income, expenses, financing terms, and market conditions at the time of sale is needed. In addition, appraisers must make certain that the net operating income of each comparable property is calculated and estimated in the same way that the net operating income of the subject property is estimated.

Often the operating data available for comparable sale properties is from the year that ended just prior to the date of sale, so appraisers may have to account for changes that have occurred over time. Both income and expense data (in the 12 months after the date of valuation) and the structure of expenses in terms of replacement allowances and other components should be similar to those of the subject property.

BACK_DEFEXP-RR-002879

Copyrighted material licensed by Charles Brigden on September 17, 2020

Moreover, neither non-market financing terms, different market conditions, nor different property rights should have affected the prices of the comparable properties. If the objective of the appraisal is to value the fee simple estate, market rent and terms must be used or adjustments will be necessary. Capitalization rates from leased properties provide capitalization rates for the leased fee, not the fee simple. If the value of the leased fee is being sought, the comparable properties should be leased in the same manner as the subject property, or again adjustments will be required. Expectations for changes in the income and value of the comparable properties should also match those of the subject property, or an adjustment to the rate will be necessary.

The overall level of risk associated with each comparable should be similar to that of the subject property. Risk can be analyzed by investigating the credit rating of the property's tenants, market conditions for the particular property, the stability of the property's income stream, the level of investment in the property by the tenant, the property's net income ratio, and the property's upside or downside potential. In some property types, bonded leases are provided when the full faith and credit of the tenant company guarantees the lease. This is common in sale leasebacks or build-to-suit leases and results in leases with significantly reduced risk to the purchasers, and therefore may affect rents and capitalization rates caused by the reduced risks.

When these requirements are met, an appraiser can estimate an overall rate by dividing each property's net operating income by its sale price. Table 25.1 illustrates this procedure using data from four comparable sales of small residential income properties. If all four transactions are equally comparable, the appraiser might conclude that an overall rate of 0.0941 to 0.0984 should be applied to the subject property. The final rate concluded depends on the degree of similarity between each sale and the subject property. For example, if Sales A and D are the most comparable, the concluded rate might be approximately 0.0960, or 9.6%.

**Table 25.1**  Derivation of Overall Capitalization Rates from Comparable Sales

|  | Sale A | Sale B | Sale C | Sale D |
|---|---|---|---|---|
| Net operating income | $35,100 | $40,000 | $30,500 | $48,400 |
| Price | $368,500 | $425,000 | $310,000 | $500,000 |
| Indicated $R_O$ | 0.0953 | 0.0941 | 0.0984 | 0.0968 |

If differences between a comparable property and the subject property that could affect the selection of the overall capitalization rate are concluded, an appraiser must account for these differences. In that case, the appraiser must decide whether the rate selection for the subject property should be higher or lower than the rate indicated by a specific sale or group of sales. Appraisal judgment is also needed to determine whether the rate selected for the subject should fall within the range established by the sales or be set above or below the range. If there are wide differences between a comparable property and the subject property that could affect the overall capitalization rate, the appraiser must be able to explain the market behavior or property elements that account for these differences.

When rates derived from comparable sales are used, the capitalization rate is applied to the subject property in a manner consistent with its derivation. In other words, if the market-derived capitalization rates are based on the properties' net

BACK_DEFEXP-RR-002880

operating income expectancies for the first year—i.e., the 12 months after the date of sale—the capitalization rate for the subject property should be applied to its anticipated net operating income for the first year of operation.

The net income to be capitalized may be estimated before or after an annual allowance for specific replacement categories, e.g., the allowance for furniture, fixtures, and equipment for hotel properties and the replacement allowance for office properties.[2] Again, it is imperative that appraisers analyze comparable sales and derive their capitalization rates in the same manner used to analyze the subject property and capitalize its income.

The following examples illustrate the importance of deriving and applying rates consistently. In the first example, the replacement allowance for the subject property is estimated to be $2,500. The overall rate indicated by comparable sales, in which a replacement allowance is not deducted as an operating expense, is 0.0850. In the second example, the replacement allowance is deducted as an operating expense, and the indicated overall rate is 0.0825. In the first calculation, the allowance is not included as an expense item for the subject property, so the net operating income there is $2,500 higher than in the second calculation. The valuation conclusions produced by the two calculations are identical because the rates were derived and applied consistently.

| Allowance for Replacements Not Included in Operating Expenses | |
| --- | --- |
| Net operating income | $85,000 |
| Overall rate | 0.0850 |
| Capitalization: $85,000/0.0850 | $1,000,000 |
| **Allowance for Replacements Included in Operating Expenses** | |
| Net operating income | $82,500 |
| Overall rate | 0.0825 |
| Capitalization: $82,500/0.0825 | $1,000,000 |

### Criteria for Supporting Overall Capitalization Rates

An overall capitalization rate provides compelling evidence of value when a series of conditions are met:

1. Data should be drawn from properties that are physically similar to and have similar property rights as the subject property and that are from similar (preferably competing) markets as the subject property. When a comparable property has significant differences, it may be afforded little or no weight.

2. Sale properties used as sources for calculating overall capitalization rates should have current date of sale and future market expectations, including income and expense patterns and likely value trends, that are comparable to those affecting the subject property.

3. Income and expenses must be estimated on the same basis for the subject property and all comparable properties. For example, if reserves for replacement are included in the net operating income for each comparable, reserves for replacement should also be reflected in the net operating income for the subject property.

4. The comparable property's price should reflect market terms, or an adjustment for cash equivalency must be made.

5. If other adjustments are considered necessary to account for differences between a comparable property and the subject property such as leasing commissions, tenant improvements, or deferred maintenance, they should be made separately from the process of calculating the overall capitalization rate and should be based on market evidence.

---

2.   In some markets, practitioners do not deduct a replacement allowance as an above-the-line item in direct capitalization. Whenever this expense item is implicit in the capitalization rate, it should not be deducted in estimating the net operating income for a subject property.

BACK_DEFEXP-RR-002881

Copyrighted material licensed by Charles Brigden on September 17, 2020

Whether net operating income is estimated with or without an allowance for replacements, the overall capitalization rate is calculated by dividing the net operating income of a comparable property by its sale price.

### Derivation of $R_0$ by Band of Investment—Mortgage and Equity

Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity return commensurate with the perceived risk, or they will invest their funds elsewhere.

The mortgage capitalization rate $(R_M)$ is the ratio of the annual debt service to the principal amount of the mortgage loan:

$$R_M = \frac{\text{Annual Debt Service}}{\text{Mortgage Principal}}$$

For example, a $500,000 mortgage loan with annual debt service of $35,000 would have a mortgage capitalization rate of 7% ($35,000/$500,000). The rate established at the inception of a mortgage is commonly called the *mortgage constant*. The annual mortgage constant for a new loan is calculated by multiplying each period's payment by the number of payments per year and then dividing this amount by the amount of the loan. A current mortgage capitalization rate may also be calculated on the basis of the outstanding mortgage amount once debt service payments have been made. It should be noted that the mortgage capitalization rate $(R_M)$ differs from the yield rate to the mortgage $(Y_M)$. The yield rate to the mortgage is the internal rate of return that equates the present value of the mortgage payments with the principal balance of the loan—i.e., the rate used to calculate the mortgage payment.

The mortgage capitalization rate is a function of the interest rate, the frequency of amortization (e.g., annual, monthly), and the amortization term of the loan. It is the sum of the interest rate and the sinking fund factor. When the loan terms are known, the mortgage capitalization rate can be calculated, using a financial calculator or any of a variety of computer software programs, or by simply dividing the annual debt service by the outstanding mortgage balance, if known.

The equity investor also seeks a systematic cash return. The rate used to capitalize equity income is called the *equity capitalization rate* $(R_E)$. It is the ratio of the annual return to the equity position to the amount of equity investment. The equity capitalization rate may be more or less than the expected equity yield rate $(Y_E)$. For appraisal purposes, a property's equity capitalization rate is the anticipated cash flow to the equity investor for the first year of the projection period divided by the initial equity investment.

The overall capitalization rate must satisfy both the mortgage capitalization rate requirement of the lender and the equity return requirement of the equity investor. For mortgage-equity analysis, it can be viewed as a composite rate, weighted in proportion to the total property investment represented by debt and equity. The overall capitalization rate is a weighted average of the mortgage capitalization rate $(R_M)$ and equity capitalization rate $(R_E)$. The loan-to-value ratio $(M)$ represents the loan or debt portion of the property investment. The equity ratio $(E$, which is sometimes shown as

BACK_DEFEXP-RR-002882

$1 - M$) represents the equity portion of the property investment. The sum of $E$ and $M$ is 1, i.e., 100%.

When sufficient market data is available, the overall rate can be calculated directly. This method is not a substitute for using rates extracted from the market if they are available. If only the mortgage and equity capitalization rates are known, however, an overall rate may be derived with the band-of-investment, or weighted-average, technique. The following formulas are used to calculate the overall capitalization rate:

| | | |
|---|---|---|
| Mortgage component | $M \times R_M =$ | _____ |
| Equity component | $+ E \times R_E =$ | $+$ _____ |
| | $R_O =$ | _____ |

To illustrate how the overall capitalization rate is calculated with the band-of-investment technique, suppose that the following characteristics describe the subject property.

| | |
|---|---|
| Available loan | 75% ratio, 7.0% interest, 25-year amortization period (monthly payment), 8.5% mortgage capitalization rate ($R_M$) |
| Equity capitalization rate | 6.5% (derived from comparable sales) |

The overall rate is calculated as follows:

$$R_O = (M \times R_M) + (E \times R_E) = (0.75 \times 0.085) + (0.25 \times 0.065) = 0.06375 + 0.01625 = 0.08000$$

Although this technique can be used to derive overall capitalization rates, the technique is only applicable when sufficient market data is available to estimate equity capitalization rates. A capitalization rate used to develop an opinion of market value should be justified and supported by market data, but sometimes this data is not available. When the available market data is scarce or not reliable, mortgage-equity techniques may be used to develop or test capitalization rates. Appraisers may develop information through interviews with market participants and from their own records. These indirect analyses are not substitutes for data from market sales of comparable properties, but they can lead to valuable insights and understandings. The mortgage yield rate ($Y_M$) should not be used in place of the mortgage capitalization rate ($R_M$), nor should an equity yield rate ($Y_E$) be substituted for an equity capitalization rate ($R_E$).

## Derivation of $R_O$ by Band of Investment—Land and Building

A band of investment formula can also be applied to the physical components of property—i.e., the land and the buildings. Essentially this methodology is the same as the mortgage-equity technique, except that the elements are the physical property components. Just as weighted rates are developed for mortgage and equity components in mortgage-equity analysis, weighted rates for the land and buildings can be developed if accurate rates for these components can be estimated independently and the proportion of total property value represented by each component can be identified. The formula is

$$R_O = (L \times R_L) + (B \times R_B)$$

where

$L$ = land value as a percentage of total property value

$R_L$ = land capitalization rate

$B$ = building value as a percentage of total property value

$R_B$ = building capitalization rate

BACK_DEFEXP-RR-002883

As an example, assume the land represents 45% of the value of a property and the building represents the other 55%. The land capitalization rate derived from comparable sales data is 8.0%, and the building capitalization rate is 11.0%. The indicated overall rate is calculated as follows:

$$R_O = (L \times R_L) + (B \times R_B) = (0.45 \times 0.08) + (0.55 \times 0.11) = 0.0360 + 0.0605 = 0.0965$$

Land and building capitalization rates may be extracted by applying residual analysis to improved properties. (Land and building residual techniques are illustrated later in this chapter.)

## Debt Coverage Formula

In addition to the traditional terms of lending—i.e., the interest rate, loan-to-value ratio, amortization term, maturity, and payment period—real estate lenders sometimes use another judgment criterion: the debt coverage ratio (DCR).[3] This is the ratio of net operating income to annual debt service ($I_M$), or the payment that covers interest on and retirement of the outstanding principal of the mortgage loan:

$$DCR = \frac{I_O}{I_M}$$

When lenders underwrite loans on income-producing property, they try to provide a cushion so that the borrower will likely be able to meet the debt service obligations on the loan even if property income declines. Lenders establish a debt coverage ratio as a matter of policy, which must be greater than 1.0 to cover debt service. More risky loans require a higher debt coverage ratio. For example, if a ratio of 1.20 is typical, a more risky loan may require a ratio of 1.50.

The debt coverage ratio can be multiplied by the mortgage capitalization rate and the loan-to-value ratio to arrive at an estimated overall rate for a property that is at stabilized occupancy. Lenders sometimes refer to overall capitalization rates developed using this method as *in-house capitalization rates*. The formula is

$$R_O = DCR \times R_M \times M$$

For a property with net operating income of $50,000 and annual debt service of $43,264, the debt coverage ratio is calculated as

$$DCR = \frac{\$50,000}{\$43,264} = 1.1557$$

If $R_M$ equals 0.085 and $M$ is 0.75, $R_O$ is estimated as

$$R_O = 1.1557 \times 0.085 \times 0.75 = 0.0737$$

Debt coverage ratio analysis is sometimes used as a check or test of reasonableness for a capitalization rate derived using another method.

## Surveys

Various national real estate and research firms survey institutional investors periodically and publish the discount and capitalization rate requirements of those investors. The results of these surveys can give appraisers an overall picture of current return requirements (in contrast to historical performance data). Many appraisers survey investors and other market observers in their local markets to augment secondary survey data.

---

3. James H. Boykin and Martin E. Hoesli, "An Argument for the Debt Coverage Method in Developing Capitalization Rates," *The Appraisal Journal* (October 1990): 558-566.

BACK_DEFEXP-RR-002884

In the development of a capitalization rate, surveys are generally used as support rather than as primary evidence of a capitalization rate. Survey data obtained directly from subscription services often contains more comprehensive information about investment criteria and trends than information published in the trade press.[4] In judging the reliability of capitalization rate survey data, an appraiser may consider the following:

- The number and composition of survey participants
- The geographical location of each sector of the real estate market covered by the survey
- The category or product, grade or quality, and locational attributes of each sector of the real estate market surveyed
- How the measures of financial performance such as overall capitalization rates are derived
- Whether reserves for replacement are included for $R_O$ survey data
- The fact that surveys almost always represent leased fee capitalization rates

Appraisers who use rates published in national surveys should understand that the participants in the surveys may not represent typical real estate investors. Often these surveys reflect the opinions of institutional investors such as insurance companies, pension funds, and other high-wealth equity investors. These investors likely will not have the same investment criteria as typical investors in small commercial and residential properties.

## Residual Techniques

Residual techniques are based on the same premises that apply to direct capitalization rates. However, while an overall rate processes the entire net operating income into a value indication, the residual techniques separate net operating income into various components. These include the income attributable to physical components (land and building residuals), financial components (mortgage and equity residuals), and legal components (leased fee and leasehold estates). Although these components can be appraised by applying yield capitalization techniques, in direct capitalization only the first year's net operating income for each component is expressly included in the analysis. The application of residual techniques is only appropriate if the inferences on which the techniques are based are reasonable.

Regardless of which known and unknown (residual) components of the property are being analyzed, an appraiser starts with the value of the known items and the net operating income, as shown in Table 25.2. To apply a residual technique, an appraiser performs the following steps:

1. Apply an appropriate capitalization rate to the value of the known component to derive the annual income needed to support the investment in that component.
2. Deduct the annual income needed to support the investment in the known component from the net operating income to derive the residual income available to support the investment in the unknown component.

---

4. Tony Sevelka, "Where the Overall Cap Rate Meets the Discount Rate," *The Appraisal Journal* (Spring 2004): 135-146.

BACK_DEFEXP-RR-002885

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD   Document 280-2   Filed 03/05/25   Page 481 of 722   Page
ID #16705

3. Capitalize the residual income at a capitalization rate appropriate to the invest-ment in the residual component to develop the present value of this component.
4. Add the values of the known component and the residual component to derive a value indication for the total property.

**Table 25.2** Known and Unknown Variables in Residual Calculations

| Residual Technique | Known | Unknown |
|---|---|---|
| Land residual | Net operating income ($NOI$ or $I_O$)<br>Building value ($V_B$)<br>Building capitalization rate ($R_B$)<br>Land capitalization rate ($R_L$) | Land or site value ($V_L$) |
| Building residual | Net operating income ($NOI$ or $I_O$)<br>Land or site value ($V_L$)<br>Land capitalization rate ($R_L$)<br>Building capitalization rate ($R_B$) | Building value ($V_B$) |
| Mortgage residual | Net operating income ($NOI$ or $I_O$)<br>Amount of equity ($V_E$)<br>Equity capitalization rate ($R_E$)<br>Mortgage capitalization rate ($R_M$) | Mortgage amount ($V_M$) |
| Equity residual | Net operating income ($NOI$ or $I_O$)<br>Mortgage amount ($V_M$)<br>Mortgage capitalization rate ($R_M$)<br>Equity capitalization rate ($R_E$) | Amount of equity ($V_E$) |

Residual techniques allow an appraiser to capitalize the income allocated to an investment component of unknown value after other investment components of known value have been satisfied. They can be applied to the land and building components of property, to the mortgage and equity components, to the leased fee and leasehold components (but only when specific property information is available), or to the income and reversion components.

Prior to the publication of *The Ellwood Tables* in 1959, the physical residual tech-niques (land and building) were the dominant methods for valuing real estate. L. W. Ellwood's contribution to the income capitalization approach changed the practice of real estate appraisal in several ways:

- Prior to *The Ellwood Tables*, appraisers generally considered all market value transactions to reflect cash transfers between the buyer and the seller with no provision for financing. Ellwood recognized that most market transactions involved cash to the seller but were financed in part with some form of debt or other financial consideration on the part of the buyer. His view was that each component—mortgage and equity—could be analyzed separately in the context of a given property.
- Ellwood promoted the simple understanding that choosing an alternate meth-od—direct capitalization or yield capitalization—did not produce a different result. As long as market rates appropriate to the method were applied, the same result would be produced.

BACK_DEFEXP-RR-002886

- Ellwood emphasized that the concept of the present worth of anticipated future benefits provides that if it is possible to construct a cash flow statement for any given time horizon, it is possible to use some form of discounting in the capitalization process. This realization permitted appraisers and investors to consider the anticipated benefits of a given property more precisely and to avoid using direct capitalization to analyze a single year's income, which might be less precise. Ellwood stated that "two years are better than just one" and even a five-year analysis is feasible for most income-producing properties.
- Until *The Ellwood Tables*, most appraisers focused on land and building components. Ellwood added the consideration of mortgage and equity components to provide another dimension to the analysis, not as a substitute.
- Ellwood did not limit his thinking to market value alone. Instead he provided an analytical framework in which specific anticipations or market expectations could be tested and the results applied to either opinions of market value or other aspects of property financial analysis.
- Although Ellwood is most often credited with adding new considerations to real property appraisal analysis, he also clarified, refocused, and brought new understanding to the fundamental appraisal methods and techniques that had been applied for many years. In this way, he helped overcome errors and abuses in traditional appraisal practices and made the analysis more precise while adding new techniques.

The development of computerized discounted cash flow analyses in professional appraisal practice has largely supplanted the use of residual techniques, except when the data needed to apply more sophisticated techniques is not available. Today residual techniques are used primarily in specialized situations—e.g., in highest and best use analysis as a test of financial feasibility. Nevertheless, residual analysis techniques remain a fundamental component of appraisal theory, and well-rounded appraisers should be familiar with them.

### Building Residual Technique

An appraiser who applies the building residual technique must be able to estimate land value independently. The technique is especially applicable when data on land values and land rents is available to establish land capitalization rates. An appraiser applies the land capitalization rate to the known land value to obtain the amount of annual net income needed to support the land value. Then this amount is deducted from the net operating income to derive the residual income available to support the investment in the building (or buildings). The appraiser capitalizes this residual income at the building capitalization rate to derive an indication of the present value of the building (or buildings). Finally, the land value and the building value are added to derive an indication of total property value.

For example, consider a small warehouse with an estimated land value of $200,000. Analysis of several sales of comparable sites reveals a land capitalization rate of 6.5% and a building capitalization rate of 10%. The net operating income of the subject property is estimated to be $67,500. Using the building residual technique, the value of the subject property is calculated as follows:

BACK_DEFEXP-RR-002887

Copyrighted material licensed by Charles Brigden on September 17, 2020

| | | |
|---|---|---|
| Estimated land value | | $200,000 |
| Net operating income | $67,500 | |
| Less income attributable to land | | |
| Land value $\times R_L$ ($200,000 $\times$ 0.065) | − $13,000 | |
| Residual income to building | $54,500 | |
| Building value (capitalized: $54,500 ÷ 0.10) | | + $545,000 |
| Indicated property value | | $745,000 |

This technique is simple, but its applicability and usefulness are extremely limited. Depending on the particular market, the building residual technique may or may not reflect the way purchaser-investors regard investment real estate. However, if the required data is available, the building residual technique can be used to value properties with improvements that have suffered substantial depreciation. In fact, current reproduction or replacement cost minus the present value of the improvements provides an estimate of total depreciation. In addition, the building residual technique directly measures the contribution of the improvements to total property value, so it can help an appraiser determine when demolition or major renovation of property improvements is economically feasible or, if appropriate, help establish the tax basis for depreciation of the improvements.

### Land Residual Technique

The land residual technique calls for a separate estimation of the value of the building (or buildings). In land residual applications, an appraiser will often consider a new highest and best use assuming a building that does not exist. In this application, building value is usually estimated as the current cost to construct a new building that represents the highest and best use of the site.

The building capitalization rate is applied to the building value to obtain the amount of annual net income needed to support the value of the building. This amount is then deducted from net operating income to indicate the residual income available to support the investment in the land. The residual income is capitalized at the land capitalization rate to derive an indication of the value of the land. Finally, the building value is added to the land value to derive an indication of total property value.

Using the same data used in the building residual example but assuming that building value rather than land value is known, the problem is calculated from the opposite viewpoint. The land and building capitalization rates derived from the market are applied to the subject property as follows:

| | | |
|---|---|---|
| Estimated building value | | $545,000 |
| Net operating income | $67,500 | |
| Less income attributable to the building | | |
| Building value $\times R_B$ ($545,000 $\times$ 0.10) | − $54,500 | |
| Residual income to land | $13,000 | |
| Land value (capitalized: $13,000 ÷ 0.065) | | + $200,000 |
| Indicated property value | | $745,000 |

The land residual technique allows an appraiser to estimate land values when recent data on land sales is not available. In practice, the technique is used often to test the highest and best use of the land or site for proposed construction. The land re-

BACK_DEFEXP-RR-002888

sidual technique is less applicable when the cost to produce a new building is inconsistent with the amount of value such a building would contribute to property value.

Land and building residual techniques should be used with extreme care because small changes in the assumptions made can often have a significant influence on value indications.

### Equity Residual Technique

To apply the equity residual technique, an appraiser deducts annual debt service from net operating income to obtain the residual income to the equity interest. The annual debt service is calculated based on mortgage loan terms typically available in the market.

To derive an equity capitalization rate from the market, appraisers may apply the following process:

| | |
|---|---|
| Net operating income | $45,000 |
| Less mortgage debt service | |
| $375,000 loan, 5.0% interest, 25-year term | |
| $375,000 × 0.07015* = | − $26,307 |
| Residual income to equity | $18,693 |
| Equity investment (known) | $212,000 |
| Equity capitalization rate | |
| $18,693 ÷ $212,000 | 8.82% |

\* Annual constant ($R_M$) for monthly loan payment from precomputed tables. A financial calculator or computer can also be used to calculate the annual constant.

For a similar property with comparable characteristics, the 8.82% equity capitalization rate can be divided into the equity income to develop an indication of equity value. When equity value is added to the mortgage amount, an indication of property value is produced. The results derived in applying the equity residual technique can also be used in the band-of-investment method.

### Mortgage Residual Technique

When the mortgage residual technique is applied, the amount of available equity is the known component and the mortgage amount or value is unknown. The income needed to satisfy the equity component at the equity capitalization rate is deducted from the net operating income to obtain the residual income to the mortgage component. The residual mortgage income is then capitalized into value at the mortgage capitalization rate. The preceding example of equity residual capitalization can be approached from the opposite side of the equation to illustrate mortgage residual technique calculations:

| | | |
|---|---|---|
| Available equity | | $212,000 |
| Net operating income | $45,000 | |
| Less equity requirement | | |
| Equity × $R_E$ ($212,000 × 0.0882) | − $18,693 | |
| Residual income to mortgage | $26,307 | |
| Mortgage value | | |
| (capitalized: $26,307 ÷ 0.07015) | | + $375,000 |
| Indicated property value | | $587,000 |

The mortgage residual technique works as a mathematical process, but it does not follow the customary logic of market participants. Its most common use is in

BACK_DEFEXP-RR-002889

Copyrighted material licensed by Charles Brigden on September 17, 2020

determining the amount of mortgage available and the associated value requirement. For example, an investor with a certain amount of equity and a given set of mortgage terms could apply the mortgage residual technique to determine how much to pay for a property. However, the technique is based on the premise that the amount of money the equity investor is willing to invest in the property has already been determined and that the investor requires a specified equity capitalization rate from the property. This implies that the loan amount depends on the residual cash flow available for mortgage debt service and the mortgage capitalization rate. Lenders generally will not make a loan unless net operating income exceeds the mortgage debt service by a specified amount. Also, once the loan is made, the lender has the legal right to receive the agreed-upon debt service, but any residual cash flow goes to the equity investor. Even with below-market loans, the equity investor receives the income remaining after payment of the contract interest. Thus, the mortgage residual technique does not necessarily reflect market behavior and would not normally be appropriate for estimating the value of a property subject to a specific mortgage.

### Leased Fee and Leasehold Residuals

Theoretically, the leased fee and leasehold components of value can be derived using residual techniques, although the assumption that the sum of the values of the leasehold and the leased fee equals the value of the fee simple estate has not historically been supported by market data. As a result, leased fee and leasehold residuals are of dubious usefulness. The remaining term of a lease, the creditworthiness of the tenants, the influence of atypical lease clauses and stipulations, and other factors can affect the value of the sum of the parts, causing the sum to be greater or less than the value of the fee simple, sometimes significantly so.

The value of the leased fee represents the owner's interest in the property. The benefits that accrue to an owner of a leased fee generally consist of income throughout the lease term and the reversion at the end of the lease.

The market value of a leasehold depends on how contract rent compares to market rent, as shown in Figure 25.1. A leasehold may acquire value if the lease allows for subletting or assignment and the remaining term is long enough so that market participants will pay something for the advantageous lease.

When analyzing a leasehold, it is essential that appraisers analyze all of the economic benefits or disadvantages created by the lease. An appraiser should ask the following questions:

- What is the term of the lease?
- What is the likelihood that the tenant will be able to meet all of the rental payments on time?
- Are the various clauses and stipulations in the lease typical of the market, or do they create special advantages or disadvantages for either party?
- Is the leasehold transferable, or does the lease prohibit transfers?
- Is the lease written in a manner that will accommodate reasonable change over time, or will it eventually become cumbersome to the parties?

A residual calculation of the value of a leasehold or leased fee is least often appropriate in the case of an above-market or below-market lease. When the value indication derived serves as an indication of the value of the fee simple, and subtracting

BACK_DEFEXP-RR-002890

**Figure 25.1**  Negative and Positive Leaseholds

Excess Rent

Market Rent

Deficit Rent

Contract Rent

Contract Rent

Contract Rent

**Negative Leasehold**
Contract Rent
above Market Rent

**Positive Leasehold**
Contract Rent
below Market Rent

the capitalized rent loss allows the value indication to be allocated between leased fee and leasehold components. Alternatively, the sales comparison approach can be used to estimate the value of the leased fee if the comparable sales have similar above- or below-market rates and are therefore already value indications for leased fee. Similarly, leased fee capitalization rates can be extracted from comparable sales with similar above- or below-market rents.

Using direct capitalization techniques to value a leased fee, an above- or below-market contract rent can be capitalized at a leased fee capitalization rate derived from comparable sales with similar above- or below-market lease characteristics. Or the market rent can be capitalized using a rate derived from comparable sales with market-rate (or near-market) leases, and the value indication can be adjusted for the above- or below-market lease.

Leasehold capitalization rates are difficult to derive and can be sensitive to lease characteristics. As a result, leaseholds are usually valued using discounted cash flow analysis instead of direct capitalization.

Appraisers cannot simply assume that each of the interests created by a lease has market value. Many leases create no separate value for the tenant. For example, a leasehold may not be a marketable interest because the lease terms do not allow for subleasing, so that the holder of the leasehold (i. e., the tenant) does not have the opportunity to take advantage of a below-market rent in the marketplace. Also, the market value of a leased fee can be sensitive to lease terms other than the rate. The analysis of the risk associated with a leasehold may differ significantly from the analysis of risk of the leased fee. Leasing terms that may be considered high risk to

BACK_DEFEXP-RR-002891

Copyrighted material licensed by Charles Brigden on September 17, 2020

the landlord may be considered low risk to the tenant. As an example, consider a renewal option to a tenant that is available at below-market rent. Tenants may look at the option to renew at a below-market rate as a benefit, whereas discounting may be inappropriate from their perspective.

## Gross Income Multipliers and Gross Rent Multipliers

Gross income multipliers (*GIM*s) are direct capitalization techniques used to compare the income-producing characteristics of properties, most often small residential income properties. Potential or effective gross income can be converted into an opinion of value by applying the relevant gross income multiplier. This method of capitalization is mathematically related to direct capitalization because rates are the reciprocals of multipliers or factors. Therefore, it is appropriate to discuss the derivation and use of multipliers under direct capitalization.

To derive a gross income multiplier from market data, sales of properties that were rented at the time of sale or were anticipated to be rented within a short time must be available. The ratio of the sale price of a property to its anticipated next year's income or its projected income over the first year of ownership is the gross income multiplier. Gross income multipliers are typically calculated on an annual basis.

The derivation and application of gross income multipliers for valuation purposes must be performed with care for several reasons. First, the properties analyzed must be comparable to the subject property and to one another in terms of physical, locational, and investment characteristics. Properties with similar or even identical multipliers can have very different operating expense ratios and, therefore, may not be comparable for valuation purposes.

Second, the term *gross income multiplier* is used because some of the gross income from a property or type of property may come from sources other than rent. A gross rent multiplier applies to rental income only and can be calculated on a monthly or annual basis, consistent with market practices.

Third, an appraiser must use similar income data to derive the multiplier for each transaction. For example, gross income multipliers extracted from full-service rentals would not be applied to a subject property leased on a net basis. The sale price can be divided by either the potential or effective gross income, but the data and measure must be used consistently throughout the analysis to produce reliable results. Different income measures may be used in different valuation studies and appraisals. The income measure selected is dictated by the availability of market data, the purpose of the analysis, the effective gross income multiplier, and the net income multiplier.

> The application of income multipliers is a direct capitalization procedure. In developing an income or rent multiplier, it is essential that the income or rent of the properties used to derive the multiplier be comparable to that of the subject and that the specific multiplier derived be applied to the same income base.

Experienced appraisers understand that gross income multipliers and effective gross income multipliers are sensitive valuation tools. Small differences in each may have a great effect on the resulting value indications.

To illustrate the difference between various gross income multipliers, the following calculations are made using the data for Sale A shown in Table 25.1. Note that

BACK_DEFEXP-RR-002892

in this case, the potential gross income for Sale A is indicated to be $85,106 and the effective gross income is $80,000.

$$\text{Potential Gross Income Multiplier} = \frac{\text{Sale Price}}{\text{Potential Gross Income}} = \frac{\$368,500}{\$85,106} = 4.33 \text{ (rounded)}$$

$$\text{Effective Gross Income Multiplier} = \frac{\text{Sale Price}}{\text{Effective Gross Income}} = \frac{\$368,500}{\$80,000} = 4.61 \text{ (rounded)}$$

After the gross income multiplier is derived from comparable market data, it must be applied on the same basis it was derived. In other words, an income multiplier based on effective gross income can only be applied to the effective gross income of the subject property. Similarly, an income multiplier based on potential gross income can only be applied to the potential gross income of the subject property. The timing of income also must be comparable. If sales are analyzed using next year's income expectation, the multiplier derived must be applied to next year's income expectation for the subject property.

BACK_DEFEXP-RR-002893

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Yield Capitalization | 26

Yield capitalization is the more complex of the two fundamental methods used in the income capitalization approach to value. Within these methods, various techniques are available for converting a series of future cash flows received over time into an indication of value.

Yield capitalization is used to convert explicit future economic benefits into an indication of present value by applying an appropriate discount rate. To select an appropriate discount rate for a market value appraisal, an appraiser analyzes market evidence of the yields anticipated by typical investors, supported by market sales data, or both. When investment value is sought, the discount rate used should reflect the individual investor's requirements, which may differ from the requirements of typical investors in the market.

To perform yield capitalization, an appraiser

1. Selects an appropriate projection period
2. Forecasts all explicit future economic benefits or cash flow patterns (including the reversion, if any)
3. Chooses an appropriate yield or discount rate
4. Converts explicit future economic benefits into present value by discounting each annual future benefit to present value or by developing an overall rate that reflects the income pattern, value change, and yield or discount rate using one of the various yield capitalization formulas

The application of capitalization rates that explicitly reflect an appropriate yield rate, the use of present value factors, and discounted cash flow analysis are all yield capitalization procedures. Mortgage-equity formulas and yield rate or value change formulas may be used to derive overall capitalization rates.

Like direct capitalization, yield capitalization should reflect market behavior. To apply the discounting procedure, appraisers must be familiar with the following concepts and techniques:

• Income patterns

BACK_DEFEXP-RR-002894

- Capital return concepts
- The mathematics of the discounting process
- Investor requirements or expectations—i.e., projection period, anticipated market changes, and inflation or deflation
- The selection of an appropriate discount rate

## Discounting

*Discounting* is a general term used to describe the process of converting future cash flows into a present value. The discount rate is the rate used for the discounting process and may be a property yield rate, equity yield rate, or some other defined rate. In real estate appraisal practice, the most common method for valuing the total bundle of rights (the fee simple) is the property yield rate ($Y_O$).

In the discounting process, periodic incomes and the reversion, if any, are converted into present value through discounting, which is based on the concept that benefits received in the future are worth less than the same benefits received today. The return on an investment compensates the investor for foregoing present benefits—i.e., the immediate use of capital—and accepting future benefits and risks. This return is usually called *interest* by lenders and *yield* by property owners and equity investors. The discounting procedure includes the expectation that the return of capital will be accomplished through periodic income, the reversion, or a combination of the two.

An investor seeks a total return that exceeds the amount invested. In order to satisfy what the investor seeks, the present value of a prospective benefit must be less than its expected future benefits. A future payment is discounted to present value by calculating the amount that, if invested today, would grow with compound interest at a satisfactory rate to equal the future payment. The standard formula for discounting future value to present value is

$$\text{Present Value} = \frac{\text{Future Value}}{(1 + i)^n}$$

where $i$ is the rate of return on capital per period (or the discount rate) that will satisfy the investor (i.e., its opportunity cost) and $n$ is the number of periods that the payment will be deferred. If a series of future payments is expected, each payment is discounted with the standard formula, and the present value of the payments is the sum of all the present values.

In discounting calculations, the amount paid (e.g., a loan payment to a lender) or received (e.g., a rent payment from a tenant) can be in the form of a single lump sum, a series of periodic installments such as rental income, or a combination of both. When income amounts are compounded or discounted, the rate used is the effective yield rate. On an annual basis, this rate is identical to the nominal yield rate. If income amounts are compounded or discounted more often than annually—e.g., semiannually or monthly—the nominal yield rate is divided by the number of compounding or discounting periods. For example, a nominal annual yield rate of 12% is an effective yield rate of 6% for semiannual conversion periods, or an effective yield rate of 1% for monthly conversions. Standard tables of factors, financial calculators, and computers can be used to facilitate the application of factors, but the user must select the appropriate compounding frequency—i.e., monthly, quarterly, or annually.

BACK_DEFEXP-RR-002895

All present value problems consider the following:

1. The starting cost, value, or investment amount
2. The amount and timing of the periodic cash flows over time
3. The reversion or resale value
4. The yield rate that equates the cash flows and reversion to the starting value[1]
5. The amount of time (number of periods) between the initial cash flow and the reversion

Because each individual cash flow is considered separately, a discounted cash flow (DCF) analysis can be used to solve any problem when three of the five factors are known.

In discounted cash flow analysis, the yield formula is expressed as

$$PV = \frac{CF_1}{1+Y} + \frac{CF_2}{(1+Y)^2} + \frac{CF_3}{(1+Y)^3} + \ldots + \frac{CF_n}{(1+Y)^n}$$

where

$PV$ = present value
$CF$ = the cash flow for the period specified
$Y$ = the appropriate periodic yield rate
$n$ = the number of periods in the projection

This standard discounting procedure is the foundation for all present value calculations.[2]

In DCF analysis, the quantity, variability, timing, and duration of cash flows are specified. In the formula, *cash flow* refers to the periodic income attributable to the interests in real estate. Each cash flow is discounted to present value and all the present values are totaled to obtain the value of the real property interest being appraised. The future value of that interest—the reversion—is forecast to occur at the end of the projection period and is also discounted. The cash flows discounted with the DCF process may be the net operating income to the entire property or the cash flows to specific interests—e.g., the cash flows to the equity interest (equity dividends) or debt service for the mortgage interest.

With the DCF process an appraiser can discount each payment of income and the reversion separately and add all the present values together to obtain the present value of the property interest being appraised. The formula treats the reversion as a cash flow that can be valued separately from the income stream. The formula can be used to develop opinions of

- Total property value ($V_O$)
- Loan value ($V_M$)
- Equity value ($V_E$)
- Leased fee value ($V_{LF}$)
- Leasehold value ($V_{LH}$)
- The value of any other interest in real estate

---

1. In discounted cash flow analysis, a *discount rate* is usually an input. The terms tend to be used synonymously, but there is a subtle difference. A *discount rate* is applied to an income stream to calculate present value. That is, the income stream and discount rate are known, while *PV* is the unknown variable that is solved for. A *yield rate* is the rate that equates an income stream to a present value. In other words, the present value and income stream are known, whereas the yield rate is the unknown that is solved for.

2. For formulas, tables, and sample applications of the six functions of one, see Appendix C.

BACK_DEFEXP-RR-002896

> ### Projection Period and Holding Period
>
> The *holding period* of an investment is defined as the term of ownership of the investment, whereas the *projection period* is a presumed period of ownership for analysis and valuation purposes. In other words, the projection period is a period of time over which expected cash flows are forecast for the purposes of analysis and valuation. Although these terms are often used interchangeably, appraisers are more often concerned with the projection period applicable to the analysis in question. In some markets, the term *designated investment period* is used.
>
> The projection period may vary with the investment and investor. An appraiser usually estimates a projection period that is consistent with investor expectations developed through surveys and interviews. In the selection of an appropriate projection period, an appraiser should consider lease expirations, vacancies, rollovers, anticipated capital improvements, and other atypical events that may cause cash flow aberrations.
>
> Risk increases as the projection period of an investment increases for several reasons:
>
> · Maintenance costs increase as a building ages.
> · Remaining economic life declines as a building ages.
> · Functional issues relating to competition from newer properties may force a property into a lower investment category.
> · In general, as forecasts look farther into the future, the conclusions become less certain.
>
> Cash flows further out are discounted more.

Any series of periodic incomes, with or without a reversion, can be valued with the basic DCF formula. Various formulas are available for valuing level annuities and increasing and decreasing annuities, which are introduced later in this chapter. These formulas have two benefits. First, they can be used as shortcuts to solve for property value, although if used as shortcuts they may be harder for an appraiser to explain and for the client to understand. Second, and more importantly, they provide a systematic method to evaluate real estate and the interactions of current value, income flows, and future value in a single problem-solving framework.

Most often financial calculators or computer programs are used to solve discounting problems mathematically. To apply compounding or discounting procedures, appraisers must know

- The basic formulas
- How the various factors relate to one another
- How they may be used or combined to apply yield capitalization and develop an indication of value

Software programs and standardized tables and factors are useful in solving various yield capitalization problems. However, in the final analysis, an opinion of value and conclusions about time, amount, and yield reflect the appraiser's judgment based on appropriate research of the subject property and relevant market data.

### Estimation of a Yield Rate for Discounting

The estimation of an appropriate discount rate is critical to DCF analysis. (A yield rate is a generic term used to describe many rates. When anticipated cash flows are used, it is called a discount rate. When actual past cash flows are used, it is called an internal rate of return.) To select an appropriate discount rate, an appraiser must verify and interpret the attitudes and expectations of market participants, including buyers, sellers, advisers, and brokers. Although the actual yield on an investment cannot be calculated until the investment is sold, an investor may set a target yield for the investment before or

BACK_DEFEXP-RR-002897

during ownership. Historical yield rates derived from comparable sales may be relevant, but they reflect past, not future, benefits in the mind of the investor and may not be reliable indicators of the current required yield. Therefore, the estimation of yield rates for discounting cash flows should focus on the prospective or forecast yield rates anticipated by typical buyers and sellers of comparable investments. An appraiser can verify investor expectations by interviewing the parties to comparable sales transactions or reviewing marketing materials for comparable properties recently offered for sale.

An appraiser narrows the range of indicated yield rates and selects an appropriate yield rate by comparing the physical, economic, financial, legal, and risk characteristics of the comparable properties with the property being appraised and assessing the competition for capital in rival investments. In some situations, there may be reason to select a yield rate above or below the indicated range. The final estimation of a yield rate requires judgment, just as an appraiser uses judgment to select an overall capitalization rate or equity capitalization rate from the range indicated by comparable sales. In selecting a yield rate, an appraiser should analyze current conditions in capital and real estate markets and the actions, perceptions, and expectations of real estate investors.

### Different Rates

Discount rates are primarily a function of perceived risks. Different portions of forecast future income may have different levels of risk and therefore different yield rates.[3] In lease valuation, for example, one rate might be applied to discount the series of net rental incomes stipulated in the lease, and a different rate might be applied to discount the reversion, which is known as the *split-rate method* or *bifurcated method*. One rate reflects the creditworthiness of the tenant as well as the benefits, constraints, and limitations of the lease contract, while the other is subject to free, open-market conditions. The decision to apply a single discount rate to all benefits or to apply different rates to different benefits should be based on investors' actions in the market and the method used to extract the yield rate. In all cases, these rates should be applied in the same way they were developed.

## Income Stream Patterns

After specifying the amount, timing, and duration of the cash flows to the property interest being appraised, an appraiser should identify the pattern that the income stream is expected to follow during the projection period. These patterns may be grouped into the following basic categories:

- Variable annuity (irregular income pattern)
- Level annuity
- Increasing or decreasing annuity

### Variable Annuity: Nonsystematic Change

In a variable annuity, payment amounts may vary in each period. To value a variable annuity, the present value of each income payment is calculated separately and these

---

3. When future events that could profoundly influence the income-producing potential of a property may or may not occur, probability analysis may be appropriate. Probability analysis is frequently required when properties are subject to potential environmental hazards and compliance with environmental regulations is pending. For example, a site may require an undetermined level of environmental remediation, the remediation required may or may not be completed within a given time frame, or the environmental regulations governing the remediation may be modified. In those situations, probability analysis can help an appraiser develop a yield rate.

BACK_DEFEXP-RR-002898

> **The Nature of Annuities**
>
> Although the word *annuity* means an annual income, the term is used to refer to a program or contract specifying regular payments of stipulated amounts. Payments need not be annual, but the interval between payments is usually regular. An annuity can be level, increasing, or decreasing, but the amounts must be scheduled and predictable. Income characterized as an annuity is expected at regular intervals and in predictable amounts. Obviously real estate income or rental income can have the characteristics of an annuity. Monthly mortgage payments are perhaps the best example of an annuity. The pattern of income expected from a real estate investment may be regular or irregular. Various capitalization techniques have been developed to apply to a wide range of income patterns.

values are totaled to obtain the present value of the entire income stream. This procedure is discounted cash flow analysis.

Any income stream can be valued as if it were a variable annuity. Level annuities and annuities that change systematically are subsets or regular patterns of income that can also be handled with special formulas that reflect the systematic pattern of the income stream. These shortcut formulas can save time and effort in certain cases, but valuing an income stream as a variable annuity with a calculator or computer program may be easier and will result in the same conclusion.

## Level Annuity

A level annuity is an income stream in which the amount of each payment is the same. It is a level, unchanging flow of income over time. The payments in a level annuity are equally spaced and regularly scheduled. Level annuities can be discounted in the same manner as variable annuities. However, compound interest tables simplify the calculation for level income patterns, while providing an identical result. There are two types of level annuities:

- Ordinary annuities
- Annuities payable in advance

### Ordinary Annuity

An ordinary annuity, which is the most common type of level annuity, is distinguished by income payments that are received at the end of each period, often referred to as "in arrears." Standard fixed-payment mortgage loans, many corporate and government bonds, endowment policies, and certain lease arrangements are ordinary annuities.

### Annuity Payable in Advance

An annuity payable in advance is a level annuity in which the payments are received at the beginning of each period. A lease that requires payments at the beginning of each month, like most apartment leases, creates an annuity payable in advance.

## Increasing or Decreasing Annuity

An income stream that is expected to change in a systematic pattern is either an increasing annuity or a decreasing annuity. Appraisers encounter three basic patterns of systematic change:

- Step-up and step-down annuities
- Straight-line (constant-amount) change per period annuities
- Exponential-curve (constant-ratio) change per period annuities

BACK_DEFEXP-RR-002899

### Step-Up and Step-Down Annuities

A step-up or step-down annuity is usually created by a lease contract that calls for a succession of level annuities of different amounts to be paid in different periods of the lease term. For example, a lease might call for monthly payments of $500 for the first three years, $750 for the next four years, and $1,200 for the next six years. Over the 13-year term of the lease, there are three successive level annuities—one for three years, one for four years, and one for six years.

### Straight-Line (Constant-Amount) Change per Period Annuity

An income stream that increases or decreases by a fixed amount each period fits the pattern of a straight-line (constant-amount) change per period annuity. These income streams are also called *straight-line increasing or straight-line decreasing annuities*. For example, a property may have an estimated first-year net operating income of $100,000 that is forecast to increase by $7,000 per year. Thus, the second year's net operating income will be $107,000, the third year's net operating income will be $114,000, and so forth. Similarly, the income stream of a straight-line decreasing annuity is expected to decrease by a constant amount each period.

### Exponential-Curve (Constant-Ratio) Change per Period Annuity

An income stream with an exponential-curve (constant-ratio) change per period is also referred to as an *exponential annuity*. This type of income stream increases or decreases at a constant ratio and therefore the increases or decreases are compounded. For example, a property with an estimated first-year net operating income ($I_O$) of $100,000 that is forecast to increase 7% per year over each preceding year's cash flow will have an $I_O$ in the second year of $107,000 ($100,000 × 1.07). However, the third year's $I_O$ will be $114,490 ($107,000 × 1.07) and the fourth year's $I_O$ will be $122,504 ($114,490 × 1.07).

## Reversion

As mentioned previously, income-producing properties typically provide two types of financial benefits—periodic income and the future value obtained from sale of the property or reversion of the property interest at the end of the projection period. The length of the projection period can usually be determined by reviewing the property's lease expiration dates or other significant, atypical events. The expectations of market participants are also relevant and must be considered. The length of the projection period and the discount rate are interactive. Generally, the longer the projection period, the greater the risk and the higher the discount rate. This future cash flow is called a *reversion* because it represents the anticipated return of a capital sum at the end of the investment.

There are several ways to estimate a resale price or property reversion. A capitalization rate can be applied to the appropriate income for the year following the end of the forecast. When an overall capitalization rate is used to estimate a resale price, it is called a *terminal*, *going-out*, *exit*, or *residual capitalization rate* ($R_N$). This rate is different from the *going-in capitalization rate*—which is the overall capitalization rate found by dividing a property's net operating income for the first year after purchase by the purchase price of the property. The terminal, or residual, capitalization rate forecast is generally, though not necessarily, higher than the going-in capitalization rate. The terminal capitalization rate must reflect the reduction in the remaining economic life of the property and the greater risk associated with estimating net operating income at

BACK_DEFEXP-RR-002900

the end of the projection period. The balance of the mortgage could then be deducted from the resale price or property reversion to calculate the owner's net sale proceeds, or equity reversion, if an equity yield analysis is being performed.

A single property may include one or more property interests that have their own streams of periodic benefits and reversions. For example, a property may have an equity interest with equity cash flow as the periodic benefit and the equity reversion— i.e., property reversion minus the mortgage balance at loan maturity or property resale—as the reversionary benefit. The same property could have a mortgage with debt service as the periodic benefit and the mortgage balance (called a *balloon payment*) as the reversionary interest.

The reversion is often a major portion of the total benefit to be received from an investment in income-producing property. The effective rate of return on the investment will be negative if the investor's capital is not recaptured through some combination of cash flow and reversion proceeds. For certain investments, all capital recapture is accomplished through the reversion, generally indicating higher risk. For other investment properties, part of the recapture is provided by the reversion and part is provided by the investment's income stream.

To judge how much of the return of an investment will be provided by the reversion, an appraiser acknowledges that three general situations could result from the original investment.

1. The property may increase in value over the projection period.
2. The property's value may not change—i.e., the value of the property at the end of the projection period may be equal to its value at the beginning of the period.
3. The property may decline in value over the period being analyzed.

Because these possible outcomes affect the potential yield of the investment and the amount of income considered acceptable, yield capitalization requires an appraiser to determine market expectations as to the change, if any, that will occur in the original investment or the property value over the projection period. (For leveraged investments, equity build-up may also occur through periodic debt service payments that include amortization.)

When a property is expected to be sold, an appraiser projects the reversion amount and considers the net proceeds of resale. The term *net proceeds of resale* refers to the net difference between a transaction price and the selling expenses, which may include brokerage commissions, legal fees, closing costs, transfer taxes. The reversion (forecasted resale price) should be carefully analyzed to determine if costs of repair, capital improvements, environmental remediation, or other extraordinary costs (if any) have been appropriately reflected. The reversion (forecasted resale price) may have to be adjusted to reflect such costs incurred by either party.

An appraiser forecasts the likely value of the reversion in light of the expectations of investors in the market for the type of property being appraised. The appraiser may ask

- Do investors expect a change in the value of this type of property in this particular locale?
- By how much will values change and in which direction?
- Do investors deduct closing cost or cost of sale for anticipated resale when they are analyzing investment opportunities?

BACK_DEFEXP-RR-002901

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 497 of 722    Page
ID #16721

The appraiser analyzes and interprets the market and estimates the value of the future reversion based on the direction and the amount or percentage of change that investors expect. The use of personal computers and software to perform lease-by-lease analysis allows appraisers to make more accurate forecasts of future cash flows, which help them establish or estimate the reversion.

## Discounting Models

The present value of any increasing, level, or decreasing income stream or of any irregular income stream can be calculated with DCF analysis. Specific valuation models or formulas, categorized as either income models or property models, have been developed for application to corresponding patterns of projected benefits.

Income models can be applied only to a stream of income. The present value of an expected reversion or any other benefit not already included in the income stream must be added to obtain the investment's total present value. When a property model is used, an income stream and a reversion are valued in one operation. Other present value models employ discounted cash flow analysis, which is discussed in Chapter 27.

### Income Models

Valuation models can be applied to the following patterns of income:

- Variable or irregular income
- Level income
- Straight-line (constant-amount) change per period income
- Exponential-curve (constant-ratio) change per period income (i.e., the *K* factor)
- Level-equivalent income

These models are not necessarily real estate- or property-specific, but they can be used to solve a variety of financial asset valuation problems that involve real estate.

#### Variable or Irregular Income

As mentioned previously, a discounting process or formula can be used to solve any present value problem. The present value of an uneven stream of income is the sum of the discounted benefits treated as a series of separate payments or reversions. This model simply totals all present values using the standard discounting formula. The routine can be applied as a property valuation model or an income valuation model because it can be adapted to include the final reversion as part of the final cash flow expected at the end of the last, or *n*th, period.

#### Level Income

When a lease provides for a level stream of income or when income can be projected at a stabilized level, one or more capitalization procedures may be appropriate depending on the investor's capital recovery expectations. Capitalization can be accomplished using what is known as *capitalization in perpetuity*. No income stream is perpetual, but the classic conception of an income stream capitalized in perpetuity is based on the assumption of an infinite level income stream. In other words, for the purposes of the analysis, the income stream is considered to be unchanged for the defined economic life of the improvements. The modern theory of an income stream capitalized in perpetuity is based on the assumption of a finite level income stream

BACK_DEFEXP-RR-002902

with its reversion equal to the present value. Although a finite income stream cannot be considered perpetual, the label *perpetuity* is applied because an investment with level income and no change in value behaves in the same manner as the classic conception of a level income stream capitalized in perpetuity.

An income stream capitalized in perpetuity can be valued using direct capitalization. However, the application of direct capitalization does not imply that the income stream associated with the property is a perpetuity. Few investments are expected to have no change in income and value over the projection period.[4]

Capitalization in perpetuity can be considered a property valuation model. If, for example, a property is expected to generate level net operating income for a finite period of time and then be resold for the original purchase price, the property could be valued with capitalization in perpetuity simply by dividing the expected periodic income by an appropriate discount rate. In this model, the discount rate and the overall capitalization rate are of the same magnitude because the original investment is presumed to be recovered at the termination of the investment.

### Straight-Line (Constant-Amount) Change per Period in Income

When income is expected to increase or decrease by a fixed amount per period, the periodic income over time can be graphically portrayed as a straight line. Thus, the term *straight-line* is used to describe this type of income pattern.

To obtain the present value of an annuity that has a starting income of $d$ at the end of the first period and increases or decreases $h$ dollars (or other unit of currency) per period for $n$ periods, the following equation is used:

$$PV = (d + hn)a_{\overline{n}|} - \frac{h(n - a_{\overline{n}|})}{i}$$

where $a_{\overline{n}|}$ is the present value of $1 per period at a rate of $i$ for $n$ periods. In the formulas, $h$ is positive for an increase and negative for a decrease.

The formula for valuing straight-line income patterns should not be confused with direct capitalization with straight-line recapture. Although direct capitalization with straight-line recapture may be seen as a model for valuing a particular income stream, the procedure can also be applied to properties in which the expected change in value is commensurate with the expected change in income. Therefore, direct capitalization with straight-line recapture and related concepts are discussed with property models later in this chapter. Again, the formula above for valuing straight-line income patterns applies to income streams only. If this model is used, the reversion, if any, must be valued separately.  Special tables of present value factors based on the formula are available.[5]

### Exponential-Curve (Constant-Ratio) Change per Period in Income

The constant-ratio model represents an income pattern that increases or decreases at the same rate per period. Many real estate income streams are anticipated to increase following a pattern close to the constant-ratio premise, although typically on a short-

---

4.  In the past, some appraisers calculated the present worth of an income stream using the Inwood premise or the Hoskold premise, which are discussed in Appendix C. Over time, the Hoskold premise has become less popular and rarely reflects the thinking of real estate investors. It is now considered appropriate only for certain types of investments, e.g., in calculating the replacement allowance for leasing equipment or personal property. A Hoskold capitalization rate can be easily constructed by adding the speculative rate to the sinking fund factor for the safe rate, e.g., the prevailing rate for insured savings accounts or government bonds.

5.  See James J. Mason, ed. and comp., *American Institute of Real Estate Appraisers Financial Tables*, rev. ed. (Chicago: American Institute of Real Estate Appraisers, 1982), Table No. 5, Ordinary Annuities Changing in Constant Amount; and Charles B. Akerson and David C. Lennhoff, ed., *Capitalization Theory and Techniques Study Guide*, 3rd ed. (Chicago: Appraisal Institute, 2009) for keystrokes.

BACK_DEFEXP-RR-002903

Copyrighted material licensed by Charles Brigden on September 17, 2020

term basis. Portrayed graphically, this type of income stream follows an exponential curve rather than a straight line. This income pattern is sometimes referred to as *changing at a compound rate*. Analysis of exponential-curve change is primarily accomplished with computers.

### Level-Equivalent Income

All non-level income streams can be converted into a level-equivalent pattern. This is particularly useful when the assignment requires that the conclusion be expressed as a level income amount but the market is performing on a non-level basis. In most markets, leases include a provision for increases over time, often in relation to an index such as a consumer price index (CPI). Therefore, in such a case the appraiser needs to first estimate the rent as it is found in the market, and then convert it into a level-income equivalent.

Converting income into a level equivalent has two steps:

1.  Calculate the present value of the irregular income stream at the appropriate yield rate.
2.  Calculate the level payment that has the same present value.

The second step can be accomplished by multiplying the present value by the installment to amortize one factor at the yield rate. Another way to adjust the income to a level equivalent is to calculate a factor that, when multiplied by the first year's income, results in the equivalent level income. When the income is forecast to change at a compound rate, the $K$ factor can be used to adjust it to a level equivalent:

$$\text{Level Income} = K \text{ factor} \times I_0$$

Of course, the calculation for any pattern of income can easily be accomplished using either a financial calculator or a computer.

### Property Models

When both property value and income changes are expected to follow a regular or predictable pattern, one of the yield capitalization models for property valuation may be applicable. These common yield capitalization models employ a capitalization rate, $R$, which is also used in direct capitalization. There is a difference, however, between direct capitalization and yield capitalization. In direct capitalization, the capitalization rate $R$ is derived directly from market data, without explicitly addressing the expected rate of return on capital or the means of recapture. In yield capitalization, $R$ cannot be determined without considering the income pattern, the anticipated rate of return on capital, and the timing of recapture. This does not mean that yield capitalization procedures are not market-oriented. On the contrary, for some property types yield capitalization procedures may represent the most realistic simulation of decision making in the marketplace.

Real estate investors are greatly influenced by expectations of change in property values. When an investor looks forward to property appreciation as a component of the eventual investment yield, that investor is anticipating that the total yield rate will be higher than the initial year's expected rate of income—i.e., the overall capitalization rate. The total yield rate is a complete measure of performance that includes any property appreciation or depreciation upon resale and increase or decrease in income. The general formula for this relationship is:

$$Y = R + A$$

BACK_DEFEXP-RR-002904

where $Y$ is the yield rate, $R$ is the capitalization rate, and $A$ is the adjustment rate that reflects the change in income and value.

Thus, the capitalization rate for an appreciating property equals the total yield rate minus an adjustment for expected growth:

$$R = Y - A$$

Similarly, the capitalization rate for a depreciating property can be seen as the yield rate plus an adjustment for expected loss:

$$R = Y - (-A)$$

or

$$R = Y + A$$

Because $A$ is often expressed as a function of the total relative change in property income and value, the Greek letter delta ($\Delta$) is used to denote change. To calculate $A$ it is usually necessary to multiply $\Delta$ by a conversion factor, such as an annual sinking fund factor or an annual recapture rate, to convert the total relative change in value into an appropriate periodic rate of change. The symbol for the annualizer is $a$. The general formula for $R$ may be expressed as

$$R = Y - \Delta a$$

where $R$ is the capitalization rate, $Y$ is the yield rate, $\Delta$ is the total relative change in income over the projection period, and $a$ is the annualizer or conversion factor.

This general formula for the capitalization rate can be adapted and used with typical income/value patterns for the property as a whole or for any property components. In the general formula, $R$, $Y$, and $\Delta$ apply to the total property and are expressed without subscripts. However, if there is a possibility of confusing the total property with any of its components, subscripts should be used for clarification—e.g., $R_O$. Once the appropriate capitalization rate has been determined, an indication of property value can be obtained by applying the following universal valuation formula:

$$\text{Value} = \frac{\text{Income}}{\text{Capitalization Rate}}$$

or

$$V = \frac{I}{R}$$

### Level Income

When both income and value are expected to remain unchanged, a property may be valued by capitalization in perpetuity. (Again, for the purposes of the analysis, the income stream is considered to be unchanged for the defined economic life of the improvements.) According to the general formula, $R = Y - \Delta a$, the capitalization rate ($R$) becomes the yield rate ($Y$) when there is no change in value because $\Delta$ equals zero.

When level income with a change in value is projected over a period of $n$ years, the general formula for $R$ is adapted by substituting the sinking fund factor at rate $Y$ over $n$ years in place of the conversion factor ($a$). For example, consider a commercial property that will generate a stable net operating income of $25,000 per year for the next eight years. Total property appreciation of 40% is expected during this eight-year period because market rents are expected to exceed contract rents and the expiring leases will provide an opportunity to release the property at higher rates. The apprais-

BACK_DEFEXP-RR-002905

er concludes that the appropriate yield rate is 11%. To solve this problem, the formula $R = Y - \Delta a$ is used with the sinking fund factor for 11% over eight years as $a$. According to the tables, the sinking fund factor is 0.084321, so $R$ is calculated as follows:

$$R = 0.11 - (0.40 \times 0.084321) = 0.076272$$

$$\text{Value } (V) = \frac{I_o}{R}$$

$$V = \frac{\$25,000}{0.076272} = \$327,776$$

Property models used in solving for value can also be used to manipulate or explain a given set of market data to determine other unknowns. For example, in the problem above, only the net operating income and rate of change or appreciation in property value are known. While DCF analysis may be used as proof of the solution, it is not feasible to apply DCF analysis to solve the problem. This is true because only the rate of appreciation is known from the market, and the dollar amount of the future reversion and the current present value are unknown and interdependent. This illustrates the most significant benefits of the property models—i.e., the ability to make value decisions based on broad trends as well as the ability to explain market behavior.

### Straight-Line (Constant-Amount) Changes in Income and Value

When income and value are expected to increase or decrease by fixed amounts per period according to the standard, straight-line pattern, property value can be estimated using direct capitalization with straight-line recapture. The general formula for the capitalization rate ($R$) can be adapted for use with the standard, straight-line income/value pattern by using the straight-line recapture rate as the conversion factor ($a$). The straight-line recapture rate is simply the reciprocal of the projection period. For example, if income is projected over a period of 25 years, the annual, straight-line recapture rate is 1/25, or 4%. Depreciation of 100% would indicate that the projection period is equal to the remaining economic life of the improvements. The concept of a limited remaining economic life does not apply to appreciating properties, but 100% appreciation would indicate a projection period equal to the amount of time required for the property to double in value.

The straight-line capitalization procedure has historically been used to value wasting assets, i.e., investments whose income is declining as their asset base wanes. This classic procedure has limited applicability due to its underlying assumptions, but it should be thoroughly understood to ensure its proper use. The classic straight-line procedure is based on the expectation that capital will be recaptured in equal dollar amounts during the investment's economic life and that net income consists of a declining amount that represents the return of capital plus a declining return on the capital remaining in the investment. Total income, therefore, diminishes until the asset is worthless and all capital has been recovered.

The presumption that value and income will decline steadily is frequently inconsistent with market behavior. Nevertheless, the procedure has important uses. Straight-line recapture is appropriate whenever the projection of income and value in an investment corresponds with the assumptions implicit in the procedure. Classic straight-line recapture is most easily understood when it is applied to an investment in a wasting asset such as a perishable structure, a stand of timber, a landfill, or a mineral deposit. The procedure is inappropriate for valuing an investment in land or another asset that can sustain value indefinitely.

BACK_DEFEXP-RR-002906

For example, consider an investment in a partial interest in real estate such as a leasehold in which all improvements must be written off during the term of the lease. If $50,000 is invested in a 10-year leasehold expected to earn 8% per year as a yield on capital, what flow of income to the investor would be required to return the entire amount of the investment on a straight-line basis during the 10-year period and, in addition, yield 8% per year to the investor?

Yearly recapture would, of course, be one-tenth of $50,000, or $5,000. The investor is entitled to a return on unrecaptured capital amounting to 8% of $50,000 in the first year, 8% of $45,000 in the second year, 8% of $40,000 in the third year, and so forth (see Table 26.1). The income flow starts at $9,000 the first year and drops by $400 each year after that. The total income payable at the end of the tenth and final year would be $5,400, of which $5,000 would be the last installment of the return of capital and the other $400 would be the interest due on the capital remaining in the investment during the tenth year. Thus, the investor achieves 100% capital recovery plus an 8% return on the outstanding capital, assuming non-level income.

Note that the recapture rate amounts to 10% of the original investment and is simply the reciprocal of the economic life. Also, all income is presumed to be payable at the end of each year, and the yields are always computed at the end of the year on the amount of capital outstanding during the year. Based on the starting income, the capitalization rate in this example would be $9,000/$50,000, or 18%. The 18% capitalization rate could also be calculated by adding the 10% recapture rate to the 8% yield rate.

**Table 26.1**  Periodic Return of and Return on Capital

| End of Year | Invested Capital | Return of Capital | Return on Capital | Total Income |
|---|---|---|---|---|
| 0 | $50,000 | – | – | – |
| 1 | 45,000 | $5,000 | $4,000 | $9,000 |
| 2 | 40,000 | 5,000 | 3,600 | 8,600 |
| 3 | 35,000 | 5,000 | 3,200 | 8,200 |
| 4 | 30,000 | 5,000 | 2,800 | 7,800 |
| 5 | 25,000 | 5,000 | 2,400 | 7,400 |
| 6 | 20,000 | 5,000 | 2,000 | 7,000 |
| 7 | 15,000 | 5,000 | 1,600 | 6,600 |
| 8 | 10,000 | 5,000 | 1,200 | 6,200 |
| 9 | 5,000 | 5,000 | 800 | 5,800 |
| 10 | 0 | 5,000 | 400 | 5,400 |

The straight-line capitalization procedure reflects some useful mathematical relationships:

$$\text{First Period Return on Investment} = \text{Original Value} \times \text{Yield Rate}$$

$$\text{Periodic Change in Value} = \text{Original Value} \times \text{Periodic Rate of Change}$$

$$\text{Periodic Change in Income} = \text{Periodic Change in Value} \times \text{Yield Rate}$$

When the decline in income and value reflects these relationships, the periodic rate of change is the recapture rate and the reciprocal of the recapture rate is the economic life.

The traditional concept of straight-line recapture can be expanded to remove some of its theoretical constraints and facilitate a broader range of practical applica-

BACK_DEFEXP-RR-002907

Copyrighted material licensed by Charles Brigden on September 17, 2020

tions. The expectation of a predictable decline in income can be expanded to include any predictable change, which allows an appraiser to consider growing assets as well as wasting assets. A predictable rate of change within the foreseeable future can also eliminate the need to consider the full economic life of a property. Although there are significant theoretical differences, the expanded straight-line concept corresponds mathematically to classic straight-line recapture.

Under both the expanded and classic straight-line concepts, changes in value and income are presumed to occur on a straight-line basis. The basic requirements for a satisfactory return on, and complete recovery of, invested capital are also preserved. However, the expanded concept does not require that capital be recaptured in annual installments throughout the economic life of a property. Rather, the property could be resold for a predictable amount at some point during its economic life, thereby providing for partial or complete return of the invested capital at the time of resale.

The straight-line capitalization rate is simply a combination of the yield rate and the straight-line rate of change, which is expressed in the general formula $R = Y - \Delta a$, where $\Delta$ is the relative change in value in $n$ periods and $a$ is $1/n$. For example, consider a leased fee interest that will produce income to the leased fee ($I_{LF}$) of $19,000 the first year. This income stream is expected to decline thereafter in the standard straight-line pattern and value is expected to fall 25% in 10 years. The anticipated income pattern must match up with the lease contract. To appraise the leased fee to yield 12%, the formula $R_{LF} = Y_{LF} - \Delta_{LF} a$ is used, where the subscript $LF$ denotes the leased fee.

$$R_{LF} = 0.12 - (-0.25 \times 0.1) = 0.145$$

$$\text{Value} = \frac{I_{LF}}{R} = \frac{\$19,000}{0.145} = \$131,034$$

The classic and expanded straight-line concepts are easy to understand and the math is simple. However, straight-line concepts have theoretical and practical limitations. The straight-line premise is seldom a realistic reflection of investor expectations of changing income and value.

### Exponential-Curve (Constant-Ratio) Changes in Income and Value

When both income and value are expected to change at a constant ratio, the capitalization rate can be determined without tables using the general formula

$$R = Y - \Delta a$$

where $\Delta a$ is the relative change in value and income for one period. Thus, $\Delta a$ can be replaced with the periodic compound rate of change ($CR$). The formula then becomes

$$R = Y - CR$$

where $Y$ is the yield rate per period and $CR$ is the rate of change per period. An expected loss is treated as a negative rate of change, and the formula becomes

$$R = Y - (-CR)$$

or

$$R = Y + CR$$

If both income and value are expected to change at the same compound rate, the capitalization rate is expected to remain constant. Therefore, this pattern of growth or decline is sometimes referred to as the *frozen cap rate pattern*. For example, suppose an

BACK_DEFEXP-RR-002908

income-producing property is expected to produce net operating income of $50,000 for the first year. Thereafter both net operating income and value are expected to grow at a constant ratio of 2% per year. In other words, 2% is the expected ratio of the increase in income for any year to the income for the previous year. The ratio of the increase in value for any year to the value for the previous year is also 2%. To appraise the property to yield 11%, the formula is

$$R_0 = Y_0 - CR = 0.11 - 0.02 = 0.09$$

$$\text{Value} = \frac{\$50,000}{0.09} = \$555,556$$

The elements in the above equation can be transposed so that

$$Y_0 = R_0 + CR$$

The overall yield rate, therefore, is equal to the overall capitalization rate plus the periodic adjustment, provided the rate of change is anticipated to continue at the same rate into the foreseeable future. Property models based on an exponential pattern of change in income and value often reflect the thinking of investors in the market.

### Variable or Irregular Income and Value Changes

When income and value are not expected to follow a regular pattern of change, the present value of a property can be obtained by applying the standard discounting formula separately to each projected benefit, including the final reversion. This is often done using discounted cash flow analysis rather than an income or property model. Examples of applications of discounted cash flow analysis are provided in Chapter 28.

### Level-Equivalent Income

As noted previously, any pattern of income can be converted into a level-equivalent income. Therefore, the level income property model, $R = Y - \Delta S_{n'}$, can be used to solve for the value of any pattern of income once that income has been converted into its level equivalent. Suppose, for example, an appraiser is valuing a property with net operating income of $200,000, growing at 4% per year. If the value is expected to increase 15% over a five-year projection period ($\Delta_O = 15\%$) and the appropriate yield rate is 12%, the value can be calculated by first calculating the level-equivalent income and then dividing that income by an overall capitalization rate developed using the level income property model.

To calculate the level-equivalent income, first calculate the present value of the cash flows at the 12% yield rate:

| Year | Net Income |
|---|---|
| 1 | $200,000 |
| 2 | $208,000 |
| 3 | $216,320 |
| 4 | $224,973 |
| 5 | $233,972 |

The net present value of the income stream at 12% is $774,096. This is easily converted to a level equivalent by multiplying it by the installment to amortize one factor, 0.277410.

$$\text{Level-Equivalent Income} = \$774,096 \times 0.277410 = \$214,742$$

BACK_DEFEXP-RR-002909

Copyrighted material licensed by Charles Brigden on September 17, 2020

The level-equivalent income can be calculated using a financial calculator with the following keystrokes:

$$200,000 \;\boxed{g}\; \boxed{CF_j}$$
$$208,000 \;\boxed{g}\; \boxed{CF_j}$$
$$216,320 \;\boxed{g}\; \boxed{CF_j}$$
$$224,973 \;\boxed{g}\; \boxed{CF_j}$$
$$233,972 \;\boxed{g}\; \boxed{CF_j}$$
$$12 \;\boxed{i}$$
$$\boxed{f}\; \boxed{NPV}$$

Solve for $\boxed{PMT}$.

Alternatively, the following keystrokes can be used:

$$1.04 \;\boxed{ENTER}\; \boxed{ENTER}\; \boxed{ENTER}$$
$$200,000 \;\boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$12 \;\boxed{i}$$
$$\boxed{f}\; \boxed{NPV}$$

Solve for $\boxed{PMT}$.

Next, the overall capitalization rate is developed using the level income property model.

$$R_0 = Y_0 - \Delta a = 0.12 - 0.15(0.157410^*) = 0.096389$$

\* Sinking fund factor, calculated using a financial calculator with the following keystrokes: 5 $\boxed{n}$, 12 $\boxed{i}$, 1 $\boxed{CHS}$ $\boxed{FV}$, solve for $\boxed{PMT}$

The value can then be obtained with the formula $V = \dfrac{I}{R}$ as follows:

$$V = \frac{\$214,742}{0.096389} = \$2,227,879$$

There are many other ways to solve this problem. The level income capitalization rate, for example, could have been divided by the $K$ factor for income growing at 4% per year for 5 years and a 12% yield rate. That factor, 1.073709, is easily found using a financial calculator, a computer, or published tables. The following keystrokes can be used on a financial calculator to calculate the K factor:

$$1.04 \;\boxed{ENTER}\; \boxed{ENTER}\; \boxed{ENTER}$$
$$1 \;\boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$\boxed{X}\; \boxed{g}\; \boxed{CF_j}$$
$$12 \;\boxed{i}$$
$$\boxed{f}\; \boxed{NPV}$$

Solve for $\boxed{PMT}$.

The capitalization rate developed using the $K$ factor, 0.089772, would then be divided into the first year's net operating income of $200,000 to yield the same value

BACK_DEFEXP-RR-002910

conclusion. In fact, because the calculation is so easily obtained—for any income pattern—from a financial calculator or computer, little emphasis is given to the use of pre-calculated factors. The factors are useful, however, in presenting the analysis to a client.

BACK_DEFEXP-RR-002911

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Discounted Cash Flow Analysis and Investment Analysis

## 27

Discounted cash flow (DCF) analysis is an appropriate tool for valuing any pattern of regular or irregular income. In many markets and for many property types, DCF analysis is the technique that investors prefer. Properly applied, DCF analysis identifies the market conditions investors are anticipating as of the date of value.[1]

Some critics argue that DCF analysis is too speculative, but the technique is not an unsupported prediction by an appraiser. Appraisers who use DCF analysis are simply identifying what investors expect on the date of appraisal and build into their pricing models. Whether the expectations of investors are realized or not, the appraisal will be prepared properly if the appraiser has correctly identified the investor's expectations on the date of appraisal.

## Applicability of DCF Analysis

Generally, DCF analysis is used to solve for present value given the rate of return or to solve for the rate of return given the purchase price. Discounted cash flow analysis can be used both to estimate present value and to extract a yield or discount rate from a comparable sale.

In typical appraisal work, an appraiser begins by developing detailed spreadsheets. These spreadsheets show itemized incomes, expenses, and cash flows year by year, or sometimes month by month, over the presumed period of ownership or another projection period that the market suggests. The cash flows, including the net resale price, are then discounted at an appropriate rate (or rates) to derive an indication of present value. In this way, an appraiser can account for all cash flows in and out of the real property interest being appraised and estimate the timing of these cash flows so that the time value of money is properly recognized in the analysis. Alternatively, if the yield is sought, these cash flows are calculated given the purchase price being realized.

Data related to cash flows and compounding or discounting conventions must be derived from consistent sources. For example, if a market-derived discount rate is

---

1.  See Advisory Opinion 33 of the Uniform Standards of Professional Appraisal Practice.

extracted based on annual cash flows and end-of-period discounting, an appraiser's analysis of cash flows should be based on these same expectations. If different expectations are applied (e.g., semiannual cash flows with beginning of period discounting), the discount rate used must be adjusted to account for the difference from the application of market-extracted terms (e.g., end-of-period discounting in arrears).

When the objective of an appraisal is to develop an opinion of market value, the frequency of discounting cash flows must reflect the actions of prospective investors. For example, the discount rates normally quoted by investors presume annual discounting in arrears. If an appraiser were to divide annual discount rates by 12 and analyze discounted cash flows on a monthly basis arguing that this is how the cash flows occur, those calculations would result in a higher value indication than the DCF analysis of annual cash flows. This result would not reflect the market value of the property because the discount rate was applied incorrectly.

Critics of DCF analysis point out that projections not warranted by market evidence can result in unsupported market value indications and that the results of the analysis can change significantly due to even small changes in the projections. Other critics object to the uncertainty of forecasting financial results 5 or 10 years into the future and cite this as a reason for not using or relying on the DCF technique. However, these arguments ignore the reality of the real estate marketplace. Investors do make forecasts and rely on DCF analysis, particularly in regard to large, investment-grade, multitenant properties such as shopping centers and office buildings and properties with nonstabilized incomes such as new buildings that require lease up.

When yield capitalization was first expanded in applications of the valuation process by L. W. Ellwood in the 1960s, there was initial confusion over mathematical processes and relationships that are now commonly understood. At first, many appraisers mistakenly believed that yield capitalization could only apply to long-term, dependable income streams. Ellwood held two positions that were considered novel at the time but were factual expressions of already accepted appraisal principles.

- First, he recognized that any form of capitalization was unreliable and potentially misleading unless the net income to be capitalized was accurately developed with market support.
- Second, he established that the yield rate for capitalization should be the market yield rate that would relate that net income (over time) to market value.

Ellwood believed that variations could be used to test and understand market behavior. For example, if the incomes including the reversion were expressed in an income statement, even a statement covering only 5 years, the effects of lesser uncertainty in the early property incomes and greater uncertainty of the reversion amount would be mitigated in present value discounting processes. In capitalization, the contribution to present value decreases as the time elapsed from the date of value increases, so greater weight is afforded to those "knowns" that are closest to the date of value. Although the discounting processes involved once required significant amounts of time (for formula calculations and to search for rates in printed tables), appraisers can now perform the calculations relatively quickly with financial calculators or computer software once the DCF model has been set up and all inputs included.

In keeping with the principle of anticipation, market-supported forecasting is the essence of valuation. Hence, it must be approached in the same way that all market data extractions are accomplished—i.e., with diligent research and careful verification.

494   *The Appraisal of Real Estate*

BACK_DEFEXP-RR-002913

Discounted cash flow analysis can only provide accurate results if the forecasts developed are based on accurate, reliable information. Unless real estate income is defined by contract at a level amount or has a defined pattern over the course of the lease term, most income streams will vary from year to year, particularly with changes in business cycles or local property markets. It is most common for appraisers to develop a "stabilized" income stream, which may be level or exhibit some consistent rate of change, to represent a property's income for yield capitalization purposes. This practice follows procedures commonly applied by buyers and sellers, and the application of the technique should mirror the reasoning and behavior of those market participants.

## Investment Analysis

In addition to developing an opinion of value or extracting a yield rate from comparable sales, discounted cash flow analysis techniques are often used to test the performance of real estate investments at a desired rate of return. Measures of investment performance include

- Net present value
- Internal rate of return
- Payback period
- Profitability index (or benefit/cost ratio)
- Time-weighted rate

Used alone, these measures sometimes produce limited conclusions, but as a collection of tools they have proven their effectiveness. They reflect a common market understanding and are useful in typical real estate applications.

### Forecasting

In making forecasts an appraiser employs the same procedure applied by investors who use DCF analysis in their decision making. The procedural steps typically include forecasting income, vacancy, operating and capital expenses, and equity income (if appropriate) over ownership periods of, for example, 5 to 15 years. In some markets and in some situations, 10 years is cited as an average or standard projection period or a typical ownership period. In others, the forecast period may be shorter or longer. When appropriate, debt service and after-tax cash flow may also be forecast. The residual income from the sale of the property at the end of the forecast period is also estimated.

Typical forecast categories to be addressed in DCF analysis include

- Current market rental rates, lease expiration dates, and expected rental rate changes
- Lease concessions and their effect on market rent
- Existing base rents and contractual base rent adjustments
- Lease extensions and renewal options
- Existing and anticipated expense recovery (escalation) provisions
- Tenant turnover
- Vacancy loss and collection allowance
- Operating expenses and changes over the projection period
- Net operating income
- Capital items including leasing commissions and tenant improvement allowances
- Reversion and any selling or transaction costs
- A discount or yield rate (or rates)

BACK_DEFEXP-RR-002914

## Net Present Value and the Internal Rate of Return

Net present value (*NPV*) and the internal rate of return (*IRR*) are two discounted cash flow models widely used to measure investment performance and develop decision-making criteria. Net present value (dollar reward) is the difference between the present value at a desired yield (discount) rate of all positive cash flows and the present value of all negative cash flows, or capital outlays. When the present value of the positive cash flows is greater than the present value of the negative cash flows or capital outlays, the investment exceeds the return requirements of the investor. If the reverse relationship exists (i.e., negative cash flows are greater than positive cash flows), the investment is not considered feasible at the desired yield, or at least not at the discount rate used to calculate present value. However, other investors may find the investment feasible.

A net present value of zero indicates that the present value of all positive cash flows equals the present value of all negative cash flows or capital outlays at the discount rate. The rate of discount that makes the net present value of an investment equal zero is the internal rate of return. In other words, the *IRR* is the rate that discounts all returns from an investment, including returns from its termination, to a present value that is equal to the original investment.

A number of decision rules for applying the *NPV* can be established. For example, suppose that a property with an anticipated present value of $1.1 million for all investment returns over a 10-year projection period can be purchased for $1.0 million. If one investor's *NPV* goal is $0, this investment exceeds that criterion. It also meets a second investor's goal for an *NPV* of $100,000, but it would not qualify if the goal were $150,000.

Net present value considers the time value of money, and different discount rates can be applied to different investments to account for general risk differences. However, this method cannot handle different required capital outlays. For example, it cannot differentiate between an *NPV* of $100,000 on a $1,000,000 capital outlay and the same *NPV* on a $500,000 capital outlay. Therefore, this technique is best used in conjunction with other measures.

A common example of the use of an *NPV* analysis is called a *hurdle rate analysis*. Some investors use a stated yield rate, which is the minimum acceptable rate of return for that investor, to determine the extent to which a potential investment can exceed that minimum. If there is a surplus of *NPV* above zero to justify further attention, the investor can then spend the time and resources to pursue a more precise estimate of potential investment yield if the investment otherwise appears to be worth the exercise.

As a simple example of calculating the internal rate of return, consider the income data in Table 27.1. The internal rate of return of 11.37% can be calculated using the following HP-12C financial calculator keystrokes:

1,600,000 CHS g CFo
100,000 g CFj
5,000 CHS g CFj
110,000 g CFj
115,000 g CFj
2,330,000 g CFj
f IRR.

BACK_DEFEXP-RR-002915

Copyrighted material licensed by Charles Brigden on September 17, 2020

Plotting the net present values of the income streams at a variety of discount rate, as shown in Figure 27.1, illustrates where *NPV* crosses the *x*-axis (i.e., where *NPV* = 0) at the *IRR*.

**Table 27.1**    Net Cash Flow

| Year | Income | Reversion | Net Cash Flow |
|---|---|---|---|
| 0 | -$1,600,000 | | -$1,600,000 |
| 1 | $100,000 | | $100,000 |
| 2 | -$5,000 | | -$5,000 |
| 3 | $110,000 | | $110,000 |
| 4 | $115,000 | | $115,000 |
| 5 | $230,000 | $2,100,000 | $2,330,000 |

**Figure 27.1**    Graphic Analysis of *IRR*



By understanding the limitations and pitfalls appraisers may encounter using the *IRR*, practitioners can avoid wasted effort and false conclusions. The search for a single *IRR* within a plausible range is not always successful. Unusual combinations of cash flows may produce strange results, and more than one *IRR*—or, in rare cases, no *IRR*—may be indicated.

### More Than One Internal Rate of Return

More than one internal rate of return is only possible with the presence of negative cash flows. Consider a real estate investment in which the investor puts down $23,000, borrows $100,000, and pays 10% interest only, with the principal to be repaid in a lump sum at the end of 10 years. The investor's net cash flows can then be tabulated as shown in Table 27.2.

BACK_DEFEXP-RR-002916

**Table 27.2**  Net Cash Flow

| Year | Cash Flow before Loan/Interest | Loan | Interest | Net Cash Flow |
|---|---|---|---|---|
| 0 | -$123,000* | $100,000 | $0 | -$23,000 |
| 1 | $20,000 | $0 | -$10,000 | $10,000 |
| 2 | $20,000 | $0 | -$10,000 | $10,000 |
| 3 | $20,000 | $0 | -$10,000 | $10,000 |
| 4 | $20,000 | $0 | -$10,000 | $10,000 |
| 5 | $10,000 | $0 | -$10,000 | $0 |
| 6 | $10,000 | $0 | -$10,000 | $0 |
| 7 | $10,000 | $0 | -$10,000 | $0 |
| 8 | $10,000 | $0 | -$10,000 | $0 |
| 9 | $10,000 | $0 | -$10,000 | $0 |
| 10 | $90,000† | -$100,000 | -$10,000 | -$20,000 |

\* Initial cash outlay

† Income and proceeds from sale

The internal rate of return for the net cash flows after financing can be obtained through graphic analysis. Net present values are calculated for even discount rates between 0% and 24% and plotted on a graph. Table 27.3 and Figure 27.2 indicate not one, but two, internal rates of return. Using a computer, the two *IRR*s are calculated as 4.50839% and 18.3931%.

Multiple rates like these are interesting from a theoretical viewpoint, but it is difficult to accept more than one internal rate of return as a useful measure of performance. In real estate investment analysis, the presence of multiple internal rates of return usually suggests that some other measure of performance (usually net present value analysis) would be more appropriate or that the cash flows or the time frame should be adjusted to permit a more meaningful analysis.

### Negative Net Present Value at Zero Rate of Return

The cumulative value of the net cash flows in Table 27.2 is negative. Negative net cash flows total $43,000, while positive net cash flows total $40,000. Therefore, the net present value—i.e., the difference between the present value of expected benefits, or positive cash flows, and the present value of capital outlays, or negative cash flows— with no discounting or at a zero discount rate is -$3,000, as shown in Figure 27.2. This should be a warning sign to an analyst.

Under these conditions, the internal rate of return cannot be positive unless the mixture of positive and negative cash flows over time is such that the net present value increases with increases in the discount rate until the net present value reaches zero. This type of reverse discounting is mathematically valid, but it is contrary to the practical notion of reducing net present value by increasing the discount rate. It is not surprising that, in cases like this, the internal rate of return is difficult to comprehend and of questionable use.

For a given discount rate ($Y$), the following statements apply:

- If the present value ($PV$) of future benefits is greater than the capital outlay ($CO$), the net present value ($NPV$) is greater than zero and the internal rate of return ($IRR$) is greater than the discount rate.

BACK_DEFEXP-RR-002917

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 27.3**    Table of Net Present Values

| Discount Rate | Net Present Value |
|---|---|
| 0 | -$3,000 |
| 2 | -$1,330 |
| 4 | -$212 |
| 6 | $483 |
| 8 | $857 |
| 10 | $988 |
| 12 | $934 |
| 14 | $742 |
| 16 | $448 |
| 18 | $79 |
| 20 | -$343 |
| 22 | -$802 |
| 24 | -$1,284 |

**Figure 27.2**    Graphic Solution to Example



- If the present value of future benefits is less than the capital outlay, the net present value is less than zero and the internal rate of return is less than the discount rate.
- If the present value of future benefits is equal to the capital outlay, the net present value equals zero and the internal rate of return is equal to the discount rate.

The formulas are:

$$\text{If } PV \text{ of future benefits} > CO \rightarrow NPV > 0 \text{ and } IRR > Y$$
$$\text{If } PV \text{ of future benefits} < CO \rightarrow NPV < 0 \text{ and } IRR < Y$$
$$\text{If } PV \text{ of future benefits} = CO \rightarrow NPV = 0 \text{ and } IRR = Y$$

*Discounted Cash Flow Analysis and Investment Analysis*    **499**

### Negative Internal Rate of Return

If the net present value of an investment at a 0% rate of return is negative, a negative internal rate of return may be indicated. The *IRR* is generally understood to be a positive rate of return, but a negative *IRR* may be interpreted as a rate of loss. Any prospective rate of loss will normally discourage capital investment.

The concept of a negative internal rate of return has theoretical, as well as practical, limitations. A glance at the *IRR* equation reveals that a negative *IRR* of 100% or more has no meaning because it involves division by zero or powers of a negative number.

### Little or No Equity

Because the internal rate of return is a measure of the return on invested capital, it cannot be used to measure the performance of opportunities that require no investment of capital. Some investments can be "financed out"—i.e., financed with loans that cover 100% or more of the capital required. If the projected net cash flows are all positive, there is no *IRR*. Obviously, no discount rate can make a series of exclusively positive benefits equal zero.

The same rationale can be applied to investments calling for very low equity or a very small down payment in relation to expected returns. For example, a profit of $1 on an investment of $1 amounts to a 100% rate of return. A return of $100 on an investment of $1 indicates a 10,000% rate of return. When the investment is very small, slight changes in income can cause astronomical changes in the rates of return and loss. The internal rate of return is an impractical yardstick for these sorts of investments.

However, the *IRR* can be a valuable indicator in analyzing investments that are 100% financed at the start and are expected to operate at a loss for a period of time. In these arrangements, the early negative cash flows may represent a significant investment of equity capital, and the prospective *IRR* may be the best measure of performance. It may also be useful to compare the prospective *IRR* before financing with an interest rate that reflects the cost of capital. The difference can be used as a measure of prospective leverage.

### Reinvestment Concepts

The internal rate of return on the capital within an investment can be applied to a single property or to an entire investment portfolio. No assumption is made as to how the investor actually employs funds that are received during the investment's ownership. The income from a real estate investment may be reinvested in another project at another rate of return, stored in a vault, or spent, but the *IRR* is not affected. Regardless of whether or not an investor in fact reinvests capital withdrawn from the investment at any given rate, a defining characteristic of the internal rate of return is that it is mathematically consistent with reinvestment at the same rate of interest as the *IRR*. This establishes a framework for distinguishing between the internal rate of return and other measures of investment return that make explicit reinvestment assumptions.

Incorporating a reinvestment concept in investment analysis is useful when viewing returns within the context of overall portfolio performance. It is a fundamental concept of finance that to calculate a rate of return on an investment and to compare two or more alternative investments, all of the funds in an investment must be considered over the entire period of analysis. Income-producing real estate typically generates both a return on and a return of the invested capital over the life of the investment. The rate of return can differ with various reinvestment assumptions.

BACK_DEFEXP-RR-002919

Copyrighted material licensed by Charles Brigden on September 17, 2020

As described earlier, there are potential problems with the concept of an internal rate of return, but its use does not force any particular reinvestment assumptions, even though it is consistent with reinvestment at the same rate as the *IRR*.

As discussed above, one problem associated with the internal rate of return is that certain situations (such as negative cash flow) can produce mathematical results that support more than one rate. A different rate of return concept with a specific reinvestment premise is sometimes used to avoid multiple *IRR*s. Although the assumption of a specific reinvestment rate other than the *IRR* does not result in an internal rate of return, reinvestment assumptions are applied in a number of rate of return concepts that make up a family of *IRR*-related measures.

The *IRR with reinvestment* is based on the expectation that all income from a project can be immediately reinvested at a specified rate and left to grow at that rate until the end of the investment projection period. The combined results of the investment's earnings and reinvestment are then reflected in one overall rate of return. The *IRR* with reinvestment traces the expected total performance of the original capital sum at work in more than one investment, rather than ignoring what occurs with portions of the capital investment during the ownership period. This measure can also be used to prevent multiple solutions to the internal rate of return equation. The *IRR* with reinvestment is often called the *adjusted* or *modified IRR* (*AIRR* or *MIRR*).[2]

As an example, consider the series of equity cash flows with a reinvestment rate for positive cash flows of 6% shown in Table 27.4. The sum of the future values of the positive cash flows is $473,208. Comparing the future value with the present value of the initial investment using a financial calculator will give an equity *MIRR* of 13.61% with the reinvestment rate of 6%, which is lower than the *IRR* of 14.8%. Using the *IRR* of 14.8% as the reinvestment rate in the calculations of *MIRR* would give an *MIRR* of 14.8%.

The *IRR with a specified borrowing rate* is another variation of the internal rate of return that can be used to prevent multiple rates. It is sometimes called the *IRR for investment* or *financial management rate of return* (*FMRR*). The *IRR* for investment specifies an interest rate for the borrowed funds needed during the period when the investment is producing negative cash flows. As with other rates derived from the internal rate of return, the *FMRR* recognizes that there are different risks and potential earnings that apply to the funds withdrawn from the original investment. The

**Table 27.4**   Equity Cash Flow with Reinvestment

| Year | Equity Cash Flow | Future Value of Positive Cash Flow* |
|---|---|---|
| 0 | -$250,000 | |
| 1 | $20,000 | $25,250 |
| 2 | $35,000 | $41,686 |
| 3 | $20,000 | $22,472 |
| 4 | $30,000 | $31,800 |
| 5 | $50,000 | $50,000 |
| Reversion | $300,000 | $300,000 |

\* The future value of the positive cash flows is calculated with a HP-12C financial calculator using the following keystrokes for Year 1: 4 [n], 6 [i], 20,000 [PV], 0 [PMT], solve for [FV]. Note that the term of reinvestment for the Year 1 cash flow is four years (from the end of the first year to the end of the fifth year).

2.   The algebraic formula for the *MIRR* appears in Appendix C.

BACK_DEFEXP-RR-002920

concept of financial management indicates that lower rates will be paid on borrowed funds and that risk management will permit the investor to eventually earn a higher rate of return on the real estate investment. Again, to derive the *FMRR*, the entire amount of invested capital is analyzed over the life of the real estate investment, as is the case with other rates that assume reinvestment (*AIRR* and *MIRR*).

As an example of the calculation of an *FMRR*, consider the series of cash flows in Table 27.5, which have an *IRR* of 21.47%. In this scenario, the cash flow of Year 2 is reduced by $23,810, which is invested at a safe rate of 5% to cover the $25,000 outlay in Year 3. Furthermore, the $100,00 outlay at the end of Year 1 is discounted at the safe rate to be accounted for as part of the initial investment. Finally, the positive cash flows are compounded at an appropriate rate—in this case, 7.5% was used—and the financial management rate of return can then be calculated as 17%.

| Table 27.5 | Positive Cash Flows | | | |
|---|---|---|---|---|
| Year | Cash Flow | Remove Outlays Using Prior Inflows* | Discount Outlays at Safe Rate | Present Value of Positive Cash Flows† |
| 0 | -$50,000 | -$50,000 | -$145,238 | -$145,238 |
| 1 | -$100,000 | -$100,000 | $0 | |
| 2 | $50,000 | $26,190 | $26,190 | |
| 3 | -$25,000 | $0 | $0 | |
| 4 | $80,000 | $80,000 | $80,000 | |
| 5 | $200,000 | $200,000 | $200,000 | $318,536 |

\* In this example, inflows are invested at a safe rate of 5%.

† In this example, an interest rate of 7.5% is used to compound the positive cash flows.

### Applicability

The internal rate of return can be as important to the real estate investor as the interest rate is to the mortgage lender. In fact, the two measures are equivalent. The interest rate on a mortgage is the same as the mortgagee's yield, or the internal rate of return, unless points or other payments such as prepayment penalties are involved. The internal rate of return is not a meaningful measure of all investments and, even when it is meaningful, it is not the only possible criterion. It is, however, a fundamental and pure measure of a particular investment's financial performance. In general, the internal rate of return is a valuable analytical tool if the decision maker understands its attributes and limitations and has access to complementary or alternative analytical techniques.

### Other Measures of Performance

Popular alternative measures of financial performance or profitability include

- Payback period
- Profitability index or benefit/cost ratio
- Time-weighted rate

These yardsticks do not measure performance or profit on the same scale or under the same assumptions as the internal rate of return. Their usefulness depends on the situation and the user's preferences. Neither the internal rate of return nor any alternative measure is superior in all situations.

BACK_DEFEXP-RR-002921

### Payback Period

As a measure of investment return, the payback period is seldom used alone. It is commonly employed in conjunction with other measures such as the internal rate of return. The payback period (*PB*) is defined as the length of time required for the stream of net cash flows produced by an investment to equal the original cash outlay. The breakeven point is reached when the investment's cumulative income is equal to its cumulative cost or loss. The payback period can be calculated from either before-tax or after-tax cash flows, so the type of cash flow selected should be identified. The equation for payback period may be expressed as follows:

$$PB = \frac{\text{Capital Outlay}}{\text{Annual Net Cash Flows}}$$

Because real estate appraisers typically account for income as if received annually at the end of the period, full payback is not considered to occur until the end of a year. Therefore, the payback period indicated by the prior equation will be rounded up to a whole number, i.e., to the end of the next year.

This measure of performance is used by investors who simply want to know how long it will take them to recapture the funds they have invested. In theory, an investment with a payback period of three years would be preferable to one with a payback period of five years, all else being equal. Similarly, an investment that will return the investor's capital in six years would be unacceptable to an investor who seeks investment payback within four years.

For an equity investment that is expected to produce equal cash flows, the payback period is simply the reciprocal of the equity capitalization rate:

$$PB = \frac{1}{R_E}$$

where the equity capitalization rate ($R_E$) is rounded up to the next whole number. For example, if $R_E = 15\%$, then $PB = 1/0.15 = 6.67$. If annual equity cash flows are not expected to be equal over the payback period, the equity cash flows for each year must be added until the sum equals or exceeds the equity capital outlay. This point indicates the year in which payback occurs.

Although the payback period is simple and easily understood, it has several drawbacks. First, it measures the amount of time over which invested money will be returned to the investor, but it does not consider the time value of the money invested. A five-year investment payback for a $100,000 investment that pays $10,000 in Year 1 and $90,000 in Year 5 is not distinguished from the payback for a $100,000 investment that pays $90,000 in Year 1 and $10,000 in Year 5. The time value of money allows the first investment to use an additional $80,000 (i.e., the difference between the $90,000 paid in the second investment and the $10,000 paid in the first investment) from the second year through the fifth.[3]

Another shortcoming of the payback period is that it does not consider the effect of any gain or loss of invested capital beyond the breakeven point and does not specifically account for investment risks. An investment with a three-year payback may be far riskier than another investment with a five-year payback, but the shorter

---

3.   A more sophisticated, but less popular, measure is the discounted payback period, which recognizes the time value of money at a stipulated rate of return. In this context the payback period is the amount of time required for the discounted benefits to equal the discounted costs.

BACK_DEFEXP-RR-002922

period generally appears preferable. Thus, this measure of performance should only be used to compare investments with similar investment characteristics or in conjunction with other performance measures in carefully weighted applications.

Despite its shortcomings, the payback period is used by investors in situations like feasibility analyses for the renovation of apartment buildings. Investors make decisions about renovation (e.g., how much new investment to make, if any) by considering how soon they can recoup their investment. For example, if an investor's payback objective is for a two-year holding period and the investor will recoup the dollar amount in two years in the form of higher rent, then the renovation will be performed. Even investors in large assets are able to use this simple, but pragmatic, approach with no discounting.

### Profitability Index

Although measuring the investment proceeds per dollar invested is too imprecise for general use, a refinement of this technique is commonly applied in investment analysis. The profitability index (*PI*), which is also called the *benefit/cost ratio*, is defined as the present value of the anticipated investment returns (benefit) divided by the present value of the total initial and annual, if any, capital outlay (cost). The formula is

$$PI = \frac{\text{Present Value of Anticipated Investment Returns}}{\text{Present Value of Total Capital Outlay}}$$

This measure employs a desired minimum rate of return or a satisfactory yield rate. The present value of the anticipated investment returns and the capital outlay are calculated using the desired rate as the discount rate. If, for example, the capital outlay is $12,300 and the present value of the benefits, based on a satisfactory yield rate of 10%, is $13,100, the profitability index is $13,100/$12,300 = 1.065.

A profitability index greater than 1.0 indicates that the investment is profitable and acceptable in light of the chosen discount rate. A profitability index of less than 1.0 indicates that the investment cannot generate the desired rate of return and is not acceptable. A profitability index of exactly 1.0 indicates that the opportunity is just satisfactory in terms of the desired rate of return and, coincidentally, the chosen discount rate is equal to the anticipated internal rate of return. The discount rate used to compute the profitability index may represent a minimum desired rate, the cost of capital, or a rate that is considered acceptable in light of the risks involved.

A profitability index is particularly useful in comparing investments that have different capital outlay requirements, different time frames for receiving income or other investment returns, and different risk characteristics. A profitability index is commonly used in conjunction with other measures, particularly with net present value. When combined, these measures provide special insights into the investments under consideration.

### Time-Weighted Rate

A time-weighted rate is technically an average of all actual rates at different points over a period of time. It is similar to the rate of growth for capital invested in a mutual fund in which all dividend income is automatically reinvested. The time-weighted rate, which is also known as the *unit-method rate* or the *share-accounting rate*, is used primarily to measure the performance of a portfolio manager, not the performance of the portfolio itself.

BACK_DEFEXP-RR-002923

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Applications of the Income Capitalization Approach

## 28

Chapters 23 through 27 described the basic theory and procedures of the income capitalization approach and introduced a number of specific techniques. The examples presented in this chapter illustrate the most common techniques used in applying the income capitalization approach.

## Applications of Income and Expense Analysis

As discussed in Chapter 24, a thorough analysis of the income and expenses of the subject property and comparable properties is the starting point for application of the capitalization procedures. The forecast of income and expenses can be for a single year, if direct capitalization is going to be used, or for multiple years, if a yield capitalization technique is more appropriate.

### Sample One-Year Income and Expense Forecast

The property being appraised, Southside Apartments, is a three-year-old, 55-unit apartment project. Pertinent information for forecasting income and expenses follows:

- The gross potential rental income at 100% occupancy (based on actual rents) is $1,101,600.
- Open parking is included with the rent.
- Additional income from coin-operated equipment averages about $4,140 per year at full occupancy so the total, annual potential gross income at l00% occupancy is $1,105,740.
- Annual vacancy and collection loss is estimated at 4%.
- Local management services are available for 5% of effective gross income.
- Last year's real estate tax bill was $53,625, but taxes are expected to be $56,100 by the end of this year. A sale of the property does *not* trigger a reassessment. Taxes are expected to increase 3% per year.

BACK_DEFEXP-RR-002924

- The owner carries $1 million in fire and extended coverage insurance and pays an annual premium of $4,700. The appraiser believes that this coverage should be increased to $1.2 million with a premium of $5,640 (1.2 × $4,700 = $5,640). The additional expense for other insurance coverage is $2,310 per year and is a typical requirement.
- The part-time building superintendent receives an annual salary of $50,400, including fringe benefits.
- The cost to cover site maintenance and snow removal averages $17,700 per year.
- Building tenants pay their own utilities, including gas and electricity for individual apartment heating and air-conditioning units. Based on the expenses of the comparables and anticipated rate changes, the electricity for public space is expected to cost $6,600 in the coming year. Expenses for other utilities, including water, consistently run about $3,000 each year.
- Historically, repair and maintenance expenses have ranged from $72,000 to $78,000 per year, including some capital expenditures.
- Trash removal costs $135 per month, pest control costs are $195 per month, and the cost of supplies is estimated at $3,300 per year.
- Most of the apartments are rented on one-year leases, with a typical redecorating cost of $1,500 per apartment every third year.
- Common area is minimal, and redecorating this space costs about $7,500 every third year.
- Miscellaneous expenditures are projected at $975 per year.
- The appraiser anticipates that capital replacement will accelerate, and the reconstructed operating statement should include a separate replacement allowance for such capital items in addition to normal repair and maintenance expenses.
- Exterior painting, which is estimated to cost $13,950 in the present market, is scheduled to be done every three years.
- All the apartments have electric stoves, refrigerators, dishwashers, garbage disposals, and bathroom exhaust fans, so a replacement allowance of $3,899 per apartment is required. The economic lives of these items vary, but they are estimated to average 10 years.
- The replacement of carpeting costs the owner about $2,700 per unit, and the average economic life of carpeting is six years.
- The roof is considered to have a 20-year life and a replacement cost of $54,000.

The operating statement shown in Table 28.1 reflects these estimates. The numerical precision of each entry is approximate, and in most cases the appraiser is rounding to the closest $5 or $10, which is well within the estimated accuracy of the data.

### Sample Multiyear Income and Expense Forecast

Table 28.2 shows a six-year forecast of the income and expenses generated by the apartment building described in the preceding example. All the techniques described in these two examples are used to develop a net operating income estimate for the first year of the forecast. Estimates for the other years are based on existing lease provisions and expected forecasts regarding lease renewals and growth rates applied to other income and operating expenses. The annual growth rate conclusions are as follows:

BACK_DEFEXP-RR-002925

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 28.1**    Southside Apartments: Reconstructed Operating Statement

| | | |
|---|---:|---:|
| Income | | |
| Potential gross annual income | | |
| Rents    11 units @ $1,500/mo. | $198,000 | |
| 12 units @ $1,575/mo. | 226,800 | |
| 16 units @ $1,725/mo. | 331,200 | |
| 16 units @ $600/mo. | 345,600 | |
| Subtotal | $1,101,600 | |
| Other income | +    4,140 | |
| Total potential gross income @ 100% occupancy | $1,105,740 | |
| Less vacancy and collection loss @ 4% | −    44,230 | |
| Effective gross income | | $1,061,510 |
| Operating expenses | | |
| Fixed | | |
| Real estate taxes | $56,100 | |
| Insurance | | |
| Fire and extended coverage | 5,640 | |
| Other | 2,310 | |
| Subtotal | $64,050 | |
| Variable | | |
| Management ($1,061,510 × 0.05) | $53,075 | |
| Superintendent | 50,400 | |
| Site maintenance and snow removal | 17,700 | |
| Electricity | 6,600 | |
| Other utilities | 3,000 | |
| Repair and maintenance | 75,000 | |
| Trash removal ($135 × 12) | 1,620 | |
| Pest control ($195 × 12) | 2,340 | |
| Supplies | 3,300 | |
| Interior decorating* | 30,000 | |
| Other | 975 | |
| Subtotal | $244,010 | |
| Replacement allowance | | |
| Exterior paint ($13,950/3) | $4,650 | |
| Kitchen and bath equipment ($3,900 × 55)/10 | 21,450 | |
| Carpeting ($2,700 × 55)/6 | 24,750 | |
| Roof ($54,000/20 years) | 2,700 | |
| Subtotal (5.04% of *EGI*) | $53,550 | |
| **Total operating expenses** | | −  $361,610 |
| Operating expense ratio ($361,610/$1,061,510) = 34.07% | | |
| Total expenses per unit ($361,610/55) = $6,576 per unit | | |
| **Net operating income** | | $699,900 |
| Net operating income ratio ($699,900/$1,061,510) = 65.93% | | |

*    55 units × $1,500 = $82,500; $82,500 + $7,500 = $90,000; $90,000/3 = $30,000

BACK_DEFEXP-RR-002926

**Table 28.2**    Income and Expense Analysis (Multiyear Forecast)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Potential gross income | 1,101,600.00 | 1,134,648.00 | 1,168,687.44 | 1,203,748.05 | 1,239,860.52 | 1,277,056.32 |
| Other income | 4,140.00 | 4,264.20 | 4,392.12 | 4,523.88 | 4,659.60 | 4,799.40 |
| Vacancy and collection loss | – 44,229.00 | – 45,387.00 | – 46,746.00 | – 48,150.00 | – 49,593.00 | – 51,081.00 |
| Effective gross income | 1,061,511.00 | 1,093,525.20 | 1,126,333.56 | 1,160,121.96 | 1,194,927.12 | 1,230,774.72 |
| **Operating expenses** | | | | | | |
| *Fixed expenses* | | | | | | |
| Real estate taxes | 56,100.00 | 57,783.00 | 59,516.49 | 61,301.97 | 63,141.03 | 65,035.29 |
| Insurance | | | | | | |
|   Fire and extended coverage | 5,640.00 | 5,809.20 | 5,983.47 | 6,162.99 | 6,347.88 | 6,538.32 |
|   Other | 2,310.00 | 2,379.30 | 2,450.67 | 2,524.20 | 2,599.92 | 2,677.92 |
| *Variable expenses* | | | | | | |
| Management | 53,076.00 | 54,668.28 | 56,308.32 | 57,997.59 | 59,737.50 | 61,529.64 |
| Superintendent | 50,400.00 | 52,920.00 | 55,566.00 | 58,344.30 | 61,261.53 | 64,324.59 |
| Site maintenance and | | | | | | |
|   snow removal | 17,700.00 | 18,231.00 | 18,777.93 | 19,341.27 | 19,921.50 | 20,519.16 |
| Electricity | 6,600.00 | 7,095.00 | 7,627.14 | 8,199.15 | 8,814.09 | 9,475.14 |
| Other utilities | 3,000.00 | 3,090.00 | 3,182.70 | 3,278.19 | 3,376.53 | 3,477.81 |
| Repair and maintenance | 75,000.00 | 77,250.00 | 79,567.50 | 81,954.54 | 84,413.16 | 86,945.55 |
| Trash removal | 1,620.00 | 1,668.60 | 1,718.67 | 1,770.21 | 1,823.31 | 1,878.03 |
| Pest control | 2,340.00 | 2,410.20 | 2,482.50 | 2,556.99 | 2,633.70 | 2,712.69 |
| Supplies | 3,300.00 | 3,399.00 | 3,500.97 | 3,606.00 | 3,714.18 | 3,825.60 |
| Interior decorating | 30,000.00 | 30,900.00 | 31,827.00 | 32,781.81 | 33,765.27 | 34,778.22 |
| Other | 975.00 | 1,004.25 | 1034.37 | 1065.42 | 1097.37 | 1130.28 |
| *Replacement allowance* | | | | | | |
| Exterior painting | 4,650.00 | 4,650.00 | 4,650.00 | 4,650.00 | 4,650.00 | 4,650.00 |
| Kitchen and bath equipment | 21,450.00 | 21,450.00 | 21,450.00 | 21,450.00 | 21,450.00 | 21,450.00 |
| Carpeting | 24,750.00 | 24,750.00 | 24,750.00 | 24,750.00 | 24,750.00 | 24,750.00 |
| Roof | 2,700.00 | 2,700.00 | 2,700.00 | 2,700.00 | 2,700.00 | 2,700.00 |
| **Total operating expenses** | 361,611.00 | 372,157.83 | 383,093.73 | 394,434.60 | 406,196.97 | 418,398.24 |
| Operating expense ratio | 34.07% | 34.03% | 34.01% | 34.00% | 33.99% | 33.99% |
| Total expenses per unit | $6,574.74 | $6,766.50 | $6,965.34 | $7,171.53 | $7,385.40 | $7,607.25 |
| **Net operating income** | $699,900.00 | $721,370.37 | $743,239.83 | $765,687.36 | $788,730.12 | $812,376.45 |
| Net operating income (rounded) | $864,900 | $727,368 | $743,241 | $765,687 | $788,730 | $812,376 |

Note: Dollar amounts are shown as two decimal places in this table. Other tables in this chapter are displayed with rounding to the nearest whole dollar, but amounts are not rounded for internal calculations, which can result in apparent mathematical errors.

- Market rents are anticipated to increase 3% annually, as are the receipts from the coin-operated equipment in the property.
- Operating expenses are forecasted to increase 3% annually, with the exception of the superintendent's salary, which will increase an average of 5% per year, and the cost of electricity for common areas, which is expected to increase 7.5% annually.

BACK_DEFEXP-RR-002927

## Applications of DCF Analysis

The first two DCF analyses that follow concern a 10,000-sq.-ft. shopping center. The first example provides an overview of the procedures used to forecast and discount cash flows into value. The second example shows how to extract a yield rate from a comparable sale. These are followed by a third example, which illustrates the application of DCF analysis to subdivision analysis.

### Forecasting and Discounting Cash Flows into Value

The property being appraised is the leased fee interest in a small strip shopping center consisting of five units of 2,000 square feet each. The following information is gathered for the DCF analysis:

- Market rents are currently $22.00 per square foot per year, and the appraiser's analysis of market rents over the past five years indicates that they have increased at a compound rate of 2.5% per year and that the market expects that pattern to continue. Market and subject lease terms are triple net.

- Store A's lease has two years remaining at a rent of $0.91 per square foot per month, or $10.95 per square foot per year. An interview with the tenant indicates that the tenant intends to renew the lease at the market rate when the lease expires.

- Store B has a 10-year lease with six years remaining. Current rent is $1.78 per square foot per month and will increase at a rate of 5% per year or one-half the change in the consumer price index (CPI), whichever is greater. The CPI is expected to increase 4% per year over the next five years.

- Stores C, D, and E were recently leased for 10 years. These leases and all new leases are set at market rent with provisions to keep the rents at market rates throughout the projection period.

- The landlord is responsible for payment of real estate taxes, exterior maintenance, management, and capital items. Tenants are responsible for all other expenses.

- Taxes are currently $7,000 per year. The tax assessor reviews and reassesses properties every three years. The subject property was reviewed one year ago, and taxes are expected to increase by about $800 with each subsequent review. The market expects this to remain constant over the next two reviews, i.e., the period of the income and expense analysis.

- General exterior maintenance, including cleanup and landscaping, costs $2,400 annually. This expense is expected to increase each year by $240.

- Property management fees are set at 5% of the effective gross income.

- A nominal collection loss of 0.5% of gross potential rent is anticipated.

- The roof needs replacement in Year 2 at $30,000 (see Table 28.3). In this simplified example, no other below-the-line expenses (e.g., leasing costs, tenant improvement costs, or capital replacement expenses) are expected during the five-year projection period. In a 10-year DCF analysis of this property, forecast expenses for the cost of replacing tenants would be accounted for as deductions from the net cash flows in the appropriate years of the projection period.

- The income forecast in Year 6 is used to estimate the resale price of the property at the end of a five-year projection period. The income for Year 6 is the income for the first year of operation under the new owner. The net resale price of the prop-

BACK_DEFEXP-RR-002928

erty in five years is forecast at $3,086,000, calculated as net operating income for Year 6 capitalized at a terminal capitalization rate of 7% less a sales expense of 3% of the sale price. In DCF calculations, the terminal capitalization rate is usually higher than the implied going-in capitalization rate—i.e., the capitalization rate in Year 1—for various reasons. For example, at the end of the projection period the improvements will be older, more expensive to maintain, and closer to the end of their economic lives, which may affect the property's economic performance in competition with newer properties. Also, an income projection farther into the future involves more risk than a projection closer to the present date. Appraisers use higher terminal rates to reflect the actions of typical market participants.

The appraiser has determined that a leased fee yield rate of 11% is proper and is using a five-year DCF analysis shown in Table 28.3 to estimate the value of the leased fee estate.

**Table 28.3**   Five-Year DCF Analysis of a Shopping Center

| Income | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| Store A | $21,900 | $21,900 | $46,228 | $47,383 | $48,568 | $49,782 |
| Store B | $38,676 | $40,610 | $42,640 | $44,772 | $47,011 | $49,361 |
| Store C | $44,000 | $45,100 | $46,228 | $47,383 | $48,568 | $49,782 |
| Store D | $44,000 | $45,100 | $46,228 | $47,383 | $48,568 | $49,782 |
| Store E | $44,000 | $45,100 | $46,228 | $47,383 | $48,568 | $49,782 |
| Subtotal | $192,576 | $197,810 | $227,550 | $234,305 | $241,282 | $248,489 |
| Collection loss (0.5%) | − $963 | − $989 | − $1,138 | − $1,172 | − $1,206 | − $1,242 |
| Effective gross income | $191,613 | $196,821 | $226,413 | $233,134 | $240,076 | $247,247 |
| Expenses | | | | | | |
|    Taxes | $7,000 | $7,000 | $7,800 | $7,800 | $7,800 | $8,600 |
|    Maintenance | $2,400 | $2,640 | $2,880 | $3,120 | $3,360 | $3,600 |
|    Management* | $9,581 | $9,841 | $11,321 | $11,657 | $12,004 | $12,362 |
|    Subtotal | $18,981 | $19,481 | $22,001 | $22,577 | $23,164 | $24,562 |
| Net cash flow | $172,632 | $177,340 | $204,412 | $210,557 | $216,912 | $222,685 |
| Replacement allowance | $0 | $30,000 | $0 | $0 | $0 | $0 |
| Net operating income | $172,632 | $207,340 | $204,412 | $210,557 | $216,912 | $222,685 |
| *PV* of $1 @ 11% factor[†] | × 0.900901 | × 0.811622 | × 0.731191 | × 0.658731 | × 0.593451 | |
| Present value of income stream | $155,525 | $168,281 | $149,464 | $138,700 | $128,726 | |
| Subtotal | | | | | | $740,697 |
| Present value of net resale price[‡] | $3,085,771 | × | 0.593451 | | = | $1,831,254 |
| Total leased fee present value indication | | | | | | $2,571,951 |

Note: Dollar amounts are rounded in the displayed amounts but not in internal calculations, which can result in apparent mathematical errors.

\*   Calculated as 5% of effective gross income.

†   The present value of $1 is calculated as $1/(1 + i)^n$. These factors are preprogrammed in financial calculators and computer spreadsheets.

‡   Calculated as Year 6 net operating income capitalized at a terminal capitalization rate of 7% ($222,685/0.07) less a selling expense of 3% of the sale price ($3,181,214 × 0.97).

BACK_DEFEXP-RR-002929

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Extracting a Yield Rate from a Comparable Sale

In the subject property's market area, a 12,000-sq.-ft. strip shopping center with four tenants was recently purchased for $817,000. Table 28.4 shows the buyer's projected income and expense data for the five-year expected holding period and for Year 6, which is used for the reversion calculation.

**Table 28.4**　Buyer's Income and Expense Forecast

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6* |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Store 1 | $10,000 | $10,400 | $10,816 | $11,249 | $11,699 | $12,165 |
| Store 2 | 17,676 | 18,210 | 18,888 | 19,453 | 19,941 | 20,835 |
| Store 3 | 13,151 | 13,677 | 14,224 | 14,793 | 15,385 | 16,000 |
| Store 4 | 19,726 | 20,515 | 21,348 | 22,189 | 23,077 | 24,000 |
| Subtotal | $60,553 | $62,802 | $65,276 | $67,684 | $70,102 | $73,000 |
| **Expenses** | | | | | | |
| Taxes | $6,600 | $6,600 | $6,600 | $7,200 | $7,200 | $7,200 |
| Maintenance | 810 | 875 | 953 | 1,060 | 1,108 | 1,210 |
| Management | 3,020 | 3,133 | 3,256 | 3,374 | 3,515 | 3,625 |
| Collection loss | 300 | 257 | 243 | 240 | 264 | 250 |
| **Subtotal** | **$10,730** | **$10,865** | **$16,252** | **$11,874** | **$17,287** | **$12,285** |
| Net cash flow | $49,823 | $51,937 | $43,824 | $55,810 | $47,615 | $60,715 |
| Replacement allowance | 0 | 0 | 5,200 | 0 | 5,200 | 0 |
| Net operating income | $49,823 | $51,937 | $49,024 | $55,810 | $52,815 | $60,715 |

\*　Income in first year under new ownership.

At the end of the five-year projection period, the investor expects to resell the property at a terminal capitalization rate of 6.5% less sales costs of 5%, resulting in a forecast reversion of $887,373. To solve for a yield rate (in this case, an internal rate of return, or *IRR*), the appraiser uses a mathematical trial-and-error process in which various overall yield rates are tested against the known sale price and cash flows. These repetitive calculations are simplified with financial calculators and spreadsheet software.

Solving for the expected overall yield rate using a financial calculator and the cash flows shown in Table 28.5 produces a yield rate of 7.8% (rounded). As an additional check, other comparable sales can be analyzed and the resulting yield rates reconciled to provide additional market support for the overall yield rate estimate.

**Table 28.5**　Projected Cash Flow in Each Year

| Period | Cash Flow |
|---|---|
| 0 | -$817,000 |
| 1 | $49,823 |
| 2 | $51,937 |
| 3 | $49,024 |
| 4 | $55,810 |
| 5 | $52,815 (cash flow) |
|  | $887,373 (reversion) |

BACK_DEFEXP-RR-002930

## Discounted Cash Flow Analysis in Subdivision Development Analysis

The following example illustrates how discounted cash flow (DCF) analysis may be applied in subdivision analysis to estimate raw land value when subdivision for a particular use, such as residential use, is the highest and best use. Subdivision development analysis can also be used in feasibility analysis or to estimate the bulk value of completed homes, condominium units, super pads, or other types of property that are commonly subdivided.[1] The projection of income and absorption in DCF analysis allows appraisers to develop an opinion of value at the point in the development timeline that is appropriate for the marketability analysis assignment. The inputs required for the application of subdivision development analysis include

- marketability analysis
- determination of highest and best use
- creation or affirmation of a supportable subdivision development plan
- determination of timing and cost for approval and development
- pricing schedule
- absorption schedule
- phasing of land development and related expenses
- marketing and related holding expenses over the absorption period
- annual real estate taxes and other holding costs, such as maintenance costs for model homes
- discount rate, including consideration of whether there is a line-item allocation for entrepreneurial incentive and whether the interest being valued is a property or an equity position

Note that even when subdivision analysis is appropriate, it should be accompanied by analysis of sales of comparable properties when that sales data is available. Subdivision analysis is generally better suited for feasibility analysis.

In this case, a 20-acre tract of vacant land is being considered for development as a 48-lot residential subdivision. It is projected to take six months to plat the subdivision, achieve entitlements, and construct the infrastructure for the entire subdivision. After permitting and construction are completed, a two-year absorption period is estimated to market and sell the entire lot inventory. Discounting will be conducted over all five semiannual phases. The market supports an average retail price of $40,000 per lot in the first semiannual marketing period. Average lot prices are expected to increase $2,000 in each succeeding six-month period. Expenses are projected as follows:

- Survey, site plan, and development fees over the permitting stage are estimated to be $35,000 in the first semiannual period. Holding costs for real estate taxes, the developer's overhead fee, and other related costs over the permitting and construction stage are estimated at about $1,300.
- On-site construction costs, including infrastructure improvements within the subdivision and soft costs, are $10,500 per lot for a total cost of $504,000 spread over Periods 1, 2, and 4 as shown in Table 28.6.
- Off-site development costs are also required as part of the subdivision approval by local authorities. This adds $5,000 per lot for a total of $240,000 for off-site

---

1. See also Don M. Emerson, *Subdivision Valuation*, second edition (Chicago: Appraisal Institute, 2017).

BACK_DEFEXP-RR-002931

**Table 28.6**   DCF Analysis (with No Line-Item Entrepreneurial Incentive)

| Description | Semiannual Period | | | | | Total |
| | 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|---|
| Beginning lot inventory | 0 | 48 | 36 | 24 | 12 | |
| Number of developed lots | 48 | 0 | 0 | 0 | 0 | 48 |
| Lots sold | 0 | 12 | 12 | 12 | 12 | 48 |
| Ending lot inventory | 48 | 36 | 24 | 12 | 0 | |
| Cumulative lots sold | 0 | 12 | 24 | 36 | 48 | |
| Average lot price | | $40,000 | $42,000 | $44,000 | $46,000 | |
| Gross lot sales income | $0 | $480,000 | $504,000 | $528,000 | $552,000 | $2,064,000 |
| *Less:* Permitting stage costs | | | | | | |
| Survey, site plan and fees | $35,000 | | | | | $35,000 |
| Holding costs during permitting and construction | $1,300 | | | | | $1,300 |
| *Less:* Construction stage costs | | | | | | |
| On-site direct and indirect construction costs | $384,000 | $95,000 | | $25,000 | | $504,000 |
| Off-site construction costs | $240,000 | | | | | $240,000 |
| *Less:* Absorption phase costs | | | | | | |
| Marketing | | $33,600 | $35,280 | $36,960 | $38,640 | $144,480 |
| Legal/closing | | $9,600 | $10,080 | $10,560 | $11,040 | $41,280 |
| Miscellaneous | | $3,000 | $3,000 | $3,000 | $3,000 | $12,000 |
| Holding costs during absorption | | $8,400 | $6,000 | $3,600 | $1,200 | $19,200 |
| *Less:* Administration/supervision costs | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $50,000 |
| Subtotal expenses | $670,300 | $159,600 | $64,360 | $89,120 | $63,880 | $1,047,260 |
| Net proceeds | -$670,300 | $320,400 | $439,640 | $438,880 | $488,120 | $1,016,740 |
| **Present value calculation** | | | | | | |
| Periodic discount rate   11.50% semiannual period | | | | | | |
| Present value factor | 0.896861 | 0.8043596 | 0.721398 | 0.646994 | 0.580264 | |
| Present value per period | -$601,166 | $257,717 | $317,156 | $283,953 | $283,238 | $540,898 |
| Indicated land value | $540,898 | | | | | |
| Rounded | $540,000 | | | | | |

road and other improvements. These costs will be incurred in the first semiannual period. The holding costs and taxes over the construction period are accounted for as part of the $1,300 cost of the permitting phase. The absorption costs include marketing at 7% of gross sales, and legal and closing costs at 2% of gross sales.

- After all lots are built, taxes are accounted for in the holding costs over the remaining absorption period. Real estate taxes are estimated at $400 per year for each developed lot in inventory in each period (calculated for the average number of lots in inventory in each six-month period at $200 per lot). Miscellaneous costs over the absorption period are $3,000 per six-month period.
- Administration and supervision costs (sometimes referred to as the *developer's fee*) are $10,000 per six-month period, which is appropriate given the relatively small size of this project.

Table 28.6 shows a DCF analysis of the income and expenses associated with the projections for the hypothetical project over the 2½-year permitting, construction, and absorption period. The DCF analysis anticipates that lot sale prices will increase and expenses will reflect the pattern shown in the 30-month projection. A yield rate of 23% (or 11.5% over each six-month period) based on market-derived rates from

*Applications of the Income Capitalization Approach*   **513**

similar subdivision development sales is used with no line-item entrepreneurial incentive. (Published surveys from national data providers are also used as sources of yield rates, which can vary greatly in different economic times.) Accordingly, all the entrepreneurial incentive associated with the project is accounted for in the selection of the yield rate. After applying the yield rate to the net proceeds, the indicated land value for the raw land in "as is" condition at the time of the appraisal can be rounded to $540,000. A change in any of the variables, including absorption estimates, can lead to significant variability in the indicated land value.

Note that some market analysts do not discount the negative cash flows in the beginning of the projection period or use a much lower discount rate, which can be appropriate when discount rates are properly supported by credible market data. Similarly, some market participants may prefer to have a separate allocation for entrepreneurial incentive as a line-item expense in the list of development expenses, which is possible with the application of a separate discount rate for the remaining cash flow after entrepreneurial incentive is accounted for. When what is known as the *bifurcated method* or *split-rate method* is used, a separate discount rate is selected in conjunction with the line-item incentive used for the calculation. Line-item incentive is a percentage of gross sales, not a yield rate. In Table 28.7, an 8% line-item entrepreneurial incentive is included in the DCF analysis. The appropriate yield rate derived from market data is 15.5% (7.75% per semiannual period) with the given line-item entrepreneurial incentive of 8% of gross lot sales each period. The total present value is rounded to $540,000, the same as the land value conclusion derived using the nonbifurcated yield rate method with no line-item entrepreneurial incentive.

As demand decreases for vacant residential lots, absorption periods increase and, all else being the same, the land value of acreage will be lower where subdivision development is the highest and best use. Under poor market conditions, especially with levels of lot prices flat or stagnant and the time frame for market absorption growing longer, raw land prices will typically decrease. This effect is demonstrated in Table 28.8, which uses the same figures shown in Table 28.6 except that the required marketing time to sell the lot inventory has increased and lot values are flat for the initial marketing period with a lower increase over the last two years.

In this example, the six-step market analysis process reveals that in this recovering market, after permitting and construction are completed, a four-year absorption period will be required to market the entire lot inventory. Discounting will be conducted over all nine semiannual phases. The market supports a current average retail price of $40,000 per lot, which is anticipated to remain constant for the first two years (four periods) of absorption. Beginning in Year 3 of the absorption period, retail lot values are anticipated to increase by $1,000 each succeeding six-month period. The projected expenses are the same as those shown in Table 28.6. Initial development costs are also the same, as are the holding costs over the permitting and construction stage, the on-site construction costs, and the off-site development costs. Holding costs including taxes are $1,300 for the permitting phase. After the lots are built, taxes are estimated at $400 per year for each developed lot in inventory in each six-month period (calculated for the average number of lots in inventory in each six-month period at $200 per lot). Miscellaneous costs over the absorption period are the same at $3,000 per six-month period, together with administrative costs of $10,000 per period. Remaining holding costs are also unchanged, with marketing sales costs of 7% of gross sales and legal and

BACK_DEFEXP-RR-002933

Copyrighted material licensed by Charles Brigden on September 17, 2020

closing costs of 2% of gross sales. The yield rate is the same at 23%, or 11.5% for each six-month period, based on market-derived rates for similar subdivision development with no line-item entrepreneurial incentive. Although the same yield rate is used in this example, the higher risk related to market conditions and the longer sellout period would typically result in a higher yield requirement for market participants.

In this example the prolonged absorption period and minimal lot value increases over the absorption period reflect a significantly lower land value conclusion of $235,000. This amount is about 57% less than the land value supported under the initial scenario in Table 28.6. In order for the developer to achieve the same rate of return (23% yield rate), the highest land value supported is $235,000.

Discounted cash flow analysis is useful as a method for checking the reasonableness of value indications derived from other methods applied to estimate the value of vacant land with development potential, but it does not serve as a suitable substitute when market land sale data is available for direct sales comparison. Comparing the value indication derived from DCF analysis with a land value indication derived using sales comparison allows an appraiser to test the feasibility of a proposed project

**Table 28.7**   DCF Analysis (with Line-Item Entrepreneurial Incentive)

| | Semiannual Period | | | | | |
| Description | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|---|
| Beginning lot inventory | 0 | 48 | 36 | 24 | 12 | |
| Number of developed lots | 48 | 0 | 0 | 0 | 0 | 48 |
| Lots sold | 0 | 12 | 12 | 12 | 12 | 48 |
| Ending lot inventory | 48 | 36 | 24 | 12 | 0 | |
| Cumulative lots sold | 0 | 12 | 24 | 36 | 48 | |
| Average lot price | | $40,000 | $42,000 | $44,000 | $46,000 | |
| Gross lot sales income | $0 | $480,000 | $504,000 | $528,000 | $552,000 | $2,064,000 |
| *Less:* Permitting stage costs | | | | | | |
| Survey, site plan and fees | $35,000 | | | | | $35,000 |
| Holding costs during permitting and construction | $1,300 | | | | | $1,300 |
| *Less:* Construction stage costs | | | | | | |
| On-site direct and indirect construction costs | $384,000 | $95,000 | | $25,000 | | $504,000 |
| Off-site construction costs | $240,000 | | | | | $240,000 |
| *Less:* Absorption phase costs | | | | | | |
| Marketing | | $33,600 | $35,280 | $36,960 | $38,640 | $144,480 |
| Legal/closing | | $9,600 | $10,080 | $10,560 | $11,040 | $41,280 |
| Miscellaneous | | $3,000 | $3,000 | $3,000 | $3,000 | $12,000 |
| Holding costs during absorption | | $8,400 | $6,000 | $3,600 | $1,200 | $19,200 |
| *Less:* Administration/supervision costs | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $50,000 |
| *Less:* Line-item entrepreneurial incentive | | | | | | |
| Percent of gross sales (8%) | $0 | $38,400 | $40,320 | $42,240 | $44,160 | $165,120 |
| Subtotal expenses | $670,300 | $198,000 | $104,680 | $131,360 | $108,040 | $1,212,380 |
| Net proceeds | -$670,300 | $282,000 | $399,320 | $396,640 | $443,960 | $851,620 |
| **Present value calculation** | | | | | | |
| Periodic discount rate   7.75% | | | | | | |
| Present value factor | 0.9280742 | 0.8613218 | 0.7993706 | 0.74187525 | 0.6885153 | |
| Present value per period | -$622,088 | $242,893 | $319,205 | $294,257 | $305,673 | $539,940 |
| Indicated land value | $539,940 | | | | | |
| Rounded | $540,000 | | | | | |

BACK_DEFEXP-RR-002934

ID #16754

**Table 28.8**   Indicated Land Value Under Superior Market Conditions

| Description | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Semiannual Period | | | | | |
| Beginning lot inventory | | 0 | 48 | 42 | 36 | 30 | 24 | 18 | 12 | 6 | |
| Number of developed lots | | 48 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48 |
| Lots sold | | 0 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 48 |
| Ending lot inventory | | 48 | 42 | 36 | 30 | 24 | 18 | 12 | 6 | 0 | |
| Cumulative lots sold | | 0 | 6 | 12 | 18 | 24 | 30 | 36 | 42 | 48 | |
| Average lot price | | | $40,000 | $40,000 | $40,000 | $40,000 | $41,000 | $42,000 | $43,000 | $44,000 | |
| Gross lot sales income | | $0 | $240,000 | $240,000 | $240,000 | $240,000 | $246,000 | $252,000 | $258,000 | $264,000 | $1,980,000 |
| *Less:* Permitting stage costs | | | | | | | | | | | |
| Survey, site plan, and fees | | $35,000 | | | | | | | | | $35,000 |
| Holding costs during permitting and construction | | $1,300 | | | | | | | | | $1,300 |
| *Less:* Construction stage costs | | | | | | | | | | | |
| On-site direct and indirect construction costs | | $384,000 | $95,000 | | $25,000 | | | | | | $504,000 |
| Off-site construction costs | | $240,000 | | | | | | | | | $240,000 |
| *Less:* Absorption phase costs | | | | | | | | | | | |
| Marketing | | | $16,800 | $16,800 | $16,800 | $16,800 | $17,220 | $17,640 | $18,060 | $18,480 | $138,600 |
| Legal/closing | | | $4,800 | $4,800 | $4,800 | $4,800 | $4,920 | $5,040 | $5,160 | $5,280 | $39,600 |
| Miscellaneous | | | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $24,000 |
| Holding costs during absorption (taxes) | | | $9,000 | $7,800 | $6,600 | $5,400 | $4,200 | $3,000 | $1,800 | $600 | $38,400 |
| *Less:* Administrative/supervision costs | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $90,000 |
| *Less:* Line-item entrepreneurial incentive | | | | | | | | | | | |
| Percentage of gross sales | (0.0%) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Subtotal expenses | | $670,300 | $138,600 | $42,400 | $66,200 | $40,000 | $39,340 | $38,680 | $38,020 | $37,360 | $1,110,900 |
| Net proceeds | | -$670,300 | $101,400 | $197,600 | $173,800 | $200,000 | $206,660 | $213,320 | $219,980 | $226,640 | $869,100 |
| **Present value conclusion** | | | | | | | | | | | |
| Periodic discount rate | (11.5%) | | | | | | | | | | |
| Present value factor | | 0.896861 | 0.8043596 | 0.7213988 | 0.64699441 | 0.580264 | 0.520416 | 0.466741 | 0.418602 | 0.375428 | |
| Present value per period | | -$601,166 | $81,562 | $142,548 | $112,448 | $116,053 | $107,549 | $99,565 | $92,084 | $85,087 | $235,730 |
| Indicated land value | | $235,730 | | | | | | | | | |
| Rounded | | $235,000 | | | | | | | | | |
| Indicated land value under superior financial conditions | | $540,000 | $27,000 per acre | | | | | | | | |
| Land value supported under poor marketing conditions | | $235,000 | $11,750 per acre | | | | | | | | |
| Difference | | -56.5% | | | | | | | | | |

Copyrighted material licensed by Charles Brigden on September 17, 2020

and solve for the appropriate discount rate and associated line-item profit allocation. If the value indication from the DCF analysis is less than the value indicated by the sales comparison technique, an appraiser may judge the proposed project to not be maximally productive. Often multiple development scenarios may be applied to provide support for a highest and best use conclusion.

Developers who are also home builders may perform a subdivision development analysis that begins with the sale prices of the finished homes. Appraisers may also use this type of analysis to develop raw land or finished lot values. However, the cost of constructing the homes must be deducted, and care must be taken in selecting the discount rate and in allocating the entrepreneurial incentive between land and improvements in accordance with market practices.

## Analysis of Office-Retail Building Investment

The analysis that follows is based on a five-year forecast of the future benefits from an office-retail building investment. Net operating income is estimated for each year. Proceeds from resale of the property at the end of the fifth year are also estimated.

### Property Analysis

The subject property is a three-story office-retail building with 32,100 square feet of gross building area. The assignment is to appraise the market value of the leased fee. The following data on the subject property has been gathered:

- On the first level at street grade, 4,018 square feet of usable area is allocated to a retail tenant.
- The building also has a ground-floor office with a rentable area of 4,500 square feet and 4,018 square feet of usable area, indicating a load factor of 12% [(4,500 – 4,018)/4,018]. The same load factor applies to the rest of the building, which is office space.
- The building was originally constructed approximately 20 years ago and underwent a major renovation about two years ago.
- Three tenants currently occupy the building, and a fourth tenant has just signed a lease.

Lease terms and data on expenditures and other property and market information are described below and summarized in Tables 28.9, 28.10, and 28.11.

### Rationale for the Forecast

The appraiser determines that investors in office buildings similar to the subject property typically forecast net operating incomes or equity incomes over a five-year projection period. To establish a value that will provide for an adequate rate of return to compensate for the perceived risk in the proposed investment, the forecast net operating incomes or equity incomes and the reversion are discounted at an appropriate yield rate.

To simulate typical investor analysis, an appraiser

1. Analyzes current income, establishes the market rent level for each tenant's space, and forecasts future income for each year of a six-year period based on existing leases, probable lease renewals at market rent and terms and expected vacancy and turnover experience.

BACK_DEFEXP-RR-002936

### Figure 28.1    Lease Abstracts

**Tenant 1**

| | |
|---|---|
| Creditworthiness | High—national credit tenant |
| Usable area | 4,018 sq. ft. |
| Rentable area | 4,500 sq. ft. |
| Term of lease | 10 years (began 2 years ago) |
| Escalation clause | None |
| Renewal clause | Yes—right to renew for another 10 years at market rental rate |
| Contract/forecast rent | $19.50 per sq. ft. per year (rentable) |

**Tenant 2**

| | |
|---|---|
| Creditworthiness | Good |
| Usable area | 13,840 sq. ft. |
| Rentable area | 15,500 sq. ft. |
| Term of lease | 10 years (began 2 years ago) |
| Escalation clause | 2% annually |
| Renewal clause | Yes—right to renew at market rental rate |
| Contract/forecast rent | $15.75 per sq. ft. per year (rentable) |

**Tenant 3**

| | |
|---|---|
| Creditworthiness | Average |
| Usable area | 6,786 sq. ft. |
| Rentable area | 7,600 sq. ft. |
| Term of lease | 5 years (began 2 years ago) |
| Escalation clause | 3.5% annually |
| Renewal clause | Right to renew for 5 additional years at $20 per sq. ft. per year fixed |
| Contract/forecast rent | 3 years at $17 per sq. ft. per year, 5 years at $20 per sq. ft. per year (rentable) |

**Tenant 4**

| | |
|---|---|
| Creditworthiness | Average |
| Usable area | 2,143 sq. ft. |
| Rentable area | 2,400 sq. ft. |
| Term of lease | 7 years |
| Escalation clause | 3.5% annually |
| Renewal clause | None |
| Contract/forecast rent | $16 per sq. ft. per year (rentable) |

### Table 28.9    Summary of Forecast Contract Rental Income

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| Tenant 1 | $87,750 | $87,750 | $87,750 | $87,750 | $87,750 | $87,750 |
| Tenant 2 | $244,125 | $249,008 | $253,988 | $259,067 | $264,249 | $269,534 |
| Tenant 3 | $129,200 | $133,722 | $138,402 | $152,000 | $152,000 | $152,000 |
| Tenant 4 | $38,400 | $39,744 | $41,135 | $42,575 | $44,065 | $45,607 |
| Potential income | $499,475 | $510,224 | $521,275 | $541,392 | $548,064 | $554,891 |

BACK_DEFEXP-RR-002937

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Table 28.10**  Total Forecast Operating Expenses Over Projection Period

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| Property taxes | $64,000 | $66,560 | $69,222 | $71,991 | $74,871 | $77,866 |
| Property insurance | $6,900 | $7,107 | $7,320 | $7,540 | $7,766 | $7,999 |
| Property management | $21,491 | $22,083 | $22,692 | $23,662 | $24,112 | $24,574 |
| Common area maintenance | $97,500 | $100,425 | $103,438 | $106,541 | $109,737 | $113,029 |
| Total operating expenses | $189,891 | $196,175 | $202,672 | $209,734 | $216,486 | $223,468 |

**Table 28.11**  Forecast Operating Expense Reimbursements Over Projection Period

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| Tenant 1 | $28,257 | $29,175 | $30,125 | $31,159 | $32,144 | $33,163 |
| Tenant 2 | $31,454 | $34,617 | $37,888 | $41,451 | $44,845 | $48,355 |
| Tenant 3 | $0 | $0 | $0 | $0 | $0 | $0 |
| Tenant 4 | $3,070 | $3,560 | $4,067 | $4,618 | $5,144 | $5,687 |
| Total operating expense reimbursements | $62,781 | $67,352 | $72,080 | $77,228 | $82,133 | $87,205 |

2. Forecasts other income, including income from escalation clauses contained in existing leases and expected escalation provisions in new leases.

3. Forecasts future property expenses after analyzing historical operating expenses, the experience of competitive properties, and the current budget for the subject property.

4. Estimates net operating income.

5. Estimates property reversion.

6. Forecasts mortgage debt service, when appropriate, based on existing or proposed financing terms.

7. When appropriate, estimates the equity income to be generated by the property in each year of the forecast projection period.

8. Estimates the reversionary benefits to be received at the end of the projection period (in this case, Year 6 $I_O$ using an 8.5% terminal capitalization rate). If a significant capital expenditure or change in leases in the sixth year—i.e., the year of reversion—is expected, the projection period may be extended to incorporate this event. This will ensure that the analysis is not unduly influenced by an unusual event in the reversion year used to calculate the reversion value.

In developing an opinion of market value for the leased fee, an appraiser must apply these steps in a manner that reflects the thinking of market participants. In this sample application, the appraiser begins by assembling pertinent information on comparable office buildings in the same market as the subject property. To verify the data, the appraiser interviews one of the participants, preferably the buyer, to determine the net operating income (or equity income) forecast of each building owner associated with each comparable property.

BACK_DEFEXP-RR-002938

### Tenants and Leases in the Subject Property

The following information has been gathered about the tenants:

- Tenant 1, a national restaurant tenant, is located on the first floor (4,018 usable square feet). The tenant moved in shortly after renovation two years ago and pays $19.50 per square foot of rentable area per year on an absolute net lease basis fixed for 10 years. This tenant has the right to renew for another 10 years at market rent and terms.

- Tenant 2, a law firm, occupies 4,911 square feet of usable area on the first floor and 8,929 square feet of rentable area on the second floor. This local firm has experienced considerable growth over the past 10 years and moved to the subject building to accommodate this expansion. The lease began two years ago and has a 10-year term with an option to renew at market rent. The tenant is currently paying rent of $15.75 per square foot of rentable area per year, with an expense stop of $4.25 per square foot. The lease calls for the rent to increase at 2% per year.

- Tenant 3 occupies 6,786 square feet of usable area on the third floor and pays $17.00 per square foot of rentable area per year on a gross full-service basis. An escalation clause provides for a 3.5% annual increase in rent over the five-year term of the lease, which began two years ago. This tenant has an option to renew for another five years at a fixed rent of $20 per square foot of rentable area per year full service and has indicated an intention to do so. At the time of renewal, the owner will provide the tenant a tenant improvements (TI) allowance of $4 per square foot of rentable area to refresh the space. The leasing commission at the time of renewal is estimated at 2% of total contract rent, and it is due in full at the time of renewal.

- The remainder of the space, 2,143 square feet of usable area on the third floor, has just been leased to Tenant 4 at $16 per square foot of rentable area per year, with rents escalating at 3.5% per year and an expense stop of $5.00 per square foot. The term of the lease is seven years. For this new tenant, the TI allowance is $12 per square foot of rentable area, and the leasing commission is 4% of total contract rent (entire term). The commission is paid during the first month.

Relevant lease information is summarized in Figure 28.1, and the rental income for each lease is forecast in Table 28.9.

### Forecast Operating Expenses and Reimbursements

Property taxes are $64,000, due at the end of the year. Property insurance is $0.23 per square foot of rentable area per year. Property management is 4% of total potential income. Common area maintenance (CAM) is $3.25 per square foot of rentable area per year. Property taxes are expected to grow at 4% per year, while insurance and CAM are expected to grow at 3% per year over the next 10 years.

The total operating expenses for each year in the six-year projection period are calculated in Table 28.10, and operating expense reimbursements are summarized in Table 28.11.

### Capital Expenses

At the time of renovation, the owners elected to postpone replacement of the roof. A capital expenditure of $40,000 will be required in about four years to replace the roof. In Table 28.12, the leasing expenses and capital costs are listed in the year those charges are incurred.

BACK_DEFEXP-RR-002939

| **Table 28.12** Leasing Expenses and Capital Costs | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Year 6** |
| Leasing commissions | $11,949 | | | $15,200 | | |
| Tenant improvements | $28,800 | | | $30,400 | | |
| Capital costs | | | | $40,000 | | |

## Other Research

Other research has uncovered the following data:

- Investors allocate a vacancy allowance of 5% of total potential income, even when a property is fully occupied.
- Reversionary capitalization rates for similar buildings are approximately 8.5%.
- A five-year projection period is typically used for analysis, and selling expenses are estimated at approximately 3%.
- Investors are typically using a 9.5% discount rate when discounting the cash flows before debt service and the reversion to arrive at a value indication.
- Market participants are not deducting a replacement allowance before calculating net operating income, but they are deducting leasing costs and capital expenses before calculating cash flow before debt service.

In Table 28.13, cash flow before debt service is calculated for each year of the five-year projection period along with the sixth year for the purposes of calculating the reversion.

## Reversion Calculation

The resale price is forecast by applying an 8.5% overall capitalization rate to the net operating income for the year after the projection period (Year 6). The net operating income for Year 6 represents the projected income for Year 1 under the next owner. In this application, sales expenses of 3% are deducted to determine the net resale price:

$$\frac{\text{6th Year } I_o}{\text{Terminal Capitalization Rate}} = \text{Reversion Value}$$

$$\frac{\$385,363}{0.085} = \$4,533,682$$

$$\text{Reversion Value} - \text{Selling Expenses} = \text{Reversion}$$

$$\$4,533,682 - \$136,010 = \$4,397,672$$

## Investor's Desired Rate of Return

The market value of the leased fee can be estimated by calculating the present value of the net cash flow for each year of the five-year projection period and adding the present value of the cash flow from the sale of the property in Year 6 (the net resale price). Suppose the typical investor requires an overall yield rate ($Y_O$) of 9.5%. At a 9.5% discount rate, the present value of the cash flow before debt service and reversion is $4,081,728 (see Table 28.14). This means that the investor would expect to earn a 9.5% rate of return if $4,081,728 is paid for the property.

BACK_DEFEXP-RR-002940

**Table 28.13**   Forecasting Cash Flows

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Tenant 1 | $87,750 | $87,750 | $87,750 | $87,750 | $87,750 | $87,750 |
| Tenant 2 | 244,125 | 249,008 | 253,988 | 259,067 | 264,249 | 269,534 |
| Tenant 3 | 129,200 | 133,722 | 138,402 | 152,000 | 152,000 | 152,000 |
| Tenant 4 | 38,400 | 39,744 | 41,135 | 42,575 | 44,065 | 45,607 |
| Potential rental income | $499,475 | $510,224 | $521,275 | $541,392 | $548,064 | $554,891 |
| Other income | $0 | $0 | $0 | $0 | $0 | $0 |
| **Expense reimbursements** | | | | | | |
| Tenant 1 | $28,257 | $29,175 | $30,125 | $31,159 | $32,144 | $33,163 |
| Tenant 2 | 31,454 | 34,617 | 37,888 | 41,451 | 44,845 | 48,355 |
| Tenant 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tenant 4 | 3,070 | 3,560 | 4,067 | 4,618 | 5,144 | 5,687 |
| Total expense reimbursements | $62,781 | $67,352 | $72,080 | $77,228 | $82,133 | $87,205 |
| Total potential income | $562,256 | $577,576 | $593,355 | $618,620 | $630,197 | $642,096 |
| Vacancy & collection allowance (5%) | − 28,113 | − 28,879 | − 29,668 | − 30,931 | − 31,510 | − 32,105 |
| Effective gross income | $534,143 | $548,697 | $563,687 | $587,689 | $598,687 | $609,991 |
| **Operating expenses** | | | | | | |
| Property taxes | $64,000 | $66,650 | $69,222 | $71,991 | $74,871 | $77,866 |
| Property insurance | 6,900 | 7,107 | 7,320 | 7,540 | 7,766 | 7,999 |
| Property management | 22,490 | 23,103 | 23,734 | 24,745 | 25,208 | 25,684 |
| Common area maintenance | 97,500 | 100,425 | 103,438 | 106,541 | 109,737 | 113,029 |
| Total operating expenses | $190,890 | $197,285 | $203,714 | $210,817 | $217,582 | $224,578 |
| Net operating income ($I_O$) | $343,253 | $351,412 | $359,973 | $376,872 | $381,105 | $385,363 |
| Leasing commissions | 11,949 | | | 15,200 | | |
| Tenant improvements | 28,800 | | | 30,400 | | |
| Capital costs | | | | | 40,000 | |
| Cash flow before debt service | $302,504 | $351,412 | $359,973 | $291,272 | $381,105 | |

**Table 28.14**   Discounting of Income Streams and Reversion

| Period | Cash Flow before Debt Service | Present Value Factors | Present Value |
|---|---|---|---|
| Year 1 | $302,504 | 0.913242 | $276,259 |
| Year 2 | $351,412 | 0.834011 | $293,081 |
| Year 3 | $359,973 | 0.761654 | $274,174 |
| Year 4 | $291,272 | 0.695574 | $202,601 |
| Year 5 | $381,105 | 0.635228 | $242,089 |
| Reversion proceeds | $4,397,672 | 0.635228 | $2,793,524 |
| Total present value | | | $4,081,728 |

BACK_DEFEXP-RR-002941

### Additional Analysis

Although property value was estimated by discounting the projected cash flow for each year rather than by applying a formula to develop an overall capitalization rate, an overall capitalization rate is implied in the solution. In this case, the overall capitalization rate ($R_O$) for Year 1 is 8.41%, calculated by dividing Year 1 net operating income by the discounted present value ($343,253/$4,081,728). This overall capitalization rate is lower than the 8.5% rate applied to projected Year 6 net operating income to estimate the resale price.[2]

This example illustrates the need to consider carefully the anticipated pattern of net operating income when selecting an overall capitalization rate to be used in direct capitalization or a property model for yield capitalization. Capitalization rates can differ significantly for properties with different patterns of net operating income beyond the first year and different resale potential. The absence of a regular income pattern does not necessarily mean that detailed DCF analysis is the only method that should be considered. An appraiser may discover that one of the standard valuation models can be adjusted to compensate for a deviation from the regular income pattern, or that a special valuation model can be devised to solve the problem at hand.

---

2.  See D. Richard Wincott, "Terminal Capitalization Rates and Reasonableness," *The Appraisal Journal* (April 1991): 253-260. If, over the projection period, a substantial capital expenditure is allocated for the refurbishment or renovation of an aging property, $R_N$ may equal or be less than $R_O$. Such a relationship between $R_N$ and $R_O$ is also likely when current income exceeds market levels or when current market conditions are inferior to those anticipated at the end of the projection period.

BACK_DEFEXP-RR-002942

BACK_DEFEXP-RR-002943

Copyrighted material licensed by Charles Brigden on September 17, 2020



# The Cost Approach 29

Like the sales comparison and income capitalization approaches, the cost approach is based on market comparisons. In the cost approach, appraisers compare the replacement cost of the subject improvements to the cost to develop similar improvements as evidenced by the cost of construction of substitute properties with the similar utility as the subject property. The estimate of development cost is adjusted for market-extracted losses in value caused by the age, condition, and utility of the subject improvements or for locational problems. The land value as if unimproved is then added, usually based on comparison with sales of comparable sites with the same or a similar highest and best use. The sum of the value of the land and the improvements is adjusted for any existing property rights (e.g., leased fee, leasehold interests) included with the subject property, which are implicit in the two other approaches to value.

In estimating land value, appraisers must be aware of the theory of consistent use, which holds that land cannot be valued on the basis of one use while the improvements are valued on the basis of another use. Consistent use is most often an issue when there are interim or transitional uses of land. For example, a property in transition from one use to another cannot be valued on the basis of one immediate use for land and another use for improvements because to do so would be inconsistent with elements of valuation. The improvements must enhance the value of the land or pay the penalty (in the form of depreciation) for any misuse of the land. A dwelling that may have many years of remaining life for a residential use cannot enhance the value of the land for which the immediate highest and best use would be for redevelopment with a commercial use.

Buyers of real property may judge the value of an existing property not only by considering the prices and rents of similar properties, but also by comparing its value to the cost to develop a new property with optimal physical condition and functional utility. For an existing property, buyers typically estimate the costs (e.g., capital expenditures, lease-up costs) required to bring the existing property to the optimal physical condition and functional utility.

It is important to note that the cost approach is a theoretical breakdown, or componentization, of the subject property. The real property components include

BACK_DEFEXP-RR-002944

land and building and site improvements. In order to reconcile the cost approach to the other two approaches to value, an appraiser must also make an adjustment for any in-place leases (e.g., unamortized leasing commissions and tenant improvement costs, lost revenue during downtime, the contribution or detriment, if any, of the existence of the lease, and the present value of the above- or below-market rent variance). Understanding the concept of componentization is important because the cost approach makes explicit what is otherwise implicit in the other two approaches to value. For example, external obsolescence is estimated in the cost approach but not required in applying the income capitalization and sales comparison approaches. The cost approach is also important because it often serves as a basis of recording fixed assets for financial reporting. (See Chapter 36.) The allocation of land and improvements affects the annual depreciation expense.

To apply the cost approach, an appraiser estimates the market's perception of the value difference between the property improvements being appraised and a newly constructed building with optimal utility (i.e., the ideal improvement identified in highest and best use analysis). In its classic form, the cost approach produces an opinion of the value of the fee simple estate (i.e., as vacant). If the purpose of the appraisal is to estimate the value of an interest other than fee simple, an adjustment will be required. For example, a property rights adjustment could be made as a lump-sum adjustment at the end of the cost approach. This would be particularly important when the interest appraised is the leased fee encumbered by a long-term lease that does not reflect market terms.

In applying the cost approach, an appraiser must distinguish between two cost bases—reproduction cost and replacement cost—and use one of the two consistently throughout the analysis. The market and physical condition of the appraised property usually suggest whether an exact replica of the subject property (reproduction cost) or a substitute property of comparable size and use (replacement cost) would be the basis of a more suitable comparison. The term *modern equivalent asset* is used in international valuation standards to describe an asset that provides "similar function and equivalent utility to the asset being valued" rather than a replica designed and constructed using current materials and methods.[1]

Appraisers estimate the cost to construct existing structures and site improvements (including direct costs, indirect costs, and an appropriate entrepreneurial incentive or profit) using one of three traditional methods:

- The comparative-unit method (or calculator method)
- The unit-in-place method (or segregated cost method)
- The quantity survey method

Appraisers then deduct all depreciation in the property improvements from the cost of the new structure as of the effective appraisal date. (Outside the United States, the term *depreciated replacement cost method* is often used to describe the application of the cost approach in this manner.) The amount of depreciation present is estimated using one or more of three fundamental methods:

- The market extraction method

---

1. International Valuation Standards Council (IVSC) Glossary, s.v., "Modern Equivalent Asset." Available online at www.ivsc.org/standards/glossary. Accessed on February 28, 2020.

BACK_DEFEXP-RR-002945

Copyrighted material licensed by Charles Brigden on September 17, 2020

- The economic age-life method
- The breakdown method

When the value of the land is added to the cost of the improvements less depreciation, the result is the indicated value of the fee simple estate by the cost approach.

Figure 29.1 illustrates the outline of the cost approach in its classic format, and this chapter explains the fundamental appraisal concepts that support this approach to value. Chapters 30 and 31 discuss the specifics of building cost and depreciation estimates—i.e., the essential techniques applied to develop a credible indication of value using the cost approach.

**Figure 29.1    Classic Cost Approach Analysis**

Estimated cost new (replacement cost or reproduction cost)
 Direct costs _____
 Indirect costs _____
 Entrepreneurial incentive (or profit) _____
 Subtotal _____
Less: Depreciation
 Physical deterioration
  Deferred maintenance _____
  Incurable short-lived items _____
  Incurable long-lived items _____
  Subtotal _____
 Functional obsolescence
  Curable
   Item 1 _____
   Item 2 _____
   . . . _____
  Incurable
   Item 1 _____
   Item 2 _____
   . . . _____
  Subtotal _____
 External obsolescence
  Location _____
  Market _____
  Subtotal _____
 Subtotal
Plus: Depreciated cost of site improvements
 (including entrepreneurial incentive or profit) _____
Plus: Estimated land value _____
Value indication of fee simple estate by cost approach _____
 Property rights adjustment _____
 Rent-up adjustment _____
Value indication of cost approach for the interest being appraised _____

BACK_DEFEXP-RR-002946

## Relation to Appraisal Principles

### Substitution

The principle of substitution is basic to the cost approach. This principle affirms that a knowledgeable buyer would pay no more for a property than the cost to acquire a similar site and construct improvements of similar desirability and utility without undue delay. In the cost approach, existing properties can be seen as substitutes for the property being appraised, and their value is also measured relative to the value of a new, optimal property. In short, the reproduction or replacement cost of property improvements on the effective date of the appraisal plus the accompanying land value provides a measure against which values for similar improved properties may be judged.

### Supply and Demand

Shifts in supply and demand cause values and prices to increase or decrease. As a result, a single property may have different values over time. If costs do not shift in proportion to price changes, the construction of buildings will be more or less profitable and the value of existing buildings will increase or decrease commensurately. If costs of production increase faster than values, new construction will be less profitable or may not be financially feasible. In other words, the incentive for developers to build is directly tied to supply and demand. Of course, the costs to be considered would include not just construction cost, but also the cost to acquire land.

### Contribution

The principle of contribution, which holds that the value of an individual component of a property is measured in terms of how much it contributes to the value of the property as a whole, is integral to the application of the cost approach. The various methods of estimating building costs are based on the contributions of the individual components of a property. International valuation standards identify the summation method as a technique used in the cost approach to value an entire asset by adding the separate values of the asset's component parts.[2]

Conversely, the principle of contribution implies that the value of a component may be measured as the amount its absence would detract from the value of the property as a whole. From this perspective, the estimation of depreciation can be seen as an application of the principle of contribution.

In the application of the cost approach, the amount each component contributes to the value of the property as a whole is measured in relation to the highest and best use of the property. For example, if the highest and best use of the property is for the conversion of the existing improvements to an alternative use, items that must be changed for the property to achieve its highest and best use would suffer from some form of depreciation.

In the cost approach, the effect on value of a deficiency or superadequacy is addressed in the estimate as a form of depreciation known as *functional obsolescence*. The deficiency or superadequacy can be identified by comparing the existing improvements with the ideal improvement and then treated by making a deduction from the cost of the improvements. As the improvements depreciate, the site often contributes a higher percentage of total property value. As the ratio of land value to total property value ap-

---

2.   IVSC Glossary, s.v., "Summation Method."

BACK_DEFEXP-RR-002947

Copyrighted material licensed by Charles Brigden on September 17, 2020

proaches 100%, the likelihood that the improvements will be demolished or remodeled and that the property will be redeveloped to a new highest and best use increases.

## Externalities

The construction cost and market value of a property may be affected differently by conditions that are external to the property. For example, externalities such as inflation or natural disasters may increase material and labor costs without a corresponding increase in market values. Real estate values do not always run parallel with other economic trends. On the other hand, an external event such as the completion of a sewer line may increase the value of the land associated with a property but have no effect on the cost of the improvements. Gains or losses in value caused by externalities may accrue to the land, the site, the building, or the property as a whole. Rising construction costs can significantly affect the market value of new construction and, in turn, the demand for and market value of older, substitute properties.

In the cost approach, a loss in building value due to external causes is attributed to external obsolescence, which is covered in detail in Chapter 31. Externalities can be either temporary or permanent and may work in positive and negative directions over the life of a building improvement.

## Highest and Best Use

In highest and best use analysis, an appraiser analyzes the site as though vacant and available to be developed to its highest and best use. An ideal improvement or course of development is identified, if the market allows for a specific highest and best use conclusion. If the site of the subject property is improved, the appraiser also compares the existing improvements to the ideal improvements or to the current standards found in the market area for the general property type if that is as specific as the highest and best use conclusion can be given the market support. Existing improvements have a value equal to the amount they contribute to the site, or they may penalize the property value if they have outlived their usefulness. This penalty is often measured by the cost to raze and remove the obsolete improvements from the site.

Existing improvements are rarely identical to the ideal improvements, unless they are new construction, and, even then, they may be an overimprovement or underimprovement by comparison with the ideal. For example, a new building that is poorly designed for the market is worth less than its cost because of the functional obsolescence in its design, which is discussed in more detail later in this chapter. An accurate and detailed analysis of highest and best use is critical to the cost approach because the comparison of the existing improvement and the ideal improvement based on the highest and best use identifies any forms of depreciation that are present in the building.

Nonconforming uses can present special valuation challenges. If, for example, an existing property is a nonconforming use because the improvements exceed the bulk regulations allowed by zoning and the existing structure could not be rebuilt or modified if it were damaged or destroyed, this can affect the highest and best use. The appraiser needs to consider any additional depreciation that may be caused by the existence of the square footage above that permitted by zoning. The cost approach is typically not the best approach to apply in this situation because buyers would not likely consider the construction of a nonconforming improvement on vacant land as an alternative.

BACK_DEFEXP-RR-002948

### Stabilization

In its classic form the cost approach estimates fee simple value without consideration of the costs or benefits associated with leasing. However, adjustments can be made to account for the value difference between a fee simple property and a leased fee, depending on the property rights being appraised. Appraisers may need to consider the holding costs that accrue during the leasing phase of property development along with other indirect costs such as leasing commissions, marketing costs, and rent concessions. Tenant finish costs may also be necessary to achieve stabilized occupancy and, if so, they must be added as a cost when valuing a leased fee.

In the appraisal of a leased fee property with rents that are higher or lower than market rents and terms, the value developed by the cost approach may require additional adjustment to reflect the specific situation of the subject property. As an alternative, factors such as tenant finish costs and above- or below-market rents could be recognized in the process of reconciling the value indications of the other approaches to value.

## Applicability and Limitations

In any market, the value of a building can be related to its cost. The cost approach is particularly important when a lack of market activity limits the usefulness of the sales comparison approach and when the property to be appraised—e.g., a one-unit residence—is not amenable to valuation by the income capitalization approach. Because cost and market value are usually more closely related when improvements are new, the cost approach is more important in estimating the market value of new or relatively new construction. The approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the highest and best use of the land as though vacant.

The cost approach can sometimes be applied to older properties given adequate data to measure depreciation. However, investors or purchasers of older buildings considering an acquisition may be more concerned about expenditures that they will need to make after the purchase to make the property suitable to their needs than they are by the calculation of replacement or reproduction cost and depreciation.

The cost approach may be used to develop an opinion of market value (or some other type of value that an appraisal assignment may require such as use value or fair value) of proposed construction, special-purpose or specialty properties, and other properties that are not frequently exchanged in the market. Buyers of these properties often measure the price they will pay for an existing building against the cost to build less depreciation or against the cost to purchase an existing structure and make any necessary modifications. If sale and rental data for comparable properties is not available, current market indications of the depreciated cost of an existing building (or the costs to acquire and refurbish the building) would be the best reflections of market thinking and, thus, of market value.

When the physical characteristics of comparable properties differ significantly, the relative values of these characteristics can sometimes be identified more precisely with the cost approach than with the sales comparison approach. Because the cost approach starts with the cost to construct a replica or a substitute property with optimal physical and functional utility, it can help an appraiser determine accurate adjust-

BACK_DEFEXP-RR-002949

Copyrighted material licensed by Charles Brigden on September 17, 2020

ments for physical differences in comparable sale properties. If, for example, an appraiser must make an adjustment for inadequate elevators in a comparable property, the cost to cure the deficiency can be used as a basis for this adjustment. Thus, the cost approach provides appraisers with data to use both in estimating depreciation and in deriving an adjustment to apply in the sales comparison approach.

The cost approach is especially useful when building additions or renovations are being considered, which is a key issue in highest and best use analysis. The approach can be used to estimate whether the cost of an improvement, including an entrepreneurial incentive, will be recovered through an increased income stream or in the anticipated sale price. The analysis of feasibility rent can help identify and prevent the construction of overimprovements.

Because the cost approach requires that land and improvements be valued separately, it is also useful in appraisals for insurance purposes, when uninsurable items must be segregated from insurable items. In valuation for accounting purposes, the cost approach is applied to estimate depreciation for income tax purposes. In cases where land value tends to make up a considerable portion of overall property value (such as agricultural properties or high-exposure commercial outparcels), the cost approach can take on greater significance in the reconciliation of the value indications of all the approaches to value applied because the cost approach is the only one requiring a separate conclusion of land value.

Finally, an estimate of probable building and development costs is an essential component of feasibility studies, which test the investment assumptions on which land use plans are based. A proposed development is considered financially feasible when market value exceeds total building and development costs plus a reasonable, market-supported estimate of entrepreneurial incentive (i.e., the anticipated profit necessary for an entrepreneur to proceed with the project).

A higher value indication from the application of the cost approach than from the sales comparison or income capitalization approaches may suggest that the real estate development is not economically feasible. If the cost approach indicates a higher value for an existing building, then an appraiser may need to take a closer look at one or more of the inputs—land value, current cost, depreciation, or entrepreneurial incentive. For older properties or properties in fluctuating markets, an inaccurate estimate of the remaining economic life could cause depreciation to be understated resulting in a higher value indication in the cost approach. When a higher or lower value is produced in the cost approach, that value indication is usually compared against the results of one or more of the other approaches and explained in the final reconciliation step of the valuation process.

When improvements are considerably older or do not represent the highest and best use of the land as though vacant, the physical deterioration, functional obsolescence, and external obsolescence may be more difficult to estimate. Furthermore, relevant comparable data may be lacking or the data available may be too diverse to indicate an appropriate anticipation of entrepreneurial profit (i.e., the profit actually earned from a completed project). These conditions may make the cost approach less reliable.

One of the weaknesses of the cost approach, from an investment perspective, is the assumption that newly constructed improvements are immediately available on the date of the appraisal. An investor looking at options for an immediate purchase may consider the months or years required to develop and construct a new property

BACK_DEFEXP-RR-002950

to be an unacceptable delay. From the perspective of that investor, the cost approach would have no relevance.

Another problem arises if the asset being valued is clearly obsolete. According to the principle of substitution, a buyer would pay no more for a property than the cost of buying or building a property of similar utility. Therefore, a property that has little utility would not be recreated, and the value of the the improvements would be minimal or nothing. Any salvage value that remains is likely to be discovered in the test of financial feasibility in the analysis of the highest and best use of the subject property.

Even though the cost approach may have an advantage over the sales comparison and income capitalization approaches when reliable data on comparable sales and rents is scarce, that same lack of data can weaken the credibility of the estimate of land value that is an essential step in the application of the cost approach. All the appraisal methods used in land valuation depend on sales comparison and income capitalization techniques.

Appraisers must remember that the cost approach initially results in an indication of the value of the fee simple estate. To value real estate held in leased fee or property subject to other partial interests, appraisers must make adjustments to reflect the specific real property rights being appraised, such as a leased fee interest. An example of adjusting for property rights is shown in Chapter 31.

## Procedure

After gathering all relevant information and analyzing data for the market area, site, and improvements, an appraiser follows a series of steps to derive a value indication by the cost approach. An appraiser will

1. Estimate the value of the site as though vacant and available to be developed to its highest and best use.
2. Determine which cost basis is most applicable to the assignment: reproduction cost or replacement cost.
3. Estimate the direct (hard) and indirect (soft) costs of the improvements as of the effective appraisal date.
4. Estimate an appropriate entrepreneurial incentive from analysis of the market.
5. Add the estimated direct costs, indirect costs, and entrepreneurial incentive to arrive at the total cost of the improvements.
6. Estimate the amount of depreciation in the improvements and, if necessary, allocate it among the three major categories:
   - Physical deterioration
   - Functional obsolescence
   - External obsolescence
7. Deduct estimated depreciation from the total cost of the improvements to derive an estimate of their depreciated cost.
8. Estimate the contributory value of any site improvements that have not already been considered. (Site improvements may be appraised at their contributory value—i.e., directly on a depreciated-cost basis—but may be included in the overall cost calculated in Step 3 and depreciated if necessary.)

BACK_DEFEXP-RR-002951

Copyrighted material licensed by Charles Brigden on September 17, 2020

9.  Add land value to the total depreciated cost of all the improvements to develop an indication of the market value of the fee simple interest in the real property.

10. If appropriate, adjust for the property interest being appraised to derive the indicated value of the specified interest in the property.

11. If the property will experience net income shortfalls during a lease-up period, then calculate a rent-up adjustment to account for the cost of leasing (distinct from leasing commissions).

12. Adjust for personal property (e.g., furniture, fixtures, and equipment) or intangible assets that are included in the appraisal.

## Land Value

In the cost approach, the estimated market value of the land or site as though vacant is added to the depreciated cost of the improvements. The value of the land is based on its highest and best use. Land value can be estimated using various techniques, which are discussed in Chapter 19. Appraisers must remember that the land value estimates produced with these techniques reflect the value of the fee simple estate. If a land lease is involved and it is not at market terms, this would change the rights appraised from fee simple to either leasehold or leased fee depending on the purpose of the assignment.

## Reproduction Cost and Replacement Cost

The cost to construct an improvement on the effective appraisal date may be developed as either the estimated reproduction cost or estimated replacement cost of the improvement. The theoretical base (and classic starting point) for the cost approach is reproduction cost, but replacement cost is more commonly used because it may be easier to obtain and can reduce the complexity of depreciation analysis. An important distinction must be made between the terms:

- Reproduction cost is the estimated cost to construct, as of the effective appraisal date, an exact duplicate or replica of the building being appraised, insofar as possible, using the same materials, construction standards, design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies, and obsolescence of the subject improvements.

- Replacement cost is the estimated cost to construct, as of the effective appraisal date, a substitute for the building being appraised using contemporary materials, standards, design, and layout. When this cost basis is used, some existing obsolescence in the property may be cured. Replacement cost may be the only alternative if reproduction cost cannot be estimated.

The decision to use reproduction cost or replacement cost is often dictated by the age of the structure, its uniqueness, and any difference between its intended use at the time of construction and its current highest and best use. In theory, the use of either reproduction cost or replacement cost should yield the same indication of value after proper application. If reproduction cost or replacement cost is used inconsistently, double-counting of items of depreciation and other errors can be introduced into the analysis. The cost basis selected for a particular appraisal should be clearly identified in the report to avoid misunderstanding and must be applied consistently throughout the cost approach to avoid errors in developing an opinion of value.

*The Cost Approach*    **533**

BACK_DEFEXP-RR-002952

The use of replacement cost can eliminate the need to measure some, but not all, forms of functional obsolescence such as superadequacies and poor design. Replacement structures usually cost less than identical structures (i.e., reproductions) because they are constructed with materials and techniques that are more modern, more readily available, and less expensive in the current market. Also, correcting deficiencies may result in lower costs. Thus, a replacement cost estimate is usually lower and may provide a better indication of the existing structure's contribution to value. A replacement structure typically does not suffer functional obsolescence resulting from superadequacies. However, if functional problems persist in the hypothetical replacement structure, an amount must be deducted from the replacement cost. Estimating replacement cost generally simplifies the procedure for measuring depreciation in components of superadequate construction. An example of functional obsolescence would be the absence of a desirable feature such as air-conditioning in an existing improvement in a market where this feature is standard. This form of obsolescence would be corrected in a replacement building.

Estimating reproduction cost can be complicated because the improvements may include materials that are no longer available and construction standards or codes may have changed. Nevertheless, reproduction cost usually provides a better basis for measuring depreciation from all causes when that sort of measurement is necessary.

## Cost Estimates

To develop cost estimates for the total building, appraisers must consider direct costs (also known as *hard costs*) and indirect costs (also known as *soft costs*). Both direct and indirect costs are essential to a reliable cost estimate. (The traditional data sources and appraisal techniques used to estimate building costs are discussed in Chapter 30.)

Direct construction costs include the costs of material and labor as well as the contractor's profit required to construct the improvement on the effective appraisal date. The entrepreneurial incentive or profit is separate and apart from the contractor's or developer's profit. The overhead and profit of the general contractor and various subcontractors are usually part of the construction contract and therefore are direct costs that should always be included in the cost estimate. In more complex projects, where multiple contractors, construction staging, or other complications are involved, a management fee may be required. Indirect costs are expenditures or allowances that are necessary for construction but are not typically part of the construction contract. These costs can include, but are not limited to, the cost of architectural and engineering services, loan origination fees, carrying costs during construction, title insurance fees, appraisal and legal fees, leasing and marketing costs, and developer's overhead and anticipated profit. Because the entrepreneur provides the inspiration, drive, and coordination necessary to the overall project, the cost approach should include an appropriate entrepreneurial incentive or anticipated profit, which is discussed later in this chapter. A construction contingency is not usually a soft cost but rather a hard cost.

The quality of materials and labor greatly influences costs, and appraisers should be familiar with the costs of the materials used in the property being appraised. A building can cost substantially more than is typical if items such as walls and windows are overinsulated or thicker slabs are used to accommodate greater floor loads. Many newer structures contain elements that may not be found in older buildings with which they compete. At one time the market may have considered features such

BACK_DEFEXP-RR-002953

Copyrighted material licensed by Charles Brigden on September 17, 2020

as internet connectivity, networking and telecommunications capabilities, and adequate, reliable power in "smart" office buildings to be high-tech overimprovements. These features may not have contributed as much value as they cost at the time of installation, but as demand for these building materials and features continues to increase so does their contribution to value.

The competitive situation in the local market can also affect cost estimates. Actual contractor bids based on the same set of specifications can vary substantially. A contractor who is working at capacity is inclined to make a high bid, while one who needs the work is likely to submit a lower figure. The items cited in the Table 29.1 include typical costs incurred in a balanced market. In markets that are out of balance, higher costs may result from a prolonged absorption period—e.g., additional marketing or carrying costs, tenant improvements, leasing commissions, and administrative expenses. The increase in costs caused by a market out of balance can contribute to external obsolescence.

Some indirect costs, such as architectural fees, are generally related to the size and cost of the project. These are often estimated as a percentage of direct costs. Other costs, such as leasing and sales commissions, are related to the type of property or market practice. Still others, such as fees for appraisals and environmental studies, are a function of the time and complexity required to accomplish the task. The

---

**Table 29.1**  Examples of Direct Costs and Indirect Costs

**Direct Costs**
- Materials, products, and equipment
- Labor used in construction
- Equipment used in construction and depreciation of equipment during construction
- Security during construction
- Contractor's shack and temporary fencing
- Material storage facilities and transportation costs
- Power line installation and utility costs
- Contractor's profit and overhead, including job supervision, coordination and management (when appropriate), worker's compensation, and fire, liability, and unemployment insurance
- Performance bonds

**Indirect Costs**
- Building permits
- Architectural and engineering fees for plans, plan checks, surveys to establish building lines and grades, and environmental studies
- Appraisal, consulting, accounting, and legal fees
- All-risk insurance expense and ad valorem taxes during construction
- The cost of carrying the investment in land and contract payments during construction*
- The cost of carrying the investment in the property after construction is complete but before stabilization is achieved (if leased fee valuation)
- Supplemental capital investment in tenant improvements and leasing commissions
- Marketing costs, sales commissions, and any applicable holding costs to achieve stabilized occupancy in a normal market (if leased fee valuation)
- Administrative expenses of the developer
- Local government development levies

---

\* If construction financing is required, the points, fees or service charges, and interest on construction loans are indirect costs.

BACK_DEFEXP-RR-002954

indirect costs of carrying an investment during and after construction are a combination of all of the above. Although total indirect costs are sometimes estimated as a percentage of direct costs, more detailed studies of these costs are often warranted. When a cost estimating service is used, it is important for appraisers to be able to identify which costs are already included in the cost estimates and which need to be added by the user of the cost service.

## Entrepreneurial Incentive and Entrepreneurial Profit

Entrepreneurs (developers, contractors, investors, and others) compete against each other in the real estate marketplace, and any building project will include an economic reward (above and beyond direct and indirect costs) sufficient to convince an entrepreneur to take on the risk associated with that project in that market. For a new building that is the highest and best use of the site, the difference between the market value and the total cost of development (i.e., the sum of land value and direct and indirect costs) is the profit—or loss—realized:

Market Value – Total Cost of Development = Profit (or Loss)

Whether or not a profit is actually realized depends on how well the entrepreneur has analyzed the market demand for the property, selected the site, and constructed the improvements. In the case of income-producing properties, the profit realized will also depend on the entrepreneur's ability to obtain the proper tenant mix and negotiate leases in a reasonable amount of time.

The term *entrepreneurial incentive* refers to the amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project. In contrast, entrepreneurial profit refers to the difference between the total cost of development and marketing and the market value of a property *after* completion and achievement of stabilized occupancy and income.[3] In short, incentive is anticipated while profit is earned. In most cases, if the entrepreneur sees no potential to make a profit, a new building will not be built. This profit is as essential to the indication of value in the application of the cost approach as the costs of building materials and labor.

The concept of entrepreneurial profit is distinct from the broader idea of economic profit, which is defined as "the difference between sales revenue and the full opportunity cost of resources involved in producing goods."[4] In perfectly competitive and efficient markets, economic profit is effectively zero in the long run because new firms enter industries that are earning excess profits, which raises the price of scarce productive resources and lowers the market price of output as the market moves toward equilibrium where market price equals the sum of the opportunity costs of all resources used in production. The term *entrepreneurial profit* or *entrepreneurial incentive* is used in the application of the cost approach to refer to the realized or expected component of value for project profit included in a value estimate.

As a market-derived figure, an estimate of entrepreneurial profit or entrepreneurial incentive is only as reliable and precise as the available market data warrants. For example, for several years following the economic downturn in 2008, a dearth of new

---

3.  Historically, *entrepreneurial profit* has been the more common term in general usage and serves as a broader term in the discussion of the cost approach. In this text, the term *entrepreneurial incentive*, which is a more recent addition to the appraisal lexicon, is used specifically in reference to a situation that calls for a forecast of the reward an entrepreneur expects to receive at the completion of a real estate development.

4.  Paul A. Samuelson and William D. Nordhaus, *Economics*, 13th ed. (Boston: McGraw-Hill/Irwin, 1989), 980.

BACK_DEFEXP-RR-002955

Copyrighted material licensed by Charles Brigden on September 17, 2020

construction left appraisers with little current data on development activity, making estimates of entrepreneurial incentive difficult to forecast. Nevertheless, most market areas have a typical or appropriate range of expected reward that can be determined through market research, usually through interviews with developers and other market participants about anticipated, acceptable, and actual levels of profit achieved in the market. The range of profit will vary for different types of structures and with the nature or scale of a given project. The entrepreneurial incentive for a proposed development may be higher where creative concepts, greater risk, or unique opportunities have market acceptance. Less risky, more standard competitive projects may merit a lower measure of profit. For example, the first speculative high-rise office park in a suburban market is likely to require greater entrepreneurial incentive than a new residential subdivision development in a community with demonstrable population growth.

The stage of development, and the different levels of risk and expertise that may be required at different stages, can affect the amount of entrepreneurial profit earned. For example, an entrepreneur can start earning a reward from the start of the project. This reward can increase as land is acquired, plans are drawn up, permits are approved, financing is secured, contracts are signed, construction is completed, and units are sold off or leased. It can be difficult to estimate exactly how much entrepreneurial profit would be earned at each stage of construction, although lenders may require interim values that reflect financing costs and taxes during the construction and leasing phases.

In practice, separating the value impact of the entrepreneurial coordination from other market influences can be difficult, particularly during periods of little new construction. To ensure the reasonableness of an estimate of entrepreneurial incentive or entrepreneurial profit, appraisers should carefully examine the source of additional property value over and above the total cost of development and the effects of supply and demand for properties of that type in the subject property's market area. For example, some appraisers point out that the value associated with the amenities of a property may be such that the sale price of the property could significantly exceed the sum of the costs of the land, building, and marketing (e.g., in an overheated seller's market where sale prices are inflated).

Some appraisers also observe that entrepreneurial profit often represents a theoretical profit in certain build-to-suit, owner-occupied properties. An owner-occupant may consider any additional operating profit due to the property's efficient design to be an incentive to develop and occupy that property. However, the entrepreneurial profit might only be realized years after the property is built, when it sells to a similar owner-occupant at a premium because the property is suitable and immediately available, unlike new construction or conversion of a different property. In this case, the entrepreneurial profit realized upon the later sale is likely to become obscured over time by changing market conditions.

The issue of entrepreneurial incentive is more complex with certain types of specialized owner-occupied properties. For example, buildings developed and used by governmental bodies or buildings owned and occupied by religious organizations are likely not developed with an expectation of realizing an entrepreneurial profit. In the case of specialized private owner-occupied improvements, entrepreneurial incentive is as much a part of the construction as the building materials used in the improvements. However, the reality is that in properties that are constructed for owner occupancy as opposed to economic returns, the entrepreneurial incentive may

BACK_DEFEXP-RR-002956

> **Contributions of the Entrepreneur, Developer, and Contractor**
>
> The measure of profit used in the cost approach is the amount required to entice an entrepreneur to take on the project. In analyzing the components of reward and compensation actually received (or anticipated) by an entrepreneur, appraisers may choose to further distinguish between the concepts of project profit, entrepreneurial profit, developer's profit, and contractor's profit:
>
> - *Project profit* is the total amount of reward for entrepreneurial coordination and risk.
> - *Entrepreneurial profit* refers to the portion of project profit attributable to the efforts of the entrepreneur, distinct from the efforts of the developer, if one is present. In projects in which the entrepreneur and the developer are the same person, the entrepreneurial profit comprises distinct cost items for the different roles served by the individual, with the sum of those items equivalent to total project profit.
> - *Developer's profit* represents compensation for the time, energy, and expertise of an individual other than the original entrepreneur—usually, in large projects, the person responsible for managing the overall development process.
> - *Contractor's profit* (including subcontractors' fees) is essentially a portion of the project's overhead and is not usually reflected in the entrepreneurial reward.
>
> The measure of project profit used in cost approach calculations usually includes both a developer's profit and an entrepreneurial profit. The profit a contractor receives is often already reflected in the fee a contractor charges and would therefore be included in the direct costs.

be the first cost lost in value if those properties are not constructed similar to the ideal improvement. An owner-occupant may consider additional operating profit, long-term control, or ownership pride or prestige to be an adequate incentive to develop and occupy that property.

The way in which comparable properties have been developed affects the availability of data. Appraisers are sometimes able to calculate entrepreneurial profit from actual comparable costs for speculatively built properties such as condominiums and multifamily developments. In the value estimate of a speculatively built property, entrepreneurial profit represents a return to the entrepreneur for the skills employed and the risks incurred, although the actual return may differ from the anticipated return. In large-scale developments, however, the issue is complicated because the entrepreneurial profit may not reflect the proportionate contributions of the improved site and the improvement to the overall property value. Developers of tract subdivisions, for example, often realize most of their profit on the value of the houses built on the finished lots, not necessarily on the value of the lots, which could be analyzed as a separate investment opportunity with its own separate measure of entrepreneurial profit.

Data on entrepreneurial profit for custom-built properties may not be available if the property owner who contracted the actual builders was acting as the developer. The prices of upscale, custom-built properties often reflect the attractiveness of these amenity-laden properties as well as the high costs of the materials used. Thus, the breakdown of costs for custom-built properties may not be comparable to the breakdown for speculatively built properties, which further complicates the task of estimating a rate of entrepreneurial profit. Theoretically, however, the value of custom-built properties should also reflect an entrepreneurial profit, although functional obsolescence may offset that profit when the custom-built improvements do not serve the market.

Appraisers should also scrutinize the cost data on which the value estimate is based to determine whether or not an allowance for entrepreneurial incentive or

BACK_DEFEXP-RR-002957

*Copyrighted material licensed by Charles Brigden on September 17, 2020*

entrepreneurial profit has already been made. If this is not done, the contribution of the entrepreneur could be included twice. Data derived from sales of comparable sites often includes a profit for the land developer. Cost-estimating services quote direct costs (e.g., contractor's profit) and indirect costs (e.g., sales costs), but they may or may not provide estimates of entrepreneurial incentive or entrepreneurial profit. Because different sources of data reflect costs in different ways, appraisers should identify where the entrepreneurial incentive or profit is considered in an estimate—i.e., whether it is an item already included in the sum of total cost and land value or a stand-alone item added to the sum of total cost and land value.

## Depreciation

The market recognizes the occurrence of losses in the value of improvements due to the effects of age, wear and tear, and other causes, and an appraiser interprets how the market perceives the collective effect of all forms of depreciation.[5] In short, depreciation is the difference between the contributory value of an improvement and its cost at the time of appraisal:

Cost of Improvement − Contributory Value of Improvement = Depreciation

where the *cost of improvement* is either reproduction cost or replacement cost. By estimating the depreciation incurred by an improvement and deducting this estimate from the improvement's reproduction or replacement cost, an appraiser can conclude the depreciated cost of the improvement. This depreciated cost is an indication of the improvement's contribution to the property's market value. (Techniques for estimating depreciation are discussed in Chapter 31.)

Depreciation in an improvement can result from three major causes operating separately or in combination:

- Wear and tear from regular use, the impact of the elements, or damage, which is known as *physical deterioration* and may be curable or incurable
- A flaw in the structure, materials, or design that diminishes the function, utility, and value of the improvement, which is known as *functional obsolescence* and again may be curable or incurable
- A temporary or permanent impairment of the utility or salability of an improvement or property due to negative influences outside the property, which is known as *external obsolescence* and is rarely curable

External obsolescence may result from adverse market conditions. Because of its fixed location, real estate is subject to external influences that usually cannot be controlled by the property owner, landlord, or tenant.

Theoretically, depreciation can begin in the design phase or the moment construction is started, even in a functional building that is the highest and best use of a site. Improvements are rarely built under ideal circumstances, and their construction takes considerable time. During the construction process, physical deterioration can be temporarily halted or even corrected, but physical deterioration tends to persist throughout the life of the improvements. Moreover, as time goes on and a building's features become dated in comparison to new buildings, functional obsolescence sets in. Consider, for example, an industrial building that was built in the early 1970s. The

---

5.  See Chapter 12 for discussion of the legal concept of "diminution in value," which is distinct from depreciation.

BACK_DEFEXP-RR-002958

structure's 18-foot-high ceilings, which were the market standard at the time of construction, might be considered totally inadequate now that greater clear heights are the norm. New buildings can have functional obsolescence even before they are constructed, which is usually attributable to a design that does not meet market standards.

In the cost approach, the depreciation attributable to all causes is extracted from the market (or calculated when market extraction is not possible) and deducted from the current cost to arrive at the depreciated cost:

$$\text{Current Cost} - \text{Total Depreciation Applicable} = \text{Depreciated Cost}$$

The depreciated cost of all improvements (or their contribution to value) and the land value are added together to provide an indication of the market value of the property:

$$\text{Depreciated Cost} + \text{Land Value} = \text{Market Value}$$

Depreciation is a penalty only insofar as the market recognizes it as causing a loss in value. For some older buildings, the value loss due to apparent depreciation may be offset by a temporary scarcity relative to demand or by an improvement's historical

---

### Depreciation in Appraising and Accounting

Many of the terms appraisers use are also used in other professions with the same, similar, or different meanings. The term *accrued depreciation*, which appeared in earlier editions of *The Appraisal of Real Estate*, was originally borrowed from accounting practice. In accounting, *accrued depreciation* (or alternatively *accruals for depreciation*) refers to the total depreciation taken on an asset from the time of purchase to the present, which is normally deducted from an asset's account value to derive net book value. While *accrued depreciation* was used in an appraisal context for many years in the past, the simpler and more concise term *depreciation* is equally suitable and has been used in the most recent editions of the textbook.*

*Book depreciation* is an accounting term that refers to the amount of capital recapture written off for an asset on the owner's books for income tax or financial reporting purposes. Under the current generally accepted accounting principles (GAAP) in the United States, the term has typically been used in income tax calculations to identify the amount allowed as accruals for the retirement or replacement of an asset under the federal tax laws. Book depreciation may also be estimated using a depreciation schedule set by the Internal Revenue Service. Book depreciation is not market-derived like the depreciation estimates developed by appraisers. Instead, various formula-based techniques (e.g., the straight-line method, the units of production method, the declining balance method, the sum-of-the-years'-digits method) have been used to calculate scheduled depreciation.

The International Financial Reporting Standards treat depreciation in a similar fashion as US GAAP with two significant distinctions:

1. The estimates of useful life and residual value of the property are reviewed at least at each annual reporting date, which can be more frequent than under US GAAP.

2. The available depreciation models include the cost model (similar to US GAAP) and the fair value–based revaluation model (which allows for the revaluation of property on a company's books when fair value can be measured).

International Accounting Standard 16: Property, Plant, and Equipment details the methods of estimating depreciation for financial reporting purposes.

Financial Accounting Standards Board Accounting Standards Codification Topic 820: Fair Value Measurements and Disclosures (formerly known as SFAS 157) calls for market-supported depreciation that is broader than depreciation for financial reporting purposes (an allocation of historical cost) or tax purposes (based on specified service lives).

---

\* The term *total depreciation* also remains in use by appraisers, although *depreciation* is used without modification in this textbook in most cases to refer to estimates of both the total amount of depreciation that a property suffers from or the amount of depreciation attributable to a particular form of depreciation (i.e., a part of the whole).

BACK_DEFEXP-RR-002959

Copyrighted material licensed by Charles Brigden on September 17, 2020

or architectural significance. In these situations, an appraiser should exercise caution not to penalize a property unduly in the cost approach.

As mentioned earlier, an appraiser's use of reproduction cost rather than replacement cost to derive a current cost estimate will affect the estimation of depreciation. Some forms of functional obsolescence are eliminated when replacement cost is used, but other forms remain unaffected. Consider an industrial building with poor access for trucks and with a 28-foot ceiling height in a market where 24-foot ceiling heights are the norm. A replacement cost estimate could be based on a building with a 24-foot ceiling height, while a reproduction cost estimate would be based on a building with a 28-foot ceiling height. By using replacement cost instead of reproduction cost, an appraiser eliminates the superadequacy attributable to the story height but not the deficiency caused by poor access to the street. Moreover, any additional costs of ownership caused by the superadequacy would not be eliminated in the replacement cost estimate. If the excess story height were the cause of additional heating, cooling, insurance, or property taxes, the superadequacy would also cause additional depreciation. An appraiser using replacement cost would have to consider any excess operating costs associated with the superadequate construction.

## Property Rights and Rent-up Adjustments

The value indication developed using the classic cost approach procedure is the value of the fee simple interest in the property at stabilized occupancy and at market rent and terms. A property rights adjustment is necessary when property rights other than fee simple are being valued. For example, property rights adjustments can be made to account for leased fee or leasehold property that is leased at a below-market rate or is empty or partially leased. A leased fee or leasehold adjustment would be necessary when a tenant is paying more or less than market rent and terms. The estimation of a property rights adjustment generally involves the use of sales comparison or income capitalization techniques, as discussed in Chapter 21.

Direct comparisons of the price of a leased fee with the price of the fee simple estate of comparable properties may reveal that the calculation of a property rights adjustment with income capitalization techniques understates or overstates the actual effect on the value of the leased fee. Real estate markets are not perfectly efficient, and risk may not always be distributed efficiently to the various legal interests, i.e., the value of the whole may not equal the sum of the parts.

Market analysis may indicate a rent-up adjustment may need to be made for an empty or partially empty building that is not yet at stabilization or has not yet achieved market rental rates. The lease-up period for a rental property typically requires an investment of time and money, so the market value of the property when it is empty is likely to be less than the value of the property when it is full. The value of the lost revenue (i.e., what is known as a *shortfall*) during a building's lease-up period could be discounted at an appropriate rate considering the risk of the shortfall.

Consider a newly developed multitenant office-warehouse with an anticipated leasing period of two years after completion of construction. Shortfalls in the first two years after completion of the property are calculated by comparing the anticipated net cash flow upon completion with the net operating income as if stabilized upon completion. For example, suppose that upon completion of construction the projected partial occupancy of the facility would generate a net cash flow of $250,000

BACK_DEFEXP-RR-002960

in the first year of operation, but, if the facility were fully leased at that time, then the property would be expected to generate $600,000 in that same period. In this case, the shortfall in the first year is $350,000. Various techniques could be used to convert the shortfalls during the lease-up period into a rent-up adjustment:

1. Discounting the shortfalls at the property yield rate and including a proportionate amount of entrepreneurial incentive for the lease-up period
2. Comparing the discounted present value of the property as if stabilized with the present value of the property upon completion discounted at a higher rate to reflect the risk of the lease-up period
3. Discounting the shortfalls at a safe rate (with or without adding entrepreneurial profit depending on market practice)
4. Summing the tenant improvements, leasing commissions, and income shortfalls and adding an entrepreneurial incentive
5. Increasing the overall capitalization rate used to calculate the value of the stabilized income stream before deducting cash flow shortfalls to account for the risk

In the application of the cost approach, estimating a rent-up adjustment usually involves discounting the shortfalls at an appropriate rate and including the proportion of the project's entrepreneurial incentive that would be expected to be achieved after the entitlement and construction phases of development (i.e., during the lease-up period).

In some situations, a property can be worth more, or can sell for more, when it is empty than when it is full. For example, in a market with rapidly rising rents, a building with empty space may be better able to take advantage of rent appreciation than a building with long-term leases in place, requiring an upward adjustment for the value of the leasehold estate. However, volatility in rental rates can be a sign of weakness in market fundamentals, so market analysis would be important in forecasting demand for the empty space and the accompanying risk of that space not being rented at all.

In a balanced market, feasibility rent—the rent needed for the property to be worth its cost—will be the same as market rent. For example, if a property costs $100 per square foot, then the feasibility rent in a market where capitalization rates for similar properties average 10% would be $10 per square foot. In a poorly performing market, new construction should not resume until the level of market rent rises to meet the feasibility rent. Similarly, the feasibility of adding new improvements or renovating existing improvements can be tested by comparing market rent with the feasibility rent after adjustments for the additional cost of the proposed changes. For example, suppose a 50,000-sq.-ft. expansion of an office-warehouse would increase the replacement cost of the building from the $100 per square foot figure for the original building to $105 per square foot for the expanded building. If the capitalization rate remained 10%, then the market rent would have to increase to $10.50 per square foot before the expansion would make economic sense.

If contract rent is greater than market rent, a negative leasehold benefit is created. In that case, the landlord is collecting more rent than would be achievable in the market at that time. In contrast, when feasibility rent is greater than current market rent, no one receives a benefit from that difference.

BACK_DEFEXP-RR-002961

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Building Cost Estimates   **30**

To apply the cost approach to value, appraisers estimate the cost of the improvements as of the effective date of appraisal. To prepare this sort of estimate, appraisers need to understand construction plans, specifications, materials, and techniques. They can access a variety of publications, computer software, and accompanying data available for this purpose, or the work can be done with the assistance of expert cost estimators. In either case, the appraiser is responsible for the result, and any existing improvements should be carefully reviewed and described by all individuals who are delegated to estimate costs. In addition, the appraiser should be sure the cost method applied is consistent with the property rights being appraised.

Proposed improvements may be valued based on plans and specifications provided that the appraiser discloses that the improvements have not yet been built. If the effective date is current, the appraisal would require a hypothetical condition that the improvements exist as of that date. If the effective date is prospective, it may require an extraordinary or specific assumption that the improvements will be constructed in the manner described and by the anticipated date. Appraisers are commonly asked to provide an opinion of prospective value under the extraordinary assumption or special assumption that a property will be completed as planned (or completed as planned and having achieved stabilized occupancy) as of a future date. Appraisers are also asked to provide a current opinion of value based on the hypothetical condition that the proposed improvements had already been completed as of the effective date.

When appraisers are asked to value property that has not yet been completed, two prospective values are sometimes called for:

1. The value at the time of completion
2. The value when stabilized occupancy and income are achieved

The values may be based on the extraordinary assumptions or special assumptions that the improvements will be completed as proposed on a future date (for the value upon completion) and that the property will be stabilized (for the value upon reaching stabilization).

BACK_DEFEXP-RR-002962

## Sources of Cost Data

Construction contracts for buildings similar to the building being appraised provide a primary source of comparable cost data. Some appraisers maintain comprehensive files of current cost data, including current costs for completed houses, apartments, hotels, office buildings, retail buildings, and industrial buildings. Another common source is a developer's construction budget, which an appraiser obtains when appraising a proposed development for construction financing purposes. These costs can provide a basis for calculating the cost to construct a proposed building or an equivalent to an existing building. Contract-reporting services may indicate building areas or a general building description, the low bids, and the contract award. Appraisers can then obtain any missing information, such as the breakdown of office and warehouse space in an industrial property, and classify the building type for filing purposes. When cost comparable files are carefully developed and managed, they can supply authentic square-foot costs on buildings of all types for use in appraisal assignments.

In the absence of construction contract data, local building contractors and professional cost estimators can be reliable sources of data. These sources can often be found online. In an active market, cost information can also be obtained by interviewing local property owners who have recently added building or land improvements similar to those found on the subject property. If work contracts and accounting records of recently improved properties are available, they can provide significant details.

## Cost-Estimating Services

Many cost-estimating services publish data for estimating the current cost of improvements. The most recognized services in the United States include the following:

- Marshall & Swift/CoreLogic (www.corelogic.com/solutions/marshall-swift.aspx)
- Dodge Data & Analytics (http://construction.com/dodge/)
- RSMeans Cost Data (www.rsmeans.com)

Data provided by cost-estimating services can be used independently as a basis for cost estimation or to confirm estimates developed from local cost data.

Published cost manuals usually include benchmarks for direct unit costs but rarely include benchmarks for indirect costs—such as escrow fees, legal fees, interest on construction loans, financing fees, carrying charges, and property taxes—because these are site specific. For example, cost manuals do not include the costs of construction loan points and permanent loan fees, so appraisers often research ranges of rates through discussion with lenders of the respective types of loans. Appraisers should recognize what indirect costs are included and excluded in published cost estimates.

Appraisers research their markets to determine which costs are most applicable to specific appraisal assignments. National cost services generally list the benchmark cost of many site improvements separately, rather than as part of building costs. This data includes the costs of roads, storm drains, rough grading, soil compaction, utilities, and jurisdictional utility hookup fees and assessments. Demolition costs may be included in published cost services and they also can be obtained from actual costs or demolition contractors. Also, entrepreneurial incentive or entrepreneurial profit is generally not included in cost service data. Appraisers usually estimate those costs separately and then include them in the estimate of total cost.

BACK_DEFEXP-RR-002963

Copyrighted material licensed by Charles Brigden on September 17, 2020

Although buildings can be measured in several ways, appraisers should measure buildings according to local custom. For cost purposes, appraisers should measure them consistently with the way the cost data is developed. However, appraisers must understand the measurement technique used by the cost service in order to use that service's data effectively. Several cost-estimating services publish manuals or maintain electronic databases that break down costs into square foot increments. Unit costs for building types usually start with a building of a certain size (i.e., a base area), which serves as a benchmark. Then additions or deductions are made to account for the actual area in square feet and the building components in the subject property.

> **Common Construction-Related Costs Typically Not Included in Cost Manuals**
> - Cost of land acquisition and assemblage
> - Trade fixtures
> - Personal property
> - Specialized equipment
> - Permanent financing fees
> - Marketing costs, leasing commissions, rent concessions, fill-up costs
> - Real estate taxes
> - Entrepreneurial incentive and developer's overhead and profit

## Cost Index Trending

Cost manuals and electronic databases periodically update the cost index tables that reflect changes in the cost of construction over a period of years. Cost indexes can be used to convert a known cost as of a past date into a current cost estimate. Sometimes cost index tables can be used to adjust costs for different geographic areas. Cost index trending is also useful for estimating the current cost of one-of-a-kind items when standard costs are not available. However, there are practical limitations in applying this procedure because the reliability of the current cost indication tends to decrease as the time span increases.

As an example of cost index trending, suppose the contract cost for constructing a building in January 2016 was $1 million. Suppose the index for January 2016 was 285.1 and the current index is 327.3. To trend the historical cost into a current cost, the current cost index is divided by the historical cost index and the resulting ratio is multiplied by the historical cost. In this case the current cost is calculated as follows:

$$\frac{327.3}{285.1} = 1.14$$

$$1.14 \times \$1,000,000 = \$1,148,000$$

Problems may arise when cost index data is used to estimate current cost. The accuracy of the figures cannot always be determined, especially when it is not clear which components are included in the data (e.g., only direct costs or direct costs with some indirect costs). Furthermore, historical costs may not be typical for the time period, and the construction methods used and building codes in effect at the time of the historical cost may differ from those applicable on the effective appraisal date.

## Cost-Estimating Methods

The three traditional cost-estimating methods are

- The comparative-unit method (or calculator method)

BACK_DEFEXP-RR-002964

- The unit-in-place method (or segregated cost method)
- The quantity survey method

The quantity survey method produces a cost estimate based on a detailed inventory of the labor, materials, and equipment used in the subject improvements. The

---

### Estimating Entrepreneurial Incentive

Entrepreneurial incentive is a cost that is as real as the cost for any building material because no development project would be undertaken without the prospect of an economic reward. The cost of entrepreneurial incentive should always be included in any estimate of building cost, but that potential economic reward will be the first loss to the entrepreneur if the project is not successful.

Regardless of the cost-estimating method applied, estimates of entrepreneurial incentive should be derived through market analysis and interviews with developers to determine the expectations of entrepreneurial reward required as motivation to undertake a particular development. Questions often asked of developers include the following:

· What percentage amount of profit was expected?
· If profit is expressed as a percentage, is it a percentage of (a) direct costs, (b) direct and indirect costs, or (c) direct and indirect costs plus site value?
· What is included in the percentage?
· Did the project meet expectations?
· Would you do another project for the same percentage of profit?

The actual entrepreneurial profit earned is a record of results and can differ from the anticipated profit (i.e., the incentive) that originally motivated the entrepreneur to proceed. A typical level of anticipation or incentive should be used in the cost estimate.

Depending on market practice, entrepreneurial incentive or entrepreneurial profit may be estimated in different ways:

· As a percentage of direct costs
· As a percentage of direct and indirect costs
· As a percentage of total current development cost, i.e., direct and indirect costs plus site value

In some markets, entrepreneurs may have a threshold amount that would induce them to take on a development project, and the appropriate amount of incentive could be a flat fee in that case rather than a percentage of a certain combination of development costs.

Presumably, the dollar amount of entrepreneurial incentive would be the same regardless of how it is calculated—e.g., as 22%, 20%, or 15% of the appropriate base cost selected, as shown below. In the following example, an appraiser investigated the dollar amount of certain costs and ratios (or relative percentages) of entrepreneurial incentive attributable to the same set of costs and then calculated entrepreneurial incentive:

| Base Cost | % Applied | Entrepreneurial Incentive |
|---|---|---|
| Direct Costs | 22.0% × $545,000 | = $120,000 (rounded) |
| Direct Costs + Indirect Costs | 20.0% × ($545,000 + $55,000) | = $120,000 |
| Direct Costs + Indirect Costs + Land Value | 15.0% × ($545,000 + $55,000 + $200,000) | = $120,000 |

Estimating an appropriate amount of entrepreneurial incentive remains a challenge for appraisers because expectations of profit vary with different market conditions and property types. Consistent relationships between profit and other costs are difficult to establish and sources are difficult to find. Other professionals may define *profit* differently than appraisers do and not every project is anticipated to be profitable. A company may need a new building for the business even though the cost of the building may be greater than its market value. This is a business decision, not a real estate investment decision. If entrepreneurial incentive is added, the loss would be considered in increased obsolescence.

---

BACK_DEFEXP-RR-002965

Copyrighted material licensed by Charles Brigden on September 17, 2020

comparative-unit and the unit-in-place methods provide less detail, but they are the primary bases for the cost estimates used in most appraisals.

Many appraisers apply the comparative-unit method using data from a cost-estimating service. The unit-in-place method and the quantity survey method require more data, and their applicability is limited when abundant construction cost data is not available. Cost-estimating services offer an efficient way to produce reasonably accurate and detailed cost calculations when the subject property is similar to the prototypes described in the manual.

## Comparative-Unit Method

The comparative-unit method is used to derive a cost estimate measured in dollars (or some other currency) per unit of area. The method employs the known costs of similar structures adjusted for market conditions and physical differences. Indirect costs may be included in the unit cost or computed separately. If the comparable properties and the subject property are in different markets, an appraiser may need to make an adjustment for location.

Unit costs vary with size. All else being equal, unit costs decrease as building areas increase. This reflects the fact that plumbing, heating units, elevators, doors, windows, and similar building components do not usually cost proportionately more in a larger building than in a smaller one and that other efficiencies and economies of scale may be realized.

The comparative-unit method is relatively simple and practical, and it is widely used. Unit cost figures are usually expressed in terms of gross building dimensions converted into square or cubic feet (or meters where appropriate). Total cost is estimated by comparing the subject building with similar, recently constructed buildings for which contract prices are available. The trend in costs between the date of the contract (or construction) and the effective appraisal date should be factored into the comparison.

Most appraisers using the comparative-unit method apply unit cost figures developed from a recognized cost service. Unit costs for the benchmark buildings found in cost-estimating manuals usually start with a base building of a specified size. Adjustments or refinements are then made to the base cost for any differences between the subject building and the benchmark building. If the subject building is larger than the benchmark building, the unit cost is usually lower. If the subject building is smaller, its unit cost will probably be higher. The cost data obtained from a recognized cost service is usually the replacement cost new, which reflects current building standards and materials. It is not an indication of reproduction cost new.

Because few buildings are identical in terms of size, design, and quality of construction, the benchmark building is often different from the subject building. Different roof designs, interior design characteristics, and irregular perimeters and building shapes can affect comparative-unit costs substantially. Figure 30.1 illustrates this situation. For example, the larger perimeter of Building B in the illustration results in higher unit costs. Most cost services include adjustment criteria to alter or adjust the base cost to the specific characteristics of the subject structure. However, all elements may not be addressed by the cost service, and a more "building-specific" cost analysis developed using the unit-in-place method may be needed.

To develop a reliable estimate with the comparative-unit method, an appraiser first identifies the construction class and type of structure, and then calculates the

BACK_DEFEXP-RR-002966

**Figure 30.1**   Unit Costs of Buildings with Different Shapes



unit cost from similar improvements or adjusts the unit cost figure to reflect varia-
tions in size, shape, finish, and other characteristics. For example, the building classes
for warehouse structures in the *Marshall & Swift-CoreLogic* cost manual are

- A
- B
- C

BACK_DEFEXP-RR-002967

- D
- S

Each of those classes refers to a particular type of basic construction (e.g., *C* corresponds to concrete masonry block with metal or wood roof structure and *S* to pre-engineered metal frame and roof structure), and the type of construction ranges from *low-cost* to *excellent*. In addition, the unit cost applied in the comparative-unit method should reflect any changes in cost levels between the date of the benchmark unit cost and the effective appraisal date. The ratio between the costs of mechanical equipment and the basic building shell has increased consistently through the years. Equipment tends to increase unit building costs and depreciate more rapidly than other building components.

To use area cost estimates, an appraiser assembles, catalogs, and analyzes data on actual building costs. These costs should be divided into general construction categories, and separate figures should be used to account for special finishes or equipment. The overall area unit cost can then be broken down into its components, which may help an appraiser adjust a known cost for the presence or absence of items in later comparisons.

The apparent simplicity of the comparative-unit method can be misleading. To develop dependable unit cost figures, appraisers must exercise judgment and carefully compare the subject building with similar or standard structures for which actual costs are known. It is important for the appraiser to make decisions about basic construction and quality based on the cost service descriptions rather than making a determination independent of these descriptions. Otherwise, the cost numbers will not be reliable. When it is correctly applied, however, the method produces credible estimates of cost.

The warehouse shown in Figure 30.2 will be used to illustrate the comparative-unit method (and later the unit-in-place and quantity survey methods). For the purpose of this example, the warehouse is of average-quality Class C construction, as defined in the *Marshall & Swift-CoreLogic* cost manual.

Table 30.1 shows how comparative-unit costs from a published cost manual can be applied to the warehouse building. Calculations such as those shown can be used to confirm a cost indication obtained from construction contracts for similar properties in the same market as the property being appraised on or near the effective appraisal date. Published data can be used independently when no local cost data is available.

In Table 30.1 an adjustment for the warehouse's sprinkler system was made using a square-foot unit cost. An appraiser should note whether it is a wet or dry system. In other cases, similar adjustments may be appropriate for observed physical differences in the amount of office area, construction features, or specific HVAC equipment.

Cost manuals rarely include all indirect costs or an allowance for entrepreneurial incentive or profit, so adjustments must often be made to obtain an indication of the total cost. In Table 30.1 adjustments are made for

- Indirect costs not included in the base price quoted in the cost manual
- Indirect costs after construction needed to achieve typical stabilized occupancy[1]
- Entrepreneurial incentive calculated as a percentage of total direct and indirect costs

---

1. The cost to achieve stabilized occupancy may be nominal for a single-tenant building or a typical owner-occupied building. However, large multitenant warehouse, office, or apartment properties can have substantial lease-up costs, promotional expenses, or other costs (or losses in income) that must be considered.

BACK_DEFEXP-RR-002968

**Figure 30.2**  Plan of a Warehouse



**Basic Construction**

Building structure:  Reinforced concrete spread footings and 12-inch stem wall; 6-inch steel framing w/
6-inch pipe columns 50-foot o.c.; 8-inch masonry block exterior walls; painted exterior finish.
Roof structure:  Steel bar joists w/ insulated metal roof deck with single-ply EPDM 20-year roof covering.
Electrical:  Average and typical.
Site improvements: 80% asphalt paving and balance landscaping.

**Office Area**

Office finish:  300 linear feet painted drywall; suspended acoustical grid w/ recessed fluorescent lighting; two
three-fixture ADA restrooms; commercial-grade glue-down carpet floor covering; aluminum storefront
w/ insulated glazing; four natural gas heat and electric forced-air rooftop unit HVAC.

The estimated land value was derived through sales comparison. The unit cost of the site improvements (i.e., landscaping and paving) shown in Table 30.1 was derived from a cost manual and adjusted for current and local cost multipliers, and the direct costs of the landscaping and paving were included with the direct costs of the building improvements in this example to account for indirect costs and entrepreneurial incentive attributable to all improvements.

BACK_DEFEXP-RR-002969

Copyrighted material licensed by Charles Brigden on September 17, 2020

Table 30.1 indicates the cost of the warehouse building plus the land value, but the result shown is more likely to represent the value of a close substitute than a duplicate structure. Cost services use typical buildings for their base cost, so an appraiser can apply the comparative-unit method, develop reliable adjustment amounts and factors, and produce a credible property value estimate.

Construction contracts normally include other improvements to the land, such as parking, driveways, water retention basins, underground drainage facilities, rail sidings, fences, and landscaping. The possible combinations and varied value contributions of these improvements can cause a wide divergence in unit cost if the total contract is related to the size of the major improvement only. Therefore, when actual contract costs from the local market are used in the comparative-unit method, it is imperative that the costs of these other improvements be excluded from the determination of the base price so that these costs are not counted twice (first implicitly in the base unit cost and then again explicitly as an adjustment based on actual costs).

| Table 30.1 | Comparative-Unit Method (Calculator Method) | | |
|---|---|---|---|
| Base cost per sq. ft. | | 60,000 sq. ft. @ | $44.89 per sq. ft. |
| Add for sprinkler system per sq. ft. | | | $2.10 per sq. ft. |
| Subtotal | | | $46.99 per sq. ft. |
| Adjustment for building height | | × | 1.086 |
| Subtotal | | | $51.03 per sq. ft. |
| Adjustment for area/perimeter | | × | 0.839 |
| Subtotal | | | $42.82 per sq. ft. |
| Current cost multiplier | | × | 1.03 |
| Subtotal | | | $44.10 per sq. ft. |
| Local cost multiplier | | × | 1.10 |
| Total building cost per sq. ft. | | | $48.51 per sq. ft. |
| Total direct costs for building | | 60,000 sq. ft. @ $48.51 per sq. ft. | $2,910,572 |
| Landscaping/paving costs | | 55,385 sq. ft. @ $3.50 per sq. ft. | $193,848 |
| Total direct costs for building and site improvements | | | $3,104,420 |
| Indirect costs not included in cost manual* | | × | 1.08 |
| Subtotal | | | $3,352,774 |
| Indirect costs from completion to stabilized occupancy* | | × | 1.05 |
| Subtotal | | | $3,520,412 |
| Entrepreneurial incentive at 10% of total direct and indirect costs | | × | 1.10 |
| Total cost for warehouse building and site improvements | | | $3,872,454 |
| Land value | | 115,385 sq. ft. @ $3.25 per sq. ft. | + 375,001 |
| Total development cost new | | | $4,247,455 |

\* Note: Contractor's overhead and profit and some other indirect costs are included in these base costs and adjustments. The source of published cost data should be studied for a complete understanding of what is included in quoted costs. For purposes of simplicity, a percentage was applied to account for indirect costs.

## Unit-in-Place Method

In the unit-in-place method (also known as the *segregated cost method*), individual unit costs for various building components are applied to the various subcomponents in the structure or to linear, area, volume, or other appropriate measures of these compo-

BACK_DEFEXP-RR-002970

nents. Using this method, appraisers compute a unit cost based on the actual quantity of materials used and the labor of assembly required for each unit of area. For example, the cost can be applied based on the square feet of floor area or linear feet of wall of a certain height. The same procedure is applied for other structural components.

Unit-in-place cost estimates are made using specific cost data for standardized structural components as installed, such as the following:

| Structural Component | Unit |
|---|---|
| Excavation | Cost per cubic yard |
| Foundation | Cost per linear foot of foundation or cubic yard of concrete |
| Floor construction | Cost per square foot |
| Interior partitions | Cost per linear foot |
| Roofing | Cost per square foot (e.g., 100 square feet of roof area) |

The unit-in-place concept is not limited to cubic, linear, or area units. The measure on which the cost is based may be the measure employed in a particular trade, such as the cost per ton of air-conditioning. The unit-in-place concept may also be applied to the cost of complete, installed components such as the cost of a roof truss that is fabricated off site, delivered, and erected.

All unit costs are totaled to provide the estimated direct cost of the entire improvement. Unit-in-place cost estimates may be based on an appraiser's compiled data, but they are usually obtained from a cost-estimating service that provides updated monthly figures. Contractor's overhead and profit may be included in the unit cost figures provided by some cost services, or they may be accounted for separately. Entrepreneurial incentive is not included. It is a separate added amount  that is estimated by the appraiser independently of the cost manual. Appraisers must know exactly what is included in any unit price quoted and the cost manual will indicate what is included. The appraiser should follow the directions given and not make judgments independent of those directions. Indirect costs are usually accounted for separately. For example, leasing and marketing costs are typically not included in cost service data, so appraisers often consult leasing agents as a source of information for estimates of leasing commissions on a new project. The objective of the unit-in-place procedure is to count all appropriate costs and avoid any double-counting.

The following example shows how the cost of a brick veneer wall would be calculated on a unit-in-place basis. Costs such as these vary with market conditions and location. The figures shown are used only for purposes of illustration.

| Description | Cost | Unit |
|---|---|---|
| 4-in. face brick, installed: common bond, ½-in. struck joints, mortar, scaffolding, and cleaning included | $460.00 | per 1,000 bricks |
| Dimension lumber, erected: 2-in.-x-4-in. wood stud framing, 16 inches on center | $360.00 | per 1,000 bd. ft. |
| Sheathing, installed: impregnated 4 ft. x 8 ft., ½-in. | $0.42 | per sq. ft. |
| Insulation, installed: 2½-in., foil backing on one side | $0.22 | per sq. ft. |
| Gypsum board: ½-in. with finished joints | $0.30 | per sq. ft. |
| Paint: primer and one coat flat | $0.25 | per sq. ft. |

From this data the cost per square foot of wall can be estimated as follows:

BACK_DEFEXP-RR-002971

| Description | Cost | Unit |
|---|---|---|
| Bricks | $3.45 | per 7½* |
| Wood stud framing | $0.24 | per ⅔ bd. ft.* |
| Sheathing | $0.42 | per sq. ft. |
| Insulation | $0.22 | per sq. ft. |
| ½-in. gypsum board | $0.30 | per sq. ft. |
| Paint | + $0.25 | per sq. ft. |
| Total for finished wall | $4.88 | per sq. ft. |

\* To calculate a total unit cost, the unit cost of certain construction elements must be converted to the unit measure of the total cost. In this example, each square foot of wall requires 7½ bricks and ⅔ board feet of wood stud framing.

After calculating the unit cost of $4.88 per square foot, an appraiser can estimate the total cost of a veneer wall that meets these standards without detailing the quantities of material and labor. In practice, a cost analyst would refine the procedure by adjusting for waste and extra framing for windows and doors, which require wall openings, lintels, and facing corners.

The unit costs for all components can be calculated in a similar fashion. Once these are established, an appraiser can estimate the cost of an entire building. When fully developed, the unit-in-place method provides a substitute for a complete quantity survey and produces an accurate cost estimate with considerably less effort. Table 30.2 illustrates how the unit-in-place method can be used to estimate the reproduction cost of the warehouse shown in Figure 30.2.

In Table 30.2, adjustments are made for the following:

- Indirect costs not included in the cost manual's base price
- Indirect costs after construction needed to achieve typical stabilized occupancy (when the appraisal is of a leased fee)
- Entrepreneurial incentive calculated as a percentage of total direct and indirect costs

Note the difference in total adjustments for indirect costs in Tables 30.1 and 30.2. As the cost of the property is broken down into more precise increments using the unit-in-place method, a smaller portion of the total indirect costs is included in the base price quoted in the cost manual for each building component. The single figure of cost per square foot that is used in the comparative-unit method typically accounts for more of the total indirect costs than the individual cost figures for excavation, site, foundation, framing, and so on. Therefore, the adjustment for "indirect costs not included in cost manual" in the comparative-unit method may be smaller than the same adjustment in the unit-in-place method.

In the unit-in-place method, the value of site improvements may be estimated separately on a depreciated-cost basis and added to the depreciated cost of the improvements, or the cost of site improvements can be included as a direct cost as shown in Table 30.2 and thereby be adjusted for entrepreneurial incentive like the other construction costs. The unit-in-place method is useful to contractors preparing construction estimates, but most appraisers would use the comparative-unit method with cost estimates from a cost manual.

BACK_DEFEXP-RR-002972

| Table 30.2 | Unit-in-Place Method | | | |
|---|---|---|---|---|
| | | | **$ per Unit** | |
| Excavation: building | 60,000 sq. ft. | 0.42 | | $25,200 |
| Excavation: site | 115,385 sq. ft. | 0.34 | | $39,231 |
| Foundation | 940 linear ft. | 36.25 | | $34,075 |
| CMU wall: base | 13,160 sq. ft. | 22.80 | | $300,048* |
| 2% per foot over 14-foot base | 0.08 | – | | $24,004† |
| Floor (concrete) | 60,000 sq. ft. | 4.01 | | $240,600 |
| Floor (asphalt tile) | 4,400 sq. ft. | 2.24 | | $9,856 |
| Ceiling (acoustical tile) | 4,400 sq. ft. | 7.40 | | $32,560 |
| Ceiling (suspended grid) | 4,400 sq. ft. | 1.47 | | $6,468 |
| Roof joists and deck | 60,000 sq. ft. | 12.10 | | $726,000 |
| Roof cover and insulation | 60,000 sq. ft. | 3.53 | | $211,800 |
| Plumbing (three-piece restrooms) | | | | |
| Fixtures | 9 fixtures | 3,450 | | $31,050 |
| Drains | 6 units | 605 | | $3,630 |
| Sprinkler systems | 60,000 sq. ft. | 2.16 | | $129,600 |
| HVAC | | | | |
| Warehouse | 55,600 sq. ft. | 1.56 | | $86,736 |
| Office | 4,400 sq. ft. | 6.70 | | $29,480 |
| Electrical and lighting | | | | |
| Warehouse | 55,600 sq. ft. | 4.82 | | $267,992 |
| Office | 4,400 sq. ft. | 11.10 | | $48,840 |
| Interior partitions | | | | |
| Walls | 4,400 sq. ft. | 3.89 | | $17,116 |
| Doors | 10 doors | 103.00 | | $1,030 |
| Overhead doors (4 10 × 14-ft. doors) | 560 sq. ft. | 35.71 | | $19,998 |
| Landscaping and paving | 55,385 sq. ft. | $3.50 | | $193,848 |
| Miscellaneous specified items | | | | $50,000 |
| Subtotal | | | | $2,529,162 |
| Current cost multiplier | | | × | 1.03 |
| Subtotal | | | | $2,605,037 |
| Local cost multiplier | | | × | 1.10 |
| Subtotal | | | | $2,865,541 |
| Architectural and engineering fees at 5% of direct costs | | | × | 1.05 |
| Total direct costs | | | | $3,008,818 |
| Indirect costs not included in cost manual‡ | | | × | 1.12 |
| Subtotal | | | | $3,369,876 |
| Indirect costs from completion to stabilized occupancy (when the appraisal is of a leased fee)‡ | | | × | 1.05 |
| Subtotal | | | | $3,538,369 |
| Entrepreneurial incentive at 10% of total direct and indirect costs | | | × | 1.10 |
| Total cost of building and site improvements | | | | $3,892,206 |
| Land value | 115,385 sq. ft. | $3.25 | + | $375,001 |
| Total development cost new | | | | $4,267,207 |

\*   Calculated as Perimeter × Base Wall Height (14 feet) × Unit Cost (per sq. ft.)

†   Calculated as Base Cost of CMU Wall × (2% × (Wall Height − 14 feet))

‡   Note: Contractor's overhead and profit and some indirect costs are included in the base costs. Architect's fees and other indirect costs are not. The source of published cost data should be studied for a complete understanding of what is included in the quoted costs. For purposes of simplicity, a percentage was applied to account for indirect costs.

BACK_DEFEXP-RR-002973

## Quantity Survey Method

The most comprehensive and accurate method of cost estimating is the quantity survey method, which is more often applied by contractors or professional cost estimators than appraisers. A quantity survey reflects the quantity and quality of all materials used in the construction of an improvement and all categories of labor required. Unit costs are applied to these figures to arrive at a total cost estimate for materials and labor. Then the contractor adds a margin for contingencies, overhead, and profit.

Depending on the size of the project and the resources of the contractor, the quantity survey and cost calculations may be prepared by a single cost estimator or by a number of subcontractors, whose bids are compiled by a general contractor and submitted as the final cost estimate. In either case, the analysis details the quantity, quality, and cost of all materials furnished by the general contractor or subcontractor and the appropriate cost allowances.

A general contractor's cost breakdown for the warehouse shown in Figure 30.2 is summarized in Table 30.3. This is only a summary. The specific quantities and costs are not indicated.

Contractor bids do not usually include indirect costs or entrepreneurial incentive or profit. The analysis illustrated in Table 30.3 reflects indirect costs and the calculation of entrepreneurial incentive as a percentage of total direct and indirect costs. In the examples presented, indirect costs are considered in various stages of the cost-estimating procedure. A breakdown of the costs that make up these estimates is preferred to the percentage adjustment, and an appraiser should provide a breakdown to support the percentages applied. Note that when the direct costs of the individual elements of construction are broken down into discrete amounts, as shown in Table 30.3, less of the total indirect costs is accounted for in those cost figures than in the figures for other cost-estimating methods. Thus, the percentage adjustment for total indirect costs is higher.

Site improvements such as parking facilities, landscaping, and signage are commonly included in a general contractor's bid and should be included in a cost estimate of all improvements. In this case, landscaping and paving are included among the direct costs so that the adjustment for entrepreneurial incentive accounts for those improvements. In a cost estimate of an existing building, a separate itemization of site improvements facilitates the consideration of depreciation. Because the quantity survey method usually produces a cost estimate of a duplicate building, Table 30.3 indicates the reproduction cost of the warehouse building as of the effective appraisal date.

To produce a quantity survey estimate, each contractor and subcontractor must provide a breakdown of materials, labor, overhead, and profit. The contractor's profit may depend on the volume of work that the contractor has lined up.

Although the quantity survey method produces a complete cost analysis of the improvements being appraised, it is time-consuming as well as costly and frequently requires the services of an experienced cost estimator. For these reasons this method is seldom used in routine appraisal assignments and is typically used only by professional cost estimators.

The use of a single cost-estimating technique, such as the comparative-unit method, may not be as effective as the use of multiple methods. In practice, some appraisers cross check a cost estimate derived from a cost manual using other cost-estimating techniques. The following example illustrates the application of multiple cost-estimating techniques.

BACK_DEFEXP-RR-002974

| Table 30.3 | Warehouse Property—Contractor's Breakdown (Quantity Survey Method) | | |
|---|---|---:|---:|
| General conditions of contract | | | $10,000 |
| Excavating and grading | | | $75,000 |
| Concrete foundation/footings | | | $35,000 |
| Concrete floor/slab on grade | | | $60,000 |
| Carpentry (includes OHD and pedestrian doors) | | | $250,000 |
| CMU walls | | | $165,000 |
| Structural steel | | | $140,000 |
| Joist, deck, and deck insulation | | | $725,000 |
| Roofing | | | $200,000 |
| Insulation | | | $12,250 |
| Sash | | | $10,000 |
| Glazing | | | $25,000 |
| Painting | | | $40,000 |
| Acoustical material | | | $7,500 |
| Flooring | | | $10,000 |
| Electric | | | $300,000 |
| HVAC | | | $115,000 |
| Piping | | | $40,000 |
| Plumbing and sprinkler system | | | $125,000 |
| Landscaping/paving | | | $195,000 |
| Subtotal | | | $2,539,750 |
| Contingencies | | 2.5% | $63,494 |
| Contractor's overhead and profit | | 8% | $203,180 |
| Total contract costs | | | $2,806,424 |
| Architectural and engineering fees | | 5% | $140,321 |
| Total direct costs | | | $2,946,745 |
| Indirect costs before, during, and after construction* | | 20% | $589,349 |
| Subtotal | | | $3,536,094 |
| Entrepreneurial incentive | | 10% | $353,609 |
| Total cost of building and site improvements | | | $3,889,703 |
| Land value | | 115,385 @ $3.25 | $375,001 |
| Total development cost new | | | $4,264,704 |

*For purposes of simplicity, a percentage was applied to account for indirect costs.

Consider a small warehouse building located in a five-year-old industrial park. The building is standard in design and construction and contains 20,000 square feet. It has 15% office space and two loading doors. There is no obsolescence. An attorney asks an appraiser to develop a cost estimate that will "hold up in court."

The appraiser obtains the following information:

- A new 24,000-sq.-ft. warehouse located in the new section of the park was sold for $1,750,000 last month. It is similar to the subject property and has 3,000 square feet of office area and three loading doors. The site value is estimated to be $350,000, the cost of a loading door is $5,000, and the site improvements contribute $6,000.

BACK_DEFEXP-RR-002975

Copyrighted material licensed by Charles Brigden on September 17, 2020

- A local building contractor was interviewed by the appraiser. The contractor built a 21,000-sq.-ft. structure similar to the subject last year at a total cost of $1,155,000. The contractor also stated that a 20,000-sq.-ft. warehouse with 3,000 square feet of office space and three loading doors would cost $60 per square foot to build today.
- The national cost service indicated a base cost of $46.10 per square foot as of two years ago. The required adjustments are 10% for changing market conditions and 12% for location.

The appraiser makes the following calculations using various cost-estimating techniques:

**Cost from Sale**

| | |
|---|---|
| Sale price | $1,750,000 |
| Site value | (350,000) |
| Site improvements | (6,000) |
| Loading door | (5,000) |
| Cost of building | $1,389,000/24,000 sq. ft. = $57.87 |

**Cost from Contractor**

The adjustment for one loading door is $0.25 per square foot.

$5,000/20,000 sq. ft. = $0.25 per sq. ft.

$60.00 per sq. ft. − $0.25 = $59.75 per sq. ft.

**Information from Cost Manual**

$46.10 × 1.10 × 1.12 = $56.79

The recent sale supports a current cost estimate for the subject building of $57.87 per square foot. Information from the contractor indicates a cost of $59.75 per square foot. The cost service indicates a cost of $56.79 square foot. The appraiser can reconcile the results of these three cost-estimating techniques to arrive at a final cost estimate for the subject warehouse.

BACK_DEFEXP-RR-002976

BACK_DEFEXP-RR-002977

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Depreciation Estimates    31

Appraisers have several methods available for estimating depreciation. Each is acceptable and should result in roughly the same value as long as appraisers apply the methods consistently and logically. The methods used in a particular appraisal assignment should reflect how an informed and prudent buyer would react to the condition and quality of the property and the market in which the property is found.

The primary goals in the analysis of depreciation are to identify all forms of depreciation recognized by the market, to treat all these forms of depreciation, and to charge only once for each form of depreciation (i.e., to avoid double-counting items of depreciation).[1] The three principal methods for estimating depreciation are

- The market extraction method
- The economic age-life method
- The breakdown method

The various methods may be combined to solve specific problems, or each method may be applied separately to test the reasonableness of the estimates derived from other methods.

Many appraisers use market extraction and economic age-life calculations as the primary methods of estimating the total depreciation in a property. The market extraction and economic age-life methods are applied to the whole property, making them simpler for appraisers to apply and easier for clients to understand. These methods are also easier for appraisers to use than the breakdown method even though the elements of depreciation are implicit, not explicit. Both market extraction and the economic age-life method are best when the subject and the sales used for extraction are most similar because the results are a lump sum of depreciation from all sources. If the subject and sales have different external or functional issues, the results will reflect different characteristics.

---

1.   Additional discussion of the estimation of depreciation and numerous examples can be found in *In Defense of the Cost Approach: A Journey into Commercial Depreciation* (Chicago: Appraisal Institute, 2011).

The breakdown method is a more comprehensive method that identifies specific elements of depreciation and treats each element separately. It enumerates the components of total depreciation—physical deterioration, functional obsolescence, and external obsolescence—and separates physical deterioration into three categories—deferred maintenance, short-lived components, and long-lived components. If estimates of total depreciation are available using the economic age-life method or the market extraction method, the result of the breakdown method can be checked against those other estimates.

Regardless of the methods applied, appraisers must ensure that the final estimate of depreciation reflects the loss in value from all causes and that no form of depreciation has been considered more than once. Double charges for depreciation can produce inappropriately low value indications in the cost approach. Also, the analysis of depreciation must be internally consistent, using either reproduction cost or replacement cost as the cost basis throughout. As explained in Chapter 29, the use of replacement cost eliminates the need to consider certain forms of obsolescence. Switching between reproduction cost and replacement cost within the analysis of depreciation greatly increases the chances of double-counting items of depreciation.

## Age and Life Relationships

All three methods of estimating depreciation consider age-life relationships either directly or indirectly. The age and life relationships relate not only to an entire structure but also to its various components. Depreciation occurs over the life of an improvement or in a single component of the whole. In theory, an improvement or component loses all of its value over the course of its life. For example, suppose that the typical life expectancy of a freestanding retail store in a given market is 40 years. Theoretically, when the building is 40 years old, it will have reached the end of its life expectancy and will have lost all of its value to depreciation, with no contributory value remaining to add to the value of the vacant site. Short-lived building components may go through this cycle several times over the same 40-year period. For example, the life expectancy of a water heater installed in a building will be much shorter than 40 years, say, 10 years. Some components may have to be replaced several times over the building's 40-year life.

In estimating the total depreciation of an improvement, the concepts most important to market extraction are

- Actual age
- Total depreciation
- Annual rate of depreciation
- The implied total economic life that can be estimated (if no functional or external obsolescence is present)

In the economic age-life method, the most important concepts are

- Total economic life
- Effective age
- Remaining economic life

BACK_DEFEXP-RR-002979

Copyrighted material licensed by Charles Brigden on September 17, 2020

In applying the concepts of economic life, effective age, and remaining economic life expectancy, appraisers consider all elements of depreciation in one calculation. Therefore, the effective age estimate includes not only physical wear and tear but also any loss in value for functional and external considerations. This type of analysis is characteristic of the market extraction and economic age-life depreciation methods. However, the economic age-life method can be modified to reflect the presence of any known items of curable physical deterioration or incurable deterioration in short-lived building components.

---

### Curable or Incurable?

The test of curability is a straightforward comparison:

· Items of physical deterioration or functional obsolescence are *economically feasible to cure if the cost to cure* is equal to or less than the anticipated increase in the value of the property.

· If the cost to cure is more than the anticipated increase in value, the item is *incurable*.

For example, if a warehouse with a poorly operating heating and air-conditioning system would require $250,000 in repairs but the increase in value after making those repairs would only be $150,000 because of a relative surplus of existing warehouse space in the market, then the deficiency is currently incurable. If in six months the demand for warehouse properties changes because a major new manufacturing facility will open in the market area, then the potential rent levels for existing warehouse space might rise and the increase in value might exceed the cost to cure the deficiency. In that case, the changing market conditions would make the deficiency curable at the later date. A marketability study can help support a forecast identifying when value will rise to the point where an item of depreciation becomes curable.

---

In the application of the market extraction method, the actual age is preferred, and it is important to extract life estimates from comparable properties that have the same physical, functional, and external characteristics as the subject property. Typically the market extraction method is not modified to reflect depreciation of short-lived building components. However, a lump-sum adjustment may be made if the subject property has curable depreciation in the form of deferred maintenance.

In estimating physical deterioration in the breakdown method, the most important concepts are

- Actual age
- Useful life
- Remaining useful life

The use of these terms in the breakdown method emphasizes the separation of physical deterioration from functional and external obsolescence. The economic age-life method employs economic life, which accounts for all three components of depreciation in one calculation. In contrast, the breakdown method employs useful life for physical deterioration, which is separated into short-lived and long-lived building components. The useful life of a building (i.e., the useful life of structural or long-lived items) is typically longer than its economic life, while the short-lived components have a useful life that is shorter than that of the whole building. (Unless there are no short-lived items, it is logically impossible for the useful life of long-lived components and the economic life of the property as a whole to be the same.) In spite of that difference, the application of useful life in the breakdown method and economic

BACK_DEFEXP-RR-002980

life in the market extraction and economic age-life methods should yield the same approximate estimate of total depreciation.

## Actual Age and Effective Age

Actual age, which is sometimes called *historical age* or *chronological age*, is the number of years that have elapsed since building construction was completed. Actual age serves two purposes in depreciation analysis. First, it is the initial element analyzed in the estimation of effective age. Second, in the application of the breakdown method, the actual age is a fundamental consideration in the age-life analysis needed to estimate physical deterioration of the short-lived and long-lived components of an improvement.

Effective age is the age indicated by the condition and utility of a structure, and an estimate of effective age is based on an appraiser's judgment and interpretation of market perceptions. Even in the same market, similar buildings do not necessarily depreciate at the same rate. The maintenance standards of owners or occupants can influence the pace of building depreciation. If one building is better maintained than other buildings in its market area, the effective age of that building may be less than its actual age. If a building is poorly maintained, its effective age may be greater than its actual age. If a building has received typical maintenance, its effective age and actual age may be the same.

As an example, consider a 23-year-old strip retail center that has been redecorated on the inside but has not been modernized. The original roof and HVAC components are still in place. The building would probably have an effective age of about 23 years. (The small amount of work done in redecorating is usually not sufficient to reduce the effective age.) Now suppose that, in addition to the redecorating, the building's roof and HVAC system have been replaced. In this case, the building would probably have an estimated effective age of less than 23 years. If the same 23-year-old building were in poor condition, had not been redecorated, had a defective HVAC system, and had below-average occupancy because of poor maintenance, it would probably have an estimated effective age greater than 23 years. The condition and functional utility of an improvement as well as market and locational factors must be taken into account in the process of estimating an improvement's effective age.

## Total Economic Life and Useful Life

An improvement's total economic life begins when that improvement is built. It ends when the improvement no longer contributes value for the use and is no longer the highest and best use of the underlying land. This period is usually shorter than the improvement's physical life expectancy.[2] At the end of a building's economic life, a property owner has two options available:

- Demolition and replacement with a suitable new structure
- Hold until one of the other options is economically feasible

Both economic life and useful life acknowledge that market forces operate in such a way that buildings are either renovated, converted to a new use, rehabilitated, remodeled, or torn down long before they physically wear out.

---

2. The concept of *physical life* is an outdated term that has persisted because its meaning is self-evident and easier to explain than the concepts of *useful life* and *economic life*. The concept of *useful life* is more complex but more useful than *physical life* in the analysis of depreciation because *useful life* includes a consideration of the economics of the use a structure was originally intended for.

BACK_DEFEXP-RR-002981

All aspects of a property and its market, including the quality and condition of the construction, the functional utility of the improvements, and market and locational externalities must be considered in the estimation of a property's economic life. The economic life of an improvement is shaped by a number of factors, including the following:

| physical considerations | The rate at which the physical components of an improvement wear out, given the quality of construction, the use of the property, maintenance standards, and the region's climate. |
|---|---|
| functional considerations | The rate at which construction technology, tastes in architecture, energy efficiency, and building design change. These factors can render an improvement functionally obsolete, regardless of its age or condition. |
| external considerations | Short-term and long-term influences such as the stage of a neighborhood's life cycle, the availability and affordability of financing, and supply and demand factors (i.e., market conditions). |

Many functional and external considerations may have no discernible effect on the value of an improvement as recognized by the market on the date of the opinion of value, but those considerations may have a profound effect at some future time—say, in 20, 50, or even 100 years. Changes in market preferences and locational attributes are not typically predictable or, for that matter, curable. Although it is difficult to forecast economic life expectancy, market study and analysis of historical trends and neighborhood life cycles may provide important information.

To estimate an improvement's economic life, an appraiser studies the typical economic life expectancy of similar improvements that have been sold recently in the market area. The techniques used to develop an estimate of total economic life include

- Extracting depreciation from comparable sales (i.e., the market extraction method)
- Observing real estate cycles and changes in market preferences to establish the length of time that similar properties are in demand and improvements are contributing to market value
- Consulting with owners and developers regarding the feasibility of improvements that extend a building's economic life
- Considering the investment horizon used by buyers and sellers, to the extent that it might be influenced by their anticipation of remaining economic life
- Interviewing property managers, leasing agents, and real estate brokers regarding market preferences
- Reviewing public records, including building permits for new construction and alterations, approved site and building plans, and other records for construction, redevelopment, and renovation projects and approvals.
- Reviewing published cost services that report average economic lives by property type
- Considering the effect that rising or falling land values will have on the remaining economic life of the improvements

To calculate total economic life expectancy as of the date of sale, an appraiser takes the reciprocal of the average annual depreciation rate. For example, consider a residential subdivision where recent home sales indicate an average annual rate of depreciation of 2% for properties that are very comparable to the subject property (i.e., all homes built in the same phase of the subdivision's development and sold near the time of the sale of the subject property). Calculating the reciprocal of 2%

BACK_DEFEXP-RR-002982

(100%/2%, or 1/0.02) results in a total economic life expectancy for the subject property of 50 years as of the date of the opinion of value. This does not mean that the total economic life expectancy of the subject has always been and will always be 50 years. Rather, at the time the property was sold, its average annual rate of depreciation indicated a total economic life expectancy of 50 years. The total economic life expectancy of 50 years serves as a denominator in calculations that help explain the total depreciation in a property at a given point in time.

Calculating total economic life from an estimate of the average annual rate of depreciation is common, but it is considered overly simplistic by critics who point out the technique's reliance on straight-line depreciation. Accounting for curvilinear patterns of depreciation (e.g., compound rather than simple accrual) requires additional data to support a more detailed, and possibly more realistic, model of the market behavior of a building over its total economic life. Figure 31.1 illustrates various possible trends in depreciation graphed over time.

Renovation and modernization can effectively extend a building's life expectancy by "resetting the clock." For example, consider an improvement with a 50-year economic life expectancy. If at the 10-year mark the improvement was substantially modernized, bringing the physical components up to current market standards for new construction, then the effective age could be reset to zero and the remaining economic life expectancy of 40 years (before the renovation) would be reset to the original 50 years—or to some other figure, depending on the extent of modification to the improvement. Many historic properties have an economic life equal to or greater than the original physical life expectancy of the building materials because of continued renovation and restoration.

Useful life is the period of time over which the components of the improvement may reasonably be expected to perform the functions for which they were designed. In the breakdown method of estimating depreciation, useful life is used in age-life calculations. Although the physical life expectancy of some components, such as structural elements made of concrete and steel, may be hundreds of years, the concept of useful life recognizes the economic influences acting on the improvements that contain these components. In more tangible terms, if a 40-year-old industrial building is being demolished so that its site can be redeveloped, it is probable that all components of the building will be demolished, regardless of their remaining physical utility.

The useful life of short-lived physical components (e.g., HVAC components, roof covering, interior decorating, floor finishes) is shorter than the life expectancy of the entire building. Conversely, long-lived components (usually the structural components of a building, such as the foundation, framing, and underground piping)



**Figure 31.1** Various Depreciation Trends

BACK_DEFEXP-RR-002983

Copyrighted material licensed by Charles Brigden on September 17, 2020

may have a life expectancy that is longer than the building's economic life expectancy. Distinguishing between short-lived and long-lived components is important when breakdown techniques are applied, and the process of differentiation gives appraisers flexibility in estimating component depreciation that is not available with the market extraction and economic age-life methods.

### Remaining Economic Life and Remaining Useful Life

Remaining economic life is the estimated period over which existing improvements are expected to continue to contribute economically to property value. The concept is applied in the economic age-life method. Usually improvements can be regarded as investments designed to contribute to value over a long period of time. Some depreciation occurs between the date when the improvements begin to contribute to value and the date of the opinion of value. Wear and tear can take their toll even during construction, which is usually a long process. The remaining economic life extends from the date of the opinion of value to the end of the improvement's economic life. The remaining economic life is never more than its total economic life as long as the highest and best use of the property does not change. In the breakdown method, total useful life is the estimated period from the construction or installation of a component to the end of its total useful life expectancy. The remaining useful life of any long-lived item is greater than its remaining economic life, unless there are no short-lived components or the short-lived components are already completely depreciated.

The total economic life of similar structures minus the effective age of the improvement will approximate the expected remaining economic life of the improvements of the subject property. As an example, consider a property with a 15-year-old building. An appraiser searches the market area and finds three sales of properties that are comparable in size, layout, and other physical characteristics:

- Property 1 has an eight-year-old building, an annual depreciation rate of 2.0%, and a total economic life expectancy of 50 years (100% ÷ 2%). Its remaining economic life expectancy is therefore 42 years (50 − 8 = 42).
- In contrast, Property 2 has a 19-year-old building, an annual depreciation rate of 1.51%, and a total economic life expectancy of 66 years (1 ÷ 0.0151). Its remaining economic life expectancy is 47 years (66 − 19 = 47).
- Property 3 has a 14-year-old building, an annual depreciation rate of 1.75%, and a total economic life expectancy of 57 years (1/0.0175). Its remaining economic life expectancy is 43 years (57 − 14 = 43).

A pattern can be observed. As a building ages, the total depreciation increases but the average annual depreciation rate may also change. The remaining economic life expectancy would increase if the effective age decreases over time due to periodic repairs and maintenance. In other words, total economic life and its components do not always remain constant. Reconciliation should be based on the improvement that is most similar in age to the subject property. Of the three sales, the improvement closest to the subject property in age is Property 3. In light of this similar sale and the pattern indicated by the market data, the appraiser could reasonably reconcile the total economic life expectancy for the subject property at 60 years. Using the economic age-life method, which will be discussed in detail later in this chapter, the total depreciation would equal 25% (15/60) of the property's cost.

BACK_DEFEXP-RR-002984

## Patterns of Depreciation

The use of age and life estimates in calculations of depreciation percentages often involves a conclusion that depreciation accrues at a constant rate, i.e., in a straight-line pattern. However, the rate and acceleration of the accrual of depreciation over time can change based on a broad range of influences, resulting in a concave, convex, linear, or other shape when value is graphed over time. A variable pattern of depreciation (e.g., reflecting periodic refurbishment of short-lived building components) is likely the most realistic scenario and does not rely on a straight-line conclusion.

Figure A illustrates a pattern of depreciation that can be exhibited by many types of buildings. As the building ages, the average annual rate of depreciation decreases, resulting in a downward curve, until total depreciation eventually levels off and the value of the improvement stabilizes at its salvage value. The economic life remains relatively stable as routine maintenance occurs and the building continues to be used for its original purpose, unless or until a competing use for the site raises the land value high enough to support demolition and redevelopment of the site. The building might also be converted to another use, supporting the concept that useful life may begin again under another intended use. Conversely, the opposite situation could occur in markets that are changing rapidly. As land value increases and as market preferences change to different designs or property types, average annual depreciation accelerates and both economic life and useful life are shortened. Both situations may occur over the life of the same improvement, which is why economic life and useful life estimates apply to a specific point in time. Figure B depicts the depreciation curve in a market that is changing rapidly and exerting upward pressure on land values. In contrast, Figure C illustrates a depreciation curve in a market where a severe downturn affects land values sharply and is then followed by a long, slow recovery.

| Figure A | Analysis of Variable Depreciation and Value Change Over Time |



Value change typical of older, stable neighborhoods.
Land value increase is steady but slow.
Value of the building declines and then stabilizes
Market value levels off and remains stable and later increases moderately.

BACK_DEFEXP-RR-002985

Copyrighted material licensed by Charles Brigden on September 17, 2020



**Figure B** Analysis of Depreciation and Value Change Over Time—Changing Market Conditions

Rate of depreciation of building remains relatively constant while rate of appreciation of land value accelerates significantly around Year 20.

Change in highest and best use around Year 28.

Building contribution declines to $0 around Year 47.

Building is demolished and property is redeveloped in Year 48.

**Figure C** Analysis of Depreciation and Value Change Over Time—Market Downturn

Land value drops precipitously in Year 14 due to a change in market conditions and does not recover significantly for many years.

Building contribution to value continues to decline steadily, causing market value to continue to decline.

BACK_DEFEXP-RR-002986

## Market Extraction Method

The market extraction method of estimating total depreciation relies on the availability of comparable sales from which depreciation can be extracted. It makes use of direct comparisons with sales of comparable properties in the market. While easy to understand and explain, the market extraction method should only be used if sufficient data exists and if the quality of that data is adequate to permit meaningful analysis. By considering all elements in one calculation, market extraction can be an oversimplification of the complex interplay of physical, functional, and external causes of depreciation. The technique is primarily used to extract total depreciation and to establish total economic life expectancy.

The market extraction method includes the following steps:

1. Find and verify sales of comparable improved properties that are similar in terms of age and utility to the subject property. Although it is desirable, it is not essential that the comparable sales be current sales or be located in the subject property's area. They can be from a market that is comparable (i.e., similar age, design, quality, functionality, and external influences).

2. Make appropriate adjustments to the prices of comparable sales for certain factors, including property rights conveyed, expenditures made immediately after purchase, financing, and conditions of sale, as appropriate. An adjustment for market conditions is not made because the appraiser is estimating cost and depreciation at the time of the sale. No adjustments are made for physical, functional, or external impairments because these factors are the source of the depreciation that is being measured and the comparable sales should be selected because they reflect similar depreciation-related influences, the very items being measured here.

3. Subtract the value of the land at the time of sale from the sale price of each comparable property to obtain the contributory value of the improvements.

4. Estimate the cost of the improvements for each comparable property at the time of its sale. The cost estimates should have the same basis—i.e., reproduction cost or replacement cost. Typically replacement cost is used because an appraiser may not have sufficient information on all the sales to develop a credible opinion of reproduction cost. Also, the cost estimate should include all direct costs, indirect costs, and entrepreneurial incentive for the improvements.

5. Subtract the contributory value of all improvements from the current construction cost to determine the total dollar amount of depreciation of the improvements as of the date the sale occurred. The extracted depreciation includes all forms of depreciation.

6. Convert the dollar estimates of depreciation into percentages by dividing each estimate of total depreciation by the construction cost at the time of sale. If the ages of the sales are relatively similar to the age of the subject property, the percentages of total depreciation can be reconciled into a rate appropriate for the subject property. This rate is applied to the subject's cost to derive an estimate of the subject's total depreciation.

7. If the ages of the comparable properties are different from the age of the subject property, then develop an annual depreciation rate. This step expands the analysis to calculate annual rates of depreciation and to support an estimate of the total eco-

BACK_DEFEXP-RR-002987

nomic life expectancy of the subject property. Note that if there is significant functional or external obsolescence, this step will not necessarily be accurate since these forms of depreciation are not necessarily related to the age of the improvements.

Consider the sales in Table 31.1. All are of fee simple estates and the ages, function, and external influences of the sale properties are similar to the subject property. In this case, the range of total depreciation percentages is so narrow that it is not necessary to annualize the calculations. The cost of the subject improvements is $240,000 (more than the price of Sale 1 but much less than the price of Sale 3), so the percentage of depreciation can be reconciled to 33% of cost. The total lump-sum dollar depreciation estimate in Example 1 comes to $80,000 ($240,000 × 33%).

**Table 31.1**   Example 1

|  | Sale 1 | Sale 2 | Sale 3 | Step in Procedure |
|---|---|---|---|---|
| Sale price | $215,000 | $165,000 | $365,000 | 1, 2 |
| Less value of land | – $60,000 | – $40,000 | – $127,750 | 3 |
| Depreciated cost of improvements | $155,000 | $125,000 | $237,250 | 3 |
| Cost of improvements | $230,000 | $195,000 | $375,000 | 4 |
| Less depreciated cost of improvements | – $155,000 | – $125,000 | – $237,250 | 5 |
| Total depreciation in dollars | $75,000 | $70,000 | $137,750 | 5 |
| Total depreciation percentage | $75,000/$230,000 32.61% | $70,000/$195,000 35.90% | $137,500/$375,000 36.66% | 6 |

If there are differences between the sales (e.g., location, amount of remodeling, functional utility, degree of maintenance), total depreciation may show greater variation, and further analysis will be needed to understand the total depreciation. Appraisers convert total depreciation into an annual depreciation rate by dividing each percentage by the actual age of the sale property. The use of effective age instead of actual age requires specific knowledge about the quality of construction and physical characteristics of the improvements. Actual age may be preferred because it is a fact that is readily available, whereas effective age is based on an appraiser's judgment. Whether actual or effective age is used, the same age basis must be applied consistently to all sales. Then the appraiser analyzes the calculated depreciation rates and compares the comparable sale properties to the subject property (if their effective ages are different) in order to select an appropriate annual depreciation rate for the subject improvements. Finally, the annual depreciation rate is multiplied by the age of the subject property to develop an estimate of total depreciation. This procedure can be misleading if there is significant functional or external obsolescence.

The comparable properties shown in Table 31.2 have a wide range of ages. Again assume that all the sales are of a fee simple interest and that no major functional or external obsolescence is evident.

In Example 2, the range of total percentage depreciation estimates is wide because of the age differences between the comparable properties. In this case, comparing annual depreciation rates provide more credible support for the depreciation estimate. If the subject improvements are 15 years old, which is closest to the actual age

*Depreciation Estimates*   **569**

**Table 31.2**   Example 2

|  | Sale 1 | Sale 2 | Sale 3 | Step in Procedure |
|---|---|---|---|---|
| Actual age of comparable property | 8 | 14 | 19 | |
| Sale price | $998,000 | $605,000 | $791,000 | 1, 2 |
| Less value of land | – $170,000 | – $130,000 | – $210,000 | 3 |
| Depreciated cost of improvements | $828,000 | $475,000 | $581,000 | 3 |
| Cost of improvements | $950,000 | $627,000 | $934,000 | 4 |
| Less depreciated cost of improvements | – $828,000 | – $475,000 | – $581,000 | 5 |
| Total depreciation in dollars | $122,000 | $152,000 | $353,000 | 5 |
| Total depreciation percentage | 9.68% | 24.24% | 37.79% | 6 |
| Actual age of comparable property | 8 | 14 | 19 | |
| Average annual depreciation rate | 1.60% | 1.73% | 1.98% | 7 |
| Total economic life expectancy | 100%/1.60% | 100%/1.73% | 100%/1.98% | |
|  | 62.5 years | 57.8 years | 50.5 years | |

of the improvements in Sale 2, a reasonable estimate of annual depreciation would be 1.7% per year, which is within the calculated range of 1.60% to 1.98% for the comparable properties. If this rate is applied to the subject property's age, total depreciation for the subject improvements can be calculated as 25.5% ($15 \times 1.7\%$).

The model can be further expanded to support an estimate of total economic life expectancy for the subject property. The average annual depreciation for the subject improvements equates to a total economic life of 58.8 years (100%/1.7%). This falls within the range of the total economic life expectancies of the comparable properties, 50.5 to 62.5 years, and appears reasonable for the subject property.

## Applicability and Limitations

When sales data is plentiful, the market extraction method provides a reliable and convincing estimate of depreciation. However, appraisers must be able to develop an accurate site value estimate and a defensible estimate of replacement cost for each comparable property. Additionally, the comparable properties should ideally have physical, functional, and external characteristics similar to the subject property, and they should have incurred similar amounts and types of depreciation.

When the comparable properties differ in design, quality, or construction, appraisers can find it difficult to judge whether differences in value are attributable to these characteristics or to a difference in age, and thus depreciation. The market extraction method is difficult to apply when the type or extent of depreciation varies greatly among the comparable properties due to characteristics other than age. Locational differences may be removed with the subtraction of land value. However, external conditions can affect building values as well, which is why it is important to select sales of properties that are subject to the same (or similar) market influences. If the sales analyzed are affected by special financing or unusual motivation, the problem is further complicated.

The usefulness of the market extraction method depends on the accuracy of the site value estimates and the cost estimates for the comparable properties. If the sales

BACK_DEFEXP-RR-002989

Copyrighted material licensed by Charles Brigden on September 17, 2020

are located in market areas that are not comparable to the subject property's, the location differences may cause the results to be less than credible. Market extraction considers all types of depreciation in a lump sum and does not break down the estimate into the various components of depreciation. However, this depreciation method is market-based and easy to understand, and for these reasons provides meaningful market-supported results when it can be appropriately supported.

## Economic Age-Life Method

The effective age and total economic life expectancy of a structure are the primary concepts used by appraisers to measure depreciation with age-life relationships. In the economic age-life method, total depreciation is estimated by calculating the ratio of the effective age of the property to its economic life expectancy and applying this ratio to the property's total cost. The formula is

$$\frac{\text{Effective Age}}{\text{Total Economic Life}} \times \text{Total Cost} = \text{Depreciation}$$

Although the economic age-life method is not always as accurate as other techniques, it is the simplest way to estimate depreciation. The method is applied in the following steps:

1. Conduct research to identify the anticipated total economic life of similar structures in the market area and estimate the effective age of the subject building. The data used in the market extraction method would also be applicable in the economic age-life method.

2. Divide the estimated effective age of the subject by the anticipated total economic life of similar structures. The resulting ratio is then applied to the subject's cost to estimate total lump-sum depreciation.

3. Subtract the lump-sum estimate of depreciation from the total cost new of the subject improvement to arrive at the improvement's contribution to property value.

As an example, market research (Step 1) yields the following information about a subject and comparable properties:

| | |
|---|---:|
| Total cost new of subject property improvements | $668,175 |
| Land value of subject property | $180,000 |
| Estimated effective age of subject property | 18 years |
| Total indicated economic life expectancy from comparable properties | 50 years |

The total percentage of depreciation is determined by dividing the estimated effective age of 18 years by the total economic life expectancy of 50 years (Step 2). Thus, the economic age-life formula indicates total depreciation of 36% (18/50). When this rate is applied to the total cost new of subject improvements of $668,175, the total depreciation indicated is $240,543 (Step 3). The cost approach calculations are applied as follows:

| | |
|---|---:|
| Total cost new of subject improvements | $668,175 |
| Less total depreciation | − $240,543 |
| Depreciated cost | $427,632 |
| Plus land value of the subject property | + $180,000 |
| Indicated value by the cost approach | $607,632 |

BACK_DEFEXP-RR-002990

## Applicability and Limitations

The economic age-life method is simple, easy to apply, and easy to understand. It allows appraisers to estimate total depreciation, which can subsequently be allocated among its various causes using breakdown procedures. Although this method is usually the simplest way to estimate depreciation, it does have limitations.

First, because the percentage of depreciation is represented by the ratio of effective age to total economic life, this method measures depreciation on a straight-line basis over the course of an improvement's economic life. The straight-line pattern of depreciation is only an approximation of the total depreciation of a property at a specific point in time.

Second, the economic age-life method, like the market extraction method, does not divide depreciation into its various categories—physical deterioration and functional and external obsolescence. In other words, obsolescence must be included in the estimate of effective age or economic life. In market areas where comparable properties incur types and amounts of depreciation that differ from the subject property, the economic age-life method is difficult to justify.

Finally, the economic age-life method, like the market extraction method, does not recognize the difference between short-lived and long-lived items of physical deterioration. Because a single figure reflects all the depreciation in the structure as a whole, varying amounts of deterioration in short-lived items are not directly indicated in the age-life method. For example, a structure as a whole may be 20% depreciated except for the roof, which, unlike the roofs of other properties in the neighborhood, is 90% depreciated. In this situation, the breakdown method allows appraisers to make more refined analyses.

The economic age-life method is appropriate so long as the economic age and remaining economic life can be reasonably estimated. For instance, when a property has significant existing deferred maintenance it may not be inhabitable in its current condition. This makes any estimate of economic age or remaining economic life unreliable. In such situations, the appraiser must separate the short lived deferred maintenance items from the longer lived items to more accurately estimate depreciation. This variation of the age-life method is known as the modified economic age-life method.

## Variations of the Economic Age-Life Method

In some situations, the effect of certain items of depreciation on value is known or can be easily and accurately estimated, and in those situations appraisers can apply a variation of the economic age-life method that involves deducting those items from the total cost before applying the age-life ratio. This type of variation of the economic age-life method combines techniques from the market extraction and breakdown methods with the traditional economic age-life method.

In the most common variation of the economic age-life method, known as the *modified economic age-life method*, the cost to cure the curable items of depreciation (both physical and functional) is known. Deducting curable items of depreciation from the cost of improvements before the age-life ratio is applied mirrors what typical purchasers consider when deciding on whether to invest in a property. That is, a potential buyer will first consider what items need to be fixed (and their hard and soft costs plus an appropriate entrepreneurial incentive) before judging the price he or she would be willing to pay given the wear and tear on the long-lived items. This procedure is most meaningful when the subject property has curable depreciation not

BACK_DEFEXP-RR-002991

Copyrighted material licensed by Charles Brigden on September 17, 2020

typically found in the market at the time of appraisal. If the cost to cure is known, it can simply be deducted from the total cost but would need to include an appropriate entrepreneurial incentive as a part of the total cost to account for effort and risk associated with undertaking the repair. When the curable items are dealt with first, an appraiser may need to use a lower effective age or a longer remaining economic life expectancy in calculating the modified economic age-life ratio.

For example, consider a 20-year-old home with a total building cost of $292,000. Deferred maintenance has left the property uninhabitable in its present condition, and the interior needs to be completely refurbished at a documented cost of $52,500 inclusive of an appropriate entrepreneurial incentive. Sales of similar properties that were sold after being refurbished are used to extract a total economic life expectancy of 50 years. In deriving an estimate of total economic life expectancy for each comparable building, the appraiser uses an effective age that is 25% lower than the building's actual age because investors in the market report that they think that the effective age of a building will be lower than its actual age once the interior has been refurbished. This avoids any double-counting of depreciation. If the effective age is 15 years *after* the refurbishment, then value would be calculated as follows:

| | |
|---|---:|
| Total replacement cost of improvements | $292,000 |
| Less depreciation (15/50 = 30%) | − $87,600 |
| Value refurbished | $204,400 |
| Less cost to refurbish interior | − $52,500 |
| Cost as is | $151,900 |
| Plus land value | + $50,000 |
| Indicated value by cost approach | $201,900 |

If the refurbished portion will be brand new but the remaining portion of the improvements has an effective (and actual) age of 20 years, then the value would be calculated as follows:

| | |
|---|---:|
| Total replacement cost of improvements | $292,000 |
| Less cost to refurbish interior | − $52,500 |
| Remaining cost | $239,500 |
| Less depreciation (20/50 = 40%) | − $95,800 |
| Value as is | $143,700 |
| Plus land value | + $50,000 |
| Indicated value by cost approach | $193,700 |

In situations where external obsolescence is present, another variation of the economic age-life method can be applied. If external obsolescence is affecting the subject property and sales of properties in the subject market have incurred the same external obsolescence, an appraiser should use the total economic life extracted from these sales in the economic age-life ratio. However, if external obsolescence is affecting the subject property but there are no sales in the subject market similarly affected, an appraiser can estimate total depreciation and economic life without the external obsolescence using the market extraction or economic age-life method and then estimate external obsolescence using techniques from another approach (e.g., the income capitalization approach). The estimated depreciation from the economic age-life method and the estimated external obsolescence from the breakdown method would be added together to arrive at an estimate of total depreciation.

BACK_DEFEXP-RR-002992

As an example, consider a property in a district where there is an oversupply of competitive properties. This glut of competitive space has resulted in a reduction in rents, which an appraiser estimates to be a 10% loss to the value indication of the building as a result of external influences. Until the oversupply is corrected through the natural interaction of supply and demand, the property will continue to be affected. The total cost new of a building improvement with an effective age of 10 years is $696,000, and the land value is $200,000. The market extraction method, applied to comparable properties in the subject property's market a year earlier when there was no oversupply, indicated a total economic life expectancy of 50 years. Using the economic age-life method, depreciation is thus estimated at 20% (10/50).

The physical and functional depreciation estimated for the subject improvements by the economic age-life method is $139,200 and the additional external obsolescence for the building is estimated at $69,600. Total depreciation, therefore, is allocated as follows:

| | |
|---|---:|
| Depreciation attributable to all causes except external obsolescence | |
| $696,000 × 20% | $139,200 |
| Depreciation attributable to the external obsolescence | |
| $696,000 × 10% | + $69,600 |
| Total depreciation (or 30% of $696,000) | $208,800 |
| Replacement cost new of improvements | $696,000 |
| Less total depreciation | − $208,800 |
| Value of improvements | $487,200 |
| Plus land value | + $200,000 |
| Indicated value by cost approach | $687,000 |

Note that the external obsolescence is caused by an oversupply in the market, and it is unlikely that such a situation will be permanent. As supply and demand again approach equilibrium, the oversupply should disappear.

Now suppose that the 10% loss in value due to external influences includes a decline in land value estimated at $25,000. The losses in value to the land and the improvements would be accounted for as follows:

| | |
|---|---:|
| Total external obsolescence | $69,600 |
| Less loss in land value | − $25,000 |
| External obsolescence to improvements | $44,600 |
| | |
| Total replacement cost new of improvements | $696,000 |
| Less physical deterioration | − $139,200 |
| Less external obsolescence | − $44,600 |
| Value of improvements | $512,200 |
| Plus land value (includes value lost from external influences | |
| $200,000 − $25,000 = $175,000) | + $175,000 |
| Indicated value by cost approach | $687,200 |

The modified economic age-life techniques work best when relatively few adjustments need to be made to the economic age-life method of estimating total depreciation. Usually, relatively nominal adjustments are made for curable physical items or for a functional or external influence. If more than one atypical element exists in a property, it may be advisable to use the more detailed breakdown method.

BACK_DEFEXP-RR-002993

Copyrighted material licensed by Charles Brigden on September 17, 2020



**Figure 31.2** Components of Depreciation

BACK_DEFEXP-RR-002994

## Breakdown Method

The breakdown method is the most comprehensive and detailed way to measure depreciation because it segregates total depreciation into individual component parts:

- Physical deterioration
- Functional obsolescence
- External obsolescence

Each step of the breakdown method calculates one type of depreciation. The process is cumulative, with each step building on the results of the prior step until all forms of depreciation have been considered. Alternatively, the depreciation calculation may begin with the estimation of total depreciation by the market extraction or economic age-life method and then apply the breakdown method to allocate total depreciation into more precise components.

The primary techniques used to calculate the different types of depreciation include

- Estimation of cost to cure, which is a measure used for curable physical deterioration (deferred maintenance) and curable functional obsolescence. This cost should include all cost inclusive of a reasonable entrepreneurial incentive.
- Application of the extraction method or of an age-life ratio to measure incurable physical deterioration for both short-lived and long-lived components
- Application of the functional obsolescence procedure to estimate all types of functional obsolescence
- Analysis of market data (paired data analysis, statistical analysis, or other techniques), which may be used to identify and estimate functional obsolescence caused by a deficiency or superadequacy as well as external obsolescence
- Capitalization of income loss or excess operating costs, which may be used to estimate incurable functional obsolescence as well as external obsolescence

Table 31.3 shows how the breakdown method can be applied to allocate an estimate of total depreciation among its various components or to develop a conclusion of total depreciation by adding together estimates of each item of depreciation.

### Applicability and Limitations

The breakdown method is primarily used when the scope of work of an appraisal assignment requires that each form of depreciation be accounted for in the appraisal. In addition to allocating lump-sum estimates of total depreciation among their various components, the breakdown method is used when the market extraction and economic age-life methods cannot be applied. This usually occurs when the multiple elements of depreciation that exist in the subject property are not accurately reflected in available sales data and a closer analysis of these elements of depreciation is required. The breakdown method may also be used when the economic age-life method is too simplistic to account for the varied forms of depreciation present.

When using the breakdown method, appraisers should keep several cautions and considerations in mind:

1. If the sum of all items of physical deterioration estimated using the breakdown method is equivalent to the total depreciation derived from the market extrac-

BACK_DEFEXP-RR-002995

Copyrighted material licensed by Charles Brigden on September 17, 2020

| Table 31.3 | Procedures for Applying the Breakdown Method |
|---|---|
| **Purpose** | To allocate a known estimate of total depreciation, developed with the market extraction or economic age-life methods, among its various components |
| **Procedure** | 1. Estimate total depreciation using the market extraction or economic age-life method. |
| | 2. Calculate all items of physical deterioration, add them up, and subtract the total from the lump-sum depreciation estimate. The residual amount, if any, represents depreciation attributable to functional and external obsolescence. |
| | 3. Calculate all items of functional obsolescence, add them up, and subtract that total from the total amount of obsolescence. Any residual represents the depreciation attributable to external obsolescence. |
| **Purpose** | To develop an estimate of total depreciation one item at a time |
| **Procedure** | 1. Calculate all items of physical deterioration, including deferred maintenance if present, using the appropriate techniques and then add up all the estimates to arrive at total physical deterioration. |
| | 2. Calculate all items of functional obsolescence, again using appropriate techniques, and add these estimates together to arrive at total functional obsolescence. |
| | 3. Calculate external obsolescence. When external obsolescence cannot be allocated from a lump-sum estimate, it is calculated either through analysis of market data or by capitalization of income loss. Sometimes part of the loss in property value is due to a decline in land value. |
| | 4. Add together all physical deterioration (including the cost to cure deferred maintenance), functional obsolescence, and external obsolescence to arrive at an estimate of total depreciation. |

tion or economic age-life methods, then no functional obsolescence or external obsolescence is present.

2. If the sum of all items of physical deterioration and all items of functional obsolescence estimated with breakdown techniques is equivalent to the total depreciation derived from the market extraction or economic age-life methods, then no external obsolescence is present.

3. If the sum of the items of depreciation estimated by the breakdown method substantially differs from the total depreciation derived from the market extraction or economic age-life methods, all the methods applied should be reviewed as a test of reasonableness.

The results obtained from the breakdown method and from the market extraction or economic age-life methods may differ for a variety of reasons. The total depreciation derived using the market extraction or economic age-life methods might not accurately reflect the characteristics of the depreciation in the subject property. For example, the subject property may have an element of depreciation that is indicated in the breakdown method but not in the market extraction or economic age-life methods due to dissimilarities in the comparable data. Conversely, the breakdown method may not be as accurate as the simpler methods of estimating depreciation if certain breakdown techniques are applied incorrectly, resulting in double-counting some element of depreciation. As another example, selecting a useful life for the long-lived components that is the same as the economic life of the property overall would be inappropriate in the breakdown method unless the property had no short-lived components.

BACK_DEFEXP-RR-002996

## Physical Deterioration

In the breakdown method, all physical depreciation of improvements falls into one of three categories:

- Deferred maintenance
- Short-lived physical deterioration
- Long-lived physical deterioration

Deferred maintenance is generally curable, whereas short-lived and long-lived items of physical deterioration are not curable, usually because it is not physically possible or economically feasible to cure them. Elements of total depreciation that are not physical deterioration must be some form of obsolescence (either functional or external).

### Curable Physical Deterioration—Deferred Maintenance

Curable physical deterioration, also known as *deferred maintenance*, applies to items in need of immediate repair on the effective date of the appraisal. Some examples include broken windows, a broken or inoperable HVAC system, finished floor coverings in need of immediate replacement, a leaking roof, and inoperable restrooms. For most properties, deferred maintenance involves relatively minor items that are 100% physically deteriorated (i.e., broken). The item must be replaced or repaired for the building to continue to function as it should and to be marketable to potential buyers. Because these repairs must be performed for the building to continue to function for the intended use, they are curable items.

Deferred maintenance is measured as the cost to cure the item or the cost to restore it to a new or reasonably new condition. The cost to cure may exceed the item's cost when it was installed new. Cost to cure is analogous to an age-life procedure because the age of a curable item equals (or exceeds) its total useful life expectancy, resulting in 100% deterioration. All deferred maintenance items are completely deteriorated, and therefore they may all be treated together in the breakdown method.

For example, suppose that during a site visit to a small office building an appraiser notes that the exterior walls need to be scraped, primed, and painted, and one inoperable window needs to be replaced. A painting contractor quotes a price of $5,000 to do the work. However, according to the appraiser's cost manual, a similar job performed at the present time—i.e., as part of an original construction project—should only cost $3,500. In this instance the correct measure of the cost to cure is $5,000. If the painting were done during the original construction, the walls would not have had to be scraped. The contractor could have just primed and painted them. Similarly, the cost of installing one window at the time of construction would be $500, but the cost to replace the broken window is higher, $750 in this case, because of the additional labor involved in removing and disposing of the existing window. The higher amounts should be used by the appraiser as the cost to cure and the appropriate measure of curable physical deterioration for these building components:

| | Current Construction Cost | Cost to Cure |
|---|---|---|
| Painting | $3,500 | $5,000 |
| Window | +  $500 | +  $750 |
| Total | $4,000 | $5,750 |
| Curable physical deterioration: | | $5,750 |

BACK_DEFEXP-RR-002997

Copyrighted material licensed by Charles Brigden on September 17, 2020

Repainting essentially resets the clock on the useful life of the paint, but the repair of the broken window only affects the useful life of one of the building's windows. The other windows may have depreciated by a certain percentage due to age, but replacing those other windows is not yet considered curable because those improvements still contribute more value than new replacements windows would after considering the cost to cure. The depreciation of the other windows would not be deferred maintenance, but rather incurable physical deterioration.

Appraisers should note also that substantial deferred maintenance items typically require lump-sum adjustments in the sales comparison and income capitalization approaches because these problems are specific to the subject property and would not be reflected in the values provided by comparable sale or comparable rental properties with routine maintenance. In other words, significant deferred maintenance items are usually atypical expenses that require a capital decision by a property owner rather than a routine repair handled by a property manager.

### Incurable Physical Deterioration—Short-lived Items

Once any curable physical deterioration is estimated, the remaining physical deterioration is allocated to either short-lived or long-lived building components. Short-lived items are those that are not ready to be replaced on the date of the opinion of value but will probably have to be replaced in the foreseeable (i.e., whatever is considered short-term) future. Examples include the roof covering, interior floor finish, furnaces, and water heaters. At the current time, a short-lived item is not 100% physically deteriorated, so it does not yet need to be cured. However, an appraiser should draw the same conclusions that market participants do—i.e., that the items will be 100% deteriorated before the end of the building's remaining useful life expectancy and will have to be replaced. When those items reach the point of 100% physical deterioration, they become curable items. Unlike items of deferred maintenance, which have lasted beyond their useful life expectancy and need to be replaced immediately, short-lived items have not reached the end of their total useful life expectancy and are not completely deteriorated, but they are substantially depreciated in comparison with the overall structure.

The deterioration in short-lived items is measured by estimating a separate age-life ratio and applying it to the current cost of each short-lived item. Because each short-lived item usually has a different age and a different total useful life expectancy, a separate age-life ratio or schedule must be calculated for each item. Age-life ratios for individual components are generally easier to estimate and support with market data than the age-life ratio for the property as a whole used in the economic age-life method.

As an example, consider a 20-year-old boiler in an apartment building. According to a boiler contractor, the total useful life expectancy of a boiler such as this is 25 years. On the date of the opinion of value, the boiler is operational and there is no need to replace it. However, a prudent purchaser or owner would anticipate that the boiler will have to be replaced within a few years. The replacement cost of the boiler is $30,000. The age-life ratio is used to estimate a depreciation rate of 80% (20/25 = 0.80). When this ratio is applied to the cost to replace the boiler ($30,000), the deterioration indicated is $24,000 ($30,000 × 0.80). The boiler would not be a short-lived item if its remaining useful life were equal to or greater than the remaining economic life of the overall property.

BACK_DEFEXP-RR-002998

The age of short-lived items may be the actual age or the effective age. In some circumstances, effective age could be more appropriate depending on the degree of maintenance or amount of wear and tear. The useful life may be developed from a variety of sources, including observation, historical data, published cost surveys, manufacturer's warranties, and discussions with builders, property managers, and others.

Many lenders and investors rely on property condition surveys to help them plan for future replacements of building components. These surveys can be useful to appraisers as well because they are usually prepared by an engineer and provide all of the detail required to complete a breakdown depreciation analysis, including identification and allocation of long- and short-lived components and the calculation of their current age and remaining useful life. Property condition surveys include replacement cost estimates and a 10- to 20-year schedule that indicates exactly when replacements will be required. They tell the property owner what expenditures are needed immediately, what replacements will be needed in future years, and how much they will cost.

### Incurable Physical Deterioration—Long-lived Items

Long-lived items include all items that were not treated as items of deferred maintenance or as short-lived items. Long-lived items have the same age and life expectancy and, therefore, they are all treated together. Examples of long-lived items include exterior walls, structural framing, the roof structure, underground piping, foundation walls, and insulation. Unless an improvement has reached the end of its useful life, long-lived items are not 100% physically deteriorated and therefore do not need to be cured. In addition, long-lived items are not normally replaced except under extraordinary circumstances—e.g., if a foundation wall is damaged. In that case, the long-lived component becomes an element of curable physical deterioration. The deterioration of long-lived items is measured by estimating an age-life ratio and applying it to all components of cost that have not already been treated for physical deterioration.

As an example, consider a small industrial building with a total cost of $700,000. It is 35 years old and and the useful life expectancy of the long-lived components of the building is 100 years. The cost to cure the curable items (deferred maintenance) is $10,000. Short-lived building components include the boiler, roof cover, and floor covering. The cost to replace the boiler is $40,000, the cost to replace the roof covering is $60,000, and the cost to replace the floor finish is $20,000. There are no other short-lived items. The age-life ratio is calculated to be 35% (35-year actual age/100-year useful life). The replacement cost of the long-lived items is estimated by deducting the cost to cure the curable items and the sum of the costs to replace the short-lived items from the cost of the structure:

| | replacement cost | |
|---|---|---|
| Total replacement cost of improvements (both long and short-lived items) | | $700,000 |
| Deferred maintenance | | − $10,000 |
| Short-lived items | | |
| Boiler | 40,000 | |
| Roof covering | 60,000 | |
| Floor finish | + 20,000 | |
| Subtotal—replacement cost of short-lived items | | − $120,000 |
| Remaining replacement cost attributed to long-lived items | | $570,000 |

The age-life ratio is then applied to the untreated costs (35% × $570,000), and the resulting amount of deterioration attributable to the long-lived items is calculated to

BACK_DEFEXP-RR-002999

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 595 of 722    Page
ID #16819

be $199,500. This represents only the depreciation attributable to the long-lived items. The total depreciation estimate would have to include depreciation attributable to deferred maintenance and short-lived items.

Note that each cost should include its share of entrepreneurial incentive and soft costs. Appraisers should also be careful to avoid deducting the depreciation of short-lived components, rather than their cost, in developing the replacement cost of the long-lived components. Although the deferred maintenance shown in the preceding table will appear as depreciation on the cost approach summary, it is also most often calculated as the replacement cost of a fully depreciated item and in that case must be included with the short-lived replacement costs before it can be deducted from the total replacement cost as depreciation.

### Understanding Age-Life Relationships and the Breakdown Method

Figure 31.3 illustrates a procedure that can be used to estimate all forms of physical deterioration, both curable and incurable. In addition to showing the correct relationship between all items of physical deterioration, the diagram is designed to ensure that all types of physical deterioration are considered and that no items of physical deterioration are treated more than once. This age-life procedure works whether the breakdown method is being used to allocate a known total depreciation amount among its components or to develop an estimate of total depreciation.

The procedure has four steps. First, the total cost is allocated among the curable items, the incurable short-lived items, and the incurable long-lived items (Row C of Figure 31.3). Second, an age-life ratio is calculated for each allocated cost item (Row D). Third, the appropriate age-life ratio is applied to the estimated cost of each item (Row E). Finally, the individual items of physical deterioration are added together to develop an estimate of total physical deterioration (Row F).

As an example of these calculations, consider a 25-year-old industrial building in average condition, illustrated in Figure 31.4. The overall cost is $800,000. On the date of the site visit, the appraiser found one overhead door damaged beyond repair, which will cost $5,000 to replace. (In this case, the $5,000 cost to cure is the original cost of the installation of the door, i.e., there is no excess cost to cure.) The roof was replaced five years ago and has a 20-year guarantee, which indicates that it is 25% depreciated. The cost to replace it is $60,000. The original HVAC components should last another



**Figure 31.3**    Age-Life Procedure for Estimating All Items of Physical Deterioration

*Depreciation Estimates*    **581**

BACK_DEFEXP-RR-003000



**Figure 31.4**  Age-Life Estimation of Physical Deterioration

| | Curables | Roof Cover | HVAC Components | Decorating | Long-lived Items |
|---|---|---|---|---|---|
| **A** | | | $800,000 | | |
| **B** | Curables | Roof Cover | HVAC Components | Decorating | Long-lived Items |
| **C** | $5,000 | $60,000 | $72,000 | $10,000 | $653,000 |
| | × | × | × | × | × |
| **D** | 100% | 25% | 83⅓ | 0% | 25% |
| | = | = | = | = | = |
| **E** | $5,000 | $15,000 | $60,000 | $0 | $163,250 |
| **F** | | | $243,250 | | |

five years, which indicates they are 83⅓% deteriorated (25/30). The cost to replace the HVAC components is $72,000. The offices were just completely redecorated at a cost of $10,000. An appraiser estimates that the offices will not have to be redecorated for another five years. Based on an analysis of demolition permits, the appraiser concludes that the total useful life expectancy of the long-lived items is 100 years.

In this example, the total physical deterioration is the sum of the individual deterioration calculations, or $243,250. On an age-life basis, the total depreciation is about 30%. The average annual physical depreciation is 1.2% per year and the economic life is 83 years (assuming that the improvements so not suffer from functional or external obsolescence). The total depreciation of short-lived items is $80,000 and the current cost of these items is $147,000.

A summary of the depreciated cost of the improvements is shown below:

| | | |
|---|---|---|
| Total current cost of all improvements | | $800,000 |
| Less depreciation | | |
|    Short-lived components | $80,000 | |
|    Long-lived components | + $163,250 | |
| Total depreciation | | − $243,250 |
| Depreciated value of building improvements | | $556,750 |

**Damage or Vandalism**

Damage or vandalism requires special treatment in the estimation of depreciation. The measure of damage is the cost to cure, but damage or vandalism must be treated separately from other forms of physical deterioration because, unlike deferred maintenance, damage is not considered in the estimate of cost new. When damage or vandalism is cured, the life of the damaged component is neither renewed nor prolonged. It is simply restored to its condition prior to the damage.

As an example, consider a brick wall that has been spray-painted with graffiti. The cost of sandblasting the wall to remove the graffiti is $5,000. Nowhere in the overall cost new of the original construction is there a provision for the removal of graffiti. The measure of damage in this instance would be $5,000, the full cost to cure.

Typically, the cost to cure damage is added to the curable physical deterioration and included among the items of physical deterioration in the breakdown method. However, the $5,000 cost to cure damage or vandalism is not subtracted from cost when calculating long-lived physical deterioration.

BACK_DEFEXP-RR-003001

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Functional Obsolescence

Functional obsolescence is caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use and the most cost-effective functional design requirements at the time of the appraisal (what is known in appraisal as the ideal improvement). A building that was functionally adequate at the time of construction can become inadequate or less appealing as design standards, mechanical systems, and construction materials evolve.

Functional obsolescence is attributable to defects within the property lines, in contrast to external obsolescence, which involves conditions outside the property lines and therefore outside the control of the owner and occupants. Functional obsolescence, which may be curable or incurable, can be caused by a deficiency—that is, some aspect of the subject property is below standard in respect to market norms. It can also be caused by a superadequacy—that is, some aspect of the subject property exceeds market norms.

In some cases, a developer or property owner creates functional obsolescence by incorporating special features at the request of the occupant that would not appeal to the market in general. An example of a superadequacy is an expensive, in-ground swimming pool in a neighborhood of relatively low-cost homes. Equally common is functional obsolescence that occurs as a result of changing tastes or market preferences. Too few bathrooms in a residence or warehouse ceiling heights that are below current standards are examples of functional obsolescence due to deficiencies.

Characteristics of the different types of functional obsolescence are illustrated in Table 31.4. Elements of depreciation not identified as physical deterioration or functional obsolescence must be external obsolescence, which is discussed later in this chapter.

Like the curability of physical deterioration, there are two major tests of curability for functional obsolescence caused by a deficiency or superadequacy:

- If spending the money to cure the item will result in a value increment equal to or greater than the expenditure, the item is curable.
- If spending the money to cure the item will not result in a value increment equal to or greater than the expenditure but will allow existing items to maintain their value, the item is again curable.

If the cost to cure the item will not result in a value increment greater than the loss in value caused by the item or building component, then the item is incurable. Functional obsolescence can be corrected in two ways:

- The functional obsolescence is cured by the property owner when this is economically feasible.

or

- Market norms change, eliminating the cause of the functional obsolescence. In other words, the functional obsolescence no longer exists.

#### Problem-Solving for Functional Obsolescence

Estimating the effect of functional obsolescence is rarely as straightforward as estimating the effect of physical deterioration because judging the relative utility of building improvements is more difficult than accounting for immediately apparent physical losses. However, the process of identifying and selecting an appropriate

BACK_DEFEXP-RR-003002

| Table 31.4 | Types of Functional Obsolescence |
| --- | --- |
| **Type** | **Characteristics/Measure** |
| Curable deficiency requiring an addition | The subject property has functional obsolescence because it does not have something that other properties in the market do have. Because the item is not present, the property cannot be penalized for any deterioration that the item would have incurred if it had been included in the original construction. However, because it usually costs more to add an item to an existing property than to include it when the property was originally built, the excess cost to cure is the appropriate measure of functional obsolescence. |
| Curable deficiency requiring substitution or modernization | A curable deficiency requiring substitution or modernization is caused by something that is present in the subject property but is either substandard compared to other properties in the market or is defective and thereby prevents some other component or system in the property from working properly. The measure is the excess cost to cure. In addition, the depreciated or remaining cost of the existing item, which is now worthless, must be deducted. |
| Curable superadequacy | A superadequacy is a type of functional obsolescence caused by something in the subject property that exceeds market requirements but does not contribute to value an amount equal to its cost. The superadequacy may have a cost to carry (i.e., higher operating costs) that must be considered. A superadequacy is only curable if it can be removed and the value that is added (or costs reduced), including any salvage value for its removal, is greater than the cost to cure. |
| Incurable deficiency | The subject property has functional obsolescence because it is missing a building component or design feature (e.g., a warehouse with unusually low ceilings) that is not economically feasible to correct. |
| Incurable superadequacy | An item of incurable functional obsolescence caused by a superadequacy is a property component that exceeds market requirements. It represents a cost without any corresponding increment in value or a cost that the increment in value does not meet. Note that in some applications of the cost approach, the need to estimate the functional obsolescence attributable to an incurable superadequacy is eliminated by using replacement cost instead of reproduction cost because superadequacies are not replicated in a replacement cost estimate. Nevertheless, whether replacement or reproduction cost is used, any extraordinary expense of ownership associated with the superadequacy is quantified and deducted as a penalty from the value of the property. Essentially, the property loses value through the added costs of ownership over time because the component is incurable. However, if the cost of ownership increases over time, the obsolescence may become curable. |

treatment for a functional problem is simplified when the problem is broken down into manageable tasks using the framework illustrated in Figure 31.5. The first step is to identify the functional problem. In many cases this is readily apparent from the site visit and information from the highest and best use analysis or other analyses in the valuation process. Once the functional problem has been identified, the next step is to determine which building components are causing the problem and identify possible corrective measures (and the associated costs to cure).

In many cases, only one cost-to-cure program will clearly identify the course of action to fix or improve a functional problem. Often there may be no economically feasible or practical method to cure the problem. (This is true especially for superadequate components.) In these cases the component is incurable and the property must endure the loss in value. If there are multiple cost-to-cure alternatives to fix a particular problem, an appraiser should select the most appropriate and cost-effective measure.

BACK_DEFEXP-RR-003003

| **Figure 31.5** | Analyzing a Functional Problem |
| --- | --- |

1. Identify the functional problem.
2. Identify the component (or components) in the facility, or the lack of a component (or components), associated with the problem.
3. Identify possible corrective measures and the related costs to cure, including entrepreneurial incentive.
4. Select the most appropriate corrective measure.
5. Quantify the loss caused by the functional problem.
6. Determine if the item is curable or incurable. (If the added value is equal to or greater than the cost to cure, the functional problem is curable.)
7. Apply the functional obsolescence procedure to calculate the amount of depreciation caused by the functional problem.

## The Curability and Incurability of Functional Issues

The test of curability is simply a comparison of the value added to the improvement if the functional problem is corrected with the cost to cure the functional problem of that improvement. If the value added is greater than the cost to cure, the functional problem is curable. If the value added is less than the cost to cure, the functional problem is incurable.

In the simplest terms, the value added is the amount that the market value of the real estate increases if a specific item is fixed. The value added is not the value of the item but rather the value that will be added to the property if the functional problem is fixed. As an example, suppose a recently built home was designed with a standard forced-air heating system with a natural gas furnace. In the five years since the house was built, high-efficiency gas furnaces have begun to replace less-efficient standard models in new homes in the subject property's neighborhood. Paired data analysis of a large pool of data comparing the recent sale prices of houses with high-efficiency furnaces and those with standard heating systems indicates a $3,000 premium for houses with a high-efficiency heating system in place. That $3,000 premium would be the value added for the subject property if the standard heating system were to be replaced with a more modern system.

The cost to cure is the amount that must be spent to correct the functional problem. In this case, estimates for the removal of a slightly depreciated heating system and replacement with a high-efficiency system average around $3,500, including all direct costs, indirect costs, and entrepreneurial incentive. The cost to cure of $3,500 is greater than the $3,000 value added, so the functional issue would be incurable. However, suppose that the existing heating system had a salvage value of $500 and a governmental incentive program promoting the installation of high-efficiency heating systems offered a $500 rebate on the installation cost of a new system. Then the total cost to cure would be $2,500 ($3,500 − $500 − $500), which would be less than the value added, making the functional problem curable.

Most curable functional obsolescence is caused by some form of deficiency like the heating system of the house that is currently below the emerging standard for energy efficiency, but some superadequacies can be treated as curable depreciation. As an example, suppose that the presence of a swimming pool in an apartment building does not mean that additional rent can be charged for the units. The swimming pool would be an overimprovement and thus an item of functional obsolescence. If this swimming pool costs $5,000 per year to operate, that $5,000 would be an expense deducted from the income generated by the property. At a market-derived overall capitalization rate of 8%, the loss of $5,000 in net income results in a $62,500 ($5,000/0.08) penalty to the value of the property. In other words, curing the functional problem of the unnecessary swimming pool would increase the market value of the apartment building by $62,500.

Now assume the problem of the unwanted swimming pool can be corrected for $10,000 by filling the pool and landscaping the area, with maintenance expenses reduced from the $5,000 to $500. The $500 loss in net income would only penalize the value of the property $6,250 (at the same 8% capitalization rate), so the total benefit to the property of removing the swimming pool would be $56,250 ($62,500 − $6,250). Clearly, the value added of $56,250 is greater than the cost to cure of $10,000, so the functional problem of a swimming pool amenity that does not make apartment units more desirable to potential tenants is a curable issue.

BACK_DEFEXP-RR-003004

The cost to cure must account for the cost to tear out or replace the existing component, the cost of the correct replacement component, any other costs above and beyond the total cost if the component had been included in the initial construction, and any salvage value. The total replacement cost for the component must include any appropriate indirect costs and entrepreneurial incentive. Essentially, the final measure is the total cost to cure offset by any salvage value:

| | |
|---|---|
| | Cost to tear out or remove existing component |
| + | Cost of correct replacement component (including entrepreneurial incentive) |
| + | Any costs above and beyond total cost if included in initial construction |
| − | Salvage value (if any) |
| = | Cost to cure |

The next step is to quantify the loss caused by the functional problem associated with the building component. The value loss could be caused by a loss in income, an increase in expenses or operating costs, or a combination of both. Alternatively, the value loss might be quantified by market evidence such as paired data analysis. By definition, the loss cured will equal the value added once the cure is accomplished. Note that the *value added* is not the same as the value referred to in the fourth step of the functional obsolescence procedure (Figure 31.6).

| **Figure 31.6** | Procedure for Estimating All Forms of Functional Obsolescence | |
|---|---|---|
| Step 1. | **Estimate** amount of component included in cost | $xxx,xxx |
| Step 2. | **Subtract** any physical deterioration charged | − $xxx,xxx |
| Step 3. | **Add** *whichever is less*: | |
| | a. cost to cure (all costs) | + $xxx,xxx |
| | *or* | |
| | b. value added (or value of loss) | + $xxx,xxx |
| Step 4. | **Subtract** cost as if included in new construction *or* value* | − $xxx,xxx |
| Step 5. | **Equals** depreciation from functional obsolescence | $xxx,xxx |

\* Sometimes an existing item has value unrelated to cost.

Next the cost to cure is compared with the quantified loss. If the value added (once the cure is accomplished) is greater than the cost to cure, then the functional problem is curable. Otherwise, the functional problem is incurable. The next step is to solve for the dollar amount of depreciation using the functional obsolescence procedure.

### Using the Functional Obsolescence Procedure

Figure 31.6 diagrams a systematic procedure that can be used to calculate all forms of functional obsolescence caused by a deficiency or a superadequacy, whether the functional issue is curable or incurable. Use of this model helps ensure that all components of functional obsolescence will be treated in a consistent manner, that none of the items will be treated more than once, and that no double charges will be made for items that have already been depreciated (i.e., charged under physical deterioration), which is particularly important for superadequacies.

First, the cost of the existing item is identified. If the item is a form of functional obsolescence caused by a deficiency requiring an addition, there will be no cost for

BACK_DEFEXP-RR-003005

Copyrighted material licensed by Charles Brigden on September 17, 2020

the item and zero will be entered on this line. If the item is a deficiency requiring rehabilitation or retrofit, there will be a cost for the item. Also, when replacement cost, rather than reproduction cost, is used as the cost basis, typically there will be no cost allotted for any superadequate items because such items would not be included in replacement cost. As stated earlier in the text, all forms of functional obsolescence present in the subject property would be included in a reproduction of that property, whereas a replacement structure is built to contemporary standards and would not have certain forms of obsolescence present in the subject improvement.

In the second step, any depreciation that has already been charged for the item is deducted. In nearly all instances, this depreciation will be physical deterioration. As in the first step, if the item does not already exist in the building, no depreciation will have been charged and zero will be entered on this line.

Regardless of the type of functional obsolescence, appraisers always investigate a cost to cure in order to determine whether an item is curable or not. In the third step of the functional obsolescence procedure, the sum of all costs associated with curing the item is compared to the value added as a result of curing the functional obsolescence. The cost to cure includes the cost of purchasing and installing a new item (including entrepreneurial incentive) and the cost of removing the old item, less any salvage value. The amount of the value added by curing the item can be obtained by capitalizing an income gain that would result from curing the item (using an income multiplier or a capitalization rate) or through analysis of market data such as paired sales. If the value added by curing the item is greater than the cost to cure, then the item is curable. If the value added by curing the item is less than the cost to cure, then the item is incurable. In the latter case, curing the item of functional obsolescence is physically possible, but the economic benefit of curing the item is outweighed by the cost to cure.

In the application of the functional obsolescence procedure, the amount recorded in the third step depends on whether the item is curable or incurable. If the item is curable, the amount recorded is the cost to cure. If the item is incurable, the amount recorded is the value that would be added if it was feasible to cure the item.

The fourth step of the procedure involves the cost of the item if it were included as part of new construction, i.e., the proper item's contribution to the replacement cost (or reproduction cost) if it had been part of the original design rather than being the source of a functional problem. For a curable item, that cost is essentially deducted from the cost to cure in the third step to calculate the item's excess cost to cure. If the item is incurable, the depreciated cost listed in the fourth step is deducted from the value of the loss listed in the third step to yield the value added over and above the cost of the item if installed in new construction.

In the final step, appraisers add up all of the entries to derive the total functional obsolescence attributable to each factor. The model described here works for all types of functional obsolescence.

### Examples of a Deficiency

Some examples of deficiencies include

- Inadequate HVAC
- Interior finish that is lower quality than the exterior
- No landscaping where the market requires it

BACK_DEFEXP-RR-003006

- Hallways that are too narrow
- Access points that are not ADA-compliant

Consider a small office building without air-conditioning in a market where this feature is standard. Because of retrofit requirements, it is more costly to install the air-conditioning now than it would have been as a part of the original construction. The current cost to install the air-conditioning is $12,000. If the work had been done as a part of new construction, the cost would have been only $10,000. Installing air-conditioning would allow the property owner to raise rents, and effective gross income would increase an estimated $2,000 per year. The current effective gross income multiplier (*EGIM*) is 7.0. The functional obsolescence is *curable* because the value added ($2,000 × 7.0 = $14,000) is greater than the cost to cure ($12,000).

Note that in the calculations shown in Table 31.5, because the air-conditioning is not present in the existing improvement, no cost is shown as the cost of the existing item and no depreciation was charged (Steps 1 and 2). The actual cost to retrofit and install the air-conditioning is $12,000 (Step 3). However, the cost to install the air-conditioning as a part of new construction on the date of the opinion of value is $10,000 (Step 4). The curable functional obsolescence is the excess cost to cure, or $2,000 (Step 5).

Now suppose that installing an air-conditioning system in the office is not economically feasible—e.g., the current cost of the necessary renovations (say, $20,000) is greater than the value gained by adding the item ($14,000). In the analysis of functional obsolescence, two elements must be identified for each building component:

- The cost to cure
- The amount of loss caused by the component or the lack of the component

When the loss is cured, the amount of the loss essentially becomes the value added. In this case, the cost to cure is $20,000. If the item is cured, the value added (or reduction in loss) is only $14,000, which means the item is incurable. In the calculations shown in Table 31.6, the value of the loss ($14,000) is less than the cost to cure ($20,000) in Step 3. The depreciation charged is the amount of the loss, over and above the cost if installed new. In the previous example, the item was curable and the measure of depreciation was the excess cost to cure.

Again, because the air-conditioning is not present in the existing improvement, no deterioration was charged. The value of the loss is equivalent to the lost income attributable to the deficiency. The effect of this loss is partially offset by the $10,000 that would have been expended to install air-conditioning as part of new construction. In other words, this building is losing $14,000 as a result of the lack of air-

---

| Table 31.5 | Curable Deficiency: Install Air-Conditioning System | |
|---|---|---|
| 1. | Amount of component included in cost | $0 |
| 2. | **Less** any physical depreciation charged | − $0 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | + $12,000 |
| | *or* | |
| | b. value added | |
| 4. | **Less** cost if included in new construction or value | − $10,000 |
| 5. | **Equals** depreciation from functional obsolescence | $2,000 |

---

BACK_DEFEXP-RR-003007

Copyrighted material licensed by Charles Brigden on September 17, 2020

| Table 31.6 | Incurable Deficiency: Absence of Air-Conditioning System | |
|---|---|---|
| 1. | Amount of component included in cost | $0 |
| 2. | **Less** any physical depreciation charged | –     $0 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | |
| | *or* | |
| | b. value of loss | + $14,000 |
| 4. | **Less** cost if included in new construction or value | – $10,000 |
| 5. | **Equals** depreciation from functional obsolescence | $4,000 |

conditioning, but, in the calculation of depreciation, it saved the $10,000 expense of installing the air-conditioning in the original construction. The incurable functional obsolescence is $4,000.

Now suppose that the value added is $7,000 instead of $14,000. The item is still incurable (see Table 31.7). The inclusion of air-conditioning is not economically feasible in this case.

Costs to cure and losses sustained by a component can and do change over time. Items identified as incurable at one point in time can become curable and vice versa over the life of the property. Now suppose that the office building has an outdated air-conditioning system that does not meet market standards and needs to be retrofitted. The reproduction cost of the existing air-conditioning system is $8,000, and the item is 25% physically deteriorated ($8,000 × 0.25 = $2,000). The cost to remove the existing air-conditioning is $4,500, the salvage value of that equipment is $3,000, and the current cost of installing an appropriate air-conditioning system is $12,000 ($10,000 to install the correct component plus $2,000 to retrofit the space). The property can still be expected to increase effective gross income by $2,000 per year (with an *EGIM* of 7.0) if an appropriate air-conditioning system is installed, so the extra value generated ($14,000) would exceed the cost to cure ($4,500 – $3,000 + $12,000 = $13,500) and the item is therefore *curable*. If the correct air-conditioning system had been installed as part of new construction, the cost would have been $10,000.

In Table 31.8, application of the formula essentially removes the existing component from cost (the $8,000 cost of the existing equipment less physical depreciation of $2,000 already charged) in the first two steps and penalizes cost by the excess cost to cure of $3,500 ($13,500 – $10,000) in the third and fourth steps.

| Table 31.7 | Incurable Deficiency: Absence of Air-Conditioning 2 | |
|---|---|---|
| 1. | Amount of component included in cost | $0 |
| 2. | **Less** any physical depreciation charged | –     $0 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | |
| | *or* | |
| | b. value of loss | +  $7,000 |
| 4. | **Less** cost if included in new construction or value | – $10,000 |
| 5. | **Equals** depreciation from functional obsolescence | $3,000 |

BACK_DEFEXP-RR-003008

**Table 31.8**    Curable Deficiency: Air-Conditioning Retrofit

| | | |
|---|---|---:|
| 1. | Amount of component included in cost | $8,000 |
| 2. | **Less** any physical depreciation charged | – $2,000 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | + $13,500 |
| | *or* | |
| | b. value added | |
| 4. | **Less** cost if included in new construction or value | – $10,000 |
| 5. | **Equals** depreciation from functional obsolescence | $9,500 |

Suppose that the existing equipment had no salvage value. The cost to cure the deficiency shown in Table 31.9 ($4,500 for removal of existing equipment plus $12,000 for installation of the new system, or $16,500) would exceed the value gained by replacing the air-conditioning system ($14,000), and the item of functional obsolescence would be *incurable*. If the $10,000 item had been installed originally, it would be 25% depreciated, i.e., with a current depreciated cost of $7,500.

**Table 31.9**    Incurable Deficiency: Inadequate Air-Conditioning System

| | | |
|---|---|---:|
| 1. | Amount of component included in cost | $8,000 |
| 2. | **Less** any physical depreciation charged | – $2,000 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | |
| | *or* | |
| | b. value of loss | + $14,000 |
| 4. | **Less** cost if included in new construction or value | – $7,500 |
| 5. | **Equals** depreciation from functional obsolescence | $12,500 |

### Examples of a Superadequacy

Some examples of superadequacies include

- Excess ceiling height
- High-end finish in a Class C office building
- A warehouse with 60% office space in a market that prefers 25% office space

A superadequacy is often difficult to cure. Consider an industrial building with 24-ft. ceiling heights where the market norm is 18-ft. ceilings. The cost of a building with 24-ft. ceilings is $1.2 million, whereas the cost of a building with 18-ft. ceilings is $1.0 million. The subject building costs $5,000 more per year to heat and cool than comparable properties with 18-ft. ceilings in the subject's market. The extra $200,000 spent in the original construction on the extra six feet of ceiling height adds no value to the property and there is no reasonable cost to cure, so the superadequacy is incurable.

In this instance, the higher ceiling has no value to be recorded in Step 4. In the calculation of functional obsolescence, the amount entered as cost if installed new is zero. Note also that if replacement cost is used, the $200,000 cost of the superadequacy will be eliminated and the measure of functional obsolescence would be only the

BACK_DEFEXP-RR-003009

capitalized additional costs of ownership. The extra ceiling height costs the subject property $5,000 more per year than the costs incurred by competitive buildings, and analysis of income and expense data for comparable buildings yields a building capitalization rate of 12.5% in this market. The incurable functional obsolescence is $40,000 ($5,000/0.125). Because the item is superadequate, it does not belong in the structure and there is no correct replacement component, so there is no entry in Step 4. The replacement cost calculation is shown in Table 31.10.

If reproduction cost is used as shown in Table 31.11, the additional $200,000 cost of the superadequacy will not be eliminated, and $200,000 would be entered in Step 1 and the 10% depreciation already charged in Step 2.

If the extra ceiling height does earn some income in the market, the calculations would be affected by that value increment unrelated to cost. Suppose the six feet of extra ceiling height yields an extra $7,000 in income. At the 12.5% building capitalization rate, the value attributable to the extra ceiling height would be $56,000 ($7,000/0.125), which would be accounted for in Step 4 of the calculations shown in Table 31.12. In this case, the extra ceiling height still costs too much and creates additional operating expenses, but it does add $56,000 in value and thus reduces the functional obsolescence charged to that functional problem.

Now suppose that market research supports an income increase of $27,500 for the extra 6 feet of ceiling height. At the 12.5% building capitalization rate, the 6-ft. height advantage has a value of $220,000 ($27,500/0.125), as shown in Table 31.13. The market norm may be 18 feet, but according to the data this market wants, and will pay for, 24 feet.

## External Obsolescence

External obsolescence is a loss in value caused by negative externalities, i.e., factors outside a property. It is almost always incurable. External obsolescence can be temporary or permanent. For example, value loss due to an oversupplied market may be regained when the excess supply is absorbed and the market works its way back to equilibrium. In contrast, the value loss due to proximity to an environmental disaster may be permanent.

External obsolescence usually has a marketwide effect and influences a whole class of properties, rather than just a single property. However, external obsolescence may affect only one property when its cause is location—e.g., proximity to negative environmental factors or the absence of zoning and land use controls. In fact, the causes of external obsolescence can be broadly characterized as either *economic obsolescence* or *locational obsolescence*. Most properties

### Positive Effects of External Forces

Depreciation is inherently a "loss" in property value, but the external forces that cause external obsolescence can also cause values to go up as well as down. Whether the positive effect of external forces is labeled a "value enhancement," a "positive externality," or "negative external obsolescence," the positive effect of those external forces can be accounted for in the value indication of the cost approach in a variety of ways.

One approach is to account for the value enhancement from market conditions as an external impact treated in the same manner as external obsolescence but as an addition rather than a deduction. An alternative is to increase the entrepreneurial incentive in the cost approach to the level of profit that the market would currently support. That may result in an overstated replacement cost (including entrepreneurial incentive). It also masks risk and could be misleading.

BACK_DEFEXP-RR-003010

| Table 31.10 | Incurable Superadequacy: Replacement Cost of Excess Ceiling Height | |
|---|---|---|
| 1. | Replacement cost of existing item | $0 |
| 2. | **Less** any physical depreciation charged | – $0 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | N/A |
| | *or* | |
| | b. value of loss | + $40,000 |
| 4. | **Less** cost if included in new construction or value | – $0 |
| 5. | **Equals** depreciation from functional obsolescence | $40,000 |

| Table 31.11 | Incurable Superadequacy: Reproduction Cost of Excess Ceiling Height | |
|---|---|---|
| 1. | Reproduction cost of existing item | $200,000 |
| 2. | **Less** any physical depreciation charged | – $20,000 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | N/A |
| | *or* | |
| | b. value of loss | + $40,000 |
| 4. | **Less** cost if included in new construction or value | – $0 |
| 5. | **Equals** depreciation from functional obsolescence | $220,000 |

| Table 31.12 | Incurable Superadequacy: Low Contributory Value of Excess Ceiling Height | |
|---|---|---|
| 1. | Reproduction cost of existing item | $200,000 |
| 2. | **Less** any physical depreciation charged | – $20,000 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | N/A |
| | *or* | |
| | b. value of loss | + $40,000 |
| 4. | **Less** cost if included in new construction or value | – $56,000 |
| 5. | **Equals** depreciation from functional obsolescence | $164,000 |

| Table 31.13 | Incurable Superadequacy: High Contributory Value of Excess Ceiling Height | |
|---|---|---|
| 1. | Reproduction cost of existing item | $200,000 |
| 2. | **Less** any physical depreciation charged | – $20,000 |
| 3. | **Plus** | |
| | a. cost to cure (all costs) | N/A |
| | *or* | |
| | b. value of loss | + $40,000 |
| 4. | **Less** cost if included in new construction or value | – $220,000 |
| 5. | **Equals** depreciation from functional obsolescence | $0 |

BACK_DEFEXP-RR-003011

experience economic obsolescence from time to time as a result of the natural expansion and contraction of the real estate market.[3] In contrast, locational obsolescence is caused by proximity to some detrimental influence on value such as heavy traffic, a landfill, or other undesirable land use outside the property being appraised. For both economic and locational obsolescence, the value-influencing factor is outside the property and outside the control of the property owner and occupant.

External factors frequently affect the value of both the land and building components of a property, but land is not affected by any of the forms of depreciation (i.e., physical deterioration, functional obsolescence, or external obsolescence). The effect of external factors on the current land value is simply the operation of market forces on the value of the land. Even though a loss in land value due to external factors is not depreciation, that loss in value will still be accounted for in the final value indication of the cost approach through the estimate of site value.

Figure 31.7 illustrates various ways in which loss in value due to external influences on a property could be allocated between the land and building components. In the figure, Column A represents the total value of the building improvements after deducting physical deterioration and functional obsolescence ($70 per square foot of building area) and the current land value ($30 per square foot of building area) without yet considering the external influences on value. This would be market value



**Figure 31.7**    Value Loss due to External Factors Allocated between Land and Building Components

---

3.  External obsolescence is sometimes called *economic obsolescence* because economic factors outside the control of property owners, like mortgage interest rates and changing employment levels, can have large effects on the value of real estate. However, economic factors are only one form of external obsolescence.

BACK_DEFEXP-RR-003012

when the market is in balance or the market value of a property in a location away from the external influence of a nuisance like a landfill. The value indication at this point in the cost analysis would be $100 per square foot.

Column B illustrates a value loss of 20%. An appraiser has demonstrated that the value is now $80. The land value is still unchanged at $30. Therefore, the $20 loss in value is taken from the value of the building and is all external obsolescence.

In Column C, the value is still $80, but the land value *increases* from $30 to $50. In this case, the building is worth $30, i.e., the loss to the building is $40, which is more than the $20 loss in value to the property as a whole. This sort of loss is often an indication of a change in highest and best use, with part of the $40 loss in building value being additional functional obsolescence. Column C could represent the change in value of a single property over time (with the land value rising as building value drops), or it could represent a comparison between one property with no value loss due to external factors and a comparable property with a higher land value but some other external issue causing depreciation of the building improvements.

Column D illustrates loss in value due exclusively to a drop in land value. In that case, the improvements do not have external obsolescence because the effect of the negative externality is completely accounted for in the $20 drop in land value.

Column E illustrates a 20% loss in value that is shared proportionately by both the land and building components of the property. In this example, both the building and the land are affected in the same way, but only the 20% loss in value to the building is external obsolescence. The 20% loss in land value is simply a loss in value due to supply and demand for sites that compete with the land being appraised, and in the cost approach the influence of the negative externality on the land is accounted for in the estimate of land value.

Note that in this case the 20% loss in land value does not double-count the 20% external obsolescence of the building because the negative externality is affecting both the land and the building. It is important not to allocate the influence of an externality incorrectly.

Direct comparison of similar properties with and without external obsolescence can be the most persuasive measurement of the effect of negative externalities on value when enough data is available for that sort of analysis. As an example of the use of paired data analysis, consider a 12-unit apartment building located downwind of a relatively new asphalt batching plant. The comparable data is summarized in Table 31.14. Comparable A is a vacant lot adjacent to the subject that is zoned for an 8-unit apartment building and was just sold for $312,000 ($39,000 per unit). Comparable B is a vacant site on the other side of town that is also zoned for a 12-unit apartment building and was recently sold for $480,000 ($40,000 per unit). Comparable C is a 9-unit apartment building in the subject's neighborhood that was recently sold for $459,000 ($51,000 per unit). Comparable D is a 10-unit apartment building on the other side of town that was sold for $540,000 ($54,000 per unit). Using Comparables C and D, an appraiser could estimate the external obsolescence attributable to the property as a whole at $3,000 per unit. The subject property would thus incur $36,000 in external obsolescence (12 units × $3,000). Comparables A and B indicate that $12,000 of this external obsolescence ($1,000 per unit) is recognized in the land value. The remaining $24,000, therefore, is attributable to the building.

An alternative to direct comparison of properties with and without external obsolescence is the capitalization of income lost due to the effect of the externality and,

BACK_DEFEXP-RR-003013

**Table 31.14**  Direct Comparison of Properties Affected by Externality

|  | Subject Property | Comparable A | Comparable B | Comparable C | Comparable D |
|---|---|---|---|---|---|
| Property type | Apartment building | Vacant site zoned for apartment use | Vacant site zoned for apartment use | Apartment building in subject property's neighborhood | Apartment building across town |
| No. of units (or units allowed by zoning) | 12 | 8 | 12 | 9 | 10 |
| Sale price | – | $312,000 | $480,000 | $459,000 | $540,000 |
| Price per unit | – | $39,000 | $40,000 | $51,000 | $54,000 |
| Location | Downwind of asphalt batching plant | Adjacent to subject property (affected by externality) | Across town from subject property | In subject property's neighborhood (affected by externality) | Across town from subject property |
| Locational effect (total property) | $36,000 ($3,000 × 12) |  |  | -$3,000 per unit | Unaffected by externality |
| Loss in land value (land) | $12,000 ($1,000 × 12) | -$1,000 per unit | Unaffected by externality |  |  |
| External obsolescence (building) | $24,000 ($36,000 – $12,000) |  |  |  |  |

if necessary, allocating that estimate of loss in total property value between the land and building components. This procedure is applied in two steps. First, the market is analyzed to quantify the income loss. Next, the income loss is capitalized to obtain the value loss affecting the property as a whole. If the income loss is anticipated to last for the economic life of the improvements, it can be capitalized by applying either a gross income multiplier to a gross income loss or an overall capitalization rate to a net income loss. If the income loss is not anticipated to be long-term, it can be estimated using discounted cash flow analysis.

An important concept in the capitalization of income loss is equilibrium rent, which is the market-derived rental rate that would be expected in the market at equilibrium. The equilibrium rent is compared with the actual rent affected by the external factor in the current market, e.g., the lower rents that result from the over-supply of competitive properties in the market. There are two methods of estimating the equilibrium rent:

1. Base the estimate on market rent during a recent period of equilibrium adjusted for inflation.
2. Base the estimate on depreciated replacement cost, similar to feasibility rent but substituting depreciated replacement cost for full replacement cost.

As a simple example of capitalizing income loss, consider a 7,500-sq.-ft. strip retail center in a market that has been hurt by a sudden, and likely long-term, population loss and demographic shift in the neighborhood. In the property's first five years of operation, the average rent was around $9.00 per square foot per year, with frictional vacancy of 10% and a net income ratio of 67%. Current rent levels have

BACK_DEFEXP-RR-003014

fallen to around $6.75 per square foot. The overall capitalization rate is 7.0%. Inflation has been nominal since the construction of the shopping center, so the equilibrium rent for the property is $67,500 ($9.00 per square foot × 7,500 square feet = $67,500). To calculate income loss, the net operating income at equilibrium rent and at the prevailing rent are both calculated:

|  | At Equilibrium Rent | At Current Rent |
|---|---|---|
| Potential gross income | $67,500 | $50,625 |
| Less vacancy and collection loss | − $6,750 | − $5,063 |
| Effective gross income | $60,750 | $45,562 |
| Net income ratio | × 0.6667 | × 0.6667 |
| Net operating income | $40,500 | $30,375 |

The income loss of $10,125 ($40,500 – $30,375) is then capitalized at the overall capitalization rate of 7% to calculate the external obsolescence, $144,643.

As an alternative, an equilibrium rent can be calculated from depreciated replacement cost. Suppose the total replacement cost of the retail center is $500,000 and entrepreneurial incentive is 10% of total cost. The shopping center has $45,000 in deferred maintenance and the remaining physical deterioration is 12.5%, based on an effective age of 5 years and a useful life of 40 years. The shopping center has no functional obsolescence, and the land value is $150,000. Equilibrium net operating income would be calculated as follows:

| | |
|---|---|
| Replacement cost (direct and indirect costs) | $500,000 |
| Entrepreneurial incentive | + $50,000 |
| Total replacement cost | $550,000 |
| Less deferred maintenance | − $45,000 |
| Remaining cost | $505,000 |
| Less remaining physical deterioration (12.5%) | − $63,125 |
| Cost of physically depreciated improvements | $441,875 |
| Plus land value | + $150,000 |
| Total depreciated cost without external obsolescence | $591,875 |
| Multiplied by capitalization rate (7%) | × 0.07 |
| Equilibrium *NOI* | $41,431 |

The income loss and corresponding amount of external obsolescence can then be calculated using the new equilibrium net operating income.

| | |
|---|---|
| Equilibrium *NOI* | $41,431 |
| Less actual *NOI* | − $30,375 |
| Income loss | $11,056 |
| Capitalized at 7% | ÷ 0.07 |
| External obsolescence | $157,943 |

Finally, the indicated value by the cost approach can be calculated by adjusting the previously calculated depreciated cost for all sources of depreciation other than external obsolescence.

| | |
|---|---|
| Total depreciated cost without external obsolescence | $591,875 |
| Less external obsolescence | − $157,943 |
| Indicated value by cost approach | $433,932 |

BACK_DEFEXP-RR-003015

Copyrighted material licensed by Charles Brigden on September 17, 2020

Note that the two estimates of obsolescence, $144,643 and $157,943, are completely attributed to the improvements. The land value is assume to be the same in both the actual net operating income and the equilibrium net operating income calculations. There is no loss allocated to the land. (If the land value is concluded to be lower due to the external issue, then the amount of external obsolescence attributed to the improvements would be, for example, the $157,943 amount less the amount of the reduction in the land value.) Also note that when the equilibrium net operating income is calculated from cost, the value indicated by the cost approach will be the same as the value indicated by the income capitalization approach:

| | |
|---|---:|
| Actual *NOI* | $30,375 |
| Capitalized at 7% | ÷ 0.07 |
| Indicated value by income capitalization approach | $433,929 |
| Indicated value by cost approach | $433,932 |

In this case, the $3 difference is a result of rounding. Otherwise the value indications would be identical.

If the income loss of the retail center is the result of a temporary oversupply of competitive properties in the market rather than a long-term phenomenon, the value loss should be calculated using discounted cash flow analysis rather than direct capitalization. In the discounted cash flow analysis, the cash flow period would be the expected term of the income loss rather than the projection period of ownership. The present value of the income loss would be the value loss due to the externality. If a direct capitalization method is used for such a short-term loss, the capitalization rate would need to be higher than the overall capitalization rate for the property because of the limited term of the condition causing the loss. However, it may be difficult to support the capitalization rate that would be applicable to a short-term condition.

BACK_DEFEXP-RR-003016

BACK_DEFEXP-RR-003017

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Reconciling Value Indications

**32**

In the valuation process, more than one approach to value is usually applied, and each approach typically provides a different indication of value. Reconciliation is the process in which different indications of value are converted into a value conclusion. If two or more approaches are used, appraisers must reconcile the value indications. Moreover, several value indications may be derived in a single approach. In the sales comparison approach, for example, the analysis of each comparable sale produces an adjusted sale price, which is an indication of value for the subject property. The various units of comparison applied to sales may also produce different value indications. For example, apartment properties may be analyzed in terms of price per unit or price per room, and office buildings in terms of price per square foot of gross building area or price per square foot of rentable area. In an analysis of income, different indications of value can result from applying income multipliers to specific types of income, directly capitalizing net income, and discounting cash flows.

Appraisers resolve multiple value indications derived within a single approach as part of the application of that approach. After resolving multiple value indications within a single approach, an appraiser applies the same process to the value indications of multiple approaches, providing the client with clear analyses of why the results of one (or more) of the approaches to value is given more weight than the results of the others.

Resolving the differences among various value indications is called *reconciliation*. Although the result of the final reconciliation process is usually the ultimate value conclusion, the reconciliation analysis may indicate that more research is needed or that new analyses must be performed to resolve conflicts or answer questions. Thus, reconciliation provides an integral quality control assessment of the valuation process prior to the final opinion of value and also helps identify key factors that must be clearly cited and explained, or explained further, in the appraisal report.

The final value opinion is not the average of the different value indications derived. No mechanical formula is used to select one indication of value over the others. The strengths and weaknesses of each of the approaches used, and the quantity

and quality of the data analyzed, must be considered and addressed in an appraisal report, and an appraiser must explain why one approach may have been relied upon more than another in a particular assignment. Final reconciliation relies on the proper application of appraisal techniques and the appraiser's judgment. Figure 32.1 illustrates the types of questions that appraisers ask when reconciling value indications within the approaches to value.

In summary, reconciliation has a defined purpose and is an essential step in the valuation process, but it also provides appraisers with an opportunity to smooth out any apparent inconsistencies. For example, reconciliation is the stage of the valuation process in which an appraiser could explain once again that the sale across the street from the subject property, which appeared comparable, was not considered because it was not an arm's-length transaction. Or, as another example, in final reconciliation an appraiser could explain that even though the client made the application of the cost approach an assignment condition, the results of that approach were not given any weight because the appraiser believed that the approach did not provide a credible value indication. Valuation standards such as USPAP require that the value conclusion be compared with any recent sale of the subject property, and this comparison can also be included in the reconciliation.

Experienced appraisers know how to write a report so that readers will know the conclusion before they see it. In other words, through a logical progression of ideas, the strengths and weaknesses of the techniques applied are described and the reasons for weighting some approaches more than others are expressed clearly. Reconciliation is an important part of appraisal and an invaluable part of the reporting process.

## Final Reconciliation

In the final reconciliation, an appraiser reconsiders the entire appraisal, making sure that the data available and the analytical techniques and logic applied have led to consistent judgments. The appraiser checks the data to ensure that it is verified, applicable to the assignment, and sufficient to support a credible opinion of value. The value definition, the identified property rights, and the qualifying conditions imposed are carefully reconsidered to make sure that the procedures used in the analysis specifically address each of these items. The appraiser examines the differences in the conclusions derived from the various approaches, applies tests of reasonableness to these primary conclusions, and resolves any inconsistencies.

At this stage of the valuation process, appraisers ask a variety of questions:

- Is the same physical condition assumed in making adjustments to comparable rents, expenses, and sale prices in the income capitalization and sales comparison approaches?
- Are the results of all the approaches consistent with the appraiser's conclusion of highest and best use?
- Do the value indications derived from the approaches applied reflect the same property rights and asset type? For example, a value indication derived from the income capitalization approach that is higher than an indication based on the cost approach may or may not include a non-realty value component.
- Are the property rights appraised consistent throughout the appraisal? For example, if the subject property is the leased fee interest and the income capitaliza-

BACK_DEFEXP-RR-003019

Copyrighted material licensed by Charles Brigden on September 17, 2020

| **Figure 32.1** | Questions Asked in Reconciling Value Indications Within the Approaches to Value |
|---|---|

**Regarding identification of the problem and the subject property:**
- Is the building area in the description of improvements generally consistent in all the approaches used in the valuation?*
- Are the property features listed in the description of improvements the same in all the approaches to value?
- Is the effective date of appraisal consistent with the data presented?
- Have the highest and best uses of the land as thought vacant and the property as improved been properly analyzed?

**Regarding the sales comparison approach:**
- Is the approach relevant to the appraisal assignment?
- Was adequate market research conducted to identify sales that are relevant to the valuation problem?
- Are the sales sufficiently verified and relevant to the effective date?
- Would market participants consider them to be reasonably comparable?
- Are there prior sales of the subject property that need to be analyzed?
- Is there adequate market support for the adjustments that were made?
- Were those factors that could not be supported by quantitative adjustment dealt with adequately using qualitative analysis in the reconciliation?
- Are the adjusted sale or unit prices within the range exhibited in the market?
- Are the conclusions of the approach consistent with the conclusions reached in the other approaches or, if not, can inconsistencies be explained?

**Regarding land valuation:**
- If a sales comparison analysis was performed, was adequate market research performed to identify sales that are relevant to the valuation problem?
- Are the sales sufficiently verified and relevant to the effective date?
- Would market participants consider them to be reasonably comparable?
- Are there prior sales of the subject property that need to be analyzed?
- Is there adequate market support for the adjustments that were made?
- Were those factors that could not be supported by quantitative adjustment dealt with adequately using qualitative analysis in the reconciliation?
- Are the adjusted sale or unit prices within the range exhibited in the market?

**Regarding the cost approach:**
- Is the approach relevant to the appraisal assignment?
- Is the land value well supported?
- Was replacement or reproduction cost estimated?
- Is the effective age of the property used in the cost approach consistent with the physical condition reported?
- Are the cost estimates reliable and market-based?
- Do the cost estimates account for all of the costs?
- Are the sales used to extract depreciation from the market reliable?
- What method was used to support depreciation estimates?
- Were physical, functional, and external depreciation estimated accurately?
- Are the conclusions of the approach consistent with the conclusions reached in the other approaches or, if not, can inconsistencies be explained?

**Regarding the income capitalization approach:**
- Is the approach relevant to the appraisal assignment?
- Is there an adequate number of rental comparables?
- Are the rental properties comparable?
- Is there market support for the adjustments that were made?
- Is historical expense information available? If so, how meaningful is it?
- Are the expense projections in line with market estimates?
- Is there market support for the capitalization or discount rate?
- Does the method of capitalizing income reflect market practices?
- Are the conclusions of the approach consistent with the conclusions reached in the other approaches or, if not, can inconsistencies be explained?

---

\* Note that the building area considered may not be the same in each approach. For instance, gross building area may be used in the cost approach for an office building, but rentable area is typically applied in the income capitalization and sales comparison approaches.

BACK_DEFEXP-RR-003020

tion approach is based on leased fee income, do the values indicated by the sales comparison and cost approaches also reflect the value of the leased fee interest?

- Is the market area analysis consistent in the sales comparison, income capitalization, and cost approaches? For example, if values are increasing and there is good demand as indicated in the neighborhood description section of the appraisal report, is that description consistent with the market conditions illustrated in the application of the approaches to value?

In final reconciliation, all mathematical calculations should be checked, preferably by someone other than the person who performed them originally. Significant errors can lead to incorrect value indications, and even minor errors can diminish a client's confidence in an appraisal. Finally, the logic employed throughout the valuation process should be scrutinized, and appraisers should ask these additional questions:

- Do the approaches and methods applied consider all the available data and systematically lead to meaningful conclusions that relate directly to the intended use of the appraisal?
- Does the appraisal provide the information required to solve the client's problem? For example, if the client wants to establish a depreciation basis to compute federal income tax, does the appraisal allocate separate values to the improvements and the land? A client who contemplates remodeling will want information on the costs and benefits of this plan. If the client is considering whether to accept an offer to purchase, the appraiser may be asked to analyze the terms of the proposed contract.

## Final Opinion of Value

In an appraisal report, the final opinion of value may be stated as a single figure, as a range of values, or in relation to a benchmark amount (e.g., "not more than" or "not less than" a certain amount). A reconciliation section of a report consisting of boilerplate and stock comments does not often present useful information. A discussion of the data analyzed and its application to the subject, how the approaches apply to the subject, and other relevant information is essential to a meaningful reconciliation.

Most often, an opinion of value is reported as a single dollar amount, i.e., a point value at a particular point in time. Because of legal or other requirements, most clients require a point estimate of value.

A point estimate should be rounded to reflect the degree of precision that an appraiser can associate with the particular opinion of value. Often the manner in which a figure is rounded is a matter of convention—e.g., to two or three significant digits. For example, if the final value estimate is a six-digit number, the figure will likely be rounded to the nearest ten thousand or hundred thousand dollars. If it is a seven-digit number, it will likely be rounded to the nearest hundred thousand dollars.

Although appraisers typically do not provide a confidence rating with a value opinion, the reconciliation section of the appraisal report is a good place to convey the concept. If, for example, there were very few recent market transaction, or there has been a recent event that may have suddenly impacted market conditions, the appraisal report should convey that there is some risk inherent in the final value conclusion. The reduced level of confidence is not the fault of the appraiser. Rather, it is the result

BACK_DEFEXP-RR-003021

Copyrighted material licensed by Charles Brigden on September 17, 2020

of applying an analytical framework to an imperfect market. The appraiser is reflecting the anticipations of market participants and market participants may be dealing with uncertainty. In another situation, there may be plenty of sales to use in the sales comparison approach, and each sale may require very little adjustment. In this case, the appraiser will be able to convey a high level of confidence in the value opinion.

BACK_DEFEXP-RR-003022

BACK_DEFEXP-RR-003023

Copyrighted material licensed by Charles Brigden on September 17, 2020



# The Appraisal Report 33

The conclusions reached by appraisers in valuation analysis are communicated to the users of appraisals in appraisal reports, which may be written or oral. Most appraisal clients request written reports, and some have specific formats that they prefer. Regardless of whether an appraisal report is written or oral, it leads the reader from the identification of the appraisal problem through the relevant descriptive and supporting data to the analysis of that data and then to the appraiser's conclusion.

The length, type, and content of appraisal reports are dictated by the intended use, the type of value, ownership interest appraised, the nature and complexity of the problem to be solved, and, most importantly, the information needs of the intended users.

Reporting formats for residential and commercial appraisals vary. As long as the reporting requirements are met, valuers have a lot of flexibility in how they communicate their analyses and conclusions.

## Valuation Standards for Appraisal Reports

Valuation standards address the required content of a written or oral appraisal report. Standard C of the Appraisal Institute Standards of Valuation Practice covers appraisal reports as well as review reports. The International Valuation Standards address valuation reporting in IVS 103. For appraisals subject to the Uniform Standards of Professional Appraisal Practice, Standard 2 sets forth the minimum requirements for reporting an appraisal of real property. Standard 4 of USPAP addresses review reports, which are covered in depth in the next chapter of this text. SVP, IVS, and USPAP all require that the appraisal results be communicated clearly, accurately, and in a manner that is not misleading, and that the report contain sufficient information to enable all intended users to understand the report properly.

The Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA) establish standards for appraisal reporting content and documentation in appraisal assignments involving real property being acquired by the federal government. The

BACK_DEFEXP-RR-003024

UASFLA document summarizes the reporting requirements and includes a report documentation checklist in an appendix.

Appraisers may use any number of forms for reporting but should be wary of appraisal report forms that do not call for all of the information required under standards. Some appraisal report forms need to be supplemented with essential information for understanding the appraisal relating to the scope of work, intended use, intended user, and highest and best use. It is incumbent on appraisers to understand whether the form or format being used allows for compliance with the reporting requirements of the applicable standards.

## Oral Reports

An appraiser may communicate assignment results in an oral report when the circumstances or the needs of the client and other intended users do not require or warrant a written report. Oral reports may be communicated to the client and other intended users in person, by telephone, in a conference call or videoconference, or by other means. Expert testimony presented in a deposition or in court in which a value opinion is given is an oral appraisal report, unless the testifying expert previously transmitted a written report or summary of an oral report to the client. In USPAP, the reporting requirements for oral reports are set forth in Standards Rule 2-4, which states that, to the extent that is both possible and appropriate, an oral report must address the substantive matters set forth for a written appraisal report in Standards Rule 2-2. Oral reports must include the underlying bases of the appraisal, especially any extraordinary assumptions or hypothetical conditions used. After communicating an oral report, an appraiser must keep a summary of the oral report and all notes and data relevant to the assignment in the workfile so that, if asked at a later date (i.e., any time during the required record retention period), the appraiser could produce a report that would meet the minimum requirements for a written appraisal report under Standards Rule 2-2(a).

> **Components of a Workfile Required by USPAP**
>
> A workfile must include a true copy of the written appraisal report(s). A workfile for an oral appraisal report must include a summary of the oral report as well as a signed and dated certification. In USPAP, *workfile* is defined as "data, information, and documentation necessary to support the appraiser's opinions and conclusions and to show compliance with USPAP."

The organization and composition of an appraiser's workfile may vary so long as the file contents are retrievable by the appraiser during the required record retention period. The workfile can reference information that is located elsewhere—e.g., stored electronically on a computer, on a website, in another file, or at some other location.

## Written Appraisal Reports

Written appraisal reports may be form reports or narrative reports. Usually an appraisal report is presented in the format requested by the client, i.e., either a form report or a narrative report depending on the intended use of the appraisal. Even if a client asks for a report that does not include detailed information (e.g., a restricted appraisal report as defined in USPAP), an appraiser must undertake the analysis required by the assignment as established by the scope of work. In such a case, the

BACK_DEFEXP-RR-003025

Copyrighted material licensed by Charles Brigden on September 17, 2020

appraiser keeps all necessary material, research data, and documents used to prepare the appraisal in the workfile. Although appraisers may never need to provide written substantiation for value opinions that are submitted in abbreviated form, they may be asked to explain or defend their opinions at a later time.

## Form Appraisal Reports

Form reports are often needed by financial institutions, insurance companies, and government agencies. For example when Fannie Mae and Freddie Mac introduced the Uniform Residential Appraisal Report (URAR), it was the first form to be adopted by all the major governmental and quasi-governmental agencies (Fannie Mae, Freddie Mac, the Department of Housing and Urban Development, the Department of Veterans Affairs, the Department of Agriculture, and the Federal Home Administration) involved in residential mortgage lending activities. Since the URAR was last revised in 2005, many more forms have been developed by different institutions to cover a variety of appraisal reporting scenarios:

- Uniform Commercial/Industrial Appraisal Report
- Exterior-Only Inspection Residential Appraisal Report
- Individual Condominium Unit Appraisal Report
- Small Residential Income Property Appraisal Report
- ERC Summary Appraisal Report
- The Appraisal Institute's Residential Green and Energy Efficient Addendum and various AI Reports forms[1]

Form reports are required for the purchase and sale of most homes and existing mortgages on residential properties in the secondary mortgage market created by government agencies and private organizations. Because these entities review many appraisal reports, using a standard report form is both efficient and convenient. When a form is used, the parties responsible for reviewing the appraisal report know exactly where to find each category or item of data in the report. By completing the appraisal report on a form, an appraiser ensures that no item required by the reviewer is overlooked. Note that the space allowed on some common report forms may not be sufficient to accommodate the supporting data or reasoning necessary for credible assignment results. Appraisers will likely need to provide additional information in an addendum or supplement to the form.

Some form reports do not address all of the information required by valuation standards. These forms may be used only if they are augmented with supplemental information so that they meet the applicable reporting standards. In addition, most forms in use do not contain the certification statements required by the Certification Standard of the Appraisal Institute. Members, candidates, and practicing affiliates of the Appraisal Institute must therefore attach supplemental material when they use these forms. (Certification statements are discussed in a later section of this chapter.)

Appraisers who use form reports must be careful. The certification included in available software may be out of date or not compliant with Appraisal Institute

---

1. For an in-depth discussion of appraisal form reports, see the following Appraisal Institute guidebooks by Mark Rattermann: *Using the Individual Condominium Unit Appraisal Report Forms: Fannie Mae Form 1073 and Exterior-Only Form 1075* (2006); *Using Residential Appraisal Report Forms: URAR, Form 2055, and the Market Conditions Form,* 2nd ed. (2009); and *Using the Small Residential Income Property Appraisal Report: Fannie Mae Form 1025/Freddie Mac Form 72* (2006).

BACK_DEFEXP-RR-003026

requirements or with applicable state appraisal law. With the exception of the Appraisal Institute's AI Reports forms, the certification provided in a form report is not compliant with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. Additional statements are required to be compliant. It does not matter where these additional statements go in the report. They can be added to the certification page or presented in another logical place.

Guide Note 3 in the Guide Notes to the Standards of Professional Practice of the Appraisal Institute addresses the use of form reports in the appraisal of residential property. Forms are increasingly being used for appraisals of both residential and nonresidential properties, e.g., apartment, commercial, and industrial properties.

Appraisers must be careful to ensure that a report form does not dictate the scope of work to be applied in the valuation process. The methods and techniques employed in a valuation are determined by the nature of the specific appraisal problem, not by the type of report. If a report form does not provide for adequate presentation and discussion of all the analysis and data that an appraiser believes to be pertinent, that information must be added as a supplement.

For example, the space provided in the Uniform Residential Appraisal Report (URAR) for reporting the highest and best use of the property is limited. Because the creators and users of the form—e.g., Fannie Mae, Freddie Mac—only intend to make loans on single-unit residential properties, they can meet their informational needs with a simple yes-no question. If the answer is not yes—i.e., the current use is not the highest and best use—those entities will not make the loan because they are only lending on properties that are residential and are expected to continue as residential property for the life of the loan.

An appraiser's perspective is different, however, and the determination of highest and best use is central to the valuation process. The highest and best use section of a form report frequently must be supplemented. It is not sufficient to simply check the box to indicate that the highest and best use is "as improved." Some additional detail is required, even when the existing improvements do represent the highest and best use. USPAP's Standards Rule 2-2(a) includes language relating to highest and best use, specifying that an appraiser "summarize the support and rationale for that opinion." A brief statement can satisfy the requirements of the standards rule, but an appraiser must provide more than a checked box.

In 2011 and 2012, the government-sponsored entities (GSEs) active in the secondary mortgage market in the United States and the US Department of Housing and Urban Development developed the Uniform Appraisal Dataset (UAD) to be used with four of the Fannie Mae/Freddie Mac residential forms (1004/70, 2055, 1073/465, and 1075/466). The key element of the UAD is the development of common appraisal data definitions to be used in UAD-compliant appraisal forms. Although the appraisal forms were not changed at that time, sections of the form inputs later were changed to incorporate the new UAD language. In other words, the forms did not change, but how they are completed did. The inputs are now standardized to enable digital recognition. The GSEs now require this new language to be used in appraisal reports for single-unit dwellings and condominiums. Standardization has been imposed on the two- to four-unit form report as well. Some of the fields are required, while others are considered instruction fields. Many of the requirements are only directions as to how to format a date or how many decimal places to use in a given field.

BACK_DEFEXP-RR-003027

Copyrighted material licensed by Charles Brigden on September 17, 2020

The change to UAD language has allowed national mortgage market participants to use computer programs to compare and contrast the inputs from a single appraiser with that individual's prior appraisals and with appraisal reports prepared by other appraisers. As a result, if an appraiser reports that a comparable sale included 1.2 acres but another appraiser reported that the same property has 2.1 acres, a query can be sent to the second appraiser to confirm the data.

### The Uniform Residential Appraisal Report (URAR) and AI Reports Forms

Typically, addenda to the URAR form are needed to meet USPAP's reporting requirements (such as the inclusion of an estimate of exposure time). Moreover, members, candidates, and practicing affiliates of the Appraisal Institute will need to add the Appraisal Institute's certification statements. Supplementation will be needed to address the reporting requirements not covered by the form, in addition to a current certification as required by Standards Rule 2-3 of USPAP.

The revised URAR form is specifically used for mortgage lending purposes. (Page 1 of the URAR form is shown in Figure 33.1.) In 2005, the Appraisal Institute designed appraisal report forms for use in non-mortgage lending situations. Use of the Appraisal Institute's AI Reports forms is highly recommended when an appraisal does not need to meet Fannie Mae, Freddie Mac, FHA, or VA requirements. If an assignment is for a lender who is not concerned with these entities, use of the URAR is not required. For a nonlending client, the URAR is not appropriate. The form was designed specifically to meet lender needs. The scope of work is tailored to mortgage lending and so are the assumptions and limited conditions and the definition of value.

AI Reports forms are available to all appraisers at www.appraisal institute.org/professional-practice/professional-practice-documents/ai-reports. (Page 1 of the AI Reports Residential form is shown in Figure 33.2.) The forms are designed around the assignment parameters and the scope of work appropriate for the assignment. The scope of work best defines the needs of the client and intended user of the report and dictates what factors an appraiser considered during the valuation process.

### Narrative Appraisal Reports

In a narrative appraisal report, the most detailed and customizable format for reporting appraisal conclusions, an appraiser provides support and rationale for his or her opinions and conclusions to convince the reader of the soundness of the final opinion of value. In preparing a narrative appraisal report, descriptive sections should be separate from analysis and interpretation. Factual and descriptive data is usually presented in early sections of the report so that subsequent analysis and interpretation may refer to these facts and indicate how they influence the final opinion of value. Unnecessary duplication should be avoided. The presentation of data may depend on the nature and complexity of the valuation problem.

The research presented in a well-prepared appraisal report can be detailed, and the report should exhibit logical organization and sound reasoning. These basic attributes are enhanced by good composition, a fluid writing style, and clear expression. The use of technical jargon, legalese, and slang should be avoided. To communicate with the reader effectively, an appraiser should set forth the contents of the report as succinctly as possible. Figure 33.3 lists some principles of effective appraisal report writing.

An appraiser might not be present when the report is reviewed or examined, so the report is the appraiser's representative. A well-written report displays the ap-

BACK_DEFEXP-RR-003028

**Figure 33.1**   Page One of the Uniform Residential Appraisal Report Form

## Uniform Residential Appraisal Report          File #

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | | | |
|---|---|---|---|
| Property Address | City | State | Zip Code |
| Borrower | Owner of Public Record | County | |
| Legal Description | | | |
| Assessor's Parcel # | Tax Year | R.E. Taxes $ | |
| Neighborhood Name | Map Reference | Census Tract | |

Occupant ☐ Owner ☐ Tenant ☐ Vacant    Special Assessments $    ☐ PUD   HOA $    ☐ per year ☐ per month
Property Rights Appraised ☐ Fee Simple ☐ Leasehold ☐ Other (describe)
Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe)
Lender/Client    Address
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☐ No
Report data source(s) used, offering price(s), and date(s).

**CONTRACT**

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
|---|---|---|---|
| Location ☐ Urban ☐ Suburban ☐ Rural | Property Values ☐ Increasing ☐ Stable ☐ Declining | PRICE   AGE | One-Unit   % |
| Built-Up ☐ Over 75% ☐ 25–75% ☐ Under 25% | Demand/Supply ☐ Shortage ☐ In Balance ☐ Over Supply | $ (000)   (yrs) | 2-4 Unit   % |
| Growth ☐ Rapid ☐ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☐ 3–6 mths ☐ Over 6 mths | Low | Multi-Family   % |
| Neighborhood Boundaries | | High | Commercial   % |
| | | Pred. | Other   % |

Neighborhood Description

Market Conditions (including support for the above conclusions)

**SITE**

| Dimensions | Area | Shape | View |
|---|---|---|---|

Specific Zoning Classification    Zoning Description
Zoning Compliance ☐ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? ☐ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☐ | ☐ | Water | ☐ | ☐ | Street | ☐ | ☐ |
| Gas | ☐ | ☐ | Sanitary Sewer | ☐ | ☐ | Alley | ☐ | ☐ |

FEMA Special Flood Hazard Area ☐ Yes ☐ No  FEMA Flood Zone    FEMA Map #    FEMA Map Date
Are the utilities and off-site improvements typical for the market area? ☐ Yes ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☐ No  If Yes, describe

**IMPROVEMENTS**

| General Description | Foundation | Exterior Description  materials/condition | Interior  materials/condition |
|---|---|---|---|
| Units ☐ One ☐ One with Accessory Unit | ☐ Concrete Slab ☐ Crawl Space | Foundation Walls | Floors |
| # of Stories | ☐ Full Basement ☐ Partial Basement | Exterior Walls | Walls |
| Type ☐ Det. ☐ Att. ☐ S-Det./End Unit | Basement Area    sq. ft. | Roof Surface | Trim/Finish |
| ☐ Existing ☐ Proposed ☐ Under Const. | Basement Finish    % | Gutters & Downspouts | Bath Floor |
| Design (Style) | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type | Bath Wainscot |
| Year Built | Evidence of ☐ Infestation | Storm Sash/Insulated | Car Storage ☐ None |
| Effective Age (Yrs) | ☐ Dampness ☐ Settlement | Screens | ☐ Driveway  # of Cars |

Attic ☐ None   Heating ☐ FWA ☐ HWBB ☐ Radiant   Amenities ☐ Woodstove(s) #   Driveway Surface
☐ Drop Stair ☐ Stairs   ☐ Other    Fuel   ☐ Fireplace(s) #  ☐ Fence   ☐ Garage  # of Cars
☐ Floor ☐ Scuttle   Cooling ☐ Central Air Conditioning   ☐ Patio/Deck ☐ Porch   ☐ Carport  # of Cars
☐ Finished ☐ Heated   ☐ Individual ☐ Other   ☐ Pool ☐ Other   ☐ Att. ☐ Det. ☐ Built-in
Appliances ☐ Refrigerator ☐ Range/Oven ☐ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☐ Other (describe)
Finished area above grade contains:    Rooms    Bedrooms    Bath(s)    Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.)

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☐ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☐ Yes ☐ No  If No, describe

Freddie Mac Form 70  March 2005    Page 1 of 6    Fannie Mae Form 1004  March 2005

BACK_DEFEXP-RR-003029

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 625 of 722    Page
ID #16849

**Figure 33.2**  Page One of AI Reports Form 100.05

BACK_DEFEXP-RR-003030

---

**Figure 33.3**    Preparing a Narrative Appraisal Report

1. Clarify the organization of the report.
2. Reveal the organization visually (e.g., using the six-step market analysis process as an outline for the report).
3. Use standard publishing techniques to increase readability.
   · Typeface
   · Size
   · Line length
   · Justification
   · Creating emphasis
4. Graphics are powerful reporting tools.
5. Calculations need to be surrounded by white space.
6. Use tables and spreadsheets effectively.
7. Pie charts, line graphs, and bar graphs reveal relationships and trends.
8. Place graphics and exhibits where they communicate most effectively.
9. Label and number exhibits for easy reference.

Source: Alan Blankenship, *The Appraisal Writing Handbook* (Chicago: Appraisal Institute, 1998), Chapter 2.

---

praiser's professional competence. The following suggestions may help appraisers make a good impression:

- If a "hard copy" report is produced, the paper, cover, and binding of the report should be of good quality.
- The size and style of the type used should be readable. Graphics such as photographs, charts, and graphs should be carefully prepared, and white space should be used judiciously to highlight the important information. The style of headings and subheadings should be appropriate to the subject matter.
- Ideally, illustrations should be integrated within the text and presented where they are discussed. For example, a photograph of the subject property can be placed near the identification of the property. A neighborhood map could be included with the neighborhood description to show the location of the subject property. Illustrations that are not directly related to the narrative can be placed in the addenda.
- The contents of the report should be presented in clearly labeled sections that are identified in the table of contents.

### General Outline

Narrative appraisal reports will vary in content and organization, depending on the needs of the client and other intended users, but they all contain certain elements. Essentially, a narrative appraisal report follows the order of steps in the valuation process.

Most narrative appraisal reports have four major parts. The contents of each section may be formally divided with subheadings or presented in a continuous narrative. In either case, the major divisions of the report should be identified with individual headings. The four basic parts of a report are (1) the introduction, (2) identification of the appraisal problem and scope of work, (3) the presentation of data, and (4) the analysis of data and conclusions. Many reports have a fifth section, the addenda, that includes supplemental information and illustrative material that would interrupt the text.

BACK_DEFEXP-RR-003031

Copyrighted material licensed by Charles Brigden on September 17, 2020

The organization of narrative reports varies, but the outline in Figure 33.4 can be used as a general guide. The arrangement of items in this outline is flexible and can be adapted to almost any appraisal assignment and any type of real property. In practice, this outline would be adapted to the particular requirements of the assign-

---

**Figure 33.4**  **General Outline of a Narrative Appraisal Report**

**Part One—Introduction**
Title page
Letter of transmittal
Table of contents
Certification
Summary of conclusions

**Part Two—Identification of the Appraisal Problem and Scope of Work**
Identification of the client and other intended users
Statement of intended use
Identification of the subject real estate and description of the property rights appraised
Type and definition of value and source of definition
Effective date of opinion of value
Extraordinary assumptions, hypothetical conditions, and jurisdictional exceptions
General assumptions and limiting conditions
Scope of work

**Part Three—Presentation of Data**
Legal description
Identification of any personal property or other items that are not real property
Property history, including prior sales and current offers or listings
Market area, city, neighborhood, and location data
Land description
Improvement description
Taxes and assessment data

**Part Four—Analysis of Data and Conclusions**
Market analysis
Highest and best use analysis
Land or site value
Cost approach
Sales comparison approach
Income capitalization approach
Reconciliation and final opinion of value
Estimate of exposure time
Qualifications of the appraiser

**Addenda**
Photographs
Detailed legal description, if not included in the presentation of data
Detailed statistical data
Leases or lease summaries
Other appropriate information
Secondary exhibits

---

BACK_DEFEXP-RR-003032

ment and to suit the personal preferences of an appraiser and, more importantly, the client and other intended users.

### Part One—Introduction

*Title Page.* The title page lists the real property identification, the date of value, the name and address of the appraiser, and the name and address of the client.

*Letter of Transmittal.* Figure 33.5 illustrates a typical format for a letter of transmittal. The letter of transmittal formally presents the appraisal report to the client. It should be drafted in proper business style and be as brief as the character and nature of the assignment permit. A suitable letter of transmittal may include the following elements:

- Date of letter and salutation
- Street address of the property and a brief description, if necessary
- Statement identifying the interest in the property being appraised
- Statement that the property inspection and all necessary investigation and analyses were made by the appraiser

---

**Figure 33.5**   Sample Letter of Transmittal

June 1, 2019

\<Client name\>
\<Client organization\>
\<Street address\>
\<City, state, and ZIP\>

RE:   Appraisal of
      1585 Northwestern Highway
      Springfield, OR 29055

Dear \<Client\>:

In accordance with your request, I have appraised the above-referenced property. The attached report, containing XX pages, provides the data and reasoning used in reaching my opinions and conclusions.

The purpose of the appraisal is to develop an opinion of the market value of the fee simple estate of the property as of May 1, 2019. The intended use of the report is to assist in a permanent lending decision. My client, \<Client\>, is the sole intended user of this report. No other use or users are intended.

The subject real estate consists of a 30,000-sq.-ft. distribution warehouse facility located on a 3-acre site. In addition to the main building, the property includes paved parking for 60 vehicles, a loading dock area, and miscellaneous landscaping and signage.

A significant factor in this appraisal is that the region was affected by Hurricane A, a category 5 hurricane, in August 20XX.  Please refer to the discussion of this event and its effect on local market conditions on p. XX.

My opinions and conclusions are based on the scope of work described in this report and qualified by the definitions, assumptions, limiting conditions, and certifications set forth.

Based on my analysis, my opinion of the market value of the subject property, as set forth, documented, and qualified in the attached report under conditions prevailing on May 1, 2019, was:

**ONE MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS**
**$1,550,000**

\<Signature\>

\<State certificate or license no. (if appropriate)\>

---

BACK_DEFEXP-RR-003033

- Reference that the letter is accompanied by an appraisal report of a specified number of pages and identification of the appraisal problem and report format
- Type of value developed in the appraisal report
- Effective date of the appraisal
- Opinion of value
- Any extraordinary assumptions and hypothetical conditions
- Appraiser's signature

*Table of Contents.* The various sections of the report are customarily listed in order in the table of contents. The major divisions of the report and any subheadings used in the report should be shown here.

*Certification.* The certification usually follows the final opinion of value and must be signed by the appraiser. The certification states that the appraiser has personally conducted the appraisal in an unbiased, objective manner in accordance with professional standards.

Note that the proper term is *certification*, not *certificate*, *certificate of value*, or *certification of value*. The certification statements relate to the entire assignment and the manner in which it was completed, not just the value conclusion.

Whether the certification is included as part of the introduction or presented on a separate, signed page, certification is important because it establishes an appraiser's role, thereby protecting both the appraiser's integrity and the validity of the appraisal. An appraiser who signs any part of the report, including a letter of transmittal, must also provide a signed certification.

Certification requirements may change, so an appraiser must provide a certification that is applicable on the report date. To assist appraisers, the Appraisal Institute provides sample certification statements for written appraisal reports and written appraisal review reports on its website. These documents, which include both the statements required by USPAP and the statements required by the Appraisal Institute, can be downloaded and copied directly into appraisal reports.

The USPAP certification does not have to be exactly the same as the language used in Standards Rule 2-3, but it must be similar in content. (In contrast, the Appraisal Institute's certification statements must be reproduced verbatim.) Appraisers must be careful not to deviate from the intent of the language if they do not use the USPAP certification language exactly. Additions relevant to the assignment are permitted. The value conclusion need not be included in the certification. The certification need not be dated (except in the case of the certification retained in the workfile for an oral report).

The certification is an important part of an appraisal report. Only an appraiser can make such a statement. The report reader should know that the appraiser is committed to doing good work, which is confirmed by the certification statements.

*Summary of Conclusions.* When an appraisal report is long and complex, a summary of the major points and conclusions in the report may be useful. Such a statement, which is sometimes called an *executive summary*, is convenient for readers of the report, and that statement allows an appraiser to stress the major points considered in reaching the final opinion of value. It is critical that the information provided in the summary not conflict with the information in the body of the report. Although all

*The Appraisal Report* **615**

BACK_DEFEXP-RR-003034

### Certification Standard of the Appraisal Institute

The Certification Standard of the Appraisal Institute requires members, candidates, and practicing affiliates of the Appraisal Institute to include the following statements:

· The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

· The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

Also, one of the following statements must be included in any report prepared by a designated member of the Appraisal Institute (according to Certification Standard Rules 1-3):

*Either*

As of the date of this report, I (or Designated Member's name or Designated Members' names) have/has completed the continuing education program for Designated Members of the Appraisal Institute.

*or*

As of the date of this report, I (or Designated Member's name or Designated Members' names) have not/has not completed the continuing education program for Designated Members of the Appraisal Institute.

Candidates of the Appraisal Institute must include one of the following statements in any report prepared by those individuals (according to Certification Standard Rules 1-4 and 1-5):

*Either*

As of the date of this report, I (or name or names) have/has completed the Standards and Ethics Education Requirements for Candidates of the Appraisal Institute.

*or*

As of the date of this report, I (or name or names) have not/has not completed the Standards and Ethics Education Requirements for Candidates of the Appraisal Institute.

Practicing Affiliates of the Appraisal Institute must include one of the following statements in any report prepared by those individuals (according to Certification Standard Rules 1-4 and 1-5):

*Either*

As of the date of this report, I (or name or names) have/has completed the Standards and Ethics Education Requirements for Practicing Affiliates of the Appraisal Institute.

*or*

As of the date of this report, I (or name or names) have not/has not completed the Standards and Ethics Education Requirements for Practicing Affiliates of the Appraisal Institute.

Once a practicing affiliate who is not an Appraisal Institute designated member has completed at least one five-year continuing education cycle in which he or she was required to fulfill the Points and Standards and Ethics Education Requirements, the practicing affiliate must include one of the following statements in the certifications of his or her written reports (according to Certification Standard Rule 1-5):

*Either*

As of the date of this report, I (or name or names) have/has completed the continuing education program for Practicing Affiliates of the Appraisal Institute

*or*

As of the date of this report, I (or name or names) have not/has not completed the continuing education program for Practicing Affiliates of the Appraisal Institute.

BACK_DEFEXP-RR-003035

of the items listed below do not apply to every appraisal assignment, the following information is frequently included in a summary:

- Brief identification of the property (i.e., the interest appraised and real estate)
- Any extraordinary assumptions or hypothetical conditions
- Determinations of the highest and best use of the land as though vacant and of the property as improved
- Distinguishing property characteristics, such as deferred maintenance or unique features that affect value
- Land value opinion
- Value indication from the cost approach
- Value indication from the sales comparison approach
- Value indication from the income capitalization approach
- Final opinion of defined value

Figure 33.6 illustrates one possible format for a summary of conclusions included in an appraisal report.

---

**Figure 33.6**  **Sample Summary of Facts and Conclusions**

| | |
|---|---|
| Property type: | 30,000-sq.-ft. distribution warehouse facility |
| Location: | 1585 Northwestern Highway<br>Springfield, OR 29055 |
| Date of value opinion: | May 1, 2019 |
| Property rights appraised: | Fee simple estate |
| Site: | A three-acre interior site that is fully improved and appears to conform to all applicable ordinances |
| Improvements: | A two-year-old masonry warehouse facility that contains 30,000 square feet of gross area. The finished office area of the building consists of 3,000 square feet, or 10%, which is typical for this type of building in this area. There is paved parking for 60 vehicles, miscellaneous landscaping, and one pole sign. |
| Client: | <Client> |
| Intended use: | To provide a value opinion and documentation that will assist in a permanent lending decision |
| Intended user(s): | <Client> |
| Zoning: | I-1 Industrial |
| Highest and best use: | |
|    As though vacant | A masonry distribution facility of 25,000 to 30,000 square feet with 3% to 5% office finish |
|    As improved | Current use as a distribution warehouse facility is optimum use |
| Site value: | $350,000 |
| Cost approach: | $1,610,000 |
| Sales comparison approach: | $1,525,000 |
| Income capitalization approach: | $1,565,000 |
| Final value opinion: | $1,550,000 |

---

BACK_DEFEXP-RR-003036

**Part Two—Identification of the Appraisal Problem and Scope of Work**

*Identification of the Client and Other Intended Users.* An appraiser who writes a report is writing to his or her client and other intended users. They are the audience for the analysis and conclusions. Valuation standards require that the report contain sufficient information to enable the intended users to understand the report properly. To ensure that the report contains sufficient information, an appraiser must first know who the intended users are.

It is a misconception that the "addressee" named in the report is necessarily the client. Although appraisers often assume it is understood that the addressee is the client, this may or may not be the case. The report must specifically identify the client, whether the client is an individual or an entity.

The client is always considered an intended user but is not necessarily the only intended user. Appraisers are responsible for reporting conclusions and analyses in a manner that is clear and understandable to all intended users identified at the time of the assignment.

*Statement of Intended Use.* The report must include a clear statement of how the appraiser intends the appraisal to be used, which should align with the client's reason for requesting it.

*Identification of Subject Property.* A complete legal description is used to identify the subject property. Depending on the nature of the subject property, an appraiser may need to provide more or less detail to identify the subject property clearly. For example, a parcel of raw land may need to be identified by a detailed metes and bounds description, or an assessor's identifying parcel number, whereas an existing home might be identified simply by a street address. Maps and surveys can be used if the sources are adequate and clear.

*Identification of Property Rights Appraised.* In identifying the subject property, an appraiser must state and describe all the rights or interests being valued. If helpful to the intended users, definitions of the rights or interests should be included. More discussion is warranted in appraisals of partial interests in property or limited rights such as surface or mineral rights. Other encumbrances such as easements, mortgages, and special occupancy or use requirements should also be identified and explained in relation to the defined value to be developed. Personal property and other items that are not real property should be identified.

*Type and Definition of Value.* The definition of the type of value being appraised is included in the report to eliminate any confusion in the mind of the intended user (or users) or other readers of the report. (Definitions of various types of value are cited in Chapter 6.) USPAP also requires that the source of the value definition be cited.

*Effective Date.* An appraisal assignment may call for one or more of the following:

- A current value opinion
- A value opinion as of a retrospective date
- A value opinion as of a prospective date

It is essential to report the date as of which the value conclusion is applicable. Commonly, the date of the opinion of value and the date of the inspection of the property are the same for appraisals of current market value. If the date of inspection differs

BACK_DEFEXP-RR-003037

Copyrighted material licensed by Charles Brigden on September 17, 2020

from the date of the opinion of value, then both dates should be noted in the appraisal report. If more than one value opinion is provided within the appraisal report, the effective date for each value opinion must be provided.

***Extraordinary (or Special) Assumptions, Hypothetical Conditions, and Jurisdictional Exceptions.*** When a value opinion is subject to an extraordinary assumption or hypothetical condition, the report must clearly and conspicuously disclose the assumption or condition and state that its use might have affected the value conclusion. In the rare case of a jurisdictional exception, the report must identify the law or regulation that precludes the appraiser from complying with a part or parts of professional standards. The report must also cite the portion or portions of the professional standards that are excepted because of the law or regulation.

***General Assumptions and Limiting Conditions.*** General assumptions and limiting conditions may be stated in the letter of transmittal, but they are usually included as separate pages in the report. The general assumptions found in a typical appraisal report deal with issues such as legal and title considerations, liens and encumbrances, property management, information furnished by others (e.g., engineering studies, surveys), concealment of hazardous substances on the property, and compliance with zoning regulations and local, state, and federal laws. General assumptions and limiting conditions should not be treated as boilerplate in the report, although they may be typically applicable to almost all assignments. (Figure 33.7 shows examples of typical general assumptions and limiting conditions.)

***Scope of Work.*** A clear and accurate description of the scope of work performed in a specific appraisal assignment helps the intended users understand the context of the appraisal, and professional standards require that an appraisal report include enough information to allow the intended users to understand the scope of work performed. (For detailed information on scope of work, see Chapter 8 of this text.)

Providing a freestanding section in the appraisal report on the scope of work helps the intended user find the discussion of what the appraiser did to solve the appraisal problem, why the activities were performed, and who provided significant professional assistance in the appraisal process. Alternatively, the scope of work of the assignment can be discussed throughout the appraisal report within each respective section, e.g., discussion of the scope of the research and analysis of comparable sales in the sales comparison approach section of the report.

Whether scope of work is discussed in its own section, throughout the appraisal report, or in some combination of the two, the scope of work discussion must be clear and not misleading.

### Part Three—Presentation of Data
***Legal Description.*** The subject real estate is identified so that it cannot be confused with any other parcel of real estate. A street address may not be sufficient. Identification of the property being appraised can be achieved by including a full legal description of the property in the report or by reference to a unique identifying parcel number. When a copy of the official plat or an assessment map is used, an appraiser may refer to it at this point and present it on a facing or following page. If an official plat is unavailable, an appraiser can describe the property by name, specifying the side of the street on which the property fronts, the street address, and the lot and block number.

BACK_DEFEXP-RR-003038

**Figure 33.7** General Assumptions and Limiting Conditions

The following assumptions and limiting conditions are commonly found in appraisal reports, but the specific wording of the items and the inclusion of a specific item may not be applicable to every assignment:

This appraisal has been made with the following general assumptions:

- Title to the property is assumed to be good and marketable unless otherwise stated.
- The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.
- Responsible ownership and competent property management are assumed.
- Information furnished by others is believed to be reliable, but no warranty is given for its accuracy.
- All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.
- It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.
- It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated in the appraisal report.
- It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been described in the appraisal report.
- It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.
- It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.
- Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.
- The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

This appraisal has been made with the following general limiting conditions:

- No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations.
- Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if they are.

Providing a photograph of the subject property on a facing page can enhance this section of the report.

*Property History.* When the value opinion to be developed is market value, USPAP, SVP, and other appraisal standards require that current agreements of sale, options, and listings of the subject property as well as sales of the subject property that occurred within three years prior to the effective date of value be analyzed and addressed in the appraisal report if available in the normal course of business. A discussion of how the value estimate compares with recent sales of the subject is helpful to the reader

BACK_DEFEXP-RR-003039

and is required by many clients. USPAP has no requirement to analyze the sales history of each comparable sale. However, Fannie Mae, Freddie Mac, and certain other government bodies ask for sales histories of comparable properties, as reflected on the URAR form. The Uniform Standards for Federal Land Acquisitions require sales of the subject transacted within the past ten years to be reported.

For properties other than one-unit residences, recent changes in the property's operations should be addressed. Historical property data may include information on

- Original assemblage, acquisition, or construction costs
- Expenditures for capital additions or modernization
- Transfers of ownership
- Operating statements and financial data
- Casualty loss experience
- History and type of occupancy
- Any other facts that may pertain to or affect the computations, estimates, or conclusions presented in the report

*Market Area, City, and Neighborhood Data.* Relevant facts about the subject property's market area, city, and neighborhood should be discussed in the report. (The use and reliability of different types of data in relation to various classifications of property and specific appraisal problems are discussed in Chapters 9 and 11.) An appraiser weighs and considers all pertinent factors in data analysis, but the report itself should discuss only the data found to be significant to the appraisal problem. Both positive and negative aspects of the market area should be discussed. If an appraiser only provides data in support of either positive or negative factors, the report will be misleading, which is evidence of bias and a lack of compliance with the ethical rules for professional conduct.

The amount of neighborhood and location data required depends on the information needs of the intended users. For example, when an appraisal is prepared for an out-of-town client who is unfamiliar with the property and the community, it may be wise to include more community and neighborhood data than would be needed by a local client.

An appraiser should also note the presence of special amenities or detrimental conditions in the neighborhood and provide reasons or data to support any conclusions about these factors. For example, if an appraiser states that the market area is growing, actual growth figures or building projections supporting that assertion should be included in the report. If a report states that a neighborhood is in decline due to abnormal deterioration or poor maintenance, an appraiser might refer to specific properties that exhibit these detrimental conditions or use photographs to illustrate neighborhood conditions. Photographs can also be used to show positive and negative value influences. Reviewers have access to aerial photographs and maps on Google Earth and other internet sites and can easily identify these influences. It is incumbent on appraisers to report these positive and negative influences in the neighborhood or market area analysis.

*Land Description.* Pertinent facts about the subject site belong in the land description section. Land description involves three different aspects of the subject property's site:

- Physical characteristics
- Legal characteristics
- Economic characteristics

BACK_DEFEXP-RR-003040

Relevant physical site data may include descriptions of the following:

- The property's frontage, depth, site area, topography, and shape
- Soil and subsoil conditions
- Utilities
- Any improvements that benefit or harm the site

In the land description section of an appraisal report, an appraiser should offer a conclusion as to the utility or adaptability of the site for existing or proposed improvements.

When significant to the appraisal problem, zoning and private restrictions (such as easements) should be discussed in detail. The report should provide sufficient land use data to help the intended users understand the limitations that zoning regulations place on the use or development of the site. If the appraiser needs to explore the possibility of a zoning change, this analysis should also be addressed. Other existing public and private restrictions such as floodplain regulations, scenic easements, wetland restrictions, or covenants, conditions, and restrictions (CC&Rs) should be discussed and their effect on the utility and value of the property described.

*Improvement Description.* In the description of improvements section of a report, all building and improvement data relevant to the appraisal problem is presented and discussed. Although an appraiser considers and processes aa great deal of data in the course of an appraisal, only significant property characteristics that influence the value conclusion are presented in the report. These characteristics may include the following:

- Actual and effective building age
- Building size
- Number and size of units
- Structural and construction details
- Mechanical equipment
- Physical condition
- Functional utility or inutility

Property information may be supported with drawings, photographs, floor plans, and elevations. If the description of structural details and mechanical equipment is long, an outline may be used in the body of the report to emphasize the important items, and full details may be included in the addenda.

*Tax and Assessment Data.* Economic characteristics of a property that may have an effect on its value and should be discussed in the appraisal report include

- Real estate taxes
- Special assessments
- Development bonds
- Facilities benefit districts or other public encumbrances affecting the site

Current assessed values and ad valorem tax rates should be reported, and, if relevant to the assignment analyses or conclusions, a calculation of the current annual tax load of the subject property should be included in the appraisal report. Existing assessment trends or prospective changes in tax rates should be analyzed and reported. The likelihood and potential effect of any overassessment or underassessment can be addressed.

BACK_DEFEXP-RR-003041

Copyrighted material licensed by Charles Brigden on September 17, 2020

It may be appropriate to discuss the tax assessment or tax load on the subject property in relation to the taxes on other properties, particularly if the difference is significant.

### Part Four—Analysis of Data and Conclusions

*Market Analysis.* Once an appraiser has gathered and presented all the data relevant to the subject property and the valuation problem, the stage is set for the presentation of the appraiser's detailed analysis of the market for the subject property. Many appraisers structure this discussion around a six-step market analysis process, which systematically answers a series of questions that a reader of the appraisal report might ask. The conclusions of market analysis provide support for the analysis of alternative land uses and ultimately the highest and best use conclusion. Market analysis also provides economic data used in the application of the approaches to value.

*Highest and Best Use.* For an appraisal of market value, the appraisal report must set forth a highest and best use opinion, including identification and analysis of the effect on use and value of existing land use regulations, reasonably probable modifications of those regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends, as outlined in appraisal standards.

It is a not appropriate to present only a statement of the appraiser's highest and best use conclusion. This is incorrect. An appraiser must summarize his or her analysis and, if the objective is market value, some analysis of highest and best use is required. In some cases, that analysis is quick and the highest and best use conclusion is obvious—e.g., in the valuation of a single-unit residence located in a subdivision of similar houses where there is little chance that a likely buyer would demolish the house and modification of the improvements would not significantly increase the value above the cost. However, Standards Rule 2-2(a) of USPAP still requires a summary of the support and rationale for the highest and best use opinion.

It is not necessary to repeat sections of the report in the highest and best use analysis. Report sections are not intended to stand alone. The market analysis and other descriptive sections of the report can be used to support highest and best use conclusions as well as the valuation sections. Material from other report sections may be referenced in the highest and best use section to support the analysis and conclusions.

*Land or Site Value.* If land is valued as though vacant, a section of the report must address this analysis. In the land value section, market data is presented along with an analysis of the data and reasoning that lead to the land value opinion. The factors that influence land value should be presented in a clear and precise manner, and the narrative should lead the reader to the land value opinion.

*Approaches to Value.* In developing an opinion of value, an appraiser applies the approaches to value that are required to produce credible assignment results. In the report, the appraiser describes the application of each approach and presents the factual data, analysis, and reasoning leading to the value indication.

If the intended users are not familiar with the mechanics of the three approaches to value, the appraiser should briefly explain the procedures applied. The extent of explanation required depends on the circumstances of the assignment and knowledge of the intended users. Simple statements that describe what is included in each of the three approaches (such as those provided in Figure 33.8) can help readers better understand the report.

*The Appraisal Report*    **623**

BACK_DEFEXP-RR-003042

---

**Figure 33.8**  Descriptions of the Approaches to Value—Examples

The approaches to value could be described in an appraisal report as follows:

In the sales comparison approach, properties similar to the subject property that have been sold recently or for which listing prices or offers are known are compared to the subject property. Data from generally comparable properties is used, and comparisons are made to demonstrate a probable price at which the subject property would sell if offered on the market.

In the cost approach, an estimated reproduction or replacement cost of the building and site improvements as of the date of appraisal is developed (including an estimate of entrepreneurial profit or incentive), and an estimate of the losses in value (which is known as depreciation) that have taken place due to wear and tear, design and plan deficiencies, or external influences is subtracted. An estimate of the value of the land is then added to this depreciated building cost estimate. The total represents the value indicated by the cost approach.

In the income capitalization approach, the potential income of the property is calculated and deductions are made for vacancy and collection loss and for expenses. The prospective net operating income of the property is then estimated. To support this estimate, operating statements for the subject property in previous years and for comparable properties are reviewed. An applicable capitalization method and appropriate capitalization rates are developed and used in calculations that lead to an indication of value.

Note that the description of the approaches to value may be more or less detailed depending on the level of detail required by the report format and the sophistication of the client.

---

***Reconciliation of Value Indications.*** Valuation standards require reconciliation of the data within each approach as well as final reconciliation of the approaches used, except in cases where only one approach is deemed necessary for credible assignment results. In that case, there is only one reconciliation. That is, the reconciliation of value indications within the application of that one approach applied *is* the final reconciliation.

A reconciliation section consisting of boilerplate and stock comments does not often present useful information. The final reconciliation section of the report includes a discussion of the data used, its application to the subject, how the approaches apply to the subject, and other information that is essential to a meaningful understanding of the appraiser's conclusions. The appraiser considers the strengths and weaknesses of each approach, the availability and reliability of the data, and other concerns. The reconciliation of value indications should lead the reader logically to the final opinion of value.

***Qualifications of the Appraiser.*** An appraiser's qualifications may be included in the report as evidence of the appraiser's competence to perform the assignment. These qualifications may include facts concerning the following:

- Professional experience
- Educational background and training
- Business, professional, and academic affiliations and activities
- Typical clients
- The types of properties appraised and the nature of the appraisal assignments undertaken

Misrepresentation of qualifications or presenting misleading information regarding qualifications is a breach of professional ethics. Ethical Rule 5-5 of the Appraisal Institute's Code of Professional Ethics states, "It is unethical to prepare or use in any manner a resume or statement of qualifications that is misleading."

BACK_DEFEXP-RR-003043

Copyrighted material licensed by Charles Brigden on September 17, 2020

### Addenda

Depending on the size and complexity of the appraisal assignment, supplementary material may be added to the report to present information that would interrupt the narrative. The following items may be included in the addenda, if they have not already been incorporated into the body of the report:

- Plot plan
- Plans and elevations of buildings
- Photographs of properties referred to in the report
- City, neighborhood, and other maps
- Charts and graphs
- Historical income and expense data
- Building specifications
- Detailed estimates of the reproduction or replacement costs of buildings
- Sales and listing data
- Leases and lease abstracts

Illustrations of many of the addenda items listed above can be seen in earlier sections of this book.

BACK_DEFEXP-RR-003044

BACK_DEFEXP-RR-003045

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Review 34

In common usage, the term *review* means to examine or critique. In appraisal practice, *review* has a very specific meaning. A review is an opinion about the quality of another appraiser's work, where that work involved an appraisal or review. Review is a valuation-related service that many different types of clients may need. The extent and nature of a review is a scope of work decision reached jointly by an appraiser and a client. There are distinct best practices and professional standards that apply when appraisers provide this type of service.

For the purposes of the discussion in this chapter, a *reviewer* is an appraiser performing a review, an *appraiser* is an appraiser whose work is being reviewed, and the

## The Evolving Usages of *Appraisal Review* and *Review*

Historically, the valuation profession has referred to the common practice of providing a professional opinion on the work of another appraiser as an *appraisal review*. Since the debut of the term in the professional literature in 1945, the discipline has matured through the publication of journal articles and books on the subject, the development of specific professional standards, and the more recent development of professional education devoted to the subject, which can lead to a professional designation for specialists trained in the practice.

The original coinage of *appraisal review* seemed to limit the practice to a "review of an appraisal," even though modern thinking acknowledges that appraisers may perform reviews of both appraisals and reviews. This scrutiny of the descriptive label has led to a more precise and broadly inclusive usage of simply *review* to describe an opinion of another appraiser's work, whether the work in question is an appraisal or another review. That more succinct label has not yet achieved complete acceptance. For example, the Uniform Standards of Professional Appraisal Practice (USPAP) document continues to use the term *appraisal review*, while the Appraisal Institute's Standards of Valuation Practice (SVP) use *review*.

The SVP defines a *review* as "the act or process of developing and communicating an opinion to a client about the quality of another's appraisal or review report." This slightly differs from how USPAP defines *appraisal review*. In the SVP definition, the party whose work is under review is not specifically identified as an appraiser. For example, a valuation professional may review the report of an economist or a real estate agent. In this case, the review can appropriately be performed in compliance with both USPAP (the applicable general rules) and the SVP (the applicable performance standards).

*subject of the review* is the work being reviewed. The subject of a review could be all or part of an appraisal report or review report. It could be an oral appraisal report or oral review report as well. All or part of an appraiser's workfile could be the subject of a review, either in conjunction with or in addition to a written or oral appraisal report.[1] A review may be limited only to certain parts of an appraisal report, e.g., the review may be performed to evaluate the report's compliance with standards. The focus and extent of the review process is always a scope of work decision.

Most often, the subject of a review is an appraisal report prepared by another appraiser. When that is the case, the review may or may not include an opinion about the appraiser's value conclusion.

Under USPAP, a service is *not* appraisal review if the work under review was prepared by a nonappraiser. For example, an appraiser may be asked to "review" a broker's price opinion (BPO) prepared by a real estate agent. While an appraiser may certainly provide this service, it is not *appraisal review*. However, if an appraiser agrees or disagrees with the BPO presented by the nonappraiser, the appraiser would at that point be providing an *appraisal*, which would be subject to professional standards relating to appraisal.

An example of a service that is *not* a review under USPAP, the SVP, or the International Valuation Standards (IVS) is one in which only facts about the work of another appraiser are stated—for example, "the capitalization rate applied in the income capitalization approach was 10%," or "the appraisal report contained all items required by USPAP for an appraisal report." However, if a reviewer expresses the opinion that the appraisal "complied with USPAP," the reviewer would be providing a review because making a determination about standards compliance involves making a determination about quality.

For a service to be a review, the communication of the reviewer's opinions and conclusions must be provided to a client. If an appraiser provides an opinion about the quality of another appraiser's work only to the appraiser who performed the work, no review service is being provided. In that scenario, one appraiser is simply providing feedback to another. This is a common practice among appraisers and serves to advance appraiser competence.

A review should never be used as an opportunity to discredit another appraiser.[2] Nor should a reviewer criticize solely for the sake of criticizing. A reviewer's findings must be supported by evidence and logic (i.e., data and analysis). A reviewer must at all times be aware that the role of a reviewer is to provide an unbiased, objective opinion about the quality of the work under review. This stance must be maintained regardless of the reason for the review. For instance, in litigation work, the role of the reviewer's client (usually an attorney) will be to advocate for the client's cause or objective. A reviewer, however, cannot assume such a role but instead must remain an impartial third party whose role is to provide unbiased, objective information to the client about matters pertaining to the quality of the work under review.

In a review assignment, it is possible that a reviewer will not find any errors or weaknesses in the work being reviewed. The belief that a review report *must* mention something negative about the work under review is incompatible with ethical practice.

---

1. The review of a workfile could pose challenges because the appraiser's workfile is not required to be understandable to parties other than the appraiser who prepared it. The workfile might include the appraiser's shorthand notes that might not make sense to others.

2. Note that in litigation, judges, lawyers, and court decisions often refer to a review as a "rebuttal report." However, whenever an appraiser comments on the quality of another appraiser's work, it is always a review service that must be performed in compliance with the professional standards that it is subject to.

BACK_DEFEXP-RR-003047

Reviewers must also keep in mind that their role is to review the work of appraisers, not the appraisers themselves. In this regard, reviewers must be careful about making statements about the competency of an appraiser. While substandard work by an appraiser may suggest a lack of competency, reviewers should refrain from expressing judgments about the individual and instead express judgments about the work under review.

## Why Reviews Are Needed

Reviews are performed to reinforce a client's confidence in the credibility of the work and its conclusions. A review, like an appraisal, is a decision-making tool. One use of this tool is understanding risk. A user of an appraiser's work (or anyone else who relies on an appraiser's work, such as a judge or jury) needs to be comfortable with the opinion that the user will rely on, and a review provides the yardstick for measuring the user's comfort level. The appraisal profession is no different from other professions in that clients often seek second opinions from other professionals. Obtaining reviews is a prudent business practice for users of appraisal services.

Reviews are critical to the decision-making processes of investors and assist judges and juries in reaching informed decisions. Reviews are also critical for regulated lending institutions. The review requirements of US lenders may be tailored to their specific policies and procedures, which include compliance with the requirements of federal agencies, most notably the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Mortgage insurers have unique appraisal requirements, as do federal and quasi-governmental agencies that conduct reviews as a normal part of their appraisal acceptance and audit procedures and of their pre- and post-funding reviews. State and local government agencies such as highway departments conduct reviews in conjunction with the acquisition of rights of way and have specific appraisal requirements for condemnation proceedings. Reviews are also critical in litigation and other dispute resolution processes where the value of property is a pivotal question.

Reviews may be performed for quality control purposes, either within an appraisal firm or by a user of appraisal services. However, when prepared within the appraisal office for quality control purposes, the activity is not *review* as long as the results are not communicated to a client. Some client groups, such as government agencies and lending institutions, have quality control policies that call for regular, periodic review of some segment of the appraisals they obtain. These quality control reviews may serve to provide important lessons in hindsight for an appraiser, an appraisal firm, or a user of appraisal services.

## Who Can Prepare Reviews?

While anyone might form an opinion about an appraiser's work, reviews as defined in valuation standards are prepared by qualified appraisers according to those standards.[3]

---

3.  The term *compliance review* has been used to describe a review performed by a nonappraiser or by an individual who may be an appraiser but is not acting as an appraiser when providing the service. These reviews are generally for the purposes of checking factual accuracy or completeness only, not for evaluating the quality of the valuation work. For example, individuals involved in loan processing often review appraisals to check their completeness for loan underwriting purposes, and attorneys often review appraisals to check their completeness and factual accuracy for litigation purposes. Nonappraisers are not expected to have appraisal competency and independence, and thus they are not expected to comply with professional appraisal standards.

BACK_DEFEXP-RR-003048

Appraisers are retained to perform these services because they possess competency in valuation methods and techniques and because they are independent, objective, and impartial. Freedom from bias is a key characteristic of a qualified reviewer.

In the United States, state appraiser licensing laws might require that a reviewer be a licensed or certified appraiser in the state where the real property that is involved in the assignment is located. A reviewer would be well advised to check with the applicable state appraiser regulatory body before accepting a review assignment. A review for a federally regulated lender must be prepared by a state-licensed or -certified appraiser if the reviewer provides a different opinion of value and the lender relies on that reviewer's opinion.[4]

Because a defining characteristic of a professional appraiser is competency in valuation methods and techniques, an appraiser acting as a reviewer must likewise have the competency needed to provide credible appraisal reviews. However, the competency level needed by the reviewer is different from the competency level needed by the appraiser. The competency level needed by reviewers is dependent upon the reviewer's scope of work. For instance, if the reviewer's scope of work includes developing an opinion about the value of the property, then market area and geographic area competency become very important. They may be less important if the reviewer's scope of work does not include agreeing or disagreeing with the appraiser's value conclusion.

A qualified reviewer generally has expertise with the property type involved in the work being reviewed and with the methods applicable to the valuation of that property type. A qualified reviewer also has expertise in review techniques, can identify the strengths and weaknesses of the work under review, and can discern between major and minor errors and omissions.

Like an appraiser in an appraisal assignment, a reviewer must be able to judge the level of competency needed for the review assignment prior to accepting it, and then judge whether he or she has that requisite competency. This requires a good understanding of the assignment—including the client's problem to be solved, the nature of the property involved, the intended use, and applicable laws and regulations—at the outset. Reviewers must also have a good understanding of their own skill sets.

Professional standards include competency requirements applicable to reviewers. For example, USPAP's Competency Rule and Standard B of the SVP apply to appraisers acting as reviewers. The Code of Professional Ethics (CPE) of the Appraisal Institute also contains requirements relating to competency. These require a reviewer (or appraiser) to understand the problem to be solved in the assignment and the competency level needed to solve it. Any lack of competency must be disclosed to the client at the time of the assignment or as soon as it is discovered. If the reviewer (or appraiser) is to proceed with the assignment, he or she must attain the needed competency. The report subsequently provided to the client must disclose the initial lack of competency and the steps taken to attain it.

A lack of competency will likely manifest itself in the quality of a reviewer's work. Without the requisite competency, the reviewer might overlook important issues or fail to discern between significant and insignificant problems in the work under review. This will result in a review that lacks sufficient credibility for its intended use.

---

4.   Interagency Appraisal and Evaluation Guidelines, December 2010, section XV.

BACK_DEFEXP-RR-003049

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Applicability of Professional Valuation Standards

When an individual is "acting as an appraiser"—i.e., the client has engaged the individual with the expectation that the individual has valuation expertise and is independent, unbiased, and objective—professional standards apply to whatever service is being provided. Standard B of the SVP applies to developing reviews and Standard C applies to reporting. In USPAP, Standards 3 and 4 address the development and reporting of a review. Reviewers may be required to comply with other standards, laws, or regulations when preparing reviews. A reviewer must identify at the outset the standards, laws, and regulations applicable to the assignment as well as any additional client requirements. For example, the Uniform Appraisal Standards for Federal Land Acquisition (UASFLA) include specific requirements for review. When those standards apply to an assignment, the reviewer must follow those requirements.

When performing fee review work for Fannie Mae, Freddie Mac, FHA, or the VA, reviewers must follow specific guidelines and use a specific review reporting form. This form (Fannie Mae Form 2000/Freddie Mac Form 1032) sets forth a minimum scope of work for reviewers, which includes agreeing or disagreeing with the appraiser's value. In accepting an assignment using the form, a reviewer agrees that the scope of work will include this determination. This agreement or disagreement is an appraisal opinion and must be made in compliance with appraisal development standards. If the reviewer's scope of work does not include agreeing or disagreeing with the appraiser's value presented in the appraisal report, then the review will not be acceptable for the purposes of those governmental and government-sponsored enterprise clients or intended users.

## Structuring a Review Assignment

The review process is an organizational scheme for thinking about the scope of work of a review assignment and how to complete the assignment. This process provides reviewers with a broad outline to ensure that key areas are being addressed. It also gives appraisers insight into the thought process of reviewers and helps clients communicate with reviewers on the scope of work of their assignments. The seven steps of the review process are as follows:

1.  Identify the problem
2.  Determine the reviewer's scope of work
3.  Examine the work under review
4.  Develop opinions about the analyses, opinions, and conclusions in the work under review
5.  Develop opinions about the report under review
6.  Develop the reviewer's own opinion of value, when applicable
7.  Prepare the review report, consistent with the intended use of the review

Different steps in the application of the process will be emphasized depending on the scope of work of a specific review assignment.

The review process is similar to the valuation process. The connections between the two are illustrated in Figure 34.1. Steps 1 and 2 and the final step of each process are directly analogous. Steps 3 through 6 of the review process cover similar tasks as Step 3 through 7 in the valuation process. In a specific assignment, a reviewer may not need to

BACK_DEFEXP-RR-003050



**Figure 34.1** Parallels Between the Review Process and the Valuation Process

Source: *Review Theory and Procedures: A Systematic Approach to Review in Real Property Valuation* (Chicago: Appraisal Institute, 2015), 16.

BACK_DEFEXP-RR-003051

Copyrighted material licensed by Charles Brigden on September 17, 2020

perform the same sort of activities that an appraiser would when valuing the property that is the subject of the work under review. However, a reviewer would certainly need to know what an appraiser should do in that central portion of the valuation process—i.e., data collection and property description, application of the approaches to value, and so on—to develop an opinion of how well those steps were performed in the appraisal under review. And, if the scope of work of the review assignment allows, a reviewer may perform some similar tasks as an appraiser during the review process, such as collecting and verifying market data and applying various techniques of the approaches to value, to test the validity of the appraiser's conclusions.

The work done in Step 3 of the review process applies to both developing and reporting an opinion of the quality of the work under review. Step 4 deals exclusively with the development of the value opinion in the work under review, while Step 5 deals exclusively with the manner in which the work under review was reported. Step 6—the development of the reviewer's own opinion of value—is an optional component of a review, depending on the scope of work of the assignment. Step 7 of the review process addresses the review report, an essential component of every review assignment that is required whether or not Step 6 is applied. Step 7 of the review process is similar to the final component of the valuation process, the creation of the appraisal report.

The first step in a review assignment is to understand why the client needs the review. All clients who engage reviewers seek to understand if the work to be reviewed has enough credibility to be relied upon for its intended use. However, many clients have specific reasons for obtaining reviews that go beyond that question. For example, some clients want a reviewer to accept or reject an appraisal based on certain criteria such as compliance with specific reporting requirements like the Uniform Appraisal Standards for Federal Land Acquisitions. Other clients want the reviewer to independently verify the data used in the appraisal and determine its accuracy. Still others want the reviewer to verify the accuracy of the description of the subject property—for example, site area, building area, physical characteristics such as condition or location attributes, or legal characteristics such as zoning.

Not all clients are specific about their reasons for wanting a review, so it is incumbent on a reviewer to consult with the client until those reasons are understood. The reason (or reasons) that the client needs the review will translate into the intended use of the review report. Once a reviewer has established the intended use and intended users, the reviewer is obligated to determine and apply a scope of work for that assignment that is appropriate for the intended use and to prepare a report that is understandable to those intended users. Therefore, *identification of the problem to be solved* in the review assignment is a critical first step. If the identification of the problem is inadequate, the risk of a reviewer providing the wrong type of service and not satisfying the client's needs increases.

Once the problem to be solved is identified, the reviewer can determine the scope of work. One of the most important steps in the review process is defining an appropriate scope of work. Key questions affecting the scope of work decision include the following:

- What will be reviewed—an entire appraisal report, a portion of a report, a workfile, or something else?
- Will the reviewer provide his or her own value opinion?
- Will the reviewer visit the property that is the subject of the appraisal (field or desk review)?

BACK_DEFEXP-RR-003052

- Will the reviewer accept or reject the work under review according to certain criteria?

The reviewer should be careful to not let a review form or format drive the scope of work. Many review forms (and formats) include a preset scope of work discussion. When the reviewer uses such a form, it is understood that the minimum scope of work will be stated in the form. However, the reviewer may determine that the scope of work should be expanded.

Along with determining the scope of work of the review, the reviewer should clarify with the client whether the reviewer is expected to communicate directly with the appraiser regarding the work under review. Depending on the circumstances, several different alternatives are possible:

- The reviewer will complete the review without having any contact with the appraiser who completed the work under review.
- The reviewer will not know the identity of the appraiser who completed the work under review.
- The reviewer will work with the appraiser from the point of the appraiser's engagement to provide guidance throughout and then review the work upon completion by the appraiser.
- The reviewer will be engaged after the appraiser has completed the report, review the report, and contact the appraiser to resolve any outstanding issues.

It is critical to clarify with the client prior to accepting the review assignment which of the above alternatives is expected. If the expectation is that the reviewer will have contact with the appraiser, the review assignment could present some additional challenges. These challenges include the need for interpersonal communication skills as well as additional time to complete the assignment.

## Development of the Review Opinion

Once the problem and scope of work have been identified, a reviewer is ready to examine the work under review—i.e., read the report. As reviewers gain experience, they tend to develop their own approaches to reading a report. When the subject of the review is an entire appraisal report, some reviewers prefer to read it through from beginning to end so they can get a sense of the report as the intended user or users will see it. Other reviewers prefer to read the portions of the report that summarize the key findings and conclusions and then focus on the sections of the report where the key analyses are presented. For example, if upon reading the final reconciliation section, a reviewer learns that the appraiser gave no weight to the cost approach, the reviewer might spend little time reviewing the cost approach section. Conversely, if the reviewer learns that a key risk factor for the property is its deteriorating condition, the reviewer might focus more attention on the portions of the report that address how the property's condition affects value.

A reviewer begins the process of analyzing the quality of the work under review by noting evidence of the following five characteristics of both the appraiser's development process and reporting process:

- Completeness
- Accuracy

BACK_DEFEXP-RR-003053

Copyrighted material licensed by Charles Brigden on September 17, 2020

- Adequacy
- Relevance
- Reasonableness

These five characteristics cover the spectrum of what are considered measures of the "quality" of the work under review.

In a review of an appraiser's work, *completeness* implies both comprehensiveness and thoroughness—i.e., nothing has been left out and the opinions and conclusions were developed and presented carefully and in a sound manner. When the intended user finishes reading an appraisal report but has lingering questions about the work performed or the results presented, that uncertainty suggests that the report is not complete.

For example, consider an appraisal report in which the zoning classification of the subject property is stated to be "C4" without any explanation of what that designation means. The code "C4" might not be meaningful to the intended users of the appraisal report if it is not explained by the appraiser, and understanding the highest and best use analysis is impossible without understanding the zoning, which establishes the legally permissible uses of the site.

Another sign of potential incompleteness is a lack of explanation for the choice of a capitalization rate from within a given range. The absence of this explanation gives the appearance of an arbitrary decision on the appraiser's part, i.e., an unsupported conclusion. The lack of support for the capitalization rate used is particularly important because small variations in the rates used to capitalize income into indications of value have a significant effect on value and therefore the results of the appraisal.

In the context of the quality of work being reviewed, *adequacy* means that the work satisfies the minimum requirements for its intended use. An appraisal described as "adequate" would not necessarily serve as a model of best practices, but it will meet professional standards. The adequacy of an appraisal relates to the scope of work and the intended use. The needs of the intended user will not be met if the scope of work is not adequate for the intended use.

To be adequate, an appraisal must also meet the current requirements of the applicable professional standards. Compliance with current standards is a baseline measure of professional competency. For example, an appraisal of market value that does not include an opinion of the exposure time would not be compliant with valuation standards, and thus the appraisal would not be adequate for the assignment.

Another example of a lack of adequacy would be an appraisal that fails to adequately address relevant property characteristics. A user could reasonably believe that the absence of discussion of potentially significant property characteristics means that these characteristics were not analyzed in the appraisal, and the credibility of the value opinion would then be in question.

The *accuracy* of an appraisal relates to the data and the application of analyses rather than the appraiser's opinions and conclusions. That is, data can be described as "accurate" or "inaccurate," whereas an opinion is either "credible" or "not credible."

Accuracy has two aspects: (1) correctness, or the absence of mistakes, and (2) provability. An appraisal is provable if the data can be retrieved and the analyses repeated. Replicable analyses are more likely to be accurate. They suggest that correct data was used and a clear methodology was applied to perform calculations.

An example of a lack of accuracy would be an appraisal report with a narrative discussion that differs from the summary provided. Another example would be

BACK_DEFEXP-RR-003054

inconsistency between a table of data and the narrative discussion of that data. Most often, a lack of accuracy in an appraisal report involves computational errors, typographical errors in data entry, or the use of incorrect valuation methods. These errors can be trivial or material.

A typographical error is not likely to be as significant a detriment to the accuracy of the work as the misapplication of a valuation technique. Consider, however, the effect of typographical errors in the application of the income capitalization approach. Suppose an appraiser analyzes the rents of comparable properties and shows a conclusion of $12.00 per square foot, but the calculations in the report use $11.50 per square foot. This sort of material error arising from a simple typo can also occur in the application of a capitalization rate. For example, the narrative discussion of capitalization rate analysis might state that an 8.5% rate was used, but 9.0% appears in the tables and calculations in the report. These typos obviously can have a significant effect on the value conclusion.

The appraisal analysis needs to be applicable to the problem, and appraisal reports need to be succinct. The inclusion of too much irrelevant information is a common problem with appraisal reports. By the same token, the report must not lack relevant information. The appraiser should address what the client needs to know. The report document should connect the dots for the intended user of the appraisal and provide all the relevant information that the intended user needs to understand the results of the assignment.

The quality of *relevance* has four aspects. The information presented should be

1. Connected
2. Applicable
3. Useful
4. Significant

The content of an appraisal report is *connected* if it is directly or indirectly relevant to the conclusion of the work. *Applicable* content is important to the outcome. *Useful* content has practical value. And content that is *significant* is essential to the user's understanding.

An appraisal report that leads the intended user to the opinion of value with applicable evidence and logic would be exhibiting relevance. Ultimately, the relevance of a report is demonstrated by how well the assignment results connect with and are based on the data, analyses, and discussion of the content presented in the report.

Evaluating reasonableness is not exclusive to appraisal. In many professions in which opinions are important, the quality of work is often judged by the *reasonableness* of the opinions presented. In a sense, reasonableness is the flip side of negligence.

Appraisers test the reasonableness of their analyses and conclusions in the context of the intended use of the appraisal. What other appraisers would do in the same situation is a standard test of reasonableness. Similarly, the body of knowledge relating to valuation (such as books, appraisal courses, and other literature) and requirements in published standards (such as the SVP, USPAP, and the IVS) are typical tests of reasonableness. An appraisal that passes the test of reasonableness will be realistic, balanced, objective, and adequate for the purpose of the assignment.

One key review function is making judgments about the quantity and quality of the data and analyses in the work under review. A competent reviewer knows when

BACK_DEFEXP-RR-003055

Copyrighted material licensed by Charles Brigden on September 17, 2020

issues are important or immaterial. Throughout the review process, a reviewer must remain cognizant of, and stay focused on, the objective of the review assignment, which is to inform the client about the quality of the work under review so that the client can decide whether or not the work can be relied upon for its intended use. The reviewer must be able to discern when judgments made in the work under review are acceptable and when additional supporting data and analyses are needed given the intended use.

A review of an appraisal report must be conducted in light of the market conditions as of the effective date of that appraisal. A reviewer must consider the data and information that the appraiser could have or should have uncovered at the time the assignment was performed. It is unreasonable to expect the appraiser who prepared the work under review to be responsible for knowing something that was not knowable at the time.

### Providing an Opinion of Value as a Reviewer

If the scope of work of a review includes the reviewer providing his or her own value opinion for the subject of the work under review, then providing support for any disagreement about the final value opinions presented in the work under review will be a matter of supporting the reviewer's own opinion of value. Remember that the development of the reviewer's own opinion of value constitutes an appraisal subject to the professional standards for the development and reporting of an opinion of value. In contrast, if the reviewer's own value opinion is not part of the assignment, the reviewer has to be careful when providing reasons for disagreement. There is always the possibility that a reviewer expressing disagreement with an appraisal will make a statement about the appraiser's value opinion that, in effect, serves as the reviewer's own opinion of value, which might not be the reviewer's intent.

A reviewer might disagree with any number of components of an appraisal other than the opinions of value. Examples of portions of an appraisal that a reviewer might disagree with include property analysis, site valuation, cost analysis, the adjustment of comparable sales, or income analysis. If the reviewer's scope of work includes providing his or her own opinion of value, the reviewer will need to provide a new analysis of the portion of the work that is the subject of any disagreement. If the scope of work does not include the reviewer's own opinion of value, the reviewer might simply note the concern as a quality issue.

Extraordinary or special assumptions play a key role in the review process when a reviewer is providing an opinion of value in the review report. For example, a reviewer might agree or disagree with an appraiser's value opinion presented in an appraisal report, but if the reviewer's scope of work does not include verification of the information presented in the appraisal report about the property, the reviewer's opinion of value is based on the assumption that the property information presented in the report under review is accurate. The reviewer must then include a statement in the review report to this effect and also state that if the assumption proves to be false (i.e., the property information in the report is inaccurate), the reviewer's opinion could be different.

Another situation in which an extraordinary or special assumption is made by a reviewer is when the reviewer's scope of work includes providing an opinion of value but does not include doing an independent search for comparable data. In this case, whether the reviewer agrees or disagrees with the appraiser's value conclu-

BACK_DEFEXP-RR-003056

sion, the reviewer would be basing the conclusions on the assumption that the data presented in the report under review is accurate and is the best available data. Again, the reviewer must include a statement in the review report to this effect and also state that, if the assumption proves to be false (i.e., the data is inaccurate or better data would have been available), the reviewer's opinion could be different.

Clear disclosure of extraordinary or special assumptions is critical—and is required by professional standards—so that the client and intended users of the review report can determine its suitability for their use. Clients might decide, for example, that their comfort level with the review and the underlying appraisal would be enhanced if the reviewer's scope of work was expanded so that extraordinary assumptions are not necessary. Or clients might find that the appraisal review report meets their needs, even though it is based on certain extraordinary assumptions.

## Reporting the Review Opinion

Clear communication of the reviewer's findings is a critical step in a review assignment. The communication could take one of several forms:

- An oral report
- A written report using a standardized form or format
- A written report in a format created by the reviewer or the client

Oral review reports may be used in cases where the client does not need a written report. In those cases, a reviewer and client might meet, in person or by phone, to discuss the work under review. Oral review reports may also be used in situations involving testimony, such as court testimony or a deposition of a reviewer.[5]

When an oral review is provided, a reviewer must develop the review opinion prior to delivering the oral report. A reviewer cannot be expected to provide an opinion about another appraiser's work on the spot. The development of a review opinion requires due diligence, and that takes time. The reviewer must ensure that the review has been properly developed and a workfile in support of the review has been created prior to delivering the oral report.

As mentioned earlier, if the review report is to be in writing, the client might request that a standardized form or format be used.[6] Reviewers who are not employed by lending institutions and are conducting one- to four-unit residential property appraisal review work generally use Fannie Mae Form 2000/Freddie Mac Form 1032. For other property types, there is no single, widely used form or format. Different client groups have created their own forms and formats that meet their specific needs.[7] Any form may require supplemental detail to make it conform to the standards that the assignment is subject to.

If a reviewer is writing a narrative report or creating his or her own format, the reviewer must make sure that (1) the review report complies with applicable profes-

---

5. Note that a review report provided in testimony is only considered to be an oral report if the testifying expert has not already provided either a written or oral report to his or her client. If a written or oral report has already been provided to the client, the expert is simply talking about that report at the deposition or trial and is not providing a separate oral report.

6. A text or email is considered written communication. Also, if an oral review report is provided and the client subsequently requests "written follow-up," that written communication is a written review report if it contains the reviewer's opinion about the quality of the appraiser's work.

7. Developing a single, standardized review form for all review assignments is difficult because the information that needs to be conveyed in a review report varies greatly with the property type and the reviewer's scope of work. A form or format that is sufficient for one review assignment might be insufficient for another assignment and, at the same time, be overly detailed for a third assignment.

BACK_DEFEXP-RR-003057

sional standards for reporting an appraisal review and (2) the review report meets the needs of the client and any other intended users.

Professional standards require the inclusion of the following items, at a minimum, in a review report:

1. The reviewer's client and any other intended users.
2. The intended use of the review. (Why does the client need the review?)
3. The purpose, or objective, of the review, including whether the assignment is to include the development of the reviewer's own opinion of value. (What is the client's question about the work under review?)
4. The subject of the review assignment. (What is being reviewed?)
   a. The ownership interest of the property that is the subject of the work under review.
   b. The date of the work under review (i.e., the date of the report).
   c. The effective date of the opinions and conclusions in the work under review.
   d. The appraiser who completed the work under review.
5. The date of the review report.
6. When the scope of work includes the reviewer's development of an opinion of value, extraordinary assumptions and hypothetical conditions used by the reviewer and a statement that their use might have affected the reviewer's conclusions.
7. The reviewer's scope of work.
8. The extent of any significant appraisal or review assistance provided by others, if any.
9. The reviewer's opinions and conclusions about the work under review, including the reasons for any disagreement.
10. When the scope of work includes the reviewer's development of an opinion of value, a statement of which information, analyses, opinions, and conclusions in the work under review the reviewer accepted as credible and used in developing the reviewer's own opinion; the effective date of the reviewer's opinion of value; and a summary of any additional information relied on and the reasoning for the reviewer's opinion of value.
11. The reviewer's signed certification.

When the reviewer is subject to USPAP, the applicable performance standard for the development and communication of the review is Standard 3. The reporting requirements for a review are set forth in Standard 4.

Unless otherwise required, a review report need not repeat what is in a report being reviewed. The purpose of the review report is not to summarize or reiterate the work under review. Instead, the purpose is to provide the client with the reviewer's clearly explained opinion about the quality of that work.

## The Reviewer's Workfile

Professional standards requirements, including the Code of Professional Ethics of the Appraisal Institute and USPAP, require the retention of records for review assignments. The records, or *workfile*, must be retained for a minimum of five years, or a minimum of two years after the final disposition of any judicial proceeding in which

BACK_DEFEXP-RR-003058

the reviewer gave testimony relating to the assignment, whichever is longer. Either the workfile must be in a reviewer's possession, or the reviewer must have an agreement that addresses retention, access, and retrieval arrangements with the party in possession of the workfile.

When a written review report is provided to a client, the workfile for the assignment must include the following:

- A true copy of the reviewer's review report. This may be documented on any type of media—e.g., it can be an electronic copy—as long as it is an *exact copy* of what was given to the client.
- Any additional data, information, or documentation necessary to support the reviewer's findings or reference to the location of the documentation. A copy of the work under review is generally necessary to meet this requirement.

When an oral review report is provided to a client, the workfile for the assignment must include the following:

- The identity of the client and any other intended users.
- All information necessary to support the reviewer's opinions and conclusions— in essence, enough information to prepare a written review report.
- Any additional data, information, or documentation necessary to support the reviewer's findings or reference to the location of the documentation. A copy of the work under review is generally necessary to meet this requirement.
- The reviewer's signed and dated certification.
- A summary of the oral review presented by the reviewer. If the oral review was given only as oral testimony at trial or in a deposition, a transcript of the reviewer's trial or deposition testimony suffices.

In addition to the minimum requirements listed above, as a matter of good business practice, a reviewer might want to retain other work notes, a copy of the engagement letter, and copies of other communications with the client and with the appraiser.

## Common Issues Found in Reviews

The challenges faced by reviewers are tied directly to the most common problems encountered by appraisers. Difficult appraisal assignments will often lead to difficult review assignments. Some reviewers use checklists to help ensure that they perform the review function competently and completely. The checklist shown in Figure 34.2 lists the sort of problems reviewers commonly find in appraisal reports.

Regardless of the scope of the review process and the tools applied, a reviewer's conclusions should be communicated professionally and without bias. The importance of review has increased in recent years with more oversight of government agencies, financial institutions, the courts, and other businesses. Ideally, the review process can raise the level of professionalism among appraisers and encourage them to produce high-quality appraisal reports. Reviewers are sometimes seen as gatekeepers of the appraisal profession, and they do hold practitioners responsible for their work product. Although this role is challenging, the review process can be an educational and rewarding exercise for the reviewer and appraiser and, if performed properly, will improve client satisfaction and confidence.

BACK_DEFEXP-RR-003059

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Figure 34.2**    Common Issues in Appraisals of Concern to Reviewers

| Portion of Appraisal Report | What to Expect | What to Watch For |
|---|---|---|
| Letter of transmittal | Introduction of the report to the client | · Statements that raise questions not answered in the body of the report<br>· Indications that the assignment was not as requested<br>· Unusual limiting conditions<br>· Errors or inconsistencies with content in the body of the report<br>· Boilerplate, especially about assignment conditions |
| Certification | · Statements required by professional standards<br>· Additional statements required by professional organizations | · Changes to standards language that change the meaning<br>· Additional certification statements that conflict with professional standards<br>· Omission of any of the statements required by professional standards<br>· Failure to name appraisers who provided significant assistance (and failure to describe what they did)<br>· When the applicable standards are USPAP, failure to include indication of inspection (or not) for all signees<br>· When the applicable standards are USPAP, failure to include statement about prior services (three years) |
| Summary of important conclusions | Quick synopsis of the report to follow | · Information or conclusions contradicted elsewhere in the report<br>· Unusual limiting conditions<br>· Confusing information |
| Identification of the client, other intended users, and intended use | Clear statements of all three items | · Failure to state the client's identity<br>· Misunderstanding of the concepts of intended use and intended user |
| Identification of the subject real property | Clear identification of the real property involved in the appraisal | · Ambiguous or vague property identification information<br>· Lack of this information |
| Identification of the property rights appraised | Clear statement or description | · Obvious evidence that the appraiser was not clear about interest<br>· Use of only a label when a full description is warranted |
| Type and definition of value | Definition and source cited | · Lack of value definition or its source<br>· Inconsistency between type of value and valuation process applied<br>· Providing liquidation or disposition value but calling it "market value" |
| Effective date of the value opinion and date of report | Clearly stated dates | · With multiple value opinions, lack of clarity about which date goes with which value opinion<br>· Inconsistency between the date of value and the valuation process applied<br>· Lack of statement of date of report |
| Assignment conditions—extraordinary assumptions, hypothetical conditions, etc. | · Clear and conspicuous statement of conditions<br>· Statement that their use might affect assignment results | · Statements identified as one of the types of assignment conditions when they are not<br>· Failure to identify and describe assignment conditions that were applied in the valuation. |
| General assumptions and limiting conditions | Standardized boilerplate, tailored to be relevant | · Unusual limiting conditions that would impair the client's ability to use the report |

BACK_DEFEXP-RR-003060

**Figure 34.2**  Common Issues in Appraisals of Concern to Reviewers *(continued)*

| Portion of Appraisal Report | What to Expect | What to Watch For |
|---|---|---|
| Scope of work | Clear statement of scope (may be in a single section, various parts of report, or a combination thereof) | · Discussion that is clearly boilerplate<br>· Vague statements, e.g., "Relevant data was researched."<br>· Inadequate explanation for omitting valuation analyses or data that would be expected |
| Legal description (if included) | Clearly presented descriptions from authoritative source | · Incorrect legal description for the property being appraised<br>· The statement "See addenda" but the legal description is not found there |
| Identification of non-realty items | Personal property or intangibles included | · Lack of clarity about items included in value opinion<br>· Lack of clarity about what items are included in the comparable data<br>· Improperly developed opinions of value of non-realty items |
| Ownership history, including prior sales, current listings, current options | · Sales within three years, current listings, or options<br>· Current or recent offers with information relevant to the valuation | · Statements that sales, etc. occurred but failure to analyze them<br>· Failure to analyze a relevant transaction |
| Market area and location information | Clear description of information relevant to the appraisal problem | · Abundance of irrelevant information<br>· Lack of relevant information<br>· No connection between the information presented and the valuation problem |
| Description of site | Relevant, understandable information that is presented clearly | · Abundance of irrelevant information<br>· Lack of relevant information<br>· No connection between the information presented and the valuation problem<br>· Little more than disclaimers about the appraiser's responsibility |
| Description of improvements | Relevant, understandable information that is presented clearly | · Abundance of irrelevant information<br>· Lack of relevant information<br>· No connection between the information presented and the valuation problem |
| Taxes and assessment data | · Clear presentation of property taxes and assessment data<br>· If relevant, description of local assessment practices | · Unexplained inconsistencies between actual taxes and taxes used in the income capitalization approach |
| Zoning and other land use regulations | Land use regulations, what they mean, and uses allowed | · Lack of explanation of land use regulations and permitted uses |
| Market analysis | Clear and meaningful discussion of market area, etc. | · Lack of adequate market analysis<br>· Conclusions that are inconsistent with the information presented |

BACK_DEFEXP-RR-003061

**Figure 34.2**   Common Issues in Appraisals of Concern to Reviewers *(continued)*

| Portion of Appraisal Report | What to Expect | What to Watch For |
|---|---|---|
| Highest and best use analysis | If appropriate, clear discussion of analysis | · Simply stating highest and best use without providing analysis<br>· Lack of support for conclusions<br>· Gaps in analysis requiring leaps of faith from reader<br>· Failure to incorporate information from the market analysis process |
| Cost approach | · Meaningful presentation of site value<br>· Support for site value<br>· Support for improvement costs | · Misapplication of the methodology<br>· Double-counting depreciation<br>· Depreciation estimate based solely on cost services<br>· Confusion over entrepreneurial incentive<br>· Improper application of age-life depreciation concepts<br>· Inadequate treatment of superadequacies |
| Sales comparison approach | Meaningful presentation of analysis of comparable sales | · Math mistakes<br>· Failure to use the appropriate unit of comparison<br>· Use of comparables that are not truly comparable<br>· Use of properties with dramatically different tenancy profiles<br>· Combining adjustments that should be considered independently<br>· Improper use of bracketing<br>· Inconsistent adjustments<br>· Failure to address sales that should have been used |
| Income capitalization approach | Meaningful presentation of<br>· all sources of income<br>· vacancy and collection loss<br>· operating expenses<br>· capitalization or discount rates<br>· rates of change (and terminal capitalization rate), if applicable | · Basing market rent estimates on asking rents only<br>· Lack of support for expense estimates<br>· Misuse of gross rent multipliers<br>· Use of a net income multiplier as well as direct capitalization (not separate, independent approaches)<br>· Confusion over distinction between $R_o$ and $Y_o$ |
| Reconciliation and final opinion of value | Meaningful discussion of strengths and weaknesses | · Boilerplate statements<br>· Failure to reconcile differences in indications of value<br>· Introduction of new data that was not previously presented<br>· Averaging without adequate justification of why it is appropriate<br>· Conclusion that is inconsistent with reconciliation discussion |
| Estimate of exposure time | Clear statement of amount of time needed for exposure | · Misunderstanding of the concept<br>· Unreasonable estimate given market evidence<br>· Lack of support<br>· Confusion between exposure time and marketing time |

Source: Adapted from *Review Theory and Procedures: A Systematic Approach to Review in Real Property Valuation* (Chicago: Appraisal Institute, 2015), 82-85.

BACK_DEFEXP-RR-003062

BACK_DEFEXP-RR-003063

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Consulting **35**

Because of their expertise and experience, appraisers may be called upon to provide services that do not involve appraisal or review opinions. These services—loosely referred to as "consulting"—range from simply providing market data to providing advice about real estate industry standards and practices or a recommendation such as whether to invest in a property or whether the contemplated design of a project conforms to market tastes.

*Consulting* is a generic term that encompasses a broad variety of advisory services, and the term should be used with care. Many services provided by an appraiser could be classified as consulting according to common dictionary definitions. To avoid being misleading, *consulting* should be used only in conjunction with a description of the type of consulting being discussed. Some consulting assignments involve the development of value or review opinions, and some do not. Either way, if the client expects the individual hired to have valuation expertise and to provide the service in an unbiased, objective manner, that individual is *acting as an appraiser* and professional standards apply regardless of whether the service includes providing an appraisal or a review opinion.

Many consulting services require specialized knowledge and skills, and additional study and experience in these areas may be required. Appraisers must be particularly careful when providing consulting or advisory services to properly identify the client's problem to be solved and advice sought as well as to ascertain whether they have the required competence to solve that problem.

If the consulting service does not involve providing valuation or review opinions, there are no performance standards applicable to the development or reporting of the service. However, requirements relating to ethics and competency apply. For example, if the appraiser is subject to the Uniform Standards of Professional Appraisal Practice (USPAP), then the ethics and competency rules of USPAP would apply. If the appraiser is a Member, Candidate for designation, or Practicing Affiliate of the Appraisal Institute, the Appraisal Institute's Code of Professional Ethics (CPE) would apply.[1]

---

1. Technically, USPAP's Preamble, Definitions, and Jurisdictional Exception Rule would also apply. The Record Keeping Rule and Scope of Work Rule would not apply.

Some consulting services do include a valuation, and this appraisal portion of the service is subject to the applicable development and reporting standards. In these circumstances, one or more appraisal opinions are "wrapped into" a consulting service. That appraisal may be prepared by the appraiser engaged in the consulting service, or it may be prepared by another appraiser. If the appraisal is prepared by another appraiser, the consulting appraiser may either: (1) review the appraisal report and agree with it (or disagree and provide an alternative value conclusion) or (2) rely on the other appraiser's appraisal report and premise the consulting conclusion on the special/extraordinary assumption that the appraisal it relies on is credible. This latter approach may be appropriate when the consulting appraiser lacks the competency (particularly geographic or market area competency) to value the property, but is competent to complete the rest of the consulting analysis. This latter approach may also be appropriate when the valuation portion of the consulting service is less critical to the final recommendation or conclusion of the consulting service. Regardless, the consulting appraiser should rely on the work of another only if the consulting appraiser has no reason to doubt its credibility.

> If the objective of the assignment is to express an opinion about another appraiser's work, then the assignment is not consulting but rather review.

## Feasibility Studies

An example of a consulting service that encompasses an appraisal is a feasibility study. The objective of a feasibility study is not to develop an opinion of value, but rather to draw a conclusion about feasibility, which is usually assessed by determining whether the financial benefit (i.e., the value) of an action or project is equal to or greater than the cost, or to analyze alternative actions or projects. In a feasibility study, the appraiser develops an opinion of value for a proposed land use and tests the feasibility of that use by comparing costs and benefits.

## Cost-Benefit Studies

Appraisers conduct cost-benefit studies on either a macroeconomic or microeconomic basis. For example, a community might require a cost-benefit study to determine the economic benefits that would most likely result from a new public project such as an expressway or a sewage treatment plant. The cost-benefit study would focus on the relationship between the benefits created and the costs associated with the project to determine whether the benefits warrant the costs.

Some public bodies hire an appraiser to determine the preliminary effect of a project. This may entail the assessment of project risk as well as the cost of implementing various project scenarios. For example, a road-widening project that results in diminished access to a commercial site may significantly reduce the value of the property, for which the owner must be compensated. This will add to the cost of the public project, which must be considered in the decision-making process.

Developers also use cost-benefit studies, particularly when they are called upon to install major items. A cost-benefit study can establish the relative worth of the expenditures in relation to the expected benefits.

BACK_DEFEXP-RR-003065

Copyrighted material licensed by Charles Brigden on September 17, 2020

In some cases, a cost-benefit study may involve an appraisal. An appraiser must carefully consider what the service involves and the valuation standards that may apply.

## Pricing and Rent Projection Studies

Pricing and rent projection studies may be components of marketability studies or the subject of separate studies. These analyses are frequently conducted to establish sales and marketing strategies for real estate projects and to facilitate decisions involving property management and investment. In some cases, such a study includes an appraisal.

## Property Tax Services

Property owners have the right to appeal the ad valorem assessments on their real property, and appraisers are often hired to provide a professional opinion of value in a dispute over the assessed value. Most property tax consulting work involves an appraisal, but on occasion the basis for the appeal is something other than value—for example, the assessor's records show an incorrect building or land area, or the records are otherwise incorrect regarding property characteristics. The use of ratio studies and equitable assessment studies may be appropriate in this context.

Property owners seeking a property tax deduction will generally claim that their properties are overvalued and/or that their properties were not assessed equitably, but appraisers must remain unbiased and report their conclusions of the defined value regardless of whether the value opinion is higher or lower than the assessed value. The appraiser cannot be an advocate for the property owner and cannot accept a fee contingent if the applicable standards are USPAP.

Specific challenges to proper appraisals for assessment purposes include

- Potentially dramatic changes in property values from year to year
- Income-producing properties that outperform the local competition
- Special-use properties that are assessed at use value rather than market value
- Identification of the relevant property interest to tax
- The increasing diversity and specialization of property types[2]

Appraisers working on property tax appeal assignments deal with these issues regularly. For example, in a market with volatile pricing and demand, the appraiser's research and collected evidence of the rapidly changing market conditions will be of critical importance to a successful application for tax abatement.

Two important areas of investigation in a property tax appeal assignment are the classification of the property and any tax exemptions that may apply. If a property is improperly classified in the jurisdiction's records, the assessed value is unlikely to be appropriate for the actual use of the property. Similarly, an appraiser's research into the economic characteristics of a property could reveal unclaimed tax exemptions that the property owner would benefit from knowing about.

---

2.   Robert W. Owens, "Valuation and the Property Tax," *The Appraisal Journal* (July 2000): 342-346.

BACK_DEFEXP-RR-003066

## Litigation Support

Real estate is often the subject of litigation. Appraisers are frequently called upon to testify in court regarding appraisal methodology, appraisal standards, or the value of property involved in a dispute. Principles and processes established by the US Supreme Court may create a need for the court to seek testimony to qualify (or disqualify) someone offered as an expert witness.[3] Methodology and standards testimony typically involves generally accepted valuation principles and methods and applicable appraisal standards.

Appearing as an expert witness is a common assignment that may involve appraisal, appraisal review, or consulting services. Behind the scenes, appraisers provide litigation support in other ways by investigating information about the subject property or comparable properties that may be useful to the case, helping organize the testimony of other expert witnesses, or suggesting other experts for the attorney's team. Attorneys and their clients may also ask appraisers to assist in the discovery process, to prepare questions for the examination or cross examination of witnesses, and to advise on the preparation of graphics to be presented in court.

Appraisers can often offer expert advice in cases involving the dissolution of a business partnership or a marriage. In addition to advising on the value of jointly held real estate assets, appraisers may counsel the parties as to the allocation of their holdings. For example, the appraiser may be able to help settle a dispute between one partner, who is willing to assume the risks and responsibility of owning a management-intensive asset, and another, who wants to retain only assets that provide cash flow with little risk.

Advocacy must be avoided when an appraiser serves as an expert witness. While attorneys are acknowledged to be advocates for their clients, appraisers can only advocate for their own value opinions in order to comply with professional standards. An appraiser on the witness stand who is seen as an advocate for the attorney's client loses credibility as an independent and objective analyst. Professional standards usually distinguish between acting as an appraiser and performing a consulting service. Regardless of the role the appraiser assumes, he or she cannot misrepresent that role in the process of completing the assignment.

## Arbitration

Another example of an appraiser serving as a consultant is in the role of an arbitrator. Appraisers may act as a sole arbitrator or more often as a member of a panel of arbitrators. Such panels typically consist of three arbitrators. Although other issues may be involved, the most common objective of the arbitrators is to determine the market value or market rent of a specific property. That determination may be based solely on the appraisal reports submitted or it may involve more formal proceedings that include sworn testimony and questioning of expert witnesses by adverse parties, typically lawyers.

---

3. John D. Dorchester Jr., "The Federal Rules of Evidence and 'Daubert': Evaluating Real Property Valuation Witnesses," *The Appraisal Journal* (July 2000): 290-306.

BACK_DEFEXP-RR-003067

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Other Consulting Services

Some other assignments that fall under the broader category of consulting services include

- Land use studies
- Market studies
- Marketability studies
- Due diligence for a client's acquisition or sale decision
- Operations audits
- Absorption analysis
- Risk analysis
- Portfolio analysis
- Adaptive reuse analyses—i.e., analysis of an existing property's proposed change of use
- Property inspections
- Capital market analyses

Consulting services are often provided to assist clients in making decisions about the acquisition or disposition of real estate, the development or redevelopment potential of a property, and the financial management and planning of alternative real estate investments. The specific services performed for a client must be tailored to the individual circumstances.

BACK_DEFEXP-RR-003068

BACK_DEFEXP-RR-003069

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Valuation for Financial Reporting

# 36

The appraisal specialty of valuation for financial reporting (VFR) is tied to accounting practice. In VFR assignments, appraisers are called on to assist in the analysis and presentation of financial data used to give owners, investors, and regulators an objective picture of the economic performance of a company. Real property valuation professionals have a special role in the calculation of the "fair value" of assets and liabilities in real property, which may be required information in a company's annual report, prospectus, or SEC Form 10-K.

The US Financial Accounting Standards Board (FASB)—which establishes and maintains the professional standards relevant to US generally accepted accounting principles (GAAP)—defines *fair value* as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." As discussed in Chapter 6, this accounting definition is close to the commonly cited definitions of *market value* used by valuers[1] of real property, as shown by the color-coordinated commonalities in Figure 36.1. Because of the similarity in these concepts, accountants may use the market value opinions of valuers as evidence of fair value in their financial reports.

Fair value is the standard of value expressed in financial accounting standards that provides information to investors about the price an asset could be sold for at the measurement date. The fair value standard does not provide information on the anticipated internal rate of return or future results that the current investors are expecting. The reporting of an appraisal prepared for financial reporting purposes might be different from the reporting of an appraisal prepared for, say, a bank. For example, the appraisal of an office building owned by a real estate investment trust for five years would not likely require an in-depth description of the property in an appraisal report prepared for financial reporting purposes because the management of the REIT that requested the report is already familiar with the property. A bank, on the

---

1. In many parts of the world, the term *valuer* is more commonly used than *appraiser* to describe a person who performs a valuation, and who is often licensed to do so.

BACK_DEFEXP-RR-003070

| **Figure 36.1**  Comparison of Definitions of Value | |
|---|---|
| **fair value** | **market value** |
| The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. | The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:<br>· Buyer and seller are typically motivated;<br>· Both parties are well informed or well advised, and acting in what they consider their best interests;<br>· A reasonable time is allowed for exposure in the open market;<br>· Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and<br>· The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. |
| FASB Accounting Standards Codification Topic 820: Fair Value Measurements and Disclosures | 12 C.F.R. Part 34.42(g); 55 *Federal Register* 34696, August 24, 1990, as amended at 57 *Federal Register* 12202, April 9, 1992; 59 *Federal Register* 29499, June 7, 1994 |

other hand, would need more information about the property to be able to assess the risk involved in providing a loan for construction or purchase of that office property.

## Relevant Accounting Concepts

Most countries in the world have either adopted International Financial Reporting Standards (IFRS), are in the process of doing so, or are converging their national accounting and financial reporting systems to comply with IFRS. For example, the Financial Accounting Standards Board (FASB) has pursued a policy of convergence between US GAAP and IFRS since the Norwalk Agreement between FASB and the International Accounting Standards Board (IASB) of the IFRS Foundation in 2002.[2]

Globally, the International Financial Reporting Standards (IFRS) affect how all assets and liabilities, including real property interests, are appraised for financial reporting. In its 2018 analysis of the use of IFRS standards around the world, the IFRS Foundation states that 144 out of 166 surveyed jurisdictions require IFRS Standards for most domestically accountable companies.

---

2.  In 2002, the Norwalk Agreement between FASB and IASB called for convergence of US GAAP and International Financial Reporting Standards. Certain milestone projects (including convergence of fair value measurement and leases) were agreed to, and completion of these was confirmed by the respective boards in 2009. The original goal was to eliminate many, if not most, distinctions between the two systems by the end of 2011. However, work continues on these and other projects. In 2005, the SEC made its first public comments about the possibility of adopting IFRS. A "roadmap" was developed a few years later outlining the participation of the commission in international accounting standards development and the possible acceptance of IFRS by 2014. In 2012, however, the report of the SEC work group formed in 2010 did not include a recommended date for the transition of the US financial reporting system to incorporate IFRS.

BACK_DEFEXP-RR-003071

Copyrighted material licensed by Charles Brigden on September 17, 2020

Early on in the development of generally accepted accounting principles, including those relating to the accumulation of accounting data for preparing earnings statements, balance sheets, and other statements for financial reporting, the US accounting profession elected to adopt what was considered a "conservative approach" when financial information was publicly disclosed or reported to third parties. The axiom of "cost or market, whichever is lower" characterized this approach. Under this system, original accounting entries commonly reflected the cost of assets such as real property rather than market value. Similar principles were applied to other tangible assets and, customarily, to liabilities. In this context, as real estate markets change, the market value of real property can rise while the books of account (and related financial reports) can still record the value of real property and many other assets at original cost less book depreciation. Because the depreciation reported in this context is customarily based on income tax or other formula-based approaches to depreciation, significant differences can develop between current fair market values and the figures shown on balance sheets.

| **Acronyms Used in Valuation for Financial Reporting** | |
|---|---|
| AICPA | American Institute of Certified Public Accountants |
| ASC | Accounting Standards Codification |
| FASB | Financial Accounting Standards Board |
| GAAP | generally accepted accounting principles |
| GAAS | generally accepted auditing standards |
| GASB | Government Accounting Standards Board |
| IAS | International Accounting Standards |
| IASB | International Accounting Standards Board |
| IFRS | International Financial Reporting Standards |
| IVS | International Valuation Standards |
| IVSC | International Valuation Standards Council |
| PCAOB | Public Company Accounting Oversight Board |
| SAS | Statement on Auditing Standards |
| SEC | Securities and Exchange Commission |
| SFAS | Statement of Financial Accounting Standards |
| VFR | Valuation for Financial Reporting |

In 2017, FASB developed a new accounting standard related to leases that changed how accountants handle a company's leases in financial reports. Effective in 2019, Accounting Standards Codification 842: Leases required companies to start including their leases on the balance sheet instead of as notes in the back of financial reports. This change was made in the interest of transparency. In the past, accounting standards allowed lessees to categorize leases as either capital leases or operating leases, and the latter were treated as off-balance sheet liabilities. The new lease standard eliminates the distinction between operating leases and capital leases by treating almost all leases as liabilities that must be recorded on the lessee's balance sheet. Real estate owners and managers have expressed concern that the new lease standard will result in greater use of short-term lease arrangements, which may add uncertainty to income and asset value and influence lease and buy decisions by businesses.

## Fair Value Accounting

In the United States, steps have been taken on several occasions to move to an accounting system that would reflect current market values in financial reporting, but the concept had generally been resisted until the 1990s. The emergence of one, consistently used definition of *fair value* in financial accounting standards effective in

BACK_DEFEXP-RR-003072

2008 has helped provide authoritative guidance to valuation specialists. Valuation for financial reporting (commonly known by the acronym VFR) is the specialized area of appraisal work for corporate accounting and auditing purposes, often involving the development of an opinion of the fair value of real property in which the definition of value used in the appraisal assignment is taken from accounting standards. Fair value measurements may not be relevant for real property valuations prepared for intended uses other than financial reporting, such as property taxation, federal gift and estate taxation, collateral valuations, divorce, or bankruptcy. Fair value accounting is of particular importance to publicly traded entities and public entities with a strong responsibility to third parties using independent valuations for the assets of the company rather than reliance on internal accounting or management declarations.

According to Accounting Standards Codification (ASC) 820: Fair Value Measurement, valuing a nonfinancial asset such as real estate "takes into account a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant that would use the asset in its highest and best use." In this context, market participants include potential buyers of a business, not just the potential buyers of an asset on its own. Also, ASC 820 outlines the possible valuation premises applicable in fair value accounting: (a) the asset is used in combination with other assets or with other assets and liabilities or (b) the asset is used on a stand-alone basis. Generally, investment property is considered on a stand-alone basis while assets used in the operation of a business should be considered in combination with other assets, and assumptions about the highest and best use should be consistent for all of the assets of the group.

Figure 36.2 illustrates a framework for performing fair value assignments. The language of fair value accounting has parallels to the language of real property appraisal as well as some important conceptual differences that should be noted. The concepts of an *entry price* and an *exit price*, which are implicit in the reference to an *exit market* in the first step of the process, do not have obvious synonyms in real property valuation. In short, the transaction price paid to acquire an asset is an entry price, whereas the price received in the sale of an asset is an exit price and is considered to be the fair value of the asset.

The similarity between the concept of an *exit price* and commonly cited definitions of *market value* can cause confusion in fair value assignments. For financial reporting purposes, real property is often accounted for in the context of the business that it serves rather than as a separate asset. Therefore, market comparisons may have to be made of sales of a group of assets rather than the real property on its own, depending on the valuation premise identified in Step 2 of the process shown in Figure 36.2. For example, if a manufacturing company owns real property that in

| **Figure 36.2** | **Fair Value Framework** |
|---|---|

| Step | Action |
|---|---|
| 1 | Identify the *exit market*—i.e., the principal or most advantageous market. |
| 2 | Identify the *valuation premise* (highest and best use). |
| 3 | Determine the *assumptions* used by market participants. |
| 4 | Apply *inputs* into the valuation techniques—cost approach, market approach, and income approach. |
| 5 | Reconcile *fair value*. |

Source: *Introduction to Valuation for Financial Reporting* seminar (Appraisal Institute, 2009)

BACK_DEFEXP-RR-003073

Copyrighted material licensed by Charles Brigden on September 17, 2020

some way uniquely serves its manufacturing process but would not have much value to other industrial users, the superadequacy of the design of the real estate may not have significant value if viewed on a stand-alone basis, but it would have value when viewed as part of the business enterprise.

Multiple valuation techniques may be appropriate for measuring fair value (Step 4 of Figure 36.2), just as multiple approaches to value can be applied in market value appraisals of real property. The reconciliation (Step 5) of the value indications derived from the approaches applied is an essential step in the both fair value accounting and the more familiar process for appraising the market value of real property.

### Hierarchy of Inputs

Financial reports contain the assumptions that market participants would use to price an asset such as the risk involved in acquiring and holding the asset. In financial accounting standards, those assumptions are known as *inputs*. The hierarchy of inputs is a system of characterizing the relative reliability of the assumptions that are included in a financial statement. For example, observable inputs like the prices of publicly traded stock are more reliable than unobservable inputs like a company's estimate of the value of an intangible asset such as a patent. Table 36.1 summarizes the hierarchy of inputs—Level 1, Level 2, and Level 3.

Level 1 characteristics are observable, are quoted prices for identical assets (or liabilities) in active markets, and are unadjusted. Level 1 inputs include (a) listed equity securities traded in active markets such as the New York Stock Exchange and the Nasdaq exchange, (b) on-the-run Treasury bills, notes, and bonds, and (c) many to-be-announced government-backed securities.

Level 2 characteristics are quoted prices for similar items in active markets. They could also be quoted prices for identical, or similar, items having no active markets. Level 2 inputs include most US public debt, short-term cash instruments, certain derivative products, and off-the-run Treasury bills, bonds, and notes. Adjustments to

**Table 36.1**  The Hierarchy of Inputs

| Level of Input | Description | Examples |
|---|---|---|
| Level 1 | Quoted prices (unadjusted) in active markets for identical assets | · Prices of stock in blue chip companies (e.g., a publicly traded REIT) |
| Level 2 | Inputs other than quoted prices included within Level 1 that are observable for the asset, either directly or indirectly | · Quoted prices for similar assets in active markets<br>· Quoted prices for identical or similar assets in markets that are not active (e.g., few transactions for the asset, prices are not current, price quotations vary substantially over time or among market makers, or little information is released publicly)<br>· Inputs other than quoted prices that are observable for the asset<br>· Valuation inputs derived principally from, or corroborated by, observable market data by correlation or other means |
| Level 3 | Inputs that are unobservable for the asset, i.e., the reporting entity's own assumptions about the inputs that market participants would use to price the asset, including risk | · Some forms of intangibles such as patents, trademarks, trade names, warranties, some commercial real estate in thinly traded markets, and minority interests |

Source: FASB Accounting Standards Codification 820 (2018) and *Introduction to Valuation for Financial Reporting* seminar (Chicago: Appraisal Institute, 2009)

BACK_DEFEXP-RR-003074

Level 2 inputs include considerations such as the condition and location of the asset on the measurement date.

Level 3 characteristics are unobservable, such as a company's own data, but the perspective of a market participant would still be required. Level 3 inputs include information obtained from broker quotes, management assumptions that cannot be corroborated with observable market data, and vendor-provided prices not corroborated by market data or transactions.

Real estate valuers regularly collect information on real property and real estate markets that qualifies as Level 2 input. Valuers are rarely able to incorporate Level 1 inputs in a valuation of real property because every parcel is unique. (Although professional valuation standards typically require analysis of the sales history of the subject property, the quoted prices of previous sales of the subject property are not current and thus would be classified as a Level 2 input rather than a Level 1 input.) In fair value accounting, Level 3 inputs are used when there is little market activity for the asset being valued. The reasonableness of information about the property becomes an issue for unobservable Level 3 inputs. That is, the observations of an independent observer such as a valuer that would be characterized as Level 2 inputs would generally be considered more reliable (and less subjective) than an entity's self-reported observations, which would most likely be characterized as Level 3 inputs. In the valuation of income-producing property using the income capitalization approach, almost all the inputs used in that approach are Level 3 inputs, which is not an issue. However, Level 3 inputs used in the application of the sales comparison approach can be problematic.

The valuation approaches used in a fair value measurement are expected to maximize the use of observable inputs and minimize the use of unobservable inputs. The availability and reliability of the inputs might affect the relevance and selection of valuation techniques, but the hierarchy of inputs affects the priority of the inputs, not the valuation techniques.

## What Services Can Appraisers Provide?

The market for valuation-related services in financial reporting is seen as a potential growth area for real estate valuers, working with (or for) accountants, business valuers, and personal property appraisers. As a significant example, corporate assets often must be valued for inclusion on corporate financial statements. A corporate merger or acquisition also triggers a valuation of the entire business, requiring that allocations be made for tangible and intangible assets in addition to determining if there is any residual goodwill in the business value. Accountants often need information on the value and depreciation of building components, both long- and short-lived items. Debt valuation is also a growing area within valuation for financial reporting.

The 2019 "Valuation Manual" of the National Council of Real Estate Investment Fiduciaries (NCREIF) and the Pension Real Estate Association (PREA) summarizes common appraisal perspectives and principles for the valuation of property-level debt as a liability, i.e., when the debt encumbers an owned asset. The measurement of the fair value of property-level debt should consider the following principles:

- Property-level debt must be measured from the perspective of a market participant.
- Market participants include those with whom the reporting entity would likely transact within an open market.

BACK_DEFEXP-RR-003075

Copyrighted material licensed by Charles Brigden on September 17, 2020

- A borrower's legal interest in a mortgage does not trade to other borrowers outside of a real estate transaction.
- Buyers of real estate analyze the effect of leverage (new or assumed) on the property cash flows to the net equity position.
- The income capitalization approach is the primary approach used to price the effect of loans whereby contractual debt service payments are discounted at a market interest rate.
- The term of the cash flow should represent what is expected to most likely occur over the life of the note, including consideration of open prepayment periods and extension options.
- Determining an appropriate market interest rate is highly dependent on the observation of market participants. Market interest rates should reflect prevailing lending rates used by market participants to analyze the effect of debt on a real estate transaction, including consideration of property type, market, loan-to-value ratio, debt service coverage, and property economics.
- Strict mathematical calculations may not reflect market behavior. Fair value measurements must reflect the price that is expected to be paid by a market participant to assume the debt and should be tested against market evidence.
- The process of developing an opinion of fair value of variable-rate debt, construction loans, and unsecured fund-level debt should follow the same practices and procedures as those followed for analysis of a reporting entity's fixed-rate debt, including consideration of prepayment terms and market participant behavior for pricing similar loans.[3]

Other valuation services that are often categorized as valuation for financial reporting include

- Portfolio review and valuation
- Review of internally generated values and information
- Audit assistance
- Purchase price allocation
- "Fresh start" accounting (i.e., Chapter 11 bankruptcy reorganization)
- Property tax analysis or assistance
- Capitalization rate and discount rate analysis
- Valuation model building
- Assistance in defining valuation procedures
- Valuation management

Valuation for financial reporting has long been a staple for valuers internationally, and this work is increasingly available for valuers in the United States who have the appropriate training and competency. For example, valuers doing this work may need to be familiar with audit review standards and requirements or be able to recognize business valuation procedures and how real estate value conclusions are incorporated into an allocation of enterprise value.

---

3.   NCREIF/PREA, *Reporting Standards Handbook Volume II: Manuals*, Valuation Manual (2019), 6-7.

BACK_DEFEXP-RR-003076

**Information Commonly Needed in Financial Reports Provided by Real Property Valuation Specialists**

· Listing and sale price information on comparable properties
· Capitalization rates or discount rates to use with cash flows
· Costs from a known cost service manual
· Depreciation rates for physical wear and tear
· Land sale prices
· Trend studies on market conditions for competitive real estate
· Demographic data demonstrating socioeconomic change patterns
· Assessment records (e.g., percentage change reports)
· Industry trends pertaining to business openings and closings

In valuation for financial reporting assignments, a valuer may be recognized as what auditing standards consider a "specialist." The Public Company Accounting Oversight Board, which was created by the Sarbanes-Oxley Act of 2002, defines a *specialist* as "a person (or firm) possessing special skill or knowledge in a particular field other than accounting or auditing," according to Auditing Standards 1210: Using the Work of a Specialist. In this context, an appraiser has the valuation knowledge and expertise that auditors are neither required nor expected to have, such as specialized knowledge of professional valuation standards, relevant state laws and regulations, property characteristics and utility, trends in market conditions, and analysis of the highest and best use of real property. Auditors generally are expected to be able to use the audit evidence provided by a valuation specialist.

An auditor, "must document the procedures performed, evidence obtained, and conclusions reached with respect to relevant financial statement assertions," according to PCAOB's Accounting Standard 1215: Audit Documentation. "Audit documentation must clearly demonstrate that the work was in fact performed. This documentation requirement applies to the work of all those who participate in the engagement as well as to the work of specialists the auditor uses as evidential matter in evaluating relevant financial statement assertions."

When acting as a specialist in an auditing assignment, a valuer must pay particular attention to the assignment's intended use and disclose the assignment's purpose in sufficient detail for the client to understand and use the valuation report as audit evidence in internal and external audits for financial reporting purposes, which from a valuer's perspective is no different from an appraisal assignment for other purposes. The opinion of value provided by a valuation specialist is useful to auditors and their clients because the valuation specialist is independent and unbiased. In fact, in certain situations the clients of auditors need to hire valuation specialists because independence issues prohibit the auditors themselves from estimating the value of assets that may affect their financial statements.

Under auditing standards, the qualifications of a specialist are similar to the requirements of practitioners in many professional fields. These qualifications are

•    Professional certification, licensing, or other recognition of competence in the field
•    Reputation and standing within the community of professional peers

BACK_DEFEXP-RR-003077

Copyrighted material licensed by Charles Brigden on September 17, 2020

- Experience in the type of work under consideration

As the valuation questions that arise in the preparation of a financial report become more complicated, the need for specialized expertise increases. As a result, valuers with demonstrated expertise with IFRS and GAAP requirements are well-positioned to forge ongoing working relationships with the auditors, accountants, and corporations who need valuation-related services.

## Impairment of Fixed Assets

A common appraisal problem in valuation for financial reporting assignments is the revaluation of fixed assets triggered by what is known as the "impairment test." According to IAS 36: Impairment of Assets, an asset is considered "impaired" if its carrying amount exceeds the amount that could be recovered through use or sale of the asset. The carrying amount is the value amount recorded in a company's financial statement for each asset within an asset group (such as buildings and infrastructure). That value includes deductions for depreciation and impairment losses, although *depreciation* in this context is accounting depreciation rather than the accumulation of physical deterioration and functional and external obsolescence that is estimated in the traditional valuation process for real property. The recoverable amount that is compared to the carrying amount is either (1) fair value less selling costs, i.e., the net selling price, or (2) value in use, whichever is higher. Again, in this context, *value in use* refers to the present value of future cash flows expected to be derived from an asset or asset complex. It is not synonymous with *use value* as used in real estate valuation.

For the purposes of financial reporting, assets that are deemed impaired would require a new fair value measurement and an estimate of remaining useful life. A revaluation of those indicators can affect the net income reported in financial statements. Companies are not required to have their assets revalued at the end of each financial reporting period, but they are required to look for indications that an impairment loss is likely.

An impairment test involves a discounted cash flow analysis using a forecast income statement based on the use of the existing fixed assets as of the date of appraisal, excluding consideration of the future growth or replacement of the assets. In an impairment test, the DCF analysis of net operating income differs from the analysis of profit and loss in that certain expenses are excluded from the calculations:

- Interest expense and interest income
- Other income and related expenses not derived from the use of the fixed asset complex
- Extraordinary gains or losses
- Depreciation expenses
- Income taxes

In other words, earnings before interest, income tax, and depreciation would be equal to net operating income, and cash flow from operations would be equal to net income because depreciation is excluded. Note that estimating value in use for an impairment test is not a business valuation, nor is it a technique for the direct valuation of assets.

BACK_DEFEXP-RR-003078

## Professional Auditing, Accounting, and Valuation Standards

The relevant set of professional appraisal standards that apply in a particular assignment for financial reporting depends on whether law, regulation, or agreement with the client requires compliance with the Uniform Standards of Professional Appraisal Practice (USPAP), the International Valuation Standards (IVS), or some other set of professional standards. Valuers in the United States who are licensed or certified by their state often must comply with USPAP because their state board requires compliance with USPAP (i.e., through law). However, a valuer may be in compliance with USPAP and IVS simultaneously.[4]

The 2020 edition of the International Valuation Standards includes a section on special considerations for financial reporting: IVS 410 Development Property. USPAP first addressed the applicability of those valuation standards in VFR assignments in the frequently asked questions section published with the 2010-2011 edition of USPAP. Global pressures will likely lead to more discussion of the potential for convergence between USPAP, IVS, and other relevant professional valuation standards along with new discussion of valuation for financial reporting by valuation standards-setting bodies.

The International Accounting Standards Board (IASB) is responsible for developing and maintaining the International Financial Reporting Standards, including the fair value accounting standards that valuation specialists must understand to be able to perform VFR assignments effectively. FASB and IASB have mutually agreed to work toward standards that

- Are principles-based (rather than rules-based)
- Are internally consistent
- Are internationally converged
- Lead to financial reporting that provides information needed for investment, credit, and similar decision making

A principles-based set of standards is commonly believed to require more interpretation by the user of the standards than a rules-based system. Proponents of principles-based standards point out that a system based on a set of consistent and coherent concepts is robust and not likely to become mired in discussion of exceptions to specific rules, whereas critics point out the significant potential for disputes (and litigation) when rules are not presented explicitly.

Since the Norwalk Agreement in 2002, FASB has written and updated a number of Accounting Standards Codification (ASC) statements recognizing the importance of market inputs when valuing tangible and intangible corporate assets (such as real property interests) for financial reporting:

- ASC 350: Goodwill and Other Intangible Assets (Goodwill Impairment Testing)
- ASC 360: Accounting for the Impairment or Disposal of Long-Lived Assets
- ASC 805: Business Combinations (Purchase Price Allocations)
- ASC 820: Fair Value Measurements (formerly *Statement on Financial Accounting Standards 157*)

---

4. More discussion of International Valuation Standards and professional practice and law can be found in Appendix A.

BACK_DEFEXP-RR-003079

Copyrighted material licensed by Charles Brigden on September 17, 2020

- ASC 840: Accounting for Leases (Leasehold Valuations)
- ASC 842: Leases
- ASC Topic 946: Financial Services—Investment Companies

Those standards codification continue to evolve. For example, in 2017 FASB issued Update 2017-01: Business Combinations: Clarifying the Definition of a Business to clarify ASC 805: Business Combinations (Purchase Price Allocation). The update addressed criticism of ASC 805 that the definition of a business was applied too broadly in that standard, creating potential ambiguity between the purchase of a business and the acquisition of an asset. The update spells out more plainly the set of characteristics required for an entity to be classified as a business in the context of a business combination.[5]

Appraisers engaged in valuation for financial reporting activities should keep abreast of evolving financial accounting standards. The organizations listed in Table 36.2 publish information on new standards and, along with professional journals covering accounting issues, they are the best sources of information about the convergence of standards internationally.

In the same manner that US and global valuation and accounting standards are converging, US generally accepted auditing standards (GAAS) are converging with their international counterpart. The American Institute of Certified Public Accountants recently completed its Clarity Project in which US generally accepted auditing standards were redrafted and recodified. AICPA's new statements on auditing standards are principles-based, mirroring the trend in the convergence of professional accounting and valuation standards.

---

5.  Financial Accounting Standards Board, "Accounting Standards Update 2017-01, *Business Combinations (Topic 805): Clarifying the Definition of a Business*," *FASB in Focus* (January 5, 2017).

BACK_DEFEXP-RR-003080

**Table 36.2    Organization Involved in Accounting, Auditing, and Valuation Standards**

| Entity | Description | Relevant Rules | Website |
|---|---|---|---|
| American Institute of Certified Public Accountants (AICPA) | The largest US national professional association for CPAs | · SAS 73: Using the Work of a Specialist<br>· SAS 101: Auditing Fair Value Measurements and Disclosures | www.aicpa.org |
| The Appraisal Foundation | A US nonprofit educational organization dedicated to the advancement of professional valuation | · Uniform Standards of Professional Appraisal Practice (USPAP) | www.appraisalfoundation.org |
| CFA Institute | The largest global nonprofit organization of investment professionals | · Global Investment Performance Standards (GIPS) | www.cfainstitute.org |
| Financial Accounting Standards Board (FASB) | A private nonprofit organization, not a government agency; the primary US standards-setting organization for developing generally accepted accounting principles; subject to oversight by the Financial Accounting Foundation (FAF) | · ASC 840: Accounting for Leases (SFAS 98)<br>· ASC 805: Business Combinations (SFAS 141(R))<br>· ASC 350: Goodwill and Other Intangible Assets (SFAS 142)<br>· ASC 360: Accounting for Impairment or Disposal of Long-Lived Assets (SPAS 144)<br>· ASC 820: Fair Value Measurements (SFAS 157) | www.fasb.org |
| IFRS Foundation | A private nonprofit standards-setting organization responsible for developing and amending international standards for financial reporting | · International Financial Reporting Standards (IFRS) | www.ifrs.org |
| International Standards Valuation Council (IVSC) | A private nonprofit organization established as an international valuation standards-setting body | · International Valuation Standards (IVS) | www.ivsc.org |
| National Council for Real Estate Investment Fiduciaries (NCREIF) | A private nonprofit trade association that provides investment performance indices and data for US commercial properties | · NCREIF/PREA Reporting Standards | www.ncreif.org |
| Public Company Accounting Oversight Board (PCAOB) | A nonprofit corporation established by Congress to oversee the audits of public companies in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports | · Sarbanes-Oxley Act of 2002 | www.pcaob.org |
| Securities and Exchange Commission (SEC) | An independent US regulatory agency with the statutory authority to establish financial accounting and reporting standards for publicity held companies | · Securities Act of 1933<br>· Securities Exchange Act of 1934<br>· Trust Indenture Act of 1939<br>· Investment Company Act of 1940<br>· Investment Advisors Act of 1940<br>· Sarbanes-Oxley Act of 2002<br>· Credit Rating Agency Reform Act of 2006 | www.sec.gov |

Note that the Standards of Professional Practice of the Appraisal Institute are composed of the Certification Standard of the Appraisal Institute and (a) the Uniform Standards of Professional Appraisal Practice or (b) the International Valuation Standards and applicable national standards.

BACK_DEFEXP-RR-003081

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Valuation of Real Property with Related Non-realty Items

# 37

The primary benefit of private real estate ownership is its ability to house human activities. For example, unimproved land is used for raw materials, agriculture, recreation, and open space. Improved properties provide shelter for households or businesses. Income to real property is generally in the form of rent (which is, in essence, a payment for the right to use property) or royalties. Whenever the income to a property includes payments for goods or services other than real property rents, the property potentially includes non-real property assets that need to be addressed appropriately. The presence of services that generate income over and above rent on the real property may create intangible property value. Often, however, the net income attributable to those services is viewed as being only incidental, and any incremental value created is considered to be inconsequential. As the proportion of income attributable to non-real estate sources increases, the potential for the property to include measurable intangible assets also rises.

Certain types of real estate improvements are designed and constructed solely for use in a business operation. Examples include a car wash, hotel, or a senior care facility where the design is specific to that business operation. Often, this type of real property is sold together with the business. In real property valuation, the business entity is referred to as a *going concern*, which can include real property, tangible personal property (such as furniture, fixtures, and equipment), and intangible assets (such as franchise agreements, other business contracts, and business goodwill). For some appraisals, an allocation or separate valuation of the real property component may be needed.

Standards Rule 1-4(g) of the Uniform Standards of Professional Appraisal Practice states, "When personal property, trade fixtures, or intangible assets are included in the appraisal, the appraiser must analyze the effect on value of such non-real property items." Those standards do not require a specific allocation of the value opinion between realty and non-realty components or a separate valuation of those components. However, the scope of work for appraisals prepared for ad valorem taxation, eminent domain, financial reporting, mortgage lending, and other purposes may encompass an allocation or a separate valuation of the real property component.

For some property types like hotels, car washes, marinas, and assisted-living facilities, the real property rarely sells independently of personal property and intangible property. In those cases, establishing a reasonable allocation of the value opinion among the realty and non-realty components can be challenging.

If a separate value in exchange opinion is provided for a non-realty component, the appraiser needs to consider the conditions of the value definition being used. For example, *market value* presumes a hypothetical sale of the asset being valued under certain stated conditions. The analyses and conclusion of value for the component must be consistent with the value definition. On the other hand, allocation is usually a matter of considering how much the component contributes to the larger asset—for example, how much it contributes to the going concern. The allocated amount does not necessarily represent a value in exchange. More likely, it represents a contributory value of that component. Furthermore, when a separate value in exchange opinion is developed for each component, the sum of those values may be more (or less) than the value of the whole as if sold together. However, in the case of allocation, the sum of the amounts allocated to each component will equal the value of the whole.

## Asset Classes and Transaction Types

Appraisal practice identifies three general classes of assets:

1. Real property
2. Personal property (tangible and intangible)
3. Financial assets

Two ways to visualize the different types of assets are shown in Figure 37.1.

Tangible assets include real property and physical personal property (for example, furniture, fixtures, and equipment). Personal property includes all tangible property not classified as real property and intangible (nonphysical) assets such as contracts, franchises, trademarks, copyrights, and goodwill items such as a valuable trade name and a trained workforce. Businesses also generally require working capital and other financial assets, which are best placed in a separate category called *financial assets*. Financial assets include cash and other assets the business intends to eventually convert to cash. A graphic representation of the components of the total assets of a business is shown in Figure 37.2.

**Figure 37.1**   Different Perspectives on the Types of Assets



BACK_DEFEXP-RR-003083

Copyrighted material licensed by Charles Brigden on September 17, 2020

**Figure 37.2** Components of the Total Assets of a Business in an Asset-Based Transaction



Note: Some appraisers consider supplies and inventory to be a subset of tangible personal property rather than a financial asset, which is also acceptable In any case, the appraisal report must make it clear to the reader what assets are included in the valuation and how they are allocated.

\* The difference between the value of the total assets of the business and the contributory value of all other identified assets."

## Appraiser Competence

Without specialized education, real property appraisers are not generally competent to provide an opinion of the value of a business itself. Valuation of a business entity requires an analysis of liabilities as well as assets, and must consider the organizational structure, capital structure, control, basis and income taxes, and other issues. Business valuation and personal property valuation are distinct segments of the valuation profession, and those disciplines require substantial specialized education and experience that most real property appraisers do not have.

Before accepting an appraisal or appraisal review assignment, an appraiser must decide that he or she has or can acquire the expertise to complete the assignment competently, and the appraiser must notify the client of any actions taken to acquire competency. For certain assignments, it may be necessary for a real property appraiser to collaborate with a personal property appraiser, a business appraiser, or both.

With adequate training and experience, a real property appraiser may become competent in valuing business entities that are primarily real property and also include tangible personal property and intangible property. However, in valuing such a property, a real property appraiser is generally only valuing the asset-based entity that could be bought and sold by businesses. Even when an appraisal assignment involves valuing only real property, any allocation is an appraisal, according to professional standards. In making an allocation, an appraiser must adhere to applicable professional standards (e.g., Standard 1 of USPAP for real property, Standard 7 for personal property, and Standard 9 for intangible assets or the various asset standards in the International Valuation Standards) and must comply with any standards rules related to competency (e.g., the Competency Rule in USPAP and Ethical Rule 1-3 in the Code of Professional Ethics of the Appraisal Institute). Tax courts have often stated that professional certification and designation programs are helpful in delineating whether an appraiser meets the knowledge and expertise of USPAP and the Federal Rules of Evidence, even if those criteria are not dispositive of a professional's competence.

BACK_DEFEXP-RR-003084

Sales of businesses can be classified in two general transaction types: (1) entity-based transactions and (2) asset-based transactions. In an entity-based transaction, the buyer acquires the actual business entity of the seller through a purchase of the stock, partnership interests, membership interests, or other specified interests, depending on the form of the business. In an asset-based transaction, the buyer acquires only the assets of the business but does not acquire the business entity itself. Say, for example, a hotel is owned by Jones Hotel Inc. and is the primary asset of that business. In an entity-based transaction, the buyer would acquire the ownership interests through stock certificates in Jones Hotel Inc. and would assume control of that company. The buyer would not only acquire the hotel and any other assets of Jones Hotel Inc. but also any liabilities of the company. In an asset-based transaction, the buyer would acquire only assets of Jones Hotel Inc., such as the real property, the personal property, certain financial assets (when appropriate), and perhaps certain intangible assets. The business entity, Jones Hotel Inc., would remain in the hands of the seller. For small businesses, asset-based transactions are often preferred because of simplicity, reduced legal exposure, and potential tax advantages.

Regardless of the form of a sale, an appraiser must take care to identify which assets were included in the transaction. For some property types, it is common for an asset-based transaction to include real property, related personal property (such as furniture, fixtures, and equipment, commonly referred to by the acronym FF&E), and certain intangible assets, but to exclude the financial assets. However, that is not always the case. In some asset-based sales contracts, a mechanism is set up for the transfer of certain financial assets like accounts receivable or inventory, but the price of those items may or may not be included in the stated purchase price. When this is the case, it poses an additional requirement for the appraiser analyzing comparable sales to determine which assets were included in the transfer. The verification process of comparable sales should also focus on the presence of any financial assets that were included. This is critical to ensure that proper rates and ratios are developed.

## The Going-Concern Premise

Business appraisers generally consider the value of a business under both a going-concern premise and a liquidation premise. Under the going-concern premise, the business is assumed to continue operating indefinitely. Under the liquidation premise, it is assumed that the business operation is closed and the assets are sold off. The premise that results in the higher value indication is used for the development of the final value opinion. The appraiser's determination of the appropriate premise is critical in determining the proper appraisal techniques, in selecting comparables, and in making an appropriate allocation of value to the various asset classes.

If the income generated by the business is less than the amount required to support the value of the assets, liquidation (closing the business and selling the assets) is the best course of action because it results in the highest value. Unless a forced liquidation is specifically assumed, the liquidation premise assumes an orderly disposition without atypical seller motivation or a limited marketing period.[1]

Suppose, for example, that an appraiser is asked to value a car wash operating under a franchise agreement with a large national chain. The building has a distinc-

---

1. A value indication under the liquidation premise is not commensurate with *liquidation value* as that term is used in real estate appraisal.

BACK_DEFEXP-RR-003085

Copyrighted material licensed by Charles Brigden on September 17, 2020

tive design and an upgraded facade required by the franchisor, and the equipment includes some specialized detailing equipment to provide services that are required by the franchise agreement. If the operation is highly profitable, the appraiser may conclude that continued operation of the business will produce the highest value. In that case, the proper allocation of value to the real property and personal property could be as high as the physically depreciated replacement cost (because the facade upgrades and specialized equipment contribute to the value of the tangible assets as a part of the going concern), and the franchise contract could be viewed as a valuable intangible asset. Alternatively, the appraiser may conclude that a higher value may be realized by closing the franchised business operation and reducing costs by eliminating franchise fees and cutting staff and other expenses related to the special services. In that case, the proper allocation to real property may be lower because the special facade required by the franchise may not contribute to value as an overimprovement to the real estate, and the proper allocation of value to the franchise contract may be zero. A third alternative is that the appraiser may conclude that demolition or conversion to a different use altogether is the highest and best use, in which case the allocation to tangible personal property may be limited to salvage value, and there may be no allocation to intangible assets.

Another important concept under the going-concern premise is that the sum of the independently development market values of the parts may not be equal to the value of the whole. It is generally improper to value the real property, personal property, and intangible property separately from the going concern and simply sum up those individual values to arrive at the value of the whole property under the going-concern premise. When a team of appraisers (e.g., a real property appraiser, a personal property appraiser, and a business appraiser) work together on an assignment, the appraisers must ensure that the valuation premises and income and expense projections are accounted for consistently in their work to avoid double-counting income or expense items.

## Application of the Approaches to Value

For real estate-intensive business properties, all three valuation approaches may be applicable. However, depending on the assignment, certain approaches could be less applicable to some of the asset classes, and certain approaches may be less helpful in determining an appropriate allocation of the final value opinion. These scope of work decisions are made by the appraiser in determining a solution to the client's problem.

### The Cost Approach

In situations where the cost approach can be developed reliably, it can be useful in determining the appropriate allocation of value to the different asset classes. A common strategy is to use the cost approach to value only the tangible asset classes. The value indication from the cost approach can then be compared to value indications from the sales comparison and income capitalization approaches. If those approaches indicate a higher value than the cost approach for only the real estate and tangible personal property, the difference may be an indication of the value of the intangible assets.

In some circumstances, it may also be appropriate to allocate value to certain intangible assets based on replacement cost. For example, the appropriate value allocation to an assembled workforce in a particular case may be the cost of replacing the workforce, including employment agency fees, advertising costs, interview expenses,

BACK_DEFEXP-RR-003086

and payroll expenses during any unproductive training period. It is important to keep in mind that, as with real property, the cost of an intangible asset does not necessarily equal value. However, cost may be an appropriate basis for an allocation.

Table 37.1 illustrates the application of the cost approach to value tangible assets alone. In cases where intangible assets can be reasonably valued based on replacement cost, it may be possible to include a column for intangible assets and develop a value indication for the total property by the cost approach.

**Table 37.1**   Application of the Cost Approach Addressing Tangible Assets Only

|  | Real Property | Personal Property | Total Tangible Assets |
|---|---|---|---|
| Direct and indirect cost | $2,500,000 | $210,000 | $2,710,000 |
| Entrepreneurial incentive | $250,000 | – | $250,000 |
| Total replacement cost | $2,750,000 | $210,000 | $2,960,000 |
| Depreciation |  |  |  |
| Physical deterioration | – $600,000 | – $42,000 | – $642,000 |
| Functional obsolescence | – $200,000 | $0 | – $200,000 |
| External obsolescence | $0 | $0 | $0 |
| Total depreciation | – $800,000 | – $42,000 | – $842,000 |
| Depreciated value of improvements | $1,950,000 | $168,000 | $2,118,000 |
| Land value | $600,000 | – | $600,000 |
| Value indication by the cost approach | $2,550,000 | $168,000 | $2,718,000 |

An important consideration for the cost approach is that allocating all the entrepreneurial incentive attributable to the property to only the real property may not be appropriate. The portion of entrepreneurial incentive relating to the development of the real property should be allocated to that asset class, but the portion of entrepreneurial incentive relating to the personal property and to establishing the business (e.g., legal, marketing, and staffing expenses) may be more appropriately allocated to those assets.

Supportable estimates for all forms of depreciation are critical to the development of a reliable cost approach. Properties that are tied to business operations tend to be specialized constructions and can be more susceptible to functional obsolescence than, say, a simple office, warehouse, or retail building. If there is any oversupply of a particular property type in a given market, it is likely that existing properties of that type exhibit external obsolescence due to market conditions.

### The Sales Comparison Approach

For certain property types, real property rarely sells independently from personal property and intangible property. However, in some cases, it may be possible to allocate the prices of comparable sales between real property, personal property, and intangible property. Also, it could be reasonable to address each asset class separately in the sales comparison approach or to address real property on its own. One consideration could be the allocation agreed to by the buyer and seller in a transaction. However, caution is necessary because those allocations may be based on income tax issues or other considerations and may not reasonably reflect the actual value contribution of the various assets. Other sources of allocation information could be industry standards or interviews with market participants.

BACK_DEFEXP-RR-003087

Copyrighted material licensed by Charles Brigden on September 17, 2020

For property types where real property rarely sells independently from the personal property and intangible property, comparable sale prices often cannot be reliably allocated to the various asset classes. In those cases, the sales comparison approach may only provide a value indication for the total property without allocation. In a sales comparison analysis without allocation, the total price of the comparable sales can be analyzed to provide a value indication for the subject property in total, including all the asset types. Whether quantitative adjustments or qualitative analyses are used, the analyses must consider differences in personal property and intangible property as well as differences in real estate characteristics. It is critical that the appraiser identify what assets were included in each comparable sale.

## The Income Capitalization Approach

Income capitalization methods used by appraisers to value properties with personal property and intangible property components vary widely. Some methods address only the total value of the property without allocation to the asset classes. Others are more detailed and break down income between the various assets or asset classes.

As with all income property valuation, the selection of the appropriate method or methods is based on three considerations:

1. The capitalization method (or methods) used by market participants. If the goal of the valuation is to predict what would have been paid for the property if it had been exposed on the open market, it is preferable to perform calculations in the way typical buyers and sellers do.

2. What market data is available. Appraisers should avoid applying techniques for which the income and expense projections or capitalization rates cannot be supported with market evidence. Depending on the scope of work, a less detailed method may be preferable to a more detailed method if it can be better supported by market data.

3. The method selected must be adequately detailed to solve the problem. For example, if the pattern of income projected for a particular property is highly irregular, an appraiser may decide that discounted cash flow analysis is necessary even though direct capitalization is more commonly used by market participants and direct capitalization rate data is more readily available.

Selecting the appropriate capitalization method for a property with personal property and intangible property components requires judgment. For some property types, data is more plentiful for overall capitalization methods. However, if the scope of work includes an allocation of the value opinion between the asset classes or

---

**Appraisal Institute Resources for Further Research on the Debate**

Numerous court decisions have been made in property tax cases in various states, and research may be performed on those cases and on the ongoing debate about allocation of assets using a variety of recommended resources:

· The Y. T. and Louise Lee Lum Library of the Appraisal Institute
· Appraisal Institute publications such as *A Business Enterprise Value Anthology* (2001) and *A Business Enterprise Value Anthology*, 2nd ed. (2011), which include citations of relevant court decisions
· Articles in *The Appraisal Journal*

---

BACK_DEFEXP-RR-003088

the value of real property only, judgments on a breakdown of income between asset classes may be necessary to apply the appropriate rates to the components.

## Valuation Techniques

Intangible assets are inherent in the operation of some property types. In those cases, appraisers do not ask whether intangibles exist, but rather how the intangibles should be measured. The same is true of personal property. The challenge of accounting for the value of non-realty assets is complicated by the variety of property types and markets in which they are traded. For example, intangible assets inherent in the operation of sports stadiums may be treated differently by market participants than the manner in which market participants treat intangible assets inherent in convenience stores. Intangible assets inherent in health care properties may be treated differently by buyers and sellers in that market than by buyers and sellers of regional malls. How market participants treat these assets may change over time and may be an unresolved issue, and various methods have been developed for appraisers to consider. One of the most reliable procedures for appraisers to follow is to interview active buyers of a specific property type (that is the same as the subject property) to determine what the actual market makers believe they are purchasing and how and why they make value allocations. Because all of the methods are subject to criticism, the professional appraiser should exercise judgment as to which method, or combination of reconciled methods, provides a credible conclusion.

The appropriate method of valuing or allocating intangible assets has been highly controversial among real property appraisers. It is important for all involved in this form of valuation work to understand the history and intensity of the debate and to understand the various alternative methodologies regarding how intangible assets should be accounted for in the valuation process.

Given the complexity of the issues and intensity of the controversy, generalizations can be dangerous. Nevertheless, several basic approaches can be identified that are being used in the marketplace, and those approaches are described below.

### The Cost Approach

The cost approach is one method of allocation that is straightforward and eliminates the need to address tangible and intangible personalty. Many appraisers use the approach as a check to see if an indication of intangibles exists in a going concern in addition to using the approach as support along with another method or methods. The cost approach is particularly useful in situations where sales of total assets of going concerns are the only sales available. The amount and type of depreciation existing in the asset play a role in the effectiveness of this approach. When significant depreciation exists, the approach may have less applicability.

The cost approach does not provide an indication of value for certain assets, such as intangibles, unless specifically supplemented to do so. Thus, the value indication of the cost approach is often compared with the value indications from the sales comparison approach and income capitalization approach when only sales of the total assets of the going concern are available to the appraiser. The premise is that the cost approach provides an indication of value of the fee simple interest in the real estate (and possibly non-realty personalty also) whereas the other two approaches may provide value indications for the total assets of the going concern. Therefore, the difference between the reconciled value using the income capitalization and sales com-

BACK_DEFEXP-RR-003089

Copyrighted material licensed by Charles Brigden on September 17, 2020

parison approaches for the total assets of the going concern and the cost approach for the fee simple interest in the real estate plus other tangible assets may represent the intangible business value. An example of the approach is shown in Figure 37.3.

**Figure 37.3**    Example of Cost Approach Application

A six-year-old, 90-bed assisted-living facility has an estimated market value of the going concern of $6,750,000. Land value has been estimated at $900,000, and the depreciated value of the improvements is estimated at $5,200,000. The estimated value of FF&E is $450,000.

*What is the allocated market value of the intangible assets?*

| | |
|---|---:|
| Market Value of the Going Concern | $6,750,000 |
| Less Depreciated Value of the Improvements | − $5,200,000 |
| Less Land Value | − $900,000 |
| Less FF&E | − $450,000 |
| Intangible Assets | $200,000 |

## Overall Capitalization without Allocation to Asset Classes

For some real estate-intensive businesses, market participants commonly estimate net income in a format similar to other real estate investments including deductions for detached management and adequate reserves to handle periodic replacement of furniture, fixtures, and equipment. For some other business types, transactions are based on other measures of income such as

- gross revenue
- gross profit
- seller's discretionary earnings (SDE)
- earnings before interest, taxes, depreciation, and amortization (EBITDA)
- earnings before interest and taxes (EBIT)
- net earnings

In some markets, EBITDA calculations do not typically include deductions for management fees, real estate rent, or returns/reserves for personal property, so appraisers clarify by using the acronyms EBITDAR and EBITDARM, where $R$ refers to rent and $M$ refers to management fees.

Table 37.2 is an example of how various multipliers or capitalization rates can be extracted from a comparable sale by comparing income at a particular level to the overall sale price including real property, tangible personal property, and intangible personal property. If the multipliers or capitalization rates extracted from comparable sales are analyzed and appropriate multipliers or capitalization rates are applied consistently to the subject property's projected income, the resulting value indication will relate to the subject property's overall value including real property, tangible personal property, and intangible personal property. Consistency is necessary to result in a credible conclusion. When extracting multipliers or capitalization rates from comparables and applying them to the subject, the income used in the calculation must be calculated consistently and the price/value used in the calculation must relate to a consistent set of assets. As with all capitalization problems, the analysis may be strengthened by using multipliers or rates based on more than one level of income.

BACK_DEFEXP-RR-003090

**Table 37.2**   Overall Capitalization Analysis (without Allocation)

Sale Price (real property, tangible personal property, and intangible personal property):                    $2,900,000

|  | Income | Rate/Factor | Type |
|---|---|---|---|
| Gross revenue | $880,000 | 3.30 | Revenue multiplier |
| Cost of goods sold | − $130,000 | | |
| Gross profit | $750,000 | 3.87 | Gross profit multiplier |
| Expenses: | | | |
| Payroll (excluding owner) | − $180,000 | | |
| Franchise fees | − $35,000 | | |
| Other operating expenses | − $110,000 | | |
| Property tax and insurance | − $40,000 | | |
| SDE (seller's discretionary earnings) | $385,000 | 7.53 | SDE multiplier |
| Market payroll for owner's labor | − $30,000 | | |
| EBITDA/EBITDARM | $355,000 | 8.17 | EBITDA multiplier |
| Management fee | − $44,000 | | |
| Replacement reserves (including FF&E) | − $21,000 | | |
| Net operating income | $290,000 | 0.10 | Overall capitalization rate |

In some markets for certain property types, overall capitalization without allocation to the various asset classes is the technique that is used most often and is most commonly recognized by market participants. Other possible advantages are that the data necessary to make the calculations is relatively plentiful and the calculations themselves are relatively simple. The disadvantage is that the resulting value indication is not broken down by asset class. Therefore, if the scope of work calls for an allocation or for a value opinion for real property only, an appraiser must use some method other than the income capitalization approach to make the allocation.

### Capitalization with Allocation to the Asset Classes

When the scope of work calls for the appraisal to include an allocation of the market value of the going concern, it may be appropriate to apply the income capitalization approach with income allocated to the various asset classes and with a separate capitalization rate or multiplier assigned to each income component. When real property is included as a fee simple estate, the appropriate income allocation to real property is generally considered to be equal to absolute net market rent. The allocation to personal property must account for both return on and return of investment for that asset class, which is more than just a replacement reserve that covers only return on investment.

### Excess Earnings Method

In the excess earnings method, which was developed by the US Department of the Treasury in the 1920s, income is first allocated to the tangible assets, and any residual income is allocated to intangible assets. Typically, no deduction is made for management fees, so the EBITDA attributable to intangible assets assumes the business is managed by the owner. However, a variation used by some appraisers for certain property types includes a management fee, so EBITDA becomes a net amount for a passive business owner. Table 37.3 illustrates an income statement for the excess earnings method, both with and without a deduction for a management fee.

BACK_DEFEXP-RR-003091

Copyrighted material licensed by Charles Brigden on September 17, 2020
Case 3:21-cv-00232-DWD    Document 280-2    Filed 03/05/25    Page 687 of 722    Page
ID #16911

| Table 37.3 | Overall Capitalization Analysis (with Allocation) | |
|---|---|---|
| | **Without Deduction for Management Fee** | **With Deduction for Management Fee** |
| Gross revenue | $880,000 | $880,000 |
| Cost of goods sold | − $130,000 | − $130,000 |
| Gross profit | $750,000 | $750,000 |
| Expenses: | | |
| Payroll | − $210,000 | − $210,000 |
| Franchise fees | − $35,000 | − $35,000 |
| Other operating expenses | − $110,000 | − $110,000 |
| Property tax and insurance | − $40,000 | − $40,000 |
| EBITDAR/EBITDARM | $355,000 | $355,000 |
| Management fee | | − $44,000 |
| Real property rent | − $230,000 | − $230,000 |
| Return on and return of personal property | − $31,778 | − $31,778 |
| EBITDA (income to intangible property) | $93,222 | $49,222 |

Ideally, the estimate of real estate rent in the excess earnings method is based on analysis of direct rent comparables. However, for some property types, data of that type is scarce or nonexistent. In those cases, the rent must be estimated in some other way, such as

- Multiplying or dividing the depreciated cost from the cost approach by a lease constant (capitalization rate or multiplier as appropriate)
- Analyzing comparable rents for similar property types (e.g., apartment rents for assisted-living facilities, big-box retail rents for a fitness club or bowling center) and making appropriate adjustments
- Applying an appropriate rent-to-revenue ratio based on data from an industry association study, interviews with market participants, or other sources

Each of the alternative methods of estimating real estate rent has potential weaknesses. Nevertheless, by using more than one method, appraisers can make reasonably supported conclusions.

The allocation of income to the personal property in the excess earnings method can also be thought of as rent and must be adequate to provide a return on and return of investment in personal property. Replacement reserves are not an adequate income allocation for personal property in the excess earnings method. A typical replacement reserve provides return of investment but not return on investment. For example, consider a property that has personal property with a replacement cost of $210,000 and a useful life of 10 years. If the personal property is an average of two years old, the value might be estimated at about $168,000 (8/10 of $210,000, rounded). A simple straight-line replacement reserve could be estimated at $21,000 per year ($210,000/10 years). However, an investor would not be attracted to purchase the personal property for $168,000 if the potential income was only $21,000 per year for eight years.

In most cases, rent comparables for furniture and equipment are not available, so the rent is calculated based on cost. One common method is to multiply the depreciated cost of the personal property from the cost approach by an appropriate lease

BACK_DEFEXP-RR-003092

constant (i.e., a capitalization rate). If the personal property has no salvage value at the end of its useful life, the lease constant is equal to a loan constant for the remaining life of the personal property at an appropriate discount rate or interest rate. For example, if the personal property has an 8-year remaining useful life and the appropriate discount rate is 10.25%, the appropriate annual capitalization rate is about 18.92% (0.189153 partial payment factor for 8 periods at 10.25% per period). If the value of the personal property is $168,000, income attributable to the personal property could be estimated at $31,778 ($168,000 × 0.189153).[2]

The final step in the excess earnings method is to apply an appropriate capitalization rate to each of the component asset classes. Table 37.4 illustrates an example of capitalization relating to the sample income statement in Table 37.3. A simple table can help keep the calculation consistent. Of course, if the excess earnings attributable to intangible property are calculated after deducting a management fee, the appropriate capitalization rate will be lower than it would be if no deduction is made for management fees. The value of the property does not change based on the method of calculating income or on the method of capitalization. The key is to extract capitalization rates from comparable data and apply them to the subject property using consistent treatment of management fees and any other expenses.

In assigning capitalization rates to the asset classes, the appropriate capitalization rate for personal property is generally considered to be higher than the capitalization rate for the real property. Land does not depreciate and real estate improvements generally have a longer life than personal property, so real property income is more durable. The appropriate capitalization rate for intangible property is generally higher than the real property capitalization rate because income to the intangible assets is much riskier. The overall capitalization rate for the total going concern should also be checked for reasonableness.

**Table 37.4**  Capitalization in Excess Earnings Method

**Example without Deduction for Management Fee**

|  | Income | Capitalization Rate | Value |
|---|---|---|---|
| Real property | $230,000 | 0.0950 | $2,421,000 |
| Personal property | $31,778 | 0.1892 | $168,000 |
| Intangible property | $93,222 | 0.3000 | $311,000 |
| Total as a going concern | $355,000 | 0.1224 | $2,900,000 |

**Example with Deduction for Management Fee**

|  | Income | Capitalization Rate | Value |
|---|---|---|---|
| Real property | $230,000 | 0.0950 | $2,421,000 |
| Personal property | $31,778 | 0.1892 | $168,000 |
| Intangible property | $49,222 | 0.1583 | $311,000 |
| Total as a going concern | $311,000 | 0.1072 | $2,900,000 |

2.  Another method used by many business appraisers to calculate income to the personal property is to figure return on investment based on a discount or interest rate applied to the current value of the personal property, and add the return of investment calculated as a replacement reserve. For the example used here, the total would be $168,000 × 10.25% = $17,220 (return on) plus $210,000/10 years = $21,000 (return of), for a total of $38,220. The income allocated to personal property on that basis is higher because the calculation does not account for the time value of money. Nevertheless, this and other methods are acceptable as long as the calculation is consistent in extracting capitalization rates from comparable sales and applying them to the subject property.

BACK_DEFEXP-RR-003093

Copyrighted material licensed by Charles Brigden on September 17, 2020

Ideally, the capitalization rate applied to real property income would be extracted from comparable sales of real property only. However, for some property types, real property rarely sells independently from personal property and intangible property, so direct capitalization comparables are scarce. In those cases, it may be possible to extract rates from sales of going concerns using a residual method. Another consideration is the use of capitalization rates for other property types that have similar income pattern and risk characteristics. If adequate support is available, it may also be possible to calculate a real estate capitalization rate using a band-of-investment technique or a property model formula. When data is scarce, use of more than one method of determining the capitalization rate can strengthen the analysis.

The capitalization rate for the intangible property should also be based on comparable data, to the extent possible. As with real property, it may be possible to use a residual technique to extract rates from comparable sales of going concerns when sales of intangibles only are not available. For many types of businesses, comparable data is available from vendors who compile that data specifically for use by appraisers, brokers, and others. It is also helpful and important to interview business brokers and other market participants.

### Parsing Income Method

In cases where the assignment is to value real property only, some appraisers use the parsing income method, which is a variant of the excess earnings method of business valuation. The difference in the parsing income method is that real property income is calculated as the residual rather than intangible property income. Table 37.5 illustrates two common formats. The intangible assets must be identified, and an income allocation assigned to each. The income allocation is based on either (a) estimating the amount the intangible asset contributes to income or reduces expense or (b) esti-

**Table 37.5**  The Parsing Income Method: Real Estate as a Residual

| | Without Deduction for Financial Assets | With Deduction for Financial Assets |
|---|---|---|
| Gross Revenue | $880,000 | $880,000 |
| Cost of Goods Sold | – $130,000 | – $130,000 |
| Gross Profit | $750,000 | $750,000 |
| Expenses: | | |
| Payroll | – $210,000 | – $210,000 |
| Franchise Fees | – $35,000 | – $35,000 |
| Other Operating Expenses | – $110,000 | – $110,000 |
| Property Tax & Insurance | – $40,000 | – $40,000 |
| EBITDAR/EBITDARM | $355,000 | $355,000 |
| Management Fee | – $44,000 | – $44,000 |
| Income to Personal Property ($168,000 x 0.1892) | – $31,778 | – $31,778 |
| Income to Intangible Property | – $49,222 | – $49,222 |
| Income to Financial Assets ($90,000 x 0.04) | n/a | – $3,600 |
| Residual Income (Rent) to Real Property | $230,000 | $226,400 |
| Real Property Capitalization Rate | 0.0950 | 0.0935 |
| Real Property Value Indication (rounded) | $2,421,000 | $2,421,000 |

BACK_DEFEXP-RR-003094

mating the value of the intangible asset by some other method and multiplying by an appropriate capitalization rate. In some models, deductions are also made for returns to financial assets. Again, consistency in extraction from market data and application to the subject property is key. Consistency must be maintained both in how income is calculated for the numerator in the capitalization rate calculation and in what assets are included in the denominator for the calculation. The valuation of a going concern that is centered on a real estate component may not include financial assets. Often, financial assets may not be included in the transfer of these properties. Table 37.5 illustrates the analysis with and without financial assets included.

In real estate appraisals, it is accepted that land has a priority claim on the value of improved real property. The total value of improved real property is allocated first to the land at its highest and best use, and the improvements are allocated the remainder. In a similar way, business appraisers generally view the tangible assets as having a priority claim on the value of the going concern. Therefore, when treating real property as a residual, some of the same caution is necessary as would be true for a land residual technique in a real estate appraisal. The appraiser must use care that, in allocating income to the intangible property, the allocation is limited to the amount the intangible assets actually contribute to the income of the entire going concern.

The parsing income method is consistent with the going-concern premise. The application of the method starts with an allocation of income and expenses to each of the asset classes, which is known as "contributory asset charges" in the business valuation community. Once the net income to each asset class is identified, it can then be capitalized into an indication of value by dividing by an appropriate capitalization rate or multiplying by an appropriate factor for each asset class. Alternatively, as shown in Figure 37.5, when only the value of the real estate is being sought, then capitalizing the income net of the contributory asset charges will accomplish this objective.

In the use of the parsing income method, it is critical for appraisers to ensure that any allocation of the income and expenses correctly identifies the contribution of the income to the total assets from tangible and intangible personalty. If the allocation is not done properly, it is unlikely that the residual value for any asset class will be correct. Critics state that this methodology is flawed because the identification of an appropriate capitalization rate to convert the residual income to different asset classes can be difficult. This method has also been criticized for the deductions applied for a return on the various components of the going concern, which create an opportunity for double-counting unless caution is exercised by an appraiser.

## The Management Fee Approach

The management fee approach has been used by some appraisers as a variant of overall capitalization analysis. From that viewpoint, deduction of franchise fees and management fees accounts for returns to the business, and replacement reserves account for future replacement of furniture, fixtures, and equipment. This approach of valuing tangible assets exclusive of intangible assets is based on the theory that once the revenue attributable to intangible assets is deducted, all other remaining income is attributable to the real property and other tangible assets. In other words, this approach involves the calculation of a residual, in much the same way that residuals are calculated in land residual analysis or in the various residual calculations in the income capitalization approach. The management fee approach is similar to the

BACK_DEFEXP-RR-003095

Copyrighted material licensed by Charles Brigden on September 17, 2020

business valuation approach called *relief of royalty*, where the value of the intangible property is equal to the value of the royalty payments from which the company is relieved by virtue of its ownership of the asset. Critics of this method assert that the value of intangible assets and rights cannot be removed by merely deducting the related expenses from the income stream to be capitalized; allowing a deduction for the associated expense does not allow for a return on the capital expenditure. However, proponents of this approach counter that a return on capital is implicit in the management fee or relief of royalty. These management fees enable the provider to operate a profitable business and obtain a return on and return of capital.

For a hotel property, proponents of this approach would deduct the management fee and franchise fee (if it is a branded hotel affiliated with a chain) along with other operating expenses. By removing management fees and franchise fees from the revenue, appraisers reason that the influence of intangible assets has been eliminated. This approach maintains that the offices, staff, salaries, and overhead associated with management of the hotel reside not with the owner of the real property but with the company that manages and operates the hotel for the owner of the real property. Advocates of this approach state that because the management fee compensates the management company for those expenses, including staffing the hotel, the value of any intangible assets is removed, and any remaining net income is attributable to the real property. Advocates further state that, in the case of branded hotels, removal of the franchise fee eliminates intangible assets attributable to the brand and the final result represents only the value of the real property and the tangible personal property.

The management fee method is also sometimes used by appraisers to account for intangible assets inherent in other property types that typically have a business management fee or franchise. Proponents of this approach say it is justified on the same grounds as the market participant survey-based approach described below in situations where market participants rely solely on the deduction of management fees to account for intangible assets. A different view is that removal of the cost of an asset or service does not remove all value associated with the existence of that asset or service. For example, opponents of this method suggest that paying the utility bills on a property does not remove the value associated with having the property served by electricity, gas, water, and sewer service.

### Market Participant Survey Approach

Interviews with market participants and, in some cases, regulatory filings may be used to assist in understanding the value allocated to intangible assets in market transactions. For example, in valuing specific property types, appraisers may interview market participants to ascertain how buyers and sellers of those properties value or allocate intangible assets in pricing decisions. The same questions may also be posed regarding personal property and how this property is valued or priced. The objective of that sort of exercise is to determine the thinking of market participants on these issues as opposed to relying on post-transaction book values recorded by accountants in financial statements.

Appraisers also research filings with the Securities and Exchange Commission. Given the dominance of real estate investment trusts (REITs) in various property classes and the regulatory requirements imposed on publicly traded companies, these filings may be insightful, if only as a secondary source. According to Account-

BACK_DEFEXP-RR-003096

ing Standards Codification Topic 805: Business Combinations, companies are required to allocate the purchase price of an acquired company among the tangible and intangible assets when acquired. As discussed in Chapter 36, the 2017 update to ASC Topic 805 redefined a "business" to clarify the conditions under which a transaction involves a business combination or an asset acquisition, which are treated differently on balance sheets under generally accepted accounting principles (GAAP).

Sales verifications and market interviews may be used as the foundation for the treatment of intangible assets. Advocates say that the strength of this approach is that its conclusions are tied directly to the marketplace. It also recognizes the possibility that treatment of intangible assets may vary based on property type (e.g., convenience stores, marinas, stadiums, and health care properties) and asset class. Critics of this approach say that survey responses of buyers and sellers may be influenced by tax or financial considerations or other nonmarket conditions, which may result in a skewed survey. Critics also assert that buyers and sellers may have no need or motivation to allocate the value of traded assets to the various component parts and that this is not really a method at all but only a part of normal verification requirements of professional standards for comparable data.

## Reconciliation

As with all appraisals, in the reconciliation of the approaches to value, appraisers consider the relative strengths and weaknesses of each of the approaches and arrive at a final value opinion. Depending on the scope of work, the value opinion for a property operated as a going concern may require an allocation of the value opinion between the asset classes. Table 37.6 illustrates how an appraiser might compile the results of the valuation techniques applied to assist in reconciling those value indications.

In some assignments, the scope of work may include an allocation of value to the asset classes, but it may not be possible to make the allocation within the approaches to value. In those cases, it may be appropriate to first reconcile to a final value opinion for the property overall and then estimate the appropriate allocation as part of the reconciliation process. Two methods commonly used to allocate the value opinion within the reconciliation are the cost approach and market participant surveys.

**Table 37.6**    Reconciliation

|  | Real Property | Personal Property | Subtotal Tangible Assets | Intangible Property | Total Value as a Going Concern |
|---|---|---|---|---|---|
| Cost approach | $2,550,000 | $168,000 | $2,718,000 | — | — |
| Sales comparison approach | — | — | — | — | $2,950,000 |
| Income capitalization approach | $2,421,000 | $168,000 | $2,589,000 | $311,000 | $2,900,000 |
| **Final value opinion** | **$2,420,000** | **$170,000** | **$2,590,000** | **$310,000** | **$2,900,000** |

Note: In this example, the cost approach is used only to value the tangible assets. The income capitalization approach uses the excess earnings method and therefore provides a value indication for each of the asset classes. The sales comparison approach is used only to value the total property as a going concern, without allocation. The breakdown of the approaches will vary depending on the assignment and on the information available. For example, it may be possible in some assignments to derive a value indication for intangible assets by the cost approach. In other assignments, the income capitalization approach may only provide a value indication for the property as a going concern, without allocation.

BACK_DEFEXP-RR-003097

Copyrighted material licensed by Charles Brigden on September 17, 2020

## Communicating Value Opinions

When talking about properties operated as going concerns, market participants sometimes use imprecise terms or use terms inconsistently. This can cause confusion for both the appraiser and the reader of the valuation report unless the appraiser clearly identifies what is included in the appraisal and what is not. For example, market participants might refer to the value of intangible property as *business value*, *business enterprise value*, *goodwill*, or *blue sky*, or sometimes even as the *going-concern value*. The total value of all asset classes might be referred to as *going-concern value*, the *value of the total assets of the business*, or sometimes *business value* or *business enterprise value*. Lenders sometimes request an opinion of what they call *dark value* or *value as if dark*, meaning the value as if the business is closed. *Going-concern value, business enterprise value*, and *dark value* are problematic terms in an appraisal setting because they may be confused with *types* of value, i.e., alternatives to market value, investment value, use value, or disposition value.

An appraisal report should include precise language that communicates four things:

1. The type of value being reported (e.g., market value, investment value, use value, disposition value)
2. The assets or asset classes included in the valuation
3. The valuation premise (i.e., the going-concern premise or the liquidation premise)
4. Property rights appraised

The following are examples of language that adequately communicates the information outlined above:

- "Market value of a going concern, including the fee simple interest in real property along with tangible and intangible personal property."
- "Market value of a going concern, including the leasehold interest in real property along with tangible and intangible personal property."
- "Use value of the real property only, as part of the going concern."

Each of the individual terms may also need to be defined in the report.

A market value opinion should be based on the going-concern premise or the liquidation premise, whichever is the highest and best use of the assets considered as a whole (i.e., all categories of assets rather than just real property). A lender or other client may request a value opinion for real property as if it were not occupied by the business, which is commensurate with the liquidation premise, even though the highest and best use is continued operation as a going concern. The actual occupancy situation and the occupancy premise for the appraisal should be clearly disclosed in the appraisal report.

BACK_DEFEXP-RR-003098

BACK_DEFEXP-RR-003099

Copyrighted material licensed by Charles Brigden on September 17, 2020



# Index

above-the-line expense, 437, 445, 462 (fn. 2)

accessibility and site analysis, 183-184

accounting, 652-656

accrued depreciation. *See* depreciation

active market, 22, 107, 280

actual age, 562

addenda, in appraisal reports, 625

additions to capital, as exclusion from reconstructed operating statements, 456

adequacy, and functional utility, 233-234

adjustable variable-rate mortgages, 119

adjusted sale price
   and bracketing, 376-377, 401
   and market data grids, 361-363, 399-400, 403
   and quantitative adjustments, 371-376

adjusted unit price, 405-406, 409-411

adjustment grid, 83, 110, 361-363, 399-400, 403

adjustments
   and comparative-unit method, 547-551
   and cost approach, 568, 574
   evaluating, 362-366
   for highest and best use, 387, 394-395
   and land and site valuation, 339-342
   for property rights, 362-366, 378-380
   in sales comparison approach, 78, 361-366, 375, 378-396

sequence of, 365-366

and trend analysis, 374-375

and unit-in-place method, 553-554

*See also* cost-related adjustments, in sales comparison approach; dollar adjustments, in sales comparison approach; gross adjustments; net adjustments; percentage adjustments, in sales comparison approach; property adjustments; quantitative adjustments; transactional adjustments

ad valorem taxes, 55, 92-93, 171

advocacy, 647-648

age. *See* actual age; effective age

age and life relationships, 560-567

agents of production, 15-16, 18-19

agricultural districts, 158-159

agricultural land, 65, 158-159, 189-191, 337

agricultural properties, 158-159, 189-191
   buildings on, 241
   and soil, 176-178

air-conditioning systems, 223-224
   as variable expense, 451-453
   *See also* heating, ventilation, and air-conditioning systems

AI Reports, 607-609

air rights, 65-66, 169, 337

BACK_DEFEXP-RR-003100

alarm systems, 226

allocation, and land valuation, 35, 342-343

alternative use, scoping, 318-319, 321

Americans with Disabilities Act (ADA), 215, 217

annual debt service, 463-465, 470

annualizer, 486

annual loan constant. *See* mortgage constants

annuities, and yield capitalization, 479-481

annuities payable in advance, 480

anticipation, 22

    and income capitalization approach, 414

    and land valuation, 335

apartment districts. *See* multifamily residential districts

apartments, and sample income and expense forecasts, 506-508

appraisal

    definition of, 1-3

    discipline of, 15-18

    foundations of, 15-18

    intended use of, 6-7, 40-41

    scope of work, 30-32, 75-80

    *See also* consulting; review; valuation process

appraisal assignments

    conditions, 30, 42-45

    types of, 6-7

appraisal client, 39-40

Appraisal Institute, 1-2, 32, 43, 49, 55-57, 87, 98, 101

appraisal problem, 30, 75-77

    definition of value, 30, 39, 44

    determination of scope of work, 30-32

    effective date of value opinion, 30-32, 41

    identification of relevant characteristics of property, 30, 32, 41-42

    limiting conditions, 42-45

appraisal reports, 37, 605-625

    addenda, 625

    analysis of data and conclusions, 623-624

    approaches to value, description, 623-624

    assessment data, 622-623

    certification, 32, 615-616

    comparison of report types, 606-612

    definition of value, 30, 41, 618

    effective date of value opinions, 618-619

    executive summary, 615

    extraordinary assumptions and hypothetical conditions, 43-44, 193-194, 619

    and Fannie Mae, 85-87, 607-609

    final value opinion, 37, 614-615, 624

    form reports, 85-87, 607-609

    general assumptions and limiting conditions, 619-620

    highest and best use, 328, 623

    history of property, 620-621

    identification of subject property, 618

    identification of type of value, 618

    improvements, description of, 622

    intended use of, 40-41, 618

    intended users of, 40, 618

    introduction to, 614-617

    land description, 621-622

    land value, 623

    letter of transmittal, 614-615

    location data, 618

    market analysis, 34, 623

    narrative reports, 609, 612-625

    oral reports, 606

    outline, 612-613

    presentation of data, 619-623

    problem identification, 618-619

    qualifications of appraiser, 624

    reconciliation of value indications, 624

    report formats, 606-612

    restricted reports, 606

    review reports, 628-633, 638-640

    scope of work, 79-80, 619

    site data, 166, 175, 177, 623

    summary of important conclusions, 615-617

    table of contents, 615

    tax data, 622-623

BACK_DEFEXP-RR-003101

Copyrighted material licensed by Charles Brigden on September 17, 2020

types of, 606-612

and Uniform Standards of Professional Appraisal Practice, 605-606

appraisal review. *See* review

appraisal reviewers. *See* reviewers

appraisal theory, 15-18

appraisers

and consulting, 645-649

and foreign investors, 88-89, 662

liability of, 7

licensing and certification, 2-3

qualifications of, 2-3

and reviewers, 627-644

approaches to value, 36-37, 78

*See also* cost approach; income capitalization approach; sales comparison approach

arbitration, 648

architectural style, 230-232

*See also* functional utility

architecture, 230-232

definition of, 230

and technological developments, 231-232

*See also* formal architecture; vernacular architecture

arm's-length transaction, 48, 109

asbestos, 207-208, 211

assemblage, 66, 173-174, 311

assessed value, 6-7, 50, 55, 92-93, 171-172, 647

assessment data

in appraisal reports, 622-623

in site description, 171-172

assessment ratio, 55, 93

asset classes, 664-666

assignments, of leasehold interests, 62

assumptions, 30, 42-44

*See also* extraordinary assumptions; general assumptions and limiting conditions; hypothetical conditions; special assumptions

attached equipment, 227

auditing, 659-662

automated valuation models (AVMs), 268-271

balance, mortgage, 119-120

balance, principle of, 25-28

and land valuation, 335-336, 342

and sales comparison approach, 352-353

balloon mortgage, 118

balloon payments, 482

band-of-investment techniques, 463-465

and land and building components, 464-465

and mortgage and equity components, 463-464

banks. *See* commercial banks; mutual savings banks; savings and loan associations

barns, 242

baseboards, 224

base lines, 167-168, 176

basements, 199, 214-215, 217-218, 234

finishes, 217-218

base rent, 420-424

bathrooms

adequacy of, 233, 235

fixtures, 221-222

bays, in commercial buildings, 236

beams, structural, 204-205, 208, 210, 214-216

below-the-line expense, 437, 445

benchmark building, 544-549

benchmarking, 198

biotechnology parks. *See* life science and biotechnology parks

blocks. *See* lot and block system

BOMA. *See* Building Owners and Managers Association International

book depreciation, 456, 540

as exclusion from reconstructed operating statements, 456

book value, 7, 540

boundaries

legal descriptions of, 166-168

of market areas, 138-139, 141-142

bounds, 166-167

bracketing, 376-377, 401

BACK_DEFEXP-RR-003102

breakdown method, of estimating depreciation, 576-597

building activity, 91-92

building, and architecture, 230-232

building capitalization rate, 464-469

building codes, 4-5, 27, 92, 113, 144-145, 149, 170, 197-198

   and highest and best use analysis, 306-309

   and ordinances, 197-198

building components. *See* building description

building costs, 92, 543-548

   and comparative-unit method, 547-551

   cost-estimating methods, 543-558

   and entrepreneurial profit, 549

   included in contractors' bids, 555-557

   and quantity survey method, 555-557

   sources of, 92, 544-545

   and unit-in-place method, 551-554

   *See also* cost-estimating services; cost index trending; direct costs; indirect costs

building description, 193, 248

   air-conditioning, 223-224

   and building codes, 197-198

   ceilings, 215, 218

   chimneys, stacks, and vents, 208, 211

   electrical systems, 223-225

   elements of, 196

   equipment and mechanical systems, 220-227

   exterior, 200-213

   exterior doors, 207, 209

   exterior walls, 207-208

   facade, 208-209

   flooring, 215-218

   footings, 204

   format, 199-200

   framing, 205-206

   heating systems, 222-224

   hot water systems, 222-224

   insulation, 205-206

   interior, 214-219

   interior doors, 214, 216

   interior supports, 214-217

   interior walls and partitions, 214, 216

   miscellaneous equipment, 225, 227

   painting and finishing, 217-218

   plumbing systems, 220-222

   protection against decay and insect damage, 219

   quality and condition surveys, 244-247

   roof and drain systems, 208

   size, 198-199

   special features, 211, 219-220

   stairs, ramps, and elevators, 215

   storage areas, 214

   substructure, 200, 204

   superstructure, 200, 205

   use classification, 197

   ventilation, 206-207, 223

   windows, storm windows, and screens, 208

building envelope, 200

Building Owners and Managers Association (BOMA) International, 98-99, 199

building residual technique, 466-470

building style and function, 193-194, 230-247

bundle of rights, 4-5, 59-61

Bureau of the Census, data from, 97, 104-105

   *See also* data collection and analysis

Bureau of Economic Analysis, data from, 97

   *See also* data collection and analysis

Bureau of Labor Statistics, data from, 98, 104

   *See also* data collection and analysis

business cycles, 114-116

business enterprise value. *See* business value

business value, 663-679

   *See also* fair value; use value

buyers and sellers, 2, 21-25, 48-52, 72, 107, 112, 114-115

call systems. *See* communication systems

CAM. *See* common area maintenance

capital

   additions to, 456

   as agent of production, 19

BACK_DEFEXP-RR-003103

sources of, 123-132

*See also* capital markets and capital market instruments; yield rates

capital expenditures, 445, 456

capitalization. *See* direct capitalization; yield capitalization

capitalization in perpetuity, 483-486

capitalization rates, 35-36, 136, 427-433, 459-474, 475-492

*See also* direct capitalization; equity capitalization rates; going-in capitalization rates; overall capitalization rates; terminal capitalization rates

capital markets and capital market instruments, 112, 116-120

*See also* debt capital; deeds of trust; equity investment; mortgage; stocks

capture, forecasting, 290, 297, 303

carpeting. *See* flooring and floor coverings

cash equivalency analysis, in sales comparison approach, 381-382

cash flow, 125, 135-136, 424-433, 436, 475-492, 493-504

*See also* discounted cash flow analysis

cash flow rate. *See* equity capitalization rates

cash on cash rate. *See* equity capitalization rates

CBDs. *See* central business districts

ceilings and ceiling heights, 215, 218

in commercial buildings, 236-239

in industrial buildings, 239-241, 583-584, 590-592

in residential buildings, 233-235

in special-purpose buildings, 241-243

in warehouses, 240-241, 406-411

census data. *See* data collection and analysis

central business districts, 154-156

central limit theorem, 265-268

central tendency, 254-256

certification, in appraisal reports, 615-616

chambers of commerce, as source of general data, 98, 142

change, principle of, 22-23

in income capitalization approach, 414

and land valuation, 335-336

in market area analysis, 114-116, 273, 275, 278-282, 289-295

changing income, and yield capitalization, 489

chattel fixtures. *See* trade fixtures

chimneys, 208, 211

*See also* fireplaces

chronological age. *See* actual age

cities, origins and growth patterns, 146

cleaning, as variable expense, 452-454

Clean Water Act, 180-181

climate, and agricultural land, 190

CMOs. *See* collateralized mortgage obligations

coal heat, 222-223

coefficient of variation, 264-265

cogeneration, 228

collateralized mortgage obligations (CMOs), 131

columns, 204, 215-216, 236-237

commercial banks, 129

commercial districts, 149-156

*See also* central business districts; community shopping centers; entertainment districts; neighborhood shopping centers; office districts; regional shopping centers; retail districts; specialty shopping centers; super-regional shopping centers

Commercial Green and Energy-Efficient Addendum, 203, 228

commercial properties, 236-239

common area maintenance (CAM), 73, 437, 441

common level ratio, 93

communication systems, 226

communications technology, 66, 227, 239

community banks, 129-130

community shopping centers, 151-153, 236-237

comparability of data, 355-358

comparable properties, 361-362

comparative analysis, 371-396

*See also* elements of comparison; paired data analysis, in sales comparison approach; relative comparison analysis; sales comparison approach

comparative-unit method of cost estimating, 547-551

BACK_DEFEXP-RR-003104

Competency Rule, 215, 243, 665

competition, 24

competitive supply, 95, 104-107, 278-279

competitive supply and demand data, 104-107

competitive supply inventory, 95

complementary land uses, 138-140, 147

complementary properties, 138-139

compound interest, 430, 476, 480

concessions, 384

concurrent ownership of real property, 68

condition of improvements. *See* quality and condition survey

conditions of appraisal, 30, 42-45

conditions of sale, in sales comparison approach, 382-385

condominium ownership, 71-72

confidence interval, 266-267, 602-603

conformity, principle of, 26-28, 147

conservation easements, 65

consistent use, 315

construction. *See* building activity

constructive notice, 169

consulting, 645-649

Consumer Price Index (CPI), 97-98

contamination and disclosure. *See* environmental liabilities

continued occupancy clauses, 445

contract for deed, 120

contractor's bid price. *See* building costs

contract rent, 62-63, 421

contribution, principle of, 26-27
    and cost approach, 528

contributory value, 51

convertible mortgages, 119

cooperative ownership, 72

corner sites, 173

corporations, 9, 14, 67-72, 133

cost, definition of, 21-22
    *See also* building costs; development cost; direct costs; indirect costs

cost approach, 36-37, 525-598
    applicability and limitations of, 530-532
    and appraisal principles, 528-530
    procedures, 532, 542

cost-benefit studies, 646-647

cost-estimating services, 544-545

cost index trending, 545

cost-related adjustments, in sales comparison approach, 375

cost to cure, 244, 561, 572-573, 576-592

Council of Economic Advisors, 97

credit regulation, and Federal Reserve, 121-122

crops, 26, 158, 189-191

curable functional obsolescence, 561, 576, 585, 588-589

curve, statistical, 260-265

damage. *See* property damage

data collection and analysis, 32-35, 81-110, 249-272
    and appraisal reports, 82-83, 85-87, 96
    and online access, 98-100
    sampling, 84-85

data levels, 251-252

data sources, 96-107
    competitive supply and demand data, 104-107
    macro-level data, 87-94, 96-99
    micro-level data, 94-97, 100-107

data splitting, 745

data standards, 85-87
    *See also* Uniform Appraisal Dataset

data types, 250-252

date of value opinion, 30, 41
    in appraisal reports, 618-619

debt capital, 129
    *See also* commercial banks; junior mortgage originators; life insurance companies; mutual savings banks; secondary mortgage market

debt coverage ratio (DCR), 465

BACK_DEFEXP-RR-003105

Copyrighted material licensed by Charles Brigden on September 17, 2020

debt service, 72, 119, 125, 135, 425, 429, 436, 457, 463-465, 470-471

decline
in demand, 19, 140-141, 279
of market areas, 140-141

decorating expenses, 450, 453

decreasing annuities, 480-481

decreasing returns. *See* increasing and decreasing returns

deeds, 59-74, 199-101, 169-170

deeds of trust, 117-120

deferred maintenance, 37, 244-246, 572-582

deficiencies, in depreciation analysis, 587-590
requiring addition, 584, 586-587
requiring substitution or modernization, 584

deficit rent, 422-423
*See also* excess rent

demand, 21-25, 95-96, 114-116, 140-141
for hotels, 294-295
for housing, 115, 292-295, 301
for industrial properties, 290, 301
inferred and fundamental, 289-304
for office space, 290, 294, 301
for proposed property, 291
for retail space, 90, 236-239, 290, 299-300
*See also* supply and demand

demand studies, 31, 95-96, 289-304

demographics, 90-91, 99-101, 141-143

depletion allowances, 456

depreciation, 17, 23, 26, 34-36, 539-541, 559-598
actual age and effective age, 562
age and life relationships, 560-567
in appraising and accounting, 540
and breakdown method, 576-597
components of, 560
and economic age-life method, 571-575
and economic life and useful life, 562-565
and external obsolescence, 591-597
and functional obsolescence, 583-591
market extraction method, 568-571
methods of estimating, 559-598

patterns, 566-567
and remaining economic life, 565
and remaining useful life, 565
reproduction and replacement cost bases, 539-541
straight-line, 564-566, 572
types of, 539-541, 578-581
*See also* book depreciation

desire, definition of, 20

deterioration. *See* physical deterioration

developer's profit. *See* entrepreneurial profit

development cost, 21, 24, 530-531, 546
for subdivision, 340, 347

diminishing returns. *See* increasing and decreasing returns

direct capitalization, 36, 433, 459-474
applicability, 460-461
and comparable sales, 460-463
defined, 459
derivation of rates, 460-466
formulas, 459-460
and gross income and rent multipliers, 473-474
and land and building band of investment, 464-465
and mortgage and equity band of investment, 463-464
and overall capitalization rates, 460-466
procedure, 460-461
and replacement allowance, 460-462
and residual techniques, 466-473
and yield capitalization, 460, 484-485
*See also* overall capitalization rates

direct costs, 21, 535

direct reduction mortgages, 119

disaggregation, 138

discounted cash flow (DCF) analysis, 36, 493-504
applicability, 493-495
common income and value patterns, 496-502
formulas, 499
and highest and best use analysis, 325

BACK_DEFEXP-RR-003106

and investment performance measurement, 495-504

office/retail building example, 517-523

shopping center example, 509-511

subdivision development example, 512-517

and yield capitalization, 494-495, 475-480

discounting, 433, 476-479

discounting models, 483-492

discount rates, 120-122, 429

disequilibrium, 279

dispersion, 256-260

disposition value, 55-57

distribution facilities, 156-157, 240-241

districts, 138-139, 142

characteristics of, 147-164

*See also* agricultural districts; commercial districts; industrial districts; market areas, neighborhoods, and districts; multifamily residential districts; one-unit residential districts; specialty districts

dividend. *See* equity dividend

Dodge Data & Analytics, 544

dollar adjustments, in sales comparison approach, 367

*See also* comparative analysis

dominant tenement, 64-65

doors, 207, 209, 214, 216

*See also* exterior doors; overhead doors

downtowns. *See* central business districts

downzoning, 331

drainage, 208, 219

easement appurtenant, 64-65

easements, 11, 64-65, 169

*See also* conservation easements

economic age-life method, 571-575

economic base, 111-113

economic base analysis, 283-287

economic characteristics, in sales comparison approach, 393-394

economic considerations

in market area analysis, 143-144, 273-307

and property values, 143-144

economic life, 244-245, 562-565

*See also* remaining economic life

economic property interest, 62-64

economic syndications. *See* syndications

economic trends, 88-91, 111-136

*See also* international economic trends; local markets, and economic trends; national and regional economic trends

education districts, 159-160, 163

effective age, 145, 562

effective date. *See* date of value opinion

effective demand, 19, 24

effective gross income (*EGI*), 424, 449

effective gross income multiplier (*EGIM*), 361, 473-474

effective purchasing power, 20, 137, 147

effective rent, 421-422

efficiency of markets. *See* real estate markets, relative efficiency of markets

*EGIM. See* effective gross income multiplier

electrical systems, 223-225

electric heating, 222-223

elements of comparison

in lease analysis, 438

in sales comparison approach, 362-365, 377-396

elevators, 211, 215-216, 225-226

Ellwood, L. W., 467-468, 494

Ellwood Tables, 467-468

eminent domain, 4-5, 59-60, 65

energy efficiency, 197, 200, 202-203, 206, 212, 227-228

entertainment districts, 156

entrepreneurial coordination, as agent of production, 18-19

entrepreneurial incentive, 19, 536-539, 546

entrepreneurial profit, 19, 536-539

environment

and market area analysis, 144-147, 293

in site description and analysis, 184-189

environmental contamination and risk, 185-189

BACK_DEFEXP-RR-003107

Copyrighted material licensed by Charles Brigden on September 17, 2020

environmental controls, and agricultural resource land, 191

environmental forces, and property values, 21-22

environmental liabilities, 308-310

environmental regulations, 308-310

equilibrium, 115, 279-283

equipment and mechanical systems, 220-227

equity capitalization rates, 136, 427-429, 463-464, 470-471, 503

equity dividend, 125, 425, 429

equity dividend rates. *See* equity capitalization rates

equity income, 425, 457

equity interests, 67, 470

and yield capitalization, 427, 477, 482

equity investment, 67, 117, 125, 130, 135, 429, 448, 463, 503

*See also* international equity capital; joint ventures; life insurance companies; partnerships; pension funds; real estate investment trusts; syndications; trusts

equity ratio, 463-464

equity residual technique, 470

equity yield rate, 134-136, 429, 463-464

escalation clauses, 443-444

rent from, 443-444

escalators, 215, 226, 237

escape clauses, 444-445

escheat, 4-5

excess earnings method, 672-675

excess land, 174-175, 328-329, 338-339

*See also* surplus land

excess rent, 422-423

*See also* deficit rent

exclusive use clauses, in leases, 445-446

expenditures made immediately after purchase, 385-386

expense and income ratios, 457-458

expense recovery clauses, 443-444

expenses

data on, 95, 108

in leases, 440-446

*See also* operating expenses

expert testimony, 686-687

exponential-curve change per period annuities, 480-481

exposure time, 43

exterior description of buildings, 200-213

exterior doors, 207, 209

exterior walls, 207-208

externalities, principle of, 28

and cost approach, 529

and sales comparison approach, 353

external obsolescence, 34, 591-597

extraction, in land valuation, 35, 78, 342

extraordinary assumptions, 30, 43-44

*See also* general assumptions and limiting conditions; special assumptions

facade, in building description, 208-209

fair value, 6-7, 51-52, 651-662

accounting, 653-656

fall-out demand, 283

Fannie Mae, 49-50, 85-87, 94, 131, 133, 198, 232

Farmer Mac, 131, 133

farms. *See* agricultural properties

feasibility analysis, and cost approach, 531-532, 542

*See also* highest and best use

feasibility rent, 542

analysis and highest and best use, 325-326

feasibility studies, 531-532, 646

Federal Agricultural Mortgage Corporation. *See* Farmer Mac

Federal Emergency Management Agency (FEMA), 178-181

federal government. *See* government; government regulations

Federal Home Loan Mortgage Corporation (FHLMC). *See* Freddie Mac

Federal National Mortgage Association (FNMA). *See* Fannie Mae

Federal Open Market Committee (FOMC), 121-122

BACK_DEFEXP-RR-003108

Federal Reserve System, 120-122

fee simple estate, 60-61

FEMA. *See* Federal Emergency Management Agency

final reconciliation. *See* reconciliation of value indications

final value opinion, 37, 602-603

Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) of 1989, 629

financial property interests, 67

financial reporting, 651-662

financing, 6-7, 40-41, 72-74, 117-120

    in sales comparison approach, 380-382

finishes and finishing, in building description, 217-218

fireplaces, 208, 217-218, 233

    *See also* chimneys

fire protection equipment, 225-227

FIRREA. *See* Financial Institutions Reform, Recovery and Enforcement Act of 1989

fiscal policy, 28, 121

fittings. *See* plumbing

fixed expenses, 426, 449-450

    *See also* insurance, and operating expenses; taxes; variable expenses

fixtures, 5-6, 221-222, 225, 246

    *See also* trade fixtures

flashing, 211, 219, 246

flat rental leases, 419

floodplains, 182-185

flooring and floor coverings, 215-218

floors, 220, 223

footings, 204

forecasting demand

    and hotel properties, 294-295

    and housing, 292-295, 301

    and industrial properties, 290, 301

    and office space, 290, 294, 301

    and retail space, 236-239, 290, 299-300

    and vacant land, 303

forecasting, in discounted cash flow analysis, 494-495

foreign investment, 88-89, 128-129, 414

formal architecture, 230

    *See also* vernacular architecture

foundations, 200, 204, 219, 246-247

fractional interests. *See* partial interests

framing, 205-206

Freddie Mac, 49, 86-87, 94, 131-133, 198, 232

frontage, 172-173

fuel oil, 222-223

functional inutility, 193-194, 230-244

functional obsolescence, 232, 235, 583-591

functional utility, 193-194, 230-244, 355-356, 392, 583-591

    and buildings on agricultural properties, 241

    and commercial properties, 236-239

    definition of, 232

    and industrial properties, 239-241

    and mixed-use buildings, 243-244

    and residential properties, 233-235

    of site, 172, 230-244

    and special-purpose buildings, 241, 243

fundamental demand analysis, 281-283, 297-303

future benefits, in income capitalization approach, 36, 424-426

future value, 476-478, 501

garbage removal, 450-451

gas, natural

    as heating fuel, 222-223

    as variable expense, 450-452

GBA. *See* gross building area

general assumptions and limiting conditions, 42-44

    in appraisal reports, 619-620

general data. *See* macro-level data

general partnerships, 69, 126

Geodetic Survey Program, 176

geographic information system (GIS), 104-106

geological survey map, 176

Ginnie Mae, 131-133

GLA. *See* gross leasable area

BACK_DEFEXP-RR-003109

Copyrighted material licensed by Charles Brigden on September 17, 2020

going-concern value. *See* business value

going-in capitalization rates, 481

going-out capitalization rates. *See* terminal capitalization rates

government
four powers of, 4-5
and market area analysis, 144-145
and property values, 87
as source of general data, 32, 91-92, 97, 106

Government National Mortgage Association (GNMA). *See* Ginnie Mae

government regulations, 4-5, 11-13, 24, 45, 91, 113, 144-145, 197-198, 215
and land and site valuation, 336-337
and real property rights, 60
*See also* building codes; zoning

government securities, 122
*See also* Treasury bills

graduated-payment mortgages, 119

graduated rental leases, 419

graphic analysis, in sales comparison approach, 374

green building, 196-200, 202-203, 212-213

gross adjustments, 367-368

gross building area (GBA), 198-199

gross income. *See* effective gross income; potential gross income

gross income multiplier, and direct capitalization, 473-474

gross leasable area (GLA), 199

gross leases, 418-419, 437

gross living area (GLA), 198-199

gross rent multiplier (GRM), 473-474

ground rent capitalization, in land valuation, 340, 345-346

grounds maintenance, as operating expense. *See* maintenance and repairs

grouped data analysis, 372-373

growth, in market life cycle, 140-141

guide meridians. *See* principal meridians

gutters and downspouts, 208, 210, 219, 246

handicapped access, 215, 217

hard costs. *See* direct costs

hard money lenders, 130

heating fuels, 222-223

heating systems, 222-224
as variable expense, 451-453

heating, ventilation, and air-conditioning systems, 224, 229

hedge funds, 128

highest and best use, 34-35, 305-334
in appraisal reports, 328
and cost approach, 313-315, 322, 332, 529
definitions of, 305-307
and excess and surplus land, 328-329
financially feasible use, 312
and ideal improvement, 313-315
intensity of use, 330-331
and interim uses, 311, 313, 330, 333
and land residual analysis, 324-325, 343-344
and land and site valuation, 338-339
of land as though vacant, 307-313
legally nonconforming uses, 330-332
legally permissible use, 306-310
and marketability analysis, 305, 310-313, 320-322
and market analysis, 320-322
maximally productive use, 307, 312
and mixed uses, 334
physically possible use, 305-307, 310-311
of property as improved, 307-308, 313-315
purpose of, 305-307
in the sales comparison approach, 331-332
and special-purpose properties, 334
and speculative investment, 311, 323
statements in appraisal reports, 328
and supply and demand, 320, 322
testing of, 305-307, 312-315
timing of use, 305-306, 310-312
and zoning changes, 309

BACK_DEFEXP-RR-003110

high-technology parks, 160-162

historical age. *See* actual age

historic districts, 163-164

historic preservation easements, 163-164

historic properties, 163-164

historic value. *See* date of value opinion

hoists, 215-216

holding period, 135, 478
   *See also* projection period

home equity loans, 117-118

Hoskold premise, 484

hot air heating systems, 222, 224

hotels, 237-239

hot water heating systems, 222-224

household formation, 89-91, 113

households, 24, 88-91, 96-99, 113
   *See also* demographics

housing demand, 147-149, 233-235

hurdle rate, 496

hydronic systems. *See* hot water heating systems

hypothetical conditions, 30, 44, 619, 639-641


identification of characteristics of property, 30, 41-42, 76-77, 165-248

improvement analysis, 193-248
   analysis of functional utility, 230-244
   building description, 193-248
   *See also* architectural style

improvements, description of, in appraisal reports, 622
   *See also* building description; tenant improvements

income
   data on, 438-446
   forecasting in income capitalization approach, 436-437, 495, 505, 509
   and reversion, 425-426, 481-483
   *See also* effective gross income; net operating income; potential gross income

income and expense estimates, 435-458, 462
   developing, 436-437, 446-458, 462

and effective gross income, 424, 449

forecast, 505-508, 511

and lease analysis, 482-483

multiyear income forecast, 506-508

net operating income, 424-425

one-year income forecast, 505-506

and potential gross income, 424, 448

by property type, 506-508

and rent, 441-442

vacancy and collection loss in, 448-449

income capitalization approach, 36, 413-524
   and anticipation and change, 414
   applicability of, 414-416
   and appraisal principles, 414
   and data analysis, 435-458
   definitions, 416-431
   and direct capitalization, 459-474
   and discounted cash flow analysis, 493-504
   forecasting income estimates, 436-437, 495, 505, 509
   formulas, 459-460, 464-465, 477, 499, 504
   future benefits, 424-426
   and income rates, 428-429
   and inflation, 431
   interests to be valued, 415
   and investment value, 416
   and land valuation, 344-349
   and market value, 416
   methods of, 431-433
   procedure, 431-433
   and rate estimation, 429-431
   rates of return, 427-429
   and residual techniques, 466-472
   and risk, 430-431
   and supply and demand, 414
   and yield capitalization, 475-492
   and yield rates, 427-430

income models, 483-485
   exponential curve (constant ratio), 484-485
   level income, 483-484
   straight-line, 484

BACK_DEFEXP-RR-003111

variable or irregular, 483

income rates, 428-429
  estimating, 429-431
  *See also* yield rates

income streams, 36
  and increasing or decreasing annuities, 480-481
  level annuities, 480
  variable annuities, 479

income taxes, as exclusion from reconstructed operating statements, 456

increasing annuities, 480-481

increasing and decreasing returns, 27

incurable functional obsolescence, 247, 561, 576, 583-584, 589

incurable physical deterioration, 247, 561, 579-581

index leases, 419

indirect costs, 21, 535

industrial
  building, sales comparison of, 406-411
  districts, 156-158
  properties, 239-241
  space demand, 301

inferred demand analysis, 280-283, 291-297

inflation, 123-124
  and rates of return, 123-124
  and value, 431

information technology, applications of, 81

infrastructure, 19, 159, 238

insect pests
  and control service expense, 454
  in improvement analysis, 219

inspection, property, 32, 79, 194-195

installment sale contract. *See* contract for deed

Institute of Real Estate Management (IREM), 457-458

insulation, 205-206

insurable value, 55

insurance, and operating expenses, 437-439, 447, 449-450

intangible assets, 5-6, 663-679

intelligent buildings, 227

intended use of appraisal, 30, 40-41, 76-77, 618

intended users of appraisal, 30, 40, 76-77, 618

interest-only mortgages, 119

interest rates, 89, 93-94, 97, 117-124
  real vs. nominal, 124
  *See also* compound interest

interim uses, 27, 311, 313, 330, 333

interior decorating, in improvement analysis, 217-218

interior description of buildings, 214-219

interior doors, 214, 216

interior walls, 214, 216

internal rate of return (*IRR*), 496-502
  and DCF analysis, 496-502
  definition of, 496
  as investment performance measurement, 496-502
  limitations of, 502
  negative, 500
  and reinvestment, 500-502
  with a specified borrowing rate, 501

international commerce, 88-90, 128-129

international economic trends, 88-90

international equity capital, 128-129

international investment, 128-129

international valuation, 2

international valuation standards, 2, 48-49, 53-54, 86

International Valuation Standards Council, 48-49

internet, data sources on, 96-106

interquartile range, 259-260

interval ownership. *See* timesharing

investment
  and internal rate of return, 496-502
  and performance measurement, 502-504

investment analysis, in income capitalization approach, 493-504
  example of, 517-523

investment value, 6, 53-55
  and income capitalization approach, 416

BACK_DEFEXP-RR-003112

investment yields, 135-136

Inwood premise, 484

IREM. *See* Institute of Real Estate Management

*IRR. See* internal rate of return

irregular income

and income models, 483, 490

and property models, 490

joint tenancy, 68

joint ventures, 127

judgment samples, 84

junior liens, 118

junior mortgage originators, 130

kurtosis, 263-264

labor

as agent of production, 16, 18

availability of, 147, 151-152, 157-158, 160, 190-191

data on, 97-98

land

as agent of production, 18

economic concepts of, 12

geographic and environmental concepts of, 10

legal concepts of, 10-12

legal description of, 10-12, 165-166, 169

physical characteristics of, 172-181

social concepts of, 12-13

title and record data, 169-172

*See also* excess land; land valuation; lot and block system; metes and bounds system; rectangular survey system; surplus land

land analysis, 165-192

corner influence, 173

and environment, 184-191

excess and surplus land, 174-175, 328-329

plottage or assemblage, 173-174

and site improvements, 182-183

size and shape, 172-173

land capitalization rate, 36, 464-469

land contract. *See* contract for deed

land description. *See* land analysis

land residual technique, 16, 469-470

and highest and best use, 35-36, 312, 324-325

and land valuation, 340, 343-344

land-to-building ratios, 174, 183, 240

land trusts, 14, 68-69

land use, 9-13

and air rights, 65-66, 169, 337

information in site descriptions, 170-171

restrictions on, 10-13, 336-337, 341

land valuation, 335-349

and allocation, 342-343

and appraisal principles, 335-336

in appraisal reports, 623

and excess and surplus land, 338-339

and highest and best use, 338-339

and income capitalization techniques, 344-349

and land residual analysis, 343-344

and market extraction, 342

and physical characteristics and site improvements, 337-338

and property rights, 336-337

and proposed subdivision, 346-349

and sales comparison, 339-342

techniques of, 339-349

layout, and functional utility, 232-235, 238-239, 244

lease analysis, 440-446

and cancellation clauses, 440

continued occupancy clauses, 445

dark store, noncompete, and exclusive use clauses, 445-446

and division of expenses, 441-442

escalation clauses, 443-444

escape clauses, 444-445

expense recovery clauses, 443-444

expense stop and expense cap clauses, 443

kick-out clauses, 444-445

purchase options, 444

BACK_DEFEXP-RR-003113

renewal options, 443

rent concessions, 441

tenant improvements, 435-437, 441-445

*See also* leases; rent

leased fee interests, 61-63

definition, 61-63

valuation of, 415

leasehold interests, 61-63

definition, 62

valuation of, 415, 423-427

*See also* contract rent; market rent; subleases

leases, 61-62, 418-420

and bundle-of-rights theory, 4

data contained in, 60-63, 418-420, 440-446

definition of, 62, 418

and expenses, 418

renewal options in, 443

types of, 60-63, 418-420

*See also* flat rental leases; gross leases; index leases; revaluation leases; step-down leases; step-up leases

leasing commissions, 437, 455, 530-535, 542, 545, 552

legal characteristics, in sales comparison approach, 394-395

legal descriptions, 42, 100

of land, 166-168

*See also* lot and block system; metes and bounds system; rectangular survey system

legal entity ownership, of real property, 68-70

legally nonconforming uses, and highest and best use analysis, 330-332

legal property interests, 64-66

lessee, 61-63, 137

lessor, 61-63, 137

letter of transmittal, 614-615

level annuities, 479-480

*See also* annuities payable in advance; ordinary annuities

level-equivalent income, 485

level income

and income models, 483-485

and property models, 486-487

leverage, 136

and equity interests, 136, 429, 500

liability, of appraisers, 7

life cycles, of real estate markets, 114-116, 140-141

life estates, 64

life insurance companies, 127-130

life science and biotechnology parks, 162-163

like-kind exchanges, 383

limited liability company (LLC), 70

limited-market property, 25, 219

limited partnerships, 69, 126-128

limiting conditions, 619-620

*See also* general assumptions and limiting conditions

linkages, 112, 146-147

liquidation value, 55-57

listing, 33, 100-103

litigation support, 648

live-load floor capacity, 236, 240

load-bearing walls, 206-208, 214-216

loading facilities, 155, 162, 225-226, 239-240

loan constants. *See* mortgage constants

loan payments, as exclusion from reconstructed operating statements, 456

loan-to-value ratios, 463-465

local markets, and economic trends, 88-102

location, 41-42

defined, 146-147

influence on value, 139, 144-147

and property adjustments, 390-392

in sales comparison approach, 390-392

long-lived items, 245-247, 580-582

lot and block system, 167-168

*See also* parcels, of land

lot size, adjustment for, 392

macro-level data, 87-94, 96-100

sources of, 96-100

*See also* data collection and analysis; micro-level data

BACK_DEFEXP-RR-003114

maintenance and repairs, as variable expense, 450-455

management fee
method of valuation, 676-677
as variable expense, 450-451

market, definition of, 9-10

marketability analysis, 273-275, 283-285

market analysis, 34, 114, 273-304
applications, 289-304
in approaches to value, 275-276, 297
definition of, 34, 273-275
and highest and best use, 274-275, 283-284, 290-291, 297, 305-306, 311-314
inferred and fundamental, 291-303
levels of, 280-285, 289-304
six-step process, 273-276, 289-291
types of, 280-285, 289-304

market area delineation, 276, 291-293

market areas, neighborhoods, and districts, 34, 137-164
analysis of, 137-164
boundaries of, 141-142, 293-295
change in, 140-141
characteristics of, 138-142
definition of, 138-140
*See also* districts

market conditions, in sales comparison approach, 387-390

market data grid, 361-363
for industrial building appraisal, 408
for office building appraisal, 403
for residential property appraisal, 399

market equilibrium, 279-280, 283, 303

market extraction method
of estimating depreciation, 568-571
and land valuation, 342

market rent, 62, 420-421, 436-438

market segmentation, 138, 276, 283-286

market value, 6-7
definitions of, 47-52
versus fair value, 652

and income capitalization approach, 416
*See also* value

Marshall and Swift/CoreLogic, 544, 548-549

mean, 260-261

mechanical systems, 220-227
*See also* plumbing

median, 260

medical districts, 159-161

metes and bounds system, 166-167

mezzanine loan, 119

micro-level data, 94-96, 100-107
sources of, 100-107
*See also* macro-level data

mineral rights, 11, 191, 336-337

miniwarehouses, 240

MISMO, 86

mixed-use buildings, 243-244

mixed-use development (MUD), 243-244

mixed uses, and highest and best use analysis, 334

mode, 255-256

modernization. *See* deficiencies, in depreciation analysis

modified gross lease, 418-419

modified internal rate of return, 501

mold, 207

money, 116-132

mortgage, 117-120
annual debt service on, 463-465, 470
components, 117-120
definition of, 118
interests, 117-120
types of, 119
*See also* adjustable variable-rate mortgages; junior liens; variable-rate mortgages

mortgage capitalization rate, 136, 463-470

mortgage constants, 463

mortgage-equity analysis, 67, 463-464
changing-income applications, 463-464
equity yield, solving for, 463
formulas, 463-464

BACK_DEFEXP-RR-003115

rate analysis, 463-464

rate extraction, 463-464

mortgage interests, 67

mortgage residual technique, 470-471

move-up demand, 277

multifamily residential districts, 149

multiple listing services, 102, 105

mutual savings banks, 130

narrative appraisal reports. *See* appraisal reports

National Association of Home Builders, 99

National Association of Realtors, 98, 102

statistics, 253

National Register of Historic Places, 160, 163

national and regional economic trends, 111-136

National Vital Statistics System, 97

natural gas, 222-223

neighborhoods, 137-140

*See also* market areas, neighborhoods, and districts

neighborhood shopping centers, 152-153

net adjustments, 367-368

net leases, 417-418, 437

net operating income, 424-425, 457

and income estimates, 424-425

net present value (*NPV*), 496-502

net proceeds of resale. *See* reversion

newspapers, as sources of data, 103, 109

*NOI. See* net operating income

nominal interest rate, 124

noncompete clauses, in leases 445-446

nonconforming uses, 170-171, 330-332

non-realty components of value, 220, 663-679

in sales comparison approach, 395-396

*See also* intangible assets; personal property

normality, statistical, 263-266

normal curve, 123, 260-261

obsolescence, 23, 232, 235, 583-597

*See also* curable functional obsolescence; depreciation; external obsolescence; functional obsolescence; incurable functional obsolescence

offering, 6-7, 102-103

office buildings, 199, 236-238

and multiyear income forecast sample, 517-523

relative comparison analysis of, 405-406

rental worksheet, 442

sales comparison of, 401-406

office districts, 150-151

office parks, 150-151

office space demand, 236-238, 290, 294, 301

off-site improvements, 165, 182-183

one-unit residential demand, 291, 301

one-unit residential districts, 147-149

on-site improvements, 165, 182-183

operating expense ratios, 457-458

operating expenses, 108, 426-427, 449-457

exclusions from, 456

sample history, 446-447

*See also* fixed expenses; variable expenses

opportunity cost, 22, 429-430

opportunity zones, 127

oral reports. *See* appraisal reports

ordinary annuities, 480

changing in constant amounts, 484 (fn 5)

OSCRE International, 86

overage rent, 88, 423-424

overall capitalization rates, 136, 427-429, 432-433, 460-466, 490-491

band of investment—land and building components, 464-465

band of investment—mortgage and equity components, 463-464

from comparable sales, 460-462

conditions for use, 433

and debt coverage formula, 465

formula, 465

and going-in capitalization rates, 481

from surveys, 465-466

overall yield rate, 136, 429, 489-490

overhead doors, 240

BACK_DEFEXP-RR-003116

overimprovements, 529-531, 535

ownership

entities, 13-14

information, 169-170

in severalty, 68

*See also* fee simple estate; partial interests; property interests, types of

painting, 217-218

paired data analysis, in sales comparison approach, 372-373

parameter, statistical, 258

parcels, of land, 4, 9-12, 20-27, 66-67, 165-168, 172-176

parking, as variable expense, 450, 453-454

parsing income method, 675-676

partial interests, 60-71

identification of, 60-71

participation mortgages, 119

partnerships, 9, 69-70, 126-127

*See also* general partnerships; limited partnerships

payback period, 503-504

payroll, as variable expense, 450-452

pension funds, 127-128

percentage adjustments, in sales comparison approach, 367, 388

percentage leases, 88, 420

percentage rent, 423

periodic payment, mortgage, 119

personal interviews, 42, 104, 108-109, 142, 171-174, 188, 377, 677-678

personal property, 5-6, 55, 66, 69, 73, 220, 384, 396, 663-679

*PGIM. See* potential gross income multiplier

physical characteristics

of land, 10, 172-191, 337-338

in sales comparison approach, 392-393

physical deterioration, 34, 578-582

physical property interests, 66-67

pipes and piping, 210-211, 221-226

plots, 166

plottage, 173-174, 383

potential, 173-174

value, 66

plumbing, 220-222

POB. *See* point of beginning, in metes and bounds land description

point of beginning, in metes and bounds land description, 166

point estimate, 30, 602-603

police power, 4-5, 13

pollution. *See* environmental liabilities

pollution rights, 184-185

population, statistical, 252-254

possession, 61

post and beam framing, 205

potential gross income (*PGI*), 424, 448

definition of, 424

potential gross income multiplier (*PGIM*), 433, 436, 474

powers of government, 4-5, 10-12, 144-145

preliminary analysis, 77

present value factors, 475, 484, 522

present value of level annuities, 479-481

price, vs. cost, 21-22

pricing and rent projection studies, 647

primary data, 87, 92, 109-110, 194

prime rates, 122

principal meridians, 167-168, 176

private equity, 113

product disaggregation, 138

production, agents of, 15-19

productivity analysis, 292-293, 297-299

profitability index (*PI*), 504

and highest and best use, 326

progression, principle of, 27

projection period, 478

property adjustments, 364-366, 390-396

property damage, 7, 55, 206, 219, 245-246, 582

property description, 32-33

property inspection, 32, 79, 194-195

*See also* site visit

BACK_DEFEXP-RR-003117

Copyrighted material licensed by Charles Brigden on September 17, 2020

property interests, types of, 61-67

   *See also* air rights; easements; economic property interests; fee simple estate; financial property interest; leased fee interests; leasehold interests; legal property interests; life estates; partial interests; physical property interests; subsurface rights; transferable development rights (TDRs); vertical interests

property models, 485-492

   exponential-curve changes, 489-490

   formula, 485-486

   level-equivalent income, 490-492

   level income, 486-487

   straight-line changes, 487-489

   variable or irregular changes, 490

property productivity analysis, 292-293, 297-299

property rights. *See* real property rights

property rights adjustment, 378-380, 407, 541-542

property taxes, 92-93, 144-145, 163-164, 437, 440, 449-450, 544-545

   consulting on, 647

   as operating expense, 437, 449-450

proposed improvements, and cost estimates, 543-544

prospective value. *See* date of value opinion

public controls. *See* government regulations

public debt, 121

public interest value, 54

public records, as source of microlevel data, 101

public utilities, 64-66, 145-147

purchase options, in leases, 444


quadrangles, in US Geological Survey, 176

qualifications of appraiser, 2-3, 624

qualitative analysis, 362, 376-377

   *See also* ranking analysis; relative comparison analysis; trend analysis, in sales comparison approach

qualitative data vs. quantitative data, 250-251

quality and condition survey, 244-247

quantitative adjustments, 371-376

quantitative analysis, 362, 371-376

   *See also* graphic analysis, in sales comparison approach; paired data analysis, in sales comparison approach

quantity survey method, 555-557


ramps, in public buildings, 215-217, 225-226

random samples, 85, 256, 266

range

   statistical, 259-266

   of value, 37, 602

ranking analysis, 377

rate extraction

   and yield capitalization, 479, 493-495

rates. *See* discount rates; income rates; interest rates; rates of return; yield rates

rates of return, 427-429

   estimating, 429-431

   return of capital, 428

   return on capital, 428

raw land, 165-166

real estate

   cycles, 114-116, 140-141, 280

   definition of, 3-4

   *See also* real estate markets

real estate investment trusts (REITs), 69, 125-126, 131-132

real estate markets, 112-116, 137-147

   characteristics of, 137-142

   cycles, 114-116, 140-141

   relative efficiency of, 114

   value influences in, 142-147

real estate mortgage investment conduit (REMIC), 131

real estate operating companies (REOCs), 69

Real Estate Standards Organization (RESO), 103

real estate taxes. *See* ad valorem taxes; property taxes

Real Estate Transaction Standard (RETS), 103

real interest rate, 124

BACK_DEFEXP-RR-003118

real property
definition of, 3-4
and economic forces, 111-113
and environmental forces, 111-113
equity interests in, 67
and government forces, 111-113
identification of, 3-4
mortgage interests in, 67, 117-120
ownership, 13-14, 67-74
and social forces, 111-113
real property rights
in cost approach, 541-542
and income capitalization approach, 415, 438, 460-462
in sales comparison approach, 378-380
*See also* fee simple estate; leased fee interests; leasehold interests; partial interests
recapture rate, 7, 486-488
recession, 115, 123, 129, 423 (fn 4)
reconciliation of value indications, 37, 599-603
in appraisal reports, 624
definition of, 599
and final value opinion, 602-603
questions asked, 601
in sales comparison approach, 366-369
reconstructed operating statement, 83, 446-458
apartment building example, 507
exclusions from, 456
rectangular survey system, 167-168
refuse and refuse collection. *See* garbage removal
regional shopping centers, 151-154
*See also* super-regional shopping centers
regression analysis, 249, 268-269
multiple regression, 249, 270
simple linear regression, 249, 268
*See also* statistics
regression, principle of, 27
reinvestment concepts, 500-502
REITs. *See* real estate investment trusts
relative comparison analysis, 376-377

remaining economic life, 244-245, 565
remaining useful life, 208, 565
REMIC. *See* real estate mortgage investment conduit
renewal options in leases, 443
rent
analysis of, 441-442
types of, 420-424
rent concessions, 441
rent projection studies, 647
rent-up adjustments, in cost approach, 541-542
repairs. *See* maintenance and repairs, as variable expense
replacement allowance, 426-427, 454-456
as variable expense, 426-427
replacement costs, 533-534, 539-541
reports. *See* appraisal reports
reproduction costs, 533-534, 539-541
resale, proceeds of, 493, 509-510, 517-523
research and development parks, 157, 159-162
Residential Green and Energy Efficient Addendum, 200, 202-203, 228
residential properties, 147-150, 233-235
ownership benefits, 19-20
sales comparison of, 397-401
residual capitalization rates. *See* terminal capitalization rates
residual demand analysis, 296-297, 301-303
residual techniques
and direct capitalization, 466-472
and highest and best use analysis, 35-36, 312, 324-325
*See also* building residual technique; equity residual technique; land residual technique; mortgage residual technique
retail districts, 149-156
retail properties, 149-156, 236-239
retail space demand, 91, 149-156, 236-239, 290, 299-300
retrospective value. *See* date of value opinion
return of capital, 428
return on capital, 124, 428
revaluation leases, 420

BACK_DEFEXP-RR-003119

Copyrighted material licensed by Charles Brigden on September 17, 2020

reverse annuity mortgage (RAM), 119

reversion, 425-426, 481-483

   and yield capitalization, 475-477, 481-483

review, 3, 627-643

   development of review opinion, 634-638

   form, 631, 634, 638

   for litigation, 628-629

   problems in, 640

   purpose of, 629

   reporting review options, 638-639

   role of reviewer, 628-630

   scope of work, 630-634

   standards for, 631

   structuring of assignments, 631-634

   who can prepare, 629-630

   workfile, 639-640

   *See also* reviewers

reviewers, 3, 627-643

   *See also* review

review reports. *See* appraisal reports

revitalization, 140-141

right of first refusal, 444

rights of way, 5, 169

risk, 134-135

   and income capitalization approach, 430-431

roofs, 208

rounding, of value opinions, 602-603

rural land trends, 89-90, 337

*R* values, 211

safe rate, 430

sales comparison approach, 36, 351-412

   and adjustments, 361-366, 375, 378-396

   applicability of, 353-355

   and appraisal principles, 352-353

   and comparative analysis, 371-396

   and data analysis, 372-373

   industrial building example, 406-411

   in land valuation, 339-342

   limitations of, 353-355

   market data grid, 361-363, 399-400, 403

office building example, 401-406

paired data analysis, 371-373

procedures, 355-369

qualitative analysis, 362, 376-377

quantitative adjustments, 371-376

reconciliation in, 366-369

residential property example, 397-401

and required data, 355-358

sample size, 252-257, 265-268

sampling, 265-268

   *See also* data collection and analysis

sandwich interests, 62-63

savings and loan associations, 130

scarcity, definition of, 20

scenario analysis, 374

scope of work, 75-80

   in appraisal reports, 79-80, 619

screens, window, 208-209, 246

secondary data analysis, 87, 109-110, 142

secondary mortgage market, 129, 131, 133

   *See also* junior liens

securities. *See* government securities; stocks

securitization, 131-132

security systems, as variable expense, 450, 452-454

segregated cost method. *See* unit-in-place method of cost estimating

sensitivity analysis, 372

sequence of adjustments, 365-366

servient tenement, 65

sewers, as variable expense, 450, 452

share-accounting rate. *See* time-weighted rate

shared appreciation mortgages, 119

shopping centers, 149-156, 236-239

   *See also* regional shopping centers; super-regional shopping centers

short-lived items, 245-246, 579-582

Sick Building Syndrome, 207

signal systems, 225-226

single-family properties. *See* residential properties

BACK_DEFEXP-RR-003120

single-family residential districts. *See* one-unit residential districts

sinking fund factors, 463, 486-487

  definition of, 166

  improvements on, 165, 182-183

  improvements to, 165, 182-183, 336-339

  vs. land, 166-167, 335

  site accessibility, 183-184

site description and analysis. *See* land analysis

site improvements, contributory value of, 165, 182-183, 342-343

site valuation. *See* land valuation

site visit, 194-195

siting, 146

situs, 291

six functions of one, 477 (fn 2)

skewness, 260-263

smart buildings, 227

snow removal, as operating expense, 453

social considerations

  and market area analysis, 12-13, 112-113, 143

  and property values, 21-22, 112-113, 143

soft costs. *See* indirect costs

software, 86-87, 96, 100, 105

  cost-estimating services, 544-545

  spreadsheets, 262, 269

  statistical, 259-260, 262-263, 269

soils and subsoils, 158-159, 176-178, 189-190

soil survey map, 190

space, division of, 214

special assumptions, 43-44

special corporation costs, as exclusions from reconstructed operating statements, 456

special-purpose properties, 241-243

  functional utility of, 241-243

  and highest and best use analysis, 334

specialty districts, 159-160

  *See also* education districts; high-technology parks; historic districts; life science and biotechnology parks; medical districts; research and development parks

specialty shopping centers, 152-156

specific data. *See* micro-level data

speculative investments, and highest and best use analysis, 311, 323

sprinklers. *See* fire protection equipment

stability, 15-17

stabilization, 79

  and cost approach, 530

stabilized occupancy, 79

stacks, 208, 211

stairs, 215

standard deviation, 262-264

Standards of Professional Appraisal Practice, 195, 215, 243

statistical analysis, in sales comparison approach, 373-374

statistics, 249-272

  applications, 269-271

  central tendency, 254-256

  defined, 250-251

  descriptive vs. inferential, 250-251

  dispersion, 256-260

  parametric vs. nonparametric, 259

  regression analysis, 268-269

steam heating systems, 205, 226

step-down annuities, 480-481

step-down leases, 419

step-up annuities, 480-481

step-up leases, 419

stigma, 184

stock corporations, 69-70

stock exchanges, 114-115

stocks, 112, 117, 121, 126-127, 134

storage areas, 214

  *See also* miniwarehouses; warehouses

storm windows, 208-209

straight-line change

  in income models, 484

  per period annuities, 481

  in property models, 487-489

straight-line depreciation, 564-566, 572

subdivision development analysis

  discounted cash flow example, 512-517

BACK_DEFEXP-RR-003121

in land valuation, 346-349

subflooring, 215

subject capture analysis, 297, 303

subleasehold interests, 61-63

subleases, 61-63

submarket, 137-138, 142

subprime loans, 131-132

substitute properties, 25, 138-139

substitution, principle of, 23-25
  and cost approach, 528
  and land valuation, 335-336
  and sales comparison approach, 352

substructure, 200, 204

subsurface rights, 66, 169, 178, 191

superadequacies, 583-586, 590-592

super-regional shopping centers, 149-153

superstructure, 200, 205

supplies, as variable expense, 450-454

supply and demand, 21, 23-25, 111-115, 275-276, 279-280, 289-290
  and cost approach, 528
  data sources, 104-107
  definition of, 23-25
  and highest and best use analysis, 320, 322
  and income capitalization approach, 414
  and land valuation, 335, 347-349
  and sales comparison approach, 352
  *See also* demand studies

surplus land, 174-175, 328-329, 338-339

surplus productivity, 26-27

surveys
  and capitalization rates, 465-466
  of market participants, 677-678

syndications, 70

taxes
  and consulting, 647
  and corporations, 133
  definition of, 4-5
  and land use information, 171-172, 182, 191
  in market areas, 113-115

*See also* ad valorem taxes; income taxes, as exclusion from reconstructed operating statements; property taxes

tax parcels, 92

Tax Reform Act of 1986, 28, 88-89

tax shelters, 70, 89, 126-127

T-bills. *See* Treasury bills

TDRs. *See* transferable development rights

telecommunications, 100

tenancy, 68
  in common, 68
  by the entirety, 68
  *See also* joint tenancy

tenant improvements (TIs), 421-422, 437, 441-445

tenement, 65

terminal capitalization rates, 417, 481-482, 510-511, 521

TIGER. *See* Topographically Integrated Geographic Encoding and Referencing datafiles

TIs. *See* tenant improvements

timesharing, 72-74

time value of money, 430

time-weighted rate, 504

title and record data, 169-171

title in fee. *See* fee simple estate

Topographically Integrated Geographic Encoding and Referencing (TIGER) datafiles, 104-106

topography, in site description and analysis, 175-181

total depreciation. *See* depreciation

trade area, 149-154

trade associations, as source of data, 96

trade fixtures, 201
  *See also* fixtures

traffic, 112, 145-146, 149-155, 173, 183-185

traffic volume data, 183

tranches, 131

transactional adjustments, 378-390

transferable development rights (TDRs), 65-66

BACK_DEFEXP-RR-003122

transition, evidence of, 115

transportation systems, 91, 98, 113

and market area analysis, 113, 141-142, 145-146, 277, 301

Treasury bills, 121

Treasury Department, 121

Treasury notes, 124, 126

trend analysis, in sales comparison approach, 374-375

*See also* economic trends

trusses, 205, 220

trusts, 68-69, 125-128

*See also* real estate investment trusts (REITs)

tunnel rights. *See* subsurface rights

underimprovements, 529

*See also* deficiencies, in depreciation analysis

Uniform Appraisal Dataset (UAD), 85-87, 608-609

Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA), 50

Uniform Mortgage-Backed Security (UMBS), 94

Uniform Residential Appraisal Report (URAR) form, 82, 607-609

Uniform Standards of Professional Appraisal Practice (USPAP), 43-44, 49, 84, 270

and appraisal review, 627-631, 639-641

and appraiser liability, 2

and definition of market value, 49

unit costs, 547-555

unit-in-place method of cost estimating, 551-554

unit-method rate. *See* time-weighted rate

units of comparison, 359-361, 368-369

URAR. *See* Uniform Residential Appraisal Report (URAR) form

urban growth patterns, 146, 284-285, 290, 298-299

useful life, 562-565

*See also* remaining useful life

use value, 6, 52-54

*See also* highest and best use

utilities

and site description and analysis, 181-182

as variable expense, 450-451

*See also* public utilities

utility, definition of, 19-20

*See also* functional utility

vacancy and collection loss, 448-449

vacant land, 34-35, 144, 148-150, 165-166, 174, 183, 281-282, 300-303, 307-313, 320-333, 338-340, 342-348

*See also* highest and best use

valuation for financial reporting (VFR), 40, 53-54, 651-662

*See also* fair value

valuation process, 29-38

value

definitions of, 21-22, 41, 47-57

factors of, 19-20

*See also* assessed value; business value; fair value; final value opinion; insurable value; investment value; market value; public interest value; use value

value influences

in market areas, 142-147

in real estate districts, 147-164

value theory, 12, 16-18

value in use, 53-54

vandalism, 582

variable annuities, 479-480

variable expenses, 426, 450-454

variable income

and income models, 483

and property models, 490

variable-rate mortgages, 118-119

variable rental leases, 419

variance, statistical, 256-258

ventilation systems, 206-207, 223

*See also* heating, ventilation, and air-conditioning systems

vents, 208, 211

venture capital. *See* equity investment

BACK_DEFEXP-RR-003123

Copyrighted material licensed by Charles Brigden on September 17, 2020

verification of data, 109

vernacular architecture, 230-231

   *See also* formal architecture

vertical interests, 66

   *See also* air rights; subsurface rights

Veterans Administration, and home mortgages, 118, 133

vital statistics, sources of, 97, 104

   *See also* micro-level data

walls, 207-208, 214-216

   *See also* exterior walls; interior walls; load-bearing walls

warehouses

   cost estimate example, 549-551

   functional utility of, 239-241

   sales comparison application example, 406-411

   *See also* miniwarehouses

water, as variable expense, 450-452

water rights, 158, 169, 190, 337

web, data sources on. *See* internet, data sources on

weighted average, 463

wetlands, 178-181

whole building approach, 229

windows, 208

wiring, 223-227

wood, decay and insect damage, 219

workfile, 606-607, 628, 639-640

work letters. *See* building costs

wraparound mortgages, 119

Yellow Book. *See* Uniform Appraisal Standards for Federal Land Acquisitions

yield analysis. *See* internal rate of return (*IRR*)

yield capitalization, 36, 433, 475-492

   and annuities, 479-481

   applicability and limitations, 475-476, 493-495

   discounted cash flow analysis, 493-495

   discounting, 476-479

   formula, 477

   income models, 483-485

   and income stream patterns, 479-481

   procedure, 475-476

   property models, 485-492

   rate extraction, 493-495

   reversion, 481-483

yield rates, 36, 123-124, 134-136, 478-479, 495-496

   estimation for discounting, 478-479, 495

   extracting from a comparable sale, 511

   *See also* equity yield rate; income rates

zero-coupon mortgages, 119

zoning

   changes, 170-171, 309

   and comparative analysis, 339, 341, 394-395

   and highest and best use, 308-310

   and land and site descriptions, 170-171

   and land valuation, 341, 348

   in market areas, 144-145

   in real estate districts, 147-164

   in sales comparison, 363-365

BACK_DEFEXP-RR-003124

BACK_DEFEXP-RR-003125

Copyrighted material licensed by Charles Brigden on September 17, 2020

BACK_DEFEXP-RR-003126

BACK_DEFEXP-RR-003127