# EXHIBIT N

# The Bundle of Property Rights*

By Leonard C. Smith

**Here is a fresh and effective consideration of what is meant by this now familiar phrase; and, as the author points out, "a deep understanding of the character of each of these rights and the part played in making up the whole is essential to the appraiser." Mr. Smith is an M.A.I. of many years' standing and in the not too distant past contributed in many ways to the educational work of the Institute.**

Five, six — pick up sticks,
Seven, eight — lay them straight.
—*old nursery rhyme*

THE TRUE NATURE of real estate ownership was relatively obscure and little understood until the late Nathan William MacChesney in his book on real estate law[1] adopted and developed the concept that property was a "bundle of rights"—like a faggot of sticks, each representing a different opportunity for use or action by the holder. Like other famous concepts, this simple device can lead the way to new vistas of thought and consideration. It makes possible an orderly disassembly of property rights as a generic entity into component parts which bear relationship but which are distinct in their influence upon the enjoyment of the benefits to be derived from ownership.

A deep understanding of the character of each of these rights and the part played in making up the whole is essential to the appraiser. The homely comparison with a bundle of sticks may be helpful in orienting the appraiser as he explores the confused pattern of interplay among property rights. Often it may provide a refuge from which he can emerge, refreshed in his ability to renew the attack upon his problem.

In this country absolute title to real estate does not exist, unless title to lands owned by the government were so considered. All titles wherein the holder has less than sovereign powers are subject to the power to tax, the power of eminent domain, and the police power for the protection of the public health, safety, morals, and general welfare. So it will be seen that, before the bundle of rights was handed down, at least three of the "sticks" were extracted and retained by the state.

The guarantees embodied in the federal

* EDITOR'S NOTE: Where, when, and why the expression, "a bundle of rights" was first used to describe property ownership is not known. It has been established that the late Dr. Richard T. Ely used it both in his writings and his lectures. However, it was left to General MacChesney to utilize this concept in his book in such a way and at such a time as to fire the imagination of those engaged in real estate practice, to widen their vision, and to give them a better and deeper understanding of that most important and vital element in the real estate profession—ownership.

[1] *The Principles of Real Estate Law* (New York: The Macmillan Co., 1927).

constitution and the Bill of Rights and in the several state constitutions may be considered to have been received in lieu of or in exchange for the "rights reserved unto the sovereign." In fact, it is through constitutional government that the bundle of rights achieves form and substance, and it is from that source that the stability of their value emanates. Certainly without some assurance of the continued enjoyment of the rights of property ownership, much of their value would be impaired or lost.

An old truism, long accepted, is that "with every privilege goes responsibility." The privilege in this case is the confidence with which property is held because of the protection of the inherent rights afforded by government under the law. But this boon is not an entirely unmixed blessing because with it go the responsibilities of citizenship in the support and defense of the government. The tenure of property rights being dependent upon the adequate and devoted discharge of responsibilities by the citizenry, it would seem logical that the responsibilities become inseparable with the rights and per se a part of the bundle. This reasoning develops a corollary on the original concept, resulting in the modified statement "real property is a bundle of rights and *responsibilities*." The array of the sticks in this augmented bundle and a brief discussion of each follow but not necessarily in the order of importance.

## Property Rights of a Physical Nature

The first of three rights in this category is "the right of possession, peaceable entry upon, and use of the parcel of land and the fixed improvements thereon." This one logically comes first because it is the right usually associated with property ownership. It is predominant among the objective rights since it has the most general application. Our titles are related to a specific description of a portion of the earth's surface, and a title in fee simple to the parcel carries with it ownership of all fixed improvements situated thereon in recognition of the precept that with the construction of improvements there came a unity with the land.

Reflection on the first of these rights brings compelling realization of the inseparability of property ownership and constitutional government. Without the guarantees of the constitutions—federal and state—the security of this and many of the rights would be tenuous and puny at best.

Second is "the right to possession and use of the subsurface materials that make up the tract of land or are available for use at the site." The conversion to use of mineral deposits under the land is prominent in the exercise of this right. It is interesting to note that, when minerals or soil have been separated from the body of the land in connection with use, they cease being real property and become personal property. But the title to the whole of the real estate in fee simple extends to and accompanies the portion which becomes personal property through removal. In practice, the exercise of this right usually carries with it the duty to consider and not to impair or abridge in any way the enjoyment of the first right with respect to the surface of the land.

The third among the rights of a physical nature is "the right to possession and use of the air space above the surface of the land." Until the time of successful navigation of the air, little thought was given to this right as being tangible and valuable as an inherent part of the property beyond the use of the air space to accommodate fixed improvements on the land. More recently the use of so-called "air rights" for a very different use from that of the surface of the land has opened broad possibilities for

profitable development of this separate right of property ownership. Usually this diversification of uses occurs in urban areas of high land values and heavy intensity of usefulness. A dramatic example of the use of air rights is the new Prudential Building in Chicago which was so ably described in the July 1956 issue of *The Appraisal Journal.*[2] The value and importance of the consideration of air rights apart from other rights in the land are very apparent.

## Property Rights of a Legal Nature

There are seven principal property rights which arise from and are protected by law. They are more subjective in character than those previously discussed but they are closely related thereto. These rights are separate because the use and enjoyment of each is distinct and stems from law or a combination of laws which enable each to be considered as an entity and a component part of property ownership.

The first of these is "the right to pledge all or part of any of the other property rights as security for a debt." The vast mortgage loan business relies on the use of this right. The practice of mortgaging property is so old and in such general practice that little more needs to be said other than to point out that often all of the fee is not subjected to the lien of debt but only one or a part of one of the rights, such as the pledge of a lease describing oil rights, the mortgage on a leasehold estate, or the hypothecation of improvements constructed on air rights.

