# EXHIBIT O

Appraisal Institute®

*Professionals Providing Real Estate Solutions*

# Real Property Valuation in Condemnation



# Real Property Valuation in Condemnation

Readers of this text may be interested in the following publications from the Appraisal Institute:

- *Applications in Litigation Valuation: A Pragmatist's Guide*
- *The Appraisal of Real Estate*
- *The Dictionary of Real Estate Appraisal*
- *Scope of Work*

Appraisal Institute®
*Professionals Providing Real Estate Solutions*

# Real Property Valuation in Condemnation

Appraisal Institute • 200 W. Madison • Suite 1500 • Chicago, IL 60606 • www.appraisalinstitute.org

The Appraisal Institute advances global standards, methodologies, and practices through the professional development of property economics worldwide.

Chief Executive Officer: Jim Amorin, MAI, SRA, AI-GRS
Director of Professional Services and Resources: Evan R. Williams, CAE, IOM
Senior Manager, Publications: Stephanie Shea-Joyce
Senior Book Editor/Technical Writer: Michael McKinley
Senior Technical Book Editor: Emily Ruzich
Manager, Book Design/Production: Michael Landis

**For Educational Purposes Only**
The materials presented in this text represent the opinions and views of the developers. Although these materials may have been reviewed by members of the Appraisal Institute, the views and opinions expressed herein are not endorsed or approved by the Appraisal Institute as policy unless adopted by the Board of Directors pursuant to the Bylaws of the Appraisal Institute. While substantial care has been taken to provide accurate and current data and information, the Appraisal Institute does not warrant the accuracy or timeliness of the data and information contained herein. Further, any principles and conclusions presented in this publication are subject to court decisions and to local, state and federal laws and regulations and any revisions of such laws and regulations.

This book is sold for educational and informational purposes only with the understanding that the Appraisal Institute is not engaged in rendering legal, accounting or other professional advice or services. Nothing in these materials is to be construed as the offering of such advice or services. If expert advice or services are required, readers are responsible for obtaining such advice or services from appropriate professionals.

**Nondiscrimination Policy**
The Appraisal Institute advocates equal opportunity and nondiscrimination in the appraisal profession and conducts its activities in accordance with applicable federal, state, and local laws.

© 2018 by the Appraisal Institute, an Illinois not for profit corporation. All rights reserved. No part of this publication may be reproduced, modified, rewritten, or distributed, either electronically or by any other means, without the express written permission of the Appraisal Institute.

**Library of Congress Cataloging-in-Publication Data**
Names: Appraisal Institute (U.S.)
Title: Real property valuation in condemnation / Appraisal Institute.
Description: Chicago,IL : The Appraisal Institute, 2018. | Includes bibliographical references.
Identifiers: LCCN 2018029483 | ISBN 9781935328742
Subjects: LCSH: Eminent domain--United States. | Real property--Valuation--United States.
Classification: LCC KF5599 .R433 2018 | DDC 343.73/0252--dc23 LC record available at https://lccn.loc.gov/2018029483

Copyrighted material licensed by Randell Bell, PhD on November 20, 2015

# Table of Contents


| | | |
|---|---|---|
| Chapter 1 | The Litigation Environment | 1 |
| Chapter 2 | Origin of Eminent Domain and Just Compensation | 9 |
| Chapter 3 | Legal Measurements of Just Compensation | 17 |
| Chapter 4 | Limitations on Property Rights | 33 |
| Chapter 5 | The Larger Parcel | 55 |
| Chapter 6 | Highest and Best Use | 75 |
| Chapter 7 | Land Use Regulations | 91 |
| Chapter 8 | Cost Approach to Value | 107 |
| Chapter 9 | Income Capitalization Approach to Value | 115 |
| Chapter 10 | Sales Comparison Approach to Value | 123 |
| Chapter 11 | Subdivision Development Analysis | 137 |
| Chapter 12 | Construction of the Public Improvement | 153 |
| Chapter 13 | Damages in Partial Taking Cases | 167 |
| Chapter 14 | Benefits—General and Special | 193 |
| Chapter 15 | Easements | 211 |
| Chapter 16 | Inverse Condemnation and Regulatory Takings | 229 |
| Chapter 17 | Writing the Report | 237 |
| Chapter 18 | Preparation for Trial | 245 |
| Chapter 19 | The Expert Witness | 263 |
| Chapter 20 | Liability Risks for Appraisers in Condemnation | 281 |
| Appendix A | Sample Easement Form | 291 |
| Appendix B | Appraisal Report Documentation Checklist | 297 |

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

# Foreword

The Appraisal Institute has a long history of scholarly engagement with litigation-related issues affecting real property valuation. The first articles in *The Appraisal Journal* to deal with condemnation situations date back to the 1940s, and the first article to address an appraiser's role as an expert witness in court proceedings was published in 1950. Other hallmark events in that history were publication of two editions of *Real Estate Valuation in Litigation* in 1982 and 1995. That book served as an essential resource for generations of appraisers.

The Appraisal Institute's new book *Real Property Valuation in Condemnation* is a reinvention of those earlier texts on valuation for litigation. This new book takes the earlier works as a model but narrows the focus, concentrating specifically on the contentious subject of condemnation and what appraisers need to know about this area of valuation practice.

Specific legal concepts in eminent domain such as the larger parcel, the federal and state rules, and just compensation (as distinct from a defined type of value) have always complicated the application of the valuation process. *Real Property Valuation in Condemnation* serves as an authoritative primer on these complex subjects and brings illustrative examples into the twenty-first century.

The relationship between attorneys and appraisers has changed in recent years as both professions have grown more comfortable with each other's role in eminent domain proceedings. The influence of legislation and legal precedent on the admissibility and effectiveness of traditional valuation practices in condemnation appraising remain significant concerns, which must be discussed by appraisers and their clients in the determination of scope of work. Those who commission appraisals understand that appraisers are hired to provide an opinion of the value of real property rather than an interpretation of case law. And the evolution of professional appraisal standards provides the clients of appraisers with a sense of confidence in the competence and commitment to ethical conduct on the part of appraisers.

A great many valuation professionals with decades of experience in the litigation arena have contributed their time, energy, and expertise to

the development of this book, from content reviewers to contributors of new material. These individuals include Rick L. Carlile, MAI, Michael H. Christensen, SRA, Stephanie Coleman, MAI, SRA, AI-GRS, AI-RRS, Stephen T. Crosson, MAI, SRA, Don M. Emerson Jr., MAI, SRA, Stephen F. Fanning, MAI, AI-GRS, Brian J. Flynn, MAI, AI-GRS, Steven J. Herzog, MAI, AI-GRS, Jeffrey A. Johnson, MAI, Kerry M. Jorgensen, MAI, Paula K. Konikoff, JD, MAI, AI-GRS, Frank J. Lucco, SRA, Maureen Mastroieni, MAI, Dan Mueller, MAI, Douglas C. Nelson, MAI, SRA, Stephen Roach, MAI, SRA, AI-GRS, Scott Robinson, MAI, SRA, AI-GRS, AI-RRS, Richard J. Roddewig, JD, MAI, Timothy P. Runde, MAI, Lori M. Safer, MAI, John A. Schwartz, MAI, Tony Sevelka, MAI, SRA, Michael V. Tankersley, MAI, SRA, AI-RRS, Nick A. Tillema, MAI, SRA, AI-GRS, AI-RRS, John R. Underwood, MAI, SRA, and John Urubek, MAI. The Appraisal Institute acknowledges the contributions of all these professionals and expresses its appreciation for their efforts.

**James L. Murrett, MAI, SRA**
2018 Appraisal Institute President

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

1

# The Litigation Environment

Ordinarily an appraiser learns how to perform a specialized type of appraisal and then worries about the relationship between the appraiser and client. Because of the unique appraiser-client relationship in valuation for eminent domain purposes, however, it is wise to discuss the appraiser's role first. Then, appraisers will know what they are getting into when accepting a valuation assignment involving condemnation.

In a condemnation assignment, the level of scrutiny that an appraiser's work product receives often surpasses the typical level of review that occurs in valuation assignments for other (more typical) intended uses of an appraisal. Every word of an appraisal report used in a litigation matter is likely to be pored over by someone who would like to prove the appraiser wrong.

In the courtroom, valuation experts act as just that—experts, in the legal sense of the term. Some valuation experts thrive in that competitive and sometimes combative environment.

The adversarial relationship among litigants must not have any effect on an appraiser serving as an expert witness. The expert's client is most often the attorney, which is where the conflict resides—attorneys are advocates for their clients whereas appraisers are required by professional valuation standards to be impartial, independent, and objective. Indeed, impartiality and independence are characteristics that define the professional practice of valuation.

In a courtroom, the work products of appraisers hired by the different parties involved in a condemnation action are commonly pitted against each other, and the appraisers on each side may be called to defend their conclusions, putting appraisers in what may be considered an implicitly adversarial relationship. There is an all-too-human impulse to conflate the quality of the work product with the competency of the producer. However, professional standards for the review of valuation reports make a distinction between criticism of another appraiser (not allowed) and criticism of another appraiser's work (the legitimate focus of a review assignment).

The relationship between appraiser and attorneys (i.e., the clients of the appraisers) can be adversarial when an attorney, as an advocate for a client, wants to influence the value opinion of the appraiser or another aspect of the valuation process. The effect of client influence on the valuation process is a perennial problem for the profession, in all sorts of appraisal assignments, not just condemnation scenarios.

Appraisers should understand the needs and expectations of their clients, and not just because of adversarial circumstances. Consideration of client expectations are part of an appraiser's determination of the scope of work (and perhaps whether the assignment should even be accepted). A lack of knowledge can also be a source of conflict and can result in bad decisions, so appraisers should expect to educate their clients and the court.

Appraisers should not judge their work, including their testimony, based upon whether the client "won" or "lost" in the litigation. Rather, an appraiser's work should be considered in terms of credibility and effective communication. Even though an appraiser may have provided an excellent work product and testimony, the findings in a case may still be adverse to the client.

## Appraiser's Responsibility and Scope of Work

There is one feature of appraisal assignments for condemnation purposes that distinguishes them from other types of appraisal assignments. When, in other types of appraisal assignments, the appraisal report has been delivered to the client, the appraiser's professional and contractual obligation to that client is finished, subject of course to the correction of any deficiencies found in review. This is not the case in appraisals prepared for condemnation cases. When appraisers accept an appraisal assignment that may involve testimony at trial, they may be committed contractually to update or revise, as necessary, the appraisal report for trial purposes, assist legal counsel in preparing for trial without becoming biased, prepare themselves for trial, and make themselves available for depositions and the trial. That is, appraisers must pay careful attention to the terms of the engagement agreement in assignments involving condemnation cases because the obligations of that agreement may, in some instances, continue for ten years or more.

Sometimes an appraiser is employed prior to the instigation of a condemnation action, but often attorneys have been retained and a lawsuit has been filed before an appraiser is even contacted. In many condemnation situations, negotiations have already failed and both parties have determined the amount of compensation that they feel is appropriate. In nearly all of these situations, appraisers will be dealing with attorneys, rather than directly with an attorney's client. In this case, the appraiser can create a proposed engagement letter specifying that the initial findings will be prepared by the appraiser acting as an attorney's consultant (which are subject to the confidentiality requirements of all appraisal assignments), and a written report suitable for trial will be prepared as an expert's opinion (which by virtue of being presented as evidence to the court cannot be considered confidential).

Assignment phasing is often identified as a practical strategy for condemnation assignments, as long as the appraiser can avoid accepting an assignment

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

where the fees are contingent on a predetermined result, which is prohibited by professional valuation standards. The appraiser should not care if the work is "of use" to the client. It is unethical to accept an assignment based on a predetermined result. That would include an assignment where an appraiser agrees to only complete the assignment if it is going to benefit the client. However, an appraiser can accept a phased assignment, where the appraiser agrees to come to a preliminary conclusion based on a certain scope of work. At that point, the client can decide whether to engage the appraiser to do more work.

One excellent tool used in valuation assignments in condemnation cases is the multipremise appraisal. Because some of the theory and applications of valuation are vague or become clouded when applied to specific factual situations, it is often impossible to determine with any certainty how the court will ultimately interpret a given rule. For instance, it is not always possible to determine whether the diminution in the value of a remainder property in a partial taking condemnation case was caused by compensable or noncompensable damage. In such a case, an appraiser can provide a multipremise appraisal of the remainder property, taking the damage into consideration under the first premise and excluding consideration of the damage under the second. Regardless of the court's ultimate ruling, the appraiser will have a credible conclusion. This procedure has the added advantage of allowing an attorney to determine the importance of this particular element of damage to the overall case. This determination can have a bearing on future negotiations and on the attorney's decision whether or not to submit a pretrial motion asking the court to make a ruling regarding the compensability of the damage item prior to trial.

The effective use of multipremise appraisals is not limited to issues relating to the compensability of damages. They can also be used in cases involving disputes concerning the proper date of value, the probability of rezoning or obtaining a permit, alternative highest and best uses, and questions concerning the larger parcel or the scope of the project. (See Chapters 5 and 6 for discussion of these terms.)

## Government Clients

When an appraiser has been retained directly by a condemning agency in the early stages of the acquisition process, the protocol is often different from what is followed in assignments for other uses. Like many appraisal clients, most condemnors have specific procedures for awarding appraisal contracts and exacting appraisal reporting requirements. (See Chapter 17 for appraisal report content requirements.) However, appraisers must not assume that their reports are suitable for trial purposes just because they have been approved by a condemning agency. It is common that appraisal reports submitted by agencies for condemnation action are *not* acceptable for trial purposes.

One advantage of working directly with a condemning agency in the early stages of the acquisition program is that appraisers do not have the agency's attorneys micromanaging the appraisal process. On the other hand, it can sometimes be difficult to obtain needed legal guidance from the agency's legal counsel at this early point in the process.

When entering into a contract with a condemning agency, appraisers must be sure that they can complete the terms of the contract without violating the standards of the professional organizations to which they belong, the standards required by state licensing or certification agencies, or their own personal ethics. According to USPAP and the Code of Professional Ethics of the Appraisal Institute, in any appraisal assignments, an appraiser must not disclose: (1) confidential information or (2) assignment results to anyone other than the client, parties specifically authorized by the client, state appraiser regulatory agencies, third parties as may be authorized by due process of law, or a duly authorized peer review committee except when the disclosure to a committee would violate applicable law or regulation. Many state licensing or certification laws provide that the state may audit an appraiser's files at random. However, the US Department of Justice, which represents all federal agencies in condemnation matters, takes the position that

> (1) An appraiser must protect the confidential nature of the appraiser-client relationship.
>
> (2) An appraiser must act in good faith with regard to the legitimate interests of the client in the use of confidential information and in the communication of assignment results.
>
> (3) An appraiser must not disclose confidential information or assignment results prepared for a client to *anyone* other than: (a) the client and persons specifically authorized by the client; (b) state appraiser enforcement agencies and such third parties as may be authorized by due process of law; and (c) a duly authorized professional peer review committee.
>
> If an appraiser receives a request or order, under items (2) or (3) above, to provide confidential information relating to an appraisal conducted for the government to a state appraiser enforcement agency or professional peer review committee, the appraiser must provide the government with written notice of the request or order *prior* to providing the confidential information to the state appraiser enforcement agency or professional peer review committee. If litigation is pending, the Department of Justice may elect to intercede if it determines such intercession would be in the best interest of the government.[1]

A condemnor client may insist that an appraiser certify that the appraiser's opinion of market value, or the difference between the market value before and after a partial taking, is "just compensation" when, as a matter of law, the terms *market value* and *just compensation* are not always synonymous and, in the strictest sense of the terms, it is the trier of fact who determines just compensation using an appraiser's opinion of market value as evidence. (See Chapter 2 for further discussion of this issue.) In the limiting conditions of an appraisal report, an appraiser may need to clarify the terminology by stating that, as a matter of law, just compensation is the mathematical equivalent of the market value of the property (or the difference in the market value of the property before and after a partial taking).

## Appraiser-Attorney Relations

An attorney is a sworn advocate for the client's interest and wants to obtain the highest (or lowest) award that is reasonably possible. Appraisers in condemnation scenarios are advocates only for their unbiased opinions of value. An attorney's purpose in a trial is to present the strongest case possible and procure the

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

most advantageous award for the client. An appraiser's purpose is to present an opinion of value in an unbiased yet persuasive manner and to come down off the witness stand with integrity and professional reputation intact. Competent litigators understand that it is in an advocate's interest to not attempt to influence appraisers into positions that can be attacked successfully by opposing counsel.

Some attorneys take their role as advocates as a license to screen the information they provide to their own appraisers, providing information advantageous to their client's interest and withholding disadvantageous information. This is never acceptable. If an appraiser knows that the client is withholding relevant information, the assignment should be declined. If opposing counsel is withholding information, the attorneys need to petition the court to make sure that both appraisers receive the same information (and have enough time after receiving the information to prepare a credible appraisal).

Often, appraisers must extend their investigation to supplement and verify attorney-supplied information. If an attorney cites a specific case in a legal instruction as support for a certain proposition, the appraiser should read the case to confirm that it does, in fact, support the proposition being advanced. However, appraisers are not necessarily qualified to interpret cases. An appraiser can complete an appraisal based on a specific legal instruction, but it must be clearly outlined in the appraisal report. Attorneys have the right to argue their own interpretations of a case to the court and to present value opinions in line with those interpretations. In outlining the legal instruction, an appraiser is effectively saying to the user of the appraisal report, "If this interpretation of the cases is correct, the value is $*x*."

Appraisers should consider the source when reading any article or text concerning real property valuation for condemnation purposes. Articles in law journals, like articles in other professional journals, express the opinions of the authors and should be viewed as such. Unfortunately, some lawyers cannot seem to get out of their advocacy mode, even when writing supposedly objective reports or treatises. An article that should be an objective report of the law sometimes becomes a vehicle to advocate a personal point of view. Appraisers should be wary, even when reading publications that have historically been considered authoritative, objective, and balanced. Whether the article has been peer-reviewed or not is an important factor to consider in evaluating its credibility.

Some attorneys try to intimidate their own appraisers by becoming belligerent and aggressive. They may attempt to persuade appraisers to change value opinions, to exclude statements or data from the appraisal report that they perceive as weakening their case, or to include statements or data in the appraisal report that they perceive will bolster their case. On the other hand, appraisers can also become belligerent when questioned about the reasoning or support for their opinions. They may refuse to discuss the basis of their opinions, to assist in pretrial preparation, or, worst of all, to correct obvious errors in their reports.

Whatever the environment, appraisers must maintain a balance, keeping an open mind, but not wavering from their opinions, unless an obvious error was made within the analysis. An appraiser's function at trial is to inform the trier of fact by expressing an unbiased opinion of value, not the attorney's opinion of value. Nevertheless, appraisers should remember that they can learn from attorneys,

**The Influence of the Courts on Appraisal Practice**

An attorney may provide an appraiser with a legal instruction relating to the acceptability of certain appraisal methods in a particular court. The rationale for that legal instruction is often based on rulings of cases involving a similar valuation situation. However, not all court decisions establish case law. The eminent domain actions brought by the federal government or any of its agencies are heard in federal district courts. Actions in federal courts generally are governed by the Federal Rules of Civil Procedure and Federal Rules of Evidence. Federal appellate court decisions and United States Supreme Court decisions interpret federal eminent domain law.

Eminent domain actions brought by a state or by a local agency are subject to the procedural, substantive, and evidentiary rules of that jurisdiction. Appellate decisions can interpret eminent domain law, and these decisions establish precedents.

Under the doctrine of *stare decisis*, once an issue is decided in an appellate decision, that decision constitutes a precedent that normally should be followed by other courts in cases involving the same issue. Therefore, a decision of a higher court is generally considered binding on a lower court.

who have a different form of expertise. Many attorneys have been specializing in real property valuation litigation for years and have a wealth of experience that can be invaluable. These attorneys may have the ability to identify flaws in an appraiser's logic and reasoning that, if not corrected, could result in an appraiser being discredited under cross-examination.

When appraisers are employed by private litigants, they should seriously consider requiring that their appraisal fee be paid up front, before the assignment is begun, or suggest that the fee be placed in escrow. If this is done, an appraiser is assured of receiving the fee earned, even if the client is not satisfied with the appraiser's ultimate opinion of value. If appraisers are not paid in advance, or at least in advance of the trial, it could be made to look like their fee is contingent on the outcome. A third alternative is to obtain a guarantee from the client's attorney that the fee will be paid, regardless of the ultimate value conclusion.

In establishing fees for their appraisal services, appraisers should recognize that the complexity of real estate valuation assignments, particularly for condemnation purposes, has increased substantially over the years. Because the condemnation appraiser cannot assume away anything that would result in an appraisal that is not credible, it is often necessary for the appraiser to retain the services of subsidiary consultants or make provisions for the client to provide for the services of consultants. The types of consultants needed might include civil engineers, environmental engineers and auditors, cost estimators or contractors, mining experts, timber cruisers or foresters, architects, and hydrologists, just to name a few. Appraisers cannot merely accept the reports of consultants as accurate. They must review the reports and adopt them only if they appear reasonable and adequately supported.[2]

Some attorneys, and some clients, routinely request that appraisers submit a "draft" report for their review prior to preparation of a final appraisal report. The Uniform Standards of Professional Appraisal Practice is currently silent on the

Copyrighted material licensed by Randall Bell, PhD on November 30, 2016

subject of drafts, only indirectly addressing them. It is advisable for appraisers to adopt a formal document retention policy consistent with USPAP and to adhere to this policy in creating a workfile.

The practice of submitting a draft report has both advantages and disadvantages. Obviously, in reviewing a draft report an attorney should identify any factual errors found within the report and improper interpretations or applications of the law as it relates to the case. These flaws can then be corrected prior to preparation of the final report. The attorney or client can also identify areas within the report that are weak, thus giving the appraiser the opportunity to shore up support for their conclusions. However, the review process can also be used by the attorney as an attempt to get the appraiser to change his or her value opinion or to include or exclude specific data or statements from the final report that were included in the draft. An appraiser who submits a draft report should be prepared to be subjected to pressure to change the final report in ways that may, in the appraiser's opinion, corrupt the objectivity of the report. The appraiser must obviously resist that pressure.

A disadvantage of submitting a draft report is that an appraiser may be asked on cross-examination whether a draft report was submitted and what changes, if any, were made in the final report. If significant changes were made, opposing counsel may suggest to the trier of fact that the appraiser's final report was dictated by the client. If an appraiser does submit a draft report, the draft should not be signed, and the draft report should clearly indicate that it is not the complete, final report.

A major revision to the Federal Rules of Civil Procedure went into effect in 2010, limiting the discovery of draft reports prepared by experts. In addition, the amendment provided work product protection to communications between attorneys and experts retained by those attorneys other than communications that (1) relate to the expert's compensation for analysis or testimony, (2) identify facts or data that the attorney provided to the expert and that the expert considered in forming opinions expressed to the court, or (3) identify assumptions provided by the attorney that the expert relied on. The rules were amended again in 2015 to emphasize "proportionality" in the scope of discovery.

It is the appraiser's opinion of value that must ultimately prevail. During the pretrial process, appraisers can sometimes become confused as to whether an attorney is explaining a legal principle or expressing an opinion in regard to the valuation. Appraisers must insist that any legal instruction by attorneys be communicated in writing and contain a proper foundation. This practice prevents confusion because attorneys are typically willing to put a valid legal instruction in writing, but they will be unwilling to put their opinions concerning a valuation premise in the form of a written instruction to an appraiser. This practice has the added advantage of forcing attorneys to prepare written legal instructions and to develop, and cite, the supporting legal authority for the instructions. A legal premise or instruction that is presented verbally to an appraiser as "cast in stone" is often not quite as clear cut when it has to be stated, and supported, in writing.

In reviewing written legal instructions, appraisers should remember that they do not have to be convinced that a legal instruction expresses the correct interpretation of the law. To accept a legal instruction, appraisers must have no

reason to doubt that the attorney's interpretation of the law, as expressed in the legal instruction, is reasonable and adequately supported. Most written legal instructions will meet this test when the instructions are "based on accepted procedures or standards and represent informed opinions on matters beyond the appraiser's expertise."[3] An appraiser can build credibility with an attorney by communicating and discussing both reasonable and unreasonable assumptions and explaining the consequences of those assumptions.

Eminent domain actions brought by the federal government or any of its agencies are heard in federal district courts. Actions in federal courts generally are governed by the Federal Rules of Civil Procedure and Federal Rules of Evidence. Federal appellate court decisions and United States Supreme Court decisions interpret federal eminent domain law.

Eminent domain actions brought by a state or by a local agency are subject to the procedural, substantive, and evidentiary rules of that jurisdiction. Appellate decisions can interpret eminent domain law, and these decisions establish precedents.

Not all court decisions establish case law. Under the doctrine of *stare decisis*, once an issue is decided in an appellate decision, that decision constitutes a precedent that normally should be followed by other courts in cases involving the same issue. Therefore, a decision of a higher court is generally considered binding on a lower court.

At the outset of and throughout an assignment, the attorney should inform the appraiser whether there are *in limine* motions or orders. These motions or orders may limit the admissibility of specified testimony.

## Notes

1. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §1.15.
2. See Guide Note 4 to the Standards of Professional Practice of the Appraisal Institute, "Reliance on Reports Prepared by Others," effective January 1, 2012, minor revisions 2017.
3. Guide Note 4 to the Standards of Professional Practice of the Appraisal Institute.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

2

# Origin of Eminent Domain and Just Compensation

*Eminent domain* is the right of the sovereign government to take private property for public use upon payment of just compensation. This right can be, and has been, conveyed to other public and quasi-public bodies such as public utility districts, development commissions, and railroad companies. *Condemnation* is the act or process of enforcing the right of eminent domain. The distinction between the two terms is quite simple. Eminent domain is the *right* of government to take private property for public use upon payment of just compensation, while condemnation is the *act* of doing so.

It is not absolutely necessary that real estate appraisers have any more understanding of the right of eminent domain and the act of condemnation than is expressed above. However, a deeper understanding of these terms will lead to better comprehension of the reasoning behind many court decisions relating to eminent domain valuation and will facilitate effective communication with members of the law profession and others involved in eminent domain and condemnation. It is wise for appraisers to acquire a thorough understanding of legal terms so that they do not add to the confusion and miscommunication found in the complex field of eminent domain litigation. An understanding of legal terms will also help appraisers comprehend court decisions that have become precedents.

## Eminent Domain

The origin of the concept of eminent domain is lost in history, but the sovereign's right of eminent domain has long been acknowledged. The first recorded condemnation action occurred in 871 B.C.[1] The condemnor, King Ahab, attempted to acquire Naboth's vineyard. Naboth refused to sell the vineyard voluntarily, and King Ahab exercised the right of eminent domain. Ahab's wife, Jezebel, became, in effect, the trier of fact–i.e., the judge or jury responsible for deciding factual issues in a trial. The decision at the end of the trial was that King Ahab did in fact have the right of eminent domain, and title to the vine-

yard was transferred to him. By way of compensation for the taking, Naboth was stoned to death for his refusal to sell the land voluntarily. There was no appeal.

The U.S. Constitution sets forth the requirement that the property owner be compensated. This is not true in every country. Many early definitions of eminent domain, including those applied in the United States, did not include a provision for just compensation. Until after the Civil War, several states exercised the power of eminent domain without paying compensation. It is now well established, however, that the right of eminent domain cannot be exercised in this country without the payment of just compensation. Consequently, the expert opinions of appraisers are integral for the successful application of the rule of law.

Although many believe that the government's right of eminent domain comes from the U.S. Constitution, it does not.[2] The sovereign has always had the right of eminent domain. Some theorize that this right originates with the principle that the sovereign owns all of the property within its boundaries, and private ownership and possession of property is always subject to reversion or repossession by the sovereign.

**Related Terms**

In some jurisdictions, such as Louisiana, the term *expropriation* has the same meaning as *eminent domain*. An old definition of *expropriation* in the appraisal literature was a "Canadian and British term representing the act of a sovereign in reclaiming its inherent ownership in real estate which in law was never given up. It is similar to the taking of private property under the law of eminent domain in the United States."* However, expropriation was later defined in *The Dictionary of Real Estate Appraisal*, sixth edition, as a "synonym for *eminent domain* used outside the United States." Obviously, these two definitions conflict. The first indicates that *expropriation* is synonymous with *condemnation*, while the second indicates that the term is synonymous with *eminent domain*.

* *Real Estate Appraisal Terminology*, rev. ed. (Cambridge, MA: Ballinger Pub. Co., 1981).

Some disagree with the idea that the power of eminent domain comes from the sovereign's inherent ownership in real estate, which was never given up. They theorize that two sovereignties cannot hold ultimate title to the land at the same time, and both the state and the U.S. government have the right of eminent domain. Not until 1875 was it clearly established that the federal government does, indeed, have the power of eminent domain.[3]

It is now generally acknowledged that the power of eminent domain is not a property right but an attribute of sovereignty.[4] The powers of the sovereign are broad enough to include the power of eminent domain. Moreover, the states are not prohibited from exercising their powers of eminent domain by the U.S. Constitution.

The power of eminent domain cannot be exercised unless the proposed taking is for a public use. For example, a public agency could not invoke its power of eminent domain to take a property from one individual for the sole benefit of

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

another individual. However, recent trends indicate that the courts interpret *public use* quite liberally. Thus, takings for scenic easements, golf courses, and open space have been held to be for *public use*. In 1984, the U.S. Supreme Court used the public use requirement to uphold the Hawaiian Land Reform Act of 1967.[5] At the time of the legislation, an overwhelming majority—92%—of the privately owned land in Hawaii was owned by only 72 landowners. The state perceived this land oligopoly to be a social and economic evil and adopted the Hawaiian Land Reform Act, which allowed lessees living on single-family lots in developments of at least five acres to ask the state to condemn the leased fee estate in the lot and resell it to the lessee. The constitutionality of the act was challenged in federal district court on the grounds that the taking was not for a public use.[6] The district court found the act to be constitutional, but the federal Ninth Circuit Court of Appeals held that the act did not meet the public use requirements of the Fifth Amendment and characterized it as "a naked attempt on the part of the State of Hawaii to take the private property of A and transfer it to B solely for B's private use and benefit."[7]

The U.S. Supreme Court overturned the Ninth Circuit Court, finding that the act met the public use requirement of the Fifth Amendment of the U.S. Constitution because the state legislature determined that the act would serve a public purpose and "deference [by the courts] to the legislature's 'public use' determination is required 'until it is shown to involve an impossibility.'"[8] In support of its decision, the court said that "[t]he Act advances its purposes without the State's taking actual possession of the land. In such cases, government does not itself have to use property to legitimate the taking; it is only the taking's purpose and not its mechanics, that must pass scrutiny under the Public Use Clause."[9]

This case demonstrates that as long as a proposed taking accomplishes a public purpose, as determined by a legislative body, it will meet the public use requirements of the Fifth Amendment to the U.S. Constitution. This decision does not, however, affect the meaning of *public use* as it may be used in various state constitutions. An act similar to Hawaii's may be found unconstitutional in other states.

More recently, the U.S. Supreme Court took up the issue of public use in *Kelo v. City of New London*.[10] The owners of condemned property in New London, Conn., challenged the city's exercise of eminent domain power on the grounds that the takings were not for public use. After approving an integrated development plan designed to revitalize its ailing economy, New London purchased properties through its agent. Because the petitioners were unwilling to sell their property, condemnation proceedings were started. The agent was New London Development Corporation, a private nonprofit entity established (several years prior) to assist in planning economic development. In 2005, after several years of litigation, the U.S. Supreme Court noted the following:

> The city has carefully formulated a development plan that it believes will provide appreciable benefits to the community, including, but not limited to, new jobs and increased tax revenue. As with other exercises in urban planning and development, the city is trying to coordinate a variety of commercial, residential, and recreational land uses, with the hope that they will form a whole greater than the sum of its parts.

In the opinion, the court noted, "Petitioners contend that using eminent domain for economic development impermissibly blurs the boundary between public and private takings." In rejecting this argument, the court noted that "the government's pursuit of a public purpose will often benefit individual private parties." Ultimately, the court affirmed the city's authority to take the properties by determining that the city's proposed condemnations were for a "public use" within the meaning of the Fifth Amendment to the U.S. Constitution.

However, it is noted that this was not a unanimous decision with four justices disagreeing. Two dissents and filed opinions were written on the case (by Justices O'Connor, Rehnquist, Scalia, and Thomas). It should be noted that in 2015—ten years after the decision—the condemned sites in New London remained undeveloped.

**Takings Clause**

**Fifth Amendment to the U.S. Constitution**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; ***nor shall private property be taken for public use, without just compensation.***

**Fourteenth Amendment to the U.S. Constitution**

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States; ***nor shall any State deprive any person of life, liberty, or property, without due process of law;*** nor deny to any person within its jurisdiction the equal protection of the laws.

Insofar as eminent domain is an inherent right of the sovereign, the right cannot be limited by the legislature. The power of eminent domain will exist, in unlimited form, as long as the sovereign itself exists.[11] The only way the power can be limited is through the sovereign's constitution. The U.S. Constitution states that "[n]o person ... shall be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation."[12] This provision of the constitution does not grant the U.S. government the power of eminent domain, but it does limit the sovereign's inherent power by providing that eminent domain cannot be exercised without due process and the payment of just compensation to the owner of the property taken.

Furthermore, this provision of the U.S. Constitution—the Takings Clause—does not affect the powers of the states. However, Section I of the Fourteenth Amendment of the U.S. Constitution reads in part, "nor shall any state deprive any person of life, liberty, or property without due process of law." This due-process-of-law provision of the amendment has been interpreted as requiring payment of just compensation for the taking of property.[13] In fact, every state in the union except North Carolina[14] has a provision in its constitution for the payment of compensation to the owner of property acquired through condemnation.[15]

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

## Just Compensation

Not all state constitutions refer to *just compensation*. Terms such as *adequate*, *reasonable*, and *due* are used in some constitutions in conjunction with *compensation*. The adjectives used to describe compensation do not alter its meaning but rather emphasize it. It has often been joked that it is difficult to imagine *unjust compensation*. About half of the state constitutions provide for compensation to be paid for the taking of, *or damage to*, private property by the sovereign.[16]

Even in jurisdictions that do not have a constitutional provision that includes damages, it has been universally held that damages to a remainder parcel in a partial taking case are part and parcel of just compensation in a constitutional sense. The basic premise is that the owner must be compensated for the taking of the land (i.e., the value of the land and any damages accrued as a result of the taking), as opposed to being compensated just for the land taken.[17] It is also generally recognized that property encompasses the entire bundle of rights inherent in the ownership of the real estate and that the taking or infringement on these rights may affect the highest and best use of the property and ultimately the market value of the property, thereby constituting a taking, even if no part of the physical real estate is taken. The taking of all access rights is an example of such a taking. "Clearly an owner of land abutting on a street or highway cannot constitutionally be deprived of all access to his premises without compensation… total deprivation of access is equivalent to a taking [of property rights] requiring compensation," according to the publication *Eminent Domain*.[18]

It is imperative that appraisers be aware of the damage provision specified in the constitution, or adopted by statute, in the jurisdiction where the property being appraised is located. A list of the constitutional and statutory provisions applicable to eminent domain in each jurisdiction is provided in the addenda. In many jurisdictions that have no provision for compensation for damage resulting from severance, there must be an actual taking of the fee simple interest before damages can be recovered. Thus, in these jurisdictions damages are only recoverable in partial taking cases. The importance of this provision is further discussed and demonstrated in Chapter 13.

*The Dictionary of Real Estate Appraisal* defines *just compensation* as "the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position pecuniarily as he or she would have been if the property had not been taken."[19] *Black's Law Dictionary* provides another definition of *just compensation*:

> Under the Fifth Amendment, a payment by the government for property it has taken under eminent domain—usu. the property's fair market value, so that the owner is theoretically no worse off after the taking.[20]

The term *just compensation* is not defined in the U.S. Constitution or in any state constitution although many states have a statutory scheme, meaning that the legislature has defined the term. The courts have generally held that just compensation is measured by market value.[21] Infrequently, the courts have deviated from this concept, most notably when the property has no ascertainable market value.

The Uniform Appraisal Standards for Federal Land Acquisitions includes the following statement concerning market value:

> Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither compelled to buy or sell, giving due consideration to all available economic uses of the property.[22] [Citations omitted]

Various jurisdictions have different definitions of market value. These definitions assume a cash sale or its equivalent. The courts have long recognized that market value need not be estimated in strict terms of cash as long as the terms upon which the value is estimated are equivalent to cash.[23] Appraisers should use the specific definition of market value dictated by the authority having jurisdiction.

If an appraisal is to be valid for condemnation purposes, appraisers must use a definition of market value that is acceptable to the trier of fact where the condemnation trial on the property will be held. It is imperative that appraisers be aware of the applicable market value definition and include it in the appraisal report. Otherwise, the entire appraisal report or the appraiser's testimony may be rejected. If an appraiser is in doubt about the proper definition of market value in the relevant jurisdiction, the safest procedure is to request the applicable market value definition and supporting authority in writing from legal counsel.

The ultimate objective of a condemnation trial is ascertaining just compensation, but this determination is not made by an appraiser. An appraiser is allowed to express an opinion, rather than testify only to factual matters, because the appraiser is an *expert witness*. According to *Black's Law Dictionary*, 10th edition, an expert is "[s]omeone who, through education or experience, has developed skill or knowledge in a particular subject, so that he or she may form an opinion that will assist the fact-finder." Both appraisers and attorneys must recognize that appraisers are experts in estimating *value*, not determining *just compensation*. The latter function rests with the trier of fact.

While appraisers should recognize that there are occasions when market value is not the best measure of just compensation, those occasions are rare. The burden of determining whether there is a better measure of just compensation than market value should not be placed on an appraiser by the client or the client's attorney. If the client's attorney suggests that a type of value other than market value would be a more appropriate measure of just compensation under the circumstances of the case, the appraiser should reject the suggestion, unless it is converted into a written legal instruction with adequate supporting authority. (See Chapter 1 for a discussion of legal instructions.)

Appraisers who attempt to determine just compensation, instead of analyzing value, are usurping the right and responsibility of the trier of fact. Appraisers should make it clear that their opinions relate to value rather than to just compensation. If an opinion of value is of an instructed type of value, rather than market value, the appraiser must make that clear in both the appraisal report and in testimony and specifically define that value.[24] To do otherwise would be misleading.

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

It is up to legal counsel to determine whether an alternative methodology can be supported as a matter of law. If the alternative can be supported, the attorney should provide the appraiser with a legal instruction to analyze the alternative value. Ideally, the legal instruction would be in writing, it would be explicit, and it would contain reasonable supporting authority.

The term *just compensation* has been determined to mean compensation that is just not only to the person whose property is being taken but also to the condemnor, who is in essence the general public or society as a whole. Thus, just compensation is "reasonable compensation" and "compensation which is just, not merely to the individual whose property is taken, but to the public which is to pay for it."[25]

Also, while the price paid for the property may have a bearing on its market value, "[i]t is not the investment, but the 'value of the interest' in land taken by eminent domain that is guaranteed to the owner; the government may neither confiscate the owner's bargain, nor be required to assume his loss."[26]

Generally, market value is the measure of just compensation, but it is often difficult for appraisers to develop an opinion of market value while adhering to the specialized rules applicable to eminent domain valuation that have been established by the legislature or handed down by the courts. This is particularly true in partial taking cases, in which appraisers are burdened with the task of developing an opinion of value of the remainder property as well as the value of the property prior to the government's acquisition. These specialized rules of valuation can create conditions in which every appraisal conducted for eminent domain purposes is made under hypothetical conditions that do not, in fact, exist in the marketplace.

## Notes

1. *Holy Bible*, revised standard version, 1 Kings 21.
2. *Kohl v. United States*, 91 U.S. 367, 371 (1876).
3. *Kohl v. United States*, 91 U.S. 367 (1876).
4. *Shoemaker v. United States*, 147 U.S. 282, 299-300 (1893); *Jockheck v. Shawnee County*, 37 P. 621 (Kan. 1894).
5. Haw. Rev. Stat., Ch. 516 (1967).
6. *Midkiff v. Tom*, 483 F. Supp. 62 (Haw. 1979).
7. *Midkiff v. Tom*, 702 F.2d 788, 798 (9th Cir. 1983).
8. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229 (1984), at 240.
9. *Hawaii Housing Authority v. Midkiff*, at 244.
10. *Kelo v. City of New London, Connecticut*, 545 U.S. 469 (2005).
11. *Kohl v. United States*, 91 U.S. 367 (1876).
12. U.S. Constitution Amendment V.
13. *De Salvo v. Arkansas Louisiana Gas Co.*, 239 F. Supp. 312 (E.D. Ark. 1965).
14. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co.), vol. 1A, §4-8 (2007).
15. "North Carolina recognizes this fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of the State." *Debruhl v. State Highway & Public Works Comm.*, 102 S.E.2d 229, 232 (N.C. 1958).
16. *Nichols'*, vol. 2, §6.01[12] [c] (2012).
17. *Bauman v. Ross*, 167 U.S. 548 (1897).
18. 26 Am. Jur. 2d. *Eminent Domain* §200.

19. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v., "just compensation."
20. *Black's Law Dictionary*, 10th ed., (St. Paul, MN: Thomson Reuters, 2014) s.v. "just compensation."
21. *Nichols'*, vol. 4, §12.01 [1] (2017); *Harwell v. United States*, 316 F.2d 791 (10th Cir. 1963); *United States v. Miller*, 317 U.S. 369 (1943).
22. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §4.2.1, p. 93.
23. For example, see *Kerr v. South Park Commissioners*, 117 U.S. 379, 386-387 (1886) and *Baucum v. Arkansas Power & Light Co.*, 15 S.W.2d 399, 401 (1929).
24. *Uniform Standards of Professional Appraisal Practice*, 2018-2019 ed. (Washington, D.C.: The Appraisal Foundation, 2018), Standards Rule 1-2 (c) and Standards Rule 2-2 (a) (v).
25. *Ballentine's Law Dictionary*, 3rd ed. (Rochester, NY: Lawyers Cooperative Pub. Co., 1969), s.v. "just compensation."
26. *Ballentine's Law Dictionary*, 3rd ed.; see also *Kinter v. United States*, 156 F.2d 5 (3rd Cir. 1946).

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

3

# Legal Measurements of Just Compensation

Due to conflicting case law and differing constitutional provisions in various jurisdictions, several different methods of computing just compensation have been promulgated. Although appraisers do not estimate just compensation, they must report their findings of market value and the difference in property value before and after a partial taking in a manner usable to those charged with the responsibility of computing just compensation.

Various condemning agencies have adopted computational rules, often in modified form, to be used by their appraisers in eminent domain valuation. Although the law recognizes exceptions to the general rule that just compensation is equal to market value, the acquisition policies of condemning agencies seldom provide for those exceptions.

The specific rules for computing just compensation are almost as numerous as states in the union. Two general rules predominate:

1. The *federal rule* (also referred to as the *before and after rule*)
2. The *state rule* (also called the *value of the take plus damages rule* or the *taking plus damages rule*)

Other rules are modifications developed to ensure compliance with applicable constitutional and statutory provisions.

To understand the two general rules, appraisers must first understand why the different rules were established. The sovereign cannot take private property for public use without the payment of just compensation. Some states have interpreted their constitutions to mean that just compensation must be paid in cash, while others have concluded that just compensation may be paid in a form other than cash, specifically in the form of special benefits bestowed on the remainder property in a partial acquisition. (See Chapter 14 for a discussion of general and special benefits.) In these other jurisdictions, the special benefits may be offset against the value of the land taken, thereby reducing the amount

of cash due the owner (sometimes to zero). This procedure would not meet the constitutional mandate in jurisdictions where compensation for the taking must be in cash. It is for this reason that two general rules have been established. The difference between the rules is generally significant only in partial taking cases in which the remainder property receives a special benefit and in which general benefits are treated in a specific manner.

## Federal Rule

The "federal rule" is somewhat of a misnomer. This rule is applicable in federal condemnation cases, but it is also applicable in a number of state jurisdictions. In its simplest form, just compensation under the federal rule is calculated as follows:

Value Before Taking – Value After Taking = Just Compensation

For example, assume one acre was taken from a 20-acre parcel of unimproved land. If the 20-acre parcel of land was valued at $5,000 per acre and the 19-acre parcel after the taking was also valued at $5,000 per acre, then the clear difference would be $5,000 ($100,000 – $95,000). If the per-acre value of the 19-acre parcel of land remaining after the taking was affected negatively by the taking—say, dropping its value from $5,000 to $4,500 per acre—then the difference would be $14,500 ($100,000 – $85,500) rather than $5,000. The damages suffered in the latter scenario would be accounted for in the higher amount of just compensation.

Under the federal rule, no further breakdown is required for trial purposes. However, the Federal Uniform Relocation Assistance and Real Property Acquisition Policy Act of 1970 (P.L. 91-646) requires condemnors to furnish property owners with a written statement summarizing how the figure offered as just compensation was reached. "Where appropriate, damages for the land acquired and consequential damages to the remaining land not taken should be shown separately," according to the act.[1] The provisions of the act apply not only to federal land acquisitions but also to acquisitions made by the states and their various subdivisions if federal matching funds are involved in either the land acquisition or construction of the public improvement. Also, it should be noted that the Internal Revenue Service treats the amount paid for the taking differently from the amount paid for damages to the remainder for federal income tax purposes.[2] For these reasons, it is often necessary for an appraiser to present a detailed breakdown of the value indications in the appraisal report.

For purposes of illustration, consider a single property valued under the two different premises: (1) a scenario in which the taking damages the remainder and (2) a different scenario in which the remainder benefits from the taking. Figure 3.1 shows a single-unit property on a site measuring 100 feet by 300 feet, or 30,000 square feet. The site is improved with a 980-sq.-ft., single-unit dwelling with an attached 280-sq.-ft. garage and miscellaneous on-site improvements such as trees, landscaping, and a driveway. The site has very poor surface drainage, and is zoned for a single-unit dwelling. It has a minimum lot size of 25,000 square feet and a minimum front yard setback of 25 feet.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

The estimated market value of the property before any acquisition is $190,000, which can be broken down as follows for analytic purposes:

| | |
|---|---|
| Site (30,000 sq. ft. @ $2 per square foot) | $60,000 |
| Dwelling | 115,200 |
| Garage | 4,800 |
| On-site improvements | 10,000 |
| Total | $190,000 |

**Figure 3.1 Plot Plan–Partial Taking**




| | |
|---|---|
| Area before taking | 30,000 sq. ft. |
| Area after taking | 29,000 sq. ft. |
| Area of taking | 1,000 sq. ft. |

## Premise 1: Damages

Suppose that the local municipality intends to acquire the westerly 10 feet of the site for a road-widening project. Within the area to be taken are two trees and a portion of the driveway. The acquisition will create a nonconforming use because the dwelling and garage will not meet the minimum required front yard setback.

Market analysis of comparable sales indicates that the contributory value of dwellings and garages that do not meet the setback requirement is 20% less than the contributory value of comparable, conforming dwellings. The contributory value of the on-site improvements remaining after the taking is estimated at $8,000. The property value before and after the taking under Premise 1 is tabulated in Table 3.1. From the information in Table 3.1, the appraiser draws the following conclusion:

| | |
|---|---|
| Value of property before taking | $190,000 |
| Value of remainder property after taking | – 162,000 |
| Difference | $28,000 |

## Premise 2: Benefits

Now suppose that, as part of the road-widening project, the municipality will install storm sewers, which will eliminate the surface drainage problems on the property. Market investigation and analysis indicates that sites with no drainage problems sell for $3 per square foot, as compared to $2 per square foot for sites with drainage problems. The property's values before and after the taking under this premise are calculated in Table 3.2. It is important to determine whether the storm sewer improvements are (a) special benefits (i.e., to the subject property only) that the state allows to be offset against the value of the taking or (b) general benefits to properties in the area. If the latter, those benefits may not be offset against the value of the taking.

Using the information in Table 3.2, the appraiser's conclusion is as follows:

| | |
|---|---|
| Value of property before taking | $190,000 |
| Value of remainder property after taking | – 191,000 |
| Difference (just compensation) | $0 |

**Table 3.1 Summary of Conclusion (Damages)**

*Accounting tabulation not indicative of appraisal method employed.*

| | | | | | |
|---|---|---|---|---|---|
| Indicated value before acquisition: | | | | | |
| Highest and best use: residential | | | | | |
| **Land Area** | | **Unit Value** | | | |
| 30,000 sq. ft. | | $2.00 | $60,000 | | |
| Total area 30,000 sq. ft. | | Total land | | $60,000 | |
| Improvements | | | | | |
| **Type** | **Size** | **Unit Value** | | | |
| Dwelling | 980 sq. ft. | $117.55 | $115,200 | | |
| Garage | 280 sq. ft. | $17.14 | 4,800 | | |
| On-site improvements | | Lump sum | $10,000 | | |
| Total improvements | | | | 130,000 | |
| **TOTAL INDICATED VALUE** | | | | | $190,000 |
| Indicated value of remainder: | | | | | |
| Highest and best use: residential | | | | | |
| **Land Area** | | **Unit Value** | | | |
| 29,000 sq. ft. | | $2.00 | $58,000 | | |
| Total area 29,000 sq. ft. | | Total land | | $58,000 | |
| Improvements | | | | | |
| **Type** | **Size** | **Unit Value** | | | |
| Dwelling | 980 sq. ft. | $94.04 | $92,160 | | |
| Garage | 280 sq. ft. | $13.71 | 3,840 | | |
| On-site | | Lump sum | 8,000 | | |
| Total improvements | | | | 104,000 | |
| **TOTAL INDICATED VALUE** | | | | | $162,000 |
| **DIFFERENCE BETWEEN BEFORE AND AFTER VALUES** | | | | | $28,000 |
| **BREAKDOWN OF ACQUISITION** | | | | | |
| **Land Area** | | **Unit Value** | | | |
| 1,000 sq. ft. | | $2.00 | $2,000 | | |
| Total area 1,000 sq. ft. | | | | $2,000 | |
| Improvements | | | | | |
| **Type** | | **Unit Value** | | | |
| On-site | | Lump sum | $2,000 | | |
| Total improvements | | | | $2,000 | |
| Damages: | | | | | |
| **Item** | | | | | |
| Nonconforming house and garage | | | $24,000 | | |
| Total damages | | | | $24,000 | |
| Subtotal | | | | $28,000 | |
| Benefits (subtract): | | | | | |
| **Item** | | | | | |
| None | | | $0 | | |
| Total benefits | | | | $0 | |
| **DIFFERENCE BETWEEN BEFORE AND AFTER VALUES** | | | | | $28,000 |

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

**Table 3.2 Summary of Conclusion (Benefits)**

*Accounting tabulation not indicative of appraisal method employed.*

| | | | | | |
|---|---|---|---|---|---|
| Indicated value before acquisition: | | | | | |
| Highest and best use: residential | | | | | |
| **Land Area** | | **Unit Value** | | | |
| 30,000 sq. ft. | | $2.00 | $60,000 | | |
| Total area 30,000 sq. ft. | | Total land | | $60,000 | |
| Improvements | | | | | |
| **Type** | **Size** | **Unit Value** | | | |
| Dwelling | 980 sq. ft. | $117.55 | $115,200 | | |
| Garage | 280 sq. ft. | $17.14 | 4,800 | | |
| On-site | | Lump sum | $10,000 | | |
| Total improvements | | | | 130,000 | |
| **TOTAL INDICATED VALUE** | | | | | $190,000 |
| Indicated value of remainder: | | | | | |
| Highest and best use: residential | | | | | |
| **Land Area** | | **Unit Value** | | | |
| 29,000 sq. ft. | | $3.00 | $87,000 | | |
| Total area 29,000 sq. ft. | | Total land | | $87,000 | |
| Improvements | | | | | |
| **Type** | **Size** | **Unit Value** | | | |
| Dwelling | 980 sq. ft. | $94.04 | $92,160 | | |
| Garage | 280 sq. ft. | $13.71 | 3,840 | | |
| On-site | | Lump sum | 8,000 | | |
| Total improvements | | | | 104,000 | |
| **TOTAL INDICATED VALUE** | | | | | $191,000 |
| **DIFFERENCE BETWEEN BEFORE AND AFTER VALUES** | | | | | $0 |
| **BREAKDOWN OF ACQUISITION** | | | | | |
| **Land Area** | | **Unit Value** | | | |
| 1,000 sq. ft. | | $2.00 | $2,000 | | |
| Total area 1,000 sq. ft. | | | | $2,000 | |
| Improvements | | | | | |
| **Type** | | **Unit Value** | | | |
| On-site | | Lump sum | $2,000 | | |
| Total improvements | | | | $2,000 | |
| Damages: | | | | | |
| **Item** | | | | | |
| Nonconforming house and garage | | | $24,000 | | |
| Total damages | | | | $24,000 | |
| Subtotal | | | | $28,000 | |
| Benefits (subtract): | | | | | |
| **Item** | | | | | |
| Improved drainage (29,000 sq. ft. @ $1.00) | | | $29,000 | | |
| Total benefits | | | | 29,000 | |
| **DIFFERENCE BETWEEN BEFORE AND AFTER VALUES** | | | | | $0 |

For compensation purposes, the difference between the before value and the after value (i.e., just compensation) cannot, of course, be less than zero. That is, the property owner cannot be made to owe the condemnor after the taking. The summary of conclusions shown in Tables 3.1 and 3.2 is typical of the type of presentation required by condemnors using the federal rule. It is advisable that appraisers include, in the limiting conditions section of their appraisal reports, a statement such as the following:

> Where the values of the various components of the property are shown separately, the values are provided for allocation purposes only. The allocated values of the various components may, or may not, be equivalent to the independently developed market values of the components.

Even in jurisdictions that strongly adhere to the federal rule, there are generally provisions allowing for deviation from the rule under certain circumstances. Deviations may be necessary when a minimal taking is involved (e.g., "strip appraisals") or when a total before and after appraisal would not be economically practical. The Uniform Appraisal Standards for Federal Land Acquisitions discusses such situations in §1.7.1.4:

> There may be rare circumstances in federal acquisitions when strict adherence to the before and after rule will create costly and/or difficult burdens on the appraiser. Examples of such situations are minor fee or easement acquisitions (for flowage, wetland or habitat protection, roads, pipelines) from large parcels, where the cost of performing a full before and after appraisal is unwarranted in view of the minor nature of the acquisition and there are clearly minor or no damages to the remainder. In those rare situations, the client agency may alter the scope of work to allow a takings plus damages procedure, sometimes called the state rule. Under this procedure, the appraiser must still determine the larger parcel and develop an opinion of the value of the part taken as it contributes to the larger parcel. Minor damages are added to the opinion of value of the part taken to provide an estimate of the compensation to be paid by the client agency.

Additional discussion appears in §4.6.4.1 of the standards document:

> The taking plus damages method lacks the "effectiveness of the before and after method in clearly and simply dealing with . . . damages" and benefits in partial acquisitions. Moreover, as recognized by the federal courts, the taking plus damages method is subject to error and apt to result in improper duplication or *double damage*. As a result, the taking plus damages method is generally improper in valuations for federal acquisitions: "It is not compensation but more than compensation to twice give the owner severance damage." For example, the Fourth Circuit was forced to vacate a compensation award based on a taking plus damages calculation that was nearly four times greater than the landowners' actual loss revealed by applying the before and after method to the same facts. The court remanded for new proceedings "to the end that duplications in just compensation are eliminated."

As mentioned earlier, although the before and after rule is commonly known as the *federal rule*, the rule is not even applied universally in federal acquisitions. The Fifth Circuit Court of Appeals of the United States has definitively ruled that the before and after rule is the only acceptable rule to be used in determining just compensation.[3] However, the Fourth Circuit Court has ruled

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

that developing an opinion of value of the taking plus damages (i.e., using the state rule) is an acceptable method of determining just compensation in federal eminent domain actions,[4] not to the exclusion of the federal rule, but as an alternative to it. The balance of the federal circuits appear to prefer the federal rule, but they have not ruled, as a matter of law, that other methods are inadmissible.

Strip appraisals are most often used in nominal taking cases in which the remainder property is neither damaged nor benefitted by the government's project. Many condemning agencies have provisions for abbreviated appraisal reports when the anticipated compensation is below a certain dollar amount. For example, the Federal Highway Administration provides for a "low value appraisal waiver," a "value finding appraisal," and a "short form appraisal," in addition to a narrative "detailed appraisal."[5] The abbreviated appraisal reports allowed by some agencies are not generally detailed enough for trial purposes, so it is often necessary for an appraiser to convert a strip appraisal into a complete before-and-after appraisal prior to trial.

Regardless of the reporting requirements, it is generally advisable for appraisers to break down their value opinions in a manner similar to that shown in Tables 3.1 and 3.2. Such a breakdown allows for easier and more accurate comparative analysis of the appraised property and comparable properties and will often reveal any flaw in the logic that the appraiser applied in reaching the value opinions. If an appraiser's analysis is flawed, it is much more comfortable for the appraiser to discover it in the privacy of his or her own office than on the witness stand under cross-examination.

## State Rule

The state rule (or the *value of the take plus damages rule*) requires more in-depth analysis than the federal rule. The steps in the state rule (excluding consideration of benefits) are as follows:

| | |
|---|---|
| 1. Value of whole before taking | $______ |
| Value of part taken as part of the whole | – ______ |
| Value of remainder as part of the whole | = $______ |
| 2. Value of remainder as part of the whole | $______ |
| Value of remainder after taking | – ______ |
| Damages to remainder | = $______ |
| 3. Value of part taken (as part of whole) | $______ |
| Damages to remainder | + ______ |
| Total difference | = $______ |

It should be noted that the results of the calculations of each step are *not* opinions of value. They are merely intermediate mathematical calculations.

In Step 1, the value before taking is the same as the first step in applying the federal rule (i.e., comparing before and after values). The appraiser then develops an opinion of the *contributory* value of the property within the area of the taking. This contributory value may be greater or less than its pro rata value, depending on the physical characteristics and utility of the part to be taken, as compared to the property as a whole.

In Step 2, the indicated value of the remainder property considers damages to the remainder property by reason of the taking and construction of the public improvement, excluding any consideration of benefits.

In Step 3, the appraiser develops an opinion of the market value of the total rights taken.

Returning to the examples presented earlier, the state rule formula can be applied to the circumstances described in Premise 1. The calculations are as follows:

| | | |
|---|---|---|
| 1. Value before taking | | $190,000 |
| Value of part taken as part of the whole | – | 4,000 |
| Value of remainder as part of the whole | = | $186,000 |
| 2. Value of remainder as part of the whole | | $186,000 |
| Value of remainder after taking (excluding benefits, if any) | – | 162,000 |
| Damages to remainder | = | $24,000 |
| 3. Value of part taken (as part of whole) | | 4,000 |
| Damages to remainder | + | 24,000 |
| Total difference | = | $28,000 |

When this formula is applied, the results under Premise 1 and Premise 2 are identical. In the standard formula, Step 2 (damages) can never be less than zero. Under this rule, the remainder value after the taking can never be greater than the remainder value before the taking because the calculations omit any consideration of benefits in developing an opinion of the value of the remainder after the taking.

In some jurisdictions, the basic state rule can be modified when the jurisdiction allows benefits to be offset against the value of the taking or damages to the remainder.

| | | |
|---|---|---|
| 1. Value of whole before taking | | $_______ |
| Value of part taken as part of the whole | – | _______ |
| Value of remainder as part of the whole | = | $_______ |
| 2. Value of remainder as part of the whole | | $_______ |
| Value of remainder after taking | – | _______ |
| Damages to remainder | = | $_______ |
| 3. Damages to remainder | | $_______ |
| Benefits to remainder | – | _______ |
| Net damages to remainder | = | $_______ |
| 4. Value of part taken (as part of whole) | | $_______ |
| Net damages to remainder | + | _______ |
| Total difference | = | $_______ |

Applying this formula to the sample property under Premise 1 results in the following calculations:

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

| | | |
|---|---|---|
| 1. | Value before taking | $190,000 |
| | Value of part taken as part of the whole | – 4,000* |
| | Value of remainder as part of the whole | = $186,000 |
| 2. | Value of remainder as part of the whole | $186,000 |
| | Value of remainder after taking | – 162,000† |
| | Damages to remainder | $24,000 |
| 3. | Damages to remainder | $24,000 |
| | Benefits to remainder | – 0 |
| | Net damages to remainder | = $24,000 |
| 4. | Value of part taken (as part of whole) | $4,000 |
| | Net damages to remainder | + 24,000 |
| | Total difference | = $28,000 |

* 1,000 sq. ft. of land @ $2.00 ($2,000) + on-site improvements ($2,000)

† 29,000 sq. ft. of land @ $2.00 ($58,000) + [the value of the dwelling ($115,200) and garage ($4,800) discounted 20% (-$24,000) for damage] + on-site improvement value ($8,000)

The results of the computations made in Steps 2 (damages) and 3 (benefits) cannot be less than zero. That is, the owner of the property taken cannot owe money to the condemnor as a result of the taking and the construction of the public improvement.

The just compensation using the modified state rule is equivalent to the amount calculated using the federal rule shown in Table 3.1. Applying the calculations of the state rule to the scenario described in Premise 2, however, yields a different amount of just compensation than illustrated in Table 3.2. The state rule computations are as follows:

| | | |
|---|---|---|
| 1. | Value before taking | $190,000 |
| | Value of part taken as part of the whole | – 4,000 |
| | Value of remainder as part of the whole | = $186,000 |
| 2. | Value of remainder as part of the whole | $186,000 |
| | Value of remainder after taking | – 191,000* |
| | Damages to remainder | = $0 |
| 3. | Damages to remainder | $0 |
| | Benefits to remainder | – 29,000† |
| | Net damages to remainder | = $0 |
| 4. | Value of part taken (as part of whole) | $4,000 |
| | Net damages to remainder | + $0 |
| | Total difference | = $4,000 |

* 29,000 sq. ft. of land @ $3.00 ($87,000) + [the value of the dwelling ($115,200) and garage ($4,800) discounted by 20% (-$24,000)] + on-site improvements ($8,000)

† 29,000 sq. ft. of land @ $1.00

Note. The amounts shown in Steps 2 and 3 cannot be less than zero.

Rather than the $0 in just compensation shown in Table 3.2 using the federal rule, where the increase in the land value after the improved drainage completely offsets the value of the part taken, the calculations above yield $4,000 in just compensa-

tion using the state rule, i.e., the full value of the part taken (as part of the whole). Generally, jurisdictions that use the state rule do not allow benefits to be offset against the value of the part taken, which would account for the difference here.

Many of these rules of compensation have been developed to avoid a chronic and dangerous problem—*double damages*, i.e., the duplication of just compensation. To illustrate how easy it is to double damages using the state rule, consider the situation depicted in Figure 3.2. Suppose that the property's annual market rent prior to the taking is $80,000 net to the lessor, and the applicable overall capitalization rate is 10.5%. The indicated before value is therefore $762,000 ($80,000/0.105), rounded. Market evidence indicates that the land has a value of $40 per square foot, or $240,000. Thus, the before value can be allocated as follows for analytical purposes:

**Figure 3.2 Plot Plan–Partial Taking**




| | |
|---|---|
| Area before taking | 6,000 sq. ft. |
| Area after taking | 5,500 sq. ft. |
| Area of taking | 500 sq. ft. |

| | |
|---|---|
| Land | $240,000 |
| Improvements | $522,000 |
| Total | $762,000 |

Now, suppose that the municipality takes a 10-foot strip from the westerly side of the property, which eliminates five parking stalls. Market analysis indicates that the market rent after the taking is $60,000 per year.

Use of the state rule formula considering benefits would result in the following:

| | | |
|---|---|---|
| 1. Value before taking | | $762,000 |
| Value of part taken as part of the whole [500 sq. ft. @ $40.00] | − | 20,000 |
| Value of remainder as part of the whole | = | $742,000 |
| 2. Value of remainder as part of the whole | | $742,000 |
| Value of remainder after taking [$60,000 income ÷ 0.105] | − | 571,425 |
| Damages to remainder | = | $170,575 |
| 3. Damages to remainder | | $170,575 |
| Benefits to remainder | − | 0 |
| Net damages to remainder | = | $170,575 |
| 4. Value of part taken (as part of whole) | | $20,000 |
| Net damages to remainder | + | 170,575 |
| Total difference | = | $190,575 |

Double damage comes into play when appraisers use a shortcut form of calculations:

| | | |
|---|---|---|
| Value of taking [500 sq. ft. @ $40.00] | | $20,000 |
| Damages [$20,000 rent loss ÷ 0.105] | + | 190,475 |
| Total difference | | $210,475 |

When this latter procedure is applied, the landowner is compensated for the taking twice. (More precisely, the latter procedure fails to take out the value of the part

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

taken as the more complete state rule formula does.) Comparison of these calculations illustrates the importance of following a set formula when using the state rule.

In the application of the state rule, the part taken generally is valued as a part of the whole property prior to the taking, according to a 1969 ruling of an Illinois court.[6] Some court rulings conflict with this position, however. A California court ruled that, if the part taken has an independent economic use and its market value as a separate entity is greater than its value as a part of the whole, it was proper to value the part taken as a separate tract, not as a part of the whole.[7] There is a considerable amount of case law on this point. Analysis of this case law clearly illustrates that these conflicting rulings are not due to differing constitutional or statutory provisions in the various jurisdictions. Rather, they likely result from insufficient or improper analysis of highest and best use or determination of the *larger parcel*. (See Chapters 5 and 6 for information on highest and best use and determination of the larger parcel.)

If, as the court rulings assert, the part taken has an independent economic use and its market value as a separate entity is greater than its value as a part of the whole, the appraiser most likely erred in determining the larger parcel because the area taken and the remainder parcel had no unity of highest and best use prior to the taking. Therefore, the larger parcel to be appraised in the before situation is the taken area itself, and there is no after situation because the taking was, in effect, a *total taking* of the larger parcel.

**Figure 3.3** **Plot Plan–Before Partial Taking**




**Figure 3.4** **Plot Plan–After Partial Taking**




| | |
|---|---|
| Area before taking | 80,000 sq. ft. |
| Area after taking | 72,000 sq. ft. |
| Area of taking | 8,000 sq. ft. |

## An Example of the Backland Theory

Considerable case law has developed over the use of a valuation procedure variously referred to as the *backland theory*, the *slide back theory*, or the *front land–rear land concept*. Figures 3.3 and 3.4 illustrate a situation in which this theory might be applicable.

Suppose that market evidence indicates that the highest and best use of the property shown in Figure 3.3 is for commercial development. Market analysis indicates that (1) tracts 200 feet wide and 200 feet deep can be sold for $16.00 per square foot, or $640,000, on the open market and (2) a tract 200 feet wide and 400 feet deep will bring a price of $800,000. Therefore, the front 200 feet has a contributory value of $16.00 per square foot, while the land beyond 200 feet has a contributory value of $4.00 per square foot. As shown in Figure 3.4, the front 40 feet of the tract will be acquired for road widening. Two diametri-

cally opposed approaches to such a situation have been developed by the courts in two jurisdictions using the state rule. These two different approaches are exemplified by rulings in a California case and a Louisiana case.

The California court (citing *City of Los Angeles v. Allen*[8]) stated the following:

> On appeal, the condemnee contended that the strip taken was frontage and that he should have been allowed the commercial value. The Supreme Court disagreed. It reasoned that if to widen the public highway, a strip of land is taken from a larger parcel under one ownership and if it is clear that the main parcel has more than one theoretical zone of value, not because of any unique characteristic in the land itself, but rather because of the proximity of the theoretical zones to the public highway or similar factors affecting property values, and if it is also clear that the same zones may be immediately reestablished after the "take," the owner is unjustly enriched if he is compensated on the basis of the highest zone of value; under these circumstances, the strip must be treated as an integral part of the whole and not as a separate piece of property having an independent value.[9]

On the other hand, in *State Department of Highways v. LeDoux, La.*, the court stated the following:

> We consider the Louisiana jurisprudence to be settled, therefore, that generally the market value of the particular part of the tract expropriated is determined by the actual market value of the portion taken, and not by its average per acre or per square foot value as a pro rata portion of the parent tract. Also, a landowner is entitled to receive the full and actual market value of highway frontage expropriated for further highway purposes, without deduction therefrom because of the fact that by reason of the taking a new highway frontage will be provided for the formerly rear portions of the parent tract.[10]

In the *Allen* case cited by the California court, the trial judge used a weighted average in determining just compensation. Applying this procedure to the circumstances described earlier would result in the following computations:

| | |
|---|---|
| 1. Value before taking [40,000 sq. ft. @ $16.00 + 40,000 sq. ft. @ $4.00] | $800,000 |
| Value of part taken as part of the whole [$800,000 ÷ 80,000 sq. ft. = $10.00; 8,000 sq. ft. @ $10.00] | – 80,000 |
| Value of remainder as part of the whole | $720,000 |
| 2. Value of remainder as part of the whole | $720,000 |
| Value of remainder after taking (excluding benefits, if any) [40,000 sq. ft. @ $16.00 + 32,000 sq. ft. @ $4.00] | – 768,000 |
| Damages | $0 |
| 3. Damages | $0 |
| Special benefits [$768,000 – $720,000]* | – 48,000 |
| Net damages | $0 |
| 4. Value of part taken as part of the whole | $80,000 |
| Net damages | + 0 |
| Total difference | $80,000 |

* This benefit is created because 8,000 square feet of land that was worth $10.00 per square foot on a blended basis before the taking will be worth $16.00 per square foot after the taking because it will front the widened roadway.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

Under the Louisiana rule, just compensation would be calculated as follows:

| | |
|---|---|
| 1. Value before taking [40,000 sq. ft. @ $16.00 + 40,000 sq. ft. @ $4.00] | $800,000 |
| Value of part taken as part of the whole [8,000 sq. ft. @ $16.00] | – 128,000 |
| Value of remainder as part of the whole | $672,000 |
| 2. Value of remainder as part of the whole | $672,000 |
| Value of remainder after taking (excluding benefits, if any) [40,000 sq. ft. @ $16.00 + 32,000 sq. ft. @ $4.00] | – 768,000 |
| Damages | $0 |
| 3. Damages | $0 |
| Special benefits | 0 |
| Net damages | $0 |
| 4. Value of part taken as part of the whole | $128,000 |
| Net damages | + 0 |
| Total difference | $128,000 |

Applying the federal rule to the example as a third alternative, the compensation would be calculated as follows:

| | |
|---|---|
| Value before taking [40,000 sq. ft. @ $16.00 + 40,000 sq. ft. @ $4.00] | $800,000 |
| Value after taking [40,000 sq. ft. @ $16.00 + 32,000 sq. ft. @ $4.00] | – $768,000 |
| Total difference | $32,000 |

The U.S. Supreme Court has justified use of the federal rule by explaining its logic as follows:

> If, for example, by the widening of a street, the part which lies next [to] the street, being the most valuable part of the land, is taken for the public use, and what was before in the rear becomes the front part, and upon a wider street, and thereby of greater value than the whole was before, it is neither just in itself, nor required by the Constitution, that the owner should be entitled both to receive the full value of the part taken, considered as front land, and to retain the increase in value of the back land, which has been made front land by the same taking.[11]

The Louisiana rule is based on the proposition that if an individual wanted to acquire 8,000 square feet of frontage out of the parcel depicted in Figure 3.3, that individual would have to pay $16.00 per square foot, or $128,000, for it. Thus, it can be argued that the state should pay the same amount. It is the monetary equivalent of the property taken—i.e., the land's market value.

However, the Louisiana ruling certainly leaves the property owner in a far better position pecuniarily than if the property had not been taken. Prior to the taking, the owner had a tract of land that could have been sold for $800,000. After the taking, the owner had $128,000 in cash plus a tract of land that could have been sold for $768,000, for a total of $896,000. In this case, the federal rule

would more closely approximate just compensation from the standpoint of placing the owner in the same, but no better, position pecuniarily than was true prior to the taking, which may be important if the relevant definition of *just compensation* includes language restricting the compensation to a level "no better than" the property owner's position before the taking.

Although either of these positions, or rules of compensation, could legitimately be argued, it is not the job of appraisers to argue the rules but rather to apply them. Comparing the results of these computations highlights the need for appraisers to be fully familiar with the rules of eminent domain valuation applicable in the jurisdiction.

## Comparison of Rules

The two rules of analyzing just compensation have evolved because legislative and judicial attitudes differ on whether the benefits created by a project can be offset against the value of the taking or any damages caused by the taking or both. (The rules relating to benefits are covered at length in Chapter 14, and the estimation of damages is discussed in detail in Chapter 13.) As mentioned earlier, jurisdictions that use the state rule generally do not allow benefits to be offset against the value of the part taken. Some, in fact, will not allow a project benefit to be set off against either the part taken or the damages caused by the taking. The federal rule is typically applied in jurisdictions that allow special benefits to be offset against both the value of the taking and the damages. Table 3.3 summarizes the offset rules state by state.

Some condemning agencies appear not to know which rule to use, and appraisal reporting requirements are a hybrid, requiring appraisers to analyze the before and after values of the property being appraised and then break down value using the state rule. Confusion in these jurisdictions results from the fact that state courts require the state rule to be used in eminent domain cases, but federal matching funds for state projects are awarded based on the federal measure of just compensation. This has caused many state agencies to attempt to acquire property using the state rule, even though they know that the federal rule will apply if the parcel must be condemned.

The two primary weaknesses of the federal rule are

1. It does not provide a mechanism to exclude special benefits from the after value.
2. It does not provide an explicit mechanism to exclude noncompensable damages from the after value.

The complexity and confusion that can result when using the state rule is demonstrated by the comments of Judge K.K. Hall, who offered a dissenting opinion in a case in which the majority of the court concluded that the lower court had awarded an owner double damages by using the state rule. He said, "I am filled with a sense of frustration because of my inability to make my brothers of the majority understand what is so clear to me."[12]

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

**Table 3.3 Benefit Offset Rules**

| Jurisdiction | Rules 1 | Rules 2 | Rules 3 | Rules 4 | Comment |
|---|---|---|---|---|---|
| United States | | | | × | |
| Alabama | | × | | | Offset to both the remainder and the value of the property taken allowed on highways, water and sewer lines, water conservation districts, and water management districts. |
| Alaska | | × | | | |
| Arizona | | × | | | |
| Arkansas | | | | × | Benefit offset not allowed for other than municipal corporations. |
| California | | × | | | |
| Colorado | | × | | | Limiting rules. See Colorado Rev. Stat. Ann. §38-1-114 (1987). |
| Connecticut | | | | × | By special assessment. |
| Delaware | | | | × | |
| District of Columbia | | | | × | |
| Florida | | × | | | Offset allowed for road, canal, levee, or water control facility right of way. |
| Georgia | | × | | | |
| Hawaii | | | | × | Offset against damage only when taking is for road widening or realignment. |
| Idaho | | × | | | |
| Illinois | | × | | | |
| Indiana | | × | | | Benefit offset not allowed for other than municipal corporations. |
| Iowa | × | | | | |
| Kansas | | | | × | Benefit offset not allowed for other than municipal corporations. |
| Kentucky | | | | × | |
| Louisiana | | × | | | |
| Maine | | | | × | |
| Maryland | | × | | | |
| Massachusetts | | × | | | |
| Michigan | | × | | | |
| Minnesota | | | | × | |
| Mississippi | × | | | | Special benefits may be offset against damages when no land is taken. |
| Missouri | | | | × | |
| Montana | | × | | | |
| Nebraska | | × | | | |
| Nevada | | × | | | |
| New Hampshire | | | | × | |
| New Jersey | | | × | | No distinction is made between special and general benefits. |
| New Mexico | | | × | | |
| New York | | | × | | |
| North Carolina | | | | × | N.C. Gen. Stat. §136-112 allows offset of general benefit if taking is for state highway purposes. |
| North Dakota | | × | | | Benefit offset not allowed for other than municipal corporations. |
| Ohio | | × | | | |
| Oklahoma | | × | | | |
| Oregon | | × | | | |
| Pennsylvania | | × | | | |
| Rhode Island | | × | | | |
| South Carolina | | | | × | |
| South Dakota | | × | | | Benefit offset not allowed for other than municipal corporations. |
| Tennessee | | × | | | |
| Texas | | × | | | |
| Utah | | × | | | |
| Vermont | | × | | | |
| Virginia | | × | | | Both general and special benefits have been offset against damages for at least highways, bridges, and ferries. |
| Washington | | | | × | Benefit offset not allowed for other than municipal corporations. Optional deferment of benefits provided. |
| West Virginia | | | × | | |
| Wisconsin | | × | | | |
| Wyoming | | × | | | |

**Rule 1.** Benefits, whether special or general, cannot be considered.
**Rule 2.** Special benefits only can be offset against damages to the remainder but not against the contributory value of the land taken.
**Rule 3.** Special benefits and general benefits can be offset against damages to the remainder but not against the contributory value of the land taken.
**Rule 4.** Special benefits can be offset against both the damages to the remainder and the contributory value of the land taken.
**Source:** *Nichols'*, vol. 3, §8.03[2-53] (2010)

## Notes

1. P.L. 91-646, Title III, §301(3).
2. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2014), vol. 7A, §10.04[1] n.1.
3. *United States v. 8.41 Acres*, 680 F.2d 388, 392 n. 5 (5th Cir. 1982).
4. *United States v. 97.19 Acres*, 582 F.2d 878, 883 (4th Cir. 1977).
5. U.S. Department of Transportation, Federal Highway Administration, *The Appraisal Guide* (Washington, D.C.: U.S. Government Printing Office, 1993).
6. *Department of Public Works and Buildings v. Oberlaender*, 235 N.E.2d 3 (Ill. 1969).
7. *People ex rel. Department of Public Works v. Corp. of Pres. of Church of Latter Day Saints*, 91 California Reporter 532, 537 (Cal. 1970).
8. *City of Los Angeles v. Allen*, 36 P.2d 611 (Cal. 1934).
9. *City of Fresno v. Cloud*, 102 California Reporter 874 (Cal. 1972).
10. *State Department of Highways v. LeDoux, La.*, 184 So.2d 604 (Ld. 1966).
11. *Bauman v. Ross*, 167 U.S. 548, 574-575 (1897).
12. *United States v. 2.33 Acres of Land, More or Less*, 704 F.2d 728, 732 (4th Cir. 1983) (dissenting opinion).

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

4

# Limitations on Property Rights

In appraisal terminology, *real estate* refers to "the physical land and appurtenances affixed to the land, e.g., structures," and *real property* refers to the "interests, benefits, and rights inherent in the ownership of physical real estate."[1] Appraisers are trained to use these terms carefully, but many states regard them as synonymous by statute.

In a legal context, *property* is defined "[a]s the term appears in constitutional provisions respecting taking of property: a word of general import, extending to every species of right and interest, capable of being enjoyed as such, upon which it is practicable to place a money value."[2] In the same context, *property rights* are "[e]conomic interests supported by the law."[3] In real estate, these property rights are referred to as the *bundle of rights*. According to *The Appraisal of Real Estate*, "[t]he total range of private ownership interests in real property is called the bundle of rights . . . including the right to use the real estate, sell it, lease it, enter it, and give it away."[4]

## Bundle of Rights

When an individual or entity is in full possession of all real property rights, that person or entity is said to have *fee* (referring to title) *simple* (referring to encumbrances) ownership, and that complete ownership of all property rights would have the most comprehensive aggregation of individual property rights, save those of government. Historically, fee simple ownership meant absolute ownership from the center of the earth, through the earth's surface, and upward to infinity. Absolute ownership has been limited, however, by the sovereign's inherent rights, constitutional provisions, and legislative actions. For example, the Air Commerce Act of 1926, the Civil Aeronautics Act of 1938, and the Federal Aviation Act of 1958 (49 U.S.C. §401) limit air rights to the height necessary for a property owner's full enjoyment of the property. Later legislation and court rulings further defined a real property owner's rights to air space above

the ground. (Aviation easements and other forms of easements are covered in Chapter 16.)

As stated in Chapter 2, the sovereign has the inherent power of eminent domain, the power of taxation, police power, and the power of escheat, all of which limit private property rights. Appraisers must be aware of the existence of escheat, although detailed treatment of this subject is beyond the scope of this book.[5]

## Access Rights

Access, or abutter's, rights have also been the subject of considerable litigation, much of it relating to right-of-way acquisitions for the interstate highway system. Access rights, which are part of a property owner's bundle of rights, include the right of reasonable ingress and egress, the right of reasonable light and air, and the reasonable right to see and be seen. (Reasonableness may need to be determined by the finder of fact.) These rights are often referred to as the *rights of access, light, view, and air*.

Access rights are subject to governmental alteration through police power and eminent domain. The government's use of its police power must, of course, be reasonable. When this power is applied reasonably, the abutting property owner is not entitled to any compensation, even though the government's action may decrease the value of the property. In federal cases and in many states, examples of police power action would be the conversion of a two-way street into a one-way street, elimination of left turns into or out of a property, diversion of street traffic to an alternate route, or installation of a median. When the government alters access rights under the power of eminent domain, however, the property owner may be entitled to compensation.[6] *Unreasonable* access restrictions fall into this category.

In all jurisdictions, the damaging alteration of a street grade is compensable if the alteration involves a partial taking of the property affected. Nevertheless, many jurisdictions have no constitutional or statutory provisions for the payment of damages in addition to compensation for a taking. For example, in a ruling of a Pennsylvania court, a damaging change of street grade that did not involve a physical taking was not compensable.[7] On the other hand, if the property is in a jurisdiction that provides compensation for damages, by its constitution or by statute, the grade change would be a compensable damage, as illustrated by the nineteenth-century ruling in *Chicago v. Taylor*.[8]

There is a gray area between police power and the power of eminent domain when it comes to the right of access. Although private, adjacent property owners have rights to ingress, egress, and a view from their land onto the public way, these rights are not unlimited. They are subordinate to the public's enjoyment and safe use of the route.[9]

In defining the limits of a property owner's access rights, various courts have referenced "reasonable access," "suitable access," and "free and convenient access" and have stressed the need to obtain a "balance between the public and private interest"[10] in regard to use of the traveled way. It is well settled that abutting owners "are not entitled to access to their properties at any and all points along" the public way.[11] Case law indicates that an abutting owner is entitled to reasonable, conve-

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

## Police Power

In regard to police power, the U.S. Supreme Court has held that "[a]n attempt to define its reach or trace its outer limits is fruitless."* Historically, the police power of government has been distinguished from its power of eminent domain by determining whether the government's action required compensation to be paid. When a regulatory action of the government became unreasonable, or went too far, it ceased being a police power action and became a taking under the government's power of eminent domain. The Tenth Circuit court stated the following:

> Police power should not be confused with eminent domain, in that the former controls the use of property by the owner for the public good, authorizing its regulation and destruction without compensation, whereas the latter takes property for public use and compensation is given for property taken, damaged or destroyed.† [Citations omitted]

*Nichols* adds the following guidance:

> Care must be taken . . . to distinguish between the power of the community to zone and the power to condemn.‡

**police power**

The inherent power of government to regulate property in order to protect public health, safety, and general welfare.

Source: *The Dictionary of Real Estate Appraisal*, 6th ed.

Both powers have their source in the authority of the community to act in the public interest, but the nature of the public interest is considered differently depending upon which of the two powers the public authority is purporting to exercise. It is not always easy to distinguish which of the two powers are being exercised. Even the Supreme Court has struggled with this issue.

More recent case law suggests that the police power of government and its power of eminent domain are not exclusive of one another but can coexist. In these more recent cases, the fact that government undertakes an action under its police power does not mean that compensation is not due for property taken or damaged. For instance, the U.S. Supreme Court clearly found that the State of Hawaii's legislation "to reduce the perceived social and economic evils of a land oligopoly" by use of its eminent domain powers was "a classic exercise of the state's police powers."§

Whether a government action results in a constitutional taking remains an "ad hoc, factual inquir[y]"** that "ultimately calls as much for the exercise of judgment as for the application of logic"†† because the court cannot establish a set formula for determining whether a regulatory taking has occurred.‡‡

Zoning and other land use regulations play an important role in eminent domain valuations. The applicable case law is extensive. Questions of zoning and other land use regulations have such an important bearing on an appraiser's determination of highest and best use and the opinion of market value that these subjects are treated separately in Chapters 6 and 7. The increased legal and appraisal activity in the area of regulatory takings is discussed in Chapter 16.

---

* *Berman v. Parker*, 348 U.S. 26, 32 (1954).

† *Lamm v. Volpe*, 449 F.2d 1202, 1203 (10th Cir. 1971).

‡ *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 1992), vol. 3, §8.01 [4] 6 (citation omitted).

§ *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 241-242 (1984).

** *Kaiser Aetna v. United States*, 444 U.S. 16-1, 175 (1979).

†† *Andrus v. Allard*, 444 U.S. 51, 61 (1979).

‡‡ *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1962).

nient, and adequate access for the proper use and enjoyment of the property for its present use and for its reasonable uses in the foreseeable future. For example, consider the property shown in Figure 4.1. If this property's highest and best use is for a single-family dwelling as improved, and there is no likelihood that the highest and best use of the property will change in the foreseeable future, legal access to the subject property could be limited to 28 feet (the width of the driveway plus the width of the walk) of the property's 100 feet of frontage without payment of compensation.

**Figure 4.1 Plot Plan**




**Figure 4.2 Plot Plan–Partial Taking**




When a partial acquisition occurs for the construction of a limited-access highway, the remainder parcel is not considered damaged by its lack of access to the new highway.[12] Figure 4.2 demonstrates this situation. The property owner cannot receive compensation for lack of access to the new facility because the owner had no prior rights of access to the road.

Figure 4.3 illustrates a property before and after a taking. The easterly 450 feet of the property's frontage becomes limited access in the after situation, leaving only the westerly 50 feet as accessible frontage. A similar situation is depicted in Figure 4.4. But there the property is a corner site with access on the side street, and access to and from the frontage road is eliminated.

If, in either of these situations, the highest and best use of the property is for a restaurant, and the property has reasonable access and can continue to operate as a restaurant after the taking, it is probable that no compensable damage has occurred from access limitation. If, however, the property becomes a second-rate highway retail location because its access has become unreasonable, substantial compensable damage may result. In other words, it is possible for a property's legal status (commercial zoning) to remain the same but a change in the access might change the property from a high-intensity use to a low-intensity use—the results of which might be compensable.

There is some inconsistency in case law with regard to replacing access with substitute access to a frontage or service road. Consider the taking depicted in Figure 4.5. In this type of situation, some courts, such as the Nebraska State Supreme Court, have ruled that the access to the new frontage road may partially

Copyrighted material licensed to Randall Bell, PhD on November 29, 2015

mitigate the damages for the loss of access to the main highway.[13] Other courts, such as the New Jersey State Supreme Court, have ruled that the access along the new frontage road totally replaces the access lost, so there can be no compensable damages.[14]

Certain elements of damage in relation to access and abutter's rights have consistently (if not always) been held to be noncompensable:

- increases, decreases, or diversions of traffic on the roadway
- circuity of travel caused by government exercise of police power (e.g., median barriers)
- relocation of highway
- changes in highway width

These elements of damage are described below.

## Increases, Decreases, or Diversions of Traffic on the Roadway

The abutting owner retains rights of access to and from the highway but has no right to benefits that may arise due to the change in traffic that uses the highway.

## Circuity of Travel Caused by Government Exercise of Police Power

The property owner is entitled to *suitable* access to the roadway. In 1968, a New York court stated the following:

> "Circuitous," in its commonly accepted understanding, indicates that which is roundabout and indirect but which nevertheless leads to the same destination. "Suitable," in its commonly accepted understanding, describes that which is adequate to the requirements of or answers the needs of a particular object. The concepts are not mutually exclusive and, therefore, a finding that a means of access is indeed circuitous does not eliminate the possibility that same means of access might also be unsuitable in that it is inadequate to the access needs inherent in the highest and best use of the property involved.[15]

In 1968, a Washington court ruled that although an abutting property owner had an inherent right of access to the abutting street, the right extended only to those

**Figure 4.3 Access Taking**




**Figure 4.4 Access Taking**




**Figure 4.5 Access Taking**



Figure 4.6 **Limits of Access Rights**




lanes of travel that actually abut the property. This situation is depicted in Figure 4.6. The jury that heard this case was instructed:

> [Y]ou may allow such compensation to respondents as you find is established by the evidence because the owners or others must take a more circuitous route in going to or leaving their remaining property as a result of the loss of direct access for northbound traffic only.[16]

On appeal, this instruction was upheld as proper. Note that this ruling is in keeping with other rulings that the government may construct a median barrier, separating lanes of traffic, or prohibit left turns into or out of a property under its police power without the payment of compensation.

### Relocation of Highways

The government has no obligation to maintain the location of a street right of way, nor does it have any obligation to continue to lead customers past a retail location. The desires, convenience, and safety of the general public have greater weight than the desires of retail street merchants. However, in a 1972 case, an Indiana court ruled that, if a through street is converted into a dead end street, the resultant traffic diversion was compensable as an unreasonable limitation of access rights.[17] In a 1950 ruling, a Rhode Island court held that the discontinuance, abandonment, or obstruction of a highway was compensable,[18] but the loss of value must be specific to the property in question because losses common to the general public are noncompensable.[19] The temporary closure of a highway is generally noncompensable,[20] but there is case law in some jurisdictions to the contrary.[21]

### Changes in Highway Width

As previously noted, the widening of a highway within the existing right of way has consistently been held to be noncompensable. On the other hand, the narrowing of a highway has been considered a partial street closing and, therefore, compensable, as illustrated in a Texas court's ruling in *City of Beaumont v. Marks*.[22] The damage resulting from the narrowing of a highway is usually not as great as that which results from the dead-ending or total abandonment of a highway.

## Multiple Estates

Real estate may be divided into more than one estate, and these various estates are often owned by different individuals or entities. Nevertheless, a condemnor generally instructs its appraiser to value the property as if the title were held by a single entity. This procedure has won court approval[23] in federal cases and in many states. It is often referred to as the *unit rule* or the *undivided fee rule*.

Condemnors will sometimes make an exception to the unit rule when they condemn less than the full bundle of rights in a property. In such an instance, the appraiser's instructions will generally be modified to indicate that the appraisal

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

will be concerned with the estate to be taken. Mineral rights, water rights, and existing mineral leases are other exceptions to the taking of the full bundle of rights. Because there are exceptions, the appraiser must obtain a formal description of the estate to be taken, read it carefully, and, most importantly, understand it. Descriptions of the estate to be taken are not always written with the utmost clarity.

When engaged by a condemnor in a federal case or in a state where the unit rule applies, an appraiser must often ignore the fact that the property is held by various estates and value only the fee simple estate. This is the case even though a knowledgeable appraiser is aware that the value of the various estates, when added together, may or may not equal the value of the fee simple estate. When appraising for a condemnor, an appraiser's assignment is often complete once the market value of the fee simple estate has been estimated. Nevertheless, a condemnor may ask the appraiser to allocate the value of the fee simple estate to the various lesser estates in the property. This allocation can then be used in negotiating settlements with all the parties who hold interests in the property.

A *life estate* in property is also considered on occasion, and the question of its value has been addressed by the courts. The *life tenant* holds the beneficial interest in the property for his or her life, or the life of a third party, while the *remainderman* holds all remaining rights of the full bundle of rights, plus the right to the beneficial interest in the property upon death of the life tenant or third party. *The Dictionary of Real Estate Appraisal* defines a life interest as "[r]ights of use, occupancy, and control, limited to the lifetime of a designated party, sometimes referred to as the *life tenant*."It has been well established in rulings by the District Court of North Carolina and the Eighth Circuit Court that a life tenant is an *owner* in the constitutional sense and is entitled to compensation in an eminent domain proceeding.[24]

Early English law required that one-third of the fee simple value (or condemnation award or settlement) go to the life tenant, with the balance going to the remainderman. Since the advent of statistically accurate mortality tables, the courts have generally held that proper apportionment can be accomplished by determining the present value of the life estate. To determine that value, the income stream from the property (or the value of the beneficial interest contained therein) over the expected life of the tenant is discounted to present value at an appropriate discount rate, according to *Nichols*.[25] The remainderman is then entitled to the difference between the market value of the fee simple estate and the present value of the life estate.

Although computers, financial calculators, and financial tables are excellent appraisal tools, before using them appraisers must have a complete understanding of the formula that the calculations are based on. If an appraiser uses the present worth of $1 per year factor, for example, the appraiser must be prepared to demonstrate, in the presence of a judge and jury, how this factor is computed manually.

## Natural Assets

The natural assets of property may include mineral deposits such as gas, oil, gravel, and sand as well as water and growing crops, including timber stands. The unit rule has been strictly observed in the valuation of mineral deposits and

crops. The rules of evidence and valuation testimony were clearly set forth in *United States v. Land in Drybed of Rosamond Lake*:

> (1) that a landowner in dealing with a parcel of land on which there is a mineral, timber or like substance may not introduce expert testimony by which the expert multiplies the gross material present by the market value per unit thereof and thereby arrive at a figure which purports to be fair market value for the parcel;
>
> (2) that a landowner may not by expert testimony capitalize the present or future value of a business enterprise and thereby arrive at fair market value; that rental value may, however, be capitalized;
>
> (3) that the landowner is entitled to have an expert or lay witness describe the commodity or substance on the land, the quantity thereof, the going price thereof as *factors* only, upon which the expert may in part base his value as to the *fair market value* of the parcel in question; that a landowner is not entitled to present testimony as to the fair market value of the mineral or timber or other substance apart from the value of the land . . . In other words, a clear distinction must be drawn between what is presented and considered as a *factor* underlying the expert's opinion as contrasted with opinion as to the fair market value of the substance, timber or mineral itself, apart from the land;

### The Unit Rule in the *Uniform Appraisal Standards for Federal Land Acquisitions*

**4.2.2. The Unit Rule.** The market value concept in federal acquisitions generally requires application of the so-called unit rule, a principle developed by the federal courts that dictates what is to be valued for just compensation purposes. Under the unit rule, the property being appraised must be valued as a unitary whole and held in single ownership. The value of the whole cannot be derived by adding together the separate values of various interests or components. As a result, summation or cumulative appraisals are improper under federal law. The unit rule relates to *ownership* interests (estates) in real estate—such as landlord and tenant, or mortgagor and mortgagee—and to various *physical* components of real estate—such as timber, mineral deposits, farmland, and buildings. As discussed in Section 4.6, the unit rule can raise particularly challenging valuation issues in appraisals for partial acquisitions, especially if easements are involved.

**4.4.4.4. Unit Rule Implications.** The unit rule, discussed in Section 4.2.2, applies in valuations using the income capitalization approach as in all other approaches to value. "The subsidiary interests in a fee cannot add to its market value and compensation for these interests must be paid out of the amount awarded for the whole." Accordingly, in federal acquisitions, if using the income capitalization approach to value, appraisers must value the property being acquired as if in single ownership—not by "computing separately the value of the various constituent legal interests" (such as lessor/lessee or operator/owner) in the property.

For example, in *United States v. 6.45 Acres of Land (Gettysburg Tower)*, the United States acquired two adjacent tracts in fee simple: Tract 4-203, owned in fee by landowner Enggren and under a 99-year lease to landowner Overview, and Tract 4-204, owned in fee by landowner Overview. On the date of value, Overview had built an observation tower on Tract 4-203 overlooking the Gettysburg Battlefield and was operating the tower as a tourist attraction and making payments to Enggren under the lease; Overview also owned and operated a gift

Copyrighted material licensed by Randall Bell, PhD on November 29, 2016

(4) that a landowner must make a showing of some sort of market, poor or good, great or small, for the commodity in question before the quantity and price of the commodity or substance may be presented to the jury to be used as a factor in the expert's opinion testimony;

(5) that since the inquiry is essentially one as to what would have been the negotiations between the willing buyer and the willing seller, there may be taken into consideration by the expert only those *factors* which would have been reasonably so considered;

(6) that except in cases where the matter is so clear that it becomes a question of law it is generally a question for the jury to determine whether the proposed *factor* underlying in part the opinion of the expert as to the fair market value, is one which would have reasonably been considered by the willing buyer and the willing seller;

(7) that where the commodity in place on the land has a defect, or is deficient in quality, testimony may be introduced showing that the defect or lack of quality may be remedied or cured by scientific or business methods if the willing buyer and willing seller in the marketplace would have reasonably considered such a *factor*;

shop, restaurant, and parking lot on Tract 4-204. The Third Circuit determined the following appraisal technique correctly followed the unit rule for this property:

> [The appraiser] explained that because he was valuing the *fee* as a whole, lease payments were not considered an expense but merely a transfer of funds between interest holders that would cancel out under a unit valuation. Because [the appraiser's] task was neither to appraise Overview's interest nor the Enggrens' interest, but rather the composite value of all interests, he did not count as an expense what was simply a transfer of value between interest holders that had no bearing on the land's inherent capacity to generate income.

The Third Circuit therefore reversed the district court's ruling, which had improperly added to the valuation just described above a separate valuation of the Enggrens' interest in the lease payments—thereby "double-count[ing] the substantial value of the lease."

As discussed in Section 4.8.1, the unit rule is frequently misapplied in valuations of properties containing minerals or other natural resources.

**4.8.1. Unit Rule and Natural Resources.** The *unit rule*, discussed in Section 4.2.2, is often misapplied in the valuation of properties with possible or proven natural resources such as minerals, timber, or oil and gas. For just compensation purposes, property must be valued as a whole—not by summation of its constituent parts. Thus, the possible or actual existence of a resource in a property can only be considered to the extent its possible or actual existence would contribute to the market value of the whole property. For example,

> [for] land that is underlaid with marketable minerals, . . . the existence of those minerals is a factor of value to be considered in determining the market value of the property, but the landowner is not entitled to have the surface value of the land and the value of underlying minerals aggregated to determine market value.

Indeed, in any given acquisition, it is possible that "the whole property is worth more than, the same as, or even less than the mineral [or other resource] it contains." [Citations omitted]

**Source:** *Uniform Appraisal Standards for Federal Land Acquisitions*, (Washington, D.C.: U.S. Government Printing Office, 2016), §4.22, 4.4.4.4, 4.8.1, pp. 97, 141-142, 178-179.

(8) that in such instance, unless the matter is so clear that it becomes a question of law, the question is one of fact for the jury to determine whether the commodity could be so remedied or cured and such a factor may only be considered by the jury as supporting the expert's opinion if the commodity could reasonably be corrected or remedied.[26]

These rules are not universal, but they are generally followed in most jurisdictions. They provide excellent guidelines for making an appraisal, writing a report, and testifying in regard to mineral deposits and croplands.

In appraising property that may contain mineral deposits, an appraiser's first step is to determine whether there is a market for the mineral deposits if they do, in fact, exist. If there is no market for the mineral, its presence or absence will have little or no effect on the market value of the property. Without a potential market, the quantity and price of the mineral present lends little, if anything, to the opinion of market value of the property, and, in accordance with Rule 4 cited above, this information is inadmissible.

In an analysis of whether or not a market exists for mineral deposits, it is improper for appraisers to consider the government project for which a property is being condemned as a possible market for the minerals.[27] For instance, if a property is being condemned for the construction of a new highway and the property has a gravel deposit on it, the quantity, quality, or price of the gravel cannot be considered by the appraiser in estimating market value if the only present or reasonably foreseeable future market for the gravel would be for construction of that new highway.[28]

If there is a market for mineral deposits thought to be on a property, an appraiser should attempt to determine the quantity and quality of the minerals. This is usually accomplished by retaining specialists such as geologists or mining engineers. If an appraiser determines that there is no market for the mineral deposits, the appraiser can save the client a substantial sum of money—if there is no market, a specialist is not needed.

It is improper to multiply the quantity of mineral deposits or crops present by a price per unit and add the results of this computation to the value of the land to arrive at an opinion of market value for the whole property. Again, the unit rule must be followed. It is the enhancement of the land value created by the presence of mineral deposits or crops that must be considered, not the value of the resource estimated mechanically. It is not improper, however, for an appraiser to consider the results of such a mathematical computation as a factor affecting the market value of the property as a whole. It is apparent that appraisers cannot simply adopt a specialist's opinion of the value of mineral deposits or crops and then add that indication of value to their own opinion of the land value. Such a procedure even goes beyond the forbidden *summation* or *cumulative* appraisal because the resultant value is not even the opinion of one individual but of two or more.

When the income capitalization approach to value is applied to property with mineral deposits, it is important to remember that the real property is to be valued, not the business conducted on the real estate. Thus, it is improper to capitalize the business profits from a mining operation into an opinion of value. Appraisers should capitalize the rental, or *royalty*, income that could be generated by the property being appraised, rather than the business income.[29] According to the Uniform Appraisal Standards for Federal Land Acquisitions:

Case 3:21-cv-00232-DWD Document 281-2 Filed 03/05/25 Page 53 of 314 Page ID #17031
Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

> In using these opinions and reports, the appraiser cannot merely accept such consultant reports as accurate, but rather must analyze such reports and adopt them only if reasonable and adequately documented and supported. The results of secondary valuation reports (minerals, fixtures, or timber valuations) cannot simply be added to the value of the land to arrive at a value of the property as a whole without proper analysis by the appraiser. To do so would violate the unit rule and professional standards. The appraiser must consider these components of the property in light of how they contribute to the market value of the property as a whole.[30]

It is extremely important that appraisers exercise great care in writing appraisal reports and testifying in court. In both instances, it must be made clear that an appraiser's final opinion of value has not been developed simply by multiplying the number of units of the mineral or crop by a price per unit. Such a computation is only one factor that an appraiser considers in arriving at a final opinion of value.

When a property being condemned has immature crops growing on it, a specific procedure for valuing the crops has been developed and accorded court approval in *State v. Dillon*.[31] The procedure has three steps:

1. Estimate the quantity of crops that would be harvested if they were allowed to mature.
2. Estimate the value of the crops if they were mature on the date of the taking (or date of destruction).
3. Deduct all costs of producing, cultivating, harvesting, and marketing the crops from the value of the crops estimated in Step 2.

Again, the value estimated with this procedure is one factor for an appraiser to consider in developing an opinion of the market value of the property as a whole.

In the valuation of land with mineral deposits or timber, appraisers must always adhere to the theory of *consistent use*: "land cannot be valued on the basis of one use while the improvements [or minerals or timber] are valued on the basis of another use."[32] In applying this theory to mineral deposits, it would not be proper to value a property for agricultural purposes and then add a substantial value increment for gravel deposits under the surface of the land. If the gravel is mined, the land, in all probability, will have no value for agricultural purposes during or after the mining operation.

The example above is, of course, somewhat oversimplified. To demonstrate the necessity of adhering to the consistent use theory, and the complexity that can be involved, consider a 100-acre tract of land that is being acquired for park purposes. The tract has a lake of 10 acres, and the rest of the land is covered with merchantable timber. Market analysis indicates that the property as is, including the area of the lake, would sell for $2,000 per acre for recreational development. A timber cruise of the property indicates there are 810 MBF (thousand board feet) of merchantable timber on the site. The cruiser estimates the timber's value to be $290 per MBF delivered at the mill, with a logging and trucking cost of $60 per MBF for clear-cutting (total removal) of the trees. Thus, the value of the standing timber (stumpage value) is $230 per MBF ($290 – $60). Using information from the timber cruise, an appraiser unaware of the consistent use theory might value the property as follows:

| | |
|---|---|
| Land (100 acres @ $2,000) | $200,000 |
| Timber (810 MBF @ 230/MBF) | 186,300 |
| Total indicated value | $386,300 |
| Rounded | $386,000 |

Obviously the two uses, recreational development and clear-cut timber harvesting, are incompatible with one another. The land will lose its aesthetic appeal for recreational use if all of the timber is removed. However, it is not necessarily correct for an appraiser to assume that the highest and best use of the property is limited to only one of the two uses. If market evidence indicates that clear-cut timberland is selling for $300 per acre of usable land area, a value estimate for timber purposes for the property might be developed as follows:

| | |
|---|---|
| Land (90 acres @ $300) | $27,000 |
| Timber (810 MBF @ $230/MBF) | 186,300 |
| Total indicated value | $213,300 |
| Rounded | $213,000 |

It might be erroneous for the appraiser to conclude at this point that the highest and best use of the property is exclusively for timber harvesting, simply because the value of the property for this use is $13,000 more than its value exclusively for recreational development ($200,000). Further investigation and analysis may show that a portion of the timber could be harvested through selective cutting without affecting the land's value for recreational development. Assume that 30% of the timber could be removed without affecting the value of the property for recreational purposes or exposing the rest of the trees to blow down. Selective cutting typically increases logging costs, so assume it will cost $10 more per MBF to harvest the timber. Under these circumstances, the value of the property could be computed as follows:

| | |
|---|---|
| Land (100 acres @ $2,000) | $200,000 |
| Contributory value of timber | 53,460* |
| Total indicated value | $253,460 |
| Rounded | $253,000 |

* Timber available for harvesting (810 MBF × 0.30 = 243 MBF). Stumpage value of timber ($290/MBF – $70/MBF = $220/MBF). Timber value (243 MBF × $220/MBF = $53,460).

This analysis clearly indicates that the two uses are not necessarily mutually exclusive. In fact, it would be prudent for an appraiser to analyze the situation further. If the appraiser discovers that land that was clear-cut 10 years ago has regained all of its recreational value due to new timber growth, and the discount rate used to calculate the present value of the land reversion is 10%, the following analysis might be appropriate:

| | |
|---|---|
| Timber value (810 MBF @ $230/MBF) | $186,300 |
| Land value (100 acres @ $770*) | 77,000 |
| Total indicated value | $263,300 |
| Rounded | $263,000 |

* Present value of $1 discounted for 10 years at 10% = 0.385543. $2,000 per acre value × 0.385543 = $771.09 present value per acre, rounded to a current value of $770 per acre.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

This computation assumes that natural reseeding of the land would occur after the timber is harvested. If the land would have to be replanted after harvesting, the cost of replanting would have to be deducted from the $263,000 estimate.

To make this type of analysis more understandable to a jury, the appraiser could explain that the acreage value, above the price the land would bring for timber production purposes, is a value increment that reflects the property's potential for future recreational development.

The preceding examples demonstrate various types of analyses that may be applied when valuing land with mineral deposits or crops. The best analysis is the one that most closely replicates the actions of buyers and sellers in the market and results in a final value opinion that reflects the price at which the property, as a single unit, would sell on the open market. If truly comparable sales exist, they are generally considered the best evidence of value. In this case, the types of analyses described above would merely be used to support the value opinion indicated by the comparable sales.

## Personal Property and Fixtures

*Personal property* can be described as "generally, movable items."[33] In other words, personal property is not permanently affixed to and a part of real estate. "Generally, and with exceptions, items remain personal property if they can be removed without serious injury either to the real estate or to the item itself."[34]

*Black's Law Dictionary* defines *fixture* as follows:

> Personal property that is attached to land or a building and that is regarded as an irremovable part of the real property, such as a fireplace built into a home. Historically, personal property becomes a fixture when it is physically fastened to or connected with the land or building and the fastening or connection was done to enhance the utility of the land or building. If personal property has been attached to the land or building and enhances only the chattel's utility, it is not a fixture. For example, if bricks are purposely stacked to form a wall, a fixture results. But if the bricks are merely stacked for convenience until used for some purpose, they do not form a fixture.[35]

Determining whether an item is a fixture or personal property is of the utmost importance to the appraiser because the condemnation of a parcel of real estate does not include the condemnation of personal property on the premises. Thus, personal property used on the real estate taken cannot be considered in the determination of just compensation.[36] If the item in question is identified as a fixture, however, it is part of the real property taken and compensation must be paid.[37]

**personal property**

The interests, benefits, and rights inherent in the ownership of tangible objects that are considered by the public as being personal.

**fixture**

An article that was once personal property but has since been installed or attached to the land or building in a rather permanent manner so that it is regarded in law as part of the real estate.

**trade fixtures**

Articles placed in or attached to rented buildings by a tenant to help carry out the trade or business of the tenant are generally regarded as trade fixtures. For example, a tenant's shelves used to display merchandise are trade fixtures and retain the character of personal property, as opposed to all other fixtures that were, but are no longer, personal property when they are attached to and become part of the real estate. Despite the consensus on the concept of trade fixtures in general, applicable law and custom govern when a specific item is a trade fixture in a particular assignment.

Source: *The Dictionary of Real Estate Appraisal*, 6th ed.

A problem arises in distinguishing between personal property and a fixture because the determination is based, in part, on the intention of the party who made the annexation. Intent is usually determined by three basic tests:

1. Method of annexation (how permanent is the attachment?)
2. Adaptation to real estate (is it being used as real estate or as personal property?)
3. Agreement (have the parties agreed as to whether it is personal property or a fixture?)[38]

In other words, when the annexation was made, did the person making the annexation intend for the item to remain in place as a part of the real estate, or did the individual anticipate removal of the item, as personalty, at some later date?

Often, the final determination of an item's status is a legal question rather than an appraisal matter. It is therefore advisable for appraisers to obtain legal instruction as to the inclusion or exclusion of questionable items in an appraisal assignment.[39] It is imperative that appraisers specify in the appraisal report which items have been considered fixtures, and therefore included in the property being appraised, and which items have been excluded from the property being appraised as personal property. Appraisers should be prepared to extract the contributory value of any questionable fixture included in the property being appraised, so that testimony can be given as to the market value of the property excluding the item if the court rules it to be personal property.

In a federal condemnation, the court will generally be guided by state law in differentiating between personalty and realty. In *United States v. Becktold*, the Eighth Circuit Court said, "This [is] a question of real estate law which must always be determined by the law of the state in which the realty is located."[40] Several years later, the Eighth Circuit Court added the following: "This does not mean, however, that every local idiosyncrasy or artificiality in a state's concepts, or the incidents thereof, necessarily will be accepted."[41]

According to the Uniform Appraisal Standards for Federal Land Acquisitions, "In those instances where specialty fixtures are encountered or when the fixtures will represent a substantial portion of the property's value, consideration should be given to the retention of a fixture valuation specialist."[42] The value of fixtures is generally based on their depreciated replacement cost.

It is a universal rule that fixtures are a part of the real estate and, subject to the issue of consistent use, compensation must be paid for them, but the general rule that compensation need not be paid for personal property on the realty being taken does have some exceptions. For example, Michigan allows compensation awards to include personal property.[43] By statute, Iowa courts also grant compensation for personal property.[44] Because of these exceptions to the general rules of compensability, it is always advisable for appraisers to consult with legal counsel.

## Condominium Valuation

In most states, ownership of the common areas of a condominium complex is held by all of the condominium owners in undivided interests. Thus, theoretically at least, the taking of any part of a condominium project is a partial taking from each of the condominium owners. Each condominium unit in the complex may

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

need to be valued before and after the partial taking of any portion of the complex so as to determine the effect of the taking, if any, on the value of each unit.

However, when a portion of the common area of a condominium complex is acquired, condemnors may attempt to value the entire complex before and after the taking as a single unit. This approach is, of course, more cost-effective than valuing each unit (and all common elements) before and after the taking. They may also attempt to negotiate with the owners association rather than with the individual unit owners. The main problem with this approach is that the owners association does not own anything and often has no authority to negotiate on behalf of the individual owners, unless the bylaws allow the board of the owners association to act on behalf of the owners or a vote of the unit owners gives the board that negotiating power.

The state condominium statute and the declaration of condominium will often control the valuation technique to be employed. Most state condominium statutes originally contained no provisions for eminent domain acquisitions. Many second-generation statutes have incorporated provisions of the Uniform Condominium Act or the Uniform Common Interest Ownership Act, both of which provide for the reallocation of common area interests when one or more condominium interests are condemned.[45] They also provide that:

> (c) If part of the common elements is acquired by eminent domain the portion of the award attributable to the common elements taken must be paid to the association. Unless the declaration provides otherwise, any portion of the award attributable to the acquisition of a limited common element must be equally divided among the owners of the units to which that limited common element was allocated at the time of acquisition.[46]

A comment to the Uniform Condominium Act states the following:

> The provisions of this statute are not intended to supplant the usual rules of eminent domain but merely to supplement the rules to address the unique problems which eminent domain raises in the context of a *condominium*.[47]

The argument for valuing a condominium complex as a single entity stems from the thinking, as expressed in *Nichols*, that "just compensation requires that condemnees receive the fair market value of their property, not the cumulative worth of their various interests in such property."[48] However, it would appear more appropriate to view the undivided ownership interest in the common area held by a condominium unit owner in the same manner that an appurtenant easement is viewed.[49] The value of an appurtenant easement is measured by its contribution to the value of the parcel it serves. Likewise, the value of an undivided interest in the common area of a condominium project should be measured by its contribution to the value of the condominium units. If the contributory value of that common area interest is affected by a partial taking of the common area, the only reasonable means of measuring that effect is by valuing each condominium unit together with the undivided interest in the common area, before and after the partial taking.

Figure 4.7 depicts the partial taking of a 100-unit condominium complex. The taking includes 33 condominium units in Building 2, on-site improvements (including a portion of the entrance drive and a swimming pool), and 25,000

square feet of land. Building 1 contains 33 units, and Building 3 contains 34 units plus a common recreation room. Unless state law or the declaration of condominium requires otherwise, appraisers would take the following steps and consider the following factors in developing an opinion of value:

1. Appraise the 33 individual condominium units in the area to be taken.
2. Appraise the 67 individual condominium units outside of the taking in the before situation.
3. Appraise the 67 individual condominium units outside of the taking in the after situation.

**Figure 4.7 Partial Taking**




4. Consider these factors after appraising the remainder units:
   - The influence, if any, of the proximity of the public improvement to the various remainder units.
   - The effect of the taking on the monthly maintenance assessments charged against each of the remaining units. This would require an analysis of the historical common area expenses and assessments, a projection of common area expenses in the after situation, and a projection of the assessments charged against each of the remainder units in light of the projected common area expenses and the reallocation of expenses among the remainder units.
   - The technique of this reallocation may be provided for in the condominium declaration or in the condominium bylaws. If not, an appraiser would have to predict how the reallocation would be accomplished and recognize the risk of the prediction in developing an opinion of the after value of the remainder units.
   - The cost to cure deficiencies (i.e., loss of entrance drive and swimming pool) in the remainder's common area improvements. To analyze this factor, an appraiser would need to determine how the cost to cure would be allocated to the remainder units and whether the cost to cure would be a reasonable measure of damage. In making this determination, the association's bylaws

Case 3:21-cv-00232-DWD Document 281-2 Filed 03/05/25 Page 59 of 314 Page ID #17037
Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

would have to be examined to determine who has the ability to institute the cure. Could association management do this, or would a vote of the remaining unit owners be required? If a vote were taken, on what basis would the votes be counted? Would each unit have one vote, or would voting strength be based on the newly allocated common area ownership interests?

- The effect of the altered relationship between the common area recreation room and the number of units it serves.

The percentage of common area ownership appurtenant to each unit is often arbitrarily established in the condominium declaration by the original developer. It is usually based on the ratio of the size of each unit to the total square footage of all of the units or on the value of the unit (set by the developer) as it relates to the value of all of the units. Therefore, the altered burden and reallocation of common area maintenance charges will tend to affect each unit differently.

Damages to a single condominium unit resulting from the taking shown in Figure 4.7 might be measured and reported:

- As the rent loss, measured by paired data analysis, multiplied by a gross rent multiplier.
- As the change in the gross rent multiplier due to the decreased ratio of net income to gross income. The taking may decrease gross income and increase owners association dues. The percentage of association expenses assessed to a single unit may increase as the total number of condominium units decreases.
- As the anticipated special assessment charged by the owners association to cover the cost to cure the deficiencies in the driveway, landscaping, and swimming pool plus the legal fees associated with the drafting and filing of a new declaration of condominium, which will be required by reason of the taking.

The sum of these indications of value would represent the total diminution in value (damages).

## Value of Reversionary Interest

*Black's Law Dictionary* defines the *possibility of reverter* as "[a] reversionary interest that is subject to a condition precedent; specif., a future interest retained by a grantor after conveying a fee simple determinable, so that the grantee's estate terminates automatically and reverts to the grantor if the terminating event ever occurs."[50] One of the most common forms of such a reversionary interest is the sale of real property with the provision that the purchaser can use the property for one purpose only and, if the purchaser violates this provision, ownership of the property reverts to the seller.

There are two valuation questions that arise when property is held subject to such a reversion. First, is the property to be valued for eminent domain purposes subject to its restricted use or as if unrestricted? In a typical appraisal assignment, an appraiser must identify characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal such as "any known easements, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of a simi-

lar nature."[51] For purposes of eminent domain, however, the Tenth Circuit Court ruled in 1948 that it is the property that is to be acquired, not the individual interests therein.[52] In 1976, a Pennsylvania court ruled that "[i]t appears . . . from an exhaustive review of the writings on the subject that the majority view in the United States where property is held subject to a restriction limiting its use to specific charitable, religious, education, or non-commercial purposes is that the property may be given a value as if it were *un*restricted."[53] There are exceptions to this majority view, however, such as earlier rulings of the Ninth Circuit Court and Massachusetts State Supreme Court,[54] so appraisers should seek guidance from legal counsel. If the law is unclear in the jurisdiction, the assignment may warrant a dual-premise appraisal—i.e., an appraisal of the property as if unrestricted and a second appraisal of the property as restricted. The situation becomes even more complex when a partial taking occurs and it is not possible to put the remainder property to the restricted use.

The second question regarding the possibility of a reverter relates to allocation of the condemnation award. The majority view is that the grantor (i.e., the owner of the reversionary interest) is not entitled to share in the condemnation award. "Land may be held in fee simple but determinable when the land ceases to be devoted to a certain use," according to *Nichols*. "In these cases, the rights of the grantor, although enforceable if the land ceased to be used for the designated purpose, are not generally considered an estate or interest in land which is compensable upon a public taking. . . . Mere *possibility of reverter* is not considered property."[55] The denial of compensation to the grantor is often based on the fact that the possibility of actual reversion is "of such a nebulous nature that it [has] no legally estimable market value," according to a California court.[56] However, if it can be shown that a reversion is probable, the grantor may be entitled to share in the award, as illustrated by an earlier ruling of the US District Court for the Western District of Arkansas.[57]

It has been recognized that in some instances applying the majority rule, that a grantor is not entitled to share in the condemnation award, results in a windfall for one party. If the property is valued as restricted, the government will receive the windfall because it will pay only the restricted value but will have unrestricted use of the land. If the property is valued as if unrestricted, the owner of the property will receive a windfall because the owner did not purchase, or own, the unrestricted fee.

For example, assume that an individual proposed developing a residential subdivision on a parcel of land and, to prevent this and conserve the land, a nonprofit environmental group purchased the land for $10 million. The environmental group then sold the land for $1 million with the provision that ownership of the land would revert to the group if the land were ever used for any purpose other than agriculture and open space. Now assume that the government subsequently condemns the land for the development of a public airport. If the government pays the $10 million unrestricted value of the property and, in accordance with the majority rule, the environmental group is not entitled to share in the award, the grantee will receive a windfall of $9 million. If the land is valued as restricted for $1 million, the government will receive a windfall of $9 million. In either case

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

the environmental group will have expended $9 million for naught, and its philanthropic goal of preserving the land will have been thwarted by the taking.

This type of situation has been recognized by the courts. "[I]t seems apparent that, at the very least, the amount, if any, by which the value of an unrestricted fee exceeds the value of the restricted fee, is something that should go to the grantor," according to a 1965 ruling by an Ohio court. "That difference certainly represents the value of something which the grantor expressly refrained from conveying to the grantee."[58] To address this apparent inequity, it has been suggested in *Nichols* that "[l]egislation modernizing the attributes of the possibility of reverter and right of reentry or the 'power of termination' will lead to different legal consequences when such interests are appropriated in the exercise of the power of eminent domain."[59]

## Restrictive Covenants

Another problem arises when a property that is being condemned is subject to restrictive covenants or plat restrictions. These restrictions are often encountered in large subdivisions where the developer has restricted the use of all lots to residential use for the benefit of all the lot owners. It is clear that the property to be condemned is to be valued in light of the restrictive covenant, but it is equally clear that the property must be valued in light of the benefit it receives by virtue of the restrictive covenant on all of the other lots in the subdivision. The question is, do those in whose favor the restriction exists (i.e., all other lot owners in the subdivision) have a compensable interest in the property condemned? Opinions on this issue are split. In 1960, the Ninth Circuit Court ruled that

> [t]he federal rule is uncertain . . . Indeed, the distinction between rights in land and consequential losses has been blurred in restrictive covenant cases by policy considerations other than the need to draw a predictable line between direct and remote interests.

However, the same court also stated the following:

> The argument that an impermissible burden is put upon the power of eminent domain by a restrictive covenant is untenable. Why should a party receive compensation for an easement right which enhances the value of his property and yet be denied compensation for a right obtained by restrictive covenant which similarly adds to the value of his holdings? Both interests are directly connected to the land and we are unable to find a distinction between them which will justify dissimilar treatment at the hands of a condemning authority.[60]

Based on this ruling, it is possible that the government's action would equate, at least theoretically, to the total taking of the lot condemned in fee simple plus the partial taking of every other property that is the beneficiary of the restrictive covenant. Thus, it is easy to see why the results in restrictive covenant cases have been blurred.

Because the law in this area is not clear, appraisers are advised to seek guidance from legal counsel before accepting an assignment involving properties that are restricted, or benefitted, by restrictive covenants.

## Notes

1. *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 4.
2. *Ballentine's Law Dictionary*, 3rd ed., (Rochester, NY: Lawyers Cooperative Pub. Co., 1969) s.v. "property."
3. *Ballentine's Law Dictionary*, 3rd ed., s.v. "property rights."
4. *The Appraisal of Real Estate*, 14th ed., 5.
5. "Escheat is the right of government that gives the state or a local government (e.g., township or county) titular ownership of a property when its owner dies without a will or any statutory heirs." *The Appraisal of Real Estate*, 14th ed., p. 6. See also *Black's Law Dictionary*, 10th ed. (St. Paul, MN: Thomson Reuters, 2014), s.v. "escheat."
6. Alternatively, a property owner might not be compensated for property taken through condemnation if the same result could have occurred under police power. See *San Diego Metropolitan Transit Development Board v. Price Co.*, 37 Cal.App.4th 1541 (1995).
7. *McGarrity v. Commonwealth*, 166 A. 895 (Pa. 1933), *appeal dismissed* 292 U.S. 19.
8. *Chicago v. Taylor*, 125 U.S. 161 (1888).
9. *State v. Lavasek*, 385 P.2d 361 (N.M. 1963).
10. *City of Houston v. Fox*, 429 5.W2d 201. 203 (Tex. 1968) reversed on other grounds 444 S.W.2d 591 (Tex. 1969); *Priestly v. State*, 242 N.E.2d 827, 829 (N.Y. 1968); *Iowa State Highway Comm. v. Smith*, 82 N.W.2d 755, 759 (Iowa 1957); *Wilson v. Iowa State Highway Comm.*, 90 N.W2d 161, 168 (Iowa 1958).
11. *Iowa State Highway Comm. v. Smith*, 82 N.W.2d 755, 759 (Iowa 1957).
12. *State v. Fonburg*, 328 P.2d 60 (Idaho 1958).
13. *Balog v. State Department of Roads*, 131 N.W.2d 402 (Neb. 1964).
14. *State, Commissioner of Transportation v. Charles Investment Corp.*, 363 A2d 944 (N.J. 1976).
15. *Priestly v. State*, 242 N.E.2d 827, 829-830 (N.Y. 1968).
16. *State v. Wineberg*, 444 P.2d 787, 789-790 (Wash. 1968).
17. *O'Brien v. Central Iron & Steel Co.*, 63 N.E. 302 (Ind. 1972).
18. *Wolfe v. City of Providence*, 74 A.2d 843 (R.I. 1950).
19. *Department of Public Works & Buildings v. Hubbard*, 1 N.E.2d 383 (Ill. 1936).
20. *Commonwealth Department of Highways v. Sherrod*, 367 S.W.2d 844 (Ky. 1963).
21. *State v. Widen*, 128 N.W.2d 755 (Minn. 1964).
22. *City of Beaumont v. Marks*, 443 S.W.2d 253 (Tex. 1969).
23. *United States v. Dunningham*, 146 U.S. 338 (1892); *Bogart v. United States*, 169 F.2d 210 (10th Cir).
24. *Stubbs v. United States*, 21 F. Supp. 1007 (D.N.C. 1958); *McGinsey v. Central Neb. P.P. & Irr. Dist.*, 124 F.2d 692 (8th Cir. 1942).
25. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co.), vol. 4, §12D.03[2][b] (2014).
26. *United States, v. Land in Dry Bed of Rosamond Lake*, 143 F. Supp. 314, 321-322 (S.D. Cal. 1956).
27. *Vobrecht. v. State, Highway Comm.*, 145 N.W.2d 429 (Wis. 1966); *United States v. Whitehurst*, 337 F.2d 765 4th Cir. 1964).
28. *United States v. Whitehust*, 337 F2d 765 (4th Cir. 1964).
29. *United States v. 103.38 Acres of Land*, 660 F.2d 208 (6th Cir. 1981).
30. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §1.13, p. 54.
31. *State v. Dillon*, 121 N.W.2d 798 (Neb. 1953).
32. *The Dictionary of Real Estate Appraisal*, 6th ed., s.v. "consistent use."
33. *Real Estate Appraisal Terminology*, rev. ed. (Cambridge, MA: Ballinger Pub. Co., 1984), 184.
34. *Real Estate Appraisal Terminology*, rev. ed., 184.
35. *Black's*, 10th ed., s.v. "fixture."
36. *United States v. Certain Lands*, 69 F. Supp. 815 (S.D. N.Y. 1947).
37. *Carmichall v. United States*, 273 F.2d 392 (5th Cir. 1960).
38. *Modern Real Estate Principles* (Chicago: Dearborn Real Estate Education, 2003), 18.
39. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.3.1.2, p. 19.
40. *United States v. Becktold*, 129 F.2d 473, 477 (8th Cir. 1942).
41. *State of Nebraska v. United States*, 164 F.2d 866, 868 (8th Cir. 1947), *cert. denied* 334 U.S. 815.
42. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.3.1.2, p. 19.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

43. *City of Fenton v. Lutz*, 250 N.W.2d 579 (Mich. 1977).
44. *Iowa Code*, §472.14 (1971).
45. Uniform Condominium Act, 7 U.LA. (West 1985 & Supp. 1989) and Uniform Common Interest Ownership Act. 7 U.L.A. (1985 & Supp. 1989).
46. Uniform Condominium Act, §1-107.
47. Commissioner's Comment to Uniform Condominium Act, §1-107.
48. *Nichols'*, vol. 4. §12D.02[3][c] (2014).
49. See Chapter 15, "Easements."
50. *Black's*, 10th ed., s.v. "possibility of reverter."
51. *Uniform Standards of Professional Appraisal Practice*, 2018-2019 ed. (Washington, D.C.: The Appraisal Foundation, 2018) Standards Rule l-2(e), p. 18.
52. *Bogart v. United States*, 169 F.2d 210 (10th Cir. 1948).
53. *Legislative Route 1094, Appeal of Commonwealth, Department of Transportation*, 352 A.2d 244, 247 (Pa. 1976).
54. *Southern California Fisherman's Association. v. United States*, 174 F.2d 739 (9th Cir. 1949); *Boston Chamber of Commerce v. City of Boston*, 81 N.E. 244 (Mass. 1907), *aff'd* 217 U.S. 189 (1910).
55. *Nichols'*, vol. 2, §5.02[5] and [5][a] (2013).
56. *People v. City of Fresno*, 26 Cal. Rptr. 853, 862 (Cal. 1962).
57. *United States v. 2184.81 Acres of Land*, 45 F. Supp. 681 (W.D. Ark. 1942).
58. *Ink v. City of Canton*, 212 N.E.2d 574 (Ohio 1965).
59. *Nichols'*, vol. 2, §5.02[5][b][i] (2013).
60. *Adaman Mutual Water Co. v. United States*, 278 F.2d 842, 847, 849 (9th Cir. 1960).

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

5

# The Larger Parcel

Appraisers seldom encounter a valuation or analytical premise in condemnation appraisal that cannot also be found in general appraisal assignments. However, the concept of the *larger parcel*—sometimes referred to as the *parent tract*, *rule of joinder*, or *separate economic unit*—is an exception. It is a complex analytical premise unique to eminent domain valuation that can be in dispute among appraisers, condemnors, lawyers, and the courts.

The Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA) defines the *larger parcel* as "[t]he tract or tracts of land that possess a unity of ownership and have the same, or an integrated, highest and best use."[1] According to the standards document, the process of determining the larger parcel involves the consideration of (a) contiguity as it bears on the highest and best use of the property, (b) unity of ownership, and (c) unity of highest and best use. The larger parcel may be all of one parcel, part of a parcel, or several parcels, depending to varying degrees on unity of ownership, unity of use, and contiguity. The standards also characterize a total acquisition as "an acquisition of an *entire* larger parcel,"[2] and a partial acquisition as "an acquisition of only *part* of a larger parcel."[3] [emphasis added]

Understanding the concept of the larger parcel is vital in condemnation appraisals subject to the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA). Under the Uniform Standards of Professional Appraisal Practice (USPAP), and as a rule in general appraisal practice, "what the subject is" is essentially dictated by the client. In contrast, the determination of the larger parcel under UASFLA is not just an appraisal assumption. Rather, the determination of the larger parcel is the first step in the valuation process in a condemnation appraisal and is independent of the valuation analysis.

In a typical appraisal assignment, an appraiser is retained to develop an opinion of the value of a parcel of land that has specific boundaries, and the parameters of the property are known before any in-depth appraisal analysis is

**Alternative Definitions**

The textbook *Principles of Right of Way* provides the following definition of *larger parcel*:

> In condemnation, the portion of a property that has unity of ownership, contiguity, and unity of use, the conditions that establish the larger parcel for valuation purposes. In many jurisdictions, contiguity is sometimes subordinated to unity of ownership and unity of use.*

*The Dictionary of Real Estate Appraisal* provides a more expansive definition of *larger parcel*, echoing the core concepts covered above:

> In governmental land acquisitions and in valuation of charitable donations of partial interests in property such as easements, the tract or tracts of land that are under the beneficial control of a single individual or entity and have the same, or an integrated, highest and best use. Elements for consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use. In most states, unity of ownership, contiguity, and unity of use are the three conditions that establish the larger parcel for the consideration of severance damages [or benefits†]. In federal and some state cases, however, contiguity is sometimes subordinated to unitary use.‡

* *Principles of Right of Way*, 4th ed. (Gardenia, CA: International Right of Way Association, 2012), 345.

† Special benefits may accrue to the entirety of a larger parcel. See *State v. Lacey*, 8 Wn. App. 542, 544, 507 P.2d 1206 (1983), *aff'd*, 84 Wn.2d 33, 524 P.2d 1351 (1984)

‡ *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v. "larger parcel."

conducted. This is not, or should not be, the case in condemnation appraisals. The appraiser is the individual with the responsibility of determining the larger parcel, not the client. In fact, an appraiser's investigation of the larger parcel may reveal that the larger parcel that should be analyzed in the valuation assignment differs from the larger parcel originally perceived by the client, and thus the original assignment may need to be revised. If the determination of the larger parcel is expected to be difficult or contentious, a client might request that an appraiser analyze a variety of valuation scenarios based on different assumptions about the larger parcel.

In some jurisdictions, the determination of the larger parcel may ultimately be a question of law, which would be determined by the court, whereas elsewhere the determination of the larger parcel may be a question of fact, which would be determined by the trier of fact. If two experts hold different opinions about the larger parcel, the court may be required to determine the larger parcel. Sometimes the court will determine the larger parcel through a separate hearing outside the presence of a jury.

An engineer or surveyor may be needed to write a legal description of the larger parcel if it is a portion of one legal parcel or a combination of more than one legal parcel. A full description of the larger parcel would also describe the legal, physical, and economic characteristics of the land and improvements. Establishing this information helps appraisers (a) analyze the larger parcel in preparation for the valuation process, (b) determine what the remainder will consist of, and (c) measure the effect, if any, of the public project on the remainder.

The parcel maps, or right-of-way maps, developed by condemnors provide useful information for the legal description of the larger parcel, and it is use-

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

ful for appraisers to understand the process of preparing a parcel map. If, for example, a roadway is to be constructed or widened, the condemnor's engineers prepare a survey of the proposed right-of-way limits. This survey is then given to the title department within the condemning agency, or to a title company, with instructions to identify all ownerships within the proposed right of way and to determine the property boundaries of each parcel. These boundaries include all land that is contiguous and under the same ownership as the land within the proposed right of way. A right-of-way map like the one shown in Figure 5.1 is then prepared. Figure 5.2 shows the typical ownership information included on such a map. The right-of-way map is then usually passed on to the appraiser with instructions to value a specific parcel identified on the map.

The physical contiguity of land is an engineering question, while unity of ownership is usually a legal question. And the highest and best use determination of the larger parcel is an appraisal question. Prior to any consideration of unity of use, a right-of-way map is prepared and the boundaries of the properties to be appraised are determined. Therefore, most appraisal contracts between an appraiser and a condemning agency, and most instructions assigning an appraisal to a staff appraiser, specify that the appraiser is to develop an opinion of the value of a parcel that may or may not be the "larger parcel." The ultimate determination of the larger parcel must be made by the appraiser because, while the contiguity of land may be an engineering-based decision and unity of ownership is a legal decision, consistency of use is a market-based decision that requires the appraiser's expertise. If it is found that the parcel defined by the right-of-way map and the appraisal contract or assignment does not constitute the larger parcel, the appraiser must insist on a revised contract or assignment. As stated in the Uniform Appraisal Standards for Federal Land Acquisitions:

> The appraiser must make a larger parcel determination in every appraisal developed under these Standards. It is not uncommon for an appraiser's conclusion regarding the larger parcel to be different from the specific parcel the client agency identified to be appraised, as the appraiser cannot determine highest and best use without considerable investigation and analysis. In such instances, the appraiser shall inform the client agency of the determination of the larger parcel and the agency shall amend the appraisal assignment accordingly.[4]

The determination of the larger parcel is particularly important in partial taking cases in which compensable damages or relevant benefits accrue to the remainder parcel after the taking. Like many other determinations in condemnation appraisal, the tests to determine the larger parcel (i.e., unity of ownership, unity of use, and contiguity) cannot be applied universally and blindly. The federal courts and some state courts have ruled that all three tests need not be met in every instance.

A situation in which a right-of-way map may not correctly depict the larger parcel is illustrated in Figure 5.3. In this case, the entire parcel meets the tests of unity of ownership and contiguity, but it fails the test of unity of use—i.e., highest and best use with the three-part conclusion regarding use, timing of economic demand, and market participants. Therefore, the service station shown on the map is not a part of the larger parcel, according to a ruling of a New York court,[5] and cannot suffer compensable damage or receive a special benefit unless




Figure 5.1 **Typical Right-of-Way Map**

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

**Figure 5.2 Typical Ownership Information**




it is clearly demonstrated that the service station is part of the highest and best use of the whole property and the uses are so intertwined that the service station is affected by the highest and best use of the whole property.

A different situation is depicted in Figure 5.4. In this example, two parcels have unity of ownership, but they are certainly not contiguous or put to the same use. However, unity of use has often been defined to include what the Fourth Circuit Court called an *integrated use*.[6] In the situation illustrated, the mill could not continue to function at its highest and best use without its raw material, which comes from the property containing the timber. In fact, the mill may have been constructed for the sole purpose of processing logs harvested from the 500-acre timber stand. Thus, while the two properties do not have identical uses, they certainly have an integrated use. In some jurisdictions, the larger parcel would be defined as the mill site plus the timber stand. In such a case, damages accruing to the mill site due to the taking of the timber stand would be compensable.

In an often-cited landmark case, the First Circuit Court ruled that two parcels located 17 miles apart, on two different islands, constituted a single larger parcel. In this ruling, the court said the following:

> The first question before us here, therefore, and the basic one in all severance damage cases, is what constitutes a "single" tract as distinguished from "separate" ones. The answer does not depend upon artificial things like boundaries between tracts as established in deeds in the owner's chain of title, nor does it depend necessarily upon whether the owner acquired his land in one transaction or even at one time. Neither does it wholly depend upon whether holdings are physically contiguous. Contiguous

**Figure 5.3 No Unity of Use**




**Figure 5.4 Noncontiguous Larger Parcel**



> tracts may be "separate" ones if used separately, and tracts physically separated from one another may constitute a "single" tract if put to an integrated unitary use or even if the possibility of their being so combined in use "in the reasonably near future is reasonably sufficient to affect market value."
>
> Integrated use, not physical contiguity, therefore, is the test. Physical contiguity is important, however, in that it frequently has great bearing on unity of use. . . . [S]eparation still remains as evidentiary, not an operative, fact.[7] [Citations omitted]

Note that the court recognized that separate parcels do not have to be put to the same use on the date of valuation. Rather, if the highest and best use of the properties requires a unity of use, then those properties make up a single larger parcel.

However, the mere fact that two parcels constitute a single larger parcel does not necessarily mean that the remainder property is damaged. For example, on remand of *Baetjer v. United States*, the District Court of Puerto Rico found that the remaining lands had not suffered any compensable damages in that case.[8]

By defining the larger parcel, appraisers can confine their judgments to those parcels, or parts of a single parcel, that are affected by condemnation. Figure 5.5 shows a 100-acre farm that is subject to two zoning classifications. The proposed widening of Road A necessitates the acquisition of the easterly 25 feet of the tract. The highest and best use of the whole property coincides with its current zoning. That is, there is current demand for the commercial zoned land, the zoning line cannot be moved due to physical constraints, and the probability of rezoning more land for commercial use is not likely. The property is owned by a single individual and is contiguous, but there is no unity of highest and best use. Thus, the larger parcel in this case is the easterly 500 feet of the ownership, and only this part of the tract is subject to compensable damages or special benefits.

This determination of the larger parcel eliminates application of the *backland theory* described in Chapter 3. The backland theory would be used—and misused—far less frequently if appraisers and others involved in condemnation proceedings had a better understanding of the larger parcel premise. Once an appraiser has identified the larger parcel, the scope of the analysis required is narrowed substantially. In the situation illustrated in Figure 5.5., only the easterly 500 feet of the tract needs to be appraised in the before appraisal because that land alone constitutes the larger parcel. Therefore, only comparable commercial land sales should be investigated and analyzed; residential land sales need not be studied.

**Figure 5.5 No Unity of Use**




As the preceding examples illustrate, appraisers must consider more than single ownership and parcel size to define the scope of an appraisal assignment. Because the tests of the larger parcel can be applied in a variety of ways, it is necessary to study each element of this trinity—unity of ownership, unity of use, and contiguity—in some depth. Although most of the rulings pertaining to the larger parcel involve the question of compensable damages, the rulings are equally applicable to benefits.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

It generally has been held that determination of the larger parcel is a matter of fact, not a matter of law. Therefore, when a question of the larger parcel arises in a condemnation trial, it is a question to be answered by the jury (or trier of fact), not by the court.[9] However, some confusion exists in this regard in the federal court system because all federal condemnation cases are conducted under the Federal Rules of Civil Procedure, which states that just compensation will be determined by the trier of fact but that

> In an action involving eminent domain under federal law, the court tries all issues, including compensation, except when compensation must be determined: (A) by any tribunal specially constituted by a federal statute to determine compensation; or (B) if there is no such tribunal, by a jury when a party demands one within the time to answer or within any additional time the court sets, unless the court appoints a commission.[10]

In *United States v. Reynolds*, the US Supreme Court said that "[t]he Rule [71(h)] thus provides that, except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented."[11]

Because determination of the larger parcel is intertwined with the question of highest and best use, strict adherence to the Federal Rules of Civil Procedure would result in the court, rather than the trier of fact, making the finding of highest and best use. The *Reynolds* decision dealt with the issue of the *scope of the project* rather than the question of highest and best use or the larger parcel. (See Chapter 6 for further discussion of the scope of the project rule.) Several federal circuit cases decided after *Reynolds* have interpreted that decision narrowly and have ruled that the question of highest and best use, and thus the larger parcel, rests with the jury.[12]

*Nichols* suggests that "it is safe for the practitioner to prepare and present the case on the assumption that the theory of unity of use [the larger parcel] is a factual question for the trier as it relates to the ultimate issue of value, damage, and just compensation. If there is a question, the *motion in limine*, or a motion for partial summary judgment, is available to preliminarily resolve questions, particularly in the federal courts where judges and magistrates have broad powers available to them at the pretrial stage of litigation."[13] It is also possible for the parties to stipulate (or agree) to certain facts in advance of the trial.

In the early stages of the appraisal assignment, the appraiser should discuss any legal (ownership) issues with legal counsel and request input from an engineer, if necessary, with regard to contiguity issues. The appraiser should also alert legal counsel if there are issues related to consistent use, and the larger parcel determination is likely to be different than what is expected. That being said, every appraiser should guard against allowing an attorney to direct or overly influence the appraisal process.

**motion in limine.** A pretrial request that certain inadmissible evidence not be referred to or offered at trial. Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to disregard. If, after the motion is granted, the opposing party mentions or attempts to offer the evidence in the jury's presence, a mistrial may be ordered. A ruling on a motion in limine does not always preserve evidentiary error for appellate purposes. To raise such an error on appeal, a party may be required to formally object when the evidence is actually admitted or excluded during trial.

Source: *Black's Law Dictionary*, 10th ed.

It is unethical for appraisers to base their analyses on a predetermined conclusion or outcome or to advocate for the cause of their client.

## Unity of Title

It is generally held that, for one or more parcels to be considered a single larger parcel, it is essential that they be owned by the same individual or group of individuals.[14] In a few cases, however, the courts have held otherwise. In a Kansas case, for instance, the court held that three contiguous parcels of land—owned by three different individuals and being used as one farm operation by mutual agreement—constituted a single larger parcel and, therefore, "injury to each [parcel] resulting from the whole taking may be considered."[15] Most cases that have allowed consideration of lands owned by others have done so under the theory of the highest and best use of an assemblage. (The highest and best use of an assemblage is discussed further in Chapter 6.)

Alternatively, some case law supports the proposition that the quality of the title to all parcels must be identical for the tract to be considered a single larger parcel. For example, if Parcel A in Figure 5.6 is owned by Mrs. Jones, as her sole and separate property, and Parcel B is owned by Mr. and Mrs. Jones jointly, some courts would rule that the larger parcel is Parcel A only and that no compensable damages can accrue to Parcel B, even though the two tracts have contiguity and unity of use. The federal government has historically supported the proposition that the form of title must be identical. The Uniform Appraisal Standards for Federal Land Acquisitions states the following:

> Historically, unity of ownership (or unity of title) was held to require all property comprising a single larger parcel to be owned to precisely the same extent (e.g., in fee simple) by precisely the same owner. . . . Fairness and market realities therefore dictate that unity of ownership does not exist when multiple decision makers are involved—that is, as one district court recently stated, "when the wishes of different individuals, and not a single individual wearing multiple hats, must be spanned to achieve unity of title." As a result, unity of ownership has been ruled lacking when one tract was owned by one person and a second tract by a spouse, sibling, or adult child.[16]

**Figure 5.6 No Unity of Title**




The federal government most often cites *United States v. Honolulu Plantation Co.* in support of identical ownership.[17] The court in that case said the following:

> The rule requiring compensation for loss in market value of the remainder of the tract is applied strictly only where there is but a single parcel owned by one party in fee simple. . . . If, therefore, the fee owner of one tract holds a lesser tenure in the tract taken, there can be no additional compensation for this reason. The explanation is that the fee is the integer. (at pages 178-179)

However, it is clear that the foregoing is dicta (i.e., statements by a court on a different point

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

than the actual issue involved in determining a case and thus not regarded as setting legal precedent). In introducing this issue, the court said (at page 178), "[a]lthough disposition has thus been made of the erroneous claims and theories of the experts, it behooves us to consider whether Plantation is entitled to compensation, without regard to the clauses of the respective leases."

Nevertheless, the same court later ruled in two different cases that identical title was not required to find a single larger parcel. In *United States v. 57.09 Acres of Land* (1983), the larger parcel was found to be ownership of an easement in one parcel and a leasehold interest in a second parcel. The Ninth Circuit Court said, "*Honolulu Plantation* is inapposite, however, because the party seeking severance damages in that case had no interest whatsoever in the land which had been condemned."[18] In the second case, *United States v. 429.59 Acres of Land* (1980), the court found that three tracts of land constituted a single larger parcel, even though the tracts were owned by three different corporations, because ownership of all three corporations was held by the same individuals. In making this ruling, the court said that "[t]he fact that land thus treated [as a single entity] is owned by different entities does not destroy the unity concept."[19] In a footnote, the court distinguished this case from *Honolulu Plantation* "because the plaintiff sugar refinery in that case had no compensable interest in sugar cane fields taken from a third party." The Uniform Appraisal Standards for Federal Land Acquisitions stresses the importance of fairness in addressing the issue of unity of ownership in the context of market realities:

> Federal courts have held that fairness compels consideration of market realities in determining unity of ownership. Accordingly, the Ninth Circuit found unity of title was satisfied for properties owned by three corporations because a single person served as the president, chairman of the board, and chief executive officer for all three entities. As one district court recently reasoned, a person with personal control of Parcel A and actual control of Parcel B as the sole owner of a corporation "would never negotiate against or attempt to undermine himself in a transaction. The relevant 'economic realities of the marketplace simply do not produce those kind of results.'" Moreover, as another district court observed, "the buyer in the marketplace could readily acquire both parcels from the same operative vendors, exercising the same business judgment in the transaction."[20]

Any appraiser involved in a federal condemnation assignment concerned with multiple tracts that have a unity of highest and best use but lack identical ownership should seek the advice of legal counsel, whether the client is the property owner or the condemning authority.

In most jurisdictions, unity of ownership does not necessarily mean that the quality of the title is identical. In a ruling by a South Dakota court, two parcels, one owned in fee and one owned equitably by a vendee's interest in a real estate contract, were considered to have unity of title.[21] In one California case, the court held that unity of title existed where an individual owned one parcel in fee and was the equitable owner of an abutting parcel because that individual had exercised an option to purchase the second parcel.[22] In another California case, however, where the interest in the second parcel existed only in the form of an unexpired but unexercised option, the court held that there was no unity of title.[23]

Unity of title generally requires equal legal control over the ownership and future use of the lands in question. Acquisition of the parts of a whole at differ-

ent times does not destroy unity of title, according to a ruling of the First Circuit Court.[24] Nor, in some cases, does the fact that one parcel is owned by an individual and the second parcel is owned by a corporation under the control of that individual.[25] For example, some occupants of a shopping center may own their own buildings and some may rent, but all are under common operating agreements for the shopping center as a whole such as common area maintenance agreements, cross access easements, common go dark agreements, cotenancy agreements, common parking ratio agreements, and the like, so the total shopping center could be considered to meet the unity of title criteria of the larger parcel. Some courts, however, have ruled conversely, such as in *Sams v. Redevelopment Authority*.[26]

A fee interest in one parcel and a leasehold interest in an abutting parcel, as depicted in Figure 5.7, can operate as one larger parcel for the remaining term of the lease.

## Unity of Use

The second test of the larger parcel requires that the parcel or parcels of land be devoted to the same use as, or an integrated use with, the land from which the taking is made. It is generally not the presence or absence of actual unity of use that is considered. Rather, the unity of *highest and best use* is the controlling factor, according to a ruling of the First Circuit Court.[27] If a property is not being put to its highest and best use but has a common highest and best use, the current use of the land does not generally destroy the unity of use, according to a ruling of the Fourth Circuit Court.[28] Some courts have ruled conversely, however.[29] These decisions, which seem to contradict the well-established premise that property is appraised at its highest and best use, are generally based on the reasoning that the unity of use has to exist because potential unity of use is too speculative and conjectural to be considered.[30] A careful reading of many of these cases (e.g., *City of Washington v. Koch*) suggests that the court may well have found that the proffered highest and best use of the property would have been too conjectural and speculative to be considered by the jury, even if the larger parcel were not at issue. If timing is an issue in the appraiser's determination of highest and best use (e.g., the determination is for office development in five years), stronger proof may also be required by the courts because of their sensitivity to what could be considered speculative.

Appraisers must recognize that stronger proof of unity of use is required when the

**Figure 5.7 Leasehold Larger Parcel**




*Unity of use* refers to highest and best use, which has a three-part conclusion: (1) use, (2) timing of economic demand, and (3) market participants.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

parcels are not currently being used as a unit but merely have a common highest and best use. This suggests that a Level C highest and best use study may be required, particularly if timing for the use is an issue. According to a Kansas court, "[t]he question of unity of use of two or more tracts is a question of fact to be determined upon the facts and circumstances of the particular case, and is not to be based upon fanciful claims, speculation or conjecture, and in such cases the burden of proof is upon the landowner to prove his claim."[31]

Political boundaries do not interrupt the continuity of use if the government's land use controls permit a continuous highest and best use. Moreover, unity of use does not require physical adjacency. There may be physical separation by barriers such as streets, railroads, and creeks, but again this type of separation requires stronger proof of unity.

## Contiguity

The third element of the larger parcel trinity, contiguity, normally requires that physical contiguity be present for a larger parcel to exist. However, this condition is not always mandatory, and jurisdictions have ruled differently on this issue. Most courts hold unity of title and unity of use as the most important tests of the larger parcel.[32] For this reason, the Uniform Appraisal Standards for Federal Land Acquisitions states the following:

> Under federal law, physical unity is considered within the context of integrated use rather than as a stand-alone test. As the First Circuit emphasized:
>
> > Physical contiguity is important, however, in that it frequently has great bearing on the question of unity of use. Tracts physically separated from one another frequently, but we cannot say always, are not and cannot be operated as a unit, and the greater the distance between them the less is the possibility of unitary operation.[33]

Unity of use—as determined by the market, not simply by the choice of the current owner—is the best indication of whether ownership of real property constitutes (1) a single larger parcel or (2) *separate* parcels. Unity of use does not preclude a reasonable physical separation. Such a separation does, however, require study. Appraisers musts be able to answer "yes" to the question "Is it probable that the separated tracts would sell as an integrated single entity, even with the separation?" Only then can the separated tracts be considered as a single larger parcel. A Rhode Island court stated the following:

> Quite a different situation is presented when, as here, the two parcels in question are unequivocally separated from each other by fixed and definite boundaries, such as a highway. In such a case it is generally held that the two tracts can be considered as one only when they are so inseparably connected in the use to which they are applied that the taking of one *necessarily* and *permanently* injures the other.[34]

The Uniform Appraisal Standards for Federal Land Acquisitions states the following:

> The availability of replacement property for the part acquired must always be considered (as noted above) and can be particularly important in partial acquisitions involving noncontiguous parcels devoted to a unitary use, such as a livestock ranch or a timber and milling operation.[35]

The greater the separation between the parcels, the more likely it is that suitable replacement property will be available. Highest and best use is market driven, so the market should be the ultimate arbiter of the decision of the larger parcel when separated tracts are being considered. The questions to be answered are how would the tracts be commonly offered for sale on the open market and how do similar properties exchange on the open market. For example, multiple noncontiguous tracts of land may all be under common ownership and may all be currently operated by the owner and used as a single farming unit. However, this common use is not market driven. Rather, it is by operator choice. If the same tracts were offered for sale on the open market, they would be offered separately in order to command the highest price. In other words, each separate parcel would stand alone as its own individual economic unit in the market. They would, therefore, fail the contiguity test and not be considered as being a part of the larger parcel, despite their common and integral use by the current owner.

Sometimes a larger parcel exists in the before situation, but, in the after situation, the parcel has been severed by the taking and becomes two separate remainder parcels. Such a situation is illustrated in Figure 5.8. Although the property had unity of ownership, unity of use, and contiguity in the before situation, it is no longer contiguous in the after situation. Quite probably, one or both of the tracts will have a different highest and best use after the taking than they did before. It could be unlikely that unity of use, or integrity of use, will exist between the two parcels in the after situation. Thus, it is unlikely they would be sold as a single parcel, and, in all probability, they would be considered two remainders.

Another problem that the courts have addressed upon occasion is illustrated in Figure 5.9. This could be described as the problem of the *paper plat*. The whole parcel, labeled as Parcel A, is, of course, considered the larger parcel, and the entire remainder parcel is subject to potential compensable damages by reason of the taking. In regard to the same parcel with a subdivision plan, labeled as Parcel B, however, the determination of the larger parcel will often depend on the specific status of the paper plat and the highest and best use of the whole parcel. The economic demand for the use will in most cases be the deciding factor for the highest and best use of Parcel A in this situation.

**Figure 5.8 Two Remainders–After Situation**




If the property owner has not dedicated the proposed street rights of way, or has only granted easements thereto while retaining the underlying fee, and no lots have been sold, the courts have generally ruled that all of Parcel B constitutes the larger parcel. The current status of the particular paper plat appears to be the key determinant. If the plat processing is beyond its initial stages, there could be two larger parcels (i.e., Lots 1 and 9), with Lots 2 through 8 falling outside the larger parcel and not subject to any compensable damages or special benefits.

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

**Figure 5.9** **Paper Plat**




An Ohio court expressed this situation well:

> As an allotment develops, as it progresses from open land to individual lots, there comes a point where the lots not only can be but must be considered as separate entities. When this point arrives and a part of the allotment only is taken, consisting of a number of lots, the question arises as to what is the remaining land to which damage may occur. Is it the whole remaining subdivision, or is it just the fragment of an individual lot not taken?
>
> Whether certain lots, taken by appropriation proceedings, constitute part of an entire tract so as to entitle the owner of the remaining continuous lots to damages within the rule is principally a question of unity of use and, as such, constitutes a factual matter to be determined by the jury under proper instructions.[36]

A situation in which an appraiser determines that the highest and best use of a vacant tract of land is to develop it into a subdivision, regardless of the timing of the highest and best use, is a special case when the appraisal is for litigation. (To apply subdivision development analysis, an appraiser performs a discounted cash flow analysis that allows for the expense of development, including the required dedications, and the sales of individual lots over time and at a pace based on market-derived absorption rates, and then discounts those cash flows back to a present value at a market discount rate.) While it is common in the market for appraisers to develop an opinion of value for a "proposed" subdivision, the courts in most jurisdictions consider this to be entirely speculative and thus inadmissible. This is contrary to market conditions. Obviously, the market could hardly function without these types of appraisals because developers would be unable to obtain loans without them.

In *City of Tulsa v. Biles*, the Oklahoma Supreme Court stated the following:

> Evidence on the value of the property for any use to which it may be reasonably adapted, is, as already stated, admissible, but such evidence must be limited to

> a bare statement why the property is adapted for a particular purpose and to testimony of its value for such purpose. As bearing upon these issues the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, *but he cannot go further and describe in detail to the jury a speculative enterprise for which in his opinion or that of some expert the land might be used, and base his estimate of value upon the profits he would expect to derive from the enterprise* [emphasis added].[37]

More recently, the Texas Supreme Court had this to say in rejecting the subdivision development method to analyze the market value of raw land:

> [T]he subdivision development method differs from the comparable sales method because it requires the appraiser to examine ready-to-build, subdivided lots—lots that are not comparable to the landowner's larger, unsubdivided condemned property. Further, as the Court explains, the subdivision development method is unlike the income method, because it is based solely on the speculative piecemeal sale of unimproved property. . . . While condemned land's adaptability to subdivision is relevant to show the land's highest and best use and thus is a factor for the jury's consideration, this cannot be used as the basis for the market-value appraisal. The underlying approach to the subdivision development method is fundamentally flawed under Texas condemnation law, because evidence about actual individual lots' value is irrelevant to show raw, unimproved condemned property's market value.[38]

With a few exceptions, appraisers must value the property not as a proposed subdivision but as vacant land.[39] The proper technique is to choose comparable sales that have a similar highest and best use, including potential for development, but where, like the subject property, development has not yet commenced. Other jurisdictions have similar rulings that allow for evidence of the possibility of development, including a hypothetical plat of the property, but only to show the suitability of the property for development and nothing else.

Like many other issues, there are differences and variations in the application of the larger parcel concept in different states and jurisdictions. Colorado, for instance, has a legal concept called the "affected area" that must be determined by appraisers and, in some instances, allows appraisers to value only a part—the affected area—of the larger parcel.

In *Palizzi v. City of Brighton*, the Supreme Court of Colorado considered a case of a property that was outside the city limits of Brighton but was located adjacent to and in between two tracts the owner's family had previously sold to developers.[40] These two tracts had been annexed by Brighton and rezoned with the requirement that 70 feet of frontage be dedicated for the future widening of the street bounding the properties. Subsequent to those sales, the City of Brighton decided to proceed with the street-widening project and condemned a 70-foot-wide strip of the subject property. The appraiser for Palizzi determined that, based on the two adjacent properties, the annexation and rezoning of the property would likely be approved and therefore decided that the highest and best use of the property was for mixed-use (commercial and residential) development and valued it accordingly with appropriate deductions for the annexation process. The appraiser concluded that though the larger parcel contained two independent economic uses, the taking affected only commercial land. The jury adopted this approach and highest and best use conclusion and awarded $204,387.15.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

Brighton valued the property at $35,250. Brighton contended that the same strip of property would have to be dedicated at time of final platting when entitlements were recorded for commercial and residential development, arguing that those facts limited the highest and best use determination to agricultural use—its current use—at the time of taking. The Palizzis were not seeking to develop any of the property when Brighton initiated its condemnation action. The court ruled in favor of the Palizzis and thereby opened the door for some consideration of the development of a property into a future use. But it seems to be only a narrow opening. The court made the following statements in its ruling:

> The valuation of property in condemnation proceedings is based on the most advantageous use of the property, taking into account the reasonable probability of future development, but not basing the valuation on that probable development as an accomplished fact.
>
> All evidence relevant to the determination of the present market value of condemned property is admissible, including evidence of the most advantageous potential future use of the entire property, even if the condemned property would need to be dedicated as part of annexation and rezoning of the entire property in the future.
>
> The purpose of the valuation proceeding in a condemnation action is to replicate the marketplace, and thus the fact finder is tasked with determining how much a willing buyer would pay for the property if the owner had voluntarily offered it for sale; in so doing, the fact finder may consider any competent evidence that affects the present market value of the land which a prospective buyer would consider.

At the heart of the matter is the unity of *highest and best use*, which is the controlling factor. The Colorado Department of Transportation right-of-way manual states the following:

> It is possible for a larger parcel to contain several independent economic uses. At times it is proper to value a portion, or an affected area, of the larger parcel. Typically, an affected area is hypothetically created and defined by the appraiser. If an affected area instead of the entire ownership is valued, a description providing information and the rationale behind establishing the affected area as an economic unit is required. An affected area should be supportable as a readily achievable economic unit and is not to be confused with the acquisition area of a partial taking. The intent is not to artificially subdivide property in contradiction to Colorado case law (e.g., *Dept. of Highways v. Schulhoff*, 167 Colo. 72, 445 P.2nd 402 [1968]). A plat delineating the affected area is required to be included in the appraisal report.
>
> Caution should be taken in determining a hypothetical affected area appraised. Damages cannot accrue to or be considered off-site or outside the affected area parcel.
>
> In some partial takings, an affected area could be the actual part to be taken. This may occur when the part to be taken does not have a unity of use with the rest of the larger parcel and is a distinct and separate economic parcel. In essence, the part taken as a part of the larger parcel is a total taking. Since the take is considered a total taking, there cannot be any damages and/or benefits.[41]

The larger parcel determination does not require the inclusion of all the contiguous real estate that is commonly owned. In fact, it would not be appropriate to include all of the commonly owned land when the test of consistent highest and best use across the tract is not met, apart from interjecting some

legal doctrine such as the "affected area" in the case of Colorado. Nevertheless, because of the subtle, and sometimes not so subtle, differences between jurisdictions, it cannot be overstated that it is incumbent upon appraisers to be highly familiar with and knowledgeable of local jurisprudence so that their appraisals will withstand legal scrutiny and be appropriate for their intended use.

## Myths About the Larger Parcel

As has been demonstrated, nearly all of the court decisions relating to the larger parcel involve either alleged damages or special benefits to the remainder. Two of the previously quoted definitions of the larger parcel specifically relate the term to damages to the remainder property. However, determination of the larger parcel is also important in cases in which damages or benefits are not claimed. In nearly all jurisdictions, the value of the land taken is measured as it contributes to the whole (larger parcel), rather than as a separate entity, regardless of whether the before and after or taking plus damages rule is applicable. (Note that damages or benefits related to the larger parcel are based on the highest and best use of the after condition and the determination of the remainder, which may or may not be the same as the larger parcel in the before situation.) Thus, appraisers must make a determination of the larger parcel in all cases.

Confusion has arisen in several jurisdictions as to the necessity or even the appropriateness of identifying and appraising the larger parcel. Attorneys who argue cases before the courts are rightly advocating for the cause of their particular client. Depending on the quality of the opposing argument, this can sometimes result in the court making a decision from a position that is not fully informed. It is clear, for federal acquisitions, that the larger parcel must be identified and appraised because it is required by the Uniform Appraisal Standards for Federal Land Acquisitions.[42] But, for states that operate according to the taking plus damages rule, it is easy to confuse the issue.

The argument against the necessity of identifying and appraising the larger parcel, when the taking plus damages rule is applicable, can be refuted with simple logic. The reasoning follows:

1. It is undisputed that, in a partial acquisition case, part of an appraiser's assignment is to determine if there are any damages or benefits to the remainder.
2. Unless the appraiser identifies the larger parcel, it is impossible to even determine what constitutes the remainder. The question "the remainder of what?" must be answered.
3. Once the larger parcel is identified, unless the appraiser analyzes and values the larger parcel, it is not possible to come to a credible conclusion as to whether or not the remainder is, in fact, damaged and to quantify those damages.

Even when damages or benefits are not alleged, determination of the larger parcel can have a significant effect on the amount of compensation indicated. Two economic factors can come into play in larger parcel valuations: (1) plottage and (2) size regression.

*Plottage* is an increment of value that results when two or more sites are combined (through what is known as *assemblage*) to produce greater utility.

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

Sometimes highest and best use results from assembling two or more parcels of land under one ownership. If the combined parcels have a greater unit value than they did separately, plottage value is created.[43]

*Size regression* is based on a basic economic principle, known as *economies of scale*, which states that, as the number of units of a commodity increases, the price per unit paid for the commodity decreases. It is the concept of the bulk sales discount. As applied to land, as the number of units (e.g., acres, square feet) in a tract of land increases beyond the optimal size, the price, or value, per unit tends to decrease. From a real estate market standpoint, this is true in part because, as the total price of a property increases, the pool of buyers who have the capacity to buy decreases. The consequence is less competition in the marketplace, which typically results in a lower price per unit.

The courts seem to recognize plottage but fail to acknowledge the effect of size regression. In fact, at least two courts have ruled, *as a matter of law*, that two assembled tracts of land always have a higher square foot value than they would if considered as two separate tracts.[44]

The situation shown in Figure 5.10 illustrates the importance of the larger parcel determination even when damages or benefits are not at issue. Suppose that the physical characteristics of all parts of the 100-acre farm depicted are equal and that sales data shows that farms of 75 to 125 acres sell for $5,000 per acre. If no damages or benefits are involved and the entire farm is considered a single larger parcel, the indicated compensation for the two-acre taking would be $10,000, regardless of whether the before and after rule or the taking (as a part of the whole) plus damages rule is applied.

However, the situation might be more complicated. In addition, suppose that small acreage properties in the area, ranging from 5 to 15 acres, typically sell for $12,500 per acre for use as rural home sites. If an appraiser concluded that the 10-acre parcel separated from the balance of the ownership by the creek had an independent highest and best use as a home site, and thus a value of $12,500 per acre, the indicated compensation would be $25,000.

Even if the 10-acre tract had the same highest and best use as the 90-acre tract (i.e., agricultural), the two parcels could constitute separate larger parcels. A conclusion that two larger parcels existed could probably be justified if there were no *actual* unity of use between the parcels or no bridge across the creek physically connecting the two parcels. In such a case, it would not be surprising to find that 10-acre tracts were selling for substantially more per acre than 100-acre tracts because of size regression, even though the tracts had the same highest and best use.

Appraisers, whether they are retained by a condemnor or a condemnee, may be tempted to value the parcel shown on the condemnor's right-of-way map without adequately analyz-

**Figure 5.10 Partial Taking of 100-Acre Farm**



ing the larger parcel or speaking with the property owner. If an appraiser receives an assignment from a condemnor to appraise the property shown in Figure 5.10 and is provided with a right-of-way map depicting the entire 100-acre ownership as the parcel to be appraised, it is the appraiser's obligation to determine whether the larger parcel is, in fact, the 100-acre parcel or the 10-acre parcel. If the appraiser reasonably concludes that the 10-acre parcel is the larger parcel and thus the value of the taking, as a part of the whole, is $25,000, it is possible that the appraiser will receive resistance or criticism from the client. Nevertheless, the determination of the larger parcel, as a part of highest and best use analysis, is the appraiser's decision, based on the highest and best use of the whole property (100 acres), and it must be made objectively regardless of the desires, or opinions, of the client.

The property owner's appraiser also has an obligation to make a proper analysis of the larger parcel, rather than merely appraise an entire ownership or the parcel shown on the condemnor's map. Returning to the situation depicted in Figure 5.10, improper analysis of the larger parcel in this case could result in the appraiser's client receiving only 40% of the compensation due.

Figure 5.11 shows the same property shown in Figure 5.10, but in this instance it is assumed that the taking is of the entire frontage of the property. Condemnors would invariably treat this situation as one taking from one larger parcel, even those condemnors who would be astute enough to recognize that the 10 acres shown in Figure 5.10 might constitute a separate larger parcel. Nevertheless, the extent or location of the taking should not alter the analysis of the larger parcel in the before situation. The larger parcel determination made under the circumstances shown in Figure 5.10 would be the same under the circumstances shown in Figure 5.11, or under the circumstances of any other taking configuration, including the taking of the entire ownership.

The Uniform Appraisal Standards for Federal Land Acquisitions states:

> **4.3.4. Criteria for Analysis.** In determining the larger parcel, federal courts consider unity of use, unity of ownership (title), and physical unity (proximity or contiguity) as it relates to highest and best use—factors historically called the three unities.Because this analysis typically involves questions of law as well as fact, appropriate legal instructions are often required. [Citation omitted]

The important message in the quote above is "as it relates to highest and best use." If an appraiser concludes that the 10-acre tract south of the stream is a separate larger parcel, based on the appraiser's determination of the highest and best use of the whole 100-acre parcel in the situation depicted in Figure 5.11, the appraiser would first develop opinions of the values of the 10-acre parcel and the 90-acre parcel as two separate, independent larger parcels.

If the appraiser is following the before and after rule, the value conclusions might be reported as follows:

**Figure 5.11 Taking of Farm Frontage**



Copyrighted material licensed by Randall Bell, PhD on November 20, 2019

| **Home site parcel** | |
|---|---|
| Before value (10 acres @ $12,500) | $125,000 |
| After value (8 acres @ $12,500) | – 100,000 |
| Difference | $25,000 |
| **Farm parcel** | |
| Before value (90 acres @ $5,000) | $450,000 |
| After value (83 acres @ $5,000) | – 415,000 |
| Difference | $35,000 |

Note that the before value of the home site parcel and the before value of the farm parcel are *not* added together and reported as a single figure. Together the value of the farm parcel and the value of the home site parcel do not equal the value of the two parcels as a single entity. The value indications above are separate appraisals and should be reported as such. If the client insists that a single figure be reported before and after the takings, this can be done, but the single figure must be shown as the *sum* of the two independent value opinions. Moreover, the appraiser must explain, when the sum is reported, that the total is the *mathematical sum* of two independent value opinions and does not (or at least may not) represent the value of the properties if sold as a single entity.

Although the courts seldom address the issue, the determination of the larger parcel can be important in cases that do not involve alleged damages or benefits. Because most legal treatises on eminent domain do not recognize this fact, they usually state that property owners often advocate for an expanded parcel (so as to claim damages to the remainder), while condemnors advocate for a more limited larger parcel (to limit the property subject to compensable damage), according to *Nichols*.[45] As the preceding discussion demonstrates, however, reducing the larger parcel can, in some circumstances, substantially increase an owner's claim of compensation.

The myth that the larger parcel determination is only important in damage or benefit cases is another myth that is easily refuted. An appraiser cannot know if an appraisal assignment involves the analysis of damages or benefits until the larger parcel is identified, analyzed, and appraised. To approach an appraisal with a predetermined conclusion about the presence or absence of damages or benefits would, without question, be unethical and in violation of USPAP.

## Notes

1. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §4.3.3, p. 110.
2. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., p. 110.
3. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., p. 110.
4. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.4.6, p. 24.
5. *O'Brien v. City of New York*, 32 A.D.2d 1059 (N.Y. 1969).
6. *United States v. Mattox*, 375 F.2d 461 (4th Cir. 1967).
7. *Baetjer v. United States*, 145 F.2d 391, 394-395 (1st Cir. 1944) *cert. denied* 325 U.S. 772 (1944).
8. *United States v. 7936.6 Acres of Land*. 69 F. Supp. 328 (P.R. 1947).
9. *Arkansas State Highway Commission v. Arkansas Real Estate Co.*, 471 S.W.2d 340 (Ark. 1971); *Sharp v. United States*, 191 U.S. 341 (1903).

10. *Federal Rules of Civil Procedure*, 71A(h).
11. *United States v. Reynolds*, 397 U.S. 14, 17 (1970).
12. *United States v. 320.0 Acres of Land, More or Less in Cty.*, 605 F.2d 762 (5th Cir. 1979); *United States v. 100 Acres of Land, Etc., Marin County, Cal.*, 468 F.2d 1261 (9th Cir. 1972), *cert. den.*, 414 U.S. 822 (1973); *United States v. 341.45 Acres of Land*, 633 F.2d 108 (8th Cir. 1980), *cert. denied* 451 U.S. 938 (1981).
13. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2010), vol. 4A, §14B.04[2].
14. *Commonwealth, Department of Highways v. Dennis*, 409 S.W.2d 292 (Ky. 1966); *United States v. 429.59 Acres of Land*, 612 F.2d 459 (9th Cir. 1980).
15. *County of Smith v. Labore*, 15 P. 577 (Kan. 1887).
16. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.3.4.2, pp. 113-114.
17. *United States v. Honolulu Plantation Co.*, 182 F.2d 172 (9th Cir. 1930) *cert. den.*, 340 U.S. 820 (1950) at 178, 179.
18. *United States v. 57.09 Acres of Land*, 706 F.2d 280, 281 (9th Cir. 1983).
19. *United States v. 429.59 Acres of Land*, 612 F.2d 459, 464 (9th Cir. 1980).
20. *Uniform Appraisal Standards for Federal Land Acquisitions*, §4.3.4.2, p. 114.
21. *State Highway Comm. v. Miller*, 155 N.W.2d 780 (S.D. 1968).
22. *County of Santa Clara v. Curtner*, 54 Cal. Rptr. 257 (Cal. 1966).
23. *People v. Hemmerling*, 58 Cal. Rptr. 203 (Cal. 1967) reversed on other grounds, *Hemmerling vs. Jombeau* 432 P.2d 697 (Cal. 1967).
24. *Baetjer v. United States*, 143 F.2d 391 (1st. Cir. 1944), *cert. denied* 323 U.S. 772 (1944).
25. *M.T.M. Realty Corp. v. State*, 261 N.Y.S.2d 815 (N.Y.1965); *United States v. 429.59 Acres of Land*, 612 F.2d 459 (9th Cir. 1980).
26. *Sams v. Redevelopment Authority*, 244 A.2d 779 (Pa. 1968).
27. *Baetjer v. United States*, 143 F.2d 391 (1st Cir. 1944), *cert. denied* 323 U.S. 772 (1944).
28. *United States v. Mattox*, 375 F.2d 461 (4th Cir. 1967).
29. *Cole Investment Co. v. United States*, 258 F.2d 203 (9th Cir. 1958).
30. *City of Washington v. Koch*, 456 S.W.2d 628 (Mo. 1970).
31. *Ives v. Kansas Turnpike Authority*, 334 P.2d 599, 407 (Kan. 1959).
32. *Barnes v. North Carolina State Highway Comm.*, 109 S.E. 2d 219 (N.C. 1959); *Baetjer v. United States*. 143 F.2d 391 (1st Cir. 1944), *cert. denied* 323 U.S. 772 (1944).
33. *Uniform Appraisal Standards for Federal Land Acquisitions*, §4.3.3.3, p. 115.
34. *Sasso v. Housing Authority of the City of Providence*, 111 A.2d 226, 230 (R.I. 1955).
35. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.3.4.3, p. 115.
36. *In re Appropriation For Highway Purpose*, 239 :N.E.2d 110, 115 (Ohio 1968).
37. *City of Tulsa v. Biles*, at 725, 726, quoting 2 *Nichols on Eminent Domain* (2nd ed.) 1170, §445.
38. *City of Harlingen v. Estate of Sharboneau*, 48 SW 3d 177 (2001).
39. In *Ramsey County v. Miller*, 316 NW 2d 917 (1982), the Minnesota Supreme Court ruled the development cost approach (subdivision development method) admissible in the state of Minnesota, but cautioned that "specific numerical, analytical and illustrative evidence supporting the development cost approach appraisal will be allowed only if the party introducing such evidence can lay a proper foundation to show that (a) the land is ripe for development; (b) the owner can reasonably expect to secure the necessary zoning and other permits required for the development to take place; and (c) the development will not take place at too remote a time."
40. *Palizzi v. City of Brighton*, 228 P.3d 957 (CO 2010)
41. Colorado Department of Transportation, *Right of Way Manual* (2016), §3.1.14, p. 14.
42. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.2.7.3.1, p. 16.
43. *The Appraisal of Real Estate*, 14th ed., (Chicago: Appraisal Insitute, 2013), 199.
44. *City of Buffalo v. Goldman*, 406 N.Y.S2d 407 (N.Y. 1978); *In re Elgart's Appeal*, 149 A.2d 641 (Pa. 1959).
45. *Nichols'*, vol. 4A, § 14B.03[2] (2010).

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

6

# Highest and Best Use

The analysis of highest and best use is at the heart of appraisals of the market value of real property.[1] This statement holds true in condemnation appraisal. The courts have long held that property acquired under the sovereign's power of eminent domain is to be valued in recognition of its highest and best use.[2]

Several different definitions of *highest and best use* have been developed. *The Dictionary of Real Estate Appraisal*, 6th ed., defines the term as follows:

> The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.[3]

*The Appraisal of Real Estate*, 14th ed., describes highest and best use as:

> Alternatively, the probable use of land or improved property—specific with respect to the user and timing of the use—that is adequately supported and results in the highest present value.[4]

In contrast, *Black's Law Dictionary*, 10th ed., gives a definition of the term that does not fit well with appraisal fundamentals, referring to *profit* rather than *economic productivity* or *value*:

> In the valuation of property, the use that will generate the most profit. This standard is used esp. to determine the fair market value of property subject to eminent domain.[5]

Older editions of *Black's* refer to *economic returns* rather than *profit* in the definition, but all those legal definitions tie the term to condemnation.

The Uniform Appraisal Standards for Federal Land Acquisitions cites the U.S. Supreme Court decision in *Olson v. United States* as the source of its definition of *highest and best use*:

> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.[6]

> Market analysis begins the process of narrowing the focus of the analysis from a broader macroeconomic view to data that is especially pertinent to the subject property. Highest and best use analysis relies on that analysis to then identify the most profitable, competitive use to which the subject property can be put.–*The Appraisal of Real Estate*, 14th ed., p. 331

When an appraisal involves a partial acquisition, the appraiser must make two separate and distinct highest and best use determinations. In determining the highest and best use of the property before the taking, any influences of the proposed public project are generally disregarded. To analyze the highest and best use of the property as though the taking has occurred (i.e., the after situation) is often more difficult because it is necessary to study the effects of the proposed public project—e.g., zoning changes that the project precipitates and general changes in the market area. Appraisers must realize that after the taking an entirely new real estate environment may be created by the project and thus a completely new study starting with analysis of the remainder is required.

The analysis of the property's highest and best use, presuming the taking has occurred, is a fully independent study of the property, not a modification of the study of the property's highest and best use in the before situation. If an appraiser does not determine the property's highest and best use correctly in both the before and after situations, it will be impossible to analyze the property's pre- and post-taking values competently.

According to the US Supreme Court in *Olson v. United States*,

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.[7]

This ruling falls in line with any highest and best use of the property as any alternative, including the continuation of the current use, must be supported with recognized methods and not just stated or assumed.

## The Economic Foundation of Highest and Best Use Analysis

The analysis of highest and best use can be thought of as the logical end of a spectrum of market analysis procedures, running from the macroeconomic overview of a general market study, through the more detailed marketability studies and analyses of financial feasibility, to the formal analysis of highest and best use.[8]

The six-step process of a marketability study is the foundation of highest and best use as it is applied to each reasonably probable alternative market segment the property is most likely to serve. The alternatives' economic demand (capture) resulting from the six-step process of market and marketability analysis then goes into the seventh step in highest and best use analysis—the financial analysis of alternatives—to determine which alternative provides the highest present value. The eighth step in highest and best use analysis is the study conclusion, sometimes called the *maximally productive analysis*, to determine which

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

alternative use of this property is most profitable at the least risk. The conclusion of the eighth step is then reported in the three-part highest and best use conclusion:

- use
- timing
- market participants:
  - most probable users of real estate space
  - most probable buyer type (e.g., owner-operator, investor, developer)

Traditionally, appraisers have emphasized the physical use in the conclusion of highest and best use, but all three considerations are necessary to identify the highest and best use fully.[9] The complete study process for the determination of highest and best use is illustrated in Figure 6.1. The elements of the six-step marketability study (Steps 1 to 6) provide the data required for the traditional four tests of highest and best use analysis (Steps 7 and 8).

**Figure 6.1 Alternative Use Scoping (Determining Reasonably Probable Alternatives to Study)**

**Step 1: Property Productivity Analysis**

What uses are probable for the property based on the property's physical, legal, and locational attributes?

In answering this question, Steps 2 to 7 are repeated for each alternative use.

**Step 2: Market Delineation**

Who are the potential typical users or likely purchasers of the property for each alternative use?

**Step 3: Demand Analysis**

Is each alternative use needed?

***Economic Demand for Each Use Generator***

- Population → Households → Housing Units
- Income → Effective Buying Power → Retail Square Feet
- Jobs → % Use Office → Office Square Feet

**Step 4: Supply Analysis**

What is the competition for each alternative use, and how much competition exists?

**Step 5: Market Equilibrium Analysis**

When will this market require new construction for each alternative use?

**Step 6: Capture Analysis**

How much of this market can the subject capture for each alternative use?

- Are the property's attributes competitive?
- Is the location competitive?
- How much of the demand can be captured?
- How much is the land worth for each alternative, and how much rent can be charged?

**Step 7: Highest and Best Use Financial Analysis**

Which alternative use is worth the most?

**Step 8: Highest and Best Use Reconciliation**

Given all the market and subject risk, which data are judged the most reliable to realize the goal of choosing the alternative that provides the best economic fit to the market, i.e., which is the highest and best use?

Source: Stephen Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014), 483.

## The Four Tests of Highest and Best Use

A property must meet four tests before its highest and best use can be determined. The use must be physically possible, legally permissible, financially feasible, and maximally productive (i.e., create the highest economic value).

While the four criteria are interrelated, the tests are often applied sequentially. The tests of physical possibility and legal permissibility are usually applied before the tests of financial feasibility and maximum profitability. These two tests usually eliminate the most uses, so they are typically applied first. While there is no law, regulation, or requirement that they must be applied first, there is little to be learned from analyzing the financial feasibility of an illegal or physically impossible use.

Land use regulations play an important role in an appraiser's determination of a highest and best use. An appraiser cannot, of course, reach a conclusion of a highest and best use that is illegal under applicable land use regulations unless there is a reasonable probability that the regulations will be changed to allow this use within the foreseeable future. The effect of land use regulations on highest and best use, and on the value of property, is discussed in detail in Chapter 7.

When there is a reasonable probability that zoning for a more intensive use can be obtained, the value of the property will reflect that probability. However, the value will still be less than an equivalent property that already carries that zoning because a buyer will recognize the time and cost of pursuing a change of zoning. Decisions on zoning ordinances are made by elected officials, and the processes are often heavily contested, costly, and time-consuming. Depending on the nature of the zoning request, detailed engineering and land use studies may be required. Zoning approval may also be contingent on exactions, i.e., the requirement imposed by local government that a developer contribute to the community by providing an amenity, paying an impact fee, or making some other monetary contribution as a condition for the right to construct a development. The outcomes are not known until official actions are taken. The probability of a zoning change is never 100%, which presents appraisers with two challenges:

1. to determine whether market participants will pay a premium over the property's current value as zoned in anticipation of a potential zoning change and
2. to provide support for that conclusion.

It is difficult to pinpoint the current value reflecting the likelihood that the zoning change will be obtained because properties are less frequently purchased by buyers willing to take the risk. Many pending sales never close because they are subject to rezoning that could not be obtained within the developer's desired time frame or could not be obtained at all.[10] The language in some court rulings can lead to the erroneous idea that it is proper to value a property as if it was already rezoned, as long as the change is reasonably probable. A high probability of a zoning change should be analyzed just like any other property feature, but valuing a property as though the zoning change is a certainty but claiming that the appraisal is based on an "assumption" that the zoning will likely change is improper practice.

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

## Relationship of Marketability Analysis to the Traditional Four Tests of Highest and Best Use

The information gathered for the property productivity analysis and supply and demand analysis steps of marketability analysis provide the necessary information to perform the four tests of highest and best use analysis. The financial analysis of that marketability analysis then leads to the highest and best use conclusions specified in terms of (a) use, (b) timing, and (c) market participants.




Source: Stephen F. Fanning, *Market Analysis for Real Estate*, 2nd ed. (Chicago: Appraisal Institute, 2014), 493.

No matter how large the market demand is for a potential use for the subject property, the competition for this demand must also be analyzed in highest and best use analysis. "Market demand is not infinite," according to *The Appraisal of Real Estate*, 14th ed. "Even though the subject may be physically and locationally suited for a use, better-located sites may satisfy the market demand for that use completely before the subject can realize its development potential." (p. 336)

The physical factors considered by appraisers in the highest and best use analysis of a parcel being appraised for eminent domain purposes are no different than those that would be considered in any other appraisal assignment. For example, parcel size, shape, the availability of utilities, topography, soils, access, and environmental influences (e.g., floodplain areas, frost damage in agricultural areas) all must be studied to assess the physical adaptability of a property to its legally allowable uses.

Once an appraiser has identified those uses of the land that are legally permissible and physically possible, the test of financial feasibility is applied.

## Highest and Best Use As Vacant and As Improved

The highest and best use of land as though vacant and the highest and best use of the property as improved are connected but distinctly different concepts. The analysis of land as though vacant focuses on alternative uses, with appraisers testing each reasonably probable use for legal permissibility, physical possibility, financial feasibility, and maximum productivity. In contrast, when appraisers apply the four tests in the analysis of the property as improved, the focus on alternative uses considers three possible actions related to the current improvements:

1. Retain the improvements.
2. Modify the improvements in some way, such as conversion, renovation, or alteration.
3. Demolish the improvements and redevelop the land.[11]

A tract of land considered as though vacant may have a highest and best use different from that of the whole property as improved. Suppose an appraiser has developed the following conclusions after investigating and analyzing the property depicted in Figure 6.2:

| | |
|---|---|
| Highest and best use of site, as if vacant multifamily | |
| Before value of site (12,000 sq. ft.) as if vacant: $9.00 per sq. ft. | $108,000 |
| After value of site (11,000 sq. ft.) as if vacant: $9.00 per sq. ft. | $99,000 |
| Highest and best use of property, as improved | single-family |
| Before value of property, as improved | $357,000 |
| After value of property, as improved | $354,000 |

If the appraiser were allowed to report and testify only on the value conclusions before and after, no problems would arise. The conclusions would be simply:

| | |
|---|---|
| Before value | $357,000 |
| After value | – 354,000 |
| Difference between before and after values | $3,000 |

However, appraisers are seldom allowed to report on or testify to only the conclusions, particularly when an experienced and knowledgeable attorney is conducting a cross-examination. "When a witness, having qualified, gives his opinion as to the value of the land sought to be condemned, he may properly give his

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

reasons upon direct examination for his conclusions," according to a California court. "As the element of highest and best use is an important factor to be considered in reaching a conclusion in respect to value it would seem clear that one who is entitled to give an opinion as to the value of real property should necessarily be in a position to give an opinion also with respect to its highest and best use."[12]

**Figure 6.2 Highest and Best Use As If Vacant**




## All Available Uses

In the analysis of highest and best use, the concept of "all available uses" does not generally include the use for which a property is being condemned. In other words, the market value of the land taken is what is analyzed, not the value of the land to the condemning authority. This distinction is illustrated by a case in which the government condemned land to improve and maintain a natural earthen dam. The property owner did not prevail when he claimed that his land was worth a substantial sum because it dammed a lake created by the eruption of Mt. St. Helens, thereby preventing the flooding of communities downstream.

It has been suggested that lands being acquired by the government and conservation groups must have a highest and best use for preservation purposes. If not, why would the government acquire them? There are many problems with this logic. First, the term *value*, as used in the context of eminent domain, must be capable of quantification in money. Second, the preservation of land falls outside the scope of the definition of *highest and best use* used by the courts, which requires an economic use. As explained earlier, the U.S. Supreme Court defined *highest and best use* for eminent domain valuation purposes as "the highest and *most profitable* use for which the property is adaptable and needed or likely to be needed in the reasonably near future."[13]

The entities participating in the market for lands acquired for preservation purposes include public agencies at all levels of government, environmental or conservation organizations like The Nature Conservancy and The Trust for Public Lands, and smaller land trusts. The market for sites purchased for open space and preservation purposes may lack the multiple bidders and competitive characteristics that are typically associated with other real estate markets. For example, The Nature Conservancy, The Trust for Public Lands, and the U.S. Fish and Wildlife Service may not be actively bidding against one another. It can be argued that these institutions are not competitors but are "acting with a common purpose."[14] In fact, conservation groups may prefer a government acquisition of the lands, and many groups actually acquire these lands for the sole purpose of holding them until a governmental agency can procure funding and buy the lands from the conservation group at its cost. These transactions thus may not meet the criteria for an open-market transaction reflecting market value. They may instead resemble a bilateral monopoly (i.e., only one seller and one buyer).

Neither government agencies nor conservation groups base their purchase price of a property on its value for preservation purposes. The price is based on the highest and best *economic* use of the property. Therefore, although the property was purchased for preservation purposes, the price paid was based on the *economic* value of the property, not some esoteric noneconomic or non-use value, which the courts have shown no inclination to accept in the context of eminent domain. According to *Nichols*,

> The very purpose of reserving in the people the power of eminent domain is to prevent an owner of a site especially available for a public work [*e.g.*, preservation], but not of great value for other purposes, from trading upon the necessities of the public when it is sought to acquire his land for public use, and from compelling the public to pay for his land whatever figure he may name, and it seems clear that the owner has no such power."[15]

For these reasons, appraisers must reject a highest and best use for preservation or conservation unless or until there is clear evidence that a competitive private market exists for this class of lands, i.e., an economic highest and best use of the land.

This prohibition does not preclude a highest and best use of "mitigation lands," which are typically lands that have suffered from environmental degradation and are purchased and environmentally restored in return for "mitigation credits" on other lands to be developed. In some parts of the country, most notably California, an active private market exists for these lands. Nor does the prohibition exclude a highest and best use as a private hunting preserve, a duck club, or the like because, again, an active private market for these lands exists in some regions.

## Consistent Use Theory

Consistent use is the concept that "land cannot be valued based on one use while improvements are valued based on another."[16] The consistent use theory seems straightforward but is often misapplied when the cost approach is used. Consider once again the property shown in Figure 6.2. In this situation, it would be a violation of the consistent use theory for an appraiser to value the land for multifamily purposes and then value the improvements for single-family purposes without deducting the functional obsolescence present in the dwelling.

This error can be carried through to the sales comparison approach by analyzing comparable sales improperly. For example, suppose an appraiser has valued the subject land for multifamily purposes at $36,000 and then makes the following (flawed) analysis of the sale of a comparable dwelling on a single-unit residential site:

| | |
|---|---|
| Sale price | $130,000 |
| Land value (12,000 sq. ft. @ $1.00) | – 12,000 |
| Value of improvements | $118,000 |
| Value of on-site improvements | – 3,500 |
| Value of dwelling | $114,500 |

The appraiser then compares the subject property to the sale property as follows:

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

| | | |
|---|---|---|
| Land—subject is superior ($36,000 – $12,000) | + | $24,000 |
| On-site improvements—subject property is inferior ($3,500 – $1,500) | – | 2,000 |
| Dwelling—properties are physically equal | | 0 |
| Net adjustment | + | $22,000 |
| Sale price of comparable property | + | 130,000 |
| Indicated value of subject property | | $152,000 |

Note that a substantial error results when the consistent use theory is misapplied by valuing land for multifamily purposes and improvements for single-family purposes. A New York court addressed a similar situation when it said the following:

> The claimant was awarded $55,500 for the entire taking of her property. It was conceded that the highest and best use for this property was commercial. At the time of the appropriation there was a dwelling house and combination garage and work shop on the property. The trial court awarded $40,850 as the market value of the land and $14,700 for the value of the buildings. The expert for the claimant as well as the State testified the buildings would of necessity have to be removed from the property to permit its use for commercial purposes. It was error, therefore, to award anything for the value of the buildings while at the same time fixing the land value for commercial usage since the two bases [*sic*] are entirely inconsistent. Under the facts here the commercial value of the land was in no way enhanced by the value of the buildings.[17] [Citations omitted]

Although it is relatively easy for appraisers to understand and properly apply the consistent use theory, it is often difficult to explain its application persuasively to a jury. It may be difficult for the average person to accept the fact that a large, well-kept single-family dwelling has no value, particularly when the property owner is living in the house and had no intention of tearing it down and constructing a commercial building.

Although it is a violation of the consistent use theory to value a parcel for two uses that are mutually exclusive, it is permissible to value a parcel for two uses that are not incompatible and can take place simultaneously. For example, a potato farm that attracts a great number of waterfowl can have a highest and best use for both farming and recreational hunting because neither use is necessarily mutually exclusive.

The consistent use theory was discussed in relation to the valuation of mineral deposits and timberland in Chapter 4.

## Interim Use

An *interim use*, which is also referred to as a *transitional use*, is the "temporary use to which a site or improved property is put until a different use becomes maximally productive."[18] Developing a property to its ultimate highest and best use may be inadvisable at the time of the appraisal because of market conditions or other factors, such as the unavailability of mortgage money. The property owner can choose to either let the property lie fallow until it is ripe for development to its ultimate highest and best use, or put it to an interim use and at least receive some benefit from the property until its ultimate highest and best use is realized. A complete highest and best use conclusion must include an opinion as to the proper timing of the use. There are not two highest and best use conclu-

sions. An interim use is not in itself a highest and best use. Rather, an interim use is part of a highest and best use. An example of an interim use would be the use of potential subdivision land for agricultural purposes.

Courts have ruled that such an analysis is proper. For example, an Arkansas court said the following:

> In the case at bar, witness Barnes substantiated his estimates with competent testimony as to the value, nature and use of the property as a dairy farm and also . . . sufficiently demonstrated an increasing demand for the property as a residential development site. Certainly a future purchaser of the Wallace property might well desire to continue the interim use of the dairy operation to offset any costs and interest charges that might exist during the piece-meal process of a housing development. There is nothing incompatible about or inconsistent in these two uses of the property.[19]

In arriving at a conclusion of highest and best use, an appraiser must consider the concept of "reasonable probability." If the amount of time between the effective date of the appraisal and the time when the property is expected to reach its ultimate highest and best use is too great, an appraiser's conclusion of highest and best use becomes speculative.

## Positive and Negative Project Influence

A pending condemnation action may have a positive or negative effect on the market value of a property. A diminution in market value was once called *condemnation blight*, and an increase in market value was once known as *project enhancement*. Now those conditions are more accurately labeled *negative* and *positive project influence*.

As a general rule, appraisers cannot properly consider either of these factors in the before situation when analyzing highest and best use or value. "The Supreme Court has ruled that in fairness, the United States cannot be charged for value it created in constructing the government project for which the property is being acquired," according to the Uniform Appraisal Standards for Federal Land Acquisitions. "Similarly, an owner cannot be penalized for any diminution in value due to that very government project."[20]

The Uniform Relocation Assistance and Real Property Acquisition Policy Act states, "Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property."[21]

Negative project influence most often occurs when public projects are announced, long before property acquisition begins, or when the acquisition program is not completed in a timely manner. Urban renewal projects are a classic example. Once an urban renewal project is announced, tenants tend to vacate buildings, vacancy rates escalate, property maintenance is often ignored, and vandalism tends to increase. These factors have a depressing effect on property values within the area. All of these conditions, except for physical deterioration within the reasonable control of the owner, must be disregarded by appraisers while analyzing the property's highest and best use and its market value.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

The owner of a property located within a designated urban renewal area is well advised to retain the services of an appraiser well before the actual appraisal will be required. If this is done, the appraiser can analyze and inspect the property and neighborhood before the negative impact of the urban renewal designation has had a chance to distort the actual before situation. Negative project influence can be so severe at times that property owners may claim a *de facto taking*.

A New York court described the distinction between *condemnation blight* and a *de facto taking* as follows:

> The concept of a de facto appropriation is limited to situations in which there has been a *direct* invasion by the condemning authority upon the property of the condemnee or some *direct* legal restraint upon the use of such property. Condemnation blight, on the other hand, properly refers to the diminution in value of the property of the condemnee, caused by acts of the condemning authority between the time of the announcement of the projected taking and the *de jure* vesting of title.[22] [Citations omitted]

The distinction between these terms is important to appraisers because the effective date of value is affected. If a de facto taking has occurred, the effective date of value is typically the date of the de facto taking, and interest must usually be paid on the condemnation award from the date of the de facto taking to the date the award is received by the condemnee. If only condemnation blight (i.e., negative project influence) has occurred, the valuation date is usually the date of the complaint, the date a deposit was made, or the date of the trial, and appraisers ignore any diminution in value caused by the proposed public improvement. To assume a de facto taking, appraisers must have adequately supported written legal instructions from legal counsel. Because of the complex distinction between a condemnation blight case and a de facto taking case, and the significant implications involved, legal counsel will often request a dual-premise appraisal, one assuming a de facto taking and one assuming negative project influence.

Positive project influence can also have a dramatic effect on property values. Zoning may be changed as a consequence of a pending public project or to accommodate a pending public project, which will require all or part of the rezoned property to be acquired. An appraiser must decide whether or not the property in question was rezoned because of the pending project. This determination will have a substantial impact on an appraiser's conclusion of highest and best use and opinion of market value in the before situation, the after situation, or both.

If the rezoning is a result of a proposed public project, under the premise of positive project influence, appraisers must ignore the rezoning in the before situation. On the other hand, if the appraiser concludes that the property would have been rezoned anyway, the conclusion of highest and best use in both the before and after situations should be made considering the rezoning. The proper treatment of this appraisal problem is demonstrated in the next chapter.

A classic example of positive project influence is a property that contains a gravel deposit. Before the announcement of a road project requiring acquisition of the property for right-of-way purposes, there was no foreseeable market demand for the gravel. However, the pending project will create a demand for

the material, and the condemnor's contractor may, in fact, use the gravel for construction of the new roadway. Nevertheless, an appraiser must not consider the demand for the gravel in the before situation because the demand was created by the project itself and is therefore positive project influence.

## Scope of the Project Rule

In addressing project influence, as well as highest and best use and value, appraisers must adhere to the scope of the project rule in assignments subject to the Uniform Appraisal Standards for Federal Land Acquisitions. The scope of the project rule essentially holds that the effects of a proposed public project *cannot* be considered in valuing a property to be acquired for the project when it was clear that the parcel under appraisal would, or probably would, be acquired in whole or in part for the project. Conversely, the effects of a project on a parcel under appraisal *must* be considered when the parcel was not included in the area to be acquired for the initial project, but the project is later expanded to include acquisition of the parcel in whole or in part for the expanded project. The scope of the project rule can best be demonstrated by analysis of an actual case.

*United States v. Miller* concerned the construction of the Shasta Dam and Reservoir in northern California.[23] Congress authorized the project in 1937, and property values escalated in the proximity of the proposed project. Alternative routes for the relocation of a railroad right of way that would be flooded by construction of the dam and reservoir were surveyed and staked in 1936. One of these routes passed through the Miller property. The federal district court ruled that the appraisers had to analyze the value of the property excluding any enhancement in value from the proposed public project after its date of authorization in 1937. The Supreme Court upheld the lower court, stating the following:

> If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken. . . .
>
> The question then is whether the respondent's lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. . . .
>
> If [the lands] were within the area where they were likely to be taken for the project, but might not be, the owners were not entitled, if [the lands] were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable by reason of their proximity to the land taken.[24]

Application of the scope of the project rule can be difficult. The two most problematic questions that arise are as follows:

- When was the government committed to the project?

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

- Was it probable that the parcel under appraisal would be acquired, in whole or in part, for the project?

The U.S. Supreme Court court stated the following:

> As with any test that deals in probabilities, its application to any particular set of facts requires discriminating judgment. The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use.[25]

In the same case, it was noted at page 18 of the ruling that in the federal courts "it is for the judge and not the jury to decide whether the property condemned was probably within the project's original scope." Thus, it may be advisable to obtain a ruling from the court in this regard prior to trial. According to the Uniform Appraisal Standards for Federal Land Acquisitions, "Because the scope of the project rule involves interrelated factual and legal questions, the valuer must request appropriate legal instruction if there is evidence the government's project affected the market value of the property being appraised."[26]

It is also possible that a property under appraisal could be subject to two takings at, or near, the same time for two different projects or for different elements of a joint project. For example, consider the situation depicted in Figure 6.3. Taking A is for the construction of a dam and reservoir, which will flood the state highway that serves much of the remainder property. This acquisition is being funded by the state. Taking B is for the construction of a new highway. The acquisition of property for this new highway right of way is being funded by the federal government. The acquisitions for both projects will be made by the state. From an appraiser's perspective, the most practical approach to this valuation problem would be to treat the two projects as one. This, however, would require agreement between the condemnee and the condemnor, which is not always possible. Even if such an agreement can be reached, it may be necessary for the appraisers, or at least the condemnor's appraiser, to allocate the total compensation between the two projects because of their different funding.

Even if the two projects must be viewed independently, the appraiser's approach to the appraisal problem must not be unreasonable. In this case, it would not be reasonable to develop an opinion of the value of the property

**Figure 6.3 Simultaneous Takings**



remaining after Taking A as if the remainder would be without access forever. Nor would it be reasonable to claim that the value of the taking and damages caused by Taking B would be totally offset by the benefits of the new highway because, without the new highway, the property would have inadequate access. The only reasonable approach would be for the appraiser, when valuing the property in conjunction with Taking A, to analyze the property's after value considering the *probability* that Taking B will occur and that the new highway will be constructed. While appraising the property in conjunction with Taking B, the appraiser would analyze the after value of the remainder considering the *probability* of Taking A and the probable construction of the dam and reservoir. If the probability of both projects coming to fruition is at, or near, 100%, there would be little or no difference in the total compensation due the owner if the projects were treated as one consolidated project or two separate projects.

In such a situation, a determination must be made as to which of the two takings will occur first. The dates of takings for the two projects, if they differ, will decide this matter. If the two takings are simultaneous, an appraiser will have to determine which is to be considered first. When an appraiser has been retained by the condemnor, it is probable that the condemnor will instruct the appraiser as to which taking to consider first. For instance, if it is found that the remainder area identified in Figure 6.3 as "isolated lands" is damaged due to the isolation, the condemnor (the state) would probably instruct its appraiser to treat Taking B as the second taking. Then the damages attributable to the isolation would be chargeable against Taking B, which is being funded by the federal government, rather than against the acquisition cost of Taking A, which is state funded.

There is some precedence for this approach. In 1978, the Washington Metropolitan Area Transit Authority (WMATA), as part of its expansion of the Washington area subway system, decided that it would acquire land from Old Georgetown for the construction of a parking lot to serve transit system users. As a part of that decision, Montgomery County agreed to extend roads into the parking lot. These road extensions required the acquisition of a portion of Old Georgetown's property. The county acquired the new right of way from Old Georgetown by negotiation. The remainder of Old Georgetown's property was split into three tracts by the county's acquisitions. When WMATA condemned 2.52 acres of Old Georgetown's property, WMATA claimed that compensation for the taking was nominal because the remainder of Old Georgetown's property was specially benefitted by its proximity to the transit facility. Old Georgetown claimed that the 2.52 acres formed a separate larger parcel because it was severed from the balance of its ownership by the rights of way acquired by the county, and there was no contiguity or unity of use between the parcels. The Fourth Circuit Court found that the entire ownership constituted a single larger parcel, stating the following:

> We think that the impact of the planned road extensions should not be taken into account, and therefore that there is a potential unity of use between the taken land and the retained land. If, with no advance warning, the same governmental entity has simultaneously condemned both the 2.6 acres needed for the rights-of-way for the planned road extensions and the 2.52 acres needed for the parking lot, there would be no doubt that the compensation should be reduced by the amount of the special benefit to be conferred, and increased by

Copyrighted material licensed to Randall Bell, PhD on November 20, 2015

> the amount of the damage to be inflicted, by the taking on the land retained by the landowner. We think for practical purposes that this is that case. Both takings—the taking of land for the rights-of-way, achieved by purchase rather than condemnation, and the taking for the parking lot—were for the same basic purpose—the extension of the Washington mass transit system into the surrounding area in Maryland. The final decisions to take both were reached contemporaneously, if not simultaneously, in 1978. Both takings were contemporaneous with each other. The only distinction between this case and that posited is that in the instant case, the acquiring authorities were two separate governmental entities. Yet they were working in a cooperative effort to accomplish a single objective so that we think the distinction is without real difference. Stated otherwise, we do not think that there should be a different result in the present case simply because it was necessary that the mass transit project be undertaken by an alliance of various governmental entities formulating, announcing and carrying out their plans at different speeds.[27]

## Highest and Best Use Conclusions

Appraisal reports may have only a "boiler plate" overview of the region, city, and neighborhood, then define the four tests, and finally, based on a leap of faith, give the appraiser's conclusion of the subject property's highest and best use. There is no economic demand analysis, no analysis of the functional capacity of the subject improvements for current or alternative uses, no analysis of alternative uses of the land as if vacant, and no financial analysis of alternative uses.

This type of general description is usually not sufficient for most condemnation appraisals unless the general data is then segmented down to the specific submarket and the subject property itself. According to *The Appraisal of Real Estate*, "Just providing data is not addressing highest and best use—the data must be analyzed."[28]

### Market Support for Highest and Best Use Conclusions

Standards Rule 1-3 of USPAP requires some level of specific economic demand analysis in all appraisals to support the highest and best use of the subject property. Many appraisal reports omit location, economic demand, and competition analysis in the discussion of highest and best use. The discussion of the region, city, and neighborhood often lacks an economic demand study specific to the subject property.

It might be argued that the comparable sales presented in the application of the sales comparison approach illustrate economic demand. However, in highest and best use analysis, a marketability study of economic supply and demand is required before selection of comparables because the marketability study serves as the economic basis of highest and best use and the three approaches to value. *The Appraisal of Real Estate*, 14th ed., says, "An existing or proposed improvement under a specified use may be put to the test of maximum productivity only after it has been demonstrated that an appropriate level of market support exists for that use."[29]

### Three Components of the Highest and Best Use Conclusion

The three-part highest and best use conclusion—(1) use, (2) timing, and (3) market participants, i.e., users and most probable buyers—is important information because the three components provide the bases for comparable sales

selection and adjustments, for income forecasting, and for the estimation of functional and economic obsolescence in the cost approach. Many appraisal reports simply state conclusions such as the following:

- The highest and best use is retail.
- The highest and best use is retail when demand warrants.
- The highest and best use is continued operation as currently improved.

All of these statements and similar statements are inadequate conclusions of highest and best use, lacking reference to the three essential components of a conclusion of highest and best use. "Traditionally, valuers have emphasized the physical use in the conclusion of highest and best use, but all three considerations are necessary to identify the highest and best use fully," according to *The Appraisal of Real Estate*.[30] All elements of the three-part conclusion are important, but one of the most crucial elements—timing—is typically not considered at all in many deficient condemnation appraisals.

## Notes

1. *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 332.
2. *Mississippi and Rum River Boom Co. v. Patterson*, 98 U.S. 403 (1879).
3. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v., "highest and best use."
4. *The Appraisal of Real Estate*, 14th ed., 333.
5. *Black's Law Dictionary*, 10th ed., (St. Paul, MN: Thomson Reuters, 2014), s.v. "highest and best use."
6. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §4.3, p.101, citing *Olson v. United States*, 292 U.S. 246, 255 (1934).
7. *Olson v. United States*, 292 U.S. 246, 257 (1934).
8. *The Appraisal of Real Estate*, 14th ed., 332.
9. *The Appraisal of Real Estate*, 14th ed., 356.
10. *The Appraisal of Real Estate*, 14th ed., 339.
11. *The Appraisal of Real Estate*,14th ed., 336-337
12. *People v. Alexander*, 27 Cal. Rptr. 720, 723 (Cal. 1963).
13. *Olson v. United States*, 292 U.S. 246, 255 (1934) (emphasis added).
14. Parker Reynolds. "Letters to the Editor," *The Appraisal Journal* (July 1992): 438.
15. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2009). vol. 4. §12B.16.
16. *The Appraisal of Real Estate*, 14th ed., 345; *The Dictionary of Real Estate Appraisal*, 6th ed., s.v., "consistent use."
17. *Spano v. State of New York*, 253 N.Y.S.2d 730, 730-731 (N.Y. 1964).
18. *The Dictionary of Real Estate Appraisal*, 6th ed., s.v. "interim use."
19. *Arkansas State Highway Commission v. Wallace*, 459 S.W.2d 812, 814 (Ark. 1970).
20. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.5, 145.
21. Uniform Relocation Assistance and Real Property Acquisition Policy Act of 1970 (P.L. 91-646) §4651 (3).
22. *Beaux Arts Prop., Inc. v. United Nations Dev. Corp.*, 328 N.Y.S.2d 16, 22 (N.Y. 1972).
23. *United States v. Miller*, 317 U.S. 369 (1943).
24. *United States v. Miller*, at 376-377, 379.
25. *United States v. Reynolds*, 397 U.S. 14, 18 (1970).
26. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.2.7.3.3, p. 17.
27. *Washington Metropolitan Area v. One Parcel of Land*, 691 F.2d 702, 705 (4th Cir. 1982).
28. *The Appraisal of Real Estate*, 14th ed., 358.
29. *The Appraisal of Real Estate*, 14th ed., 300.
30. *The Appraisal of Real Estate*, 14th ed., 356.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

7

# Land Use Regulations

A property's highest and best use must be a *legal use*, so zoning and other land use regulations are of utmost importance in determining highest and best use and developing an opinion of value. Market value is not inherent in the tangible real estate. Value is created by utility, scarcity, demand, and effective purchasing power, all of which are influenced by zoning and other land use regulations. It is imperative that appraisers be completely familiar with the applicable land use regulations and their influence on the utility—and therefore value—of the property being appraised. Land use regulations are part of the sovereign's police power, and the number and scope of those regulations have generally increased over time. Some common land use regulations include the following:

- comprehensive plans (or master plans, general plans, or city plans)
- zoning ordinances
- building codes, including structural codes, energy codes, fire codes, electrical codes, plumbing codes, health codes, and earthquake codes
- off-street parking ordinances
- mining regulations
- development moratoriums
- environmental impact statement or report regulations
- shorelines management ordinances
- floodplain management ordinances
- subdivision (platting) ordinances
- short plat ordinances
- open space ordinances
- rent controls
- timber harvesting controls

- air, water, and noise pollution controls
- wetlands regulations
- endangered species regulations
- slope ordinances
- solid waste ordinances
- inclusionary housing regulations
- resilience requirements
- green infrastructure regulations
- green building ordinances
- sea level rise mitigation requirements
- on-site energy generation requirements
- transportation demand management plans
- additional layers of private land use controls such as part of subdivision plats and deed restrictions

An investigation of current entitlements may include a review of subdivision or parcel maps, building permit records, variances, conditional or special use permits, title documents, and other records.

Some jurisdictions have ruled that a land use designated in a comprehensive plan takes precedence over the land use designated in a zoning ordinance if there is a conflict between the two. Historically, however, comprehensive plans have been considered long-range planning tools rather than enforceable ordinances. Some municipalities have denied development permits based on their comprehensive plans, even though those municipalities have no ordinances to implement the plan.

Developers have adopted tactics for managing the risk and uncertainty of the entitlement process. For example, a buyer and seller may agree to a price with escrow to close at some point in the future when all development entitlements, or some specified level such as a final map for a residential, industrial, or commercial subdivision, are recorded. Thus, the purchaser incurs no risk relating to when entitlements will be available or if the entitlements will be available at all—time, expense, and foregone alternative opportunities notwithstanding. But a property being appraised for eminent domain purposes may lack a similar level of development entitlements (e.g., some but not all entitlements in place) and therefore may be in a different economic position than the typical sale property. The highest and best use of competing properties should be carefully analyzed to determine if transactions can in fact be credibly adjusted for the entitlement status or if the difference in economic condition, or market conditions due to time elapsed, is too great. Some transactions may in fact be more like a purchase option agreement rather than a bona fide sale transaction.

Due to the complexity of the development permit process, some investors and developers who acquire raw land by purchase or option will pursue and complete all necessary development entitlements and then resell the land. They make a profit not on the actual development but on the incremental value produced by the existence of the entitlements.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

Each additional permit and approval required to develop a tract of land to its physical and economic highest and best use increases the risk that the land cannot be developed for that use. Potential purchasers in the marketplace consider this added risk in determining the price they are willing to pay for the land. When the risk increases, potential purchasers require a greater return, which often results in a diminution of unentitled land value. The land's physical limitations are set by nature, but land use regulations are dynamic and are affected by social, legal, and political influences over time. In some cases, regulations that define the legally permitted uses of property may seem to lack an obvious rational basis in legal or appraisal theory. Nonetheless, the existing land use regulations remain the legal limitations, within which the real estate market must function and within which appraisers must value property. "The concept of highest and best use is applicable in determining fair market value in appropriation cases," according to an Ohio court. "It is not a concept to be considered in determining the constitutionality of a zoning ordinance."[1]

Property rights advocates have made some inroads against the overregulation of land use. However, it has generally been held that a condemnation trial is not the proper forum for challenging a land use regulation.[2] As will be discussed in Chapter 16, these sorts of legal challenges are generally conducted by separate action.

## Legally Nonconforming Use

Some properties are classified as legally nonconforming uses under existing zoning. This situation can result when the improvement of a property predates the applicable zoning ordinance or when the ordinance has been changed since the improvements were constructed. A *nonconforming use* is defined as follows:

> Land use that is impermissible under current zoning restrictions but that is allowed because the use existed lawfully before the restrictions took effect.[3]

Zoning nonconformity may have a detrimental or beneficial effect on a property's market value. If a nonconforming use exists on the property being appraised, a valuer must extensively investigate and analyze the specific ordinance provisions governing nonconforming uses and determine how the nonconformity may or may not affect the market value of the property.

Some zoning ordinances require that a nonconforming use be terminated when the property is sold or transferred. Others preclude the use of the property for a nonconforming activity if it has been vacant for a specific period of time—e.g., one year. Some ordinances preclude the enlargement or repair of a nonconforming use and may not allow the improvement to be rebuilt if it is even partially destroyed by a disaster such as a fire or flood. For example, in some jurisdictions the owner of a property valued at $100,000 would be unable to restore the improvement if it were 50% destroyed by fire. The owner might receive an insurance settlement for the physical loss sustained but would not be able to recover the additional loss of market value. A provision that forbids the repair or structural alteration of nonconforming improvements will often decrease the remaining economic life of the improvements. Some ordinances provide for an automatic phasing out, or amortization, of nonconforming uses, which establishes the maximum economic life of the nonconforming use.[4]

Apppraisers must analyze these factors to determine whether they have any effect on the market value of the nonconforming property being appraised. In verifying sales of nonconforming properties, it is important for appraisers to establish whether the buyer was aware of the nonconformity at the time of purchase and, if so, whether the buyer understood the implications of the nonconformity. If a value penalty or benefit due to the nonconformity is reflected in the market, an appraiser must account for it in the opinion of value.[5] If, on the other hand, market analysis indicates that no change in market value can be attributed to the nonconformity, appraisers must report this fact too. If the appraiser believes there should be a differential, the appraiser must provide the rationale in the form of data and analysis.

In addition to determining whether a nonconforming use exists prior to an acquisition by a condemning authority, appraisers should recognize that a partial acquisition may result in the remainder property becoming a nonconforming use. If this is the case, appraisers must make the same type of investigation and analysis outlined above in the after situation. The definition of nonconforming use presented earlier relates only to uses that predate the zoning ordinance, not to uses that became nonconforming after the date that the ordinance took effect. For this reason, appraisers will have to make a specific determination as to how the zoning authority will treat the post-ordinance nonconforming use. Because such post-ordinance nonconforming uses are not supposed to exist, there may be no provision for their treatment in the zoning ordinance. Appraisers will have to assess the options available to the owner of such a property, e.g., the probability of obtaining a variance to the ordinance.

A property can benefit from a preexisting nonconformity, particularly in regard to density and occupancy.[6] For example, consider a 6,000-sq.-ft. site improved with a 10-unit apartment structure. The property is now subject to a zoning ordinance that requires 1,000 square feet of land area for each dwelling unit. Vacant land in the neighborhood under the same zone classification is selling for $24,000 per allowable unit. However, other land that is similar to the site being appraised but subject to zoning that requires only 600 square feet of land area per unit is selling for $18,000 per allowable unit. Based on this data, it appears that the subject property enjoys a value enhancement, or bonus, due to its nonconformity:

| | |
|---|---|
| Value of site as nonconforming use (10 units @ $18,000) | $180,000 |
| Value of site as though vacant (6 units @ $24,000) | – 144,000 |
| Value enhancement due to preexisting nonconformity | $36,000 |

Note that theoretically this value bonus is created by the existence of the building, not because of some special characteristic of the land. Therefore, under classic appraisal methodology, the bonus is attributable to the building, while the land value for the property's highest and best use as though vacant remains at $144,000. In practice, the remaining economic life of the building (and therefore the nonconforming use) should be accounted for. Appraisers may find it helpful to allocate the value among the land, the improvements, and the value increment created by the nonconforming use.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

## Variances

Most zoning ordinances provide for variances, or special-use permits, in some instances. These variances may, for example, reduce setback requirements, allow a preschool facility to locate in a residential area, reduce parking requirements, or modify building density requirements. *Zoning variance* is defined as follows:

> A legally authorized modification in the use of property at a particular location that does not conform to the regulated use set forth in the zoning ordinance for the surrounding area; not an exception or change in the legally applicable zoning. A zoning variance is typically only granted if the property owner can prove a particular hardship due to unusual property characteristics.[7]

To consider the variance's effect on property value, appraisers must confirm that the variance is transferable and runs with the land, rather than the owner of the land. It is generally the market value of the property that is to be analyzed, not the value of the property for a specific use or to a specific user. If the variance is nontransferable, legal counsel should be consulted to determine the advisability of preparing a dual-premise appraisal to analyze the market value and the use value of the property. This latter value opinion can usually be made with the special or extraordinary assumption that the variance would be transferable to a new buyer of the property. A dual-premise appraisal is most often undertaken with a written legal instruction. It is then up to legal counsel to convince the court of the appropriate measure of just compensation, given the facts of the case.

The possible impact on value attributable to an existing variance is analyzed and assessed in the same way that a nonconformity's effects are investigated. In the case of a partial acquisition, appraisers must determine whether a variance will automatically be extinguished or continued. On some occasions it will be necessary to obtain a variance to develop the remainder land to its highest and best use. In such a case, appraisers must determine whether there is a reasonable probability of obtaining the variance and what effect this probability may have on the market value of the remainder parcel. Care must be exercised, however, because many zoning ordinances provide for variances for new construction only. They make no provision to allow a variance for a nonconformity that occurs after initial construction, which may be the case in a partial acquisition. Some jurisdictions may have condemnation relief ordinances in place, which could provide a formal process for obtaining a variance.

## Zoning in Anticipation of a Public Project

It has generally been held to be improper for a government entity to zone or refuse to rezone a property in an attempt to depress the property's value so it can be acquired for a lower price in a future eminent domain proceeding. An Illinois court said, "Where the real purpose of the enactment [of an ordinance] was to depress or limit property values in order to minimize the costs of acquisition of such property in anticipated condemnation proceedings the courts have not been reluctant to declare such ordinances unconstitutional and void."[8] A Maryland court said, "Zoning cannot be used as a substitute for eminent domain proceedings to defeat the payment of just compensation by depressing values and so reducing the amount of damages to be paid when private property is to be taken for public use."[9]

In fact, it has been ruled that any government action or inaction intended solely to depress the value of property to be condemned is improper. The District Court of Maryland said the following:

> An easement, which otherwise would have been extinguished upon request of the landowner, may not be used by a government to diminish the value of the fee simple interest in the land in order to allow that government or other public agency to acquire said fee simple interest by eminent domain at a lesser cost for a purpose entirely different from that for which the easement originally existed. Such action would be an abuse of governmental authority, resulting in a denial of due process, no different in principal [*sic*] than using the zoning process for the purpose of depressing values in eminent domain proceedings."[10]

It is incumbent upon appraisers to investigate any government action concerning the allowable uses of the property being appraised that occurred within a reasonable length of time preceding the condemnation action. The period of time to be investigated will depend on how long the project for which the property is being acquired has been contemplated. Interviews with property owners can help determine whether there has been any change in zoning or any refusal to rezone by the government. Also, if a hearing on rezoning the property has been held, an appraiser might review the minutes of the hearing to establish the reasons for any legislative action taken.

If an appraiser concludes that a zoning action was taken in anticipation of the property's acquisition by a government body, this fact must be considered in the conclusion of highest and best use and the analysis of market value. Appraisers may reach one of three conclusions:

1. The action taken would have been the same if the acquisition were not pending.
2. There is a reasonable probability that the action taken would have been different if an acquisition were not anticipated.
3. The action taken would definitely have been different had there been no anticipation of an acquisition.

If it is concluded that the action would have been the same with or without the anticipated acquisition, appraisers need only report a summary of the zoning activity. If, however, an appraiser concludes that the zoning action was affected, or there is a reasonable probability that it was affected, by the anticipated acquisition of the property in question, the matter must be specifically addressed in the appraisal report. An appraiser is rarely going to be able to make an absolute conclusion on this issue. It will ultimately be up to the court to decide what the motivation was for the zoning change.

At times, the record so clearly indicates that the condemning agency has taken a zoning action—influenced a zoning action by another governmental entity—because of the pending acquisition of property that it can be concluded that, except for the pending acquisition, the action would have been different. For example, in one case an appraiser discovered that the state department of transportation had sent a letter to a county planning commission that included the following statements:

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

> [W]e feel that if this change in zoning was approved, it would increase the value of the property and represent an undue expenditure of public funds.
> We would like to urge that the planning commission refuse this zone change in light of the forthcoming purchase.

In this case, the appraiser refused to accept a legal instruction from his condemnor-client that he appraise the property under its current zoning. The appraiser found this instruction to be unreasonable and unsupported, and he included the following statement in his appraisal report:

> It is specifically called to the client's attention that Subject has been appraised as if it had been rezoned to general manufacturing on [the date of the planning commission hearing]—not as if a reasonable probability exists for such rezoning as of the effective date of this appraisal.

The appraiser concluded that the property would have been rezoned had it not been for the state's interference with the zoning application and the planning commission's improper consideration of how the rezoning would affect the cost of acquisition of the property by the state. Under these circumstances, the appraiser's approach was warranted.

In another example, a property owner could not get the county to act on a zoning change request because the Department of Transportation was planning a freeway through the property that would change all the access and likely make the property unsuitable for apartments. The property owner sued the county and won, so the county was forced to proceed with the zoning process and even a site plan approval they knew was never going to happen. Because the property owner had a fully entitled apartment project before the DOT started condemnation, the award was vastly higher.

Most active condemnors are aware of the hazards of interfering with requests to rezone property they plan to acquire and do not interfere with those requests, or at least show a greater degree of subtlety in their dealings. Appraisers should also be aware that an opposite situation has been known to occur—i.e., a property is rezoned for a higher use at the request of the property owner, and the planning commission agrees with the rezoning for the specific purpose of assisting the property owner to achieve a larger award. This type of scenario generally occurs in smaller communities and is referred to by some condemnors as being *home-towned*.

An appraiser who encounters zoning actions that were taken in response to pending governmental acquisition of the property under appraisal is well advised to seek appropriate legal counsel before preparing an appraisal. There are some legal intricacies that need to be addressed in these situations. For instance, a California court said the following in a 1973 ruling:

> The distinction between the governmental entity imposing the improper restrictions in the guise of zoning and the governmental unit taking property for which the constitution demands it pay just compensation creates the critical problem in case at bench. A zoning restriction imposed to depress value with a view to future eminent domain proceedings itself creates a cause of action in inverse condemnation against the governmental unit enacting the zoning ordinance.[11] [Citations omitted]

In establishing this rule, however, the court limited its applicability to instances in which the condemnor and the zoning authority were the same government entity.

It is not improper for a zoning authority to base its decisions, in part, on a proposed project that will involve government acquisition of real estate. It is improper, however, for the zoning authority to take action purposefully to depress the value of the property to be acquired. Zoning agencies cannot be prevented from incorporating consideration of proposed public projects into their planning and land use documents. However, if the zoning authority takes action, the proximate cause of which is the proposed public project, the appraiser must disregard the zoning action in appraising the property in the before situation. On the other hand, if the eminent domain proceedings involve only a partial acquisition, the appraiser must consider the zoning action in analyzing the value of the property in the after situation.

For example, consider the partial taking shown in Figure 7.1. The property consisted of 50 acres before the taking and was zoned for its highest and best use for single-family residential development. The condemnor proposed acquisition of 20 acres of the property for the construction of a new, limited-access highway. The county planning commission rezoned the property for multifamily residential use, primarily so that the remaining area could act as a buffer zone between the proposed highway and the surrounding single-family residential areas. Thus, after the rezoning, the subject property had a highest and best use for multifamily residential use.

**Figure 7.1 Rezoning Due to Pending Public Project**




| | |
|---|---|
| Area before taking | 50 acres |
| Area after taking | 30 acres |
| Area of taking | 20 acres |

The rezoning to multifamily use cannot be considered in an appraiser's before valuation because it was predicated on the proposed highway project. The before value must be based on single-family zoning and highest and best use. In the after situation, however, the appraiser must value the property based on multifamily residential zoning and highest and best use because the zoning change was a direct result of the proposed highway project.

If land with a highest and best use for single-family residential development is selling for $50,000 per acre, and land with a highest and best use for multifamily residential development is selling for $75,000 per acre, the before and after values might be computed as follows in jurisdictions that allow the offsetting of special benefits against the taking:

| | |
|---|---|
| Before value (50 acres @ $50,000) | $2,500,000 |
| After value (30 acres @ $75,000) | − 2,250,000 |
| Difference between before and after values | $250,000 |

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

In jurisdictions that do not allow special benefits to be offset against the taking, the computations would be as follows:

| | |
|---|---|
| Value before taking (50 acres @ $50,000) | $2,500,000 |
| Value of part taken (20 acres @ $50,000) | – 1,000,000 |
| Remainder value before taking | $1,500,000 |
| Remainder value after taking (30 acres @ $75,000) | – 2,250,000 |
| Damages | $0 |
| Special benefits (30 acres @ $25,000) | – 750,000 |
| Net damages | $0 |
| Value of part taken | 1,000,000 |
| Total difference | $1,000,000 |

Special benefits are discussed in Chapter 14.

Now suppose that the rezoning would have occurred regardless of the proposed project. In this case, the property would be valued under its multifamily residential zoning and highest and best use in both the before and after situations. The benefit offset rule would make no difference in these calculations:

| | |
|---|---|
| Before value (50 acres @ $75,000) | $3,750,000 |
| After value (30 acres @ $75,000) | – 2,250,000 |
| Difference between before and after values | $1,500,000 |

## Probability of Rezoning

In general, present market value must be determined by consideration only of the uses for which the land "is adapted and for which it is available." The exception to this general rule is that if the land is not presently available for a particular use by reason of a zoning ordinance or other restriction imposed by law, but the evidence tends to show a "reasonable probability" of a change "in the near future" in the zoning ordinance or other restriction, then the effect of that probability upon the minds of purchasers generally may be taken into consideration in fixing present market value.[12]

There is a considerable amount of case law on the subject of the reasonable probability of rezoning. According to *Nichols*, "[a]n appraiser is reasonably expected to possess the special knowledge of the factors which bear upon market value [and o]ne such factor is a study of the reasonable probability of a change in a zoning restriction due to trends of which he is cognizant."[13] Most court rulings on the subject state that appraisers *may* consider reasonably probable zone changes, but, ethically and professionally, appraisers *must* consider reasonably probable zoning changes.[14]

The ultimate judge of whether rezoning is reasonably probable is not the appraiser or even the court, but buyers and sellers in the marketplace. For example, suppose Lot 7 in Figure 7.2

**Figure 7.2 Probability of Rezoning**



is being appraised. The entire neighborhood is currently zoned for single-family residential purposes.

A search of public records discloses the following lot sales, all transacted in the past six months.

| Lot No. | Price | Price/Sq. Ft. |
|---|---|---|
| 1 | $60,000 | $12.00 |
| 3 | $64,000 | $12.80 |
| 4 | $55,000 | $11.00 |
| 6 | $68,000 | $13.60 |
| 9 | $60,000 | $12.00 |

Three other lots on the opposite side of the street were also sold in the last six months:

| Lot No. | Price | Price/Sq. Ft. |
|---|---|---|
| 11 | $22,500 | $4.50 |
| 16 | $24,000 | $4.80 |
| 18 | $24,750 | $4.95 |

These last three lots, which are located on the south side of the street, have been developed with one-unit homes since their purchase. Lots 1, 3, 4, 6, and 9, which are on the north side of the street, remain undeveloped. Verification of the sales with the purchasers indicates that the lots were purchased for commercial development in anticipation of rezoning.

Under these circumstances it makes no difference what an appraiser thinks about the chances of having the area rezoned. Buyers and sellers speak louder than appraisers in these instances because they are talking with money. Even if the purchasers were overenthusiastic about the potential for rezoning, the current market evidence indicates that there are enough overenthusiastic buyers to create a market value of $11.00 to $12.80 per square foot for the property being appraised.

Appraisers do not determine what constitutes a good buy or a bad buy. They only analyze the price at which a property can be sold on the open market. Authoritative texts and courts have recognized this fact. As an Arizona court put it:

> The test, of course, is not either possibly (*sic*) or probability of rezoning in absolute terms, but the fair market value of the locus in the light of the chances as they would appear to the hypothetical willing buyer and seller. . . .
>
> We think that the "market effect" principle . . . is the crux of the test to be applied. The ultimate enquiry in any condemnation case is the market value of the condemnee's land. Evidence which has a material bearing on market value should be admissible, without regard to whether it relates to an eventuality that might or might not occur in the "near" or more "distant" future, as long as the prospect of the event has substantial present influence on market value. It seems to us that the real purpose of the "near future" and anti-"remote or speculative" qualifications of the rule . . . is to exclude consideration of an asserted prospective rezoning which is nothing much more than a figment of a bullish owner's imagination.[15]

It should be noted that some courts have used the phrase "reasonable probability" of rezoning, while others have used the phrase "reasonable possibility" of rezoning,

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

while still others have used the phrases interchangeably. Appraisers should use the phrase applicable in the circuit [or jurisdiction] in which the property is located. However, appraisers should remember the guidance offered by a Tennessee court:

> The difference between the "reasonable probability" standard and the "any possibility sufficiently substantial to affect market value" standard urged in the *Aioschetti* and *Wolff* cases should not, in our opinion, be exaggerated. They are but different expressions of the requirement that evidence must be relevant and material to be admissible. It is the effect, if any, upon the fair market value on the date of taking which makes relevant the evidence of a possible rezoning of the property. A prospect of rezoning, no matter how imminent, is irrelevant if it has no effect upon such fair market value; and, on the other hand, a prospect of rezoning which may appear to be somewhat remote should, nevertheless, be considered by the court if it affects the fair market value of the property on the date of taking.[16] [Citations omitted]

It should be noted that the U.S. Court of Federal Claims introduced the question of "How *knowledgeable* is *knowledgeable*?" as the term is used in the definition of market value.[17] The court found that there was no viable market for the property that was the subject of the lawsuit, even though some 240 purchases of similar land nearby had occurred in the 1970s and 1980s and the owners of the property in question had rejected a cash offer of $3.5 million for the property. In the court's view, none of the purchasers were "knowledgeable" concerning land use regulations that might impede development of the lands. The court substituted its judgment regarding the value and potential use of the lands for the judgment of actual market participants.

While the U.S. Court of Federal Claims may feel that it can substitute its judgment for that of actual market participants in regard to the degree of knowledge that is or is not required to constitute a prudent investment, appraisers may not. If there is an adequate number of typically informed buyers to constitute a viable market, the prices that these buyers are paying are indications of market value and should not be ignored by appraisers. Sellers of real estate seldom reject offers because they feel the buyers did not have sufficient knowledge to make an informed purchase. The government appealed this decision to the United States Court of Appeals for the Federal Circuit. In considering this appeal, the court noted that

> The Court of Federal Claims rejected the testimony of [the government's appraiser]—the same testimony which we had noted with approval in *Florida Rock II*—solely because [the government's appraiser] with little exception, assumed sufficient knowledge on the part of the purchasers. (*Florida Rock II*, 21 CL Ct. at 172.) Instead, the court accepted the testimony of Florida Rock's assessor, which rejected all of the comparable sales values on the principle that none of the purchasers were sufficiently sophisticated and knowledgeable. That was error—contrary to our instruction in *Florida Rock II*, contrary to generally accepted understandings of market valuation, and finally, contrary to the working assumptions of a free market.[18]

In a footnote to the ruling, the court said "[t]he market from which a fair market value may be ascertained need not contain only legally trained (or advised) persons who fully investigate current land use regulations; *ignorance of the law is every buyer's right*" (emphasis added), and added, "[w]hen the market provides a well-substantiated value for a property, a court may not substitute its own judg-

ment as to what is a wise investment."[19] The court then vacated the judgment of the Court of Federal Claims and remanded the case back to that court, stating that "[t]he Court of Federal Claims must reconsider the assessments [i.e., appraisals] proffered by the parties and other evidence in the record, and determine a fair market value accordingly."[20]

The Appellate Court denied both the government's and Florida Rock's petitions for a "rehearing and suggestion for rehearing en Banc." Appraisers who are verifying sales should pay particular attention to what knowledge buyers had. Appraisers should also be prepared to see surveys made by pollsters introduced in an attempt to discredit the validity of an entire segment of the real estate market.

Unfortunately, market evidence that there is, or is not, an increment in value attributable to the probability of rezoning is not always clear. As the possibility that an area will be rezoned for a more intensive use begins to appear, prices in the neighborhood begin to rise. Property owners in the area withhold their properties from the market in hopes of receiving ever-higher prices as the potential rezoning moves closer toward becoming a reality. When potential sellers hold onto their properties, market activity decreases, and appraisers using the sales comparison approach to value are faced with two choices. They may use (1) residential sales with no rezoning potential and develop a reliable increment of value for the property's commercial potential or use (2) commercial sales and develop a reliable discount to reflect the fact that the property being appraised is not, in fact, zoned for commercial purposes.

Under the doctrine of reasonable probability, a property cannot be valued as if it were already rezoned for a higher use. A New Jersey court stated the following:

> The important caveat is that the true issue is not the value of the property for the use which would be permitted if the amendment were adopted. . . . A purchaser in a voluntary transaction would rarely pay the price the property would be worth if the amendment were an accomplished fact. No matter how probable an amendment may seem, an element of uncertainty remains and has its impact upon the selling price. At most a buyer would pay a premium for that probability in addition to what the property is worth under the restrictions of the existing ordinance. In permitting proof of a probable amendment, the law merely seeks to recognize a fact, if it does exist. In short if the parties to a voluntary transaction would as of the date of taking give recognition to the probability of a zoning amendment in agreeing upon the value, the law will recognize the truth.[21]

The courts have recognized that "the fact that the rezoning had not actually been accomplished would call for at least some discount"[22] and that the burdens of obtaining rezoning must be considered. For instance, if rezoning would require the property owner to dedicate additional land for a right of way, this fact would have to be considered.[23] The probability of rezoning a remainder property may be considered in a partial taking for the purpose of analyzing special benefits.[24]

The courts appear to favor the practice of analyzing sales of comparable properties with the same zoning as the existing zoning on the property being appraised, rather than using higher-zoned sale properties and discounting their values. Ultimately, however, the choice of technique is generally left to the judgment of the appraiser subject to the discretion of the court. Even if there is little doubt that the

Copyrighted material licensed by Randall Bell, PhD on November 20, 2016

property will be rezoned, the rezoning process may be costly and time-consuming, and the sale prices of higher-zoned sales would still have to be discounted accordingly. Depending on the nature of the rezoning, exactions may also be required, and they too would have to be accounted for in the adjustment process of higher-zoned land sales. Therefore, it is generally best to analyze sales of properties that have the same zoning as the property being appraised and adjust the sale prices upward if needed. In either case, it is often advisable for appraisers to include and discuss both lower-zoned and higher-zoned sales in the appraisal report to establish minimum and maximum values for the property being appraised.[25]

If an appraiser concludes that the property being valued has a highest and best use that is physically and economically contrary to its existing zoning, an exhaustive analysis of the possibility of having the property rezoned must be undertaken. Factors to be considered in this analysis include the following:

- rezoning applications and the government's reaction to rezoning in the area
- actual rezonings after the date of taking (to demonstrate probability on the date of taking)
- community growth patterns
- changes in land use patterns and the character of the area
- demand for certain types of land use in the area
- provisions of applicable comprehensive plans or master land use plans
- age of the zoning ordinance
- sales of similar properties at prices that reflect anticipated rezoning
- physical characteristics of subject and surrounding properties
- availability of and access to utilities
- attitudes and opinions of zoning officials
- traffic patterns and volume
- condition of improvements in the area
- activities and attitudes of community groups in regard to past zoning matters

Many courts will not admit the opinion testimony of a *zoning expert* because, as an Illinois court said, "[t]he difficulty of anticipating what any legislative body is going to do is obvious, and the practice of permitting prognostication on legislative policy . . . should not be encouraged."[26]

These rulings do not, of course, preclude appraisers from interviewing zoning officials and members of the legislative body that would ultimately rule on a rezoning request. In fact, this should be done if it is at all possible. Sometimes an appraiser can obtain a commitment from the zoning administrator as to whether the administrator would make a favorable or unfavorable recommendation to the legislative body on a particular rezoning request. Then, the appraiser should determine whether the legislative body routinely follows the administrator's recommendation or often overrides it. Appraisers and lawyers should be aware, however, that planners and zoning officials are often much less decisive on the witness stand than they are in their offices.

It has become increasingly difficult for appraisers to obtain opinions regarding potential rezoning or permit approvals from members of legislative bodies and zoning officials for two reasons. First, the appearance of fairness doctrine is applicable in many jurisdictions. This doctrine holds that it would be unfair, or at least appear unfair, for a public official to offer an opinion on the advisability of proposed legislative action before all interested parties have had a chance to be heard. It has also been held, under this doctrine, that it is improper for a public official to meet and discuss proposed legislative action without inviting all interested parties to the discussion, i.e., a public hearing. Thus, a member of a legislative body cannot, at least theoretically, decide on the advisability of proposed legislative action until all public hearings have been held and all interested parties have had an opportunity to express their views. For this reason it is often impossible for an appraiser to have a meaningful discussion with a member of a legislative body, a zoning official, or a land use permit official about the possibility of rezoning.

A second impediment arises from the increase in inverse, or regulatory, taking cases being filed, which have made many governmental officials reluctant to express their opinions on the probability of obtaining a rezoning or a permit. In fact, many agencies have adopted policies that prohibit their employees from expressing their opinions on these matters, even to employees of other agencies within the same government entity. Often appraisers are simply told that the zoning official has absolutely no idea whether rezoning will be granted and that the only way to find out is to submit a formal application for rezoning. These responses are not terribly enlightening and have made quantifying the probability of rezoning (or permit issuance) even more difficult for appraisers. However, it is possible to engage planning officials in discussions in a general sense as to what fees, documentation, and studies are required in support of an application for rezoning to a specific use and the time that it usually takes to achieve rezoning.

The courts have expanded the concept of *reasonable probability* beyond the question of rezoning. They have referred to reasonable probability in the context of a "zoning ordinance or other restriction,"[27] extending the concept to the reasonable probability of an annexation,[28] a zoning variance,[29] and issuance of environmental permits,[30] including "the reasonable probability of obtaining an EPA permit for the operation of a sanitary landfill."[31]

## Environmental Contamination

According to USPAP, "When necessary for credible assignment results in developing a market value opinion, a valuer must identify and analyze the effect on use and value of existing land use regulations [and the] reasonably probable modifications of such land use regulations."[32] Although the federal government does not have the power to zone land, it does have broad authority to regulate land use and does so through environmental laws and regulations that affect land use. State and local governments have added their own environmental and other land use regulations. Some of the most significant regulations relate to hazardous contaminants.

Because the field of hazardous waste is so technical, it is beyond the scope of the appraiser's expertise, often employing a blanket limiting condition that assumes the property is clean of any toxic contamination. Such an assumption

Copyrighted material licensed by Randall Bell, PhD on November 29, 2016

can lead to an appraisal that is not credible. According to the Uniform Appraisal Standards for Federal Land Acquisitions, "it is improper (unless specifically instructed otherwise) for an appraiser to make an assumption that the property being appraised is free of contamination when there is evidence from the property inspection or the past use of the property that contamination may exist."[33]

Appraisers *must* take all reasonable steps to determine whether the property being appraised is or is not contaminated. If there is any suspicion whatsoever that a property may be contaminated, the procurement of an environmental audit is generally required. Procurement of such an audit can create problems for appraisers because audits are often time-consuming and expensive.

Many condemning agencies are required, by their policies or regulations, to determine whether property is contaminated before they acquire it. They will, therefore, undertake an environmental investigation before an appraisal of the property is conducted, but these same agencies sometimes fail to provide their appraisers with the results of their investigation. Appraisers should always determine what property investigations the condemning agency has already made and procure copies of all reports pertinent to the appraisal of the property. A similar request should be made by an appraiser retained by a property owner.

If no environmental audit has been conducted and a valuer suspects that the property under appraisal may be contaminated, the valuer must do everything possible to procure such an audit. The valuer must explain to the client that any appraisal report prepared without an audit, under the assumption that the property is free of contamination, will be meaningless for eminent domain purposes. If the client agrees that an audit is required, the next question is who will select and retain the auditor.

Valuers must remember that they are eventually going to be asked to accept the environmental professional's report and adopt the findings it contains. Thus, regardless of who selects or retains the environmental consultant, a valuer must be sure that the individual is qualified and has been requested to provide answers to the questions that the valuer needs answered. The valuer must have enough confidence in the consultant to rely on the environmental professional's findings.

Environmental audits are generally conducted in three phases. Phase 1 determines if there is enough risk of contamination to require actual physical investigation (e.g., soil samples). Phase 2 sampling determines whether the property is actually contaminated. Phase 3 includes development of a mitigation or cleanup plan and estimation of its cost. In reviewing the qualifications of any auditor, even for a simple Phase 1 audit, it is important to confirm that the auditor has the qualifications to conduct Phase 2 and Phase 3 audits if they become necessary.

For years, valuers have relied on the services of specialized consultants such as general contractors, marketing experts, civil engineers, geologists, hydrologists, and structural engineers. An environmental consultant is no different.

## Notes

1. *Flair Corp. v. City of Brecksville*, 359 N.E.2d 459, 466 (Ohio 1976).
2. *Robinson v. Commonwealth*, 141 N.E.2d 727 (Mass. 1957).
3. *Black's Law Dictionary*, 10th ed., (St. Paul, MN: Thomson Reuters, 2014), s.v. "nonconforming use."

4. William R. Theiss, ed., "The Appraisal Docket," *The Appraisal Journal* (January 1966): 123.
5. *Gebrian v. Bristol Redevelopment Agency*, 370 A.2d 1055 (Conn. 1976).
6. *Gebrian v. Bristol Redev. Agency*, 370 A.2d 1055 (Conn. 1976).
7. *The Dictionary of Real Estate Appraisal*, 6th ed., (Chicago: Appraisal Institute, 2015), s.v. "zoning variance."
8. *Department of Public Works & Buildings v. Exchange National Bank*, 334 N.E.2d 810, 819 (Ill. 1975).
9. *Symonds v. Bucklin*, 197 F.Supp. 682, 685 (Md. 1961).
10. *Washington Metropolitan Area Transit Authority v. One Parcel of Land*, 413 F.Supp. 102, 106 (D. Md. 1976).
11. *People, Department of Public Works v. Southern Pacific Transportation Co.*, 109 Cal. Rptr. 525, 528- 529 (Cal. 1973).
12. *Martens v. State*, 554 P.2d 407, 409 (Alaska 1976).
13. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2017), vol. 4, §12C.03[3].
14. *Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019 ed., (Washington, D.C.: The Appraisal Foundation, 2018), Standards Rule 1-3, p. 17.
15. *Moschetti v. City of Tucson*, 449 P.2d 945, 950 (Ariz. 1969).
16. *Nashville Housing Authority v. Cohen*, 541 S.W.2d 947, 951-952 (Tenn. 1976).
17. *Florida Rock Industries, Inc. v. United States*, 21 Cl. Ct. 161 (1990) *cert. denied* 115 S.Ct. 898 (1995).
18. *Florida Rock Industries, Inc. v. United States*, 18F.3d 1560 (Fed. Cir. 1994).
19. *Florida Rock Industries, Inc. v. United States*, 18F.3d 1567 (Fed. Cir. 1994).
20. *Florida Rock Industries, Inc. v. United States*, 18F.3d 1568 (Fed. Cir. 1994).
21. *State v. Gorga*, 138 A.2d 833, 835 (N.J. 1958).
22. *City of New York v. Nelkin*, 415 N.E.2d 970, 970 (N.Y. 1980).
23. *City of Fresno v. Cloud*, 102 Cal. Rptr. 874 (Cal. 1972).
24. *Department of Public Works & Buildings v. Exchange National Bank*, 334 N.E.2d 810 (Ill. 1975).
25. William B. (Trey) Knipe III, "Valuing the Probability of Rezoning," *The Appraisal Journal* (April 1988): 217-222.
26. *Park District of Highland Park v. Becher*, 208 N.E.2d 621, 623-624 (Ill. 1965).
27. *Martens v. State*, 554 P.2d 407, 409 (Alaska, 1976).
28. *Lake County Forest Preserve District v. Reliance Standard Life Insurance Co.*, 329 N.E.2d 344 (Ill. 1975).
29. *Redevelopment Agency v. Contra Costa Theatre*, 185 Cal. Rptr. 159 (Cal. 1982).
30. *Laurel, Inc. v. State*, 362 A.2d 1383 (Conn. 1975).
31. *Lake County Forest Preserve District v. Petersen*, 417 N.E.2d 862, 864 (Ill. 1981).
32. USPAP, 2018-2019 ed., Standards Rule 1-3(a), p. 17.
33. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., (Washington D.C.: U.S. Government Printing Office, 2016), §1.2.7.1, p. 13.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

8

# Cost Approach to Value

According to *The Dictionary of Real Estate Appraisal*, the cost approach to value is

> A set of procedures through which a value indication is derived for the fee simple estate by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive or profit; deducting depreciation from the total cost; and adding the estimated land value. Adjustments may then be made to the indicated value of the fee simple estate in the subject property to reflect the value of the property interest being appraised.[1]

According to *The Appraisal of Real Estate*,

> This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market. Cost approach techniques can also be employed to derive information needed in the sales comparison and income capitalization approaches to value, such as the costs to cure items of deferred maintenance.[2]

The major steps in applying the cost approach are as follows:

- Estimate the replacement cost or reproduction cost of the improvements as of the date of appraisal, including an appropriate entrepreneurial incentive.
- Estimate the amount of obsolescence present in the improvements.
- Deduct total obsolescence from the estimated cost new to arrive at an indicated value of the improvements as of the date of appraisal.
- Add the estimated value of the land to the indicated improvement value to arrive at an indication of market value.

In testimony before the trier of fact, appraisers should emphasize that the three approaches to value are interrelated and integral parts of the appraisal process. One or more approaches may be used depending on which approaches are necessary to produce credible assignment results, given the intended use of the appraisal, the type of property being appraised, and the property rights involved.[3]

The indicated values derived by the various approaches are then reconciled into a final opinion of property value after consideration of the relative strengths and weaknesses of each approach in relation to the property being appraised.

Many courts do not seem to understand that each of the three approaches to value is an integral part of the valuation process. Many court rulings appear to be based on the assumption that the three approaches to value are totally independent of one another and that only the most applicable approach is used in the appraisal of a specific property.

In 1972, a Washington court formally recognized the relationship between the three approaches to value, citing *The Appraisal of Real Estate*, fifth edition, as its authority.[4] Citing the Washington case, however, a Massachusetts court said the following:

> Whatever the relative importance or usefulness of the three methods to the real estate profession, however, they have not been viewed as equally applicable or as interchangeable under the law of eminent domain as it has developed in our cases. More specifically, the introduction of evidence concerning value based upon DRC [depreciated reproduction cost] computations has been limited to special situations in which data cannot be reliably computed under the other two methods.[5]

To say that the cost approach is generally disliked by the courts is an understatement. Another court stated the following:

> A third method of appraisal is somewhat tentatively and timidly put forward by the claimant, namely, the reproduction method. Here an expert is called upon to give his version of the sound value of the building by estimating what it would cost to reproduce it, and then deducting a fair amount for depreciation. This "method" is perhaps the most excellent example conceivable to demonstrate that none of such abstractions ought to have a place in the search for market value, generally speaking. . . . [I]gnoring the fact that on the figures an absurd result is reached, it is apparent that the reproduction method is in itself absurd in the ordinary case, because even in ordinary times it is ridiculous to suppose that anyone would think of reproducing this or any like property, and that same thing would be true in the vast majority of cases, I should think.[6]

Despite pronouncements of that type, most courts allow the cost approach into evidence as long as the improvements enhance the value of the land for its highest and best use and proper deductions are made for depreciation of the improvements. The minority rule, which excludes consideration of cost data, has evolved for a number of reasons. The cost approach has been viewed by some courts as a violation of the unit rule. (See Chapter 4 for a discussion of multiple estates and the undivided fee rule.) Other courts have referred to the cost approach as a *summation* appraisal, which is typically forbidden. The cost approach, as applied, has also been seen as a violation of the consistent use theory. (See Chapter 6.)

The usefulness of the cost approach is discounted in many condemnor appraisal guidelines. For example, according to the Uniform Appraisal Standards for Federal Land Acquisitions:

> While not inherently flawed, the cost approach has often been misused, leading a number of courts to identify the cost approach as "one of the least reliable indicia of market value" for the purpose of measuring just compensation. Indeed, as the Fifth Circuit observed, when improperly applied, "reproduction cost

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

evidence, though perhaps making it easier to reach some solution, only ma[kes] the proper solution more difficult." As a result, the cost approach is rarely acceptable as a stand-alone indication of value for federal acquisitions; instead, it is typically employed either to test the financial feasibility of a potential highest and best use or to "check" or test the reasonableness of estimates of value indicated by other approaches. . . .

[T]he cost approach as a means of measuring value "may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid." Its relevance to market value therefore cannot be merely assumed in federal acquisitions; rather, the appraiser must demonstrate that application of the cost approach to a specific property would be relevant to market participants. The Ninth Circuit suggested possible ways to make the necessary showing in *United States v. 55.22 Acres of Land*, such as with evidence that "a prudent investor would reproduce the improvements at the reproduction cost figure [stated]," or that "willing vendees and vendors would deem reproduction cost less depreciation relevant in negotiating a purchase and sale of the property." The court further suggested that limited use of the cost approach as but "one guide" considered by the appraiser in arriving at a fair market value might have been acceptable. Federal courts agree that reliance on the cost approach is improper "when no one would think of reproducing the property," or when no prudent investor would reproduce it for the figure or amount estimated as replacement or reproduction cost. Thus courts reject the cost approach without "unequivocal evidence that the [improvements] involved would be reproduced by private investors at the risk of private capital."[7]

## Cost Estimates

In the appraisal profession, the distinction between reproduction cost and replacement cost is quite clear. *Reproduction cost* is the current cost to reconstruct the improvements physically using the same or very similar materials. *Replacement cost* is the cost of constructing improvements equal in utility to the improvements being appraised using modern materials.

For example, consider a lumber mill constructed in 1920 that is a wood-frame structure of 4-in.-by-4-in. timbers with a sawtooth roof and 3-in.-thick wood decks over 18-in.-by-18-in. floor framing. If reproduction cost is to be estimated, the cost estimate will represent the cost of building these facilities using the same or similar materials. If replacement cost is to be used, however, the appraiser may estimate the cost of a steel-frame structure with steel skin, concrete floors, and a gable roof, which has the same utility as the existing facility. Replacement cost is differentiated from reproduction cost by the removal of many, if not all, items of construction excess, and therefore use of a replacement cost estimate may eliminate the need to make certain deductions for functional obsolescence.

Although there is a clear distinction between replacement cost and reproduction cost in appraisal, these terms are not clearly distinguished by the courts in most jurisdictions. Because many courts fail to distinguish between reproduction cost and replacement cost, appraisers must be careful in using these terms on the witness stand. When the terms are used, appraisers must explain their precise meanings in an appraisal context. It is generally permissible for an appraiser to estimate either reproduction cost or replacement cost as long as all forms of depreciation are accounted for in a manner consistent with the cost estimate used.

There are three standard methods for estimating reproduction or replacement cost: (1) the quantity survey method, (2) the unit-in-place method, and (3) the comparative-unit method.[8] The quantity survey method is generally considered the most accurate, while the comparative-unit method is generally considered the least reliable. Whichever method is used by an appraiser, it is important that all indirect costs be included in the cost estimate and that entrepreneurial incentive be considered as an element of cost.

Appraisers must, of course, make an accurate, detailed property inspection and review building plans, if available, before a cost estimate can be developed. Many of the computations can be made after a field inspection, especially if a detailed field inspection checklist is used in the physical inspection of the property. This practice is recommended because it obviates multiple trips to the property to obtain data overlooked during the first inspection and, more importantly, prevents embarrassing situations on the witness stand. An appraiser will not have to answer inquiries about construction details by saying "I don't know," "I didn't notice," or, worse, "No, that item of cost is not included in my replacement cost estimate."

When an appraiser cannot testify to the size of the hot water tank in a single-family dwelling being appraised, typical jurors often forget that they do not know the size of the hot water tank in their own homes. Instead, jurors may wonder how the appraiser was able to estimate the replacement cost of the hot water tank without knowing its size. Jurors may also speculate that, if the appraiser missed this item of replacement cost, the appraiser may have missed others and made significant errors in the appraisal.

Appraisers must avoid representing themselves to the trier of fact as both *expert appraisers* and *expert cost estimators*. In a Rhode Island case, an appraiser was precluded from testifying to the cost of replacing a portion of a fence taken in an eminent domain action when the court ruled that being an expert appraiser does not necessarily qualify the appraiser as an expert fence builder.

If the cost approach is important to an appraiser's value conclusion, the appraiser is well advised to obtain an estimate of reproduction cost or replacement cost from at least one qualified contractor. To supplement the contractor's cost estimate, the appraiser should consider developing at least one other cost estimate or use one developed by a cost service. If the appraiser adopts the contractor's estimate with no other evidence, the estimate is not the opinion of the appraiser but of the contractor. In such a circumstance, the appraiser could be excluded from testifying in regard to the cost of the improvements because the estimate is not the appraiser's opinion and, therefore, is hearsay evidence. A simple solution to this problem is for the appraiser to obtain two independent cost estimates, using two different qualified contractors or two different methods. Then the appraiser can consider both cost estimates and arrive at a final opinion of the reproduction cost or replacement cost of the improvements.

The problem of hearsay can also arise if an appraiser uses a published cost service as the sole source of data. Aside from the hearsay rule, using a cost service as the sole source of data in estimating reproduction cost has been viewed with skepticism by some courts. For example, a Washington, D.C., Circuit Court said the following:

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

> They [the appraisers] relied largely upon reproduction costs calculated on a rule of thumb cubic footage basis, less depreciation. . . . [T]he rule of thumb basis for estimating cost of reproduction, used by the Agency appraisers, has been described as being "not even approximately accurate, except for a few highly standardized types of structures." There is no showing that this was such a standardized structure. Accordingly, if such testimony is repeated on a new trial the jury should be cautioned . . . that the cubic foot cost method of computing reproduction cost is not entitled to great weight in such a case as this even in arriving at reproduction cost.[9]

## Depreciation

Depreciation analysis is a valuable appraisal tool, but presenting it to a judge or jury may lead to confusion. Phrases such as *curable physical deterioration* or *incurable functional obsolescence caused by a superadequacy* have precise meanings in the real property appraisal profession, but they are meaningless to most jurors. If an appraiser uses technical terms on the witness stand, the jury may be confused or, even worse, they may feel patronized or manipulated. Any appraiser who uses a detailed breakdown method to estimate the depreciation present in a property being appraised is advised to find a way to explain the methodology in simple terms before taking the witness stand. Alternately, simplifying the analysis presented in the appraisal report may lay the foundation for a more convincing presentation at trial.

For condemnation appraisals, "[t]he depreciation from all causes—including physical deterioration, functional obsolescence, and economic or external obsolescence—must be properly identified and analyzed," according to the Uniform Appraisal Standards for Federal Land Acquisitions. "The estimated dollar amounts associated with each form of depreciation must be supported by market data using the breakdown method or the market extraction method. Depreciation should not be estimated by the use of published tables or age-life computations."[10]

## Land Value

Six techniques of land valuation are recognized in the appraisal profession:

- sales comparison
- ground rent capitalization
- subdivision development analysis
- allocation
- extraction
- land residual

Subdivision development and land residual techniques have been harshly criticized in most jurisdictions. Many courts will exclude an appraisal using either technique.

If an appraiser does not employ the cost approach to value, analyzing the value of the land separately is not technically required in a typical appraisal assignment. However, in eminent domain valuation, a separate land value opinion is often required, even if the cost approach is not applied. There are two reasons for this requirement. First, a partial taking requires a separate land value opinion because without it the value of the part taken cannot be accurately analyzed. If

the before and after rule is applied, it is possible that the before and after values of the property cannot be properly analyzed without a separate land value estimate. Second, many condemnors require a separate opinion of land value.

The sales comparison technique is the preferred method of land valuation. It is the only technique of land valuation recognized by some condemnors when the land value opinion is being used in the cost approach to value. According to the Uniform Appraisal Standards for Federal Land Acquisitions, "The value of the land, vacant and subject to improvement, is generally developed by the sales comparison approach for land."[11]

The technique applied to value land using comparable sales is the same as the technique used to value whole properties in the sales comparison approach to value. The technique is described in Chapter 10. Similarly, to value land with the ground rent capitalization technique, appraisers apply the same procedures employed to value improved properties by the income capitalization approach, which are covered in Chapter 9. The subdivision development analysis technique is described in Chapter 11.

Attempts to value vacant land using improved property sales, as prescribed in the allocation and extraction techniques, have generally been rejected by the courts. The single exception to this rule may be the use of the extraction technique when the improvements constitute a comparatively small percentage of the total sale price of the comparable property. The procedure used to analyze land value by extraction is similar to the procedure applied to estimate the amount of depreciation in the improvements, which was outlined previously. In this case, however, the residual value is the land value rather than the depreciated value of the improvement. In other words, the depreciated (or contributory) value of all of the improvements on a sale property are deducted from the sale price of the property and the remaining portion of the sale price represents the land value.

The land residual technique for analyzing land value is, to say the least, looked upon with disfavor by the courts. As a New York court put it:

> Such a method of evaluation of vacant, unimproved land is completely unprecedented. There is no authority cited by claimants in support of it and none is to be found, for how can income be capitalized to produce a residual land value when the appropriated land is neither producing income nor equipped to produce such income.[12]

All six techniques of land valuation are discussed in detail in *The Appraisal of Real Estate*.[13] In general, valuation of land using the extraction, allocation, or land residual method is not well received by the courts and may be inadmissible in some jurisdictions. The land residual technique of land valuation, which involves projecting income from a hypothetical improvement, would appear to have no place in the courtroom or in eminent domain valuation.[14]

Appraisers who are forced to develop an opinion of land value with a method other than the sales comparison technique should expect to receive strong criticism from the courts and their clients.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

## Notes

1. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v. "cost approach."
2. *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 47.
3. *The Appraisal of Real Estate*, 14th ed., 36.
4. *State v. Wilson*, 493 P.2d 1252, 1256 (Wash. 1972).
5. *Correia v. New Bedford Redevelopment Authority*, 377 N.E.2d 909, 911 (Mass. 1978).
6. *United States v. 49,375 Square Feet of Land in Borough of Manhattan*, 92 F. Supp. 384, 387-388 (S.D. N.Y. 1950), *affirmed per curiam sub. Nom. United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952), *cert. denied*, 343 U.S. 928 (1952) (Footnote omitted).
7. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §4.4.3-4.4.3.1, pp. 131-133.
8. For examples illustrating how estimates of reproduction cost or replacement cost are developed by these methods, see *The Appraisal of Real Estate*, 14th ed., 584-595.
9. *Riley v. District of Columbia Redevelopment Land Agency*, 246 F.2d 641, 644 (D.C. Cir. 1957) (citations omitted).
10. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.5.3.1.2, p. 34.
11. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.5.3, p. 33.
12. *Levitin v. New York*, 207 N.Y.S.2d 798, 799 (N.Y. 1960).
13. *The Appraisal of Real Estate*, 14th ed., 359-376.
14. *United States v. 75.13 Acres of Land, etc.*, 693 F.2d 813, 816 (8th Cir. 1982).

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

9

# Income Capitalization Approach to Value

In all jurisdictions, the courts appear to accept evidence developed through the income capitalization approach when the property in question is or is likely to be income-producing or sufficient market data to develop the sales comparison approach is not available. In general, the courts seem to view the income capitalization approach as superior to the cost approach but inferior to the sales comparison approach.

The Uniform Eminent Domain Code states, "A valuation witness . . . may consider, as a basis for an opinion of value, the actual or reasonable net rental income attributable to the property when used for its highest and best use, capitalized at a fair and reasonable interest rate."[1] Although the code allows experts to *consider* the income capitalization approach to value, it does not necessarily allow for testimony in this regard. By way of explanation, the code states that a "valuation witness . . . may consider as the basis for his opinion of value any nonconjectural matters ordinarily relied upon by experts in forming opinions as to the fair market value of property, whether or not they are admissible in evidence."[2]

The various steps and methodologies of the income capitalization approach are discussed in detail in *The Appraisal of Real Estate*:

> Deriving capitalization rates from comparable sales is the preferred technique when sufficient information about sales of similar, competitive properties are available. . . . An overall capitalization rate provides compelling evidence of value when a series of conditions are met:
>
> 1. Data must be drawn from properties that are physically similar to the property being appraised and from similar (preferably competing) markets. When a comparable property has significant differences, it may be afforded less weight or may be discarded entirely.
> 2. Sale properties used as sources for calculating overall capitalization rates should have current (date of sale) and future market expectations, including income and expense patterns and likely value trends, that are comparable to those affecting the subject property.

3. Income and expenses must be estimated on the same basis for the subject property and all comparable properties. For example, if [replacement allowances] are included in the net operating income for each comparable, reserves for replacement should be reflected in the net operating income for the subject property also.
4. The comparable property's price must reflect market terms, or an adjustment for cash equivalency must be made.
5. If adjustments are considered necessary for differences between a comparable and the subject property, they should be made separately from the process of calculating the overall capitalization rate and should be based on market evidence.[3]

The first step in the income capitalization approach is to estimate the annual gross rental income the property being appraised would produce if it were 100% occupied. To accomplish this, appraisers usually investigate and analyze the actual rent schedule of the property, if there is one, and compare it with the rent schedules and recent leasing activity of similar properties. From this analysis, appraisers estimate the market rent (or "economic rent") applicable to the property being appraised. According to the Uniform Appraisal Standards for Federal Land Acquisitions,

> As with a recent and unforced sale of the subject property, if the property is actually rented, its current rent is often the best evidence of its economic (or market) rent and should be given appropriate consideration by the appraiser in developing an opinion of the gross economic rent of the property.[4]

If the property being appraised is rented and the appraiser's conclusion of market rent deviates from the actual rent schedule, the appraiser is professionally obligated to present strong market support for the deviation.

Note that there are exceptions to the general rule that a business located on property being condemned is not to be valued and that compensation is not to be paid for the taking of the business. A number of states (e.g., Florida, Vermont, California) have made specific statutory provisions allowing payment for the taking or destruction of businesses under certain circumstances. Other states (e.g., New York, Pennsylvania, Louisiana, Georgia) permit compensation for business losses under certain circumstances.

Compensation for business loss has been found to be appropriate when the government actually takes over a business located on a condemned property. This most commonly occurs when the government condemns a public utility such as a water company and continues its operation. This situation also arises in federal condemnations. For example, the federal government condemned a commercial laundry during World War II and continued to operate the facility, retaining many of the condemnee's 180 employees. In this case, the court ruled that the business itself had been condemned and, in addition to the real estate, compensation was due for the business.[5] This line of reasoning was followed in a later case in which the National Park Service condemned a canoe livery facility and planned to operate a canoe livery service.[6] Compensation for business loss is generally due only in unique and legally complex circumstances.

Appraisers typically use rent comparables in estimating the market rent of the property being appraised, whether or not the conclusion conforms to the

Copyrighted material licensed by Randall Bell, PhD on November 29, 2016

property's actual rent schedule. A few courts exclude testimony on comparable rentals, but most follow the same rules adopted regarding the admissibility of comparable sales. (See Chapter 10.)

Expenses and a vacancy allowance must be deducted from the effective gross income of the property. Fixed expenses, operating expenses, and replacement allowances for short-lived items are estimated by appraisers and deducted from the effective gross income of the property to arrive at an estimate of net operating income. "In considering evidence of existing rents as an element in the determination of market value, care must be taken to distinguish between gross rentals and net rentals," according to *Nichols*. "It is the latter which is ordinarily considered as an evidentiary factor in the valuation process. Thus, rentals may be considered as evidence of value only after expenses such as light and heat have been deducted from gross rentals."[7]

In estimating the expenses applicable to the property being appraised, appraisers should be aware of expense trends as well as the historical expenses of the property. The actual expenses incurred by comparable properties can also be used to make accurate expense projections. For example, persuasive evidence will result if an appraiser can testify that estimated expenses are 30% of the property's effective gross income and that comparable rental properties (or comparable sales used in the sales comparison approach) are experiencing expenses ranging from 28% to 32% of their effective gross incomes. According to *Nichols*, "It is important to carefully scrutinize 'actual' operating expenses, since in any one year they are apt to include either a substantial capital investment or at least disbursements which are more properly spread or prorated over a number of years, depending upon the life of the particular improvements."[8]

Appraisers should prepare a clear, detailed stabilized income and expense statement for presentation to the trier of fact and inclusion in the appraisal report. Also, appraisers must convince the trier of fact and the reader of the appraisal report of the accuracy of the estimate of net operating income. If the appraiser's estimate of net operating income is not credible, the application of an appropriately derived capitalization rate will be irrelevant, regardless of how clearly and convincingly it is presented.

## Direct Capitalization

The mathematics of direct capitalization are straightforward. The process is based on the direct relationship between the value of a property and the net operating income it can produce in a single year. The relationship of income and value is expressed most simply in the formulas $I \div R = V$ and $I \times F = V$. The factor $F$ is simply the reciprocal of the rate $R$. Thus, the reciprocal of 5% is 20 (1/0.05), and the reciprocal of 20 is 0.05 (1/20), or 5%.

Although the relationship between value, income, and rate of return is ingrained in the appraiser's mind, it is less apparent to the typical juror or lawyer. Therefore, an appraiser often must explain this relationship. Otherwise, some or all of the members of the jury will not comprehend the appraiser's testimony regarding the capitalization process. Appraisers must carefully educate the jury in lay terms. An appraiser's explanation must be so clear and precise that it cannot

be misunderstood, without appearing condescending. An appraiser's explanation will be most effective if it is presented to a jury in both visual exhibits and oral form. It might be wise to illustrate the relationship between value, income, and rate of return with something familiar to most jurors, such as the operation of a savings account.

If the trier of fact is not a jury but a judge or commission, an appraiser's task may be simplified or obviated. Appraisers should seek the advice of legal counsel in this regard. Attorneys typically know the level of experience and understanding of the judge or commission hearing the case.

The degree to which a trier of fact must be educated on the capitalization process depends on the complexity of an appraiser's testimony. If an appraiser testifies about the process of developing an applicable overall capitalization rate from market evidence, the members of the jury only need to understand two relationships in the derivation and application of the overall capitalization rate:

1. $\frac{\textit{Comparable Property's Income}}{\textit{Comparable Property's Price}} = \textit{Capitalization Rate}$
2. $\frac{\textit{Subject Property's Income}}{\textit{Capitalization Rate}} = \textit{Subject Property's Value}$

On the other hand, if the appraiser's testimony involves concepts such as the band-of-investment technique of rate derivation, equity capitalization, one of the residual techniques, or yield capitalization, these more complex techniques must be understood by the members of the jury.

However, an appraiser's job is not to conduct a capitalization seminar but to give the jurors enough information to understand the testimony about the income capitalization approach. The application of an overall capitalization rate that converts net operating income into an indication of value by way of direct capitalization is a basic mathematical operation. It is the derivation of a proper rate that appears complex to the uninitiated. If residual techniques, equity yield rates, discount rates, equity capitalization rates, and the like can confuse attorneys who are not continually engaged in disputed valuations involving income-producing property, imagine their effect on a trier of fact.

Each technique of capitalization rate derivation has implicit assumptions regarding the nature of the income stream, the income projection term, the form of the investment yield rate, the amount of money recaptured over the projection period, the recapture term, and the recapture rate. It is not enough for appraisers simply to understand and use the appropriate technique to derive the capitalization rate. Appraisers must fully understand all techniques available in the rate selection process, be able to describe them, and be prepared to explain why they are not as reliable or applicable to the property being appraised.

When an appraiser has employed direct capitalization using an overall capitalization rate derived directly from comparable sales, the resulting value indication is often difficult to attack effectively on cross-examination. In those circumstances, some attorneys try to confuse the trier of fact about the entire capitalization process, rather than directly attack the appraiser's income capitalization approach valuation. By displaying a complete understanding of all facets

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

of the income capitalization approach, appraisers can often derail this line of questioning. For this reason, appraisers should understand all the methodologies and techniques available for use in the income capitalization approach and be able to explain them in a manner that will not confuse the trier of fact. These methodologies are described in detail in *The Appraisal of Real Estate*.[9]

In selecting the method of capitalization to be applied to a specific property, appraisers must ensure that the assumptions built into the method apply to the property being appraised and that the method of analysis would be employed by typical buyers and sellers of properties of that type. According to a ruling of the Tenth Circuit Court, "one of the principal keys in the capitalization of income process is determination of the capitalization rate, i.e., that percentage which will provide for the recapture or amortization of the value of the investment in the improvements, plus a reasonable and proper rate of return to the investor."[10]

Time and time again, the courts have recognized the importance of selecting the proper capitalization rate to be applied to the net income of the property being valued. They often insist that the rates selected be supported by market data. For example, a Nevada court stated the following:

> Market value is ascertained by the income approach by the mathematical process of dividing the estimated annual income from the highest use of the property by a capitalization rate appropriate to the type of investment risk involved. A slight variation in the capitalization rate profoundly affects the value to be attributed to the property. Accordingly, unless the components of the formula, the annual income and the capitalization rate, are determined with reasonable certainty, the resulting value is speculative, and of little use to the trier of fact. . . .
>
> Absent foundation information about the relevant capitalization rate the witness should not be permitted to express an opinion on market value by use of the income approach to value.[11]

Extracting rates from comparable sales is the most easily understood technique for deriving an overall capitalization rate. On several occasions, the federal court has approved the admission of comparable sales, even when the sole purpose was to establish the ratio between income and sale price or cash-equivalent sale price, adjusted for atypical financing (i.e., the overall capitalization rate). This form of analysis, presented graphically to the trier of fact, is convincing evidence. Although appraisers may have to analyze that data further in an appraisal report or in later testimony, its preliminary presentation to the trier of fact in the format shown in Table 9.1 is generally most persuasive. Appraisers may subse-

**Table 9.1 Rate Derivation by Direct Comparison**

| | Sale 1 | Sale 2 | Sale 3 | Subject |
|---|---|---|---|---|
| 1. Confirmed sale price | $213,200 | $346,000 | $325,725 | N/A |
| 2. Effective gross income | $24,240 | $35,976 | $36,736 | $34,208 |
| 3. Less expenses | – 9,850 | – 13,272 | – 14,880 | – 14,077 |
| 4. Net operating income (2 – 3) | $14,390 | $22,704 | $21,856 | $20,131 |
| 5. Overall capitalization rate (4/1) | 0.067495 | 0.065618 | 0.067099 | N/A |
| Rounded | 6.75% | 6.56% | 6.71% | |

quently break down the overall rate into components of return on investment and recapture, or into debt service and equity capitalization rates. The trier of fact will be better able to follow an appraiser's analysis if a clear understanding has been established of how the overall rate was developed.

For example, suppose an appraiser has chosen to use a mortgage-equity, band-of-investment technique to derive a capitalization rate rather than an overall rate developed by direct comparison because of the variation in the financing of each comparable sale. To describe this procedure, the analysis of each comparable sale could be expanded and presented as shown in Table 9.2.

From the information developed in Table 9.2, an appraiser could reasonably conclude that the appropriate equity capitalization rate for the property being appraised is 8%. If the property being appraised could be financed on the date of valuation with a 75% loan with a 25-year amortization term and a 6% interest rate, an applicable overall capitalization rate of 7.80% could be developed, with the calculations demonstrated in Table 9.3.

Appraisers who choose to use annuity or mortgage-equity methods of rate derivation must fully understand the construction of the rates or mortgage constants used and be able to demonstrate the methods in court. Furthermore, they must be able to distinguish how the adopted rates relate to the real estate market and to competitive investments. As the Second Circuit Court pointed out in describing a poor presentation by an appraiser:

> Capitalization of income comprehends the use of a rate of return in comparable investments. . . . There was no testimony whatsoever about comparable investments. [The appraiser] merely used a formula from a handbook of factors for present value of an annuity of $1.00 per year.[12]

**Table 9.2 Rate Derivation by Band of Investment**

| | Sale 1 | Sale 2 | Sale 3 |
|---|---|---|---|
| 1. Confirmed sale price | $213,200 | $346,000 | $325,725 |
| 2. Mortgage amount | – 170,500 | – 250,000 | – 260,500 |
| 3. Equity (1 – 2) | $42,700 | $96,000 | $65,225 |
| 4. Net operating income | $14,390 | $22,704 | $21,856 |
| 5. Annual debt service | – 10,929 | – 15,313 | – 16,315 |
| 6. Equity income (4 – 5) | 3,461 | $7,391 | $5,541 |
| 7. Equity capitalization rate (6/3) | 0.081053 | 0.076989 | 0.084952 |
| Rounded | 8.10% | 7.70% | 8.50% |

**Table 9.3 Mortgage-Equity Band-of-Investment Rate Derivation**

| | % of Total Investment | | Rate | | Weighted Rate |
|---|---|---|---|---|---|
| Mortgage | 0.75 | × | 0.0773162* | = | 0.057987 |
| Equity | 0.25 | × | 0.08 | = | 0.020000 |
| Totals | 1.00 | | | | 0.077987 |
| Overall rate (rounded) | | | | | 7.80% |

* Annual mortgage constant for 25-year loan with 6% interest.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

## Yield Capitalization (Discounted Cash Flow Analysis)

Yield capitalization is a second technique of valuation used in the income capitalization approach. The most common application of this approach is discounted cash flow (DCF) analysis, which is not prevalent in condemnation cases. The technique is generally difficult to explain to the uninitiated, and some courts may consider the forecasts of income and reversion to be speculative.

Yield capitalization is used to convert future benefits, typically consisting of a periodic income stream and reversion, into present value by discounting each future benefit by an appropriate yield rate that explicitly reflects the investment's level of risk. To perform yield capitalization, an appraiser

1. Selects an appropriated projection period
2. Forecasts all future cash flows or cash flow patterns (including the reversion, if any)
3. Chooses an appropriate yield (or discount) rate
4. Converts future benefits into present value by discounting each annual future benefit or by developing an overall rate that reflects the income pattern, value change, and yield rate using one of the various yield capitalization formulas

The application of capitalization rates that reflect an appropriate yield rate, the use of present value factors, and DCF analysis are all yield capitalization procedures.

"The yield capitalization method has limited use in an eminent domain setting because it requires the appraiser to forecast a number of different factors into the future such as income change, holding period, property value at the end of the holding period, and the yield rate or discount rate to be applied to the future stream of income in order to arrive at the present value of the property," according to the Uniform Appraisal Standards for Federal Land Acquisitions.

> Because of this, valuations based on this method can be complicated, confusing, and speculative. If this method is to be used in developing an appraisal under these Standards, it is critical that the appraiser develop market support for each of the many factors that must be forecasted in order to show that the analysis reflects what buyers and sellers for that property type are considering on the effective date of value. If appraisers are considering the use of this method, they should discuss it with their client as part of the scope of work conversation.
>
> The yield capitalization method can be a useful tool in testing feasibility in highest and best [use] analysis and as support for the other approaches to value. This method can be very useful in appraisals of leasehold acquisition involving potential damages to a remainder after the taking. It is useful as a means of determining the value of the property before and after the leasehold taking in order to identify the difference.[13]

DCF analysis is often employed in subdivision development analysis. "DCF analysis has become a requirement of many real property clients and other intended users," according to USPAP. "These users of appraisal services favor the inclusion of DCF analysis as a management tool in projecting cash flow and return expectations, capital requirements, refinancing opportunities, and timing of future property dispositions. DCF analysis is regarded as one of the best

methods of replicating steps taken to reach investor buy/sell/hold decisions and is often a part of the exercise of due diligence in the evaluation of an asset."[14]

DCF analysis can be useful in certain partial taking and temporary taking cases in which the government's action will result in a temporary interruption of a property's income stream. In some cases, such as a temporary construction easement, it may be the only reliable method available.

Presenting the results of DCF analysis in a clear and credible manner can be a challenge in any appraisal assignment. "Appraisals using the DCF method in the income capitalization approach may contain computerized projections of itemized future cash flow supported by exhaustive printouts that can be misleading," according to USPAP. "The seeming precision of computer-generated projections may give the appearance of certainty to projections and forecasts that are actually variable within a wide range."[15]

## Notes

1. Uniform Eminent Domain Code, 1974, §11.10, p. 11.10.
2 Uniform Eminent Domain Code, §11.06, p. 11.7.
3. *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 493, 495.
4. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §2.3.3.5, p. 67.
5. *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949).
6. *United States v. 0.88 Acres of Land*, 670 F.Supp.210 (W.D. Mich. 1987).
7. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2015), vol. 5, §19.03 [1].
8. *Nichols'*, vol. 5, §19.03 [1] (2015).
9. *The Appraisal of Real Estate*, 14th ed., 439-559.
10. *Sill Corp. v. United States*, 343 F.2d 411,417 (10th Cir. 1965).
11. *Eikelberger v. State, Department of Highways*, 429 P.2d 555, 557 (Nev. 1967).
12. *United States v. 158.76 Acres of Land, etc.*, 298 F.2d 559, 561 (2nd Cir. 1962).
13. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.5.4.5.
14. *Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019 ed. (Washington, D.C.: The Appraisal Foundation, 2018), Advisory Opinion 33: Discounted Cash Flow Analysis, p. 162.
15. USPAP, 2018-2019 ed., Advisory Opinion 33: Discounted Cash Flow Analysis, p. 163.

Copyrighted material licensed by Randall Bell, PhD on November 30, 2018

10

# Sales Comparison Approach to Value

The sales comparison approach is

> The process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales is available.[1]

The admissibility of various sorts of market evidence used in the application of the sales comparison approach is the most important consideration in using the approach in eminent domain valuation assignments.

## Admissibility of Comparable Sales Data

According to Standards Rule 1-4 (a) of the Uniform Standards of Professional Appraisal Practice,

> When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion.

Evidence of comparable sales has been admitted in nearly all jurisdictions, but the reasons for admitting this sort of evidence vary. In 1960, a Texas court said,

> Evidence of sales of comparable property may be offered under three conditions: (I) on direct examination of expert or lay witnesses as independent substantive evidence of the value of the property to which the comparison relates, or (II) on direct examination of the value-witness to give an account of the factual basis upon which he founds his opinion on the issue of value of the real estate in controversy, or (III) on cross-examination of the value-witness to test his knowledge, experience, and investigation and thus affect the weight to be given to his opinions.[2]

The current trend is to allow direct evidence of comparable sales on direct examination. "If the admission of comparable sales evidence is regulated with reasonable judgment by the trial court, these sales are one of the best types of evidence a jury can use to arrive at fair market value," according to *Nichols*.[3] Some jurisdictions have, in fact, enacted legislative exception to the hearsay rule to allow evidence of comparable sales on direct examination.

An exception to the hearsay rule—i.e., the generally accepted rule that testimony or documents quoting a person who is not in the courtroom are not admissible—is allowed in federal courts under the Federal Rules of Evidence. This exception allows an expert to testify to the factors that the expert's opinion is based on, if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," according to Federal Rule of Evidence 703.

It is of little concern to an appraiser whether the sale price of a comparable property is admitted as direct evidence of the value of the property being appraised or as support for the appraiser's opinion of market value. It may be significant, however, insofar as a sale presented as direct evidence of the market value of the property being appraised must generally have a higher degree of comparability than a sale submitted as support for an appraiser's opinion of market value. In fact, a court will often rule on the comparability of a sale, as a matter of law, before an appraiser is allowed to testify to the price of the comparable property.

Most jurisdictions allow the price of comparable land to be admitted as direct, or independent, evidence of the market value of the property in dispute. Under those circumstances, the rule of admissibility is an exception to the hearsay rule and the best evidence rule (i.e., the legal doctrine that an original piece of evidence is superior to a copy). The reasoning behind this exclusion from the rules is well stated in a Montana case:

> All expert opinion is based on "hearsay" to a great extent and much of what is presented by such witnesses is "secondary" evidence. We feel we can achieve speedy litigation and still preserve the truth by the rule adopted here. It must be shown that the witness is expert and that the sales are comparable and recent. With these safeguards plus the fact that the witness has his professional reputation riding on his testimony we feel that the repugnancy of this line of testimony is reduced, if not eliminated altogether. The development of a value pattern by one experienced in the business and knowledgeable as to the area involved will best bring uniformity to the market value determination in the most efficient manner.[4]

In discussing an expert's reliance on hearsay evidence, Federal Rule of Evidence 703 notes that "[t]he physician makes life-and-death decisions in reliance upon [hearsay evidence]. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes."[5]

A comparable sale admitted only in support of an appraiser's opinion of value generally does not have to possess the same high degree of comparability that a sale submitted as direct evidence of value does. In such a case, "there is less reason for being strict in regard to similarity, because the evidence serves the purpose only of supporting the credibility of the estimate of value given by the witness," according to a ruling in a Kentucky case.[6] When this sort of support

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

testimony is given, it is not usually necessary for the court to rule on its comparability before admitting the sale price of the comparable property. The price is not admitted as direct evidence of value but, rather, to assist a jury in measuring the reliability of an expert's ultimate opinion of value.

## Sale of Subject Property

"Prior sales of the same property, if unforced arm's-length, for cash or its equivalent, and reasonably recent to the date of valuation, are extremely probative evidence of market value," states the Uniform Appraisal Standards for Federal Land Acquisitions. "Accordingly, the appraiser must determine what the owner paid for the property being appraised."[7] For this reason, appraisers are required to consider and report recent sales of the property being appraised, if available in the normal course of business. Federal standards require the following:

> **Sales history.** Include a 10-year record of all sales and, if the information is available, any offers to buy or sell the subject property. If no sale of the property has occurred in the past 10 years, the appraiser must report the last sale of the property, irrespective of date.
>
> Information to be reported must include the name of the seller, name of the buyer, date of sale, price, terms and conditions of sale, and the appraiser's verification of the sale and whether the transaction met the conditions required for a comparable sale under Section 1.5.2.2.[8]

The Uniform Standards of Professional Appraisal Practice states,

> When the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business:
>
> (a) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and
>
> (b) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal.[9]

The Federal Highway Administration's appraisal guide states the following:

> Short form appraisal must contain . . . [t]itle information, including a five-year sales history of the subject property.

and

> Minimum requirements for a detailed appraisal are set forth in 49 CFR [Code of Federal Regulations] Part 24 and include . . . title information, including five-year sales history.[10]

Despite what the various professional standards and governmental regulations say, listings and options are inadmissible in some jurisdictions although they provide useful information on market trends and should be considered in market analysis.

A historical sale of the property in dispute is universally admitted as direct evidence of the value of the property if the sale was recent and voluntary. Adjustments to the sale price are warranted if there were significant changes in the property's physical attributes or material changes in market conditions since the date of sale or if the sale was project-influenced. No rule has been set down as to what constitutes *recent*. Whether the sale of a property is recent enough to allow it into evidence is generally within the discretion of the court.

For instance, in a 1959 case a federal district court excluded from evidence a sale that occurred two years prior to the date of valuation for being too remote in time,[11] but in a 1942 case the federal court of appeals approved the admission into evidence of the purchase price of the property in dispute even though the sale occurred 14 years prior to the date of valuation.[12] In 1970, a Michigan court ruled that a "nine-year interval between the purchase of the land and its condemnation does not render the purchase price patently inadmissible."[13] Of course, evidence explaining the circumstances of a prior sale may be admitted, and it has been held that consideration must be given to any appreciation between the date of sale and the date of condemnation. Therefore, the appraiser must make an adjustment for any changes in market conditions that may have occurred since the date of sale if it is warranted.

The rules regarding the admission of a prior sale of the property in dispute were laid down by a North Carolina court as follows:

> In general, purchase price is admissible if it is relevant to the value of the land at the time of condemnation. This rule was stated by this Court in *Board of Transportation v. Revis*, 40 N.C.App. 182, 252 S.E.2d 262, *review denied*, 297 N.C. 452, 256 S.E.2d 805 (1979).
>
> We review the established rules in North Carolina governing the competency and admissibility of evidence of purchase price paid by a condemnee for land later appropriated for public use, in a proceeding to establish just compensation for the taking:
>
> (1) It is competent as evidence of market value to show the price at which the property was bought if the sale was voluntary and not too remote in point of time.
> (2) When land is taken by condemnation, evidence of its value within a reasonable time before the taking is competent on the question of its value at the time of the taking.
> (3) Such evidence must relate to the value of the property sufficiently near the time of taking as to have a reasonable tendency to show its value at the time of its taking.
> (4) The reasonableness of the time is dependent upon the nature of the property, its location, and the surrounding circumstances. Some of the circumstances to be considered are the changes, if any, which have occurred between the time of purchase by the condemnee and the time of the taking by the State, including physical changes in the property taken, changes in its availability for valuable uses, and changes in the vicinity of the property which might have affected its value.
> (5) The fact that some changes have taken place does not per se render the evidence incompetent. If the changes have been so extensive that the purchase price does not reasonably point to or furnish a fair criterion for determining value at the time of the taking, when purchase price is considered with other evidence affecting value, the evidence of purchase price should be excluded.
> (6) The ultimate criterion is whether, under all the circumstances, the purchase price fairly points to the value of the property at the time of the taking.[14]

Several courts have held that a prior sale price of the property being condemned is the best evidence of value. It is imperative, therefore, that appraisers investigate and thoroughly analyze any recent sale of the property being ap-

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

praised. Although an appraiser may conclude that comparable sales more than two years old are too remote in time to be meaningful, this would not necessarily apply to an earlier sale of the property being appraised.

If it is determined that a prior sale of the property is, in fact, relevant to its current value, this sale should be analyzed like any other comparable sale. Often, but not always, the only adjustment needed is for the date of sale. It is extremely important to verify any sale of the subject property. If an appraiser cannot make a reliable verification of the sale of the subject property, it may be necessary to ask legal counsel to help verify the sale, possibly through the discovery process.

Appraisers may justifiably conclude that the prior sale of the subject property should be given greater weight in the final opinion of value due to the lack of adjustments required for physical differences. However, this is not necessarily true as a matter of law. The prior sale price of the property in question is only one of many factors to be considered in arriving at a final opinion of value. As stated by the Third Circuit Court, "[w]e reject the conception that a prior sale or sales of condemned property must always, as a matter of law, be given more weight in condemnation proceedings than sales of comparable property. Recent sales of the very property condemned are entitled to considerable weight, but sales of similar property are entitled to weight also; and the relative importance of the two is dependent on the facts in the particular condemnation proceedings."[15]

## Comparable Sales

An appraiser will generally investigate, analyze, and consider many sales before selecting the sales that are the most pertinent to valuation of the property being appraised. Standards require the consideration of all comparable sales that are available. Then the pool of available sales is whittled down based on comparability. It takes analysis to decide which sales to keep and which to discard. No sales should be routinely discarded based on arbitrary rules. Because the appraiser is usually attempting to analyze market value and, according to the Tenth Circuit Court, "[t]he best evidence of such value is like and comparable sales within a reasonable time preceding the condemnation,"[16] it is imperative that all relevant factors be considered in the selection process.

The best comparable sales, from both an appraisal practice standpoint and a legal standpoint, are those that are most similar (i.e., least dissimilar) to the subject property. An Illinois court stated that "'similar' does not mean 'identical,' but means having a resemblance, and that property may be similar in the sense in which the word is here used though each possesses various points of difference."[17] The degree of similarity varies from case to case, so neither appraisers nor the courts can arrive at a formula to test comparability or similarity. In one instance, adjustments totaling 15% of the sale price may indicate that the property is, in fact, not a comparable sale, but in another instance a sale with total adjustments equaling 15% of the sale price might be the most comparable sale available.

A sale that is a good comparable is one that involved an *open market transaction*. An appraiser asks, did the sale occur in accordance with all criteria set forth in the definition of market value? (See Chapter 2 for a discussion of market

value.) If the questions listed in Figure 10.1 can all be answered affirmatively, the sale probably meets the criteria for an arm's-length market value transaction. A negative answer to Question 1 does not necessarily eliminate the sale as a comparable, however. For instance, if a property with a lease in place was sold, it may be possible to adjust the sale price of the property to reflect the effect of any difference in property rights. A positive answer to Question 6 will eliminate sales involving trades or exchanges for other real or personal property.

A negative answer to some of the questions listed in Figure 10.1 does not necessarily mean the sale was not an open-market, arm's-length transaction. For example, a seller may have paid a portion of the purchaser's financing fees. If the fees paid by the seller to benefit the buyer can be determined, this amount may be used as the basis for an adjustment to the indicated sale price. If the sale was a contract sale, it may or may not be admissible as evidence, depending on the jurisdiction and the specific terms and conditions of the transaction.

To determine whether a contract sale is admissible within a specific jurisdiction, applicable case law must be analyzed carefully. Case law is divided on the admissibility of installment sales. Most jurisdictions appear to allow their admissibility, taking the position that if the offered sale is a contract of sale, this fact affects the weight of the evidence, not its admissibility. As *Nichols'* has stated, "[i]f evidence were to be excluded of all sales every cent of which was not cash, the door would all but close as to the evidence of other sales."[18] The admission of evidence in regard to contracts to sell, such as earnest money contracts, has met with mixed reactions. As a general rule, unexercised options are not admissible. Similarly, sales that involve the exchange of property are generally inadmissible.

Appraisers should personally verify sales with either the buyer or seller. If neither is available, the verification of a participating broker or attorney who handled the transaction is generally satisfactory. Verification of a sale with the broker or attorney *and* the buyer or seller will usually produce the greatest amount of useful, reliable information.

Many real estate appraisers employ research assistants or associate appraisers, who do much of the field research required for an appraisal and, at times, verify sales. "Verification must be by competent and reliable personnel, and, if the property goes into condemnation, the sale must be personally verified by the

**Figure 10.1 Questions About Comparability**

1. Did the sale convey unencumbered fee simple title or its equivalent?
2. Were both the buyer and seller typically motivated?
3. Was the market open to all prospective participants, and was there competition?
4. Were both parties well informed or well advised and each acting in what they considered their own best interests?
5. Was the property allowed exposure in the open market for a reasonable length of time?
6. Was payment made in cash or its equivalent?
7. Was financing, if any, on terms generally available in the community at the time of sale and typical for the property type in its locale?
8. Did the price represent normal consideration for the property sold unaffected by special financing amounts or terms, services, fees, costs, or other credits incurred in the transaction, often referred to as *seller concessions*?

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

appraiser who will testify," according to the Uniform Appraisal Standards for Federal Land Acquisitions.[19]

The weight of authority holds that a sale to a purchaser with the power of eminent domain is not admissible. For example, California law prohibits the use of a sale of a property or property interest "if the acquisition was for a public use for which the property could have been taken by eminent domain."[20] In most cases, a property conveyed to a potential condemnor is not exposed to an open and competitive market. Moreover, whether the seller was typically motivated is questionable. However, there have been exceptions to this rule. According to a 1942 ruling of the District of Columbia Circuit Court, "the burden is upon the party who offers such evidence to establish as a preliminary fact that the purchase, concerning which evidence is offered, was made without compulsion, coercion or compromise."[21] If appraisers are to use that sort of sale, they must verify it with all the parties involved and explain the results of that verification explicitly in the appraisal report and in testimony.

If the seller made the initial contact and offered the property to the potential condemnor, there may be strong evidence of no unusual compulsion. Also, a historical review of the number of parcels acquired amicably versus the number condemned by the condemning authority over a period of time can give some insight into any possible undue compulsion to buy or sell. Sales to purchasers with the power of eminent domain do not necessarily demonstrate a pattern of being either above or below market value. "A company condemning land might be willing to give more than it was worth, and the owner of the land might be willing to take less than it is worth, that is, less than its market value, rather than have a lawsuit," according to an Arkansas court.[22] The procedure recommended for reliable verification of sales to the government is discussed later in this chapter.

The appraisal profession recognizes that accurate quantitative adjustments can sometimes be made for atypical financing and conditions of sale.[23] Adjustments for these factors can be made within the adjustment process of comparative analysis. For example, an FHA discount paid by a seller to obtain a purchaser's financing can generally be accurately quantified by proper sales verification. The discount can then be deducted from the gross sale price of the property to determine the cash-equivalent price the seller received for the property. In the same way, an atypical contract of sale may be accurately converted to a cash-equivalent price.

## Comparability

As is the case with sales to an entity with the power of eminent domain, "[t]he party offering the sales claimed to be comparable has the burden of proving, as a preliminary to the introduction of the prices involved in such sales, that they are similar both in character and locality to the land being condemned," according to an Illinois court.[24] In another ruling in Illinois, the court stated, "no fixed or general rule has or could be laid down which governs the degree of similarity that must exist between the properties sold and that condemned to make evidence of the sale or sales admissible."[25] However, it is universally recognized that to be valid, a comparable sale must have the same economic highest and best use

as the property being appraised. Sales that have a different highest and best use are generally not considered comparable and thus are rejected.

According to *The Appraisal of Real Estate*:

> Appraisers have a special responsibility to scrutinize the comparability of all data used in a valuation assignment. They must fully understand the concept of comparability and should avoid comparing properties with different highest and best uses, limiting their search for comparables, or selecting inappropriate factors for comparison.[26]

*The Appraisal of Real Estate* lists ten basic elements of comparison:

1. Real property rights conveyed
2. Financing terms
3. Conditions of sale
4. Expenditures made immediately after purchase
5. Market conditions
6. Location
7. Physical characteristics
8. Economic characteristics
9. Legal characteristics
10. Non-realty components of value[27]

The Uniform Appraisal Standards for Federal Land Acquisitions lists the same factors of adjustment.[28]

The date of sale (i.e., the market conditions at the time of sale) of a comparable property is important in a rapidly changing market. At times, an appraiser may be allowed to present a time increment or market conditions study to support an adjustment for this factor, even though the sale properties used in the study are not *comparable*. Whether or not the specific data used in such a study is admissible, a market conditions study should be undertaken by the appraiser, even if the appraiser makes no market conditions adjustments. Although appraisers may not be able to testify to the specifics of the study, they will generally be allowed to testify that the market conditions adjustment, or lack of an adjustment, was based on such a study.

Sales occurring after the date of valuation have met with mixed reactions. The use of these sales falls under what is often termed the *hindsight rule*. It has long been argued that sales transacted subsequent to the date of taking should not be submitted as evidence, or considered by the appraiser, for two reasons. First, these sales represent information that would not have been available to the hypothetical purchaser on the date of the taking. Thus, an appraiser would be considering market factors unknown as of the date of value. Second, sales occurring after the date of taking may reflect *project influence*, which appraisers must generally disregard in analyzing the value of a property at the time of taking.

"A retrospective appraisal is complicated by the fact that the appraiser already knows what occurred in the market after the effective date of the appraisal," according to the Uniform Standards of Professional Appraisal Practice. "Data subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

seller as of that date. The appraiser should determine a logical cut-off for the data to be used in the analysis because at some point distant from the effective date, the subsequent data will no longer provide an accurate representation of market conditions as of the effective date. This is a difficult determination to make."[29]

"Sales that occurred after the date of valuation may be considered if they are not otherwise incompetent as evidence of value," according to the Uniform Appraisal Standards for Federal Land Acquisitions.[30] As a general rule, "[s]ales occurring after the date of acquisition [i.e., the date of taking] can be used to show the value of the subject property in the 'before' situation," according to a 1973 ruling by an Arizona court. "It is also the general rule that comparable sales which reflect an enhanced value brought about by the making of the improvement are not admissible."[31] Sales occurring subsequent to the date of taking have generally met with greater acceptance when used to analyze a property's after value in a partial taking case rather than to value the property in the before situation. Those sales will often demonstrate damages or special benefits accruing to a remainder parcel.

Both appraisers and attorneys must be aware of the applicable law in the jurisdiction regarding the admissibility of sales subsequent to the date of valuation. Such information is essential even if the appraiser does not anticipate using sales that occurred after the date of valuation because the appraisers testifying for the opposing party may. If the admissibility of certain sales is not clear in the specific jurisdiction, appraisers should have available alternative sales to which they can testify if sales subsequent to the date of valuation are ruled inadmissible.

The degree of proximity required of any specific sale property will vary with the type of property being appraised and sales activity in the area. The courts have, on many occasions, recognized this fact. "[N]o general rules can be laid down as to the distance at which other land ceases to be similar enough in location to the land in question so that evidence as to its sale price is admissible to prove the value of the latter land," according to a 1951 ruling by an Illinois court. "The determination of this question depends upon the character of the land involved and the facts and circumstances of a particular case."[32]

If an appraisal involves a single-family dwelling located within a subdivision, it may not be necessary for an appraiser to look outside that subdivision for comparable sales. If, however, the property being valued is a commercial site on an interstate freeway, properties 100 miles away could be deemed *comparable* since comparable properties are not always found in the immediate vicinity of the property being appraised and the properties would probably be competing for the same customers--interstate highway users.

The test of comparability in terms of location is not the physical distance between properties, but whether the properties are within *economic proximity*. In other words, do the subject property and the comparable property share similar linkages to the surrounding area, and are they affected by similar macroeconomic and microeconomic forces such as demographics, household income levels, housing density, educational facilities, employment centers, and the like? As stated by a Texas court:

> The distance between the condemned property and the property involved in an alleged comparable sale is important in determining whether both are in the same economic use area.[33]

A property's unique physical features can also expand the geographical area from which comparable sales may be drawn. In a ruling of a 1971 case, a California court said:

> We also reject the condemnor's contention that the trial court erred in admitting into evidence sales of property located in the Old Creek area, 30 to 50 miles from the Bailey land. The county apparently claims that all four of these sales were "noncomparable" as a matter of law, because the lands involved in these sales were "too remote" from the property which was the subject of the eminent domain proceeding. The 30 to 50 miles distance alone, it is suggested, required the exclusion of this evidence. . . .
>
> In the instant case defendants' appraisal witness explained that because of the rather distinctive terrain of the Bailey property there were few sales of "comparable property" within the immediate vicinity. He testified that he searched for sales of properties which were similar to the condemned property in "size, character, topography, suitability for recreational use, access to creeks and access to roads," and on that basis, chose the Old Creek sales which plaintiff now claims are too distant to be "comparable." Given the great variety of factors of "comparability" to be considered, and the relative scarcity of similar property in the immediate vicinity, we cannot find that the trial judge abused his discretion in admitting the challenged sales.[34]

Nevertheless, all else being equal, the best comparable properties are those located closest to the property being appraised. If an appraiser retained by one party in a dispute must go far afield to find truly comparable properties, it is likely that the appraiser retained by the opposing party will have to do the same. However, appraisers must be cautious in assessing the comparability of such a sale.

A comparison of the physical characteristics of two properties can, of course, cover many items. The specific characteristics that require adjustment, or at least consideration, will vary with the type of property being appraised. An extensive list of the different physical characteristics of the properties can be developed, but appraisers should only consider and include in the appraisal report those differences that are reflected in the marketplace. All these differences should be recorded in the appraiser's notes, whether or not an actual adjustment is called for, to help the appraiser testify competently.

The mere existence of physical differences between two properties does not mean adjustments are required. An adjustment is necessary only if the difference affects the price at which sellers are willing to sell and buyers are willing to buy.

In comparing the physical characteristics of properties, it is often desirable, and sometimes absolutely necessary, to apply a common unit of measure. The common units of measure for comparing vacant land are price per square foot, price per acre, price per front foot, price per whole site, price per buildable square foot, and in some instances price per developable (or typical) unit. This last unit of measure is often applied to land that has a highest and best use for multifamily dwellings and lodging facilities. A common unit of measure for urban commercial sites is the allowable floor area ratio (FAR), also referred to as *buildable square feet*. Appraisers should use the unit of comparison that is common in the area and produces the most reliable range of indicated values for the property being appraised.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

## Cash-Equivalent Sales

The courts have universally acknowledged that market value is to be measured in terms of cash or its equivalent. However, many cases reported deal with comparable sales that involved property exchanges or other non-cash considerations, not sales on installment terms or other seller financing. When market value is defined in terms of cash or its equivalent, appraisers recognize that comparable sales sold on terms other than cash must be analyzed to determine whether the price paid was affected by the non-cash nature of the transaction. According to the Uniform Appraisal Standards for Federal Land Acquisitions:

> [T]he appraiser must make a diligent investigation to determine the financial terms of each comparable sale. When comparing the sale to the property being appraised, the appraiser shall analyze and make appropriate adjustments to any comparable sale that included favorable or unfavorable financing terms as of the date of sale. Such adjustment must reflect the difference between what the comparable sold for with the favorable or unfavorable financing and the price at which it would have sold for cash or its equivalent.[34]

Appraisers use a number of methods to adjust non-cash sales to a cash-equivalent price.[35] However, according to the Uniform Appraisal Standards for Federal Land Acquisitions, "[w]hile cash equivalency of favorable or unfavorable financing can be estimated by discounting the contractual terms at current market or yield rates for the same type of property and loan term over the expected holding period of the property, the preferred method of estimating a proper cash equivalency adjustment is by the analysis of actual market data, if such data is available."[36] Because the courts have not addressed the appropriate methodology for adjusting non-cash sale prices to a cash-equivalent value, appraisers must be prepared to demonstrate the reasonableness of any cash equivalency adjustment made with market data.

If paired sales data is not available and an appraiser is forced to use a discounting process to equate the actual terms of the sale to typical financing terms, the appraiser should be prepared to demonstrate, with factual market data, the typical financing terms available at the time of the sale and how the typical holding period of the property was determined. Appraisers should also be ready to demonstrate the mathematics of the discounting process.

## Sales to Government

In a perfect world, appraisers would always find an abundance of comparable market data and there would never be a need to even consider using a sale to a governmental entity as a comparable sale. Some governmental agencies have historically prohibited the use of sales to the government as comparable sales in their appraisals, while others merely discourage it. But, because of the unique needs of some government agencies, there is sometimes an inadequacy of private market data with which to develop a reliable indication of market value. Indeed, without resorting to sales to governments as comparables, it could be impossible to develop an indication of market value by the sales comparison approach at all. The one positive aspect of this situation is that, unlike most private purchases, a government purchase and the decision-making process that led to it are usually

well documented. Appraisers can take advantage of that documentation in the sales verification process. In fact, appraisers *must* take advantage of it.

The legislation that authorized, or mandated, the property purchase is, of course, available for public inspection. It should be studied carefully to ensure that the purchase was not authorized for a price other than market value. Many acquiring agencies are required by law to release the information and data they relied on in making land purchases once the transactions are consummated. This information can include appraisal reports, appraisal reviews, the report or diary of the negotiator, correspondence relating to the acquisition, internal memoranda justifying the final acquisition price, and copies of all conveyance and closing documents. The type of available documentation supporting the purchase and the difficulty encountered in obtaining it will vary from agency to agency. If adequate documentation is not willingly provided and a particular sale is critical to an appraisal, appraisers may want to consider filing a formal request under the federal Freedom of Information Act or a similar state law.

Equally important is thorough verification of the sale with the seller. This can lead to additional insight, such as whether the seller had the property appraised. Also, sellers will sometimes sell at prices that they believe are below market value if they support the government's project, are simply tired of the protracted government negotiations (which in some circumstances go on for years), or want to avoid litigation. Sellers occasionally do "bargain sale" agreements with agencies, in which they have a property appraised, sell at or near the agency's appraised value, and "donate" the difference.

The whole purpose of documentation and verification is to ensure that any sale used as a comparable sale is a true representation of market value and that the price paid by the government is equivalent to the price that would have been paid for the property had it been sold to a private party. However, the fact that the price paid by the government was different from the value conclusion derived in its approved appraisal or was influenced by nonmarket factors does not necessarily invalidate the transaction as a reliable comparable sale. Sales to the government at prices that are slightly above the appraised value should not necessarily be rejected as invalid. Sales that are substantially higher than the government's appraised value do, however, require scrutiny.

Some sales that have been affected by nonmarket factors can be adjusted and used as comparable sales. For example, if the fee simple estate was appraised and the government paid the appraised value but, as part of the negotiations, the property owner retained a life estate in the property, then the sale price could be adjusted for the present value of the life estate, if such an adjustment is justified. Similarly, if an internal memorandum in the government's file indicates that the government agreed to pay a price higher than market value because the excess was less than the cost of a condemnation trial, a reasonable adjustment could be made for this factor.

If a sale to the government is used as a comparable sale, an appraiser must fully report the investigation and analysis that were undertaken to verify the sale. Because sales to the government are generally considered inadmissible, it is incumbent upon appraisers to convince intended users of appraisal reports of the reliability of the sale as a valid and admissible indication of market value.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

Sales of property for conservation purposes can have unusual characteristics. When a public project such as a wildlife refuge is authorized, but the acquisition has not been funded, an environmental organization might acquire lands within the project area for the sole purpose of transferring those lands, at the organization's cost, to the government when funding becomes available. At times, the relationship between the government agency and the environmental group is so close that the environmental group almost seems to act as an agent of the government. Appraisal reports commissioned by an environmental group for purposes of acquisition are prepared in accordance with the government agency's requirements and guidelines and, on occasion, may even be reviewed and approved by the government agency before the environmental organization makes the purchase.

It is not unheard-of for sellers of such lands to take (or attempt to take) a tax write-off for a contribution to the environmental group and claim a value for the contribution in excess of the actual purchase price of the property. In some instances, the property owners know that if they do not sell to the environmental group, they will be unable to sell their land on the open market because it has been designated as being within the government's authorized but not-yet-funded project area and is scheduled for government acquisition in the future. The motivation behind purchases by environmental groups (i.e., transfer to the government) is certainly not the motivation behind most market transactions (i.e., purchase to put the land to its highest and best use).

Because of these complications, appraisers should avoid using such sales if at all possible. If they must be used, objections should be anticipated, so careful verification is essential. Appraisers should determine whether the purchases were made based on competent appraisals and whether the instructions, if any, specified that the market value of the property for its highest and best use be analyzed. The appraiser's investigation should determine whether the environmental group's appraisal was written in accordance with government guidelines and whether the report was reviewed and approved by the government agency. If a tax write-off was claimed by the seller, an adjustment for this factor should be considered.

Even with verification of this additional information, some courts may exclude evidence of these sales. They are often so much a part of the government project for which the property is being acquired that no amount of verification or adjustment can totally remove the blemish from the sale.

## Notes

1. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v. "sales comparison approach."
2. *Hays v. State*, 342 S.W.2d 167, 170-171 (Tex. 1960).
3. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2015), vol. 5, §21.01[3][b].
4. *State v. Greenfield*, 399 P.2d 989, 992 (Mont. 1964).
5. Federal Rule of Evidence 703, "Notes of Advisory Committee on 1972 Proposed Rules."
6. *West Kentucky Coal Co. v. Commonwealth*, 368 S.W.2d 738, 741 (Ky. 1963).
7. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §4.4.2.4.1, p. 123.
8. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §2.3.2.3.5, p. 62.

9. *Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019 ed. (Washington, D.C.: The Appraisal Foundation, 2018), Standards Rule 1-5, p. 18.
10. U.S. Department of Transportation, Federal Highway Administration, *The Appraisal Guide*, (Washington, D.C.: U.S. Government Printing Office, 1993), 29, 37.
11. *United States v. 765.56 Acres of Land*, 174 F.Supp. 1 (E.D. N.Y. 1959).
12. *United States v. Becktold Co.*, 129 F.2d 473 (8th Cir. 1942).
13. *Petition of Michigan State Highway Comm. v. McGuire*, 185 N.W.2d 187. 188 (Mich. 1970).
14. *City of Winston-Salem v. Davis*, 296 S.E.2d 21, 23-24 (N.C. 1982).
15. *Hickey v. United States*, 208 F.2d 269, 273 (3rd Cir. 1953) *cert. denied*, 347 U.S. 919 (1954).
16. *Onego Corporation v. United States*, 295 F.2d 461, 463 (10th Cir. 1961).
17. *City of Chicago v. Vaccaro*, 97 N.E.2d 766, 773 (Ill. 1951).
18. *Nichols'*, vol. 5, §21.01[3][c] (2015).
19. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.4.2.3, p. 122.
20. California Evidence Code, § 822.
21. *Hannan v. United States*, 131 F.2d 441, 442 (D.C. Cir. 1942).
22. *Yonts v. Public Service Co.*, 17 S.W.2d 886, 887 (Ark. 1929).
23. *The Appraisal of Real Estate*, 14th ed., (Chicago: Appraisal Institute, 2013), 407-412.
24. *Department of Public Works & Buildings v. Exchange National Bank*, 336 N.E.2d 376, 383 (Ill. 1976).
25. *City of Evanston v. Piotrowiez*, 170 N.E.2d 569, 575 (Ill. 1960).
26. *The Appraisal of Real Estate*, 14th ed., 125.
27. *The Appraisal of Real Estate*, 14th ed., 390.
28. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.5.2.3, p. 27.
29. USPAP, 2018-2019 ed., p. 164.
30. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.4.2.4.7, p. 130, citing *United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613, 618-19 (9th Cir. 2008); *United States v. 68.94 Acres of Land in Kent County*, 918 F.2d 389, 398-99 & n.6 (3d Cir. 1990); *United States v. 0.161 Acres of Land in Birmingham*, 837 F.2d 1036, 1044 (11th Cir. 1988); *United States v. 312.50 Acres, Prince William County, Va.*, 812 F.2d 156, 157 n.3 (4th Cir. 1987); *United States v. 428.02 Acres of Land in Newton & Searcy Ctys.*, 687 F.2d 266, 270 (8th Cir. 1982); *United States v. 320.0 Acres of Land, More or Less, Etc.*, 605 F.2d 762, 799-803 (5th Cir. 1979); *United States v. 691.81 Acres of Land in Clark County*, 443 F.2d 461, 462 (6th Cir. 1971); *United States v. 63.04 Acres of Land at Lido Beach*, 245 F.2d 140, 144 (2d Cir. 1957).
31. *City of Tucson v. Ruelas*, 508 P.2d 1174, 1176 (Ariz. 1973) [citation omitted].
32. *Chicago v. Harbecke*, 100 N.E.2d 616, 619 (Ill. 1951).
33. *Hays v. State*, 342 S.W.2d 167, 172 (Tex. 1960).
34. *County of San Luis Obispo v. Bailey*, 483 P.2d 27, 32-33 (Cal 1971).
35. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.5.2.3, p. 28.
36. For examples, see *The Appraisal of Real Estate*, 14th ed., 408-410.
37. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.5.2.3, p. 28.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

11

# Subdivision Development Analysis

Subdivision development analysis can be used to estimate vacant land value when the highest and best use of the property is for subdivision development. This income capitalization technique is one of the six methods used to value vacant land.

According to *The Dictionary of Real Estate Appraisal*, the *subdivision development method* is, "[a] method of estimating land value when subdividing and developing a parcel of land is the highest and best use of that land." The definition of the term also outlines the elements of the valuation technique: "When all direct and indirect costs and entrepreneurial incentive are deducted from an estimate of the anticipated gross sales price of the finished lots (or the completed improvements on those lots), the resultant net sales proceeds are then discounted to present value at a market-derived rate over the development and absorption period to indicate the value of the land."[1] This method of land valuation has also been referred to as the *development approach*, the *anticipated use method*, the *lot method*, and the *developer's residual approach*.

There has been a great deal of controversy and confusion among the various courts as to the applicability of this procedure. Thus, a considerable amount of case law has been developed on the subject. Also, subdivision development analysis has in many cases been applied under the wrong circumstances or in the wrong way.

There are many appropriate variations in applying subdivision development analysis to value. The Appraisal Institute published the second edition of *Subdivision Valuation* in 2017, and several different methods of subdivision analysis are demonstrated in that book.[2] All of the methods are useful, but some are more applicable under certain circumstances.

## Applicability

The direct land sales comparison technique is always the preferred method for the valuation of vacant land. However, in situations where there is a lack of comparable land sales or unique "in fill" vacant sites are to be valued, subdivision

development analysis may be the primary, or perhaps the only, method of valuation. This method is applied in a condemnation case when

1. An appraiser concludes through proper market analysis that the property in question does in fact have near-term market demand for subdivision development to support a highest and best use conclusion for subdivision purposes,
2. Comparable before or after sales are limited or difficult to analyze, and
3. Sufficient market and technical data is available to estimate the value of the property being appraised reliably using subdivision development analysis.

In determining that a property's highest and best use is for subdivision purposes, appraisers must consider supply and demand, zoning, the availability of utilities, the direction of population growth, the physical characteristics of the property being appraised, local land development regulations, and local government attitudes towards the development of properties in the area, among other factors. Of particular concern is the "legally permissible" criterion of highest and best use when the property is not currently zoned for the proposed development.

Properties valued with subdivision development analysis may range from raw acreage to sites that are nearly 100% developed. With a partially developed site, of course, there is a stronger case for determining that the highest and best use is for subdivision purposes and that subdivision development analysis is appropriate. If data is available on recent sales of developed lots that were originally part of the tract being appraised, the demand for developed lots can be demonstrated with factual market data. In fact, a Pennsylvania court expressed the importance of demand analysis explicitly in a ruling. "The bald assertion by the condemnee or his witnesses that such a demand exists is not enough," stated the court. "Such a demand must be established by competent proof."[3]

If sales of comparable properties are available, they should be used in evaluating the property being appraised. "Sales comparison is the most common technique for valuing sites, and it is the preferred method when comparable sales are available," according to *The Appraisal of Real Estate*.[4] If the sale property is truly comparable, it will have the same potential as the property being appraised. As a New York court put it,

> The comparable sales relied upon by both expert witnesses in valuing the subject property involved properties purchased by developers for development purposes and accordingly were sales in which development costs have been considered and were reflected in the sale price. To add an increment to the value established on the basis of these sales is to inflate and distort the market value of the subject property.[5] [Citations omitted]

Another New York decision stated the following:

> The court actually valued the property as having a residential development potential by relying upon the state's comparable sales. In the present case, there was no need for a separate increment value to be found by the appraisers or the court because the market data inherently included the value in raw acreage sales.[6]

This is not to say that subdivision development analysis should be totally disregarded under those circumstances. Rather, it should be used to support the

Copyrighted material licensed to Randall Bell, PhD on November 29, 2018

indicated value of the property developed using comparable sales, if additional support is needed. Appraisers should consult with the attorneys of the client on the scope of work of the assignment, which would include whether to present subdivision development analysis as a stand-alone valuation technique or to use it only to support adjustments to an analysis of comparable sales. From an appraiser's perspective, this technique may be the best approach to solving an appraisal problem in some situations, but from a legal perspective, the conclusions of subdivision development analysis may be unacceptable in court. The procedure applied in subdivision development analysis can often give appraisers greater insight into the relative comparability of sale properties. Although many condemning agencies will not allow subdivision development analysis to be used as the only measure of value, they recognize it as supporting evidence. For example, the Washington State Department of Transportation stated the following in its *Right of Way Manual*:

> The employment of the hypothetical subdivision to develop raw land value may be introduced to support the market data and to illustrate the amount of money a prudent purchaser would likely pay for raw subdivision land. However, due to the many variables and speculative elements, the estimate of value is never based solely upon such a hypothesis.[7]

If an appraiser cannot find any raw acreage sales with development potential comparable to the property being appraised, the analysis of supply and demand for developed lots as well as the highest and best use conclusion may need to be reexamined. Similarly, if market data on retail lot prices, development costs, and sellout times in the neighborhood is not available, a review of the supply and demand analysis and highest and best use conclusion may be required. While a lack of sales or development activity may indicate an insufficient supply of land suitable for such a use, it can also indicate a lack of demand. Any appraiser who uses subdivision development analysis should confirm that the lack of market data is a result of the former condition rather than the latter.

Technical data can be obtained from engineering firms involved in plat design and development cost estimating or from contractors who install underground utilities or construct other subdivision improvements. According to the Uniform Appraisal Standards for Federal Land Acquisitions, "this approach to value is complex, often requires the assistance of other experts, and always requires substantial amounts of research, analysis, and supporting documentation."[8]

## Appraisal Procedure

For subdivision development analysis to be applicable, highest and best use analysis must support a conclusion of near-term subdivision development for the property being appraised. Both inferred and fundamental market analysis techniques may be used to support the absorption forecast and the near-term market demand forecast for the defined product category. If subdivision development analysis is applicable, an appraiser must apply it in a logical sequence consistent with proper appraisal methodology. Essentially, subdivision development analysis is a land residual technique applied to a specific development scenario, where market demand supports near-term development.

The subdivision development procedure is used to provide an estimate of vacant land value as of the current date. The process considers the three phases of development:

1. The entitlement phase
2. The construction phase
3. The absorption phase

The present value calculation considers the required time frame to complete each phase of development and discounts the future cash flows and costs to a present value conclusion, reporting an "as is" vacant land value conclusion.

## Market Support

Market support is needed to determine the overall time horizon for the analysis and related conclusions. This includes consideration of the entitlement period for parcels that require additional entitlements or building permit approval, the time needed to construct the subdivision, and the future absorption time needed to market lots to end users.

Entitlement time frames can vary significantly depending on the current status of the zoning and whether additional approvals are required. Many communities have established time lines for the approval process as well as the required time period to complete subdivision construction. Absorption time lines are critical to the success of any proposed development and require the most scrutiny.

Appraisers must be completely familiar with the economic factors affecting the market in which the property being appraised is located. For example, when evaluating a proposed residential development, an appraiser should establish the geographic boundaries of the areas that will compete with the parcel being appraised. This calls for both inferred and fundamental market analysis using the six-step market analysis process. The area of competition may be a neighborhood, a city, or an entire county. After the geographical area is determined, the appraiser should analyze current inventory and the market absorption of lots or finished product in competing subdivisions. Current competition and future competition from any proposed competing developments are considered for the subject-specific absorption forecast.

An inferred demand study is made to ascertain the number of dwellings constructed annually in the competitive market area over the past several years. Under normal circumstances, this will indicate how many have been absorbed each year within the subject property's market area. This information, combined with a fundamental demand analysis based on future demographic estimates for growth, allows an appraiser to conduct a residual demand analysis. Subject capture is estimated based on the anticipated completion date, a future lot sales forecast, and the absorption time needed to sell the proposed lot inventory. All forecasts must be supported by market evidence, and appraisers must estimate carefully. If an appraiser testifies that a hypothetical subdivision of 400 lots can be sold out within two years, when historically only 150 lots have been absorbed each year in the entire area of competition, the court or trier of fact will likely be skeptical.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

## The Court's View

Many courts have recognized the widespread reliance on subdivision development analysis by both the developer and appraiser communities. As a general rule, it can be said that as a tract of land physically and legally progresses from a state of raw acreage to a completed subdivision, subdivision development analysis also progresses from inadmissibility to admissibility. These two extremes were discussed in a federal case in 1972:

> It may well be that even though the highest and best use of a property is for a residential subdivision, if no meaningful steps have been taken in that direction, viz., construction expenses and actual lot sales, then a "lot method" appraisal or a "developer's residual" approach, as it is also known, would be inappropriate. But that is not the situation here. The status of the subdivision and its availability for sale within the reasonably foreseeable future was an actual and real one, certainly not hypothetical, remote or speculative. Someone about to purchase the property on . . . the date of condemnation, would have to regard it as having a highest and best use as a subdivision and, in determining what purchase price he would be willing to pay, would have to consider all factors, including sales price for individual lots and additional expense of development, in arriving at his decision. . . . This is not a case where a landowner dreamily contemplates the use to which his property may be put at some undefined future time but rather one where the property is geographically suited for development; is located in a booming developmental area; has been subdivided into lots according to a duly certified map; has been cleared and graded and improved with the creation of a spring-fed lake, the construction of access roads, and the digging of a deep well sufficient to supply water to 150 homes; and where actual sales of lots as identified on the map have taken place, the deeds of which contain building restrictions compatible only with a residential real estate development.[9]

According to another source,

> The First, Sixth, and Ninth [federal] Circuits have indicated that [subdivision development analysis] is a permissible approach to valuation, but only if the costs of subdivision are taken into account; the rationale is that the potential value of land if subdivided could be considered by a willing buyer and a willing seller where subdivision is a reasonable possibility and the costs of subdivision are not speculative or uncertain.[10]

The admissibility of subdivision development analysis is not questioned in most jurisdictions when the property being appraised is fully subdivided land, although appraisers should carefully analyze the determination of the larger parcel (see Chapter 5). If the lots affected by the taking are fully developed and saleable as separate entities, it is possible that each individual lot represents a separate larger parcel, and each should be valued independently.

When the land being appraised is not a fully developed subdivision, there is no clear-cut rule applicable to those properties. For one property, a legal plat may have been filed, while on another a portion of the property may have been physically and legally subdivided. There is simply no uniform standard to determine what point the development process must reach before subdivision development analysis is admissible, according to a New Hampshire court.[11]

The weight of authority, however, appears to favor starting with raw acreage value and adding incremental upward adjustments as may be needed for subdivi-

sion potential and for the legal and physical steps taken towards actual subdivision development. A California court stated, "The actual market value of the lots insofar as that value is presently enhanced by the property's availability for subdivision may be shown, but the possible future value if subdivision were made may not be shown."[12] And a New York court said, "There being no dispute that the most advantageous use of claimants' property at the time of taking was as a potential residential subdivision, the correct rule to be applied 'was to treat the premises not as raw acreage nor as part of the completed development but as a potential subdivision site giving the acreage an increment in value because of that potential use.'"[13] [Citations omitted] An earlier ruling by a New York court included the following explanation: "Whenever such an increment must be added to the raw acreage value to reflect a property's subdivision potential, then the specific increment which is selected and applied must be based upon sufficient evidence and be satisfactorily explained."[14] If a comparable sale has subdivision potential equal to that of the property being appraised, no additional adjustment for that factor is required.

There is conflicting case law regarding the admissibility of the actual costs of subdivision development, such as the engineering and platting fees incurred by the owner of the property. Some jurisdictions allow for the admission of this evidence, but only to better analyze the incremental value present in the property being appraised rather than as a separate value or damage item. In other words, only the contributory value rather than the actual cost of those items may be considered.

The resistance of the courts to admitting subdivision development analysis stems from a fear that testimony regarding the technique may mislead the trier of fact into determining just compensation based on a fully developed subdivision, rather than the land as it existed on the date of taking. Before attempting to present a case or testify to a value based on subdivision development analysis, extensive review of applicable law in the jurisdiction is required. This review should consider the specific circumstances surrounding the property being appraised.

Extensive pretrial conferences between attorneys and appraisers will be required. The admissibility of subdivision development analysis may turn on a single question put to an appraiser by an attorney or on the appraiser's response to that question. Because the views of the courts vary on this issue, it is difficult to predict the admissibility of evidence from the technique. Even the courts can find the absence of definite rules on this issue confusing. For example, an Indiana court stated the following:

> The line of demarcation between those circumstances in which testimony of specific intended use and lot by lot evaluation is admissible, and those circumstances under which it is not, is too finely drawn for us to follow. We remain uninstructed as to the appropriate method for "properly guarding" such evidence so as to allow its admission.[15]

## The Partially Developed Property

As noted previously, the admissibility of subdivision development analysis is less questionable when the property being appraised is fully subdivided land. Divergent rulings are more prevalent when the property being appraised is only partially developed. Factual circumstances, applicable case law, or the condemnor's appraisal reporting requirements may necessitate some modification of the traditional development technique. In some cases only the written or verbal pre-

Copyrighted material licensed to Randall Bell, PhD on November 29, 2015

sentation of the technique may be modified. In other cases, the factual situation may require modification of the technique's application.

To illustrate the application of subdivision development analysis in a before and after scenario, consider the tract of land identified as the proposed Springhill subdivision in Figure 11.1, which contains 25 acres and was acquired 10 years ago by a broker-developer. An overall conceptual master plan for the Springhill subdivision was submitted to the planning commission three years ago and was approved at that time. This plan is shown in Figure 11.2. While the planning commission was considering the master plan, it was learned that the state planned to widen the freeway right of way to the north by adding a frontage road, which would have a direct effect on the southern portion the subject property. For this reason, the property owner requested final plat approval for Phase 1 only on the northern portion of the site and delayed final plat approval on the southern land area until more specific information was available regarding the proposed road project. The approved conceptual plan is shown in Figure 11.2. The Phase 1 approved plat supports 14 individual lots as depicted in Figure 11.3.

Accordingly, the overall site has vested entitlements as a result of the conceptual master plan approval and construction permits in hand for the Phase 1 development. The only remaining entitlements required are the submission of the Phase 2 plat and engineered construction drawings. The overall land use entitlements were in place, and typically the construction plans are submitted at the point in time when construction begins. For all purposes, the entitlement phase is completed. The remaining phases to be considered are the construction and absorption phases.

The property is located in a rural area, about 10 miles from a small city with a population of 40,000. There are no public water or sanitary sewer facilities in the area. Consequently, while developing the 14 northerly Phase 1 lots, the property owner drilled a well and constructed a community water system adequate to supply domestic water to all 34 lots proposed in the original master plan. Then the

**Figure 11.1 Springhill Plot Plan–Raw Land**




**Figure 11.2 Springhill Master Development/ Site Plan**



**Figure 11.3 Springhill Phase 1 Plat**




**Figure 11.4 Springhill Larger Parcel**




14 northerly lots were developed and sold. About one year later, the state's right of way plans were finalized and made public, and the owner made no attempt to develop the tract further. The state's right of way plan is superimposed over the original master plan in Figure 11.4. Because the original 14 lots were sold, the larger parcel is the unplatted portion of the tract, which consists of 15.21 acres.

In the before situation, the tract that is the larger parcel has these unique characteristics:

- The property abuts the first phase of a successful existing subdivision and is the future Phase 2 land.
- A community water system is available to it. It contains the well that serves Phase 1 of the overall development.
- It is suitable for development with septic tanks.
- It has an approved master plan.
- Preliminary engineering on the tract is complete.
- Proposed streets have been roughed in.

Due to the unique features of the tract, market research did not identify any comparable sales. Analysis of the site indicates that the highest and best use of the tract in the before situation is completion of the subdivision improvements in conformity with the original master plan. Based on all those factors, subdivision development analysis is deemed appropriate. Table 11.1 provides a summary of the project and the proposed taking.

The appraiser's research indicates that all the lots in the original subdivision sold for $62,500, regardless of their size, and that lot prices at a more recently completed subdivision across the freeway were $63,750, regardless of size. Based

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

on this data, a developed lot price of $63,750 is considered reasonable. With information from an engineering consultant, cost indexes, an analysis of comparable subdivisions, and the appraiser's data files, the development costs are estimated as shown in Table 11.2.

The land valuation is performed using DCF analysis in both the before and after situations. Since the site already has entitlements in place, the forecast considers the remaining construction and absorption phases of development including reconfiguration of the plat. The future cash flows and expenses are discounted using the split-rate (bifurcated) method with semiannual discounting. Under this valuation scenario, line-item profit of 10% of gross sales is allocated as an expense with a yield rate of 16% per year or 8% for semiannual discounting. Both calculations contribute to the overall entrepreneurial incentive. The two-year sellout period considers the historical experience of the subdivision across the freeway. From this data, the before value of the property can be analyzed. The calculations are shown in Table 11.3.

In the before taking analysis, the absorption is estimated at five lots per period, with a total absorption time frame of two years. The indicated land value is $478,497, or about $31,459 per acre. The indicated yield rate or internal rate of return without line-item profit as an expense reflects an overall yield rate of 25.5%. Both methods, if employed correctly, should reflect about the same overall entrepreneurial incentive.

The next step is consideration of the taking and analyzing the remainder parcel in the after situation. The after analysis is based on a highest and best use for continued subdivision development incorporating elements of the original development plan. However, reconfiguration is required to achieve a supportable development plan for the remainder parcel. The optimum development would follow the plan shown in Figure 11.5. To analyze the property in the after situation, the following factors must be considered:

- Only eleven lots can be developed, so nine lots have been lost.

**Table 11.1 Springhill Subdivision Project Summary**

| | Lots | Acres |
|---|---|---|
| Overall property | 34 | 25.00 |
| **Allocation as follows:** | | |
| Phase 1 (completed 4 years ago) | 14 | 9.79 |
| Phase 2 | 20 | 15.21 |
| **Proposed Taking: Phase 2** | | |
| Larger parcel (Phase 2) | 20 | 15.21 |
| Land taken (Phase 2) | – 9 | – 5.36 |
| Remainder parcel after taking | 11 | 9.85 |

**Table 11.2 Development Costs of Springhill Subdivision Phase 2**

| | Before Taking | |
|---|---|---|
| Available lots | 20 | |
| Estimated retail lot value | $63,750 | |
| Gross sales | $1,275,000 | |
| **Construction Phase** | | |
| Soft costs: final plat, engineering, and permits | $25,000 | |
| Hard costs: construction grading, clearing, and site infrastructure | $200,000 | $10,000 per lot |
| **Absorption Phase** | | |
| Sales costs: 5% of gross sales | | |
| Management and supervision: 10% of gross sales | | |
| Taxes: vacant land ($2,000 per year) | | |
| Taxes: improved lots ($1,000 per lot per year) | | |
| Miscellaneous: 3% of gross sales | | |

**Figure 11.5 Springhill Plot Plan–After Situation**



- The property contains 9.85 acres in the after situation.
- The community water system becomes an overimprovement.
- The previous master plan still "vests" the entitlements. However, the Phase 2 plats must be redesigned and market absorption is anticipated to be slower.
- The average lot size will be larger than it was in the before situation.
- The tract will have 1,300 linear feet of frontage on the new frontage road and few interior streets will need to be constructed.
- The new frontage road will carry a fairly high volume of traffic.

Investigation indicates that lots fronting on arterial streets or frontage roads are typically larger than interior lots, but this advantage is offset by the disadvantage of fronting on a highly traveled street.

**Table 11.3 Before Taking Situation—Value Conclusions**

| | | | Construction Phase | Absorption Phase | | | |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| Semiannual Periods | | | Months 1-6 | Months 7-12 | Months 13-18 | Months 19-24 | Months 25-30 |
| Absorption (lots) | Starting inventory | | | 20 | 15 | 10 | 5 |
| | Lots sold | | | 5 | 5 | 5 | 5 |
| | Ending inventory | | | 15 | 10 | 5 | 0.0 |
| Average price per lot | | | | $63,750 | $63,750 | $63,750 | $63,750 |
| Gross revenue | | | | $318,750 | $318,750 | $318,750 | $318,750 |
| Less: Development and sales costs | | | | | | | |
| Entitlement phase | | | | | | | |
| None | | | n/a | | | | |
| Construction phase | | | | | | | |
| Soft costs | | | $25,000 | | | | |
| Construction costs ($10,000 per lot) | | | $200,000 | | | | |
| Taxes | | | $1,000 | | | | |
| Absorption period | | | | | | | |
| Sales costs | 5.0% | | $15,938 | $15,938 | $15,938 | $15,938 | |
| Supervision | 10.0% | | $31,875 | $31,875 | $31,875 | $31,875 | |
| Miscellaneous | 3.0% | | $9,563 | $9,563 | $9,563 | $9,563 | |
| Taxes | | | | $8,750 | $6,250 | $3,750 | $1,250 |
| Line-item profit | 10.0% | | $31,875 | $31,875 | $31,875 | $31,875 | |
| **Net proceeds** | | | ($226,000) | $220,750 | $223,250 | $225,750 | $228,250 |
| Discount rate | 16% annual, 8% semiannual | 8.0% | 0.92593 | 0.85734 | 0.79383 | 0.73503 | 0.68058 |
| Present value | | | ($209,259) | $189,258 | $177,223 | $165,933 | $155,343 |
| Summary | Indicated land value | | $478,497 | | | | |
| | | 15.21 acres | $31,459 per acre | | | | |
| | Indicated *IRR* with Ø line-item profit | | 25.5% | | | | |
| | Profit summary: Line-item profit | | $127,500 | | | | |

Note: The line-item profit and discount rate calculations both contribute to the overall entrepreneurial incentive when using the split-rate method.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

Based on this data, discussions with a consulting engineer, reference to cost indexes, and the actual costs of comparable subdivisions, an indication of the after value of the property can be produced (see Table 11.4). In the after situation, the cost of street improvements per linear foot increased because part of the new street had not previously been roughed in. Also, water costs per linear foot increased because the water line could not be extended across the street. Engineering expenses per lot increased to redesign the Phase 2 plat.

This valuation also considers the required construction period and plat engineering. The absorption is estimated at four lots per six-month period, with a total absorption time frame of 18 months. The time is reduced because there is a smaller lot inventory in the after taking situation. This analysis reflects a land value of $251, 678, or about $25,551 per acre. Total dollar profit is significantly less in the after taking situation, with only eleven lots available for development.

**Table 11.4 After Taking Situation—Value Conclusions**

| | | | Construction Phase | Absorption Phase | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | | |
| Semiannual Periods | | | Months 1-6 | Months 7-12 | Months 13-18 | Months 19-24 | Totals | Per Lot |
| Absorption (lots): | Starting inventory | | | 11 | 7 | 3 | | |
| | Lots sold | | | 4 | 4 | 3 | 11 | |
| | Ending inventory | | | 7 | 3 | - | | |
| Average price/lot | | | | $63,750 | $63,750 | $63,750 | | |
| Gross revenue | | | | $255,000 | $255,000 | $191,250 | $701,250 | $63,750 |
| Less: Development & sales costs | | | | | | | | |
| Entitlement phase | | | | | | | | |
| None | | | n/a | | | | | |
| Construction phase | | | | | | | | |
| Soft costs | | | $25,000 | | | | $25,000 | $2,273 |
| Construction costs ($12,000/lot) | | | $132,000 | | | | $132,000 | $12,000 |
| Taxes | | | $1,000 | | | | $1,000 | $91 |
| Absorption period | | | | | | | | |
| Sales costs | | 5.0% | | $12,750 | $12,750 | $9,563 | $35,063 | $3,188 |
| Supervision | | 10.0% | | $25,500 | $25,500 | $19,125 | $70,125 | $6,375 |
| Miscellaneous | | 3.0% | | $7,650 | $7,650 | $5,738 | $21,038 | $1,913 |
| Taxes | | | | $4,500 | $2,500 | $750 | $7,750 | $705 |
| Line-item profit | | 10.0% | | $25,500 | $25,500 | $19,125 | $70,125 | $6,375 |
| Net proceeds | | | ($158,000) | $179,100 | $181,100 | $136,950 | $339,150 | $30,832 |
| Discount rate | 16% annual, 8% semiannual | 8.0% | 0.92593 | 0.85734 | 0.79383 | 0.73503 | | |
| Present value | | | ($146,296) | $153,549 | $143,763 | $100,662 | $251,678 | $22,880 |
| Summary: | Indicated land value | | $251,678 | | | | | |
| | 9.85 acres | | $25,551 per acre | | | | | |
| | Indicated IRR with Ø line-item profit | | 27.8% | | | | | |
| | Profit summary: Line-item profit | | $70,125 | | | | | |

The valuation results are summarized using both the federal rule allocation and the state rule format in Table 11.5.

This example demonstrates a relatively simple application of subdivision development analysis in a partial taking case. As the complexity of the analysis increases, the chances of the results being approved by either the court or the condemnor's review appraiser decrease. As mentioned earlier, it may be necessary to modify subdivision development analysis or its presentation to ensure its acceptance.

For example, in analyzing the before situation of the tract (Figure 11.2), appraisers must first investigate and verify sales of vacant land that is comparable to the parcel being appraised but without development improvements. However, the contributory value of any entitlements in place as part of the plat approval are to be considered.

The costs to develop each comparable parcel are then estimated just as the costs to develop the property being appraised are estimated. For comparison purposes, it is often convenient to convert these cost factors into a cost per lot or a cost per acre. This process is shown in Table 11.6, using the 15.21-acre larger parcel as the subject property and a hypothetical sale of a comparable parcel of 20.2 acres that sold for $395,000. In actual practice, appraisers may want to break this adjustment down for individual items of dissimilarity, such as "comparable's lack of water system" or "comparable's lack of preliminary engineering."

From an appraisal standpoint, the comparative analysis shown in Table 11.6 is nothing more than a slightly modified application of subdivision development analysis. However, in this case the technique has not been used to analyze the value of the property being appraised. Rather, it has been used to help the appraiser analyze and support a proper adjustment for the physical and economic differences between the comparable property and the property being appraised. This adjustment factor is subsequently used in the sales comparison approach to value.

**Table 11.5 Analysis Summary**

| | | | | |
|---|---|---|---|---|
| | **Valuation Under the Federal Rule (Before and After)** | | | |
| Before value | 15.21 acres @ $31,459 per acre | | = | $478,497 |
| After value | 9.85 acres @ $25,551 per acre | | = | – $251,678 |
| | | Difference | | $226,819 |
| | **Valuation Under the State Rule (Taking Plus Damages)** | | | |
| Value before taking | | | | $478,497 |
| Less: Value of part taken | 5.36 acres @ $31,459 per acre | | = | – $168,622 |
| | | Remainder (before) | | $309,875 |
| Remainder (before) | 9.85 acres @ $31,459 per acre | | = | $309,875 |
| Less: Remainder after | 9.85 acres @ $25,551 per acre | | = | – $251,678 |
| | | Damage | | $58,197 |
| Less: Special benefits | | None | | – $0 |
| Net damage | | | | $58,197 |
| Summary: State rule | | Value part taken | | $168,622 |
| | | Net damages | | $58,197 |
| | | Difference | | $226,819 |

Copyrighted material licensed by Randall Bell, PhD on November 29, 2016

**Table 11.6 Developed Land—Comparative Analysis**

| | Comparable Property | Subject Property |
|---|---|---|
| Project size in acres | 20.2 | 15.21 |
| Number of potential lots | 26 | 20 |
| Sale price per lot | $63,750 | $63,750 |
| Less: Entitlement period costs | – $500 | – $500 |
| Less: Construction period costs | – $10,000 | – $11,300 |
| Less: Absorption period costs | – $13,450 | – $12,475 |
| Net before profit allocation | $39,800 | $39,475 |
| Less: Profit incentive (total line-item and time value profit) | – $25,000 | – $16,050 |
| Indicated value per lot "as is" | $14,800 | $23,425 |
| Lots per acre | 1.287 | 1.315 |
| Indicated value per acre "as is" | $19,050 | $30,802 |
| **Adjustment Process** | | |
| Indicated per-acre adjustment for subject well and septic and physical status and greater development potential | | |
| $30,802 less $19,050 | | $11,752 |
| Rounded | | $11,800 |
| Comparable land price | | $395,000 |
| Comparable price per acre | | $19,544 |
| Adjustment for subject characteristics | | + $11,800 |
| Indicated value for subject price per acre | | $31,354 |
| Rounded | | $31,400 |
| Indicated land value subject parcel | | $477,592 |
| Rounded | | $478,000 |

Appraisers must sometimes resort to a direct sales comparison approach to ensure the acceptance of standard appraisal practices, which are widely recognized in the profession as valuable appraisal tools. The use of this methodology is valid and can mean the difference between the acceptance or rejection of an appraisal report by the condemnor's review appraiser. It can also mean the difference between the *admissibility* or *inadmissibility* of valuation testimony. However, this particular technique is sometimes known as "appraising the comp" and is prohibited in some jurisdictions.

If an adjustment methodology has been used, appraisers may want to meet with legal counsel to consider how much detail about the specific elements of the adjustment process counsel will want or be allowed to present under direct examination. An appraiser may choose only to testify about the differences between the comparable property and the property being appraised or about the gross adjustment called for. The appraiser might state the following:

> I considered the fact that the sale property has no water system and the property under appraisal has a water system. I also considered the fact that the preliminary master plan has been approved for the subject, but none exists for the comparable. After considering these differences, the indicated adjustment factor would be +$11,800 per acre, which would indicate a value for the property being appraised in the before situation of $31,400 per acre, or approximately $478,000.

Further explanation of the adjustment factor could meet with objection and be ruled inadmissible. If in cross-examination, however, opposing counsel is so bold as to ask how the appraiser can justify this adjustment of $11,800 per acre, the appraiser should be prepared to explain the adjustment down to the smallest detail.

## Time Lag and the Risk of Development

At one time, an appraiser or engineer could walk into a local planning office, pick up a copy of the local zoning ordinance and subdivision ordinance, and determine from these documents how many lots a tract could be subdivided into and the amount of time required to obtain the necessary approvals. This is no longer possible. Zoning and subdivision ordinances are now written in such a way that the local government agency can alter development requirements on a project-by-project basis, which places unique demands on developers.[16] Two common demands are development fees and exactions of land or easements for public use. Dedications of road rights of way or access easements are common, as are exactions or reservations of land for parks, schools, and other public purposes.

In addition to zoning and subdivision land use controls, there are a myriad of new land use regulations. Wetlands, open space, shoreline, storm water detention (or run-off), impact fees, and inclusionary housing ordinances are just a few of these additional ordinances. (See Chapter 7 for more information on land use regulations.) In a 1991 decision by the Northern District Court of California, a regulation that required a developer to comply with a city-established wage rate to obtain a building permit was ruled not to be a taking.[17]

The flexibility of land use regulations, the introduction of new regulations, and the practice of exacting money and land from developers have substantially increased the risks of land development. The participation of citizen and environmental groups in the development approval process has also increased these risks, as has the amount of time required to obtain development permits. "When resistance from local residents and the general public (often called *NIMBYism*, for 'not in my backyard') occurs, it can pressure public officials to stop or limit certain real estate developments or change the density or character of a specific plan," according to *The Appraisal of Real Estate*.[18] For these reasons, many sales of land acquired for development purposes are subject to the condition that the purchaser obtain necessary development permits prior to closing. This takes considerable risk out of the development process. If subdivision development analysis is applied to a tract of land and permits have not been issued for its development on the date of valuation, the risks and time lag associated with the entitlement period and any required indirect costs to obtain such permits must be considered in the analysis.

Appraisers must take these factors into consideration in projecting the sellout period for a development and in estimating the appropriate entrepreneurial incentive factor to be applied in subdivision development analysis. It is not unusual for two or three years to be spent obtaining all the permits necessary for the subdivision of land, especially if development approvals are appealed.

The increased speculation brought about by new development ordinances and more land use regulations will probably make the courts even more reluctant to

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

accept evidence from subdivision development analysis, especially in the appraisal of raw land when no meaningful steps toward development have been made.

## Notes

1. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v. "subdivision development method."
2. Don M. Emerson Jr., *Subdivision Valuation*, 2nd ed. (Chicago: Appraisal Institute, 2017).
3. *Shillito v. Metropolitan Edison Co.*, 252 A.2d 650, 651 (Pa. 1969).
4. *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 365.
5. *Ridgeway Associates, Inc. v. State*, 300 N.Y.S.2d, 944, 947 (N.Y. 1969).
6. *United Artists Theatre Circuit, Inc. v. State*, 384 N.Y.S.2d 543, 544 (NY 1976).
7. Washington State Dept. of Transportation, *Right of Way Manual* (February 2016), Appendix 4-1, p. 114-132.
8. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §1.5.1.2, p. 25.
9. *United States v. 147.47 Acres of Land*, 352 F.Supp. 1055, 1060 (M.D. Pa. 1972).
10. Jacques B. Gelin and David W. Miller, *The Federal Law of Eminent Domain* (Charlottesville, VA: The Michie Company, 1982), §4.2, p. 344, citing *United States v. 125.07 Acres of Land*, 667 F.2d 243, 245, 246, 251 (1st. Cir. 1981); *United States v. 47.3096 Acres*, 583 F.2d 270, 272 (6th Cir. 1978); *United States v. 100 Acres*, 468 F.2d 1261, 1266, 1267 (9th Cir. 1972), cert. denied, 414 U.S. 822, 864 (1973).
11. *Dover Housing Authority v. George*, 220 A.2d 156 (N.H. 1966).
12. *Santa Clara County Flood Control, etc., Dist. v. Freitas*, 2 Cal. Rep. 129, 131 (Cal. 1960).
13. *County of Suffolk v. Firester*, 339 N.E.2d 154, 156 (N.Y. 1975).
14. *Ridgeway Associates, Inc. v. State*, 300 N.Y.S.2d 944, 946- 947 (N.Y. 1969).
15. *City of Lafayette v. Beeler*, 381 N.E.2d 1287, 1294 (Ind. 1978).
16. When these demands become outrageous, the courts have, on occasion, found them to be takings, requiring the payment of just compensation. See Chapter 17.
17. *Associated Builders & Contractors v. Baca*, 769 F.Supp. 1537 (N.D. Cal. 1991).
18. *The Appraisal of Real Estate*, 14th ed., 339-340.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

12

# Construction of the Public Improvement

Although some may argue that not all public construction constitutes the construction of a public *improvement*, discussion of this question is beyond the scope of this work. For purposes of this discussion, it is assumed that all public construction constitutes public improvements. Historically, the value of a remainder property in a partial taking case was analyzed under the assumption that the public improvement was complete and operational on the date of valuation.[1] Because of the large size and high costs of contemporary public projects and the relatively long time that elapses between the land acquisitions and completion of the public improvements, it is now common to analyze the value of a remainder property in its physical condition as it exists on the effective date, giving consideration to the proposed public construction and its anticipated effect.

If the relevant jurisdiction requires that the remainder property be viewed as it physically exists on the effective date of valuation, an appraiser must take into account the anticipated timing to complete the construction of the public improvement and its effect on the value of the remainder property. Therefore, appraisers must be able to visualize the remainder property after the proposed public project is complete to analyze its value and develop an opinion of the damages or benefits that will accrue to the property.

Appraisers demonstrate a full and accurate understanding of the after-taking situation by describing it in writing in an appraisal report and verbally on the witness stand. They must understand not only the portion of the public project that will abut the remainder property, but also the entire public improvement.

There is considerable case law applicable in many (but not all) states indicating that damage to the remainder property is limited to the damage caused by only that portion of the public project that occupies the area taken from the original larger parcel.[2] This perspective is based on the fact that "the just compensation assured by the Fifth Amendment [of the U.S. Constitution] to an owner, a part of whose land is taken for public use, does not include the diminution in value of the remainder caused by the acquisition and use of adjoining

lands of others for the same undertaking."[3] This concept, and the difficulty of attempting to apply it in the real world, is discussed in Chapter 13.

## Engineering, Property Staking, and Inspection

The first thing an appraiser must do is become familiar with the property being appraised. This is accomplished by performing a property inspection (site and improvements), which will include identifying points of vehicular ingress and egress, noting any potential environmental concerns on-site and off-site, examining the abstract of title to the property, and making a preliminary investigation of the location and availability of services, zoning, market area trends, and general economic conditions. As part of the inspection process, the subject property, abutting and nearby properties, and abutting road allowances should be photographed (and date-stamped) and any relevant aerial views should be examined, if available. Then the appraiser is ready to meet with the condemnor's engineer or project manager to learn about the proposed construction. If an appraiser has been employed by the condemnee, it is often necessary for the condemnee's attorney to make arrangements for such a meeting. If the condemnor's attorney or engineer does not make the required information available, the required information may be elicited through interrogatories or by deposition.

The amount and thoroughness of information concerning construction plans and specifications that is available for review by appraisers will generally depend on the specific condemnor and the type of public project proposed. Whenever possible, the property should be inspected by an appraiser and an engineer together. If appraisers do not understand the proposed construction adequately, they must continue to question the engineer until full comprehension of the proposed project is achieved.

Some condemnors designate one engineer to act as the condemnor's *court engineer*. The court engineer testifies in condemnation cases whenever engineering testimony is required and is usually available to assist the condemnor's attorney and appraiser in preparing for trial. If the condemnor has a court engineer, it is generally advisable for the appraiser to work with or at least through, that individual regardless of whether the appraiser has been retained by the condemnor or the condemnee. The reasons for this are twofold. First, court engineers are practiced in explaining complex engineering concepts to lay people because of their experience in testifying before a trier of fact. Second, the court engineer will be explaining the engineering details to the trier of fact and it is important that appraisers obtain all necessary engineering data from the same source. Juries are not impressed when the condemnor's appraiser describes a feature of the public construction in a manner that conflicts with the description given by the condemnor's engineer.

It is often helpful, and in some instances absolutely necessary, for appraisers to have the property staked by the condemnor's engineer. Some condemnors resist such a request, but if staking is needed for an appraiser to understand the conditions that will exist in the after situation of a partial taking, the appraiser must insist on it.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2016

Appraisers should make arrangements to be notified as soon as the staking is in place. Survey stakes may disappear or move about, so it is prudent for appraisers to view and photograph the property as soon as possible after the staking is complete. The type and degree of staking required by appraisers will vary from case to case, depending on the type of public construction proposed and the physical characteristics of the property being appraised. For instance, in a partial acquisition for construction of a new highway, an appraiser might request that the following items be staked:

- pertinent property corners
- taking or right of way line
- edge of shoulder of road
- edge of pavement
- centerline of road
- extent of limited-access line, if any
- location of new road approaches, if any
- temporary and other easement limits
- construction limits

The acquisition of a power line easement might require staking of the limits of the easement, the tower locations, and the limits of any danger tree areas. (Danger tree areas are discussed in the next section.)

Often appraisers are required by law or policy, e.g., when projects involve federal funds, to invite the property owner to the property inspection.[4] Whether or not this is required, it is good practice for eminent domain appraisal work. If the property is to be staked, the ideal time for a joint inspection of the property is immediately after staking. This is also the best opportunity for an attorney to inspect the property with the appraiser or owner.

If an appraiser has been retained by a condemnor and is advised that the property owner is represented by legal counsel, the appraiser *must* only contact the owner with, or through, the owner's legal counsel. Direct contact with the property owner should not be made without the permission of the owner's legal counsel. If the appraiser is given permission to arrange for property inspection directly with the owner but is instructed by the owner's legal counsel that he is not to ask the owner any questions concerning the property, the appraiser must adhere to these instructions. This does not mean, however, that the appraiser cannot take note of any unsolicited comments made by the property owner and consider them in analyzing the value of the property. For this reason, the owner's legal counsel often decides to accompany the owner and the condemnor's appraiser on their joint property inspection.

Figure 12.1 depicts an actual taking for construction of a roadway. It is presented to illustrate why an appraiser or an owner's attorney should insist that the property be staked and that a joint inspection of the property be made with the property owner. In this case, no evidence of a septic tank, drain field, or well was visible from ground level. The applicable health regulations required a totally clear zone 100 feet in diameter around a well and prohibited a drain field,

**Figure 12.1 Partial Taking**




driveway, or other improvement within this area. When the taking line was determined, the condemnor was not aware of the location of the septic tank drain field. The appraiser and attorney retained by the condemnee were also unaware of the location of the drain field until the owner pointed it out during a joint inspection of the property. The taking line was then staked to verify its location in relation to the drain field.

The local health authority was contacted, and it was determined that the drain field could not be relocated on the remainder and still keep the required 100-ft. clear zone around the well. Therefore, the remainder property suffered damage of nearly 100%. When informed of these circumstances, the condemnor in this case decided that it would be physically possible and more cost-effective to construct a small retaining wall west of the proposed taking line and move the take line to the west to avoid the underground septic tank drain field.

It must be noted that the condemnor is generally not limited to the use proposed at the time of the taking unless the condemnor limited or restricted itself to specific plans and specifications submitted at that time. If such a limitation is made by the condemnor, and the condemnor subsequently expands or changes the use of the land, the condemnee may be entitled to additional compensation.[5] If no such limitation is made, however, the condemnor is not restricted in its use of the land taken and appraisers must consider what the condemnor *is acquiring a right to do*, not what the condemnor *plans to do* as of the date of value. Appraisers must assume that the condemnor will use the land taken to the fullest legal extent possible.[6]

On the other hand, an appraiser cannot assume that the condemnor will put the land taken to the use that, in the appraiser's opinion, would be the most injurious to the remainder.[7] Any potential uses must be reasonably probable to have a detrimental effect on the current market value of the remainder. A California court stated,

> While it is true that a condemnation award must "once and for all" fix the damages, present and prospective, that will accrue reasonably from the construction of the improvement, and in this connection must consider the most injurious use of the property reasonably possible, that does not mean that the jury may speculate on the possibility of damage from some future abandonment of the improvement. Remote, speculative, or conjectural elements of damage cannot be submitted to or considered by the jury.[8] [Citations omitted]

A Texas court said,

> It has been frequently held that if a portion of a tract is condemned and compensation is paid, the condemnee or his successor in interest cannot recover additional damages because of any subsequent use of the land taken which could reasonably be foreseen at the time of the original condemnation, the theory being that the condemnee was compensated for any use of the condemned property foreseeable at the time of the taking.[9]

Copyrighted material licensed by Randall Bell, PhD on November 30, 2018

The most common partial acquisitions are

- overhead easements (for power lines)
- surface easements or takings (for roadways)
- subsurface easements (for utility lines)

The specific engineering data typically available in these cases and the information needed by appraisers to value properties involved in these partial takings are discussed in detail below. Of course, if the taking is of a fee simple estate rather than an easement, the taking is technically of the whole property including the space above the ground and the area below the ground. Thus, references to *overhead*, *surface*, and *subsurface easements* refer to the anticipated use of the area taken rather than the form of the taking.

## Overhead Use

The most common overhead use easement is acquired for the construction of electrical transmission lines. Many overhead easements also convey the right to place natural gas pipelines, telecommunications facilities, or other facilities. The taking of an easement for installation of long-run, high-capacity lines often requires the services of professional appraisers and can result in condemnation trials. Topographical maps of the easement area are generally available from the condemnor, along with parcel or ownership strip maps.

Figure 12.2 is an example of a strip map. These maps generally show the location of existing buildings, the limits of the proposed easement acquisition, the ownership of the land, the proposed tower locations, and various physical features of the land such as roads, waterways, and fences. These maps also delineate danger tree areas, labeled "DTA," which are areas outside of the easement proper where the condemnor will have the right to top off or completely remove any trees that it perceives to be dangerous to the proposed transmission line. However, these maps often do not show the entirety of the affected larger parcels. Large- and small-scale aerial photographs are also useful and generally available to appraisers involved in valuing larger ownerships.

To value a property subject to an overhead easement, appraisers will require engineering data on easement widths and areas, danger tree areas, if any, and the types, styles, locations, and heights of towers or poles. Appraisers should also investigate the anticipated initial line capacity, expected increases in line capacity (if the easement conveys only the right to construct a transmission line of a specified capacity), and whether operation of the line is likely to cause coronas (i.e., a halo-like electrical discharge around a transmission line component causing transmission inefficiency). Information on arcing (i.e., electricity flow through the air between transmission lines causing power outages), television disturbance, or radio interference is also useful. Any and all safety features of the line should also be investigated. Recent cases suggest two elements of damage to be considered by appraisers:

1. Infestation of the property by noxious weeds that are likely to be brought in by the condemnor or its contractors[10]

2. Perceived potential human and animal health hazards from the electromagnetic fields (EMFs) created by the transmission lines[11]

If the market's perception of these elements could have an effect on the current market value of a property, the appraiser should determine if any precautions have been or will be taken by the condemnor to minimize the effect of those elements.

If an easement is to be acquired, its specific terms and conditions must be analyzed to determine which rights will remain with the underlying fee owner and which will be transferred to the condemnor. A typical easement form used by the U.S. Department of Energy is shown in Appendix A. Note that easements for overhead use often also include rights of surface use such as access, grading, and prohibition of certain surface uses by the grantor. As an example, the easement template shown in the appendix includes language that gives the government the right to designate other trees that are owned by the fee owner but not specified in the easement as "additional danger trees" and to remove them upon payment of their market value to the fee owner.

## Surface Use

The most common land acquisitions for surface use are fee acquisitions for roadway purposes. To appraise a partial acquisition for roadway purposes, an

**Figure 12.2 Strip Map**



Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

appraiser generally requires substantial engineering data—more than is needed for any other partial taking. Fortunately, most condemnors of road rights of way employ competent, full-time engineering staffs or retain competent independent engineers, so engineering data is plentiful. When appraisers have been employed by condemnors, much of this information is furnished at the onset of the appraisal. When the employer is the condemnee, however, appraisers may have to ask—often several times—for each specific document or item of data.

The right-of-way maps prepared by condemnors are generally informative and of good quality, although they sometimes fail to depict the entire larger parcel. An example of a typical highway right-of-way map was presented in Chapter 5. Centerline profile maps and roadway cross section maps are also generally available (Figure 12.3.). It is important to obtain both centerline and cross section profile maps of proposed highways (Figure 12.4). Although the centerline elevation map

**Figure 12.3 Centerline Profile and Roadway Cross Section Maps**




**Figure 12.4 Centerline and Cross Section Profile Maps of Proposed Highways**



in Figure 12.3 appears to indicate that the taking will cause no loss of view, the cross section map in Figure 12.4 clearly shows that the property under appraisal will suffer such a loss.

A cross section map can also help appraisers determine the feasibility of reconstructing road approaches and driveways. Figures 12.5 and 12.6 demonstrate why this information is necessary. The right-of-way map shown in Figure 12.5 suggests that damages to the remainder, if any, would be nominal. However, the cross section map in Figure 12.6 clearly indicates that the garage will be unusable after the taking because an acceptable driveway cannot be constructed. The dwelling may also suffer damage due to the loss of light, view, and air, and some drainage problems may result. When a highway right-of-way plan shows that a particular section of the right of way is considerably wider than the right of way as a whole, it often indicates that the roadway in this section of the right of way will be constructed considerably above or below the grade of the existing land.

In addition to showing the areas affected and the location of the improvements, engineering maps can help appraisers determine whether any ancillary rights are being acquired. These rights might include

- slope easements (permanent or temporary)
- drainage easements
- flowage easements (permanent or occasional)
- construction easements of varying scope

**Figure 12.5 Plot Plans**




**Figure 12.6 Cross Sections at Station 6 + 50**



Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

- water channel relocations (permanent or temporary)
- limitations on the right to light, view, and air
- access rights or restrictions on road approaches

Appraisers should obtain detailed plans of drainage, traffic control, and traffic channelization as well as profiles and cross sections of any frontage road or interchange on/off ramp that could possibly affect the property being appraised. Roadway widths, the number of proposed lanes, and anticipated traffic volume should be investigated along with any plans for the construction of sidewalks and curbs or the installation of streetlights. If fences are to be constructed, appraisers must know the type of fence to be built and who will be responsible for its maintenance.

Engineering consultants can help appraisers estimate the increases or decreases in traffic noise, dust, and headlight glare to be anticipated due to the operation of the proposed improvements. Dust and noise created by *construction* of the improvement are typically noncompensable damage items, but dust and noise created by the *operation* of the completed improvement may be compensable if they diminish the market value of the remainder property and the damage is particular to the property being appraised. Large- and small-scale aerial photographs of the property are often available and can be particularly helpful if the engineer has identified the boundaries of the property and prepared a digital right-of-way map depicting the after situation.

Another common type of surface use is a flowage easement in the form of an occasional flowage easement, a permanent flowage easement, or a combination of the two. Extremely accurate, small-scale topographic maps may be absolutely essential in the appraisal of flowage easements. Appraisers may be asked to estimate the amount of land area that will be inundated with water, but this information is generally more reliable if it is developed by engineering staff or another expert, such as a hydrology consultant, agronomist, or geologist. If the easement specifies occasional inundation, appraisers must estimate how frequently the land will be flooded by examining available records and questioning the condemnor's engineer. Appraisers should attempt to discover whether the property to be encumbered by the easement has had a history of flooding.

Two areas are often overlooked in the appraisal of property for flowage easements. The first item is the potential for damage to the unencumbered portion of the property due to the impairment or elimination of physical access from the roadway to the property, or from one portion of the property to another. It may be necessary to construct a bridge or roadway with a culvert to rectify this situation.

The second consideration is the potential damage or benefit to the unencumbered remainder from a change in the groundwater elevation caused by the flow of water to a higher elevation than existed before the acquisition of the flowage easement.[12] The unencumbered remainder can be damaged by more frequent flooding, the destruction of crops and trees, or the failure of a septic tank system. On the other hand, increasing the elevation of the water table could benefit arid land, producing natural subirrigation and decreasing or eliminating the need for artificial irrigation of the unencumbered area (i.e., a special benefit).

If an appraiser is concerned about how a flowage easement will affect surrounding unencumbered land, a hydrology consultant should be retained.

## Subsurface Use

An acquisition for subsurface use generally takes the form of an easement for underground utilities such as gas lines, water lines, oil lines, sewer lines, and cables for television, data, and electrical service. In appraising a property for the acquisition of a subsurface easement, appraisers must identify the specific use to which the easement area will be put. If a pipeline carrying a potentially dangerous material is to be installed, the safety features of the pipe must be explored. The cleanup of hazardous waste sites sometimes requires the transportation of hazardous materials by pipeline across neighboring properties. Safety features and the underlying fee owner's liability for cleanup if a leak or spill occurs should be considered in an appraisal because damage accrues from market perceptions of risk and the corresponding effect on value.

The depth of the pipe or cable to be laid should be ascertained. Although it will generally require some research, appraisers should also investigate how often the condemnor will have to go back onto the property to reopen the ground for inspection or repair of the pipe or cable. The specific easement form to be used must be examined to answer the following questions:

1. Who is responsible for repairing the surface of the ground and any site improvements?
2. Will any additional temporary construction easements be acquired and, if so, for how long?
3. Can the underlying fee owner build on or otherwise use any part of the easement area?
4. Will the condemnor construct any surface structures within the easement area such as valves, valve houses, pump stations, and manholes?

If unsightly surface structures are to be built, appraisers can often analyze the damage by calculating the cost of planting sight-obscuring shrubbery around the structures. Of course, this method cannot be used if the cost of buying and planting the shrubbery is greater than the diminution in property value caused by the unsightly structures.

## Visualizing the After Situation

To ensure complete understanding of the after situation, appraisers must paint a visual and verbal picture of the property after the taking and after construction of the public improvement. All engineering data used should be verified in writing by the engineer. This document is retained in an appraiser's file for later reference. Appraisers must always identify the plans and specifications used in the preparation of an appraisal report and include the date when these plans were last revised. For example, an appraiser might include a statement such as the following in an appraisal report:

> This appraisal was made under the presumption that construction of the proposed public improvement will occur as depicted on the Department of

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

> Transportation's right-of-way and profile maps for SR 5, MP (mile post) 42.04 to MP 51.66, Rocky Point to Toutle River. Specific reliance has been placed on (1) the right-of-way plans designated as sheet 19 of 51 sheets having an original date of February 14, 2016, and a last revision date of April 15, 2018, and (2) the profile plan designated as sheet 36 of 51 sheets having an original date of February 14, 2016, with no subsequent revision date.

Only with extreme caution should appraisers rely on an artist's or architect's rendering of an after situation. Those lovely, towering trees that screen the remainder from the offending view and noise of the public improvement may only be 18 inches high when they are planted. The gently sloping, cultivated landward side of the dike or levee may turn out to be quite steep and covered in riprap or large rocks. Appraisers must depend on engineering plans and specifications, not on the fertile imagination of an artist with a flair for drawing aesthetically pleasing pictures.

The rule of exclusion generally precludes appraisers from listening to engineering testimony given at the condemnation trial. If an engineer's testimony and the information furnished to an appraiser by the engineer are not consistent, this discrepancy must be resolved either before the engineer is excused from the witness stand or before the appraiser takes the stand. Although appraisers may be ready to admit what they do not know on the witness stand, ignorance about basic engineering data that will affect the property being appraised in the after situation is rarely acceptable. Appraisers must thoroughly understand the effect that the construction may have on the remainder property.

It is imperative that appraisers and attorneys reach an identical understanding well before the trial of how the engineering plans will affect the property being appraised. If they do not, an attorney may not recognize the inconsistency between the engineer's testimony and the engineering data used by the appraiser until it is too late and the appraiser's description of the property in the after situation is being discredited under cross-examination.

Not only do appraisers want to know about the subject project but also similar recent projects that have been completed. Similar projects are an excellent source of market sales or rental data on properties that have experienced a similar change. If the proposed construction is atypical in any manner, appraisers should try to locate a similarly constructed public improvement, inspect it, and take date-stamped aerial or ground photos of the improvements. Appraisers may also want to inspect previously appraised remainder properties again after the public improvements are completed and operational. By doing so, appraisers can ascertain whether the remainder does, in fact, match the verbal and written picture prepared before the taking. Interviewing the owners of these properties can also be informative. If an appraiser attempts to inspect a previously appraised property after completion of the public improvements and cannot recognize the remainder property, it is quite possible that the appraiser's visual and written picture of the remainder was not entirely accurate.

## Visualizing the Before Situation

Sometimes appraisers are faced with a situation in which the date of value is historical and the property to be appraised was physically altered after the date of

value and before the appraiser was able to inspect it. The government taking may have already occurred and the public improvement may already have been constructed. In other words, the appraiser may be able to inspect the property in the after situation but not in the before situation. This situation typically results when an appraiser is retained by a condemnee, or by a condemnor's legal counsel after settlement negotiations have failed and the case has been turned over for trial.

This is obviously an awkward position for the appraiser, and any cross-examiner who is alert will try to take advantage of the situation. However, there are a number of things an appraiser can do to determine the condition and physical characteristics of the property in the before situation and dampen the effectiveness of cross-examination. The procedure used to determine the before condition of the property is the same as that used to forecast the after condition of the property under appraisal—only the sources of information are different. Google Earth and Google Maps both have features that allow appraisers to access aerial views and street views of certain properties that were photographed on previous dates, and historical aerial photography might be available. Individuals with an interest in the property and the market are also good sources of information, such as the property owner at the time of the taking. Local taxing authorities will often have physical descriptions and photographs of the property. Prior appraisals of the property are also excellent sources of information, as are the appraisers who prepared them. If the property was previously listed for sale, historical MLS listings and marketing materials can provide historical information of potential interest.

Some clients will balk at providing appraisers with prior appraisals of the property, arguing that they do not want appraisers to be swayed by prior valuations. This argument has little merit, however. First, if an appraiser is faced with the problem of valuing a property that he or she was never able to inspect physically, the appraiser should insist on access to *all* information concerning the physical features of the property. Second, the assertion that an appraiser's opinion is going to be unduly swayed by the findings of another appraiser is groundless. If that were the case, appraisers should not look at the assessed value of the property (which may or may not be an accurate indication of market value), yet most appraisal reporting standards require that appraisers report this value.[13]

Following this sort of questionable logic, it could be argued that appraisers should avoid becoming informed about a recent sale price of the property being appraised or seek the opinions of local real estate agents familiar with values in the area. This information could also sway an appraiser's opinion. In actual practice, appraisers should accumulate and consider *all* of the data available on the property being appraised. The weight given to the data or information accumulated then becomes a matter of judgment for appraisers. Appraisers must not allow others to screen the information to be considered, and all sources of data relied upon by the appraiser should be disclosed in the appraisal report.

Cross-examiners will often ask appraisers whether other appraisal reports have been reviewed. Experience shows that a positive response to this question, rendered in a straightforward, nondefensive manner, has little if any negative influence on the trier of fact.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

## Notes

1. Joseph M. Montano, *Recognition of Benefits to Remainder Property in Highway Valuation Cases*, National Research Program Report No. 88 (Washington, D.C.: Highway Research Board, 1970), 8.
2. *St. Regis Paper Co. v. United States*, 313 F.2d 45 (9th. Cir. 1962).
3. *Campbell v. United States*, 266 U.S. 368, 372 (1924).
4. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, P.L. 91-646, as amended. 42 U.S.C. §4601, *et seq.*
5. *McCubbin v. Village of Gretna*, 116 N.W.2d 287 (Neb. 1962).
6. *Western Union Tel. Co. v. Polhemus*, 178 F. 904 (3rd Cir. 1910).
7. *Andrews v. Cox*, 17 A.2d 507 (Conn. 1941).
8. *People ex rel Dept. of Public Works v. Schultz Co.*, 268 P.2d 117, 124 (Cal. 1954).
9. *Texas Electric Service Co. v. Campbell*, 328 S.W.2d 208, 213-214 (Tex. 1959).
10. *United States v. 33.5 Acres, Okanogan Cty., Wash*. 789 F.2d 1396 (9th Cir. 1986).
11. *Ryan v. Kansas Power*, 815 P.2d 528 (Kan. 1991).
12. This would not include surface flooding of areas outside the easement taking, however, because additional surface flooding would be considered an *expansion of the taking* and would be compensable only under a subsequent legal action. See *United States v. 38.60 Acres of Land, More or Less*, 652 F.2d 196, 199 (8th Cir. 1980).
13. *Uniform Appraisal Standards for Federal Land Acquisitions* (Washington, D.C.: U.S. Government Printing Office, 2016), §1.3.1.7, p. 21.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2016

13

# Damages in Partial Taking Cases

Damages can only result from a partial taking, according to a 1975 ruling by a Pennsylvania court.[1] The taking need not be a physical taking but may be the taking of a property right. According to the Fifth Circuit Court, "In this regard, what constitutes a 'taking' of private property is not susceptible of facile definition, but it is axiomatic that 'it is the character of the invasion [by the sovereign], not the amount of damage which results from it . . .' which determines the question of whether there has been a taking."[2] For instance, an Ohio court said, "a material injury to the easement of view is a taking of property,"[3] as is the placement of cable television facilities (36 feet of cable one-half inch in diameter and two 4-in. × 4-in. × 4-in. metal boxes occupying one-eighth of a cubic foot) on the roof of a five-story apartment building.[4] It is the damage to the part of the tract not taken that is compensable, in addition to the property or property rights actually taken. This damage arises from the actual taking or from the use of the land taken in the manner proposed.

Damages are often dependent on the construction on, or other use of, the land acquired by the condemnor. For example, if land is acquired for public park purposes, any damages to the remainder would be considered differently than if the land were being acquired for construction of a limited-access interstate freeway. Before appraisers begin to analyze damages to a remainder property, they must have a thorough understanding of the proposed use of the portion of the tract being taken by the condemning agency. Appraisers must also fully understand what rights are being acquired by the condemnor. Property owners are entitled to consideration for the damage the condemnor has the power to inflict. Appraisers should assume that the condemnor will use the rights acquired to their fullest extent.

Nevertheless, it cannot be assumed that the condemnor will put the property taken to the use that is most damaging to the remainder. Appraisers must determine whether the condemnor is required to put the land taken to the specific use proposed on the effective date of valuation or whether the condemnor has the right to expand or change the use of the land taken at some future date.

For example, Figure 13.1 illustrates a proposed taking for a new limited-access highway and shows the proposed plan of construction for the project. Appraisers must consider whether the condemnor is limited in its use of the area taken. Could the condemnor at a later date expand or realign the highway and bring the traveled roadway to within 20 feet of the dwelling located on the remainder? If this is the case (and it generally is), the damage is not measured as if the planned expansion had or will take place, but rather in recognition of the condemnor's right to expand its use without additional compensation. It is not what the condemnor actually *does* or *plans to do* with the land acquired that determines the amount of damage suffered by the remainder, but rather what the condemning agency *acquires the right to do*.

This type of damage is generally measured by analyzing sales of properties that are similar to the property being appraised in the after situation. Analysis of sales will often show whether buyers and sellers in the market believe that the likelihood of future highway expansion is significant enough to affect the current market value of the property in question.

In analyzing such situations, appraisers must keep this question in mind: If the government does not plan on using all of the rights that it is acquiring, then why is it acquiring them? If a power company is acquiring a transmission line easement for the stated purpose of constructing one 230 kilovolt (kv) power line and has no intention of constructing additional lines or increasing the voltage of the line, the rights to be taken should read "an easement for the construction and operation of one 230 kv electrical transmission line," not "an easement for the construction and operation of electrical transmission lines." A New York court said the following:

> If the State wishes to limit its rights under the easement to the continuance of the presently existing use or to the prospective use envisaged by its expert, it should do so by formal action, by deed, release or otherwise. In the absence of such modification, the damage must be evaluated on the basis of what the State has the right to do under the terms of the easement appropriated.[5]

**Figure 13.1 Proposed Use of the Land Taken**




Another question appraisers might consider is: Can the condemnor at a future date partially or totally change the use for which the property is being acquired? For example, a municipality acquiring land for park purposes may or may not be able to later convert the land into a landfill site. Consider Figure 13.2, which illustrates an actual situation in which an easement for the construction and maintenance of a drainage canal was acquired. A number of years later, the condemnor devised a plan to use the canal maintenance area as a public bicycle and pedestrian path as well as for canal maintenance. In this case, the condemnor's right to put the easement area to this

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

additional use, without acquiring any additional rights or paying additional compensation, hinged on the specific wording of the original easement. The agency dropped its plan when it learned that the expanded use of the easement area would constitute an additional taking and thus require additional compensation.

This example highlights the importance of determining exactly what rights are being acquired by condemnors. If satisfactory clarification cannot be provided by the acquiring agency, an appraiser must obtain legal instructions in regard to the rights being acquired. Whenever possible, a written copy of the proposed taking—e.g., the declaration of taking or the easement document—should be obtained by the appraiser and included in the appraisal report. For self-protection, appraisers must always explicitly state the rights that are assumed to be acquired in both the appraisal report and in valuation testimony. This point is further illustrated in Figure 13.3.

In this case, an easement was being acquired for the construction of a levee. The appraiser asked the condemnor to clarify what rights the underlying fee owner would retain in regard to construction within the easement area. When the condemnor's engineer indicated that construction within the easement area would require a permit, the appraiser advised the condemnor that the appraisal would have to be based on the assumption that the condemnor would exercise its rights to the fullest and that no construction within the easement area would be allowed. Discussions with the condemnor and its legal counsel led to the adoption of the drawing shown in Figure 13.3, which was attached to the easement acquired and identified as an illustration of the type of construction that would be allowed within the easement area and for which a permit would be issued. In

**Figure 13.2 Rights Acquired**




**Figure 13.3 Sample Cross Section of Allowable Construction Within Easement**



the appraisal report, the appraiser included a copy of the proposed easement and the drawing of "allowable construction."

Two years after construction of the levee, the condemnor found that the elevation of the levee had to be raised, which required an additional easement taking. The condemnor retained the same appraiser to value the property for the second easement taking, which specifically provided that construction within the easement area would not be allowed. The condemnor's legal counsel provided the appraiser with a legal instruction to the effect that construction within the first easement area would require a permit from the condemnor and that the appraiser was to assume that such a permit would be denied. The appraiser refused to accept the legal instruction and, after a review of the appraiser's appraisal report for the first easement taking (which included the drawing of "allowable construction" and the written assumption and limiting condition that the construction would be permitted), the legal instruction was withdrawn. If the appraiser had not insisted upon written clarification of the rights retained by the owner of the land when the first easement was taken and included a comprehensive description of these rights, the owner of the property might well have received substantially less than what was due to him.

In many jurisdictions, appraisers are not technically required to specifically identify or estimate the dollar amount of damages for condemnation trial purposes. They need only analyze the market value of the property before the partial acquisition and the market value of the remainder property immediately after the proposed acquisition. Many condemning agencies require an allocation between the value of the property being acquired and damages to the remainder.[6] One reason for this requirement is that payment for the taking and payment for damages to the remainder property are treated differently for income tax purposes. Also, from a practical standpoint, appraisers must attempt to isolate and identify all elements of damage present in the remainder property. This is not to say that appraisers must, or even should, estimate a specific dollar amount for each item of damage, only that each should be acknowledged and considered.

Whether an appraiser is working under the federal rule or state rule of measuring just compensation, the procedural steps of valuation are the same. (See Chapter 3 for a discussion of these two measures of just compensation.) The estimate of damages should be no more conjectural or speculative than the appraiser's opinions of market value before and after the acquisition. Damage estimates must exclude highly improbable damages, but reflect those damages that would be considered by prudent buyers and sellers to have a significant effect on market value. "[S]trict proof of the loss in market value to the remaining parcel is obligatory," according to a 1950 ruling of the Ninth Circuit Court.[7] In a 1954 ruling, the Eastern District Court of New York said, "the extent to which the utility of the property has been destroyed and its market value diminished must necessarily be established by factual data having a rational foundation in support of such a claim."[8]

Appraisers measure damages not as an end in itself but to assist in analyzing the market value of the remainder tract. Under the federal rule, compensation is paid for takings, not damages. That is, the estimate of damages is the basis for

Copyrighted material licensed by Randall Bell, PhD on November 29, 2016

arriving at an adjustment that will be applied to various approaches to value in the analysis of the property in the after situation. One of the most commonly used and reliable methods of estimating damage is by analyzing comparable sales using paired data analysis. Damages can also be analyzed by capitalizing the net rent loss resulting from the damage.

A third method applied to estimate a proper adjustment for damage is known as the *cost to cure*. This method can be used when the property being appraised has suffered damage that can be physically and economically corrected, e.g., through correction of drainage, replacement of fencing, reestablishment of access, or replacement of sewage or water systems. Under no circumstances can the cost to cure measure of damage be applied if the cost to cure exceeds the diminution in value that would result if such a cure were not undertaken, according to a 1963 ruling by an Arkansas court.[9] However, if the cost to cure is less than the diminution in the value of the remainder, the cost to cure measure of damage *must* be used.

Although *Nichols'* suggests that the cost to cure measure of damage is an *exception* to the before and after method of valuation and determination of compensation,[10] this measure of damage actually ensures conformance with the rule. If a property with a deficiency is placed on the market, both the buyer and seller will consider the cost to cure the deficiency, if it is physically and economically curable. The price at which the property will sell is the value of the property as deficient or the value of the property without the deficiency minus the cost to cure the deficiency, whichever is higher. If a remainder property lacks a connecting road approach or driveway to an abutting road, for example, it would be illogical to analyze the market value of the remainder property as if it would be landlocked in perpetuity. If a road approach could physically and legally be constructed, the value of the property would be its market value with access minus the cost of constructing the access, unless the cost to construct the access was greater than the value of the property with access less the value of the property as landlocked.

The measure of damages cannot be based on an assumption that adjacent land can be acquired, but appraisers can consider the general availability of suitable replacement property. This is particularly true when the property in question is a noncontiguous larger parcel. Figure 13.4 illustrates the misuse of such an assumption. In this situation it would be improper to estimate the damage to the remainder of Parcel A as the cost of acquiring Parcel B.

By contrast, consider a situation in which 9,500 acres are to be taken from a 25,000-acre tract of timberland. Suppose that the timberland is held, along with other lands, as a source of raw material for a paper mill 136 miles away. The mill property and the timberland holdings constitute a unitary use and are thus a single larger parcel. In an actual case similar to this scenario, the owner's appraiser estimated damages to the mill property "without taking into consideration whether other lands were available for purchase that would in all respects

**Figure 13.4 Acquisition of Other Lands**



make up the deficiency resulting from the taking." The owner claimed that "the availability of other lands made absolutely no difference in ascertaining that the mill property became worth $46 less for each acre of land that it lost or disposed of." The court found this approach "clearly fallacious," pointing out that "the record show[ed] that [the property owner] actually purchased 100,000 acres of land subsequent to the taking" of the 9,500 acres.[11] The court found the following:

> [The owner's] contention that it is entitled to receive what amounts to approximately three times the value of the land taken upon the theory discussed above, not only offends the court's sense of justice, but it also offends any rules relating to the awarding of just compensation for property taken for public use. There is no authority for such proposition.[12]

The key to this debate appears to be that appraisers can consider the availability of replacement land in general, but they cannot consider the availability and cost of acquiring any other *specific* parcel in estimating a cost to cure adjustment.

An appraiser who uses the cost to cure method to estimate a proper adjustment must take care to include all the costs that will be incurred. Appraisers must remember that the property is being appraised in its uncured condition. Thus, a purchaser of the property in the after situation will acquire it recognizing the need to cure the damage and incur the direct costs of correction. In addition, the typical purchaser will demand an incentive to purchase the damaged parcel. Many appraisers make the mistake of not considering this incentive, or *entrepreneurial incentive*, in estimating a cost to cure adjustment. Even when an appraiser does include an entrepreneur's incentive in a cost to cure estimate, some condemnors delete this amount from the indicated just compensation before making the property owner an offer of settlement.

**Figure 13.5 Partial Taking**




To illustrate the fallacy of this methodology, consider two identical (or nearly identical) single-family properties (Parcels A and B), each with a before value of $75,000 (see Figure 13.5). An underground utility easement is to be acquired across both parcels. After a detailed analysis of comparable properties, the appraiser concludes that the existence of such an easement, in and of itself, does not result in any diminution in the values of similar properties. However, the septic tank and drain field systems serving Parcel A are located within the easement area, and they will have to be relocated. No such condition exists on Parcel B.

The appraiser obtains a firm bid from a local contractor who for $3,500 can replace

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

the septic tank on Parcel A and repair the lawn. The new system can be installed about 30 days after authorization to begin the work is received, and there will be no loss of sewer service during the installation. Using this information, the appraiser draws the following conclusions:

| **Valuation of Parcel A** | |
|---|---|
| Before value | $75,000 |
| Minus after value ($75,000 – $3,500 cost to cure) | – 71,500 |
| Difference | $3,500 |

| **Valuation of Parcel B** | |
|---|---|
| Before value | $75,000 |
| Minus after value | – 75,000 |
| Difference | $0 |

The appraiser must remember that the value of Parcel A in the after situation is estimated in its "as is" condition.

Suppose that immediately after the easement taking both Parcel A and Parcel B are placed on the open market for sale. Parcel A is listed at $71,500 and Parcel B at $75,000. Now, a potential purchaser inspects both of the properties and decides to acquire one of them. Which one will it be? Will the purchaser (a) buy Parcel B, which has a functioning septic system, for $75,000 or (b) acquire Parcel A for $71,500 knowing that an additional $3,500 will have to be spent to install a new septic system?

Obviously a prudent purchaser would acquire Parcel B to avoid waiting for the installation of a new septic system and the hassle of obtaining the necessary installation permits and dealing with the contractor. This situation is analogous to a situation in which a building contractor offers to sell a potential purchaser a newly completed house or to build an identical house on the lot next door for the same price. All else being equal, the purchaser will take the existing house to avoid the hassle and delay that accompany any construction project.

Returning to the example, it is clear that the damage to Parcel A exceeds the direct cost to cure. The purchaser who acquires Parcel A in its "as is" after condition will need some incentive to undertake the construction project required as a result of the taking. To account for this factor, appraisers add an *entrepreneurial incentive* to the direct cost to cure, either in the form of a percentage of the contract bid or as a flat dollar amount. Giving no consideration whatsoever to entrepreneurial incentive in an analysis of an appropriate cost to cure adjustment would be difficult to justify to the court.

Appraisers must inspect the property to be valued closely and interview the property owner to determine whether underground improvements like the septic system will be affected by the proposed acquisition. If the system must be replaced, it is imperative to determine whether the local health authority will approve the replacement and, if so, under what terms and conditions. Assuming that physical replacement can be accomplished, the cost of the replacement should then be established.

It is generally of little consequence how many dollars an appraiser assigns to the value of the portion of the sewage disposal system taken and how much is allocated to damages to the remainder of the system. The amounts allocated do make a difference in situations where the remainder property is specially benefitted and, under applicable law, special benefits can be offset against damages but not against the value of the taking. Normally the value of the part of the system taken plus damages to the remainder property will equal the cost of restoring the remainder system. In some areas, however, it is difficult to estimate the cost of drilling a well so a *well agreement* may be made between the condemnor and the condemnee. Such an agreement stipulates that the condemnor agrees to replace the well taken, at its cost, with one of equal quality on the remainder site. In this situation, an appraiser can usually assume that the remainder property includes a domestic water system equal to the one that existed before the taking.

## Condemnor's Use of the Land Taken

In measuring damages to a remainder property, appraisers must consider only those elements of damage that are compensable in the applicable jurisdiction and under the specific circumstances of the case. Many jurisdictions use the rule stated in the Uniform Appraisal Standards for Federal Land Acquisitions: "[D]iminution in value of a landowner's remainder caused by the United States'

### Guidelines for Analyzing Damages

*Do:*

✓ follow logical steps in analyzing the before and after values of property.

✓ consider all the rights being acquired by the condemnor.

✓ develop market support for all estimates of damage.

✓ use damage estimates to better analyze the market value of the remainder property.

✓ use the format shown in Table 3.1 on page _____to summarize value conclusions.

✓ follow the rules of compensability established by the courts.

✓ get supported legal instructions for any damage item of questionable compensability.

✓ use common sense.

*Do not:*

⊘ assume damages.

⊘ go on a crusade to find damages.

⊘ use confusing terminology, e.g., consequential damages, severance damages.

⊘ use the cost to cure measure of damage if the cost to cure exceeds the diminution in market value that would result if the cure were not undertaken.

⊘ try to disguise noncompensable damages as something else.

⊘ try to separate elements of damage that are inseparable.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

use of *other* lands is not compensable and cannot be considered in valuations for just compensation purposes."[13]

That rule has its genesis in *Campbell v. United States* and is commonly referred to as the Campbell rule.[14] This is one of those rules adopted by the courts that appraisers often find impossible to apply in the real world. Figure 13.6 depicts a situation in which the Campbell rule could be applied. Suppose that the government has taken from others all the lands necessary for the construction of a dam and establishment of a reservoir behind it. The area taken from the property being appraised is to be used for mitigation of the wetlands destroyed as part of the dam and reservoir project. The area taken will be left in its existing, natural state. In valuing the remainder property under the Campbell rule, the appraiser must exclude from consideration any effect on value caused by the use to which the government has put land taken from others—in this case the entire dam and reservoir. The only damage that can be considered is the diminution in value caused by the taking itself and by the use to which the government will put the land taken, i.e., wetlands mitigation.

**Figure 13.6 Use of Lands Taken from Others**




Few cases are so straightforward. Referring back to the situation shown Figure 13.1, for example, application of the Campbell rule becomes more difficult. Under the rule, only damages resulting from the portion of the highway situated on the area taken could be considered. In this case, then, traffic noise might be considered a damaging factor, but only the traffic noise emanating from southeast-bound cars and only when those cars are physically on the portion of the highway located in the area taken. A Kentucky court recognized that in situations like this "it is difficult, if not impossible to separate one element [of damage] from the other."[15]

The theory behind the Campbell rule was explained by the Supreme Court as follows:

> If the former private owners [of the abutting lands] had devoted their lands to the identical uses for which they were acquired by the United States or to which they probably will be put, as found by the court, they would not have become liable for the resulting diminution in value of plaintiff's property. The liability of the United States is not greater than would be that of the private users.[16]

Of course, this decision was made in 1924, when zoning was almost unheard of in the United States. It also fails to address the fact that few private owners construct dams, highways, or military bases, nor do they operate bombing ranges or nuclear missile sites.

Some jurisdictions have taken exception to the Campbell rule, especially when the damages caused by the use of the land taken from the subject parcel are inseparable from the damages caused by the use of the land taken from others. As one court put it:

> For the purpose of determining severance [compensable] damage to the part not taken, the part of the defendant's land taken is to be considered as an integral and inseparable part of a single highway project not limited to the segment of the highway on his land but extending so far as the construction and use of the highway has a reasonable tendency to cause detriment to the part not taken and to reduce the market value of his land not taken from the viewpoint of a ready, able and willing buyer.[17]

The U.S. Court of Appeals for the Ninth Circuit has reviewed the Campbell rule on two occasions—in 1961 and 1982.[18] The Uniform Appraisal Standards for Federal Land Acquisitions summarized the court's opinions as follows:

> The Ninth Circuit created a narrow exception to the *Campbell* rule in *United States v. Pope & Talbot, Inc.* to allow compensation for damage resulting from the use of another's property in limited circumstances. Thus, in the Ninth Circuit, damage to the remainder resulting from the use of others' property may be considered if (1) the part acquired is *indispensable* to the government project; (2) the part acquired contributes *substantially* (not inconsequentially) to the project and the resulting damage; and (3) damage to the remainder due to the use of the part acquired is *inseparable* from damage to the remainder due to the government's use of its adjoining land in the project. For example, consider a partial taking of a tract for construction of a contaminated soils depository, which would be constructed partly on the property taken and partly on property acquired from others: it might not be practical to separate the diminution in value of the remainder caused by the use of *the property acquired* from that caused by the use of *lands acquired from others*. In such situations, the appraiser should seek legal guidance.[19]

The remainder property shown in Figure 13.6 does not have the three elements noted above and would likely fall under the Campbell rule, depending on jurisdictional law. The area taken was not indispensable to the dam and reservoir project, and any damages from the dam and reservoir project would be separable from those caused by the taking and the use that the government put the land taken to.

On the other hand, the property shown in Figure 13.1 might well meet the criteria set down in *Pope & Talbot*. The area taken is obviously indispensable to the project. The project cannot be completed without it. As the test of substantiality is applied to assure indispensability, it would appear that this test has also been met. The third test, inseparability, is also satisfied. Any attempt to separate the damages to the remainder caused by the use that the property taken was put to from the damages caused by the use to which the government put lands taken from others would, from a practical standpoint, be futile.

If an appraiser has any question whatsoever regarding the compensability of damages that are fully or partially caused by the use to which the government will put land taken from others for the same project, official guidance or legal instructions should be requested. This does not mean, however, that appraisers must, or even can, accept a legal instruction that is impossible to carry out.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

For instance, if legal counsel instructed an appraiser who is appraising the remainder depicted in Figure 13.1 that, as a matter of law, the noise damage resulting from cars using the portion of the highway located in the area taken must be separated from the noise damage resulting from cars using the rest of the highway, the appraiser would undoubtedly have to inform legal counsel that this separation is impossible. The law does not require appraisers to guess. If the condemnor thinks it can find an appraiser who is capable of making the separation and convincing a trier of fact of the logic and reasonableness of the separation, the condemnor is free to retain that individual. However, it is an appraiser's professional reputation that is on the line on the witness stand, not the condemnor's.

In the federal courts, it is for the district judge "to decide 'all issues' other than the precise issue of the amount of compensation to be awarded."[20] Therefore, if it is unclear whether the Campbell rule applies to a specific set of circumstances or the *Pope & Talbot* exception is applicable, the best course of action may well be to obtain a court ruling on this matter prior to trial.

## Valuation Procedure

Regardless of the methodology used or the specific rules applied, the estimation of compensable damage in the appraisal must be done thoroughly and in logical steps. An appraiser's first step is to determine the larger parcel or parcels in the before situation. (See Chapter 5 for more discussion on identifying the larger parcel.) It is important that an appraiser's determination of the larger parcel reflect unity of use, unity of ownership or control (i.e., a single decision-maker), and physical contiguity or adequate proximity.

The second step is to analyze the highest and best use of the property in the before situation. (Highest and best use is covered in Chapter 6.) In analyzing highest and best use, appraisers must try to overlook the fact that they will later be considering an after situation. Appraisers should adhere to the principle of *reasonable probability* in analyzing both highest and best use and the larger parcel. That is, a property that has a reasonable probability of rezoning should not be valued as though it has already been rezoned. Rather, the influence on value of the opportunity to rezone the property should be reflected.

As a third step in the valuation process, the market value of the property being appraised must be analyzed in the before situation, using all applicable approaches to value. In most circumstances, all three approaches will have some applicability. If an approach to value is not applicable, the appraiser must explain why.[21] A client's request or instruction that one or more of the standard approaches to value be excluded is not an acceptable reason to exclude an otherwise applicable approach.

The fourth step starts this procedure all over again, but this time the after situation is studied. Appraisers begin by identifying the larger parcel in the after situation. A property may consist of one larger parcel in the before situation and two noncontiguous remainders in the after situation. As stated by a Kentucky court:

> It is unfortunate that no witness on either side was asked to express an opinion as to the market value of the two remainder tracts if sold separately. . . . [I]n the absence of evidence to the contrary it may be assumed that the highest and best use of a farm cut in two by a condemnation remains the same after the taking as before, and that its highest value is still as a single unit, [but] this case is

> different. . . . The case presents a classic instance in which the remainder tracts should have been evaluated separately.[22]

In the fifth step, appraisers analyze the remainder parcel's highest and best use. In making such a determination in the after situation, appraisers should specifically consider several factors, including the proximity of the new or proposed public improvement to the remainder parcel and the possible existence of special or general benefits resulting from the project. (See Chapter 14 for more information on special and general benefits.) The reduced land area and the change in the shape of the remainder parcel are also important considerations, as are changes in access to the remainder property and the nature of the public improvements to be constructed. Appraisers must not only consider changes in the highest and best use of the property between the before and after situations, but also consider material change in the intensity of use. The final step in the valuation process is to analyze the value of the remainder property, again using all applicable approaches to value. Finding information on sales and rentals of comparable properties located in similar project areas will make comparative analysis in the approaches to value easier to apply.

In analyzing the value of the remainder tract, it is important that appraisers consider all observations made in determining the highest and best use of the tract in the after situation and the effect, if any, of the proposed public improvements. It is also important to look beyond the immediate boundaries of the remainder property to identify other forces that could affect the property's after value.

The Uniform Appraisal Standards for Federal Land Acquisitions caution against linking the estimate of the market value before the taking with the estimate of the market value of the remainder in a partial taking:

> Under this procedure, the appraiser develops opinions of both the market value before the acquisition and the market value after the acquisition. Requiring this valuation procedure allows acquiring agencies, the Department of Justice, and the courts to calculate a reasonable measure of compensation by deducting the remainder or after value from the larger parcel's before value. The result is a figure that includes the value of the property acquired as well as any compensable damages and/or direct (special) benefits to the remainder property. It should be noted that these are two separate appraisals within the same assignment requiring the appraiser to perform a new analysis and valuation of the remainder after the taking. It should also be noted that it is improper for an appraiser to develop an opinion of the market value of the larger parcel in the before situation and then deduct the opinion of value of the property acquired together with separately calculated damages to arrive at the value of the remainder.[23]

The analysis supporting each estimate of market value is an independent exercise.

Figure 13.7 illustrates the before and after situations of a single-family dwelling affected by the widening of an interstate highway. In the before situation, the property could be accessed via the frontage road and the interstate or the frontage road and County Roads 1 and 2. In the after situation, the depth of the remainder parcel was only nominally reduced and the traveled lanes of the frontage road were no closer to the dwelling than they were before. However, the highway project called for: (1) the closure of the intersection of the interstate and County Road 1, (2) the closure of the intersection of the interstate and

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

**Figure 13.7 Damage–Loss of Adequate Access**




County Road 2, and (3) the construction of a new roadway extending County Road 2 to connect with a new interchange on the interstate. The remainder parcel did suffer from some circuity of travel due to the closure of the two intersections, but this item of damage was ruled noncompensable before the trial.

Based on these facts alone, it would appear that the property in question suffered little, if any, diminution in value by reason of the taking and that there was no compensable damage. However, the appraiser for the property owner testified during the trial that, in the preceding 15 years, County Road 1 had flooded an average of 45 days per year at a point two miles from the remainder property and that during future flooding the only access to the remainder property would be by rowboat. As there were no plans to alleviate this flooding, the appraiser testified that the subject remainder had suffered extensive damage. After an extended recess of the trial, at the request of the condemning agency, the condemnor stipulated in court that it would expand its project to include elevating County Road 1 to alleviate future flooding.

The difference between an appraiser's opinion of the before value of the property and its after value is the value of the part of the tract taken, as a part of the whole, plus damages to the remainder (reduced by applicable benefits), if any. Damages reflect the judgment of appraisers and are based on market analysis, which often requires the use of different comparable sales in the after situation than in the before situation. A damage estimate is not an arbitrary percentage based on the appraiser's "vast years of experience." As L.W. (Pete) Ellwood said:

> I believe experience can teach lessons which may lead to sound judgment. I believe sound judgment is vital in selecting the critical factors for appraisal. But, I also believe the bright 17-year old high school student in elementary astronomy can do a better job estimating the distance to the moon than the old man of the mountains who has looked at the moon for 80 years. So, I find it difficult to accept the notion that dependable valuation of real estate is nothing more than experience and judgment.
>
> I would not give a red cent for an appraisal by the "expert" who beats his breast and shouts; "I don't have to give reasons. I've had 40 years experience in this business. And, this property is worth so much because I say so."

> After all, value is expressed as a number. And, no man lives who, through experience, has all numbers so filed in the convolutions of his brain that he can be relied upon to choose the right one without explicable analysis and calculation.[24]

Appraisers must be able to support their conclusions. According to the Uniform Appraisal Standards for Federal Land Acquisitions:

> [L]egally compensable damages can only be considered if proved: as with any element affecting value, damage to the remainder (i.e., diminution in value) can never be assumed but must always be fully supported by the facts of each situation. Damage that is "vague and speculative in character" or premised on "possibilities more or less remote" cannot be considered. As a result, it is improper to use damage as a catchall, simply stating an amount without specifying the basis for the opinion.[25]

According to several rulings, unsupported damage estimates will be rejected by the courts.

On the other hand, appraisers must also use common sense. For instance, suppose an appraiser is valuing the property depicted in Figure 13.8 in the after situation. After the taking, the dwelling is located three feet from the fenced right of way, and its roof overhangs the taking line. An appraiser cannot conclude that the dwelling suffers no proximity damage simply because no comparable sales of dwellings three feet from an interstate highway right of way can be found in the market. Appraisers must exercise sound judgment in these types of matters, whether or not strong market evidence exists.

Some condemnors' right of way procedures seem to encourage appraisers to conclude that a remainder property has suffered no damage. A staff appraiser is given a specific amount of time to complete an assignment, or a fee appraiser is given a flat fee for the work. If damages (or special benefits) are not found, the sales, income, and cost data used in appraising the property in the before situation may still be applicable in the after situation. However, if damages (or special benefits) are found, appraisers must often collect and analyze a new set of cost, income, and sales data, which is much more time-consuming. Thus, appraisers may be tempted to ignore potential damages. A condemnee's appraiser is often faced with a different dilemma. The condemnee may say, "I don't want you to prepare an appraisal unless you can come up with damages." Appraisers must guard against all pressure of this sort and be wary of attempts to influence their judgment. (Suggestions for handling these situations are discussed in Chapter 1.)

**Figure 13.8 Proximity Damage**




## Causes of Damage

It is simply impossible to develop an all-inclusive list of the potential damages that could

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

accrue to property in a partial taking case. However, some forms of damage do occur regularly.

In considering damages, appraisers must remember that some state constitutions provide for the payment of compensation only when property is taken, while others require payment of compensation when a property is taken or damaged indirectly. Thus, in the former case, there must be an actual taking of a property right for compensable damages to occur. In the latter case, compensable damages may result even where no actual taking has occurred, but the damage must be specific to the property in question, not a condition suffered in common with the general public, according to a ruling by the Eighth Circuit Court.[26]

An appraiser who is uncertain about the compensability of an item should obtain a properly supported legal instruction. If the compensability of the damage is not clearly established under applicable law, the attorney should inform the appraiser of this fact and instruct the appraiser to prepare two after appraisals—one including the questionable item of damage and one excluding it. Then, the appraiser will be prepared to testify on this issue regardless of the court's ruling. Sometimes, an attorney can submit information on a questionable item of damage to the court and obtain its determination prior to the condemnation trial.

The appraiser must not presume the existence of damages. According to the Uniform Appraisal Standards for Federal Land Acquisitions, "the mere fact of a partial acquisition will not necessarily entitle a landowner to damages."[27] A Louisiana court said, "damages are never presumed, and they will not be allowed if based on speculation or conjecture."[28] Unless the alleged damage has a demonstrable impact on the market value of the remainder property being appraised, it cannot be considered by an appraiser, according to a 1913 ruling by the U.S. Supreme Court.[29] Some items of damage are considered too remote and speculative to merit consideration. For this reason, in a 1911 case a Kentucky court disregarded an owner's contention that the construction of a railroad across his land would result in vagrants using his barn.[30] In a similar 1907 case, a Mississippi court would not consider the argument of a farmer who contended that his laborers would stop work to watch trains go by.[31]

The existence of damages can most easily be discerned when the highest and best use of the property in the after situation is diminished, according to a ruling by a Louisiana court.[32] There may be a complete change in the highest and best use of the property, or the highest and best use that existed in the before situation may have been modified. Generally the most dramatic change in highest and best use occurs when a property is landlocked or left without legal access in the after situation. Its only practical use is sale to an abutting owner.

## Lack of Access

A property without access may actually lack a market value, in the true sense of the term. The number of potential buyers for a property lacking access is often so severely limited that the property cannot, for all practical purposes, be placed on the open market. The number of abutting owners to a landlocked remainder property will often have a bearing on its value because these individuals are often the only potential buyers for the property. Another factor to be considered is the value contribution that the remainder property would make if it were merged with the various

abutting ownerships. For example, a property without access might be located in a greenfield environment and included in land use planning for future urban development mandated as part of a master plan. In this case, the value of the property would be enhanced by the highest and best use of the collective property rather than reduced because of the lack of access when the parcel is analyzed on its own.

The value of a landlocked property is typically measured by analyzing similarly situated properties that have been sold recently. State departments of transportation often have information on relevant sales because their highway projects often create landlocked parcels that they must purchase as uneconomic remnants.[33] The agencies then resell the landlocked parcels as excess rights of way.

Some appraisers question whether landlocked sales can technically be considered *comparable sales*. These properties are generally not available on the open market, and the sellers are under undue compulsion to sell because potential buyers are few and the seller has no legal access to the property. Sales of those properties would have to be adjusted for atypical motivations and lack of normal exposure to the market—i.e., value influences that are virtually impossible to quantify.

It is often difficult, if not impossible, to locate sale properties that are physically similar to a landlocked property. In the absence of physically comparable sales, appraisers must often analyze the property's loss in value due to the lack of access. This is essentially an application of the paired data technique of sales comparison analysis applied to landlocked properties. Such a study is illustrated in Figure 13.9. Based on the information provided, it might be concluded that the landlocked parcel (Sale 6) would sell for about $8.75 per square foot if it had legal access. In fact, it sold for $1.47 per square foot, indicating an 83% diminution in value due to its landlocked condition ([$8.75 – $1.47]/$8.75).

A number of studies of landlocked parcel sales must be made to develop a pattern of value diminution. These studies may show a pattern in the price paid per square foot, total price paid, or percentage of price paid for landlocked parcels as compared to surrounding properties that are not landlocked. It is important that the lands studied are put to the same type of use as the lands surrounding the landlocked parcel being appraised. If a tract is surrounded by commercial land, which typically sells on a square foot basis, the contribution that the landlocked parcel will make, as a percentage of value, to an abutting parcel with access will tend to be higher. If the surrounding land is residential, the landlocked parcel may only serve to increase the abutting tract's backyard area.

It is quite possible that the details of an appraiser's studies of landlocked parcel sales will not be admissible in court, but these types of studies are often the only basis for analyzing the value of a landlocked remain-

**Figure 13.9 Landlocked Parcel Study**




| Sale | Price | Size | Price per Sq. Ft. |
|---|---|---|---|
| 1 | $90,000 | 10,000 sq. ft. | $9.00 |
| 2 | $87,500 | 10,000 sq. ft. | $8.75 |
| 3 | $75,000 | 8,500 sq. ft. | $8.82 |
| 4 | $80,000 | 9,000 sq. ft. | $8.89 |
| 5 | $72,500 | 8,500 sq. ft. | $8.53 |
| 6 | $12,500 | 8,500 sq. ft. | $1.47 |

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

der. Even if the specifics of the studies are not admissible, appraisers generally can and should testify that they have made the studies and that their conclusion about the diminution in the value of the property being appraised (i.e., its after value) is based on these studies.

## Size and Shape

A change in the shape of a tract due to a partial acquisition can have a damaging effect on the value of the remainder. The change in shape may make it impossible to develop the site with a building as efficient as the building that could have been built in the before situation. If the property is farmland, inefficiencies may be created by changing the areas of cultivation or irrigation. Generally the effect of an irregular shape on the market value of a property is measured using comparable sales. Capitalized rent loss can also be used in some instances.

Reducing the size of a tract can result in a substantial reduction in the value of the remainder tract, particularly if the reduction transforms the remainder property into a nonconforming use. A taking could reduce the size of a tract below the minimum area required by applicable regulations, or the remaining amount of frontage, depth, or width could fall below the minimum required by zoning standards or by market expectations for properties of that type. If the property in question is improved, a taking could result in inadequate front, side, or rear yard setbacks. A taking could also leave a building with insufficient off-street parking or create a remainder with too high a ratio of building area to land area. If any of these conditions are produced, the effect of the nonconformity must be determined.

Some land use regulations provide that nonconforming properties are automatically considered conforming if the nonconformity resulted from a partial acquisition by a public agency. If no such provision exists, an appraiser must determine if there is a reasonable probability that a variance from the land use regulation could be obtained. The effect of the nonconformity on property maintenance costs, fire insurance rates, and the ability to finance the property must also be ascertained. Depending on the specific effect of the size reduction, the diminution in value can be measured using comparable sales or capitalization of the rent loss. In some instances, appraisers can use the cost to cure—e.g., when the parking facilities taken can be replaced with site improvements on a portion of the remainder not used for such purposes in the before situation.

When the size of a parcel has been reduced by a taking, it is imperative that appraisers consider the concept of before and after value. Under the state rule (i.e., value of the part taken as a part of the whole plus damages to the remainder), it may be necessary to allocate the total difference between the before and after values to the value of the part taken and damages to the remainder, but it is much safer to do so only *after* completing the before and after value analyses. If this procedure is not followed, an appraiser may be inadvertently considering the damage to the property twice and thereby duplicate the compensation. A Kentucky case illustrates this potential problem:

> The second basis for damages given by the two witnesses was that, by reason of lack of depth, a portion of the separated parcel had a reduced value for lot purposes. They computed the damages on the basis of percentages of a desirable

> lot depth. For example, at one end of the separated parcel, where the depth was only 55', one of the witnesses said that the value had been reduced 75%, so he computed that the original potential lot with a value of $1,000 had been damaged to the extent of $750. The trouble with this is that the landowners had already been allowed compensation in the award for the land taken, for the land that would have added the necessary depth to the 55' lot. [See Figure 13.10] In other words, if the back 75% of the lot is *taken*, and paid for, the landowner should not recover again, in the form of resulting damages, another 75% of the potential lot value. To do so would allow 150% recovery.
>
> It may be that if 75% of a lot were taken so as to render valueless, because of its smallness, the remaining 25%, the owner should be paid the full value of the lot. But he cannot be paid the value of the part taken and be awarded that value again as damages to the remainder.[34]

If the appraisers involved in this case had used a computational format like the one described in Chapter 3 of this text, or the form shown in Tables 3.1 and 3.2, this error would not have been made.

## Change in Grade

The taking or alteration of access rights, including changes in grade, access, light, view, and air, can also result in damage to the remainder parcel. Because a change in street grade without a physical taking is not compensable in all jurisdictions, compensability must first be determined. A change in street grade can increase the development costs of a remainder property or eliminate existing driveway or road approaches. In the latter case, the physical and economic practicability of replacing the approaches should be considered. In doing so it may be necessary to investigate the use of a curved driveway and retaining walls, the slope of the approach, and the loss of usable site area for driveway fills or cuts. A change in grade can also alter the physical setback required to construct buildings on a site.

For example, consider the before and after situation of the single-family dwelling shown in Figure 13.11. In the before situation, the site was on grade with the street. After the taking, however, the street will be eight feet higher than the site. To establish a new road approach at an acceptable slope—say, 12%—the drive must be extended about 67 feet beyond the right of way line, which will necessitate removing the garage from its present location. Also, assuming a 2:1 slope of the driveway fill, more than 1,000 square feet of the site must be devoted to fill for the driveway.

The measure of damage in this instance would be the cost to construct the new approach plus either (a) the cost to demolish the garage and the diminution in property value

**Figure 13.10 Remainder Dominated by Taking**



Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

Figure 13.11 **Change in Grade**




due to the lack of garage facilities or (b) the cost of relocating the garage further back on the site to accommodate the new driveway, whichever is less (a or b). Further consideration would, of course, have to be given to the potential value loss due to the greater amount of site area required for fill and driveway purposes and the fact that the site and improvements will be eight feet below street grade. Any loss in value caused by these factors would generally be measured by analyzing comparable sales. If the remainder property was in a market area where a single-family residence without vehicular access would be marketable, the diminution in value caused to the remainder by the lack of vehicular access would have to be compared to the cost to cure items noted above. The lesser amount would be the proper measure of damage.

The severe loss or limitation of access, light, view, and air can alter the highest and best use of a property. Estimating these damages will require the use of different comparable sales in the after situation than in the before situation. Thus, it can be said that the diminution in value is measured through the analysis of comparable sales.

## Proximity to the Public Improvement

The term *proximity damage* is defined as "[a]n element of severance damages that is caused by the remainder's proximity to the improvement being constructed (e.g., a highway); may also arise from proximity to an objectionable characteristic of a site or improvement (e.g., dirt, dust, noise, vibration)."[35] Proximity damage is typically measured using comparable sales. Once again, it is often impossible to find recently sold properties that are similar enough to the subject property in the after situation to use for direct comparison. In this case, a *proximity study*, which is similar to a landlocked parcel study, could be developed by an appraiser. The appraiser would investigate and analyze several recently sold comparable properties located near public facilities similar to the proposed public improvements. The appraiser would then compare each of these sale properties with other properties that have been sold recently and are comparable except for their proximity to the public improvements. From such a study, an appraiser can develop an estimate of the potential damage attributable to proximity of such a public facility.

At times, and in some markets, appraisers may find that there is no price difference between properties near a public facility and similar properties located some distance away. Before an appraiser concludes that no damages are attributable to proximity to the public facility, however, all of the sales used in the various proximity studies must be investigated. It may be that the prices paid for the properties reflect no proximity damages, but a much longer time was required to sell these properties.

**Table 13.1 Proximity Study**

| Sale | List Price | Sale Price | Location | Days to Sell |
|---|---|---|---|---|
| 1 | $400,000 | $397,500 | On freeway | 265 |
| 2 | $410,000 | $412,500 | No proximity | 64 |
| 3 | $437,500 | $420,000 | No proximity | 108 |
| 4 | $390,000 | $390,000 | No proximity | 92 |
| 5 | $337,500 | $337,500 | On freeway | 272 |
| 6 | $330,000 | $320,000 | No proximity | 87 |
| 7 | $355,000 | $350,000 | No proximity | 70 |
| 8 | $325,000 | $325,000 | No proximity | 91 |
| 9 | $475,000 | $462,500 | On freeway | 294 |
| 10 | $455,000 | $450,000 | No proximity | 36 |
| 11 | $462,500 | $462,500 | No proximity | 102 |
| 12 | $475,000 | $462,500 | No proximity | 76 |
| 13 | $335,000 | $330,000 | On freeway | 198 |
| 14 | $300,000 | $300,000 | No proximity | 94 |
| 15 | $297,500 | $295,000 | No proximity | 87 |
| 16 | $312,500 | $310,000 | No proximity | 38 |

Table 13.1 illustrates a proximity study. If adequate data is available, appraisers can develop a meaningful statistical analysis of how proximity to a freeway affects the amount of time required to sell similar properties. Assume that an appraiser has studied the data in Table 13.1 and concludes that dwellings close to a freeway can be sold in about 270 days, or nine months. Since the other properties were sold in one to three months, the appraiser could consider the cost of holding the property for an additional six months to be a possible measure of proximity damages. It is highly unlikely that a residential property could be rented while it is actively being marketed, so it is unlikely that any income can be generated to offset the holding costs. The appraiser should also consider whether the owner of the property is paying more sales costs (e.g., a higher real estate commission) than the costs paid by owners of properties farther from the freeway.

In any study of marketing time, appraisers must keep in mind that marketing time varies geographically, seasonally, in different price ranges, and in response to the type and amount of financing offered. For these reasons, published marketing time studies are notoriously unreliable. They often cover a larger geographical area, include all property sales within a type class (e.g., single-family dwellings), and do not reflect differences in financing. Data on marketing time obtained from a multiple listing service is generally even more skewed. Marketing time is only reported for properties that have been sold. Expired listings, which may have been on the market for an extended period, are ignored. Also, once listings have expired, properties are often relisted and subsequently sold, but only the duration of the second (more recent) listing may be reported as the marketing time for the property. Sometimes sales fall through and the property is placed back on the market under a new listing. This can skew data, as can sales that are reported when an earnest money agreement, or sales contract, is signed rather than when a sale actually closes.

If an appraiser is going to use a study of marketing time to estimate an adjustment or an item of damage, the study should be conducted with the specific subject property in mind. Moreover, appraisers should collect, or at least verify, all the data personally or under their direct supervision. If they do not, the results of the study may be found to be unreliable and inadmissible as hearsay.

It is not always necessary for appraisers to reach a conclusion as to why the value of a property is diminished by its proximity to a public facility such as a freeway. In fact, it is sometimes advisable to avoid this issue. Elements such as noise that one would normally assume to be present in proximity damages have, on occasion, been ruled noncompensable. It is sometimes best for appraisers to

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

simply demonstrate with market evidence that single-family properties some distance from the freeway sell for *X* dollars, while comparable properties next to the freeway sell for *Z* dollars less. This procedure has been approved by the courts. According to a ruling by a Utah court:

> In making the appraisal, it is not only permissible, but necessary to consider all of the facts and circumstances that a prudent and willing buyer and seller, with knowledge of the facts, would take into account in arriving at market value. The testimony of the defendant's expert which is here under attack indicates that he conformed to that formula. He properly and candidly included the facts that the new freeway adjacent to the property, with the attendant increase in traffic and noises, were among the factors considered in making his appraisal. But there was no attempt to segregate and place a separate money value thereon. We think the trial court was well advised in admitting his testimony and that no prejudicial error was committed.[36]

Often a permanent taking is accompanied by a temporary taking in the form of a construction easement. A temporary construction easement, often referred to as a "TCE" or "TE," accommodates the construction of the public improvements. It may be automatically extinguished at the completion of construction or extended somewhat beyond completion of construction, and then the unencumbered fee interest in the land reverts back to the owner. The fact that a taking is temporary in nature does not relieve the sovereign from the obligation to pay just compensation. Estimating the diminution in value caused by a temporary taking, which can be quite complex, is discussed in Chapter 16.

## Noncompensable Damages

Some damages are, as a matter of law, noncompensable. Care must be taken in determining compensability because in some jurisdictions an item of damage is compensable only if it is accompanied by a partial acquisition. One example of a generally recognized damage item would be the construction of a median barrier in the center of a street. In 1971, a Louisiana court ruled that when a median barrier is placed in the street as a part of a public project for which a portion of the property in question was taken, construction of the median barrier may be considered an element of damage.[37] In contrast, a California court ruled differently on the issue, finding that actions within the sovereign's police power do not constitute compensible damage and are not substantial.[38]

Damages that are remote and speculative do not merit consideration, according to a 1913 Supreme Court ruling.[39] Generally damages resulting from the sovereign's police power are noncompensable. These actions include

- changes in traffic patterns that increase or decrease traffic
- temporary blockage of a street or highway
- deprivation of legal access, light, view, and air caused by a newly constructed, limited-access highway
- construction of improvements in a preexisting right of way, e.g., medians, noise walls

Other items of damage that are generally noncompensable include

- loss of business
- tenant relocation
- moving of personal property
- frustration of an owner's plans

An annoyance or inconvenience such as circuity of travel is often ruled noncompensable because the damage is shared with the public in general and is not peculiar to the remainder property. For the same reason, noise, dust, and fumes from highway traffic are sometimes ruled noncompensable. When inverse condemnation suits involving avigation easements are successful, however, noise is often recognized as a compensable item of damage in all types of condemnation so long as the noise has a detrimental effect on the property's market value in the after situation. Moreover, when noise levels reach an unreasonable level, they have been ruled compensable, even when no physical taking has occurred. For example, a Washington court said the following in a 1971 ruling:

> The instant case does not involve a physical taking of respondent's property. This fact does not prevent an award for damages under article 1, section 16, of the Washington Constitution (amendment 9). Generally, compensation is not allowed in such circumstance where the injury or damage is one suffered in common with the general public. On the other hand, where the injury or damage is special or peculiar to the particular property involved and not such as is common to all the property in the neighborhood, compensation may be allowed not as a distinct element of damage, but only as it may affect the market value of the property. The measure of damages is the difference between the fair market value before and after the infliction of the damage. . . .
>
> We believe the [freeway] ramp to be constructed in this case may create an echo chamber for 1-way traffic immediately adjacent to the south end of respondent's warehouse and may thereby materially affect the fair market value of respondent's property. This is a special damage differing in kind from the damage sustained by other properties due to the improvement in question. In this situation the jury may consider noise as a factor, if it is a factor, in determining the before and after fair market values of respondent's property. It is not, however, to be singled out separate and apart from all of the other relevant factors in determination of the market values."[40]

## Dangerous Consequences of Public Improvements

A reasonable fear of danger due to a taking or proposed construction and operation of public improvements—if the fear is well-founded—has been held to be compensable. However, a fear of danger that is unfounded has met with mixed reaction. Some jurisdictions have ruled that unfounded fear is a compensable item because any factor that has a detrimental effect on the market value of the remainder property is a proper consideration. Other jurisdictions have ruled that unfounded fear is not a proper consideration because the damage was not caused by the condemnor's taking but rather by "the ignorance, prejudice, or folly of those who wrongly conceive and believe that it will cause them damage," according to a Connecticut court.[41]

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

Even if fear of danger is a proper element to be considered in analyzing the remainder value of a property, it does not necessarily follow that evidence to prove the reasonableness of the fear will be admissible. For instance, a court in Florida ruled in 1987 that the fear of danger was a proper element of damage but that evidence to support the reasonableness of the fear (in this case, scientific evidence relating to health hazards) was inadmissible because in Florida this type of damage is recoverable, irrespective of whether the fear is reasonable.[42]

If the property being appraised is located in a jurisdiction that considers fear of danger an element of damage only if it is determined that the fear is well-founded or reasonable, it is not the obligation of appraisers to make this determination. This task is generally well beyond an appraiser's expertise and far beyond the scope of the appraiser's assignment. An appraiser's job is merely to analyze the market value of the property being appraised before and after the taking. If the property reflects a diminution in value because of fear of danger, appraisers should report this fact to legal counsel, who should, in turn, provide appraisers with a supported legal instruction about the proper treatment of the damage item.

Such a legal instruction could take one of several forms. For instance, an instruction could advise an appraiser to consider the fear, whether founded or not, as a damage element if the property is located in a jurisdiction that does not require fear to be reasonable or well-founded. If the jurisdiction requires the fear to be well-founded before it can be considered, a legal instruction could advise an appraiser to conduct a double-premise appraisal in the after situation—one reflecting the diminution in value caused by fear and the other excluding consideration of that damage. As an alternative, a legal instruction could advise an appraiser to assume that the fear was reasonable (or unreasonable) and to conduct the appraisal accordingly. However, this latter instruction would have to contain legal or scientific support to be accepted by an appraiser.

## Access, Circuitry of Travel, and Diversion of Traffic

As noted in Chapter 4, a property owner has the right to reasonable access and compensation is due if this right is taken. But, as noted earlier in this chapter, an owner is not due compensation for circuity of travel or diversion of traffic. These seem to be fairly clear rules of law, until an appraiser attempts to apply them in the marketplace and the courts attempt to apply them to factual situations. A Massachusetts court said the following in 1979:

> We do not deal here in absolutes. . . . Circuity of access may be rendered extreme to the point of counting as a substantial impairment of access. Thus the problem in each case consists of assessing a variety of factors, including most notably the existence, availability and feasibility of routes, all in connection with the uses to which the property has been (or may be) put, to determine whether the claimant or his patrons, previously in a reasonable relation to a road system reaching the property, have now been left without such a relation.[43]

One of the problems with applying these rules is that the definition of *suitable access* varies with the current (or highest and best) use of the property in question. What constitutes suitable access for a single-family dwelling may

be unsuitable access for commercial uses, and what is suitable for one retail use may be unsuitable for a different retail use. Another problem is that these rules often have harsh results and can lead to an exception to the *before and after rule* wherein all damages are considered.

The harshness of these rules can be illustrated by referring back to Figure 13.6. In this case, property was taken for mitigation of the wetlands destroyed for a dam and reservoir project. The portion of the parcel not taken (the remainder property) was improved with a commercial facility, highly dependent on patronage from people traveling the state highway abutting the property. In the before situation, the traffic count on the highway was approximately 10,000 cars per day. Because the new reservoir flooded a portion of the state highway, however, a new highway route was constructed to the west that diverted most of the traffic away from the remainder property. The old highway was closed at a point north of the remainder property. In the after situation, the remainder property reverted to a highest and best use for agricultural and residential purposes, reducing the after value by more than 70% of the before value.

This diminution in value was not compensable. Access (ingress and egress) to the remainder property had not changed and circuity of travel was minimal. The entire diminution in value resulted from the diversion of the state highway traffic from the old right of way to the new highway route. As diversion of traffic is a noncompensable damage, there was no compensation for damages due to the owner of the remainder.

If the government had abandoned the highway right of way in front of the remainder property, the owner of the remainder would have been due compensation because the remainder property's access to a public road system would have been unsuitable. Also, in some jurisdictions the owner would have been due compensation if the remainder property had abutted the highway at the point of closure, i.e., if the highway had been closed at the northeast corner of the remainder property.

Often a public project will have a direct impact on the access to a property and, at the same time, will result in some circuity of travel and diversion of traffic. It is nearly impossible to segregate the damages to the remainder property due to these individual elements. The rules of compensation for the damages resulting from these combined elements will vary from jurisdiction to jurisdiction and from situation to situation. Often, a court's decision on compensability will hinge on the words an appraiser uses on the witness stand to describe and explain the estimate of damage to the remainder property.

When an appraiser encounters a remainder property that has been affected by a change in access, circuity of travel, or diversion of traffic, the best course of action is to request advice on compensability (and supported legal instruction, if necessary) from legal counsel. The worst course of action would be for an appraiser to attempt to classify damage clearly caused by a diversion of traffic as damage caused by a change of access. Appraisers do not have the option of bending the rules of compensability to fit their own views of fairness. Appraisers are not in the business of determining what is fair. They are in the business of analyzing market value *in accordance with the rules set down by the courts*.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

## Notes


1. *In re Condemnation of 2719,21, 11 E. Berkshire St.*, 343 A.2d 67 (Penn. 1975).
2. *Florida East Coast Properties, Inc. v. Metropolitan Dade County*, 572 F.2d 1108, 1111 (5th Cir. 1978) *cert. denied*, 439 U.S. 894 (1978).
3. *Bramson v. Berea*, 293 N.E.2d 577 (Ohio 1971).
4. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).
5. *Spinner v. State*, 167 N.Y.S.2d 731,733 (N.Y. 1957).
6. U.S. Department of Transportation, Federal Highway Administration, *The Appraisal Guide* (Washington, D.C: U.S. Government Printing Office, 1993), 8.
7. *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950), *cert. denied*, 340 U.S. 820 (1950).
8. *United States v. 26.07 Acres of Land in Hampstead*, 126 F.Supp. 374, 377 (E.D.N.Y. 1954).
9. *Arkansas State Highway Commission v. Ptak*, 364 S.W.2d 794 (Ark. 1963).
10. *Nichols' Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2014), vol. 8A, §16.01[2] (2017).
11. *International Paper Company v. United States*, 207.
12. *International Paper Company v. United States*.
13. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §4.6.2.2.
14. *Campbell v. United States*, 266 U.S. 368 (1924).
15. *Commonwealth v. Williams*, 487 S.W.2d 290 (Ky. 1972).
16. *Campbell v. United States*, 266 U.S. 368, 371-372 (1924).
17. *State Highway Commission v. Bloom*, 93 N.W.2d 572, 579 (S.D. 1958).
18. *United States v. Pope & Talbot, Inc.*, 295 F.2d 822 (9th Cir. 1961); *United Stales v. 15.65 Acres of Land*, 689 F.2d 1329 (9th Cir. 1982), *cert. denied*, 460 U.S. 1041 (1985).
19. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.2.2.
20. *United States v. Reynolds*, 397 U.S. 14, 20 (1970); Federal Rules of Evidence, 71.1.
21. *Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019 ed. (Washington, D.C.: The Appraisal Foundation, 2018), Standards Rule 2-2(a)(viii), p. 22, and Standards Rule 2-2(b)(viii), p. 23; *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §2.3.1.8, p. 61.
22. *Commonwealth, Department of Highways v. Rowland*, 420 S.W.2d 657, 660 (Ky. 1967).
23. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.7.1, p. 37. Note that in acquisitions subject to the state rule, this procedure does not apply.
24. L. W. Ellwood, *Ellwood Tables for Real Estate Appraising and Financing* (Ridgewood, N.J.: L.W. Ellwood, 1959), preface p. IX.
25. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.2.2, p. 156.
26. *Feltz v. Central Nebraska P.P. & I. Dist.*, 124 F.2d 578 (8th Cir. 1942).
27. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.2.2, p. 156.
28. *State Department of Highways v. Gordy*, 322 So.2d 418, 422 (La. 1975).
29. *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913).
30. *Louisvillle, etc. R. Co. v. Hall*, 136 S.W. 905 (Ky. 1911).
31. *Yazoo, etc. R. Co. v. Jennings*, 43 So. 469 (Miss. 1907).
32. *State Department of Highways v. Beatty*, 288 So.2d 900 (La. 1973).
33. Pub. L 91-646, Title III §301(9).
34. *Commonwealth v. Raybourne*, 364 S.W.2d 814, 815 (Ky. 1963).
35. *The Dictionary of Real Estate Appraisal*, 6th ed., (Chicago: Appraisal Institute, 2015), s.v. "proximity."
36. *State Road Comm. v. Rohan*, 487 P.2d 857 (Utah 1971).
37. *State Department of Highways v. Bagwell*, 255 So.2d 852 (La. 1971).
38. *San Diego Metropolitan Transit Development Board v. Price Co.*, 37 Cal. App. 4th 1541 (1995).
39. *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913).
40. *City of Yakima v. Dahlin*, 485 P.2d 628, 630-6 31 (Wash. 1971).
41. *City of Meriden v. Zwalniski*, 91 A. 439, 441 (Conn. 1914).
42. *Florida Power & Light Co. v. Jennings*, 518 So.2d 895 (Fla. 1987).
43. *Malone v. Commonwealth*, 389 N.E.2d 975, 979 (Mass. 1979).

Copyrighted material licensed to Randall Bell, PhD on November 29, 2016

14

# Benefits—General and Special

General benefits and special benefits—like damages—relate only to partial acquisitions. When a whole property is acquired, there is no remainder that benefits can accrue to. *Benefits*, as described here, are defined as "the advantageous factors that arise from a public improvement for which private property has been taken."[1]

There are two classifications of benefits:

1. General benefits
2. Special benefits

"[B]enefits are positive effects on market value that result from the public project for which the property was acquired," according to the Uniform Appraisal Standards for Federal Land Acquisitions. "There are two categories of benefits for federal acquisition purposes: direct (special) benefits, which must be offset against total compensation, and general (indirect) benefits, which must be ignored. As with damages, whether a benefit is general or direct is a mixed fact/law question that requires a *legal instruction*."[2] In practice, the distinction between *general benefits* and *special benefits* is largely case-specific, making broad categorizations difficult.

The ruling in *United States v. 2,477.79 Acres of Land* has long provided an authoritative distinction between special benefits and general benefits:

> "The most satisfactory distinction between general and special benefits is that general benefits are those which arise from the fulfillment of the public object which justified the taking, and special benefits are those which arise from the peculiar relation of the land in question to the

**special benefits**
In condemnation, the benefits that arise from the peculiar relation of the land in question to the public improvement, usually resulting from a change in its highest and best use. Special benefits may accrue to multiple parcels (such as all four quadrants of a newly constructed freeway interchange) because the parcels are directly benefitted in a similar manner, if not to the same degree.

**general benefits**
In eminent domain takings, the benefits that accrue to the community at large, to the area adjacent to the improvement, or to other property situated near a taken property.

Source: *The Dictionary of Real Estate Appraisal*, 6th ed. (2015)

> public improvement. Ordinarily the foregoing test is a satisfactory one, though sometimes difficult to apply. In other words, the general benefits are those which result from the enjoyment of the facilities provided by the new public work and from the increased general prosperity resulting from such enjoyment. The special benefits are ordinarily merely incidental and may result from physical changes in the land, from proximity to a desirable object, or in various other ways."
>
> It has been held that special benefits are to be differentiated from general benefits where the differences are in kind and not in degree. . . . We think that special benefits are those which are direct and peculiar to the particular property as distinguished from the incidental benefits enjoyed to a greater or lesser extent by the lands in the area of the improvement. A special benefit is nonetheless such because other lands in like situations are similarly benefitted.[3] [citations omitted]

In reference to the preceding argument, a Hawaii court said the following:

> This definition of and distinction between general and special benefits, while fundamentally sound, is too general to admit of ready application to specific situations. The difficulty arises not so much from recognition of the basic principles categorizing special and general benefits as in the application of the same to particular factual situations. The application of the distinction between general and special benefits is influenced by the nature of the eminent domain proceedings and the manner in which special benefits are to be utilized.[4]

In 1970, an Arizona court said:

> There is probably more judicial discord as to what is or is not a special benefit than in any other area of the law of eminent domain. Where there is an actual physical improvement to the property, such as the draining of a swamp, it is easy to see a special benefit. It is equally easy to recognize, at the other end of the spectrum, a general benefit such as an improved system of highways, since everybody in a community benefits from such an improvement. The difficulty lies in the amorphous grey area between these two extremes.[5]

In 1996, a California court commented on the ambiguity of the term "peculiar" in the context of defining special benefits and general benefits, while overturning the long-standing *Beveridge* ruling:

> Related to the ambiguity of the term "peculiar" is the *Beveridge* court's failure to define the "community" relevant to the determination of general or special benefits, whether as the immediate neighborhood of the affected property, the town or city in which it is located, or, more broadly, the county or region. The more expansively the community is defined, the more likely the benefit will be deemed peculiar and, hence, a special benefit entitling the condemner to a setoff. In the present case, for example, if the relevant community is defined as those properties within walking distance of the Douglas Street Station, then the benefit of proximity is universally shared within the community and is thus self-evidently general. If, on the other hand, we define the relevant community as the greater Los Angeles metropolitan area (as we might do if our conception of community includes all those whose taxes presumably help pay for the transit system and all who might be expected to use it), then the benefit of proximity begins to appear much more peculiar to properties, such as Continental's, that are within walking distance of the Douglas Street Station.[6]

While the characterization of special benefits is fact-specific, there is a growing consensus among a number of states and legal scholars that all benefits

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

should be considered in analyzing the market value of a remainder, effectively moving to a strict adherence of the concept of market value, and that nonspeculative increases in value should be acknowledged.

In *Borough of Harvey Cedars v. Karan*, the New Jersey Supreme Court overturned an appellate court ruling that had affirmed a jury award of $375,000 in damages, premised mostly on the loss of oceanfront view.[7] A portion of the landowner's beachfront property was taken as part of a massive public works project to construct a dune that connects with other dunes running the entire length of Long Beach Island in Ocean County. The dunes serve as a barrier wall, protecting the beachfront homes and businesses from the "destructive fury of the ocean."

In overturning the decision of the lower courts, the New Jersey Supreme Court adopted an approach that allows all nonconjectural factors, positive and negative, to be considered in analyzing the market value of a remainder, reasoning as follows:

> In a partial takings case, homeowners are entitled to the fair market value of their loss, not to a windfall, not to a pay out that disregards the home's enhanced value resulting from a public project. To calculate that loss, we must look to the difference between the fair market value of the property before the partial taking and after the taking.

In light of the various cases and treatises written on the distinction between special benefits and general benefits and attempts to apply that distinction to particular factual situations, the best advice for appraisers may be to seek competent legal instruction. According to the Uniform Appraisal Standards for Federal Land Acquisitions, "[i]n contemporary federal acquisitions, appraisers are rarely asked to quantify *indirect* and *general benefits* in making valuations for just compensation purposes."[8]

## Existence of Benefits

An appraiser and an attorney must first determine whether any benefits are present in a specific situation and, if so, whether it makes any difference if the benefits are considered general or special. Because benefits can only accrue to a remainder property in a partial taking case, appraisers must first carefully consider what constitutes the larger parcel. (See Chapter 5.) Although a parcel may be owned by the same condemnee and may, in fact, be benefitted by the public project, benefits cannot accrue unless the parcel is an integral part of the larger parcel. Benefits are not caused by the taking of a portion of a tract of land but by the use that the condemnor will put the land taken to, according to a Connecticut court.[9] According to the Uniform Appraisal Standards for Federal Land Acquisitions:

> Consideration and offset of the government project's direct and special benefits to remainder property does not violate the scope of the project rule, discussed in Section 4.5. Rather, the general principle, as the Supreme Court expressly stated in *United States v. Fuller*, is that the United States "may not be required to compensate a [landowner] for elements of value that the Government has created. . . ." And this general principle does not prevent application of the scope of the project rule to exclude increments in value due to the government's project when necessary "to do substantial justice." Application of the scope of the project rule turns on the question: "Should the owner have the benefit of any increment of value added to the property taken by the action of the public

> authority[?]" As discussed in Section 4.5, the answer to this question depends on the precise facts of each acquisition, and "requires discriminating judgment" and *legal instructions*.[10] [citations omitted]

Screening out the influence of the project applies when valuing the larger parcel before the taking and excludes value-influencing factors unrelated to the project, according to the Uniform Appraisal Standards for Federal Land Acquisitions:

> The scope of the project rule applies only to changes in value *attributable to the government's project*; it does not allow an appraiser to disregard changes in value attributable to other factors. For this reason, changes in value prior to the date of valuation due to physical deterioration within the landowner's reasonable control must be considered.
>
> In partial acquisitions, the scope of the project rule typically excludes consideration of government project influence on the value of the larger parcel before the acquisition, and includes consideration of government project influence on the value of the remainder after the acquisition.[11]

It should be noted, however, that project influence is a proper consideration in the after situation and may be composed of general benefits, special benefits, or a combination of the two. Thus, it may be necessary, depending on the jurisdiction, to allocate the beneficial effects of project influence between special benefits and general benefits and to consider only the special benefits in analyzing the value of the property in the after situation. In considering the presence of benefits, appraisers must be sure to adhere to the scope of the project rule, which is covered in Chapter 6.

## Rules of Benefit Offset

The identification and classification of benefits are important because different jurisdictions have different benefit offset rules. The five separate benefit offset rules listed in Figure 14.1 are used by various jurisdictions in the United States.

Attempts have been made to classify each jurisdiction under one of these five rules. However, there is so much conflicting case law and statute law regarding the offsetting of benefits in some jurisdictions that a comprehensive and current list cannot be prepared.

According to *Nichols*, "the Supreme Court of the United States has held offsetting benefits against severance damages is constitutional."[12] The 2016 edition of the Uniform Appraisal Standards for Federal Land Acquisitions says the following:

> Under federal law, compensation for a partial acquisition must reflect any <u>direct and special benefits</u> to the remainder due to the government project. Indirect and general benefits, on the other hand, are not considered because they are enjoyed by the public as a whole rather than arising from an acquisition's particular impact on a specific property.[13]

**Figure 14.1 The Five Benefit Offset Rules**

| | |
|---|---|
| **Rule 1.** | Benefits, whether special or general, cannot be considered. |
| **Rule 2.** | Special benefits only can be offset against damages to the remainder, but not against the contributory value of the land taken. |
| **Rule 3.** | Special benefits and general benefits can be offset against damages to the remainder, but not against the contributory value of the land taken. |
| **Rule 4.** | Special benefits can be offset against both the damages to the remainder and the contributory value of the land taken. |
| **Rule 5.** | Special and general benefits can be offset against both damages to the remainder and the contributory value of the land taken. |

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

Nevertheless, some state jurisdictions still allow the offsetting of general benefits. Thus, legal counsel must decide where the weight of authority lies and advise appraisers about whether general benefits can or cannot be offset against the taking or damages.

Table 14.1, which appeared previously in Chapter 3, generally classifies the benefit offset rule that is most prevalent in each jurisdiction. Because exceptions and conflicting case law exist in these jurisdictions, it would be unwise to determine the applicable rule based solely on the information in Table 14.l. Applicable case law, statutory law, and constitutional law should be thoroughly researched.

Some jurisdictions have also recognized the speculative nature of special benefits (and damages) that are derived from yet-to-be built public improvements. Colorado provides that "any amount of compensation determined initially shall remain subject to adjustment for one year after the date of the initial determination to provide for additional damages or benefits not reasonably foreseeable at the time of the initial determination."[14] Michigan law provides that "upon demand of the owner before trial, the court may require the agency to acquire that portion of the remainder of the tract which the agency claims to be enhanced if the agency claims enhancement."[15] A state-by-state discussion of benefit offset is Provided in *Nichols'*.[16]

The rules applicable in various jurisdictions are summarized in Table 14.1, which indicates that two jurisdictions follow Rule 1, thirty-one follow Rule 2, four follow Rule 3, and fifteen follow Rule 4. The applicable benefit setoff rule will often dictate the format that appraisers must use in reporting value conclusions (see Chapter 3).

## Reason for Rules

The various setoff rules in existence today have evolved from constitutional law, statutory law, and case law. A detailed discussion of why various jurisdictions have adopted one of the five rules is beyond the scope of this work, but a general understanding of their reasoning can be useful to appraisers.

### Rule 1. *Benefits, whether special or general, cannot be considered.*

Rule 1 originates with provisions in many state constitutions that hold that private property cannot be taken or damaged without the payment of just compensation. In some of these jurisdictions, the courts have historically ruled that just compensation must be paid in money, so the receipt of a benefit by the landowner cannot be substituted. In other jurisdictions, constitutional provisions exclude from consideration, in arriving at just compensation, "any advantage that may result to the owner on account of the improvement for which it is taken."[17]

### Rule 2. *Special benefits only can be offset against damages to the remainder, but not against the contributory value of the land taken.*

Rule 2 exists because many state constitutions require that the sovereign pay just compensation for the taking of property, and case law supports the position that this payment must be made in cash. In many of these jurisdictions, howev-

er, there is no special constitutional provision that requires the payment of just compensation for damages. Therefore, it has been established by code or case law that, although the property owner must be compensated for damages to the remainder property, the compensation may be in the form of benefits rather than cash because the requirement for payment is not a constitutional one.

Rule 2 prohibits the offsetting of damages by general benefits. "Arguably, the setoff of general benefits denies the condemnee the constitutional guarantee of just compensation since the condemnee is singled out and deprived of a share in the increased prosperity of his or her fellow citizens merely because the public happens to want a portion of the condemnee's land," according to *Nichols*. "The condemnee pays in taxation for his or her share of general benefits, just as other members of the public, and therefore, is entitled to receive his/her fair portion of the general advantages brought about by a public improvement."[18]

### Rule 3. *Special benefits and general benefits can be offset against damages to the remainder, but not against the contributory value of the land taken.*

Rule 3 is similar to Rule 2, but it provides that general benefits as well as special benefits may be offset against damages. In jurisdictions that follow this rule, it is argued that general benefits do, in fact, reduce the damage suffered by a property owner, and, as long as the owner's pecuniary position after the taking is equal to, or better than, the position held before the taking, the constitutional mandate of just compensation has been met.

### Rule 4. *Special benefits can be offset against both the damages to the remainder and the contributory value of the land taken.*

Rule 4 is often referred to as the *before and after rule* or the *federal rule*. (See Chapter 3.) The rule exists simply because it ensures that the property owner is in exactly the same monetary position in the after situation as in the before situation. The constitutions of jurisdictions using this rule have generally been interpreted as not necessarily requiring the actual payment of just compensation in cash. Rather, they require that the property owner be in as good a position monetarily after the taking as he or she was before. In some states, a special benefits assessment may be levied against a remainder property. In these cases, great care must be exercised not to offset damages with benefits in the condemnation action and subsequently assess the same property for the same benefit. A Connecticut court has held that if the owner's remaining land has a value greater than its value in the before situation, the owner may be liable to the state for the difference.[19]

### Rule 5. *Special and general benefits can be offset against both damages to the remainder and the contributory value of the land taken.*

Rule 5 is similar to Rule 4, but it holds that both general benefits and special benefits may be offset against the taking and damages. As noted previously, this rule does not appear applicable in any jurisdiction, except in limited circumstances.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

**Table 14.1 Benefit Offset Rules**

| Jurisdiction | Rules 1 | 2 | 3 | 4 | Comment |
|---|---|---|---|---|---|
| United States | | | | × | |
| Alabama | | × | | | Offset to both the remainder and the value of the property taken allowed on highways, water and sewer lines, water conservation districts, and water management districts. |
| Alaska | | × | | | |
| Arizona | | × | | | |
| Arkansas | | | | × | Benefit offset not allowed for other than municipal corporations. |
| California | | × | | | |
| Colorado | | × | | | Limiting rules. See Colorado Rev. Stat. Ann. §38-1-114 (1987). |
| Connecticut | | | | × | By special assessment. |
| Delaware | | | | × | |
| District of Columbia | | | | × | |
| Florida | | × | | | Offset allowed for road, canal, levee, or water control facility right of way. |
| Georgia | | × | | | |
| Hawaii | | | | × | Offset against damage only when taking is for road widening or realignment. |
| Idaho | | × | | | |
| Illinois | | × | | | |
| Indiana | | × | | | Benefit offset not allowed for other than municipal corporations. |
| Iowa | × | | | | |
| Kansas | | | | × | Benefit offset not allowed for other than municipal corporations. |
| Kentucky | | | | × | |
| Louisiana | | × | | | |
| Maine | | | | × | |
| Maryland | | × | | | |
| Massachusetts | | × | | | |
| Michigan | | × | | | |
| Minnesota | | | | × | |
| Mississippi | × | | | | Special benefits may be offset against damages when no land is taken. |
| Missouri | | | | × | |
| Montana | | × | | | |
| Nebraska | | × | | | |
| Nevada | | × | | | |
| New Hampshire | | | | × | |
| New Jersey | | | × | | No distinction is made between special and general benefits. |
| New Mexico | | | × | | |
| New York | | | × | | |
| North Carolina | | | | × | N.C. Gen. Stat. §136-112 allows offset of general benefit if taking is for state highway purposes. |
| North Dakota | | × | | | Benefit offset not allowed for other than municipal corporations. |
| Ohio | | × | | | |
| Oklahoma | | × | | | |
| Oregon | | × | | | |
| Pennsylvania | | × | | | |
| Rhode Island | | × | | | |
| South Carolina | | | | × | |
| South Dakota | | × | | | Benefit offset not allowed for other than municipal corporations. |
| Tennessee | | × | | | |
| Texas | | × | | | |
| Utah | | × | | | |
| Vermont | | × | | | |
| Virginia | | × | | | Both general and special benefits have been offset against damages for at least highways, bridges, and ferries. |
| Washington | | | | × | Benefit offset not allowed for other than municipal corporations. Optional deferment of benefits provided. |
| West Virginia | | | × | | |
| Wisconsin | | × | | | |
| Wyoming | | × | | | |

**Rule 1.** Benefits, whether special or general, cannot be considered.
**Rule 2.** Special benefits only can be offset against damages to the remainder but not against the contributory value of the land taken.
**Rule 3.** Special benefits and general benefits can be offset against damages to the remainder but not against the contributory value of the land taken.
**Rule 4.** Special benefits can be offset against both the damages to the remainder and the contributory value of the land taken.
While only Rules 1 through 4 are shown in the table, note that Rule 5 may be used in certain situations, such as a state highway acquisition in North Carolina (see North Carolina General Statute §136-112) or a beach sand project in Alabama (see 2016 Code of Alabama §18-171).
**Source:** *Nichols'*, vol. 3, §8.03[2-53] (2010).

## General Benefits

A complete list of general benefits cannot be prepared because the specific circumstances of each partial taking will differ. Often a benefit may be ruled as general in one instance and special in another. For example, improved drainage has been ruled both a general benefit and a special benefit in Oregon and Missouri.[20] Similarly, Arizona, Vermont, and Missouri have ruled that an increase in traffic is not a special benefit, but a New York court ruled that such an increase is a special benefit.[21] In some cases an increase in traffic that creates a benefit must be considered, but, when the increase in traffic has a detrimental effect on property value, the damage is generally considered to be noncompensable.[22]

General benefits are those that accrue to an entire neighborhood or community and have a beneficial effect on the value of properties not subject to a taking or damage as well as the properties that have been taken or damaged. A typical example of a general benefit is the construction of an interstate highway. The construction will generally have a beneficial effect on property values in the neighborhood because the highway will improve access to shopping and employment centers. This may, in turn, result in higher land values, new housing starts, and the development of new subdivisions in the area.

Usually, most property owners in the area will contribute no land to the highway project, nor will they be damaged by it. However, they will share in the benefits created by the project. Other property owners will have their lands taken or damaged. It is often argued that because the public improvement is being paid for with tax dollars, the owner whose land is damaged should not have the damage reduced by the amount of general benefit to be received because the owner has already paid for the benefit by paying taxes. Figure 14.2 illustrates such a situation. In most circumstances, the benefits received by any property owner in the area will be classified as general.

## Special Benefits

In the situation depicted in Figure 14.2, none of the properties were specially benefitted, but this is not always the case. Properties that abut the roadway may re-

**Figure 14.2 General Benefits**




**Figure 14.3 General and Special Benefits**



Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

ceive a greater benefit than the community as a whole. This benefit must, of course, accrue from the construction of the roadway, not from the taking. Special benefits are particularly likely to accrue if an interchange is part of the improvement project, as depicted in Figure 14.3. In this instance, it could be said that construction of the roadway creates a general benefit, while construction of the interchange ramps results in a special benefit to some of the properties in the immediate vicinity. Thus, these properties may receive both general and special benefits.

Figure 14.4 **Special Benefits**




Figure 14.5 **Special Benefits**




Figures 14.4 and 14.5 illustrate special benefits caused by improved drainage. In the before situation, the property in Figure 14.4 might be inundated on occasion by surface water runoff. The remainder parcel to the right of the proposed road construction, however, could be protected from future inundation because the roadway would dam up the water runoff.

Figure 14.5 depicts an actual situation concerning a property owner who continually removed a beaver dam from his property because it backed up water and caused severe flooding. However, each time the beavers would rebuild the dam and flooding would reoccur. Because of the periodic flooding, the property's highest and best use was for seasonal pasture. If the property did not flood, its highest and best use would have been for subdivision purposes.

As part of a state highway construction project, the state was required to place a culvert under the roadway large enough to accommodate maximum water flow from the creek. To accomplish this, the state had to remove the beaver dam and to take measures to see that the dam was not reconstructed. The state trapped all of the beavers in the area and relocated them to a different stream some distance away from the existing dam. This action eliminated the flooding of the property in question and changed its highest and best use from seasonal pasture in the before situation to subdivision land in the after situation. The remainder property clearly received a special benefit.

Figure 14.6 depicts another situation with the potential for special benefits. The property will have more than 450 feet of road frontage in the after situation, as compared to 150 feet of road frontage prior to the taking. The increased frontage could increase the utility of the site substantially, depending on its highest and best use.

Figure 14.7 illustrates the taking of a portion of a property for construction of a highway. In this case, the property might receive special benefits due to an increase in its marketability and a change in its highest and best use. In the before situation,

**Figure 14.6 Special Benefits**




**Figure 14.7 Special Benefits**




the property was zoned for low-density residential and farm use, while in the after situation it is, or could be, zoned for multifamily use.

The probability of rezoning in the after situation can often be resolved with greater certainty than the probability of rezoning in the before situation. This is true for two reasons. First, a highway (like most other public projects) has probably been in the planning stages for years and the property in question, although still zoned for low-density residential and farm use, may be designated for multifamily use in the local government's comprehensive plan, which will also designate the location of the long-planned public improvement. Second, a review of the planning commission actions may reveal a definite pattern, indicating that the planning commission tends to zone land abutting an interstate highway or other public facility for multifamily use, so the area can be used as a buffer between the highway and surrounding lower-density uses.

A special benefit may also accrue when a taking creates a corner lot from what was originally an inside lot. Consider the before and after situation of a commercial property depicted in Figure 14.8. Under these circumstances, the highest and best use of the site may remain commercial in both the before and after situations, but the site may have greater appeal and utility, and therefore value, in the after situation because of its increased visibility, advertising appeal, or accessibility.

As previously noted, one of the easiest ways to determine that a property has been damaged is when its highest and best use has been diminished in the after situation from what existed before the taking (see Chapter 13). The opposite is true in discerning special benefits, which may be indicated by a change to a more valuable highest and best use. Figure 14.9 shows the before and after situations of a 20-acre tract that is subject to a taking. In the before situation, the tract was restricted to one road approach and one single-family dwelling because all other rights of access were previously acquired by the

**Figure 14.8 Special Benefits**




**Figure 14.9 Special Benefits**




condemnor. Therefore, from a practical standpoint, any highest and best use for the property other than residential use would have to be dismissed as speculative.

In the after situation, the tract is located on an interchange and is served by a newly constructed frontage road. Five acres of the tract and the single-family dwelling located on the site have been acquired. The Parcel A remainder contains five acres and has a highest and best use for commercial purposes. The Parcel B remainder contains ten acres and has a highest and best use for residential subdivision purposes. It is obvious that the property has been specially benefitted. Even under the protest of legal counsel, the appraiser should consider the very real possibility that two remainders exist in the after situation—one west of the frontage road and one east of the road.

Now suppose that this property is located in a jurisdiction that provides for the offsetting of special benefits against both damages and the value of the taking (Rule 4). In such a situation, the property owner would likely receive no compensation because the combined values of the commercial land and the subdivision land after the taking will be considerably greater that the property's value before the taking. Market evidence may overwhelmingly support such a conclusion. Difficul-

ties will be encountered, however, when the condemnor tries to convince the jury that the property owner—say, an elderly widow—should be paid nothing. The condemnor takes her house and five acres of her land and then claims to owe her nothing? What does she want with a potential restaurant and service station site and a potential 30-lot subdivision when she has no place to live? In such a case, the condemnor's argument is a difficult one, regardless of the strong market evidence or the predominance of statutory and case law supporting the condemnor's position.

Figure 14.10 illustrates a special benefit that is often overlooked—the transfer of a financial obligation. The property in question is a farm, and, in the before situation, the owner of this farm owns and maintains 10,560 linear feet of fencing. As part of the construction project, the condemnor will be responsible for installing a fence along its easterly right-of-way line and maintaining this fencing in perpetuity. Thus, the landowner has been relieved of the financial responsibility of maintaining 2,720 linear feet of fencing, which could well represent a special benefit. However, it must be remembered that it is not the amount of maintenance assumed by the condemnor that is the benefit. Rather, it is the enhancement in the value of the remainder, if any, that has resulted from the condemnor's assumption of the maintenance cost.

Appraisers must also remember that it is not necessary for only one property to receive a special benefit. Many properties may be benefitted, and the benefit can still be classified as special. As stated by an Arizona court:

> We believe that the following benefits are "special" benefits therefore, offsetable:
>
> 1) The unique benefit—a benefit not shared by any other parcel, and

**Figure 14.10 Special Benefits**



Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

2) The special benefit—a benefit which may be shared by other parcels along the roadway similarly situated.

We would classify as non-offsetable or "general" benefits the following:

1) The local or neighborhood benefit—a benefit shared with other parcels not abutting the road but in the near vicinity, and
2) The general or community benefit—a benefit shared with other parcels in the community arising from the fulfillment of the public object which justified the taking.[23]

A Utah court stated,

> The test is not whether the improvement affects one or more owners by creating special advantages to their property; but whether the benefits are in fact such as add anything to convenience, accessibility, and use of the property as contradistinguished from benefits arising incidentally out of the improvement and enjoyed by the public generally.[24]

For instance, all four quadrants of a highway interchange could receive special benefits.

Figure 14.11 depicts six contiguous ownerships. In the before situation, the street on which these tracts front had no sidewalks. In many jurisdictions, the construction of a sidewalk in front of these dwellings would represent a special benefit to each of the tracts and, therefore, the sidewalk construction could be offset against the taking or damages in some jurisdictions. However, Figure 14.11 could also illustrate another common situation in which a jurisdiction imposes a *special assessment* on each of the affected landowners under the sovereign's power of taxation.

Special benefits are not offset where the condemning authority has the power to require property owners to pay for the improvements through the levy of special assessments. If the rule were otherwise and damages resulting from condemnation proceedings were offset by special benefits and, either before or after the condemnation proceedings, a special assessment was levied against the same land for such benefits, then the landowner would be required to pay twice for the same special benefits. This would deny the landowner the just compensation guaranteed by the federal and state constitutions, which has been recognized by an overwhelming majority of the courts in the country.[25]

**Figure 14.11 Special Benefits–Taking for a New Sidewalk**




## Appraisal Procedures

The procedures used in appraising a property that may be benefitted are no different than the procedures used to value properties that have been damaged by a partial acquisition. (See Chapter 13.) Here, too, the most common and reliable method of estimating benefits is through the analysis of comparable sales, using paired data analysis. In many cases, the treatment of damages and benefits is quite similar.

If a benefit reduces the expenses of property ownership, and thus increases the net income derived from the operation of the property, the additional

income can be capitalized to indicate the value of the benefit received. Also, if a deficiency in a property will be partially or wholly corrected by the construction of a public improvement, a benefit to the remainder will result. Such a situation may occur when the elevation of a roadway is altered, bringing the new, finished roadway closer to the elevation of the tract of land being appraised. In the after situation, this could benefit the property owner by reducing the cost to construct a road approach to the property.

The units applied to measure damage can also be applied to measure benefits. Like damages, benefits are estimated only to better analyze the market value of the subject property in the after situation. However, in jurisdictions that allow benefits to be offset only against the damages to the remainder, a separate estimate of damages and benefits is needed to ensure that the benefits are not being used to offset any of the value of the part taken.

While the burden of proof of damages is generally on landowners, the burden of proof of benefits is on condemnors. A condemnor's appraiser must provide market evidence and appraisal report documentation that is extensive and convincing. Strong market evidence and report documentation will be needed because, if a conclusion of zero compensation is reached, a condemnation trial is sure to follow. When owners are offered little or nothing for a taking, they have little to lose by going to trial, other than the potential cost if there is no guarantee of reimbursement.

To be considered a benefit, the situation created by the taking must be permanent.[26] Inconvenience during construction is generally not a compensable form of damage. Similarly, the rerouting of cars in front of a commercial establishment creating greater visibility during construction cannot be an offsetting benefit.

Appraisers should remember that, when the scope of the project rule is applicable, project influence must be disregarded in the before situation (see Chapter 6). In many jurisdictions, general benefits must be disregarded in the after situation. (See Table 14.1.) This can be extremely complicated, particularly when special benefits are present and land is appreciating rapidly.

## Estimating Benefits

The complexity of estimating benefits is illustrated in Figure 14.12. None of the properties shown are restricted in use by a zoning ordinance or any other land use regulation. The properties are in a rapidly growing residential area. The east-west street shown is the major traffic arterial connecting residential development to the south of these tracts with the central business district and employment center of the city.

The history of real estate activity for the parcels is as follows:

| | |
|---|---|
| 1998 | Tract A sold for $5,000 per acre. |
| 2000 | Interstate highway plans (shown in Figure 14.13) were announced. |
| 2001 | Tract A sold for $10,000 per acre. |
| 2001 | Tract E sold for $7,000 per acre. |
| 2004 | Tract A sold for $32,000 per acre. |
| 2005 | Tract B (after the taking) sold for $27,500 per acre. |
| 2006 | Tract C sold for $28,000 per acre. |

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

2006 Tract E sold for $12,000 per acre.

2006 Tract G sold for $15,000 per acre.

In 2007, several appraisals were obtained relating to Tract H in the before and after situations shown in Figure 14.13. The appraisers were asked to analyze the value of the property as of 2007. They were instructed to disregard any project influence in the before situation. Because the property is in a jurisdiction that allows special benefits to be offset against both the taking and damages (Rule 4), the appraisers were also instructed to disregard any general or special benefits the property might reflect in the before situation. In the after situation, the appraisers were instructed to disregard general benefits, but to consider any special benefits. The appraisers were further instructed, as was typical at the time, to assume in the after situation that the proposed public improvement had been completed in accordance with plans and specifications.

**Figure 14.12 Tracts Affected by Proposed Freeway**




**Figure 14.13 Proposed Taking for Freeway**




Using the historical data, careful verification, and price increment studies made in similar neighborhoods with no highway construction pending, each appraiser was asked to estimate the amount attributed to project influence, general benefits, and special benefits in each of the sales transactions (involving Tracts A, B, C, E, and G) to assist in arriving at legally acceptable value opinions for Tract H in the before and after situations. Needless to say, the final determination of these questions, and the question of just compensation, was to be made by the trier of fact.

This illustration reveals another problem. In appraisals of property subject to a partial acquisition, the value of the property in the before situation is analyzed as of the appropriate date (generally, the date of the taking but also possibly the date of deposit, date of trial, or date of de facto taking), as if no proposed public taking or improvement project were contemplated. The value of the property in the after situation is also analyzed as of the same date, but many condemnors have historically instructed their appraisers to analyze the value of the remainder property as if the public improvement project were, in fact, complete.

Returning to the illustration, it is apparent that these assumptions conflict. At the time of the trial in 2008, it was anticipated that the entire interstate proj-

ect, which would convey substantial special benefits to the remainder property, would be completed in 2010. However, in accordance with legal instructions supported by case law, the appraisals in the after situation were made as if the interstate project was actually complete. The interstate project was not actually completed until 2017. Therefore, the benefits that were assessed against the owner in 2008 did not accrue until more than eight years later.

A situation such as this is probably not so critical when damages are involved because the condemnor is acquiring the right to inflict the damages anytime it desires. Moreover, as previously stated, any inconvenience caused by construction of the public improvement is generally not a compensable damage.[27] However, timing is particularly important in a benefits case. To illustrate, suppose that Tract H in the before situation contained a total of 12 acres and had a value of $15,000 per acre, or $180,000. In addition, there was an office building on the portion of the tract taken with a contributory value of $100,000. The area taken consisted of three acres. The remaining nine acres had a value, assuming the public project was complete, of $32,500 per acre, or $292,500. Therefore, *theoretical just compensation* could be computed as follows:

| **Value in before situation:** | |
|---|---|
| Land (12 acres@ $15,000) | $180,000 |
| Office building | + 100,000 |
| Total value in before situation | $280,000 |
| Value in after situation (9 acres @ $32,500) | – 292,500 |
| Difference | $0 |

Now suppose that the remainder property will not receive its benefit until construction of the public improvement is complete, some eight years in the future. The benefit that the property will receive at that time, assuming no change in land value, is $17,500 per acre ($32,500 – $15,000), or $157,500 (9 acres × $17,500). Thus, the owner of the remainder property has the right to receive $17,500 per acre, or $157,500, in eight years. After analyzing market data, the appraiser concluded that a 9% discount rate was appropriate in this instance, so the present value of the right to receive $157,500 in eight years can be computed as $157,500 times the present value of $1 discounted at 9% for eight years, or $157,500 × 0.501866 = $79,044.

So it can be said that the current value of the estimated benefit is $8,783 per acre ($79,044/9 acres), and the value of the property in the after situation considering the present value of the benefit to be received in eight years is $23,783 ($15,000 + $8,783), rounded to $23,750 per acre. Based on this premise, the value difference could be computed as follows:

| **Value in before situation:** | |
|---|---|
| Land (12 acres @ $15,000) | $180,000 |
| Office building | + 100,000 |
| Total value in before situation | $280,000 |
| Value in after situation (9 acres @ $23,750) | – 213,750 |
| Difference | $66,250 |

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

In some circumstances, it could be argued that to take advantage of the benefit that will accrue to this land upon completion of the public improvement, the owner will have to leave the land fallow until the public improvement is complete. This assumes, of course, that there would be no economic interim use that the land could be put to while awaiting project completion. Under this scenario, the value difference could be calculated as follows:

| **Value in before situation:** | |
|---|---|
| Land (12 acres @ $15,000) | $180,000 |
| Office building | + 100,000 |
| Total value in before situation | $280,000 |
| Value in after situation (9 acres @ $32,500 × 0.501866) | − 146,796 |
| Difference | $133,204 |

Under these circumstances it would appear that the benefit is deferred so far into the future that the highest and best use of the remainder is not to hold the property until the benefit is conferred upon it, but rather to use the property for its highest and best use in the *before situation*, assuming this use remains a viable option in the after situation. With a highest and best use in the before situation on the remainder parcel of nine acres and a value of $15,000 per acre for that use, the remainder property would have a value of $135,000 (9 acres @ $15,000). This before use creates a higher value than would be created by holding the property for eight years awaiting the special benefit to be realized.

## Notes

1. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v. "benefits."
2. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §1.2.7.3.6, p. 18.
3. *United States v. 2,477.79 Acres of Land, Etc.*, 259 F.2d 23, 28 (5th Cir. 1958).
4. *Territory of Hawaii v. Mendonca*, 375 P.2d 6, 13 (Haw. 1962).
5. *Taylor v. State ex re. Hernan*, 467 P.2d 251, 254 (Az. 1970).
6. *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.*, (1997) 16 Cal.4th 694, 66 Cal.Rptr.2d 630; 941 P.2d 809.
7. *Borough of Harvey Cedars v. Karan*, 70 A. 3d 524 (2013) 214 N.J. 384.
8. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.3, p. 163.
9. *Hoyt v. Stamford*, 165 A. 357 (Conn. 1933).
10. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.3, p. 165.
11. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.2.7.3.3, p. 16.
12. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Mathew Bender Co., 2010), vol. 3, §8A.02[6].
13. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.3, p. 162.
14. Colo. Rev. Stat. Ann. §38-1-114(2)(a) (1987).
15. *Mich. Stat. Ann*. §213.73(3) (1980).
16. *Nichols'*, vol. 3, §8A.03 (2011).
17. Iowa Const., Art. 1. §18.
18. *Nichols'*, vol. 3, §8A.02[6] (2010).
19. *Hanson v. Commissioner of Transp.*, 408 A.2d 8 (Conn. 1979).
20. *Portland, Oregon City Ry. Co. v. Penny*, 158 P. 404 (Ore. 1916); *State v. Cady*, 400 S.W.ld 481 (Mo. 1965).

21. *Phoenix Title and Trust Co. v. State*, 425 P.2d 434 (Ariz. 1967); *Howe v. State Highway Bd.*, 187 A.2d 342 (Vt. 1963); *State Highway Commission v. Parker*, 387 S.W.2d 505 (Mo. 1965); and *Vanech v. State*, 270 N.Y.S.2d 357 (N.Y. 1966).
22. *Iowa State Highway Commission v. Smith*, 82 N.W.2d 755 (Iowa 1957).
23. *Taylor v. State ex. rel. Herman*, 467 P.2d 251, 254 (Az. 1970).
24. *Hampstead v. Salt Lake City*, 90 P. 397, 401(Utah 1907).
25. *City of St. Louis Park v. Engell*, 168 N.W.2d 3, 7-8 (Minn. 1969).
26. *Reading, etc., R. Co. v. Balthaser*, 13 A. 294 (Pa. 1888).
27. *Wyoming State Highway Department. v. Napolitano*, 578 P.2d 1342 (Wyo. 1978).

Copyrighted material licensed by Randall Bell, PhD on November 30, 2016

15

# Easements

An easement is usually the right to use a particular parcel of land, or a portion of a parcel of land, for a stated purpose without owning the underlying fee. In some instances, however, an easement may merely prohibit the underlying fee owner from certain uses of the property in question, without giving the owner of the easement any possessory interest in the real property (e.g., facade easements, scenic easements). A continuous easement across multiple tracts of land is often referred to as a *right of way*.[1] This term is generally used to refer to easements for streets and roads, railways, and utility and fiber optic lines.[2] These easements are referred to as *easements in gross*, as opposed to *appurtenant easements*, which are easements created to benefit another tract of land, the use of the easement being incident to the ownership of that other tract.[3] An easement is an interest that may be severed from the bundle of rights and can be defined in terms of time and space.

## Easement Duration

An easement may be temporary, with either a specific or an indefinite termination date. One common temporary easement with a specific termination date is a temporary construction easement, often referred to as a TCE or TE. This type of easement is often used in a street, highway, utility service, and other public right of way project and is necessary when more land area is needed to construct a public improvement than will be needed to operate and maintain the facility after construction is completed. Although these easements generally have a specific termination date, some temporary easements have an indefinite termination date. For example, an easement for ingress and egress through a tract of land for the purpose of harvesting timber on an adjoining tract will often terminate when the harvest is completed.

Some roadway easements terminate upon abandonment of the roadway. However, the courts generally regard such an abandonment clause as having little, if any, bearing on the amount of compensation due a fee owner for the taking of the easement. A North Carolina court said the following:

> A condemnor cannot demand a perpetual easement with one breath and insist with the next that he be excused from paying full compensation for the perpetual easement on the ground that there is a bare possibility that he may abandon the perpetual easement on some uncertain day before the last lingering echo of Gabriel's horn trembles into ultimate silence. This is true because the law of eminent domain deems the possibility of the abandonment of a perpetual easement by [a] nonuser so remote and improbable it will not allow the contingency to be taken into consideration in determining the value of the easement.[4]

Permanent or perpetual easements (PEs) are generally acquired for electrical transmission lines, natural gas transmission pipelines, sewer lines, water lines, other utility lines, highways, and other public facilities. Often an easement will have both temporary and permanent elements, as is the case with many utility line easements. If an easement width of 40 feet is required for installation of a sewer line but only 25 feet is required for its maintenance and operation, a 15-foot temporary construction easement is acquired in addition to a 25-foot permanent easement.

## Easement Occupancy

In terms of space, an easement may be defined as subsurface, surface, or overhead. Subsurface easements are required to install natural gas pipelines, sewer lines, water lines, communication lines, and tunnels. Common surface easements allow for drainage, flowage, railroads, and highways. Aviation, air, noise, and line-of-sight easements are overhead easements. Some easements may involve the rights to two or even all three types of space, as is the case with high-power transmission lines. The lines and the upper portion of the towers occupy overhead space, the towers rest on the surface, and the foundation footings for the towers occupy subsurface space.

From a strictly technical point of view, an easement cannot be exclusively a surface easement. An easement for roadway purposes, for example, must include enough subsurface rights for the removal of topsoil and installation of base rock

### Floating Construction Easements

One of the most complicated issues in valuing TCEs is how to handle "floating" construction easements, with no defined start or end date. For example, an agency may know it needs to be on the property for one month, but given the size and scope of the project (and the fact that construction phasing or methodologies typically are decided by the contractor), the agency may not know when that one month will commence—it could be years down the line.

Appraisers who have to handle TCEs may find a required methodology for doing so, depending on the project and the funding source. For example, highway projects or infrastructure developments with federal funding and oversight by the Federal Highway Administration must follow a recent valuation directive. Specifically, the FHWA has concluded:

> Although the actual/physical use of a property may be anticipated for a limited duration within a set timeframe, the property is considered to be encumbered for the entire duration of the set timeframe. . . . TCEs cannot "float". . . . For example, a TCE for a 12-month anticipated duration to be used within a 36-month timeframe is not permitted. . . . [T]his constitutes a "taking" (encumbrance) even if actual/physical possession is only anticipated for 12 months. A property owner must be compensated for the entire TCE term (in this case, for the entire 36-month duration).

**Source:** Bradford B. Kuhn, "The Art of Easements," *Valuation* (Third Quarter 2017): 31.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

and paving and enough overhead, or above-surface, rights for practical use of the roadway. Although a purely surface easement cannot exist from a practical standpoint, easements for roadways, railroads, and other uses are still commonly referred to as *surface easements*. Only when the encroachment below or above the surface of the ground is extreme or excessive for the intended surface use of the easement area is the easement typically classified as multiple-space occupancy.

## Specialty Easements

Many common easements create no unique problems for appraisers. Properties encumbered by easements for roadway, railroad, power transmission lines, sewer lines, and slopes (or cuts and fills) are common, so, with diligence, appraisers can obtain enough comparable data to make an accurate market analysis of the effect of these easements on a property's market value. In fact, studies have been published on the impact of some common easements such as power transmission line easements.[5] However, easements come in many varieties because an easement can be created for almost any purpose as long as the right, or interest, to be acquired can be severed from the underlying fee. These unique types of easements can create difficult valuation problems for appraisers and, therefore, require individual consideration.

### Flowage Easements

A flowage easement grants the easement owner the right to flood the fee owner's land. Such an easement is often taken in conjunction with a hydroelectric or flood control project. The easement will generally specify whether the easement owner has the right to flood the land occasionally or permanently. If the right is to flood permanently, the fee owner retains only the land under the water. This type of easement acquisition can damage the land to nearly 100% of its fee value. The fee owner may retain the right to fill the encumbered land (above the flood stage) and to build structures on it, but these rights often require the specific approval of the easement owner. Also, even the occasional flooding of land may cause it to be classified as a wetland, thereby requiring state or federal[6] development permits. In *Arkansas Game & Fish Commission v. United States*, the US Supreme Court ruled that "government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection."[7]

Occasionally a flowage easement gives the easement owner the right to inundate the land only periodically. These easements are often acquired in addition to permanent flowage easements to allow an easement owner to encroach occasionally on the land above the level of the permanent flowage easement. They also protect easement owners from damage, or inverse condemnation, suits that might result if the land is eroded by wave action.

A flowage easement is generally described as encumbering all of the fee ownership lying between a low and high elevation mark. Therefore, appraisers must have access to accurate topographic maps. They should investigate whether the land to be encumbered is subject to flooding in the before situation and, if so, to what degree and how frequently. If the acquisition involves an occasional flowage easement, the same information pertaining to flooding will be required for the after situation.

## Aviation Easements

Aviation easements are divided into two classifications: clearance easements and flight easements. A clearance easement is acquired to ensure that no structure (or natural growth) exceeds a maximum height, if structures are allowed at all. Its purpose is to give aircraft an unobstructed view and provide a safety margin for flights that may have to descend due to pilot error, poor weather conditions, or other circumstances. A flight easement allows the frequent overflight of aircraft over the encumbered land. It is separate and distinct from a clearance easement.[8]

The courts have, on occasion, refused to consider potential damage from overflights when only a clearance easement was being condemned. In 1957, the Third Circuit Court said the following:

> On this record it must be accepted that the claimed right of clearance is merely a provision for assuring that space shall be unoccupied and vision unobstructed above a designated altitude. Unquestionably this is in aid of aviation. But no flight easement is mentioned or to be inferred, much less claimed, in the present pleadings and, therefore, no servitude can be imposed except for the asserted and precisely limited rights of clearance.
>
> It is well established that, absent bad faith which is not argued here, the government's determination and explicit assertion of the nature and extent of the estate to be taken are not judicially reviewable. If any subsequent low flying of aircraft over appellee's land should occur and should be said to invade property rights, the acquisition of the right to keep that space clear will not have conferred any attendant right to fly through it.[9]

In other words, the court in the case cited above was applying the *expansion of the taking rule*.[10] In a similar situation, the Northern District Court of Texas ruled as follows:

> [S]ince the government has not acquired a right to fly aircraft over the condemnee's land by these proceedings, it follows that, if the government does cause its aircraft to make flights over the lands of these defendants, or has already done so, at such elevation and with such frequency as to result in taking beyond that described in the Declaration of Taking on file in these cases, or in actual physical damages, the landowners would have a right to bring suit against the Government for damages or just compensation.[11]

## Preservation Easements

The term *preservation easement* includes what are variously called historic, open space, scenic, conservation, and facade easements. These easements are typically nonpossessory easements—i.e., they restrict the fee owner's use of the land rather than grant some use of the property to the holder of the easement.

### *Historic Preservation (Facade) Easements*

Facade easements prohibit the fee owner from altering the facade, or exterior, of an existing improvement on the land in question. These easements are generally imposed on structures of historic significance for the purpose of historic preservation. For a building to have a facade easement it should be listed on a local historic registry or in a historic district and, if facade easement tax credits are sought, the property also must be on the National Registry of Historic Properties. Facade easements usually apply to a single property and, depending on the specific provisions of the easement or restriction, may constitute a taking.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

However, if such a restriction is placed on all structures within a designated historic district, it may be accomplished with zoning regulations (if the historic district was established by the local government rather than a federal entity) and, therefore, generally does not constitute a compensable taking.

Often an appraiser will be asked to perform a before and after appraisal of a facade easement when the easement has, in fact, been formally donated by the landowner. These appraisals are often requested for federal income tax purposes. Some considerations in appraising facade easements include the following:

- tax consequences
- historic preservation
- zoning as a historic district
- income tax credits
- the high cost of development to preserve the easement, which is important because the redevelopment costs of a building are often higher due to the facade easement

One of the most difficult determinations to be made in facade easement cases is whether a taking has actually occurred. The restriction placed on the property may instead fall under the sovereign's police power. Some jurisdictions have ruled that a facade easement may be taken even if the ordinance creating the easement is directed at only one parcel of land.[12] Appraisers would be well advised to obtain legal verification on this point before an appraisal assignment is undertaken. (For further discussion of this issue, consult Chapter 16.)

## Scenic Easements

Scenic easements became prominent with the adoption of the Highway Beautification Act of 1965. The act provided that 3% of the funds apportioned to each state for federal aid highways in any fiscal year be "used for landscape and roadside development within the highway right-of-way and for acquisition of interests in and improvement of strips of land necessary for the restoration, preservation, and enhancement of scenic beauty adjacent to such highways."[13] The adoption of the Wild and Scenic Rivers Act (16 USC §1271) has also stimulated the proliferation of scenic easements.

Scenic easements generally restrict the underlying fee owner from using the land in question in any manner that would diminish its aesthetic appeal. However, easement forms vary substantially from state to state and from project to project. It is imperative that appraisers make an exact determination of the rights to be acquired in each instance. Scenic easements are generally acquired on lands parallel to highway rights of way or scenic rivers. Studies have been made to ascertain how the imposition of a scenic easement affects the market value of a tract of land.[14]

Scenic easements often call for the forced removal of existing advertising signs and prohibit future signs. Compensation for existing signs must be paid to both the landowner and the owner of the sign, in accordance with Title 1 of the Highway Beautification Act.[15] The prohibition against future advertising is almost always accomplished through the sovereign's police power.

With scenic easements, as with facade easements, it is often difficult to determine whether a taking has actually occurred, or whether the sovereign has restricted the use of the land through its police power. Some jurisdictions have ruled that the aesthetic factor alone is a valid basis for police power regulations.[16] Again, appraisers must clearly distinguish between the rights being acquired by eminent domain and the limitations on rights imposed by the sovereign's police power. Often, this can only be accomplished with the guidance of an attorney who is thoroughly familiar with the applicable law.

## Conservation Easements

Scenic easements could be considered a subset of the broader category of "conservation easements." More precisely, a conservation easement is "[a]n interest in real property restricting future land use to preservation, conservation, wildlife habitat, or some combination of those uses," according to *The Dictionary of Real Estate Appraisal*, sixth edition. "A conservation easement may permit farming, timber harvesting, or other uses of a rural nature to continue, subject to the easement." Typically, conservation easements limit land uses that are not "of a rural nature," such as residential, commercial, and industrial uses on land that is intended to be preserved in a natural state.

Millions of acres in the United States have been protected using conservation easements. Nearly all states have enacted laws to allow for conservation easements, many modeled on the Uniform Conservation Easement Act, which was drafted in 1981 and last revised in 2007. In addition to serving as a tool for environmental protection, conservation easements provide landowners who donate a conservation easement to a qualifying entity with a tax deduction. Since the IRS began accepting conservation easements as noncash charitable contributions in 1969, appraisers have been hired by landowners to value the nonpossessory rights conveyed to the easement holder—generally a private land trust or federal agency—through a conservation easement.

Conservation easements can involve a variety of land restrictions, all of which may have an influence on value:

- restrictions on commercial, industrial, or residential uses
- restrictions on subdivision or the number of lots or homes
- restrictions on the transfer of development density to other sites
- restrictions on the locations where structures can be built
- restrictions on the number, type, or location of accessory structures
- restrictions on building size (for example, total square footage) and height
- restrictions on the design of, and construction materials used in, new construction and additions
- restrictions on hunting and wildlife management
- restrictions on types of allowable recreational uses
- restrictions on logging or timber cutting
- restrictions on surface or subsurface mining and mineral extraction
- restrictions on water usage or sale of water rights

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

- restrictions on agricultural practices
- requirements for proper vegetation management
- restrictions on use of fertilizers and pesticides
- restrictions on the location, type, character, or number of roads

In the conveyance of a conservation easement, the landowner retains title to the land but allows access to the easement holder so that the easement holder can monitor and enforce the terms of the conservation easement, i.e., the restrictions delineated in the easement document.

Commonly, appraisers value two sets of property rights: (1) the value of the rights of ownership that existed prior to the encumbrance with the conservation easement and (2) the value of the rights of ownership after. The highest and best use analysis of the property in the before and after situations can be complex. In addition, making meaningful comparisons of properties with similar restrictions resulting from conservation easements can be challenging for appraisers when comparable properties with comparable land use restrictions are scarce, although the maturation of the market for land subject to this sort of encumbrance has helped.

**Estates Created**

The owner of an easement is said to have a *dominant estate*, while the owner of the underlying fee is said to have a *subservient estate*. A dominant estate is sometimes referred to as an *affirmative easement* and a subservient estate as a *negative easement*. The terms are somewhat self-explanatory in that the interest in the land held by the owner of the easement dominates the rights retained by the fee owner. Although the fee owner may retain the right to use the land encumbered by the easement, this use may not interfere in any manner with the easement owner's use of the property for the purposes specified in the written easement. Thus, a fee owner's interest in the easement area is subservient to the interest of the easement owner.

## Value Considerations

The principles and techniques applied in appraising land for easement acquisitions are the same as those applied in other condemnation appraisals. The only difference is that in appraising land for easement acquisitions, only a partial taking may occur. Even if an entire ownership is to be encumbered by an easement, the landowner will retain the underlying fee interest in the form of a subservient estate. In jurisdictions that use the before and after, or federal, rule, appraisers simply value the property before and after the easement acquisition. As the Fifth Circuit Court said in remanding a case for retrial, "we suggest that the measure of the appellant's detriment should be the difference, if any, between the fair market value of his land immediately before and after the perpetual easements were imposed by the taking."[17]

In jurisdictions using the state rule (i.e., the taking plus damages rule), appraisers will be required to analyze the value of the easement interest acquired plus damages to the remainder, if any.[18] When either rule is applied, the measure

of damage caused by an easement acquisition is the loss of saleable utility both to the area encumbered and to the unencumbered portion of the larger parcel.

Some courts have ruled, as a matter of law, that the property's loss in market value is not the proper measure of value in the case of temporary easement acquisitions.[19] It has been held that the proper measure of compensation is the value of the property for the period it is to be held by the condemnor[20] or the diminution in the value of the property by reason of the owner's loss of its use and occupancy during possession by the condemnor.[21] The most common measure of damages accepted by the courts is the rental value of the easement area for the period of occupancy by the condemnor.[22]

Like permanent takings, temporary takings can result in damages. Temporary damages can result when a condemnor acquires a permanent property right, in fee or through an easement, plus a temporary easement beyond the permanent property right for construction of a proposed public improvement. After construction of the public improvement is completed, the construction easement is extinguished and the unencumbered fee interest in the land reverts back to the owner. The fact that a taking is temporary in nature does not relieve the sovereign from paying just compensation.

Damages that result from temporary construction easements (TCEs) are usually based on the market rent of the affected area for the term of the temporary easement. If rental data is unavailable, an appropriate rate of return on the land for the term of the easement is customarily estimated. For example, consider a partial taking of a farm as shown in Figure 15.1. Assume that this 80-acre farm has a before value of $5,000 per acre and comparative analysis indicates that land encumbered by a permanent gasline easement is diminished in value by 50%.

Suppose also that the temporary construction easement shown will have a term of 18 months and that comparable farmland would rent for $500 per acre per year. The property's value in the after situation could be computed as shown in Table 15.1.

**Figure 15.1 Temporary Construction Easement**




If comparable rental data were not available, an appraiser would have to estimate an appropriate rate of return on the temporary easement area and adjust the value of the area to compensate the owner for losing the beneficial interest in the property for 18 months. If the rate of return was 10% per year, the property value in the after condition would be computed as shown in Table 15.2.

Usually the land area affected is so small and the term of the temporary easement so short that discounting the rent loss (or appropriate return) is unnecessary. Only when the rent loss is substantial or the temporary easement is of extended duration do appraisers typically choose to discount the rent loss, or return on investment, to a present value.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

**Table 15.1 Value in After Situation**

| | | | |
|---|---|---|---|
| Value in the before condition | 76.66 acres @ $5,000 | | $383,300 |
| Permanent easement | 1.52 acres @ $5,000 per acre × 50% | | $3,800 |
| Temporary easement | 1.82 acres @ $5,000 per acre | $9,100 | |
| Less rent loss | 1.82 acres @ $500 × 1.5 years | – $1,365 | |
| Value of temporary easement area | | | $7,735 |
| Value in the after condition | | | $394,835 |
| Rounded | | | $395,000 |

**Table 15.2 Value in After Situation**

| | | | |
|---|---|---|---|
| Value in the before condition | 76.66 acres @ $5,000 | | $383,300 |
| Permanent easement | 1.52 acres @ $5,000 per acre × 50% | | $3,800 |
| Temporary easement | 1.82 acres @ $5,000 per acre | $9,100 | |
| Less rent loss | $9,100 @ 10% per year × 1.5 years | – $1,365 | |
| Value of temporary easement area | | | $7,735 |
| Value in the after condition | | | $394,835 |
| Rounded | | | $395,000 |

"However, appraisers must recognize that the shortcut methodology will be found unacceptable under these Standards if the indicated compensation is more than nominal," according to the Uniform Appraisal Standards for Federal Land Acquisitions. "When the indicated compensation for the acquisition of a TCE is more than nominal, the appraiser must use proper appraisal methodology to develop the present value of the rent loss. This will entail the use and presentation of properly documented comparable rentals, and the discounting of the lost rental income stream into a present value."[23] Of course, if the existence of the TCE will affect the value of the unencumbered land as well as the easement area, this fact must also be considered in analyzing the value of the property after the taking.[24]

The examples presented here may suggest that analyzing the amount of just compensation due for a temporary taking is simple, which may not be borne out in the marketplace. More complex factual situations are discussed in Chapter 16 of this text.

The damages to land due to the imposition of an easement can range from 0% to 100% of the easement area's fee value. Some courts have ruled, as a matter of law, that under certain circumstances compensation for an easement taking is equal to 100% of the fee value of the land encumbered by the easement. "Under our law it is firmly settled that when a permanent easement is taken by eminent domain, depriving the owner of the use of the property, the compensation must equal the full value of the land, as if a fee were being acquired," according to an Arkansas court in a 1963 ruling.[25] Conversely, other courts have ruled, again as a matter of law, that compensation for an easement taking cannot equal 100% of the fee value of the land encumbered. As a Texas court put it, "what the plaintiff

**Figure 15.2 Easement Location**




took was merely an easement, which, being in law less than the title, can in law only entail compensation for less than the fee title."[26]

The degree of damage resulting from the same type of easement can vary greatly depending on the highest and best use of the land. For example, a pipeline running 25 feet beneath grazing land may have little or no effect upon the productivity, or market value, of the land encumbered with the easement. If such a pipeline traversed a tract of timberland, however, the loss in saleable utility, and thus market value, could be great because the typical pipeline easement agreement precludes the growth of timber within the easement area.

Another factor that can affect the degree of damage caused by an easement acquisition is the location of the easement in relation to the boundary line of the larger parcel. Consider the situation illustrated in Figure 15.2, which depicts the taking of a 10-foot water line easement from two single-family residential lots.

The rights acquired from Parcels A and B are identical, as is the amount of land to be encumbered. However, because the easement on Parcel A is located close to the boundary line, within the side yard building setback, the tract may have lost little, if any, of its original utility. Parcel A's highest and best use is for development of a single-family dwelling, both before and after imposition of the easement. Parcel B, on the other hand, has probably suffered severe loss of utility due to the easement acquisition. Before imposition of the easement, the tract's highest and best use was for construction of a single-family dwelling. However, the location of the easement in relation to the tract's boundaries makes such a use impractical in the after situation because the highest and best use is no longer the same and the dwelling cannot be built. The only practical use of Parcel B after the acquisition of the easement may be its sale to an abutting owner, reflecting its contributory value as potentially surplus land.

The location of an easement in relation to improvements on the larger parcel is also

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

important. Figure 15.3 shows two encumbered parcels with identical rights and areas. Due to the location, the easement on Parcel A could severely restrict the future expansion of the industrial building. In addition, the presence of power lines could obstruct the use of large industrial machinery around the structure, and the towers could hamper freight loading and delivery. Any loss in Parcel B's utility by reason of the easement acquisition may be minor. The employee parking area may need to be modified slightly to accommodate the tower locations. In summary, the location of an easement in relation to boundary lines of the larger parcel and to existing improvements can have a substantial effect on the property's market value.

Before the effects of an easement acquisition can be properly evaluated, an appraiser must know exactly what purpose the easement area will be used for, what rights are to be acquired, and how responsibilities will be divided between the parties. "There is no 'generic' road easement, conservation easement or any other type of easement," according to the Uniform Appraisal Standards for Federal Land Acquisitions.[27] The full impact of an easement acquisition cannot be estimated until an appraiser determines the following:

1. The loss of present utility
2. The loss of future utility
3. The accessory rights to be acquired
4. The obligations of the parties

Accessory rights may include the right to maintain the easement area and the right to enter onto the property for inspection, repair, or replacement. On occasion, accessory rights may also include the right to expand the use of the easement area for other purposes or to expand the area itself without paying additional compensation or by paying an amount calculated with a predetermined compensation formula. Power line easements, for instance, sometimes include a provision that allows the easement owner to remove dangerous trees from unencumbered areas of the fee owner's larger parcel perpetually with little or no additional compensation, or with compensation set by a predetermined formula.

In investigating the obligations of the parties, appraisers should determine the following:

1. Whether the easement owner will be responsible for returning the land to its original state after the construction, replacement, or repairs are completed

**Figure 15.3 Easement Location**



2. Who will be responsible for fence repair and maintenance, if any
3. Who is obligated to maintain the easement area, including the control of noxious weeds
4. Who will be responsible for potential personal injury losses occurring in the easement area

Depending on the nature of an easement acquisition, the potential damage items that an appraiser must consider can vary in number and complexity. The following is an actual jury instruction that lists the potential damage items that an appraiser was required to consider in analyzing the diminution in market value caused by an easement acquisition:

> In arriving at this difference [in the market value before and after the easement acquisition], you should take into consideration the actual legal rights taken and also the following items:
>
> (a) depreciation, if any, due to the existence of the pipeline itself; (b) loss of crops, if any, this year and future years; (c) loss, if any, of use of pasture due to the use by the corporation of said fifty foot right-of-way and temporary easements this year and in future years; (d) reasonable expense, if any, to respondents in keeping cattle from said fifty foot right-of-way now and in the future and during periods necessarily required in order to reestablish the crops and pasture on said fifty foot right-of-way; (e) reasonable expense, if any, to respondents in building and maintaining necessary works to insure proper irrigation of the land during such times as said corporation shall have the right to occupy said fifty foot strip under the terms of its easement; (f) reasonable expense, if any, to respondents in keeping water from said fifty foot strip during periods of construction, replacement and repair; (g) reasonable expense, if any, to respondents in leveling and releveling said fifty foot strip and hauling of additional soil to fill settlements; (h) reasonable extra expense, if any, to respondents caused by said fifty foot right-of-way due to the interference thereof with the operation of said dairy herd farm unit and said cattle feeding farm unit; (i) reasonable extra expense, if any, to the respondents in puddling the trench in which said pipeline will be laid in preventing water from seeping along said pipeline, and preventing consequent damage; (j) extra reasonable expense, if any, to the respondents of regrading, replanting and caring for, and seeding said fifty foot right-of-way; (k) reasonable damages, if any, to crops and land due to the necessity of keeping water off during periods of occupancy of said right-of-way by said corporation under the terms of its easement; (l) such other reasonable expenses, if any, supported by the evidence, reasonably necessary to restore said premises to normal productivity.[28]

This case was eventually remanded for retrial. In doing so, the court said the following:

> While the listed items may have a bearing on the depreciation in market value which would result from the granting of the easement, they could not be considered as distinct items of damages. It was not proper for the jury to consider them in addition to the legal rights taken, the value of which, the jury had previously been told, was this same difference in market value.[29]

Appraising a property subject to an easement may be more complex than valuing a property acquired in a fee taking. Full, detailed appraisal reports are often required—i.e., either a full before and after appraisal or an appraisal of the taking plus damages, depending on the applicable rules in the jurisdiction.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

However, there are occasions when the imposition of an easement will have only a nominal, or even nonexistent, effect on market value.

## Nominal Acquisitions

In cases in which damages are nominal or nonexistent, it is often impractical, from an economic standpoint, to have a fully documented appraisal report prepared. The fee for a fully documented appraisal report could amount to considerably more than the estimated loss in property value. The treatment of nominal acquisitions will vary among condemnors. For instance, the Uniform Appraisal Standards for Federal Land Acquisitions provides for deviation from its standards based on economic considerations. When an appraisal assignment involves a noncomplex acquisition, the appraiser should consult with the client to determine the scope of work required. However, "Under no circumstances may the scope of work result in an appraisal that does not meet the minimum requirements under the Uniform Act," according to the Uniform Appraisal Standards for Federal Land Acquisitions.[30]

For large easement acquisition projects (e.g., for the installation of a pipeline through a rural area), some condemnors will analyze land values in the area and make an administrative determination of the amount of compensation each property owner will be offered. According to the Uniform Appraisal Standards for Federal Land Acquisitions:

> For some types of easements, such as for electric, telephone, fiber optics, cable, transmission line, or pipeline purposes, there may be a customary "going rate" (per pole, per line-mile, or per rod, for example). But while customary rates may offer a convenient pricing system in other settings, going rates cannot be used as a proxy for market value in federal acquisitions requiring payment of just compensation. Going rates tend to reflect non-compensable considerations above the market value of the property acquired, such as avoiding the cost of condemnation or other litigation, and economic pressures to complete construction and place the planned facility or infrastructure in operation. As the Fifth Circuit recognized, "consideration of the expense and lost motion involved in relocation, additional construction, pipe and material costs and delay—none of which relate to the fair market value—are inevitably involved." Amid such nonmarket considerations, "[t]here is no basis for translating a dollar per rod settlement figure into a market value per acre figure." [citation omitted] Moreover, the use of a "going rate" improperly assumes the easement acquired is a separate economic unit to be valued based on the government's planned use of the property—assumptions the federal courts reject as improper. [citation omitted] For these reasons, appraisals of easements for federal acquisitions cannot be based upon going rates but rather must be based upon the accepted before and after appraisal method.[31]

It therefore goes without saying that sales of easements based on those measures cannot be considered valid comparable sales.

Although appraising is not an exact science, some easement takings have such a minimal effect on value that no discernible difference in market value before and after the taking can be ascertained in the market. Nevertheless, it is generally recognized that no property owner can be expected to convey land or an interest in land without compensation (except in the case of special benefits).

If no discernible difference in market value before and after an easement acquisition can be demonstrated, some condemnors will make an administrative

determination that the property owner should be offered a nominal amount of compensation, irrespective of the appraisal. For instance, the Federal Highway Administration's *Appraisal Guide* provides "a minimum payment of up to $500 even if the Value Finding Appraisal reflects a lesser or even zero consideration."[32] The Washington State Department of Transportation *Right of Way Manual* states the following:

> If the market evidence reveals no difference between the value before and the value after the acquisition, the Appraiser reports the facts dictated by the market. The Appraiser is not obligated to report a difference when none exists in fact. The Appraiser is obligated to report only the facts and conclusions based purely on appraisal considerations.[33]

Other condemnors, however, may require an abbreviated appraisal report (such as an "administrative offer summary" as defined in some jurisdictions) and attempt to coerce appraisers into reporting a value differential even when a differential cannot be supported by market data. That is, the appraiser may be directed to report a nominal differential without including any sales data in the report. While this procedure may satisfy the condemnor's requirement that an appraisal be prepared prior to making an offer to a property owner, it transfers a burden that rightfully belongs to the condemnor's administrative staff to the appraiser. Admittedly, nothing ruins a negotiator's day faster that trying to get a property owner to sign an easement that pays no compensation whatsoever, but it is generally the condemnor's administration that should determine the amount of compensation in this unique situation.

Nearly all condemnors have the administrative latitude to make these determinations. To force an appraiser to derive a value differential when none, in fact, exists is to corrupt and undermine the valuation process. Also, if the easement cannot be obtained voluntarily, the testimony of an appraiser who estimated the "nominal—say, $500" compensation is usually not credible in a condemnation proceeding. While the appraiser could have supported a conclusion of no value differential with market data, the appraiser will likely be unable to support the $500 compensation estimate. Furthermore, if the appraiser revises the earlier appraisal and reports no differential in value before and after the acquisition, the prior appraisal will undoubtedly be discovered and presented to the trier of fact to impeach the appraiser's testimony.

## Existing Easements

The preceding discussion focused on the appraisal of real property for easement acquisition purposes. Appraisers must also consider the effects of existing easements on a property's utility and market value. Easements can be held *in gross* or as an *appurtenance* to other property that is held in fee, usually by the easement owner. An easement held in gross has a servient estate but no dominant estate. That is, an easement in gross has utility in and of itself or in conjunction with other continuous easements, such as power line easements, utility easements, and similar types of easements.

An easement held as an appurtenance, however, usually has no independent utility. It is useful only in conjunction with other property. An example of an ap-

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

purtenant easement is an easement across a tract of land for ingress to and egress from an abutting tract of land that is held in fee by the owner of the easement. This easement would have no material value to its owner if that entity did not also own the tract of land that the easement serves.

Many jurisdictions require that a tract of land encumbered with an easement be appraised considering the easement's negative effect on the property's market value. Appraisers must be aware of the effects of all easements encumbering a property being appraised. It should be recognized that this treatment of easements is an exception to the undivided fee, or unit, rule discussed in Chapter 4 of this text.

Appraisers must also be aware of easements on other lands that may be appurtenant to the parcel being appraised. Appurtenant easements must be carefully investigated because some jurisdictions do not require that an appurtenant easement be legally described in a condemnor's declaration of taking.[34] When an appurtenant easement exists, the fee parcel is appraised considering the beneficial effect of the easement across the other land. In other words, the larger parcel is the fee ownership plus the easement ownership in the abutting land.[35] Similarly, when only an appurtenant easement is acquired, the interest of the easement owner is considered in light of the abutting fee ownership. In this case, the larger parcel is the easement ownership plus the abutting fee ownership.[36] According to *Nichols*:

> An easement is appurtenant to a parcel of property known as the dominant tenement. A dominant tenement will generally be worth more with the appurtenant easement than without it. Thus, if there is a destruction of the easement, either by a direct taking of the easement itself or by a taking of the servient estate, the owner of the easement is damaged to the extent that the value of the owner's dominant tenement has been impaired by such taking.[37]

And according to a New York court:

> For purposes of valuation an easement is to be considered as appurtenant to the dominant tenement. *Together they constitute a single entity*.[38]

To illustrate this principle, consider the acquisition depicted in Figure 15.4. In an appraisal of Parcel A, the larger parcel is the unencumbered fee of Parcel A plus the dominant estate, or interest, in the access easement across Parcel B. If

**Figure 15.4 Appurtenant Easement**




**Figure 15.5 Taking of an Appurtenant Easement**



Parcel A's easement interest across Parcel B were not considered, Parcel A would be landlocked and could have only a nominal value. However, the existence of the access easement through Parcel B gives Parcel A a great deal more utility and value than the tract would have without it. In this instance, Parcel B is not legally affected by the highway acquisition and need not be appraised.

Now, if the acquisition were to follow the course shown in Figure 15.5, Parcel B would be directly affected by the highway acquisition and would need to be appraised. The larger parcel is not the unencumbered fee of the parcel, however, but the fee as encumbered by the easement. In other words, the easement's detrimental effect on Parcel B's value, if any, must be considered by an appraiser in analyzing the tract's before and after values.

Although no portion of Parcel A is being acquired in Figure 15.5, an appraisal of Parcel A is still necessary. As previously stated, the fee interest in Parcel A coupled with the easement interest in Parcel B are a single entity for purposes of valuation. In Figure 15.4, the larger parcel is the fee estate of Parcel A plus the easement interest in Parcel B. In the situation depicted in Figure 15.5, it is quite possible that Parcel A will be more severely damaged by the highway acquisition than Parcel B, even though there is to be no physical invasion of Parcel A.

## Notes

1. Note that in certain sections of the country, the term *right of way* is used whether the right is owned in fee or held through an easement.
2. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v. "right of way," 311.
3. *Black's Law Dictionary*, 10th ed., (St. Paul, MN: Thomson Reuters, 2014), s.v. "easement appurtenant."
4. *North Carolina State Highway Dept. v. Black*, 79 S.E.2d 778, 784-785 (N.C. 1954).
5. Ted Tatos, Mark Glick, and Troy A. Lunt, "Property Value Impacts from Transmission Lines, Subtransmission Lines, and Substations," *The Appraisal Journal* (Summer 2016): 205-229; Sandy G. Bond, Sally Sim, and Peter Dent, *Towers, Turbines, and Transmission Lines: Impacts on Property Value* (West Sussex, England: Wiley-Blackwell, 2013); Steven C. Bottemiller and Marvin L. Wolverton, "The Price Effects of HVTLs on Abutting Homes," *The Appraisal Journal* (Winter 2013): 45-62; James A. Chalmers and Frank A. Voorvaart, "High-Voltage Transmission Lines: Proximity, Visibility, and Encumbrance Effects," *The Appraisal Journal* (Summer 2009): 227-245; Jennifer M. Pitts and Thomas O. Jackson, "Power Lines and Property Values Revisited," *The Appraisal Journal* (Fall 2007): 323-325; Jeffrey Johnson, "Case Study 1.2: Partial Taking—Electrical Transmission Line," *Applications in Litigation Valuation: A Pragmatist's Guide* (Chicago: Appraisal Institute, 2012), 53-79.
6. 33 U.S.C. §1251 *et seq.* Clean Water Act 404 permits §1344.
7. *Arkansas Game Commission v. United States*, 568 U.S. (2012).
8. *United States v. 48.10 Acres of Land, etc.*, 144 F.Supp. 258 (S.D. N.Y. 1956).
9. *United States v. 64.88 Acres of Land, etc.*, 244 F.2d 534, 535-536 (3rd Cir. 1957).
10. For a discussion of this rule, see *United States v. 38.60 Acres*, 625 F.2d 196 (8th Cir. 1980). See also *United States v. 101.88 Acres*, 616 F.2d 762 (5th Cir. 1980).
11. *United States v. 4.43 Acres of Land*, 137 F.Supp. 567, 572 (N.D. Tex. 1956).
12. *Mayor, etc., of City of Annapolis v. Anne Arundel County*, 316 A.2d 807 (Md. 1974).
13. Public Law No. 89-285, §301(a), *amending* 23 U.S.C. §319.
14. James H. Boykin, "Valuing Scenic Land Conservation Easements," *The Appraisal Journal* (October 2000): 420-426); Ted D. Englebrecht, "An Analysis of the Tax and Valuation Attributes of Scenic Easements," *The Appraisal Journal* (April 1999): 147-152; *Scenic Easements—Legal, Administrative, and Valuation Problems and Procedures*, Highway Research Program Report No. 56 (Washington, D.C.: Highway Research Board, 1973); and Richard J. Roddewig, *Appraising Conservation and Historic Preservation Easements* (Chicago: Appraisal Institute, 2011).
15. 79 Stat. 1028, *amending* 23 U.S.C. §131.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

16. *Berman v. Parker*, 348 U.S. 26 (1954); *Oregon City v. Hartke*, 400 P.2d 255 (Ore. 1965).
17. *Calvo v. United States*, 303 F.2d 902, 909 (9th Cir. 1962). See also *United States v. 8.41 Acres of Land, Etc.*, 680 F.2d 388 (5th Cir. 1982).
18. *Illinois Telegraph News Co. v. Meine*, 90 N.E. 230 (Ill. 1909).
19. *City of Norwood v. Sheen*, 186 N.E. 102 (Ohio 1933).
20. *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949).
21. *City of Norwood v. Sheen*, 186 N.E. 102 (Ohio 1933).
22. *United States v. General Motors Corp.*, 323 U.S. 373 (1945).
23. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. (Washington, D.C.: U.S. Government Printing Office, 2016), §1.91, p. 42.
24. See Dwight Pattison, "Eight Approaches to the Valuation of Temporary Easements," *Right of Way* (August 1992): 5-6.
25. *Chicago Mill and Lumber Company v. Board of Directors*, 366 S.W.2d 184, 185 (Ark. 1963).
26. *Mitchell v. Texas Electric Service Company*, 299 S.W.2d 183 (Tex. 1957).
27. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.5, pp. 168.
28. *Pacific Northwest Pipeline Corp. v. Myers*, 311 P.2d 655, 658 (Wash. 1957).
29. *Pacific Northwest Pipeline Corp. v. Myers*.
30. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §1.1, p. 9.
31. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §4.6.5.1.1, p. 171. citing United States v. 8.41 Acres of Land, Etc., 680 F.2d 388 (5th Cir. 1982).
32. U.S. Department of Transportation, Federal Highway Administration, *The Appraisal Guide* (Washington, D.C.: U.S. Government Printing Office, 1993), 16.
33. Washington State Dept. of Transportation, *Right of Way Manual* (February 2016), Appendix 4-1, §C(1)(b), p. 4-12.
34. *State ex rel. Lindermann v. Preston*, 170 N.E.2d 489 (Ohio 1960).
35. *United States v. Welch*, 217 U.S. 333 (1910).
36. *Matter of City of New York (West 10th St.)*, 196 N.E. 30 (N.Y. 1935).
37. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Mathew Bender Co., 1990), vol. 4, §12D.01[2][a] (2017).
38. *Matter of City of New York (West 10th St.)*, 196 N.E. 30, 33 (N.Y. 1935) (emphasis added).

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

16

# Inverse Condemnation and Regulatory Takings

In a typical condemnation proceeding, the government is the plaintiff and the landowner is the defendant. In inverse condemnation, the roles are reversed, with the action initiated by the landowner as the plaintiff and the government responding as the defendant. Hence the term *inverse condemnation*.

"Inverse condemnation should be distinguished from eminent domain," according to the U.S. Supreme Court's ruling in *Agins v. City of Tiburon*. "Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property." In contrast, inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted."[1]

The question of whether a compensable taking has occurred is central to an inverse condemnation case. A property owner typically sues for compensation and thus has the burden of proof on two issues: (1) that a compensable taking has occurred and (2) the amount of damage that the taking has caused. Some jurisdictions separate the court proceedings into one trial to determine if a compensable taking has occurred (in which an appraiser may have little involvement) and, if it is found that a taking has occurred, a separate trial to determine the amount of compensation due (in which an appraiser would likely take a prominent role).

Inverse condemnation generally occurs for one of two reasons:

1. The physical invasion of private property by the government or by a third party under authority of the government
2. The overregulation of land use by the government

As a general rule, a physical invasion is more easily identified as a taking—requiring the payment of just compensation—than a regulatory taking is.[2] In various rulings, the U.S. Supreme Court found that a state statute authorizing a cable television company to place cable television facilities on private property

The concept of inverse condemnation is not new. The U.S. Supreme Court decided an inverse condemnation case in favor of a landowner for the first time in 1872: *Pumpelly v. Green Bay & Mississippi Canal Company*, 80 U.S. 166 (1872).

was a taking,[3] as was the EPA's placement of monitoring wells on private property.[4] Inverse condemnations can also result from a combination of a physical invasion and an overly burdensome land use regulation. For example, in *Nollan v. California Coastal Commission*, the government attempted to condition the issuance of a building permit on the owner's granting of an easement for public beach access, although there was no relationship between the public's ability to access the beach and the proposed construction.[5]

Regulatory takings that do not involve physical invasion are not so easily discernible. In 1922, Justice Holmes said, "The general rule, at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."[6] In 2005, the US Supreme Court ruled on a precedent-setting case—*Lingle v. Chevron USA Inc.*—that more clearly established regulatory taking guidelines "with an aim to identify regulatory actions that are functionally equivalent to a direct appropriation of or ouster from private property."[7] The factors that should be considered in the analysis of a potential taking include the following:

- physical intrusion[8]
- elimination of all or essentially all economic uses[9]
- significant impact on investment-backed expectations[10]
- the relationship between the requirement and the articulated government interest[11]

As might be expected, there have been challenges to building permit denials, rezoning denials, denials of permits to fill wetlands, development permit denials, and development permit conditions and exactions. In 1987, the U.S. Supreme Court found that inverse condemnation is, in fact, a proper remedy for an overly burdensome land use control.[12] At page 321 of the published ruling, the court stated the following:

> Once a court determines that a taking has occurred, the government retains the whole range of options already available—amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain. Thus we do not, as the Solicitor General suggests, "permit a court, at the behest of a private person, to require the . . . Government to exercise the power of eminent domain." . . . We merely hold that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.

In other words, the government may elect to rescind the offending ordinance and pay the owner for the temporary taking of the property from the date the ordinance became effective until the ordinance was rescinded, or it may choose to leave the ordinance in place and pay the property owner for the permanent damage to the property resulting from the ordinance. A "landowner has no right under the Just Compensation Clause to insist that a 'temporary' taking be deemed a permanent taking," according to the court.[13]

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

In considering the amount of just compensation due for these temporary takings, the court indicated that the constitution "requires that the government pay the landowner for the value of the use of the land during this [temporary taking] period" and that "[i]t is the owner's loss, not the taker's gain, which is the measure of the value of the property taken."[14] The court indicated that substantial guidance could be found in cases where the government temporarily exercised its right to use private property, citing a number of World War II cases in which the government condemned leasehold interests in industrial properties.[15]

But Justice Brennan suggested that "additional rules may need to be developed,"[16] and Justice White indicated that "the issue of what constitutes just compensation in this context is a particularly meaty one, which merits substantial reflection and analysis."[17] Chief Justice Rehnquist suggested that "the questions surrounding what compensation . . . is due a property owner in the context of 'interim' takings are multifaceted and difficult [and that he] would not reach these questions without first permitting the courts below to address them."[18]

When an appraiser is asked to value a property in conjunction with an alleged inverse, or regulatory, taking, the appraiser need not form an opinion of whether a compensable taking has, in fact, taken place. The appraiser need only (1) analyze the value of the property prior to the governmental action that is alleged to have been a taking and (2) analyze the value of the property after the governmental action. The date of value in these cases is generally the date of the alleged taking. Appraisers should consult with legal counsel regarding the valuation technique to be applied in an inverse condemnation appraisal.

## Compensation for Temporary Takings

The comments by the various Supreme Court justices quoted above have given lawyers practicing in the field of inverse condemnations an opportunity to encourage the lower courts to use methods of determining just compensation in regulatory taking cases that have historically been rejected in direct condemnation cases in which temporary takings—e.g., the taking of temporary construction easements—were involved. Appraisers should be familiar with the traditional methods of estimating compensation for temporary takings as well as the more novel approaches that have been suggested as alternatives. Appraisers should also be aware that there are significant differences between estimating compensation for a temporary construction easement (TCE), for instance, and a temporary regulatory taking.

First, compensation for the taking of a TCE is generally estimated at, or near, the time that the TCE is actually taken and the term of the taking is known. Compensation is effectively paid to the property owner contemporaneously with the taking. In regard to an alleged regulatory taking, the duration of the taking cannot be established until the court has ruled on whether a taking has actually occurred. This ruling is often made at the same trial in which compensation is considered. If the court rules that a taking has occurred, the government determines whether it will retain the offending regulation, thereby making the taking permanent, or choose to rescind or amend it. Thus, appraisers often estimate value for a regulatory taking in hindsight. They estimate value at the end of

the temporary taking rather than at its beginning, and the courts generally allow appraisers to consider market events that occurred during the taking period.

Note that interest payments are not considered by appraisers in analyzing value. Appraisers assume that compensation is paid on the date of taking. When payments are not made on the date of taking, interest on the delayed payment is generally awarded in accordance with an adopted statute. The interest payment is not within the purview of the appraiser, although occasionally appraisers may be asked to present evidence of the applicable interest rate.

Because compensation for a temporary regulatory taking is never paid until after the termination of the taking, some appraisers, lawyers, and courts seem to have a difficult time separating the compensation paid to an owner for the taking from the interest due because payment of the compensation was delayed. This has resulted in double compensation in some instances. Appraisers have mistakenly added interest to their estimates to recognize that the compensation has been delayed, and then the courts have added interest to the appraiser's estimate for the same delay. Appraisers *must* assume that compensation was paid contemporaneously with the taking. The court will take care of the additional compensation required for the delay in the payment of the compensation. The confusion could be avoided if appraisers would remember that their function is to analyze value, not just compensation.

The diminution in value resulting from a temporary taking is usually based on the market rent of the affected area for the term of the temporary taking. If rental data is unavailable, an appropriate rate of return on the land for the term of the taking is customarily estimated. The purpose of these estimates is, of course, to measure what the owner has lost. The concept of the *market value* of the property before and after the taking is abandoned not because the lost rent is a better measure of what an owner has lost, but rather because there is usually little or no market data with which to analyze the value of a property that has been subject to a temporary taking. Similarly, with little or no rental data from which to estimate the rent lost during the term of the temporary taking, appraisers must often estimate an appropriate return on the property for the term of the taking in some other way.

This is not as easy as it might appear. Appraisers must first analyze the market value of the fee simple estate in the property as of the date of taking, both before and after the taking. Appraisers next estimate the rate of return typical in the current real estate market for the type of property being appraised. This can be accomplished by analyzing sales of similar property that were rented at the time of sale. The rate of return selected can then be applied to the market value of the property being appraised, both before and after the taking (assuming there is a residual value). This methodology was specifically approved in a ruling by a California court:

> Here, the capitalization method of valuation was not employed by owners' witnesses, apparently because of the lack of market data on short-term ground leases of vacant land with the same characteristics of the subject property.
>
> Instead, owners' witnesses adopted a methodology whereby they examined ground leases in the general area of the subject property to determine the prevailing percentage rate relationship between the value of underlying vacant land

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

> and the rent it will bring from a tenant developing the property. The testimony regarding the results of the witnesses' inquiry was thus admitted only to show what the owners of property in the general area expected as a return on their investments, and not to establish any absolute rental values for non-comparable properties. Limited to such purpose, the testimony was properly admitted as shedding some light on the appropriate amount of precondemnation damages.[19]

In applying this technique, appraisers must remember that just compensation is assumed to be paid as of the date of taking in one lump sum, while rent (or an appropriate return) would be paid periodically over the term of the lease (or taking). Thus, appraisers must convert the rental payments lost due to the temporary taking into a lump sum value as of the date of taking. This requires the development of a discount rate.

As a simple example, consider the following sequence of events:

- An industrial development permit application was filed on January 1, 2015.
- The permit was denied on July 1, 2015. (This example could just as easily relate to a taking of a temporary construction easement by the government.)
- On January 1, 2018, it was determined that the permit denial was a taking.
- The development permit was issued on July 1, 2018. Thus, the duration of the temporary taking was three years—July 1, 2015, to July 1, 2018.
- The market value of the industrial land (based on comparable sales) was concluded to be $1 million as of July 1, 2015, if the permit had been issued.
- The land had no economically viable use without the permit. Thus, it had only a nominal value after the permit was denied.
- No lands comparable to the subject property (with development permits) were leased in the area. Thus, market rent could not be determined.
- The market rate of return for industrial land in the area was 10% of market value as of July 1, 2015. Therefore, the market rent for (or appropriate return on) the property with the permit is concluded to be the $1,000,000 value × 10%, or $100,000 per year. (The landowner's costs—taxes, insurance, management, etc.—have been disregarded in this example for simplicity. Likewise, this example assumes no changes in the annual market rent and market value over the projection period in order to simplify the calculations—i.e., the discount rate of 10% is equal to a capitalization rate of 10%.)

Thus, the owner lost $100,000 per year for three years, or $300,000. Land rent is paid annually. (Ground rent is often paid annually in advance, but, for purposes of this example, it is assumed that in this area ground rent is typically paid in arrears.) The government is responsible for the payment of a lump sum award as of July 1, 2015. (Typically, interest on the award would be paid from July 1, 2015, until the date of payment. However, this is a court determination and should not be considered by appraisers.) Therefore, an appraiser must compute a lump sum award that is equal to the right to receive $100,000 per year for three years. That computation can be made, using a 10% discount rate, as illustrated in Table 16.1.

The present value of the right to receive $100,000 per year over the next three years, discounted at 10%, is $248,685. In analyzing the calculations in

**Table 16.1 Calculation of Lump Sum Award**

| Date | Period | Payment | PV of $1 Discounted at 10% Factor | Present Value |
|---|---|---|---|---|
| 7/1/16 | 1 | $100,000 | 0.909091 | $90,909 |
| 7/1/17 | 2 | $100,000 | 0.826446 | 82,645 |
| 7/1/18 | 3 | $100,000 | 0.751315 | 75,131 |
| Total | | $300,000 | | $248,685 |

Table 16.1, appraisers must remember that the date of taking—and thus the effective date of the appraisal—was determined to be July 1, 2015. Appraisers must *assume* that the government entity responsible for the taking paid the compensation due on that date.

An even easier way to compute the compensation is to recognize that, in this instance, what the owner retains after the permit denial is simply the right to get the property back, with a permit, at the end of three years. Therefore, it is a simple matter to compute the present value of the right to receive $1 million (in the form of the property with the permit) in three years. The factor used to convert the July 1, 2018, payment to its present value (0.751315) can be applied as follows:

| | |
|---|---|
| Amount to be received in three years | $1,000,000 |
| Reversion factor | × 0.751315 |
| Present value of reversion | $751,315 |

Therefore,

| | |
|---|---|
| Property value before the taking | $1,000,000 |
| Less property value after the taking | − 751,315 |
| Difference (just compensation) | $248,685 |

This latter methodology has the advantage of retaining the "before and after" methodology of computing just compensation, which has long been favored in condemnation actions in many jurisdictions.

The example included the assumption that the subject property would have no economically viable use during the temporary taking, which would not be unusual in a regulatory taking case. In arriving at the highest and best use of a property subject to a temporary regulatory taking, appraisers must adhere to the consistent use theory. For instance, suppose that the property in the example would have a highest and best use for industrial purposes with the issuance of the requested permit, but, if such a permit could be constitutionally denied without paying compensation, the property would have a highest and best use for residential purposes and a value of $500,000. In the context of a temporary regulatory taking, it would not be permissible to conclude that the highest and best use of the property during the temporary taking was for residential use. Such a conclusion would commit the property to a nonindustrial use for a period well beyond the term of the temporary taking.

The only appropriate highest and best use of a property subject to a temporary regulatory taking during the period of that taking is one that will be

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

relatively short-lived, can be terminated on short notice, and requires no or little capital improvement. These interim uses might include a parking lot for urban lands or grazing for rural parcels. The continuation of an existing use of the property during the temporary taking might also be appropriate.

Because the purpose of the methodology described in the example above is to put the owner in the same position monetarily that the owner would have enjoyed had no taking occurred, it is important to determine what that position would have been. In doing this, it is easier to assume that the $1 million land value is in the form of cash rather than land. Then the following analysis can be made:

| | |
|---|---|
| Cash on hand as of July 1, 2015 | $1,000,000 |
| Interest (rent or return) for Year 1 @ 10% | + 100,000 |
| Balance at end of Year 1 | $1,100,000 |
| Interest for Year 2 @ 10% ($1,100,000 × 10%) | + 110,000 |
| Balance at end of Year 2 | $1,210,000 |
| Interest for Year 3 @ 10% ($1,210,000 × 10%) | + 121,000 |
| Balance (cash on hand) at end of Year 3 | $1,331,000 |

If the government had issued a permit to the owner of the property on July 1, 2015, instead of denying it, the owner's monetary position as of July 1, 2018, would have been $1,331,000, as shown above.

Now suppose that the court decided to award interest on the $248,685 in compensation at a rate of 10% compounded annually from the date of taking (July 1, 2015) to the date of actual payment and permit issuance (July 1, 2018). The owner's monetary position would then be calculated as follows:

| Year | | Interest | Balance |
|---|---|---|---|
| 1 | Government payment | | $248,865 |
| 1 | ($248,685 × 10%) | $24,865 | $273,730 |
| 2 | ($273,730 × 10%) | $27,370 | $301,100 |
| 3 | ($301,100 × 10%) | $30,110 | $331,210 |
| 3 | Total award (including court-awarded interest) | | $331,000 |
| 3 | Reversion (sale of property)* | | 1,000,000 |
| Total cash on hand | | | $1,331,000 |

* For purposes of simplicity,, no change in value over the three years is assumed in these calculations.

Thus, an award of $248,685 plus court-awarded interest would place the owner in the same position as if a taking had never occurred and a permit had been issued on July 1, 2015.

## Multiple Regulations

A single tract of land can be subject to local, state, regional, and national land use regulations simultaneously. Individually, none of these regulations may result in the land having no economically viable use, but the composite effect of all the applicable regulations may leave the land without any utility. For example, a local zoning ordinance may restrict a land parcel to industrial use (precluding residential use), while state shoreline or coastal zone management regulation may restrict

the land to residential use. Neither regulation precludes the economically viable use of the land, but the two regulations together result in the land having little, if any, utility or value. Thus, one of the regulations may not result in a compensable taking, but the combined effect of the regulations may entitle the landowner to just compensation. Such a situation becomes even more complex when the regulations involved have been promulgated by government entities at different levels and would require consideration by different court systems (e.g., a local regulation would be a state court matter, while a federal regulation would require consideration by the United States Court of Federal Claims). Appraisers must be aware of all these possibilities and consult legal counsel if they are encountered.

## Notes

1. *Agins v. City of Tiburon*, 447 U.S. 255, 258 n.2 (1980).
2. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).
3. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).
4. *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991).
5. *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987).
6. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).
7. *Lingle, Governor of Hawaii, et al v. Chevron U.S.A. Inc.*, 544 US 528 (2005).
8. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).
9. *Lucas v. South Carolina Costal Council*, 505 U.S. 1003, 1014 (1992)
10. *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979). See also *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).
11. *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987). See Also *Dolan v. City of Tigard*
12. *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987).
13. *First English Evangelical Lutheran Church v. Los Angeles County*, at 317.
14. *First English Evangelical Lutheran Church v. Los Angeles County*, at 319 citing *United States v. Causby*, 328 U.S. 256, 261(1946).
15. See *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *United States v. Petty Motor Co.*, 327 U.S. 372 (1946); *United States v. General Motors Corp.*, 323 U.S. 373 (1945).
16. *San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 659 (1981) (Brennan, J., dissenting).
17. *McDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 363 (1986) (White, J., dissenting).
18. *McDonald, Sommer & Frates v. Yolo County*, at 564 (Rehnquist, C.J., dissenting).
19. *People etc. v. Peninsula Enterprises, Inc.*, 153 Cal. Rptr. 895, 904 (Cal. 1979).

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

17

# Writing the Report

Much has been written on the proper methodology and format for writing appraisal reports. Appraisal reporting is discussed in a variety of appraisal publications.[1] Most condemning agencies have their own report writing guidelines. These instructions may be similar, but no two sets are identical. Specific report writing guidelines for condemnation appraisals may be found in the Uniform Appraisal Standards for Federal Land Acquisition[2] and in the guidelines of various condemning agencies.

The 2016 edition of the Uniform Appraisal Standards for Federal Land Acquisitions provides guidance on report content and examples of different report formats for different types of valuation assignments:

> The report formats described in Section 2.3, consisting of a four-part appraisal report for total acquisition appraisals and a seven-part appraisal report for partial acquisition appraisals, are recommended guides that agencies can modify as appropriate for agency needs.[3]

Each state department of transportation has its own formatting and content requirements for appraisal reports, which can be found readily online.[4] Many states have similar requirements because they are all striving to meet the requirements of the Uniform Appraisal Standards for Federal Land Acquisitions. Nevertheless, state requirements will vary due to variations in state statutory and decisional laws. The recommended format and content for an appraisal report prepared in conjunction with a federal condemnation can be found in Appendix B.

Although an appraiser must write an appraisal report in the required format when a condemning agency is the client, these regimented reporting requirements must not dictate or constrain the appraiser's thinking. In preparing a report for an agency that has only a recommended format or a report for a condemnee, an appraiser generally has a freer hand in determining the format and content of the appraisal report. However, every appraisal report must be tailored to the needs of the intended users.

The assumptions and limiting conditions of an appraisal must be reviewed carefully. For example, if an appraisal is of vacant land and the assignment's assumptions state that the appraiser has assumed that the improvements on the site are free from hazardous materials or that the improvements conform to existing zoning and building codes, the client (and the intended users of the appraisal report) might perceive the entire report as boilerplate, and a reviewer may agree. The assumptions must also be reviewed carefully to ensure that they do not include an assumption or limiting condition that might be construed to "limit the scope of work [of the assignment] to such a degree that the assignment results are not credible in the context of the intended use."[5]

Condemnation assignments may also require the disclosure of jurisdictional exceptions to USPAP. This type of disclosure must include a citation of the law or regulation that precludes compliance with USPAP as well as a citation of the part of USPAP that is voided by that law or regulation for the assignment.[6] However, unless mandated by law, instructions from a client or attorney do not establish a jurisdictional exception.

If an appraiser is qualified to testify as an expert in a federal trial or deposition, the appraiser's report must satisfy not only the federal standards but also the content requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure:

> Rule 26(a)(2)(B) requires a written report, prepared and signed by the expert, that contains:
>
> i. a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> ii. the facts or data considered by the witness in forming them;
>
> iii. any exhibits that will be used to summarize or support them;
>
> iv. the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> v. a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> vi. a statement of the compensation to be paid for the study and testimony in the case.[7]

## Report Content

Various professional appraisal organizations, state licensing or certification agencies, and appraisal clients require that an appraiser's certification include certain statements in addition to those required by the Uniform Standards of Professional Appraisal Practice (USPAP). These may include attestations that the appraisal report has been prepared in accordance with the client's appraisal reporting guidelines, the professional organization's standards and codes of ethics, or applicable law; that the appraiser is a certified (or licensed) appraiser in the state where the property is located; or that the appraiser has met the continuing education requirements of the professional organization that he or she is a member of.

Report content is controlled by the applicable standards and the pertinent rules of civil procedure. The additional content of an appraisal report for eminent domain purposes will depend on the property type, the nature of the taking, and the requirements of the client or the client's legal counsel. The condemnor-client

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

may be very specific about report content and format. For instance, the Uniform Appraisal Standards for Federal Land Acquisitions states the following:

> In reporting the results of the sales comparison approach for land valuation, the appraiser shall provide detailed descriptions of confirmed sales of lands that have the same or similar highest and best use as the subject property. The description of each sale transaction used as a comparable sale should at a minimum include the date of the transaction, the price paid, the name of the seller, the name of the buyer, the size of the property, the location of the property, the zoning or other legal constraints on the property, and a description of the physical characteristics of the property. The person with whom the transaction was verified should also be identified.
>
> Differences between the comparable sales and the subject property shall be considered and adjustments made to the sales to address these differences. Items of comparison shall include property rights conveyed, financing terms, conditions of sale, market conditions, location, physical characteristics, economic characteristics, legal characteristics, and non-realty components of value. The adjustments must be summarized in an adjustment grid and each adjustment (whether qualitative or quantitative) should be supported with market data. The data and analysis must provide sufficient detail for the client and intended users to understand the data, the analysis, and the logic of the appraiser's opinion of market value for the subject land as if vacant.[8]

Because the appraisal reporting requirements of intended users of appraisal reports vary widely, appraisers should never accept an assignment without first reviewing the applicable guidelines.

The stated purpose of many appraisal report writing guidelines is (1) to ensure that appraisers have considered all the required elements of value in arriving at the value conclusion and (2) to maintain a uniform method of narrative appraisal report writing that will expedite the appraisal review function. Although the first purpose is legitimate, the second is questionable. The overriding purpose of any appraisal reporting guidelines for condemnation appraisals should be to encourage uniform approaches to appraisal problems that consistently lead to credible indications of value and result in equitable treatment of the individual whose property has been taken and the public that must pay for the taking.

An appraiser retained by a condemnee is generally given a freer hand in determining the content of the appraisal report. However, it is always advisable to include an explanation of the assumptions that the various approaches to value are based on and the methodology applied. It is also advisable to state the legal premise of just compensation briefly and to explain that the appraiser is generally bound by the applicable jurisdiction's concept of just compensation, i.e., market value. The appraiser may choose to indicate that the owner's unwillingness to sell or sentimental attachment to the property has no bearing on market value and, therefore, cannot be considered in the appraisal process.

An appraiser should consult with the client's legal counsel about the content of the appraisal report. This discussion will give an appraiser an indication of the attorney's understanding of the appraisal process, which may, in itself, help the appraiser determine the appropriate report content. During this consultation, the appraiser and the attorney can review the applicable rules of discovery in the jurisdiction and discuss how these rules may or may not affect the desired report content. Under no circumstances, however, can the report's content fall

below the minimum content required by the appropriate professional valuation standards. Before preparing an appraisal report, an appraiser should ask legal counsel to determine whether there are any reporting requirements unique to the jurisdiction in which the case will be heard.

In writing appraisal reports and preparing exhibits for appraisals made for eminent domain purposes, appraisers should keep in mind that their reports are often read and reviewed by individuals who have never seen the property. They may never have been in the town, city, or state where the property is located and may have little, if any, knowledge of the government project for which the property is being acquired. For this reason, maps of comparable sales, plot plans, neighborhood maps, and (date-stamped) street scenes and aerial photos should be prepared carefully, under the assumption that the intended users of the report are unfamiliar with the property, the neighborhood, the region, and the project necessitating the condemnation.

While a local reviewer might skip over an appraiser's neighborhood description and a local project engineer might find reading the section on the government's project tedious, any regional or national reviewers or attorneys assigned the case will find this information most helpful. Providing basic information up front may put the reader in a receptive frame of mind and facilitate reviewing the important subsequent valuation sections of the appraisal report.

## Report Appearance

The quality of an appraisal report will be judged on its appearance as well as its content. Often appraisers and their clients never meet face to face. The only way a client can judge an appraiser's work is through the written appraisal report. An appraisal report must look professional. Appraisers should be aware that many regional and national appraisal reviewers must respond to one important question after they review an appraisal report: Would you recommend this appraiser for future assignments?

There is absolutely no excuse for submitting anything less than a professional-looking appraisal report. However, both writers and users of appraisal reports should be warned that fancy charts and graphics will not make up for deficiencies in important property-specific documentation and supporting market data. Professional standards require clearly written appraisal reports that contain adequate support for a credible opinion of value.

## Report Review

Appraisal reports may be subjected to more than one level of review, particularly when they are prepared for condemnors. The first level of review is usually conducted by a staff reviewer of the condemning agency. The staff reviewer's primary concerns are that the appraisal report conforms to the provisions of the appraiser's contract with the agency, including its reporting guidelines, that the report is free of mathematical errors, and that it presents a credible value opinion that is sufficiently supported. Once an appraiser has received report approval from the agency, the initial contract obligations are complete.[9] However, it might be wise to make the appraisal conditional or subject to change should new or additional

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

### The Project Appraisal Report

At times, an appraiser will be retained by a condemnor to appraise several properties for the same public project. Such an assignment sometimes lends itself to the preparation of a *project report*. Project reports are often requested for reasons of economy. "[P]roject appraisal reports (or multiple-parcel appraisal reports) are not appraisal shortcuts; they are clerical shortcuts."* They are intended to eliminate the repetition of standard sections of appraisal reports such as the city or market area description, scope of work, appraiser qualifications, and assignment conditions. If the same comparable sale properties are used in the appraisal of all, or most, of the parcels, base information and photographs concerning these properties need only be included in the addenda of the project report.

Assignments suitable for project reports are those in which a group of parcels are being taken in whole, all parcels are vacant or similarly improved, all have the same or a similar highest and best use, and the same market data will be relied on for all the valuations. For example, it might be possible to rely on the same comparables in the valuation of a strip taking along the frontage of similarly zoned uniform agricultural parcels intended for a proposed highway corridor. A project appraisal report may include extensive market studies such as market condition (time) studies, damage studies, and benefit studies.

Some condemnors have specific guidelines for the preparation of project appraisal reports, while others develop them on an ad hoc basis. It is important that the project report and the appraisal of each property within the project report meet the requirements of USPAP. Note that project reports may be acceptable to the condemning agency for purposes of negotiating amicable agreements with property owners, but they may not be acceptable to the agency's legal counsel if one or more of the properties has to be condemned.

Project reports do not lend themselves to discovery or exchange. There may be information in the project report that is not applicable to the property being condemned and that the agency or its legal counsel does not want to divulge to opposing counsel. In such a case, appraisers should be prepared to develop an appraisal report that covers only the property that is the subject of the condemnation action.

* *Uniform Appraisal Standards for Federal Land Acquisitions* (Washington, D.C.: U.S. Government Printing Office, 2016), §2.5, 73.

data come to light or if it becomes necessary to retain the services of an engineer, planner, or other third-party professional, in anticipation of an updated appraisal.

If the agency is unsuccessful in its negotiations with the property owner, however, the case may be turned over to the agency's legal counsel for condemnation. The package turned over to counsel typically includes the appraiser's original report, or the appraiser may be asked to update the appraisal report for trial purposes.[10] If such a request is made, the appraiser should bear in mind, both in quoting a fee for the update and in preparing the updated report, that this report will probably be reviewed at a different level and will be reviewed more critically than it was originally. Moreover, the updated report will probably end up in the hands of the property owner's lawyer as a part of the discovery or exchange process.

A pretrial reviewer, who can be an appraiser or an attorney, will often have a different focus than the agency reviewer. The pretrial reviewer is not particularly

concerned about whether the report meets the provisions of the appraiser's contract or the agency's precise formatting guidelines. Instead, the pretrial reviewer will concentrate on the substance of the report and whether the value opinion, and the data and analysis on which it was based, can stand up to the rigors of trial. The agency reviewer often wants to approve the report and, therefore, may overlook technical errors that have no influence on the final value opinion. The pretrial reviewer views the report as he or she believes legal counsel for the property owner will view it. Thus, attention is focused on the weaknesses and any technical errors in the report.

For example, suppose an appraiser stated in a report that it was observed that the market was appreciating at the rate of 10% per year and the appraiser adjusted the comparable sales accordingly. The agency reviewer may have approved this appraisal report because the conclusion was reasonable from that reviewer's personal experience and observation of the market. The pretrial reviewer, on the other hand, may insist that the appraiser prepare a market-supported time-increment study, using paired sales or sales-resales, or some sort of statistical research like trend analysis to support the propriety of the market conditions adjustment. The reviewer does not make this demand because the adjustment is unreasonable but because the appraiser needs to be able to demonstrate the credibility of the adjustment to the trier of fact.

The appraiser or agency reviewer may feel that the time adjustment has little effect on the final value opinion and, therefore, does not justify the additional research and analysis. The pretrial reviewer has another motivation, however—to avoid a long, drawn-out, and damaging cross-examination. Also, the pretrial reviewer may have information that is not available to the appraiser or the agency reviewer—e.g., a copy of the agency negotiator's report or correspondence from the owner's legal counsel asserting that property values in the area have been increasing at the rate of 30%, not 10%, per year.

The pretrial reviewer may make other requests as well, such as asking that the appraiser remeasure the improvements on the subject property or further verify a sale if these items have been questioned by the owner during negotiations. The pretrial reviewer may also insist that the appraisal report be modified to correct a minor technical noncompliance with USPAP, not to harass the appraiser, but to avoid cross-examination of the appraiser about the point of noncompliance and the suggestion that the appraiser routinely acts in an unprofessional manner. The pretrial reviewer is essentially a surrogate cross-examiner. Unlike cross-examination by the owner's counsel, the pretrial reviewer's cross-examination is conducted in private and gives an appraiser an opportunity to conduct additional market research and think of better ways to explain the conclusions presented in the appraisal report before the questions are asked again at trial.

Appraisers should take advantage of the pretrial review process, which provides an opportunity to bolster weaknesses in an appraiser's analysis and conclusions. However, it is important for the agency, the pretrial reviewer, and the agency's legal counsel to recognize that any appraisal work conducted after the initial approval of the appraisal report by the agency may be beyond the scope of an appraiser's initial assignment and contract.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

## Notes

1. See *The Appraisal of Real Estate*, 14th ed., (Chicago: Appraisal Institute, 2013) and *Review Theory and Procedures: A Systematic Approach to Review in Real Property Valuation* (Chicago: Appraisal Institute, 2015).
2. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., (Washington, D.C.: U.S. Government Printing Office, 2016), §2.3, 58-72.
3. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed. §2.1, 56.
4. Search for "appraisal" on the website of a state department of transportation to find formatting requirements and examples of acceptable appraisal reports.
5. See The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019 ed. (Washington, D.C.: The Appraisal Foundation, 2018), "Scope of Work Rule," 12.
6. USPAP, 2018-2019 ed., "Jurisdictional Exception Rule," 14.
7. Federal Rules of Civil Procedure 26(a)(2)(B) (through amendments effective Dec. 1, 2015).
8. *Uniform Appraisal Standards for Federal Land Acquisitions*, 2016 ed., §2.3.3.2.1, 65.
9. The contract may provide for additional services such as appraisal report updating or testimony at trial, for which the appraiser receives an additional fee.
10. Advisory Opinion 3 of the USPAP Advisory Opinions discusses the development and reporting requirements of updates of prior appraisals.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

18

# Preparation for Trial

Preparations for trial will vary somewhat depending on whether the client is a condemnor or a condemnee. A client who is an active condemnor generally has one or more staff attorneys or an attorney on retainer. An active condemnor will also have an approved appraiser list, a staff of appraisers, or both. An appraiser who is given an assignment by a condemnor often knows the attorney who will handle the case. On the other hand, an attorney often does not have any input into the selection of the appraiser. In fact, attorneys are often unaware of a case until the staff or fee negotiators have failed to settle the dispute. When the case is turned over to an attorney, that person generally has the choice of keeping the original appraiser or choosing a new appraiser to replace or assist the first one.

Many condemnor's attorneys, as a matter of policy, refuse to go to trial with staff appraisers, particularly when the compensation at stake is substantial. The reason for this practice is that many attorneys do not feel that they can convince a trier of fact that a staff appraiser is not an advocate in favor of the condemnor who employs the appraiser. This policy has the unfortunate consequence of eliminating from the trial appraisers who, in many instances, are most familiar with the market data in the area at the time of the taking and have more experience in the appraisal of local properties than any fee appraisers who might be retained for trial purposes long after the fact.

When the client is the condemnee, the situation is different. The client may approach either the attorney or the appraiser first. An appraiser who is contacted first should encourage the client to retain legal counsel immediately. If the attorney is contacted before an appraiser has been retained, one of the attorney's primary functions will be to counsel the client to retain the services of an appraiser. "If at all possible, trial counsel should participate in the selection of the valuation expert," according to *Nichols*. "Trial strategy begins with the selection of the expert valuation witness(es), who are normally qualified appraiser(s) or realtor(s)."[1] The sooner the appraiser is identified, the better, as it might be nec-

essary to retain third-party professionals, such as an engineer, planner, or other professional, to assist with the valuation.

Some attorneys falsely believe that hiring an appraiser late in the game can save the client appraisal fees because the appraiser will not be able to spend as much time on the appraisal and the preparation for trial. Whatever the reason for procrastination, attorneys should retain the services of appraisers at the outset, and appraisers should decline to accept any assignment if there is not adequate time and resources to complete the appraisal properly and prepare for trial.

Triers of fact have an uncanny knack for distinguishing between (a) an expert witness who is an advocate for a client and is testifying to a false or contrived value and (b) an expert who is testifying to an unbiased opinion of value. Experienced condemnation lawyers know this and will dump, without hesitation, any appraiser who taints a value opinion to satisfy the interest of a client. An appraiser who cannot develop an objective, supportable opinion of value will have a short professional career.

## Selection of an Appraiser

The selection of an appraiser by an attorney, generally in concert with the property owner, may be one of the most important steps in preparing for trial. Thinking about this selection process from the perspective of attorneys may help appraisers present themselves in the best light in a crowded marketplace. All states have appraiser licensing or certification laws that incorporate USPAP or other professional standards. However, not all states require appraisals conducted for all purposes to be prepared by licensed or certified appraisers. Because the impetus for the licensing or certification of appraisers was federal legislation in response to the savings and loan crisis, some states applied the federally mandated licensing or certification requirements only to appraisals made for lending purposes in which the lender is a federal agency or a federally insured institution. Therefore, in some states, appraisers do not need to be state-licensed or -certified to perform appraisals for condemnation purposes.

Nevertheless, many condemning agencies have adopted the policy that all fee appraisers retained to prepare appraisals for the agency must be licensed or certified. Federal regulations now require that all federal agencies that employ contract appraisers must hire only state-certified appraisers.[2] Many state condemning agencies have also adopted requirements that all contract appraisers employed be licensed or certified.

Although in some states a condemnee may have the option of retaining an appraiser who is not licensed or certified, there is no advantage and many potential disadvantages to exercising this option. State licensing or certification laws require uniform minimum experience and continuing education. Although possession of a state license or certificate does not guarantee an appraiser's competence to perform an eminent domain appraisal assignment, the appraiser's client can be assured of some minimum qualifications.

If an attorney is not personally familiar with any appraisers, referrals can generally be obtained from other attorneys, real estate agents, bankers, and various condemnors. When relying on referral, attorneys should be careful to avoid enlisting the services of an unethical or incompetent appraiser. Some appraisers

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

**Do Appraisal Reports Need to Be Updated for Trial?**

The legal counsel of some condemnors hold the opinion that any appraisal report prepared for a government acquisition should be adequate for condemnation trial purposes. Thus, the modification of the appraisal report would *not* be an essential part of trial preparation. While this is admirable in theory, it is often not practical. Condemning agencies often award appraisal contracts to the lowest qualified bidder, recognizing that the vast majority of properties are acquired without the necessity of a trial. Agency reviewers are more concerned with (1) the reasonableness of the opinion of value, (2) report format and content, and (3) compliance with agency guidelines than they are with the appraiser's ability to support the analysis at a trial. Therefore, modification of initial appraisal reports—sometimes major modification due to a change in the date of value or the relevant characteristics of the subject property or the taking—in preparation for trial is generally the rule rather than the exception. Often new information comes to light that was not made available to the appraiser when the initial appraisal was prepared on behalf of the condemnor.

work only one side of the street—i.e., only for condemnors or for condemnees. This in and of itself is no reason to reject a referral, but, if the referred appraiser only works for condemnees, it is advisable to ask some attorneys who represent condemnors about the appraiser. Similarly, if the appraiser in question works only for condemnors, it is advisable to obtain the opinions of attorneys who specialize in representing condemnees. Experience has shown that attorneys have respect for well-qualified, honest appraisers, even if they only work the other side of the street. If, however, the appraiser seems to see every condemned parcel as a potential shopping center site or, at the other end of the spectrum, only seems to see the potential for use as pastureland, attorneys are not likely to keep silent on the matter.

Hiring an unethical or incompetent appraiser (or an appraiser who is continually overly optimistic or overly pessimistic) may initially appear to be in the best interest of the client. However, this practice can have serious, adverse results. First, opposing counsel may take the position that "if the other side is going to use that unscrupulous appraiser, then we are going to hire our own." This is the "fight fire with fire" approach. Second, hiring a disreputable appraiser will all but eliminate the possibility of a negotiated settlement. Third, the property owner may draw false hope if the appraiser reaches an outlandish conclusion. When the condemnation award does not even approach the appraiser's value opinion, the attorney will be partially to blame, at least in the eyes of the property owner. Finally, if the appraiser testifies to a value that the trier of fact finds totally unbelievable, the trier of fact's only alternative may be to base the award solely on the evidence presented by the opposing party to the dispute.

When the valuation testimony diverges greatly, the trier of fact may adopt the premise presented by one party to the suit and exclude the other. Therefore, the award may be based on a single premise and value opinion. There is another reason to avoid presenting excessively high or low estimates of compensation. In some jurisdictions, the decision as to whether a condemnee is awarded trial costs

is based on the relationship between the compensation award and the valuation testimony of the witnesses.

If the appraiser selected has a reputation for competency and objectivity as well as a professional demeanor on the witness stand, the simple act of retaining the appraiser may assist in reaching a negotiated settlement. This is particularly true if the appraiser selected has worked with opposing counsel in the past. Opposing counsel will then know that the case presented will be credible, well-prepared, and believable.

There is debate within both the legal and appraisal professions as to whether appraisers should accept assignments from both condemnors and condemnees, particularly in cases that relate to different properties affected by the same public improvement project. Some condemnors have gone so far as to include a clause in their appraisal contracts that prohibits the appraiser from performing appraisals for any condemnee involved with the same project. Of course, each individual appraiser engaged in this work and each attorney who retains appraisers on behalf of parties in condemnation actions must determine whether or not to agree to this clause. There are a couple of factors to be considered in making this decision.

First, appraisers might not want to restrict themselves because appraisers who have worked for both condemnors and condemnees can include this information in testifying to their qualifications. It is particularly effective when an appraiser testifying on behalf of a condemnee can state that he or she has appraised for the condemnor. This implies that the condemnor finds the appraiser competent, unbiased, and honest. In this situation, the condemnor can only suggest to the trier of fact that, although the appraiser is well-qualified, this time the appraiser has made a mistake. This seems to be the basis for the belief that "[u]se of an appraiser who specializes in representing only condemnors or condemnees . . . should be avoided."[3]

If an appraiser has been offered an appraisal contract by a condemnor but has declined the assignment because of a restriction against conducting appraisals for condemnees, this fact can also be effective under direct examination. For this reason, condemnors should carefully consider the consequences of adopting such a restrictive policy.

Appraisers should also be wary of a condemnee's attorney who wants to put the appraiser on a small "retainer," allegedly because the condemnee is not quite ready to have the appraiser prepare a fully documented appraisal report. Some attorneys have used this technique as a means of ensuring that a particular appraiser will not be available to the opposing party although they have no intention of actually contracting for the appraiser's services. An appraiser does not have a client until that party actually engages the appraiser for an assignment. Unless acceptance of a retainer is considered the acceptance of an appraisal assignment—which may be the case under applicable state or federal law—professional appraisal standards and ethics do not place an appraiser under any duty of confidentiality to an attorney until the attorney has become a client. As an alternative to putting an appraiser on retainer, an attorney might hire an appraiser to prepare an oral or restricted report and tell the appraiser that the assignment is confidential so that the appraiser is precluded under USPAP from

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

accepting another assignment involving that property for three years (because of USPAP's required disclosure of services involving a specific property in the previous three years).

An appraiser who works for both condemnors and condemnees is, of necessity if not inclination, kept honest. The appraiser's analysis of the sale of a comparable property simply cannot change from assignment to assignment. Once the analysis is made and reported, the appraiser is stuck with it, unless new relevant information about a comparable property's sale comes to light. For instance, in analyzing the *Coulter* case,[4] George C. Handley said the following in *Condemnation Appraisal Practice*:

> It happened that in the present proceeding the condemnee's two expert witnesses had been previously employed by the state in a similar capacity. Moreover, each of the witnesses had made studies, appraisal reports, and in one or more instances had testified in court as a state witness in relation to the value of property in the immediate area. It was developed on cross-examination that one of their appraisals concerned the property adjoining the [property being appraised], and that another appraisal was in relation to an entire block of property directly across [the street from the property in dispute]. Further cross-examination with respect to sales data (upon which the state's experts were to rely in large measure) disclosed that while these two witnesses had each previously considered the same data helpful in their appraisals of property in this vicinity when appearing for the state, they now chose to disavow the comparability of such transactions.[5]

In selecting an appraiser, an attorney must determine the appraiser's competency and review the individual's general qualifications. An appraiser who holds a designation from a professional appraisal organization will have specific additional qualifications and is subject to an additional code of ethics. The designation requirements, standards of professional appraisal practice, and codes of ethics of many of these organizations go beyond the requirements of USPAP and state licensing and certification requirements. The professional reputation of appraisers should also be investigated. This is especially important in small communities.

Attorneys should determine whether an appraiser will need any special qualifications or experience for a particular assignment. For instance, an appraiser who is qualified to cruise timber may be helpful in a case involving timberland. Experience in litigation valuation and as an expert witness is advantageous, as is an appraiser's attendance at, or successful completion of, educational offerings that emphasize the appraisal of property for condemnation and other litigation purposes. The selected appraiser should be able to assist the attorney in preparing exhibits, negotiations, and, of course, testimony during the trial. It is, perhaps, unfortunate that attorneys must put so much emphasis on the appraiser's demeanor on the witness stand. However, if an appraiser falls apart under cross-examination, or under direct examination for that matter, that individual becomes a liability rather than an asset to the attorney.

Once an appraiser has been selected, a contract for appraisal services should be prepared and signed. A condemnor-client will generally have a standard form appraisal contract. Some contracts between a condemnee and an appraiser specify a flat fee for appraisal services, while others specify an hourly fee or daily fee (sometimes with an agreed maximum). Provisions are generally made for pretrial

and trial work. These contracts are generally made directly between the appraiser and the client. Appraisers should make provisions to ensure the payment of appraisal fees by clients who may otherwise refuse to pay because they object to the appraiser's final opinion of value. Typical engagement letters in litigation provide that the expert has the right to withhold services, including providing testimony, until billing is current.

## Preparing the Appraisal

There is considerable disagreement in legal circles as to how much legal instruction an attorney should initially give an appraiser. An appraiser experienced in condemnation appraising only needs to be instructed, at least initially, to "appraise a specific set of property rights as of a certain date." Experienced appraisers know the rules of determining just compensation, which damage items are compensable and which are not, and the rules regarding the offsetting of benefits in the applicable jurisdiction. More importantly, an experienced appraiser will recognize a questionable point of law and will ask for assistance from legal counsel. Appraisers can usually do a much better job if the attorneys are not continually looking over their shoulders.

If an appraiser has been retained by the condemnor or its legal counsel after initial acquisition negotiations have failed, at least one appraisal report on the property already exists. A hotly contested question immediately arises: Should the newly retained appraiser be furnished with any or all of the information in the initial appraisal report? Those who are against providing that information argue that they do not want the new appraiser's opinion swayed or corrupted by the analysis or opinion of the first appraiser. They also question what effect the fact that the appraiser was furnished with a prior appraisal will have during cross-examination.

Professional appraisers are (or should be) retained for their objectivity. Nearly all condemnors' appraisal guidelines require that appraisers investigate and report the subject property's assessed value and tax burden. A property's assessed value is nothing more than an assessor's opinion of the property's market value, yet condemnors are not concerned that an assessor's opinion will corrupt the opinion of appraisers. Further, in discussion of the collection and analysis of market data, *The Appraisal of Real Estate* advises appraisers to seek information and opinions from real estate brokers, appraisers, property and asset managers, and bankers.[6]

Refusal to furnish appraisers with information from a prior appraisal is akin to the historical practice of many appraisers who did not want to know the recent sale price of a property under appraisal, its pending sale price, or its listed price because they wanted to remain objective. The absurdity of this practice has now been recognized in USPAP:

> When the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business:
>
> (a) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and
>
> b) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal.[7]

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

Appraisers may want to request copies of all prior appraisals of the subject property. If an appraiser's objectivity can be corrupted by merely reading someone else's appraisal report, that appraiser should not have been hired in the first place. Concern about cross-examination questions is unnecessary. Appraisers should reference any prior appraisals reviewed in preparing their own appraisals and testify on direct examination that the prior report was one of the items of information furnished to the appraiser by the condemnor. If the question does come up on cross-examination, an appraiser could respond, "Of course I read the prior appraisal of the property. I reviewed every bit of information I could get my hands on regarding the property that I was asked to appraise."

An appraiser who is employed by a condemnee is likely to want to be made aware of the initial offer made by the condemnor and furnished with any information submitted to the property owner by the condemnor in support of the offer, including any comparable sales information and appraisal reports. With knowledge of the condemnor's offer, the appraiser may be able to save the condemnee thousands of dollars in appraisal fees. An appraiser who is familiar with the area where the property is located might be able to arrive at a range of values within which the final opinion of value will fall, depending on the type of property and the complexity of the appraisal assignment.

If an appraiser's preliminary opinion of value is unsatisfactory to the condemnee-client and the attorney, the attorney will usually try to reemphasize the advantageous aspects of the property or the potential damages that may accrue to the property due to the taking and construction of the public improvement. It is only natural, of course, that the attorney will want to confirm that the appraiser has considered the important factors affecting the property.

If a value opinion is deemed unfavorable, an attorney must counsel the condemnee about the available alternatives. The condemnee can accept the condemnor's offer or attempt to negotiate a higher settlement figure without an appraisal. Another option is to hire another appraiser.

The most advantageous posture for an attorney to take is to inform the client that serious negotiations cannot begin until the client obtains an appraisal. If the results of the appraisal commissioned are unfavorable to the client, the next move is the client's. The attorney should maintain that without an appraisal, the case cannot be taken to trial. Does the client want to incur the expense of another appraisal, and another, and another? Clients have a tendency to become more realistic about just compensation when they have to shell out money time after time just to be told that their expectations are unrealistic.

If the range of values developed by an appraiser is found to be acceptable and the client wishes to proceed, the appraiser can begin to develop a well-supported appraisal report that includes photographs, maps, and other graphics. The appraiser determines the actual content of the report in conjunction with the attorney and in light of applicable court rules, the rules of discovery, and the minimum requirements for an appraisal report set forth in professional standards and by any professional appraisal organization that the appraiser belongs to.

An appraiser should consider the legal date of the taking and the legal date of value. In many federal condemnations, the declaration of taking is the date of value,

but the date of taking actually precedes the preparation of the appraisal report. Appraisers should bear in mind that whatever is included in an appraisal report must be supported during the trial. There are no second chances in such a situation.

On the other hand, many jurisdictions require that the date of value be the date of the trial. Similarly, in "complaint-only" straight condemnations under the General Condemnation Act in which the federal government does not file a declaration of taking, the date of value is usually the date of the trial. (That is, no taking actually occurs until the trial itself.) In this case, an appraiser may be required to update the appraisal report just before the trial. However, the appraiser should be aware that any prior appraisal referenced in the updated appraisal report may become the subject of discovery by opposing counsel. Thus, the appraiser may be subjected to cross-examination regarding errors in an outdated report, even though the errors have been corrected in the updated report, and inconsistencies between various reports. By disclosing in the updated appraisal report that errors in the original appraisal were corrected, an appraiser is likely to avoid being cross-examined on the issue of the previous errors.

## The Attorney's Review of the Appraisal Report

An attorney should be given ample time to read the appraisal report carefully. An attorney should look for data, methods, or approaches that may be inadmissible, keeping in mind that the inadmissibility of a piece of data does not necessarily mean that the appraiser should not have considered or even relied on it. For instance, an offer to sell might be inadmissible in a certain court. Therefore, it would be improper for the appraiser to testify that he or she considered the fact that a property abutting the property under appraisal was listed at $5 per square foot. It would not be improper, however, for the appraiser to testify that he or she considered the present listing price of a property abutting the property being appraised. It is the actual asking price that would be inadmissible, not the fact that it was considered. In another jurisdiction, however, the relevant law might say that the piece of data is inadmissible and should not be considered.

In examining appraisal reports, attorneys should use a checklist to verify that the appraiser has included all pertinent data. The condemnor's published appraisal guidelines are useful for this purpose. For example, a suggested checklist designed for use in conjunction with appraisal reports prepared under the Uniform Appraisal Standards for Federal Land Acquisitions can be found in Appendix B.

If an appraiser has been retained by the condemnor, the attorney's review of the report is at least the second, and more likely the third or fourth, review of the appraisal report conducted. Neither the appraiser nor the attorney should assume that the report is error-free just because it has withstood a number of reviews.

In addition to reviewing the appraisal report, an attorney should look over any prior reviews of the appraisal report and any notes in the case file concerning past negotiations. A negotiator's report can be useful in anticipating the claims made by opposing parties and the direction that cross-examination of the attorney's expert may take.

After reviewing an appraisal report, an attorney should consider two alternatives. First, the attorney must decide if a second appraiser should be employed.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

The answer to this question generally depends on the number of appraisers retained by opposing counsel and, more important, the amount of money at stake. The condemnee's attorney should consider whether there are any provisions for the condemnor to pay the condemnee's expert witness fees in the jurisdiction where the case will be heard. Also to be considered are the local rules of the court. Some court rules limit the number of appraisal witnesses who may testify at a trial.

Attorneys should acknowledge that it is unlikely that two appraisers will approach a valuation problem the same way or arrive at exactly the same value. Therefore, using two or more appraisers will generally result in the presentation of two or more different approaches and conclusions to the trier of fact. If the trier of fact is a jury, the submission of two or more approaches and conclusions by the same party may adversely affect the outcome of the trial. "The outcome of the trial of a case involving the value of real estate depends upon the presence of well-qualified and thoroughly competent expert witnesses," according to Theodore Labrecque writing in *The Appraisal Journal*. "The trial pattern and the success or failure of the case is in direct ratio to the *quality*, not quantity of the witnesses testifying in the proceedings."[8]

The second alternative attorneys may want to consider is whether to employ an appraiser as a consultant. An appraiser who values the property will testify in court regarding his or her own value opinion. A consulting appraiser is retained strictly as a consultant, who never appraises the property and who never makes an appearance as an expert witness. That valuation professional is available to the attorney throughout the preparations for trial and, if necessary, during the trial itself.

Some condemnors and many large private law firms that specialize in real estate litigation have appraisal consultants on staff. Such a consultant may be called (a) an appraiser, (b) an appraisal reviewer, or (c) an appraisal consultant. Regardless of the label, though, the consultant's primary function is to help an attorney and an appraisal witness prepare for trial. The consulting appraiser reviews the appraisal report as he or she believes it will be reviewed by the opposing party's legal counsel.

So, the purpose of the consulting appraiser's review is twofold. While it is intended to ensure technical conformance with the relevant professional appraisal standards (and specific agency guidelines, if applicable), the primary purpose of the consulting appraiser's review is to assist the client's legal counsel in preparing for trial (and preparing the appraiser for trial). Because of the dual purpose of consulting appraiser's reviews, they are used only as a trial preparation tool by legal counsel and often are not shown to the appraiser who prepared the value opinion.

The purpose of a consulting appraiser's review is not to belittle or degrade appraisers. There are weaknesses in all appraisal reports and in the appraisal process itself. Every approach to value has its inherent weaknesses. Appraisers must recognize these weaknesses and be prepared to respond to questions and criticism on the witness stand.

Attorneys should consider retaining an appraisal consultant under four circumstances:

1. If the attorney has very little condemnation experience, the appraisal consultant can be of invaluable assistance.

2. An appraisal consultant may be useful in a complex case because the appraiser who is preparing for his own portion of the trial may not have enough time to assist the attorney in preparing other portions or elements of the trial.
3. If the case involves very technical appraisal methodology, even a seasoned condemnation lawyer may need assistance in preparing for and conducting the trial. An attorney may need clarification if the appraisal problem involves the use of statistics or the application of a newer, more technical aspect of the income capitalization approach to value.
4. A consulting appraiser can be very useful in jurisdictions in which "the rule" is typically invoked. ("The rule" is a court order that excludes witnesses who have yet to testify from the courtroom so they cannot hear the testimony of other witnesses.) In this situation, a consulting appraiser may be the only appraisal expert available to the attorney who is allowed to remain in the courtroom throughout the trial. ("The rule" is discussed further in the next chapter.)

Consulting appraisers can also assist by discussing technical appraisal matters directly with the appraiser. Attorneys have a tendency to talk in *legalese*, while appraisers may hear in *appraisalese*. Consulting appraisers can act as interpreters between the two professions. Consulting appraisers can also advise attorneys when they are overstepping their bounds by asking an appraiser to do something that may jeopardize professional objectivity or violate professional appraisal standards.

## Attorney-Appraiser Conference

Once an attorney (and a consulting appraiser, if one is used) has completed the appraisal review, the attorney should confer with the appraiser. Again, a "pretrial checklist" can be used for such a conference.[9] The first matter to be covered in this conference is any deficiencies in the appraisal report that may require corrective action. The strengths and weaknesses of an appraiser's approach to the valuation problem should be discussed in detail. The appraiser should acknowledge any inherent weaknesses in the approach to value used and discuss them with the attorney.

If an appraiser has relied heavily on the income capitalization approach to value and the market data used to justify the capitalization rate is weak, this fact should be pointed out to the attorney, and both individuals should decide how best to present the available capitalization data to the trier of fact. Probable cross-examination and redirect examination on this matter should also be discussed. The appraiser should inform the attorney of all market data that was considered, but eventually rejected, because this data may be addressed on cross-examination. The appraiser should be able to explain clearly why the data was rejected. If the appraiser is unable to do this, the trier of fact may get the impression, with the assistance of opposing legal counsel, that the appraiser has used only the data that supports a dictated or preconceived value opinion. "The appraisal report should contain only those comparable sales actually relied upon (not only considered) by the appraiser in arriving at the estimate of market value," according to *Nichols*. "All comparable sales data and verification sheets,

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

deeds, and site, locational and/or plat maps, including those used in the report, should be contained in a separate indexed data book or file together with all other information reviewed and considered by the appraiser."[10] Generally, appraisers should convey this secondary information to the attorney, although appraisal reports prepared under Standards Rule 2-2(a) of USPAP require only a summary of the data and analyses used in the appraisal report, in which case the data that was not used does not have to be included in either the report or the workfile.

Making rejected data available to an attorney has another advantage in that it makes the attorney aware of that data and why the properties were not considered comparable. This information can be invaluable to an attorney in cross-examination if opposing parties use that data in support of their value opinion.

During their initial conference, attorneys and appraisers should determine what exhibits will be required for trial and who will be responsible for their preparation. Typically, PowerPoint slides or other forms of trial exhibits are quickly and efficiently prepared by law firm staff or outside litigation consultants who do nothing but create exhibits for trial purposes. The testifying expert needs to approve all exhibits but does not typically need to prepare them. If an exhibit is directly connected with an appraiser's testimony, the appraiser should ensure that the material is consistent with the appraiser's analysis and conclusions. Appraisers can become confused, disoriented, and vulnerable to attack by opposing counsel if the exhibit presented does not conform to their report or testimony.

## The Discovery Process

Discovery is an integral part of the trial preparation process. Through this process, attorneys and appraisers learn the theory of the opposing party's case and the facts and opinions on which it is based. Eminent domain cases are a battle of experts. According to Rule 26 of the Federal Rule of Civil Procedure:

> In cases of this character, a prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation. The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgement on the stand. A California study of discovery and pretrial in condemnation cases notes that the only substitute for discovery of experts' valuation materials is "lengthy—and often fruitless—cross-examination during trial," and recommends pretrial exchange of such material.[11]

Rule 26 also provides the following:

(2) Disclosure of Expert Testimony.

(A) In General. . . . a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, 705 [relating to expert testimony].

(B) Witness Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming the opinions;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

(D) Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

(i) at least 90 days before the date set for the trial date or for the case to be ready for trial; or

(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.[12]

The rule also provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided."[13]

When preparing their appraisal reports, appraisers should keep in mind that, under this rule, opposing counsel will have at least 90 days to scrutinize their appraisal reports and prepare questions for cross-examination. Appraisers should not assume that misstatements of facts or omissions, however small, will go unnoticed.

Attorneys should inform appraisers when depositions are taken under a *subpoena duces tecum*, which means that appraisers must bring to the deposition all documents (and categories of documents) listed in the subpoena. After the subpoena is served, appraisers have the right to work with the retaining attorney to appeal that list, and requested items are often deleted as being beyond the scope of the discovery process.

Computations and notes that were not used to support the final value opinion should be removed from the appraiser's workfile. The necessary documentation is required by the Record Keeping Rule of USPAP to be in the report itself. In fact, a true copy of the report itself is the only item required to be in the workfile (unless the client requested anonymity, in which case the client's identity must also be in the workfile). All superfluous notes, memos, calculations, and e-mail messages should be discarded. Appraisers must be aware of, and able to explain, every scrap of paper in any file taken to the deposition.

In general, e-mail is discoverable, whereas voicemail is not. As a consequence, many appraisers prefer phone conversations with attorneys and vice versa. If legal counsel has submitted anything in writing to an appraiser that is marked "attorney's work product" or "confidential," this material should be

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

removed from the file—indeed this material would not be a required part of the workfile anyway. If the file contains any correspondence from legal counsel that is not marked confidential but may be considered to be the "attorney's work product," the appraiser should ask legal counsel whether it should be left in the file. If an appraiser being deposed is asked whether he or she has removed anything from the file or has any other papers concerning the case that were not brought to the deposition, the appraiser should answer in the affirmative and explain, if asked, that the papers were considered "attorney's work product." If opposing counsel wishes to challenge that classification, the attorney can ask the court for a ruling on the matter, at which point it is up to the attorneys to fight it out.

**interrogatory**
In a legal proceeding, a discovery device consisting of written questions about the case submitted by one party to the other party. The answers to the interrogatories are usually given under oath.

Initial discovery is generally accomplished through interrogatories.[14] A standard set of interrogatories taken from a law book may not be helpful because each condemnation case has its own peculiarities. Under no circumstances should an attorney send out a set of interrogatories without asking the client's appraiser, "Is there anything you need to know to make your job easier or to better prepare you for trial?" Although the answer to a seemingly trivial question suggested by the appraiser may mean nothing to the attorney, it may reveal to the appraiser the entire valuation approach that the opposing party's appraiser is going to use.

One crucial item of information is, of course, the list of sales that the opposing party's appraiser has used, and will probably testify to, in arriving at the value conclusion. The appraiser and the attorney work as a team, and the appraiser is often asked to document or confirm, verify, and analyze the sales submitted as comparable by the opposing party to the litigation. If the scope of work of the assignment allows it, the appraiser should furnish all pertinent data relating to these sales to the attorney, including the following information:

- Documentation or confirmation that the sale did, in fact, occur
- Verification of the sale to confirm statements of fact with principals to the transaction, if possible, or with the brokers, closing agents, or lenders involved, and notation of the date of verification[15]
- Date of sale
- Property address or legal description
- Seller and purchaser
- Property rights
- Price
- Financing terms
- Detailed property description
- Photo of property and date taken, and other sources, such as Google Earth, if applicable

- Determination of comparability
  If it is not comparable, why not?
  If it is, why wasn't it used in the appraiser's own analysis?

A consulting appraiser's notes or appraisal review are not generally subject to discovery, and the consultant's deposition cannot be taken. The consultant's review of the appraisal is prepared in anticipation of the trial and is generally considered privileged as attorney work product. According to the Federal Rules of Civil Procedure:

> Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only: . . .
>
> (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.[16]

In other words, the burden is squarely on the attorney seeking access to the notes of a consultant who will not be called to testify to make an argument that exceptional circumstances exist. "The attorney, not the appraiser, is responsible for determining what communications are protected under jurisdictional law and court rules," according to *Nichols*.[17]

## Demonstrative Evidence

When the term *demonstrative evidence* is used, many people think in terms of formal exhibits. However, demonstrative evidence is, "Physical evidence that one can see and inspect (i.e., an explanatory aid, such as a chart, map, and some computer simulations) and that, while of probative value and usually offered to clarify testimony, does not play a direct part in the incident in question," according to *Black's Law Dictionary*.[18]

Demonstrative evidence may take many forms, including

- whiteboards
- charts
- graphs
- diagrams
- renderings
- document enlargements
- color coding
- photographs
- PowerPoint slides
- video
- models
- actual objects
- computer analyses and representations

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

The identification and preparation of formal exhibits are essential to proper trial preparation. The complexity of the case and the amount of money involved will affect both the number and quality of the exhibits required. Attorneys and appraisers must determine the exhibits that will be required early on because preparing exhibits can be time-consuming, and a hastily prepared exhibit is much more likely to contain errors than one prepared well in advance. If a witness has to correct an erroneous exhibit during testimony, the correction will be obvious and, each time the trier of fact views the exhibit, the witness's error will be reinforced. It makes no difference to the trier of fact whether the exhibit was prepared by the witness or by someone else. The trier of fact will likely view it as the witness's error.

The Federal Rules of Civil Procedure make the early identification and preparation of exhibits even more critical. As noted earlier, under these rules an expert's report must be provided to opposing counsel at least 90 days before trial, and this report must include any exhibits that will be used to summarize or support the opinions of the expert. Attorneys and appraisers must reach an agreement as to what exhibits will be used at trial so these exhibits can be included in the appraisal report.

The appraisal report and any addenda to the report are excellent sources of possible exhibits. Cost approach computations and data supporting depreciation estimates, income capitalization approach data and computations, and market data charts should always be viewed as potential exhibits. Photographs of the property being appraised, comparable land that has sold, and comparable properties that have been rented or sold should almost always be considered as exhibits. Each photograph should be clearly identified with the appraiser's name, the date the photo was taken, and the property depicted (e.g., "Comparable Rental 5"). Maps of comparable properties sometimes make good illustrations, as do detailed before and after plot plans, sketches, and aerial maps and images of the property being appraised and the neighborhood.

Information uncovered in the discovery process will often suggest exhibits that may be helpful in the presentation of rebuttal evidence. For example, the condemnor in one case learned through interrogatories that the condemnee's expert would testify that the dwelling being condemned was in a neighborhood where property values had, in recent years, been adversely affected by the pending government project. The condemnee's appraiser then used "comparable sales" from an entirely different neighborhood in the city. In light of this knowledge, the condemnor's attorney and appraiser concluded that a detailed presentation of historical sales data from the subject neighborhood and from other neighborhoods in the city was essential.

## Calculations and Verification

All computations, spreadsheet formulas, and inputs used in an appraisal report that might be entered into evidence should be checked, double-checked, and triple-checked. When an attorney asks, "Would you show us just how you calculated that in your spreadsheet using your laptop computer?" most appraisers tend to become uneasy, no matter how many times they have rechecked their mathemat-

ics. While this apprehension can never be eliminated, appraisers should take all steps to minimize the panic that arises when asked to demonstrate a calculation on the witness stand.

All computations in an appraisal report should be checked at least three times before the trial by three different people. If an appraiser is asked to demonstrate a computation made in the appraisal and an error was made, the appraiser will invariably copy the erroneous figures from the notes. Since the advent of calculators and computers, many people have difficulty doing mathematics in their heads. With twelve jurors and a judge waiting for an appraiser to complete the calculations, and an attorney ready to pounce on the smallest of errors, a difficult task becomes even more difficult.

## Mock Examination

When all information has been gathered and all exhibits are prepared, attorneys and appraisers might stage a mock examination. There is no law against rehearsing an appraiser's direct examination and cross-examination. It is, in fact, a useful step in the trial preparation process. Attorneys should ask appraisers every question they expect to ask on the witness stand, and appraisers should answer the questions as if they were in court. This rehearsal should be repeated until the attorney is satisfied. Then the attorney, or preferably an associate attorney, should take the position of opposing counsel and cross-examine the appraiser. This rehearsal will uncover any weak points in an appraiser's presentation and give the appraiser and attorney time to strengthen the testimony.

"By rehearsing with the expert, counsel can determine the expert's reaction under the stress of trial," according to *Nichols*. "In addition, counsel can suggest ways that the expert might refine the testimony."[19] Appraisers and attorneys must remember, however, that refinement is one thing while corruption is another. If an appraiser's answer to a question cannot be ethically and objectively refined by the appraiser to the satisfaction of the attorney, there is a very simple solution: The attorney should not ask the question.

After a few rehearsals between the appraiser and the attorney, the process can be abbreviated. In fact, the entire process of preparing for trial will be expedited if all members of the team are aware of what is expected of them individually and they all have enough confidence in each other to know that they will perform as required.

### Notes

1. *Nichols' The Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co., 2014), vol. 7A, §13.03.
2. 49 C.F.R. 24.103(d).
3. *Nichols'*, vol. 7, §4.06[4][d] (2017).
4. *B. F. Coulter Co. et al.*, Superior Court, Los Angeles, Case No. 574469.
5. George C. Handley, "Presentation of the Case," *Condemnation Appraisal Practice* (Chicago: American Institute of Real Estate Appraisers, 1961), 492-512.
6. *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 120.
7. *Uniform Standards of Professional Appraisal Practice*, 2018-2019 ed. (Washington, D.C.: The Appraisal Foundation, 2018), Standards Rule 1-5, p. 18

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018


8. Theodore J. Labrecque, "The Court and the Expert Witness," *The Appraisal Journal* (January 1961): 87-93.
9. William H. Crouch, "Pretrial Conference Checklist of Factors Affecting Valuation," *The Appraisal Journal* (October 1964): 523-530.
10. *Nichols'*, vol. 7A, §13.04 (2014).
11. Federal Rule of Civil Procedure 26 (Notes of Advisory Committee on Rules 1970 amendment).
12. Federal Rule of Civil Procedure 26, pp. 29-30.
13. Federal Rule of Civil Procedure 26, p. 34.
14. For a definition, see *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), s.v. "interrogatory."
15. *The Appraisal of Real Estate*, 14th ed., 385.
16. Federal Rules of Civil Procedure, p. 40.
17. *Nichols'*, vol. 7, §G4.05[9][d] (2018).
18. *Black's Law Dictionary*, 10th ed. (St. Paul, MN: Thomson Reuters, 2014), s.v. "demonstrative evidence."
19. *Nichols'*, vol. 7, §8.04[4] (2017).

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

19

# The Expert Witness

Appraisers serving as expert witnesses—and any professionals serving as expert witnesses, for that matter—are not always regarded favorably by the courts. Some members of the legal profession have also been critical of individual real estate appraisers and the appraisal profession.

*Black's Law Dictionary* defines the term *burden of proof* as follows: "A party's duty to prove a disputed assertion or charge; a proposition regarding which of two contending litigants loses when there is no evidence on a question or when the answer is simply too difficult to find."[1] In the United States, the courts have employed three possible rules with respect to the burden of proof in condemnation cases:

(1) The taking agency has the burden of proving just compensation. It is the moving party and seeks to change the status quo. The condemnor therefore must prove all parts of its case. (Followed in Georgia, Mississippi, and Washington. Illinois and Kentucky also may be placed in this group for want of a further subdivision to fit their somewhat unusual procedural practices.)

(2) Neither party has the burden of proof. The measurement of just compensation involves a question of fact to be determined *in rem* and without adversary pleadings. This rule is based on the theory that the parties are not adversaries, therefore neither should have a greater burden of proof than the other. (Ohio)

(3) When the taking agency is a governmental subdivision, it is presumed to have made a fair offer, and accordingly, the landowner has the burden of proof that just compensation requires a sum greater than the amount conceded by the govern-

**expert**

Someone who, through education or experience, has developed skill or knowledge in a particular subject, so that he or she may form an opinion that will assist the fact-finder. Fed R. Evid. 702.

**expert witness**

A witness qualified by knowledge, skill, experience, training, or education to provide a scientific, technical, or other specialized opinion about the evidence or a fact issue. Fed R. Evid. 702-706.

Source: *Black's Law Dictionary*, 10th ed.

ment. (So-called majority rule, followed in at least 24 states [and in federal courts].)[2] [Citations omitted]

The party that has the burden of proof is generally given the right to open and close the trial proceedings—i.e., makes its opening remarks first and has the last closing argument. The party with the burden of proof usually will present its case-in-chief first. (The *case-in-chief* is "the part of a trial in which a party presents evidence to support the claim or defense," according to *Black's*.) An ap-

**The View**

The trier of fact is often given the opportunity to view the property in question. Some jurisdictions do not provide for a view of the premises by statute, so the court may decide whether or not to view the property.* On occasion, a view is denied because the property in question has been altered so much between the date of value and the date of trial that such a view might mislead the trier of fact. A view could also be denied if the property in question is far away from the location of the trial and a view of the property would therefore be overly time-consuming. However, historical aerial views of specific properties are often publicly accessible online and can be relied upon to minimize concerns about the characteristics of a property and its surroundings at the time of the taking.

Depending on the circumstances, a view can be advantageous or disadvantageous to the parties. In one instance, the owner's claim that the land in question had a highest and best use as a manufactured home community was somewhat defused when the federal marshal who accompanied the jurors to the property refused to allow them to exit the bus, explaining that he was fearful that someone would be bitten by a rattlesnake. In another instance, a judge accompanied the jury to view a recreational island being acquired by the government. While traveling to the property by pleasure boat on an unusually beautiful spring day, the judge was overheard telling the government's legal counsel, "It looks like a million-dollar day to me."

Those permitted to accompany the trier of fact to view a condemned property will vary with the jurisdiction and the circumstances. The judge will often, but not always, accompany a jury. A bailiff, or federal marshal, will always accompany a jury, and legal counsel for both parties will nearly always go too. On occasion, an engineer or other factual witness familiar with the property and the government project will accompany the jury on the view. If a juror has a question while on the view, it may be presented to the judge who, in turn, may ask the engineer to answer it. Otherwise, those accompanying a jury on a view are not allowed to speak to the jurors. Appraisers seldom participate in a view of the property, nor do owners, except when the property involved is the owner's personal residence. In this case, the owner is generally allowed to be present at the residence during the view.

A view of the property in question by the trier of fact can be considered in two ways. Some jurisdictions allow the trier of fact to consider what he or she has seen on the view as evidence. Other jurisdictions instruct the trier of fact that this information is not evidence but only background to facilitate a better understanding of the testimony. Realistically, however, the trier of fact is going to consider what it saw on the view, regardless of the court's instructions. In any case, if the jury has viewed the property in question, presentation of the case is easier for both parties to the suit.

* *Justice v. United States*, 145 F.2d 110 (9th Cir. 1944).

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

praiser called by the party with the burden of proof can generally expect to spend more time on the witness stand than other appraisers because the first appraisal witness usually must educate the trier of fact as to the property involved, the appraisal process, appraisal terminology, and other technical matters. Many times, however, some engineering or other expert testimony has already been presented or the trier of fact may have viewed the property before the first appraiser testifies. These preliminaries will may assist the appraiser in describing the property or the public improvement project that necessitates the taking.

## Appraiser's Attendance in Court

The appraiser's attendance in court is important, whether the appraiser is on the witness stand or simply an observer in the courtroom, as is the presence of the consulting appraiser, if one has been retained by legal counsel. The appraiser or the consulting appraiser should take notes on the testimony of other witnesses, so the appraiser or consulting appraiser can discuss this testimony with legal counsel. (Be forewarned that those notes may be discoverable when the appraiser takes the stand.) The expert in question can be especially helpful to the attorney by explaining the technical elements of the other appraiser's testimony.

An attorney who dismisses an appraiser because the attorney feels he or she does not need any assistance may find out otherwise. If the appraiser—charging by the hour to appear as an expert witness—is dismissed to save money, this is probably a false economy. If two or three extra days of appraisal fees are that critical, the case probably never should have gone to trial in the first place. "Before undertaking a cross-examination you should consult your own experts," says Sidney Z. Searles, addressing attorneys. "I have found such consultation of considerable assistance, and I would recommend that your expert be present in court to listen, not only to the direct examination of the expert of the adverse party, but the cross-examination as well."[3]

## Preparing to Testify

An appraiser who takes the witness stand may want to take along any notes or materials that may be needed under direct examination and cross-examination. However, opposing counsel has the absolute right to inspect any paper referred to by appraisers on the witness stand. Appraisers should think before taking any document to the witness stand that could embarrass themselves or be detrimental to the client's case.

"The witness must be able to respond to questions in a timely, professional manner, and should not be constantly searching or fumbling through large stacks of paper or documents for answers," according to *Nichols*.[4] In preparing notes for the witness stand, appraisers must be very thorough and organized. Cross-examining attorneys will often ask trivial questions, in the hope that appraisers will have to fumble through their papers for the answers. A few seconds of silence in the courtroom, while a witness looks through papers for an answer, can seem like hours. Responding in a timely manner to any such questions will ensure that this line of questioning is short-lived.

The trier of fact in an eminent domain trial can be the court (i.e., the judge), a commission, or a jury. The nature and extent of an appraiser's testimony

will depend to a certain degree on the forum in which it will be heard. If a trial will be heard only by the court, and the judge has considerable experience in hearing (or trying) condemnation cases, a detailed explanation of the appraisal process will not be required. Similarly, an experienced commission will not need a short course in appraisal. If the property is one of several being condemned for a large government project, it is quite possible that the commission will have heard a number of cases relating to similar properties in the same area. Thus, the

### The Rule

An appraisal witness may be excluded from the courtroom if "the rule" is imposed. A trial judge may, under certain circumstances, sequester witnesses and require that they be kept apart from other witnesses until they are called to testify. From the time an appraisal witness is placed under the rule of exclusion, "until the trial is over, no fact or detail of the case should be discussed with anyone," according to an *Appraisal Journal* article. The authors add the following:

> Otherwise, testimony may be disqualified. In jurisdictions that base their evidence and procedure rules on the federal model, and in all federal courts, the requirement that no witness discuss the case with jurors, other witnesses, or the opposing party is so strong it is known among attorneys merely as "The Rule"; it is the only rule, of several hundred rules of evidence and procedure, that is so referenced. If the court places a witness "under the Rule," the witness will be required to wait outside the courtroom to testify, and will not be permitted to hear the testimony of other witnesses. What a layperson might consider casual conversation in the hall with jurors, other witnesses, or the judge can result in extremely serious consequences. The expert may not be allowed to testify, previous testimony may be disregarded, or a mistrial may be called; in extreme cases contempt of court might be cited.*

"At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion," according to the Federal Rule of Evidence 615.† "The efficacy of excluding or sequestering witnesses has long been recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion," according to the Notes of Advisory Committee on 1972 Proposed Rules.‡

The practice of imposing the rule in condemnation cases appears to be regional in nature. In some parts of the country, invocation of the rule is standard operating procedure, while in others it is all but unheard of. Both attorneys and appraisers must know the custom in regard to imposition of the rule in the jurisdiction where their case will be heard.

As discussed in Chapter 18, some attorneys retain the services of a valuation professional as a consulting expert. Some condemnors assign a staff appraiser to assist legal counsel. This appraiser should be aware of the contents of the condemnor's appraisal report and be familiar with all the circumstances surrounding the case. With a staff appraiser or consulting appraiser to assist, the appraisal witness can be released without disbanding the appraiser-attorney team. Of course, the condemnor and legal counsel must agree on the concept of using a staff or consulting appraiser. The ultimate decision as to whether a consultant should be used and, if so, who will be retained, must be left to trial counsel.

* John S. Bean, Theresa H. Waller, and Neil G. Walker, "Real Estate Professionals as Expert Witnesses," *The Appraisal Journal* (January 1988): 87.

† Federal Rule of Evidence 615.

‡ Federal Rule of Evidence 615, Notes of Advisory Committee on 1972 Proposed Rules.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

market area description can be abbreviated, and local land use regulations and the comparable sales may already be known to the commission.

The attorney will know whether a trial will be heard by the court, a commission, or a jury. The attorney will (or should) structure his or her case and the appraiser's testimony accordingly. The attorney will also know, or should find out, the background and experience of the court or the members of the commission. With this information, a determination can be made as to the amount of basic appraisal methodology and terminology that will have to be presented.

The following discussion assumes that the condemnation trial will be heard by a jury. In that instance, more elementary and detailed appraisal testimony is required. It is also under these circumstances that some attorneys feel they must put on a show for the jury, becoming belligerent or attempting to trap witnesses with trick questions. Actions like this are typically not appreciated, and sometimes not tolerated, by experienced judges and commissions.

## Direct Examination

An appraiser's direct examination can be logically broken down into specific steps, probably presented in this order:

1. Qualification as an expert
2. Description of the valuation process
3. Appraiser's description of the scope of work undertaken in appraising the property that is the subject of the trial
4. Description of the subject property
5. Market analysis
6. Highest and best use analysis
7. Application of the approaches to value (e.g., cost, sales comparison, income capitalization)
8. Final reconciliation of value

If the trial concerns the partial taking of a property, Steps 4 through 8 will be presented as they apply to the property in the before situation and then be repeated for the property in the after situation, or appropriate analyses will be presented to value the part taken as part of the whole and to value damages and benefits, if any.

As noted in the previous chapter, the attorney and the appraiser may want to rehearse the appraiser's testimony in preparation for trial. Some practitioners suggest that the attorney write out all the questions that the appraiser will be asked on direct examination. Others believe that only an outline should be prepared.

In responding to questions, appraisers must speak loudly enough to be heard by the trier of fact, the attorneys, and the court reporter. Appraisers should address the jury, not the questioner. If the attorney did not already know the answer to the question, it would not have been asked. Appraisers must not talk down to the jury or answer questions in a monotone. They should behave as naturally as possible on the witness stand and not try to project a false image. Cross-examining attorneys will often stand on the opposite side of the room

from the jury when asking their questions to make it awkward for the witness to address the jury. In such a situation, appraisers should face the jury, tum their heads to face the cross-examiner only while a question is being asked, and turn back to address their responses to the jury. If, on direct examination, counsel moves to a spot behind or beside the jury to ask questions, this is probably a subtle reminder to the witness to face the jury when responding to questions.

## Qualifying as an Expert

"The first object of the direct examination of the expert is to establish qualifications," according to *Nichols*. "Because it is best to try and impress the jury with the qualifications and experience of the appraiser, counsel should not accept a stipulation to the appraiser's qualifications [unless, of course, opposing counsel is willing to stipulate that the appraiser is the best qualified and the most experienced appraiser that will appear as a witness in the trial]. Establishing the appraiser's qualifications may be an awkward phase of the trial, however, because it may appear immodest for the expert to recite qualifications."[5]

The specific methodology for eliciting this sort of testimony should be determined well before the trial. Qualification testimony is usually best presented by an appraiser responding to an attorney's leading questions.[6] For instance, the question, "Who have you provided appraisals for?" puts an appraiser in an awkward position. The appraiser can reply, "Government agencies, lending institutions, industrial clients, and a number of individuals," or the appraiser may recite specific clients. Listing individual clients, however, can be quite time-consuming and may make appraisers look like braggarts in the eyes of a jury.

To present an appraiser's credentials to the jury most effectively, the question should be broken down into several segments. The exchange might proceed as follows:

*Attorney:* Have you ever provided any appraisals for the federal government?

*Appraiser:* Yes.

*Attorney:* And could you tell the jury which agencies of the federal government you have provided appraisals for?

*Appraiser:* The United States Army Corps of Engineers and the U.S. Fish and Wildlife Service.

The attorney can continue asking questions in the same form to present the appraiser's experience working for state governmental agencies, local governmental agencies, industrial clients, commercial clients, and others. If the appraiser has performed appraisals for the condemnor, this should always be mentioned when testifying for the condemnee. Similarly, in testifying for a condemnor, appraisers should note any appraisals they have performed for condemnees where the opposing party was this same condemnor. Appraisers should also reveal if they have performed any appraisals for the county or city in which most of the jurors reside. The specific clientele cited will depend on the type of property being appraised, the location of the property, the location of the trial, the makeup of the jury, and other factors.

Testimony on an appraiser's qualifications will generally cover historical employment experience, current employment, general educational background,

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

specialized training in appraising, any teaching experience, professional affiliations and designations and any offices held, articles or papers published, typical clientele, types of property appraised, expert testimony and experience, and the geographical area of experience.

"Nowhere is the phrase 'battle of the experts' more apropos than in a condemnation trial," according to *Nichols*.[7] All else being equal, the trier of fact will rely on the expert who is best qualified and most experienced. For that reason, it is important that the appraiser's qualifications are adequately presented before the trier of fact. Even if opposing counsel is willing to stipulate that the appraiser is an expert and therefore qualified to express an opinion, the court is required to allow counsel to present the expert's qualifications to the jury.[8] As the First Circuit Court put it:

> It was error not to permit appellants' expert to state his qualifications. The fact that the commonwealth "accepted" his qualifications went only to whether the court should permit him to testify. It did not meet the further question of what weight the jury might wish to give his opinion, which might well be governed by its appraisal of his background and experience.[9]

## Description of the Valuation Process

After an appraiser's qualifications are established, the appraiser will describe the appraisal process. An exhibit like the chart shown in the preceding chapter (Figure 18.1) can assist in presenting this testimony. Emphasis should be placed on those parts of the process that were most significant in the appraisal of the property being acquired. In other words, the appraiser can skim over the cost and income capitalization approaches if a non-income-producing tract of land with no improvements is being appraised. In this instance, the description of the appraisal process will focus on the sales comparison approach. In the overview of the appraisal process, only a brief description of the approaches to value is needed. A detailed description of the applicable approaches is best left until the appraiser begins to testify on how each approach was applied to the property being appraised.

The description of the valuation process provides an opportunity for the expert witness to define some appraisal terms that will be used throughout the trial. These terms might include *market value*, *highest and best use*, *the subject property*, *capitalization rate*, and *comparables*. The appraiser and the attorney should decide which terms will be used and at what points in the description of the valuation process the attorney will interrupt the appraiser to ask for the definition of a term. The attorney may say, "A moment ago you mentioned the term *highest and best use*. Could you explain to us what appraisers mean when they use this term?" In this way, the terminology is explained to the jury without the appraiser lecturing or talking down to them. Also, by using the term "us" in the question, the attorney lets the jury know that they are not expected to be familiar with the term. This helps to establish rapport between the attorney and the jury. The attorney should only interrupt the appraiser's description of the appraisal process at a natural breaking point to avoid destroying the continuity of the description.

## Description of the Scope of Work

An appraiser explains the scope of work of an appraisal assignment to show the jury that the appraiser has made a thorough investigation and that an appraisal

consists of more than looking at a property and reporting its value. An effective explanation of the work undertaken in a particular assignment mirrors the narrative description of the "scope of work" in the appraisal report. The description should follow the valuation process step by step. It is often helpful to refer back to the valuation process at certain points in testimony to reinforce the appraiser's application of a systematic analysis of the relevant market data.

## Property Description

In describing the subject property to the jury, an appraiser should attempt to set the audience up to accept the final conclusion, just as the appraiser would describe the property in a written appraisal report. For example, if the improved property suffers from functional obsolescence, this fact should be stated in describing the property, so the jury is not surprised when the appraiser makes a deduction for functional obsolescence in the approaches to value. The cross-examiner may well attempt to demonstrate to the jury that there is some physical feature about the property that the appraiser does not know. All features should be noted even if they have no bearing on the market value of the property.

Here again attorneys can help appraisers present a full description of the property to a jury by asking specific questions such as

- Would you describe the land?
- Would you describe the dwelling?
- Would you describe the on-site improvements?
- Are there any other improvements on the land?

These questions usually lead to a more detailed property description than a question such as "Would you describe the property?" Then the attorney can ask about a specific feature of the property if it is important to the case and has not been mentioned. Again, the first appraiser to testify will generally be expected to give the most detailed description of the property.

Of course, photographs are helpful in describing a property, and their use can shorten the appraiser's testimony. In describing the property, appraisers should consider whether the jury has viewed the property. If so, obvious property features can be noted without details. In describing specific property elements, appraisers may preface their remarks by saying, "As I am sure the jurors saw when they viewed the property."

## Highest and Best Use

The extent of the appraiser's testimony regarding highest and best use will depend on whether the parties agree or disagree. If the highest and best use of the subject property is its existing use and the opposing party agrees with that position, little evidence on this topic is needed. Testimony can generally be limited to the definition of highest and best use and a statement that the subject property's existing use conforms to its highest and best use, if that is the case. In defining highest and best use, appraisers should always emphasize that the use must be physically possible, legally permissible, financially feasible, and result in maximum profitability.

If the highest and best use of the property is different from its current use, greater explanation is required, even if there is no dispute between the parties

Copyrighted material licensed to Randall Bell, PhD on November 29, 2018

concerning the property's highest and best use. Appraisers must explain the steps taken in arriving at the opinion of highest and best use and the data and analysis on which it was based. If any existing improvements are not compatible with the property's highest and best use and will add little or nothing to the value of the property as a whole, a careful explanation of the *consistent use* theory, with clear examples, will be needed. The trier of fact must not be surprised when an appraiser later testifies that the improvements have no value.

A difference of opinion regarding highest and best use is generally recognized as the leading cause of divergence in market value opinions in eminent domain cases. Appraisers and attorneys must recognize this fact and be prepared to convince the jury that the appraiser's conclusion of highest and best use is correct. If the parties disagree about the highest and best use of the property, the case is no longer about whose comparable sales are better or whose adjustments are more appropriate. Instead, it boils down to the single question of highest and best use, and the party that presents the most convincing evidence in this regard will likely win the case. For that reason, this portion of an appraiser's testimony may well be the most important part to be presented. Therefore, it must be planned with precision and presented with utmost clarity. If circumstances warrant, it may be advisable to have subsidiary witnesses, such as marketing experts, contractors, or developers, available to support an appraiser's analysis and conclusion.

## Cost Approach

If the property is improved and the cost approach was not used in valuing the property, the jury should be told why. If the cost approach was applied, the appraiser should explain in detail how an indication of value is developed by this approach. The appraiser should keep in mind that the jury was briefly exposed to the cost approach during the description of the appraisal process. It is important to emphasize that the value indication developed in the application of the cost approach is an indication of *market value* when the cost approach is applicable, and the inputs are market-derived. The advantages and disadvantages of the various methods of estimating cost and depreciation in the cost approach and the likelihood of these methods being understood by the trier of fact were discussed in Chapter 8.

The oral testimony about the application of the cost approach and land valuation should be augmented with photographs of the comparable sites and a chart of comparable land sales. (See Chapter 10.) Because the cost approach is rather mechanical, it lends itself to graphical illustration. Each step in the cost approach should be presented to the jury in chart form as well as in testimony.

## Income Capitalization Approach

The mechanics of the income capitalization approach can be very difficult for a jury to understand, particularly discounted cash flow analysis. If the income capitalization approach is integral to the appraiser's value opinion, it is worthwhile to present the intricacies of the approach in detail. Appraisers should first describe the basic steps in the income capitalization approach and then go back and carefully explain and illustrate the capitalization process and the deriva-

tion of a capitalization rate or a discount rate. (The presentation of this data is covered in Chapter 9.) The methodology used by the appraiser to select an appropriate rate will have a major bearing on the extent of explanation needed to make the jury understand. If the rate was developed by direct comparison, the explanation can be rather simple. If the mortgage-equity method of rate selection was used, however, extensive explanation may be required.

When a complex method of rate selection must be explained, some appraiser-attorney teams prefer to have appraisers testify on rate development in a rather general manner on direct examination. For instance, an appraiser might explain that he used the band-of-investment method of rate selection, which necessitates the consideration of available financing and the equity rates required by investors. If opposing counsel wants to delve further into the development of the discount or capitalization rate, the appraiser should be prepared to explain the process under cross-examination.

Attorneys and appraisers must be absolutely certain that the jury understands the concept and mathematics of the income capitalization approach before they attempt to present the approach as it relates to the property being condemned. The development of the property's market rent and annual net operating income should be presented to the jury both verbally and in chart form. Mathematical computations should be presented in a chart, or appraisers can actually work the calculations while testifying. If an appraiser states, "Based on the subject property's net operating income and the capitalization rate, the value of the property is $1.5 million," the jury will wonder where the $1.5 million came from. The best way for an appraiser to present a final indication of value by the income capitalization approach is to write the computations while explaining them. The appraiser might write the computations on a board while saying something like the following:

> Now that the net operating income from the property has been estimated and an appropriate capitalization rate has been selected, a simple mathematical calculation is used to develop the indicated market value of the property. The basic *IRV* formula, which I explained earlier, is used. The income is known and the rate is known. Thus, the unknown factor is value. The formula is Income ÷ Rate = Value. The net operating income previously developed was $120,000 and the appropriate capitalization rate is 8%. Dividing the $120,000 income by the 8%, or 0.08, capitalization rate results in a value indication of $1,500,000.

Explaining such a simple calculation in detail may seem unnecessary, but bear in mind that the mere concept of valuing property by the income capitalization approach is likely to be completely foreign to the jury. While appraisers and attorneys are constantly exposed to the concepts and mechanics of the income capitalization approach, the members of a jury are not. Furthermore, appraisers and attorneys have spent hours preparing for trial (or they should have). They have analyzed the concepts and mathematics of the income capitalization approach in relation to the specific property in question, but the jury has not had this opportunity.

It is extremely discouraging to watch an appraiser spend several hours on the witness stand carefully explaining the concept and mathematics of the income capitalization approach, developing in minute detail the estimate of

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

market rent, and convincingly explaining the derivation of the capitalization rate to the jurors only to ruin the presentation at the last minute by neglecting to show the final computation. Once again, it is extremely important to stress that the value indication developed by the income capitalization approach is an indication of *market value*.

## Sales Comparison Approach

The sales comparison approach to value is most often relied on by the trier of fact. Therefore, it is important that this approach to value be presented in a detailed, believable, and accurate manner. Photographs of comparable sales are almost always essential. These photographs should be admitted into evidence so that the jury can look at them while the appraiser is describing each comparable sale. This procedure is very effective. The photographs will also be available to the jury during their deliberations, so the appraiser should note the specifics of the sale on the back of each photograph. This information might include the sale number, the date of the sale, the location of the property, the date of the photograph, and the appraiser's name.

Graphics for presenting comparable sales data and analysis to the trier of fact were discussed in Chapter 10. It is generally advisable to have these graphics prepared before the trial by professionals to ensure that they can be easily read by the trier of fact. Both appraisers and attorneys must remember that the sale price of a property may not be admissible until the property's comparability has been established. Establishing the comparability of sales may be handled in two ways.

First, the comparable sales chart may be prepared without the sale prices and indicated value of the property being appraised. As the appraiser testifies to the comparability of each sale property and explains the analysis, the appraiser can testify to the price of each comparable property and then write the price on the sales chart. As the comparative analysis is further developed, the appraiser can fill in the prices of all the comparable sales and, ultimately, write the value of the subject property as indicated by the comparable sales analysis.

A second, and perhaps cleaner, method of admitting into evidence the comparable sales chart, which includes the price of each comparable property and the value of the property being appraised as indicated by the analysis of the sales, is for the appraiser first to give an adequate amount of testimony on each sale property to establish its comparability to the satisfaction of the court. This testimony will generally include the date of the sale, the location of the sale property, and a general description of its physical characteristics. Once the attorney feels that the appraiser has provided enough information for the court to rule on the admissibility of the sale price of the comparable property, the attorney should ask the appraiser the sale price of the property and move on to the next comparable sale. If opposing counsel objects to the admissibility of the sale price of a property on the grounds that comparability has not been established and the court sustains this objection, the attorney must then elicit more information on the sale property and its comparability from the appraiser until the court is satisfied that the sale is comparable and allows testimony as to the price of the property to be admitted.

After an appraiser has testified to all the sales on the comparable sales chart in the manner indicated, the attorney can have the sales chart identified by the

court. The appraiser can then refer to the chart in giving detailed testimony as to the similarities and dissimilarities of each sale property. Thus, the jury is led through the comparative analysis and adjustment process applied by the appraiser to each comparable sale. Once the appraiser has testified to all the sales on the chart in the manner described, the attorney may confidently move for the comparable sales chart to be admitted into evidence. After the chart is admitted, the jurors will have the opportunity to study the chart during their deliberations. If the chart is not admitted into evidence, the jury would have to try to remember its contents.

This second method of securing the admission of a comparable sales chart has an added advantage in that it reduces the possibility that opposing counsel will raise numerous objections as to comparability during a critical part of the appraiser's testimony. With this procedure, the court will have ruled that each sale property has sufficient similarity to be admitted as a comparable before the appraiser even begins testifying to the details of the comparable analysis. If numerous objections are made during the appraiser's presentation of the comparable analysis, the continuity and effectiveness of the testimony can be destroyed. Such interruptions can also confuse the trier of fact or, worse yet, the appraiser.

Extreme care must be exercised in selecting the comparable sales relied on by the appraiser and shown on the comparable sales chart. If, on cross-examination, opposing counsel is able to establish that one of the sales used by the appraiser is not a valid comparable, as a matter of law, the cross-examiner will relish striking the sale from the chart with a bold marker. Later, when the jurors are contemplating the chart during their deliberations, it is debatable whether they will be thinking about the detailed, professional analysis the appraiser has made or about the fact that the court has ruled that some of the data the appraiser has relied on in reaching the value conclusion is invalid or improper.

## Final Reconciliation of Value Opinion

In final reconciliation, appraisers have the opportunity to review with the trier of fact the indicated market value of the property as developed by the various approaches to value. To begin this portion of the trial, an appraiser should testify to the final opinion of market value. This allows a chart similar to Table 19.1 to be placed before the jury or other trier of fact early in this portion of the appraiser's testimony. This chart will help the appraiser review and summarize his testimony and, at the same time, provide the trier of fact with visual exposure to the appraiser's conclusion. When the direct examination is over, opposing counsel will usually remove from view all charts and diagrams presented as part of the appraiser's direct testimony. Because the attorney does not want the trier of fact exposed to the appraiser's conclusions any longer than necessary, the attorney will usually remove any visual evidence under the pretext that the exhibit space will soon be needed for other purposes.

Once a chart such as Table 19.1 has been placed before the trier of fact, the appraiser should briefly review how each indication of market value was developed. Note that Table 19.1 refers to *indicated market value*, not *indicated value* or simply *value*. The fact that all three approaches to value result in an indication of *market value* should be continually emphasized. The appraiser should describe

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

in detail the reasoning that was applied to arrive at the final opinion of value and how the results of each approach to value were weighed in that opinion.

The reliability of each approach to value and its applicability in solving the particular appraisal problem should be explained. If one approach to value was emphasized, the reasons for this should be given. The appraiser's testimony should highlight the strengths of the approach that was given primary weight in the final conclusion. It is also important to explain the weaknesses of the other approaches under the particular circumstances of the case. The testimony of other appraisers, whether it is presented earlier or anticipated in the future, will have a bearing on the appraiser's presentation. If all the appraisers agree that a particular approach to value is the most reliable in the instant case, detailed testimony on the weaknesses of the other approaches to value is not needed. Instead, the importance of properly analyzing the integral elements of the most applicable approach to value should be emphasized.

### After Value

In cases involving a partial taking, appraisers repeat Steps 4 through 9 of the direct examination (i.e., property description, highest and best use, application of the cost, income, and sales comparison approaches, and final reconciliation), but this time in the after situation. The procedure followed to value the property in the before situation should be repeated with equal clarity and detail in the after situation. It is useless to convince the trier of fact of the accuracy of the before value if the trier does not accept the after value opinion. Awards in partial taking cases are not based on before value alone.

If jurisdictional rules require that the state rule (or the taking plus damages rule) be applied, the after value testimony must be framed to comply with the applicable rules. If benefits are not present in the after situation, little alteration will generally be required and the results will, or at least usually should, be identical to the results produced using the federal rule (or the before and after rule).

Under the federal rule, the indicated market value of the property in the after situation should be presented to the trier of fact in the manner shown in Table 19.1. The remainder value after the taking should be presented in the same way under the state rule. However, the final mathematical calculation under the federal rule might be presented as shown in Table 19.2, while the mathematical computations under the state rule, assuming no benefits, might be presented as shown in Table 19.3. If special benefits are present, the appraiser's conclusions under the state rule would be presented as shown in Table 19.4, assuming special benefits are to be offset against damages.

**Table 19.1 Reconciliation of Appraiser's Opinion of Market Value**

| Approach to Market Value | Indicated Market Value |
|---|---|
| Cost approach | $1,650,000 |
| Income capitalization approach | $1,500,000 |
| Sales comparison approach | $1,600,000 |
| Final opinion of market value | $1,600,000 |

**Table 19.2 Appraiser's Final Conclusions under Federal Rule**

| | |
|---|---|
| Before value | $1,600,000 |
| After value | – 1,350,000 |
| Difference | $250,000 |

## Cross-Examination

In an eminent domain case that goes to trial, how do attorneys and testifying experts prepare

**Table 19.3 Appraiser's Final Conclusions under State Rule**

| | | |
|---|---|---|
| Value before taking | $1,600,000 | |
| Value of part taken | – 150,000 | $150,000 |
| Remainder value before taking | $1,450,000 | |
| Remainder value after taking | – 1,350,000 | |
| Damages | $100,000 | + 100,000 |
| Total difference | | $250,000 |

**Table 19.4 Appraiser's Final Conclusions under State Rule Assuming Special Benefits**

| | | |
|---|---|---|
| Value before taking | $1,600,000 | |
| Value of part taken | – 150,000 | $150,000 |
| Remainder value before taking | $1,450,000 | |
| Remainder value after taking | – 1,400,000 | |
| Damages | $50,000 | |
| Special benefits | – 40,000 | |
| Net damages | $10,000 | + 10,000 |
| Total difference | | $160,000 |

for cross-examination? First, they try to identify the points on which the expert will be most closely cross-examined. In other words, what are the weaknesses in the appraiser's analysis of value and, thus, the weakest points in the appraiser's testimony? How can the appraiser best defend against cross-examination on these points? Neither the attorney nor the valuation professional should assume that the appraisal is without weak points or hope that opposing counsel will overlook them. They must view their case objectively, identify problem areas, and prepare to defend them against attack. Sometimes appraisers have trouble identifying weak points in their own appraisals. This is only natural. The appraiser has completed a credible appraisal, perhaps over several months, and is confident in the reasonableness of the value opinion. For this reason, some attorneys prefer to have a consultant identify technical weaknesses in the appraisal rather than rely on the appraisal witness. This practice has the added advantage of not making appraisal witnesses identify the weaknesses in their own conclusions. If there is one thing attorneys do not need just prior to trial, it is appraisers who have begun to doubt the credibility of their conclusions.

With proper preparation, opposing counsel should never be able to bring out a weakness of an appraiser's direct testimony that has not been recognized as a weakness prior to trial. For instance, in one case the value opinion developed by the condemnor's appraiser was 30% below the price actually paid for the property two months prior to the date of the taking. Thanks to proper preparation before the trial, the appraiser was able to defend his value opinion on cross-examination so successfully that the trier of fact completely disregarded the prior sale price of the property and found the property's market value to be the value testified to by the condemnor's appraiser.

*Wigmore on Evidence* says that "cross-examination takes the place in our legal system that torture occupied in the medieval systems of civilization."[10] From the point of view of attorneys, the ultimate goal of cross-examination is to destroy a witness's direct testimony completely. If, as a by-product, the witness's professional reputation is tarnished or destroyed, so be it. This is, after all, an adversarial proceeding. Appraisers have wisely been advised that "[c]ross-examination is the anvil of truth and you must be prepared for the thorough hammering."[11] It is with these thoughts in mind that appraisers should prepare for cross-examination.

It can be either a great insult or a great compliment for a cross-examiner to stand up after an appraiser's direct testimony and say, "No questions." If

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

the appraiser has presented a strong and detailed case for an opinion of value during direct examination, cross-examination may be declined because opposing counsel feels the appraiser is so well-prepared and confident on the witness stand that any cross-examination would only strengthen the direct testimony. Under these circumstances, it is best for opposing counsel to try to give the trier of fact the impression that the appraiser's approach to the valuation problem is so ill-conceived that cross-examination would be a waste of time. Cross-examining a very strong witness can do more harm than good, and the cross-examiner's best strategy is to get the appraiser out of sight, and hopefully out of mind, as quickly as possible. Even in these circumstances, some attorneys cannot overcome the temptation to ask a couple of "nonquestions" such as: "Isn't it true, Mr. Appraiser, that appraisal is not an exact science?" and "Isn't it a fact, Ms. Appraiser, that two professionally trained appraisers can reach different opinions of value for the same property?" The answers to these questions do not tell the jury anything new, but the questions tell opposing counsel that the cross-examiner thinks his or her case is in trouble.

On the other hand, a cross-examiner may forego cross-examination if the appraiser's direct testimony is not particularly strong or does not materially damage the cross-examiner's case in chief. For example, if an appraiser testifies to a value opinion under direct examination without providing the facts on which the opinion is based, it is often wise to forego cross-examination. The cross-examiner might ask, "Do you have any sales to back up your totally unsupported opinion?" to point out to the trier of fact that the opinion is unsupported. However, this strategy could backfire if the witness answers the question well. The opinion might be much better supported than the cross-examiner wanted it to be, and, even worse, the question will allow opposing counsel to delve into the question of comparable sales on redirect examination. Often it is best for the cross-examiner to forego cross-examination and emphasize during closing arguments that the appraiser's opinion is without basis.

It is important for a cross-examiner to ask the appraiser the assignment conditions (hypothetical conditions, extraordinary assumptions, and jurisdictional exceptions under USPAP) and legal instructions under which the appraisal was made, if this information is not covered in direct examination. Too often the question is left unasked. Regardless of the answer, this question should not be injurious to the cross-examiner's case. The trier of fact is seldom aware of the standard assumptions and limiting conditions under which a typical appraisal is made. While a recitation of the appraiser's assumptions and limiting conditions will not be particularly harmful to the appraiser, the cross-examiner may try to convince the trier of fact in the final argument that the appraiser seems to have assumed everything and knows nothing.

The real advantage of asking for a recitation of the appraisal's assumptions is the possibility that one of the assumptions, limiting conditions, or legal instructions applied is unsupported or false, is contrary to eminent domain and valuation law in the jurisdiction, or limits the scope of work of the appraisal assignment to such a degree that the assignment results are not credible in the context of the intended use of the appraisal.

It may surprise attorneys who do not specialize in eminent domain litigation to know that very often real property appraisals are made under assumptions, limiting conditions, or attorney instructions that are unacceptable to the court or inappropriate. When this flaw is exposed, it can substantially weaken the effectiveness of the witness and, at times, the court may rule that some or all testimony given by the appraiser as an expert witness should be disregarded by the trier of fact.

Appraisers must remain calm on the witness stand and think before answering each question. They should respond to each question as briefly as possible, but avoid a long series of "yes" and "no" answers. Many appraisers answer too quickly, without considering the full ramifications of the question or the answer.

Appraisers should not be lulled into a feeling of false security on the witness stand. They must be on the lookout, at all times, for trick and hypothetical questions. The question "Did you consider the sale of 1234 Oak Street for $500,000?" is improper if no proof of this sale has been submitted. Opposing counsel should object to such a question. Hypothetical questions such as "If a sale of 1234 Oak Street occurred two months ago for $500,000, would that affect your opinion?" are acceptable and should be answered. Only with proper preparation can an appraiser respond to this question. The appraiser must know that there was, in fact, no sale of 1234 Oak Street two months ago. The appraiser should not try to argue whether such a sale did or did not occur. It is opposing counsel's job to point out to the trier of fact, one way or the other, that no proof of such a sale was presented.

When questioned during cross-examination about a comparable sale used by the opposing party's appraiser, an appraiser may answer, "Yes, I considered that sale, but felt it was not comparable." Or "Yes, I considered that sale, but disregarded it in my final analysis because it occurred more than two years ago, the property was twice the size of the subject property, it did not have sewer service like the subject property, it has flooded three out of the last five years, and it is subject to a different zone classification than the property being appraised." The first response will generally prompt the cross-examiner to ask the same question about each and every comparable sale used by the other appraiser. The second, more complete response will generally lead to an entirely new field of inquiry and shorten the cross-examination process.

Generally, appraisers will be allowed to respond to questions on cross-examination by stating "Yes, because . . ." and then explaining their reasoning. However, there are times when the court, usually at the request of the cross-examiner, will instruct the witness to answer the question simply, without any explanation. Appraisers must heed this instruction scrupulously. Trial consultants hired by counsel teach experts how to provide a reasoned answer to yes/no questions, or the witness can discuss this with the attorney before the trial.

Humor is a wonderful thing, and it is not necessarily out of place in the courtroom, particularly near the end of a four-day condemnation trial. Nevertheless, testifying experts should leave humorous remarks to the court and the attorneys. Although appraisers must keep a sense of humor on the witness stand, which is sometimes difficult when their professional credibility is being attacked,

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

**One Hundred Questions**

There is no shortage of advice for appraisers on effective performance as an expert witness such as "One Hundred Questions on Cross-Examination," "One Hundred Questions on Direct Examination," and "One Hundred Questions Which Will Worry Weak Witnesses."* This last article states:

> It does not take 100 questions to upset an expert witness. Sometimes it takes only one question asked at the right moment with the proper voice inflection. However, sometimes it takes a selection of two or three hundred questions to get the right one.

The 100 questions to worry weak witnesses are divided into ten categories of questions designed to demonstrate the following:

1. Bias—factual or inferred
2. Collusion and advocacy
3. Lack of real estate experience on special property types
4. Lack of appraisal education, training, and professional recognition
5. Personal incompetence—factual or inferred
6. Dishonesty
7. Lack of local experience
8. Lack of preparation and carelessness
9. Imperfections of appraisal techniques
10. Trick questions

Smith summarizes his observations by stating, "[N]ow, after reading these 100 questions, you know why many appraisers refuse to do condemnation appraisals."

Appraisers who lack experience in cross-examination and do not know quite what to expect should go to the source—the lawyers. They are advised to read articles written by and for lawyers about how to cross-examine appraisal experts.

* Walstein Smith, Jr., "One Hundred Questions on Cross-Examination." *Real Estate Appraiser* (May 1963): 8-13; "One Hundred Questions on Direct Examination," *Residential Appraiser* (June 1962): 3-6; "One Hundred Questions Which Will Worry Weak Witnesses," *Real Estate Appraiser* (February 1967): 11-16.

experts are not hired as comedians and should never, under any imaginable circumstances, attempt humor from the witness stand.

## Redirect

Redirect examination of an appraisal witness could more descriptively be called *rehabilitation* or *reconstruction*. Redirect examination gives the attorney-appraiser team a chance to repair any damage done during cross-examination and to clarify any points that were made confusing, intentionally or not, by opposing counsel. In redirect examination, an attorney can, through questions to the witness, clarify that there was no sale of 1234 Elm Street two months ago as suggested by opposing counsel. In addition, the appraiser can explain more fully the simple "yes" and "no" responses given in cross-examination, if further explanation is desirable.

## Final Argument

Final arguments are totally within the purview of the attorneys. This is not the time to explain appraisal techniques to the jury. If the jurors do not understand a case by this time, attorneys may as well save their breath—the case is lost.

There is some debate as to whether appraisers should stay in the courtroom during final arguments. Appraisers must abide by the wishes of legal counsel but will generally encourage counsel to allow them to be excused. How should appraisers react if they are going to stay in the courtroom? Each time an appraiser's name is mentioned, every member of the jury will turn to watch the appraiser's reaction. When the client's attorney extols the virtues of the appraiser, should the appraiser blush? Does the appraiser watch the attorney or stare the jurors square in the eye? During final arguments, opposing counsel may well imply that the appraiser is an advocate, a nonprofessional, an incompetent, or worse. Again, how does an appraiser, sitting there in the spectator's gallery in full view of the jury, react:

- with a noncommittal look?
- staring straight ahead with a threatening glare at the cross-examiner?
- or with a smile?

A better business practice is for appraisers to request to leave. Appraisers, who have no stake in the case as independent parties, should leave after the job is finished, which is before the final arguments.

### Notes

1. *Black's Law Dictionary*, 10th ed., (St. Paul, MN: Thomson Reuters, 2014), s.v. "burden of proof."
2. *State Highway Commission v. Nelson et al.*, 353 P.2d 616, 617 (Ore. 1960).
3. Sidney Z. Searles, "Examination and Cross-Examination of Appraisers in Eminent Domain," *Institute on Planning, Zoning and Eminent Domain*, Southwestern Legal Foundation (New York: Matthew Bender Co., 1973).
4. *Nichols' Law of Eminent Domain*, rev. 3rd ed. (New York: Matthew Bender Co.), vol. 7A §13.03 (2014).
5. *Nichols'*, vol. 7, §8.10[5][c] (2017).
6. *Nichols'*, vol. 7, §8.10[5][c] (2017).
7. *Nichols'*, vol. 7, §13.03 (2014).
8. *Trowbridge v. Abrasive Co. of Philadelphia*, 190 F.2d 825 (3rd Cir. 1951).
9. *Wolf v. Commonwealth of Puerto Rico*, 341 F.2d 945 (1st Cir. 1965).
10. *Wigmore on Evidence* 29 (1940).
11. John P. Hogan, "Ten Court Room Commandments for Appraisers," *Right of Way* (October 1959), 21-25.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

20

# Liability Risks for Appraisers in Condemnation

*by Peter Christensen, LIA Administrators & Insurance Services*

"Only appraisers who do appraisals for mortgage lending get sued." This frequently repeated statement probably developed because most valuation work is performed for lending, and therefore a higher volume of liability cases arise from lending work. It is, however, a myth. Valuers who provide nonlending valuation services, including expert services for condemnation, unfortunately do find themselves from time to time as defendants to professional liability claims. Failing to recognize potential liability problems may actually increase a valuer's risk for such a claim.

On the other hand, some real property valuation practitioners may see potential liability for expert work in a negative light and fear liability at every turn. Such a valuer might reason, "If I'm working for a government agency as its expert and the property owner on the other side of the case isn't happy with the valuation, won't the property owner just sue me?" There is a small bit of truth to that concern, but the legal reality is that claims by unhappy parties on the other side of a case are usually untenable.

## Legal Elements of a Professional Negligence Claim

It is important to have a general understanding of the type of legal claim that is usually asserted when valuers are accused of problems in the performance of their valuation services. Whether the alleged problems relate to a traditional lending assignment or to services performed as an expert, the primary legal claim made by plaintiffs suing valuers is professional negligence. The elements of a professional negligence claim are similar in nearly all states. A plaintiff must show that

- the defendant valuer owed a duty to the plaintiff to conform in their professional work to a particular standard of care,

- the defendant valuer breached that standard of care (which may be USPAP and/or another valuation standard or other applicable professional requirements), and
- the plaintiff suffered damages as the result of that breach.

Before addressing the question of whether a valuer made a mistake—or breached the applicable standard of care—the element of "duty" is key to many valuer negligence lawsuits. It is clear that a valuer owes a legal duty to his or her client, but many negligence lawsuits are filed by non-clients, and a preliminary issue in each of these cases is: Did the valuer owe this non-client plaintiff a legal duty? If not, the negligence claim should not go forward. In the liability situations discussed below, the valuer's awareness of and statements about the parties to whom the valuer may be viewed as owing a duty are of utmost importance. As with other types of valuation work, the valuer's identification of the intended users of his or her appraisal report is a key factor in determining such parties.

## Witness Immunity

### Protection Provided by Witness Immunity

One aspect of expert witness liability that sets it apart from regular professional negligence situations concerns a legal protection called *witness immunity*. Expert witness work is different from most other areas of valuation work because it occurs in an adversarial context. Unless acting in the role of a court-appointed expert, an expert witness valuer in condemnation is almost always retained by one side or the other in a case. At the end of a case, chances are that one of the properties is going to be unhappy with the result. If that unhappy party is the property owner, can that owner sue the government's valuation expert, blaming the unhappy result on a "low" valuation? Or, in another situation, can the government agency sue the property owner's expert when the judge or jury awards an amount several times higher than the amount the government believes to be just compensation for the taking? The short answer is no. There is very real protection here that keeps litigation from devolving into a cycle of one side suing the other side's witnesses. That protection, which is called *witness immunity* in some states and the *litigation privilege* in other states, can be a comfort to expert witness valuers.

Witness immunity, or the litigation privilege, generally protects witnesses, including expert witnesses, from claims by unhappy parties in litigation (and in arbitration as well). It immunizes witnesses from civil lawsuits about their testimony, regardless of whether their testimony is right or wrong. A New Hampshire condemnation case provides an excellent example for how the privilege usually and properly applies.[1] In the case, an experienced appraiser and his firm were hired by the state to value a largely undeveloped parcel for highway condemnation purposes. The appraiser valued the property at approximately $1 million. The property owner declined a pre-litigation offer based on that appraisal, and the state commenced an eminent domain proceeding. At trial, the state's appraiser testified to the same value, while the property owner's expert witness appraiser testified to a $7 million value. The jury "split the baby," and the award to the property owner was approximately $4 million. The property owner, however, was not satisfied and sued the

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

state's expert witness appraiser, contending that his valuation was erroneously low and alleging various claims of negligence. The owner alleged that the condemnation award at trial should have been higher but for the allegedly erroneous low value and demanded damages from the state's expert and his firm for the difference. The owner then sued the appraiser and his firm for alleged professional negligence.

The trial court dismissed the property owner's claims against the appraisers, and New Hampshire's Supreme Court upheld that dismissal based on witness immunity. As the court wrote in its opinion, "The purpose of this privilege is to encourage witnesses to testify and to ensure that their testimony is not altered or distorted by the fear of potential liability." In most states, the doctrine protects a witness from claims not only based on actual testimony on the witness stand or in deposition but also based on communications or statements that are reasonably related to the litigation or potential litigation. The proper remedy for an unhappy condemnee litigant who blames the less-than-hoped-for outcome on an opposing expert witness's "flawed" testimony is to appeal the condemnation action to a higher court, not sue the witness in a new case.

Given similar facts, courts in almost all states would reach the same result as New Hampshire's Supreme Court. Many courts also would agree with an additional reason to dismiss such claims by an opposing party, and this point goes back to the basic elements of a professional negligence claim: the expert witness hired by one side in a case, in ordinary circumstances, does not owe a professional duty to the opposing party. Without the existence of such a duty, a professional negligence claim should not be maintained.

## Limits of Witness Immunity

Does the existence of witness immunity mean that valuers serving as experts in condemnation cases (or in other types of litigation) are free from the worry of professional liability claims? Unfortunately, no. Professional liability insurance claim records include numerous claims against expert valuers. Legally tenuous lawsuits such as the one made by the property owner in New Hampshire do get filed anyway. Sometimes, the plaintiff's attorney does not know the law, and some parties just do not seem to care whether they are legally right. Beyond those kinds of tenuous and frivolous claims, viable claims can be made against valuers serving as experts under many states' laws. Although an expert is well protected from claims by an *opposing* party, the expert's potential liability for negligence to *his or her own client* is a different matter.

One of the key appellate decisions driving this point home arose in California.[2] It was not a condemnation case, but the legal lessons apply just as well to experts in condemnation actions. In this case, a married couple owned a home in the San Francisco Bay Area that had been destroyed by a fire. They could not agree with their fire insurance company on the amount of the property loss to be covered and had commenced an arbitration proceeding to resolve that dispute. The homeowners hired an appraiser to serve as an expert witness on their behalf in the arbitration. When the result of the arbitration was announced, the homeowners were unhappy with the award and they sued their appraiser expert, blaming him for the unfavorable outcome. He tried to argue that as an expert witness, he should be shielded by the litigation privilege (California's label for

witness immunity). The appraiser won that argument at the trial court level, but then the homeowners appealed.

The California Court of Appeal decided that the "litigation privilege [aka witness immunity] does not apply to prevent a party from suing his own expert witness, even if that suit is based upon the expert's testimony."[3] Thus, the appellate court held that the homeowners' case could go forward against their expert witness valuer.[4] Courts in many other states have reached similar conclusions. Accordingly, a general rule has developed that witness immunity will protect an expert from claims by the other side of a case, but that experts—as hired professionals—still have legal responsibility to their own clients and can still be sued for professional negligence.[5]

## Common Real-World Claims

The most common claims against valuers serving as expert witnesses in condemnation fall into three categories:

1. Disclosure issues
2. Overly optimistic valuations
3. Outright errors

### Disclosure Issues

A frequent allegation is that a defendant expert witness failed to disclose a factual matter that later made the expert's report or testimony less credible and led to a poor outcome. Examples of undisclosed matters that clients have sued valuation experts over include the following:

- The valuer had appraised very similar property in other assignments for different parties at values making the valuation testimony not credible.
- The valuer expert did not have a valid appraisal license (if required) in the state in which the property was located and where the case was being litigated.
- The valuer failed to disclose to the client prior discipline or litigation against the valuer.

### Overly Optimistic Valuations

Another allegation made in multiple claims is that overly optimistic, negligent valuations at the outset of a proceeding caused the client to pursue a case that ended poorly for the client. The client typically alleges that it would not have pursued the case except for the erroneous initial valuation and seeks to recover its attorneys' fees and expenses from its valuer expert.

### Outright Errors

As one might expect, some cases are based on the straightforward allegation that the expert valuer committed errors in the valuation or errors in testimony that led the court to disregard the valuation or reach an erroneous conclusion, causing a poor outcome for the valuer's client or a third party. The client then sues its expert, blaming the expert for the unfavorable outcome and seeking to recover the loss from the valuer. (In the case referenced earlier, the homeowners' claim against their expert witness was essentially that he was not convincing enough.)

Copyrighted material licensed by Randall Bell, PhD on November 29, 2016

## How to Avoid Becoming a Defendant

The most important thing that any appraiser expert can do to avoid a claim regarding testimonial work is to produce carefully supported, error-checked, and proofread appraisals and appraisal reports that are consistent with applicable standards and accepted methodologies. This is doubly true in the context of expert witness work for condemnation because unsupported positions or errors are almost always exposed in the adversarial process of litigation. Getting it right in condemnation is just plain important. Beyond the necessity of doing the valuation work right, following the specific suggestions described below can help decrease liability risk.

### Choose Your Clients

Trust your instincts about clients and assignments. When considering a client for an expert witness assignment, a valuer should trust his or her instinct about the client's propensity to be difficult, unreasonable, or unrealistic. If it seems like the client, especially a client who is the property owner, is counting on an implausible valuation or unrealistic litigation result, then it may be wise to back away from the assignment. The appraiser already knows that the client probably will not be happy with the outcome. If the prospective client has hired and fired other valuers (and is bad-mouthing them) or has gone through a series of lawyers, those are strong clues that the client may be difficult to satisfy. Besides making the work harder for the valuer, these kinds of clients pose a higher risk of suing. When reporting claims to professional liability insurers about litigation assignments, many appraisers start the call by saying, "I knew this guy was going to be a problem. I wish I hadn't taken the assignment." Avoid this regret.

### Disclosure

Be upfront with disclosure when being hired. Claim records show a common scenario in which a client sues its own expert when the expert failed to disclose something relevant to the client's hiring decision. Perhaps the valuer did not disclose a pending disciplinary investigation and the existence of it came out in a very negative light during the valuer's testimony, causing the client to settle the case for much less than hoped. It would have been better for the valuer to bring up the issue and explain it beforehand. Or, perhaps the dispute concerns a unique property type such as a mobile home park, but the valuer failed to tell the client that he or she had never appraised such a property and the valuer is discredited on the stand because of that. Full disclosure of all information relevant to an expert engagement is a key to reducing liability. As a basic rule of thumb, an expert witness should not let the client or the client's attorney be surprised by something that could have been mentioned (and possibly resolved) before the expert was retained.

### Conflicts

When receiving inquiries about potential expert assignments, be careful with conflict issues. Valuers contemplating condemnation litigation work need to understand some potential traps that relate to the confidentiality protections that apply to an attorney's representation of clients. The confidentiality of attorney-client communications and attorney work product (i.e., private materials or

information containing an attorney's theories, research, impressions, or analysis) are highly protected by law. When an attorney interviews or hires an expert like an appraiser, the attorney may share such confidential information with the appraiser being considered as a potential consultant or witness. If the other side's attorney, perhaps not knowing the appraiser had been communicating with his opponent, now reaches out to that appraiser to potentially hire him and they communicate about confidential matters discussed with the other attorney, there is a real risk under the law of many states and under federal law that either the attorney or the appraiser will be disqualified from working on the case. In some cases, disqualification has occurred even when the first attorney only interviewed the proposed consultant without actually hiring that person.

It is vital that valuers be careful about potential conflicts in litigation consulting and expert witness assignments. When an attorney is inquiring about the possibility of hiring a valuation expert, one of the first things the valuer should do is find out the case name and court and who the parties and attorneys are on all sides to make sure that the valuer doesn't have a conflict. Valuers performing services in a significant number of cases should keep a database of the cases they have been involved with and the identity of the parties. When valuers make it clear to hiring attorneys that they recognize the relevance of conflict issues, they are making a good impression. When an attorney reaches out about an assignment, one of the first things the valuer should say is something like, "Before we get into any details, could you please email me a caption page from the case and the names of the parties and attorneys?" (The "caption" is generally the section of the first page of a lawsuit pleading document that shows the names of the parties and court, but sometimes all parties may not be shown in the caption. Thus, it's important to confirm them by getting a complete list.) A valuer's failure to be careful about conflicts—by being unsure about whether he or she has already been involved with a case or consulted with other attorneys in it—can make an attorney feel uncomfortable about hiring that person.

As a matter of self-interest, the valuer should be careful not to receive any confidential information in any detailed discussion with an attorney before being hired by that attorney. If the attorney does provide confidential information but does not hire the valuer, the valuer could be conflicted out of being hired by the other side's attorneys, or the attorney or valuer could later be disqualified. For that reason, it is good practice to follow up initial inquiries with an email confirming in a friendly way that no discussion of any confidential matter occurred.

## The Engagement Agreement

Develop a good engagement agreement for expert work, and get it signed.
A well-tailored expert witness engagement agreement is an effective tool for preventing and minimizing legal claims by clients. Agreements for expert work do not need to be complex or lengthy. In fact, complex agreements stating many caveats and assumptions for expert witness matters can raise problems in depositions or testimony if the agreements are "discoverable" in the litigation by the other side in a case. For liability prevention purposes, however, the key points discussed below should be established in an agreement for expert witness services.

First, the agreement should spell out the timing and terms of payment clearly. Ideally, fees should be paid up front or, at least, before trial. Alternatively, it is

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

advantageous to have the hiring attorney as well as the party he or she represents both obligated to pay the valuer (but attorneys do resist this arrangement).

Second, to lessen the risk of an appraisal report prepared for litigation being misused later for some other purpose (such as seeking investments in the subject property), the agreement should include clear, narrow statements about the intended use and intended users of any reports that will be prepared (and, of course, the same narrow statements should be included in the reports themselves). An example of such a provision for the engagement agreement is:

> Intended Use and Users of Appraisal Reports. In the event that we prepare any appraisal reports as part of this engagement, the intended use and users of the appraisal reports will be identified in the reports. The use of any such appraisals shall be limited to litigation of the above referenced matter. The appraisal reports may not be used or relied on, in whole or in part, for any other purposes or by any parties we do not identify as intended users.

Third, the engagement agreement should indicate that the appraiser's opinions and testimony are based on the appraiser's independent, professional judgment and are in no way predetermined. The following is a sample of such a provision:

> Independent Nature of Services. As appraisers, our services will be performed in a manner that is independent, impartial and objective. We do not warrant the outcome of this matter, and neither the amount nor payment of our fees is contingent on any result. We shall have no liability to Client or any other party for any result or outcome of the litigation for which we are being retained that is not favorable to the Client.

Fourth, in condemnation actions the date of valuation of the taking is critical, and that date may depend on the law of the particular jurisdiction and/or matters and orders in the case itself. It is a *legal* issue, however, and one that properly should be the responsibility of legal counsel. Despite this, professional liability claims have been made against valuers for erroneously chosen dates of value. For this reason, it is a good practice to clearly specify that the date of value is not the valuer's ultimate responsibility by including a provision such as the following:

> Valuation Dates. If the development of any appraisal is needed in this engagement, Client and its legal counsel shall have responsibility for determining and advising us of the date(s) of value that are legally pertinent to the matter. We are not responsible for the determination of the appropriate date(s) of value.

Fifth, the engagement agreement should state that the valuer has the right to withdraw from the assignment as an expert for non-payment and also in the event of an ethical or professional standards issue or disagreement. (Actual withdrawal from a case should only occur after careful thought is given to the potential predicament that could result if the client has no testifying expert for an upcoming trial.) An example of such language follows:

> Right to Withhold Services and/or Withdraw. Without liability on our part and without regard to the stage of litigation, we shall have the right to withhold providing services (including delivering any report or providing testimony) or withdraw completely, at our sole option, if any of our invoices are past due more than 30 days or if we determine that an irreconcilable conflict has arisen.

Sixth, limitations of potential liability should be considered. Many valuers include limitations of their liability in their engagement agreements. These limitations—even if not perfectly enforceable under the laws of every state—do assist in both preventing and defending claims. A sample provision for consideration follows:

> Limitation of Liability. To assure that our services in this matter can be rendered freely and independently, Client agrees that the total collective liability of our firm, its owners, appraisers and employees for any and all claims of any kind arising out of, relating to or connected with this engagement and the services provided under this Agreement shall be limited to the total fees paid to us for this engagement. The foregoing shall not apply to any matter resulting from our gross negligence or willful misconduct.

Finally, with regard to any engagement agreement that is desired for the purpose of protecting the valuer or assuring that the valuer is paid, it is both obvious and critical that the engagement agreement be signed by the client or parties engaging the valuer.

## Identification of Client and Intended Users

A valuation expert should be careful with the identification of the client and intended user(s) in reports. When working for the government side in a condemnation matter, there is a risk that the property owner, or a court hearing later negligence claim, will construe the valuer's appraisal work as being on the owner's behalf and for the owner's use and reliance. This opens the door for the court to find that the valuer owed the property owner a legal duty for purposes of a professional negligence claim. When the valuer is retained by the government, the party to whom such duty is owed can be blurred because, in pre-litigation negotiations for eminent domain acquisition, offers to the property owner are usually made based on appraisals, and the offers are often accompanied by the appraisal reports or appraisal summaries. Valuers can lower their risk by being very clear in their reports for government entities about who the client is (the government agency) and who the intended user is (the government agency). A valuer is safer from a professional liability claim by an unhappy property owner if the valuer is able (under the client's applicable conditions) to identify only the government agency as the intended user(s) of the report. When the property owner is identified as an intended user, the door is more easily opened for their potential claims.

## State Licensure

An appraiser acting as an expert witness should be prepared to answer this question: Are you licensed as an appraiser in this state? This is a common question on cross-examination of an appraiser expert who is testifying outside of a state in which he or she is licensed. Recently, a well-regarded appraiser had flown across the country to offer testimony in support of a former property owner's title insurance claim pertaining to a very specialized industrial property. Both the case and property were in a state in which the appraiser was not licensed. To the question about whether he was licensed in that state, the valuer had to answer "no." With only a short time to go before trial and worried about the credibility (in an evidentiary sense) of the appraiser's testimony at trial, the client settled

Copyrighted material licensed by Randall Bell, PhD on November 20, 2015

the case for much less than the client believed was reasonable. The client then sued the appraiser for professional negligence, and the appraiser's firm later settled the suit for an undisclosed amount. If a valuer is being considered for a case involving a property in a state where he or she is not licensed, the valuer should research the need for a license in that state even before accepting the assignment. If the local license is not needed, the valuer should be prepared with a thoughtful response when the question comes up.

## Don't Overreach

Overreaching can backfire and create liability (and it usually doesn't work strategically anyway). New expert witnesses sometimes overreach in their opinions, offering unsupportable conclusions in an effort to please a client. It usually doesn't work and can backfire by opening the door for a cross-examination that makes the valuer less credible as a witness. And overreaching can lead a court to disregard an expert appraiser's opinions completely. When this occurs and the client is injured, the client may well sue the valuer over the poor result. As other chapters in this book have indicated, good appraiser expert witnesses do not become advocates. Following this instruction also can prevent potential liability claims.

## Collecting Fees

Be prudent in collecting fees. Valuers absolutely deserve to be paid for their time and service as experts regardless of the outcome of a case. In fact, a real property appraiser's compensation cannot ethically or legally be based on the outcome. A problem results when a case does not go the way a client hoped, and the client is less inclined to pay. Because of this tendency, it is important to keep litigation clients current in payment throughout the engagement, rather than allow a large receivable to accumulate for collection at the end. This is important not just for financial management but also because valuers who are forced to threaten to file a collection action or to sue a client to collect a fee are much more likely to be sued by the client, who will contend that the reason for nonpayment is alleged negligence by the valuer.

When circumstances put a valuer in the position of possibly suing a client, the valuer should assess the following:

- Will the time, effort, and cost of suing be worth the recovery?
- Were there any genuine problems with your work in the case that the client can hold against you?
- Did a judge reject your appraisal work as not credible or have severely negative comments about its quality?
- Are the unpaid fees worth the risk of having the client sue you back for professional negligence?

These factors should be weighed realistically before a valuer sues his or her own client.

## Liability Insurance

One last detail to consider in decreasing liability risk with regarding condemnation work relates to professional liability (E&O) insurance coverage. If an apprais-

al firm chooses to maintain such coverage for protection against claims, it is important that the firm be aware of the details of the policy. A few policies marketed to the profession do not provide coverage for right-of-way valuation services.

## Notes

1. *Provencher v. Bunzell-Plourde Assocs.*, 142 N.H. 848 (1998).
2. *Lambert v. Carneghi*, 158 Cal.App.4th 1120 (2008).
3. *Lambert*, at 1128.
4. The appellate court did hold, however, that a second appraiser serving as an arbitrator in the arbitration was protected by *arbitral immunity* and that the homeowners' claim against him should be dismissed.
5. A few states do extend witness immunity to protect an expert witness against claims from his or her own client for testimony given in court, but will generally not give immunity to the professional work that led up to the actual testimony.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

# Appendix A

# Sample Easement Form

## Appendix VI

## Transmission Easement Template

AFTER RECORDING, RETURN TO
Bonneville Power Administration
TERP-3
P.O. BOX 3621
PORTLAND, OR 97208-3621

Legal description: A portion of the of Section , Township , Range , .M., County, , as described in Exhibit(s) and shown on Exhibit(s) . (Affects Tax Account No. .)

BPA Tract No(s):

**U.S. DEPARTMENT OF ENERGY-BONNEVILLE POWER ADMINISTRATION**

**EASEMENT**
**Exclusive Transmission**

THIS AGREEMENT, made between , the Grantor, whether one or more, and the United States of America and its assigns, the Grantee, pursuant to the Bonneville Project Act, of August 20, 1937, as amended, 16 U.S.C.§§ 832 et seq.; the Federal Columbia River Transmission System Act, of October 18, 1974, as amended, 16 U.S.C.§§ 838 et seq.; the Department of Energy Organization Act, of August 4, 1977, as amended, 42 U.S.C. § 7152; and the Pacific Northwest Electric Power Planning and Conservation Act, of December 5, 1980, as amended, 16 U.S.C. §§ 839 et seq.

The Grantor, for and in consideration of the sum of DOLLARS ($ ) and the provisions contained in this agreement, hereby grants and conveys to the United States of America and its assigns, a perpetual exclusive easement and right-of-way for electric power transmission purposes in, upon, over and under the following described land ("Transmission Easement Area"), as described in Exhibit(s) , attached hereto and by this reference made a part hereof. The acquiring federal agency is the Department of Energy, Bonneville Power Administration.

A. Transmission Easement Area

The grant shall include the right to enter and to locate, construct, operate, maintain, repair, reconstruct, upgrade, remove and patrol one or more lines of poles or structures and appurtenances thereto, supporting conductors of one or more electric circuits of any voltage and any communication lines or equipment and appurtenances thereto (collectively, "Facilities").

The grant further includes the right of ingress and egress over and across the Transmission Easement Area, including the right to grade and gravel routes of access if necessary, as determined by the Grantee.

The Grantor also hereby grants and conveys to the United States and its assigns the present and future right to clear the Transmission Easement Area and to keep it clear of all types of trees, shrubs, brush and other vegetation, except as reserved below.

The Grantor reserves the right to grow and maintain non-woody low growing plants, such as non-structure-supported agricultural crops or vegetative cover with a mature height not to exceed feet. Any other trees, shrubs, brush or other vegetation within the Transmission Easement Area will not be allowed unless the Grantor contacts the Grantee and secures a written agreement allowing such use. In no event shall the Grantor plant any agricultural crops or vegetative cover, or trees, shrubs, brush or other vegetation covered by the written agreement within a 50-foot radius of all poles or structures. The Grantor also agrees not to obstruct access to these poles or structures within the Transmission Easement Area at any time. Any rights reserved by the Grantor shall not interfere with the rights of the Grantee.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

The Grantor also hereby grants and conveys to the United States and its assigns the present and future right to clear the Transmission Easement Area and to keep it clear of any and all, structures, above and below ground improvements or infrastructure, fire and electrical hazards.

The Grantor agrees that prior to undertaking any activity (including, but not limited to, building a structure, placing any manmade item, planting, digging, earth-moving, burning, piling or storing materials) within the Transmission Easement Area, the Grantor agrees to contact the Grantee to seek a determination from the Grantee as to whether the proposed activity is safe and compatible with the Grantee's use, and does not interfere with the Grantee's current or future needs. The Grantor shall not proceed with any proposed activity within the Transmission Easement Area without written consent from the Grantee.

All unauthorized trees, shrubs, brush and other vegetation, structures, above and below ground improvements or infrastructure, fire and electrical hazards within the Transmission Easement Area shall become the property of the Grantee on the date of acceptance of this agreement and thereafter, and may be disposed of by the Grantee in any manner it deems suitable.

The Grantor also hereby grants and conveys to the United States and its assigns the present and future right to top, limb, or fell, and to remove, sell, burn, or otherwise dispose of "Danger Trees" located on the Grantor's land adjacent to said Transmission Easement Area. A Danger Tree is any growing or dead tree, or snag, whether stable or unstable, which the Grantee at any time determines (1) could within a five-year period fall, bend or swing (a) within 25 feet of the Facilities, or (b) within electrical arcing distance of said Facilities, or (2) could interfere with the construction, operation and maintenance of said Facilities.

The Grantor covenants to and with the Grantee that the title to all Danger Trees identified, now or in the future, or cut from the Grantor's land adjacent to said Transmission Easement Area is and shall be vested in the Grantee and its assigns; and that the consideration paid for conveying this easement and the rights granted herein is accepted as full compensation for all damages incidental to the exercise of any said rights. At the Grantee's election title to Danger Trees may revert to the Grantor.

B. General Provisions

In addition to the consideration paid hereunder, the Grantee shall repair or make compensation only for damage caused by the Grantee that is not incidental to the exercise of any of the above said rights and which results from and during construction, reconstruction, removal, or maintenance activities associated with the purposes of this agreement on and adjacent to the Transmission Easement Area. Payment for such damage shall be made on the basis of a damage estimate approved by the Grantee.

The rights granted herein are subject to easements of record and mineral rights of third parties.

The Grantor agrees to satisfy of record such encumbrances, including taxes and assessments, as may be required by the Grantee and to obtain such curative documents as may be requested by the Grantee.

The Grantee shall pay all costs incidental to the preparation and recordation of this instrument and for the procurement of any title report and title insurance that it may require.

The Grantor covenants to and with the Grantee and its assigns that the Grantor is lawfully seized and possessed of the land aforesaid, with a good and lawful right and power to sell and convey the same; that the land is free and clear of encumbrances, except as herein provided; and that the Grantor will forever warrant and defend the title to the rights granted herein and the quiet possession thereof against the lawful claims and demands of all persons whomsoever.

The provisions hereof shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors, and assigns of the Grantor and upon the assigns of the United States.

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018

| | |
|---|---|
| ______________________<br>Grantor:<br><br>______________________<br>Title (if applicable)<br><br>______________________<br>Date | ______________________<br>Grantor:<br><br>______________________<br>Title (if applicable)<br><br>______________________<br>Date |

| | |
|---|---|
| ______________________<br>Grantor:<br><br>______________________<br>Title (if applicable)<br><br>______________________<br>Date | ______________________<br>Grantor:<br><br>______________________<br>Title (if applicable)<br><br>______________________<br>Date |

| |
|---|
| Accepted for the<br>UNITED STATES OF AMERICA<br><br>______________________<br>Signature<br><br>______________________<br>Title<br><br>______________________<br>Date |

A- 46

Source: Bonneville Power Administrator, *The Fish and Wildlife Lands Deskbook*, Version 1.1 (November 2016), A-42-A-46.b.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

# Appendix B

# Appraisal Report Documentation Checklist

## INTRODUCTION

### Title Page

- ❑ Agency name
- ❑ Agency tract no.
- ❑ Property address
- ❑ Appraiser's name(s)
- ❑ Appraiser's address
- ❑ Effective date of value

### Transmittal Letter

- ❑ Date of letter
- ❑ Property identification
- ❑ Property rights appraised
- ❑ Effective date of value
- ❑ Extraordinary assumptions
- ❑ Table of contents
- ❑ Client and legal instructions
- ❑ Opinion of value before acquisition
- ❑ Opinion of value after acquisitions
- ❑ Difference
- ❑ Appraiser signature

### Appraiser's Certification

- ❑ Conforms to USPAP
- ❑ Conforms to Federal Standards
- ❑ Property inspection
- ❑ Offered owner accompaniment
- ❑ Opinion of value before acquisition
- ❑ Opinion of value after acquisition
- ❑ Difference
- ❑ Effective date of value
- ❑ Appraiser signature

### Executive Summary

| | |
|---|---|
| ❑ Property identification | ❑ Effective date of value |
| ❑ Highest and best use–before acquisition | ❑ Highest and best use–after acquisition |
| ❑ Description before | ❑ Description after |
| Value before | Value after |
| ❑ Cost approach | ❑ Cost approach |
| ❑ Sales comparison approach | ❑ Sales comparison approach |
| ❑ Income capitalization approach | ❑ Income capitalization approach |
| ❑ Final opinion of value | ❑ Final opinion of value |
| ❑ Photos of subject | ❑ Assumptions and limiting conditions |

### Scope of Work Description

- ❑ Client
- ❑ Intended users
- ❑ Intended use
- ❑ Definition of market value
- ❑ Definition of market rental value
- ❑ Effective date
- ❑ Property characteristics
- ❑ Assignent conditions
- ❑ Geographic area and timespan of market data research
- ❑ Type of market data researched
- ❑ Extent of market data confirmation
- ❑ Data sources

**FACTUAL DATA AND ANALYSIS—BEFORE ACQUISITION**

- ❏ Legal description
- ❏ Area data

**Site Data**

- ❏ Existing use
- ❏ Access
- ❏ Topography
- ❏ Soils
- ❏ Vegetation
- ❏ Land area
- ❏ Land shape
- ❏ Utilities
- ❏ Minerals
- ❏ Easements
- ❏ Hazards

**Improvement Data**

- ❏ Type
- ❏ Size
- ❏ Actual age
- ❏ Effective age
- ❏ Condition
- ❏ Quality
- ❏ Occupancy
- ❏ On-site improvements
- ❏ Fixtures
- ❏ Use history
- ❏ Sales history
- ❏ Rental history

**Tax/Assessments**

- ❏ Assessed value
- ❏ Tax load
- ❏ Zoning and land use regulations

**Highest and Best Use**

- ❏ As vacant
- ❏ As improved
- ❏ Physical possibility
- ❏ Legal permissibility
- ❏ Financial feasibility
- ❏ Degree of profitability
- ❏ Larger parcel

**Land Valuation**

- ❏ Describe comparables
- ❏ Photos of comparables
- ❏ Analysis of comparables
- ❏ Final value analysis/opinion of value

**Cost Approach**

- ❏ Included *or* ❏ Omission explained
- ❏ Reproduction/replacement cost
- ❏ Depreciation
- ❏ Market support
- ❏ Final value analysis/opinion of value

**Sales Comparison Approach**

- ❏ Included
- ❏ Describe comparables
- ❏ Photos of comparables
- ❏ Analysis of comparables
- ❏ Final value analysis/opinion of value

**Income Capitalization Approach**

- ❏ Included *or* ❏ Omission explained
- ❏ Market rental comparables
- ❏ Gross income estimate
- ❏ Vacancy
- ❏ Fixed expenses
- ❏ Operating expenses
- ❏ Market support for capitalization rate
- ❏ Explain selection of capitalization rate
- ❏ Final value analysis/opinion of value

**Reconciliation and Final Opinion of Value**

- ❏ Provided
- ❏ Avoid summation appraisal

Copyrighted material licensed by Randall Bell, PhD on November 29, 2015

## FACTUAL DATA AND ANALYSIS—AFTER ACQUISITION

**Legal Description/Description of Acquisition**
- ❏ Legal description of remainder
  *or*
- ❏ Description of acquisition

**Area Data**
- ❏ Describe government project
- ❏ Address project impact

**Site Data**
- ❏ Shape
- ❏ Size
- ❏ Easements
- ❏ Utilities
- ❏ Acres
- ❏ Relationship to project

**Improvement Data**
- ❏ Describe improvements
- ❏ Fixtures
- ❏ Use after acquisition
- ❏ Rental history after acquisition

**Tax/Assessments**
- ❏ Estimated assessed value
- ❏ Estimated tax load

**Zoning and Land Use Regulations**
- ❏ Rezone considered

**Highest and Best Use**
- ❏ Change considered
- ❏ Intensity considered
- ❏ Restoration considered
- ❏ Effects of TCEs *or* ❏ n/a
- ❏ Zoning nonconformance addressed

**Land Valuation**
- ❏ Same *or* ❏ different comparables
- ❏ Describe comparables
- ❏ Photos of comparables
- ❏ Analysis of comparables
- ❏ Final value analysis/opinion of value

**Cost Approach**
- ❏ Included *or* ❏ Omission explained
- ❏ Reproduction/replacement cost
- ❏ Depreciation
- ❏ Market support
- ❏ Final value analysis/opinion of value

**Sales Comparison Approach**
- ❏ Included
- ❏ Same *or* ❏ different comparables
- ❏ Describe comparables
- ❏ Describe comparables
- ❏ Photos of comparables
- ❏ Analysis of comparables
- ❏ Final value analysis/opinion of value

**Income Capitalization Approach**
- ❏ Included *or* ❏ Omission explained
- ❏ Gross income estimate
- ❏ Vacancy
- ❏ Fixed expenses
- ❏ Operating expenses
- ❏ Market support for capitalization rate
- ❏ Explain selection of capitalization rate
- ❏ Final value analysis/opinion of value

**Reconciliation and Final Opinion of Value**
- ❏ Provided
- ❏ Avoided summation appraisal

**Acquisition Analysis**
- ❏ Recapitulation
- ❏ Proper format

**Damage (if applicable)**
- ❏ Allocate part acquired vs. damage to remainder *or* ❏ n/a
- ❏ Note allocation is accounting exercise
- ❏ Estimate cost to cure damage

**Benefits (if applicable)**
- ❏ Consider direct (special) benefits
- ❏ Disregard indirect (general) benefits
- ❏ Explain benefits analysis

**ADDENDA AND EXHIBITS**

- ❏ Location map
- ❏ Comparable sales data maps

**Comparable Sales Data Sheets**

- ❏ Sales confirmed
- ❏ Terms reported
- ❏ Buyer and seller
- ❏ Date of sale
- ❏ Recording information
- ❏ Location
- ❏ Existing use
- ❏ Highest and best use
- ❏ Zoning
- ❏ Legal
- ❏ Physical description

**Subject Property Plot Plan**

- ❏ Property boundaries shown
- ❏ Dimensions before acquisition
- ❏ Dimensions after acquisition
- ❏ Street frontage before acquisition
- ❏ Street frontage after acquisition
- ❏ Photo locations
- ❏ Improvement locations
- ❏ Subject property floor plan
- ❏ Title report
- ❏ Other exhibits
- ❏ Appraiser qualifications

Source: *Uniform Appraisal Standards for Federal Land Acquisitions* (2016), Appendix A, 208-212.

Copyrighted material licensed by Randall Bell, PhD on November 20, 2018

Copyrighted material licensed by Randall Bell, PhD on November 29, 2018