# EXHIBIT Q

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

CITY OF EAST ST. LOUIS, )
)
Plaintiff, )
)
vs )Case No.
)3:21-cv-00232-DWD
MONSANTO COMPANY, et al., )VOLUME II
)
Defendants. )
---------------------------------)

The Continued Video-Recorded Deposition of
CHARLES BRIDGEN

Date: Tuesday, January 21, 2025
Time: 2:35 p.m.
Place: Jones Lang LaSalle
200 East Randolph Street, 46th Floor
Chicago, Illinois 60601

Called as a witness by the Plaintiff in accordance with the Federal Rules of Civil Procedure for the United States District Court, Southern District of Illinois, pursuant to Notice.

Reported Stenographically by
Angela J. Galipeau, RPR, CSR-IL
Notary Public, State of Indiana
Job No. 7125719

APPEARANCES:

PAUL W. JOHNSON, ESQ. (Via Zoom)
The Driscoll Firm, P.C.
211 North Broadway, Suite 4050
St. Louis, Missouri 63102
(314) 932-3232
paul@thedriscollfirm.com

MATTHEW J. LIMOLI, ESQ. (Via Zoom)
The Driscoll Firm, P.C.
301 Fayetteville Street, Suite 1825
Raleigh, North Carolina 27601
(919) 582-6516
matthew@thedriscollfirm.com

ANDREW A. LEMMON, ESQ. (Via Zoom)
Milberg Coleman Bryson Phillips Grossman, LLP
5301 Canal Boulevard
New Orleans, Louisiana 70124
(985) 783-6789
alemmon@milberg.com

MARIA BROWN, ESQ. (Via Zoom)
Milberg Coleman Bryson Phillips Grossman, LLP
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
(865) 247-0080
maria.brown@milberg.com

ROY L. MASON, ESQ. (Via Zoom)
Smouse & Mason, LLC
233 Duke of Gloucester Street
Annapolis, Maryland 21401
(410) 269-6620
rlm@smouseandmason.com

For the Plaintiff;

TYLER SCHWETTMAN, ESQ.
Shook, Hardy & Bacon, LLP
190 Carondelet Plaza, Suite 1350
St. Louis, Missouri 63105
(314) 690-0200
tschwettman@shb.com
For the Defendants, Monsanto and Pharmacia;



CHARLES R. HOBBS, ESQ. (Via Zoom)
Lathrop GPM, LLP
7701 Forsyth Boulevard, Suite 500
St. Louis, Missouri 63105
(314) 613-2800
ron.hobbs@lathropgpm.com

For the Defendant, Solutia;

ALSO PRESENT
Ross Colby, Videographer
Jim Farmer, Concierge
Abby Fears.

* * *



INDEX

THE CONTINUED VIDEO-RECORDED DEPOSITION OF CHARLES BRIDGEN

EXAMINATION
By Mr. Johnson................................ Page 5

* * *

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | JLL Expert Report | 26 |
| Exhibit 19 | USPAP 2024 | 6 |


* * *



THE VIDEOGRAPHER: Good afternoon. We are going on the record at 2:35 p.m. on January 21, 2025. This is media unit one of the video-recorded deposition -- the second volume of the video-recorded deposition of Charles Bridgen.

THE WITNESS: Bridgen. Thank you.

THE VIDEOGRAPHER: Bridgen.

THE WITNESS: Bridgen.

THE VIDEOGRAPHER: Bridgen. Will the court reporter please swear the witness.

CHARLES BRIDGEN

called as a witness by the Plaintiff, having first been duly sworn, was examined and testified as follows:

CONTINUED EXAMINATION

BY MR. JOHNSON:

Q. Could you state your full name again for the record, please?

A. Sure. Charles Bridgen.

Q. And, Mr. Bridgen, we were together last Friday, January 17, in the St. Louis offices of Shook, Hardy & Bacon, taken in the first round of your deposition, correct?

A. Yes.

Q. And you understand that as we continue today for the next 90 minutes that you are still under oath to tell the

truth, the whole truth, and nothing but the truth, correct?
A. Yes.
MR. JOHNSON: All right. I'd like to start out, Jim, the concierge, by demonstrating Exhibit 19, which as it's set up here, or displayed, Mr. Bridgen, I will represent to you is the 2024 version of USPAP.
And if we can turn, please, to PDF 106, Jim, it's designated kind of weird as page G, as in "girl," 19, and it's PDF 106. There we go. And if you could emphasize at the bottom of the page, Jim, the diminution in value -- the property value diminution definition, please.
BY MR. JOHNSON:
Q. Mr. Bridgen, you understand that -- well, first of all, let's identify USPAP 2024 is certainly one of the sources that you cited in your JLL report in this matter; is that fair?
A. Yes.
Q. Okay. And you understand that part of USPAP 2024 includes Advisory Opinion 9, or what we referred to Friday as "AO-9," correct?
A. AO-9 is an Advisory Opinion 9 to the standards, which are referred to as "USPAP."
Q. Okay. And certainly AO-9, as we're now displaying a



portion of it, is within USPAP 2024, correct?
A. At the risk of sounding like I disagree with you, there's very specific language that it is not part of USPAP. It is something -- and I could be wrong on this, and I will live with whatever the truth is. But I believe that there is specific rules in how AO-9 is characterized with respected to USPAP.
Q. Okay. In any event, under -- the specialized terms and definitions section on this page includes the definition of "Diminution in value (property value diminution)," correct?
A. Yes.
Q. Yes. And I'm going to read that for the record. It's being displayed on the screen now. "The difference between the unimpaired and impaired values of the property being appraised, this difference can be due to the increased risk and/or costs attributable to the property's environmental condition." Did I read that correctly, sir?
A. That's what it says.
Q. Yes, sir. And do you believe --
Well, first of all, is Advisory Opinion 9 titled -- we can go out to the title of the whole document if need be. But you know from your experience how to take it, that the title is "The appraisal of real property that may be contaminated by environmental contamination."



A. It does not say that.
Q. It's not the title of Advisory Opinion 9?
A. I believe it says something different than what you just read.
Q. Well, you read me your definition at the top of AO-9, please.
A. "The appraisal of real property that may be impacted by environmental contamination."
Q. Okay. Fair enough. So do you believe that the methodology in USPAP AO-9 is the difference between the unimpaired and impaired value of the property being appraised?
A. I am not sure what you mean by "the methodology." There's not a section that says "the methodology" in AO-9.
Q. Do you believe that the assessment of property possibly contaminated by environmental contamination includes an assessment of the difference between the unimpaired and impaired value of the property being appraised?
A. I guess I would put it a different way. I would say that specialized terms and definitions are a component of AO-9. And among other things, they include definitions for diminution in value. And diminution in value also makes reference to, as we see here in front of us, the term "unimpaired value" and "impaired value." And those terms are further defined on the next page.



And so I would answer your question with -- a better way to answer your question is to look at all three of those definitions because together they relate.
Q. Okay. The definition of "diminution in value," "property value diminution" does not include the words "use" or "use effect," and nor does it refer to anything having to do with "use effect"; is that correct, Mr. Bridgen?
A. The definition of one of the terms included in AO-9, in this case diminution in value, has the definition that you read. And I do not see the word "use" in there in the definition of that word, correct.
Q. Mr. Bridgen, do you believe it is inappropriate for a real estate appraiser to deviate from the language of AO-9 in the context of an appraisal of an environmentally contaminated property?
A. I'm not really sure what you're asking because you're saying "inappropriate," "to deviate from," and that implies -- that implies sort of a binary deviation, a binary thing.
When, in reality, advisory opinions are very much included right in the term "advisory." They provide guidance to appraisers to properly apply sound appraisal practices. You know, that's one definition that I just gave to us. There's no black and white.
Now, are there definitions? Are there concepts

Page 10

within AO-9 that are absolutely important to our practice? Yes. I would not answer your question as saying it would be improper to deviate from something that does not enjoy any true black and white or binary dynamic.
Q. Generally speaking, do you believe it is inappropriate for an appraiser to deviate from the language of AO-9 in the context of an appraisal of an environmentally contaminated property?
MR. SCHWETTMAN: Objection; asked and answered.
A. Do you mean, like, using terms that aren't recognized in the lexicon?
Q. I'll just stand by the question and just ask you, do you believe -- let me ask it another way, Mr. Bridgen. Here we go.
Do you believe it's inappropriate for an appraiser to expand on the language of AO-9 within the context of an appraisal of an environmentally contaminated property?
MR. SCHWETTMAN: Object to form.
A. Appraisers all the time will substitute language of appraisal terms. The certification, perhaps the most important thing of an appraisal absolutely says you do not have to follow an exact thing, as long as the substance and the materialness is being followed. So I would not answer your question and agree with you in that strict interpretation of that question.

