# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | Case No. |
| | ) | 3:21-cv-232-DWD |
| MONSANTO COMPANY, et al., | ) | |
| Defendants. | ) | |

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

DANNY REIBLE, PhD, PE(LA), BCEE, NAE

AUGUST 16, 2024

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF DANNY REIBLE, PhD, PE(LA), BCEE, NAE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on August 16, 2024, from 9:43 a.m. to 5:23 p.m., before Donna Wright, CSR in and for the State of Texas, reported by machine shorthand, at the law firm of HENDLER LAW, 901 South Mopac Expressway, Building 7, Suite 300, pursuant to the Federal Rules of Civil Procedure and any stipulations or agreements stated on the record or attached hereto.

# A P P E A R A N C E S

FOR THE PLAINTIFF:

Mr. Andrew A. Lemmon
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
5301 Canal Boulevard
New Orleans, Louisiana 70124
(985) 783-6789
alemmon@milberg.com

-and-

Mr. Christopher J. Quinn
THE DRISCOLL FIRM, PC
211 North Broadway, Suite 4050
St. Louis, Missouri 63102
(314) 932-3232
chris@thedriscollfirm.com

-and-

Mr. Matthew J. Limoli (via Zoom)
THE DRISCOLL FIRM, PC
301 Fayetteville Street, Suite 1825
Raleigh, North Carolina 27601
(919) 404-9510
matthew@thedriscollfirm.com

FOR THE DEFENDANT MONSANTO COMPANY:

Mr. William S. "Buddy" Cox, III
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 5th Avenue N
Birmingham, Alabama 35203
(205) 521-8185
bcox@bradley.com

-and-

Mr. Tyler W. Schwettman
SHOOK, HARDY & BACON LLP
The Plaza in Clayton
190 Carondelet Plaza, Suite 1350
St. Louis, Missouri 63105
(314) 690-0228
tschwettman@shb.com

FOR THE DEFENDANT SOLUTIA:

Mr. Charles Ronald Hobbs, II (via Zoom)
LATHROP GPM
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, Missouri 63105
(314) 613-2577
ron.hobbs@lathropgpm.com

INDEX

Appearances............................ 2

DANNY REIBLE, PhD, PE(LA), BCEE, NAE

Examination by Mr. Lemmon............... 7
Examination by Mr. Cox.................. 222
Reporter's Certificate.................. 223

EXHIBITS



| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | .......................... Reible CV | 9 |
| Exhibit 2 | .......................... Engagement Letter | 34 |
| Exhibit 3 | .......................... Reible Report | 66 |
| Exhibit 4 | .......................... Notice of Deposition | 89 |
| Exhibit 5 | .......................... Invoice | 92 |
| Exhibit 9 | .......................... Monsanto Pledge | 143 |
| Exhibit 10 | .......................... Weeks Report | 75 |
| Exhibit 15 | .......................... 2016 EPA Letter to Mayor Jackson-Hicks | 189 |
| Exhibit 17 | .......................... Report of Aroclor Ad Hoc Committee (2nd Draft) October 15, 1969 | 158 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:43 a.m. on August 16, 2024.

Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video the recording will continue to take place unless all parties agree to go off the record.

This begins Media Unit No. 1 of the video-recorded deposition of Danny Reible taken by the -- counsel for the plaintiff in the matter City of East St. Louis versus Monsanto Company, et al., filed in the U.S. District Court for the Southern District of Illinois, Docket No. 3:21-cv-232-DWD. The location of the deposition is 901 South Mopac Expressway, Austin, Texas.

My name is Casey Mummert representing Veritext, I am the videographer. The court reporter is

Donna Wright from the firm Veritext. I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present, including remote, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. LEMMON: Andrew Lemmon on behalf of the plaintiff, City of East St. Louis, Illinois.

MR. QUINN: Chris Quinn, also on behalf of the plaintiff.

MR. LIMOLI: Matthew Limoli on behalf of the plaintiff.

MR. SCHWETTMAN: Tyler Schwettman on behalf of Monsanto Company and Pharmacia, LLC.

MR. COX: Buddy Cox on behalf of Pharmacia and Monsanto.

MR. HOBBS: Ron Hobbs for

defendant Solutia.
THE VIDEOGRAPHER: Will the court reporter please swear in the witness and then counsel may proceed.
DANNY REIBLE, PhD, PE(LA), BCEE, NAE, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LEMMON:
Q. Good morning, Dr. Reible. Andrew Lemmon on behalf of the plaintiffs in this case. Nice to see you again.
A. Nice to see you.
Q. Would you please give us your name and professional address?
A. I'm Danny Reible and I'm a professor at Texas Tech University. And the address there is 901 Boston, Lubbock, Texas 79409.
Q. And you have given your deposition before and know basically how the process goes, I know. But if you don't understand something or need me to repeat something, please ask. If you answer the question, we will understand that you

assume -- you understood the question. And it's all going to be recorded and on the record for the court.

Do you understand that?

A. I do.

Q. And if you need to take a break or anything like that, just let us know, as long as it's not during the time that there's a question on the floor, and we will accommodate you.

Is there anything that prevents you from giving full and accurate testimony today?

A. No, there is not.

Q. And I understand that you have been hired by the defendants to testify as an expert witness in property damage in this case?

A. That is correct.

Q. And if I use the term "defendants," that would include Monsanto, Solutia, Pharmacia.

Is that okay with you?

A. That is fine.

Q. And if it needs to be

different, then we will -- we will make that clear, but that's how I'm going to generally refer to either defendants or sometimes maybe even Monsanto. Okay?

A. That will be fine.

Q. All right. And I gave you, before we started, what I have marked as Exhibit No. 1.

(Exhibit 1 marked)

Q. And is that a copy of the curriculum vitae that you provided along with your expert report?

A. It is.

Q. And is it up-to-date and accurate?

A. It is, although I identified a typographical error at one point that was recently added to it. I will correct that.

Q. All right. Can you explain the acronyms after your name? P.E., I suppose, is professional engineer?

A. That's right, professional engineer in Louisiana. And then a board certified environmental engineer is B.C.E.E. And N.A.E. represents National Academy of

Engineering.

Q. And what is F.N.A.I.?

A. That is a fellow of the National Academy of Inventors.

Q. And the certifications, other than the engineering, is in Louisiana or other places?

A. The professional engineering is in Louisiana.

Q. And the others are national certifications?

A. That's correct.

Q. Now, can you tell us what particular area of expertise you are going to testify on in this case?

A. My particular focus in this case is -- was the technologies that were used to control emissions from the facility, particularly in the time prior to the recognition of the hazards, the specific and somewhat unique hazards that the PCBs pose.

And then also I did review as part of that some other expert's report and made some notes relative to dispersion downwind from the facility of any air

emissions, as well as the implications of that in terms of remediation.

But my primary focus was to examine the -- what was known about the hazards and where the chemical processes, both conventional and appropriate, to try to address those hazards, as they were known, especially prior to the time of recognition of the unique hazards of PCBs.

Q. When was the time of recognition of the unique hazards of PCBs?

A. That largely began in 1966 with the -- the work of a Swedish scientist who found that PCBs had been -- that had been released in the environment were found in a variety of organisms, especially a higher level of organisms, and that they -- there was evidence of an accumulation as these organisms would interact with other organisms, would consume other organisms and they are accumulating the PCBs.

That was also reflected in identification in 1968 in the United States that indeed the same things were observed here. And that very quickly led to a lot of

focus on PCBs and ultimately they were banned from production in the late 1970s.
Q. So 1966 was the first time that the bioaccumulation of PCBs was understood. Is that what you're saying?
A. That was the first time that it was well-documented in the literature. I don't know of any specific references to it prior to that time. And it was at that time that it was beginning to be identified and more broadly in the scientific literature it became very quickly at that point.
Q. And what in particular qualifies you to testify about the emission control technology that was used by Monsanto in the manufacture of PCBs prior to recognition of the hazards?
A. Well, all of my degrees are in chemical engineering, so I have been trained in the area of chemical processes. And, in addition, I teach courses on pollution control and -- both into the atmosphere and to other phases.
Q. Pollution control and other phases?

A. Yeah. You know, pollution control to the atmosphere as well as to water. I teach courses in environmental engineering, both how do we assess and manage the behavior of the contaminants in the environment, but also how do we control those contaminants and control their release.

Q. Specifically, what did you know about Monsanto's emission control technology prior to 1966?

A. So the -- I examined the process and examined the control of that process. There are -- I feel that there are four significant points in the process that could lead to releases to the air of PCBs.

The two most important are in the actual reactor that forms PCBs from biphenyl and in the -- that's the chlorination reaction, and in the distillation in which the product was refined. And in both cases, there were -- I would refer to them as conventional control equipment to avoid the release of those, any release to the atmosphere of any significance.

In addition, there were two other points that I think led to concerns, at least within the facility itself, which was the processes of handling or the handling of the solids, the high molecular weight, the high chlorinated PCBs. And the management of that led to dust, at least in Anniston and, you know, potentially anywhere that it was being processed when they are handling those solids.

And then the second was an aeration of the product Aroclors, just to remove trace impurities. And those two didn't have any controls because there was not anywhere near the amount of releases as you would have expected from both the reactor and the -- the distillation system.

Q. You said -- what was the word that --

A. So the aeration is actually the appropriate word, yes. It was aeration of the product.

And so those were areas where I looked at the process where I identified there is potential for air releases. The --

of course, with respect to the processing of the solids, that ended in the Krummrich facility in 1949, and they no longer processed the high chlorinated materials, as I understand it.

And then the aeration process was later estimated to produce something on the order of a half pound or 1-1/2 pound per day, which are pretty insignificant emissions.

Q. So the aeration of products would be expected to produce a half to one pound per day of emissions?

A. Half to 1-1/2, I believe.

Q. 1-1/2.

A. I did not make that estimate. It was estimated by Monsanto scientists, once the concerns about releases, potential releases of PCB became known, there was a large effort to both estimate, and then later control, what those emissions might be.

And so as part of that process, that -- the emissions from aeration were estimated at half to 1-1/2 pounds per day.

Q. These four points of concern

would all have been in the manufacturing process?
A. That's correct.
Q. So did you consider potential emissions in the packaging or distribution process?
A. That's where the solids would be -- you know, when the solid is processing and the dust that was formed from that was part of the packaging process.
Q. Okay. So that's a -- so it's really one, two and four are in the manufacture and three is separate -- if I'm separating the distribution --
A. Well, if you were separating the processing of the final materials for packaging and shipment as separate, yes.
Q. And was all of those four points of concern confined within Unit 246?
A. I'm not sure of the number of the unit, but within the confines of the production facility itself.
Q. Okay. Was there a particular document that you looked at that described the process of the manufacture of PCBs at any

given time and then also over time?
A. There is a document, I believe it's -- it's referenced in my report, I believe it's dated in the mid-1950s.
Q. Would that be the Mather, Process for Production, in 1950 -- April of 1955 at Footnote 1 of your report? And I can hand you your report if you want.
A. I do have a copy of it.
And, yes, that is correct.
Q. Is there a document that describes the manufacture of PCBs prior to 1955?
A. That document seemed to describe the process that was, to my knowledge, existing the entire time at the Krummrich facility up until -- there were minor changes that were made in the late 1960s and early '70s to try to control any emissions from the facility.
But, largely, I believe that that process was existing and operating, as discussed there, from the entire period of 1936 until the plant was shut down.
Q. Have you ever consulted or

testify -- testified regarding air dispersion or soil contamination from PCBs?

MR. COX: Object to form.

THE WITNESS: I have testified in the past relative to PCB contamination in the environment. Much of that has been focused on sediments, contaminated sediments.

Q. (BY MR. LEMMON) So it's sediments in water, though, right?

A. That's correct.

Q. Have you ever testified regarding the contamination of soil on -- you know, that's not in water that was not related to any water settling?

A. I don't believe that I have right offhand. I don't remember one specifically relative to soil. I certainly have given testimony about air dispersion of contaminants, similar to the -- well, any contaminant, including what might be present in the air from PCBs.

Q. Have you had any field experience with any kind of detection or sampling for PCBs?

A. A lot of my research is based on passive sampling in the environment. And what we do with that technology is that we use -- for PCBs, it's primarily polymeric materials that we insert into soils and settlements to measure PCBs. And what we're measuring is the PCBs in the bore water, in the interstitial water of the soils and of the sediments.

So in terms of analysis, I've spent a lot of my last 20 years of my career to develop those techniques to be able to both, well, measure and assess availability and mobility of contaminants, including among those PCBs.

Q. And are you able to describe the phenomenon by which PCBs are emitted or dispersed on particulates?

A. Certainly the partitioning to the particulates is an area that I'm well-versed in and I studied a great deal myself and how that might absorb under particulates, and then how particulates might move, either in the atmosphere or contain contaminants in place on the ground, yes, I

believe I can address that.

Q. And how long has that phenomenon been understood?

A. The air dispersion of particulates is probably one of the first parts of air pollution that were known because the primary air pollution concerns, when we look back in the 1960s, was associated with visible smoke. And that is particulates that -- and the contaminants they carry.

Admittedly, the study of the contaminants absorbed on those particulates is much more recent and stems largely from the 1970s and 1980s and since that time.

Q. During the time that they were studying smoke or were aware of smoke being particulates, they were aware that it was something that was causing that --

A. They were certainly aware of the particulates themselves being both a concern due to potential for soot collection on surfaces. So, you know, it was certainly a nuisance.

And they became more aware of

the environmental hazards of that soot particularly in the early 1950s as a result of the accumulation of smog or, in this case, soot-based smog over the city of London. Many people died. And so certainly relatively early on, the hazards associated with particulates were relatively known.

Q. And in your study of PCBs, are you familiar with Dr. Erickson?

A. Are we talking about the Erickson that is a --

Q. Mitchell Erickson.

A. I don't -- no, I don't believe I know him personally. But I'm aware of the report that he provided.

Q. Are you aware of his textbook or any of the other things that he has written?

A. I am -- I believe that I have seen that textbook. And, quite honestly, I wasn't sure it was the same -- I didn't realize it was the same Erickson.

Q. Okay. Is that -- would you recognize that textbook as being authoritative on the nature and chemistry of

PCB?

MR. COX: You are talking about Dr. Erickson's chemistry of PCBs textbook precisely, correct?

MR. LEMMON: Correct.

THE WITNESS: Yes, I have made use of that textbook in the past and it reflects our understanding of the analytical chemistry of PCBs at the time it was published.

Q. (BY MR. LEMMON) Has that changed? Has the understanding changed since the publication?

A. Most of those topics that are addressed in that book, I would say probably not. Certainly our understanding of hazards and toxicity of PCBs and, as I mentioned, how we might measure them, for example, using passive sampling has certainly changed.

Q. You give a general description of the characteristics of PCBs -- tell you what, let me delay that for a moment.

You mentioned that part of what you were doing is criticism or analysis, anyhow, of other expert opinions, making

comments -- comments, is what you said, on others' opinions.
A. That's correct.
Q. Do you intend to go beyond any of the criticism that's -- or comments that are stated on Page 14 of your report?
A. I have not been asked to go further and I don't intend to go further at this time.
Q. The description that you give on -- in the background section on Page 4 and 5 of your report, is there anything in particular about that description that is unique to this case or is this basically to give a background of PCBs as an introduction to the opinions in your report?
A. I would say that this would be a background to general PCBs that's not unique to this case. I guess the one point that might be specifically relevant to this case is the -- when the recognition of bio accumulation associated with PCB became known, and as we talked about before, that was largely in the late 1960s that the scientific community began to be aware of

that and very quickly our understanding improved a great deal relative to bioaccumulation of PCBs.

Q. And that's Jensen's report?

A. Jensen is the first scientist to identify it in food chains and the accumulation of food chains that led to a lot of the studies that were done thereafter.

Q. And going back for a second to the process at Krummrich, what particular emission control technology did Krummrich use up until 1966, or up until, I think, 1969, when they added what you characterized as minor changes?

A. And so the -- so the first step in the process is the chlorination of biphenyl, and then there were the product stream from that, which would include a vapor stream that would have the dechlorinated biphenyl. There was a condenser, a scrubbing tank, a cyclone separator, which are all standard approaches to remove the -- both vapors and particulates from that particular process.

In addition, in the

distillation process where the product was refined, there were, again, condensation, there's a light Aroclor adsorber [sic] and condenser, and then the vapors were sent through a coke scrubber before being released to the atmosphere.

The product was also treated with a soil adsorbent, with Fulton's earth, which is a way to remove primarily trace acids, but it would also absorb other things as well.

So those are the primary steps in the process that are control equipment.

Q. And that's what you describe -- what you just answered in response to that last question is what's described on Page 6 of your report?

A. That's correct.

Q. Or beginning of Page 6?

A. Correct.

Q. And even with the use of those technologies, there was still some release to the air, some emissions to the air of PCBs during the manufacturing process, right?

A. So the vapors from the

distillation ultimately, after the coke scrubber, were released to the atmosphere, so there was likely some release. Again, no treatment process is 100 percent perfect, but those would likely be very small and I think subsequent estimates of what those might be indicated that they were quite small.

The HCl from the primary chlorination step at Krummrich was used in other processes. So that stream did not discharge directly into the atmosphere.

Q. And when you say "quite small," I think that we talked -- that your report talks about approximately 4.9 pounds day?

A. That was the estimate by -- I guess an EPA-contracted air dispersion estimate, which I find -- I thought that they employed a reasonable scientific approach, a credible approach. I believe Weeks was the author of that report.

And the overall estimate was about five pounds a day, max -- a maximum of 12 pounds per day during the period of maximum production in the 1970s.

Q. Okay. So you -- five pounds a

day, you think, is a reasonable estimate of the emissions to the air from the manufacturing process?

A. And that estimate was reached by -- from a number of different approaches, which is also always helpful. I, again, did not make those estimates, but Weeks, as well as the efforts by Monsanto, especially when they became sensitized to PCB releases, made a number of measurements and estimates, and all of those seemed to focus in the range of this five pounds a day.

Q. And you accept that?

A. I believe that those are very reasonable estimates of the emission rate.

Q. Okay, great.

Did you ever work in a chemical manufacturing plant?

A. I have worked in a refinery for -- it was actually while I was still an undergraduate as a co-op, but a total of about two years working in a refinery.

Q. Did you work in either emission control or --

A. I was -- I worked in the

process engineering part of the process engineering department, and some of my projects involved environmental control, process control.

None of them were directly related to air pollution. But I, for example, designed some facilities to improve their wastewater treatment plants.

Q. Gotcha.

Did you work in industrial hygiene?

A. I have not worked in industrial hygiene.

Q. And what was the waste stream that you were working to control?

A. In -- while I was working --

Q. The refinery.

A. -- in this refinery?

Oh, it was a mixed hydrocarbon waste stream from trace contamination of their discharged water and that they would have a wastewater treatment system. And what -- my process unit that I was designing and testing was a tertiary treatment, a filter, basically, after biological

treatment, after primary clarification to try to improve the quality of the wastewater.

