**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

CITY OF EAST ST. LOUIS,                  )
                                         )
                    Plaintiff,           )        Case No. 3:21-cv-232-DWD
                                         )
                                         )
v.                                       )
                                         )
PHARMACIA LLC, *et al.*,                 )
                                         )
                    Defendants.          )


**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**
**<u>ON PLAINTIFF'S CLAIMS AND MEMORANDUM IN SUPPORT</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF MATERIAL FACTS ...................................................................... 5

I.    Polychlorinated Biphenyls And Their Applications ............................. 5

II.    Monsanto's W.G. Krummrich Plant .................................................... 9

III.    EPA's Regulatory Authority Under TSCA And CERCLA .................... 11

IV.    The City's Lawsuit ............................................................................. 14

    A.    The Vacant Properties .................................................... 14

    B.    The City's Invalid Assignment Of Rights ....................... 17

    C.    PCB Levels In Identified Properties ............................... 19

    D.    Procedural Background ................................................... 21

LEGAL STANDARD .............................................................................................. 21

ARGUMENT ........................................................................................................ 22

I.    The City Lacks Standing To Recover For All But 24 Parcels (All Counts) ......... 22

    A.    The City Has Failed To Demonstrate Injury For The Vast Majority Of The Parcels At Issue ............................................................. 23

    B.    The City Cannot Bypass Ordinary Standing Requirements ..................... 28

II.    The City's Damages Claims And Ordinance Claims Are Time-Barred (Counts I, III-VII) ............................................................................. 30

    A.    The City's Damages And Ordinance Claims Are Barred By The Five-Year Statute Of Limitations ................................................. 30

    B.    The Statute Of Repose Bars The City's Strict Product-Liability Claims (Counts V And VI) ............................................................. 34

    C.    The Public-Rights And Continuing-Tort Doctrines Do Not Apply .......... 35

III.    The City's Claims Fail On The Merits ................................................ 40

    A.    The City's Public Nuisance Claim Fails (Count I) ..................................... 40

    B.    The City's Nuisance Claims Fail Because Necessary Parties Have Not Been Joined (Counts I, III) ................................................... 44

    C.    The City's Ordinances Do Not Authorize Civil Suits To Abate Nuisances (Count III) ................................................................. 45

    D.    The City Has Not Presented Evidence To Support The Elements Of A Trespass Claim (Count IV) ................................................ 47

    E.    The City Has Failed To Establish "Use" Of A Product (Counts V-VII) ........................................................................ 50

F.    The City's Design-Defect Claim Fails As A Matter Of Law (Count V) ................................................................................................ 51

IV.    The Court Should Abstain From Adjudicating The City's Requests For Abatement Until The EPA Has Exercised Its Primary Jurisdiction (All Counts) ...................................................................................................... 53

CONCLUSION ................................................................................................................ 55

Defendants Monsanto Company ("Monsanto"), Pharmacia LLC ("Pharmacia"), and Solutia Inc. ("Solutia") (collectively "Defendants") hereby jointly move for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56.

## INTRODUCTION

From 1936 to 1977, the former Monsanto Company ("Old Monsanto") lawfully manufactured polychlorinated biphenyls ("PCBs") at its W.G. Krummrich Plant in Sauget, Illinois ("Sauget Plant"). During the time Old Monsanto manufactured PCBs and in the time since, science and technology evolved. In the mid-1960s, analytical tools emerged that allowed PCBs to be detected and quantified in air, water, and soil. And when reports of PCBs' presence in the environment began to surface in the late 1960s, Old Monsanto took unprecedented steps to respond: It eliminated sales of certain PCBs that were deemed less controllable in the environment, confined PCB sales to manufacturers of enclosed electrical equipment, began a program to monitor and control PCB discharges from the Sauget Plant into wastewater treatment systems, and constructed a state-of-the-art incinerator to thermally destroy PCBs returned by Old Monsanto's customers. Old Monsanto voluntarily ceased all production of PCBs by 1977.

More than four decades later, in February 2021, the City of East St. Louis ("City") filed this lawsuit against Old Monsanto's alleged successors-in-interest ("Defendants"), claiming that Old Monsanto's PCB production and waste-handling practices led to the contamination of 273 vacant parcels of real estate. Represented by private law firms retained on contingency, the City pressed numerous ordinance and tort claims seeking potentially hundreds of millions of dollars in allegedly diminished property values, lost tax revenues, and abatement costs, as well as injunctive relief to compel Defendants to remediate the alleged contamination. Dkt. 129 ¶¶ 75, 100, 118.

This Court has already dismissed the City's claim for nuisance-based municipal penalties (Count II), holding that they fell outside the Court's jurisdiction. Dkt. 171. The City has failed to

substantiate its remaining claims.  Discovery has revealed that, for the vast majority of the properties at issue, the City either does not own the property or has not demonstrated PCB levels above the ad hoc standard the City has selected as its cleanup level (more than 0.23 parts per million ("ppm") PCBs), which the U.S. Environmental Protection Agency ("EPA") has made clear should *not* be used as a cleanup standard.  The City's claims were also filed years after the statute of limitations had run, and the undisputed facts confirm that multiple other independent grounds foreclose the City's claims, as well.  For all of these reasons, the Court should grant summary judgment for Defendants.

*First*, the City lacks Article III standing to seek much of its requested relief, which significantly narrows the scope of the case.  The City seeks forward-looking equitable relief, including remediation of the 273 vacant parcels it claims are contaminated.  Yet the City today owns only 100 of those 273 properties.  After Defendants uncovered that fact in discovery, the City's contingency-fee counsel initially orchestrated an improper attempt to acquire claims from St. Clair County for an additional 73 properties the City does not own.  The City, however, has now conceded that this attempted assignment was void, and its remediation expert accordingly has focused his rebuttal report only on the 100 properties that the City actually owns.  As to those properties, even under the City's artificially low 0.23 ppm PCBs cleanup level—more than 100 times more stringent than the 25 ppm standard for low-occupancy use set by the EPA—the City's sampling evidence (if admissible) would support standing for only 82 of the 100 City-owned properties.  *See* Appendix.  Further, only 52 of these vacant properties exceed the 1 ppm standard that the City's experts concede is the level typically used by the EPA for high-occupancy residential soil cleanup levels.  And *none* of these vacant parcels exceeds the 25 ppm standard for low-occupancy areas.  It is undisputed that there is no plan to redevelop the parcels; indeed, any

redevelopment would require reconstructing streets, sewers, and other infrastructure that the City has allowed to fall into disrepair. The City thus has established no concrete, non-speculative injury for most, if not all, of its claimed properties and therefore lacks Article III standing as to those parcels.

The City also seeks backward-looking damages relief for purported "loss of use" of the 273 vacant properties. But the City has *never* owned 126 of the 273 properties, and it therefore could not have suffered any loss-of-use injury as to those parcels. As to the remaining 147 parcels, only 65 exceed the 1 ppm level typically used for residential cleanup (which is the use the City claims it lost). Moreover, the City transferred its ownership of 47 properties to third parties years ago, leaving claims for only the 100 parcels it currently owns. And many of the parcels are located in woodlands inaccessible by paved streets or roads, precluding any residential use that could support loss-of-use damages.

*Second*, the City's claims—both its common-law damages claims (for public nuisance, trespass, design defect, failure to warn, and negligence, Counts I, IV-VII) and its ordinance-based claim (Count III)—are all time-barred under the five-year statute of limitations. The City's product-liability claims are also barred by Illinois's statute of repose. There is no dispute that Monsanto stopped manufacturing PCBs in 1977 and that the last allegedly tortious act thus occurred decades ago. Yet the City did not bring suit until 2021. No exception to either time bar can save the City's claims.

*Third*, the City's claims fail on the merits. The City's common-law public-nuisance claim (Count I) fails because the City has not shown the invasion of any public right by a physically offensive nuisance. The City alleges only that invisible, odorless PCBs are present at trace levels on vacant properties. Trace levels of imperceptible chemicals on vacant, unused properties do not

interfere with anyone's use and enjoyment of these parcels and, therefore, cannot support a nuisance claim. The City's ordinance-based nuisance claim (Count III) is barred because the ordinances at issue are inapplicable on their face. They do not support the type of freestanding civil nuisance suit at issue here, much less for imperceptible chemicals. Further, to the extent the City seeks injunctive relief for properties it does not own, both nuisance claims (Counts I and III) fail because the City has impermissibly failed to join the owners of the properties. As to the trespass claim (Count IV), the City has failed to present evidence showing that Defendants intended to invade any of the properties at issue, or that the presence of invisible, odorless PCBs constitutes a tangible invasion on the City's possessory rights as a matter of law. All the City's products-liability claims (Counts V, VI, and VII) fail because the City does not allege any harm stemming from a use of a product. And the City's design-defect claim (Count V) doubly fails because the City cannot satisfy the governing consumer-expectations or risk-utility tests under Illinois law where, as here, the alleged defect is an inherent property of the product.

*Finally*, at minimum, the City's requests for abatement and similar equitable relief cannot proceed because the EPA has not exercised its primary jurisdiction over the cleanup of the identified parcels. The record shows that, since 2009, the EPA has twice tested sites in East St. Louis for PCB contamination and even reached out to two different City mayors about investigation and possible remediation efforts. This Court should not use the blunt instrument of an injunction to supplant the EPA's carefully reticulated scheme for PCB cleanup with local control.

The Court should grant summary judgment for Defendants.

## STATEMENT OF MATERIAL FACTS

### I.    Polychlorinated Biphenyls And Their Applications

1.    PCBs are non-flammable organic chlorine compounds. Ex. 1 at 8; Ex. 2 at 2. They consist of a class of "209 discrete chemical compounds, known as congeners, that contain one to ten chlorine atoms attached to a biphenyl molecule." Ex. 3 at 2. At the trace levels reportedly observed on the 273 subject parcels, PCBs are imperceptible to human senses; they are "colorless, odorless, and tasteless." Ex. 4 at 7.

2.    "Each unique PCB molecule or congener may be grouped by the number of chlorine atoms it contains." Ex. 3 at 2. Since there are a total of ten possible chlorine sites on the biphenyl ring, "there are ten congener classes or isomers," also known as "homologs." Ex. 3 at 2. PCB products include many different congeners involving varying chlorine concentrations. Ex. 5 at 5.

3.    PCB manufacturing in the United States began in 1929, when Swann Chemical Company began manufacturing "Aroclors"—Swann's trade name for PCB mixtures—at its Anniston, Alabama facility. Ex. 1 at 9; Ex. 2 at 2-3; Ex. 6 at 2. Aroclor is also the trade name that Old Monsanto later applied to certain of its PCB mixtures after acquiring Swann. Ex. 3 at 5.

4.    "[D]ue to a variety of beneficial chemical properties," such as low volatility, chemical stability, and nonflammability, PCBs were commercially popular and were widely used in a range of end products, including compressor lubricant, hydraulic fluid, heat transfer fluid, caulk, sealants, paints, and coatings. Ex. 5 at 5; *see* Ex. 7 at 4; Ex. 8 at 5-6; Ex. 2 at 5; Ex. 9 at 4-5. PCB-based fluids had a significantly lower fire risk than alternative fluids for use in electrical applications like transformers. Ex. 2 at 2-5. And PCB-based fluids were used as fire-safety fluid in many other applications, including hydraulics, heat-transfer systems, and compressors. Ex. 2 at 47.

5.      The commercial applications for PCBs generally fell into three categories.  PCBs were used in: (1) completely closed systems, which are sealed off from the environment (such as capacitors, transformers, and electromagnets); (2) semi-closed systems, which are partially but not entirely sealed off from the environment (such as hydraulic systems); and (3) open systems, in which the PCB-containing material is embedded in an unenclosed commercial product (such as coatings, inks, adhesives, and plasticizers).  Ex. 5 at 5.

6.      PCBs were deemed essential for certain uses from the time they were first manufactured until the time Old Monsanto ceased making them.  During World War II, for example, the government issued Necessity Certificates to Old Monsanto and funded multiple expansions of Old Monsanto's PCB-manufacturing facilities in Alabama to support PCB production for the military and defense contractors.  *See* Ex. 2 at 117; Ex. 10 at 3-5.  During the War, the majority of PCBs that Old Monsanto produced were for use by the U.S. military in applications such as banding and sheet rubber, electrical transformers, non-flammable wire and cable coatings, heat-resistant paint, and missile-launch tubes.  *See* Ex. 10 at 4 (rubber and transformers); Ex. 11 at 3 (cable and wire coatings); Ex. 12 at 2 (heat-resistant paint); Ex. 13 at 2 (missiles). Old Monsanto continued to manufacture PCBs for the government and defense contractors into the 1970s.  Many products had exacting specifications for fire resistance, thermal and electrical conductivity, and other attributes requiring the use of PCBs, and military specifications continued to call expressly for Old Monsanto's PCB-containing Aroclor products. *E.g.*, Ex. 14 at 4; Ex. 15 at 1; Ex. 16 at 1; Ex. 2 at 37, 41.

