**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **CITY OF EAST ST. LOUIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-232-DWD** |
| | ) | |
| **MONSANTO COMPANY, *et al.*,** | ) | |
| | ) | |
| **Defendants** | ) | |

**PLAINTIFF'S RESPONSE TO MONSANTO'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. RANDALL BELL**

The City of East St. Louis, Illinois ("the City"), through its undersigned counsel, respectfully submits its Response to the Defendants' (collectively "Monsanto") Motion to Exclude Expert Testimony of Dr. Randall Bell, its real estate appraiser and damages expert, whose expertise, knowledge, training, and experience will more likely than not be helpful to the jury in understanding complex real estate damages concepts in the context of environmental contamination. In support of his capacity to testify, the City states as follows:

**INTRODUCTION**

Dr. Randall Bell is a preeminent real estate appraiser retained by the City to assess the real estate and economic impacts to the City's tested land parcels confirmed to be contaminated with Monsanto's polychlorinated biphenyls ("PCBs"). PCBs are a toxic, carcinogenic chemical the further manufacture of which is now outlawed by virtually every nation state on Earth. Bell is one

of the leading real estate appraisers in the world, having authored the seminal treatise, *Real Estate Damages*.[1] Bell initially prepared a 228-page Report[2] and then a 104-page Rebuttal Report[3] in this case. The methodology for both was in strict compliance with real estate appraisal industry guidelines, standards, protocols, and peer-reviewed literature.[4] With Bell's opinions having derived from an appropriate and reliable application of real estate appraisal industry damages assessment methodology, Accordingly, the Monsanto Motion to Exclude[5] should be denied forthwith.

*First*, Bell's entire damages analysis hinges upon and is *founded on* the confirmed presence of Monsanto PCBs on the City's tested parcels, a finding which is essentially uncontradicted by Monsanto.[6] His calculations concerning cost effect; use effect; and risk effect damages the City has sustained in this matter are essentially uncontradicted by Monsanto's real estate appraiser, Charles Brigden, who has, not surprisingly, offered no countering calculations of his own.[7]

*Second*, Monsanto's strawman, that Bell's "threshold opinion" is that PCBs were the primary reason the tested properties were abandoned at some point around the 1970s, is bogus. Bell's threshold opinion is that the City sustained substantial cost effect; use effect; and risk effect damages *because of* Monsanto storing PCBs on its land parcels for more than 70 years without

---

[1] Ex. 1, Randall Bell, *Real Estate Damages*, (3d Ed. 2016)

[2] Ex. 2, Bell Report

[3] Ex. 3, Bell Rebuttal

[4] Ex. 1, *Real Estate Damages*; Ex. 4, The Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* ("Guide Note 6") (Chicago, IL: Appraisal Institute, 2013), 13; Ex. 5 Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116; Ex. 6, USPAP 2024, Advisory Opinion 9 ("AO9"), p. G22:157-170; Ex. 7, Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003).

[5] Referred to hereinafter as "Motion." [Dkt. 259].

[6] "Referring to appraisals of environmentally contaminated properties, AO9, which is fully endorsed by Brigden, provides: "In these assignments, the appraiser is asked to analyze the effects of *known* environmental contamination on the value of property." Ex. 6, AO9, p. G18:11-12) (italics added). In addition, and very conspicuous by their absence throughout this entire case are *any* PCB tests performed by or on behalf of Monsanto. The reasons for this are obvious, as is the conspicuousness of the absence. *See* Ex. 3, Bell Rebuttal, p. 13, fn. 38, quoting Brigden: "A proper application of [AO9] is consistent with the accepted methodology."

[7] Ex. 3, Bell Rebuttal, 4-8; 21.

notice, permission, consent, or payment. In so doing, Monsanto intentionally impaired several of the City's "bundle of rights," including its right to exclude others from using its property, and its right to occupancy and use. There is not *one reference* in the Motion to the bundle of rights, a maxim of Illinois law since the late 1800s.[8]

***Third***, the City will disentangle the intentional Monsanto obfuscation of the real matter at hand in a real estate damages assessment in the context of environmental contamination. In so doing, it will appropriately segregate, and not conflate, the tripartite components of real estate damages in this context: cost effect; use effect; and risk effect. The City will demonstrate that Bell's analyses are in strict conformance to the real estate appraisal industry's methodology and with an appropriate application of same. Who says so? In many respects, Monsanto's own appraisal expert, Brigden, does.

## LEGAL STANDARD

The City incorporates by reference as if fully set forth herein the Legal Standard Section III of Dkt. 278.

## BACKGROUND

Where practicable, the City will respond to Monsanto's "Background" section in the order in which its points were raised.

I.     **Applying the Real Estate Appraisal Industry's Equations for Appraising Properties That May Be Impacted By Environmental Contamination**

Straight out of real estate appraisal industry guideposts for this exact topic, and consistent with the co-author of Monsanto's own appraiser expert's published works, Bell accurately applied the standard three equations (methodology) that appraisers apply in appraising environmentally contaminated properties:

---

[8] Ex. 3, Bell Rebuttal, pp. 18-20, including all footnotes.

