# EXHIBIT 1



Appraisal Institute®

Professionals Providing
Real Estate Solutions

# Real Estate Damages

**Third Edition**

By Randall Bell, PhD, MAI

BACK_DEFEXP-RR-003818

# Real Estate Damages

BACK_DEFEXP-RR-003819

Readers of this text may be interested in the following publications from the Appraisal Institute:

- *The Appraisal of Real Estate*
- *Appraising Industrial Properties*
- *The Dictionary of Real Estate Appraisal*
- *Scope of Work*
- *Valuing Contaminated Properties: An Appraisal Institute Anthology*

BACK_DEFEXP-RR-003820



Professionals Providing
Real Estate Solutions

# Real Estate Damages

### Third Edition

By Randall Bell, PhD, MAI

Appraisal Institute • 200 W. Madison • Suite 1500 • Chicago, IL 60606 • www.appraisalinstitute.org

The Appraisal Institute advances global standards, methodologies, and practices through the professional development of property economics worldwide.

BACK_DEFEXP-RR-003821

*Reviewers:* Michael S. MaRous, MAI, SRA

Nick A. Tillema, MAI, SRA, AI-GRS, AI-RRS

Larry T. Wright, MAI, SRA, AI-GRS

*Chief Executive Officer:* Frederick H. Grubbe, MBA, CAE

*Director of Professional Services and Resources:* Evan R. Williams, CAE, IOM

*Senior Manager, Publications:* Stephanie Shea-Joyce

*Senior Technical Book Editor:* Emily Ruzich

*Manager, Book Design/Production:* Michael Landis

**For Educational Purposes Only**

The materials presented in this text represent the opinions and views of the author. Although these materials may have been reviewed by members of the Appraisal Institute, the views and opinions expressed herein are not endorsed or approved by the Appraisal Institute as policy unless adopted by the Board of Directors pursuant to the Bylaws of the Appraisal Institute. While substantial care has been taken to provide accurate and current data and information, the Appraisal Institute does not warrant the accuracy or timeliness of the data and information contained herein. Further, any principles and conclusions presented in this publication are subject to court decisions and to local, state and federal laws and regulations and any revisions of such laws and regulations.

This book is sold for educational and informational purposes only with the understanding that the Appraisal Institute is not engaged in rendering legal, accounting or other professional advice or services. Nothing in these materials is to be construed as the offering of such advice or services. If expert advice or services are required, readers are responsible for obtaining such advice or services from appropriate professionals.

**Nondiscrimination Policy**

The Appraisal Institute advocates equal opportunity and nondiscrimination in the appraisal profession and conducts its activities in accordance with applicable federal, state, and local laws.

© 2016 by the Appraisal Institute, an Illinois not for profit corporation. All rights reserved. No part of this publication may be reproduced, modified, rewritten, or distributed, either electronically or by any other means, without the express written permission of the Appraisal Institute.

**Library of Congress Cataloging-in-Publication Data**

Names: Bell, Randall, author.
Title: Real estate damages / by Randall Bell, PhD, MAI.
    Description: Third edition. | Chicago, IL : Appraisal Institute, [2016] |
Includes bibliographical references and index.
Identifiers: LCCN 2016013284 | ISBN 9781935328667
Subjects: LCSH: Real property--Valuation--United States. | Damages--United
    States. | Real property--Valuation--United States--Case studies.
Classification: LCC HD1389.5.U6 B45 2016 | DDC 333.33/2--dc23 LC record available at
https://lccn.loc.gov/2016013284

BACK_DEFEXP-RR-003822

Copyrighted Material Provided by Richard J. Roddewig – June 2016

# Table of Contents

**About the Author**................................................................................................................................ix

**Acknowledgments**...............................................................................................................................xi

**Foreword** ...............................................................................................................................................xv

**Preface**................................................................................................................................................xvii

**Introduction.**    Fundamentals of Property Valuation ..............................................................................1

**Chapter 1.**    General Conditions ...................................................................................................19
    Santiago Landslide Case Study
        *Michael V. Sanders, MAI, SRA* ......................................................................67

**Chapter 2.**    Transactional Conditions.........................................................................................73
    Feng Shui Case Study
        *Orell C. Anderson, MAI*..................................................................................89

**Chapter 3.**    Distress and Sociological Conditions......................................................................93
    Luby's Cafeteria Case Study
        *Randall Bell, PhD, MAI, and Orell C. Anderson, MAI*...........................107

    September 11 Case Study
        *Randall Bell, PhD, MAI*............................................................................... 108

    Sandy Hook Case Study
        *Randall Bell, PhD, MAI*............................................................................... 121

**Chapter 4.**    Legal Conditions..................................................................................................... 123
    Pacific Motel Case Study
        *Orell C. Anderson, MAI*............................................................................... 130

**Chapter 5.**    External Conditions ............................................................................................... 137
    Sea-Tac International Airport Case Study
        *Hellmuth, Obata + Kassabaum, Inc.*
        *Raytheon Infrastructure Services, Inc.*
        *Thomas Lane & Associates, Inc.*
        *Michael J. McCormick, AICPA*..................................................................... 148

    Florida Airport Noise Case Study
        *Randall Bell, PhD, MAI*............................................................................... 154

BACK_DEFEXP-RR-003823

**Chapter 6.** Building and Manufacturing Conditions ..........................................................173
Legacy Hills Subdivision Case Study
*Michael V. Sanders, MAI, SRA* .................................................................. 182

**Chapter 7.** Site and Infrastructure Conditions ..................................................... 185
Benedict Canyon Landslide Case Study
*Randall Bell, PhD, MAI* .................................................................. 199

**Chapter 8.** Environmental and Biomedical Conditions.................................................... 203
Love Canal Case Study
*Randall Bell, PhD, MAI* .................................................................. 243

**Chapter 9.** Conservation Conditions ......................................................................... 249
Yuba River Floods Case Study
*Burrell E. Montz and Graham A. Tobin* .................................................. 265

**Chapter 10.** Natural and Climate Conditions ..........................................................277
Alaskan Good Friday Earthquake Case Study
*Randall Bell, PhD, MAI* .................................................................. 301

**Chapter 11.** Admissibility of Expert Testimony
*Richard J. Tyler* .............................................................................. 305

**Chapter 12.** Completing a Reliable Damage Analysis........................................................ 313

**Additional Case Studies**

Simpson Condominium
*Randall Bell, PhD, MAI*.................................................................. 329

Industrial Building
*Michael V. Sanders, MAI, SRA* .................................................................. 331

Oklahoma Federal Building
*Randall Bell, PhD, MAI*.................................................................. 334

Weatherby Pointe
*Orell C. Anderson, MAI*.................................................................. 336

Single-Family Residential
*Michael V. Sanders, MAI, SRA* .................................................................. 342

Bruce McNall House
*Randall Bell, PhD, MAI*.................................................................. 343

Davis Building
*Mark W. Smith, MAI*.................................................................. 344

Hill View Development
*Joseph Haeussler, MAI*.................................................................347

California Airport Noise Impact
*Randall Bell, PhD, MAI*.................................................................. 350

Hollywood Boulevard Sinkhole and Subsidence
*Orell C. Anderson, MAI*.................................................................. 354

Nonphysical Damage–Fractional Discounts
*Dennis A. Webb, MAI, ASA, MRICS*.................................................................. 356

Townhome Project
*Michael V. Sanders, MAI, SRA* .................................................................. 360

BACK_DEFEXP-RR-003824

Durham Woods
*Randall Bell, PhD, MAI*.................................................................................. 362

Desert Resort Subdivision
*Mark W. Smith, MAI*...................................................................................... 364

Beverly Hills Estate
*Randall Bell, PhD, MAI*.................................................................................. 368

Krantz House
*Joseph Haeussler, MAI*................................................................................... 372

Bark Beetle Infestation
*Orell C. Anderson, MAI*................................................................................. 375

Ashby Building Leaking Underground Storage Tank
*Randall Bell, PhD, MAI*..................................................................................377

Three Brownfields
*Gregory D. Trimanche and Craig A. Moyer*.................................................. 380

Degrees of Indemnification
*Richard A. Neustein, MAI, SRA*..................................................................... 384

Exxon Valdez Oil Spill
*Randall Bell, PhD, MAI*.................................................................................. 386

Three Mile Island
*Randall Bell, PhD, MAI*.................................................................................. 388

Sinkholes
*Sandra Laudone, MAI, SRA* .......................................................................... 391

Dahmer Apartment Building
*Orell C. Anderson, MAI*................................................................................. 393

**Appendix A.**    Federal and State Agencies.................................................................. 397

**Appendix B.**    Online Sources of Public Disclosure Information ......................................... 439

**Appendix C.**    Associations and Periodicals................................................................ 441

**Glossary**.................................................................................................................. 455

**Bibliography**...........................................................................................................471

**Index** .................................................................................................................... 497

BACK_DEFEXP-RR-003825

BACK_DEFEXP-RR-003826

# About the Author

Randall Bell, PhD, MAI, specializes in real estate damage economics and strategy. He has traveled extensively in his research of detrimental conditions and the impact they have on real estate values. Founded upon this research, he has written various specialized methodologies, which were the basis for the *Detrimental Conditions* seminar developed by the Appraisal Institute.

Dr. Bell is also the author of *Rich Habits Rich Life, Strategy 360: 10 Steps for Creating a Complete Game Plan for Business & Life* as well as *Disasters: Wasted Lives, Valuable Lessons.* He also authored the Owners Manual series, including the *Home Owners Manual* and the *Property Owners Manual*, as well as numerous articles that have been published in various professional journals. He has lectured internationally on the topic of property damages and mitigation strategies.

Often quoted in the media, Dr. Bell's career has been profiled on many occasions. He has appeared in *The Wall Street Journal*, the *San Francisco Chronicle*, *People* magazine, the *Chicago Tribune*, *The New York Times*, and the *Los Angeles Times*, and on all major television networks, ABC's "20/20," and CNN. Additionally, his career has been profiled by the media in Europe, Asia, and Australia.

Dr. Bell has an MBA in real estate from the University of California, Los Angeles, and a BS in finance and accounting from Brigham Young University. He is a native of Southern California, where he resides with his wife, Melanie, and their four children, Michael, Steven, Britten, and Drake.

BACK_DEFEXP-RR-003827

BACK_DEFEXP-RR-003828

# Acknowledgments

In the early 1990s, a rash of problems hit Southern California. They included the Malibu floods and fires, the Los Angeles riots, the contamination of much of the city of Avila Beach, the Laguna Niguel landslides, the O. J. Simpson murder trial, the Laguna Canyon floods and firestorms, and the Northridge earthquake. Of course, these situations damaged many properties and, like other appraisers in the area, I received many assignments to determine the impact that these events had on property values. Aside from these issues, my family had just moved to a new house. While I knew that it was near a small sewage treatment plant, I was not aware that the plant was soon to be expanded. On top of that, the area had expansive soils and slope creep, and would be in an area near the flight path for a proposed international airport. Shortly after moving, an earthquake cracked our swimming pool. Both my business and home life were now filled with situations that I came to call *detrimental conditions.*

Faced with this, I researched extensively to create a central source to deal with the valuation of properties affected by these types of situations. I found that many outstanding articles have been written on the specific topics of environmental contamination, airport noise, crime scene stigma, geotechnical issues, and so forth. However, I could not find anything that addressed all these situations collectively, and a universal valuation methodology was nowhere to be found.

Consequently, I listed all the situations that I was dealing with and started categorizing them. This eventually evolved into a chart that I started using in my practice. One day I showed the chart to my friend and colleague, Joanne Cheynne, SRA, a leading residential appraiser. Joanne then told me that she was responsible for organizing 10 seminars for the Summer Seminar Spectacular in Anaheim, California, that she only had found nine, and that I would be the tenth. Her faith in me prompted an amazing journey.

After the Anaheim seminar, Misa Zane, MAI, approached me and asked if I would like to teach the seminar in Hawaii. After considering her offer for about a second, I agreed. That seminar led to others, and eventually the *Detrimental Conditions* seminar was approved and sponsored nationally by the Appraisal

BACK_DEFEXP-RR-003829

Institute. From there, I traveled extensively around the country and the world conducting research and lecturing, and I had an amazing experience.

There were many important people who unselfishly contributed their support, time, and talents to this book effort, and I wish to thank them. First, I wish to acknowledge the authors of the many articles and papers written on various property damage-related topics. Many of them were very helpful in developing a detrimental condition valuation methodology, and they are referenced in the Bibliography. Next, my great friend and colleague, Orell C. Anderson, MAI, assisted me greatly along the way. He received many late night phone calls and faxes and always provided invaluable insight and feedback as I obsessed over refining the detrimental condition matrix, models, and charts. Along with Orell, I surrounded myself with technical advisors whom I consider to be some of the brightest minds in the profession. They are Michael V. Sanders, MAI, SRA, Richard Neustein, MAI, SRA, and Valeo Schultz. I greatly thank them.

Ted Whitmer, MAI, AI-GRSN, is probably the nation's best-known and most-liked appraiser. In spite of his busy schedule, he provided considerable technical insight as well as invaluable encouragement and wisdom regarding the dynamics of the appraisal community. My good friend (and Spanish interpreter) Neil Balholm provided an outstanding tour of the earthquake damage in Mexico City. Duane King and Jon Wilcox, also great friends and well-known Los Angeles bankers, provided extensive tours of fire-damaged properties in Malibu.

One night I watched a documentary on television about the great Alaskan earthquake of 1964. A woman relayed the ordeal she experienced as a young girl, clinging to the roof of her home with her family as tidal waves continuously pounded them throughout the night. Wanting to study the long-term effects on real estate, I called the only person I knew in Alaska, a prominent appraiser by the name of Steve MacSwain, MAI, who I had met when I lectured at the national conference of the Appraisal Institute in Washington, D.C. Steve graciously offered to show me around Alaska. When I arrived there I learned, in an amazing coincidence, that it was his wife, Linda, whom I had seen on TV. On top of this, Steve had done much of the appraisal work on the Exxon Valdez oil spill. Together they provided one of the most amazing tours of my professional life.

I also had the honor of meeting a group of prominent appraisers in Hawaii who provided invaluable insight as I visited the sites of some of the most spectacular natural disasters in the world, ranging from landslides and rockslides to volcanoes and tidal waves. These appraisers are Misa Zane, MAI, Cary Murakami, John Tuquero, Walter Jung, SRA, J. Michael Chun, SRA, Harlin S. K. Y. Young, MAI, SRA, and Tom Miyata. J. D. Eaton, MAI, SRA, a well-known appraiser and author, patiently answered many questions about the Mount St. Helens volcano eruptions and the residual effects on real estate. Also, attorney John Van Vlear provided significant data on environmental contamination. Steve Yoblanzki, the attorney who successfully defended Occidental Chemical in the Love Canal litigation, provided many interesting and useful documents relating to the most famous environmental contamination case in the world. Joe Haeussler, MAI, a friend and former colleague at Bell & Associates, Inc., conducted considerable research. I also wish to thank Nick A. Tillema, MAI, SRA, AI-GRS, AI-RRS.

BACK_DEFEXP-RR-003830

Rudy Robinson, MAI, SRA; Wayne Hunsperger, MAI, SRA; Joe Campanella, MAI; and Mike Hedden, MAI: Each of these individuals works extensively in the field of property damages and has provided me with important insights.

Ted Slack, MAI, SRA, one of the best known instructors for the Appraisal Institute, along with his wife, Sue Slack, MAI, SRA, as well as Diane Gilbert, MAI, SRA, and Chris Moore, MAI, all provided considerable information, including a tour of Miami. Edward N. Parker, MAI, got up early one Saturday morning to provide a tour of properties damaged by Hurricane Andrew on the east coast of Florida. Dan Jalbert, MAI, provided various items of research he conducted on recent legislation of disclosure issues in Massachusetts.

Maureen Kanka, the mother of Megan Kanka, shared many difficult and incomprehensible experiences with me about the tragic loss of her daughter and recounted to me the events that occurred within her neighborhood. Her activism resulted in the federal legislation of "Megan's Law." Louis Brown, the father of Nicole Brown Simpson, shared many of his experiences with me, as did Sam Kouthesfahani, PhD, the owner of the Heaven's Gate mansion in Rancho Santa Fe, California. These conversations provided invaluable insight into the dynamics and profound impact of market resistance, or "stigma."

I had written this book by the time that I joined Price Waterhouse in 1997 and founded the Real Estate Damages practice there. Nonetheless, two of the firm's partners, Robert Knudsen and George Strong, encouraged me to use the resources of the firm to make further enhancements. As a result, my research team at Price Waterhouse provided details that I added to the book. At what would become the world's largest consulting firm of PricewaterhouseCoopers, Jim Chalmers, PhD, provided a review of the manuscript that prompted some refinements.

Of course, I believe that this book is greatly enhanced by the many case studies that were contributed, and my thanks go out to each of those authors. I appreciate Peter Bernstein providing the aerial photographs. I must also thank all the people responsible for research and other contributions who haven't yet been mentioned: Barry J. Alperin, MAI, AI-GRAN, ASA; Stephanie Cochran; Brandon Dickens; John Ellis, MAI; Steve Johnson; Gary Justiss; James Kearns, SR/WA; Daniel Kim; Jeff Leedom; Kelly Mellahan; Bryan Merica; Craig A. Moyer; Rebecka Nevarez; Ronald A. Oppedisano, MAI; Ken Rugeti; Michael Terry; and Gregory D. Trimarche.

As I have lectured and taught the seminar around the country, I have had the benefit of receiving comments, letters, and feedback from hundreds of very intelligent people, many of whom are members of the Appraisal Institute, and I thank them. My invitation to lecture in South America at an international conference sponsored by UPAV was a great honor. There I addressed real estate experts from many countries. From that conference and others, I gained considerable insight into detrimental conditions all over the world, including Russia, Japan, Chile, Germany, and China.

The people of the Appraisal Institute have been incredible, and I have tremendous respect for the organization, the staff, and many of its members. I wish to specifically thank the Appraisal Institute's book editor, publications manager, client education manager, and tech-based education manager.

*Acknowledgments*    **xiii**

BACK_DEFEXP-RR-003831

When the first edition of *Real Estate Damages* was published in 1999, it broke new ground as the first text to address detrimental conditions. Since then, I have received considerable feedback. We have all witnessed an even more pressing need for expertise in this area, especially in light of events such as September 11 and Hurricane Katrina. In addition to all those who helped with the first edition, I wish to thank those who assisted with the second edition, including Steve Valdez, Christina Cowan, and Dennis Nowicki, as well as our dedicated office staff of Barbara Dyvig and Bobbie Caraway.

In 1999, the Real Estate Damages practice was established at Bell Anderson & Sanders LLC. Later, my two partners, Michael V. Sanders, MAI, SRA, and Orell C. Anderson, MAI, agreed to be contributing authors for the second edition. This meant that the book was carefully and extensively updated to reflect new concepts and information that has been researched and monitored since the first edition was published. In the process of completing the second edition, I was impressed that the first edition was fundamentally sound, especially considering that it was pioneering new territory. On the other hand, the book needed to be carefully examined and fully updated. Mike and Orell provided invaluable insights and work in producing the second edition, and I thank them.

The Real Estate Damages practice is now established at Landmark Research Group, LLC. I wish to thank Tyler Baird, Michael Tachovsky, Michael Bell, Britten Bell, Terrance Dickens, Steven Bell, and Shelley Bird.

A great deal of thanks goes to Richard J. Tyler, who is a partner with the law firm Jones Walker LLP and a resident in its New Orleans Office. He is a member of the firm's Business and Commercial Litigation Practice Group, and his practice is focused on the resolution of disputes involving construction and real estate matters. Mr. Tyler contributed Chapter 11 of this book, "Admissibility of Expert Testimony."

The Appraisal Institute has long been considered as the premier organization with regards to the valuation of real estate. With this book going into its third edition, it is clear that the Appraisal Institute can also be considered the apex source of diminution in value issues. I again thank the staff and members of the Appraisal Institute for many years of support.

Finally, this book involved a period of considerable travel and many nights and weekends of exhaustive research and writing. Though all of this, my family has been wonderfully supportive, and I give them my greatest thanks.

BACK_DEFEXP-RR-003832

# Foreword

The events that make news often involve death and destruction, including natural disasters, crime, and environmental contamination. Many of these catastrophic events are life-changing for the people involved and, as a practical consideration, they impact property values. Most appraisers will be asked to appraise a property that has been affected by detrimental conditions at some point in the course of their careers.

*Real Estate Damages* breaks down the expansive topic of damaged real estate in an organized and easy-to-understand manner. In this third edition, new discussions have been added on controversial topics including cellular towers, strip mining, fracking, and climate change. New case studies have been added as well, including an in-depth look at the Flight 93 crash site and other memorial sites. This comprehensive resource also provides updated and expanded listings of useful print and online resources and relevant agencies and associations.

In the analysis of detrimental conditions, it is important that the appraiser be knowledgeable about the available tools of analysis, properly select and apply these tools, use relevant market data to support opinions and conclusions, and avoid unproven or suspect methodologies. We hope this new edition of *Real Estate Damages* will serve as an invaluable guide to help appraisers tackle unique, complicated, and sometimes difficult assignments involving damaged real estate.

**Scott Robinson, MAI, SRA, AI-GRS**
2016 President
Appraisal Institute

BACK_DEFEXP-RR-003833

BACK_DEFEXP-RR-003834

Copyrighted material issued by Hubbard P. and Covington June 20, 2016

# Preface

This third edition of *Real Estate Damages* begins with an Introduction that discusses the fundamentals of property valuation and includes a new discussion of research methods. Chapter 1 provides a brief overview of general conditions and a general introduction to detrimental conditions. The application of the cost approach, sales comparison approach, and income capitalization approach to the valuation of properties with detrimental conditions is also included in Chapter 1.

Chapter 2 focuses on different types of transactional conditions, including real estate economics, assemblage, distress sales, 1031 exchanges, and market trends. A discussion of project delay has also been added to this chapter. Chapter 3 examines distress and sociological conditions, such as crime and terrorist attacks. Chapter 4 zeroes in on legal conditions, including eminent domain, temporary construction easements, absorption, lease positions, and title defects. Chapter 5 addresses the external conditions of airport noise, transmission lines, cellular towers, and view and privacy issues, and Chapter 6 discusses building and manufacturing conditions, such as construction issues, infestation, and lack of compliance with the Americans with Disabilities Act (ADA). Chapter 7 covers site and infrastructure conditions, specifically soil and geotechnical construction issues. Chapter 8 provides a thorough discussion of a variety of environmental and biomedical conditions, including fracking, different types of environmental contaminants, and environmental regulations. Chapter 9 discusses conservation conditions, which include natural resources, historic properties, and cultural resources. Chapter 10 covers natural and climate conditions and disasters such as earthquakes, flooding, volcanoes, hurricanes, and tornadoes. Chapter 11 explores the admissibility of expert appraisal testimony in court. Chapter 12, the final chapter, provides pointers for completing a reliable damage analysis and discusses appraiser competence and ethics.

Most chapters are immediately followed by case studies that illustrate some of the important concepts presented in the text. Additional case studies are also included at the back of the book for further illustration. This edition of *Real Estate Damages* also includes updated listings of important federal and state agencies

BACK_DEFEXP-RR-003835

(Appendix A), online sources of public disclosure information (Appendix B), and
relevant associations and periodicals (Appendix C). A glossary and bibliography
with suggestions for further reading are also provided.

BACK_DEFEXP-RR-003836

*Copyrighted material used solely by Richard R. Hardington, June 20, 2006*

# Introduction

## Fundamentals of Property Valuation

The events that make newspaper headlines and lead news updates at the top of the hour often involve death and destruction—floods, earthquakes, tornadoes, terrorist attacks, environmental contamination, crime, and catastrophic disasters. The list goes on and on. In the aftermath of a damaging event, firefighters put out the fires and rescue the victims, paramedics treat the survivors, police arrest the criminals, lawyers have trials, and reporters tell the stories. Many of these events are very emotional for the participants involved. These situations also involve practical considerations, including the impact that the event may have on property values.

An old and oversimplified real estate adage states that real estate values are driven by "location, location, location." Clearly, there are many important issues in real estate other than location. One way to view the concept of "value" is to consider that the needs, tastes, fears, sensitivities, desires, and anticipations of sellers and buyers are being translated into a number or price. To accurately analyze real estate, one must be able to monitor and interpret the actions of the participants in the market. After all, properties do not deal with one another, but people do. When carefully considered, all the factors that have an influence on a property's desirability, and therefore its value, are traced back to the market's perceptions. To truly understand real estate valuation, one must conscientiously focus on and measure these perceptions. Buyers typically want the largest discounts they can get for damaged real estate. On the other hand, sellers are often resilient and often want to maximize their sales prices. This interplay of interests is an important ingredient for studying real estate damage economics. In fact, a more accurate adage may be that real estate values are driven by "perception, perception, perception."

To understand perceptions within the real estate market, market data must be used to measure how the market actually reacts. A property is considered "innocent" until a negative impact is demonstrated through an analysis of relevant market data. The simple assumption that an incident caused a diminution in value is one of the most common errors in the field. These are sometimes called

BACK_DEFEXP-RR-003837

*ipse dixit* opinions of value. *Ipse dixit* is a Latin term essentially meaning "It is because I said so," or "It is just the way it is" without the benefit of any actual support or critical thinking. It is the antithesis of any position that has timely, reasoned support or evidence.

Real estate values are estimated through the application of the three traditional approaches to value, and volumes have been written on the many facets of real estate economics, principles of value, and the appraisal process. However, when real estate is damaged or impaired, an additional and often more complex analysis is required. At this point, the assignment changes from an appraisal to a damage analysis. Although these studies of property damages can be very involved, they are in fact based on the same fundamental economic and valuation principles. The traditional appraisal techniques provide the foundation on which an analysis of real estate damages and detrimental conditions may be made.

The term *unimpaired value* refers to the value of a property as if no detrimental condition exists (i.e., the baseline value), while the term *impaired value* reflects the value of the property with the influence of a detrimental condition. An estimate of the unimpaired value is often part of a detrimental conditions assignment because the effect of the detrimental condition is usually at issue. The measure of the effect or damages may be the difference between the unimpaired and impaired values. Sometimes, however, if a market transaction has established the value of the property as impaired, then the essence of the assignment is to estimate the unimpaired value. At other times, the unimpaired market value is known and not at issue, and the remaining task is to estimate the impaired value. Lastly, if a diminution in value study is completed first and no damage is indicated, the unimpaired value may not be relevant.

Estimation of the unimpaired value does not differ from a traditional appraisal assignment, except that the value estimate often refers to some retrospective date–i.e., the date of the damage or the date the damage was discovered. At this starting point, the unimpaired value can be derived by the application of several fundamental appraisal concepts and one or more of the three traditional approaches to value.

**Exhibit I.1**    **The Bundle of Rights**



## Ownership Rights

Understanding ownership rights is essential in any valuation assignment, including the valuation of damaged real estate. The most complete ownership of real estate is the fee simple estate, which is the complete and total bundle of rights, as shown in Exhibit I.1. The fee simple estate is subject only to taxes (i.e., property taxes), police power (i.e., zoning and other land use regulations), eminent domain

BACK_DEFEXP-RR-003838

(the sovereign right of the government to take property for the public good and pay just compensation to the owner), and escheat (governmental intervention if the owner dies with no will).

Portions of the bundle of rights may be broken off, given away, or sold. For example, the right to occupy the property may be given to another party in return for a rental or lease payment. In this case, the fee simple owner becomes the owner of a leased fee estate (or lessor), and the tenant (or lessee) has a leasehold estate.

## Principles of Regression and Conformity

Two other important concepts in the valuation of real estate are the principles of regression and conformity, which are illustrated in Exhibits I.2 and I.3. Property values are negatively impacted when surrounding properties are of lesser



**Exhibit I.2    Principle of Regression**

A property's value is negatively impacted when surrounded by properties of lesser value.



This property will tend to be worth less.

A property of lesser value tends to be enhanced when the adjoining property values are high.



This property will tend to be worth more.

*Fundamentals of Property Valuation*    **3**

BACK_DEFEXP-RR-003839

**Exhibit I.3**   **Principle of Conformity**

Property values are optimal and maximized when a property generally conforms to the surrounding properties. Values are negatively impacted when a property does not.



value. Conversely, a property of lesser value is enhanced when the adjoining property values are high. For example, a run-down house in an expensive beach community tends to be worth much more than the same house in a community where all the houses are in bad condition. On the other hand, it is generally not a good idea in terms of optimal value to buy or build the biggest and best house in the neighborhood. Optimal property values are generally experienced when the properties within a neighborhood exhibit a reasonable degree of conformity, which is one of the hallmarks of the "planned community" concept.

## The Appraisal Process

The appraisal process involves three main tasks, as shown in Exhibit I.4.

1. Defining the appraisal problem
2. Describing the subject property
3. Analyzing the property and reconciling its value

BACK_DEFEXP-RR-003840

Copyrighted material used solely by Richard R. Cunningham, June 20, 2016

**Exhibit I.4**     Appraisal Flow Chart



Defining the appraisal problem involves identifying the subject property, usually by address, assessor parcel, or legal description. The rights involved and the scope of work of the appraisal assignment must also be discussed.

The Uniform Standards of Professional Appraisal Practice (USPAP) define the scope of work as "the type and extent of research and analyses in an appraisal or appraisal review assignment." According to USPAP's Scope of Work Rule,

> For each appraisal and appraisal review assignment, an appraiser must:
>
> 1. identify the problem to be solved;
> 2. determine and perform the scope of work necessary to develop credible assignment results; and
> 3. disclose the scope of work in the report.
>
> An appraiser must properly identify the problem to be solved in order to determine the appropriate scope of work. The appraiser must be prepared to demonstrate that the scope of work is sufficient to produce credible assignment results.

BACK_DEFEXP-RR-003841

<u>Comment</u>: Scope of work includes, but is not limited to:

- the extent to which the property is identified;
- the extent to which tangible property is inspected;
- the type and extent of data researched; and
- the type and extent of analyses applied to arrive at opinions or conclusions.

Appraisers have broad flexibility and significant responsibility in determining the appropriate scope of work for an appraisal or appraisal review assignment.

Credible assignment results require support by relevant evidence and logic. The credibility of assignment results is always measured in the context of the intended use.[1]

There are various definitions of the term *value*. Commonly, the term *value* is used to denote *market value*. The definition used should be clearly stated in the appraisal report. Depending on the scope of work, an appraisal can include a general description of the area, a market analysis, and a description of the site as well as any improvements. Of course, like any valuation assignment, the date of value is a critical issue in measuring real estate damages, as values change over time.

Next, a study of the property's highest and best use may be completed to determine the highest and best use of the land as if vacant and as improved. In such an analysis, the physically possible, legally permissible, financially feasible, and maximally productive uses are considered. This is an involved process that may include a market analysis considering the use for the land as if vacant and as if improved, as well as discussions of the physical use, the timing of the use, and the most probable use with and without the effects of the detrimental conditions. Like a funnel, highest and best use analysis narrows down the options to a final conclusion as to the maximally productive use of the property, as shown in Exhibit I.5.

Once the highest and best use is determined, the property may be valued by employing the three approaches to value: the cost approach, the sales comparison approach, and the income capitalization approach. Each approach represents a technique by which market data may be processed into an indication of value. All three approaches to value are, in essence, market data approaches because the data inputs are derived from the market.

The cost approach in appraisal analysis is based on the proposition that an informed buyer will pay no more than the cost of producing a substitute property with the same utility as the subject property. This approach is particularly appropriate when the property being appraised

**Exhibit I.5**    **Highest and Best Use "Funnel"**



Physically Possible

Legally Permissible

Financially Feasible

Maximally Productive

---

1. Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice (USPAP)*, 2016-2017 ed. (Washington, D.C.: The Appraisal Foundation, 2015), 4, 14.

BACK_DEFEXP-RR-003842

*Copyrighted material used by Richard R. Crissie, June 20, 06*

includes relatively new improvements that represent the highest and best use of the land, when relatively unique or specialized improvements are located on the subject site, or when market data on similar properties cannot be obtained. Simply stated, in the cost approach, an indication of value is estimated by adding the land value to the depreciated value of the improvements.

In the sales comparison approach, the market value estimate is based on the prices paid in actual market transactions and on listings or offers to buy or sell. This approach involves analyzing sales of comparable properties with relevant sales dates to derive an indication of the most probable sale price of the property being appraised. For single-family residences, the price of each comparable sale may be analyzed, with adjustments made for significant physical and locational differences between the comparable and the subject property. The adjustment process can also be applied to commercial and industrial properties, which are often compared on a price-per-square-foot basis.

The income capitalization approach converts anticipated income to be derived from the ownership of the property into a value estimate. This approach is widely applied in appraising income-producing properties. Anticipated future income or reversions are converted to present value through a capitalization or discounting process. The most common process is based on a relationship that exists between value, income, and rate. The net operating income ($I$) divided by the rate (capitalization rate, or $R$) results in an indication of value ($V$). A means of extracting the capitalization rate from the market is to divide the income by the sale price of a comparable transaction. A simple example of deriving an indication of value from the income capitalization approach would begin by calculating the net operating income and then dividing it by the capitalization rate. By using a market-derived capitalization rate, the net income can then be capitalized into an indication of value. The income capitalization approach can also include a discounted cash flow analysis, whereby the cash flow is projected for a certain period and then converted into a present value based on a selected yield rate ($Y$).

By using one or more of the three approaches to value and ignoring the effects of the detrimental condition, a value as if no detrimental condition exists, also known as the unimpaired or "baseline" value, may be derived. This generates a benchmark for the following studies that establish the effect, if any, on the value of the property caused by the detrimental condition.

## Research Methods

In the fields of real estate valuation, consulting, and economics, quality of information is paramount. Conducting research is an essential skill set for real estate professionals. *Epistemology* addresses the questions surrounding knowledge and how it is developed. Valuation is firmly grounded in the field of epistemology and fully reconciles with the most rigorous scientific research standards. In fact, the valuation process as set forth by USPAP and the Appraisal Institute employs not just one or two but a complete spectrum of established academic research meth-

BACK_DEFEXP-RR-003843

odologies. There are many types of research, and these methods can be applied to investigate questions and provide reliable conclusions. Because real estate professionals have an absolute dependence on information, understanding various research methods is critical. The selection of the appropriate method or methods is important, as is their application. Researcher bias can be an issue in any type of research. The investigator needs to set aside theoretical ideas or notions as much as possible so that the analytic, substantive understandings can emerge.[2]

Inevitably, virtually all researchers will make claims of having conducted creditable research. A working knowledge of research methods can make one aware of the mischievous, reckless, or unethical use of research by others.[3] Knowledge of the various research methods can enhance one's awareness of the methods that others purport to use and thereby put one in a better position to review, critique, and assess the reliability of that research.

The valuation process is firmly grounded in epistemology that surrounds economics and sociology. In a single assignment, it is quite conceivable that a researcher would:

- Use multiple research sources (constructionism) and rely upon their general experience (action)
- Demonstrate or acquire geographic competency (ethnography)
- Conduct a literature review and comply with USPAP (hermeneutics)
- Use sale or lease comparables, vacancy rates, expenses, and capitalization rates (empirical research)
- Use adjustment grids or other means to compare and contrast the data (comparative research)
- Have discussions with property owners or managers (testimony); verify the market data with the parties involved or survey participants within the market (phenomenology); and ultimately produce findings that are logical, innate, testable, and repeatable (rationalism)

Understanding the depth and breadth of each research method can result in a higher level of professionalism.

### Empirical Research: Market Data

Empirical research is analytical, objective, controlled, precise, tangible, and measurable. Its origins are found in the movement within the natural sciences to generate studies backed by facts, data, and logic. The word *empirical* derives from the Greek word for experience and simply means "experiential" or "based on experience."[4] Empirical research can take the form of the scientific method, positivism, or analytics and is designed to ultimately answer the researcher's question, "What are the facts?"

---

2. John W. Creswell, *Qualitative Inquiry and Research Design: Choosing Among Five Approaches* (Thousand Oaks, CA: Sage Publishing, 2012).

3. Royce A. Singleton Jr. and Bruce C. Straits, *Approaches to Social Research* (New York: Oxford University Press, 1999).

4. Valerie Malhotra Bentz and Jeremy J. Shapiro, *Mindful Inquiry in Social Research* (Thousand Oaks, CA: Sage Publishing, 1998).

BACK_DEFEXP-RR-003844

Applications of empirical research in real estate include the collection of transactional market data, such as sale or lease comparables, vacancy rates, expenses, and capitalization rates. A key benefit of empirical research methods, such as comparable sales, is that tests can be replicated and measurements can be tested and validated or invalidated by others. A negative aspect of empirical studies is that they can lack the "story behind the data" and are only as good as the data relied upon.

Empirical evidence is inherently objective. In the usual sense of the term, this means that observations are free from emotion, conjecture, or personal bias.

In real estate valuation, empirical data is essential for use in the sales comparison, income capitalization, and cost approaches. This data is also required for both simple and multiple regressions. Case studies can be a valid means of empirical research.[5] These are all staple valuation methodologies.

## Hermeneutics: Utilizing Published Texts

The term *hermeneutics* simply means "the art and science of interpretation." While the term *epistemology* was introduced by the Scottish philosopher James Frederick Ferrier in the 1880s, examples of hermeneutics easily precede this. For example, the concept of hermeneutics was originally brought into broad usage by theologians to interpret the Bible. This form of epistemology quickly spread into other realms as other texts were published and made available. A key benchmark in the progression of hermeneutics came with the interpretation of law and the US Constitution.[6]

Hermeneutics is practiced by a host of professionals in a wide variety of fields. Radiologists interpret X-rays, judges interpret the law, and Wall Street interprets the stock market. Likewise, competent real estate professionals inevitably have a significant library and dedicate a significant amount of time to not only refreshing their knowledge of the fundamentals but also staying current with changes and developments within the profession and real estate markets. Appraisers have an ethical obligation to their profession to conduct research with honesty and integrity as well as an obligation to the general public to promote the beneficial application of research findings.[7] Fortunately, the real estate appraisal profession has accumulated a large body of literature on which to draw.

Appraisal applications of hermeneutics include seminal texts such as the *Uniform Standards of Professional Appraisal Practice* or *The Appraisal of Real Estate*. These and other prominent texts provide written standards and directives for the valuation of real estate.

Because of its advantages and despite its disadvantages, hermeneutics continues to grow in popularity as an epistemological method of research.

---

5.  Thomas Jackson and Randall Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 86-95.

6.  Bentz and Shapiro, *Mindful Inquiry in Social Research*.

7.  Singleton and Straits, *Approaches to Social Research*.

BACK_DEFEXP-RR-003845

## Phenomenology: Verification or Surveys

*Phenomenology* is an attempt to document one's own experience or enter into the mind of another person in order to experience complete understanding and empathy with that person. Its origins are found in the study of phenomena as it occurs within the mind of the subject.

Real estate markets do not exist in a vacuum, and discussions with local market participants are a staple research tool. USPAP requires that appraisers "collect, verify, and analyze all information necessary for credible assignment results."[8] The verification process allows the appraiser to better understand the attitudes and motivations of the market. Phenomenology has strong advantages as a research method. At its essence, it is an effort to understand others' points of view, and it develops understanding and empathy in obtaining the "complete story."

Phenomenology also has the advantage of allowing for large samples and statistical testing of results. Survey research is used when information is needed to answer questions about a population. This approach dates back to the Roman Empire, when Caesar wanted information about the population in the empire in order to impose taxes.[9] Informal interviews with knowledgeable subjects often provide valuable information and have long been a staple of research.

As with any epistemology, there are drawbacks to this research method.[10] A negative aspect of phenomenology is that questions that are not asked are thus never answered. Also, while a certain level of empathy for the subject is achievable, it is more difficult for the researcher to actually have the same experience as the subject. The actual mechanism for inquiry must be carefully selected. For instance, the questions posed to the subject along with the way that they are asked could alter the experience for the subject. Some phenomenologists have been criticized for collecting data based on expectations and perceptions that as a result is not truly reflective of the situation being studied. And as with any type of epistemology, researcher bias in phenomenology could sway a subject away from a forthright description of their experience.

## Ethnography: Geographic Competency

Ethnography involves the study of local customs and practices. It is an effort to enter and immerse oneself into the world and reality of a specific group or culture. Its origins come from instances when a researcher would live with a remote culture and become part of the group. Ethnographers study the meaning of the behavior, language, and interaction among members of the culture-sharing group. Ethnography is immersion into the culture or group in order to answer the question, "What is it like being a part of this group or culture?" Real estate appraisers and economists might consider ethnography to be aligned with geographic competency.[11] In other words, USPAP itself recognizes the importance of

---

8. USPAP, 2016-2017 ed., 20.

9. Bentz and Shapiro, *Mindful Inquiry in Social Research*.

10. Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53-60.

11. USPAP, 12.

BACK_DEFEXP-RR-003846

understanding the local markets or taking measures to gain an understanding of the local market, laws, regulations, customs, and practices.

Ethnography focuses on the natural setting and gathering large amounts of data and has the potential to generate understanding of the outside world. As a process, ethnography involves extended observations of the group, most often through *participant observation*, in which the researcher is *immersed* in the day-to-day lives of the people and observes and interviews the group participants.[12] In this way the researcher actually lives, eats, and works with the group and effectively becomes a part of the group.

Ethnography is generally not a study of an individual person. Accordingly, it is important for the researcher to interact with all tiers of the group being studied so as to avoid a narrow view. There may be numerous viewpoints within a singular culture.

The downside of ethnography is primarily twofold. First, it can be time consuming. Second, the "outsider" presence of the researcher may alter the experience. In other words, the culture or group may not act the way they normally would in the presence of the researcher.

The researcher seeks to understand the world as his or her subjects see it and to collect information without unduly influencing its shape and content.[13] Clearly, being an effective ethnographer is an art that requires an ability to elicit genuine behavior while not causing disturbances to the group being studied.

As with all qualitative inquiry, there is no single way to conduct ethnographic research.[14] While ethnography is typically considered within the context of living or extensively interacting with a group, it could also include site visits and observations within the field.

## Comparative Research: Adjustment Grids

Comparative research is comparing and contrasting multiple groups' features and characteristics. Its origins are found in the comparing and contrasting of various characteristics or experiences with each other. Comparative research attempts to answer the question, "How does 'this' compare with 'that'?"

The positive side of comparative research is that it allows for multiple positions to be considered and thought about critically. However, some items may have limited comparability or may not be comparable at all.

An application of comparative research in real estate appraisal would be creating an adjustment grid or comparing and contrasting case studies. Case study research involves the study of an issue explored through one or more cases within a bounded system (i.e., a setting or context).[15] In a real estate damage context, it could include case studies wherein the conditions being studied (i.e., environmental contamination, landslides, terrorist sites, and so forth) are compared with each other in an effort to identify common features or outcomes.

---

12. Creswell, *Qualitative Inquiry and Research Design*.

13. Singleton and Straits, *Approaches to Social Research*.

14. Creswell, *Qualitative Inquiry and Research Design*.

15. Ibid.

BACK_DEFEXP-RR-003847

## Action: Experience

Action is a repetitive cycle in which problems are diagnosed, plans are formulated, actions are taken, results are evaluated, and feedback is obtained for the next cycle. In other words, as its name implies, this is a hands-on, "learn by doing" approach to knowledge. Its origins are found in the business management movement to find pragmatic solutions to immediate problems.

The positive side of action research is that it allows the researcher to gain practical experience. Because action research involves one's own ideas and potential solutions to one's own problems, it provides a sense of ownership. On the downside, it may eliminate outside knowledge and thus outside solutions. Furthermore, this approach may be incompatible with the scientific method or other methods of inquiry and as a result lack full credibility. Also, it injects the facilitator's bias into the group and may cause a fear of retribution.

In the valuation process, action research is essentially the cumulative experience of the appraiser or economist. At its best, the action research process becomes embedded within the participant system. Thus, it can be said that successful action research builds into the system (i.e., the organization, the person, or the society being studied) an ability to identify and solve problems, to select goals, and to evaluate movement toward these goals. Successful action research builds a learning capacity into the system.[16]

## Rationalism: Intrinsic or "Common Sense"

Rationalism involves the human brain inherently or instinctively generating natural or innate information. Its origins are found in the recognition that living organisms are born with instincts and reason that facilitate the survival of their species.

Rationalism uses intuition or intrinsic knowledge to answer the researcher's question, "Does this make sense?" As a result, rationalism facilitates intuitive and self-evident information. However, what is "rational" to one person or group may not make sense to another. Thus, some view rationalism as being unsupportable, lacking in data, and incomparable with the scientific method. Nonetheless, rationalism has some merit. Scientists and appraisers alike are expected to follow the principles of logical reasoning. This does not mean that logic can tell scientists how to think or reason; rather, once an act of reasoning has taken place and is communicated, logic provides the criteria for evaluating the correctness of the reasoning.[17] Thus, more accepted applications of rationalism could be positions that are demonstrated to be established or peer-reviewed.

## Constructivism: Multiple Research Sources

Constructivism is the combining of convention, human perception, and social experience. Its origins are found in the different viewpoints that come from multiple perspectives. The constructivist strives to accumulate multiple research methods to answer the question, "How does everything add up?" or "How do we reconcile multiple research methods or angles?"

---

16. Bentz and Shapiro, *Mindful Inquiry in Social Research*.

17. Singleton and Straits, *Approaches to Social Research*.

BACK_DEFEXP-RR-003848

While it may be desirable to have research established by multiple methods of inquiry, it certainly is not always practical or necessary. One carefully conducted interview may be sufficient for some research. But in other cases, the researcher may conduct 20 to 30 interviews based on several visits "to the field."[18] In a real estate valuation context, one comparable may provide an initial indication of value; but numerous sales comparables add credibility, "bracket" the market, and provide a far more reliable indication of value. Furthermore, multiple approaches to value are generally preferred over just one.

### Testimony: Statements or Reports by Others

Testimony includes presentations or statements, both sworn and unsworn, given by others. Sworn testimony is often admissible evidence in court. In litigation support, such statements can be made in formal declarations made to the court. Furthermore, testimony in the form of statements or declarations are also considered as support or proof of a fact.

Real estate professionals often obtain statements or observations of market participants which can be included in a report. Examples might include reports completed by contractors or engineers or statements or representations made by property owners, property managers, brokers, or agents.

These nine methods of research are summarized in Exhibit I.6.

## Due Diligence

A basic function of any real estate appraisal is to identify the characteristics of the subject property and inform the client of any adverse or detrimental conditions based on the agreed-upon scope of work.

In addressing these issues, the appraiser draws from the following sources of information:

• Personal knowledge observed generally within the market
• Documents requested from engineers, architects, and other experts, such as environmental Phase I or Phase II reports
• On-site observations
• Online research of public agency databases
• Interviews with property owners or managers

The professional should be aware of these resources and state in the appraisal report the actions that were taken within the scope of work for the assignment.

### Personal Knowledge

Simply stated, professionals are the eyes and ears of the lender or client and must disclose any significant issue they are aware of. This could include information from prior experience, other professionals, industry publications, news or media reports, seminars or meetings, or discussions with other market participants.

---

18. Creswell, *Qualitative Inquiry and Research Design*.

BACK_DEFEXP-RR-003849

**Exhibit I.6**   **Epistemology: Methods of Research**

| Form of Knowledge | Concept | Origins | Overview | Researcher's Question | Pros | Cons | Business Applications | Real Estate Applications |
|---|---|---|---|---|---|---|---|---|
| **Empirical Research** | Scientific method, positivism, analytical | Movement in natural sciences to generate studies backed by facts, data, & logic | Research that is analytical, objective, controlled, precise, tangible, & measurable | What are the facts? | Tests can be replicated & the measurements can be tested | · The "story" behind the data may be missing<br>· Studies are only as good as the data relied upon | · Product specifications<br>· Statistical research<br>· Financial reports | · Sales comparables<br>· Lease comparables<br>· Transactional market data |
| **Hermeneutics** | Interpret text | Interpretation of the Bible | Art & science of interpretation, such as of text, law, etc. | What does the text mean? | Text is tangible evidence that may be re-read | · Text may be outdated or there may be variances from translation<br>· No face-to-face time<br>· Researcher bias | · Industry publications<br>· Time value of money<br>· Business law<br>· Regulations | · USPAP<br>· *The Appraisal of Real Estate*<br>· *Real Estate Damages* |
| **Phenomenology** | Researcher documents phenomenon | Study of phenomena as it occurs in mind of subject | Attempt to document one's own experience or enter mind of another person and have complete understanding & empathy | What was your experience? | Develops understanding & empathy in obtaining the whole story | Questions that are not asked are not answered | Customer or employee research | · Data verification<br>· Interviews<br>· Surveys<br>· Semi-structured interviews<br>· Discussions |
| **Ethnography** | Immersion into culture or group | A researcher living with a remote culture & becoming part of the group | Attempt to immerse oneself fully into the world & reality of another culture or group | What is it like being part of this group or culture? | Focus is on the natural setting, large amounts of data, and the ability to generate understanding of the outside world | · Time-consuming<br>· Researcher's presence may alter experience | Market research | · Geographic competency<br>· Visits to the field<br>· Observations |
| **Comparative Research** | Compare & contrast multiple sources | Compare & contrast various characteristics or experiences | Comparing & contrasting multiple groups' features & characteristics | How does "this" compare to "that"? | Allows for study & critical thinking about multiple positions | Some situations may have limited or no comparability | Competitive research | Case studies |
| **Action** | Learn by doing | Movement to find pragmatic solutions to immediate problems | Iterative cycle in which problem is diagnosed, plan is formulated, action taken, results evaluated, and feedback obtained | How do we figure this out together? | · Practical<br>· Researcher gains experience and develops solutions to own problems<br>· Sense of ownership | · Incompatible with scientific method<br>· Lack of credibility<br>· Injects facilitator's bias into group<br>· Fear of retribution | Trial & error | Prior experience |
| **Rationalism** | Observations with intuition or innate knowledge | Recognition that living organisms are born with instincts that facilitate survival of the species | The human brain instinctively generates innate information | Does this make sense? What do I instinctively know about this issue? | Facilitates the inclusion of intuitive & self-evident information | · Unsupportable and incomparable with scientific method<br>· Lack of data | · "Business sense"<br>· Information "makes sense" or "feels right" | · Reasonable<br>· Established<br>· Makes sense |
| **Constructivism** | Accumulating multiple research methods | Viewpoints from multiple perspectives | Combination of convention, human perception, & social experience | How does everything add up? | Knowledge is gained through multiple sources | It may not be practical or necessary to use multiple research methods | Total enterprise | Reconciliation & conclusions |
| **Testimony** | Statement by trusted source | Judgments made upon sworn testimony of witness | Emphasizes role of experience, especially that based on perceptual observation | What did they say? | Researcher obtains knowledge from a firsthand source of the observer of fact | Witness may have faulty recollection, be biased, or have an agenda | Insights from business leaders & experts | · Property owner statements<br>· Reports by others |

BACK_DEFEXP-RR-003850

### Requests for Documents

Often, considerable property information is available simply by requesting it. The documents requested may include

- Aerial photographs
- Appraisals
- Architectural plans
- Claims or litigation documents, including any related fire or police reports
- Contracts
- Environmental impact reports
- Land use regulations–i.e., zoning or general plans
- Leases
- Loan, escrow, or closing documents
- Phase I or II environmental studies
- Property inspection reports or structural engineering studies
- Site plans
- Site surveys
- Soils or geotechnical reports
- Tax reassessment appeals
- Special studies
- Termite reports
- Title reports
- Other relevant studies or documents relating to the property

Keep in mind that only in rare circumstances would all of these documents be available for a single property.

### On-Site Observations

Appraisers generally make on-site observations of the subject property. At times, they may only view the exterior of the property or not visit the property at all, if this is agreeable to the client and set forth in the scope of work. On-site observations may involve noting any obvious evidence of damage to the roof (as observed from the ground level), ceilings, walls, floors, or appliances, as well as the general condition of the electric, gas, and plumbing services. The general operation of heating, air conditioning, and hot water units; elevators; and other mechanical systems may also be noted. Of course, the scope of work for most appraisers would not typically be the same as the work performed by a professional property inspector. The extent of a real estate appraiser's site visit and property observation should typically be on par with that of a typical buyer.

BACK_DEFEXP-RR-003851

## Online Research

Information that was once very difficult or even impossible to obtain is now readily available on the Internet. Information on environmental risks, pipelines, natural hazards, proximity to a jail or prison, and other public agency data can often be researched in a short amount of time.

## Interviews with Property Owners or Managers

The property owner or manager is an obvious and important source of information. The following questions can be used in interviews with property owners and managers. Note that the different category headings for these questions are also the detrimental condition classifications. Each classification will be discussed in a separate chapter of this book.

### Twenty Questions for Real Estate Professionals

**General Conditions**

1. Are the property's general features and past, present, or proposed issues identified–i.e., size, history, title, trend, etc.?

**Transactional Conditions**

2. What were the circumstances of the property transfer–i.e., a non–arm's-length transaction, foreclosure, option, assemblage, etc.?
3. Is there any special financing –i.e., seller financing, property exchange, balloon mortgage, wraparound mortgage, etc.?

**Distress and Sociological Conditions**

4. Are there problems related to an accident or tragedy–i.e., fire, violation, death, etc.?
5. Are there problems related to crime–i.e., a crime scene, a burglary, a neighbor with a criminal record, etc.?

**Legal Conditions**

6. Are there legal factors–i.e., leases, easements, liens, bonds, contracts, moratoriums, conditions, covenants, and restrictions (CC&Rs), etc.?
7. Are there suit or claim issues–i.e., a legal claim, insurance claim, title claim, etc.?
8. Are there special government restrictions–i.e., eminent domain, unusual zoning-assessment, etc.?

**External Conditions**

9. Are there land use issues in the area–i.e., an airport, jail, school, cemetery, power line, pipeline, etc.?
10. Are there any nuisances–i.e., noise, odor, view, construction, traffic, etc.?

**Building and Manufacturing Conditions**

11. Are there building issues–i.e., defects, termites, pests, violations of the Americans with Disabilities Act (ADA), codes, permits, etc.?

BACK_DEFEXP-RR-003852

12. Are repairs needed–i.e., roof, structural, window, door, utility, appliance, floor, etc.?

### Site and Infrastructure Conditions

13. Are there soil problems–i.e., corrosive, expansive, porous, subsidence, slide, creep, etc.?

14. Are there geotechnical concerns–i.e., grading, cut and fill, compaction, drainage, crack, etc.?

### Environmental and Biomedical Conditions

15. Are hazardous substances involved–i.e., hydrocarbon, solvent, radioactive, bio, metal, etc.?

16. Are there contamination problems–i.e., lead paint (affects construction before 1978), asbestos (affects construction before 1979), spill, leak, septic, etc.?

17. Are there environmental agency issues–i.e., Superfund, leaking underground storage tank (LUST), landfill, Resource Conservation and Recovery Act (RCRA), National Priority Pollutants List (NPPL), etc.?

### Conservation Conditions

18. Are there natural resource issues–i.e., habitat, open space, wetland, etc.?

19. Are historic or cultural resources involved–i.e., district, National Register of Historic Places (NRHP), archeology, etc.?

### Natural and Climate Conditions

20. Are there natural hazards–i.e., flood, wildfire, earthquake, tornado, storm damage, etc.?

BACK_DEFEXP-RR-003853

BACK_DEFEXP-RR-003854



# 1

# General Conditions

General conditions (Class I) relate to all the locational, physical, legal, and economic attributes associated with any piece of real property. Such attributes might include property interest, year built, size, condition, amenities, zoning, restrictions, and encumbrances. In many instances, these attributes relate to the unimpaired or baseline value of the property and are not necessarily considered to be detrimental, except when a material aspect of the property may have been misrepresented or disputed, or in some situations involving a title dispute.

Many detrimental conditions require far more than a simple analysis. Virtually any real estate professional at some point in his or her career will be confronted with a situation involving a property that has been impacted by a complex detrimental condition. Literally hundreds of such situations may impact property values, and many of them create a valuation challenge that goes well beyond the scope of the three traditional approaches to value. To add to the complexity, a property may be impacted by two or more detrimental conditions. Furthermore, as with any appraisal, adjustments must be considered for market conditions, which could offset or amplify the damages. When computing damages, one must recognize that there may be a difference between real estate damages, which are based upon the most likely market reaction, and legal definitions of damage that may or may not reflect the market's reaction.

This chapter presents a framework for studying the vast number of detrimental conditions that may affect properties and the issues surrounding them. Although identifying, categorizing, and analyzing these conditions may seem overwhelming, the task becomes manageable when the fundamental stages and value effects are considered in a logical sequence. The basic tools for detrimental condition analysis are

- The detrimental condition matrix
- The detrimental condition model
- The Bell Chart
- The three approaches to value

BACK_DEFEXP-RR-003855

## The Detrimental Condition Matrix

Detrimental conditions follow a logical sequence of events, and identifying and organizing these events can facilitate a useful study. The first step is to recognize that real property affected by a detrimental condition has a life cycle with three potential stages. Exhibit 1.1 outlines a matrix of these three stages of analysis and related issues that should be considered for every detrimental condition: the assessment stage (before repair), the repair stage (during repair), and the on-going stage (after repair), along with cost, use, and risk issues that could potentially impact value during each stage. Legal, physical, and financial perspectives should be considered in each stage identified in the nine quadrants, just as they are considered in the highest and best use portion of a typical appraisal.

Not every stage is necessarily relevant to every detrimental condition. It would be extraordinarily rare for all nine quadrants to be utilized in any single valuation assignment. For example, if an airport is developed near a residential neighborhood, there may only be an ongoing stage and no assessment or repair stage. The value is driven not only by the inclusion or exclusion of these stages but also by three fundamental issues that may occur within each relevant stage:

• Costs and responsibility for payment of those costs

• Use and any restrictions on use

**Exhibit 1.1    The Detrimental Condition Matrix**

| | | Detrimental Condition Stages | | |
| --- | --- | --- | --- | --- |
| | | Assessment | Repair | Ongoing |
| **Detrimental Condition Issues** | **Cost** | Cost to assess and responsibility<br><br>Engineering<br>Phase I, II, III studies | Repair costs and responsibility<br><br>Repairs<br>Remediation<br>Contingencies | Ongoing costs and responsibility<br><br>Operations and maintenance (O&M) monitoring |
| | **Use** | All loss of utility while assessed<br><br>Disruptions<br>Safety concerns<br>Use restrictions | All loss of utility while repaired<br><br>Income loss<br>Expense increase<br>Use restrictions | Ongoing use disruptions<br><br>Alterations to highest and best use |
| | **Risk** | Uncertainty factor<br><br>Discount, if any, where extent of damage is unknown | Project incentive<br><br>Financial incentive, if any, to complete repairs | Market resistance<br><br>Residual resistance, if any, due to situation |

Source: Randall Bell, *Property Owners Manual* (Laguna Beach, CA: Owners Manual Press, 2004).

BACK_DEFEXP-RR-003856

- Risks

While all valuation assignments depend on the date of value, the date is an even more important issue for a property impacted by a detrimental condition because the property's value can vary considerably over the three potential stages of a detrimental condition.

## Assessment Stage: Before Repair

The assessment stage occurs when the damage is assessed, usually by engineers, contractors, or other qualified experts. This stage includes all the costs, use issues, and risks associated with monitoring and assessing the detrimental condition before any repairs are made.

If the problem is self evident, there may not be an assessment stage at all. For example, if a tornado destroys a toolshed, there is no question as to what the damage is. The only question is the contributory value of the toolshed, which might be measured by the cost to repair or replace it. With other detrimental conditions, the assessment stage may be very involved, as the extent of the problem may not be self evident and may require the expertise of qualified engineers or other professionals. This stage could include environmental studies, engineering studies, contractor estimates, soils and geotechnical studies, well monitoring, laboratory analysis, and other assessment costs. The contractors or engineering firms that do such studies might also provide cost estimates for repairs. Just as an owner or prospective buyer would do, the appraiser should review the estimates for general reasonableness.

## Repair Stage: During Repair

If repairs are required, they take place after the assessment stage. Repairs may involve remediation, reconstruction, preventative construction, actual repairs, cleanup and correction of the condition, and contractor contingencies. Repairs may require a vast spectrum of costs depending on the issue and the remediation or repair method chosen. Costs may include agency oversight, engineering, legal review, permits, sampling, improvement demolition, improvement reconstruction, scientific analysis, and backfill.

## Ongoing Stage: After Repair

There may be continuing or subsequent problems associated with the detrimental condition. If so, the post-repair ongoing stage reflects these issues. Sometimes a detrimental condition will cause ongoing costs to be incurred even after repairs are completed. There might be ongoing responsibility for monitoring and reporting groundwater or soil conditions or continuing maintenance associated with foundation repairs due to a geotechnical condition. Such a situation could also necessitate operations and maintenance (O&M) programs to monitor air quality or to maintain drainage systems installed in the aftermath of a problem.

BACK_DEFEXP-RR-003857

# Factors Affecting Value

Cost, use, and risk issues must be considered as they relate to the subject property at the specific date of value within each applicable stage. While these headings are the same for each stage, the issues involved may differ depending on the stage being considered.

## Cost

Within each stage, costs include out-of-pocket direct costs, holding costs, related costs, and contingencies. In addition, the party responsible for the payment of those costs should be considered, as this relates to the impact on value.

Repair cost estimates are often provided by engineers of the firm contracted to conduct the remediation or repairs. However, special care should be taken to review the completeness of such estimates, as it is possible that original cost estimates for remediation involving environmental, geotechnical, or other complex problems may be exceeded. Exhibit 1.2 illustrates an actual compilation of a relatively small environmental cleanup with estimates from four environmental contractors.

As Exhibit 1.2 illustrates, a wide range of estimates can be presented for the same work. In fact, some unscrupulous contractors will purposely submit low initial bids to get the contract, fully expecting that more costs and contingencies will be added as the job progresses. An expression that is often heard in the environmental cleanup industry, "The hole always gets bigger," means that the

---

**Exhibit 1.2**   **Comparison of Environmental Remediation Costs**

| Contractor A | | Contractor B | | Contractor C | | Contractor D | |
|---|---|---|---|---|---|---|---|
| Asbestos removal/ disposal | $46,080 | Asbestos removal/ disposal | $18,500 | Asbestos removal/ disposal | $34,135 | Asbestos removal/ disposal | $18,500 |
| Lead-based paint removal/disposal | 22,500 | Lead-based paint removal/disposal | 22,500 | Lead-based paint removal/disposal | 35,000 | Lead-based paint removal/disposal | 22,500 |
| Demolition | 704,160 | Demolition | 289,000 | Demolition | 509,625 | Demolition | 289,000 |
| UST removal/ closure | 34,560 | UST removal/ closure | Included in demolition | UST removal/ closure | 21,000 | UST removal/ closure | 34,258 |
| Remediation of hazardous waste and site closure | 27,099 | Remediation of hazardous waste and site closure | 22,850 | Remediation of hazardous waste and site closure | 94,000 | Remediation of hazardous waste and site closure | 7,900 |
| Total | $834,399 | Total | $352,850 | Total | $693,760 | Total | $372,158 |

Comments:
1. Prices for "budget" purposes only and subject to change.
2. All permits and below-ground demolition included in bid.

Comments:
1. Add $50,000 to remove crushed concrete from site for a total of $402,850.
2. Includes removal of structures below grade.

Comments:
1. Demolition budget includes below-ground demo with off-site removal of concrete.
2. Bid does not include security, water and power, permits, finishing, grading, removal of lead-based paint (if required), and fill.
3. Bid assumes removal of lead-based paint will not require additional payment given demolition of site.
4. Demolition bid includes removal of structures to 5 feet below surface, off-site concrete crushing, and $60,000 for oversight of demolition.

BACK_DEFEXP-RR-003858

initial site assessments often do not characterize all of the contaminants, and the required remediation sometimes goes beyond what is originally expected.

Because remediation costs can exceed their original estimates, cost contingencies are sometimes required to adjust remediation costs to reflect the full range of possible outcomes. Insurance products called *cost cap policies* that guarantee against cost overruns can be obtained from insurance companies to eliminate or mitigate these factors. On top of that, the repair costs should be reasonable, necessary, and avoid economic waste. All things considered, informed potential buyers need reasonable assurance that they have a clear indication of their total exposure and potential cash liability, so it is essential that the total remediation costs accurately reflect the total reasonable repair costs rather than just a cursory and optimistic estimate.

For example, $200,000 worth of environmental testing and analysis may be required just to define the nature and extent of the contamination and to understand what kind of remediation is going to be required by the regulators. This activity culminates in an approved remediation plan as part of the assessment stage. Next, implementation of the remediation plan during the repair stage could involve any number of actions and might cost $700,000. Finally, even after the remediation is complete and a "no further action" (NFA) letter has been issued, there may be ongoing costs of $15,000 per year for 10 years to monitor environmental conditions at the site.

Understanding the magnitude of each of these costs and how they relate to each stage is a critical task in assessing damages. Of course, the estimation of these costs is not the responsibility of the appraiser or analyst. Rather, qualified environmental engineers and scientists must provide the foundational estimates on which the appraiser's analysis is built. These should be reviewed for reasonableness and internal consistency, but ultimately the credibility of these numbers lies with the experts who generate them.

Along with the issue of costs is the question of who is responsible for the payment of those costs. Relevant statutes are important here, as are contractual obligations such as representations, warranties, and indemnities. The example described previously indicated assessment plus remediation costs of $900,000 as well as ongoing costs of $15,000 per year for 10 years, although responsibility for those charges remains unclear. Identifying the responsible party is particularly important when the detrimental condition is an externality. Repair costs or expenses not charged to the ownership position are generally not considered to be damage. Sometimes a neighbor concerned with upgrading property values in the area or a previous owner aware of the detrimental condition has assumed full responsibility for the condition and, therefore, the value of the subject property is not affected by these repair costs.

Often, a seller indemnifies a buyer against the detrimental condition in question. In environmental contamination cases, a responsible party (other than the property owner) will often assume full responsibility for the cleanup. If the responsibility for repair falls to someone other than the owner of the subject property and this responsible party is both solvent and willing to make the repair, the value of the subject property may not be affected insofar as the repair

BACK_DEFEXP-RR-003859

costs are concerned. For example, consider a situation in which the groundwater under a house is contaminated, the house is connected to city water rather than well water, and the contamination issues are being addressed by the responsible party in adherence to governmental agency requirements. In this case, it may be inappropriate to deduct repair costs from the value of the subject property.

As another example, the owner may have no liability for repair costs if a building material manufacturer has assumed all responsibility for replacing defective materials. Other cases may involve the owner bearing some of the costs, while a responsible party bears the rest.

In interpreting the responsibility for repairs or remediation, an appraiser will often need professional legal input on liability issues driven by various statutory or contractual considerations. Furthermore, these issues may be in dispute between the parties. In fact, disagreement over cleanup liability or repairs is at the heart of many detrimental condition disputes. The appraiser or analyst may not have a responsibility to resolve the issue, which ultimately may be a question of law to be settled in court. Accordingly, the scope of work and underlying assumptions must be clearly addressed.

A key issue to consider is the market's response to proposed remediation or repair costs and the related empirical evidence of such a response. Repairs or remediation that are mandated by government authority or required for health and safety reasons are normally legitimate deductions from unimpaired value. The cost of repair or remediation does not necessarily equal value diminution, however, and it is critically important to make sure that such deductions are consistent with market behavior.

Similarly, the costs relative to the benefits must be studied. If a house has faulty soils compaction that results in that house slipping a couple of inches, an analysis must be made to determine whether or not such damage can be economically cured. It may be an economic waste to spend $700,000 to repair such a condition for a house that is only worth $400,000. In other words, a deduction for costs is not automatic. One must consider insurance issues, who bears the responsibility for paying the costs, and whether the costs are actually required and make economic sense in the context of the marketplace.

Finally, insurance recoveries and other mitigating factors should be considered. Although insurance recoveries may mitigate the losses associated with a detrimental condition, it may not be appropriate to incorporate them into an analysis because insurance may not be relevant to the real property–i.e., it is often an attribute of the business or individual that owns the policy. As such, an insurance policy may be more relevant to a particular property owner (investment value) than to the market value. Consequently, the significance of a particular detrimental condition to a particular property owner with a specific insurance policy may not be reflective of the market as a whole. If the assignment involves litigation, the venue and local jurisdiction may dictate important compensable issues for the appraiser to consider.

On the other hand, other mitigating factors may be considered and may even offset the damages. For example, if certain insurance proceeds are held in an escrow account and are specifically earmarked for property repairs, this amount could offset damages because it is assured that the real estate will directly benefit

BACK_DEFEXP-RR-003860

from the proceeds. Additionally, if a property can generate some rental income while being repaired or if property taxes can be appealed, these factors along with any other benefits should be considered as an offset to damages.

## Use

Detrimental conditions may impact or restrict the use of a property. During each stage, the use or utility of the property should be considered as compared to the use during the unimpaired stage. In the fields of finance and valuation, it is well known that "time is money." Accordingly, if the detrimental condition causes delays, a "project delay" or "loss of use" analysis may be conducted. In the context of income-producing properties, use has specific consequences. If income falls or expenses rise, there will be a change in net operating income that will translate into a decrease in the property's value. Care should be taken to determine if these are short-term alterations or if they are expected to continue in perpetuity. The relevant use issue is whether the detrimental condition impacts rental income, vacancy, expenses, or some combination of these. For example, rental rates may decline or vacancy rates might rise, either of which would cause the effective gross income to fall. It is also possible that operating expenses might be higher if the detrimental condition resulted in a period of higher utility charges, increased security requirements, or perhaps rental of auxiliary parking spaces on an adjacent or nearby property.

With non-income-producing or residential properties, the use and utility issue is more straightforward. Apart from the issue of cost of repair and who is responsible for it is the question of whether the detrimental condition has had enough of an impact on the use or utility of the property that the market would reflect a measurable discount, typically measured by the rental value of the premises affected by such a condition. In general, the more the livability of a home, building, or neighborhood is affected by the detrimental condition, the more likely it is that use and utility will be affected, with a corresponding impact on market value. On the other hand, if the property can be occupied normally, this consideration may not be relevant. For land or redevelopment sites, loss of use could be analyzed by utilizing a discounted cash flow with and without the delay, or by analyzing the ground rent for the period of the project delay.

## Risk

There may be risks, as perceived by the market, associated with each applicable stage. These risks are sometimes referred to as *stigma*, a somewhat non-specific term relating to adverse public perception. USPAP Advisory Opinion 9 essentially states that stigma is generally considered to be an adverse effect on value resulting from the market's perception of increased risk. Risks may be temporary or permanent in nature, depending on the analysis of empirical market data. However, most appraisal assignments require a risk measurement as of a specific date of value.

In the context of detrimental conditions, risk may include incremental risks above and beyond the risks of an unimpaired property. If profit or entrepreneurial incentive is applicable to a property with detrimental conditions, it would be considered within the risk category.

BACK_DEFEXP-RR-003861

Risks generally fall into three categories for each of the three stages:

1. Risk associated with a property prior to the situation being assessed, termed an *uncertainty factor*
2. Risk and uncertainty associated with the cost and effort to repair, including entrepreneurial profit, termed a *project incentive*
3. Risk and uncertainty associated with an ongoing reluctance by the market to purchase a property with a history of having a detrimental condition, including any reduced marketability or concern of third-party liability, which is termed *market resistance*

An *uncertainty factor* relates to a property that has been impacted by a detrimental condition requiring an assessment that has not yet been completed. Clearly, the risk is likely to be highest and the value lowest at this point because, without a definitive assessment, market participants may be extremely hesitant to purchase a property in which the extent of the damage is uncharacterized. This would be similar to buying a car without being allowed to turn the ignition key or open the hood. Buyers under such circumstances would often expect a higher discount to compensate for risk and uncertainty and to reflect some degree of entrepreneurial profit for such a venture. However, on a practical basis, this type of risk no longer applies once the assessment has been completed. Accordingly, this type of risk is not relevant in many assignments.

*Project incentive* reflects the risk, uncertainty, and entrepreneurial profit associated with the repair process. In other words, project incentive reflects any discount in addition to any loss of use or repair costs required to entice a buyer to purchase a property in a damaged condition. More simply, this concept might apply when a buyer purchases a "fixer-upper" at a discount, reflecting the costs to repair the property (cost), the loss of utility while repairs are being made (use), and the financial incentive or entrepreneurial profit for doing so (risk).

Project incentive can take a variety of forms. The detrimental condition being studied may be common and the procedures required to assess and repair it may be well understood. Furthermore, large contingencies may be built into the cost estimates, which in turn may reduce or even eliminate this type of risk. Or the repair may be small relative to the overall property value. As a result, there may be no or little risk involved with the repairs. On the other hand, a large financial incentive may be required to assume the trouble of being responsible for making significant repairs, which includes an entrepreneurial profit that would be expected by a buyer purchasing a property in damaged condition and subsequently making the necessary repairs. Additionally, there are many situations in which reasonable repair cost estimates have been made, but there is a significant risk that the estimates could be exceeded, possibly by a substantial amount. These considerations would likely weigh heavily on the mind of a prospective buyer and would therefore be reflected in a higher cost contingency, a higher project incentive, or an insurance policy to limit costs and liability. When studying cost contingencies, it is important that a distinction be made between contingencies for the contractor and those for an owner or developer.

BACK_DEFEXP-RR-003862

Ultimately, the project incentive reflects the certainty of the repairs being completed on time and on budget, the time needed to manage or oversee the repair process, and the general financial profit or incentive necessary to accept responsibility for the repair process. This could be similar to purchasing a car when it is known that the car needs a new transmission. While the situation is fully assessed and characterized, a financial or profit incentive may be required for the buyer to purchase the car knowing that a repair is required along with all the associated problems and risks of completing the repairs. On the other hand, the repair may be inconsequential because the market would pay full value despite the fact that a small repair must be made. Market data is required to support the conclusion reached.

*Market resistance* refers to the risks and uncertainties, if any, associated with the negative reactions by the market towards a property that has a history of being damaged. For example, deep groundwater contamination usually does not interfere with the use of improved commercial or industrial properties. Hence, the market may reflect that net operating income (*NOI*) is unaffected by the detrimental condition, and there is no risk or uncertainty that *NOI* will be affected in the future. In this situation, there may be no market resistance if both the lenders and the equity market do not require any premium on the loan terms.

Alternatively, a ground subsidence issue may have been adequately addressed at an improved industrial property, and the *NOI* may be unaffected by the property's history. There may be a significant risk, however, that the problem could reoccur. If it did reoccur, use of the property would be significantly affected. In this case, the value of the property may reflect this type of risk or uncertainty.

Related to market resistance are any risks and uncertainties associated with third-party liability. This consideration relates primarily to litigation risk that is somehow associated with the detrimental condition. An example of a situation in which this kind of risk can occur is an environmental case in which the contamination has migrated from the source site to neighboring properties. In this case, the source site property owner may face liability with respect to lawsuits brought by neighboring property owners, even if those lawsuits have no merit.

In other situations, there may be no assessment stage or repair stage, but only market resistance that is attributable to a negative event, such as a crime that occurred on the property. In these situations, market resistance reflects any risks associated with the history of the property. Going back again to the example of a car, this would be similar to buyer resistance toward a car that was damaged in an accident and later repaired. Depending on the situation, the market may require a discount as an incentive to purchase the car, given its history.

The most important consideration in evaluating potential risk, stigma, or market resistance is to support opinions with relevant market data. The discovery or disclosure of a current or prior detrimental condition does not automatically result in value diminution, and it is incumbent upon the appraiser or analyst to provide proper support for any opinions related to market resistance.

BACK_DEFEXP-RR-003863

## The Detrimental Condition Model

Each detrimental condition is analyzed on a case-by-case basis because each may have a variety of impacts on value. The detrimental condition model, shown in Exhibit 1.3, illustrates the fundamental issues graphically, and a wide variety of additional illustrations may be derived from it. While the detrimental condition (DC) model includes all possible stages, keep in mind that it is theoretical and many detrimental conditions do not include all of the stages that are depicted. In other words, the DC model reflects one possible value pattern, but any number of subset graphs could be applicable depending on the empirical data.

Unimpaired value is reflected as Point A in the DC model. Upon the occurrence or discovery of the detrimental condition, the value may fall to Point B if the facts and market data support such a decline. Some detrimental conditions require an assessment, such as a soil, environmental, or engineering study. The value during this period is often the lowest, or the property may even be unmarketable because a potential buyer would likely require a significant discount as an enticement to purchase a property for which the extent of damage is uncharacterized. However, in a retrospective appraisal assignment in which all assessment, repair, and ongoing issues are studied, a determination of the value at Point B can be made.

While there are a variety of patterns that could describe the assessment stage, the model reflects a simple increase to Point C after characterization is completed. If repairs are required, the value will generally increase upon their completion as reflected at Point D. Point E reflects the value of the property after considering the cost, responsibility for costs, and use issues in the ongoing stage.



**Exhibit 1.3    The Detrimental Condition Model**

Source: Bell, *Property Owners Manual*.

Like any value issue, the risk that is associated with the ongoing stage could have a variety of impacts. To illustrate this concept, market resistance (risk) is reflected with multiple arrows at Point F. While there are a variety if definitions of *stigma*, this is synonymous with many of these risk definitions. Of course, any issue within any stage could have a similar negative, positive, or neutral impact on value, which can only be determined on a case-specific basis.

## The Bell Chart

The detrimental condition model is a framework showing the relationship of time and value with a variety of graphical patterns, depending on the relevance and impact of each value

BACK_DEFEXP-RR-003864

issue during each stage. Out of the hundreds of detrimental conditions, certain common attributes arise that suggest distinct groupings. The Bell Chart organizes all detrimental conditions into 10 standard categories, as shown in Exhibit 1.4.

## Exhibit 1.4 — The Bell Chart: 10 Categories of Detrimental Conditions

| DC Class | Description |
|---|---|
| I. General Conditions | **Baseline description and general market issues,** i.e., real estate, franchise, business, FF&E, goodwill, personal property, products, services, etc. |
| II. Transactional Conditions | **Unique sales or transfer issues,** i.e., motivation, option, assemblage, distress, financing, bankruptcy, foreclosure, etc. |
| III. Distress and Sociological Conditions | **Human loss and tragedy issues,** i.e., crime, war, terrorism, accident, car crash, air disaster, train derailment, shipwreck, death, disability, illness, injury, etc. |
| IV. Legal Conditions | **Legal issues,** i.e., eminent domain, contract, tort, insurance claim, title, lot line, CC&R, lien, bond, lease, historic, moratorium, zoning, easement, etc. |
| V. External Conditions | **Neighborhood issues,** i.e., nuisance, proximity, noise, odor, hazard, power lines, airport, privacy, view, etc. |
| VI. Building and Manufacturing Conditions | **Construction, equipment and mechanical issues,** i.e., defects, engineering, repairs required, design, code, architecture, infestation, regulations, permits, etc. |
| VII. Site and Infrastructure Conditions | **Soils, geotechnical and right-of-way issues,** i.e., drainage, grading, fill, cracking, subsidence, slides, roads, corrosive soils, compaction, groundwater, utilities, etc. |
| VIII. Environmental and Biomedical Conditions | **Contamination, health and toxicity issues,** i.e., spills, haz-mat, asbestos (1979), lead paint (1978), mold, radioactive, metals, solvents, biological, hydrocarbons, plague, epidemic, etc. |
| IX. Conservation Conditions | **Cultural and natural resource issues,** i.e., habitat, endangered species, natural and cultural resources, archeological, shoreland, wetland, overpopulation, etc. |
| X. Natural and Climate Conditions | **Natural disaster and weather issues,** i.e., flood, hurricane, typhoon, wildfire, seismic, volcano, tornado, global warming, tsunami, famine, drought, storms, etc. |

### Damage Valuation

Detrimental conditions (DCs) are issues that *potentially* have a financial impact. DCs may fall along a continuum ranging from no economic impact to a complete loss of value, or even a liability. If a question of value arises, a detrimental condition (DC) analysis is required. The starting point for such an analysis is the DC matrix, which illustrates the array of potentially relevant issues. All nine elements of the DC matrix should be considered. This can yield a variety of valuation patterns based on the inclusion, exclusion, and timing of each element as reflected in the DC model. Damages are benchmarked against the *baseline value*. In determining the impact on value, it is critical that a distinction be made between the DC and unrelated issues. For example, market conditions may be responsible for a change in value that is unrelated to the condition being studied.

The impact of DCs on property values is ultimately an empirical question that requires the application of one or more of the three traditional approaches to value:

1. The sales comparison approach utilizing market data with and without the DC

2. The income capitalization approach utilizing income and risk factors with and without the DC

3. The cost approach utilizing data with and without the losses associated with a DC

The DC matrix, coupled with the three approaches to value, provides the framework for the analysis of DCs.

### Detrimental Condition Matrix

| | | | |
|---|---|---|---|
| **Cost** | Assessment Cost & Responsibility | Repair Costs & Responsibility | Ongoing Costs & Responsibility |
| **Use** | Use Impacts While Assessed | Use Impacts While Repaired | Impact on Highest & Best Use |
| **Risk** | Uncertainty Factor | Project Incentive | Market Resistance |



**DC Model**

**Key to Graphs**
— Unimpaired Value
– – Value with DC
**A:** Unimpaired Value
**B:** DC Occurs-Discovered
**C:** Assessment Stage
**D:** Repair Stage
**E:** On-Going Stage
**F:** Market Resistance

### Damage Economics

DCs may have a variety of impacts which, upon analysis, vary on a case-by-case basis.



No DC or Benign | One-Time Premium | Market Cycles | Recovery | Permanent | One-Stage Repaired | Two-Stage Repaired | Three-Stage Repaired | Full DC Model | Liability

Premium | Increasing Market | Decreasing Market | Temporary Issue | Declining Value | One-Stage Residual | Two-Stage Residual | Three-Stage Residual | No Value

© Randall Bell, PhD, MAI. All rights reserved.

*General Conditions* **29**

BACK_DEFEXP-RR-003865

In determining the impact on value, it is critical that a distinction be made between the detrimental condition and unrelated issues. For example, market conditions may be responsible for a change in value that is unrelated to the condition being studied. In addition to the detrimental condition categories, the chart illustrates some of the various value patterns resulting from detrimental conditions.

## Application of the Three Approaches to Value

Detrimental conditions can be visualized along a continuum ranging from no value impact to severe conditions resulting in a complete loss in value or even a liability. For example, if a shopping center is the scene of a shoplifting crime, this single occurrence is not likely to have an impact on property value. However, if the same shopping center is the scene of a particularly violent and well-publicized crime, this crime may have a significant impact on property value. If a homeowner accidentally kicks over a can of paint in the garage, it is not likely to have any impact on the value of the property. However, if a large manufacturing firm spills thousands of gallons of contaminants into the soil, this may incur profound clean-up costs and environmental impacts. The impact of a detrimental condition can only be determined by a comprehensive analysis of relevant market data.

The impact of detrimental conditions on property values is ultimately an empirical question that requires the application of one or more of the three traditional approaches to value. While the fundamental detrimental condition issues seem straightforward, the real challenge of such an assignment lies in the skill with which the appraiser or analyst collects and properly analyzes market data. As might be expected, each of the three approaches to value has potential applicability depending on the situation.

## The Cost Approach Applied to Detrimental Conditions

The cost approach employs data with and without the costs and losses associated with a detrimental condition. This approach deducts the costs or losses associated with each stage from the unimpaired value. Generally, only those costs and losses that are the responsibility of the property owner would be included, as only these would impact the market value. (As a practical matter, if market resistance were applicable, it would likely be determined from the sales comparison or income capitalization approaches.) The fundamental calculations for the cost approach applied to detrimental conditions are shown in Exhibit 1.5.

In the detrimental condition model (shown in Exhibit 1.3),

- Point A relates to the estimate of market value as if unaffected by the detrimental condition
- Point B relates to the estimate of value upon realization that a detrimental condition has occurred
- Point C relates to the estimate of value upon assessment of the situation

**30**   *Real Estate Damages*

BACK_DEFEXP-RR-003866

- Point D relates to the estimate of value upon the condition being repaired, remediated, or otherwise resolved
- Point E relates to the estimate of value upon consideration of any ongoing costs
- Point F reflects the estimated impact of any risks associated with residual market resistance

Proper evaluation of these costs requires the consideration of each of the value issues, specifically the repair costs and the responsibility for those costs, the effects on use, and risk.

There are numerous costs to consider in the cost approach. In the assessment stage, costs might include engineering studies, laboratory analysis, legal oversight, governmental oversight and fees, and contractor estimates. The repair stage includes not only the direct repair or remediation costs themselves, but all related costs such as increased expenses, additional security costs, tenant relocation costs, carrying costs, contingency costs, the cost of rebuilding structures or tenant improvements destroyed in the process, and moving costs. The ongoing stage could include costs for such items as monitoring wells, additional security, operations and maintenance (O&M) programs, and so forth.

In the cost approach, effects on use relate to a number of factors. During all the stages, consideration should be given to the utility of the property as compared to its utility in an unimpaired state. For example, during the assessment stage or the repair stage, the detrimental condition may be disruptive or the situation may be dangerous, thereby preventing the property from being occupied. During the ongoing stage, the detrimental condition may result in a permanent and altered use of the property.

In general, when income-producing properties experience a diminution in value, use issues take the form of a decrease in income, an increase in vacancy rates and operating expenses, or a combination of these factors. For example, with a natural disaster such as a mudslide, there might be a complete loss of use from the time of the slide until the repair phase is completed. The loss of use for this period may be measured by the rental value, which would be added to the other costs associated with the mudslide. It is also possible that there may be a change in operating expenses associated with the mudslide for increased maintenance or preventative measures. If so, these changes will have to be estimated and incorporated into the analysis.

Risk must also be considered in the cost approach. Once all of the issues associated with repair costs, responsibility for repair costs, and effects on use have been addressed, the question remains as to whether there are remaining

| Exhibit 1.5 | Cost Approach Applied to Detrimental Condition |
|---|---|
| Unimpaired value | Point A |
| – Assessment stage value effects | Point B to Point C |
|     Cost and responsibility | |
|     Use | |
|     Risk (uncertainty factor) | |
| – Repair stage value effects | Point C to Point D |
|     Cost and responsibility | |
|     Use | |
|     Risk (project incentive) | |
| – Ongoing stage value effects | Point D to Point F |
|     Cost and responsibility | |
|     Use | |
|     Risk (market resistance) | |
| = Impaired value | |

BACK_DEFEXP-RR-003867

risks as a result of the detrimental condition. For an income-producing property, risks during any of the three detrimental condition stages are ultimately borne by the equity investor (the owner) and, if the property is financed, by the lender. One way to characterize this risk issue is to investigate whether an additional discount is required to compensate for increased risk due to the detrimental condition once an allowance has been made for the costs already discussed. This could result from the equity investor requiring additional incentive because of risks associated with remediation cost overruns, subsequent effects on use or third-party lawsuits, or the costs of financing being increased due to lower loan-to-value ratios or higher borrowing costs or interest rates.

As an illustration of a cost approach application, consider a property in an undamaged condition with a market value of $475,000. The assessment costs are $5,000, the repair stage costs are $75,000, the ongoing costs are $4,000, and the market resistance (part of the ongoing stage) is $15,000. In addition, suppose the property owner is not responsible for $50,000 of the costs, which will be borne by others. The cost approach calculations would be as follows:

| | |
|---|---|
| Unimpaired value | $475,000 |
| Less:  Assessment stage | (5,000) |
| Repair stage | (75,000) |
| Ongoing stage | (4,000) |
| Market resistance (risk) | (15,000) |
| Plus: Offset for costs borne by others | +   50,000 |
| Impaired value | $426,000 |

It must be noted that risk factors such as market resistance can only be estimated using the sales comparison approach or the income capitalization approach. While many of the examples include scenarios in which there is market resistance in order to demonstrate the appropriate mathematical calculations, it should be noted that this is not always the case. In many analyses of detrimental conditions, the empirical data shows that there is no risk, stigma, or market resistance whatsoever.

While the cost approach is a useful way to organize the process and the effects that detrimental conditions have on value, market evidence will ultimately have to be analyzed relative to many of the issues considered.

## The Sales Comparison Approach Applied to Detrimental Conditions

The sales comparison approach utilizes market data with and without the detrimental condition. This approach may not always be easy to apply because of the difficulty in finding relevant market data, but it still is a very strong approach for quantifying value issues in a detrimental condition assignment.

According to the 14th edition of *The Appraisal of Real Estate*, the principle of substitution states that when several similar or commensurate commodities, goods, or services are available, the one with the lowest price attracts the great-

BACK_DEFEXP-RR-003868

est demand and widest distribution. This is the primary principle upon which the cost and sales comparison approaches are based.[1]

As related to the detrimental condition model, the sales comparison approach applied to detrimental conditions is summarized in Exhibit 1.6.

| Exhibit 1.6 | Sales Comparison Approach Applied to Detrimental Condition |
|---|---|

|   |   |
|---|---|
|   | Control area market data |
|   | (No detrimental condition, Point A) |
| − | Test area market data |
|   | (With detrimental condition, Points B, C, D, E, or F) |
| = | Diminution in value |

## Paired Sales Analysis

One of the most useful applications of the sales comparison approach is paired sales analysis. This type of analysis may compare the subject property or similarly impacted properties called *test areas* (at Points B, C, D, E, or F) with unimpaired properties called *control areas* (Point A). A comparison may also be made between the unimpaired value of the subject property before and after the discovery of a detrimental condition. If a legitimate detrimental condition exists, there will likely be a measurable and consistent difference between the two sets of market data; if not, there will likely be no significant difference between the two sets of data. This process involves the study of a group of sales with a detrimental condition, which are then compared to a group of otherwise similar sales without the detrimental condition. As with a conventional appraisal, care should be taken by the appraiser or analyst when using a paired sales analysis in a sale-resale context to consider and adjust for any major alterations or renovations made to the properties after the first sale but before the subsequent sale.

For example, a group of properties near a sewage treatment plant can be compared with similar properties that are not located near such a plant. Exhibit 1.7 provides an example of a comparison between a test area and a control area. Five sales were located within the test area. Several control area sales were located that are similar to those in the test area except for the detrimental condition. The study indicates that properties impacted by the condition within the test area sell for approximately 11% to 18% less than otherwise similar properties in the control area.

| Exhibit 1.7 | Paired Sales |
|---|---|

| | Test Area with Detrimental Condition | Control Area with No Detrimental Condition | | | Indication from Control Area Comparables | % Loss |
|---|---|---|---|---|---|---|
| | | Sale 1 | Sale 2 | Sale 3 | | |
| Property 1 | $495,000 | $600,000 | $585,000 | $580,000 | $588,000 | 15.8% |
| Property 2 | $525,000 | $590,000 | $605,000 | $575,000 | $590,000 | 11.0% |
| Property 3 | $490,000 | $570,000 | | $600,000 | $585,000 | 16.2% |
| Property 4 | $505,000 | $580,000 | | $605,000 | $592,500 | 14.8% |
| Property 5 | $485,000 | | | $590,000 | $590,000 | 17.8% |

---

1.  *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 30.

BACK_DEFEXP-RR-003869

## Impaired Sales Comparables

In the sales comparison approach, impaired sales data can be analyzed to determine if value diminution exists. For example, suppose a one-acre commercial land parcel was being valued that had previously been the location of a service station. Also, assume that the station had leaking underground storage tanks (LUSTs), but the contamination had been cleaned up to the satisfaction of regulatory authorities and a NFA letter was in place on the property.

Since this set of facts is common in many large cities, it may be quite possible to find comparable sales that match the subject both in terms of physical and locational characteristics as well as environmental characteristics. If four sales were found that were similar in size and location and each had an NFA letter covering historical petroleum contamination, these sales might indicate the following for the subject after appropriate adjustments were made:

> Impaired Comparable Sale 1, adjusted to $7.40 per sq. ft.
> Impaired Comparable Sale 2, adjusted to $6.80 per sq. ft.
> Impaired Comparable Sale 3, adjusted to $8.20 per sq. ft.
> Impaired Comparable Sale 4, adjusted to $7.80 per sq. ft.

Given this market data, it can be concluded that the impaired value of the subject was $7.60 per square foot, based on an evaluation of the adjusted prices of the four comparables.

To estimate the subject property's unimpaired value, the same procedure would be followed using similar comparable sales without the historical environmental condition. If the resulting estimate of unimpaired value was approximately $7.60 per square foot, the conclusion would be that the environmental condition seems not to have had any ongoing or lasting impact on value. However, if the resulting unimpaired estimate was $8.40 per square foot, it would indicate that the market resistance associated with the environmental history of the property is approximately 10%.

## Market Resistance Estimation

Some companies actually are in the business of buying impaired or damaged properties. Accordingly, they may be an excellent resource in determining the appropriate market resistance.

As an extension or application of the sales comparison approach, market resistance can be derived from sales comparables that sold in impaired conditions. For example, suppose an industrial property is being evaluated just after an earthquake. Several sales of properties that sold in a damaged condition (impaired value) similar to the subject property are found. The unimpaired value can be determined from market data on unimpaired sales comparables immediately prior to the earthquake or from properties that sold after the earthquake and were not damaged. By verifying the market data, the analyst can determine the total assessment costs, repair costs (inclusive of project incentive), and ongoing costs for each property as well as whether these costs would be the owner's responsibility. As might be expected in an earthquake, loss of use was a signifi-

BACK_DEFEXP-RR-003870

cant issue for several of the sales, and rental income loss was estimated for the period of interrupted occupancy. Using the relationship between the unimpaired value and impaired value, the data can now be used to estimate market resistance as shown in the following table.

|  | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|
| Unimpaired value | $1,000,000 | $2,500,000 | $1,500,000 | $3,000,000 | $4,750,000 |
| – (Assessment, repair, ongoing costs) | 75,000 | 440,000 | 115,000 | 1,750,000 | 2,000,000 |
| + (Costs owner not responsible for) | None | None | None | None | None |
| – (Loss of use) | 25,000 | 160,000 | 65,000 | 50,000 | 150,000 |
| – Impaired sale price | 800,000 | 1,600,000 | 1,200,000 | 800,000 | 2,000,000 |
| = Market resistance | $100,000 | $300,000 | $120,000 | $400,000 | $600,000 |
| As % of unimpaired value | 10% | 12% | 8% | 13% | 13% |

Assuming that the subject property and the comparable sales are similar in character, one could estimate from the market data in this example that the market resistance is between 8% and 13% of the unimpaired value.

## Sale/Resale Analysis

Another type of paired sales analysis involves studying the sale and subsequent resale of the same property. This method is used to determine the influence of time on market values or to determine the impact of a detrimental condition by comparing values before and after the discovery of the condition.

The following table illustrates a neighborhood study that determines the net effects of market influences on properties between 2010 and 2015. Properties that had major renovations or remodeling during this time period may need to be eliminated, and adjustments for physical depreciation or renovations may also be necessary. The study illustrates five properties that sold in 2010 and then resold in 2015.

|  | 2010 | 2015 | Percent Change |
|---|---|---|---|
| Property A | $78,000 | $85,500 | 9.6% |
| Property B | $75,000 | $80,000 | 6.7% |
| Property C | $77,000 | $86,000 | 11.7% |
| Property D | $77,500 | $85,000 | 9.7% |
| Property E | $76,000 | $83,500 | 9.9% |

The table shows that property values have experienced a net increase ranging from 6.7% to 11.7% within the five-year period. Of course, the net impact could also be negative.

The same type of sale and resale analysis could be used for estimating the impact of a detrimental condition on property values. The following study illustrates a situation in which five properties were sold prior to the discovery of a detrimental condition and then resold after the condition occurred or became apparent.

BACK_DEFEXP-RR-003871

|  | Sale Before DC 2014 | Sale After DC 2015 | Percent Change | Percent Attributable to Market | Percent Attributable to DC |
|---|---|---|---|---|---|
| Property A | $482,000 | $385,500 | -20.0% | -5% | -15.0% |
| Property B | $476,500 | $370,000 | -22.4% | -5% | -17.4% |
| Property C | $478,000 | $376,500 | -21.2% | -5% | -16.2% |
| Property D | $477,000 | $386,000 | -19.1% | -5% | -14.1% |
| Property E | $480,000 | $383,500 | -20.1% | -5% | -15.1% |

This study illustrates that property values dropped from 14.1% to 17.4% as a result of the detrimental condition. Like any detrimental condition study, care should be taken to adjust for any market factors that are not associated with the issue being studied.

## Neighborhood Studies

The neighborhood comparative study looks at a large number of transactions to see whether generalizations can be made for an area impacted by a detrimental condition. An appraiser or analyst must recognize that if some systematic effect of the detrimental condition does reveal itself in the analysis of a neighborhood in the aggregate, the effect on individual properties must still be quantified if applicable. This requires the application of one or both of the appraisal techniques discussed earlier.

The neighborhood comparison approach requires the definition of a test area that contains the allegedly affected properties and one or more control areas that are generally agreed to have been unaffected by the detrimental condition. The more similar the control areas are to the test area except for the influence of the detrimental condition, the better. A variety of secondary data sources can be used to try to match land use, property, and demographic characteristics. Realistically, however, all areas have their own unique features, and it is a mistake to think of the comparison areas as *comparables* in the sense that appraisers use the term in the sales comparison approach.

The critical consideration in neighborhood comparison is whether there appears to be any change in the relationship between the test area and the control (unimpaired) area after the market becomes aware of the issues related to the detrimental condition; this is usually resolved by observing trends in price or price per square foot. If the trends start to diverge in favor of the control areas after the market becomes aware of a detrimental condition, this suggests that the divergence (i.e., diminution in the test area) is due to the detrimental condition. To reach this conclusion, however, other plausible explanations for the divergence must be investigated; in other words, causality cannot necessarily be assumed.

If the test and control areas have had active markets, a simple approach to calculating the trend for each area is to calculate the mean or median sale price for each time period. The control area trends can then be compared to the test area trend. In many cases, the timing associated with discovering and publicizing the detrimental condition can be well defined—e.g., a high-profile accident or spill—and the relationship of the trends in price between the two areas can be compared before and after the detrimental condition with some precision. The resulting analysis can be summarized simply in a chart like the one shown in

BACK_DEFEXP-RR-003872

Exhibit 1.8. In this exhibit, Control Area A appears to be inferior (on average) to the subject neighborhood, while Control Area B is slightly superior to the test area. Furthermore, the first graph shows no evidence of any change in the value relationship subsequent to the date of the incident, so there is no empirical support for a claim of value diminution. However, if the spill did cause a diminution in value, it might have a pattern similar to the second graph shown in Exhibit 1.8.

The following issues commonly arise in this type of analysis:

- Ambiguity in the date of impact
- Level of market participant knowledge
- Appropriate controls for other factors influencing neighborhood sales prices
- Correct interpretation and application of the results

| Exhibit 1.8 | Neighborhood Comparison Approach |
| --- | --- |



### Ambiguity in the Date of Impact/Level of Market Participant Knowledge

In Exhibit 1.8, a well-defined point in time when the market became aware of a highly publicized spill is assumed; however, the market may have come to understand the detrimental condition over a considerable period of time. Local press coverage may be a good proxy for market knowledge. While no media is 100% efficient and there are usually some uninformed people in a given market, an event featured in the local media generally indicates that the market has been well informed about it. By using a service such as LexisNexis, the total amount of media exposure can be estimated over a specified time period.

Exhibit 1.9 shows a hypothetical history of media coverage associated with contamination issues. The graph shows that there were occasional articles in the late 1990s and early 2000s, but intense coverage occurred from 2005 to 2010. This would suggest that the appraiser or analyst look carefully for changes in the trend relationship between the test and the control areas beginning in 2005. Investigation of disclosures made in connection with sales transactions in the test area might also be helpful, although this information can sometimes be difficult to obtain.

BACK_DEFEXP-RR-003873

**Exhibit 1.9** — **Local Press Coverage of Contaminated Issues**



## Appropriate Controls for Other Factors Influencing Neighborhood Sales Prices

The previous discussion was based on a simple comparison of mean (or median) values relating to price (or price per square foot) for properties in a test area and one or more control areas. If the mix of sales between large custom homes and tract homes was changing over time in the areas, however, a change in the relationship of the trends between the different areas could mistakenly be attributed to the detrimental condition. The appraiser or analyst will often try, therefore, to control for other factors that could impact value.

These might include property-specific variables (square footage, age, condition, lot size, number of rooms, bathrooms, etc.) and location-specific variables (school district, proximity to nuisances, amenities, etc.).

If a very small number of sales were being analyzed, the appraiser or analyst could make specific adjustments for these factors. More frequently, however, the assignment deals with relatively large areas over significant periods of time. This situation generates a sufficiently large number of observations so that statistical methods can be used to isolate time trends, holding other factors constant. Time series and multiple regression analyses are commonly used for this kind of analysis.

## Correct Interpretation and Application of the Results

Particular care has to be exercised in the interpretation of the results of neighborhood comparison analysis. First, a divergence in the value trends of the test and control areas does not necessarily prove causality due to the detrimental condition; it simply indicates that there is some cause of divergence beyond the variables that are controlled for in the study. Other possible causes of the divergence must be carefully analyzed and eliminated before the divergence can be attributed to the detrimental condition. Second, the conclusion that results from this analysis is a conclusion about the neighborhood as a whole, not about individual properties. Additional property-specific research may be required to understand how the aggregate results would apply to individual properties.

## Proximity Studies

A proximity study is similar to a neighborhood comparison study, but it focuses exclusively on the test area, attempting to determine whether there is any evidence of a systematic effect on value associated with proximity to a detrimental condition.

Proximity can be defined in different ways as long as any plausible hypothesis of effect can be tested. In an environmental context, it might be the distance to the property boundary of the source site, the distance to the nearest contaminated water well, or a binary (yes or no) variable reflecting whether the property is over the

BACK_DEFEXP-RR-003874

plume of contamination. Proximity studies can also be used for a variety of negative externalities, including those associated with noise, odors, or visual impacts.

A basic test might study values or value trends associated with particular proximity variables. Suppose, for example, that the appraiser or analyst was testing for differences in value trends within the test area based on three different distance zones from an environmental source site–less than 1,000 feet, between 1,000 and 2,000 feet, or more than 2,000 feet. Suppose further that, other factors being equal, the value trends were higher as distance from the source site increased, as shown in Exhibit 1.10. Does this result suggest that contamination has affected home values? Suppose the contamination-related event occurred in 2010 and was well publicized in the market at that time. Under this assumption, the detrimental condition does not seem to have affected value if the pattern resembles the first graph. The same value relationships that existed before the detrimental condition-related event also exist after. There does not appear to have been any change in proximity-related value trends due to the detrimental condition. However, in the second graph the pattern suggests that the contamination does impact properties less than 1,000 feet from the site.

Like neighborhood comparison analysis, proximity analysis can be carried out based on simple mean or median sale price data or by using multiple regression analysis to control for specific variables that may affect value. Similarly, the same admonitions that apply to the interpretation of results in neighborhood comparison analysis are relevant here.

## Case Study Analysis[2]

Determining the impacts that detrimental conditions have on property value requires real estate analysts to address a number of factors and elements not con-



**Exhibit 1.10**    **Value Trends Associated with Proximity to the Test Site**

---

2. This discussion originally appeared in "The Analysis of Environmental Case Studies" by Thomas Jackson, PhD, MAI, and Randall Bell, PhD, MAI, which appeared in the January 2002 issue of *The Appraisal Journal*.

BACK_DEFEXP-RR-003875

sidered in the more typical sales comparison analysis of non-impacted or unimpaired properties. These factors may be considered or analyzed using case studies.

The first step in a case study analysis involves research into the subject property and a determination of the key factors that impact that property. Then, in an effort to determine any effect on value, case studies are developed from other properties that are similarly situated with respect to the subject property and its detrimental condition. Like any valuation technique, case study analysis can be applied properly or improperly. In order for the analysis to be reliable and valid, case studies must make "apples to apples" comparisons, which means that the case studies being used must have similar property, market, and detrimental condition characteristics as the subject property.

Appraisal methodologies ultimately fall within one of the three traditional approaches to value: the cost approach, the sales comparison approach, or the income capitalization approach. Case study analysis involves situations in which similar properties have been impacted by similar conditions. Thus, the analysis of case studies is an extension of the sales comparison approach. However, in addition to the typical elements of comparison such as property type and location, valid and reliable case studies must consider other elements and property characteristics.

Like any application of the sales comparison approach, it is difficult and in some situations impossible to find comparables that are identical in all respects to the subject property. Nonetheless, there should be similarities in certain key characteristics in order for the resulting inferences and conclusions to be reliable, valid, and not misleading.

Generally, case studies are used when there is a lack of direct market data or when analyses of direct market data need additional support. For example, if the impact of a landfill on surrounding properties was being studied, the most pertinent approach would involve actual sales of the surrounding properties. In the event that no direct market data is available, then the case study approach utilizing market data relative to other landfill-proximate sales would become relevant. Although case studies are useful any time there is available and relevant data, they have a secondary role if direct market data is available at the subject site.

A case study must take into consideration property characteristics. Like a market data grid in the sales comparison approach, a case study comparison chart organizes and compares the characteristics or elements of the case study to the subject property. As in any type of sales comparison analysis, the subject property and case studies should ideally be similar in all respects; however, in reality this does not always occur. Problems arise if a significant number of issues differ substantially from the subject property conditions, and the question may arise as to whether the case study is really comparable at all. For example, case studies involving accidental environmental discharges are not comparable to situations in which the discharge was legally permitted, and an environmental source site case study may not be comparable to a non-source site subject property, except to establish an upward limit of damage. A house should not be compared to a shopping center. After selecting an appropriate set of case studies, a relative comparison analysis can be performed, leading to a net comparison ranking for each case study relative to the subject. It is also a well-known attribute of the real estate

BACK_DEFEXP-RR-003876

market that prospective buyers are likely to be more forgiving of certain conditions when the market is increasing than they would be during a period of market decline. Because of this attribute, strong market conditions sometimes have a mitigating effect, while weak market conditions tend to amplify negative issues.

## Statistical Studies

Historically, statistics was a highly specialized and complex topic that few academics and fewer practitioners were proficient in. The barriers of entry were high, as statistical calculations were made using exhaustive algebraic formulas, hand-held calculators, mainframe computers, or Fortran programming on punch cards.

Today, virtually every desktop and laptop computer has the ability to efficiently perform statistical calculations that once took hours in a matter of seconds. The longhand algebraic formulas have been set aside in favor of practical applications for real estate professionals using Excel software. Conventional software, such as Microsoft Excel, SPSS, or Minitab, is well suited for real estate valuation issues.[3] The traditional real property appraiser plays an important role in this changing world by bridging the gaps between purely mathematical valuation models, local market conditions, and the physical real estate being analyzed.

Statistical studies, including simple and multiple regression analysis, are considered a refined version of sales comparison analysis that generally uses more data and allows for the statistical testing of results. Statistical analysis is useful for large data sets, which are often available in the analysis of detrimental conditions. This type of study allows for the consideration of more than a small sample of sales or other data, and in many cases facilitates a relatively sophisticated and more meaningful analysis.

The use of statistical modeling requires an understanding of the term *variable*, which may be defined as a property attribute that can assume some range of values. There are both dependent and independent variables. In valuation, price is usually the dependent variable. In other words, the price or value depends upon a number of independent variables, such as size, age, room counts, and other factors.

Variables can be quantitative, qualitative, ordinal (rank), or either discrete or continuous. Examples of significant quantitative variables include sale price, rental rate, site area, age, or building size. Ordinal data might be used to describe views, quality, or the condition of improvements. Qualitative variables are also known as binary or "dummy" variables. Binary variables take on values of 1 or 0 depending on the presence or absence of a particular characteristic, such as dock-high loading, a swimming pool, or location in a specific neighborhood. Statistical charts and graphs provide a pictorial view of the data and can be especially useful for presentation purposes. The presentation of data in tabular form is common, and data is often sorted into an array from low to high. While this type of array can be helpful when identifying extreme values or outliers, it may have limited utility in helping the user to visualize numerical relationships. Charts and graphs, on the other hand, provide a pictorial view of the data and are especially useful for presentation purposes. Some charts, such as histograms or pie charts, describe a single variable.

---

3.   Marvin L. Wolverton, *An Introduction to Statistics for Appraisers* (Chicago: Appraisal Institute, 2009), 5.

BACK_DEFEXP-RR-003877

Other types of charts, such as scatter diagrams or line charts, demonstrate a relationship between two variables. Graphing more than two variables requires three or more dimensions; this is often difficult to visualize in either a table or a chart and requires the use of more sophisticated statistical techniques. Consider Exhibits 1.11 and 1.12, which present the same information in table and scatter diagram form.

While both the table in Exhibit 1.11 and the scatter diagram in Exhibit 1.12 utilize the same data set, the relationship between time and price is much more obvious in the scatter diagram. Exhibit 1.12 shows an increasing price trend during 2012 and no sales activity during 2013. Significantly lower prices start again in early 2014, and prices do not attain peak 2012 levels until late 2015. Descriptive statistics, as the name implies, describe or summarize data. *The Dictionary of Real Estate Appraisal* defines *descriptive statistics* as "a branch of statistics concerned only with characterizing, or describing, a set of numbers."[4] In the context of descriptive statistics and real estate valuation, there are three fundamental categories of descriptive statistical studies:

- Single variable studies, such as pie charts, histograms, or bar charts
- Simple regression analyses, which include two-variable graphs or scatter diagrams, typically on an x-axis and y-axis, that demonstrate the relationship between two variables
- Multiple regressions, which involve three or more variables and utilize more advanced studies
Graphing three or more variables requires multiple dimensions. It is impossible to visualize these analyses on a table or a chart, and multiple regression

| Exhibit 1.11 | Sales Information in Table Form |
| --- | --- |
| **Sale Date** | **Price per Sq. Ft.** |
| 01/05/12 | $141.00 |
| 03/23/12 | $143.00 |
| 04/10/12 | $142.00 |
| 05/30/12 | $145.00 |
| 07/05/12 | $150.00 |
| 09/28/12 | $150.00 |
| 11/10/12 | $151.00 |
| 02/03/14 | $134.00 |
| 05/08/14 | $128.00 |
| 08/03/14 | $125.00 |
| 09/10/14 | $132.00 |
| 12/05/14 | $130.00 |
| 03/03/15 | $137.00 |
| 04/10/15 | $142.00 |
| 07/31/15 | $145.00 |
| 10/29/15 | $151.00 |
| 12/31/15 | $150.00 |

4. *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 321.

BACK_DEFEXP-RR-003878

Copyrighted material. Subject to the standard license. Redistribution June 26, 2016

**Exhibit 1.12**    Sales Information in Scatter Diagram Form



analyses require the use of more sophisticated, yet less presentation-friendly, statistical techniques.

Inferential statistics is less relevant for real estate professionals. In contrast to descriptive statistics, it draws inferences or conclusions about a population based on observations from a smaller sample. Two important sets of statistics, measures of central tendency and measures of variance, are commonly used to describe data distributions.

The measures of central tendency are:

• Mean–the average of all the variables

• Median–the midpoint between the high and low values of an ordered data distribution

• Mode¬the most frequent value

The measures of variance are:

• Range–the difference between the highest and lowest values

• Quartiles–the points dividing the arrayed data into four equal groups

• Standard deviation–the square root of the average of the sum of squared differences between each data point and the mean

• Standard error–the standard deviation of a regression coefficient

The mean and median are the most commonly used measures of central tendency. The mean has important statistical applications and is easily understood, although it is more strongly influenced by extreme values (outliers) than the median. The median is simply a "midpoint" of all the data, regardless of how much data there is. It is important to consider the inclusion or exclusion of outliers, since a small number of extreme values can impact some statistical analyses.

*General Conditions*    **43**

BACK_DEFEXP-RR-003879

However, the basis for excluding any outliers should be clearly demonstrated. Outliers should normally be excluded using a decision rule (i.e., more than two standard deviations from the mean, 10% above or below the next highest or lowest value, etc.) to minimize bias in the data selection and refinement process. At a minimum, outliers should be investigated to determine why these values differ significantly from the rest of the data. Measures of variance generally describe the dispersion of the data. The standard deviation, though complicated to calculate manually, is often preferred in situations requiring more sophisticated analyses. If data is normally distributed (as represented by a bell-shaped curve such as the one shown in Exhibit 1.20), statistics tells us that there is a 68% probability that a predicted value will be within one standard deviation of the mean, a 95% probability that a predicted value will be within two standard deviations of the mean, and a probability in excess of 99% that a predicted value will be within three standard deviations of the mean. This information is often used to construct confidence intervals around point estimates. Numerous outputs can be generated with programs such as Microsoft Excel, which is often used in statistical analyses.

The analysis of detrimental conditions using large data sets often involves the selection of a *study area* or *test area*, which is essentially a group of properties with some attribute of interest (such as location over a plume of contaminated groundwater) that is then compared to one or more similar *control areas* for the purpose of determining the impact, if any, of the particular attribute on market pricing. Such comparisons often consider differences between mean or median values for the study and control areas to determine whether a certain attribute has any impact on value or marketability. However, the variance and number of observations in each group are also significant, particularly when differences in measures of central tendency are small.

### Single-Variable Statistics

Single-variable statistics are relatively straightforward and are of considerable benefit in the real estate professions. The general public is well familiar with single, independent variable statistics, as newspapers and magazines often use these statistical models to present numerical information in the form of pie charts, bar charts, or tables. Bar and pie charts provide a picture summarizing the information from a table.[5] For example, a pie chart such as the one shown in Exhibit 1.13 can be used to set forth the age distribution in a community. Bar charts, such as the one shown in Exhibit 1.14, can be used in a variety of ways. A histogram is a type of bar chart showing the distribution of a data set, in which the total area of the bars equals either the number of observations or 100%, depending on how the chart is constructed.

### Simple Regression Analysis: Time Series

Simple regression analyses are relatively straightforward statistical models that can be highly effective in setting forth the relationship of two variables, such as price and time, price and size, or other relationships. Because they use two variables, they are commonly graphed on an x-axis and a y-axis that show the

---

5. Wolverton, *An Introduction to Statistics for Appraisers*, 57.

BACK_DEFEXP-RR-003880

Copyrighted material licensed to Richard Roddewig on June 20, 2016



**Exhibit 1.13**   Pie Chart

**Exhibit 1.14**   Bar Chart

relationship between these two variables. The dependent variable, usually price, typically goes on the y-axis, whereas the independent variable, often time or size, typically goes on the x-axis. *The Cambridge Dictionary of Statistics* defines *correlation* as "a general term for interdependence between pairs of variables."[6] When two variables move together, then they are said to be correlated.[7]

Because time series studies chart time on one axis of a graph and value on the other, these studies are invaluable for evaluating market trends, which might be due to market conditions or other factors. Using a time series study for a detrimental condition analysis typically involves comparing price changes in a study area (for example, a neighborhood allegedly impacted by contamination, construction defects, etc.) with price changes in one or more control areas over the same time frame. Control areas can include a larger geographic area (county or city) or another neighborhood. Direct comparability is not always critical in a time series analysis as long as the control areas used for comparison are not impacted by other factors that might have an impact on price trending.

In a time series analysis, data can be analyzed for discrete time periods (months, quarters, years, etc.) or continuously over a specified time frame. Discrete time periods often use the mean or median price per period. Analysis of continuous data, usually shown graphically in a scatter diagram, can be greatly enhanced by using a trend line. Such trend lines can take a variety of forms, both linear (straight-line) and non-linear or polynomial (curved), depending on what best fits the data. Exhibit 1.15 shows examples of simple regressions with linear and polynomial trend lines.

Fitting a trend line to a series of data points is a simple regression (using one independent variable) with time plotted on the x-axis. The *coefficient of determi-*

---

6.   B. S. Everitt and A. Skrondal, *The Cambridge Dictionary of Statistics*, 4th ed. (New York: Cambridge University Press, 2010), 107.

7.   Wolverton, *An Introduction to Statistics for Appraisers*, 52.

BACK_DEFEXP-RR-003881

**Exhibit 1.15**    Simple Regression: Straight (Linear) and Curved (Polynomial) Trend Lines



*nation* ($r^2$) describes the "goodness of fit" and can provide valuable insight into the appropriate form for the trend line. In theory, the coefficient of determination ranges from 0% (no correlation) to 100% (perfect correlation), although in practice $r^2$ will typically fall somewhere between these two extremes. While a linear form is simplest, a polynomial form often best describes data over a significant time frame, particularly when the direction or magnitude of a market trend changes at some point. Exhibit 1.16 shows a graphical representation of the data set used in Exhibits 1.11 and 1.12, with a polynomial trend line reflecting $r^2 = 0.8942$, which would be considered a "good fit." Note that a linear (straight-line) trend line would be almost meaningless in accurately describing this data.

**Exhibit 1.16**    Graphic Representation of Data

BACK_DEFEXP-RR-003882

Paired sales analysis using the sale and resale of the same property can also demonstrate market trends, assuming that there have been no significant changes to a property over the interim period. However, while paired sales can be used to show average trends (often expressed on a compounded monthly basis) over a certain time period, they are less effective at showing specifically how the trend is changing over this period.

## Multiple Regression Analysis

Multiple regression analysis is an econometric model that expresses the value of a dependent variable, usually price in a real estate context, as a function of two or more independent variables, such as location, site area, age, or building size. In contrast to simple regression, this technique is considered a multivariate model, which analyzes the relationship among several variables at the same time. While a detailed treatment of multiple regression is beyond the scope of this text, an overview of the approach and its applications is useful, as this type of analysis is often applicable to the study of detrimental conditions with a sufficient quantity of data.

While regression modeling can be used to estimate value, its use in a detrimental condition analysis tends to focus on the coefficient(s) relating to specific independent variables associated with some detrimental condition. Variables chosen for the model will depend to some degree on the issue being studied, the availability of market data, and the judgment of the analyst.

The most straightforward regression model is additive, which assumes a linear relationship between the dependent and each of the independent variables. Even if such relationships are not truly linear, they may be close to linear over a finite range, simplifying the specification of the model. The analyst should take care to avoid inferring that data is linear when it is not. In some situations, variables can also be mathematically transformed from a curvilinear function to a straight line.

The regression equation normally takes a form similar to the following equation:

$$y = a + bx_1 + cx_2 + \ldots + zx_n,$$

where $y$ = dependent variable

$a$ = constant ($y$-intercept)

$b, c \ldots z$ = coefficients for independent variables

$x_1, x_2 \ldots x_n$ = independent variables

Multiple regression calculates a number of statistics that measure the overall validity of the model as well as the specific independent variables. The coefficient of determination ($r^2$) was discussed briefly with respect to time series analysis using simple regression and has a similar meaning: the percentage of variation in the dependent variable that is explained by the model (i.e., the independent variables).

A related statistic is the *adjusted $r^2$*, which adjusts the coefficient of determination for the number of independent variables, assisting in the identification of extraneous or redundant independent variables. In multiple regression analysis, a low adjusted $r^2$ normally indicates a significant amount of unexplained variation, although this does not necessarily invalidate the model.

BACK_DEFEXP-RR-003883

The *F-statistic* is a better test of the overall significance of the regression equation; it essentially measures the strength of the relationship between the dependent variable and all the independent variables. The larger the *F*-statistic, the more confident one can be that the regression results are meaningful. The *F*-statistic can be compared to critical *F-values* from a statistical table, although it is common for regression output to include the calculation *significance F*, which effectively measures the probability of obtaining the regression results by chance.

Regression residuals, reflecting the difference between the actual and predicted values of the dependent variable, are useful in identifying potential outliers that can impact the results of the analysis.

*T-statistics* (*t-stats*) calculated for each independent variable reflect the ratio of the coefficient divided by its standard error, with corresponding *P-values* for specific confidence levels indicating the probability that the relationship between the dependent and independent variables is due to random chance (i.e., that the coefficient is really zero). Significant correlation between two or more independent variables results in *multicollinearity*, which often produces unreliable estimates of coefficients for collinear variables (usually with low *t*-statistics). While multicollinearity does not necessarily affect the ability of a model to predict the dependent variable, the validity of conclusions about collinear independent variables is a concern. As a result, multicollinearity issues should be treated carefully. Exhibit 1.17 provides an overview of regression analysis.

### Landslide Case Study

The following is a brief overview showing one possible application of regression modeling in a situation involving homes located adjacent to a major landslide. This case study addresses the question of whether residential properties located in a particular landslide area experienced a diminution in value following the slide relative to similar homes located outside the landside area.

In all, 1,006 sales were analyzed over a period of nearly seven years. A few of these sales are summarized in the input table in Exhibit 1.18, which was created using Microsoft Excel software. Homes located within the landslide study area are represented by the binary variable 1, while those outside the study area are denoted by the variable 0. The home price is the dependent variable, while the independent variables include lot square footage, age, gross living area (GLA), and the number of months after the landslide that the sale occurred. Exhibit 1.19 summarizes important attributes of the data set, including measures of central tendency and variability.

The summary output table in Exhibit 1.21 can be generated by Excel or other dedicated statistical software packages using a mathematical model to minimize the sum of the squared residuals relative to the 1,006 home sales included in the study. (The residual is the difference between the actual and predicted values of the dependent variable.)

While a complete discussion of this case study would be beyond the scope of this text, the following are some key statistical observations from this example:

• The mean is the same as the average of the data. In this case, the mean selling price of the transactions included in the data set is approximately $289,000.

BACK_DEFEXP-RR-003884

**Exhibit 1.17** **Regression Analysis**

- The standard deviation is a measure of variability from the mean. For a normal distribution, like that shown in the bell curve in Exhibit 1.20, approximately 95% of the data would fall within ±2 standard deviations, or approximately $123,000.

- The $r^2$ ranges from 0% to 100%, reflecting the amount of price variation explained by the model (about 51% in the example).

- The $F$-statistic reflects the overall significance of the regression equation. Simply stated, the higher the $F$-statistic, the more reliable the analysis. Significance $F$ measures the probability that the results were obtained purely by chance. As a result, the lower the figure, the more meaningful the study. The high $F$-statistic in this example (208.46) is significant to 152 decimal places.

BACK_DEFEXP-RR-003885

**Exhibit 1.18**    **Summary Input Table**

| Data No. | Street Address | Price | Sale Date | Months from Landslide | Lot Sq. Ft. | Age | GLA | Study Area |
|---|---|---|---|---|---|---|---|---|
| 1 | 423 S. Paseo Serena | $247,000 | 05/29/2006 | 41 | 11,000 | 26 | 2,117 | 0 |
| 2 | 483 S. Paseo Serena | $245,000 | 10/21/2007 | 58 | 6,500 | 26 | 2,117 | 0 |
| 3 | 482 S. Paseo Real | $190,000 | 11/20/2006 | 47 | 6,300 | 26 | 1,607 | 0 |
| 4 | 432 S. Paseo Real | $285,000 | 09/24/2008 | 69 | 11,750 | 26 | 1,607 | 0 |
| 5 | 411 S. Paseo Real | $227,500 | 05/15/2007 | 53 | 11,700 | 26 | 2,386 | 0 |
| 6 | 423 S. Paseo Real | $229,000 | 12/26/2005 | 36 | 5,250 | 26 | 1,698 | 0 |
| 7 | 443 S. Paseo Real | $211,000 | 03/07/2007 | 51 | 6,300 | 26 | 2,117 | 0 |
| 8 | 483 S. Paseo Real | $260,000 | 09/11/2008 | 69 | 6,600 | 26 | 1,698 | 0 |
| 9 | 6343 E. Via Estrada | $279,000 | 09/22/2008 | 69 | 17,825 | 26 | 2,048 | 0 |
| 10 | 6394 E. Via Estrada | $245,000 | 02/13/2008 | 62 | 15,200 | 26 | 2,048 | 0 |
| 1005 | 6709 E. Leafwood Drive | $325,000 | 06/18/2009 | 78 | 8,400 | 23 | 2,196 | 1 |
| 1006 | 1068 S. Burlwood Drive | $375,000 | 06/04/2009 | 78 | 9,100 | 22 | 2,582 | 1 |

Note: This table presents a summary of data. The data between Item 10 and Item 1005 is not shown for the sake of simplicity.

**Exhibit 1.19**    **Descriptive Statistics**

| | Price | Sale Date | Months from Landslide | Lot Sq. Ft. | Age | GLA | Study Area |
|---|---|---|---|---|---|---|---|
| Mean | $289,312 | 11/10/2006 | 46.8 | 10,590 | 22.7 | 2,413 | 0.1 |
| Median | $280,000 | 03/07/2007 | 51.0 | 9,035 | 22.0 | 2,436 | 0.0 |
| Mode | $275,000 | 08/31/2008 | 78.0 | 7,000 | 22.0 | 1,932 | 0.0 |
| Standard deviation | $61,549 | N/A | 22.8 | 5,793 | 3.6 | 464 | 0.2 |
| Range | $422,000 | N/A | 80.0 | 87,156 | 20.0 | 2,252 | 1.0 |
| Minimum | $135,000 | 01/11/2003 | 1.0 | 4,200 | 12.0 | 1,332 | 0.0 |
| Maximum | $557,500 | 09/30/2009 | 81.1 | 91,356 | 32.0 | 3,584 | 1.0 |
| Count | 1,006 | 1,006 | 1,006 | 1,006 | 1,006 | 1,006 | 1,006 |

- Coefficients are calculated for each independent variable, reflecting a marginal rate of change. Coefficients are normally reviewed for expected magnitude and signage. In this case, the coefficient for age is negative, indicating a value change of approximately -$1,600 per year. The coefficient for gross living area is positive, indicating that each additional square foot is worth approximately $74.

- *T*-statistics are also calculated for each independent variable, effectively testing the null hypothesis that the calculated regression coefficients are equal to zero. The larger the *t*-stat, the more one can be confident that the coefficient is meaningful. Conversely, the *P-value* measures the probability that the true value of the coefficient is zero (the significance level). An acceptable significance level for coefficients in most applications is 10%, or a *P*-value of 0.10 or less.

An appraiser or analyst typically conducts numerous statistical runs to eliminate extraneous variables and outliers. A table of residuals (not shown) compares actual and predicted values of the dependent variable for each data item, which is helpful in identifying outliers that might impact the analysis.

In this example, the coefficient calculated for the landslide study area is -$34,657, which is significant at better than the 0.00000001 level. This data re-

BACK_DEFEXP-RR-003886

Copyrighted material reproduced with permission... Richard Roddewig... June 20, 2016



**Exhibit 1.20** | **Bell Curve Showing Normal Distribution**

**Exhibit 1.21** | **Summary Output Table**

**Regression Statistics**

| | |
|---|---|
| Multiple $r^2$ | 0.7144 |
| $r^2$ | 0.5104 |
| Adjusted $r^2$ | 0.5079 |
| Standard error | 43,176.25 |
| Observations | 1,006 |

| ANOVA | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 5 | 1.94306E+12 | 3.88612E+11 | 208.461604 | 0.00000000 |
| Residual | 1,000 | 1.86419E+12 | 1864188203 | | |
| Total | 1,005 | 3,80725E+12 | | | |

| | Coefficients | Standard Error | t-stat | P-Value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|---|
| Intercept | 90,421.85 | 14,552.62 | 6.213441 | 0.00000000 | 61,864.67 | 118,979.04 |
| Months from landslide | 926.45 | 59.93 | 15.459222 | 0.00000000 | 808.85 | 1,044.05 |
| Lot size (sq. ft.) | 1.56 | 0.24 | 6.493514 | 0.00000000 | 10.9 | 2.03 |
| Age of improvements | -1,623.82 | 410.01 | -3.960463 | 0.00008011 | -2,428.39 | -819.24 |
| Gross living area (sq. ft.) | 73.78 | 3.19 | 23.160400 | 0.00000000 | 667.53 | 80.03 |
| Study area | -34657.19 | 5,709.57 | -6.070019 | 0.00000000 | -45,861.31 | -23,453.08 |

flects that during the 81-month study period, property transactions within the landslide study area sold for $34,657 less than properties outside the study area, reflecting a discount of approximately 12% relative to the mean sale price of all properties included in the data set.

## Other Considerations

Variables are those features in the real estate market that are often of interest to professionals, such as square footage, number of bedrooms, location in or

BACK_DEFEXP-RR-003887

outside of some particular neighborhood influence, and so forth. In descriptive statistics, this can be studied with one-variable models (pie charts, bar charts), two-variable models (graphs, simple regressions) and multiple-variant modeling (Excel analysis of variance (ANOVA) studies). All of these analyses can provide creditable insights, depending upon the circumstances of the study. Both one-variable and two-variable studies have a high degree of transparency, so that other professionals and laymen alike can examine the data and the resulting analyses in a straightforward manner. On the other hand, while multiple-variable studies are more complex, they may lack transparency. Multiple regression analyses can be problematic. They may involve a subjective process of selecting numerous independent variables, the criteria for eliminating outliers can be criticized, and there is an opportunity to manipulate data. As multiple regressions are premised upon all of the variables being linear in nature, this is obviously problematic when the data is curved, such as prices that rise and fall over the time period being studied. In some situations, non-linear data may be transformed using natural logs.

Statistics certainly cannot be oversimplified, and many issues clearly go beyond the scope that is discussed here. Real estate professionals should utilize the core appraisal literature, including those sections of *The Appraisal of Real Estate* and *The Dictionary of Real Estate Appraisal* that are devoted to statistics, as well as books specifically devoted the topic, such as *An Introduction to Statistics for Appraisers.*

Regardless of the statistical methodology employed, it is critical that real estate professionals clearly present their studies so that they are transparent and make sense to other real estate professionals, as well as to a judge or jury. A competent professional provides clients and colleagues with studies that show all of the underlying data and tables in order to avoid distortion and enhance the users' comprehension of the topic.[8]

## Market Interviews and Surveys

Informal interviews with knowledgeable market participants have long been a staple of appraisal analysis, and they commonly provide valuable information about macro-level location and market characteristics, as well as transactional data and other property-specific data. Formal surveys, on the other hand, are typically based on more scientific survey research techniques. Such surveys have historically been used in marketing, policy analysis, and social science research.

Generally, one or more of the above appraisal-based methods may be used in determining the impact, if any, of a detrimental condition. In some rare circumstances, the detrimental condition may be so unique that finding situations in which it has affected other properties is very difficult or even impossible. For example, if a single-family residence has a sewer manhole cover in the backyard and such a feature is not found anywhere else in the region, it may not be possible to find comparable market data from which to make a detrimental condition analysis. Other examples for which this approach may be applicable would be an office building with explosive levels of methane, a school building where the

---

8. Wolverton, *An Introduction to Statistics for Appraisers*, 61.

BACK_DEFEXP-RR-003888

Copyrighted material licensed to Matthew Richard Breckenridge on June 20, 2016

brick mortar was improperly mixed and left a poor cosmetic result, or a high-rise condominium that was built visibly out of plumb. Finding comparable sales or case studies involving similarly impacted properties might be virtually impossible, yet a legitimate diminution in value may exist.

In these types of unusual situations, a market survey might be a valid means to query property owners and brokers and determine their perspectives and perceptions relative to the effect on value, if any. Additionally, a market survey may be used as secondary or supporting documentation for primary market data. However, a survey should not be the sole method used when relevant market data is available. In other words, prior to relying solely upon a survey method, an analyst should make a full search for relevant transactional data and exhaust other alternatives.

Formal market surveys are typically distinguished by structured and standardized questions and may include a statistical analysis of survey responses. It is important that any survey, formal or informal, be conducted in such a manner as to elicit objective responses with attention to both thoroughness and brevity. Surveys can be administered in person or using a variety of methods, including the telephone, mail, or the Internet.

Surveys have the advantage of allowing for large samples and statistical testing of results. However, surveys can also be criticized for not being truly reflective of the market, as the person conducting the survey may collect data based on expectations and perceptions rather than actual transactions or observed behavior. The use of surveys to estimate risk or stigma, particularly in cases involving environmental contamination and other detrimental conditions, is a relatively new concept and has proven to be controversial. This concern is often justified, as environmental and other issues are so common that more relevant transactional market data can usually be found.

A particular concern with some surveys is *hypothetical bias*, which is the potential error that arises from not confronting an individual with a real situation. Hypothetical bias is problematic, since there are no economic consequences to respondents who overstate or understate values in a hypothetical scenario.

Formal surveys are often pretested to assess objectivity and respondent comprehension and are redesigned as needed to enhance understanding by participants. The selection of a representative sample, the response rate, the elimination of ambiguity and bias in the survey instrument, and the accurate documentation of responses are of particular importance. Furthermore, the analyst should understand the overall viewpoints or agendas of the parties, such as any significant political or community issues.

Two specialized survey techniques are *contingent valuation* and *conjoint analysis*; both utilize survey data from participants responding to hypothetical scenarios.

### Contingent Valuation

Contingent valuation (CV) surveys were first proposed in theory as far back as 1947 as an alternative for valuing public goods that are not typically bought and sold in the marketplace. The first practical application of this methodology involved the economic value of a Maine wilderness area to hunters and tourists

BACK_DEFEXP-RR-003889

in 1963. The government's ability to sue for natural resource damages under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) led to increased interest in contingent valuation to estimate damages to passive uses. The 1989 Exxon Valdez oil spill was one of the first cases when this technique was used as a quantitative assessment of damages.

Contingent valuation essentially creates a hypothetical market and surveys respondents about the economic impact of an issue, measuring value using either *willingness to pay* (WTP) or *willingness to accept* (WTA) criteria. Questions can either be open-ended or involve discrete choices, although the results may differ depending on the structure of the questionnaire.

A concern about contingent valuation and surveys in general is that respondents' actual behavior may differ from stated preferences. Criticism of this approach ultimately led the National Oceanic and Atmospheric Administration (NOAA) to convene a panel of economists to study the issue in 1992. Acknowledging the difficulty in obtaining accurate economic values using surveys, the NOAA panel developed a number of specific recommendations for the design and control of contingent valuation surveys.

The use of contingent valuation in measuring the value of private goods, including environmental and other property damages, has nonetheless remained controversial; transactional data from the market, when available, is clearly a preferred alternative.

The appraisal literature indicates that contingent valuation is generally a less reliable and less accurate indicator of value than the analysis of market data.[9] Accordingly, it is appropriate to use contingent valuation in the rare circumstance of market data being unavailable or as a tertiary approach to confirm a market data analysis. Contingent valuation is not generally accepted as primary valuation method when transactional market data is ample and available.

As with all research methods, all components must be transparent. The survey design, the survey itself, the responses, and their tabulation should be made available and should be testable and repeatable.

### Conjoint Analysis

Conjoint analysis is a statistical technique that originated in mathematical psychology during the early 1970s and determines which combination of a limited number of attributes is preferred by respondents. Respondents rank the various attributes of a good or service by preference, and this information is then used to assess the relative desirability of different commodities. This technique is often used in market research and product development. In a real estate context, the interdependent attributes of a single-family dwelling might include quantitative variables such as age and size, along with qualitative variables such as neighborhood and school desirability. Price would also be an attribute, recognizing that there would be inevitable trade-offs between pricing and the desire for superior locational and physical amenities. This type of analysis typically requires special statistical software to input and analyze responses.

---

9. Kristy E. Mathews, "Under the Microscope: Dissection of a Contingent Valuation Survey," *The Appraisal Journal* (Summer 2008): 259-269.

BACK_DEFEXP-RR-003890

*Copyrighted material the property of Richard Roddewig, June 2016*

In real estate valuation, survey methodology has gained increased attention, but its legitimate use is generally limited to unusual situations in which little or no empirical data is available. It can also be used to obtain additional information in support of primary valuation techniques that rely on the collection and analysis of market data. Survey research can support a causal relationship between an issue and observed market behavior without necessarily being used as a substitute for credible transaction-based valuation methods. Objectivity is critical, particularly when a survey is the sole method used for solving a valuation problem.

A common pitfall with surveys is that without proper discipline, planning, and thought, they can become little more than casual conversations in which preconceived ideas and notions become superficially validated. Surveys can in some instances provide valuable insight into market behavior, although the use of surveys is rarely a substitute for the analysis of actual market data when it is available. It should be noted that formal surveys, particularly such specialized techniques as contingent valuation and conjoint analysis, are beyond the expertise of many appraisers and may require the use of specialized experts.

Surveys can be categorized as follows:

- **Type I surveys**
  Type I surveys include interviews with those who were involved with the actual issue being studied. A prime example of a Type I survey is the typical verification process used by appraisers, who contact active market participants such as buyers, sellers, other appraisers, or the brokers involved in an actual transaction. This type of survey can be very straightforward and effective.

- **Type II surveys**
  Type II surveys include interviews with participants who were active in the market but not involved in a specific transaction. This type of survey may be acceptable in situations in which Type I surveys are impossible or no relevant market data is obtainable; they may also be acceptable for use as a backup approach to transactional market data. In other words, Type II surveys may be a valid means of gathering market data in very rare or unusual situations when no transactional data is available. The interviews must qualify the participants, be carefully scripted, and accurately set forth all the relevant issues in a fair and unbiased way. Ideally, both sides of the issues should be studied, i.e., questions from both the buyers' and sellers' perspectives should be asked. This type of survey can be valid, but only if it is correctly designed and administered.

- **Type III surveys**
  Type III surveys include interviews in which survey participants are not qualified as active participants in the market but are asked to pretend that they are participating in the market and that they are going to purchase a property with certain attributes. Given the superior option of Type I or II surveys, this type of survey generally has the least validity.

To be truly valid, a survey must follow some fundamental guidelines. First, the survey should be carefully scripted to ensure that each participant is prequalified

BACK_DEFEXP-RR-003891

and that uniform questions are asked throughout. The questions should be carefully and objectively worded. The survey should be designed in such a manner that no bias or preconceived notions are projected in the questions being asked, and the questions must be truly relevant to the issues at hand.

Examples of semiformal survey questionnaires involving an environmental issue are included on the following pages. Note the careful presentation of case facts so that respondents have a well-defined context in which to answer the questions.

### Lender Questionnaire

Hello, my name is Steve Preston and I'm a local appraiser from the firm of XYZ Appraisals. We're conducting a brief opinion survey of lenders in the local area. Your answers will remain confidential, and I will not need to contact you again. This survey has eight questions and will take no more than several minutes. Would you be willing to help?

Lender company: _____

Contact name:  _____

Interview date:  _____

Phone: _____

1. Do you provide real estate loans in the local area?    ❏ Yes   ❏ No

    If yes, for how long have you been doing this? _____

2. Do you generally lend on commercial properties, residential properties, or both? _____

3. Is loan activity generally stable, increasing, or decreasing? _____

4. Are there any particularly positive issues that you have noted in the lending activities in the local area? _____
    _____
    _____

5. Are there any particularly negative issues that you have noted in the lending activities in the local area? _____
    _____
    _____
    _____

6. In the local area, similar to other areas around the state, there are a variety of underground plumes of contamination. Some have migrated under homes and businesses. Such plumes are investigated and under agency supervision. Any clean-up costs are paid for by the responsible parties, and homes and businesses have no financial responsibilities for any clean-up costs. As the plume is underground, it does not affect the surface of the property, and the city-supplied drinking water is safe.

    Are you aware of any such underground plume affecting loans on local properties?    ❏ Yes   ❏ No

    If yes, please indicate if this results in the following:

    · Higher interest rates (DCR)  _____
    · Larger down payments (LTV) _____
    · Extra due diligence  _____
    · Other impacts _____

7. Has the knowledge of any underground plumes affected your company's decision to finance any property in the local area?
    ❏ Yes   ❏ No

    If yes, how has your decision been affected? _____
    _____
    _____

8. Have you or your bank/mortgage company ever refused to underwrite a loan in the local area due to environmental issues?
    ❏ Yes   ❏ No

    If yes, which property/properties were affected by this and why? _____
    _____
    _____

That completes the survey. Thanks for your help, and I hope you have a pleasant day.

BACK_DEFEXP-RR-003892

## Homeowner Questionnaire

Hello, my name is Steve Preston and I'm from the consulting firm of XYZ Consulting. We're conducting a brief opinion survey of owners or recent homebuyers in the area. Your answers will remain confidential, and I will not need to contact you again. This survey has 11 questions and will take no more than five minutes. Would you be willing to help?

Owner name: _____

Street address: _____

Interview date: _____

Purchase date and price: _____

1. How long have you lived in the neighborhood? _____

2. Why did you decide to purchase your home in this neighborhood? _____

    Please indicate if any of the following were factors in your purchase decision.

    · Price _____

    · Schools _____

    · Location _____

    · Other _____

3. What were the positive aspects of buying or owning a home in this area? _____
    _____
    _____

4. What were the negative aspects of buying or owning a home in this area? _____
    _____
    _____

5. Did you receive any special premiums or discounts when you purchased the property? _____
    _____

6. Do you feel that you paid a fair price for your home? _____
    _____

7. Were you satisfied with the financing on your home? _____

8. Are you generally happy or unhappy about your home purchase? Why? _____
    _____
    _____

9. Has the street construction impacted your quality of life? _____
    _____

10. Are you aware of the environmental issues below ground surface in the area? _____
    _____

11. Are you aware that _____?
    _____

That completes the survey. Thanks for your help, and I hope you have a pleasant day.

BACK_DEFEXP-RR-003893

## Real Estate Broker/Agent Questionnaire

Hello, my name is Steve Preston and I'm from the consulting firm of XYZ Consulting. We're conducting a brief opinion survey of owners or recent homebuyers in the area. Your answers will remain confidential, and I will not need to contact you again. This survey has 10 questions and will take no more than five minutes. Would you be willing to help?

Agent: _____

Company: _____

Location: _____

Date: _____

1. Are you a licensed agent or broker?    ❏ Yes   ❏ No
   (If no, end the survey.) If yes, how long have you been a licensed agent or broker? _____
   _____

2. Are you actively involved in the local area? _____

3. Do you specialize in residential properties, commercial properties, or both? _____

4. How would you describe the local real estate market (i.e., strong, stable, weak, etc.)?_____
   _____
   _____

5. What is the typical listing period? _____
   _____

6. What are the positive features of the local area? _____
   _____

7. What are the negative features of the local area? _____
   _____
   _____

8. In the local area, similar to other areas around the state, there are a variety of underground environmental plumes. Some have migrated under homes and businesses. Such plumes are investigated and under agency supervision. Any clean-up costs are paid for by the responsible parties, and homes and businesses have no financial responsibilities for any clean-up costs. As the plume is underground, it does not affect the surface of the property and the city-supplied drinking water remains safe.

   Are you aware of any such underground plume affecting loans on local properties?    ❏ Yes   ❏ No
   If yes, which property/properties have been affected and how? _____
   _____

9. Are you aware of any such underground plume affecting insurance on local properties?    ❏ Yes   ❏ No
   If yes, which property/properties have been affected and how? _____
   _____

10. Are you aware of any such underground plume affecting the sales, sales prices, or marketing periods on local properties?    ❏ Yes   ❏ No
    If yes, which property/properties have been affected and how? _____
    _____

That completes the survey. Thanks for your help, and I hope you have a pleasant day.

BACK_DEFEXP-RR-003894

## Broker Questionnaire

Hello, my name is Steve Preston and I'm calling from the consulting firm of XYZ Consulting. We're conducting a brief opinion survey of real estate agents and brokers in your area. Your answers will remain confidential, and I will not need to contact you again. This survey has six questions and will take no more than two to three minutes. Would you be willing to help?

1.  This survey is among real estate brokers or agents who are licensed in the State of Ohio.  Are you currently a licensed broker or agent?
    ❏ Yes   How long?   _____
    ❏ No   Thank you for your time.

2.  In your experience, if a home is worth approximately $300,000 in good condition, yet it requires $20,000 to fix it up to be habitable, what would you expect the house to sell for? $ _____

3.  In your experience, which statement is true?
    If a $300,000 home has $20,000 in flood damage,
    ❏ a)   The buyer would pay full price
    ❏ b)   A buyer would take a $20,000 deduction off the normal price
    ❏ c)   A buyer would take a $20,000 deduction, plus an additional discount, off the price
    ❏ d)   Nobody would buy it
    If the answer is "c," what is your opinion as to the percentage discount? _____ %

4.  If a property has been damaged by a flood and has been fully repaired, do you feel that there is any residual "stigma" or market resistance towards the house after the repairs are completed?    ❏ Yes   ❏ No
    If yes, how much?

5.  Have you had experience with transactions of this type?    ❏ Yes   ❏ No
    If yes, could you give me one or two examples? _____
    _____
    _____
    _____

6.  Do you have any additional comments about the incentive to purchase damaged or repaired properties or the market's resistance towards such properties? _____
    _____
    _____
    _____

That completes the survey.  Thanks for your help, and I hope you have a pleasant day.

BACK_DEFEXP-RR-003895

# The Income Capitalization Approach Applied to Detrimental Conditions

The income capitalization approach utilizes income and risk factors with and without the detrimental condition. This approach to value focuses on the impact that a detrimental condition has on income (both short-term and in perpetuity) and risk (capitalization rate, discount rate, or both). The risk rate itself is a combination of both mortgage and equity risks. Although the analysis of market data can get quite complicated, the basic principles are straightforward as they relate to the detrimental condition model, as shown in Exhibit 1.22.

## Income-Producing Properties

### Conceptual Framework

The fundamentals of real property valuation recognize that value reflects an anticipated stream of future benefits capitalized at a return necessary to attract capital to the investment opportunity. Detrimental conditions have the potential to decrease the stream of future benefits and raise the return necessary to attract capital, both of which will decrease value. The valuation issues then become quantifying the decrease in future benefits (i.e., the effects on net operating income) and the increased yield (i.e., the risk premium due to the detrimental condition). Exhibit 1.23 illustrates the basic steps in this process.

Initially, there is an investigative phase in which the nature and extent of the detrimental condition must be assessed and fully characterized. In addition, an evaluation of the detrimental condition from the public and regulatory perspectives, as well as a full understanding of the consequences of the problem (i.e., remediation costs and alternatives, liability, use restrictions) are necessary. The results of the investigative phase become a critical component throughout the remainder of the valuation process and allow for the preliminary assessment of whether the value of the property may have been diminished.

The findings from the investigative phase provide the basis for determining the direct costs associated with the property as well as developing the fact pattern from which to evaluate the risk perceptions of market participants relative to the affected property. The fact pattern becomes the foundation for assessing whether the market perceives additional risk to be associated with the property (i.e., project incentive or market resistance). If the property and its history are well described, it is usually possible to obtain definitive opinions with a high degree of consensus from users, lenders, and investors regarding the impact of the detrimental condition on their business decisions and strategies. The direct costs and risk-adjusted capi-



**Exhibit 1.22**  **Income Capitalization Approach Applied to Detrimental Condition**

$$R = \frac{I}{V}$$

**Detrimental Condition Value Issues**                                  **Effect on Value**

Costs and responsibility
Use ⎱——— Income, or *I*

Risk (uncertainty factor, project incentive, or market resistance) ⎱——— Rate, or *R*

BACK_DEFEXP-RR-003896

Copyrighted material/license only to Richard Whiting at one 20, 2016

**Exhibit 1.23    Income Property Analysis**



talization or yield rates are then used in conjunction with the anticipated future cash flows of the property to determine the property's value in an impaired state.

## Risk Quantification by Market Participants

Capitalization rates reflect risk, and risk is one of the three main elements of a detrimental condition analysis. If the detrimental condition has a material impact on value, then the capitalization rate may be incrementally higher as compared to an unimpaired capitalization rate. This incremental increase to risk would reflect the financial incentives, inclusive of entrepreneurial profit, associated with the property and the detrimental condition.

As illustrated in Exhibit 1.23, the valuation of a property impacted by a detrimental condition depends on estimates of net operating income effects combined with adjustments for the risks perceived by market participants. Quantification of appropriate risk adjustments in light of particular, site-specific fact patterns is typically the most challenging part of the valuation problem.

In the income capitalization approach, risk analysis and quantification may begin with the perceptions of lenders and equity investors. Research on the perceptions and reactions of these market participants can provide great understanding of the range and type of market responses to the changes detrimental conditions create in the risk characteristics of real property. For mortgage investors, market response to a detrimental condition may take the form of adjustments in the underwriting stan-

BACK_DEFEXP-RR-003897

dards for loan decisions or in the availability of credit or the terms on which credit is offered. For equity investors, market response may include adjustments to the yield or return requirements necessary to compensate for the increased risk associated with the detrimental condition or hazard. The approach to quantifying these effects has two components: structured interviews and comparable sales.

### Structured Interviews

Appraisers and analysts have always depended heavily on firsthand discussions with market participants (buyers, sellers, brokers, lenders, investors, users, etc.) to understand and evaluate the market. Due to the large number of important, property-specific issues associated with a detrimental condition, structured interviews are both important and highly instructive. As discussed, the person being interviewed is given a short but detailed description of the economic characteristics of the property and whatever is known about the nature and extent of the detrimental condition, the regulatory status, likely repairs or remediation, liability, indemnification, off-site issues, and other information. The interview is then guided by an outline of questions that, in the case of a lender, begin with the terms on which credit would be available in the absence of detrimental condition issues. This question is then followed up with a series of questions dealing explicitly with the detrimental condition and its effect on the credit terms.

Through careful selection of market participants (specifically those people to whom the subject property presents a relevant loan or investment opportunity) and with careful delineation of the facts on which such decisions are based, a clear consensus usually emerges after a few interviews and gives the appraiser or analyst a reliable basis on which to form an opinion.

### Comparable Sales

Analysis of actual transactions is applied here in the context of the income capitalization approach, not the sales comparison approach. Specifically, the object is to find actual transactions with characteristics similar enough to the subject so that the self-reported behavior of lenders and investors can be checked. For example, the terms under which a large regional bank has extended credit on a property with considerable contamination but with very strong indemnity from an economically strong, responsible party may shed considerable light on a subject property with similar contamination facts, even if it has somewhat different economic characteristics. Similarly, the equity requirements of an investor who purchased a contaminated property similar to the subject would be quite useful in establishing an appropriate risk premium.

### Direct Capitalization

The income capitalization approach recognizes that value ($V$) reflects an anticipated stream of future benefits (income, or $I$) capitalized at a return (rate, or $R$) necessary to attract capital to the opportunity. The detrimental condition has the potential to decrease the stream of future benefits or to increase the return necessary to attract capital, either or both of which will decrease value. The valuation issue then becomes how to quantify the decrease in future benefits, the increased return, or both.

BACK_DEFEXP-RR-003898

As an illustration, consider the following two sets of capitalization rates. One set relates to properties impacted by a detrimental condition and the other does not.

| Capitalization Rates Without Detrimental Condition | Capitalization Rates With Detrimental Condition |
|---|---|
| 10.0% | 12.1% |
| 9.6% | 11.8% |
| 10.5% | 12.6% |
| 9.7% | 11.9% |
| 10.2% | 11.6% |

| | Capitalization Rates Without Detrimental Condition | Capitalization Rates With Detrimental Condition |
|---|---|---|
| Average | 10.0% | 12.0% |

In this example, unimpaired properties have a capitalization rate of approximately 10%, while impaired properties have a capitalization rate of approximately 12%, suggesting a risk premium of approximately 200 basis points. The capitalization rates must be derived from market data that are comparable to the subject property in both its impaired and unimpaired condition. Assuming that the net income of $100,000 is not impacted by the detrimental condition, value would be calculated as follows:

| | Net Operating Income | Capitalization Rate | Income Rate |
|---|---|---|---|
| Without detrimental condition | $100,000 | 10% | $1,000,000 |
| With detrimental condition | $100,000 | 12% | $835,000 (rounded) |

The overall capitalization rate can be estimated in a variety of ways, including extraction from market transactions or derivation using a mortgage-equity technique.

When both the sale price ($V$) and net operating income ($I$) are known, the capitalization formula can be used to extract the capitalization rate ($R$).

$$R = I/V$$

Suppose, for example, that an apartment damaged by an earthquake is being valued after all repairs are completed. There are no ongoing repair costs or any loss of use issues. Assume further that the subject property has an *NOI* of $400,000 per year. After researching the market, two transactions are found that involve very similar apartment complexes that had suffered earthquake damage but are now fully repaired. The basic data on the two transactions follows:

| | Sale 1 | Sale 2 |
|---|---|---|
| *NOI* | $600,000 | $525,000 |
| Sale price | $7,250,000 | $6,100,000 |
| Extracted $R_O$ | 8.28% | 8.61% |

The appraiser or analyst might conclude from these sales an impaired rate for the subject of 8.5% and a value of $4,705,000 (rounded) based on an *NOI* of $400,000.

The second approach to estimating the impaired capitalization rate uses the band-of-investment approach to build up a capitalization rate as a weighted average of a debt rate ($R_M$) and an equity rate ($R_E$) in which the weight reflects the loan-to-value ratio ($M$).

BACK_DEFEXP-RR-003899

$$R_O = ((M)\ R_M) + ((1 - M)\ R_E)$$

The overall capitalization rate has to reflect its two components, the debt rate and the equity rate, weighted by their relative magnitude in the capital base of the investment.

For example, suppose the facts applicable to an unimpaired industrial building are a 70% loan-to-value ratio ($M$) with a 9% mortgage constant and a 10.5% equity dividend rate ($R_E$).

$$\text{Unimpaired } R_O = ((0.70)\ 0.09) + ((0.30)\ 0.105) = 0.0945$$

Next, consider a similar building subject to environmental contamination. Assume that the contamination has been remediated and that there is no effect on the use or utility of the property. In this case, however, some significant risk issues could exist if the contamination has migrated off site and has directly affected the surface of several neighboring properties. By discussing these facts with brokers, lenders, and investors, useful insight can be gained on how they see the financing of the project being affected by the environmental issues.

The analyst has carried out structured interviews with lenders and investors, and the results indicate that the loan-to-value ratio would drop to 50%, the mortgage constant would be unchanged, and the equity dividend rate would have to be increased to 11.5% to attract equity capital. This reflects the impact of risk in the form of market resistance.

Assuming that market data supports the interview results reported above, the impaired capitalization rate can be calculated as follows:

$$\text{Impaired } R_O = ((0.50)\ 0.09) + ((0.50)\ 0.115) = 0.1025$$

Thus, the impact of the detrimental condition is to raise the $R_O$ 80 basis points from 9.45% to 10.25%. If the *NOI* of the property (both unimpaired and impaired) were $200,000, this would cause the value to fall by approximately $165,000.

$$\text{Unimpaired value} = \$200,000\ /\ 0.0945 = \$2,115,000 \text{ (rounded)}$$
$$\text{Impaired value} = \$200,000\ /\ 0.1025 = \$1,950,000 \text{ (rounded)}$$

This analysis suggests that potential buyers might require a discount of approximately 8% to purchase the impaired property. The market resistance is due to the fact that the greater risk associated with the property requires a higher rate of return to attract capital to the project. This is true because of the requirement by lenders that there be a larger equity investment relative to debt and the requirement by equity investors that their equity return be higher. Higher risk requires a higher return that lowers value.

A detrimental condition can also affect *NOI* because of repair costs or use issues. Since these repair costs and effects on income or expenses tend to vary from year to year, they are best analyzed in a discounted cash flow framework. If the detrimental condition causes *NOI* to be permanently reduced by $15,000 in the previous example (perhaps because of some ongoing cost or due to rental concessions), impaired value would fall by a total of $310,000, a discount of approximately 14.7%.

BACK_DEFEXP-RR-003900

Copyrighted material used solely by Richard Roddewig, June 2016

$$\text{Unimpaired value} = \$200{,}000 \,/\, 0.0945 = \$2{,}115{,}000 \text{ (rounded)}$$
$$\text{Impaired value} = \$185{,}000 \,/\, 0.1025 = \$1{,}805{,}000 \text{ (rounded)}$$

## Discounted Cash Flow Analysis

Discounted cash flow analysis involves the calculation of the present value of an income stream and can reflect how the various costs and revenues are impacted by a detrimental condition over a specific period of time. For example, if a property is undergoing asbestos abatement or soils remediation, the cash flow study would incorporate all the costs related to the assessment stage, repair stage, and ongoing stage, including any change in effective gross income or operating expenses. (Exhibits 1.24 and 1.25 illustrate the application of these costs in an example of discounted cash flow calculations.) Specifically, the study could include air or groundwater monitoring costs and, if some contaminants remain, any future demolition, disposal, or cleanup costs. If rental rates or vacancy levels

**Exhibit 1.24**   **Discounted Cash Flow (in Thousands of Dollars) – Unimpaired**

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Potential gross income | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Vacancy (10%) | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Effective gross income | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 |
| Operating expenses | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| NOI | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 |
| Reversion @ $R_O = 10\%$ | – | – | – | – | – | – | – | – | – | 1,800 | – |
| Cash flow | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 1,980 | – |

Value unimpaired at beginning of Year 3: present value @ 12% = $1,596,000

**Exhibit 1.25**   **Discounted Cash Flow (in Thousands of Dollars) – Impaired**

| | Unimpaired Stage | | Assessment Stage | | Repair Stage | | | Ongoing Stage | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Potential gross income | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Vacancy | 30 | 30 | 150 | 150 | 150 | 150 | 150 | 45 | 45 | 45 | 45 |
| Effective gross income | 270 | 270 | 150 | 150 | 150 | 150 | 150 | 255 | 255 | 255 | 255 |
| Operating expenses | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Repair costs: | | | | | | | | | | | |
|    Assessment costs | – | – | 20 | 20 | – | – | – | – | – | – | – |
|    Repair costs | – | – | – | – | 60 | 40 | 20 | – | – | – | – |
|    Ongoing costs | – | – | – | – | – | – | – | 15 | 15 | 15 | 15 |
| NOI | 180 | 180 | 40 | 40 | 0 | 20 | 40 | 150 | 150 | 150 | 150 |
| Reversion @ $R_O = 10\%$ | – | – | – | – | – | – | – | – | – | 1,500 | – |
| Cash flow | 180 | 180 | 40 | 40 | 0 | 20 | 40 | 150 | 150 | 1,650 | – |

Discovery — above Year 3 (Assessment Stage)
Approved Repair Plan — above Year 5 (Repair Stage)
Repair Complete — above Year 8 (Ongoing Stage)

Value impaired at beginning of Year 3: present value @ 13% = $972,000

BACK_DEFEXP-RR-003901

are impacted, the effective gross income would reflect that. Also, any changes in operating expenses due to the detrimental condition would have to be accounted for. Any market resistance or other risks could be incorporated into the reversionary capitalization rate or the discount rate. This type of analysis is particularly useful in situations when the income, vacancy, or expense impacts of a detrimental condition are highly variable or occur over a long period of time.

As the discounted cash flow analysis illustrates, value drops by more than $600,000 due to the detrimental condition. The impact occurs in three areas—cost to repair, loss of use, and market resistance (risk). As shown, there are significant assessment costs in Years 3 and 4, repair costs in Years 5, 6, and 7, and ongoing costs from Year 8 going forward. In addition, the detrimental condition severely affected occupancy, with 50% of the property remaining vacant through the assessment and repair stages. Furthermore, even after repairs are completed, vacancy at 15% is higher than it was prior to the discovery of the detrimental condition at the beginning of Year 3. Finally, because of the changed risk profile of the property, this example assumes that the market will require a higher yield (discount rate) than is the case with the property in an unimpaired state. This yield rate can be quantified using the same techniques used to quantify the capitalization rate: extraction from comparable sales, lender or investor surveys, and the band-of-investment approach.

BACK_DEFEXP-RR-003902

# Santiago Landslide Case Study

### By Michael V. Sanders, MAI, SRA

**Note:** This case study and all the other case studies that appear in this book are based on actual events. However, in some cases names have been changed and data has been summarized or altered. These case studies are intended to provide examples of various detrimental condition analyses and methodologies, but they are not intended to provide any valuation conclusions whatsoever.

## Background

The Santiago Landslide was arguably the largest and most well-publicized landslide associated with the 1993 rainstorms in Southern California, with a ground deformation area generally believed to be about 25 acres in size. The landslide occurred in the community of Anaheim Hills, located in the easterly portion of the city of Anaheim, and was named for the street near the landslide's head scarp (Avenida de Santiago).[1] The area surrounding the landslide was subdivided and developed for residential use in the 1970s and 1980s, with tract homes in a downslope area at the base of the slide and custom homes along a ridgeline above.

Initial observations in the vicinity of the ultimate landslide related to minor cracking and distress to on-site and off-site improvements in early- to mid-1992, following locally intense rainfall during the previous winter. The landslide mass was hypothesized to have mobilized slowly and continuously over the next several months, with the area of distress subsequently expanding. Deformations became more severe and included damage to underground utilities.

The rainfall total during the 1992-1993 rainy season was approximately 29 inches, the third highest total over the prior 100 years, with ground movement accelerating during early January 1993 by as much as one inch per day. Approximately 46 homes were ultimately evacuated in the wake of the landslide in mid-January. The most significant damage was to custom homes located along the head scarp of the landslide. Three of these homes were red-tagged as unsafe to occupy, and a few tract homes below the landslide also sustained some damage.

Observed distress associated with the Santiago Landslide was attributed to subsurface failure at an estimated depth of 75 to 160 feet, possibly an ancient landslide that was reactivated in conjunction with rising groundwater levels in late 1992 and early 1993. A number of old landslides were mapped in this area prior to mass grading.

Following the landslide, a number of dewatering wells were installed that initially extracted as much as 267,000 gallons of water daily. A total of 119 dewatering wells were eventually installed, removing a total of 12 to 15 million gallons of water by early April of 1993. Groundwater observation wells and slope inclinometers were also installed to monitor hydrological conditions as well as the magnitude and rate of ground movement.

Dewatering efforts following the landslide generally halted significant

---

1. The *head* is the upslope portion of the landslide. The *scarp* is a steep (nearly vertical) region of exposed soil and rock at the head of the landslide where the failure surface ruptures the ground surface. (Source: "Landslide Features," Kansas Geological Survey, Public Information Circular (PIC) 13, www.kgs.ku.edu/Publications/pic13/pic13_2.html.)

BACK_DEFEXP-RR-003903

ground displacement by the end of January 1993 and are believed to have arrested its potential enlargement. Groundwater extraction declined significantly through 1994, with groundwater elevations substantially lower than those recorded in January of 1993. Heavy rainfall during the 1994-1995 rainy season resulted in another high groundwater condition, but without reactivation of the slide mass.

It was the opinion of the city's engineers that cessation of ground movement in the slide area and adjoining terrain was totally dependent on the control of groundwater, necessitating a permanent dewatering program for an indefinite period. A Geologic Hazard Abatement District (GHAD) was ultimately established in 1999 for the purpose of operating, maintaining, and funding the dewatering system, including monitoring groundwater elevations and earth movement in the slide area. Initial funding was provided from a portion of total proceeds paid by the City of Anaheim to settle numerous lawsuits stemming from the slide. It was not anticipated that homeowners within the GHAD would be required to pay assessments over the foreseeable future.

Also of note was a smaller landslide about 2,000 feet west of the Santiago slide, generally known as the Pegasus Landslide, named for the street where it occurred. The Pegasus slide involved the failure of a buttress fill that destroyed a dewatering system previously installed after a 1978 landslide in the same location. The two landslides were considered unrelated except for causation (high groundwater), although they effectively bracketed a well-defined geographic area

ultimately used to study the market impact of the landslides.

## Scope of Study/Methodology

The study area ultimately included 208 relatively homogenous tract homes situated between the ground deformation areas associated with the Santiago and Pegasus Landslides, 36 of which were actually located within an identified ground deformation area. Damage to homes within the study area was generally light, as compared to the major damage suffered by a number of custom homes in the vicinity of the head scarp above. The use of tract homes for study purposes also facilitated a more meaningful comparison with similar tract homes elsewhere in the Anaheim Hills community.

For comparison purposes, a large control area was identified that generally consisted of tract homes in Anaheim Hills with physical characteristics similar to those in the study area but located at least a half-mile from either of the slide areas. Along with the study and control areas, a third area was also identified as a "nearby area," which consisted of properties between the study and control areas. Engineering studies confirmed that this area was not within the landslide zone. No known damage occurred to private property improvements in this area, although its proximity to the landslide was problematic for control purposes, particularly as many homeowners in this area were involved in litigation with the City of Anaheim. Data assembled for empirical analysis included all sales within the study area, nearby areas, and control areas over a time period from January 1990 through the third quarter of 1999, with over 1,500

BACK_DEFEXP-RR-003904

sales transactions assembled to facilitate a variety of empirical studies.

## Application of Valuation Techniques

### Price Trend Analysis

Exhibit A shows square foot price trends from January 1990 through September 1999, with separate data sets and trend lines for the study, nearby, and control areas. The highest $r^2$ of 0.7144 was noted for the study area, with lower $r^2$ values for the nearby and control areas reflecting a somewhat greater variation in physical characteristics not explicitly considered in the analysis. Also shown are monthly median resale prices for Orange County, expressed on a square-foot basis.

It is clear that values for the three groups of homes in Anaheim Hills tracked fairly closely through mid-1992, at which point transactions in the study area began to diverge in a downward direction. This point generally corresponds to the first discovery of problems in the area. It is also apparent that the velocity of sales in the study area declined during this time period, with only two transactions between May 1992 and February 1994. It was not until September 1994 that transactions began to occur in the landslide area, with several subsequent transactions indicating extremely depressed prices.

While it is known that prices generally declined during the early to mid-1990s, it is clear that the price trend in the study area showed a much sharper decline than that for the control area, which represents the broader market in Anaheim Hills. From the



**Exhibit A**    Santiago Landslide Price Comparison



BACK_DEFEXP-RR-003905

point at which the trend lines for the study and control areas converge in mid-1991 at approximately $135 per square foot, average prices in the control area declined to about $110 per square foot at their lowest point in late 1995, while average prices in the study area declined to approximately $90 per square foot, a difference of about 18% relative to the control area.

The difference is even larger when compared to the countywide median price. At the beginning of the study (January 1990), the median price of a resale home in Orange County was approximately $149 per square foot versus $146 per square foot for the study area. By the time of the landslide, market conditions had pushed the countywide median down to $135 per square foot, while the time series indicates $115 per square foot for the study area. At the bottom of the market, average prices in the study area at $90 per square foot were 25% below the countywide median of $120 per square foot. The difference between trend lines for the control area and Orange County may reflect some degree of perceived risk for all of Anaheim Hills, an opinion expressed by several market participants.

## Comparative Analysis

For the purpose of determining the variance between the price of the study area properties and the average price of comparable homes in the control area, each sale transaction in the study area was also compared to sales of similar homes in the control area that sold during the same time frame. Of particular interest was whether the variances between the two groups of homes differed significantly before and after the landslide. A total of 77 sales from the study area were analyzed over a time period from January 1990 to March 1999; of these, 24 sold before the January 1993 landslide, with the balance of the transactions occurring after the landslide.

Properties from the control area were selected based on comparability in terms of gross living area (±200 square feet) and date of sale (± six months). Prices were analyzed on a square-foot basis, with outliers more than 10% above or below the next highest or lowest indication discarded. The chart in Exhibit B shows the average variance between the study and control areas by year. Prior to the landslide, the variance ranged from −1.3% to +1.1%, indicating relative price parity between the two areas. After the slide, the average yearly variance was consistently and substantially negative, ranging from −7.5% to −17.1% through 1998.[2] The same data was also aggregated by location within or outside the ground deformation area, with sales inside the ground deformation area showing a greater variance following the slide than those immediately outside the actual slide area. This may be due to a greater negative perception by the market or the possibility of unknown damage to homes within the slide area.

## Multiple Regression

The sales data was also used to construct a multiple regression model that included all sales from the study and control areas from January 1993 to September 1999. Price was the dependent variable, with independent variables relating to date of sale, lot size, year built, and gross living area. A

2.   Data for 1999 showed a positive variance based on only two transactions analyzed through March 1999.

BACK_DEFEXP-RR-003906

Copyrighted material used only by Richard F. Whittington June 20, 2006



**Exhibit B** — Aggregate Price Variance per Year: Study Area vs. Control Group

dummy variable was used to indicate location within the study area. The coefficient of determination indicated a significant amount of unexplained variation in the model, which was not necessarily unexpected since a number of other factors were not included as additional independent variables for practical purposes. Importantly, the *F-statistic*, which measures the overall significance of the regression equation, was highly significant. All coefficients for the selected independent variables with expected values and signs were also highly significant, with t-statistics all significant at the 0.0001 level or better.

The value of the coefficient for location within the study area was approximately $34,700, meaning that properties within the study area sold for an average of nearly $35,000 less than properties in the control area subsequent to the landslide. With homes in the control group reflecting an average price of approximately $289,000 over the time period in question, the location coefficient suggests an average discount of approximately 12% over the time period subsequent to the landslide, consistent with the results indicated by both price trending and comparative analysis.

## Sale/Resale Analysis

Six properties in the study area sold prior to the landslide and resold again after the landslide. The difference in the selling price of each property was compared to the change in the Orange County median home price over the same period. The price change for the study area properties was uniformly negative. More importantly, the variance relative to the countywide price trend was also negative, ranging from −4.4 to −23.8%, again suggesting a negative market perception of homes in and around the landslide area.

## Market Interviews

Questionnaires were constructed for the purpose of interviewing real estate agents who had listed or sold homes in and around the study area since

*General Conditions* **71**

the landslide, as well as homeowners in the study area who had purchased properties since the landslide. The agent interviews were conducted by telephone, and the homeowner interviews were conducted in person.

The interviews tended to confirm that the most significant damage affected custom homes along the ridgeline above the landslide, outside the study area. A significant number of respondents indicated that prices were discounted because of disclosure of the landslide, which is generally consistent with the results of comparative analysis for the respective properties, although there was no indication of any material change with respect to financing or marketing time. A majority of the agents surveyed felt that the immediate area was stigmatized by the landslide, with some indicating that the entire Anaheim Hills locale was stigmatized to some degree by the negative publicity. The strongest feelings were expressed by those marketing the custom homes that sustained the most damage. Negative perceptions were generally believed to have improved over time. The formation of the GHAD was considered positive, although there was general agreement that homeowner assessments would almost certainly be negatively received by the market.

## Summary

Study of the 1993 Santiago and Pegasus Landslides was useful because, due to the extensive publicity and media exposure, market participants were well informed about the slide and associated risks. The study focused primarily on sales of tract homes within an area immediately adjacent to the two land-slides over a time period six years after the slide. Most of these homes, even those within the identified ground deformation areas, sustained relatively little damage in comparison to custom homes near the head scarp.

Several empirical analyses were used–price trending, comparative analysis of transactions within the study area, multiple regression, and sale/resale analysis–along with a survey of agents and homeowners in and around the landslide area, which was used to better understand the observed reactions of market participants.

The landslide clearly affected transaction volume within the study area for the first few years following the event. The most obvious impact, however, was on pricing. Prices in the study area declined to a much greater extent than those in the control area and remained significantly depressed for at least five years after the landslide.

It is unclear as to whether the landslide resulted in area-wide market resistance throughout Anaheim Hills or if the impact was more localized as originally hypothesized. The data suggests that countywide prices did not drop as much during the recession as prices within the control area used in this study, although it is difficult to tell if this is merely a local market condition or a reaction to publicity surrounding the slide.

Without a recurrence of the landslide, market resistance appears to have diminished, reflecting a perceived reduction in risk and uncertainty. Heavy rainfall during the 1994-95 rainy season did not reactivate the slide, providing support for the dewatering program as effective mitigation to continue indefinitely through the formation of the GHAD in 1999.

BACK_DEFEXP-RR-003908



# 2

# Transactional Conditions

Specific conditions related to a specific sale or transaction are known as *transactional conditions.* In other words, these conditions apply to a single transaction and are not a physical component of the property, as contamination, construction defects, or other detrimental conditions might be. Examples of transactional conditions include special motivations such as the desire to assemble properties, project delay, or the need to sell quickly due to a divorce or bankruptcy.

Most commonly, real estate sales are *arm's-length* transactions, in which the parties involved are acting in their own best interests. A common definition of *market value*, used by agencies that regulate federally insured financial institutions in the United States, is

> The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> - Buyer and seller are typically motivated;
> - Both parties are well informed or well advised, and acting in what they consider their best interests;
> - A reasonable time is allowed for exposure in the open market;
> - Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
> - The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

While this definition of *market value* is clear, the reality of the real estate market is that not all buyers and sellers are knowledgeable and well informed. Additionally, the transaction may have involved considerations other than cash, special financing may have been a factor, or one of the parties may have been knowledgeable but not typically motivated. In fact, by no means does the term *market value* define all the situations that actually take place in the real estate market, and real estate transactions may reflect prices other than market value.

---

1. 12 C.F.R. Part 34.42(g); 55 *Federal Register* 34696, August 24, 1990, as amended at 57 *Federal Register* 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994.

BACK_DEFEXP-RR-003909

Class II transactional conditions relate to situations in which some particular and unique issue impacted a specific transaction. This classification includes transactions in which a buyer pays more than necessary to acquire a property or a seller disposes of a property at a discount.

## Real Estate Economics

The factors that determine the value of real property are complex and interconnected. Each property has unique characteristics, such as location, size, and topography. Just like people, no two properties are alike, so in some cases estimates based on market data become as important to real estate valuation as a laboratory study is to a doctor assessing a patient's condition. There are four interdependent factors critical to the creation of value–utility, scarcity, desire, and effective purchasing power–which act in concert with the economic principles of supply and demand.

As is commonly known, real estate values fluctuate over time. In a strong market–commonly referred to as a *seller's market*–prices are increasing, listing periods tend to be short, fewer properties are on the market, and construction is active. Conversely, in a weak market, prices are falling, listing periods are long, many properties are available for sale, and construction activity is limited. A weak market is commonly referred to as a *buyer's market* because buyers can be selective and demand lower prices. While it is possible to think of market cycles as a transactional condition, these value patterns are more properly considered general conditions, driven by supply and demand in the overall economy.

The theory of supply and demand is the basic concept by which value is determined in economics. Typically, supply and demand are represented on a two-dimensional graph with price measured on the vertical y-axis and quantity represented on the horizontal x-axis. Demand curves are typically downward-sloping. In other words, higher prices mean that a lesser quantity of the item will be demanded. Similarly, a relationship exists between the price of a good and the quantity of that good supplied by the market. A normal supply is represented on a graph as an upward-sloping curve, meaning that higher prices result in a greater quantity available for sale.

The point at which supply and demand intersect represents equilibrium–i.e., the combination of price and quantity from which the market has no intrinsic pressures to move away, as shown in Exhibit 2.1. To illustrate the equilibrium concept, supply exceeds demand at all points to the right of the equilibrium. Thus, the prices fall and create a buyer's market. Demand outpaces supply at all points to the left of the equilibrium, so prices rise as buyers compete with each other for goods or services. Therefore, at any point away from the equilibrium, market pressures tend to bring the price and quantity in that market back to equilibrium. It is important to note that the supply of land is virtually fixed–i.e., one cannot create more land in the way that one could manufacture more automobiles or another consumer product. However, the supply of land can be somewhat effectively increased through efficiencies. The supply of improvements,

BACK_DEFEXP-RR-003910

Copyrighted material reproduced with permission from the Appraisal Institute, Chicago, Illinois. June 20, 2016

such as housing or office space, can be increased through development. Therefore, movements in the demand for land usually drive land values.

Supply and demand analysis provides a model for understanding general market forces and cycles and how they affect real property values. For example, a recession or depression leads to a contraction of general market wealth. Less income and wealth for investment leads to decreasing demand for real property at every price level. Accordingly, there is a downward shift in the demand curve in which there is less quantity of property demanded for every given price level. The downward or leftward shift of demand causes the equilibrium point to move down the supply curve—i.e., the equilibrium price for the property at every quantity level is now lower, as shown in Exhibit 2.2. The converse is true for prices

**Exhibit 2.1**    **Operation of Supply and Demand**



**Exhibit 2.2**    **Operation of Supply and Demand (Demand Shifts)**



*Transactional Conditions*     **75**

BACK_DEFEXP-RR-003911

in an economic boom. This explains the fall in real property prices associated with recession and the increasing prices during periods of economic expansion. While this represents general supply and demand curves, in real estate the supply is often considered to be static, or nearly fixed.

Other market forces also affect real property values. For example, general economic uncertainty brought about by factors such as high inflation, high unemployment rates, and political uncertainty can also affect real property values. Periods of uncertainty increase the perceived risks of all investments.

## Assemblage

A common Class II condition might involve the assemblage of two parcels. If a developer or property owner strongly desires to combine an adjoining parcel with an existing property, that entity may be willing to pay a premium to acquire it. In fact, the two properties combined as one may be of more use and have a higher value than two separate properties. If land is worth $10 per square foot and an especially motivated property owner is willing to pay $12 per square foot for the adjoining parcel, then the premium would be a factor or 1.20, or 20%. Class II conditions illustrate the disparity between price and value that sometimes occurs as a result of atypical motivations associated with a particular transaction.

This concept can be illustrated by the following example. An investor owns a 3,500-sq.-ft. fast food restaurant on a main traffic thoroughfare. The lessee wanted to install a drive-through window that she expected would increase her business by 20% to 40%. The increase in business would require a 1,000-sq.-ft. addition to the restaurant, and another 15 parking spaces would be needed to meet the city's parking code. The investor would be able to increase the lessee's rent significantly if he could assemble some land next to his site to accommodate the additional parking. He spoke to the owner of the land adjacent to the restaurant site, who was reluctant to sell. The investor eventually enticed the adjacent owner to sell the land, but the owner required a price that reflected a 20% premium over market value.

The investor calculated that if the rents could be increased from the current rate of $1.50 to $1.85 per square foot, then he would recover the premium paid for the land in two years. From that point on, the investor would make a profit from the lease. He presented a proposal to the lessee offering to purchase the adjoining land if the lessee would construct the additional improvements and sign a five-year lease at $1.85 per square foot. The lessee agreed, so the investor went ahead and purchased the land, knowing that he was paying 20% over market value.

## Distress Sales

Distress sales often reflect prices below market value due to specific seller motivations, including bankruptcy, lender repossessions (short sale or real estate-owned), and other factors. When dealing with distressed properties, real estate professionals need to be aware of why these properties may be discounted below market value.

BACK_DEFEXP-RR-003912

## Real Estate Owned Properties

Real estate owned (REO) properties are those properties acquired by a lending institution, often as a result of foreclosure on the collateral securing a delinquent loan. These properties are often troubled, non-earning assets and are typically disposed of at the first opportunity. REO properties are frequently considered unsound bank assets, even when carried at or below the appraised value.

Institutions that have taken back real estate are often motivated to dispose of these assets quickly to avoid penalties from federal regulators. Stock prices and credit ratings may be penalized if the bank holds an REO property for an extended period of time or if too much of the bank's asset base is invested in non-performing real estate. In some cases, these factors motivate banks to accept below-market prices.

## Duress, Non-Market Motivation, and Limited Exposure

Distressed properties typically involve sales or leases by owners or landlords acting under duress (i.e., imminent foreclosure, divorce, or negative cash flow issues). Such properties often suffer from deferred maintenance or adverse economic conditions, motivating owners to voluntarily or involuntarily lower prices or rents in the hopes of securing a transaction.

Forced or semiforced sales such as REO transactions may result in below-market sales prices and, as a result, would not be indicative of typical motivations associated with most definitions of market value.

Liquidation value is often associated with the following types of transactions:

- **Court-ordered liquidation** by absolute auction
- **Foreclosure on a mortgage**, which may result in sale by public auction
- **Partition sale** of a property owned by more than one individual that cannot be feasibly divided when the owners no longer get along
  (If the parties agree to an orderly disposition, this transaction may not be a liquidation.)
- **Resolution of controversy** involving real estate, which often results in a court-ordered liquidation of property
- **Dissolution of a partnership or a marriage** when the parties cannot agree on an orderly disposition or division of the real estate
- **Non-foreclosure liquidation to resolve indebtedness** when the debtor urgently needs to convert the real estate into cash
- **Real estate owned (REO)**, which may be liquidated by a bank or other financial institution as a result of a regulator's mandate or company policy
- **Liquidation to pay** inheritance or property taxes
- **Liquidation in anticipation of death**
- **Alternate use of proceeds**, which may prompt a liquidation sale if the equity needs of the new investment are pressing or the owner needs cash
- **Relief of carrying a cost burden**, which may compel individuals, particularly owners of industrial property, to dispose of non-revenue-producing real estate

*Transactional Conditions*    **77**

(Carrying costs often burden the owners of large, functionally obsolete manu-facturing plants.)

- **Year-end corporate accounting results** (both the profit-and-loss statement and the balance sheet), which may motivate liquidation
  (Smart investors may learn the date of the fiscal year-end and make low offers a couple of months before that time in the hopes that current liquidation favors a sacrifice price.)
- **Corporate or other institutional decisions** (not motivated by year-end accounting) to generate cash, which may dictate that certain properties be liquidated from their real estate portfolios as early as possible
  (Included in this group are sale-leasebacks of viable properties at low price-to-value ratios.)
- **Other situations** including, but not limited to, shedding of potential liability of ownership, poor relationships with tenants, etc.
  (In some instances, a seller will bundle dissimilar properties in a single trans-action, resulting in a purchaser being interested only in one, or a few, of the properties. In such cases, the purchaser may need to liquidate those unwanted properties in the bundle.)[2]

In addition to seller duress or other non-market motivations, below-market prices are also associated with limited market exposure. Market value generally presumes that properties will be exposed to the market for a reasonable period of time and through channels that are typical for the property type (such as MLS listings for residential properties). An analysis of case studies needs to consider the method of sale, property type, demand, and type of buyer (i.e., owner/users, investors, etc.).

## 1031 Exchanges

Section 1031 of the Internal Revenue Code (IRC) is a significant benefit to tax-payers, and tax-deferred exchanges have been a part of the tax code since 1921. These types of exchanges make up a notable portion of all real estate transactions in the United States.

The 1031 Exchange, as it generally relates to real estate, is a tax vehicle by which property owners can divest themselves of assets, acquire different properties, and defer payment of taxes on capital gains. All of these actions must be carried out under very strict tax rules. The real estate professional should be aware that this type of transaction may not reflect market value due to possible premiums being paid by exchange participants in order to avoid significant tax penalties.

Section 1031 of the Internal Revenue Code states that "no gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."[3] To participate in this program, owners must swap the relin-

---

2. Max J. Derbes Jr. and Max J. Derbes III, "Liquidation Price and Semi-Forced Sellers," *The Appraisal Journal* (January 2001): 32-33.

3. The Internal Revenue Code is available online on the website of the US House of Representatives, Office of the Law Revision Council, at http://uscode.house.gov/download/pls/26C1.txt.

BACK_DEFEXP-RR-003914

quished property for a replacement property of a similar type or *like kind. Like kind* usually relates to the nature and character of the property rather than its grade or quality. Real estate can be exchanged for other real estate without regard to property type. For example, an apartment building can be exchanged for an industrial property or shopping center. A single property can be exchanged for multiple properties or vice versa, or for tenant-in-common (TIC) interests in a larger property.

Swapping a property means that a property owner must either first sell the relinquished asset and place the proceeds within the control of a qualified intermediary or have the intermediary take and hold title to the replacement property before the taxpayer finds a buyer for the relinquished property, a process also known as *reverse exchange.* In a process known as *direct deeding*, the intermediary purchases the replacement or relinquished property and transfers title to the exchange participant.

Under the Internal Revenue Code, participants must have held the relinquished property for a certain period of time and have a limited period of time to identify and close escrow on the replacement property, which must be of equal or greater value. Because the relinquished property is usually sold before the replacement property is found, undue pressure may be placed on the exchange participant to avoid capital gains tax, thereby resulting in an above-market price for the replacement property.

## Market Trends

The forces of real estate economics cause fluctuations in the real estate market. While predicting future trends is speculative, quantifying historical trends is relatively simple because it involves only the accumulation of historical market data, as shown in Exhibit 2.3.

Market trends simply reflect increased, decreased, or level market conditions over time. One way of measuring trends involves the study of several comparable sales that are resold at a later date (i.e., sale/resale analysis). By comparing the initial and subsequent sales dates and values, a determination can be made as to the market condition trends. For example, if market conditions have declined 5% per year and the situation involves an 18-month time period, then the adjustment would be a factor of -0.075.

Market conditions are a simple yet significant concept. For example, a certain property condition may be believed to have had an effect on value, when in reality that condition was benign and market conditions actually caused the observed loss or gain in value.

The effect of market conditions is illustrated in the following example. A property owner named Chris Anderson built a large lakeside house outside Appleton, Wisconsin. He put the property on the market for $350,000, and it promptly went into escrow for $340,000 to Lane King, a local mortgage banker. King asked for, and received, several extensions of the escrow. After six months, King broke the contract and pulled out of the sale, although Anderson had met every require-

BACK_DEFEXP-RR-003915

80

*Real Estate Damages*

BACK_DEFEXP-RR-003916

**Exhibit 2.3**      **Market Trends Graph**



**Orange County Industrial Transactions
Average Price per Square Foot**

| | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Transactions | 83 | 116 | 117 | 83 | 82 | 66 | 73 | 95 | 83 | 160 | 109 |
| Total $ Volume | $107,489,037 | $130,611,402 | $171,647,052 | $124,801,920 | $108,405,812 | $75,598,094 | $71,905,440 | $90,084,039 | $83,659,919 | $165,661,046 | $123,631,195 |
| Total Square Feet | 1,803,491 | 2,137,373 | 2,401,480 | 1,819,082 | 1,723,707 | 1,332,553 | 1,446,051 | 1,836,053 | 1,755,579 | 3,339,227 | 2,356,227 |
| Avg. Sales Price | $1,295,049 | $1,125,960 | $1,467,069 | $1,503,638 | $1,322,022 | $1,145,426 | $985,006 | $948,253 | $1,007,951 | $1,035,382 | $1,134,231 |
| Avg. Price Per Sq. Ft. | $59.60 | $61.11 | $71.48 | $68.61 | $62.89 | $56.73 | $49.73 | $49.06 | $47.65 | $49.61 | $52.47 |
| Median Price Per Sq. Ft. | $58.81 | $58.77 | $69.04 | $67.02 | $65.00 | $62.50 | $53.12 | $49.61 | $48.10 | $50.43 | $54.51 |
| Avg. Cap Rate | 9.11 | 9.13 | 8.20 | 8.07 | 8.67 | 9.13 | 9.08 | 8.78 | 8.28 | 9.47 | 10.10 |
| *GRM* | N/Av | N/Av | N/Av | 9.81 | 10.34 | 8.72 | 8.87 | 9.20 | 9.46 | 8.67 | 8.11 |

© 1997 COMPS InfoSystems, Inc. All rights reserved. COMPS has obtained the information contained herein from sources which it believes to be reliable. COMPS makes no representation, warranty or guarantee, express or implied, as to the accuracy or reliability of the information contained herein.

\*    **Special Notes:**

Property type is industrial. Market: Orange County. Submarket areas: 01, 02, 03, 04, 05, 06, 07, 08, 10. Square feet: 10,000 to 50,000.

Data for 1997 is through 9/30/97; however, due to an extensive confirmation process, additional transactions will continue to be added.

ment of the escrow. The market conditions had been declining, and at the time King pulled out of the escrow, the house had a market value of $300,000. Anderson filed suit against King for the $40,000 lost due to market conditions and the delays caused by King. The appraisal process verified market values of $340,000 and $300,000 as of the respective dates of value, so the effect of market conditions over time amounted to -11.76%.

This appraisal assignment required a simple appraisal at the time of the opening of escrow and at the time that the contract was broken. Additionally, secondary data such as market trend reports could be collected to show that the decline was typical for the area. A study of local market conditions could be conducted by looking at sales and subsequent resales of local properties during this time period. If a market trend report is used, the total number of transactions needs to be significant enough to support that trend. If only three or four transactions have occurred, the trend indication may not be usable without additional research.

By downloading publicly available data (multiple transactions from publicly available data sources such as tax records and grant deeds), a trend line study may be conducted using financial spreadsheet software and basic statistical modeling, similar to the time series example provided in Chapter 1. This type of study is ideal for residential properties because numerous sales are often available. However, this type of study may be problematic for income-producing properties due to a lack of data. In cases like this, other studies may be relied upon. Various real estate brokerage firms publish quarterly and annual reports, as do community redevelopment firms, colleges, universities, newspapers, and industry-specific journals. Other sources may also include surveys and questionnaires by large real estate appraisal and accounting firms or simple primary research by the appraiser.

## Project Delay

On March 1, 1954, the United States military detonated a thermonuclear hydrogen bomb at the Bikini Atoll in the Marshall Islands. Given the code name "Castle Bravo," this was the most powerful atmospheric nuclear bomb in the history of the world. The blast was so powerful that it vaporized two-and-a-half islands and created a crater approximately a mile wide and 400 feet deep.

This nuclear test also became the largest environmental case in world history. Nuclear fallout spread out over a hundred miles and contaminated vast areas, including inhabited islands. Like many environmental contamination cases, one of the issues to arise from the event involved property damage claims.

Like any real estate damage case, the focus was on costs, loss of use, and risk, sometimes referred to as *stigma*. The costs were paid for by the United States government. However, the contaminated areas were so vast that the remediation took decades, and much of the land has never been remediated.

In spite of the size and complexities of this case, the key valuation issue in a property damage analysis completed for the Nuclear Claims Tribunal came down to "loss of use." Indeed, the loss or delay of use is often the core issue in many real estate damage assignments.

BACK_DEFEXP-RR-003917

Time is money. Real estate valuation is often based on schedules and revenues that are forecasted over time. With forecasts, it is always important to identify and address issues that can cause delays.[4] In most circumstances, the original projections reasonably reconcile with actual performance. However, despite the best management practices, some delays may be unforeseen or unavoidable. Other delays may be due to negligence or other improper conduct. Regardless of the underlying reasons, delays can impact construction, sales, leasing, or land development. Because of this, delay claims are major sources of litigation.[5]

With project delay cases, the "target date" represents the point in time when the project would have gone forward if not for the delay. The "delay date" represents the point in time when the project actually goes forward. Both a target date and a delay date represent their respective dates of value.

In sale or lease situations, delays can show up as additional days, months, or years to sell or lease a property. In land development projects, delays can show up as additional time to commence construction. In construction projects, delays can result in additional completion time, or a delay in the ultimate utilization of the property.[6]

A central theme in the analysis of project delay is the "time value of money" and the reality that timing has an impact on value. In some assignments, the absorption costs have considerable significance. Segregating variable and fixed costs can also be important. Adding to the complexity is that there are both static and forecasted valuation models.

While delays often have negative consequences, they can also have positive or neutral financial effects, depending upon a number of factors. In one case, the hold up of construction could cost a developer millions of dollars, yet in another case a delay could result in better market conditions or other factors whereby profits are higher than they would have been on the target date. For example, if a house is in escrow for $300,000 and the sale is delayed when the buyer backs out, but the property is then quickly sold for $315,000 to another buyer, the delay could have had a positive effect on that property owner. Still other delays may be inconsequential or part of the inherent risks of a project. Some delays can be mitigated, while others cannot. Some delays may be inconsequential, but multiple-year delays and substantial economic losses are possible.[7]

## Construction Delays

A key objective of a construction project is to deliver a quality product in a timely, cost-effective, and safe manner.[8] Yet because of the severity of impact, delay is one of the most important issues in construction management.[9] The scheduling

---

4. M. E. Abd El-Razek, H. A. Bassioni, and A. M. Mobarak, "Causes of Delay in Building Construction Projects in Egypt," *Journal of Construction Engineering and Management* (November 2008): 831-841.

5. Hamed A. Al-Saggaf, "The Five Commandments of Construction Project Delay Analysis," *Cost Engineering* (April 1998): 37-41.

6. George R. Stumpf, "Schedule Delay Analysis," *Cost Engineering* (July 2000): 32-43.

7. Jay Dushoff and Denise Henslee, "When Eminent Domain 'Working Rules' Don't Work," *The Appraisal Journal* (July 1991): 429-435.

8. Osama Abudayyeh, "A Multimedia Construction Delay Management System," *Microcomputers in Civil Engineering* (May 1997): 183-192.

9. Jungwuk Kim et al., "Activity Vulnerability Index for Delay Risk Forecasting," *Canadian Journal of Civil Engineering* (October 2006): 1261-1270.

BACK_DEFEXP-RR-003918

of construction projects is complex, with some tasks being performed in parallel to others and other tasks being serial in nature. A delay in one area can have a downstream effect that impacts other tasks.

Delays may result in disputes, claims, and even total project abandonment.[10] Excusable delays are those that are not attributable to the contractor's actions and typically involve unforeseen events. These events are beyond the contractor's control and are without fault or negligence on their part.[11] Non-excusable delays result from the contractor's or subcontractor's actions or inactions. These can include poor planning, negligence, and other errors or omissions.

## Other Causes of Project Delay

While construction scheduling is a common type of project delay, a wide variety of other factors can also cause delay. The discovery of asbestos, lead-based paints, expansive soils, subsurface contaminants, or other issues during a redevelopment project could cause delays.

Non-construction issues that cause project delay include delayed sales or disruptions to leases or land development projects. Extended absorption periods erode profitability.[12] Other possible issues include legal or title disputes, toxic spills, buyer back-out, crimes, geotechnical discoveries, eminent domain issues, and area-wide calamities such as tsunamis, earthquakes, environmental disasters, volcanic eruptions, train derailments, fires, and plane crashes. A variety of externalities and other detrimental conditions can also cause delay.

In practice, projects may also suffer from financial complications and delays.[13] In fact, the appraisal process itself could cause a transactional delay. An erroneous appraisal can throw a sophisticated transaction completely out of whack and result in costly delays.[14]

## Market Conditions

Adding to the complexity of project delay and the time value of money issues is the fact that real estate markets move in cycles. As a result, the market value for a project between the target date and the delay date may differ for reasons completely independent of the project itself. Although the adjustment for market conditions is often referred to as a time adjustment, time is not the cause of the adjustment. In other words, changes within the market itself as of different points in time are the basis for an adjustment. Changes within the market could cause an increase or decrease or have a neutral impact on values between the target and delay dates.

---

10. Abdelnaser Omran et al., "Delays in Construction Projects Development: The Case of Klang Valley, Malaysia," *Journal of Academic Research in Economics* (November 2010): 135-158.

11. Sabah Alkass, Mark Mazerolle, and Frank Harris, "Construction Delay Analysis Techniques," *Construction Management and Economics* (1996): 375-394.

12. Don M. Emerson, *Subdivision Valuation* (Chicago: Appraisal Institute, 2008), 105.

13. Jamal Al Duaij, Tareq Awida, and A. E. Kollarayam, "Performing Value Analysis on Construction Project Variation Orders," *Cost Engineering* (June 2007): 23-27.

14. "Commentary," *The Real Estate Appraiser and Analyst* (November-December 1979): 10.

BACK_DEFEXP-RR-003919

## Valuation Applications

Just as there are a variety of project delay scenarios, there are also varied methodologies to measure the impact, if any, that project delay has on value. There is no single method for analyzing the impact of delays on construction work.[15] The methodology employed should reflect the individual characteristics of the assignment. When analyzing a project delay case, the primary considerations are incremental costs, loss of use, and market conditions.

Typically, a contractor or engineer computes any incremental costs or savings as a result of the delay, leaving any loss of use or market conditions to valuation experts. The following are examples of different delay situations and valuation methodologies to compute loss of use and market conditions.

### Construction Delay

With a typical construction delay case, the calculation may be relatively straightforward. If a setback causes a $1,000,000 project a 60-day delay and the appropriate return is 12%, then the costs of the delay could be estimated as follows:

$$\$1,000,000 @ 60 \text{ days} @ 12\% = \$20,000$$
$$(\$1,000,000 \times (2/12) \times 0.12)$$

In this case, market conditions are level and nominal as a result. However, when the delay is longer and market conditions are relevant, they should also be analyzed.

This amount reflects the time value of money and the property owner attaining use of the property 60 days later than the target date. More complex construction delay cases may also include an analysis of absorption costs and market trends.

### Delay of Occupied Improved Sale

Some project delays, such as the loss of use or delay in the sale of an improved property, can be computed largely with conventional appraisal methodologies using values at the target date and the delay date. These indications of market value should also reconcile with published market trend studies. As the property is occupied, there may not be any loss of use damage issues.

As an example, consider a retail store that was scheduled to close escrow on a target date of March 14, but the prospective buyer fails to perform on the contract. The property is leased and performing normally, and as a result there are no direct incremental costs or loss of use issues. Then suppose that the property is relisted and sells a year later. An appraisal on both dates could indicate the impact, if any, that the delay caused. It is conceivable that the values are higher, lower, or similar, depending on market conditions. In this example, the market values are as follows:

$$\text{Target Date (Escrow Date) Market Value} = \$1,000,000$$
$$\text{Delay Date Market Value} = \$1,100,000$$

In this case the delay is solely due to market conditions that were increasing and was not damaged by the delay. However, if prices had fallen between the

---

15. David W. Bordoli and Andrew N. Baldwin, "A Methodology for Assessing Construction Project Delays," *Construction Management and Economics* (1998): 327-337.

BACK_DEFEXP-RR-003920

two dates, the damages could be determined accordingly. Of course, this simple calculation may not apply to all circumstances, and other case-specific issues should be considered.

### Loss of Use of Unoccupied Improved Property

In a delay case in which an improved property cannot be conventionally occupied, a common valuation methodology would be to use the lease or rental rate of the property as a proxy for determining the damages caused by the loss of use.

Of course, any fixed or holding costs should also be considered in the analysis, such as taxes, insurance, management, maintenance, or utilities. With an income-producing property, the generated revenues may offset any such fixed or holding costs. While fixed expenses should certainly be deducted from the rents, a question arises as to the inclusion or exclusion of variable expenses. As a rule of thumb, it would be impractical to consider variable costs for shorter delays as compared to longer delays.[16] What constitutes a longer or shorter delay would depend on the practicality of eliminating and later re-instituting variable costs.

For example, suppose that a house is discovered to have a construction defect whereby the property must be vacated while repairs are underway. In terms of use and occupancy, the damages could be benchmarked to the rental rate for the property. In other words, the damages would be equivalent to the cost of renting a comparable, substitute property. In this example, the repairs will take seven months and the rental rate of the property is $2,600 per month, thus the use damages would be computed as follows:

$$7 \text{ Months @ } \$2,600/\text{Month} = \$18,200$$

Of course, this is only a part of the overall equation of damages, as costs and risks must also be considered. In this example, market conditions are not relevant as the scenario involves only a temporary loss of use rather than a sale.

### Loss or Delay of Land Use

Delays related to vacant land can often be computed by ground lease valuation methodologies. Ground rent is the amount paid for the right to use and occupy land according to the terms of a ground lease. It can be used in estimating the value of the landowner's interest in the land, i.e., the leased fee interest. A vacant parcel of land that is slated for development may not generate any income and may have considerable holding costs that cannot be offset.

As an example, consider a vacant parcel of land that was in escrow when an area-wide flood reveals that a nearby property owner illegally graded their property and damaged the local drainage systems. As a consequence of the floods and the risks to the property, the prospective buyer backs out of the escrow. Suppose that engineers assess the underlying grading problems and that the project delay is one year.

In this case, the impacts of the delay may be calculated by first establishing the market value of the land and then applying a ground lease rate for the period of delay. In this calculation, there is a need to establish rates of return for ground-

---

16. Orell C. Anderson and Edward B. Gentilcore, "A View from the Ground Up: Calculating Damages Due to Construction Project Delay," *Construct!* (Fall 2005): 1-3.

BACK_DEFEXP-RR-003921

leased property.[17] Ground lease rates may inherently include both the use of the property as well as the anticipated market escalations, thus there is no need to make a separate adjustment for market conditions. However, appraisers should consider that ground lease rates usually reflect a long-term rate, and in some cases another rate could be used. With relevant data, the project delay of the vacant site could be calculated as follows:

Land Market Value, $1,000,000 @ 10% Ground Lease Rate @ 1 Year Delay = Project Delay, $100,000

### Delay of Land Development Project

With both land development projects and improved income-producing properties, the benefits include the cash flows or sales proceeds accruing to the real property over the holding or projection period.[18] However, when those streams of anticipated income are interrupted, the value can change accordingly.

In valuing real estate, the analyst could use a discounted cash flow technique that compares alternative investments and select the one that maximizes the present value of cash flows.[19] The underlying objective is to account for the entire flow of cash in and out of the project with respect to time, so that the time value of money is properly recognized in the analysis.[20]

Typical land developments and portfolios have varying and uneven portions of the project that are closer to development or sale than others. Generally, market conditions are such that only so much can be absorbed at a time. When an entire project or portfolio is delayed, it tends to shift the entire project forward. Market conditions and absorption rates may be separate and apart from the delay issue itself, yet market conditions may partially exacerbate or mitigate any damages. By creating two cash flows, one with the expected cash flow and the other which incorporates the delayed cash flow, any damages from the delay can be ascertained.

The cash flow model in Exhibit 2.4 illustrates the financial effects of a land development project that is delayed under the scenarios of five- and 20-year forecasts. This model was also computed using market trend rates of 0% and -2%. Of course, as with any analysis, actual sales prices and land comparables may also be relevant.

Cash flow modeling demonstrates that project delay, expressed as a percentage of the unaffected value, correlates with inflation rates, discount rates, and the length of delay; however, the term of the project has no impact.

The initial discounted cash flow represents a target or baseline analysis prior to any delay. The following cash flows are "pushed back" for one, two, three, and 10 years, respectively. The grey area represents the portions computed for the five-year discounted cash flow analyses.

The following are examples of the discount-to-market value of a land development project in which the discount rate is 22%.

---

17. Chris Carneghi, "Determining Ground-Lease Rental Rates," *The Appraisal Journal* (April 1994): 256-263.

18. Ibid., 456.

19. James H. Burton, *Evolution of the Income Approach* (Chicago: American Institute of Real Estate Appraisers, 1982), 238.

20. Charles B. Akerson, *Capitalization Theory and Techniques Study Guide*, 3rd ed., ed. David C. Lennhoff (Chicago: Appraisal Institute, 2009), 129.

BACK_DEFEXP-RR-003922

BACK_DEFEXP-RR-003923

Transactional Conditions    87

**Exhibit 2.4**    **Project Delay Anlaysis**

### Baseline Cashflow

| Year | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Parcels Sold | | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| Parcel Price (Inflation) | 2.0% | $40,000 | $40,800 | $41,616 | $42,448 | $43,297 | $44,163 | $45,046 | $45,947 | $46,866 | $47,804 | $48,760 | $49,735 | $50,730 | $51,744 | $52,779 | $53,835 | $54,911 | $56,010 | $57,130 | $58,272 | $59,438 | $60,627 | $61,839 | $63,076 | $64,337 |
| Gross Sales Income | | 480,000 | 489,600 | 499,392 | 509,380 | 519,567 | 529,959 | 540,558 | 551,369 | 562,397 | 573,644 | 585,117 | 596,820 | 608,756 | 620,931 | 633,350 | 646,017 | 658,937 | 672,116 | 685,558 | 699,269 | 713,255 | 727,520 | 742,070 | 756,912 | 772,050 |
| Expenses: | | 410,000 | 418,200 | 426,564 | 435,095 | 443,797 | 452,673 | 461,727 | 470,961 | 480,380 | 489,988 | 499,788 | 509,783 | 519,979 | 530,379 | 540,986 | 551,806 | 562,842 | 574,099 | 585,581 | 597,293 | 609,238 | 621,423 | 633,852 | 646,529 | 659,459 |
| Net Proceeds | | 70,000 | 71,400 | 72,828 | 74,285 | 75,770 | 77,286 | 78,831 | 80,408 | 82,016 | 83,656 | 85,330 | 87,036 | 88,777 | 90,552 | 92,364 | 94,211 | 96,095 | 98,017 | 99,977 | 101,977 | 104,016 | 106,097 | 108,219 | 110,383 | 112,591 |
| Present Value Factor | 22.0% | 0.81967 | 0.67186 | 0.55071 | 0.45140 | 0.37000 | 0.30328 | 0.24859 | 0.20376 | 0.16702 | 0.13690 | 0.11221 | 0.09198 | 0.07539 | 0.06180 | 0.05065 | 0.04152 | 0.03403 | 0.02789 | 0.02286 | 0.01874 | 0.01536 | 0.01259 | 0.01032 | 0.00846 | 0.00693 |

### No Project Delay

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Proceeds | 70,000 | 71,400 | 72,828 | 74,285 | 75,770 | 77,286 | 78,831 | 80,408 | 82,016 | 83,656 | 85,330 | 87,036 | 88,777 | 90,552 | 92,364 | 94,211 | 96,095 | 98,017 | 99,977 | 101,977 |
| Present Value Per Period | 57,377 | 47,971 | 40,107 | 33,532 | 28,035 | 23,439 | 19,597 | 16,384 | 13,698 | 11,453 | 9,575 | 8,005 | 6,693 | 5,596 | 4,678 | 3,911 | 3,270 | 2,734 | 2,286 | 1,911 |

| 5-Year Land Value | 207,022 |
|---|---|
| 5-Year Discount | 0.0% |
| 20-Year Land Value | 340,253 |
| 20-Year Discount | 0.0% |

### One-Year Project Delay

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Proceeds | 0 | $71,400 | $72,828 | $74,285 | $75,770 | $77,286 | $78,831 | $80,408 | $82,016 | $83,656 | $85,330 | $87,036 | $88,777 | $90,552 | $92,364 | $94,211 | $96,095 | $98,017 | $99,977 | $101,977 | $104,016 |
| Present Value Per Period | - | 47,971 | 40,107 | 33,532 | 28,035 | 23,439 | 19,597 | 16,384 | 13,698 | 11,453 | 9,575 | 8,005 | 6,693 | 5,596 | 4,678 | 3,911 | 3,270 | 2,734 | 2,286 | 1,911 | 1,598 |

| 5-Year Land Value | 173,084 |
|---|---|
| 5-Year Discount | 16.39% |
| 20-Year Land Value | $284,474 |
| 20-Year Discount | 16.39% |

### Two-Year Project Delay

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Proceeds | 0 | 0 | $72,828 | $74,285 | $75,770 | $77,286 | $78,831 | $80,408 | $82,016 | $83,656 | $85,330 | $87,036 | $88,777 | $90,552 | $92,364 | $94,211 | $96,095 | $98,017 | $99,977 | $101,977 | $104,016 | $106,097 |
| Present Value Per Period | - | - | 40,107 | 33,532 | 28,035 | 23,439 | 19,597 | 16,384 | 13,698 | 11,453 | 9,575 | 8,005 | 6,693 | 5,596 | 4,678 | 3,911 | 3,270 | 2,734 | 2,286 | 1,911 | 1,598 | 1,336 |

| 5-Year Land Value | 144,709 |
|---|---|
| 5-Year Discount | 30.10% |
| 20-Year Land Value | $237,639 |
| 20-Year Discount | 30.10% |

### Three-Year Project Delay

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Proceeds | - | - | - | $74,285 | $75,770 | $77,286 | $78,831 | $80,408 | $82,016 | $83,656 | $85,330 | $87,036 | $88,777 | $90,552 | $92,364 | $94,211 | $96,095 | $98,017 | $99,977 | $101,977 | $104,016 | $106,097 | $108,219 |
| Present Value Per Period | - | - | - | 33,532 | 28,035 | 23,439 | 19,597 | 16,384 | 13,698 | 11,453 | 9,575 | 8,005 | 6,693 | 5,596 | 4,678 | 3,911 | 3,270 | 2,734 | 2,286 | 1,911 | 1,598 | 1,336 | 1,117 |

| 5-Year Land Value | 120,987 |
|---|---|
| 5-Year Discount | 41.56% |
| 20-Year Land Value | $198,849 |
| 20-Year Discount | 41.56% |

### Ten-Year Project Delay

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Proceeds | - | - | - | - | - | - | - | - | - | - | $85,330 | $87,036 | $88,777 | $90,552 | $92,364 | $94,211 | $96,095 | $98,017 | $99,977 | $101,977 | $104,016 | $106,097 | $108,219 | $110,383 | $112,591 |
| Present Value Per Period | - | - | - | - | - | - | - | - | - | - | 9,575 | 8,005 | 6,693 | 5,596 | 4,678 | 3,911 | 3,270 | 2,734 | 2,286 | 1,911 | 1,598 | 1,336 | 1,117 | 934 | 781 |

| 5-Year Land Value | 34,548 |
|---|---|
| 5-Year Discount | 83.31% |
| 20-Year Land Value | $56,781 |
| 20-Year Discount | 83.31% |

**Impacts of Delay on a Land Development Project**
**Percentage Loss of Unimpaired Market Value**

| Annual market change | -2% | 0% | 2% |
|---|---|---|---|
| 1-year delay | -19.67% | -18.03% | -16.39% |
| 2-year delay | -35.47% | -32.81% | -30.10% |
| 3-year delay | -48.17% | -44.93% | -41.56% |
| 10-year delay | -88.81% | -86.31% | -83.31% |

If a land development project has a $10,000,000 unimpaired market value, the market is escalating at 2% annually, and some unforeseen event delayed development for two years, the diminution in value due to the project delay would be approximately 30.10%, resulting in an "as is" market value of approximately $7,000,000. If the delay was 10 years, the diminution in value would be 83.31%, resulting in an "as is" value of approximately $1,700,000. As this cash flow modeling illustrates, taking a land development project and pushing the development back just one year has a very significant impact on the value. As this model assumes that all expenses are variable in nature, the damages would actually be greater in cases with fixed expenses.

With project delays, there are a number of variables and a number of possible outcomes, which are dependent upon case-specific factors. While it is an involved and sometimes complex topic, determining the financial impacts of project delay or loss of use is ultimately the application of conventional valuation methodologies that apply to the specific characteristics of the assignment.

BACK_DEFEXP-RR-003924

# FENG SHUI CASE STUDY

*By Orell C. Anderson, MAI*

## Class II Detrimental Condition
## Transactional Condition

*Feng shui*, which literally means "wind and water," is an ancient Chinese system of beliefs governing the arrangement of physical living and working environments using the concept of harmony. These beliefs can impact the price paid for either residential or commercial land or improvements in areas where buyers' choices are motivated by these issues. Premiums may be paid for properties that have good *feng shui*. On the other hand, properties with bad *feng shui* may be burdened by extended marketing periods, may receive a lower price, or may not be considered altogether as a purchase option.

According to Sheida Hodge in her book *Feng Shui: A Guide for Increased Real Estate Sales to Asians*, the application of *feng shui* is proper, harmonious placement–the proper siting of a building, its architectural configuration, and its interior layout.

A survey was conducted with real estate agents, brokers, and other active market participants in the Southern California area working with clients who hold these beliefs. The following questions were asked:

- What percentage of the Asian population is motivated by *feng shui*?
- What significant items are typically considered by potential buyers as very negative or positive features?
- If a property is suffering from bad *feng shui*, what can be done to mitigate the issues?

The study indicated that approximately 70% of purchasers consider *feng shui* in their buying decisions. If the property has bad *feng shui*, these buyers generally will not consider purchasing it. Of this 70%, 25% to 30% retain the services of a *feng shui* master (geomaster) to inspect the property or give input before buying.

Items that are considered undesirable include homes that have garages or front doors facing the street. The survey indicated that most prospects did not want a home with this type of street orientation. The number 4 in an address was also considered detrimental, as this unlucky number means death to those who subscribe to *feng shui* beliefs. Developers marketing directly to the Asian community also will go to great lengths to avoid including this number in an address. Finally, lots with a "T" orientation (a street pointing at it) or buildings at a "Y" junction are undesirable.

The ideal property has hills or mountains to the north and water to the south of a gently sloping lot with a southerly orientation. It is desirable to have trees located on the northwest lot line. A commercial property with good feng shui is located on a corner or convergence of two-way streets. In certain Chinese cities, apartment complexes with a southerly orientation receive higher lease rates. Building size and style should conform to other buildings in the neighborhood. In Hong Kong, where the Bank of China constructed a blade-like, high-rise office building that jutted out of the center of the city, neighboring businesses and residents complained that

BACK_DEFEXP-RR-003925

the building destroyed the good *feng shui* of surrounding buildings. The high-rise has reportedly suffered from high vacancy rates and a stigma of bad luck resulting in lower rental rates as an incentive to lease.

If a property suffers from bad *feng shui*, several actions can be taken to mitigate its state. The survey, as well as Hodge's book, indicate that landscaping or remodeling are typical remedies. This may take the form of relocating the front door to face a different direction, installing a curved staircase that does not face the front door, installing party walls and/or a fountain, changing the address, planting trees, or placing wind chimes in key areas. However, the greatest incentive was the perception of a good value on the part of the buyer. This is not limited to just discounting the price, but may include the perception of increasing market values or non-quantifiable items known only to a particular buyer.

Based on the above discussion, two case studies were conducted to investigate this Class II detrimental condition and specific transactional conditions.

The first case study is a vacant, rectangular industrial site located in Anaheim, California. The subject property contains 122,425 square feet with frontage on three streets in an industrial/business park. The parcel was purchased in the fall of 1995 for $10.68 per square foot. It has good freeway access. The intended use was to construct a user-owned, 70,000-sq.-ft. industrial/office building (i.e., flex space). In terms of good *feng shui*, hills were located to the north, the lot sloped slightly to the south, where there was vacant land and a lake, and the site was situated on a corner.

In analyzing this transaction, it became apparent that the property had sold for a slight premium over other properties in the area. This was verified by one of several brokers involved with the transaction. One broker noted that the buyer had special *feng shui* motivations, which amounted to a premium of approximately 5% being paid. As a check of reasonableness, five comparable land sales were analyzed. The chart below sets forth the most pertinent comparable sales.

The unadjusted prices per square foot ranged from $9.92 to $12.96 per square foot. No adjustment for market conditions was necessary. Sales 1 and 4 were considered superior as compared with the subject property in terms of their location in a beach city and their smaller size. Sales 2 and 5 were considered inferior in terms of location. Sale 3 was considered the most similar to the subject property in terms of location and size, and sold for approximately 6.18% less than the subject property. The market data supported the comments of the broker who believed that the market value of the subject property was approximately $10.00 per square foot. Because of his special motivations, the buyer had purchased the property for a premium of 5%. This was supported by both the market data and broker opinion.

The second study involves a residential subdivision in Southern California that was built near two other competing developments. Some buyers in the area hold *feng shui* beliefs. The subject development includes 96 homes ranging in size from 1,300 to 1,700 square feet, with two or three bedrooms. The two-story homes are located on small lots of approximately 3,500 square feet. Amenities include private parks, swim-

BACK_DEFEXP-RR-003926

ming pools, tennis courts, and a central recreation center/clubhouse. Prices in 1996 ranged from $218,000 to $235,000, with incentives of $10,000 to $12,000.

Knowing that some buyers who hold beliefs in *feng shui* would pay premiums, one developer consulted with a *feng shui* expert who gave planning input that included site orientation, landscaping, space planning, and structural design. The sales strategy included the elimination of the address numbers 4, 14, 24, and 34 for the first two phases. Additionally, the developer went to great lengths to restrict lots facing a "T" intersection. According to on-site agents, the residential market was "soft" at the time. Absorption rates for the subject property, for the first year, averaged one unit per week with the gradual elimination of incentives. The competing developments that had not gone to any efforts to address *feng shui* issues had considerably lower absorption rates of one unit per month. In June 1997, the market became "hot" and absorption increased to approximately 3.75 homes per week, while the competing developments demonstrated an absorption rate of 2.5 homes per week.

As many buyers were enticed to buy in the subdivision with *feng shui* incentives, the competing developments incurred some losses for lots and homes with bad *feng shui*. Although many lots with "unlucky" addresses and locations were discounted to offset the unlucky numbers, they remained on the market for six to eight months longer as compared to similar undeveloped lots. They did not sell until they were developed with homes and landscaping, at additional costs and risk to the developer, and after the market had significantly improved. Lots that faced "T" intersections did not sell until they were discounted by $5,000. A young Asian couple not aware of the bad *feng shui* perceived this discount as a great value and made an offer to purchase the lot. However, when informed by their agent as to the meaning behind the discount, they pulled their offer and refused to look at any homes that were not three lots away from "T" intersections.

As the surveys and market data indicated, certain buyers may pay a premium if a property is perceived to have good *feng shui*, as compared to a residence that is functionally similar.

### Land Sales Summary

| Sale | Location | Size (sq. ft.) | Sale Date | Price per Square Foot |
|---|---|---|---|---|
| Subject | Anaheim | 122,425 | Fall 1995 | $10.68 |
| 1 | Huntington Beach | 26,160 | Winter 1995 | $12.96 – |
| 2 | Santa Ana | 54,711 | Spring 1995 | $10.00 + |
| 3 | Anaheim | 142,267 | Spring 1995 | $10.02 |
| 4 | Huntington Beach | 21,830 | Winter 1994 | $12.00 – |
| 5 | Santa Ana | 33,780 | Spring 1994 | $9.92 + |

BACK_DEFEXP-RR-003927

BACK_DEFEXP-RR-003928



# 3

# Distress and Sociological Conditions

Class III conditions may involve a crime scene, terrorism, an accident, or a similar tragic event. Because of the nature of such incidents, the subsequent requirements for disclosure, and media coverage, the general public may be aware of the events that took place and the market's perception of the property involved may be negatively impacted.

Measuring Class III detrimental conditions often involves comparing the subject property to other properties that were subject to similar Class III conditions and were subsequently sold to buyers who were informed of the detrimental condition. At times, a lower sale price may be required to entice buyers to purchase these properties. Market data is essential in quantifying Class III detrimental conditions. In addition, extended marketing times are not uncommon and should be considered because this can be another aspect of the loss.

## Crime

Interviews with brokers and agents indicate, almost without fail, that a violent crime committed within a residence has an adverse effect on value when disclosed.

The following example illustrates such a situation. In a middle-class upstate New York suburb, a violent crime was committed in a typical two-story dwelling. The situation shocked the community, which was considered a safe and quiet place to live. The incident was reported in the local papers and was a local topic of conversation for months. Because of the tragedy, the occupants moved out of the area and put the house on the market. The house was well kept, and no physical traces of the incident remained. However, every local real estate broker and agent knew of the situation and tended to steer their clients away from the house.

While most detrimental conditions involve some physical issues and some detrimental conditions involve both physical and stigma issues, crime scenes often involve only market resistance, or stigma. Still, the effects of stigma can be profound. Because crime scenes involve only market resistance, they provide valuable insight into the study of pure stigma. The market resistance may actually cause two losses: the carrying costs associated

BACK_DEFEXP-RR-003929



Prior to March 1997, this large home in Rancho Santa Fe, California, was just one of hundreds of estates located in the prestigious community. When police discovered the bodies of 39 followers of the Heaven's Gate cult inside, it shocked the world and had a significant impact on perceptions of this property.

with the extended marketing time (if the property is not occupied), and a discount to entice potential buyers to purchase the property.

As another example, consider the Heaven's Gate property in California. On March 26, 1997, police discovered 39 dead bodies within a mansion in Rancho Santa Fe, California, an exclusive suburb of San Diego. The first police officers to arrive at the scene were overcome by the odor created by decaying bodies. The 39 bodies belonged to members of the Heaven's Gate cult, who believed that they were discarding their "vehicles" to return to a spaceship that followed the Hale-Bopp Comet. The house is the site of the largest mass suicide in the history of the United States. The property is a two-story, single-family residence that contains 9,011 square feet of livable area, seven bedrooms, seven bathrooms, a two-car garage, a limousine garage, a sauna, a pool, a spa, a tennis court, and a view amenity on 3.11 acres. The house is very private and is not visible from the public streets or the entry gate. The Heaven's Gate members rented the house, and the lease specifically limited occupancy to seven people.

The property was purchased in June 1994 for $1,375,000. After the event, the property was listed for sale for $1,595,000. The house was cleared of the bodies and all belongings by county authorities, but significant physical damage remained. The physical damage amounted to well over $100,000, which created

BACK_DEFEXP-RR-003930

Copyrighted Material Reviewed by Richard J. Roddewig, Volume 2P

significant carrying costs for the property. A false rumor was generated that local homeowners would pay full value for the house and bulldoze it. The property was marketed, but all offers were for less than $800,000. This amount is approximately 50% of its undamaged value, which attests to the profound impact of perceived stigma. In October 1998, the owner gave the deed back to the bank.

Another lesson from this situation is that it may be easier to rent or lease a stigmatized property than to sell it. Generally, time does tend to help in these situations, as depicted in Exhibit 3.1 and in the following examples.

**Exhibit 3.1    Market Resistance (Stigma) Graph**



On August 9, 1969, the followers of criminal Charles Manson murdered actress Sharon Tate and others in a small, farmhouse-style home off Benedict Canyon in an area north of Beverly Hills, California. Throngs of curiosity-seekers found the home and visited the property for years after the crime. The house was built in 1941 on a site that has an outstanding view of the Los Angeles basin. It contained 2,324 square feet, three bedrooms, four bathrooms, a guest house, and a pool. In 1991, the original house was demolished, the site was regraded, and a new, large Mediterranean home was built. The grading has dramatically altered the appearance of the site. Research indicates that today, more than 45 years after the crime, there is little or no residual stigma associated with the property. Aided by the remote location of the site and the extensive grading, curiosity-seekers have long forgotten about the property. The current property owner states that he did not receive any discount due to stigma when he purchased the property, and local residents state that the issue rarely resurfaces. Apparently, time has cured the stigma associated with this property.

BACK_DEFEXP-RR-003931



This site was once improved with the house where the followers of criminal Charles Manson murdered actress Sharon Tate and her friends. Today the site has been re-graded and improved with a large Mediterranean villa and looks nothing like it did in 1969, when the crimes occurred. Although this was one of the most infamous crimes in history, the real estate market has long forgotten about the stigma that was once associated with this site.

The studies of properties that have been impacted by crime scene stigma yield some other interesting lessons. First, market resistance cannot be easily elimi-nated by simply demolishing the structure. In these instances, the stigma goes to the site rather than the improvements, so bulldozing them often solves little. For example, in October 1984, a man walked into a McDonald's restaurant in San Ysidro, California, and shot and killed 21 people before he himself was shot and killed by a police sniper. McDonald's donated the restaurant to the city within 90 days of the incident. A long debate ensued among local leaders as to what to do with the property. The community expressed a strong desire to demolish the im-provements and erect a memorial. Due to lack of action by the city, McDonald's bulldozed the improvements one night, and by the next morning nothing was left but dirt and two palm trees. McDonald's then acquired another site one-quarter mile away and constructed a new restaurant, which still exists today.

Various ideas were presented for possible uses of the site. One suggestion was for park use, but this was thought of as nonconforming within the business-area location. The best location for a memorial was thought to be in another part of the city, with proceeds from the subject site sale financing the memorial. The subject site stood vacant for approximately six months. The city listed the prop-

BACK_DEFEXP-RR-003932

Copyrighted Material Licensed by Richard J. Roddewig June 2009



This memorial in San Ysidro, California, marks the spot where 21 people were killed in a McDonald's restaurant in 1984, the largest mass murder up to that time in the United States. McDonald's bulldozed its restaurant on the site, and eventually the land was donated for use as an educational center.

erty for sale at $425,000, and then for $300,000, but there were no legitimate inquiries. Finally, a local community college offered to build an education annex if the site was donated. The school had a competition for an on-site memorial and design, and an educational annex with a small memorial was constructed on the site 2½ years after the tragedy.

In addition to the effects of stigma on the site of a crime scene, market resistance may tend to be more pronounced in bad economic times than in good, as the market tends to "forgive" more problems when demand is high. High-end properties may be impacted by crime scene stigma more than less expensive properties. For example, a buyer in the market for an expensive home tends to be in a more comfortable stage of life and less willing to accept the inconvenience associated with this type of market resistance. In contrast, a person seeking low-income housing has more basic needs to fill and may have fewer options and therefore be less particular.

As an example, on March 20, 1996, a jury convicted Lyle and Erik Menendez of first-degree murder for the August 1989 slayings of their parents in their Beverly Hills mansion. The property contains 9,063 square feet, six bedrooms, eight bathrooms, and a total of 23 rooms. Amenities include a pool, a tennis court, and a guest house. Tourist buses still stop at the house today, more than 15 years after the incident.

Copyrighted Material Licensed by Richard J. Roddewig June 2009

BACK_DEFEXP-RR-003933



From the air, the home where Lyle and Erik Menendez murdered their parents can be seen to be a large estate with a tennis court, swimming pool, guest house, and other amenities associated with the grand Beverly Hills lifestyle. Photo courtesy of Fred Emmert Air Views.

BACK_DEFEXP-RR-003934

*Copyrighted material licensed by Richard Roddewig for one 2...*

The murders occurred approximately one year after the parents purchased the home for $4 million. The living room where the murders occurred was completely renovated, and no physical trace of the crime remains. The house was placed on the market in April 1991 and was listed for approximately 1½ years before a buyer came forward in October 1992. The property sold for $3 million. By 1992 the property would have been worth approximately $4.2 million with no stigma. The $3 million sale price indicates that there was an approximate 28.5% discount attributed primarily to stigma. In addition, the property suffered from an extended marketing period of approximately 1½ years, which was significantly longer than the typical six-month marketing time frame in the neighborhood. Today, the property has normal use.

## Terrorist Attacks

The Oklahoma Federal Building was located at Fifth Street and Harvey Avenue in Oklahoma City. In April of 1995, a powerful bomb left in a rented vehicle destroyed the building. The bomb blew off the north side of the building, taking the lives of 168 people and injuring more than 600 others. Timothy McVeigh was convicted in connection with the attack.

Although the Oklahoma Federal Building was the focus of nearly all the media attention, the blast actually destroyed numerous other buildings to the north, east, and west. The YMCA, the Regency Towers Apartments, several churches, and the post office were also damaged. Many of these buildings were later torn down, repaired, or rebuilt. Soon after the rescue efforts were completed, the balance of the federal building was demolished, the site was fenced, and a grass lawn was planted. Traffic on Fifth Street was permanently closed, and a memorial and museum were later constructed on part of the site.

While much of the public is under the assumption that the entire federal building was eventually torn down, the building's parking structure and terrace were not damaged and are still used today by the courthouse to the south. Literally half the site was demolished and never rebuilt out of respect for the victims and their families, while the other half provides important parking and other uses to the community.

Another lesson learned from this disaster is that when the Oklahoma Federal Building was constructed, national terrorism was not a major concern. The design of future government buildings fundamentally changed as a result of this incident. The United States government purchased numerous destroyed properties to the north of the federal building and constructed a low-rise building complex that serves as a model for future government buildings designed to resist such attacks in the future. The rural or urban settings of property should also be considered when evaluating market resistance. It is possible that market resistance may be more pronounced in rural settings, while it may be diluted by the hustle and bustle of urban life. A good example of this phenomenon is the first terrorist attack on the World Trade Center in New York City.

BACK_DEFEXP-RR-003935

In February 1993, a bomb-loaded vehicle was detonated on the second level of the underground parking structure beneath the World Trade Center. The blast was so powerful that it formed a crater penetrating six levels down. Five people died in the tragedy. Although the blast occurred underground at a location between the two towers, there was no permanent damage to the towers themselves.

Despite the tragedy, leasing activity at the World Trade Center remained largely unchanged. For example, the Bank of America, which had commenced lease negotiations for six floors of the World Trade Center before the explosion, continued with talks and consummated a lease after the bombing. Some tenants did not renew their leases, but it is not known if this was related to the bombing. The property manager instituted new and advanced security measures and provided seminars about these changes to building tenants. The most noteworthy change was that all visitors were required to show photo ID at a visitor's reception counter and verify that they had legitimate business within the building. Visitors would then be issued a card that is scanned by a guard at the elevator.

On September 11, 2001, terrorists again attacked the World Trade Center. Four commercial airliners were hijacked on suicide missions to destroy prominent US government and financial centers. The terrorists were successful in destroying the World Trade Center complex and a portion of the Pentagon in Washington, D.C. The passengers and crew of Flight 93 successfully thwarted the plane's hijackers from reaching their intended target, and instead the plane crashed in a field in Pennsylvania. In New York City, more than 12.5 million square feet of Class A office space was destroyed, and 13.3 million square feet of Class A office space was damaged.

Of course, the September 11 tragedy has had profound political, sociological, and emotional impacts. In addition, the scope of the disaster has raised questions about the real estate markets' perceptions of prominent properties. Some ques-



The 1993 bombing of the World Trade Center occurred in a parking structure between the two towers.

BACK_DEFEXP-RR-003936

Copyrighted Material Reviewed by Richard Marchitelli, June 2014



Before the World Trade Center bombing, the building's tenants and their visitors simply took an elevator to the various offices. Today, any tenant or visitor wishing to enter an office suite must first be registered at a visitors desk in the lobby.

tioned if the "romance" surrounding high-rise properties would end and whether concerns over future attacks might ultimately translate into a diminished demand for "trophy" real estate. However, the Freedom Tower and other large commercial office buildings have since been constructed on the World Trade Center site.

Alan Hevesi, the comptroller of New York City at the time, assessed the damage shortly after the disaster and released several important statistics. The World Trade Center actually consisted of a complex of seven buildings, which included the Twin Towers. All seven buildings as well as an adjacent Marriot Hotel were destroyed. According to the New York mayor's office, one additional building was torn down, 12 more buildings sustained major structural damage, and 70 buildings were damaged and in need of repair and cleaning but remained structurally stable. The repair stage for detrimental conditions includes the time period during which any property conditions are corrected or repaired. After the September 11 tragedy, this stage began with clean-up efforts nearly immediately.

The repair stage includes the costs, the impacts on use, and the risks (project incentive or entrepreneurial profit) of rebuilding or redevelopment. Even when reconstruction and repairs are ultimately completed, there may be ongoing issues that impact not just the New York markets, but high-rise office markets in general. These may include costs (i.e., higher insurance or security), use (i.e., higher vacancy or lower rents), and potential risk (i.e., market resistance) of such properties.

BACK_DEFEXP-RR-003937

The destruction of the World Trade Center resulted in increased demand for other office buildings in the area to house the displaced businesses that were located in the destroyed buildings. In terms of the real estate market, the damages could be considered to be temporary in nature.

The Oklahoma City and two World Trade Center case studies provide key insights into the risks and other factors related to terrorist attacks when studied under the framework of the detrimental conditions matrix:

- Notwithstanding the terrorist attacks, increases or declines in high-rise and other property values may be the result of economic conditions that were clearly in force prior to the event. Market participants should use caution in attributing all losses to a terrorist attack, and also consider the possible impact of general economic conditions and other factors.

- The World Trade Center site is in the process of being reconstructed, and the National September 11 Memorial and Museum is part of the new complex. An announcement was made very soon after September 11 to rebuild on the World Trade Center site, and it should be apparent to the real estate market that other properties would not be doomed as might have been feared.

- Even in the emotionally charged atmosphere immediately following the terrorist attacks, no mass exodus occurred. Tenants have remained at other prominent properties in the country, such as Chicago's Willis Tower and John Hancock Building, New York City's Empire State Building, and Los Angeles' US Bank Tower.

- Some architects have proposed the overall construction of stronger buildings, but this concept has been widely dismissed. The strength of construction needed to withstand a direct hit by a commercial airliner is extremely difficult, if not impossible, to achieve and is not economically viable on a large commercial scale.

- The threat of suicide airliner attacks on prominent properties must and will be largely eliminated through increased airport and airplane security and a new mindset. In light of the September 11 attacks, pilots and passengers are not likely to sit passively in the event of another hijacking attempt. Nevertheless, the management of any prominent property will need to consider the possibility of another attack.

- Due to the risk of "truck-bomb" terrorists, prominent high-rise office buildings that have minimal street setbacks may be viewed less favorably compared to otherwise similar structures with large setbacks. Potential investors and lenders will likely focus more on this feature. Security measures at prominent properties may include searches of all trucks or vans entering subsurface parking facilities.

- Going forward, security and safety-related issues may take a more important role over status-related issues in properties. High-rise properties that the market perceives to be relatively secure may fare better than those that are not perceived as secure.

- As a result of the initial World Trade Center bombing, national and international real estate markets mimicked the new security measures originally instituted by

BACK_DEFEXP-RR-003938

*Copyrighted Material Licensed to Richard Roddewig Volume 2&*

the World Trade Center attack. This suggests that the actions taken in rebuilding the World Trade Center complex will be carefully studied and, to a large degree, replicated at other large-scale office developments around the world.

• As a result of the Oklahoma City bombing, the United States government insti-tuted policies preventing street traffic from coming close to existing structures and fundamentally changed requirements for future developments to low-rise structures in campus-type complexes. These policies may help limit exposure to potential attacks in the future. The events of September 11 now pose the same issues for the private real estate markets that were faced by the federal government after the Oklahoma City bombing, namely increasing security at existing structures and a trend toward building more campus-style develop-ments in the future.

• Security measures may have two impacts on value: demand and rental premi-ums for safer buildings may offset the higher cost of security.

• While market resistance toward some high-rise properties is possible, re-search of Class III detrimental conditions has indicated that such negative reactions generally diminish over time and may be eliminated altogether through adequate security measures.

Lessons from history clearly indicate that, in spite of a national disaster such as a terrorist attack, real estate markets are resilient and investors will likely continue to invest for the long term. While the securities market can rise and fall in the course of a single day, the relatively illiquid characteristics of real estate mandate a significant cooling-off period after such an event. Accordingly, the 1920 J. P. Morgan bombing, the attack on Pearl Harbor, and the assassination of John F. Kennedy all shocked the nation but did not result in any plunge in the real estate or securities markets. More importantly, the first World Trade Center bombing and the Oklahoma City bombing were both large-scale terrorist attacks, and neither resulted in any extended catastrophic drops in real estate values. These lessons from history provide valuable insights into the likely reactions and expectations of real estate markets.

## Megan's Law

While a variety of tragedies and detrimental conditions can impact real estate values, perhaps none is more disturbing than a crime against a child. Real estate professionals know about properties that have become crime scenes and realize the difficulties often encountered in selling these properties. Another issue that may more directly impact the typical property owner is the potential of having a former convicted felon as a neighbor. While the thought of living near anyone with a criminal record may be unsettling, the reality of living near a convicted child molester is particularly worrisome. Whether such individuals can ever be rehabilitated is a controversial issue. Because of the seemingly unacceptable rate of repeat offenses committed by sex offenders, there is a real risk to children living near convicted child molesters. Homes and other properties located near

BACK_DEFEXP-RR-003939

these offenders' residences may be less desirable, possibly extending marketing times and diminishing values.

Considerable attention has been focused on this subject, largely due to legislation referred to as *Megan's Law*. This law encourages states to enact legislation requiring residents of a community to be notified when a convicted child molester lives in the area. Because these issues can impact property values, this law prompts many important questions for appraisers: What exactly is Megan's Law? How can it impact real estate values? Should this issue be researched and reported like other neighborhood factors such as airport noise or a flood zone designation? If properties near a convicted child molester's residence can be worth less, how should this issue be addressed in the appraisal report? A review of how Megan's Law came into existence is a good place to begin to find answers to these questions.

On June 30, 1994, seven-year-old Megan Kanka stopped to visit a man who lived near her family's home in Hamilton Township, a suburb of Trenton, New Jersey. Nobody in the neighborhood was aware that the man, Jesse Timmendequas, was a twice-convicted child molester, nor were they informed that he had served just six years of a 10-year sentence for his most recent crime and was living with two other convicted child molesters whom he had met in prison.

Timmendequas talked to Megan in his driveway and then invited her into his house to see his new puppy. The young girl accepted his invitation and went into the house. Timmendequas subsequently strangled and sexually assaulted the girl, leaving her body in a wooded area three miles from the house. When he was eventually arrested, Timmendequas confessed to the crime. In court, he was found guilty and sentenced to death.

A considerable public outrage ensued after the crime. This outrage focused on the fact that three repeat offenders were allowed to live in a family-oriented neighborhood while local residents were not informed of the offenders' backgrounds. Megan's mother argued convincingly to the public that she would not have allowed her daughter to stroll through the neighborhood if she had known the criminal history of her three neighbors.

The fury grew. The house where the crime occurred was demolished, and the city developed a park in its place. However, the situation affected real estate beyond the crime scene. New state and federal laws were passed that fundamentally altered the issues surrounding disclosure.

Megan's Law began as a New Jersey state law and became a model for the federal law enacted in 1996, which established that states were to inform communities of any sex offenders residing in the area. Furthermore, states would lose certain federal funding if they did not adopt a version of Megan's Law. New Jersey, New York, and Connecticut were the first states to comply and adopt their own federally mandated versions of the law. Criminal-rights activists have challenged the federal law and some state laws; however, these laws have ultimately been declared constitutional. There has been a clear trend favoring these types of laws throughout the United States and even in other countries.

While Megan Kanka's tragic death clearly prompted major new disclosure laws that impacted real estate, these types of laws actually began with the 1983

BACK_DEFEXP-RR-003940

California case *Reed v. King.* This case involved the sale of a house that had been involved in a 1973 multiple murder. The buyer was told by both the listing and selling agents that the house was ideal for her, and both agents failed to make any mention of the murders. After moving in, the new owner learned the history of the property from neighbors. The buyer filed suit, alleging that the property was worth less than the price she paid because of its undisclosed history. The trial court dismissed the case, but an appeals court ruled that a seller has an obligation to disclose facts that materially affect the value of a property when those facts are known only to the seller and are not readily available to the buyer.

In the late 1980s, Helen Ackley wrote an article published in Reader's Digest describing how three ghosts had been haunting her home in Nyack, New York. However, when Ackley sold the house, she did not disclose the alleged haunting to either her agent or the buyer. A New York appeals court ruled in 1991 that the buyers of this home had a right to seek repayment of their $32,000 down payment. The agent was not found to be liable in this case.

Practical influences of Megan's Law have spread throughout the nation. Alaska now publishes a list of resident paroled sex offenders on the Internet. In Connecticut, police will release names, addresses, and photos of paroled offenders to anyone who requests such information. California also provides information on its registered sex offenders online.

The federal version of Megan's Law declares that states can inform citizens of convicted offenders in one of three ways: (1) by releasing the offenders' names to newspapers, (2) by notifying schools and child-care centers, or (3) by allowing access to lists by request.

If the appraiser is aware that an offender lives near a subject property, the situation can be handled in one of two ways. The first option is to disclose the issue, plainly alert the reader of the report to the situation within the report's cover letter, and state whether the scope of work included a discussion of this issue and the impact it might have on property value. As with any detrimental condition, the appraiser should follow USPAP and the Scope of Work Rule, including the use of an extraordinary assumption, if applicable.

Alternatively, the appraiser can investigate the situation, study its effect on properties in the neighborhood, and measure any diminution in value caused by it. If the assignment includes quantifying any diminution in value, there are numerous factors that should be considered. Quantifying the effects of stigma caused by an offender living in an area is difficult, particularly when no estimate can be made of the duration of their stay. It is conceivable that until a molester leaves a family-oriented neighborhood, it could be very difficult to sell a property in that neighborhood, particularly if the offender has notoriety and their location is well known. Of course, this does not mean that the property in question has no value, but rather that the extended amount of time before a sale and other uncertainties could cause losses in carrying and holding costs as well as discounts offered to entice potential buyers. However, when the offender moves, the value of the property in question could quickly rebound back to its normal market value.

As Megan's Law has been implemented, the ramifications to real estate have been documented throughout the country and some interesting dynamics have

BACK_DEFEXP-RR-003941

become evident. When traditional family-oriented communities have been notified of an offender living in an area, the consequences have been predictable. Simply stated, local residents in family-oriented communities have inevitably wanted the offenders to leave. In many cases, when the residents organize a protest, the offender does leave the neighborhood.

To measure the impact of an offender living near a specific property, a study must be conducted that is based on market data and the attitudes of market participants. Of course, the most useful market data would be derived from the actual sales of homes that were located in proximity to the offender as compared to prices of similar homes not located near an offender's residence. Care should be taken to consider both discounts and extended marketing periods. In addition, comparisons should only be made using market data from similar neighborhoods. If a diminution in value actually does exist, it will become apparent and quantifiable in the process.

It is clear that perceptions about certain homes and neighborhoods may be affected by disclosures regarding sex offenders or criminal activity in general. At the very least, appraisers should be aware of these issues and fully disclose the specific scope of work during the course of the assignment and in their reports.

BACK_DEFEXP-RR-003942

# Luby's Cafeteria Case Study

*By Randall Bell, PhD, MAI, and Orell C. Anderson, MAI*

## Class III Detrimental Condition
## Crime Scene

In October 1991, a man drove his truck through the window of a cafeteria-style restaurant called Luby's in Killeen, Texas, shot and killed 23 people, and then turned the gun on himself.

As a result of Luby's management style and in spite of the tragedy, the City of Killeen petitioned Luby's to not abandon the site but rather to reopen the facility. The restaurant management extensively remodeled the property and approximately five months later reopened the restaurant. Employees were compensated for the downtime of the restaurant. Both the local and corporate management maintains an open and cooperative attitude towards the media and other inquiries, and today the restaurant enjoys business as usual. According to a company spokesperson, the key to this situation was that Luby's was not focused on stock values, but rather on how they could genuinely help the community. The company's CEO, Pete Erben, flew to the site within hours of the incident and immediately put $100,000 towards assisting the victims and their families. Luby's management indicated that they have no intention of selling the property. While there is no memorial on the site, there is a memorial commemorating those who died in this incident at a nearby community center. The Luby's incident is considered by many to be a textbook case on properly handling a tragedy.



BACK_DEFEXP-RR-003943

# SEPTEMBER 11 CASE STUDY

*By Randall Bell, PhD, MAI*

## Class III Detrimental Condition
## Memorial Site

On the morning of September 11, 2001, the United States came under attack. Terrorists hijacked four commercial airliners and used them to strike several targets on US soil.

Two planes struck the Twin Towers of the World Trade Center in New York City, and one plane struck the Pentagon near Washington, D.C. Due to the heroism of the passengers and crew aboard United Airlines Flight 93, the airliner did not arrive at its intended destination. Instead, it crashed into a rural field in Stonycreek Township, Somerset County, Pennsylvania, killing all aboard. Soon after the attacks, a temporary memorial formed from spontaneous tributes left by visitors formed near the Flight 93 crash site to honor the flight's heroes.

### Valuation Approach

The World Trade Center and Flight 93 crash sites are of considerable national and international significance following the terrorist attacks. The income capitalization approach to value was utilized for these sites via the land residual technique. The sales comparison approach to value was also utilized. The cost approach to value was not utilized, as the subject properties were primarily vacant land. The high-



The September 11 Memorial Plaza set within the footprints of the former Twin Towers of the World Trade Center in New York City

BACK_DEFEXP-RR-003944

Copyrighted material licensed to Richard Belzer/Litigation by...



One World Trade Center, also known as the "Freedom Tower," stands at the center of this photo. It is the main building of the rebuilt post-September 11 World Trade Center complex in New York City.



A portion of the Flight 93 crash site in Pennsylvania

*Distress and Sociological Conditions*    **109**

BACK_DEFEXP-RR-003945



A temporary memorial for the Flight 93 passengers and crew quickly formed near the crash site in Pennsylvania.





An aerial view of the Flight 93 crash site

**110**   *Real Estate Damages*

BACK_DEFEXP-RR-003946

est and best use of the sites as memorials and related visitor's centers were viewed as operating enterprises due to the commercial viability of the sites.

The land residual approach was primarily utilized in the valuation of both subject properties. This technique relies upon the income capitalization approach—employing market-derived income, operating expense assumptions, and construction costs—and results in a final residual land value. This approach is specific to the highest and best use of each subject site as a memorial and related visitor's center.

In the land residual approach, potential income from the memorial, visitor's center, and concessions were estimated. From the potential gross revenues, the estimated construction costs and operating expenses were deducted. The resulting projected net operating income is capitalized to yield a value that is indicative of the price an investor or developer may pay for the subject property.

In conducting the land residual analysis, 20 sites of national and international interest have been examined. While all information was requested, limited data is available. Some figures are dated but are the best available information.

## 1. Oklahoma City National Memorial and Museum 620 North Harvey Avenue Oklahoma City, Oklahoma

The Alfred P. Murrah Federal Building was a US government development located in Oklahoma City, Oklahoma. Built in 1977, the federal structure cost $14.5 million to build and was named after Federal Judge Alfred P. Murrah, an Oklahoma native. On the morning of April 19, 1995, it became the target of a bombing. Timothy McVeigh parked a rented Ryder truck loaded with explosives in front of the complex. At 9:02 a.m., a massive explosion occurred that sheared off the entire north side of the building, killing 168 people. Following the rescue efforts and investigation, the remaining structure was demolished on May 23, 1995. The subsequent memorial honors the victims, survivors, rescuers, and all those who were impacted by this tragedy.

The adult admission price is $10.00 (2011). The annual number of visitors is 164,000. The 2004 average admission paid was $5.75. There is no fee for visiting the outside memorial areas or museum store. The net concession income was approximately $1.00 per attendee (2004). The site is part of the National Park Service in conjunction with a private nonprofit organization.

## 2. The Alamo 300 Alamo Plaza San Antonio, Texas

Once named the Mission San Antonio de Valero, the Alamo was once home for missionaries and Native American converts. In the 1800s, the Alamo was utilized by the Spanish cavalry. David Crockett, Jim Bowie, and other Texians defended the Alamo against Antonio Lopez de Santa Anna and the Centralists in the Texas Revolution. The Texians were eventually defeated, but the bravery of Crockett and the others is memorialized in the museum here. This site is part of the National Park Service in association with a private nonprofit organization. The Alamo has approximately 2.5 million visitors annually. The Alamo does not charge an admission fee (2011).

## 3. Graceland 3734 Elvis Presley Boulevard Memphis, Tennessee

It is estimated that Elvis Presley has sold over one billion record units worldwide, more than anyone in re-

BACK_DEFEXP-RR-003947

cord industry history. As such, Elvis has many devoted fans. Elvis died at his Graceland estate on August 16, 1977. There is a great demand for tours of this estate. Graceland opened in 1982 and is operated by a private for-profit organization. Graceland was placed on the National Register of Historical Places in 1991. Graceland receives ±600,000 visitors annually. Entrance fees range from $31.00 to $70.00 per adult (2011).

### 4. Hiroshima Peace Memorial
####     1-2 Nakajimama-cho
####     Hiroshima, Japan

The Hiroshima Peace Memorial is located in the area where an atomic bomb was dropped on August 6, 1945, near the end of World War II. Approximately 140,000 people died, and the city center was destroyed. The Hiroshima Peace Memorial displays belongings of the victims, photos, and other exhibits of the horrors of the bombing. Tours are offered in 17 languages. The admission fee is ±$4.28 and includes an audio tour (2011). The memorial receives approximately 1,400,000 visitors per year.

### 5. National Civil Rights Museum
####     450 Mulberry Street
####     Memphis, Tennessee

Following the assassination of Dr. Martin Luther King Jr. on April 4, 1968, at the Lorraine Motel in Memphis, the motel fell into a long and steep decline. It fell into foreclosure in 1982. Concerned that this historic site would be destroyed through neglect and indifference, the Martin Luther King Memorial Foundation was formed to salvage the property. The Foundation purchased the Lorraine at auction for $144,000 in December 1982, and the Lorraine Civil Rights Foundation was created. On September 28, 1991, the National Civil

Rights Museum opened its doors to visitors, with the former Lorraine Motel as part of the museum complex. The museum is owned and operated by a private nonprofit organization. Attendance in 2010 was approximately 200,000, with 180,000 being paid attendance. The net concession income was approximately $3.50 per attendee (2010). The adult admission fee is $13.00 (2011).

### 6. The National World War II
####     Museum
####     945 Magazine Street
####     New Orleans, Louisiana

The National World War II Museum recognizes all amphibious landings made in World War II through the telling of personal accounts and the showing of artifacts, documents, and photographs. Exhibits show all aspects of the war, with a special emphasis on providing the human side of the conflict. Visitor attendance in 2010 was 294,014, with approximately 267,285 of those being paid admissions. Concession revenue is ±$3.50 per person (2010). The adult admission fee is $18.00 (2011). The museum is owned and operated by a private nonprofit organization.

### 7. The Empire State Building
####     Observatory
####     350 Fifth Avenue
####     New York, New York

The Empire State Building is one of the most famous structures built during the twentieth century. This tower, with a height of 1,250 feet, has dominated the New York City skyline since its completion in 1931. It was constructed by John Jacob Raskob, a financier, and Alfred E. Smith, the former governor of the state of New York. The observatory, which is located on the building's 86th floor, had a paid attendance of ±3.35 million in 2003, with

BACK_DEFEXP-RR-003948

an average admission cost of $8.92 per person. Gross income was more than $28.6 million, and the net concession income was $1.50 per attendee (2003). The Empire State Building is owned by a for-profit organization. Admission in 2010 was ±3.8 million, and the 2011 adult admission fee is $19.29-$36.00.

## 8. The Sixth Floor Museum at Dealey Plaza
### 411 Elm Street
### Dallas, Texas

President John F. Kennedy visited Dallas on November 22, 1963. He, his wife Jacqueline, Texas Governor John Connally, and Connally's wife Nellie rode in a motorcade through Dealey Plaza on their way to the Dallas Trade Mart. At 12:30 p.m., after the motorcade turned from Houston Street onto Elm Street, President Kennedy was killed by gunfire and Governor Connally was wounded. Bob Jackson, a *Dallas Times Herald* photographer, looked up and spotted a rifle in a sixth-floor window of the Texas School Book Depository building. This location is now The Sixth Floor Museum at Dealey Plaza and contains a permanent historical exhibition of the life, death, and legacy of the late President John F. Kennedy. The exhibitions focus on the impact of Kennedy's death on the nation and the world. The attendance rate is approximately 325,000 per year, with an adult admission of $13.50 (2011). The museum is owned by a private nonprofit organization.

## 9. USS Arizona Memorial
### 1 Arizona Memorial Place
### Honolulu, Hawaii

The USS Arizona is the final resting place for many of the battleship's 1,177 crew members who lost their lives on December 7, 1941, in the attack on Pearl Harbor by the Japanese. The 184-ft.-long memorial structure spanning the mid-portion of the sunken battleship consists of three main sections: the entry and assembly rooms, a central area designed for ceremonies and general observation, and the shrine room, where the names of those killed on the ship are engraved on the marble wall.

The attack was part of a "grand strategy of conquest" in the Western Pacific by the Japanese. The first wave of aircraft arrived over their target areas shortly before 7:55 a.m. At approximately 8:10 a.m., the USS Arizona exploded, having been hit by a 1,760-lb., armor-piercing bomb.

Admission to the memorial is free. The USS Arizona Memorial had approximately 1.37 million visitors in 2004. The net concession income was approximately $3.34 per attendee, not including the snack bar. While admission is free, many visitors choose to visit the adjacent memorials that do have paid admission, such as the Battleship Missouri Memorial. Attendance at the USS Arizona Memorial in 2010 was 1,407,879. The memorial is operated by the National Park Service and a private nonprofit entity.

## 10. USS Bowfin Submarine Museum and Park
### 11 Arizona Memorial Dr.
### Honolulu, Hawaii

The USS Bowfin Submarine Museum and Park exists to restore and preserve the World War II submarine USS Bowfin and submarine-related artifacts. The USS Bowfin launched on December 7, 1942, and successfully completed nine war patrols. It was acquired from the US Navy in 1979 and opened to the public in 1981. In 1986, the submarine was designated as a National Historic Landmark by the Department of the Interior. The 2011

BACK_DEFEXP-RR-003949

adult admission fee is $10.00, with 200,000-300,000 visitors annually. The museum is owned and operated by a private nonprofit organization.

## 11. Johnstown Flood Museum
### 304 Washington Street
### Johnstown, Pennsylvania

The South Fork Dam in Pennsylvania created a man-made lake called Lake Conemaugh. When the dam failed on May 31, 1889, the ensuing flood killed 2,209 people and caused $17 million in damage to the Johnstown area. Flooding destroyed four square miles of development. This memorial is located within the former Cambria Library in Johnstown, which was built to replace the old library destroyed by the flood. The total number of attendees at the Johnstown Flood Museum in 2010 was 135,308. The net concession revenue was approximately $2.00 per attendee (2010). The adult admission fee is $8.00 (2011). The site is part of the National Park Service in conjunction with a private nonprofit organization.

## 12. Statue of Liberty National Monument
### New York, New York

The Statue of Liberty, located on Liberty Island in New York City, was presented to the people of the United States in 1886 as a gift from France. The statue became a national monument in 1924, and nearby Ellis Island was declared part of the Statue of Liberty National Monument in 1965. From 1892 to the mid-1930s, Ellis Island was the primary immigration entry port into the United States. Millions of immigrants from around the world passed through its gates. There is no charge to visit the islands; however, a fee is charged for the ferry ride from the mainland to the two islands. In addition to an on-site gift shop, Ellis Island has a highly visited online store that sells immigration records and historical documents. Income from the online and physical stores has been combined to reflect a 2004 net concession income of $4.08 per attendee. The annual number of visitors is 3,555,244. The site is part of the National Park System in conjunction with a private nonprofit organization. The fee for an adult ferry ride is $13.00 (2011).

## 13. Ford's Theatre
### 511 Tenth Street
### Washington, D.C.

President Abraham Lincoln was shot while visiting Ford's Theatre on April 14, 1865. The President was then carried to the Petersen Boarding House across the street, where he died the following day. The 2008 attendance at Ford's Theatre was 335,865. This site is owned and operated by a private nonprofit organization in conjunction with the National Park Service. The theatre has no admission fee (2011).

## 14. Gettysburg National Military Park
### 1195 Baltimore Pike
### Gettysburg, Pennsylvania

Located 50 miles northwest of Baltimore, the small town of Gettysburg, Pennsylvania, was the site of the largest battle ever waged during the American Civil War. Fought in the first three days of July 1863, the Battle of Gettysburg resulted in a hallmark victory of the Union "Army of the Potomac" and successfully ended the second invasion of the North by General Robert E. Lee's "Army of Northern Virginia." Historians have referred to the battle as a major turning point in the war, the "high-water mark of the Confederacy." It was also the single most tragic battle of the war, resulting in over 51,000 soldiers

BACK_DEFEXP-RR-003950

killed, wounded, captured, or missing. The Gettysburg National Cemetery was dedicated on November 19, 1863, when President Abraham Lincoln delivered his renowned Gettysburg Address there. The cemetery contains more than 7,000 interments, including over 3,500 from the Civil War. The National Park Service built a new bookstore and museum store on site in 2007. The net concession income per attendee was previously estimated at $2.76 per visitor. Admittance to the park is free, but there is a $10.50 fee to visit the museum (2011). The annual number of visitors is 1,455,951.

### 15. Winchester Mystery House
###    525 South Winchester Boulevard
###    San Jose, California

The Winchester Mystery House is the former home of Sarah Winchester, heiress to the Winchester Rifle fortune, and is an extravagant maze of architecture. The 160-room house is so named because no one knows the true reason for its elaborate and odd design, although some suspect that Sarah Winchester's meetings with a spirit medium, participation in séances, or simply grief from losing both her daughter and husband to illness may have been contributing factors. Different tours of the estate include features such as the property's orchards, stables, unfinished ballroom, Victorian gardens, and the Winchester Historic Firearms Museum. Admission fees range from $27.00 to $35.00 (2011). The Winchester House is owned and operated by a for-profit organization.

### 16. Hearst Castle
###    750 Hearst Castle Road
###    San Simeon, California

An estate complete with 165 rooms and 127 acres of gardens, terraces, pools, and walkways, the Hearst Castle was the estate built for newspaper magnate William Randolph Hearst and his family. Construction of the mansion began in 1919. Different tours include features such as the estate's upper floors, north wing, and garden, and self-guided and evening tours are also offered. Fees for each tour range from $24.00 to $30.00 (2011). This site is owned and operated by the California State Parks. In the fiscal year 2008-2009, the castle gave 646,027 tours.

### 17. The National D-Day Memorial
###    Three Overload Circle
###    Bedford, Virginia

The National D-Day Memorial has been created to preserve the legacy of the events that took place on June 6, 1944, the day the Western Allies entered Normandy in northern France during World War II. More than 12,000 troops died on D-Day. Casualty rates in the first- and second-wave companies were sometimes as high as 90%. Bedford, Virginia, sustained the highest per capita D-Day losses in the nation. The concave wall within the memorial holds the names of the more than 4,400 Allied servicemen who were killed in action. The memorial had 81,510 attendees in 2010. The entrance fee is $7.00 (2011). The site is owned and operated by a private non-profit organization.

### 18. The National Civil War Museum
###    One Lincoln Circle at Reservoir Park
###    Harrisburg, Pennsylvania

The National Civil War Museum serves to inspire learning about the American Civil War through the preservation and balanced presentation of the American peoples' struggles for survival and healing. It was estab-

BACK_DEFEXP-RR-003951

lished to memorialize the events that took place between 1850 and 1876 and portrays the issues straining the nation through the war's conclusion at the Appomattox Courthouse. The museum has an annual attendance of approximately 45,000. The admission fee is $9.00 per adult (2011). The site is owned and operated by a private non-profit organization.

### 19. USS Constitution Museum Charlestown Navy Yard, Building 22 Charleston, Massachusetts

The USS Constitution Museum brings to life the nation's oldest commissioned ship. The museum focuses on early maritime history in the United States. The museum is located adjacent to the water where the ship is positioned. Visitors numbered 311,606 in 2009. There is no admission fee (2011). The site is owned and operated by a private nonprofit organization.

### 20. The National World War I Museum and Memorial 100 West 26th Street Kansas City, Missouri

The purpose of the National World War I Museum and Memorial is to make the experiences of the World War I era meaningful and relevant for present and future generations. The Great War included about 65 million soldiers worldwide, of which two million were from the United States. Approximately nine million soldiers died in the war. The war involved 36 countries and lasted for five years. Two original museum buildings opened in 1926, which provided 5,000 square feet of gallery space. Today, the Museum has a total of approximately 100,000 square feet, with a large permanent exhibit and several special exhibits. The museum had an attendance of 140,251 in 2009, with a paid ratio of approximately 92%. Concession revenue contributed $4.28 per visitor (2009). The adult admission is $12.00 (2011).

Exhibit A summarizes the information on these properties.

BACK_DEFEXP-RR-003952

**Exhibit A**    **Memorial Site Case Studies**

| No. | Case Study Location | Bldg. Size (Sq. Ft.) & Site Area (Acres) | Paid Adm. Ratio | Adult Adm. Rate | Annual No. of Visitors | Concess./ Visitor | Gross Revenue 2007 | Gross Revenue 2008 | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Oklahoma City National Memorial & Museum Oklahoma City, OK | 30,000 sq. ft. 3.3 acres | | $10.00 | 164,000 | $1.00 | $2,915,767 | $3,002,238 | - Honors those killed in the 1995 bombing of the Alfred P. Murrah Building<br>- National Park Service and private nonprofit entity |
| 2 | The Alamo San Antonio, TX | 4.2 acres | | $0.00 | 2,500,000 | | $1,825,442 | $785,260 | - Memorializes a battle fought during the Texas Revolution<br>- National Park Service and private nonprofit entity |
| 3 | Graceland Memphis, TN | 14 acres | | $31.00-$70.00 | 600,000 | | | | - Memorializes Elvis Presley<br>- For-profit entity |
| 4 | Hiroshima Peace Memorial Hiroshima, Japan | 126,078 sq. ft. 30 acres | | $4.28 | 1,400,000 | | $489,116 | | - Honors those killed by the atomic bomb dropped during World War II in 1945 |
| 5 | National Civil Rights Museum Memphis, TN | 47,303 sq. ft. 4.14 acres | ±90% | $13.00 | 200,000 | $3.50 | $4,601,100 | $3,991,905 | - Location of the 1968 assassination of civil rights activist Dr. Martin Luther King Jr.<br>- Private nonprofit entity |
| 6 | National World War II Museum New Orleans, LA | 107,000 sq. ft. 4.6 acres | ±91% | $18.00 | 294,014 | $3.50 | $19,587,867 | $36,084,296 | - Recognizes all amphibious invasions during World War II<br>- Private nonprofit entity |
| 7 | Empire State Bldg. Observatory New York, NY | 2,600,000 sq. ft. 2 acres | | $19.29-$36.00 | 3,800,000 | $1.50 | $28,600,000 (2003) | | - Prior to the World Trade Center, this was the world's tallest building<br>- For-profit entity |
| 8 | Sixth Floor Museum Dallas, TX | 3.07 acres | | $13.50 | 325,000 | | $4,021,567 | $4,563,601 | - Location of the assassination of President John F. Kennedy<br>- Private nonprofit entity |
| 9 | USS Arizona Memorial Honolulu, HI | 10.5 acres | | $0.00 | 1,407,879 | $3.34 | $6,611,557 | $4,464,989 | - Honors the crewmen who died during the 1941 Japanese attack on Pearl Harbor<br>- National Park Service and private nonprofit entity |
| 10 | USS Bowfin Submarine. Museum & Park Honolulu, HI | 13,800 sq. ft. 5 acres | | $10.00 | 200,000-300,000 | | $2,961,565 | $3,029,254 | - Memorializes the USS Bowfin, a sub used in WWII<br>- Private nonprofit entity |

BACK_DEFEXP-RR-003953

**Exhibit A**      **Memorial Site Case Studies** *(continued)*

| No. | Case Study Location | Bldg. Size (Sq. Ft.) & Site Area (Acres) | Paid Adm. Ratio | Adult Adm. Rate | Annual No. of Visitors | Concess./ Visitor | Gross Revenue 2007 | Gross Revenue 2008 | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 11 | Johnstown Flood Museum Johnstown, PA | 14,000 sq. ft. ±0.5 acre | ±90% | $8.00 | 135,308 | $2.00 | $2,692,056 | $1,804,055 | - Honors those who died in the 1889 flood that killed 2,209<br>- National Park Service and private nonprofit entity |
| 12 | Statue of Liberty/Ellis Island New York, NY | 39.5 acres | | $13.00 | 3,555,244 | $4.08 | $8,331,137 | $2,419,290 | - Former immigration entry port that became a national monument in 1985<br>- National Park Service and private nonprofit entity |
| 13 | Ford's Theatre Washington, D.C. | | | $0.00 | 335,865 | | $25,125,705 | $25,510,733 | - Location of the assassination of President Abraham Lincoln<br>- National Park Service and private nonprofit entity |
| 14 | Gettysburg National Military Park Gettysburg, PA | 6,000 acres | | $10.50 | 1,455,951 | $2.76 | $33,330,781 | $24,370,832 | - Memorializes the largest battle waged during the American Civil War<br>- National Park Service and private nonprofit entity |
| 15 | Winchester Mystery House San Jose, CA | 75,903 sq. ft. 15.86 acres | | $27.00-$35.00 | | | | | - Former home of heiress Sarah Winchester and extravagant maze of architecture<br>- For-profit entity |
| 16 | Hearst Castle San Simeon, CA | 90,080 sq. ft. 127 acres | | $24.00-$30.00 | 646,027 | | | | - Estate of newspaper tycoon William Randolph Hearst<br>- California State Parks |
| 17 | National D-Day Memorial Bedford, VA | 88 acres | ±90% | $7.00 | 81,510 | | $2,244,855 | $1,461,266 | - Memorial to the events that took place on D-Day<br>- Private nonprofit entity |
| 18 | National Civil War Museum Harrisburg, PA | 65,000 sq. ft. 85 acres | | $9.00 | 45,000 | | $2,001,756 | $1,253,742 | - Memorializes the events surrounding the American Civil War<br>- Private nonprofit entity |
| 19 | USS Constitution Museum Charlestown, MA | 0.62 acre | | $0.00 | 311,606 | | | $1,819,383 | - Memorializes the nation's oldest commissioned ship, the USS Constitution<br>- Private nonprofit entity |
| 20 | National WW I Museum & Memorial Kansas City, MO | 100,000 sq. ft. 47 acres | ±92% | $12.00 | 140,251 | $4.28 | $4,586,278 | $4,721,158 | - Memorializes the events of World War I<br>- Private nonprofit entity |

BACK_DEFEXP-RR-003954

Copyrighted material reproduced with permission of Richard J. Roddewig, Volume 26

Both the World Trade Center and the Flight 93 crash site were appraised utilizing the same case study data and underlying market data for significant memorials. National tragedies have both emotional and practical considerations. Several memorial sites allow for visitors to view all or portions of the sites at no cost and provide an additional museum or visitor's center with an admission fee. Bookstores and other concessions are often available, which also generate income.

Based upon each of the case study's data and examination of key incomes, expenses, and other financial issues, the primary assumptions underlying the land residual analysis were analyzed. The assumptions utilized are based upon a privately operated memorial and visitor's center.

The following is a summary of calculations made for the Flight 93 crash site:

### Average Admission Rate

Of the memorial and related sites studied, the admission fees range between no charge to $70.00 and generally range from $8.00 to $13.00. The admission rate for the paying component of the Flight 93 site has been estimated to be $9.00 per person.

### Bookstore and Concession Income

Of the museums and memorials researched, the net income from bookstores and concessions ranged from $2.00 to $4.28 per person. Based upon the market data, the bookstore and concession net income is estimated to be $4.00 per person.

### Visitors per Year

Actual and projected visitor figures were reviewed, and it is estimated that 230,000 visitors per year would visit the subject property. All such visitors would be expected to visit a distant view of the memorial; however, not all visitors would be expected to pay admission to the visitor center. The other memorial sites researched indicated that 12% to 100% of the visitors pay for museum or visitor's center admission. Based upon this information, 80% of all visitors to the site, or 184,000 visitors, are estimated to pay for entrance to the visitor's center.

### Expense Ratio

Of the other sites researched, the expense ratios ranged from 23% to 100%. The higher expense ratios reflect situations in which there are large government subsidies or the operation reflects how the majority of revenues are paid in various administrative functions. The expense ratio at the Flight 93 crash site is estimated to be 30%.

### Land Area

The subject has a land area of ±275.8142 acres, or 12,014,284 square feet.

### Building Area

This analysis is based on a building area of 12,553 square feet, which is the area of the subject property improvements. It is noted that these improvements are located on a bluff that affords an outstanding view of the crash and memorial site.

### Capitalization Rate

The net operating income is converted into a value indication by means of direct capitalization. This represents the relationship between income and value and reflects the most likely investment motives of typical buyers and sellers. The subject site is of considerable national significance, which sets it apart from vacant land with no commercially viable use. The subject property is considered secure from an investment standpoint.

BACK_DEFEXP-RR-003955

The primary source for capitalization rate information was derived from the Korpacz Real Estate Investor Survey dated 4Q 2009. Korpacz is a widely recognized authoritative source for capitalization and discount rates. The capitalization rates for several markets were analyzed, including office and shopping center markets on the local and national levels. The survey notes the lower and upper end of the range for each market. The range of low rates is 5.00%-8.00%, while the high rate range is 8.5%-12.00%.

The appraisal report by Gregory D. Jones of Cassidy Turley, dated November 23, 2010, noted a capitalization rate of 12.0% that was utilized in the development feasibility-sensitivity matrix.

In their discounted cash flow analysis in the appraisal report dated March 12, 2008, Thomas E. Kabat and J. Philip Cook utilized a terminal capitalization rate of 6.5%, with a 2.5% inflation rate applied to the potential gross income.

The capitalization rate for the subject property is estimated to be 7%.

## Construction Costs

To determine projected construction costs for an appropriate memorial and visitor's center on the subject site, the construction costs of recently built memorials were considered. The events of September 11, 2001, were of tremendous historical significance. The memorial and related visitor's center would be expected to reflect this significance. The total existing building area is approximately 12,553 square feet, which is considered ample for a visitor's center and related uses. The use of existing buildings maintains the historical integrity of the property. It is estimated that the conversion of the existing buildings to a memorial, visitor's center, and related uses will be approximately $300 per square foot.

## Summary of Land Residual Calculations

Based upon the analysis of the Flight 93 crash site and 20 memorial sites of national significance, the following table summarizes the land residual calculations:

| | |
|---|---|
| Gross income–admissions | $1,656,000 |
| Expenses | $(496,800) |
| Net operating income–admissions | $1,159,200 |
| Net income–bookstore and concessions | $736,000 |
| Total net income | $1,895,200 |
| Capitalization rate | 7.0% |
| Indicated value | $27,074,286 |
| Memorial construction & development costs | $3,765,900 |
| Indicated land value | $23,308,386 |
| Rounded | $23,300,000 |
| Indicated value, per sq. ft. | $1.94/sq. ft. |

## Sales Comparison Approach

The value as indicated by the land residual technique was compared to commercially viable land sales throughout the state of Pennsylvania. The site area is 275.8142 acres, or 12,014,467 square feet. It was noted that the indicated land value is equivalent to $1.94 per square foot, which was well supported by the sales comparables, which range from $1.29 per square foot to $5.19 per square foot, with an average of $2.23 per sq. ft.

The National Park Service has since constructed a permanent memorial and a visitor's center on the Flight 93 crash site.

BACK_DEFEXP-RR-003956

# Sandy Hook Case Study

*By Randall Bell, PhD, MAI*

## Class III Detrimental Condition
## Crime Scene

On December 14, 2012, 20-year-old Adam Lanza did the unthinkable. Lanza walked into the Sandy Hook Elementary School in Newtown, Connecticut, and killed 20 children and six adult staff members. The world was stunned.

The crime spree actually began within Lanza's home, where he lived with his mother. The house was a white, two-story, 3,000-sq.-ft. home with green shutters. It was located atop a two-acre hill in an upscale neighborhood, surrounded by other upscale homes. Inside, the home was nicely decorated with comfortable chairs and furniture that followed a Colonial theme. The property included expansive green lawns and an outdoor playhouse and swings, and backed up to a beautiful wooded area.

Adam Lanza was a recluse and had moved from his upstairs bedroom down into the basement of the house. The crime spree began when Lanza walked into the upstairs master bedroom and shot his mother, Nancy Lanza, four times as she lay in her four-poster bed. From there, Lanza drove down the long driveway to the street and then to the school, which is now the scene of the nation's worst elementary school shooting.

As with every tragedy, there was irreparable emotional damage. There were also practical questions, includ-



The former residence of Adam and Nancy Lanza in Newtown, Connecticut

BACK_DEFEXP-RR-003957

ing the question of what to do with the Lanza house, which was now owned by the bank. The bank's primary concern was respecting the concerns of the community.

There was an immediate concern about the status of the property. It was quickly decided that the property should be secured and maintained until final decisions could be reached. Furthermore, the parties believed that it was appropriate to remove and destroy all of the furniture and belongings within the house. A local property manager carefully oversaw and documented that all of the home's belongings were properly removed and incinerated.

Research was conducted as to the fate of properties associated with other tragedies throughout the United States and Europe. This research was presented to Newtown's mayor and police chief. The findings outlined nine options for handling the Lanza house, with pros and cons presented for each option.

Ultimately, the community leaders determined that the best option was to bulldoze the house. The community was sensitive to those who had lost loved ones in the shooting, and that house stood as a sad, uncomfortable reminder of those losses. After the tragedy, the ownership of the house reverted to the bank, who subsequently donated the property to the city. In turn, the city demolished the house, with no plans for redevelopment.

BACK_DEFEXP-RR-003958

Copyright Material — Not for Resale — Provided by Appraisal Institute, June 2014



## 4

## Legal Conditions

Legal conditions imposed upon properties include eminent domain, temporary easements, title issues, lease agreements, or other conditions of a legal nature.

### Eminent Domain

Road expansion, an increased number of utility lines, and more infrastructure and public services are needed to accommodate the United States' constant population growth. This expansion will affect the resident population and existing private property owners.

Eminent domain is the power of the government to take private property for public use without the owner's consent, restricted only by the constitutional provision for "just compensation." The first instance of eminent domain is not known, but the federal government clearly established this power in 1875. The Fifth Amendment to the US Constitution protects private property owners and promises that they be paid just compensation for property that is taken. As long as state and local governments do not violate the Constitution, they have power in non-federal court proceedings. Eminent domain proceedings are determined either by a jury in a court of law or by an arbitrator.

The challenge to real estate appraisers is to estimate what just compensation ought to be; this has many permutations, as shown in Exhibit 4.1. It should be noted that just compensation may or may not be equivalent to market value. However, in most jurisdictions some version of market value has been adopted. For example, California uses the term "fair market value," which is an indication of the "highest price" rather than the "most likely price" that would be expected within the market.

The solution to this problem depends on the state in which the eminent domain proceeding takes place. There are two rules for measuring just compensation: the *before and after* (federal) rule and the *value plus damage* (state) rule.

The *before and after* (federal) rule is a valuation method used in federal cases and many states. (The Fifth Circuit Court of Appeals of the United States has

BACK_DEFEXP-RR-003959

ruled that the before and after rule is the only acceptable valuation method; other circuit courts accept variations of the rule.) Generally, the federal rule states that the value of the property taken is the value before the taking minus the value after the property is taken. The difference in value equals just compensation. Exhibit 4.2 outlines the states that use the before and after rule.

There are some recognized problems with the before and after rule. One problem is that this rule does not provide a component to exclude benefits from the "after" value; another is that this rule also does not provide a way to exclude noncompensable damages from the "after" value. Because of these problems, some jurisdictions use variations of the rule.

The *value plus damage* (state) rule is an alternate method of calculating just compensation in partial takings. The calculation of just compensation according to this rule is

Value of the part taken

**Plus** damages to the remainder

**Less** special benefits

*Special benefits* are benefits that the remainder obtains as a result of the public improvement. It should be noted that some jurisdictions allow special benefits only to the extent that they offset damages. Accordingly, it is critical for the appraiser to be familiar with the applicable codes and laws.

With the value plus damage (state) rule, the property owner is given just compensation through payment of *fair market value* for the property taken plus severance damages for the remainder. This rule involves a more detailed and in-depth analysis than the before and after rule. Exhibit 4.3 demonstrates the procedures of the

---

### Exhibit 4.1    Eminent Domain Diagram

Eminent domain is the right of government to codemn or take a property from the property owner for the good of the general public (i.e., roadways, fire stations, road widening). When taking a property, the government is obliged to pay just compensation.

**Value of Partial Acquisitions**



Value of the whole before acquisition

Value of the part acquired as part of the whole

Value of the remainder as part of the whole

Value of the remainder after the acquisition and before consideration of special benefits

Value of the remainder after the acquisition and after consideration of special benefits

---

### Exhibit 4.2    States That Use the Before and After (Federal) Rule

| | | | |
|---|---|---|---|
| Alabama | Maryland | New Jersey | Tennessee |
| Arkansas | Michigan | New Mexico | Virginia |
| Connecticut | Minnesota | Ohio | Washington |
| Delaware | Mississippi | Oklahoma | Wisconsin |
| Hawaii | Missouri | Pennsylvania | Wyoming |
| Iowa | North Carolina | Rhode Island | |
| Maine | New Hampshire | South Dakota | |

Source: J. D. Eaton, *Real Estate Valuation in Litigation*, 2nd ed. (Chicago: Appraisal Institute, 1995).

**124**    *Real Estate Damages*

value plus damage rule, although the potential for double-counting damages is sometimes a problem. Exhibit 4.4 lists the states that use the value plus damage rule. Exhibit 4.5 sets forth the federal and state eminent domain setoff rules and policies.

Perhaps one of the most controversial issues in condemnation relates to the right-to-take question—i.e., whether the principle of eminent domain allows for the government to take land in order to encourage private economic development. Eminent domain has historically been used for projects required for public

---

**Exhibit 4.3**    **Value Plus Damage Rule Calculations**

| | | |
|---|---|---|
| Value before taking (unimpaired) | | $1,500,000 |
| Value of part taken | − | 50,000 |
| Remainder value before taking | | $1,450,000 |
| Remainder value after taking (impaired) | − | 1,250,000 |
| Damages to remainder | | $200,000 |
| Special benefits to remainder | − | 50,000 |
| Net damage to remainder | | $150,000 |
| Value of part taken | + | 50,000 |
| Just compensation | | $200,000 |

---

**Exhibit 4.4**    **States That Use the Value Plus Damage (State) Rule**

| | | | |
|---|---|---|---|
| Arizona | Illinois | Montana | South Carolina |
| California | Indiana | Nebraska | Texas |
| Colorado | Kansas | Nevada | Utah |
| Florida | Kentucky | New York | Virginia |
| Georgia | Louisiana | North Dakota | Vermont |
| Idaho | Massachusetts | Oregon | West Virginia |

Source: Eaton, *Real Estate Valuation in Litigation*, 2nd ed.

---

**Exhibit 4.5**    **Federal and State Eminent Domain Setoff Rules and Policies**

| | | Of Jurisdictions That Set Off Compensation with Both General and Special Benefits | | | | | |
|---|---|---|---|---|---|---|---|
| | | Benefits are Applied Against | | | Future Damages and Benefits | | |
| Jurisdiction | Benefits Applied to Compensation | Damages to Remainder | Value of Part Taken | Percent of Total Cases | Future Years to Count | Discount Future Values | Typical Rates |
| Federal* | Special | Yes | No* | 10%-15% | 3–5 years | Yes | 8%-12% |
| Illinois | General and special | Yes | No | 1%± | 1 year | No | — |
| New Mexico† | General and special | Yes | No | 2%± | 1 year | Yes† | — |
| New York | General and special | Yes | No | 5%± | 3–5 years | No | — |
| West Virginia | General and special | Yes | No | 1%± | 2–7 years | Yes | 9%-11% |
| California** | General and special | Yes | No | 1%–2%** | 3–5 years | Yes | 8%-12% |

\*    The federal government applied both general and special benefits to both damages and the value of the part taken as recently as 1992.

†    New Mexico ordinarily only counts benefits realized within the first year. These needn't be discounted. In some cases, incremental income ascribable to benefits may be discounted for many years into the future.

\*\*    On August 25, 1997, a decision by the California Supreme Court merged general and special benefits into "benefits." Historically special benefits were 1% to 2% of cases.

Source: Richard A. Neustein and Orell C. Anderson, "Condemnation in California: Redefining Damages for Partial Takings," *Right of Way* (Spring 1998): 34-36.

BACK_DEFEXP-RR-003961

use, such as highways, airports, or schools. Increased redevelopment, however, has resulted in more takings for public benefit, often involving acquisitions that are subsequently transferred to private developers. Agencies respond to this issue by noting that taxes generated by taking private property and giving it to other private users ultimately benefit the public.

Some agencies have been accused of abusing their authority. For example, the City of New York used eminent domain to improve Times Square, expand the Stock Exchange, and build the World Trade Center prior to the September 11 terrorist attacks. The US Supreme Court has reviewed the broad power of governments to take private property, resulting in the landmark decision of *Kelo v. City of New London.*

In 2005, the Supreme Court ruled in the *Kelo* matter that local governments may force property owners to sell and make way for private economic development deemed to benefit the public, even if the property is not blighted and the new project's success is not guaranteed. In response to the *Kelo* decision, both the federal government and many states are considering changing their laws to prevent or restrict takings for private use.

## Temporary Construction Easements

A common Class IV situation involves a temporary construction easement (TCE), wherein a portion of a property is used by another party while adjoining construction is underway. This type of easement is often part of a project involving eminent domain. Upon completing the construction, the property is returned to its original state. These conditions may have a brief effect with no long-term impact or may have a serious, long-lasting effect that often diminishes over time. Because of the temporary nature of these easements, there are three important components of the property loss:

- The amount of the property loss
- The timing of such loss
- The net effect of both increases and decreases in value over time

A temporary disruption in use can have an impact on value. For example, if temporary construction disrupts the traffic patterns around a shopping center, the diminution in value may be extracted from lost revenues, higher vacancy rates (use), and other related losses (risk). These losses would be in addition to the rental rate of the land being used during the temporary construction use. The rental rate for the land is often based either on an annual rate of return of the fee simple land value (expressed as a percentage) or on the rent per square foot of land derived from other rental comparables.

## Absorption

Absorption losses are another type of Class IV detrimental condition. For example, if a particular situation causes a large tenant to abruptly vacate a building,

BACK_DEFEXP-RR-003962

*Copyrighted material licensed to Richard Fett Abington June 2021*

the value of the property could drop and then increase over time as the vacant space is absorbed and the property regains stabilized occupancy. Specific items usually considered in an absorption analysis include lost rents, leasing commissions, and tenant improvements. Absorption losses may be due to general economic conditions but can also be caused by factors specific to the property, including other detrimental conditions, lease expirations, and remodeling.

## Lease Positions

Improvements depreciate over time, and eventually their value drops to the point at which they no longer contribute to the value of the land. While detrimental conditions are often imposed by time or other unpreventable factors, they can also include the voluntary acts of a property owner, such as entering into a ground lease. For example, from the perspective of the ground lessee (tenant), a 99-year lease can be worth virtually the same as the fee simple estate, assuming the same discount rate applies. However, the value of the ground lease diminishes over time, and the value of the ground lease as a percentage of the fee estate starts to drop significantly as the lease approaches expiration. By computing the value of a 99-year lease, the effects of time can be seen to be nearly nonexistent for periods of over 30 years. Values then decrease until the leasehold estate has no value at the termination of the lease at Year 0, as shown in Exhibits 4.6 and 4.7.

## Title Defects

Title insurance is an integral part of most real estate transactions. A title insurance policy typically provides constructive notice of matters relating to the insured property, insuring the ownership of a specified property interest, and indemnifying against losses related to defects in the title. The extent of coverage may be limited to examination of public records, or it may include additional risks through an extended coverage policy or special endorsements.

Included in a title policy is a legal description of the insured property along with recorded liens and encumbrances against the property, commonly known as *exceptions from title*. A title policy protects against certain risks that are not apparent from the examination of public records and some errors in reporting matters of record. Title defects often involve an incorrect legal description or failure to note a recorded easement or other encumbrance as an exception from title. When discovered, such defects normally result in a claim for damages by the insured property owner with reimbursement by the title company for financial losses, including those related to property value diminution.

Evaluation of a title claim involves careful consideration of the property with and without the defect in question. Special attention should be paid to any potential impact on the use of the property. Paired sales analysis is preferable if relevant data is available. For example, a residential property owner pulling a permit for a new swimming pool might discover an easement for a gas pipeline that was not shown as an exception from coverage in the title policy. If the pipeline

BACK_DEFEXP-RR-003963

**Exhibit 4.6**    Leasehold versus Fee Simple Value

Discount Rate = 12.50%

| Years Remaining | Annuity Factor | Reciprocal of Discount Rate | Leasehold As % of Fee Estate | Years Remaining | Annuity Factor | Reciprocal of Discount Rate | Leasehold As % of Fee Estate |
|---|---|---|---|---|---|---|---|
| 99 | 7.999931 | 8.00 | 0.999991 | 49 | 7.975076 | 8.00 | 0.996885 |
| 98 | 7.999922 | 8.00 | 0.999990 | 48 | 7.971961 | 8.00 | 0.996495 |
| 97 | 7.999913 | 8.00 | 0.999989 | 47 | 7.968456 | 8.00 | 0.996057 |
| 96 | 7.999902 | 8.00 | 0.999988 | 46 | 7.964513 | 8.00 | 0.995564 |
| 95 | 7.999889 | 8.00 | 0.999986 | 45 | 7.960077 | 8.00 | 0.995010 |
| 94 | 7.999876 | 8.00 | 0.999984 | 44 | 7.955086 | 8.00 | 0.994386 |
| 93 | 7.999860 | 8.00 | 0.999983 | 43 | 7.949472 | 8.00 | 0.993684 |
| 92 | 7.999843 | 8.00 | 0.999980 | 42 | 7.943156 | 8.00 | 0.992895 |
| 91 | 7.999823 | 8.00 | 0.999978 | 41 | 7.936051 | 8.00 | 0.992006 |
| 90 | 7.999801 | 8.00 | 0.999975 | 40 | 7.928057 | 8.00 | 0.991007 |
| 89 | 7.999776 | 8.00 | 0.999972 | 39 | 7.919064 | 8.00 | 0.989883 |
| 88 | 7.999748 | 8.00 | 0.999968 | 38 | 7.908947 | 8.00 | 0.988618 |
| 87 | 7.999716 | 8.00 | 0.999965 | 37 | 7.897565 | 8.00 | 0.987196 |
| 86 | 7.999681 | 8.00 | 0.999960 | 36 | 7.884761 | 8.00 | 0.985595 |
| 85 | 7.999641 | 8.00 | 0.999955 | 35 | 7.870356 | 8.00 | 0.983795 |
| 84 | 7.999596 | 8.00 | 0.999950 | 34 | 7.854151 | 8.00 | 0.981769 |
| 83 | 7.999546 | 8.00 | 0.999943 | 33 | 7.835920 | 8.00 | 0.979490 |
| 82 | 7.999489 | 8.00 | 0.999936 | 32 | 7.815410 | 8.00 | 0.976926 |
| 81 | 7.999425 | 8.00 | 0.999928 | 31 | 7.792336 | 8.00 | 0.974042 |
| 80 | 7.999353 | 8.00 | 0.999919 | 30 | 7.766378 | 8.00 | 0.970797 |
| 79 | 7.999272 | 8.00 | 0.999909 | 29 | 7.737175 | 8.00 | 0.967147 |
| 78 | 7.999181 | 8.00 | 0.999898 | 28 | 7.704322 | 8.00 | 0.963040 |
| 77 | 7.999079 | 8.00 | 0.999885 | 27 | 7.667362 | 8.00 | 0.958420 |
| 76 | 7.998964 | 8.00 | 0.999870 | 26 | 7.625782 | 8.00 | 0.953223 |
| 75 | 7.998834 | 8.00 | 0.999854 | 25 | 7.579005 | 8.00 | 0.947376 |
| 74 | 7.998688 | 8.00 | 0.999836 | 24 | 7.526381 | 8.00 | 0.940798 |
| 73 | 7.998524 | 8.00 | 0.999816 | 23 | 7.467178 | 8.00 | 0.933397 |
| 72 | 7.998340 | 8.00 | 0.999792 | 22 | 7.400575 | 8.00 | 0.925072 |
| 71 | 7.998132 | 8.00 | 0.999767 | 21 | 7.325647 | 8.00 | 0.915706 |
| 70 | 7.997899 | 8.00 | 0.999737 | 20 | 7.241353 | 8.00 | 0.905169 |
| 69 | 7.997636 | 8.00 | 0.999705 | 19 | 7.146523 | 8.00 | 0.893315 |
| 68 | 7.997341 | 8.00 | 0.999668 | 18 | 7.039838 | 8.00 | 0.879980 |
| 67 | 7.997009 | 8.00 | 0.999626 | 17 | 6.919818 | 8.00 | 0.864977 |
| 66 | 7.996635 | 8.00 | 0.999579 | 16 | 6.784795 | 8.00 | 0.848099 |
| 65 | 7.996214 | 8.00 | 0.999527 | 15 | 6.632894 | 8.00 | 0.829112 |
| 64 | 7.995741 | 8.00 | 0.999468 | 14 | 6.462006 | 8.00 | 0.807751 |
| 63 | 7.995208 | 8.00 | 0.999401 | 13 | 6.269757 | 8.00 | 0.783720 |
| 62 | 7.994609 | 8.00 | 0.999326 | 12 | 6.053476 | 8.00 | 0.756685 |
| 61 | 7.993936 | 8.00 | 0.999242 | 11 | 5.810161 | 8.00 | 0.726270 |
| 60 | 7.993178 | 8.00 | 0.999147 | 10 | 5.536431 | 8.00 | 0.692054 |
| 59 | 7.992325 | 8.00 | 0.999041 | 9 | 5.228485 | 8.00 | 0.653561 |
| 58 | 7.991365 | 8.00 | 0.998921 | 8 | 4.882045 | 8.00 | 0.610256 |
| 57 | 7.990286 | 8.00 | 0.998786 | 7 | 4.492301 | 8.00 | 0.561538 |
| 56 | 7.989072 | 8.00 | 0.998634 | 6 | 4.053839 | 8.00 | 0.506730 |
| 55 | 7.987706 | 8.00 | 0.998463 | 5 | 3.560568 | 8.00 | 0.445071 |
| 54 | 7.986169 | 8.00 | 0.998271 | 4 | 3.005639 | 8.00 | 0.375705 |
| 53 | 7.984440 | 8.00 | 0.998055 | 3 | 2.381344 | 8.00 | 0.297668 |
| 52 | 7.982495 | 8.00 | 0.997812 | 2 | 1.679012 | 8.00 | 0.209877 |
| 51 | 7.980307 | 8.00 | 0.997538 | 1 | 0.888889 | 8.00 | 0.111111 |
| 50 | 7.977845 | 8.00 | 0.997231 | 0 | – | 8.00 | 0.000000 |

BACK_DEFEXP-RR-003964

Copyrighted Material Reproduced by Richard J. Kromer, MAI June 2017

**Exhibit 4.7**    Leasehold versus Fee Simple Value



right-of-way traverses other properties in the neighborhood, sales of impacted properties could be compared to sales of similar properties without the pipeline easement, providing a market-derived discount for such an encumbrance.

Adequate data is often unavailable for paired sales analysis in cases in which title claims involve relatively unique issues or defects with a nominal impact on the use of the property. In such cases, a variation of the state rule for condemnation appraisal is sometimes used, valuing the property lost because of the title defect (part taken) plus consideration of any residual damages to the remaining property.

It is important for the appraiser or analyst to understand the legal rules associated with the appraisal of title defects in the jurisdiction where the property is located, particularly with respect to the proper date of value and the use of the property at the valuation date. The date of value may be the date the title defect was discovered or some other date; the appraiser or analyst normally relies on the client to provide this information. The use of the property is often an issue, particularly when a title defect is discovered on a property purchased for a change of use or redevelopment, as some jurisdictions require valuation based on the use of the property at the date of value irrespective of highest and best use.

Infrastructure, such as major freeways in Southern California, is a necessity for any community. When a freeway is widened, it may require the taking or partial taking of properties along its path. See the following case study for an example of such a scenario.

BACK_DEFEXP-RR-003965

# Pacific Motel Case Study

*By Orell C. Anderson, MAI*

## Class IV Detrimental Condition
## Eminent Domain Partial Taking

The Pacific Motel (not the real name) is a 100-room budget motel in California, comprising five buildings totaling approximately 25,000 square feet on a 75,000-sq.-ft. site. Current occupancy is 70%, and the average daily room rate (ADR) is $30. Amenities include a gift shop, a breakfast room with complimentary continental breakfast, a video arcade, laundry, a snack room, a complimentary heated swimming pool, luggage storage, free cable television, and concierge service in the lobby. In the "before" condition, the subject property had good freeway exposure with fair access.

The subject property was partially condemned by the State of California Department of Transportation for the expansion of the local freeway. Because the motel improvements currently utilized as the Pacific Motel sit on a portion of the part taken parcel, a portion of these improvements are to be demolished by the Department of Transportation in the process of the road widening. Finally, various site improvements will also be acquired, demolished, or relocated for this acquisition.

The scope of the appraisal assignment was to address the effect of the proposed acquisition by the condemning agency, any damages incurred, and any benefits attributable to the condemnation. The purpose of the assignment was to estimate total just compensation as supported by fair market value. As this is considered a permanent imposed condition, the value of the remainder parcel will be negatively impacted in perpetuity.

### Larger Parcel

Methodology utilized in this analysis includes the three standard approaches: the cost approach, the sales comparison approach, and the income capitalization approach.

The cost approach indicated a value of $2,250,000. The cost of building the subject improvements was in excess of the value of the subject property indicated through the income capitalization approach as well as the sales comparison approach. It became apparent that the difference was attributable to external obsolescence, as the income generated by the subject motel cannot justify the cost to construct the improvements. External obsolescence in the form of economic obsolescence was estimated. Land was concluded to be valued at $15 per square foot for the 75,000-sq.-ft. site.

The sales comparison approach indicated a value on a per-room basis of $22,000 per room for 100 rooms, indicating a $2.2 million estimate.

The income capitalization approach indicated a value of $2 million. The ADR of the subject property was considered to be normal as compared to rental comparables within the subject property neighborhood. Therefore, the existing ADR for the subject property as well as its current occupancy was concluded to be appropriate for the analysis.

In the reconciliation of the various approaches to value, major consideration was given to the sales comparison approach, which was supported by the income capitalization ap-

BACK_DEFEXP-RR-003966

*proprietary material used by the author's permission only, issue 2.*

proach. The cost approach was considered a secondary indicator of value primarily due to the presence of external obsolescence and the difficulty of estimating accrued depreciation.

Based on the above factors, it is concluded that the fair market value of the fee simple estate of the Pacific Motel as the larger parcel in the "before" condition is $2,200,000, allocated as $1,125,000 to the land and $1,075,000 to the improvements.

The larger parcel is a key aspect of an eminent domain appraisal, as it reflects the property owner's true overall context of value. For example, if one acre is taken from a larger parcel of 100 acres, the value of that parcel should be based upon the valuation of 100 acres rather than the value of a one-acre parcel.

## Part Taken Parcel

Two parcels are being acquired, one at fee and one temporary construction easement. The total land area of the part taken parcel is 5,000 square feet. The part taken parcel is irregular in shape, generally comprising a long strip of land. Improvements located within the part taken parcel include portions of Buildings A and B used for both guest rooms and a manager's unit used for additional office space and storage. Additional improvements within that area include a gift shop, a breakfast room converted from three motel rooms in Building A, and various site improvements including concrete and asphalt paving, a concrete block wall, landscaping and irrigation with six large trees, one pole sign, and one wall-mounted sign (to be relocated). The number of parking spaces in the "before" condition was 108 with 100 rooms.

The severance of the part taken parcel will effectively result in the loss of five motel rooms. Additionally, cut and reface work will result in the reconfiguration of areas affected by the part taken, including the reconfiguration of the breakfast room, gift shop, lobby, storage, and office areas. In summary, five motel rooms are located in the part taken area, and five rooms will be lost during the cut, reface, and remodel, making a total room loss of 10.

The subject site in the "before" condition had three points of egress and ingress. During the demolition and construction, the center access point will be temporarily eliminated. The loss of on-site circulation is not considered significant in terms of passenger cars or tour buses; however, 18-wheel trucks will be hindered in their ability to drive completely around the motel. Access to the front desk, which will be relocated into temporary office trailers during remodeling of the lobby building, will be available at a northerly driveway. In the "after" condition, all three driveways will be regraded as a part of construction contract work by the highway department, and full on-site circulation will be restored. Finally, the existing wall and pole signs will be relocated.

The area encompassed by the temporary construction easement (TCE) is effectively located at the front of the subject property, adjacent to the frontage road. The total area is 1,500 square feet. Improvements located within the TCE include various site improvements, such as paving and landscaping. No additional motel rooms are affected by the temporary construction easement. Duration of the TCE is 12 months.

The construction of the public improvements in the manner proposed

BACK_DEFEXP-RR-003967

is anticipated to significantly disrupt motel operations. In the severing, removing, and remodeling of a portion of the two motel buildings, it is anticipated that there will be a reduction in income from operating the motel. The income loss is associated primarily with the reduction of all rentable rooms in both Building A and Building B during remodeling. General overall occupancy reduction due to the on- and off-site construction is also anticipated. The reduction in occupancy will also result in the possible loss of a portion of various motel market segments. The administrative office will be required to be relocated into portable office trailers during the remodeling. Motel operations are anticipated to resume on-site within these portable office trailers.

## Value of the Part Taken as Part of the Whole

### Land

The land value of the part taken parcel is based upon the unit value of the entire larger parcel. Having previously calculated the value of the whole, the value of the part taken parcel is as follows:

5,000 square feet
at $15 a square foot
equals $75,000

### Improvements

The value of the five motel units located within the part taken parcel, net of land value, is $10,750 per room. This yields an indicated value of the motel improvements for five rooms of $53,750. The value of the site improvements is based upon the unit value of the components as previously calculated in the cost approach of the larger parcel section, which included

paving, landscaping, block walls, and the relocation cost of the pole and wall signs. The total depreciated value of the motel improvements and site improvements is $114,750. The value of the part acquired as part of the whole is therefore $189,750. Landscaping was not depreciated but was given a contributory value only.

### Valuation of the Temporary Construction Easement

Ground lease rates and interviews were obtained for use in this analysis. The lease rates and interviews of individuals familiar with ground lease rates range from an annual payment equivalent to 8-10% of the fee simple value of the land. Based upon these leases as well as interviews, the land rate has been estimated to be 9%. Upon termination of the construction period, the easement area will be reverted to the remainder parcel and will be otherwise unaffected.

The value calculation of the temporary construction easement is as follows:

1,500 square feet
at $15 a square foot at 9%
for 12 months
equals $2,025

Valuation of the loss of total income and site improvements associated with the TCE was estimated as a cost to cure damage and is presented in the "Curative Work and Cost Estimate" section of this case study.

### Description of the Remainder Parcel

The remainder parcel is smaller in size by 5,000 square feet, or a remaining total of 70,000 square feet. In the "after" condition, it will continue to have an irregular shape. It will be reduced by 10

BACK_DEFEXP-RR-003968

Copyrighted material reproduced with permission of the Appraisal Institute, Chicago, Illinois. All rights reserved.

motel rooms within the part taken parcel. The manager's unit/office area will be incorporated with the entire ground floor of Building A, which contained the original lobby/front desk area and offices. The breakfast room and gift shop will be relocated into Building B. The wall-mounted sign as well as the pole sign will have been relocated onto the subject property outside the area of the part taken parcel. Access as well as exposure and visibility will be similar in the "after" condition. As indicated previously, parking will have been reduced from 108 spaces to 100 spaces. Current zoning requirements are one space per motel room. Therefore, the remaining parking ratio conforms to existing zoning.

### Project Impact

There are several project impacts related to the fee taking in the TCE that are considered significant. Temporary project impacts related to the TCE include the following:

- There will be a temporary loss of mature landscaping and pavement for a 12-month period during the construction phase of the freeway widening. These site improvements will be removed and later replaced.
- There will be a temporary loss and removal of an existing wall sign mounted on Building A during construction.
- There will be temporary noise, dust, and fumes related to the freeway and frontage road construction as well as from demolition and construction of the subject motel and site improvements.
- There will be a temporary loss of the front desk lobby area and blocking of the motel rooms in Buildings

A and B during demolition and construction for cut and reface.

The collective project impact associated with temporary construction is anticipated to result in the reduction of the motel's occupancy level for a 12-month period. Cut and reface is estimated to be set for only a six-month period.

### Permanent Project Impacts

There will be a loss of landscaping, paving, and 10 motel rooms. The cost to demolish the existing improvements within this part taken area and the remodel of the remaining motel room improvements is addressed in the "Curative Work and Cost Estimate" section of this case study.

Finally, the freeway will be three feet further away from the subject property's ultimate right-of-way line as compared to the "before" condition. The frontage road will have been widened from 33 feet in the "before" condition to 36 feet in the "after" condition (net effect). As the freeway is further away from the subject property in the "after" condition, no sound/noise study was necessary. Prior to the analysis of the highest and best use of the remainder parcel and evaluation of the remainder parcel, an analysis of curative work to restore utility to the remainder parcel is necessary.

### Curative Work and Cost Estimate

A brief discussion follows of each of the curative features required to restore utility to the remainder parcel in the "after" condition, addressing the temporary project impacts related to the temporary construction easement and the respective cost estimates.

**Demolition and remodeling cost estimates.** To determine the costs associated with this construction work,

BACK_DEFEXP-RR-003969

attempts were made to obtain a summary of estimated costs from the subject property owner. However, the information was not made available for this analysis. Therefore, the associated costs were estimated by a team of motel/hotel developers, investors, and managers who had extensive experience in building and remodeling motel facilities. Based on their estimates, the concluded cost to cure was $200,000.

**Occupancy.** While the majority of the frontage road and the freeway construction work will occur at the perimeter of the subject site, construction will clearly impact normal operation of the motel. It was concluded that there will be a loss of occupancy revenue due to the temporary construction easement for a 12-month period. The on- and off-site construction for the public improvements is anticipated to occur over a 12-month period. The remodel of the motel is estimated to last approximately six months. In addition, 13 rooms in Buildings A and B will be blocked during the cut and reface period. Furthermore, the gift shop will also be closed for this period. No income will be derived from the blocked rooms or the gift shop during this period.

To address the occupational impacts of construction, the motel owner has two options (from the appraiser's perspective): 1) continue to operate the motel to the best of their ability during the construction period, or 2) close the motel on a temporary basis and reopen upon the completion of construction. Based upon interviews of both the subject property's management company as well as surveys of other motels that had been impacted by freeway widenings in the area, it was concluded that the best option was for the continued operation of the subject

motel during the construction period. The loss of room revenue is estimated through analysis to be a 40% reduction in occupancy. This was based upon accounts of loss of occupancy of other motel operators in the area who have been impacted by construction.

The total loss of income is calculated by adding the loss of income resulting from the motel operation and gift shop during the construction period plus the income that would have been generated from the blocked rooms. This is based upon a stabilized occupancy. The net overall loss of *NOI* during the TCE and the income loss to the blocked rooms and gift shop during the construction period was estimated at $175,000.

**Temporary office facility.** The subject property will require the leasing of portable office trailers to operate its office and front desk facilities during the remodel of the impacted office in Building A for a six-month period. The cost to lease two trailers was estimated by a professional office trailer rental company at approximately $2,000.

**Replacement of landscaping and pavement.** During construction, the majority of these improvements will be lost as they are located in a temporary construction easement, therefore requiring their replacement in the "after" condition. The price and cost of these items have been estimated using a cost publication service. The concluded estimate is $7,000.

**Banners (installation of temporary sign).** Disruptions due to the construction work will require the placement of a temporary sign on the office trailer to inform prospective patrons that the facility is open during construction and that the trailer is the temporary

BACK_DEFEXP-RR-003970

*Copyrighted Material licensed only by Richard J. Kotzen, filed June 2025*

location of the front desk area. A temporary sign could be attached to the trailer if a custom vinyl sign is used and professionally installed. The cost of one banner that is approximately 5 by 20 feet, including installation, is approximately $500, as provided by a professional banner sign company.

**Summary.** In summary, curable severance damages include the demolition and remodel of two motel buildings at $200,000. Income lost during the temporary construction easement and blocked rooms for cut and reface is at $175,000. Replacement of paving and landscaping is at $7,000. The temporary sign is at $500, and the temporary office trailer for a six-month rental period is at $2,000, for a total of $384,500.

### Highest and Best Use of the Remainder Parcel
The highest and best use of the remainder parcel resulting from the part taken parcel is for the continued use of the lodging improvements after curative work is performed. The subject property includes all the necessary amenities for a competitive budget-scale motel and is considered competitive with most other budget motel properties in the market area. Parking ratios in the "after" condition also appear to be conforming to current zoning ordinances and well within the range of parking ratios of other motels in the area.

### Valuation of the Remainder Parcel
For the valuation of the remainder parcel, the sales comparison approach was applicable in determining the value of the lodging facility in the "after" condition. The income capitalization approach was considered secondary support. The cost approach was not utilized due to the substantial accrued depreciation including external obso-

lescence and the effects of a property with improvements that have significantly different chronological and effective ages within the same structure.

### Sales Comparison Approach
The remainder parcel in the "after" condition will be reduced by 10 rooms. The total number of rental units will be 90. The sales comparison approach is based upon the same conclusions as those set forth in the larger parcel sales comparison approach. The value on a per-room basis for the remainder parcel after the acquisition and in a cured condition but before any benefits is $22,000 per room. Therefore, 90 rooms at $22,000 per room equals $1,980,000.

### Income Capitalization Approach
Using the income capitalization approach and measuring any loss of value as a result of a decrease of 10 motel rooms caused by the part taken cut and the reface and relocation of the breakfast room, gift shop, and lobby office, the subject's motel revenues and expenses were analyzed and adjusted accordingly. The estimate of fair market value as indicated by the capitalization method is $1,895,000.

### Reconciliation
The strength of the sales comparison method is its simplicity, and it is a method utilized by many buyers who simply compare properties on a total price basis. Based upon market conditions and various transactions of similar lodging facilities that have occurred on a price per room basis, primary weight was given to the sales comparison approach, with secondary weight given to the income capitalization approach. The value of the remainder after the acquisition (cured condition) and before benefits is therefore $1,980,000.

BACK_DEFEXP-RR-003971

## Incurable Severance Damages and Benefits

Based on the highest and best use analysis in valuation of the remainder parcel, it was concluded that severance damages apply to the remainder parcel as a result of the partial taking and are estimated to be $30,250 (due to the additional loss of five rental units lost to remodeling and cut and reface issues). This is the difference between the value of the remainder as a part of the whole ($2,000,000), less the concluded value of the remainder after the acquisition (cured condition) and before benefits ($1,980,000). The remainder parcel was also analyzed for any benefits as a result of proposed construction of public improvements, and none were found. As a result, the value of the remainder after the acquisition and after considering benefits is also $1,980,000. The indicated total just compensation for the subject property due to the part taken parcel is therefore $604,500. A summary of value calculations is provided below.

### Summary of Severance Damages and Benefits

| | | Amount |
|---|---|---|
| Value of the whole before acquisition | | $2,200,000 |
| Land | $1,125,000 | |
| Improvements | $1,075,000 | |
| Value of the part acquired as part of the whole | | $189,750 |
| Land | $75,000 | |
| Improvements | $114,750 | |
| Value of the remainder as part of the whole | | $2,010,250 |
| Land | $1,050,000 | |
| Improvements | $960,250 | |
| Value of the remainder after the acquisition (cured condition) and before benefits | | $1,980,000 |
| Land | $1,050,000 | |
| Improvements | $930,000 | |
| Severance damages (incurable) | | $30,250 |
| Land | $0 | |
| Improvements | $30,250 | |
| Value of the remainder after the acquisition and after considering benefits | | $1,980,000 |
| Land | $1,050,000 | |
| Improvements | $930,000 | |
| Special benefits | | $0 |
| Land | $0 | |
| Improvements | $0 | |
| Net damages or net special benefits | | $30,250 |
| Value of the part acquired as part of the whole | | $189,750 |
| Severance damages (incurable) | | $30,250 |
| Curable severance damages | | |
| Partial demolition and remodel of two motel buildings | $200,000 | |
| Income loss during TCE and blocked rooms (cut and reface) | $175,000 | |
| Replace paving and landscaping | $7,000 | |
| Temporary sign | $500 | |
| Temporary office trailer, 6-month rental | $2,000 | |
| Total | | $384,500 |
| Total compensation | | $604,500 |

BACK_DEFEXP-RR-003972



# 5

# External Conditions

There are many different types of neighborhood nuisances, such as prisons, tunneling projects under properties, power plants, sewage treatment plants, and landfills. These can all be categorized as external conditions. This chapter will specifically discuss airport noise, transmission lines, cellular towers, and view diminution and privacy issues. The first topic discussed will be airport noise. Few external conditions have received as much attention or formal study as this nuisance for property owners. Studying airport noise demonstrates many of the concepts that are relevant to neighborhood nuisances in general.

## Airport Noise

For decades, the use of commercial jet aircrafts has increased. Consequently, airport noise has become a growing concern for a number of communities located near airports. While noise has been the primary issue, jet fuel, increased street traffic, overflights, visual impairments, and other issues also raise concerns. In the 1970s, the Federal Aviation Administration (FAA) developed policies that required airlines to phase in quieter aircraft. However, the continued increase in the volume of commercial jet aircrafts can be expected to have growing adverse effects. Some studies have linked airport noise to a variety of health problems. In addition to the annoyance and disruption caused by airport noise, homeowners may feel its impact in terms of reduced property values.

Numerous measurements of noise exist. Some measurements gauge only single noise events, while others look at average exposure levels over a 24-hour period, weighting more heavily for noises that occur in the evening and overnight. However, simply measuring airport noise does not necessarily predict the human reaction to it. As the FAA states in its Noise Abatement Policy, it is "uncertain whether people, in reacting to aircraft noise, are more annoyed by the number of aircraft noise events or the noise levels of individual events."[1]

---

1. "FAA Aviation Noise Abatement Policy," Federal Aviation Administration, accessed February 24, 2016, http://airportnoiselaw.org/faanap-2.html.

BACK_DEFEXP-RR-003973

The most commonly used and most widely known measurement of noise to the layperson is the decibel (dB). The decibel scale starts at 0, the point at which only the faintest sounds are heard, and increases in a logarithmic pattern in which the sound pressure doubles with every increase of 10 dB. The dB scale is somewhat ineffective in measuring the true loudness or the "judged intensity" of noises because the human ear responds selectively to various frequencies. True loudness is also a function of the frequency levels of the sound wavelength–i.e., a low frequency sound is perceived as louder than a higher frequency sound of equal intensity on the dB scale. Another scale that accounts for sound intensity and frequency was developed: the dBA (decibels with an "A weighting") scale, which is illustrated in Exhibit 5.1. For every increase of 3 dBA, sound doubles.

| Exhibit 5.1 | Common Sounds and Their dBA Ratings |
| --- | --- |
| **Sound Element** | **dBA** |
| Rustling leaves | 20 |
| Room in a quiet dwelling at midnight | 32 |
| Soft whispers at 5 feet | 34 |
| Window air conditioner | 55 |
| Conversational speech | 60 |
| Busy restaurant | 65 |
| Vacuum cleaner in private residence (at 10 feet) | 69 |
| Ringing alarm clock (at 2 feet) | 80 |
| *Beginning of hearing damage if prolonged exposure over 85 dBA* | |
| Printing press plant | 86 |
| Heavy diesel-propelled vehicle (about 25 feet away) | 92 |
| Home lawnmower | 98 |
| Air hammer | 107 |
| Jet airliner (500 feet overhead) | 115 |

Source: *FAA Report on Airport Noise* (March 1988)

There is currently no agreement on the exact physiological and psychological effects of airport noise on human beings. A housing survey conducted by the US Census Bureau and the Department of Housing and Urban Development indicated that of those households experiencing airport noise, 34.2% considered the noise to be "disturbing, harmful, or dangerous," and 6.3% would like to move from the neighborhood because of the noise. Airport noise is not thought to cause any direct health problems such as hearing loss, but its indirect effects may still be harmful.

## Reducing the Effects of Airport Noise

The FAA has developed policies that require airlines to phase quieter aircraft into their fleets. However, simply lowering the level of noise may not be a complete solution. In its Noise Abatement Policy, the FAA states that "Airport proprietors are primarily responsible for planning and implementing action designed to reduce the effect of noise on residents of the surrounding area. Such actions include optimal site location, improvements in airport design, noise abatement ground procedures, [and] land acquisition."[2]

---

2.  FAA Aviation Noise Abatement Policy.

BACK_DEFEXP-RR-003974

In essence, the FAA is stating that airports should be constructed in areas that will least affect people–i.e., away from highly populated areas where people live and work, such as the location of the new Denver International Airport.

While some efforts have been made to mitigate the effects of airport noise, many properties are nevertheless located in proximity to major airports. Several studies have been conducted that have measured the diminution in property value due to airport noise. Usually these studies are based on paired sales analyses in which homes that are located under or near a flight corridor are compared to otherwise similar homes that are not located near any airport flight corridor. There are dozens of published studies on this topic, and they virtually all come to the conclusion that homes under or near the flight corridors of national or international airports experience some value diminution.

Utilizing the detrimental condition matrix, it is apparent that several issues are relevant in studying airport noise. Based on this discussion, the matrix as related specifically to airport noise can be summarized as shown in Exhibit 5.2.

**Exhibit 5.2**    **The Detrimental Condition Matrix—Airport Noise and Residential Properties**

| | | Stages | | |
|---|---|---|---|---|
| | | **Assessment** | **Repair** | **Ongoing** |
| **Issues** | Cost | Assessment by noise engineers and related costs | Noise mitigation such as double pane windows, insulation, etc. | Ongoing noise mitigation—i.e., water fountains, background music, etc. |
| | Use | Not generally applicable | Not generally applicable | Impaired enjoyment of peace and quiet |
| | Risk | Not generally applicable | Not generally applicable | Market resistance, if any, as demonstrated by market data |

## Measuring Airport Noise

The perceptions and impacts of airport noise must be defined in order to be studied. Accordingly, a number of noise measurement methods are used by acoustical engineers. The impact of airport noise and those related perceptions are typically delineated by "noise contour lines" that vary from airport to airport, depending on the size of the airport, prevailing winds, topography, and other factors. By measuring noise contours, a standard can be derived to which the impact of noise from different airports can be compared.

*Air Transport World* defines *noise* as unwanted sound. According to that definition, the sound emanating from jet aircraft would be considered noise to most people. The real estate professional must determine the market's perceptions of airport noise, knowing that those perceptions are expressed as sales prices when the properties are sold. While most people would agree that excessive noise is bothersome, it is an issue that is sometimes difficult to define completely. For example, it would be difficult to arrive at definite answers to the following questions:

• Is a single firecracker more or less annoying than five motorcycles driving by at one-minute intervals?

BACK_DEFEXP-RR-003975

- Is one motorcycle driving by at 73 dB more or less annoying than a jet flying overhead at 68 dB for 27 seconds?

- Is noise more annoying during the day or at night? If noise is more annoying at night, how much more annoying is it?

In an effort to answer these questions, there has been a proliferation of noise measurement terms, techniques, and acronyms. To add to the confusion, there are ongoing debates over the merits of each approach. In an effort to provide at least some clarification of these issues, the Airport Noise Comparison Chart in Exhibit 5.3 outlines the primary noise measurement terms, their meanings, and related comments that are summarized from various published sources. It is important to note that each of the noise measurement systems is scientifically designed to measure the level of noise, which is a relatively objective standard, rather than annoyance, which is an admittedly more subjective standard. Furthermore, acceptable "thresholds" for noise levels vary.

To illustrate the noise issue, one can compare noise measurement methods to methods of measuring the volume of water in a river. The total number of

| Exhibit 5.3 | Airport Noise Comparison Chart |

| Term | Meaning | Comments |
| --- | --- | --- |
| dB | Decibels | The most fundamental of noise measurements; however, this scale fails to account for noise frequency. |
| dB(A) | Decibels with "A weighting" | The most common measurement of noise. The "A weighting" accounts for the fact that the human ear does not hear low frequencies and high frequencies as well as middle frequencies and corrects accordingly. (There are also "B" and "C" ratings that are not discussed here.) "A weighting" has become so common that it is often considered synonymous with dB. It is a geometric (not logarithmic) scale measured in tenths. The term *decibels* is derived from a combination of *decimals*, which means "one tenth," and the name of the developer of the decibel, Alexander Graham *Bell*. |

**What People Will Accept Without Undue Complaint**

| Location | Day dBA | Night dBA |
| --- | --- | --- |
| Rural residential | 35-40 | 25-35 |
| Suburban residential | 40-50 | 30-40 |
| Urban residential | 45-55 | 35-45 |
| Commercial | 55-65 | 45-55 |
| Industrial | 60-70 | 50-60 |

**Estimated Community Response to Noise**

| Noise Level in dB(A) Above Acceptable Level | Estimated Community Response |
| --- | --- |
| 0 | No observed reaction |
| 5 | Sporadic complaints |
| 10 | Widespread complaints |
| 15 | Threats of action |
| 20 | Vigorous action |

**Human Effects Criteria for Noise Control**

| Objectives | Noise Levels at Which Harmful Effects Begin to Occur, dB(A) |
| --- | --- |
| Prevention of hearing loss | 75-85 |
| Prevention of extra-auditory physiological effects | 65-75 |
| Prevention of speech interference | 50-60 |
| Prevention of interruption of sleep | 45-50 |
| Satisfying subjective preferences | 45-50 |

BACK_DEFEXP-RR-003976

*Copyrighted Material Used by Richard R. Wilson, Volume 2*

| Exhibit 5.3 | Airport Noise Comparison Chart *(continued)* |
|---|---|

| | | |
|---|---|---|
| PNL | Perceived noise level | An active band analysis that measures noise in one-octave intervals. The PNL measures sound in each octave and compensates for discrete tones that are annoying but not necessarily loud, such as fingernails scratching a blackboard. |
| EPNL | Effective perceived noise level | Similar to PNL, but measures noises in one-third octaves. A noise measurement method in which the decibels of aircraft noise include the loudness and the frequency spectrum of the noise for takeoffs and landings. This measurement utilizes EPNdB over time. |
| EPNdB | Effective perceived noise level in decibels | Noise generated by a single event. Few people can detect a sound below 5 EPNdB. An increase of 10 EPNdB is usually perceived as a doubling of loudness. This system requires rigorous mathematical calculations and accounts for the qualities of jet noise that are particularly annoying. |
| SEL | Sound exposure level | A measurement of noise that accounts for both sound intensity and duration. The net noise energy is calculated from the area of a triangle formed by the graphically illustrated increase, peak, and decrease of a noise event and converted into a one-second measurement. |
| SENEL | Single event noise exposure level | Synonymous with SEL |
| CNR | Composite noise rating system | A graphically produced measure which is used to measure aircraft noise annoyance based on the number of flights, the time of day, and the perceived loudness of noise. Any rating of less than 100 CNR is designated as CNR Zone 1, ratings from 100 to 115 are designated as Zone 2, and any CNR greater than 115 is designated as Zone 3. On that basis, a rough approximation of CNR Zones and dBA can be made as follows: Zone 1 is less than 67 dB(A), Zone 2 ranges from 67-82 dB(A), and Zone 3 is greater than 82 dB(A). This approach is scientifically valid but for practicality has been largely replaced by the DNL measure in more current noise studies. |
| NEF | Noise exposure forecast | Provides a measure of the total aircraft-generated noise energy received at locations near an airport during a typical 24-hour period, with an added penalty for nighttime (after 10 p.m.) noise.<br><br>The NEF method has been adopted by the Department of Housing and Urban Development, which will not guarantee mortgages on properties within NEF 40+ and generally considers properties with NEF 30+ unacceptable. At or below NEF 30, few people complain, at 30-40 NEF, individuals may complain and there may be group action. At 40+ NEF, there are numerous and repeated complaints and group action is probable. NEF = Ldn 65; NEF 40 = Ldn 75. This approach is scientifically valid but for practicality has been largely replaced by the DNL measure in more current noise studies. |
| CNEL | Community noise exposure level | A metric measurement method that is used in some areas of California. It has an additional night penalty over and above the DNL method: a 5 dB(A) penalty for evening noise in addition to a 10 dB(A) penalty for night noise. Thus, CNEL noise contours tend to be larger than DNL contours. |
| ASDS | Aircraft sound description system | A "time above" system that measures the amount of time during which noise exceeds a certain level, such as the amount of time during a 24-hour period that the noise exceeds 85 dB(A). This approach is scientifically valid but for practicality has been largely replaced by the DNL measure in more current noise studies. |
| DNL or Ldn | Day-night average sound level | A sound measurement scale that accounts for nighttime noise levels in which sounds between 10:00 p.m. and 7:00 a.m. incur a 10-dB(A) penalty over a 24-hour period and accounts for various weather patterns that may affect noise levels. One nighttime event is considered equal to 10 daytime events at the same level. (As an approximate conversion, NEF 40 = Ldn 75.) Generally speaking, this measurement scale converts the dB(A) of various noise events into SEL, which measures the noise level of each individual event in a one-second period. These individual events are then computed over the 24-hour period to reflect a DNL.<br><br>One should be cautious before using DNL in measuring disruption or annoyance. However, according to one study, Ldn has been correlated to the following: |

| Disruption | DNL or Ldn Level |
|---|---|
| Low | 60-65 Ldn |
| Moderate | 60-70 Ldn |
| Substantial | 70-75 Ldn |
| Severe | 75-80 Ldn |

The FAA generally identifies a DNL level of 65 as the threshold level of aviation noise, and the EPA identifies 55 DNL as a threshold level. However, these identifications do not suggest that no one is annoyed below these levels, although this error in judgment is commonly made. According to one study, approximately 12% of people experiencing noise levels below 65 DNL are "highly annoyed" at this level, and 55-65 DNL is described as "moderate exposure" to noise.

BACK_DEFEXP-RR-003977

| **Exhibit 5.3** | **Airport Noise Comparison Chart** *(continued)* |
|---|---|
| | DNL is not intended to be or considered to be a good indication of "single event" noise. A 65 DNL is equivalent to 87.5 dB(A) with 500 events, 94.4 dB(A) with 100 events, and 97.4 dB(A) with 50 events. A single event at 97.4 dB(A), while considered somewhat "acceptable" under the 65 DNL threshold, would actually be equivalent to the noise from a power mower or a newspaper press. In other words, because of the "averaging" effect of DNL noise measurements, a person could be abruptly aroused from sleep every night, but the remaining 24 hours of quiet would result in a DNL measurement that would be very low, yet erroneously suggesting that there was no annoyance. |
| | The DNL is a scientifically valid measurement of noise; however, some have inferred that its measurements reflect something that it is simply not designed to do. For these and other reasons, the interpretations of the DNL method are controversial and considered by many to be a "fictitious" averaging of sound. Accordingly, this measurement has been widely criticized for understating the practical effects of noise and the related annoyance. |
| Leq — Level of equivalent sound | Measures the number of events or energy summation, the exposure level, and the time-average of sound over a specified period of time. It measures the volume of noise in a similar way as rainwater is collected in a coffee can over a period of time. |
| NNI — Noise and Number Index | Like NEF, NNI combines measures of loudness and the number of events into a single cumulative index: 30 NNI equals 73 planes a day at 82 PNdB, which is about as loud as a vacuum cleaner at a distance of 10 feet. It differs from NEF in the way that it measures loudness as the maximum perceived noise level for each event. Like NEF, it is a cumulative energy measure and therefore may mask the effects of loudness and the number of events. This measure is further criticized as understating annoyance. This system is utilized primarily in Great Britain. |

Definitions and comments relative to this terminology were obtained from the Federal Aviation Administration (www.faa.gov) and from other published sources cited in the bibliography.

gallons flowing past a certain point per day, the speed of the river, the volume of water between two points in the river at a specific point in time, and peak water levels can all be considered. However, these measurement techniques are not intended to measure flood-related damage, which in turn causes annoyance. The techniques themselves are only designed to measure noise.

## Noise Mitigation

There are only three ways to mitigate noise.

1. Quiet the source.
2. Put more distance between the source of the noise and the receptor.
3. Build or create a barrier to the noise.

Homeowners usually cannot quiet the source of jet noise, and it is equally impractical to move their houses further from the airport. The third choice is often the only option for homeowners impacted by airport noise. To create a barrier against noise, attics and walls can be insulated and double-pane windows can be installed. Continuous background music, fountains, or running water may also drown out some of the noise. Of course, outside activities such as barbeques, sports, and swimming do not generally benefit from these measures. It is estimated that airport noise heard within the interior of a property with lightweight construction can be reduced from 15 to 30 dB(A).

The primary problem with double-pane windows is that they must be kept closed to effectively reduce airport noise. Considering the cost of air-conditioning, double-pane windows can have a significant effect on a household budget in locations where the climate is mild and natural breezes would otherwise cool the home.

BACK_DEFEXP-RR-003978

Copyrighted material reproduced with permission from Richard J. Roddewig, June 20

## Market Segments

According to studies completed for the FAA, detached housing tends to be impacted more than semi-detached or terraced housing. The data suggests that more expensive homes tend to be impacted more than less expensive homes. Rural areas tend to be impacted more than suburban areas, which in turn tend to be impacted more than urban areas. Other research indicates that the number of flights is less important than the loudness and the variability of loudness of single events.[3] However, newer and quieter jet designs have somewhat offset this problem.

When studying the "most likely impact" of airport noise on real estate, it should be recognized that there are outlying extremes. Like many detrimental conditions, there is a segment of the market that appears to be almost immune to the effects, while at the opposite extreme there is often a segment that will not purchase a property that is impacted by a detrimental condition at any cost. For example, a portion of the population seems more or less imperturbable.[4] If located close to an airport or under a flight path, these people will not be seriously disturbed.

Nevertheless, noise is a significant issue for most people, and there is a segment of the population that will live under a major flight corridor if enticed through a discount on the home price.[5] However, a slight majority of the market will not purchase a property that is close to a major airport *at any discount*.[6] Similarly, a significant portion of the market will neither purchase a property that is close to a motorway, nor one that is a few miles from a major airport.[7] Those with special political agendas, such as pro- or anti-airport groups, often selectively cite study results such as these. A proper and unbiased study should consider the net effects of these issues on balance.

## Value Impacts

The fact that a property is situated near a noise source is not automatic evidence of a loss in market value, and the analyst must employ valid methods to accurately measure value impacts. Commonly used techniques include paired sales analysis and multiple regression analysis. Unfortunately, as illustrated in the discussion of various noise measurement methods, no single standard exists, which adds to the complexity of such a study.

## Transmission Lines

Electromagnetic fields (EMFs) are produced by power lines, electrical wiring, and electrical equipment. EMFs are invisible lines of force that surround any electrical device. By definition, an *electromagnetic field* is a property of space

---

3. Terrence J. Levesque, "Modeling the Effects of Airport Noise on Residential Housing Markets," *Journal of Transport Economics and Policy* (May 1994): 209.

4. M. E. Paul, "Can Aircraft Nuisance Noise Be Measured in Money?" Report of the Commission on the London Airport, H.M.S.O., 1971, 298. These market participants are termed the "survivor population."

5. These market participants are known as the "enticed population."

6. These market participants are known as the "exodus population."

7. Paul, "Can Aircraft Nuisance Noise Be Measured in Money?" 316.

BACK_DEFEXP-RR-003979

caused by the motion of an electric charge. A stationary charge will produce an electric field only in the surrounding space. If the charge is moving, a magnetic field is also produced. An electric field can also be produced by a changing magnetic field. The mutual interaction of electric and magnetic fields produces an electromagnetic field.

Electromagnetic fields are created by electric charges. Electric fields represent the forces that charges exert on other charges, while magnetic fields result from the additional forces that moving charges exert on other moving charges. Electric fields are produced by voltage, and they increase in strength as the voltage increases. The electric field strength is measured in units of volts per meter (V/m). Magnetic fields increase in strength as the current increases. They are measured in units of gauss (G) or tesla (T). A major difference between electric and magnetic fields is that as long as electrical equipment remains connected to the source of electrical power, electrical fields are still present, even when the equipment is switched off. Magnetic fields, on the other hand, are produced when electrical equipment is turned on–i.e., the current must be flowing.

Electric power lines and appliances produce low-frequency fields, which typically operate at a frequency of 60 Hz (hertz). Much research is ongoing concerning the health effects of 60 Hz fields. These are the kind of EMFs found in virtually every home and workplace. Both electric and magnetic fields are present around electrical equipment and power lines, but the concern about potential



Some scientific studies have shown that electromagnetic fields are not linked to childhood leukemia. Regardless of these conclusions, the impact on real estate values is determined by the market and not by scientific analysis.

BACK_DEFEXP-RR-003980

health effects is focused on magnetic fields. Electric fields are shielded or weakened by materials that conduct electricity, such as trees, buildings, and human skin. Magnetic fields, on the other hand, pass through most materials.

Electric power is produced at generating stations, transported via transmission lines, and delivered via distribution lines from substations after high voltages used for transmission are reduced using step-down transformers. Most high-voltage transmission lines in the United States are rated at 115, 230, 345, 500, or 765 kV (kilovolts). Those with voltages of less than 345 kV are ordinary high-voltage lines, and those with voltages over 345 kV are extra high-voltage lines. For some 500 kV lines, the maximum magnetic field of approximately 140 mG directly under the line will drop to about 3.0 mG at approximately 300 feet, depending on the amount of current within the line.

Before the introduction of extra high-voltage lines, concerns about transmission lines were mostly limited to their aesthetic impacts, particularly the large steel towers and crossarms needed to support the overhead lines. Also, safety issues were sometimes raised because of the possibility of structures or conductors falling. Most major transmission lines are designed with circuit breakers to de-energize conductors when they hit the ground and property damage associated with structural failure of transmission lines or towers is rare.

Since the advent of extra high-voltage transmission lines, however, the impact of EMFs on human health and property values has been the subject of controversy. More recently, similar concerns have arisen about the impacts of radio frequency emissions from cellular towers. Numerous studies have been conducted on both the health and property impacts from EMFs, sometimes with conflicting results. As with many detrimental conditions, subjective fear of a hazard does not necessarily equate to objective evidence of diminished property value. While proximity to a power line may be objectionable to some segments of the market in some areas, there may be other markets in which such locations are considered desirable because of additional open space or other perceived amenities.

## Cellular Towers

A cellular (cell) tower, also referred to as a *cell site*, is a cellular telephone site where electronic communication and antennae are placed. Cell towers are usually placed in high-population areas to create a cellular network. Sometimes, residents have concerns about the visual or perceived health issues involving these towers.

Cell towers use radiofrequency (RF) energy, including radio waves and microwaves. According to the Federal Communications Commission (FCC), RF energy is of increasing importance. In the United States, the FCC authorizes or licenses most RF telecommunications services, facilities, and devices used by the public, industry, and state and local government organizations. Heightened awareness of the expanding use of RF technology has led some people to speculate that "electromagnetic pollution" is causing significant risks to human health from environmental RF electromagnetic fields. These concerns are somewhat similar to those expressed about transmission lines.

BACK_DEFEXP-RR-003981

Electromagnetic "radiation" can best be described as waves of electric and magnetic energy moving together (i.e., radiating) through space. Like any wave-related phenomenon, electromagnetic energy can be characterized by a wavelength and a frequency. The electromagnetic spectrum is illustrated in Exhibit 5.4.



**Exhibit 5.4**    The Electromagnetic Spectrum

According to the FCC, *ionization* is a process by which electrons are stripped from atoms and molecules. This process can cause molecular changes that can lead to damage in biological tissue, including effects on DNA genetic material. Ionizing radiation is also associated with the generation of nuclear energy, in which case it is often simply referred to as "radiation." RF electromagnetic waves are not great enough to cause the ionization of atoms and molecules, and RF energy is therefore characterized as non-ionizing radiation. It is important that the terms *ionizing* and *non-ionizing* not be confused when discussing the biological effects of electromagnetic radiation or energy, since the mechanisms of interaction with the human body are quite different.

Due to the local opposition of new cell sites and for safety and appearance reasons, a new trend to develop "concealed cell sites" is emerging. These sites are designed to conform to surrounding areas, with the antennae and accessory parts concealed in a natural manner.

## View Diminution and Privacy Issues

A view is normally considered a scene or outlook from a property. Views of bodies of water, city lights, natural settings, parks, golf courses, and other amenities are often considered desirable features, particularly for residential properties. Such desirable views are typically an enhancement to value. In some cases, however, a view can be considered a negative attribute. A vista of incompatible land

BACK_DEFEXP-RR-003982

uses, dilapidated buildings, junk vehicles, or other undesirable features can be a detriment to value. Allegations of value diminution most often arise from situations in which a view is altered or changed. Examples might include the blockage or obstruction of a desirable view or the creation of an undesirable view.

View amenities may or may not be protected by law or regulation. It is sometimes argued that views have value only if they are protected by a view easement, a zoning ordinance, or covenants, conditions, and restrictions (CC&Rs), although such protections are relatively uncommon as a practical matter. The market often assigns significant value to desirable views irrespective of whether or not such views are protected by law.

In some cases, properties enjoy "borrowed" views. For example, a home may enjoy a good ocean view only by virtue of the existence of a vacant lot between the home and the ocean, with a reasonable expectation that the view might be partly or completely obstructed upon development of the adjacent lot. This same concept applies to potentially undesirable views of a new development when the development conforms to applicable zoning and other regulations. Arguing value diminution in such cases is difficult, since the possible development of the offending property should have been known. On the other hand, the rezoning of a neighboring property to allow for an undesirable land use could legitimately result in a negative impact on value when such rezoning was not known or anticipated on the date of value.

In contrast to view, *visibility* relates to how well a property can be seen by others. For retail stores, shopping centers, and other types of commercial properties, visibility is often a desirable attribute that results in greater sales volume and enhanced property value. Visibility may also be neutral or, particularly for residential properties, perceived as a negative feature. Visibility in this context is closely related to the concept of privacy, which is often considered a desirable attribute for residential properties.

For example, consider a single-family home with a private backyard pool area that is subsequently impacted by the addition of a large second story on an adjacent home. This addition creates what is informally called a "fishbowl effect," and those using the pool now have less privacy than before. While this loss of privacy is arguably undesirable, its effect on value is probably more dependent on how much privacy really existed in the "before" condition and what is typical for the neighborhood in question. The occupant of an urban apartment will obviously have much different privacy expectations than the owner of a suburban tract home or a large estate property.

Ultimately, issues relating to view diminution and privacy are dependent on the analysis of relevant market data. The value of an obstructed view can be measured by the difference between homes with and without similar views. Similarly, the impact of the fishbowl effect can be measured by comparing sales of properties with private pools against those with more visible backyard areas. Along with empirical data analysis, anecdotal evidence from market participants can be helpful in gaining insight into how such amenities as views and privacy are weighted in the marketplace.

BACK_DEFEXP-RR-003983

# SEA-TAC INTERNATIONAL AIRPORT CASE STUDY

## Class V Detrimental Condition
## External Condition

**Initial Assessment and Recommendations**
February 1997
Prepared Under a Grant from the State of Washington for the:
- City of Burien, Washington
- City of Des Moines, Washington
- City of Federal Way, Washington
- City of Normandy Park, Washington
- City of Tukwila, Washington
- Highline School District
- Highline Community Hospital

**Prepared by:**
- Hellmuth, Obata + Kassabaum, Inc., Dallas, Texas
- Raytheon Infrastructure Services, Inc., Denver and Philadelphia

**In Association with:**
- Thomas Lane & Associates, Inc. Seattle, Washington
- Michael J. McCormick, AICPA Olympia, Washington

### Airport Noise Study

#### Potential Socioeconomic Impacts and Mitigation

*Expected changes in land values, land uses, home ownership tenure, local government revenue, and social service needs resulting from construction of the third runway and related facilities*

Aircraft operations at Sea-Tac International Airport in the state of Washington impact the value of nearby properties in two ways.

First, the airport's operations depress property values below the level that real estate markets would produce if the airport did not exist. If a single-family residential house located in Burien, for example, could be physically transported to an identical location on an identical lot in another part of King County, its value would be increased, and the amount of its increase is the depression in value caused by proximity to the airport. The next section of this study estimates the average loss in value of real estate located in close proximity to Sea-Tac International Airport by comparing a large sample of comparable single-family housing units in northwest and southwest King County, holding constant the non-airport factors that also influence real estate values.

A second way in which Sea-Tac International Airport operations impact the value of real estate is in the variation in value among properties caused by their proximity to the flight paths of arriving and departing aircraft. Such changes are the "shadow" effects (noise pollution, visual pollution, possible air quality pollution, and a generally degraded environment for human habitat) caused by living under low-flying aircraft. The third section of this study uses a statistical technique known as *regression analysis* to estimate Sea-Tac International Airport's shadow effects by measuring the difference in value of a property, holding other factors constant, when it is located at different distances from directly under one of Sea-Tac International Airport's arrival/departure flight paths.

The remaining subsections provide information on the changes in land use produced by airport-induced depressions in adjacent land values and on the alteration in the demographic

BACK_DEFEXP-RR-003984

profile of persons living in jurisdictions where depressed land values result in altered land uses.

It is important to remember that the following analysis addresses the issue of depressed but not declining land values. All parts of the Puget Sound region have experienced population growth in the recent past, and the entire area is expected to experience rates of population growth above the national average in the foreseeable future. This means that the Puget Sound region is expected to have significant net in-migration. As a result, average real estate values will undoubtedly rise. Real estate located in close proximity to the airport will participate in these growth trends and will also experience rising land values.

Because of the airport, however, the rate of appreciation in the value of nearby real estate is expected to be less than it otherwise would have been. The correct measure of the airport-induced depression in land values, consequently, is the price difference between comparable properties located close to and distant from the airport. Neither a simple calculation of whether or not property values have increased nor a comparison of properties inside or outside any specific LDN (level day night) contour line provides an appropriate basis for comparison.

### Airport Impacts on Average Property Values

The impact of proximity to the airport was evaluated using average property values for comparable housing units in 10 census tracts in southwest King County immediately around Sea-Tac International Airport and 10 census tracts in northwest King County–the area that generally conforms to the city of Shoreline.

Northwest King County was chosen for comparison based on the following criteria:

- The census tracts are all located in King County and are equally affected by county and state land use and development policies. The census tracts are all bordered by Puget Sound to the west and Lake Washington to the east.
- Both clusters of census tracts contain commercial areas bordering Highway 99, and both have a mix of residential areas ranging from low/moderate income to high/upper income.
- Both clusters of census tracts contain racially and ethnically diverse populations.

The cluster of 10 census tracts around the airport contained 17,046 housing units in 1990, of which 11,526 (67.6%) were single family. The cluster of 10 census tracts in northwest King County contained 19,523 housing units in 1990, of which 12,683 (65.0%) were single family.

The following parameters were used to screen housing units in the two clusters of census tracts for comparability:

- Only units rated as being in "very good" condition by the King County Assessor's Office were included.
- All units with a "view" were excluded.
- All units were in "single-family" zoned areas and were classified as single-family land uses.
- All units had an above-ground structure of 1,000 square feet or more.
- All units were located on lots of between 10,000 and 14,999 square feet.
- All units had three or more bedrooms.

BACK_DEFEXP-RR-003985

- All units had two or more bathrooms.

These screening criteria excluded the top and the bottom of the distribution of housing units in both areas and resulted in a total of 739 of the 11,526 single-family properties (6.4%) in the 10 census tracts around the airport (southwest King County) and 760 of the 12,683 single-family properties (6.0%) in 10 census tracts in northwest King County being used for comparison of real estate values. Summary statistics from the King County Assessor's Office for these units are shown in Exhibit A.

The two groups of properties compared closely in terms of their physical attributes. The difference in average lot size between the southwest and northwest King County properties was 3.3%. The difference in the sizes of the structures was 2.0%, 1.4% in the number of bedrooms, and 0.6% in the number of baths. In terms of property values, however, the differences were more pronounced. The average assessed value of land was 14.1% higher in northwest King County than it was in areas immediately surrounding the airport, and the assessed value of structures was 7.7% higher. The assessed value of land and structures combined was 10.1% higher.

Standardized for view, condition of structure, size of structure, lot size, number of bedrooms, number of baths, zoning, land use, county/state development policies, and similarity of neighborhoods, a housing unit selling for $141,400 in the immediate vicinity of the airport would sell for $155,700, or $14,300 (10.1%) more, if it were located elsewhere.

The average difference of 10.1% in the assessed value of real estate (property plus structure) when all other factors are adjusted for is attributable to the impact of low-flying aircraft in the immediate vicinity of Sea-Tac International Airport. The resulting depression of property values as of 1993, taking community differences into account, is shown in Exhibit B.

Between 1993 and 2000, operations (i.e., landings and takeoffs) at Sea-Tac International Airport were forecast to increase by 39,700, or 11.7%. Between 2000 and 2020, operations are forecast to increase by an additional 62,400, or

**Exhibit A**    **Comparison of Housing Units in Southwest and Northwest King County— 1993**

|  | Southwest Mean Value | Northwest Mean Value | Difference (SW–NW) | Percent Difference |
|---|---|---|---|---|
| **Size** | | | | |
| Lot size | 11,914 sq. ft. | 11,522 sq. ft. | +392 sq. ft. | 3.3% |
| Above ground structure size | 1,538 sq. ft. | 1,507 sq. ft. | -31 sq. ft. | -2.0% |
| **Rooms** | | | | |
| Number of bedrooms | 3.6 | 3.6 | 0 | -1.4%* |
| Number of bathrooms | 2.0 | 2.0 | 0 | 0.6%* |
| **Value** | | | | |
| Assessed value of land | $52,734 | $60,181 | -$7,447 | -14.1% |
| Assessed value of structure | $88,703 | $95,550 | -$6,847 | -7.7% |
| Total assessed value | $141,437 | $155,731 | -$14,294 | -10.1% |

\*   Differences due to rounding.

Source: King County Assessor's Office

BACK_DEFEXP-RR-003986

16.5%. Applying these same rates of change to the estimated 1993 difference in single-family residential property values caused by aircraft operation at Sea-Tac International Airport produces the depressed values shown in Exhibit C. The next to the last column of the table contains the expected reduction in value for the average single-family residential housing unit between 2000 and 2020. The last column shows the average difference in value experienced over the entire 20-year period from 2000 through 2020.

There will be no reduction in property value attributable to the Sea-Tac International Airport expansion until 2000. The decline will be small the first year because there will be few operations over the airport's annual service volume (ASV). As operations over the ASV threshold increase, the relative decline in property value will increase,

reaching, in the case of Burien, $26,356 in 2020. Averaged over the entire 20-year period, the decline is $13,179, as shown in the last column of Exhibit C.

This loss of value occurs after Sea-Tac International Airport would have reached its ASV capacity limit had the third runway and related facility improvements not been built.

## Flight Track Impacts on Average Property Values

The impact on value of a parcel's location under, or in close proximity to, the approach/departure flight track of aircraft operating at Sea-Tac International Airport was estimated using the following linear regression model:

$$y = a + \hat{a}_1 X_1 + \hat{a}_2 X_2 + \hat{a}_3 X_3 + \hat{a}_4 X_4 + \hat{a}_5 X_5 + \hat{a}_6 X_6 + \hat{a}_7 X_7 + \hat{a}_8 X_8 + \hat{a}_9 X9 + \hat{a}_{10} X_{10}$$

where:

$y$ = Assessed value of land and structures

| **Exhibit B** | **Estimated Average Depression in Single-Family Residential Property Values by Community—1993** | | |
|---|---|---|---|
| **Community** | **Actual Average Assessed Value of Housing Unit** | **Estimated Assessed Value Without Airport** | **Difference** |
| Burien | $129,900 | $143,000 | -$13,100 |
| Des Moines | $136,100 | $149,800 | -$13,700 |
| Federal Way | $142,900 | $157,300 | -$14,400 |
| Normandy Park | $173,600 | $191,100 | -$17,500 |
| Tukwila | $122,400 | $134,800 | -$12,400 |

| **Exhibit C** | **Forecast of Average Depression in Single-Family Residential Property Values Caused by Aircraft Operations at Sea-Tac** | | | | |
|---|---|---|---|---|---|
| **Community** | **1993** | **2000** | **2020** | **Change 2000-2020** | **Average Difference 2000-2020** |
| Burien | -$13,100 | -$29,831 | -$56,187 | -$26,356 | -$13,179 |
| Des Moines | -$13,700 | -$31,227 | -$58,835 | -$27,608 | -$13,804 |
| Federal Way | -$14,400 | -$32,804 | -$61,795 | -$28,991 | -$14,496 |
| Normandy Park | -$17,500 | -$39,859 | -$75,079 | -$35,220 | -$17,610 |
| Tukwila | -$12,400 | -$28,172 | -$53,016 | -$24,844 | -$12,422 |

BACK_DEFEXP-RR-003987

$X_1$ = Lot size (square feet)

$X_2$ = Structure size (square feet)

$X_3$ = Number of bedrooms

$X_4$ = Number of bathrooms

$X_5$ = Distance from center of jet flight track (east of runway 16/34R or west of runway 16/34L), measured in tenths of a mile

$X_6$ = A binary variable representing the city of Des Moines

$X_7$ = A binary variable representing the city of Normandy Park

$X_8$ = A binary variable representing the city of Sea-Tac

$X_9$ = A binary variable representing unincorporated King County

$X_{10}$ = A binary variable representing the city of Tukwila

The model's parameters were estimated from assessors' data on 3,026 properties in 10 census tracts in the immediate vicinity of the airport. The regression coefficient (adjusted $r^2$) was 0.65.

The model initially contained variables for the cities of Federal Way and Kent, but these places had too few cases to be meaningful and were dropped from the final model. The distance from each parcel to the center of the airport was also initially used as a variable, but its coefficient was not statistically significant and it was also dropped from the final model. The fol-

lowing housing units were excluded in estimating the regression model:

- Units with fewer than three bedrooms
- Units whose condition was less than "good" or "very good"
- Units with a view
- Units not in single-family residentially zoned areas

The ratio of the regression's standard error to the standard deviation of the dependent variable was 0.59. The log likelihood ratio was -35379, and the $F$-statistic was 566. The Durbin-Watson statistic was 1.44.

All of the independent variables in the model were statistically significant at the 90% level, and seven were statistically significant at the 99% level. The variable measuring a property's distance from a flight track was significant at the 99% level.

The coefficient on the variable for distance from a jet aircraft flight track was 17,784, meaning that all other factors remaining equal, the value of a house and lot increases by about 3.4% ($4,450 on the average valued house of $129,900) for every one-quarter mile the house is farther away from being directly underneath the flight track of departing/approaching jet aircraft. This relationship is shown in Exhibit D and illustrated in Exhibit E.

BACK_DEFEXP-RR-003988

**Exhibit D**    **Estimated Impact of Jet Flight Track on Average Property Values**

| Miles from Flight Track | Burien | Des Moines | Federal Way | Normandy Park | Tukwila |
|---|---|---|---|---|---|
| 0.00 | $104,151 | $109,122 | $114,574 | $139,189 | $98,138 |
| 0.25 | $107,843 | $112,990 | $118,636 | $144,123 | $101,617 |
| 0.50 | $111, 666 | $116,996 | $122,241 | $149,232 | $105,210 |
| 0.75 | $115,625 | $121,143 | $127,196 | $154,522 | $108,949 |
| 1.00 | $119,724 | $125,438 | $131,705 | $160,000 | $112,811 |
| 1.25 | $123,822 | $129,732 | $136,214 | $165,478 | $116,673 |
| 1.50 | $128,062 | $134,174 | $140,878 | $171,143 | $120,668 |
| 1.75 | $132,446 | $138,767 | $145,701 | $177,002 | $124,799 |
| 2.00 | $136,980 | $143,518 | $150,689 | $183,062 | $129,072 |

**Exhibit E**    **Impact of Jet Flight on Property Values**



Average Value Structure and Property by Community

BACK_DEFEXP-RR-003989

# Florida Airport Noise Case Study

*By Randall Bell, PhD, MAI*

## Class V Detrimental Condition
## External Condition

This study addresses the impact of the Fort Lauderdale-Hollywood International (FLL) Airport's expansion on surrounding property values due to increased noise levels. Specifically, this study addresses any negative impact of increased noise levels, along with any positive impact of the installation of central air-conditioning and impact glass windows on the affected homes through the airport's noise mitigation program.

A community's comprehensive plan is essential for researching the effects on surrounding properties.[1] More than 23 million passengers fly through the Fort Lauderdale-Hollywood International Airport annually. In 2010, FLL ranked 22nd in total passenger traffic in the United States. More than 600 flights fly in and out of the airport daily to more than 60 US cities and international destinations in Canada, the Bahamas, the Caribbean, Mexico, Latin America, and Europe.

According to the Broward County Aviation Department (BCAD) website, the expansion of the Fort Lauderdale-Hollywood International Airport is progressing with the expansion of the south runway and related projects. The overall program consists of three major aspects:

1. Land acquisition
2. Expansion of the south runway and Terminal 4
3. Gate replacement

DMJM, Inc., is the program management office consultant responsible for managing the overall program.

The project will extend, shift, and lengthen Runway 9R-27L from 5,276 feet to 8,000 feet. It will give the airport two parallel runways that can accommodate larger commercial flights. Parallel runways can increase airport capacity dramatically. This expansion will increase the airport's capacity from 84 flights per hour to 107 flights per hour. Without the runway expansion, delays could reach more than 20 minutes per flight. As of the completion of this case study, the South Runway Project was expected to be substantially complete by the third quarter of 2014.[2]

January 23, 2012, marked the beginning of construction for the South Runway Project. Airport Director Kent George, Broward County Mayor John E. Rodstrom Jr., and the entire Board of County Commissioners were joined by more than 300 guests to help celebrate the beginning of one of the country's most significant aviation construction projects. US Transportation Secretary Ray LaHood and Acting Federal Aviation Administrator Michael Huerta joined to help break ground for the $791 million runway expansion. At the event, LaHood was quoted as saying, "This is one of the

1. Wayne Rasmussen, "Use of the Local Comprehensive Plan in the Appraisal Process," *The Appraisal Journal* (Summer 2011): 223.
2. "FLLAIR–Project History," Broward County, accessed February 22, 2016, www.broward.org/Airport/FLLair/History/Pages/FLLair.aspx.

BACK_DEFEXP-RR-003990

*Copyright Material – Provided by Broward Building Service 2*

**Exhibit A**      **Artist's Rendering of Completed Terminals**



Source: "Capital Improvement Plan," *Broward County*, www.broward.org/Airport/FLLair/CapitalImprovement/Pages/Default.aspx.

**Exhibit B**      **Artist's Rendering of Completed Runway**



Source: "Capital Improvement Plan," Broward County.

largest and most important airport construction projects in the country right now. Modernizing our airport infrastructure will keep our economy moving forward and put thousands of Americans back to work." Huerta was quoted as saying, "Fort Lauderdale-Hollywood International Airport is one of the fastest-growing airports in the country. The expanded runway

BACK_DEFEXP-RR-003991

**Exhibit C**　　**Noise Contour Map**



will provide additional airport capacity and will help reduce flight delays."[3]

The program's original budget is $1,165,628,000. The committed budget is $570,147,980 (over $490 million more than the prior year), and the work in place totals $98,454,133 (over $60 million more than the prior year). When constructtion activity peaks, the project will contribute more than $1 million per day to the local economy. The runway costs are estimated to be $791 million. The project is estimated to create 10,822 temporary jobs during the construction.

Noise mitigation is an important aspect of this project. The approximate cost of the noise mitigation program at the Fort Lauderdale-Hollywood International Airport is $175 million.[4]

## Research Methods

In a valuation context, statistical studies of market data are considered a refined version of the sales comparison approach, which is often used for larger data sets. In this study, both a simple regression and a multiple regression were utilized.

There are essentially two types of statistical studies: inferential statistics and descriptive statistics. Inferential statistics draw inferences or conclusions about a population based on observations from a smaller sample.

---

3.　Ibid.

4.　"Capital Improvement Plan," Broward County, accessed February 22, 2013, www.broward.org/Airport/FLLair/Capital-Improvement/Pages/Default.aspx.

BACK_DEFEXP-RR-003992

The *Dictionary of Real Estate Appraisal* defines *inferential statistics* as "the process of drawing conclusions about population characteristics through analysis of sample data."[5] Historically, much of statistics has dealt with inferential statistics because it was difficult to collect complete data sets prior to the computer age. Accordingly, it was necessary to collect samples of a population from which conclusions could be inferred. In this case, complete data sets were available, so inferential statistics are generally of less importance.

Descriptive statistics, as the name implies, describe or summarize data. *Descriptive statistics* is defined as "a branch of statistics concerned only with characterizing, or describing, a set of numbers."[6] In the context of descriptive statistics and real estate valuation, there are three fundamental categories of descriptive statistical studies:

1. Single variable studies, such as pie charts, histograms, or bar charts

2. Simple regression analyses, which include two variable graphs or scatter diagrams, typically on an x-axis and y-axis, that demonstrate the relationship between two variables

3. Multiple regressions, which involve three or more variables and utilize more advanced studies
   Because graphing three or more variables requires multiple dimensions, it is impossible to visualize these analyses on a table or a chart. Multiple regression analyses require the use of statistical techniques and charts.

In the context of real estate damage economics, regressions often compare multiple neighborhoods. The subject neighborhood being studied is conventionally called the *test area*, while the comparable neighborhoods are called *control areas.*

Simple linear regression models may be utilized as trend studies. These are often "time-value" models in which the single independent variable "time" is graphed on the x-axis and the dependent variable "value" is graphed on the y-axis. Multiple regressions use tables.

### Two-Variable Statistics (Simple Regression)

Simple regression analyses are relatively straightforward statistical models that can be highly effective in setting forth the relationship of two variables, such as price and time, price and size, or other relationships. Because they use two variables, they are commonly graphed on an x-axis and a y-axis, which shows the relationship between these two variables. The dependent variable, usually price, typically goes on the y-axis, whereas the independent variable, often time or size, typically goes on the x-axis. The *Cambridge Dictionary of Statistics* defines *correlation* as "A general term for interdependence between pairs of variables."[7] When two variables move together, they are said to be correlated.[8]

Analysis of continuous or discrete data, usually shown graphically in a scatter diagram, can be greatly enhanced by using a trend line, which is a simple regression. Standard soft-

---

5. Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 314.

6. Ibid., 321.

7. B. S. Everitt and A. Skrondal, *The Cambridge Dictionary of Statistics*, 4th ed. (New York: Cambridge University Press, 2010), 107.

8. Marvin L. Wolverton, *An Introduction to Statistics for Appraisers* (Chicago: Appraisal Institute, 2009), 52.

BACK_DEFEXP-RR-003993

ware, such as Excel, will facilitate a simple regression analysis.[9]

Analysis of detrimental conditions using large data sets often involves the selection of a test or study area, which is essentially a group of properties associated with some distinct attribute (for example, a neighborhood impacted by contamination, airport noise, construction defects, etc.) that is then compared to one or more otherwise similar control areas for the purpose of determining the impact, if any, of the particular attribute on market pricing. Such studies compare the impacted test area to unimpacted but otherwise similar control areas to determine whether a certain attribute has any impact on value or marketability. In a time-series analysis, data can be analyzed for discrete time periods (months, quarters, years, etc.) or continuously over a specified time frame. Discrete time periods often use the mean or median price per period.[10]

### Multiple-Variable Statistics

In contrast to simple regression, a multiple regression is considered a multivariate model, which analyzes the relationship among several independent variables at the same time. Multiple regression analysis is a statistical model that expresses the value of a dependent variable, usually price in a real estate context, as a function of two or more independent variables, such as location, site area, age, building size, view, pool, and so forth.[11]

Mathematically, the objective of a multiple regression is to minimize the sum of the squared residuals relative to the data inputted into the study. Stated simply, the objective of a multiple regression is to find the relationship, if it exists, between the dependent variable and the independent variables, and to find to what extent they are correlated. In other words, in the context of real estate damage economics, the objective is to determine if the price (the dependent variable) is affected by some factor within the marketplace. While regression modeling can be used to estimate the value of individual properties, its use in a detrimental condition analysis tends to focus on the coefficients relating to specific independent variables associated with some detrimental condition, such as airport noise, airport zones, environmental contamination, and so forth. *The Dictionary of Real Estate Appraisal* defines *coefficient* as "a statistic used as a measure of change, association, or dispersion."[12]

Multiple regressions are a mass appraisal technique. *Mass appraisal* is defined as "the process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing."[15] Mass appraisal methodologies rely on statistical tools to estimate values of properties in an appropriate geographic area. The valuation methodologies employed in this approach should be in conformance with the Appraisal Foundation, USPAP Standard 6 (2016-2017), and the Standard on Mass Appraisal of Real Property promulgated by the

---

9. Ibid., 5.

10. Ibid.

11. Ibid.*,* 291-292.

12. *The Dictionary of Real Estate Appraisal*, 6th ed., 319.

13. Ibid., 143.

BACK_DEFEXP-RR-003994

*Copyrighted material reproduced with the permission of Richard J. Bullington-McGuire 2[...]*

International Association of Assessing Officers (April 2013).

## Variables

Statistics involves the study of issues, or *variables*. There are several types of numerical variables that are most relevant to real estate economics. Not all statistic literature uses the same names and descriptions, but more modern statistical references cite variables falling under one of four categories:

- Nominal variables, which have a name, such as "waterfront," "impact windows," or "central air-conditioning"

- Ordinal variables, which are ranked, such as "no view, limited view, or outstanding view," or "fair, average, good, or excellent condition"[14]
  Ordinal variables also include number of bedrooms or bathrooms, or binary or "dummy" variables, which are those that are simple yes or no questions or "have" versus "have not" features.[15] For example, a house has or does not have a pool. According to *The Dictionary of Real Estate Appraisal*, "Dummy variables are used in statistics to convert categorical information into numerical data."[16]

- Interval or continuous variables, which are features that are measured, such as in inches, feet, or square feet[17]
  In this study, the interval variable would include home size.

- Ratio variables, which have a real zero point, such as the percentage of yard area or percentage of building-to-land ratios
  No ratio variables were required in this study.

Not all variables can be used for the same mathematical functions. For example, a zip code (a nominal variable) cannot be added or multiplied to produce a meaningful number.

Variables can generally be placed into two categories: dependent variables and independent variables. Dependent variables "depend" upon independent variables. In real estate statistical analyses, there is one dependent variable, usually price per unit or price per square foot, where there can be one or more independent variables. The *dependent variable* is the variable being estimated.[18] For example, the value of a house (a dependent variable) can depend on the date of sale, the square footage, the number of bedrooms, the number of bathrooms, and the quality, which are all potential independent variables. In this study, the dependent variable is home price. In other words, a home's price depends on the independent variables.

The independent variables considered in this case study are:

1. Sale date
2. Living area
3. Lot area
4. Pool

---

14. Ibid., 329.
15. Wolverton, *An Introduction to Statistics for Appraisers*, 39.
16. *The Dictionary of Real Estate Appraisal*, 6th ed., 322.
17. Wolverton, *An Introduction to Statistics for Appraisers*, 39.
18. *The Dictionary of Real Estate Appraisal*, 6th ed., 322.

BACK_DEFEXP-RR-003995

5. Inside or outside the 65 DNL noise contour area[19]

6. Inside or outside the 70 DNL noise contour area

7. Year built

8. Distress sale (short sale or fore-closure)

9. Gated community

10. Central air conditioning

11. Dock

12. Waterfront with open ocean access

13. Waterfront with fixed bridge ocean access

14. Lakefront

15. Impact windows

### Specific Neighborhood Features

There are a variety of externalities that may negatively impact portions of the subject neighborhood study area that were considered. The first is the Florida Power and Light power transmission lines that run from Port Everglades southeast through the Dania Beach area. The second is the waste station on the west end of the airport known as South Broward County Resource Recovery, located at 4400 South State Road 7 in Ft. Lauderdale. The third is a gas transmission line, which crosses the Dania Cut-off just east of I-95 at 1487 NW 10th Street. The gas transmission line is managed by TECO Peoples Gas. These neighborhood externalities were identified in the market data set.

There are at least four fixed bridges east of Federal Highway. The clearance of these bridges restricts open ocean access to boats with heights of less than nine feet. These factors were considered in the study.

### Study Area

The general parameters for the study area included the homes located in the 65+ DNL noise contours surrounding the Ft. Lauderdale International Airport, extending outward to include areas that would either be impacted as a result of the runway expansion as well as areas that would not be impacted. Specifically, the area of study is approximately 21 square miles surrounding the airport. The northern boundary is approximately S 24 Street, in the greater Fort Lauderdale area. The western boundary is Florida's Turnpike near the west end of Dania Beach. The south side is Sterling Road, also in the Dania Beach area. The east side of the study area is the Intracoastal Waterway.

These 21 square miles are also known as range 41, township 50, sections 24, 25, and 36. Included are range 41, township 50, sections 19 through 36. In the middle of this area is the airport, with most of the commercial and industrial land use towards the east. The west and center of the areas are generally single-family residential properties. All sales that were identified since 2000 were included in the study area, which ultimately totaled a population of 530 sales transactions, all screened by the local appraiser for accuracy.

---

19. DNL (Day-Night Sound Level) is based on sound levels measured in relative intensity of sound, or decibels (dB), on the "A" weighted scale (dBA). This scale most closely approximates the response characteristics of the human ear to sound. The higher the number, the louder the sound. DNL represents noise exposure events over a 24-hour period. To account for human sensitivity to noise between 10 p.m. and 7 a.m., noise events occurring during these hours receive a "penalty" when the DNL is calculated. Each nighttime event is measured as if 10 daytime events occurred. (Source: "Frequently Asked Noise Questions," Broward County, accessed February 21, 2016, www.broward.org/Airport/Community/Documents/noisefaqs2.pdf.)

BACK_DEFEXP-RR-003996

*Copyrighted material licensed to Richard Marchitelli Hagood time 2.*

As a result of suggestions made by local residents at an airport advisory neighborhood meeting, local appraiser Pat Sullivan, SRA, conducted an interview with Pompano Beach Airport manager Steven Rocco on June 5, 2013. The interview took place at the airport office located in city hall at Pompano Beach.

Rocco indicated that there were no residential properties in the 65 DNL level. He further indicated that only one commercial/industrial property was located within a 65 DNL corridor. Accordingly, the Pompano Beach market area is not considered to be comparable to the subject neighborhood study areas.

## Research Results

### Simple Regression

The simple regression study measures a single independent variable, price per square foot, over time, the dependent variable. The study utilized 145 single-family residential sales within the 65 and 70 DNL contours against 2,843 sales outside of the noise contours.

All the sales occurred between September 1, 1992, and the current date. The data sets were outputs of the local MLS and the Broward County Assessor's public records. Only properties coded as single-family residential and arm's-length transactions have been included. The data sets were plotted on a graph with polynomial (curved) trend lines to determine how the two data sets varied over time.

The resulting graph, shown in Exhibit D, shows that since 1992, properties inside the contour lines consistently sold for a significantly lower value than those outside of the contours over the entire span of time.

**Exhibit D       Simple Regression**



BACK_DEFEXP-RR-003997

While a simple regression does not incorporate all of the independent variables, it generally indicates a diminution in value of over 15%.

## Multiple Regression

The multiple regression study addresses the question of whether residential properties located in the 65 DNL contour area sell for more or less as compared to similar properties located outside the 65 DNL area. In all, 530 sales were analyzed over a period since 2000. "Home price" is the dependent variable.

The independent variables considered in this case include sale date, living area, lot area, pool, inside versus outside the 65 DNL noise contour area, inside versus outside the 70 DNL noise contour area, year built, distress sale (short sale or foreclosure), gated community, central air-conditioning (AC), dock, waterfront with open ocean access, waterfront with fixed bridge ocean access, lakefront, and impact windows.

Further analysis indicated that some of these independent variables were not statistically significant in a mass appraisal context. These included lot area, inside versus outside the 70 DNL noise contour area, central AC, dock, and impact windows.

Lot area is normally statistically significant. However, as many of the homes sit on small, oceanfront lots, the price per square foot did not statistically correlate to larger lots off the water. There was only one sale identified within the 70 DNL noise contour, which is not a valid population size. Central air-conditioning was skewed due to the fact that over 90% of the properties already have central air and those that do not are disproportionally older homes with a mean value of approximately $169,000, relative to the overall mean home value of approximately $281,000. The "dock" independent variable was considered to pose a multicollinearity (redundancy) issue with the other waterfront features already being studied. The impact windows also indicated a low statistical reliability from a mass appraisal perspective.

## Summary Input Table

The summary input table sets forth all of the market data in this study. The variables studied are the sale price (the dependent variable) and the independent variables. Exhibit E shows a sample of the market data utilized.

## Descriptive Statistics Table

The descriptive statistics table in Exhibit F sets forth a summary of the key statistics for the multiple regressions.

### *Central Tendency (Mean, Median, and Mode)*

The first three indicators—mean, median, and mode—are different ways of describing *central tendency*. Central tendency asks the question, "Is there a single number that best represents the variable in question?"[20] These are often called the *typical* or *average* number. The mean is the most commonly used measurement in which the variables are totaled and divided by the population. The *mean* is the same as the *arithmetic average* of the data. In this case, the mean selling price for the transactions included in the data set is approximately $281,185. The *median* is the midpoint between the lowest and highest variable. The *mode* is the most frequently occurring variable.

---

20. Wolverton, *An Introduction to Statistics for Appraisers*, 70.

BACK_DEFEXP-RR-003998

## Exhibit E — Summary Input Table

| No. | City | Sale Price | Sale Date | Living Area (Sq Ft) | Pool | 65 DNL | Year Built | Distress | Gated | Water Open | Water Fixed | Lake Front | Central AC | Impact Window |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Dania Beach | $ 124,000 | 02/18/00 | 1,950 | 1 | 1 | 1972 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 2 | Dania Beach | $ 84,300 | 04/27/00 | 1,007 | 0 | 1 | 1955 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 3 | Dania Beach | $ 83,100 | 12/04/00 | 1,464 | 0 | 1 | 1960 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | Ft Lauderdale | $ 129,000 | 12/29/00 | 1,176 | 0 | 1 | 1969 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 5 | Ft Lauderdale | $ 122,500 | 05/04/01 | 1,608 | 0 | 1 | 1998 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 6 | Ft Lauderdale | $ 118,000 | 06/07/01 | 1,394 | 0 | 1 | 1961 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 7 | Dania Beach | $ 119,000 | 07/03/01 | 1,747 | 1 | 1 | 1976 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 8 | Hollywood | $ 375,000 | 09/05/01 | 3,198 | 1 | 0 | 1998 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 9 | Ft Lauderdale | $ 119,000 | 10/16/01 | 1,394 | 1 | 1 | 1971 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | Ft Lauderdale | $ 50,000 | 11/21/01 | 1,147 | 0 | 1 | 1954 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | Ft Lauderdale | $ 154,900 | 08/02/02 | 1,408 | 0 | 1 | 1958 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 12 | Dania Beach | $ 92,000 | 08/27/02 | 922 | 0 | 1 | 1955 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 13 | Ft Lauderdale | $ 120,000 | 02/07/03 | 1,043 | 0 | 1 | 1955 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 14 | Dania Beach | $ 115,800 | 04/05/03 | 1,479 | 0 | 0 | 2004 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 15 | Dania Beach | $ 150,000 | 04/25/03 | 1,761 | 0 | 1 | 1957 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 16 | Dania Beach | $ 180,000 | 05/02/03 | 1,566 | 0 | 1 | 1973 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 17 | Hollywood | $ 275,000 | 05/05/03 | 2,212 | 0 | 0 | 1997 | 0 | 1 | 0 | 0 | 1 | 1 | 0 |
| 18 | Hollywood | $ 305,000 | 06/05/03 | 2,237 | 0 | 0 | 2000 | 0 | 1 | 0 | 0 | 1 | 1 | 0 |
| 19 | Hollywood | $ 260,000 | 06/05/03 | 2,137 | 0 | 0 | 2000 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 20 | Hollywood | $ 330,000 | 06/05/03 | 2,493 | 0 | 0 | 2000 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 21 | Hollywood | $ 301,500 | 07/05/03 | 2,237 | 0 | 0 | 2000 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 22 | Dania Beach | $ 350,000 | 07/28/03 | 1,924 | 0 | 1 | 2002 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |
| 23 | Hollywood | $ 363,000 | 09/05/03 | 3,669 | 0 | 0 | 2003 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 24 | Dania Beach | $ 260,000 | 09/30/03 | 1,678 | 1 | 1 | 1978 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |
| 25 | Dania Beach | $ 178,000 | 11/24/03 | 1,680 | 0 | 1 | 2003 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 26 | Ft Lauderdale | $ 209,000 | 12/10/03 | 1,219 | 1 | 1 | 1961 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 27 | Hollywood | $ 285,000 | 01/05/04 | 2,185 | 0 | 0 | 2000 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 28 | Dania Beach | $ 325,000 | 03/31/04 | 1,942 | 1 | 1 | 1973 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| 29 | Ft Lauderdale | $ 75,000 | 04/14/04 | 644 | 0 | 0 | 1941 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 30 | Ft Lauderdale | $ 302,000 | 04/21/04 | 2,813 | 1 | 1 | 1972 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 31 | Ft Lauderdale | $ 103,000 | 05/05/04 | 1,139 | 0 | 0 | 1952 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 32 | Hollywood | $ 330,000 | 05/05/04 | 2,231 | 0 | 0 | 1998 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 33 | Dania Beach | $ 105,000 | 05/24/04 | 1,014 | 0 | 1 | 1956 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 34 | Ft Lauderdale | $ 359,900 | 07/05/04 | 1,517 | 0 | 0 | 1955 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 35 | Ft Lauderdale | $ 395,000 | 07/05/04 | 1,432 | 0 | 0 | 1956 | 1 | 0 | 1 | 0 | 0 | 1 | 1 |
| 36 | Dania Beach | $ 235,000 | 07/30/04 | 1,532 | 0 | 1 | 1971 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 37 | Ft Lauderdale | $ 215,000 | 08/02/04 | 1,483 | 0 | 1 | 1972 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 38 | Ft Lauderdale | $ 420,000 | 08/05/04 | 2,702 | 0 | 0 | 2000 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 39 | Ft Lauderdale | $ 525,000 | 09/05/04 | 1,720 | 0 | 0 | 1963 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| 40 | Dania Beach | $ 357,000 | 09/05/04 | 1,966 | 1 | 0 | 1978 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 41 | Ft Lauderdale | $ 500,000 | 10/05/04 | 1,586 | 0 | 0 | 1956 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 42 | Hollywood | $ 348,500 | 11/05/04 | 2,237 | 0 | 0 | 2001 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 53 | Ft Lauderdale | $ 470,000 | 01/05/05 | 1,380 | 0 | 0 | 1956 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 44 | Dania Beach | $ 121,500 | 01/05/05 | 981 | 0 | 0 | 1940 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 45 | Ft Lauderdale | $ 280,000 | 02/28/05 | 1,337 | 0 | 1 | 1960 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 46 | Hollywood | $ 380,000 | 03/05/05 | 2,212 | 0 | 0 | 1997 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 47 | Ft Lauderdale | $ 535,000 | 04/05/05 | 1,670 | 0 | 0 | 1953 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 48 | Hollywood | $ 590,000 | 04/05/05 | 3,650 | 0 | 0 | 1998 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 49 | Ft Lauderdale | $ 258,000 | 04/22/05 | 1,390 | 0 | 1 | 1960 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 50 | Hollywood | $ 610,000 | 05/05/05 | 3,198 | 1 | 0 | 1997 | 0 | 1 | 0 | 0 | 1 | 1 | 0 |
| 51 | Hollywood | $ 525,000 | 05/05/05 | 2,882 | 1 | 0 | 2000 | 0 | 1 | 0 | 0 | 1 | 1 | 0 |
| 52 | Hollywood | $ 491,500 | 06/05/05 | 2,148 | 1 | 0 | 1997 | 0 | 1 | 0 | 0 | 1 | 1 | 0 |
| 53 | Ft Lauderdale | $ 287,000 | 06/27/05 | 1,296 | 1 | 0 | 1956 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 54 | Ft Lauderdale | $ 525,000 | 07/05/05 | 1,734 | 0 | 0 | 1958 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 55 | Dania Beach | $ 571,500 | 07/08/05 | 2,712 | 0 | 0 | 2005 | 0 | 1 | 1 | 0 | 0 | 1 | 0 |
| 56 | Ft Lauderdale | $ 310,000 | 07/20/05 | 1,483 | 0 | 1 | 1972 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 57 | Dania Beach | $ 236,500 | 08/05/05 | 1,737 | 0 | 0 | 1984 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 58 | Ft Lauderdale | $ 337,000 | 08/06/05 | 1,641 | 0 | 0 | 1956 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

*External Conditions*   **163**

BACK_DEFEXP-RR-003999

**Exhibit F**    **Descriptive Statistics Table**

| | Sale Price | Sale Date | Living Area (SqFt) | Pool | 65 DNL | Year Built | Distress | Gated | Water-Open | Water-Fixed | Lakefront |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mean | $ 281,175 | 4/19/2009 | 1,818 | 0.28 | 0.12 | 1972 | 0.29 | 0.25 | 0.21 | 0.08 | 0.06 |
| Standard Error | $ 6,542 | 44.95 | 28.07 | 0.02 | 0.01 | 0.85 | 0.02 | 0.02 | 0.02 | 0.01 | 0.01 |
| Median | $ 270,000 | 10/8/2009 | 1,671 | - | - | 1961 | - | - | - | - | - |
| Mode | $ 300,000 | 1/14/2013 | 2,212 | - | - | 1956 | - | - | - | - | - |
| Standard Dev. | $ 150,618 | 1,035 | 646 | 0.45 | 0.33 | 19.48 | 0.46 | 0.43 | 0.40 | 0.27 | 0.24 |
| Sample Variance | 22,685,846,864 | 1,070,823 | 417,642 | 0.20 | 0.11 | 379.49 | 0.21 | 0.19 | 0.16 | 0.07 | 0.06 |
| Kurtosis | 0.27 | (0.09) | 2.05 | (1.03) | 3.34 | (1.32) | (1.17) | (0.62) | 0.13 | 7.50 | 11.75 |
| Skewness | 0.71 | (0.68) | 1.19 | 0.99 | 2.31 | 0.50 | 0.92 | 1.18 | 1.46 | 3.08 | 3.70 |
| Range | $ 740,000 | 4,856 | 4,189 | 1.00 | 1.00 | 86 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Minimum | $ 35,000 | 2/18/2000 | 624 | - | - | 1926 | - | - | - | - | - |
| Maximum | $ 775,000 | 6/5/2013 | 4,813 | 1.00 | 1.00 | 2012 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Sum | $ 149,022,757 | 21,158,687 | 963,554 | 148.00 | 65.00 | 1,045,142 | 155.00 | 131.00 | 109.00 | 43.00 | 32.00 |
| Count | 530 | 530 | 530 | 530 | 530 | 530 | 530 | 530 | 530 | 530 | 530 |

### Standard Deviation (Variance)

The *standard deviation* is a measurement of dispersion, which essentially states how far the data sits away from the typical or the mean. Mathematically, it is the positive square root of the variance. But unlike the variance, which is a mathematical factor, it is expressed in terms of the units defined. In this case, it is simply expressed as dollars. The standard deviation is a measure of variability from the mean. *Measures of variance* generally describe the dispersion of the data, while the *standard deviation*, though complicated to calculate manually, is often preferred in situations requiring more sophisticated analyses.

If data is normally distributed (represented by a bell-shaped curve), there is a 68% probability that a predicted value will be within one standard deviation of the mean, a 95% probability that a predicted value will be within two standard deviations of the mean, and a probability in excess of 99% that a predicted value will be within three standard deviations of the mean. This information is often used to construct confidence intervals around point estimates. For a normal distribution, approximately 95% of the data would fall within ±2 standard deviations or, in this case, approximately $150,618.

### Range

The *range* simply expresses the highest and lowest variable. The range indicator here is the difference between the maximum price and the minimum price.

### Count

The *count* is simply the number of transactions analyzed in this analysis. The data set includes 530 total single-family residential sales, of which 65 are within the 65 and 70 DNL contour areas.

### Summary Output Table

Excel produces an analysis of variance (ANOVA) summary output table using a mathematical model that essentially performs two functions: It provides the "answer" to the question as well as statistical indicators that relate to the reliability of this "answer." Of the four tables typically utilized in a multiple regression analysis, this is the most involved. (See Exhibit G.)

This data set includes 530 property sales occurring between January 2000 and May 2013. All the sales are verified MLS transactions, and many were observed in the field. Additionally, all the sales had a verified Broward County public record. Only single-family residential, arm's-length transactions are included in the final data set.

BACK_DEFEXP-RR-004000

Copyrighted material licensed to Richard J. Roddewig, Clarion Associates, Inc. by Appraisal Institute, June 2017

## Exhibit G    Summary Output Table

SUMMARY OUTPUT 7

| Regression Statistics | |
|---|---|
| Multiple R | 86% |
| R Square | 73% |
| Adjusted R Square | 73% |
| Standard Error | 78,303 |
| Observations | 530 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 10 | 8,818,668,161,891 | 881,866,816,189 | 143.83 | 0.00 |
| Residual | 519 | 3,182,144,829,053 | 6,131,300,249 | | |
| Total | 529 | 12,000,812,990,944 | | | |

| | | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|---|
| Intercept | $ | 3,197,430 | 593,045 | 5.39 | 0.00 | 2,032,366 | 4,362,494 | 2,032,366 | 4,362,494 |
| Sale Date | $ | (42.16) | 3.54 | (11.92) | 0.00 | (49.10) | (35.21) | (49.10) | (35.21) |
| Living Area (SqFt) | $ | 130.57 | 7.85 | 16.63 | 0.00 | 115.14 | 146.00 | 115.14 | 146.00 |
| Pool | $ | 24,672 | 8,352 | 2.95 | 0.00 | 8,263.61 | 41,079.44 | 8,263.61 | 41,079.44 |
| 65 DNL | $ | (61,471) | 11,456 | (5.37) | 0.00 | (83,975) | (38,966) | (83,975) | (38,966) |
| Year Built | $ | (761) | 294 | (2.59) | 0.01 | (1,339) | (184) | (1,339) | (184) |
| Distress | $ | (61,586) | 7,842 | (7.85) | 0.00 | (76,991) | (46,180) | (76,991) | (46,180) |
| Gated | $ | 36,905 | 13,411 | 2.75 | 0.01 | 10,559 | 63,251 | 10,559 | 63,251 |
| Water-Open | $ | 141,916 | 9,822 | 14.45 | 0.00 | 122,620 | 161,212 | 122,620 | 161,212 |
| Water-Fixed | $ | 107,361 | 13,143 | 8.17 | 0.00 | 81,541 | 133,181 | 81,541 | 133,181 |
| Lakefront | $ | 42,768 | 15,261 | 2.80 | 0.01 | 12,787 | 72,750 | 12,787 | 72,750 |

Mean: $281,175

## Primary Indicators
### Analysis Conclusion
The foremost indicator, which also reflects the "answer" to the study, is the coefficient of -61,471. In this case it reflects that properties within the study area (the 65 DNL noise contour airport area) typically sell for $61,471 less than otherwise similar properties outside the study area.

### Coefficients
Other coefficients are calculated for each independent variable, reflecting a marginal rate of change.[21] Coefficients are normally reviewed for expected magnitude and signage. In this case, the coefficient for age is negative, indicating a value change of approximately -$761 per year. The coefficient for gross living area is positive, indicating that each additional square foot is worth approximately $130. Values also in-

crease, as expected, for water frontage, gated communities, and pools. Each of these figures makes sense and easily reconciles with the experience and observations of real estate professionals.

### R-Squared
The *coefficient of determination* ($r$-squared or $r^2$) ranges from 0% to 100%, reflecting the amount of price variation explained by the model. In this case it reflects 0.73, or 73%. An alternative calculation is an *adjusted $r^2$* of 0.73, or 73%, which adjusts the coefficient of determination for the number of independent variables, assisting in the identification of extraneous or redundant independent variables. In multiple regression analysis, a low $r^2$ normally indicates a significant amount of unexplained variation, although this does not necessarily invalidate the model. However, the

---

21. *The Dictionary of Real Estate Appraisal*, 6th ed., 310.

BACK_DEFEXP-RR-004001

*r*-squared with this airport study indicates a strong, statistically valid study.

### Significance F

*Significance F* measures the probability that the results were obtained purely by chance.[22] In this case, there is a near zero chance that these results were obtained purely by chance.

### T-Statistic

*T-statistics (t-stats)* are also calculated for each independent variable and reflect the difference between a sample mean and a hypothesized value of the population mean divided by an estimate of the standard error of the mean.[23] The larger the *t*-stat, the more one can be confident that the coefficient is meaningful. All of the *t*-statistics indicated in this study are valid.

### P-Value

The *P-value* measures the probability that the true value of the coefficient is zero (the significance level). An acceptable significance level for coefficients in most applications is 10%, or a *P-value* of 0.10 or less.

### Standard Error

The standard error is the standard deviation of a regression coefficient estimate.[24] In this case, the standard error is 78,303, which essentially means that the home prices are typically $281,175 (the mean discussed above), plus or minus $78,303. As this is one standard deviation, this would only account for about 68% of the variability in *y*.

### Observations

There are 530 items of market data, or observations, in this analysis. In this study, the coefficient calculated for the airport study area is -$61,471. In other words, the conclusions of the analysis show that properties located within the airport area typically incur a diminution in value of $61,471, or approximately 21.9% of the mean value.

### Contributory Value of Central Air-Conditioning

As discussed, the central air variable was skewed in the multiple regression due to the fact that over 90% of the properties already have central air and those that do not are disproportionally older homes with a mean value of approximately $169,000, relative to the overall mean home value of approximately $281,000.

To determine the contributing value of air-conditioning as a mitigation measure, a paired sales analysis was conducted. The study area involved homes that sold with central AC as compared to otherwise similar homes with wall AC units. All market data involved homes in proximity to the airport. The homes selected had similar sales dates, external influences, amenities, ages, utilities, DNL levels, and site characteristics (waterfront, dry lots, pools, etc.). The selected homes had no sales concessions. Adjustments were made for other characteristics based on typical residential adjustments in the south Florida market.

The first neighborhood is known as the east Dania Beach market. These are homes south of NE 2 Street, west of SE 6 Avenue, north of Stirling Road, and east of Federal Highway. In this area, a sale occurred at the home located at 39 SE 7 Street, Dania Beach. This is a 1958 vintage home on a 7,074-sq.-

22. Randall Bell, *Real Estate Damages*, 2nd ed. (Chicago: Appraisal Institute, 2008), 39.

23. *The Dictionary of Real Estate Appraisal*, 6th ed., 333.

24. Ibid., 332.

BACK_DEFEXP-RR-004002

ft. site with a livable area of approximately 1,654 square feet, according to county tax records. This is a typical three-bedroom, two-bathroom home of standard building construction. The home is in good condition, but according to the MLS, it has a mostly original kitchen and bathrooms. The home sold on June 21, 2013, for $165,000. There were no sales concessions and no external or functional inadequacies. The home does not have an in-ground pool, but it does have a one-car carport.

The comparable home has central AC and is located at 27 SE 13 Terrace, Dania Beach. The home sold on February 22, 2013, for $182,000. This home has a similar livable area of 1,654 square feet, according to the Broward County Tax records. After adjustment, the contributing value of the AC was estimated to be $9,600.

The second neighborhood to be considered is a modest neighborhood in the near southwest section of Dania Beach. This area is made up of mostly residential properties of 600 square feet to 1,200 square feet. These are older homes with fair and average quality construction.

A home located at 117 NW 13 Avenue, Dania Beach, has wall AC units. This home sold on May 4, 2012, for $38,000, according to the MLS and county tax records. The home is approximately 1,133 square feet on a 6,066-sq.-ft. site. The home is in fair to average condition and was built in 1947. There were no sales concessions recorded in the MLS. It is a one-story home with no in-ground pool and no functional or external inadequacies.

This property was compared to a sale of a home located at 525 SW 1 Street, Dania Beach, for $51,900 on March 6, 2012. It has central AC, was built in 1956, and is in average condition, according to the MLS. The home has a living area of approximately 1,192 square feet and has no in-ground pool and no functional or external inadequacies. There were no sales concessions noted. The home is on a 4,921-sq.-ft. site. After adjustments, the contributing value of the central AC was estimated to be $4,400.

The third neighborhood is located in west Dania Beach. The two homes are located just off of Griffen Road and west of Ravenswood Road. Both of these properties are on non-waterfront sites and are of similar age and comparable quality and did not have in-ground pools. Located at 4975 SW 28 Avenue is a home with a wall AC unit, which sold on May 10, 2012, for $91,100. The home contains approximately 1,151 square feet of living area on a 11,901-sq.-ft. site. The home was in average to good condition and contained six rooms, three bedrooms, and two bathrooms. It has a one-car garage and no in-ground pool. Built in 1950, this is a typical home but on a slightly larger site.

Situated at 4709 SW 28 Avenue, two blocks away, is a home that sold for $90,000 on April 9, 2012. This home contains 1,069 square feet and was built in 1957. The home is in average condition and contains a one-car garage and a four-car carport. It contains six rooms, three bedrooms, and two bathrooms, and is of comparable quality. The home sits on a 6,000-sq.-ft. site and backs to a multifamily rental building. This property sold through FHA with no sales concessions. After adjustments, the contributing value of central AC was estimated to be $10,900.

The fourth neighborhood is a waterfront neighborhood in the Fort Lauderdale area, located northwest of

BACK_DEFEXP-RR-004003

the Fort Lauderdale International Airport. The neighborhood is commonly known as Lauderdale Isles and consists largely of medium to larger-sized homes on finger canals. These canals lead to the New River, and on to the Intracoastal Waterway and the Atlantic Ocean. It is an older, established Fort Lauderdale neighborhood with a mix of properties.

A sale was located of a home with a wall AC unit at 2512 Sugarloaf Lane. It is a 936-sq.-ft. home on a 7,150-sq.-ft. waterfront finger canal. The site has approximately 65 front feet on the water. It is a two-bedroom, one-bathroom home in average to good condition. The home sold on April 4, 22, 2013, for $246,000 with no sales concessions. The home has a boat dock but does not contain an in-ground pool. This is an average-quality home built in 1956.

A comparable home sold at 2453 Bimini Lane. This home is also in the immediate Lauderdale Isles neighborhood and sold for $245,000 on June 21, 2013. This is also a two-bedroom, one-bathroom home and contains approximately 936 square feet of living area. It is in average condition. This home has 60 front feet on the water and a 6,596-sq.-ft. site area. This comparable property is also on a finger canal with ocean access. The home has a private dock and no in-ground pool. There were no sales concessions noted. After adjustments, the contributory value of central AC was estimated to be $16,050.

These four paired sales are considered to be representative of typical homes in and around the Fort Lauderdale International Airport. Each of the paired sales properties were from "like kind" comparable residential neighborhoods. The homes were of similar quality, age, DNL levels, and utility, and had comparable locational characteristics. None of the homes contained in-ground pools. The necessary adjustments were made for differences, and these adjustments are considered typical for residential properties in the Broward County market.

The net adjustments for the paired sales ranged from $4,400 to $16,050 for central AC. The low adjustment was from a modestly priced residential neighborhood, while the high adjustment was from an upscale waterfront ocean-access neighborhood. The remaining two indicated adjustments of $10,900 and $9,600 relate to properties located in typical residential neighborhoods in Fort Lauderdale and Dania Beach.

Based on this analysis, the contributing value of central AC is estimated to be $10,000 for a home with a mean value of approximately $281,179, or 3.6% of home value.

### Contributory Value of Impact Windows

A paired-sales analysis was conducted to determine the contributory value, for a typical home, with regards to impact glass windows verses standard windows. Standard windows include awnings, sliding windows with standard glazing, jalousie windows, and other basic glass window systems. Homes with impact windows provide for a significant reduction in outside noise, additional home security, and protection from tropical storms.

The purpose of the study was to compare homes in various residential neighborhoods near the airport with impact glass windows versus those with standard windows. This paired sales analysis utilized homes built during similar time periods with similar external influences, amenities,

BACK_DEFEXP-RR-004004

ages, pools, utilities, site characteristics (waterfront or dry lots), and DNL levels. The sales involved no sales concessions. Adjustments were made for differing characteristics based on typical residential adjustments in the south Florida market. It was noted that impact windows are typically not found in modestly priced homes due to cost factors. Four paired sales analyses were conducted.

The first study involved a home in west Dania Beach at 5020 SW 29 Avenue. This is a 1,492-sq.-ft. home on a 8,101-sq.-ft. site with impact windows. The home sold on June 27, 2013, for $141,500. This is a three-bedroom, two-bathroom home in good condition built in 1964 with central AC and open parking.

Found two streets east is a home at 4935 SW 27 Terrace. This is a similar home that sold two months earlier on April 18, 2013, for $140,000. This is a four-bedroom, two-bathroom home with standard windows. The home is on a smaller 4,301-sq.-ft. site and was built in 1979. This home is larger, with 1,690 square feet, and no pool. After adjustments, this indicates a contributory value for the impact windows of $8,800.

The second paired sale study is located in the north Fort Lauderdale area. A sale occurred of a home with impact windows at 2591 SW 16 Street on January 11, 2013, for $170,000. The home is on a 6,361-sq.-ft. site and contains approximately 1,435 square feet of living area. The home was built in 1974 and contains three bedrooms and two bathrooms. The home had limited upgrades, but has a two-car garage and no pool.

Situated five blocks west of this home is a property located at 3075 SW 16 Street. This is a 1,218-sq.-ft. home with three bedrooms and two bathrooms, with standard windows. This home sold on July 24, 2012, for $150,000. This home is smaller but on a larger 10,085-sq.-ft. site. The home was in average condition, built in 1976, and has more recent upgrades. It has open parking and an in-ground pool. After adjustments, this indicates a contributory value for the impact windows of $11,500.

The third paired sale study is located in the east section of Dania Beach at 126 SE 3 Avenue. This home was built in 1976 and contains impact windows. The home sold on August 30, 2010, for $260,000, and is in good condition. The home contains approximately 1,645 square feet of living area and is located on a 8,282-sq.-ft. site. This is a three-bedroom, two-bathroom home with a one-car garage and no in-ground pool. This home has had some remodeling.

Located three blocks away is a home at 406 SE 3 Place, Dania Beach, with standard windows. This home is on a 6,736-sq.-ft. site and contains approximately 1,499 square feet of living area. This is a newer home built in 1992 but with less remodeling. This comparable home sold on September 1, 2010, for $250,000. It does not have an in-ground pool. This indicates a contributory value of $10,000 for the impact windows.

The fourth paired sales study is located at 2460 Bimini Lane. It is a home with impact windows on a waterfront site with ocean access. This property is on a 70-ft.-wide site with a total land area of 7,699 square feet. This home was built in 1959 and is in good condition. The home contains approximately 1,225 square feet and has three bedrooms and two bathrooms. This home has central AC, a one-car garage, and no in-ground pool. This home sold on

BACK_DEFEXP-RR-004005

January 3, 2013, for $320,000.

Situated on the same block, at 2543 Bimini Lane, is a smaller home of 936 square feet with two bedrooms and one bathroom. This home sold on June 21, 2013, for $245,000. This home is on a smaller 6,569-sq.-ft. site and has 60 front feet on the water. The home is considered to be in average condition but, as with the home on Bimini Lane, it has central AC and no in-ground pool. This home was built in 1955 and has covered parking. After adjustments, this indicates a contributory value of $12,100 for impact windows.

The adjusted values ranged from a low of $8,800 to a high of $12,100 for more expensive waterfront properties. Two other typical neighborhoods indicated contributory values of $10,000 and $11,500. Based on these factors, the adjustment to a mean value for impact glass is $11,000 of approximately $281,179, or 3.9% of the home value.

## Conclusions

This study has incorporated a variety of inputs, including multiple site visits of the subject neighborhoods, neighborhood residents' comments, review of relevant articles, paired sales analyses, simple regressions, and multiple regressions.

The simple regression, which utilized market data going back to 1992, clearly illustrates a distinct delineation between properties above and below the 65 DNL areas. While there is only one property sale within the 70 DNL area, it is noteworthy that it is located below both trend lines.

The multiple regression sets forth a coefficient of -$61,471 for homes within the 65 DNL, which equates to 21.9% less than the mean value of homes outside the 65 DNL area. According to several sources, non-impacted noise areas have DNL levels generally ranging from 45-55.[25] Based on an unimpacted DNL level of 45-55 DNL, this equates to an approximately 1.25% loss for each DNL point increase.

The literature sets forth a study by Cohen and Coughlin using spatial econometric techniques (proximity to airport noise) in which they compared models and estimation methods in a hedonic price framework to examine the impact of noise on 2003 housing prices near the Atlanta airport. In their preferred model, houses located in an area in which noise disrupts normal activities (defined by a day-night sound level of 70–75 decibels) sold for 20.8% less than houses located where noise does not disrupt normal activities (defined by a day-night sound level below 65 decibels). It is interesting to note that the multiple regression in this study is virtually the same, or 21.9%.

These findings are consistent with prior findings that were compiled from a variety of studies, which are summarized as follows.[26]

It is concluded that those properties that were outside of the 65 DNL noise contours prior to the airport expansion and that will be in a 65 DNL noise

25. William Albee, Tom Connor, Royce Bassarab, Roger Odegard, and Clint Morrow, "What's in Your DNL?" *Wyle Laboratories* (October 2006): 6; Paul D. Schomer, "On Normalizing DNL to Provide Better Correlation with Response," *Sound and Vibration* (December 2002): 20-21; Coffman Associates Airport Consultants, "Aircraft Noise and Land Use Compatibility Guidelines," technical information paper, 3, "The Measurement and Analysis of Sound," technical information paper, 5, and "Effects of Noise on People," Metromedia Draft Mitigated Negative Declaration, 5.11-2; Mestre Greve Associates, "Kodiak Airport Environmental Impact Statement," July 2009, 9; Southern California Association of Governments, "Draft Program Environmental Impact Report," December 2011: 3.9-6.

26. Randall Bell, "The Impact of Airport Noise on Residential Real Estate," *The Appraisal Journal* (July 2001): 321.

BACK_DEFEXP-RR-004006

Copyrighted Material licensed by Richard J. Roddewig, June 2017

**Exhibit H**    **Relationship Between Various Effects of Habitual Environmental Noise and a Composite Noise Rating**



Source: Commission of London's Third Airport Papers and Proceedings VII, Part II, and Further Research Team Work 51. DNL and CNL reference added on sale of NEF30 = 65 DNL and NEF40 + 70 DNL.

contour after the runway expansion will incur a 21.9% diminution in value. Those properties that were in a 65 DNL noise contour prior to the runway expansion and that will be in a 70 DNL noise contour after the expansion will incur a 6.3% diminution in value due to the incremental noise increase.

Offsetting these effects are the contributory value of installing central AC and impact windows as a noise mitigation effort. The contributory value of central AC is estimated to be 3.6%, and the contributory value of impact windows is estimated to be 4.3%.

Based on these factors, the effects of the runway expansion and resulting increased noise, combined with the mitigating effects of central AC and impact windows, is set forth as follows:

**Outside DNL Noise Contour vs. 65 DNL Noise Contour**

| | |
|---|---|
| Outside DNL Noise Contour vs. 65 DNL | -21.9% |
| Contributory Value of Central AC | 3.6% |
| Contributory Value of Impact Windows | 3.9% |
| Net Impact on Home Value | -14.4% |

**65 DNL Noise Contour vs. 70 DNL Noise Contour**

| | |
|---|---|
| Outside DNL Noise Contour vs. 65 DNL | -6.3% |
| Contributory Value of Central AC | 3.6% |
| Contributory Value of Impact Windows | 3.9% |
| Net Impact on Home Value | 1.2% |

BACK_DEFEXP-RR-004007

BACK_DEFEXP-RR-004008



# Building and Manufacturing Conditions

Class VI detrimental conditions are those conditions that are associated with the construction of improvements, such as construction defects, Americans with Disabilities Act (ADA) non-compliance, deferred maintenance, and functional obsolescence.

A basic premise of Class VI detrimental conditions is that they are man-made, which generally means that they can be physically repaired. However, these conditions may or may not be able to be repaired economically. (See Exhibit 6.1 for a diagram of common construction terms.) Often the full value of the property is restored upon the completion of repairs. Sometimes the problems are self-evident, and no special studies are required to determine the scope of the problem; however, all detrimental condition stages and issues should be addressed.

Like most detrimental conditions, quantifying construction-related conditions requires a careful study of market perceptions and reactions. As construction issues are relatively common, case studies and market data are generally available. Value diminution may include the cost of repairs and engineering as well as related costs for tenant relocation, lost rent while repairs are being made, post-repair cleanup, etc. Some tenant relocation costs can be partially, if not entirely, mitigated simply by waiting until the property is vacant to make the repairs.

Consider the example of the Ashby Building, a three-story mixed-use complex in Eugene, Oregon. The ground level has retail uses, while the upper levels have mixed office and apartment uses. The building was constructed in 1991 with a frame-and-stucco design. The builder failed to install the insulation required by the architectural plans, and as a result the property is very "energy inefficient." In addition, the building is noisy, with sound traveling between rooms because of the lack of insulation. Most of the tenants have lodged complaints with the owner over these issues.

The economics of the situation must be examined carefully. If the damages cannot be fully repaired economically, there may be an ongoing condition that results in a diminution in value, if this is supported by the market. For the Ashby Building, the income levels would need to justify the intrusive repairs required

BACK_DEFEXP-RR-004009

**Exhibit 6.1**     **Building Diagram**

### Construction Terms



to install insulation in all the walls. In other words, a comparison of curable functional obsolescence versus incurable functional obsolescence is needed. There may be a permanent loss of value because the condition remains, or is perceived to remain, unchanged over time.

There is no general rule for comparing or correlating cost of repair with loss of value, although in many jurisdictions cost of repair and diminution in value are considered alternative remedies. As an extreme example, if a jet airliner has a $5 fuse that fails, the delay may cause the flight to be canceled with a corresponding revenue loss of $50,000. Likewise, a relatively small matter may cause a very significant loss of value in a building.

Of course, common sense must play a role in value diminution studies. Unless a liability is caused by the detrimental condition, the loss generally does not exceed the value of the property. For example, if a property has a value of $250,000 and is impacted by the discovery of major construction defects within the improvements, the maximum loss would be the undamaged value less the contributory value of the land—i.e., the depreciated replacement cost of the improvements.

## Construction Defects

Approximately two million permits are issued nationwide each year for the construction of new housing units, and many more are issued for the construction of commercial, industrial, and other buildings and for the remodeling of existing structures. Unlike many manufacturing processes, construction is a labor-intensive endeavor, which sometimes involves imperfect materials and procedures. Under these conditions, perfection is an elusive goal, and differences between expectations and performance are not uncommon. In extreme cases, construction defects can be fatal; well-known examples include the 1967 failure of the Silver Bridge over the Ohio River in West Virginia that killed 46 people and the 1981 failure of two suspended walkways at the Hyatt Regency in Kansas City that resulted in 114 deaths.

Buildings and other structures are complex, and what is properly classified as a "defect" is often a point of contention in cases involving allegations of defective

BACK_DEFEXP-RR-004010

Copyrighted material licensed to Richard Rehbaugh on December 21,



The Silver Bridge in Point Pleasant, West Virginia, collapsed in December 1967, resulting in 46 deaths. (Photo courtesy of West Virginia State Archives, Maurice Hamill Collection.)

construction. Although homes and other structures are often mass-produced, field conditions sometimes warrant changes from an approved design, and mistakes are occasionally made. It should also be noted that acceptable building materials and construction techniques have changed over the years. Products such as aluminum wiring and most forms of asbestos are now obsolete, and new products such as exterior insulation and finish systems (EIFS) have been introduced.

Attempts to define defective construction are often problematic, frequently relying on a subjective standard of reasonableness. The State of Nevada's statutes have perhaps the most complete definition of a construction defect. This definition relates specifically to residential properties, but could apply to any property type.

A defect in the design, construction, manufacture, repair or landscaping…

1. Which is done in violation of law, including…local codes or ordinances;
2. Which proximately causes physical damage…
3. Which is not completed in a good and workmanlike manner in accordance with the generally accepted standard of care in the industry…or
4. Which presents an unreasonable risk of injury to a person or property.[1]

---

1. "Nevada Revised Statutes," Chapter 40, Section 40.615, Nevada Legislature, accessed February 24, 2016, www.leg.state.nv.us/nrs/NRS-040.html#NRS040Sec615.

BACK_DEFEXP-RR-004011

Construction defects can theoretically involve those that have caused actual damage and those with the potential to cause future damage. Actual damage may be limited to the defective component (such as broken roof tiles) or may involve resultant damage to other components (such as water intrusion because of the broken roof tiles). Defects are also classified as *patent* or *latent*. Patent defects are visible deficiencies that are apparent from reasonable observation, while latent defects are problems not apparent from reasonable observation. It is important for the appraiser to understand these nuances because market responses to them may vary.

The list of possible construction defects is almost endless. Water or moisture intrusion typically accounts for the majority of alleged construction defects, which can affect almost any part of the building envelope and its components, including the foundation, slab, exterior walls, roof, doors, windows, and plumbing. Defects might also involve structural components, soil, fire protection, electrical or mechanical systems, or other issues.

Defects can arise at any point before, during, or after the construction process and can include design defects, improper site selection and preparation, failure of manufactured components, code violations, poor workmanship, and inadequate or improper off-site improvements (drainage, landscaping, etc.). Construction problems in some cases surface after a natural disaster, resulting in substantial stresses on building components. A good example is the failure of welded connections in steel-frame, high-rise office buildings following the 1994 Northridge Earthquake in Los Angeles. Poor or inadequate maintenance can also lead to problems with buildings and appurtenant structures, but these problems are not properly attributed to defective construction.

Construction claims can involve any property type, including residential, commercial, industrial, special-purpose, and institutional buildings and public works projects. However, allegations of defective construction are most common for residential properties. Litigation in such cases can involve a single property, a group of properties, or an entire project. Lawsuits involving a large number of plaintiffs might be brought by a homeowners association (in the case of a condominium or other common interest development), or as a class action in which questions of law, fact, and damages are common to all plaintiffs. The builder/developer is typically a defendant in such actions; other parties might include design professionals, subcontractors, material suppliers, property managers, and insurance carriers. Construction defects may also be an issue in disclosure cases and may involve suits against a seller, a real estate broker, or other parties involved in a transaction.

Construction experts are normally utilized to evaluate the existence and cause of building defects, recommend repair options, and determine associated costs. Such evaluations may entail destructive or invasive testing to better understand the problems, particularly in the case of latent defects. A site visit by the valuation expert is still important, as the appraiser views the property in much the same way as a principal or agent and gains valuable knowledge to be used in sales comparison analysis. In cases involving multiple properties, observing a representative sample is sometimes acceptable in lieu of observing all properties involved in the litigation.

In most jurisdictions, damages in a construction defect case are measured by either the cost of repair or the diminution in value. The cost of repair is with-

BACK_DEFEXP-RR-004012

Copyrighted material licensed by Richard J. Roddewig June 2020



This photograph shows destructive testing on a single-unit dwelling, exposing framing and other building components that are not normally visible during an ordinary site visit or inspection.

in the purview of the construction experts and is beyond the expertise of most appraisers. The scope of the valuation expert is to analyze the market, focusing specifically on whether and to what extent alleged construction issues impact the value or marketability of the property. Simply deducting the repair cost from the baseline (undamaged) value is rarely appropriate without corroborating market data and does not provide an independent measure of damages.

## Construction Project Delay

Another common problem in the construction industry is project delay. The real estate expert must determine which methodology to use to derive indirect damages due to delays in construction schedules.

A construction project may be delayed for a variety of reasons, such as material shortages and scheduling or regulatory issues. Delays can also be a consequence of poor workmanship and construction defects.

The first step in a delay study for an income-producing property is for the appraiser or analyst to be provided with an extraordinary assumption that the subject property has sustained a delay. This information should be based on calculations by a qualified construction expert. The change to the timeline then supplies

BACK_DEFEXP-RR-004013

the analyst with the foundation for the number of days, weeks, or months that will form the basis for the ultimate damage calculation.

The appraiser or analyst must then establish a pro forma income and expense statement, which would include market-based income, vacancy rates, and fixed and variable expenses from which adjusted daily lost revenues can be derived. The analyst should be aware that it is not appropriate to use the initial absorption period for calculating the damage estimate. Revenues relating to stabilized occupancy should be used instead. Ultimately, the estimated daily lost revenue is multiplied by the total number of days of delay, as provided by the construction expert, to form a final opinion of damage.

Project delay was discussed in more detail in Chapter 2 of this book.

## Infestation

Pest infestation occurs within most real estate improvements, from commercial and industrial properties to single-family residences. A well-managed property will include a program for pest management that conforms to health codes and minimizes damage to building improvements.

Types of pests vary significantly depending on the geographic location, weather conditions, habitat, the availability of food, and breeding settings. Pests are a mild nuisance at best, and unhealthy and very destructive at worst.

According to the US Centers for Disease Control and Prevention, diseases spread by insects and rodents include West Nile virus, rabies, hantavirus, malaria, tapeworms, salmonella, typhoid fever, tuberculosis, strep, staph, polio, Lyme disease, dysentery, dengue, cholera, and the plague. Cockroach droppings have even been found to cause childhood asthma.

The National Pest Management Association (NPMA) lists ants, roaches, and stinging insects as the most common pests during summer, and mice, rats, squirrels, raccoons, and opossums among the rodents most likely to infiltrate properties during winter. The most common pest problem found in wood-frame structures is the termite. If identified in the early stages of infestation, termites can be exterminated at a reasonable cost. "Termite work" is often used as a generic term, referring to repair work done to correct infestation or damage done by wood-destroying organisms, such as dry rot, fungus, termites (of which there are various kinds), wood-boring beetles, carpenter ants, and others.

A termite report is almost certainly part of the due diligence work a potential buyer would conduct before buying a property. Before marketing a property, sellers can also obtain a termite inspection, which provides useful information about the condition of the structure and how much corrective work might be required to consummate a transaction. Local real estate market convention usually dictates who pays to correct wood pest damage during the course of a sale. Sellers often pay to repair damage and infestation that developed during their period of ownership. Buyers usually take responsibility for items called out in a report that are not active problems but that could become a problem in the future. Contracting with exterminators can limit future costs and help prevent significant damage.

BACK_DEFEXP-RR-004014

## Deferred Maintenance

Like many products, real estate improvements require periodic maintenance over their useful life. While physical deterioration is inevitable, deferred maintenance often implies excess physical deterioration associated with neglect or abuse. Deferred maintenance normally refers to curable physical deterioration that should be corrected immediately, and continued deferred maintenance frequently results in the rapid depreciation of improvements, sometimes shortening their useful life.

The effect of deferred maintenance on value can usually be observed in the marketplace. It is often measured by the cost to cure or the cost to restore the improvements to a condition typical of competitive properties of similar age in the local market.

## Chinese Drywall

The term "Chinese drywall" refers to drywall manufactured in China and imported to the United States starting in 2001. The drywall is associated with environmental health issues caused by defective manufacturing. Specifically, the material emits gases that corrode electrical, air conditioning, and other constructional components.

The US Consumer Product Safety Commission (CPSC) has received 3,770 reports from residents in 42 States, the District of Columbia, American Samoa, and



The Chinese drywall installed in this house caused the corrosion of the copper coils in this air conditioning unit.

BACK_DEFEXP-RR-004015

Puerto Rico who believe that their health symptoms or the corrosion of certain metal components in their homes are related to the presence of drywall produced in China.

The CPSC is leading the federal investigation. The US Centers for Disease Control and Prevention (CDC), the Agency for Toxic Substances and Disease Registry (ATSDR), the US Environmental Protection Agency (EPA), and the US Department of Housing and Urban Development (HUD) are providing technical support to the CPSC. According to the CPSC, the drywall was first imported to the United States in 2001, used to build or remodel homes until 2008, and may still be in use. The number and location of all homes containing imported drywall is not known but is estimated to be in the tens of thousands.

Common complaints to the CPSC and state health departments from residents who live in homes believed to contain problem drywall include a "rotten egg" smell or the smell of matches or fireworks in their homes. Issues related to metal inside their homes include blackened and corroded metal components and the need for frequent replacement of metal components in air conditioning units.

Health symptoms (also consistent with other air quality problems) can include irritated and itchy eyes and skin, difficulty breathing, nasal irritation, headaches, sinus infections, and the exacerbation of asthma.

According to the CPSC, indoor air test results have found low part per billion (ppb) levels of reactive sulfur gases, including hydrogen sulfide and carbonyl sulfide. These gases are higher in homes that contain imported drywall than those that do not. CPSC off-gassing studies also show higher emissions of reactive sulfur gases in imported drywall than drywall manufactured in the United States. Many sulfur-based compounds occur naturally in the environment, such as in swamps. Paper mills, the textile industry, petroleum and natural gas extraction, and other industries produce these gases as waste products. Cigarette smoke, septic tanks, wastewater treatment, and automobiles also emit these compounds.

Sulfur gases are colorless and have an unpleasant odor. According to the CDC, most people can smell these chemicals at levels below those known to cause adverse health effects. Exposure to high levels of sulfur-containing compounds can cause olfactory fatigue. That is, the olfactory sensing cells in the nose become saturated and no longer signal the brain that the substance is present. According to the CDC, exposure to reactive sulfur gases may result in problems affecting the eye, nose, and throat, as well as the exacerbation of respiratory problems. Less is known about chronic exposure to low levels (1-30 parts per billion) of these compounds, such as those found in the limited indoor testing conducted in homes reported to contain imported drywall.

## Americans with Disabilities Act

The Americans with Disabilities Act (ADA) was passed in 1990 to bring persons with disabilities into mainstream life. The law is actually an extension of the 1964 Civil Rights Act, which states that an employer cannot discriminate on the basis of race, color, sex, national origin, or religion. Simply stated, the ADA adds

BACK_DEFEXP-RR-004016

Copyrighted material licensed to Richard Levine for Volume 2

"disability" to that list. The ADA relates to employment issues as well as physical building features.

With regard to real estate, ADA Accessibility Guidelines are issued by the Architectural and Transportation Barriers Compliance Board and have been adopted by the Justice Department. The ADA places restrictions on many property types:

• Places of lodging, such as hotels, motels, and inns (unless the building in which the establishment is located contains no more than five rooms for rent or hire and the proprietor resides on the premises–e.g., small boarding houses)

• Establishments serving food or drink, such as bars, nightclubs, and restaurants

• Places of exhibition or entertainment, such as concert halls, movie and live theaters, and stadiums

• Places of public gathering, such as auditoriums, convention centers, and lecture halls

• Sales or rental establishments, such as bakeries, bookstores, car rental agencies, clothing stores, grocery stores, hardware stores, jewelry stores, pet stores, shopping centers, and video rental stores

• Service establishments, such as banks, barbers, beauty shops, hair salons, funeral parlors, hospitals, insurance offices, laundromats, pharmacies, travel services, and offices of lawyers, accountants, and health care providers

• Specified public transportation stations, such as depots and terminals

• Places of public display or collection, such as galleries, libraries, and museums

• Places of recreation, such as parks, zoos, and amusement parks

• Places of education, such as colleges, nurseries, private schools, and trade schools

• Social service center establishments, such as adoption agencies, day care centers, food banks, halfway houses, homeless shelters, rape crisis centers, senior citizen centers, and substance abuse treatment centers

• Places of exercise or recreation

The ADA contains a multitude of regulations on the width of hallways, the slopes of floors and ramps, parking areas, stairs, elevators, lifts, types of doors, restrooms, alarms, tables, signage, and even light switches and drinking fountains. Information on ADA guidelines is available on the ADA website at www.ada.gov or through the ADA Information Line at (800) 514-0301.

BACK_DEFEXP-RR-004017

# Legacy Hills Subdivision Case Study

*By Michael V. Sanders, MAI, SRA*

## Class VI Detrimental Condition Construction Defects

The Legacy Hills Subdivision consists of over 300 single-family homes and is part of a large neighborhood made up of relatively conforming tract homes of similar vintage. The homes in the subdivision were built in the early to mid-1990s and sit on standard lots, some with area views. These homes feature several standard floor plans ranging from approximately 1,800 square feet to 3,000 square feet, with two- and three-car garages. Properties exhibit normal levels of maintenance and are similar in overall appeal to other single-family homes in the same market area.

A construction defect action was filed in 2002 that alleged a variety of design and construction defects, including problems relating to

- Soil conditions
- Drainage
- Exterior building envelope (roof, stucco, and windows)
- Structural framing
- Plumbing
- Ventilation

A total of 85 properties were ultimately included in the litigation, although some were dismissed prior to the eventual settlement of the case in early 2005. Problems noted during site inspections were fairly minor, and many were relatively typical for 10-year-old homes.

A number of procedures were undertaken to analyze whether there was any measurable value diminution associated with the alleged construction defects. A comprehensive sales history was compiled for Legacy Hills, including all known transactions in the project. This data was displayed as a graphical time series, with comparisons to median resale prices for single-family homes in the county, the city, an adjacent city that abutted the project, and the zip code, which more or less defined the boundaries of the general neighborhood. Exhibit A provides a comparison of prices in the subject project versus the county.

The home prices in the subject project generally matched the county median price fairly well throughout the time period studied and are consistent with the behavior of home prices in most areas of Southern California during this time frame. The county median price appears to have "caught up" with the subject during 2003, although it should also be noted that this coincided with a large wildfire that destroyed several homes in the neighborhood (none in Legacy Hills). Similar time series charts were constructed for the city, the adjacent city, and the zip code; all indicated similar patterns. Exhibit B compares the overall appreciation rates indicated for the subject and each of the benchmark control areas from early 1992 through late 2004.

A number of properties involved in the litigation sold during the course of the lawsuit, and many were ultimately dismissed from the action. Five sales, however, involved properties that were not dismissed; four were sold with the

BACK_DEFEXP-RR-004018



**Exhibit A** — **Comparative Sales History—Legacy Hills vs. County Median (SFR Resale)**

Legacy Hills
County Median

Date of Sale

**Exhibit B** — **Comparative Price Appreciation—January 1992 through November 2004**

BACK_DEFEXP-RR-004019

assignment of litigation rights to new buyers, and one was sold without the assignment of rights.

Deposition transcripts as well as interviews with the real estate agents involved in the transactions were reviewed for each sale transaction. In general, none of the five homes sold with any significant damage, litigation disclosure was typically made after the buyer's offer, and no negotiations or price discounts associated with such disclosure were reported. In two cases in which litigation rights were assigned, the assignment was not executed until several months after the close of escrow.

The one sale without an assignment was to a buyer who was trading up from another home in the project, was well aware of the lawsuit, and did not wish to participate. Agents representing parties in transactions involving homes that were dismissed from the litigation also indicated awareness and disclosure of the litigation but no significant property damage or price discount.

The five homes that were not dismissed were also appraised using standard sales comparison analysis, with adjustment grids similar to those used on the Uniform Residential Appraisal Report (URAR) form. Comparables were verified to ensure that none were impacted by current or historical issues related to defective construction. Variances from measures of central tendency indicated by the market ranged from −1.7% to +2.5%, with averages (based on mean and median adjusted prices) very close to zero.

A regression model was also developed to determine whether location in the project or identification as a litigation property had any measurable impact on market value. The model used 175 neighborhood sales (including sales in the subject project) during 2003 and 2004. Relevant variables were date of sale, lot size, traffic, location, view, age, gross living area, three-car garage, and pool or spa. Coefficients were also used to support adjustments in sales comparison analysis. Coefficients associated with Legacy Hills in general, or the litigation properties in particular, were both negative, although neither was statistically significant.

Based on ample market data and several different methods of analysis, there was no evidence of value diminution associated with the subject project in general or sales of the litigation properties in particular.

BACK_DEFEXP-RR-004020

Copyrighted Material of the Board of Regents, Volume 2



# 7

# Site and Infrastructure Conditions

Class VII detrimental conditions involve soils and geotechnical construction issues. Generally, these problems are more difficult to repair than Class VI building conditions because of the challenges of assessing conditions below grade and the associated drilling, coring, and earth moving. Class VII detrimental conditions relate to site grading, compaction, slope problems, drainage, tunneling, retaining walls, and other structures designed to stabilize potential adverse soil or geotechnical conditions.

## Introduction to Geotechnical Issues

There are two basic categories of geotechnical problems. First are problems that occur naturally, such as expansive soils, subsidence, ancient landslides, and slope creep. Second are those that might be considered man-made problems resulting from improper compaction, leaking pipes, inadequate construction or drainage, and other actions, such as fracking. Both types of problems may result in cosmetic cracking, structural distress, or even complete structural failure. Some natural conditions related to geotechnical issues are addressed in Chapter 10.

A tell-tale sign of geotechnical or soils problems is structural distress, such as cracks in the foundation, walls, or site improvements. Some problems can be prevented by maintaining proper slope gradients away from building improvements and installing rain gutters and drains to divert water away from the structure. Cracks should be promptly patched, and any leaks should be quickly repaired. It is important to note that when dealing with soil or geotechnical problems, the underlying problem rather than the symptoms must be addressed. If only the symptom is corrected (i.e., the cracked foundation rather than the underlying cause), the problem may reoccur or even worsen.

To illustrate site conditions, consider Preston Manor, a low-income housing development outside of Cleveland, Ohio. The area has slightly rolling topography, and a number of small hills were graded to fill in the "valleys." The contractors did not properly compact the soils. After the homes were built, several

BACK_DEFEXP-RR-004021

experienced differential settlement. A number of foundations cracked, and the community pool leaned, causing the water level to be three inches higher on one side. Although soils engineers agreed that the soils eventually settled fully, significant damage had already occurred.

Subterranean Class VII problems often require drilling and soils sampling to determine the nature and extent of the problem. Appraisers and analysts have an obligation to consider the reasonableness of the soils report and other expert reports they rely on. Appraisers should also be aware that some remediation efforts are more effective than others. The repair costs should be compared to the benefits, and the likelihood of problems recurring should be considered. With any detrimental condition, scientific opinions are important, but the perceptions of the market ultimately drive property values.

*Geotechnics* refers to the use of engineering principles to understand the behavior and interaction of earth materials, including solid materials (rock and soil) and fluid materials (water and gases). Geotechnical expertise is often critical in design and construction, and the failure of buildings or other structures due to geotechnical problems often requires the services of an appraiser or analyst to measure loss in value. Such problems include casualty losses caused by natural forces such as earthquakes, sinkholes, and landslides, as well as man-made problems resulting from accidental damage or construction defects.

Although detailed knowledge of geotechnics is well beyond the expertise of most appraisers, an elementary understanding of some situations likely to be encountered is helpful. While geotechnical problems often involve the physical movement and associated damage of structural improvements, damage can sometimes result from other factors. When the movement of structures results in damage, the damage can be sudden, as in an earthquake, or much more gradual, as in subsidence or settlement. Because the sources of geotechnical problems are often located beneath the surface, determining the appropriate repairs and associated costs is a somewhat inexact science and there may be some uncertainty as to the effectiveness of repairs and the probability of recurrence.

Some knowledge of geotechnical issues is therefore essential for appraisers and analysts involved in this type of work. This knowledge will help facilitate communication with engineers, geologists, and other professionals, and ensure the proper evaluation of significant detrimental condition factors, including the cost of repair, loss of use, ongoing costs, incentives, and market resistance.

## Valuation Analysis

Class VII detrimental conditions can often be assessed and repaired, although doing so may require reinforced foundations or underpinning of the improvements. As with Class VI detrimental conditions, to calculate the diminution in value the analyst reviews the functional utility of the property and the repairs necessary to prevent a loss of life or property. Engineering and repair costs and the disruption of use should be considered, but only to the extent that the marketplace recognizes such costs as legitimate deductions from unimpaired value. Sometimes a

BACK_DEFEXP-RR-004022

market may accept soils or geotechnical issues as normal or inconsequential or may reflect discounts that do not relate specifically to the cost of repair.

Like Class VI detrimental conditions, Class VII conditions can often be physically corrected. In some extreme cases, there may be an ongoing condition that impacts value but cannot be fully assessed or repaired. As with Class VI detrimental conditions, the functional use of the property and the economic necessity of the repairs must be carefully reviewed.

For example, if a site has fill soil that is up to 100 feet deep and differential settlement occurs, it may not be economically or physically possible to install piles and extra building foundations to bedrock, which would support the improvements and fully mitigate the situation. As a result, it may be reasonable to expect that the property will be more prone to earthquake or continued settlement damage. A naturally occurring sinkhole may indicate a significant risk of future subsidence. In this type of situation, the value of the property may be permanently impaired. This is not true of other Class VI and VII detrimental conditions that can be economically and physically cured. In either case, market data should ultimately indicate the extent of any value diminution.

Some conditions may be so minor that they do not have any effect on value. For example, if improperly compacted shallow soils cause some minor settlement cracks in the floor area of a warehouse building and similar settlement cracks are commonly found in comparable properties with no known soils problems, the issue may not have any impact on value. This is particularly true if the occupant's use of the property is unaffected by the condition and the marketability of the space is similar to comparable properties.

## Repair Methodologies

Remediation of geotechnical problems may be accomplished by a variety of methods, including excavation and removal of defective soils, de-watering, foundation replacement or underpinning, soil grouting, and construction of retaining structures. Such remedies invariably involve engineering professionals. Still, it is important for the appraiser or analyst to get an adequate layman's understanding of the proposed solution to the problem and its estimated effectiveness.

There are three primary repairs made to cracked foundations or other structural damages caused by geotechnical or natural forces. These are

• Reinforced repair

• Underpinning

• Caissons or piles

The reinforced repair of cracked foundations involves filling small cracks by injecting epoxy. Larger cracks require a multiple-step process in which the crack is saw cut on both sides, the slab is drilled to accept steel dowels, and the area is refilled with concrete, as shown in Exhibit 7.1. Underpinning may be used in a situation in which the foundation has settled and can be lifted back into place, as shown in Exhibit 7.2. This repair is used when the soils have subsided because of

BACK_DEFEXP-RR-004023

**Exhibit 7.1** | **Reinforced Repair for Cracked Foundation**

Small cracks may be filled by injecting epoxy. Larger cracks require this four-step process.

1. Concrete is sawed back on both sides of crack.
2. Steel pins or rods are placed into holes drilled into the slab.

3. Plastic sheeting (6–10 mm) is placed on ground and covered with layer of sand.
4. New concrete is poured and leveled.

Original crack

Source: Randall Bell, *Property Owners Manual* (Laguna Beach, CA: Owners Manual Press, 2004).

**Exhibit 7.3** | **Caissons or Piles**

1. Soils are excavated, including a deep hole to house the caisson or pile.
2. Braces or supports may be put into place along with supports along the foundation.



Foundation

3. Caissons or piles, which may be over 50 feet deep, are placed by inserting steel supports into the hole and filling with concrete.
4. The excavated area is filled with concrete.

Source: *Property Owners Manual*

**Exhibit 7.2** | **Underpinning**

1. Soil is excavated.
2. Concrete platform is constructed.



Structure

3. Numerous jacks are used to lift the foundation back into place.
4. The excavated area is filled with concrete. The jacks may be removed or left in place. The process often causes significant cracking in both exterior and interior walls, which are then repaired.

Source: *Property Owners Manual*

hillside construction, drainage problems, expansive soils, or improper soil compaction. With the most serious geotechnical problems, caissons (columns with a widened base) or piles (columns only) may be used to set the structure upon firm bedrock or to prevent soil movement in a hillside area. These structures may be 50 feet or more in depth and several feet in diameter. Both caissons and piles are constructed of steel-reinforced concrete, as shown in Exhibit 7.3.

## Types of Geotechnical Issues

### Sulfates and Corrosive Soils

Building foundations are typically constructed of concrete, a material whose service life and durability can be impacted by many factors, including environmental exposure to frost, fire, or deleterious compounds of sulfates or chlorides. Sulfates are naturally occurring mineral salts in sedimentary rock and

BACK_DEFEXP-RR-004024

Copyrighted Material licensed to Richard Ferris flight 2024 one 21



Core samples are taken to determine the thickness and quality of the concrete and foundation construction. Here two workers are drilling samples for analysis.

some soils. They are acknowledged as corrosive. A chemical reaction between the cement and sulfate salts results in the deterioration of concrete when sulfates are present in sufficient concentration.

The effects of sulfates on concrete have been known for many years and can usually be prevented by using the proper cement type, water-cement ratio, or admixtures that make the concrete less permeable and more resistant to sulfates. Moisture barriers are also helpful in protecting concrete from sulfate damage, although common plastic moisture barriers often lack integrity, particularly when penetrations are necessary for plumbing or mechanical systems.

Other natural compounds may also attack concrete. This has been noted particularly in areas previously used for dairy operations. Slabs and other large expanses of relatively thin concrete are most vulnerable, although footings have also been known to sustain damage due to the action of sulfates and other corrosive materials. Furthermore, non-porous soils may not allow adequate drainage and may cause "pooling" of water in yard areas or basements.

## Expansive Soils

Expansive soils are generally soils with a high clay content that experience volume changes in response to changes in moisture. Such soils tend to expand when wet and shrink when dry, and they are capable of generating forces that can easily lift buildings. Some estimate that expansive soils cause more damage

BACK_DEFEXP-RR-004025

annually than the combined impact of floods, hurricanes, tornadoes, and earthquakes. Differential movement is the main problem with expansive soils, especially when the soils are allowed to become saturated or dry at varying locations. Heavy vegetation, especially large trees, planted in expansive soils close to buildings are particularly troublesome because they draw large quantities of water, which can dry the soil and undermine support for adjacent structures.

## Soils Movement and Settlement

While buildings may be founded on bedrock or have loads that are transferable to bedrock via caissons or piles, many structures are built on unconsolidated material (i.e., soil) where bedrock is too far below the surface to feasibly provide support. Imposition of vertical loads to the ground results in consolidation of the soil, causing many buildings to settle. Modern construction invariably makes an allowance for normal settlement, which is considered acceptable if not excessive or differential.

Uniform settlement is considered excessive only if it is so severe that it threatens underground infrastructure (e.g., utilities, pipelines) or disrupts surface drainage. Differential settlement is generally much more problematic and tends to produce the greatest damage to structural improvements, as shown in Exhibit 7.4. The Leaning Tower of Pisa in Italy is perhaps the best-known example of this phenomenon.

Differential settlement can occur on both natural and filled soils, but it is generally more prevalent on filled ground, particularly with deep fills and differing fill thicknesses. Differential settlement is also common where cut-and-fill grading is used on hilly topography. Settlement may also occur when there is a buried stratum of weak soil beneath a site. This is particularly true of organic soils, which can hold many times their weight in groundwater, and are commonly found in bogs, marshes, peat, and swamps. These soils are often not detected at the time of original construction and are particularly prone to settlement and associated structural failure.

### Liquefaction

Liquefaction is a soil condition that is strongly associated with seismic activity. It is a temporary loss of shear resistance in the soil, which is transformed into a fluid mass (similar to quicksand) during an earthquake. Liquefaction occurs almost exclusively in water-saturated sandy soils that are exposed to strong tremors, causing the soil to lose strength as water pressure increases and absorbs more load, predictably impacting the structural integrity of buildings. In California, governmental agencies publish maps showing known liquefaction zones.



**Exhibit 7.4**    **Differential Settlement**

Cut Soil | Area of Cracking | Differential Settlement | Fill Soil Improperly Compacted | Cracking and Slippage

Source: *Property Owners Manual*

BACK_DEFEXP-RR-004026



Geotechnical problems are as old as civilization itself. The ancient city of Machu Picchu in Peru has suffered from ground settlement problems. The stones that normally fit so well that a knife blade would not fit in between them are now separating in some areas because of differential settlement.

## Slope Movement

*Slope movement* is an all-inclusive term encompassing both sudden movements, popularly known as *landslides*, and more gradual movements, such as slope creep. Slope movements are often classified by type of failure, including falls, topples, slides, spreads, and flows. Slope movement is usually a natural occurrence due to the force of gravity, but it can be amplified by increased loading from buildings or the accumulation of moisture.

Slope instability often develops slowly over time, and sudden landslides are usually the result of a critical event, such as an earthquake. Changes in groundwater conditions from overwatering, water retention from devegetation, and heavy rainfall are frequently to blame for landslides, causing an increase in the effective weight of the soil and weakening unconsolidated materials.

Slope movement involving deep failures frequently occurs on the site of ancient landslides, which are inherently unstable and can be reactivated by head loading (grading on top of the hill) or toe removal (excavating the bottom of a hill). Unstable natural slope conditions often involve sedimentary bedrock and layers of clay. These conditions can usually be mapped with topographic interpretation of aerial photographs, but they are sometimes missed during preliminary site investigations, leading to subsequent structural failures that can occur many years after original construction.

Slopes composed of clay soils are most susceptible to shallow failures, due to both a decrease in the frictional resistance of saturated soils with a high content of clay minerals and a decrease in permeability when compared to sandy soils.

BACK_DEFEXP-RR-004027

The expansive qualities of clay soil are also instrumental in generating slope creep, in which soil slowly moves outward and downward during successive cycles of wetting and drying.

## Landslides

Landslides, sometimes called *landslips* or *mass wasting* by geologists, are one of the most serious, and yet least publicized, soils conditions. Although large landslides occur infrequently, they have the potential to cause enormous loss of life, property, and resources. For example, in 1959 a rock landslide occurred in British Columbia and the debris reached speeds of up to 360 kilometers per hour. During a 1903 rock landslide in the coal mining town of Frank, Alberta, 90 million tons of limestone detached from Turtle Mountain and buried part of the town, resulting in the deaths of about 75 people. In the United States, it is estimated that landslides cause in excess of $1 billion in damages and 25 to 50 deaths each year. Globally, landslides are the cause of hundreds of billions of dollars in damages annually and have been responsible for hundreds of thousands of deaths and injuries. The well-known 1980 landslide at Mount St. Helens in the state of Washington is the largest in recent history, although the deadliest was an earthquake-induced slide that killed 40,000 to 50,000 people in western Iran in 1990.



A landslide at La Conchita, north of Ventura, California, killed 10 people and destroyed 36 homes in this small community in January 2005, coming almost a decade after a similar but less destructive landslide at the same location in 1995.

BACK_DEFEXP-RR-004028

*Copyrighted Material Licensed to Richard Roat on 03/06/2012 June 2016*

Landslides can be doubly costly and dangerous in that they are usually accompanied by, or even caused by, another major natural disaster. Excessive precipitation can cause landslides in sloped areas where vegetation is scarce as a result of wildfires. Avalanches caused by heavy snows and lava flows resulting from volcanic eruptions are also forms of landslides. Oceanic landslides can result in tsunamis.

### Types of Landslides

Some common terms describing different types of landslides include *avalanches*, *lava flows*, and *mudslides*. However, geologists have a seemingly endless list of terms describing different types of landslides. These terms differentiate between the composition of the landslide (soil, lava, snow, etc.), speed, volume, and cause, as well as many other factors. A change in one of these factors affects the behavior of the landslide and thus the term geologists use to describe it. At the macro level, the most common landslides are creep, slump, earthflow, slope failure, and debris flow.

*Creep* is the indiscernibly slow movement of soil and near-surface rock materials downslope. As is implied by this definition, the process is generally not directly observed. Instead, the movement can be best detected through the movement or response of objects affected by the process, such as walls, utility poles, fences, and concrete slabs. When under the influence of a creep, fence posts will tilt downslope and, if enough time passes, may approach a horizontal position. Small trees on a slope experiencing creep likewise display the landslide effects. As the trees' trunks are progressively tilted over by creep, their new growth responds phototropically upwards towards the sun, leading to curvature of the trunk. Doors or windows may stick or jam for the first time. New cracks may appear in plaster, tile, brick, or foundations. Outside walls, walks, or stairs may pull away from the building. Slowly developing, widening cracks may appear on the ground or on paved areas such as streets or driveways. Underground utility lines may break, or bulging ground may appear at the base of a slope.

A *slump* is a much quicker type of landslide. A slump is the movement of a large block of earth material through downward rotation along a curved surface of failure, similar to a snowball rolling downhill. Slumps are especially common where clay-rich materials are exposed on overly steep slopes, such as on river cutbacks or on highway roadcuts.

A slump with little or no rotation of the mass involved is called an *earthflow*. An earthflow is the downslope movement of water-saturated, clay-rich materials. In contrast to a slump, the mass "slides" downhill as opposed to "rolling" downhill. However, many slumps terminate in earthflows. The sliding mass moves along a shear surface that generally parallels the slope surface.

*Slope failure* is a term used to describe a landslide with properties of both a slump and an earthflow. Rolling of the mass downhill and sliding both occur in slope failures. As is true of most landslides, heavy snowmelt or rains contribute to the magnitude of the landslide. Fast-moving landslides commonly start out as a coherent mass but may break up into a debris flow if enough distance is covered and enough water is present. The term *debris flow* implies that a fluid mass

BACK_DEFEXP-RR-004029

is moving down a slope. Debris flows look and act like wet, flowing concrete and contain about 30% water. Large debris flows can reach velocities of more than 110 miles per hour on the steepest slopes. Smaller debris flows (i.e., the small, narrow flows that descend steep slopes after a heavy rain) commonly move at 10 to 20 miles per hour.

### Contributing Factors

Although gravity acting on an overly steep slope is the primary reason for a landslide, there are other contributing factors:

- Erosion by rivers, glaciers, or ocean waves helps to create steep slopes that increase the chance of a landslide. Rock and soil slopes can be weakened through saturation by snowmelt or heavy rains. When slope materials become saturated with water, a debris flow or mudflow may develop. The resulting slurry of rock and mud may pick up trees, houses, and cars, thus blocking bridges and tributaries as well as causing flooding along its path.

- Earthquakes can create stresses that make already weak slopes fail or cause weaknesses in slopes where there were previously none. Vibrations from machinery, traffic, blasting, and even thunder can, to a lesser degree, have the same effects as an earthquake, causing weak slopes to fail.

- Volcanic eruptions produce loose ash deposits, heavy rain, and debris flows as the force of the eruption throws vast amounts of earth into the air. Additionally, excess weight from the accumulation of rain or snow, stockpiling of rock or ore from waste piles, or man-made structures may stress weak slopes to failure, causing landslides of varying magnitude.

- As weathering and erosion play a major part in the risk of landslides, the prevailing rock type in an area determines how susceptible the area is to erosion. In general, quartzite is the most resistant rock to weathering. Granite will weather faster than quartzite. Basalt tends to weather faster than granite. Limestone tends to erode faster than quartzite, granite, or basalt, and sedimentary evaporates (salt rock) tend to weather fastest of all. Although the physical causes of many landslides cannot be removed, geologic investigation, good engineering practices, and effective enforcement of land-use management regulations can reduce landslide hazards.

In general, any area composed of very weak or fractured materials resting on a steep slope can and will likely experience landslides, which occur in every state and US territory. The Appalachian Mountains, the Rocky Mountains, the Pacific Coastal Ranges, and some parts of Alaska and Hawaii have significant landslide problems. Other areas prone to landslides include existing old landslides, areas on or at the base of slopes, areas in or at the base of minor drainage hollows, areas at the base or top of an old fill slope or steep cut slope, and developed hillsides where leach field septic systems are used. In contrast, areas that have a lower risk of landslides include areas on hard, non-jointed bedrock that have not moved in the past, sites on relatively flat-lying areas away from sudden changes in slope angle, and areas set back from the tops of slopes.

BACK_DEFEXP-RR-004030

Copyrighted material reviewed by Richard J. Roddewig, June 2021

As an example of a landslide's potential effects, consider two landslides, the Paty-Alani and the Hulu-Woolsey, which damaged and destroyed approximately 150 homes in a large residential neighborhood of Honolulu, Hawaii. The area, known as Manoa, was originally developed in 1951. It is considered a premier area, and many of the homes in this area have an outstanding view of downtown Honolulu and the ocean. The ground movement was first noticed in approximately 1981 and continues today. The slow-moving slippage has caused the ground to heave or sink several feet over a period of several months or even years. As a result, many homes have slowly sunk, tilted, crumbled, or fallen down the hillside, and some streets have a dramatic "rollercoaster" effect. The city began remediation efforts in 1986.

At first, the city considered condemning numerous homes at a cost of $10 to $15 million, but it later opted to attempt to repair and reinforce the soils. This effort is ongoing. Most agree that the slippage is due to water-saturated soils; however, the source of the water is disputed. Some contend that the soils saturation was caused by heavy rains, which in turn caused water and sewer lines to burst. Others feel that the water and sewer lines were not installed and maintained properly, causing them to burst and thereby saturating the soils.

When evaluating a property in a landslide area, consideration should be given to the risk of a landslide, the magnitude of that landslide, and the possible effects the landslide could have on the area. Basic information on landslide risks can usually be obtained from the county geologist or county planning department



What was once a covered carport is now a crumbled section of walls.

Copyrighted material reviewed by Richard J. Roddewig, June 2021

BACK_DEFEXP-RR-004031



With their foundations undermined from the Manoa landslide, some homes require bracing to prevent their collapse.

in the area. Additionally, the United States Geological Survey (USGS) produces landslide susceptibility maps for many areas in the country, which can be helpful in assessing the risk of landslides in a specific area.

To mitigate the losses to properties threatened by a landslide, steps can be taken to reduce the risk of landslide damage, such as planting appropriate ground cover on slopes and building structures to channel drainage and retain potentially unstable slopes. In mudflow areas, channels can be built to deflect the flow around buildings. Caissons and piles can also be used to support buildings and retain slopes. Paired sales, case studies, or other analyses are typically used to measure the potential loss in value if a property is impacted by a landslide threat.

In Manoa, many homes collapsed completely, and the sites were considered unbuildable. Therefore, they suffered a total loss of value. Many more homes have suffered a variety of structural damages from cracked walls, fallen carports, sunken fences, cracked foundations, and tilting. While many homes have not been impacted, most residents have found it virtually impossible to sell their properties. However, there were seven home sales from 1989 to 1997 reflecting deep discounts, with prices ranging from $150,000 to $398,500 in an area that would normally command prices of $500,000 to $1 million.

## Strip Mining

According to the Office of Surface Mining Reclamation and Enforcement (OS-MRE), strip mining is a type of surface mining that involves excavating earth,

BACK_DEFEXP-RR-004032

Copyrighted material licensed to Richard Grant Rigazio by Thomson Reuters (Scientific), Inc.

rock, and other materials to uncover a tabular, lens-shaped, or layered mineral reserve. Strip mining is the opposite of underground mining, in which the overlying rock is left in place and the mineral is removed through tunnels.

The mineral extracted is typically coal or other rocks of sedimentary origin. The mineral is extracted after the overlying material, called *overburden*, is removed. The excavation of overburden is completed in rectangular blocks called *pits* or *strips*. The pits are parallel and adjacent to each other, with each strip of overburden and the mineral beneath extracted sequentially. The mining process uses both equipment and explosives.

The process involves moving overburden laterally to an adjacent empty pit, where the mineral has been excavated. This lateral movement is called *casting* or *open-casting*. Strip mining may also be called *open-cut mining*, *open-cast mining*, or *stripping*.

The Surface Mining Control and Reclamation Act of 1977 created two programs to regulate the environmental effects of coal mining, one for regulating coal mines and the other for reclaiming abandoned mines. First, the Office of Surface Mining Reclamation and Enforcement (OSMRE) is a bureau within the US Department of the Interior created in 1977 when Congress enacted the Surface Mining Control and Reclamation Act. The OSMRE is responsible for establishing a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.

Second, the Surface Mining and Reclamation Act of 1977 also established a fund to pay for the cleanup of mine lands abandoned before the passage of the statute. The act was amended in 1990 to include mine lands abandoned after 1977.

## Erosion

While clay soils are often a contributing factor to slope instability, erosion can be a problem in areas of sandy soil. Erosion is most prevalent along coastal beaches, lakeshores, and coastal bluffs. Erosion can be generated by a number of factors, primarily water and wind, and can act on both rock and soil.

Revetments and seawalls are structures often placed on embankments or bluffs to protect against erosion by waves or currents, and seawalls may also extend into the water to provide additional coastal protection (breakwater). Such structures may be constructed of rigid concrete or stone, or of more flexible stone riprap or interlocking concrete blocks.

## Subsidence and Settlement

Subsidence is related to settlement and often caused by the extraction of underlying minerals, water, oil, or natural gas. While settlement is usually a localized condition, subsidence is normally spread over a wide area and may have less impact on individual properties. Even so, subsidence over a wide, low-lying area might lead to increased risk of flooding. Extraction of minerals or other materials is often accompanied by the injection of water to replace the material removed, which is designed to minimize subsidence. Sinkholes are a related, but much more localized, phenomenon.

BACK_DEFEXP-RR-004033

Where the topography is rolling or sloped, it is common for the higher areas to be "cut" by earth-grading equipment, such as bulldozers, and for those cut soils to be used to fill in the void's lower areas. Often, the cut areas are stable, as the new cut surface is naturally compacted; however, the fill areas must be properly compacted. If they are not, the fill areas may settle over time and cause differential settlement.

BACK_DEFEXP-RR-004034

*Copyrighted Material Owned by Richard J. Roddewig, June 2024*

# BENEDICT CANYON LANDSLIDE CASE STUDY

*By Randall Bell, PhD, MAI*

## Class VII Detrimental Condition
## Landslide

The subject property is a single-family residence containing 3,946 square feet of living area, four bedrooms, three bathrooms, and a pool on 6.23 acres of land in the Benedict Canyon area of Los Angeles, California. This area is well-located and has proximity to schools, shopping, employment, and other amenities. The area generally has very good appeal. The subject property was purchased by the current owners, David J. and Anita B. Lowd, on January 4, 1979, for $1,130,500. The property sits at the base of a large canyon, and the mountains to the rear rise approximately 1,500 feet above the grade of the subject property.

On four occasions during winter rain storms over the prior three years, the property was damaged by large volumes of mud, rock, and debris that flooded the home and general area. The debris came from the canyon walls above, which had been stable for all recorded history until the local fire department graded fire roads at the ridge of the mountains. These fire roads were installed without any engineering and have caused tremendous erosion, which has funneled down the canyon into the subject property. On multiple occasions, the house was partially destroyed by debris measuring over eight feet in height. The pool was filled with



A *revetment* is a structure constructed to hold back mud or debris flows. While a revetment can be effective, it is also very expensive and requires tremendous upkeep with each incident.

BACK_DEFEXP-RR-004035

mud and rock debris, and part of the house was flooded. The property underwent extensive refurbishment by the owner. The property also has an extensive revetment (a fenced area with multiple dams), which is designed to retain mud, rock, and debris in the event of another landslide.

## Market Value As If No Detrimental Condition

The value as if no detrimental condition exists was determined by the traditional appraisal process using the sales comparison approach and the cost approach. Value was estimated at $1.5 million. In its current condition, the subject property is an attractive single-family residence. However, the revetment distracts from the canyon characteristics and location.

## Market Value As Is

In completing the report, the appraiser visited the subject property and reviewed an engineering geologic report prepared by Anderson Geo-Soils, Inc. (dated August 1, 1993). The appraiser also researched, observed, and photographed various improved comparables, and spoke with 12 brokers who have been involved with similar Class VII detrimental condition situations specifically involving flooding and landslides. Additionally, research was conducted regarding numerous sites involving flooding and landslides throughout the Southern California area to estimate the loss in property values as a result of flood damage.

After the site visit to the subject property, a review of photographs and videos showing the flood and landslide damages, and an observation of adjoining canyon areas, the appraiser concluded that the subject property has no value in its current condition.

This conclusion was drawn for the following reasons:

1. The condition that originally caused the flood and landslide damage is located off the subject site, thereby preventing the current owner from making the repairs necessary to prevent future damages.

2. The cause of the damages requires very significant repairs at a high cost in relation to the value of the subject property.

3. The historical damages were severe, resulting in damage to the structure of the residence (over $50,000 per incident).

4. The cost of removing debris for each incident is high (over $75,000), and the cost of installing and maintaining the revetment is also high in relation to the overall property value.

5. A risk to life and personal property exists for occupants of the residence. The piles of debris have exceeded eight feet and could seriously injure or kill a person within its path.

6. There may be a liability, or perceived liability, if future landslides pass over the subject property and onto adjoining properties.

Based on these factors, it is concluded that a reasonable buyer would not purchase the property at any price, since the costs, inability to make repairs, risks to life and property, and possible liability exceed the value of the residence.

## Value As If Repaired and Indemnified

In the event that the causes of the flood and landslide damage are repaired to the satisfaction of qualified engineering professionals, a residual loss to

BACK_DEFEXP-RR-004036

property value may remain due to the perceptions of the market.

Because of the severity of the historical problems, a potential buyer would likely be hesitant to purchase the property at its full market value when other properties are available that do not have any past incidence of severe flooding and landslides. This hesitancy would likely be due to perceived risks of human judgment in making the repairs, as well as the general unpredictability of nature and related natural disasters.

In order to entice a potential buyer upon the completion of repairs, a discount to the market value would be warranted. In order to quantify this market resistance, various homes and areas involving flooding were studied, and local brokers were surveyed. These areas included Blue Bird Canyon, Mystic Canyon, and Laguna Canyon in Laguna Beach; Temecula; Murrietta; Anaheim Hills; and Malibu.

Of those areas studied, the loss in value ranged from 0% to 50.2%, based on the severity of the problem and the value of the property. In extreme cases, when repairs were yet to be completed, homes were considered to be "unmarketable." A summary of the market data follows.

### Market Resistance—Flood-Damaged Homes Sold After Repairs

| Study | Market Resistance* | Comments |
|---|---|---|
| Blue Bird Canyon, Laguna Beach | | |
| Property A | 6.4% | Minor damage |
| Property B | 2.2% | Minor damage |
| Property C | 32.4% | Major damage, no warranty |
| Mystic Canyon, Laguna Beach | | |
| Property A | 9.8% | Minor damage |
| Property B | 50.2% | Major damage, no warranty |
| Property C | 5.0% | Minor damage |
| Property D | 22.3% | Major damage, warranty |
| Laguna Canyon, Laguna Beach | | |
| Property A | 18.7% | Major damage, warranty |
| Property B | 19.9% | Major damage, warranty |
| Temecula | | |
| Property A | 12.0% | Moderate damage |
| Property B | 4.2% | Minor damage |
| Murrietta | | |
| Property A | 14.5% | Reflooding unlikely |
| Anaheim Hills | | |
| Property A | 27.1% | Major damage, unsure slope |
| Property B | 25.5% | Major damage, unsure slope |
| Malibu | | |
| Property A | 0% | On ocean, accustomed to storm damages |
| Property B | 7% | Minor damage from landslide |
| Property C | 0% | On ocean, accustomed to storm damage |

* Market resistance is computed as the estimated loss, as a percentage of the property value unimpaired, of a fully repaired property that has sold with a history of landslide or flood damage.

BACK_DEFEXP-RR-004037

Based on interviews and other information, it is estimated that a 20% loss in value would be applicable to the subject property located in Benedict Canyon, in the event that repairs were made. This assumes that the property owner is fully indemnified by those making the repairs against any future damages. This loss in value would not likely diminish significantly for several years, and then only after several heavy rains that demonstrate to potential buyers the true effectiveness of any repairs.

### Conclusion

| | |
|---|---|
| Market value as if no detrimental condition | $1,500,000 |
| Market value "as is" | No value—liability |
| Market value as if repaired and indemnified | $1,200,000 |

BACK_DEFEXP-RR-004038

*Copyrighted material reproduced with the standard permission of the 2x*



# 8

# Environmental and Biomedical Conditions

There are a wide variety of environmental and biomedical issues that can affect properties, including air, water, and soil pollution. When dealing with environmental pollution and its impact on a specific property, three broad categories of contaminants must be considered.

- Building contaminants
- Soil contaminants
- Water contaminants

Building contaminants are categorized as hazards that are part of or contained within the improvements. Building contaminants include asbestos, radon, lead paint, and formaldehyde. Soil and groundwater contaminants include hydrocarbons, solvents, chemicals such as pesticides and herbicides, and other toxins that threaten the environment. It is entirely possible for the same contaminant to be found in buildings, soils, and groundwater. For example, lead-based paints can be found in many buildings, and lead can also be found in soils and drinking water. Also, although asbestos is most commonly associated with asbestos-containing building materials, it is possible for asbestos to contaminate soil.

## Contaminants in Building Improvements

Exhibit 8.1 lists contaminants that are commonly found within property improvements. The main risk associated with these hazardous materials is the potential for direct human contact. A child may eat lead paint chips, asbestos fibers may be inhaled by the occupants of an office building, or radon gas or formaldehyde fumes may be inhaled by a family in their home.

A laboratory analysis is almost always required to determine the presence and concentrations of building contaminants. Assessments are easier to conduct for improvements than for soil because the materials are easily accessed above grade. Remediation is often easier as well because the necessary work is conducted above grade.

BACK_DEFEXP-RR-004039

**Exhibit 8.1**    **Environmental Conditions Within Building Improvements**



Various remediation methods for dealing with contaminated properties include encapsulation, enclosure, immediate removal, capping, staged removal, or an operations and management program with removal upon demolition.

## Soil and Groundwater Contamination

*Soil contamination* is a general term that sometimes includes the contamination of both soil and groundwater. The contamination may consist of materials in a variety of locations, such as on or near the soil's surface, as is often the case with heavy metals or asbestos. Gases or vapors can form from volatile materials in the subsurface or can be found within subsurface soils, which is typical for leaking underground storage tanks (LUSTs). Contaminants may impact the groundwater in a dissolved state, as a separate phase, or in both forms. Various forms of soil contamination are illustrated in Exhibit 8.2.

The danger with some contaminants, such as lead or asbestos, is that they are found on the surface of the soil and can be ingested by humans or animals. If a contaminant is capable of being absorbed downward into the soil, the main concern is risk to the groundwater, water supply, or aquifer, which is an underground layer of soil, rock, or sand that contains water. If the groundwater is contaminated, then the contaminants may be ingested by humans, animals, or plants and cause a variety of health-related problems. When mixed with groundwater, some contaminants dissolve, some float on the surface, and some sink to the bottom in the same way that oil and vinegar in salad dressing separate. These attributes may create additional problems in terms of assessing and remediating the contamination. On the other hand, if the groundwater is not used as a drinking water supply, or if well-head treatment is installed, many or all of these

BACK_DEFEXP-RR-004040

**Exhibit 8.2**  **Contamination in the Soil**



Source: Randall Bell, *Property Owners Manual* (Laguna Beach, CA: Owners Manual Press, 2004).

concerns may be alleviated. Environmental engineers will ultimately determine the risks and related mitigation measures needed.

## Source/Non-Source/Adjacent/Proximate Site[1]

A critical issue in evaluating an environmentally contaminated property is identifying whether it is a *source, non-source, adjacent,* or *proximate site* (SNAP) property. A *source site property* is defined as the site from which the contamination was released. An example of a source site is a service station with a leaking underground storage tank. A *non-source property* is contaminated, but the contamination originated from another property (the source site). An example of a non-source property would be a doughnut shop located next to a contaminated service station in which the contamination has migrated off site and under the doughnut shop property. An *adjacent property* is not contaminated, but it shares a property line with a property that is contaminated. A *proximate property* is not contaminated and not adjacent to any contaminated property; however, it is in

---

1.  This discussion originally appeared in "The Analysis of Environmental Core Studies" by Thomas Jackson, PhD, MAI, and Randall Bell, PhD, MAI, in *The Appraisal Journal* (January 2002): 86-95.

BACK_DEFEXP-RR-004041

the same general neighborhood as a contaminated source site property. These distinctions are essential in accurately evaluating contaminated properties, because the risks vary considerably between the categories. Source sites have a much different set of environmental risk factors than non-source or adjacent properties. Generally, the source property owners or prior owners are responsible for the remediation of the contamination. The costs and risks of cleanup and regulatory oversight are far greater for source site properties than any other type of property, so comparing a source site property case study to a non-source, adjacent, or proximate property could be misleading. Accordingly, if the subject property is the source of the contamination, source site case studies would provide the most meaningful comparisons. Inferences drawn from source site case studies relative to a non-source site subject may be biased and may overestimate environmental impacts.

## Permitted vs. Accidential Discharges

In the industrialized world, vast quantities of contaminants are produced every day. However, contaminants that are considered *permitted discharges* should be distinguished from those that occur by accident. A permitted discharge includes governmentally allowed releases such as industrial discharges into a body of water, automobile exhaust, washing machine discharges, landfills, and deep soil discharges or storage. *Accidental* or *illegal discharges* include leaking underground storage tanks, oil tanker spills, and improper dumping. There are critical distinctions between these two types of discharges. Permitted discharges do not generally involve any level of remediation, while an accidental discharge may require remediation if the quantity of contamination rises above the actionable levels set by governmental agencies. Accidental discharges may be subject to fines and sanctions, while permitted discharges generally are not. The release of a potentially hazardous substance under a legally authorized permit with regulatory oversight has a much different set of risk characteristics than the release of hazardous materials from an unplanned or accidental explosion or leak. Market risk perceptions are related to unknown information, and an accidental release has many more unknown factors (cleanup costs, off-site impacts) than a planned release of materials that has been reviewed and permitted by the appropriate regulatory authority.

## Level of Contamination

While perhaps initially startling to some, a simple reality of industrialized society is that virtually all air, water, and soil are contaminated to some degree. Car emissions alone contaminate the air, water, and soil. Asbestos is a naturally occurring substance, and everyone breathes some asbestos fibers daily. Sewer pipes often leak and contaminate soils. These low-level situations are termed *background contamination.* The critical factors in this regard are the standards established by the appropriate regulatory authority. Various governmental agencies set "actionable levels" providing that when some contaminants meet

BACK_DEFEXP-RR-004042

or exceed a certain level, there must be action on the part of a responsible party to remediate the condition. Many agencies tailor their standards to the property type and risk exposure characteristics of the property and surrounding area. These standards are also typically tied to risk-based cleanup action (RBCA) requirements that have been adopted by many states. Thus, rather than asking, "Is a property contaminated?" more valid questions to ask would be, "What is the level of contamination?" "Is the contamination really a risk?" or "Does the level of contamination exceed governmental standards?"

## Toxicology

*Toxicology* is often defined as the science of poisons or the study of the harmful effects of chemicals on living things. Within the context of contamination, toxicology is more rightly viewed as a way to define and quantify the adverse effects of chemicals in order to establish safe human exposure levels. The latter definition is more appropriate because our society has chosen to live with a broad spectrum of chemicals, some of which have the potential to cause harm or death. An important distinction exists between the terms *hazardous* and *toxic*. For example, table salt is generally not considered hazardous, but if ingested at high levels it becomes toxic. Likewise, gasoline is a hazardous substance but is considered toxic, again, only if ingested at certain levels. A hazardous material is considered toxic only if it becomes *bioavailable*, meaning that harmful levels come into contact with humans.

A particularly important set of safe exposure levels was set forth by the Environmental Protection Agency (EPA) in its Drinking Water Standards in the 1996 publication EPA 822-B-96-002. This government document lists over 250 elements or compounds and includes maximum contaminant levels (MCLs) for about 100 of them. The MCL is the maximum concentration of a substance allowed in drinking water, usually expressed as milligrams or micrograms per liter (mg/L or ug/L) or parts per million or per billion (ppm or ppb). Because one of the primary goals of environmental policy is to protect drinking water resources, MCLs often play an important role in establishing cleanup goals.

### Area Bioavailability/Risk Exposure[2]

Contamination generally can impact one of three broad categories: air, surface, or subsurface. These categories can be further broken down into six areas:

- Air
- Water
- Building improvements
- Surface/shallow soils
- Groundwater aquifers
- Deep soils

2. Ibid.

BACK_DEFEXP-RR-004043

These categories are relevant because of the concept of *bioavailability*, or the extent to which a contaminant becomes available to humans or the plants and animals of a region in general. Air pollution would be considered to have a relatively high level of bioavailability. Contaminants that are restricted to deep soils may have no bioavailability, but they may also be more difficult to access. These categories are regarded quite differently by regulatory agencies due to their different levels of health risk exposure. Simply put, when there is no exposure risk, there should be no environmental risk that reduces the value of the real property. Newer risk-based cleanup standards treat sites with limited exposure differently from sites in which the exposure is more immediate and of more serious concern. For example, hazardous materials that are trapped thousands of feet underground are different from sites with hazardous materials in shallow groundwater or exposed soil. The risk levels, the level of market concern, and the resulting effects on property value for these two examples would differ greatly.

Environmental engineers frequently use the following formula, which has applicability to property valuation as well:

$$\text{Toxicity} \times \text{Exposure} = \text{Risk}$$

In other words, if the contaminant is at low levels, or if there is a low risk of exposure, the overall risk of the situation is generally considered low. Conversely, if both the toxicity and exposure are high, so is the risk. Exposure is a critical element in evaluating the legitimacy of an environmental claim.

## Geology and Hydrogeology

The sciences of geology and hydrogeology enable environmental engineers to understand the structure of the subsurface and how groundwater and contaminants move through that structure. The reason that these sciences are important is that one of the focal points of environmental engineering is the protection of drinking water resources. Groundwater is a major source of the water used for drinking and irrigation, and it accounts for 40% of the water consumed in the United States.

When contamination enters a site, it typically first sinks into the soil. There, gravity prompts the contaminant to continue its path downward. Most contaminants move quickly through porous layers like sand and gravel and are slowed by clays, but all contaminants generally continue their descent under gravity's influence. When a descending plume of contaminant runs into an aquifer, its direction of travel may change significantly. Movement of water within the aquifer is generally horizontal rather than downward. Thus, when the plume reaches the aquifer, it makes a turn and starts to migrate to the side, often toward other properties. Once the moving plume crosses a property line, it has carried contamination to the property of others.

### Floating and Sinking Contaminants

Water is known as the universal solvent because it dissolves most contaminants and many hydrocarbons. A dissolved contaminant is said to be in the *aqueous phase*. Once the water has dissolved all it can, the contaminant then begins to

BACK_DEFEXP-RR-004044

develop a separate layer of undissolved material, a non-aqueous phase liquid (NAPL). Materials that are less dense than water are called *light non-aqueous phase liquids* (LNAPLs). They float and accumulate near the upper water surface, which makes them relatively easy to find. In contrast, some contaminants sink in water because they are more dense than water. These dense non-aqueous phase liquids (DNAPLs) are usually harder to find and treat than LNAPLs.

## Environmental Regulations

Class VIII detrimental conditions relate to all environmental conditions that may affect the improvements, site, subsurface, or even air space. Contamination can result from a variety of pollutants being emitted in a number of ways. Some contaminants are released into the air through factory or vehicle emissions. Others are discharged or spilled onto the ground or directly into oceans, lakes, or rivers.

Modern society depends on many hazardous substances. Fuels are needed for automobiles and to heat buildings. Solvents are necessary for manufacturing processes and the dry cleaning of clothes. Other chemicals are needed to control agricultural pests and weeds, to ensure that paint goes onto surfaces smoothly, or to make plastic bags that keep food fresh. In years past, society was largely ignorant of the health effects of hazardous materials, but as more was learned, it became apparent that contaminants are directly responsible for a variety of diseases and health problems. These and other revelations have prompted new laws and regulations, many of which may impose severe financial burdens on property owners, lenders, and tenants.

### Laws and Regulations

While environmental laws were established for many decades before the 1960s, the public was jolted into awareness of the detrimental effects of contamination in the early 1960s with the publication of the book *Silent Spring* by Rachel Carson. In this book, the author reported on the insecticide DDT and how it entered the food chain and caused the thinning of egg shells, which in turn caused eggs to break before hatching. This book is generally acknowledged as a catalyst for the creation of the modern environmental movement, which spawned a network of new federal, state, and local laws and regulations, as shown in Exhibit 8.3. Two of the more recent laws deserve special attention because they and their derivative regulations established many of the terms and precedents that are almost universal today. They are the Resource Conservation and Recovery Act (RCRA) of 1976 and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, which is commonly referred to as the Superfund Act. The intent of all these laws is to protect human health and the environment from harm caused by hazardous materials.

### Resource Conservation and Recovery Act (RCRA)

Under the RCRA of 1976, when a party generates hazardous waste, it must be labeled, manifested, placarded, and shipped by an approved transporter to a per-

BACK_DEFEXP-RR-004045

**Exhibit 8.3**     **Chronology of Selected Environmental Acts, Laws, Regulations, and Cases**

| Year | Act, Law, Regulation, Policy, or Case |
|---|---|
| 1899 | Rivers and Harbors Act ( The "Refuse Act")<br>Designed to protect navigable waters, especially the Mississippi River system, from floating debris that constituted hazards to navigation. |
| 1947 | Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) |
| 1948 | Federal Water Pollution Control Act (Old Clean Water Act) |
| 1954 | Atomic Energy Act |
| 1956 | Clean Water Act |
| 1963 | Clean Air Act (CAA) |
| 1966 | National Historic Preservation Act |
| 1967 | Clean Air Act Revision |
| 1969 | National Environmental Policy Act |
| 1972 | Marine Protection, Research, and Sanctuaries Act<br><br>Federal Coastal Zone Management Act<br><br>Federal Water Pollution Control Act Amendments (Clean Water Act) |
| 1973 | Federal Endangered Species Act |
| 1974 | Safe Drinking Water Act |
| 1976 | Resource Conservation and Recovery Act (RCRA)<br>Defined what was hazardous and drew a distinction between hazardous material and hazardous waste.<br><br>Toxic Substances Control Act (TSCA) |
| 1977 | Clean Water Act Amendments |
| 1978 | Uranium Mill Tailings Radiation Control Act |
| 1979 | Hazardous Liquid Pipeline Safety Act |
| 1980 | Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) "Superfund"<br>Intended to take care of cleanups at sites that were no longer being operated. |
| 1984 | Hazardous and Solid Waste Amendments |
| 1985 | Supreme Court Support of Adjacent or Isolated Wetlands as "Waters of the U.S." |
| 1986 | Safe Drinking Water and Toxic Enforcement Act (California Proposition 65)<br><br>Superfund Amendment and Reauthorization Act (SARA)<br><br>Maryland Bank and Trust<br>Superfund liability can attach to a lender that takes title to a property through foreclosure. |
| 1987 | Federal Water Quality Act<br><br>Air Toxics "Hot Spots" Information and Assessment Act |
| 1990 | Oil Pollution Act<br><br>Pollution Prevention Act<br><br>Hazardous Waste Operations and Emergency Response Act<br><br>Fleet Factors<br>A lender doesn't even have to hold title to have liability under CERCLA. If the lender exerts control over a business, then it may become liable. |
| 1992 | OSHA Process Safety Management Standards<br><br>Title X Housing and Community Development Act (lead-based paint)<br><br>EPA Issues Lender Liability Rule<br>Attempted to protect lenders, etc., and struck down by Appeal Court 2/4/94. |
| 1994 | ASTM Standard Practice for Site Assessment |
| 1995 | EPA Officially Begins Brownfields Programs<br>Contaminated Aquifer Policy<br>Prospective Purchaser Agreements<br>Comfort Letters<br><br>EPA Issues Lender Liability Policy<br>Attempts to protect still unconvinced lenders. |
| 1997 | The **Kyoto Protocol** results in 38 industrialized nations reducing greenhouse emissions. The United States agrees to reduce emissions by 7%. |
| 2000 | The **Everglades** obtain $7.8 billion in aid to restore the ecosystem. |
| 2001 | The Bush Administration refuses to sign the **Kyoto Protocol**. It is ratified in 2005; however, the United States and Australia do not sign the treaty. |
| 2014 | The **United Nation's Intergovernmental Panel of Climate Change (IPCC)** releases a major report concerning climate change. |

BACK_DEFEXP-RR-004046

mitted storage or disposal facility. The waste remains the property of the generator, and the generator remains liable for it even when it is stored elsewhere. This has been termed *cradle-to-grave* responsibility. RCRA also provides for sizable daily penalties for knowingly violating its restrictions.

A material is defined as hazardous if it appears on one of the lists maintained by the Environmental Protection Agency (EPA), as shown in Exhibit 8.4, or if it has at least one of the four characteristics of *ignitability*, *corrosivity*, *reactivity*, or *toxicity*. Ignitability and toxicity are the characteristics that most often qualify a waste material as an RCRA hazardous waste. If a material spontaneously catches fire at a temperature below 140º F, then it is considered to be hazardous because of ignitability.

| **Exhibit 8.4** | **Lists of Hazardous Materials (or Wastes) Maintained by the EPA** | |
|---|---|---|
| **EPA List Code** | **Characteristic** | **Description** |
| D001 | Ignitability | Flashpoint < 140 º F (spontaneously catches fire) |
| D002 | Corrosivity | pH is less than 2.0 (acid) or more than 12.5 (base) |
| D003 | Reactivity | Reacts violently or generates pressure |
| D004-D017 | Toxicity | Toxic at specified concentrations |
| F List | Listed wastes | Listed wastes from non-specific sources |
| K List | Listed wastes | Wastes from listed sources or processes |
| P List | Listed wastes | Specific substances |
| U List | Listed wastes | Off-spec or discarded products and/or residues |

These hazard characteristics are the basis of a commonly seen, diamond-shaped sign on nearly every building that contains hazardous materials. The sign, as shown in Exhibit 8.5, was devised by the National Fire Protection Association (NFPA) as a way to quickly inform firefighters about the nature of the materials within a building and the appropriate firefighting techniques to use. Real estate professionals can also find knowledge of the risks posed by a building's contents useful.

## Superfund Act

Some of the most seriously contaminated sites in the United States are the result of what were accepted business practices in the distant past. Some of these sites have posed dangers to resident populations, while the parties who contributed to the contamination are no longer around or not easily found. The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as the Superfund Act, was enacted in 1980 to marshal the forces needed to clean up the worst of these sites and to get those who are responsible to pay for it. The Superfund Act initially targeted 400 of the nation's worst sites for cleanup. These were placed on a National Priority List (NPL), which eventually grew to well over 1,000 sites.

CERCLA conferred extraordinary powers on regulators by providing for swift responses to emergency situations and by defining liability broadly to fall on

BACK_DEFEXP-RR-004047

**Exhibit 8.5**    NFPA Hazard Identification System



| Identification of Health Hazard<br>Color Code: Blue | | Identification of Flammability<br>Color Code: Red | | Identification of Reactivity<br>Color Code: Yellow | |
|---|---|---|---|---|---|
| **Signal** | **Type of Possible Injury** | **Signal** | **Susceptibility of Materials to Burning** | **Signal** | **Susceptibility to Release of Energy** |
| 4 | Materials that on very short exposure could cause death or major residual injury even though prompt medical treatment was given | 4 | Materials that will rapidly or completely vaporize at atmospheric pressure and normal ambient temperature or which are readily dispersed in air and which will burn readily | 4 | Materials that in themselves are readily capable of detonation or of explosive decomposition or reaction at normal temperatures and pressures |
| 3 | Materials that on short exposure could cause serious temporary or residual injury even though prompt medical treatment was given | 3 | Liquids and solids that can be ignited under almost all ambient temperature conditions | 3 | Materials that (1) in themselves are capable of detonation or explosive reaction but require a strong initiating source or (2) must be heated under confinement before initiation or (3) react explosively with water |
| 2 | Materials that on intense or continued exposure could cause temporary incapacitation or possible residual injury unless prompt medical treatment is given | 2 | Materials that must be moderately heated or exposed to relatively high ambient temperatures before ignition can occur | 2 | Materials that (1) in themselves are normally unstable and readily undergo violent chemical change but do not detonate or (2) may react violently with water or (3) may form potentially explosive mixtures with water |
| 1 | Materials that on exposure could cause irritation but only minor residual injury even if no treatment is given | 1 | Materials that must be preheated before ignition can occur | 1 | Materials that in themselves are normally stable but that can (1) become unstable at elevated temperatures or (2) react with water with some release of energy but not violently |
| 0 | Materials that on exposure under rare conditions would offer no hazard beyond that of ordinary combustible material | 0 | Materials that will not burn | 0 | Materials that in themselves are normally stable, even when exposed to fire, and that do not react with water |

generators (those with whom the contaminants originated), transporters (those who carried the materials to the site), operators (those who accepted the materials at the site), and owners of the site. Those who are considered likely to be responsible under CERCLA are termed potentially responsible parties (PRPs).

**212**    *Real Estate Damages*

BACK_DEFEXP-RR-004048

Often, a group of PRPs will band together to handle a regional problem they all contributed to because costs can quickly escalate to millions of dollars. The basic steps in the Superfund process are shown in Exhibit 8.6.

| Exhibit 8.6 | Steps in the Superfund Process |
|---|---|
| **Name of Step** | **Comments** |
| Preliminary assessment | Initial reconnaissance to ascertain whether there is a need for emergency action. |
| Emergency removal action | If needed, materials that pose an immediate threat to human health or the environment are removed. |
| Site inspection | This is a more thorough inspection in order to get a better idea of the problem and to better plan the investigations to come. |
| Hazard ranking | The hazard ranking score (HRS) is computed for the known conditions at the site in order to see whether the property should be added to the National Priority List. If the HRS is 28.5 or greater, then the property gets listed. |
| Remedial investigation (RI) | This involves both field and laboratory investigations and is usually done iteratively with the feasibility study until the site is sufficiently characterized. |
| Feasibility study (FS) | Based upon information from the remedial investigation, various technologies are studied in order to select those that will achieve the remediation goals most cost effectively. |
| Remedial action plan (RAP) | This is the plan to remediate the problem. It brings together scientific, engineering, regulatory, and community concerns into a unified program. |
| Record of decision (ROD) | This is the formal document that accepts and records the remedial action plan. |
| Remedial design | The systems and procedures to implement the plan are designed. |
| Remedial action | The contamination is remediated according to the RAP. |

Source: Environmental Protection Agency

## Types of Contaminants

There are literally hundreds of environmental contaminants. These contaminants can be categorized as follows:

- Hydrocarbons, including crude oil and refined petroleum
- Asbestos, a natural mineral that can be crushed and used as a building material
- Solvents, which may be used for cleaning or manufacturing
- Radioactive materials, including radon
- Metals, such as lead, chrome, or arsenic
- Biologicals, such as sewage and medical waste

The type of contamination or hazardous substance can have a significant effect on the market's perception of risk and, in turn, property value diminution. When collecting market data for case studies, the type of contaminant should ideally be the same for both the subject and the case study properties because different contaminants may invoke different responses from the marketplace. It would be improper, for example, to compare a case study involving the effects of petroleum hydrocarbon contamination from a leaking underground storage tank to a subject property impacted by asbestos or radon. However, there are situations in which a study is comparable, even though the contaminants differ slightly. For example, it might be worthwhile to study a shopping center that has soil contam-

BACK_DEFEXP-RR-004049

ination from a service station's leaking underground storage tank with another shopping center that has soil contamination from dry cleaning solvents. Careful analysis would be required in a situation like this.

## Lead

Lead can be found in paints, car batteries, dust, pipes, solder, and drinking water. When exposure is excessive, lead can accumulate in the blood, tissues, and bones. Damage to the brain, kidneys, male reproductive organs, and nervous system may result. Lead accumulation can cause learning disabilities, decreased IQ, and behavioral problems.

The two most common sources of lead are paint and water. The Environmental Protection Agency estimates that lead-based paints were used in about two-thirds of the homes built before 1940, one-third of the homes built between 1940 and 1960, and in some homes built after 1960. Beginning in 1978, the federal government required that paints for home use contain less than 0.06% lead. Paints for other uses, such as industrial, military, or marine purposes, may have much higher lead contents. For this reason, homeowners should only use paints that are specifically intended for residential properties when painting their residences. It should be noted that there are different standards for the use of lead-based paints in commercial and marine situations.

Any home that was painted before 1978 has the potential to contain lead-based paint. Home paints that contain lead may be covered by wallpaper, paneling, or more recent layers of non-lead paint. A test called *X-ray fluorescence* (XRF) can now distinguish which paint layers contain lead. Removing the paint by methods such as sanding may actually increase the risk of exposure to lead in the form of inhaled or ingested dust.

Lead may enter the drinking water via lead pipes or lead solder used on copper pipes. Lead pipes are usually found only in homes built before 1930, and lead soldering materials have been banned since 1988. Since October of 1996, the EPA's MCL action level for lead in drinking water has been 0.015 mg/L or parts per million (ppm), or 15 parts per billion (ppb). If lead is found in a property's drinking water, residents may need to renovate the plumbing system, employ water filters, or use only bottled water. If any reason exists to suspect that lead is contained in paints or water, laboratory testing of samples should be conducted. If lead concentrations above MCL are detected in any samples, corrective measures should be taken.

## Asbestos

Although asbestos and asbestos-containing materials (ACMs) have been used in building construction since they were introduced by the Greeks and Romans in the first century A.D., their days of being considered staple building materials are clearly over. Asbestos is a naturally formed fibrous material with properties that are well-suited to building uses. It is non-combustible, has high tensile strength, and has outstanding thermal, electrical, and acoustical insulating properties. According to some studies, it has been shown to pose health risks. Its use has been mostly discontinued, and it has been removed from some buildings.

BACK_DEFEXP-RR-004050

Copyrighted material. Reproduced by Richard J. Cudworth, June 20...

In the past, the use of asbestos in the building industry was commonplace. The EPA estimates that of the 30 million tons of asbestos used from 1900 to 1980, 60% to 70% was in the construction industry. (The United States produced 25% of the asbestos it consumed and imported 97% of the remainder from Canada.) Two terms frequently used when referring to ACMs are *friable* and *non-friable*. *Friable* simply means that the ACMs can be pulverized or crushed with hand pressure. *Non-friable* ACMs are formed into solid building materials and cannot be crushed with hand pressure. Examples of friable uses are sprayed acoustical ceilings and sprayed fireproofing on structural steel. Non-friable materials include vinyl flooring, insulating bricks, and roofing materials. Typical locations of ACMs in buildings include sprayed surfaces, such as thermal insulation on structural steel, sprayed acoustical ceilings or walls, pre-formed block insulation surrounding furnaces, insulation on boilers and hot water tanks, drywall, pipe wrap, patching compounds, texture paints, and vinyl floor tiles.

While asbestos was widely used for centuries, in the early 1970s it was declared a health risk. No safe threshold has ever been established for exposure to asbestos. ACMs in and of themselves do not pose a health hazard, but asbestos fibers released by disturbance, destruction, or decay can cause serious health problems if ingested. Several diseases are attributed to asbestos, the two most common being mesothelioma, a lung cancer, and asbestosis, a chronic lung disease. Because of these health risks, the federal government has intervened and restricted asbestos use. As would be expected, the demand for ACMs has fallen dramatically, with the 1989 use level approximately 15% of what it was in 1979. The EPA estimates that as many as 31,000 schools and 733,000 public and commercial buildings contain friable ACMs. ACMs can be found in approximately 20% of the 3.6 million commercial properties in the United States.

The following is a summary of the legal limitations placed on ACMs used in new construction or products:

- 1973:  All sprayed ACMs that contain an amount of 1% asbestos by weight or volume banned
- 1978:  All friable ACMs banned
- 1989:  A phased-in ban of virtually all ACMs employed
- 1990:  Phase I of the ban goes into effect, prohibiting ACMs in roofing and flooring felt, sheeting, tile, and clothing
- 1993:  Phase II of the ban goes into effect, prohibiting ACMs in brake linings, transmission components, clutches, and other friction products
- 1996:  Phase III of the ban goes into effect, prohibiting ACMs in floor coatings, paper, brake blocks, pipes, and shingles

With the exception of school buildings, ACMs in existing buildings were not affected by the EPA bans and regulations.

In ascertaining whether or not a building contains ACMs, the first consideration is the construction date. Properties constructed prior to 1979 are more likely to have ACMs. Friable or sprayed construction materials are also a warning sign that there may be ACMs within a building. It is important to review building

BACK_DEFEXP-RR-004051



The office building shown above was photographed before and after an asbestos abatement program was initiated. Asbestos abatement, like many remediation processes, can be highly intrusive and result in the demolition of the tenant improvements.

**216**   *Real Estate Damages*

BACK_DEFEXP-RR-004052

Copyrighted Material Reviewed by Richard J. Gonzalez Volume 2

**Exhibit 8.7**    **Asbestos in the Home**



Source: *Property Owners Manual*

**Exhibit 8.8**    **Asbestos in the Office**



Source: *Property Owners Manual*

BACK_DEFEXP-RR-004053

records of any building in question, but the only way to be certain of the presence of ACMs is to test air and building material samples.

Air sampling, as the name implies, means taking samples of the air for laboratory testing. The air is tested in the laboratory for fiber counts using one of three microscopy methods. Samples of building materials are often taken in conjunction with air sampling. Asbestos sampling is usually unobtrusive and can be done without causing any risk of exposure to the building occupants.

Attitudes towards asbestos have changed dramatically since the 1970s and 1980s. The high profits that attracted many contractors to the asbestos abatement business in the 1980s have fallen.

In 1990, the EPA issued the *Green Book*, which recommends various means of treating or managing ACMs. As a result of this and other studies, most banks do not require ACM removal as a condition of financing.

### Asbestos Removal

Removing ACMs from a building has permanent results, but the process is usually expensive. In actual abatement projects, costs are not calculated on gross building area but rather on *reflective* area, which refers only to the areas within the building that have ACMs. Removal brings its own set of challenges. The dust can be an environmental concern in and of itself. With removal, the building owner retains legal ownership, and thus liability, for up to 40 years for any disposed materials, even when taken to a landfill or storage site. Another negative aspect of removal is that, according to a study by the Energy and Environmental Policy Center at Harvard University, removal may actually increase asbestos exposure for building occupants because of the disruption of the asbestos.

There are three options for removing ACMs:

- Immediate or initial removal
- Staged removal over a period of time
- Removal at the end of the economic life (demolition) of the building

As an alternative to removal, ACMs can also be enclosed or encapsulated, which effectively eliminates exposure risk while leaving the materials in place.

### Operations and Management

Another option for dealing with ACMs is an *operations and management* (O&M) program. In this type of program, ACMs in good condition are simply left alone while the situation is monitored to ensure that there are no health hazards to the building occupants. According to the EPA, a good O&M program is 95% effective. The EPA recommends an O&M program over removal when the ACMs are in good condition.

When implementing an O&M program, the building owner or manager hires a qualified O&M consultant, who in turn trains the building management, engineers, custodians, and occupants concerning the handling of ACMs. The consultant may also conduct routine air sampling and building inspections to ensure that no fibers are released into the air through disturbance. The O&M program is generally continued until the ACMs are removed or the building is eventually

BACK_DEFEXP-RR-004054

Copyrighted material licensed by Richard J. Roddewig, Vol. 2, 2007

demolished. Even with an O&M program, ACMs must either be removed initially, through staged removal over a number of years, or at the end of the building's economic life. In the event that the ACMs are removed at demolition, special ACM handling and disposal can double the demolition costs.

## Mold and Biologicals

Biological pollutants, including animal dander, dust mites, fungi, bacteria, and pollen, are often associated with poor indoor air quality. Mold has rapidly become the most recognized of biological contaminants due to high-profile court cases and sensational media coverage. While there is little evidence that mold is more prevalent now than in the past, fungal metabolism presents potential risk to structures in addition to air quality concerns.

Molds are simple fungi (including dry rot, mildew, yeasts, plant rusts, smuts, and mushrooms), whose biological purpose is to aid in the decomposition of plant materials. Fungal organisms lack chlorophyll and typically produce airborne spores (bioaerosols), requiring an organic food source high in cellulose and sufficient moisture to sustain growth. Unfortunately, organic matter containing cellulose is a component of many common building materials, including wood, drywall, insulation, ceiling tiles, carpet, and textiles. The characteristic musty odors associated with the growth of mold are often due to substrate degradation and metabolic by-products, sometimes resulting in the production of compounds with toxic properties (mycotoxins).

Thousands of species of known fungi have been classified to date. Well-known genera of mold include *Alternaria*, *Aspergillus*, *Cladosporium*, *Penicillium*, and *Stachybotrys*, and multiple species of each have been identified. In sufficient quantity, most molds can produce irritation and allergic reactions in humans and animals. The most common exposure pathway is inhalation, although mold can also be ingested or absorbed through the skin. While some species are considered potentially pathogenic, scientific research to date has failed to establish conclusive evidence of mold toxicity. Links between airborne mycotoxins and chronic health effects have also not been proven, although these issues continue to be debated. Individual responses to mold exposure can vary, although people with compromised immune or respiratory systems may be most at risk.

Because molds and other biological contaminants are naturally found almost everywhere in the environment, identifying a mold "problem" is often difficult, invariably requiring the services of a properly qualified and trained professional. Air sampling comparing indoor and outdoor types and concentrations of various fungal species is normal practice in determining the existence of an indoor air quality problem. Surface sampling of potentially contaminated areas is also common, with air and surface samples typically sent to accredited laboratories for analysis.

Mold growth on building materials most often occurs in conjunction with excessive or persistent moisture conditions, including flooding, high humidity, plumbing leaks, or water intrusion through the building envelope. Inadequate ventilation is also frequently a contributing factor. The appearance of mold can

BACK_DEFEXP-RR-004055

vary from small dots to continuous sheets of mold colonies; colors and textures can also vary widely. Conditions supporting fungal growth, particularly sewage leaks and spills, sometimes result in bacterial contamination as well.

Attempts to define threshold limits or standards relating to mold exposure have generally been unsuccessful. Uniform standards are considered impractical due to the broad range of fungal species, geographic differences, seasonal variations, varied human responses, and lack of conclusive data regarding health impacts. Repair and restoration costs are extremely project-dependent and more difficult to generalize than many other conditions requiring repair. Contaminated materials must be either cleaned or replaced, and large remediation projects often involve specialized contractors, protective clothing, and the construction of elaborate containment systems to prevent the migration of mold spores to other parts of the structure. The federal government has drafted voluntary guidelines regarding indoor air quality (IAQ) and suggested remediation standards for both residential and commercial/institutional properties. Information published by the City of New York also contains recognized remediation protocols.

## Radiation

According to *Understanding Radioactive Waste* by Raymond L. Murray, radioactive issues can cause public concern. People are aware of the fearful effects of the atom bomb. They know that a nuclear weapon is not the same as a nuclear reactor, but they tend to associate the two and are uneasy because both involve nuclear fission and radioactivity.[3]

Radiation is naturally occurring, and everyone is exposed to radiation on a daily basis. Radiation occurs naturally from sunlight, rocks and soils, naturally occurring radon gas, natural sources within the human body, and cosmic rays from space that bombard our atmosphere and all beings on the earth's surface. Furthermore, people voluntarily expose themselves to radioactivity from medical and dental X-rays. According to the 1988 National Council on Radiation Protection and Measurements Report No. 93, radioactive levels are also much higher inside a jet airliner than at ground level. The average American is exposed to 360 millirems of radiation annually.

Studies of radiation effects have ultimately lead to two conclusions. First, there is no direct evidence of genetic damage in humans caused by radiation, even though mutations have been observed in plants and lower animals. Second, a single radiation dose of around 400 rems will be fatal to half of those who receive it, while half will survive with some possible impairment of function. Since such large doses of radiation are rare, the more relevant issue is the effect of small doses of radiation.

Regardless of the establishment of a safe level, it is undisputed that "zero risk" from radiation is not a sensible goal, as it would obviously entail infinite cost. Ultimately, the United States government established what has been called "the 15 millirem standard," which essentially states that a property that has been contaminated with radiation measuring 15 millirems above normal background

---

3.   Raymond L. Murray, *Understanding Radioactive Waste*, 4th ed. (Columbus: Battelle Press, 1994).

BACK_DEFEXP-RR-004056

levels is considered to be unsafe and contaminated. This standard is used for many nuclear-related projects nationwide.

Radioactive materials emit high speed particles or energetic photons, collectively called *ionizing radiation.* Ionizing radiation includes alpha and beta particles, gamma rays, X-rays, neutrons, and heavy ions. Nearly all human exposure to radiation comes from natural background radiation (81%) or medical tests (14%). Contrary to some perceptions within the real estate market, nuclear power plants actually emit only a small amount of radiation, sometimes even less than coal- or oil-powered plants. Neutrons, X-rays, and gamma rays can penetrate deeply into the human body. Alpha and beta particle sources cause damage mainly when they are inside the body from being inhaled, ingested, or directly applied to the skin. Radioactive particles move at velocities that approach the speed of light: 186,000 miles per second. It is theorized that these fast-moving particles can break up or alter molecules, thereby causing cancer.

A group of 8,500 Japanese atom bomb survivors who were exposed to doses of radiation measured at 100,000 to 600,000 millirems was carefully monitored. To date, there have been 200 (2.4%) cases of excess cancers among this group (i.e., 2.4% more cases than the normal probability). Another study followed British medical patients exposed to unusually high levels of radiation. About 14,000 British patients received X-ray doses averaging 300,000 millirems, resulting in 100 excess cancers (0.7%).

As related to real estate, by far the most common source of radioactive exposure is from radon, as can be seen in Exhibit 8.9. Radon has only recently been recognized as significant. Radon-222 results from the decay of radium-226 and is the parent of some radioactive isotopes. Radon is a colorless and odorless naturally occurring radioactive gas that forms when radioactive uranium and radium decay within rocks, as shown in Exhibit 8.10. As an invisible gas, radon may seep into buildings from the ground and can be breathed in by occupants. The gas has been determined by the EPA to be a carcinogen. It accumulates in areas closest to the source, usually the ground or basement levels. Smokers are impacted more by

| Exhibit 8.9 | Sources of Radiation | |
| --- | --- | --- |
| Radiation Source | Dose (Millirem/Year) | Percent of Total |
| Natural indoor radon | 200 | 54% |
| Natural cosmic radiation | 100 | 27% |
| Medical procedures | 53 | 14% |
| Nuclear bomb testing | 6 | 2% |
| Other man-made conditions (soot, dust) | 10 | 3% |
| Nuclear power plant | 0.1 | 0% |
| Totals | 369 | 100% |

Source: American Council on Science and Health

**Exhibit 8.10    Radon**

Rocks containing uranium, usually shales and granite, form a radioactive gas—radon

Radon gas passes through cracks in the basement or foundation and circulates within the structure

Source: *Property Owners Manual*

*Environmental and Biomedical Conditions*    **221**

BACK_DEFEXP-RR-004057

radon, although the effects may take over 20 years to become apparent. The EPA recommends that action be taken if radon levels are over 4 picocuries per liter of air (pCi/L). In addition to gases, radon may also enter the water system, particularly when water comes from wells. Water treatment for radon includes a granular-activated carbon unit (GAC) or an aeration unit.

Radon gas is unpredictable and may affect one property and not the one next door. If any reason exists to suspect radon gas may be present, only a special laboratory test will provide conclusive answers. Often, a modestly priced system of fans and ducts provides sufficient ventilation to disperse radon and reduce its concentration to acceptable levels. Even so, radon remains a controversial topic in some communities.

## Metals and Solvents

A variety of solvents used for cleaning and manufacturing purposes are carcinogenic materials that do not biodegrade easily. They often are compact, dense molecules that may move fairly quickly through soil and sink through groundwater to the bottom of an aquifer, where they may be difficult to remediate.

Most metal manufacturing operations produce some hazardous waste. It is likely that an operation generates hazardous waste if it uses any solvents, strong acid or alkaline solutions, plating solutions, paints, cyanide solutions, or any solutions containing heavy metals. Facilities that generate hazardous waste might be subject to RCRA requirements covering the generation, transportation, and management of hazardous waste.

The wastes associated with metal manufacturing processes fall into several major categories:

- *Spent solvent* and *solvent still bottoms* result from cleaning and degreasing operations. The types of solvents used in this category include chlorinated solvents (e.g., methylene chloride, dichlorobenzene, carbon tetrachloride, trichloroethylene), hydrocarbons (e.g., xylene, toluene, benzene), and kerosene or mineral spirits ("Stoddard" solvents).

- Strong acid wastes are generated in considerable quantity wherever any type of metal is formed or processed. Many pickling solutions are highly acidic. The acid, if not neutralized, might be carried to subsequent manufacturing operations. Subsequent operations can include drawing, rolling, pressing, electroplating, hot dip galvanizing or hot tinning, anodizing, phosphating, metal coloring (patina), and many others.

- Strong alkaline wastes are generated from the use of pickled aluminum and sometimes zinc.

- Plating wastes are generated from electroplating operations. These wastes can be acidic or alkaline and contain significant concentrations of heavy metals. Acid plating solutions generally contain free acids and heavy metals such as copper, nickel, zinc, and possibly tin or cadmium. Alkaline plating solutions include zinc baths and sometimes tin baths. The waste products from plating can include spent plating solutions or sludges as well as stripping and cleaning bath solutions.

BACK_DEFEXP-RR-004058

*Copyrighted Material Licensed by Richard J. Washington, June 2...*

- Heavy metal wastewater sludges are generated from wastewater treatment. Depending on the operation, these sludges can contain arsenic, barium, chromium, cadmium, lead, mercury, silver, or selenium. High concentrations of lead are found in the sludges from battery manufacturing plants. Other sludges can come from grinding, tank clean-outs, dust collectors, and lead pots.

- Paint and coating wastes are generated by several segments of the paint industry. Generally, hazardous paint wastes contain cadmium, chromium, lead, or mercury. Paints, lacquers, adhesives, and varnishes might contain toxic organic chemicals as well.

- Cyanide wastes are generated from cyanide plating solutions and simple cyanide solutions. Cyanide plating solutions are used in metal plating operations. Simple cyanide solutions are used mainly for hardening and metal cleaning. Cyanide baths are commonly used in metal finishing and heat treating operations.

Other ignitable or toxic wastes are also generated by the metal manufacturing industry. Reactive wastes are generated primarily by the photographic equipment and supplies industry, though other metal manufacturing industries can also generate reactive wastes. These wastes can include strong oxidizing agents such as chromic acid, perchlorates, and permanganates used in metal finishing as well as other reactive compounds such as hypochlorites, peroxides, sulfides, nitrates, and sodium hydroxide.

## Hydrocarbons

*Hydrocarbons* is a general term for all carbon-based chemicals. These include methane gas, gasoline, oils and greases, asphalt, solvents, pesticides, plastics, and even DNA. Contamination is typically concerned with only the categories of fuels and solvents, many of which are considered hazardous because of their flammability or toxicity characteristics.

The fuel hydrocarbons of most concern have been the four ubiquitous components of gasoline: benzene, toluene, ethylbenzene, and xylene, known collectively as BTEX. One of the most hazardous of these is benzene, a known carcinogen. Many sites that have had a gasoline tank have some BTEX in the soil and perhaps even in the groundwater. Once viewed with great alarm, BTEX contamination in soil is now treated as a fairly routine matter. However, it is still considered very dangerous if a drinking water supply is threatened.

Total petroleum hydrocarbon (TPH) is a term used to describe a large family of several hundred chemical compounds that originally come from crude oil. Crude oil is used to make petroleum products, which can contaminate the environment. Because there are so many different chemicals in crude oil and in other petroleum products, it is not practical to measure each one separately. However, it is useful to measure the total amount of TPH at a site. TPH is made up of a mixture of chemicals, mainly a combination of hydrogen and carbon known as *hydrocarbons*. Scientists divide TPH into groups of petroleum hydrocarbons that act alike in soil or water. These groups are called *petroleum hydrocarbon fractions*. Each fraction contains many individual chemicals. Some chemicals that may be found

BACK_DEFEXP-RR-004059

in TPH are hexane, jet fuels, mineral oils, benzene, toluene, xylene, naphthalene, and fluorene, as well as other petroleum products and gasoline components. TPH may enter the environment through accidents, from industrial releases, or as byproducts from commercial or private uses. TPH may be released directly into water through spills or leaks. Some TPH fractions will float on the water and form surface films, while other TPH fractions will sink to the bottom sediments.

Every person is exposed to TPH from many sources. Pathways to TPH exposure include breathing air at gasoline stations, using chemicals at home or work, applying certain pesticides, drinking water contaminated with TPH, working in occupations that use petroleum products, or living in an area near a spill or leak of petroleum products.

## Fracking

*Hydraulic fracturing*, also known by its nickname "fracking," is an advanced drilling technique that originally began in the 1940s. While conventional drilling is vertical, fracking is used to extract otherwise inaccessible natural gas and oil from deep-shale formations by using an innovative horizontal drilling method. By drilling horizontally, natural resources can be extracted from relatively thin layers of shale and other subsurface structures that are otherwise inaccessible.

Like all developments, fracking has both positive and negative impacts. One of the positive impacts of this advanced drilling method is the United States coming closer to oil independence, spurring economic growth and lowering energy prices. On the other hand, fracking has sparked controversy among some environmentalists who are concerned about the large quantities of freshwater the process uses, as well as related wastewater treatment and geotechnical issues.

### The Fracking Process

While the fracking process is one that takes several months to establish, the investment can pay off from 20 to 40 years of oil or natural gas extraction. The process starts out like any other conventional drilling method. A vertical wellbore is drilled by using a drill pipe and drill bit. A *wellbore* is the hole that is drilled to aid in the recovery of natural resources. This hole is drilled past the deepest underground freshwater supply to protect against underground water contamination. After the hole is drilled, the vertical wellbore is encased by materials such as steel and cement to stabilize the well and create a protective barrier for both the well stream and any underground freshwater reservoirs.

The hole is then drilled about a mile or more down to what is called the "kick-off point." At the kick-off point, the wellbore begins curving to then become horizontal. Again, surface casing is inserted and then reinforced by cement. Next, a perforating gun is lowered down to the rock formation, which contains the resource targeted for extraction. The perforating gun contains explosive charges. When the perforating gun is lowered and sent down the horizontally drilled portion of the wellbore, the explosive charges are fired to create fractures in the rock containing the oil or natural gas. This first portion of the fracking process is illustrated in Exhibit 8.11.

Next, a solution usually consisting of about 99.5% water and sand and less than 1% chemicals is pumped into the deep-underground rock formations. The

BACK_DEFEXP-RR-004060

solution is pumped down at high pressures to help create more fractures in the deep-shale rock formations containing the oil or gas. When the fractures are created, the sand materials, also known as *proppants*, insert themselves into the fractures to allow them to be held open. The chemicals used are commonly found in household items and help keep bacteria from forming as well as help carry the sand.[4] Afterwards, the oil or gas are ready for extraction. This second portion of the fracking process is illustrated in Exhibit 8.12.

### Fracking Controversies

Like all industrial activities, there are both positive and negative aspects of fracking. Opponents note the



**Exhibit 8.11** | **Part 1 of The Fracking Process: Creating Fractures in the Rock**

Rock Containing Oil or Natural Gas

Fractures Caused by Explosive Charges

Wellbore Kick-off Point

**Exhibit 8.12** | **Part 2 of The Fracking Process: Extracting the Oil or Natural Gas**

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Water Acquisition | Chemical Mixing | Well Injection | Flowback and Produced Water (Wastewater) | Wastewater Treatment and Waste Disposal |



Natural gas or oil flows from fissures into well

A solution of water and sand is mixed with chemicals and pumped into the ground at high pressures to help create more fractures. The sand particles insert themselves into the fractures to keep them open in order to extract the oil or natural gas. The wastewater from the process is then treated and disposed of.

---

4. Ground Water Protection Council and ALL Consulting, *Modern Shale Gas Development in the United States: A Primer*, prepared for the US Department of Energy, Office of Fossil Energy, and National Energy Technology Laboratory, April 2009, accessed February 29, 2016, http://fracfocus.org.

*Environmental and Biomedical Conditions*    **225**

BACK_DEFEXP-RR-004061

high amounts of freshwater used, seismic concerns, concerns over groundwater contamination, and so forth. On the other hand, proponents of fracking note its benefits to the economy, the industry's overall safe track record, and the reduced reliance on foreign oil among its benefits.

### Groundwater Contamination

Some critics claim that groundwater could be contaminated from fracking when fractures created through the process extend to freshwater aquifers. As the distance between fresh underground water and the deep-shale rock formations that are being fracked are almost a mile apart, the chance of fresh underground water being contaminated is low. Even if hydraulic fracture stimulation created enough pressure and fluid within the relatively impermeable shale for vertical fractures to reach overlying geologic formations, these fractures would encounter more permeable formations before reaching aquifers.[5]

If there is potential for groundwater contamination resulting from oil and gas production, a more likely source (other than a surface spill) is improper surface well casing. This is the case for both injection wells that are conventionally drilled and wells that are hydraulically fractured.

Hydraulic fracturing is one of the last steps in drilling an oil and gas well. The first steps, which are crucial to prevent groundwater contamination, are the drilling, casing, and cementing of the surface hole portion of the well.[6]

Contamination as a result of a poor surface casing job, therefore, has nothing to do with the actual process of hydraulic fracturing. All wells–including those that are not hydraulically fractured–have surface casing, and improper surface casing may lead to contamination under certain circumstances, whether or not the well was fracture stimulated.[7]

The EPA also concluded that hydraulic fracturing in coal bed methane formations did not create pathways for fluids to travel between rock formations to affect the drinking water supply.[8] Specifically, the researchers found methane in 85% of the water wells they sampled, regardless of gas industry operations. Another study conducted in Pennsylvania also found no causal link between hydraulic fracturing and water well contamination.[9]

The media has also tainted the image of fracking. In a scene from the 2010 documentary film *Gasland*, a Colorado residents ignites the water running from his home faucet. This was meant to illustrate how fluids or natural gas from the fracking process have contaminated the aquifer used by the resident's home located near a fracking site. However, an analysis of the water conducted by the Colorado Oil and Gas Conservation Commission showed otherwise. The study

---

5.  American Petroleum Institute, *Guidance Document API HF1, Hydraulic Fracturing Operations—Well Construction and Integrity Guidelines*, First Edition/October 2009, supra note 8, at 15–18, accessed February 29, 2016, www.api.org.

6.  American Petroleum Institute, "Natural Gas Shale Horizontal Drilling Video," accessed March 23, 2012, www.api.org.

7.  George E. King, Apache Corporation, *Estimating Frac Risk and Improving Frac Performance in Unconventional Gas and Oil Wells*, January 23, 2012, accessed February 29, 2016, http://gekengineering.com.

8.  US Environmental Protection Agency, Office of Ground Water and Drinking Water, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs*, June 2004, accessed February 29, 2016, http://nepis.epa.gov.

9.  Elizabeth W. Boyer et al., The Center for Rural Pennsylvania, *The Impact of Marcellus Gas Drilling on Rural Drinking Water*, March 2012, accessed February 29, 2016, www.rural.palegislature.us.

BACK_DEFEXP-RR-004062

found that Markham's well was naturally biogenic and found coal formations present within the aquifer that supplied his home's water. Thermogenic methane, a key component of natural gas, was not present in the aquifer. Also, the well did not test positive for chemicals used in the fracking process. This study provided evidence that hydraulic fracturing was not the cause of the water contamination.[10]

### Earthquakes and Seismic Issues

A study conducted at Durham University in the United Kingdom found that hydraulic fracturing was responsible for only three earthquakes large enough to be felt on the surface. One earthquake was in Canada, one was in the United States, and one was in the United Kingdom. Of these three earthquakes, the largest occurred in 2011 in the Horn River Basin of Canada, registering at M3.8, a magnitude on the lower end of earthquakes that can be felt by people.[11]

Other human activities can trigger much larger earthquakes. For example, building dams and filling reservoirs have caused earthquakes ranging in magnitude from M2.0 to M7.9, mining can cause earthquakes in the M1.6 to M5.6 range, using injection wells for carbon capture and sequestration and disposing of wastewater can trigger M2.0 to M5.3 quakes, and using geothermal energy wells has caused earthquakes in the M 1.0 to M4.6 range.[12] Some scientists have concluded that hydraulic fracturing is not a significant mechanism for inducing felt earthquakes. It is extremely unlikely that any of us will ever be able to feel an earthquake caused by fracking.[13]

### Fracking Fluids

Fracking fluids serve a variety of functions, such as preventing bacterial buildup in the well and water, helping to carry sand, helping to increase the viscosity of the fracture fluid, and helping to minimize friction between the fluid and the pipe.[14]

In a study conducted by researchers at the University of Colorado Boulder, the surfactant chemicals found in samples of fracking fluid collected in five states were no more toxic than substances commonly found in homes. Michael Thurman, lead author of the study and a cofounder of the Laboratory for Environmental Mass Spectrometry at the university's College of Engineering and Applied Science, said, "We found chemicals in the samples we were running that most of us are putting down our drains at home."[15]

While some critics are concerned that the chemicals used in fracking are harmful, such claims should be considered in context. For example, chlorine is harmful in higher dosages, but it is mostly drinking water in a diluted form. The

---

10. Colorado Oil and Gas Conservation Commission (COGCC), *COGCC Gasland Correction Document*, October 29, 2010, accessed February 29, 2016, https://cogcc.state.co.us.

11. Richard Davies et al., Durham University, *Induced Seismicity and Hydraulic Fracturing for the Recovery of Hydrocarbons*, 2013, accessed February 29, 2016, https://pangea.stanford.edu/researchgroups.

12. Ibid.

13. "New Fracking Research Led by Durham University Finds It Is 'Not Significant' in Causing Earthquakes," *Durham University News* (April 10, 2013), www.dur.ac.uk/news/.

14. Ken Cohen, "'Fracking' Fluid Disclosure: Why It's Important," *ExxonMobil Perspectives* (August 25, 2011), www.exxonmobilperspectives.com.

15. "Major Class of Fracking Chemicals No More Toxic Than Common Household Substances," press release, University of Colorado Boulder, November 12, 2014, accessed February 29, 2016, www.colorado.edu/news/releases/2014.

BACK_DEFEXP-RR-004063

consequences of drinking pure chlorine can prove to be very hazardous, if not fatal. When such chemicals are safely and properly handled, however, the chance of harm is low. With hydraulic fracturing, proponents believe that while a few chemical additives could be hazardous, they don't pose a risk when diluted and properly handled.[16]

Other concerns over hydraulic fracturing include conflicting water sources and radioactivity. These tend to be addressed on a local level, given the varying availability of water and background radiation issues in various locales.

Some municipalities and agencies require that groundwater be tested prior to drilling. This is to establish a baseline level of the existing groundwater supply and prevent property owners from blaming oil companies for defects in the water supply that had already existed. Whether or not this is required, it is a good practice.

## Benefits of Fracking

### Oil Independence

About 43 years ago, the Arab oil embargo began. The countries that were part of it belonged to the Organization of Petroleum Exporting Countries, or OPEC, which had banded together 15 years earlier to strengthen their ability to negotiate with international oil companies. The embargo led to widespread shortages in the United States, higher prices at the gas pump, and long lines at gas stations. By the time it ended, the price of oil had risen from $3 a barrel to $12.[17] Today, the price for oil can exceed $100 a barrel, an indication of dwindling foreign supply.

With the new technology of fracking, oil imports as a percentage of US consumption have dramatically decreased from 70% in 2009 to 37% in 2013.[18] With the increase of new wells being drilled, North America is projected to be energy independent by 2020. This projection would not be possible if it were not for the advances and uses of hydraulic fracturing.[19]

### Cheaper Oil and Gas

Another positive outcome from the fracking movement is that, because there has been an increase in output here in the United States, natural gas consumers have saved more than $100 billion in 2011.[20] Furthermore, with the increase in demand and output of oil and natural gas, the unconventional oil and gas industry supported hundreds of thousands of direct jobs in 2012. This has boosted the economy in several states, including North Dakota, Pennsylvania, and Texas.[21] On properties where hydraulic fracking is feasible, property owners have seen an increase in those property values.

---

16. Ground Water Protection Council and ALL Consulting, *Modern Shale Gas Development in the United States: A Primer*.

17. Joe Nocera, "A World Without OPEC?" *The New York Times* (October 20, 2014), www.nytimes.com.

18. David Blackmon, "The Texas Shale Oil and Gas Revolution—Leading the Way to Enhanced Energy Security," *Forbes* (March 19, 2013), www.forbes.com.

19. Megan L. O'Sullivan, "'Energy Independence' Alone Won't Boost US Power," *Bloomberg View* (February 14, 2013), www.bloombergview.com.

20. Robert M. Ames et al., Social Science Research Network, *The Arithmetic of Shale Gas*, June 15, 2012, accessed March 1, 2016, http://ssrn.com/abstract=2085027.

21. IHS Inc., *America's New Energy Future: The Unconventional Oil and Gas Revolution and the US Economy*, October 2012, accessed March 1, 2016, www.uschamber.com/sites/default/files/legacy/reports/AmericasNewEnergyFuture.pdf.

BACK_DEFEXP-RR-004064

*Copyrighted Material Reviewed by Richard Harding Revision 2.1*

### Formaldehyde

Formaldehyde is a colorless gas emitted from a variety of products and categorized as a probable carcinogen (i.e., a cancer-causing substance) by the EPA. Household products that possibly contain formaldehyde include compressed wood products such as particleboard, urea-formaldehyde foam, insulation, fabrics, paints, plastics, photographic materials, and resins. Two main areas of concern are materials used in mobile homes and compressed wood products, although formaldehyde may also be produced by improperly vented gas or kerosene heaters. Newer products are more likely to emit formaldehyde gas than older ones.

Formaldehyde exists in the outside air at levels ranging from 0.0002 to 0.05 ppm. Many people experience throat or eye irritation at levels of 0.1 ppm or above. The only way to determine if formaldehyde levels are excessive (over the outdoor air levels) is through laboratory testing of air samples. Gas levels, if excessive, may be reduced by removing the materials that contain formaldehyde and generally increasing air circulation.

## Environmental Life Cycles

Properties that have been impacted by contamination undergo a four-phased process:

- Phase I: Preliminary site assessment (surface and records review)
- Phase II: Intrusive site investigation involving subsurface exploration to ascertain if contamination exists (subsurface study)
- Phase III: Systematic testing to fully describe the nature and extent of the contamination (characterization)
- Phase IV: Remediation of the contaminants (remediation)

Many professionals effectively combine Phases II and III, creating a three-phase scenario.

### Phase I: Surface and Records Review

A Phase I study is an initial review of a site to determine if there is any reason to suspect contamination. It may also address compliance with environmental or Occupational Safety and Health Administration (OSHA) laws and regulations. A Phase I study is conducted by a trained environmental engineer or assessor who inspects the site and reviews aerial photographs to determine if there were any historical uses that might be linked with contamination, such as a manufacturing facility or agricultural uses with pesticides. Records from local fire, health, planning, and building and safety agencies as well as public works departments may be reviewed for evidence of historical uses, underground tanks, special manufacturing permits, or other issues that may warrant further investigation. Agencies such as the EPA and air and water quality control boards are also contacted, and their lists are reviewed to determine if there are any records reflecting historical or current contamination issues related to the property. Current

BACK_DEFEXP-RR-004065

and former tenants may also be interviewed to learn of any actions taking place on the property that may be associated with contamination.

Nearly all regulatory agencies maintain databases of properties that are somehow known to be connected with contamination. There are lists of properties with suspected contamination, contamination that is still to be cleaned up, sites that have been remediated and approved, sites that are partly remediated and contain residuals, and so forth. Usually when a property is put on a list, it remains on that list permanently. Some recent programs provide for listings to be removed as certain goals are met. With databases being maintained by federal, state, and local agencies, a single agency will likely have two or more overlapping databases, particularly if it enforces regulations for two or more programs. Nearly every database or list is available to the public, and the EPA and many state agencies have Internet sites that can be a helpful research source. There are even environmental research services that charge a very modest fee to tap into all applicable lists, produce a summary report and map for any address, and transmit this information to the requestor.

If the Phase I study indicates that no reason exists to suspect contamination, then no other studies may be necessary. However, if evidence indicates that the site may be contaminated, then a Phase II study may be required.

## Phase II: Subsurface Study

The goal of the Phase II study is to establish whether contamination exists at a site. A Phase II assessment may include collecting samples of soil, groundwater, surface water, sediment, soil vapor, and even building materials. Samples are usually taken near likely sources (tanks and plumbing) and from suspicious areas, such as those with discolored soil or standing puddles of unidentified fluids.

The EPA and other agencies have prescribed sampling techniques and laboratory analyses to be done for a broad spectrum of contaminants. Samples must often be kept cool or frozen and delivered to a certified lab in a timely manner. Chain of custody is documented, and the labs have quality control and assurance programs that must be strictly followed. These ensure that the samples have not been altered by activities in the field or the lab.

The Phase II study may find no contamination or concentrations that are below regulatory action limits. These are usually seen as positive findings because the property is then deemed to be unimpaired by contamination. If contamination is found and is present at levels that require remediation, a Phase III investigation will be necessary.

## Phase III: Characterization

Before a cleanup plan can be designed, it is necessary to define the nature and extent of the contamination. For example, a groundwater plume's length, width, and depth as well as the direction and speed at which it is moving must be known. These studies are more often referred to as *remedial investigations* (RIs) than Phase III studies and are necessary before the effectiveness and costs of various remedial alternatives can be examined in feasibility studies (FSs).

BACK_DEFEXP-RR-004066

The culmination of the site assessment process is the development of the remedial action plan (RAP). This plan is subject to careful review by the regulatory agencies involved and must be approved by them. It is the blueprint for the schedule, the methods to be applied, and the results to be achieved in the cleanup process. An approved RAP sets the stage for the start of the actual remediation process.

## Phase IV: Remediation

The remediation process is the actual cleanup of the released material. The goal of the remediation phase is not necessarily to return the property to an uncontaminated state but rather to remedy the problem to the satisfaction of the regulatory authorities. Parts of the property may be excavated and refilled, piping may be extended into the soil, and wells may be used to reach and treat groundwater. Numerous remediation technologies are available, depending on the specific mix of contaminants and where they are found. The choices of remedial technologies for various categories of contaminants are summarized in Exhibit 8.13. In many cases, a succession of technologies is used as concentrations change to remediate the problem most efficiently.

**Exhibit 8.13** Remedial Technology Choices for Various Contaminants

| Remediation Method or Process | Aqueous Solutions | | Organic Liquids | Sludges and Slurries | Solids |
| | Inorganic | Organic | | | |
| --- | --- | --- | --- | --- | --- |
| Adsorption | | √ | √ | | |
| Bioremediation | | √ | √ | √ | |
| Dewatering | √ | | √ | √ | |
| Distillation | | | √ | | |
| Drying | | | √ | | |
| Emulsion breaking | | √ | √ | | |
| Extraction | | √ | √ | √ | |
| Incineration | | √ | √ | √ | √ |
| Landfarming | | √ | √ | √ | |
| Landfill/landspreading | | | | √ | √ |
| Neutralization | √ | √ | | √ | |
| Oxidation | √ | √ | √ | √ | √ |
| Precipitation | √ | | | | |
| Solidification | √ | | | | |
| Stabilization | √ | | | √ | √ |
| Steam stripping | | √ | √ | | |
| Surface impoundments | √ | √ | | √ | |
| Wastewater treatment | √ | √ | | √ | |

## Effects of Environmental Contamination on Value

Environmental life cycles are an important set of factors in determining the effects of environmental contamination on real estate prices and market value. The point of the life cycle refers to the stage of remediation (before, during, or after cleanup) at the date of value. Research has shown that the risks perceived by the market change dramatically as a property moves though the remediation cycle. Before cleanup, risk and any property value diminution attributable to environmental conditions would generally be the greatest. Such risks decline as

BACK_DEFEXP-RR-004067

remediation is underway pursuant to an approved cleanup plan. After cleanup and regulatory closure, property value impacts are often minimal and, in many cases, disappear.

### The Before Cleanup/Assessment Stage[22]

Prior to being assessed, there may be great uncertainty about the environmental condition of the subject property, thereby generating uncertainty and a discount to account for the unknown characterization of the property's condition. Upon assessment, this uncertainty is reduced or eliminated. The principle underlying this effect is that risk is directly related to uncertainty about, and potential variance in, future cash flows. If there is little known about an environmental problem that might later require substantial expenditures for remediation, then future cash flows are less predictable and the investor would require a higher rate of return to compensate for this unknown risk and uncertainty. In fact, there may be a level at which risk and uncertainty are so high that a property is difficult to market or even unmarketable until greater knowledge becomes available. For contaminated properties, greater knowledge involves identifying the nature and extent of the contamination as well as the requirements, costs, and timing of the remediation effort.

### The During Cleanup/Repair or Remediation Stage[23]

Upon being assessed, a contaminated property typically goes through a remediation phase in which the contaminants are removed, treated, enclosed, or left to "bioremediate" through a more passive cleanup strategy. Often there are significant costs associated with a remediation project. Like any property that requires rehabilitation, there is risk associated with these efforts. The assessment of risk during this stage considers whether the cleanup plan has been approved by the appropriate regulatory authority and is being conducted in compliance with the provisions of such a plan. If a property is sold in an assessed but unremediated state, there may be a discount to account for project risk, which can be considered the *project incentive* required by the buyer if that buyer is responsible for cleanup. Otherwise, the risk could be termed *market resistance* if another party is responsible for the cleanup costs and related activities. It is likely that there is some combination of these two categories of risk operative at this stage.

#### Remediation Methods

All remedial options fall under one of two categories, *in situ* and *ex situ*. *In situ* remediation means that the treatment of the soil or groundwater is completed while keeping the soil and groundwater in place. *Ex situ* remediation measures, on the other hand, involve the excavation of soil. *In situ* processes are less disruptive and less expensive than *ex situ* methods, but they may take longer than *ex situ* methods and are often not as thorough.

---

22. This discussion originally appeared in "The Analysis of Environmental Core Studies," by Thomas Jackson, PhD, MAI, and Randall Bell, PhD, MAI, *The Appraisal Journal* (January 2002): 86-95.

23. Ibid.

BACK_DEFEXP-RR-004068

*In Situ* **Remediation Method.** There are a variety of *in situ* procedures:

- *Bioremediation and bioventing* involve the injection of oxygen or oxygen-releasing compounds through pipes into the soils or groundwater. The oxygen injected in this process stimulates aerobic biodegradation of the carbon-based contaminants.

- *Biodegradation* is a process in which microorganisms are mixed and added to soils to break down contaminants within the soils or groundwater.

- *Soil vapor extraction (SVE)* is a process in which fresh air is drawn into the ground with a vacuum pump. The air mixes with the contaminant's vapors and is then vacuumed back to the surface. The mix of air and contaminants is filtered, incinerated, or otherwise treated.

- *Passive biodegradation* involves the concept of natural attenuation, allowing the natural biodegradation of contaminants by the microbes that are already in the soil.

- *Groundwater treatment* involves boring wells or driving pipes down to the contaminated groundwater tables and pumping the subsurface contaminated groundwater to the surface, much like a regular water well. The contaminated water is filtered or otherwise treated and then, according to permit, is either discharged as waste or pumped back down into the ground through an injection well. An alternative treatment, called *air sparging*, involves injecting air into the groundwater to stimulate aerobic degradation and microbial activity and to promote the migration of contaminants in the remedial process.

- *Enclosure* involves the construction of air-tight walls that surround the building contamination materials (BCMs). BCMs are often surrounded with drywall. Enclosure is an effective technique and is less expensive than removal, although it has important engineering considerations because of the added weight of the enclosures. Additionally, access is not always available to all the areas within buildings that contain BCMs. Like encapsulation, enclosure is considered only a temporary solution, as all BCMs must be removed from a building prior to demolition.

- *Encapsulation* is a term used when sealants are sprayed onto the contaminant. The sealants surround, coat, and bond the contaminant and prevent any particles from being released into the air, creating a hard coating. Encapsulation may be less expensive than removal or, in many cases, enclosure, but it has disadvantages as well. The added weight of the encapsulating materials may hasten the decay of the contaminant, and encapsulated contaminants are more difficult to remove than those that have not been treated at all. Encapsulation is usually considered a temporary solution. It is currently not recommended as being a viable abatement choice, except in special circumstances.

- *Capping* is used when it is considered best not to disturb the subsurface material but there is still a chance that rain or other water moving through the soil could promote contaminant migration. Some contaminants may be removed and an impermeable cap may be placed over the contamination, preventing water from moving down into the site, thereby halting any movement of the contaminants. The site may be capped with vapor barriers, clean soils, concrete, or asphalt.

BACK_DEFEXP-RR-004069



Most people who visit this service station may never notice the small enclosed area near the corner. However, a closer investigation reveals a vapor extraction unit that has been installed to remediate the contaminants located in the soils.

BACK_DEFEXP-RR-004070

*Copyrighted material licensed to Richard Neustadt Nguyen on 2...*

***Ex Situ* Remediation Methods.** There are also a variety of ex situ remediation methods:

- *Excavation and off-site disposal*, sometimes called *scoop and haul*, is the simplest concept. Contaminated soil is simply excavated, exported, and disposed of in an approved off-site landfill. Then the soil is replaced with imported clean soils. While conceptually straightforward, this process is relatively costly, and there may be a lingering liability associated with the contaminated soils that were shipped off-site.

- A variation of excavation and off-site disposal is to excavate the soils, treat them on- or off-site, and then put them back into the excavation. One way of treating excavated soils, either on- or off-site, is by simply burning the contaminants through incineration. In a process known as on-site *low temperature thermal desorption*, soils are heated to vaporize and release the contaminants, which are then collected and treated.

- *Bioremediation*, *biomounding*, and *land farming* all involve excavating contaminated soils, adding nutrients or bacteria to stimulate microbes already in the soil, and perhaps adding microbes as well, all in order to facilitate biodegradation. The soils are spread by a bulldozer over a lined treatment area or kept in mounds. The soils are tilled from time to time to stimulate the process.

- *Fixation* or *encapsulation* involves the excavation of contaminated soils and the addition of fixation materials that stabilize, enclose, or encapsulate contaminants.

## The After Cleanup/Ongoing Stage[24]

Lenders may be willing to provide mortgage loans after a property has been remediated or has achieved a "no further action" status with the appropriate regulatory agencies. Perceptions of environmental risk by lenders and investors may decline significantly as a property is remediated, and some lenders and investors may perceive no additional risk after cleanup to applicable standards and the achievement of "no further action" status.

Residual risk, termed *market resistance*, may be eliminated through indemnification, cost cap insurance, secured creditor insurance, value assurance programs, re-opener insurance, pollution legal liability policies, or other factors in some situations with ongoing monitoring or O&M programs. In a valuation analysis, special attention must be paid to the specific status and condition of the subject property within the remediation life cycle at the date of value. Market data from properties in a similar remediation stage should be selected, as these would be most reflective of the subject's environmental impacts. Clearly, the risks associated with a contaminated property that has not yet been assessed are greatly different from the risk associated with a property that has been fully assessed and remediated and is in the after-cleanup stage of its life cycle. Identifying the specific life cycle phase is critical for a valid and reliable analysis.

When all the remedial goals are met, the responsible government agency generally confirms this fact in writing. The written document is often called

---

24. Ibid.

BACK_DEFEXP-RR-004071

a *closure letter* or a *no further action (NFA) letter*, which states that the case is closed or that no further action is required. An NFA letter is a positive step, as it serves as evidence that regulators are satisfied for the time being. It may also signal that a listing of the property has been moved from one publicly available database to another with less onerous connotations, which may reduce or eliminate the potential risks of property ownership and is often viewed favorably by potential lenders. Nevertheless, an NFA letter does not automatically indicate that a property is free of contamination, that it poses no further risks, or even that all of the contamination has been found. Furthermore, it does not indicate that there will not be additional, future investigations interfering with property use. The letter simply means that no further action is required on the project for which the letter was issued. No governmental agency will irrevocably certify a site as clean, even if the site has undergone remediation and has site closure status. However, while a technical risk may exist, the market perceptions may be such that no material risk exists at that point. Market data must be used to make such a determination.

## Environmental Costs, Use, and Risk[25]

Three issues must be taken into account when measuring diminution in value for any detrimental condition: costs, impacts on use, and risk factors. Environmental contamination provides an opportunity to study these issues in further detail. While these may or may not apply in all circumstances, they should all be considered.

### Costs and Responsibility for Remediation

The issue of responsibility for cleanup costs has profound implications if remediation is necessary and the subject property is evaluated in a non-remediated state. Whether or not the potentially responsible party (PRP) is known, has assumed responsibility for the environmental contamination, or has offered or provided indemnities to other parties and property owners can make a significant difference in the market's perception of environmental risk. A site for which the PRP has not been identified or for which the PRP does not accept responsibility for remediation will generally be more adversely impacted than an otherwise similar site for which the PRP accepts responsibility and has fully financed the cleanup plan. In addition, the financial strength of the party responsible for site remediation affects the market's perception of environmental risks. Much of the risk associated with contamination is centered on who will have to pay for cleanup and whether the responsible party is financially solvent.

For example, consider two service station sites that have been sold with leaking underground storage tanks. A major oil company, which has assumed all responsibility for cleanup costs, owns Service Station A. The company is solvent and financially responsible. Furthermore, not only will the oil company reme-

---

25. Ibid.

BACK_DEFEXP-RR-004072

diate the site, but it will also provide an indemnification to future owners of the property in which they accept any future liability associated with the contamination they caused. On the other hand, consider an otherwise similar Service Station B, which was owned by a now-retired husband and wife who have moved out of the state. The property has changed hands on several occasions, and it is uncertain who is responsible for the releases. Furthermore, all the potentially responsible parties deny any responsibility and have limited financial resources. Clearly, the impact of contamination on the value of Service Station A will not be comparable with the impact on Service Station B.

## Costs and Scale of the Project

Simply stated, some projects are quite large and some are quite small. For example, some of the largest contamination cases in world history include the nuclear power plant disaster of Chernobyl in Russia and radioactive contamination in the Marshall Islands from nuclear testing on the Bikini Atoll. The dynamics of these cases obviously differ substantially from radon gas in a single-family residence or a leaking underground storage tank near a commercial property. Whatever the situation, the same concept applies: in order to be valid, market data should generally relate to properties similar to the subject property in terms of the scale of the project.

## Impacts on Use and Use Limitations

Whether or not a property's utility has been impacted is another key factor. A situation in which the contamination has resulted in the property being vacated is clearly different from a situation in which the remediation is non-intrusive and the user can continue operations with little or no disruption. In addition, the effects of risk-based cleanups should be addressed. Risk-based cleanups typically allow remediation standards to be tailored to specific risk exposures and can allow for regulatory closure without the removal of all constituents. The notion that all constituents must always be removed is naive and does not reconcile with risk-based environmental cleanup programs.

For example, an industrial property would be remediated to industrial standards rather than more costly residential standards. There might then be a future use restriction on such a property, perhaps allowing only industrial uses or land uses with similar risk profiles. This restriction is typically recorded as a deed restriction. Deed restrictions may have an impact on use if the prohibited uses represent realistic alternatives for highest and best use, such as a restriction from developing homes on a site for which residential use would otherwise be considered the highest and best use. On the other hand, a historic museum that is always expected to remain a museum would not likely be materially impacted by a deed restriction prohibiting such uses as a school, day care center, hospital, or residence.

## Third-Party Liability Risk

Litigation from non-source property owners is possible in situations in which contaminants have migrated off-site from a source property. Some non-source or

BACK_DEFEXP-RR-004073

adjacent property owners may litigate, even though they have not been impacted in any material way. This risk to the source property owner must be considered, even though the merits of such cases may be questionable. In addition, employees or tenants of contaminated properties may pursue claims for personal injury. Third-party claims, especially from off-site migration of groundwater contamination, may pose an additional risk factor that should be considered.

### Time-Frame Risks

Perceived environmental risks have generally declined over time, so market data should ideally be collected from a time period similar to the subject property's date of value. Due to the rapidly changing nature of the market and people's experience with environmental risks, contaminated properties sold many years ago may not be appropriate comparisons for properties with current dates of value. The impact of contamination on real estate values has been generally lessened and even eliminated in some cases due to more flexible regulations, risk-based cleanup standards, better science, more effective remediation techniques, lenders and investors who are more experienced with environmental issues, and government programs that encourage the cleanup and reuse of contaminated sites.

### Risk Related to Indemnification and Insurance

An indemnification is a responsible party's written assurance that the party will incur all costs and risk associated with the contamination. When an indemnifying party is financially solvent and willing to pay the required remediation costs, the risk is reduced or may be eliminated altogether. Also, many risks can be insured. For example, remediation cost overruns, third-party liability, loss in property value, agency "re-openers," and other concerns may be largely or entirely eliminated by insurance.

## Cost, Use, and Risk Factors and Advisory Opinion 9

USPAP's Advisory Opinion 9 (AO-9) sets forth specific criteria to be used when dealing with an environmentally contaminated property. Any valuation of contaminated property should include a careful review of AO-9, along with the terms and questions posed. The life cycle and the cost, use, and risk factors set forth within the detrimental condition matrix are consistent with AO-9. As with any detrimental condition, the economic impacts of contamination on property value may be effectively studied within this framework. Although they may not all apply, the categories of cost, use, and risk should each be considered.

### Assessment Stage—Before

#### Costs

Costs during the assessment stage include any out-of-pocket expenses associated with assessing the level of contamination.

BACK_DEFEXP-RR-004074

### Use

Use considerations during the "before" stage include any disruptions in the use of the property during the assessment period. There may be no such disruptions or, in other cases, the occupants of a property may have to vacate the premises while testing is conducted.

### Risk

Risk in the "before" stage refers to any uncertainties associated with a property that has not been assessed. Certainly, the market may be reluctant to purchase a property for which contamination issues have been identified but have not yet been characterized. However, this uncertainty is only temporary in nature and would cease to be an issue upon the characterization of any problems.

In most cases, it is impossible to value an environmentally contaminated property "as is" without first being provided with the assessment and remediation cost estimates of an environmental engineer.

## Repair Stage—During

### Costs

In the repair stage, the costs associated with remediating the contamination and the responsibility for these costs must be considered. In other words, it would be improper to deduct environmental cleanup costs from a property value in a situation in which those costs are actually going to be paid by another party.

### Use

Use considerations during the repair stage include disruptions to use during any necessary remediation. As the remediation process may be intrusive, any loss of use during this period must be accounted for. On the other hand, environmental remediation techniques are frequently not intrusive, so there may be little or no loss of use. When applicable, this loss may be derived from the moving costs and the cost to rent alternative premises while repairs are underway. For an income property, impacts on rent and occupancy would be objective measures for the loss of use.

### Risk

Risk considerations in the "during" stage include the project incentive, if any, to entice a buyer to purchase a property that is damaged but not yet repaired. Like any "fixer-upper" property, a contamination-damaged property may incur an incremental discount above the actual repair and remediation costs if it were to be placed on the market and sold, assuming the standard definition of market value. Such an incremental discount would account for any managerial and profit motivations associated with damaged properties in general and may also include consideration of ongoing issues after repair. A simple, yet effective technique for deriving pre-repair risk or project incentive is to first identify properties with contamination that sold in a damaged condition, determine the unimpaired "baseline value," and subtract the actual repair costs.

BACK_DEFEXP-RR-004075

For example, a contamination-damaged comparable sale could yield the following data:

| | |
|---|---:|
| Baseline or unimpaired value: | $500,000 |
| Less: Actual sale price | 400,000 |
| Actual repair costs | 60,000 |
| Use issues | None |
| Project incentive | $40,000 |
| Percentage of baseline value | 8% |

If market perceptions are such that contamination does not result in a measurable element of pre-repair risk, the contamination-damaged comparable sale could yield the following:

| | |
|---|---:|
| Baseline or unimpaired value: | $500,000 |
| Less: Actual sale price | 440,000 |
| Actual repair costs | 60,000 |
| Use issues | None |
| Project incentive | None |
| Percentage of baseline value | 0% |

Some contamination issues could be so minor that their repair would be on par with common maintenance and the market data would reflect no project incentive. Also, project incentive damages may not be compensable by some court jurisdictions. However, this factor is not necessarily relevant to the appraiser or analyst, as the damage "is what it is" whether or not it is legally compensable.

## Ongoing Stage—After

### Costs

Costs in the "after" stage include any ongoing costs such as costs for groundwater or air monitoring to ensure the effectiveness of the repairs and remediation. If such monitoring costs are to occur over a significant time period, they would properly be discounted to present value.

### Use

Use considerations in the "after" stage include any ongoing changes to or limitations on the use or highest and best use of the subject property. Environmental contamination may or may not result in an alteration of the ongoing highest and best use of a property. If contamination does alter a property's highest and best use, it must be accounted for.

### Risk

Risk considerations in the "after" stage include ongoing risk, also known as *market resistance* or *stigma*, which could exist because of a history of contamination. This type of risk may not apply in situations in which contamination issues were properly addressed. If this type of risk is applicable, it could be analyzed as follows:

BACK_DEFEXP-RR-004076

| | |
|---|---|
| Baseline or unimpaired value: | $500,000 |
| Less: Actual sale price (repaired) | 470,000 |
| Use issues | None |
| Market resistance | $30,000 |
| Percentage of baseline value | 6% |

If market perceptions are such that contamination does not result in a measurable element of post-repair risk or market resistance, a previously contaminated comparable sale that sold in a repaired condition could yield the following:

| | |
|---|---|
| Baseline or unimpaired value: | $500,000 |
| Less: Actual sale price | 500,000 |
| Use issues | None |
| Market resistance | None |
| Percentage of baseline value | 0% |

## Agency Databases

Environmental issues generally require considerable specialized research. The following websites are key environmental resources that can provide assistance with such research:

- US Government Official Web Portal: *www.usa.gov*
- A to Z index of US government departments and agencies: *www.usa.gov/federal-agencies/a*
- US Environmental Protection Agency (EPA): *www3.epa.gov*
  - The Superfund program for cleaning up the nation's uncontrolled hazardous waste sites: *www.epa.gov/superfund*
  - The Brownfields program: *www.epa.gov/brownfields*
    This program is designed to authorize states, communities, and others in economic redevelopment to clean up and reuse *brownfields,* which are underused or abandoned commercial or industrial sites that suffer from real or perceived contamination, through revolving loan funds and cleanup grants.
  - Natural resource damages (NRD): *www.epa.gov/superfund/natural-resource-damages-primer*
    NRD responsibilities during CERCLA actions center on notification and coordination with Natural Resource Trustees.
- The US Fish and Wildlife Service: *www.fws.gov*
- FedStats: *https://fedstats.sites.usa.gov*
  This site provides statistics from over 100 federal agencies.
- National Technical Information Service (NTIS): *www.ntis.gov*
  This site serves as the largest central resource for government-funded scientific, technical, engineering, and business-related information.

BACK_DEFEXP-RR-004077

- US Department of the Interior (DOI): *www.doi.gov*
  The DOI is a Cabinet-level agency that manages America's vast natural and cultural resources. THE DOI uses sound science to manage and sustain America's lands, water, wildlife, and energy resources.

- US Department of Housing and Urban Development (HUD): *www.hud.gov*
  HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes.

- US Department of Transportation (DOT): *www.transportation.gov*
  The US Department of Transportation oversees the formulation of national transportation policy and promotes intermodal transportation.

- The Occupational Safety and Health Administration (OSHA): *www.osha.gov*
  OSHA enforces the safety of the workplace through inspections and investigations.

- The US Army Corps of Engineers (USACE): *www.usace.army.mil*
  The USACE provides engineering services to the nation, including navigation, flood control, environmental protection, and disaster response.

- The Centers for Disease Control and Prevention (CDC):
  *www.cdc.gov/environmental*
  This website covers topics related to health and the environment.

BACK_DEFEXP-RR-004078

# LOVE CANAL CASE STUDY

*By Randall Bell, PhD, MAI*

## Class VIII Detrimental Condition
## Environmental Contamination

The Love Canal was christened by a nineteenth-century industrialist named William T. Love. In 1893, Love began construction of a 10-mile canal from the Lake Erie side of the Niagara River to the Lake Ontario side to the north. The plan was that the 110-ft. drop would bypass Niagara Falls, and the hydro-power from the running water would produce electricity to power the "model city" he envisioned. Only about a mile of the canal was ever dug, and the project was abandoned due to the discovery of alternating current, which could travel long distances over power lines. The abandoned canal filled with rain and runoff water and became a local swimming hole in the summer and an ice rink in the winter.

From 1942 to 1953, Hooker Chemical Company and others disposed of 21,800 tons of toxic chemicals, including acid chlorides, sulfur compounds, trichlorophenol (TCP), and bentyl alcohol, in the canal. The site was later covered with a clay "cap" and sod, and it was sold for $1 to the local school board. It was common knowledge that the site harbored dangerous chemical contaminants, yet the school board built the 99th Street elementary school directly on top of the old covered canal. In the 1950s, hundreds of middle-class homes were built in the immediate area. Little or nothing was ever done by either the school board or local developers to monitor or maintain the property.

In the 1970s, local residents became alarmed by health problems, sludge, fumes, and phosphorous rocks, which would make a fiery impact when thrown by children. By the mid- and late 1970s, chemicals were found seeping into basements of homes surrounding the old landfill property. The Love Canal Homeowners Association became very vocal, and the situation received high-profile media attention. On August 7, 1978, President Jimmy Carter declared a federal state of emergency for the area, and the government offered to pay full price for all homes in the impacted areas, referred to as Rings 1, 2, and 3. (Ring 1 was the worst area, directly on or near the canal, Ring 2 was not considered fit for residential use and was eventually enclosed within Ring 1, and Ring 3 surrounded the canal and was the least impacted.)

The Love Canal Area Revitalization Agency (LCARA) was created to facilitate the buying of over 789 homes. This high-profile incident was the epicenter of the explosion of environmental legislation, particularly CERCLA, the $1.6 billion Superfund Act passed on December 12, 1980. The school was demolished, as were all the homes in the immediate area of the old canal (Rings 1 and 2). The canal area itself is currently covered and fenced off, and a remediation unit treats the underlying areas. Many homes to the east (a portion of Ring 3) still stand but are mostly abandoned, and there are plans to demolish all of them and build light industrial buildings and a retail power center. The Lasalle public housing project to the west was demolished, and the site is currently vacant.

Houses to the north (in a portion of Ring 3) were largely abandoned, but

BACK_DEFEXP-RR-004079



**Exhibit A**    Love Canal in 1978

BACK_DEFEXP-RR-004080



**Exhibit B**    Love Canal in 1998

BACK_DEFEXP-RR-004081

many were eventually refurbished and resold by the LCARA. This area is currently called Black Creek Village and, in retrospect, never posed much, if any, real environmental danger. The homes in Ring 3 began to sell on August 15, 1990, at a 20% discount under the appraised value. The first home was sold on November 28, 1990. The discount required to entice buyers has gradually been reduced, and after seven years the remaining homes were sold for their full value. Homes outside of the EPA study area (Rings 1, 2, and 3) were not considered impacted. While hundreds of families made an exodus, seven families in the eastern portions of Ring 3 never left the area and still reside there today, although there are rows of homes within this area that are abandoned.

Major litigation arose from the Love Canal, and much can be learned from the Court's decision, reported at 850 F. Supp. 993 (W.D.N.Y. 1994). Superfund claims by the United States and New York, along with personal injury and property damage claims by area residents, were filed against Occidental Chemical, the successor to Hooker Chemical. The government's claim ultimately totaled $865 million, and personal injury, property damage, and punitive claims totaled $25 billion. Related insurance claims totaled in the hundreds of millions.

An eight-month trial ensued, and dozens of expert witnesses, public officials, toxicologists, risk assessors, engineers, chemists, and hydrologists testified. Senior Federal Judge John T. Curtin rejected the state's claims.



Hundreds of deserted and boarded-up homes that were once part of a thriving neighborhood are all that remain in much of the area east of the Love Canal treatment area. Despite the hazards associated with the site, a few residents chose to remain, even after the disaster was discovered.

BACK_DEFEXP-RR-004082

*Copyrighted Material licensed to Richard Meehan, Igor Medic 20...*

Basically, the decision stated that the practices and science of the 1940s and 1950s could not be measured against the science and technology of the 1990s. The Court rejected much of what it called "junk science" and further found that only eight to 10 homes were in fact contaminated. Further, court documents showed that Hooker Chemical had actually been very reluctant to sell the site to the school district, and the company donated it only after providing strong warnings not to build on the site of the canal, which the school district ignored.

The Love Canal situation illustrates a spectrum of numerous important issues related to damaged real estate. On one hand, it awakened society to the dangers of environmental contamination, yet in some ways it illustrated the overreaction, hysteria, fear, and anxiety that can be generated by "junk science." Nevertheless, hundreds of homes were, in fact, abandoned, and many areas surrounding the canal area remain vacant today. In those areas that were shown to not be environmentally impacted, the homes still sustained a 20% discount for market resistance. However, this discount was eliminated after seven years, and the homes now sell for full value. Clearly, those areas directly over and immediately adjacent to the canal have no value, or are even a liability, as they can never be built upon or developed.

BACK_DEFEXP-RR-004083

BACK_DEFEXP-RR-004084



# 9

# Conservation Conditions

Conservation real estate involves three broad categories of issues:

• Natural resources, such as rivers, coastlines, canyons, wetland habitat, and endangered species
• Historic resources, such as historic homes, civic buildings, and battlefields
• Cultural resources, such as prehistoric villages, kivas, geoglyphs, effigies, stone chambers, and mound cities

Over the years, some landowners have lost economically productive uses of their properties upon realizing that their land was also home to an endangered species, historical designation, or archeological site. Furthermore, some coastal properties are automatically considered to have conservation issues, such as those imposed by the California Coastal Commission. For example, some landowners have learned that "the old swimming hole" is now classified as a protected wetland or that an entire property was once a prehistoric burial site. In 1996, many citizens, ranchers, and oil speculators were upset when the Clinton administration used an executive order to protect several million acres of environmentally sensitive land in Southern Utah. On the other hand, many environmentalists supported protecting this land. Land in this protected area has been encumbered by regulation and use restrictions that can drastically alter a property's highest and best use as well as its ability to be developed.

The past decades have brought a noticeable cognitive shift in the way property owners understand and respond to their environmental surroundings. Historically, land was usually perceived as being valuable if it was ripe for development or could be monetized through mining, agricultural or timber production, or connection to water rights. However, there is now a growing awareness of land's utility in a natural, preserved condition. As the demand for environmentally sensitive property increases for nonconsumptive and nonexploitive purposes, the value of these uses may begin to effectively compete with conventional development uses.

Some market segments place great value on endangered species habitats or archaeologically significant areas. Landowners may or may not be able to capi-

BACK_DEFEXP-RR-004085

**Exhibit 9.1**     **Conservation and Real Estate Issues**

| | | Real Estate (Real Property) | Non-Real Estate (Personal Property) |
|---|---|---|---|
| Natural Resource (Nature) | Issues | Features | Flora/Fauna |
| | Examples | Wetlands | Fish |
| | | Streams | Bears |
| | | Rivers | Elk |
| | | Waterfalls | Deer |
| | | Canyons | Birds |
| | | Minerals | Insects |
| | | Plants | Plants |
| | | Trees | Trees |
| Historical Resource (Historic Man-Made) | Issues | Features | Artifacts<br>Biofacts |
| | Examples | Houses | Letters |
| | | Civic buildings | Books |
| | | Offices | Guns/swords |
| | | Retail buildings | Cannon balls |
| | | Battlefields | Taxidermy |
| | | Cemeteries | Bones |
| | | Churches/places of worship | |
| Cultural Resource (Prehistoric Man-Made) | Issues | Features | Artifacts<br>Biofacts |
| | Examples | Ruins | Arrowheads |
| | | Villages/kivas | Pottery |
| | | Effigies | Carvings |
| | | Petroglyphs | Fossils |
| | | Geoglyphs | Horns |
| | | Cairns | Seeds |
| | | Cleared circles | |
| | | Stone walls | |
| | | Chambers | |

Note: Plants and trees could be considered real property in some situations and personal property in others. For example, agricultural crops are sometimes considered personal property.

talize on these properties, which are often encumbered by development restrictions. This may result in a divergence between the private and public utility of a property. The concept of *public interest value* originated in the 1970s in connection with the dedication or donation of private land for non-economic public purposes, including conservation and preservation.

This shift in society's response to its surroundings has sometimes led to political changes in land uses, causing conflicts between those who wish to preserve a unique, scarce, or environmentally sensitive resource and private landowners who wish to develop it. For example, consider a landowner who wants to fill a wetland near a prime intersection in order to build a strip retail center. This wetland may serve various non-market purposes, such as providing a duck habitat, absorbing spring runoff that helps reduce flooding, or purifying the water that soaks into the aquifer. Yet, even if the parties who benefit from the presence of the wetlands (e.g., duck hunters, potential downstream flood victims, users of the local aquifer) have adequate funds and value the benefits sufficiently to justify paying for them, the landowner might find it difficult to get the interested parties to pay enough to match the private benefits of building a shopping center.

BACK_DEFEXP-RR-004086

When market mechanisms to ensure the protection of a particular property do not exist, a government entity may intervene. The government may regulate the use of properties that share characteristics deemed worth protecting. The most notable examples of these laws include the Endangered Species Act of 1973 (ESA) and Section 404 of the Clean Water Act, which regulates the use and development of wetlands. In addition, many state and local governments have adopted laws to protect various species and habitats. In some cases, state and local requirements exceed federal requirements. In fact, different federal, state, and local agencies sometimes have conflicting and confusing regulatory objectives. These multilayered regulatory and permitting processes are often viewed by developers as effectively being a veto process. In addition, the lack of a consistent and coherent set of polices can lead to greater uncertainty and higher development costs, and may diminish the value of undeveloped land.

Some property owners have addressed this issue with inverse condemnation lawsuits. An inverse condemnation lawsuit is a legal action by a property owner alleging the taking of private property rights for public use without payment of just compensation. From the perspective of a property owner, such a taking may be considered a violation of the US Constitution's Fifth Amendment. Furthermore, a market has been created for mitigation land wherein a developer purchases sensitive land for preservation, in exchange for being allowed to go forward with development.

Because conservation issues are complex, some appraisers resort to less reliable valuation methodologies in an effort to simplify the appraisal process. This could include using contingent valuation approaches or other non-transaction-based methodologies. In reality, there are transactions involving vast amounts of conservation lands for purposes such as land banking, deed restrictions, creating open space, or other purposes. While perhaps difficult to research, there is generally ample transactional market data to conduct an analysis based upon the actual behaviors within the market.

It is critical to understand that natural resources, along with historical and cultural resources, can include both real estate and non-real estate issues. Of course, the Uniform Standards of Professional Appraisal Practice (USPAP) apply to both real estate and non-real estate valuations. Real estate natural resources could include land features such as waterfalls, rivers, or lakes. Of course, real estate appraisers would address such real estate features. On the other hand, in the context of natural resources, non-real estate issues could include wildlife such as fish, elk, or bears.

A real estate appraiser may be asked to address both real estate and non-real estate issues, provided they are qualified for both. Non-real estate issues may call for valuation methodologies known as resource equivalency analysis (REA), habitat equivalency analysis (HEA), and by other terms, which essentially attempt to find economic substitutes from the market for similar non-real estate resources. When properly conducted, these are simply applications of the established three approaches to value. For example, a non-real estate issue could be determining the value of the fish in a particular lake. The answer to this question would be derived from the traditional approaches to value. Specifically, this issue could be

BACK_DEFEXP-RR-004087

addressed by analyzing the cost to restore the fish, comparable sales or case studies involving fish, or the income generated by similar fish. In other words, valuation principles and the three approaches to value are well-established and apply equally to real estate and non-real estate issues, including natural, historical, and cultural resources. Real estate issues typically involve land features such as streams, rivers, waterfalls, volcanoes, or canyons, thus conventional land valuation methodologies would likely be applicable in related assignments.

## Natural Resources

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Oil Pollution Act (OPA) define *natural resources* broadly to include land, fish, wildlife, biota, air, water, groundwater, and drinking water supplies. By definition, a natural resource must belong to or be managed or controlled by the United States, an individual state, a Native American tribe, or a local or foreign government. Examples of natural resource damage would include damage done to rivers, trees, bears, or fish.

CERCLA focuses on the primary goal of addressing any release, or threatened release, of hazardous substances, pollutants, or contaminants that could endanger human health or the environment. CERCLA also focuses on the protection of human health, the environment, and natural resources. The OPA was enacted in reaction to the Exxon Valdez oil spill and addresses oil pollution and oil spills. Both the CERCLA and OPA give authority to assess and restore any damaged natural resources. The regulations define several different types of "injuries" to natural resources.

The federal government defines natural resource damages (NRD) as injury to, destruction of, or loss of natural resources. The measure of damages under the CERCLA and OPA would consider the cost of restoring injured natural resources to their baseline condition, compensation for the interim loss of injured resources pending recovery, and the reasonable costs of a damage assessment.

Detailed methods of determining damages to land resulting from the discharge of oil or other hazardous substances are outlined in the CERCLA and the Clean Water Act. This assessment includes costs needed to ensure that the public be compensated for losses suffered as a result of the discharge and lost services during the time the resource could not produce its normal services as well as costs needed to bring the resource back to its original condition. In addition to lost use values such as the loss of recreation or subsistence activities, such as fishing or hunting, damages resulting from the loss of existence or bequest value may also be recoverable, recognizing that people may derive value from simply knowing that the resource is there even if it is never actively used. In some economics literature, natural resource values not related to the present use of the resource have been termed *existence*, *intrinsic*, *passive*, or *non-use* values.

A natural resource damage assessment can be seen as the difference between the pristine (unimpaired) "before" condition and the damaged (impaired) "after" condition, including assessment costs, loss of use expenses, and repair costs.

BACK_DEFEXP-RR-004088

The monetary assessments are then used to restore damaged ecosystems such as rivers, wildlife habitats, and beaches. This restoration includes rehabilitation, replacement, or acquisition of equivalent resources and requires careful study of the dollar costs for and risk involved with bringing a natural resource back to its baseline condition.

## Wetlands and Endangered Species

The Endangered Species Act (ESA), passed in 1973, is one of the most comprehensive pieces of environmental legislation ever enacted by Congress. The act sets forth clear public policy to preserve the nation's natural resources, particularly those species at risk for extinction. The US Fish and Wildlife Service's responsibilities as set forth by the ESA include providing consulting services, planning for species recovery, providing necessary permits, and implementing the recovery.

The Endangered Species Act provides a means to *conserve* the ecosystems on which endangered and threatened species depend. The ESA defines *conservation* as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."[1]

Recovery is the cornerstone and ultimate purpose of the ESA. The objectives of recovery are to

1. Identify the ecosystems and organisms that face the highest degree of threat
2. Determine the tasks necessary to reduce or eliminate the threat
3. Apply the resources available to the highest-priority recovery tasks
4. Reclassify and delist species as appropriate

*Wetlands* are defined by the Emergency Wetlands Resources Act of 1986 as land with a predominance of hydric soils that is saturated or inundated by surface or groundwater at a frequency and duration that can support, and under normal conditions does support, hydrophytic vegetation typical for saturated soil conditions.[2] Wetlands are generally open-water habitats that are seasonally or permanently waterlogged. Wetland areas are naturally occurring systems in which the exposure of the soils to water creates soil conditions in which vegetation and fish or wildlife communities thrive. These areas are often characterized as bogs, marshes, swamps, and tidal areas. Wetlands can also appear seasonally as *vernal pools*, which are pools that form in spring but are dry the rest of the year, or *playas*, which are the bottoms of undrained desert basins that are sometimes covered with water. Wetlands can also appear seasonally as *prairie potholes*, which are depressional wetlands that usually take the form of freshwater marshes.[3] Wetland areas, especially marshes and bogs, are among the most vul-

---

1. The Endangered Species Act, as amended through the 108th Congress, Section 3. The Act can be found on the website of the US Fish and Wildlife Service at www.fws.gov.
2. Emergency Wetlands Resources Act of 1986. 16 U.S.C. 3901-3932, November 10, 1986, as amended 1988 and 1992.
3. "Prairie Potholes," US Environmental Protection Agency, accessed March 3, 2016, www.epa.gov/wetlands/prairie-potholes.

BACK_DEFEXP-RR-004089

Case 3:21-cv-00232-DWD    Document 316-1    Filed 04/04/25    Page 274 of 526    Page ID #24815



Wetlands are fragile natural resources that support life as well as provide flood control, recreation, and scenic views. (Photo of an inland watercourse in Connecticut provided courtesy of the Town of Branford, Inland Wetlands and Watercourses Agency.)

nerable to disturbance because they can easily be modified for a variety of uses. For example, wetlands can easily be drained to eliminate mosquito breeding grounds, or they can be drained and reclaimed for agriculture or forestry uses. Wetlands can also be easily modified to provide a water supply, flood control, hydroelectric power, waste disposal, and other uses.

Over the past decade, members of the scientific community, government agencies, and an increasing majority of the public have become more aware of issues surrounding the ecological role wetlands and habitat play in the environment. Wetlands filter and recharge aquifers, improve the quality of water in rivers and streams, and provide habitat for threatened and endangered species. In addition, wetlands provide a number of economic benefits to society, including helping to furnish a variety of valuable resources such as fish, timber, wild rice, and furs. Wetlands also help absorb heavy rains and snowmelts, reducing or slowing the runoff that often causes devastating floods. Wetland vegetation can also slow floodwaters. The loss of large amounts of wetlands throughout the Midwest and in California's Central Valley certainly increased the severity of flooding and damage caused to communities in those areas during the major floods of the mid-1990s.

BACK_DEFEXP-RR-004090

*pyrighted material available only through Richard Roddewig's Course 2*

The identification and general valuation of wetlands is covered in the book *The Valuation of Wetlands* by David Michael Keating, MAI, published by the Appraisal Institute.

### Legal Issues

Section 404 of the Clean Water Act is the primary federal program that regulates activities within wetlands. The Section 404 program is administered by both the US Army Corps of Engineers (USACE) and the Environmental Protection Agency (EPA). The act states that the USACE holds primary responsibility for issuing permits. The USACE is authorized, after notice and public hearing, to issue permits for the discharge of dredged or fill material into the "waters of the United States," which has been interpreted to include wetlands. The EPA is responsible for reviewing and commenting on permit applications and has veto power over permits. It should be noted that Section 404 regulates only the discharge of dredged or fill material, and does not explicitly prohibit the drainage or excavation of wetlands unless those activities involve the discharge of dredged or fill material. Permits to fill or dredge wetlands are usually only issued under the following circumstances:

1. There is no available practical alternative with fewer effects on the aquatic ecosystem.

2. Dischargers will neither violate other applicable regulations or laws (e.g., state water quality standards, toxic effluent standards, the Endangered Species Act), nor significantly degrade the waters into which they discharge.

3. All appropriate and practical steps have been taken to minimize and otherwise mitigate the impacts of the discharge on the aquatic ecosystem.

Many state and local governments also regulate development activities in wetland areas as well as the drainage and excavation of wetlands. In August 1991, President George Bush signed an executive order establishing a national goal of "no net loss" of wetlands. The Clinton Administration subsequently took this up as an interim goal, while establishing a long-term goal of increasing the quantity and quality of the country's wetlands. Generally, the political climate has created more and more restrictive uses for wetlands.

### Habitat

While the definition and categorization of wetlands is relatively easy, the categorization of *habitat* is substantially more complicated. *Habitat* is the physical and biological environment used by an individual, a population, a species, or a group of species. The term *habitat* is typically used as it applies to a single species, such as the spotted owl habitat. This can be compared to an *ecosystem*, which is a group of organisms and their physical environment.

A habitat is a complex web of relationships among plants, animals, soil, and climate. While plants and animals have developed over millions of years, their habitats and communities are in a state of constant change. A habitat goes through a youth-to-maturity process similar to that of a living organism, usually in a period of less than 1,000 years. The process of maturation involves a series of habitat successions until a mature, balanced ecosystem becomes established.

BACK_DEFEXP-RR-004091

These systems are sometimes knocked out of balance by fires, volcanic eruptions, floods, and other periodic catastrophes. The resulting ecological succession is also the process of healing a habitat. Human-induced stress is becoming a more common cause of habitat degradation, and as a result more laws that restrict habitat degradation are being adopted. When a habitat or ecosystem is severely degraded over a long period of time, the land or water becomes so damaged that natural restoration cannot occur without explicit efforts to aid the process.

The Endangered Species Act (ESA) prohibits the *taking* of an endangered or threatened species. The act defines *taking* as harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, collecting, or attempting to engage in any of these actions. In addition, criminal and civil penalties can be brought against individuals who take a species.

Real estate development in sensitive areas often impacts a species in a manner that is construed to be a taking. However, the ESA allows for the US Fish and Wildlife Service to issue "incidental take" permits following the successful completion of a habitat conservation plan (HCP). The HCP must specify

- The impact that will result from the taking
- The steps that will be taken to minimize and mitigate the negative impacts, including the identification of the sources of funding
- The available alternative actions to the taking and the reasons for not selecting those options
- Other measures required by the Secretary of the Interior as being necessary or appropriate

Such a permit is to be issued only if the following four conditions are met:

- The taking is incidental to an otherwise lawful activity
- The applicant minimizes and mitigates the impacts of the taking to the maximum extent practical
- The applicant ensures that adequate funding will be provided
- The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild

One problem that has plagued planners and government agencies is the identification of the habitats of various species that have been designated as threatened or endangered. For example, much of the debate surrounding the northern spotted owl in the Pacific Northwest has to do with the appropriate size of the habitat. Early studies indicated that a nesting pair of northern spotted owls required a minimum of 300 acres of old growth forests surrounding the nest. Although such an observation appears to lead to an obvious solution, important facts remain uncertain, such as whether this minimum size would be large enough for multiple nesting pairs or for the pairs' offspring to breed and continue the species.

Another problem is that a preservation plan's concentration on one species ignores the interrelatedness with and potential impacts on other animal and

BACK_DEFEXP-RR-004092

Copyrighted Material Reserved, Richard J. Roddewig, June 2025

plant species. These types of issues continue to plague development in areas that contain the habitat of an endangered species.

### Past Development Trends in Sensitive Areas

In the past, property owners and developers were rarely constrained by legal obstacles in land development, and highest and best use was generally a function of financial feasibility and maximum net return. A property owner was relatively sovereign in the use of his or her property.

In the past, the market generally believed that most environmentally significant real estate could be put toward the private use that represented the greatest net return to the property owner. In other words, any diminution in value of environmentally significant real estate was solely the result of overcoming a natural obstacle. For example, some environmentally significant real estate, such as wetlands, were considered by many market participants to be a nuisance that often added little or no contributory value to a given property. If a wetland area did have a substantial market value, it was because the wetland offered an amenity such as a view to a residential use or because it was a source of raw materials, such as the hardwood forests located in the swamps of the American Southeast. In some cases, the cost of draining or filling a wetland area was lower than the resulting value of the filled, usable site. As the population increased and developable land became scarce, many entrepreneurs filled and drained wetlands as a profitable activity. The reclamation of wetlands was further increased by government subsidy programs that promoted the draining and filling of wetlands for agricultural use.

### Current Development Trends in Sensitive Areas

The market for many properties in environmentally sensitive areas is in a state of flux. Although laws impacting environmentally sensitive real estate are being enforced more vigorously, mitigation of impact is often perceived as a viable tool in the development process. In addition, individuals, government entities, and groups such as the Audubon Society, the Nature Conservancy, the Trust for Public Lands, and Ducks Unlimited are competing to purchase some of these properties and creating a market for them in the process.

The protection of wetlands and the protection of habitat areas have similar impacts on the ability to develop and use real estate. If a property is impacted by wetland or habitat protection issues, a permit will likely be required in order for development to proceed. While builders have been frustrated by resulting costs and delays, conservation interests are frustrated that the case-by-case permitting process can degrade an ecosystem and thereby damage habitat.

In some areas of the country, developers and conservationists have acknowledged a common interest in developing a process that is more predictable and offers long-term assurances. They have begun to act together in conjunction with regulatory agencies to devise regulations and mitigation plans that are acceptable to both sides and meet legal requirements. The result of these multiconstituency programs has been the development of focused special-area programs, such as wetland mitigation banks and multispecies habitat reserves. Both of these programs mitigate impact by setting aside a protected wetland or habitat area.

BACK_DEFEXP-RR-004093

Government regulations permit a property owner to develop a property if the potential impact on a wetland or sensitive habitat area can be mitigated. Mitigation usually requires that a developer buy a property that has had its naturally occurring habitat damaged and restore it.

### Mitigation Land Banks

Often developments are approved under the condition that the developer mitigates for any natural resources taken. Instead of requiring developers to create and maintain wetlands, a task they are not well trained for, the development of mitigation banks is an option. Mitigation banks are wetland areas that have been restored or created by a government agency or an investor who "transfers" restored, preserved wetlands (in the form of credits) to a developer. The developer can then use these mitigation credits to offset the impact of wetland or habitat destruction resulting from development. Although these banks are often owned and operated by the government or large corporations, there is a growing trend toward private, entrepreneurial mitigation banks, which are being developed to sell mitigation credits on the open market.

The following are examples of different types of mitigation banks:

- Single-owner or -user banks are usually established by a large company or public agency whose future development plans call for filling numerous small wetlands over several years. The company or agency may create a large wetland from which it can later withdraw "credits" as compensation for future wetland fills, rather than create a small wetland at each site on a case-by-case basis.

- Entrepreneurial banks are similar in principle to single-owner banks except that the bank is established by a landowner or investor and the credits can be purchased by anyone.

- Joint projects typically arise when a consortium of developers agree to fund a mitigation project to compensate for specific, future losses of wetlands or endangered species habitat.

### Highest and Best Use Analysis

The four standard tests of highest and best use (physical possibility, legal permissibility, financial feasibility, and maximum productivity) need to be analyzed for any property. However, the existence of a wetland or protected species habitat usually requires additional analysis. In the first stage, the proposed mitigation must be analyzed in terms of the four criteria of highest and best use to ascertain whether mitigation of the site is permitted, feasible, and represents the greatest net return to the site. If the mitigation is warranted, then a traditional highest and best use analysis can be performed.

In addition to zoning regulations, building codes, and deed restrictions, agencies as diverse as the USACE, the Department of the Interior, the Department of Agriculture, and the federal Department of Commerce may have legal jurisdiction over a given property. State and local governments can also restrict development through a variety of agencies.

It is fundamental for the appraiser or analyst to research the legal restrictions impacting development of an environmentally sensitive property. Often, the

BACK_DEFEXP-RR-004094

property owner seeking the appraisal has already researched and applied for the necessary permits required for the proposed development. The developer's attorney may be a good source of information for determining the legal status. Legal restrictions may or may not eliminate the possibility of traditional private property uses. The existence of a wetland or an endangered species habitat on a property usually does not mean that the property cannot be developed, but rather that the development must meet a variety of restrictive requirements. Variances to zoning and other legal constraints may be granted, but generally not until sufficient studies are conducted or sufficient reasons are provided by the property owner. Furthermore, if there has been some type of environmental spill or other damage and restoration is mandated by a governmental agency, then that mandate in and of itself may alter the highest and best use of a property.

If a property meets federal, state, and local regulations, then development is considered to be legally permissible. Once the legal ability to mitigate a wetland or habitat is established, the next step is to evaluate the physical possibility of any mitigation. For example, is there adequate room on site to mitigate the wetland or habitat? Is it possible to buy mitigation credits from a mitigation bank, or is there an HCP in effect that permits developing habitat? If none of these options are available, is it possible to mitigate the sensitive area off site?

The process of mitigation often requires in-kind preservation–i.e., the destruction of a wetland must result in the creation of at least an equal amount of wetland or habitat area. If the desirable form of mitigation is the restoration or enhancement of a wetland or habitat, then several acres may need to be restored for every acre developed. Thus, the ability to locate and develop restorable wetland areas is crucial in evaluating the physically possible uses.

The third test of highest and best use is that of financial feasibility. If the resulting value of a project is greater than its costs, development is considered to be financially feasible. Government regulation usually increases the cost of doing business. The expense of hiring experts, applying for permits, and responding to lawsuits by interested third parties has stopped many real estate developments. Nevertheless, many projects are built in ecologically sensitive areas, indicating that traditional market activities can still be feasible even with increased costs from regulation. Ultimately, it is an issue of balancing both objectives of development on one hand and the protection of the environment and natural resources on the other.

The maximally productive use is the one that produces the highest residual land value (pre-mitigation) consistent with the rate of return warranted by the market for that use. In other words, this test requires that the appraiser or analyst determine the residual value of a site by estimating its value after mitigation and subtracting all of the mitigation costs.

## Historic Properties

There are a wide variety of properties that can be considered historic. They may be informally labeled as historic buildings or officially designated by governmental institutions, such as the National Park Service's National Register of Historic

BACK_DEFEXP-RR-004095

**Exhibit 9.2**    Wetlands Highest and Best Use Analysis



Places (NRHP), the nonprofit National Trust for Historic Preservation, numerous cities, or numerous preservation councils. These entities often have special criteria for evaluating a property, along with a host of protocols and procedures. Many cities, towns, and counties have special historic districts, along with an accompanying set of development standards.

Sociologically, it is often considered beneficial to preserve such buildings, as they contribute to a community's overall sense of heritage. Types of historic buildings include homes, commercial properties, hotels, restaurants, or office buildings. Parcels of land where historic events took place, such as battlefields, can also be historic. Often historic properties such as bed and breakfasts, museums, parks, or other specialty uses have intrinsic charm and character and could create special demand.

Economically, a historical designation may be positive, negative, or neutral. On the positive side, a formally designated historic property may be eligible for special treatment, grants, restoration loans, tax benefits, favorable zoning, or other benefits. The character of the building may command rent premiums or increased demand. Historical properties are often located within historical districts, which can add a sense of distinct overall charm and attraction to the neighborhood.

BACK_DEFEXP-RR-004096

On the negative side, historic properties may not be energy efficient, may not comply with the Americans with Disabilities Act (ADA), may have an inefficient or outdated design, or may not represent the highest and best use of the land. Restoration costs may be high and require contractors with specialized skills, and in some cases the restoration costs may be even higher than new construction. Repairs or modification may be restricted, cumbersome, or expensive.

Like any real estate venture, historical properties present a host of unique costs and benefits, which the appraiser must research and analyze. Ultimately, the valuation of historical properties comes down to what restrictions the property has for updating or redevelopment and the income potential, sales prospects, and alternative uses for the property. A credible solution often involves a detailed study of the specific historic designation, a careful review of restoration and operating costs, and finding similar historical property income and sales comparables.

## Cultural Resources

Natural resources, which include natural features such as fish, wildlife, trees, and waterways, are distinct from historical or cultural resources, which are prehistorically man-made. The term *prehistoric* typically refers to a time period prior to writing, which in the United States is generally considered to be before Columbus. As such, cultural resources involve archaeology, which studies ancient civilizations, beliefs, and how historic or prehistoric people lived and worked. The three broad categories of archeology are:

- Artifacts–items placed in a museum or collection, such as bowls, weapons, or tools
- Biofacts (also called *ecofacts*)–natural items such as horns, bones, or seeds that were historically used by people
- Features–such as building structures, kivas, petroglyphs, pictograms, wheels, henges, stone walls, or chambers

Archaeological features are attached to the land and are legally considered to be real estate, thus valuation issues come under the domain of the real estate appraisal profession. Archeological features exist not only around the world, but throughout the United States. Some archeological features are historic (having to do with the original colonies, pioneers, the Civil War, or the World Wars), while others are prehistoric (having to do with the Native Americans, Mississippians, Pueblo peoples, etc.). Examples include stone walls and chambers in New England, as well as numerous mound cities and effigies (structures that resemble animals or other shapes when viewed from the air) along the Mississippi River and its tributaries. Nationally, and specifically in western states, there are thousands of petroglyphs (carvings into stone), pictograms (paintings), geoglyphs (figures viewable from the air), villages, cliff villages, kivas (round structures), roads, trails, bedrock mortars (circular holes in rocks), cleared circles, stone and wood henges, cairns (piles of stones), and carved stones. On top of this, many of

BACK_DEFEXP-RR-004097

these features have archaeo-astronomy characteristics, meaning that they were constructed to view lunar or solar events, such as solstices or equinoxes.

There is a clear distinction between archeological and real estate issues. As noted, archeological features are attached to the land, thus they are legally real estate. Accordingly, real estate appraisers would value the contributory value (if any) of these features in a similar way as evaluating conventional building improvements. In such an assignment, appraisers should be familiar with these features and similar features in the marketplace. However, appraisers should generally not render archeological opinions as to who constructed these features or speculate as to when they were constructed or the purpose for which they were constructed, unless it is obvious and undisputed.

While the clear focus of real estate appraisers is on real estate features, it can be helpful to have some overall context of the archeological field. Archaeology involves research, interpretation, and cultural resource management, which are divided into the three categories of land, water, and survey. These three divisions can be further classified into two types of study: *in situ*, which studies the natural site to inventory resources and produce conservation facilities, and *on the shelf*, which is the collection and recording of information about the site. Proper maintenance of archaeological objects, specimens, and reproductions is important to the preservation of these artifacts.

It is clear that there were vast prehistoric civilizations that constructed innumerable archeological features within the United States and across the world. With modern development and infrastructure, it was inevitable that many of these features were destroyed. Additionally, many of these resources have been looted or vandalized. One of the most commonly used and destructive methods for gathering historical data is excavation. Once a site is excavated, re-excavation is impossible. This is why archeologists sometimes meticulously record the initial location of all significant objects on a site before it is excavated.

Cultural resources are those sites that have particular historical interest, such as ancient burial grounds or battlegrounds, or artwork carved onto mountains or rocks. Archeologists, historians, and other specialists work to locate these resources, document their significance, and sometimes make them available to the public. Cultural resource sites are often nonrenewable. Once a site is disturbed or an object is removed, little can be done to recover those resources. Even so, many tens of thousands of archeological features still remain today.

Archaeological and cultural resources can also be considered in the context of the following categories:

• *Archeological resources* are the remains of past human activity and records documenting the scientific analysis of these remains. Examples of archeological resources include stratified layers of household debris, a field notebook, laboratory records of pollen analysis, or museum cases of polychrome pottery. Archeological features are typically buried but may extend above ground; they are commonly associated with prehistoric people but may be products of more contemporary society. What matters most about an archeological resource is its potential to describe and explain human behavior. Archeological resources

BACK_DEFEXP-RR-004098

*Copyrighted Material - Not for Resale, Distribution, or Redistribution Purpose 28*

have shed light on the family organization and dietary patterns of different cultures and have helped people understand the spread of ideas over time and the development of settlements from place to place.

- *Cultural landscapes* are settings that people have created in the natural world. They reveal fundamental ties between people and the land. These ties are based on people's need to grow food, give form to settlements, enjoy recreational activities, and find suitable places to bury the dead. Landscapes are intertwined patterns of natural and constructed items such as plants, fences, watercourses, and buildings. Landscapes can be formal gardens, cattle ranches, cemeteries, pilgrimage routes, or village squares.

- *Structures* are material assemblies that extend the limits of human capability. Without structures, people would be restricted to temperate climates, the distances they can walk, and the loads they can carry. With structures, people can live where they choose, cross continents in a matter of hours, or send a spacecraft to the moon. Examples of structures include buildings, bridges, temple mounds, fishing vessels, auto factories, and bronze statues. Structures can be thought of as elaborations of human productive ability and artistic sensitivity.

- *Museum objects* or artifacts are evidence of a culture's technical development, scientific observation, personal expression, curiosity about the past, common enterprise, and daily habits. Examples of museum objects include prehistoric sandals, an American president's walking cane, a blacksmith's tools, a marine biologist's field notes, fossilized dinosaur bones, business journals, or household furnishings. Museum objects are invaluable samples and fragments of the world preserved through time. Artifacts are man-made items, while ecofacts or biofacts are natural items, such as animal horns, bones, or seeds, which have been collected or used by people.

- *Ethnographic resources* are basic expressions of human culture and the basis for the continuity of cultural systems. Cultural systems include traditional arts, native languages, and religious beliefs. Some of these traditions are supported by ethnographic resources, which include special places in the natural world, structures with historic associations, and natural materials. Examples of ethnographic resources include a riverbank used as a Pueblo ceremonial site, a schoolhouse associated with Hispanic education, sea grass used for making baskets in an African-American tradition, or a nineteenth-century sample of carved ivory from Alaska. Management of ethnographic resources acknowledges that culturally diverse groups have their own ways of viewing the world and a right to maintain their traditions.

A critical issue related to cultural resources is the concept of *significance.* Some features are relatively rare, while others are quite common. To be considered significant, a cultural resource must have important historical, cultural, scientific, or technological associations. Cultural resources may be linked to historic events or noteworthy people or provide evidence of technical accomplishment. Cultural resources may also be sources of important information for historical or archeological research or be significant to a particular ethnic group.

BACK_DEFEXP-RR-004099

When studying cultural features, the appraiser must consider the type of feature, the abundance of similar features, whether the feature can be "monetized" in some way (such as through admission costs, parking fees, bookstores, etc.), and possible preservation costs. This should all be done in the context of development potential, as well as the balance between preservation and the need for continuing development.

The most prominent features in the nation have been monetized. Examples of such sites are Serpent Mound in Ohio, Cahokia Mounds in Illinois, America's Stonehenge in New Hampshire, and the Manitou and Mesa Verde Cliff Dwellings in Colorado. Secondary features are not monetized but may be preserved, such as the Blythe Intaglios geoglyphs in California, as well as numerous bedrock mortar, petroglyph, and mound city sites. Lesser-known features tend to be numerous and also tend to be neither monetized nor protected.

Often, the ultimate question to answer is what incremental value, if any, the feature has on the value of the property. When questions arise as to the value or diminution in value of features, the established real estate valuation methodologies apply. Transactional market data is always preferred over contingent valuation or other less reliable methodologies. With tens or hundreds of thousands of archeological features available, utilizing sales comparables and case studies is not only feasible but essential for a credible analysis.

BACK_DEFEXP-RR-004100

*Copyrighted material reproduced by Richard Roddewig Volume 2*

# Yuba River Floods Case Study

*By Burrell E. Montz and Graham A. Tobin*

## Class X Detrimental Condition Flooding

In February 1986, the communities of Linda and Olivehurst in Yuba County, California, were flooded when a levee broke along the Yuba River. Research following that flood centered on two lines of inquiry to evaluate the immediate impacts of flooding on residential property values:

1. Identification of relationships that may exist between characteristics of the flood event and changes in house values over time.

2. Determination of the extent to which house prices are influenced by the flood hazard.[1]

The findings of that research demonstrated spatial and temporal impacts of flooding on house values. Not only was there a significant decline in property values throughout the floodplain over a two-year period, including non-flooded properties in the area, but the degree of impact was also directly related to the depth of flooding. Those properties flooded in excess of 10 feet clearly experienced the greatest decline in sales prices. By the end of the research period, properties flooded to lesser depths (18 inches) were beginning to increase in value, even relative to non-flooded properties, a fact explained in part by the improvements made to such properties because of the flooding. Thus, the effects of the flood were felt throughout the entire residential real estate market and not just in submarkets defined by flood depths. Further, the flood made a significant contribution to explaining differences in selling prices, as greater flood depths meant lower selling prices. A particularly important result of this research, therefore, was the identification of real estate submarkets based on flood experience.

The foregoing discussion presents the situation in Linda and Olivehurst within two years following the 1986 flood and documents the immediate post-flood impacts. However, in order to determine how long it takes a residential real estate market to recover to pre-flood levels, it is necessary to examine house prices over a longer period. It is such a longitudinal analysis of the residential property values in Linda and Olivehurst that is the focus of current research, the results of which are reported here. Three general research questions were addressed in this phase of the research:

1. What is the length of the recovery period for the residential real estate market following catastrophic flooding?

2. Do the flood depth submarkets continue to exhibit differences in property values more than six years after the flood?

3. To what extent do variables associated with flooding continue to explain differences in selling prices for houses?

### Related Literature

Studies on both long- and short-term responses of housing markets to a nat-

---

1.  Montz and Tobin, 1988; Tobin and Montz, 1988; Tobin and Montz, 1994. See case study bibliography for complete citation.

BACK_DEFEXP-RR-004101

ural event, or to the threat of an event, have been undertaken, with most of this research focusing on earthquakes and floods. The premise on which most of these studies are based suggests that the existence of a hazard or the occurrence of an event will have a negative effect on house values because of a decrease in utility that is associated with the hazard or event. For instance, in a theoretical examination of the earthquake hazard, researchers suggested that house values would fall in high-risk areas and rise in low-risk areas,[2] an argument that has been supported empirically in a study of Los Angeles and San Francisco.[3] In these cities, houses in areas designated as Special Studies Zones, and thus particularly prone to earthquakes, sold for less than houses outside those zones. Studies of the flood hazard have shown similar results, although there have been some contradictory findings in different communities.[4]

This research theme is not limited to the United States. Studies in Australia[5] and New Zealand[6] demonstrated an immediate depreciating effect following disaster events with some continued impact over the longer term. However, these studies also pointed out problems associated with trying to separate flood-related market impacts from market impacts relating to other socioeconomic and environmental variables.

Furthermore, there is another, more indirect impact that has been found by this research, and that relates to the existence of housing submarkets. Earlier research by the authors identified discernible submarkets associated with flood depths,[7] and submarkets were also identified in the communities studied in Australia and New Zealand. Again, the earthquake hazard also illustrates the importance of submarkets, wherein older brick buildings that do not meet building standards regarding earthquake safety comprise a submarket.[8]

What remains to be documented is the longevity of these submarkets– that is, whether they are a short-term response to a hazardous situation or whether they continue over the long term. Part of this may be explained by the expectation model proposed by Yezer and Rubin (1987). This model relates economic change to anticipation of events. If an event is unanticipated, then economic change will follow; if anticipated, no change occurs or there is no lasting impact. Certainly flooding from a levee break, as in Linda and Olivehurst in 1986, was unanticipated, so economic impacts might have been expected and were, in fact, documented.[9] The extent to which these economic impacts can be seen 10 years later is under study here.

### The Theoretical Foundation
The conceptual framework for this work was presented in Tobin and Newton (1986) and is depicted in Ex-

2.  Scawthorn, et al., 1982.

3.  Brookshire, et al., 1985.

4.  MacDonald, et al., 1987; Muckleston, 1983; Shilling, et al., 1985.

5.  Lambley and Cordery, 1991.

6.  Montz, 1992.

7.  Tobin and Montz, 1994.

8.  Alesch and Petak, 1986.

9.  Montz and Tobin, 1988.

BACK_DEFEXP-RR-004102

Copyrighted material unlawfully distributed by Richard Jacobs litigation zone 2x

hibit A. Briefly, the graph presents three scenarios following a flood (or other event).

Immediately following a flood, property values decrease because the utility that can be derived from that parcel of land is reduced. Depending upon the nature of the flood, in terms of frequency and magnitude, recovery can follow any of several paths, three of which are presented here. Line A represents a situation in which frequent flooding may keep land prices low relative to non-flood areas. While the trend in property values may not be entirely flat, any increases that may occur are negated by the next flood. Line C represents the opposite situation, that of extreme flooding–either a very infrequent, "once-in-a-lifetime" event or extremely catastrophic flooding, or both. In this case, it is expected that property values will decrease immediately after the event but will recover eventually to pre-flood levels and perhaps rise even higher. Under other circumstances, property values might recover somewhere in between these two extremes (Line B).

Research to date has verified this model, to a certain extent. For instance, the community of Des Plaines, Illinois, experiences relatively frequent flooding. Although other dynamics of the real estate market had a significant impact in this Chicago suburb, capitalization of flooding was apparent after the community experienced two floods within a 10-month period and five floods within 50 years.[10] Similarly, in Wilkes-Barre, Pennsylvania, trends in sales prices for properties flooded more than nine feet in a catastrophic event in 1972 virtually replicate Line



**Exhibit A**    **Theoretical Framework Depicting Utility Following Flooding**

Lines A, B, and C represent different flood hazard scenarios.



C on the graph in Exhibit A. However, properties flooded less than nine feet (the mid-range depth for this event) recovered rather quickly, and prices exceeded pre-flood values within one year of the flood. Thus, empirical evidence from several study areas tends to support the theoretical base, although there are variations from what was expected in some submarkets.

Previous work in Linda and Olivehurst also served to validate the model. The decrease in sales prices immediately following the flood was followed by recovery to almost pre-flood prices for those properties flooded to 18 inches, in keeping with the model. Properties flooded to 10 feet or more experienced some recovery after the initial drop, but prices never got higher than 80% of pre-flood levels and then experienced another decline.[11] Of course, the time periods examined in the initial study may have reflected short-term market fluctuations unrelated to the flood, as well

10. Tobin and Montz, 1990 and 1994.

11. Montz and Tobin, 1988.

BACK_DEFEXP-RR-004103

as impacts of the flood. Nonetheless, it appeared at the time that the flood was in fact capitalized in property values, as hypothesized, and the data on the non-flooded property supported this contention. Examination of a longer time period, therefore, permitted further evaluation of the extent to which the model continues to apply and provided a longitudinal test of the concept of capitalization of the flood.

## Study Area and Methods

As mentioned earlier, the 1986 flood in Linda and Olivehurst, California, was triggered by a levee break along the Yuba River (Exhibit B). Prior to this event, flooding in this area had affected the communities of Marysville and Yuba City, on the other side of the Feather and Yuba Rivers, while Linda and Olivehurst received only localized storm damage. The 1986 flood was devastating, affecting approximately 6,500 buildings in the two communities, which in 1990 had a combined population of approximately 22,000. The floodplain in this area is extensive, with levees virtually ringing the two towns along the Feather, Yuba, and Bear Rivers. Because of the levee break, water flowed rapidly into the towns. Because of the level topography, it slowed in velocity but increased in depth, up to 12 feet in places. In addition, the level topography caused the water to remain in some places for more than two weeks. Thus, damage resulted from both rapid water velocities and from the long duration of saturation. In the end, more than 3,000 homes were damaged and 895 destroyed. Total public and private losses were estimated at $22.5 million.[12]

In order to evaluate any relationship between flood experience and impacts on house prices, the communities were divided into three spatial areas: those neighborhoods flooded to 18 inches, those flooded to 10+ feet (the eaves of the single-story houses), and non-flooded areas. For all houses in these areas, data on house listings and sales were obtained from the multiple listing service records of the Sutter-Yuba Board of Realtors, for the period January 1983 (to establish the pre-flood market) until December 1996. Unfortunately, the Board of Realtors was unwilling to make available pre-flood data on non-flooded properties, though an estimate of median selling price was offered. The number of properties in each flood area is presented in Exhibit C.

All information that was consistently available was collected for each residential listing and sale, including list price, sale price, date listed, date sold, number of days on the market, number of bedrooms and bathrooms, and square footage of the house. For the most part, the flooded houses were located in tract developments and had similar sizes and configurations. Chi-square analysis of housing characteristics between and within the flooded neighborhoods, undertaken for the earlier studies, showed no significant differences among the flooded neighborhoods, thus verifying the homogeneity of the tract developments.[13] Consequently, controls on differences in housing type and size are embedded in the sample. Non-flooded houses were more dispersed throughout the communities and therefore not as uniform, but chi-square analysis of hous-

---

12. Teets and Young, 1986.

13. Montz and Tobin, 1988.

BACK_DEFEXP-RR-004104



**Exhibit B** The Study Area: Linda and Olivehurst, California

Linda and Olivehurst, California

BACK_DEFEXP-RR-004105

| Exhibit C | Number of Properties by Flood Category |
|---|---|
| **Flood Category** | **Number of Sales** |
| Non-flood | 108 |
| Flooded 1.5 feet | 107 |
| Flooded > 10 feet | 71 |

ing characteristics (square footage and number of beds and baths) resulted in no significant difference for pre-flood conditions between the flooded and non-flooded areas. All list and sales prices were converted to 1984 dollars, using the CPI housing index.

Analysis of the data was divided into three parts, reflecting the research questions presented earlier. First, the percentage change in mean house values, as manifested by the sale price, was graphed by flood zone at yearly or several-year intervals to depict market patterns over time. This graph allowed for comparison of trends as they varied between spatial areas, that is, with flood depths. Changes in sales prices were then compared within flood groups using $t$-tests, such that each floodplain category was defined by its own mean price, and temporal changes within groups were evaluated. Two sets of analyses were presented. The first compared pre-flood mean sales prices to post-flood sales prices for successive periods after the flood, providing an analysis of the impact of the flood on house prices. A significant difference between pre- and post-flood prices indicated a possible impact of the flood. The second set compared immediate post-flood prices to sales prices for successive years. Here, a significant difference between immediate post-flood prices and later post-flood prices indicated a recovery of the market in that flood area.

Finally, the extent to which location, in this case flood zone, influences selling prices of houses was analyzed using a form of hedonic modeling. Because hedonic models have been found to be useful in determining significant differences in prices due to specific factors, they have direct application to the third research question. Earlier research showed that flood depth was a significant contributor to explaining sales prices such that greater flood depth meant lower house prices. Whether that relationship holds over the 10-year period considered here was an important question.

## Temporal Changes in Selling Prices

The graph in Exhibit D, depicting the different experiences of each flood zone, indicates that the flood did indeed have an impact on sales prices that varied depending upon depth of flooding. Properties flooded to more than 10 feet experienced a significant, immediate post-flood decline in sales prices, such that even after one year, prices were almost 30% lower than pre-flood levels. An increase by the end of the second year probably reflected investments in repairs and the resale of houses. But this did not last, as prices fell again over the next two years, only rebounding somewhat at the end of the 10-year period. In contrast, the sales prices for houses flooded to 18 inches reproduced the theoretical pattern presented by Line B in Exhibit A. Prices fell immediately following the flood but then increased gradually over time and ended the period with the highest proportional increase. Non-flooded houses also experienced a post-flood decline, perhaps contrary to what might be expected, although this may have reflected a general lack of interest in the housing

BACK_DEFEXP-RR-004106

market of Linda and Olivehurst after such a catastrophic event.

Although indicative of temporal trends and differences among submarkets, the changes presented in the graphs do not necessarily represent statistically significant differences in recovery. Therefore, $t$-tests were used to evaluate the statistical significance, if any, and directions of impacts over different time periods. The comparison of pre- and post-flood mean sales prices is presented in Exhibit E. As noted earlier, data on pre-flood, non-flooded properties was not available. Nevertheless, the flood clearly had a differential impact on sales prices over the long term. For example, properties flooded to the greatest depths continued to elicit a significant difference between pre- and post-flood means throughout the 10-year study period, whereas a different pattern emerged regarding properties flooded to lesser depths. While pre- and post-flood sales prices for these properties were significantly different at the end of 12 months, the degree of difference waned over time, and within two years no significant difference was found. Thus, the flood depressed property values throughout the flooded areas, but the significance of impact differed depending upon flood depth.

Given that a significant change from pre-flood values had been documented, the next step was to determine if there was a significant difference in the recovery of property values in the different areas. Once again, $t$-tests were used, this time to compare immediate post-flood sales prices to sales prices for successive years after the flood. A significant difference between the means would indicate a measure of recovery with later values higher

than immediate post-flood values. The results of these analyses are presented in Exhibit F. There was no significant difference for either flood area until more than six years after the flood, when sales prices for those properties in the lesser flooded area eventually rebounded. In addition, there was no significant recovery in the area flooded to greater depths over the same period. Therefore, not only was the impact of flooding most severe in areas of greatest flood depths, but recovery was also extended. While the first result may appear to be obvious, the second is not. One might have expected that those houses flooded to the eaves would be worth more after five years because of subsequent repairs and upgrades made to properties. These data suggest that this is not the case. This issue is discussed later in the conclusions.

| Exhibit D | Trends in Sales Prices for Three Submarkets Following the 1996 Flood |
|---|---|

Changes are proportional to pre-flood house prices for each submarket.



Non-flood
Flooded 10 feet
Flooded 18 inches

BACK_DEFEXP-RR-004107

BACK_DEFEXP-RR-004108

| Exhibit E | Impact of the Flood on Property Values by Time Period | | | |
|---|---|---|---|---|
| | | **Difference\*** | | |
| | N | (1984 $) | T-Value | Probability |
| 1 year after | | | | |
| Flooded 1.5 ft. | 26 | -4,730 | 2.12 | .044[†] |
| Flooded > 10 ft. | 21 | -14,550 | 2.26 | .035[†] |
| 2 years after | | | | |
| Flooded 1.5 ft. | 49 | -4,369 | 1.90 | .062 |
| Flooded > 10 ft. | 34 | -13,482 | 2.42 | .021[†] |
| 4 years after | | | | |
| Flooded 1.5 ft. | 71 | -3,227 | 1.72 | .09 |
| Flooded > 10 ft. | 42 | -14,927 | 2.41 | .021[†] |
| > 6 years after | | | | |
| Flooded 1.5 ft. | 107 | -561 | 0.30 | .77 |
| Flooded > 10 ft. | 71 | -12,351 | 2.1 | .04[†] |

\*   Difference = post-flood sale price − pre-flood sale price

†   Significant at 0.05

| Exhibit F | Significance of Post-Flood Recovery by Time Period | | | |
|---|---|---|---|---|
| | | **Difference\*** | | |
| | N | (1984 $) | T-Value | Probability |
| 1 year: 2 years | | | | |
| Flooded 1.5 ft. | 34 | 534 | -0.17 | .865 |
| Flooded > 10 ft. | 29 | 2,383 | -0.58 | .567 |
| 1 year: 4 years | | | | |
| Flooded 1.5 ft. | 33 | 3,268 | -1.86 | .072 |
| Flooded > 10 ft. | 24 | -5,616 | 0.93 | .365 |
| 1 year: 6+ years | | | | |
| Flooded 1.5 ft. | 47 | 8,317 | -4.26 | .000[†] |
| Flooded > 10 ft. | 45 | 5,485 | -1.51 | .140 |

\*   Difference = later sale price − immediate post-flood sale price

†   Significant at 0.05

## Flooding as a Variable in Selling Price

To examine the extent to which flooding contributed to variations in selling prices, a hedonic model was used, as follows:

Sale price = $f$ (house size, number of bedrooms, number of bathrooms, square footage of the house, listing date, sale date, days on the market, and flood depth)

Two multiple regression analyses were undertaken to test the model. One utilized the full data set, and the other included only those properties sold after February 1990 (four years after the flood). The results of the first model are presented in Exhibits G and H. Variations in sales prices were explained in part by four variables:

1.  Number of bathrooms

2.  Square footage

3.  Flood depth

4.  Date listed

Although these account for only 44% of the variation in prices, the results support earlier findings. As expected, some of the variation in prices can be attributed to housing characteristics. More importantly for the questions raised here, though, is the significance of flood experience, represented directly by flood depth and more indirectly by listing and sale dates. The results of the regression model demonstrate that greater flood depths translate into lower sales prices. Listing dates emerged as a significant variable, although this raises some questions. Immediately following the flood, listing dates were significant, indicating that houses listed after the flood tended to sell for less, as had been hypothesized. However, as time from the flood increased, one would expect that the effect of this variable

*Copyrighted material reviewed by Richard J. Roddewig, Volume 2*

would diminish as recovery proceeds. The results here suggest otherwise. Clearly, however, the flood has had a continuing negative influence on house values in Linda and Olivehurst.

## Conclusions

The empirical evidence from this research validates, to a large extent, the theoretical model depicted in Exhibit A. The effects of flooding remained long after a catastrophic event, and, while recovery was evident, the effects varied with flood experience. The results of this work, then, serve to provide answers for the research questions presented earlier.

### Length of the Recovery Period

Properties that experienced flooding did eventually recover to near pre-flood levels, but the length of time that this recovery took varied with depth of flooding. More than six years after this flood, properties experiencing flood depths greater than 10 feet had not yet returned to pre-flood values, while those flooded to 1.5 feet showed evidence of recovery. When compared to immediate post-flood values, houses with lower flood levels recovered more quickly and exhibited a greater increase in sales prices. For houses experiencing greater depths, recovery was not yet evident 10 years after the flood.

Earlier research showed that repairs to flooded properties may influence recovery such that properties with greater flood depths would perhaps recover more quickly because there were more extensive repairs and thus upgrading and updating of houses.[14] This did not appear to be the case over the longer term. In fact, the different recovery rates and times for different flood levels confirmed that the flood had been capitalized into property values in spite of repairs. That is, the rebound in prices documented earlier did not last, as the market continued to reflect differences related to flood depths. Therefore, despite the once-in-a-lifetime nature of this flood, the spatial variations in recovery demonstrated that the effects are long-lasting. Part of this may be due to the fact that not all properties in the areas with the greatest flood depths were repaired. In fact, many years after the flood, some houses remained abandoned. Certainly this is a constant

| **Exhibit G** | **Model Results (All Data)** | | | |
| --- | --- | --- | --- | --- |
| **Variable** | **B** | **Beta** | **T-ratio** | **Probability** |
| No. of bathrooms | 11779.911 | .421040 | 7.024 | .0000 |
| Square footage | 12.356 | .409926 | 8.640 | .0000 |
| Days on market | 4.288 | .023065 | .487 | .6263 |
| Flood depth | 4555.610 | .410451 | 8.892 | .0000 |
| Sale date | -69.886 | -.020127 | -.354 | .7239 |
| List date | -691.250 | -.157739 | -2.627 | .0090 |
| No. of bedrooms | -2277.970 | -.107449 | -1.729 | .0848 |
| Constant | 20728.003 | | 6.994 | .0000 |
| Adjusted $R^2$ = .44362 | | | | |
| Standard error of the estimate = 13899.05 | | | | |

14. Tobin and Montz, 1994.

BACK_DEFEXP-RR-004109

**Exhibit H        Model Results (After February, 1990)**

| Variable | B | Beta | T-ratio | Probability |
|---|---|---|---|---|
| No. of bathrooms | 23312.857 | .481332 | 7.054 | .0000 |
| Days on market | 14.421 | .050368 | .871 | .3854 |
| List date | -2412.437 | -.134448 | -2.328 | .0214 |
| Flood depth | 4714.560 | .366189 | 6.290 | .0000 |
| Square footage | 7.898 | .124601 | 1.943 | .0541 |
| No. of bedrooms | 409.846 | .008306 | .129 | .8980 |
| Constant | 19874.187 | | 1.184 | .2383 |

Adjusted $R^2$ = .53829

Standard error of the estimate = 15871.69

reminder of the flood for potential buyers, in addition to the depreciating effect such properties can have on surrounding property values. Hence, although the expectation of flooding is probably low, given the nature of this flood, the reminders that exist in the communities influence recovery.

### Flood Submarkets

In keeping with the recovery trends documented above, flood submarkets remained identifiable over the long term. The areas experiencing differences in flood depths continued to have different market recovery trends. Throughout the 10-year study period, trends in sold prices verified that the flood was having a significantly negative impact, with greater flood depths having more difficulty recovering to pre-flood levels. Results from the earlier research indicated that the differences among flood areas were waning, perhaps in response to the relative homogeneity of the housing stock and the timing and extent of repairs. In fact, some houses in the area with higher flood depths were repaired and remodeled rather quickly, considering the amount of damage incurred. Thus, they were on the market with those properties flooded to lower depths, and they competed well,

perhaps given the once-in-a-lifetime perception of this flood event. However, this did not last over the long term. There remain reminders of the extent of devastation, and flood submarkets have become more distinct.

### Flooding as a Variable in Selling Price

The results of the hedonic model supported the continued significance of flood submarkets, as flood-related variables surfaced as significant contributors to variations in sales prices, no matter what time frame was considered. In fact, as time from the flood progressed, the proportion of explanation related to these flood-related variables increased. This provided further evidence of the long-term negative effect that flooding can have on property values and for the differentiation of the community into flood submarkets. The results were consistent over time, with the strength of the model increasing as the amount of time elapsed since the flood lengthened.

The results of this longitudinal study are in line with the theoretical model. Recovery of residential property values was dependent on the extent of flooding, and the impacts of floods on the market remained long after repairs had been made. It had

BACK_DEFEXP-RR-004110

been suggested that the expectation of future flooding has an influence on the nature of change that occurs in a community,[15] and early results tended to verify this idea.[16] However, over the long term this does not appear to hold. The levee was repaired and "protection" was back, providing once again a sense of security from floods and decreasing expectations of future floods. However, either the losses were so significant or faith in flood protection so lost that this once-in-a-lifetime event continued to have lasting impacts on the residential real estate market.

### Epilogue

In January 1997, Olivehurst was flooded twice within a two-week period. The areas affected were not the same ones as those flooded in 1986, but the cause was the same–two levee breaks. Two issues arise from these more recent floods. The first is the question of what impact, if any, these floods will have on the submarkets in Linda and Olivehurst that are the subject of this study. The related second issue concerns the extent to which the 1997 floods will affect expectations of flooding for areas spared in 1997 but flooded in 1986. The answers to these questions remain to be seen and are the focus of further research.

## Literature Cited

Alesch, D. J., and W. J. Petak. *The Politics and Economics of Earthquake Hazard Mitigation: Unreinforced Masonry Buildings in Southern California.* Program on Environment and Behavior Monograph 43. Boulder: Institute of Behavioral Science, University of Colorado, 1986.

Brookshire, D. S., M. A. Thayer, J. Tschirhart, and W. D. Schulze. "A Test of the Expected Utility Model: Evidence from Earthquake Risks." *Journal of Political Economy* 93, no. 2: 369–389.

Lambley, D. B., and I. Cordery. "Effects of Floods on the Housing Market in Sydney." *Proceedings of International Hydrology and Water Resources Symposium*, 1991. Perth, Australia, 1991, 863–866.

MacDonald, D. N., J. L. Murdoch, and H. L. White. "Uncertain Hazards, Insurance, and Consumer Choice: Evidence from Housing Markets." *Land Economics* 63, no. 4: 361–371.

Montz, B. E., and G. A. Tobin. "The Spatial and Temporal Variability of Residential Real Estate Values in Response to Flooding." *Disasters: The Journal of Disaster Studies and Management* 12 (1988): 345–355.

Montz, B. E. "The Effects of Flooding on Residential Property Values in Three New Zealand Communities." *Disasters: The Journal of Disaster Studies and Management* 16, no. 4 (1992): 283–298.

Muckleston, K. W. "The Impact of Floodplain Regulations on Residential Land Values in Oregon," *Water Resources Bulletin* 19: 1–7.

Scawthorn, C., H. Iemura, and Y. Yamada. "The Influence of Natural Hazards on Urban Housing Location." *Journal of Urban Economics* 11: 242–251.

Shilling, J. D., J. D. Benjamin, and C. F. Sirmans. "Adjusting Comparable Sales for Floodplain Location." *The Appraisal Journal* (July 1985): 429–436.

15. Yezer and Rubin, 1987.

16. Tobin and Montz, 1994.

BACK_DEFEXP-RR-004111

Teets, B., and S. Young. *Rivers of Fear: The Great California Flood of 1986.* Terra Alta, WV: C. R. Publications, 1986.

Tobin, G. A., and B. E. Montz. "Catastrophic Flooding and the Response of the Residential Real Estate Market." *The Social Science Journal* 25, no. 2 (1988): 167–177.

___. "Response of the Real Estate Market to Frequent Flooding: The Case of Des Plaines, Illinois." *Bulletin of the Illinois Geographical Society* 32, no. 2 (1990): 11–21.

___. "The Flood Hazard and Dynamics of the Urban Residential Land Market." *Water Resources Bulletin* 30, no. 4 (1994): 673–685.

Tobin, G. A., and T. G. Newton. "A Theoretical Framework of Flood Induced Changes in Urban Land Values." *Water Resources Bulletin* 22 (1986): 67–71.

Yezer, A. M., and C. B. Rubin. *The Local Economic Effects of Natural Disasters.* Natural Hazard Research Working Paper 61. Boulder: Institute of Behavioral Science, University of Colorado, 1987.

BACK_DEFEXP-RR-004112

Copyrighted material licensed to Richard Knight by Thomson Reuters (Professional) UK Ltd, June 2017.



# 10

# Natural and Climate Conditions

Class X detrimental conditions are natural conditions including phenomena such as earthquakes, flooding, volcanic eruptions, hurricanes, tornadoes, and other natural disasters.

Many areas that are susceptible to natural disasters also feature incredible scenery, which is very enticing and may even command a premium within the real estate market, such as with waterfront homes or homes perched on cliffs. For some sites, risks associated with natural disasters "come with the view," and there is an interesting resilience among a portion of the home-buying market that seems to be drawn to areas with these risks. Some prime real estate is located in areas susceptible to hurricanes, wave damage, flooding, firestorms, and the like. Of course, other areas prone to natural disasters do not have any particular view or location amenity. Appraisers should study the local market before drawing any general conclusions about the impact of natural disasters on property values. The view premiums may, as perceived by the local market, outweigh the risks.

Natural disasters can result in spectacular damage. For example, on April 1, 1946, a tsunami that originated in the Aleutian Islands struck the island of Hawaii and killed over 170 people. The fatalities occurred mostly in the towns of Laupahoehoe and Hilo, where wave heights averaged 30 feet. The maximum wave height was 55 feet, occurring at Pololu Valley on the northern tip of the island. Much of downtown Hilo was destroyed. A schoolyard clock in Hilo frozen at 1:04 (a.m.) marks the exact time of the destruction; this clock is now a memorial to the victims of what is known as the April Fool's Day Tsunami. (Another tsunami hit Hilo on May 23, 1960. Warning systems were more advanced then, and only six people were killed.)

The eastern areas of downtown Hilo have never been rebuilt. Remnants of many empty blocks of old streets, gutters, and sidewalks still exist. A major tourist attraction, Lili'uokalani Gardens replaces an area that was once improved with various structures. After the 1946 tsunami, the debris was bulldozed into large piles, soaked with kerosene, and burned. Over the years, the buried burnt debris has decomposed and caused considerable soil subsidence problems

BACK_DEFEXP-RR-004113



A clock set at 1:04 (a.m.), the exact time of the April Fools' Day Tsunami, is all that remains of an elementary school that was entirely destroyed by the disaster in Hilo, Hawaii.



Despite being in a tidal wave zone, Hilo, Hawaii, still draws many tourists. This restaurant has even marked the water levels from two of this century's tsunamis.

BACK_DEFEXP-RR-004114

Copyrighted Material Available at Richard Hughes Dwight Lane 2nd

throughout the area. As a result, many parking lots have large open holes and depressions. A civil defense warning system and evacuation routes are located throughout the area, and the threat of another tsunami still exists today.

In addition to the continuing threat of tsunamis, Hilo is also in a Zone 2 Volcano Area. Zone 1 is designated the most dangerous and Zone 9 the least dangerous. Recent lava flows came within four miles of Hilo. Further inland, a 1987 lava flow from the Kilauea Volcano within Hawaii Volcanoes National Park buried much of the Royal Gardens Subdivision in Kapa'ahu under 40 feet of lava. The volcano destroyed numerous homes and a newly constructed multimillion-dollar visitor center and museum near the Poupou-Kauka ancient villages. The 1987 lava flows spared an ancient temple once used for human sacrifices, but it was subsequently destroyed by more lava flows in 1997. The lava flowed slowly, and the destruction occurred gradually over the span of months. Efforts to divert the lava flow with concrete ledges were entirely ineffective.

The Royal Gardens Subdivision in Kapa'ahu is located in a Zone 2 Volcano Area. Housing in this area has always been inexpensive by Hawaiian standards, and a typical house with an ocean view in this area can sell for the price of a car. While some homes were spared by the lava flows, the area's infrastructure was destroyed. Some people still reside in these homes, but they have no water, electricity, gas, or telephone. Roads exist over portions of old lava flows. Lots in the subdivision sell for nominal amounts of approximately $500, although there is little chance of ever rebuilding on them.

## Floods

In terms of human hardship and economic loss, floods are the most frequent and costly of natural disasters. Excluding droughts, approximately 90% of the damage related to natural disasters is caused by floods and the associated mud and debris flows. Between 1985 and 1994, floods caused an average of $3.1 billion in yearly losses in the United States. Floods also caused an average of 95 deaths annually between 1925 and 1988. (Most flood-related deaths do not involve flooded properties. Rather, 80% of flood-related deaths occur in vehicles navigating flood waters.)

Hurricane Katrina in 2005 was the largest natural disaster in the history of the United States. Subsequent flooding from the hurricane caused massive destruction and loss of life in New Orleans and the Mississippi Gulf Coast region. Preliminary damage estimates were well in excess of $100 billion, eclipsing by many times the damage wrought by Hurricane Andrew in 1992.

No place is entirely safe from the threat of floods, as they occur in all 50 states. Communities that are exceptionally at risk are those located in low-lying areas, near water, or downstream from a dam. However, any area is susceptible to floods in the time periods following spring rains, massive thunderstorms, or winter snow thaws.

Floods can rise quickly or develop over many days depending on the *watershed*, which is a large area of land that drains into a waterway such as a drainage sewer, river, or stream. Floods are caused when a watershed takes on so

BACK_DEFEXP-RR-004115

much water from rain or dam failure that its waterways cannot drain suitably. Excess rain or melting snow within a watershed causes increased water levels downstream. Levees may be constructed to contain flooding. However, as more communities construct levees, the river water is forced to run at higher levels because it cannot extend outward. During a deluge, the water runs at a higher level, deposits sediment, and raises the riverbed. During prolonged periods of rain or runoff, a levee may give way because it is under pressure from the swollen river and is being undercut by water seepage. Levee failures were largely responsible for much of the damage from Hurricane Katrina in New Orleans. Dam failures are often the most harmful fast-rising flood events, which can result from inadequate design or maintenance or structural damage caused by a superior event such as an earthquake. When a dam fails, a mammoth amount of water is released.

Properties located on rivers and streams often command a premium price, as they provide recreation, fishing opportunities, view amenities, and irrigation and drinking water supplies. However, small amounts of excess water can cause significant damage to these same properties and threaten the lives of occupants. Six inches of rapidly moving flood water can knock a person down, and a few feet of water can destroy an entire region. The Great Flood of 1993 covered an area 500 miles long and 200 miles wide along the Mississippi and Missouri Rivers. More than 50,000 homes were damaged and 12,000 acres of farmland were washed out, with total losses estimated at $20 billion. Another massive flooding event along the lower Mississippi River in 1927 inundated 27,000 acres and by some estimates may have killed over 1,000 people. In 1900, hurricane-induced flooding in Galveston, Texas, resulted in approximately 600 deaths.

If a property is flooded, a variety of damages can occur. Foundations may be cracked, and utilities may be destroyed. Basement flooding can cause structural damage to an entire building. Septic tanks, cesspools, pits, and leaching systems may be damaged and pose a health hazard. Roads and infrastructure may be weakened to the point that they may collapse under the weight of a vehicle.

### Federal Emergency Management Agency

The Federal Emergency Management Agency (FEMA) is a government program designed to help people affected by disasters such as floods. Flood-impacted property owners may be eligible to receive rental payments for temporary housing or grants to make repairs. Additionally, special loans may be available for the replacement of damaged homes, farms, or businesses.

FEMA also publishes flood zone maps, which delineate areas that are susceptible to flooding. The "100-year flood" standard was developed primarily to estimate flood frequencies in floodplain mapping. The term "100-year flood" does not mean that a flood will occur once every 100 years; rather, it is a statistical tool used to estimate the risk of certain flood levels. A 100-year flood has a 1% chance of happening within a given year. Within the span of a 30-year mortgage, a homeowner can expect about a 25% chance of the property being flooded. For the same 30-year cycle, the more frequent 10-year flood has a 96% chance of oc-

BACK_DEFEXP-RR-004116

curring. Statistically, properties located within a 10-year floodplain are virtually certain to flood within a 30-year mortgage term.

### Flood Insurance Coverage

There are about 11 million buildings located in designated flood hazard areas in the United States, yet less than 23% are insured against floods. As flooding is the leading cause of property loss from natural disasters, flood insurance issues may be important in calculating any diminution in property value. Standard home-owner insurance policies do not compensate for flood damage. Special flood insurance coverage is available for residential and nonresidential buildings, and details about flood insurance are available through any licensed property or casualty insurance agent.

## Earthquakes

An earthquake is a shaking, rolling, or sudden shock of the earth's surface generated by the movement of the earth's crust or upper mantle as a result of a buildup of stress. Failure occurs at a single point or in a fairly small zone, known as the *focus*, with the *epicenter* being the point on the earth's surface directly above this focus. However, once failure has occurred, movement may persist along a zone of weakness, known as a *fault*, for a considerable distance that can be as long as hundreds of miles. On average, thousands of earthquakes occur every week around the world, and there can be more than one million per year. However, most earthquakes are mild, occur in remote areas or under the ocean, and are not noticeable. Severe earthquakes can be expected once every eight to 10 years or so, but many smaller earthquakes that are also capable of destruction occur on a regular basis.

Earthquakes show a marked spatial distribution. The vast majority are located within narrow zones that correspond to the boundaries of the earth's *lithospheric plates*, which are blocks of the earth's crust that remain in continuous movement relative to each other. This movement is thought to be driven by the connective processes in the earth's mantle (i.e., the region of rocks beneath the crust that are heated to the point of becoming plastic). The energy released by a large earth-quake can equal that of about 200 million tons of TNT, and its energy may be 10,000 times as great as that of the first atomic bomb.

### Richter Scale

The strength of an earthquake is measured using a system called the Richter Scale, which was developed by American seismologist Charles F. Richter in 1935. Scientists calculate Richter magnitude using information obtained from a seismograph, an instrument that records ground motion. Each number on the Richter Scale represents an earthquake 10 times as strong as an earthquake of the next-lowest magnitude. For example, an earthquake of magnitude 8 is 10 times stronger than one of magnitude 7, and an earthquake of magnitude 7 is 100 times as strong as one of magnitude 5. There are approximately 1,000 earth-

BACK_DEFEXP-RR-004117

quakes daily with a magnitude of 2 or less, and those with magnitudes under 5 are considered to be minor as they typically cause little damage. Earthquakes with magnitudes of 7 or greater can cause serious damage. Other measurements of intensity can be made, as an earthquake of one given magnitude may cause different damage from place to place. The Modified Mercalli Intensity Scale classifies earthquakes into 12 categories, ranging from those barely felt to ones that cause catastrophic and near-total destruction.

## Property Issues

While certain areas are more prone to earthquakes than others, seismic events cannot be accurately predicted. California can expect a catastrophic earthquake once every 50 to 100 years, but unlike other types of natural disasters, there is no warning as to when an earthquake will occur. When an earthquake does hit, the damage can be terrifying. During a strong earthquake, the ground shakes violently, buildings crack and topple, electric transformers explode, windows break, and power lines snap. Because of earthquakes' unpredictability and intense damage, many areas prone to earthquakes have strict building codes to limit damage. Building codes are not an assurance that a property will not suffer any earthquake damage; rather, they are primarily designed to prevent building collapse and spare human life.

At 4:31 a.m. on January 17, 1994, the costliest earthquake and one of the most expensive natural disasters in American history shook the Southern California region. Although this earthquake was considered to be moderate with a magnitude of 6.8 on the Richter Scale, the epicenter was in the highly populated Los Angeles suburb of Northridge. The quake caused 57 deaths, injured approximately 1,500 people, and caused more than $10 billion in damage. Of the 66,546 buildings inspected, 6% were "red tagged" (severely damaged) and 17% were "yellow tagged" (moderately damaged). Some of the most traveled freeways in the nation were closed for several months, and 11 major roads providing access to Los Angeles were damaged. Many residents and businesses were displaced to adjacent, less-damaged areas while repair projects were being completed.

When the Northridge Earthquake occurred, real estate values in the San Fernando Valley were generally declining due to a regional economic downturn. Immediately following the earthquake, most pending sales of real estate in the San Fernando Valley were postponed until damage assessments could be completed. Values of damaged properties were negatively impacted for a short period while they were repaired. Undamaged properties experienced no long-term loss in values. Adjacent areas such as the Conejo Valley to the east experienced an upsurge in occupancy for short-term housing such as apartments and rental homes, while displaced homeowners sought temporary residences as repair projects were completed.

Residential buyer confidence experienced a short downturn with little or no long-term implications, but the investor market for large commercial properties required more time for buyer confidence to recover. Many steel-frame office buildings, previously thought to be impervious to damage from moderate

BACK_DEFEXP-RR-004118

*Copyrighted material reviewed by Richard Roddewig Volume 2B*

earthquakes, were discovered to have sustained damage from failed welds and diminished structural integrity. These damages resulted in changes to construction practices as well as changes to how the equity and lending markets evaluate potential failure risk. Marketing time for many properties was extended during repair efforts, yet no permanent effect was evident. The negative impacts on real estate that stemmed directly from the Northridge Earthquake were short-lived and generally related to repair costs and temporary loss of use, although some structures were destroyed. The market generally reacts on the assumption that earthquakes are random in nature and impact California as a whole. The perceived likelihood of an earthquake reoccurring in Northridge is generally the same as that of any other community in Southern California.



From a distance, this condominium complex seems to be another trendy development in Encino, California. However, closer inspection reveals that tremendous damage was incurred from the Northridge Earthquake, which forced the residents of the property to vacate.

## Volcanoes

Throughout history, volcanic eruptions have come with little warning and destroyed entire cities. Approximately 430 volcanic eruptions throughout the world have been documented. A volcano is defined as a place on the earth's surface from which gases, molten rock, and fragmentary materials are extruded. A vent or chimney connects a reservoir of molten matter known as *magma* from deep within the earth's crust to the surface of the earth. When the magma

BACK_DEFEXP-RR-004119

nearly reaches the earth's surface, it then becomes what is known as *lava*. Lava comprises by far the greatest volume of material erupting from volcanoes, and it moves at speeds ranging from less than 1 mile per hour to up to 60 miles per hour. While some associate a volcano with a burning mountain of smoke and fire, there is no actual "burning" in the sense of combustion. The "smoke" is actually condensed steam, which is frequently mixed with dust particles that make it dark in color. The "fire" is the reflection of the red-hot material on the vapor clouds above the volcano.

The movement of plates across the earth's crust causes volcanoes to occur in two ways. First, separating plates, normally in the middle of the ocean, open a seam that allows magma to well up. Secondly, when plates crash into one another and the heavier one plunges beneath the lighter one, the resulting increase in pressure squeezes molten rock up through fractures in the overlying plate. In Southern California, the plates grind past one another or butt together without ever overriding. This produces strong earthquakes but no lava. The explosion of a volcano is comparable to the opening of a soda can that has been shaken up. When water changes its state from a liquid to a solid, such as ice, it expands by about one-ninth of its volume. However, when water changes to a gaseous state, its volume increases 1,000 times. This increase in volume happens as the magma heats up and bubbles beneath the earth's surface. At some point the pressure of the gas becomes so great that it pushes up and through the surface of the earth. The explosion, or eruption, is similar to that of a cork being released from a champagne bottle.

Dormant since 1857, Mount St. Helens in the state of Washington erupted on May 18, 1980, at 8:32 a.m., after a 5.0 magnitude earthquake. It had the most destructive force of any volcano in the history of the United States and caused the world's largest recorded landslide. The eruption was equivalent to the force of 27,000 atomic bombs, and the blast blew 1,300 feet of the mountain down into the Toutle River Valley below. Volcanic ash towered 16 miles above the mountain, and the explosion was heard over 700 miles away. Widespread destruction, encompassing 150,000 square miles, was caused by hot gasses, glacier and debris avalanches, mudflows, and flooding. The majority of damage occurred in about 10 seconds.

There are two different types of volcanoes, *shield* and *composite*. In a shield volcano, the mountain is a gently sloping dome composed of a series of lava flows, and each flow rarely exceeds 25 feet in thickness. Fragmented materials erupt from these volcanoes in very small quantities. An eruption of lava takes place not only through the central vent but also through lateral fissures, which makes the volcano increase in diameter but not in height. Examples of shield volcanoes are those found in Hawaii. A composite volcano is characterized by rock fragments that explode from the throat of the mountain being interspersed with lava flows from the vent or fissures along the mountainside. This type of volcano is normally steeply sloping and symmetrical, with a small crater in the top. The crater is a funnel-shaped depression that rarely exceeds a mile or so in diameter. Many composite volcanoes rise 10,000 feet or more above their base. Some of these volcanoes are found in the Philippines and Italy. Mount St. Helens and Mount Fuji in Japan are composite volcanoes.

BACK_DEFEXP-RR-004120

Copyrighted Material. Reproduced by Richard Jones. Resale, June 29



Mount St. Helens, the largest landslide in the history of the world, caused damage for a radius of 18 miles from its north face.



While the damages from the Mount St. Helens eruption were immense, they have been at least partially offset by the tourism that the site of the eruption now attracts. This playground, at a visitor's center, is fashioned after a scaled-down version of the volcano.

BACK_DEFEXP-RR-004121

Until the eruption of Mount St. Helens, only two known casualties within the United States (one in Hawaii and one in Alaska) had been attributed to volcanoes. The Mount St. Helens disaster, however, caused 57 deaths. Some who perished simply ignored warnings to stay out of the six- to 10-mile danger zone, while others were in areas that were destroyed by the unexpected lateral blast of the mountain and resulting floods. Ninety-eight cabins at the base of the mountain and around Spirit Lake, a YMCA camp, Boy and Girl Scout camps, and other re-sorts and campgrounds were covered by debris up to 400 feet deep. Mudflows and flooding completely or partially destroyed 221 homes along the Toutle River. One hundred eighty-five miles of highways and 15 miles of railroads were destroyed or irreparably damaged, and four billion board feet of lumber was lost. The loss to wildlife was staggering, including nearly 7,000 deer, elk, and bears, and 12 mil-lion salmon. The property damage and cleanup costs totaled $1.1 billion.

The immediate areas around the eruption that were destroyed, called the "blast zone," spanned north 18 miles from the mountain, far beyond the six- to 10-mile radius of damage that was initially predicted. Every property within the blast zone was completely destroyed. These homes and cabins were buried under 400 feet of debris, yet some of them later sold for $500 to $750, which was considered a "novelty value." The government eventually condemned these properties and paid the owners market value for the land but not for the im-provements. Some of these improvements were insured, and those that were not were a complete loss. The downriver areas were impacted by the flooding and dramatic changes in the flood zones. When the floods subsided, many homes had been lifted from their foundations, and the changes in topography created a land surveyor's nightmare. River courses were completely altered, and elevations changed considerably over thousands of acres. Many property owners simply did not know where their property boundaries were. Other properties that were well outside the floodplain were now within two-year floodplains. These properties, while still standing after the explosion and flooding, lost much or nearly all of their value because of the risk of future flooding. Some homes are gone, some have been rebuilt, and others still stand partially buried in mud.

The impact on real estate from this natural disaster varied greatly. Some prop-erties were completely buried and experienced a complete loss of value. For oth-er properties, the damage amounted to the cost of cleanup and related expenses. Some areas actually benefited somewhat from the eruption, as the volcanic ash added nutrients to some agricultural lands located east of the volcano. Other commercial properties along the highway route to the volcano also benefited from the tourism that the eruption site now attracts.

Modern technology provides warnings about volcanoes on the verge of erup-tion. Researchers have at their disposal an arsenal of newly developed volcanolo-gy hardware, ranging from satellites to acoustical sensors to highly sensitive gas sniffers. For example, scientists took the pulse of Mount Pinatubo in the Philip-pines in 1991, predicted it was about to erupt, and persuaded officials to evacuate 35,000 people two days before it did. Unfortunately, the Colombian government did not listen to seismologists in 1985 who warned that the Mount Ruiz volcano was smoldering dangerously. The data was considered to be "too spotty" by the

BACK_DEFEXP-RR-004122

*Copyrighted Material Licensed by Richard Hudak to Litigation. One 2K,*

government, and nothing was done. The mountain erupted one month later, and 23,000 lives were lost. Close watch is kept on Mount Rainier, located 50 miles southeast of Seattle. Some consider it to be the most dangerous volcano in the United States, as it could erupt in the foreseeable future.

One of the phenomena of natural disasters, which the media called the "barrier wars," was illustrated by the Mount St. Helens explosion. When a real estate market is threatened by a natural disaster, it is common for some property owners to go into a state of denial and even try to defy nature. Despite warnings and police blockades, many property owners forced their way past police roadblocks and barriers to get to their properties. One man who lived nearby, Harry Randall Truman, became a local folk hero for refusing to listen to repeated warnings and leave his home. He was killed, along with many others.

## Fire

American fire departments responded to about 1.5 million fires in 2004. Fires result in approximately 3,900 deaths per year, with roughly 80% occurring in residential structures. A civilian death from fire occurs approximately once every 135 minutes. Additionally, approximately 18,000 injuries per year result from fires. In terms of property damages, fires account for approximately $10 to $12 billion in damages per year, with residential property loss accounting for about half of that total. Interestingly, the smallest communities (less than 2,500 residents) have the highest fire rate, at 12 fires per one thousand people.

A fire injury occurs at an average rate of once every 30 minutes. Intentionally set fires (arson) number about 36,500 per year, making up approximately 2.7% of total fires. Arson alone causes over 300 deaths per year and over $700 million in property damage.

Wildfires are another type of fire-related threat occurring through the United States. The most recent wildfire disaster occurred in October 2007, with multiple fires burning over 500,000 acres in Southern California from Santa Barbara to the Mexican border, destroying at least 1,500 homes and resulting in the evacuation of more than 900,000 people. The fires were exacerbated by persistent drought conditions, hot weather, and seasonal winds, demonstrating the complex interrelationship of conditions that often contribute to major disasters.

## Tsunamis

A tsunami is a series of waves traveling quickly across the ocean with wavelengths of up to hundreds of miles between wave crests. *Tsunami* is a Japanese word that translates as "harbor wave." Tsunamis are also called *tidal waves*, although there is a distinction between the two terms. Tidal waves are simply the periodic movement of water associated with the rise and fall of tides produced by the gravitational attraction of the sun and moon.

The waves seen at the beach are often generated by wind blowing over the sea surface. The size of these waves depends on the strength of the wind creat-

BACK_DEFEXP-RR-004123

ing them and the distance over which the wind blows. Tsunamis, on the other hand, are caused by activity that displaces large amounts of water. This activity is most commonly an earthquake that occurs along the sea floor, but a tsunami can also be caused by a submarine volcanic explosion or landslide. Under most circumstances, submarine earthquakes must have a magnitude of 7 or greater on the Richter Scale to create a significant tsunami. Tsunamis created by volcanic activity or landslides are much less energetic than those caused by earthquakes.

Tsunamis usually travel approximately 300 miles an hour and have been known to reach speeds of 500 to 600 miles an hour. Their amplitude in the open ocean is usually less than four feet, which looks like nothing more than the gentle rise and fall of the sea surface and makes detection extremely difficult. For example, the 1986 Sanriku tsunami that struck Honshu, Japan, killed 28,000 people and destroyed 170 miles of coastline, yet fishermen 20 miles out to sea did not notice the wave pass under their boats because it only had a height of about 15 inches. The fishermen were totally unprepared for the devastation that await-ed them when they returned to the port of Sanriku. While tsunamis are generally confined to the Pacific basin, they have been recorded in all the major oceans of the world. Early records of other destructive tsunamis include one caused by the Krakatoa volcano explosion in 1833, which drowned some 36,000 people in Java and Sumatra.

More recently, the Asian Tsunami of December 2004 was caused by an earth-quake in the Indian Ocean with a 9.15 Richter magnitude. The tsunami devastat-ed shoreline areas of Indonesia, Sri Lanka, India, Thailand, and other countries. More than 283,000 people were killed, making the tsunami one of the deadliest natural disasters in modern history.

Many people visualize an enormous wave breaking on the shore when they picture a tsunami. Actually, tsunamis appear as an advancing tide without hav-ing a developed wave face, resulting in the rapid flooding of low-lying coastal areas. Normally the first sign of a tsunami is a receding water level caused by the trough of the wave. Between wave crests, the tide has been known to expose up to 500 feet of seafloor in the seaward direction. The incoming wave approaches much like the incoming tide but at a much faster speed.

The impact of a tsunami is devastating. Both personal and real property can be submerged, broken, or washed further inland or out into the ocean. Power and phone lines are highly vulnerable to tsunamis. Even underground utilities such as sewer and water facilities can be affected, as a tsunami may also result in soil erosion and sedimentation. It is common for widespread fires to erupt if tank farms for fuel are damaged. Boats docked at sea are often damaged by pounding against one another or against the docks. The economy of a coastal community can be greatly disrupted if it depends heavily on shipping, fishing, tourism, or water transportation.

After the 1946 tsunami in Hawaii, scientists and governmental agencies es-tablished the Pacific Tsunami Warning System for the Hawaiian Islands and US territories in the Pacific. The system involves submarine earthquake detection and a close watch of unusual changes in water level at tide-gauging stations lo-cated throughout the Pacific, in order to predict a time of arrival to allow time for

BACK_DEFEXP-RR-004124

*Copyrighted Material Provided by Richard Weingroff, June 21*

evacuation. Unfortunately, the system has not proven to be completely reliable. Seventy-five percent of all warnings issued since 1948 have been false. In 1948, Honolulu was evacuated on a false alarm that cost more than $30 million. Fortunately, today's technology for monitoring the earthquakes that generate tsunamis provides some warning. However, nothing can ever be done to prevent tsunamis from occurring, which always leaves open the possibility of mass destruction to coastlines in affected areas.

## Avalanches

An avalanche is a large mass of snow, ice, earth, rock, or other material moving swiftly down a mountainside or over a precipice. Soil and mud avalanches are caused when water-saturated soils break loose and ooze down a mountainside. Ice avalanches contain some snow but are primarily made up of glacier ice.

Snow avalanches are the most common type of avalanche. Snow avalanches have caused death and destruction at mining and transportation facilities in the past. Today, mountain cabins are the properties most at risk from damage due to snow avalanches.

Snow avalanches require three conditions:

- Sufficient snow
- A sufficient slope, generally greater than 30 degrees
- Instability within the snowpack

Unless all of these conditions exist, there is no risk of an avalanche.

There are two types of avalanches: *loose snow* and *slab* avalanches. *Loose snow* avalanches begin from a single point and expand as they descend. The slide path looks much like an upside-down *V*. Loose snow avalanches are usually fairly minor, but they can be very dangerous in late spring or in exposed climbing situations. *Slab avalanches* are a greater threat to skiers, climbers, and snowmobilers. A *slab* is a cohesive layer of snow that has not bonded well with the layer below it. As a result, it is under stress as it supports its own weight on a slope. When the stress within the snow layer exceeds the strength of the snow, the slab releases, much like a pane of glass that shatters under its own weight. The trigger may be another storm, a change in temperature, or even the weight of a person.

The most devastating snow avalanches are triggered by earthquakes. One of the most destructive snow avalanches caused by an earthquake took place in Peru. First, on January 10, 1962, a hanging glacier on the summit of Mount Huascaran broke off at an approximate altitude of 6,300 meters. It traveled 16 kilometers, falling 4,000 meters in elevation, and destroyed everything in its path. More than 4,000 lives were lost and nine small towns were destroyed. A small hill protected the city of Yungay, but it fell victim to another destructive avalanche eight years later. On May 31, 1970, a large earthquake shook Peru and released another monstrous avalanche from Mount Huascaran. This time, the avalanche spilled over the hill, buried Yungay, and took 20,000 lives.

BACK_DEFEXP-RR-004125

An average avalanche of snow is two to three feet deep at the fracture line and 100 to 200 feet wide, and it will fall 300 to 500 feet in elevation. The speed of an avalanche of this size is roughly 50 to 60 miles an hour, if the snow is dry. If the snow is wet, either from heavy rain or thaw, the speed will be slower, probably in the range of 20 to 40 miles an hour. In general, larger avalanches result in higher speeds, and the fastest avalanches measured have traveled at speeds of up to 230 miles per hour.

In the winter of 1976, an avalanche in Utah's Rocky Mountains destroyed the "Bear Claw" cabin featured in the 1972 movie *Jeremiah Johnson*. The cabin was located in an exclusive area associated with the Sundance Ski Resort, owned by the actor Robert Redford. Numerous subsequent avalanches have occurred in this area, including a Class 4 avalanche in 1986 (Class 5 is designated as the worst). The only residence damaged in this incident was to a 6,500-sq.-ft. cabin owned by Robert G. Allen, author of the real estate book *Nothing Down: How to Buy Real Estate with Little or No Money Down*. The cabin was condemned.

Due to the destruction of trees and other natural defenses, avalanches continued in the area with increased frequency and impact. In 1996, another avalanche (Class 3) impacted a total of four cabins within the "Nothing Down" area or path, which was named after the 1986 slide. One house, which was hit by the shock waves rather than the avalanche, was blown off its foundation and ended up in a pile of rubble. The area is now considered a "frequent return interval," with imminent future exposure to avalanche hazard.

## Tornadoes

Tornadoes, one of nature's most fascinating and devastating events, are the result of great instability in the atmosphere. Most tornadoes form along a front between cool, dry air from the north and warm, humid air to the south. A narrow zone of cumulonimbus (thunderstorm) clouds develops along such a front. This zone of clouds, called a "squall line," produces violent weather when a mass of warm, humid air rises extremely rapidly. As this air rises, more warm air rushes in to replace it. The inrushing air also rises and may begin to rotate. These strong storm updrafts, sometimes coupled with the dragging effect of falling rain or hail, result in a further tightening in a rotational motion. The rotating funnel cloud extends downward from the mass of dark storm clouds. Some funnels do not reach the ground, but others dip down and strike the earth.

Tornadoes can occur in many parts of the world, in any month, and at any time, but certain patterns and characteristics do exist. The winds of a tornado spin in a counterclockwise direction in the Northern Hemisphere and clockwise in the Southern Hemisphere, due in part to recurring weather patterns in each hemisphere. Most occur in the spring and early summer and most frequently during the middle and late afternoon. The greatest number of the world's tornadoes occurs in the Mississippi River Valley in the United States, but Australia, Sweden, Russia, Italy, New Zealand, and the United Kingdom also have high incidence rates. Within the United States, Texas has had the most reported tor-

BACK_DEFEXP-RR-004126

*Copyrighted Material reproduced by Richard Reisinger. License 20...*

nadoes, with an average of 139 per year. Most tornadoes last less than an hour and travel a distance of approximately 20 miles at a speed of 10 to 25 miles per hour. In extreme cases, a tornado can last a few hours and travel up to 200 miles at speeds up to 60 miles per hour. The US National Weather Service constantly gathers weather information from all parts of the country and issues tornado warnings. These warnings include the anticipated intensity of the tornado as well as its location and path.

The winds of a tornado are the most violent on earth and may whirl at speeds of more than 300 miles per hour. Most tornadoes measure several hundred yards in diameter, but they can measure as far across as a mile and a half and can destroy anything in their path. Tornadoes are capable of lifting entire homes and other structures off their foundations and completely demolishing them. Where foundations remain, the winds can literally strip floors of their tile and linoleum. Mature trees can be pulled out by their roots.

## Fujita Scale

The Fujita Scale is used to measure a tornado's intensity and is named after Dr. T. T. (Ted) Fujita, who made the first systematic study of tornado forces. Dr. Fujita devised a classification scheme for tornadoes based on their damage. On a scale from F0 to F6, F0 is the weakest tornado and F6 the most intense, as shown in Exhibit 10.1. The majority of tornadoes on record have been of Class F0 to F1.

Following a tornado warning at 3:30 p.m. on May 27, 1997, a tornado hit Jarrell, Texas, with winds of 261 miles per hour as measured at 3:42 p.m. This tornado was an extremely rare event, with an F5 Fujita Scale ranking. The disaster caused 27 deaths, and virtually everything in the path of the tornado was

**Exhibit 10.1**  **The Fujita Scale**

| | | | |
|---|---|---|---|
| F0 | Gale tornado | 40–72 mph | Some damage to chimneys, breaks branches off trees, pushes over shallow-rooted trees, damages sign boards. |
| F1 | Moderate | 73–112 mph | The lower limit is the beginning of hurricane wind speed: peels surface off roofs, mobile homes pushed off foundations or overturned, moving autos pushed off the roads, attached garages may be destroyed. |
| F2 | Significant tornado | 113–157 mph | Considerable damage: roofs torn off frame houses, mobile homes demolished, boxcars pushed over, large trees snapped or uprooted, light object missiles generated. |
| F3 | Severe tornado | 158-206 mph | Roof and some walls torn off well-constructed houses, trains overturned, most trees in forest uprooted. |
| F4 | Devastating tornado | 207-260 mph | Well-constructed houses leveled, structures with weak foundations blown off some distance, cars thrown, and large missiles generated. |
| F5 | Incredible tornado | 261-318 mph | Strong frame houses lifted off foundations and carried considerable distances to disintegrate, automobile-sized missiles fly through the air in excess of 100 meters, trees debarked, steel reinforced concrete structures badly damaged. |
| F6 | Inconceivable tornado | 319-379 mph | These winds are very unlikely. The small area of damage they might produce would probably not be recognizable along with the mess produced by F4 and F5 winds that would surround the F6 winds. Missiles such as cars and refrigerators would do serious secondary damage that could not be directly identified as F6 damage. If this level is ever achieved, evidence for it might only be found in some manner of ground swirl pattern, for it may never be identifiable through engineering studies. |

BACK_DEFEXP-RR-004127

destroyed. Trees were debarked and uprooted, grass was pulled from the ground, 300 head of cattle were lost, and dozens of cars were thrown distances of over one-half mile.

Strong tornadoes are not a new event in Jarrell. On May 17, 1989, a tornado destroyed many properties, including a local market and diner. The tornado in 1997 passed just west of downtown Jarrell and struck the Double Creek residential subdivision. The destroyed homes either lost the value of the structure or incurred the cost of repairs. Much of the damage was paid for by volunteers, insurance claims, and governmental disaster relief funds.

### Tornado Risk

Within "Tornado Alley" (a tornado-prone area stretching from Illinois to Texas), the prevalent perception is that acts of nature are random and an inherent risk associated with the many benefits of living in the area. As a result, many property owners believe that properties in impacted areas stand no greater risk of being destroyed again in the future than any other properties in the region. In other words, as the entire region is perceived to have a risk of tornadoes, there is no discount applied to areas that have been impacted as opposed to those that have not.

Properties can be constructed with tornado safety in mind. In some areas, homes are constructed from concrete that is engineered to withstand 200-mile-per-hour winds. A storm cellar provides the best protection against a tornado, and a basement is considered the next best place to take shelter. Mobile homes that are not anchored should always be vacated if a tornado is approaching. They provide almost no protection and can be overturned very easily by strong winds. A high water table in some areas precludes construction of basements, which makes residents more vulnerable.

The center of a tornado is an area of remarkably low pressure, which may cause buildings to explode if they are not sufficiently ventilated for rapid adjustment to the change in pressure. That is why some recommend that a window be opened to allow the inside of a structure to adjust to rapid changes in air pressure.

## Droughts

A drought is a deficiency of water in the ground, streams, lakes, and reservoirs that results from a prolonged lack of rain or snow melt or an imbalance of water vapor entering the atmosphere by evaporation. Most of the moisture for rain and snow on the land surfaces of the world comes originally from the oceans. Warm ocean waters yield great quantities of moisture to the atmosphere by evaporation. Cooler waters yield much less, especially when water temperatures are cooler than the air above.

There are two different kinds of droughts. The first is a *meteorological drought*, which is a period of abnormally low rainfall. The other is an *agricultural drought*, which is a reduction in soil moisture. The first can be detected by rainfall figures, but the other relies more heavily on the region affected. While it may be assumed that these types of droughts go hand-in-hand, this is not always

BACK_DEFEXP-RR-004128

Copyrighted Material Licensed by Richard Hagar to Dearborn, Inc.

true. The difference between them is a measure of the dryness or wetness of a climate. In desert regions, where drought conditions are perpetual, the rates of evaporation and *transpiration*, which is water's evaporation from plants, are much greater than the rate of precipitation.

Aside from the fact that droughts result from a lack of precipitation, they may be intensified by high temperatures, strong winds, and low humidity, all of which increase from the loss of moisture by a combination of evaporation and transpiration known as *evapotranspiration*. Many times, low-pressure storm systems will shift tracks across a region, leaving some areas without their normal precipitation levels. Low sea-surface temperatures are another cause of drought. In desert regions throughout the world, the lack of rain may be attributed to the amount of dust in the air. Particles in the atmosphere are necessary in order for raindrops to form. However, if there is an abundance of dust particles in the lower atmosphere, a phenomenon called *supernucleation*–in which too little water condenses around each particle and clouds do not form properly–occurs. Because of this factor, areas such as east-central Australia, China, southern Africa, India, Central and North America, and northeast Brazil all predictably have frequent drought-like conditions.

The actual impact and denotation of a drought varies from region to region, depending on the normal rainfall. A drought in Cairo, Egypt, where the normal annual precipitation is 1.1 inches, is vastly different from a drought in New Orleans, Louisiana, where 64 inches of precipitation is expected annually. In Britain, a drought is described as a period of at least 15 consecutive days without rain. In the United States, it is a period of 21 days when rainfall is 30% less than the average for the place and time.

The impacts of drought are commonly referred to as *direct* or *indirect*. Examples of direct impacts include reduced crop and forest productivity, increased fire hazards, reduced water levels, increased livestock and wildlife mortality rates, and damage to wildlife and fish habitat. The consequences of these direct impacts have residual effects, or indirect impacts. For example, a reduction in crop, rangeland, and forest productivity may result in reduced income for farmers and agribusiness, increased prices for food and timber, unemployment, reduced tax revenues because of reduced expenditures, increased crime, foreclosures on bank loans to farmers and businesses, migration, and disaster relief programs. As these factors affect the economy in general, they tend to impact all the real estate in the region, rather than just a specific property or neighborhood.

## Climate Change

The earth is real estate. When climate change impacts the earth on a macro level, individual properties are being impacted on a micro level. As demonstrated by Hurricane Katrina and the wide acclaim of the documentary film *An Inconvenient Truth*, global warming has become considered more of a reality and less the subject of theoretical debate. This in turn has resulted in significant real estate economic issues. Some insurance companies, citing actual damages and perceived future risks, are raising many insurance premiums. This alone will alter financing and real

BACK_DEFEXP-RR-004129

estate prices. Numerous other issues must be monitored over the coming years, as climate issues will inevitably have an increased role in the real estate markets.

While the effects of global warming have been dismissed by some and taken seriously by others, it is undisputed that the world's overall temperature has risen over the last 100 years. The controversy in global warming lies in the areas of cause and effect. Some blame the industrial revolution and the unprecedented use of fossil fuels for causing this "greenhouse effect," while other scientists note that the earth has undergone cyclical warming and cooling trends for many millennia. Some envision the inevitable inundation of coastal areas and other major calamities if corrective action is not taken. In fact, both the *San Francisco Chronicle* and *The New York Times* have published the projected new coastlines of coastal communities assuming that global warming continues unabated. Still others insist the situation is a fad, a minor condition that ultimately–after much hoopla–will have the same net effect as the Y2K craze.

There are several impacts that climate change potentially could have in the future:

• Changes in land use

• Rises in sea level

• Changes in annual precipitation and soil evaporation

• Extreme weather

• Glacier retreat

• The extinction of some species of plants and wildlife

• The spreading of disease and the emergence of new diseases

Of these issues, the first four already have or potentially could impact real estate values in the future.

• Changes in land use, such as deforestation, could impact both the economic value of forests themselves as well as construction and lumber costs. Other related land-use changes could include effects from bark beetles in mountain and resort areas as well as the rising mosquito line in some areas.

• Rising sea levels could obviously impact all properties constructed in proximity to a coastline, resulting in the construction of new sea walls, raising properties onto stilts, or destroying the properties altogether. Furthermore, the seas are getting warmer, which already has killed off coral reefs in some areas. This could have an impact on resort properties that feature scuba diving and snorkeling.

• Changes to and the redistribution of annual precipitation and soil evaporation could impact agricultural properties, increase the price of wheat and other agricultural products, and require additional infrastructure to provide dependable sources of water.

• Extreme weather, the most obvious of the climate issues, recently has been witnessed on a large scale. While some may question a direct tie to global warming, most scientists are convinced that this is no coincidence.

BACK_DEFEXP-RR-004130

Both Hurricane Katrina and *An Inconvenient Truth* have had an awakening effect on the insurance industries. The perspective of current and future insurance risk can be understood better in the context of history. In 1938, a Category 3 hurricane known as the "Long Island Express" hit several areas of New England, including New Hampshire, New York, and Rhode Island. The storm killed 500 to 700 people and caused an estimated $6.5 billion worth of damage in current dollars. Today, the same storm would cost approximately $200 billion.

According to Evan Mills, an environmental scientist at the US Department of Energy, weather-related damage increased from approximately $1 billion per year in the 1970s to an average of $17 billion per year over the last decade. In 2005, the year Hurricane Katrina hit, the figure rose to between $70 billion and $80 billion, with $45 billion of that consisting of insured losses. In other words, there is a real risk that another single event could result in a financial liability of an amount over four times that caused by Hurricane Katrina. These and similar facts and figures have gotten the attention of the insurance industry. Such an event simply would wipe out many insurance carriers altogether, not to mention completely overwhelm many federal government agency and volunteer resources. In addition to Hurricane Katrina, insurance companies have noted a host of other extreme weather events, including freak ice storms, wildfires, windstorms, the freezing of citrus crops, and the flooding of lettuce fields. Consequently, insurance companies have announced a variety of new policies and practices that actually are impacting some real estate markets. Property owners on the East Coast, from Maine to the Carolinas and Florida, are either losing their insurance policies or their premiums are doubling and sometimes tripling. This is no minor issue, as 54% of the nation's population lives within 50 miles of the coast. Furthermore, the most expensive homes in the nation are generally located on the coasts of Florida, Southern California, and Long Island in New York.

This is a critical situation because obtaining property insurance is a fundamental aspect of real estate financing and ownership. Simply stated, a property that cannot be insured conventionally generally cannot be financed conventionally. Discounts to the values of properties that cannot be financed conventionally are well documented. On top of that, owning a property that is uninsurable, and thus entirely exposed to calamity, is troubling at best. While the full impact on real estate markets has yet to play out, it is apparent that real estate financing and insurance issues will continue to impact considerable portions of the market. With trillions of dollars of real estate in the United States, the stakes are high. For example, if insurance rates are increased just 1% as a result of climate-change issues, this translates into a multibillion dollar cost to property owners per year. Considering the incremental costs of construction, financing, insurance, lumber, and municipal infrastructure, the confluence of climate change conditions could create exponential economic damages to property owners.

Climate change has created a world of opportunity for the development of more fuel-efficient transportation, new technologies, and renewable energy sources. As concerns over climate and demands for energy efficiency increase, so will demand for new technologies to be integrated with real estate. Climate change issues will continue to grow and influence real estate markets. Similar to conservation and

*Natural and Climate Conditions*    **295**

wetland land banking, there are opportunities in the field of "carbon credits" for property owners who emit carbon dioxide and other greenhouse gases to trade or bank shares for greenhouse gas emissions. Furthermore, there could be offsets for development and emissions by planting trees or deeding properties as perpetual open spaces. For example, landscape architects qualified in climate-change issues could expand their practices to include passive solar designs using trees to provide shade during the warmer hours and allow in sunlight during the cooler hours.

Likewise, the expansion of green buildings and "smart" buildings is inevitable. The embryonic stage of smart building involved using automated switches and computers, such as HVAC and lighting controls, primarily to save energy. Human sensors immediately can turn lights on and off as well as control the temperature of a building. Building automation systems can integrate air conditioning, heating, lighting, and security with traditional information technology infrastructure. These features provide real-time building information about utility costs and usage that, along with access throughout the building, are continually monitored and adjusted for efficiency and safety.

These smart features not only cut energy costs but also create an entirely new experience for building occupants. For example, a tenant could use a card reader or keypad for secure access to an office building, which in turn automatically sends an elevator, turns on a computer, opens or closes curtains, adjusts the shades for sunlight, turns on lights, activates thermostat pre-set preferences, plays background music, and even turns on a network coffeemaker. All the while, high-tech security features keep people just in the areas they are allowed to be in and out of areas where they do not belong.

In addition to smart technology, there are flex designs. The multipurpose flex design concept has been around for some time. For example, a major arena such as the Staples Center in Los Angeles can convert into a hockey rink, a basketball court, and a concert venue. While they are not exactly high tech, multipurpose rooms allow for special-use properties such as churches, community centers, and schools to use one space for a variety of purposes. The multipurpose room recently has been advanced to a new level with the concept of "flex room" space. For example, automated carpet panels can change a basketball court into a meeting room with dark-colored carpet or a wedding hall with light-colored carpet, and the basketball hoops can fully retract into the ceiling and disappear.

A rooftop patio can be converted with the push of a button into an ice skating rink. A dance studio can be converted to a business meeting room with the help of wood panels that slide over the full-length mirrors. Pool tables can be transformed when conference tabletops drop from the ceiling, allowing the room to be used for playing pool and watching TV sports or having a board meeting and video conference.

These flex room features make real estate more effective and productive. For the first time, green real estate construction has been integrated with the full spectrum of smart building technology and the intelligent verticality of flex rooms. Combined into one project, this represents an entirely new category of real estate known as the *automated business and community center (ABC)*. Developed and trademarked by the Noah Corporation, ABCs demonstrate the

BACK_DEFEXP-RR-004132

possibility of property design that reduces environmental impacts. Advanced videoconferencing features reduce the need for commuting, flat screens use half the amount of electricity that conventional screens use, and human sensors and computer controls turn lights on and off.

There also are a variety of other ABC green features and technologies. Renewable building supplies are used whenever possible, such as in the form of clay pavers, recycled concrete, reused wood planks for flooring, and roofing shingles made from recycled tires. Rare wood species and old growth lumber are not used, and plywood is used only when absolutely required, as it can emit formaldehyde fumes. Rather than a cheaper petroleum-based urethane floor sealant, a more expensive but environmentally friendly water-based sealant is used.

Energy costs are controlled in ABCs on various levels. Room temperature is monitored in real time, saving costs and providing ideal interior temperatures. This is accomplished in part with well water kept at a consistent 58°F that is pumped from one side of the site, circulated through the walls to keep the building at a consistent year-round temperature that can be adjusted incrementally, and then injected back into the groundwater on the other side of the site. This system has an overall cooling effect in the summer and heating effect in the winter. All combined, the ABC's flex room, green, and smart features result in construction that has minimal impact on the environment, yields energy cost savings, and allows one room to be used for multiple purposes, increasing efficiency and reducing environmental impacts. While the ABC concept itself has patent rights, real estate developers may take note of some of the features that are becoming available to construct more efficient and environmentally friendly properties.

Real estate developers, investors, owners, and professionals are entering a new frontier with climate and global warming issues. Accordingly, new issues inevitably will arise, including the following:

- Much of the real estate market impacts will be determined by the extent to which people will invest in the new reality of global warming. Will real estate markets that historically have commanded premiums in part because of their desirable weather, such as California and Florida, become less desirable, will the market "shrug it off," or will consumers "head for the hills"?

- "New coastlines" are being predicted by some for coastal areas if global warming is not abated. Will coastal properties, along with their ocean views, continue to command heavy premiums?

- Glaciers are melting and mountain weather patterns are changing. Will mountain resorts, which often depend on snowfall and ski-related economies, suffer financially as a result of less dependable weather patterns?

- California's Napa Valley historically has been known for its ideal climate for growing grapes, yet other parts of the state have suffered enormous losses with frost and citrus crops. Will the desirability and value of agricultural properties with historically stable weather patterns be impacted, and if so, how? Will new agricultural technologies be developed that will mitigate or offset the risks of the greenhouse effect?

BACK_DEFEXP-RR-004133

- The "Malibu Factor" is the name given for the phenomena that much of the priciest real estate in the world is located in areas that are often the most dangerous and risky. The name refers to expensive homes that have been built for many years on the Malibu coastline in California, which is intermittently flooded by rogue waves. Many conventional insurance policies have not been made available for some beachfront homes. In some cases, there has been government-subsidized flood insurance to allow the wealthy to build in these areas. Will similar government subsidies and intervention increase in other high-risk areas?

- Entire small nations, such as the Marshall Islands, have average elevations of only five or six feet above sea level. Will real estate development in these developing countries halt pending some kind of forthcoming answers on the topic of climate change? If seas continue to warm and coral reefs continue to die, will the resort and tourism industries be affected?

- Many central business districts (CBDs) in the United States are located on the coast or near the banks of large rivers or lakes (i.e., Chicago, Miami, New York, San Diego, San Francisco, Seattle, and Washington, D.C.). The same is true around the world (i.e., Hong Kong, London, and Paris). Could climate change have a disproportionate detrimental impact on CBDs?

- New extreme climates could have a significant impact on property cooling and heating costs. Will solar glass need to be installed in high-rise office towers? Will additional insulation be required in real estate construction?

- "Carbon footprints," which are a measure of a business' carbon dioxide emissions, may be scrutinized more closely over time. Industrial properties designed to have a smaller carbon footprint may be more marketable than an otherwise similar facility with a larger footprint. Accordingly, will industrial facilities constructed to yield smaller carbon footprints be worth more than other facilities with larger footprints?

- It is conceivable that climate issues are not necessarily bad news for every real estate market. For example, many northern areas, and certainly Canada, are known for particularly long and harsh winter seasons. Will global warming moderate the harsher climates in some of these areas, extend tourist seasons, and generally increase the desirability of some regions?

- Will real estate markets look to the government for the solution to climate issues rather than adjusting individual or regional property values?

- The ABC model demonstrates the capabilities of combining flex room, green, and smart technologies. Will smart building technologies be implemented more aggressively by real estate developers in their efforts to contribute to the solutions to global warming? If so, what effect will that have on construction costs and rents?

As demonstrated by the immense property damage caused by Hurricane Katrina, the wide acclaim of the movie *An Inconvenient Truth*, and the implementation of the Kyoto Protocol international treaty, global warming has become less of a theoretical debate and more of a reality. This in turn already has

BACK_DEFEXP-RR-004134

Copyrighted Material Reviewed by Richard Hagar, Volume 2k

resulted in significant real estate economic issues. Insurance companies, citing global warming, unprecedented damages, and perceived future risks, are raising premiums or canceling policies altogether. This alone can alter conventional real estate financing. Global warming also means enormous opportunity for new advancements and technologies, and the real estate industry is no exception. By combining flex room, green, and smart technologies, properties have been constructed that are remarkably efficient and that can economically outpace almost anything ever built before. Climate issues will inevitably have an increased role in future real estate markets.

## Hurricanes

Hurricanes are large, rotating tropical cyclones of extraordinary violence. They can be found in all tropical and subtropical oceans except the south Atlantic and eastern Pacific. They are not as violent as tornadoes, but the combination of size and intensity makes them the most dangerous and destructive of all storms. Hurricanes frequently cause flooding and other damage. Hurricanes generally develop between June and November, which coincides with changes in the general circulation of the earth's atmosphere and increases in the temperature of seawater. When the water reaches a temperature of about 80° F, which is warm even for tropical seas, hurricanes may begin to form. The storm mass moves forward at a rate of five to 15 miles per hour. Near the center of a storm, wind speeds reach 75 to over 150 miles per hour, although the maximum speeds are rarely recorded because few wind-measuring devices can withstand such conditions. The total rainfall in the course of an average storm ranges from three to six inches, depending on the speed of the storms.

Hurricanes are part of a family of weather systems known as tropical cyclones. A hurricane begins as a disorganized storm system that forms over warm, tropical waters. When the storm system becomes more organized, it is classified as a *tropical depression*. If winds then grow in intensity to 40 miles per hour, it is reclassified as a *tropical storm* and receives a name. When winds in the storm reach 75 miles per hour, the storm is upgraded to a hurricane.

The winds of a hurricane are structured around a central *eye*, which is a relatively calm area that is free of clouds. In the Northern Hemisphere, winds blow around the eye in a counterclockwise motion. The *eyewall*–the portion containing clouds, wind, and rain–is the most destructive part of the storm. The eye on average is about 14 miles in diameter, but it can be twice that size. Including the eyewall, the hurricane may cover an area more than 100 miles in diameter and extend over thousands of square miles. While most storms have a short life span, hurricanes may live for weeks.

The impact of a hurricane can be disastrous. Over the oceans, the human activities at risk are primarily oil rigs, shipping vessels, and air traffic. The state of the sea is chaotic, and monstrous waves may develop. In November 1985, Hurricane Kate, located in the eastern Gulf of Mexico, created wave heights greater than 38 feet. Of course, hurricanes mostly pose a threat to life and property over

BACK_DEFEXP-RR-004135

land. They can cause a rapid rise in the sea level when a storm approaches the coastline, and excessive rainfall may cause landslides and flooding. The strong winds can produce considerable structural damage to improvements, ruin vegetation, and cause risk to life from flying debris.

There are approximately eight tropical cyclones in the North Atlantic area per year, of which about five are usually intense enough to be classified as hurricanes. The Gulf areas and all of the southern states lining the Atlantic Ocean have experienced hurricanes. Hurricanes Andrew in 1992, Hugo in 1989, and Opal in 1995 caused total damages in excess of $40 billion. Other recent hurricanes that have caused significant property damage and loss of life include Hurricanes Audrey in 1957, Camille in 1969, Charley in 2004, and Sandy in 2012.

In August 2005, Hurricane Katrina caused well over $100 billion in damages, much of it resulting from levee failures and flooding throughout New Orleans. Hurricane Katrina slammed a wide area of the Gulf Coast, killing more than 1,800 people and causing tens of billions of dollars in property damage. The wind, flood, and tornado damage destroyed entire towns and cities far beyond New Orleans.

In the aftermath, anyone driving through New Orleans and the Gulf Coast would be astounded at the scale of destruction. House upon house, street upon street, neighborhood after neighborhood, and city after city have been completely destroyed. Not only were homes ruined, but so were infrastructures, offices, restaurants, and retail stores. The amount of damage was so immense that after 10 years, many areas still remain uninhabitable or never rebuilt. This has left many municipalities in a difficult position because rebuilding the infrastructure is enormously expensive but not rebuilding could result in inverse condemnation suits brought by property owners.

Given the fact that many believe New Orleans and its infamous levy system never should have been built in the first place, there are no easy solutions. The unprecedented damage caused by Hurricane Katrina has resulted in astounding human suffering, financial losses, and property damages, which in turn greatly amplified the awareness and legitimacy of global warming concerns. It is difficult to ignore the fact that Katrina occurred in 2005, which was also the hottest year in recorded history. Prior to Hurricane Katrina, climate issues were more of a debate and less of an accepted public reality. However, this storm hit the national pocketbook so hard that it began to fundamentally alter the real estate markets. Citing climate issues, insurance companies have raised premiums significantly in high-risk areas or canceled policies altogether. In turn, this impacts the ability to finance a property. All summed, this translates to property value losses.

While some believe that global warming has resulted in increased hurricane activity, research shows that over the last 25 years the number of hurricanes has actually declined. In reality, there has simply been more coastal development in recent years, putting more properties at risk for hurricane damage. In the 1970s and 1980s, almost half of all new construction in the United States took place in coastal areas.

BACK_DEFEXP-RR-004136

*Copyrighted Material licensed by Richard Roesler, August 26, 2021*

# ALASKAN GOOD FRIDAY EARTHQUAKE CASE STUDY

*By Randall Bell, PhD, MAI*

## Class X Detrimental Conditions
## Earthquake and Tsunami

Over the past 200 years, over 1,000 "strong" earthquakes have been recorded in Alaska. Of these, 14 have been catastrophic. On March 27, 1964 (Good Friday), at 5:36 p.m., a 9.2 Richter Scale earthquake centered west of the town of Valdez hit Alaska. It was the largest earthquake in North American history, the second largest in the recorded history of the world, and the most violent in the recorded history of the world. Thousands of square miles of Alaska rose and fell by as much as 13 feet, and large cracks in the earth opened up. A 35,000-square-mile area sank between 1 and 5 1/2 feet, causing serious flood damage to numerous coastal towns. Thirty-three people were missing and presumed dead, and 78 people were killed, for a total of 111 lives lost. The earthquake lasted approximately four minutes and caused large tidal waves as high as 90 feet that greatly amplified the destruction of some coastal towns and villages. The earthquake lasted so long that some local residents recall going into the streets and taking bets on which side of the street various buildings would fall and crumble on. Numerous boats and barges were destroyed, and the vast Alaskan fishing industry was



The Alaskan earthquake of 1964 shifted ground levels by over 10 feet. These homes were once located in an area well above sea level, but the entire area fell and is now considered a wetland.

BACK_DEFEXP-RR-004137



Some structures survived the 1964 earthquake and tidal waves and were later moved to a new town site. This liquor store was once a home on the old town site.

virtually wiped out, as was much of the transportation infrastructure. The earthquake and subsequent tidal wave caused approximately $1 billion in damage. Of this, $400 million was in real estate damages.

Although it was 150 miles from the epicenter of the earthquake, Anchorage suffered the most extensive damage, as the city straddles the fault line. Deep crevasses and fissures occurred throughout the city, entire city blocks broke off towards the coastline, and many homes tumbled into the ocean. In Anchorage, 215 homes were totally destroyed, and 157 commercial buildings were destroyed or condemned. Fifty to sixty percent of the water lines, 15% of the sewer lines, and 50% of the city's streets, curbs, gutters, and sidewalks were severely damaged. Two

major slides occurred. One dropped a full block of Fourth Avenue, the main business street, 20 to 30 feet down into the earth. The other landslide destroyed Turnagain by the Sea, a high-priced housing area that overlooked Knik Arm, throwing the homes into the Cook Inlet. This area was never rebuilt and is now called Earthquake Park. Large cracks in the earth are still visible there today.

The earthquake caused what is known as the "bathtub effect," where inlets, or "ocean fingers," swish back and forth like the water in a tub, causing major recurring tidal waves. In Seward, an oceanfront community south of Anchorage, the earthquake ignited several oil storage tanks. The town lost 95% of its railroad. This impacted all of Alaska, as Anchorage

BACK_DEFEXP-RR-004138

Copyrighted Material made only for Richard Jarvis et al, June 2?



Not all disasters mean devastation for everyone. The home to the right did not have an ocean view prior to the 1964 Alaskan earthquake, as this area was once developed with the town's commercial business district. The tidal waves destroyed this business district, and now the home has an unobstructed ocean view.

served as the rail head of the Alaskan railroad. The city also experienced a mile-long area collapse into the sea. On top of the earthquake damage, the town suffered enormous destruction from subsequent tidal waves. Numerous homes and businesses were swept away into the ocean, and one family clung to their roof for 14 hours as recurring tidal waves ripped the house from the foundation and floated it over the neighborhood. That residential area is vacant today, as is much of the destroyed downtown area, which is used for recreational parking.

This disaster has had a variety of impacts. The only residential development within the damaged tidal wave zone has been housing that is rented to low-income occupants. Some homes located off the coastline now enjoy outstanding oceanfront views, and as a result of the tragedy their values were enhanced. Although the same risk for another tidal wave exists today as in 1964, a $60 million ocean research and aquarium facility began construction in 1996 on lower-risk areas of the coast.

The tidal waves also hit Valdez (a small town later made famous by the Exxon Valdez oil spill, which also occurred on Good Friday). The largest tidal waves occurred here, where they reached 70 meters. Much of the town was destroyed, yet several homes and businesses survived the waves. Later, the entire town was uprooted and moved to a new site that was not impacted a few miles away. Nearly every building that was not destroyed was eventually moved to the new town,

BACK_DEFEXP-RR-004139

and the old original town site is currently vacant with only some concrete remnants. The local visitor's center offers tourists a walking tour map of the various homes and businesses that were moved from the old town site.

The entire town suffered a significant loss, through either the cost of destroyed buildings or the cost of relocating to the new town site. Only the few homes and structures that exist near the old town site suffer from market resistance, as they sell for significant discounts because of the very real danger of a recurrence.

The moving of entire towns is not an isolated incident. The Alaskan Eskimo village of Chenega on Chenega Island was destroyed by the tsunami from the same earthquake. A group of residents from the village rebuilt a new Chenega on nearby Evans Island.

The destruction resulting from the Alaskan Earthquake and tidal waves was not limited to Alaska alone. States as far away as Florida and Texas experienced vertical movements of up to five to 10 centimeters of earth. California, Canada, Hawaii, and Oregon also incurred damages from the tsunami.

**Exhibit A**    **Damages and Fatalities from the 1964 Alaskan Earthquake Tsunami**

| Location | Fatalities from Tsunami | Damage from Tsunami |
|---|---|---|
| Alaska | 107 | $84,268,000 |
| California | 11 | $8,939,000–$9,789,000 |
| Canada | 0 | $10,250,000 |
| Hawaii | 0 | $67,590 |
| Oregon | 4 | $716,000 |

BACK_DEFEXP-RR-004140

Copyrighted Material Reproduced by Richard J. Tyler Volume 2B,



# Admissibility of Expert Testimony

*By Richard J. Tyler[1]*

The Federal Rules of Evidence (FRE) govern the admissibility of testimony and evidence in the federal court system.[2] As a general proposition, the rules provide that all relevant evidence is admissible, and that evidence which is not relevant is not admissible.[3] Evidence is considered to be "relevant" if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[4]

In addition to the requirement of relevance, the Federal Rules of Evidence impose additional requirements with respect to the admission of opinion testimony by expert witnesses. FRE 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if
>
> (1) the testimony is based upon sufficient facts or data,
>
> (2) the testimony is the product of reliable principles and methods, and
>
> (3) the witness has applied the principles and methods reliably to the facts of the case.

The text of FRE 702 adopted in 2000 codifies the holdings of three Supreme Court decisions: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*; *General Electric Co. v. Joiner*; and, *Kumho Tire Co. v. Carmichael*.[5] The *Daubert* case charged trial judges with the responsibility of acting as "gatekeepers" to exclude unreliable scientific evidence. The *Joiner* case established that a trial court could examine whether proffered expert testimony "fits" the data relied upon and the facts of the

---

1. Richard J. Tyler is a partner with the law firm Jones Walker LLP and a resident in its New Orleans office. He is a member of the firm's Business and Commercial Litigation Practice Group, and his practice is focused on the resolution of disputes involving construction and real estate matters.

2. The Federal Rules of Evidence (FRE) were initially adopted by the United States Supreme Court in 1975, and apply to proceedings in United States courts. See FRE Rule 101. Roughly three-quarters of the states have adopted the Uniform Rules of Evidence promulgated by the National Conference of Commissioners on Uniform State Laws, whose uniform rules are similar to the FRE. The FRE and Uniform Rules of Evidence can be accessed at www.law.cornell.edu/uniform/evidence.

3. FRE 402.

4. FRE 401.

5. 113 S.Ct. 2786 (1993); 118 S.Ct. 512 (1997); and 119 S.Ct. 1167 (1999).

BACK_DEFEXP-RR-004141

case. In *Kumho Tire*, the Court clarified that the trial court's gatekeeper function applies to all expert testimony, not just scientific evidence. The challenge posed by these three decisions is applying the rigor of the scientific method to expert opinions that involve art as much as they do science.[6]

## The Point of the Beginning: *Frye v. United States*

For many decades, the seminal case on the admissibility of expert opinion was *Frye v. United States.* This case arose out of the exclusion of evidence offered by a criminal defendant–specifically, the results of a "systolic blood pressure deception test," which is an early version of the lie detector test.[7] In affirming the exclusion of the evidence, the Court of Appeals for the District of Columbia stated:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
>
> We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.

This holding became known in legal circles as the "general acceptance" test, and it became the "dominant standard" for determining the admissibility of expert opinion testimony in the federal and state courts for decades.[8] In fact, the *Frye* general acceptance test remains the evidentiary standard in a number of state courts.[9]

## *Daubert, Joiner,* and *Kumho Tire*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court reviewed the exclusion of certain expert opinions based on the *Frye* general acceptance test.[10] The case involved the issue of whether ingesting the antinausea drug Bendectin during pregnancy caused the plaintiffs' birth defects. The defendant pharmaceutical company moved for summary judgment, and this motion was supported by an expert affidavit that concluded, based on a review of all existing epidemiological literature on the drug, that there was no support for the proposition that Bendectin posed a risk for fetal malformation. The plaintiffs countered with experts who, based on animal studies and a "reanalysis" of the medical literature, concluded that Bendectin could cause birth defects. The trial court

---

6. See Bill Mundy, "The Scientific Method and the Appraisal Process," *The Appraisal Journal* (July 1992).

7. 293 F. 1013 (D.C. Cir. 1923).

8. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786, 2792 (1993) ("In the 70 years since its formulation in the *Frye* case, the 'general acceptance' test has been the dominant standard for determining the admissibility of novel scientific evidence at trial." (citation omitted)).

9. See 6 Jones on Evidence (7th ed.) § 40:15 (West 2011).

10. 113 S.Ct. 2786 (1993).

BACK_DEFEXP-RR-004142

granted the defense motion for summary judgment, finding that the plaintiffs' expert evidence was not sufficiently established to have general acceptance in the field.[11] The decision was affirmed by the court of appeals, citing *Frye*.[12]

The Supreme Court reversed, finding that the *Frye* test had been superseded by the adoption of the Federal Rules of Evidence, specifically FRE 702. In this regard, the Court stated that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[13] The Court summarized the trial court's responsibilities as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.[14]

The Court then described a non-exclusive list of factors that bear on this inquiry, which is commonly referred to as a "gatekeeping" role:

- Whether the theory can be or has been tested
- Whether the theory or technique has been subjected to peer review and publication
- The known or potential rate of error of the technique
- The existence and maintenance of standards controlling the technique's operation
- Whether the theory has general acceptance in the relevant scientific community.[15]

After discussing these factors, the Court emphasized that the inquiry envisioned by Rule 702 is a flexible one, whose "overarching subject is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."[16]

Four years later, in *General Electric Co. v. Joiner*, the Supreme Court again addressed the admissibility of expert testimony.[17] In this case, the trial court excluded expert testimony purporting to establish that the plaintiff's lung cancer had been "promoted" by his workplace exposure to polychlorinated biphenyls (PCBs) and their derivatives, furans and dioxins. The Supreme Court held that the trial court did not abuse its discretion in excluding the testimony because the animal studies relied on by the plaintiff's experts "were so dissimilar to the facts presented in this litigation,"[18] and the human studies relied on did not show a statistical-

---

11. 727 F.Supp. 570 (S.D. Cal. 1989).

12. 951 F.2d 1128, 1129-30 (9th Cir. 1991).

13. 113 S.Ct. at 2795.

14. Id. at 2796 (footnotes omitted).

15. Id. at 2796 - 97.

16. Id. at 2797.

17. 118 S.Ct. 512 (1997).

18. The animal studies involved the injection of "massive doses" of PCBs directly into the bodies of infant mice, who then developed a different type of cancer than Joiner. None of the studies demonstrated that adult mice developed cancer from exposure to PCBs. Id. at 518.

BACK_DEFEXP-RR-004143

ly significant increase in cancer from PCB exposure or suggest a link between lung cancer and PCB exposure.[19] In this regard, the Court stated:

> Respondent points to *Daubert*'s language that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." He claims that because the District Court's disagreement was with the conclusion that the experts drew from the studies, the District Court committed legal error and was properly reversed by the Court of Appeals. But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.[20]

The *Joiner* decision is seen as elucidating the other requirement for admissibility under FRE 702, whether the proffered testimony is helpful to the trier of fact "to understand the evidence or to determine a fact in issue." Evidence that does not "fit" the facts of a particular case, or conclusions that do not "fit" the methodology, can be excluded as irrelevant.[21]

Because the *Daubert* and *Joiner* cases involved the admissibility of scientific evidence, the decisions left open the questions of if, and how, the *Daubert* gatekeeping obligation applied to expert testimony concerning "technical, or other specialized knowledge," and so-called "soft" sciences such as psychology.[22] In *Kumho Tire Co. v. Carmichael*, the plaintiffs were traveling in a van that overturned after the right rear tire blew out.[23] After the accident, the plaintiffs brought suit against Kumho Tire, claiming that the tire blew out because it was defective. The plaintiffs' case relied upon the opinions of a mechanical engineer who was offered as an expert on "tire failure analysis." Based on visual inspection of the tire's "wear and tear" prior to the accident, the expert concluded that a defect in the manufacture or design of the tire caused the blowout; specifically, that the tire was defective because of insufficient adhesion between the rubber, steel, and nylon components. The expert, who had worked for Michelin in tire design for ten years, based this opinion on his experience looking at blown-out tires and identifying markings that reveal abuse or defect. The district court granted a motion by Kumho Tire to exclude the expert, finding the expert's methodology unreliable.[24] On appeal, the Eleventh Circuit reversed, finding that the district court erred in applying *Daubert* to testimony that the court characterized as skill- or experienced-based rather than scientific.[25]

---

19. Joiner's experts cited four epidemiological studies. One found that lung cancer rates among ex-employees exposed to PCBs were "higher than might be expected," but refused to conclude that PCB exposure caused the increased rate. The second study found that workers at a PCB production plant had a "somewhat higher" incidence of lung cancer deaths, but deemed it "not statistically significant." The third study made no mention of PCB exposure. While workers in the fourth study had a significant increase in lung cancer rates, they had also been exposed to numerous other potential carcinogens. Id. at 518-19.

20. Id. at 519.

21. On the issue of "fit," the Advisory Committee Notes to FRE 702 list factors relevant to the inquiry, including "[w]hether the expert has adequately accounted for obvious alternative explanations" and "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion."

22. In fact, there was a split among the federal courts of appeal on this issue. Compare, e.g., *Cummins v. Lyle Industries*, 93 F.3d 362 (7th Cir. 1996) (*Daubert* factors applicable to all types of expert evidence) with *McKendall v. Crown Control Corp.*, 122 F.3d 803 (9th Cir. 1997). (*Daubert* factors should be applied only when there is testimony bearing on scientific knowledge.)

23. 119 S.Ct. 1167 (1999).

24. 923 F.Supp. 1514 (S.D. Ala. 1996).

25. 131 F.3d 1433 (11th Cir. 1997).

BACK_DEFEXP-RR-004144

In its decision, the Supreme Court held that *Daubert*'s general holding, setting forth the trial judge's general "gatekeeping" obligation, applied to testimony based on technical and other specialized knowledge rather than only to testimony based on scientific knowledge. The Court emphasized that the factors listed in *Daubert* did not constitute a definitive checklist or test and acknowledged that the factors identified in *Daubert* "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[26] While rejecting again the notion that "Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts," the Court re-emphasized the importance of *Daubert's* gatekeeping requirement:

> The objective of the requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.[27]

Turning to the exclusion of the plaintiffs' expert, the Court found that the district court reasonably concluded that the expert's testimony "fell outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'"[28] More specifically:

> The particular issue in this case concerned the use of Carlson's two-factor test and his related use of visual/tactile inspection to draw conclusions on the basis of what seemed small observational differences. We have found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire experts such as Carlson normally make the very fine distinctions about, say, the symmetry of comparatively greater shoulder tread wear that were necessary, on Carlson's own theory, to support his conclusions. Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach. Indeed, no one has argued that Carlson himself, were he still working for Michelin, would have concluded in a report to his employer that a similar tire was similarly defective on grounds identical to those upon which he rested his conclusion here. Of course, Carlson himself claimed that his method was accurate, but, as we pointed out in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[29]

## The *Daubert* Trilogy and Real Estate Damages

Under the *Daubert* line of cases, the trial court's gatekeeping function involves three determinations:

- Is the expert qualified?
- Does the expert's testimony rest on a "reliable foundation"?
- Is the expert's testimony "relevant to the task at hand"?[30]

---

26. 119 S.Ct. 1167, 1175 (quoting with agreement the Solicitor General's brief).

27. Id. at 1176.

28. Id. at 1177 (citing *Daubert*, 113 S.Ct. at 2786).

29. Id. at 1178-79 (citations omitted).

30. See *Daubert*, 113 S.Ct. at 2788.

BACK_DEFEXP-RR-004145

Stated differently, a court must answer three questions:

• Is this junk science?
• Is this a junk scientist?
• Is this a junk opinion?[31]

In assessing the reliability of an expert's methodology, it must be remembered that the focus "must be solely on principles and methodology, not on the conclusions that they generate."[32] Accordingly, courts generally take the view that flaws in applying an accepted methodology affect the weight to be accorded the expert's opinion, not the admissibility of that opinion.[33] One example of this view is presented in *Massachusetts Mut. Life Ins. Co. v. DB Structured Products, Inc.*, a case arising out of alleged misstatements and omissions contained in the offering documents for residential mortgage-backed securities (RMBS).[34] The defendants sought to exclude the plaintiff's expert opinion that assessed the accuracy of appraisals underlying these securities by using an automated valuation model (AVM). In particular, the defendants challenged the expert's use of a model of his own creation (referred to as GAVM) and the lack of any independent validation, peer review, publication, or industry acceptance of that model. In addition, the defendants maintained that the expert's AVM produced inaccurate and inconsistent results, used inappropriate variables, omitted other important variables, and employed dubious filtering techniques. The district court held that all these challenges went to the weight, rather than the admissibility, of the expert's opinions:

> As for [the expert's] testimony regarding GAVM, the court finds his opinion is relevant and rests upon sufficiently reliable grounds for admissibility purposes. First, contrary to Defendants' assertions, peer review and independent validation are not necessarily required. In any event, it is clear that AVMs have been subject to peer review and are accepted within the real estate appraisal and underwriting industry, although this exact model is particular to [the expert]. In fact, Deutsche Bank itself used AVMs as part of its valuation due diligence for loans at issue in this action. Moreover, as Plaintiff's counsel explained at the hearing, unlike commercially available AVMs, which are proprietary and thus cannot be tested or reverse-engineered, [the expert] provided the computer code for GAVM and the CoreLogic database to Defendants, whose experts were able to replicate its results. Accordingly, [the expert's] methodology can be adequately tested on cross examination.[35]

There is, however, a "tipping point" at which the use of a generally accepted methodology can be so flawed as to be unreliable under the "fit" test. For exam-

---

31. *First Choice Armor & Equipment, Inc. v. Toyobo America, Inc.*, 839 F.Supp. 2d 407, 416 (D. Mass. 2012) (quoting *McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F.Supp. 2d 418, 424 (D. Mass. 2008)). As a general rule, challenges to experts based on qualifications are exceedingly rare, and successful challenges are rarer still. E.g., *Capitol Justice LLC v. Wachovia Bank, N.A.*, 706 F.Supp. 2d 34 (D. D.C. 2009) (witness, who was not a certified appraiser, permitted to give expert testimony as to value of commercial real estate based on thirty years' experience in the relevant market; lack of appraisal certification deemed to affect weight to be accorded testimony).

32. See *Daubert*, 113 S.Ct. at 2797.

33. *Wal-Mart Stores, Inc. v. Qore, Inc.*, 2009 WL 224908 (N.D. Miss. Jan. 28, 2009) (declining to exclude expert appraiser who failed to fully comply with USPAP, finding that the errors raised, while providing ample areas for cross examination, did not rise to the level of preventing the expert from presenting an opinion).

34. 2015 WL 2130060 (D. Mass. May 7, 2015).

35. 2015 WL 2130060, *9. See also *New Orleans City v. BellSouth Telecommunications, Inc.*, 728 F.Supp. 2d 834 (2010) (in suit alleging inadequate compensation for utility's use of city rights-of-way, challenges to appropriateness of methodology, proper use of appraisal methods, and failure to consider certain facts more properly addressed through vigorous cross-examination and presentation of contrary evidence at trial, rather than through a motion to exclude testimony).

BACK_DEFEXP-RR-004146

ple, in *Cannon v. BP Products North America, Inc.*, a putative class action arising out of plant emissions, the court excluded an expert's hedonic regression analysis due to several flaws in the model, including:

• The model's unproven premise that sulfur dioxide ($SO_2$) emissions were worse in the class area than in the control area

• The failure to properly compare the subject group before and after the relevant date with a control group before and after the same

• The failure to adequately account for alternative explanations for property diminution, such as crime rates, location in or outside of the floodplain, and the availability of insurance following Hurricane Ike

• The inability of the model to accurately attribute the alleged property value diminution to conduct for which BP would potentially be liable.[36]

As a result, the district court found the regression model to be unreliable and the expert's opinions based on it to be inadmissible.[37]

Beyond fatal data errors and structural flaws in methodology, expert testimony can be excluded when an expert employs a methodology that is not generally accepted or applies an accepted methodology in an unconventional manner. Illustrative of the first point is the exclusion of the expert in *Development Specialists, Inc. v. Weiser Realty Advisors LLC*, a suit involving claims of a negligent appraisal.[38] In this case, the court excluded the plaintiff's expert for "failure to engage" the USPAP standards and employing a valuation methodology of her own devising:

> At her deposition, [the expert] was unable to identify any professional standards on which she had relied in preparing her reports, despite being asked repeatedly to do so. She admitted that she had not even considered whether Weiser's appraisal departed from the professional standards, and, indeed, conceded that she did not even know what the standards were. She also failed to cite any professional literature in support of her position.
>
> Instead, [the expert] testified that her methodology of calculating the value of the leasehold interest to the landlord was based on "the idea" of one of her partners, derived from his personal experience owning a large number of properties in the Manhattan area. That idea–in addition to departing from the USPAP standards, which [the expert] admitted–was also speculative, based on her conjecture that the landlord in September 2005 might potentially have sold or refinanced the Grace Building. Such an approach–different than that used by other experts in the industry, without known validation in the industry literature, and "connected to existing data only by the *ipse dixit* of the expert"–is not reliable, especially in light of the determinative question in this action. Accordingly, [the expert's] testimony should be excluded.[39]

---

36. 2013 WL 5514284 (S.D.Tex. September 30, 2013); Id., *6-12.

37. See also *Cayuga Indian Nation of New York v. Pataki*, 83 F.Supp. 2d 318 (2000) (expert applying a sales comparison approach excluded when sales data was inaccurate and expert improperly doublecounted, failed to apply procedures consistently, failed to make adjustments, and was unable to articulate an objective basis for his selection of sales data to compare); *Ponca Tribe of Indians of Oklahoma v. Continental Carbon Co.*, 2009 WL 5842042 (W.D. Okla. Jan. 23, 2009) (multiple regression analysis of residential property value diminution related to the potential for future emissions excluded as not directly tied to the emission events at issue in the lawsuit); *Hartle v. FirstEnergy Generation Corp.*, 2014 WL 1317702 (W.D. Pa. March 31, 2014) (survey fact card that conflated two different emission events "would not give the jury a proper basis for determining damages. This is not a mere 'technical flaw'; it is fatal to the reliability of the survey.").

38. 2012 WL 242835 (S.D. NY Jan. 24, 2012).

39. Id., at *8. *Accord*, *Exxon Mobil Corp. v. Albright*, 71 A.3d 30 (Md. 2013) (valuation methodology that disregarded data of actual comparable sales inadmissible).

BACK_DEFEXP-RR-004147

The decision in *Cannon*, *supra*, illustrates the problems associated with using a valuation methodology outside its normal context. In this case, the expert sought to support his ultimate opinion of value with the results of contingent valuation surveys. After noting that a "debate exists in the scientific community about the validity of contingent valuation as a methodology for assessing market discounts associated with real estate disamenities," the court excluded the opinions based on contingent valuation surveys because it was "unclear how the contingent valuation analysis, standing alone, could calculate damages on a classwide basis."[40]

In conclusion, problems of admissibility arise when experts seek to base their opinions on novel or unorthodox techniques that have yet to stand the tests of time in order to prove their validity.[41]

---

40. *Cannon*, 2013 WL 5514284, at *13; Id., at *14.

41. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995).

BACK_DEFEXP-RR-004148



# 12

# Completing a Reliable Damage Analysis

The field of real estate damage economics has evolved considerably over the past two decades. Continued growth is inevitable, as what was once a disjointed series of topics has grown into a well-defined and structured field of study. Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice (USPAP) focuses specifically on environmental conditions, recognizing the importance of properly analyzing such conditions, and is generally applicable to most detrimental conditions. USPAP's Scope of Work Rule allows appraisers the necessary flexibility in identifying the problem to be solved and the scope of work necessary to produce credible results.

Real estate appraisers and economists must be aware of the landscape surrounding a real estate damage assignment. For example, one should be aware of and address any issues related to determining a diminution in value, which may or may not be synonymous with determining legally compensable damages. In fact, there may be a large gulf between what the diminution in market value is and what is legally compensable under a specific law or statue. Likewise, "market value" may or may not be the same as "price." The National Park Service, the IRS, and other federal and state agencies and institutions have a variety of regulations and valuation constraints that the real estate professional must navigate in real estate damage assignments. The purpose of this final chapter is to address a number of fundamental issues and obstacles involved in completing a credible analysis of detrimental conditions.

## Detrimental Condition Fundamentals

Understanding the basics of detrimental conditions is critical to performing a credible damage analysis. It is essential to understand the applicability of the assessment, the repair and ongoing stages of a detrimental condition, and the relevant impacts on cost, responsibility, use, and risk within each stage. The detrimental condition matrix, detrimental condition model, Bell Chart, and three approaches to value provide a fundamental framework for the analysis of detrimental conditions.

BACK_DEFEXP-RR-004149

It is important to understand the subject's market segment as well as the basic characteristics of the property in an unimpaired condition. A crack running through a warehouse floor may be perceived quite differently from the same crack running through the living room of a single-unit home. Buyers of upscale luxury housing might be very sensitive to amenities, as opposed to the more price-sensitive buyers of entry-level housing. Property owners in an urban area may have an entirely different perception of external disamenities as compared to property owners in a suburban or rural area. Older neighborhoods often have much different dynamics than newer neighborhoods or planned communities. Reactions to a detrimental condition might differ based on market conditions. All of these dynamics can influence market perceptions and ultimately affect value, sometimes independently of the underlying issues.

There is often a predisposition to believe that detrimental conditions automatically have a negative impact on property values. However, it is important to keep in mind that if a property's value is to be affected by a negative condition, whether internal or external to the property, that condition must be given enough weight in the decision-making process of buyers and sellers to have a material effect on pricing relative to all the other positive and negative attributes that influence the value of that particular property.

It is also important to keep in mind that the observation of value diminution does not automatically reflect causality with respect to a detrimental condition. Some challenges in this regard might include:

- Distinguishing the effects of a detrimental condition, which often occur over a significant period of time, from the effects of market conditions
- Distinguishing the effects of a detrimental condition from simple proximity to other disamenities
- Distinguishing the effects of a detrimental condition from other sources of neighborhood change, such as public education opportunities, transportation patterns, and the location of employment centers and shopping facilities

All costs that are recognized by the market as legitimate reflections of possible value diminution should be accounted for. Use issues can be temporary or permanent and may result in a lesser use of the property or even a complete change in highest and best use. Risk issues can occur at any of the three stages of a detrimental condition, reflecting risks over and above the normal risk associated with an unimpaired property, including profit or entrepreneurial incentive. Understanding the date of value relative to the detrimental condition timeline is critical.

As many detrimental conditions involve litigation or other adversarial proceedings, an additional concern is organizing and presenting the analysis in such a way that it is understandable to the client, opposing parties, and the judge or jury.

## The Scientific Method

The fields of economics and valuation must employ methods that are scientifically valid. The scientific method is a process that involves observation, develop-

BACK_DEFEXP-RR-004150

ment of a theory, establishment of a hypothesis, and testing. The valuation process applies principles of the scientific method as a model, based upon economic principles (primarily substitution) as the hypothesis. The model is widely used by appraisers and the marketplace. It is noteworthy that the founders of appraisal practice in the United States referred to the science of appraising in the same sense that they referred to the science of economics.[1] This is particularly important in the context of expert testimony.

In this regard, the appraisal literature recognizes that the purpose of the *Daubert* "gatekeeper" requirement (which was discussed in Chapter 11 of this book) "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[2] The "court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science."[3]

The valuation process is set forth by the Appraisal Institute within its texts, courses, and seminars. This process is observed in various forms worldwide and is built upon the scientific method.[4] To embrace predictive analysis, practicing appraisers need to understand and utilize the basics, including the following:

- Statistical assumptions, in addition to appraisal assumptions
- How imperfect assumptions and imperfect data each affect analyses
- The crucial role of methodology
- Modeling decisions
- The aspect of art
- The scientific method
- Critical thinking
- Statistical thinking

These constitute what needs to be the emphasis of statistical education for appraisers.[5]

The scientific method is an established outline of procedures for conducting credible research. In *Foundations of Behavioral Research*, Fred N. Kerlinger defines scientific research as "the systematic, controlled, empirical, and critical investigation of natural phenomena guided by theory and hypotheses about the presumed relations among such phenomena."[6] When an analyst uses the scientific method, the credibility of his or her work product increases. To be considered

1. John D. Dorchester Jr., "The Federal Rules of Evidence and *Daubert*: Evaluating Real Property Valuation Witnesses," *The Appraisal Journal* (July 2000): fn. 8, 291.
2. *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1176 (1999).
3. Richard Hoyt, Robert Aalberts, and Percy Poon, "*Daubert* and Qualification of the Appraisal Expert Witness," *The Appraisal Journal* (Summer 2010): 285
4. Dorchester, "The Federal Rules of Evidence and *Daubert*," 300.
5. George Dell, "Common Statistical Errors and Mistakes: Valuation and Reliability," *The Appraisal Journal* (Fall 2013), 340.
6. Fred N. Kerlinger, *Foundations of Behavioral Research*, 3rd ed. (New York: Holt, Rinehart, and Winston, 1986), 10.

BACK_DEFEXP-RR-004151

"scientific," the methodologies must be observable, measureable, and repeatable by one's peers. Reliability can be evaluated based on two characteristics:

- The ability to repeatedly obtain a consistent, predictable result using either the same or different measurement techniques
- The ability to obtain an accurate result with the measurement techniques or instruments used[7]

The Appraiser Qualifications Board has stated that appraisers should be trained in scientific methods. This is becoming increasingly relevant, as all federal courts and half of the state courts have started requiring expert witnesses to couch their expertise in the scientific method in order to conform to the ruling in the *Daubert* case.[8] Most appraisers would agree that the valuation profession would be advanced and its stature enhanced if appraisers were to strive for a higher degree of reliance on the scientific method, thus increasing the precision of value estimates.[9] The steps for the scientific method are outlined as follows:

1. Identify the problem.
2. Collect relevant data.
3. Propose a hypothesis.
4. Test the hypothesis.
5. Assess the validity of the hypothesis.[10]

The following is a discussion of the established steps of the scientific method and the valuation process as set forth by the Appraisal Institute and USPAP. These steps are also shown in Exhibit 12.1.

### Step 1: Identify the Problem

The first step of the scientific method is to properly identify the problem. In the context of the valuation process, this is identifying the problem and establishing the scope of work.

In the scientific method, the objective is to look for explanations for defined problems, whether they be initial conditions or some of the universal laws or both.[11] In this first step of the valuation process, an appraiser identifies all the assignment elements that are relevant in the appraisal: the client, the intended users, the intended use of the appraisal, the purpose of the assignment including the definition of value (with source), the effective date of the value opinion, the relevant characteristics of the property, and any assignment conditions, such as extraordinary assumptions or hypothetical conditions. This combination of ele-

---

7. Bill Mundy, "The Scientific Method and the Appraisal Process," *The Appraisal Journal* (July 1992): 494.

8. Bruce R. Weber, "Environmental Uses of GIS, the Scientific Method, and *Daubert*," *Valuation Insights and Perspectives* (Third Quarter 2002), 38.

9. Mundy, "The Scientific Method and the Appraisal Process," 493.

10. David E. O'Connor and Christopher Faille, *Basic Economic Principles: A Guide for Students* (Westport, CT: Greenwood Press, 2000), 7.

11. Jeremy Bray, "The Logic of Scientific Method in Economics," *Journal of Economic Studies* 4, no. 1 (1977): 8.

BACK_DEFEXP-RR-004152



**Exhibit 12.1** **The Scientific Method and the Valuation Process**

Scientific Method and the Valuation Process

| Scientific Method | | Valuation Process |
|---|---|---|
| 1 | Identify the Problem | Identification of the Problem<br>Scope of Work Determination |
| 2 | Collect Relevent Data | Data Collection and Property Description |
| 3 | Propose a Hypothesis | Data Analysis<br>Land Value Opinion<br>Application of Approaches to Value |
| 4 | Test the Hypothesis | Reconciliation of Value<br>Indications and Final Opinion of Value |
| 5 | Assess the Validity<br>of the Hypothesis | Report of Defined Value |

Accept    Reject

Sources: David E. O'Connor and Christopher C. Faille, *Basic Economic Principles: A Guide for Students* (Westport, CT: Greenwood Press, 2000); *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013).

ments creates a unique assignment. If an element changes, another assignment is created.[12]

In an appraisal assignment, for example, the identification of the problem to be solved requires the appraiser to identify the client and any intended users, the intended use of the appraiser's opinions and conclusions, the type and definition of value, the effective date of the appraiser's opinions and conclusions, the subject of the assignment and its relevant characteristics, and the assignment conditions.[13]

With regard to competency, USPAP states, "The appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently. Competency requires: *1. the ability to properly identify the problem to be addressed;* 2. the knowledge and experience to complete the assignment competently; and 3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment" [emphasis added].[14]

12. *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 49.

13. Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice (USPAP)*, 2016-2017 edition (Washington, D.C.: The Appraisal Foundation, 2015), 14.

14. Ibid., 12.

BACK_DEFEXP-RR-004153

In the valuation process, the identification of the assignment elements leads directly into the scope of work of the assignment, i.e., the type and extent of research needed to solve the appraisal problem. Professional standards place the responsibility for determining the appropriate scope of work of the appraisal assignment squarely on the appraiser's shoulders. The scope of work for an assignment is acceptable if it leads to credible assignment results, is consistent with the expectations of parties who are regularly intended users for similar assignments, and is consistent with what the actions of the appraiser's peers would be in the same or a similar assignment.[15]

To solve any problem, the problem must first be identified, and only then can the appropriate solution to the problem be determined. In appraisal practice, problem identification logically precedes the scope of work determination.[16] The first step to solving a problem is to identify the problem. Appraisers cannot derive a solution, let alone a value, until they know exactly what the problem is.[17]

### Step 2: Collect Relevant Data

Once the valuation problem has been established, the second step in the scientific method is to collect the relevant data. As set forth by the Appraisal Institute, this is the data collection and property description step. The market data must be applicable to the problem that has been identified.

Setting forth clear objectives acts as a guide to where to look for theories, what concepts are relevant, what kind of models are needed, and ultimately, how the data is to be collected.[18]

In real estate appraisal, the quality and quantity of information available for analysis are as important as the methods and techniques used to process the data and complete the assignment. Therefore, the ability to determine the amount and type of data needed to answer the client's question, to distinguish between different types of data, to research reliable data sources, and to manage information is essential to effective appraisal practice.[19]

USPAP Standards Rule 1-4 states, "In developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results."[20] In the first step, the practitioner asks, "Why is this data collection project being conducted?" The data verifier should review the purpose of the data collection, the data in the sample collection, the data generation, and the documentation.[21]

The US Department of Health and Human Services (HHS) guidelines note that there are two important considerations that apply to all data collections: attention

---

15. *The Appraisal of Real Estate*, 87.

16. Ibid., 38

17. Stephanie Coleman, "Scope of Work and Problem Identification: The Significant Seven," *The Appraisal Journal* (Summer 2006): 232.

18. Bray, "The Logic of Scientific Method in Economics," 18.

19. *The Appraisal of Real Estate*, 95.

20. *USPAP*, 20.

21. Donald R. Epley, "Data Management and Continual Verification for Accurate Appraisal Reports," *The Appraisal Journal* (Winter 2006): 69.

BACK_DEFEXP-RR-004154

to detail and data recovery.[22] For even greater accuracy, one could use greater care in data collection–for example, collecting more and bigger samples of algae to analyze, collecting samples more frequently, or otherwise improving the raw data.[23]

Ultimately, collecting accurate, reliable data remains an essential task because the conclusions of appraisers' analyses are only as good as the data that supports those conclusions.[24]

## Step 3: Propose a Hypothesis

In this step, the appraiser analyzes the market data in an effort to reach a credible hypothesis of what properties would most likely sell for if placed on the market. In the valuation process, this is the step involving the analysis of data, land value opinion, and applications of the relevant approaches to value. In essence, the valuation process uses multiple approaches to value that can result in multiple hypotheses, which are later reconciled.

While the first two steps of the scientific method are easily identified within valuation nomenclature, the term *hypothesis* may be less intuitive, but still squarely within the scope of the valuation process.

A *hypothesis* is a theoretical system that is drawn by means of logical deduction.[25] The term *hypothesis* has meanings ranging from a mere educated guess or assumption to a position that is highly probable in light of established research or facts. A hypothesis can be an explanation accounting for a set of facts that can be tested by further investigation.[26] This later definition reconciles in the context of valuation, as often an appraiser's final opinion of value is actually a value based upon a *hypothetical* sale, or *hypothesis*. This position also reconciles with USPAP, which states that, "The effective date of the appraisal is the date on which the hypothetical sale of the subject property is assumed to occur."[27]

Just as appraisers can use multiple approaches to value property, each with divergent viewpoints, an appraiser can actually develop multiple hypotheses in a single assignment, which later can be reconciled. An appraiser's hypothesis or opinion of value is derived from a variety of analyses (market analysis, highest and best use analysis) and the application of different approaches to value (sales comparison, cost, income capitalization). Each of these forms of analysis deals directly with different sets of data about the subject property, competitive properties, and the larger market. However, all of these traditional appraisal analyses are increasingly influenced by the discipline of statistics. The valuation process specifically includes a component for land value, as land provides potential utility as the site for a structure or use as a recreational facility, agricultural tract, right of way for transportation routes, water storage, or other uses.[28]

---

22. Ibid., 73.

23. Max Kummerow, "Protocols for Valuations," *The Appraisal Journal* (Fall 2006): 359.

24. *The Appraisal of Real Estate*, 95.

25. Karl R. Popper, *The Logic of Scientific Discovery* (London: Seventh Impression, 1974), 32.

26. *Webster's II New College Dictionary* (Boston: Houghton Mifflin, 2001), 545.

27. Richard Marchitelli and Peter Korpacz, "Market Value: The Elusive Standard," *The Appraisal Journal* (July 1992): 321.

28. *The Appraisal of Real Estate*, 275, 359.

BACK_DEFEXP-RR-004155

In assignments involving developing an opinion of market value, the ultimate goal of the valuation process is a well-supported value conclusion that reflects all of the potential factors that influence the market value of the property being appraised. To achieve this goal, an appraiser studies a property from three different viewpoints, which are referred to as the approaches to value.[29]

Value is measured from the closing date of each property sale to the hypothetical closing date of the subject property (i.e., the effective date of appraisal). Just as the time and effort required to market the sale properties were historical to their respective closing dates, any efforts to market the subject property are assumed to be historical to the effective date of the appraisal. This assumption is clearly the basis on which the valuation process operates in every situation that requires a current value estimate.[30]

The scientific approach's hypothesis framework is also found in USPAP. For example, USPAP states that exposure time is the "estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal."[31] It has been observed that the criterion is a hypothetical sale; hence, the buyers referred to are hypothetical buyers, not actual and existing purchasers.[32] Market value is the prediction of an economic event. Since the appraiser is to judge what the property would bring if exposed to the market, he or she must predict the outcome of an event that has not yet occurred–i.e., the hypothetical sale of the property and the subsequent transaction price.[33]

Ultimately, in the context of the scientific method and the valuation process, an appraiser may develop multiple hypotheses using multiple approaches to value.

### Step 4: Test the Hypothesis

In Step 4 of the scientific method, the analyst attempts to test and reconcile the data. In the valuation process, this is the reconciliation of the various indications of value into a final opinion. The scientific approach requires that the hypotheses developed in the valuation process be tested.

Resolving the differences among various value indications is called *reconciliation*. In the final reconciliation, the appraiser reconsiders the entire appraisal, making sure that the data available and the analytical techniques and logic applied have led to consistent judgments.[34] The appraiser resolves multiple value indications derived within a single approach as part of the application of that approach. Then, after resolving multiple value indications within a single approach, the appraiser applies the same process to the value indications of the various approaches, providing the client with clear analyses of why the results of one (or more) of the approaches to value is given more weight than the results of the others.

---

29. Ibid., 36.

30. Marchitelli and Korpacz, "Market Value: The Elusive Standard," 321.

31. *USPAP*, 2-3.

32. Julius L. Sackman, "Market Value Approach to Valuation," *The Appraisal Journal* (January 1973): 58.

33. Richard U. Ratcliff, "Is There a 'New School' of Appraisal Thought?" *The Appraisal Journal* (October 1972): 525.

34. *The Appraisal of Real Estate*, 641-642.

BACK_DEFEXP-RR-004156

All theories are trials. Theories are tentative hypotheses, tried out to see whether they work. All experimental corroboration is simply the result of tests undertaken in a critical spirit, in an attempt to find out where our theories err.[35] In this step of the scientific method, the approach given the most weight is "test-ed" most obviously against the other approaches to value as well as all other in-dications of value. This includes, but is not limited to, the sale price of the subject property itself, regression residuals, escrow prices, listing prices, and prior sales prices of the subject property.

To be valid, a measurement process should have discriminant and convergent validity. Kerlinger notes that discriminant validity means "that one can empirically differentiate a variable from other variables that may be similar, and that one can point out what is unrelated to the variable. Convergence means that evidence from different sources gathered in different ways all indicate the same or similar mean-ing."[36] In appraisal, discriminant validity can be illustrated by the discrete nature of the three approaches to value. The use of data from the income capitalization approach in the sales comparison approach, for example, would violate discrimi-nant validity.[37]

The multi-method/multi-trait approach is an important scientific technique for analyzing data. It is based on the premise that independent analyses of discrete sets of data will yield results that tend to validate one another. When multiple approaches are used with discrete sets of data, the reliability of the result should improve. This technique is relevant to the valuation profession because three separate approaches are used in valuing property.[38]

Once these hypotheses have been formulated, a research plan must be devised that allows the analyst to credibly test the veracity of the null hypothesis.[39] Once the sales comparison, cost, and/or income capitalization approaches to value have been completed, the indication of value by each must be reconciled into a final opinion of value. A thorough review of each of the approaches is made in order to ensure accuracy and consistency. If the results from one particular approach appear to be at a great divergence from the other or others, then each phase of this approach should be reconsidered to account for the difference.[40]

The ultimate goal of the valuation process is a sound conclusion of value. This requires a reconciliation of the value indications derived from the approaches to value. Consideration should be given to the relevance of the approach and the reliability of the value indication based on the quantity and quality of the data available and analyzed within the approaches used. When value indications are substantially different, careful analysis of the valuation data used and the assump-tions made is needed to determine which value indicator is the most reliable.[41]

---

35. Karl R. Popper, *The Poverty of Historicism* (London: Rutledge, 1974).

36. Kerlinger, *Foundations of Behavioral Research*, 421.

37. Mundy, "The Scientific Method and the Appraisal Process," 495.

38. Ibid.

39. Marvin L. Wolverton, "Research Design, Hypothesis Testing, and Sampling," *The Appraisal Journal* (Fall 2009): 371.

40. Office of Real Estate Appraisers, *Appraisal and Valuation*, 419.

41. New York State Department of Taxation and Finance, *Valuation Standards*, Section IV.

BACK_DEFEXP-RR-004157

In the final reconciliation, the appraiser reconsiders the entire appraisal, making sure that the data available and the analytical techniques and logic applied have led to consistent judgments.[42]

### Step 5: Assess the Validity of the Hypothesis

In this step, the scientific approach mandates that the validity of the hypothesis be rejected or accepted. If the study's resulting theory is not corroborated by the data from which it was derived, independent means of corroboration must be sought.[43]

If the hypothesis is accepted, the conclusions reached by the appraiser in the valuation analysis are communicated to the client in the appraisal report, which may be written or oral. Facts, reasoning, and conclusions must be presented clearly and succinctly.[44]

Ultimately, the valuation process must be constructed on a scientifically solid foundation. In reviewing the scientific method, the valuation process reconciles ideally with the scientific method whereby the appraiser:

1. Identifies the problem
2. Collects relevant data
3. Proposes a hypothesis by analyzing the market data and utilizing the three approaches to value
4. Tests the hypothesis by determining if the indicated values reconcile
5. Assesses the validity of the hypothesis and renders a final opinion of value

Through this established process, the real estate market and courts are provided with valuations that are scientifically sound.

### Market Data

Specialized techniques for collecting relevant market data should be used to draw properly supported conclusions. Market data for the analysis of detrimental conditions is not necessarily as easy to obtain as conventional appraisal data, but the process of collecting market data is an essential aspect of the analysis. Leads for data can often be obtained from government resources on similar detrimental conditions, such as environmental action lists and maps of flood zones, earthquake hazards, and endangered species zones. Real estate brokers can also be an excellent resource, and multiple listing services (MLS) sometimes give clues that properties may be impacted by detrimental conditions. For example, a so-called "fixer-upper" property might suffer from simple deferred maintenance or have major structural problems. Utility companies can often provide maps of tunnels and easements as well as gas, water, sewer, and power lines, which might help facilitate a search for relevant sales transactions. Many detrimental conditions receive media coverage, making historical news archives an invaluable tool in

---

42. *The Appraisal of Real Estate*, 642.

43. O'Connor and Faille, *Basic Economic Principles*, 7.

44. *The Appraisal of Real Estate*, 649.

BACK_DEFEXP-RR-004158

locating market data leads. The Internet has also revolutionized searching for all types of information, including information on detrimental conditions.

The quality of the market data ultimately drives the quality of the analysis, regardless of the analytical approaches chosen. Quantifying damages based solely on experience and professional judgment is reckless at best and probably unethical, particularly when some type of market data for measuring the impact of almost any detrimental condition is available.

It is important to understand that in detrimental condition analysis there are no "off the shelf" solutions; charts or matrices used for illustration purposes cannot be generalized to predict or quantify damages. In fact, it is entirely possible for the same detrimental condition to result in different value impacts in different markets or at different times. For example, studies show that electromagnetic fields (EMFs) have caused a diminution in value in some areas of the country, have no impact in other areas, and even enhance property values in areas where the open corridors are used for snowmobiles or are otherwise considered an amenity.

Failing to research and apply relevant market data is the single most common flaw noted in the analysis of detrimental conditions. While preconceptions about the analysis of detrimental conditions do exist, questions can only be resolved with relevant market data. The effect of a detrimental condition cannot be generalized and is unique to a particular market and the facts of a particular property at a specific date of value.

## Competence and Ethics

An appraiser must not go beyond his or her area of expertise. An assignment involving a detrimental condition may require an understanding of engineering, legal factors, or other types of issues. Assessing soil conditions, identifying contaminants, designing remediation protocols, and estimating the duration of various repair activities all require appropriate engineering or scientific knowledge beyond the expertise of most appraisers. Similarly, concerns regarding regulatory compliance, contract interpretation, or statutory liability may be equally critical to the analysis and require legal expertise. The appraiser or analyst should advise the client that the assignment requires this foundational information from qualified sources, and without it he or she may be unable to complete the assignment.

### Proper Use of Extraordinary Assumptions and Hypothetical Conditions

Appraising properties with detrimental conditions sometimes involves the use of an extraordinary assumption or hypothetical condition. USPAP defines an *extraordinary assumption* as "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions." A *hypothetical condition* is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis."[45]

45. *USPAP*, 3.

BACK_DEFEXP-RR-004159

The primary difference between an extraordinary assumption and a hypothetical condition is that extraordinary assumptions presume as fact otherwise uncertain information, while hypothetical conditions assume conditions contrary to known facts. Qualifications on the use of extraordinary assumptions and hypothetical conditions are discussed in Standards Rule 1-2(f) and (g) of USPAP, which note that both must result in a credible analysis and be clearly and conspicuously disclosed in reporting the results of an appraisal. Disclosure and reporting requirements can also be found in USPAP's Standards Rule 2-1(c) as well as Standards Rule 2-2 a(x), b(x), and c(x).

As a practical matter, hypothetical conditions are most often used when a detrimental condition is known but *not* accounted for in the valuation analysis. An example of this type of situation might be the appraisal of a service station with leaking underground storage tanks in which the client's problem to be solved calls for the property to be appraised without consideration of the contamination or related issues. A value estimate that does not include any adjustments for detrimental conditions is sometimes called the *baseline* or *unimpaired* value.

Extraordinary assumptions are often necessary in the analysis of detrimental conditions, when the appraiser has a reasonable basis for the extraordinary assumption and it is necessary to properly develop credible opinions and conclusions. For example, an appraiser might rely on other experts for assessment of a detrimental condition or associated repair costs and then utilize this information to estimate diminution in value, acknowledging that a change in the underlying assumptions may change the resultant analysis and conclusion. In a case like this, the extraordinary assumption would be that the cost information provided by the experts is indeed accurate.

It is critical that the use of extraordinary assumptions or hypothetical conditions remains reasonable within the context of the assignment. It is never appropriate to generally assume that a detrimental condition causes a loss in value or to assume value diminution in the absence of supporting data.

## Buyer Knowledge and Information

A common definition of market value requires buyers and sellers to act prudently and knowledgeably and assumes that the involved parties are well-informed or well-advised. These standards, although stated differently, are typical in most market value definitions. Buyer knowledge is important to the analysis of transactions that may have been impacted by detrimental conditions. A potential buyer who is provided no information or has no knowledge of a detrimental condition cannot make an informed decision. Reliance on such a transaction for valuing an impaired property is inappropriate, since the sale would not be consistent with most definitions of market value. Information about buyer knowledge can be ascertained in a number of ways, including personal interviews, media coverage, sworn testimony, disclosures, or other documents provided in connection with the transaction.

In a litigation context, appraisers may sometimes dismiss transactions as not being reflective of the market because buyers were not "fully informed" or did

BACK_DEFEXP-RR-004160

not have "full information." While it is important that buyers be knowledgeable and well-informed, the standard of "full information" is one that is rarely met in any transaction involving something as complex as real estate. If a sale involves a property in litigation, it would normally be appropriate for a buyer to have information about both sides of the case and conduct an independent investigation if possible. With respect to buyer knowledge and information, "reasonably informed" or "typically informed" are terms that are generally more consistent with the perspective of the marketplace and accepted definitions of market value.

## Cost of Repair and Diminution in Value

While cost, use, and risk factors are important to consider in detrimental condition studies, automatically deducting repair costs is generally not appropriate. In addition to the costs themselves, the responsibility for paying those costs is an essential consideration. If the property is indemnified, it would generally be improper to deduct costs that will be paid by another party. Further, the issue of "economic waste" must be considered. In other words, the appraiser or analyst must decide if it is sensible to make a repair if the diminution in value is less than the cost of the repair. Estimating the impaired value of a damaged property also involves the consideration of cost and risk effects as noted in USPAP's Advisory Opinion 9.

In litigation, the cost of repair and diminution in value are often alternative legal remedies. Nonetheless, it is not uncommon for appraisers to erroneously assume that the cost of repair equals diminution in value without analysis to support this contention or consideration of other factors. Repackaging the cost of repair and calling it value diminution is inherently misleading. Just as cost does not equal market value, cost of repair does not necessarily equal diminution in value. It is incumbent upon the appraiser or analyst to conduct a diligent study of the market and to resist the temptation to automatically deduct repair costs without supporting market data.

## Indemnification

Particularly when evaluating the impact of environmental contamination, the indemnification by a responsible and financially able party for future cleanup costs may eliminate any diminution in value. However, if no indemnification is offered or in place, assuming that an indemnification exists would be a hypothetical condition and must be identified as such. In other words, it would be improper to appraise a property and ignore the risks involved by assuming that the property will be indemnified when it is sold unless there is a pending offer or agreement by the owner or another responsible party to do so. Finally, it is possible in certain situations to have a contaminated property sell at full value with no indemnification at all. Again, the conclusions are based on market data.

BACK_DEFEXP-RR-004161

## Economic Waste

The usual measurement of damaged real estate may include the reasonable cost of repair and completion of the building in accordance with the original or pre-existing design. However, there is an exception to this if the cost to repair or replace the damaged construction is grossly disproportionate to the results to be attained and the building is not required to be repaired as the result of an unsafe condition. This is known as "economic waste." In the case of damaged real estate, the amount of damages is the difference between the unimpaired value and the impaired value, which may or may not reflect that the market makes a full deduction for repair costs. The repair costs must make sense in terms of the economics of the property in the context of the real estate market as a whole. While appraisers often rely on the repair estimates provided by others, if the figures are high and generate obvious questions related to economic waste, a competent appraiser must address the issue and not blindly plug in these figures into the report's damage analysis and conclusions.

The concept of economic waste is well established in law and has been set forth for decades. The doctrine of economic waste originated in the opinion of *Jacob & Young's, Inc. v. Kent*, written by Justice Cardozo ((129 N.E. 889 (N.Y. 1921)). In that case, a contract for residential construction required the use of a specific brand of plumbing pipe called a Reading pipe. The owner discovered after completion of the residence that the builder had used a different brand of pipe known as Cohoes for a portion of the plumbing work. He refused to pay the builder the amount owed under the contract. The court was dissatisfied with the existing contract law, which would have left the builder unpaid, as he had fully performed under the contract but had made an insignificant breach by not installing the brand of pipe stated in the agreement. Justice Cardoza applied the concept of "substantial performance," enabling the builder to receive the full payment for the contract, less any damages his breach had caused.

The court applied four tests to determine whether full performance constituted substantial performance:

- The purpose to be served
- The desire to be gratified
- The excuse for deviation from the letter
- The cruelty of enforced adherence

Justice Cardoza noted that there was no objective difference between pipe brands and created the following rule regarding the measure of damages: "The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value."

Federal and state courts have applied the doctrine of economic waste in cases when a potential windfall to an aggrieved party would prevail, to the detriment of a breaching contractor if the cost of repair was disproportionate to the benefits provided. Under the doctrine of economic waste, a court may not require a

BACK_DEFEXP-RR-004162

*Copyrighted material reproduced with the permission of the copyright holder, Appraisal Institute*

contractor to spend exorbitant amounts of money to fix a minor issue. In some states, the measure of damage is cost of repairs or diminution in value, whichever is less. In any event, the appraiser must determine any diminution in value from the real estate market's perspective.

## Junk Science and Accepted Damage Valuation Methodologies

The term *junk science* is often applied in legal disputes relating to spurious claims about scientific data, research, or analysis. The courts have come to recognize the need to combat this problem, as illustrated by the well-known 1993 case *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and the subsequent 1999 case *Kumho Tire Company v. Carmichael.*

Just as it is improper to render value opinions without market data, it is also improper to rely on methodologies that have not been at least "generally accepted" through publication and peer review. Those rendering opinions of market value or diminution in value should be properly credentialed and licensed, acknowledging that competent experts can still disagree because of limited market data, differing scopes of work, or other factors. While new concepts and ideas are important in the evolution of any practice area, junk science should be avoided. Instead, appraisers and analysts should focus on analytical methods and techniques that have been widely published, taught, and reviewed.

The fact that a property is impacted by a detrimental condition does not automatically mean that it has a material impact on the property's value. Detrimental conditions may or may not cause a material impact on value. Frequently, detrimental conditions have no material impact on value whatsoever. In the analysis of detrimental conditions, it is important that the appraiser be knowledgeable about available tools, properly select and apply those tools, avoid unproven or suspect methodologies, and ultimately have relevant market data to support opinions and conclusions.

BACK_DEFEXP-RR-004163

BACK_DEFEXP-RR-004164

Copyrighted material licensed by Richard J. Roddewig, June 20, 2018.

# Additional Case Studies

## SIMPSON CONDOMINIUM CASE STUDY

*By Randall Bell, PhD, MAI*

### Class III Detrimental Condition
### Crime Scene

The murders of Nicole Brown Simpson and Ron Goldman occurred on the walkway to a West Los Angeles condominium on Bundy Avenue in June 1994. The property is a well-designed, tri-level condominium, which contains 3,405 square feet, four bedrooms, three bathrooms, and a rooftop patio.

The property was purchased in January 1994 by Nicole Simpson for an effective price of $652,000. Shortly thereafter, she listed the property for rent for $4,800 per month in an effort to relocate.

The condominium was listed for sale shortly after the crime for $795,000. Over the last two years, various written offers have been presented, but none were consummated. The property suffered from an extended marketing period of approximately $2\frac{1}{2}$ years, far beyond the typical six-month time frame for residential properties in the area. The property was scheduled to be auctioned in January 1997, but it was sold prior to the public auction for a price less than the $595,000 asking price.

BACK_DEFEXP-RR-004165



From the air, the Bundy Drive condominium can be seen to be more of a duplex rather than part of a large condominium complex.

BACK_DEFEXP-RR-004166

Copyrighted material reproduced with permission of Richard J. Roddewig, Volume 2017, Page

# INDUSTRIAL BUILDING CASE STUDY

*By Michael V. Sanders, MAI, SRA*

## Class IV Detrimental Condition
## Title Defect/Easement

The subject is a single-tenant industrial property located within a large light industrial district in Orange County, California. Development in this area has occurred mostly over the past 30 to 35 years with a diverse mix of low-rise industrial and commercial uses ranging from small manufacturing facilities to corporate offices.

The subject site consists of 24,803 square feet and is zoned for light industrial use. The site is level at curb grade and has one driveway entrance from the street. Improvements consist of an average concrete tilt-up industrial building of 10,514 square feet that was built in 1978 with about 10% finished office space. The building abuts the westerly property line with three ground-level loading doors–two along the east side of the building and one at the rear. Improvements are typical for this market, reflecting site coverage of slightly over 42%.

The issue at hand is an adjacent building that also abuts the westerly property line and has two ground-level loading doors along its west side that can only be accessed via the subject property. Exhibit A is a site plan that shows the configuration of the subject and adjacent property.

The subject's owner indicated that he was aware of this arrangement when purchasing the property several years ago but believed that access existed only by virtue of an informal agreement rather than a recorded easement. The owner of the subject property reportedly became aware of the existence of a 30-foot access easement extending the entire depth of the site subsequent to the sale of the adjacent property. Because a title policy issued in connection with the owner's acquisition of the property did not show the recorded easement as an exception from coverage, a title claim was filed for the diminution in the value of the subject property due to the easement.[1]

It is clear that the easement has some impact on the functional utility of the subject property. Because the easement area must be kept clear to allow the dominant tenement to utilize it for "ingress and egress and incidental purposes thereto," the area is not available for use by the subject in a manner that would impede the ability of the adjacent property to use it for access purposes (e.g., equipment or materials storage, parking, etc.).

Industrial properties in this market are typically developed with a site coverage ratio of 40% to 50%. The portion of the site not occupied by the building is used to satisfy parking and setback requirements as well as outdoor storage incidental to the operation of the permitted use. A typical user in this market would find the easement area useful for the storage of equipment, materials, and finished products or refuse, which is often necessary in conjunction with normal industrial usage.

---

1. Under California law, title defects are measured by the diminution in value as of the date of discovery, based on the use of the property at that time.

BACK_DEFEXP-RR-004167



**Exhibit A** **Site Plan**

Without the area of the easement (5,637 square feet), the subject site would be reduced to 19,166 square feet with a coverage ratio of nearly 55%, which is significantly higher than the coverage ratios of most comparable properties in this market. Using mul-

tiple regression, a preliminary study was conducted to determine the impact of site coverage on sale price with inconclusive results. Even with meaningful results, this analysis would tend to overstate the magnitude of any loss associated with the easement, since the

BACK_DEFEXP-RR-004168

subject has not lost all use of the easement area but only the right to use it for storage or other purposes that would impede the use of the easement by the dominant tenement for loading access.

Since the dominant and subservient estates essentially share use of the easement area for access to their respective properties, valuation of the easement is best expressed as a percentage of the fee value of the underlying land plus the contributory value of any surface improvements. Given that both properties have roughly equivalent rights to use the easement area for access purposes, the land underlying the easement is apportioned equally between the dominant and subservient estates.

Sales comparison was used to value the land at $19.50 per square foot, with the easement valued as follows:

$$\$19.50 \times 5{,}637 \text{ square feet} \times 50\% = \$54{,}961$$

The easement area is improved with asphalt paving that exhibited significant distress, likely due to traffic loading and lack of regular maintenance, and has nominal contributory value.

While explicit valuation of the easement accounts for the loss of use with respect to the easement area itself, it was also necessary to consider any additional impacts on the property. Required parking was not located within the easement area and was not a consideration. The most significant impact was the inability of the subject owner to gate the front of the property to provide a fenced yard area, which is a desirable security feature for industrial properties in this area. While the front of the property could not be gated and a fenced yard area could not be provided unilaterally by the owner of the subject property, this could be accomplished in cooperation with the owner of the dominant tenement to benefit both properties. An additional benefit to the subject owner might be a lower cost for such an improvement, presuming that the adjacent owner would be willing to share the expense.

The diminution in value associated with the failure to properly show the recorded easement as an exception from coverage in a policy of title insurance was estimated at $55,000. The unimpaired value of the subject property (no easement) was estimated at $82.00 per square foot of improvements, or approximately $860,000. In this case, the diminution in value was equivalent to about 6.4% of the unimpaired value.

BACK_DEFEXP-RR-004169

# OKLAHOMA FEDERAL BUILDING CASE STUDY

*By Randall Bell, PhD, MAI*

## Class III Detrimental Condition
## Terrorist Bombing

In April 1995, the Alfred E. Murrah Federal Building in Oklahoma City, Oklahoma, was destroyed by a powerful bomb left in a rented vehicle. This tragedy took the lives of 168 people, injured 600 others, and irreparably damaged the nine-story building.

Although the Federal Building received the focus of media attention, the blast destroyed numerous other buildings to the north, east, and west, including the YMCA, the Regency Towers Apartments, several churches, and the post office. Many of these buildings were later demolished, repaired, or rebuilt.

Soon after the rescue efforts were completed, the balance of the Federal Building was demolished, the site was fenced, and a grass lawn was planted. Traffic on Fifth Street has been permanently closed, and plans have been made to erect a memorial on part of the site. The parking structure and terrace were not damaged, and the parking structure is still used today by the courthouse located south of the site.

The incident fundamentally altered the future building plans of the federal government. The government purchased numerous destroyed properties to the north and are planning a



The Oklahoma City bombing affected many properties beyond the Federal Building. The post office across the street was destroyed, and the two buildings seen here were also damaged.

BACK_DEFEXP-RR-004170

low-rise building complex that will be a model for future government buildings, all having permanent barriers to prevent any similar delivery of a large-scale explosive.



The blast zone from the Oklahoma City bombing expanded for many blocks. This structure collapsed, although it was located several blocks away from the explosion.

BACK_DEFEXP-RR-004171

# WEATHERBY POINTE CASE STUDY

*By Orell C. Anderson, MAI*

## Class I General Condition
## Market Conditions

Weatherby Pointe is a residential subdivision located in the community of Fox River, California. The subject property is located within the subdivision and is a two-story tract home with four bedrooms and three bathrooms. This development was built in 1972 and contains 632 homes with four models. Because of the rolling topography, many of the homes, including the subject property, enjoy a view amenity.

In 1991, the Schultz family purchased the subject property on Summit Avenue, which had a sweeping, panoramic view. At the time they inspected the home, there was a large shopping center (Center A) located approximately 150 yards directly behind the house, and a large vacant tract of land located about 1.5 miles away to the far right peripheral view, as shown in Exhibit A. Most of the surrounding areas were developed with residential housing, schools, and churches.

Soon after they purchased the home, construction began on a shopping center (Center B) on the large vacant site. The Schultz family filed a lawsuit against the broker for not disclosing that a 24-hour shopping center would be built on the vacant site. The family's contention was that the shopping center was an eyesore and had caused their property value to drop.

The analytical assignment was to determine if it was reasonable to conclude that a shopping center 150 yards away did not cause a diminution in value but one 1.5 miles away did. Indeed, the value of the subject property had dropped 10% over the past two years.

**Exhibit A**    **Map of View**



BACK_DEFEXP-RR-004172

An examination of the subject property was conducted to evaluate the impact of a 24-hour shopping center on the adjacent residential neighborhood. Extensive interviews and surveys were performed, and a quantitative analysis of the possible impact of 24-hour operated shopping centers on residential home values was derived through a paired sales analysis. The analysis provided a quantitative technique to compare homes near 24-hour retail operations with similar properties that are not near those types of operations, in an effort to determine if there is any impact on home values.

Exhibit B is a summary of responses from police departments, chambers of commerce, and municipal leaders such as city managers, community development directors, and senior planners. The participants were asked to rate specific land uses on a scale of 1 (bad) to 5 (neutral) to 10 (good) for each use's potential impact on homes at night.

The survey indicated that a 24-hour retail center basically had a neutral rating of 5.8 to 6.3. The major concern

**Exhibit B**    **Land Use Ranking**

| Police Department | Long Beach | Torrance | Redondo Beach | Carson | La Habra | Mission Viejo | Santa Ana | Huntington Beach | Tustin | Mean |
|---|---|---|---|---|---|---|---|---|---|---|
| Land use | | | | | | | | | | |
| Public park | 6 | 2 | 5 | 7.5 | 8 | 8 | 8.5 | N/Av | 4.5 | 6.2 |
| 24-hour quick mart | 2 | 5 | 5 | 6 | 4 | 3 | 3.5 | N/Av | 1.5 | 3.8 |
| Industrial | 2 | 7 | 8 | 8 | 5 | 5.5 | 3.5 | N/Av | 7.8 | 5.9 |
| Shopping center | 8 | 7 | 5 | 8 | 5 | 5.5 | 8.5 | N/Av | 5.6 | 6.6 |
| 24-hour center | 2 | 7 | 5 | 8 | 6 | 4.5 | 8.5 | N/Av | 5.6 | 5.8 |
| Apartments | 2 | 6 | 4 | 6 | 4 | N/Av | 8.5 | N/Av | 5 | 5.1 |
| Office | 5 | 8 | 8 | 9 | 5 | 5.5 | 8.5 | N/Av | 7.5 | 7.1 |
| **Chamber of Commerce** | | | | | | | | | | |
| Land use | | | | | | | | | | |
| Public park | 7 | 8 | N/Av | N/Av | 8 | 10 | N/Av | 8.5 | 8 | 8.3 |
| 24-hour quick mart | 7 | 3.5 | N/Av | N/Av | 9 | 2 | N/Av | 1 | 2.5 | 4.2 |
| Industrial | 7 | N/Av | N/Av | N/Av | 5 | 2 | N/Av | 2.5 | 6 | 4.5 |
| Shopping center | 9 | 3.5 | N/Av | N/Av | 8 | 9.5 | N/Av | 5 | 5 | 6.7 |
| 24-hour center | 9 | 3.5 | N/Av | N/Av | 9.5 | 9.5 | N/Av | 3.5 | 3 | 6.3 |
| Apartments | 8 | N/Av | N/Av | N/Av | 7 | 5 | N/Av | 2.5 | 4 | 5.3 |
| Office | 9 | 8.5 | N/Av | N/Av | 7 | 2.5 | N/Av | 8.5 | 5 | 6.8 |
| **Cities** | | | | | | | | | | |
| Land use | | | | | | | | | | |
| Public park | N/Av | N/Av | N/Av | N/Av | 3.5 | 8 | 8.5 | 8 | 8 | 7.2 |
| 24-hour quick mart | 1.5 | N/Av | N/Av | N/Av | 5 | 4 | 4 | 4 | 3 | 3.6 |
| Industrial | 5 | N/Av | N/Av | N/Av | 7 | 7 | 4.5 | 6 | 5 | 5.8 |
| Shopping center | 4 | N/Av | N/Av | N/Av | 7 | 7 | 9.5 | 5 | 8 | 6.8 |
| 24-hour center | 4 | N/Av | N/Av | N/Av | 8 | 7 | 7 | 4 | 8 | 6.3 |
| Apartments | 6 | N/Av | N/Av | N/Av | 7.5 | 4 | 3.5 | 6 | 9 | 6.0 |
| Office | 8 | N/Av | N/Av | N/Av | 8.5 | 9 | 7.5 | 7 | 9 | 8.2 |

Key:   Ranking of land use   1 = bad,   5 = neutral,   10 = good

BACK_DEFEXP-RR-004173

derived from the survey was that of late night noise and parking lights disturbing adjoining homes. This could be mitigated with proper planning and restrictions regarding truck delivery and garbage pickup times, such as structure and landscaping buffering. The John's Grocery Store chain has successfully accomplished this with approximately 150 stores, 75 of which are operated on a 24-hour basis, with the remaining stores open from 6 a.m. until 2 a.m.

Sixteen retail centers in the region were investigated. Of these, five 24-hour retail facilities in five cities were located that abut residential properties. These were studied to determine if they had any impact on value. Areas included Long Beach (John's), Torrance (First-Save Drug), Carson (First-Save Drug), La Habra (Mega-Mart), Mission Viejo (John's), and Huntington Beach (John's). Paired sales analyses were conducted comparing the sale price of homes adjacent to these retail facilities to the sale price of homes not impacted by the retail operations. Exhibit C sets forth the net overall effect of this study as a percentage.

Based upon the paired sales analysis, no correlation exists between home values and adjacent 24-hour shopping centers.

Three sale/resale analyses (sale and resale of the same properties in the area) revealed that the majority of homes in the subject property neighborhood with or without similar view amenities had decreased in value. They are set forth in Exhibits D, E, and F.

Sales Trend Study 1, Weatherby Pointe subdivision (excluding the street where the subject property is located), indicated that only 5 of 26 resales had increased in value, while the remainder all decreased in value. The overall mean indicated a -12.6% change with an average of a -5.6% change annually. Sales Trend Study 2, the community of Fox River (excluding Weatherby Pointe), indicated that only 2 of 30 resales had increased in value, while the remainder all decreased in value by 11.3% on average. The mean annual change was -4.2%. Sales Trend Study 3, the community of Pleasant Grove (an adjacent city considered similar to the subject property area), indicated that 7 of 38 resales had increased in value, while the majority on average decreased in value by 9.5%. The mean annual change was -6.5%.

In conclusion, the Schultz family's contention that the decline of their home value was a result of the con-

**Exhibit C**    **Paired Sales Analysis Summary**

**Net Overall Effect**

|  | Test No. 1 | Test No. 2 | Test No. 3 | Test No. 4 |
|---|---|---|---|---|
| Long Beach | 6.30% | -10.90% | 3.30% | 5.00% |
| Torrance | 10.50% | | | |
| Carson | -1.50% | -2.40% | 1.00% | |
| La Habra | 3.30% | | | |
| Mission Viejo | -4.00% | 7.20% | -5.50% | |
| Huntington Beach | -7.90% | -7.60% | | |

Positive numbers indicate that homes away from the shopping center sell for more as compared with homes directly adjacent to the facility.

Negative numbers indicate that the homes further from the retail area sell for less as compared with the home adjoining the 24-hour retail operation.

BACK_DEFEXP-RR-004174

struction of Center B was, in fact, false. The home did indeed incur a 10% drop in value. However, this decrease was due to general market conditions that had impacted nearly all homes in the region. Furthermore, the interviews and paired sales analysis indicated that no correlation existed between the presence or absence of a shopping center on nearby residential property values.

**Exhibit D**     **Sales Trend Study No. 1—Weatherby Pointe (Exclusive of Summit Ave.)**

| No. | Original Price | Date | Sale Price | Date | % Change | Annual Change | Total Gain/Loss |
|---|---|---|---|---|---|---|---|
| 1 | $400,000 | 19-Apr-89 | $395,000 | 15-Jan-93 | -1.3% | -0.3% | ($5,000) |
| 2 | $502,200 | 6-Feb-81 | $319,000 | 21-Jan-93 | -36.5% | -3.1% | ($183,200) |
| 3 | $695,000 | 31-Aug-90 | $395,000 | 15-Apr-93 | -43.2% | -16.4% | ($300,000) |
| 4 | $705,000 | 28-Aug-90 | $388,000 | 13-Aug-93 | -45.0% | -15.2% | ($317,000) |
| 5 | $557,200 | 22-Oct-92 | $445,000 | 26-Feb-93 | -20.1% | -57.6% | ($112,200) |
| 6 | $1,220,600 | 17-Jun-87 | $927,000 | 23-Jul-93 | -24.1% | -3.9% | ($293,600) |
| 7 | $575,000 | 6-Feb-89 | $668,500 | 22-Apr-93 | 16.3% | 3.9% | $93,500 |
| 8 | $555,000 | 12-Jul-89 | $425,000 | 3-Sep-93 | -23.4% | -5.7% | ($130,000) |
| 9 | $795,000 | 9-Nov-90 | $725,000 | 10-Jun-93 | -8.8% | -3.4% | ($70,000) |
| 10 | $773,000 | 25-May-90 | $649,000 | 19-Mar-93 | -16.0% | -5.7% | ($124,000) |
| 11 | $420,000 | 28-Feb-89 | $377,000 | 1-Sep-93 | -10.2% | -2.3% | ($43,000) |
| 12 | $628,000 | 28-Nov-90 | $450,000 | 11-Aug-93 | -28.3% | -10.5% | ($178,000) |
| 13 | $390,000 | 8-May-90 | $437,000 | 29-Jun-93 | 12.1% | 3.8% | $47,000 |
| 14 | $352,000 | 6-Apr-90 | $480,000 | 13-May-93 | 36.4% | 11.7% | $128,000 |
| 15 | $365,000 | 31-Aug-89 | $304,000 | 13-Sep-93 | -16.7% | -4.1% | ($61,000) |
| 16 | $416,000 | 21-Apr-89 | $387,500 | 7-May-93 | -6.9% | -1.7% | ($28,500) |
| 17 | $448,500 | 29-Jun-89 | $400,000 | 27-Jan-93 | -18.1% | -5.1% | ($88,500) |
| 18 | $460,000 | 16-Feb-89 | $520,000 | 28-May-93 | 13.0% | 3.0% | $60,000 |
| 19 | $612,000 | 16-Aug-91 | $550,000 | 6-Aug-93 | -10.1% | -5.1% | ($62,000) |
| 20 | $567,000 | 6-Mar-89 | $475,000 | 22-Jun-93 | -16.2% | -3.8% | ($92,000) |
| 21 | $469,000 | 27-Feb-89 | $405,000 | 23-Mar-93 | -13.6% | -3.4% | ($64,000) |
| 22 | $460,000 | 10-May-90 | $341,000 | 2-Sep-93 | -25.9% | -7.8% | ($119,000) |
| 23 | $389,000 | 16-Nov-89 | $320,000 | 21-May-93 | -17.7% | -5.0% | ($69,000) |
| 24 | $345,000 | 7-Aug-90 | $303,000 | 26-Jul-93 | -12.2% | -4.1% | ($42,000) |
| 25 | $690,000 | 21-Jun-91 | $745,000 | 23-Jul-93 | 8.0% | 3.8% | $55,000 |
| 26 | $679,500 | 16-Aug-90 | $545,000 | 7-Jan-93 | -19.8% | -8.3% | ($134,500) |
| Mean | $558,038 | – | $476,000 | – | -12.6% | -5.6% | (82,038) |

BACK_DEFEXP-RR-004175

**Exhibit E**      **Sales Trend Study No. 2—Fox River**

| No. | Original Price | Date | Sale Price | Date | % Change | Annual Change | Total Gain/Loss |
|---|---|---|---|---|---|---|---|
| 1 | $328,000 | 02-Nov-90 | $326,000 | 02-Feb-93 | -0.6% | -0.3% | ($2,000) |
| 2 | $390,000 | 23-Aug-91 | $365,000 | 11-Jun-93 | -6.4% | -3.6% | ($25,000) |
| 3 | $355,000 | 13-Jan-89 | $320,000 | 9-Sep-93 | -9.9% | -2.1% | ($35,000) |
| 4 | $343,000 | 07-Nov-92 | $337,500 | 24-Mar-93 | -1.6% | -3.5% | ($5,500) |
| 5 | $435,000 | 03-Apr-90 | $338,500 | 23-Jul-93 | -22.2% | -6.7% | ($96,500) |
| 6 | $343,000 | 29-Sep-89 | $305,000 | 27-Apr-93 | -11.1% | -3.1% | ($38,000) |
| 7 | $401,500 | 22-Mar-89 | $300,000 | 16-Apr-93 | -25.3% | -6.2% | ($101,500) |
| 8 | $350,000 | 29-Aug-90 | $375,000 | 08-Jul-93 | 7.1% | 2.5% | $25,000 |
| 9 | $519,000 | 09-Apr-91 | $430,000 | 02-Jul-93 | -17.1% | -7.7% | ($89,000) |
| 10 | $332,000 | 09-Dec-91 | $300,000 | 30-Jun-93 | -9.6% | -6.2% | ($32,000) |
| 11 | $475,000 | 28-Mar-91 | $335,000 | 21-Jul-93 | -29.5% | -12.7% | ($140,000) |
| 12 | $399,000 | 30-Aug-91 | $345,000 | 24-Aug-93 | -13.5% | -6.8% | ($54,000) |
| 13 | $476,500 | 09-Jul-89 | $430,000 | 01-Sep-93 | -9.8% | -2.4% | ($46,500) |
| 14 | $431,000 | 12-Sep-89 | $458,000 | 03-May-93 | 6.3% | 1.7% | $27,000 |
| 15 | $453,000 | 06-Dec-91 | $451,000 | 26-Jan-93 | -0.4% | -0.4% | ($2,000) |
| 16 | $404,000 | 12-Oct-90 | $390,000 | 17-Jun-93 | -3.5% | -1.3% | ($14,000) |
| 17 | $433,000 | 24-May-90 | $405,500 | 30-Jul-93 | -6.4% | -2.0% | ($27,500) |
| 18 | $446,000 | 10-Jun-91 | $366,000 | 30-Jun-93 | -17.9% | -8.7% | ($80,000) |
| 19 | $425,000 | 04-Mar-92 | $385,000 | 27-Jul-93 | -9.4% | -6.3% | ($40,000) |
| 20 | $485,000 | 04-Oct-89 | $352,000 | 30-Jun-93 | -27.4% | -7.3% | ($133,000) |
| 21 | $393,000 | 16-Nov-90 | $370,000 | 31-Aug-93 | -5.9% | -2.1% | ($23,000) |
| 22 | $490,000 | 15-May-92 | $435,000 | 04-Jun-93 | -11.2% | -10.7% | ($55,000) |
| 23 | $450,000 | 09-Nov-90 | $400,000 | 26-Feb-93 | -11.1% | -4.8% | ($50,000) |
| 24 | $370,000 | 22-Feb-92 | $370,000 | 31-Mar-93 | 0.0% | 0.0% | $0 |
| 25 | $440,000 | 01-Feb-91 | $438,000 | 09-Jul-93 | -0.5% | -0.2% | ($2,000) |
| 26 | $547,000 | 20-Dec-89 | $430,000 | 16-Jul-93 | -21.4% | -6.0% | ($117,000) |
| 27 | $558,500 | 01-Mar-89 | $480,000 | 07-May-93 | -14.1% | -3.4% | ($78,500) |
| 28 | $565,000 | 22-Sep-89 | $380,000 | 18-Aug-93 | -32.7% | -8.4% | ($185,000) |
| 29 | $680,000 | 04-Jan-89 | $539,000 | 01-Dec-93 | -20.7% | -4.2% | ($141,000) |
| 30 | $712,000 | 10-Apr-89 | $625,000 | 28-May-93 | -12.2% | -3.0% | ($87,000) |
| Mean | $447,650 | — | $392,717 | — | -11.3% | -4.2% | ($54,933) |

BACK_DEFEXP-RR-004176

**Exhibit F**        **Sales Trend Study No. 3—Pleasant Grove**

| No. | Original Price | Date | Sale Price | Date | % Change | Annual Change | Total Gain/Loss |
|---|---|---|---|---|---|---|---|
| 1 | $420,000 | 27-Aug-91 | $380,000 | 24-Aug-93 | -9.5% | -4.8% | ($40,000) |
| 2 | $485,000 | 31-May-91 | $395,000 | 22-Jun-93 | -18.6% | -9.0% | ($90,000) |
| 3 | $390,000 | 30-May-90 | $327,000 | 05-Feb-93 | -16.2% | -6.0% | ($63,000) |
| 4 | $381,000 | 15-Mar-90 | $330,000 | 01-Jun-93 | -13.4% | -4.2% | ($51,000) |
| 5 | $314,500 | 25-May-90 | $338,000 | 15-Sep-93 | 7.5% | 2.3% | $23,500 |
| 6 | $332,500 | 28-Mar-91 | $354,000 | 16-Apr-93 | 6.5% | 3.2% | $21,500 |
| 7 | $365,000 | 23-Apr-91 | $330,000 | 21-Jan-93 | -9.6% | -5.5% | ($35,000) |
| 8 | $314,500 | 15-Mar-91 | $332,500 | 23-Jun-93 | 5.7% | 2.5% | $18,000 |
| 9 | $438,000 | 30-Jul-92 | $400,000 | 04-Jun-93 | -8.7% | -10.3% | ($38,000) |
| 10 | $327,000 | 08-Mar-91 | $315,500 | 10-Feb-93 | -3.5% | -1.8% | ($11,500) |
| 11 | $360,000 | 25-Apr-90 | $305,000 | 14-May-93 | -15.3% | -5.0% | ($55,000) |
| 12 | $387,500 | 20-Oct-90 | $340,000 | 27-Jan-93 | -12.3% | -5.4% | ($47,500) |
| 13 | $425,000 | 06-Sep-91 | $457,500 | 21-Jul-93 | 7.6% | 4.1% | $32,500 |
| 14 | $362,500 | 05-Apr-91 | $379,000 | 02-Sep-93 | 4.6% | 1.9% | $16,500 |
| 15 | $442,500 | 18-Jul-89 | $300,000 | 14-Jul-93 | -32.2% | -8.1% | ($142,500) |
| 16 | $422,500 | 01-Jun-90 | $349,000 | 02-Aug-93 | -17.4% | -5.5% | ($73,500) |
| 17 | $390,000 | 12-Mar-92 | $357,000 | 23-Mar-93 | -8.5% | -8.2% | ($33,000) |
| 18 | $345,000 | 19-Mar-91 | $315,000 | 14-Jan-93 | -8.7% | -4.8% | ($30,000) |
| 19 | $398,000 | 19-Aug-91 | $365,000 | 26-Feb-93 | -8.3% | -5.4% | ($33,000) |
| 20 | $422,000 | 05-Jul-91 | $370,000 | 01-Mar-93 | -12.3% | -7.4% | ($52,000) |
| 21 | $400,000 | 13-Sep-91 | $370,000 | 06-Aug-93 | -7.5% | -4.0% | ($30,000) |
| 22 | $517,000 | 17-Apr-89 | $390,000 | 21-May-93 | -24.6% | -6.0% | ($127,000) |
| 23 | $445,000 | 04-Feb-92 | $385,000 | 27-Aug-93 | -13.5% | -8.6% | ($60,000) |
| 24 | $555,000 | 26-Jun-90 | $450,000 | 30-Aug-93 | -18.9% | -5.9% | ($105,000) |
| 25 | $510,000 | 26-Apr-91 | $475,000 | 02-Apr-93 | -6.9% | -3.5% | ($35,000) |
| 26 | $795,000 | 09-Feb-90 | $700,000 | 03-May-93 | -11.9% | -3.7% | ($95,000) |
| 27 | $365,000 | 27-Dec-90 | $425,000 | 22-Apr-93 | 16.4% | 7.1% | $60,000 |
| 28 | $508,500 | 26-Sep-89 | $479,000 | 14-Jul-93 | -5.8% | -1.5% | ($29,500) |
| 29 | $429,000 | 30-Mar-93 | $385,000 | 06-May-93 | -10.3% | -102.8% | ($44,000) |
| 30 | $420,000 | 19-Apr-91 | $368,500 | 28-Apr-93 | -12.3% | -6.1% | ($51,500) |
| 31 | $457,500 | 07-Apr-89 | $410,000 | 06-Aug-93 | -10.4% | -2.4% | ($47,500) |
| 32 | $505,000 | 12-Jul-89 | $507,000 | 20-Aug-93 | 0.4% | 0.1% | $2,000 |
| 33 | $544,500 | 05-Jan-90 | $420,000 | 08-Sep-93 | -22.9% | -6.2% | ($124,500) |
| 34 | $375,000 | 10-Mar-92 | $310,000 | 28-Apr-93 | -17.3% | -15.3% | ($65,000) |
| 35 | $462,500 | 28-Jul-89 | $435,000 | 26-May-93 | -5.9% | -1.6% | ($27,500) |
| 36 | $550,000 | 18-Nov-80 | $450,000 | 12-Jul-93 | -18.2% | -1.4% | ($100,000) |
| 37 | $488,000 | 30-Oct-89 | $415,000 | 09-Aug-93 | -15.0% | -4.0% | ($73,000) |
| 38 | $460,000 | 18-Dec-89 | $390,000 | 25-Aug-93 | -15.2% | -4.1% | ($70,000) |
| Mean | $434,461 | — | $389,579 | — | -9.5% | -6.5% | ($44,882) |

BACK_DEFEXP-RR-004177

# SINGLE-FAMILY RESIDENTIAL CASE STUDY

*By Michael V. Sanders, MAI, SRA*

## Class V Detrimental Condition
## Freeway Nuisance

A study was undertaken to determine the impact of freeway proximity on single-unit homes in Orange County, California, without the benefit of an engineered soundwall. Such soundwalls have become increasingly common in an effort to buffer adjacent homes from noise and other nuisances associated with freeway proximity.

The study sought to examine the discount on prices of single-unit homes adjacent to freeways without soundwalls. Search parameters specified relatively homogenous product types with significant numbers of freeway-adjacent homes, and ultimately five locations were identified for analysis.

Local market data was analyzed via multiple regression, using sales from public records between 1996 and 1999. A number of variables were considered, with date of sale, gross living area, and freeway location (a dummy variable) found to be most significant in terms of the impact on selling price. A summary of the findings is shown in the following table.

While the adjusted $r^2$ ranges from 45% to 78%, all regression equations are significant at better than the 0.0001 level, and independent variables associated with date of sale and gross living area are generally significant to several decimal places. Coefficients for freeway location are all significant at the 0.1 level or better except for Location 4, which had the smallest number of total observations.

The results of the study indicate that a property abutting a freeway with little or no noise buffer, over the time frame studied, would be expected to sell at a discount of approximately 5% to 14% relative to a similar property that is not adjacent to the freeway. It is also interesting to note that the observed discounts tended to show significant correlation with traffic volume. Locations 1 and 2 reflected average daily traffic (ADT) of 140,000 to 175,000 vehicles, while the highest indication from Location 3 reflected ADT well in excess of 300,000 vehicles. Though not within the scope of the assignment, a similar study could have been done for freeway-adjacent homes *with* a soundwall, providing information as to whether a soundwall would have a beneficial effect on values of adjacent homes.

| Location ID | Total Observations | Freeway Observations | Adjusted $r^2$ | $F$-statistic | Sign. $F$ | Freeway Discount |
|---|---|---|---|---|---|---|
| 1 | 812 | 29 | 55.78% | 341.9956 | 0.000000 | 5.6% |
| 2 | 195 | 11 | 45.55% | 55.0931 | 0.000000 | 4.7% |
| 3 | 113 | 8 | 73.10% | 103.3783 | 0.000000 | 14.1% |
| 4 | 20 | 6 | 68.02% | 15.1785 | 0.000046 | 10.5% |
| 5 | 217 | 22 | 77.97% | 255.8519 | 0.000000 | 7.7% |

BACK_DEFEXP-RR-004178

*Copyright material licensed by Richard J. Roddewig, vol me 2*

# BRUCE MCNALL HOUSE CASE STUDY

*By Randall Bell, PhD, MAI*

## Class III Detrimental Condition
## White-Collar Crime

The former owner of the Los Angeles Kings hockey team, Bruce McNall, was convicted of various white-collar crimes and sentenced to prison. The bank foreclosed on McNall's 12,214-sq.-ft. West Los Angeles home, which sold promptly for full value when put on the market.

This was a high-profile case but only regionally reported by the local media. This indicated that the market did not require a discount for white-collar crimes in this instance, although market impact might have been different if a violent crime had been committed.



This West Los Angeles home was previously owned by Bruce McNall, who formerly owned the Los Angeles Kings hockey team. After McNall was convicted of white-collar crimes, the home was sold for its full market value and had a normal marketing period. As opposed to violent crimes, white-collar crimes tend to not impact property values.

BACK_DEFEXP-RR-004179

# Davis Building Case Study

*By Mark W. Smith, MAI*

## Class III Detrimental Condition
## Absorption Loss and Profit Potential Study

The subject property is an average quality, four-story, steel frame and glass curtain wall office building. The building is 13 years old and contains about 77,000 rentable square feet. It has generally been kept in good condition.

Shortly after the building was completed, the owner leased the entire building to two tenants. Each tenant leased two full floors. The tenant on the lower two floors signed a 12-year lease, and the tenant on the upper two floors signed a 14-year lease. Both tenants had somewhat atypical tenant improvement (TI) requirements. The tenant on the lower floors, a major aerospace contractor, had highly specialized testing facilities installed in its space. The tenant on the upper two floors, a major insurance company, had a need for large open spaces for back-office employees.

The local economy entered a period of decline just prior to the expiration of the lower tenant's lease. The tenant of the lower two floors decided not to exercise its renewal options and vacated the two lower floors at the end of its lease. Given the highly specialized nature of the TIs, the lower two floors were gutted and brought down to a shell condition.

The tenant of the two upper floors was purchased by a competing firm. The new parent company gave notice it would not renew the lease of the upper two floors. The tenant vacated the premises and offered the upper two floors for sublease for the 18 months remaining on the existing lease. The consensus among local brokers was that the insurance company would be unable to find a sublessee for such a short remaining lease term. Given the minimal TIs, consisting primarily of ceiling panels, lighting, electrical outlets, and carpeting (no interior walls), the upper two floors would likely need to be substantially reworked prior to re-leasing the space.

The building is part of a fairly large portfolio. The portfolio manager is contemplating the sale of the building prior to re-tenanting the property. The purpose of the assignment was to estimate the potential profit associated with re-leasing the building to stabilized occupancy prior to sale.

The assignment began by using the income capitalization approach to estimate the value of the building assuming stabilized multitenant occupancy. A rent survey was conducted as a portion of the income approach. The rent survey served not only to estimate the potential income from the building once it is re-leased but also to give an indication of the anticipated absorption period, or the likely amount of time necessary to achieve stabilized occupancy. Based upon the rent survey and an expense analysis, the net operating income of the subject was estimated as shown in Exhibit A. Based upon observed conditions in the subject's local market, the anticipated time necessary to attain stabilized occupancy was two years as of the date of this analysis.

A search was then conducted to locate and verify transfers of office buildings that were operating at sta-

BACK_DEFEXP-RR-004180

**Exhibit A    Net Operating Income Calculations**

| | | |
|---|---|---|
| Monthly potential gross income | 77,000 sq. ft. @ $1.30 | $100,100 |
| Vacancy and collection loss | | − $7,510 |
| Collected rents | | $92,590 |
| | | × 12 mos. |
| Effective annual gross income | | $1,111,080 |
| Total expenses | | − $529,889 |
| Net operating income | | $581,191 |

**Exhibit B    Stabilized Office Building Sales**

| | Subject | Sale A | Sale B | Sale C | Sale D |
|---|---|---|---|---|---|
| Square footage | 77,000 | 107,252 | 161,778 | 91,437 | 56,192 |
| Year built | 1984 | 1981 | 1987 | 1987 | 1980 |
| Quality | Average | Average | Good | Average | Average |
| Condition | Average | Average | Good | Good | Average |
| Scheduled gross income | | $1,801,834 | $3,203,204 | $1,536,142 | $876,336 |
| Less: vacancy | | 230,634 | 160,160 | 153,614 | 43,817 |
| Effective gross income | | $1,571,200 | $3,043,044 | $1,382,528 | $832,519 |
| Less: expenses | | 643,512 | 1,213,335 | 594,341 | 359,559 |
| Net operating income | | $927,688 | $1,829,709 | $778,187 | $472,960 |
| Cash equivalent price | | $9,400,000 | $20,500,000 | $8,600,000 | $5,000,000 |
| Date of sale | | 5/28/97 | 12/20/96 | 12/4/96 | 10/1/96 |
| Overall rate | | 9.87% | 8.93% | 9.16% | 9.46% |

bilized occupancy at the time of sale. Of the sales found generally meeting the search criteria, the four shown in Exhibit B were thought to be the most similar to the subject property.

A 9.4% overall rate was considered appropriate for the subject property. With a 9.4% overall rate and net operating income as shown above, the value of the subject property, assuming stabilized multitenant occupancy on the date of value, was estimated to be $6,180,000.

As mentioned earlier, local market conditions had declined prior to the expiration of the lower tenant's lease. Market conditions had declined to a point where there were numerous sales of office buildings operating well below stabilized occupancy. Five sales of under-occupied buildings (four of which were entirely vacant), including the relatively recent sale of the building adjacent to the subject property (Sale I) were verified and documented as shown in Exhibit C.

The unadjusted price per square foot of the five comparables ranges from $27.10 to $56.09. This is a wide range, suggesting there is no rhyme nor reason to the market's reaction to under-occupied office buildings.

During the verification process, it was discovered that most buyers of under-occupied office buildings in the area use a simplified price per square foot analysis when making their purchase decisions. Many of those inter-

BACK_DEFEXP-RR-004181

**Exhibit C**    **High-Vacancy Office Building Sales**

|  | Subject | Sale E | Sale F | Sale G | Sale H | Sale I |
|---|---|---|---|---|---|---|
| Square footage | 77,000 | 35,051 | 91,404 | 59,725 | 84,500 | 76,800 |
| Year built | 1984 | 1981 | 1981 | 1980 | 1979 | 1984 |
| Quality | Average | Average | Average | Average | Average | Average |
| Condition | Average | Fair | Average | Average | Average | Average |
| Cash-equivalent price |  | $950,000 | $3,750,000 | $3,500,000 | $3,800,000 | $4,050,000 |
| Date of sale |  | 6/2/97 | 4/29/97 | 3/31/97 | 11/21/96 | 8/31/95 |
| Vacancy at sale |  | 100% | 100% | 90% | 100% | 100% |
| Anticipated mo. lease rate | $1.30 | $1.40 | N/A | $1.30 | $1.50 | N/A |
| Price per square foot |  | $27.10 | $41.03 | $56.09 | $40.00 | $52.73 |
| Anticipated absorption costs |  | $28.50 | $21.88 | $4.05 | $15.00 | $7.60 |
| Adjusted price/sq. ft. |  | $55.60 | $62.91 | $60.14 | $55.00 | $60.33 |

viewed stated they simply deduct the cost of rehabilitating and re-leasing the building from their estimate of the value of the property once it is leased, then deduct their desired profit to arrive at the maximum price per square foot they can afford to pay.

After adding the buyer's anticipated rehabilitation and re-leasing costs to the price per square foot paid, it appears the market does act rationally. After adjusting each comparable for these anticipated costs, the range of adjusted square foot prices for the five comparables narrows considerably to $55.00 to $62.91 per square foot, suggesting that a rehabilitated office building, inclusive of all absorption costs, has a value of approximately $60 per square foot. Anticipated absorption costs for the subject (includ-

ing tenant improvement costs and leasing commissions) were estimated at about $18 per square foot, indicating a value "as is" of $42 per square foot, or $3,235,000 (rounded).

Profit, or the benefit from re-leasing the building prior to sale, was then calculated as follows:

| | |
|---|---|
| Value assuming stabilized occupancy | $6,180,000 |
| Value inclusive of acquisition and absorption costs (at $60/sq. ft.) | – $4,620,000 |
| Profit | $1,560,000 |

The cost of earning this profit is $18 per square foot. With both the cost and profits of re-leasing known, the investor is now able to make an informed investment decision after assessing the risk involved with re-leasing the building.

BACK_DEFEXP-RR-004182

*Copyrighted Material Reviewed by Richard J. Roddewig June 20*

# HILL VIEW DEVELOPMENT CASE STUDY

*By Joseph Haeussler, MAI*

## Class V Detrimental Condition
## Privacy

The Hill View residential subdivision is an upper-middle class neighborhood in a suburban area northwest of Los Angeles. Within the development is a property that was the subject of litigation. The case involved a 1,784-sq.-ft. single-family home built in 1971. The house is of good-quality, wood-frame and stucco construction, and the floorplan is "Plan Three" of the Montego Plan within the Hill View Development. The single-story house was built on a 6,565-sq.-ft. site, which is typical for the homes in the development.

The property is located in an area undergoing revitalization, and many homes are undergoing additions or being remodeled or substantially reconfigured. The subject property is level and abuts the surrounding residences at grade, with the properties to the rear being above grade approximately four feet.

An appraiser was retained by the sellers of the subject property, Ken and Linda Gattenio, and their attorney. The subject property sold in August 1993 to Gregory and Sherrie Connor for the sum of $407,000. After the close of escrow, a complaint ensued. The buyers asserted that prior to the start of escrow, the adjacent property owners to the rear, Oscar and Ann Andersen at 1802 Arlow Place, began the approval process for a second-story add-on. The community association required the Andersens to have a Neighborhood Awareness Form signed by all surrounding neighbors affected by the proposed project. Mr. Gattenio signed the form.

Weeks after Mr. Gattenio was made aware of the Andersens' plans to construct a second-story add-on, he sold the property to Mr. and Mrs. Connor. After buying the property, the Connors removed mature trees to add sunlight into the backyard, unaware of the plans of the adjacent property owner to build an addition. Weeks later Mrs. Connor observed construction activity at the Andersen property. She asked the construction personnel about the construction project and the time of its completion. According to the Connors, once the construction was completed, the loss of privacy and light would permanently impact the property. The Connors filed a complaint for rescission and damages, fraudulent failure to disclose, and intentional infliction of emotional distress.

The appraiser was hired to assess the damage, if any, of the apparent imposed condition of a second-story add-on to the adjacent property. One of the Connors' complaints was that the value of their property would be permanently diminished due to the loss of privacy from the second-story add-on of the adjoining property.

Given the full line of complaints that the Gattenios were required to deal with, the appraiser's focus of attention was to interpret the market's opinion as to a two-story residence existing to the rear of a property versus a single-story home existing to the rear of a property. Data was sought to test if an imposed or benign condition existed.

BACK_DEFEXP-RR-004183

In addressing the appraisal problem, two tests were employed. The first involved the analysis of the market's reaction to a home having an adjoining two-story home versus an adjoining one-story home to the rear. A paired sales analysis was employed to study the impact on similar homes with the distinguishing characteristic of a one- or two-story home to the rear of the property.

The second test was a study of the subject property and the surrounding homes. The complaint was that the buyers were buying the home with "privacy," and after they had purchased the home, the adjacent second-story addition negatively impacted the perceived privacy. This study of the subject property addresses the privacy of the subject property, before and after the completion of the second-story addition to the property to the rear.

The initial study involved a search of recent sales of homes in the area of the subject property. The homes were first categorized by size and then by whether each home had a one-story or two-story home to the rear. All of the homes compared were in the same development and were in similar condition when compared to the subject property. The quality of construction and location are all similar, as they were built in a similar time frame and by the same developer. Exhibit A sets forth the market data used for analysis.

The market data in Exhibit A was then paired to establish market support as to whether an impaired or benign condition existed. Exhibit B sets forth the market data used for the paired data analysis. The indicated adjustments are a result of the various pairings of homes with adjoining one-story homes and homes with ad-

joining two-story homes. The percentage adjustment is the indicated adjustment for a home with an adjoining two-story home.

| Exhibit A | | Hill View Development Market Data | | |
|---|---|---|---|---|
| Sale No. | Address | Sale Price | Sale Date | Year Built |
| Plan 1 (1,475 square feet) sales | | | | |
| Adjoining one-story home to the rear | | | | |
| 1 | 1859 Abbey Street | $390,000 | 3/93 | 1969 |
| 2 | 1979 Albans Place | $430,000 | 3/93 | 1970 |
| 3 | 1933 Bridge Avenue | $467,000 | 9/93 | 1970 |
| 4 | 2041 Vince Place | $385,000 | 1/94 | 1969 |
| Plan 1 (1,475 square feet) sales | | | | |
| Adjoining two-story home to the rear | | | | |
| 5 | 1936 Sea Place | $435,000 | 7/94 | 1969 |
| 6 | 2021 Bridge Avenue | $390,000 | 5/93 | 1969 |
| 7 | 2045 Bridge Avenue | $425,000 | 9/94 | 1969 |
| 8 | 1806 Gart Place | $425,000 | 3/94 | 1970 |
| 9 | 1859 Berly Place | $380,000 | 8/94 | 1970 |
| 10 | 1843 Leigh Place | $405,000 | 4/93 | 1971 |
| Plan 2 (1,659 square feet) sales | | | | |
| Adjoining one-story home to the rear | | | | |
| 1 | 1700 Charles Place | $405,000 | 7/94 | 1969 |
| 2 | 1800 Bourne Place | $410,000 | 7/93 | 1969 |
| 3 | 1800 Wheel Place | $406,000 | 1/93 | 1970 |
| 4 | 1982 Albans Place | $425,000 | 5/93 | 1971 |
| Plan 2 (1,659 square feet) sales | | | | |
| Adjoining two-story home to the rear | | | | |
| 5 | 1942 Bourne Place | $389,000 | 3/94 | 1970 |
| 6 | 1960 Digan Place | $445,000 | 6/93 | 1971 |
| 7 | 1930 Rant Place | $410,000 | 6/93 | 1971 |
| 8 | 1950 Bish Place | $490,000 | 7/94 | 1971 |
| 9 | 1974 Ward Place | $580,000 | 2/93 | 1971 |
| 10 | 1967 Bourne Place | $437,000 | 1/93 | 1970 |
| Plan 3 (1,784 square feet) sales | | | | |
| Adjoining one-story home to the rear | | | | |
| 1 | 1964 Vince Place | $385,000 | 12/93 | 1970 |
| 2 | 1801 Berly Place | $445,000 | 7/93 | 1970 |
| 3 | 1942 Ward Place | $480,000 | 8/94 | 1971 |
| Plan 3 (1,784 square feet) sales | | | | |
| Adjoining two-story home to the rear | | | | |
| 4 | 1723 Heff Place | $407,000 | 5/94 | 1968 |
| 5 | 2018 Sea Place | $535,000 | 7/94 | 1969 |

BACK_DEFEXP-RR-004184

**Exhibit B**          **Paired Data Analysis**

| Adjoining One-Story | | Adjoining Two-Story | | Indicated Adjustment |
|---|---|---|---|---|
| Sale No. | Sale Price | Sale No. | Sale Price | |
| Plan 1 | | | | |
| 1 | $390,000 | 5 | $435,000 | |
| 2 | $430,000 | 6 | $390,000 | |
| 3 | $467,000 | 7 | $425,000 | |
| 4 | $385,000 | 8 | $425,000 | |
| | | 9 | $380,000 | |
| | | 10 | $405,000 | |
| Average | $418,000 | | $410,000 | -1.9% |
| Plan 2 | | | | |
| 1 | $405,000 | 5 | $389,000 | |
| 2 | $410,000 | 6 | $445,000 | |
| 3 | $406,000 | 7 | $410,000 | |
| 4 | $425,000 | 8 | $490,000 | |
| | | 9 | $580,000 | |
| | | 10 | $437,000 | |
| Average | $411,500 | | $458,500 | 11.42% |
| Plan 3 | | | | |
| 1 | $385,000 | 1 | $407,000 | |
| 2 | $445,000 | 2 | $535,000 | |
| 3 | $480,000 | | | |
| Average | $436,667 | | $471,000 | 7.9% |

By comparing the two types of data sets, no correlation was found as to the appropriate adjustment. From a slight negative property attribute of having an adjoining two-story home, the next two pairings indicate a positive value. From the data set used and the mixed indicated adjustments, it was clear that there is no correlation between home prices that do or do not adjoin homes to the rear that look into the backyard. This is a market indication of a benign condition.

The second study was the analysis of the existing privacy of the backyard before the sale took place. During the property inspection, it was noted that the site did not have privacy as of the date of sale because other two-story homes were already visible from the subject backyard. If an imposed condition was created by the addition to the adjoining rear property, then it would not be a condition that existed prior to the start of the project. It was also a condition that existed between many homes in the development.

The market data and the paired sales showed that no correlation exists between homes with a one-story or two-story home adjoining to the rear. The Connors claimed that an imposed condition would permanently impair or diminish the value of the subject property. From a test of the market data, it was apparent that there was no impact to property value. To further support this claim, the analysis of the subject property's rear yard privacy showed that if an imposed condition existed, it was in place prior to the Andersen's plans to construct a second-story add-on. Therefore, it was the conclusion of the analyst that the market interprets this condition as being benign.

BACK_DEFEXP-RR-004185

# CALIFORNIA AIRPORT NOISE IMPACT CASE STUDY

*By Randall Bell, PhD, MAI*

## Class V Detrimental Condition
## Airport Noise

The subject properties consist of a subdivision of single-family residences in Irvine, California. The nearby El Toro Marine Base will be closed by the year 1999, and the County is considering developing an international airport in its place. The occupants' homes adjoin the flight corridor of the proposed airport. The homeowners and some local business owners are concerned that a proposed international airport will cause a diminution in value to their properties located under or near the flight corridors.

The environmental impact report published by the County states that the proposed airport will serve 38.3 million passengers annually. This would be the fifth largest airport in the United States. By comparison, the Los Angeles International Airport currently serves 54 million passengers annually. At peak operations, the proposed airport will have 116 takeoffs and landings per hour, or approximately one every 30 seconds. So far, the County has not conducted any studies as to the impact that the airport will have on property values, yet airport proponents contend that the airport will have no impact on values. The property owners question this position and desire to know the general impact that airports have had in other Southern California locations.

The fact that the military base will close is a foregone conclusion; therefore, the scope of this assignment included simply studying the effects of the noise associated with an international airport compared with no airport noise, as related to single-family residences. Noise pollution, like any nuisance, may have a significant impact on property values, although if the losses in property values are real, they may be derived from the market. Class V detrimental conditions typically show a value "as if unimpaired" as compared to "as impaired." This difference may be expressed as a dollar amount or as a percentage. This comparison may be made by simply comparing properties that are otherwise similar, except for the issue being studied, which in this case is proximity to an airport.

A paired sales analysis was used comparing sales of homes that were under or near flight corridors with otherwise similar homes that were not, as shown in Exhibit A. If a real loss in property value exists, a distinct and pronounced difference in price levels should be apparent.

This study is accomplished by a paired sales analysis, whereby paired sets of data are compared to each other. The objective was to examine sale comparables that are similar in all respects except for their airport proximity.

In this study, sales of single-family residences, primarily from 1,500 to 2,000 square feet, that had similar lot sizes and sold within a six-month period were studied. Further, the homes were all located in the same or similar nearby communities. By using these search parameters, virtually all non-airport elements of value are eliminated, such as the size of the improvements, location, market conditions, etc. In all, 190 sales comparables were studied.

BACK_DEFEXP-RR-004186

Copyrighted material reviewed by Richard J. Roddewig Volume 2, Page



**Exhibit A**     **California Airport Study Diagram**

Test Area A
Takeoffs

Control Area A

Similar Properties
No Airport Impact

Airport Runway

Test Area B
Proximity

25R

Control Area B

Similar Properties
No Airport Impact

Test Area C
Landings

This study indicated that in this location airport proximity consistently has a negative impact on value. These market data indicate that single-family residences located in proximity to an airport are worth less than an otherwise similar property that is not located by an airport. This impact on value ranges from -15.1% to -42.6% and averages -27.4%.

As part of this study, secondary market data related to the LAX office market were reviewed. It is well-known within the local real estate community that the LAX market has the lowest rental rates of any office market in the region despite the facts that the office market has outstanding freeway and airport access and the office improvements themselves are comparable with other office buildings in the area.

The LAX office market is distinct from other markets within the area in that many of the office buildings are located on Century Boulevard under

BACK_DEFEXP-RR-004187

the airport's final landing approach. These office buildings have similar features and amenities and are otherwise comparable with other office buildings throughout Southern California, except these office buildings are subjected to considerable noise and related airport issues.

The LAX office market has an average actual rental rate of $0.85 per square foot per month. Other office buildings within the South Bay office market have average actual rental rates ranging from $1.05 per square foot to $1.50 per square foot. The rental rates for the LAX office market range from 19.1% to 43.3% lower than any other market in the surrounding South Bay area. Combined with the effects of also having the highest vacancy rate of 38.1%, the negative net impact on value is further amplified, as shown in Exhibit B.

## Conclusions

The market data from this study indicated that national and international airports impact the values on properties in close proximity to flight corridors. The impact on single-family residences located in proximity to an airport was consistently negative, as compared to otherwise similar properties not located near an airport. The impact on single-family residences ranged from -15.1% to -42.6% and averaged -27.4%. This did not include the costs of noise mitigation measures that individual home owners may incur.

Additional studies could address issues that this study did not address, such as whether properties in closer proximity to an airport are more significantly impacted as opposed to properties located further away. Additionally, there may be distinctions between locations on the final landing, takeoff, and side-proximity that this study did not address.

The LAX office market enjoys outstanding transportation access, and the improvements are comparable with other office buildings in the area. However, this market is distinct in that it is located under the final landing approach to an international airport. The rental rates for the LAX office market are from 19.1% to 43.3% lower than any other office market in the surrounding South Bay area. Combined with the effects of also having

**Exhibit B**    **South Bay Office Building Market**

**1995 Vacancy and Absorption**

**Square Feet in Thousands**

| Submarket | Rentable Sq. Ft. | Vacant Sq. Ft. | % Vacant Direct | Avg. Net Absrp. | Effective Rent $/Sq. Ft. FSG |
|---|---|---|---|---|---|
| El Segundo/Manhattan Beach | 9,295 | 1,933 | 20.8% | -330 | $1.50 |
| Torrance Freeway | 3,291 | 1,070 | 32.5% | -266 | $1.35 |
| Torrance Central | 3,255 | 629 | 19.3% | 80 | $1.40 |
| Carson | 1,621 | 330 | 20.4% | 45 | $1.05 |
| **LAX/Century Blvd.** | **4,198** | **1,599** | **38.1%** | **-70** | **$0.85** |
| Long Beach Suburbs | 4,278 | 615 | 14.4% | 458 | $1.35 |
| Long Beach Downtown | 3,826 | 996 | 26.0% | -120 | $1.40 |
| South Bay Total | 29,763 | 7,172 | 24.1% | -203 | $1.28 |

Source: Grubb & Ellis

BACK_DEFEXP-RR-004188

Copyrighted Material licensed to Richard Roddewig Volume 26,

the highest vacancy rate of 38.1%, the negative net effects on value are further amplified. These figures do not include any special noise mitigation costs incurred by the property owners.

The market data clearly and consistently indicate that as of the date of value and within the local regional market, homes that are under or near a flight corridor did sell for less than an otherwise similar home in the area that was not located under or near a flight corridor. This is supported by a study published by the FAA indicating that the diminution in value would be expected to exceed 19% for upper-middle class homes.

Based upon the market data, it was concluded that the diminution in value on a mid- to high-value, single-family residence under a flight corridor of an international airport would experience a significant loss in property value of over 25%.

BACK_DEFEXP-RR-004189

# HOLLYWOOD BOULEVARD
# SINKHOLE AND SUBSIDENCE CASE STUDY

*By Orell C. Anderson, MAI*

## Class VII Detrimental Condition
## Tunneling

The Los Angeles Metropolitan Transit Authority broke ground in 1983 for the construction of the Red Line, a commuter train line that connects downtown Los Angeles with North Hollywood. The first phase was completed January 30, 1993, with the second phase completed on July 13, 1996, at Western and Wilshire Boulevards. The next scheduled opening was for November 1998 at Hollywood and Vine. In August 1994, the construction crew punched through one of two tunnel segments, 80 feet below Hollywood Boulevard. Ground subsidence was anticipated to be one-half inch, but 2 inches resulted. The second tunnel segment was punched through 21 days later, which resulted in 5 to 6 inches of subsidence, with a maximum subsidence of 10 inches. The cause was attributed to a variety of factors, including water content in the soil and the alleged use of improper materials in the support shield of the tunnel.

The most significant damage occurred on the 6500 block of Hollywood Boulevard, between Vine and the El Capitan Theater, with several buildings incurring severe damage such as storefronts separating from the main



Portions of the Hollywood Walk of Fame crumbled when the underlying soils subsided as a result of the tunneling project. Situations such as these may cause public skepticism towards engineers' assurances of project safety.

BACK_DEFEXP-RR-004190

Copyrighted material licensed by Richard Evan Goldsmith, June 2012



The soil subsidence underneath Hollywood Boulevard literally pulled buildings towards the center of the street, as depicted by the large crack along the side face of this retail building.

portion of the structures. Significant damage also occurred on Hudson Street, involving an apartment building and a three-story retail/office building. On June 22, 1995, allegedly faulty and "unrealistic" design work triggered the dramatic 80-foot-wide sinkhole within the 6300 block of Hollywood Boulevard. Transit officials were forced to shut down the street again on June 27 after discovering a cluster of serious cracks in the tunnel near the giant sinkhole. The problem was brought under control within a few months after it occurred, but it left visible signs, such as boarded-up buildings, for a longer period. As of September 1997, the apartment and retail/office buildings in the 6500 block area continue to require structural bracing.

This area was impacted by an economic recession, which accounted for some of the declines in value, but the dramatic decline exceeded the typical market declines. In 1992, prior to the tunneling event, ground-level retail rents were $1.50 to $2.50 per square foot triple net; in 1997 they ranged from $0.50 to $1.25 per square foot. Second-story office space leased for $1.00 per square foot gross previously and dropped to approximately $0.50 per square foot. Ground-floor retail values were approximately $175 to $200 per square foot in 1992, and in 1997 they were approximately $125 per square foot. Land values were approximately $100 per square foot in 1992, and in 1997 they ranged from a low of $40 per square foot to $60 per square foot. In 1992, retail occupancy was approximately 90%, but in 1997 it dropped to 25% for ground-floor retail and 50% for second-floor office.

BACK_DEFEXP-RR-004191

# NONPHYSICAL DAMAGE— FRACTIONAL DISCOUNTS CASE STUDY

*By Dennis A. Webb, MAI, ASA, MRICS*

## Class II Detrimental Condiiton
## Transactional Conditions

Detrimental conditions are often understood to be physical aspects of the site or its improvements. Detrimental conditions are also commonly perceived to result in some form of diminution in value. However, not all losses due to detrimental conditions are physical.

Anytime a property's ownership is divided between two or more parties, the property rights associated with an interest are diminished. Whether this reduction is experienced as "damage" depends on the facts, circumstances, and expectations of the interest holder. When the appraiser is called to give an opinion on value under the fair market value standard, which postulates a hypothetical buyer and seller, the value of a fractional interest is nearly always less than the interest's pro rata share of the value of the property as a whole. This type of damage is generally "self-inflicted" and is arguably the most common form of impairment attributable to an interest in real property. It can be caused by a number of ownership forms, including general and limited partnerships, limited liability companies (LLCs), corporations, and tenancy in common (TIC), the simplest form of fractional ownership.

A variety of circumstances create common tenancy ownership. For example, investors can choose to pool their funds to invest in a property, co-tenancy rights may be transferred by gift or inheritance, or the relationship can be created by operation of law. A recent development is the formation of "syndicated" TIC structures to accommodate tax-deferred exchanges of real property under Internal Revenue Code (IRC) §1031. Pooling of funds or entering into a TIC is not likely to be perceived as creating a loss with the interest having a market value of less than the pro rata share of the whole. Gifts, inheritances, or operations of law do not necessarily represent investment choices, but also result in market values that are less than their pro rata share. Perception aside, rights are in fact reduced. Whether the value of the interest is damaged (or more commonly, "impaired") is likely to change with time and succession.

In any case, a loss will not be experienced if the property is held for the expected term and sold and the proceeds are then distributed. If the interest holder wants to sell the interest before the end of the term, a loss may very well be realized. A third party buyer, under the definition of fair market value, is unlikely to pay the pro rata value of the underlying property specifically because of the difficulty of selling the interest and other limitations arising from reduced property rights and shared control of the legal structure.

To analyze control and liquidity impairment, the appraiser considers likely holding/exit strategies and develops an opinion of the nonphysical "damage" to value caused by the ownership structure. Such impairments have been discussed in numerous articles

BACK_DEFEXP-RR-004192

published over the past decade. A full case study is presented in the Appraisal Institute book *Valuing Undivided Interests in Real Property: Partnerships and Cotenancies.*[1] The case presented in the book is stated here in a highly abbreviated form, to illustrate one method of valuing the reduction in property rights that leads to a reduction in value.

## Example

John Builder developed office buildings in Southern California over the course of 35 years and accumulated a sizable portfolio. He owned many of the buildings outright and some with his longtime partner, Ed Helper. Some properties are owned by family limited partnerships, but the subject property and a few others are owned with Ed and family members as tenants in common.

The subject property is a 33,000-sq.-ft. suburban multi-tenant office building located in Tustin, California. John and Ed initially owned the property 50/50. Through various transfers over the years, John ended up owning a 20% share at the time of his death. Other interest holders included Ed Helper (40%), John's son Billy and daughter Sarah (18% each through gifts), and the local Boy's Home (4%, also through a gift). Billy had been involved directly with management of the property for two years prior to his dad's death and continues on as the manager. The assignment is to value the common tenancy interest held by John Builder as of the date of his death for estate tax reporting purposes.

The property was appraised at $3,250,000. There is a loan balance of just over $1,800,000, a bank account balance, and a small security depos-

it liability. The net owners' equity is $1,428,054. Cash flow after debt service for the following 12-month period is forecast to be $82,509.

The original conditions that brought Ed and John together to co-own the property were clearly not present at the time of John's death. A buyer of the 20% interest would presumably be in agreement with at least some of the contingencies at the time the interest was purchased, but if the conditions were to change (personal, macroeconomic expectations, etc.) and the buyer wanted to then sell the interest, it might create a very difficult situation. The appraiser has concluded that it is only marginally feasible for the interest holder to pursue a partition action (in this instance, a legal action to force a sale and distribute the proceeds). Even if it were feasible, the process would be costly and carries its own risks.

The hypothetical buyer of the interest would expect a holding period of approximately five years for reasons that concern the real property (leases, loans) and the other owners (development plans, conflicts). However, the exact time period is uncertain. During the holding period, issues that would concern any owner of the property are made more difficult by the ownership structure, since all owners are involved in the decision-making process by law. The appraiser has analyzed the expectations for the investment and concluded the following:

| Level | Asset | Equity |
|---|---|---|
| Value | $3,250,000 | $1,428,054 |
| Yield (discount) rate | 12.0% | 12.0% |
| Value growth | 1.4% | 5.2% |
| Cash flow growth | 0.03% | 0.0% |

---

1. Dennis A. Webb. *Valuing Undivided Interests in Real Property: Partnerships and Cotenancies.* Chicago: Appraisal Institute, 2004.

BACK_DEFEXP-RR-004193

Risk is increased, which can be expressed as an increase in the yield rate. The reasons for the increased risk in this case are:

- Holding period uncertainty
- The buyer's due diligence requirement
- Management risk (lease rollover and certain development plans)
- Lack of control (due to the need for unanimity to make many property-related decisions as well as the fact that other interests may be transferred without permission or notice, further exacerbating the problem)
- The likelihood that the buyer would have to bring a lawsuit to perfect its rights (forced sale)

These conditions are incorporated into the analysis with an increase of 5.3% to the yield rate, bringing the investor's required yield rate to 17.3%.

These conclusions can be incorporated in a simple present value model shown in Exhibit A. This model is one of several quantitative methods for developing the discount from the pro rata

owners' equity. The model shows the present pro rata value of the interest as $1.00, so the discount can be computed.

**Present Values**

| | |
|---|---|
| *FV* of $1.00 @ 5.2%/year for 5.0 years = $1.287 | |
| $1.287 discounted to present value at 17.3% | $0.580 |
| Dividend stream, growing at 0.0% per year, discounted to present value at 17.3% | 0.184 |
| Sum of present values | $0.764 |
| Concluded discount        (1 – 0.763) = 0.237 | |
| Or expressed as a percentage and rounded | 23.5% |

This percentage represents the discount from the interest's pro rata share of owners' equity and is the amount demanded by the market to compensate for the increased risk/loss of property rights attendant to this form of ownership.

| | |
|---|---|
| Owners' net equity | $1,428,054 |
| Interest held by John Builder    × 20.0% = | 285,611 |
| Less discount    × 23.5% = – | 67,119 |
| Concluded market value | $218,492 |
| (Rounded) | $220,000 |

**Exhibit A**



BACK_DEFEXP-RR-004194

The concluded value of the interest reflects nonphysical damage caused by dividing the ownership of the property. The discount is highly variable and dependent largely on the risk associated with the property, the buyer's expected holding period, the value of the interest, and other elements. There are also several other methods of analyzing such "damages," which are applicable in different situations. Refer to *Valuing Undivided Interests in Real Property: Partnerships and Cotenancies* for the complete case study.[2]

---

2. The book demonstrates undivided interest analysis in detail, with two "live" cases that include full documentation and complete narrative solutions. The cases are intended to be instructional for real estate and business appraisers experienced in fractional interest valuation, but they also serve as an orientation for beginners and a useful reference for accountants, attorneys, tax examiners, and others working with fractional interest valuations.

BACK_DEFEXP-RR-004195

# TOWNHOME PROJECT CASE STUDY

*By Michael V. Sanders, MAI, SRA*

## Class VIII Detrimental Condition
## Water Intrusion/Mold

The subject is a planned-unit development (PUD) in Southern California consisting of 187 attached townhouse units on individual lots averaging slightly over 1,900 square feet. The project was built in the mid-1960s, with six floor plans ranging from approximately 1,000 to 1,500 square feet. Community recreation facilities include a pool and spa. The three units in question each have two bedrooms and two baths and are situated adjacent to the Interstate 5 Freeway. Pertinent physical characteristics of these units are listed in the following table.

| Unit | Location | Gross Living Area | Condition |
|------|----------|-------------------|-----------|
| 1 | End | 1,200 sq. ft. | Good |
| 2 | Interior | 1,200 sq. ft. | Average |
| 3 | End | 1,200 sq. ft. | Good |

Expansion of the freeway during the mid to late 1990s resulted in the construction of a 48-inch cross-drainage facility discharging to a greenbelt area immediately adjacent to Unit 1. This new facility modified established drainage patterns, with additional and excessive runoff directed to existing storm drainage facilities within the subject project. A report prepared for the city in 2001 noted that there was flooding, even during minor rainfalls, in the area where drains empty across the subject project's property line.

The first flooding event occurred in February 1998, primarily impacting Unit 1 with water at a depth of approximately two inches. Restorative work at the time consisted of cleaning and painting. The second flooding event happened in January 2001, subsequent to the construction of a short concrete block barrier outside the northerly wall of Unit 1 by the homeowners association in late 2000. Exterior water levels were in excess of one foot, with interior flooding of the referenced units to reported depths as high as six inches. Damage was more widespread compared to the 1998 event. Affected owners apparently made superficial repairs, although an environmental report in late 2002 identified mold within Unit 1. Mold was also suspected to be present in other affected units. Litigation ultimately ensued between the affected owners against the California Department of Transportation (Cal Trans). The case was settled by selling the referenced units to the State of California in January 2004.

The state subsequently listed all three units for sale in March 2004 at $350,000 each, noting that all were "fixer[s] to be sold in 'as is' condition with full disclosure, no warranties implied," referencing mold reports, and specifying "mold remediation responsibility of buyer at buyer's expense" with respect to Unit 1. Units sold for prices in the range of $275,000 to 325,000 in June 2004, as noted in the following table:

| Unit | Location | Gross Living Area | Condition | Sale Price |
|------|----------|-------------------|-----------|------------|
| 1 | End | 1,100 sq. ft. | Good | $300,000 |
| 2 | Interior | 1,200 sq. ft. | Average | $275,000 |
| 3 | End | 1,200 sq. ft. | Good | $325,000 |

BACK_DEFEXP-RR-004196

All three units were reportedly impacted by mold, with selling price differences based on the extent of mold contamination and overall condition. Unit 1, which experienced the worst flooding, sold for $25,000 less than Unit 3. Unit 2 was in poor condition, was a somewhat less desirable interior unit, and reflected the lowest sale price. The selling agent procured a buyer for one of the units. This buyer was a contractor who brought in two other contractor acquaintances to purchase the other units. This factor reportedly influenced the prices, although the extent of the influence is unclear.

Excluding extremes, prices for similar two-bedroom units elsewhere in the project during the same time period were generally within the range of $360,000 to $385,000, suggesting overall discounts of approximately 15% to 25%. However, the discount attributable solely to water intrusion and associated mold problems is probably lower because the affected units are considered less desirable than others in the project due to their freeway proximity. There are also indications that more favorable pricing may have been obtained due to the existence of three buyers with roughly concurrent closings.

Discounts reflect some degree of risk associated with the unknown condition of the units, along with whatever repairs might be necessary, since limited information was available at the time of purchase. Ultimately, the selling agent indicated that the buyer of Unit 1, which was considered to be the unit that suffered the most damage, found the problem not as bad as feared after opening the walls to make repairs. The buyers understood that authorities had committed to modify drainage facilities in early 2005, limiting the risk associated with future flooding to one rainy season.

BACK_DEFEXP-RR-004197

# DURHAM WOODS CASE STUDY

*By Randall Bell, PhD, MAI*

## Class VIII Detrimental Condition
## Gas Pipeline Explosion



Today a playground sits in an area that was destroyed by the Durham Woods pipeline explosion. The charred trees in the background are a constant reminder of the damage that was caused years ago.

On March 23, 1994, a 36-inch diameter, underground methane gas pipeline exploded in Edison, New Jersey. The pipeline was operated by Texas Eastern Transmission Corporation and had last been inspected in 1986. The explosion created a crater 60 feet deep and sent a 300-foot fireball into the air that could be seen by residents of New Jersey, New York, and Pennsylvania. Homes shook for a 10-mile radius, and the blast was likened by many to a nuclear disaster. Workers needed 2½ hours to turn off the gas flow. Fifteen hundred tenants were forced to flee their homes, the Red Cross intervened, and the area was declared a federal disaster area. The disaster prompted new federal legislation regarding pipeline operations. While the tragedy occurred near midnight, there was only one related death (a heart attack suffered by a fleeing person), and the balance of the victims successfully escaped.

The Durham Woods apartment complex contains 63 buildings, of which eight (containing 128 units) were completely destroyed. A total of 96 units in six buildings were damaged. Insurance proceeds paid for the reconstruction of the damaged and destroyed units at a cost of $12.25 million.

BACK_DEFEXP-RR-004198

The apartment building owners eventually were able to re-lease the rebuilt units. An adjoining condominium development, called Talmadge Village, was in the approved planning stages at the time of the disaster. As it is generally much easier to rent properties associated with tragedies as opposed to selling them, the development was converted to an apartment complex in order to keep the project progressing.

BACK_DEFEXP-RR-004199

# DESERT RESORT SUBDIVISION CASE STUDY

*By Mark W. Smith, MAI*

## Class IV Detrimental Condition
## Imposed Loss of Access

Inadequate or inappropriate planning of a development opportunity can have a pronounced negative impact on a property. In cases where the property is in an area with an ample supply of developable land, the effects of poor planning can linger for many years, and in the most severe instances indefinitely.

The following case study involves a residential subdivision in a desert resort community. As both the climate and the geography of the area have had a dramatic impact on local development patterns, a short description of both is helpful.

The community is in a valley bordered by mountain ranges on the north and south. The valley has narrow openings at the northwest and southeast. Very high winds constantly blow through these openings from northwest to southeast along the lower slopes of the northern mountain range. The crescent-shaped southern mountain range offers protection from the constant high winds. Winter temperatures typically range from about 65° to 80° F, but summer temperatures routinely exceed 100°, and frequently soar to well above 110°.

Over the last four decades, the mild winter weather has attracted a large number of relatively affluent vacation home buyers. The areas best sheltered from constant winds have been developed with hotels, restaurants, upscale shopping, museums, and private golf course-oriented residential communities.

As the entire valley is closely associated with winter golfing activities, it is not surprising that the areas best protected from the wind are in the highest demand by the most affluent buyers. Areas impacted by high winds are generally populated by the considerably less affluent year-round residents who work in the local service industries. This being the case, construction quality and property values generally increase as one travels from the north to the south.

The subject of this case study is a 10-acre parcel in the far northern, or less affluent, sector of the community. In contrast to virtually all of the surrounding neighborhoods, the subject's developer chose to improve the site as a private (walled and gated) 67-lot residential subdivision with private streets and a private park. A plat map (Exhibit A) of the subdivision has been reproduced on the following page.

The homes in the subject development are of good to very good quality. The quality of the homes is similar to homes found in some of the valley's most desirable neighborhoods. The subdivision is, however, in a neighborhood only marginally protected from the high winds. In short, the area is only attractive to the most price-sensitive local service industry employees. Given the price sensitivity of the typical buyer in the area, the homes immediately surrounding the subject site are of only fair quality.

Construction of the backbone infrastructure was completed early in the development process, including the installation of underground utilities and construction of perimeter walls,

BACK_DEFEXP-RR-004200

Copyright material licensed by Richard Marchitelli, Volume 2

**Exhibit A**    **Plat Map of Subdivision**



therefore absorption, was considerably weaker than the developer anticipated. Fifteen of the homes were completed and sold before the developer was forced into bankruptcy. Thirteen of the homes were about 95% complete at the time of bankruptcy.

It is quite common in the area to have a set of conditions, covenants, and restrictions (CC&Rs) for enforcing rules and regulations in a planned community similar to the subject. These CC&Rs usually work to the benefit of the owners within the community. Unfortunately, the subject's history as a failed subdivision created some unusual circumstances for the individual lots.

The CC&Rs required the developer to set up the association prior to the close of the first escrow. Once the first escrow within each phase was closed, the association was to collect assessment fees for each lot within the phase. In other words, once the first escrow of a lot in phase one was closed, assessments would be levied on all the lots within that phase. Each property owner is responsible for the payment of assessment fees. In the case of lots not yet sold, the developer was to pay the assessment fees until the lot was sold.

In an effort to limit the fees they would have to pay for unsold homes, the developer intended to build the project in several phases. To further limit their liability for assessment fees on unsold homes, the developer decided to encumber only those lots in the initial construction phases with the original declaration of the CC&Rs for the community. The recorded document provided the means for annexing the remaining lots in the tract into the association as construction pro-

gates, and the private park. All of the 67 lots were rough-graded and the streets were cut. Construction of the first two phases of homes was begun simultaneously. The first phase consisted of 11 homes, while the second phase consisted of 17 homes.

As the homes in the subject development are vastly superior to the homes in the surrounding neighborhood, the developer would have to sell the homes for some 50% more per square foot than the prevailing market values in the area just to break even. Market acceptance of the project, and

BACK_DEFEXP-RR-004201

ceeded, thereby encumbering the annexed lots with the CC&Rs.

Only the phase one lots were initially encumbered by the CC&Rs. This included Lots 1 through 7 inclusive, Lots 19 through 22 inclusive, Lot 68 (the community park), common area landscaped lots fronting to the primary access point, and various private street lots as shown in the plat map.

To ensure the project would be completed as originally intended, the CC&Rs gave the developer certain benefits not granted to others. Among these benefits was the right to annex the remaining lots in the tract into the homeowners association without a majority vote from the members of the association. Another benefit granted to the developer was the right to cast three votes for each lot it owned. These benefits had expiration dates specified within the original declaration of CC&Rs.

Prior to the bankruptcy, the developer annexed Lots 8 through 18 inclusive, 23 through 25 inclusive, 45 through 47 inclusive, and the remaining street lots into the association. This declaration encumbered these lots with the CC&Rs and transferred title to the private streets to the homeowners association.

The 13 unfinished homes and 39 rough-graded vacant lots were foreclosed upon by the construction lender subsequent to the developer's bankruptcy. The owner's right to cast three votes for each lot it owned expired shortly thereafter, prior to the completion of the subdivision and annexation of the 39 vacant lots into the homeowners association. Likewise, the homeowners no longer have the right to annex additional property into the association, thereby encumbering the added lots with the terms of the CC&Rs without a 67% majority vote of the members of the association.

The expiration of these rights created a problem for the development of the 39 vacant lots. These unimproved lots are wholly within the walls and gates of the community and are accessed by the private streets now owned by the homeowners association. Technically, because the owner of the 39 vacant lots no longer has the right to annex the lots into the association and because the access streets to the vacant lots are owned by the association, the owner of the 39 lots no longer has legal access to the lots.

Even if the association agrees by majority vote to annex the vacant lots into the association, development of the 39 vacant sites may not be possible. When the developer's special privileges expired, control over what could be built on each site was turned over to the association's architectural committee. The homes within the development are vastly superior to virtually every other product in the immediate neighborhood. The developer's failure to sell all of the existing homes provides adequate proof that the original product line is economically infeasible in the subject neighborhood. Unfortunately, the owners of the existing homes have made it abundantly clear to local building officials that they will not allow the construction of a product materially different from the existing one. In short, the association will only allow the construction of the existing product, a product proven to be economically infeasible even if the land value is zero.

The circumstances outlined above created a conflict between the existing homeowners and the owner of the

BACK_DEFEXP-RR-004202

vacant lots. To make matters worse, there is an abundant supply of vacant land in the immediate neighborhood and in more upscale neighborhoods to the south to satisfy virtually all development requirements well into the foreseeable future. This being the case, there is virtually no incentive for anyone to take control of the subject lots and bring them to a buildable status. Conversations with numerous local developers, investors, and agents revealed that the subject lots have been rendered virtually unmarketable and actually represent a liability from a property tax standpoint. Control of the lots has since been turned over to a federal agency. Five years after the foreclosure transferred title to the construction lender, the sites remain unsold and undeveloped, with the property taxes seriously in arrears.

BACK_DEFEXP-RR-004203

# BEVERLY HILLS ESTATE CASE STUDY

*By Randall Bell, PhD, MAI*

## Class VI Detrimental Condition
## Building Construction Defects and Water Damage

The subject property is a 6,544-sq.-ft. house in the city of Beverly Hills, California. The scope of this assignment was to

1. Inspect the subject property referenced above.
2. Determine if the sale price of $2,750,000 on January 4, 1994, was considered to be the market value.
3. Determine the diminution in value, if any, resulting from undisclosed construction defects.

The subject property was thoroughly inspected by appraisers, contractors, and a licensed land surveyor. The subject property contains a pool, indoor spa, tennis court, terraced grounds, and a panoramic view of the Los Angeles basin. Several areas of water damage throughout the house were also noted during the subject property inspection.

In order to determine if the sale price was commensurate with the market value, a search was made for other luxury home sales in the same time frame. The subject property is large and does not lack any of the amenities expected in a luxury home. Additionally, the subject site is particularly private and enjoys an exceptional view amenity. As would be expected, market data was limited for single-family residences of a similar caliber, yet five comparable sales were identified and field inspected. All five sales comparables sold at similar prices, ranging from $2,250,000 to $3 million. The subject property is most similar to the sales comparable located at 755 Parker Lane, which sold for $2.7 million in December 1994. Based upon these factors, it is concluded that the subject property did sell for an appropriate market value, assuming that the property suffered from no detrimental conditions.

It was represented that the subject property was sold without the proper disclosure of construction defects and water intrusion problems. Not being a licensed contractor or engineer, the appraiser relied upon information and figures provided by construction experts. However, the appraiser reviewed the information provided by other professionals in an effort to determine its reasonableness. The appraiser's inspections indicated that there have been severe water intrusion problems at the subject property. Further, these problems occurred in various parts of the residence, so apparently the problem is not isolated to one particular issue or area. It appears reasonable that significant construction problems do exist; however, the valuation analysis is based upon the assumption that the cost to repair the damage as provided by the contractors is accurate and correct.

The subject property is categorized as Class VI, which is the classification given to detrimental conditions involving above-grade construction defects. Typically, Class VI detrimental conditions are relatively easy to assess, while Class VII (below grade) are more difficult. When construction defects are severe, as they are in this

BACK_DEFEXP-RR-004204

case, the Detrimental Condition Model is applicable.

The basic premise of this model is to answer the question, "What would the market value have been if the detrimental conditions were known to the buyer at the time the property was purchased?" This model basically indicates that there are four considerations that must be made when quantifying the diminution in value due to a detrimental condition. These are

1. The costs to assess the situation

2. The costs to repair and remediate the problems

3. The costs of any ongoing conditions or monitoring (i.e., additional financing charges, insurance costs, etc.)

4. The market resistance, which is the discount or incentive to entice a prospective buyer to purchase a previously damaged property

To calculate the damages, the costs of damage assessment, repairs, remediation, and carrying costs provided on the Record of Defect/Damage Issues were assumed to be correct. When purchasing a severely damaged property, a typical buyer will not occupy the premises until the repairs are completed. In this situation, it has been represented that the owners purchased the property without knowledge of the detrimental conditions. As a result, they have or will incur moving costs that would not have otherwise been incurred. According to the owner's legal counsel, the moving-out costs were $4,560. It was assumed that this same cost will be incurred to move back into the premises.

Some detrimental conditions will incur ongoing costs, even after the condition is repaired. For example, a flood-damaged property may incur the costs of maintaining a revetment or levee, and a contaminated property may require ongoing monitoring. Construction defects do not typically incur such costs. The appraiser was not made aware of any such ongoing costs, and as such costs are not typically applied in construction defect situations, no such deduction has been made.

The final consideration in quantifying a diminution in value issue is the discount to reflect the risks, contingencies, and trouble to which a buyer is exposed when purchasing a damaged property. This is termed the "project incentive" to a damaged property. A typical buyer will not simply deduct the costs of repair from the normal sales price. Otherwise, there is an incentive to just purchase an undamaged property and avoid the considerable risks and trouble. In an effort to quantify this "discount" or project incentive, market data was studied in the local market for similar discounts when damaged properties were purchased, as shown in Exhibit A.

These market data reflect a discount ranging from 4% to 33%, typically 15% to 25%. This reflects the risks, carrying costs, and entrepreneurial profit that one requires to be enticed to purchase a damaged property. It was noted that when repairs are relatively minor, there is little or no project incentive. Less expensive homes also generally have a lower project incentive as compared with more expensive homes. Considering the high value of the asset, the significant carrying costs, the significant damage, and the limited number of buyers who are financially capable and willing to purchase a damaged property of this type, the most similar market data is in the

BACK_DEFEXP-RR-004205

## Exhibit A    Summary of Damaged Property Sales

**Project Incentive of Homes with No Market Resistance**
**Single-Unit Residences—Bel Air, Holmby Hills, Westwood**

| Study | Value Undamaged | Value Damaged | Detrimental Condition | DC Class | Assessment Repairs/ Carrying Costs/ Contingencies | Project Incentive (Dollars) | Project Incentive (Percentage) | Broker Opinion of Project Incentive | Market Resistance/ Ongoing Costs | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $600,000 | $420,700 | Site damage | VII | N/A | N/A | N/A | N/A | None | Buyers were end users |
| 2 | $1,800,000 | $1,400,000 | Earthquake damage | IX | $150,000 | $250,000 | 13.89% | N/A | None | House shifted |
| 3 | $1,500,000 | $1,000,000 | Earthquake damage | IX | $200,000 | $300,000 | 20.00% | N/A | None | Interior finish and décor needed |
| 4 | $400,000 | $155,000 | Earthquake damage | IX | $150,000 | $95,000 | 23.75% | N/A | None | House shifted |
| 5 | $800,000 | $537,500 | Soil subsidence | VII | $200,000 | $62,500 | 7.81% | N/A | None | Sub-floor buckling |
| 6 | N/A | $328,000 | Earthquake damage | IX | N/A | N/A | N/A | 25.00% | None | Exterior cracking and leaking |
| 7 | $625,000 | $460,000 | Site drainage | VII | $55,000 | $110,000 | 17.60% | N/A | None | Electric, roof, and plumbing |
| 8 | $560,000 | $455,000 | Soil subsidence | VII | N/A | N/A | N/A | 25.00% | None | Sinkhole on site |
| 9 | $2,000,000 | $1,275,000 | Site drainage | VII | $250,000 | $475,000 | 23.75% | 20.00% | None | High-end property needs high incentive |
| 10 | $400,000 | $295,000 | Earthquake damage | IX | $30,000 | $75,000 | 18.75% | 15.00% | None | Foundation damage |
| 11 | $4,750,000 | $2,800,000 | Incomplete construction | VI | $800,000 | $1,150,000 | 24.21% | 25.00% | None | Buyer is contractor |
| 12 | $300,000 | $240,000 | Site drainage | VII | $30,000 | $30,000 | 10.00% | 20.00% | None | Buyer is end user |
| 13 | $325,000 | $229,000 | Earthquake damage | IX | $55,000 | $41,000 | 12.62% | 10.00% | None | Low-end property for area |
| 14 | $2,500,000 | $1,425,000 | Incomplete construction | VI | $500,000 | $575,000 | 23.00% | 25.00% | None | High-end property needs high incentive |
| 15 | $1,400,000 | $630,000 | Incomplete construction | VI | $300,000 | $470,000 | 33.57% | 25.00% | None | 10% incentive is not worth the risk |
| 16 | $1,700,000 | $1,185,000 | Construction defect | VI | $145,000 | $370,000 | 21.76% | 25.00% | None | Problems with second-story addition |
| 17 | $2,700,000 | $2,100,000 | Incomplete construction | VI | $500,000 | $100,000 | 3.70% | 20.00% | None | Needs flooring and certificate of occupancy |
| Average | | | | | | | 18.2% | 21.4% | | |

range of 15% to 25%, and is estimated to be most likely 20%.

All of the costs and losses set forth within the detrimental condition model were considered, and based upon the analysis, the value of the sub-ject property, as of January 4, 1994, was $1,900,000, which represents an overpayment of $850,000 for the un-disclosed construction defects and related costs. A summary of value calculations follows.

| | | |
|---|---|---:|
| Value "as of" 1-4-94—without detrimental conditions | | $2,750,000 |
| Less: | | |
| Assessment stage | | |
| Contractors assessment and report | | $18,000 |
| Repair stage | | |
| Repair costs (from contractor) | | $193,626 |
| Contingencies (from contractor) | | $13,232 |
| Carrying costs (mortgage and taxes @ 4 months) | | $60,276 |
| Project incentive (see market data) | 20% | $550,000 |
| Incidental costs to repairs and remediation | | |
| Moving costs (out only) | | $4,560 |
| Moving costs (back) | | $4,560 |
| Ongoing stage (post-remediation) | | |
| None known | | 0 |
| Market resistance | | |
| Incentive to purchase previously defective property | | 0 |
| Total diminution in value | | $844,254 |
| **Value "as is"** | | **$1,905,746** |
| **Rounded** | | **$1,900,000** |

BACK_DEFEXP-RR-004207

# Krantz House Case Study

*By Joseph Haeussler, MAI*

## Class VII Detrimental Condition
## Subsurface Construction Condition

The Krantz House is located in an upper-class neighborhood in a suburb of Boston, Massachusetts. The property is a custom single-unit residence comprising 6,716 square feet of livable area. The home is a two-story structure built in 1989, with a concrete foundation, wood-frame and stucco construction, and Colonial-style architecture. The 5-bedroom, 5¾-bathroom house was constructed on a 0.85-acre site with a pool and spa. The property is located in a small development of custom single-unit homes. In the extended area, the homes range from middle to upper-middle price properties.

As of the date of the initial inspection, the subject property had evidence of subsurface construction defects. The area of the subject property is known to have expansive soils in the natural state. Soils engineers had conducted studies and determined that prior to the construction of the subject property and during the site preparation phase, substandard fill soils were transported and used on a portion of the site.

At some point after the completion of construction, the subject property began to have signs of subsurface failure in the southwest wing of the home. After the assessment was conducted by engineers, it was found that the property had poor fill material in the immediate area of the failure. The faulty soil material on the subject property included "silty gravelly sand fill, loose black silty gravelly sand topsoil with organic materials, and silty gravelly alluvium," according to the geotechnical reports. The material could not hold the load-bearing capacity of a portion of the improvements. The engineering reports indicated that a portion of the subject property had a distressed foundation as evidenced by a ⁵⁄₁₆-inch-wide slab crack running across the southwest end of the house. The foundation also had indications of depressions of one-half to one inch in the same area. Further engineering tests indicated that the southwest corner of the home was constructed on an area with relative soil compaction of 75%, which is less than the 90% typically required.

The damage was located in only one portion of the subject property, in a bedroom and a bathroom on the southwest end of the home. The remediation and repair efforts of the subject property would be concentrated in this portion of the house only, an area that is approximately 20% of the total area of the home.

The current owners of the subject property purchased the subject property from the original owners of the home in July 1996. The current owners claim that the construction defect preexisted the purchase contract, and that the former owners and the selling real estate agent did not disclose the known defective construction issues. The scope of the assignment was to

1. Inspect the subject property
2. Determine if the sale price of $899,000 was considered to be market value as if no defect existed

BACK_DEFEXP-RR-004208

3. Determine the diminution in value, if any, resulting from undisclosed construction defects

The diminution in value study focused on a) the assumption of the entrepreneurial incentive to purchase and assume responsibility of a defective property and b) the market resistance relating to owning a home with a history of a construction defect. Both of these issues are addressed as a percentage of the total sale price. Costs to assess, remediate, and monitor the repair project were compiled by soils and structural experts and were not within the scope of the assignment.

## Valuation as if Not Damaged

The sales comparison approach was used to value the subject property as if no construction defects existed. The sale of the subject property itself was a strong indication of its market value. This indication of value reflects the value of the subject property with no defect or damage because the buyers of the subject property were not aware of the defective condition of the property at the time of sale. Additionally, a search was conducted for other custom homes in the area in an undamaged condition. Five sales, one of which was the sale of the subject property, were considered. The sale prices were from $750,000 to $1,025,000. In the comparison process, the sale of the subject property is well supported by the market data. Therefore, the best indication of value is the sale of the subject property at $899,000.

## Exhibit A — Undamaged Sales Comparables

| No. | Address | Date | Area (Sq. Ft.) Bed/Bath | Site Area (Acres) | Sale Price | Other Features |
|-----|---------|------|-------------------------|-------------------|------------|----------------|
| SP | 1034 Abbey Lane | 7/96 | 6,716 5/5.75 | 0.85 | $899,000 | Pool |
| 1 | 1048 Lamon Street | 10/95 | 4,756 5/4.5 | 1.17 | $1,025,000 | Pool, tennis, guest house |
| 2 | 394 Pend Street | 11/95 | 6,900 5/4.5 | 0.80 | $860,000 | Pool |
| 3 | 3742 Hollins Street | 2/96 | 7,018 5/4.75 | 0.81 | $815,000 | Pool |
| 4 | 852 Penin Place | 1/96 | 5,010 4/4.5 | 0.67 | $750,000 | Pool |

## Exhibit B — Comparable Sales with Soils Issues

| No. | Undamaged Value | Damaged Value | Class VII Remediation | Project Incentive | Market Resistance |
|-----|-----------------|---------------|------------------------|-------------------|-------------------|
| 1 | $1,000,000 | $700,000 | $100,000 | $150,000 (15%) | $50,000 (5%) |
| 2 | $700,000 | $525,000 | $60,000 | $115,000 (16%) | $0 (0%) |
| 3 | $450,000 | $215,000 | $85,000 | $100,000 (22%) | $50,000 (11%) |
| 4 | $1,750,000 | $900,000 | $450,000 | $300,000 (17%) | $100,000 (6%) |

BACK_DEFEXP-RR-004209

## Valuation as Damaged

The second analysis, based on the detrimental condition model, involved conducting a search for properties that have sold with similar construction defects or detrimental condition issues in place at the time of sale. The sales were relatively similar to the subject property in size and type of improvements. But most importantly the purchasers were able to quantify the costs of repair, the entrepreneurial incentive, and the market resistance.

While market data was limited, four sales of properties with Class VII soils issues were located and verified. Sales 1 and 4 were most similar to the subject property. Based upon these factors, an entrepreneurial incentive of 15% and market resistance of 5% were considered applicable to the subject property.

By applying the factors to the normal market value of the subject property, a value conclusion with the existing detrimental condition can be concluded as shown below.

This conclusion is the value of the subject property as of the date of value, with consideration given to the market resistance and the assumption of entrepreneurial incentive of a damaged property. A potential buyer of this property in a damaged state would likely retain an engineer to assess the problem and seek an estimate of costs to repair the defects.

| | | |
|---|---|---|
| Normal market value | $899,000 | |
| Less | | |
| Entrepreneurial incentive @ 15% (rounded) | $135,000 | |
| Market resistance @ 5% (rounded) | $45,000 | |
| Value, as of July 1996, with detrimental condition | $719,000 | less assessment costs and repair process |

BACK_DEFEXP-RR-004210

*Copyrighted material licensed by Richard Roddewig to the 2021 Page*

# BARK BEETLE INFESTATION CASE STUDY

*By Orell C. Anderson, MAI*

## Class VI Detrimental Condition Infestation

Bark beetles are a type of pest that can cause significant damage to trees and losses in overall home values. The beetles chew their way through the outer bark of a tree and emit a chemical scent (called a *pheromone*) that attracts other beetles. There are 600 species of the destructive bark beetle in the West, all belonging to the Scolytidae family. The Mountain Pine bark beetle attacks a tree by building galleries that core out from a central tunnel made by the female parent beetles that lay eggs and deposit a fungus. These galleries combine with the fungus to girdle the pine tree and kill it. Once bark beetles invade a tree, it cannot be saved.

In 2002, conditions were especially favorable for these insects because a region-wide drought weakened trees' normal resistance to bark beetles. Consequently, millions of trees were killed in Arizona, New Mexico, and Southern California. Four years of severe drought left the forests of San Bernardino, Riverside, and San Diego counties in Southern California significantly stressed and vulnerable to a bark beetle infestation that created millions of dead and dying trees.

Lake Arrowhead, located just 90 miles east of Los Angeles in the San Bernardino Mountains, was a resort community in transition. For many years, the region had been known as "Mile-High Hollywood," attracting countless movie companies and big name celebrities to the fresh mountain air and four-season climate. Shirley Temple filmed the original *Heidi* movie in Lake Arrowhead, Michael Jordan and Bugs Bunny were on location at the Lake Arrowhead Country Club for the filming of the movie *Space Jam,* and the UCLA Conference Center doubled as Camp David in the movie *The American President.*

The Lake Arrowhead region was being impacted by a prolonged drought that caused the 784-acre private lake's level to drop drastically. Bark beetles infested old-growth pine trees on the lake's north shore, where an estimated 80% to 90% of the pines died.

According to the California Department of Forestry (CDF), the infested area grew to over 150,000 acres. "With the trees dying," CDF spokesperson Bill Peters said, "something had to be done. The trees had to go and that's the unfortunate part of life." Not only were the trees a fire danger, but also with strong, dry Santa Ana winds, they posed a threat to visitors and residents alike. Therefore, San Bernardino County ordered more than 600 north shore property owners to begin removing dead or dying trees within a 30-day period or face possible charges and liens on their property. At the time, the average cost of removing a 100-foot tall pine tree was about $1,000. These expenses prompted some mountain residents to take out loans to finance the removal of trees from their properties or to put their properties up for sale. Elected officials scrambled to find emergency funds to help pay for tree removal on public lands and extra fire prevention efforts.

Exhibit A illustrates historical listings in the area from 1998 through

BACK_DEFEXP-RR-004211

mid-2003 for homes selling for over $1 million. Due to perceived fear, in addition to loss of landscaping and view amenities, the amount of housing for sale increased drastically according to local key market participants. The listings show how bark beetle infestation may likely have caused panic selling. Unfortunately, in the fall of 2003 the fears turned to reality when a fire destroyed hundreds of homes.

**Exhibit A**



**Semiannual New Listings of Properties Selling for Over $1,000,000, 1998 to 2003, Lake Arrowhead Woods and Waterfront Homes**

BACK_DEFEXP-RR-004212

# ASHBY BUILDING LEAKING UNDERGROUND STORAGE TANK CASE STUDY

*By Randall Bell, PhD, MAI*

## Class VIII Detrimental Condition Environmental Contamination

The Ashby Building is a 240,644-sq.-ft. multitenant industrial building located in Eugene, Oregon. It was sold without the proper disclosure of an illegally installed underground storage tank (UST). The UST had originally been used to store petroleum products but was later abandoned for that purpose and utilized for the storage of hazardous fiberglass resins by a custom speedboat manufacturer. Without proper governmental disclosure, the UST was later removed, but the contents of the UST had leaked into the soil and groundwater.

Because the tank had been illegally installed and removed, there were no records of its existence in the city's files. The problem went undetected by the property's buyer and the contracted environmental engineer until ground settlement problems arose in the area where the UST had been located. Apparently, the soils had not been properly compacted when the UST was removed. The soil settlement led to an investigation whereby the new property owner learned of the UST's history from prior tenants who had occupied other units within the industrial complex.

A lawsuit was filed against the prior property owner in 1989. The scope of the appraisal assignment was to determine the actual market value of the subject property inclusive of the UST. In other words, while the property owner paid $6.5 million for the property, what was the real market value when it was purchased? As the property owner had thought he was purchasing an environmentally clean property, the actual purchase price of $6.5 million was accepted by both the plaintiff and defendant as the value as if not contaminated.

In order to determine the value as contaminated, construction and remediation estimates were obtained from the respective consultants. The property assessment costs included all the costs associated with assessing the environmental damages, such as Phase I and II studies, soil and geotechnical studies, well monitoring, and other costs. These costs were provided by the engineering firms. In this situation, the site assessment costs totaled $50,542.

The remediation costs involve all costs associated with the actual clean-up and correction of the site contamination. This could include a vast spectrum of costs, depending on the remediation method chosen. In this case, the remediation method chosen was the excavation of the most problematic contaminated soils, treatment of some of the soil by incineration, and disposal of some soil in an approved landfill. These costs included agency oversight, engineering, legal review, permits, sampling and analysis, backfill, and the actual remediation, totaling $331,188. Again, these costs were provided by the engineers of the firm contracted to conduct the remediation.

As stated, remediation costs can exceed their original estimates. For this

BACK_DEFEXP-RR-004213

reason, a contingency was required to adjust the remediation costs to reflect a truly reasonable worst-case scenario. The premise for this adjustment was that the real estate market must have a sensible assurance that *all* possible remediation costs will be accounted for in the estimates provided. In this case, upon investigation it was determined that the remediation costs were estimated on an expected-case basis. In a deposition, the engineers and technical experts stated that these costs could reasonably increase by $75,000. Based on this information, a $75,000 contingency was applied to the remediation costs to reflect what costs may actually be incurred. It is important to note that the contingency applied to the remediation costs relates to the hard costs of remediation and should not be confused with intangible losses, such as market resistance or stigma. Informed potential buyers must have reasonable assurance that they have a clear indication of their potential cash liability. Therefore, it is essential that the total remediation costs accurately reflect the total maximum reasonable cleanup costs, not just a cursory and optimistic estimate.

During environmental remediation, the property may experience a significant down time while the cleanup process is carried out. In these situations, there may be considerable carrying costs, such as interest payments, lost rents, property taxes, security, etc. These various user-related costs were analyzed and estimated to be $325,000.

Under the conditions of market value, a knowledgeable prospective buyer would not likely purchase a property in a contaminated state unless there was a financial incentive to do so. This is much like the profit required by a developer who purchases vacant land and builds a structure. The buyer must be enticed through a lower price or a discount. Without such an incentive, the prospective buyer would likely just buy another similar property that is not contaminated, and thereby avoid the risks and trouble associated with purchasing a contaminated site. In order to determine what the incentive should be, various investors who specialize in purchasing contaminated properties were contacted and interviewed. In addition, properties that sold in a contaminated state were located, and the buyers were interviewed as to the discount they received in purchasing an environmentally contaminated property. This information was compiled and ranged from 5% to 45% (exclusive of market resistance) of the value of the property in an uncontaminated state. This particular property was located in an area where contamination was not uncommon, and there was a very good assurance as to the reliability of the remediation estimates. Based upon the interviews, market data, and subsequent analysis, a project incentive of from 10% to 15% was considered likely, and a 12.5% project incentive was considered reasonable.

Contaminated or formerly contaminated sites may incur difficulty in obtaining financing or insurance. Lenders and insurance carriers may not even consider financing a site that is yet to have contamination remedied and may be reluctant to finance a property that has been remedied. This is usually due to the concerns related to governmental agencies not permanently certifying a site as "clean." This could result in an environmental review of

BACK_DEFEXP-RR-004214

the property, additional loan points, a higher interest rate, or a lower loan-to-value ratio. The net result is that the property owner may pay additional financing costs. In this case, a survey was conducted with numerous lenders, and based on site-specific characteristics and the prevalent attitudes in 1989, an additional financing fee of $13,442 was considered appropriate.

A contaminated site may also incur restrictions in use. For example, a commercial site could be limited to an industrial use. In this case, the highest and best use went unchanged, so no adjustment was required for this factor.

At this point, an adjustment was made for the market resistance related to a formerly contaminated property. This reflected the market's resistance to purchase a property after remediation, but with a history of contamination. In this case, market data and interviews with such buyers indicated that a 5% discount would be appropriate in this situation involving a "source property." This rate is applied to the overall property value to indicate a final value "as contaminated." Again, this reflected the attitudes in 1989.

The total diminution in value was $1,932,672, which reflected a market value as contaminated of $4,567,328. The total losses attributable to the contamination are approximately 30% of the Class I value. This figure is cross-referenced for reasonableness and is comparable with the percentage losses of other similar contaminated properties. As this case study illustrates, the remediation costs ($331,188) are often just a portion of the overall diminution in value ($1,932,672). A summary of the calculations used in the valuation process follows:

| | | |
|---|---|---|
| Value undamaged | | $6,500,000 |
| Less | | |
| Assessment costs | | $50,542 |
| Repair process | | |
|     Remediation costs | $331,188 | |
|     Contingency costs | 75,000 | |
|     Use-related costs | 325,000 | |
|     Project incentive (risk) @12.5% | 812,500 | |
| | | $1,543,688 |
|   Ongoing costs | | 13,442 |
|   Market resistance (risk) @ 5% | | 325,000 |
| Value as damaged | | $4,567,328 |

BACK_DEFEXP-RR-004215

# THREE BROWNFIELD CASE STUDIES

*By Gregory D. Trimanche and Craig A. Moyer*

## Class VIII Detrimental Condition
## Large-Scale Contamination

### Solutions Emerge for the Port of Seattle

In Seattle, strategic planning for the Port of Seattle's restoration of a 200-acre contaminated industrial property led to a fast-track expansion of its existing marine terminal facilities. As a result, an international shipping firm relocated its headquarters there.

Although remediation occurred at many levels, two properties were particularly challenging. One was an existing marine terminal that contained contamination from petroleum hydrocarbons deposited in the soil and groundwater during 70 years of operation. The other was a 25-acre site that housed a wood-preserving facility. The 25-acre property had been designated as a Superfund site during property negotiations. Spills, leaks, drips, and on-site waste disposal of organic and inorganic preservatives used in the wood treatment process had impacted soil and groundwater. The risk exposure analysis indicated that petroleum hydrocarbons were leaching to the groundwater and subsequently through and around the bulkhead to the ocean.

Through the cooperative efforts of the Port Authority, the property owner, and the state environmental agency, a risk management plan was proposed that protected human health and the environment through the implementation of key remediation strategies:

- Removal of soils with high concentrations of petroleum hydrocarbons
- Construction and operation of a biologically stimulated zone (or "bio-barrier") near the bulkhead to prevent impacted groundwater from migrating to the ocean
- Construction and operation of a bioventing/sparging system to degrade the petroleum hydrocarbons

The Environmental Protection Agency (EPA) estimated that at least $50 million would have to be spent to remediate the site, a sum the property owners did not have. The owners' liability problem presented the Port Authority with an opportunity to design a win-win proposal, which all interested parties accepted.

Approval of this plan enabled the Port Authority to purchase the property, negotiate consent agreements with various state authorities, and specify the conditions of sale that would absolve the former property owner of continued liability.

Under the plan, the EPA agreed to relieve current property owners from future liability if in exchange they agreed to go out of business and place the business assets and acquisition funds from the Port Authority into a cleanup trust. This provided the Port Authority with the basis for productive negotiation with the EPA for a prospective purchaser agreement and covenant not to sue under CERCLA. This in turn absolved the Port Authority of any liability for existing contamination.

In exchange for the covenant not to sue, the Port Authority agreed either to pay money into a cleanup fund or to conduct remedial work. The Port Authority was willing to do both. It

BACK_DEFEXP-RR-004216

agreed to place an amount equivalent to what it would cost to acquire the property, if it were clean, into the trust and to perform "in kind" work–a pledge valued at close to $17 million.

The Port Authority implemented a risk-based remediation plan that could be integrated with new construction. Its plan utilized the EPA's presumptive remedies for wood-treating sites under the Superfund Accelerated Cleanup Model (SACM). The remedy selection focused on

1. Removal of soil and debris that contained only the greatest concentrations of contamination

2. Construction of barriers that would prevent physical contact with a migration of hazardous constituents into nearby waters

This approach limited potential exposure to human health and the environment. The EPA and the Port Authority estimated that this approach saved approximately $8 million in disposal costs.

## Another City Learns a Tough Brownfields Lesson

One eastern city took a revolutionary step when it crafted and successfully negotiated a voluntary cleanup agreement for a contaminated 200-acre site. A multidisciplinary team of city planners, lawyers, and environmental consultants had advised the city to reject a traditional investigation and cleanup approach. The city's innovative approach led to a voluntary agreement with the state's environmental agency. The agreement promoted cooperation instead of conflict among property owners, developers, lenders, and regulatory agencies. It encouraged the innovative and mutually beneficial approach to problem solving that is necessary for brownfield projects.

Once a flourishing industrial complex, the multi-owner site had become blighted with derelict factory buildings, an unused fuel tank farm, and neglected empty lots. In the post-World War II period, more than 10,000 people worked there; that number had decreased to less than 1,000 by 1996. Known and suspected contamination, and the liability that went with it, kept property owners, developers, and lenders from participating in what otherwise would be considered a prime site for industrial and commercial development.

The city initially negotiated a Letter of Intent with the state agency. The letter provided for a phased approach, with the city acting as an intermediary between the state and property owners, lenders, and developers. It described in advance what each of these stakeholders could expect from the process. Its foundation was an area-wide, risk-based, site-specific determination of remediation goals, which took into account

• Future land use

• The risk of human exposure to existing contamination in the context of the proposed land use

• The use of engineering and institutional controls to contain and control contamination and exposure

• Relief of liability for past contamination through prospective purchaser agreements issued by the city to future landowners

Through this strategy, the letter agreement consolidated what otherwise would have been separate but substantially similar efforts in regulatory compliance, site investigation, and remediation. By setting common standards and goals for all property

BACK_DEFEXP-RR-004217

owners, the agreement was intended to remove much of the regulatory, technical, and liability uncertainty that can paralyze restoration. It was also intended to prevent potential adversarial relationships between property owners and the state.

The letter agreement was to be followed by Consent Orders that would allow demolition of abandoned structures and construction of a new access road and a factory. With the cooperation of the site's responsible parties, the city would take the lead in the overall site investigation, focusing on defining a cost-effective, sitewide, risk-based remedial strategy. By participating in the program, responsible parties would obtain releases from certain environmental liabilities, take advantage of risk-based cleanup standards and solutions, and convert economic liabilities into assets. To facilitate the city's efforts, the city was awarded a pilot grant of $200,000 from the EPA under the Brownfields Economic Redevelopment Initiative.[1]

However, despite the federal support and the considerable effort by the stakeholders, the city's innovative cleanup and redevelopment plans soon became stuck in the quagmire of the traditional regulatory regime, which threatened to make the project technically and economically infeasible. The Letter of Intent, the city's crowning achievement, was scrapped.

As this book goes to press, the stakeholders and their representatives continue their efforts to achieve an innovative solution. They continue to work with the state's voluntary cleanup program in an effort to negotiate a feasible cleanup plan, and they continue to pursue an areawide, risk-based investigation and remediation strategy. They remain committed to consolidating the various efforts in regulatory compliance, site investigation, and remediation. They also have established a dialogue directly with the Governor's office and various regulatory agencies to promote regulatory reform.

There are important lessons to be learned from this city's experience. Perhaps most significant is that responsible agency staffers, at every level, must embrace the project. They must accept the brownfields concepts of flexible cleanup standards based on future land use, balancing the needs of the community and the interests of the project proponents against the actual risks posed at the site, and breaking with the tradition of tunnel-visioned "command and control" regulatory oversight. This process of forging a common vision among project proponents, regulators, and the public is essential to a successful brownfields project.

### Cleanup Plan for Koppers Site Based on Ultimate Use

In 1988, EPA Region IX announced that it would amend the cleanup plan for the Koppers wood treatment and storage facility located south of Oroville, California. The site, owned by Beazer East, Inc., is heavily contaminated with hydrocarbons, dioxins, heavy metals, and other wood treatment chemicals. A 1989 cleanup plan for the site assumed that future use would be for residential purposes. Since that time, Region IX has reevaluated the soil cleanup standards and the technology available to meet those standards, and determined that the available remediation techniques

---

1. The Brownfields Economic Redevelopment Initiative is a cornerstone of the federal government's effort to encourage redevelopment of contaminated industrial sites nationwide.

BACK_DEFEXP-RR-004218

could not reduce the contaminant levels to residential standards.

In a somewhat surprising move, Region IX then decided to change the cleanup standards. The amended cleanup plan is based on future industrial use of the site. This may be the first time that the EPA has amended an existing cleanup plan for a National Priorities List (NPL) site to retroactively change cleanup standards to reflect future land use. The amended plan changed both the cleanup standards and the technology to be used. To reflect the assumption of future industrial use, the amended plan requires that deed restrictions be placed on the property to prevent residential use.

The move came after considerable negotiations with local planning authorities, other local officials, and the community. Clearly, this type of integrated approach, particularly when it incorporates risk-based cleanup standards, goes a long way toward solving the brownfields puzzle.

BACK_DEFEXP-RR-004219

# DEGREES OF INDEMNIFICATION CASE STUDY

*By Richard A. Neustein, MAI, SRA*

## Class VIII Detrimental Condition
## Environmental Contamination

This contamination case illustrates that the amount of value diminution varies with the degree of indemnification. Ordinary indemnifications for this detrimental condition are usually limited to the cost to monitor and remediate the contamination. This is known as a Level 1 indemnification. Level 0 is no indemnification, while Levels 2 and 3 successively add indemnification of acquisition financing and then development financing. A Level 2 indemnification was involved in this case.

This case involves a 39,587-sq.-ft. concrete tilt-up industrial building on 3.68 acres of land in Thousand Oaks, California. The 14-foot clear building had heavy power and contained 90% office space. The buyer intended to remove much of the office space and renovate the rest. At the same time, the roof cover was to be replaced. The rehabilitation work was expected to take four months and to cost approximately $500,000.

The seller of this property had at one time also leased an adjacent property on which there was an underground solvent tank that leaked. The solvents, trichloroethane (TCA) and trichloroethylene (TCE), reached groundwater. In addition, chloroform was also found in the groundwater. Neither this property nor the adjacent one is a likely source of the chloroform contamination.

In 1988, the property had gone into escrow at $2.5 million. The buyer withdrew when contamination was found. In the following years, as values in the local market rose and then fell, a number of interested buyers turned away when contamination was disclosed or when their lenders declined to finance the property. In November 1992, after five months of negotiations, the property entered escrow for sale at $1.2 million with a $200,000 cash down payment. The seller indemnified the buyer against costs of monitoring, remediation, consequential damages, and loss of the ability to finance the property. This is the only sale that has been found with a Level 2 indemnification. This sale is summarized and analyzed in Exhibits A and B.

The reason that this sale went together at all was that the seller, a division of Communications Satellite Corporation, had the financial muscle to effectively stand behind its indemnification. During this same time frame, properties that were not backed by such strength were not selling. This points out the need for indemnification from an entity with virtually doubtless financial strength in order to return marketability to a property with a serious contamination problem.

BACK_DEFEXP-RR-004220

Copyrighted Material Reproduced by Richard J. Roddewig, June 2007

**Exhibit A     Summary of Contaminated Property Sale**

Newbury Park (Thousand Oaks), California

| | |
|---|---|
| Land | 160,284 square feet |
| Building | 39,587 square feet, 14-foot clear, CTU manufacturing building, 90% office area with HVAC, 1600 amps @ 480/277 VAC |
| Sale dates | Negotiation since 6/92 |
| | Agreed 11/92 |
| | Recorded 12/31/92 |
| Sale price | $1,200,000 |
| Cash down | $200,000 |
| Trust deed | $1,000,000 seller T.D. |
| | 9.0%, 30-year amortization, 5-year call |
| Indemnification | · Seller pays for all future monitoring, including wells already on the property. |
| | · Seller pays for cleanup of problems that existed before the sale. |
| | · Seller indemnifies against future consequential damages in the amount of $1.2 million (the price of the property). |
| | · Seller indemnifies buyer's ability to borrow by providing for extension of the note and T.D. if contamination by the seller prevents conventional financing. Any extended loan would be based upon the value of the property at the time of extension. |
| Deferred maintenance | Buyer is to repair or replace the roof and water-damaged interior elements, most partitioning, HVAC, etc., and to modify the driveway to lessen its slope. Estimated direct cost is $500,000. |

**Exhibit B     Analysis of Contaminated Sale**

| | | |
|---|---|---|
| Sale price (as though contaminated, but with indemnifications) | | $1,200,000 |
| Cash 16.67% | | $200,000 |
| Seller financed T.D. (9%, 30-year amortization/5-year call; indemnified by seller) | | $1,000,000 |
| Property value as though in good condition and never contaminated | | |
| Supported by market evidence and opinion of listing broker, $50/sq. ft. | | $1,979,350 |
| Rounded to | | $1,975,000 |
| Less cost to monitor and remediate prior contamination (indemnified) | | $0 |
| Less cost of rehabilitation | | |
| Property rehabilitation | $500,000 | |
| Financing cost @ 9%, 4 months construction time | | |
| $500,000 × 0.09 × 4 / 12 = | $15,000 | |
| Holding cost @ 9%, 4 months construction time | | |
| $1,200,000 × 0.09 × 4 / 12 = | $36,000 | |
| Total rehabilitation cost | $551,000 | |
| Rounded to | | − $550,000 |
| Property value as though unrehabilitated and never contaminated | | $1,425,000 |
| **Less sale price** | | **− $1,200,000** |
| **Decline in value** | | **$225,000** |
| **Value decline as percentage of uncontaminated value** | | **15.79%** |

BACK_DEFEXP-RR-004221

# Exxon Valdez Oil Spill Case Study

*By Randall Bell, PhD, MAI*

## Class VIII Detrimental Condition
## Oil Spill

At 12:04 a.m. on March 24, 1989, an oil tanker loaded with 1,264,155 barrels of North Slope crude oil ran aground on Bligh Reef in the northeastern portion of Prince William Sound, Alaska. Approximately one-fifth of the cargo, 11.2 million gallons, spilled into the ocean. In 1981, at the approval of the State of Alaska, and in order to save money, the company's emergency response team had been disbanded. Despite this, containment efforts were started soon after the accident. However, after three days of calm seas, strong northeasterly winds arose and dispersed the oil beyond any hope of containment. Some oil formed a floating sheen, while some mixed with sea water, creating a thick emulsion known as *mousse*, which does not burn and is very difficult to clean up. The sheen and mousse spread over a 470-mile trajectory from Prince William Sound to the Alaska Peninsula. Seven hundred ninety miles of Prince William Sound coastline were oiled, of which 200 miles were heavily oiled. In the Kenai Peninsula-Kodiak region, more than 2,400 miles of coastline were oiled.

The damage to wildlife was high. Between 100,000 and 300,000 birds and 2,650 sea otters were killed, and



Much of the area along Alaska's coastline is covered with dark-colored rocks, which makes the presence of spilled oil difficult to discern.

BACK_DEFEXP-RR-004222

*Copyrighted material reviewed by the Board of Certification June 20, 2018*

fishing was severely impacted. The cleanup efforts took three years, involving more than 11,000 people and 1,400 marine vessels. On June 10, 1992, the federal government issued a letter officially stating that the cleanup effort was concluded. The cleanup effort cost $2.1 billion, of which $95 million was spent in just the first six weeks.

The Exxon Valdez spill caused enormous wildlife destruction, but the direct impact on real estate values was less severe. The vast majority of impacted coastlines were uninhabited wilderness areas, and inhabited areas were quickly "boomed off" so damage to these areas was minimal or nonexistent. Unlike many environmental disasters, the spill did not impact subterranean soils or the groundwater. As such, property remediation efforts were limited to the coastline surfaces, which were easily accessed, and the verification of complete cleanup was much more assured. Additionally, because the contamination involved crude oil on the surface rather then refined petroleum with chemical additives in the soils, bioremediation (natural disintegration) and evaporation assisted greatly in restoring the coastline surfaces. As nearly all the impacted coastline was wilderness, the real estate damages related to the temporary disruptions of logging, recreational uses, fishing, subsistence lifestyles (living off the land), and mining. The impact on property values was computed on a case-by-case basis, determined by the level of oil on the coast and the disruption (if any) to each of the above uses. The large amounts of money spent in the cleanup efforts actually created a stronger demand for some real estate, as many people came from out-of-state to live and work in the many new remediation-related jobs created by the spill.

BACK_DEFEXP-RR-004223

# THREE MILE ISLAND CASE STUDY

*By Randall Bell, PhD, MAI*

## Class VIII Detrimental Condition
## Nuclear Power Plant Disaster

Construction began on the Three Mile Island (TMI) nuclear power plant in 1968 on a 382-acre island located on the Susquehanna River in Londonderry Township, about 10 miles south of Harrisburg, Pennsylvania. The plant has two units. Commercial operation of Unit 1 began on September 2, 1974, and Unit 2 began commercial operation in December 1978. The reactor buildings are 200 feet high and have a wall thickness of four feet. They are designed to withstand a strike by a 200,000-pound aircraft and earthquakes up to 6.5 on the Richter scale. The cooling towers have a flow of 222,000 gallons per minute. The plant is capable of generating 870 megawatts of electricity, enough to supply approximately 500,000 homes. Unit 1 cost $400 million to construct, and Unit 2 cost $700 million. It would cost approximately $4 billion today to construct a plant comparable to Unit 1. The plant is owned by GPU, Inc., a utility holding company.

On March 28, 1979, a valve within Unit 2 malfunctioned, and river water used to cool the nuclear core flowed out of the reactor's system. Due to inadequate operator training, the stuck valve went unnoticed for 2 hours and 20 minutes. The core overheated and some



Some residents near Three Mile Island have stated that while their concerns about the power plant are diminishing, their concerns about airport noise from the nearby Harrisburg International Airport are increasing.

BACK_DEFEXP-RR-004224



Despite the accident, homes located in close proximity to Three Mile Island do sell. The accident has had a variety of impacts on the surrounding real estate, ranging from the increased demand for workers hired to clean up after the accident, to developers who had to discount their properties in order to sell them, to some local farmers who stated that the accident had no impact on their property values.

radioactive material (within prescribed limits) was released into the atmosphere. The core temperature reached 5,000° F. TMI came within one hour of a "Group 1" accident–a complete meltdown with failure of the backup safety system, a near impossibility calculated at one chance in 200 million reactor years. (The nuclear disaster at Chernobyl, Russia, was a Group 1 accident.) Local residents were advised to evacuate the area. The full extent of damage was not known until mid-1982 when a remote camera showed that about 90% of the 37,000 fuel rods were damaged. Cleanup was completed 14 years after the accident. The subsequent cleanup took the efforts of over 1,000 people and cost $973 million. The radioactive core debris was shipped by railroad to Idaho.

Reactor Unit 1 was never damaged and still operates today. A report issued by The President's Commission on the Accident at Three Mile Island concluded that there will be no significant health effects to the public as a result of the accident; however, some researchers allege that cancer levels are up for people living downwind of the reactor. Clearly, the health risks issue is controversial.

The areas immediately around TMI predominately comprise scarcely populated farmlands. More populated areas are located about five miles away, and Harrisburg is 10 miles away. Interviews with numerous local residents indicated that there are mixed reactions related to real estate values. In fact, a spectrum of impact has occurred on

BACK_DEFEXP-RR-004225

real estate values, ranging from losses to no impact to even a positive impact.

The local farms are owned predominately by families who have long-term ties to the area. Many of these residents indicated that they never left the area, even during the period of the initial accident. Many of these farmers indicated that the accident did not disrupt their farming activities or their property values. However, one developer indicated that it was virtually impossible to sell property in the immediate area, and only after waiting approximately 1½ years after the accident were they able to sell a spec-built home at a 30% discount. In other nearby urban areas, particularly Harrisburg, real estate values remained level or even increased. This phenomenon was attributed to the fact that only 200 workers were displaced by the accident and new demand was created by over 1,000 new workers employed for the 14-year cleanup. At the time of the last field inspection, in 1997, virtually all parties agreed that the incident no longer impacted real estate values. Some people stated that their concerns with TMI are receding, while their concerns over the noise from the local airport (Harrisburg International) are increasing.

Prompted by the Three Mile Island accident, emergency planning became a federal requirement in 1979. The US Nuclear Regulatory Commission (NRC) retained jurisdiction of emergency planning for nuclear plant sites. By 1980, all nuclear utilities were required to coordinate with local, state, and federal officials every other year. These delineated areas near a nuclear power plant have ongoing monitoring and civil warning sirens throughout the area.

The NRC established the following four levels of emergency classification for the nuclear power industry, which impact properties within the emergency planning zone:

### 1. Unusual Event

There is a minor problem at the plant. No release of radioactive material is expected. Public officials will be notified. Residents within the emergency planning zone will not have to do anything.

### 2. Alert

Also a minor problem. It is not expected to seriously affect the safety of the plant. Any releases of radioactivity are expected to be limited to small fractions of federal exposure limits. Officials will be notified. Most likely, residents will not have to do anything. Public officials may, at their discretion, sound a steady siren tone for three minutes. This means turn on your radio or television to an emergency broadcast station and listen for official information.

### 3. Site Emergency Area

A more serious event has occurred. Major plant systems might be affected, but releases of radioactivity would not be expected to exceed any federal limits outside the site boundary. Public officials may, at their discretion, sound a steady siren tone for three minutes. This means turn on your radio or television to an emergency broadcast station and listen for official information.

### 4. General Emergency

Such an emergency would involve serious damage at the plant and the release of radioactivity beyond the site boundary. Public officials may, at their discretion, sound a steady siren tone for three minutes. This means turn on your radio or television to an emergency broadcast station and listen for official information.

BACK_DEFEXP-RR-004226

# SINKHOLES CASE STUDY

*By Sandra Laudone, MAI, SRA*

## Class VII Detrimental Condition
## Incurable Subsurface Condition

This assignment involved the valuation of a 1,600-sq.-ft. suburban tract house, circa late 1960s, located in Northampton County, Pennsylvania. When a water main broke, the soils became saturated and sinkholes developed, significantly damaging the subject property. Ultimately, the real estate was condemned as "uninhabitable." The report developed the *before* and *after* value of the real estate to determine the total damages to the property value.

A *before* value, or unimpaired value immediately prior to the occurrence of the sinkhole, was estimated to be $143,000, using a standard sales comparison approach. This value established a benchmark from which all of the costs and losses associated with the detrimental condition were based. Next, the three stages of a detrimental condition were considered (assessment stage, repair stage, and ongoing stage inclusive of market resistance).

From both a physical and financial standpoint, the detrimental condition had a major impact on the subject property. Even assuming that the building could be repaired and the land could be remediated, several factors still adversely impacted the market value. Since December 26, 1995, the local municipality has condemned the house, and the homeowner's insurance carrier has canceled the fire insurance policy.

The primary factors that were considered in estimating damages included the following:

- The property was uninhabitable and had been condemned.
- Mortgage financing was not available.
- Fire and homeowner's insurance was not available and would be unavailable in the future due to the history of the site.
- Local real estate agents would not market the property.

During the assessment stage, independent contractors and engineers estimated the cost of repairs to be $135,121. This would cure the site damage and make the structure inhabitable. This figure includes all direct and indirect costs, but not the points and interest that must be paid to finance the repairs, which were estimated to be $10,000. Nor does that cost to cure estimate provide for the time it will take to complete the repairs, estimated at approximately six months to one year. As reported in the sales comparison approach, the estimate of market value before the water main break was $143,000, of which 28% is attributed to the land. Thus, the $145,121 cost of repairs for the site and the improvement, plus the interest and loss of use, exceeds the unimpaired value of the subject property.

The appraisal problem included analyzing the general effects of post-repair market resistance. The perceived risk of ownership was high within the local market because over the past 12 years there had been two separate water main breaks at the same location. Although independent studies stated

BACK_DEFEXP-RR-004227

that the land had the potential of being stabilized, apparently there were no guarantees against a reoccurrence, and the site could not be insured. Serious questions remained as to the integrity of the site. Based upon interviews with local brokers, there was no market for the site as if vacant. With more than an adequate inventory of building lots readily available, no prudent buyer would purchase the lot and then spend a considerable amount to improve it. Based upon these factors, market resistance would exist, even after remediation, thereby severely limiting future development. There was no market demand for "open space" lots, and there was no market created by neighbors who were concerned about the costs of maintaining a lot with a history of sinkholes.

Based on these factors, the value of the subject property as if unimpaired was $143,000. The subject property had no value as impaired. There is no economic justification to repair the subject property. Nevertheless, if it were repaired, the improved property would suffer from significant market resistance due to the site's history.

BACK_DEFEXP-RR-004228

*Copyrighted Material — Reproduced by Richard J. Roddewig, June 2, Page*

# DAHMER APARTMENT BUILDING CASE STUDY

*By Orell C. Anderson, MAI*

## Class III Detrimental Condition
## Crime Scene

Jeffrey Lyle Dahmer was arrested on July 22, 1991, for suspicion of murder. Dahmer stored and consumed his victim's remains within his apartment unit. He was subsequently convicted of murder and sent to prison, where he later died in a prisoner attack.

The 24-unit apartment building in Milwaukee, Wisconsin, where Dahmer had lived and committed his crimes, was owned by a private party. After the discovery of Dahmer's crimes, most of the renters in the oth-er units quickly moved, and within a year the vacancy rate within the apartment building rose to 83%. Although the owner realized the building had diminished in value, he did not want to demolish it, nor did he want to discount the apartment for liquidation.

The apartment was located in a blighted urban area where the crime rate was high and drug houses and absentee landlords were common. These neighborhood conditions negatively impacted nearby Marquette Universi-



The Jeffrey Dahmer apartment site is surrounded by a variety of uses, predominantly other apartments. While many tragedies affect the purchasing decisions of potential buyers, they have a lesser effect on rental activity because of the temporary nature of a leasing relationship. Various tenants in the adjoining buildings report that while they are not pleased to be located next to the site of the crimes, the fact that they can move at any time gives them the assurance they need to remain as tenants in the building.

BACK_DEFEXP-RR-004229



A "tot lot" was once planned for the site where Jeffrey Dahmer's apartment building once stood. However, those plans have not materialized.

ty, which has an enrollment of 10,000 students. In 1991, the neighborhood became part of a revitalization program under a nonprofit organization called Campus Circle, which was in the start-up process at the time of Dahmer's arrest. Within a year of its inception, Campus Circle had acquired approximately 100 properties ranging from abandoned single-unit residences to a 59-unit apartment building. By 1994, it had constructed a $35 million retail and residential development two blocks from the university, and a community-oriented police station was constructed on 21st Street. As a result of this redevelopment activity, the drug houses disappeared and crime rates dropped 44%. The enrollment at the university increased notably. Despite the progress made in this redevelopment activity, the apartment building

where Dahmer had lived was a daily reminder to the local residents and the university of the crimes that were committed there. As would be expected, its presence had a significant negative impact upon the Campus Circle project and the university. Many members of the community, the victims' families, and Campus Circle desired to demolish the Dahmer apartment building and build a small playground.

Similar apartment buildings in the area had sold for $9,000 to $10,000 per unit. The apartment building owner was aware of the surrounding redevelopment and the special motivations of Campus Circle. It was finally sold to Campus Circle on August 7, 1992, for $325,000, or $13,500 per unit. This is reportedly $3,000 to $4,000 per unit above market rate. This premium was paid due to the organization's major

BACK_DEFEXP-RR-004230

*pyrighted material reviewed by Richard J. Roddewig. ne 2015*

financial investment in the neighbor-hood and school, as well as to address the desires of the victim's families. In November 1992, the improve-ments were demolished. The planned "tot-lot" development had a cost of $150,000, and the city was to maintain the park. However, for various rea-sons the park was never started, and the site remains vacant. Current plans include the use of the site as a parking lot for the telephone company's offices across the street. There are no plans for a memorial on the site.

This situation is unusual and stands in contrast to most crime scene situations. Technically, the property sold for a premium, although it was purchased in an effort to demolish the building and thereby enhance the neighborhood. In recognizing the high vacancy rate caused by the crimes and the special motivations of the buyer to acquire the property and promptly de-molish it, it is apparent that the apart-ment building was negatively impact-ed by the crime scene stigma, yet in this instance the prior owner profited from the situation.

To this day, the site is a negative re-minder to the community of the trag-edy. The site has apartment buildings on both sides of the vacant lot. One tenant commented that he rented his apartment without knowing about the history of the vacant lot next door, and now places a large picture on the win-dow sill to shut off the view. Generally the tenants commented that they rent their apartment knowing that they can leave at any time. This case study il-lustrates that, while it is difficult to sell stigma-impacted properties, it is gen-erally easier to rent them. It also illus-trates that market resistance can have a powerful effect on property values.

BACK_DEFEXP-RR-004231

BACK_DEFEXP-RR-004232



APPENDIX

A

# Federal and State Agencies

## Federal Agencies

Department of Transportation
1200 New Jersey Avenue SE
Washington, D.C. 20590
202/366-4000 (Direct Operator Line for all Divisions)
www.transportation.gov

Hazardous Materials Hotline
800/424-8802

Emergency Planning and Community Right-to-Know
202/282-2240

Office of Energy and Safety
202/366-0116

Federal Highway Administration
202/366-0660

Office of Environment and Planning
202/366-0106

Environmental Operations Division
202/366-2065

Office of Right of Way
202/366-2058

Hazardous Materials Programs Division
202/366-6121

Office of Safety and Environment
202/366-6409

Department of Transportation
800 Independence Avenue SW
Washington, D.C. 20593

Federal Aviation Department
202/267-9165

Environmental Protection Agency (EPA)
Ariel Rios Building
1200 Pennsylvania Avenue NW
Washington, D.C. 20460
202/272-0167
www3.epa.gov

Public Information Center
Room W385
202/260-4048

Small Business and Asbestos Ombudsman
202/566-2827

RCRA/Superfund/UST Hotline
800/424-9346

Safe Drinking Water Hotline
800/426-4791

Office of Pollution Prevention and Toxics
202/554-1404

US EPA (MD-D243-05)
Research Triangle Park, NC 27711

Air Act Hotline, Clean Air Technology
919/541-0800

BACK_DEFEXP-RR-004233

EPA–Region 1
1 Congress Street, Suite 1100
Boston, MA 02114-2023
888/372-7341

Direct Line for all Divisions (CT, ME, MA, NH, RI, VT)

Region 1 Headquarters
617/918-1111

Air Toxics
617/918-1656

Waste Management Division
RCRA Bureau
617/918-1361

Superfund I
207/287-2651

Superfund II
207/287-2651

Water Management Division
Water Compliance Bureau
617/918-1601

Wastewater Management Bureau
617/918-1601

Water Quality Branch
617/918-1561

Groundwater Management and Water Supply
617/918-1571

Emergency Planning and Response Division
617/918-1251

Oil and Hazardous Waste Materials Hotline
800/424-8802

EPA–Region 2
290 Broadway
New York, NY 10007
877/251-4575

Direct Line for all Divisions (NY, NJ, Puerto Rico, US Virgin Islands)

Region 2 Headquarters
212/637-3660

Office of Regional Counsel
New York/Caribbean Superfund Bureau
212/637-3158

New Jersey Superfund Branch
212/637-3118

Air Sub-Branch
212/637-3198

Waste/Toxic Sub-Branch
212/637-3196

Water/General Law
212/637-3232

Air and Waste Management Division
Hazardous Solid Waste Programs Bureau
212/637-4126

Hazardous Waste Compliance Bureau
212/637-4126

Hazardous Waste Facilities Branch
212/637-4126

Air Compliance Branch
212/637-4080

Air Programs Branch
212/637-4249

Water Management Division
Water Permits/Compliance Branch
212/637-3725

Wetlands Protection Branch
212/637-3801

Surface Water Quality Branch
212/637-3866

Drinking Groundwater Protection Branch
212/637-3880

Emergency and Remedial Response Division
New York/Caribbean Programs
212/637-4392

New Jersey Superfund Branch I
212/637-3251

New Jersey Superfund Branch II
212/637-3251

New York Caribbean Superfund Branch I
212/637-4262

New York Caribbean Superfund Branch II
212/637-4262

BACK_DEFEXP-RR-004234

EPA–Region 2
Woodbridge Avenue
Edison, NJ 08837

Emergency and Remedial Response Division

Removal Action Branch
732/321-6657

Environmental Services Division
Pesticides/Toxics Sub-Branch
732/321-6765

Technical Support Branch
212/637-4392

EPA–Region 3
1650 Arch Street
Philadelphia, PA 19103
800/438-2474

Direct Line for all Divisions (DE, DC, MD, PA, VA, WV)

Region 3 Headquarters
215/814-5000

Water Management Division
Drinking/Groundwater
215/814-2300

Permits Enforcement Branch
215/597-6511

Municipal Wastewater Construction Grants
215/597-9966

Hazardous Waste Management Division
Superfund Programs Branch
215/814-3126

Superfund Pennsylvania Remediation Branch
215/814-2092

RCRA
215/814-3385

RCRA Programs Branch
215/814-3423

RCRA Enforcement/Underground Storage Tanks
215/814-3382

Superfund Removal Branch
215/814-3211

Air, Radiation, and Toxics Division
Air Programs Branch
215/814-2100

Air Enforcement Branch
215/814-3438

Toxics and Pesticides Branch
215/814-2196

Environmental Services Division
Environmental Assessment Branch
215/814-2700

EPA–Region 4
61 Forsyth Street SW
Atlanta, GA 30303
800/241-1754

Direct Line for all Divisions (AL, FL, GA, KY, MS, NC, SC, TN)

Region 4 Headquarters
404/562-9900

Water Management Division
Municipal Facilities Branch
404/562-9655

Groundwater Protection Branch
404/657-6126

Water Permits and Enforcement Branch
404/562-9758

Groundwater and Facilities Branch
404/562-9453

Wetlands, Oceans, and Watersheds Branch
404/562-9351

Air, Pesticides, and Toxics Division
Air Programs Branch
404/562-9077

Waste Management Division
North Superfund Remediation Branch: KY, NC, SC, TN
404/562-8744

South Superfund Remediation Branch: AL, GA, FL, MI
404/562-8719

Waste Programs Branch
404/562-8651

RCRA/Federal Facilities Branch
404/562-8705

BACK_DEFEXP-RR-004235

Office of Municipal Solid Wastes
404/562-8651

RCRA Permit/Compliance Branch
404/562-8705

Emergency Response/Removal
404/562-8718

Air Enforcement
404/562-9170

Pest/Toxic Substances Branch
404/562-8968

Environmental Compliance Branch
404/562-9631

EPA–Region 4
980 College Station Road
Athens, GA 30605

Laboratory & Field Operations
Ecological Support Branch
706/355-8500

EPA–Region 5
77 West Jackson Boulevard
Chicago, IL 60604
800/621-8431

Direct Line for all Divisions (IL, IN, MI, MN, OH, WI)

Region 5 Headquarters
312/353-2000

Great Lakes National Program Office
Remedial Program Staff
312/886-3857

Surveillance/Research Staff
312/353-4328

Regional Counsels
Air/Water/Toxics/General Law
312/886-2944

Solid Waste/Emergency Response
312/886-6184

Air and Radiation Division
Air Enforcement Branch
312/353-2654

Air, Toxics, and Radiation Branch
312/886-6030

Environmental Services Division
Pest/Toxic Substances Branch
312/886-7435

Monitoring/Quality Assurance Branch
312/353-6189

Waste Management Division
Office of Superfund
312/353-9295

Water Division
Water Quality Branch
312/886-0125

Water Compliance Branch
312/886-9296

Safe Drinking Water Branch
312/886-0123

Water Protection Branch
312/886-9296

EPA–Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX 75202
800/887-6063

Direct Line for all Divisions (AR, LA, NM, OK, TX)

Region 6 Headquarters
214/665-6444

Hazardous Waste Management Division
RCRA Enforcement Branch
214/665-7224

RCRA Programs Branch
214/665-7224

Superfund Management Branch
214/665-7601

RCRA Permits Branch
214/665-7224

Superfund Programs Branch
214/665-7601

Air, Pesticides, and Toxics Division
Air Programs Branch
214/665-7593

Air Enforcement Branch
214/665-7242

Pesticides and Toxics Branch
214/665-7593

Environmental Services Division
Emergency Response Branch
214/665-2284

BACK_DEFEXP-RR-004236

Emergency Response Branch/24-Hour Hotline
800/424-8802

Water Management Division
Enforcement Branch
214/665-3187

Municipal Facilities Branch
214/665-7101

Permits Branch
214/665-7170

Water Quality Branch
214/665-7135

Water Supply Branch
214/665-7150

EPA–Region 7
901 North 5th Street
Kansas City, KS 66101
800/223-0425

Direct Line for all Divisions (IA, KS, MO, NE)

Region 7 Headquarters
913/551-7003

Regional Counsel
Air/Water/Toxics/General Law
913/551-7446

Hazardous Waste/RCRA Emphasis
913/551-7446

Hazardous Waste/CERCLA Branch
913/551-7446

Air and Toxics Division
Air Branch
913/551-7487

Toxics/Pesticides Branch
913/551-7139

Waste Management Division
RCRA Branch
913/551-7446

Superfund Branch
913/551-7587

Criminal Investigation Division
913/551-7457

Water Management Division
Drinking Water Branch
913/551-7431

Groundwater Protection
913/551-7431

Water Compliance Branch
913/551-7431

Environmental Services Division
Emergency Planning and Response
913/551-7566

Environmental Services Division
Support Branch
913/551-7146

Environmental Monitoring/
Compliance Branch
913/551-7146

EPA–Region 8
1595 Wynkoop Street
Denver, CO 80202
800/227-8917

Direct Line for all Divisions (CO, MT, ND, SD, UT, WY)

Region 8 Headquarters
303/312-6312

Hazardous Waste Management Division
Superfund Remedial Branch
303/312-6401

RCRA Implementation Branch
303/312-6352

RCRA Management Branch
303/312-6352

Emergency Response Branch
303/312-6827

Superfund Management Branch
303/312-6807 or 303/312-6803

Air and Toxics Division
Air and Technical Operations Branch
303/312-6776

Radiation Indoor Air Programs Branch
303/312-6348

Water Management Division
Drinking Water Branch
303/312-6896

Wastewater Branch
303/312-6390

Groundwater Branch
303/312-6575

BACK_DEFEXP-RR-004237

Water Quality Branch
303/312-6233

Federal Facilities Branch
303/312-6249

EPA–Region 9
75 Hawthorne Street
San Francisco, CA 94105
866/372-9378

Direct Line for all Divisions (AZ, CA, HI, NV, American Samoa, Commonwealth of Northern Marina Islands, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau)

Region 9 Headquarters
415/947-8000

Air Toxics Division
Air Planning Branch
415/947-8715

Stationary Source Branch
415/947-8715

Air Compliance Branch
415/947-8715

Pesticide/Toxic Branch
415/947-8704

Hazardous Waste Management Division
Facilities Branch
415/947-8708

Waste Compliance Branch
415/947-8708

RCRA Programs Branch
415/947-8708

Superfund Remedial Action Branch
415/947-8709

Superfund Enforcement Branch
415/947-8709

Water Management Division
Watershed Protection Branch
415/947-8707

Permits and Compliance Branch
415/947-8707

Drinking Water Protection Branch
415/947-8707

EPA–Region 10

1200 Sixth Avenue, Suite 900
Seattle, WA 98101
800/424-4372

Direct Line for all Divisions (AK, ID, OR, WA)

Region 10 Headquarters
206/553-1200

Water Division
Drinking Water/Groundwater Branch
206/553-1389

Surface Water Branch
206/553-1890

Wastewater Management/Enforcement Branch
206/553-1280

Environmental Services Division
Risk Evaluation Branch
503/326-6554

Investigation and Technical Evaluation Branch
206/553-2117

Air and Toxics Division
Air and Radiation Branch
206/553-7660

Pesticides and Toxic Substances Branch
206/553-0682

Hazardous Waste Division

Program Management Branch
206/553-7660

Waste Management Branch
206/553-7660

Superfund Remediation Branch
206/553-1855

Superfund Response/Investigation Branch
206/553-1855

Department of Labor
Occupational Safety and Health
Administration (OSHA) Information
200 Constitution Avenue NW
Washington, D.C. 20210
800/321-6742
202/693-4999
www.osha.gov

**402**   *Real Estate Damages*

BACK_DEFEXP-RR-004238

OSHA–Region 1
(CT, MA, ME, NH, RI, VT, Puerto Rico, Virgin Islands)
JFK Federal Building, Room 525A
25 New Sudburg Street
Boston, MA 02203
617/565-2072

OSHA–Region 2
(DC, DE, MD, PA, VA, WV, NJ)
US Department of Labor
170 South Independence Mall West, Suite 633E
Philadelphia, PA 19106-3306
215/861-5100

OSHA–Region 3
(AL, FL, GA, KY, MS, NC, SC, TN)
61 Forsyth Street SW, Suite 6B75
Atlanta, GA 30303
678/237-0630

OSHA–Region 4
(IL, IN, MI, OH, WI, IA, KS, MN, MO, NE, ND, SD)
230 South Dearborn Street
Room 3194
Chicago, IL 60604
312/353-6976

OSHA–Region 5
(AR, LA, NM, OK, TX, CO, UT)
525 Griffin Street, Room 734
Dallas, TX 75202
972/850-4708

OSHA–Region 6
(American Samoa, AZ, CA, AK, ID, OR, WA, Guam, HI, HV, Pacific Trust Territories)
90 7th Street, Suite 2-650
San Francisco, CA 94103-1516
415/625-2630

Department of Housing and Urban Development (HUD)
Office of Single Family Housing and Mortgage Activities
451 Seventh Street SW
Washington, D.C. 20410
202/708-1112
www.hud.gov

Office of Enforcement and Compliance Assurance
Office of Compliance
Water Mall
401 M Street SW
Washington, D.C. 20460

Agriculture and Ecosystem
202/564-2320

Chemical, Commercial Services, and Municipal Division
202/564-2310

Office of Criminal Enforcement
Water Mall
401 M Street SW
Washington, D.C. 20460
202/564-2220

Criminal Enforcement Counsel Division
202/564-2480

Criminal Investigations Division
202/564-2490

Office of Enforcement and Compliance Assurance
Office of Regulatory Enforcement
Water Mall
401 M Street SW
Washington, D.C. 20460

Air Enforcement Division–Air Toxics
202/564-2260

Mobile Source
202/564-2260

SIPS-NSPS-Acid Rain
202/564-2260

RCRA Enforcement Division–Waste Identification and Enforcement
202/564-2270

Waste Management Branch
202/564-2270

Toxics and Pesticides Enforcement Division
202/564-2325

Water Enforcement Division
202/564-2240

BACK_DEFEXP-RR-004239

Office of Site Remediation Enforcement
Water Mall
401 M Street SW
Washington, D.C. 20460

Headquarters
202/564-5110

Policy and Program Evaluation Division
202/564-5100

Regional Support Division

202/564-4200

Department of Policy, Planning, and
Evaluation
Ariel Rios Building
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Office of Water

Office of Groundwater and Drinking
Water
1200 Pennsylvania Avenue NW
Washington, DC 20460

Drinking Water Standards Division
Drinking Water Technical Branch
202/260-3022

Drinking Water Implementation
Division
202/564-3750

Groundwater Protection Division
202/260-1894

Office of Water

Office of Wastewater Management
1200 Pennsylvania Avenue NW
Washington, DC 20460

Municipal Support Division
202/260-5859

Office of Wetlands, Oceans, and Watersheds
1200 Pennsylvania Avenue NW
Washington, DC 20460

Assessment and Watershed Protection
Division

Monitoring Branch
202/566-1146

Nonpoint Source Control
202/566-1207

Watershed
202/566-1373

Oceans and Coastal Protection Division

Coastal Management Branch
202/566-1256

Marine Pollution Control Branch
202/566-1288

Wetlands/Aquatic Resources
202/566-1652

Office of Solid Waste and Emergency
Response
1200 Pennsylvania Avenue NW
Washington, DC 20460

Office of Emergency and Remedial
Response (Superfund)

One Potomac Yard South Building
2777 South Crystal Drive
Arlington, VA 22202
703/603-8960

Office of Program Management
EPA West Building 5103T
1301 Constitution Avenue NW
Washington, D.C. 20004
202/566-1884

Office of Solid Waste
Municipal and Industrial Solid Waste
Division
Two Potomac Yard North Building
5301W
2733 Crystal Drive
Arlington, VA 22202
703/308-8254

Office of Underground Storage Tanks
703/412-9810

US Coast Guard
National Response Center Hotline
800/424-8802

BACK_DEFEXP-RR-004240

## State Agencies

### Alabama

Department of Environmental
Management
1400 Coliseum Boulevard
Montgomery, AL 36110-2400
334/271-7700
www.adem.alabama.gov

Air Quality
334/271-7861

Emergency Response Commission
334/271-7700

Environmental Protection
334/271-7700

Hazardous Waste
334/271-7730

Solid Waste Management
334/271-7730

Underground Storage Tanks
334/271-7823

Waste Minimization and Pollution
Prevention
334/394-4352

Water Quality
334/271-7823

Coastal Zone Management
Water Division
4171 Commanders Drive
Mobile, AL 36615-1421
251/304-1176

Department of Conservation and Natural
Resources
64 North Union Street, Room 567
Montgomery, AL 36130

Fish and Wildlife
334/242-3465

Natural Resources
334/242-3486

Department of Labor
Occupational Safety
100 North Union Street
Suite 620
Montgomery, AL 36130
334/242-3460

Department of Agriculture and Industries
Pesticide Registration
1445 Federal Drive
Montgomery, AL 36109
334/240-7171

Department of Environmental
Management
PO Box 301463
Montgomery, AL 36130-1463
334/271-7730

### Alaska

Department of Environmental
Conservation
410 Willoughby Avenue
Suite 303
Juneau, AK 99811-1800
www.dec.alaska.gov

Direct Lines:

Juneau- 907/465-5066

Anchorage- 907/269-7500

Fairbanks- 907-451-2100

Air Quality
907/269-7634

Coastal Zone Management
907/465-3562

Emergency Preparedness and
Community Right-to-Know
800/478-2337

Environmental Health
907/269-7634

Solid Waste Management
907/269-7802

Underground Storage Tanks
800/478-4974

State Recycling
907/269-7644

State Used Oil Recycling
907/465-5010

Water Quality
907/465-5180

BACK_DEFEXP-RR-004241

Pesticide Control
1700 East Bogard Road
Building B, Suite 202
Wasilla, AK 99654
907/376-1870

Watershed Development
610 University Avenue
Fairbanks, AK 99709-3643
907/451-2101

Department of Fish and Game

Wildlife Conservation
PO Box 115526
Juneau, AK 99811-5526
907/465-4190

Department of Natural Resources
550 West 7th Avenue, Suite 1260
Anchorage, AK 99501-3557
907/269-8400

Department of Labor

Occupational Safety
PO Box 111149
Juneau, AK 99811-1802
907/465-4855

Department of Environmental
Conservation
555 Cordova Street
Anchorage, AK 99501
Compliance Assistance Office
907/465-5010

Hazardous Waste and Pollution Prevention
907/269-3054

Drinking Water and Wastewater
907/269-7644

### Arizona
Department of Environmental Quality
1110 West Washington Street
Phoenix, AZ 85007
800/234-5677
www.azdeq.gov

South Region Office
400 W. Congress Street, Suite 433
Tucson, AZ 85701
888/271-9302

Air Quality
602/771-2308

Environmental Protection
602/771-2300

Statewide Watershed Management
602/771-4469

State Recycling
602/771-4398

State Used Oil Recycling
602/771-4140

Solid Waste Management
602/771-4110

Underground Storage Tanks
602/771-4255

Water Quality
602/771-4641

Pollution Prevention
602/207-4235

Division of Emergency Management
5636 East McDowell Road
Phoenix, AZ 85086-5000
602/267-2700
www.dem.azdema.gov

Department of Game and Fish
5000 West Carefree Highway
Phoenix, AZ 85086-5000
602/942-3000
www.azgfd.gov

State Land Department
Natural Resources
2525 E. Beardsleu Rd.
Phoenix, AZ 85050
602/569-6900

Industrial Commission of Arizona
Occupational Safety
800 West Washington
Phoenix, AZ 85007
855/268-5251
602/542-5795
www.ica.state.az.us

Arizona Department of Agriculture
Pesticide Registration
1688 West Adams
Phoenix, AZ 85007
602/542-4373
www.agriculture.az.gov

BACK_DEFEXP-RR-004242

## Arkansas

Department of Environmental Quality
5301 Northshore Drive
North Little Rock, AR 72118
888/233-03267
581/682-0744
www.adeq.state.ar.us

Air Quality
501/682-0730

Emergency Preparedness and
Community Right-to-Know
501/682-0716

Environmental Preservation
501/682-0542

Hazardous Waste Management
501/682-0833

Solid Waste Management
501/682-0600

Underground Storage Tanks
501/682-0999

State Recycling
501/682-0814

State Used Oil Recycling
501/682-0868

Water Quality
501/682-0663

Department of Labor

Occupational Safety
10421 West Markham
Little Rock, AR 72205
501/682-4534

Game and Fish Commission

Fish and Wildlife
2 Natural Resources Drive
Little Rock, AR 72205
800/364-4263
501/223-6300

Department of Arkansas Heritage

Natural Heritage
1500 Tower Building
323 Center Street, Suite 1500
Little Rock, AR 72201
501/324-9619

State Plant Board

Pesticide Registration
1 Natural Resources Drive
Little Rock, AR 72205
501/225-1598

Pollution Control and Ecology
Commission
101 East Capitol Avenue, Suite 205
Little Rock, AR 72201
501/682-7890

## California

California Environmental Protection
Agency Headquarters
PO Box 2815
1001 I Street
Sacramento, CA 95812-2815
916/323-2514
www.ca.gov

Air Resources Board
PO Box 2815
Sacramento, CA 95812-2815
800/242-4450

Office of Emergency Services
3650 Schriever Avenue
Mather, CA 95655

Emergency Preparedness and
Community Right-to-Know
916/845-8731

Emergency Planning and Response
916/845-8741

Department of Toxic Substances Control
1001 I Street
Sacramento, CA 95814-2828

Hazardous Waste Management
916/322-0504

State Waste Reduction Program
916/324-1815

1416 Ninth Street
Sacramento, CA 95814

Resources Agency
Natural Resources
916/653-5656

Department of Fish and Game
Fish and Wildlife
916/445-0411

BACK_DEFEXP-RR-004243

Department of Industrial Relations

Occupational Safety
1515 Clay Street, Suite 1901
Oakland, CA 94612
510/286-7000

Department of Pesticide Regulations

Pesticide Registration
PO Box 4015
1001 I Street
Sacramento, CA 95812-4015
916/445-4400

Integrated Waste Management Board
PO Box 4015
1001 I Street
Sacramento, CA 95812-4015
916/341-6000

> Solid Waste Management
> 916/341-6320

> State Used Oil Recycling
> 916/341-6457

Water Resources Control Board

Underground Storage Tanks
PO Box 4015
1001 I Street
Sacramento, CA 95812-4015
916/341-5851

Department of Toxic Substances Control

Pollution Prevention and Technology
Development
PO Box 806
Sacramento, CA 95812-0806
916/322-3670

Department of Conservation

Recycling Division
801 K Street, MS 19-01
Sacramento, CA 95814
916/323-3836
800/RECYCLE

Water Resources Control Board
Water Quality
1001 I Street
Sacramento, CA 95812-4015
916/341-5250

## Colorado

Department of Public Health and
Environment
4300 Cherry Creek Drive S
Denver, CO 80246-1530
303/692-2000
www.state.co.us

> Air Quality
> 303/692-3100

> Emergency Preparedness and
> Community Right-to-Know
> 303/692-3020

> Hazardous Materials and Waste
> Management
> 303/692-3300

> Pollution Prevention
> 303/692-2976

> State Recycling
> 303/692-2979

> State Used Oil Recycling
> 303/692-2979

> Solid Waste Management
> 303/692-3300

> Water Quality
> 303/692-3500

Environmental Protection Info Center
1595 Wynkoop Street
Denver, CO 80202-1129
303/312-6312

Division of Wildlife
6060 Broadway
Denver, CO 80216
303/297-1192

Natural Resources
1313 Sherman Street, Room 718
Denver, CO 80203
303/866-3311

Department of Agriculture

Pesticide Registration
700 Kipling Street, Suite 4000
Lakewood, CO 80215-8000
303/239-4140

BACK_DEFEXP-RR-004244

Colorado State Oil Inspection Office
Underground Storage Tanks
1515 Arapahoe Street
Tower 3, Suite 610
Denver, CO 80202-2117
303/318-8533

### Connecticut

Department of Environmental Protection
79 Elm Street
Hartford, CT 06106-5127
860/424-3000
www.ct.gov

Air Quality
860/424-3026

Coastal Zone Management
860/424-3034

Emergency Preparedness and
Community Right-to-Know
860/424-3001

Emergency Response and Spill
Prevention
860/424-3024

Environmental Protection
860/424-3002

Fish and Wildlife Division
860/424-3011

Groundwater Management
860/424-3705

Hazardous Waste Management
860/424-3023

Natural Resources
860/424-3010

Pesticide Registration
860/424-3324

Solid Waste Management
860/424-3366

Underground Storage Tanks
860/424-3376

Pollution Prevention
860/424-3297

State Recycling
860/424-3000

Used Oil Recycling
860/424-3023 or 888/424-4193

Water Quality
860/424-3704

Department of Labor
Occupational Safety
38 Wolcott Hill Road
Wethersfield, CT 06109
860/263-6900

Waste Management Service
State Waste Reduction Program
50 Columbus Boulevard, Fourth Floor
Hartford, CT 06106
888/424-4193

### Delaware

Department of Natural Resources and
Environmental Control
Richardson and Robbins Building
89 Kings Highway
Dover, DE 19901
www.delaware.gov

Air Quality
302/739-9402

Coastal Zone Management
302/739-9283

Air and Waste Management
302/739-9400

Environmental Protection
302/739-9401

Fish and Wildlife
302/739-9910

Groundwater Management
302/739-9945

Hazardous Waste Management
302/739-9400

Natural Resources
302/739-9000

Pollution Prevention
302/739-9000

State Recycling
302/739-9403

Solid Waste Management
302/739-9400

Water Quality
302/739-9949

BACK_DEFEXP-RR-004245

Department of Public Safety

Emergency Management Agency
165 Brick Store Landing Road
Smyrna, DE 19977
302/659-3362

Department of Agriculture

Pesticide Registration
2320 South Dupont Highway
Dover, DE 19901
302/698-4500

Facilities Management

Used Oil Recycling
302/739-4611

### District of Columbia
Department of Consumer and Regulatory Affairs
941 North Capitol Street NE
Washington, D.C. 20002
202/442-4400
www.dc.gov

Air Quality
202/535-2257

Environmental Protection
202/535-2600

Fish and Wildlife
202/535-2260

Groundwater Management
202/535-1722

Hazardous Waste Management
202/535-2270

Natural Resources
401/757-0861

Pesticide Registration
302/698-4500

Water Quality
202/535-2190

Emergency Management Agency

Emergency Preparedness and
Community Right-to-Know
2720 Martin Luther King Jr. Avenue SE
Washington, D.C. 20032
202/727-6161

Department of Employment Services

Occupational Safety and Health
64 New York Avenue NE, Second Floor
Washington, D.C. 20002
202/671-1800

Office of Waste Reduction

Pollution Prevention

Office of Industrial Technology
Washington, D.C. 20585
202/962-8696

2750 South Capitol Street SE
Washington, D.C. 20032

State Recycling
202/645-7190

Department of Energy
Used Oil Recycling
202/645-7190

Department of Consumer and
Regulatory Affairs

Underground Storage Tanks
941 North Capitol Street NE
Washington, D.C. 20002
(202) 442-4400

### Florida
Department of Environmental Protection
Air Quality
2600 Blair Stone Road
MS 5000
Tallahassee, FL 32399-2400
www.dep.state.fl.us
850/717-9000

Division of Emergency Management
2555 Shumard Oak Boulevard
Tallahassee, FL 32399-2100
850/245-2010
800/226-4329

Department of Environmental Protection
3900 Commonwealth Boulevard, MS 49
Tallahassee, FL 32399-2400

Environmental Protection
850/245-2211

Hazardous Waste Management
850/245-8705

Natural Resources
850/245-3140

BACK_DEFEXP-RR-004246

Pollution Prevention
800/245-8733

Recycling
850/245-8706

Used Oil Recycling
850/245-8755

Solid Waste Management
850/245-8705

Water Quality
850/245-8417

2600 Blair Stone Road
Tallahassee, FL 32399-2400

Storage Tank Regulation Section
850/245-8839

Department of Environmental Protection

Groundwater Management
850/245-8336

Game and Fresh Water Fish Commission

Fish and Wildlife Conservation
620 South Meridian Street
Tallahassee, FL 32399-1600
850/488-4676

Department of Agriculture
Pesticide Registration
3125 Conner Boulevard
Tallahassee, FL 32399-1650
850/487-2130

## Georgia
Department of Natural Resources
2 Martin Luther King Jr. Drive SE
East Tower
Atlanta, GA 30334
404/656-3500
http://georgia.gov

Air Quality
404/363-7000

Coastal Resources Division
One Conservation Way
Brunswick, GA 31520
912/264-7284

Environmental Protection
404/656-4713

Natural Resources
404/656-3500

Solid Waste Management
404/362-2692

Groundwater Management
404/656-3214

Water Quality
404/656-4807

Emergency Response
404/656-3204
800/241-4113

State Used Oil Recycling
404/651-5120

Hazardous Waste Management
404/656-7802

Department of Natural Resources

Fish and Wildlife
2070 US Highway 278 SE
Social Circle, GA 30025
770/918-6400

Department of Labor

Occupational Safety and Health
Administration
1700 Century Circle, Suite 100
Atlanta, GA 30345
404/679-0687

Department of Agriculture

Pesticide Registration
19 Martin Luther King Jr. Drive, Room 550
Atlanta, GA 30334
404/656-9378

Department of Community Affairs

State Recycling
60 Executive Park South NE
Atlanta, GA 30329-2231
404/679-1598

Department of Natural Resources

Waste Reduction Program
4244 International Parkway, Suite 104
Atlanta, GA 30354
404/362-2694

Underground Storage Tanks
4244 International Parkway, Suite 104
Atlanta, GA 30354
404/362-2687

BACK_DEFEXP-RR-004247

Environmental Protection Department

Pollution Prevention
7 Martin Luther King Jr. Drive SW #450
Atlanta, GA 30334-9004
404/651-5120
800/685-2443

## Hawaii

Department of Health
1250 Punchbowl Street
Honolulu, HI 96813
808/586-4410
https://portal.ehawaii.gov/

Environmental Health Administration
919 Alabama Boulevard
Honolulu, HI 96814
808/586-4304

Air Quality
Room 203
808/586-4200

Hazardous Waste Management
Room 212
808/586-4226

Pollution Prevention
Room 312
808/586-4337

State Used Oil Recycling
808/586-4226

Solid Waste Management
Room 212
808/586-4226

Underground Storage Tanks
808/586-4226

Emergency Response
Room 206
808/586-4249

Water Quality
Room 301
808/586-4309

Environmental Protection
Room 312
808/586-4337

Department of Land and Natural Resources
1151 Punchbowl Street
Honolulu, HI 96813

Fish and Wildlife
Room 325
808/587-0166

Groundwater Management
808/587-0214

Natural Resources
Room 131
808/587-0377

Labor and Industrial Relations Department

Occupational Safety
830 Punchbowl Street
Room 425
Honolulu, HI 96813
808/586-9100

Office of Environmental Quality Control

Environmental Protection
235 South Beretania Street #702
Honolulu, HI 96813
808/586-4185

Department of Agriculture

Pesticide Branch
1428 South King Street
Honolulu, HI 96814-2512
808/973-9401

Department of Health
State Recycling
Recycling Association of Hawaii
808/586-4226

## Idaho

Department of Health and Welfare
Division of Environmental Quality
1410 North Hilton, Second Floor
Boise, ID 83706
www.idaho.gov

Air Quality
208/373-0440

Environmental Protection
208/373-0232

Groundwater Management
208/373-0475

BACK_DEFEXP-RR-004248

Hazardous Waste Management
208/373-0148

Pollution Prevention
208/373-0502

Solid Waste Management
208/373-0148

State Recycling
208/465-8442

State Used Oil Recycling
208/373-0124

Leaking Underground Storage Tanks
208/373-0247

Water Quality
208/373-0120

Department of Health and Welfare

Emergency Response
208/373-0120

Department of Fish and Game

Fish and Wildlife
600 South Walnut Street
Boise, ID 83712
208/334-2920

Labor and Industrial Services Department

Occupational Safety
317 West Main Street
Boise, ID 83735
208/332-3570

Department of Agriculture

Pesticide Registration
PO Box 7723
2270 Old Penitentiary Road
Boise, ID 83707
208/332-8610

## Illinois

Illinois Environmental Protection Agency
1021 North Grand Avenue E
Springfield, IL 62794-9276
www.illinois.gov

Air Quality
217/524-7636

Office of Emergency Management
217/782-2700

Environmental Protection
217/782-3397

Leaking Underground Storage Tanks
217/782-6762

State Recycling
217/785-9407

State Used Oil Recycling
217/785-9407

Groundwater Management
217/785-4787

Water Quality
217/782-1654

Emergency Management Agency

Emergency Preparedness and
Community Right-to-Know
2200 South Dirksen Parkway
Springfield, IL 62703
800/782-7860

Department of Natural Resources

1 Natural Resources Way
Springfield, IL 62702-1271

Fish and Wildlife
217/782-6384

Coastal Zone Management
217/785-8270

Natural Resources
217/782-6302

1 Hazelwood Drive
Champaign, IL 61820

Environmental Protection Agency
Hazardous Waste Management
217/782-1322

Pollution Prevention
217/782-8700

State Waste Reduction Program
217/333-8940

Department of Labor

Occupational Safety
1 West Old State Capitol Plaza
Springfield, IL 62701-1293
217/782-1704

Department of Agriculture

Pesticide Registration
PO Box 19281, State Fairgrounds
Springfield, IL 62794-9281
217/785-2427

BACK_DEFEXP-RR-004249

Solid Waste Management
217/785-8604

Office of State Fire Marshal

Underground Storage Tanks
1035 Stephenson Drive
Springfield, IL 62703
217/785-1020

Industrial Waste Elimination Resources
Waste Management and Research Center
One Hazelwood Drive
Champaign, IL 61820-7465
217/333-8940

### Indiana

Department of Environmental
Management
100 North Senate Avenue
Indianapolis, IN 46204-2251
www.in.gov

Air Quality
317/233-0178

Pollution Prevention and Technical
Assistance
317/232-8172

State Recycling
317/232-8172 or 800/988-7901

State Used Oil Recycling
317/308-3103 or 800/451-6027

Solid and Hazardous Waste
Management
317/233-4624

Underground Storage Tanks
317/232-8900 or 800/451-6027

Coastal Zone Management
317/232-8670

Department of Natural Resources
402 West Washington Street
Indianapolis, IN 46204
Natural Resources
317/232-4200

Fish and Wildlife
317/232-4080

Department of Labor
Occupational Safety
317/232-2655

Division of Water

Groundwater Management
402 West Washington Street
Indianapolis, IN 46204
317/232-4160 or 877/928-3755

Department of Agriculture

Pesticide Registration
Office of Indiana State Chemist
Purdue University
175 South University Street
West Lafayette, IN 47907-2063
765/494-1492 or 765/494-1587

Department of Environmental
Management

Waste Minimization and Pollution
Prevention

Clean Manufacturing and Technology
Institute (CMTI)
School of Civil Engineering
Center for the Environment
Purdue University
2655 Yeager Road
Suite 103
West Lafayette, IN 47906-1337
765/463-4749

### Iowa

Department of Natural Resources
Air Quality Bureau
7900 Hickman Road, Suite 1
Urbandale, IA 50322
515/242-5100
www.iowa.gov

Department of Natural Resources
Wallace State Office Building
502 East Ninth Street
Des Moines, IA 50319-0034

Emergency Response
515/281-8694

Environmental Protection
515/281-5918

Fish and Wildlife
515/281-5918

Hazardous Waste Management
515/281-6807

BACK_DEFEXP-RR-004250

Natural Resources
515/281-5918

Solid Waste Management
515/281-6807

Underground Storage Tanks
515/281-8941

Waste Minimization and Pollution Prevention
515/281-5353

State Used Oil Recycling
515/281-5859

State Recycling
915/281-8672

Water Quality
515/725-0282

Department of Agriculture

Pesticide Registration
Wallace Building, First Floor
502 East Ninth Street
Des Moines, IA 50319-0034
515/281-8590

Department of Labor Services

Occupational Safety and Health
1000 East Grand Avenue
Des Moines, IA 50319-0209
515/281-3469

Center for Industrial Research and Services
Iowa State University
2272 Howe Hall, Suite 2620
Ames, IA 50011
515/294-3420

## Kansas
Department of Health and Environment
Division of Environment
Curtis State Office Building
1000 SW Jackson
Topeka, KS 66612
www.kansas.gov

Air Quality
785/296-1593

Environmental Protection
785/296-6603

Solid Waste Management
785/296-1600

Underground Storage Tanks
785/296-1684

Leaking Underground Storage Tanks
785/296-1674

Pollution Prevention
785/296-0669 or 800/357-6087

State Recycling
785/296-6596

State Used Oil Recycling
785/296-1609

State Waste Reduction Program
785/296-1617

Emergency Preparedness and Community Right-to-Know
785/296-4359

Water Quality
785/296-5500

Department of Wildlife and Parks

Fish and Wildlife
512 Southeast 25th Avenue
Pratt, KS 67124-8174
620/672-5911

Department of Human Resources

Occupational Safety
800 SW Jackson, Suite 1500
Topeka, KS 66612-1281
785/296-4386

Board of Agriculture

Pesticide Registration
109 Southwest Ninth Street
Topeka, KS 66612-1281
785/296-4179

## Kentucky
Department for Environmental Protection
300 Fair Oaks Lane
Frankfort, KY 40601
www.kentucky.gov

Air Quality
502/573-3382

Emergency Preparedness and Community Right-to-Know
502/564-2150

Environmental Protection
502/564-2225

BACK_DEFEXP-RR-004251

Groundwater Management
502/564-3410

Hazardous Waste Management
502/564-6716

Solid Waste Management
502/564-6716

State Recycling
502/564-6716

State Used Oil Recycling
502/564-6716

State Waste Reduction Program
502/564-6716

Underground Storage Tanks
502/564-5981

Water Quality
502/564-3410

Department for Environmental Protection
Division of Emergency Management
100 Minuteman Parkway
Frankfort, KY 40601
502/607-1600

Fish and Wildlife Resources Department
1 Sportsman Lane
Frankfort, KY 40601
800/858-1549

Department of Natural Resources
2 Hudson Hollow
Frankfort, KY 40601
502/564-6940

Department of Labor

Occupational Safety
1047 US 127 South
Suite 4
Frankfort, KY 40601
502/564-3070

Department of Agriculture

Consumer and Environmental Protection

Pesticide Registration
107 Corporate Drive
Frankfort, KY 40601
502/573-0282

Department of Chemical Engineering

Waste Minimization and Pollution
Prevention
University of Louisville
iTRC Building, Shelby Campus
9001 Shelbyville Road
Louisville, KY 40222
502/852-0965

## Louisiana

Department of Environmental Quality
Galvez Building
602 North Fifth Street
Baton Rouge, LA 70802
www.louisiana.gov

Environmental Quality
225/219-3715

Air Quality
225/219-3488

Water Quality
225/219-3235

Hazardous Waste Management
225/219-3456

Solid Waste Management
225/219-3070

State Recycling
800/305-6621

State Used Oil Recycling
800/305-6621

State Waste Reduction Program
225/219-3236

Underground Storage Tanks
225/219-3236

Department of Natural Resources

Coastal Zone Management
PO Box 44487
Baton Rouge, LA 70804-4487
225/342-8921 or 800/267-4019

Office of State Police

Emergency Preparedness and
Community Right-to-Know
7919 Independence Boulevard
Baton Rouge, LA 70808
225/925-6113

BACK_DEFEXP-RR-004252

Wildlife and Fisheries Department

Fish and Wildlife
2000 Quail Drive
Baton Rouge, LA 70808
225/765-2800

Natural Resources
PO Box 94396
LaSalle Building
617 North Third Street
Baton Rouge, LA 70804-9396
225/342-4500

Department of Labor

Occupational Safety
PO Box 94094
1001 North 23rd Street
Baton Rouge, LA 70804-9094
225/342-9601 or 800/201-2495

Department of Agriculture and Forestry

Pesticide Registration
PO Box 3596
Baton Rouge, LA 70821-3596
225/925-3789

## Maine
Environmental Protection Department
17 State House Station
Augusta, ME 04333-0017
800/452-1942
www.maine.gov

Air Quality
207/287-2437

Environmental Protection
207/287-4728

Groundwater Management
207/287-7733

Pollution Prevention
207/287-7767

State Recycling
207/287-3261

Hazardous Waste
207/287-7674

State Used Oil Recycling
207/287-2651

Solid Waste Management
207/287-7718

Underground Storage Tanks
207/287-2651

Water Quality
207/287-7700

Coastal Zone Management
207/287-3901

Emergency Preparedness and
Community Right-to-Know

Maine Emergency Management Agency
72 State House Station
45 Commerce Drive
Augusta, ME 04333
207/624-4400
800/452-8735 (in ME)

Department of Inland Fisheries and
Wildlife

Fish and Wildlife Commissioner
41 State House Station
284 State Street
Augusta, ME 04333-0041
207/287-8000

Department of Labor

Occupational Safety
45 State House Station
Augusta, ME 04333-0045
207/623-7900 or 877/723-3345

Department of Agriculture

Board of Pesticide Control
Pesticide Registration
28 State House Station
Augusta, ME 04333-0028
207/287-2731

## Maryland
Department of the Environment
1800 Washington Boulevard
Baltimore, MD 21230
410/537-3000
www.maryland.gov

Air Quality
410/537-4225

Emergency Preparedness and
Community Right-to-Know
410/537-3800

Environmental Protection
410/537-3000

BACK_DEFEXP-RR-004253

Groundwater Management
410/537-3510

Hazardous Waste Management
410/537-3343

Solid Waste Management
410/537-3304

Underground Storage Tanks
410/537-3443

Waste Minimization and Pollution Prevention
410/537-4119

State Recycling
410/537-3314

State Waste Reduction Program
410/537-3304

Water Quality
410/537-3706

Department of Natural Resources
Tawes State Office Building
580 Taylor Avenue
Annapolis, MD 21401

Coastal Zone Management
410/260-8735

Fish and Wildlife
410/260-8540

Natural Resources
410/260-8100

Department of Labor

Occupational Safety and Health
Licensing and Regulation Department
500 North Calvert Street, Suite 401
Baltimore, MD 21212
410/767-2215

Department of Agriculture

Pesticide Registration
50 Harry S. Truman Parkway
Annapolis, MD 21401
410/841-5710

Department of the Environment

State Used Oil Recycling
Maryland Environmental Service
259 Najoles Road
Millersville, MD 21108
410/729-8200
800/473-2925

## Massachusetts

Department of Environmental Protection
One Winter Street
Boston, MA 02108
www.mass.gov

Air Quality
617/292-5520

Environmental Protection
617/556-1000

Groundwater Management
617/292-5749

Hazardous Waste Management
617/292-5580

Solid Waste Management
617/292-5632

Leaking Underground Storage Tanks
617/292-5887

Source Reduction Program
617/338-2255

State Recycling
617/574-6875

State Used Oil Recycling
617/556-1022

Water Quality
617/292-5706

251 Causeway Street
Boston, MA 02114

Coastal Zone Management
617/626-1200

Department of Fish and Game

Fish and Wildlife
617/626-1500

BACK_DEFEXP-RR-004254

Department of Environmental Management

Natural Resources
617/292-5500

Department of Labor and Workforce Development

Division of Occupational Safety
617/626-6945

Department of Food and Agriculture

Pesticide Registration
617/626-1700

Waste Minimization and Pollution Prevention
617/574-6875

State Waste Reduction Program
617/292-5632

Emergency Management Agency

Emergency Preparedness and
Community Right-to-Know
Office of Public Safety and Security
One Ashburton Place, Suite 2133
Boston, MA 02108
617/727-7775

## Michigan

Department of Environmental Quality
PO Box 30473
Lansing, MI 48909-7973
616/356-0500
www.michigan.gov

Air Quality
517/626-2600

Coastal Zone Management
517/335-3168

Emergency Preparedness and
Community Right-to-Know
517/373-8481 or 517/335-4650

Environmental Protection
517/335-2784

Hazardous Waste Management
517/373-9875

Solid Waste Management
517/335-4035

State Recycling Waste Management Division
517/335-2690

State Used Oil Recycling
517/335-2690

State Waste Reduction Program
517/373-1322

Leaking Underground Storage Tanks
517/373-4035

Waste Minimization and Pollution Prevention
800/662-9278 or 517/373-9122

Water Quality
517/373-6437

Department of Natural Resources
Stevens T. Mason Building
530 West Allegan Street
PO Box 30028
Lansing, MI 48909

Fish and Wildlife
517/373-1263

Natural Resources
517/373-2329

Department of Labor

Occupational Safety
611 West Ottawa
PO Box 30004
Lansing, MI 48909
517/373-1820

Department of Community Health
Lewis Cass Building, Sixth Floor
320 South Walnut
Lansing, MI 48913
517/373-0408

Department of Agriculture

Pesticide Registration
Constitution Hall
525 West Allegan
PO Box 30017
Lansing, MI 48909
517/335-3308 or 800/292-3939

BACK_DEFEXP-RR-004255

## Minnesota

Pollution Control Agency
520 Lafayette Road N
St. Paul, MN 55155-4194
651/296-6300
www.state.mn.us

Air Quality
612/296-7667

Groundwater Management
651/296-8582

Hazardous Waste Management
651/296-8577

Solid Waste Management
612/624-1300

Underground Storage Tanks
651/649-5451

Waste Minimization and Pollution Prevention
651/296-9207 or 612/624-1300

State Recycling
651/215-0270

State Used Oil Recycling
800/657-3938

State Waste Reduction Program
651/215-0203

Water Quality
651/296-7241

Emergency Preparedness and Community Right-to-Know
Minnesota Safety Council
474 Concordia Avenue
St. Paul, MN 55103
651/291-9150 or 800/444-9150

Department of Natural Resources
500 Lafayette Road
Saint Paul, MN 55155-4001
651/296-6157 or 888/646-6367

Fish and Wildlife
651/259-5180

Shoreland Management
651/259-5697

Department of Labor and Industry

Occupational Health and Safety
443 Lafayette Road North
St. Paul, MN 55155-4307
651/284-5050

Department of Agriculture

Pesticide Registration
625 Robert Street North
St. Paul, MN 55155-2538
651/201-6208

Office of Waste Management

State Used Oil Recycling
1350 Energy Lane
Suite 201
St. Paul, MN 55108-5272
651/282-6143

Minnesota Technical Assistance Program
University of Minnesota
Gateway Center
200 Oak Street SE, Suite 350
Minneapolis, MN 55455-2008
800/247-0015 (in MN)
612/624-1300

## Mississippi

Department of Environment Quality
PO Box 2249
Jackson, MS 39225
www.ms.gov

Air Quality
601/961-5134

Solid Waste Management
601/961-5304

Underground Storage Tanks
601/961-5670

Water Quality
601/961-5098

Department of Marine Resources

Coastal Zone Management
1141 Bayview Avenue, Suite 101
Biloxi, MS 39530
228/374-5000

BACK_DEFEXP-RR-004256

Emergency Management Agency

Emergency Preparedness and
Community Right-to-Know
PO Box 5644
Pearl, MS 39208
601/933-6362 or 800/222-MEMA (6362)

Environmental Protection
601/961-5167

Natural Resources
601/961-5171

Hazardous Waste Management
601/961-5094

Pollution Prevention
601/961-5284

State Recycling
601/961-5005

State Used Oil Recycling
601/961-5005

Department of Wildlife, Fisheries, and Parks

Fish and Wildlife
1505 Eastover Drive
Jackson, MS 39211-6374
601/432-2400

Department of Labor

Occupational Safety
Mississippi State University
Center for Safety and Health
2151 Highway 18
Suite B
Brandon, MS 39042
601/825-0783

Department of Agriculture and Commerce

Pesticide Registration
PO Box 5207
Mississippi State University, MS 39762
662/325-7761

### Missouri

Department of Natural Resources
Division of Environmental Quality
1101 Riverside Drive
PO Box 176
Jefferson City, MO 65102-0176
800/361-4827
www.mo.gov

Air Quality
573/751-4817

Environmental Protection
800/361-4827 or 573/751-3443

Hazardous Waste Management
573/751-3176

Natural Resources
800/361-4827

Solid Waste Management
573/751-5401

Waste Minimization and Pollution Prevention
573/751-5401

State Recycling
573/751-5401

State Used Oil Recycling
573/751-7560

State Waste Reduction Program
573/751-5401

Underground Storage Tanks
573/751-6822

Water Quality
573/751-1300

Department of Natural Resources
Emergency Preparedness and
Community Right-to-Know
2302 Militia Drive
PO Box 3133
Jefferson City, MO 65102
573/526-9261 or 800/780-1014

Department of Conservation
Fish and Wildlife
2901 West Truman Boulevard
PO Box 180
Jefferson City, MO 65102-0180
573/522-4115

Department of Natural Resources
Groundwater Management
111 Fairground Road
PO Box 250
Rolla, MO 65401
573/368-2100

BACK_DEFEXP-RR-004257

Labor and Industrial Relations
Department
Occupational Safety
421 East Dunklin Street
PO Box 599
Jefferson City, MO 65102-0599
573/751-4091

Department of Agriculture
Pesticide Registration
1616 Missouri Boulevard
PO Box 630
Jefferson City, MO 65102-0630
601/751-5504

## Montana

Department of Environmental Quality
Lee Metcalf Building
1520 East Sixth Avenue
PO Box 20091
Helena, MT 59620-0901
406/444-2544
www.mt.gov

Air Quality
406/444-3490

Emergency Preparedness and
Community Right-to-Know
406/444-2544

Disaster and Emergency Services
406/841-3911

Environmental Protection
406/444-4953

Groundwater Management
406/444-4806

Hazardous Waste Management
406/444-1435

Pollution Prevention
406/841-5217

State Recycling
406/841-5253

State Used Oil Recycling
406/841-5250

Solid Waste Management
406/444-5345

Underground Storage Tanks
406/841-5055

Water Quality
406/444-3080

Fish, Wildlife, and Parks Department

Fish and Wildlife
1420 East Sixth Avenue
PO Box 200701
Helena, MT 59620-0701
406/444-2535

Department of Natural Resources and
Conservation

Natural Resources
1625 11th Avenue
PO Box 201601
Helena, MT 59620-1601
406/444-2074

Department of Labor and Industry

Occupational Health and Safety
PO Box 1728
Helena, MT 59624-1728
406/444-1605

Department of Agriculture

Pesticide Registration
303 North Roberts
PO Box 200201
Helena, MT 59620-0201
406/444-5400

## Nebraska

Department of Environmental Quality
301 Centennial Mall South
PO Box 98922
State House Station
Lincoln, NE 68509-8922
877-253-2603
www.nebraska.gov

Air Quality
402/471-2189

Emergency Preparedness and
Community Right-to-Know
402/471-4208 and 402/471-4230

Groundwater Management
402/471-2186

Department of Agriculture

Pesticide Registration
402/471-2394

BACK_DEFEXP-RR-004258

*Copyrighted Material Licensed by Richard Fleischman Zone 2A*

Pollution Prevention
402/471-0001

Solid Waste Management
402/471-4210

Underground Storage Tanks
402/471-2186

Water Quality
402/471-4700

State Emergency Management Agency

Emergency Preparedness
1300 Military Road
Lincoln, NE 68508-1090
402/471-7420 or 877/297-2368

Department of Environmental Quality

Environmental Protection
1200 N Street, Suite 400
Box 98922
Lincoln, NE 68509-8922
402/471-2186

Game and Parks Commission

Fish and Wildlife
2200 North 33rd Street
PO Box 30370
Lincoln, NE 68503-0370
402/471-0641

Natural Resources Commission
301 Centennial Mall South
Box 94676
Lincoln, NE 68509-4676
402/471-2363

Department of Labor

Occupational Health and Safety
PO Box 95024
Lincoln, NE 68509-5024
402/471-2239

Department of Administrative Services

Material Division
State Recycling
PO Box 94847
Lincoln, NE 68509-4847
402/471-2431

Department of Economic Development

State Used Oil Recycling
PO Box 94666
Lincoln, NE 68509-4666
800/426-6505

State Fire Marshal's Office

Underground Storage Tanks
246 South 14th Street
Lincoln, NE 68508-1804
402/471-9465

## Nevada

Department of Conservation and Natural
Resources
901 South Stewart Street
Carson City, NV 89701-5249
775/684-2712
www.nv.gov

Air Quality
775/687-9350

Environmental Protection
775/687-9395

Department of Wildlife
1100 Valley Road
Reno, NV 89512
775/688-1500

Groundwater Management
775/684-2800

Hazardous Waste Management
775/687-9462

Natural Resources
775/687-2712

Pollution Prevention
775/687-9395

State Recycling
800/597-5865

State Used Oil Recycling
800/597-5865

Solid Waste Management
775/687-9467

Underground Storage Tanks
775/687-9376

BACK_DEFEXP-RR-004259

Water Quality
775/687-9444

Department of Public Safety

Emergency Management
2478 Fairview Drive
Carson City, NV 89701
775/687-0300

Division of Industrial Relations
400 West King Street
Suite 200
Carson City, NV 89703
775/684-7620

Occupational Health and Safety
Administration
1301 North Green Valley Parkway
Suite 200
Henderson, NV 89074
775/486-9044

Division of Agriculture

Pesticide Registration
350 Capitol Hill Avenue
Reno, NV 89502
775/688-1182 ext. 252

## New Hampshire
Department of Environmental Services
Air Quality
29 Hazen Drive
PO Box 95
Concord, NH 03302-0095
603/271-3503 or 800/498-6868
www.nh.gov

Department of Environmental Services

Coastal Zone Management
50 International Drive, Suite 200
Pease Tradeport
Portsmouth, NH 03801
603/559-1500

Department of Safety

Emergency Management
33 Hazen Drive
Concord, NH 03301
603/271-2231 or 800/852-3792

Department of Environmental Services
29 Hazen Drive
PO Box 95
Concord, NH 03301-0095

Environmental Protection
603/271-1987

Groundwater Management
603/271-6542

Hazardous Waste Management
603/271-2937

Pollution Prevention
603/271-6460 or 800/273-9469 (in NH)

State Recycling
603/271-2900

State Used Oil Recycling
603/271-6424

Solid Waste Management
603/271-6467

Underground Storage Tanks
603/271-2986

Water Quality
603/271-3434

Fish and Game Department
11 Hazen Drive
Concord, NH 03301
603/271-3211

Department of Resources and Economic Development

Natural Resources
Division of Forests and Lands
172 Pembroke Road, PO Box 1856
Concord, NH 03302-1856
603/271-2214

Coalition for Occupational Safety and Health
57 School Street
Concord, NH 03301
603/226-0516

Department of Agriculture

Pesticide Registration
25 Capitol Street, Second Floor
PO Box 2042
Concord, NH 03302-2042
603/271-3550

BACK_DEFEXP-RR-004260

### New Jersey

Environmental Protection Department
401 East State Street
PO Box 402
Trenton, NJ 08625-0402
866/337-5669
www.state.nj.us

Environmental Protection
609/292-2885

Hazardous Waste Management
609/984-6985

Pesticide Registration
609/984-6619

Solid Waste Management
609/633-1418

Underground Storage Tanks
609/984-3081

State Recycling
609/984-3438

State Used Oil Recycling Control
609/984-3438

Environmental Protection Department

Air Quality Management
PO Box 418
Trenton, NJ 08625-0418
609/292-6710

Environmental Protection Department
PO Box 402
Trenton, NJ 08625

Coastal Zone Management
PO Box 418
401 East State Street
Trenton, NJ 08625
609/633-2201

Natural Resources Restoration
PO Box 404, Station Plaza 5
Trenton, NJ 08625-0404
609/984-5475

Fish, Game, and Wildlife
PO Box 400
Trenton, NJ 08625
609/292-2965

Environmental Protection Department
Emergency Preparedness
609/633-2168

Community Right-to-Know
PO Box 368
Trenton, NJ 08625-0368
609/984-2202

Environmental Protection Department

Groundwater Management
PO Box 409
Trenton, NJ 08625
609/292-7219

Department of Health

Occupational Safety and Health
John Fitch Plaza
Trenton, NJ 08625-0110
609/984-1863

Environmental Protection Department

Waste Minimization and Pollution
Prevention
28 West State Street
Room 514
Trenton, NJ 08625-0406
609/292-3600

Environmental Protection Department

Water Quality
401 East State Street
PO Box 029
Trenton, NJ 08625
609/292-4543

### New Mexico

Department of Public Safety
Emergency Preparedness and
Community Right-to-Know
4491 Cerrillos Rd.
Santa Fe, NM 87507

PO Box 1628
Santa Fe, NM  87504-1628
505/827-9036
www.newmexico.gov

Department of Environment
1190 St. Francis Drive Suite N4050
Santa Fe, NM 87505-4182
800/219-6157

Environmental Protection
800/219-6157

Groundwater Quality Bureau
Room N2250
505/827-2918

BACK_DEFEXP-RR-004261

Pollution Prevention
505/827-0677

State Recycling
505/827-0197

State Used Oil Recycling Control
505/827-0197

Solid Waste Management
Room S2050
505/827-0197

Surface Water Quality Bureau

Water Quality
Room N2050
505/827-0197

Underground Storage Tanks

Petroleum Storage Tank Bureau
1301 Siler Road, Bldg. B
Santa Fe, NM 87507
505/476-4397

Air Quality
1301 Siler Road
Building B
Santa Fe, NM 87507
505/476-4300

Occupational Safety and Health
Department

Occupational Safety
525 Camino de Los Marquez
Suite 3
Santa Fe, NM 87505
505/476-8700

New Mexico Game and Fish Department

Fish and Wildlife
PO Box 25112
Santa Fe, NM 87504
505/476-8000

Department of Environment

Hazardous Waste Management
2905 Rodeo Park, Building 1
Santa Fe, NM 87505
505/476-6000

Department of Energy, Minerals, and
Natural Resources
1220 South St. Frances Drive
Santa Fe, NM 87505
505/476-3200

Department of Agriculture

Pesticide Registration
PO Box 30005
Las Cruces, NM 88003-0005
575/646-7020

## New York
Department of Environmental
Conservation
625 Broadway
Albany, NY 12233
www.ny.gov

Air Quality
518/402-8396

Emergency Preparedness and
Community Right-to-Know
800/457-7364

Environmental Protection
518/402-9167

Fish and Wildlife
518/402-8919

Groundwater Management
518/402-8178

Solid and Hazardous Waste
Management
518/402-8605

Natural Resources
518/402-8924

Pesticide Registration
518/402-8788

Underground Storage Tanks
518/402-9543

Pollution Prevention
518/402-9469

State Recycling
518/402-8678

State Used Oil Recycling
518/402-8678

State Waste Reduction Program
518/402-8678

Water Quality
518/402-8180

BACK_DEFEXP-RR-004262

Department of State

Division of Coastal Resources
99 Washington Avenue, Suite 1010
Albany, NY 12231-0001
518/474-6000

State Emergency Management Office

Emergency Response Commission
1220 Washington
Building 22, Suite 101
Albany, NY 12226-2251
518/292-2321

Department of Labor

Occupational Safety
State Office Building Campus
Building 12
Albany, NY 12240
518/457-9000

### North Carolina
Department of Environment and
Natural Resources
1601 Mail Service Center
Raleigh, NC 27611
www.nc.gov

Air Quality
PO Box 29580
919/733-3340

Coastal Zone Management
PO Box 27687
919/733-2293

Environmental Protection
PO Box 27687
919/733-2870

Groundwater Management
PO Box 29578
919/733-7015

Hazardous Waste Management
PO Box 27626
919/715-4061

Solid Waste Management
PO Box 27626
919/715-4061

Water Quality
PO Box 29578
919/733-7015

Emergency Response Commission

Emergency Preparedness and
Community Right-to-Know
116 West Jones Street
Raleigh, NC 27603-1335
4714 Mail Service Center
Raleigh, NC 27604-1188
919/733-1361

Wildlife Resources Commission

Fish and Wildlife
Centennial Campus
1751 Varsity Drive
Raleigh, NC 27603
919/707-0050

Department of Environment and Natural
Resources
1601 Mail Service Center
Raleigh, NC 27699-1601
919/733-4984

Department of Labor

Occupational Safety
1101 Mail Service Center
Raleigh, NC 27699
919/807-2900

Department of Agriculture

Pesticide Registration
1090 Mail Service Center
Raleigh, NC 27699
919/733-3556

Department of Environment and Natural
Resources

Underground Storage Tanks
441 North Harrington Street
Raleigh, NC 27603
919/733-9413

Department of Environment and Natural
Resources

Waste Minimization and Pollution
Prevention
1639 Mail Service Center
Raleigh, NC 27699
919/715-6500

### North Dakota
600 East Boulevard Avenue
Bismarck, ND 58505
www.nd.gov

BACK_DEFEXP-RR-004263

Department of Health
Air Quality
701/328-5188

Department of Health
Environmental Protection
Chief, Environmental Health Section
701/328-5150

Fish and Wildlife
701/328-6300

Groundwater Management
701/328-5210

Hazardous Waste Management
701/328-5166

Department of Labor
701/328-2660

Agriculture Department
Pesticide Registration
701/328-1505

Pollution Prevention
701/328-5166

State Recycling
701/328-5166

State Used Oil Recycling
701/328-5166

Solid Waste Management
701/328-5166

Underground Storage Tanks
701/328-5166

Division of Water Quality
Environmental Health Section
701/328-5210

Emergency Preparedness and
Community Right-to-Know
918 East Divide Avenue
Bismarck, ND 58501
701/328-2270

## Ohio

Environmental Protection Agency
PO Box 1049
Columbus, OH 43216-1049
614/644-2160
www.ohio.gov

Air Quality
614/644-2270

Emergency Preparedness and
Community Right-to-Know
614/644-2270

Emergency Response Commission
614/644-2270

Environmental Protection
614/644-3020

Groundwater Management
614/644-2752

Hazardous Waste Management
614/644-2917

Pollution Prevention
614/644-3469

State Used Oil Recycling
614/644-3020

State Waste Reduction Program
614/644-3020

Solid Waste Management
614/644-2621

Waste Minimization and Pollution
Prevention
614/644-3469

Water Quality
614/644-3020

Department of Natural Resources

Coastal Zone Management
105 West Shoreline Drive
Sandusky, OH 44870
419/626-7980 or 888/644-6267

Fish and Wildlife
2045 Morse Road
Columbus, OH 43229-6693
619/265-6300

Natural Resouces
614/265-6879

Department of Commerce

Division of Labor and Work Safety
77 South High Street, 22nd Floor
Columbus, OH 43229-6693
614/644-2239

Underground Storage Tanks
614/752-8200

BACK_DEFEXP-RR-004264

*Copyrighted material licensed to Richard Faulk on 2013-05-22. For personal use only. Reproduction or distribution is not permitted.*

Department of Agriculture

Pesticide Registration
8995 East Main Street
Reynoldsburg, OH 43068-3399
614/728-6987

## Oklahoma

Department of Environmental Quality
PO Box 1677
Oklahoma City, OK 73101
www.ok.gov

Air Quality
405/702-4157

Environmental Protection
800/887-6063

Fish and Wildlife
405/702-6100

Hazardous Waste Management
405/702-5152

Natural Resources
405/702-6100

Solid Waste Management
405/702-5217

State Recycling
405/702-5295

State Used Oil Recycling
405/702-5295

State Waste Reduction Program
405/702-5295

Waste Minimization and Pollution Prevention
405/702-5217

Water Quality
405/702-8170

Emergency Management
2401 Lincoln Blvd., Suite C51
Oklahoma City, OK 73105
405/521-2481

Department of Agriculture

Pesticide Coordinator
Oklahoma State University
127 Noble Research Center
Stillwater, OK 74078-0285
405/744-5531

Oklahoma Corporation Commission

Underground Storage Tanks
Jim Thorpe Building
2101 North Lincoln Boulevard
Oklahoma City, OK 73105
405/521-4683

## Oregon

Department of Environmental Quality
811 Southwest Sixth Avenue
Portland, OR 97204-1390
www.oregon.gov

Air Quality
503/229-5359

Coastal Zone Management
503/229-5324 or 541/686-7838

Environmental Protection
503/229-6124

Groundwater Management
503/229-6124

Hazardous Waste Management
503/229-5630

Natural Resources
503/986-4700

Solid Waste Management
503/229-5630

State Recycling
503/229-5630

State Used Oil Recycling
503/229-5630
800/452-4011 (in OR)

State Waste Reduction Program
503/229-5630

Underground Storage Tanks
503/229-5630

Waste Minimization and Pollution Prevention
503/229-5630

Water Quality
503/229-6124

State Fire Marshal
Emergency Response
4760 Portland Road NE
Salem, OR 97305-1760
503/373-1540 ext. 238

BACK_DEFEXP-RR-004265

Community Right-to-Know
4760 Portland Road NE
Salem, OR 97305-1760
503/373-1540 ext. 214

Department of Fish and Wildlife
3406 Cherry Avenue NE
Salem, OR 97303
503/947-6339

Department of Consumer and Business Services

Occupational Safety
800 NE Oregon Street, Suite 1045
Portland, OR 97232
971/673-0761

Department of Agriculture

Pesticide Registration
635 Capitol Street NE
Salem, OR 97310
503/986-4635

## Pennsylvania

Environmental Protection Department
400 Market Street
Harrisburg, PA 17101-8468
www.state.pa.us

Air Quality
717/787-9702

Environmental Protection
717/787-2814

Groundwater Management
717/787-8184

Hazardous Waste Management
717/787-6239

State Recycling
717/787-6239

State Used Oil Recycling
717/787-6239

Bureau of Waste Management
717/783-2388

Water Quality
717/787-5017

Bureau of Watershed Conservation
Coastal Zone Management
PO Box 2063
Harrisburg, PA 17105-8555
717/772-4785

Emergency Management Agency

Emergency Preparedness and Community Right-to-Know
2605 Interstate Drive
Harrisburg, PA 17110-9797
717/651-2007

Department of Fish and Wildlife
2001 Elmerton Avenue
Harrisburg, PA 17110-9797
717/787-4250

Environmental Protection Department

Natural Resources
PO Box 8767
400 Market Street
Harrisburg, PA 17105-2063
717/558-2711

Department of Labor and Industry
Occupational Safety
Room 1529
Harrisburg, PA 17120
717/787-3323

Department of Agriculture

Pesticide Registration
2301 North Cameron Street
Harrisburg, PA 17110-9408
717/787-4843

Bureau of Land Recycling and Waste Management

Solid Waste Management
PO Box 8471
Harrisburg, PA 17105-8471
717/783-2388

Department of Environmental Protection

Underground Storage Tanks
PO Box 8762
Harrisburg, PA 17105-8762
717/772-5599

117 Technology Way
University Park, PA 16802

Department of Environmental Protection

Waste Minimization and Pollution Prevention
717-787-7382

BACK_DEFEXP-RR-004266

State Waste Reduction Program

Pennsylvania Technical Assistance Program
814/865-0427

### Rhode Island
Department of Environmental Management
235 Promenade Street
Providence, RI 02908-5767
www.ri.gov

Air Quality
401/222-2808

Coastal Resources
401/783-5551

Environmental Protection
401/222-3961

Hazardous Waste Management
401/222-1360

Natural Resources
401/222-4700

Ocean State Cleanup/Recycling
401/222-2797

Pesticide Registration
401/222-2781

Solid Waste Management
401/222-2797

State Recycling
401/222-2797

State Used Oil Recycling
401/222-2797

Waste Minimization and Pollution Prevention
401/222-2797

Underground Storage Tanks
401/222-1360

Water Quality
401/222-1360

Department of Environmental Management

Emergency Response Commission
235 Promenade Street
Providence, RI 02908
401/222-4700

Department of Environmental Management

Fish and Wildlife
4808 Tower Hill Road
Wakefield, RI 02879
401/789-3094

Department of Labor

Occupational Safety
Center General Complex
1511 Pontiac Avenue
Cranston, RI 02920
401/462-8570

Center for Environmental Studies

Brown University
PO Box 1943
135 Angell Street
Providence, RI 02912
401/863-3449

### South Carolina
Department of Health and Environmental Control
2600 Bull Street
Columbia, SC 29201
www.sc.gov

Air Quality
803/898-4123

Emergency Preparedness and Community Right-to-Know
803/896-4102

Environmental Protection
803/898-3900

Hazardous Waste Management
803/896-4000

Pollution Prevention
800/768-7348

State Recycling
800/768-7348

State Used Oil Recycling
800/768-7348

Solid Waste Management
800/768-7348

Underground Storage Tanks
803/896-7957

Water Quality
803/898-4300

BACK_DEFEXP-RR-004267

Department of Natural Resources
1000 Assembly Street
Columbia, SC 29201
803/953-9300

Department of Wildlife and Marine Resources

Fish and Wildlife
Dennis Building
PO Box 167
Columbia, SC 29203
843/953-5291

Department of Labor

Occupational Safety
PO Box 11329
Columbia, SC 29211-1329
803/896-7665

Department of Agriculture

Pesticide Registration
1200 Senate Street
Columbia, SC 29211
803/734-2210

Ocean and Coastal Resource Management
1326 McMillan Avenue, Suite 400
Charleston, SC 29405
843/953-0200

## South Dakota
Department of Environmental and Natural Resources
Joe Foss Building
523 East Capitol Avenue
Pierre, SD 57501-3181
www.sd.gov

Air Quality
605/773-3151

Emergency Preparedness and Community Right-to-Know
605/773-3153

Environmental Protection
605/773-3151

Groundwater Management
605/773-3296

Hazardous Waste Management
605/773-3153 or 605/773-4127

Natural Resources
605/773-3151

Pollution Prevention
605/773-3153

State Recycling Program
605/773-3153

State Used Oil Recycling
605/773-3153

Solid Waste Management
605/773-3153

Underground Storage Tanks
605/773-3296

Water Quality
605/773-3754

Department of Game, Fish, and Parks

Fish and Wildlife
605/773-3381

Department of Agriculture

Pesticide Registration
523 East Capitol Avenue
Pierre, SD 57501-3182
605/773-5436

## Tennessee
Department of Environment and Conservation
L&C Tower
401 Church Street
Nashville, TN 37243
888/891-8332
www.tn.gov

Environmental Protection
21st Floor
615/532-0463

Solid Waste Management
Fifth Floor
615/532-0780

State Recycling
888/891-8332

State Used Oil Recycling
888/891-8332

Underground Storage Tanks
Fourth Floor
615/532-0945

Water Quality
Tenth Floor
615/532-0152

BACK_DEFEXP-RR-004268

Department of Environment and Conservation
L&C Annex
401 Church Street
Nashville, TN 37243

Air Quality
Ninth Floor
615/532-0127

Hazardous Waste Management
Fifth Floor
615/532-0780

Department of Environment and Conservation

Waste Minimization and Pollution Prevention
Eighth Floor
615/532-8012

Emergency Management Agency

Emergency Preparedness and Community Right-to-Know
3041 Sidco Drive
Nashville, TN 37204
615/741-0001
800/258-3300 (outside TN)
800/262-3300 (inside TN)

Wildlife Resources Agency

Fish and Wildlife
PO Box 41489
Nashville, TN 37204
615/781-6610

Department of Environment and Conservation

Natural Resources
Customs House, First Floor
Nashville, TN 37243
615/742-6747

Department of Labor

Occupational Safety
220 French Landing Drive
Nashville, TN 37243
615/741-2793

Department of Agriculture

Pesticide Registration
PO Box 40627, Melrose Station
Nashville, TN 37204
615/837-5103

Department of Environment and Conservation

State Waste Reduction Program
University of Tennessee
102 Alumni Building
Knoxville, TN 37966
615/974-2456

### Texas

Natural Resource Conservation Commission
PO Box 13087
Austin, TX 78711-3087
512/239-1000
www.state.tx.us

Air Quality
512/239-6082

Hazardous Waste Management
512/239-2334

Natural Resources
512/239-1000

Pollution Prevention
512/239-2200

State Recycling
512/239-2200

State Used Oil Recycling
512/239-2200

Underground Storage Tanks
512/239-2200

Water Quality
512/239-4671

Natural Resource Conservation Commission
12100 Park 35 Circle
Austin, TX 78753

Coastal Zone Management
512/239-1000

Groundwater Management
512/239-4691

Department of Health

Occupational Safety Program
1033 La Pasada Drive, Suite 375
Austin, TX 78756
512/916-5783
800/452-2791 (in TX)

BACK_DEFEXP-RR-004269

Department of Health
PO Box 149347
1100 West 49th Street
Austin, TX 78756

>  Emergency Preparedness and
>  Community Right-to-Know
>  512/458-7219
>
>  Environmental Protection
>  512/458-7541
>
>  Solid Waste Management
>  512/458-7271

Parks and Wildlife Department

Fish and Wildlife
4200 Smith School Road
Austin, TX 78744
512/389-4800

Department of Agriculture

Pesticide Registration
PO Box 12847
Austin, TX 78711
800/835-5832

### Utah

Department of Environmental Quality

Air Quality
PO Box 144810
150 North 1950 West
Salt Lake City, UT 84114
801/536-4000
www.utah.gov

Department of Environmental Quality
PO Box 144810
168 North 1950 West
Salt Lake City, UT 84114
801/536-4100

Department of Natural Resources
PO Box 144870
288 North 1460 West
Salt Lake City, UT 84114-4870
801/538-6146

Occupational Safety
PO Box 146650
160 East 300 South, Third Floor
Salt Lake City, UT 84114
801/530-6901

Department of Agriculture and Food
Pesticide Registration
PO Box 146500
350 North Redwood Road
Salt Lake City, UT 84114-6500
801/538-7187

### Vermont

103 South Main Street
Waterbury, VT 05671
www.vermont.gov

>  Department of Health
>
>  Department of Public Safety
>  802/244-8721
>
>  Agency of Natural Resources
>
>  Air Quality
>  802/241-3840
>
>  Environmental Protection
>  802/241-3808
>
>  Department of Fish and Wildlife
>  802/241-3700
>
>  Groundwater Management
>  802/241-3400
>
>  Hazardous Waste Management
>  802/241-3888
>
>  Natural Resources
>  Pollution Prevention
>  State Recycling Program
>  State Used Oil Recycling
>  802/241-3800
>
>  Solid Waste Management
>  Underground Storage Tanks
>  802/241-3888
>
>  Water Quality
>  802/241-3777

Department of Health

Emergency Preparedness and
Community Right-to-Know
Essex Police Department
81 Main Street
Essex Junction, VT 05452

>  Emergency Management
>  802/244-8721

BACK_DEFEXP-RR-004270

Department of Labor and Industry

Occupational Safety
National Life Building, Drawer 20
Montpelier, VT 05620-3401
802/828-2765

Department of Agriculture, Food, and
Markets

Pesticide Registration
116 State Street, Drawer 20
Montpelier, VT 05620-2901
802/828-2431

## Virginia

Department of Environment Quality
PO Box 1105
Richmond, VA 23240
www.virginia.gov

Air Quality
804/698-4284

Groundwater Management
804/698-4042

Underground Storage Tanks
804/698-4287

Water Quality Standards
804/698-4375

Department of Environment Quality
629 East Main Street
Richmond, VA 23219

Coastal Zone Management
804/698-4323

Emergency Preparedness and
Community Right-to-Know
804/698-4442

Environmental Protection
804/698-4157

Hazardous Waste Management
804/698-4129

State Waste Reduction Program
804/698-4129

State Recycling
800/698-4029

State Used Oil Recycling
804/698-4029

Solid Waste Management
804/698-4206

Waste Minimization and Pollution
Prevention
804/698-4344

Department of Game and Inland Fisheries

Fish and Wildlife
4010 West Broad Street
Richmond, VA 23230
804/367-1000

Department of Natural Resources
PO Box 1475
Richmond, VA 23212
804/786-0044

Department of Labor and Industry
Powers-Taylor Building
13 South 13th Street
Richmond, VA 23219

Occupational Safety
804/371-2324

Headquarters
804/371-2327

Department of Agriculture and Consumer
Services

Pesticide Registration
PO Box 1163
Richmond, VA 23209
804/371-6558

## Washington

Department of Ecology
PO Box 47600
Olympia, WA 98504-7600
www.wa.gov

Air Quality
360/407-6880

Coastal Zone Management

Department of Ecology
360/407-4357

Hazardous Waste Management
360/407-6700

Solid Waste Management
360/407-6132

BACK_DEFEXP-RR-004271

State Recycling
360/407-6132

State Used Oil Recycling
360/407-6132

Underground Storage Tanks
360/407-6913

Waste Minimization and Pollution Prevention
509/407-6132

Water Quality
360/407-6405

Department of Community Development

Community Right-to-Know
Ninth and Columbia Building
Olympia, WA 98504
360/407-6729

Environmental Protection
1200 Sixth Avenue, Suite 900
Seattle, WA 98101
206/553-1200

Natural Resources Building
600 Capitol Way
Olympia, WA 98501
360/902-2267

Department of Labor and Industries
7273 Linderson Way SW
Turnwater, WA 98501

Occupational Safety
360/902-5495

Federally Approved Program
360/553-5495

Department of Agriculture

Pesticide Registration
Natural Resources Building
600 Capitol Way, Second Floor
Olympia, WA 98501
360/902-2026

## West Virginia

Division of Environmental Protection

Air Quality
601 57th Street SE
Charleston, WV 25304
304/926-0445
www.wv.gov

Department of Agriculture

Pesticide Registration
304/558-2209

Division of Environmental Protection

Emergency Response Commission
Room EB-80
304/558-5380

Department of Natural Resources
304/558-2754

Fish and Wildlife
304/558-2771

State Used Oil Recycling
State Capitol Building 3
Room 669
1900 Kanawha Boulevard, E
Charleston, WV 25305
304/926-0499

Department of Industry, Labor, and Human Relations

Occupational Safety
304/558-7890

Department of Natural Resources

State Recycling Contact
304/558-2754

Division of Environmental Protection
1201 Greenbrier Street
Charleston, WV 25311

Groundwater Management
304/926-0470

Water Quality
304/926-0499 ext. 1033

Division of Environmental Protection
601 57th Street SE
Charleston, WV 25301
304/926-0499

## Wisconsin

PO Box 7921
101 South Webster Street
Madison, WI 53707-7921
www.wisconsin.gov

Department of Natural Resources
608/266-2621

BACK_DEFEXP-RR-004272

Department of Environmental Management

Air Quality
608/266-7718

Environmental Protection
608/266-1099

Water Quality
608/266-2104

Coastal Zone Management
PO Box 7868
Madison, WI 53707-7868
608/266-8234

Department of Resource Management, Fish and Wildlife
800/847-9367

Department of Natural Resources
Groundwater Management
608/266-0821

Hazardous Waste Management
608/266-1327

Department of Natural Resources

Leaking Storage Tanks
608/266-2621

State Recycling Contact
608/266-5239

State Used Oil Recycling Contact
608/266-5239

Department of Labor and Human Relations

Occupational Safety
PO Box 7969
Madison, WI 53707-7969
608/266-1816

Department of Agriculture, Trade, and Consumer Protection

Pesticide Registration
2811 Agriculture Drive
Madison, WI 53708-8911
608/266-7130

Department of Industry, Labor, and Human Relations

Underground Storage Tanks
201 East Washington Avenue
PO Box 7969
Madison, WI 53702-7969
608/266-7605

## Wyoming

Herschler Building
122 West 25th Street
Cheyenne, WY 82002
www.state.wy.us

Department of Environmental Quality

Air Quality
Second Floor West
307/777-7391

Department of Employment

Occupational Safety
1510 East Pershing Boulevard, West Wing
Cheyenne, WY 82002
307/777-7786

Federally Approved Program
307/777-7786

Solid and Hazardous Waste Management
Fourth Floor West
307/777-7752

Underground Storage Tanks
Fourth Floor West
301/777-7095

State Recycling
State Used Oil Recycling
State Waste Reduction Program
307/777-7752

Water Quality
Fourth Floor West
307/777-7781

Waste Minimization and Pollution Prevention
Fourth Floor West
307/777-7752

BACK_DEFEXP-RR-004273

Emergency Management Agency

Emergency Preparedness and
Community Right-to-Know
122 West 25th
First Floor East
Cheyenne, WY 82009-3320
307/777-4663

Game and Fish Commission

Fish and Wildlife
5400 Bishop Boulevard
Cheyenne, WY 82006
307/777-4600

Department of Agriculture

Pesticide Registration
2219 Carey Avenue
Cheyenne, WY 82002-0100
307/777-6573

**438**    *Real Estate Damages*



APPENDIX

# B

# Online Sources of Public Disclosure Information

| Item of Disclosure | Home Page | Specific Site Address |
|---|---|---|
| Airports | www.rita.dot.gov | www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/subject_areas/ |
| Cell towers | www.fcc.gov | |
| Census information | www.census.gov | |
| Colleges | www.ed.gov | http://nces.ed.gov/globallocator |
| Conservancy and Recovery Act sites | www3.epa.gov | www.epa.gov/laws-regulations |
| Convicted child molesters | www.usatrace.com | www.familywatchdog.us |
| Dams | www.usace.army.mil | www.usace.army.mil/Missions/CivilWorks/DamSafetyProgram.aspx |
| Earthquake faults | www.usgs.gov | earthquake.usgs.gov/hazards/qfaults/map/ |
| Fall zones | www.fcc.gov | |
| Federal historic sites | www.nps.gov | www.nature.nps.gov/ |
| Federal superfund sites | www3epa.gov | www.epa.gov/superfund |
| Flood hazards | www.fema.gov | http://msc.fema.gov/portal |
| Hurricanes | www.noaa.gov | www.nhc.noaa.gov/ |
| Jails and prisons | www.corrections.com | |
| Leaking underground storage tanks | www3.epa.gov | www.epa.gov/ust |
| Military airports | www.faa.gov | |
| National parks | www.nps.gov | |
| National priorities list (NPL) resources | www.federalregister.gov | |
| Nuclear power plants | www.nrc.gov | www.nrc.gov.reactors.power.html |
| Pipelines | www.usgs.gov | |
| Places of worship | www.rita.dot.gov/bts/ | |
| Power lines | www.usgs.gov | |
| Radon zones | www3.epa.gov | www.epa.gov/radon |
| Railways | www.commerce.gov | |
| Schools | http://nces.ed.gov | http://nces.ed.gov/globallocator |
| Solid waste sites | www3.epa.gov | |
| Superfund sites | www3.epa.gov | www.epa.gov/superfund/action/law/index.html |
| Tidal wave zones | www.noaa.gov | |
| Tornado zones | www.noaa.gov | |
| Transport-disposal sites | www3.epa.gov | |
| Volcano zones | www.noaa.gov | |

BACK_DEFEXP-RR-004275

BACK_DEFEXP-RR-004276

Copyrighted Material licensed to by Richard Hutchinson on 2017-06-28



# APPENDIX
# C

## Associations and Periodicals

Acid Rain Hotline
1200 Pennsylvania Avenue NW
Mail Code 6204M
Washington, D.C. 20460
202/343-9620
www3.epa.gov/acidrain/contact.html

Agency for Toxic Substances and Disease
Registry (ATSDR)
Toxic Profile Information System (TOX)
Information Line
4770 Buford Highway NE
Atlanta, GA 30341
770/488-0706
www.atsdr.cdc.gov

Air & Waste Management Association
420 Fort Duquesne Blvd., #300
Pittsburgh, PA 15222
412/232-3444
www.awma.org
Periodical:    *The Journal of the Air & Waste Management Association*

American Academy of Environmental
Engineers and Scientists
147 Old Solomans Island Road, Suite 303
Annapolis, MD 21401
410/266-3311
www.aaees.org
Periodical:    *Environmental Engineer and Scientist*

American Association for the
Advancement of Science
1200 New York Avenue NW
Washington, D.C. 20005
202/326-6400
www.aaas.org

American Bankers Association
1120 Connecticut Avenue NW
Washington, D.C. 20036
800/226-5377
www.aba.com

American Chemical Society
1155 16th Street NW
Washington, D.C. 20036
800/227-5558
202/872-4600
www.acs.org
Periodical:    *Environmental Science & Technology*

American Chemistry Council
700 Second Street NE
Washington, D.C. 20002
202/249-7000
www.americanchemistry.com

American Coatings Association
1500 Rhode Island Avenue NW
Washington, D.C. 20005
202/462-6272
www.paint.org

American College of Toxicology
1821 Michael Faraday Drive, Suite 300
Reston, VA 20190
703/547-0875
www.actox.org
Periodical:    *International Journal of Toxicology*

American Council on Science and Health
1995 Broadway, #202
New York, NY 10023
212/362-7044
http://acsh.org
Periodical:    *Priorities for Long Life and Good Health*

American Crop Protection Association
1156 15th Street NW
Washington, D.C. 20005
202/296-1585

American Hotel and Motel Association
12501 Street NW, Suite 1100
Washington, D.C. 20005-3931
202/289-3100

American Industrial Hygiene Association
3141 Fairview Park Drive, Suite 777
Falls Church, VA 22042
703/849-8888
www.aiha.org
Periodical:    *American Industrial Hygiene Association Journal*

American Institute of Architects
1735 New York Avenue NW
Washington, D.C. 20006
800/242-3837
202/626-7300
www.aia.org

American Institute of Biological Sciences
1800 Alexander Bell Drive, Suite 400
Reston, VA 20191
571/748-4415
www.aibs.org
Periodical:    *BioScience*

American Institute of Biomedical Climatology
1023 Welsh Road
Philadelphia, PA 19115
215/673-8368

American Institute of Chemical Engineers
120 Wall Street, Floor 23
New York, NY 10005
800/242-4363
www.aiche.org
Periodicals:    *AIChE Journal
Bioenginnering & Translational Medicine
Biotechnology Progress
CEP Magazine
Environmental Progress & Sustainable Energy
Process Safety Progress*

American Institute of CPAs
1211 Avenue of the Americas
New York, NY 10036-8775
212/596-6200
www.aicpa.org

American Littoral Society
18 Hartshorne Drive, Suite 1
Highlands, NJ 07732
732/291-0055
www.littoralsociety.org
Periodicals:    *Littorally Speaking
Underwater Naturalist*

BACK_DEFEXP-RR-004278

American Meteorological Society
45 Beacon Street
Boston, MA 02108
617/227-2425
www2.ametsoc.org
Periodicals:    *Bulletin of the American Meteorological Society (BAMS)*
*Interactions*
*Journal of Applied Meteorology and Climatology*
*Journal of Atmospheric and Oceanic Technology*
*Journal of the Atmospheric Sciences*
*Journal of Climate*
*Journal of Hydrometeorology*
*Journal of Physical Oceanography*
*Monthly Weather Review*
*Weather, Climate, and Society*
*Weather and Forecasting*

American Petroleum Institute
1220 L Street NW
Washington, D.C. 20005
202/682-8000
www.americanpetroleuminstitute.com

American Planning Association
205 North Michigan Avenue
Suite 1200
Chicago, IL 60601
312/431-9100
www.planning.org
Periodicals:    *The Commissioner*
*Journal of the American Planning Association*
*Zoning Practice*

American Public Health Association
800 I Street NW
Washington, D.C. 20001
202/777-2742
www.apha.org
Periodicals:    *American Journal of Public Health*
*The Nation's Health*

American Public Works Association
1200 Main Street, Suite 1400
Kansas City, MO 64105
816/472-6100
www.apwa.net
Periodical:    *APWA Reporter*

American Real Estate and Urban Economics Association
Florida State University School of Business
821 Academic Way, 223 RBB
Tallahassee, FL 32306
850/644-7898
www.areuea.org
Periodical:    *Real Estate Economics*

American Resort Development Association
1201 15th Street NW, Suite 400
Washington, D.C. 20005
202/371-6700
www.arda.org

American Society of Agricultural and Biological Engineers
2950 Niles Road
St. Joseph, MI 49085-9659
269/429-0300
www.asabe.org
Periodical:    *Resource Magazine*

American Society of Agronomy
5585 Guilford Road
Madison, WI 53711
608/273-8080
www.agronomy.org
Periodicals:    *Agricultural & Environmental Letters*
*Agronomy Journal*
*Applied Turfgrass Science*
*Crop, Forage & Turfgrass Management*
*Crop Management*
*Crops & Soils*
*CSA News*
*Forage & Grazinglands*
*Journal of Environmental Quality*
*Natural Sciences Education*

BACK_DEFEXP-RR-004279

American Society of Appraisers
11107 Sunset Hills Road, #310
Reston, VA 20190
800/272-8258
703/478-2228
www.appraisers.org

American Society of Civil Engineers
1801 Alexander Bell Drive
Reston, VA 20191
800/548-2723
703/295-6300
www.asce.org
A list of ASCE journals is available at
www.asce.org/publications.

American Society of Farm Managers and
Rural Appraisers
950 South Cherry Street, Suite 508
Denver, CO 80246
303/758-3513
www.asfmra.org

American Society of Golf Course
Architects
125 North Executive Drive, Suite 302
Brookfield, WI 53005
262/786-5960
www.asgca.org

American Society for Microbiology
1752 N Street NW
Washington, D.C. 20036
202/737-3600
www.asm.org

American Society of Sanitary Engineering
(ASSE) International
18927 Hickory Creek Drive, Suite 220
Mokena, IL 60448
708/995-3019
www.asse-plumbing.org
Periodical:    *Backflow Prevention &*
                *Plumbing Standards (BPPS)*

American Water Resources Association
4 West Federal Street
Middleburg, VA 20117
540/687-8390
www.awra.org
Periodicals:    *Impact*
                *Journal of the American*
                *Water Resources Association*
                *(JAWRA)*

Amusement and Music Operators
Association
600 Spring Hill Ring Road, Suite 111
West Dundee, IL 60118
800/937-2662
847/428-7699
https://amoa.memberclicks.net/

Appraisal Institute
200 West Madison, Suite 1500
Chicago, IL 60607
888/756-4624
www.appraisalinstitute.org
Periodicals:    *The Appraisal Journal*
                *Valuation*

Asbestos Information Association/
North America
1745 Jefferson Davis Highway, Suite 509
Arlington, VA 22202
703/979-1150

Association of American Pesticide Control
Officials
PO Box 466
Milford, DE 19963
302/422-8152
http://aapco.org

Association of American Railroads
425 Third Street SW
Washington, D.C. 20024
202/639-2100
www.aar.org

Association for the Environmental Health
and Sciences
150 Fearing Street
Amherst, MA 01002
413/549-5170
www.aehs.com

Association of Metropolitan Sewerage
Agencies (AMSA)
1816 Jefferson Place NW
Washington, D.C. 20036
202/833-2672

BACK_DEFEXP-RR-004280

Association of New Jersey Environmental Commissions
PO Box 157
300 Mendham Road
Mendham, NJ 07945
973/539-7547
www.anjec.org
Periodical: *ANJEC Report*

Association of State and Interstate Water Pollution Control Administrators
750 First Street, Suite 1010
Washington, D.C. 20002
202/756-0600

Association of State and Territorial Health Officials (ASTHO)
2231 Crystal Drive, Suite 450
Arlington, VA 22202
202/371-9090
www.astho.org

Association of State and Territorial Solid Waste Management Officials (ASTSWMO)
1101 17th Street NW, Suite 707
Washington, D.C. 20036
202/640-1060
www.astswmo.org

Association of Zoos and Aquariums (AZA)
8403 Colesville Road, Suite 710
Silver Spring, MD 20910
301/562-0777
www.aza.org

Biotechnology Innovation Association
1201 Maryland Avenue SW, Suite 900
Washington, D.C. 20024
202/962-9200
www.bio.org

Bowling Proprietors' Association of America
621 Six Flags Drive
Arlington, TX 76011
800/343-1329
817/649-5105
http://bpaa.com

Building Owners and Managers Association International (BOMA)
1101 15th Street NW, Suite 800
Washington, D.C. 20005
202/408-2662
www.boma.org

Cement Kiln Recycling Coalition
PO Box 7553
Arlington, VA 22207
703/624-4513
www.ckrc.org

Center for Health, Environment, and Justice
105 Rowell Court
Falls Church, VA 22046
703/237-2249
chej.org

Chamber of Commerce of the United States
1615 H Street NW
Washington, D.C. 20062
800/638-6582
202/659-6000
www.uschamber.com

Chemical Waste Transportation Council
4301 Connecticut Avenue NW, Suite 300
Washington, D.C. 20008
202/244-4700

Chlorine Institute, Inc.
1300 Wilson Boulevard
Arlington, VA 22209
800/424-9300
703/527-3887
www.chlorineinstitute.org

Coalition for Environmentally Responsible Economics (CERES)
99 Chauncy Street, Sixth Floor
Boston, MA 02111
617/247-0700
www.ceres.org

Commercial Real Estate Development Association
2201 Cooperative Way, Suite 300
Herndon, VA 20171
703/904-7100
www.naiop.org

Consumer Federation of America
1620 I Street NW
Suite 200
Washington, D.C. 20006
202/429-0960
consumerfed.org

BACK_DEFEXP-RR-004281

Container Recycling Institute (CRI)
4361 Keystone Avenue
Culver City, CA 90232
310/559-7451
www.container-recycling.org

Council on Economic Priorities
30 Irving Place, Ninth Floor
New York, NY 10003
212/420-1133

Council for Environmental Education
5555 Morningside Drive, Suite 212
Houston, TX 77005
713/520-1936
www.councilforee.org

Council of Producers & Distributors of Agrotechnology
1730 Rhode Island Avenue, Suite 812
Washington, D.C. 20036
202/386-7407
http://cpda.com

Council of State Governments
Iron Works Pike
2760 Research Park Drive
Lexington, KY 40511
859/244-8000
www.csg.org

Craighead Environmental Research Institute
201 S. Wallace Avenue
Bozeman, WY 59715
406/585-8705
www.craigheadresearch.org

Dangerous Goods Advisory Council (DGAC)
1101 Vermont Avenue NW, Suite 301
Washington, D.C. 20005
800/634-1598
202/289-4550
www.dgac.org

Ecological Society of America
1990 M Street NW, Suite 700
Washington, D.C. 20036
202/833-8773
www.esa.org

Periodicals:    *The Bulletin of the Ecological Society of America*
*Ecological Applications*
*Ecological Monographs*
*Ecology*
*Ecosphere*
*Ecosystem Health and Sustainability*
*Frontiers in Ecology and the Environment*

Electronic Industries Environmental Association Coalition
Electronic Industries Association
1737 King Street, Suite 330
Alexandria, VA 22314
571/858-5721

Employee Relocation Council
1720 N Street NW
Washington D.C., 20036
202/857-0857

Entomological Society of America
3 Park Place, Suite 307
Annapolis, MD 21401
301/731-4535
www.entsoc.org

Periodicals:    *American Entomologist*
*Environmental Entomology*
*Journal of Economic Entomology*
*Journal of Insect Science*
*Journal of Integrated Pest Management*
*Journal of Medical Entomology*

Environmental Assessment Association
PO Box 879
Palm Springs, CA 92263
877/743-6806

BACK_DEFEXP-RR-004282

Environmental Business Association
1150 Connecticut Avenue NW, Suite 900
Washington, D.C. 20036
202/862-4363
www.eaa-assoc.org

Environmental Careers Organization
286 Congress Street, Third Floor
Boston, MA 12210
617/426-4375

Environmental Defense Fund
1875 Connecticut Avenue NW, Suite 600
Washington, D.C. 20009
212/505-2100
www.edf.org

Environmental and Energy Study
Institute (EESI)
1112 16th Street NW, Suite 300
Washington, D.C. 20036
202/628-1400
www.eesi.org
Periodicals:    *Climate Change News (CCN)*
                *EESI Update*
                *Sustainable Bioenergy,*
                *Farms, and Forests (SBFF)*

Environmental Industry Association
4301 Connecticut Avenue NW, Suite 300
Washington, D.C. 20008
202/244-4700

Environmental Information Association
6935 Wisconsin Avenue
Suite 306
Chevy Chase, MD 20815
888/343-4342
301/961-4999
www.eia-usa.org

Environmental Law Institute
1730 M Street NW, Suite 700
Washington, D.C. 20036
202/939-3800
www.eli.org
Periodicals:    *The Environmental Forum*
                *The Environmental Law*
                *Reporter*
                *Journal of Energy and*
                *Environmental Law*
                *The National Wetlands*
                *Newsletter*

Environmental Mutagenesis and
Genomics Society
1821 Michael Faraday Drive, Suite 300
Reston, VA 20190
703/438-8220
www.emgs-us.org
Periodical:     *Environmental and*
                *Molecular Mutagenesis*

Environmental Technology Council (ETC)
1112 16th Street NW, Suite 420
Washington, D.C. 20036
202/783-0870
www.etc.org

ERIC Clearinghouse for Science,
Mathematics, and Environmental
Education
1929 Kenny Road
Columbus, OH 43210-1080
614/292-6717
800/276-0462
http://eric.ed.go

Farm Credit Council
50 F Street NW, Suite 900
Washington, D.C. 20001
202/626-8710
www.fccouncil.com

Foundation for Environmental Education
Society of Environmental Toxicology and
Chemistry (SETAC)
1010 North 12th Avenue
Pensacola, FL 32501
850/469-1500
www.setac.org
Periodicals:    *Environmental Toxicology*
                *and Chemistry (ET&C)*
                *Integrated Environmental*
                *Assessment and*
                *Management (IEAM)*

Freshwater Society
2424 Territorial Road, Suite B
St. Paul, MN 55114
651/313-5800
http://freshwater.org
Periodical:     *Facets of Freshwater*

Government Institutes, Incorporated
4 Research Place, Suite 200
Rockville, MD 20850
301/921-2300

BACK_DEFEXP-RR-004283

Green Seal
1001 Connecticut Avenue NW, Suite 827
Washington, D.C. 20036-2215
202/872-6400
www.greenseal.org

Hazardous Materials Control Research Institute
1 Church Street, Suite 200
Rockville, MD 20850-4129
301/251-1900
Periodical:  *Focus*

Illinois Hazardous Waste Research and Information Center
One Hazelwood Drive
Champaign, IL 61820
217/333-8940
For a list of periodicals, visit: www.istc. illinois.edu/info/library_clearinghouse.cfm

Institute of Clean Air Companies
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
571/858-3707
www.icac.com

Institute for Environmental Auditing
28 East Ostend
Baltimore, MD 21230
410/706-1849

Institute of Environmental Sciences
2340 S. Arlington Heights Road, Suite 620
Arlington Heights, IL 60005
847/981-0100
www.the-ies.org
Periodical:  *Environmental Scientist*

Institute of Hazardous Materials Management
11900 Parklawn Drive, Suite 450
Rockville, MD 20852
301/984-8969
www.ihmm.org

Institute for Local Self-Reliance
1710 Connecticut Avenue NW, Fourth Floor
Washington, D.C. 20009
202/898-1610
https://ilsr.org

Institute of Noise Control Engineering
12100 Sunset Hills Road, Suite 130
Reston, VA 20190
703/234-4073
www.inceusa.org
Periodicals:  *Noise Control Engineering Journal*
*Noise News International*

Institute of Real Estate Management
430 North Michigan Avenue
Chicago, IL 60611
800/837-0706
www.irem.org
Periodical:  *Journal of Property Management*

Institute of Scrap Recycling Industries, Inc. (ISRI)
1615 L Street NW, Suite 600
Washington, D.C. 20036
202/622-8500
www.isri.org
Periodical:  *Scrap Magazine*

International Association of Assessing Officers
314 West 10th Street
Kansas City, MO 64105
800/616-4226
816/701-8100
www.iaao.org

International Council of Shopping Centers
1221 Avenue of the Americas, 41st Floor
New York, NY 10020
646/728-3800
www.icsc.org

International Institute for Energy Conservation
10005 Leamoore Lane, #100
Vienna, VA 22181
703/281-7263
www.iiec.org

International Right of Way Association
19210 South Vermont Avenue
Bldg. A, Suite 100
Gardena, CA 90248
310/538-0233
www.irwaonline.org
Periodical:  *Right of Way*

BACK_DEFEXP-RR-004284

International Society of Chemical Ecology
North Dakota State University
Department of Entomology
Fargo, ND 58105
701/231-6444
www.chemecol.org
Periodical:    *Journal of Chemical Ecology*

Interstate Council on Water Policy
505 North Ivy Street
Arlington, VA 22220-1707
573/303-6644
www.icwp.org

Keep America Beautiful, Inc.
1010 Washington Boulevard
Stamford, CT 06901
203/659-3000
www.kab.org

Legal Environmental Assistance
Foundation, Inc. (LEAF)
1114 Thomasville Road, Suite E
Tallahassee, FL 32303
850/681-2591

Manufacturers of Emission Controls
Association
1730 M Street NW, Suite 206
Washington, D.C. 20036
202/296-4797
www.meca.org

Mortgage Bankers Association
1919 M Street NW, Fifth Floor
Washington, D.C. 20036
800/793-6222
202/557-2700
www.mba.org

Mortgage Guaranty Insurance
Corporation
250 East Kilbourn Avenue
Milwaukee, WI 53202
800/558-9900
www.mgic.com

Mortgage Insurance Companies of
America
727 15th Street NW, 12th Floor
Washington, D.C. 20005
202/393-5566

National Academies of Sciences,
Engineering, and Medicine
500 Fifth Street NW
Washington, D.C. 20001
202/334-2000
www.nationalacademies.org

National Apartment Association
4300 Wilson Boulevard, Suite 400
Arlington, VA 22203
703/518-6141
www.haahq.org

National Association of Chemical
Recyclers
1200 G Street NW, Suite 800
Washington, D.C. 20005
202/434-8740

National Association of Clean Air
Agencies
444 North Capitol Street NW, Suite 307
Washington, D.C. 20001
202/624-7864
www.4cleanair.org

National Association of Conservation
Districts (NACD)
509 Capitol Court NE
Washington, D.C. 20002
202/547-6223
www.nacdnet.org

National Association of Environmental
Risk Auditors (NAERA)
6645 Colerain Avenue
Cincinnati, OH 45253
513/674-1109

National Association of Independent Fee
Appraisers (NAIFA)
401 North Michigan Avenue, Suite 2200
Chicago, IL 60611
312/321-6830
www.naifa.com

National Association of Manufacturers
733 10th Street NW
Washington, D.C. 20001
202/637-3000
www.nam.org

BACK_DEFEXP-RR-004285

National Association of Master Appraisers
303 West Cypress Street
San Antonio, TX 78212
800/229-6262

National Association of Noise Control
Officials
53 Cubberly Road
West Windsor, NJ 08550
609/586-2684

National Association for PET Container
Resources (NAPCOR)
7310 Turfway Road, Suite 550
Florence, KY 41042
859/372-6635
www.napcor.com

National Association of Realtors
www.realtor.org
Washington, D.C. Office
500 New Jersey Avenue NW
Washington, D.C. 20001
800/874-6500
Chicago Office
430 North Michigan Avenue
Chicago, IL 60611
800/874-6500
312/329-8200

National Association of State Development
Agencies
750 First Street NE, Suite 710
Washington, D.C. 20002
202/898-1302

National Capital Poison Center
3201 New Mexico Avenue, Suite 310
Washington, D.C. 20016
202/362-3867
www.poison.org

National Centers for Environmental
Information
Geophysics: 303/497-6826
Oceanographic: 301/713-3277
Coastal Data: 228/688-2936
Weather/Climate: 828/271-4800 X-2
Satellite: 828/271-4850 X-1
www.ncei.noaa.gov/contact

National Council on Radiation Protection
and Measurements
7910 Woodmont Avenue, Suite 400
Bethesda, MD 20814
301/657-2652
http://ncrponline.org

National Council for Urban Economic
Development
1730 K Street NW, Suite 700
Washington, D.C. 20006
202/223-4735

National Environmental Development
Association
620 Fort Williams Parkway
Alexandria, VA 22304
571/970-3721

National Environmental Health
Association
720 South Colorado Boulevard
Suite 1000-N
Denver, CO 80246
303/756-9090
www.neha.org

National Environmental, Safety and
Health Training Association
PO Box 10321
Phoenix, AZ 85064
602/956-6099
http://neshta.org

National Fire Protection Association
1 Batterymarch Park
PO Box 9101
Quincy, MA 02169
617/770-3000
www.nfpa.org

National Golf Foundation
1150 South US Highway 1, Suite 401
Jupiter, FL 33477
561/744-6006
www.ngf.org

National Governors Association
Hall of the States
444 North Capitol Street NW, Suite 267
Washington, D.C. 20001-1512
202/624-5300
www.nga.org

BACK_DEFEXP-RR-004286

National League of Cities
1301 Pennsylvania Avenue NW, Suite 550
Washington, D.C. 20004
202/626-3000
www.nlc.org

National Materials Exchange Network
509/466-1532

National Mining Association
101 Constitution Avenue NW
Suite 500 East
Washington, D.C. 20001
202/463-2600
www.nma.org

National Oil Recyclers Association
(NORA)
7250 Heritage Village Plaza, Suite 201
Gainesville, VA 20155
703/753-4277
https://noranews.site-ym.com
Periodical:    *Liquid Recycling*

National Pesticide Information Center
800/858-7378
http://npic.orst.edu/

National Retail Federation
325 Seventh Street NW, Suite 1100
Washington, D.C. 20004
202/783-7971
800/673-4692
https://nrf.com

National Technical Information Service
52885 Port Royal Road
Springfield, VA 22161
703/605-6050
www.ntis.gov

National Water Resources Association
3800 North Fairfax Drive, Suite 4
Arlington, VA 22203
703/524-1544
www.nwra.org

National Wetlands Technical Council
1616 P Street NW, Suite 200
Washington, D.C. 20036
202/328-5150

National Wildlife Federation
11100 Wildlife Center Drive
Reston, VA 20190
800/822-9919
www.nwf.org
Periodical:    *National Wildlife*

Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
212/727-2700
www.nrdc.org

North American Association for
Environmental Education
2000 P Street NW, Suite 540
Washington, D.C. 20036
202/419-0412
https://naaee.org

Northeast Waste Management Officials'
Association (NEWMOA)
89 South Street, Suite 600
Boston, MA 02111
617/367-8558
www.newmoa.org

Pollution Prevention Information
Clearinghouse
202/566-0799
www.epa.gov/p2/pollution-prevention-
resources

Public Lands Foundation
PO Box 849
Newberg, OR 97132
971/832-3945
www.publicland.org

Real Estate Educators Association
7739 E Broadway, #337
Tucson, AZ 85710
520/609-2380
www.reea.org

Real Estate Research Corporation
980 North Michigan Avenue, Suite 1110
Chicago, IL 60611
312/587-1800
www.rerc.com

BACK_DEFEXP-RR-004287

Recreational Vehicle Industry Association
1896 Preston White Drive
Reston, VA 20191-4363
703/620-6003
www.rvia.org

Sierra Club
85 Second Street
San Francisco, CA 94105
415/977-5500
www.sierraclub.org
Periodical:    *Sierra Magazine*

Society of Chemical Manufacturers & Affiliates
1850 M Street NW, Suite 700
Washington, D.C. 20036
202/721-4100

Society for Epidemiologic Research
PO Box 990
Clearfield, UT 84089
801/525-0231
https://epiresearch.org

Society of Industrial and Office Realtors (SIOR)
1201 New York Avenue NW, Suite 350
Washington, D.C. 20005
202/449-8200
www.sior.com
Periodical:    *Professional Report*

Society of Toxicology
1821 Michael Faraday Drive
Suite 300
Reston, VA 20190
703/438-3115
www.toxicology.org
Periodical:    *Toxicological Sciences*

Society for Vector Ecology (SOVE)
1966 Compton Avenue
Corona, CA 92881
951/340-9792
www.sove.org
Periodicals:   *Journal of Vector Ecology*
               *SOVE Newsletter*

Soil and Water Conservation Society
945 Southwest Ankeny Road
Ankeny, IA 50023
515/289-2331
www.swcs.org
Periodical:    *Journal of Soil and Water Conservation*

Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902-5065
434/977-4090
www.southernenvironment.org

Southwest Research and Information Center
PO Box 4524
Albuquerque, NM 87196
505/262-1862
www.sric.org
Periodical:    *Voices from the Earth*

State and Territorial Air Pollution Program Administrators
444 North Capitol Street, Suite 307
Washington, D.C. 20001
202/624-7864

Steel Recycling Institute (SRI)
680 Andersen Drive
Pittsburgh, PA 15220-2700
800/876-7274
www.recycle-steel.org

Technical Association of the Pulp and Paper Industry (TAPPI)
15 Technology Parkway South
Norcross, GA 30092
770/446-1400
www.tappi.org
Periodicals:   *Paper360*
               *TAPPI Journal*
               *Tissue360*

Union of Concerned Scientists
2 Brattle Square
Cambridge, MA 02238-9105
617/547-5552
www.ucsusa.org

BACK_DEFEXP-RR-004288

United Nations Environment Programme (UNEP)
Regional Office of North America
900 17th Street NW
Suite 506
Washington, D.C. 20006
202/785-0465
http://unep.org

United States-Asia Environmental Partnership (US-AEP)
US Agency for International Development
320 21st Street NW, Suite 3319
Washington, D.C. 20523-0047

United States Operating Committee of ETAD
1850 M Street NW
Washington, D.C. 20036
202/296-8577

United States  Public Interest Research Group (PIRG)
218 D Street SE
Washington, D.C. 20003
202/546-9707
www.uspirg.org
Periodical:     *Citizen Agenda*

Urban Land Institute
1025 Thomas Jefferson Avenue NW, Suite 500W
Washington, D.C. 20007
202/624-7000
http://uli.org
Periodical:     *Urban Land*

Washington Workshops Foundation
Global Environment Seminar
3222 N Street NW
Suite 340
Washington, D.C. 20007
202/965-3434
www.workshops.org

Water Environment Federation
601 Wythe Street
Alexandria, VA 22314-1994
800/666-0206
703/684-2400
www.wef.org
Periodicals:   *The Stormwater Report*
*Water Environment Regulation Watch*
*Water Environment Research*
*Water Environment & Technology*
*WEF Highlights*
*World Water: Stormwater Management*
*World Water: Water Reuse & Desalination*

Water Resources Association of the Delaware River Basin
PO Box 1267
Exton, PA 19341
610/917-0090
www.wradrb.org

Wildlife Society
5410 Grosvenor Lane
Suite 200
Bethesda, MD 20814
301/897-9770
http://wildlife.org
Periodicals:   *The Journal of Wildlife Management*
*Wildlife Monographs*
*The Wildlife Professional*
*Wildlife Society Bulletin*

World Environment Center
1300 Pennsylvania Avenue
Suite 550 Mailbox 142
Washington, D.C. 20004
202/312-1370
www.wec.org

BACK_DEFEXP-RR-004289

World Research Foundation
41 Bell Rock Plaza
Sedona, AZ 86351
928/284-3300
www.wrf.org

World Resources Institute
10 G Street NE, Suite 800
Washington, D.C. 20002
202/729-7600
www.wri.org

Worldwatch Institute
1776 Massachusetts Avenue NW
Washington, D.C. 20036
202/452-1999
www.worldwatch.org

World Wildlife Fund
1250 24th Street NW
PO Box 97180
Washington, D.C. 20090
202/293-4800
www.worldwildlife.org

BACK_DEFEXP-RR-004290

Copyrighted material licensed by Howard Landis. Single user license. Not for distribution. Volume 2b

# Glossary

**abatement**. The removal or controlled release of contaminants. Includes operations and maintenance (O&M), encapsulation, and enclosure.

**above-ground release**. Any release of gasoline or other contaminants to the surface of the land or surface water, such as from the above-ground portion of an underground storage tank (UST) system or overfills.

**above-ground tank**. A storage reservoir device that is situated above grade so that the entire surface area, including the bottom, can be visually inspected.

**accidental discharge**. Environmental contamination that occurs by accident and may be subject to fines and sanctions or require remediation. Examples include leaking underground storage tanks (LUSTs), oil tanker spills, and improper dumping. Also known as *illegal discharge.*

**ACM**. Asbestos-containing material.

**action level**. The concentration of a contaminant that determines the necessity to remediate.

**action research**. A repetitive cycle of research in which problems are diagnosed, plans are formulated, actions are taken, results are evaluated, and feedback is obtained for the next cycle.

**ADA**. The Americans with Disabilities Act. An act passed in 1990 which states that an employer cannot discriminate on the basis of disability. This act relates to employment issues as well as physical building features and places restrictions on many property types.

**adjacent property**. A property that is not contaminated but is located next to or near a site that is.

**aeration**. The introduction of oxygen into a contaminated liquid, which creates gases that are then released.

**aerobic**. Requiring oxygen.

**air and light diminution**. The loss of natural sunlight or air space due to the construction of improvements.

**air sample clearance test**. Air monitoring at the completion of a contamination abatement or remediation project.

**air stripping**. An *in situ* groundwater remediation process in which contaminated groundwater is pumped to the surface and processed in an air-stripping tower. The water flows over packing materials, the contaminated water comes in contact with air, and

**Note**. All definitions with a Merriam-Webster source reference are reprinted from Merriam-Webster's online dictionary, www.merriam-webster.com.

the contaminants mix with the air. The contaminated air is then released or filtered.

**amended water.** A mixture of water and surfactant.

**ANOVA F-test.** The analysis of variance F-test. An advanced statistical comparison that compares differences among three or more groups.

**aquatic flora.** Any plant life associated with the aquatic ecosystem, such as algae or seaweed.

**aquifer.** A subterranean geological formation that is capable of supplying a significant amount of water to a well or spring.

**archeological resources.** The remains of past human activity. Archeological resources are typically buried and commonly associated with prehistoric people.

**arm's-length transaction.** A transaction between unrelated parties under no duress.

**asbestos.** Natural mineral mined from rock and used in construction. Properties of asbestos include noncombustibility, corrosion resistance, high tensile strength, and both thermal and electrical insulating capability.

**asbestosis.** A chronic lung disease resulting from the scarring of lung tissues by asbestos fibers.

**assemblage.** A collection of two or more parcels by one property owner. The buyer may pay a premium over the market value for an assemblage because of special motivations associated with the use of the combined parcels.

**assessment stage.** The first stage of a detrimental condition analysis. It includes all costs and losses of income.

**attainability analysis.** A scientific assessment of a proposed use or possible remediation.

**avalanche.** The sudden and swift flow of a mass of ice, snow, soil, rock, or other material down a hillside or mountainside.

**backfill.** Clean soil replacing excavated contaminated soil.

**baseline value.** *See* unimpaired value.

**BCMs.** Building contamination materials.

**Bell Chart.** An organizational chart used in the real estate professions that delineates 10 classifications of real estate damages and detrimental conditions.

**below-ground release.** Any release of contaminants to the subsurface or the groundwater, such as from an underground storage tank (UST).

**benign condition.** Any condition that occurs but has no impact on the real estate associated with the event.

**benzene.** A fuel additive that is 2% to 4% gasoline; a known carcinogen.

**bioavailability.** The extent to which a contaminant becomes available to humans or the plants and animals of a region.

**blast zone.** The area impacted by the explosion of a bomb, volcano, or other situation.

**blight.** The disease or injury of plants resulting in withering, cessation of growth, and death of parts without rotting. Also, a term used to describe older neighborhoods with high crime rates.

**blowdown.** The discharge of recirculating water for the purpose of discharging materials within the system. This eliminates the buildup of materials that could cause damages.

**brackish marsh.** A marsh, bog, or swamp that receives an influx of both salt and fresh water.

**brownfield.** A large site that has been contaminated from operations on the

BACK_DEFEXP-RR-004292

site. Upon remediation, it may be referred to as a greenfield.

**BTEX**. Benzene, toluene, ethylbenzene, and xylene. Primary toxins of soils and groundwater associated with petroleum products.

**building construction condition**. Any defective material or workmanship to the improvements.

**capping**. An *in situ* remediation method that is used when it is considered best not to disturb the subsurface material but there is still a chance that rain or other water moving through the soil could promote contaminant migration. Some contaminants may be removed and an impermeable cap may be placed over the contamination. The site may be capped with vapor barriers, clean soils, concrete, or asphalt.

**carcinogen**. A cancer-causing substance.

**casing**. A pipe or tubing lowered into a borehole to support the sides of the hole or to prevent water or gas from entering or exiting the hole.

**catastrophic collapse**. The disastrous, sudden, and utter failure of support structures or soils.

**cellular tower**. A cellular telephone site where electronic communication and antennae are placed. Also referred to as a *cellular site*.

**cementing**. The injection of cement slurry into a drilled hole or behind the casing.

**CERCLA**. The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, often referred to as the Superfund Act.

**Chinese drywall**. Drywall manufactured in China and imported into the United States that is associated with environmental health issues caused by defective manufacturing.

**chlorinated solvents**. Cleaning solutions containing chloride.

**comparative research**. The comparing and contrasting of the features and characteristics of multiple groups.

**condemnation**. The right, as stated within the US Constitution, of the government to take property for the public good and upon the payment of just compensation to the property owner.

**confining bed**. A mass of impermeable or less permeable material stratigraphically adjacent to an aquifer.

**confining zone**. A geological formation that limits the movement of water or other fluids.

**connection with identified uses**. The association of a property with contaminants or prior uses that lead to contamination.

**constructivism**. The combining of convention, human perception, and social experience.

**contaminant**. Any physical, chemical, biological, or radiological substance in the soil, water, or air.

**contamination**. The polluting of air, soils, improvements, or groundwater by the introduction of a hazardous substance into the environment.

**continuous discharge**. An emission that occurs without interruption except for maintenance or other infrequent activity.

**contraction**. Expansion of soils.

**corrosion inhibitor**. A substance that is designed to form a protective film against rust or other corrosion.

**cost issues**. All costs related to the assessment, repair, and ongoing stages of a detrimental condition analysis.

**covenant**. A promise to use or not use a property in a specific way.

**cultural landscapes**. Settings created by people in the natural world. Intertwined patterns of natural and constructed items that reveal fundamental ties between people and the land.

BACK_DEFEXP-RR-004293

**current or past uses in the surrounding area**. The external obsolescence created by a historical or ongoing undesirable use near a property.

**current use(s) of adjoining properties**. The operations or applications to which contiguous properties are being put.

**current use(s) of the property**. The operations or applications to which a property is being put.

**cut and fill**. The removal (cut) of soil or the addition (fill) of soil.

**cyclone**. A violent storm with a rotating center of low atmospheric pressure.

**daily discharge**. The emission or discharge, in terms of mass, of a pollutant in a 24-hour period.

**debris compost**. The decay of debris and the resulting soils subsidence it causes.

**deferred maintenance**. Routine property upkeep that has been neglected.

**degraded wetlands**. Swamps, bogs, marshes, etc., that have been negatively altered by man.

**deluge**. A sudden flooding or inundation of water.

**detrimental condition**. Any issue or condition that may cause a diminution in value to real estate.

**detrimental condition matrix**. A matrix that illustrates the three detrimental stages (assessment, repair, and ongoing) and three detrimental condition issues (cost, use, and risk).

**detrimental condition model**. A graph that illustrates all of the categories of stages and issues that must be considered when studying the effects of a detrimental condition on real estate values—e.g., assessment stage, repair stage, ongoing stage, and market resistance.

**detrimental condition stages**. The three stages of a detrimental condition analysis, specifically, the assessment, repair, and ongoing stages.

**diatomaceous earth filtration**. A water filtering process whereby a coat or "cake" of diatomaceous earth filter media is deposited over a membrane (septum) and water is passed through.

**differential settlement**. Soils with differing compaction or materials that settle to unequal levels.

**diminution in value**. The lost value of real estate before (as if impaired) and after (or upon discovery of) a detrimental condition.

**direct condemnation**. The physical taking of property through the process of eminent domain.

**disamenity**. A feature that is perceived negatively; the opposite of an *amenity*.

**discharge**. The spillage, leakage, pouring, emitting, or dumping of hazardous materials into land, air, or water.

**disinfectant**. Any oxidant, such as chlorine, used to kill microorganisms.

**disintermediation**. A time period in which long-term interest rates are lower than short-term interest rates.

**disposal**. The discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid or hazardous waste into the air, water, ground, or groundwater.

**disposal system**. A system of man-made or natural barriers that isolate spent nuclear fuel or radioactive waste or other contaminants.

**distillation**. A water purification technique that purifies water by heating the water and condensing the steam. The process reduces salt concentration but is ineffective in removing pesticides and volatile organic contaminants such as benzene or chloroform.

**drainage**. The sheet water flow and ability of a site to divert and drain excess water.

BACK_DEFEXP-RR-004294

drought. The prolonged lack of rain or availability of an adequate water supply.

earthquake. The shaking of the ground due to seismic activities. Like some natural disasters, they are unpredictable, unpreventable, and cause indiscriminate damage, so they tend to not cause a diminution in value to a particular property or neighborhood but rather impact a region as a whole.

earthquake fault zone. The area along where the ground or subsurface areas move, creating earthquakes.

earthquake retrofit. Additional structural support added to improvements to provide the support necessary to withstand earthquake destruction or bring the property into conformity with current earthquake building regulations.

easement. The non–fee simple estate right to utilize a site, or a portion of a site, in some defined manner.

economic depreciation. A decline in the economy that negatively impacts real estate values.

economic disaster. A large-scale event that negatively impacts the overall economy, which in turn impacts real estate values.

economic obsolescence. The loss incurred when the depreciated value of the improvements, from a cost perspective, is more than the market value.

ecosystem. The natural community and its environment functioning as a total system.

effluent. Treated liquid waste.

egress diminution. The partial or total loss of the ability to exit or leave a site.

EIFS. Exterior insulation and finish systems.

electromagnetic fields (EMFs). The electric forces emitted by power lines or other electrical devices.

eminent domain. The taking of property, as allowed under the US Constitution, for the public good and upon payment of just compensation.

empirical. Based on testing or experience. (Merriam-Webster)

encapsulant. Liquid substances that are applied to contaminants to prevent their escape. Bridging encapsulants form a coating over the contaminant's surface. Penetrating encapsulants soak into the contaminants to bind its components together. The two types are frequently used together.

encapsulation. A contamination remediation process that encapsulates the contaminants to prevent leaching and surface seepage of contamination into the air, groundwater, or storm drainage system.

enclosure. Construction of an airtight or watertight structure that surrounds the contaminant.

encroachment. An improvement that is constructed in such a manner that it crosses the property line or otherwise encroaches upon an adjacent property.

end removal. The removal of contaminants when the property is eventually demolished.

environmental impact report. A study required by governmental agencies to determine the impact that a proposed development will have on the surrounding areas.

environmental lien. A restriction placed on a property for environmental reasons.

environmentally sensitive area. An area where the plant or animal life or their habitat are either rare or particularly vulnerable.

EPA. US Environmental Protection Agency.

epistemology. The study or a theory of the nature and grounds of knowledge, especially with reference to its limits and validity. (Merriam-Webster)

BACK_DEFEXP-RR-004295

**equipment decontamination enclosure system**. A washroom, holding area, and uncontaminated area for handling materials and equipment.

**ethnographic resources**. Basic expressions of human culture and the basis for the continuity of cultural systems.

**ethnography**. The study of local customs and practices.

**expansion**. The enlargement of soils due to moisture inundation or another natural event.

**expansive soil**. Soils that expand when moist.

**exposure**. Contact with a contaminant through skin absorption, inhalation, or ingestion.

**ex situ**. A remediation process that involves excavation.

**external depreciation**. *See* external obsolescence.

**externality**. A feature, external to the property, that might impact the property in some way. An externality can be positive or negative.

**external obsolescence**. Any event or development located off-site that negatively impacts the subject property.

**feasibility**. The capability of a project or development to be accomplished in a successful manner within a reasonable amount of time.

**feng shui**. An ancient Asian belief that in part relates to the orientation and planning of a property site and the improvement layout.

**fill dirt**. Soils that are used to fill in low-lying areas.

**filtration**. A water purification process that screens out contaminants using a sediment process, a filter, or a sieve.

**flash floods**. Sudden-moving flood waters that are generally caused by heavy rains over soils that are not capable of absorbing the moisture.

**flex room**. A space that can be used for a number of functions.

**floodplain**. The lowland and flat areas adjoining rivers, canyons, lakes, and ocean waters that are prone to flooding.

**formaldehyde**. A liquid that is used to preserve woods and other materials and is sometimes used in construction processes.

**fracking**. An advanced drilling technique used to extract otherwise inaccessible natural gas and oil from deep-shale formations using a horizontal drilling method. Also known as *hydraulic fracturing.*

**fresh water marshes**. Marshes where the water has concentrations of salt of less than five parts per 1,000.

**friable**. Building materials, such as asbestos, that may be crumbled by hand pressure.

**functional depreciation**. *See* functional obsolescence.

**functional obsolescence**. All losses to a property's value except for external influences and physical depreciation—e.g., an outdated and undesirable floor plan or design.

**general plan**. A proposed outline for the overall development of a city or other municipality that is written and issued by that municipality. Also known as a *master plan.*

**generator**. A site where hazardous waste is produced.

**gentrification economics**. The improvement and fixing up of older neighborhoods.

**geotechnical issues**. Matters relating to soils or soils engineering.

**GHAD**. Geologic hazard abatement district.

**global warming**. The recent increase in the world's temperature that is believed to be caused by the increase of

BACK_DEFEXP-RR-004296

certain gases (such as carbon dioxide) in the atmosphere. (Merriam-Webster)

**government incentives**. A city's or other government entity's enticement to develop or use a property in a particular manner, which may alter the highest and best use of the property.

**government mandates**. A city's or other government entity's decree or order to develop or use a property in a specific manner.

**grading**. Earth moving for the purposes of property development.

**ground lease**. The rental of a site for a specified period and at specified terms.

**groundwater**. Water below the land surface or subsurface soils that are saturated with water.

**groundwater contamination**. The introduction of hazardous or toxic material into the underground water supply or aquifers.

**groundwater seepage**. Saturated soils that flow up to the surface.

**hazardous substance**. A material that is determined by qualified engineers to be poisonous, reactive, flammable, corrosive, toxic, or that has been designated as such by a governmental or regulatory agency.

**heavy metal**. Uranium, plutonium, or thorium placed in a nuclear reactor.

**HEPA**. High-efficiency particulate air–e.g., HEPA filter or HEPA vacuum–that filters asbestos fibers.

**hermeneutics**. The art and science of interpretation.

**hurricane**. A violent storm that is capable of destroying real estate improvements.

**hydric soils**. Soils that are saturated with water at or near the surface and are oxygen-deficient long enough to disrupt the growing season.

**hydrophytic plants**. Plants that grow in or near water, in wet habitats, or in hydric soils.

**hypothesis**. A theoretical system that is drawn by means of logical deduction. An explanation accounting for a set of facts that can be tested by further investigation. A hypothesis can range from an educated guess or assumption to a position that is highly probable in light of established research or facts.

**illegal discharge**. *See* accidental discharge.

**illegal use**. Improvements that have been constructed without the proper building permits.

**impaired value**. The indicated value of a property with a detrimental condition reached upon the application of one or more of the three approaches to value.

**imposed condition**. An act or forced event that affects value. Includes long-term and permanent external obsolescence.

**incurable condition**. A detrimental condition that cannot be economically or physically remedied.

**indoor air quality problem**. A mechanical issue or construction defect that results in inadequate air circulation or a use within a property that results in a nuisance or health risk to its occupants.

**infestation**. An invasion of insects, plants, or animals that disrupts a property's use or value.

**ingress diminution**. The entire or partial loss of the ability to enter or access a site.

**in-ground tank**. A storage device any portion of which is located below grade, thereby preventing a visual inspection of the external bottom surface.

**initial removal**. The up-front and immediate removal of contaminants.

**inner liner**. A protective layer of material placed inside a tank or container that helps prevent corrosion.

BACK_DEFEXP-RR-004297

**in situ**. An on-site remediation process that does not involve excavation.

**invasion**. *See* infestation.

**inverse condemnation**. The damages caused by an external issue or use that does not physically impact the property.

**ionization**. A process by which electrons are stripped from atoms and molecules.

**IRC**. Internal Revenue Code.

**junk science**. Fraudulent claims about scientific data, research, or analysis.

**land disposal**. The placement of waste or contaminants on land. Examples include a landfill, surface impoundment, waste pile, injection well, land treatment facility, salt dome or salt bed formation, underground mine, cave, bunker, or vault.

**landfill**. A site that is used for trash disposal. May cause environmental problems or neighborhood nuisances.

**landslide**. A sudden or creeping movement of earth downslope.

**latent defects**. Construction defects that are not apparent by reasonable inspection.

**leach**. To dissolve contaminants by percolating liquid in order to separate the soluble components.

**leachate**. A liquid, such as suspended compounds in liquid, which has percolated through or drained from hazardous materials.

**lead**. A chemical element that is considered environmentally hazardous in some situation where it may be ingested.

**lead paint**. Paint that has lead as one of its ingredients. Considered hazardous if ingested.

**leak**. An unintended seepage of fluids, such as water or gasoline, which requires repairs or remediation.

**levees**. Embankments to protect flooding along rivers or other bodies of water.

**liquefaction**. The amalgamation or settlement of soils. May result from phenomena such as a seismic event.

**lithology**. The description of rocks based on their physical and chemical characteristics.

**lithosphere**. The solid part of the earth below the surface, including any groundwater.

**littoral zone**. The area between the low tide water mark and the high tide water mark.

**loading capacity**. The maximum level of contaminant discharge that water can receive without violating water quality standards.

**LUST**. Leaking underground storage tank.

**Malibu effect**. A slang term used to describe the resilience of property values for many waterfront properties that have been repeatedly damaged by natural forces.

**market conditions**. An increase or decrease of real estate value due to general market conditions.

**market resistance**. The risk, if any, associated with the ongoing stage of a detrimental condition analysis. Market resistance includes the reluctance on the part of the real estate market to buy a property that has historically been damaged or tainted. Sometimes called *stigma*.

**matrix**. Hard, non-friable material (e.g., concrete) that contains asbestos.

**maximum contaminant level (MCL)**. The maximum level of contaminant discharge that does not violate regulatory standards. The MCL is usually mandated by state requirements and often refers to maximum levels of toxins in drinking water.

BACK_DEFEXP-RR-004298

**mesothelioma**. A form of chest and abdominal cancer caused by asbestos exposure.

**metals**. A classification of possible contaminants such as mercury or lead.

**MLS**. Multiple listing service.

**monitoring facility**. Equipment installed to monitor groundwater below or near an encapsulated site. Used to test if seepage or leaching is occurring on an encapsulated site.

**monsoon**. A violent storm with the characteristics of heavy rains and strong winds.

**MRI release**. The escape of magnetic fields from a medical diagnostics device.

**MTBE**. Methyl tertiary butyl ether, a gasoline additive.

**museum objects**. Evidence of a culture's technical development, scientific observation, personal expression, curiosity about the past, common enterprise, and daily habits.

**National Marine Fisheries Service**. Federal agencies and regulations related to fisheries and aquatic habitat.

**natural condition**. A detrimental condition that occurs naturally and entirely without the interference of man, such as a volcano, tornado, earthquake, etc.

**natural resources**. Land, fish, wildlife, biota, air, water, groundwater, and drinking water supplies. A natural resource must belong to or be managed or controlled by the United States, an individual state, a Native American tribe, or a local or foreign government.

**nature preserve**. An area designated by governmental agencies to remain in its natural condition, thereby preventing or restricting its development.

**neighborhood blight**. Urban decay within a community. May be an imposed condition that is ongoing or may be

cured and considered a temporary condition.

**neighborhood nuisance**. Any annoying or irritating external condition or influence. May be permanent or temporary.

**NIOSH**. National Institute for Occupational Safety and Health

**no discharge of free oil**. A discharge that does not cause a film, sheen, or discoloration on the surface of the water or a sludge or emulsion beneath the water surface.

**non-conforming use**. Improvements that are not in line with surrounding uses, such as a jail in the middle of a residential neighborhood.

**non-friable**. A building material that is not capable of being crumbled by hand pressure.

**non-market motivation**. Any special influence whereby a buyer, seller, or tenant acts in a way that is not typical for the market. For example, a property owner who is in financial distress may sell the property for less than what he or she would have received under normal circumstances.

**non-source property**. A property that is contaminated, although the discharge of the contaminant occurred on another property—i.e., not the responsible party.

**normal property value**. The market value of a property in an undamaged condition and without consideration of any detrimental condition.

**NPPL**. National Priority Pollutants List. A list of common pollutants caused by underground storage tank facilities.

**obstruction**. The placement of an improvement in such a manner that it interferes with the normal use of a property. A tree planted in front of a gate would be considered an obstruction.

BACK_DEFEXP-RR-004299

**oil seepage**. The leakage of oil, possibly from natural underground deposits or from leaking containers or plumbing.

**oil spill**. The accidental release of oil, often crude oil, into the environment.

**ongoing stage**. The third stage in a detrimental condition analysis. It includes all costs associated with a damaged property after all repairs or remediation have been completed—e.g., additional financing or insurance costs and market resistance.

**on the shelf**. Archeological study that entails the collection and recording of information about a site.

**OPA**. The Oil Pollution Act, which was enacted in reaction to the Exxon Valdez oil spill and addresses oil pollution and oil spills.

**operations and maintenance (O&M)**. An ongoing maintenance program for contaminated properties. For example, O&M for asbestos could include training, HEPA vacuuming, wet cleaning, and air monitoring. This is also termed *end removal*, as the contaminants remain until the eventual demolition of the building.

**OSHA**. Occupational Safety and Health Administration, a division of the US Department of Labor.

**parts per million (PPM)**. A unit of concentration. One part per million can be compared to one cent in $10,000.

**passive detector**. A measurement device that functions without oversight or energy.

**patent defects**. Construction defects that are apparent by reasonable inspection.

**PCBs**. Polychlorinated biphenyls. Sometimes found in electrical or hydraulic equipment.

**PCE**. Perchloroethylene or tetrachloroethylene, nicknamed *perk*. A solvent often used for dry cleaning and other uses.

**permeability**. A measure of a material's ability to transmit water.

**permitted discharge**. Environmental contamination that is allowed by the government. Permitted discharges do not generally involve any level of remediation and are not subject to fines and sanctions. Examples include industrial discharges into a body of water, automobile exhaust, washing machine discharges, landfills, and deep soil discharges or storage.

**pesticide**. A substance that controls agricultural pests, such as demeton, guthion, malathion, mirex, methoxychlor, and parathion.

**phenomenology**. An attempt to document one's own experience or enter into the mind of another person in order to experience complete understanding and empathy with that person.

**pickleweed**. A salt marsh vegetation.

**pipeline easement**. The right or privilege to install and maintain a pipeline on a property. Can be considered a detrimental condition if the market reacts negatively towards the risks associated with a pipeline explosion or leak.

**plume**. The areas that are saturated or impacted by underground contaminants.

**pollutant**. A contaminant, such as dredged soil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, or radioactive materials.

**ponding**. The puddling of water on a site or its improvements due to improper water sheet flow.

**potable water supply**. A water supply that is fit for human consumption.

**PPB**. Parts per billion.

**prescriptive easement**. The securing of easement rights through adverse possession.

BACK_DEFEXP-RR-004300

Copyrighted Material Covered by Richard J. Roddewig, Volume 2

**PRG**. Unofficial preliminary risk goals set forth by the US Environmental Protection Agency regarding soil contamination.

**process wastes**. Any designated pollutant resulting from a manufacturing process.

**project incentive**. The risk, if any, associated with the repair stage of a detrimental condition analysis.

**protected species or vegetation**. Any plant or animal that has been designated by a governmental agency to be safeguarded. This designation may limit or restrict development.

**puddling**. *See* ponding.

**quicksand**. A soil type that creates a mire whereby a person or animal walking over the area will sink. May create a hazard and limit the developability of a site.

**radioactive**. Having unstable atoms that decay or break down to another kind of atom. The process emits high-energy particles. For example, radium decays to form radon. Radiation emits high-energy particles, which include alpha and beta particles and gamma rays.

**radon**. A colorless and odorless gas that is emitted from decaying uranium deposits. The gas may enter improvements through cracks and create a health hazard if inhaled.

**rail easement**. The right for the construction, maintenance, and operation of a train on a property.

**rationalism**. A theory that reason is in itself a source of knowledge superior to and independent of sense perceptions. (Merriam-Webster)

**RCRA**. The Resource Conservation and Recovery Act of 1976. According to this act, hazardous waste must be labeled, manifested, placarded, and shipped by an approved transporter to a permitted storage or disposal facility by the party that generated the waste. The waste remains the property of the generator, and the generator remains liable for it even when it is stored elsewhere. RCRA also provides sizable daily penalties for knowingly violating its restrictions.

**recharge**. Any process whereby water is added to the saturated zone of an aquifer.

**reciprocal parking easement**. The contractual right of two adjacent parties to share parking.

**reconciliation**. The act of resolving the differences among various value indications arrived at during the valuation process.

**release**. A spill, leak, emission, discharge, escape, leach, or disposal from an underground storage tank into the soils, ground, or surface water.

**REO properties**. Real estate owned properties, which are properties that have been acquired by a lending institution, often as a result of foreclosure on the collateral securing a delinquent loan. These properties are often troubled, non-earning assets and are typically disposed of at the first opportunity. They are frequently considered unsound bank assets, even when carried at or below the appraised value.

**repair stage**. The second stage in detrimental condition analysis. It includes all the costs of repairs or remediation resulting from a detrimental condition, including incidental costs, contingencies, use issues, and project incentive.

**representative sample**. A sample (e.g., of groundwater or waste) that can be expected to exhibit the average properties of the whole.

**retaining slope**. A mound of soil that is designed to hold back the ground behind it.

BACK_DEFEXP-RR-004301

**retaining wall**. A wall that is designed to hold back the ground behind it.

**retrofit**. The renovation of a property to a higher standard. For example, an old brick building may be retrofitted to withstand an earthquake.

**reverse osmosis**. A water purification process used to remove salts, such as from seawater. The process yields drinking water and salt residues.

**riparian habitats**. Areas in water courses that are the home of associated animal and plant life.

**risk issues**. All risks associated with a detrimental condition analysis, specifically within the assessment stage (uncertainty factor), the repair stage (project incentive), and ongoing stage (market resistance).

**RP**. Responsible party.

**salt flat**. A site with poor drainage where the water evaporates, leaving salt behind.

**Santa Claus factor**. A slang term used to describe a situation where the repaired property is better than the improvements that were damaged or destroyed.

**saturated zone or zone of saturation**. Soils in which all voids are filled with water.

**sea water percolation**. Underground sea water that passes through soils and seeps to ground level.

**sedimentation**. A prefiltering process for the removal of solids by gravity or separation.

**septic system**. An on-site system or cesspool to process wastes.

**settlement**. The sinking of soils, such as those that have not been adequately compacted.

**shear strength**. An engineering term used to describe a soil or structure that resists applied forces that cause or tend to cause two contiguous parts of a body to slide relative to each other.

**sheen**. A glistening appearance on the water surface from oil residue.

**short-term condition**. Any detrimental condition that lasts for a short period of time.

**sick building syndrome**. *See* indoor air quality problem.

**sinkhole**. An opening in the earth created by either natural or man-made subterranean activities. For example, if a tunnel fails, it may create a sinkhole.

**site grading**. The leveling of land for development.

**slope creep**. A natural landslide that occurs at a very slow rate.

**slow sand filtration**. A process whereby water is drained through a bed of sand at low velocity, removing particles by physical and biological mechanisms.

**sludge**. A solid, semisolid, or liquid waste generated from a wastewater treatment plant, less the treated effluent.

**SNAP property**. Source, non-source, adjacent, or proximate site property. A *source property* is defined as the site from which the contamination was released. A *non-source property* is contaminated, but the contamination originated from another property (the source site). An *adjacent property* is not contaminated, but it shares a property line with a property that is contaminated. A *proximate property* is not contaminated and not adjacent to any contaminated property; however, it is in the same general neighborhood as a contaminated source site property.

**soft water**. Water that contains low levels of dissolved minerals, such as salts, calcium, or magnesium.

**soil**. All unconsolidated materials naturally found at the surface of the earth, such as clays, silts, sands, and small rocks.

BACK_DEFEXP-RR-004302

**soil compaction**. Fill soils that have been pressed to avoid subsidence.

**soil contamination**. The introduction of a hazardous material into the ground.

**soil excavation**. A type of remediation process that involves the digging of contaminated soil from the subsurface, where it is treated or disposed of.

**soils subsidence**. Soils that are unstable and sink.

**solder**. A metal compound used to seal plumbing joints. Solder compounds containing lead are now banned.

**solid waste**. Nonliquid trash or other disposed materials.

**solvent contamination**. The accidental introduction of a cleaning or chemical solution into the soils or groundwater.

**source property**. Any site that is the source of discharging a pollutant.

**staged removal**. The staged removal of contaminants over time (i.e., floor-by-floor, one unit at a time).

**stigma**. *See* market resistance, project incentive, *or* uncertainty factor.

**storage tanks**. Aboveground or underground tanks that are used for storing fluids, such as gasoline or propane.

**stratum**. A sedimentary bed or layer that generally consists of the same kind of soils or rock material.

**stressed vegetation**. Plants that have been damaged.

**strip mining**. A type of surface mining that involves excavating earth, rock, and other materials to uncover a tabular, lens-shaped, or layered mineral reserve. Also called *open-cut mining, open-cast mining*, or *stripping*.

**structures**. Material assemblies that extend the limits of human capability. Examples include buildings, bridges, temple mounds, fishing vessels, auto factories, and bronze statues.

**subsidence**. The falling or failure of soils.

**subsurface construction defect**. Any soils-related problem that results from a man-made condition.

**sulfates**. A potentially corrosive, and naturally forming, substance found within certain soils. May cause concrete foundations to erode.

**Superfund site**. A property that has been designated under CERCLA to be remedied.

**super-surface construction defect**. The failure to properly construct some component of the improvements.

**supply and demand**. The fundamental economic forces that drive real estate prices. Some theorize that the supply of real estate is fixed, and that only demand changes.

**surface water**. All water that is open to atmosphere.

**surfactant**. Wetting agent that enhances the penetration of water.

**surging soil**. Soils that are upheaving.

**SVOC**. Semi-volatile organic compounds.

**TCA**. Trichloroethane, a solvent.

**TCE**. Trichloroethylene, or trichloroethene, a solvent.

**temporary condition**. A short-term event or one-time situation. Includes temporary external obsolescence.

**temporary construction easement (TCE)**. The incidental and interim right to use a property or a portion of a property, through eminent domain, while construction is underway.

**termites**. A small insect that feeds on wood. An infestation of termites can damage or destroy a wood-frame structure.

**termite work**. A generic term often used to refer to repair work done to correct infestation or damage done by wood-destroying organisms such as dry rot, fungus, termites (of various

BACK_DEFEXP-RR-004303

kinds), wood-boring beetles, carpenter ants, and others.

**testimony**. Presentations or statements, both sworn and unsworn, given by others.

**tidal influence**. An oceanfront area that is affected by tides.

**tidal wave**. *See* tsunami.

**tornado**. A violent storm in which various natural forces cause a strong circular wind that can reach over 300 miles per hour. Like other natural disasters, tornadoes are unpredictable and unpreventable and they cause indiscriminate damage, so they tend to not cause a diminution in value to a particular property or neighborhood but rather impact a large region.

**torrent**. A downpour of rain that may cause flooding.

**toxicity**. The level to which a substance is toxic.

**toxic waste**. The disposal of a hazardous material in such a way that it threatens plants, animals, or humans.

**TPH**. Total petroleum hydrocarbons, typically measured by levels of BTEX.

**traffic diminution**. The loss of vehicular or pedestrian traffic. Can be a permanent or temporary issue.

**treatment zone**. A soil area of the unsaturated zone of a land treatment unit within which hazardous constituents are degraded, transformed, or immobilized.

**TRPH**. Total recoverable petroleum hydrocarbons.

**tsunami**. A large wave usually caused by an earthquake or an underwater landslide. While unpredictable and unpreventable, they tend to impact certain zones or areas.

**tunneling**. Drilling or trenching for the placement of underground passages for utility lines, subways, trains, roads, or other uses. Tunnels can cause a diminution in value if the market perceives that they may not be structurally sound or may fail during a seismic event, such as an earthquake.

**uncertainty factor**. The risks, if any, associated with the assessment stage of a detrimental condition analysis.

**unchlorinated solvents**. Cleaning solutions to which no chlorine has been added.

**unidentified substance containers**. A drum or other container holding unidentified substances suspected of being hazardous or containing petroleum products.

**unimpaired value**. The value as if no detrimental condition exists.

**unsaturated zone or zone of aeration**. The area between the land surface and the groundwater table.

**uplands**. An area above and adjacent to the high tide level.

**urban decay**. The deterioration of infrastructure and improvements within a metropolitan area.

**US Army Corps of Engineers**. A governmental agency whose duties include overseeing dredging, salt marsh restoration, and reviewing navigational aspects of projects. Also known as the *Corps of Engineers.*

**USDW**. Underground source of drinking water.

**use issues**. All losses associated with the use of the property during the assessment, repair, and ongoing stages of a detrimental condition analysis.

**US Environmental Protection Agency**. A federal governmental agency that oversees a variety of environmental issues and regulations.

**US Fish and Wildlife Service**. A federal governmental agency that oversees wildlife issues and consults with the

BACK_DEFEXP-RR-004304

EPA and the Corps of Engineers under the Clean Water Act and the Fish and Wildlife Coordination Act.

**UST**. Underground storage tank.

**utility disruption**. The temporary interruption of utilities, such as water, electricity, gas, etc.

**utility easement**. The rights granted to use a portion of a property for utility lines.

**vacuum extraction**. A type of remediation process that removes the majority of contaminants through the use of one or more suction wells, or a series of air injection and suction wells. The method is typically less disruptive than soil excavation and may be less expensive than other techniques involving excavation.

**variance**. The right granted by a city or municipality to develop or use a property in a way that varies from the typical or stated requirements.

**view**. A scene or outlook *from* a property.

**view diminution**. The partial or entire loss of a view amenity.

**visibility**. How well a property can be seen by others.

**VOC**. Volatile organic compounds.

**volcano**. A mountain that historically has erupted, or can erupt in the future, and can cause landslides or other destruction. Like other natural disas-

ters, volcanoes are unpredictable and unpreventable, and cause indiscriminate damage, so they tend to not cause a diminution in value to a particular property or neighborhood but rather impact a large region.

**wastewater**. A liquid (including stormwater) that discharges into a tunnel, drain, ditch, or stream.

**water intrusion**. The undesired influx of water onto a site or into improvements.

**water table**. The upper level of the saturated zone of groundwater.

**wetlands**. Areas that are inundated or saturated by surface or groundwater, such as lakes, swamps, marshes, bogs, sloughs, quagmires, wet meadows, river overflows, mud flats, lagoons, and ponds.

**woodrot**. A situation in which a wood structure has become moist and decayed.

**worker decontamination enclosure system**. A series of three temporary rooms for entering or exiting a contaminated work site. They are the clean room (adjacent to the outside or uncontaminated area), the shower room, and the equipment room (dirty room).

**x-ray release**. The undesired discharge of radiograms.

BACK_DEFEXP-RR-004305

BACK_DEFEXP-RR-004306

# Bibliography

## Detrimental Conditions—General

*The Appraisal of Real Estate*. 14th ed. Chicago: Appraisal Institute, 2013.

Arens, Scott B. "The Valuation of Defective Properties: A Common Sense Approach." *The Appraisal Journal* (April 1997): 143-148.

Bell, Randall. "Detrimental Conditions: A Profile of Valuation Methodologies with Environmental Contamination, Crime Scene Stigma, and Natural Disaster Case Studies." Paper presented at the national symposium of the Appraisal Institute, Washington, D.C., June 1997.

___. "The Impact of Detrimental Conditions on Property Values." *The Appraisal Journal* (October 1998): 380-391.

*Black's Law Dictionary*. 2nd pocket ed. St. Paul, MN: West Publishing, 2001.

*The Dictionary of Real Estate Appraisal*. 6th ed. Chicago: Appraisal Institute, 2015.

Harris, Timothy J. "The Requirement of Expert Testimony in Appraisal Litigation." *The Appraisal Journal* (January 1992): 68-73.

Jaconetty, Thomas. "Stigma, Phobias, and Fear: Their Effect on Valuation." *Assessment Journal*, vol. 3, no. 1 (January/February 1996).

Love, Terrence L. "Guidelines for the Witness: Pointers for Giving Effective Testimony." *The Appraisal Journal* (October 1995): 457-464.

McClelland, Gary H., William D. Schulze, and Brian Hurd. "The Effect of Risk Beliefs on Property Values." *Policy Analysis*, vol. 10, no. 4 (1990).

Mitchell, Phillip S. "Estimating Economic Damages to Real Property Due to Loss of Marketability, Rentability, and Stigma." *The Appraisal Journal* (April 2000): 162-170.

Mundy, Bill. "Stigma and Value." *The Appraisal Journal* (January 1992): 7-13.

Neustein, Richard A. "Estimating Value Diminution by the Income Approach." *The Appraisal Journal* (April 1992): 283–287.

Rabianski, Joseph, and Neil G. Carn. "Cross-Examination: How to Protect Yourself and the Appraisal Report." *The Appraisal Journal* (October 1992) 472-482.

*Reference Manual on Scientific Evidence*. 2nd ed. Federal Judicial Center, 2000.

Robinson, Rudy R., III, and Scott R. Lucas. "Seller Disclosure and Buyer Knowledge: How They Affect Market Value." *The Appraisal Journal* (Spring 2007): 134-139.

Sanders, Michael V. "Value Diminution as a Measure of Real Property Damages." *Orange County Lawyer* (February 2000).

Sandman, Peter M. *Responding to Community Outrage: Strategies for Effective Risk Communication.* Fairfax, VA: American Industrial Hygiene Association, 1993.

Snyder, David B. "How Much Do You Have to Disclose? *Valuation* (Second Quarter 1997): 32-33.

Wilson, Albert R. "Emerging Approaches to Impaired Property Valuation." *The Appraisal Journal* (April 1996): 155-170.

## Introduction. Fundamentals of Property Valuation

### Research Methods

Creswell, John W. *Qualitative Inquiry and Research Design: Choosing Among Five Approaches.* Thousand Oaks, CA: Sage Publishing, 2012.

Malhotra Bentz, Valerie, and Jeremy J. Shapiro. *Mindful Inquiry in Social Research.* Thousand Oaks, CA: Sage Publishing, 1998.

Singleton, Royce A., Jr., and Bruce C. Straits. *Approaches to Social Research.* New York: Oxford University Press, 1999.

Wilson, Albert R. "Contingent Valuation: Not an Appropriate Valuation Tool." *The Appraisal Journal* (Winter 2006): 53-60.

## Chapter 1. General Conditions

### Case Studies

Jackson, Thomas O. "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation." *The Appraisal Journal* (Spring 2004): 111-118.

Jackson, Thomas O., and Randall Bell. "The Analysis of Environmental Case Studies." *The Appraisal Journal* (January 2002): 86-95.

Roddewig, Richard J. "Adjusting Environmental Case Study Comparables by Using an Environmental Risk Scoring System." *The Appraisal Journal* (October 2000): 371-374.

### Statistical Analysis/Multiple Regression

Allison, Paul D. *Multiple Regression: A Primer.* Thousand Oaks, CA: Pine Forge Press, 1999.

Cowart, Lary B. "Trending and Graphical Analysis." *Journal of Property Economics* (2006).

Dilmore, Gene. *Quantitative Techniques in Real Estate Counseling.* Lexington, MA: D. C. Heath and Company, 1981.

Goddard, Bryan L. "The Power of Computer Graphics for Comparative Analysis." *The Appraisal Journal* (April 2000): 134-141.

___. "The Role of Graphic Analysis in Appraisals." *The Appraisal Journal* (October 1999): 429-435.

Guy, Rebecca F., and Louis G. Pol. *Statistics for Real Estate Professionals.* Westport, CT: Greenwood Press, 1989.

Isakson, Hans R. "Using Multiple Regression Analysis in Real Estate Appraisal." *The Appraisal Journal* (October 2001): 424-430.

Jackson, Thomas O. "Evaluating Environmental Stigma with Multiple Regression Analysis." *The Appraisal Journal* (Fall 2005): 363-369.

Kane, M. Steven, Mark R. Linné, and Jeffrey A. Johnson. *Practical Applications in Appraisal Value Modeling.* Chicago: Appraisal Institute, 2004.

Kummerow, Max. "A Statistical Definition of Value." *The Appraisal Journal* (October 2002): 407-416.

___. "Thinking Statistically About Valuations." *The Appraisal Journal* (July 2000): 318-325.

BACK_DEFEXP-RR-004308

Levine, David M., Mark L. Berenson, and David Stephan. *Statistics for Managers Using Microsoft Excel.* Upper Saddle River, NJ: Prentice-Hall, 1998.

Linné, Mark R., and M. Steven Kane. "Appraisal Valuation Modeling: The Application of Statistical Analysis." *Valuation* (Third Quarter 2000): 10-13.

Linné, Mark R., M. Steven Kane, and George Dell. *A Guide to Appraisal Value Modeling.* Chicago: Appraisal Institute, 2000.

Myllynen, John. "Regression Analysis with Your HP-12C." *The Appraisal Journal* (Summer 2005): 318-320.

Ramsland, Maxwell O., Jr., and Daniel E. Markham. "Market-Supported Adjustments Using Multiple Regression Analysis." *The Appraisal Journal* (April 1998): 181-191.

Tufte, Edward R. *The Visual Display of Quantitative Information.* Cheshire, CT: Graphics Press, 1983.

## Market Surveys/Contingent Valuation

Allen, Marcus T., and Grant W. Austin. "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge." *The Appraisal Journal* (October 2001): 394-403.

Austin, Grant W. "Putting the 'Survey' Method to the Test." *Valuation* (Fourth Quarter 1999): 35-36.

Carson, Richard T. "Contingent Valuation: A User's Guide." *Environmental Science & Technology* 34, no. 8 (2000).

Flynn, James, Donald G. MacGregor, Wayne Hunsberger, C. K. Mertz, and Stephen M. Johnson. "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation." *The Appraisal Journal* (Winter 2004): 35-44.

Jackson, Thomas O. "Surveys, Market Interviews, and Environmental Stigma." *The Appraisal Journal* (Fall 2004): 300-310.

Kinnard, William N., Jr., Sue Ann Dickey, and Mary Beth Geckler. "Fear (As a Measure of Damages) Strikes Out: Two Case Studies, Comparisons of Actual Market Behavior with Opinion Survey Research." Paper presented at the annual conference of the American Real Estate Society, Santa Barbara, CA, April 1994.

Mathews, Kristy E., and William H. Desvousges. "The Truth, the Partial Truth, or Anything but the Truth: Survey Reliability and Property Valuation." Prepared for the Symposium on Environmental and Property Damages: Standards, Due Diligence, Valuation, and Strategy, Toronto, ON, April 4-6, 2002.

McLean, David G., and Bill Mundy. "The Addition of Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property." *Journal of Real Estate Practice and Education* 1, no. 1 (1998).

Mitchell, Robert C., and Richard T. Carson. *Using Surveys to Value Public Goods: The Contingent Valuation Method.* Washington, D.C.: Resources for the Future, 1989.

Mundy, Bill, and David McLean. "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications." *The Appraisal Journal* (July 1998): 290-297.

Roddewig, Richard J. "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches." *The Appraisal Journal* (October 1999): 447-453.

Roddewig, Richard J., and James Frey. "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace." (Summer 2006): 267-280.

US Department of Commerce. "Report of the NOAA Panel on Contingent Valuation." Washington, D.C.: Nation-

BACK_DEFEXP-RR-004309

al Oceanographic and Atmospheric Administration, 1993. Published in *Federal Register* 58, no. 10 (January 1993).

Wilson, Albert R. "Contingent Valuation: Not an Appropriate Valuation Tool." *The Appraisal Journal* (Winter 2006): 53-61.

### Geographic Information Systems

Castle, Gilbert H., III, ed. *GIS in Real Estate: Integrating, Analyzing, and Presenting Locational Information*. Chicago: Appraisal Institute, 1998.

## Chapter 2. Transactional Conditions

### Assemblage

Parli, Richard L. "Disassembling Assemblage." *The Appraisal Journal* (Summer 2005): 296-304.

### Distress Sales

Allen, Marcus T. "Discounts in Real Estate Auction Prices: Evidence from South Florida." *The Appraisal Journal* (January 2001): 38-43.

Anglyn, William Ted. "Distressed Property Valuation Issues." *The Appraisal Journal* (Spring 2005): 210-215.

Derbes, Max J., Jr., and Max J. Derbes III. "Liquidation Price and Semi-Forced Sellers." *The Appraisal Journal* (January 2001): 31-37.

Slade, Barrett A. "Conditions of Sale Adjustment: The Influence of Buyer and Seller Motivations on Sale Price." *The Appraisal Journal* (Winter 2004): 50-56.

US Comptroller of the Currency, Administrator of National Banks. "Other Real Estate Owned." In *Comptroller's Handbook* (Narrative: March 1990, Procedures: April 1998).

### 1031 Exchanges

Anderson, Orell C. "Old Dogs, New Tricks–The 1031 Exchange." *Right of Way* (May/June 2005).

Holmes, Andrew, and Barrett A. Slade. "Do Tax-Deferred Exchanges Impact Purchase Price? Evidence from the Phoenix Apartment Market." *Real Estate Economics* 29, no. 2 (1998).

Leavins, John R., and Samuel Penkar. "An Overview of Real Estate Like-Kind Exchanges." *The Appraisal Journal* (July 2003): 266-271.

Nicolay, Claire. "Adventures in Tax-Deferred Exchange: Opportunities and Trends in Section 1031 Transactions." *Valuation* (Fourth Quarter 2002): 10-12, 14, 47.

### Market Trends

Bottum, MacKenzie S., and Scott D. Evans. "Supply-Saturation-Induced External Obsolescence: Two Techniques for Quantifying Value Loss." *The Appraisal Journal* (October 1993): 545-552.

Ling, David C. "The Valuation of Income Property in Overbuilt Markets." *The Appraisal Journal* (July 1993): 332-341.

### Project Delay

Abd El-Razek, M. E., H. A. Bassioni, and A. M. Mobarak. "Causes of Delay in Building Construction Projects in Egypt." *Journal of Construction Engineering and Management* (November 2008): 831-841.

Abudayyeh, Osama. "A Multimedia Construction Delay Management System." *Microcomputers in Civil Engineering* (May 1997): 183-192.

Akerson, Charles B. *Capitalization Theory and Techniques Study Guide*, 3rd ed. Edited by David C. Lennhoff. Chicago: Appraisal Institute, 2009.

Al Duaij, Jamal, Tareq Awida, and A. E. Kollarayam. "Performing Value Analysis on Construction Project Variation Orders." *Cost Engineering* (June 2007): 23-27.

Alkass, Sabah, Mark Mazerolle, and Frank Harris. "Construction Delay Analysis Techniques." *Construction Management and Economics* (1996): 375-394.

Al-Saggaf, Hamed A. "The Five Commandments of Construction Project

BACK_DEFEXP-RR-004310

Delay Analysis." *Cost Engineering* (April 1998): 37-41.

Anderson, Orell C., and Edward B. Gentilcore. "A View from the Ground Up: Calculating Damages Due to Construction Project Delay." *Construct!* (Fall 2005): 1-3.

Bordoli, David W., and Andrew N. Baldwin. "A Methodology for Assessing Construction Project Delays." *Construction Management and Economics* (1998): 327-337.

Burton, James H. *Evolution of the Income Approach.* Chicago: American Institute of Real Estate Appraisers, 1982.

Carneghi, Chris. "Determining Ground-Lease Rental Rates." *The Appraisal Journal* (April 1994): 256-263.

Dushoff, Jay, and Denise Henslee. "When Eminent Domain 'Working Rules' Don't Work." *The Appraisal Journal* (July 1991): 429-435.

Emerson, Don M. *Subdivision Valuation.* Chicago: Appraisal Institute, 2008.

Kim, Jungwuk, Sangyoub Lee, Taehoon Hong, and Seungwoo Han. "Activity Vulnerability Index for Delay Risk Forecasting." *Canadian Journal of Civil Engineering* (October 2006): 1261-1270.

Omran, Abdelnaser, Ooi Ai Ling, Abdul Hamid Kadir Pakir, and Mahyuddin Ramli. "Delays in Construction Projects Development: The Case of Klang Valley, Malaysia." *Journal of Academic Research in Economics* (November 2010): 135-158.

Stumpf, George R. "Schedule Delay Analysis." *Cost Engineering* (July 2000): 32-43.

### Partial Interests

Humphrey, Walter H., and Bruce B. Humphrey. "Unsyndicated Partial Interest Discounting." *The Appraisal Journal* (July 1997): 267-274.

Keating, David Michael. *Appraising Partial Interests.* Chicago: Appraisal Institute: 1998.

Webb, Dennis A. "Bridging the Gap: Marketability Discounts for Real Estate Interests." *The Appraisal Journal* (January 2001): 95-111.

_____. "Minority Interest Discounts: A Quantitative Approach for Real Estate Limited Partnerships." *The Appraisal Journal* (April 1999): 174-182.

Wiggins, C. Donald, and Sidney B. Rosenberg. "Revisiting Valuation of Real Estate Partial Interests: Recent Case Studies." *The Appraisal Journal* (October 2001): 404-409.

## Chapter 3. Distress and Sociological Conditions

Baen, John S., and Sofia V. Dermisi. "The New Orleans-Katrina Case for New Federal Policies and Programs for High-Risk Areas." *Journal of Real Estate Literature* 15, no. 2 (2007).

Chastain, Steve. "US Pipeline Security in a Post 9/11 Environment." *Right of Way* (March/April 2005).

Dermisi, Sofia V. "Recovering from an External Economic Shock: The Effect of Terrorism Threat on Chicago 'Trophy' Buildings and their Immediate Area." *Journal of Real Estate Literature* 14, no. 3 (2006).

___. "Terrorism Protection and Prevention Measures for Office Buildings." *Journal of Real Estate Literature* 14, no. 1 (2006).

Guidry, Krisandra A. "Antiterrorism Security Measures for Commercial Buildings: Inspection and Appraisal Guidelines." *The Appraisal Journal* (Fall 2007): 354-361.

Larsen, James E., Kenneth J. Lowery, and Joseph W. Coleman. "The Effect of Proximity to a Registered Sex Offender's Residence on Single-Family House Selling Price." *The Appraisal Journal* (July 2003): 253-265.

Little, Sheila A. "Effects of Violent Crimes on Residential Property Values." *The Appraisal Journal* (July 1988): 341-343.

BACK_DEFEXP-RR-004311

Miller, Norman G. "The 9/11/2001 Impact on Trophy and Tall Office Property." *Journal of Real Estate Portfolio Management* (May-August 2003).

Robinson, Ronald R. "Transferring Terrorism's Risks–A Specific Peril Solution." *Environmental Claims Journal* (Summer 2006).

## Chapter 4. Legal Conditions

### Eminent Domain

Buesing, Robert H. "Condemnation for Electric Transmission Lines: Meeting the Challenge of Adequate Proof." *Probate & Property* (May/June 1994).

Champagne, David M. "Appraising Partial Takings for Eminent Domain." *Right of Way* (January/February 2002).

Clauretie, Terrence M., William Kuhn, and R. Keith Schwer. "Residential Properties Taken Under Eminent Domain: Do Government Appraisers Track Market Values?" *Journal of Real Estate Research* 26, no. 3 (2004).

Dearth, Richard C., and J. Russell Hardin. "*Kelo v. The City of New London:* What Does It Really Mean?" *Real Estate Issues* (Winter 2005-2006).

Duvall, Richard O., and David S. Black. "The Development Approach to Valuation in Eminent Domain Litigation: Capitalizing on Potential Use." *The Appraisal Journal* (July 2000): 351-359.

Eaton, J. D. *Real Estate Valuation in Litigation.* Chicago: Appraisal Institute, 1995.

Harrison, Harold S. *Harrison on Eminent Domain: A Guide for Appraisers and Others.* Chicago: Society of Real Estate Appraisers, 1980.

Interagency Land Acquisitions Conference 2000. *Uniform Appraisal Standards for Federal Land Acquisitions.* Chicago: Appraisal Institute, 2000.

Morton, Justin R. "Post-*Kelo* Legislation on Eminent Domain Impacts Valuations." *The Appraisal Journal* (Fall 2006): 383-385.

Patel, Purushottam H. "Eminent Domain." *The Appraisal Journal* (January 1995): 91-101.

Pickett, Todd. "Highest and Best Use and Partial Acquisitions." *Right of Way* (July/August 2006).

Rahn, Arthur G. "Across the Fence Methodology for Valuation of Corridors: What Is It and How Is It Used?" *The Appraisal Journal* (July 2001): 270-276.

___. "The Enhancement Factor: Exploring a Unique Aspect of Transportation Corridor Appraisals." *Right of Way* (May/June 1999).

Seymour, Charles F. "The Continuing Evolution of Corridor Appraising (Back to the Basics)." *Right of Way* (May/June 2002).

Sklaroff, Michael. "The Value of Corridors in Eminent Domain: The Chester Valley Branch." *Real Estate Issues* (Winter 2005-2006).

Snyder, David B. "Eminent Domain after *Kelo:* The Battle Continues." *Real Estate Issues* (Summer 2006).

Zulaica, Richard J. "Valuing a Corridor Within a Corridor." *Right of Way* (March/April 2000).

### Title Insurance

Arrunada, Benito. "A Global Perspective on Title Insurance." *Housing Finance International* (December 2001).

Nyce, Charles, and M. Martin Boyer. "An Analysis of the Title Insurance Industry." *Journal of Insurance Regulation* (Winter 1998).

### Easement Valuation

Allen, Albert N. "The Appraisal of Easements." *Right of Way* (November/December 2001).

Graham, Lannie M. "Prescriptive Easements and a Highest and Best Use Decision." *The Appraisal Journal* (October 1991) 471-478.

Sherwood, Donald. "Easement Valuation." *Right of Way* (May/June 2006).

BACK_DEFEXP-RR-004312

Valentine, Gary. "Appraising Pipeline Easements: A Practical Approach." *Right of Way* (March/April 2008).

West, Robert J. "Statistical Inference: An Aviation Easement Analysis." *Real Estate Issues* 13, no. 1 (Spring/Summer 1988).

## Chapter 5. External Conditions

Abelson, Peter W. "Property Prices and the Value of Amenities." *Journal of Environmental Economics and Management* 6, no. 1 (March 1979).

Bowes, Peter D., Douglas C. Brown, and Albert R. Wilson. "Damage to Market Value and Location Premiums." *Real Estate Issues* (Winter 2004-2005).

Boyle, Melissa A., and Katherine A. Keil. "A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities." *Journal of Real Estate Literature* 9, no. 2 (2001).

Dear, Michael. "Understanding and Overcoming the NIMBY Syndrome." *Journal of The American Planning Association* 58, no. 3 (Summer 1992).

Edge, Larson. "Proximity Damage: Where Do You Draw The Line?" *Right of Way* (January/February 2003).

Kinnard, William N., Jr. "Property Valuation: A Primer on Proximity Impact Research." Paper presented at Executive Enterprises conference on electric and magnetic fields, Washington, D.C., December 1993.

Kinnard, William N., Jr., Mary Beth Geckler, and John K. Geckler, "Are Residential Property Values Impacted by Proximity to Alleged or Perceived Hazards to Human Health and Safety?" *Journal of Property Tax Management* (Fall/Winter 1995).

"Property Devaluation from Off-Site Environmental Hazards." *Environmental Strategies for Real Estate* 2, no. 8. (May 1995).

Wilson, Albert R. "Proximity Stigma: Testing the Hypothesis." *The Appraisal Journal* (Summer 2004): 253-262.

### Airport Noise

Bell, Randall. "The Impact of Airport Noise on Residential Real Estate." *The Appraisal Journal* (July 2001): 312-321.

Billitzer, Barbara. "Safe & Sound: LAX Sound Insulation Program." *Right of Way* (September/October 2006).

Booz-Allen & Hamilton. "The Effect of Airport Noise on Housing Values: A Summary Report." Federal Aviation Administration, Office of Environment and Energy, September 15, 1994.

Bornis, Sanford F. "Mieszkowski and Saper's Estimate of the Effects of Airport Noise on Property Values: A Comment." *Journal of Urban Economics* 9, no. 1 (January 1981).

Crowley, Ronald W. "A Case Study of the Effects of an Airport on Land Value." *Journal of Transport Economics and Policy* VII, no. 2 (May 1973).

Frankel, Marvin. "Aircraft Noise and Residential Property Values: Results of a Survey Study." *The Appraisal Journal* (January 1991): 96-110.

Gautrin, Jean-Francois. "An Evaluation of the Impact of Aircraft Noise on Property Values with a Simple Model of Urban Land Rent." *Land Economics* (February 1975).

Levesque, Terrence J. "Modeling the Effects of Airport Noise on Residential Housing Markets." *Journal of Transport Economics and Policy* (May 1994).

Mieszkowski, Peter, and Arthur M. Saper. "An Estimate of the Effects of Airport Noise on Property Values." *Journal of Urban Economics* 5, no. 4 (October 1978).

Nelson, Jon P. *Aircraft Noise and the Market for Residential Housing: Empirical Results for Seven Selected Airports.* Washington, D.C.: Department of Transportation, Research, and Special Programs Administration, September 1978.

BACK_DEFEXP-RR-004313

_____. "Airport Noise, Location Rent, and the Market for Residential Amenities." *Journal of Environmental Economics and Management* (December 1979).

___. "Airports and Property Values: A Survey of Recent Evidence." *Journal of Transport Economics and Policy* XIV, no. 1 (January 1980).

O'Byrne, Patricia Habuda, Jon P. Nelson, and Joseph J. Seneca. "Housing Values, Census Estimates, Disequilibrium, and the Environmental Cost of Airport Noise: A Case Study of Atlanta." *Journal of Environmental Economics and Management* 12, no. 2 (June 1985).

Paul, M. E. "Can Aircraft Nuisance Noise Be Measured in Money?" Report of the Commission on the Third London Airport, H.M.S.O., 1971.

Pennington, G., N. Topham, and R. Ward. "Aircraft Noise and Residential Values Adjacent to Manchester International Airport." *Journal of Transport Economics and Policy* XXIV, no. 1 (January 1990).

Stone, Robert S., Kenneth R. Regier, and Ellwyn Brickson. "The Human Effects of Exposures to Aircraft Noise in a Residential Environment." Technical report. CA: Division of Environmental Health, Orange County Health Department, May 19, 1972.

Walters, A. A. "Airports—An Economic Survey." *Journal of Transport Economics and Policy* XII, no. 2 (May 1978).

## Transmission Lines and Related Issues

Ball, Thomas A. *A Study of the Economic Effects of High Voltage Electrical Transmission Lines on the Market Value of Real Property.* Tempe, AZ: Salt River Project, 1989.

Beasley, Ben. "High Voltage Power Lines: Impact on Nearby Property Values." *Right of Way* (February 1991).

Bolton, David R. "Properties Near Power Lines and Valuation Issues: Condemnation or Inverse Condemnation?" Paper presented at annual conference of the Institute on Planning, Zoning and Eminent Domain, Dallas, November 17-19, 1993.

Bond, Sandy G. "The Effect of Distance to Cell Phone Towers on House Prices in Florida." *The Appraisal Journal* (Fall 2007): 362-370.

Bond, Sandy G., and Ko-Kang Wang. "The Impact of Cell Phone Towers on House Prices in Residential Neighborhoods." *The Appraisal Journal* (Summer 2005): 257-277.

Bottemiller, Steven C., James M. Cahill, and J. R. Cowger. "Impacts on Residential Property Values Along Transmission Lines." *Right of Way* (July/August 2000).

Bryant, James A., and Donald R. Epley. "Cancerphobia: Electromagnetic Fields and their Impact on Residential Loan Values." *Journal of Real Estate Research* 15, no. 1/2 (1998).

Chapman, Dean. "Transmission Lines and Industrial Property Values." *Right of Way* (November/December 2005).

Clark, Louis E., Jr., and F. H. Treadway Jr. *Impact of Electric Power Transmission Line Easements on Real Estate Values.* Chicago: American Institute of Real Estate Appraisers, 1972.

Colwell, Peter F. "Power Lines and Land Value." *Journal of Real Estate Research* 5, no. 1 (1990).

Colwell, Peter F., and Kenneth W. Foley. "Electric Transmission Lines and the Selling Price of Residential Property." *The Appraisal Journal* (October 1979): 490-499.

*Cost Effectiveness Analysis: Mitigation of Electromagnetic Fields Compared to a Study of the Potential Health Effects of EMF Emissions from High-Voltage Transmission Lines.* Providence, RI: Public Utilities Commission, 1993.

Cowger, John R., Steven C. Bottemiller, and James M. Cahill. "Transmission Line Impact on Residential Property Values." *Right of Way* (September/October 1996).

BACK_DEFEXP-RR-004314

Delaney, Charles J., and Douglas Timmons. "High Voltage Power Lines: Do They Affect Residential Property Value?" *The Journal of Real Estate Research* 7, no. 3 (Summer 1992).

Des Rosiers, Francois. "Power Lines, Visual Encumbrance and House Values: A Microspatial Approach to Impact Measurement." *Journal of Real Estate Research* 23, no. 3 (2002).

Dorin, Allen G., Jr., and Joseph W. Smith III. "The Impact of Communication Towers on Residential Property Values." *Right of Way* (March/April 1999).

Furby, Lita, Robin Gregory, Paul Slovic, and Baruch Fischhoff. "Electric Power Transmission Lines, Property Values, and Compensation." *Journal of Environmental Management* 27 (1988).

Hamilton, Stanley W., and Gregory M. Schwann. "Do High Voltage Electric Transmission Lines Affect Property Value?" *Land Economics* (November 1995).

"High-Voltage Transmission Lines." California Energy Commission, 1992.

Ignelzi, Patrice C. "Successfully Conducting Transmission Line Impact Assessments of Property Values." In *Transmission Lines in Residential Neighborhoods: Issues in Siting and Environmental Planning.* Portland, OR: Edison Electric Institute,1989.

Ignelzi, Patrice C., and Thomas Priestley. *A Methodology for Assessing Transmission Line Impacts in Residential Communities.* Washington, D.C.: Edison Electric Institute, 1989.

___. *A Statistical Analysis of Transmission Line Impacts in Six Neighborhoods.* 2 vols. Albany, CA: Pacific Consulting Services, 1991.

Jaconetty, Thomas A. "Do You Want Your Children Playing Under Those Things? The Continuing Controversy About High Voltage Electromagnetic Fields, Human Health, and Real Property Values." *Assessment Journal* (May/June 2001).

Kinnard, William N., Jr. "The Effect of High-Voltage Overhead Transmission Lines on Sales Prices and Market Values of Nearby Real Estate: An Annotated Bibliography and Evaluative Analysis." In *Transmission Lines in Residential Neighborhoods: Issues in Siting and Environmental Planning.* Portland, OR: Edison Electric Institute, 1989.

___. "The Impact of High Voltage Transmission Lines on Real Estate Values." *Journal of Property Tax Management* I, no. 4 (1990).

___. "Patterns of Property Value Impacts from Proximity to High-Voltage Transmission Lines: Analytical Update." Paper presented at Edison Electric Institute conference, Duluth, MN, August, 1992.

Kinnard, William N., Jr., Sandy Bond, Paul M. Syms, and Jake W. DeLottie. "Effects of Proximity to High-Voltage Transmission Lines on Nearby Residential Property Values: An International Perspective on Recent Research." Paper presented at the international conference of the American Real Estate and Urban Economics Association, Berkeley, CA, May 1997.

Kinnard, William N., Jr., and Sue Ann Dickey. "A Primer on Proximity Impact Research: Residential Property Values near High-Voltage Transmission Lines." *Real Estate Issues* (April 1995).

Kinnard, William N., Jr., Mary Beth Geckler, and Jake W. DeLottie. "Effects of Proximity to High-Voltage Transmission Lines on Nearby Residential Property Values: An International Perspective." Paper prepared for Chartered Surveyors' Education Channel Television Education Network, Royal Institution of Chartered Surveyors, London, August 1996.

___. "Post-1992 Evidence of EMF Impacts on Nearby Residential Property Values." Paper presented at the annual conference of the American Real Estate Society, Sarasota, FL, April 1997.

BACK_DEFEXP-RR-004315

Kinnard, William N., Jr., Phillip S. Mitchell, and James R. Webb. "The Impact of High-Voltage Overhead Transmission Lines on the Value of Real Property." Paper presented at the annual conference of the American Real Estate Society, Arlington, VA, April 1989.

Kroll, Cynthia A. "Property Valuation: A Primer on Proximity Impact Research." Paper presented at the Conference on Electric and Magnetic Fields, San Francisco, February 8, 1994.

Kroll, Cynthia A., and Thomas Priestley. "The Effects of Overhead Transmission Lines on Property Values: A Review and Analysis of the Literature." Report prepared for the Siting and Environmental Planning Task Force, Edison Electric Institute, Piedmont, CA, December 1991.

Kung, Hsiang-te, and Charles F. Seagle. "Impact of Power Transmission Lines on Property Values: A Case Study." *The Appraisal Journal* (July 1992): 413-418.

Mitchell, Phillip S., and William N. Kinnard Jr. "Statistical Analysis of High-Voltage Overhead Transmission Line Construction on the Value of Vacant Land." *Valuation* 40, no. 1 (June 1996).

Pitts, Jennifer M., and Thomas O. Jackson. "Power Lines and Property Values Revisited." *The Appraisal Journal* (Fall 2007): 323-325.

Porter, Jeffrey R., and Carolyn S. Langer. "Electromagnetic Fields: Courts Deal with EMFs' Effect on Property Values." *Massachusetts Lawyer's Weekly* (February 27, 1995).

Priestley, Thomas. "Perceptions of Transmission Lines in Residential Neighborhoods: Results of a California Case Study." In *Transmission Lines in Residential Neighborhoods: Issues in Siting and Environmental Planning.* Portland, OR: Edison Electric Institute Workshop, 1989.

Priestley, Thomas, and Gary Evans. *Perceptions of Transmission Lines in Residential Neighborhoods: A Case Study in Vallejo, California.* Southern California Edison Company, 1990.

Reed, Richard A. "Fear and Lowering Property Values in New York: Proof of Consequential Damages from 'Cancerphobia' in the Wake of *Criscuola v. Power Authority of the State of New York*." *New York State Bar Journal* (March/April 1994).

Rigdon, Glenn J. "138 kV Transmission Lines and the Value of Recreational Land." *Right of Way* (December 1991).

Rikon, Michael. "Electromagnetic Radiation Field Property Devaluation." *The Appraisal Journal* (January 1996): 87-90.

Sewell, E. Larry. *230 kV Transmission Lines: Impact Study on Real Estate Marketability.* Sarasota, FL: Sewell, Valentich, Tillis and Thatcher, 1989.

Snitzer, Edward L. "Unsightliness of an Electric Transmission Line as Evidence of Severance Damage." *The Real Estate Appraiser* (September-October 1971).

Tikalsky, Susan M., and Cassandra J. Willyard. "Aesthetics and Public Perception of Transmission Structures." *Right of Way* (March/April 2007).

University of California at Berkeley. "Electrophobia: Overcoming Fear of EMFs." *Wellness Letter* (November 1994).

US Department of Energy, National Institute for Occupational Safety and Health, and National Institute of Environmental Health Sciences. *EMFs in the Workplace.* Washington, D.C.: US Government Printing Office, 1996.

Wellman, Juliana B. "The Threat of EMF Litigation and the Case for Sound Science." *The Litigation Journal* (Fall 1993).

White, Andrew A., statistical consultant, Rhodeside and Harwell. *Perceptions of Power Lines: Residents' Attitudes.* Richmond, VA: Virginia Power Company, 1988.

BACK_DEFEXP-RR-004316

_____. *Transmission Line Impact on Property Values.* Richmond, VA: Virginia Power Company, 1992.

Wolverton, Marvin L., and Steven C. Bottemiller. "Further Analysis of Transmission Line Impact on Residential Property Values." *The Appraisal Journal* (July 2003): 244-252.

### View Diminution and Privacy Issues

Benson, Earl D., Julia L. Hansen, and Arthur L. Schwartz Jr. "Water Views and Residential Property Values." *The Appraisal Journal* (July 2000): 260-271.

Dombrow, Jonathan, Mauricio Rodriguez, and C. F. Sirmans. "The Market Value of Mature Trees in Single-Family Housing Markets." *The Appraisal Journal* (January 2000): 39-43.

Rinehart, James R., and Jeffrey J. Pompe. "Estimating the Effect of a View on Undeveloped Property Values." *The Appraisal Journal* (January 1999): 57-61.

Rodriguez, Mauricio, and C. F. Sirmans. "Quantifying the Value of a View in Single-Family Housing Markets." *The Appraisal Journal* (October 1994): 600-603.

Seiler, Michael J., Michael T. Bond, and Vicky L. Seiler. "The Impact of World Class Great Lakes Water Views on Residential Property Values." *The Appraisal Journal* (July 2001): 287-295.

### For Further Reading

#### *Landfills and Waste Facilities*

Bachrach, Kenneth M., and Alex J. Zautra. "Assessing the Impact of Hazardous Waste Facilities: Psychology, Politics, and Environmental Impact Statements." *In Advances in Environmental Psychology, Volume 6. Exposure to Hazardous Substances: Psychological Parameters.* Edited by Lebovits, et al. Hillsdale, NJ: Lawrence Erlbaum Associates, 1984.

Baker, Brian. *Land Value Surrounding Waste Disposal Facilities.* Ithaca, NY: Department of Agricultural Economics, New York State College of Agricultural and Life Sciences, Cornell University, 1982.

Baker, Mary Dunn. "Property Values and Potentially Hazardous Production Facilities: A Case Study of the Kanawha Valley, West Virginia." PhD dissertation, Florida State University, 1986.

Bleich, Donald H., M. Chapman Findlay III, and G. Michael Phillips. "An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values." *The Appraisal Journal* (April 1991): 247-252.

Cartee, Charles P. "A Review of Sanitary Landfill Impacts on Property Values." *The Real Estate Appraiser and Analyst* (Spring 1989).

"Costs and Benefits to Local Governments Due to the Presence of a Hazardous Waste Management Facility and Related Compensation Issues." NC: University of North Carolina, Institute for Environmental Studies, 1985.

Coughlin, R., H. Newburger, and C. Seigner. "Perceptions of Landfill Operations Held by Nearby Residents." Discussion paper. Philadelphia: Regional Science Research Institute, Discussion Paper Series no. 65, 1973.

Gamble, Hays B., and Roger H. Downing. "Effects of Sanitary Landfills on Property Values and Residential Development." In *Solid and Liquid Wastes: Management, Methods and Socioeconomic Consideration.* Edited by S. K. Majumdar and E. Willard Miller. Philadelphia, PA: Pennsylvania Academy of Sciences, 1986.

Gamble, Hays B., Roger H. Downing, J. S. Shortle, and D. J. Epp. "Effects of Solid Waste Disposal Sites on Community Development and Residential Property Values." Institute for Research on Land and Water Resources, Pennsylvania State University, Final Report for Bureau of Solid Waste Management Department of Environmental Resources Commonwealth of Pennsylvania, November 1982.

BACK_DEFEXP-RR-004317

Garippa, John E., and Kenneth R. Kosco. "The Developing Law of Landfill Valuation." *Journal of Property Tax Management* 6, no. 4 (Spring 1995): 1-15.

Goldberg, L., et al. *The Effects of Solid Waste Disposal Sites on Property Values.* Washington, D.C.: US Environmental Protection Agency, 1972.

Greenberg, Michael, and Richard F. Anderson. *Hazardous Waste Sites: The Credibility Gap.* New Brunswick, NJ: Center for Urban Policy Research, 1984.

Greenberg, Michael, and James Hughes. "Impact of Hazardous Waste Sites on Property Value and Land Use: Tax Assessors' Appraisal." *The Appraisal Journal* (January 1993): 42-51.

Havlicek, Joseph, Jr., Robert Richardson, and Lloyd Davies. *Measuring the Impacts of Solid Waste Disposal Site Location on Property Values.* In *University of Chicago Urban Economics Report No. 65.* University of Chicago, November 1972.

Ketkar, Kusum. "Hazardous Waste Sites and Property Values in the State of New Jersey." *Applied Economics* 24.

Massey, D. *Attitudes of Nearby Residents Toward Establishing Sanitary Landfills.* Washington, D.C.: US Environmental Protection Agency, 1978.

McClelland, Gary H., William D. Schulze, and Brian Hurd. "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site." *Risk Analysis* (December 1990).

Mitchell, Robert, and W. H. Desvousges. "The Value of Avoiding a LULU: Hazardous Waste Disposal Sites." *Review of Economics and Statistics* 68.

Mundy, Bill. *The Impact of Waste Disposal Sites on Nearby Property Values: A Bibliography of Related Literature.* Seattle: Mundy and Associates, 1991.

___. "The Impact of Waste Disposal Sites on Nearby Property Values: Summary of Literature." In *Environmental Analysis and Valuation Seminar.* Seattle: Mundy and Associates, 1992.

Nelson, Arthur C. "Anticipated Market Impacts on Sales Prices of Residential Properties Near Proposed Laidlaw Waste Systems Landfill." Unpublished report, Northeast Kansas City, MO, 1991.

Nelson, Arthur C., John Genereux, and Michell Genereux. "Price Effects of Landfills on House Values." *Land Economics* 68, no. 4 (November 1992).

Pettit, C. L., and Dr. Charles Johnson. "The Impact on Property Values of Solid Waste Facilities." *Waste Age* (April 1987).

Price, Joe R. *The Impact of Solid Waste Management Facilities on Surrounding Real Estate Values.* West Palm Beach, FL: Callaway and Price, 1989.

Reichert, Alan K., Michael Small, and Sonil Mohanty. "The Impact of Landfills on Residential Property Values." *The Journal of Real Estate Research* 7, no. 3 (Summer 1992).

Rudzitis, G., and E. G. Hwang. "The External Costs of Sanitary Landfills." *Journal of Environmental Systems* 7, no. 4 (1977-78).

"Siting of Hazardous Waste Management Facilities and Public Opposition. Document SW-809." Washington, D.C.: Centaur Associates and US Environmental Protection Agency, Office of Waste and Waste Management, 1979.

Smith, Martin A., F. M. Lynn, and R. N. Andrews. "Economic Impacts of Hazardous Waste Facilities." *Hazardous Waste and Hazardous Materials* (1986).

Smith, V. Kerry, and William H. Desvousges. "Asymmetries to the Valuation of Risk and the Siting of Hazardous Waste Disposal Facilities." *American Economic Review* (May 1986).

___. "The Values of Avoiding a LULU: Hazardous Waste Disposal Sites." *The Review of Economics and Statistics* (May 1986).

BACK_DEFEXP-RR-004318

Smolen, G. E., G. Moore, and L. V. Conway. "Hazardous Waste Landfill Impacts on Local Property Values." *Real Estate Appraiser* (April 1992).

Wise, Kenneth, and Johannes P. Pfeifenberger. "The Enigma of Stigma: The Case of the Industrial Excess Landfill." *Toxics Law Reporter* (May 1994).

Zeiss and Atwater. "Waste Facility Impacts on Residential Property Values." *Journal of Urban Planning and Development* (1989).

### Land Use

Crafts, John M. "Impact of Commercial Development on Adjacent Residential Properties." *The Appraisal Journal* (January 1998): 6-10.

Guttery, Randall S. "The Effects of Subdivision Design on Housing Values: The Case of Alleyways." *Journal of Real Estate Research* 23, no. 3 (2002).

Knipe, William B. (Trey), III. "Valuing the Probability of Rezoning." *The Appraisal Journal* (April 1988): 217-222.

Li, Ling Hin. "The Impact of Social Stigma: An Examination of the Public and Private Housing Markets in Hong Kong." *The Appraisal Journal* (Summer 2005): 305-317.

MaRous, Michael S. "Low-Income Housing in Our Backyards: What Happens to Residential Property Values." *The Appraisal Journal* (January 1996): 27-33.

### Pipelines

Kinnard, William N., Jr. "The Impact of Proximity to High-Pressure Natural Gas Pipelines on Single-Family Residential Property Values." Paper presented at the 1993 annual meeting of the American Real Estate Society, Key West, FL, April 1993.

Kinnard, William N., Jr., Sue Ann Dickey, and Mary Beth Geckler. "Natural Gas Pipeline Impact on Residential Property Values: An Empirical Study of Two Market Areas." *Right of Way* (June/July 1994).

### Traffic/Transportation Corridors

Allen, Gary R. "Highway Noise, Noise Mitigation, and Residential Property Values." *Transportation Research Record* 812 (1981).

Allen, W. Bruce, and David E. Boyce. "Impact of High Speed Rapid Transit Facility on Residential Property Values." *High Speed Ground Transportation Journal* 8, no. 2 (Summer 1974).

Gamble, Hays B., Owen H. Sauerlender, and C. John Langley. "Adverse and Beneficial Effects of Highways on Residential Property Values." *Transportation Research Record* 508 (1974).

Hall, Fred L., Barbara E. Breston, and S. Martin Taylor. "Effects of Highway Noise on Residential Property Values." *Transportation Research Record* 686 (1978).

Hall, Fred L., and J. Douglas Welland. "The Effect of Noise Barriers on the Market Value of Adjacent Residential Properties." *Transportation Research Record* 1143 (1987).

Hirschman, Ira, and Michael Henderson. "Methodology for Assessing Local Land Use Impacts of Highways." *Transportation Research Record* 1274 (1990).

Hughes, William T., Jr., and C. F. Sirmans. "Adjusting House Prices for Intra-Neighborhood Traffic Differences." *The Appraisal Journal* (October 1993): 533-538.

_____. "Traffic Externalities and Single-Family House Prices." *Journal of Regional Science* (November 1992).

Hyde, James V., Jr. "The Appraiser's Approach to Noise Damage." *The Real Estate Appraiser* (November-December 1976).

Jacobe, Allison P. "Stonewalling for Time: A History of the Garden Grove Sound Wall." *Right of Way* (July/August 2001).

Kamerud, Dana B., and Calvin R. von Buseck. "The Effects of Traffic Sound and its Reduction on Houses Prices." *Transportation Research Record* 1033 (1985).

BACK_DEFEXP-RR-004319

Langdon, F. J. "Noise Nuisance Caused by Road Traffic in Residential Areas: Part III." *Journal of Sound and Vibration* 49, no. 2 (1976).

Langley, C. John, Jr. "Adverse Impacts of the Washington Beltway on Residential Property Values." *Land Economics* 52, no. 1 (February 1976).

___. "Highways and Property Values: The Washington Beltway Revisited." *Transportation Research Record* 812 (1981).

_____. "Time-Series Effects of a Limited-Access Highway on Residential Property Values." *Transportation Research Record* 583 (1976).

Lewis, Harold J. "The Appraisal of Highway Noise Damages." *The Appraisal Journal* (October 1977): 499-504.

Nelson, Jon P. "Highway Noise and Property Values: A Survey of Recent Evidence." *Journal of Transport Economics and Policy* 16, no. 2 (May 1982).

Nelson, Roland D., and Laurence G. Allen. "Expressway Proximity Damages to Residential Property." *Right of Way* 30, no. 1 (February 1983).

Palmquist, Raymond B. "Impact of Highway Improvements on Property Values in Washington State." *Transportation Research Record* 887 (1982).

Simons, Robert A., and Abdellaziz El Jaouhari. "The Effect of Freight Railroad Tracks and Train Activity on Residential Property Values." *The Appraisal Journal* (Summer 2004): 223-233.

Taylor, S. M., B. E. Breston, and F. L. Hall. "The Effect of Road Traffic Noise on House Prices." *Journal of Sound and Vibration* 80, no. 4 (February 1982).

Wigle, W. G. "The Effect of Urban Expressways on Adjacent Land Values." *Right of Way* (February 1975).

## Other Proximity Issues

Blomquist, Glenn. "The Effects of Electrical Utility Power Plant Location on Area Property Value." *Land Economics* 50 (February 1974).

Flower, Patrick C., and Wade R. Ragas. "The Effects of Refineries on Neighborhood Property Values." *Journal of Real Estate Research* 9, no. 3 (Summer 1994).

Guidotti, Tee L. "The Cancer Non-Epidemic of County 20: Case Study of an Epidemiological Mistake." *Public Health Review* 19 (1991-92).

Guidotti, Tee L., and Sheila Abercrombie. "Voices of Leadership in a Community Under Stress: Personal Observations by Officials on an Epidemiologic Mistake." *Journal of Public Health Medicine* (1994).

Guidotti, Tee L., and Philip Jacobs. "The Implications of an Epidemiological Mistake: A Community's Response to a Perceived Excess Cancer Risk." *American Journal of Public Health* 83 (1993).

Kiel, Katherine A., and Katherine T. McClain. "The Effect of an Incinerator Siting on Housing Appreciation Rates." *Journal of Urban Economics* (May 1995).

_____. "House Prices During Siting Decision Stages: The Case of an Incinerator from Rumor Through Operation." *Journal of Environmental Economics and Management* (March 1995).

Ragas, Wade R., and Patrick C. Flower. "Petroleum Refineries–Can Larger Site Buffers Limit Adjacent Property Value Impacts?" Professional Report of the Society of Industrial and Office Realtors, October 1994.

___. "Refineries and Neighborhood Property Values." In *Technical Report 1018*. College Station, TX: Texas A&M University, 1994.

BACK_DEFEXP-RR-004320

## Chapter 6. Building and Manufacturing Conditions

American Society of Home Inspectors, and Carson, Dunlop & Associates. "Recognizing Structural Defects in Houses." *Valuation* (Fourth Quarter 2000).

Anderson, Orell C., and Edward B. Gentilcore. "A View from the Ground Up: Calculating Damages Due to Construction Project Delay." *Construct!* (American Bar Association) 15, no. 1 (Fall 2005).

Dawson, Michele. "Tired of Being Bugged? How to Keep Winter Pests at Bay in and Around Your Home." *Realty Times* (January 21, 2003).

Feinberg, Ross W., and Ronald L. Perl. *Construction Defect Litigation.* Alexandria, VA: Community Association Press, 2006.

Feld, Jacob, and Kenneth L. Carper. *Construction Failure.* 2nd ed. New York: John Wiley and Sons, 1997.

Harrison, Henry S. "Common Problems of Homeowners." *The Real Estate Appraiser* (September-October 1975).

Johnson, Ken H., Sean P. Salter, Leonard P. Zumpano, and Randy I. Anderson. "Exterior Insulation and Finish Systems: The Effect on Residential Housing Prices and Marketing Time." *Journal of Real Estate Research* 22, no. 3 (2001).

Laurain, Janet. "Synthetic Stucco: A Study in Structural Chaos." *Valuation* (Fourth Quarter 1997): 17-19.

Miller, Thomas E., and Rachel M. Miller. *Handling Construction Defect Claims: Western States.* 3rd ed. Gaithersburg, NY: Aspen Law and Business, 1999.

## Chapter 7. Site and Infrastructure Conditions

Lea, Robert M. "Subway Tunnel Easements in Metropolitan Areas." *The Appraisal Journal* (April 1994): 310-313.

Sanders, Michael V. "Post-Repair Diminution in Value from Geotechnical Problems." *The Appraisal Journal* (January 1996): 59-66.

## Chapter 8. Environmental and Biomedical Conditions

Airst, Randall L. "Appraising Dormant Brownfield Properties." *Right of Way* (January/February 2004).

___. "Insure Success: Sell Brownfield Sites While Eliminating Liability." *Right of Way* (November/December 2003).

Anderson, Orell C. "Environmental Contamination: An Analysis in the Context of the DC Matrix." *The Appraisal Journal* (July 2001): 322-332.

Bell, Randall. "Quantifying Diminution in Value Due to Detrimental Conditions: An Application to Environmentally Contaminated Properties." *Environmental Claims Journal* (Autumn 1996).

Campanella, Joseph A. "Valuing Partial Losses in Contamination Cases." *The Appraisal Journal* (April 1984): 301-304.

Carver, Robert P., and Anthony W. Crowell. "Toxic Tax Assessments: The Ad Valorem Taxation of Contaminated Property." *Real Estate Issues* (Fall 1999).

Chalmers, James A., and Thomas O. Jackson. "Risk Factors in the Appraisal of Contaminated Property." *The Appraisal Journal* (January 1996): 44-58.

Chalmers, James A., and Scott A. Roehr. "Issues in the Valuation of Contaminated Property." *The Appraisal Journal* (January 1993): 28-41.

Christensen, Barbara. "Can Pollution Contaminate Value?" *The Real Estate Appraiser and Analyst* 53, no. 3 (Fall/Winter 1987).

Ciambrone, David F. *Environmental Life Cycle Analysis.* Boca Raton, FL: Lewis Publishers, 1997.

BACK_DEFEXP-RR-004321

___. *Waste Minimization as a Strategic Weapon*. Boca Raton, FL: Lewis Publishers, 1996.

Civins, Jeff, and Bane Phillippi. "Who's Liable Now?–New Federal Brownfields Legislation." *Real Estate Issues* (Winter 2003-2004).

Decker, Christopher S., Donald A. Nielsen, and Roger P. Sindt. "Is Pollution a Homogenous Determinant of Value?" *The Appraisal Journal* (Spring 2005): 183-197.

Dotzour, Mark G. "Groundwater Contamination and Residential Property Values." *The Appraisal Journal* (July 1997): 279-285.

Elliot-Jones, Michael. "Real Estate Value and Toxic Sites." *Digest of Environmental Law* 5, no. 7 (1992).

___. *Rents and Proximity to Toxic Sites*. San Francisco: Foster Associates, 1991.

___. *'Stigma' in Light of Bixby Ranch, DeSario, and T&E Industries*. San Francisco: Foster Associates, 1995.

___. *Toxic Sites, Property Values and Liquidity*. San Francisco: Foster Associates, 1991.

Environmental Information Limited. *Hazardous Waste Movement in the United States*. Washington, D.C.: National Solid Wastes Management Association, 1991.

Farrah, George R. "Strategies for Compliance." In *Environmental Tax Handbook*. Washington, D.C.: The Bureau of National Affairs, 1989.

Ferguson, Jerry T., and Phyllis S. Myers. "Managing the Hazardous Waste Risk of Landlords and Lenders." Paper presented at the annual meeting of the American Real Estate Society, Hilton Head, SC, April 1995.

Ferruggia, Frank E. "Valuation of Contaminated Property: New Jersey's Inmar Decision." *Assessment Digest* (March/April 1991).

Garippa, John E., and Seth I. Davenport. "The Effects of Environmental Contamination on Property Values for Tax Assessment Purposes." Paper presented at 15th annual conference of the Institute for Professionals in Taxation (IPT), Reno: June 26, 1991.

Girasole, Anthony P., Jr. "The Lesson of Love Canal." *Valuation* (First Quarter 1999): 9-13.

Gladstone, Robert A. "Contaminated Property: A Valuation Perspective." *Toxics Law Reporter* (November 27, 1991).

Goodman, Gary A., and Dennis P. Harkawik. "Handling Transactions Involving Environmentally Contaminated Property." *Real Estate Review* (Spring 1991).

Greenberg, Michael, and Justin Hollander. "Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey." *The Appraisal Journal* (Spring 2006): 161-173.

Harrison, David, Jr., and James H. Stock. *Hedonic Housing Values, Local Public Goods, and the Benefits of Hazardous Waste Cleanup*. In *Harvard University Energy and Environmental Policy Center Discussion Paper E-84-09*, Cambridge: Harvard University Energy and Environmental Policy Center, 1984.

Healy, Patricia R., and John J. Healy Jr. "Lenders' Perspectives on Environmental Issues." *Real Estate Issues* 16, no. 2 (Fall/Winter 1991). Reprinted in July 1992 issue of *The Appraisal Journal*.

Hogin, Bradley R. "Post-Cleanup Stigma Claims: The Latest Front in the War Over Hazardous Waste Cost Recovery." *Analysis and Perspective*. Washington, D.C.: Bureau of National Affairs, 1995.

Hunsperger, Wayne L. "Case Example: Impact of Hazardous Waste Material on Appraisal." *Focus: The Bulletin of Environmental Risk Evaluation and Management* (February 1, 1991).

BACK_DEFEXP-RR-004322

___. "Heavy Metal Pollution and Residential Property Damages." *Environmental Watch* VI, no. 3 (Fall 1993).

Hurd, Brian H. "Valuing Superfund Site Cleanup: Evidence of Recovering Stigmatized Property Values." *The Appraisal Journal* (October 2002).

Jackson, Thomas O. "Appraisal Standards and Contaminated Property Valuation." *The Appraisal Journal* (April 2003): 127-133.

___. "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices." *The Appraisal Journal* (April 2001): 200-210.

___. "The Effects of Environmental Contamination on Real Estate: A Literature Review." *Journal of Real Estate Literature* 9, no. 2 (2001).

___. "Environmental Contamination and Industrial Real Estate Prices." *Journal of Real Estate Research* 23, nos. 1 and 2 (2002).

___. "Environment Risk Perceptions of Commercial and Industrial Real Estate Lenders." *Journal of Real Estate Research* 22, no. 3 (2001).

___. "Groundwater Contamination and Real Estate Investment Risk." *Journal of Real Estate Practice and Education* 8, no. 1 (2005).

___. "Investing in Contaminated Real Estate." *Real Estate Issues* (Winter 1997).

___. "Methods and Techniques for Contaminated Property Valuation." *The Appraisal Journal* (October 2003): 311-320.

Jackson, Thomas O., and J. Michael Sowinski Jr. "Institutional Controls and Contaminated Property Valuation." *The Appraisal Journal* (Fall 2006): 328-332.

Jessup, Deborah Hitchcock. *Guide to State Environmental Programs.* 3rd ed. Washington, D.C.: Bureau of National Affairs, 1994.

Keiter, Allen C. "No Further Action Letter's Status Can Change." *The Appraisal Journal* (October 2002): 374.

Kiel, Katherine A. "Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on House Values." *Land Economics* (November 1995).

Kiel, Katherine A., and Jeffrey Zabel. "Estimating the Economic Benefits of Cleaning Up Superfund Sites: The Case of Woburn, Massachusetts." *Journal of Real Estate Finance and Economics* 22, no. 2 (2001).

Kinnard, William N., Jr. "Analyzing the Stigma Effect of Proximity to Hazardous Materials Sites." *Environmental Watch* II, no. 4 (December 1989).

___. "Current Techniques and Procedures for Dealing with the Effects of Property Contamination." Paper presented at 1990 Society of Real Estate Appraisers symposium, San Antonio, September 13, 1990.

___. "Measuring the Effects of Contamination on Property Values." *Environmental Watch* IV, no. 4 (Winter 1992).

___. "Measuring the Effects of Contamination on Property Values: The Focus of the Symposium in the Context of Current Knowledge." Technical report. Chicago: Appraisal Institute, 1992.

___. "Measuring Locational Obsolescence from Nearby Hazardous Facilities." Seminar presented at national conference of the Appraisal Institute, Boston, July 29, 1992.

___. "Measuring Locational Obsolescence: Proximity to Hazardous Materials Sites." Presentation given at silver anniversary professional seminar on appraisal of distressed properties for the International Association of Assessing Officers, Montreal, October 13, 1990.

___. "The Stigma Effects of Contamination on Real Property Values." Paper pre-

BACK_DEFEXP-RR-004323

sented at the International Association of Assessing Officers legal seminar, Scottsdale, AZ, November, 1995.

___. "What Appraisers Can Do and Must Do to Estimate the Impact of Contamination on Property Value." Paper presented at American Bar Association meeting, New York, March 1993.

Kinnard, William N., Jr., Jake W. DeLottie, Mary Beth Geckler, and Benjamin H. Noble. "The Impact of Widespread, Long-Term Soil Contamination on Residential Property Values: A Case Study." Paper presented at the annual meeting of the American Real Estate Society, Hilton Head, SC, April 1995.

Kinnard, William N., Jr., Mary Beth Geckler, and Jake W. DeLottie. "The Effect of Varying Levels of Negative Publicity on Single-Family Property Values: A Case Study of Soil Contamination." *Assessment Journal* 3, no. 5 (September/October 1996).

Kline, Stephen M. "Valuing Contaminated Property: New and Unfamiliar Territory." *Journal of Technical Valuation* (August 1991).

Kolhase, Janet E. "The Impact of Toxic Waste Sites on Housing Values." *Journal of Urban Economics* (1990).

Lautenberg, Sandra. "The Effects of Abandoned Hazardous Waste Dump Sites on Land Use and Values in Edison, New Jersey." Unpublished paper, Department of Urban Planning and Policy Development, New Brunswick, NJ, 1982.

Lawson, Jeffrey T., and Barbara H. Cane. "Hazardous Waste and the Real Estate Transaction: A Practical and Theoretical Guide (For the Technical Consultant, Real Estate Attorney, Business Person, Investor, or Anyone Involved in Buying and Selling Land)." Presentation given at the National Symposium on Management of Uncontrolled Hazardous Waste Sites, Washington, D.C.: November 29-December 1, 1982.

Long, F. A., and Glenn E. Schwietzer, eds. *Risk Assessment at Hazardous Waste Sites.* Washington, D.C.: American Chemical Society, ACS Symposium Series 204, 1982.

Mays, Richard H. *Environmental Laws; Impact on Business Transactions: A Practical Guide with Forms.* Washington, D.C.: Bureau of National Affairs, 1992.

McGregor, Gregor I. "Land Owner Liability for Hazardous Waste." *The Journal of Real Estate Development* (Winter 1989).

McLain, Wallis E., Jr. *US Environmental Laws.* Washington, D.C.: The Bureau of National Affairs, 1991.

Milligan, Peter A. "Contaminated Land or Toxic Real Estate: Lessons from Ontario." *Journal of Property Tax Management* 16, no. 3 (Winter 1995).

Mueller, Glenn R. "Brownfields Capital–Unlocking Value in Environmental Redevelopment." *Journal of Real Estate Portfolio Management* (January-April 2005).

Mundy, Bill. *Hazardous & Toxic Materials and Property Valuation: Bibliography.* Seattle: Mundy and Associates, March 1992.

___. "Hazardous Waste: Contamination, Fear, and Industrial Property Transactions." Professional report. Washington, D.C.: Society of Industrial and Office Realtors, 1993.

___. "The Impact of Hazardous Materials on Property Value." *The Appraisal Journal* (April 1992): 155-162.

___. "The Impact of Hazardous and Toxic Material on Property Value: Revisited." *The Appraisal Journal* (October 1992) 463-471.

___. "Stigma Influences on Value: Methodologies for Valuation of Real Property Impacted by Pollution from Hazardous and Toxic Materials." Seminar presented and prepared by the Real Estate Counseling Group of America, Orlando, FL, February 28, 1991.

BACK_DEFEXP-RR-004324

O'Brien, James P., and Frank William Harris. *Environment Due Diligence: The Complete Resource Guide for Real Estate Lenders, Buyers, Sellers, and Attorneys.* Washington, D.C.: The Bureau of National Affairs, 1989.

Olsen, Howard G., and Tom Bergamini. "Advance Due-Diligence Activities Benefit Contaminated Real Estate Transactions." *Real Estate Issues* (Winter 2003-2004).

Olsen, Ralph K. "Hazardous Waste Sites." *The Appraisal Journal* (April 1989): 233-236.

Patchin, Peter J. "Contaminated Properties and the Sales Comparison Approach." *The Appraisal Journal* (July 1994): 402-409.

___. "Contaminated Properties: Stigma Revisited." *The Appraisal Journal* (April 1991): 167-172.

___. "The Valuation of Contaminated Properties." *Real Estate Issues* (Fall/Winter 1991).

___. "Valuation of Contaminated Properties." *The Appraisal Journal* (January 1988): 7-16.

Peters, Bill Thomas. "How the Cost of Cleanup, Liability Factors, and Governmental Regulation of Hazardous Wastes Impacts Property Values for Purposes of Ad Valorem Taxation." Presentation given at 9th annual International Association of Assessing Officers legal seminar, New Orleans, November 9, 1989.

Phillips, Beverly S., Peter D. Bowes, and John Reisse Jr. "Environmental Issues and Diminution of Value: A Case Study." *The Canadian Appraiser* (Summer 1994).

Reichert, Alan K. "The Impact of a Toxic Waste Superfund Site Upon Residential Property Values." Paper presented at the annual meeting of the American Real Estate Society, Hilton Head, SC, April 1995.

___. "The Persistence of Contamination Effects: A Superfund Site Revisited." *The Appraisal Journal* (April 1999): 126-135.

Rinaldi, Anthony J. "Contaminated Properties–Valuation Solutions." *The Appraisal Journal* (July 1991): 377-381.

Robinson, Rudy R., III, Scott R. Lucas, and Garland G. Rasberry. "Watersbend: Appraising a Brownfield Redevelopment Project." *The Appraisal Journal* (July 2002): 309-317.

Roddewig, Richard J. "Classifying the Level of Risk and Stigma Affecting Contaminated Property." *The Appraisal Journal* (January 1999): 98-102.

___. "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries." *The Appraisal Journal* (October 1996).

___, ed. *Valuing Contaminated Properties: An Appraisal Institute Anthology.* Chicago: Appraisal Institute, 2002.

___, ed. *Valuing Contaminated Properties: An Appraisal Institute Anthology.* Volume II. Chicago: Appraisal Institute, 2014.

Silverman, Gerald B. (Bureau of National Affairs). "Love Canal: A Retrospective." *Environmental Reporter* 20, no. 20, part II (September 15, 1989).

Smart, Miles M., and David L. Wynes. "The Impact of Environmental Conditions on Real Property." *Assessment Digest* (November/December 1990).

*Standard on the Valuation of Property Affected by Environmental Contamination.* Chicago: International Association of Assessing Officers. 1992.

Stimson, James A., Jeffrey J. Kimmel, and Sara Thurin Rollin. *Guide to Environmental Laws from Premanufacture to Disposal.* Washington, D.C.: Bureau of National Affairs, 1993.

Sullivan, Thomas F. P. *Environmental Information Sources.* 5th ed. Rockville, MD: Government Institutes, 1995.

BACK_DEFEXP-RR-004325

Svoboda, Robert S. "Valuation Case Studies Involving Environmental Issues." Presentation given at 15th Annual Institute of Professionals in Taxation conference, Reno, June 23, 1991.

Thompson, Donald N. *The Economics of Environmental Protection.* Cambridge, MA: Winthrop Publishers, 1973.

"Valuing Contaminated Land." In *Environmental Law 14.* London: Denton Hall, 1994.

Vidich, Charles. "Calculating the Risk of Purchasing Toxic Real Estate." Paper presented at 1991 annual conference of the American Real Estate Society, Sarasota, FL, April 12, 1991.

White, Mark A. "Appraisal Practice Considering Environmental Risks." *Focus* 2, no. 2 (November 1, 1989).

___. "Calculation of an Extraordinary Risk Premium." *Focus* 5, no. 2 (January 2, 1992).

___. "Emerging Approaches to Impaired Property Valuation." *Environmental Watch* VII, no. 2 (Summer 1994).

___. "The Environmental Impact on Valuation." Presentation given at the 39th annual property assessment program of the Virginia Association of Assessing Officers, Charlottesville, July 20-22, 1994.

___. "Environmentally Impaired Valuation: A Team Approach to a Balance Sheet Presentation." Technical report. Chicago: Appraisal Institute, 1992.

___. "The Environmental Opinion: Basis for an Impaired Value Opinion." *The Appraisal Journal* (July 1994): 410-423.

___. *Environmental Risk: Identification and Management.* Chelsea, MI: Lewis Publishers, 1991.

Wilson, Albert R., Maxwell O. Ramsland Jr., Thomas Wilhelmy, and Roger Groves. "Ad Valorem Taxation and Environmental Devaluation (Parts I and II)." *Journal of Property Tax Management* (Summer/Fall 1993).

Wise, Kenneth T. *Analysis of Property Value Impacts in the Uniontown Class Area.* Cambridge, MA: The Brattle Group, February 1993.

Worobec, Mary Devine, and Girard Ordway. "Federal Regulation of Chemicals in the Environment." In *Toxic Substances Controls Guide.* Washington, D.C.: Bureau of National Affairs, 1992.

### Air Pollution

Egar, Francis J. "Air Pollution and Property Values in the Hartford Metropolitan Region." Unpublished PhD dissertation, Fordham University, 1973.

Freeman, A. Myrick, III. "On Estimating Air Pollution Control Benefits from Land Value Studies." *Journal of Environmental Economics and Management* (May 1974).

Smith, V. Kerry, and Timothy A. Deyak. "Measuring the Impact of Air Pollution on Property Values." *Journal of Regional Science* (July 1986).

Smith, V. Kerry, and Ju-Chin Huang. "Can Markets Value Air Quality? A Meta-Analysis of Hedonic Property Value Models." *Journal of Political Economy* 103, no. 1 (February 1995).

Vanderver, Timothy A., Jr. *Clean Air Law and Regulation.* Washington, D.C.: Bureau of National Affairs, 1992.

### Asbestos

American Institute of Real Estate Appraisers. *Asbestos: Basic Information for Appraisers.* 2nd ed. Chicago: American Institute of Real Estate Appraisers, 1990.

Bell, Randall. "The Impact of Asbestos on Real Estate Values." *Right of Way* (October 1994).

Brittendall, Gerald. "Identifying and Resolving Asbestos Problems." *Journal of Property Management,* bulletin 371 (May/June 1985).

Fisher, Jeffrey D., George H. Lentz, and K. S. Maurice Tse. "Valuation of Effects of Asbestos on Commercial Real Estate."

BACK_DEFEXP-RR-004326

*The Journal of Real Estate Research* 7, no. 3 (Summer 1992).

Lentz, George H. "Asbestos and the Value of Commercial Real Estate." *Municipal Government Information Center Newsletter* (March/April 1989).

Mansfield, Richard H., III. "Disclosure of Asbestos, Who Is Responsible?" *Legal Line* (April 1992).

Ramsland, Maxwell O., Jr. "An Asbestos Abatement Model: A Valuation Methodology for Appraisers." *Environmental Watch* (Spring 1990).

___. "Asbestos: Risk and the Remediation Process." Technical Report. Chicago: Appraisal Institute, 1992.

Tenenbaum, Wayne A. "The Effect of Asbestos on Market Value: A Suggested Methodology." Presentation given at the 14th annual Institute for Professionals in Taxation conference, June 1990.

US Environmental Protection Agency. *EPA Study of Asbestos-Containing Materials in Public Buildings.* Washington, D.C.: US Government Printing Office, 1988.

Wilson, Albert R. "Probable Financial Effects of Asbestos Removal on Real Estate." *The Appraisal Journal* (July 1989): 378-391.

### Mold

Aalberts, Robert J., and Richard W. Hoyt. "Toxic Mold Liability Update: Implications of Kilian v. Equity Residential Trust." *The Appraisal Journal* (Spring 2006): 174-182.

Barsh, Kerri L. "Toxic Mold: What You Should Know About It and What You Can Do About It." *Real Estate Issues* (Summer 2002).

Guidry, Krisandra. "Sick Commercial Buildings: What Appraisers Need to Know." *The Appraisal Journal* (January 2002).

Sanders, Michael V. "Mold: What Appraisers Should Know." *Valuation* (Third Quarter 2005): 42-43.

Silfer, Brian E. "Mold: The Next Asbestos?" *Environmental Claims Journal* (Summer 2002).

Vlosky, Richard P., and Todd F. Shupe. "An Exploratory Study of Home Builder, New-Home Homeowner, and Real Estate Agent Perceptions and Attitudes About Mold." *Forest Products Journal* (December 2004).

### Radiation

Abkowitz, Mark D., Moses Karakouzian, and James A. Cardle. "Developing an Impact Analysis System for the Transport of High-Level Nuclear Waste." *Transportation Research Record* 1264 (1990).

American Council on Science and Health. *Health Effects of Low-Level Radiation.* New York: American Council on Science and Health, 1989.

Bjornstad, David J., and David P. Vogt. "Some Comments Relating to Model Specification on 'Effects of Nuclear Power Plants on Residential Property Values.'" *Journal of Regional Science* 24, no. 1 (1984).

Capitol Region Planning and Development Agency. "Adverse Housing Related Impacts on Viability of Neighborhoods Due to the Three Mile Island Accident." Report to Pennsylvania Department of Community Affairs, Bureau of Policy Planning, August 21, 1980.

Chalmers, J. D., K. Pijawka, K. Branch, P. Bergmann, and J. Flynn. *Socioeconomic Impacts of Nuclear Generating Stations: Summary Report.* Washington, D.C.: Nuclear Regulatory Commission (CR-2750), 1982.

Friedman, Jack P., and Barry Diskin. "Nuclear Waste Disposal: A Taxing Real Estate Issue." *Real Estate Issues* (Summer 2006).

Galster, George. "Nuclear Power Plants and Residential Property Values: A Comment on Short-Run vs. Long-Run

BACK_DEFEXP-RR-004327

Considerations." *Journal of Regional Science* (1986).

Gamble, Hays B., and Roger H. Downing. "Effects of Nuclear Power Plants on Residential Property Values." *Journal of Regional Science* (1982).

___. Institute for Research on Land and Water Resources, Pennsylvania State University. "Effects of the Accident at Three Mile Island on Residential Property Values and Sales." Report prepared for the US Nuclear Regulatory Commission (NUREG/CR-2063), 1981.

Griffin, C. R. "Assessing the Impact on Housing Prices of the Environmental Hazard of Rocky Flats, CO: An Initial Examination." Paper presented at the annual meeting of the American Real Estate Society, Sarasota, FL, April 11, 1991.

Griffin, C. R., and Daniel R. Vellenga. "Homeowner Attitudes toward Purchasing and Living in the Near Proximity to a Nuclear Facility." Paper presented at annual conference of the American Real Estate Society, Key West, FL, April 17, 1993.

Hageman, Ronda K. "Nuclear Waste Disposal: Potential Property Value Impacts." *Natural Resources Journal* (October 1981).

Hoyt, Richard W., R. Keith Schwer, and William Thompson. "A Note on Homebuyer Attitudes Toward a Nuclear Repository." *Journal of Real Estate Research* 7, no. 2 (Spring 1992).

Kinnard, William N., Jr., and Mary Beth Geckler. "The Effects on Residential Real Estate Prices from Proximity to Properties Contaminated with Radioactive Materials." *Real Estate Issues* 16, no. 2 (Fall/Winter 1991).

Kinnard, William N., Jr., Phillip S. Mitchell, and Gail L. Beron. "The Market Impact of a Release of Radioactive Materials on Local Housing Values: An Econometric Study." *Journal of Property Tax Management* (Fall 1990).

Kinnard, William N., Jr., Phillip S. Mitchell, Gail L. Beron, and James R. Webb. "Market Reactions to an Announced Release of Radioactive Materials: The Impact on Assessable Value." *Property Tax Journal* 10, no. 3 (September 1991).

Miller, Norman G. "A Geographic Information System-Based Approach to the Effects of Nuclear Processing Plants on Surrounding Property Values: The Case of the Fernald Settlement Study." Paper presented at the American Real Estate Society annual meeting, San Diego, April 1992.

Murray, Raymond L. *Understanding Radioactive Waste.* Columbus-Richland, NE: Battelle Press, 1994.

Nelson, Jon P. "Three Mile Island and Residential Property Values: Empirical Analysis and Policy Implications." *Land Economics* (August 1981).

Payne, B. A., S. J. Olshansky, and T. E. Segel. Argonne National Laboratory, IL. "The Effects on Residential Property Values of Proximity to a Site Contaminated with Radioactive Waste." Presentation given at Waste Management Conference, Tucson, March 24, 1985.

Pijawka, D., and J. Chalmers. "Impact of Nuclear Generating Plants on Local Areas." *Economic Geography* (January 1983).

Shearer, Don Paul. *Three Mile Island Nuclear Accident Community Impact Study on Real Estate.* Greater Harrisburg Board of Realtors, TMI Impact Study Committee, 1978.

Twark, Richard D., Raymond W. Eyerly, and Roger H. Downing. *The Effect of Nuclear Power Plants on Residential Property Values: A New Look at Three Mile Island.* University Park, PA: Environmental Resources Research Institute, Pennsylvania State University, 1990.

Webb, James R. "Nuclear Power Plants: Effects on Property Values." *The Appraisal Journal* (April 1980): 230-235.

BACK_DEFEXP-RR-004328

## Fracking

American Petroleum Institute. *Guidance Document API HF1, Hydraulic Fracturing Operations–Well Construction and Integrity Guidelines.* First Edition/October 2009. www.api.org.

Ames, Robert M., Anthony Corridore, Joal Nathan Ephross, Edward Hirs, Paul W. MacAvoy, and Richard Tavelli, Social Science Research Network. *The Arithmetic of Shale Gas.* June 15, 2012. http://ssrn.com/abstract=2085027.

Blackmon, David. "The Texas Shale Oil and Gas Revolution–Leading the Way to Enhanced Energy Security," *Forbes.com* (March 19, 2013).

Boyer, Elizabeth W., Bryan R. Swistock, James Clark, Mark Madden, and Dana Rizzo, The Center for Rural Pennsylvania. *The Impact of Marcellus Gas Drilling on Rural Drinking Water.* March 2012. www.rural.palegislature.us.

Cohen, Ken. "'Fracking' Fluid Disclosure: Why It's Important," *ExxonMobil Perspectives* (August 25, 2011), www.exxonmobilperspectives.com.

Davies, Richard, Gillian Foulger, Annette Bindley, and Peter Styles, Durham University. *Induced Seismicity and Hydraulic Fracturing for the Recovery of Hydrocarbons.* 2013. https://pangea.stanford.edu/researchgroups.

Ground Water Protection Council and ALL Consulting. *Modern Shale Gas Development in the United States: A Primer*, prepared for the US Department of Energy, Office of Fossil Energy, and National Energy Technology Laboratory. April 2009. http://fracfocus.org.

IHS Inc., *America's New Energy Future: The Unconventional Oil and Gas Revolution and the US Economy*, October 2012, www.uschamber.com/sites/default/files/legacy/reports/AmericasNewEnergyFuture.pdf.

King, George E., Apache Corporation. *Estimating Frac Risk and Improving Frac Performance in Unconventional Gas and Oil Wells.* January 23, 2012. http://gekengineering.com.

Nocera, Joe. "A World Without OPEC?" *The New York Times* (October 20, 2014).

O'Sullivan, Megan L. "'Energy Independence' Alone Won't Boost US Power," *Bloomberg View* (February 14, 2013), www.bloombergview.com.

US Environmental Protection Agency, Office of Ground Water and Drinking Water. *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs.* June 2004. http://nepis.epa.gov.

## Other Types of Contamination

Bible, Douglas S., Chengho Hsieh, Gary Joiner, Chuo-Hsuan Lee, and David W. Volentine. "Analysis of the Effects of Contamination by a Creosote Plant on Property Values." *The Appraisal Journal* (Winter 2005): 87-97.

Simons, Robert A. "Estimating Proximate Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach." *The Appraisal Journal* (October 2002): 388-400.

Simons, Robert A., and Rudy R. Robinson III. "Negative Proximity Influence of Leaking Underground Storage Tanks/Toxic Neighbors on Residential Property: Issues of Information and Measurement." Paper presented at the annual meeting of the American Real Estate Society, Hilton Head, SC, April, 1995.

Simons, Robert A., Kimberly Winson-Geideman, and Brian A. Mikelbank. "The Effects of an Oil Pipeline Ruptures on Single-Family House Prices." *The Appraisal Journal* (October 2001): 410-418.

## Chapter 9. Conservation Conditions

Arnold, Brent G. "Respecting the Environment." *Right of Way* (July/August 2004).

BACK_DEFEXP-RR-004329

Benson, Virginia O., and Richard Klein. "The Impact of Historic Districting on Property Values." *The Appraisal Journal* (April 1988): 223-232.

Bunkley, William, and Charles P. Edmonds III. "Appraising Wetlands." *The Appraisal Journal* (January 1992): 107-112.

Byers, Elizabeth, and Karin Marchetti Ponte. *Conservation Easement Handbook.* 2nd ed. Washington, D.C.: The Land Trust Alliance and The Trust for Public Land, 2005.

Byrne, Craig L., and Michael Minck. "Understanding the Evolution of Conservation Easement Appraisal through Case Law." *The Appraisal Journal* (October 2000): 411-419.

Edmonds, Charles P., III, David Michael Keating, and Sarah Stanwick. "Wetland Mitigation." *The Appraisal Journal* (January 1997): 72-76.

Freeman, A. Myrick. *The Measurement of Environmental and Resource Values.* Washington, D.C.: Resources for the Future, 2003.

Guidry, Krisandra A., and A. Quang Do. "Appraisal Assignments Involving Endangered Species." *The Appraisal Journal* (January 1994): 98-102.

Guttery, Randall S., Stephen L. Poe, and C. F. Sirmans. "The Empirical Investigation of Federal Wetlands Regulation and Flood Delineation: Implications for Residential Property Owners." *Journal of Real Estate Research* 26, no. 3 (2004).

Hunter, Malcolm L., Jr. *Fundamentals of Conservation Biology.* Cambridge, MA: Blackwell Science, 1995.

Keating, David Michael. "The Loss of Wetlands and the Resulting Valuation Problems." *Valuation* (Third Quarter 2002): 5-8.

___. *The Valuation of Wetlands.* 2nd ed. Chicago: Appraisal Institute, 2002.

Keating, David Michael, Charles P. Edmonds III, and Sarah W. Stanwick. "A Conceptual Framework for Appraising Wetland Mitigation Banks." *The Appraisal Journal* (April 1997): 165-170.

Kopp, Raymond J., and V. Kerry Smith. *Valuing Natural Assets: The Economics of Natural Resource Damage Assessment.* Washington, D.C.: Resources for the Future, 1993.

Lassner, Janis A. "Valuing Agricultural Conservation Easements." *The Appraisal Journal* (April 1998): 145-150.

Lee, Valerie Ann. *The Natural Resource Damage Assessment Deskbook: A Legal and Technical Analysis.* Washington, D.C.: Environmental Law Institute, 2002.

Marsh, Lindell L., Douglas R. Porter, and David Salvesen. *Mitigation Banking: Theory and Practice.* Washington, D.C.: Island Press, 1996.

McKenzie-Smith, Robert H. "Endangered Species Habitat and Urban Development." *The Appraisal Journal* (January 1994): 129-137.

Mitchell, John G. "Our Disappearing Wetlands." *National Geographic* 192, no. 4.

Moss, Kioren. "Understanding Conservation Easement Valuation." *Right of Way* (March/April 2003).

Odum, Eugene P. *Ecology and Our Endangered Life-Support Systems.* Sunderland, MA: Sinauer Associates, 1993.

Porter, Douglas R., and David A. Salvesen. *Collaborative Planning for Wetlands and Wildlife.* Washington, D.C.: Island Press, 1995.

Renner, Rebecca. "Calculating the Cost of Natural Resource Damage." *Environmental Science & Technology* 32, issue 3 (February 1, 1998).

Reynolds, John E., and Alex Regalado. "The Effects of Wetlands and Other Factors on Rural Land Values." *The Appraisal Journal* (April 2002): 182-190.

Reynolds, Judith. *Historic Properties: Preservation and the Valuation Process.* 3rd ed. Chicago: Appraisal Institute, 2006.

BACK_DEFEXP-RR-004330

Taff, Steven J., and Sanford Weisberg. "Compensated Short-Term Conservation Restrictions May Reduce Sale Prices." *The Appraisal Journal* (Winter 2007): 45-55.

Turner, R. K., Carl Folke, I. M. Gren, and I. J. Bateman. "Wetland Valuation: Three Case Studies." In *Biodiversity Loss: Economic and Ecological Issues.* Edited by Charles Perrings, Karl-Goeran Maeler, Carl Folke, C. S. Holling, and Bengt-Owe Jansson. Cambridge: Cambridge University Press, 1995.

US Department of the Interior, Fish and Wildlife Service. *Classifications of Wetlands and Deepwater Habitats of the United States.* Washington, D.C.: US Government Printing Office, 1979.

Want, William L. *Law of Wetlands Regulation.* New York: Clark Boardman Co., 1989.

Wilson, Donald C. "Highest and Best Use: Preservation Use of Environmentally Significant Real Estate." *The Appraisal Journal* (January 1996): 76-86.

World Wildlife Fund. *Statewide Wetlands Strategies: A Guide to Protecting and Managing the Resource.* Washington, D.C.: Island Press, 1992.

## Chapter 10. Natural and Climate Conditions

Armstrong, Betsy, and Knox Williams. *The Avalanche Book.* Colorado: Fulcrum, 1986.

Ayre, Robert S. *Earthquake and Tsunami Hazards in the United States: A Research Assessment.* Boulder: University of Colorado Institute of Behavioral Science, 1995.

Bleich, Donald. "The Reaction of Multifamily Capitalization Rates to Natural Disasters." *Journal of Real Estate Research* 25, no. 2 (2003).

Brindze, Ruth. *Hurricanes: Monster Storms from the Sea.* New York: Atheneum, 1973.

Bullard, Fred M. *Volcanoes of the Earth.* Austin University of Texas Press, 1984.

Campbell, Don. *Drought: Causes, Effects, Solutions.* Melbourne, Australia: F.W. Cheshire, 1968.

Graham, J. Edward, and William W. Hall. "Hurricanes, Housing Market Activity, and Coastal Real Estate Values." *The Appraisal Journal* (October 2001): 379-387.

Graham, J. Edward, William W. Hall, and Peter W. Schuhmann. "Hurricanes, Catastrophic Risk, and Real Estate Market Recovery." *Journal of Real Estate Portfolio Management* (July-September 2007).

Harrison, David M., Greg T. Smersh, and Arthur L. Schwartz Jr. "Environmental Determinants of Housing Prices: The Impact of Flood Zone Status." *Journal of Real Estate Research* 21, no. 1-2 (2001).

Helm, Thomas. *Hurricanes: Weather at Its Worst.* New York: Dodd, Mead and Co., 1967.

Meltzer, John A., and Noah Schlaes. "Rebuilding After Katrina: An Owner's Perspective Two Years Later." *Real Estate Issues* 22, no. 1 (2008).

Nicolay, Claire. "After the Storm: Appraisal Challenges in Katrina's Wake." *Valuation* (Fourth Quarter 2005): 16-20, 22-23.

Oakeshott, Gordon B. *Volcanoes and Earthquakes: Geologic Violence.* New York: McGraw-Hill, 1976.

Perla, Ronald I., and M. Martinelli Jr. *Avalanche Handbook.* US Department of Agriculture Forest Service, 1976.

Pielke, Roger A. *The Hurricane.* New York: Routledge, 1990.

Teeman, Alison, and Michael Yovino-Young. "A Disastrous Assignment." *Valuation* (First Quarter 1999): 19-21, 46.

Tyler, Charles. "The Arid Earth." *Geographical Magazine* (May 1989).

BACK_DEFEXP-RR-004331

Ward, Richard C. "Floodplain Development–Learning from the Great Flood of 1993." *Real Estate Issues* (Winter 2006-2007).

## Chapter 11. Admissibility of Expert Testimony

Mundy, Bill. "The Scientific Method and the Appraisal Process." *The Appraisal Journal* (July 1992).

## Chapter 12. Completing a Reliable Damage Analysis

Bray, Jeremy. "The Logic of Scientific Method in Economics." *Journal of Economic Studies* 4, no. 1 (1977): 8.

Coleman, Stephanie. "Scope of Work and Problem Identification: The Significant Seven." *The Appraisal Journal* (Summer 2006): 232.

Dell, George. "Common Statistical Errors and Mistakes: Valuation and Reliability." *The Appraisal Journal* (Fall 2013): 340.

Dorchester, John D., Jr. "The Federal Rules of Evidence and *Daubert*: Evaluating Real Property Valuation Witnesses." *The Appraisal Journal* (July 2000): fn. 8, 291.

Epley, Donald R. "Data Management and Continual Verification for Accurate Appraisal Reports." *The Appraisal Journal* (Winter 2006): 69.

Hoyt, Richard, Robert Aalberts, and Percy Poon. "*Daubert* and Qualification of the Appraisal Expert Witness." *The Appraisal Journal* (Summer 2010): 285.

Kerlinger, Fred N. *Foundations of Behavioral Research*, 3rd ed. New York: Holt, Rinehart, and Winston, 1986.

Kummerow, Max. "Protocols for Valuations." *The Appraisal Journal* (Fall 2006): 359.

Marchitelli, Richard, and Peter Korpacz. "Market Value: The Elusive Standard." *The Appraisal Journal* (July 1992): 321.

O'Connor, David E., and Christopher Faille. *Basic Economic Principles: A Guide for Students*. Westport, CT: Greenwood Press, 2000.

Popper, Karl R. *The Logic of Scientific Discovery*. London: Seventh Impression, 1974.

Ratcliff, Richard U. "Is There a 'New School' of Appraisal Thought?" *The Appraisal Journal* (October 1972): 525.

Sackman, Julius L. "Market Value Approach to Valuation." *The Appraisal Journal* (January 1973): 58.

Weber, Bruce R. "Environmental Uses of GIS, the Scientific Method, and *Daubert*." *Valuation Insights and Perspectives* (Third Quarter 2002): 38.

Wolverton, Marvin L. "Research Design, Hypothesis Testing, and Sampling." *The Appraisal Journal* (Fall 2009): 371.

BACK_DEFEXP-RR-004332

*Copyrighted material reviewed by Howard E. Levrington, June 28,*

# Index

absorption, 126-127

absorption loss, 126-127

accidental discharges, 206
    *See also* permitted discharges

ACM. *See* asbestos-containing material

action level. *See* maximum contaminant level

action research, 8, 12, 14

ADA. *See* Americans with Disabilities Act

adjacent property, definition of, 205

adjusted $r^2$, 47, 51

Advisory Opinion 9 (AO-9). *See* Uniform Standards of Professional Appraisal Practice

agricultural drought, definition of, 292-293

air and light diminution, case study, 347-349

airport noise, 137-143, 148-171
    Air Transport World definition of, 139
    case studies, 148-171, 350-353
    measuring, 139-142
    mitigation of, 142
    value impacts of, 143

air sampling. *See* asbestos, testing for

Alamo, 111

Alaskan Good Friday Earthquake, case study, 301-304

Americans with Disabilities Act (ADA), 180-181

Anaheim Hills, California. *See* Santiago Landslide, case study

analysis of variance (ANOVA) studies, 49-52

AO-9. *See* Uniform Standards of Professional Appraisal Practice

appraisal process, 4-7

April Fools' Day Tsunami, 277-279

aqueous phase, 208-209

archeological resources, 261-264

Architectural and Transportation Barriers Compliance Board, 181

arm's-length transaction, 73

asbestos, 214-219
    legal limitations on use, 215
    and operations and management (O&M) program, 218-219
    removal of, 218
    testing for, 215-218
    treating for, 218-219

asbestos-containing material (ACM), 214-219

asbestosis, 215

assemblage, 76

assessment stage, of detrimental condition matrix and model, 20-21, 28

automated business and community center (ABC), 296-298

avalanches. *See* landslides

bark beetles, case study, 375-376

barrier wars, 287

baseline value, 19, 29, 324

bathtub effect, 302

BCM. *See* building contamination material

before and after rule, 123-124

Bell Chart, 28-30

Benedict Canyon Landslide, case study, 199-202

benzene, toluene, ethylbenzene, and xylene (BTEX), as environmental contaminants, 223

Bikini Atoll, radioactive contamination on, 237

bioavailability, 207-208

biodegradation, 233

biomedical conditions. *See* environmental and biomedical conditions

bioremediation, 233

bioventing, 233

bogs, differential settlement in, 190

brownfields, case study, 380-383

   *See also* Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)

BTEX. *See* benzene, toluene, ethylbenzene, and xylene

building contamination material (BCM), 233

building and manufacturing conditions, 173-184

   case study, 182-184

bundle of rights, 2-3

buyer's market, 74


caissons or piles, 187-188

   *See also* reinforced repair *and* underpinning

Cannon v. BP Products North America, Inc., 310-312

capping, 233

carcinogen, 221-223, 229

Carmichael. *See* Kumho Tire Company v. Carmichael

Carson, Rachel, 209

case study analysis, 39-41

cellular towers, 145-146

CERCLA. *See* Comprehensive Environmental Response, Compensation, and Liability Act

Chernobyl, nuclear power plant disaster in, 237

Chinese drywall, 179-180

Clean Water Act, 210

climate change, 293-299

climate conditions. *See* natural and climate conditions

closure letter. *See* no further action letter

coefficient of determination ($r^2$), 45-47, 71

comparative research, 8, 11, 14

competence of appraiser, in detrimental conditions situations, 13-17, 323-324

Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or Superfund), 211-213

   steps in the process, 213

condemnation. *See* eminent domain

conformity, principle of, 3-4

   *See also* regression, principle of

conjoint analysis, 53-59

conservation conditions, 249-276

construction defects, 174-177

   Nevada Revised Statutes definition of, 175

construction project delay. *See* project delay

construction terms, 173-174

constructivism, 12-14

contamination. *See* environmental contamination

contingent valuation, 53-55

control area, in neighborhood studies, 36-38

   in paired sales analysis, 33

corrosivity, as characteristic of hazardous substance, 188-189

   *See also* sulfates, as environmental contaminants

cost, as component of detrimental condition matrix and model, 20-28

cost approach, as applied to detrimental conditions, 30-32

cradle to grave responsibility, for environmental contamination, 210-211

creep, 193

crime scene, 93-99

   case study, 107, 121-122

cultural resources, 261-264

cyclones. *See* hurricanes


Dahmer, Jeffrey, apartment building, case study, 393-395

Daubert v. Merrell Dow Pharmaceuticals, Inc., 305-312

Dealey Plaza, 113

deferred maintenance, 179

demand, 74-76

   *See also* supply

dense non-aqueous phase liquid (DNAPL), 209

dependent variables, 41-50, 70

detrimental condition matrix, 20-27

detrimental condition model, 28

detrimental conditions

   Class I. *See* general conditions

   Class II. *See* transactional conditions

   Class III. *See* distress and sociological conditions

   Class IV. *See* legal conditions

   Class V. *See* external conditions

BACK_DEFEXP-RR-004334

*Copyrighted Material Licensed by Richard J. Roddewig, June 2017*

Class VI. *See* building and manufacturing conditions

Class VII. *See* site and infrastructure conditions

Class VIII. *See* environmental and biomedical conditions

Class IX. *See* conservation conditions

Class X. *See* natural and climate conditions

Development Specialists, Inc. v. Weiser Realty Advisors LLC, 311

differential settlement, 190

direct capitalization, 62-64

direct deeding, 79

discounted cash flow analysis, 65-66

distress sales, 76-78

distress and sociological conditions, 93-122

    case study, 107-122

DNAPL. *See* dense non-aqueous phase liquid

drinking water, standards, 207

drought, 292-293

drywall, Chinese, 179-180

due diligence, 13-17

    and interviews (with property owners or managers), 16-17

    and online research, 16

    and on-site observations, 15

    and personal knowledge, 13

    and requests for documents, 15

Durham Woods pipeline explosion, case study, 362-363

earthflow, 193

earthquakes, 281-283

    case study, 301-304

    as factor in landslide, 284-285

    as factor in tsunami, 287-289

economic recession, 74-76

economic waste, 326-327

EIFS. *See* exterior insulation and finish systems

electromagnetic fields (EMFs), 143-145

electromagnetic spectrum, 146

Ellis Island, 114

Emergency Wetlands Resources Act, 253

EMFs. *See* electromagnetic fields

eminent domain, 123-126

    case study, 130-136

    and Kelo v. City of New London, 126

Empire State Building, 112-113

empirical research, 8-9, 14

encapsulation, of environmental contaminants, 233

enclosure, of environmental contaminants, 233

Endangered Species Act, 256

environmental agency databases, 241-242

environmental and biomedical conditions, 203-247

environmental contamination, 203-247

    in building improvements, 203-204

    in soil and groundwater, 204-205

    third-party liability for. *See* indemnification, of responsibility for environmental contamination. *See also* environmental remediation

environmental costs, use, and risk, 236-241

Environmental Protection Agency (EPA), 207-230, 241

    *See also* Clean Water Act; Comprehensive Environmental Response, Compensation, and Liability Act; *and* Resource Conservation and Recovery Act

environmental remediation, 232-235

    ex situ remediation methods, 235

    in situ remediation methods, 233

environmental site assessment, 229-231

    Phase I study, 229-230

    Phase II study, 230

    Phase III study, 230-231

EPA. *See* Environmental Protection Agency

epistemology, 7-14

equilibrium, of market, 74-75

erosion, 194, 197

ethics of appraiser, in detrimental conditions situations, 323-324

ethnography, 8, 10-11, 14

evidence, admissibility of in court, 305-310

    relevance of in court, 305-310

excavation, of environmental contaminants, 235

expansive soils, 189

    case study, 372-374

expert testimony, admissibility of in court, 305-312

ex situ. *See* environmental remediation, ex situ remediation methods

exterior insulation and finish systems (EIFS), 175

external conditions, 138-171

    case study, 148-171

BACK_DEFEXP-RR-004335

extraordinary assumptions, 323-324

Exxon Valdez oil spill, case study, 386-387

Federal Aviation Administration (FAA), 137-143

Federal Emergency Management Association (FEMA), 280-281

federal rule. *See* before and after rule

Federal Rules of Evidence (FRE), 305-308

fee simple estate, 2

FEMA. *See* Federal Emergency Management Association

feng shui, as detrimental condition, 89-91

fire, 287

fixation, of environmental contaminants, 235

flex rooms, 296-299

Flight 93 crash site, 108-120

flooding, 279-281
    case study, 265-276
    role of wetlands in preventing, 254

flood insurance coverage, 281

Florida airport noise, case study, 154-171

Ford's Theatre, 114

formaldehyde, as environmental contamination, 229

Fort Lauderdale-Hollywood International (FLL) Airport, 154-171

fracking, 224-228
    benefits of, 228
    and earthquakes, 227
    fluids, 227-228
    and groundwater contamination, 226-227
    process, 224-225

fractional discounts, case study, 356-359

freeway nuisance, case study, 342

friability, of asbestos-containing material, 215

Frye v. United States, 306-307

F-statistic, 48-49, 71

Fujita Scale, 291-292

F-values, 48

general conditions, 19-72

General Electric Co. v. Joiner, 305-309

Geologic Hazard Abatement District (GHAD), 68, 72

geology, use of, by environmental engineers, 208-209

geotechnical issues, 185-198

Gettysburg National Military Park, 114

GHAD. *See* Geologic Hazard Abatement District

global warming, *See* climate change

government agencies. *See* specific titles of agencies

governmental regulations. *See* specific titles of regulations

Graceland, 111-112

grading, as factor in landslide, 191

Green Book, 218

groundwater, 204-205
    contamination of, 204-205
    treatment, 233

habitat, 255-257
    *See also* wetlands

habitat conservation plan, 256

hazardous substance, characteristics of, 211
    *See also* maximum contaminant level

Hearst Castle, 115

Heaven's Gate property, 94-95

hermeneutics, 8-9, 14

highest and best use, 5, 7
    of wetlands, 258-259

Hill View development, case study, 347-349

Hiroshima Peace Memorial, 112

historic properties, 259-261

Hodge, Sheida, 89-90

Hollywood Boulevard sinkhole and subsidence, case study, 354-355

homeowner questionnaire, 57

Hurricane Katrina, 279-280, 293-295, 298-300

hurricanes, 299-300
    *See also* flooding

hydraulic fracturing. *See* fracking

hydrocarbons, as environmental contaminants, 223-224

hydrogeology, use of, by environmental engineers, 208-209

hypothesis, 315-322

hypothetical conditions, 323-324

ignitability, as characteristic of hazardous substance, 211

impaired sales comparables, 34

impaired value, definition of, 2

imposed loss of access, case study, 364-367

BACK_DEFEXP-RR-004336

income capitalization approach, as applied to detrimental conditions, 60-66

income-producing property, diminution of property value in, 60-62

indemnification, of responsibility for environmental contamination, 325, 384-385

independent variables, 41-52, 70-71

industrial building, case study, 331-333, 377-379, 384-385

infestation, 178
  case study, 375-376

infrastructure conditions. *See* site and infrastructure conditions

in situ. *See* environmental remediation, in situ remediation methods

Internal Revenue Code (IRC), 78-79

ionization, 146

IRC. See Internal Revenue Code

Jarrell, Texas, tornado, 291-292

Johnstown Flood Museum, 114

junk science, 327

just compensation, 123-125, 130, 136

Kelo v. City of New London. *See* eminent domain

Kumho Tire Company v. Carmichael, 305-309

landslides, 191-196
  case study, 67-72, 199-202
  as factor in tsunami, 288

land use regulations. *See* Clean Water Act, Endangered Species Act, *and* wetlands

Lanza house, 121-122

latent defects, 176

lava flow. *See* landslides *and* volcanoes

lead, as environmental contaminant, 214

leaking underground storage tank (LUST), 204-206, 213-214, 236-237
  case study, 377-379

Leaning Tower of Pisa, 190

lease positions, 127

Legacy Hills Subdivision, case study, 182-184

legal conditions, 123-136
  case study, 130-136

lender questionnaire, 56

level of contamination, 206-207

LexisNexis, 37

liability, for contamination, 209-212, 235-238

for costs, 22-25

light non-aqueous phase liquid (LNAPL), 209

like kind, 77-78

linear regression, use in value calculations, 151-153, 157

liquefaction, 190

liquidation value, 77-78

LNAPL. *See* light non-aqueous phase liquid

Lorraine Motel, 112

Love Canal, case study, 243-247

Luby's Cafeteria, case study, 107

LUST. *See* leaking underground storage tank

Manoa landslides, 195-196

Manson family murder site, 95-96

manufacturing conditions. *See* building and manufacturing conditions

market data, example of, 79-81
  sources and use of, 322-323

market interviews and surveys, 52-59
  agent questionnaire, 58
  broker questionnaire, 59
  homeowner questionnaire, 57
  lender questionnaire, 56
  structured interviews, 62

market resistance, 20, 25-27
  case study, 336-341, 377-379, 384-385, 354-355
  estimation of, 34-35
  as form of risk, 25-27

market trends, influence on value, 79-81

market value, definition of, 73-74

marsh, differential settlement in, 190

Massachusetts Mut. Life Ins. Co. v. DB Structured Products, Inc., 310

maximum contaminant level (MCL), 207, 214

Megan's Law, 103-106

memorial sites, 108-120

Menendez mansion, 97-99

Merrell Dow Pharmaceuticals. *See* Daubert v. Merrell Dow Pharmaceuticals, Inc.

mesothelioma, 215

metals, as environmental contaminants, 222-223

meteorological drought, 292

mining, 196-197
  open-cast, 197
  open-cut, 197
  strip, 196-197

BACK_DEFEXP-RR-004337

mitigation land bank, 258

    *See also* wetland mitigation

mold, 219-220

    case study, 360-361

monsoons. *See* hurricanes

Mount St. Helens, 284-286

mudslides. *See* landslides

multicollinearity, 48

multiple regression analysis, 47-52

multivariate model, 47

NAPL. *See* non-aqueous phase liquid

National Civil Rights Museum, 112

National Civil War Museum, 115-116

National D-Day Memorial, 115

National Fire Protection Association (NFPA), hazard identification system, 211-212

National Pest Management Association (NPMA), 178

National Priority List (NPL), 211

    *See also* brownfields, case study, *and* Comprehensive Environmental Response, Compensation, and Liability Act

National WWI Museum and Memorial, 116

National WWII Museum, 112

natural and climate conditions, 277-304

    case study, 301-304

natural resources, 252-259

neighborhood comparison approach, 36-37

neighborhood nuisance, 137

    case study, 342, 350-353

neighborhood studies, 36-38

New London, city of. *See* eminent domain

Newton, Connecticut, 121-122

NFA letter. *See* no further action letter

NFPA. *See* National Fire Protection Association

no further action (NFA) letter, 236

    *See also* indemnification, of responsibility for environmental contamination

non-aqueous phase liquid (NAPL), 208-209

non-friable. *See* friability, of asbestos-containing material

nonphysical damage, case study, 356-359

non-source property, definition of, 205

Northridge Earthquake, 282-283

"Nothing Down" avalanche, 290

NPL. *See* National Priority List

NPMA. *See* National Pest Management Association

Occupational Safety and Health Administration (OSHA), 210, 229, 242

Oil Pollution Act (OPA), 252

oil spill, case study, 386-387

Oklahoma City National Memorial and Museum, 111

Oklahoma Federal Building, 99

    case study, 334-335

O&M. *See* operations and management program

ongoing stage, of detrimental condition matrix and model, 20-21, 28

    in cost approach, 30-32

    in discounted cash flow (DCF) analysis, 65-66

on-site low temperature thermal desorption. *See* environmental remediation, ex situ remediation methods

OPA. *See* Oil Pollution Act

open-casting, 197

operations and management (O&M) program, 218-219, 235

OSHA. *See* Occupational Safety and Health Administration

ownership rights, 2-3

Pacific Motel, case study, 130-136

Pacific Tsunami Warning System, 288-289

paired sales analysis, 33

    example, 336-341

patent defects, 176

Pearl Harbor, 113

Pegasus Landslide, 68, 72

permitted discharges, 206

    *See also* accidental discharges

phenomenology, 8, 10, 14

piles. *See* caissons or piles

planned unit development (PUD), case study, 360-361

plume, of environmental spill, 205, 208, 230

potentially responsible party (PRP), for environmental contamination, 212-213, 236

power lines, 143-145

preliminary site assessment. *See* environmental site assessment, Phase I study

privacy, issues, 146-147

project delay, 81-88, 177-178

BACK_DEFEXP-RR-004338

project incentive, 26
    case study, 368-371, 377-379
    as form of risk, 20, 25, 28, 30-32, 60-61
proximity studies, 38-39
PRP. *See* potentially responsible party
PUD. *See* planned unit development
P-value, 48-51

questionnaires, 54-59

radiation, as environmental contamination, 220-222
    case study, 388-390
radiofrequency (RF) energy, 145
radon, as environmental contamination, 220-222
RAP. *See* remedial action plan
rationalism, 8, 12, 14
RCRA. *See* Resource Conservation and Recovery Act
reactivity, as characteristic of hazardous material, 211-212
real estate broker/agent questionnaires, 58-59
real estate economics, 74-76
real estate-owned (REO) properties, 77
recession. *See* economic recession
reconciliation, in the valuation process, 320-322
regression, principle of, 3
    *See also* conformity, principle of
reinforced repair, 187-188
    *See also* caissons or piles *and* underpinning
remedial action plan, 213, 231
    *See also* environmental remediation
remedial investigation. *See* environmental site assessment, Phase III study
remediation. *See* environmental remediation
removal, of contaminants, 204, 213-214, 229, 232-235
    of asbestos, 218
repair stage, of detrimental condition matrix and model, 20-21, 28
    in cost approach, 177-178
research methods, 7-14
Resource Conservation and Recovery Act (RCRA), 209-211
responsible party, for environmental contamination, 206-207, 236-238
restrictions on use. *See* use, as component of detrimental condition matrix and model

retrospective appraisal, 28
reverse exchange, 79
Richter Scale, 281-282
risk, as component of detrimental condition matrix and model, 20-21, 25-28
    in cost approach, 30-32
    in income capitalization approach, 60-62
    quantification of, by market participants, 61-62
    in sales comparison approach, 52-53
    *See also* market resistance, project incentive, *and* uncertainty factor
r-square (r²). *See* coefficient of determination

SACM. *See* Superfund Accelerated Cleanup Model
sale/resale analysis, 35-36
sales comparison approach, as applied to detrimental conditions, 32-59
Sandy Hook, case study, 121-122
Santiago Landslide, case study, 67-72
scientific method, 314-322
    and the valuation process, 317
scoop and haul, of environmental contaminants. *See* excavation, of environmental contaminants
scope of work, definition of, 5-6
Scope of Work Rule. *See* Uniform Standards of Professional Appraisal Practice
seller's market, 74
September 11 terrorist attacks, 100-103, 108-120
    case study, 108-120
significance F, 48-51
Silent Spring, 209
Silver Bridge failure, 174-175
simple regression, 42, 44-48
Simpson condominium, case study, 329-330
single-family residence, case study, 342
sinkhole, 186-187, 197
    case study, 354-355, 391-392
site and infrastructure conditions, 185-202
    case study, 199-202
Sixth Floor Museum at Dealey Plaza, 113
slope creep, 193
slope failure, 193
slope movement. *See* landslides
slump, 193
smart buildings, 296-298

BACK_DEFEXP-RR-004339

SNAP. *See* source, non-source, adjacent, or proximate site property

snow avalanche, 298-290

    *See also* landslides

sociological conditions. *See* distress and sociological conditions

soil contamination, 203-205

soil vapor extraction, of environmental contaminants, 233

solvents, as environmental contaminants, 222-223

soundwall, case study, 342

source, non-source, adjacent, or proximate site (SNAP) property, 205-206

source site property, definition of, 205

Standards Rule (SR) 1-2. *See* Uniform Standards of Professional Appraisal Practice

Standards Rule (SR) 2-1. *See* Uniform Standards of Professional Appraisal Practice

Standards Rule (SR) 2-2. *See* Uniform Standards of Professional Appraisal Practice

state rule. *See* value plus damage rule

statistical studies, 41-52

Statue of Liberty National Monument, 114

stigma. *See* market resistance

strip mining, 196-197

structured interviews, use in income capitalization approach, 62, 64

subsidence, 198

    case study, 354-355

subsurface study. *See* environmental site assessment, Phase II study

sulfates, as environmental contaminants, 188-189

Superfund. *See* Comprehensive Environmental Response, Compensation, and Liability Act

Superfund Accelerated Cleanup Model (SACM), 380-383

supply, 74-76

    *See also* demand *and* market trends, influence on value

surveys. *See* market interviews and surveys

suspended walkway failure, 174

swamps, differential settlement in, 190

TCE. *See* temporary construction easements

temporary construction easements (TCEs), 126

tenancy in common, case study, 356-359

termites, 178

terrorist attacks, 99-103

    case study, 108-120

test area

    in neighborhood studies, 36-38

    in paired sales analysis, 33

testimony, admissibility of in court, 305-312

third-party liability risk, 237-238

Three Mile Island, case study, 388-390

tidal waves. *See* tsunamis

time frame risks, 238

time series, 44-47

title defects, 127-129

tornadoes, 290-292

townhome project, case study, 360-361

toxicity, as characteristic of hazardous substance, 208, 211

toxicology, use of, by environment engineers, 207-208

transactional conditions, 73-91

    case study, 89-91

transmission lines, 143-145

tropical cyclones. See hurricanes

t-statistic (t-stat), 48-50, 71

tsunami of 2004 (Asia), 288

tsunamis, 287-288

    case study, 301-304

    *See also* earthquakes *and* flooding

tunneling, case study, 354-355

uncertainty factor, as form of risk, 20, 26, 28, 31, 60-61

underground storage tank (UST), 204-206, 213-214, 236-237

underpinning, 187-188

    *See also* caissons or piles *and* reinforced repair

Uniform Standards of Professional Appraisal Practice (USPAP), 313, 316-320, 323-325

    Advisory Opinion 9 (AO-9), 238-241, 313, 325

    Scope of Work Rule, 313

    Standards Rule (SR) 1-2, 324

    Standards Rule (SR) 2-1, 324

    Standards Rule (SR) 2-2, 324

unimpaired value, 24, 28-35, 61, 64

    in cost approach, 30-32

    definition of, 324

    estimation of, 34-35

    in income capitalization approach, 61-64

    in sales comparison approach, 33-35

BACK_DEFEXP-RR-004340

Copyrighted Material Reviewed by Richard J. Rehmann Volume 20,

US Army Corps of Engineers (USACE), 242, 255, 258

US Constitution, provisions for just compensation, 123

use, 25

   as component of detrimental condition matrix and model, 20, 28

US Geological Survey (USGS), 196

USPAP. *See* Uniform Standards of Professional Appraisal Practice

USS Arizona Memorial, 113

USS Bowfin Submarine Museum and Park, 113-114

USS Constitution Museum, 116

UST. *See* underground storage tank

value plus damage rule, 123-125

view, definition of, 146-147

view diminution, 146-147

   case study, 336-341

visibility, definition of, 147

volcanoes, 283-287

   as factor in landslide, 284-285

   as factor in tsunami, 288

water damage, case study, 368-371

water intrusion, case study, 360-361

wetland mitigation, 258

wetlands, 253-259

   current trends in development, 257-258

   definition of, 253

   highest and best use analysis of, 258-259

   legal issues, 255

   past trends in development, 257

white-collar crime, case study, 343

Winchester Mystery House, 115

World Trade Center, 99-103, 108-109

x-ray fluorescence, as test for lead paint, 214

Yuba River floods, case study, 265-276

BACK_DEFEXP-RR-004341

BACK_DEFEXP-RR-004342