# EXHIBIT 2

# EXPERT REPORT

**In the Matter Of:**

City of East St. Louis
vs
Monsanto Company, Solutia Inc., and Pharmacia, LLC

United States District Court
For the Southern District of Illinois
Civil Action Number 3:21-cv-00232-DWD

County of St. Clair
State of Illinois

---

**City of East St. Louis**

**Clients:**

The Driscoll Firm, LLC
The Driscoll Firm, P.C.
Chatham & Baricevic
Sanders Phillips Grossman, LLC
Smouse & Mason, LLC

**Prepared By:**

Randall Bell, PhD, MBA, MAI
Landmark Research Group, LLC
33971 Selva Road, Suite 230
Dana Point, California 92629



## CASE OVERVIEW

**Subject Properties**

Landmark Research Group was retained by the Plaintiffs in this matter. This expert report sets forth findings with respect to the real estate and economic damages, if any, to 273 subject properties impacted by the polychlorinated biphenyl ("PCB") contaminants in East St. Louis, Illinois.

**Nature of Case**

The City of East St. Louis (Plaintiff) brought action against the Defendants, Monsanto Company, Solutia, Inc., and Pharmacia LLC. The City of East St, Louis claims the Defendants' Monsanto Plant in the adjacent city of Sauget, Illinois, contaminated lands with PCBs. Monsanto manufactured PCBs and other chemical products at the Monsanto Plant from approximately 1936 to 1977.[1] In June 2022, 273 lots were tested, and soil samples were taken from lots located north and northeast of the Monsanto Plant.



Figure 1: Subject Properties Map

---

[1] "Second Amended Complaint for Damages and Abatement," City of East St. Louis v. Monsanto, et al., April 24, 2023.

The Monsanto Company, based in St. Louis, is a multinational agricultural biotechnology corporation. "The Solutia W.G. Krummrich Plant was formerly operated by Monsanto, which spun-off its chemical business in 1997. Solutia is a chemical manufacturer that has operated at 500 Monsanto Avenue in Sauget, Illinois for nearly 100 years. It is located just east of the Mississippi River along Illinois Route 3 in the American Bottom floodplain."[2]

Solutia Inc. and Pharmacia LLC, successors to Monsanto Company, will complete the cleanup of four former landfills and waste lagoons in Sauget, Illinois, across the Mississippi River from St. Louis. Solutia and Pharmacia will be required to implement the remedy selected by EPA for over 270 acres designated as Sauget Area 2 Sites O, Q, R and S. The sites were used by area industry to dispose of hazardous and other wastes throughout much of the 20th century. The hazardous waste includes toxic substances and known carcinogens, including PCBs, dioxin, lead, cadmium, benzene and chlorobenzene.[3]

**Polychlorinated Biphenyls (PCBs)**

Polychlorinated Biphenyls ("PCBs") belong to a broad family of man-made organic chemicals known as chlorinated hydrocarbons. PCBs were domestically manufactured from 1929 until manufacturing was banned in 1979. Due to their non-flammability, chemical stability, high boiling point and electrical insulating properties, PCBs were used in hundreds of industrial and commercial applications.[4]

Today, PCBs can still be released into the environment from poorly maintained hazardous waste sites that contain PCBs, illegal or improper dumping of PCB wastes, leaks or releases from electrical transformers containing PCBs, and disposal of PCB-containing consumer products into municipal or other landfills not designed to handle hazardous waste. They do not readily break down once in the environment and can remain for long periods cycling between air, water, and soil.[5]

PCBs have been demonstrated to cause a variety of adverse health effects. They have been shown to cause cancer in animals as well as a number of serious non-cancer health effects in animals, including effects on the immune system, reproductive system, nervous system, endocrine system, and other health effects. Studies in humans support evidence for potential

---

[2] "Hazardous Waste Cleanup: Solutia Inc. Facility - Sauget, Illinois," United States Environmental Protection Agency, last modified July 6, 2022, https://www.epa.gov/hwcorrectiveactioncleanups/hazardous-waste-cleanup-solutia-inc-facility-sauget-illinois.

[3] "Monsanto Successor Companies Agree to Clean Up Remaining Surface Contamination at Sauget Superfund Sites under Federal Settlement," United States Environmental Protection Agency, last modified November 28, 2022, https://www.epa.gov/newsreleases/monsanto-successor-companies-agree-clean-remaining-surface-contamination-sauget.

[4] "Polychlorinated Biphenyls (PCBs)," United States Environmental Protection Agency, last modified April 12, 2023, https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls.

[5] "Polychlorinated Biphenyls (PCBs)," United States Environmental Protection Agency, last modified April 12, 2023, https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls.

carcinogenic and non-carcinogenic effects of PCBs. The potential health effects of PCB exposure include cancer and non-cancer effects, immune effects, reproductive effects, neurological effects, and endocrine effects.[6] The singular topic being studied at the subject properties are PCBs. PCBs are in a close family of chemicals that are related to dioxins.[7] Accordingly, due to the limited information focused solely on PCBs, dioxins were also included in our research.

**Environmental Exposure Pathways**

Human health risks associated with PCBs and other hazardous contaminants are present when a pathway to exposure exists. A pathway to exposure is contact with a contaminant through skin absorption, inhalation, or ingestion.[8] The pathway to exposure considered in this analysis is soil.

Just because a property does not have a direct pathway to exposure, does not automatically mean that there is no impact to property value and economic impact. In some instances, properties that are adjacent or proximate to contaminant sources may also incur an impact to property value and economic impact. Market participants may view these properties as having risks and uncertainties as those with a direct pathway to exposure.

There are numerous potential pathways of exposure involving real estate including air, topsoil, surface, surface water, household water, deposition, and many more. The Figure illustrates the different pathways to exposure in relation to sources of real estate contamination.



Figure 2: Environmental Exposure Pathways (SNAP)

---

[6] "Polychlorinated Biphenyls (PCBs)," United States Environmental Protection Agency, last modified April 12, 2023, https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls.
[7] "Learn About Dioxin," United States Environmental Protection Agency, last modified January 28, 2014, https://www.epa.gov/dioxin/learn-about-dioxin.
[8] Randall Bell, *Real Estate Damages, 3rd Edition* (Chicago: Appraisal Institute, 2016): 460.

**Timeline**

The following is a timeline outlining East St. Louis, the Monsanto Plant and PCB events.



Figure 3: Timeline

**Neighborhood Blight**

Some environmental issues may be less evident to market participants, as general detrimental cues may be absent; for instance, contaminants themselves may be colorless, odorless, and tasteless. Even if some cues of a detrimental condition exist, market awareness of the condition may still be lacking or not be recognized by all market participants.[9] Buyers typically become knowledgeable about a detrimental condition based upon what the buyer observes, hears, or smells during property inspections, or what is disclosed to them. With real estate impacted by a detrimental condition, prospective buyers may be made aware of a detrimental condition in a variety of ways, including:

---

[9] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 111.

- Abandoned properties
- Barricades
- Bottled water programs
- Containment or exclusion zones
- Decay
- Demolition
- Drinking water restrictions
- Emergency alert
- Evacuation zones
- Fenced areas

- Guarded zones
- Land use restrictions
- Media or online searches
- Movies or documentaries
- Noise
- Odors
- Public protests
- Seller disclosure
- Signage
- Sirens

These detrimental cues can be evidence of environmental blight. The following examples are of environmental cases and readily observable instances of blight:



Housing Abandonment and Decay



School Abandonment



Signage



Emergency Evacuation



Demolished Neighborhoods



Odors and Signage



Fences or Barricades



Exclusion Zones

Although PCBs are themselves colorless, odorless, and tasteless, there are visual cues of blight in the subject neighborhood such as property abandonment, decay, and demolition. Inherently, properties impacted by environmental contamination that have incurred a loss in value are known as being "stigmatized," "blighted," or "tainted."[10] Accordingly, PCB contaminates result in property and neighborhood blight.

**Damage Analysis**

The City of East St. Louis files a complaint seeking fines and damages for the contamination of its lands with polychlorinated biphenyls ("PCBs").[11] The City of East St. Louis set forth claims concerning numerous city code violations, including a provision of City Code §1-15 regarding penalties for ordinance violations. The provision was set forth in the early 1970s and states that

---

[10] Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January 1996): 59-60.

[11] "First Amended Complaint for Damages and Abatement," City of East St. Louis v. Monsanto, et al., April 23, 2021.

7

there is a $750 per offense per day per parcel from June 12, 2003, through the present; from July 1, 1973, through June 12, 2003, the maximum fine was $500 per day per parcel.

Ordinance Violation Fines

Accordingly, economic damages have been analyzed based on the fees set forth under the ordinance violations. The following summary calculates the penalties for each of the 273 subject properties.

As customary within the real estate appraisal profession, government documents such as city plans, zoning codes, environmental documentation, and so forth are reviewed. Accordingly, the City of East St. Louis Ordinance Code §1-15 were examined. An ordinance violation fee of $500 per day per property was applied from July 1, 1973 (Ordinance Violation) to June 11, 2003 (Day Prior to Change in Penalty). From June 12, 2003 (Change in Penalty) to February 1, 2025 (Start of Trial) a violation fee of $750 was applied. These computations account for the ordinance provisions, as well as leap years.

In addition, a future value calculation was considered relative to the fines to bring the historical violations to a current date. The future value calculation involved analyzing various rates of return, rates such as treasury bills, government bonds, corporate bonds, and the stock market were considered. Ultimately, counsel provided instructions to not include a future value calculation.

| CITY OF EAST ST. LOUIS Ordinance Fines (Landmark File: 155-1-21) | | | | | |
|---|---|---|---|---|---|
| Start Date | End Date | Number of Days | Rate per Day per Property | Subject Properties | Total |
| 7/1/1973 | 6/11/2003 | 10,937 | $500 | 273 | $1,492,900,500 |
| 6/12/2003 | 2/1/2025 | 7,905 | $750 | 273 | $1,618,548,750 |
| Total | | | | 273 | **$3,111,449,250** |

*Microsoft Excel has a one day discrepincy depending upon how it is calculated. Accordingly, the more conservative computation was utilized.

Figure 4: Ordinance Fines

Real Estate Damage

The Illinois Supreme Court Committee on Jury Instructions in Civil Cases set forth Rule 30.17 Measure of Damages – Damage to Real Property-Repairable Damage, which states:

> The damage to real property, determined by the reasonable expense of
> necessary repairs to the property which was damaged [and the value of
> loss of the use of the (building) (improvements) for the time reasonably
> required for the repair] [and the difference between the fair market value

8

of the real property immediately before the occurrence and its fair market value immediately after the repairs].[12]

The Illinois Jury Instructions on damages parallels a real estate damages analysis, which is measured by cost, use, and risk effects. Cost effects correlating with expense of repairs, use effects correlating with loss of use, and risk effects correlating with the difference in market value before and after a detrimental condition (or with and without). Accordingly, utilizing standard real estate damage methodologies, an analysis was conducted to set forth damages incurred by the subject properties. The real estate damages set forth in this report were calculated for all 273 subject properties, which have all been owned by the City of East St. Louis for at least one point in time since 1973. In addition, damage calculations were made that accounted for the recorded ownership of the subject properties by the City of East St. Louis and public entities.

Environmental contamination issues are considered Class VIII detrimental conditions such a condition may impact the market value of a property. When there may be an impairment to market value, impairments are analyzed by considering cost, use, and risk effects.[13] The traditional approaches to value involve the cost approach, income approach, and sales comparison approach. While all these approaches were considered, a real estate damage assessment involves an analysis of cost, use, and risk effects. The Uniform Standards of Professional Appraisal Practice ("USPAP") and the Appraisal Institute, sets forth that cost, use, and risk effects are considered to determine any impacts to market value from a detrimental condition.[14] The following calculations can be utilized for determining real estate damages, as they illustrate the methodology applied to a real estate damage assessment:

**Impaired Value = Unimpaired Value - Cost Effects (Remediation and Related Costs) - Use Effects (Effects on Site Usability) - Risk Effects (Environmental Risk/Stigma)**

**Property Value Diminution = Cost Effects (Remediation and Related Costs) + Use Effects (Effects on Site Usability) + Risk Effects (Environmental Risk/Stigma)**

---

[12] Illinois Pattern Civil Jury Instructions, Damage Instructions Rule 30.17 Measure of Damages – Damage to Real Property-Repairable Damage.

[13] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22; The Appraisal Institute, Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process (Chicago, IL: Appraisal Institute, 2013); Randall Bell, Real Estate Damages, 3rd ed. (Chicago: Appraisal Institute, 2016); and Appraisal Institute, The Appraisal of Real Estate, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 186-189.

[14] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22; The Appraisal Institute, Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process (Chicago, IL: Appraisal Institute, 2013); Randall Bell, *Real Estate Damages*, 3rd ed. (Chicago: Appraisal Institute, 2016); Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116; and Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 186-189.

**Impaired Value = Unimpaired Value - Property Value Diminution[15]**

A real estate damage assignment does not require both an unimpaired and impaired value, let alone either of them. In fact, the Appraisal Institute's Guide Note 6, "Consideration of Hazardous Substances in the Appraisal Process," specifies that property value diminution is the sum of cost effects, use effects, and risk effects,[16] without regard to an unimpaired and impaired value.[17] The three components of "Property Value Diminution" were analyzed, and a summary of the findings are set forth as follows:

Cost effects were estimated by Environmental Health & Engineering, Inc. They set forth an estimated cost of remediation that is expected to exceed $50,200,000 and estimated that the remediation effort will take approximately 24 months.

Cost effects primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser and should include consideration of any increased operating costs due to property remediation.[18]

Use effects were determined, as there were impacts to the bundle of rights and to the conventional use of the subject properties. The calculation of use effects is grounded in the income approach. In measuring use effects of a property, a common valuation methodology is to use the rental rate of the property.[19] The general calculation of any use effect is Market Rent x Period of Time = Use Effect.[20]

"Market rent" can be derived from different sources, such as standard monthly rates on the MLS. Alternatively, short-term rates, such as vacation rentals, or special event rentals, such as film industry rental rates can be considered.[21] In a use effect analysis, market rent is calculated on the unimpaired rent rate, in other words, the market rent but for the detrimental condition. In other

---

[15] The Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* (Chicago, IL: Appraisal Institute, 2013), 13; and Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116.

[16] Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* (Appraisal Institute, July 26, 2013, rev. 2020), 7.

[17] Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 112-113.

[18] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22.

[19] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 85.

[20] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116; and Randall Bell, "Project Delay Economics," *The Appraisal Journal* (Fall 2011): 296.

[21] Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 112.

words, the rental rate reflects the market value for the right to use a property, one example would be the right to use the subject properties for the storage of PCBs. In this analysis, unimpaired monthly rental rates on the MLS were analyzed and indicated a rate of **$1,400 per month per improved subject property**. For those subject properties without improvements, land rental rates were analyzed. Land rental rates are also referred to as ground lease rates, which a based on a percentage of land value. Land sales were analyzed as part of the risk effect sales comparison approach, they indicated a value of $40,000 per lot. The ground lease data generally ranged from 6% to 10%, a rate of 7% was utilized. This indicated a rate of **$233.33 per month per unimproved subject property**.

Rents were discounted using the consumer price index (CPI).[22] Interest for the Use Effect component was calculated utilizing a 9% rate, based on the average annual return of the SP 500 Index from 1973 to 2024. This interest rate is appropriate because the Use Effect represents both (a) the City's loss of the normal use and enjoyment of the subject properties, and (b) the market value for the right to use the subject properties. Whether the City's loss of use is viewed as (a) the amount that the City would have spent to obtain the use of equivalent property for its residents and visitors, or (b) the amount the City should have received from Monsanto for its use of the subject properties, those amounts could have been invested and earned a return which the City could use in the public interest. The S&P 500 Index is a reasonable approximation of the City's expected return on such an investment.

"Time" can be the period when there is an impact to the bundle of rights. A key component in the bundle of rights includes the "right to use"[23] which transacts regularly in the real estate market and is reflected as a rental rate. It can also be the period in which conventional use and enjoyment of the property is impaired or delayed, whether in part or in whole. In this analysis, time was the period from the ordinance violation on July 1, 1973, to the scheduled start of trial, February 1, 2025 plus 24 months to conduct remediation efforts to February 1, 2027, indicating a total of approximately 53.59 years (19,573 days).[24] This is a conservative estimate, as PCBs were conceivably present on the subject properties prior to July 1, 1973, and it is understood that other experts will be presenting evidence on this matter.

In regards to loss of use, the Illinois Supreme Court Committee on Jury Instructions sets forth that "the value of loss of the use of the (building) (improvements) for the time reasonably

---

[22] In the real estate profession, "CPI is used to measure changes in costs, such as building costs, and can be used as a barometer for determining changes in lease rates." The Appraisal Institute, *The Appraisal of Real Estate*, 15th Edition (Chicago, IL: Appraisal Institute, 2020), 485.

[23] JD Eaton, *Real Estate Valuation in Litigation, 2nd Edition* (Chicago, IL: Appraisal Institute, 1995), 45; and The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal Institute, 2020), 4.

[24] 7/1/1973 to 2/1/2027 = 19,573 days ÷ 365.25 days per year = 53.59 years; Environmental Health & Engineering, Inc. estimated approximately 24 months for remediation efforts. In addition, it is likely that remediation would not begin until after the end of trial.

11

required for the repair."[25] The loss of use pertains to a reasonable period of time from the date of contamination to the completion of the remediation or repairs.

<u>Risk effects</u> (stigma) or "market resistance" was determined by developing literature reviews on the effects of PCBs and Dioxins on properties, researching case studies involving comparable environmentally contaminated neighborhoods, and conducting a sales comparison analysis.

The risk effect analyses indicated that when properties and their neighborhoods are impacted by PCB contaminants, they can become stigmatized and blighted. Inherently, properties impacted by environmental contamination that have incurred a loss in value are known as being "stigmatized," "blighted," or "tainted."[26] Furthermore, detrimental cues including but not limited to abandonment, decay, demolition, signage, barricades, and fencing can be indicators of blight.

Contaminated neighborhoods, such as the subject properties, commonly experience neighborhood blight. The neighborhood was once vibrant and residential homes were being developed, yet the subject properties and their neighborhood have suffered abandonment, decay, and demolition. Historical aerial imagery exhibits the detrimental impacts that have occurred over time. Additional aerial imagery is in the addenda.

 

Figure 5: Aerial Image of the Subject Property Neighborhood in 1968

Figure 6: Aerial Image of the Subject Property Neighborhood in 1988

---

[25] Illinois Pattern Civil Jury Instructions, Damage Instructions Rule 30.17 Measure of Damages – Damage to Real Property-Repairable Damage.

[26] Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January 1996): 59-60.

Accordingly, the risk effects measure this loss by calculating the "but for" improved value of comparable residential properties. The historical aerial imagery of the subject property neighborhood was geocoded and overlayed with parcel data to determine which subject properties were improved.[27] For any subject properties that did not include improvements, land values were utilized for the risk effects.

The risk effect data indicates that properties impacted by environmental contaminants, such as PCBs, incur risk effects up to -100%. There are numerous case studies of neighborhoods that have been abandoned and demolished. For example, Anniston, Alabama, Times Beach, Missouri, Mount Dioxin, Florida, Carver Terrace, Texas, Agricultural Street Landfill, Louisiana, and Mossville, Louisiana. The subject properties share many similarities with those comparable neighborhoods that have been blighted, abandoned, and demolished. Accordingly, the indicated risk effects for the subject properties in this case are -100% in their "as-is" unrepaired condition.

The data also sets forth that when an environmental contaminant is remediated, the risk effects can be lower. Nevertheless, if remediation is conducted on the subject properties, they will be vacant lots with past PCB issues, rather than improved residences with no prior PCB issues. Accordingly, in the "as-if" repaired condition, the estimated value of lot sales in the control neighborhoods are offset from the -100% loss in the "as-is" unrepaired condition. Effectively, if repaired, the value of the subject properties would be similar to the control neighborhood sales.

The "as-if" repaired risk findings do not negate or offset the cost effects, use effects, or ordinance fees. For the subject properties to be in a repaired state, costs will be incurred. Moreover, the loss of use and fee violations are ongoing.

**Reconciliation and Conclusion**

For the Use Effect and Risk Effect calculations were made to account for the years in which the City of East St. Louis held a recorded ownership to the subject properties.[28] As a conservative measure, and while all subject properties were negatively impacted by PCBs, subject properties with a lot size less than 1,000 SqFt were not included in the damage calculations, this is consistent with the low end of the lot sizes observed in the comparable sales data.[29]

The following figure sets forth the findings in this matter:

---

[27] Public property records, MLS records, street frontage, Google Earth imagery, aerial imagery in 1952, 1958, 1968, 1973, 1980, 1988, 1992, 1996, 1998, 2009, 2011, 2014, and 2017 were examined to determine the historical composition of the subject properties. Some of the records lacked complete data, requiring confirmation across all the different sources. This data is contained in the workfile.

[28] At the time of this report, ownership records were not available for parcel 01-23.0-206-004 were not available from 1973 to 1999. Accordingly, it was assumed that that parcel was not publicly owned during that period of time; however, if the data becomes available, the analysis can be updated.

[29] There were 6 subject properties with lot sizes less than 1,000 SqFt: 01-24.0-121-022, 01-24.0-121-024, 01-24.0-121-027, 01-24.0-121-032, 01-24.0-121-035, and 01-24.0-136-011.

13

| CITY OF EAST ST. LOUIS<br>Damage Summary<br>(Landmark File: 155-1-21) | | | | |
|---|---|---|---|---|
| | **Market Rate Improved** | **Market Rate Land** | **Time** | **Total** |
| **Ordinance Fines** | $500 per Day<br>$750 per Day | $500 per Day<br>$750 per Day | Pre 6/12/2003<br>Post 6/12/2003 | **-$3,111,449,250** |
| **Cost Effect** | Environmental Health &<br>Engineering, Inc. | Environmental Health &<br>Engineering, Inc. | 24 Months | **More than<br>-$50,200,000** |
| **Use Effect*<br>(See Schedule)** | $1,400<br>per Month<br>$46.00<br>per Day | $233.33<br>per Month<br>$7.67<br>per Day | 53.59 Years<br>@ 9% Interest | **-$989,632,338** |
| **Risk Effect**<br>("As-is" Unrepaired)** | $140,000<br>@ -100%<br>184 Subject Properties | $40,000<br>@ -100%<br>38 Subject Properties | Current | **-$27,280,000** |
| **Risk Effect**<br>("As-if" Repaired)** | None noted | Unrepaired Risk + $40,000<br>222 Subject Properties | Current | **-$18,400,000** |

*There are 273 subject proper ies; however, ownership has varied over time. Ownership was accounted for in he use effect calculations.

**Risk effects were applied to the subject properties that the City of East St. Louis and government agency held recorded ownership of in 2023, which was a total of 228. There were 6 subject proper ies with lot sizes less han 1,000 SqFt, these were not included in the Use or Risk Effect calculations.

Figure 7: Damage Summary

As this matter is ongoing, these analyses may be updated and supplemented at a later date. We reserve the right and can amend our analyses to reflect such changes. We also reserve the right and can amend our analyses to reflect any new information.



**Landmark Research Group, LLC**
33971 Selva Road, Suite 230
Dana Point, California 92629
Office: (949) 497-7600
Facsimile: (949) 497-7601
LandmarkResearch.com

February 16, 2024

John Driscoll, Esq.
The Driscoll Firm, P.C.
1311 Avenida Ponce de Leon, 6th Floor
San Juan, Puerto Rico 00907

Re:   Expert Appraisal Report
      Impacts of PCB Chemicals on 273 Subject Properties
      City of East St. Louis, State of Illinois

Dear Mr. Driscoll:

In accordance with your request, I have conducted an evaluation of the impairment and economic impact, if any, of the subject properties due to the impacts of PCB chemicals.

In estimating the total damage attributable to PCB chemicals on properties, ordinance violation fines, cost, use, and risk effects were each given consideration.

The accompanying expert report is a restricted appraisal report. This report can only be understood in combination with the supporting work file documentation, deposition, and trial testimony. Accordingly, the work file is considered a part of this report.

As discovery may be ongoing in this case, Landmark Research Group reserves the right to revise and supplement this expert report.

Very truly yours,

_____

Randall Bell, PhD, MBA, MAI
Illinois State License (553002895)

15

# TABLE OF CONTENTS

Case Overview _____ 2

    Subject Properties _____ 2

    Nature of Case _____ 2

    Polychlorinated Biphenyls (PCBs) _____ 3

    Environmental Exposure Pathways_____ 4

    Timeline _____ 5

    Neighborhood Blight_____ 5

    Damage Analysis_____ 7

        Ordinance Violation Fines _____ 8

        Real Estate Damage_____ 8

    Reconciliation and Conclusion _____ 13

Executive Summary _____ 19

    Landmark Research Group File Identification _____ 19

    Type of Report _____ 19

    Clients of this Report_____ 19

    Purpose of the Report _____ 19

    Intended Users of the Report_____ 19

    Intended Use of the Report _____ 19

    Property Rights Appraised _____ 20

    Scope of Work_____ 20

    Report Assumptions and Conditions_____ 21

        Extraordinary Assumptions _____ 21

        Hypothetical Conditions _____ 22

        Jurisdictional Exceptions_____ 22

        General Assumptions and Limiting Conditions _____ 22

    Effective Dates of Value _____ 22

    Date of Report _____ 22

    Type of Value _____ 22

    Exposure Time _____ 22

    Statement of Competency _____ 23

Subject Properties _____ 25

Ordinance Violations Analysis _____ 26

Real Estate Damage Analysis _____ 27

Market Data Collection and Verification _____ 29

Typical Subject Property Characteristics _____ 31

Cost Effects_____ 33

Applicability _____ 33

Use Effects _____ 34

Applicability _____ 36

Market Rent_____ 38

Period of Time_____ 40

Conclusion of Use Effect Analysis _____ 41

Risk Effects_____ 43

Literature Review _____ 44

Application of the Literature Review _____ 45

PCB Literature Review _____ 45

Dioxin Literature Review _____ 51

Case Studies _____ 53

Application of the Case Studies_____ 54

Case Study Findings _____ 61

Sales Comparison Analysis_____ 63

Conclusion of Risk Effects _____ 67

Reconciliation and Conclusion _____ 68

Addenda _____ 69

Qualifications of Randall Bell, PhD, MBA, MAI_____ 70

Summary of Testimony Experience – Prior Four Years_____ 81

Statement of Compensation _____ 83

Certification_____ 84

General Assumptions and Limiting Conditions _____ 85

Documents Considered _____ 87

Definitions_____ 96

Mass Appraisal _____ 106

Geographic Information System (GIS) _____ 110

Detrimental Condition Overview _____ 113

USPAP Advisory Opinion 9 _____ 117

Guide Note 6 _____ 122

Bell Chart _____ 131

Damage Economics: A Comparative Illustration _____ 132

USPAP AO9 in Context of the Subject Properties _____ 133

Media Headlines _____ 136

Subject Property Summary with Ownership History _____ 140

Subject Properties Descriptive Data _____ 154

Highest and Best Use _____ 161

Real Estate Market Trends _____ 163

Literature Review: Use Effects _____ 165

Ground Lease Data _____ 180

Caseyville Improved Lease Matrix _____ 189

Fairview Heights Improved Lease Matrix _____ 190

Belleville Improved Lease Matrix_____ 191

Caseyville Improved Sales Matrix _____ 192

Fairview Heights Improved Sales Matrix _____ 193

Belleville Improved Sales Matrix _____ 194

Fairmont City Improved Sales Matrix _____ 195

Caseyville Land Sales Matrix _____ 196

Fairview Heights Land Sales Matrix_____ 197

Belleville Land Sales Matrix_____ 198

RED Reports _____ 199

Historical Aerial Imagery of the Subject Property Neighborhood _____ 209

List of Figures _____ 225

**EXECUTIVE SUMMARY**

**Landmark Research Group File Identification**

Case Number: 155-1-21
"City of East St. Louis"

**Type of Report**

This expert report is a restricted report, containing a summary of information. This expert report may not contain supporting rationale,[30] it can only be understood in combination with the supporting work file documentation, deposition, and trial testimony. All of the work file was produced, which contains all the detailed data used for this report. This assignment involves 273 subject properties. Accordingly, a self-contained appraisal report would necessitate a document numbering thousands of pages. As a practical matter, the work file contains this detail and is considered a part of this restricted appraisal report. As discovery is ongoing in this case, Landmark Research Group reserves the right to revise and supplement this report as we continue to review and analyze the case file, and as more information becomes available.

**Clients of this Report**

The Driscoll Firm, LLC
The Driscoll Firm, P.C.
Chatham & Baricevic
Sanders Phillips Grossman, LLC
Smouse & Mason, LLC

**Purpose of the Report**

The purpose of this report is to determine the real estate and economic damages, if any, of the subject properties due to the impacts of PCB chemicals.

**Intended Users of the Report**

The clients are the sole intended users of this report. No other users are intended or identified. This expert report may not be utilized or relied upon by any other party, nor may it be relied upon by the clients for any purpose other than the stated use.

**Intended Use of the Report**

The intended use of this expert report is for the legal matter involving City of East St. Louis

---

[30] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 38* (United States of America, 2024), 115-116.

vs. Monsanto Company, Solutia Inc., and Pharmacia, LLC. This expert report may be presented to the court in this matter. This report can be updated to include additional properties and damage analyses.

**Property Rights Appraised**

Fee simple estate

**Scope of Work**

The Scope of Work is set forth throughout this expert report, and is summarized as follows:

- Reviewed various legal documents.
- Reviewed various PCB contaminant documents.
- Reviewed USPAP and other appraisal textbooks and articles relating to appraisal and valuing detrimental conditions.
- Researched market data of subject, control, and various neighborhoods.
- Researched public property records, GIS database records, and MLS records.
- Researched subject properties and general neighborhood properties.
- Researched zoning and land use records.
- Conducted a damage analysis of the total fines attributable to City code violations. This included accounting for leap years, examining City ordinances, and considering future value calculations to bring the historical violations to a current date and analyzing various rates of return.
- Considered the cost approach, income approach, and sales comparison approach.
- Performed a real estate damage analysis that considered the cost effects, use effects, and risk effects.
- Cost effects were provided by other experts.
- Conducted a use effect analysis that involved researching and analyzing comparable leases.
- Performed numerous literature reviews, including those related to use effects, PCBs and Dioxins on property values.
- Researched market data of various neighborhoods utilized in the case study analysis.
- Developed case studies relating to risk effects.
- Conducted a risk effect analysis that involved researching and analyzing comparable sales.
- Prepared this expert report.
- Michael Tachovsky, PhD performed general market research including case studies, literature review, sale and lease analysis, fieldwork, subject property research, and assisted with expert report drafting.
- Kristopher Williams performed general market research including case studies, literature review, sale and lease analysis, subject property research, and assisted with expert report drafting.
- Greyson Benson performed general market research including case studies, media review, and literature review.

20

- Melanie Levy performed general market research including media review, and sale and lease analysis.
- Patrick Mara performed general market research including GIS mapping.
- Spencer Thompson performed general market research including GIS mapping, subject property research, case studies, literature review, media research and sales and lease analysis.
- Faith Rehagen performed general market research including GIS mapping.
- Daniel Meyers performed general market research including timeline development and exhibits.
- Performed inspections of the subject property neighborhood, locations of the subject properties, market areas, control neighborhoods, and the former Monsanto plant. Inspections began in February 2022 and have been ongoing.

**Report Assumptions and Conditions**

The use of any noted extraordinary assumptions or hypothetical conditions might affect assignment results.[31] USPAP requires that an appraiser states all extraordinary assumptions, hypothetical conditions, and jurisdictional exceptions in a report.[32]

Extraordinary Assumptions

It is an extraordinary assumption that the following data, files, and experts are accurate and correct:

- It is an extraordinary assumption that the environmental testing, including the identification of the subject properties, is accurate and correct. This data was presented by Kevin Coghlan, M.S., C.I.H. of Environmental Health & Engineering, Inc. Furthermore, PCBs were present on the subject properties prior to July 1, 1973. Other experts will be presenting evidence on this matter.
- It is an extraordinary assumption that the City of East St. Louis ownership history is accurate and correct, as provided by counsel. At counsel's request, any ownership noted by a government agency was included in the damage calculations. In addition, there were not ownership records for 2024 or beyond; however, we were instructed by counsel to mirror the ownership data from 2023, as ownership has been relatively consistent over recent years.

---

[31] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 38* (United States of America, 2024), 115-116.

[32] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, Standard 2: Real Property Appraisal, Reporting; Standard 4: Appraisal Review, Reporting; USPAP Guidance Advisory Opinion 38* (United States of America, 2024), 22-25, 31, and 115-116.

21

<u>Hypothetical Conditions</u>

- It is a hypothetical condition that in the unimpaired condition, the subject properties are not impacted by PCB contaminants. In reality, the subject properties have been impacted by PCB contaminants.

<u>Jurisdictional Exceptions</u>

No jurisdictional exceptions were utilized in this expert report.

<u>General Assumptions and Limiting Conditions</u>

General assumptions and limiting conditions are in the report addenda.

**Effective Dates of Value**

December 31, 2023

**Date of Report**

February 16, 2024

**Type of Value**

Market Value

**Exposure Time**

Reasonable exposure time for an uncontaminated home or residential lot is approximately 30 days.

22

**Statement of Competency**

The Uniform Standards of Professional Appraisal Practice ("USPAP") does not require a statement of competency in all reports.[33] However, I am a real estate economist with a certified general appraiser and a real estate broker license. I hold the professional designation of MAI from the Appraisal Institute. A copy of my qualifications is in the addenda.

I am a licensed appraiser in the State of Illinois (#553002895). I have conducted studies as set forth throughout this report and I am competent in completing this assignment.[34] I am the Director of Landmark Research Group, LLC, a consulting and appraisal firm that specializes in real estate damage economics. Prior to this, I led Bell Anderson & Sanders, LLC and the national real estate damages practice at Price Waterhouse and PricewaterhouseCoopers.

I have a PhD degree in Human and Organizational Systems (socioeconomics emphasis) from Fielding Graduate Institute, an MBA degree (real estate emphasis) from UCLA and a BS degree (finance and accounting emphasis) from BYU.

I have over 35 years of experience in appraisal, consulting and research regarding residential, multi-family, commercial, special purpose, retail, industrial, recreational and investment properties in several states, as well as internationally. Since approximately 1992, I have specialized in real estate damage economics, which includes valuation issues related to a variety of detrimental conditions, including environmental issues, geotechnical issues, construction defects, natural disasters and so forth.

I am the author of the Appraisal Institute's course titled "The Valuation of Detrimental Conditions in Real Estate" and I have taught the course on dozens of occasions throughout the United States, Canada, South America, and Asia. This course specifically addresses the appropriate methodologies for valuing properties that have been impacted by detrimental conditions. I am the author of numerous published articles related to the effect that detrimental conditions have on real estate values.

I am the author of the book, "Real Estate Damages" which is published by the Appraisal Institute. This book is widely regarded as the authoritative text on determining the impacts if any, that a detrimental condition has on property values. Specifically, Chapter 1 addresses

---

[33] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, Competency Rule* (United States of America, 2024), 188.

[34] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, Competency Rule,* (United States of America, 2020), 13-14. "Competency can be acquired in various ways, including, but not limited to, personal study by the appraiser, association with an appraiser reasonably believed to have the necessary knowledge and/or experience, or retention of others who possess the necessary knowledge and/or experience. In an assignment where geographic competency is necessary, an appraiser who is not familiar with the relevant market characteristics must acquire an understanding necessary to produce credible assignment results for the specific property type and market involved."

23

diminution-in-value methodologies and Chapter 8 addresses environmental and biomedical conditions.

I have been retained in hundreds of complex economic assignments, including the World Trade Center, Hurricane Katrina and the Bikini Atoll Nuclear Test Sites. Relative to this assignment, I have computed damages, if any, for various environmentally contaminated properties. Many of these cases involved damages spanning many years or decades. For example, for approximately 7 years I was retained by the Nuclear Claims Tribunal to compute damages that spanned from the 1950s to 2000s.

## SUBJECT PROPERTIES

In this case, the subject properties are comprised of 273 parcels in East St. Louis, Illinois. The subject properties are located north and northeast of the Monsanto Plant, they were tested in June 2022. The subject properties are visually represented in the following map:



Figure 8: Subject Properties Map

25

## ORDINANCE VIOLATIONS ANALYSIS

The City of East St. Louis files a complaint seeking fines and damages for the contamination of its lands with polychlorinated biphenyls ("PCBs").[35] The City of East St. Louis set forth claims concerning numerous City code violations, including a provision of City Code §1-15 regarding penalties for ordinance violations. The provision was set forth in the early 1970s and states that there is a $750 per offense per day per parcel from June 12, 2003, through the present; from July 1, 1973, through June 12, 2003, the maximum fine was $500 per day per parcel.

Accordingly, economic damages have been analyzed based on the fees set forth under the ordinance violations. The following summary calculates the penalties for each of the 273 subject properties.

As customary within the real estate appraisal profession, government documents such as city plans, zoning codes, environmental documentation, and so forth are reviewed. Accordingly, the City of East St. Louis Ordinance Code §1-15 were examined. An ordinance violation fee of $500 per day per property was applied from July 1, 1973 (Ordinance Violation) to June 11, 2003 (Day Prior to Change in Penalty). From June 12, 2003 (Change in Penalty) to February 1, 2025 (Start of Trial) a violation fee of $750 was applied. These computations account for the ordinance provisions, as well as leap years.

In addition, a future value calculation was considered relative to the fines to bring the historical violations to a current date. The future value calculation involved analyzing various rates of return, rates such as treasury bills, government bonds, corporate bonds, and the stock market were considered. Ultimately, counsel provided instructions to not include a future value calculation.

| CITY OF EAST ST. LOUIS Ordinance Fines (Landmark File: 155-1-21) | | | | | |
|---|---|---|---|---|---|
| Start Date | End Date | Number of Days | Rate per Day per Property | Subject Properties | Total |
| 7/1/1973 | 6/11/2003 | 10,937 | $500 | 273 | $1,492,900,500 |
| 6/12/2003 | 2/1/2025 | 7,905 | $750 | 273 | $1,618,548,750 |
| Total | | | | 273 | **$3,111,449,250** |

*Microsoft Excel has a one day discrepincy depending upon how it is calculated. Accordingly, the more conservative computation was utilized.

Figure 9: Ordinance Fines

---

[35] "First Amended Complaint for Damages and Abatement," City of East St. Louis v. Monsanto, et al., April 23, 2021.

26

## REAL ESTATE DAMAGE ANALYSIS

The Illinois Supreme Court Committee on Jury Instructions in Civil Cases set forth Rule 30.17 Measure of Damages – Damage to Real Property-Repairable Damage, which states:

> The damage to real property, determined by the reasonable expense of necessary repairs to the property which was damaged [and the value of loss of the use of the (building) (improvements) for the time reasonably required for the repair] [and the difference between the fair market value of the real property immediately before the occurrence and its fair market value immediately after the repairs].[36]

The Illinois Jury Instructions on damages parallels a real estate damages analysis, which is measured by cost, use, and risk effects. Cost effects correlating with expense of repairs, use effects correlating with loss of use, and risk effects correlating with the difference in fair market value before and after a detrimental condition (or with and without). Accordingly, utilizing standard real estate damage methodologies, an economic damages analysis was conducted to set forth a range of damages incurred by the subject properties. The real estate damages set forth in this report were calculated for all 273 subject properties, which have all been owned by the City of East St. Louis for at least one point in time since 1973. In addition, damage calculations were made that accounted for the recorded ownership of the subject properties by the City of East St. Louis.

In any real estate valuation scenario, damages, or impairment to market value, are determined by considering cost, use, and risk effects.[37] Cost, use, and risk effects were all considered in this real estate damage assessment. A real estate damage assignment does not require both an unimpaired and impaired value, let alone either of them. In fact, the Appraisal Institute's Guide Note 6, "Consideration of Hazardous Substances in the Appraisal Process," specifies that property value diminution is the sum of cost effects, use effects, and risk effects,[38] without regard to an unimpaired and impaired value.[39]

---

[36] Illinois Pattern Civil Jury Instructions, Damage Instructions Rule 30.17 Measure of Damages – Damage to Real Property-Repairable Damage.

[37] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22; The Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* (Chicago, IL: Appraisal Institute, 2013, rev. 2020); Randall Bell, *Real Estate Damages, 3rd ed.* (Chicago, IL: Appraisal Institute, 2016); and The Appraisal Institute, *The Appraisal of Real Estate, 15th ed.* (Chicago, IL: Appraisal Institute, 2020), 186-189.

[38] Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* (Appraisal Institute, July 26, 2013, rev. 2020), 7.

[39] Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 112-113.

27

Environmental contamination issues are considered Class VIII detrimental conditions such a condition may impact the market value of a property. When there may be an impairment to market value, impairments are analyzed by considering cost, use, and risk effects.[40] The traditional approaches to value involve the cost approach, income approach, and sales comparison approach. While all these approaches were considered, a real estate damage assessment involves an analysis of cost, use, and risk effects. The Uniform Standards of Professional Appraisal Practice (USPAP) and the Appraisal Institute sets forth that cost, use, and risk effects are considered to determine any impacts to market value from a detrimental condition.[41]

In the context of valuing damaged property, the concept of the three approaches to value and the application of a cost, use, and risk analysis are consistent with the three approaches to value.

the appraisal methodologies that can be used to determine impacts, if any, are all extensions of the three traditional approaches to value.[42]

| Real Estate Economics | |
|---|---|
| **Unimpaired**<br>Traditional Appraisal Methods | **Impaired**<br>Real Estate Damage Analysis |
| Cost Approach | Cost Effects |
| Income Approach | Use Effects |
| Sales Comparison Approach | Risk Effects |

Figure 10: Real Estate Damage Economics

---

[40] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22; The Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* (Chicago, IL: Appraisal Institute, 2013, rev. 2020); Randall Bell, Real Estate Damages, 3rd ed. (Chicago: Appraisal Institute, 2016); and Appraisal Institute, The Appraisal of Real Estate, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 186-189.

[41] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22; The Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* (Chicago, IL: Appraisal Institute, 2013, rev. 2020); Randall Bell, *Real Estate Damages*, 3rd ed. (Chicago: Appraisal Institute, 2016); Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116; and Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 186-189.

[42] The Appraisal Institute, *The Appraisal of Real Estate, 14th Edition* (Chicago, IL: Appraisal Institute, 2013): 214.

**Market Data Collection and Verification**

Market data in this report consists of sale and rent transactions that were gathered from the Maris Multiple Listing Service ("MLS"). In addition, public property records were also gathered, which included data from St. Clair County and Realist. When analyzing sale and rent transactions, MLS data was utilized because it was contemporaneous with the condition of the property at the time of transaction. Public records were utilized as an additional source of confirmation.

Real estate damage assessments can be conducted by analyzing data before and after a detrimental event or with and without a detrimental condition. With and without analyses are also referred to as "test" and "control" analyses. When considered, techniques are generally employed that compare properties impaired by a detrimental condition (test properties) to properties unimpaired by a detrimental condition (control properties).[43] The basic premise being that a "test" property is one impacted by a detrimental condition and a "control" property is similar, but it is not impacted by a detrimental condition. Test and control analyses are fundamental to the appraisal profession, a common example is comparing a property with a pool (test) to an otherwise similar property without a pool (control), and the measured difference between the prices of those properties indicates the contributory value of the pool.



Figure 11: Test vs. Control Exhibit

---

[43] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 33 and 44.

In this case, the subject properties are considered "test" properties, as they are impacted by PCBs. Control properties were also developed with lease transactions for the use effect study and sales transactions for the risk effect study. The identified control properties were in municipalities adjacent to East St. Louis without contamination issues. The following map sets forth the control areas in blue, noting that the cities of Sauget, Alorton, and Centerville[44] were considered but not utilized because of contamination issues.



Figure 12: Control Area Map

The sale and rent data collected for the analyses were closed transaction in 2023. As part of the data confirmation process, the sales and rental data was mapped using geographic information systems (GIS) software. The sale, rent, and public property record data was then examined for errors, completeness, and consistency. When deficiencies or discrepancies were found that could be reliably and reasonably addressed, the data was corrected. When the reliable or reasonable solution to these deficiencies or discrepancies could not be discerned, the data was set aside with the reasoning noted.

---

[44] Around 2021, Alorton and Centerville were merged with Cahokia to form Cahokia Heights.

30

<u>Typical Subject Property Characteristics</u>

In studying the subject properties over a period of more than 50 years, the majority of subject property improvement information was no longer available. To draw comparisons between the subject properties in an unimpaired condition (improved residential) and control properties, data of other improved non-subject property residences in the neighborhood were analyzed.[45] The public property records in the surrounding neighborhood were examined and the data was tabulated. For any properties that transacted, the corresponding MLS records were examined as an additional source of confirmation. The following figure summarizes the property characteristics of improved residences in the subject property neighborhood. Additionally, some of the subject property neighborhood data included historical improvement information, even though the property is currently vacant. This data was included in the summary because it provides information as to the properties that once existed.

The range of improvements from the subject property neighborhood was utilized to set a range of data utilized from the control areas in the lease and sales comparison analyses. In other words, the control area data was similar to the unimpaired condition of the subject properties. In addition, the subject neighborhood lot size range was not utilized, rather the range in lot size of the subject properties were utilized, which was 436 SqFt to 73,181 SqFt with an average of approximately 4,843 SqFt and a median of approximately 3,049 SqFt.

| CITY OF EAST ST. LOUIS<br>Subject Neighborhood Improved Properties Matrix<br>(Landmark File: 155-1-21) | | | | | | |
|---|---|---|---|---|---|---|
| | Number of Properties | Low | High | Average | Median | % of Properties With Feature |
| Bedrooms* | 556 | 1 | 4 | 3 | 3 | NA |
| Total Bathrooms | 556 | 1 | 5 | 2 | 2 | NA |
| Above Ground SqFt** | 556 | 368 | 2,412 | 1,064 | 1,004 | NA |
| Year Built | 556 | 1872 | 2010 | 1948 | 1940 | NA |
| Basement (Yes/No) | 556 | NA | NA | NA | NA | 23% |
| Garage (Yes/No) | 556 | NA | NA | NA | NA | 35% |
| Carport (Yes/No) | 556 | NA | NA | NA | NA | 6% |

*There was one property with 5 bedrooms, one property with 6 bedrooms, and one property with 7 bedrooms. Due to the limited number of properties with 5, 6, and 7 bedrooms, they were not utilized.
**There were four properties with over 2,500 Above Ground SqFt. Due to the limited number of properties with more than 2,500 Above Ground SqFt, they were not utilized.

Figure 13: Subject Neighborhood Improved Properties Matrix

---

[45] The subject properties are located in two neighborhoods that the MLS and public records define as Rush City and Southend.

31



Figure 14: Subject Neighborhood Map



Figure 15: Subject Neighborhood with St. Louis Gateway Arch in Background

32

## COST EFFECTS

Cost effects related to detrimental conditions are grounded in the traditional cost approach, which can be utilized by considering appropriate deductions of the "costs and responsibilities" that are related to the detrimental condition.

AO-9 notes that **"**[c]ost effects primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser and should include consideration of any increased operating costs due to property remediation. The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value."[46]

Under these conditions, a licensed real estate appraiser relies on the costs from outside sources and other professional experts, which is allowed under USPAP provided there is a reasonable expectation that those completing the estimates are competent, and there is no reason to doubt the credibility of the work.[47] A licensed real estate appraiser may also develop costs, such as simple deferred maintenance (example: carpet replacement).

Applicability

Cost effects were estimated by Environmental Health & Engineering, Inc. They set forth an estimated cost of remediation that is expected to exceed $50,200,000 and estimated that the remediation effort will take approximately 24 months.

---

[46] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22.

[47] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, Appraisal Reporting – Certification and Signatures* (United States of America, 2020), 252-253.

## USE EFFECTS

AO-9 notes that "[u]se effects reflect impacts on the utility of the site as a result of the contamination. If the contamination and/or its cleanup rendered a portion of the site unusable, or limited the future highest and best use of the property, then there could be a use effect on value."[48]

In the field of finance and valuation, it is well known that "time is money." Use effect is often a core issue in many real estate evaluations. In a property damage analysis, the key valuation issue comes down to use effects. Indeed, the loss or delay of use is often the core issue in real estate damage assignments.[49]

When use effects exist because of a detrimental condition, the property rights of property owners or occupants are affected. In real estate, these property rights are referred to as the "bundle of rights" because ownership of a parcel of real estate may embrace a great many rights, such as the right to its occupancy and use; the right to sell it in whole or in part; the right to bequeath; the right to transfer, by contract, for specified periods of time, the benefit to be derived by occupancy and use of the real estate.[50] The Appraisal of Real Estate 15th Edition also presents some of the many property rights, such as the right to use the real estate, sell it, lease it, enter it, and give it away.[51]

The bundle of rights is the right to do any of these, whether or not they have been exercised. For example, "the right to refuse to exercise any property rights," as the absence of compulsion to use any right merely rounds out and makes complete the freedom of will in the enjoyment of property ownership.[52] Moreover, it is also generally recognized that property encompasses the entire bundle of rights inherent in the ownership of the real estate and that the taking or infringement on these rights often constitutes a taking, even if no part of the physical real estate is taken.[53] Accordingly, use issues may not always be visible or apparent.

---

[48] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22.

[49] Randall Bell, "Project Delay Economics," *The Appraisal Journal* (Fall 2011), 292.

[50] JD Eaton, *Real Estate Valuation in Litigation, 2nd Edition* (Chicago, IL: Appraisal Institute, 1995), 45.

[51] The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal Institute, 2020), 4.

[52] Leonard C. Smith, "The Bundle of Property Rights," *The Appraisal Journal* (October 1956): 487.

[53] JD Eaton, *Real Estate Valuation in Litigation, 2nd Edition* (Chicago, IL: Appraisal Institute, 1995), 16.

**THE BUNDLE OF RIGHTS**



Source: *The Appriasial of Real Estate, 14th Edition*

Figure 16: Bundle of Rights

In addition to trespass and an infringement of property rights, there are other factors that account for a loss of use. A property owner not only purchases a home but a neighborhood. Similarly, a tenant leases not just a home but a neighborhood. This reality is the basis for the old real estate adage, "location, location, location." A property's neighborhood and location are critical. Indeed, the concept of "neighborhood analysis" is part of the appraisal lexicon. Neighborhood Analysis is defined as "[t]*he objective analysis of observable or quantifiable data indicating discernible patterns of urban growth, structure, and change that may detract from or enhance property values; focuses on four sets of considerations that influence value: social, economic, governmental, and environmental factors.*"[54] As a result of the PCB contaminants, the "environmental" pillar has been impacted.

The loss of normal use and enjoyment is a standard component of real estate and computing damages. "Damages," in part, is defined as, "[i]*n other types of suits for trespass or nuisance, for example, in determining the effect of adverse environmental conditions on property prices, values, or **use and enjoyment***, *a loss in value that may be quantified as the difference between the unimpaired value and the value of the property as is.*"[55] (**emphasis added**) As such, "use" is a is a core component when calculating real estate damages. The nuisance and overall neighborhood conditions resulted in the normal use and enjoyment of the homes being lost.

---

[54] The Appraisal Institute, *Dictionary of Real Estate Appraisal, 7th Edition* (Chicago, IL: Appraisal Institute, 2022), 130.

[55] The Appraisal Institute, *Dictionary of Real Estate Appraisal, 7th Edition* (Chicago, IL: Appraisal Institute, 2022), 48.

35

<u>Applicability</u>

In this case, the subject properties conventional use has been impacted because of the PCB contaminants. A detrimental use effect exists whether or not the market is properly informed. However, when a market is properly informed as to the exposure of contaminants, the use effects can be profound in terms of use issues and actual property values.

Examples of use impacts include:

- Anniston, Alabama. Air, waters, and soil were contaminated, the local school was shut down and many properties were abandoned.
- Herculaneum, Missouri. Air and soil were contaminated, many homes were bulldozed.
- Porter Ranch, California. Air was contaminated, homeowners were offered the option to evacuate and many did.
- Hinckley, California. Water was contaminated, many of the homes were bulldozed.
- Love Canal, New York. Soil, the estimated temporary relocation costs exceeded the estimated costs of a permanent buyout.[56]

In some of these cases, an impact on a portion of a property or part of the bundle of rights still resulted in a total loss of use. The conventional use of property generally assumes the enjoyment of safe air, soils, and water. If this is not the case, as reflected in the case studies above, the impact on use can be 100%.

The calculation of use effects is grounded in the income approach. In other words, a use effect can be benchmarked by the loss of income or opportunity cost that the subject property could have enjoyed but for the detrimental condition. In measuring use effects of a property, a common valuation methodology is to use the lease or rental rate of the property in determining use effect damages. Accordingly, the damages would be equivalent to the cost of renting a comparable, substitute property.[57] The general calculation of any use effect damage is as follows:

$$\textbf{Market Rent x Period of Time = Use Effect[58]}$$

Measurement of temporary use effects generally centers on market rents. It is not centered on whether there has been an impact to market rental rates or whether a property is used, but rather on whether there is an impact to the conventional use and enjoyment of the property or its rights

---

[56] Allan Mazur, *A Hazardous Inquiry: The Rashomon Effect at Love Canal* (Cambridge, MA: Harvard University Press, 1998), 157.

[57] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 85.

[58] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116; and Randall Bell, "Project Delay Economics," *The Appraisal Journal* (Fall 2011): 296.

or whether the bundle of rights has been impaired.[59] In this context, "conventional" relates to a customary or traditional usage or custom.[60]

There may be situations such as displacement during and after an event, periods of trespass, periods of assessment, periods of repair, environmental assessment and remediation, delays, periods of nuisance, or as a result of many other situations that may impact the temporary conventional use or enjoyment of a property. A use effect may be present even though a cost or risk effect is absent. Accordingly, an impaired property may not sell at a discount, yet it may still have incurred a use effect.[61]

---

[59] Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 121.
[60] *Black's Law Dictionary*, 4th ed., s.v. "conventional."
[61] Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 112.

**Market Rent**

"Market rent" can be derived from different sources, such as standard monthly rates on the MLS. Alternatively, short-term rates, such as vacation rentals, or special event rentals, such as film industry rental rates can be considered.[62] In a use effect analysis, market rent is calculated on the unimpaired rent rate, in other words, the market rent but for the detrimental condition. In other words, the rental rate reflects the market value for the right to use a property, one example would be the right to use the subject properties for the storage of PCBs. In this analysis, monthly rental rates on the MLS were analyzed and indicated a rate of **$1,400 per month per improved subject property**. For those subject properties without improvements, land rental rates were analyzed. Land rental rates are also referred to as ground lease rates, which a based on a percentage of land value. Land sales were analyzed as part of the risk effect sales comparison approach, they indicated a value of $40,000 per lot. The ground lease data generally ranged from 6% to 10%, a rate of 7% was utilized. This indicated a rate of **$233.33 per month per unimproved subject property**.

| CITY OF EAST ST. LOUIS Improved Lease Matrix (Landmark File 155-1-21) | | | | | | |
|---|---|---|---|---|---|---|
| No. | City | Number of Leases | Low Lease Rate | High Lease Rate | Average Lease Rate | Median Lease Rate |
| SP | East St. Louis | NA | NA | NA | NA | NA |
| 1 | Caseyville | 4 | $900 | $1,850 | $1,444 | $1,513 |
| 2 | Fairview Heights | 12 | $975 | $2,300 | $1,495 | $1,350 |
| 3 | Belleville | 39 | $850 | $2,100 | $1,293 | $1,200 |
| 4 | Fairmont City | 0 | - | - | - | - |
| 5 | Washington Park | 0 | - | - | - | - |
| 6 | Sauget* | - | - | - | - | - |
| 7 | Centreville* | - | - | - | - | - |
| 8 | Alorton* | - | - | - | - | - |
| Overall Average | | | $908 | $2,083 | $1,411 | $1,354 |

*Contamination Issues

Figure 17: Lease Matrix

---

[62] Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 112.

**CITY OF EAST ST. LOUIS**
**Improved Control Leases 2023**
**(Landmark File: 155-1-21)**



Figure 18: Improved Control Leases

**Period of Time**

"Time" can be the period when there is an impact to the bundle of rights. A key component in the bundle of rights includes the "right to use"[63] which transacts regularly in the real estate market and is reflected as a rental rate. It can also be the period in which conventional use and enjoyment of the property is impaired or delayed, whether in part or in whole. In this analysis, time was the period from the ordinance violation on July 1, 1973, to the scheduled start of trial, February 1, 2025 plus 24 months to conduct remediation efforts to February 1, 2027, indicating a total of approximately 53.59 years (19,573 days).[64] This is a conservative estimate, as PCBs were conceivably present on the subject properties prior to July 1, 1973, and it is understood that other experts will be presenting evidence on this matter.

In regards to loss of use, the Illinois Supreme Court Committee on Jury Instructions sets forth that "the value of loss of the use of the (building) (improvements) for the time reasonably required for the repair."[65] The loss of use pertains to a reasonable period of time from the date of contamination to the completion of the remediation or repairs.

---

[63] JD Eaton, *Real Estate Valuation in Litigation, 2nd Edition* (Chicago, IL: Appraisal Institute, 1995), 45; and The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal Institute, 2020), 4.

[64] 7/1/1973 to 2/1/2027 = 19,573 days ÷ 365.25 days per year = 53.59 years; Environmental Health & Engineering, Inc. estimated approximately 24 months for remediation efforts. In addition, it is likely that remediation would not begin until after the end of trial.

[65] Illinois Pattern Civil Jury Instructions, Damage Instructions Rule 30.17 Measure of Damages – Damage to Real Property-Repairable Damage.

**Conclusion of Use Effect Analysis**

Use effects can be presented in aggregate, or on a property-by-property basis. While the actual dollar impact per property varies, the analysis applied and the nature of impacts, is uniform.

Rents were discounted using the consumer price index (CPI).[66] Interest for the Use Effect component was calculated utilizing a 9% rate, based on the average annual return of the SP 500 Index from 1973 to 2024. This interest rate is appropriate because the Use Effect represents both (a) the City's loss of the normal use and enjoyment of the subject properties, and (b) the market value for the right to use the subject properties. Whether the City's loss of use is viewed as (a) the amount that the City would have spent to obtain the use of equivalent property for its residents and visitors, or (b) the amount the City should have received from Monsanto for its use of the subject properties, those amounts could have been invested and earned a return which the City could use in the public interest. The S&P 500 index is a reasonable approximation of the City's expected return on such an investment.

In addition, calculations were made to account for the years in which the City of East St. Louis held a recorded ownership to the subject properties.[67] As a conservative measure, and while all subject properties were negatively impacted by PCBs, subject properties with a lot size less than 1,000 SqFt were not included in the damage calculations, this is consistent with the low end of the lot sizes observed in the comparable sales data.[68]

---

[66] In the real estate profession, "CPI is used to measure changes in costs, such as building costs, and can be used as a barometer for determining changes in lease rates." The Appraisal Institute, *The Appraisal of Real Estate*, 15th Edition (Chicago, IL: Appraisal Institute, 2020), 485.

[67] Ownership records were not available for parcel 01-23.0-206-004 were not available from 1973 to 1999 at the time of this report. Accordingly, it was assumed that that parcel was not publicly owned during that period of time; however, if the data becomes available, the analysis can be updated.

[68] There were 6 subject properties with lot sizes less than 1,000 SqFt: 01-24.0-121-022, 01-24.0-121-024, 01-24.0-121-027, 01-24.0-121-032, 01-24.0-121-035, and 01-24.0-136-011.

41

| Year | CPI | Market Rent per Month | Market Rent Annual | Number of Subject Properties with Historical Improvements | Sub Total Market Rent | Lot Value | Land Rent Annual (7%) | Number of Land Subject Properties | Sub Total Land Rent | Years Remaining | Cumulative Use Effect @ 9% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **CITY OF EAST ST. LOUIS** | | | | | | |
| | | | | | **Use Effect Schedule** | | | | | | |
| | | | | | **(Landmark File: 155-1-21)** | | | | | | |
| Total | | | | | | | | | | | $989,632,338 |
| Feb-27 | 304.70 | $1,400 | $16,800 | 185 | $3,108,000 | $40,000 | $2,800 | 38 | $106,400 | 0.00 | $3,214,400 |
| 2026 | 304.70 | $1,400 | $16,800 | 185 | $3,108,000 | $40,000 | $2,800 | 38 | $106,400 | 1.08 | $3,529,208 |
| 2025 | 304.70 | $1,400 | $16,800 | 185 | $3,108,000 | $40,000 | $2,800 | 38 | $106,400 | 2.08 | $3,846,610 |
| 2024 | 304.70 | $1,400 | $16,800 | 185 | $3,108,000 | $40,000 | $2,800 | 38 | $106,400 | 3.09 | $4,193,547 |
| 2023 | 304.70 | $1,400 | $16,800 | 185 | $3,108,000 | $40,000 | $2,800 | 38 | $106,400 | 4.08 | $4,570,697 |
| 2022 | 292.65 | $1,345 | $16,136 | 195 | $3,146,480 | $38,419 | $2,689 | 41 | $110,261 | 5.08 | $5,047,388 |
| 2021 | 270.97 | $1,245 | $14,940 | 221 | $3,301,776 | $35,572 | $2,490 | 42 | $104,581 | 6.08 | $5,754,061 |
| 2020 | 258.81 | $1,189 | $14,270 | 220 | $3,139,354 | $33,976 | $2,378 | 42 | $99,889 | 7.09 | $5,965,283 |
| 2019 | 255.66 | $1,175 | $14,096 | 218 | $3,072,907 | $33,562 | $2,349 | 42 | $98,671 | 8.08 | $6,365,961 |
| 2018 | 251.11 | $1,154 | $13,845 | 214 | $2,962,831 | $32,964 | $2,308 | 42 | $96,915 | 9.08 | $6,693,831 |
| 2017 | 245.12 | $1,126 | $13,515 | 209 | $2,824,612 | $32,178 | $2,252 | 42 | $94,604 | 10.08 | $6,960,759 |
| 2016 | 240.01 | $1,103 | $13,233 | 202 | $2,673,069 | $31,507 | $2,206 | 42 | $92,631 | 11.09 | $7,189,500 |
| 2015 | 237.02 | $1,089 | $13,068 | 193 | $2,522,153 | $31,115 | $2,178 | 41 | $89,299 | 12.08 | $7,399,059 |
| 2014 | 236.74 | $1,088 | $13,053 | 186 | $2,427,796 | $31,078 | $2,175 | 41 | $89,193 | 13.08 | $7,772,785 |
| 2013 | 232.96 | $1,070 | $12,844 | 176 | $2,260,597 | $30,582 | $2,141 | 37 | $79,207 | 14.08 | $7,875,455 |
| 2012 | 229.59 | $1,055 | $12,659 | 155 | $1,962,125 | $30,140 | $2,110 | 33 | $69,624 | 15.09 | $7,455,377 |
| 2011 | 224.94 | $1,034 | $12,402 | 136 | $1,686,703 | $29,529 | $2,067 | 32 | $66,145 | 16.08 | $7,010,431 |
| 2010 | 218.06 | $1,002 | $12,023 | 123 | $1,478,791 | $28,625 | $2,004 | 32 | $64,121 | 17.08 | $6,725,777 |
| 2009 | 214.54 | $986 | $11,829 | 119 | $1,407,615 | $28,164 | $1,971 | 32 | $63,086 | 18.08 | $6,987,577 |
| 2008 | 215.30 | $989 | $11,871 | 120 | $1,424,508 | $28,264 | $1,978 | 32 | $63,311 | 19.09 | $7,706,476 |
| 2007 | 207.34 | $953 | $11,432 | 113 | $1,291,818 | $27,219 | $1,905 | 31 | $59,065 | 20.08 | $7,626,481 |
| 2006 | 201.59 | $926 | $11,115 | 114 | $1,267,103 | $26,464 | $1,852 | 31 | $57,427 | 21.08 | $8,150,219 |
| 2005 | 195.29 | $897 | $10,768 | 113 | $1,216,737 | $25,637 | $1,795 | 31 | $55,633 | 22.08 | $8,533,388 |
| 2004 | 188.88 | $868 | $10,414 | 114 | $1,187,225 | $24,796 | $1,736 | 31 | $53,807 | 23.09 | $9,073,912 |
| 2003 | 183.96 | $845 | $10,143 | 115 | $1,166,412 | $24,149 | $1,690 | 32 | $54,094 | 24.08 | $9,726,407 |
| 2002 | 179.88 | $826 | $9,918 | 117 | $1,160,356 | $23,613 | $1,653 | 32 | $52,894 | 25.08 | $10,538,130 |
| 2001 | 177.07 | $814 | $9,763 | 117 | $1,142,240 | $23,245 | $1,627 | 32 | $52,068 | 26.08 | $11,306,558 |
| 2000 | 172.20 | $791 | $9,494 | 118 | $1,120,340 | $22,606 | $1,582 | 32 | $50,637 | 27.09 | $12,085,532 |
| 1999 | 166.58 | $765 | $9,184 | 121 | $1,111,296 | $21,867 | $1,531 | 32 | $48,983 | 28.08 | $13,052,112 |
| 1998 | 163.01 | $749 | $8,988 | 109 | $979,650 | $21,399 | $1,498 | 11 | $16,477 | 29.08 | $12,213,330 |
| 1997 | 160.52 | $738 | $8,850 | 109 | $964,675 | $21,072 | $1,475 | 11 | $16,225 | 30.08 | $13,108,268 |
| 1996 | 156.85 | $721 | $8,648 | 109 | $942,639 | $20,591 | $1,441 | 11 | $15,855 | 31.09 | $13,964,103 |
| 1995 | 152.38 | $700 | $8,402 | 14 | $117,625 | $20,004 | $1,400 | 0 | $0 | 32.08 | $1,867,775 |
| 1994 | 148.23 | $681 | $8,173 | 8 | $65,380 | $19,458 | $1,362 | 0 | $0 | 33.08 | $1,131,544 |
| 1993 | 144.46 | $664 | $7,965 | 111 | $884,097 | $18,964 | $1,327 | 11 | $14,602 | 34.08 | $16,952,775 |
| 1992 | 140.32 | $645 | $7,736 | 111 | $858,750 | $18,420 | $1,289 | 11 | $14,184 | 35.09 | $17,951,916 |
| 1991 | 136.19 | $626 | $7,509 | 110 | $825,996 | $17,879 | $1,252 | 11 | $13,767 | 36.08 | $18,822,912 |
| 1990 | 130.66 | $600 | $7,204 | 111 | $799,640 | $17,152 | $1,201 | 11 | $13,207 | 37.08 | $19,858,225 |
| 1989 | 123.97 | $570 | $6,835 | 111 | $758,687 | $16,274 | $1,139 | 11 | $12,531 | 38.08 | $20,535,681 |
| 1988 | 118.26 | $543 | $6,520 | 24 | $156,487 | $15,524 | $1,087 | 3 | $3,260 | 39.09 | $4,637,330 |
| 1987 | 113.63 | $522 | $6,265 | 31 | $194,209 | $14,916 | $1,044 | 3 | $3,132 | 40.08 | $6,243,893 |
| 1986 | 109.61 | $504 | $6,043 | 26 | $157,127 | $14,389 | $1,007 | 3 | $3,022 | 41.08 | $5,522,826 |
| 1985 | 107.57 | $494 | $5,931 | 116 | $687,971 | $14,121 | $988 | 14 | $13,839 | 42.08 | $26,378,954 |
| 1984 | 103.88 | $477 | $5,728 | 116 | $664,413 | $13,637 | $955 | 18 | $17,183 | 43.09 | $27,929,872 |
| 1983 | 99.60 | $458 | $5,492 | 119 | $653,493 | $13,075 | $915 | 18 | $16,475 | 44.08 | $29,922,382 |
| 1982 | 96.50 | $443 | $5,321 | 122 | $649,115 | $12,668 | $887 | 21 | $18,622 | 45.08 | $32,504,906 |
| 1981 | 90.93 | $418 | $5,013 | 219 | $1,097,898 | $11,936 | $836 | 41 | $34,257 | 46.08 | $60,068,960 |
| 1980 | 82.41 | $379 | $4,544 | 212 | $963,256 | $10,818 | $757 | 41 | $31,048 | 47.09 | $57,513,091 |
| 1979 | 72.58 | $333 | $4,001 | 211 | $844,314 | $9,527 | $667 | 41 | $27,344 | 48.08 | $54,953,375 |
| 1978 | 65.23 | $300 | $3,597 | 211 | $758,904 | $8,564 | $599 | 41 | $24,577 | 49.08 | $53,836,619 |
| 1977 | 60.61 | $278 | $3,342 | 211 | $705,098 | $7,956 | $557 | 41 | $22,835 | 50.08 | $54,518,190 |
| 1976 | 56.91 | $261 | $3,138 | 213 | $668,329 | $7,471 | $523 | 41 | $21,441 | 51.09 | $56,319,334 |
| 1975 | 53.82 | $247 | $2,967 | 212 | $629,053 | $7,065 | $495 | 41 | $20,276 | 52.08 | $57,785,549 |
| 1974 | 49.31 | $227 | $2,719 | 213 | $579,075 | $6,473 | $453 | 41 | $18,578 | 53.08 | $57,970,057 |
| Jul-73 | 44.40 | $204 | $2,448 | 214 | $523,879 | $5,829 | $408 | 41 | $16,728 | 53.59 | $54,763,551 |

Figure 19: Use Effect Schedule

42

**RISK EFFECTS**

Risk effects (stigma) or "market resistance" is generally considered to be an adverse effect on value resulting from the market's perception of increased risk.[69] Risk effects can be measured using a variety of techniques that are extensions of the sales comparison approach. When considered, techniques are generally employed that compare properties impaired by a detrimental condition (test properties) to properties unimpaired by a detrimental condition (control properties).[70] Similarly, the sale of a property or numerous properties can be compared before and after a detrimental condition or event. In addition, sales data and detrimental condition data can be verified with market participants, agencies, engineers, contractors, and so forth.

In the valuation of real estate, there are three general approaches to value; specifically, they are in the sales comparison approach, income approach, and cost approach. Other approaches are subsets of these. While there are numerous techniques available to real estate valuation professionals, it is not necessary to use them all; some or even one technique can produce credible opinions in an assignment.[71]

To evaluate risk effects, the following analyses were conducted: (1) Literature Review, (2) Case Studies Analysis, and (3) Sale Comparable Analysis.

---

[69] Randall Bell, *Real Estate Damages, 3rd ed.* (Chicago, IL: Appraisal Institute, 2016), 25; and Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 109.

[70] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 33 and 44.

[71] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 114.

**Literature Review**

Literature reviews are based on the interpretation of the published work of others. The appraisal profession has amassed a considerable body of work from which to draw material from,[72] which addresses countless areas of focus within the profession.

A literature review is an established real estate research method that is grounded in hermeneutics.[73] Hermeneutics simply means "the art and science of interpretation."[74] It is practiced by a host of professionals in a wide variety of fields. Radiologists interpret X-rays, judges interpret the law, and Wall Street interprets the stock market.[75] For real estate valuation professionals, the practice of hermeneutics might start with texts such as USPAP. In addition to USPAP, the valuers may consult the accumulated large body of professional knowledge and literature. The professional literature serves as a resource that appraisers can use to expand their wealth of knowledge and provide a meaningful evaluation of environmentally contaminated properties,[76] or those impacted by other conditions.

The Appraisal Institute offers members access to the Lum Library, an essential resource for appraisers. Appraisers rely on the library to provide accurate, in-depth information when researching a topic. The Lum Library's database includes almost 30 years of The Appraisal Journal, 22 years of Real Estate Appraiser and Analyst, 7 years of Valuation Insights & Perspectives, and approximately 1,500 books.[77]

Additionally, the Appraisal Journal is the Appraisal Institute's quarterly peer-reviewed journal. Winner of a Gold Circle Award from The Center for Association Leadership (ASAE), the Journal is recognized as the appraisal profession's premier technical and academic publication. Nearly 20,000 appraisers and others rely on the Journal for well-researched, innovative, and thought-provoking articles on a wide variety of valuation topics. More than 350 pages are written by leading practitioners in the appraisal profession each year.[78]

---

[72] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 9.

[73] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 114.

[74] Valerie Malhotra Bentz and Jeremy J. Shapiro, Mindful Inquiry in Social Research (Thousand Oaks, CA: Sage Publications, 1998), 105.

[75] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 9.

[76] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 114.

[77] "Advanced Research Techniques of the Lum Library," The Free Library, accessed May 22, 2019, https://www.thefreelibrary.com/Advanced+research+techniques+of+the+Lum+Library+(1).-a0113602005.

[78] "The Appraisal Journal," Appraisal Institute, accessed May 30, 2019, https://www.appraisalinstitute.org/publications/the-appraisal-journal/.

44

Application of the Literature Review

A literature search was performed for PCBs and Dioxins and their impact on property values utilizing the Appraisal Institute's Y.T. and Louise Lee Lum Library (Lum Library). The results of the searches are outlined in the following Literature Reviews.

PCB Literature Review

The following table summarizes the PCB literature review and the findings, if any, put forth by the respective authors of the published work:

| No | Article Title & Author (Year Published) | Source | Property Type & Issue | Citations | Findings |
|---|---|---|---|---|---|
| | CITY OF EAST ST. LOUIS Literature Review - PCBs (Landmark File: 155-1-21) | | | | |
| 1 | Under the Microscope: Dissection of a Contingent Valuation Survey Mathews (2008) | Lum Library | Residential PCBs (Air, Soil, Water) | "Simons[5] uses multiple methods, including CV, to estimate the decrease in property value for residential property potentially affected by PCBs in Anniston, Alabama. While the market-based methods in that study reveal a diminution of approximately 30%–60%, the CV survey results suggests a 95% loss in the value of the residential property." Source Article [5]: Robert A. Simons, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," The Appraisal Journal (October 2002): 388–400. | -30% to -95% |

Figure 20: PCB Literature Summary, Article 1

45

| | CITY OF EAST ST. LOUIS<br>Literature Review - PCBs<br>(Landmark File: 155-1-21) | | | | |
|---|---|---|---|---|---|
| No | Article Title<br>&<br>Author<br>(Year Published) | Source | Property<br>Type<br>&<br>Issue | Citations | Findings |
| 2 | Estimating Proximate Property Damage From PCB Contamination in a Rural Market: A Multiple Techniques Approach<br><br>Simons (2002) | Lum Library | Residential<br><br>PCBs (Air, Soil, Water) | "It is [Anniston, Alabama] one of very few places in the U.S. where PCBs were manufactured and where the Monsanto plant had been making them for decades."<br><br>"The assignment was to evaluate the effect of continued releases from the plant on both a single subject property at the edge of the buyout area and also on its surrounding neighborhood just east of the plant."<br><br>"Several commercial businesses in the neighborhood were also fenced off and abandoned. The house adjacent to the subject property was abandoned and other signs of blight were evident on the subject's street. The area appeared to be suffering from substantial lack of updating and investment. The subject property is one of about 35 PCB soil sampling sites."<br><br>"To summarize, the market trends approach showed that properties in the areas directly impacted by the plant were reduced in value by 60% and that this reduction was attributable to the effects of the plant."<br><br>"Not one of the eight sales in 1999 and 2000 in the Monsanto impact area sold for within 15% of its original list price, and the average discount was almost 30% over the seller's original seller list price."<br><br>"Using the CVA, the buyer's side of the market was down 95%, in part due to the high concentration of PCBs on the subject's soils. Overall, conclusion of the subject property's value loss was 90%. This figure is less than the 95% estimate from the CVA, but larger than the 60% reduction indicated by market trends. The market trends data does not show local factors such as proximity to the plant's property purchase program and associated blight, which were considered in raising the total loss to 90%."<br><br>"[T]he resulting conclusion is that the property is almost valueless for residential use, leaving only a token value of 5% (such as for shortterm storage)." | -30% to -95% |

Figure 21: PCB Literature Summary, Article 2

| | CITY OF EAST ST. LOUIS<br>Literature Review - PCBs<br>(Landmark File: 155-1-21) | | | | |
|---|---|---|---|---|---|
| No | Article Title<br>&<br>Author<br>(Year Published) | Source | Property Type<br>&<br>Issue | Citations | Findings |
| 3 | Testing the Reliability of Contingent Valuation in the Real Estate Marketplace<br><br>Roddewig, Frey (2006) | Lum Library | Residential<br><br>PCBs (Soil, Water) | "In Crystal Springs, PCBs from a manufacturing facility had migrated off-site and been found in a creek and the soil at some single-family homes in the neighborhood adjacent to the plant."<br><br>"On the date of the contingent valuation study, only some of the properties had been remediated. Four different types of survey-based research studies were conducted. The median predicted negative impacts ranged from 25% to 100%.[45]"<br><br>"To test the contingent valuation results, the asking prices set by admittedly knowledgeable sellers, and the prices offered or paid by actual fully informed buyers, were examined. The results of the analysis indicate that the survey was highly inaccurate in predicting the prices that would be set and paid by fully informed knowledgeable sellers and buyers."<br><br>Source Article [45]: Mundy Associates, LLC, "Appraisal of Twelve Properties Located in Crystal Springs, Mississippi, Kellum, et al. vs. Kuhlman Electric Corporation, et al." (April 4, 2003), 97, 110. | Mundy Associates:<br>-25% to -100%<br><br>Roddewig, Frey: Qualitative |
| 4 | Environmental Pollution: Valuation in a Changing World<br><br>Dorchester, Jr (1991) | Lum Library | Residential and Office<br><br>PCBs | "In 1982 it was discovered that the town of Times Beach, Missouri, had been completely contaminated by the widespread distr bution of PCBs (PolyChlorinated Biphenyls) into the soil."<br><br>"The town was abandoned and is now undergoing a massive cleanup in an attempt to make it habitable once again."<br><br>"In 1983 an electrical transformer explosion occurred in an office building occupied by governmental agencies of the state of New York. The transformer contained PCBs."<br><br>"Measurements after the explosion revealed that the PCBs had been chemically altered into dioxins by the heat of the explosion, and that these dioxins had been carried into various areas of the building. It was abandoned and still is not in use." | "The town was abandoned and is now undergoing a massive cleanup in an attempt to make it habitable once again." |

Figure 22: PCB Literature Summary, Articles 3-4

| | | | CITY OF EAST ST. LOUIS<br>Literature Review - PCBs<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|---|---|
| No | Article Title<br>&<br>Author<br>(Year Published) | Source | Property Type<br>&<br>Issue | Citations | Findings |
| 5 | Implications of the Kumho Tire Case for Appraisal Expert Witnesses<br><br>Hoyt, Aa berts<br>(2001) | Lum Library | Farmland<br><br>PCBs<br>(Soil) | "The case [Rockwell International Corporation v. Vance Wilhite] involved the contamination of farms because of polychlorinated biphenyls (PCBs) discharged by Rockwell into streams that flow past the farms."<br><br>"Rockwell appealed after a circuit court awarded over $217.5 million in compensatory and punitive damages."<br><br>"The value of the properties if uncontaminated was estimated to exceed the compensatory damage portion of the award, which exceeded $7.5 million. This portion of the award was based almost entirely on the testimony of a single real estate appraiser whom the court found qualified to act as an expert witness."<br><br>"The empirical model used by the appraiser was not tested elsewhere, had no support in the literature, was not subjected to peer review (except in informal discussions with two other appraisers), and was not based on a scientific assumption that any quantity of PCB contamination is harmful."<br><br>"Because his opinion was unsupported, the appeals court indicated that it could not form the basis for a damage award and ruled that the trial court should have excluded the appraiser's testimony." | "The appraiser stated that flood plain property with any level of PCB contamination was worthless." |
| 6 | Daubert and the Appraisal Expert Witness Revisited<br><br>Hoyt, Aa berts<br>(2008) | Lum Library | Farmland<br><br>PCBs<br>(Soil) | "Rockwell had discharged polychlorinated biphenyls (PCBs) into streams that flowed past farms, thereby contaminating adjoining farm properties."<br><br>"The trial court awarded over $7.5 million in compensatory damages and $210 million in punitive damages."<br><br>"The opinion of Wilhite's expert was that 'a reasonable person would not farm or otherwise use PCB contaminated property until it has been thoroughly tested and, if necessary, remediated'"<br><br>"Wilhite's expert 'admitted that this was merely his subjective opinion and pointed to no scientific evidence to support his view.'"<br><br>"The appellate court stated that Wilhite's expert witness's empirical model, 'constructed for this case and untested in any other forum, finds no support in the literature. It has not been subjected to peer review … [t]here is no scientific basis for the assumption upon which it rests.'"<br><br>In referring to Wilhite's expert, the Kentucky Supreme Court stated the 'testimony was not insufficient, it was inadmissible. As it was persuasive evidence supporting the verdict and final judgment, the Court of Appeals properly reversed and we affirm that portion of the decision.' The case was then remanded to the previous courts for matters other than valuation. | "Wilhite's expert 'admitted that this was merely his subjective opinion and pointed to no scientific evidence to support his view.'" |

Figure 23: PCB Literature Summary, Articles 5-6

| | | | CITY OF EAST ST. LOUIS<br>Literature Review - PCBs<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|---|---|
| No | Article Title<br>&<br>Author<br>(Year Published) | Source | Property<br>Type<br>&<br>Issue | Citations | Findings |
| 7 | Daubert and Qualification of the Appraisal Expert Witness<br><br>Hoyt, Aaberts, Poon (2010) | Lum Library | Farmland<br><br>PCBs<br>(Soil) | "In the case of Wilhite v. Rockwell International Corporation, the plaintiffs originally were awarded $7.5 million in compensatory damages and $210 million in punitive damages (the cost to remediate the land) for the release of polychlorinated biphenyl (PCB) by Rockwell and subsequent contamination of farmland."<br><br>"His model opined that floodplain land with any level of PCB contamination is essentially worthless, and there may be a negative value because of the cost of remediation. The appraiser admitted that this was his subjective opinion and he had no scientific evidence to support his view."<br><br>"On review, the Kentucky Supreme Court agreed with the state's intermediate appeals court, ruling that the expert's testimony should not have been admitted into evidence. However, the high court did remand the case back to the trial court since there was other evidence supporting the conclusion that permanent injury did occur to the land in question for which the landowners would be entitled to compensation." | "His model opined that floodplain land with any level of PCB contamination is essentially worthless, and there may be a negative value because of the cost of remediation." |
| 8 | Expert Testimony: Regression Analysis and Other Systematic Methodologies<br><br>Colwell, Heller, Trefzger (2009) | Lum Library | Farmland<br><br>PCBs<br>(Soil) | "In Wilhite v. Rockwell International Corporation, Kentucky's supreme court found that an appraiser's testimony, which included a systematic analysis, was persuasive—but ultimately inadmissible."<br><br>"The appraiser had developed his own empirical model, based on unsupported assertions that any PCB contamination would leave farmland with zero value."<br><br>"Properly constructed regression models, supported by relevant data, could have solved many of these methodological problems, easily meeting the objectivity, reliability, and systematic analysis requirements for admissibility under amended Rule 702 or those any state court would seem likely to impose." | "The appraiser had developed his own empirical model, based on unsupported assertions that any PCB contamination would leave farmland with zero value." |

Figure 24: PCB Literature Summary, Articles 7-8

The published appraisal literature discusses the impact of PCBs on property values. Articles 1, 2, and 3 quantify impacts from -24% to -100%. While articles 4 through 8 set forth qualitative findings.

Articles 1 and 2 examined PCBs at Anniston, Alabama. The study indicates that there are a range of risk effects resulting from the presence of PCBs. Furthermore, Article 2 cites a study in the UK that indicates risk effects can decline after remediation. Specifically, "It found that contamination from high-hazard substances would reduce property values by 58% prior to

49

remediation, declining to 15% postremediation. Losses from very high-hazard substances would be 90% preremediation, and 54% postremediation."[79]

Article 3 reviews a study on the impacts of PCBs at Crystal Springs, Missouri. The study indicated risk effects of -25% to -100%; however, the authors argue that the results in the study were inaccurate because they did not reflect a fully informed knowledgeable buyer and seller. Nevertheless, the author's argument has its own flaws, as the market value standard is not premised on a "fully" informed buyer and seller.

Article 4 examined the effects of PCBs at Times Beach, Missouri, noting that the town has been abandoned and undergoing cleanup. Times Beach remains abandoned, undeveloped, and is utilized as a park.

Articles 5 through 8 discuss the admissibility of expert opinions, citing the case Wilhite v. Rockwell that involved PCBs on farmland and an expert opinion that was developed without any empirical evidence. These articles focus on the admissibility of such expert testimony.

---

[79] Paul Syms, "Perceptions of Risk in the Valuation of Contaminate Land," *Journal of Property, Valuation and Investment* (UK, 15: 1): 27–39. See table on page 32.

Dioxin Literature Review

In addition, a literature review on Dioxins was conducted. The following table summarizes the Dioxin literature review and the findings, if any, put forth by the respective authors of the published work:

| | | | | CITY OF EAST ST. LOUIS Literature Review - Dioxins (Landmark File: 155-1-21) | |
|---|---|---|---|---|---|
| No | Article Title & Author (Year Published) | Source | Property Type & Issue | Citations | Findings |
| 1 | Is Pollution a Homogeneous Determinant of Value? Decker, Nielsen, Sindt (2005) | Lum L brary | Residential Dioxins | "This study uses a cross-sectional, hedonic pricing model to investigate the link between different types of chemical releases and prices paid by purchasers of single-family residences in Omaha, Nebraska's Douglas County." *This article displays a table of chemicals released between 1995 and 2000 in Douglas County, Nebraska that includes Dixon and Dioxin-l ke compounds. "A 10% increase in TRI [toxic release inventory] releases per square mile reduces a home's price by 0.015% (0.0015 * 10). Relative to the mean value of a home in the sample, such an increase translates into a $2,207 reduction in price ($147,167 *0.015)." "The results indicate that aggregate toxic chemical releases adversely impact the selling price of a home. However, there is no evidence that releases of specific toxic chemicals known to be carcinogenic result in any additional downward adjustment on price." "It appears that buyers do not have sufficient information or the inclination to distinguish between pollutants with differing impacts on human health and the environment." | Quantitative Findings: 10% increase in TRI = -0.015% in home price Qualitative Findings: "It appears that buyers do not have sufficient information or the inclination to distinguish between pollutants with differing impacts on human health and the environment" |

Figure 25: Dioxin Literature Summary, Article 1

51

| No | Article Title & Author (Year Published) | Source | Property Type & Issue | Citations | Findings |
|---|---|---|---|---|---|
| | **CITY OF EAST ST. LOUIS** | | | | |
| | **Literature Review - Dioxins** | | | | |
| | **(Landmark File: 155-1-21)** | | | | |
| 2 | Environmental Pollution: Valuation in a Changing World<br><br>Dorchester, Jr (1991) | Lum L brary | Commercial<br><br>Dioxins | "In 1983 an electrical transformer explosion occurred in an office building occupied by governmental agencies of the state of New York. The transformer contained PCBs."<br><br>"Measurements after the explosion revealed that the PCBs had been chemically altered into dioxins by the heat of the explosion, and that these dioxins had been carried into various areas of the building. It was abandoned and still is not in use." | Quantitave Findings: 25% of contaminated properties fail to sell. 80% of lenders require an environmental survey.<br><br>Qualitative Findings: "It [the office buidling] was abandoned and still is not in use." |
| 3 | Valuing Partial Losses in Contamination Cases<br><br>Campanella (1984) | Lum L brary | Does not specify<br><br>Dioxins | "Contaminated properties sell very rarely; when they do great care must be taken to compare only those properties of similar uses, which are contaminated by a similar pollutant and in a similar manner."<br><br>"How does one compare the damage sustained by a retail property where PCB is found in the drains with an office building insulated with asbestos?"<br><br>"Is the loss in value for a farm contaminated with dioxin similar to the loss in value sustained by residences whose private wells test too high in iron and phosphates?"<br><br>"The appraiser must be careful to draw comparisons from those sales where the level of "threat" was similar to that facing the typical buyer of the subject property." | "Contaminated properties sell very rarely; when they do great care must be taken to compare only those properties of similar uses, which are contaminated by a similar pollutant and in a similar manner."<br><br>"In many cases, however, the cost-to-cure is reduced to a "broad brush" approach to the solution. Flat percentage or dollar amounts become deductions purporting to reflect the true loss in property value." |
| 4 | The Dose Makes the Poison: Environmental Phobia or Regulatory Stigma?<br><br>Lusvardi (2000) | Lum L brary | Does not specify<br><br>Dioxins | "L kewise, the evacuation of the community of Times Beach, Missouri, due to the presence of dioxins was reported as a 'textbook example of hype, panic, and the use of science for political purposes.' It was caused by people's inability to understand what a 'safe' dose of dioxin might be."<br><br>"The initial coverage of the Times Beach incident by the media evoked fear and panic. The fact that these initial reports were later recanted could not undo the real damage of evacuation and site abandonment." | "Some real estate appraisers assert that market value is entirely subjective, including the market's assessment of environmental risks." |

Figure 26: Dioxin Literature Summary, Articles 2-4

The literature indicates that dioxins have a negative impact on property values. Furthermore, Article 1 indicates that buyers do not distinguish between different types and amounts of pollutants. The findings support the use of comparable environmental contamination cases that involve different types and amounts of contaminants.

**Case Studies**

The case study approach itself is a comparative method[80] and a common approach throughout sciences, having a distinguished history across many disciplines including law, psychology, medicine, and political science.[81] Case studies involve the study of an issue through one or more cases within a bounded system[82] and numerous case studies may be considered in an analysis. A case study analysis involves situations in which similar properties have been impacted by a similar condition. Thus, the analysis of case studies is an extension of the sales comparison approach.[83]

If a market is uninformed or misinformed of a detrimental condition, it is appropriate to consider utilizing a case study methodology. The effects of defects on other properties or communities other than the subject can be analyzed to:

1. Understand how informed real estate markets in similar settings react to or perceive risk,
2. Study how these reactions translate into overall value,
3. Test the reasonableness of other valuation or evaluation techniques, and
4. Apply these findings to subject properties.

To determine any effect on value, case studies are developed from other properties that are similarly situated with respect to the subject property and its detrimental condition.[84] However, when conducting a case study analysis, the similarly situated property(ies) do not need to be in the same area as the subject property, as data limitations may necessitate searching a broad geographic area.[85]

Case Studies involving sales of previously damaged properties provide a reliable method of evaluating stigma, even if case study properties are not locationally or physically comparable to the subject.[86] As explained in Guide Note 11 of the Guide Notes to the Standards of Professional Practice of the Appraisal Institute, it may be necessary to expand the geographic search area for

---

[80] Bell and Bell, "Real Estate Research Methods," *The Appraisal Journal* (Fall 2015): 316.

[81] Creswell and Poth, *Qualitative Inquiry and Research Design: Choosing Among Five Approaches, 4th Edition* Sage (2018), 97.

[82] John Creswell, *Qualitative Inquiry and Research Design: Choosing Among Five Traditions, 2nd Edition* Sage (2007), 61.

[83] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 33 and 40.

[84] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 40.

[85] Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January 1996): 61; and Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 316.

[86] Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January 1996): 65.

comparable sales (or case studies) in markets where there have been few sales or to research sales further back in time.[87]

A case study analysis seeks to compare "apples to apples" but recognizes that actual sales transactions are not necessarily like for like. Like any application of the sales comparison approach, it is difficult and in some situations impossible to find comparables that are identical in all respects to the subject property;[88] nevertheless, the objective is to find case studies that are similar on some level.[89]

<u>Application of the Case Studies</u>

In this investigation, case studies with similar surface contaminant issues were studied. In addition to PCBs and Dioxins, case studies involving other contaminants of concern were also studied. Research suggests that toxic pollutant releases do adversely affect home prices; however, discounting of value is complete with proximity to any type and amount of pollutant release.[90] In other words, matter at hand is whether there is exposure or risk of exposure to a toxic release, not necessarily the amount or type of contaminant.

---

[87] The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal Institute, 2021): 356.

[88] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016), 40.

[89] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 112.

[90] Christopher Decker, et al., "Is Pollution a Homogeneous Determinant of Value?," *The Appraisal Journal* (Spring 2005): 194.

| | | | CITY OF EAST ST. LOUIS Case Studies Summary (Landmark File: 155-1-21) | | | |
|---|---|---|---|---|---|---|
| No. | Case Study | Property Type(s) | Conveyance Constituents SNAP | Case Overview | Quantitative Findings | Qualitative Findings |
| SP | East St. Louis Illinois | Residential | Air, Soil PCBs Non-Source | **Between 1936 and 1977, PCBs were produced at the Monsanto Plant in Sauget, Illinois.** | TBD | TBD |
| 1 | Anniston Anniston, Alabama | Residential | Soil PCBs Non-source | From 1929 to 1971, Monsanto produced Polychlorinated biphenyls (PCB's) at its Anniston facility. Between 1999 and 2000, the EPA discovered PCBs in residential soil around the Monsanto Facility. | -15% to -60% Typically: -55% | "In recent years, Monsanto has bought and demolished around 100 PCB-contaminated houses and businesses in the area, turning the neighborhood into a virtual ghost town." (2014-09-15 Feature Shoot) |
| 2 | Times Beach Times Beach, Missouri | Residential, Commercial | Soil Dioxins Non-source | In 1982, the Center for Disease Control recommended permanently relocating residents in Times Beach after dioxin contamination was discovered to have spread across the town in a flood. Times Beach was placed on the National Priorities List (NPL) in 1983 and removed in 2001. | -100% (Demolished) | In response to a health advisory issued by the Center for Disease Control, the EPA announced in February 1983 the permanent relocation of 800 residential properties and 30 businesses in Times Beach due to contamination. |
| 3 | Mount Dioxin Pensacola, Florida | Residential | Soil, Groundwater Dioxin, arsenic, and lead Non-source | In 1995, soil samples from neighboring properties to the Escambia Wood Treating Facility revealed dioxin, arsenic, and lead contamination. The Escambia Wood Treating Facility was placed on the National Priorities List (NPL) in 1994. | -100% (Demolished) | Relocation and demolition of the former residential neighborhoods ended in 2008 and included more than 400 households. Land use of the former residential homes was restricted to commercial and industrial uses. |

Figure 27: Case Study Summary, 1-3

55

| | | | CITY OF EAST ST. LOUIS<br>Case Studies Summary<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|---|---|---|
| No. | Case Study | Property Type(s) | Conveyance Constituents SNAP | Case Overview | Quantitative Findings | Qualitative Findings |
| SP | East St. Louis Illinois | Residential | Air, Soil<br><br>PCBs<br><br>Non-Source | Between 1936 and 1977, PCBs were produced at the Monsanto Plant in Sauget, Illinois. | TBD | TBD |
| 4 | Carver Terrace<br><br>Port Arthur, Texas | Residential | Air, Soil<br><br>Sulfur dioxin, benzene, hydrogen sulfide, and butadiene<br><br>Non-source | Smoke stacks released from the Motiva Oil Refinery contain elevated levels of benzene, sulfur dioxide, hydrogen sulfide, 1,2-butadiene. | -100% (Demolished) | In 2013, Carver Terrace was selected by the Port Arthur Housing Authority (PAHA) for the Housing Mobility Program, which intended to demolish 204 public housing units and assisted in finding relocation housing. |
| 5 | Agriculture Street Landfill<br><br>New Orleans, Louisiana | Residential, school, recreation and community center, and electronic substation | Soil, Groundwater<br><br>Lead, arsenic, and cPAHs<br><br>Source, Non-source | In 1997, the EPA issued an Action Memorandum for residential properties, a 48-acre undeveloped property, and a community center built on the former Agriculture Street Landfill. The EPA identified constituents of concern as lead, arsenic, and cPAHs. The Agriculture Street Landfill was placed on the National Priorities List (NPL) in 1994 and was partially deleted from the NPL in 2000 with some sites still in the process of removal. | -100% (Abandoned and Demolished) | After Hurricane Katrina flooded the area, Press Park apartments and the senior center were demolished while other buildings were left partial demolished, leaving the neighborhood blighted. Disaster insurance would not cover homes built on contaminated ground. Residents have requested relocation assistance. In 2022, a civil court judge ordered the city of New Orleans to pay $75 million in property damage, relocation costs, and emotional stress.<br><br>"Without buyouts, relocating is imposs ble for most of them since their homes have little resale value." (2014-06-27 Truth Out)<br><br>"The properties are almost impossible to sell because of the contamination" (2022-04-01 Washington Post) |

Figure 28: Case Study Summary, 4-5

56

| | | | CITY OF EAST ST. LOUIS<br>Case Studies Summary<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|---|---|---|
| No. | Case Study | Property Type(s) | Conveyance Constituents SNAP | Case Overview | Quantitative Findings | Qualitative Findings |
| SP | East St. Louis Illinois | Residential | Air, Soil<br><br>PCBs<br><br>Non-Source | Between 1936 and 1977, PCBs were produced at the Monsanto Plant in Sauget, Illinois. | TBD | TBD |
| 6 | Mossville<br><br>Mossville, Louisiana | Residential | Soil, Groundwater<br><br>Dioxins, ethylene dichloride, and more<br><br>Non-source | An estimated 4 million pounds of toxic chemicals including: dioxin, polycyclic aromatic hydrocarbons, xylene and toluene, ethylene dichloride, and heavy metals such as lead and mercury are released each year from the surrounding industrial plants. | -100% (Demolished) | Properties impacted by the Condea Vista Spill in 1994 were bought out and demolished by 2004.<br><br>In 2013, Sasol announced a voluntary buyout program for Mossville residents to make room for Sasol to expand its facility. According to Sasol, 584 homes were purchased and 195 offers were rejected as of July 2020<br><br>"Mossville is now a shadow of what it once was, with many remaining houses surrounded by empty lots and bare slabs." |
| 7 | Doe Run<br><br>Herculaneum, Missouri | Residential | Soil<br><br>Lead, arsenic, cadmium, and other metals<br><br>Non-source | Samples taken from the Doe Run Herculaneum Smelter and the surrounding community found elevated levels of lead, arsenic, cadmium, and other metals. In 2002, a Voluntary Property Purchase Plan was implemented for residential properties within a designated area. | Cost: -100%<br>Use: Not developed<br>Risk: -50%"<br><br>Unimpaired: $46,495,033 | Approximately 160 homes received purchase options. Homes purchased in the Plan were demolished. |
| 8 | Love Canal<br><br>Niagara Falls, New York | Residential, School | Soil<br><br>Dioxins and more<br><br>Source, Non-source, Adjacent, Proximate | In 1978, sampling discovered chemical contamination at residential properties adjacent to the original landfill. The Love Canal was placed on the National Priorities List in 1983 and removed in 2004. | -20% (Adjacent/ Proximate) to -100% (Source/ Non-source) | After the discovery of contamination in the soil, an Emergency Declaration was issued in 1978 that allowed residences on 97th and 99th street to evacuate. In 1980, President Carter issued $20 million in federal funds to purchase homes and assist in relocation. |

Figure 29: Case Study Summary, 6-8

57

| CITY OF EAST ST. LOUIS<br>Case Studies Summary<br>(Landmark File: 155-1-21) | | | | | | |
|---|---|---|---|---|---|---|
| **No.** | **Case Study** | **Property Type(s)** | **Conveyance Constituents SNAP** | **Case Overview** | **Quantitative Findings** | **Qualitative Findings** |
| **SP** | **East St. Louis Illinois** | **Residential** | **Air, Soil**<br><br>**PCBs**<br><br>**Non-Source** | **Between 1936 and 1977, PCBs were produced at the Monsanto Plant in Sauget, Illinois.** | **TBD** | **TBD** |
| 9 | PG & E Hinkley Compressor Station<br><br>Hinkley, California | Residential | Household Water<br><br>Hexavalent chromium,<br><br>Non-source | In 1952 PG & E started using hexavalent chromium, also known as chromium 6, to fight corrosion in cooling towers. The source site is an industrial site located at 35863 Fairview Road, Hinkley, California. | Up to -100% | The contaminated area in Hinkley is virtually a ghost town. The sites are now largely vacant. |
| 10 | Flint<br><br>Flint, Michigan | Residential | Household Water<br><br>Lead<br><br>Non-Source | In 2015, water in Flint homes was found to exceed the EPA's standard for lead in drinking water. In October 2016, Flint residents were advised to use approved water filters for lead removal before drinking city tap water. | -27% to -39% | A study in the American Economic Journal estimated that Flint's housing stock fell by at least $520 million from 2015-2019. The study found prices remained depressed 16 months after drinking water in Flint was declared safe for consumption. |

Figure 30: Case Study Summary, 9-10

| | | CITY OF EAST ST. LOUIS<br>Case Study Adjustment Grid<br>(Landmark File: 155-1-21) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Subject Property | Case Study 1 | | Case Study 2 | | Case Study 3 | | Case Study 4 | | Case Study 5 | |
| Address / Name | East St. Louis | Anniston<br>Anniston, Alabama | | Times Beach<br>Times Beach, Missouri | | Mount Dioxin<br>Pensacola, Florida | | Carver Terrace<br>Port Arthur, Texas | | Agriculture Street Landfill<br>New Orleans, Louisiana | |
| Effective Date | 2023 | 1999-2000 | | 1982 | | 1995 | | 2013 | | 1997 | |
| Property Land Use | Residential | Residen ial | | Residential, commercial | | Residen ial | | Residential | | Multiple | |
| Element | | Observation | Comparison | Observa ion | Comparison | Observa ion | Comparison | Observation | Comparison | Observation | Comparison |
| Accidental / Permitted | To be determined | Accidental | Similar | Accidental | Similar | Accidental | Similar | Permitted | Similar | Permitted | Similar |
| Status of the property with regard to regulatory compliance | To be determined | In compliance | Similar | In compliance | Similar | In compliance | Similar | In compliance | Similar | In compliance | Similar |
| Remediation lifecycle stage | Assessment | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior |
| Contamina ion constituents | PCBs | PCBs | Similar | Dioxins | Similar | Dioxin, creosote, polycyclic aromatic hydrocarbons (PAHs), and PCP | Similar | Sulfur dioxin, benzene, hydrogen sulfide, and butadiene | Similar | Lead, arsenic, and cPAHs | Similar |
| Conveyance | Air, Soil | Soil | Similar | Soil | Similar | Soil, groundwater | Similar | Air, soil | Similar | Soil, groundwater | Similar |
| SNAP | Non-source | Non-source | Similar | Non-source | Similar | Non-source | Similar | Non-source | Similar | Source, Non-source | Similar |
| Cost and timing of remedia ion | To be determined | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar |
| Liabili ies | To be determined | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar |
| Limitations on use | To be determined | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar |
| Off-site / migra ion from Source Site | Yes | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar | No | Similar |
| Risk Effects | | -15% to -60%<br>Typically -55% | | -100%<br>(Demolished) | | -100%<br>(Demolished) | | -100%<br>(Demolished) | | -100%<br>(Abandoned and Demolished) | |
| Overall Comparison to Subject | | Similar | | Similar | | Similar | | Similar | | Similar | |

Figure 31: Case Study Adjustment Grid 1-5

59

| | CITY OF EAST ST. LOUIS<br>Case Study Adjustment Grid<br>(Landmark File  155-1-21) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Subject Property** | **Case Study 6** | | **Case Study 7** | | **Case Study 8** | | **Case Study 9** | | **Case Study 10** | |
| Address / Name | East St. Louis | Mossville<br>Mossville, Louisiana | | Doe Run<br>Herculaneum, Missouri | | Love Canal<br>Niagara Falls, New York | | PG & E Hinkley Compressor Station<br>Hinkley  California | | Flint<br>Flint, Michigan | |
| Effective Date | 2023 | 2013 | | 2001 | | 1978 | | 1993-2019 | | 2015 | |
| Property Land Use | Multiple | Residential | | Residential | | Residential, school | | Residential | | Residential | |
| Element | | Observation | Comparison | Observation | Comparison | Observation | Comparison | Observation | Comparison | Observation | Comparison |
| Accidental / Permitted | To be determined | Accidental | Similar | Accidental | Similar | Permitted | Similar | Accidental | Similar | Accidental | Similar |
| Status of the property with regard to regulatory compliance | Not determined | In compliance | Similar | In compliance | Similar | In compliance | Similar | In compliance | Similar | In compliance | Similar |
| Remediation lifecycle stage | Assessment | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior | Ongoing | Inferior |
| Contamination constituents | PCBs | Dioxin, polycyclic aromatic hydrocarbons, xylene and toluene, ethylene dichloride, and heavy metals | Similar | Lead, arsenic, cadmium, and other metals | Similar | PAHs, halogenated organics, pesticides, chlorobenzenes and trichlorophenols (dioxin) | Similar | Hexavalent Chromium | Similar | Lead | Similar |
| Conveyance | Air, Soil | Soil, Groundwater | Similar | Soil | Similar | Soil | Similar | Household water | Similar | Household water | Similar |
| SNAP | Non-source | Non-source | Similar | Non-source | Similar | Source, Non-source, Adjacent, Proximate | Similar | Non-source | Similar | Non-source | Similar |
| Cost and timing of remediation | Not applicable | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar |
| Liabilities | To be determined | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar | Not determined | Similar |
| Limitations on use | To be determined | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar |
| Off-site / migration from Source Site | Yes | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar | Yes | Similar |
| **Risk Effects** | | **-100%<br>(Demolished)** | | **-50%** | | **-20% (Adjacent/Proximate) to -100% (Source/Non-source)** | | **Up to -100%** | | **-27% to -39%** | |
| **Overall Comparison to Subject** | | **Similar** | | **Similar** | | **Similar** | | **Similar** | | **Similar** | |

Figure 32: Case Study Adjustment Grid 6-10

60



Figure 33: Case Study Map

Case Study Findings

The case study analysis draws on cases with environmental contamination issues similar to the PCB issues that impact the subject properties. The case study adjustment grid is somewhat similar to the URAR form report; however, the case study adjustment grid draws on detrimental condition characteristics. The detrimental condition characteristics in the case study adjustment grid are the 10 relevant environmental property characteristics outlined in USPAP AO9.[91]

If detrimental condition characteristics outlined in the case study adjustment grid are noted to have a qualitative or quantitative influence on value when compared to the subject property's PCB contaminant issue, observations are noted in the "comparison" column. The case study adjustment grid indicates that all the case studies exhibit overall similarities to the subject properties in context of a detrimental condition analysis.

---

[91] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22.

The subject properties are currently in the assessment stage, as no remediation has commenced. The case studies are in the ongoing stage, meaning that they have been through the assessment and remediation stage. Generally, a property in the assessment stage incurs a greater diminution in value than one that has been remediated. Thus, the case studies reflect a lower limit of real estate damage. Further information on each case study is outlined in RED Reports and made available in the addenda of this report and in the work file.

**Sales Comparison Analysis**

The Sales Comparison Approach is the process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison.[92]

The subject properties were developed residential homes; however, as a result of the presence of PCBs, the subject properties have been blighted and are now vacant land. Accordingly, the risk effects measure this loss by calculating the "but for" improved value of comparable residential properties. The control area sales indicated an **improved value of $140,000 per property and a land value of $40,000 per lot.**

| | | | | CITY OF EAST ST. LOUIS<br>Improved Sales Matrix<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|---|---|---|
| No. | City | Number of Sales | Low Sale Price | High Sale Price | Average Sale Price | Median Sale Price |
| SP | East St. Louis | NA | NA | NA | NA | NA |
| 1 | Caseyville | 46 | $28,000 | $369,900 | $142,357 | $123,100 |
| 2 | Fairview Heights | 157 | $34,900 | $365,000 | $180,769 | $171,500 |
| 3 | Belleville | 744 | $4,900 | $430,000 | $154,581 | $148,250 |
| 4 | Fairmont City | 1 | $115,000 | $115,000 | $115,000 | $115,000 |
| 5 | Washington Park | 0 | - | - | - | - |
| 6 | Sauget* | - | - | - | - | - |
| 7 | Centreville* | - | - | - | - | - |
| 8 | Alorton* | - | - | - | - | - |
| | Overall Average | | $4,900 | $430,000 | $148,177 | $135,675 |

*Contamination Issues

Figure 34: Sales Matrix – Improved

---

[92] Appraisal Institute, *The Dictionary of Real Estate Appraisal,* 7th ed. (Chicago, IL: Appraisal Institute, 2015), 170.

**CITY OF EAST ST. LOUIS**
**Improved Control Sales 2023**
**(Landmark File: 155-1-21)**



Figure 35: Improved Control Sales Map

| | **CITY OF EAST ST. LOUIS**<br>**Land Sales Matrix**<br>**(Landmark File: 155-1-21)** | | | | | |
|---|---|---|---|---|---|---|
| **No.** | **City** | **Number of Sales** | **Low Sale Price** | **High Sale Price** | **Average Sale Price** | **Median Sale Price** |
| SP | East St. Louis | NA | NA | NA | NA | NA |
| 1 | Caseyville | 6 | $12,000 | $65,000 | $42,000 | $37,500 |
| 2 | Fairview Heights | 3 | $29,900 | $102,000 | $62,800 | $56,500 |
| 3 | Belleville | 10 | $3,800 | $80,000 | $25,960 | $21,000 |
| 4 | Fairmont City | 0 | - | - | - | - |
| 5 | Washington Park | 0 | - | - | - | - |
| 6 | Sauget* | - | - | - | - | - |
| 7 | Centreville* | - | - | - | - | - |
| 8 | Alorton* | - | - | - | - | - |
| **Overall Average** | | | **$3,800** | **$102,000** | **$43,587** | **$37,500** |

**\*Contamination Issues**

Figure 36: Sales Matrix – Land

**CITY OF EAST ST. LOUIS**
**Control Land Sales 2023**
**(Landmark File: 155-1-21)**



Figure 37: Control Land Sales

**Conclusion of Risk Effects**

The literature and case studies indicated that when properties and their neighborhoods are impacted by PCB contaminants, they can become stigmatized and blighted. Inherently, properties impacted by environmental contamination that have incurred a loss in value are known as being "stigmatized," "blighted," or "tainted."[93] Furthermore, detrimental cues including but not limited to abandonment, decay, demolition, signage, barricades, and fencing can be indicators of blight. Accordingly, contaminated neighborhoods, such as the subject properties, commonly experience neighborhood blight.

The risk effect data indicates that properties impacted by environmental contaminants, such as PCBs, incur risk effects up to -100%. There are numerous case studies of neighborhoods that have been abandoned and demolished. For example, Anniston, Alabama, Times Beach, Missouri, Mount Dioxin, Florida, Carver Terrace, Texas, Agricultural Street Landfill, Louisiana, and Mossville, Louisiana. The subject properties share many similarities with those comparable neighborhoods that have been blighted, abandoned, and demolished. Accordingly, the indicated risk effects for the subject properties in this case are -100% in their "as-is" unrepaired condition.

The data also sets forth that when an environmental contaminant is remediated, the risk effects can be lower. Nevertheless, if remediation is conducted on the subject properties, they will be vacant lots with past PCB issues, rather than improved residences with no prior PCB issues. Accordingly, in the "as-if" repaired condition, the estimated value of lot sales in the control neighborhoods are offset from the -100% loss in the "as-is" unrepaired condition. Effectively, if repaired, the value of the subject properties would be similar to the control neighborhood sales.

| CITY OF EAST ST. LOUIS Risk Effect Summary (Landmark File: 155-1-21) | | | |
|---|---|---|---|
| | **Improved** | **Land** | **Total** |
| **Market Rate** | $140,000 | $40,000 | |
| **Number of Subject Properties** | 184 | 38 | |
| **Risk Effect** | -100% | -100% | |
| **"As-is" Unrepaired** | -$25,760,000 | -$1,520,000 | **-$27,280,000** |
| **Market Rate** | None noted | $40,000 | |
| **Number of Subject Properties** | None noted | 222 | |
| **Total Offset** | $0 | $8,880,000 | $8,880,000 |
| **"As-if" Repaired** | | | **-$18,400,000** |

*As a conservative measure, and while all subject properties were negatively impacted by PCBs, subject properties with a lot size less than 1,000 SqFt were not included in the damage calculations, this is consistent with the low end of the lot sizes observed in the comparable sales data. The total number of improved properties in the "As-is" calculation was reduced from 190 to 184 and the total in the "As-if" calculation was reduced from 228 to 222.

Figure 38: Risk Effect Summary

---

[93] Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January 1996): 59-60.

## RECONCILIATION AND CONCLUSION

For the Use Effect and Risk Effect calculations were made to account for the years in which the City of East St. Louis held a recorded ownership to the subject properties.[94] As a conservative measure, and while all subject properties were negatively impacted by PCBs, subject properties with a lot size less than 1,000 SqFt were not included in the damage calculations, this is consistent with the low end of the lot sizes observed in the comparable sales data.[95]

The following figure sets forth the findings in this matter:

| CITY OF EAST ST. LOUIS Damage Summary (Landmark File: 155-1-21) | | | | |
|---|---|---|---|---|
| | **Market Rate Improved** | **Market Rate Land** | **Time** | **Total** |
| **Ordinance Fines** | $500 per Day $750 per Day | $500 per Day $750 per Day | Pre 6/12/2003 Post 6/12/2003 | **-$3,111,449,250** |
| **Cost Effect** | Environmental Health & Engineering, Inc. | Environmental Health & Engineering, Inc. | 24 Months | **More than -$50,200,000** |
| **Use Effect\* (See Schedule)** | $1,400 per Month $46.00 per Day | $233.33 per Month $7.67 per Day | 53.59 Years @ 9% Interest | **-$989,632,338** |
| **Risk Effect\*\* ("As-is" Unrepaired)** | $140,000 @ -100% 184 Subject Properties | $40,000 @ -100% 38 Subject Properties | Current | **-$27,280,000** |
| **Risk Effect\*\* ("As-if" Repaired)** | None noted | Unrepaired Risk + $40,000 222 Subject Properties | Current | **-$18,400,000** |

\*There are 273 subject properies; however, ownership has varied over time. Ownership was accounted for in he use effect calculations.

\*\*Risk effects were applied to the subject properties that the City of East St. Louis and government agency held recorded ownership of in 2023, which was a total of 228. There were 6 subject properies with lot sizes less han 1,000 SqFt, these were not included in the Use or Risk Effect calculations.

Figure 39: Damage Summary

As this matter is ongoing, these analyses may be updated and supplemented at a later date. We reserve the right and can amend our analyses to reflect such changes. We also reserve the right and can amend our analyses to reflect any new information.

---

[94] At the time of this report, ownership records were not available for parcel 01-23.0-206-004 were not available from 1973 to 1999. Accordingly, it was assumed that that parcel was not publicly owned during that period of time; however, if the data becomes available, the analysis can be updated.

[95] There were 6 subject properties with lot sizes less than 1,000 SqFt: 01-24.0-121-022, 01-24.0-121-024, 01-24.0-121-027, 01-24.0-121-032, 01-24.0-121-035, and 01-24.0-136-011.

68

**ADDENDA**

**Qualifications of Randall Bell, PhD, MBA, MAI**

Dr. Bell specializes in real estate damage economics and valuation. This includes environmental, geotechnical, construction defects, natural disasters, eminent domain, and other conditions involving a wide variety of property types. He is experienced in complex valuation and diminution-in-value studies and damage issues for government, major corporations, oil and utility companies, and property owners. He is licensed in various states and has testified as an expert in multiple courts.

Education

Doctoral Studies: Fielding Graduate University, PhD, Human and Organizational Systems – Dissertation: *Post Traumatic Behaviors: The Socioeconomic Reasoning of Homeowners Who Voluntarily Remained in the Aftermath of Hurricane Katrina*

Graduate Studies: UCLA – MBA Degree, Real Estate Emphasis

Professional Studies: Appraisal Institute – MAI; UCLA Extension, Certificate in Real Estate

Undergraduate Studies: BYU – BS Degree, Finance and Accounting

License and Memberships

Certified General Real Estate Appraiser (AG1672)
Appraisal Institute – MAI Designation (M9360)
State of California – Real Estate Broker (01111436)
International Right of Way Association – Member (06746314)
Bureau of National Affairs (BNA) – Advisory Board Member
American Statistical Association – Member
Econometric Society – Member
American Economic Association (AEA) – Member
Association of Social Economics – Member

Appraisal Institute

Instructor - Continuing Education Requirements Current Appointed to the Regional Ethics and Counseling Panel Elected to the Advisory Council, 1996, 1997
Chairman of the Litigation Seminar Committee, 1994, 1995 Member – Task Force on Advanced Education Standards, 1999 Member – Committee for Statistical & Survey Standards, 1999-2002
Recipient of Year's Outstanding Article in the Appraisal Journal – Swango Award, 2002, 2008
Member of the National Strategic Planning Committee, 2013-2014

Expert Witness

United States District Court, Court Appointed Appraiser, State Superior Courts, Assessor's Boards, United States Bankruptcy Court, Arbitration & Mediation

70

Book Author

Real Estate Damages: Applied Economics and Detrimental Conditions Third Edition, Appraisal Institute - *Chicago, Illinois* - Author

Real Estate Damages: An Analysis of Detrimental Conditions Appraisal Institute - *Chicago, Illinois* - Author

The Appraisal of Real Estate – 14th Edition Appraisal Institute - *Chicago, Illinois* – Contributing Author

Real Estate Investing for Dummies – 3rd Edition – John Wiley & Sons – *Hoboken, New Jersey* - Technical Editor

Real Estate Valuation in Global Markets Second Edition, Appraisal *Institute - Chicago, Illinois* – Contributing Author

Applications in Litigation Valuation Appraisal *Institute - Chicago, Illinois* – Contributing Author

Valuing Contaminated Properties *Appraisal Institute - Chicago, Illinois* – Contributing Author

Me We Do Be: The Four Cornerstones of Success Owners Manual Press – *Laguna Beach, California* - Author

Conversations On Success – Chapter *Insight Publishing – Sevierville, Tennessee* – Contributing Author

Owners Manual Series: Quick-Ref, Home, Property, Business *Owners Manual Press – Laguna Beach, California* - Author

Disasters: Wasted Lives, Valuable Lessons *Tapestry Press, Irvine Texas* – Co-Author

Professional Background

Dr. Bell specializes in real estate damage economics. He served as the CEO of Bell Anderson and Sanders, LLC for 15 years and led the Real Estate Damages practice of Price Waterhouse, which later merged to become PricewaterhouseCoopers. He was an independent real estate appraiser, analyst and consultant from 1986 to 1997.

Dr. Bell has completed considerable research in the field of property damages and detrimental conditions. These include Chernobyl, Hiroshima, Hanford Washington Site, the 1960 Chile Earthquake, the 1964 Alaska Earthquake, the World Trade Center Bombing, the Oklahoma City Bombing, the Jarrell Texas Tornadoes, Mt. St. Helen's Volcano, the Royal Gardens Subdivision destroyed by the Hawaii Volcanoes, Waco Texas, Oklahoma City, Weldon Springs Missouri, Times Beach Missouri, Rocky Flats Colorado, the Manoa Hawaii Landslides, Woburn Massachusetts, Hinckley, California, and many others.

71

His career has been profiled by the *Wall Street Journal*, *Today's Realtor*, the *Los Angeles Times*, the *Associated Press*, *The San Francisco Chronicle*, *People Magazine,* and *The Chicago Tribune* and on various television broadcasts by all major networks and *CNN*. He has been quoted by *USA Today*, the *New York Times*, *Harper's Magazine*, *Time Magazine*, and *US News and World Report*, as well as the media in Europe, Australia, and Japan.

Selected Assignments

Bikini Atoll Nuclear Testing Sites: Retained by the Nuclear Claims Tribunal to determine the damages caused by radioactive contamination and nuclear fallout as a result of nuclear testing on the Bikini Atoll in the Marshall Islands. This is the largest environmental contamination case in the history of the world. Involved radioactive, cultural resource and natural damage issues. Testified before the Nuclear Claims Tribunal on two occasions.

World Trade Center Site – New York: Retained by the Lower Manhattan Development Corporation (an entity created by the City and State of New York) to determine the value of the WTC site in the aftermath of the September 11th tragedies.

United Flight 93 Crash Site: Computed the impact on value of the coal mining fields where Flight 93 crashed on September 11th. Retained by the property owner.

Hurricane Katrina: Retained as a consulting expert on the Murphy Oil Spill case in the aftermath of Hurricane Katrina, which resulted in oil contamination over large portions of Saint Bernard's Parish in the aftermath of the hurricane. Retained by Murphy Oil Company.

BP Oil Spill: Retained as a consulting expert on the BP Oil Spill case, the largest oil spill in United States history.

Caribbean Resort Hurricane Damage: Retained as a consulting expert to compute the impact on value of a major Caribbean hotel resort as a result of extensive damage from Hurricane Omar.

Tulum Mexico: Computed the damages caused by a National Park overlay being placed by the Federal Government on a large ocean-front proposed resort site.

Little Gas Shack Oil Spill - Kauai, Hawaii: Computed the damages, if any, caused to multiple commercial properties as a result of a gasoline and oil spill in a resort bay. Retained by an oil company.

LA Metro Mall Landfill: Estimated the effect of an encapsulated landfill on present and future commercial property values. The proposed retail development was to have been constructed on top of a contaminated solid waste landfill.

Honeywell New Jersey Landfill: Computed the proximity damages, if any, resulting from landfill site, in the process of remediation, on adjacent property values. Retained by Honeywell.

Stringfellow: Determined the diminution in value on nearby properties that are in proximity to Stringfellow, which is the largest inactive liquid disposal hazardous waste facility in California.

Property Tax Assessment Boards: Retained both as an agent and appraiser in numerous assessment hearings, including overseeing a portfolio valued in the hundreds of millions of dollars.

Tiverton Rhode Island Gas Company: Measured the diminution in value, if any, of nearby residential properties with a site with 1800's historic and non-recurrent buried coal gasification waste materials which caused ground water contamination below actionable levels.

Doe Run Lead Contamination, Missouri: Class action suit involving Doe Run, which operated the United States' last primary lead smelter. Calculated the diminution in value, if any, caused by surface soil contamination which resulted in numerous residential properties in being razed.

Straight Lane Texas House: Case involving the largest house in the United States. Calculated the diminution in value resulting from a massive explosion and subsequent fire. The property is located on what is informally called, "Billionaire Row" in the Dallas Texas area. Field work included inspecting the nation's largest estate homes from coast to coast.

City of Chico Landfill: Measured any diminution in value from groundwater contamination from burn ash on nearby developments.

Cooper Cameron, Texas: Measured the impact, if any that offsite TCE groundwater contamination that had migrated underneath a high-end neighborhood in the Houston Texas area.

Jack Brown Cleaners, Austin Texas: Measured the impact of PCE and TCE groundwater that had migrated under a condominium project.

Lennar LNR Bankruptcy: Appraised a major portfolio of numerous subdivisions and commercial developments in California, New Jersey, Florida, Texas, Nevada and Arizona for bankruptcy purposes.

Gasoline Pipeline Transfer Site – Arkansas: Studied the impacts, if any, that MTBE soils contamination had on an adjoining property owner.

SunCal Development - Palm Springs Area: Conducted market trends related to a breach of contract case involving a large subdivision.

BFI Landfill – Los Angeles Area: Estimated the value of on operating landfill as if with and without permits and as of three historical dates. This is one of the largest operational landfills in the Los Angeles area.

Staples Center: Retained by the City of Los Angeles to appraise numerous parcels being acquired through eminent domain for the assemblage and development of the Staples Center.

<u>FBI Identified Terrorist Target:</u> Calculated the damages, if any, caused to a large landmark property in the Southern California area which had been identified by the FBI as a specific terrorist target in the aftermath of the attacks of September 11, 2001.

<u>Dole Pineapple Plantation - Hawaii:</u> Computed the diminution in value, if any, resulting from the State's largest contamination case involving pesticides.

<u>Chevron Service Station:</u> Computed the diminution in value, if any, resulting from a leaking underground storage tank (LUST) in the San Diego area. Retained by Chevron.

<u>Monsanto:</u> Retained as a consulting expert in a case where toxins were illegally disposed in a creek and spread throughout a town. Many homes, churches, businesses and schools were deserted or razed. This is considered by some to be the most notorious environmental contamination case in the history of the United States.

<u>Passaic River, New Jersey:</u> Studied the impact contaminated sediments in a major waterway on the surrounding economy. This case involved an NPL Superfund site.

<u>Whitaker Bermite:</u> Analyzed the effect of unexploded ordinance and perchlorate contamination on development property and proximal neighborhoods. Retained by the facility.

<u>ATK Rocket Facility:</u> Analyzed the effect of perchlorates and other chemicals on rural residential property valuations. The facility produces solid-fuel rocket bodies for the Space Shuttle. The contamination impacts the air and soils surrounding the facility. Retained by the facility.

<u>Ko Loco Hawaii Dam Failure:</u> This major dam failure caused fatalities and millions of dollars of property damage to a small village. Assigned to estimate the residual effect of the dam failure on local residential property values.

<u>Big Rock Nuclear Power Plant</u>: Analyzed the impact, if any, that a safe-storage nuclear fuel storage system had on surrounding property values at a decommissioned nuclear power generating facility. Retained by the U.S. Justice Department.

<u>GM - Delphi Plant, Michigan</u>: Involved an underground TCE plume migrating from an auto parts manufacturing facility to under a nearby home neighborhood. Analyzed historic market trends and regression data, as well as developed case studies to estimate the impacts, if any, on value. Retained by Delphi.

<u>Paducah Kentucky Radioactive Contamination:</u> Developed regression data for neighborhoods in proximity to a gaseous diffusion plant which had released radioactive contamination.

<u>Luke Walton Home</u>: Determined the damages, if any, caused to neighbors from parties hosted by NBA player Luke Walton. Retained by Luke Walton.

East Chicago Hazardous Landfill: Computed the value of a hazardous waste landfill in Indiana which is licensed to receive hazardous waste. Included a complete cash flow analysis of the landfill over the expected life of the operations.

Northridge Earthquake: Retained to estimate the damages to numerous properties in several cases resulting from the earthquake. One assignment included determining the diminution in value to high-rise properties in downtown Los Angeles due to weld fracturing and alleged construction defects.

LA Riots: Retained to compute fire damages to numerous properties in one of the worst civil uprisings in the history of the United States.

Guam Landfill: Computed the damages caused by the condemnation of the Tolofufu Falls and Sergeant Youki Cave site for the purpose of constructing the only operational landfill in Guam. Involved cultural resource and natural damage issues. Also involved market research in Guam and Saipan.

Milwaukee Baseball Stadium: Studied the impact on proposed development resulting from a superfund site associated with a baseball stadium. Field research involved visiting and documenting the surrounding uses at every major-league baseball stadium in the United States and Canada.

MID Power Lines, Modesto California: Appraised numerous properties on a power line corridor for eminent domain purposes. Research included issues of EMF, crop dusting impairment, agricultural impacts, conservation easements and hindrance of future development. Retained by the utility company.

Estate Home Construction Defects: Determined the diminution in value caused by various construction defects of large estate homes and condominiums in Beverly Hills, Bel Air, Homby Hills, Santa Monica and West Los Angeles.

Ft Lauderdale Florida Condo Construction Defects: Determined the diminution in value caused by fire pipe leakage and related mold allegations.

Disneyland: Computed the part-take damages caused to Disneyland as a result of a freeway widening project. Retained by Cal-Trans.

Getty Museum: Determined the diminution in value, if any, to a neighboring property nearby the newly constructed Getty Museum in Los Angeles. Retained by the Getty Museum.

Avila Beach Oil Spill: Computed damages caused by a 300,000-gallon spill. According to a front-page article in the Los Angeles Times, Avila Beach is one of California's largest contamination cases. Contacted by both plaintiff and defendant in the case.

Via Estoril Landslides in Laguna Niguel: Computed damages caused by the sudden 125- foot landslide that destroyed seven ocean-view homes.

75

Crime Scene Stigma: Consulted in calculated economic damages caused by various crime scenes, including the Jon Benet Ramsey house, the Heaven's Gate Mansion in Rancho Santa Fe and the OJ Simpson and Nicole Brown Simpson Condominium, Andrew Luster House.

Nebraska Floods: Estimated damages caused by residential construction within a flood zone.

Airport Noise Diminution in Value Studies: Calculated the diminution in value caused by the proposed construction of airports in Hawaii, Washington, California and Texas.

Oil Refinery: Studied the diminution in value resulting from an oil refinery leak in Long Beach. Retained by ARCO.

New Jersey Durham Woods Pipeline Explosion: Researched the attributes of market resistance (stigma) associated with a catastrophic pipeline explosion that destroyed eight apartment buildings.

Hawaii Tank farm Leak: Computed the diminution in value resulting from a tank farm leak in Maui, Hawaii. Retained by Chevron, Shell and Unocal.

Articles and Papers

Project Delay Economics *The Appraisal Journal*

Analysis of Environmental Case Studies *The Appraisal Journal*

The Impact of Detrimental Conditions on Property Values *The Appraisal Journal*

Real Estate Research Methods *The Appraisal Journal*

Real Estate Damage Economic: The Impact of PFAS "Forever Chemicals" on Real Estate Valuation *Environmental Claims Journal*

Diminishing Diminution: A Trend in Environmental Stigma *Environmental Claims Journal*

Basic Due Diligence *Environmental Claims Journal*

The Impact of Airport Noise on Residential Real Estate *The Appraisal Journal*

Hydraulic Fracturing and Real Estate Issues *The Appraisal Journal*

The Impact of Megan's Law on Real Estate Values *Valuation Insights and Perspectives*

Ten Standard Classifications of Detrimental Conditions *Right of Way Magazine*

Quantifying The Diminution In Value Due To Detrimental Conditions: The Theory and Application to Environmentally Contaminated Properties *Environmental Claims Journal*

76

Medical Office Building Appraisal *The Appraisal Journal*

Assessing Diminution in Value – A Methodology for Categorizing Detrimental Conditions *Right of Way*

Detrimental Conditions: A Profile of Valuation Methodologies with Environmental Contamination, Crime Scene Stigma and Natural Disaster Case Studies *Paper presented to the National Symposium of the Appraisal Institute in Washington DC*

Strategies for Rebutting Junk Science in the Courtroom *Bloomberg BNA*

Valuation of Contaminated Property *The Bureau of National Affairs, Inc.*

Contaminated Waterways and Property Valuation *The Appraisal Journal*

The Impact of Asbestos on Real Estate Values *The Appraisal Journal*

Climate Change and Real Estate Economics *The Bureau of National Affairs, Inc.*

The Scientific Method and the Valuation Process *The Bureau of National Affairs, Inc.*

Where Art Meets Science: Statistics *Valuation Strategies*

Seminar Author

Real Estate Disclosure Seminar: Author and instructor of a one-day seminar published and sponsored by the Appraisal Institute that addresses the responsibility of appraisers, brokers and agents to make a full disclosure of the known conditions associated with a property.

Detrimental Conditions Seminar: Author and instructor of a one-day seminar published and sponsored by the Appraisal Institute. This seminar illustrates a valuation methodology for categorizing numerous Detrimental Conditions (i.e., environmental contamination, natural disasters, geotechnical issues, construction defects, market conditions, imposed conditions, etc.) and quantifying the diminution in value. It was approved in all 50 states by each appraisal licensing agency and the California State Bar for continuing education credit and has been taught nationwide and internationally.

Diminution-In-Value Issues

ADA; Absorption; Airport Noise; Asbestos; Benign Issues; Bonds; Condemnation; Construction Defects; Crime Scene Stigma; Deferred Maintenance; Easements; Earthquake; Economic Decline; EMF; Environmental Contamination; Flood Damage; Geotechnical; Landfills; Litigation; Market Conditions; Natural Disasters; Neighboring Construction; Pipeline Explosion; Riots; Sewage Treatment Plant; Soil Subsidence; Traffic Noise; Tunneling; View Diminution

Interests Appraised

Fee Simple Interest; Leased Fee Interest; Lease Hold Interest; Sandwich; Interest; Majority & Minority Fractional Interests

Functions of Appraisals

Absorption Studies; Acquisition; Assessor Disputes; Bankruptcy; Bond Financing; Construction Loans; Diminution in Value; Disposition; Divorce Settlement; Donation; Environmental Effect Studies; Estate Settlement; Excess Land; Exchanges; Fair Value Issues; Feasibility Studies; Foreclosure; Fraud; Ground Lease Renewal; Highest and Best Use Analysis; Income Tax Appeal; Investment Analysis; Judicial Foreclosure; Review Appraisal; Lease Negotiations; Lease Renewals; Litigation Support; Loan Review; Market Trend Studies; Mortgage Lending; Negotiation; Partnership Dissolution; Portfolio Evaluation; Property Tax Appeal; Redevelopment Zone Studies; Refinancing

Speeches and Symposium Presentations

Dr. Bell has spoken at numerous events throughout the United States, Canada, South America and Asia. Following are some examples of these presentations:

Analyzing the Effects of Environmental Contamination on Real Property *Appraisal Institute, Dallas, Texas*

Environmental Damage Economics *American Bar Association, New Orleans, Louisiana*

The Rebuttal of Junk Science in the Courtroom *Appraisal Institute, Newport Beach, California*

Exposing & Attacking Junk Science *Appraisal Institute, Reno, Nevada*

Airport Noise & Property Values*, FAA National Conference, Ft. Lauderdale, Florida*

Socio-Economics & Real Estate *University of Utah, Salt Lake City, Utah*

Assessing the Damages: Valuing Stigmatized Properties *BC Land Summit, Vancouver, BC Canada*

Property Valuation & Tax Appeals *IPT Property Tax Symposium, Palm Springs, California*

Real Estate Damage Economics *Councilors of Real Estate National Convention, San Antonio, Texas*

Statistics & Real Estate Damage Economics *Appraisal Institute National Meeting, Indianapolis, Indiana*

Environmental Damage Economics *Princeton Real Estate Conference, Princeton, New Jersey*

78

Detrimental Conditions & The Uniform Standards of Professional Appraisal Practice *Appraisal Foundation, San Francisco, California*

Project Delay Economics *Environmental Bankers Association, New Orleans, Louisiana*

Stigma and Its Impact or Real Estate Values *Keynote Speaker, The National Association of Real Estate Editors, Las Vegas, Nevada*

The Valuation of Environmentally-Impacted Properties *Brownfields Symposium, Irvine California*

Detrimental Conditions - A Profile of Valuation Methodologies with Environmental, Crime Scene Stigma and Natural Disaster Case Studies The National Symposium of the Appraisal Institute, Washington, DC

Property Damage Analysis for a REO Portfolio *Western States Loan Servicing Conference California Mortgage Bankers Association, Las Vegas, NV*

The Analysis of Detrimental Conditions *Keynote Presentation – International Conference Union Panamericana de Asociaciones de Valuacion, Cusco, Peru*

High-Profile Disasters and the Impact on Real Estate Values *The National Symposium of the Appraisal Institute, San Antonio, Texas*

Real Estate Damages: Analytical Tools and Their Application to High-Profile Case Studies *International Real Estate Society Conference, Kuala Lumpur, Malaysia*

Standardized Approaches to Valuing Contaminated Properties *Los Angeles County Bar Association*

Expert Witness Testimony Involving Contaminated Properties *Appraisal Institute - Southern California Chapter*

Contamination, Natural Disasters & Crime Scene Stigma *Orange County Bar Association*

Ethics and the Appraiser *Appraisal Institute - Southern California Chapter*

Diminution in Value: A Focus on Environmental Contamination, Natural Disasters and Stigma Damages *San Diego Bar Association*

Researching and Reporting Detrimental Conditions *Multiple lectures to COMPS, Inc. nationwide* Real Estate Investment Strategies *Newport Beach Rotary Club*

Environmental Contamination & Natural Disasters Workshop *Appraisal Institute - Southern California Chapter*

79

The Valuation of Environmentally Impacted Properties *Block Environment & Jeffer, Mangels, Butler & Marmaro*

The Impact of an International Airport on Real Estate Values *El Toro Reuse Planning Authority*

The Financial Analysis of Investment Grade Properties *Guest Lecturer at Cal-State Fullerton*

The Valuation of Asbestos-Contaminated Properties *International Right of Way Association*

Airports, Stigma and Property Values *Trabuco Canyon Community Association*

Technical Aspects of the Appraisal of Medical Properties *Appraisal Institute - Los Angeles Chapter*

The Appraisal of Estate Homes *Appraisal Institute - Southern California, San Diego and Ventura Chapters*

Market Resistance Towards Damaged Properties *Appraisal Institute - Fresno Chapter*

Real Estate Damages Valuation Methodologies *Summer Seminar Spectacular – Disneyland Hotel, Southern California Chapter of the Appraisal Institute*

High Profile Disasters and Property Damages *Orange County Appraisal Society, Orange County Assessor's Office*

The Appraisal: Diminution in Value Methodologies *Chicago Title Company, Western Division Claims Conference*

Project Delay Economics *Southern California Chapter, Appraisal Institute*


Due Diligence The Center for Advanced Property Economics Symposium on Property and Environmental Damages, Toronto, Canada

Correspondence

Randall Bell, PhD, MAI
Landmark Research Group, LLC
33971 Selva Road, Suite 230
Dana Point, California  92629

Direct: (949) 497-7607
Office: (949) 497-7600
Fax: (949) 497-7601
Email: Bell@LandmarkResearch.com

80

**Summary of Testimony Experience – Prior Four Years**

1. David Hinojosa and Maria Hinojosa et. al. v. Mo-Vac Service Co., United States District Court, 406th Judicial District, Webb County, Texas, 1/20, Deposition

2. Schwarz and Oakenfold v. Coldwell Banker et. al., Los Angeles Superior Court, 3/20, Deposition

3. William Gandsey, et al. v. Southern California Gas Company, et al., Los Angeles Superior Court, 9/20, Deposition

4. Kevin Brown, et al. v. Saint Gobain Performance Plastics Corporation, United States District Court, Southern District of Hillsborough County, 5/21, Deposition

5. SA Athnassia, LLC v. Pieco, Inc., et al., Superior Court of California, County of Orange-Central District, 5/21, Deposition

6. John Bedrosian, et. al. v. Mohamed Hadid, et. al., Superior Court of California, Los Angeles Superior Court, 8/21, Trial

7. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs, United States Court of Federal Claims, 10/21, Deposition

8. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs, United States Court of Federal Claims, 01/22, Deposition

9. City of Hamilton v. Municipal Property Assessment Corporation and Stelco Inc. and Legacy Lands Hamilton Inc., Assessment Review Board Ontario, Canada, 02/22, Hearing

10. Alexander, et al. v. The Woodlands Land Development Company L.P., et al., District Court of Harris County, Texas, 04/22, Deposition

11. Nevada Real Estate Commission Public Meeting, 05/22, Hearing

12. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs, United States Court of Federal Claims, 06/22, Trial

13. Kevin Brown, et al. v. Saint Gobain Performance Plastics Corporation, United States District Court, Southern District of Hillsborough County, 11/22, Hearing

14. United States of America v. 0.2853 Acres of Land, United States District Court, Northern District of Texas, 6/23, Deposition

15. Holden-McDaniel Partners, LLC v. City of Arlington, et. al., Superior Court of Washington, Snohomish County, 06/23, Deposition

16. Grey Fox, LLC, et. al. v. Plains All American Pipeline, L.P., et. al., United States District Court, Central District of California, 8/23, Deposition

81

17. Lendlease (US) Construction, Inc. v. 10777 Wilshire Boulevard, LLC, JAMS Arbitration and Mediation Services, 10/23, Arbitration

**Statement of Compensation**

Landmark Research Group, LLC charges $775 per hour for my research and $875 per hour for deposition and court testimony. Support staff are billed at lesser rates.

**Certification**

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the properties that are the subject of this report and no personal interest with respect to the parties involved.
- I have performed no services, as an appraiser or in any other capacity, regarding the properties that are the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.
- I have no bias with respect to the properties that are the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*
- I have made a personal inspection of the property that is the subject of report.
- Michael Tachovsky, PhD, Kristopher Williams, Greyson Benson, Melanie Levy, Spencer Thompson, Faith Rehagen, Patrick Mara, and Daniel Meyers provided significant real property appraisal assistance to the person signing this certification.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, I have completed the continuing education program for Designated Members of the Appraisal Institute.

_____

Randall Bell, PhD, MBA, MAI
Illinois State License (553002895)

84

**General Assumptions and Limiting Conditions**

This appraisal has been made with the following general assumptions:

1. Title to the property is assumed to be good and marketable unless otherwise stated.
2. The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.
3. Responsible ownership and competent property management are assumed.
4. Information furnished by others is believed to be reliable, but no warranty is given for its accuracy.
5. All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.
6. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.
7. It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated in the appraisal report.
8. It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been described in the appraisal report.
9. It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.
10. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.
11. Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.
12. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

This appraisal has been made with the following general limiting conditions:

13. No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations.

85

14. Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if they are.[96]

---

[96] The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal Institute, 2020), 620.

**Documents Considered**

1. Any documents referenced or summarized within this report, as well as documents contained within the workfile are considered as part of the documents considered
2. 2024 Uniform Standards of Professional Appraisal Practice (USPAP)
3. Real Estate Damages 3rd Edition, Randall Bell PhD
4. The Appraisal of Real Estate 15th Edition, Appraisal Institute
5. The Appraisal of Real Estate 14th Edition, Appraisal Institute
6. The Dictionary of Real Estate Appraisal 7th Edition, Appraisal Institute
7. Black's Law Dictionary 4th Edition, Bryan Garner
8. Real Estate Valuation in Litigation 2nd Edition, J.D. Eaton, MAI, SRA
9. Guide Note 6 Consideration of Hazardous Substances in the Appraisal Process, Appraisal Institute
10. Federal Reserve Economic Data (FRED)
11. Maris MLS and accompanying property records
12. All MLS and property records contained within this report and workfile
13. Property Record Cards
14. Google Earth
15. CoStar
16. Environmental Health & Engineering, Inc. Report
17. Environmental Protection Agency
18. Environmental Protection Agency, Learn about Dioxin
19. PricewaterhouseCoopers Investor Survey, 2012 to 2023
20. S&P 500 Historical Prices by Year
21. U.S. Department of Housing and Urban Development, "Consolidated Plan Executive Summary," 1995
22. Environmental Protection Agency, "Hazardous Waste Cleanup: Solutia Inc. Facility – Sauget, Illinois," 2022
23. Environmental Protection Agency, "Monsanto Successor Companies Agree to Clean Up Remaining Surface Contamination at Sauget Superfund Sites under Federal Settlement," 2022
24. Environmental Protection Agency, "Learn about Polychlorinated Biphenyls," 2023
25. Bell and Bell, "Real Estate Research Methods," 2015
26. Bentz and Shapiro, "Mindful Inquiry in Social Research," 1998
27. Blettner, "Mass Appraisals Via Multiple Regression Analysis," 1969
28. Creswell, "Qualitative Inquiry and Research Design: Choosing Among Five Approaches," 2nd Edition, 2007
29. Creswell and Poth, "Qualitative Inquiry and Research Design: Choosing Among Five Approaches," 4nd Edition, 2018
30. Decker, Nielsen, and Sindt, "Is Pollution a Homogeneous Determinant of Value?," 2005
31. East St. Louis, IL Code of Ordinances
32. Great St. Louis Inc., "Regional Overview,"
33. Illinois Damage Instructions
34. Jackson, "Methods and Techniques for Contaminated Property Valuation," 2003
35. Mazur, "A Hazardous Inquiry: The Rashomon Effect at Love Canal," 1998
36. Neustein, "Estimating Value Diminution by the Income Approach," 1992

87

37. Patchin, "Valuation of Contaminated Properties," 1988
38. Patchin, "Contaminated Properties Stigma Revisited," 1991
39. Patchin, "Contaminated Properties and the Sales Comparison Approach," 1994
40. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," 1996
41. Smith, "The Bundle of Property Rights," 1956
42. Swango, "Resource Center – Economic Research Resources," 2017
43. Syms, "Perceptions of Risk in the Valuation of Contaminated Land," 1997
44. Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," 2022
45. Goodman, "Advance Research Techniques of the Lum Library," 2004
46. 2021 04 23 [29] FIRST AMENDED COMPLAINT
47. 2023-04-24 Amended Complaint
48. 2024 01 26 ESTL Years of Ownership (273 Parcels)
49. 2024 01 31 Non-ESTL Parcel Owners
50. All Samples – M
51. cleaned and transformed data EHE 02092023
52. ESTL AND WGK AERIAL PHOTOGRAPHS
53. Figure 1 – Study Area
54. PCB Plant figures_1_11
55. sample data transformed
56. 1968
57. 6995334.1 topos
58. 6995334.2 sanborns
59. 6995334.4 aerials
60. Topo Map
61. Campanella, "Valuing Partial Losses in Contamination Cases," 1984
62. Decker, "Is Pollution a Homogeneous Determinant of Value?," 2005
63. Dorchester, Jr., "Environmental Pollution: Valuation in a Changing World," 1991
64. Lusvardi, "'The Dose Makes the Poison:' Environmental Phobia or Regulatory Stigma?" 2000
65. Colwell, Heller, and Trefzger, "Expert Testimony: Regression Analysis and Other Systematic Methodologies," 2009
66. Dorchester Jr., "Environmental Pollution: Valuation in a Changing World," 1991
67. Hoyt, Aalberts, and Poon, "Daubert and Qualification of the Appraisal Expert Witness," 2010
68. Hoyt and Aalberts, "Implications of the Kumho Tire Case for Appraisal Expert Witnesses," 2001
69. Hoyt and Aalberts, "Daubert and the Appraisal Expert Witness Revisited," 2008
70. Mathews, "Under the Microscope: Dissection of a Contingent Valuation Survey," 2008
71. Roddewig and Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," 2006
72. Simmons, "Estimating Proximate Property Damage From PCB Contamination in a Rural Market: A Multiple Techniques Approach," 2002
73. The Appraisal Foundation, "Advisory Opinion 9 (AO-9)," 2016 – 2017
74. Anderson, "Environmental Contamination: An Analysis in the Context of the DC Matrix," 2001

75. Angers, "Valuation of Pipeline Servitudes," 1972
76. Barnes, "Replacement Housing: Relocation assistance for atypical owner-occupants," 2017
77. Bell, "Project Delay Economics," 2011
78. Bell, "Radioactive Contamination of Nuclear Weapons Test Site," 2012
79. Black, "Beyond Ordinary Wear and Tear: The Government's Liability for Building Maintenance in a Temporary Taking," 2001
80. Blair, "Recent Court Decisions on Real Estate and Valuation," 2019
81. Bond, Kinnard, Jr., Kennedy, and Worzala, "An International Perspective on Incorporating Risk in the Valuation of Contaminated Land," 2001
82. Brown, "Condemnation Interest," 1985
83. California Department of Transportation, "Your Rights and Benefits as a Displacee Under the Uniform Relocation Assistance Program (Residential)," 2014
84. Chalmers and Roehr, "Issues in the Valuation of Contaminated Property" 1993
85. Chen, Weeks, and Weiss, "Compensation and Relocation Assistance for New Jersey Residents Displaced by Redevelopment: Reform Recommendations of the State Department of the Public Advocate," 2009
86. Cordes, "Compensation through Relocation Assistance," 1979
87. Downey, "Environmental Cleanup Actions, the Valuation of Contaminated Properties, and Just Compensation for Affected Property Owners," 1993
88. Dushoff and Henslee, "When Eminent Domain "Working Rules" Don't Work," 1991
89. Hosios and Smith, "Valuing First Nation Land Claims and Other Historical Damages," 2006
90. International Right of Way Association, "Q&A: Determining When a Dwelling is Decent, Safe and Sanitary," 2011
91. Johansen, "Litigating Mold Claims: Crisis? What Crisis?," 2004
92. Kamlet, "Appraisal Techniques in Restoration Claims," 1966
93. Kuhn, "The art of easements.", 2017
94. Kuhn and Duran-Brown, "Shifting the Date of Value for Public Agency Acquisition Appraisal Assignments," 2014
95. Lang and Smith, "Valuing a Gas Pipeline Easement," 1998
96. Lazar and Prisman, "Valuing Historical Claims of Loss of Use of Land with Sparse Data," 2018
97. Mitchell, "Estimating Economic Damages to Real Property Due to Loss of Marketability, Rentability, and Stigma," 2000
98. Mueller, "Cases in Brief – Recent Court Decisions on Real Estate and Valuation," 2017
99. Nakahara, "Perceptions of the Radiation Disaster from H-bomb Testing: Subsistence Economy, Knowledge and Network among the People of Rongelap in the Marshall Islands," 2018
100. Patel, "Eminent Domain," 1995
101. Pattison, "Eight Approaches to the Valuation of Temporary Easements," 1992
102. Rinaldi, "Contaminated Properties Valuation Solutions," 1991
103. Robinson, "Watersbend: Appraising a Brownfield Redevelopment Project," 2002
104. Roddewig, "Environment and the Appraiser," 1997
105. Root, "What to Do With Last-Minute Displacees: The problematic issue of subsequent residential tenant occupants," 2014

106. Sackman, "Apportionment of Award Between Lessor and Lessee," 1970

107. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," 1996

108. Sanders, "Mold: What Appraisers Should Know," Valuation Insights & Perspectives," 2005

109. Tachovksy, "Environmental Dead Zones: The Evaluation of Contaminated Properties," 2021

110. Theiss, "The Appraisal Docket: City Street plans as Affecting Severance Damages Assessed Against County," 1967

111. Wilson, Butler, and Hamilton "The Appraisal Docket: Cases, decisions, and other matters involving rulings and precedents affecting real estate and valuation," 1951

112. Wilson and Hamilton, "The Appraisal Docket: Cases, decisions, and other matters involving rulings and precedents affecting real estate and valuation," 1944

113. Louisiana Department of Health and Hospitals, "Health Consultation: Hurricane Response Sampling Assessment for the Agriculture Street Landfill," 2006

114. Dermansky, "A Forgotten Community in New Orleans: Life on a Superfund Site," 2014

115. Environmental Protection Agency, "Agriculture Street Landfill – EPA Region 6 – Orleans Parish – Louisiana," 2015

116. Environmental Protection Agency, "Fourth Five-Year Review Report for Agriculture Street Landfill Superfund Site New Orleans, Orleans Parish, Louisiana," 2018

117. Parker, "Their houses were built on a landfill; finally New Orleans asks their interest in buyouts," 2021

118. Romero, "Victory for Gordon Plaza homeowners," 2022

119. Fears, "New Orleans' Gordon Plaza is a toxic nightmare," 2022

120. Environmental Protection Agency, "Superfund Site: Agriculture Street Landfill New Orleans, LA,"

121. New York Times, "$700 Million Settlement in Alabama PCB Lawsuit," 2003

122. Israel, "Pollution, Poverty and People of Color: Dirty Soil and Diabetes," 2012

123. Kail, "Compelling Photos Reveal the Legacy of America's Most Hated Corporation," 2014

124. Agency for Toxic Substance and Disease Registry, "PCBS in Anniston," 2015

125. Environmental Protection Agency, "Fact Sheet for RESIDENTIAL SOIL OU1/OU2 of the Anniston PCB Superfund Site," 2017

126. Environmental Protection Agency, "Anniston PCB Site (OU1/OU2)," 2017

127. Pinkney, "EPA Announces Record of Decision for Cleanup of PCB Site in Anniston, AL," 2017

128. McCreless, "EPA approves next plan to clean up PCBs in Anniston," 2017

129. The Guardian, "Toxic neighbour: Monsanto and the poisoned town," 2018

130. Washington, "Monsanto Poisoned This Alabama Town — And People Are Still Sick," 2019

131. Environmental Protection Agency, "Anniston PCB Site (Monsanto Co) Anniston, AL – Cleanup Activities"

132. Spears, "Baptized in PCBs: Race, Pollution, and Justice in an All-American Town," 2014

133. Kjac, "Residents look forward to possible demolition," 12News, 2012

134. Housing Choice Partners, "Final Report Housing Mobility Program," 2014

135. Genoways, "Port Arthur, Texas: American Sacrifice Zone," 2014

90

136. Sturdivant, "Carver Terrace comes down amid former councilman's concerns," 2016
137. Lerner, "Sacrifice Zones: The Front Lines of Toxic Chemical Exposure in the United States," 2012
138. Environmental Protection Agency, "Fact Sheet: Herculaneum Lead Smelter Site, Herculaneum, Missouri," 2001
139. Environmental Protection Agency, "Community Involvement Plan: Herculaneum Lead Smelter Site, Herculaneum, Missouri," 2007
140. Fenston, "The end of a lead-laced era: polluting smelter to close after 120 years," 2012
141. U.S. Fish and Wildlife Services, Missouri Department of Natural resources, "Herculaneum Lead Smelter Site Natural Resource Damage Assessment and Restoration," 2019
142. Hemphill, "'Don't stay quiet' - and other lessons Herculaneum's cleanup offers decades later," 2022
143. Kennedy, "A Step-By-Step Look At What Happened: The Two-Way: NPR," 2016
144. Centers for Disease Control and Prevention, "Flint Water Crisis," 2020
145. Environmental Protection Agency, "Flint Drinking Water Response," 2022
146. Fonger, "Judge who refused to dismiss EPA from Flint water crisis lawsuit deals second blow," 2022
147. Michigan.Gov, "Flint enters final phase of lead service line replacement," 2022
148. Christensen, Keiser, and Lade, "Economic Effects of Environmental Crises: Evidence from Flint, Michigan," 2023
149. Fonger, "Value of Flint's housing stock dropped after water crisis with 'no evidence of recovery,' study says," 2023
150. Cohen Milstein, "Flint Water Crisis Class Action Litigation,"
151. Michigan.Gov, "Taking Action on Flint Water,"
152. Richards, "The Poisoned Earth: Long Silences Above the LoveCanal," 1979
153. Healthy New York, "A special Report to the Governor & Legislature," 1981
154. Environmental Protection Agency, "EPA Marks 40th Anniversary of Love Canal Site Niagara Falls, New York – Fact Sheet," 2018
155. Environmental Protection Agency, "Fourth Five-Year Review Report, Love Canal Superfund Site, City of Niagara Falls, Niagara County, New York," 2019
156. Atlas Obscura, "Love Canal Containment Zone," 2023
157. Environmental Protection Agency, "Site Inspection: Mossville North of Highway 90 Sulphur and Westlake, Calcasieu Parish, Louisiana," 2011
158. Mother Jones, "A Massive Chemical Plant Is Poised to Wipe This Louisiana Town off the Map," 2014
159. Rogers, "How Pollution Killed a Louisiana Town," 2015
160. Sayre, "Closing Costs: As a chemical plant expands, Mossville, Louisiana, vanishes," 2017
161. EJ Atlas, "Mossville, Louisiana: environmental racism in 'cancer alley', United States," 2019
162. Smith, "Vanishing Black community of Mossville set for visit by EPA head," 2021
163. Environmental Protection Agency, "Fifth Five-Year Review Report for Escambia Wood – Pensacola Superfund Site, Escambia County, Flordia," 2022
164. EJ Atlas, "Mount Dioxin at Pensacola, FL, USA," 2020

91

165. Warren-Hicks, "Escambia Wood led to third largest Superfund relocation in U.S. history. Final cleanup begins soon." 2021

166. Flordia A&M University College of Law, "A Tale of Two Cities: The Need for Greater Federal Involvement to Ensure Proper Notification, Medical Monitoring and Treatment, and Successful Relocation for Tallevast, Florida and Other Environmental Justice Communities," 2014

167. Environmental Protection Agency, "Superfund Site: Escambia Wood – Pensacola, FL,"

168. Sharp, ""Erin Brockovich": The real story," 2000

169. Martin, "Edward L. Masry, 73, Pugnacious Lawyer, Dies," 2005

170. Litoff, "California Wasteland: Erin Brockovich Still Fighting for Neighbors Over Contaminated Drinking Water," 2011

171. California Department of Public Health, "Chromium-6 Fact Sheet: CALIFORNIA DEPARTMENT OF PUBLIC HEALTH," 2012

172. California Waterboards – Lahontan Regional Water Quality Control Board, "RESIDENTIAL DRINKING WATER WELL SAMPLING IN HINKLEY AREA," 2014

173. Esquivel, "15 years after 'Erin Brockovich,' town still fearful of polluted water," 2015

174. Arcadis, "Second Quarter Plume Map," 2019

175. Genecov, "Still Toxic After All These Years," 2019

176. Environmental Protection Agency, "Final Closeout Report: Times Beach Site, St. Louis County, Missouri," 1999

177. Environmental Protection Agency, "A Town, a Flood, and Superfund: Looking Back at the Times Beach Disaster Nearly 40 Years Later," 2020

178. Environmental Protection Agency, "Times Beach, Times Beach, MO – Cleanup Activities,"

179. Carneghi, "Determining Ground-Lease Rental Rates," 1994

180. Sevelka, "Ground leases: rent reset valuation issues," 2011

181. Sevelka, "Ground lease rental disputes," 2004

182. American Bar Association, "Reappraisal of Ground Lease Rentals," 2017

183. Point Acquisitions, "Ground Lease Real Estate Agreement Explained," 2022

184. Maglasang, "Breaking down the modern-day ground lease: More efficient capital for construction projects and a lifeline for distressed assets," 2020

185. Fisch and Berg, "Reset Clauses in Ground Leases," 2020

186. Utah Property Investors, "Commercial Real Estate – Investing in Ground Leases," 2012

187. USA Research & Campus Crest – Ground Lease

188. Tribeca Pointe – Amendment 1

189. Tribeca Point

190. Tribeca Park

191. Tribeca Green

192. Tribeca Bridge Tower – P.S. 89 Lease – Amendment 1

193. Tribeca Bridge Tower – P.S. 89 Lease

194. Tribeca Bridge Tower

195. The Visionaire – BPCA-Site_3_Lease

196. The Verdesian – Amendment 2

197. The Verdesian

198. The Soundings – Amendment 1

199. The Soundings – Amendment 2
200. The Soundings – Rent Reset Agreement
201. The Soundings
202. The Regatta – Amendment 1
203. The Regatta – Amendment 2
204. The Regatta – Amendment 3
205. The Regatta – Rent Reset Amendment
206. The Regatta
207. The South Cove Plaza – Amendment 1
208. The South Cove Plaza
209. Ruth v S.Z.B Corp – 1956 Ruth v. S.Z.B. Corp. Summary
210. Riverhouse – Amendment 1
211. Riverhouse – Amendment 2
212. Riverhouse – Amendment 3
213. Riverhouse
214. River Watch
215. River & Warren – Amendment 1
216. River & Warren – Amendment 2
217. River & Warren
218. Ritz Carlton Residences
219. Ritze Carlton Residences – Skyscraper Museum Deed
220. Rector Square
221. Millenium Tower Residence – Amendment 1
222. Millenium Tower Residence
223. Liberty View – Amendment 1
224. Liberty View – Amendment 2
225. Liberty View – Amendment 3
226. Liberty View
227. Liberty View – Rent Reset Amendment
228. Liberty Luxe – Amendments 1-72
229. Liberty Luxe
230. Liberty House – Amendment 1
231. Liberty House – Amendment 2
232. Liberty House
233. Liberty House – Rent Reset Agreement
234. Liberty Green – Amendments 1-72
235. Liberty Green
236. Liberty Court – Amendment 1
237. Liberty Court – Amendment 2
238. Liberty Court – Amendment 3
239. Liberty Court – Amendment 4
240. Liberty Court
241. Liberty Court – Rent Reset Agreement
242. Hudson View West – Amendment 1
243. Hudson View West – Amendment 2
244. Hudson View West – Amendment 3

245. Hudson View West
246. Hudson View West – Rent Reset Amendment
247. Hudson View East – Amendment 1
248. Hudson View East – Amendment 2
249. Hudson View East – Amendment 3
250. Hudson View East
251. Hudson View East – Rent Reset Amendment
252. Hudson Tower – Amendment 1
253. Hudson Tower – Amendment 2
254. Hudson Tower
255. Hudson Tower – Rent Reset Amendment
256. Hallmark Senior Res – The Hallmark
257. Gateway Plaza - BPCA-2009_Gateway_restated_lease
258. Gateway Plaza – BPCA-87568-v1-003_-_First_Amendment_to_Amended_and_Restated_Indenture_o...
259. Gateway Plaza – BPCA-Gateway_Plaza_Amendment_1
260. Gateway Plaza – BPCA-Gateway_Plaza_Amendment_2
261. Gateway Plaza – BPCA-Gateway_Plaza_Amendment_3
262. Gateway Plaza – BPCA-Gateway_Plaza_Amendment_4
263. Gateway Plaza - BPCA-Gateway_Plaza_Lease
264. Eastern Rail Yards – Ground Lease
265. Daytona Airport - Lease Rates Analysis Prescott Municipal Airport
266. From the Ground Up Appraisal Institute PPT
267. Appraisal Institute PPT
268. 6550 W 9th Steet – Ground Lease
269. 3050 Wilshire Boulevard - 1958 Bullock's, Inc. v. Security-First Nat. Bank.
270. Environmental Protection Agency, Centreville Inspection Report, 2021
271. Illinois Environmental Protection Agency, "Violation Notice: City of Cahokia Heights," 2021
272. Environmental Protection Agency, "Administrative Order on Consent Regarding Alleged Violations of the Clean Water Act," 2021
273. Environmental Protection Agency, "July 25-28, 2022, MS4 Inspection Report for the City of Cahokia Heights," 2022
274. Illinois Environmental Protection Agency, "Violation Notice: City of Cahokia Heights" 2022
275. Landis, "Longtime EPA water scientist to manage sewer problems in Cahokia Heights," 2023
276. Cortes, "Illinois health officials fail to help desperate residents as sewage floods their homes," 2023
277. Environmental Protection Agency, "Cahokia Heights Fact Sheet,
278. The Ecologist, "Monsanto: A Checkered History," 1998
279. Eckert, "'Incorporated to Be a Sewer': A Historical Analysis of Industrial Pollution in Sauget, Illinois," 2020
280. Madison County Record, "Case activity for City of East St. Louis, Illinois vs Monsanto Company on March 1," 2021

281. Illinois Attorney General, "Attorney General Raoul Files Lawsuit Against Monsanto for Continued Effects of PCB Contamination," 2022

282. Jackson, "Illinois AG Files Environmental Tort Lawsuit Against Monsanto Over PCB Water Contamination," 2022

283. Ross, "Illinois AG files environmental damages lawsuit alleging PCB water contamination against Monsanto," 2022

284. Korris, "East St. Louis seeks roughly $2.7 billion in penalties for pollution; Monsanto moves to file counter claim," 2023

285. Cortes, "East St. Louis says Monsanto polluted its land. It could collect billions in fines.," 2023

286. Cortes, "East St. Louis is suing Monsanto for pollution," 2023

287. Cortes, "East St. Louis says Monsanto polluted its land. It could collect billions in fines.," 2023

288. EJAtlas, "East St. Louis Chemical Plants and Waste Incinerators, USA,"

289. University of Michigan, "Environmental Justice Case Study: East St. Louis, Illinois,"

290. Candeub & Fleissig, Planning Consultant, "Master Plan/East St. Louis," 1960

291. Woolpert, Inc., "County Comprehensive Plan St. Clair County, Illinois," 2011

292. EIN Presswire, "The City of East St. Louis Begins Plans To Remake Public Housing,"

293. The Rite Plan Initiative, "East St. Louis Revival,"

294. New Way Developments, "Rite Plan – Phase 1,"

295. City of East St. Louis, "Parcel Based Zoning Map,"

296. Environmental Protection Agency, "EPA Bans PCB Manufacture; Phases Out Uses," 1979

297. Siue, "Illinoistown: East St. Louis History Timeline," 1998

298. Grunwald, "Monsanto Hid Decades Of Pollution," 2002

299. Gonzalez, Feng, Sutherland, Waller, Sok, Hesse, and Rosenfeld, "Urban Environmental Pollution 2010: PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL," 2011

300. U.S Department of Energy, "Solutia: Utilizing Sub-Metering to Drive Energy Project Approvals Through Data," 2011

301. Environmental Protection Agency, "Results Released for Homes and Former Dead Creek Area," 2012

302. Environmental Protection Agency, "Learn about Polychlorinated Biphenyls (PCBs)," 2015

303. Encyclopedia.com, "Monsanto Company | Encyclopedia.com," 2018

304. Markowitz and Rosner, "Monsanto, PCBs, and the creation of a 'world-wide ecological problem'," 2018

305. In The United States District Court For The Southern District of Illinois, "First Amended Complaint for Damages and Abatement," Case No. 3:21-cv-00232-DWD, 2021

306. American Unites, "The History of PCBs,"

307. Museum.State.Il.US, "ILLINOISTOWN - a central river crossing,"

308. In The United States District Court For The Southern District of Illinois, "Memorandum & Order," Case No. 3:21-cv-00232-DWD, 2022

**Definitions**

<u>Market Value</u>

The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

<u>Market Rent</u>

The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby lessee and lessor are typically motivated; both parties are well informed or well advised, and acting in what they consider their best interests; payment is made in terms of cash or in terms of financial arrangements comparable thereto; and the rent reflects specified terms and conditions typically found in that market, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, frequency of payments (annual, monthly, etc.), and tenant improvements (TIs). (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Benefits</u>

In eminent domain valuation, the advantageous factors that arise from a public improvement for which private property has been taken. The law in some jurisdictions makes a distinction between general benefits and special benefits because only special benefits are considered in determining the value of the remainder in a partial acquisition. The distinction between special benefits and general benefits is both a factual and a legal question, so appraisers may need to consult legal counsel to resolve questions about the classification of benefits. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Change</u>

The result of the cause and effect relationship among the forces that influence real property values. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Class</u>

A set of items defined by a common characteristic. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 6th Edition)

96

Conventional

A generally accepted rule or practice; usage or custom. (Black's Law Dictionary, 4th Edition)

Count

Frequency. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Data

Unprocessed observations and descriptions about real property and the markets in which real property is bought and sold. These raw observations fall into two categories: (1) qualitative data, which descriptive in nature, and (2) quantitative data, which has to do with numbers. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Days on Market

The length of time between the date a property is listed and advertised for sale and the date it is sold or removed from the market; commonly used as a measure of the marketability of a property and as an indication of the general health of the market. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Delta ($\Delta$)

In mathematics, change in a variable, symbolized by the upper case Greek letter delta. For example, $\Delta x$ means "change in the variable x." In calculus, the lower case Greek letter delta refers to a partial derivative. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Detrimental Condition

Any issue or condition that may cause a diminution-in-value to real estate. (Appraisal Institute: Real Estate Damages 3rd Edition).

Diminution-in-value (Property Value Diminution)

The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Easement

The right to use another's land for a stated purpose. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

97

Excess Land

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Exposure Time

1 The time a property remains on the market.
2. An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Extraordinary Assumptions

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021)

Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Ground Lease

A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Ground Rent

The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Highest & Best Use

This may be defined as "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity." (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Hypothetical Conditions

A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021)

Impaired Value

The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Jurisdictional Exceptions

An assignment condition established by applicable law or regulation, which precludes an appraiser from complying with a part of USPAP. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021)

Just Compensation

In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position pecuniarily as he or she would have been if the property had not been taken. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Kurtosis

A statistical term that refers to the "peakedness" of the data distribution. A normal distribution has a kurtosis of 3 and is moderately peaked, while a distribution with a kurtosis higher than 3 is leptokurtic, and one with a kurtosis of less than 3 is platykurtic. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Leased Fee Estate

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Leasehold Estate

The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

99

Linear Regression

A type of statistical analysis used to investigate a linear relationship between a dependent variable and one or more independent variables; used to predict the value of the dependent variable on the basis of the values of the independent variables and to develop an understanding of how a unit change in an independent variable relates to change in the dependent variable. Linear regression models employing a single independent variable are called simple linear regression models. Those employing more than one independent variable are called multiple linear regression models. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Market

A set of arrangements in which buyers and sellers are brought together through the price mechanism; the aggregate of possible buyers and sellers and the transactions between them. A gathering of people for the buying and selling of things; by extension, the people gathered for this purpose. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Market Participants

Individuals actively engaged in transactions. In real property markets, primary market participants invest in real property or use real estate, such as buyers, sellers, owners, lenders, and tenants. Secondary market participants include those who advise primary market participants, such as agents and brokers, advisors, counselors, underwriters, and appraisers. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Market Resistance

The risk, if any, associated with the ongoing stage of a detrimental condition analysis. Market resistance includes the reluctance on part of the real estate market to buy a property that has historically been damaged or tainted. Sometimes called *stigma*. (Appraisal Institute: Real Estate Damages 3rd Edition)

Mass Appraisal

The process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing. (USPAP, 2020-2021 ed.) Often associated with real property tax assessment valuation. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Mean

A measure of central tendency. The sum of values for a variable in a sample or population divided by the number of items in the sample or population. The arithmetic average. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

100

<u>Median</u>

A measure of central tendency identified as the middle value in an ordered array of numerical values, e.g., 7 is the median of (1, 4, 6, 6, 7, 9, 11, 22, 41). If the ordered array contains an even number of values, then the median is the mean of the two values on either side of the middle. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Mode</u>

A measure of central tendency consisting of the numerical value or categorical characteristic that occurs most frequently in a sample or population. For example, the mode of the data set (2, 4, 5, 6, 6, 7, 7, 8, 8, 8, 8, 10, 12) is 8, and the mode of (poor, poor, below average, average, average, average, average, good, good, excellent) is average. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Nuisance</u>

Something that interferes with the use and enjoyment of property or is a source of discomfort and annoyance to others; legally divided into two classes: public, or common, nuisances, which touch the public interest, and private nuisances, which destroy or injure an individual's property, interfere with its lawful use and enjoyment, or deny an individual common rights. (Appraisal Institute, 6th Edition)

<u>Permanent Easement</u>

An easement that lasts forever. Sometimes referred to as a perpetual easement. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Personal Property</u>

1. Tangible or intangible objects that are considered personal, as opposed to real property. Examples of tangible personal property include furniture, vehicles, jewelry, collectibles, machinery and equipment, and computer hardware. Examples of intangible personal property include contracts, patents, licenses, computer software, and intellectual property. See also trade fixtures.
2. Any tangible or intangible article that is subject to ownership and classified as real property, including identifiable tangible objects that are considered by the general public as being "personal," such as furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment, and intangible property that is created and stored electronically such as plans for installation art, choreography, emails, or designs for digital tokens. (USPAP, 2020-2021 ed.) (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Range</u>

In statistics, the difference between the highest and lowest values in a set of numbers. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Regression Analysis

A statistical method that examines the relationship between one or more independent variables and a dependent variable. Regression models can be used to examine the structure of a relationship or to forecast dependent variable values. Simple linear regression has one independent variable, whereas multiple linear regression includes more than one independent variable. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Remediation Cost

The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Remediation Lifecycle

A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Sample Variance

Sample variance equals $S^2$, where S is the sample standard deviation. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Severance Damages

In condemnation, the loss in value to the remainder in a partial taking of property. Generally, the difference between the value of the whole property before the taking and the value of the remainder after the taking is the measure of the value of the part taken and the damages to the remainder. Note that different regions of the country and different courts may use terms such as consequential damages and severance damages differently. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

102

Skewness

The degree of deviation from symmetry in a statistical distribution. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Source, Non-source, Adjacent and Proximate Sites (SNAP)

Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Standard Deviation

The square root of the variance. The sample standard deviation is the square root of the sample variance and the population standard deviation is the square root of the population variance, i.e., the square root of the sum of the squared deviations from the mean divided by either the population size or by the sample size minus 1. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Standard Error

The standard deviation of a regression coefficient estimate. Also, the standard deviation of regression errors (residuals). (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Stigma

Stigma is essentially jargon, or a slang term given to "risk" or "market resistance".

An adverse public perception regarding a property, commonly the identification of a property with a condition such as environmental contamination or other detrimental condition, such as a violent crime, that penalizes the marketability of the property and may also result in a diminution in value. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Sum

Add up what follows. (Appraisal Institute: An Introduction to Statistics for Appraisers)

<u>Surplus Land</u>

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Survey</u>

1. The process in which the quantity or location of a piece of land is scientifically ascertained; may reflect the physical features of land, e.g., grades, contours, structures.
2. A map or plot that describes the courses, distances, and quantity of land and shows the lines of possession.
3. A market analysis procedure used to identify consumer preferences. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Temporary Construction Easement (TCE)</u>

An easement granted for a specific purpose and applicable for a specific time period. A construction easement, for example, is terminated after the construction of the improvement and the unencumbered fee interest in the land reverts to the owner. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Unimpaired Value</u>

A value estimate that does not include any adjustments for detrimental conditions. (Appraisal Institute: Real Estate Damages 3rd Edition)

<u>Unit of Value</u>

The market value of the whole reduced to a value per unit of measurement. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 6th Edition)

<u>Units of Comparison</u>

The components into which a property may be divided for purposes of comparison, e.g., price per SqFt, front foot, cubic foot, room, bed, seat, apartment unit. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Unit Rule</u>

A valuation premise often applicable in condemnation appraisals. The unit rule has two aspects, the first dealing with ownership interests and the second dealing with physical components. The first aspect of the rule, also referred to as the undivided fee rule, requires that property be valued as a whole rather than by the sum of the values of the various interests into which it may have been carved (such as lessor and lessee, life tenant and remainderman, and mortgagor and mortgagee, etc.). This is an application of the principle that it is the property, not the interests, that is being acquired. The second aspect of the rule is that different physical elements or components of a tract of land (such as the value of timber and the value of minerals on the same land) are not to be separately valued and added together. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Whole Property</u>

Or "larger parcel" is in governmental land acquisitions and in valuation of charitable donations of partial interests in property such as easements, the tract or tracts of land that are under the beneficial control of a single individual or entity and have the same, or an integrated, highest and best use. Elements for consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use. In most states, unity of ownership, contiguity, and unity of use are the three conditions that establish the larger parcel for the consideration of severance damages. In federal and some state cases, however, contiguity is sometimes subordinated to unitary use. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

<u>Zoning</u>

Public regulation of the use of private land through application of police power; accomplished by establishing districts or areas with uniform requirements relating to lot coverage, setbacks, type of improvement, permitted activities, signage, structure height, minimum lot area, density, landscaping, and other aspects of land use and development. Zoning regulations are established by enactment of a local (city, town, or county) zoning ordinance. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

105

**Mass Appraisal**

Mass appraisal models were originally developed by property tax assessors to "improve productivity and fairness in non-rural locations where manpower was insufficient to carry out the function of estimating assessed value."[97] The mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of values that allow for statistical review and analysis of results.[98]

Mass valuations of real estate have been established in the mainstream of the appraisal profession since at least the 1950s and 60s.[99] Mass appraisal is defined as the process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing (USPAP, 2020 – 2021 ed.).[100]

The keys to distinguishing a mass appraisal are: 1) the subject of the appraisal is a "universe" of properties, meaning more than one property; and 2) the assignment involves standard methodology employing common data that allows for statistical testing. These models may be based on the cost approach, the income approach, the sales comparison approach or any combination of these approaches to value.[101]

To accommodate mass appraisal assignments, Uniform Standards of Professional Appraisal Practice (USPAP) established Standards 5 and 6. The appraisal profession has also aided in the progression of mass appraisal assignments by requiring statistical analysis as part of the certified general license qualifying education and The Appraisal Institute has developed statistical course requirements to obtain the MAI designation. In addition, Chapter 14, "Statistical Analysis," in The Appraisal of Real Estate, 14th Edition, is dedicated to the use of statistical methodology that can be used in a mass appraisal assignment; in fact, "traditional appraisal techniques have been steeped in statistical analysis."[102] More specifically, the Appraisal of Real Estate, 14th Edition states that "statistical techniques like regression analysis have become accepted tools in the application of the approaches to value."[103]

---

[97] Appraisal Institute. *The Appraisal of Real Estate*, 14th ed. (Chicago, IL: Appraisal Institute, 2013), 296.

[98] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 32* (United States of America, 2024), 93-95.

[99] Robert A. Blettner, "Mass Appraisal via Multiple Regression," *The Appraisal Journal* (1969): 513-521.

[100] Appraisal Foundation, USPAP Standard 6, and the Standard on Mass Appraisal of Real Property promulgated by the International Association of Assessing Officers.

[101] Appraisal Foundation, USPAP Standard 6, and the Standard on Mass Appraisal of Real Property promulgated by the International Association of Assessing Officers.

[102] The Appraisal Institute, *The Appraisal of Real Estate, 14th Edition* (Chicago, IL: Appraisal Institute, 2013): 276.

[103] The Appraisal Institute, *The Appraisal of Real Estate, 14th Edition* (Chicago, IL: Appraisal Institute, 2013): 275.

Statistical techniques such as regressions provide useful tools when studying groups of properties, as they are engineered to produce a variety of designs and outputs including, (1) aggregate results, (2) an output that allows damage calculations on a property-by-property basis, or (3) outputs that allow damage calculations on a zone-by-zone or neighborhood-by-neighborhood basis. Also, a regression model can utilize subclasses, although not necessary.

Indeed, mass appraisal techniques are relatively common within the appraisal profession and include, among others, paired sales analysis, case studies, multiple regression analysis,[104] and other types of analyses utilizing property sales and rent data.

As the following figure illustrates, the real estate valuation profession sets forth a variety of accepted quantitative and qualitative methodologies that are applicable to mass appraisals. This applies to both rental (use effects) and sales (risk effects) analyses. Mass appraisals can be completed with various approaches. Specifically, there are eight main pillars for appraisals, any one of which can produce a credible result. The eight main pillars when analyzing sales data are: simple regression, multiple regression, paired sales, sale/resale, case study, literature review, survey, and sale delay. The eight main pillars when analyzing rental data are: simple regression, multiple regression, paired rent, rent/rerent, case study, literature review, survey, and loss of use. In addition to the eight main pillars, there are other applicable analyses noted in the following figure:

---

[104] The Appraisal Institute, *The Appraisal of Real Estate, 14th Edition* (Chicago, IL: Appraisal Institute, 2013): 214.

107



Figure 40: Appraisal Methodologies

While all these techniques are generally accepted, not all of these techniques may be necessary to arrive at a conclusion. These techniques, which are in fact subsets of the three basic valuation

108

techniques, do not ignore individual characteristics of properties such as quality, type, size, and age, but instead take them into account.

When real estate damages exist, the application of the described techniques may result in a percentage diminution-in-value. The appropriateness of percentage adjustments, applied to the subject properties, is recognized and established in the appraisal literature.[105]

---

[105] The Appraisal Institute, *The Appraisal of Real Estate, 14th Edition* (Chicago, IL: Appraisal Institute, 2013): 367.

109

**Geographic Information System (GIS)**

A Geographic Information System (GIS) is a tool that allows the user to analyze, interpret, and display data that is associated with a specific location on the earth. It begins with a blank model of Earth which provides a space to store, display, and compare two or more types of data on the same plane. Its use is essential when needing to understand how data is distributed, to display geospatial data, and to identify data based on spatial characteristics, among other capabilities.

Types of Data

GIS data represents features of the real world in two ways: as a vector or a raster. Vectors are files of data that exist in discrete dimensions whereas rasters are files that contain continuous data, existing in all areas that the data represents. Rasters usually look like an image because the data does not stop as vectors do. Each pixel in a raster contains a value that is itself a data point. An example of a raster is a digital elevation model (DEM). DEM's often look like a grayscale aerial image because each pixel in the file has a value that is represented by the median elevation of the location represented by the raster.

Vectors can be in the form of points, lines, or polygons. Points are associated with one specific latitude and longitude and has no dimension. Lines are one dimensional data, and polygons are data of two dimensions. An example of a feature represented by a point is the source of a detrimental condition. Examples of a line are roads or rivers, and examples of polygons are land parcels or lakes. Additionally, non-spatial data in the form of a table can be joined to spatial data to add information to the features represented in the GIS project.

Data Sources

A GIS allows its user to spatially compare data from different sources. Data is sourced from various reliable agencies. For example, sales data could be obtained from a multiple listing service (MLS), parcel data in the form of polygon vectors from the county tax assessor, contaminated zones from an environmental scientist, and population data from the U.S. Census Bureau.

What it Does

When a table of sales data is joined to parcel vectors, the user can identify the locations of all sales in the study and compare their spatial relationship to the source of the detrimental condition.

GIS software allows the user to analyze spatial relationships, determine distances between two types of data, display these relationships as they relate to each other, and communicate data in a visual way that is easy to understand. Additionally, GIS software is used to verify that the data used is where it is expected to be.

110



Figure 41: Geographic Information Systems (GIS) Overview

A geographic information system using line data allows an appraiser to analyze information on traffic analysis zones, acreage available for development, zone densities, and other physical characteristics and geographical relationships in a market area. Other GIS databases contain information about local taxes (e.g., property assessments, school levies) and infrastructure (e.g., gas lines). Geographic information system technology facilitates the addition of geographic reference data to individual items in real estate databases. Personal computers and larger, networked computer workstations can draw on this information to map or model the spatial referents and show the spatial relationships among the data points. Equally important, spreadsheets or tabular grids can be produced in written formats, which can help the user better understand these relationships.[106]

In addition, it is noted that data used to generate these maps is typically found in computer databases that include referents to a specific point on the earth's surface (i.e., latitude and longitude) or a specific area (e.g., city, zip code area, census tract). Given sufficient information, the system can quickly pinpoint properties with specific characteristics.[107]

Applicability

GIS technology can be utilized to locate the latitude and longitude of properties. Property data can be gathered from various souses, including public records, client supplied documents, government databases, MLSs, amongst others. By assigning a GIS coordinate to properties, the data and information collected can be matched and combined.

In other words, GIS technology can be used as part of the data collection and confirmation process. GIS technology allows for the organization of the market data for subsequent analytical uses.

---

[106] Appraisal Institute, *The Appraisal of Real Estate*, 14th ed. (Chicago, IL: Appraisal Institute, 2013), 122.

[107] Appraisal Institute, *The Appraisal of Real Estate*, 14th ed. (Chicago, IL: Appraisal Institute, 2013), 122.

**Detrimental Condition Overview**

The evaluation of detrimental conditions (DCs) on the valuation of properties is an area of special study in the appraisal profession. A DC can interfere with the bundle of rights that comes with property ownership. There are many types of DCs and many of them can create valuation challenges; however, an analysis of DCs indicates that they can all be classified into one of 10 basic categories. Included below is a recreated excerpt from the Bell Chart, which summarizes ten classes of detrimental conditions as well as their potential impacts on value.

| DC Class | Name | Description |
|---|---|---|
| | **The Bell Chart: 10 Categories of Detrimental Conditions** | |
| I | General Conditions | **Baseline description and general market issues** - Real estate, franchise, business, FF&E, goodwill, personal property, products, services, etc. |
| II | Transactional Conditions | **Unique sales or transfer issues** - Motivation, option, assemblage, distress, financing, bankruptcy, foreclosure, etc. |
| III | Distress and Sociological Conditions | **Human loss and tragedy issues** - Crime, war, terrorism, accident, car crash, air disaster, train derailment, shipwreck, death, disability, illness, injury, etc. |
| IV | Legal Conditions | **Legal issues** - Eminent domain, contract, tort, insurance claim, title, lot line, CC&R, lien, bond, lease, historic, moratorium, zoning, easement, etc. |
| V | External Conditions | **Neighborhood issues** - Nuisance, proximity, noise, odor, hazard, power lines, airport, privacy, view, etc. |
| VI | Building and Manufacturing Conditions | **Construction, equipment, and mechanical issues** Defects, engineering, repairs required, design, code, architecture, infestation, regulations, permits, etc. |
| VII | Site and Infrastructure Conditions | **Soils, geotechnical, and right-of-way issues** - Drainage, grading, fill, cracking, subsidence, slides, roads, corrosive soils, compaction, groundwater, utilities, etc. |
| VIII | Environmental and Biomedical Conditions | **Contamination, health, and toxicity issues** - Spills, hazmat, asbestos (1979), lead paint (1978), mold, radioactive, metals, solvents, biological, hydrocarbons, plague, epidemic, etc. |
| IX | Conservation Conditions | **Cultural and natural resource issues** - Habitat, endangered species, natural and cultural resources, archaeological, shoreland, wetland, overpopulation, etc. |
| X | Natural and Climate Conditions | **Natural disaster and weather issues** - Flood, hurricane, typhoon, wildfire, seismic, volcano, tornado, global warming, tsunami, famine, drought, storms, etc. |

Figure 42: Excerpt from the Bell Chart

The professional real estate appraisal and economics literature concerning impaired property valuation methodologies is the basis for the methodologies used today. Much of the early

113

literature has been developed in the context of environmental contamination but may have relevance to any type of property damage.[108] These earlier articles outline the evolution which eventually led to the current methodologies and standards.

One of the earliest articles on the topic of detrimental conditions is entitled "Valuation of Contaminated Properties."[109] In this article, Peter Patchin noted that stigma damages are related to "increased risks of ownership, difficulties in financing, and so forth" and that "a valuation tool that utilizes all of these factors is the capitalization rate. Consequently, with its mortgage-equity measurement techniques the capitalization rate appears to offer a means of valuing contaminated property."[110] In "Contaminated Properties - Stigma Revisited," Patchin notes, "the inability to obtain financing, either for the sale of the property or its future development, is one of the most frequent causes of stigma-related value loss."[111]

In an analysis of industrial properties, Patchin noted that the increasing flow of market data (as of 1994) has made the sales comparison approach more viable.[112] Prior to this, the sales comparison approach had generally been completely dismissed for detrimental condition analyses. Patchin noted "while income techniques are still valid and frequently provide the most accurate indication of value, the sales comparison approach now provides a valuable back-up for the income approach conclusions".[113] Thus, the income approach, with capitalization rate adjustments, was the primary approach according to Patchin, but the sales comparison approach could be a secondary method in estimating stigma (risk) effects. He did not suggest that the sales approach be the sole method; however, as he notes, "while market data have not yet developed to the extent that this approach (sales comparison/case study) can be used as a primary indicator of value in most cases, it has become useful as a confirming approach (to the income approach)."[114] This general approach is supported in "Estimating Value Diminution by the Income Approach" in which Richard Neustein demonstrated that the overall capitalization rate reflects the increased risk premium required by investors to offset the condition impacting the property.[115]

---

[108] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021), 115.

[109] Peter Patchin, "Valuation of Contaminated Property," *The Appraisal Journal* (January 1988), 7-16.

[110] Peter Patchin, "Valuation of Contaminated Property," *The Appraisal Journal* (January 1988), 13.

[111] Peter Patchin, "Contaminated Properties - Stigma Revisited," *The Appraisal Journal* (April 1991), 169.

[112] Peter Patchin, "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994), 402-409.

[113] Peter Patchin, "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994), 403.

[114] Peter Patchin, "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994), 403.

[115] Richard A. Neustein, "Estimating Value Diminution by the Income Approach," *The Appraisal Journal* (April 1992), 283-287.

The articles show an evolution of thought in the appraisal profession relating to the valuation of damaged real estate.

Today, the contemporary basic framework for valuing any real estate damage allegation is set forth with the Detrimental Conditions Matrix.[116] This matrix was first published in 1998 and is the basis for fundamental changes of the Uniform Standards of Professional Appraisal Practice (USPAP) that were published in 2002 and made effective January 1, 2003. The detrimental condition matrix remains in effect as of the date of this expert report.

| Detrimental Condition Stages | | | |
|---|---|---|---|
| | Assessment | Repair | Ongoing |
| **Cost** | Cost to assess and responsibility<br><br>Engineering Phase I, II, III studies | Repair costs and responsibility<br><br>Repairs Remediation Contingencies | Ongoing costs and responsibility<br><br>Operations and maintenance (O&M) monitoring |
| **Use** | All loss of utility while assessed<br><br>Disruptions Safety concerns Use restrictions | All loss of utility while repaired<br><br>Income loss Expense increase Use restrictions | Ongoing use disruptions<br><br>Alterations to highest and best use |
| **Risk** | Uncertainty factor<br><br>Discount, if any, where extent of damage is unknown | Project incentive<br><br>Financial incentive, if any, to complete repairs | Market resistance<br><br>Residual resistance, if any, due to situation |

*(Left axis label: Detrimental Conditions Issues)*

Figure 43: Detrimental Condition Matrix

All quadrants of the DC Matrix were considered.

USPAP Advisory Opinion 9 sets forth the "cost, use, and risk" elements, as follows:

Satisfying SR 1-4 Requirements:

When the appraiser addresses the diminution in value of a contaminated property and/or its impaired value, the appraiser must recognize that the value of an interest in impacted or

---

[116] Randall Bell, *Real Estate Damages, 3rd edition* (Chicago, IL: Appraisal Institute, 2016): 20-27.

115

contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of the value as if unaffected (unimpaired value).

Rather, *cost*, *use* and *risk* effects can potentially impact the value of contaminated property. **Cost effects** primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser, and should include consideration of any increased operating costs due to property remediation. The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value. **Use effects** reflect impacts on the utility of the site as a result of the contamination. If the contamination and/or its cleanup rendered a portion of the site unusable, or limited the future highest and best use of the property, then there could be a use effect on value. **Risk effects** are typically estimated by the appraiser and often represent the most challenging part of the appraisal assignment. These effects are derived from the market's perception of increased environmental risk and uncertainty. The analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment.

In general, an opinion of the subject property's unimpaired value can be developed using the sales comparison approach [SR 1-4(a)], cost approach [SR 1-4(b)], and income approach [SR 1-4(c)]. Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods. These methods should be consistent with the requirements related to the valuation approaches in USPAP.[117]

---

[117] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22.

116

**USPAP Advisory Opinion 9**

DEFINITIONS　　STANDARDS　　OPINIONS　　FAQs　◁▷

## ADVISORY OPINION 9 (AO-9)

*This communication by the Appraisal Standards Board (ASB) does not establish new standards or interpret existing standards. Advisory Opinions are issued to illustrate the applicability of appraisal standards in specific situations and to offer advice from the ASB for the resolution of appraisal issues and problems.*

**SUBJECT: The Appraisal of Real Property That May Be Impacted by Environmental Contamination**
**APPLICATION: Real Property**

### THE ISSUE:

Appraisals of contaminated properties, or properties suspected of being contaminated, are sometimes developed using either a hypothetical condition or an extraordinary assumption that the property is free of the contamination. While this is acceptable practice under certain conditions and for certain intended uses, there are assignments that require an appraisal of the "as-is" condition of the property, with full consideration of the effects of environmental contamination. In these assignments, the appraiser is asked to analyze the effects of known environmental contamination on the value of the subject property.

How does an appraiser comply with USPAP when appraising properties that may be impacted by environmental contamination?

### ADVICE FROM THE ASB ON THE ISSUE:

**Relevant USPAP & Advisory References**

- DEFINITIONS, specifically the definitions of

  - *Extraordinary Assumption: an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.*

    *Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis.*

  - *Hypothetical Condition: a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.*

    *Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.*

- ETHICS RULE, particularly:

  *Conduct: An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests .... An appraiser must not communicate assignment results with the intent to mislead or to defraud.*

- COMPETENCY RULE:

  *An appraiser must: (1) be competent to perform the assignment; (2) acquire the necessary competency to perform the assignment; or (3) decline or withdraw from the assignment. In all cases, the appraiser must perform competently when completing the assignment.*

18

GO BACK

USPAP Guidance: Advisory Opinions
© The Appraisal Foundation

117

 

**ADVISORY OPINION 9**

- Standards Rule 1-1(a):

  *In developing a real property appraisal, an appraiser must: (a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal;*

- Standards Rule 1-2(e):

  *In developing a real property appraisal, an appraiser must: (e) identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal….*

- Standards Rule 1-2(f) and (g):

  *In developing a real property appraisal, an appraiser must: (f) identify any extraordinary assumptions necessary in the assignment; and (g) identify any hypothetical conditions necessary in the assignment.*

- Standards Rule 1-3(b):

  *When necessary for credible assignment results in developing a market value opinion, an appraiser must: (b) develop an opinion of the highest and best use of the real estate.*

- Standards Rule 1-4:

  *In developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results.*

**Competency and Related Issues**

Consistent with Standards Rule 1-1(a): in the appraisal of a property as impacted by environmental contamination, an appraiser must *be aware of, understand, and correctly employ those recognized methods and techniques necessary to produce a credible appraisal*. Accordingly, an appraiser must have the requisite knowledge about appropriate methods, and be able to assemble the required information. An appraiser who lacks knowledge and experience in analyzing the impact of environmental contamination on the value of real property must take the steps necessary to complete the assignment competently, as required by the COMPETENCY RULE. However, an appraiser need not be an expert on the scientific aspects of environmental contamination, and in most situations the appraiser will utilize scientific and other technical data prepared by others, such as environmental engineers. In these situations, the appraiser should utilize an extraordinary assumption regarding the information obtained from other experts that is used in the appraisal.[1] Examples of such information include items (1) to (10) under the header titled "Relevant Property Characteristics" later in this Advisory Opinion. This is especially important in situations where there is conflicting information about such information.

**Specialized Terms and Definitions**

The appraisal of properties that may be impacted by environmental contamination involves specialized terms and definitions that might not be used in an appraisal assignment in which the effect of the property's environmental condition is not analyzed, or when the property is not contaminated. Though it is recognized that there are other valid definitions of these and similar terms, for purposes of this Advisory Opinion, the following definitions apply:

**Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination:** Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies.

---

1     In USPAP publication see Standards Rule 1-2(f).

118

DEFINITIONS    STANDARDS    OPINIONS    FAQs    ◀▶

**ADVISORY OPINION 9**

**Environmental Risk:** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning:

1)  the nature and extent of the contamination;

2)  estimates of future remediation costs and their timing;

3)  potential for changes in regulatory requirements;

4)  liabilities for cleanup (buyer, seller, third party);

5)  potential for off-site impacts; and

6)  other environmental risk factors, as may be relevant.

**Environmental Stigma:** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (See Environmental Risk.)

**Impaired Value:** The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

**Remediation Cost:** The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

**Remediation Lifecycle:** A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

**Source, Non-source, Adjacent and Proximate Sites:** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

**Unimpaired Value:** The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

#### Relevant Property Characteristics

The appraisal of a property that includes the effects of environmental contamination on its value usually requires data not typically used in an appraisal of an otherwise similar but uncontaminated property or an appraisal of a potentially impacted property using either a hypothetical condition or an extraordinary assumption that it is uncontaminated or not impacted. The inclusion of these additional relevant property characteristics is consistent with Standards Rule 1-2(e). The relevant property characteristics may include, but are not limited to:

1)  whether the contamination discharge was accidental or permitted;

2)  the status of the property with respect to regulatory compliance requirements;

3)  the remediation lifecycle stage (before, during or after cleanup) of the property as of the appraisal date;

4)  the contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.);

5)  the contamination conveyance (air, groundwater, soil, etc.);

6)  whether the property is a source, non-source, adjacent or proximate site;

7)  the cost and timing of any site remediation plans;

8)  liabilities and potential liabilities for site cleanup;

---

GO BACK

DEFINITIONS    STANDARDS    OPINIONS    FAQs

**ADVISORY OPINION 9**

9)  potential limitations on the use of the property due to the contamination and its remediation; and

10) potential or actual off-site impacts due to contaminant migration (for source sites).

Since the appraiser is usually not an expert on the scientific aspects of contamination, experts from other fields will typically provide this information. Appropriate regulatory authorities should also be consulted to confirm the presence or absence of contamination. The appraiser should consider the use of extraordinary assumptions when this information serves as a basis for an opinion of value. The appraiser should also collect similar data for any comparable sales used in the analysis.

**Valuation Issues – As If Unimpaired**

In some assignments, the appraiser may be asked to appraise a property known to be contaminated under the hypothetical condition that the real estate is free of contamination. In these assignments, an appraiser may appraise interests in real estate that is known to be contaminated under the hypothetical condition that the real estate is free of contamination when:

1)  the resulting appraisal report is not misleading,

2)  the client has been advised of the limitation, and

3)  all the requirements of the ETHICS RULE have been satisfied.

To avoid confusion in the marketplace, the appraiser should disclose available information about the contamination problem, explain the purpose of the *hypothetical condition* that the real estate is not contaminated, and state that the use of the hypothetical condition might have affected the assignment results in accordance with Standards Rule 2-2(a)(xiii) and (b)(xv).

In other situations, the appraiser may be asked to appraise a property believed to be free of contamination or for which the environmental status is uncertain due to the lack of information or conflicting information. For these assignments, the property may be appraised under the *extraordinary assumption* concerning assumed factual information about its environmental condition and status. Indeed, since an appraiser is usually not an expert in detecting contamination, or confirming its absence, extraordinary assumptions regarding environmental condition may be necessary in many assignments.

**Valuation Issues - As Impaired**

Highest and Best Use Issues: The appraisal of properties that may be impacted by environmental contamination usually involves extensive highest and best use analysis. In accordance with Standards Rules 1-2(e) and 1-3(b), the appraiser must consider relevant factors in developing an opinion of the highest and best use of the property in its impaired condition. The valuation of properties impacted by environmental contamination usually involves the estimate of two values: the unimpaired value and the impaired. As such, two highest and best use analyses are typically required. The first does not consider any limitations on the property due to the environmental contamination. The second does consider any limitations due to the contamination, its remediation, and any legal use restrictions associated with the cleanup of the contamination source. Environmental contamination and its remediation to appropriate regulatory standards may affect the feasibility of site development or redevelopment, use of the site during remediation, use of the site after remediation, marketability of the site, and other economic and physical characteristics of a contaminated property. The appraiser should consider the possibility that site remediation and any remaining limitations on the use of the site following remediation may alter or limit its highest and best use in the impaired condition. In addition, excessive environmental risk and stigma may deter site development or redevelopment and thereby limit the highest and best use until the property's environmental risk is reduced to levels acceptable to the relevant market participants.

GO BACK

120

**ADVISORY OPINION 9**

Satisfying Standards Rule 1-4 Requirements: When the appraiser addresses the diminution in value of a contaminated property and/or its impaired value, the appraiser must recognize that the value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of the value as if unaffected (unimpaired value). Rather, *cost, use* and *risk* effects can potentially impact the value of contaminated property. *Cost effects* primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser, and should include consideration of any increased operating costs due to property remediation. The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value. *Use effects* reflect impacts on the utility of the site as a result of the contamination. If the contamination and/or its cleanup rendered a portion of the site unusable, or limited the future highest and best use of the property, then there could be a use effect on value. *Risk effects* are typically estimated by the appraiser and often represent the most challenging part of the appraisal assignment. These effects are derived from the market's perception of increased environmental risk and uncertainty. The analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment.

In general, an opinion of the subject property's unimpaired value can be developed using the sales comparison approach [Standards Rule 1-4(a)], cost approach [Standards Rule 1-4(b)], and income approach [Standards Rule 1-4(c)]. Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods. These methods should be consistent with the requirements related to the valuation approaches in USPAP.

GO BACK

USPAP Guidance: Advisory Opinions
© The Appraisal Foundation

121

**Guide Note 6**



# Guide Note 6
## Consideration of Hazardous Substances in the Appraisal Process

Appraisal Institute®






## Introduction

The consideration of environmental conditions along with social, economic, and governmental conditions is fundamental to the appraisal of real property. Although appraisal literature has recognized environmental conditions can affect property value, the focus has been on the consideration of climatic conditions, topography and soil, the surrounding neighborhood, accessibility, and proximity to points of attraction. These more general environmental conditions might be apparent to a member of the general public who is not specifically trained as an expert in observing these forces. There is, however, a growing need to give special consideration to the specific impacts of hazardous substances on the valuation of real property. Consistent with accepted guidance on this topic and as incorporated herein, "hazardous substances"

122

# GUIDE NOTE 6

## Introduction (continued)

would be considered "environmental contamination" when their concentrations exceed appropriate regulatory standards. (See Definitions below).

The purpose of this Guide Note is to provide guidance in the application of the *Standards of Valuation Practice* (SVP) and the *Uniform Standards of Professional Appraisal Practice* (USPAP) to the appraisal of real property affected by or potentially affected by environmental contamination and, in particular, to the consideration of environmental contamination in the appraisal process. It is not the purpose of this Guide Note to provide technical instructions or explanations concerning the detection or measurement of the effect of hazardous substances.

## Competency

The Competency Rule of the USPAP, for example[1], requires the appraiser to either:

   a) properly identify the problem to be addressed, and have the knowledge and experience necessary to complete the assignment competently, and recognize and comply with laws and regulations that apply to the appraiser or to the assignment; or
   b) disclose the appraiser's lack of knowledge and/or experience to the client before accepting the assignment, take all steps necessary or appropriate to complete the assignment competently, and describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report; or
   c) decline or withdraw from the assignment.

The competency provisions of valuation Standards and Ethical Rules are of particular importance in the appraisal of real property that may be affected by hazardous substances. Most appraisers do not have the knowledge or experience required to detect the presence of hazardous substances or to measure the quantities of such material. The appraiser, like the buyers and sellers in the open market, typically relies on the advice of others in matters that require special expertise.

There is nothing to prevent a professional appraiser from becoming an expert in other fields but the real estate appraiser is neither required, nor expected, to be an expert in the special field of the detection and measurement of hazardous substances. This Guide Note therefore addresses the problem of hazardous substances from the viewpoint of the appraiser who is not qualified to detect or measure the quantities and concentrations of hazardous substances. If an appraiser is qualified to detect or measure hazardous substances, a different set of standards would apply.

In appraisal assignments in which the appraised value is to take into account the effects on value of hazardous substances, most appraisers require the professional assistance of others. In appraisal assignments in which the appraised value does not take into account the possible effects on value of known hazardous substances (i.e. the unimpaired value, see below), the appraiser would not require the professional assistance of others.

The appraiser may accept an assignment involving the consideration of hazardous substances without having the required knowledge and experience in this special field, provided the appraiser discloses such lack of knowledge and experience to the client prior to acceptance of the assignment, arranges to complete the assignment competently and describes the lack of knowledge or experience and the steps taken to competently complete the assignment in the report. This may require association with others who possess the required knowledge and experience or reliance on professional reports prepared by others who are reasonably believed to have the necessary knowledge and experience. If the appraiser draws conclusions based upon the advice or findings of others, the appraiser must have a reasonable basis for believing that the advice or findings are made by persons who are competent. (See Guide Note 4: Reliance on Reports Prepared by Others and the USPAP Comment to SR 2-3.)

---

[1] Ethical Rule 1-3 of the *Code of Professional Ethics* of the Appraisal Institute and paragraph 50 of the IVS Framework of the *International Valuation Standards* (IVS) contain similar provisions.

# Scope of Work

The SVP's Standards Rule A-3: Scope of Work requires the valuer to "determine the scope of work necessary to develop an appraisal that is credible given its intended use."

The USPAP SCOPE OF WORK RULE requires that, in any assignment, the appraiser establish the appropriate scope of work necessary to complete that assignment. Part of the scope of work decision includes how, and to what extent, the appraisal problem will address known or suspected hazardous materials that may impact the property. Both the SVP and USPAP provide two tests for the acceptability of the scope of work decision; the intent and meaning is the same in both the SVP and USPAP. The Comment to the USPAP Scope of Work Acceptability section states:

> The scope of work is acceptable when it meets or exceeds:
> • the expectations of parties who are regularly intended users for similar assignments; and
> • what an appraiser's peers' actions would be in performing the same or a similar assignment.
>
> ...An appraiser must be prepared to support the decision to exclude any investigation, information, method or technique that would appear relevant to the client, another intended user, or the appraiser's peers.

The USPAP Scope of Work Acceptability section includes two more major provisions:

> • An appraiser must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use.
> • An appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased.

The disclosure obligations of the USPAP SCOPE OF WORK RULE and USPAP SR 2-2(a)vii) and (b)(vii) and the SVP's C-2(Xii) require that the scope of work performed be disclosed in the appraisal report.

Depending on the intended use, the appraisal may be prepared so that the value opinion reflects no known or suspected environmental contamination that may impact the property, or it may be prepared so that the value opinion does reflect known contamination. In either case, the appraiser must take special precautions in the development and reporting process to ensure that the results of the assignment are credible and that the report is not misleading.

# Extraordinary/Special Assumptions and Hypothetical Conditions

In assignments involving contaminated properties or properties that may be adversely impacted by environmental contamination (contaminated property assignment), the appraisal will likely be premised on one or more Extraordinary/Special Assumptions and/or Hypothetical Conditions. Typically in these types of assignments, Extraordinary/Special Assumptions are used when relying on the work of others, such as environmental engineers or other technical specialists, while Hypothetical Conditions are used when the appraiser estimates the value of a property known to be contaminated in an unimpaired or uncontaminated condition[ii]

---

[1] The Appraisal Institute *Standards of Valuation Practice* (SVP) address assumptions and hypothetical conditions in the Definitions section (definitions of hypothetical condition and special assumption), SR A-2(g), SR B-2(e), SR C-2(a)(xvi) and SR C-2(b)(xiii). Portions of the Appraisal Institute *Code of Professional Ethics* (CPE) that relate to this topic include ER 3-4 and ER 3-5. Applicable sections of the *Uniform Standards of Professional Appraisal Practice* (USPAP) include the Definitions section (definitions of hypothetical condition and extraordinary assumption), SR 1-2(f) and (g), SR 2-1(c), SR 2-2(a) and (b)(xi), and SR 3-2(f) and 4-2(f). Applicable sections of the *International Valuation Standards* (IVS) include the Definitions section (definition of special assumption); IVS 101 Scope of Work, 20.3 (k); IVS 103 Reporting 10.2, and Bases of Value, 200.4 and 200.5.

124

# Assignments prepared under USPAP

USPAP provides the following definition for "extraordinary assumption."

> An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions.

> Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property, or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

In addition, it may be appropriate to premise the appraisal on an extraordinary assumption in the event there is suspected but not confirmed contamination. An environmental assessment by a qualified environmental professional would be required for such conclusions or determinations.

USPAP Standards Rule 1-2(f) requires that in developing an appraisal the appraiser identify "any extraordinary assumptions necessary in the assignment." The Comment states:

> "An extraordinary assumption may be used in an assignment only if:
> • it is required to properly develop credible opinions and conclusions;
> • the appraiser has a reasonable basis for the extraordinary assumption;
> • use of the assumption results in a credible analysis; and
> • the appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions."

USPAP Standards Rules 2-2(a) and (b)(xi) require the appraiser to clearly and conspicuously state in the appraisal report all extraordinary assumptions upon which the value opinion is premised. These reporting Standards Rules also require a clear and conspicuous statement that the use of these extraordinary assumptions "might have affected the assignment results."

USPAP Standards Rule 2-1 requires the report to "clearly and accurately disclose all ... extraordinary assumptions ... used in the assignment."

USPAP provides the following definition for "hypothetical condition":

> "A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

> Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in the analysis."

USPAP Standards Rule 1-2(g) requires that in developing an opinion of value the appraiser identify "any hypothetical conditions necessary in the assignment." The Comment states:

> "A hypothetical condition may be used in an assignment only if:
> • use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;
> • use of the hypothetical condition results in a credible analysis; and
> • the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions."

USPAP Standards Rule 2-1(c) requires the report to "clearly and accurately disclose all ... extraordinary assumptions, hypothetical conditions ... used in the assignment."

USPAP SR 2-2(a)(xi) and (b)(xi) require the appraisal to "clearly and conspicuously" state all extraordinary assumptions and hypothetical conditions and state that their use "might have affected the assignment results." These USPAP Standards Rules do not require that the appraiser quantify the impact on value, such as by both valuing the property subject to the hypothetical condition and valuing it not subject to the hypothetical condition.

## Assignments prepared under SVP

SVP provides the following definition for "special assumption":

> An assumption, directly applicable to a specific service, which, if found to be false, could alter the opinions or conclusions in an appraisal or review.

In addition, it may be appropriate to premise the appraisal on a special assumption in the event there is suspected but not confirmed contamination. An environmental assessment by a qualified environmental professional would be required for such conclusions or determinations.

SVP Standards Rule A-2(g) requires that the valuer must identify the appraisal problem to be solved at the time of engagement. To identify the appraisal problem, the valuer must ascertain any special assumptions necessary in the appraisal.

SVP Standards Rule C-2(a)(xvi) requires the report to "clearly and conspicuously state all special assumptions ..., and that their use might have affected the valuer's opinion(s) and conclusion(s)"

SVP provides the following definition for "hypothetical condition:"

> "A condition that is presumed to be true when it is known to be false."

SVP Standards Rule A-2(h) requires the valuer to identify the appraisal problem to be solved at the time of engagement. To identify the appraisal problem, the valuer must ascertain any hypothetical conditions necessary in the appraisal.

SVP Standards Rule C-2(a)(xvi) requires the report to "clearly and conspicuously state all ...hypothetical conditions, and that their use might have affected the valuer's opinion(s) and conclusion(s)." This Standards Rule does not require that the appraiser quantify the impact on value, such as by both valuing the property subject to the hypothetical condition and valuing it not subject to the hypothetical condition.

## Example of the Disclosure of a Hypothetical Condition under SVP or USPAP

An example of the disclosure of such a hypothetical condition is:

> *It is reported that groundwater contamination is present beneath the subject property. In accordance with the client's instructions and consistent with the intended use of this appraisal report, the value opinion is based on the hypothetical condition that the subject property is not impacted by groundwater contamination. The appraiser cautions against the use of this appraisal report for any use other than the intended use stated herein.*

When such disclosure is required it may be placed anywhere in the appraisal report (provided that is clear and conspicuous) including but not limited to the letter of transmittal, scope of work disclosure, or general comments section, depending on the type and length of report prepared. In an oral report, the appraiser should present the same information, if possible.

126

Over the past few years, a common and generally accepted set of definitions related to the appraisal of properties that may be impacted by contamination have emerged. These are as follows:

**Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination:** Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state and/or local agencies.

**Environmental Risk:** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning: (1) the nature and extent of the contamination; (2) estimates of future remediation costs and their timing; (3) potential for changes in regulatory requirements; (4) liabilities for cleanup (buyer, seller, third party); (5) potential for off-site impacts; and (6) other environmental risk factors, as may be relevant.

**Environmental Stigma:** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (see Environmental Risk, above).

**Impaired Value:** The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

**Remediation Cost:** The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

**Remediation Lifecycle:** A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

**CONTAMINATED PROPERTY VALUATION - SPECIALIZED TERMS AND DEFINITIONS**

**Source, Non-source, Adjacent and Proximate Sites:** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

**Unimpaired Value:** The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

---

[2]Sources: *The Appraisal of Real Estate,* 14th Edition, *The Dictionary of Real Estate Appraisal, Environmental Contamination Glossary,* 6th Edition, both published by the Appraisal Institute; USPAP Advisory Opinion 9: The Appraisal of Real Property That May Be Impacted by Environmental Contamination, by The Appraisal Foundation.

# Basis for Proper Valuation

The specialized terms and definitions are an important part of the valuation framework for appraising properties that may be impacted by environmental contamination. This framework begins with the following formulae or equations:

| Impaired Value | = | Unimpaired Value - Cost Effects (Remediation and Related Costs) - Use Effects (Effects on Site Usability) - Risk Effects (Environmental Risk/Stigma) |
| Property Value | = | Cost Effects (Remediation and Related Costs) + Use Effects (Effects on Site Usability) + Risk Effects (Environmental Risk/Stigma) |
| Diminution | | |
| Impaired Value | = | Unimpaired Value - Property Value Diminution |

These equations set forth the relationships between the key elements of the valuation framework, and highlight the steps to be taken by the appraiser in such assignments. Three general steps are typically taken. The first involves the estimation of the unimpaired value, as defined above. This estimate is usually undertaken with a Hypothetical Condition that the property is being appraised as if uncontaminated (See section on Hypothetical Conditions, above). The second general step involves the estimation of property value diminution. Property value diminution can have three forms: cost effects, use effects and risk effects. The third step involves the estimation of the impaired value of the subject property. This value can usually be derived by deducting an estimate of diminution from the unimpaired value. These estimates must be appropriate and well supported by market data typically involving actual transactions by market participants. As noted in The Dictionary of Real Estate Appraisal, 6th Edition, "market participants" are "individuals actively engaged in transactions." Thus, non-market participants and related non-market and non-transactional data would not establish an appropriate basis for estimating property value diminution.

## Cost Effects

There are several considerations in analyzing the three effects comprising property value diminution. Cost effects involve deductions for costs to remediate a contaminated property by reducing concentrations of contamination to below appropriate regulatory standards. Accordingly, prerequisites for such a deduction would be: (1) that the property was contaminated, with concentrations of hazardous materials above appropriate regulatory standards; (2) that the costs were necessary for remediation of the property; and (3) that the costs would be borne by a prospective purchaser of the property rather than by a third party such as the current owner or the owner of adjacent property or some other third party responsible for the remediation. The market may not recognize any and all potential costs but only those costs necessary to achieve regulatory compliance and reduce concentrations of hazardous materials to below the appropriate regulatory standard. Regulatory standards are those established by the appropriate state, local or federal authority. The appraiser should rely on those entities to establish this threshold. Other thresholds and cleanup objectives desired by landowners or others would not establish an appropriate basis for a market based cost effects deduction.

## Use Effects

Use effects involve limitations on the utility of a site due to contamination and its remediation. In some situations, these effects may result in a limitation on the highest and best use of a property and this potential effect should be analyzed by the appraiser. For example, at the conclusion of some approved remedial action plans, especially those utilizing risk-based standards, subsurface contamination may remain in place so long as certain conditions are met. These conditions, which may have a deed recordation, could limit site utility or the use of the site for alternative future uses. However, the appraiser should be aware that not all site use limitations will have an effect on market value and it is the market and its reaction, as borne out in actual market data, to these limitations that should be the primary focus of the appraiser's work in estimating use effects.

128

### Risk Effects

Lastly, risk effects can result from uncertainties concerning the contamination and its remediation and other factors (see Definitions). If the uncertainties and perceptions of the market result in reductions in property value (property value diminution) then the appraiser might conclude that the subject property suffers from environmental stigma. Environmental stigma for the appraisal profession is the product of uncertainty and adverse perceptions of the market but is always measured on the basis of actual market data and transactions that reflect these perceptions. The appraiser is cautioned that not all uncertainty and increased concern and perceptions in the market may reduce property values, and that any analysis of risk effects and stigma must be based on actual data from the relevant market or submarket and should not be assumed to occur without such evidence. Further, the appraiser should employ relevant and generally accepted methods and techniques to analyze the relevant and reliable market data in order to develop an opinion concerning the existence and extent of any risk and stigma that may exist before applying such a deduction to the subject property or properties. Lastly, important considerations in the estimation of risk effects are the subject property's stage in the remediation lifecycle (before, during or after cleanup) and the whether the subject and any sales comparables are source, non-source, adjacent or proximate sites as these factors can and do influence the extent to which a property will suffer from environmental risk and stigma.

**1.** Disclose to the client the appraiser's lack of knowledge and experience with respect to the detection and measurement of hazardous substances (CPE Ethical Rule 1-3, USPAP Competency Rule).

**2.** Take the necessary steps to complete the assignment competently such as personal study by the appraiser, association with another appraiser who has the required knowledge and experience, or obtaining the professional assistance of others who possess the required knowledge and experience ((CPE Ethical Rule 1-3, USPAP Competency Rule).

**3.** Identify as an extraordinary/special assumption reliance on any third party reports or obtained expert association that may have contributed to the valuation beyond the appraiser's own competence.

**4.** Under USPAP
- Identify in the appraisal process and state in the report if the appraisal is based on an extraordinary assumption or hypothetical condition that the property is appraised as if unaffected by hazardous substances (USPAP SR 1-2(f) and/or (g), SR 2-1(c), and SR 2-2(a)(xi) and 2-2(b)(xi).
- Identify in the appraisal process the environmental condition of the subject property and surrounding properties, and the existence of documented instances of environmental contamination that may affect the value of the property. (USPAP SR 1-2(e)(i)).
- Identify the scope of work necessary to complete the assignment, including the manner and degree to which the existence of environmental contamination will be addressed (USPAP SCOPE OF WORK RULE).
- Consistent with the USPAP SCOPE OF WORK RULE, develop an opinion of unimpaired value of the subject property using an appropriate Hypothetical Condition clearly disclosed in the report.

Under SVP
- Identify in the appraisal process and state in the report if the appraisal is based on a special assumption or hypothetical condition that the property is appraised as if unaffected by hazardous substances (SVP A-2(g) and/or (h), and C-2(a)(xvi)).
- Identify in the appraisal process the environmental condition of the subject property and surrounding properties, and the existence of documented instances of environmental contamination that may affect the value of the property. (SVP A-2(f)).
- Identify the scope of work necessary to complete the assignment, including the manner and degree to which the existence of environmental contamination will be addressed (SVP A-3).
- Consistent with the SVP A-3, develop an opinion of unimpaired value of the subject property using an appropriate Hypothetical Condition clearly disclosed in the report.

129

**5.** Where and if appropriate, apply the estimates of cost, use and risk effects (property value diminution) to estimate the value of the subject property in its impaired condition.

(Please Note: The purpose of this Guide Note to the Standards of Professional Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective July 26, 2013
Minor revisions 2018

**Bell Chart**



Figure 44: Bell Chart

131

**Damage Economics: A Comparative Illustration**

Figure 45: Real Estate Damage Economics: A Comparative Illustration

**USPAP AO9 in Context of the Subject Properties**

Source, Non-Source, Adjacent, Proximal (SNAP)

Figure 46: Environmental Exposure Pathways (SNAP)

Source

The source site is understood to be the former Monsanto plant in Sauget, Illinois.

Non-Source

The subject properties are non-source.

Adjacent

There are no adjacent properties.

Proximate

There are no proximate properties.

133

Exposure

In this report surface exposure is the pathway that is being considered.

Detrimental Condition Class

The subject properties are impaired by a Class VIII (Environmental and Biomedical Conditions) detrimental condition in the form of PCB chemicals.

Remediation Lifecycle Phase

Assessment phase

Accidental or Permitted Discharge

To be determined

Regulatory Compliance

This case involves regulatory issues associated with the presence of PCBs at the subject properties.

Constituents

Polychlorinated Biphenyls – PCBs chemicals

Conveyance

Conveyance was by air and deposition.

Remediation Costs and Timing

Addressed in the Cost Effects section.

Liability

Refer to the report by Kevin Coghlan, M.S., C.I.H. of Environmental Health & Engineering, Inc.

Limitations on Use

Normal use of the subject properties has been impacted and is addressed in the Use Effect analysis.

134

<u>Off-site / Migration</u>

Off-site migration is noted, as PCB chemicals have migrated from the source property onto surrounding properties.[118]

---

[118] As set forth by Environmental Health & Engineering, Inc.

**Media Headlines**

| | | | | CITY OF EAST ST. LOUIS<br>Media Summary<br>(Landmark File: 155-1-21) |
|---|---|---|---|---|
| No | Article Title | Source | Date | Overview |
| 1 | East St. Louis says Monsanto polluted its land. It could collect billions in fines. | Pantagraph | 2/19/2023 | "East St. Louis is alleging the old Monsanto plant in Sauget polluted its town, and it's seeking what could potentially be billions of dollars in fines."<br><br>"The city is suing Monsanto Company, Solutia Inc. and Pharmacia LLC in federal court, accusing the companies of polluting its land with chemicals known as polychlorinated biphenyls, or PCBs, that are toxic and dangerous to people and the environment."<br><br>"East St. Louis says in court documents that it became aware of "highly elevated PCB levels" in the community in December 2020 when it received test results from soil samples." |
| 2 | East St. Louis Is Suing Monsanto for Pollution | Local News Today | 2/17/2023 | "The city is suing Monsanto Company, Solutia, Inc. and Pharmacia LLC in federal court, accusing the companies of polluting its land with chemicals known as polychlorinated biphenyls, or PCBs, which are toxic and hazardous to humans and the environment."<br><br>"East St. Louis' April 23, 2021 complaint found that the highest PCB concentration found in the city was 75,300 parts per billion and the average was 3,416 parts per billion. The complaint compared those numbers to a 2007 study by the US Environmental Protection Agency, which estimated the average concentration of PCBs in rural soil to be about 3 parts per billion."<br><br>"East St. Louis accuses Monsanto of hiding its knowledge of the toxic effects of PCBs. 'Despite its early knowledge of the dangers associated with PCBs, Monsanto launched a decades-long campaign of disinformation and deception to prolong the manufacture, incineration and disposal of PCBs in East St. Louis and thereby preserve the substantial profits made from PCBs for the company,' the city's lawsuit states." |

Figure 47: Media Summary, Articles 1-2

| | | CITY OF EAST ST. LOUIS<br>Media Summary<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|---|
| **No** | **Article Title** | **Source** | **Date** | **Overview** |
| 3 | East St. Louis Says Monsanto Polluted its Land. It Could Collect Billions in Fines. | Belleville News-Democrat | 2/16/2023 | "East St. Louis is alleging the old Monsanto plant in Sauget polluted its town, and it's seeking what could potentially be billions of dollars in fines."<br><br>"The city is suing Monsanto Company, Solutia, Inc. and Pharmacia LLC in federal court, accusing the companies of polluting its land with chemicals known as polychlorinated biphenyls, or PCBs, that are toxic and dangerous to people and the environment." |
| 4 | East St. Louis Seeks Roughly $2.7 Billion in Penalties for Pollution; Monsanto Moves To File Counter Claim | Madison Record | 2/8/2023 | "Monsanto has moved to file a counter claim against the city alleging violations of due process, equal protection, and a prohibition against excessive fines.<br><br>"The city has responded that its penalties would be proportional to the damage from Monsanto's production of polychlorinated biphenyl, or PCB." |
| 5 | Illinois AG Files Environmental Damages Lawsuit Alleging PCB Water Contamination Against Monsanto | Local News Today | 10/7/2022 | "Illinois AG files environmental damages lawsuit alleging PCB water contamination against Monsanto"<br><br>"Raoul points out that Sauget, a town of 141 people, is already the site of two US Environmental Protection Agency (EPA) Superfund sites, and the nearby communities of East St. Louis and Cahokia Heights"... "'are bearing the brunt' carry environmental pollution from Monsanto."<br><br>"In these communities there are permanent ordinances prohibiting the use of groundwater for drinking water supply due to pollution." |
| 6 | Illinois AG Files Environmental Tort Lawsuit Against Monsanto Over PCB Water Contamination | About Lawsuits | 10/6/2022 | "Monsanto faces a lawsuit brought by the Illinois Attorney General over the discharge, dumping and leaking of toxic polychlorinated biphenyls (PCB) chemicals in the state, which have resulted in widespread water contamination and damage to the environment."<br><br>"As a result the reckless conduct of Monsanto, PCBs and other toxic chemicals, such as dioxins, chlorobenzenes, mercury and phosphorous now contaminate the states creeks, rivers, lakes and beaches and have degraded the state's wildlife and other natural resources, according to the lawsuit." |

Figure 48: Media Summary, Articles 3-6

| | CITY OF EAST ST. LOUIS<br>Media Summary<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|---|
| No | Article Title | Source | Date | Overview |
| 7 | Attorney General Raoul Files Lawsuit Against Monsanto for Continued Effects of PCB Contamination | Illinois Attorney General | 8/29/2022 | "Raoul Alleges Monsanto's Decades of PCB Production Caused Ongoing Contamination Near Sauget Facility and Throughout Illinois"<br><br>"To this day, Illinois suffers from immense PCB contamination resulting from Monsanto's conduct in the design, manufacture, use, marketing, sale and distribution of commercial PCB mixtures. For decades, Monsanto discharged massive amounts of hazardous wastes from its Krummich Plant in Sauget directly into the surrounding environment, including into sewers that allowed the toxic waste to enter the Mississippi River."<br><br>"Sauget – a town of only 141 residents – is home to two EPA superfund sites and is surrounded by East St. Louis and Cahokia Heights"... "which bear the brunt of the environmental contamination caused by decades of Monsanto's reckless practices in Sauget."<br><br>"The groundwater in and near Sauget is so significantly contaminated that local ordinances in East St. Louis, Sauget and the former Cahokia prohibit the use of groundwater as a potable water supply." |
| 8 | Case activity for City of East St. Louis, Illinois vs Monsanto Company on March 1 | Madison Record | 3/3/2021 | "The U.S. District Court for the Southern District of Illinois reported the following activities in the suit brought by City of East St. Louis, Illinois against Monsanto Company on March 1." |

Figure 49: Media Summary, Articles 7-8

<table>
<tr>
<td colspan="5" align="center"><b>CITY OF EAST ST. LOUIS</b><br><b>Media Summary</b><br><b>(Landmark File: 155-1-21)</b></td>
</tr>
<tr>
<td><b>No</b></td>
<td><b>Article Title</b></td>
<td><b>Source</b></td>
<td><b>Date</b></td>
<td><b>Overview</b></td>
</tr>
<tr>
<td>9</td>
<td>"Incorporated to Be a Sewer": A Historical Analysis of Industrial Pollution in Sauget, Illinois</td>
<td>Washington University in St. Louis</td>
<td>5/13/2020</td>
<td>"On August 7, 1926, the southern Illinois region in which Sauget now exists held a vote for the incorporation of the Village of Monsanto."<br><br>"Reports of the targeted environmental contamination highlighted dioxins and PCBs as the cause of numerous public health concerns."</td>
</tr>
<tr>
<td>10</td>
<td>Monsanto: A Checkered History</td>
<td>The Ecologist</td>
<td>September /October 1998</td>
<td>"The world's center of PCB manufacturing was Monsanto's plant on the outskirts of East St. Louis, Illinois."<br><br>"East St. Louis is a chronically economically depressed suburb, across the Mississippi River from St. Louis, bordered by two large metal processing plants in addition to the Monsanto facility."<br><br>"While Monsanto has consistently denied any connection to the Times Beach incident, the St. Louis-based Times Beach Action Group (TBAG) uncovered laboratory reports documenting the presence of large concentrations of PCBs manufactured by Monsanto in contaminated soil samples from the town."</td>
</tr>
<tr>
<td>11</td>
<td>Environmental Justice Case Study: East St. Louis, Illinois</td>
<td>University of Michigan</td>
<td>None Noted</td>
<td>"East St. Louis, located in west-Central Illinois across the Mississippi River from St. Louis, Missouri, has suffered tremendous economic and environmental setbacks. A booming town at the turn of the century, East St. Louis profited greatly from centrally located rail freight facilities that distributed locally produced chemicals. "<br><br>"Monsanto began producing polychlorinated Biphenyls or PCBs in the early 1930s until its deadly effects were discovered forty years later. In the late 1940s, Monsanto began manufacturing herbicide 2,4,5-T."<br><br>"An internal memo made public in 1987 indicated that large amounts of dioxin, a by-product of PCBs and a known carcinogen, were disposed in the East St. Louis area."</td>
</tr>
</table>

Figure 50: Media Summary, Articles 9-11

139

**Subject Property Summary with Ownership History**

| | CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 1 | 01-23.0-205-005 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 2 | 01-23.0-205-006 | Yes | 1973-1985, 1987-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 3 | 01-23.0-205-012 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 4 | 01-23.0-205-033 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 5 | 01-23.0-205-036 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 6 | 01-23.0-205-037 | No | 1973-1985, 1989-1993, 1996-1998 2014-2023 (St. Clair Trustee) |
| 7 | 01-23.0-205-038 | No | 1973-1985, 1989-1993, 1996-1998 2014-2023 (St. Clair Trustee) |
| 8 | 01-23.0-205-039 | No | 1973-1985, 1989-1993, 1996-1998 2014-2023 (St. Clair Trustee) |
| 9 | 01-23.0-205-040 | No | 1973-1985, 1989-1993, 1996-1998 2014-2023 (St. Clair Trustee) |
| 10 | 01-23.0-205-043 | Yes | 1973-1985, 1989-1993, 1996-1998 2006-2023 (St. Clair Trustee) |
| 11 | 01-23.0-206-004 | Yes | 2012 (St. Clair Trustee),2019-2023 (St. Clair Trustee) |
| 12 | 01-23.0-206-006 | Yes | 1981-1985, 1989-1993, 1996-1998 2012 St. Clair Trustee), 2018-2023 (St. Clair Trustee) |
| 13 | 01-23.0-206-007 | Yes | 1981-1985, 1989-1993, 1996-1998 2012 (St. Clair Trustee), 2018-2023 (St. Clair Trustee) |
| 14 | 01-23.0-206-009 | Yes | 1981-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 15 | 01-23.0-206-011 | Yes | 1973-1985, 1987-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 16 | 01-23.0-206-020 | Yes | 1973-1993, 1996-1998 2015-2023 (St. Clair Trustee) |
| 17 | 01-23.0-206-021 | Yes | 1973-1993, 1996-1998 2015-2023 (St. Clair Trustee) |
| 18 | 01-23.0-206-022 | Yes | 1973-1993, 1996-1998 2015-2023 (St. Clair Trustee) |
| 19 | 01-23.0-206-031 | Yes | 1973-1985, 1989-1993, 1996-1998 2017-2023 (St. Clair Trustee) |
| 20 | 01-23.0-206-034 | Yes | 1973, 1981-1985, 1989-1993, 1996-1998 2010-2023 (St. Clair Trustee) |

Figure 51: Subject Properties Summary, 1-20

140

| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
|---|---|---|---|
| 21 | 01-23.0-206-036 | Yes | 1973-1985, 1989-1993, 1996-1998  2015-2023 (St. Clair Trustee) |
| 22 | 01-23.0-206-037 | Yes | 1973-1985, 1989-1993, 1996-1998 2016-2023 (St. Clair Trustee) |
| 23 | 01-23.0-206-057 | Yes | 1973-1985, 1989-1993, 1996-1999  2013-2023 (St. Clair Trustee) |
| 24 | 01-23.0-401-008 | Yes | 1973-1985, 1989-1993, 1996-1998  2017-2023 (St. Clair Trustee) |
| 25 | 01-23.0-401-009 | Yes | 1973-1985, 1989-1993, 1996-1998  2018-2023 (St. Clair Trustee) |
| 26 | 01-23.0-401-010 | Yes | 1973, 1981-1985, 1989-1993, 1996-1998  2017-2023 (St. Clair Trustee) |
| 27 | 01-23.0-401-013 | Yes | 1981-1985, 1989-1993,1996-1998 2012-2023 (St. Clair Trustee) |
| 28 | 01-23.0-401-022 | Yes | 1974, 1976, 1980-1985, 1989-1993, 1996-1998 2016-2023 (St. Clair Trustee) |
| 29 | 01-23.0-401-089 | Yes | 1973-1985, 1989-1993, 1996-1999 2011-2023 (St. Clair Trustee) |
| 30 | 01-23.0-402-005 | Yes | 1973-1985, 1989-1993, 1996-1998  2016-2023 (St. Clair Trustee) |
| 31 | 01-23.0-402-006 | Yes | 1973-1985, 1989-1993, 1996-1998 2016-2023 (St. Clair Trustee) |
| 32 | 01-23.0-402-007 | No | 1973-1985, 1989-1993, 1996-1998 2016-2023 (St. Clair Trustee) |
| 33 | 01-23.0-403-031 | Yes | 1973-1985, 1989-1993, 1996-1998 2014-2023 (St. Clair Trustee) |
| 34 | 01-24.0-121-021 | Yes | 1973-1985, 1989-1993, 1995-2014 2015-2023 (St. Clair Trustee) |
| 35 | 01-24.0-121-022 | Yes, but Lot Size Less than 1,000 SqFt | 1973-1985, 1989-1993, 1996-2014 2015-2023 (St. Clair Trustee) |
| 36 | 01-24.0-121-023 | Yes | 1973-1985, 1989-2014 2019-2023 (St. Clair Trustee) |
| 37 | 01-24.0-121-024 | Yes, but Lot Size Less than 1,000 SqFt | 1973-1985, 1989-1998  2020-2023 (St. Clair Trustee) |
| 38 | 01-24.0-121-025 | Yes | 1973-1985, 1989-1993, 1996-1998 2020-2023 (St. Clair Trustee) |
| 39 | 01-24.0-121-026 | Yes | 1973-1985, 1989-2014  2019-2023 (St. Clair Trustee) |
| 40 | 01-24.0-121-027 | Yes, but Lot Size Less than 1,000 SqFt | 1973-1985, 1989-2014  2019-2023 (St. Clair Trustee) |

**CITY OF EAST ST. LOUIS**
**ESTL Parcel Ownership and Improvements**
**(Landmark File: 155-1-21)**

Figure 52: Subject Properties Summary, 21-40

141

| | | CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 41 | 01-24.0-121-028 | Yes | 1973-1985, 1989-2014 2019-2023 (St. Clair Trustee) |
| 42 | 01-24.0-121-031 | Yes | 1973-1985, 1989-1993, 1996-2014  2015-2023 (St. Clair Trustee) |
| 43 | 01-24.0-121-032 | Yes, but Lot Size Less than 1,000 SqFt | 1973-1985, 1989-1993, 1996-2014  2015-2023 (St. Clair Trustee) |
| 44 | 01-24.0-121-033 | Yes | 1973-1985, 1989-1993, 1996-2014 2015-2023 (St. Clair Trustee) |
| 45 | 01-24.0-121-035 | Yes, but Lot Size Less than 1,000 SqFt | 1973-1985, 1989-1993, 1996-2014  2015-2023 (St. Clair Trustee) |
| 46 | 01-24.0-130-019 | Yes | 1973-1985, 1989-1998 2016-2022 (St. Clair Trustee) |
| 47 | 01-24.0-135-017 | Yes | 1973-1985, 1989-1993, 1996-1998  2008-2021 (St. Clair Trustee) |
| 48 | 01-24.0-135-025 | Yes | 1973-1985, 1989-1998  2013-2021 (St. Clair Trustee) |
| 49 | 01-24.0-136-001 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 50 | 01-24.0-136-011 | Yes, but Lot Size Less than 1,000 SqFt | 1973-1985, 1989-1993, 1995-1998 1999-2022 (St. Clair Trustee) |
| 51 | 01-24.0-136-018 | Yes | 1973-1985, 1989-1993, 1995-1998 2016-2022 (St. Clair Trustee) |
| 52 | 01-24.0-136-019 | Yes | 1973-1985, 1989-1993, 1995-1998 2016-2022 (St. Clair Trustee) |
| 53 | 01-24.0-136-021 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 54 | 01-24.0-136-022 | Yes | 1973-1985, 1989-1993, 1995-1998 2015-2023 (St. Clair Trustee) |
| 55 | 01-24.0-136-030 | Yes | 1973-1985, 1989-1993, 1995-1998 2017-2022 (St. Clair Trustee) |
| 56 | 01-24.0-136-040 | Yes | 1973-1985, 1989-1993, 1995-1998 2016-2022 (St. Clair Trustee) |
| 57 | 01-24.0-136-043 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2022 (St. Clair Trustee) |
| 58 | 01-24.0-137-020 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2023 (ESTL Housing Authority) |
| 59 | 01-24.0-137-021 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2023 (ESTL Housing Authority) |
| 60 | 01-24.0-137-022 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2023 (ESTL Housing Authority) |

Figure 53: Subject Properties Summary, 41-60

142

| CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 61 | 01-24.0-139-007 | Yes | 1973-1985, 1989-1993, 1996-1998 2017-2022 (St. Clair Trustee) |
| 62 | 01-24.0-139-011 | Yes | 1973-1985, 1989-1993, 1996-1998 2017-2022 (St. Clair Trustee) |
| 63 | 01-24.0-139-012 | Yes | 1973-1994, 1996-1998 2015-2022 (St. Clair Trustee) |
| 64 | 01-24.0-142-006 | Yes | 1973-1987, 1989-1993, 1996-1998 2013-2021 (St. Clair Trustee) |
| 65 | 01-24.0-142-007 | Yes | 1973-1987, 1989-1993, 1996-1998 2013-2021 (St. Clair Trustee) |
| 66 | 01-24.0-142-008 | Yes | 1973-1987, 1989-1993, 1996-1998 2013-2021 (St. Clair Trustee) |
| 67 | 01-24.0-142-011 | Yes | 1973-1987, 1989-1993, 1996-1998 2013-2021 (St. Clair Trustee) |
| 68 | 01-24.0-142-018 | Yes | 1973-1987, 1989-1993, 1996-1998 2008 (St. Clair Trustee), 2014-2015 (St. Clair Trustee),2021-2023 (St. Clair Trustee) |
| 69 | 01-24.0-304-003 | Yes | 1973-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 70 | 01-24.0-312-045 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 71 | 01-24.0-312-046 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 72 | 01-24.0-312-047 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 73 | 01-24.0-312-048 | Yes | 1973-1981,  1999-2006 2007-2023 (ESTL Housing Authority) |
| 74 | 01-24.0-312-057 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 75 | 01-24.0-312-058 | Yes | 1973-1981, 1999-2006  2007-2023 (ESTL Housing Authority) |
| 76 | 01-24.0-312-096 | Yes | 1973-1981 1999-2023 (ESTL Housing Authority) |
| 77 | 01-24.0-312-104 | Yes | 1973-1981, 1999-2023 |
| 78 | 01-24.0-312-112 | Yes | 1973-1981, 1999-2023 |
| 79 | 01-24.0-312-117 | Yes | 1973-1981, 1999-2023 |
| 80 | 01-24.0-312-118 | Yes | 1973-1993, 1996-1998 2014-2023 (St. Clair Trustee) |

Figure 54: Subject Properties Summary, 61-80

143

| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
|-----|-----------|-------------------------|------------------------------|
| colspan="4" | **CITY OF EAST ST. LOUIS**<br>**ESTL Parcel Ownership and Improvements**<br>**(Landmark File: 155-1-21)** | | |
| 81 | 01-24.0-312-119 | Yes | 1973-1981, 1999-2023 |
| 82 | 01-24.0-314-016 | Yes | 1973-1981, 1999-2023 |
| 83 | 01-24.0-314-032 | Yes | 1973-1981 1999-2021 (ESTL Housing Authority) |
| 84 | 01-24.0-314-034 | No | 1973-1981 1999-2021 (ESTL Housing Authority) |
| 85 | 01-24.0-314-035 | Yes | 1973-1981 1999-2023 (ESTL Housing Authority) |
| 86 | 01-24.0-315-001 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 87 | 01-24.0-315-002 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 88 | 01-24.0-315-003 | No | 1973-1985, 1989-1993, 1996-1998  2012-2023 (St. Clair Trustee) |
| 89 | 01-24.0-315-004 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 90 | 01-24.0-315-005 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 91 | 01-24.0-315-006 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 92 | 01-24.0-315-007 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 93 | 01-24.0-315-008 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2023 (St. Clair Trustee) |
| 94 | 01-24.0-315-009 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2023 (St. Clair Trustee) |
| 95 | 01-24.0-315-010 | Yes | 1973-1985, 1989-1993, 1996-1998 2019-2023 (St. Clair Trustee) |
| 96 | 01-24.0-315-012 | No | 1973-1985, 1989-1993, 1996-1998 1999-2023 (St. Clair Trustee) |
| 97 | 01-24.0-315-014 | Yes | 1973-1985, 1989-1993, 1996-1998 2004 (St. Clair Trustee), 2015-2023 (St. Clair Trustee) |
| 98 | 01-24.0-315-015 | Yes | 1973-1985, 1989-1993, 1996-1998 2004 (St. Clair Trustee), 2015-2023 (St. Clair Trustee) |
| 99 | 01-24.0-315-016 | Yes | 1973-1985, 1989-1993, 1996-1998 2005-2006 (St. Clair Trustee), 2012-2023 (St. Clair Trustee) |
| 100 | 01-24.0-315-017 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |

Figure 55: Subject Properties Summary, 81-100

144

| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
|---|---|---|---|
| | CITY OF EAST ST. LOUIS ESTL Parcel Ownership and Improvements (Landmark File: 155-1-21) | | |
| 101 | 01-24.0-315-028 | Yes | 1973-1985, 1989-1993 2012 (St. Clair Trustee),2018-2023 (St. Clair Trustee) |
| 102 | 01-24.0-316-027 | No | 1999-2023 |
| 103 | 01-24.0-317-038 | Yes | 1973-1981, 1999-2023 |
| 104 | 01-24.0-317-039 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 105 | 01-24.0-317-044 | Yes | 1973-1981, 1999-2004, 2006-2009 2005 (ESTL School District #189), 2010-2023 (ESTL School District #189) |
| 106 | 01-24.0-317-045 | Yes | 1973-1981, 1999-2004, 2006-2009 2005 (ESTL School District #189), 2010-2023 (ESTL School District #189) |
| 107 | 01-24.0-317-046 | Yes | 1973-1981, 1999-2004, 2006-2009 2005 (ESTL School District #189), 2010-2023 (ESTL School District #189) |
| 108 | 01-24.0-317-064 | Yes | 1973-1981, 1999-2023 |
| 109 | 01-24.0-317-065 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 110 | 01-24.0-317-094 | Yes | 1973-1981, 1999-2023 |
| 111 | 01-24.0-317-095 | Yes | 1973-1981 1999-2023 (ESTL Housing Authority) |
| 112 | 01-24.0-317-096 | Yes | 1973-1981, 1999-2004 2005-2023 (ESTL School District #189) |
| 113 | 01-24.0-317-102 | Yes | 1973-1981, 1999-2023 |
| 114 | 01-24.0-319-103 | Yes | 1973-1981 1999-2023 (ESTL Housing Authority) |
| 115 | 01-24.0-319-111 | Yes | 1973-1981, 1999-2006  2007-2023 (ESTL Housing Authority) |
| 116 | 01-24.0-319-112 | No | 1973-1981, 1999-2006  2007-2023 (ESTL Housing Authority) |
| 117 | 01-24.0-319-113 | No | 1973-1981, 1999-2006  2007-2023 (ESTL Housing Authority) |
| 118 | 01-24.0-319-114 | Yes | 1973-1981, 1999-2006  2007-2023 (ESTL Housing Authority) |
| 119 | 01-24.0-319-115 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 120 | 01-24.0-319-116 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |

Figure 56: Subject Properties Summary, 101-120

145

| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
|---|---|---|---|
| | **CITY OF EAST ST. LOUIS**<br>**ESTL Parcel Ownership and Improvements**<br>**(Landmark File: 155-1-21)** | | |
| 121 | 01-24.0-319-117 | Yes | 1973-1981, 1999-2006  2007-2023 (ESTL Housing Authority) |
| 122 | 01-24.0-320-010 | Yes | 1973-1981, 1999-2006 2007-2023 (ESTL Housing Authority) |
| 123 | 01-24.0-320-011 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2003 (St. Clair Trustee),2008-2021 (St. Clair Trustee) |
| 124 | 01-24.0-320-074 | Yes | 1986-1988, 1994-1995 1999-2023 (ESTL Housing Authority) |
| 125 | 01-24.0-320-086 | Yes | 1973-1981, 1999-2023 |
| 126 | 01-24.0-320-087 | Yes | 1973-1981, 1999-2023 |
| 127 | 01-24.0-320-088 | Yes | 1973-1981, 1999-2023 |
| 128 | 01-24.0-324-017 | Yes | 1973-1981, 1999-2023 |
| 129 | 01-24.0-325-007 | Yes | 1973-1981, 1999-2023 |
| 130 | 01-24.0-325-008 | Yes | 1973-1981, 1999-2023 |
| 131 | 01-24.0-332-016 | Yes | 1973-1981, 1999-2023 |
| 132 | 01-24.0-332-017 | Yes | 1973-1985, 1999-2023 |
| 133 | 01-24.0-332-018 | Yes | 1973-1981, 1999-2023 |
| 134 | 01-24.0-332-019 | Yes | 1973-1983, 1999-2023 |
| 135 | 01-24.0-332-035 | Yes | 1973-1981, 1999-2023 |
| 136 | 01-24.0-332-036 | Yes | 1973-1981, 1999-2023 |
| 137 | 01-24.0-332-037 | Yes | 1973-1981, 1999-2023 |
| 138 | 01-24.0-332-038 | Yes | 1973-1981, 1999-2023 |
| 139 | 01-24.0-332-039 | Yes | 1973-1981, 1999-2023 |
| 140 | 01-24.0-332-040 | Yes | 1973-1981, 1999-2023 |

Figure 57: Subject Properties Summary, 121-140

| | CITY OF EAST ST. LOUIS ESTL Parcel Ownership and Improvements (Landmark File: 155-1-21) | | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 141 | 01-24.0-332-044 | Yes | 1973-1981 2013- 2023 (St. Clair Trustee) |
| 142 | 01-24.0-332-045 | Yes | 1973-1981 1999-2002 (St. Clair Trustee), 2013-2023 (St. Clair Trustee) |
| 143 | 01-24.0-332-046 | Yes | 1973-1981 2013- 2023 (St. Clair Trustee) |
| 144 | 01-24.0-332-049 | Yes | 1973-1981 2013- 2023 (St. Clair Trustee) |
| 145 | 01-24.0-332-050 | Yes | 1973-1976 2013-2023 (St. Clair Trustee) |
| 146 | 01-24.0-332-051 | Yes | 1981-1985, 1989-1993, 1996-1999 2013- 2023 (St. Clair Trustee) |
| 147 | 01-24.0-333-011 | Yes | 1973-1985, 1989-1993, 1996-1998 2013-2023 (St. Clair Trustee) |
| 148 | 01-24.0-333-012 | Yes | 1973-1985, 1989-1993, 1996-1998 2013-2023 (St. Clair Trustee) |
| 149 | 01-24.0-333-013 | Yes | 1973-1985, 1989-1993, 1996-1998 |
| 150 | 01-24.0-333-014 | Yes | 1973-1985, 1989-1993, 1996-1998 |
| 151 | 01-24.0-333-015 | Yes | 1973-1985, 1989-1993, 1996-1998 2013-2023 (St. Clair Trustee) |
| 152 | 01-24.0-333-016 | Yes | 1973-1981, 1999-2023 |
| 153 | 01-24.0-333-017 | Yes | 1973-1981, 1999-2023 |
| 154 | 01-24.0-333-018 | Yes | 1973-1981, 1999-2023 |
| 155 | 01-24.0-333-019 | No | 1973-1981, 1999-2023 |
| 156 | 01-24.0-333-020 | No | 1973-1981, 1999-2023 |
| 157 | 01-24.0-333-038 | Yes | 1973-1981, 1999-2023 |
| 158 | 01-24.0-333-039 | Yes | 1973-1981, 1999-2023 |
| 159 | 01-24.0-333-040 | Yes | 1973-1981, 1999-2023 |
| 160 | 01-24.0-333-041 | Yes | 1973-1981, 1999-2023 |

Figure 58: Subject Properties Summary, 141-160

| | CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 161 | 01-24.0-333-042 | Yes | 1973-1981, 1999-2023 |
| 162 | 01-24.0-333-049 | No | 1973-1981 2013-2023 (St. Clair Trustee) |
| 163 | 01-24.0-333-055 | Yes | 1973-1983 2013- 2023 (St. Clair Trustee) |
| 164 | 01-24.0-333-056 | Yes | 1973-1983 2013- 2023 (St. Clair Trustee) |
| 165 | 01-24.0-334-017 | Yes | 1973-1981, 1999-2023 |
| 166 | 01-24.0-334-018 | Yes | 1973-1981, 1999-2023 |
| 167 | 01-24.0-334-019 | Yes | 1973-1981, 1999-2023 |
| 168 | 01-24.0-334-020 | Yes | 1973-1981,1999-2023 |
| 169 | 01-24.0-334-021 | Yes | 1973-1981, 1999-2023 |
| 170 | 01-24.0-334-022 | Yes | 1973-1981, 1999-2023 |
| 171 | 01-24.0-334-038 | Yes | 1973-1981, 1999-2023 |
| 172 | 01-24.0-334-039 | Yes | 1973-1981, 1999-2023 |
| 173 | 01-24.0-334-040 | Yes | 1973-1981, 1999-2023 |
| 174 | 01-24.0-334-041 | Yes | 1973-1981, 1999-2023 |
| 175 | 01-24.0-334-042 | Yes | 1973-1981, 1999-2023 |
| 176 | 01-24.0-334-043 | Yes | 1973-1981, 1999-2023 |
| 177 | 01-24.0-334-044 | Yes | 1973-1981, 1999-2023 |
| 178 | 01-24.0-334-052 | Yes | 1973-1981  2013-2023 (St. Clair Trustee) |
| 179 | 01-24.0-334-053 | Yes | 1973-1981, 2004-2023 |
| 180 | 01-24.0-334-058 | Yes | 1973-1985 2013-2023 (St. Clair Trustee) |

Figure 59: Subject Properties Summary, 161-180

148

| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
|---|---|---|---|
| **CITY OF EAST ST. LOUIS** <br> **ESTL Parcel Ownership and Improvements** <br> **(Landmark File: 155-1-21)** | | | |
| 181 | 01-24.0-421-010 | Yes | 1973-1985, 1987-1993, 1996-1998 2011-2021 (St. Clair Trustee) |
| 182 | 01-24.0-421-011 | Yes | 1973-1985, 1989-1993, 1996-1998 2011-2021 (St. Clair Trustee) |
| 183 | 01-24.0-421-012 | Yes | 1973-1985, 1989-1993, 1996-1998 2008-2021 (St. Clair Trustee) |
| 184 | 01-24.0-421-013 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2021 (St. Clair Trustee) |
| 185 | 01-24.0-421-023 | Yes | 1973-1985, 1989-1993 2011-2023 (St. Clair Trustee) |
| 186 | 01-24.0-421-024 | Yes | 1973-1985, 1989-1993, 1996-1998 2017-2022 (St. Clair Trustee) |
| 187 | 01-24.0-421-057 | Yes | 1973-1985, 1989-1993, 1996-1998 2020-2021 (St. Clair Trustee) |
| 188 | 01-24.0-433-001 | Yes | 1973-1981, 1999-2023 |
| 189 | 01-24.0-433-002 | Yes | 1973-1981, 1999-2023 |
| 190 | 01-24.0-433-023 | Yes | 1973-1981, 1999-2023 |
| 191 | 01-24.0-433-047 | Yes | 1973-1981 1999-2023 (ESTL Housing Authority) |
| 192 | 01-24.0-433-051 | Yes | 1973-1981 1999-2023 (ESTL Housing Authority) |
| 193 | 01-24.0-433-067 | Yes | 1973-1981 1999-2023 (ESTL Housing Authority) |
| 194 | 01-24.0-434-013 | Yes | 1973-1985, 1989-1993, 1996-1998 2014-2021 (St. Clair Trustee) |
| 195 | 01-24.0-434-014 | Yes | 1973-1985, 1989-1993, 1996-1998 2014-2021 (St. Clair Trustee) |
| 196 | 01-24.0-434-015 | Yes | 1973-1985, 1987-1998 2014-2021 (St. Clair Trustee) |
| 197 | 01-24.0-434-016 | Yes | 1973-1993, 1996-1998 2014-2021 (St. Clair Trustee) |
| 198 | 01-24.0-434-017 | Yes | 1973-1993, 1996-1998 2014-2021 (St. Clair Trustee) |
| 199 | 01-24.0-434-074 | Yes | 1973-1993, 1996-1998 2012-2021 (St. Clair Trustee) |
| 200 | 01-25.0-101-018 | No | 1973-1982, 1999-2023 |

Figure 60: Subject Properties Summary, 181-200

149

| | CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 201 | 01-25.0-101-019 | No | 1973-1982, 1999-2023 |
| 202 | 01-25.0-101-020 | No | 1973-1982, 1999-2023 |
| 203 | 01-25.0-101-021 | No | 1973-1981, 1999-2023 |
| 204 | 01-25.0-101-022 | No | 1973-1984, 1999-2023 |
| 205 | 01-25.0-101-039 | Yes | 1973-1982, 1999-2023 |
| 206 | 01-25.0-101-040 | Yes | 1973-1981, 1999-2023 |
| 207 | 01-25.0-101-041 | No | 1973-1981, 1999-2023 |
| 208 | 01-25.0-101-042 | No | 1973-1981, 1999-2023 |
| 209 | 01-25.0-101-043 | No | 1973-1984, 1999-2023 |
| 210 | 01-25.0-101-044 | No | 1973-1984, 1999-2023 |
| 211 | 01-25.0-101-045 | No | 1973-1984, 1999-2023 |
| 212 | 01-25.0-101-047 | Yes | 1973-1982, 1999-2023 |
| 213 | 01-25.0-101-048 | Yes | 1973-1982 2013- 2023 (St. Clair Trustee) |
| 214 | 01-25.0-101-049 | Yes | 1973-1981 2013- 2023 (St. Clair Trustee) |
| 215 | 01-25.0-102-011 | Yes | 1973-1981, 1999-2023 |
| 216 | 01-25.0-102-016 | No | 1973-1981, 1999-2023 |
| 217 | 01-25.0-102-017 | Yes | 1973-1981, 1999-2023 |
| 218 | 01-25.0-102-018 | Yes | 1973-1981, 1999-2023 |
| 219 | 01-25.0-102-019 | Yes | 1973-1981, 1999-2023 |
| 220 | 01-25.0-102-031 | Yes | 1973-1981, 1999-2023 |

Figure 61: Subject Properties Summary, 201-220

150

| | CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 221 | 01-25.0-103-016 | No | 1973-1981, 1999-2023 |
| 222 | 01-25.0-103-017 | No | 1973-1981, 1999-2023 |
| 223 | 01-25.0-103-018 | No | 1973-1981, 1999-2023 |
| 224 | 01-25.0-103-019 | Yes | 1973-1981, 1999-2023 |
| 225 | 01-25.0-103-021 | Yes | 1973-1981, 1999-2023 |
| 226 | 01-25.0-103-022 | Yes | 1973-1981, 1999-2023 |
| 227 | 01-25.0-103-027 | No | 1973-1981, 1999-2023 |
| 228 | 01-25.0-103-028 | No | 1973-1981, 1999-2023 |
| 229 | 01-25.0-103-029 | Yes | 1973-1981, 1999-2023 |
| 230 | 01-25.0-103-030 | Yes | 1973-1981, 1999-2023 |
| 231 | 01-25.0-103-031 | Yes | 1973-1987, 1999-2023 |
| 232 | 01-25.0-103-032 | Yes | 1973-1981, 1999-2023 |
| 233 | 01-25.0-103-033 | Yes | 1973-1985, 1999-2023 |
| 234 | 01-25.0-103-034 | Yes | 1973-1981, 1999-2023 |
| 235 | 01-25.0-103-035 | Yes | 1973-1981, 1999-2023 |
| 236 | 01-25.0-103-036 | Yes | 1973-1981, 1999-2023 |
| 237 | 01-25.0-103-037 | No | 1973-1981, 1999-2023 |
| 238 | 01-25.0-103-038 | No | 1973-1981, 1999-2023 |
| 239 | 01-25.0-103-039 | Yes | 1973-1981, 1999-2023 |
| 240 | 01-25.0-103-040 | Yes | 1973-1981, 1999-2023 |

Figure 62: Subject Properties Summary, 221-240

| | | CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 241 | 01-25.0-103-041 | Yes | 1973-1987, 1999-2023 |
| 242 | 01-25.0-103-042 | No | 1973-1981 1999-2023 (ESTL Township) |
| 243 | 01-25.0-103-043 | No | 1973-1981 1999-2023 (ESTL Township) |
| 244 | 01-25.0-106-001 | No | 1973-1988, 1999-2023 |
| 245 | 01-25.0-106-002 | No | 1973-1981, 1999-2023 |
| 246 | 01-25.0-106-003 | No | 1973-1988, 1999-2023 |
| 247 | 01-25.0-106-004 | No | 1973-1988, 1999-2023 |
| 248 | 01-25.0-106-009 | Yes | 1973-1985, 1989-1993, 1996-1998 2016-2023 (St. Clair Trustee) |
| 249 | 01-25.0-106-010 | Yes | 1973-1985, 1987-1993, 1996-1998 2016-2023 (St. Clair Trustee) |
| 250 | 01-25.0-106-011 | Yes | 1973-1993, 1996-1998 2014-2023 (St. Clair Trustee) |
| 251 | 01-25.0-106-012 | Yes | 1973-1985, 1989-1993, 1996-1998 2014-2023 (St. Clair Trustee) |
| 252 | 01-25.0-106-019 | Yes | 1973-1993, 1996-2023 |
| 253 | 01-25.0-106-021 | Yes | 1973-1988, 1999-2023 |
| 254 | 01-25.0-106-030 | Yes | 1973-1993, 1996-2002 2010-2023 (St. Clair Trustee) |
| 255 | 01-25.0-110-001 | Yes | 1973-1985, 1989-1993, 1996-1998  2013- 2023 (St. Clair Trustee) |
| 256 | 01-25.0-110-005 | Yes | 1973-1993, 1996-1998  2013-2021 (St. Clair Trustee) |
| 257 | 01-25.0-110-008 | Yes | 1973-1985, 1989-1993, 1996-1998  2015-2023 (St. Clair Trustee) |
| 258 | 01-25.0-110-029 | Yes | 1973-1985, 1989-1993, 1996-1998 2013-2021 (St. Clair Trustee) |
| 259 | 01-25.0-110-031 | Yes | 1973-1993, 1996-1998 2015-2021 (St. Clair Trustee) |
| 260 | 01-25.0-116-005 | Yes | 1973-1982, 1999-2023 |

Figure 63: Subject Properties Summary, 241-260

152

| | | CITY OF EAST ST. LOUIS<br>ESTL Parcel Ownership and Improvements<br>(Landmark File: 155-1-21) | |
|---|---|---|---|
| No. | Parcel ID | Historical Improvements | Years Owned by Public Entity |
| 261 | 01-25.0-200-005 | Yes | 1973-1985, 1989-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 262 | 01-25.0-200-008 | Yes | 1973-1993, 1996-1998 2012-2023 (St. Clair Trustee) |
| 263 | 01-25.0-200-028 | Yes | 1973-1993, 1996-1998 2008-2023 (St. Clair Trustee) |
| 264 | 01-25.0-201-059 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2003 (St. Clair Trustee), 2008-2023 (St. Clair Trustee) |
| 265 | 01-25.0-201-060 | Yes | 1973-1985, 1989-1993, 1996-1998 1999-2003 (St. Clair Trustee),2008-2023 (St. Clair Trustee) |
| 266 | 01-25.0-201-061 | No | 1973-1985, 1989-1993, 1996-1998 1999-2003 (St. Clair Trustee),2008-2023 (St. Clair Trustee) |
| 267 | 01-25.0-202-001 | Yes | 1973-1985, 1989-1993, 1996-1998 2010-2021 (St. Clair Trustee) |
| 268 | 01-25.0-202-002 | Yes | 1973-1985, 1989-1993, 1996-1998 2010-2021 (St. Clair Trustee) |
| 269 | 01-25.0-202-005 | Yes | 1973-1985, 1989-1993, 1996-1998 2013-2021 (St. Clair Trustee) |
| 270 | 01-25.0-202-009 | No | 1973-1985, 1989-1993, 1996-1998 2013-2022 (St. Clair Trustee) |
| 271 | 01-25.0-202-010 | No | 1973-1985, 1989-1993, 1996-1998 2013-2022 (St. Clair Trustee) |
| 272 | 01-25.0-202-011 | No | 1973-1985, 1989-1993, 1996-1998 2013-2022 (St. Clair Trustee) |
| 273 | 01-25.0-202-030 | Yes | 1973-1993, 1995-2000 2011-2021 (St. Clair Trustee) |

Figure 64: Subject Properties Summary, 261-273

153

**Subject Properties Descriptive Data**

<u>Regional Overview</u>

The subject properties are located within St. Clair County, Illinois. They are in a residential neighborhood that was once vibrant and expanding, close to downtown St. Louis, one of the largest regional economies in the United States. The 15-county bi-state area comprises 2.8 million residents, 1.5 million workers and 88,000 business establishments. Greater St. Louis has a vast and talented workforce of 1.5 million people. And each year, they welcome about 50,000 people relocating into the region, a major source of new workforce talent for employers. Currently, in the midst of an entrepreneurial renaissance, Greater St. Louis forms more than 6,000 new businesses annually — a number that employs more than 50,000. Greater St. Louis has a Cost of Doing Business index of 93 percent of the U.S. metro average, a key advantage for a large metro area. The region's affordability and income levels offer the seventh-highest standard of living among the 53 largest U.S. metro areas.[119] Yet, the subject properties and their neighborhood have suffered abandonment, decay, and demolition.



Figure 65: Regional Map[120]

---

[119] Greater St. Louis Inc., "Regional Overview," accessed January 24, 2024, https://greaterstlinc.com/region/regional-overview#:~:text=By%20the%20Numbers-,Greater%20St.,workers%20and%2088%2C000%20business%20establishments.
[120] Greater St. Louis Inc., "Regional Overview," accessed January 24, 2024, https://greaterstlinc.com/region/regional-overview#:~:text=By%20the%20Numbers-,Greater%20St.,workers%20and%2088%2C000%20business%20establishments.

154



Figure 66: Subject Area Map

155

<u>Location</u>

The general geographic area of the subject properties is approximately represented by the following map.



Figure 67: Location Map

156

<u>Access</u>

Access to the subject properties includes numerous public streets.

<u>Street Improvements</u>

The streets are generally asphalt paved with concrete curbs and sidewalks. Many of the streets serving the subject properties also offer streetlights. In aggregate, the subject properties appear to be adequately served by the street improvements noted in the area.

<u>Physical Address</u>

Addresses are set forth in the work file.

<u>Zoning and Land Use</u>

Zoning can be described as a land use regulation imposed by local governments to assist in strategic planning. Zoning also allows for the future or anticipated growth of the municipality and promotes homogeneous land uses within a defined area. The following map describes the subject property zoning.

157



Figure 68: Zoning Map

Topography

The subject property geographic area is generally level.

Drainage

No drainage studies were provided. There are no known adverse drainage issues.

Soil and Subsoil

Soil studies were provided indicating the presence of PCBs.

Earthquake Subject Properties

No earthquake studies were provided. There are no known adverse earthquake issues.

Flood Zone

No flood studies were provided. There are no known adverse flood issues.

Easements and Encumbrances

No title reports were provided. There are no known adverse easement issues.

Site Improvements

Typically, subject properties are vacant lots.

Parking

Typical street parking.

Utilities

The subject properties generally have typical utilities to the lots.

Site Size

Information relating to the subject properties site size is retained in the work file.

Site Dimensions and Overall Shape

The subject properties are generally rectangular or irregular in shape.

159

Environmental Hazards

PCBs are present at the subject properties.

Off-site Influences

The former Monsanto plant is located in proximity to the subject properties.

Improvement Description

Improvement descriptions are based on public records, MLS when available, and observations made during field inspections. Specific improvement information is set forth in the work file.

Property Types

The subject properties are currently vacant residential lots; however, they were previously improved residential properties.

160

**Highest and Best Use**

Highest and best use is the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value.[121] The four criteria the highest and best use must meet are:

- Legally permissible;
- Physically possible;
- Financially feasible; and
- Maximally productive.

The four criteria of highest and best use were analyzed in the "unimpaired" and "impaired" condition. As there were similar observations in highest and best use between the "unimpaired" and "impaired" conditions, they were summarized collectively, with any differences noted.

As Vacant

Legally Permissible: The legally permissible use of the subject property sites are generally residential in nature. The subject property sites are consistent with others in the area. Therefore, the legal use that the sites would accommodate is residential use.

Physically Possible: The sites are generally sloping and level and at street grade and are primarily rectangular in shape, with some that are irregular. The subject property sites are served by residential feeder, secondary, and arterial streets. The sites allow for an array of physically possible uses.

Financially Feasible: Similar sites in the surrounding neighborhood area are generally developed as residential single-family properties, indicating that development as such is financially feasible. However, in the impaired condition, the presence of PCBs and the cost of remediation can impact the financial feasibility of development.

Maximally Productive: In consideration of the physical, legal and financial factors discussed, the maximally productive use of the subject property sites is for single-family residential development. However, the presence of PCBs can impact the feasibility of such development and in the impaired condition holding for possible future development after remediation would be maximally productive. The most probable buyer would be a developer.

As Improved

Currently, the subject properties are mostly vacant land; however, some are improved as single-family residences, which is a use that is physically possible, legally permissible, financially feasible, and maximally productive, but for the PCBs. The highest and best use of the subject properties, as improved, is for continued use as a single-family residence; however, similar to the

---

[121] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 306.

analysis as vacant, PCBs impact the use of the subject properties. The timing of the use would be current, and the most likely buyer would be owner-user or investor.

**Real Estate Market Trends**

The division of Economic Research at the Federal Reserve Bank of St. Louis (FRED) is responsible for expanding economic knowledge by producing research in many fields, including applied microeconomics, macroeconomics, and money/banking.[122] The Federal Reserve Bank of St. Louis is a leading, respected resource for economic and financial information.[123] The FRED publishes a house price index in numerous markets across the country, including those markets relevant to this study. While real estate valuation professionals may consider trending prices in a neighborhood(s), using the FRED index is an appropriate approach.[124]



Figure 69: Market Trends Data

In addition to the FRED Housing Index, the United States Consumer Price Index (CPI) was also analyzed. CPI is a measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services.[125] In the real estate profession, CPI is used to measure changes in costs, such as building costs, and can be used as a barometer

---

[122] "About Economic Research at the St. Louis Fed," Economic Research at the Federal Reserve Bank of St. Louis, accessed December 17, 2019, https://research.stlouisfed.org/about.html.
[123] Dan L. Swango, "Economic Research Resources," *The Appraisal Journal* (Spring 2017): 148.
[124] Michael Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 120.
[125] US Bureau of Labor Statistics, "Consumer Price Index," accessed April 23, 2021, https://www.bls.gov/cpi/.

for determining changes in lease rates.[126] In this report, CPI data for "All Items in U.S. City Average, All Urban Consumers, Not Seasonally Adjusted" was collected. The average annual growth rate since 1973 was approximately 4.0%.



Figure 70: Consumer Price Index

---

[126] The Appraisal Institute, *The Appraisal of Real Estate*, 15th Edition (Chicago, IL: Appraisal Institute, 2020), 485.

**Literature Review: Use Effects**

| No | Source Article Title Author (Year) | Citations | Findings |
|---|---|---|---|
| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
| 1 | Advisory Opinion 9<br><br>The Appraisal Foundation | "Use effects reflect impacts on the utility of the site as a result of the contamination. If the contamination and/or its cleanup rendered a portion of the site unusable, or limited the future highest and best use of the property, then there could be a use effect on value." | None Noted |
| 2 | The Appraisal Journal<br><br>Environmental Dead Zones: The Evaluation of Contaminated Properties<br><br>Tachovsky (2021) | "market rent x time = use effect."<br><br>"In some instances, a use effect may be temporary, such as an evacuation, and others may be ongoing, such as a change in use." | Market Rent x Time = Use Effect |
| 3 | The Appraisal Journal<br><br>The Appraisal Docket<br><br>Wilson, Hamilton (1944) | "The use condemned was for a period of one year out of an unexpired lease of approximately six years. Subsequently, an amendment in the petition for the condemnation was filed which changed the one year period to a term expiring June 30, 1943, renewable for additional yearly periods thereafter during the existing national emergency at the election of the Secretary of War. The case was tried by a jury and the government proceeded on the theory that compensation for the use taken was limited to the fair market rental value of the floor space condemned. The trial court accepted this theory and submitted the case to the jury on this basis." | Time x Fair Market Rental Value of Condemned Space = Compensation |

Figure 71: Literature Review - Use Effect Articles 1-3

165

| | CITY OF EAST ST. LOUIS<br>Literature Review - Use Effect<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|
| **No** | **Source<br>Article Title<br>Author (Year)** | **Citations** | **Findings** |
| 4 | The Appraisal Journal<br><br>The Appraisal Docket<br><br>Wilson, Butler, Hamilton (1951) | "In the condemnation suit the Government secured from the landowner at the time an agreement stipulating the fair rental value of the leasehold estate, and by which the landowner agreed to accept said sum in full and complete satisfaction for the land for said period, and in consideration of the sum so paid, released the United States for any and all claims for damages." | Fair Rental Value x Said Period of Time = Claims for Damages |
| 5 | The Appraisal Journal<br><br>Appraisal Techniques in Restoration Claims<br><br>Kamlet (1966) | "In addition to the diminution value, a sum should be allowed for the diminished use or loss of use of the property, whichever may be the case, as part of just compensation for the time required to restore the property. This sum should be measured by the value of the use of the land while in its injured conditioned its decreased rental value." | Loss of Use is in Addition to Diminution |
| 6 | The Appraisal Journal<br><br>The Appraisal Docket: Cases, decisions, and other legal matters involving rulings and precedents affecting real property and valuation<br><br>Theiss (1967) | "The taking should be considered as to the reduction, if any, of the value of the lease because of the loss of use for the remaining years of the lease of the part taken." | None Noted |

Figure 72: Literature Review - Use Effect Articles 4-6

166

| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
|---|---|---|---|
| **No** | **Source**<br>**Article Title**<br>**Author (Year)** | **Citations** | **Findings** |
| 7 | The Appraisal Journal<br><br>Apportionment of Award Between Lessor and Lessee<br><br>Sackman (1970) | "The proper measure of damages for the taking of a temporary easement is the decrease in the rental value of the premises subject to the easement during the term of the temporary easement (sometimes referred to as the 'rental value' of the easement) plus consequential damages, if there be any."<br><br>"In partial taking cases in New York in which the remainder area is *not rendered uninhabitable* the lessee is entitled to an abatement in the amount of the rent proportionate to the partial loss of use." | (Decrease in Rental Value of the Premises (Rental Value of the Easement) x Time of the TCE) + Any Consequential Damages = Damage |
| 8 | The Appraisal Journal<br><br>Valuation of Pipeline Servitudes<br><br>Angers (1972) | "The fairest way for the appraiser to estimate the value of a temporary work space is to base his estimate on the fair rental value of the property required." | Fair Rental Value of the Property |
| 9 | Compensation through Relocation Assistance<br><br>Cordes (1979) | "In general, the size of the loss will depend on: (1) the length of time it is sustained, and (2) on the size of the loss per period of time. If the size of the loss is consistent over time, one need only estimate the initial magnitude and duration of loss. If, however, the size of the loss changes over time, it would also be necessary to determine the way in which the loss adjusts over time."<br><br>"Cash assistance available to both urban renewal and highway displaces under the uniform relocation assistance act".<br><br>"Under all alternative assumptions, relocation assistance payments provided adequate or more than adequate compensation for these losses." | None Noted |

Figure 73: Literature Review - Use Effect Articles 7-9

167

| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
|---|---|---|---|
| **No** | **Source**<br>**Article Title**<br>**Author (Year)** | **Citations** | **Findings** |
| 10 | The Appraisal Journal<br><br>Condemnation Interest<br><br>Brown (1985) | "Nor did the Commission err by compounding the 6.635 average rate of interest to arrive at the figure of 7.4% simple interest per annum. Compounding of interest is appropriate to compensate the landowners for the loss of use of the interest that the deficiency award would have been producing for them during the interim. | Compounding Interest can be Considered for Loss of Use |
| 11 | Contaminated Property Valuation Solutions<br><br>Rinaldi (1991) | "All cleanup requirements result in costs that fall into three categories: cost to cure, deferred utility; and excess operating expenses." | None Noted |
| 12 | The Appraisal Journal<br><br>LAW AND THE APPRAISER: When Eminent Domain "Working Rules" Don't Work<br><br>Dushoff, Henslee (1991) | "The government argued that because the lease contained no right of renewal, Almota was entitled to compensation only for the loss of use of the improvements for the remaining seven years of the lease. The government argued that the court and the appraisers should close their eyes to the marketable probability that Almota's lease would be renewed." | None Noted |

Figure 74: Literature Review - Use Effect Articles 10-12

| | | CITY OF EAST ST. LOUIS<br>Literature Review - Use Effect<br>(Landmark File: 155-1-21) | |
|---|---|---|---|
| **No** | **Source<br>Article Title<br>Author (Year)** | **Citations** | **Findings** |
| 13 | Eight Approaches to the Valuation of Temporary Easements<br><br>Pattison (1992) | "Full 100 Percent Value: This method would pay Farmer Bill the 100 percent fee simple value for his two acres."<br>"Rate of Return of Land: This method is based on the market value of the property and what the property would bring as an investment."<br>"Capitalized Rent Loss: The rental for the property at $600 per year would be capitalized at the going rate for approximately two years."<br>"Percentage of Fee Value: Some companies in parts of the United States pay a percentage, anywhere from 10 to 15 percent, of fee value for temporary easements."<br>"Lump Sum: Certain utilities pay a lump sum for temporary easements, usually on a per year basis."<br>"No Payment: There are certain government amenities that have a philosophy that they are for the good of the people, and they do not feel it is necessary to pay for a temporary easement."<br>"Special Benefits: Under some circumstances, the federal government and some agencies require the property owner to actually pay back an amount." | 1) Full 100 percent value<br>2) Rate of return on land<br>3) Normal rent<br>4) Capitalized rent loss<br>5) Percentage of fee value<br>6) Lump sum<br>7) No payment<br>8) Special benefit |
| 14 | Issues in the Valuation of Contaminated Property<br><br>Chalmers and Roehr (1993) | "Additional insight is provided by Richard Neustein in 'Estimating Value Diminution by the Income Approach,' who shows how the income impairment of contaminated property and the risk premium necessary to attract capital to it combine to determine the value discount of a contaminated property relative to an uncontaminated property. | Consequences of contamination<br>=<br>Direct Costs<br>(Loss of Income, Remediation, and Indemnification)<br>&<br>Stigma |

Figure 75: Literature Review - Use Effect Articles 13-14

169

| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
|---|---|---|---|
| **No** | **Source**<br>**Article Title**<br>**Author (Year)** | **Citations** | **Findings** |
| 15 | The Appraisal Journal<br><br>Eminent Domain<br><br>Patel (1995) | "In a temporary, or working, easement the claimant is only entitled to recover the rental value for the subject property, from the date of actual entry until the filing of the termination certificate." | Rental Value for the Subject Property x Time (Date of Actual Entry Until the Filing of the Termination Certificate) = Entitled Recovery |
| 16 | The Appraisal Journal<br><br>Post-Repair Diminution in Value from Geotechnical Problems<br><br>Sanders (1996) | "Restrictions on future use, increased expenses of operation, compensation for loss of use, and lost profits may also be legitimate issues affecting property value, particularly in cases involving litigation." | None Noted |
| 17 | Temporary Stigma: Lessons from Exxon Valdez Litigation<br><br>Roddewig (1997) | "Both sides attempted to quantify the damages to real estate by determining an imputed economic loss. They disagreed on the characterization of this loss as lost rent or payment for a license to use the land during the oiling and subsequent cleanup." | None Noted |
| 18 | Right of Way<br><br>Valuing a Gas Pipeline Easement<br><br>Lang, Smith (1998) | "We have generally treated compensation for them as a rent on the land during the period of construction only, and not as a percent of fee value for the land affected. We believe this is a more accurate method of compensation since the land is only temporarily affected." | Rent of the Land x Period of Construction = Compensation |

Figure 76: Literature Review - Use Effect Articles 15-18

170

| | CITY OF EAST ST. LOUIS<br>Literature Review - Use Effect<br>(Landmark File: 155-1-21) | | |
|---|---|---|---|
| **No** | **Source<br>Article Title<br>Author (Year)** | **Citations** | **Findings** |
| 19 | Estimating Economic Damages to Real Property Due to Loss of Marketability, Rentability and Stigma<br><br>Mitchell (2000) | "*direct damages*, is relatively easily measured by the cost to cure, remedy or remediate the physical damage or situation. The second damage category is that of *indirect damages*, which has sometimes been referred to as *stigma damages*. Indirect damages relate to the increased risk of further economic loss associated with the contamination or other impairment or defect, and the effects of this risk on marketability, rentability, mortgageability, insurability, income, and value of the property after cleanup and approval issued by the appropriate authority." | Loss of marketability and loss in rentability or projected future rents |
| 20 | The Appraisal Journal<br><br>Beyond Ordinary Wear and Tear: The Government's Liability for Building Maintenance in a Temporary Taking<br><br>Black (2001) | "During proceedings to determine just compensation due to the owners of the laundry business, the trial court ordered the government to pay the fair market rental value of the property. In addition, the government was ordered to pay compensation for damage to the plant and machinery beyond ordinary wear and tear incurred during the government's use of the facility." | Fair Market Rental Value x Time = Just Compensation |
| 21 | The Appraisal Journal<br><br>Recent Court Decisions on Real Estate and Valuation<br><br>Blair (2019) | "The court held that, generally, the measure of the damages for a temporary taking is the rental value of the land actually occupied by the condemnor." | Rental Value of the Land Actually Occupied by the Condemnor |

Figure 77: Literature Review - Use Effect Articles 19-21

171

| | | CITY OF EAST ST. LOUIS<br>Literature Review - Use Effect<br>(Landmark File: 155-1-21) | |
|---|---|---|---|
| **No** | **Source<br>Article Title<br>Author (Year)** | **Citations** | **Findings** |
| 22 | The Appraisal Journal<br><br>Environmental Contamination: An Analysis in the Context of the DC Matrix<br><br>Anderson (2001) | "Restrictions on use, increased operating expenses, and business interruption may be legitimate compensation issues for loss of use during this stage." | None Noted |
| 23 | An International Perspective on Incorporating Risk in the Valuation of Contaminated Land<br><br>Bond, Kinnard, Kennedy and Worzala (2001) | "Patchin identified the causes of market-value loss experienced by contaminated properties as falling under three broad categories: 1. Cost of cleanup [sic] 2. Liability to the public 3. Stigma after cleanup." | Estimate unimpaired market value, then deduct the following:<br>1) Present worth of the estimated cost to remediate<br>2) Present worth of reduced revenues (occupancy, rent)<br>3) Present worth of increased operating expenses (insurance premiums, interest on debts, cost after remediation)<br>4) Present worth of holding costs (insurance, taxes, repairs, maintenance) |

Figure 78: Literature Review - Use Effect Articles 22-23

172

| No | Source Article Title Author (Year) | Citations | Findings |
|---|---|---|---|
| | **CITY OF EAST ST. LOUIS** **Literature Review - Use Effect** **(Landmark File: 155-1-21)** | | |
| 24 | The Appraisal Journal Watersbend: Appraising a Brownfield Redevelopment Project Robinson, Lucas, Rasberry (2002) | "These conditions could cause loss of use and legal expenses for defense of any third party lawsuits stemming from residual contamination at the property; however, this policy does not cover loss in market value." | None Noted |
| 25 | Litigating Mold Claims: Crisis? What Crisis? Johansen (2004) | "For construction defect mold cases, damages can include repair costs, loss of market value, remediation, damage and degradation of building products, additional living expenses, and relocation costs." | None Noted |
| 26 | Valuation Insights & Perspectives Mold: What Appraisers Should Know Sanders (2005) | "Identification and assessment of a mold problem and estimates relative to remediation and/or restoration costs are clearly outside the expertise of most appraisers, although loss-of-use claims may necessitate estimates of fair rental value or the value of comparable housing for a specified period of time." | Loss of Use = Fair Market Rent x Period of Time |

Figure 79: Literature Review - Use Effect Articles 24-26

173

| CITY OF EAST ST. LOUIS<br>Literature Review - Use Effect<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|
| **No** | **Source<br>Article Title<br>Author (Year)** | **Citations** | **Findings** |
| 27 | The Appraisal Journal<br><br>Valuing First Nation Land Claims and Other Historical Damages<br><br>Hosios, Smith (2006) | "The discussion also develops a procedure for estimating the loss of use value associated with an inappropriate taking of land. The loss of use value, lost actual and/or imputed rent, can be estimated using information on the total real rate of return for real estate and/or land. Since the total return decomposes into the net rental return and the rate of asset price appreciation, the net rental return can be estimated as the total return minus the rate of asset price appreciation." | None Noted |
| 28 | Compensation and Relocation Assistance for New Jersey Residents Displaced by Redevelopment: Reform Recommendations of the State Department of the Public Advocate<br><br>Chen, Weeks, and Weiss (2009) | "The state and federal constitutions require the government to pay a displaced property owner "just compensation. The usual measure of just compensation for a homeowner is the "fair market value" of the property taken, based on a professional appraisal."<br><br>"when a municipality uses the power of eminent domain to take a property in a blighted area, the owner is entitled to "no less than the value of his land on the date of the [blight] declaration."<br><br>"The Legislature should amend the law to provide that, when the government displaces a homeowner for redevelopment, the municipality must pay compensation sufficient to enable the owner to purchase a comparable replacement home in the same community." | None Noted |

Figure 80: Literature Review - Use Effect Articles 27-28

| CITY OF EAST ST. LOUIS<br>Literature Review - Use Effect<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|
| No | Source<br>Article Title<br>Author (Year) | Citations | Findings |
| 29 | Determining When a Dwelling is Decent, Safe and Sanitary<br><br>IRWA (2011) | "The requirement to purchase and occupy decent, safe and sanitary replacement housing is a protection provided to the displace under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended. Your relocation agent will fully inform you of these minimum requirements and what you must do in order to claim your relocation payment." | None Noted |
| 30 | The Appraisal Journal<br><br>Project Delay Economics<br><br>Bell (2011) | "In a delay case where an improved property cannot be conventionally occupied, a common valuation methodology would be to use the lease or rental rate of the property as a proxy for determining the damages caused by the loss of use"<br><br>"In other words, the damages would be equivalent to the cost of renting a comparable, substitute property. In this example, the repairs will take 7 months and the rental rate of the property is $2,600 per month, thus the use damages would be computed as follows: 7 months x $2,6000/month = $18,200."<br><br>"In a delay case where an improved property cannot be conventionally occupied, a common valuation methodology would be to use the lease or rental rate of the property as a proxy for determining the damages caused by the loss of use." | Market Value x Lease Rate x Delay Time = Project Delay Impact<br><br>Lease or Rental Rate x Time = Damages |

Figure 81: Literature Review - Use Effect Articles 29-30

| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
|---|---|---|---|
| **No** | **Source**<br>**Article Title**<br>**Author (Year)** | **Citations** | **Findings** |
| 31 | Radioactive Contamination of Nuclear Weapons Test Site<br><br>Bell (2012) | "Comparable land transactions in the Marshall Islands were extensively researched to estimate a loss in use value for the subject property. A review was made of historic appraisal and consulting reports, legal decisions, land use agreements, and land settlement agreements. Historic memoranda and meeting notes were reviewed, as were Nuclear Claims Tribunal, Foreign Claims Settlements, Trust Territory, and other documents. Interviews were conducted with attorneys, property owners, and other knowledgeable market participants. Further, the research included a detailed review of all documents recorded at the Majuro Courthouse and the Attorney General's Office of the Government of the Marshall Islands." | Comparable Market Lease Rates x Acres x Period of Time = Loss of Use |
| 32 | What to Do With Last-Minute Displaces<br><br>Root (2014) | "In situations where the owner is concerned the tenants will move and there will be loss of rental income, the Agency may offer to make a payment to replace lost rent for vacancies occurring due to relocation for a reasonable period of time." | None Noted |

Figure 82: Literature Review - Use Effect Articles 31-32

| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
|---|---|---|---|
| **No** | **Source**<br>**Article Title**<br>**Author (Year)** | **Citations** | **Findings** |
| 33 | Your Rights and Benefits as a Displace Under the Uniform Relocation Assistance Program (Residential)<br><br>California Department of Transportation (2014) | "Displaced Person or Displace: Any person who moves from real property or moves personal property from real property as a result of the acquisition of the real property, in whole or in part, or as the result of a written notice from the agency to vacate the real property needed for a transportation project. In the case of a partial acquisition, Caltrans shall determine if a person is displaced as a direct result of the acquisition."<br><br>"If you qualify as a displaced person, you are entitled to reimbursement of your moving costs and certain related expenses incurred in moving." | None Noted |
| 34 | The Appraisal Journal<br><br>Shifting the Date of Value for Public Agency Acquisition Appraisal Assignments<br><br>Kuhn, Duran-Brown (2014) | "Instead, in assessing damages, the landowner is entitled only to those losses caused by the agency's actions, which are typically measured by the loss of use or diminution in the market value of the property. The landowner is not entitled to any decline in market value that is caused by general conditions unrelated to the activities of the condemning agency."<br><br>"The court found that the government unreasonably delayed condemnation, and held that loss of use damages were recoverable." | None Noted |

Figure 83: Literature Review - Use Effect Articles 33-34

| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
|---|---|---|---|
| **No** | **Source**<br>**Article Title**<br>**Author (Year)** | **Citations** | **Findings** |
| 35 | Replacement Housing<br><br>Barnes (2017) | "The Agency is not required to provide persons owning only a fractional interest in the displacement dwelling a greater level of assistance to purchase a replacement dwelling than the Agency would be required to provide such persons if they owned fee simple title to the displacement dwelling. This indicates that the calculation and assistance for a partial interest owner should be the same as that for a full owner."<br><br>"If such assistance is not sufficient to buy a replacement dwelling, the Agency may provide additional purchase assistance or rental assistance."<br><br>"Also, a partial owner-occupant who cannot afford to purchase comparable replacement housing may be relocated as a tenant and provided a rental assistance payment in accordance with §24.402." | None Noted |
| 36 | The Appraisal Journal<br><br>Recent Court Decisions on Real Estate and Valuation<br><br>Mueller (2017) | "IEPC's appraiser added that he calculated the damage to the respective properties within the temporary easement by using a "cash rental rate of $400 an acre for the contribution of the use of the land for a two-year period." | Rental Rate x Time = Damage |
| 37 | Valuation<br><br>The Art of Easements<br><br>Kuhn (2017) | "Many public agencies view temporary acquisitions as inconsequential, and if they budget for them at all, it's typically for the short-term rental value of the property." | Short Term Rental Value of the Property |

Figure 84: Literature Review - Use Effect Articles 35-37

| | **CITY OF EAST ST. LOUIS**<br>**Literature Review - Use Effect**<br>**(Landmark File: 155-1-21)** | | |
|---|---|---|---|
| **No** | **Source**<br>**Article Title**<br>**Author (Year)** | **Citations** | **Findings** |
| 38 | Perceptions of the Radiation Disaster from H-bomb Testing: Subsistence Economy, Knowledge and Network among the People of Rongelap in the Marshall Islands<br><br>Nakahara (2018) | "This paper shows that ecosystem changes from H-bomb radiation have deprived traditional forms of knowledge about the natural environment of their usefulness; this is not to be confused with a loss of explicit knowledge, but it does mean the loss of knowledge as a cultural heritage." | None Noted |
| 39 | Valuing Historical Claims of Loss of Use of Land with Sparse Data<br><br>Lazar and Prisman (2018) | "They need to establish an annual lease rate. They need to agree on the duration of a lease; this in turn, affects the lease rate. They need to determine the annual price of the land in question, for the lease rates are applied to the price of land to estimate the annual losses. Finally, they have to choose the appropriate rates of interest to bring forward the estimates of the annual losses to the time of trial."<br><br>"Evaluating the loss of use in dollars at the time of the taking, as explained in the introduction, requires only the price of the asset at that time and the rental rate, but not the price trajectory." | Annual Lease Rate x Duration of Lease = Loss of Use |
| 40 | Environmental Cleanup Actions, the Valuation of Contaminated Properties, and Just Compensation for Affected Property Owners<br><br>Downey (2018) | "The court held that if a 'temporary' regulatory taking denies a landowner all use of his property, the landowner must be compensated for the period during which the taking was effective."<br><br>"The initial inquiry, however, is the fair market value on the date of acquisition, which equates to the reasonable price that a willing seller would demand and a willing buyer would pay for the property." | None Noted |

Figure 85: Literature Review - Use Effect Articles 38-40

**Ground Lease Data**



Figure 86: Ground Lease Chart

| No. | Source | Location | Site Size (SqFt) (acres) | Lease Start Date | Term (Years) | Annual Rent Amount | Annual Rent $/SqFt | Rate (Low) | Rate (High) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **GROUND LEASE DATA** | | | | |
| 1 | Washington Bl 1/2 Mi W of Whittier Bl | Whittier, CA | Unk | 1974 | 55 | N/A | N/A | 7.0% | 7.0% | Land value is reappraised every 5 years. Lease expires in 2029. |
| 2 | NEC 6th St & Hill St | Los Angeles, CA | 48,444 SqFt 1.11 acres | 1978 | 75 | $100,000 | $2.06 | 10.0% | 10.0% | Rent = 10% of land value, plus "participation" in lessee's income. |
| 3 | 441-447 S Hill St | Los Angeles, CA | 15,800 SqFt 0.36 acres | 1981 | 99 | $200,000 | $12.66 | 10.0% | 10.0% | Rent = 10% of land value. CPI bump each 3 years, <10% per year. |
| 4 | S of 730 S Hope St | Los Angeles, CA | 8,000 SqFt 0.18 acres | 1984 | 45 | $135,000 | $16.88 | 10.0% | 10.0% | Land value was reduced by 25%, because landlord retained half of the site's 6:1 FAR. 2 @ 15 Yr options. |
| 5 | NWC Colorado & Roosevelt | Pasadena, CA | 76,200 SqFt 1.75 acres | 1986 | 35 | $259,080 | $3.40 | 10.0% | 10.0% | Rent = 10% of land value, reduced during construction & lease-up. CPI bump each 5 years. |
| 6 | Surrounding Intermodal Way | Carson, CA | 1,171,767 SqFt 26.90 acres | 1987 | N/A | N/A | N/A | 10.0% | 10.0% | Rent = 10% of land value. |
| 7 | NEC 98th St & Vicksburg Av | Los Angeles, CA | 28,723 SqFt 0.66 acres | 1987 | 5 | $73,200 | $2.55 | 10.0% | 10.0% | Rent = 10% of land value. |
| 8 | 9620-9784 Bellanca Av | Los Angeles, CA | 146,880 SqFt 3.37 acres | 1987 | 30 | $413,736 | $2.82 | 8.0% | 8.0% | Rent = 8% of land value. Tenant bought leasehold and bought & demolished improvements. |
| 9 | 5592 Sepulveda Bl | Culver City, CA | 10,999 SqFt 0.25 acres | 1989 | 20 | $96,160 | $8.74 | 10.0% | 10.0% | Rent = 10% of land value + 12% of improvement cost paid by landlord. 2@ 5 year options. CPI @ 2 Years. |
| 10 | NEC Foothill Bl & Castle Rd | La Canada, CA | 22,640 SqFt 0.52 acres | 1989 | N/A | $72,448 | $3.20 | 8.0% | 8.0% | Rent = 8% of land value. |
| 11 | 275 E Cordova St | Pasadena, CA | 53,673 SqFt 1.23 acres | 1989 | 42 | $130,000 | $2.42 | 8.5% | 8.5% | Rent = 8.5% of land value. Part of sale-leaseback transaction. |
| 12 | SEC Soledad Cyn & Luther Dr | Santa Clarita, CA | 400,752 SqFt 9.2 acres | 1990 | 66 | $725,000 | $1.81 | 10.0% | 10.0% | Rent = 10% of land value. Lessee paid $150,000 to demolish improvements formerly on site |
| 13 | 2400 E Pacific Coast Hwy | Wilmington, CA | 1,383,816 SqFt 31.77 acres | 1990 | 20 | $1,591,388 | $1.15 | 10.0% | 10.0% | Rent = 10% of land value. |
| 14 | 744 S Alameda St | Los Angeles, CA | 131,551 SqFt 3.02 acres | 1990 | N/A | $459,000 | $3.49 | 9.0% | 9.0% | Rent = 9% of land value. Two more 5-year options remain to be exercised. |
| 15 | 0.2853 acres of Land Corner of Park Access Road and Hackberry Road | Dallas, TX | 12,428 SqFt 0.29 acres | 1993 | 20 | $2,084 | $0.17 | 9.0% | 9.0% | United States FAA leasing land for Terminal Doppler Weather Radar. Lease rate based on estimated property value of $2 per SqFt. Lease rate revision every 4 years, based on increase in market value of property. The lease renews every year until, 2013, unless the US Government chooses to terminate lease early in writing. |
| 16 | State of California San Diego Gas & Electric Co. | San Diego, CA | Various | 1995 | 30 | N/A | N/A | 9.0% | 9.0% | Annual rent based on middle range of value of the submerged land. Last rent adjustment was based on appraised value of $10-$12/SqFt discounted 50% for submerged nature of site. Reviews every five years. |
| 17 | NEC Junipero Av & 28th St | Signal Hill, CA | 115,870 SqFt 2.66 acres | 1996 | 10 | $69,520 | $0.60 | 10.0% | 10.0% | Rent = 10% of land value. |
| 18 | 468 N Rodeo Dr SEC Santa Monica Bl | Beverly Hills, CA | 15,250 SqFt 0.35 acres | 1996 | 10 | $1,200,000 | $78.69 | 9.5% | 9.5% | 2 @ 5-year options. Flat rent years 1-5, then annual CPI |
| 19 | 9440 Santa Monica Bl SEC Beverly Dr | Beverly Hills, CA | 25,710 SqFt 0.59 acres | 1996 | 55 | $600,000 | $23.34 | 8.5% | 8.5% | 38 of 55 years were left. Rent =8.5% of Land Value. Land value adjusts to market each 10 years. |
| 20 | Santa Monica Business Park | Santa Monica, CA | 1,689,239 SqFt 38.78 acres | 1998 | 55 | $2,316,000 | $1.37 | 7.7% | 7.7% | 4 @ 11-year options. Rent =7.72% of land value. Land value adjusts to market every 10 years. |

Figure 87: Ground Lease Rates, 1-20

181

| No. | Source | Location | Site Size (SqFt) (acres) | Lease Start Date | Term (Years) | Annual Rent | | Rate (Low) | Rate (High) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Amount | $/SqFt | | | |
| 21 | SWQ 110 Fwy & MLK Jr., Bl. | Los Angeles, CA | 82,000 SqFt 1.88 acres | 1999 | 20 | $205,000 | $2.50 | 10.0% | 10.0% | Rent = 10% of agreed land value. 10% rent bump every 5 years. |
| 22 | 2981 Main Street | Irvine, CA | 182,952 SqFt 4.2 acres | 1999 | 150 | $434,625 | $2.38 | 9.0% | 9.0% | Rent = 9% of land value. CPI adjustment every 5 years. |
| 23 | 4403 Donald Douglas Dr | Long Beach, CA | 101,059 SqFt 2.32 acres | 1999 | 39 | $150,000 | $1.48 | 7.0% | 7.0% | Rent adjusts to 7% of land value every 5 years, plus participation = $60,000/yr+, raising yield to 9.8% |
| 24 | Home Depot Honolulu, Oahu, Hawaii | Oahu, HI | 392,040 SqFt 9 acres | 1999 | 25 | N/A | $50.00 | 7.5% | 8.0% | Home Depot entered signed a letter of intent in April 1997, with the lease initiating on September 1, 1999. The initial 5 year term is based on a 7.5% rate, with the subsequent based on an 8% rate. |
| 25 | 2201 Wilshire Bl | Santa Monica, CA | N/A | 2001 | N/A | N/A | N/A | 10.0% | 10.0% | Whole Foods was a relatively weak tenant when the 10% yield was negotiated |
| 26 | NEC Coldwater Cyn & Magnolia | Valley Village, CA | 40,700 SqFt 0.93 acres | 2001 | 20 | $400,000 | $9.83 | 10.0% | 10.0% | 8 @ 5-year options. |
| 27 | NEC Hollywood Bl & Van Ness | Hollywood, CA | 27,269 SqFt 0.63 acres | 2001 | 20 | $135,000 | $4.95 | 9.0% | 9.0% | There are several options. |
| 28 | SWC Wilshire Bl & Roxbury Dr | Beverly Hills, CA | 21,600 SqFt 0.50 acres | 2002 | 99 | $720,000 | $33.33 | 6.0% | 6.0% | Arbitrated value & rent in ground lease renegotiation 6% Rate of Return was established in 1955. |
| 29 | 101 Civic Center Drive | Santee, CA | 358,499 SqFt | 2002 | 55 | N/A | N/A | 10.0% | 10.0% | 3 five-year options to renew. Rent based on a 10% return on land value ($5.70/SqFt) with a cost of living adj. every 5 years. Base rent subject to change every 15 years, based upon mean cost-of-living and fair market rent. |
| 30 | James Campbell Industrial Park - Kapolei | Oahu, HI | 56,628,000 SqFt 1,300 acres | 2002 | 5 to 45 | N/A | N/A | 8.0% | 8.0% | Campbell Estate owns 1,300 acres including roads and leases numerous sites for industrial and commercial purposes. Leases are renegotiated every 5 to 10 years at 8% of fair market value. Major business on the site include Tesoro, Chevron, Ball Corporation, Coca Cola, Kraft Foods, and Fleming Foods. |
| 31 | Olympic Bl near Bundy Av | Los Angeles, CA | N/A | 2003 | N/A | N/A | N/A | 8.0% | 8.0% | Koll originally offered a 7% return on land value, but finally agreed to 8%. |
| 32 | 9000 & 9001 Olympic Bl NWC & SWC Almont Dr | Beverly Hills, CA | 42,864 | 2003 | 20 | N/A | N/A | 6.9% | 6.9% | Broker verified that rent = 6.75% to 7% of Land Value. Rent bump after 10 years. |
| 33 | Metropolitan Transit Systems Fairfield Residential | La Mesa, CA | N/A | 2003 | 55 | N/A | N/A | 8.0% | 8.0% | Initial annual base rent escalates from $85,333 to $256,000 plus 1.25% of overage rent for first 30 years. Base rent is adjusted to 8% of MV based on appraisals in yrs 31, 56, and 81 with rent changes every 5 years linked to CPI, max of 15% per adjustment. |
| 34 | NEC Rosecrans & Prairie Ave | Hawthorne, CA | 51,571 SqFt 1.18 acres | 2004 | 20 | $226,500 | $4.39 | 9.0% | 9.0% | Term & rent begin when tenant gets building permit. 9% @ 10-Year options. Rent bump every 10 years. |
| 35 | Creekside Marketplace at San Marcos Boulevard | San Marcos, CA | Between 32,000 SqFt - 11.2 acres | 2004 | 15-20 | N/A | N/A | 10.0% | 10.0% | Leases based on a 10% return on land value. Rents are adjusted every five years based on CPI to a range of 10%-13%. Tenants include Lowe's, Applebee's, Johnny Carino's, In-N-Out Burger, & Krispy Kreme. |
| 36 | 2701 El Camino Real | Palo Alto, CA | 40,946 SqFt 0.94 acres | 2004 | N/A | N/A | N/A | 10.0% | 10.0% | Developed as *Sunrise Assisted Living* |
| 37 | Padres Tailgate Park | San Diego, CA | 217,800 SqFt 5 acres | 2004 | 30 | 25% gross revenue initial, 35% remainder | N/A | | | Padres baseball signed a ground lease with the Redevelopment Agency of the City of San Diego. The 30 year lease includes an option to extend and renew for an additional 10 years. The contact includes a minimum annual rent of $150,000 that escalates 4% per year. |
| 38 | Hertz, National, and Avis Rental Car Agencies | San Diego, CA | N/A | 2005 | N/A | N/A | N/A | 9.5% | 9.5% | Three rental car companies renewed their leases on Port District land. Rents were based on a land value of $24.50 per square foot. |
| 39 | Between the San Diego Bay & Interstate 5 | Chula Vista, CA | 688,248 SqFt 15.8 acres | 2005 | N/A | N/A | N/A | 9.5% | 9.5% | Port District and Duke Energy agreed to the rate of return based on the market value of the land, ±$13/SqFt. However, the transaction did not go forward. |
| 40 | Confidential | Kearny Mesa, CA | 217,800 SqFt 5 acres | 2005 | 25 | N/A | N/A | 10.0% | 10.0% | Rent is based on 10% return on $38.00 /SqFt land value. Rent adjustments of 10% every five years. Five-year options to renew. |

Figure 88: Ground Lease Rates, 21-40

182

| No. | Source | Location | Site Size (SqFt) (acres) | Lease Start Date | Term (Years) | Annual Rent Amount | Annual Rent $/SqFt | Rate (Low) | Rate (High) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41 | 2540 Shelter Island Drive | San Diego, CA | | 2006 | N/A | N/A | N/A | 9.5% | 9.5% | Twenty Five Forty, LLC. Rent based on land and water rents and percentage rents on sales. |
| 42 | Great Mall Pkwy. @ Hwy. 880 | Milpitas, CA | 196,020 SqFt 4.5 acres | 2007 | N/A | N/A | N/A | 8.0% | 8.0% | Revaluation every 10-15 years. |
| 43 | Sydney V. Hamber, *The ABCs of Ground Leases,* Society of Industrial and Office REALTORS Foundation (2008) | Canada | N/A | 2008 | 25 | N/A | N/A | 5.0% | 6.0% | Ground leases are written for 5 years with four five-year options, resulting in the land being tied up for 25 years. |
| 44 | Sydney V. Hamber, *The ABCs of Ground Leases,* Society of Industrial and Office REALTORS Foundation (2008) | CT | N/A | 2008 | 20 | N/A | N/A | 10.0% | 12 0% | 20-year primary with escalations every 5 years, typically escalation is 10%. At the end of the 20 year period the land will be re-evaluated. |
| 45 | NASA Research Park | Mountain View, CA | 1,842,588 SqFt 42.30 acres | 2008 | 40 | $3,660,000 | $1.99 | 7.0% | 7.0% | Leased by Google for corporate office development of 1 million SqFt building/campus. Initial construction started in 2013. Revaluation of underlying land every 10 years. |
| 46 | Prescott Municipal Airport | Prescott, AZ | N/A | 2008 | N/A | N/A | N/A | 7.0% | 10 0% | The City of Prescott Airport Master Plan. Analyses performed by The Louis Berger Group, Inc. |
| 47 | Daytona Airport | Daytona Beach, FL | N/A | 2008 | N/A | N/A | N/A | 7.0% | 10 0% | The City of Prescott Airport Master Plan. Analyses performed by The Louis Berger Group, Inc. |
| 48 | 35060 Newark Blvd. | Newark, CA | 48,787 SqFt 1.12 acres | 2011 | 30 | N/A | N/A | 8.7% | 8.7% | Buildings constructed in 2012. Current tenants: AutoZone, Starbucks, T-Mobile. Commercial (retail) site. 30 year term. |
| 49 | County of Los Angeles | Los Angeles, CA | N/A | 2012 | N/A | N/A | N/A | 8.0% | 8.0% | |
| 50 | County of Orange | Orange, CA | N/A | 2012 | N/A | N/A | N/A | 8.0% | 9.0% | |
| 51 | Port of Long Beach | Long Beach, CA | N/A | 2012 | N/A | N/A | N/A | 8.0% | 12 0% | |
| 52 | Port of Los Angeles | Los Angeles, CA | N/A | 2012 | N/A | N/A | N/A | 10.0% | 10 0% | |
| 53 | San Bernardino County | San Bernardino, CA | N/A | 2012 | N/A | N/A | N/A | 10.0% | 10 0% | |
| 54 | City of Pasadena | Pasadena, CA | Multiple | 2013 | N/A | N/A | N/A | 5.0% | 6.0% | The City of Pasadena generally look for a 5% to 6% ground lease rate. |
| 55 | City of Long Beach | Long Beach, CA | N/A | 2013 | N/A | N/A | N/A | 7.0% | 12 0% | Stated range required by the City of Long Beach. |
| 56 | 3235 Lakewood Blvd. | Long Beach, CA | 191,228 SqFt 4.39 acres | 2013 | 5 | $167,092 | $0.87 | 8.0% | 8.0% | Renewal of lease to the Sheriff's Department of a portion of the Long Beach Airport. City documents state a required range of 7% to 12%. |
| 57 | 4,225 acres in Clark County Nevada | Clark County, NV | 4,225 SqFt 0.10 acres | 2015 | N/A | N/A | N/A | 7.0% | 7.0% | Appraisal performed by Anderson Valuation Group, LLC. Zoned for Rural and open land. |
| 58 | State of Nevada and NV Energy | NV | N/A | 2015 | N/A | N/A | N/A | 8.0% | 10 0% | |
| 59 | Property owners and developers in the greater Las Vegas valley | Las Vegas, NV | N/A | 2015 | N/A | N/A | N/A | 8.0% | 10 0% | Vacant industrial or industrial storage sites. |
| 60 | Bureau of Land Management | NV | N/A | 2015 | N/A | N/A | N/A | 6.9% | 6.9% | "Solar 2010-2015 Per Acre Base Rent Schedule" - unimproved large vacant tracts of land. |

Figure 89: Ground Lease Rates, 41-60

| No. | Source | Location | Site Size (SqFt) (acres) | Lease Start Date | Term (Years) | Annual Rent | | Rate (Low) | Rate (High) | Comments |
|-----|--------|----------|--------------------------|-----------------|--------------|--------|--------|------------|-------------|----------|
| | | | | | | Amount | $/SqFt | | | |
| 61 | Bobbi Thompson | Douglas County, NV | N/A | 2016 | N/A | N/A | $0 20 and $0.25 | 10.0% | 10 0% | Bobbi Thompson, Douglas County Airport Manager (775)782-9871. According to Bobbi rates are recorded in the Board of County Commissioner January 15, 2016 minutes. Based on comparable sale records, the yield rate is 10%. |
| 62 | City of Kenai Kenai, Alaska | Kenai, AK | Multiple | 2019 | N/A | N/A | N/A | 8.0% | 8.0% | City of Kenai, AK leases 24 properties/land parcels within the Airport Reserve boundary at a rate of 8% of the fair market value. The property types include mixed use and light to heavy industrial. |
| 63 | 204 E 17th Street | Costa Mesa, CA | 61,420 SqFt 1.41 acres | 2020 | N/A | N/A | N/A | 10.0% | 10 0% | Annual rent payable by the ground tenant will be adjusted to equal 10% of the then fair market value of the land (subject to additional terms and conditions). |
| 64 | CalTrans Aliso Walkway | Laguna Beach, CA | Multiple | 2021 | 42.5 months | N/A | N/A | 10.0% | 10 0% | CalTrans negotiated TCE takings during the construction of a new pedestrian walkway north of Aliso Beach along Pacific Coast Highway. The impacted properties were single-family residential and a 10% ground lease rate was utilized over the duration of the construction. |
| 65 | Gateway Plaza | New York, NY | N/A | 1969 | 60 | $205,440 | N/A | 8.0% | 8.0% | The original lease started in 1969 with several amendments. Lease states 8% of Fair Market Value. Beginning 1/1/1987 Land Rent increases by $10,000 per year until 6/30/2023. |
| 66 | Hallmark Senior Residence | New York, NY | 19,600 SqFt 0.450 acres | 1999 | 70 | $150,000 | $7.65 | 6.0% | 6.0% | 6% of Fair Market Value of the land Initial lease with four (4) fifteen year renewals. |
| 67 | Hudson Tower | New York, NY | 130,000 SqFt 2.98 acres | 1984 | 85 | N/A | N/A | 6.0% | 6.0% | 6% of Fair Market Value of the land Rent Reset Amendment dated 2011 - 2040 contains a lease year base rent schedule of $638,000 - $1,344,000. Amendment 1, 1985, states a Certificate of Occupancy must be in place before rental units can be occupied. Amendment 2, 1985, establishes a Landlord's Lien for any unit owner default. Luxury residences |
| 68 | Hudson View East | New York, NY | 105,000 SqFt 2.41 acres | 1984 | 56 | N/A | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Rent Reset Amendment contains a lease year base rent schedule of $569,000 - $1,104,000 Amendment 1, 1985, states a Certificate of Occupancy must be in place before rental units can be occupied. Amendment 2, 1985, establishes a Landlord's Lien for any unit owner default. Amendment 3, 1985 addresses the definition of Institutional Lender and Mortgage. Condominiums |
| 69 | Hudson View West | New York, NY | 90,000 SqFt 2 07 acres | 1984 | 56 | N/A | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Rent Reset Amendment  dated 2012 - 2040 contains a lease year base rent schedule of $569,000 - $1,204,000. Amendment 1, 1985, states a Certificate of Occupancy must be in place before rental units can be occupied. Amendment 2, 1985, establishes a Landlord's Lien for any unit owner default. Amendment 3, 1985 addresses the definition of Institutional Lender and Mortgage. Condominiums |
| 70 | Liberty Court | New York, NY | 534,500 SqFt 12.27 acres | 1984 | 56 | $200,000 | $0.37 | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Rent Reset Amendment dated 2012 - 2041 contains a lease year base rent reschedule of $1,580,000 - $5,928,000. Amendment 1, 1985, establishes a Landlord's Lien for any unit owner default. Amendment 2, 1985, amends the square footage from 540,000 to 534,500. Amendment 3, 1987 is an extension of completion date. Amendment 4, 1987, addresses completion dates and certification of occupancy. Luxury residences |

Figure 90: Ground Lease Rates, 61-70

184

| No. | Source | Location | Site Size (SqFt) (acres) | Lease Start Date | Term (Years) | Annual Rent Amount | $/SqFt | Rate (Low) | Rate (High) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **GROUND LEASE DATA** | | | | |
| 71 | Liberty Green | New York, NY | 17,353 SqFt 0.39 acres | 2008 | 62 | $590,004 | $34.00 | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Lease shows a 25 year base rent schedule of $590,004 - $1,199,358 Three additional lease periods of (15) years each. Base rent Second Period through Fourth Period shall escalate by (15%) of the Base Rent or the percentage increase, if any, of the CPI. There are 72 amendments, none of which affect ground rent. Luxury residences. |
| 72 | Liberty Luxe | New York, NY | 32,213 SqFt 0.74 acres | 2007 | 55 | $889,996 | $27.63 | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Lease shows a 25 year base rent schedule of $889,996 - $1,809,177 Three additional lease periods of (15) years each. Base rent Second Period through Fourth Period shall escalate by (15%) of the Base Rent or the percentage increase, if any, of the CPI. There are 72 amendments, none of which affect ground rent. Luxury residences. |
| 73 | Liberty View | New York, NY | N/A | 1987 | 30 | $1,039,500 | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Base rent $1,039,500. The Rent Reset Amendment 2011 - 2040 shows a rent schedule of $2,468,000 - $3,610,000 Four additional lease periods of (15) years each. Base Rent Second Period through Fifth Period shall be the greater of 6% of Fair Market Value of the land or (125%) of the Base Rent in the last Lease Year of the preceding period. Amendment 1 2011 - 2025 shows an Annual Base Rent of $2,425,676 - $3,741,725. Luxury residences. |
| 74 | Liberty House | New York, NY | 214,000 SqFt 4.91 acres | 1984 | 85 | $90,000 | $0.42 | 6.0% | 6.0% | 6% of Fair Market Value of the land. Rent Schedule shows $90,000/annual Luxury residences |
| 75 | Millenium Tower Residences | New York, NY | N/A | 2005 | 60 | N/A | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land for 25 years. Three additional lease periods of (15) years each. Base rent will escalate every 5 years by the greater of 15% of the Base Rent set for the prior 5 years or the percentage increase, if any, of the CPI until January, 2065. Amendment 1 does not affect ground rent. Luxury residences. |
| 76 | Rector Square | New York, NY | N/A | 1984 | 85 | $152,000 | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Lease shows a base rent schedule of $152,000 - $1,659,301. Three additional lease periods of (15) years each shall pay an amount equal to the lesser of (115%) of the previous 12 month base rent or (6%) of Fair Market Value of the land. For each lease year during the remainder portion of the term base rent will be (6%) of the Fair Market Value of the land. Luxury residences. |
| 77 | The Regatta | New York, NY | N/A | 1987 | 20 | $471,240 | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land or (125%) of the base rent for the lease year prior to the first appraisal date. Three additional lease periods of (15) years each shall pay 6% of Fair Market Value of the land or (125%) of the base rent for the lease year prior to the first appraisal date. Lease shows a base rent schedule for first 25 years of $471,240 - $1,835,857. 3 Amendments. Amendment 2 2009 - 2023 shows an annual base rent of $1,893,584 - $2,920,947. Amendment 3 2009 - 2038 shows an annual base rent of $1,855,000 - $2,512,000. Rent Reset Amendment 2009 - 2023 shows an annual base rent of $1,893,584 - $2,920,947 Luxury residences. |
| 78 | The Verdesian | New York, NY | 14,264 SqFt 0.34 acres | 2004 | 65 | $150,000 | $10.53 | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Base rent schedule for year 1 - 25 is $150,000 - $684,930. Three additional periods of (15) years each. Base rent will escalate by the greater of (15%) of base rent set for the prior 5 years or the percentage increase, if any, of the CPI . Amendment 2 does not affect base rent. Luxury residences. |

Figure 91: Ground Lease Rates, 71-78

185

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **GROUND LEASE DATA** | | | | | | | | | |
| No. | Source | Location | Site Size (SqFt) (acres) | Lease Start Date | Term (Years) | Annual Rent | | Rate (Low) | Rate (High) | Comments |
| | | | | | | Amount | $/SqFt | | | |
| 79 | Ritz Carlton Residences | New York, NY | 42,100 SqFt 0 97 acres | 2000 | 70 | $953,650 | $22 65 | 6.0% | 6.0% | 6% of the Fair Market Value of the land or $494,744 for the hotel base rent and $458,906 for the residential base rent. Three additional lease periods of (15) years each shall pay 6% of the Fair Market Value of the land or (125%) of the residential base rent of the preceding period. Luxury residences. |
| 80 | River Watch | New York, NY | N/A | 1998 | 70 | $93,429 | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land. Base rent schedule for year 1 - 22 is $93,429 - $318,499. Initial lease of 10 years with four (15) year renewals. Base Rent for the first period is the amount resulting from dividing such sum by (150,000) and multiplying the result by the number of square feet of "floor area. Luxury residences. |
| 81 | River & Warren | New York, NY | 317,104 SqFt 7.28 acres | 1999 | 70 | $488,847 | $1.54 | 6.0% | 6.0% | 6% of the Fair Market Value of the land or the product derived by multiplying the base rent payable by the applicable percentage for the preceding period. Initial lease of 10 years with (4) fifteen year renewals. Base rent schedule for year 1 - 22 is $488,847 - $977,726. Amendment 2 establishes a revised base rent during the second period. 2021 - 2035 annual base rent is $1,683,606 - $2,546,605. Luxury residences |
| 82 | Riverhouse | New York, NY | 30,713 SqFt 0.71 acres | 2005 | 65 | $1,100,000 | $35 82 | 6.0% | 6.0% | 6% of the Fair Market Value of the land or the base rent payable from the prior period. Initial lease of 25 years with three additional lease periods of (15) years each. Second through fourth period base rent shall be 15% of the base rent for the prior (5) lease years or the percentage increase, if any, of the CPI. Base rent for lease year 1 - 25 is $1,100,000 - $3,547,610. Luxury residences |
| 83 | The Soundings | New York, NY | 114,500 SqFt 2.63 acres | 1984 | 85 | $80,000 | $0.70 | 6.0% | 6.0% | 6% of Fair Market Value of the land. Rent schedule lease year 1 - 25 is $80,000 - $224,000. Base rent is subject to a 10% increase every five (5) years. Rent Reset Amendment lease year 2012 sets base rent as $405,000 - 2041 $1,028,000. Amendment 2 changes the square footage from 109,000 to 114,500. Luxury residences |
| 84 | South Cove Plaza | New York, NY | 200,000 SqFt 4.59 acres | 1999 | 70 | $497,920 | N/A | 6.0% | 6.0% | 6% of the Fair Market Value of the land or the product derived by multiplying the base rent payable by the applicable percentage for such lease year. Initial lease of 10 years with (4) fifteen year renewals. Base rent for lease year 1 - 20 is $497,920 - $873,106. Amendment 1 adjusts ground rent to mean $900,000 for the lease year beginning on the amendment date of 8-22-2016 and increasing by 2% for each lease year through 6-30-2054. Luxury residences |
| 85 | Tribeca Bridge Tower | New York, NY | 28,026 SqFt 0.643 acres | 1996 | 70 | $1 | $3.57 | 6.0% | 6.0% | Amendment 1 states base rent for the Second, Third and Fourth Periods (5 year renewals) will be the greater of 15% of the prior 5 lease years or the percentage of increase, if any, of the CPI. Luxury residences |
| 86 | Tribeca Green | New York, NY | N/A | 2003 | 65 | $450,000 | N/A | 6.0% | 6.0% | 6% of Fair Market Value of the land. Base rent lease year 1 - 25 is $450,000 - $723,797. Base rent for the Second, Third and Fourth Periods (15 year renewals) will be the greater of 15% of the Base Rent set for the prior (5) year lease. Luxury residences |

Figure 92: Ground Lease Rates, 79-86

186

| | | | | | | **GROUND LEASE DATA** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **No.** | **Source** | **Location** | **Site Size (SqFt) (acres)** | **Lease Start Date** | **Term (Years)** | **Annual Rent** | | **Rate (Low)** | **Rate (High)** | **Comments** |
| | | | | | | **Amount** | **$/SqFt** | | | |
| 87 | Tribeca Park | New York, NY | N/A | 1997 | 72 | $863,853 | N/A | 6.0% | 6.0% | 6% of Fair Market Value of the land. Base rent for the Second, Third, Fourth and Fifth Periods (15 year renewals) will be 6% of Fair Market Value of the land or the product derived by multiplying the base rent payable in the last lease year by the applicable percentage for such lease year. Luxury residences |
| 88 | Tribeca Pointe | New York, NY | N/A | 1997 | 72 | $175,000 | N/A | 6.0% | 6.0% | 6% of Fair Market Value of the land. Base rent for the Second, Third, Fourth and Fifth Periods (15 year renewals) will be 6% of Fair Market Value of the land or the product derived by multiplying the base rent in the previous lease year by the applicable percentage for such lease year. Lease year 1 - 20 base rent is $175,000 - $413,000. Amendment 1 changes ground rent lease year 1 - 48 to $450,000 - 4,973,808 Luxury residences |
| 89 | The Visionaire | New York, NY | N/A | 2006 | 60 | $901,829 | N/A | 6.0% | 6.0% | 6% of Fair Market Value of the land. Base rent for the Second, Third periods (15 year renewals) and Fourth period (5 year renewal) will be the greater of 15% of the Base Rent set for the prior (5) year lease. Base rent lease year 1 - 25 is $0.00 - $1,863,735. Luxury residences |
| 92 | Eastern Rail Yards | New York, NY | N/A | 2012 | 99 | $21,996,000 | N/A | 6.5% | 6.5% | 6 5% of Adjusted Initial Land Value. Adjusted land value for ERY: $338,400,000 Base rent is subject to a 10% increase every five (5) years. Fair Market Value resets of base rent occur in lease years 30,55 and 80. Luxury residences |
| 93 | 6550 West 95th Street | Oak Lawn, IL | N/A | 1998 | N/A | N/A | N/A | 10.0% | 10 0% | Three 5 year options "Lessee shall pay to Lessor annual rent, in an amount equal to Ten percent (10%) of the appraised value of the Demised Premises (exclusive of the value of all Improvements)." Utilized date of document for "Lease Start Date" |
| 94 | 7711 Carondelet | Calyton, MO | 30,401 SqFt 0.70 acres | 2000 | N/A | $58,000 | $1.91 | 9.3% | 9.3% | Two 20 year extensions which apply a rate of 9.25% of the land value to determine annual ground rent The property is improved with a Hi-rise office Utilized date of sale on CoStar for "Lease Start Date" |
| 95 | USA Research and Technology Corp (landlord) and Campus Crest at Mobile, L.L.C (tenant) | Mobile, AL | 500,940 SqFt 11.5 acres | 2006 | 40 | N/A | N/A | 8.5% | 8.5% | One 20 year extension One 15 year extension "Annual Base Rent from the Rent Commencement Date and for the first five years of the Initial Term shall be an amount equal to 8½ % of appraised fair market value of the Land." |
| 96 | Ruth E Abers etal., v Christine Marie Rounsavell | Santa Ana, CA | 805,860 SqFt 18.5 acres | 1969 | 30 | N/A | N/A | 8.0% | 8.0% | "the rent for the leased land was to be reassessed after 30 years, adjusted to 8% of the then current fair market value, exclusive of all land improvements." |
| 97 | Manhattan Church of Christ Inc. v. 40 East 80 Apt, Corp. | New York, NY | 54,260 SqFt 1 25 acres | 1969 | 99 | $60,000 | $1.11 | 6.0% | 6.0% | The parcel contains a 25-story apartment building. The lease began on May 9, 1969, and provided for a fixed "basic" rent for the first 32 years and nine months of the 99 year lease term, after which on April 1, 2002, the basic rent payable was to be adjusted to 6% of the fair market value of the land, considered as vacant, unimproved and unaffected by the lease. Annual basic rent increased from $60,000 to $569,730 on April 1, 2002. |
| 98 | Ruth v S.Z.B. Corp. | New York, NY | N/A | 1936 | 60 | N/A | N/A | 6.0% | 6.0% | The lease provided for an initial term of 20 years from January 1, 1936 and for two successive renewal terms of 20 years each. The lease provided for a two-story store and showroom. 6% of the fair market value of the land as vacant and unimproved, in fee simple, by private contract, free of lease and unencumbered. |

Figure 93: Ground Lease Ratees, 87-98

187

| | | | | | | Annual Rent | | Rate | Rate | |
|---|---|---|---|---|---|---|---|---|---|---|
| No. | Source | Location | Site Size (SqFt) (acres) | Lease Start Date | Term (Years) | Amount | $/SqFt | (Low) | (High) | Comments |
| 99 | 3050 Wilshire Boulevard Los Angeles, CA  Bullock's, Inc. v. Security First Nat'l Bank of L.A. | Los Angeles, CA | N/A | 1956 | 50 | $17,750 | N/A | 5.0% | 5.0% | Property was occupied by Bullock's Downtown. The property was originally leased in 1906 by Bullock's predecessor. Rent was based upon a fixed percentage of the value of the land. In 1943 Bullock's entered into a new lease commencing at the termination of the prior lease for 50 years beginning on June 1, 1956. Rent was set at 5% of the appraised value of the leased land, but not less than $17,750 annually. The trial court determined the land's fair market value to be $478,980. |
| 100 | 768 5th Avenue New York, NY  Plaza Hotel Associates v. Wellington Associates | New York, NY | N/A | 1967 | N/A | N/A | N/A | 3.0% | 3.0% | The land is occupied by the Plaza Hotel. The lease did contain a use restriction - hotel purpose only. Utilized date from Sevelka (2011) for "Lease Start Date" |
| 101 | 112 Central Park South New York, NY  New York Overnight Partners v. Gordon | New York, NY | N/A | 1963 | 15 | $78,000 | N/A | 6.5% | 6.5% | The building located on the site was known at that time as the Navarro Hotel and is currently known as the Ritz-Carlton Hotel. The lease provides for an initial term of thirty-years at an annual rate of $78,000. Afterwards, a 15-year rent renewal term was calculated at 6.5% of the appraised value of the land. |
| 102 | 550-999 Canada Place Vancouver, BC  No. 100 Sail View Ventures Ltd. v. Janwest Equities Ltd. | Vancouver, BC | N/A | 1981 | N/A | N/A | N/A | 10.0% | 10 0% | The leased premises was restricted to the purpose of a hotel and related hospitality business. The base rent was 10% of the fair market value of the leased premises as bare land at the date of the review and not be less than $550,000 in any one year. |
| 103 | Appraisal Institute PPT | Toronto, Canada | N/A | 1956 | N/A | N/A | N/A | 5.0% | 13 0% | There were numerous ground leases that ranged from 1956 to 2014. Source: Microsoft PowerPoint - Ground Leases - 6.17 - AIC Conference ppt [Compatibility Mode] https //www.appraisalinstitute org/assets/1/7/From_t he_Ground_Up_Part_1_6.11_1030a.pdf |
| 104 | Appraisal Institute PPT | Toronto, Canada | N/A | 2014 | N/A | N/A | N/A | 5.0% | 13 0% | There were numerous ground leases that ranged from 1956 to 2014. Source: Microsoft PowerPoint - Ground Leases - 6.17 - AIC Conference ppt [Compatibility Mode] https //www.appraisalinstitute org/assets/1/7/From_t he_Ground_Up_Part_1_6.11_1030a.pdf |
| 105 | 817 Durham Drive Houston, TX | Houston, TX | 24,280 SqFt 0 58 acres | 2021 | N/A | $180,000 | $0.62 | 6.0% | 6.0% | Estimated value at the time of lease was approximately $125 per SqFt or $3,035,000. The tenant planned to expend approximately $1,000,000 on rebuilding/renovations. NNN. |
| 106 | Utah Property Investors 2012-05-07 | N/A | N/A | 2012 | N/A | N/A | N/A | 4.0% | 7.0% | Title of the article is "Commercial Real Estate \| Investing in Ground Leases" Utilized date of article for "Lease Start Date" |
| 107 | Law Journal Newsletters 2020-02-01 | N/A | N/A | 2020 | N/A | N/A | N/A | 5.0% | 6.0% | Title of the article is "Reset Clauses in Ground Leases" Utilized date of article for "Lease Start Date" |
| 108 | Biz Journals 2020-10-16 | N/A | N/A | 2020 | N/A | N/A | N/A | 4.5% | 6.5% | Title of the article is "Breaking Down the Modern-Day Ground Lease: More Efficient Capital for Construction Projects and a Lifeline for Distressed Assets" Utilized date of article for "Lease Start Date" |
| 109 | Point Acquisitions 2022-03-10 | N/A | N/A | 2022 | N/A | N/A | N/A | 7.0% | 9.0% | Title of the article is "Ground Lease Real Estate Agreement Explained" Utilized date of article for "Lease Start Date" |
| 110 | American Bar Association (2017) | N/A | N/A | 2017 | N/A | N/A | N/A | 6.0% | 9.0% | Title of the article is "Reappraisal of Ground Lease Rentals" Utilized date of article for "Lease Start Date" |
| 111 | Carneghi (1994) | N/A | N/A | 1994 | N/A | N/A | N/A | 7.0% | 9.0% | Title of the article is "Determining Ground-Lease Rental Rates" Utilized date of article for "Lease Start Date" |

GROUND LEASE DATA

Figure 94: Ground Lease Rates, 99-111

**Caseyville Improved Lease Matrix**

| | **Number of Leases** | **Low** | **High** | **Average** | **Median** | **% of Properties With Feature** |
|---|---|---|---|---|---|---|
| | | | CITY OF EAST ST. LOUIS<br>Caseyville 2023 Lease Matrix<br>(Landmark File: 155-1-21) | | | |
| **Lease Rate (Monthly)** | 4 | $900 | $1,850 | $1,444 | $1,513 | NA |
| **Bedrooms** | 4 | 2 | 3 | 3 | 3 | NA |
| **Total Bathrooms** | 4 | 1 | 2 | 2 | 2 | NA |
| **Above Ground SqFt** | 4 | 597 | 1,704 | 1,249 | 1,347 | NA |
| **Lot SqFt** | 4 | 12,197 | 44,867 | 28,968 | 29,403 | NA |
| **Year Built** | 4 | 1939 | 1990 | 1959 | 1953 | NA |
| **Basement (Yes/No)** | 4 | NA | NA | NA | NA | 50% |
| **Garage (Yes/No)** | 4 | NA | NA | NA | NA | 50% |
| **Carport (Yes/No)** | 4 | NA | NA | NA | NA | 0% |

Figure 95: Caseyville Improved Lease Matrix

189

**Fairview Heights Improved Lease Matrix**

| CITY OF EAST ST. LOUIS<br>Fairview Heights 2023 Lease Matrix<br>(Landmark File: 155-1-21) | | | | | | |
|---|---|---|---|---|---|---|
| | **Number of Leases** | **Low** | **High** | **Average** | **Median** | **% of Properties With Feature** |
| **Lease Rate (Monthly)** | 12 | $975 | $2,300 | $1,495 | $1,350 | NA |
| **Bedrooms** | 12 | 2 | 4 | 3 | 3 | NA |
| **Total Bathrooms** | 12 | 1 | 4 | 2 | 2 | NA |
| **Above Ground SqFt** | 12 | 864 | 2,316 | 1,438 | 1,400 | NA |
| **Lot SqFt** | 12 | 7,841 | 15,246 | 10,709 | 10,019 | NA |
| **Year Built** | 12 | 1953 | 2007 | 1978 | 1978 | NA |
| **Basement (Yes/No)** | 12 | NA | NA | NA | NA | 25% |
| **Garage (Yes/No)** | 12 | NA | NA | NA | NA | 75% |
| **Carport (Yes/No)** | 12 | NA | NA | NA | NA | 0% |

Figure 96: Fairview Heights Improved Lease Matrix

**Belleville Improved Lease Matrix**

| | Number of Leases | Low | High | Average | Median | % of Properties With Feature |
|---|---|---|---|---|---|---|
| CITY OF EAST ST. LOUIS Belleville 2023 Lease Matrix (Landmark File: 155-1-21) | | | | | | |
| **Lease Rate (Monthly)** | 39 | $850 | $2,100 | $1,293 | $1,200 | NA |
| **Bedrooms** | 39 | 1 | 4 | 3 | 3 | NA |
| **Total Bathrooms** | 39 | 1 | 3 | 2 | 2 | NA |
| **Above Ground SqFt** | 39 | 460 | 2,394 | 1,225 | 1,176 | NA |
| **Lot SqFt** | 39 | 2,831 | 16,988 | 8,662 | 7,405 | NA |
| **Year Built** | 39 | 1882 | 2004 | 1950 | 1953 | NA |
| **Basement (Yes/No)** | 39 | NA | NA | NA | NA | 41% |
| **Garage (Yes/No)** | 39 | NA | NA | NA | NA | 67% |
| **Carport (Yes/No)** | 39 | NA | NA | NA | NA | 10% |

Figure 97: Belleville Improved Lease Matrix

191

**Caseyville Improved Sales Matrix**

| | CITY OF EAST ST. LOUIS<br>Caseyville 2023 Sales Matrix<br>(Landmark File: 155-1-21) | | | | | |
|---|---|---|---|---|---|---|
| | **Number of Sales** | **Low** | **High** | **Average** | **Median** | **% of Properties With Feature** |
| **Sale Price** | 46 | $28,000 | $369,900 | $142,357 | $123,100 | NA |
| **Bedrooms** | 46 | 2 | 4 | 3 | 3 | NA |
| **Total Bathrooms** | 46 | 1 | 4 | 2 | 1 | NA |
| **Above Ground SqFt** | 46 | 600 | 1,924 | 1,169 | 994 | NA |
| **Lot SqFt** | 46 | 2,614 | 70,132 | 16,051 | 10,890 | NA |
| **Year Built** | 46 | 1928 | 2010 | 1965 | 1958 | NA |
| **Basement (Yes/No)** | 46 | NA | NA | NA | NA | 52% |
| **Garage (Yes/No)** | 46 | NA | NA | NA | NA | 67% |
| **Carport (Yes/No)** | 46 | NA | NA | NA | NA | 7% |

Figure 98: Caseyville Improved Sales Matrix

**Fairview Heights Improved Sales Matrix**

| CITY OF EAST ST. LOUIS Fairview Heights 2023 Sales Matrix (Landmark File: 155-1-21) | | | | | | |
|---|---|---|---|---|---|---|
| | **Number of Sales** | **Low** | **High** | **Average** | **Median** | **% of Properties With Feature** |
| **Sale Price** | 157 | $34,900 | $365,000 | $180,769 | $171,500 | NA |
| **Bedrooms** | 157 | 1 | 4 | 3 | 3 | NA |
| **Total Bathrooms** | 157 | 1 | 5 | 2 | 2 | NA |
| **Above Ground SqFt** | 157 | 528 | 2,290 | 1,449 | 1,450 | NA |
| **Lot SqFt** | 157 | 6,534 | 66,647 | 14,974 | 11,761 | NA |
| **Year Built** | 157 | 1925 | 2010 | 1969 | 1963 | NA |
| **Basement (Yes/No)** | 157 | NA | NA | NA | NA | 57% |
| **Garage (Yes/No)** | 157 | NA | NA | NA | NA | 82% |
| **Carport (Yes/No)** | 157 | NA | NA | NA | NA | 3% |

Figure 99: Fairview Heights Improved Sales Matrix

193

**Belleville Improved Sales Matrix**

| | Number of Sales | Low | High | Average | Median | % of Properties With Feature |
|---|---|---|---|---|---|---|
| **CITY OF EAST ST. LOUIS**<br>**Belleville 2023 Sales Matrix**<br>**(Landmark File: 155-1-21)** | | | | | | |
| **Sale Price** | 744 | $4,900 | $430,000 | $154,581 | $148,250 | NA |
| **Bedrooms** | 744 | 1 | 4 | 3 | 3 | NA |
| **Total Bathrooms** | 744 | 1 | 4 | 2 | 2 | NA |
| **Above Ground SqFt** | 744 | 490 | 2,394 | 1,403 | 1,341 | NA |
| **Lot SqFt** | 744 | 1,089 | 66,211 | 11,790 | 9,583 | NA |
| **Year Built** | 744 | 1872 | 2010 | 1953 | 1955 | NA |
| **Basement (Yes/No)** | 744 | NA | NA | NA | NA | 68% |
| **Garage (Yes/No)** | 744 | NA | NA | NA | NA | 74% |
| **Carport (Yes/No)** | 744 | NA | NA | NA | NA | 7% |

Figure 100: Belleville Improved Sales Matrix

**Fairmont City Improved Sales Matrix**

| CITY OF EAST ST. LOUIS<br>Fairmont City 2023 Sales Matrix<br>(Landmark File: 155-1-21) | | | | | | |
|---|---|---|---|---|---|---|
| | **Number of Sales** | **Low** | **High** | **Average** | **Median** | **% of Properties With Feature** |
| **Sale Price** | 1 | $115,000 | $115,000 | $115,000 | $115,000 | NA |
| **Bedrooms** | 1 | 3 | 3 | 3 | 3 | NA |
| **Total Bathrooms** | 1 | 1 | 1 | 1 | 1 | NA |
| **Above Ground SqFt** | 1 | 1,052 | 1,052 | 1,052 | 1,052 | NA |
| **Lot SqFt** | 1 | 11,326 | 11,326 | 11,326 | 11,326 | NA |
| **Year Built** | 1 | 1965 | 1965 | 1965 | 1965 | NA |
| **Basement (Yes/No)** | 1 | NA | NA | NA | NA | 0% |
| **Garage (Yes/No)** | 1 | NA | NA | NA | NA | 0% |
| **Carport (Yes/No)** | 1 | NA | NA | NA | NA | 0% |

Figure 101: Fairmont City Improved Sales Matrix

**Caseyville Land Sales Matrix**

| CITY OF EAST ST. LOUIS<br>Caseyville 2023 Land Sales Matrix<br>(Landmark File: 155-1-21) | | | | | |
|---|---|---|---|---|---|
| | Number of Sales | Low | High | Average | Median |
| **Sale Price** | 6 | $12,000 | $65,000 | $42,000 | $37,500 |
| **Lot SqFt** | 6 | 10,019 | 27,878 | 19,036 | 19,343 |

Figure 102: Caseyville Land Sales Matrix

**Fairview Heights Land Sales Matrix**

| CITY OF EAST ST. LOUIS<br>Fairview Heights 2023 Land Sales Matrix<br>(Landmark File: 155-1-21) | | | | | |
|---|---|---|---|---|---|
| | **Number of Sales** | **Low** | **High** | **Average** | **Median** |
| **Sale Price** | 3 | $29,900 | $102,000 | $62,800 | $56,500 |
| **Lot SqFt** | 3 | 45,302 | 74,488 | 55,612 | 47,045 |

Figure 103: Fairview Heights Land Sales Matrix

**Belleville Land Sales Matrix**

| CITY OF EAST ST. LOUIS<br>Belleville 2023 Land Sales Matrix<br>(Landmark File: 155-1-21) | | | | | |
|---|---|---|---|---|---|
| | **Number of Sales** | **Low** | **High** | **Average** | **Median** |
| **Sale Price** | 10 | $3,800 | $80,000 | $25,960 | $21,000 |
| **Lot SqFt** | 10 | 9,583 | 231,739 | 43,238 | 16,117 |

Figure 104: Belleville Land Sales Matrix

**RED Reports**

| **REDReport** Anniston | | | **No:** 1 |
|---|---|---|---|
| **Use:** | Residential | **Date of Incident:** | 1999-2000 |
| **Address:** | Multiple | **Class:** | VIII |
| **City:** | Anniston | **Type:** | Environmental |
| **State:** | Alabama | **Issue:** | Contamination |
| **APN:** | Multiple | **Stage:** | Ongoing |

**Case Overview:**
From 1929 to 1971, Monsanto produced Polychlorinated biphenyls (PCB's) at its Anniston facility. Between 1999 and 2000, the EPA discovered PCBs in residential soil around the Monsanto Facility.

**Case Research:**
In 2003, the EPA negotiated a Partial Consent Decree (PCD) with Pharmacia Corporation and Solutia Inc. to perform a Non-Time Critical (NTC) removal action on contaminated residential properties.

By 2014, a Remedial Investigation (RI) identified that approximately 7,600 properties had been sampled for contamination. Of the 7,600 sampled properties, PCBs were detected in 4,322 properties.

The EPA announced a Record of Decision (ROD) in 2017. The ROD identified remedial plans for Operable Unit 1 (residential areas) and Operable Unit 2 (nonresidential areas). Cleanup included the complete removal of contaminated soil from residential properties, removing dredge spoil piles, capping unapproved waste disposal areas, removing contaminated soil in nonresidential areas, and more.

Many properties were abandoned. Market resistance showed a discount of 15% for surrounding homes compared to areas with less environmental concern. Market resistance ranged from -15% to -60%, typically -55%. Total settlements were $700 million. Additionally, Richard Maloy a real estate expert testified that by "the most conservative estimates" "homes and land in West Anniston were valued at 50 percent below the appropriate figure." (Baptized in PCBs, 2014, pg. 254)

"In recent years, Monsanto has bought and demolished around 100 PCB-contaminated houses and businesses in the area, turning the neighborhood into a virtual ghost town." (Feature Shoot, 2014)

**Site Overview:**
The sites were residential properties that were abandoned and/or demolished.

**Building Overview:**
Improvements consisted of residential properties before they were demolished.

**Environmental:**
| | |
|---|---|
| Agency: | EPA |
| SNAP: | Non-Source |
| PRP: | Pharmacia and Solutia |
| Constituents: | PCBs |
| Media: | Soil |

**Case Findings:**
Cost: Not determined
Use: Not determined
Risk: -15% to -60% (typically -55%)

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 105: RED Report Case Study 1 – Anniston, Alabama



**REDReport**   Times Beach                                      No: 2

| | | | |
|---|---|---|---|
| Use: | Residential, Commercial | Date of Incident: | 1982 |
| Address: | Mulitple | Class: | VIII |
| City: | Times Beach | Type: | Environmental |
| State: | Missouri | Issue: | Contamination |
| APN: | Multiple | Stage: | Ongoing |

**Case Overview:**

In 1982, the Center for Disease Control recommended permanently relocating residents in Times Beach after dioxin contamination was discovered to have spread across the town in a flood. Times Beach was placed on the National Priorities List in 1983 and removed in 2001.

**Case Research:**

Starting in the early 1970s, Times Beach used waste oil as a dust control measure for unpaved roads in the town. An investigation by the EPA in 1982 discovered that the town used dioxin-contaminated oil. Shortly after, the Meramec River flooded the town and residents evacuated.

In response to a health advisory issued by the Center for Disease Control, the EPA announced in February 1983 the permanent relocation of 800 residential properties and 30 businesses in Times Beach due to contamination.

The EPA funded the remediation of the town. The remediation involved demolishing and incinerating hazardous materials and constructing a ring levee to protect against future floods. The cleanup was completed in 1997.

As of 1999, the area is now Route 66 State Park.

**Site Overview:**

The sites were residential and commercial properties that were demolished.

**Building Overview:**

Improvements consisted of residential and commercial properties before they were demolished.

**Environmental:**

| | |
|---|---|
| Agency: | EPA |
| SNAP: | Non-Source |
| PRP: | City of Times Beach |
| Constituents: | Dioxins |
| Media: | Soil |

**Case Findings:**

Cost: Not determined
Use: Not determined
Risk: -100% (Demolished)

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 106: RED Report Case Study 2 – Times Beach, Missouri



| REDReport | Mount Dioxin | No: 3 |
|---|---|---|

| Use: | Residential | Date of Incident: | 1995 |
|---|---|---|---|
| Address: | Multiple | Class: | VIII |
| City: | Pensacola | Type: | Environmental |
| State: | Florida | Issue: | Contamination |
| APN: | Multiple | Stage: | Ongoing |

**Case Overview:**

In 1995, soil samples from neighboring properties to the Escambia Wood Treating Facility revealed dioxin, arsenic, and lead contamination. The Escambia Wood Treating Facility was placed on the National Priorities List in 1994.

**Case Research:**

From 1942 to 1982, the Escambia Wood Treating Company (ETC) created pressure-treated wood products. In 1991, the Escambia Wood Treating Company abandoned the facility leaving approximately 120 acres of soil contamination and a 1.5 mile long plume of groundwater contamination.

By 1992, the EPA evacuated and stockpiled approximately 225,000 cubic yards of contaminated materials with a liner cap. The mound of contaminated material became known as "Mt. Dioxin."

In 1997 the EPA released a Record of Decision (ROD) to permanently relocate 358 residents from the Rosewood Terrace, Oak Park, Herman & Pearl/Goulding subdivision, and Escambia Arms Apartments. In 2006, the EPA included the permanent relocation of the Clarinda Triangle Neighborhood.

Relocation and demolition of the former residential neighborhoods ended in 2008 and included more than 400 households. Land use of the former residential homes was restricted to commercial and industrial uses.

As of 2018, "the EPA transferred the 70-acre parcel of land and placed it under the control of Escambia County for the development of a new commercial, and potentially industrial, facility intended to bring new life to the previously-abandoned residential neighborhoods on North Palafox." (PNJ, 2021)

**Site Overview:**

The sites were residential properties that were demolished.

**Building Overview:**

Improvements consisted of residential properties before they were demolished.

**Environmental:**

| Agency: | EPA |
|---|---|
| SNAP: | Non-Source |
| PRP: | ETC |
| Constituents: | See Case Research |
| Media: | Soil, Groundwater |

**Case Findings:**

Cost & Use: Not determined
Risk: -100% (Demolished)

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 107: RED Report Case Study 3 – Mount Dioxin, Florida

201



**REDReport**    **Carver Terrace**    No: 4

| Use: | Residential | | Date of Incident: | 2013 |
|---|---|---|---|---|
| Address: | Multiple | | Class: | VIII |
| City: | Port Arthur | | Type: | Environmental |
| State: | Texas | | Issue: | Contamination |
| APN: | Multiple | | Stage: | Ongoing |

**Case Overview:**

Smoke stacks released from the Motiva Oil Refinery contain elevated levels of benzene, sulfur dioxide, hydrogen sulfide, 1,2-butadiene.

**Case Research:**

In 2013, Carver Terrace was selected by the Port Arthur Housing Authority (PAHA) for the Housing Mobility Program, which intended to demolish 204 public housing units and assisted in finding relocation housing.

The Port Arthur Housing Authority received approval from HUD for $20 million in disaster relief money to help facilitate new replacement housing for Carver Terrace residents.

Between 2015 and 2016, the Carver Terrace housing units were demolished.

**Site Overview:**
The sites were residential properties that were demolished.

**Building Overview:**
Improvements consisted of residential properties before they were demolished.

**Environmental:**
Agency: Port Arthur Housing Authority
SNAP: Non-Source
PRP: Motiva, Valero
Constituents: See Case Overview
Media: Air and Soil

**Case Findings:**
Cost & Use: Not determined
Risk: -100% (Demolished)

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 108: RED Report Case Study 4 – Carver Terrace, Texas

## REDReport    Agriculture Street Landfill                    No: 5

| Use: | Residential, School, Rec. Center, Community Center, Substation | Date of Incident: | 1997 |
|---|---|---|---|
| Address: | Multiple | Class: | VIII |
| City: | New Orleans | Type: | Environmental |
| State: | Lousiana | Issue: | Contamination |
| APN: | Multiple | Stage: | Ongoing |

**Case Overview:**

In 1997, the EPA issued an Action Memorandum for residential properties, a 48-acre undeveloped property, and a community center built on the former Agriculture Street Landfill. The EPA identified constituents of concern as lead, arsenic, and cPAHs. The Agriculture Street Landfill was placed on the National Priorities List (NPL) in 1994 and was partially deleted from the NPL in 2000 with some sites still in the process of removal.

**Case Research:**

The use of the Agriculture Street Landfill began in 1909 and continued until the 1950s. The landfill reopened in 1965 for one year to burn disposal debris created from Hurricane Betsy. Between the 1970s and 1980s, approximately 47 acres were developed into supported single-family homes, multiple-family dwellings, retail businesses, an elementary school (closed in 2005), a community center (closed in 2005), a recreation center (closed in 2005), and an electrical substation.

The cleanup process involved 179 Housing Authority of New Orleans townhomes, 128 Gordon Plaza apartments, 7 retail businesses, and 58 of 67 single-family homes in the Gordon Plaza subdivision. A Record of Decision was signed in 2002, determining no further action.

In 2005, Hurricane Katrina hit the area, destroying most structures except single-family homes and the electrical substation. The remaining structures await demolition and redevelopment, leaving the community largely "vacant and abandoned." According to a 2022 Washington Post article, residents' disaster insurance would not cover homes built on contaminated ground. Residents have requested relocation assistance for over 30 years.

In 2022, a civil court judge ordered the city of New Orleans to pay $75 million in property damage, relocation costs, and emotional stress.

**Site Overview:**

The sites included multiple uses before Hurricane Katrina destroyed most structures. Remaining sites include residential.

**Building Overview:**

Improvements consisted of residential homes, a school, community and recreation center, and an electronic substation.

**Environmental:**

| Agency: | EPA |
|---|---|
| SNAP: | Source & Non-source |
| PRP: | City of New Orleans |
| Constituents: | See Case Overview |
| Media: | Soil, Groundwater |

**Case Findings:**

Cost & Use: Not determined

Risk: -100% (Abandoned and Demolished)

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 109: RED Report Case Study 5 – Agricultural Street Landfill, Louisiana

203



| REDReport    Mossville | No: 6 |
|---|---|

| Use: | Residential | Date of Incident: | 2013 |
| Address: | Multiple | Class: | VIII |
| City: | Mossville | Type: | Environmental |
| State: | Louisiana | Issue: | Contamination |
| APN: | Multiple | Stage: | Ongoing |

**Case Overview:**

An estimated 4 million pounds of toxic chemicals including: dioxin, polycyclic aromatic hydrocarbons, xylene and toluene, ethylene dichloride, and heavy metals such as lead and mercury are released each year from the surrounding industrial plants.

**Case Research:**

In 1994, one million pounds of ethylene dichloride spilled, contaminating well water in the area (Condea Vista Spill). Residents engaged in a class action lawsuit against Condea Vista alleging that the company allowed carcinogen ethylene dichloride to seep into the town's soil. Residents won relocation opportunities and Condea Vista purchased properties between 1998 and 2004. Most of the structures were removed by 2004.

In 2013, Sasol announced a voluntary buyout program for Mossville residents to make room for Sasol to expand its facility. According to Sasol, 584 homes were purchased and 195 offers were rejected as of July 2020

In 2016 Sasol offered an additional buyout program to the whole town of Mossville to create a buffer zone for its industrial complex. Homeowners were offered $100,000 plus 60% of the appraised value of the house. Of the approximately 750 property owners who applied to the buyout program Sasol made offers to approximately 550. In Mossville 229 homeowners and 134 vacant land owners accepted.

"Every three or four days, another house disappears from the streets around the church. Concrete slabs and mailboxes mark the departed." (Nola, 2017)

"Mossville is now a shadow of what it once was, with many remaining houses surrounded by empty lots and bare slabs." (Advocate, 2021)

**Site Overview:**

The sites were residential properties that were demolished.

**Building Overview:**

Improvements consisted of residential properties before they were demolished.

**Environmental:**

| Agency: | Sasol |
| SNAP: | Non-Source |
| PRP: | Multiple |
| Constituents: | See Case Overview |
| Media: | Soil, Groundwater |

**Case Findings:**

Cost & Use: Not determined
Risk: -100% (Demolished)

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 110: RED Report Case Study 6 – Mossville, Louisiana



REDReport    **Doe Run**                                                    **No: 7**

| Use: | Residential | Date of Incident: | 2001 |
|---|---|---|---|
| Address: | Multiple | Class: | VIII |
| City: | Herculaneum | Type: | Environmental |
| State: | Missouri | Issue: | Contamination |
| APN: | Multiple | Stage: | Ongoing |

**Case Overview:**
Samples taken from the Doe Run Herculaneum Smelter and the surrounding community found elevated levels of lead, arsenic, cadmium, and other metals. In 2002, a Voluntary Property Purchase Plan was implemented for residential properties within a designated area.

**Case Research:**
From 1892 to 2013, the Doe Run Herculaneum Smelter processed lead and heavy metals. During operations, pollutants emitted in the form of stack emissions were deposited in the surrounding area.

In 2001, an Administrative Order involving the EPA, Missouri Department of Natural Resources and Doe Run required Doe Run to cleanup lead-contaminated residential soils in the community.

By April 2002, the Missouri Department of Natural Resources (MDNR) entered a settlement agreement with Doe Run, establishing a Voluntary Property Purchase Plan. Approximately 160 homes received purchase options. Homes purchased in the Plan were demolished.

In addition, a separate study included 474 properties analyzed, of which 53 were vacant lots or improved with mobile homes, and 401 were improved single-family residential. The mobile homes were treated as vacant lots because they may be moved.

The total unimpaired value of the 474 properties was $46,495,033. The total remediation costs were reported to be $62,304,040. The total risk was estimated to be -50% of the unimpaired value.

**Site Overview:**
The sites were residential properties that were demolished.

**Building Overview:**
Improvements consisted of residential properties before they were demolished.

**Environmental:**
| Agency: | MDoH & EPA |
|---|---|
| SNAP: | Non-Source |
| PRP: | Doe Run |
| Constituents: | See Case Overview |
| Media: | Soil |

**Case Findings:**
Cost: $62,304,040 - 100%
Use: Not developed
Risk: $23,247,516 - 50%

Unimpaired: $46,495,033

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 111: RED Report Case Study 7 – Doe Run, Missouri

205



| REDReport    Love Canal | | No: 8 |
|---|---|---|
| **Use:** | Residential, School | **Date of Incident:** 1978 |
| **Address:** | Multiple | **Class:** VIII |
| **City:** | Niagara Falls | **Type:** Environmental |
| **State:** | New York | **Issue:** Contamination |
| **APN:** | Multiple | **Stage:** Ongoing |

**Case Overview:**

In 1978, sampling discovered chemical contamination at residential properties adjacent to the original landfill. The Love Canal was placed on the National Priorities List in 1983 and removed in 2004.

**Case Research:**

From 1942 to 1953, Hooker Chemical Company used Love Canal to dispose of approximately 21,000 tons of chemical waste. Constituents included: polycyclic aromatic hydrocarbons (PAHs), halogenated organics, pesticides, chlorobenzenes and trichlorophenols, containing 2,3,7,8- tetrachlorodibenzo-p-dioxin (TCDD or dioxin).

In 1953 after covering the landfill with soil, Hooker Chemicals deeded the Love Canal to the Niagara Falls Board of Education, which developed the land with residential homes and a school.

After the discovery of contamination in the soil, an Emergency Declaration was issued in 1978 that allowed residences on 97th and 99th streets (Rings I and II) to evacuate. In 1980, President Carter issued $20 million in federal funds to purchase homes and assist in relocation. By 1982, Ring I and II homes and the 99th Street School were demolished.

Many homes were bought out and demolished, and some areas remain vacant today. Homes in the northern Black Creek area were bought out but were later found to be environmentally unaffected. Yet, these homes sustained a -20% discount due to market resistance. Over time, this discount gradually reduced, and today sell for full value. Market resistance generally ranged from -20% to -100%

**Site Overview:**

The sites were residential properties and a school that were demolished.

**Building Overview:**

Improvements consisted of residential properties and a school before they were demolished.

**Environmental:**

| Agency: | EPA |
|---|---|
| SNAP: | SNAP |
| PRP: | Hooker Chemicals |
| Constituents: | See Case Research |
| Media: | Soil |

**Case Findings:**

Cost: Not determined
Use: Not determined
Risk: -20% (Adjacent/Proximate) to -100% (Source/Non-source)

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 112: RED Report Case Study 8 – Love Canal, New York



**REDReport**   **PG&E Hinkley Compressor Station**                                    **No: 9**

| Use: | Residential | Date of Incident: | 1993 - 2019 |
| Address: | Multiple | Class: | VIII |
| City: | Hinkley | Type: | Environmental |
| State: | California | Issue: | Contamination |
| APN: | Multiple | Stage: | Ongoing |

**Case Overview:**
In 1952 PG&E started using hexavalent chromium, also known as chromium 6, to fight corrosion in cooling towers. The source site is an industrial site located at 35863 Fairview Road, Hinkley, California.

**Case Research:**
The contamination site is approximately 2 miles southeast of Hinkley and 12 miles west of Barstow in southern California.

Contaminated wastewater from the cooling towers was discharged to unlined ponds at the site, which then percolated to the groundwater, affecting an area approximately 2 miles long and nearly a mile wide. The contaminated water was also used as irrigation water by local farmers. PG&E was under orders from the Lahontan Water Board to stop plume expansion and clean up the plume.

PG&E purchased numerous properties located above the plume, razing the improvements and leaving properties vacant. The contaminated area in Hinkley is virtually a ghost town. The sites are now largely vacant.

**Site Overview:**
The residential home sites are generally level.

**Building Overview:**
There were numerous residential homes surrounding the PG&E facilities.

**Environmental:**

| | |
| --- | --- |
| Agency: | State of CA EPA |
| SNAP: | Non-source |
| PRP: | PG&E |
| Constituents: | Hexavalent Chromium |
| Media: | Household Water |

**Case Findings:**
Cost: Not determined
Use: Not determined
Risk: Up to -100%

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 113: RED Report Case Study 9 – PG&E Hinkley Compressor Station



| **RED**Report    Flint, Michigan | | **No:** 10 |
|---|---|---|
| **Use:** Residential | | **Date of Incident:** 2015 |
| **Address:** Multiple | | **Class:** VIII |
| **City:** Flint | | **Type:** Environmental |
| **State:** Michigan | | **Issue:** Contamination |
| **APN:** Multiple | | **Stage:** Ongoing |

**Case Overview:**

In 2015, water in Flint homes was found to exceed the EPA's standard for lead in drinking water. In October 2016, Flint residents were advised to use approved water filters for lead removal before drinking city tap water.

**Case Research:**

On April 25, 2014, the City of Flint began sourcing their water from the Flint River. The water pipes corroded, and the drinking water in Flint became contaminated with lead and other pollutants.

The City of Flint received $100 million from the EPA and over $350 million from the State of Michigan to improve their water quality and access to food, healthcare, education, and work.

A study in the American Economic Journal estimated that Flint's housing stock fell by at least $520 million from 2015-2019. The study estimated the decline in average home values to be between -27% and -39% after switching the source of drinking water to the Flint River. Prices remained depressed 16 months after drinking water in Flint was declared safe for consumption.

In response to class action and individual lawsuits from over 90,000 Flint residents, the Eastern District of Michigan approved a $626.25 million settlement.

In its remediation efforts, the City of Flint reported 95% of its lead service lines were replaced by September 2022. Flint signed a $17.9 million contract with Lakeshore Global Corporation to complete the final phase of the project.

**Site Overview:**

The sites are residential properties.

**Building Overview:**

Improvements consist of residential properties.

**Environmental:**

| | |
|---|---|
| Agency: | EPA |
| SNAP: | Non-Source |
| PRP: | City of Flint |
| Constituents: | Lead |
| Media: | Household Water |

**Case Findings:**

Cost: Not determined
Use: Not determined
Risk: -27% to -39%

© Copyright 2023. Landmark Research Group, LLC. All rights reserved. LandmarkResearch.com

Figure 114: RED Report Case Study 10 – Flint, Michigan

208

**Historical Aerial Imagery of the Subject Property Neighborhood**



Figure 115: Subject Property Neighborhood in 1952a



Figure 116: Subject Property Neighborhood in 1952b



Figure 117: Subject Property Neighborhood in 1958



Figure 118: Subject Property Neighborhood in 1968



Figure 119: Subject Property Neighborhood in 1973a



Figure 120: Subject Property Neighborhood in 1973b



Figure 121: Subject Property Neighborhood in 1980



Figure 122: Subject Property Neighborhood in 1988a



Figure 123: Subject Property Neighborhood in 1988b

217



Figure 124: Subject Property Neighborhood in 1992



Figure 125: Subject Property Neighborhood in 1996



Figure 126: Subject Property Neighborhood in 1998



Figure 127: Subject Property Neighborhood in 2009



Figure 128: Subject Property Neighborhood in 2011



Figure 129: Subject Property Neighborhood in 2014



**Ownership as of 2023**
- Publicly Owned Parcels
- Non Publicly Owned Parcels
- Former Monsanto Plant

Source: The EDR Aerial Photo Decade Package. Photo Year 2017

Figure 130: Subject Property Neighborhood in 2017

**List of Figures**

Figure 1: Subject Properties Map _____ 2
Figure 2: Environmental Exposure Pathways (SNAP)_____ 4
Figure 3: Timeline_____ 5
Figure 4: Ordinance Fines _____ 8
Figure 5: Aerial Image of the Subject Property Neighborhood in 1968_____ 12
Figure 6: Aerial Image of the Subject Property Neighborhood in 1988_____ 12
Figure 7: Damage Summary _____ 14
Figure 8: Subject Properties Map _____ 25
Figure 9: Ordinance Fines_____ 26
Figure 10: Real Estate Damage Economics _____ 28
Figure 11: Test vs. Control Exhibit_____ 29
Figure 12: Control Area Map _____ 30
Figure 13: Subject Neighborhood Improved Properties Matrix _____ 31
Figure 14: Subject Neighborhood Map_____ 32
Figure 15: Subject Neighborhood with St. Louis Gateway Arch in Background ___ 32
Figure 16: Bundle of Rights _____ 35
Figure 17: Lease Matrix _____ 38
Figure 18: Improved Control Leases _____ 39
Figure 19: Use Effect Schedule _____ 42
Figure 20: PCB Literature Summary, Article 1 _____ 45
Figure 21: PCB Literature Summary, Article 2 _____ 46
Figure 22: PCB Literature Summary, Articles 3-4 _____ 47
Figure 23: PCB Literature Summary, Articles 5-6 _____ 48
Figure 24: PCB Literature Summary, Articles 7-8 _____ 49
Figure 25: Dioxin Literature Summary, Article 1 _____ 51
Figure 26: Dioxin Literature Summary, Articles 2-4 _____ 52
Figure 27: Case Study Summary, 1-3_____ 55
Figure 28: Case Study Summary, 4-5_____ 56
Figure 29: Case Study Summary, 6-8_____ 57
Figure 30: Case Study Summary, 9-10_____ 58
Figure 31: Case Study Adjustment Grid 1-5_____ 59
Figure 32: Case Study Adjustment Grid 6-10_____ 60
Figure 33: Case Study Map_____ 61
Figure 34: Sales Matrix – Improved_____ 63
Figure 35: Improved Control Sales Map _____ 64
Figure 36: Sales Matrix – Land _____ 65
Figure 37: Control Land Sales _____ 66
Figure 38: Risk Effect Summary _____ 67
Figure 39: Damage Summary _____ 68
Figure 40: Appraisal Methodologies _____ 108
Figure 41: Geographic Information Systems (GIS) Overview_____ 111
Figure 42: Excerpt from the Bell Chart _____ 113
Figure 43: Detrimental Condition Matrix_____ 115
Figure 44: Bell Chart _____ 131

Figure 45: Real Estate Damage Economics: A Comparative Illustration _____ 132
Figure 46: Environmental Exposure Pathways (SNAP) _____ 133
Figure 47: Media Summary, Articles 1-2 _____ 136
Figure 48: Media Summary, Articles 3-6 _____ 137
Figure 49: Media Summary, Articles 7-8 _____ 138
Figure 50: Media Summary, Articles 9-11 _____ 139
Figure 51: Subject Properties Summary, 1-20 _____ 140
Figure 52: Subject Properties Summary, 21-40 _____ 141
Figure 53: Subject Properties Summary, 41-60 _____ 142
Figure 54: Subject Properties Summary, 61-80 _____ 143
Figure 55: Subject Properties Summary, 81-100 _____ 144
Figure 56: Subject Properties Summary, 101-120 _____ 145
Figure 57: Subject Properties Summary, 121-140 _____ 146
Figure 58: Subject Properties Summary, 141-160 _____ 147
Figure 59: Subject Properties Summary, 161-180 _____ 148
Figure 60: Subject Properties Summary, 181-200 _____ 149
Figure 61: Subject Properties Summary, 201-220 _____ 150
Figure 62: Subject Properties Summary, 221-240 _____ 151
Figure 63: Subject Properties Summary, 241-260 _____ 152
Figure 64: Subject Properties Summary, 261-273 _____ 153
Figure 65: Regional Map _____ 154
Figure 66: Subject Area Map _____ 155
Figure 67: Location Map _____ 156
Figure 68: Zoning Map _____ 158
Figure 69: Market Trends Data _____ 163
Figure 70: Consumer Price Index _____ 164
Figure 71: Literature Review - Use Effect Articles 1-3 _____ 165
Figure 72: Literature Review - Use Effect Articles 4-6 _____ 166
Figure 73: Literature Review - Use Effect Articles 7-9 _____ 167
Figure 74: Literature Review - Use Effect Articles 10-12 _____ 168
Figure 75: Literature Review - Use Effect Articles 13-14 _____ 169
Figure 76: Literature Review - Use Effect Articles 15-18 _____ 170
Figure 77: Literature Review - Use Effect Articles 19-21 _____ 171
Figure 78: Literature Review - Use Effect Articles 22-23 _____ 172
Figure 79: Literature Review - Use Effect Articles 24-26 _____ 173
Figure 80: Literature Review - Use Effect Articles 27-28 _____ 174
Figure 81: Literature Review - Use Effect Articles 29-30 _____ 175
Figure 82: Literature Review - Use Effect Articles 31-32 _____ 176
Figure 83: Literature Review - Use Effect Articles 33-34 _____ 177
Figure 84: Literature Review - Use Effect Articles 35-37 _____ 178
Figure 85: Literature Review - Use Effect Articles 38-40 _____ 179
Figure 86: Ground Lease Chart _____ 180
Figure 87: Ground Lease Rates, 1-20 _____ 181
Figure 88: Ground Lease Rates, 21-40 _____ 182
Figure 89: Ground Lease Rates, 41-60 _____ 183
Figure 90: Ground Lease Rates, 61-70 _____ 184

Figure 91: Ground Lease Rates, 71-78 _____ 185
Figure 92: Ground Lease Rates, 79-86 _____ 186
Figure 93: Ground Lease Ratees, 87-98 _____ 187
Figure 94: Ground Lease Rates, 99-111 _____ 188
Figure 95: Caseyville Improved Lease Matrix _____ 189
Figure 96: Fairview Heights Improved Lease Matrix_____ 190
Figure 97: Belleville Improved Lease Matrix_____ 191
Figure 98: Caseyville Improved Sales Matrix _____ 192
Figure 99: Fairview Heights Improved Sales Matrix _____ 193
Figure 100: Belleville Improved Sales Matrix _____ 194
Figure 101: Fairmont City Improved Sales Matrix_____ 195
Figure 102: Caseyville Land Sales Matrix _____ 196
Figure 103: Fairview Heights Land Sales Matrix_____ 197
Figure 104: Belleville Land Sales Matrix _____ 198
Figure 105: RED Report Case Study 1 – Anniston, Alabama _____ 199
Figure 106: RED Report Case Study 2 – Times Beach, Missouri _____ 200
Figure 107: RED Report Case Study 3 – Mount Dioxin, Florida_____ 201
Figure 108: RED Report Case Study 4 – Carver Terrace, Texas _____ 202
Figure 109: RED Report Case Study 5 – Agricultural Street Landfill, Louisiana _____ 203
Figure 110: RED Report Case Study 6 – Mossville, Louisiana _____ 204
Figure 111: RED Report Case Study 7 – Doe Run, Missouri _____ 205
Figure 112: RED Report Case Study 8 – Love Canal, New York _____ 206
Figure 113: RED Report Case Study 9 – PG&E Hinkley Compressor Station _____ 207
Figure 114: RED Report Case Study 10 – Flint, Michigan _____ 208
Figure 115: Subject Property Neighborhood in 1952a_____ 209
Figure 116: Subject Property Neighborhood in 1952b_____ 210
Figure 117: Subject Property Neighborhood in 1958_____ 211
Figure 118: Subject Property Neighborhood in 1968_____ 212
Figure 119: Subject Property Neighborhood in 1973a_____ 213
Figure 120: Subject Property Neighborhood in 1973b_____ 214
Figure 121: Subject Property Neighborhood in 1980_____ 215
Figure 122: Subject Property Neighborhood in 1988a_____ 216
Figure 123: Subject Property Neighborhood in 1988b_____ 217
Figure 124: Subject Property Neighborhood in 1992_____ 218
Figure 125: Subject Property Neighborhood in 1996_____ 219
Figure 126: Subject Property Neighborhood in 1998_____ 220
Figure 127: Subject Property Neighborhood in 2009_____ 221
Figure 128: Subject Property Neighborhood in 2011_____ 222
Figure 129: Subject Property Neighborhood in 2014_____ 223
Figure 130: Subject Property Neighborhood in 2017_____ 224

227

© 2024 Landmark Research Group, LLC
All Rights Reserved