Second: "the right to transfer all or part of any of the other property rights for a specified term or in perpetuity." Leases, deeds, and easements are evidences of the exercise of this right.

[2] Arthur B. Hall, Harry H. Harper, Richard J. Leyden, "Approaches to the Valuation of Air Rights," pp. 325–347.

Third: "the right to demand and to receive or not receive monetary or other consideration for the transfer of all or part of any of the other rights." Rents, interest, and payment for conveyance by deed or easement are received under this right.

Fourth: "the right to recapture part or all of any right or rights at the expiration of the term in an instrument of transfer or upon default in compliance with any of the provisions of such an instrument." An example would be the owner regaining through reversion the rights previously granted in a lease at the expiration of the leasehold or upon failure of the lessee to conform to the covenants expressed in the agreement.

Fifth: "the right to bequeath a part or all of any of the rights to specified legatees." The execution of a will is the exercise of this right.

Sixth: "the right to have all rights held at death of the owner to pass to his legal heirs." If a man dies intestate—without leaving a will—his property rights are distributed to his heirs according to law.

Seventh and last of the legal rights: "the right to refuse to exercise any property right." The absence of compulsion to use any right merely rounds out and makes complete the freedom of will in the enjoyment of property ownership.

## Responsibilities of Property Ownership

It was Disraeli who said "Property has its duties as well as its rights." The inseparability of the duties or responsibilities of property ownership with the rights therein is well attested by their interdependence.

The first responsibility is "to conform strictly to the exercise of the sovereign powers of the government." There remains little choice on the part of the property owner with respect to the use of some of

its powers by the sovereign—witness the power to condemn land for public use. The only course left is the determination of just compensation. The power to tax may be resisted but to do so places continued ownership of title in jeopardy. Failure to conform to the police powers usually results in punishment in one form or another. So, in a sense, the first responsibility is much more forced upon the individual than it is a voluntary action. But the real duty that devolves upon the individual is that of devotion to the principles of government without which the continued enjoyment of property rights would be threatened.

The other responsibility is "to conform faithfully to the terms of any lawful agreement or legal undertaking for the pledge or transfer of any property right or part thereof." There may be more of an area of choice by the owner in this regard but courts of law and equity constantly force this responsibility upon individuals who attempt to evade it. It is the great body of citizens who hold sacred their devotion to the responsibilities of property ownership that holds intact the forces of check and balance which have continued to preserve the cherished rights.

## The Bundle Concept in Practice

The concept of property rights and responsibilities as a bundle of sticks can serve as more than an academic exercise. It could well become a simple, graphic device for the appraiser to assist in visualizing the separation of the various interests in the more complicated problems of valuation. A case in point would be the appraisal of the site of the new Prudential Building in Chicago, previously mentioned. It is possible that a more involved example for illustrative purposes could be contrived but the Prudential case certainly presents many interesting departures from the ordinary in property tenure.

At the outset of negotiations for the Prudential deal the railroad company was the holder of the bundle of sticks (or property rights). But, if any of the land had been acquired under eminent domain from a fee owner, the bundle would already have been minus one of its sticks because the fee owner would still be holding the right, however negligible, of reversion if any of the rights in the land were to pass out of use for the purposes for which it was condemned. It is presumed in this discussion that the title was held in fee simple and the "bundle" was intact.

In conveying fee simple title to the various small sites which serve to support the piers upon which the building rests, the railroad likely conveyed all of the rights of ownership. The use of the air rights above a specified distance over the intervening areas environing the pier sites was conveyed by transfer of part of the "right to possession and use of the air space above the surface of the land." The railroad retained the surface and subsurface rights along with the right to the air space below the specified level. The transfer brought need for the introduction of the third dimension into the description of the portion of the right conveyed.

It appears that legal validity has been found or provided in the Prudential case for the treatment and negotiation of leases in the same manner as if the building were on a conventional site. Undoubtedly, the property located within the described air space could be transferred, pledged as security for a debt and be subjected to bequest, easement, and judgment or other process of law in the usual manner.

Meanwhile, the railroad is free to use the rights retained, to deal with respect to any subsurface mineral resources, and to

pledge or transfer such retained rights in quite the same manner as if the air rights had not been conveyed.

The Prudential Building is interesting as an example of the practical separation of property rights but the use of the concept under discussion is not confined merely to such rare cases. The principle is brought into play in every lease transaction, in the creation of a life estate, the granting of an easement—in short, in every occasion where property is subjected to lien or transfer in any form less than the entire fee simple.

As developments in centers of high population density progress and our urban life becomes more and more complex under the impact of fast transportation and communication and of fantastic technological achievements, the application of the "bundle of sticks" concept will become of growing value to the appraiser.

History reveals that mankind has not always been so fortunate as to have great truths revealed just when they were most needed. And it is not given to every man or to more than a few in a generation to be privileged to reduce to a simply-stated common denominator an attitude or precept which had remained vague through the ages. From the earliest days of land ownership it was considered that man held it much as he held chattels or other objects of value. Study of law and legal history shows the slow transition from the objective attitude to the subjective. Of such was the concept that property ownership does not partake of physical characteristics as much as it does consist of a bundle of rights and responsibilities. Surely this statement is akin to what was in Wordsworth's mind when he spoke of "truths that wake to perish never."

**Each October issue of *The Appraisal Journal* contains an Index of all articles which have been published during that year. *Journal* readers will find the Index for Volume XXIV, 1956, on pages 632–637 of this issue.**