Page 11

MR. JOHNSON: Okay. Jim, if we could stay within the same Exhibit 19, the USPAP 2024, and go to PDF 110. And on PDF 110, it's G, as in "girl," 22, please, and specific now lines 157 through 161.
MR. SCHWETTMAN: Say that again, Paul.
BY MR. JOHNSON:
Q. Yes, lines 157 through 161. And, Mr. Bridgen, I'll read that into the record. "When the appraiser addresses the diminution in value of a contaminated property and/or it's impaired value, the appraiser must recognize that the value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of the value as if unaffected (unimpaired value). Rather, cost, use, and risk effects can potentially impact the value of contaminated property."
First of all, did I read that correctly, sir?
A. I believe you did.
Q. And do you agree with that quoted portion of AO-9, sir?
A. Yes.
Q. Mr. Bridgen --
MR. JOHNSON: And, Jim, you can take down that exhibit for the time being.
BY MR. JOHNSON:
Q. Mr. Bridgen, what is a temporary construction easement, or otherwise known, I suppose, in your industry, as a "TCE"?

Page 12

A. I don't use that term, "TCE." That actually means something entirely different in my field, trichloroethylene.
Q. I'll go back to my original question. And that is, what is a temporary construction easement? And I won't use the "TCE." How about that?
A. You can tell me. I'm not sure. I mean, I have a definition of it. But if you have a definition of it, I'll listen to yours.
Q. No, you're the witness. So I'm asking you as the real estate appraiser for JLL, and on behalf of Monsanto in this case, what is your understanding of the term "temporary construction easement"?
A. You know, I didn't use it in my report. I don't have a definition as we sit here today. Sorry.
Q. Okay. So you're telling the court staff and the jury that having prepared a 370-report on behalf of JLL in this case that you cannot tell the jury and court staff what a temporary construction easement is; is that correct?
MR. SCHWETTMAN: Objection to form, asked and answered, argumentative.
A. Well, you actually asked two different things now in your last question and in the first question. You said please provide me a definition. And then now you just said I don't know what it is or I -- so those are two different things, sir.

Page 13

I understand generally what it is, but I don't have a definition for you that I think is required in this situation.
Q. Well, generally, what is your understanding of what a temporary construction easement is, sir?
A. There you go. I can answer that question. It is a temporary access agreement for construction.
Q. Temporary access agreement for construction. Okay. And in the condemnation context, Mr. Bridgen, of the appraisal industry, is it true that if a governmental agency purchases the right to use the property with a temporary construction easement, using your understanding of that term, the property owner is paid for the use of that property whether or not the owner was trying to lease the property beforehand?
A. Was there a question?
Q. Yes, sir. Do you want me to repeat it?
A. Yes, I was listening. I was trying to focus on the content, and I missed the hook. I missed the question.
Q. That's okay. I'll repeat it.
Isn't it true that if a governmental agency purchases the right to use a property with a temporary construction easement, as you just gave your general understanding of

that term, the property owner is paid for the use of that property whether or not the owner was trying to lease the property beforehand?
MR. SCHWETTMAN: Object to form. It's an incomplete hypothetical.
A. I don't have an opinion on that.
Q. Can you answer the question, sir, as the expert put forth for this deposition today?
A. I haven't been studying condemnation concepts and their application in a hypothetical context. There's not enough information for me here, nor is there the time for me to study the ramifications to consult the appropriate reference material and answer your question. So I'm unable to answer your question.
MR. LEMMON: We're going to be here for, like, four or five more days before you answer a question, sir. This is outrageous what is going on. This has been outrageous. It was outrageous the last deposition.
MR. SCHWETTMAN: Who is this?
MR. LEMMON: And we're wasting time.
MR. SCHWETTMAN: Who is this?
MR. LEMMON: This is Andrew Lemmon. You can mark me down as saying I am the person who is speaking. This is outrageous.



MR. SCHWETTMAN: And I'm going to move to strike that colloquy. He's answering the question to the best of his ability.
MR. LEMMON: You can move to do whatever you want. I would love to put it before the judge. So please do move.
If you want to continue to talk like this, sir, we're going to speak with the judge and maybe you will be part of that discussion.
MR. SCHWETTMAN: Move to strike that colloquy as well.
Paul, do you have another question?
MR. JOHNSON: Yes. Thanks for asking.
BY MR. JOHNSON:
Q. Didn't you write a book on condemnation, Mr. Bridgen?
A. I was a contributing author to a textbook on the topic where I contributed to -- I'm sorry.
Q. I'm sorry. Go ahead. I'm sorry. I thought you were done.
A. Where I coauthored, I believe, two chapters.
Q. And this was published by the Appraisal Institute, this book; was it not?
A. Together with the Canadian -- another organization, yes.
Q. And part of the book includes sections, does it not, on appraising conservation easements, sir? Isn't that true?



A. I am not aware of whether or not it includes a section on conservation easements. I think it may, actually. But we're talking about the condemnation book, right?
Q. Yes. It was entitled "Appraising Conservation and Historical Preservation Easements," sir.
A. Was what titled that?
Q. Was the book that you wrote that was published by the Appraisal Institute titled "Appraising Conservation and Historical Preservation Easements"?
A. It 100 percent was. I believe your first question, though, was the condemnation book. So there's another book that I was a contributing author to which you've confused me on because that has to do -- that has to do with condemnation. And you used the term "condemnation." So I thought you were talking about that textbook.
Q. Okay. So let's get out then the title of the condemnation book to which you just referred, sir.
A. I'm not certain of that. I believe it's "Corridor Valuation."
Q. Okay. So you're an author or coauthor on two books; "Corridor Valuation" and "Appraisal Conservation and Historical Preservation Easements," correct?
A. I'm contributing author to the former and coauthor of the latter.
Q. And let's get back to the question posed a moment ago.



With that authorship and experience in those areas in mind, within the appraisal industry, isn't it true that if a governmental agency purchases the right to use a property with a temporary construction easement, as you've generally described your understanding of that term, the property owner is paid for the use of that property whether or not the owner was trying to lease the property beforehand?
MR. SCHWETTMAN: Object to form, asked and answered.
A. I do not hold myself out as an expert in construction easements. I am an expert in certain partial interests of real estate. But nowhere do I represent any particular expertise in temporary construction easements. And as we sit here today, I cannot think of a prior case where I have been involved in such a topic.
Q. Sir, I'm just asking you, please, to answer my question posed, not to describe your experience or lack thereof in answer to my question. Do I need to repeat the question again for the record?
A. Well, I'm not comfortable answering something that I don't understand the topic, sir.
Q. So you're telling the court staff and the jury in this case that you're unable to answer this question: Isn't it true that if a governmental agency purchases the right to

use a property with a temporary construction easement, the property owner is paid for the use of that property whether or not the owner was trying to lease the property beforehand; is that correct, sir?
A. I mean, I don't fully understand. I don't understand the lease. Is it an improved property? Sir, is it a ground lease? Is it an access agreement? Is it a simple crossing? There are a lot of considerations here. I do not dabble in the world of analyzing compensation from government entities for temporary construction easements. And I am unable, especially as we sit here today, to give you an answer to that question. I'm sorry. That is the truth.
Q. I would say move to strike as non-responsive, but I think I can live with that nonanswer.
Mr. Bridgen, there is no requirement in the appraisal industry that says an appraiser cannot value a property unless it is sold or leased, correct, sir?
A. Did you give me a double negative? Because I'm focused on the last part.
Q. I'll repeat again. There is no requirement in the appraisal industry that says an appraiser cannot value a property unless it is sold or leased; is that correct, sir?
A. Could you please rephrase that? Because I -- is there --



there is not a requirement. Okay? So if that's what you're saying, please rephrase it that way, and I'll answer it. But you're tripping me up on the double -- I'm wondering if it's a triple negative.
Q. Mr. Bridgen, is there a requirement in the appraisal industry that says an appraiser cannot value a property unless it is sold or leased?
A. No, there is nothing that says in order to appraise something it must be leased or sold; no, there is not such a requirement.
Q. Thank you, sir.
Mr. Bridgen, isn't it true that even though properties do not sell or get leased, they still have a market value and market rental rate?
A. Yes, as demonstrated by their peers and their substitutes, especially those within their local market, yes, because everybody -- I mean, not everybody's house sells. It will stay in the family, right? It doesn't mean that that house can't be appraised, there can't be a value.
And so they look to the sales next to that house or across the street from that house. And if indeed the houses are similar, similar yards, similar frontage, similar access, similar schools, similar amenities, disamenities, the like, that is how appraisers operate, yes.