Q. Where was that?

A. This was in Beaumont, Texas.

Q. What particular company?

A. It was Union Oil at the time. I believe the refinery no longer exists.

Q. Did you, in looking at the Monsanto processes, have the opportunity to -- did you look at other documents or were there other documents besides the Mather document that you described?

A. I relied on no other document other than the ones that I have cited in the report. And there are other documents, although the Mather report includes a lot of the, you know, memos, et cetera, that are also cited in here.

Q. Did you have the opportunity to look at -- or to -- access to any of the Monsanto archives of PCBs?

A. I did not directly address the archives. I focused specifically, for example, on that Mather report. I did skim through the exhibits of other experts that

included various memos and, you know, to some extent they may have been, you know, the ones that I found relevant to my work that I focused on and that relied upon other ones that I cited here.

Q. Okay. And they are not cited anywhere in your report, at least not that I saw.

A. Well, there are some specific documents that have -- I presume, for example, your reference to an archive, Footnote 14 and 15 refers to some specific pages from, presumably, those archives, since they have the "ARCH" indicator. And the -- there are references to a few memos, for example, 25, 1974. That, again, is an archive document.

Q. So maybe I misunderstood, but when you were talking about the experts, are you talking about from this case or experts --

A. Oh, I was looking at depositions that were also a part of this case. And so I did review and see if any of those exhibits were relevant to forming my

opinion, and those that I found that were useful, in my opinion, are the ones that I've cited here.

Q. Gotcha.

What about the experts that are hired by Monsanto in this case? I think yours is only the second deposition taken of the experts.

A. So I did not -- other than the ones that had already been deposed, for example, Pierle, Mr. Kaley, I think those are some depositions that were already in place.

But other than those, I did not review any depositions or reports prior to the fact that in preparation for this over the past week I have reviewed three experts from Monsanto. They were final reports.

Q. And is there anything about those three expert reports that you reviewed that changes your opinion in any way or enlightens or supports your opinion in any way?

A. I feel that the -- in some cases they there were -- like the question about air dispersion, I raised questions when

I reviewed the -- some of the plaintiff's expert reports. For example, the -- or in the literature, I refer to one literature paper, I believe that's Hermanson.

THE REPORTER: What is it?

THE WITNESS: Hermanson.

Q. (BY MR. LEMMON) Right. It's the --

A. That's right. And, you know, tree bark. So in my report, I raised --

Q. Footnote 12?

A. That's correct, Footnote 12.

I raised questions about the observations that were made that seemed inconsistent with the -- both the wind directions, as well as the way contaminants would disperse, and it seems inconsistent with the Weeks report, the EPA report from Weeks. And so I basically raised questions about them. I believe that's explored further in those experts.

And so I think it supports the questions that I had, but I would say in only that regard. It certainly has not changed anything that I have in my report. But there

was -- and that's an example of where it supported the questions that I raised in my report.

Q. And the -- the question about the wind direction in particular and the consistency with the Weeks report is already in your report, right?

A. That's correct.

Q. So there is nothing about what you read that changes anything in the --

A. It doesn't change my report. The primary issues that I raised in the report were observations to the east of -- the tree bark, for example, concentrations to the east were very high.

But perhaps more importantly, that the concentrations in any direction, some of the highest concentrations were at the furthest distance, which is the opposite of what you would expect from air dispersion.

I didn't explore that in detail in my report. I just made those, as you referred to them, as comments. But they are explored in more detail by some of the defense experts, and in their reports it

appears to support, again, the same inconsistencies were noted and explored further.

Q. Did you talk to any of those --

A. I have not spoken with any of them.

MR. COX: Make sure you wait until Andrew finishes before you jump in.

THE WITNESS: Thank you.

MR. LEMMON: Thanks. I probably should have said that.

(Exhibit 2 marked)

Q. (BY MR. LEMMON) We kind of jumped around a little bit, but I'm going to hand you Exhibit 2, which is a May 2nd, 2024 letter to you from Adam Miller at Shook, Hardy & Bacon.

Do you recognize that document?

A. I do.

Q. And is this -- was this the engagement letter that you received from Shook Hardy for this case?

A. It is.

Q. And did you render any opinions

other than what was asked for in this letter?
A. I don't remember this letter defining specifically the scope. It was more discussion with the defense counsel afterwards as to what they would like me to evaluate and address.
Q. So, I guess, what did they ask you to evaluate and address?
A. Well, the -- I'll turn to my report where I identify that in the first paragraph that it specifically asks if the design, operation, and management of potential atmospheric releases from the consistent -- from the facility were consistent with chemical manufacturing and engineering communities' understanding of the risk posed by PCPs at the time of their manufacture.
Further asked to opine on whether offsite observations of PCBs -- and I'll shorten this -- were consistent with atmospheric deposition from the facility, and to respond to opinions of plaintiff's experts regarding atmospheric dispersion of PCBs.
Those were the sum total that I

was asked to discuss.
Q. And did your opinions go outside of what you were asked to discuss?
A. I don't believe so.
Q. I'm going to wait to put the expert report, which is Exhibit 3, until after we take a break because there's -- it's all mixed up.
A. You need a big clip, too. It includes the supporting materials. My report is actually quite short, but --
Q. Exactly, and I appreciate that fact.
What is the basis of your being able to testify about the consistency or the understanding of the manufacturing and environmental community risk posed by PCBs?
A. So the -- first, I teach courses in pollution control as to what processes might be used to control environmental releases, but also when they might be appropriate, that include discussions of assessment of risk. Certainly the first effort would be to identify is there a risk that needs to be addressed and

how might we address that to -- adequately. And so I teach courses on that, some of my research bears on that matter.

In this particular case, I believe that the -- the view of PCBs, until 1966, by both the industrial community as well as the scientific community, was that these were innocuous chemicals that had excellent property, that those products were -- the fact they were low volatility, they didn't dry out, they didn't change their chemical character, they had consistent -- persistence and they were stable. And so they were ideal for industrial processes or industrial products that needed that.

So, for example, PCBs in transformers, the PCBs in carbonless copy paper because carbonless copy paper, which has oils embedded into it, clearly don't want that to be a fire hazard. So using a nonflammable oil at the time was an ideal solution to that. The same for transformers, trying to avoid fires. The same reason that PCBs were required by the Federal Government to be embedded in the insulation on wiring

during the period of World War II.

All of these were excellent properties, and as a result the view of this was that it was an innocuous chemical that had -- like all industrial chemicals, there were potential concerns, for example, to workplace exposure, so we tried to manage that and minimize that.

But largely the -- these chemicals would not easily move into other phases. They would not be -- they would not migrate in soils, they would not move into the air, they were not soluble in water. And so on the basis of the risk -- the understanding of the risk, you would identify control systems to manage that risk. And I believe that the control systems were more than adequate to manage that risk as they understood it prior to 1966.

Q. And they understood it, the "they" is really Monsanto because they were the manufacturer, right?

A. That's -- that is correct.

Q. And so if Monsanto was making the product or if any -- take it -- make it

less specific, in general terms, if someone is making a product, wouldn't it be their responsibility to know what the risks are?

A. There is a need to identify those risks, and the way that we have normally been able to identify them is, first of all, identification of issues with worker exposure, what sort of exposure they have and what sort of response they might have.

As a -- because of the unique properties of PCBs, that it isn't a direct risk largely to -- so, for example, did not see, like DDT, of it being able to control insects, you would not see direct hazards resulting from this. There were some worker chloracne issues that were identified at Anniston that at least have been linked to impurities in the feed.

But there was no real evidence of any risks and, as a result, I don't think that the -- it would be possible for scientists from Monsanto to --

Q. There weren't any studies either, though. There weren't any -- there weren't any findings, but that's because

there weren't any studies. If you don't look for something, you are not going to find it, right?

A. Certainly the standard industrial practice at the time would have been once worker risks were observed, once a specific risk would have been observed within workers, which presumably would have the highest exposure, whether they were workers at Monsanto or workers of someone that purchased the equipment, then -- or purchased the product, then that would be an impetus to do further studies. Certainly that was the approach taken at the time. Sometimes --

Q. Some of those --

MR. COX: Hold on, let him finish.

THE WITNESS: I was saying sometimes, admittedly, that led to the recognitions of risk after people had had hazards, and I'm speaking specifically of benzene. We know a lot about benzene as a result of its prominent use as an industrial chemical and worker response to that,

development of -- of cancer, et cetera, that -- that as a result of that benzene became much more controlled and it continues to be better understood and better controlled.

But no such events occurred relative to PCBs or there were no evidence of any effects of PCBs that I'm aware of until, again, bioaccumulation in the environment became understood and observed.

Q. Well, the -- the reports of chloracne in workers in Japan and and -- at Anniston were both before 1970, right?

MR. COX: Object to form.

THE WITNESS: So the evidence of chloracne, at least at Anniston, was linked to the impurities in the benzene. And, again, benzene being the -- it was a Benzoil product, a raw form of benzene, that was initially used to make the biphenyl, and it was linked to that. The --

Q. (BY MR. LEMMON) That's not

responsive to the question, though.
The question is -- and did you -- have you made an effort to validate whether or not the finding that it was related to benzene is an accurate finding?
A. I don't know that. And I would -- I would say that the recognition of chloracne, even if it were associated with PCBs, that appropriate techs within the -- appropriate steps within the understanding of that effect were taken to, for example, improve housekeeping, to improve -- or to ensure that people were not eating the -- anything contaminated with the PCBs, improve ventilation within the facility.
And that apparently resolved the issues because there was essentially no -- I believe there was one case of chloracne that was observed at the Krummrich facility in the 1936 to 1947 timeframe. I know of no other.
So, again, they identified a hazard of worker exposure and took the appropriate steps to manage it.
Q. Including, in particular at

Krummrich, providing changes of clothing and the opportunity to shower to the workers, right?

A. That would be correct.

Q. And that's something that was not provided at Anniston, right?

MR. COX: Object to form.

THE WITNESS: I don't know the details what was occurring at Anniston, but I don't believe that was the case prior -- when the chloracne was observed at Anniston.

Q. (BY MR. LEMMON) I know you talked some about the characteristics of PCBs that made them desirable in products. But a lot of those same characteristics made -- ultimately made them problematic, right?

A. Ultimately, when bioaccumulation is observed, the fact that they were persistent was -- the very characteristic that made them so valuable was also -- became of concern.

Q. And with the persistence, it -- what's the difference between persistence and biodegradability?

A. Well, the persistence means that it's not subject to normal degradation, including biodegradation, whereas the biodegradation is something that occurs for almost everything because microbes exist throughout the environment.

And so some degree of microbial degradation or transformation is -- is a key process in the environment and actually, to some extent, with PCBs, but not to the extent of other things that are easily biodegradable.

Q. And even within PCBs, there is a difference depending on the amount of chlorine in the PCB itself, right?

A. That is correct, there is a difference in terms of the degradability.

Q. And would you describe what the difference is?

A. Well, in general, the more chlorinated PCBs are less degradable or less transformable to lower molecular weight PCBs. There are variations within the individual congeners, that specific congeners are even of similar homologs that is containing the

same amount of chlorine have different degradability.

But, in general, the more chlorinated, the lower the degradability, but also the more strongly contained within the environment in terms of absorption onto solids. The more chlorinated also tend to be less soluble, less volatile and more sorbing.

THE REPORTER: More --

THE WITNESS: Sorbing, S-O-R-B-I-N-G.

Q. (BY MR. LEMMON) What -- what exactly does sorbing mean?

A. Sorbing means that it would absorb onto soils and adhere tightly to those soils. Typically for PCBs it would be to the organic matter in those soils. So if there's a few percent organic carbon in the soil, that's where the PCBs would be found.

Q. And that's the phenomenon that would have it attached to particulates that ultimately would carry it into the atmosphere; is that correct?

A. If particulates were being carried, it also is what -- means that it

stays on the soil. So if the soil is not moving, it stays in that soil. It reduces the amount that might move to the air or to the water.

Q. I'm just going to go through a couple of things that -- just to make sure that we're not going to cover them, and then probably after that would be a good time for a break because it will be about an hour.

MR. COX: That's fine.

Q. (BY MR. LEMMON) You're not going to offer any testimony in toxicology, correct?

A. I will not offer any testimony in toxicology.

I should state that I have a general knowledge of hazards and effects and risks because, again, these are things that I teach. But I would not consider myself an expert in toxicology or the toxicology of PCBs.

Q. Okay. Or epidemiology?

A. That is correct, I will --

Q. Medicine?

A. That is correct.

Q. Law?
A. That is correct.
And I'm answering that is correct that I will not offer opinions in these areas.
Q. Thank you.
You are not going to offer any opinions about EPA or Illinois EPA regulation?
A. I will not.
I should mention that I'm not sure whether it applies to any of these. As a general rule, I would not be doing -- be offering any opinions about toxicology or epidemiology, but recognize that this question, for example, relative to regulation, if I was asked by the counsel to examine those regulations and compare them to other states, I might subsequently review that.
But I have not been asked that now and I bear no opinion at this point as to whether they are unusual or usual or typical or atypical.
Q. And don't intend to do that?

A. And I don't intend to do that.
Q. Okay. Are you familiar with Krummrich's regulatory history, whether they have been cited by the EPA, ERPs and Superfunds or anything else, is that going to formulate any part of your opinion?
A. I have no knowledge of that.
Q. Nor do you have any knowledge of whether Monsanto worked with or cooperated with or didn't cooperate with or work with inspections or other EPA investigations?
A. I have no opinion on that, other than the -- some of the memos that I cite refer to, for example, stack testing of the incinerator, that it -- that it was a collaborative effort between the EPA and Monsanto, as I read that memo. But other than that, I have no opinions in this matter.
Q. Are you going to offer any opinions on land use?
A. No.
Q. Are you going to offer any opinions on manufacturing processes of any other industrial facilities in East St. Louis, other than Krummrich?

A. No.
Q. Any -- are you going to offer any opinions about any industrial facilities in general?
A. Only to the extent that I did in my report where I was referring to is this conventional pollution control equipment to control the streams that they were -- were used in.
Q. Okay. Do you have knowledge or plan to offer an opinion about historical industrial operations in East St. Louis?
A. No.
Q. Historical or -- historical use or disposal of PCBs in East St. Louis?
A. No.
Q. By the way, did you consider whether or not Krummrich itself produced inadvertent PCBs?
A. I did not.
Q. And did you consider specifically whether any other industrial facility in East St. Louis produced inadvertent PCBs?
A. I did not.

Q. So the -- we will get to that later.
You are not going to offer any opinion on the adequacy of information provided by Monsanto to any of its customers?
A. I am not.
Q. You are not going to offer any opinions on municipal governance?
A. I'm not.
Is that an oxymoron?
Q. Probably should move to strike that.
A. Please.
Q. You don't have any opinion or knowledge as to what information was in the hands of or available to East St. Louis about PCBs?
A. No.
Q. Why don't we take a break.
MR. COX: That's fine.
THE VIDEOGRAPHER: This is the end of Media Unit 1. The time is 10:45 a.m. We're off the record.
(Recess from 10:45 a.m. to 11:02 a.m.)

THE VIDEOGRAPHER: This begins Media No. 2. It is 11:02 a.m. We are on the record.

Q. (BY MR. LEMMON) I'm going to try not to retread old ground, but I do have a couple of follow-ups and then -- to get back, when we were talking about the emissions from the four points of concern, you quantified an estimate anyhow of the aeration part being 0.5 to 1.5 pounds per day.

Are you able to quantify the reactor or the distillation or the handling of solids and dust?

A. So the handling of solids and dust would have ceased in 1949. And prior to that, I do not have any information on that.

Weeks did make an estimate of how much windblown dust might move from the facility and made the note that the dispersion would have been confined very close to the facility. I'm not exactly sure what he meant by that in his report, but it was less than the dispersion and he focused on the dispersion and then the result of

his -- the rest of his evaluation.

The concern about dust was primarily for the workers if there was inadequate ventilation within the area. But, again, that ended at Krummrich in 1949.

The other two emission points in the distillation process, the -- excuse me -- the HCl that was formed from the reaction process was transferred into other parts of the facility. The HCl was used, and so there was no direct release into the air from that one.

And then the final one I did not make an estimate, although the -- again, the emissions from that, given the treatment associated with the condenser, the absorption and then the final coke absorber would leave it to be small. How small, I'm not sure. But, again, the total estimate based upon Weeks' evaluation for the emissions were a maximum of 12 pounds per day in 1970, but averaging over the period of -- the entire period of production of about five pounds a day, a little less than five pounds a day.

Q. Okay. We talked about benzene

in particular being something that was known early on to be dangerous, and I'm trying to -- as I understand it, when you're making -- when PCBs are made, you start with the benzene, right?

A. The first step is in the production of the biphenyl itself, which may be purified. But the biphenyl is to benzene rings, but that is very different from benzene itself. Benzene is the first of what we call an aromatic compound. These are all aromatic. They have benzene rings, but, again, they are very different from benzene itself.

And even among the so-called BTEX compounds, which are benzene, toluene, ethylbenzene, and xylene, they all have much different properties, even though at their core they are a single benzene ring just like benzene.

Q. But they are all still toxic?

MR. COX: Objection to form.

THE WITNESS: They all have hazards. They vary in toxicity, you know, quite a bit. Again, that's one

of the reasons that I mentioned those specifically is that those are very closely related compounds, but they vary quite a bit in terms of physical properties, chemical properties, and hazard properties.

So, for example, benzene used to be widely used as a solvent in chemical labs. We do not use benzene as a solvent in our chemical labs. We use toluene, which is just benzene with a single methyl group, a carbon attached to it. But that small difference changes dramatically. It's both physical, chemical, and hazard properties.

Q. And I think I understood you to say that Krummrich had been shut down?

A. Krummrich was shut down in the late 1970s, 1977, I believe, for production of PCB.

Q. PCB. But the plant is still in operation?

A. I do not know that. I'm not sure.

Q. And you have not worked in -- you did say you worked in manufacturing in a petroleum refinery, but you have not worked in the manufacture of PCBs?

A. I have not.

Q. Have you ever actually worked in the -- in storing or handling of PCBs?

A. I routinely conduct analytical measurements in the field using passive sampling that I referred to before. And as a result, we handle PCB standards all the time to set up our instruments, calibrate our instruments, evaluate, doing laboratory tests with PCBs. So I use PCBs in the laboratory.

Q. It's in a residual capacity, though. It's not like in a bulk storage or a mass storage or a handling of a PCB product?

A. That is correct, we do not use bulk PCBs.

Q. Would you describe the litigation experience that you have had?

A. I have had experience early in my career associated primarily with atmospheric releases in Louisiana, working with both plaintiff and defense attorneys, as

you're aware of in some cases.

A lot of that work was focused on emergency releases from chemical facilities as a result of shutdowns or perhaps upsets in the units. And the concept or the concern was what members of the community might have been exposed and to what and how much. That was a lot of the early work that I have done in that area in terms of litigation.

More recently, I have done expert testimony in a PCB case associated with the Kalamazoo River, based upon my research in PCBs and their fate and behavior in the environment. That was associated with largely trying to define how much of the PCBs were introduced into the -- in the environment before this 1968 time period, and specifically before 1968, when the U.S. was first made aware that PCBs were a contaminant in the environment in the U.S. that would be of concern.