7.      After Old Monsanto decided in the early 1970s to terminate PCB manufacturing for certain applications like paint, adhesives and sealants, the federal government invoked the Defense Production Act to order Old Monsanto to manufacture PCBs for such uses by military

6

contractors. *See* Ex. 17 at 1 (directing Old Monsanto to accept purchase orders for Aroclor 1242 "pursuant to Section 101 of the Defense Production Act of 1950"). Old Monsanto complied with the government's directive, but it explained that it had otherwise ceased selling PCBs "for the uses which we understand [the defense contractors] intend for the Aroclor 1242," in light of "the increasing environmental concerns expressed about products containing polychlorinated biphenyls (PCBs)." *See* Ex. 18 at 1.

8.      From the 1930s to the 1970s, PCBs were also deemed essential to the maintenance of the nation's electric grid. In 1971, the federal government convened an Interdepartmental Task Force, which in 1972 issued a report determining the continued use of PCBs to be "necessary" in certain electrical applications because no alternative product was available. *See* Ex. 19 at 14. The report stated that the "use of PCBs should not be banned entirely," and that the "continued use for transformers and capacitors in the near future is considered necessary because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use." Ex. 19 at 2-5, 81.

9.      Knowledge about the potential environmental and health effects of PCBs has changed over time. Ex. 20 at 73, 77. According to the City's chemical expert, Dr. Mitchell Erickson, "[e]nvironmental PCB analysis emerged in the late 1960s, as instrumentation and techniques became available and scientists slowly became aware of PCBs in various environmental compartments." Ex. 21 at 31; *see* Ex. 22 at 135, 136 (until at least the 1960s, "there was no instrumentation available to detect" PCBs in the "air"). Before that, "[t]he techniques and technology to conduct analysis at the trace levels needed were not available . . . to find PCBs in the environment or to evaluate PCBs' environmental properties." Ex. 21 at 31. Indeed, "[n]ot only were there limits to the technology to find PCBs at part-per-million and part-per-billion levels,

7

but there was a lack of awareness.  Scientists did not even know to ask the question."  Ex. 21 at 31.  As late as 1988, an EPA scientist researching PCBs found no convincing clinical evidence that PCBs cause chronic health effects in humans.  Ex. 20 at 142-43.

10.    Knowledge of alternatives to PCBs for various industrial applications—and willingness to use them—has also changed over time.  For instance, fire-safety developments in the 1970s provided several new approaches to mitigating fire risks, including the rise of improved automatic sprinkler systems and other fire systems, leading to greater willingness to use non-PCB fluids in electrical equipment.  Ex. 2 at 86-87.  Still, even into the 1980s, no one-for-one substitutes had yet been developed to substitute for PCB fluids in reducing fire risks.  Ex. 2 at 27-31, 83-88.

11.    In addition to PCBs manufactured for use in end products, a variety of industrial processes involving the presence of chlorine, carbon, and high temperatures generate PCBs as an inadvertent byproduct.  Ex. 5 at 5; *see* 47 Fed. Reg. 24,976, 24,989 (EPA June 8, 1982) ("PCBs can be generated from virtually any starting hydrocarbon structure," and "PCB formation appears to be possible whenever chlorine and carbon are present in a reaction vessel at elevated temperatures").  Such processes include pigment production, the manufacturing of silicone products and their precursors, secondary copper smelting operations, the manufacturing of metallic titanium, and the synthesis of dozens of other organic chemicals.  Ex. 5 at 6; Ex. 21 at 99-100; Ex. 6 at 31.[1]

---

[1]  Facilities performing these types of processes were located near the Sauget Plant, which is situated "in a heavily industrialized area, referred to as the Sauget Industrial Corridor."  Ex. 5 at 14; Ex. 23 at 361.  As of 2000, "active . . . facilities in the area included Big River Zinc (zinc smelter), Cerro Copper (copper smelter), Clayton Chemical (waste oil and spent solvent recycling and recovery), Ethyl Corporation (petroleum additives), Resource Recover Group (waste recycling), Sterling Steel Castings (foundry), Trade Waste Incineration (hazardous waste treatment), and Union Electric (electricity distribution), in addition to bulk storage warehouses."  Ex. 5 at 15.  Several of these industrial facilities, including Cerro Copper and Sterling Steel Castings, were in the immediate vicinity of Old Monsanto's Sauget Plant.  Ex. 5 at 87 (Fig. 3.3).  The operations of any of these facilities "may be associated with [byproduct] PCBs."  Ex. 5 at 39-

12.     The burning of household trash can also generate PCBs.  Ex. 21 at 100.

13.     Byproduct PCBs "have been produced globally both before and after [the Toxic Substances Control Act] was enacted."  Ex. 5 at 6.  Today, "byproduct PCB generation may, in fact, exceed peak product PCB production."  Ex. 5 at 7.

## II.    Monsanto's W.G. Krummrich Plant

14.     Old Monsanto's Sauget Plant began producing PCBs in 1936, after Old Monsanto acquired Swann Chemical Company in 1935 and the rights to its Aroclor patent.  Ex. 5 at 2, 5.

15.     Old Monsanto manufactured Aroclors at the Sauget Plant from 1936 until 1977.  Ex. 6 at 3.  Old Monsanto also manufactured Aroclors at a plant in Anniston, Alabama.  Ex. 6 at 2.  The company produced 12 types of Aroclors, designated by number.  Ex. 6 at 4.  The last two digits represent the percentage of chlorine in the mixture; Aroclor 1254, for example, consisted of 54% chlorine.  Ex. 6 at 4.  Liquid Aroclors, which included 1221, 1016, 1242, 1248, 1254, 1260, and 1262, were the most common Aroclors in production.  Ex. 6 at 4.

16.     Old Monsanto took steps to ensure that PCBs would not escape from the Sauget Plant.  From the beginning, Old Monsanto designed the manufacturing process to be an enclosed process.  Ex. 24 at 611-12.  In the 1960s, Old Monsanto further reviewed the PCB-manufacturing process to ensure that there were no intentional releases of PCBs into the atmosphere.  Ex. 24 at 599-600.  The company also built a dedicated wastewater treatment plant for the company's complex; as a result, Old Monsanto's sewage waste from the Sauget Plant was never released into East St. Louis.  Ex. 25 at 699-700; Ex. 5 at 22-23.  And in the late 1960s and early 1970s, the

---

42 (identifying "more than 100 possible sources that could have handled or released PCBs . . . located in the vicinity of" East St. Louis, and explaining that documented uses "includ[e] paint and/or ink processing/manufacturing, metal foundries, and other metals manufacturing and/or scrapping facilities, specialty chemical companies, disposal sites and junkyards, electrical utilities, and rail operations").

company installed a series of settling basins and catch tanks to minimize the loss of PCBs in the manufacturing process. Ex. 24 at 694.

17.     In 1971, Old Monsanto began operating a state-of-the-art incinerator "to safely dispose of PCBs." Ex. 3 at 7; Ex. 5 at 23. This was a significant investment—at the time, "other commercially available waste incinerators were not able to manage a PCB waste stream." Ex. 6 at 2. Old Monsanto's operation of the incinerator was "closely monitored" by the EPA "to confirm that it was operating as designed," and at normal operating temperatures, it "achieved 99.9998% destruction of PCBs." Ex. 6 at 2. The EPA inspected Old Monsanto's incinerator in 1976, concluding that the exhaust from the incinerator was essentially PCB-free. Ex. 24 at 725-30.

18.     Despite the fact that there are active clean-up activities around the plant in Sauget, no regulatory authority—neither the federal EPA nor the Illinois Environmental Protection Agency—requested that Old Monsanto clean up the parcels at issue in this litigation or placed them on the national priorities list. Ex. 25 at 703. The City also never notified the company of any alleged PCB contamination in East St. Louis. Ex. 25 at 703.

19.     Old Monsanto "voluntarily ceased sales of open-use PCB systems in 1970, and by 1972, had ceased sales of semi-closed systems." Ex. 5 at 18. It voluntarily ceased all production in 1977, two years before the EPA banned the production of most PCBs. Ex. 2 at 113; Ex. 5 at 19; Ex. 3 at 4.

20.     In 1979, as information about PCBs' potential health effects continued to emerge, the EPA required manufacturers largely to cease PCB production under the Toxic Substances Control Act of 1976 ("TSCA"). Ex. 5 at 5; *see* Ex. 1 at 9; 15 U.S.C. § 2605(e)(2)(A). The EPA's regulations, however, continue to permit PCB use in completely closed applications, Ex. 5 at 5, and they "allow inadvertently generated PCBs . . . at defined concentrations, under certain

conditions, and with requirements to report to EPA and maintain certain records," EPA, *Learn About Polychlorinated Biphenyls* (July 26, 2024), https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls.

## III.    EPA's Regulatory Authority Under TSCA And CERCLA

21.    Today, the EPA regulates sites potentially contaminated by PCBs under both TSCA and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

22.    TSCA provides specific standards for the cleanup and disposal of PCB waste based on the intended use of the site and the type of PCB waste present.  As relevant here, "[u]nder TSCA the cleanup goal for PCBs in low occupancy areas, such as vacant lots, is 25 [ppm]."  Ex. 5 at 30-31.  The "low occupancy" designation is "consistent with the current use of the occupied parcels" in this case.  *See* Ex. 5 at 30 ("low occupancy" means annual occupancy "for less than 335 hours (an average of 6.7 hours per week) for bulk PCB remediation waste (soils)" under 40 C.F.R. § 761.3).  The City's soil-sampling expert, Kevin Coghlan, agreed that all properties at issue here are "low occupancy" under TSCA.  Ex. 26 at 132.

23.    TSCA's implementing regulations include detailed procedures, including for self-implementing cleanups.  They impose "specific regulations on pre- and post- remedial sampling of PCB-contaminated waste."  Ex. 5 at 11; 40 C.F.R. § 761.61(a)(2).  Before any corrective action for PCBs may be taken, the EPA must be notified.  *See* 40 C.F.R. § 761.61(a)(3)(i) ("At least 30 days prior to the date that the cleanup of a site begins, the person in charge of the cleanup or the owner of the property where the PCB remediation waste is located shall notify, in writing, the EPA Regional Administrator[.]").  The City's expert, Coghlan, admitted that the "type of corrective action . . . prescribed in [his] expert witness report" would "likely" "require EPA notification and approval."  Ex. 26 at 122.

24.     CERCLA, meanwhile, authorizes the federal government to respond to the release of PCBs and created the Superfund trust to pay for federal response actions. Ex. 5 at 7. "The CERCLA response process requires a series of steps including preliminary site assessment and inspection, completion of a remedial investigation (RI) and feasibility study (FS), remedy selection, remedial design, and remedial action before site completion and closure." Ex. 5 at 7; *see* 42 U.S.C. ch. 103.

25.     Under CERCLA, the EPA provides "Regional Screening Levels" that apply to all U.S. regions and are intended to provide a uniform screening standard for chemical exposure levels at Superfund sites. The presence of a chemical in excess of a Regional Screening Level simply means that additional work should be undertaken to determine whether remediation is needed. Ex. 1 at 16, 50-51. The EPA has made clear that these Regional Screening Levels "are *not* cleanup standards and should *not* be used as cleanup levels." Ex. 5 at 10 (quoting EPA, *Regional Screening Levels* (2023), https://www.epa.gov/risk/regional-screening-levels-rsls) (emphases added). The question whether remediation is needed—and, if so, what kind of remediation—depends on the chemical levels and the nature of the location. Ex. 5 at 29; Ex. 7 at 14; Ex. 6 at 37, 49.

26.     After Old Monsanto ceased PCB production, the EPA undertook PCB cleanup actions for the Sauget Plant, as well as at two neighboring Superfund sites in the Sauget area. Ex. 26 at 30; Ex. 27 at 4; Ex. 28 at 1; *In re Solutia Inc., 500 Monsanto Ave., Admin. Order On Consent*, U.S. EPA Region 5, Docket No. R8H-5-00-003 (May 3, 2000). Site clean-ups concluded as early as 2000. *See* U.S. Env't Prot. Agency, *Five Year Report, Sauget Area 2 Superfund Site* 17 (June 26, 2008), https://semspub.epa.gov/work/05/302666.pdf ("removal action" to address PCB contamination in Sauget Area 2 "was completed on April 5, 2000").

27.     Both the EPA's involvement and the alleged soil contamination in the south end of East St. Louis (where the claimed parcels are located) were well-known by the 2000s.  Ex. 29 at 47 (City Manager explaining that he knew that EPA "did some studies and some testing at one period of time . . . and determined that there was some high levels of contamination in the south end area"); Ex. 30 at 68-69 (City Manager testifying that prior to 2006, when he worked for the Housing Authority, he knew that "the south end portion of town" is "a contaminated area," which affected housing-development ideas); Ex. 31 at 57-58 ("very clear that there was soil contamination in the south end pertaining to Monsanto"); Ex. 32 at 10 (in connection with Sauget site clean-ups, "[e]veryone EPA spoke with said they knew there was contamination in the area"); Ex. 30 at 44-45 (alleged industrial contamination, along with Old Monsanto's cessation of PCB production and the ban on PCBs in the late 1970s, "was certainly no secret in the community").