**Impaired Value = Unimpaired Value - Cost Effects (Remediation and Related Costs) - Use Effects (Effects on Site Usability) - Risk Effects (Environmental Risk/Stigma)**

**Property Value Diminution = Cost Effects (Remediation and Related Costs) + Use Effects (Effects on Site Usability) + Risk Effects (Environmental Risk/Stigma)**

**Impaired Value = Unimpaired Value - Property Value Diminution.**[9] [10]

## Cost Effects

Bell appropriately assessed cost effects by relying upon an environmental engineer, Coghlan, who estimated the costs of remediation at over $22 million and a two-year time frame.[11] As per AO9 and Guide Note 6, "in most situations the appraiser will utilize scientific and other technical data prepared by others, *such as environmental engineers*. In these situations, the appraiser should utilize an extraordinary assumption regarding the information obtained from the other experts."[12] This is, of course, *exactly* what Bell did.[13] This methodology and its application are fully compliant with the real estate appraisal industry. Section III of the Motion[14] should be denied forthwith.

## Use Effects

Bell determined there were use effect damages *because* there were impacts to the City's bundle of rights, including its right to exclude, to occupy, and to use its properties, resulting from

---

[9] Ex. 2, Bell Report, pp. 9-10; Ex. 4, Guide Note 6, p. 13; Ex. 5, "Environmental Dead Zones," p. 116; Ex. 6, AO9, p. G22:157-170; Ex. 7, "Contaminated Property Valuation," *The Appraisal Journal* (April 2003) 132; and Ex. 3, Bell Rebuttal, p. 21.

[10] The co-author of JLL's Report, Richard Roddewig, also agrees with these well-established equations. Ex. 8, Richard Roddewig (Editor), *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Chapter 1: USPAP and the Appraisal of Properties Impacted by Contamination of Environmental Risk (Appraisal Institute 2015), 14 and 18. Literally incredibly, Brigden disagreed with his own partner, saying the last equation was "disagreeable." Ex. 9, Brigden Deposition 1, 237:19-25---238:1-2.

[11] Ex. 3, Bell Rebuttal, pp. 8; 89 (Documents Considered No. 20).

[12] Ex. 6, AO9, p. G18:59-62; Ex. 4, Guide Note 6, p. 14 ("In assignments involving contaminated properties…, the appraisal will likely be premised on one or more Extraordinary/Special Assumptions...Typically in these types of assignments, Extraordinary/Special Assumptions are used when relying on the work of others, such as environmental engineers..."); *see also* Ex. 3, Bell Rebuttal, p. 32.

[13] Ex. 3, Bell Rebuttal, p. 71, for the Extraordinary Assumption that the environmental testing and remediation estimates were performed accurately.

[14] Motion, Section III, pp. 21-22.

Monsanto's use and occupation of the properties to store its PCBs on the City's property without notification, permission, consent, or payment.[15] Causation is simple and direct: if you use someone's property, you pay for it.

**Risk Effects**

Risk effects (stigma) or "market resistance" were determined by developing literature reviews on the effects of PCBs and dioxins on similarly contaminated properties; researching case studies involving similarly contaminated neighborhoods, and conducting a sales comparison analysis.[16] Again, utilization of these tools *directly* conforms with real estate appraisal industry guideposts for such analyses, despite Monsanto's nonsensical arguments that all three methods are not "market data."[17] [18]

**Real Estate Appraisal Industry Assessments of Environmentally Contaminated Property**

Monsanto's appraiser experts agree that: USPAP's AO9 is applied in assessing impacts to environmentally contaminated property; [19] [20] [21] AO9 dictates that cost; use; and risk effects are

---

[15] Ex. 2, Bell Report, p. 10; Ex. 3, Bell Rebuttal, pp. 3; 5-9; Dkt. 278, pp. 7-13.

[16] Ex. 2, Bell Report, pp. 12; 43; Ex. 1, *Real Estate Damages,* p. 25; and Ex. 10, Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022), p. 109; Ex. 5, "Environmental Dead Zones," pp. 112; 114 (summarizing case studies and literature reviews, respectively)..

[17] Ex. 10, Stigma, p. 115: "When determining risk effects…there are numerous potential methodologies to consider…including…*paired sales analysis…literature review*…, [and] *case study analysis*…While there are numerous techniques available to real estate…professionals, it is not necessary to use them all; some or even one technique can produce credible opinions…If the market value or properties in the [test area] had been reduced by stigma related to the risk of environmental issues, this would be reflected in a reduction of prices in the test area relative to prices of otherwise similar properties in the control areas." Ex. 12, The Appraisal of Real Estate, p. 188 ("These methods involve one or more of the following: …(2) Analysis of environmental case studies…").

[18] Motion, Section II, C, p. 21. *But see* Ex. 1, *Real Estate Damages*, p. 9: "Applications of empirical research in real estate include the collection of *transactional market data*, such as *sale or lease comparables*…A key benefit of empirical research methods, such as *comparable sales*, is that tests can be replicated...; p. 34; 39-40 (case studies).

[19] Ex. 2, Bell Report, pp. 34-42; 165-179; Ex. 3, Bell Rebuttal Report, pp. 3-9; 17-20; 32-34; Dkt. 278, pp. 7-13.

[20] And so is Ex. 4, Guide Note 6, published by The Appraisal Institute, which has the same definitional terminology and methodology as AO9 but which, for inexplicable reasons, Brigden denied was a leading Appraisal Institute publication for those purposes and did not recall the specifics of that document. Ex. 9, Brigden Deposition 1, 27:16-23; and 28:11-15. Perhaps Monsanto acknowledging the obvious, that PCBs are categorized as "hazardous substances" by CERCLA, the Clean Water Act, the Resource Conservation and Recovery Act ("RCRA"), and by the USEPA, is a bridge too far to candidly (and accurately) acknowledge.