Q. Mr. Bridgen, has there ever been a requirement in the appraisal industry that says -- excuse me.
Is it true that an owner of real estate can be economically damaged even if he does not sell or lease his property?
MR. SCHWETTMAN: Object to form, incomplete hypothetical.
A. I'd love it if you could maybe restate that with a couple more words because I'm lacking a little bit of information. Are we talking about an improved property, a vacant property, an income-producing property? I need a little bit more specifics, and I should be able to answer this.
Q. I'm going to stand by my question as I stated it, Mr. Bridgen. This is a very basic question. Is it true that a holder of real estate can be economically damaged, even if he or she does not sell or lease that property?
MR. SCHWETTMAN: Incomplete hypothetical, asked and answered.
A. So I'm thinking a lot here about what you're not saying and not the very simple words that you are giving me. And I would need more information here because, for example, is there a ground lease on the property? For example, is there an offer to purchase outstanding? For example, is there a cross easement where somebody else has a



prescribed easement to go across their property? These are things that must be considered before I can give you an answer to this.
Q. So, Mr. Bridgen, just to be clear, for the record, in the rather simplistic version of the question I posed a couple times to you, you are telling the jury and court staff that you are unable in its current form as submitted to you to answer, correct?
A. You can read your question again in the very few words that it is, and I would like to ask you some questions about it. But the way that you have given it to me, it is overly simplified, hypothetical, without requisite details for me to give a reasoned expert response.
Q. Maybe we can go about it in a different way. And let me do that, or attempt to do that, Mr. Bridgen, sir, in the form of a hypothetical question.
So please assume that an owner of a home and lot is worth $1 million. Please further assume that the home and lot become contaminated with a federally banned substance. Please further assume that the value of that home and lot decreases to $500,000 because of the contamination of the federally banned substance.
Mr. Bridgen, if that homeowner in this hypothetical needed to utilize the home as collateral for a 1-million-dollar loan, isn't it true that the owner will

Page 22

not be able to qualify for that hypothetical loan because of the 50 percent decrease in the value of his property?
MR. SCHWETTMAN: Objection; incomplete hypothetical.
A. So, in your hypothetical, you gave me the after value or the as-impaired value of $500,000. Was that determined on the use of sales data, transactions from within the local market?
Q. Sir, I'm going to again let the question in the hypothetical and the facts stand as asked. And I will represent to you that I believe that it is clear, and I'd be glad to repeat it one more time to see if you can answer it in the way I phrased it, if that's okay with you.
A. I'll hear it again.
Q. Okay. Please assume that an owner of -- a home and lot is worth $1 million. Second, please assume that the home and lot become contaminated with a federally banned substance. Third, please assume that the value of that home and lot decreases to $500,000.
Mr. Bridgen, if that homeowner needed to utilize that home as collateral for a 1-million-dollar loan, isn't it true that the owner would not be able to qualify for that hypothetical 1-million-dollar loan because of the 50 percent decrease in the valuation of his home and lot?

Page 23

MR. SCHWETTMAN: Same objection.
A. I don't know that to be true whatsoever because if -- for example, if we're saying that I'm supposed to assume the value as diminished was $500,000, well, that's not a fact, sir. That's something that is measured by an appraiser. And we have to take into consideration the methodology used by that appraiser.
So if, for instance this appraiser based that $500,000 on unsupported market evidence or hearsay or testimony of others or buy-out programs or results of other cases, there's no way that that fact would obviate the would-be homeowner for getting a loan. There's no way that would ever interrupt their ability to get a mortgage on that property.
MR. JOHNSON: I will move to strike as non-responsive.
BY MR. JOHNSON:
Q. And just ask by way of follow-up, Mr. Bridgen, are you unable to answer the question under oath in the manner in which I have submitted it to you on two occasions now?
A. So I believe that I responded to your question with the amount of information given and the fact that you required me to assume things, the latter of which is something that we just don't see in our world.
In order for me to assume it's worth $500,000, it's

Page 24

not just an ipse dixit, I mean, right? It has to be appraised. And so I can't comment to you that it's because of the contamination or that they wouldn't get the financing. I can't give you that answer. Nobody could.
Q. Sir, you've been deposed as a real estate appraising expert more than ten times, correct?
A. I would have to count. I don't think it's more than ten times, no.
Q. Okay. However many times you've been deposed, you've been asked hypothetical questions in your status as a purported real estate appraisal expert, correct, sir?
A. I have been asked questions before.
Q. Hypothetical questions before, sir?
A. I'm sure I have.
Q. Why can't you answer this one?
A. I would love to answer it. I just need some clarification on some very important components that I have been asking you for. And if you're not able to give me that, I wouldn't want to just guess. I don't think anybody here wants us to guess.
MR. SCHWETTMAN: I don't want you to guess.
BY MR. JOHNSON:
Q. Mr. Bridgen, I'm going to move along here given the time limitations we have today. Would you agree with me that the appraisal industry at times requires that an appraisal

Page 25

presume a hypothetical sale or rental of the asset being valued?
A. That is generally correct. I will answer it by saying an appraisal presumes a sale is a very typical statement. And I agree with that. I don't want to put any closure on the absolute terms. But that is an appraisal concept that I recognize.
Q. Mr. Bridgen, did you appraise any of the 273 East St. Louis subject tested properties in this case?
A. No. I reviewed the Bell report and the shortcomings of Bell -- the Bell report's attempt to value the previously referenced properties are well outlined in my report.
Q. Mr. Bridgen, would you agree that Advisory Opinion 9 specifically tells us that an appraisal of a property that includes the effects of environmental contamination can include the assessment of data of an otherwise similar but uncontaminated property, correct?
A. Can you -- some of those words sound familiar, and they appear to be lifted from definitions also in Advisory Opinion 9. I'd like to have a conversation about what it is you just asked me. I'd like to start with you, please, reread this again, and I'm going to write it down.
Q. Yes, sir. Mr. Bridgen, would you agree that Advisory Opinion 9 specifically tells us that an appraisal of a property that includes the effects of environmental

Page 26

contamination can include the assessment of data of an otherwise similar but uncontaminated property, correct?
A. You know, it sounds very similar to a lot of the words that are in Advisory Opinion 9 and other treatises, also perhaps included in my report.
From the way that you've read that, I think that that is generally consistent with words I recognize. But I would defer to what the actual words of Advisory Opinion 9 include.
MR. JOHNSON: Jim, if we could turn to Exhibit 6, which is the JLL report.
MR. SCHWETTMAN: Your report.
MR. JOHNSON: And within Exhibit 6, please get to PDF 13. And, Jim, if you could, emphasize Section 1.1 -- excuse me, PDF 13, which is actual page 11. My apologies, Jim. And specifically conclusions from the review of the Bell report, the first two paragraphs ending with "-5 percent."
BY MR. JOHNSON:
Q. And you recognize this, of course, because you wrote it, Mr. Bridgen, as part of the conclusions from the JLL report in this matter; is that correct, sir?
A. Yes, of course.
Q. And you state that, "The cost, use, and risk-effect damages, conclusions in the Bell report are not

Page 27

supportable," and that -- jumping to the third paragraph, "When the errors, omissions, and misinterpretations in the Bell report, review of the literature on risk effect, case studies are corrected, it supports the conclusion that the risk effect to values from the PCB investigation in the subject neighborhood as of December 2023 was no more than -5 percent"; is that correct, sir? That's what you wrote, right?
A. That is what that says.
Q. Yes. Is it your opinion, Mr. Bridgen, that this section I just read, specifically the last paragraph, does not state an opinion of value?
A. So this -- happy to clarify this. It is frequently misunderstood. When doing a review appraisal, we are looking at the underlying work, in this case the appraisal of 273 properties by the Bell report. A review appraisal looks at what was conducted or not conducted as part of that effort and corrects the analytical approaches undertaken within that approach, within that report.
And just because we were able to successfully identify a myriad and numerous errors and oversights, that when those are corrected that indicates between zero and -5, that does not mean that that is my opinion of an appraisal of those properties. Rather, it is the result of a corrected calculus offered by another appraiser.