And so the effort there was to, again, evaluate how much of the PCBs were introduced into the environment prior to 1968

versus post-1968, and the reasons were largely to -- for the judge to decide who was most responsible. Prior -- post-1968, the expectation was that there was -- everyone should have known, perhaps, what the hazards were and they should have responded accordingly.

Prior to that was the expectation that they would not necessarily have known and, again, perhaps a different liability.

Q. Who was your client in that case?

A. I was working with NCR in that case.

Q. And what did NCR do?

A. They were providing PCBs into carbonless copy paper, I guess, the raw materials for carbonless copy paper. The paper plants would recycle that paper and it was in the recycling that a lot of the PCBs that were embedded in that paper were introduced into the environment.

Q. And that -- the introduction into the environment in that case was through

discharge into the sewer or the water?
A. Typically discharge into waterways through their standard wastewater treatment systems because their systems could not deal with the PCBs.
Q. Was there any air dispersion of the PCBs in the --
A. That was not part of the study at all, not part of the case at all. It was the impact on the Kalamazoo River of the discharges from the pulp and paper companies.
Q. And how did you tell the difference between pre-'68 and post-'68?
A. In my work, we chose to use the sediments that had accumulated in the lake. It was a very stable environment, that the sediments were accumulated steadily over time. And you can use cesium, actually, to define a date of sediments, and so I was using information on cesium profiles in the sediment to date the sediments; that is the -- which layer of sediments were placed in 1950, which were in 1952, which were in 1953.
And then the PCBs, which,

again, are relatively stable, could be associated with a date by where their location was within that sediment column. And on the basis of that, I made an estimate of the total mass of PCBs that were introduced into that lake, which was one of the primary receivers of PCBs that were coming down river prior to 1968 and post-1968.

Q. None of that dating was attempted in this case, was it?

A. That's correct, none of that was done.

Q. Could it have been done?

A. I don't believe it could. You have -- you have to have a stable sediment depositing environment. Cesium was actually introduced by thermonuclear aboveground explosions, and so there is a very small period of time that it was introduced to the environment from the early 1950s, peaking in 1963, and then it was banned by aboveground testing treaties after 1967, I believe.

And so you have a distinct cesium profile, where you begin to see it,

where the peak is or provide you two dates in the settlement column, and any disruption of that sediment column and then it's not a useful exercise. It has to be a -- in this case, it was a lake that was continually to -- continuing to receive sediments and steadily receiving sediments over the 60 years between when cesium was first introduced to the atmosphere and which was prior to significant use of the PCBs and through the period of max use of the PCBs.

So it was -- it made a good tracer or identification of the date of those sediments, and then with the -- coupled with the PCBs, you could determine where the PCBs were located. Again, the PCBs not only are stable, they absorb very strongly to the soils and sediments. And so where the sediments were in 1963 is where the releases in 1963 of the PCBs occurred.

Q. And in this case, did you make any -- this case being the East St. Louis case, did you use any other methodology to predict whether it was historical emissions from Monsanto or other PCBs that contaminated

the sites or the parcels that are of concern?
A. I have not.
Q. And you don't plan to do that?
A. I don't plan to do that.
Q. Did anyone else do that, to your knowledge?
A. Not to my knowledge, other than Weeks who estimated dispersion each year from the site between 1936 and 1977.
I'm not sure I completely finished the comment that I was making further as to why I wouldn't necessarily be able to use the soils to look at a similar dating exercise is because I would not expect those soils to have been undisturbed over a 40- or 50-year period. So the cesium profile wouldn't be telling.
Q. Other than opining that the process that Monsanto used was appropriate, were you asked to give any opinions or do you have any opinions as to whether there were other technologies that would have been available to control emissions from the PCB manufacturing process?
A. I did not evaluate other

technologies, although I believe that the technologies that were used were appropriate for the streams that they were attempting to control.

Q. Can you describe or would you describe the physical manufacturing process at Krummrich, first off, beginning with the -- like with the building or the unit itself, can you describe that?

A. I have not seen the building, I have not seen even pictures of the building, so I couldn't describe the physical system. I have -- do describe in my report the process steps, but I could not describe to you the physical system.

Q. And you looked at the process description in the Weeks report as well and the -- sort of the drawing -- I don't know exactly what to call it --

A. I think --

Q. -- flow chart of the process itself?

A. I believe the Weeks pictures were pictures that were drawn from some of the other documents. I think the more

detailed description of the same process is in the -- the 1955 document that we were referring to earlier.

Q. The Mathers document?

A. That's correct. I believe that Weeks' figure also came from another part of that same document, but I think that the more detailed version is the one that's within the Mather document.

Q. Do you know whether or not the unit where PCBs were manufactured was open air or covered or enclosed in any way?

A. I don't know specifically at Krummrich. I do know that -- I'm referring back to a document that was referring to efforts to control worker exposure within a building, and that might have been referring to Anniston, and as the aeration was vented at the roof of that facility.

But I do not know the physical character of Krummrich and have not seen pictures of the facility, whether it was enclosed or open.

Q. Do you know how -- have you seen the references to improve -- it sounds

like that you have seen the references to improving workers' safety by increasing the ventilation?
A. I have seen reference to that, which suggests that it would be an enclosed building.
Q. Do you know specifically what they did to increase ventilation in the worker areas?
A. I do not. And some of that is unclear in my mind, at least, as to whether we are discussing Anniston or Krummrich because the 1955 report, there are discussions of both, and I refer to another report as well, but that a lot of what was in Anniston was transferred to Krummrich. And so a lot of the discussion was focused on Anniston, but it's unclear what differences, if any, in terms of physical setting might have been at Krummrich.
Q. Wouldn't the ventilation of the unit be important to predicting the outputs or the emissions that came from the unit itself?
A. In general, the ventilation of

the building would affect the concentrations you would be exposed to within that building. The actual emissions outside are a result of emission from the process. So whether they were ultimately inside the building or outside the building, they both ultimately would move outside the building.

Q. Got it.

We went over Exhibit 2. Have you worked with Monsanto before or with Shook Hardy?

A. I don't believe I have.

Q. And is the May 2nd -- I can't remember the year, 2022 or 2024?

MR. COX: 2024.

Q. (BY MR. LEMMON) 2024 timeframe, approximately, when you started working on this case?

A. That is when I started working on the case. The only contact prior to that was a preliminary exploration of my expertise and whether it would be relevant to this. That was then followed up with this retention letter and my assignment.

Q. So the preliminary exploration,

like, in other words, you had a phone call with somebody --

A. Exactly.

Q. -- who asked you some questions?

Okay. And I presume that would be counsel?

A. That's correct.

(Exhibit 3 marked)

Q. In describing your task on Page 2 of your report, which is marked as Exhibit 3 -- and for the record, it has an extra page all the way at the end of Exhibit 3. You can probably disregard that last page in the record because the CV was already -- the page after the report because there is -- there is another page -- there was another couple pages that followed. But the CV was taken out because that was already introduced as an exhibit.

A. You are referring to the first page of the CV, which shows as the back side of the --

Q. Right, exactly. Back side of Page 14.

But looking at Page 2 of your report, when you talk about your engagements, really the first paragraph of the report, I have a couple other specific questions.

And just for clarification, when you talk about "at the time" in the first part of the task after you -- "I was specifically asked," the time means basically before 1969?

A. At the time of their manufacture, which would include even up to the '77. But the primary focus of the -- of the bulk of the period is pre-1968. The -- after that, there were certainly efforts to try to limit -- both to assess and limit releases to the extent that were possible, and then ultimately, of course, the system was shut down.

But, yes, the bulk of this is associated with the equipment was designed during a timeframe prior to 1968 and it was -- I was asked to specifically look at was it appropriate in that pre-1968 or even before we understood some of the unique hazards of PCBs.

Q. And if -- if I understood correctly, essentially that meant keeping the emissions away from the workers. Is that a good starting point?

A. It meant addressing any risk that might be from the facility. And, again, there would have been concerns if the -- if the actual reactor or the distillation columns did not have any controls on them at all. Of course, they wouldn't be making as much product because then that -- some of that product would have been released in the environment.

But the -- so there -- that was to control releases, whether it was to workers or beyond, but to manage the process appropriately. The concerns that were raised prior to 1968 were largely associated, in fact, totally associated in my mind, with the potential for worker exposure and, yes, that was how do we ensure that the workers are not exposed to the dust or to vapors that are of concern within the work area itself, fully expecting that if you're protecting the workers that are exposed to the highest

concentrations, then you're also protecting anything surrounding the facility.

Q. Now, the workers are also -- you say the workers are exposed to the highest concentrations. That is of -- in an acute sort of sense of the word, right, as it's being manufactured?

A. That is correct. And I would say that the knowledge of industrial hygiene and hazards and risks were largely associated with acute risks without knowledge of potential chronic risks, without clear understanding of long-term hazards and risks, such as bioaccumulation.

Q. You mentioned the financial incentive to enclose and capture as much of the product as possible without it being emitted. And then that was obviously an additional motivation for Monsanto in their design and operation of the -- of the unit?

A. I have no doubt that it -- the primary reason for the control on the overhead streams in both the reactor and the distillation system was to produce the product to the extent possible.

Q. Do you know anything about what Monsanto informed the regulators about -- about the manufacture of PCBs with respect to safety or human health and the environment?
A. I do not.
Q. Do you know whether or not Monsanto was truthful to the authorities in its -- in its reporting of risk or -- or other information to the -- to the authorities?
MR. COX: Object to form.
THE WITNESS: I have no opinion on what they relayed to the authorities.
Q. (BY MR. LEMMON) Do you know when Monsanto first understood that PCBs were potentially toxic to humans?
A. I do not.
MR. COX: Object to form.
Q. (BY MR. LEMMON) Are you aware of Monsanto or its contractors falsifying data or changing the language of reports regarding PCB risk?
A. I do not, or I am not.
Q. I just want to close this door

while we're talking about it.

Do you -- when talking about Dr. Zeliger, it's the penultimate opinion on Page 14, I was a little confused by the statement, "Dr. Zeliger failed to acknowledge or recognize the various air pollution control devices and techniques were used during the manufacture of PCBs to limit atmospheric emissions."

What exactly did Dr. Zeliger miss?

A. So Dr. Zeliger, in his deposition, implied -- perhaps it was my reading of that deposition, but he implied that there were no controls whatsoever and that these process units were vented directly to the atmosphere. That -- that was my reading of his deposition and that's the reason for this comment.

Q. And the controls that you are saying that he didn't consider are the ones described in your report, and I'm looking for the page.

A. Page 6.

Q. Okay. So your understanding is

that Dr. Zeliger didn't -- didn't realize or didn't understand that there was a condenser or a cyclone separator or a scrubbing tank within -- within the manufacturing process?

A. That was my reading of his deposition, that's correct.

Q. Okay, got it.

So in No. 2, the second -- sorry, I numbered it No. 2. I don't think -- I don't think we would be talking about the same thing.

A. Which page?

Q. But on the second page of the report, the second thing, the second part of your engagement sentence starts with, "I was further asked," and it goes on, "to opine on whether off-site observations of PCBs on properties in the East St. Louis area were consistent with atmospheric deposition from the operation of the PCB manufacturing facility or the on-site PCB incinerator."

Can you explain the first part of that, the consistency with the operation of the manufacturing facility?

A. So as I indicated, I have not

done any air dispersion modeling myself, but I did find Weeks' report for EPA as credible.

And so in terms of what does that mean relative to concentrations off-site, I relied totally on that. The concentrations that he estimated for deposition would be limited to a part per million. Less than that, any significant distance off-site seemed the -- some results appeared inconsistent with that.

Perhaps more importantly from my opinion, the biggest question of consistency was location and changes in concentration with distance. And I would turn to the data that I looked at most closely, which was the report on tree bark, which was showing that the highest concentrations were furthest from the site, which is contrary to the way atmospheric dispersion would operate.

And, in addition, there was highest concentrations -- or one of the three highest concentration areas was to the east of the site, which seemed inconsistent with wind direction. So when I talk about

consistency, it was -- even though I did not do a detailed evaluation myself, I would have expected concentrations decreasing with distance from the site and concentrations that were solely towards the northwest and southeast, or at least largely to the northeast -- excuse me, northwest and southeast based upon predominant wind directions. So that was the reference to consistency.

Q. And the wind direction, what you're relying on is -- comes from Weeks' report?

A. Either Weeks' report or I also cite another site that was my -- it was just a source of wind information from a climate site. The actual link is referenced in the report.

And Weeks seemed a little different from that, largely consistent, but showing more towards the east than I saw. And what I found, the discrepancy apparently was the fact that the wind rose from the site that I had first looked at was averaged over a 30-year period and Weeks used a five-year

period. So I suspect that Weeks' five years of data is somewhat different from the long-term average, and the long-term average, I believe about 15 percent of the time the wind would be blowing towards the East.

And in terms of the tree bark concentrations, that was one of the three locations that showed the highest. It's also in the direction of a railroad yard, which immediately raised questions as to whether that railroad yard was relevant because oftentimes when we find environmental releases, we can't explain if it's in terms of -- it could have been a rail accident or it could have been loading or unloading issues.

So I did not explore any of those, but I was surprised both by the lack of general decrease with distance from the site and the fact that there were also concentrations that were relatively high to the East as well as to the northwest and southeast.

Q. I'll hand you what's marked as Exhibit 10, which is the Weeks report.

A. Uh-huh.
(Exhibit 10 marked)
Q. And the wind rose that you were talking about is on Page 13 of that report?
A. That is correct.
Q. And if you -- over this five-year period, when you're -- when you said I think around 15 percent of the time it was -- the wind was blowing from the East; is that what --
A. According to this wind rose, it's closer to 30 percent.
Q. Okay. So if this wind --
THE VIDEOGRAPHER: Sorry, something just happened. Can we go off the record?
(Lunch recess from 11:42 a.m. to 12:44 p.m.)
THE VIDEOGRAPHER: The time is 12:44. We're on the record.
MR. LEMMON: Just for the record, this is the first time in almost 40 years of practicing law that when we said it's going to be an hour, it was actually a little bit less.

MR. COX: It helps when you can walk to lunch.
Q. (BY MR. LEMMON) When we broke, we were talking about the wind rose, and in particular, looking at Exhibit 10, which was the Weeks report. And you were mentioning that you looked at some other wind information that was identified in your report. I think it's at Footnote 24 in your report.
A. That is correct.
Q. And if -- let's see if I can go back a little bit. The difference between those was the number of years that -- of data that was collected; is that -- am I remembering that correctly?
A. That appears to be correct, five years versus 30 years.
Q. Are you familiar with Jay Turner, who is the plaintiff's expert in this case?
A. I don't remember the name. I'm not familiar.
Q. Did you read his report?
A. I did not.

Q. And did you look at the wind rose that he prepared in connection with his testimony in this case?
A. I did not.
Q. So there is nothing that you are going to say that's going to be -- you are not going to -- you are not expressing opinions critical of his analysis or whatever he came up with in his opinion, correct?
A. That is correct.
Q. Can you explain the derivation of the -- a wind rose?
A. A wind rose is just a way of representing graphically the wind direction and speed information. The -- so the -- it's -- you can't see it in the black and white version, but in a colored version, you have speed impressed on these arrows and there is a sector, essentially a pie slice, and the length of that pie slice represents the percent of the time the wind is blowing from that direction and the different colors represent the percentage of that time that it's blowing in that direction of a given speed.

And so they show a -- like in this case, there's a certain color that's between 0.5 and 2.1 meters per second and then different colors showing at higher velocities.

And the wind rose in Weeks, the largest piece of pie, if you will, is the -- from the south, directly from the south, and then there are significant fractions at the time from the south and southeast and from the northwest, which I also observed in my 30-year wind rose. So it's percentage of the time and speed are both shown on these wind rose graphs.

Q. And the point of the pie, if you will, is the direction, actually, that the wind is blowing in, correct?

A. It shows the direction from.

Q. The fat part is the -- is the direction that it's coming from, right, and the point is the direction that it's going to?

A. That's right, the point would be the direction it's going to. By convention, a westerly wind is from the west

and carrying material to the east.
Q. I have a color copy that I want to use as the exhibit for the court, but it's marked as Exhibit 14. So we will fix the marking on it, but just so you have the color.
A. Okay.
MR. LEMMON: I can't find the color copy of Exhibit 10, so --
MR. COX: Okay. That's fine. I can see it. Is this still going to be ten or are you going to change the number?
MR. LEMMON: I'm going to change that to ten, change 14 to 10.
MR. COX: Okay.
MR. LEMMON: I'm going to fix it so it matches.
Q. (BY MR. LEMMON) And if you're trying to measure the wind direction from a particular point or to a particular point, the closer you are to that point, the better information that you would have as far as wind speed and direction, or the more accurate depiction it would -- it would

represent?
A. You're saying that if the wind monitoring station was closer to the -- the actual location that you're trying to define directions, in general, yes, it would be better as long as the requirements are met relative to no obstructions.
So, for example, at an airport, they are -- the standard National Weather Service take great efforts to try to make sure that there are no trees upwind of the monitor. Sometimes that's much more difficult if you try to have a more local monitoring station.
Q. And that would be true for like calibration of the equipment and that kind of thing?
A. Absolutely.
Q. Did Monsanto have a meteorological station on -- at Krummrich?
A. I'm not aware of one.
Q. Did you ask?
A. I did not.
Q. I had one follow-up to -- the second time I'm going to follow up, kind of

the same question.

But when we talked about the four points of concern, we were able to -- you were able to estimate the aeration point at 0.5 to 1.5, and I'm trying to reconcile the estimation of five pounds total coming from those four points of concern.

Do you have any way to distinguish between the other three?

A. Well, the five points -- pounds total comes from a variety of sources. There are other locations that won't perhaps perhaps specifically associate -- I don't -- specifically associated with the process. There may have been other sources that were included in those estimations.

I don't -- I did not make those estimates, so I'm not sure what was included in those estimates.

Q. Okay.

A. And, in fact, the only one from the process that we have any estimation of any significant amount of release that I'm aware of is, in fact, that aeration, which was the 0.5 to 1.5.

Q. Okay.

A. Although there may very well have been attempts to -- from the coke scrubber to also make an estimate, and that may make up part of the other calculation.

But, again, those are not my calculations and I do not know all of the contributing factors for that. This does outline some of that that were part of his calculation.

Q. Okay. And then the second part of Point No. 2 of your engagement addressed the deposition from the on-site incinerator.

What can you tell us about the incinerator at Krummrich?

A. In the documents that I looked at, one of which I cited specifically, there was stack testing done, I believe in cooperation with the EPA, and they estimated the amount of -- of PCBs that would have been released under a variety of conditions.

The maximum value during those measurements are identified in my report and 0.006 pound per day was the maximum that was estimated based upon that stack testing. And

that -- I think the result of that is that I came to the same conclusion that Weeks did, that the incinerator added a negligible amount of additional PCBs into the environment.