28.     Indeed, the longtime City Attorney for East St. Louis (serving from 1999 to 2017) was for a time simultaneously counsel for the Village of Sauget at the Area 1 and Area 2 Superfund proceedings.  Ex. 33 at 38, 41; Ex. 34 at 43.  He testified that "everybody at city hall was aware of environmental cleanup" occurring "directly to the south of city hall."  Ex. 33 at 38.  He also testified that he believed the City was "aware that there was a Super Fund cleanup that was underway there. . . . I think it was general knowledge in the community."  Ex. 33 at 41.

29.     To investigate the effects of historical manufacturing, the EPA also tested the south end of the City for PCB contamination in 2009 and renewed its testing in 2012.  Ex. 34 at 79-82; Ex. 35 at 1.  Between 2012 and 2016, the EPA sent letters to two City mayors about the presence of PCBs in the south end of the City.  *See* Ex. 34 at 83, 94; Ex. 33 at 220-27; Ex. 35 at 1.  Initial sampling revealed PCB levels ranging from 0.2 to 17 ppm, and the EPA suggested "additional investigation in this area to assess how contamination levels should be considered during future

13

development." Ex. 34 at 1; *see also* Ex. 6 at 38. The EPA, however, has since taken no further action, and the City has not engaged with the EPA to take additional steps. Ex. 33 at 184, 186-87; Ex. 34 at 57-58, 93; Ex. 26 at 37-38, 123.

## IV.    The City's Lawsuit

30.    On February 3, 2021—more than 40 years after Old Monsanto ceased manufacturing PCBs at the Sauget Plant in 1977—the City filed this lawsuit against Defendants in the Circuit Court of St. Clair County, Illinois. Defendants removed the case to this Court on March 1, 2021, Dkt. 1, and the City filed its operative, Second Amended Complaint on April 24, 2023, Dkt. 129.

31.    The City is represented in this litigation by private attorneys retained by the City pursuant to a contingency-fee agreement. East St. Louis City Council Meeting (Jan. 9, 2020), https://www.facebook.com/estlcityhall/videos/527243471479394 (noting that The Driscoll Firm represents the City on contingency and stands to gain one-third of the City's recovery). It asserts multiple common-law and ordinance-based causes of action based on alleged PCB contamination purportedly released from the Sauget Plant. The City stakes its claims on PCB levels detected in soil samples collected at 273 vacant parcels of real estate. Dkt. 129 ¶¶ 10, 11.

32.    Discovery has revealed that the City owns only 100 of the 273 properties at issue. *See, e.g.*, Ex. 36 at 1.

33.    The City recently attempted to orchestrate an assignment of claims for 73 additional properties, but it now acknowledges that this assignment was invalid. Ex. 29 at 51-54.

### A.    The Vacant Properties

34.    During discovery, the City produced a list of 273 properties in the southern part of East St. Louis that it claims have been contaminated by Old Monsanto's operations in Sauget. *See* Ex. 37; Ex. 4 at 2; Ex. 6 at 6 n.4.

14

35.     The 273 parcels are vacant, undeveloped lots that serve no residential or commercial purposes. Ex. 30 at 106, 129. The City's damages expert, Dr. Bell, noted: "[T]he 273 properties today are vacant a hundred percent." Ex. 30 at 20, 21-24; *see also* Ex. 6 at 37 ("At the time of and since the 2022 sampling event, all of the City-owned parcels with representative data were undeveloped and vacant."). He also noted that many of the parcels are "not accessible to a paved street" because the "streets have decayed to the point of not being recognizable streets." Ex. 30 at 150. The City's corporate representative, Michael Wagner, likewise testified that, without going through each parcel individually, he was confident that "the vast majority of [the parcels] are vacant." Ex. 33 at 69.

36.     The City's sampling expert Coghlan testified that most of the lots lack any structures in which anyone could conceivably reside, Ex. 26 at 82; indeed, as of 2023, only four structures of any sort existed on any of the lots, Ex. 5 at 29. Coghlan also testified that, "given the conditions of the lots," they likely "have been vacant for some time." Ex. 26 at 82, 105. He noted that most of the parcels are overgrown by vegetation, which imposes "a natural barrier to occupancy on the lot, from people spending any time on the lots." Ex. 26 at 83-84.

37.     Coghlan further testified that, other than his sampling crew, he was unaware of anyone who had been potentially exposed to PCBs on the lots. Ex. 26 at 116-18. And "as long as the lots are vacant and no one's exposed," he explained, "you can't have the risk" of harm to human health from PCBs. Ex. 26 at 115. None of the City's experts offered any opinion "on the magnitude of actual human health risk that might exist to entrants on any of the parcels" at issue. Ex. 26 at 115; Ex. 38 at 56 (explaining that those who were "not in a location" were "not likely to have excess exposure").

38.    According to the City's own reports and historical newspapers, the area in which the parcels are located has, for decades, suffered from economic headwinds unrelated to environmental concerns about PCBs.  The City's website explains that "the once heavily industrialized City has been a victim of an industrial decline and subsequent resident flight for many years." Ex. 39 at 2.  According to a master development plan that the City adopted in 2011, the City's population peaked in 1950, and an "industrial exodus beg[a]n" in 1955 "with a 25 percent drop in employment at Alcoa, the largest employer in the area," followed by the 1959 closing of the Armour and Company slaughterhouse and the subsequent closing of Swift & Co. Ex. 40 at 127.  As early as 1960, an East St. Louis Plan Commission report stated that the south end of the city already "contain[ed] the most extensive area in need of a major redevelopment program"—48% of the housing units in this area were classified as "dilapidated," and 29% lacked a private bathroom.  Ex. 41 at 67, 76.  By 1979, the "City's assessed value [had] fall[en] to $38 million, compared to $169 million in 1970." Ex. 40 at 127.  A 1979 City Council resolution determined that a significant area of the south end of the City was "a slum, blighted and decadent area," without reference to PCBs.  Ex. 42 at 3.  And a 1983 newspaper article detailed how worsening economic conditions had transformed the "boom town," which was then experiencing significant "deca[y]." Ex. 42 at 1.

39.    The City has not identified any concrete plans for redeveloping the 273 parcels for residential or commercial use, and redevelopment would encounter substantial barriers unrelated to the presence of PCBs.  The City's fact witness, Dorene Hoosman, testified that the City could not sell many of the vacant parcels it owned on the south end of East St. Louis because "they're not large enough to build anything on" due to the narrow lot sizes.  Ex. 43 at 92-93. Wagner testified that, because residential redevelopment would require rebuilding infrastructure (like

16

sewage systems) from "scratch," any attempt at redevelopment would be for industrial or heavy

commercial use—and he pointed to no concrete plans.  Ex. 33 at 91.  Similarly, Coghlan testified

that he had "not seen any plans on redevelopment for that area," noting only that the City's mayor

had once expressed to him a general "desire to do some redevelopment and . . . for some housing."

Ex. 26 at 139.

40.    The City had undertaken no efforts to address PCB contamination on the 273

parcels before this suit.  *E.g.*, Ex.  44 at 72 (City Director of Regulatory Affairs unaware of any

efforts to remediate); Ex. 45 at 45 (Mayor unaware of any City efforts to find grants to address

PCB contamination); Ex. 34 at 1 (City no longer has a health department to abate nuisances).

**B.    The City's Invalid Assignment Of Rights**

41.    Discovery revealed that the City today owns just 100 of the 273 parcels at issue in

this case.  Ex. 6 at 6-7; Ex. 23 at 6, 53.  St. Clair County, in the role of trustee, owns 73 of the

parcels.  Ex. 23 at 6, 53.  The remaining 100 parcels are held by private persons or entities other

than the City, such as the East St. Louis Housing Authority, the East St. Louis School District, and

the East St. Louis Township.  Ex. 23 at 53.

42.    The City has never owned 126 of the 273 properties.  Ex. 6 at 6 & n.6; Ex. 47.  Of

the remaining 147 parcels, the City does not currently own 47 of the parcels, and has not owned

them since 2011 at the latest.  Ex. 47; Ex. 48 at 5.

43.    More than three years after the City filed suit—and after discovery revealed that

the City does not own the vast majority of the 273 parcels at issue—the City attempted to acquire

an assignment of rights from St. Clair County.  On August 30, 2024, Lonnie Mosley, the Trustee

Committee chairman, purported to assign to the City any claims the County might pursue for the

73 properties it owned.  *See* Ex. 49 at 2-3 (purporting to assign to the City the County's "right,

title, and interest in and to all claims, causes of action, and choses in action for damages to the [73

17

listed] Properties that [the County] has or may have").  The City signed the General Assignment

on September 3, 2024, agreeing to pay "$10.00 Dollars per Parcel" for the assignment of claims.

Ex. 49 at 2-3.

      44.     After the City disclosed the General Assignment in this litigation, this Court

"extend[ed] the current scheduling order" for additional discovery on the assignment and its effect

on the City's claims.  Dkt. 219 (Minute Entry).

      45.     On October 21, 2024, Mark A. Kern, Chairman of the St. Clair County Board,

requested a legal opinion from James A. Gomric, the St. Clair County State's Attorney, on the

validity of the assignment of claims for the 73 parcels.  Ex. 50 at 1.  Chairman Kern's request

explained that the General Assignment "reflect[ed] the purported signature of Lonnie Mosley as

Chairman of 'St. Clair County Trustee,'" but that "[n]o minutes or agendas reflect this agreement

coming before the Trustee Committee or the full County Board."  Ex. 50 at 1.  Chairman Kern

sought "a formal opinion . . . as to the legal effect and sufficiency" of the General Assignment.

Ex. 50 at 1.

      46.     On November 7, 2024, Attorney Gomric issued a formal opinion concluding that

the transfer was "utterly void" because it failed to comply with Illinois procedural requirements

for formal county action.  Ex. 51 at 3 (quoting *City of Belleville v. Ill. Fraternal Ord. of Police*,

312 Ill. App. 3d 561, 563 (2000)).  He explained that Illinois law recognizes the County *Board* as

the proper entity to conduct business on behalf of the County, and that the majority of the Board

must be present to transact business.  Ex. 51 at 2-3 (citing 55 ILCS 5/5-1004; *id.* 5/2-1005).  While

St. Clair County had endowed the Trustee Committee of the County Board with certain powers to

review tax programs and supervise tax sales, neither the Committee nor the Board had approved

the General Assignment.  Ex. 51 at 2-3.  Instead, the General Assignment was signed only by the

Trustee Committee chairman, Lonnie Mosley.  Attorney Gomric concluded that Mr. Mosley
lacked authority to unilaterally convey the County's interest in the 73 parcels, so "the General
Assignment is void, invalid, and of no legal effect/sufficiency."  Ex. 51 at 2-3.

47.    Beyond the General Assignment's procedural invalidity, Attorney Gomric also
concluded that "substantively, the General Assignment belies the County's responsibility as tax
trustee for *all* interested taxing districts under Section 21-90 of the Illinois Property Tax Code (35
ILCS 200/21-90)."  Ex. 51 at 3.

48.    The City's counsel prepared the General Assignment, gave it to Mr. Mosley's
nephew (with whom one of the City's attorneys had a "friendly" relationship), and instructed the
nephew that counsel wanted "the chairman of the trustee committee to sign it" in connection with
ongoing litigation against Defendants.  Ex. 52 at 16-19.  Mr. Mosley, in turn, signed the document
at his nephew's request.  Ex. 52 at 16, 22.

49.    The City has now conceded that the General Assignment is void and did not effect
a transfer of any of the County's claims.  Ex. 29 at 51-54.

**C.    PCB Levels In Identified Properties**

50.    The 273 parcels at issue have been sampled twice in connection with this suit—
once in 2020, and again in 2022.  Ex. 33 at 51, 53.  The initial round of sampling in 2020 was
undertaken "to help determine whether or not there was a threshold level of PCB contamination
that would support a lawsuit," with testing financed "on behalf of counsel" and not involving any
"city funds."  Ex. 33 at 58-59.  The 2022 sampling, which likewise was funded by outside counsel,
was conducted by Environmental Health & Engineering ("EH&E").  Ex. 33 at 231.  Kevin
Coghlan—a principal scientist at EH&E—later testified on the City's behalf.  *See* Ex. 26.  Coghlan
is a frequent plaintiff expert in PCB cases.  *E.g.*, *Erickson v. Pharmacia LLC*, 548 P.3d 226, 235

(Wash. Ct. App.) (excluding two of Coghlan's three methodologies for calculating historical, pre-remediation PCB levels at a school), *review granted*, 556 P.3d 1098 (Wash. 2024).

51.     In 2022, EH&E collected samples from the parcels to determine PCB levels.  Ex. 26 at 79.  "Three to five individual samples" were combined into a "single sample" for each parcel and analyzed" for PCB congeners.  Ex. 3 at 8; Ex. 26 at 67.  Coghlan proposed that "remediation of PCB-impacted soil" on the properties should involve "removal to an estimated depth of 2 feet at all parcels where the total concentration of PCB congeners exceeds 0.23 [ppm]."  Ex. 3 at 26. He selected the 0.23 ppm cleanup level, he testified, based on EPA's "regional screening level for PCBs," Ex. 26 at 109, even though Regional Screening Levels are not intended to be used as cleanup values, *supra* ¶ 25.  Given that selected target level, Coghlan did not propose any remedial action for parcels "that had total PCB concentrations of less than or equal to 0.23 [ppm]."  Ex. 26 at 139; Ex. 3 at 1 (arguing for "remediation . . . to reduce the level of contamination below the" Regional Screening Level.  Of the 100 parcels owned by the City, Coghlan calculated that 18 parcels have PCB levels at or below 0.23 ppm.  *See* Appendix; Ex. 53; Ex. 47.