[21] Ex. 9, Brigden Deposition 1, 27:3-8 ("[I]s one of the authoritative source materials for real estate appraisers in your industry that address how to evaluate environmentally contaminated real estate, the so-called Advisory

appropriately considered;[22] and, the use effect equation applied is: **Market Rent x Period of Time= Use Effect.**[23] Monsanto might not like Bell's calculations or results, but it cannot legitimately contest his use effect real estate appraisal methodology or its application. Monsanto does not invoke *one* real estate appraisal industry standard in support of its exclusion arguments.

## I.        Bell's Calculation of "Use Effect" Damages

First, the strawman. Monsanto misstates the record by deflecting from what use effect damages represent and the reasons they are assessed against it in this case. It sets the purported reasons Bell thought that the City's tested parcels became vacant at some point around 1970 as the predicate for Bell to assess use effect damages. Making no sense whatsoever,[24] and with inapposite citations to Bell's first deposition, Monsanto baldly states that Bell "claims" that use effect damages are "warranted" *because* most of the now vacant City tested parcels had homes on them at one time.[25] This causation theory is simply nonsense.

Bell assessed use effects *because of* Monsanto's storage of its PCBs on the tested City properties since at least 1955.[26] Use effect measures damages due to Monsanto's decades long storage of its property on the City's tested properties until they are remediated. This storage or use

---

Opinion 9? A. Yes.").

[22] Ex. 9, Brigden Deposition 1, 204:22-25---205:1-3 ("Q/ Do you agree that a damages assessment in the context of environmentally contaminated real estate involves an assessment of three different aspects, cost effect, use effect, [and] risk effect? A. Those -- yes, those are three components of analysis.").

[23] Ex. 9, Brigden Deposition 1, 217:1-6 ("Q/ [D]o you agree that the generally recognized use effect equation or formula so to speak is market rate rental times time period equals use effect damages, generally? A/ It is an approach that I have used and absolutely has a role in this area. Yeah."); 220:6-8 ("Q/ Market rate rental times time equals loss of use, right? A/ Generally, that's, yeah. We're good."). *See also* Ex. 3, Bell Rebuttal, pp. 11-14.

[24] Monsanto incredibly spends its entire page 4 "arguments" referring to risk effect damages! It even uses the term "environmental risk" in its inapposite use effect "arguments." Motion, p. 4.

[25] Motion, pp. 3-4.

[26] The PCB production began at the Monsanto W.G. Krummrich Plant in 1936. The volitional venting of Monsanto's PCBs and the inevitable emitting of PCBs into the ambient atmosphere due to leaks, spills and standard operations began shortly thereafter. The City could have assessed use effect damages during the entire period of contamination.

constitutes a continuing infringement of and impairment to the City's bundle of rights, including most notably its right to exclude others from infringing upon its exclusive occupancy and use.[27]

### A. Calculation: Market Rental Rate and the "Control" Properties

Monsanto *again* begins with the bogus strawman. Bell does *not* base his use effect calculations "on the assumption that the properties are blighted because of the PCB contamination…" Monsanto ignores previous reports which demonstrate Bell's strict adherence to real estate appraisal industry methodology in establishing appropriate "control" properties for his use effect and risk effect[28] analyses.[29] The basic premise that "test properties" (contaminated City parcels) are impacted by a detrimental condition (PCB contamination) while "control properties" are similar in nature, but are not impacted by the detrimental condition, is even accepted by Monsanto's appraiser expert as axiomatic within the industry.[30] Accordingly, Bell *did* assess the areas in the immediate vicinity of the tested parcels and the (now) Cahokia Heights area[31] and determined that they were *not* suitable "control areas" because of contamination issues.[32]

The lease (use effect) and sales (risk effect) data collected for the analyses were closed transactions in 2023. As part of the data confirmation process, the data was mapped using

---

[27] Ex. 2, Bell Report, pp. 10-12; 34-42; Ex. 3, Bell Rebuttal, pp. 4-9.

[28] Because of space limitations, the City will discuss Bell's selection of the control areas for both his use effect and risk effect analyses here. In all other respects the City will not conflate the three separate aspects of a real estate damages assessment.

[29] Ex. 2, Bell Report, pp. 29-32; 38-39; Ex. 3, Bell Rebuttal, pp. 7-9; 11-12; Dkt. 278, pp. 10-12. *See also* Ex. 2, Figure 11.

[30] Ex. 9, Brigden Deposition 1, 291:12-25---292:1-15 ("It is a restating of a…simple, well understood…analysis.").

[31] *See* Ex. 2, p. 94 of Documents Considered: No. 271: IEPA, "Violation Notice: City of Cahokia Heights," 2021; No. 272: USEPA, "Administration Order on Consent Regarding Alleged Violations fo the Clean Water Act," 2021; No. 273: USEPA, July 25-28, 2022, MS4 Inspection Report for the City of Cahokia Heights, 2022; No. 274: IEPA, "Violation Notice: City of Cahokia Heights," 2022; No. 275: "Longtime EPA water scientist to manage sewer problems in Cahokia Heights; No. 276: Cortes, "Illinois health officials fail to help desperate residents as sewage floods their homes," 2023; and No. 277: USEPA, "Cahokia Heights Fact Sheet."