Page 28

That's my answer.
Q. You told me moments ago, just moments ago, that you and JLL did not do an appraisal of any of the 273 East St. Louis tested subject parcels, correct?
A. 100 percent correct.
Q. And in the first sentence of conclusions from your review of the Bell report, it states again, "The cost, use, and risk-effect damages, conclusions in the Bell report are not supportable," correct?
A. That's what it says.
Q. Then why not just leave it there and say it's not credible? Because as you described the scope of your assignment in this case from Monsanto's lawyers, that was the scope of your work, to review the Bell report, correct?
A. I'm not following you.
Q. Well, once you give a quantitative number, as you did at the end of that sentence, -5 percent, with no more than 5 percent, isn't that an appraisal, sir?
A. No, it is not, sir. In fact, I will read for you two pages prior in my report where I explain, like all review appraisers explain, if you were to read the report, there's a paragraph that explains what an appraisal review is, what we did in this case, which is consistent with the standards of appraisal review; and that when performing an

Page 29

appraisal review, it can include our conclusions.
And I quote at page 9, end of the first full paragraph, "This appraisal review report does include, however, our conclusions concerning the effect of correcting the misrepresentations, errors, and omissions, and the conclusions in that reviewed Bell report."
So what that says is when we correct for the deficient components of the Bell report, we present the results of the calculus that is 100 percent allowed in appraisal practice and is consistent with USPAP.
Q. Mr. Bridgen, are you and JLL critical when appraisers throw out numbers in reports without conducting a proper appraisal?
MR. SCHWETTMAN: Object to form. That's vague.
A. That is quite -- the majority of my practice, our practice, involves things that sound similar to what you just said. So it's a very simply constructed sentence to which I do not have a yes-or-no answer. I could give you examples in the affirmative and in the opposite.
Q. Have you and JLL been critical in litigation reports and/or appraisal reviews of other appraisers in litigation when, in your opinion, those opposing appraisers have not conducted a proper appraisal?
A. Yes, sir. I did in this matter. I can direct you to the pages where I describe it, but that is what we -- that is

Page 30

what I report to the court regarding the Bell report. So the answer is automatically yes.
Q. I'm talking about other contexts of other JLL litigation reports of which you have been a signer.
A. Okay. I need the -- are you talking about myself reviewing other JLL-authored appraisal reports?
Q. Have you and/or JLL authored reports where you've been critical of opposing appraisers in the litigation context like we are here where, in your opinion, in JLL's opinion, the opposition appraisers threw out numbers in their reports and in their testimonies without conducting the proper appraisal?
A. So if you would have stopped halfway through, that was an automatic yes; caveat that there's a lot in that second clause. I would say there would have had to have been cases that that answer is yes to that question.
Q. Okay. Now, Mr. Bridgen, and you can turn to -- you have a copy of your JLL report in front of you; is that correct, sir?
A. I do.
Q. Okay. If you need to turn to the table of contents, please do so. But what I want to know right now is where in the JLL report is its highest and best-use analysis.
A. So it wouldn't be there because I did not do an appraisal, sir, of any properties. I did a review report, which

Page 31

we've covered, and I guarantee you is addressed in this report. In fact, I'm looking at the page where I explain it.
There will not be a highest and best-use analysis. And as we talked on Friday, what is remarkable is that the Bell report does not have a complete highest and best-use analysis.
MR. JOHNSON: Move to strike as non-responsive after the answer given that there was no highest and best-use analysis.
BY MR. JOHNSON:
Q. Mr. Bridgen, did you apply your not more than -5 percent risk effect number that we went through a moment ago to any of the 273 subject East St. Louis tested properties?
A. Is that the question?
Q. Yes, sir.
A. Okay. No, I did not apply. However, I describe that -- you describe it as that number. I describe it as the result of a corrected calculation, which is included in the Bell report. No. Why would I apply that to anything? I don't believe I did. It's a correction of the Bell report.
MR. JOHNSON: Move to strike as non-responsive after the answer, "No."

Page 32

BY MR. JOHNSON:
Q. I need to go back and confirm that. I think I heard what the answer was, but we were somewhat talking at the same time.
So is the answer no, Mr. Bridgen, you did not apply your -5 percent risk effect number to any of the 273 subject tested East St. Louis parcels?
MR. SCHWETTMAN: Asked and answered.
A. I did a review appraisal, not an appraisal of one or six or 273 properties. So I would have no reason to do that. I did a review appraisal. I did not do an appraisal of any of the subject properties. However, I corrected the Bell appraisals' analysis.
MR. JOHNSON: Now is a good time to take about a five-minute break.
THE WITNESS: I'm fine to keep going.
MR. JOHNSON: Let's take a five-minute break. Off the record, please.
THE VIDEOGRAPHER: We'll go off the record. The time is 3:22 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record at 3:27 p.m.
BY MR. JOHNSON:
Q. Mr. Bridgen, just before I move on to another area of

Page 33

questioning, and kind of hopefully tying up our previous discussion before we took a break, doesn't a corrective appraisal review constitute an appraisal?
A. Did you say "corrective appraisal"?
Q. Yes, I'll state it again. Does not a corrective appraisal review constitute an appraisal within your industry, sir?
A. I mean, it's a great question. There's an appraisal and there's an appraisal review. An appraisal review is an appraisal review. And I know I sound like a nursery rhyme, but an appraisal review is not necessarily an appraisal.
So, I mean, we could agree to disagree on the very confusing terminology, but there is no gray area on is an appraisal different from an appraisal review, period.
Q. So do you recognize -- tell me "yes" or "no." Do you recognize the term "corrective appraisal review" to be a term of art within your appraisal industry, sir?
A. I do not recognize "corrective appraisal review" as a term of art in my industry.
Q. Okay.
A. It does not mean there isn't one. I'm saying I do not recognize it.
Q. That's fair.
A. I do, however -- I did read for you the definition of an appraisal review with an alternate value or a corrected --

Page 34

or a corrected value. I read you that, and that is what we did in this case.

MR. JOHNSON: Move to strike as non-responsive after the initial answer that you do not know what -- did not know whether a corrective appraisal review constitutes a term of art in your industry.

All right. Next, Jim, within JLL report Exhibit 6, could you please display starting on PDF 70; and then for Mr. Bridgen, that's going to be page 68, I believe, in your actual copy you have in front of you.

MR. SCHWETTMAN: Say that page number again, Paul. Sorry.

MR. JOHNSON: I'm sorry, Tyler. What?

MR. SCHWETTMAN: Can you say the page number again? 68?

MR. JOHNSON: Yes. Actually, pages 68 to 70, PDF page 72.

MR. SCHWETTMAN: Thank you.

MR. JOHNSON: You need to go back to PDF 70, Jim, please. It's Section 6.1, I believe, or 6.2. 6.2. Go back a few pages. Back a few pages. No. Sorry, 6.4. My bad, guys. My bad. 6.4. And display this, the title of that section, please, the title and the first paragraph. There we go. And the first

Page 35

paragraph. There we go.

BY MR. JOHNSON:

Q. The title of this portion of the JLL report states, "The new construction (not mentioned in the Bell report) and higher-priced homes sold in the subject neighborhood are evidence that there has not been a 100 percent impact on prices and values due to PCBs." Did I read that title of your JLL report section correctly, sir?

A. 6.4, yes, I think you read that correctly.

Q. Okay. Do you agree that Section 6.4 of your JLL report serves as evidence that there has not been a 100 percent impact on prices and values due to PCBs, sir?

A. Well, what it says is the Bell report ignores all sales in East St. Louis and -- to my recollection, to my substantive recollection, and does not look at any sales in the area that he claims is impacted to the tune of a hundred percent.