Q. And the stack testing was done by Monsanto, right?

A. I don't remember specifically. I know that there was at least -- perhaps it was simply EPA reviewing the documents. There was some EPA involvement. I would have to look back at the document, specifically how it was done, whether it was EPA doing testing or Monsanto doing the testing with oversight from EPA. That I'm not sure.

Q. But it was -- it was during operating conditions of the incinerator, right?

A. It was during the incinerator operations.

Q. Were there times when the incinerator malfunctioned, had excursions or other problems?

A. I'm not aware of any excursions. There certainly were periods of

time where they encountered challenges of one sort or another. Perhaps it was they were not feeding material properly, whatever the cause was, they would shut the system down. It did not run 24 hours a day.

I believe the amount that was actually incinerated was of the order of 30, 35 percent of what it could have been if it were operating continuously. Whether that was because they didn't have enough feed or they were -- they had some sort of downtime, I'm not sure. I would not expect any significant emissions during the time that the incinerator was shut down.

Q. Would you expect emissions during the time if it was not functioning properly, like if it wasn't up to the right temperature?

A. I think under these conditions, given the focus of attention on it and the monitoring of the system, that it would have been shut down completely if they were unable to operate it the way they expected to. I have no information on upsets and continued operation.

Q. Do you know why they shut down the incinerator entirely when they did?
A. I'm not aware of specifically why they did that. My understanding is that -- and I don't know whether it was the primary reason, but my understanding is that there were now commercial entities that provided this service for waste and I suspect Monsanto had no interest in being in this business if there were commercial entities that could serve that.
Q. Do you know what commercial entities they were?
A. I don't remember the names. There was certainly a number of hazardous waste incinerators that were -- came online during this period, and it was a pretty common way to try to deal with hazardous waste of all types.
Q. And do you know whether Monsanto set its PCBs to the other incinerators --
A. I have no knowledge of that.
Q. -- for destruction?
Do you know whether they sent

the PCBs that they had in storage or how they disposed of the PCBs that they had in storage at the time that they shut down their incinerator?

A. I don't know that they had any in storage, but I have no knowledge of the disposition of it.

Q. What was the extent of your review of the depositions -- or the expert reports or depositions of Kevin Coghlan, Dr. Zeliger, Dr. Erickson?

A. I scanned through them. I don't think that in general they were extremely relevant to my own report, other than a few comments that I made.

So I would characterize my review of them was developing a general impression of what the -- what they were attesting to and the -- the nature of their reports.

Q. Were the specific comments that you made about each of these three reports responsive to a particular question that you were asked?

A. I wouldn't characterize it as I

was asked to review their depositions. It was part of the materials that were provided to me and I scanned through them and these are my impressions from them, based upon the other -- this and the other material that I reviewed.

Q. Okay. You didn't watch the video of any of their depositions?

A. I did not.

Q. Are there any other expert reports on this case from the plaintiff's side that you looked at that you may have comments about?

A. There are none.

Q. I'm not sure that I asked this.

But was Footnote 1, the Mather process description, the earliest process description that you saw? In other words, was 1955 the oldest process description that you saw?

A. There was a document earlier than that that was part of the materials that were provided to me. I don't remember the details of that offhand because I -- it wasn't a primary resource material, but it

was included in the documents that were provided to me.

Q. What did -- what did it have to do with specifically?

A. I believe it was a document primarily discussing the Anniston process and the preparation of moving that process or -- either moving the process or moving the technology to Krummrich.

Q. You mentioned several times that the -- the solid Aroclors production stopped at Anniston in -- I mean, sorry, at Krummrich in 1949.

What is the source of that information?

A. There were references to that in some of the cited documents. I will say that I haven't specifically referenced that document, so I would have to go back and identify which document it was. But it was -- it probably was referenced in that 1955 report as well.

(Exhibit 4 marked)

Q. I'm going to hand you Exhibit 4, which is the subpoena that was

issued.
Do you recognize that document?
MR. COX: I think he's still looking at it.
THE WITNESS: Yes.
Q. (BY MR. LEMMON) Did you attempt to provide all of the documents that were requested of you?
MR. COX: Subject to the objections that we filed.
THE WITNESS: The requests for production were made by the defense attorneys and they indicated to me when they had any questions -- since I had already provided my report and all of the materials, if they had any questions or they needed additional material, they then contacted me and I did provide that.
Q. (BY MR. LEMMON) Were there any materials that you were unable to provide in response?
A. None that I'm aware of.
Q. One of the questions in the subpoena was requesting documents that were

provided to you.
Did you have an understanding of what those documents purported to represent?
A. Well, I have -- I mean, there is a listing of documents that were provided to me and I presume that they were all provided to you.
Q. What I'm asking is -- like was the document sent that you received, was it to be like a full representation of all process information for Monsanto or what did you understand it to be?
A. I understand it to be a set of documents that would be relevant to the questions that were asked of me.
Q. Was there anything that you expected to be in that set of documents that was not there?
A. No, I didn't identify anything that would fit that category.
Q. Was there anything -- did you ask for additional information from counsel or from anybody -- from other experts?
A. I did not.

Q. And were you provided with a copy of the complaint, the lawsuit?
A. I don't remember that I was. It's possible that it would have been in there.
Q. Have you read the complaint?
A. I have not read the complaint.
Q. Exhibit 5, I'm handing you an invoice.
(Exhibit 5 marked)
Q. Is this invoice -- is this Exhibit 5 accurate as of its date, July 10th of 2024?
A. That reflects my invoices at that time.
Q. And are there additional charges since then?
A. There will be.
Q. And that's for preparation and for this deposition?
A. That's correct.
Q. Anything else? Any other --
A. No.
Q. Is -- how much of your time do you spend in consultation for -- in

litigation consultation?

MR. COX: Are you talking -- are you talking generally or just --

MR. LEMMON: Generally.

MR. COX: Okay.

THE WITNESS: Very little. I have been involved in one other court case in the past five years, which I cited in my report. So it's a very small fraction of my time.

Q. (BY MR. LEMMON) So I would assume that's also a very small fraction of your income?

A. That is correct.

Q. Do you do other consulting, industrial consulting?

A. I do.

Q. Can you describe that?

A. I often provide advice and review of assessment and management of contaminated sediment sites in particular. This might be to industrial concerns or it can also be, and has been, EPA, state of Oregon --

(Brief interruption)

THE WITNESS: Excuse me, but Matthew Limoli entered the waiting room. Do you want me to push -- oh, I guess he has been admitted. Sorry.

So it is included -- EPA, state of Oregon, so state governance, where I -- as well as industry, where I provided advice on the assessment and management of contaminated sediments, primarily, and certainly in the past ten to 20 years it's almost been entirely in sediments. There are many contaminated sediment sites that my advice has been sought as to how they might be assessed or managed. And so I provided that as a consulting service.

Q. Did you review Dr. Kaley's testimony?

A. I reviewed the testimony, yes.

Q. Was that also you basically skimmed it the same way you did Erickson, Zeliger and Coghlan, or was it more detailed?

A. Dr. Kaley, perhaps, is that a --

MR. COX: That's one of the 30(b)(6) witnesses. I think that's how it's identified in his report.

THE WITNESS: The -- I would say that it -- the first thing that I would do with any of them would be to review or identify anything that was relevant in their testimony to my own.

I can't remember specifically. I think -- I believe that Dr. Kaley was a source of some of the exhibits that were provided him, provided some input to my report when I was looking at those exhibits. And to the extent that I relied upon them, I cited them in my report.

Q. (BY MR. LEMMON) Okay. And did you speak with Dr. Kaley?

A. I have not.

Q. Do you have an understanding of what his job is in this litigation?

A. I do not.

Q. Did you review any other witness's testimony, Mike Wagner or the City of East St. Louis or anybody else?

A. Neither of those. I do remember a Mr. Pierle; is that correct?
Q. Pierle?
A. Yes. That's the only other one that I remember beyond the ones that we have just said.
Q. So would you describe the methodology that you used to render the opinions that you did in this case?
A. So I reviewed the documents that were identified and tried to develop an understanding of the process and both how it was set up, how it was operated, the control equipment.
I used other documents that -- as I was going through that to identify if there were emission calculations made, how they were -- the response of Monsanto after learning of the potential for bioaccumulation.
So I basically examined the -- the documentary record from what I was provided, as well as the exhibits and the individuals that were deposed for which I had access to and developed an understanding of

the process and how people had assessed the impacts of that process previously and then formed these opinions from that.

Q. Were there any gaps in your understanding that you needed to fill in in order to render your opinion beyond what's described in the opinion itself?

A. There were some gaps that were not provided by the counsel, and so those are the ones that are cited that are not -- were not provided by counsel. There were a few items that were -- that are cited in my report that I looked up myself.

Q. So, for example, that would have been like the climate website?

A. That would have been a good example.

Q. Did you, in your review of documents, come to an understanding that Monsanto manufactured 99-plus percent of PCBs manufactured in the United States during the period PCBs were manufactured?

A. I'm not sure that the documents explicitly identify that, but I'm aware that Monsanto was the only manufacturer that I'm

aware of in the United States for the Aroclors.
Q. And Aroclor is another way of describing PCB products?
A. True, but there are -- it seems to be a growing recognition of other sources of PCBs, so-called inadvertent PCBs that I'm less well aware of. But the Aroclors were a specific product that were being generated by Monsanto containing PCBs, and I believe that the vast majority of PCBs that were produced from the United States were associated with that production for Monsanto in the form of Aroclors, which are mixtures of the individual PCBs.
Q. So you would agree that the intentionally produced PCBs, you wouldn't dispute that intentionally produced PCB are 99 percent plus manufactured by Monsanto?
MR. COX: Object to the form.
Q. (BY MR. LEMMON) Fair enough?
A. I would not disagree with that.
Q. Okay. What percentage of total PCBs are the inadvertent produced PCBs?
A. I don't have --

MR. COX: Object to the form.
THE WITNESS: I don't have an opinion of that. I do -- there is some recent literature as of this year, in fact, that, perhaps surprisingly, it's more than I would have thought it were.
I have found PCB-11, which is one of the commonly identified PCBs for inadvertent production. It's not been associated with Aroclors. And I have encountered that in my own sampling, but I always presume that this was a fairly small fraction of the total.
Some of the recent literature suggests that it's a lot more than a small fraction, but I don't have a personal opinion on that.
Q. (BY MR. LEMMON) And is the variable number, at least in part, caused by the fact that there is no more production of -- intentional production of PCBs?
A. And as a result, there is no monitoring of that production. Certainly the

inadvertent production is apparently not regulated at this stage.

Q. Is there any measurement that you're aware of of inadvertent production of PCBs as it relates to what is on the East St. Louis property?

A. Nothing specifically for East St. Louis property. I know that there have been estimates made in a few locations by individuals that have studied the inadvertent production of PCBs.

And, for example, I'm aware that there was an estimate of 6 percent of the PCBs in the Portland Harbor Superfund site are likely inadvertent PCBs. But I have no knowledge of anyone doing a similar sort of assessment at East St. Louis.

Q. And in your criticism of Dr. Erickson, you talk about him not considering inadvertent PCBs?

A. That is not in my opinion. The only comment that I made relative to Dr. Erickson was the -- the fact that his estimates of potential releases don't seem to match up with others' estimates of releases.

That's the only comment that I have relative to him. I don't have an inadvertent PCB --
Q. So then --
A. -- comment.
Q. -- maybe I have misread your opinion and didn't intend to -- didn't intend to do that.
But on the bottom of Page 13 and then going on to Page 14, you say, "Plaintiff's expert witness failed to consider or evaluate alternative sources of soil contamination from other uses of PCBs in the area or the inadvertent production of PCBs."
So I had assumed that you were talking about Dr. Erickson, but who are you talking about in that particular instance?
A. Well, I think it would also apply to Dr. Coghlan talking about remedial costs. I'm not sure that I have attributed that to an individual. But there was a -- an assumption that the PCBs were from the Krummrich facility and that potentially other sources or inadvertent production of PCBs, which would still be other sources, doesn't

appear to have been evaluated.
Q. But if I remember correctly, we have -- okay, let me just ask directly.
What specific inadvertent production of PCBs would be an alternative source of soil contamination in East St. Lewis?
A. Again, I'm not an expert on inadvertent PCBs. I understand that they are associated with paints and dyes, as one source. And so if there were a facility that were producing paints and dyes, that's a possibility.
I have no knowledge of a specific facility. It's simply a statement that before attributing all of the PCBs in a location to a particular facility, you should explore the potential for other -- other potential sources or the potential for other sources of those PCBs.
Q. And converse would be true as well, right? You shouldn't assume that it is an alternative source unless you know that it's an alternative source?
A. You should not assume that it

would either be an alternative source or from this particular facility without trying to address potential alternatives.

Q. And you are not going to testify specifically that any other facility is more than a possibility of an alternative source of the soil contamination in East St. Louis, right?

A. I have no knowledge of other facilities and will not be identifying any specific source as a -- as an actual source of those PCBs.

Q. And would the same be true for the other uses of PCBs in the area that you described? In other words, you're not going to testify that there's any other particular use that is probably -- that is a probable source of soil contamination in East St. Louis, will you?

A. I will not. I have no other information of other potential use sources.

Q. Do you have any information at all about other uses of PCBs possibly being a source of soil contamination in East St. Louis?

A. Not specifically in East St. Louis. I will say that almost every site that I am -- have worked on and am working on is associated with PCBs from inappropriate use or leaks or discharges during use as posed to production of PCBs.

And so the vast majority of the environmental impacts that we see throughout most of the nation is, in fact, from use, not -- not from production, although recognize that production is two -- two facilities whereas use was all over the U.S.

Q. Objection to the lack of foundation.

And Monsanto itself used PCBs at Krummrich, didn't it?

A. I don't know of any use specifically at Krummrich.

Q. I think I asked you this already, but I want to make sure.

Did you do anything to evaluate Monsanto's inadvertent production of PCBs?

A. I have not.

Q. At Krummrich, I mean. Sorry.

A. I have not.

Q. And other than having a giant PCB manufacturing facility in the adjacent town, do you know anything about East St. Louis that makes it unique in susceptibility to having soil contamination, PCB soil contamination?

MR. COX: Object to the form.

THE WITNESS: I would say that I would not find anything that makes it unique. It is a -- it was heavily industrialized throughout much of its history and these are widely used industrial chemicals. I would say the opposite, that there is a potential for plenty of users of PCBs. I just do not know any specific. But I would be surprised that some of the industrial users or industrial facilities, industrial operations within East St. Louis didn't employ PCBs.

Q. (BY MR. LEMMON) I guess I should have qualified the question a little bit.

But there are other industrial

areas around the country, right, so the question really is whether or not East St. Louis is unique to an industrial -- industrialized area as far as susceptibility to PCB contamination in the soils.

A. I do not believe it's unique, although I would say that most of the industrial areas around the U.S. have PCB contamination.

Q. Do you have any reason to dispute that Monsanto knew about the properties of PCBs to be persistent, stable, resistant to biodegradation or sorbing throughout the time of their manufacture of PCBs?

MR. COX: Object to the form.

THE WITNESS: I believe that they were aware of many of those physical properties and, in fact, those were the sought after properties that led to their production and use.

Q. (BY MR. LEMMON) Do you have any reason to disagree that Monsanto -- Monsanto's practice was to prevent fumes and vapors from its PCB manufacturing unit

throughout the time that it manufactured PCBs?

A. We identified that, for example, during aeration, I believe there was no treatment of that, that the aeration would be exhausted into the atmosphere and it would have a small amount of PCBs. And those -- again, that 0.5 to 1.5 pound per day.

The low volatility of the PCBs is what would make them appropriate for operations such as that without significant controls. You wouldn't operate a facility the same way, for example, with benzene. It's much more volatile. It would be much more of -- regardless of toxicity, you would lose much more material because of its high volatility. The very low volatility of the PCBs likely led to lack of concern for the small amount being released through aeration, for example.

And, again, 0.5 to 1.5 pounds per day, when the production was up to 50 million pounds per year, if this were a pollution control process you would be achieving 99.99 percent treatment and you

would be very proud of your treatment capabilities.

Q. When it was produced -- when they were producing 50 million pounds a year is when they were releasing like 12 pounds a day, right?

A. That was the estimated 12 pounds a day, and that does still correspond to 99.9 percent removal, if you will.

Q. 12 pounds is still 12 pounds?

A. It's 12 pounds.

Q. I have seen in a couple of different places discussion of the word fumes and vapors and the emissions. Do those words mean different things in your mind?

A. They actually -- they do have a formal definition. I would say that they are -- normally, that definition is not adhered to. But when we think of -- and I would have to reach back at this, but when we think of mist versus fumes versus vapors, fumes, I believe are often -- for example, the combination of metal vapors and perhaps even some condensing metals from smelting operations are referred to as fumes.

But, of course, in the general parlance, a fume is something that you're smelling. So there is the -- the general public definition, but I would say that, at least early on, there was a differentiation between the types of air releases, whether they were in the form of a mist or an aerosol or a fume or straight vapors.

THE REPORTER: Or straight what?

THE WITNESS: Vapors.

THE REPORTER: Oh, sorry. Thank you.

Q. (BY MR. LEMMON) So regardless of what we call them, if they are released into the atmosphere, they would travel -- they would be expected to travel in a downwind direction?

A. That's correct, although if they are associated with particulates or even condensing solids, then they would not travel as far as if they were vapors that were dissolved in the air, if I could use that term.

Q. That all depends on the size of

the molecule?

A. The size of the particles that they are associated with, not necessarily the molecule.

Q. And the first attempt that Monsanto made to reduce PCB emissions from its manufacturing was in the end of 1969; is that correct?

MR. COX: Objection, form.

THE WITNESS: I would say that special efforts were undertaken in -- beginning in '68 and '69 once the, again, unique hazards of PCBs are recognized. I can't really say that they didn't attempt -- in fact, we have already talked about the reduction in exposure to workers within the facility, which was dated prior -- well prior to that.

Q. (BY MR. LEMMON) And that's ventilation, though, right?

A. True, but it is, you know, an effort to control exposure.

Q. Did Monsanto attempt to inventory or measure the loss through the

venting prior to 1970?

A. Likely -- first of all, I think difficulty in measurement of this, given the availability of equipment, would suggest that they did very little measurements in the '30s and '40s of this. I believe they may very well have had measurements in the worker exposure area and I believe that there was some reference to attempts to measure that. But, of course, their ability to measure PCBs at low levels was very limited at that time.

Certainly that improved or the efforts increased a great deal once the risks of PCBs became more apparent in the late '60s.

Q. There were some crude ways that they could have measured, like the measurement of chlorine, to make at least an educated guess as to how much PCB was being released?

A. Since they were generating HCl in the process, chlorine wouldn't have been a very good indicator. But they did measure PCBs in the worker area, I believe there is reference to that in some of the documents

that identify -- but the 1955, which includes a compilation of a variety of memos, I think there is reference to a measurement of worker exposure and meeting the standards of worker exposure at the time.

But, again, their ability to detect exceedingly low levels was certainly not available to them at that time.