52.     Another of the City's experts, Dr. Mitchell D. Erickson, suggested a different abatement standard in his report:  "[R]emediation of residential soils will require excavation of any soil contaminated above one part PCB per million parts soil . . . and replacement with clean soil."  Ex. 54 at 116.  Forty-eight of the 100 parcels owned by the City have PCB levels at or below 1 ppm.  *See* Appendix; Ex. 53; Ex. 47.

53.     Under TSCA standards, the cleanup level for a low-occupancy lot (like the parcels at issue here) is 25 ppm—"over 100x the cleanup goal (0.23 [ppm]) that Mr. Coghlan used."  Ex. 5 at 30-31.  None of the parcels sampled showed total PCB concentrations greater than 25 ppm. *See* Appendix; Ex. 53; Ex. 47; Ex. 5 at 30-31.

54.     For the Court's convenience, the number of parcels with PCBs at or below thresholds identified above is summarized in the Appendix submitted with this motion.

55.     The City retained a separate expert, Dr. Erickson, to analyze Coghlan's soil-sample findings and determine the likely source of the PCB contamination on the identified parcels.  Ex. 54 at 97.  Erickson's report acknowledged "unusually high concentrations of nona- and decaCBs," *i.e.*, the heaviest-chlorinated PCBs, around the Sauget Plant.  Ex. 54 at 29.  Old Monsanto only briefly produced these heaviest-chlorinated PCBs and ceased producing them in 1949, Ex. 6 at 4, 20, 26, 29; Ex. 5 at 19 (Fig. 3.4), and these PCBs can be produced as byproducts of other processes, Ex. 5 at 4-5.  Erickson later acknowledged in his deposition that he could not "explain why" these heaviest-chlorinated PCBs were found in "trees sampled in Sauget but not in Anniston," the location of Old Monsanto's other PCB-production facility.  Ex. 54 at 183.

### D.      Procedural Background

56.     On March 12, 2024, this Court dismissed Count II of the City's operative complaint for lack of jurisdiction.  Six claims therefore remain: common-law public nuisance (Count I); nuisance under East St. Louis Municipal Code §§ 50-79, 62-2 (Count III); trespass (Count IV); design defect (Count V); failure to warn (Count VI), and negligence (Count VII).

## LEGAL STANDARD

Summary judgment is warranted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Although the Court must view the facts and draw inferences "in the light most favorable to the nonmoving party," *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011), "inferences . . . must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors," *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994).  Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its

version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quotation marks omitted).

## ARGUMENT

The City's claims fail for numerous reasons. As an initial matter, the scope of the case can be significantly narrowed because the City lacks Article III standing to pursue equitable claims for many of the parcels of land at issue. It currently owns only 100 of the 273 properties, and many undisputedly contain PCB levels below the City's own proposed benchmarks for remediation. The City also seeks backward-looking relief for purported "loss of use" of the 273 properties, but it has *never* owned 126 of the 273 properties and has failed to show heightened PCB levels for many of the others. Additionally, the City's claims are all time-barred, and its claims seeking injunctive relief such as abatement and remediation implicate the EPA's primary jurisdiction over the disputed parcels. Finally, the City's claims fail on the merits. Summary judgment is warranted for Defendants.

## I.  The City Lacks Standing To Recover For Most, If Not All, Of The Parcels (All Counts)

Federal jurisdiction is limited to "'actual cases or controversies.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) (citation omitted). That basic principle requires a plaintiff to establish standing, including by showing an injury-in-fact caused by the defendant. *Id.* at 380. "[S]tanding is not dispensed in gross," and the City "must demonstrate standing for each claim . . . and for each form of relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (similar). To establish injury-in-fact, the plaintiff must show the invasion of a "legally protected interest" that is "(a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (citations omitted).

At summary judgment, the City must "suppl[y] evidence of specific facts that, taken as true, show each element of standing." *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 667 (7th Cir. 2021) (quotation marks omitted). The City has not done so and thus lacks standing to seek relief as to many of the parcels at issue.

## A.  The City Has Failed To Demonstrate Injury For Most Or All Of The Parcels At Issue

The City's claims relate to 273 vacant parcels of land that allegedly have elevated PCB levels. But the City currently owns only 100 of those parcels. *See* Statement of Material Facts ("SMF") ¶ 32. It does not own the remaining 173 parcels, and it has *never* owned 126 of those parcels at any time between 1955 and 2023. SMF ¶ 42. Further, as reflected in the attached Appendix and the below figure, the City has failed to present evidence of elevated PCB levels (and thus injury) on many if not all of the parcels:



Appendix, fig. 1.

Because a plaintiff at the summary-judgment stage must prove that *the plaintiff* suffered a concrete injury, *Lujan*, 504 U.S. at 560-61, the City faces insurmountable standing obstacles barring many of its claims. It lacks standing to seek prospective equitable relief (*e.g.*, abatement and remediation) for properties it does not *currently* own, it lacks standing to seek retrospective damages for properties it has *never* owned, and it lacks standing to seek *any* relief for properties that it has not shown to have elevated PCB levels. For the reasons explained below, the City thus lacks standing to pursue prospective relief as to *at least* 191 of the 273 properties at issue (*i.e.*, all but 82), and it lacks standing to pursue retrospective loss-of-use damages as to *at least* 160 of the 273 properties (*i.e.*, all but 113)—with both numbers increasing when official TSCA clean-up figures are used. *See* Appendix (providing lists of the parcels at issue).

**Standing for Abatement and Remediation.** It is undisputed that the City owns only 100 of the 273 parcels today. SMF ¶ 32. Because the City does not have legal rights in the remaining 173 properties it does not own, it cannot show that the alleged presence of PCBs on those properties is causing it to suffer the concrete injury required to seek forward-looking equitable relief from a federal court. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

When Defendants uncovered in discovery that the City does not own most of the properties at issue, the City initially attempted to bolster its case by engineering an assignment of claims for 73 properties held by the County. SMF ¶¶ 41-43. But that assignment was officially and conclusively deemed invalid by the St. Clair County State's Attorney. SMF ¶ 46. The City has now abandoned reliance on the invalid assignment, SMF ¶ 33, and its remediation expert's rebuttal report focused on the 100 properties that the City owns, Ex. 36 at 1—a tacit recognition that the City lacks standing to pursue abatement and remediation for the other parcels.

24

Even as to the 100 parcels that the City owns, the City has failed to present evidence supporting a cognizable injury for many, if not all, of them.  To establish injury, the City needed to present evidence that PCB levels on the parcels were high enough to produce harmful effects. The mere presence of PCBs, without more, is not enough to show cognizable injury.  *Millman v. RTX Corp.*, 2024 WL 4986613, at *7 (N.D. Ind. Dec. 5, 2024) ("[S]imple exposure to environmental toxins does not satisfy the injury-in-fact requirement for standing."); *Tiger v. Verizon Commc'ns Inc.*, 2025 WL 437019, at *6 (W.D. Pa. Feb. 7, 2025) (collecting cases).  That requirement reflects the cardinal rule of toxicology that "the dose makes the poison," which recognizes that "all chemical agents are intrinsically hazardous," and that "[e]ven water, if consumed in large quantities, can be toxic."  *C.W. v. Textron, Inc.*, 2014 WL 4979211, at *3 (N.D. Ind. Oct. 3, 2014) (citations omitted), *aff'd*, 807 F.3d 827 (7th Cir. 2015).  The mere *presence* of a negligible amount of chemicals thus does not establish a "concrete and particularized injury in fact."  *Emerald Coast Utils. Auth. v. 3M Co.*, 746 F. Supp. 2d 1216, 1231 (N.D. Fla. 2010).

Here, the City's sampling expert, Kevin Coghlan, opined that the lowest contamination level necessary to protect against the risks posed by PCB exposure is 0.23 ppm, *i.e.*, the EPA's "regional screening level for PCBs."  SMF ¶ 51.  Coghlan did not propose any remedial action for parcels "that had total PCB concentrations of less than or equal to 0.23 [ppm]."  SMF ¶ 51.[2] Eighteen of the 100 parcels the City owns concededly have PCB levels at or below the 0.23 ppm

---

[2]  Defendants do not agree that 0.23 ppm is the proper standard.  As explained below, under TSCA, the remedial obligation for vacant lots is not triggered unless the level of PCB contamination exceeds 25 ppm, which is more than 100 times higher than the amount Coghlan used, SMF ¶ 53, and even if the lots were somehow redeveloped and put to productive use—an entirely speculative proposition—remedial obligations for high-occupancy areas still would not be triggered unless PCB levels exceeded 1 ppm, SMF ¶ 52.  Nevertheless, even if 0.23 ppm were the actionable injury threshold, the City still would lack standing as to the vast majority of the 273 properties.

threshold. SMF ¶ 51; *see* Appendix. By its own lights, the City has no standing to seek prospective

relief for those parcels.

The City's standing is winnowed further still under applicable TSCA standards. The EPA

is clear that Regional Screening Levels—such as the 0.23 ppm figure—"are not cleanup standards

and should not be used as cleanup levels." SMF ¶ 25. That figure therefore cannot support

standing. And under the 1 ppm standard that TSCA specifies as the remedial level for high-

occupancy areas, no remediation would be required for 48 of the 100 properties the City owns.

SMF ¶ 52.

Even 1 ppm is not the applicable standard. As the City's experts concede, the parcels at

issue are all vacant, such that their use is consistent with that of "low occupancy" areas. SMF

¶ 22. Under TSCA's 25 ppm standard for low-occupancy areas that will remain in that condition—

like the vacant lots here, SMF ¶¶ 22, 52—*none* of the properties would be subject to remediation.

Any suggestion that the vacant lots will be put to a more productive use in the future is entirely

"conjectural" and "hypothetical" and thus cannot support standing. *Lujan*, 504 U.S. at 560

(quotation marks omitted); *see* SMF ¶ 39.

Further, the City seeks to prove its purported contamination levels only through Coghlan's

expert reports. Defendants are contemporaneously moving to exclude Coghlan's testimony on the

grounds that (1) his sampling and testing methods are unreliable; (2) his remediation costs are

based on an improper clean-up standard and factually unsupported remediation methods; and

(3) his opinions regarding the sources of PCBs on the parcels is not based on any expert

knowledge. If this Court grants Defendants' motion, the City would have no evidence of injury

sufficient to support standing as to *any* property or *any* relief on its claims. *See Brown v. CACH,*

*LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (failure to "produce evidence" of injury at the summary-judgment stage defeats Article III standing).

In sum, the City cannot establish standing to seek prospective relief for properties it does not own—and even for those it does own, it must demonstrate a concrete injury by presenting evidence of PCB contamination levels above actionable thresholds.  For *at least* 18 of the 100 parcels the City owns (under the City's own standards) and as many as *all* of the properties (under TSCA standards), the City has not presented "evidence [of] specific facts supporting [its] standing to sue" for injunctive relief.  *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022) (quotation marks omitted).

***Retrospective relief.***  The City also seeks backward-looking loss-of-use damages for the claimed parcels, arguing that the properties could have been used for residential purposes.  But it has *never* owned 126 of the claimed parcels at any time between 1955 through 2023.  SMF ¶ 42. For those parcels, the City cannot recover even retrospective relief.  *See Notre Dame Affordable Hous., Inc. v. City of Chicago*, 838 F. App'x 188, 190-91 (7th Cir. 2020) (plaintiff lacked standing for claims related to allegedly wrongful demolition of property where plaintiff lacked "ownership interest" in the property); *Landmarks Pres. Council of Ill. v. City of Chicago*, 125 Ill. 2d 164, 175 (1988) (no standing to bring cause of action for damages on property in which plaintiff lacks ownership interest or other "legally cognizable stake").  Damages claims for those 126 properties must also be dismissed for lack of standing.

As to the remaining 147 parcels, 34 properties had PCB levels concededly falling at or below the 0.23 ppm threshold that Plaintiffs selected; claims as to those properties must also be dismissed, leaving only 113 properties in excess of that artificially low threshold.  And 82 of the 147 properties fell at or below the 1 ppm level typically used for residential purposes, leaving only

27

65 properties that could support claims for loss of residential use. *See* Appendix. None of the 147 parcels exceeds the 25 ppm level for low-occupancy use. *See* Appendix.

Further, the City transferred ownership of 47 of the 147 properties to third parties by 2011, SMF ¶ 42; any loss-of-use claims as to those 47 properties are clearly time-barred, as the City did not even *sustain* a purported injury within the five-year limitations period (to say nothing of when the claims accrued). *See infra* at 30-40 (discussing statute of limitations). Excluding those 47 properties leaves only the 100 parcels that the City currently owns—and as explained, only 82 of the 100 parcels have PCB levels in excess of the 0.23 ppm level, and only 52 have levels in excess of the 1 ppm level typically used for residential cleanup. *Supra* at 25-26.