[32] Ex. 2, Bell Report, pp. 29-31; 38; Ex. 3, Bell Rebuttal, p. 9.

geographic information systems (GIS) software. The public property record data was then examined for errors, completeness, and consistency. When deficiencies or discrepancies were found that could be reliably and reasonably addressed, the data was corrected. When the reliable or reasonable solution to these deficiencies or discrepancies could not be discerned, the data was set aside with the rationale noted.[33]

In studying the subject properties over a period of more than 50 years, most of the subject property improvement information was no longer available. To draw comparisons between the subject properties in an unimpaired condition (improved residential) and control properties, data of other improved non-subject property residences in the neighborhood *were* analyzed. The public property records in the surrounding neighborhood *were* examined and the data *was* tabulated. For any properties that had transactions, the corresponding MLS records *were* examined as an additional source of confirmation. Figure 13 below summarizes the property characteristics of improved residences in the subject property neighborhood. Additionally, some of the subject property neighborhood data included historical improvement information, even though the property is currently vacant. This data was included in the summary because it provides information as to the properties that once existed.[34]

The historical aerial views of the subject property neighborhood was geocoded and overlayed with parcel data to determine which subject properties were improved. For any subject properties that did not include improvements, land values were utilized for the risk effects. The historical aerial photographs assisted Bell and his staff in determining which of the subject tested parcels had improvements on them at relevant points in time.[35] [36]

---

[33] Ex. 2, Bell Report, p. 30.
[34] *Id.*, p. 31.
[35] *Id.*
[36] Ex. 2, Bell Report, pp. 209-224.

The range of improvements from the subject property neighborhood was utilized to establish a range of data utilized from the control areas in the sales comparison analyses. In other words, *the control area data was similar to the unimpaired condition of the subject properties.*

| CITY OF EAST ST. LOUIS<br>Subject Neighborhood Improved Properties Matrix<br>(Landmark File: 155-1-21) | | | | | | |
|---|---|---|---|---|---|---|
| | Number of Properties | Low | High | Average | Median | % of Properties With Feature |
| Bedrooms* | 556 | 1 | 4 | 3 | 3 | NA |
| Total Bathrooms | 556 | 1 | 5 | 2 | 2 | NA |
| Above Ground SqFt** | 556 | 368 | 2,412 | 1,064 | 1,004 | NA |
| Year Built | 556 | 1872 | 2010 | 1948 | 1940 | NA |
| Basement (Yes/No) | 556 | NA | NA | NA | NA | 23% |
| Garage (Yes/No) | 556 | NA | NA | NA | NA | 35% |
| Carport (Yes/No) | 556 | NA | NA | NA | NA | 6% |

*There was one property with 5 bedrooms, one property with 6 bedrooms, and one property with 7 bedrooms. Due to the limited number of properties with 5, 6, and 7 bedrooms, they were not utilized.
**There were four properties with over 2,500 Above Ground SqFt. Due to the limited number of properties with more than 2,500 Above Ground SqFt, they were not utilized.

Figure 13: Subject Neighborhood Improved Properties Matrix

After appropriately choosing control areas in Belleville, Fairview Heights, Caseyville, and Fairmont City, Bell compared and contrasted the information from his leasing and sales data (for use effect and risk effect, respectively) with the subject parcels area, including lease rates; bedrooms; bathrooms; square footage; lot square footage; year built; basement; and garage.[37] This was far from an "eyes only" review.[38] Monsanto, of course, had all of the evidence from Bell's Report before filing their Motion. The allegation that Bell failed to control for or even address

---

[37] Motion, Section II, Part A, pp. 16-18 [Dkt. 259]; *But see* Ex. 2, Bell Report, pp. 29-31; 38-39; 63-67; 189-198.
[38] Motion, Section II, Part A, p. 17 [Dkt. 259].

differences between the test and control areas[39] as a purported basis for *Daubert* exclusion is absurd given that Monsanto has had the initial Bell Report for more than one year.

For his use effect calculations, Bell arrived at his appropriate market rate rental of $1,400/month for improved parcels (a parcel that at one time had a home on it); and $233/month for non-improved parcels (without a home).[40] The whole idea is simple. Had Monsanto appropriately advised south end City landowners in 1955[41] that it was going to store PCBs on the subject properties for the next 70 years, the parties would have negotiated a fair market rental rate based on the properties that were subject to contamination.[42]

**B.  Use Effect Conclusions**

Bell's revised use effect damages calculations for the 100 parcels owned by the City as of 2024, and another 47 parcels owned at one time by the City since 1955, are set forth at pages 47-48 of his Rebuttal Report.[43]

Bell's methodology and application are in strict accordance with industry guidelines and standards, including the appropriate selection of the control areas for his use effect (control area leases) and risk effect (control area sales) analyses. His methodology and the application thereof are reliable. Thus, Section II, Part A of Monsanto's Motion (control group) should be denied forthwith.

Monsanto's claim that Bell's (and its own expert's) methodology for use effect damages analysis is unreliable is similarly specious. Bell applied the same equation that Monsanto's

---

[39] Motion, Section II, Part A, pp. 17-18 [Dkt. 259].