And what I am saying here is that's quite remarkable because even though the Bell report does not pin down any sort of timeframe of damages, it just says everything is worthless. And all I'm doing here is saying that's a little bit head scratching because we got 43 sales of homes that are alleged to have been made worthless decades ago, or some other undetermined date, and this page is saying that's not true.

Page 36

Q. Before I go back and re-ask my question, is it accurate to state, Mr. Bridgen, that Dr. Bell only appraised 273 properties; is that correct?

A. I would not say that's correct because he didn't appraise them. The subject of his report -- he did not properly appraise them. The subject of his report was 273 properties.

Q. Now, we have displayed on the video right now the title to your own report, which you cosigned with another gentleman, Richard Roddewig of JLL. "The new construction not mentioned in the Bell report and higher priced homes sold in the subject neighborhood are evidence that there has not been a 100 percent impact on prices and values due to PCBs." I read your title to this section correctly; did I not, Mr. Bridgen?

A. As I've already said, you did.

Q. Okay. Next question, do you agree that this Section 6.4 of your report serves as evidence that there's not been a hundred percent impact on prices and values due to PCBs, just as you titled this section, correct, sir?

MR. SCHWETTMAN: Asked and answered.

A. I'm going to answer it again using different words. I am saying the Bell claim that properties are worthless is not borne out by these sales of houses. That's what that says. That's what that means.

Page 37

Q. So you researched 43 -- I'm sorry. Let me go back.

MR. JOHNSON: Move to strike as non-responsive to the question posed, but I will move in the cause of time limitations.

BY MR. JOHNSON:

Q. Question, Mr. Bridgen. So you researched 43 homes that were sold in the subject neighborhood; is that correct?

A. That's literally what the first sentence says, yes. So yes. Yes, that is correct.

Q. Okay. For those 43 sales in the subject East St. Louis neighborhood, what were the levels of PCBs on those specific properties?

MR. SCHWETTMAN: Object to form, asked and answered.

A. I mean, we could go to the list, which is in my report, my review report, which has the 273 properties, and to raise them against the maximum contaminant testing level. Moreover, my September 7 -- sorry, my January 7, 2025, supplement has further sales that answer that question. So that's where I would look.

MR. JOHNSON: Move to strike as non-responsive.

BY MR. JOHNSON:

Q. And let me submit the question again. For the 43 sales that are the topic of Section 6.4 of the JLL report, what were the specific levels of PCBs on those properties?

MR. SCHWETTMAN: Same objection; asked and answered.
A. I mean, some we wouldn't know what they are, and others we were. And it's knowable, and we can go and look. But I can't tell you right now.
Q. With regard to those properties you just answered that you could go and look, where in your report and where specifically in your work file is the evidence of the levels of PCBs on those properties, sir?
A. Well, I told you. You look at the addresses. You compare them to the list of 273. If any of those addresses match up, you will see what the test result is.
Q. Are you able at this time in your deposition under oath to point me to where is the testing to demonstrate that any one or more of the 43 sales you referred to in Section 4 of your report were contaminated with PCBs and at what level?
MR. SCHWETTMAN: Asked and answered.
A. I mean, I'm happy to walk you through here. There's a lot of pages. I believe we got the test results from you, from counsel from plaintiffs. And they were incorporated into various expert reports. We took that data, and we --
UNKNOWN SPEAKER: Can I shorten this up? You guys are missing each other. If I can help this out, you guys are two ships passing in the night. I think



what Paul is saying is -- Paul is saying he doesn't think any of the 43 properties are in the 273. And, Charlie, you're saying, I think, some of the 43 may be in the 273, and we would have to check those numbers. You guys are missing each other. The question is whether the 43 and the 273 intersect anywhere.
A. Yeah. I'm saying it's knowable. I don't happen to know right now. But it's knowable, sure.
Q. Is it your testimony that some of the 43 are in the 273 East St. Louis subject tested parcels, Mr. Bridgen?
A. Sir, I've answered that. I've said I do not know one way or another, but we could find out. That's all. And I -- I mean, sure. I'm happen to sit here and -- 1720 Wilford Avenue and then turn back 40 pages and go look for that address if that's what we want to do. But that's how I would answer it.
Q. Can you point to any part of your work file that has the testing for any one of these 43 parcels or property sales that you talk about, home sales that you talk about in the subject East St. Louis neighborhood?
And if so, can you point me to a page in your report or pages in your work file that include that data, please?
MR. SCHWETTMAN: Asked and answered.
A. No, I have not done any testing, which we talked about on



Friday, that is outside of testing that you have given us or that others have provided us.
Q. Okay. Fair to say, Mr. Bridgen, that if you as a real estate appraiser in your industry are measuring PCBs, don't you need to know that properties are contaminated or not by PCBs?
MR. SCHWETTMAN: Object to form.
A. It absolutely depends. I mean, it depends on what the market's understanding is. It depends on the market's resistance to it. You know, as my January supplement shows, there are properties with known contaminants on them -- I'm sorry, in this case -- where PCB testing results are known to exist and are available, and yet they sell. And they sell at prices higher than properties where they don't have test results.
Moreover, as we explained in our report, there are properties where there were sales for people that were involved in the settlement and where test results were known, and those properties sold. So there is not a one-size-fits-all you have to know this or you can't use the data. There's -- I cannot answer your question.
MR. JOHNSON: Okay. Move to strike as non-responsive.
BY MR. JOHNSON:
Q. And let me pose it in a slightly different way.



Mr. Bridgen, if you are measuring the impact of PCBs on properties, don't you need to know in the first instance that properties are contaminated by PCBs?
MR. SCHWETTMAN: Object to form, vague.
A. I mean, we rely on experts that are in that field to make that determination. So I don't make a determination if something is contaminated. It is viewed against appropriate state and local and federal set regulatory thresholds. Moreover, the interpretation of those thresholds is done by other experts. That is the answer to that question.
Q. Mr. Bridgen, would you agree with me that as a real estate appraiser that if you don't know a property -- a specific property has PCBs on it, that you cannot measure the impact of PCBs on it?
MR. SCHWETTMAN: Object to form.
A. Well, I mean, let's just play logics 101. If we don't know if it's on there, we don't know what we're measuring. I guess I'm not really following you. I don't --
Q. Just as a general proposition, as a real estate appraiser, if you are attempting to measure the impact of PCBs on a given piece of property, the real estate appraiser must know whether that property has PCBs on it; fair to say?
A. No. Many, many situations where that's not true.
Q. So you're denying that if a real estate appraiser is

tasked with assessing the impact of PCB contamination on a given parcel of property, that appraiser in the first instance needs to know whether there's PCB contamination on the given property?
A. Okay. We're going to have to roll that one back a little bit. A lot of kind of complicated terminology there. Could you repeat that?
Q. Sure. Do you agree with me -- I'm sorry.
Would you agree with me that if a real estate appraiser in your industry is tasked with assessing the impact of PCB contamination on a given parcel of property, that appraiser needs to first determine whether that property has PCB contamination on it; fair to say, sir?
A. I mean, it depends on the scope of the assignment. I mean, you know, there are many assignments where I do not make a determination. Somebody else does. I might deliver the sales analysis and geocode it; and others, we rely on other's determination. So, no, I can't agree with that. There are instances where that is correct and instances where that's not correct.
Q. Can you turn to, and give me a moment to find the page -- it's Section 15.14, Mr. Bridgen, of the original JLL report. And I'll get the PDF in a moment. I apologize.
A. I might be able to get us there. I'm there.
Q. What page? What actual page is it?



A. Sure, sure, sure. It is page 231 on the bottom. I must warn you, there's a scary face on the page.
Q. And what section is 15.14, Mr. Bridgen, of your JLL report?
A. The addenda.
Q. Okay. And does that include part of your work file in this case, in that section?
A. I'm sorry. The page that I'm looking at, does that include my work file?
Q. Sorry. I'm sorry. I have the wrong section. Give me a moment to find the right section. I apologize. I'm sorry. It's 15.14. I have sight limitations. I apologize.
A. I do too, sir. I've had cataract surgery. Sorry. Yes. This time, I might need a page number because -- you said 15.14. I'm looking for that.
MR. JOHNSON: Jim, can you locate 15.14?
BY MR. JOHNSON:
Q. You can go to your table of contents, Mr. Bridgen, and find it, please.
A. Sure. That's a good idea.
Q. Thank you.
MS. BROWN: It's page 278.
MR. JOHNSON: Thank you, Maria.
A. Okay. 15.14. I'm there.