Q. What about measuring PCBs in soil as far as the -- when would that have been available?

A. Well, I think the first concern would be why would they be measuring in soil. It wasn't considered necessarily a risk or an exposure pathway, but the ability to measure PCBs in the environment largely came about in the '60s with the development of gas chromatography, mass spectometry -- good luck with this spelling -- and with the electron capture detection, which specifically measures chlorine.

This is the reason that I review the document. I can help you with those.

Q. It's fair to say that Monsanto

didn't ever actually look into where the PCBs that it emitted into the air wound up?

MR. COX: Object to form.

THE WITNESS: I'm not sure that they would have identified this as a potential issue. Again, I think this was viewed as an innocuous chemical, didn't have apparent direct toxic effects. It was chosen because it was persistent and stable and had low volatility. And the amount that we're talking about moving into the environment would have been considered just absolutely minimal at the time and considered of no risk.

So I'm not sure that they would have found any incentive to measure soil concentrations until we came to be concerned about low levels of PCBs in the environment.

Q. (BY MR. LEMMON) Well, are you aware of whether Monsanto tried to measure where the PCBs came up -- wound up after they found out that it was an environmental problem in 1966?

A. I'm not aware of any specific actions. I think they were more concerned about the use of PCBs and the general environmental background of PCBs, but I don't know that they were concerned about that directly.

I do know that they were -- Monsanto's scientists that were tracking the environmental concentrations and exposure of PCBs, but I'm not aware of that through this case. I just know that they published literature in the '70s and '80s, trying to better understand the behavior of PCBs in the environment. But that's not connected to East St. Louis, necessarily, or to Krummrich.

Q. And the statement that -- that PCBs were viewed as an innocuous chemical without apparent direct toxic effects is based on information from Monsanto about their product, right?

A. Not just that. The lack of direct effects, for example, what I cite in my report is in a National Academy of Sciences committee that I served on that includes an appendix on PCBs and their

effects. And there is a direct quote from there that was probably written by John Giesy, who is one of the foremost experts from toxic effects from PCBs throughout much of his career. He points out that PCBs were different from DDT because they had no direct toxic effects. Let's see what that specific specific quote was.

Q. Where is that quote?

A. So this on Page 5, "Unlike DDT, PCBs were not considered particularly toxic to lower-level biota."

THE REPORTER: Lower-level --

THE WITNESS: Biota, lower-level biota. And that's Footnote 5.

And by implication, if it's not toxic to some of the most sensitive organisms that we often use as indicators and bellwethers of toxicity, they were -- likely assumed it was not a toxic effect to higher organisms as well.

Q. (BY MR. LEMMON) Well, this -- the time of this theory or the time of it

being -- of PCBs not being particularly toxic was after -- would be after their -- discovery of their persistence in the environment, right?

The time of the consideration, you know, to make that determination was later. Before that, people relied on what Monsanto said about its PCBs is -- is the point I'm asking.

A. That's likely the case. I don't know major users that were controlling the product that was including PCBs, like General Electric may very well have come to similar conclusions, perhaps of their own volition. I do not know that.

This particular quote was a -- even though it appears in a 2001 document, it's clearly referring back to the past work that showed very little direct toxicity. When that -- when that work was done, when those studies were done, I do not know.

Q. Do you have any knowledge of whether or not Monsanto considered PCBs to be nontoxic prior to 1966?

A. I can't speak specifically to

Monsanto. I believe that would be a general conclusion by the scientific community about -- and the industrial community about PCBs.

Q. Is it your understanding that and would you agree that Monsanto manufactured about 700 million pounds of PCBs at Krummrich?

A. I don't know the exact number, but since the -- in the late '60s, early '70s, it was tens of millions of pounds. That seems like a reasonable total.

Q. Are you familiar with where the -- which properties are alleged to be contaminated in this case from Monsanto PCBs?

A. I am not.

Q. So this is kind of getting to a different topic. It's been about an hour.

MR. COX: Want to take a break?

MR. LEMMON: Yeah.

MR. COX: Okay.

MR. LEMMON: Very short.

THE VIDEOGRAPHER: This is the end of Media 3. We're going off the record at 1:42.

(Recess from 1:42 p.m. to p.m.)

THE VIDEOGRAPHER: This is the beginning of Media No. 4. The time is 1:53. We're on the record.

Q. (BY MR. LEMMON) You mentioned that you were surprised about a 6 percent estimation of inadvertent PCBs in a site that you had read about.

Are you aware of any other place where there is 6 percent or over estimate, anywhere at all?

MR. COX: Object to the form.

THE WITNESS: Actually, the same manuscript and I would have to look at the specific reference, implies that there is -- it's a higher percentage in some other locations. Portland Harbor is stuck in my mind because I have done so much work in the Portland Harbor with the 6 percent. But I am not an expert in the inadvertent PCBs, but there is recent literature on this very topic. And I think one of the other defense

experts actually explores this in more detail more than I have for sure.

Q. (BY MR. LEMMON) Did you evaluate that other expert's expertise in inadvertent PCBs?

A. I have not.

Q. Did you even review his or her report about inadvertent PCBs?

A. I reviewed that report very recently in preparation for this, but I -- you know, I do not have any opinions relative to that other than I found the inadvertent PCBs of interest and I have recently done some literature review to try to learn more about it.

Q. Just out of curiosity?

A. Yes, because I found it interesting and a new challenge to me. I had always known -- and I think I mentioned this, I had always known that PCB-11 is one of those that's been identified as an inadvertent PCB and not linked to Aroclors. And when I find that in my environmental samples, I recognize that as a tracer of those inadvertent PCBs.

But I hadn't gone any further than that. And it was usually a very small fraction -- PCB-11 by itself being a small fraction of the total PCBs that were being measured.

Q. Do you know the industrial profile of any of the places that were considered in that -- that article?

A. No, I haven't explored it in any more detail than I have outlined so far.

Q. And what -- do you know the citation to that article or the publication?

A. I do not at this time. There are several articles on inadvertent PCBs. I know that Keri Hornbuckle has written publications on inadvertent PCBs. I -- right offhand, I can't remember others that have worked in that area.

Q. Do you know her? Do you know Keri Hornbuckle?

A. I know her.

Q. Do you consider her to be an expert at inadvertent PCBs?

A. I believe that she is published in it. I'm not sure how much of her work has

been in inadvertent PCBs. I do believe that she is well-versed in PCB chemistry and behavior in the environment.

Q. And who is the expert that Monsanto hired in this case to talk about inadvertent PCBs?

A. I would have to look at the list. The name -- since I have just reviewed these this past week, I'm not sure of the specific individual.

Q. Was the last name Herman or Hitchins?

A. I believe it is Herman.

Q. Okay. That's the one that you reviewed?

A. There were -- there were three experts that are -- reports that were provided to me in the past couple of weeks and I had a chance to look at them last week, just skimming their documents, because, again, they are not necessarily anything to do with my own opinions, although, as I mentioned before, they were providing some more clarification of some of the questions that I had after I looked at, for example,

that tree ring data, tree bark data.
Q. And what specifically did it clarify for you, any of those reports?
A. Well, the key one was this question of the -- talking a bit more about why 209 doesn't necessarily get linked to the site. 209 was -- that was found in the tree bark was also a bit of a surprise to me. 209 is the highest congener and it's present only in those Aroclors that were produced prior to 1949, so they haven't been produced at Krummrich in quite some time.
But those were some of the highest concentrations of PCB-209, and one of the experts describes that in more detail as to where that might have come from.
Q. And is it -- where is -- where do you understand him to say that the 209 came from or could come from?
A. I think you should ask them as an expert. I just know that they were also questioning the 209, which I found supportive of my own questions about why the 209 is there.
Q. Okay. So it's more of a

question than an opinion about the 209?
A. In my case, yes, it was -- I had these questions. I did not try to find the answers of where -- what are the additional sources, as we have talked about. But those questions are explored more fully by those experts.
Q. Okay, fair enough.
Now, how far would you expect the 209 dust or flakes to travel if they are emitted into the atmosphere?
A. They are only going to move as far as the dust that they are associated with because they have very, very low volatility, they have very low -- they -- it -- it, the 209, has very low volatility, doesn't dissolve in water to any significant extent. It is absorbed strongly onto solids, and so it's going to go where the solids go. And so if the solids were to blow, be carried by the wind that contains 209, then the 209 would go with it.
Q. And so as far as the particles would go, whether that be hundreds of yards or whether that be a mile or whatever it

is --
A. That's correct, although the -- as Weeks pointed out, his assessment of the windblown dust would suggest that it would stay very close to the plant site.
Q. And what does "very close" mean in that context? Do you know?
A. I believe in his report he is vague about that, but he found it as insignificant compared to the atmospheric dispersion and did not pursue it further.
Q. Okay. Do you know how far the properties in East St. Louis are from the -- I'll call it the source at Krummrich?
MR. COX: Object to form.
THE WITNESS: No.
Q. (BY MR. LEMMON) Do you know what direction the properties are from the source at Krummrich?
A. I don't remember anything specific about any of the individual properties. The directions of the tree bark that were reported in the literature article by Hermanson does show specific areas towards the north, as well as the south, as well as

to the East, as we have talked about before.

Q. Okay. By the way, do you know where the PCB manufacturing unit was at Krummrich?

A. Not within the confines of the facility. I know where the Krummrich facility -- let's say the Monsanto land was and the facility was somewhere within that property.

Q. I think you answered this already, but you would agree with Dr. Erickson that airborne PCBs, like other vapor and solid-phase pollutants, would travel with the bulk air mass?

A. The pollutants that are in the air or contaminants that are in the air would move with the air motion. If they are associated with particles, they will also have an additional settling velocity that would tend to carry them to the ground. And so they would move in the general direction of the air, but they would not travel completely by just the motion of the air.

Q. So is it fair to say that it is not your opinion that zero percent of the

PCBs identified in East St. Louis came from Monsanto's manufacturing?

A. I could not say that zero percent would come from the facility.

Q. Can you say that -- would you say more probably than not that any of the soil -- PCB soil contamination in East St. Louis came from Monsanto's manufacturing?

MR. COX: Object to the form.

THE WITNESS: I believe it's -- certainly the facility released PCBs and that would have been carried by the wind to locations downwind. And that -- what proportion and what concentrations, I think the best estimates are those that have been calculated by Weeks.

Q. (BY MR. LEMMON) Okay. Do you know when Monsanto realized or knew that the PCB vapors or fumes were contributing to overall air pollution?

MR. COX: Object to form.

THE WITNESS: I believe that there were concerns about air releases from their facility that were probably

not realized until, again, at least '68 and '70, when there were documentation of efforts to try to reduce those amounts.

I'm not sure that they ever viewed it as a significant pathway to ecological exposures and risk and bioaccumulation, which was largely associated with broader distribution throughout the environment.

Q. Are you aware that Monsanto admitted in its deposition testimony that it was aware that the PCB contribution to air pollution by at least 1964?

MR. COX: Object to the form.

THE WITNESS: I'm not aware of that.

Q. (BY MR. LEMMON) If that is what the testimony is, you wouldn't dispute that?

A. I wouldn't dispute it if that was the testimony.

Q. Now, I know you didn't read the complaint and aren't testifying as a lawyer. But you do understand that this lawsuit is

not being brought under any EPA or Illinois state regulation, right?
A. That's my understanding.
Q. And that there are no allegations of violations of any environmental statutes, CERCLA, RCRA, TSCA, any of those?
THE REPORTER: What?
MR. LEMMON: T-S-C-A, TSCA.
MR. COX: You are saying there are no violations of TSCA or --
MR. LEMMON: No alleged violations in this litigation.
THE WITNESS: That is my general understanding.
Q. (BY MR. LEMMON) And the PCB contamination in this case is not the subject of any consent order, remediation plan or any other judicial or regulatory decree?
A. That's my understanding.
Q. And that the property is not -- the property itself is not subject to any consent or remediation plan or other judicial regulatory decree?
A. That's my understanding.

Q. Do you know -- do you have any understanding or knowledge of what other products were made at Krummrich during its operations?
A. No.
Q. Any -- any other chlorinated organic compounds that they created there?
A. Not that I'm aware of.
Q. Did Anniston and Krummrich make all of the same products?
A. No. Anniston, of course, up until 1936, made all of the PCBs, or at least that Monsanto was making. After Krummrich opened, until 1949, they probably made a similar mix of products.
After 1949, I think the only source of the high molecular weight congeners was, in fact, Anniston.
Q. Was the Krummrich manufacture of PCBs considered a closed system?
A. The processes were batch systems throughout at least most of their process life. That is that they would make discrete batches. The systems themselves are closed during the production of the material,

but the -- you know, they would -- the product would then be packaged, placed into drums, and then perhaps an additional batch, especially at the distillation step.
Q. When was the technology first available for the incinerator that was installed at Krummrich to destroy the PCBs?
A. I believe it was the first incinerator of its type.
Q. The one that they installed?
A. That is correct.
Q. Do you --
A. I believe that they were largely -- worked with a manufacturer to design and build and then operate.
Q. Do you know what the cost was?
A. No, I do not.
Q. Do you know what the cost would have been to otherwise store or destroy the PCBs?
A. I do not know what those costs would have been at that time.
Q. Do you know where in the plant the incinerator was located?
A. I do not.

Q. Was the loading of barrels or tank cars with PCBs in the same location as the manufacture of PCBs?
A. I do not know.
Q. And any PCBs that were released during the loading of tank cars or barrels would be in addition to those five pounds that were estimated during the manufacturing process; is that right?
MR. COX: Object to the form.
THE WITNESS: I believe to the extent that those were on the facility, that Weeks would have attempted to estimate those as well and include them in his estimates.
Q. (BY MR. LEMMON) And what did he -- what's the basis of that stated belief?
A. Because he was attempting to estimate the cumulative total of PCBs that would have been released to the air from the facility. And if there was on-site releases from parts of the facility that he didn't consider, his work would be incomplete.
But I have no -- I did not evaluate the emissions myself, but took his

estimates to be the best that I have seen. And, again, they are consistent from some other estimates that Monsanto did when they were trying to evaluate that these releases might be and they were -- I do believe that Monsanto, in the late 1960s, early '70s, undertook an effort to evaluate vapor releases from every component at the facility that might contribute.

Q. I know that there has been some implication that because sometimes inadvertent PCBs are stated in a permit, that they would have been created, manufactured.

But is it fair to say that just because something is in a permit, just because someone is allowed to emit something, doesn't necessarily mean that they actually do, right?

MR. COX: Object to form.

THE WITNESS: That is correct, just because it allowed it, it may not be -- the permit might not be fully utilized.

Q. (BY MR. LEMMON) So I think I'm right in saying this, but I want to make

sure.

But your opinion doesn't really include anything about East St. Louis specifically; is that fair?

A. Other than the facility was there and my discussion of the potential releases and releases from the facility deal with East St. Louis.

But in terms of the surrounding area, the land, other potential industrial sources, no, I have no opinions about those.

Q. All right. When you get on Page 12 to -- of your report to the Opinions section, the first part of the first opinion is that PCBs were an important and useful industrial chemical that were produced at WGK using standard industrial practices.

The fact of PCBs being useful and important doesn't really weigh on your opinion one way or the other, does it?

A. No, it does not.

Q. Whether something is useful or important, you still have to consider safety, toxicity, bioaccumulation, those types of things; is that fair?

A. Although bioaccumulation, again, was not even recognized as a thing at the time throughout much of that, but certainly you would still be trying to address risks as you observed and know them.

Q. And the risks include impinging on the rights and safety of the neighbors of the facility where something is manufactured, right?

A. I think that this risk, the nature of those risks has certainly evolved over time and that our view and perspective on what is a damage to a neighbor is certainly far different from what it was at that time.

I think that the primary concern would have been looking for directly toxic effects, negative health impacts, and certainly to the extent that they were identified attempting to address those was appropriate.

Q. And the end of that sentence talks about minimizing air emissions. What are the reasons to -- at the time to minimize air emissions? I know we talked about

financial incentive so that you don't lose product.
What are the other -- what are the other incentives to minimize air emissions?
A. Well, certainly initially that was the most important, and then to protect workers was certainly an important factor. I don't believe that there was a view that there was any off-site impacts, and so that was not necessarily a concern.
Q. In the third bubble, the one without the -- it's not filled in, you conclude by saying that the solid Aroclors would generate dust -- or have the potential to generate dust, but significantly impacting only the plant area.
What's the base of that statement?
A. Largely, the calculation by Weeks that suggests that dust would be a minimal impact beyond the plant -- well, in fact, that the air dispersion was a bigger concern.
Q. How close was the manufacturing

facility to the plant boundary?
A. I do not know.
Q. What testing was done within the plant boundary to determine whether or not there was impact within the plant area?
MR. COX: Object to the form.
THE WITNESS: There was effort to ensure that the workers that were exposed to that dust were not exposed significantly, again, to the concerns about chloracne, concerns about contamination of clothing, food, et cetera.
And I think that the focus during the period when those solids were being produced was strictly that, ensuring that there was no significant impact on the workers that were processing that -- those solids, all of which, of course, would have been within the fence line.
Q. But after there was a concern raised about effects beyond the fence line, pollution, any kind of dispersion, was there any testing done up to the fence line to see

that it stopped at the fence line, as this implies?

A. There is -- I have no knowledge of any specific testing that was done. I do know that Monsanto, in the late 1960s, early '70s, was conducting assessments of release, and I'm sure that that would also include some measurements in and around the facility. Certainly I am aware in one of the memos that -- that I refer to that they measured concentrations in air around workers at the facility and were meeting the limits of what they were allowing.

Q. Did Monsanto do anything to make sure that any hazardous consequences of its manufacturer were contained within the plant facility?

A. I'm not aware of any specific actions other than the efforts to estimate and control releases in that post-1968 timeframe.

Q. Even before 1969, the standard of care would require a responsible manufacturer to make sure that its manufacturing activities didn't impact its

neighbors adversely, right?
MR. COX: Object to the form.
THE WITNESS: And as I have indicated, I believe that the general view was that there was no potential for any impact, other than potential for worker impact and worker exposure.
Q. (BY MR. LEMMON) But that general view is not necessarily based on science, is it?
MR. COX: Object to the form.
THE WITNESS: It has a lot to do with the properties of the PCBs, given their very low volatility, given the fact that they are unlikely to move into the air, the fact that they were -- had low levels within the worker area.
And, of course, once it's outside of the worker area, it would be diluted dramatically. I think that is a basis in science.
Q. (BY MR. LEMMON) But low volatility means that it's not going to vaporize, basically, right?

A. Which if we're concerned about atmospheric releases, for example, during aeration, this would be the physical property that would be important and a concern.

Q. But if you're aware that the product attaches, sorbs to particulates, you would also be aware that the substance would be capable of transporting the air, right?

A. You would also be concerned about the, for example, dust blowing around the facility. And I don't know whether it was paved or unpaved, but I would guess that the initial concern would be were there activities that were leading to dust moving to people beyond the fence line. Only then would there be concern about, well, what's in that dust.

Q. And are you saying that Monsanto would have been unaware whether dust was moving beyond their fence line?

MR. COX: Object to form.