Finally, even if the City could show an injury from PCB contamination on a particular property, it has failed to show that any purported loss-of-use damages are "fairly traceable" to that contamination (as opposed to other factors), a prerequisite for Article III standing. *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see* SMF ¶ 38 (south end of City was already blighted by 1979); SMF ¶¶ 35-36 (many parcels are inaccessible, precluding any residential use that could serve as a basis for loss-of-use damages).

### B.   The City Cannot Bypass Ordinary Standing Requirements

The City cannot satisfy the injury-in-fact requirement by invoking "injuries to the public interest and to the health, safety, and well-being of its residents." Dkt. 129 ¶ 98. While *sovereigns* can sometimes assert a claim as *parens patriae* to protect a quasi-sovereign interest in the public welfare, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982), local municipalities like the City are not sovereigns, *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 53-54 (1982). In the United States' "'dual system of government,'" "all sovereign authority . . . resides either with 'the Government of the United States, or [with] the States of the Union.'" *Id.* at 53 (quoting *Parker v. Brown*, 317 U.S. 341, 351 (1943); *United States v. Kagama*, 118 U.S.

28

375, 379 (1886)).  Because *parens patriae* standing invokes a sovereign power, "the doctrine of *parens patriae* cannot be asserted by political subdivisions such as cities." *Village of Niles v. USPS*, 1985 WL 2900, at *7 n.3 (N.D. Ill. Sept. 30, 1985) (Rovner, J.); *see Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985) ("[P]olitical subdivisions . . . cannot sue as *parens patriae* because their power is derivative and not sovereign."); *El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) ("[A] political subdivision of the state . . . may not assert the economic injuries of its citizens on their behalf as *parens patriae*.").

*Parens patriae* standing for properties the City does not own would fail in any event because the City would be "merely litigating as a volunteer the personal claims of its citizens," not suing to vindicate "sovereign or quasi-sovereign interests." *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976).  Nor is the City seeking relief for a "substantial segment of its population," *Alfred L. Snapp & Son*, 458 U.S. at 607.  Indeed, there has been limited occupancy on the lots, and the City's expert agreed that if there is little or no exposure, then "you can't have" any risk to human health.  SMF ¶ 37.  And the City has proffered no evidence "on the magnitude of actual human health risk that might exist to entrants on any of the parcels" in an outdoor environment.  SMF ¶ 37.

\*      \*      \*

In sum, even accepting the City's flawed remediation thresholds, *supra* at 25 n.2, the City has shown a concrete injury sufficient to seek forward-looking equitable relief (such as abatement or remediation) for at most 82 of the 273 parcels, and to seek backward-looking loss-of-use damages for at most 113 of the 273 properties.  These numbers fall further still under TSCA's

29

remediation standards.  Accordingly, many of the City's claims fail for lack of standing, and the scope of the case should be narrowed accordingly.[3]

## II.    The City's Damages Claims And Ordinance Claims Are Time-Barred (Counts I, III-VII)

Summary judgment is warranted because the City's claims are time-barred.  Both the City's common-law claims for damages and its sole remaining ordinance-based claim are governed by a five-year statute of limitations.  735 Ill. Comp. Stat. 5/13-205; *see City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817, 827 (N.D. Ill. 2014) (holding ordinance claims governed by 735 Ill. Comp. Stat. 5/13-205).  The City's product-liability claims are also independently subject to a statute of repose.  735 Ill. Comp. Stat. 5/13-213(b).  "[A] statute of limitations governs the time within which lawsuits may be commenced after a cause of action has accrued, while a statute of repose extinguishes the action itself after a fixed period of time, regardless of when the action accrued." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 61 (2006).  Both time limitations bar the City's claims here.

### A.    The City's Damages And Ordinance Claims Are Barred By The Five-Year Statute Of Limitations

The City's claims seek either damages for injury to real property, *see* Dkt. 129 ¶¶ 101(A) 124(A), 137(A), 149(A), 158(A), or relief under municipal ordinances for which a statute of limitations is not expressly provided.  Under 735 Ill. Comp. Stat. 5/13-205, the limitations period for an "actio[n] to recover damages for an injury to real property" or any civil action not otherwise provided for is "five years." *Meyers v. Kissner*, 149 Ill. 2d 1, 8-9 (1992); *see City of Evanston*, 19 F. Supp. 3d at 827 (ordinance claims subject to five-year statute of limitations); *Village of DePue v. Viacom Int'l, Inc.*, 713 F. Supp. 2d 774, 779 (C.D. Ill. 2010) (same for nuisance and trespass);

---

[3]  Alternatively, for the same reasons the City lacks standing, the City's claims fail on the merits because it cannot establish injuries caused by Defendants.

*Allstate Ins. Co. v. Menards, Inc.*, 202 Ill. 2d 586, 594 (2002) (same for product-liability claims); *Chi. & S. Airlines, Inc. v. Volpar, Inc.*, 54 Ill. App. 3d 609, 612 (1977) (same for negligence). The five-year clock "begins to run on the date the plaintiff's cause of action accrues," *Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119, 1150 (2011)—*i.e.*, "when facts exist that authorize one party to maintain an action against another," *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003). Because the City brought this action on February 3, 2021, it must prove that its claims did not accrue until after February 3, 2016. It cannot make that showing.

The City's suit comes four decades too late. Old Monsanto undisputedly stopped manufacturing PCBs at the Sauget Plant by 1977—more than 40 years before the City filed suit in 2021. Dkt. 129 ¶ 2; SMF ¶ 19. The operative complaint acknowledges that Old Monsanto's allegedly unlawful waste handling ceased in "the 1980s." Dkt. 129 ¶ 3. Any conduct relevant to the City's claims was thus complete and "present" by that point. *See* Ex. 21 at 54; *Brucker v. Mercola*, 227 Ill. 2d 502, 544 (2007) (ordinarily, "the facts authorizing the bringing of a cause of action will exist at the time of occurrence" of allegedly wrongful acts). Because the City brought suit decades later, the City's claims are "facially barred by the statute of limitations." *DePue*, 713 F. Supp. 2d at 779.

The City's claims are not saved by the "discovery rule." *Knox Coll. v. Celotex Corp.*, 88 Ill. 2d 407, 414-15 (1981). Under that "exception" to traditional claim-accrual principles, *Feltmeier*, 207 Ill. 2d at 285, the limitations period is tolled until the plaintiff "knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused," *Knox*, 88 Ill. 2d at 414-15.

The discovery rule is no help to the City here because the City plainly knew, or at minimum should have known, of the alleged contamination of its lands well before 2016. It was public

knowledge that the Sauget Plant ceased manufacturing PCBs in 1977, shortly before the EPA banned the manufacture of PCBs in 1979 due to environmental concerns. Following these developments in the 1970s, and according to the City's own expert, the East St. Louis community was aware of potential contamination in the areas at issue (*i.e.*, the south end of the City of East St. Louis). *See* SMF ¶¶ 27-28; Ex. 30 at 44-45. In 2000, the EPA was working with Defendants to conduct clean-up at sites associated with the Sauget Plant. *See* U.S. Env't Prot. Agency, *Five-Year Review Report, Sauget Area 2 Superfund Site* 17 (June 26, 2008), https://semspub.epa.gov/work/05/302666.pdf (action to address PCB contamination in Sauget Area 2 "was completed on April 5, 2000"); *see also* U.S. Env't Prot. Agency, *Record of Decision, Sauget Area 1 Superfund Site* 5 (Sept. 24, 2013), https://semspub.epa.gov/work/05/446573.pdf (EPA had previously conducted "extensive cleanup activities in Sauget Area 1"). And the City of East St. Louis was aware of the environmental cleanup, which took place "directly to the south of city hall." *See* SMF ¶ 28; Ex. 33 at 41. Indeed, before 2006, developers opted not to pursue building projects because they knew of industrial contamination and pollutants in the south end of the City of East St. Louis, where the parcels are located. *See* SMF ¶ 27; Ex. 29 at 68-69. The EPA also began testing the area at issue for PCB contamination as early as 2009, and it renewed its testing in 2012. *See* SMF ¶ 29. From 2012 to 2016, the EPA then dispatched letters to two different City mayors about PCB contamination in the south end of the City. *See* SMF ¶ 29. That knowledge is "imputed to the City." *Heath v. City of Naperville*, 2024 WL 4096234, at *6 (Ill. App. Sept. 6, 2024).

Those undisputed facts belie the City's allegation that it had no reason to suspect "PCB contamination of its lands" until it received test samples funded by its attorneys in December 2020. Dkt. 129 ¶ 72. The EPA put it on *actual* notice of the contamination well before 2020, yet the City

did nothing in response.  *See* SMF ¶ 29.  And the City seeks damages based on the notion that the properties were unusable precisely *because* it claims that the *entire community knew* of the presence of PCBs on the properties at issue.  The City cannot now plead ignorance for purposes of the statute of limitations.  The City's "stale claims" exemplify the purpose of limitations periods—"to encourage diligence in the bringing of actions."  *Tom Olesker's Exciting World Fashion, Inc. v. Dun & Bradstreet, Inc.*, 61 Ill. 2d 129, 137 (1975).[4]

Courts have held municipal suits alleging property contamination untimely under similar circumstances.  In *Village of DePue*, for example, a municipality brought nuisance and trespass claims based on allegations that contamination from a waste site had flowed onto municipal land and into a lake partially owned by the municipality.  The defendant's last allegedly tortious act— the operation of a zinc smelting facility and fertilizer plant by a corporate predecessor—occurred in 1989; the EPA and a state regulator "began to investigate" in 1992; and the state regulator issued fact sheets in 1992, 1995, and 2002 apprising the public of elevated levels of chemical contamination in the lake.  713 F. Supp. 2d at 776-80.  The municipality, however, did not file suit until 2008.  The court held that suit untimely, squarely rejecting application of the discovery rule. *Id.* at 780-81.  The court reasoned that the government investigations and fact sheets put the municipality "on inquiry to determine whether actionable conduct is involved."  *Id.* at 780 (quotation marks omitted).  Thus, "well before" the municipality filed suit, it "was on notice that there was a potential risk to health and that contaminated water was flowing onto Village

---

[4]  If the statute of limitations did not bar the action, principles of laches would.  Laches applies "when a party's failure to timely assert a right has caused prejudice to the adverse party."  *Van Milligan v. Bd. of Fire & Police Comm'rs of the Vill. of Glenview*, 158 Ill. 2d 85, 89 (1994).  "The two fundamental elements of *laches* are lack of due diligence by the party asserting the claim and prejudice to the opposing party."  *Id.*  Here, the City has delayed for decades in pursuing its claims.  This delay has led to flawed, astronomical claims for damages.  *See* Ex. 4 at 38-42.

property." *Id.* at 781. The fact that the municipality later received "more detailed information" did "not negate this knowledge." *Id.*

That same reasoning applies here. The EPA's actions squarely put the City on notice of its potential claims. *See, e.g.*, SMF ¶ 29 (2012 EPA Bulletin discussing 2009 and 2012 EPA testing for PCBs in East St. Louis); SMF ¶ 29 (2016 EPA Letter to East St. Louis mayor). According to the City's witnesses, it was widely known among City residents that the soil at the south end of the City was contaminated. SMF ¶¶ 27-28. And the fact that the City later "obtained more detailed information" through testing samples prepared for litigation "does not negate" its earlier knowledge. *DePue*, 713 F. Supp. 2d at 781. Accordingly, all of the City's claims—both its common-law claims (Counts I, IV-VII) and remaining ordinance claim (Count III)—are time-barred.[5]

## B. The Statute Of Repose Bars The City's Strict Product-Liability Claims (Counts V And VI)

Illinois's statute of repose for strict product-liability claims independently bars the City's design-defect and failure-to-warn claims. *See* Dkt. 129 at 38. The statute provides that strict product-liability actions may not be commenced after the earlier of two dates: (i) 12 years after "the date of first sale, lease or delivery of possession by a seller," or (ii) 10 years "from the date of first sale, lease or delivery of possession to its initial user, consumer, or other non-seller, whichever period expires earlier." 735 Ill. Comp. Stat. 5/13-213(b).

Both dates have lapsed. Old Monsanto stopped manufacturing PCBs in 1977, SMF ¶ 19, and the EPA banned most "distribution in commerce" of PCBs in 1979, *Polychlorinated Biphenyls (PCBs): Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions*, 44 Fed.

---

[5] For the avoidance of doubt, the statute-of-limitations defense applies to all parcels and all forms of relief.

Reg. 31,514 (May 31, 1979); *see* Dkt. 129 ¶¶ 4-8.  The City has presented no evidence that any relevant sales occurred after those dates, much less within 10-12 years of this suit.