[40] Rental rates were depreciated annually back to 1955 with an improved market rental rate of $123/month and a non-improved rental rate of $20.50/month.

[41] The City could have begun its use effect damages assessment shortly after 1936. See footnote 21.

[42] Dkt. 278, p. 12. Monsanto has produced no data regarding whether its suggested control areas near the tested parcels are contaminated, or not. They chose not to do testing because they knew what the results would be.

[43] Ex. 3, Bell Rebuttal, pp. 47-52.

appraisal expert testified he uses. The use effect damages numbers are large because of the 70+ years of illegal storage of a now-worldwide-banned chemical on the City's properties. Again, Monsanto does not like the conclusions or the numbers, but Bell's methodology used and the means by which he applied it, are in strict accordance with AO9 and Guide Note 6. Section II, Part B of the Motion (use effect methodology) should be denied forthwith.

## II.    Bell's Calculation of Risk Effect Damages

The City addressed above the Bell (and real estate appraisal industry) methodology in selecting the control areas for his use effect (leasing data) and risk effect (sales data) analyses and respectfully urges the Court to deny all relief sought by Monsanto in Section II, Part A of the Motion. For the sake of brevity, the City incorporates by reference Bell's detailed risk effect analyses set forth in his Report and Rebuttal.[44] Simply put, the City produced a single page exhibit at Bell's February 7, 2025, deposition which itemized the $11,500,000.00 adjusted risk effect damages amount, given that the City now owns 100 parcels at issue (and at one time owned 47 more).[45] And as referenced in Bell's Rebuttal Report, "cleaning up the PCBs (through an appropriate remediation) both terminates the Use Effect and eliminates the Risk Effect."[46]

Data on similar properties with PCBs (or other similarly situated contaminants), of course, are essential to answer the question of whether sales prices for real estate in the tested parcels area have been negatively affected by the contamination, or the perception of the contamination. Whether it's called risk effects (stigma) or "market resistance", it was determined by supportive literature reviews on the effects of PCBs and Dioxins on similar contaminated properties; researching case studies involving comparable environmentally contaminated neighborhoods; and

---

[44] Ex. 2, Bell Report, pp. 9-14; 38; 43-68; Ex. 3, pp. 8-9; 28-31.
[45] Ex. 13, City of East St. Louis Risk Effect Summary (Exhibit 3 to Bell Deposition 2, February 7, 2025).
[46] Ex. 3, Bell Rebuttal, p. 9. This addresses Motion, Section II, Part C, Point Three, p. 21.

conducting a sales comparison analysis.

Accordingly, the risk effects category measures this loss by calculating the "but for" improved value of comparable residential properties.[47] The risk effect data establishes that properties impacted by environmental contaminants, such as PCBs, incur risk effects up to -100%. Further, Bell analyzed several analogous case studies of neighborhoods that have been abandoned and demolished due to PCB or dioxin contamination: Anniston, Alabama; Times Beach, Missouri; Mount Dioxin, Florida; Carver Terrace, Texas; Agricultural Street Landfill, Louisiana; and Mossville, Louisiana. The subject properties are near replicas of those other neighborhoods that ultimately were blighted, abandoned, and demolished.[48]

As one example, Bell considered a peer-reviewed case study[49] from the only other PCB manufacturing area in the United States, Anniston, Alabama. He found that several commercial businesses in the Anniston neighborhood near the Monsanto PCB plant had been fenced off and abandoned. A house adjacent to the subject property was abandoned and other signs of blight were evident on the subject street. The Anniston area in question was suffering from a dearth of recent construction and investment. The author of the case study (not Bell) stated that "the resulting conclusion is that the property is almost valueless for residential use, leaving only a token value of 5% (such as for short term storage)."[50] This, of course, is exactly the situation for the City.

One last example is Times Beach, Missouri. In 1982, it was discovered that nearly the entire town had been contaminated with dioxins. The town was and now is completely abandoned. The

---

[47] Ex. 2, Bell Report, p. 12.
[48] *Id.*, pp. 12-13.
[49] Simons, Robert A., Contamination in a Rural Market: A Multiple Techniques Approach, *The Appraisal Journal*, pp. 388-400 (October 2002).
[50] *Id.*, p. 46. Put another way, Simons concluded a -95% risk effect.

USEPA arranged for a complete relocation of the 2000 residents and a buyout of the 800 residential properties. After major cleanup operations were undertaken, the former town is now a state park.[51]

A. **<u>Risk Effect Conclusions</u>**

Bell appropriately applied a literature review; case study; and sales comparison analysis for his risk effect analysis. As discussed above, these are alternative appropriate methodologies for appraisers to apply in this context. Bell reliably extrapolated from various sources referenced in his Report, the most analogous one from the only other PCB manufacturing plant area in the United States, Anniston, Alabama, where a peer-reviewed study in the Appraisal Journal concluded that there was a -95% risk effect.

Finally, the City has clarified that its revised risk effect damages amount is $11,500,000.00, as was stated and discussed at Bell's second deposition. The City further acknowledged that the risk effect will terminate upon completion of an appropriate remediation of the City parcels.[52]

III.    **<u>Argument</u>[53]**

In this real estate property damages case, Bell's anticipated damages testimony strictly applies appropriate real estate appraisal industry standards, guidelines, and protocols. His testimony will help the jury understand and ultimately resolve the pertinent real estate damages concepts in this environmental contamination context. *In re Paraquat Liability Litigation,* 730 F.Supp.3d 793, 806 (S.D. Ill. 2024). At this *Daubert* stage of these proceedings, the Court's role is to determine that the expert's testimony is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ that methodology.