Q. Yes. And that -- that is part of the report we were discussing, the JLL PCB case studies, correct?
A. Yes. It's a summary title of an ancillary analysis whereby we include past research into case studies involving PCBs.
Q. And, in fact, this particular portion of the addenda to the JLL report contains eight JLL PCB case studies; is that correct, Mr. Bridgen?
A. I'll take your word for it. It sounds about right.
Q. Okay. Now, is it true that JLL failed to provide the East St. Louis attorneys with the work file for these eight JLL PCB case studies until after the due date for the report of July 9, 2024?
MR. SCHWETTMAN: Object to form.
A. I mean, I'll take your word for it on whatever the dates are. I don't know. I mean, some of these things -- I was in high school when some of these things were performed because they're quite old. And let me just explain for everyone's benefit, our report includes a review of the Bell report. Those case studies -- happy to talk about -- largely fall flat on -- dead on arrival when viewed by the standards in Bell's own book because they don't analyze any sales data, nor do they involve PCBs by and large.
So as part of our review, we said, hey, let's include some case studies that do use sales data and that do



address PCBs, and here they are. Some of them are quite old. There may not be a work file for them, or this is the work file for them.
MR. JOHNSON: Move to strike as non-responsive.
BY MR. JOHNSON:
Q. Mr. Bridgen, on these eight JLL case studies, were some of them going back to the Clarion days with you and Mr. Roddewig, sir?
A. As I said, they go back to days when I was even in high school. And these are case studies that we don't offer in any affirmative way. We just offer up case studies of PCBs, many of which are decades old, similar to the Bell case studies.
Q. Mr. Bridgen, was JLL or Clarion, to your knowledge, ever retained in any capacity for any of these case studies as discussed in Section 15.14 in the JLL report?
A. Let me refresh my memory on the actual locations. So the answer is most -- it's probably more likely than not that there is one or more or all. I don't have an answer to that. Sometimes our role, it's very complicated. Sometimes our role is investigating this particular issue as part of another case. So it wouldn't surprise me if we were hired in all eight of them. It wouldn't surprise me if we find out we were only hired on one of them for the nuances that I laid out for you.

Page 46

Q. And when you're retained, either with Clarion or Mr. Roddewig or now with JLL with Mr. Roddewig, when you're retained, don't you typically, either with Clarion and/or now with JLL, prepare a report, correct?
MR. SCHWETTMAN: Mr. Bridgen, I would just caution you not to disclose anything that you are a confidential litigation consultant. To the extent you were retained and disclosed, don't discuss that.
A. Okay. I was not part of the retention of these -- from what I can tell, these agreements. So I can't answer about any of these specifically. Your question was something about when we're retained we do a report. Sometimes that's true; sometimes that's not true.
Q. Okay. In this particular case, where you included in Section 15.14 these eight JLL and, perhaps, even Clarion case studies, we looked through your work file and did not see as part of the work file any Clarion or any JLL reports or depositions from those retentions on any of these eight PCB case studies. And my question is why was that, sir?
A. Why would there be?
Q. Because if you're preparing a report -- well, first of all, we asked for them. Secondly -- secondly, if you go to cite them as part of your report, which clearly on Section 15.14, being displayed on the video right now,

Page 47

they're part of your report submitted for the defense of Monsanto in this case. That's why we're asking for it, and that's why we're asking for the whereabouts of formal reports and possibly formal depositions that support or purport to support those eight case studies.
A. Sir, let me explain to you how appraisal practice works with respect to a work file. So you're trying to draw a distinction of the term "work file." A work file has a very specific definition. A work file pertains to the matter at hand. The matter at hand is an appraisal review of the Bell report.
My work file are the materials required to support the appraisal review. A work file does not mean anything and everything that is mentioned in a report, whether it was this year or 50 years ago, has to have its associated work files and any piece of paper ever associated with it. That's preposterous. So I'd be happy to explain more what a work file means.
Q. Well, let me ask you this: Why did it seem here in what was produced, that you produced -- you retained all the backup documents on these eight case studies and put them in as Section 15.14 of the JLL report but do not produce any of the actual reports and transcripts that might have been part and parcel of those case studies is my question.
MR. SCHWETTMAN: Were there reports and

Page 48

transcripts for these case studies?
THE WITNESS: Not to my knowledge. I mean, I happen to know that the first one was done on a typewriter, I think. And when I started working for the company, this is a case study, and this is the case study. This is the work file. There's nothing that is not disclosed.
BY MR. JOHNSON:
Q. All right, sir. I want to kind of tie up the questioning in this area and move on to some other questions and kind of pivot.
Mr. Bridgen, do you agree that an appraiser must prepare a work file for each appraisal or appraisal review assignment?
A. I will defer to whatever language is included in USPAP. I mean, if you want to point me to USPAP where that says that, I will happily agree with you. But I'm going to defer to USPAP.
Q. Sir, you've described yourself as an experienced appraiser in the industry and prepared a 370-page report on behalf of JLL in this case with your partner, Mr. Roddewig. Are you telling the jury and court staff that you're unable to answer right now whether or not an appraiser must prepare a work file for each appraisal or appraisal review assignment?

Page 49

MR. SCHWETTMAN: Object to form, asked and answered.
A. What you asked me was something different. You asked me for what I thought was a verbatim acceptance of something official. I've already described to you my knowledge of a work file. I think it's kind of extensive actually. And, yes, an appraiser has to keep it, yes.
Q. And a work file must be in existence prior to the issuance of any report for assignment results, correct?
A. I believe that's generally correct, yes.
Q. Sir, I want to ask some questions about risk-effect damages in this case, and let's just start out with would you agree with me, Mr. Bridgen, that the assessment of risk effect as a generally accepted appraisal method as stated in Advisory Opinion 9, sir?
A. I don't think that was a complete question.
Q. Do you agree that the assessment of risk effect is a generally accepted appraisal method as per Advisory Opinion 9?
A. No. It's a component of the analysis. If you wish to elevate something to the status that you include, I will say no all day long, and I will happily read for you AO-9. Let's go there. But if you're -- we did this on Friday. And you're substituting terminology that I say I disagree with; for example, authoritative source, and then you

Page 50

follow it with something else. And I'm telling you no. So I'm happy to discuss what AO-9 actually says.
Q. I'm just trying to get past an easy -- I think an easy topic to broach and get further down the road here. And that is a component called "risk effect" is generally accepted as an appraisal method as per Advisory Opinion 09 in your industry, sir, correct?
A. No.
Q. Okay.
A. Risk effect is not a method, sir. We covered this on Friday. So there are three potential areas of measurement of impact; cost, whereby we consider the cost of remediation, the cost to cure, hard costs, soft costs related to clean-up, et cetera; use effects, how is the property being affected, how is the house being affected, how is the backyard and the garden being affected; and risk effects, sometimes referred to as stigma, impact, things like that. How is it measured in the marketplace? How is the resistance measured? So risk effect is not a methodology.
Q. Yes. My question now is to evaluate risk effects, is it appropriate to perform the following analyses; one, literature review; two, case study and analysis; and three, sales comparable analysis?
A. I will defer to whatever is in my report because those can

Page 51

be acceptable methods when applied properly. But actually, no, your statement is actually false. Literature review is not a method that can stand on its own. It can be used in support of data.
In fact, the Bell damages book goes to great lengths to identify those methods that are most appropriate and most relevant, and they include empirical market-based evidence. So I will not give you a blanket yes that those are the methods.
Q. I don't think I said "methods" as opposed to "analyses." So let me restate it quickly.
To evaluate risk-effect damages, is it appropriate to perform the following analyses: One, literature review -- let's stop there. One, literature review, is that appropriate?
A. It is an appropriate piece of analysis that should be undertaken to support -- in support of data analysis. On its own, it is not an accepted methodology. Taking the results of somebody else's research in somebody else's location, those that may or may not have involved sales analysis is not a substitute for doing your own primary research.
MR. JOHNSON: Move to strike as non-responsive after acknowledging that literature review is an acceptable analysis to evaluate risk effect.