THE WITNESS: I'm saying that I believe that the first instance would be a recognition of is there dust moving, is there a challenge due to

dust moving into off-site properties.
And if that were the case, then I would be concerned about the dust being generated during the handling of the solid materials at the facility, at least up until 1949.
Q. And then once it would leave the unit or the facility, then it would become diluted, as you said, but if it's deposited and it's all close enough to be deposited, wouldn't it then reaccumulate?
MR. COX: Object to the form.
THE WITNESS: You can see accumulation over time. Again, we would expect -- just like air dispersion, we would expect the highest concentrations closest in. And the first concern would be on the plant site, are there high PCB concentrations, for example, deposited on soil within the facility or on -- on buildings or vehicles, process equipment within the facility.
And I don't think there was any identification of that, but I'm not

aware of any identification of that as
a potential issue or concern.
Q. (BY MR. LEMMON) And you're not even aware that there was an attempt to identify there -- whether that was measured at all, right?
A. Except for the fact that there was concern about workers, for example, in the cafeteria, so efforts to keep -- to ensure that any dust wasn't carried into that from clothes or by other means. I do believe they would have been concerned during the handling of the solids if that -- those solids were moving beyond the area; that is beyond the area of actual production within the building.
Q. At the same time, Monsanto did know and recognize that PCBs were persistent. I think we already established that, right?
A. They were stable and, therefore, not subject to degradation, which was one of the positive properties of that material and why it became such a common industrial chemical.
Q. And they marketed that fact,

right?
A. Yes.
Q. Whether PCBs themselves were useful or important wouldn't allow the manufacturer to place its waste on other people's property without permission or without paying rent to do that, right?
MR. COX: Object to the form.
Q. (BY MR. LEMMON) In other words, they don't have the right to condemn somebody's property by putting stuff on it without permission. It's not that important?
A. I think that the view of the population about this at that time was much different than it is today. And whether it would consider a nuisance or a damage, it's -- it's impossible for me to say what an individual might feel like at that time.
Q. But if it's still there and it's still a nuisance, the previous production wouldn't allow them to -- wouldn't allow Monsanto to leave it there without paying for it. You're not saying that, are you?
MR. COX: Object to the form.

THE WITNESS: What I'm saying is that if we're working at a construction site and we carry -- let's say there is dust that moves into the air and moves onto off-site property, the question of whether that is a nuisance and damages are collectible on that is, I think, somewhat of a question as to the amount and the sensitivity of the person that's receiving it. I -- and I certainly would suggest that that's changed over the past 40 or 50 years.

(Exhibit 9 marked)

Q. (BY MR. LEMMON) I'm going to hand you Exhibit 9, which is the Monsanto Pledge.

Have you seen that before?

A. I believe I may very well have. I think it might be in one of the documents that was provided, or perhaps it was produced as an exhibit in one of the depositions that I was thinking about.

Q. Likely so. It's got a bunch of stickers on it.

So at least as of 1990, when this was issued, if you look on the second pledge, "It is our pledge to ensure that -- that no Monsanto operation poses an undue risk to our employees or our communities."
A. I see that.
Q. That is evidence of the change in attitude that you were talking about?
MR. COX: Object to the form.
THE WITNESS: I do not know necessarily believe that is a change in attitude. I think our willingness to -- as to what we view as environmental damage has certainly changed. But I think that second pledge could equally apply to the 1936 to 1977 operation of the facility because I believe that up until 1968, there was a belief that there was no significant risk being posed by the Aroclors, even if there was inadvertent exposure to those Aroclors.
Q. (BY MR. LEMMON) And that's based on the risk information that you --

that statement is based on the risk information that you are aware of that Monsanto owned up to or admitted or published?

A. And the general understanding in the scientific community.

Q. And if you look on this second page, the first full paragraph, "But it's not enough to simply 'unpollute' the world," Monsanto is -- part of its pledge is more than unpolluting the world; is that a fair statement, a fair reading of this?

A. Yes.

Q. And it goes on to say, "We must rectify the mistakes of the past while we continue to develop and introduce new technologies to provide the essentials for mankind in the future."

What has Monsanto done to rectify the mistakes of the past with respect to PCB contamination, particularly with respect to East St. Louis?

MR. COX: Object to form.

THE WITNESS: I think a first example of that -- and I could not

speak to what in totality they may have accomplished or attempted to do, but certainly a first example of that was the construction of an incinerator and operation of an incinerator and taking waste from users of PCBs back and trying to dispose of them in an environmentally-sound way.

Q. (BY MR. LEMMON) Can you identify anything else?

A. Well, as I mentioned, I know that environmental scientists within Monsanto were trying to better understand the behavior of PCBs in the '70s and that continued into the '80s, and they were -- they were working to use that understanding to try to define appropriate interventions. That's perhaps another example.

Q. Are they doing anything now to address the PCB contamination in East St. Louis?

MR. COX: Object to the form.

THE WITNESS: I'm not aware of anything, but I'm not in a position to be aware of what they might be doing

relative to East St. Louis.

Q. (BY MR. LEMMON) Do you know what it costs Monsanto to incinerate the PCBs that it incinerated?

A. I do not.

Q. Do you know what it saved them?

A. I do not.

Q. Do you know -- do you know or have you seen anything written as to why they installed the incinerator?

A. I'm not sure that I have seen anything written. I do believe that it recognizes that it was the inability of many of the users of PCBs to effectively deal with their waste; and, therefore, Monsanto provided an opportunity to deal with that waste without contributing to environmental impact of improper disposal of that waste.

Q. And so by installing the incinerator, they could continue to sell PCBs?

MR. COX: Object to form.

THE WITNESS: I have no idea whether that would be a factor or not, although it would be a -- a way to

avoid the misuse and the release of the PCBs into the environment and perhaps one means of limiting the impact, the negative impacts of PCBs.

Whether you saw that as a commercial advantage or simply a way to avoid the problems that were being caused by PCBs, I think they both end up at the same place.

Q. Well, either one of them may be a fair interpretation, though. I mean, you have attributed an altruistic motive to them and I think there is also a financial incentive that may be equally or completely at work; is that fair?

MR. COX: Object to the form.

THE WITNESS: I certainly would suggest that your -- you know, when you have a problem with a potential product and you try to address that problem, and this is an example of that. Of course, soon thereafter, PCB production was banned.

Q. (BY MR. LEMMON) Reading somebody else's handwriting is worse than

reading my own.

Are you aware of any published standards with the operation of a PCB manufacturing facility?

A. Since there are no manufacturing facilities in the U.S., I'm not aware of any standards that apply to them or if there -- any standards were ever developed.

Q. Right, and I don't mean currently. Obviously they are not currently -- but are there some that existed at the time that it was in operation, other than Monsanto's publications of its own, whatever it did?

A. I'm certainly not aware of any, and I would be frankly surprised that they -- if any did exist. There were -- in the last few years of the plant's operation, there were standards that were set for water discharges. In fact, I refer to one of those in my report.

MR. COX: Are you going to get to another good stopping place soon?

MR. LEMMON: This is as good as

any.

MR. COX: Okay. Thank you.

THE VIDEOGRAPHER: This is the end of Media No. 4. The time is 2:48. We're off the record.

(Recess from 2:48 p.m. to p.m.)

THE VIDEOGRAPHER: This starts Media No. 5. The time is 3:06. We're on the record.

Q. (BY MR. LEMMON) All right. Is it a fair statement that the chemical properties of PCBs that dictate their behavior in the environment includes persistence and stability?

A. Yes.

Q. In looking at Exhibit 10, which is the -- the Weeks report.

A. Yes.

Q. He concluded that the emission estimate was biased low because it didn't consider emissions from the charging -- from charging the distillation still, filtration, and earth treatment, which Monsanto reported as being a source of some of its most severe

emissions.

MR. COX: Object to the form.

Q. (BY MR. LEMMON) Do you recall that passage in here?

A. I don't remember that passage. If you want me to read it --

Q. Do you remember that sentiment?

A. I don't remember that sentiment. I do remember him discussing the nature of his estimates, certainly the -- I don't remember the question of charging the distillation or charging the process as being the most significant.

Q. For the record, I don't have it pulled up, but I have the citation to Monsanto's testimony through Dr. Kaley in his deposition at Page 21.

And if that is what's -- I don't have the passage in front of me, but if that's in here, you wouldn't have any reason to dispute that conclusion?

MR. COX: Object to form.

THE WITNESS: I wouldn't have any reason to dispute the conclusion, although I would suggest that the

releases that might occur during charge or shutdown of these facilities would be transient and short term. And so it remains unclear whether they would significantly alter the overall mass release estimates.

Q. (BY MR. LEMMON) But you wouldn't have any argument with Monsanto if Monsanto reported that charging the distillation still, filtration, earth treatment were sources of some of the most severe emissions?

MR. COX: Object to form.

THE WITNESS: I wouldn't -- I mean, I can't dispute their statement, if indeed that's what it was. My challenge is that when they estimate emissions, I don't see reference to that in the Monsanto documents I reviewed.

Q. (BY MR. LEMMON) All right. We will get back to that. I'll just put a marker there.

A. I do believe I see the statement that you have on Page 6 of the

Weeks report.

Q. I don't see it.

MR. QUINN: It's at the very end.

Q. (BY MR. LEMMON) In fact, in this particular citation, it's talking about the 12.76 pounds a day estimate not being the entirety of the PCB releases, correct?

A. That's what it's referring to.

Q. Do you have any reason to dispute that statement?

A. I do not, although I would believe that Weeks is using the best estimate of an emission factor in his calculations, the best estimate of the emission release -- of the release amounts in his calculations, as he should. He should use whichever estimate he believes to be the most accurate.

Q. Okay.

A. I should also mention the 12.76 pounds at 53 million pounds per year is approximately the value that he employed in his estimation.

Q. As far as his percentage?

A. No, as a poundage amount, that

the -- right, and also as a percentage. But the -- his highest estimate, as I note in my report, is at 50 million pounds per year. I'm not putting my hand on it right now, but it was of the order of 12 pounds. It also was 12 pounds per day at the 50 million pounds per year.

Q. How much did Monsanto realize in revenue and profit from manufacturing 50 million pounds of PCBs?

A. I do not know. It's 12 pounds per day.

Q. The conclusion that you reached that the venting without treatment were -- was expected to be de minimis release because of low volatility, who is -- how is "de minimis" defined in relationship to amount of product that's being made?

A. So the amount that was estimated from that was 0.5 to 1.5 pounds per day, which puts it at the -- at 10 percent or less of the total emissions, even though it was one of the four points that I was concerned about.

Q. Okay. So that's just a

particular part of the process is what this is directed at?

A. That's correct.

Q. Okay. That -- thank you, that clears it up.

And you're aware that the Unit 234, which is the PCB manufacturing unit --

MR. COX: I think it's 246.

MR. LEMMON: I wrote it down wrong.

THE WITNESS: You did say 246 earlier today. But the PCB production facility.

Q. (BY MR. LEMMON) Is there an Exhibit 7 over there?

A. I don't think so. I do not see a seven.

THE VIDEOGRAPHER: It did it again.

THE WITNESS: Did it do it again?

THE VIDEOGRAPHER: Off the record. The time is 3:18. We're off the record.

(Recess from 3:18 p.m. to

p.m.)

THE VIDEOGRAPHER: This begins Media No. 6. The time is 3:35. We're on the record.

Q. (BY MR. LEMMON) So when you talked about the expectation that the emissions would be de minimis due to low volatility, did Monsanto ever do any testing or monitoring to confirm that the emissions with that treatment were de minimis?

A. I know that in the post-1968 timeframe, the -- Monsanto did a variety of tests, as well as estimates of emissions. I don't know specifically about this one.

Again, the mass that was released from the aeration was 0.5 to 1.5, it was by estimate, which I believe is a Monsanto estimate. I don't know whether they did measurements to follow that up. I'm not aware of any specific measurements.

Q. So when you're talking about 1966, that moment in time is when the Jensen report was issued?

A. '66 was when the Jensen manuscript was published, yes.

Q. And was that -- were those findings a surprise to Monsanto?
A. I have no idea. It appears to have been a surprise because there was such activity within Monsanto after that. Certainly I would say that it was a surprise to the scientific community.
Q. But if Monsanto knew about this phenomenon ahead of time, it didn't publish that information to the public anyhow?
MR. COX: Object to the form.
THE WITNESS: I don't know of anyone who understood bioaccumulation. There may well have been individual scientists that raised the possibility, but it was certainly not a generally accepted view until it began to be observed, beginning with Jensen as being one of the first clear identifications of environmental levels of PCBs and then Riseborough in '68 in the U.S.
Q. (BY MR. LEMMON) Was there a reason why Monsanto didn't understand the similarities of the phenomenon between PCBs

and DDT as far as the mass contamination?

A. First of all, DDT was only known for a few years before that as well. I'm not sure of the specific timeline of DDT. But DDT was not -- we were not concerned about bioaccumulation of DDT until roughly this same timeframe. Admittedly, a little earlier, but, of course, DDT had observable direct toxic effects as well.

Q. I'm going to hand you what's been marked as Exhibit 17, and hand you at least part of it right now.

(Exhibit 17 marked)

Q. This is a 1969 report of the Aroclor ad hoc committee. This purports it to be the second draft, but it also appears that there is -- at least it was distributed. And the very first line, when it's talking about evidence of the problem, says, "For the last fifteen years there has been growing worldwide concern regarding the persistence of chlorinated pesticides (particularly DDT) and their universal presence in man, food, animals ..." et cetera.

And this is relating it --

relating that to PCB contamination and the discovery of PCB contamination. Is it an unreasonable interpretation to understand that at least for 15 years, there was some consideration of the effect of PCBs and other chlorinated compounds in the atmosphere?

MR. COX: Object to form.

THE WITNESS: I would say the specific differences that DDT had known toxic effects; PCB did not. And as a result, I doubt that even if someone had felt that bioaccumulation could be an issue, they didn't see it as a significant concern.

But it is true that you could put -- recognizing the properties of DDT and PCBs at least had some similarities that it may have raised the question, which is likely, of course, why Jensen pursued the research that he did.

Q. (BY MR. LEMMON) But PCBs were at least considered that they could be toxic to humans from as early as the '30s; isn't that true?

MR. COX: Object to form.
THE WITNESS: There was the evidence of chloracne. But I would say that as a toxic chemical, any more toxic than most of our industrial household chemicals, I'm not convinced that it was.
Recognize as well that there's a lot of difference between DDT and PCBs in terms of the release to the environment. DDT was directly released to the environment and was sprayed into the environment.
PCBs, at least in principle at that time, were supposed to be contained within vessels, they were supposed to be -- like transformers, they were supposed to be contained as hydraulic fluid, they were contained in carbonless copy paper as opposed to freely distributed into the environment.
So, again, both from the point of view of direct toxicity, as well as the distribution into the environment,

I can see that there is every reason to believe that the PCBs should not be as prevalent as a problem as the DDT.

Q. (BY MR. LEMMON) Well, I'm not suggesting that they are equal in problem, but they do have similar characteristics, certainly, as -- as far as bioaccumulation and some toxicity that at least the ad hoc committee mentioned it as its first item and as evidence of the problem when addressing PCB contamination; is that not fair?

MR. COX: Object to form.

THE WITNESS: Well, they identify specifically DDT. The question is whether DDT should have immediately led to concerns about PCBs, and it's not so clear to me at all that that would have been the case.

Also, the properties that DDT and PCBs have in common with respect to hydrophobicity, low solubility, their adsorption on the solids, the knowledge of that and the ability to quantify that was in its infancy.

Would they necessarily have known that DDT and the PCBs would have behaved similarly in the environment, again, I'm not convinced that is true. Much of the literature about adsorption and accumulation came in the '70s after the initial observations that indeed these compounds were present in organisms in the environment.

Q. (BY MR. LEMMON) Did Monsanto not manufacture DDT?

A. I do not know.

Q. You mentioned chloracne a couple of times. Are you aware of the association of exposure to Aroclors and liver and kidney disease?

MR. COX: Object to the form.

THE WITNESS: I do not know much of the toxic effects. Much of that is from, again, my knowledge and literature that postdates all of this.

Q. (BY MR. LEMMON) So you're not really rendering an opinion as to the toxicity of PCBs?

A. I am not, with the exception of the comment that I cited in the report about not directly toxic to organisms' biota that I referred to in the report from the National Academy of Sciences report.

Q. Okay. On the third page -- it's not the third page, but it's Page 3, and discussing the toxicological aspects of PCBs, the very first sentence says, "Data available at present indicate that PCBs may be moderately toxic to man," and then goes on to talk about chloracne and liver and kidney issues from exposure; is that right?

A. That's what it says, yes. I think it provides, again, evidence that these were not considered acutely toxic chemicals. There are very few industrial or household chemicals that wouldn't be considered at least moderately toxic as the -- kind of the standard refrain of a toxicologist is the dose makes the poison, that it depends on how much. And we are talking about moderately toxic would require more exposure to give rise to toxic effects than something that was acutely toxic.

Q. But at this point, like, without knowing the details of it, it's somewhat guesswork, right?

MR. COX: Object to form.

THE WITNESS: My comments are based on just my general knowledge of toxicology relevant to the courses that I teach in environmental engineering. And when you refer to it as guesswork, it is just a recognition of what's being written.

Q. (BY MR. LEMMON) So, in other words, it's not your opinion. It's what you have read; is that --

MR. COX: Object to form.

THE WITNESS: It's not my opinion because it's this document's opinion.

Q. (BY MR. LEMMON) Got it.

A. Later in this document, it also talks about a safe level for Aroclors in diet. And so it's important recognition as to what is the route of exposure, both the quantity and route of exposure.

Certainly PCBs would never be

suggested that they should be part of a person's diet. It did turn out that because of bioaccumulation in the environment, it became part of people's diet inadvertently.

Q. So that now there is PCBs virtually in every human being on earth?

MR. COX: Object to the form.

Q. (BY MR. LEMMON) Are you aware?

A. Is that a question?

Q. Yes.

A. I do believe that we can measure given both a combination of its persistence, prevalence in the environment, as well as our ability to detect extremely low levels, that we can detect PCBs in most anyone on Earth.

THE REPORTER: On Earth, is that what you said?

THE WITNESS: On Earth.

Q. (BY MR. LEMMON) When did the Monsanto incinerator open?

A. I'm not remembering the exact date. I believe it was approximately 1970.

Q. Look at Page 10 of Exhibit 17.

Monsanto is recognizing the

legal implications of the widespread PCB contamination, correct?

A. Yes.

Q. And that would give another reason why they would open up an incinerator to limit their potential legal liability?

MR. COX: Object to the form.

THE WITNESS: That certainly would be another potential reason for that. It seemed like they all lead to the same conclusion, how do we limit the amount of PCBs that are spread throughout the environment.

Q. (BY MR. LEMMON) What was the -- scratch that.

Was the flaking process for the solid Aroclors different at Krummrich than Anniston?

A. The only differences of which I am aware is efforts to ensure that the dust problem was not as severe as it was, at least initially at Anniston.