The discovery rule again lends the City no assistance.  While the statute of repose generally reserves a plaintiff's right to sue within 2 years of being on inquiry notice of claimed property damage, that right terminates *regardless* of the plaintiff's knowledge if more than "8 years" have lapsed since "the date on which such . . . property damage occurred."  735 Ill. Comp. Stat. 5/13-213(d).  Like many statutes of repose, therefore, Section 5/13-213 "terminate[s] the possibility of liability after a defined period of time, regardless of a potential plaintiff's lack of knowledge of his or her cause of action."  *Ferguson v. McKenzie*, 202 Ill. 2d 304, 311 (2001); *see Wisniewski*, 406 Ill. App. 3d at 1150-51 (similar); *Lusinski v. Wright Med. Tech., Inc.*, 2021 WL 4522292, at *1 (N.D. Ill. Apr. 9, 2021) (applying eight-year bar).  Here, far more than eight years have passed since the City's properties were allegedly contaminated.  SMF ¶¶ 27-30, 34.  And in any event, the two-year period has likewise passed because the City has known about alleged PCB contamination since, at the latest, 2012, *see supra* at 34—yet it did not file suit until 2021, SMF ¶ 30.

### C.    The Public-Rights And Continuing-Tort Doctrines Do Not Apply

The *nullum tempus* (or public rights) doctrine and continuing-tort doctrine cannot revive the City's time-barred claims.  Dkt. 129 ¶¶ 73-74.

**1.  *Nullum Tempus*.**  When a municipality asserts its own "private rights" as a plaintiff, it is "subject to statutes of limitation to the same extent as individuals."  *Brown v. Trs. of Schs.*, 224 Ill. 184, 187 (1906); *see City of Chicago v. Latronica Asphalt & Grading, Inc.*, 346 Ill. App. 3d 264, 269 (2004) ("when the entity is acting in a private capacity, its claim may be subject to a limitations defense").  Citing the principle that "time does not run against the King," the City

asserts that it is vindicating "public rights." Dkt. 129 ¶¶ 74-75. But the City cannot disguise the essentially private nature of this suit through artful pleading.

In evaluating the public-rights doctrine, "the Court looks to substance over form." *City of Chicago v. Doordash, Inc.*, 2024 WL 4252797, at *6 (N.D. Ill. Sept. 20, 2024). The "bare fact" that litigation "is brought in the name of the People . . . is not controlling." *People ex rel. Town of New Trier v. Hale*, 320 Ill. App. 645, 652 (1943). Rather, courts consider three factors in assessing whether *nullum tempus* applies: (1) the effect on the public interest; (2) whether the City is obligated to act on behalf of the public; and (3) the public revenues spent to remedy the problem the suit seeks to redress. *Champaign Cnty. Forest Pres. Dist. v. King*, 291 Ill. App. 3d 197, 200 (1997). All three *Champaign* factors cut against the City.

*First*, as to the public interest, "Illinois cases that have applied *nullum tempus* typically have done so in actions involving threats to public health, safety, and property that have the potential to affect the *entire* municipality." *DoorDash*, 2024 WL 4252797, at *7. The City's claim, in contrast, is based on alleged injury to specific "City-owned lots." Dkt. 129 ¶ 11; *id.* at 37 (seeking damages for "East St. Louis's lands"). Indeed, the City's remediation expert now focuses on the 100 properties that the City owns. Ex. 36 at 1. The City lacks standing to pursue claims as to other properties, *see supra* at 22-28, which, in any event, are owned by individual third parties and thus do not implicate *public* rights. Moreover, the City's experts concede that PCBs on the vacant parcels are "not likely" to pose a health risk to the public at large beyond the particular parcels at issue. Ex. 38 at 56; Ex. 26 at 115.[6] And the loss-of-use damages that the City seeks are a quintessential private remedy for a landowner. *Wilson v. DiCosola*, 352 Ill. App. 3d

---

[6] Indeed, no expert provided any estimate as to whether PCBs on the vacant parcels could become airborne at concentrations that would pose a health risk to others, so any such claim would be speculative and unsupported.

223, 225 (2004) ("Courts have allowed damages for loss of use where a breach deprives a plaintiff of the use of personal property."); Restatement (Second) of Torts § 931, Comment b (1979) (loss-of-use damages go to "[t]he owner of" the property).  This is thus a textbook private-rights case— one in which the City invokes rights belonging "'only to the government or some small, distinct subsection of the public at large,'" not to the *general* public."  *DePue*, 713 F. Supp. 2d at 781 (emphasis added) (citation omitted); *DoorDash*, 2024 WL 4252797, at *7 (same).

While the City references the "economic health and well-being of East St. Louis's citizens," Dkt. 129 ¶ 133, it is established that "lost potential tax and business revenues, in and of themselves, are not damages that are part of a 'public' cause of action," *DePue*, 713 F. Supp. 2d at 782; *DoorDash*, 2024 WL 4252797, at *7 (rejecting similar "economic damages" theory).  The mere prospect that the residents of a particular municipality could indirectly "benefit" from relief sought in a lawsuit "is not alone sufficient to render [a suit] 'public' in nature."  *DePue*, 713 F. Supp. 2d at 781.  And even if the City's argument were legally viable, the City has proffered no evidence of lost tax or business revenues that could support it.

The City's retention of a "private firm" through a "contingency fee arrangement" cements this suit's essentially private character.  *DoorDash*, 2024 WL 4252797, at *8; *see* Dkt. 129 (City represented by private firms); SMF ¶ 31.  "[I]f the state becomes a partner with individuals, or engages in business, it divests itself of its sovereign character and is subject to the statute [of limitations]."  *New Trier*, 320 Ill. App. at 651 (quoting *Brown*, 224 Ill. at 186).  Thus, "in circumstances where a private law firm—as opposed to a public entity—stands to recover a significant portion of penalties sought, the public character of the proceeding is lessened."  *DoorDash*, 2024 WL 4252797, at *8.

37

*Second*, as to the obligation to act on behalf of the public, the City bears no *legal duty* to remediate imperceptible chemicals on the properties or to seek historical loss-of-use damages. "Each Illinois case applying *nullum tempus* has involved a more specific duty to act" imposed by a state statute, *DoorDash*, 2024 WL 4252797, at *9, whereas the City's public-nuisance, trespass, product-liability, and negligence claims are ordinary common-law claims. The City's cited ordinances also impose no "specific duty," *id.*; they speak in general, discretionary terms. *See* Municipal Code § 50-79 (City officials "are authorized" to abate nuisances); *id.* § 62-2 (long-defunct health department shall abate nuisances "which it may deem" harmful in its discretion). Moreover, to the extent the health or safety of third parties is implicated by alleged PCB contamination on the long-vacant parcels at issue, those private persons may vindicate their interests on their own behalf. *City of Chicago v. Equte LLC*, 2022 WL 2132630, at *5 (N.D. Ill. June 14, 2022) (public right is involved when "the public is incapable of acting on its own behalf"); *DoorDash*, 2024 WL 4252797, at *10 ("Nor is the Court convinced that the City is the only party who can remedy DoorDash's alleged misconduct").[7] The government thus does not have the type of "legal *obligation* to undertake the action" required to trigger *nullum tempus*. *DePue*, 713 F. Supp. 2d at 783 (emphasis added); *see DoorDash*, 2024 WL 4252797, at *9 ("discretion by government decisionmakers" undermines second factor).

*Finally*, as to expending public revenues to remedy the problem, the City itself has expended no material funding to address PCB contamination, and the City has presented no evidence showing any intent to do so in the future. *See, e.g.*, SMF ¶ 40 (Mayor unaware of any

---

[7] That is certainly true of the properties the City does not own; for those properties, *only* private persons with cognizable property interests may bring their own claims. Even as to the properties the City does own, under Illinois law, a private person may bring claims for public nuisance if he suffers "some special damage." *David H. Swain Son v. Chic., Burlington & Quincy R.R. Co.*, 252 Ill. 622, 626 (1911).

City efforts to find grants to address PCB contamination).  The "costs of prosecuting this lawsuit" are not "evidence of public expenditures since the City was not 'required by law to undertake' this suit."  *DoorDash*, 2024 WL 4252797, at *10 (quoting *DePue*, 713 F. Supp. 2d at 784).

Because the City brings suit in a non-sovereign capacity, the City's claims are "subject to the lapse of time."  *People ex rel. City of Chi. v. Com. Union Fire Ins.*, 322 Ill. 326, 331 (1926).

**2.  *Continuing Tort.***  The continuing-tort rule cannot save the City's common-law tort claims either.  Under that rule, "'the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease.'"  *Feltmeier*, 207 Ill. 2d at 278.  But a continuing *injury* is not a "continuing tort."  *Powell v. City of Danville*, 253 Ill. App. 3d 667, 669 (1993).  "A continuing violation of tort is occasioned by *continuing unlawful acts and conduct*, not by continual ill effects from an initial violation."  *Feltmeier*, 207 Ill. 2d at 278 (emphasis added). "[W]here there is a single overt act" (or set of past overt acts) "from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury," even though the injury from the original act may be "continuing."  *Id.* at 279.  In cases of environmental contamination, the date of the last alleged tortious act starts the clock, even if "the effects may be continuing."  *Powell*, 253 Ill. App. 3d at 669; *see LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 951 (7th Cir. 2019) (rejecting continuing tort theory where "the 'continuing' action they allege is not that GE is continuing to release contaminants, but that the original contamination is continuing to migrate"); *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 435 (7th Cir. 2009) ("continuing violation rule" does not apply under Illinois law where claim "did not depend upon a longstanding or unbroken course of activity"); *Muniz v. Rexnord Corp.*, 2006 WL 1519571, at *5 (N.D. Ill. May 26, 2006) (no continuous trespass where defendants ceased dumping chemicals in 1980).

Here, Defendants undisputedly stopped manufacturing PCBs by 1977. Any "continuing" "*effects*" from that past conduct cannot extend the limitations period. *Powell*, 253 Ill. App. 3d at 669 (emphasis added). The City's common-law claims are therefore untimely.[8]

## III.    The City's Claims Fail On The Merits

Threshold obstacles aside, the City's claims also fail on the merits. "'[F]ederal courts sitting in diversity ought to be circumspect in expanding the law of a state beyond the boundaries established in the jurisprudence of the state.'" *King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997). On the undisputed facts, established Illinois law forecloses each of the City's claims.

### A.    The City's Public Nuisance Claim Fails (Count I)

Although the City owns some of the properties, the Complaint does not advance a private-nuisance claim—presumably because such a claim "brought solely to recover damages allegedly incurred because of [the City's] interests as a private landowner" would be plainly time-barred. *DePue*, 713 F. Supp. 2d at 784; *see supra* at 31-41. Attempting to invoke the *nullum tempus* rule, the City instead casts its nuisance claim as one for a *public* nuisance. As explained, that effort to avoid the statute of limitations falls flat, and the public-nuisance claim fails on its own terms as well.

To establish a public nuisance under Illinois law, the City must show "(1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3)

---

[8] Although the City's failure-to-warn claim briefly references fraudulent concealment, *see* Dkt. 129 ¶ 144, the evidence and the City's own allegations squarely foreclose that theory. Fraudulent concealment applies only in cases where the plaintiff shows it "could not have discovered the fraud any sooner through the exercise of greater diligence or that the trust and confidence placed in the defendant prevented the plaintiff from discovering the fraud any sooner." *Hagney v. Lopeman*, 147 Ill. 2d 458, 464 (1992). Here, the Complaint alleges that the dangers of PCBs were widely known by the time the EPA prohibited PCB production in the late 1970s, Dkt. 129 ¶ 8, and the evidence confirms that the City was well aware of the specific threat of PCB contamination on properties in and around the City by the early 2000s, SMF ¶¶ 27-29.

proximate cause; (4) and, injury." *In re Syngenta Mass Tort Actions*, 272 F. Supp. 3d 1074, 1091 (S.D. Ill. 2017). Here, the City cannot satisfy the public-right element because the parcels at issue are vacant lots not held out for public use. Nor has the City shown any substantial and unreasonable interference with a public right. The mere presence of invisible, odorless PCBs at relatively low levels in the soils on vacant lots is not physically offensive and does not implicate the harms that nuisance law protects against.

1. The City grounds its request for damages on its nuisance claims on the purported "loss of value in the City's properties" and "loss of revenue to the City." Dkt. 129, at 24. But those alleged property-based injuries do not implicate a *public* right under Illinois law. A public-nuisance claim requires "unreasonable interference with a right common to all members of the general public." *In re Paraquat Prod. Liab. Litig.*, 2022 WL 451898, at *10 (S.D. Ill. Feb. 14, 2022) (citing 7 American Law of Torts § 20:5). That is because "[a] public right is 'collective in nature.'" *Id.* (quoting Restatement (Second) of Torts § 821B (1979)). Thus, for example, the pollution of a stream could create a public nuisance if it impacts a public beach or kills fish in the stream, but not if it simply prevents other owners of land adjacent to the river from using the water for their land. *Id.*

The Illinois Supreme Court has emphasized that "the existence of a right common to the general public" is essential for a public-nuisance claim, rejecting efforts to expand public-nuisance doctrine to encompass rights or property not collectively enjoyed by the public. *See City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 370 (2004). In *Beretta*, for instance, the Illinois Supreme Court rejected a public-nuisance claim brought by a municipality against gun manufacturers and dealers based on the alleged negative public-health impacts of guns in the community. The court reasoned that such a public right would be too "broad and undefined," and

41

that the harm at issue was instead a "harm to individual members of the public, not to the public generally." *Id.* at 374.  A public right "'is collective in nature,'" the court explained, "'and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured.'" *Id.* at 373 (quoting Restatement (Second) of Torts § 821B, Comment g, at 92 (1979)).  The mere fact that the city had "assert[ed], on behalf of the entire community, . . . the individual right not to be assaulted" did not establish an actionable public-nuisance claim.  *Id.* at 374.