---

[51] *Id.*, p. 47. *See also* https://www.epa.gov/mo/town-flood-and-superfund-looking-back-times-beach-disaster-nearly-40-years-later (last visited: March 28, 2025).

[52] This addresses the arguments asserted at Section II, Part C, Point Three, p. 21 of the Motion.

[53] Monsanto only challenges Bell's qualifications in the context of his purportedly "calculating" remediation costs. This argument is completely without merit and has already been addressed. Accordingly, the City will not address qualifications any further.

*Stollings v. Ryobi Technologies, Inc.,* 725 F.3d 753, 765 (7th Cir. 2013). This does not, however, ordinarily extend to the reliability of the conclusions those methods produce—that is, whether the conclusions are unimpeachable. *Stollings*, 725 F.3d at 766. An expert may provide testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to a conflicting opinion and even doubt. It is the role of the jury to weigh the opinion and any sources that create doubt in the opinion. *Id.*, at 766.

*Stollings* clarifies that where expert testimony is based on well-established science, courts most often conclude that reliability problems go to weight, not admissibility. Quoting from the Second Circuit, the Seventh Circuit noted that gatekeepers do not assume "the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul" that would "inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1045 (2d Cir.1995).

This is especially so in the real estate appraisal industry, where courts in this Circuit have noted that "appraising is art, not science," and that "the value of property is largely a matter of opinion." *Buchanan Energy, LLC v. Lake Bluff Holdings, LLC,* 2017 WL 1232973, No. 15-cv-3851, at *5 (N.D. Ill. Apr. 4, 2017), citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996); and *In re Jones*, 2004 WL 298612, No.: 03-BR-84129, at *1 (C.D. Ill. Feb. 5, 2004). In *Buchanan*, a case involving a valuation of land dispute where both sides sought to exclude the other's appraisal experts, the Northern District stated that it is not the gatekeeper's function to assess the evidence itself or the correctness of the appraisers' assumptions or conclusions. Instead, the soundness of the factual underpinnings of the appraiser's analysis and the correctness of the conclusions are factual matters to be determined by the trier of fact, citing *Kawasaki Kisen Kaisha, Ltd. V. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015). Rather than excluding the appraisers,

14

the court noted that grueling cross examination and presentation of contrary evidence are the appropriate means to attack the opposing appraiser's opinions. *Buchanan*, 2017 WL 1232973, at *6. The Northern District noted the need, especially in land valuation cases, to proceed cautiously before removing from the factfinder's consideration expert assessments of value[54] which may prove helpful. *Id.*, at *8. Because the expert had used a reliable methodology for his appraisal the testimony was admissible. *Id.*

Similarly, in *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 486 F. Supp. 2d 741, 749 (N.D. Ill. 2007), defendants asked the court to exclude an appraiser's opinion that was "subjective, unreasoned, unsupported by market data, and inconsistent with the established methodology of the real estate profession." The court declined, finding that "[r]eliance on judgment and experience is an accepted appraisal technique." *Id.* While the court acknowledged that some of the appraiser's data sources "lacked credibility," the court found that such criticism "is a question of weight rather than admissibility." *Id.; see also Powell v. Tosh*, 942 F. Supp. 2d 678, 690 (W.D. Ky. 2013) (denying motion to exclude appraiser's opinion, purportedly based upon selective and unreliable data, because such a challenge goes to weight, not admissibility, of the appraiser's testimony).

With Monsanto's Motion not having any actual nexus with the real estate appraisal profession, and with Bell's real estate damages assessment based on the industry methodology with which Monsanto's own appraisal experts agree, it is difficult to conceive how the Motion could succeed.

---

[54] The City notes its Motion to Exclude JLL and Brigden. *Dkt.* 278. One main point there was that JLL and Brigden do *not* have opinions of value on *any* of the three aspects of real estate damages in this matter: cost; use; and risk effects. *Dkt.* 278, pp. 13-14.

**Causation**

First, the City has pointed out the strawman which Monsanto created in an attempt to change the playing field from what it is. Second, Bell included an entire section of his Report on assessing the "Subject Properties Descriptive Data"[55] in arriving at his opinions in this case. That five-page assessment included data on the subject property neighborhood; the City; the region, including St. Louis; the workforce; the population; zoning; street improvements; other relevant statistics, and on and on. Any objection Monsanto has to causation issues[56] can be challenged with "grueling cross examination and presentation of contrary evidence." *Buchanan*, 2017 WL 1232973, at *6. More fundamentally, the Motion cites no cases within the real estate appraisal profession, but rather a railroader's cumulative trauma back injury case where his ergonomist's and treating physicians' causation opinions were excluded because they did not conduct a differential diagnosis, a topic completely foreign to this case. *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Even further afield, the other case cited by the defense was a products liability case where an expert was found to be speculating about the cause of a house fire. *Gopalratnam v. Hewlitt-Packard Co.*, 877 F.3d 771, 787 (7th Cir. 2017).

**Control Group**

This entire section of the Motion is based upon the false predicate that Bell did not perform a comparison of the subject tested parcels area with his proposed control areas in outlying St. Clair

---

[55] Ex. 2, Bell Report, pp. 154-160.