Page 52

A. No, I said something different.
Q. Same question. Let's move on. To evaluate risk effects, is it appropriate, Mr. Bridgen, to perform case-study analyses?
A. Only when there is an absence of primary data in the marketplace. That is incredibly well understood. In fact, the only reason why case studies are even mentioned is because there isn't local sales data available from which to analyze. And we know in this case that is not the case. So I would not think that case studies would be needed in this matter.
MR. JOHNSON: Move to strike as non-responsive. And I just really need a yes-or-no answer.
BY MR. JOHNSON:
Q. And that is, Mr. Bridgen, to evaluate risk-effect damages, is it appropriate to perform case-study analyses?
MR. SCHWETTMAN: Asked and answered.
A. So I answered this, and I'm happy to explain it again. The Bell book describes this, as does USPAP and the appraisal of real estate.
When there is an absence of local sales data, what does that mean? Sales in East St. Louis. When there are none, it may be appropriate to consult outside case studies in other markets. But then if that is performed, you must look at sales data, not some other substantive

Page 53

data. That is my answer.
Q. Mr. Bridgen, to evaluate risk effects, is it appropriate to conduct sales-comparable analyses?
A. Can be, certainly.
Q. Okay.
A. Can be. In fact, I would use sales-based analyses over case-study analyses for the reasons I just mentioned.
Q. Case-study analyses are comparative; are they not, sir?
A. I mean, if one wants to talk about them that way, perhaps. But they're -- traditional context, sir, is viewing them as a substitute for sales data when not available. The very --
It's a very simple concept. If you're having trouble analyzing something in the immediate market, which is what your situation is because there are no sales, what else are you going to do? You might have to go somewhere else. But when you have sales in your local market, why go somewhere else?
Q. And did the JLL report include a case-study analysis, including both a critique of Bell's case studies and additional case studies not in the Bell report?
A. Yes, and we covered this. I gave you the reason why.
Q. And isn't it true that all of JLL's case studies were included in the JLL report to address risk-effect damages?
A. No.

Page 54

MR. SCHWETTMAN: Object to form.
BY MR. JOHNSON:
Q. Although you take the position that you did not provide an opinion of value in this case, why did you develop your own case studies separate and apart from Dr. Bell's case studies, sir?
A. I believe that's described in my report. I'd be happy to go find it. Of the 370 pages, I don't have that memorized.
Q. Well, can you tell me why -- I'm sure you're not going to explain in your report exactly why you developed your own case studies. But you don't know your own report? You can't answer my question I just posed?
MR. SCHWETTMAN: Object to form, argumentative.
A. I mean, sir, if you recall, about 15 minutes ago I actually gave you the answer to this question. So I said even though the Bell report offers case studies that are inappropriate because they do not rely upon sales, something that is required in the construction of case studies, the Bell book says that, as do numerous other sources.
Moreover, many of them don't even include PCB situations. So even though we correct each of the inappropriate Bell case studies -- and when I say "inappropriate," I mean the conclusions that flow from

Page 55

them. We took a look at case studies that had already been performed by us in the past. So it may be helpful to this matter.
MR. JOHNSON: And since I'm running low on time, I want to turn, please, Jim, if we could, to Exhibit 6, the JLL report at -- I believe it's actual page 169 and the PDF 171. And I want to emphasize, Jim, the diagram in the middle of the page there, if you could.
BY MR. JOHNSON:
Q. First of all, Mr. Bridgen, you're on your own copy of the same page, correct, with the diagram?
A. Yes, I am.
Q. Yes, sir. Now, this has to do with your JLL analysis of the Doe Run situation; is that correct?
A. Yes.
Q. And what was the purpose for JLL to include the Doe Run analysis in the JLL report, sir, generally speaking?
A. As described numerous times today and Friday and in the report, it was a Bell case study offered in the Bell report improperly constructed, analyzed, and applied. And as consistent with the review appraisal or appraisal review, we summarized the errors, omissions, misrepresentations, improper comparisons, and required corrections, which is required by USPAP. That is what

Page 56

this is.
Q. Okay. So the diagram in front of us -- well, first of all, let me ask you for definitional purposes, what does it mean when a corporation that contaminated a property performs buy-outs? What does that mean to you within the appraisal industry context, sir?
MR. SCHWETTMAN: Object to form.
A. I mean, I'm going to give you just my layman's terms understanding of it because I don't -- I'm not an expert in a buy-out space in terms of I don't perform buy-outs, and I do not work for a chemical corporation that has to perform buy-outs.
But my general understanding is for reasons that can include political neighbor -- neighbor mitigation, good neighbor programs, efficacy, timing, press concerns. It's easier for a company to say we're going to buy up these properties and give these folks money; and we're going to take their properties, and they're going to move.
Q. With that definitional background, or that understanding of background in mind, does the yellow area depicted in the diagram that we're displaying on the video now purport to be Doe Run's buy-out area, sir?
A. You know, there were -- there's different geographies and there were different buy-outs. For instance, if you lived in a certain area, you got some percentage of your home

Page 57

plus maybe a sweetener or an extra, but you had to act in a certain date. A different area had different terms. I think generally the area in yellow is the buy-out, but I'm not positive.
Q. Okay. Is it true that when corporations perform buy-outs, such as the one in Doe Run that we're diagramming here, they pay the unimpaired full market value of a property despite the fact that the properties are impaired?
MR. SCHWETTMAN: Object to form, incomplete hypothetical.
A. They pay an amount that they want to pay. Sometimes they pay a lot more. Sometimes they pay less. I don't really have an answer to your question. Their motivations are very different from an appraisal. I couldn't speak to that.
Q. My follow-up is simply what you just said in your answer, sir; they pay whatever amount, sometimes more, sometimes less than the unimpaired full market value.
But my point is despite the fact that the properties are unimpaired, is that correct, sir? Is that not correct, sir?
A. They could be. They could not be. I know in several instances, the Bell case studies mistakenly identify areas as being outside of the area. But, in fact, in the case of Escambia, the buy-out was extended to other areas,

Page 58

other homes because they were also Section 8 housing, and they weren't going to be able to politically buy out one complex and give everybody, you know, a free ride, or however they termed it, and not do the other one down the street. So, I mean, these are political reasons. Sometimes it's campaign promises. So I wouldn't read too much into what the track record is in one versus the other.

MR. SCHWETTMAN: I think that's 90 minutes.

MR. JOHNSON: Move to strike as non-responsive.

BY MR. JOHNSON:

Q. All I was asking, sir, is that when corporations perform buy-outs, whether they pay above the full unimpaired market value of the property or less than the full unimpaired market value of the property, they do so despite the fact that the properties are impaired, correct?

MR. SCHWETTMAN: Asked and answered. And, Paul, I think we're at 90 minutes.

A. I would say that not necessarily. And there's an important distinction; that a buy-out is not equal to diminution. A buy-out means you're trading your property for money and you move.

Diminution is an allegation that somebody did something to my property, and you won't buy it from me, or

Page 59

whatever it is, and I believe that I should be given something in return. They are two totally different things. Are not appropriate from an appraisal context as a substitute for one another.

MR. JOHNSON: Move to strike as non-responsive, and let me just continue on.

MR. SCHWETTMAN: I think we're at 90 minutes, Paul.

BY MR. JOHNSON:

Q. Did you or someone on your team inspect Doe Run prior to submitting your report on this matter?

A. Yes.

MR. SCHWETTMAN: Paul, we're at 90 minutes. We're done.

MR. JOHNSON: Are you not going to allow me to ask this witness questions about the Doe Run diagram buy-out area being displayed on the video screen right now?

MR. SCHWETTMAN: I allowed you to ask this witness questions in accordance with our agreement, and it's been 90 minutes. You got your additional time. And this witness has to leave.

MR. JOHNSON: I asked you a question, Tyler. That is --

MR. SCHWETTMAN: I answered it.

Page 60

MR. JOHNSON: Are you not allowing this witness to answer my specific questions now on Doe Run? It's only going to take a few minutes.

MR. SCHWETTMAN: I didn't -- do you need to leave, Mr. Bridgen?

THE WITNESS: I have to leave. I mean, I have children to pick up, but --

MR. LEMMON: You can waste some more of our time, and we can come back another time because you haven't answered the questions, and you played this silly game the whole time, the last time and today.

MR. SCHWETTMAN: Paul, you can finish Doe Run.

MR. LEMMON: You can do whatever you want. You do whatever you want.