Q. And what did they do to limit the dust problem at Krummrich?

A. There were several things that

were identified. Again, some of them were providing change of clothes, ensure that there was hand washing, et cetera, then as well, the ventilation.

Perhaps other things as well, but I don't remember them offhand.

Q. What, in your opinion, that additional process and procedures, including efforts to reduce or eliminate atmospheric discharges, were implemented to respond to potential environmental impacts as they became known beginning in the 1960s, what were those additional processes that were introduced, again, in the late 1960s?

A. I don't remember the specific actions that were taken. There are several memos that are in the documents that I reviewed where they identified opportunities to reduce the amount released.

In many cases, they were focused on releases to water, which perhaps were more important or -- in terms of mass, release them into the atmosphere. But there were identification of a number of -- in the memos, there were identification of a number

of approaches to try to reduce emissions.

Q. Now, I know we kind of covered this before, but people knew about -- in the industrial community, knew about air pollution or the impact of air pollution at least since the '40s because of complaints about smoke and dust and fumes in the air, right?

A. There were certainly concerns that predate even that. There was a -- the king of England at some point in, I believe, about 1100, banned the combustion of coal within the city of London for air pollution issues.

A lot of the initial concerns were associated with visibility, and certainly in the '40s and '50s, there was growing recognition of the problems of air pollution. There seems to have been a delay in the concept of connecting health effects to that air pollution, and I don't think that really crystalized until after the 1954 London smog that connected typical levels of atmospheric pollution and actual acute health effects.

There is a quote that I found interesting that I did include in my report from a pollution control document for industry that was from a manufacturers association, and basically identified that, yes, there is a lot of nuisance issues, visibility concerns about potential property damage, but basically didn't identify health effects as the primary driver for control of air pollution. That is a fair statement of what must have been the view of the day.

Q. In one of your conclusions or opinions, you say that after 1968, Monsanto made significant efforts in progress to reduce these emissions even further.

Again, are there specific -- is there specific steps that they took that you're characterizing as significant efforts in progress?

A. They identify it as changes. I did not cite those and I did not include these and I don't remember specifically what they were. But the -- there are, in the cited information, some of the efforts to do exactly that.

Q. The actual emissions from Monsanto's manufacturing operations increased during those periods, didn't they?

MR. COX: Object to form.

THE WITNESS: I would say that they likely increased up until 1970. I believe 1970 was the largest volume of PCBs being made.

After that, I suspect they would continue to be reduced. It is also true that the primary focus was not on air emissions, but on other releases, releases to other media, such as water.

Q. (BY MR. LEMMON) And Exhibit 10, on Table 3, Mr. Weeks estimates the yearly annual emit -- Aroclor emissions.

MR. COX: I'm sorry, what page are you on, Andrew?

MR. LEMMON: It is -- it's Table 3. It's Page 2 of Table 3. It's about -- it's toward the end of the document.

MR. COX: Oh, gotcha.

THE WITNESS: My document may

not have the figures and tables. Oh, maybe it does. There we go.
Yes, Table 3, yes.
Q. (BY MR. LEMMON) Am I reading this correctly, the emissions increased almost every year, it dropped after 1970, but then started increasing again in '72, three, four, five, six, until it stopped completely.
Does that change what you just said about the reduction?
A. No, this shows that the 1970 was the largest. I believe that even after 1970 that Weeks used the same emission factor to take the amount produced and to translate that into an amount released into the atmosphere.
So I don't think he took advantage of any changes in the process that might have reduced that mass. And as I mentioned, I think that much of the efforts weren't necessarily focused on air releases because I believe that they were probably viewed as less of a concern than releases, for example, to water.
Q. Okay. But in this case, what

we're worried about in the litigation is releases to the air rather than to the water.

A. But I believe unless there is -- I would have to look much more closely, but I know that Weeks used an emission factor that was based upon the amount produced and it was the same every year and I believe that same value was used after 1970.

So he wouldn't have even attempted to take into account any reductions in emissions as a result of any changes to the process.

Q. So in particular, with respect to the statement that the additional reductions in '68 and thereafter, that relates more to water than to air?

A. Certainly as a mass basis, that relates more to water. But certainly the air was a focus and there is memos that discuss some of the changes to the process that were attempted to reduce that.

And, again, I cannot speak to them directly because I did not try to estimate what those emissions were, but certainly there were efforts undertaken to

identify sources of significant emissions and to reduce those.

Q. And I think I asked you this. But you agree with Dr. Erickson's statement that the chlorinated -- higher chlorinated molecules were more persistent?

A. The higher chlorinated biphenyls are more persistent and more sorbing onto the soil phases.

Q. More sorbent means that they would -- they would bond more readily to -- to the soil?

A. There would be a larger percentage of mass associated with the soil phase.

Q. And when Monsanto said -- Monsanto said that the PCBs were virtually indestructible and resistant to biological influences, and although they didn't say it, is it a fair conclusion that that simple fact also means that they would accumulate somewhere else or somewhere?

MR. COX: Object to form.

THE WITNESS: To the extent that they may have been released into

the environment, I don't believe that anyone expected the amount of the PCBs released into the environment.

Certainly the goal was to make sure that they stayed in the transformer or in the carbonless copy paper until -- when they expected better performance of the wastewater treatment center to remove it in that case. There was also an expectation of -- for example, in hydraulic fluid, they didn't plan for leaks.

But to the extent that it is persistent, then whatever leaks there are would lead to slow accumulation in the environment.

Q. (BY MR. LEMMON) Do you have an opinion about the locations showing high concentrations to the east of the site being inconsistent with the wind direction information?

And then go on to say, "Given the substantial industrial use of Aroclors, these concentrations could be associated with commercial or industrial use or inadvertent

production rather than the manufacture."
You don't have an opinion that one is more probable than the other, do you?
A. I do not. I would simply raise it as a possibility because we see concentrations at similar levels to the north and then to the south to where the east -- that is the levels in the east are similar to the levels in the north or south, and yet the wind doesn't blow that way nearly as often, according to the wind rose information I collected.
And then, again, both in that direction, as well as the other two, the concentrations appear to increase with distance from the plant, and that is contrary to expectations.
Q. The deposition of any kind of particulate with PCBs on it in one direction or another would depend on the wind whenever it was emitted, right?
A. That is correct.
Q. So if there were circumstances where there was a higher emission at a particular time when the wind was blowing in

a particular direction, that could at least partially explain the anomaly that you are talking about?
A. Potentially the anomaly location. There doesn't appear to be any evidence that there were periods -- significant periods of time where the emission was significantly different.
But it also would not explain the anomaly of the concentration not decreasing from distance from the plant.
Q. Let's talk about Kevin Coghlan. And how extensive of a review did you perform of his opinions recorded in the deposition?
A. As with the other two experts, I reviewed the report. Again, I performed several specific opinions that stood out to me in reviewing that report and those are what are cited here.
Q. So other than those -- the observations that you offer, you don't have any other criticism or opinion of Mr. Coghlan's report?
A. That is correct. For example, no -- any specific properties he referred to

or specific actions other than this general issue of an approach, I do not have any comment about it.

Q. So you mentioned that he doesn't recognize that other remedial alternatives exist.

Why is that -- is that accurate and is that necessarily a problem in his report and opinion?

MR. COX: Object to form.

THE WITNESS: If he did consider other alternatives, I didn't see a basis for choosing removal. In fact, it's been my experience that for -- in many cases with PCB contamination, we try to avoid removal, if at all possible, depending upon future uses, depending upon the degree of exposure.

Much of my own career is focused on you how do we manage large complicated sites in place. That is without removing new contamination. And for something as strongly sorbing as PCBs, something as simple as a

simple soil cover can effectively contain exposure and, therefore, allow a variety of future uses of a property without any significant exposure to PCBs.

That would certainly be commonly used in brown field and industrial sort of environments, and if that is indeed a planned future use, that may be quite an appropriate remedy, even accepting that there is currently risk, which I think would be the first question. And I have not attempted to answer that.

But you first attempt to identify what are the risks, what are the exposure pathways now, how do we intervene to manage that risk and does that require removal or is there other options that will achieve the same goals.

Q. And what is the goal that you're trying to achieve?

A. To minimize risk or to reduce risk to a point that is at a manageable

level.

Q. So are you aware of whether or not the parcels in East St. Louis are zoned for residential or industrial or brown field use?

A. I don't know the specific properties and what their planned use are.

Q. And if you were to choose a less complete remedy, such as putting a cap or in some other way leaving the PCB in place, wouldn't that lead to a restriction on use?

A. It may very well lead to a restriction on use. At the same time, no remedy is 100 percent effective. There will always be -- whatever remedy might be put in place for a soil site, there will always be a residual contamination level that must be managed, and the question is how to balance what that residual might be with future uses.

And it's often more effective and cost effective to do something like a soil cover, especially if the future use is industrial, or even recreational, which also does not have as high an exposure level.

Q. If --
A. It would be --
Q. Isn't that similar to having a car that somebody runs a red light into and, you know, you get it repaired and you get it back and it's never the same as it was before -- before the wreck?
MR. COX: Object to form.
Q. (BY MR. LEMMON) Is it a question of who is responsible for fixing it?
MR. COX: Object to the form.
THE WITNESS: I believe that the question of the ultimate use of this property, what is the ultimate goal, is the ultimate goal to turn it into a property that is productive and -- for example, if it's commercial or industrial, is it a source of economic activity and taxes for the community, the brown -- the concept -- the whole concept of brown fields is based upon that; that is to take property that would be -- otherwise be unused and make a cost effective remedy so that it can be used, or,

again, recreational or, ultimately, if you want to try to restore something to residential, that would have the strictest standards that would have to apply to it.

I think there -- when we look at environmental contamination, it is true that we have made choices in the past that have left -- left us with perhaps not the best choices, but we -- we try to identify what is the best balance of managing risk and achieving the goals of having, for example, productive commercial and industrial activities on properties, should that be the most appropriate.

Q. (BY MR. LEMMON) But East St. Louis didn't make the choice to have -- or to allow Monsanto to deposit PCBs on its property or to store it there in perpetuity, did it?

MR. COX: Object to the form.

THE WITNESS: There is a whole host of questions that have to be addressed, and I didn't address them

all, some of the other experts did, is that, one, is there a risk; second, what is the nature of that risk, what is the path, routes of exposure; second, who is the source of that risk, assuming that there is a risk, who is the source of that risk or who are the contributors if there is more than one; and then, finally, how do we best translate this problem, whatever it is, into a positive outcome.

If there is a risk and a single identifiable source, that becomes kind of an easier balance than if there is a more complicated situation.

Q. (BY MR. LEMMON) And the list you just gave isn't really exclusive either, is it?

A. That's --

Q. I mean, you also have the question of who would pay for it and who would get to decide, just to name two --

A. And ultimately who would be benefitting from it as well.

Q. So this is -- the other

remedies that exist that you're saying he doesn't -- Mr. Coghlan doesn't recognize include capping.

Are there others that you would suggest?

A. Well, you know, capping is perhaps an obvious one that is commonly used. That is soil cover that is a commonly used approach for this.

It does depend on future use. If there's a warehouse facility that would be built on this property with a foundation, that leads to a different set of requirements than if -- again, if you were trying to have a commercial or industrial activity or even a recreational or residential activity that would have different levels and routes of exposure.

Q. I'm going to get back to that in a second.

But I want to ask, just in the general part of the opinion, you suggest that regional screening levels were rarely, if ever, used to define cleanup requirements and only after further evaluation of their

applicability in a particular situation.

So your criticism is of Mr. Coghlan's use of remedial -- the remedial alternative of reducing the contamination to the regional screening level?

A. The identification of risk, I think, would be a better characterization of it on the basis of the regional screening level.

Q. Okay. But isn't that -- isn't the regional screening level the characterization of risk chosen by the EPA to determine whether or not something needs to be evaluated?

A. "Needs to be evaluated" is different from "needs to remedied to that level." Even EPA does not recognize regional screening levels as a remedial level.

It is true that when you exceed regional screening levels, the path forward is normally to evaluate routes of exposure, the extent of exposure along those routes, and what is the risk at this particular site, given site-specific information, given what might be conduct that would be -- you know,

the uses of the site.

Those are the sort of studies that would be triggered by exceeding the regional levels, but that the regional levels don't make the decision for you.

Q. But once there is a determination that there is an exceedance of the regional screening level, isn't the property basically suspect until you get a letter of no further action?

MR. COX: Object to form.

THE WITNESS: It is suspect requiring investigation before you decide what, if any, actions are warranted.

Q. (BY MR. LEMMON) And until that time, it remains that -- the property would remain suspect, at least in the --

A. That would be a fair characterization.

Q. Okay. And are you aware that there there are some jurisdictions that do require remediation to the regional screening level?

MR. COX: Object to form.

THE WITNESS: There is a tendency for small government organizations, sometimes even at the state level, but certainly at smaller sub-governmental divisions, they don't have the capability to do investigations, so the easiest thing is to try to act on those screening levels.

In general, when you are at the state level or regional EPA, they recognize that these are just that, screening levels. But it is -- if you don't have the resources to conduct an investigation, they may be stronger triggers than -- than EPA designs them to be.

Q. (BY MR. LEMMON) And if -- if the property is owned by someone who did not make the choice to have the contamination on their property, shouldn't it be their decision as to what level of remediation would be proper?

MR. COX: Object to the form.

THE WITNESS: I don't believe

that's the way that we have normally operated in the U.S. You would perhaps ask EPA, or the Illinois equivalent, to review and evaluate this and help define whether there is risk at an unmanageable level.

Q. (BY MR. LEMMON) Well, the EPA or the IEPA is not going to object if the property is cleaned to -- to catfish-pond clean, right?

MR. COX: Object to the form. Is that a standard you can cite?

MR. LEMMON: In Louisiana it is.

THE WITNESS: You know, I find the -- they won't disagree with you cleaning up your property does not sound like an actionable effort.

Q. (BY MR. LEMMON) Well, what I'm saying is if -- there is not going to be an objection that it's too clean from EPA or IPA -- IEPA, right?

A. They would never object to anything being too clean. I don't believe

that anyone would be in that category.
Q. And the -- the regional screening level is -- is a regulatory tool, right?
MR. COX: Object to form.
THE WITNESS: It's to help identify where you should focus attention.
Q. (BY MR. LEMMON) And it's -- it was identified initially as a risk threshold as well, right?
A. It is a risk threshold subject to a variety of assumptions that may or may not be applicable at a particular site and it's to help guide -- certainly both EPA and IEPA are faced with an almost insurmountable task because I can go to most any location in Illinois and identify some level of contamination.
So how do you decide where you are going to apply limited resources to try to best manage the environment and best control the exposure and risk, and that's what screening levels are designed to do, to help you identify where additional attention

needs to be focused.

Q. Are you aware that the EPA did some testing in East St. Louis and identified some areas of concern and sent a letter to the mayor in September of 2016, which I'm going to offer as Exhibit 15?

A. I have not reviewed such a document and I'm not aware of it.

(Exhibit 15 marked)

Q. Having sent this letter, EPA has notified East St. Louis that it does have some concerns about PCB contamination in East St. Louis that require further investigation, correct?

A. Correct, that's what the memo is referring to.

Q. And so if EPA has not followed this up with a letter of no further action, then it would not be an accurate statement to say that EPA is not concerned about PCB contamination in East St. Louis, would it?

MR. COX: Object to the form.

THE WITNESS: I have never made such an assertion.

Q. (BY MR. LEMMON) But it

wouldn't an accurate assertion if someone did make that, right?

A. I believe this memo suggests that EPA does have concerns with portions of East St. Louis.

MR. COX: Can we take a short break?

MR. LEMMON: Yeah.

MR. COX: How are you doing?

MR. LEMMON: I'm close.

THE VIDEOGRAPHER: This is the end of Media No. 6. The time is 4:30. We're off the record.

(Recess from 4:30 p.m. to 4:39 p.m.)

THE VIDEOGRAPHER: This begins Media No. 7. The time is 4:39. We're on the record.

Q. (BY MR. LEMMON) Do you know whether Monsanto has done or asked to do any sampling of any locations in East St. Louis for PCBs?

A. I don't know that they have done any. They have not asked me to do any.

Q. You have not seen any results

of any sampling that Monsanto may have done?
A. I have not.
Q. Do you know whether they conducted any further investigation or what further investigation they conducted after learning of PCB sampling results in East St. Louis?
A. I do not.
Q. Do you know whether -- scratch that.
You suggest in your second bubble, with respect to Kevin Coghlan, that additional investigation should define potential pathways of exposure and potential risk based on current and future property uses.
What scope of additional investigation do you have in mind?
MR. COX: Object to form.
THE WITNESS: I don't know enough about the area that is potentially impacted to be able to say.
I do think that this document is one that has some specific

locations and they also make that recommendation of some additional investigation.

Q. (BY MR. LEMMON) This document being Exhibit 15?

A. This is Exhibit 15, that's correct.

And, you know, it shows a specific area for -- based upon their previous investigation, it appears to be perhaps a half a mile or so in area, half mile square.

Q. And you would combine that with the -- by the way, have you seen the sampling results from the properties in East St. Louis that are -- the 272 parcels that are alleged in the complaint?

A. I have not, or if they were part of a report, I have not reviewed them in any detail or even examined the results or locations at all.

Q. So the scope of investigation would include an area that would contain where the EPA has taken samples and where the samples have been taken by the plaintiffs who

also identify areas or locations with results above 0.23 or above --

A. I don't know enough about the specifics to be able to say what the scope of that investigation would be.

My first questions would be for EPA as to what are they suggesting to -- in terms of scope of investigation.

Q. Well, assuming the EPA is not involved at this point because this -- as we have talked about, this is not a regulatory or an EPA circle type investigation, but it's a -- you know, a private claim among private parties.

But who -- who would be the person you would presume or you would anticipate that the person performing that investigation would be some consultant or environmental engineer?

MR. COX: Object to the form.

You're asking him to speculate.

THE WITNESS: Regardless of who is -- who ultimately is supporting the investigation, it would almost undoubtedly be conducted by a

consulting firm at the direction of someone. I don't know who that should be.

Q. (BY MR. LEMMON) And the -- there obviously is a substantial expense associated with those consulting firms.

Do you have an opinion as to who should be responsible to pay for that?

MR. COX: Object to the form.

THE WITNESS: I would -- if there is a lack of clarity of the specific source, I think the only option would be for the property owner to do the investigation, and then if they can identify a specific source of those PCBs, may seek reimbursement of those expenses.

Q. (BY MR. LEMMON) And at this point, there is identification of at least part of the source for those PCBs?

A. There is at least a potential source.

Q. Would it be fair for a court to make a determination as to who should pay for that investigation in advance?

MR. COX: Object to the form.
THE WITNESS: I'm not sure I could state what might be fair for a court to do.
Q. (BY MR. LEMMON) Do you know what -- since learning of the potential risk in East St. Louis from either the September -- or from any of the testing that EPA did of East St. Louis or that the plaintiffs did, do you know what Monsanto has done to define potential pathways of exposure and risk?
A. I do not.
Q. Do you know if they have done anything?
A. I do not.
Q. Are you aware that the presence of PCBs in East St. Louis has been declared by East St. Louis to be a nuisance created by Monsanto?
MR. COX: Object to the form.
THE WITNESS: I am not aware of that.
Q. (BY MR. LEMMON) And you are aware or would agree that the remedial

alternatives that you suggest could require -- or would require certain restrictions for future development?