Similar reasoning applies here.  Despite the public-nuisance label, the City's claim ultimately asserts an individual right not to encounter alleged pollutants on the parcels at issue. There is no evidence that any of the parcels was held open to the general public, as with a park; instead, all 273 parcels are "vacant and undeveloped" lots that serve no residential or commercial purposes.  SMF ¶ 35.  The City's soil-sampling expert (Coghlan) testified that the properties today are "overgrown . . . with a lot of shrubs, trees, [and] tall grass"; that this overgrowth imposes "natural barrier[s] to occupancy on the lot"; and that "[n]o one's been on them for an extended period of time."  Ex. 26 at 83-84, 105; SMF ¶ 36.  For that reason, Coghlan also was unaware of anyone actually "expos[ed] to PCBs from these lots."  SMF ¶ 37.  Simply put, the public does not enjoy a collective right to use these properties—if a private person entered one of them, he likely would be trespassing.

Accordingly, accepting the City's public-nuisance claim would improperly expand Illinois law beyond its "established" "boundaries."  *King*, 113 F.3d at 97.  Even if the presence of PCBs on the City's vacant parcels did somehow threaten harm to certain individual members of the public, the purported harm would not resemble the rights "'traditionally understood as public rights for public nuisance purposes—obstruction of highways and waterways, or pollution of air or

42

navigable streams.'" *City of Chicago v. Am. Cyanamid Co.*, 355 Ill. App. 3d 209, 216 (2005) (expressing skepticism that the presence of lead-containing paint in private homes implicated a "sufficient interest in the general public" to sustain a public-nuisance claim) (quoting D. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 818 (2003)).

To be sure, in ruling on Defendants' motion for a more definite statement, this Court correctly noted that a public nuisance could be "'actionable even if the claim is premised on a nuisance present on private property.'" Dkt. 41, at 10 (quoting *Latronica*, 346 Ill. App. 3d at 270). But for such a nuisance to be actionable, it still must interfere with a *public* right. *Latronica* explained how the illegal dumping at issue impacted the "community" collectively, 346 Ill. App. 3d at 272, and the cases it relied upon involved nuisances originating from private properties that harmed recognized public rights, *see Donaldson v. Cent. Ill. Pub. Serv. Co.*, 199 Ill. 2d 63, 100-02 (2002) (private coal gasification plant harmed clean air); *City of Chicago v. Cecola*, 75 Ill. 2d 423, 427 (1979) (private brothel harmed public health and morals). Here, the alleged passive presence of PCBs on a limited number of parcels does not create the same type of public harm.

Further, any asserted loss of tax revenues likewise does not implicate a public right, because no public right is implicated when merely economic losses are involved. *See DePue*, 713 F. Supp. 2d at 782; *supra* at 42. If the rule were otherwise, any interference with private rights leading to a net economic loss would also constitute a public nuisance. That is not the law.

At bottom, the City's nuisance claim seeks to vindicate non-public rights that belong either to itself as a landowner, to other landowners, or to other individuals who are not parties to this suit. These rights are not collectively rights held by the public as a whole and thus cannot support a public-nuisance claim.

**2.**   The City has also failed to show that PCB contamination constitutes the sort of physically offensive invasion necessary to support a nuisance claim under Illinois law.   "The Illinois Supreme Court has frequently stated that a nuisance must be *physically offensive* to the senses to the extent that it makes life uncomfortable"—for instance, "noise, smoke, vibration, dust, fumes, and odors produced on the defendant's land and impairing the use and enjoyment of neighboring land."  *Dobbs v. Wiggins*, 401 Ill. App. 3d 367, 375-76 (2010) (emphasis added) (citing *In re Chi. Flood Litig.*, 176 Ill. 2d 179, 205-06 (1997)); *see Solorio v. Rodriguez*, 2013 IL App (1st) 121282 at ¶¶ 8-12.

Here, the City has adduced no evidence showing that the alleged presence of imperceptible PCBs in soils at relatively low levels on vacant parcels is "physically offensive to the senses." *Dobbs*, 401 Ill. App. 3d at 375.  To the contrary, PCBs have "no known taste or smell."  EPA, *What Are PCBs?*, tinyurl.com/mfk8p8z9 (last accessed March 5, 2025).  PCBs are themselves "colorless, odorless, and tasteless."  SMF ¶ 1.  This federal Court should not expand state nuisance law beyond its traditional focus on physically offensive hazards.  *See Beretta*, 213 Ill. 2d at 377-78.

### B.    The City's Nuisance Claims Fail Because Necessary Parties Have Not Been Joined (Counts I, III)

The City also cannot seek an injunction requiring Defendants to abate and remediate the 173 parcels that the City does not own because it has not joined the owners of those properties as parties to this litigation.  Both its common-law (Count I) and ordinance-based (Count III) public-nuisance claims purport to seek "[i]njunctive relief in the form of Court Orders mandating the immediate and complete abatement and remediation of all East St. Louis lands," including those that the City does not own.  Dkt. 129 ¶¶ 99, 116, 118.  Under Illinois law, a court may not issue a mandatory injunction to a non-owner or non-controller of the property subject to the injunction.

*Vill. of Schaumburg v. Kingsport Vill., Inc.*, 106 Ill. App. 3d 1055, 1057-58 (1982); *see People v. Tang*, 2002 WL 34482537 (Ill. Cir. Ct. Oct. 4, 2002) (same).  Rather, "all parties" who have a "substantial legal or beneficial interest" in the property at issue, and who would therefore "be materially affected by the decree," "must be made parties to the litigation."  *Vill. of Schaumburg*, 106 Ill. App. 3d at 1058; *McMechan v. Yenter*, 301 Ill. 508, 511 (1922) (noting this "familiar rule of equity").

Discovery has shown that the City does not own or control 173 of the sites at issue.  SMF ¶ 32.  Because the City has not named any other parties to this action, it cannot obtain injunctive relief as to any of these sites it does not own or control.  *Schaumburg*, 106 Ill. App. 3d at 1058-60 (dismissing similar claims); *cf. Hobbs v. Pinnell*, 17 Ill. 2d 535, 536 (1959) (if an "indispensable" party is not joined, "the court should not proceed to a decision . . . upon the merits").

### C.     The City's Ordinances Do Not Authorize Civil Suits To Abate Nuisances (Count III)

The City's ordinance-based nuisance claim independently fails as a matter of law because neither of its cited ordinances—Municipal Code § 50-79 and § 62-2—authorizes a civil action for abatement.

Section 50-79 provides that city "officials are authorized to cause" any "nuisance" within city limits "to be summarily abated in such manner as may be directed."  That authority to summarily abate nuisances empowers city officials to take administrative actions against property owners who have created certain nuisances on their properties, and ultimately to abate the nuisance itself if the property owner does not take action.  It does not create a freestanding right of action to seek *judicial* relief directing third parties to abate imperceptible nuisances on *the City's own properties*.  The Ordinance's structure and plain text leave no doubt on that score.  Section 50-79 follows sections of the City Code (§§ 50-71–50-78) that prohibit various kinds of perceptible

nuisances, including a "house, factory, building or structure" that is in a condition "offensive to the neighborhood," § 50-72, a "pigpen . . . nauseous to any person residing in the vicinity," § 50-73, and lots containing "standing" water, § 50-74. Section 50-79 authorizes city officials to abate *those* nuisances (and similar ones) if the property owner fails to do so. *See* Defs.' Mot. for Summary Judgment on Amended Counterclaim, at 16-19. And § 50-80 provides a specific procedure to trigger § 50-79's authorization: The "duly authorized authorities" must serve "a written notice upon the owner, occupant, agent or person in possession, charge or control of any lot, building or premises in or upon which any nuisance may be found"; if the nuisance is "not abated within the time specified in such notice, it shall be the duty of such authorized authority to proceed at once to cause such nuisance to be abated." Nothing in these provisions empowers the City to ask a court to order third parties to clean up imperceptible chemicals on the City's own property.

Section 62-2 is even narrower. It authorizes only "the health department" to abate nuisances, and the "health department" established under this section no longer exists (and has not existed for over 25 years). Ex. 46 at 1; *see* East St. Louis: Departments, https://www.cesl.us/101/ Departments (no health department listed). And like § 50-79, § 62-2's text and structure confirms that it provides no general right to seek a civil judicial remedy compelling abatement. Instead, § 62-3 provides a specific mechanism for enforcement of the "orders and sanitary regulations of the health department": "Whoever shall neglect and refuse to obey any order of the health department and the department of regulatory affairs, as required in this section, shall be deemed guilty of a misdemeanor." In short, §§ 62-2 and 62-3 combine to give the City's *health department* the power to *order* the abatement of certain nuisances—such as those related to "Dead Animals" (Article III), "Rat Control" (Article IV), and "Food Establishments" (Article V)—on pain of

46

*criminal* penalty.  Nothing in § 62-2 authorizes *the City* itself to seek *civil* relief for imperceptible chemicals on City property, untethered from any specific "orde[r] . . . of the health department."

"If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them."  *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).  The City cannot short-circuit the specific procedures and remedies of §§ 50-79 and 62-2 by transmuting them into general rights to seek judicially mandated abatement by third parties on city-owned properties.[9]

### D.    The City Has Not Presented Evidence To Support The Elements Of A Trespass Claim (Count IV)

The City's trespass claim fails because the City has not shown (1) that Old Monsanto had the requisite intent to cause PCBs to invade East St. Louis properties, or (2) that the presence of PCBs constitutes the kind of tangible, physical invasion necessary for trespass.

**1.**    Count IV of the operative complaint alleges intentional trespass, claiming that Old Monsanto "knew with substantial certainty" that PCBs from its facilities contaminated land in East St. Louis.  Dkt. 129 ¶ 120; *see Dial v. City of O'Fallon*, 81 Ill. 2d 548, 553 (1980) ("conduct intended to cause an intrusion on the plaintiff's premises" is the "only . . . type of invasion wherein recovery may be sought purely on the basis of the tort of trespass").  To show intentional trespass, the City must demonstrate that Old Monsanto "intended or knew with a high degree of certainty that" the invasion would follow from its actions.  *Dietz v. Ill. Bell Tel. Co.*, 154 Ill. App. 3d 554, 559 (1987).  "[T]he act must be done 'with knowledge that it will to a substantial certainty result

---

[9]  For the reasons explained in Defendants' Motion for Summary Judgment on the Amended Counterclaim, the Ordinances also are unenforceable here because they fail to provide fair notice as applied to purported nuisances created by imperceptible PCBs and impermissibly allow arbitrary enforcement.

in the entry of the foreign matter.'" *Dial*, 81 Ill. 2d at 555-56 (quoting Restatement (Second) of Torts § 158, Comment i (1979)).

The City has identified no evidence showing that Old Monsanto intentionally caused PCBs to enter East St. Louis properties. Nothing suggests that the company should have reasonably foreseen the alleged injuries here, much less that it *knew* they would occur. Old Monsanto took extensive measures to prevent harmful levels of PCBs from escaping the Sauget Plant. In 1936, for example, Old Monsanto designed the manufacturing process to be enclosed. SMF ¶ 16. In the 1960s, Old Monsanto reviewed its PCB-manufacturing process to minimize atmospheric PCB emissions, and the company built a dedicated wastewater treatment plant to prevent the Sauget Plant's sewage waste from being discarded in East St. Louis. SMF ¶ 16. In the late 1960s and early 1970s, the company installed a series of settling basins and catch tanks to prevent the loss of PCBs during the manufacturing process. SMF ¶ 16. And in 1971, the company installed a state-of-the-art incinerator "to safely dispose of PCBs," achieving 99.9998% destruction of PCBs. SMF ¶ 17. Those latter steps coincided with the emergence of new modes of "environmental PCB analysis" in the 1960s; as the City's expert Erickson acknowledged, before then, the technology was "not available" to evaluate PCBs' environmental properties. SMF ¶ 9.

As to the 273 parcels at issue here, the City points to no evidence that Old Monsanto intentionally caused PCBs to reach these parcels or knew that its operations would, "to a substantial certainty, result in the entry of [PCBs]." *Dial*, 81 Ill. 2d at 555-56. As explained, the record shows the opposite—the company took numerous steps, including the installation of a wastewater treatment plant and incinerator, to prevent the release of PCBs from the Sauget Plant. SMF ¶¶ 16-17. Neither the federal EPA nor the Illinois Environmental Protection Agency asked Old Monsanto to remediate the parcels at issue here or placed them on the national priorities list. SMF

48

¶ 18.  And the City never notified the company of any alleged PCB contamination in East St. Louis.  SMF ¶ 18.

As the City's chemical expert (Erickson) acknowledged, Old Monsanto could not possibly have been aware of environmental contamination from PCBs in East St. Louis until the 1960s, and it did not *actually* become aware of potential PCB presence in East St. Louis until the 1970s.  SMF ¶¶ 9-11.  The company promptly stopped manufacturing PCBs in 1977.  Thus, because Plaintiffs have not presented evidence that Old Monsanto *intended* to invade the properties at issue, the City has no actionable claim for trespass.