[56] Motion, Section I, pp. 12-16. It need be noted here, however, that this section of the Motion deals entirely with "risk effect" damages, and not cost effect or use effect damages, although Monsanto fails to mention this. Again, it is the confirmed presence of Monsanto PCBs on the City's tested parcels for ~70 years without notice, permission, consent, or payment which has *directly caused* the need for remediation (cost effect) and payment for that unauthorized storage or use (use effect). As to risk effects, Bell used appropriate industry methodology, a case study from the only other PCB manufacturing area in North America, Anniston, Alabama, where a peer-reviewed study found a -95% risk effect on area land prices.

16

County. As discussed herein, that is simply not true, as Monsanto has known for over one year now.

To the extent that Monsanto cited *Prantil v. Arkema France S.A.*, 2022 WL 1570022 (S.D. Tex. May 18, 2022), in support of its arguments, the City notes that this is a risk effect damages damages case (determining whether the flooding incident in question caused local real estate prices to plunge after the incident). *Prantil*, 2022 WL 1570022, at *10.[57] Moreover, the excluded expert in *Prantil* did not even know the nature of the contaminant in question and had not adequately compared the test properties with the comparator (control) properties. *Id.* Obviously, Bell knew about the confirmed PCB contamination of the City tested parcels and the City has conclusively demonstrated that Bell assessed the characteristics of the subject parcels area and his control areas.

### Use Effect and Risk Effect Methodologies

Again, any objections Monsanto has to methodological issues[58] can be challenged with "grueling cross examination and presentation of contrary evidence." *Buchanan*, 2017 WL 1232973, at *6. Moreover, and in addition to the factual rebuttal of Monsanto's arguments concerning methodology, it must be noted that Monsanto baldly asserts, with nary an example to support its reckless claims, that Bell did not consider when a historically improved parcel featured the improvement.[59]

---

[57] Likewise, *Player v. Motiva Enterprises, LLC*, 240 Fed.Appx. 513, 515-16 (3d Cir. 2007) was cited by Monsanto ostensibly to support its "exclude because of bad methodology" in choosing the control group arguments. Motion, Section II, Part A, pp. 16-18. In the event the Court sees this case as relevant, this is a risk effect damages case which was evaluating the "stigma" damages associated with gasoline leaks from a service station into and onto plaintiffs' lands. *Player*, 240 Fed.Appx. at 515-16.

[58] Motion, Section II, Parts B and C. The City notes that this Motion and Response are not the vehicles by which to dispute and brief the legal issue of the amount of damages to which it is entitled if successful in this case. Motion, p. 19.

[59] Motion, Section II, Part B, Second Point, p. 19.

**Illinois Law Allegedly Limits Recovery**

Although the legal issue of whether the City can collect cost effect; use effect; and risk effect damages should not be decided in this Motion to Exclude, the City notes its discussion in Bell's Report and Rebuttal on these issues.[60] Just as Monsanto reserved its right to argue its damages positions,[61] the City reserves the right to argue, as it did in Bell's initial Report, that the likely Illinois Pattern Instruction—Civil jury instruction on real estate damages, IPI 30.17, includes the tripartite approach to damages that the Bell Report and Rebuttal do, something the parties will certainly argue about in different contexts.[62]

**Illinois Law and Prejudgment Interest**

Monsanto inappropriately categorizes Bell's applying a 9% interest rate on to the established market rental rate from 1955 onward as "pre-judgment interest."[63] Again, the assessing of the use effect damages here presupposes a hypothetical negotiation between Monsanto and City landowners in 1955 regarding the storage costs for Monsanto's storing its PCBs on the City's parcels for the next ~70 years. Presumably, "those amounts could have been invested and earned a return which the City could use in the public interest."[64] And "that interest rate is appropriate because the Use Effect represents both (a) the City's loss of the normal use and enjoyment of the subject properties; and (b) the market value for the right to use the properties…"[65] The 9% rate is based on the average annual return of the S&P 500 Index from 1955 to 2024. The S&P 500 Index is an appropriate approximation of the City's expected return on such an investment.[66]

---

[60] Ex. 2, Bell Report, pp. 7-14; 27-68; Ex. 3, Bell Rebuttal, pp. 3-9; 15-20.
[61] *Mtn.*, Section IV, Part A, p. 22, fn. 10.
[62] Illinois Pattern Instruction-Civil, 30.17.
[63] *Mtn.*, Section IV, Part B, p. 23.
[64] Ex. 2, Bell Report, p. 11.
[65] *Id.*, at 11.
[66] *Id.*

There is no pre-judgment interest here yet because there is no judgment. Because Bell's anticipated testimony concerning use effects will include how and why he applied a 9% compounding interest rate to his discounted market rental rates going back to 1955, the City reserves the right to argue, as here, that this compounding does not equate to pre-judgment interest at all.

**Bell and His Alleged Overcounting of Parcels**

Much has been made by Monsanto of the number of parcels issues with Bell's Report and Rebuttal.  But, as Bell has repeatedly stated, the number of parcels involved in his assessment of the real estate and other damages caused to the City properties affects only his mathematics, not his applied methodology.[67]  Moreover, this remains the case whether or not the number of parcels the City is deemed to own or control changes between now and the time of trial.