MR. SCHWETTMAN: Paul, finish Doe Run and we're done.

MR. LEMMON: You can stop him and you can object to me and you can move to strike and all that stuff, but I'm going to tell you --

MR. SCHWETTMAN: Andrew, now you're wasting time. Paul, I said you can do Doe Run.

MR. LEMMON: We're going to take this to the court. This is baloney. This is just not something that we're going to just, like, take. Sorry. You guys --

Page 61

MR. SCHWETTMAN: Paul, do you want to ask about Doe Run?

MR. LEMMON: You've gone way too far. Thank you very much, Mr. Bridgen. You have evaded as many questions as you could.

MR. SCHWETTMAN: Okay. Paul, do you want to ask about Doe Run and then we can be done?

MR. JOHNSON: Yes, I want to ask questions about Doe Run, and then I'll be completed because of the time limitations.

MR. SCHWETTMAN: Thank you.

BY MR. JOHNSON:

Q. So when was the inspection conducted at Doe Run? Just a general timeframe, sir.

A. I believe it was the end of June.

Q. What specifically did the inspection consist of, Mr. Bridgen?

A. I drove it. I drove the entire area. I drove the perimeter of the buy-out area. I inspected the neighborhoods above the veteran's memorial building that was just constructed right next to the racetrack there. I inspected the residential neighborhoods that generally are all around this photo and beyond. I inspected the ongoing operations that are at whatever legacy or continuing industrial operations that are there.

Q. Okay. On page -- actual page 172 of your report, which would be PDF 174, you have three properties listed at the top; 555 Reservoir Street, 359 Station Street, and 552 Reservoir Street, correct, sir?
A. Yes.
MR. JOHNSON: Jim, you have to go back to actual page 172, please. There we go.
BY MR. JOHNSON:
Q. Were there any other specific sales, Mr. Bridgen?
A. What do you mean were there any other sales?
Q. Well, at the top of page 172, you have three properties listed at the top. Are those the three sales that you studied pertaining to this case study?
A. Okay. Okay. Well, in this instance, the buy-out area was very comprehensive, and all of the property -- well, all or the majority of the properties were removed. And I don't believe -- either none of these three or one of these three is actually located in the original buy-out area. And either two or either all of them are just outside of that buy-out area.
And so I believe I describe that in here, and they're offered as proxy for being right there. And so that was the analysis that was performed.
Q. Okay. So quickly, with respect to that first property listed, 555 Reservoir Street, just for clarity here, that



sold in November of 2014. Where is that property located in relation to the yellow buy-out area on the map, outside or inside?
A. It's incredibly close, if not inside, to the area to the right of the racetrack.
Q. Okay. So it would be outside the buy-out area to the north; is that fair, sir?
A. Either within or just outside to the north.
Q. Okay. Next, the second property, 359 Station Street, which your report indicates was sold in June of 2015, where is that located on the map with regard to outside or within the buy-out area, Mr. Bridgen?
A. It says it's approximate to the Herculaneum site. So it's very close. It's -- I believe it's School Street or I think it was -- Station Street. Station and Reservoir are just right next door to the former smelter and racetrack.
And so while it was not a buy-out home and it wasn't demolished, it was a home that's less than a couple of blocks from the source site and, therefore, eligible for analysis. Very, very acceptable technique.
Q. Was the 359 Station Street residence which sold in 2015, was that an improved single-family residential sale, Mr. Bridgen?
A. Three-bedroom, one bath, yep.
Q. Okay. Was this property a Doe Run buy-out?



A. No.
Q. Okay. Even though you stated this was a single-family residential sale, you recognize that the property was vacant; is that correct, sir?
A. I was not there in 2015. So I don't know if it was vacant or not.
Q. Okay. Do you know what was there at 359 Station Street during the actual inspection, Mr. Bridgen?
A. You know, by the way you're questioning me, it could have subsequently been demolished. And if that's the case, it wouldn't shock me, so...
MR. SCHWETTMAN: Paul, are you almost finished with Doe Run questions?
MR. JOHNSON: I am.
BY MR. JOHNSON:
Q. How did you account for the fact that Doe Run bought out this property, which was abandoned, demolished, and has become vacant and unused, sir?
A. Could you repeat that?
Q. How did you account or did you account for the fact that Doe Run bought out this property, which was then abandoned, demolished, and has become vacant and unused, Mr. Bridgen?
MR. SCHWETTMAN: Object to form.
A. I mean, what I said earlier was the Bell report



inappropriately relies on buy-out program information, which by their very definition lead to, typically, demolition and become something else. The company buys up the properties for a variety of reasons, as I explained earlier.
The purpose of a case study is to inform when there are no sales in the local market, which is not the case here. But when there are no sales in the local market from which to analyze, we look at case studies where we can look at actual sales data. That doesn't mean that the case study has to look at a buy-out property. That doesn't tell us anything. A buy-out property tells us very little. It tells us that somebody settled with a neighbor and gave them some money. It doesn't tell us how much damages there are, if any.
However, sales right next to the plant allege to be a sore sight, et cetera, can be an effective appraisal indication. And that's what I've done here.
Q. Mr. Bridgen, speculation about what may happen in the future to a given parcel is exactly that, just speculation, correct?
MR. SCHWETTMAN: Object to form, vague. And it sounds like we're done with Doe Run.
MR. JOHNSON: I'm still within Doe Run.

BY MR. JOHNSON:
Q. Mr. Bridgen?
A. Could you repeat the question?
Q. Yes. Speculation about what may happen in the future is exactly that, just speculation, correct? As it pertains to 359 Station Street, 552 Reservoir Street in the Doe Run study?
MR. SCHWETTMAN: Same objections.
A. Are we talking about appraisal speculation or land development? I don't understand your question, sir.
MR. JOHNSON: Tyler, how much time are you going to give me to finish up the Doe Run question and answers here?
MR. SCHWETTMAN: Well, how much time do you have planned? Because we're well past the 90 minutes now.
MR. JOHNSON: At least 15 minutes.
MR. SCHWETTMAN: No.
MR. JOHNSON: Mr. Bridgen, in light of that answer from your counsel, that's all the questions I have today. Thank you, sir.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: We'll go off the record. The time is 4:22 p.m., and this concludes today's testimony given by Charles Bridgen. The total number of media units used was two and will be retained by



Veritext Legal Solutions.
(The deposition concluded and witness excused at 4:22 p.m.)
* * *



CERTIFICATE

I, Angela J. Galipeau, a Notary Public, in and for the County of Porter and State of Indiana, do hereby certify:

That CHARLES BRIDGEN appeared before me on Tuesday, January 21, 2025, and was duly sworn or affirmed to testify the truth, the whole truth, and nothing but the truth to questions propounded at the taking of the foregoing deposition in a cause now pending and undetermined in said court;

That I further certify that I then and there reported stenographically the proceedings at the said time and place; that the proceedings were then transcribed from my original shorthand notes; and that the foregoing typewritten transcript is a true and correct record thereof;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 22nd day of January, 2025.

Angela J. Galipeau

Angela J. Galipeau, RPR, CSR-IL
Notary Public, State of Indiana
Residence: Porter County
Commission Expires: 4-23-25



Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

January 24, 2025

To: Tyler Schwettman, Esq.

Case Name: City of East St. Louis v. Monsanto Company, et al.

Veritext Reference Number: 7125719

Witness: Charles Bridgen Deposition Date: 1/21/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 70

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7125719
CASE NAME: City of East St. Louis v. Monsanto Company, et al.
DATE OF DEPOSITION: 1/21/2025
WITNESS' NAME: Charles Bridgen

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

______________ ______________________
Date Charles Bridgen

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

_________________________________
Notary Public

_________________________________
Commission Expiration Date

Page 71

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7125719
CASE NAME: City of East St. Louis v. Monsanto Company, et al.
DATE OF DEPOSITION: 1/21/2025
WITNESS' NAME: Charles Bridgen

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

______________ ______________________
Date Charles Bridgen

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal
this ______ day of____________________, 20____.

_________________________________
Notary Public

_________________________________
Commission Expiration Date

Page 72

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7125719

PAGE/LINE(S) / CHANGE /REASON

________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________

________________ __________________________
Date Charles Bridgen

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________ DAY OF ________________________, 20______ .

___________________________________
Notary Public

___________________________________
Commission Expiration Date