MR. COX: Object to the form.

THE WITNESS: It's been my experience in most remedies that restrictions of future development are almost always part of that remedy, regardless of the remedy.

Q. (BY MR. LEMMON) And those restrictions would be published in public record?

A. Presumably.

Q. You would agree that there is no benefit to East St. Louis to have PCB waste stored on its property?

MR. COX: Object to the form.

It's not a PCB waste.

Q. (BY MR. LEMMON) PCB stored on its property.

MR. COX: Object to form.

THE WITNESS: Again, the use of the word "stored" seems inappropriate as well. But PCBs on the property would not be valued by the property

owner.
Q. (BY MR. LEMMON) Well, you don't want to use the word "stored," but isn't -- isn't it sitting on the property of -- isn't PCBs sitting on the property of someone else?
MR. COX: Objection, form.
THE WITNESS: Yeah, but the reason I wouldn't use the word "stored" is because when I think of storing something, it was an action that was and to deliberately place some material for a period of time that I may later retrieve, and this doesn't -- that doesn't seem appropriate here. That's just my definition of what "stored" would be, like if I stored my bicycle at my neighbor's house.
Q. (BY MR. LEMMON) Intentional -- intentionally -- what's the difference between intentional placement and intentional ignorance as to where it is being placed?
MR. COX: Object to the form.
THE WITNESS: Perhaps it's just

the reference of the use of the word "stored." If I had accidentally done some damage to my neighbor's house, I wouldn't say that I -- because of something that I -- that was moved from my property, I wouldn't call it that I was storing my property there.

Q. (BY MR. LEMMON) But the act of ventilation of the PCBs by Monsanto from its manufacturing operation was intentional, wasn't it?

MR. COX: Object to form.

THE WITNESS: I still would not refer to this as stored. I mean, it is -- you know, however, perhaps it's just me. That is just not what I think of with the word "stored."

Q. (BY MR. LEMMON) Okay, fair enough, fair enough.

We could perhaps start with the proposition that no one would want PCBs placed on their property without their permission?

A. I think we could start with that proposition.

Q. Okay. What assurances are there that a soil cover or paving or construction would solve the PCB problem in East St. Louis?

MR. COX: Object to the form.

THE WITNESS: This is something that would need to be assessed and there was usually, in almost all remedies, institutional controls that are put in place, in addition to perhaps future use limitations. But those institutional controls may limit access in some fashion, that are designed to maintain the remedy as designed and as implemented to -- in order to remove the opportunity for that exposure and risk. So...

Q. (BY MR. LEMMON) Is it your experience that having -- using one of these alternative remedies affects the value of the property negatively?

MR. COX: Object to form.

THE WITNESS: I can't speak to what effect it would have on value. But certainly if you limit future

uses, that may, in fact, be the case. The contaminated sites that have been contaminated and require remediation, again, I don't know of any situations where you are not having a negative impact at some point in the future on value. How much, I could not say.

Q. (BY MR. LEMMON) Okay. And using one of those alternative methods would also require continuous monitoring of the property to make sure that the cap or cover or paving is working?

A. Any remedy that implemented would require at least occasional monitoring because no remedy is complete and 100 percent effective. And so all sites of which I'm aware have some degree of monitoring into the future. How much perhaps depends upon the particular remedy that's implemented.

Q. And, of course, there is a cost that goes with that, right?

A. That is correct.

Q. If there is a disturbance to the soil cap or to the building or to the paving, there would have to be immediate

repair under those regulations?
A. That would depend upon the nature of the disruption and whether, again, it led to a significant increase in exposure and risk.
Q. It would have to be evaluated at the time that such a disruption would occur?
A. I believe that would be the case.
Q. Okay. And, again, that would come with a substantial cost, or at least a cost?
MR. COX: Object to form.
THE WITNESS: Depending upon how it's set up, the person that caused the disruption may then be the liable party.
Q. (BY MR. LEMMON) The difference between removing the contaminated soil and the other alternatives seems to be cost driven?
A. It is partially cost driven, and part of the reason for that is that if you are trying to redevelop a brown field,

you have to recognize that there is -- for it to be a cost effective redevelopment, it needs to be a -- sometimes that may suggest that there should be limited or there should be some -- that the remedial costs are somewhat less or the future environmental liabilities.

There is certainly a complex balancing act there in terms of making a redevelopment cost effective for the redeveloper, and that is the basic driver behind a brown field through a developer.

Q. The cost of -- you mentioned in the -- in the report that the removal of impacted soils is rare, primarily due to limitations on disposal of waste and only a few locations in the United States choose to accept PCB-contaminated soil.

Is the reason that -- what is the reason for there to be such a limited number of available sites?

A. Public resistance to that disposal, primarily.

Q. And it's -- if there is a permitted site to accept PCB waste, the --

it's very costly to transport it there and also to place it there, right?

A. It is.

Q. But if you have to get rid of PCBs, you have sort of a limited number of choices in order to get rid of them and the price has to be paid, whatever it is, if you're ultimately getting rid of the PCBs, right?

A. You know, it is just balancing considerations as to -- balancing all of these factors, this is certainly true.

Q. And I'm just going to go through a couple of things that I think are basic.

But if someone wanted to use someone else's land, you would need to get their permission, fair?

A. Fair.

Q. And if you get -- if they ask, you would have to pay for it?

MR. COX: Objection, form.

THE WITNESS: There are certainly -- in general, that's correct, yes.

Q. (BY MR. LEMMON) And if you were placing a substance onto somebody's property, including something like a landfill, you would be paying for that as well?

MR. COX: Object to the form.

THE WITNESS: If you were --

Q. (BY MR. LEMMON) In other words, there's a cost of placing PCBs on someone else's property?

MR. COX: Object to form.

THE WITNESS: In general, yes, if you were making use of someone else's property, then the principle of that would be that you would compensate the owner for that.

Q. (BY MR. LEMMON) And as far as you know, East St. Louis is not in the business of storing PCBs and didn't give Monsanto permission to disperse PCBs that got onto their property?

MR. COX: Object to form.

THE WITNESS: Again, the question of the observation of PCBs on the property I believe is real. The

source of those PCBs or the sources of the fraction of those PCBs and who is the responsible party I think are still questions that are being discussed, litigated.

I think without knowing the history of individual parcels, I couldn't really say as to what would be the best disposition or the -- who is responsible for the cost of remediating those should remediation be required.

Q. (BY MR. LEMMON) When you talked about Dr. Erickson, in your words, significantly and consistently overstates the potential releases to the atmosphere from the operation and the manufacture of PCBs and the operation of the incinerator, what is -- how do you characterize the difference between the emissions that you accept and -- five pounds a day and the estimates that he -- that he postulated?

A. Well, the estimates in -- both from Weeks, as well as contained in the EPA and Monsanto documents that I reviewed are

all of the order -- about an order of magnitude or more or less than what Erickson suggested.

There also appears to be at least a few points where a potential for release was used by Dr. Erickson. And that doesn't necessarily mean it was a realized potential. I did not find his estimates to be well supported with evidence.

Q. Are the estimates based on anything other than Monsanto documents?

A. I don't know. But, again, those documents referring to things like potentials for release or -- as opposed to the actual either measurements or detailed estimates that were made that all end up in this range of five, or thereabouts, pounds per day.

Q. But we don't have measurements of other emissions -- we don't have really any measurements of emissions from the Monsanto --

A. There are some measurements of concentrations, for example, in work areas. And the approaches that were employed by

Weeks, again, I don't -- I can't find any particular fault with those.

As you pointed out, there was a -- there are areas that he didn't include, but he felt that those were not significant or else he would have tried to estimate those in more detail.

They are consistent with the estimates and I do believe there is some measurements where possible of release points within Monsanto.

Q. There weren't measurements of releases. There were measurements of --

A. Concentrations.

Q. -- various concentrations in the air at a specific point?

A. Relate back to what those releases might be. For example, the incinerator, the measurement of simultaneously volume and concentrations does, in fact, estimate a release.

Q. And regardless of what Dr. Erickson said, the five pounds a day you find to be a reasonable estimate put forward by Weeks based on Monsanto data, and your

statement that you believe that Erickson overstated it is based on his use of potential sources --

A. As well as the other available information, which was in Monsanto documents, not from Weeks' EPA document, that also suggested a total release weight of the order of five pounds per day. And so --

Q. So is it a difference between --

MR. COX: Did you finish?

Danny, did you finish?

THE WITNESS: No.

Q. (BY MR. LEMMON) Sorry, I didn't mean to interrupt.

A. The fact that there are more than one estimate of the order of five pounds per day and we have one outlier that I don't find significant justification for as the basis for not trusting Erickson's estimate.

Q. So is it a difference between five pounds per day, which we sort of know, and then other things that -- like we talked about earlier, that Monsanto said were potentially significant sources of emissions

that had not been calculated or estimated and him using those in reaching his ultimate conclusion?

MR. COX: Object to the form.

THE WITNESS: One in particular that I cite, he identifies a -- a potential release that was, by design, removed through the control equipment on that process.

And he neglects the fact that that control equipment was going to be put in place on that. He used an estimate of the release as if there were no equipment there and, in fact, equipment were supposed to be put in there.

Q. (BY MR. LEMMON) What particular piece of equipment are you talking about?

A. Let me turn to the -- I believe it was a 1016 process code for facility for continuous production of 1016.

Yes, Aroclor -- this is on Page 8, second paragraph, that employed draft documents from a project in the Aroclor

department in 1970 designed to produce --

THE REPORTER: From the --

MR. COX: You need to slow down if you're reading so she can catch that.

THE REPORTER: Draft documents from the --

A. Dr. Erickson employed draft documents from a project in the Aroclor department in 1970, paraphrasing that sentence. This is a project designed to produce Aroclor 1016 and that the final plans for the project included an ejector system, which would be cooled to essentially eliminate the possible discharge of PCBs to the atmosphere.

Q. So we're talking about the -- a reduction in the emissions after 1970?

A. No, this was with a new process that was -- I believe this was going to be the continuous process that wasn't the previous process, but included a change in the process to ensure that the PCBs were not -- in the new process that was not going to have significant PCB release.

This is not the process that I described in the 1955 documents.

Q. Right. So what I'm asking is -- I think what I'm understanding you to say is that he continued to count those PCBs as if they were being emitted form 1970 through the end of production, and that's what the criticism is.

A. It was a reference to the amount being released associated with this facility that was based upon draft plans and not the final design. And that is just an example of where he might have achieved a much higher emission rate than what other estimates were.

Q. When was this particular piece of equipment installed that he failed, in your opinion, to consider? In 1970, correct?

A. I think this is circa 1970.

Q. Okay. So we're only talking about an overestimation on this particular issue from 1970 through the end of production.

Is that -- am I understanding you correctly?

A. But this particular -- prior to this, there wasn't a continuous production, and so the previous estimates prior to that would still apply. That is that we would not have additional releases that are associated with this process, with this particular process.

And I would have to look through the details of it to see how applicable that was. It's just an example of trying to use information that was incomplete or in draft form to try to get emissions, and I believe that may be why his estimates are so much higher than everyone else's.

Q. So I'm confused now.

A. This is just an example.

Q. Right.

A. This is not all of --

Q. Well, what is the rest of the criticism of the incomplete information that you're suggesting?

A. When I see an example like that, I would have to go back through, but I did not look at it in detail. But I see an example like that and it makes me question

the basis for his estimates and the fact that his estimates are higher than the other estimates. Potentially using approaches or -- or bases such as that doesn't give me any confidence that the higher estimates that he has are correct.

Q. Okay. So if there is incomplete information in this period of time, you question the rest of it as well because of the result?

A. Effectively.

Q. Okay.

A. I did not look at it point by point.

Q. Got it.

So -- but I'm still confused about 1970 forward. Are you saying that this -- on this particular point, he failed to consider that in 1970 there was some additional emission control that came online from 1970 through the end?

A. I believe that this is associated with making a modification to a process to make 1016 on a continuous form. That required additional control over and

above what was the previous systems.
And the -- Dr. Erickson did not use the final form of that new process to try to estimate emissions.
Q. And the final form was 1970-ish?
A. And it wasn't emitting prior to that. Prior to that, everything was still in the batch forms.
Q. Okay. So there was a different process design --
A. That is --
Q. -- in the draft document than there was in the final document?
A. That is my understanding.
Q. Okay. But there is not a measurement of those emissions anyhow, is there?
A. I don't know of any measurement of those emissions.
Q. Dr. Erickson, at some point, concludes that the exact number is not the most important.
MR. COX: Is that a question?
MR. LEMMON: It's not a

complete question. I'm on the wrong page.

Q. (BY MR. LEMMON) Isn't it true that in Dr. Erickson's opinion, he ultimately concludes that -- and I'm reading from Page 59 of his report, whether the airborne PCB emissions were 60,000 pounds, 190,000 pounds, or some other amount, these tons of airborne PCB emissions had to be deposited somewhere after they were emitted from the Aroclor production facility?

A. And the emissions would deposit somewhere either on the site or potentially off-site.

Q. And so in this particular case -- in this particular quote, he -- he compares whether it's five pounds a day or 12 pounds a day. And in either case, his conclusion, as far as the effect of the emissions, is the same.

Would you disagree with that?

MR. COX: Object to form.

THE WITNESS: I would disagree with that because the dose defines the poison, in the words of the

toxicologist.

And so the idea of the level of concern always has to be related to how much; that is, if there are concerns off-site, is it associated -- is the releases -- are the releases of sufficient amount to lead to levels of concern off-site.

Q. (BY MR. LEMMON) And ultimately, the dose, as you say, is going to be determined by the measurement of what is on the ground, what's deposited in the soil, right?

MR. COX: Object to form.

THE WITNESS: The question of how much of that is linked to a particular site also defined by how much is released from any particular source.

Q. (BY MR. LEMMON) Well, based on the release that you're predicting or that you accept having come from the site through -- through the EPA report, the Weeks report, do you have a calculation of how much of the contamination in East St. Louis came

from Monsanto?

A. What Weeks calculated --

MR. COX: Object to form.

THE WITNESS: What Weeks calculated was a concentration in soil surrounding the site and indicated that very near the site there were concentrations that would be expected above one ppm, but that at any distance from the site, they were in the range of less than a ppm, between 0.25 and 0.75, and this includes distances. I would have to look at the report to define the exact distances.

But when you're looking over most of East St. Louis, the concentrations would be below one ppm.

Q. (BY MR. LEMMON) And one ppm is an action level, isn't it?

MR. COX: Object to the form.

THE WITNESS: I'm not sure what the action level would be for soils in Illinois.

MR. COX: Can we take a real

quick break?

THE VIDEOGRAPHER: This ends Media 7. The time is 5:16. We're off the record.

(Discussion off the record)

THE VIDEOGRAPHER: This begins Media No. 8. The time is 5:17. We're on the record.

Q. (BY MR. LEMMON) Is there anything that we talked about today that you saw today or learned today that changes your opinion in any way?

A. No.

Q. After all of your view of all of what Monsanto did, do you have any criticism of what Monsanto did in its manufacture of PCBs at Krummrich?

A. No.

Q. Do you have any criticism of how or what Monsanto did to protect its neighbors from their operations at Krummrich?

A. No.

Q. Do you know whether any of the neighbors of Krummrich suffered from chloracne or liver problems from exposure to

PCBs from Monsanto's operations?
A. I have no knowledge of that.
Q. Do you know how many locations -- wind locations there were on the website that you cited for the wind rose?
A. This is specifically the website for St. Louis.
Q. So it's just in St. Louis?
A. This is in the -- just as in the Weeks report, it was the wind rose from the Lambert Airport, which is kind of the northern part of downtown or north of downtown of the city.
Q. I know you haven't studied Jay Turner's report, but do you know the locations -- or do you know that he used several locations in order to select the -- or to predict the wind rose from -- for this case?
A. I was not aware of that.
Q. Are you aware that he actually used locations within East St. Louis in order to -- to make his predictions for this case?
A. I'm not aware of that. Again, my concern might be that are those stations

adequately designed to ensure that they are not conflicted with local wind information.

But that is -- in general, if we have sources of air data that is closest to our facility of interest, that would be better data to use if it is not subject to interferences from local buildings, trees, et cetera.

Q. And assuming that the data that he used was accurate, or more accurate than the St. Louis data, that could affect -- or would affect your opinions as far as the location, at least of the PCBs that you suggest are anomalies in this report?

A. The primary anomaly was still the fact that the highest concentration in the tree bark was at the further distances. I didn't necessarily find that the directions to the northwest and to the southeast as problematic. They seem consistent with the wind direction. Even to the east, there is a fraction of the time that it blows to the east.

It is still a surprise that the concentrations are highest, again, at further

distance from the Krummrich, but also higher than -- or equal to in magnitude as to the north and to the south in this direction to the east.

If that eastern location had higher percentage of winds when the meteorological information in East St. Louis is provided, then that might at least suggest transport in that direction, but it would still not answer the question of why the highest concentration was further from the site.

Q. Right. But I'm particularly looking at the -- the opinion on the bottom of Page 13 where you say, "Locations that currently show high concentrations to the east side of the site appear to be inconsistent with the wind direction information."

A. That particular sentence would -- would be -- could be at risk if that wind information changes.

Q. Okay, great. Thank you very much. I enjoyed seeing you again and enjoyed spending the day with you.

MR. COX: One question.

EXAMINATION

BY MR. COX:

Q. Dr. Reible, you haven't been asked to evaluate what, if any, institutional controls would be appropriate for -- if there was any remediation performed at East St. Louis?

A. I have not been asked.

Q. And you don't have any opinions about those, do you?

A. I do not have any opinions.

MR. COX: Okay.

THE VIDEOGRAPHER: We are off the record at 5:22 p.m. This concludes today's testimony given by Danny Reible.

The total number of media used was eight and will be retained by Veritext.

(Proceedings concluded at 5:23 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CITY OF EAST ST. LOUIS, )
Plaintiff, )
)
VS. ) Case No.
) 3:21-cv-232-DWD
MONSANTO COMPANY, et al.,)
Defendants. )

REPORTER'S CERTIFICATION OF THE ORAL
DEPOSITION OF
DANNY REIBLE, PhD, PE(LA), BCEE, NAE
AUGUST 16, 2024

I, Donna Wright, a Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, DANNY REIBLE, PhD, PE(LA), BCEE, NAE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to Mr. William Cox, III;

That a copy of this certificate was served on all parties and/or the witness shown herein on ______________________;

I further certify that pursuant to FRCP

Rule 30(3) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me on this, the 21st day of August, 2024.

Donna Wright

DONNA WRIGHT, Texas CSR 1971
Expiration Date: 11/30/24
VERITEXT LEGAL SOLUTIONS
300 Throckmorton Street
Ft. Worth, Texas 76102
Firm Registration No. 571