**2.**  The City's trespass claim fails for the additional reason that it cannot show an "'actual physical invasion'" of the properties.  *City of E. St. Louis v. Netflix, Inc.*, 630 F. Supp. 3d 1003, 1018 (S.D. Ill. 2022) (applying Illinois law).  An actionable trespass must involve a physical invasion "by a person or tangible thing."  *Id.*; *see, e.g., In re Chi. Flood Litig.*, 176 Ill. 2d at 205 (trespass involves "a crass physical invasion"); Dan B. Dobbs et al., *The Law of Torts* § 53 (2d ed. 2024) ("Because the action for trespass was conceived as a means of protecting *possession*, a tangible entry upon the land has been traditionally required." (emphasis added)).  Intangible "particulate" matter, such as PCBs, does not qualify.  *Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 700-01, 705 (Minn. 2012) (presence of pesticide does not support trespass claim because pesticide is intangible); *see Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 772 (S.D. W. Va. 2009) (holding that chemicals are intangible under "the traditional rule requiring a trespass to involve an invasion of property by tangible objects"); *see also* 7 American Law of Torts § 23:9 (2025) ("An invasion of land by intangible substances, such as gases and odors, has usually been considered not to constitute a trespass."); 75 Am. Jur. 2d *Trespass* § 29 (2018) ("The traditional common law rule . . . provides that a trespass only exists

where the invasion of land occurs through a physical, tangible object, and under that rule, intangible matter or energy, such as smoke, noise, light, and vibration, are insufficient to constitute a trespass.").

PCBs are intangible, microscopic chemicals that are "'invisible to the naked eye,' and 'lack a characteristic odor or appearance.'" *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66 (1st Cir. 2017). They are "colorless, odorless, and tasteless." SMF ¶ 1. The alleged presence of these PCBs in the soil thus does not fit under the trespass rubric because it does not interfere with possession. *Rhodes*, 657 F. Supp. 2d at 772; *Johnson*, 817 N.W.2d at 700-01, 705.

### E.    The City Has Failed To Establish "Use" Of A Product (Counts V-VII)

The City's product-liability claims for strict-liability design defect and failure to warn, and for negligent design and failure to warn, fail as a matter of law because the City is challenging the alleged *release* of chemicals from a manufacturing plant, not the use of a defective or dangerous *product* placed into the stream of commerce. To establish any claim for product liability, whether sounding in strict liability or negligence, the plaintiff must show that it was foreseeably harmed by *the use* of the defendant's product for its intended purpose. *See Kuziw v. Lake Eng'g Co.*, 586 F.2d 33, 35 (7th Cir. 1978) ("In Illinois, product liability is predicated on injuries *caused by products* which are unreasonably dangerous *when used* in a foreseeable manner." (emphases added)); *Gray v. Ford Motor Co.*, 2011 WL 4859995, at *11 (C.D. Ill. Oct. 13, 2011) ("the threshold question for products liability claims under a negligence or strict liability theory is the same," but "the key additional element in a negligence claim is the need to establish the defendant's fault"). To be sure, "a manufacturer's liability is not limited *to users* of the product." *Hayes v. Kay Chem. Co.*, 135 Ill. App. 3d 932, 933-34 (1985) (emphasis added). But product liability still does not extend beyond third parties foreseeably harmed "'*in the process of [the product's] use* for its intended purpose.'" *Id.* (emphasis added).

50

Here, the City identifies no "use" of PCB products that purportedly produced its injuries. Rather, its theory is that PCBs were unwittingly released during Old Monsanto's *manufacturing processes* and contaminated the properties.  That is not a claim for product liability.  *Cf. Maddan v. R. A. Cullinan & Son, Inc.*, 88 Ill. App. 3d 1029, 1030 (1980) (no product liability for half-constructed guardrail that "had not been placed in the stream of commerce").

## F.    The City's Design-Defect Claim Fails As A Matter Of Law (Count V)

The City's design-defect claim fails as a matter of law because the City cannot satisfy either the consumer-expectations test or the risk-utility test.  *See Lamkin v. Towner*, 138 Ill. 2d 510, 529 (1990) (recognizing both tests).

Under the consumer-expectations test, the City must prove that PCBs are "'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'"  *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 254 (2007) (quoting Restatement (Second) of Torts § 402A, Comment i, at 352 (1965)).  Old Monsanto's PCB customers were manufacturers, and the City has presented no evidence that PCBs were dangerous beyond what a reasonable manufacturer would have expected for incorporation into their end products.

Nor can the City prevail under the risk-utility test, which requires proof that "the risk of danger inherent in the challenged design outweigh[ed] the benefits of such design" at the time of manufacture.  *Calles*, 224 Ill. 2d at 255.  The City has presented no evidence on "the availability and feasibility of alternate designs at the time of [PCBs'] manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation."  *Id*.  The record shows that Old Monsanto manufactured PCBs in accordance with all

applicable laws and regulations, and it stopped manufacturing PCBs before the EPA banned them. SMF ¶ 19. There is no evidence that any other PCB design would have been less dangerous.

The risk-utility test is especially difficult to satisfy where, as here, the plaintiff alleges that the design defect is an inherent characteristic of a product. To prevail on a design-defect claim, Illinois courts traditionally recognized that a plaintiff needed to prove "a distinct defect" in a product—*i.e.*, a defect that does not "derive merely from . . . inherent properties" in the product. *Hunt v. Blasius*, 74 Ill. 2d 203, 211-12 (1978). Thus, for instance, "the fact that all vehicles will skid . . . on ice or other slippery surfaces does not per se make them an unreasonably dangerous product." *Zidek v. Gen. Motors Corp.*, 66 Ill. App. 3d 982, 985 (1978); *see also Fanning v. LeMay*, 38 Ill. 2d 209, 212 (1967) ("all shoes have [the tendency] to become slippery when wet," but "this common propensity" alone "does not make them dangerous products"). Although courts no longer apply a bright-line rule against defects based on inherent properties, it remains a significant "factor" to consider in the risk-utility calculus, *see Blue v. Env't Eng'g, Inc.*, 215 Ill. 2d 78, 103 (2005), and a design-defect claim generally does not lie when *all* potential designs of a product "have the same propensities as does defendants' product," *Zidek*, 66 Ill. App. 3d at 985.

Here, the City points only to the alleged harmfulness of PCBs themselves, not to some defect in their design. But "PCBs cannot be PCBs without the presence of PCBs themselves, along with their inherent characteristics." *Town of Lexington v. Pharmacia Corp.*, 133 F. Supp. 3d 258, 270 (D. Mass. 2015); *see also Milwaukee Metro. Sewerage Dist. v. Monsanto Co.*, 2023CV007313 (Wis. Cir. Ct. May 30, 2024) (dismissing design-defect claim in PCB case where the alleged defect "ar[ose] from the chemical compound itself rather than a defect in the design process"). Taken alongside the City's inability to muster any alternative design or to identify a violation of

regulations or industry standards, the City's effort to impose liability for inherent characteristics of PCBs forecloses the City's design-defect claim.

## IV.    The Court Should Abstain From Adjudicating The City's Requests For Abatement Until The EPA Has Exercised Its Primary Jurisdiction (All Counts)

If the Court does not outright dismiss, the Court should at minimum abstain from adjudicating the City's abatement claim (Count III) and similar requests for injunctive relief (all counts) because the EPA has primary jurisdiction over the remediation of PCBs on the parcels and, indeed, has already been involved in testing for and monitoring PCB levels in East St. Louis.

The doctrine of primary jurisdiction counsels a federal court to stay its hand when the "enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. Ry. Co.*, 352 U.S. 59, 63-64 (1956).  In such cases, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* at 64.  The doctrine thus allows federal and state courts "to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight," *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004)  (some quotation marks omitted), thereby promoting the "proper relationshi[p] between the courts and administrative agencies charged with particular regulatory duties," *W. Pac.*, 352 U.S. at 63; *see also People v. NL Indus.*, 152 Ill. 2d 82, 95 (Ill. 1992).

Here, the City seeks "the immediate and complete abatement and remediation" of the allegedly contaminated sites, Dkt. 129 ¶ 118(B), as well as a "determination that each Defendant is liable for . . . the investigation, abatement, remediation and removal" of PCBs on those sites, *id.* ¶¶ 101(D), 124(C), 137(D), 149(D), 158(D).  These claims raise complex factual issues relating to exposure risks, releases from numerous potential sources, waste disposal, and soil remediation, all

of which fall squarely within the EPA's expertise under TSCA, 15 U.S.C. § 2601 *et seq.*  With the

passage of TSCA, Congress "'set in place a comprehensive, national scheme to protect humans

and the environment from the dangers of toxic substances.'"  *Cent. & S.W. Servs., Inc. v. EPA*, 220

F.3d 683, 686 (5th Cir. 2000).  TSCA authorizes the EPA to regulate chemicals that pose risks to

human or environmental health, including PCBs.  *See* 15 U.S.C. §§ 2605(a), (e)(1)(A), (2)(B)

(authorizing EPA to promulgate rules regarding the "disposal," "manufacture, processing,

distribution in commerce or use . . . of any [PCB]").  Since the Act's passage, the EPA has used

its expertise to develop a complex, detailed regulatory scheme governing the manufacturing,

processing, distribution in commerce, storage, and disposal of PCBs.  *See* 40 C.F.R. § 761 *et seq.*;

*Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations*,

88 Fed. Reg. 59,662 (Aug. 29, 2023).

Under this scheme, TSCA implements specific clean-up standards that differ based on the

intended site use and the types of PCBs present.  SMF ¶ 22.  The EPA must be notified before any

corrective action for PCBs may be taken.  *See* 40 C.F.R. § 761.61(a)(3)(i).  And even for "self-

implementing cleanup of PCB remediation waste," the EPA must be involved in the process of

"site characterization" and approval of a self-implementing cleanup plan.  *Id.* § 761.61(a)(2),

(a)(3)(ii); *see* SMF ¶ 23.  The City's expert, Coghlan, acknowledged that the EPA "likely" would

need to be notified for the type of remedial action recommended in his expert report.  SMF ¶ 23.

The EPA, moreover, has regularly evaluated whether areas of East St. Louis near the

Sauget Plant "qualif[y] for removal actions" under TSCA, including by sampling PCB levels in

East St. Louis soils in 2009 and 2012.  SMF ¶ 29.  As a result of its investigations, the EPA

recommended "additional investigation in this area to assess how contamination levels should be considered during future development."  SMF ¶ 29.[10]

In light of the EPA's involvement, any potential remediation action would need to be executed under EPA's purview.  Rather than working through the EPA's established processes, however, the City and its private counsel opted to sue.  SMF ¶ 31.  The City has not even notified EPA about its requested abatement.  *See* SMF ¶ 29; *see* 40 C.F.R. § 761.61(a)(3)(i) (notification requirements).

This Court should not endorse the City's effort to sidestep the regulator vested by Congress with primary jurisdiction over PCB remediation.  Any abatement or remediation plan would "requir[e] the resolution of issues" that "have been placed within the special competence" of the EPA.  *W. Pac.*, 352 U.S. 59 at 64; *Centreville Citizens for Change v. City of Cahokia Heights*, 2024 WL 69085, at *5 (S.D. Ill. Jan. 5, 2024) (referring case to EPA because the agency is "uniquely equipped to effect and enforce remediation efforts"); *see also* 40 C.F.R. § 761.61.  To ensure "consistency and uniformity" in the application of the EPA's regulations and remedial scheme, this Court should stay this case and yield jurisdiction of the City's abatement claim to the EPA.  *CenturyLink Commc'ns, LLC v. Peerless Network, Inc.*, 2022 WL 602504, at *2 (N.D. Ill. Mar. 1, 2022).

## CONCLUSION

The Court should grant summary judgment in Defendants' favor on all claims and as to all parcels.

---

[10]  The EPA's involvement in the area extends beyond TSCA.  Under the Resource Conservation and Recovery Act and CERCLA, the EPA also undertook cleanup actions for the Sauget Plant and related Superfund sites.  SMF ¶ 26.

Dated:  March 5, 2025

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Russell B. Balikian*
Russell B. Balikian (*pro hac vice*)
rbalikian@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8535

Justine Goeke (*pro hac vice*)
jgoeke@gibsondunn.com
200 Park Ave
New York, NY 10166
Telephone: 212.351.5372

*Attorneys   for   Defendants   Monsanto Company and Pharmacia LLC*

**SHOOK, HARDY & BACON L.L.P.**

*/s/ Adam E. Miller*
Adam E. Miller (6206249)
amiller@shb.com
Tyler W. Schwettman (6333327)
tschwettman@shb.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Telephone:  314.690.0200

*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

**LATHROP GPM LLP**

*/s/ Charles R. Hobbs II*
Charles R. Hobbs II (625917)
Ron.Hobbs@lathropgpm.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, MO 63105
Telephone:  314.613.2800

*Attorneys for Defendant Solutia Inc.*

56

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this 5th day of March 2025, a true and correct

copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.


<u>*/s/ Adam E. Miller*</u>

*Attorney for Defendants Monsanto Company
and Pharmacia LLC*