Another Monsanto misstatement must be addressed here. Misquoting from Bell's book, Real Estate Damages, Monsanto claims that any City PCB parcel testing below 0.23 ppm gives Monsanto a free pass to contaminate City properties (or anyone's else's property) up to that threshold amount, which is, of course, ludicrous. In the context of discussing a "Phase II study," Bell stated: "The [Phase II study] may find no contamination or concentrations that are below regulatory action limits. These are usually seen as positive findings because the property is then deemed to be unimpaired by contamination."[68]

Monsanto then conveniently omits the full AO9 definition of "environmental contamination" in attempting to make its point. This is the same intentional "oversight" for which

---

[67] Ex. 3, Bell Rebuttal, p. 6.
[68] Ex. 1, *Real Estate Damages*, p. 230.

the JLL co-author of its Report in this matter, Richard Roddewig, has already been called out.[69]

"Environmental contamination" is defined correctly, and fully, in AO9 as follows:

> "Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater, or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, or local agencies."

As the City has repeatedly stated here and in other contexts of this lawsuit, this is *not* a regulatory case. Monsanto concludes its Motion by not only misstating the "environmental contamination" definition of AO9, by quoting Bell's *Real Estate Damages* book out of context, and then jumping to the fanciful conclusion that somehow "Defendants are not liable *as a matter of law* for the City's parcels with alleged PCB contamination below the action level…" without citation, analysis or even a rationale.

## CONCLUSION

Dr. Randall Bell's anticipated testimony is more likely than not going to be very helpful to the jury in assessing and ultimately deciding relevant complex real estate appraisal damages concepts and terminology in this environmental contamination lawsuit. He has utilized the real estate appraisal industry guidelines, standards, opinions, and peer reviewed literature, in addition to his own seminal textbook, in appropriately applying the cost effect; use effect; and risk effect damages methodology with which even the Monsanto appraiser experts agree. If there is any

---

[69] Roddewig authored an article about the Palestine, Ohio, train derailment and associated chemical contamination in The Appraisal Institute's *Valuation* magazine in Spring 2023 entitled: "Off the Rails." In his article, Roddewig attempted to "define" AO9's definition of "environmental contamination" as "adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil," and that the releases *generally must* "exceed regulatory limits…" (italics added). When confronted about this misstating of AO9 in his deposition in the matter of *Grey Fox, LLC, et al. v. Plains All American Pipeline, L.P.*, No. 16-cv-3157 (C.D. Cal. Sept. 28, 2021), Roddewig quickly backtracked and agreed that the clause should read: "*Generally*, the releases of such substances *would* exceed…" Ex. 14 - Roddewig Deposition, 99:22-25---101:24. When asked why he included the word "must" in his article even after he proofed it, Roddewig testified he could not remember. 101:5-24.

"shaky" testimony forthcoming from Bell, and as per the caselaw cited herein, Monsanto can crossexamine Bell and make their points accordingly. The Motion to Exclude should be denied in its entirety.

Dated: April 4, 2025

Respectfully Submitted,

**THE DRISCOLL FIRM, P.C.**

By:   */s/ Paul W. Johnson*
Paul W. Johnson, #6193774
Christopher J. Quinn, #6310758
211 N. Broadway, Suite 4050
St. Louis, MO 63102
Phone: (314) 932-3232
Fax: (314) 932-3233
paul@thedriscollfirm.com
chris@thedriscollfirm.com

**SMOUSE & MASON, LLC**
Roy L. Mason, #938118
Zachary E. Howerton, #151215033
233 Duke of Gloucester Street
Annapolis, MD 21401
Phone: (410) 269-6620
Fax: (410) 269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

**THE DRISCOLL FIRM, P.C.**
Matthew J. Limoli, #6328051
434 Fayetteville Street, Ste. 560
Raleigh, NC 27601
Phone: (919) 582-6516
matthew@thedriscollfirm.com

**CHATHAM & BARICEVIC**
John Baricevic, #3121537

**THE DRISCOLL FIRM, LLC**
John J. Driscoll, #6276464
1311 Avenida Ponce de
Leon, 5th Floor
1825 San Juan, PR 00907
Phone: (618) 444-6049
Fax: (314) 932-3233
john@jjlegal.com

**MILBERG, COLEMAN, BRYSON, PHILLIPS, GROSSMAN, PLLC** Paul
Andrew A. Lemmon (#18302)
5301 Canal Boulevard
New Orleans, LA 70124
Phone: (985) 783-6789
Fax: (202) 318-5306
alemmon@milberg.com

**MILBERG, COLEMAN, BRYSON, PHILLIPS, GROSSMAN, PLLC**

21

Grey Chatham, #6312518
107 W. Main Street, Suite 1
Belleville, IL 62220
Phone: (618) 233-2200
Fax: (618) 233-1589
john@chathamlaw.org
greyjr@chathamlaw.org

Melissa Sims, #6231297
800 S. Gay Street Suite 1100
Knoxville, TN 37929
Phone: 815-878-4674
Fax: 865-522-0049
msims@milberg.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 4, 2025, the foregoing document was electronically filed with the Clerk of Court and will be served by operation of the Court's CM/ECF system upon all registered parties. The foregoing document also was served via electronic mail upon:

Philip Rice
Rice Law Offices
110 E. Lincoln Street
Belleville, Illinois 62220
price@ricelawoffices.com

*/s/ Paul W. Johnson*