# EXHIBIT 3

## EXPERT REPORT – REBUTTAL OF JLL REPORT

**In the Matter Of:**

City of East St. Louis
vs
Monsanto Company, Solutia Inc., and Pharmacia, LLC

United States District Court
For the Southern District of Illinois
Civil Action Number 3:21-cv-00232-DWD

County of St. Clair
State of Illinois

---

**City of East St. Louis**

**Clients:**

The Driscoll Firm, LLC
The Driscoll Firm, P.C.
Chatham & Baricevic
Sanders Phillips Grossman, LLC
Smouse & Mason, LLC

**Prepared By:**

Randall Bell, PhD, MBA, MAI
Landmark Research Group, LLC
33971 Selva Road, Suite 230
Dana Point, California 92629





**Landmark Research Group, LLC**
33971 Selva Road, Suite 230
Dana Point, California 92629
Office: (949) 497-7600
LandmarkResearch.com

January 28, 2025

John Driscoll, Esq.
The Driscoll Firm, P.C.
1311 Avenida Ponce de Leon, 6th Floor
San Juan, Puerto Rico 00907

Re:     Expert Rebuttal Report
        Impacts of PCB Chemicals on 273 Subject Properties
        City of East St. Louis, State of Illinois

Dear Mr. Driscoll:

In accordance with your request, I have set forth a rebuttal, with an opinion of value, of the opinions given by Monsanto's experts in this matter, Mr. Richard Roddewig and Mr. Charles Brigden.

The accompanying expert rebuttal report can only be understood in combination with the supporting work file documentation, deposition, and trial testimony. Accordingly, the work file is considered a part of this report. This transmittal letter, case overview, and the attached expert report constitute one complete document and cannot be utilized separately. As discovery is ongoing in this case, I reserve the right to revise and supplement this expert rebuttal report.

Very truly yours,

_____
Randall Bell, PhD, MBA, MAI
Illinois State License (553002895)

2

**INTRODUCTION**

This case involves determining the impacts due to the presence of PCBs since 1955 on tested East St. Louis properties. The PCBs that were identified on the East St. Louis subject properties did not exist prior to Monsanto's commencing PCB production at its W.G. Krummrich Plant in the neighboring city of Sauget, Illinois, in 1936.[1] During the PCB production period at Krummrich from 1936 through 1977, Monsanto knowingly emitted toxic PCBs off its property and onto that of its neighbors, including East St. Louis. In December 1955, Monsanto reacted to the serious illnesses affecting its employees by "venting" those toxins into the atmosphere over the City. The prevailing winds spread the toxins over East St. Louis.[2] Monsanto did not advise or warn East St. Louis of the public health and environmental hazards associated with PCBs. Indeed, even after it became public knowledge in the mid-to-late 1970s that Monsanto's PCBs had caused a worldwide human health and environmental disaster, Monsanto never offered to conduct any public testing or cleanup in East St. Louis.[3] Eventually, the EPA conducted testing in East St. Louis, where they discovered Monsanto's PCBs.[4] Accordingly, the EPA recommended further investigation. Subsequent testing was conducted by Environmental Health & Engineering in 2022.

---

[1] Robert Kaley Deposition, page 37, lines 12-16; *see also* Kaley Deposition Exhibit 12, Interdepartmental Task Force on PCBs, *Polychlorinated Biphenyls and the Environment* (May, 1972); *see also* Kaley Exhibit 19, U.S. EPA, *PCBs in the United States Industrial Use and Environmental Distribution*, Office of Toxic Substances, Washington, D.C. (February, 1976).
[2] Robert Kaley Deposition, page 41, lines 9-25, to page 42, lines 1-17; *see also id.* at page 45, lines 9-22; *see also* Kaley Deposition Exhibit 14, US EPA Archive Document, David A. Weeks, P.E., BCEE, CIH, *Air Modeling Analysis of Potential Historical Releases at Solutia, Inc. W.G. Krummrich Plant, Sauget, Illinois*, Risk Management & Engineering Ltd. (Jan. 20, 2011); *see also* Kaley Exhibit 23, Stratton and Sosebee, *PCB and PCT Contamination of the Environment near Sites of Manufacture and Use*, Environmental Science and Technology (Vol. 10, No. 3, Dec. 1976); Kaley Exhibit 16, Hermanson, et al., *Polychlorinated Biphenyls in Tree Bark near Former Manufacturing and Incineration Facilities in Sauget, Illinois, United States*, Environmental Science and Technology (Vol. 50, No. 12, May 16, 2016); *see also* Kaley Exhibit 21, Gonzalez, et al., *PCBs and dioxins/furans in attic dust collected near former PCB production and secondary copper facilities in Sauget, IL*, Procedia Environmental Sciences (Vol. 4 (2011).
[3] Robert Kaley Deposition, page 160, lines 4-12; *see also id.* at page 176, lines 1-7.
[4] U.S. EPA, Jose Cisneros Letter to the Honorable Emeka Jackson-Hicks (Sep. 9, 2016).

3

Economic impacts have long been determined utilizing the real estate valuation profession's framework of cost-use-risk effects.[5] "Cost Effects" measure cleanup costs; "Use Effects" measure damages due to the historical and continued presence (or occupancy) of PCBs on the subject properties until they are cleaned up; and "Risk Effects" measure the forward-thinking perception that a potential buyer would have when determining what price one would pay for a property knowing that it has (or had) PCBs.[6]

On February 16, 2024, I submitted an affirmative report setting forth my opinions on this matter ("Bell Report"). Monsanto's appraisal experts, Mr. Richard Roddewig and Mr. Charles Brigden, submitted an Appraisal Review Report on July 9, 2024, and two Supplemental Review Reports on September 3, 2024, and January 7, 2025 ("JLL Reports") in response to my opinions.

Although the JLL Reports do not offer opinions of market value or rental value of any specific property included in the Bell Report,[7] the reports baldly project the belief that there is no more than a -5% risk effect.[8] In contrast to the severe limitations of the JLL Report, the Bell Report considered all three standard components of real estate damages – cost, use, and risk effects.[9] Specifically, the Use Effect for the approximately 70 years that Monsanto has used the subject properties for the storage of their PCBs without the City's consent; and the Risk Effect outstanding from the presence of the PCBs on properties that will not end until the subject properties are cleaned up.[10]

Beyond JLL's limited opinion regarding the risk effects, the JLL Report contains a variety of errors, omissions, and misrepresentations that result in unreliable and irrelevant opinions regarding the matter at hand in this case–the presence of PCBs on tested East St. Louis Parcels since (at least) December 1955.

---

[5] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 18-22; The Appraisal Institute, Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process (Chicago, IL: Appraisal Institute, 2013); Randall Bell, *Real Estate Damages*, 3rd ed. (Chicago: Appraisal Institute, 2016); Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116; Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 186-189; and Charles Brigden Deposition January 17, 2025, page 204, lines 22-25 and page 205, lines 1-3.

[6] Charles Brigden Deposition January 17, 2025, page 217, lines 7-24.

[7] JLL Report, "Limiting Condition," page 21; Charles Brigden Deposition January 21, 2025, page 25, lines 8-12; page 28, lines 2-5; and page 31, lines 12-25, to page 32, lines 1-13.

[8] JLL Report, page 11. This opinion only applies to uncontaminated adjacent or proximate properties and properties that have been remediated. It does not apply to the subject properties which have PCBs and have not been remediated.

[9] Charles Brigden Deposition January 17, 2025, page 205, lines 4-17.

[10] Bell Report, page 67.

4

Ultimately, the JLL Report ignores Monsanto's use of the subject properties for the storage of PCBs, which in real estate damage economics is unequivocally a "Use Effect."[11] Instead, JLL utilizes their term "actual use" which is a term they manufactured.[12] It has no basis in the real estate damage economic and appraisal professions literature, and yet it is used by JLL. The term "actual use" is fatally flawed because it is not a term used in the appraisal profession, but it does conveniently ignore Monsanto's use of the subject properties and fails to account for the infringement on the bundle of rights, including the right to use, occupy, exclude, and for peaceful enjoyment.[13]

For example, when the right to use is taken, infringed, or utilized, there has been an impairment to the "bundle of rights." These types of damages are considered Use Effects, which are measured utilizing lease rates over the period of impairment. The right to use a property is transacted thousands, if not millions, of times, every single day at a market rental rate. This issue is often played out in legal settings, one example is condemnation. The textbook *Real Property Valuation in Condemnation*, published by the Appraisal Institute, explains:

> The most common measure of damages accepted by the courts is the rental value of the easement area for the period of occupancy by the condemnor.[14]

> The fact that a taking is temporary in nature does not relieve the sovereign from paying just compensation.[15]

**Revised Use Effect Calculations**

The Bell Report contained Use Effect calculations based on the client's instruction to include any of the 273 tested parcels that were owned by a government entity since the ordinance violation on July 1, 1973. Then, in March 2024, after the Bell Report was issued, the Court, however, dismissed the nuisance ordinance violation count. Accordingly, as instructed by the client, Use Effect calculations in this rebuttal have been revised to only include parcels during the years in which title was held by the City of East St. Louis (rather than not all any government entities). Additionally, based on evidence obtained after the Bell Report was issued, the Use Effect in this

---

[11] Charles Brigden Deposition January 17, 2025, page 284, lines 2-11.

[12] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that the term "actual use" was added by JLL as "just a modifier of that term [use] to distinguish from hypothetical use of a property." (Hamilton Parks v. SCE Depo. 15:12-19).

[13] See Bell Report, pages 10-11. "In other words, the rental rate reflects the market value for the right to use a property, one example would be the right to use the subject properties for the storage of PCBs."

[14] Appraisal Institute, *Real Property Valuation in Condemnation* (Appraisal Institute: 2018), 218; citing to United States v. General Motors Corp., 323 U.S. 373 (1945).

[15] Appraisal Institute, *Real Property Valuation in Condemnation* (Appraisal Institute: 2018), 218.

rebuttal were calculated dating back to December 1, 1955.[16] In essence, this assessment period goes back throughout most, but not all, of the entire time period of contamination, which Mr. Brigden confirmed is an important consideration.[17] The revised Use Effect calculations did not change the methodology, but only the mathematical calculations involved.



Figure 1: Revised Subject Properties Map

Utilizing December 1955 as a starting date is consistent with professional appraisal practice when an entity (private or public) utilizes or occupies a property for any purpose. For example, when a condemnor exercises the right to use a property, "[t]he most common measure of damages accepted by courts is the rental value of the easement area for the period of occupancy by the condemnor."[18] The basic premise is that an owner must be compensated for the taking of

---

[16] Reible Deposition at 26–27 - Between 1/1/1936 and 12/1/1955 (7,274 days) that is equivalent to 36,370 pounds of emissions. Substantial contamination as of Dec. 1955 is also supported by Erickson 9/10/24 Rebuttal Report at pages 24–25.

[17] Charles Brigden Deposition January 17, 2025, page 217, lines 17-24.

[18] The Appraisal Institute, *Real Property Valuation in Condemnation* (Chicago: 2018), 218.

the land (i.e., the value of the land and any damages accrued as a result of the taking), as opposed to being compensated just for the land taken.[19]

In real estate, these property rights are referred to as the "bundle of rights" because ownership of a parcel of real estate may embrace a great many rights, such as the right to its occupancy and use; the right to sell it in whole or in part; the right to bequeath; the right to transfer, by contract, for specified periods of time, the benefit to be derived by occupancy and use of the real estate.[20] Real estate transactions do not require that the entire bundle of rights be transferred; the right of occupancy and use of real estate is transacted every day and paid for as a rental rate, which is why utilizing a market rental rate is the appropriate measure when a Use Effect exists.

Furthermore, the bundle of rights is the right to do any of these, whether or not they have been exercised. For example, "the right to refuse to exercise any property rights," as the absence of compulsion to use any right merely rounds out and makes complete the freedom of will in the enjoyment of property ownership.[21] Moreover, it is also generally recognized that property encompasses the entire bundle of rights inherent in real estate ownership and that the taking or infringement on these rights often constitutes a taking, even if no part of the physical real estate is taken.[22]

The revised Use Effect calculations included in this Rebuttal include three Scenarios:

> Scenario A – Bell Report Market Rent Rates ($1,400 per month improved and $233 per month land)
>
> Scenario B – JLL Report Market Rent Rates ($900 per month improved and $233 per month land)[23]
>
> Scenario C – Land Only Market Rent ($233 per month)

---

[19] The Appraisal Institute, *Real Property Valuation in Condemnation* (Chicago: 2018), 13.

[20] JD Eaton, *Real Estate Valuation in Litigation, 2ⁿᵈ Edition* (Chicago, IL: Appraisal Institute, 1995), 45.

[21] Leonard C. Smith, "The Bundle of Property Rights," *The Appraisal Journal* (October 1956): 487.

[22] JD Eaton, *Real Estate Valuation in Litigation, 2ⁿᵈ Edition* (Chicago, IL: Appraisal Institute, 1995), 16.

[23] The JLL Report determined that properties in East St. Louis were renting for $900 per month compared to the Bell Report's $1,400 per month rental rate based on comparable uncontaminated control neighborhoods, see JLL Report page 80. Mr. Brigden testified as to this number: "[W]hen consideration of proper local rents is performed $900 (per month) is the result." Charles Brigden Deposition January 21, 2025, page 287, lines 20-21. The Bell Report noted that JLL's utilization of East St. Louis and Cahokia data is improper due to the various contamination issues in both cities, however. [Bell Report pages 10, 29-30, and 38]. Moreover, Mr. Brigden did not appraise or apply his findings to any of the 273 subject properties; *see* JLL Report, "Limiting Condition," page 21; Charles Brigden Deposition January 21, 2025, page 25, lines 8-12; page 28, lines 2-5; and page 31, lines 12-25, to page 32, lines 1-13.

7

In addition, JLL proposed using a 3% compounding rate; however, they did not include any evidence to support such a rate, **nor did they conduct any Use Effect calculations**.[24] The Bell Report utilized a 9% rate, which is consistent with the historical S&P 500 index, and therefore represents the broad overall performance of the economy.[25] Additionally, the rate is consistent with Illinois law, 735 ILCS 5/2-1303, which provides: "[J]udgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied." The following Figure 1 presents the cost, use, and risk effect damages with the revised Use Effect calculations; a detailed table of the calculations is contained within the workfile and presented in the addenda of this rebuttal.



Figure 2: Cost-Use-Risk Effect Timeline

Scenario A is most appropriate because it utilizes rental rates of uncontaminated properties as control rates, and therefore reflects the expected rental value of the East St. Louis properties

---

[24] The JLL Reports and work files do not contain any Use Effect analysis or calculations. In addition, Mr. Brigden confirmed that none were conducted for his deposition. Charles Brigden Deposition January 17, 2025, page 263, lines 15-25, to page 264, lines 1-8.

[25] Using a broad overall economic indicator captures a reasonable rate of return without needing to make assumptions about how and where money would be invested.

absent Monsanto's PCB contamination. This is consistent with *The Appraisal of Real Estate, 15th Edition*, which sets forth that when developing opinions of value, appraisers can expand searches across geographies.[26] JLL is critical that the Bell Report does not utilize rental data from East St. Louis and the adjacent city of Cahokia, but JLL ignores that the Bell Report's use of rental data from adjacent cities in St. Clair County is in line with all recognized real estate authorities.[27] JLL's criticism is not even consistent with its own approach because the JLL Reports include data from case studies developed in at least seven different states.[28] Inexplicably, Mr. Brigden testified that he did not even know whether the control cities the JLL Reports considered were uncontaminated, although this is a key issue when identifying proper control areas.[29] Mr. Brigden's failure to confirm that the JLL control areas were uncontaminated ignores basic appraisal principles.

Scenario B is less appropriate because the $900 rental rate that JLL calculated is based on rental data from East St. Louis and Cahokia Heights. The Bell Report (page 38) appropriately considered but did not include those cities from its rental rate analysis because of their known contamination issues. As explained above, a Use Effect analysis must consider uncontaminated areas when determining the control rental rate to eliminate any detrimental impact on rental value caused by the contamination.

Scenario C is clearly inappropriate (and is presented for comparison purposes only) because it uses a land lease rate only. The other Scenarios apply a rental rate derived from improved properties to the East St. Louis properties that had improvements when Monsanto's PCB storage period "began"[30] on December 1, 1955. It is appropriate to utilize an improved property rental rate for properties that had improvements when Monsanto's PCB storage began because the subsequent loss of those improvements cannot be disentangled from the PCB contamination. As the case studies considered in the Bell Report demonstrate, PCB or similar contamination in residential areas often leads to depopulation and abandonment.

Lastly, the Risk Effect in the above calculations is 0% because they assume that full remediation has been carried out, and the "stigma" therefore has been removed.[31] In the Bell Report, this was referred to as the "as-if" repaired condition. Cleaning up the PCBs both terminates the Use Effect and eliminates the Risk Effect.

---

[26] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 356.

[27] JLL Report, page 80.

[28] See JLL PCB Case Studies in JLL Report Section 15.14.

[29] Charles Brigden Deposition January 17, 2025, page 320, lines 7-14.

[30] This is meant in the sense that this Report assumes a beginning date of December 1, 1955, for its Use Effect calculations; the evidence shows that Monsanto's PCB storage likely began even earlier. Danny Reible Deposition August 16, 2024, page 25:21 through 27:15; Mitchell D. Erickson, Ph.D.'s September 10, 2024 Rebuttal Report, pages 24-26.

[31] The Bell Report set forth that in the "as-if" repaired condition, the subject properties would still incur $18,400,000 in damages. This is because 184 of the subject properties were once improved, and the cost of redeveloping the improvements was not included in the proposed cleanup estimate.

9

**Table of Contents**

Introduction _____ 3

   Revised Use Effect Calculations _____ 5

1. Failure to Address the Matter at Hand _____ 11

2. Fabrication of Term "Actual Use" _____ 15

3. Miscategorized Case Study Properties _____ 21

4. Supplemental Study Undermined by Auction Sales _____ 24

Conclusion _____ 26

Appendix A: Landmark Responses to JLL Conclusions _____ 28

Appendix B: JLL Irrelevent PCB Case Studies _____ 37

Appendix C: JLL Supplemental Analysis _____ 41

Addenda _____ 46

   Revised Use Effect Scenario A (Bell Report Rates) _____ 47

   Revised Use Effect Scenario B (JLL $900 per Month Improved Rents) _____ 49

   Revised Use Effect Scenario C (Land Only Rates) _____ 51

   Historical Aerials with East St. Louis Owned Parcels _____ 53

   Rebuttal Report Executive Summary _____ 69

   General Assumptions and Limiting Conditions _____ 73

   Certification _____ 75

   Definitions _____ 76

   Statement of Compensation _____ 86

   Summary of Testimony Experience – Prior Five Years _____ 87

   Documents Considered _____ 89

   Qualifications of Randall Bell, PhD, MBA, MAI _____ 91

   List of Figures _____ 103

**1. FAILURE TO ADDRESS THE MATTER AT HAND**

**This case involves the valuation of residential properties that have been tested and found to be contaminated with PCBs. Landmark Research utilized professionally-accepted methodologies to determine the real estate damages. On the other hand, JLL failed to: (1) analyze the properties and place them into Source, Non-Source, Adjacent or Proximate ("SNAP") categories; or (2) render any opinions of value. Accordingly, JLL does not even attempt to address the fundamental matter at hand – the presence of PCBs on tested East St. Louis Parcels since 1955.**

JLL begins its work by refusing to even evaluate the presence of PCBs on the subject properties.[32] By definition, these are "non-source" properties. Instead, JLL attempts to dodge the issues and make misleading representations by claiming this case involves "PCB investigation in the neighborhood or from the remediation at the Monsanto/Krummrich facility site" and that they are measuring the impact to "properties adjacent or near sites being investigated or remediated."[33]

Thus, from the start, JLL does not follow protocol in the appraisal profession. JLL does not understand that properties that do not have contaminants on them are referred to as "adjacent" and "proximate" properties. Mr. Brigden's testimony on this principal characteristic of environmentally contaminated properties directly contradicts Mr. Roddewig's (JLL Report Co-Author) professional publications.[34]

The Uniform Standards of Professional Appraisal Practice ("USPAP") defines the status of a property's relationship to environmental contamination with the acronym "SNAP."

> **Source, Non-source, Adjacent and Proximate Sites (SNAP):** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not

---

[32] At deposition Mr. Brigden was asked whether he "[w]ould agree that properties contaminated with PCBs on have a detrimental effect on those properties?" Mr. Brigden answered "[t]hat was outside the scope of what I was asked to do and not something I'm prepared to answer." Mr. Brigden's inability to answer a question that directly addresses the matter at hand in this case indicates that JLL not only insufficiently studied the issues in this case but never developed opinions relevant to them. *See* Charles Brigden Deposition January 17, 2025, page 97, lines 7-13.

[33] JLL Report, page 11.

[34] Richard Roddewig (Editor), *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Chapter 1: USPAP and the Appraisal of Properties Impacted by Contamination of Environmental Risk (Appraisal Institute 2015), 5. Specifically, Mr. Roddewig states in his text that "adjacent" and "proximate" sites are "uncontaminated." "For example, 'liabilities and potential liabilities for site cleanup' would not apply to **adjacent or proximate uncontaminated sites**, but AO-9 does not make this clear." (**emphasis added**). *See also* Charles Brigden Deposition January 17, 2025, page 299, lines 17-25, to page 300, lines 1-7.

11

contaminated and not adjacent to a source site, but are in close proximity to the source site.[35]

**ENVIRONMENTAL EXPOSURE PATHWAYS**

Figure 3: SNAP Exhibiting JLL's Irrelevant Data

Blatant errors and misstatements of basic appraisal guidelines permeate the JLL report and Mr. Bridgen's sworn testimony. For example, JLL omits an analysis of SNAP entirely.[36] This directly contradicts USPAPs guidance on evaluating contaminated properties. In addition, Mr. Roddewig (JLL Report Co-Author and former witness) stresses the importance of analyzing SNAP in the appraisal process.

> The distinction between source sites, non-source sites, adjacent sites, and proximate sites is also one of the 10 "relevant property characteristics" referenced in the 2002 AO-9 as **important to the appraisal process**. According to the 2003 Jackson article, understanding this distinction

---

[35] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 20.

[36] Charles Brigden Deposition January 17, 2025, page 293, lines 10-22.

is important because "**different types of sites have significantly different risks and costs due to contamination.**"[37] (**emphasis added**)

The omission of SNAP resulted in the improper application of Advisory Opinion 9 and the analysis of contaminated properties. Thus, the JLL Report does not comply with the accepted industry guidance as defined by Mr. Brigden, Mr. Roddewig, or any reputable authority.[38]

Moreover, Mr. Roddewig, a JLL Report co-author, has published that adjacent and proximate properties are indeed not contaminated in reference to Advisory Opinion 9.

> For example, "liabilities and potential liabilities for site cleanup" would not apply to **adjacent or proximate uncontaminated sites**, but AO-9 does not make this clear.[39] (**emphasis added**)

However, when Mr. Brigden was asked whether an adjacent or proximate property could be contaminated, he was unable to answer the question.

> Q.    But under no circumstances according to the definitions in Advisory Opinion 9 **can an adjacent or proximate property be contaminated**, correct, sir?
> MR. SCHWETTMAN:  Object to the form. This document speaks for itself.
> A.    **I'd have to think about that**.[40]

> Q.    I'm asking you is it accurate to state that in such an assessment under Advisory Opinion 9 **that adjacent sites and proximate sites can not have contamination on them** in order to do a proper assessment in accordance with Advisory Opinion 9.  Is that fair to say based on the definitions right in front of you.
> MR. SCHWETTMAN:  Asked and answered and it speaks for itself.
> A.    No.  I am an appraiser, it is not my responsibility nor am I here today to testify to take concepts of guidance offered in USPAP and to turn words around and to suggest that they could be something higher than what they really are offered which is just a definition.  So **I don't have an opinion on that**.[41] (**emphasis added**)

---

[37] Richard Roddewig (Editor), *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Chapter 1: USPAP and the Appraisal of Properties Impacted by Contamination of Environmental Risk (Appraisal Institute 2015), 4.

[38] "A proper application of Advisory Opinion 9 is consistent with the accepted methodology." Charles Brigden Deposition January 17, 2025, page 206, lines 12-14.

[39] Richard Roddewig (Editor), *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Chapter 1: USPAP and the Appraisal of Properties Impacted by Contamination of Environmental Risk (Appraisal Institute 2015), 5.

[40] Charles Brigden Deposition January 17, 2025, page 298, lines 16-22.

[41] Charles Brigden Deposition January 17, 2025, page 299, lines 17-25, to page 300, lines 1-7.

13

Finally, this case involves properties with PCBs and the Bell Report properly evaluates these "non-source" properties.[42] In contrast, the JLL Report evaluates uncontaminated, adjacent, and proximate properties, which is also improper because it contradicts the standards of care for an appraiser conducting a review. The Appraisal of Real Estate, 15th Edition states: "Most often, the subject of a review is an appraisal report prepared by another appraiser. When that is the case, the review may or may not include an opinion about the appraiser's value conclusion."[43] In other words, JLL should have studied the same matter at hand as the Bell Report.

By ignoring the subject of the Bell Report (the matter at hand) and by not applying any opinions of value to the subject properties,[44] the JLL Report is meaningless and does not provide any relevant opinions regarding the subject properties in their current and historical condition.

---

[42] Bell Report, page 133. "The subject properties are non-source."

[43] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 628.

[44] JLL Report, "Limiting Condition," page 21; Charles Brigden Deposition January 21, 2025, page 25, lines 8-12; page 28, lines 2-5; and page 31, lines 12-25, to page 32, lines 1-13.

## 2. FABRICATION OF TERM "ACTUAL USE"

**The JLL Report repeatedly utilizes and relies upon the term "actual use." However, the term "actual use" was invented by JLL and is not recognized within the appraisal profession. Indeed, JLL Executive Vice President Thomas Hamilton admitted under oath that it was "just a modifier of that term [use]."[45] As the foundation of the JLL Report is dependent upon this invented and unrecognized terminology, the entire report is without merit.**

In this case, the JLL approach consists of multiple strategies. One is to only focus on risk effects, the component of damage that discounts future risk. Yet JLL ignores that Monsanto has stored PCBs on the subject properties since (at least) December 1955, nearly 70 years. Still, JLL does not have any opinions regarding historical Use Effect damages or whether the subject properties bundle of rights has been infringed.[46]

Another example of this strategy is that JLL claims that "[t]here is no support in the principal treatises of the appraisal profession (including Bell's own *Real Estate Damages* book) to support the Bell decision to ignore "actual use" of the city's properties and instead to rely on a hypothetical concept called "conventional use" or "normal use" to support a claim that all use and enjoyment of the city's properties has been affected for the past 50 years and measure it based on hypothetical leases and rents."[47]

First, JLL's rhetoric on "hypothetical leases and rents" is false, as it contradicts appraisal methodology and practice. The profession requires that appraisals "presume a hypothetical sale [or rent] of the asset being valued."[48] Using JLL logic, the only way a property could be valued is if it actually sells or leases, which is obviously not true; properties have value whether or not they are for sale or lease.[49]

Moreover, JLL is apparently unaware of USPAP AO9, where it specifically states in its Relevant Property Characteristic section that "[t]he appraisal of a property that includes the effects of environmental contamination on its value usually requires data not typically used in an appraisal

---

[45] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that the term "actual use" was added by JLL as "just a modifier of that term [use] to distinguish from hypothetical use of a property." (Hamilton Parks v. SCE Depo. 15:12-19).

[46] The JLL Reports and work files do not contain any Use Effect analysis or calculations. In addition, Mr. Brigden confirmed that one was not conducted at the deposition. Charles Brigden Deposition January 17, 2025, page 263, lines 3-25 to page 264, lines 1-8; and Charles Brigden Deposition January 17, 2025, page 115, lines 2-14.

[47] JLL Report, page 12.

[48] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 664.

[49] Charles Brigden Deposition January 21, 2025, page 19, lines 5-10.

15

of an otherwise similar but  uncontaminated property or an appraisal of a potentially impacted property **using either a hypothetical condition or an extraordinary assumption** that it is uncontaminated or not impacted."[50] (**emphasis added**)

Secondly, as stated above, "actual use" is not a term utilized in appraisal profession literature addressing the valuation of impaired, contaminated, or damaged properties.[51] It is a term coined by JLL to assist its litigation expert needs. While the JLL Report is critical that the Bell Report ignored principal treatises of the appraisal profession on "actual use," this criticism is wholly improper. When pressed on whether "actual use" was a standard in the appraisal industry, Mr. Brigden refused to answer the question and erroneously stated that he did not have an opinion:

> Mr. Johnson: Move to strike as being nonresponsive.
> Q.    (By Mr. Johnson) Would you agree with me that **actual use is not the standard in the appraisal industry** to assess contamination real estate, and never has been, isn't that true Mr. Brigden?
> MR. SCHWETTMAN:  Object to the form.
> A.    **I don't have an opinion on that**.[52] (**emphasis added**)

JLL's next baseless claim is that the "right to use," "conventional use," and "normal use" are hypothetical concepts that are not supported by the literature; however, that is false and misleading.[53] Dr. Tachovsky's articles "Environmental Dead Zones: The Evaluation of Contaminated Properties" and "Stigma: A Case Study Analysis of Long-Term Environmental Risk" outline the application of use effects and their impact on conventional use.[54]

Both Tachovsky articles passed peer review and were published in the Appraisal Institute's industry publication, The Appraisal Journal, thereby forming part of the appraisal literature utilized and relied upon by the appraisal profession. Tellingly, JLL's Executive Vice President, Thomas Hamilton, who billed hundreds of hours on this case and assisted in developing this report, serves on The Appraisal Journal's peer review committee.[55] At least forty (40)

---

[50] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 20.

[51] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that the term "actual use" was added by JLL as "just a modifier of that term [use] to distinguish from hypothetical use of a property." (Hamilton Parks v. SCE Depo. 15:12-19).

[52] Charles Brigden Deposition January 17, 2025, page 279, lines 5-13.

[53] JLL Report, pages 10-12 and 209-211.

[54] JLL Report, pages 68-69.

[55] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that his only issue with Dr. Tachovsky's statement

16

publications reviewed as part of the Bell Report also address the concept of "use effects" and the calculation of damages.[56] This term of art in the profession is a defined term, whereas JLL's invented the term "actual use," which is best described by Dr. Hamilton as a "modifier." Apparently, JLL does not accept either of them.

**The critical issue in this case, however, is not how owners or renters used their property (actual or otherwise), but that Monsanto <u>actually occupied and used the subject properties</u> for the storage of PCBs.[57] In doing so, Monsanto violated the City of East St. Louis' fundamental right to exclude others from using their properties without consent.**

> "When calculating a temporary use effect, questions may arise regarding what a property owner or renter does at the property during the time of impairment; however, from a real estate valuation perspective, the pertinent question is in regard to the effects on real estate and property rights. In other words, it is not a real estate valuation professional's duty to value people—it is their duty to value real estate. For example, if a property owner is on vacation and their house becomes the site of an environmental spill, that does not automatically mean that they did not incur a real estate damage because they were absent at the time of the spill. In a situation where a sudden disaster strikes and property owners remain bunkered down in their home, this is not necessarily evidence that there was no loss of use. Although the homeowners remained in their home, a use effect can still exist as this does not constitute conventional use and enjoyment of a property or its rights. Ultimately it comes down to if a property or its rights are impacted, not necessarily how the property owner reacts."[58]

In other words, the impairment suffered by the City of East St. Louis applies universally whether or not they were physically present, whether or not the property was listed for sale or for lease, and irrespective of the "actual use" of the property at the time of the impairment.

Ultimately, JLL fails to consider that the "right to use" is a critical component in the "bundle of rights," a fundamental principle that has been part of the appraisal profession for decades.[59] In the real estate appraisal profession, property rights are referred to as the "bundle of rights" because ownership of a parcel of real estate may embrace a great many rights, such as the right

---

of "use effects" was the term "conventional," a term he acknowledged was later defined in the article. (Hamilton Parks v. SCE Depo. 23:4-18).

[56] Bell Report Addenda, pages 165-179 (Literature Review: Use Effect).

[57] Bell Report, page 11 and 38.

[58] Michael Tachovsky, PhD, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," *The Appraisal Journal* (Spring 2022): 111.

[59] The JLL Reports and work files do not contain any Use Effect analysis or calculations. In addition, Mr. Brigden confirmed that one was not conducted at the deposition. Charles Brigden Deposition January 17, 2025, page 263, lines 3-25 to page 264, lines 1-8; and Charles Brigden Deposition January 17, 2025, page 115, lines 2-14.

17

to its occupancy and use; the right to sell it in whole or in part; the right to bequeath; and the right to transfer, by contract, for specified periods of time, the benefit to be derived by occupancy and use of the real estate.[60] The "bundle of rights" principle of real property rights appears in literature dating back to 1932 and has been cited in multiple treatises including the *Appraisal of Real Estate, 15th edition*; *Real Estate Damages, 3rd edition*, *Real Property Valuation in Condemnation*, and at least 300 Appraisal Journal articles.

Similarly, the "bundle of rights" has been set forth by the 1st District Court of Appeals in Illinois:

> Property, in the constitutional sense, is frequently described conceptually as a "bundle of sticks," with each stick in the bundle representing a different right that is inherent in the ownership of the physical thing that we typically think of as property, such as a parcel of land. **Those rights include the right of possession, the right to use the property, the right to dispose of or transfer the property, and the right to exclude others from the property. Although every stick in the bundle is potentially important in assessing a takings claim, the right to exclude others, including the government, is frequently described as the most 'fundamental' and 'treasured' of all property rights.[61]**

*The Appraisal of Real Estate, 15th Edition*, also describes and presents some of the many property rights, such as the right to use real estate, sell it, lease it, enter it, and give it away.[62] With each of those rights flows the "negative" right, that is, the right *not* to use the property, *not* to sell or lease it, including *not* having the property used by others, i.e. the right to exclude. This fundamental principle is universally accepted in the real estate profession and in Illinois, has been the law since at least 1881.[63]

In this context, JLL's "actual use" theory of real estate damages <u>directly contradicts</u> the established body of knowledge governing property rights. The bundle of rights is the right to do any of these [use property in any way], whether or not they have "actually" been exercised. For example, "the right to refuse to exercise any property rights," as the absence of compulsion to use any right merely rounds out and makes complete the freedom of will in the enjoyment of property ownership.[64] Moreover, it is generally recognized that property encompasses the entire

---

[60] JD Eaton, *Real Estate Valuation in Litigation, 2nd Edition* (Chicago, IL: Appraisal Institute, 1995), 45.

[61] People v. Farr, 2020 IL App (1st) 171514-U, P42, 2020 Ill. App. Unpub. LEXIS 1188, *33-34.

[62] The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal Institute, 2020), 4.

[63] "Property consists of certain rights in things secured by law. These rights are usually defined to be the right of user, the right of exclusion, and the right of disposition." *Rigney v. City of Chicago*, 102 Ill. 64, 66 (1881).

[64] Leonard C. Smith, "The Bundle of Property Rights," *The Appraisal Journal* (October 1956): 487.

18

bundle of rights inherent in the ownership of the real estate and that the <u>taking or infringement on these rights</u> will constitute a taking, even if no part of the physical real estate is taken.[65]

Portions of the bundle of rights may also be broken off, given away, or sold. For example, the right to occupy the property may be given to another party in return for a rental or lease payment. In this case, the fee simple owner becomes the owner of a leased fee estate (or lessor), and the tenant (or lessee) has a leasehold estate.[66]

**As a result, a core principle in real estate is that if you use someone else's property, you must pay for it.** As "use" relates to this case, there are at least 7 core issues at hand:

1. If you want to use someone else's property, you need their permission;
2. If you want to use someone else's property, you need to pay them for it;
3. If you want to use someone else's property to store your PCBs (e.g., commercial landfill), you need to pay them for it;
4. Some places that are in the business of storing environmental waste will not take PCBs, regardless of what one is willing to pay;
5. East St. Louis is not in the business of storing environmental waste, they did not give permission to Monsanto to store its PCBs, and has not been compensated for Monsanto storing its PCBs for approximately 70 years;
6. Monsanto operated in Sauget, not East St. Louis. East St. Louis was not involved in the approval of Monsanto's operations, but East St. Louis received its PCBs without permission or payment;
7. Under real estate appraisal principles, the City of East St. Louis is entitled to the rental rate of its properties for Monsanto's unpermitted, uncompensated 70 years of PCB occupancy and storage.

Mr. Brigden could not answer questions on these core issues.[67] He dodged answering questions by generally claiming: "I can't make that statement without study and making an appraisal determination."[68] Mr. Brigden's answers were not compelling. He had an obligation to develop the requisite competency to address these issues and answer the questions to the matter of hand. In Mr. Brigden's answers, he admitted that he did not develop the requisite competency to address these issues and answer the questions that were posed to him over the course of thousands of hours in billable research and drafting of a 350+ page report.  In addition, **Mr. Brigden's lack of ethics or competency was apparent when he refused to answer whether he would want his kids to live on a property with Monsanto's PCBs.[69]** Being an appraiser does not prevent one from answering straightforward questions.

---

[65] JD Eaton, *Real Estate Valuation in Litigation, 2nd Edition* (Chicago, IL: Appraisal Institute, 1995), 16.

[66] Randall Bell, *Real Estate Damages,* 3rd edition (Chicago, IL: Appraisal Institute, 2016), 3.

[67] Charles Brigden Deposition January 17, 2025, pages 93-136.

[68] Charles Brigden Deposition January 17, 2025, page 103, lines 24-25.

[69] Charles Brigden Deposition January 17, 2025, page 125, line 25, page 126, lines 1-25 to page 127, lines 1-11.

19

In sum, when the right to use is taken, infringed, or utilized, there has been an impairment to the "bundle of rights." These types of damages are considered Use Effects, which are measured utilizing lease rates over the period of impairment. The right to use a property is transacted thousands, if not millions of times, every day expressed as a rental rate. This issue is frequently played out in legal settings, one example being condemnation.

The damages model developed in this case is based on Monsanto's infringement upon the "right to exclude" and unlawful exercise of the "right to use" the subject properties for the storage of PCBs, without permission or consent. When there is a Use Effect, the general methodology follows the equation "Market Rent x Period of Time = Use Effect," which, in effect, is the entire time a particular property is contaminated.[70] The Bell Report's approach is consistent with these fundamental real estate appraisal principles and has broad support in the literature addressing the valuation of impaired and/or contaminated properties.

---

[70] Michael Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," *The Appraisal Journal* (Spring 2021): 116; Randall Bell, "Project Delay Economics," *The Appraisal Journal* (Fall 2011): 296; and Charles Brigden Deposition January 17, 2025, page 216, lines 24-25 to page 217, lines 1-24.

## 3. MISCATEGORIZED CASE STUDY PROPERTIES

**JLL purports to calculate the "Risk Effects" by "correcting" the Bell Report and supplementing its findings with additional case studies. However, the JLL Report consistently fails to properly classify the test (contaminated) and control (uncontaminated but otherwise similar) properties utilizing the industry standard SNAP criteria. Accordingly, the JLL "analysis" is meaningless. Furthermore, Mr. Brigden admits that he "never did an appraisal."[71]**

The subject properties are "non-source" former residences with PCBs, a toxic chemical whose production has been banned in the United States and worldwide. Although JLL did not develop an opinion of value, they set forth numerous studies all pertaining to risk effects in sections 6, 8, 9, 10, 11, 15.11, 15.12, 15.13, and 15.14 of their report. All JLL's studies are irrelevant to the matter at hand becasue they involve uncontaminated properties (adjacent, proximate, or cleaned) or industrial properties, nor do they address Use Effect damages.

The Appraisal Institute's Guide Note 6 and Dr. Thomas Jackson's article on USPAP Advisory Opinion 9 specify that property value diminution is the sum of cost effects, use effects, and risk effects.[72]

Yet despite this literature, Mr. Brigden boldly stated that he did not agree that property value diminution is the sum of cost effects, use effects, and risk effects. He then disagrees with his JLL partner and Report co-author, Mr. Roddewig, who published the exact formula twice in "Chapter 1: USPAP and the Appraisal of Properties Impact by Contamination or Environmental Risk" of his anthology *Valuing Contaminated Properties, Volume II.*

> Property Value Diminution = Cost Effects (Remediation and Related Costs)
> + Use Effects (Effects on Site Usability)
> + Risk Effects (Environmental Risk/Stigma)[73]

To further contrast the two co-authors in this case, Mr. Brigden stated in his deposition:

> Q.    What about the next equation which states, property value diminution equals cost effects, the remediation of alleged costs, plus use effects, effects in site usability plus risk effects, environmental risk stigma.

---

[71] JLL Report, "Limiting Condition," page 21; Charles Brigden Deposition January 21, 2025, page 25, lines 8-12; page 28, lines 2-5; and page 31, lines 12-25, to page 32, lines 1-13.

[72] Appraisal Institute, *Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process* (Appraisal Institute, July 26, 2013, rev. 2020), 7; and Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 14.

[73] Richard Roddewig (Editor), *Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II*, Chapter 1: USPAP and the Appraisal of Properties Impacted by Contamination of Environmental Risk (Appraisal Institute 2015), 14 and 18.

Do you have, fundamentally is that equation agreeable to you, sir, and if not what are your specific criticisms?

A.    It is disagreeable.[74]

Furthermore, JLL only studies "risk effects" which focuses on prospective damages rather than historical "use effects" and current "cost effects."[75] When addressing risk effects, the basic economic principle on which a risk effect analysis (and the sales comparison approach) is based is the principle of substitution.

> According to the principle of substitution, a buyer will not pay more for one property than for another that is equally desirable. Property values tend to be set by the cost of acquiring an equally desirable substitute property. The principle of substitution recognizes that buyers and sellers of real property have options, i.e., other properties are available for similar uses.[76]

The analogy would be what price would a potential buyer pay for a property with PCBs versus the price they would pay for an otherwise similar property without PCBs?

In essence, data on similar properties with PCBs (or other similarly situated contaminants) are essential to answer this question. However, JLL omits such data altogether and focuses on properties that have already been remediated ("cleaned"), properties that were never contaminated but rather in proximity to contamination, or non-residential properties. These flaws are additionally addressed in Appendix B but Mr. Brigden's deposition testimony here indicates that JLL did not study properties with PCBs or the impact of PCBs on property values.

When asked whether he believed properties with PCBs would sell for less than properties without PCBs, rather incredibly he did not have an opinion.

> Q.    Do you agree as a real estate professional Mr. Brigden that **all things being equal property with PCB contamination on them will be worth less than property without PCB contamination on them?**
> MR. SCHWETTMAN: Object to the form.
> A.    That is not supportable unless the sales data transaction and research revealed such a determination.

---

[74] Charles Brigden Deposition January 17, 2025, page 237, lines 19-25 to page 238, page 1-2.

[75] "[T]he "risk effect" to values from the PCB investigation in the subject neighborhood as of December 2023 was no more than -5%." JLL Report, page 11. And "The Bell Report Conclusion Concerning the 'Risk Effect' Impact on Prices and Values of the Subject Properties" JLL January 7, 2025, Supplemental Report, page 13. Moreover, the words "cost" and "use" do not appear in either the September 3, 2024, or the January 7, 2025, Supplemental Reports.

[76] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago, IL: Appraisal Institute, 2020), 25; and Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 14.

Q.    (BY MR. JOHNSON) **So you are unable to answer that simple question**, do you agree that all things being equal property with PCB contamination will be worth less than property without PCB contamination?

MR. SCHWETTMAN: Object to form, asked and answered.

A.    Sir, I'm telling you once again that **I'm unable to answer it because doing so without the formation of informative primary data I'm not allowed to answer that question**, no appraiser is.[77] **(emphasis added)**

---

[77] Charles Brigden Deposition January 17, 2025, page 104, lines 1-20.

## 4. SUPPLEMENTAL STUDY UNDERMINED BY AUCTION SALES

**A fundamental aspect of real estate valuation is that the buyer and seller are "knowledgeable" of the relevant property characteristics. The JLL Report purports to analyze sales of the subject properties; however, these were actually auction sales where the contamination was not known to be disclosed to the buyers. Thus, the buyers were not "knowledgeable" as to the environmental condition of the subject properties and so these "sales" could not reflect "market value." Furthermore, these were auction sales. According to JLL, auction sales are not suitable for determining market value.[78] Additionally, JLL fails to compare the subject property test (contaminated) properties to proper control (uncontaminated but otherwise similar) properties.**

JLL's Supplemental Reports entirely focus on risk.[79] The studies are improper because they utilize auction sales which violates their own standards of care. For example, "[t]o ensure valid comparisons we excluded distressed sales such as foreclosures, auctions, short sales, and REOs."[80] Most seriously, Mr. Brigden then draws the absurd conclusion that PCBs increase property values.[81]

Not only do the JLL Report and JLL Supplemental Report contradict their own merits, but utilizing properties in East St. Louis and Cahokia as "control" data is improper. A proper control area would not include areas with contamination issues, to ensure the data being utilized is truly unimpaired and, thus, a valid control. Comparing JLL's supplemental sales to the unimpaired value of land at $40,000, as determined in the Bell Report, the sales indicate risk effects ranging from -94.1% to -98.0%, with an average of -97.1% and a median of -97.5%. A summary of the JLL Supplemental Analysis is in Appendix C.

**Ultimately, Mr. Brigden absurdly concluded that the JLL Supplemental Report proves that <u>PCB contamination can have a positive effect on value</u>.**

> Q.    (BY MR. JOHNSON)  Can you answer my question, and that is can you think of any circumstance as a real estate appraiser where parcels contaminated with PCBs, **whether the PCB contamination causes a positive effect for those parcels**?
> MR. SCHWETTMAN:  Object to the form. Asked and answered.
> A.    In a real estate appraisal context **I actually did exactly that in my supplemental report**.  Now, I'm not using the words that you attached to it but I evaluated sales data including sales of property in the Bell subject area and including actual sales of properties that are

---

[78] JLL Report, page 74, footnote 83.

[79] "The Bell Report Conclusion Concerning the 'Risk Effect' Impact on Prices and Values of the Subject Properties" JLL January 7, 2025, Supplemental Report, page 13. Moreover, the words "cost" and "use" do not appear in either the September 3, 2024, or the January 7, 2025, Supplemental Reports.

[80] JLL Report, page 74, footnote 83.

[81] Charles Brigden Deposition January 17, 2025, page 98, lines 23-25 to page 99, lines 1-15.

at issue in this case.  **So, yes, I can give you an answer that my supplemental report dated January 7th sheds some light on that topic and is responsive to your question.**[82] **(emphasis added)**

---

[82] Charles Brigden Deposition January 17, 2025, page 98, lines 23-25 to page 99, lines 1-15.

**CONCLUSION**

In conclusion, the criticisms offered by JLL are unsubstantiated and may be comfortably dismissed. The Bell Report's real estate damage model is valid and meets widely accepted industry standards. Additionally, the Bell Report's damages analysis calculation attributed to the impairment of the subject properties is consistent with the real estate appraisal principles governing the valuation of impaired and/or contaminated properties and has broad support in the appraisal literature. Finally, JLL's criticisms directed at the Bell Report damages analysis are unreliable and contrary to industry standards.

JLL and Mr. Brigden made a series of fatal errors and omissions. For example, JLL affirmatively asserts that the Bell Report "contains no highest and best use analysis."[83] Yet, the Bell Report includes a highest and best use analysis on pages 161 to 162. Moreover, the JLL Report is premised upon JLL's unorthodox and invented term "Actual Use."[84] In addition, JLL studied the "**PCB investigation** in the neighborhood or **from the remediation at the Monsanto/Krummrich facility** site" and that they are measuring the impact to "**properties adjacent or near sites being investigated or remediated**."[85] **(emphasis added)** This case does not involve an "investigation of the subject neighborhood" or "remediation at the Monsanto/Krummrich Plant," it involves PCBs specifically on 273 East St. Louis subject properties that have never been remediated. Individually, each of these issues undermine the credibility of the JLL Report and Mr. Brigden's testimony. Taken together, they suggest a consistent pattern that is misleading.

**The JLL Reports do not offer any opinions of value, including market value or rental value, of any of the subject properties.[86] Thus, the JLL Reports are meaningless to the matter at hand.** The JLL Report projects their belief rather than an opinion that there is no more than a -5% risk effect.[87] In contrast to the JLL Reports, the Bell Report considered all three components of real estate damages – cost, use, and risk effects.[88] Specifically, a Use Effect for the approximately 70 years that Monsanto has used the subject properties for the occupancy and

---

[83] JLL Report, page 12.

[84] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that the term "actual use" was added by JLL as "just a modifier of that term [use] to distinguish from hypothetical use of a property." (Hamilton Parks v. SCE Depo. 15:12-19).

[85] JLL Report, page 11.

[86] JLL Report, "Limiting Condition," page 21; Charles Brigden Deposition January 21, 2025, page 25, lines 8-12; page 28, lines 2-5; and page 31, lines 12-25, to page 32, lines 1-13.

[87] JLL Report, page 11. This opinion only applies to uncontaminated adjacent or proximate properties and properties that have been remediated. It does not apply to the subject properties which have PCBs and have not been remediated.

[88] Charles Brigden Deposition January 17, 2025, page 205, lines 4-17.

26

storage of their PCBs; and a Risk Effect during the presence of the PCBs that will end when the subject properties are cleaned up.[89]

In all, JLL did not offer any affirmative opinions that applied to the subject properties. Accordingly, when asked whether he agrees with the premise that PCBs will not increase a property's value, Mr. Brigden stated: "I can't make that statement without study and making an appraisal determination."[90] The JLL Reports and Mr. Brigden's deposition testimony contain a variety of errors, omissions, and misrepresentations that result in unreliable and irrelevant opinions regarding the matter at hand in this case–the presence of PCBs on tested East St. Louis parcels since (at least) December 1955.

---

[89] Bell Report, page 67.
[90] Charles Brigden Deposition January 17, 2025, page 103, lines 24-25.

27

**APPENDIX A: LANDMARK RESPONSES TO JLL CONCLUSIONS**

1. JLL Conclusion: The cost, use, and risk effect damages conclusions in the Bell Report are not supportable. JLL case study analysis in East St. Louis, Cahokia and elsewhere indicates that residential properties adjacent or near sites being investigated or remediated for PCB contamination or in neighborhoods in the "assessment stage" of the remediation lifecycle do not automatically experience an adverse impact on prices and values, and when there are impacts, they are significantly less than the 100% conclusion of impacts in the Bell Report.

**1. Landmark Response: JLL case study analysis is irrelevant because they study cleaned-up, uncontaminated, adjacent and proximate properties. Furthermore, their claim that they studied properties in the "assessment" stage is false. The "assessment" stage is defined as AO9; what they actually study is properties in the post-remediation "ongoing" stage.**

**JLL's opinion that the conclusions in the Bell Report are not supportable is an unsupportable generalization because their critique does not address the matter at hand. As a result, their opinions are irrelevant because they do not present <u>any data</u> regarding impacts due to the presence of PCBs on residential real estate.**

2. JLL Conclusion: When the errors, omissions, and misrepresentations in the Bell Report review of the literature and "risk effect" case studies are corrected, it supports the conclusion that the "risk effect" to values from the PCB investigation in the subject neighborhood as of December 2023 was no more than -5%.

**2. Landmark Response: Characterizing their work as "corrections" is improper and misleading because JLL does not correct any data, in fact, they conduct completely different studies than those presented in the Bell Report.**

**For example, the Bell Report studied Times Beach, where homes were demolished and remain vacant to this day. Yet, inappropriately, JLL studies the uncontaminated neighborhood of Elk Run over a mile from Times Beach.**

28



Figure 4: Times Beach (with PCBs) vs Elk Run (No PCBs)

**The effects of PCBs on properties that were actually contaminated starkly contrast with the uncontaminated neighborhoods in the JLL Report.**

| **Landmark Proper Analysis of Contaminated Properties** | **JLL Improper Analysis of Uncontaminated Properties** |
|---|---|



Bell – Times Beach (Bell Workfile)



JLL – Elk Run Subdivision (Google Street View 2023)[91]



Bell – Carver Terrace (Bell Workfile)



JLL – Port Arthur Neighborhood (JLL Workfile)



Bell – Mossville (Bell Workfile)



JLL – Mossville (JLL Workfile)

---

[91] The JLL production did not include any photographs or images of the Elk Run subdivision.

30





Bell – Doe Run Demolished 359 Station Street (Google Street View 2022)

JLL – Doe Run (JLL Workfile – Paired Sales Image from 2015)

**The data in the JLL Report and analyses are misleading. For example, in Doe Run, JLL asserts that properties in proximity to the lead smelter do not show an impact on market prices and values.[92] However, JLL studies properties that were purchased by the polluter in 2015 as part of a buyout program.[93] In a buyout program polluters often pay homeowners the unimpaired market value of their property, despite the contamination issues. In Doe Run, after the polluter purchased the buyout properties, they were demolished. Nevertheless, JLL not only omits these key damage issues and omit fieldwork photographs from their report of the vacant buyout lot that was included in their flawed analysis.[94]**

3. JLL Conclusion: In addition, our analysis of actual prices paid in the subject neighborhood compared to prices and price trends in both East St. Louis and the adjacent community of Cahokia since 2002 indicates no "risk effect" impact on prices in the subject neighborhood from the PCB investigation in the neighborhood or from the remediation at the Monsanto/Krummrich facility site. Our local market study case analysis of the Alcoa Superfund site indicated no impact in the adjacent neighborhood during the "assessment stage" of the remediation lifecycle between 2003 and 2012 when the U.S. EPA was investigating the situation and testing soils on the main portion of the site. Our other local market case study of property prices in the neighborhood adjacent to the Dead Creek portion of the Sauget Area 1 Superfund site indicates that during the active remediation of Dead Creek, the impact on prices in the adjacent neighborhood that included soil testing at some homes was no greater than about -11%, and upon remediation there was no permanent or lingering impact observed. When all three of those analyses of actual sale transactions are considered, and when considering the out of market case studies from other locations under different circumstances and at different time periods, the collective analysis and information indicate an impact on prices of between 0% and no more than -5%.

**3. Landmark Response: JLL does not have any evidence that the properties they studied in proximity to Dead Creek and the Alcoa sites were actually contaminated.[95] At best these**

---

[92] JLL Report, page 176.

[93] 359 Station Street was purchased by Doe Run Resource Corp on June 24, 2015.

[94] JLL Report, page 174.

[95] Charles Brigden Deposition January 17, 2025, page 313, lines 8-25, to page 314, line 1, and page 314, lines 9-14, and page 316, lines 6-19.

**were adjacent or proximate sites, which are different than the non-source subject properties in East St. Louis. Indeed, JLL stated: "Our local market study case analysis of the Alcoa Superfund site indicated no impact in the <u>adjacent neighborhood…</u>" and "Our other local market case study of property prices in the <u>neighborhood adjacent</u> to the Dead Creek…"[96]**

4. JLL Conclusion: The Bell Report "cost effect" conclusion of $52.5 million is not reliable because information in the Coghlan Report relied on by Bell, as well as statements made in the Coghlan deposition, demonstrate such reliance by Bell is not credible. The fact that only 54 of the 100 city-owned properties tested above 1 ppm in the Coghlan sampling is further indication of the unreliability of reliance by Bell on the Coghlan Report. Those may be the only city-owned properties where some type of remediation may be necessary in the future depending on the use to which they are eventually put.

**4. <u>Landmark Response</u>: Neither Mr. Roddewig or Mr. Brigden have any training, education, or experience as an environmental scientist. Their erroneous comments and critiques regarding remediation confirm their lack of knowledge and poor understanding of environmental issues. The Bell Report properly relies on the expertise Mr. Coghlan and confirms that reliance in conformance with USPAP AO9 as stated below.**

> **Since the appraiser is usually not an expert on the scientific aspects of contamination, experts from other fields will typically provide this information. Appropriate regulatory authorities should also be consulted to confirm the presence or absence of contamination. The appraiser should consider the use of extraordinary assumptions when this information serves as a basis for an opinion of value. The appraiser should also collect similar data for any comparable sales used in the analysis.[97]**

5. JLL Conclusion: The Bell Report fails to look at any actual sales or leases in the subject neighborhood to determine if there was any type of actual effect on use. The actual sales and leases in the subject neighborhood indicate that the prices and rental rates used in the Bell Report to calculate "use effect" damages are not supportable.

---

[96] JLL Report, page 11.
[97] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 9* (United States of America, 2024), 21.

32

**5. Landmark Response: JLL's critique is addressed in the body of this Rebuttal Report. In brief, "actual use" is not an appraisal standard or methodology.[98] Nevertheless, JLL could not seem to comprehend a simple fact: the "actual use" of the subject properties by Monsanto to store their banned PCBs. By occupying the subject properties with PCBs, the "right to use," "right to occupy," and "right to exclude" have been infringed upon and taken. Furthermore, to address JLL's criticism regarding subject neighborhood lease rates, Use Effect calculations were conducted with the lease rate of $900 per month set forth in the JLL Report and in Mr. Brigden's deposition.[99] However, utilizing a rate of $900 per month is inadequate and deficient because JLL did not appraise or apply its findings to any of the subject properties, and the rate is based on properties in areas with contamination issues.[100]**

6. JLL Conclusion: The Bell Report "use effect" analysis also does not include any research to determine if the city has actually leased or sold any of its properties even though there is information in the Bell Report that ownership of the city's properties has varied substantially over the years. The Bell Report fails to provide any support for using a CPI discount factor or a rate of return based on the S&P 500. Finally, there is no support in the principal treatises of the appraisal profession (including Bell's own *Real Estate Damages* book) to support the Bell decision to ignore "actual use" of the city's properties and instead to rely on a hypothetical concept called "conventional use" or "normal use" to support a claim that all use and enjoyment of the city's properties has been affected for the past 50 years and measure it based on hypothetical leases and rents.

**6. Landmark Response: Once again, JLL blatantly ignores the "actual use" of the subject properties by Monsanto to store their banned PCBs. This omission is fundamental to all of the opinions expressed by JLL.**

**The Bell Reports' use of CPI is supported by the Appraisal of Real Estate 15th Edition. CPI is a measure of the average change over time in the prices paid by urban consumers for a**

---

[98] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that the term "actual use" was added by JLL as "just a modifier of that term [use] to distinguish from hypothetical use of a property." (Hamilton Parks v. SCE Depo. 15:12-19); and Charles Brigden Deposition January 17, 2025, page 279, lines 5-13.

[99] JLL Report, page 80; and Charles Brigden Deposition January 17, 2025, page 287, lines 14 to 25, to page 288, lines 1 to 13.

[100] JLL Report, "Limiting Condition," page 21; Charles Brigden Deposition January 21, 2025, page 25, lines 8-12; page 28, lines 2-5; and page 31, lines 12-25, to page 32, lines 1-13.

33

market basket of consumer goods and services.[101] In the real estate profession, CPI can be used as a barometer for determining changes in lease rates.[102]

The Bell Report utilized a 9% rate, which was consistent with the S&P 500 index, an interest rate that best represents the broad overall performance of the economy.[103] Additionally, the rate is consistent with Illinois law, 735 ILCS 5/2-1303, " [j]udgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied."

Additionally, "actual use" is not a term of art utilized in appraisal profession literature addressing the valuation of impaired, contaminated, or damaged properties. It was coined by JLL to use as a "modifier," whatever that means.[104]

JLL makes an unfounded claim that the "right to use," "conventional use," and "normal use" are hypothetical concepts that are not supported by the literature; however, that is factually incorrect and misleading.[105] Dr. Tachovsky's articles "Environmental Dead Zones: The Evaluation of Contaminated Properties" and "Stigma: A Case Study Analysis of Long-Term Environmental Risk" outline the standard application of use effects and their impact on conventional use.[106] Both articles authored by Dr. Tachovsky went through peer review and were published in the Appraisal Institute's industry publication, The Appraisal Journal, thereby forming part of the appraisal literature utilized and relied upon by the appraisal profession.[107] JLL's Executive Vice President Thomas Hamilton, who billed hundreds of hours on this case and assisted in developing this report, serves on The Appraisal Journal's peer review committee. At least forty (40) publications reviewed as

---

[101] US Bureau of Labor Statistics, "Consumer Price Index," accessed April 23, 2021, https://www.bls.gov/cpi/.

[102] The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal Institute, 2020), 485.

[103] By utilizing a broad overall economic indicator, it avoids the need to assume how and where money would be invested.

[104] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that the term "actual use" was added by JLL as "just a modifier of that term [use] to distinguish from hypothetical use of a property." (Hamilton Parks v. SCE Depo. 15:12-19); and Charles Brigden Deposition January 17, 2025, page 279, lines 5-13.

[105] JLL Report, pages 10-12 and 209-211.

[106] JLL Report, pages 68-69.

[107] In the matter *Park, et al., v. Southern California Edison Co., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. JCCP 4965 Related to Case No. BC691146. (a case cited by JLL in this matter, see footnote 139 on page 114 of the JLL Report), Dr. Hamilton testified at deposition on November 5, 2023, that his only issue with Dr. Tachovsky's statement of "use effects" was the term "conventional," a term he acknowledged was later defined in the article. (Hamilton Parks v. SCE Depo. 23:4-18).

34

**part of the Bell Report also address the concept of "use effects" and the calculation of damages.[108]**

7. JLL Conclusion: All of the issues we have raised related to the Bell Report indicate that it violates the standards of professional appraisal practice and that the damages analysis and conclusions within it do not comply with generally accepted methods of the real estate appraisal profession. For example, Standards Rule 1-3 of the Uniform Standards of Professional Appraisal Practice (USPAP) states that an appraiser, "when developing a market value opinion, must: (a) analyze the effect on use and value of (i) existing land use regulations; (2) reasonably probably modifications of such land use regulations; (iii) economic supply and demand; (iv) the physical adaptability of the real estate; and (v). market area trends; and (b) develop an opinion of the highest and best use of the real estate.

**7. Landmark Response: JLL misrepresents the Bell Report and USPAP. First, the Bell Report addresses (a) analyze the effect on use and value of (i) existing land use regulations;[109] (2) reasonably probably modifications of such land use regulations;[110] (iii) economic supply and demand;[111] (iv) the physical adaptability of the real estate;[112] and (v). market area trends;[113] and (b) develop an opinion of the highest and best use of the real estate.[114]**

**Second, USPAP does not require either a market analysis or highest and best use analysis. JLL misrepresents USPAP by omitting the first half of the sentence they cited in USPAP Standard Rule 1-3, which states "When <u>necessary for credible assignment results in</u> developing a market value opinion, an appraiser must:" (<u>Omitted by JLL</u>).**

**Indeed, the first paragraph on page 1 of USPAP states that "[i]t is essential that appraisers develop and communicate their analyses, opinions, and conclusions to intended users of their services in a manner that is meaningful and <u>not misleading</u>."[115] JLL's routine misrepresentations indicate that their report and opinions lack credibility.**

8. JLL Conclusion: The Comment to that rule states "An appraiser must avoid making an unsupported assumption or premise about market area trends . . ."

**8. Landmark Response: JLL's comments are irrelevant because the Bell Report includes a highest and best use analysis and market analysis.[116]**

---

[108] Bell Report Addenda, pages 165-179 (Literature Review: Use Effect).
[109] Bell Report, pages 157-158.
[110] Bell Report, pages 161-162.
[111] Bell Report, pages 154, 163-164.
[112] Bell Report, pages 154-162.
[113] Bell Report, pages 163-164.
[114] Bell Report, pages 161-162.
[115] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, Preamble9* (United States of America, 2024), 1.
[116] Bell Report, pages 154 and 161-163.

35

**In fact, based on JLL's own merits, their opinions regarding any market value impacts, such as risk, are improper because they do not conduct a highest and best use analysis.**

9. JLL Conclusion: Because the Bell Report ignores all sales that have occurred in the subject neighborhood and in the City of East St. Louis over the past 25 years and because it contains no highest and best use analysis and no consideration of the physically possible and legally permissible uses of the 273 subject properties in his report, it does not meet the requirements of Standards Rule 1-3.

**9. Landmark Response: JLL misrepresents the Bell Report and workfile, which includes a highest and best use analysis,[117] an analysis of the subject neighborhood,[118] and subject property records contained within the workfile.**

10. JLL Conclusion: The Scope of Work Rule in USPAP states that "an appraiser must . . . determine and perform the scope of work necessary to develop credible assignment results." It also states that the scope of work "must include the research and analyses that are necessary to develop credible assignment results." As indicated above in our Summary of the Errors, Omissions and Misrepresentations in the Bell Report, the Bell Report fails to contain the research and analysis necessary for credible assignment results.

**10. Landmark Response: JLL misrepresents the Bell Report and workfile. The JLL critique of the Bell Report is completely irrelevant to the matter at hand in this case – the presence of PCBs on tested East St. Louis parcels since 1955. JLL's opinions regarding the Bell Report are based on a false and misleading narrative.**

---

[117] Bell Report, pages 161-162.
[118] Bell Report, pages 31, 32, and 154-160.

36

**APPENDIX B: JLL IRRELEVENT PCB CASE STUDIES**

| | CITY OF EAST ST. LOUIS<br>JLL PCB Case Studies<br>Section 15.14<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|---|
| **No.** | **Case Study** | **Property Type(s)** | **JLL Findings** | **JLL Flaws** |
| **SP** | **East St. Louis, Illinois** | **Residential** | **No opinion of value** | **JLL did not develop an opinion of value.** |
| 1A | Riverwood Condominium<br><br>Stamford, Connecticut | Residential | "Possible impact of between **0% and 5% on development site** sold for residential construction; **no impact on sale prices of homes adjacent** built on the site and despite proximity to unremediated portion of source site" (JLL Report, page 278). | JLL improperly studies uncontaminated "adjacent," "proximate," and "clean" properties. Whereas, the Bell Report studies "non-source" properties with contaminates. |
| 1B | New York Sports Club<br><br>Stamford, Connecticut | Industrial | "**No impact on prices**; no impact on mortgage financing" (JLL Report, page 278). | JLL improperly studies industrial properties. Whereas, the Bell Report studies residential properties. |
| 1C | Springdale Branch, U.S. Post Office<br><br>Stamford, Connecticut | Industrial | "Impact on Prices: Low -- **between 0% and 5%** due to some additional construction costs and some design and planning delay" (JLL Report, page 279). | JLL improperly studies industrial properties. Whereas, the Bell Report studies residential properties. |

Figure 5: JLL Improper PCB Case Studies, 1A-1C

| | CITY OF EAST ST. LOUIS<br>JLL PCB Case Studies<br>Section 15.14<br>(Landmark File: 155-1-21) | | | |
|---|---|---|---|---|
| **No.** | **Case Study** | **Property Type(s)** | **JLL Findings** | **JLL Flaws** |
| SP | East St. Louis, Illinois | Residential | **No opinion of value** | **JLL did not develop an opinion of value.** |
| 2 | Kuhlman Electric<br><br>Crystal Springs, Mississippi | Residential | **"There was no impact on residential market prices and values in the surrounding area attributable to the Kuhlman Electric environmental situation.** Prices and marketing trends for properties within an allegedly affected area in close proximity to the Kuhlman facility were comparable to those in a control area. However, a few properties with documented PCB contamination had not yet been remediated. During the scheduled on-site remediation, the owners would suffer some loss of use and delayed ability to sell their properties. The amount of that **temporary impact ranged between -2.1% and -[28].3% of the market value of the six properties affected**" (JLL Report, page 289, [typo corrected]). | JLL does not include any loss of use calculations in its report or work file. In addition, the purported loss of use is limited to the period of remediation, which is improper because it ignores the entire period during which the contaminates were on the properties.<br><br>JLL improperly studies uncontaminated "adjacent," "proximate," and "clean" properties. Whereas, the Bell Report studies "non-source" properties with contaminates. |
| 3 | Big Spring Creek<br><br>Lewistown, Montana | Residential, Land | **"There was no adverse temporary or permanent impact on prices, values or marketing times** resulting from the December 2003 announcement of the **catch and release order** for Upper Big Spring Creek" (JLL Report, page 307-308). | JLL studies the effects of catch and release orders, which is irrelevant to this case.<br><br>JLL improperly studies uncontaminated "adjacent," "proximate," and "clean" properties. Whereas, the Bell Report studies "non-source" properties with contaminates. |

Figure 6: JLL Improper PCB Case Studies, 2-3

38

| | | | CITY OF EAST ST. LOUIS<br>JLL PCB Case Studies<br>Section 15.14<br>(Landmark File: 155-1-21) | |
|---|---|---|---|---|
| **No.** | **Case Study** | **Property Type(s)** | **JLL Findings** | **JLL Flaws** |
| **SP** | **East St. Louis, Illinois** | **Residential** | **No opinion of value** | **JLL did not develop an opinion of value.** |
| 4 | Reichhold Chemical Neighborhood<br><br>Columbia, Mississippi | Residential | "The analysis by one of the two local appraisers who studied the situation and testified in some of the litigation is more supportable than that of the other. Mr. Shelton Ball, a local appraiser, testified that in 1989 the diminution in value to homes immediately **adjacent** to the Reichhold/Newsom site was **no more than 10% to 15%**" (JLL Report, page 315). | JLL improperly studies uncontaminated "adjacent," "proximate," and "clean" properties. Whereas, the Bell Report studies "non-source" properties with contaminates. |
| 5 | Times Beach Superfund Site<br><br>Times Beach, Missouri | Residential | "Any impacts in **neighborhoods around the Times Beach site** were temporary. There was a **possible temporary impact of between 5% and 15% on prices in Elk Run**" (JLL Report, page 324). | JLL improperly studies uncontaminated "adjacent," "proximate," and "clean" properties. Whereas, the Bell Report studies "non-source" properties with contaminates. |
| 6 | St. Lawrence & Grasse River<br><br>Massena, New York | Residential, Land | "Both the sale/resale analysis and the price trend analysis indicate **little, if any, impact on prices and values of land and single-family homes** in the portions of the shoreline along the Grasse River involved in the PCB environmental situation. The price trend index analysis indicates no apparent impact on prices or values even following the announcement and 2017 initiation of the Grasse River 'Area of Concern' sediment capping project" (JLL Report, page 341). | No evidence that properties studied by JLL were contaminated. |

Figure 7: JLL Improper PCB Case Studies, 4-6

| CITY OF EAST ST. LOUIS<br>JLL PCB Case Studies<br>Section 15.14<br>(Landmark File: 155-1-21) | | | | |
|---|---|---|---|---|
| **No.** | **Case Study** | **Property Type(s)** | **JLL Findings** | **JLL Flaws** |
| **SP** | **East St. Louis, Illinois** | **Residential** | **No opinion of value** | **JLL did not develop an opinion of value.** |
| 7 | Solutia/ Eastman Facility<br><br>Anniston, Alabama | Residential | "The Simons article indicated a value impact of between 60% and 95%, and he concluded the impact of the 'value loss' due to PCB contamination was 90%. Mr. Bliss did 30 retrospective appraisals of properties that had sold in the affected areas of Anniston, and in 24 of the appraisals the results indicated a sale price that was at or above the market value using unaffected comparable sales. Dr. Chalmers compared sales during the years 1992 through mid-2001 in a control area and in the affected area of Anniston. Chalmers too could find no adverse impact on value from proximity to the source of the PCB contamination. The Bliss and Chalmers studies both indicated no impact resulting from the PCB situation in West Anniston. **Given the differences between the expert reports, it is unlikely that the impact, if any, extends to the 60%-95% 'value loss' indicated by the Simons article.**" (JLL Report, page 351). | Omits analyses and testimony of the Plaintiff's expert Mr. Richard Malloy. Relies on the testimony of defense experts who claim contaminated homes were selling for premiums. The Anniston, Alabama case settled for $700 million. |
| 8 | Escambia Wood Treating Facility<br><br>Pensacola, Florida | Residential, Industrial, Industrial Land | "The homeowners were paid 100% of the market value of their homes -- therefore, **the homeowners did not suffer a loss**" (JLL Report, page 355).<br><br>"**The United States government will not sustain a 100% loss** in acquiring the properties, but instead will recoup prices paid for the homes by selling the land for industrial and commercial development" (JLL Report, page 355).<br><br>"Based upon industrial land values around the site, it is possible that the value of the land taken for the cleanup will exceed the prices paid for the homes. **It is therefore possible that the cleanup program will enhance the value of the land taken. Our research in 2001 indicated home values above the extended contaminated groundwater plume had not been affected.** The Escambia County Property Assessor reports they have not observed a value reduction in the neighborhoods with the underground plume" (JLL Report, page 356). | JLL's comment regarding the homeowners and the US government is speculative and irrelevant to the real estate. Today, the real estate is not being used, the neighborhood has been demolished and is fenced off. |

Figure 8: JLL Improper PCB Case Studies, 7-8

40

**APPENDIX C: JLL SUPPLEMENTAL ANALYSIS**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CITY OF EAST ST. LOUIS**<br>**JLL Supplemental Subject Property Auctions**<br>**(Landmark File: 155-1-21)** | | | | | | | |
| **No.** | **Address** | **Tax IDs** | **Auction Sale? (Yes / No)** | **JLL Sale Date** | **JLL Sale Price** | **LRG Unimpaired "Control" Land Value** | **Risk Effect (LRG "Control" Land Value vs. JLL Sale Price)** |
| 1 | Tudor Avenue East St. Louis, IL | 01240121021<br>01240121022 | Yes | 7/26/2024 | $1,060 | $40,000 | -97.4% |
| 2 | Tudor Avenue East St. Louis, IL | 01240121023<br>01240121024<br>01240121025<br>01240121026<br>01240121027<br>01240121028 | Yes | 4/26/2024 | $1,211 | $40,000 | -97.0% |
| 3 | Tudor Avenue East St. Louis, IL | 01240121032<br>01240121033 | Yes | 7/26/2024 | $1,000 | $40,000 | -97.5% |
| 4 | Tudor Avenue East St. Louis, IL | 01240121035 | Yes | 7/26/2024 | $1,025 | $40,000 | -97.4% |
| 5 | 1307 Baker Avenue East St. Louis, IL | 01240130019 | Yes | 10/10/2023 | $1,500 | $40,000 | -96.3% |
| 6 | 913 South 13th Street East St. Louis, IL | 01240135017<br>01240135025 | Yes | 7/5/2022 | $1,000 | $40,000 | -97.5% |

Figure 9: JLL Supplemental Subject Property Auctions, 1-6

41

| | | | | | | LRG | Risk Effect |
|---|---|---|---|---|---|---|---|
| **No.** | **Address** | **Tax IDs** | **Auction Sale? (Yes / No)** | **JLL Sale Date** | **JLL Sale Price** | **LRG Unimpaired "Control" Land Value** | **Risk Effect (LRG "Control" Land Value vs. JLL Sale Price)** |

**CITY OF EAST ST. LOUIS**
**JLL Supplemental Subject Property Auctions**
**(Landmark File: 155-1-21)**

| No. | Address | Tax IDs | Auction Sale? (Yes / No) | JLL Sale Date | JLL Sale Price | LRG Unimpaired "Control" Land Value | Risk Effect (LRG "Control" Land Value vs. JLL Sale Price) |
|---|---|---|---|---|---|---|---|
| 7 | 1314 Baker Avenue East St. Louis, IL | 01240136011 01240136018 01240136019 01240136040 01240136043 | Yes | 4/10/2023 | $1,111 | $40,000 | -97.2% |
| 8 | 1305 Boismenue Avenue East St. Louis, IL | 01240136021 01240136022 | Yes | 4/3/2024 | $851 | $40,000 | -97.9% |
| 9 | 1321 Boismenue Avenue East St. Louis, IL | 01240136030 | Yes | 10/10/2023 | $1,000 | $40,000 | -97.5% |
| 10 | 1320 Boismenue Avenue East St. Louis, IL | 01240139007 01240139011 01240139012 | Yes | 10/10/2023 | $2,000 | $40,000 | -95.0% |
| 11 | Russell Avenue East St. Louis, IL | 01240142006 01240142007 01240142008 | Yes | 7/6/2022 | $1,995 | $40,000 | -95.0% |
| 12 | 1728 Russell Avenue East St. Louis, IL | 01240314032 01240314034 | No | 6/29/2022 | $2,351 | $40,000 | -94.1% |

Figure 10: JLL Supplemental Subject Property Auctions, 7-12

| | **CITY OF EAST ST. LOUIS** **JLL Supplemental Subject Property Auctions** **(Landmark File: 155-1-21)** | | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **Address** | **Tax IDs** | **Auction Sale? (Yes / No)** | **JLL Sale Date** | **JLL Sale Price** | **LRG Unimpaired "Control" Land Value** | **Risk Effect (LRG "Control" Land Value vs. JLL Sale Price)** |
| 13 | Falling Springs Road East St. Louis, IL | 01240315001 01240315002 01240315003 01240315004 01240315005 01240315006 01240315007 01240315008 01240315009 01240315010 01240315012 | Yes | 1/25/2024 | $1,686 | $40,000 | -95.8% |
| 14 | 1226 Gay Avenue East St. Louis, IL | 01240315014 01240315015 01240315016 01240315017 | Yes | 1/25/2024 | $936 | $40,000 | -97.7% |
| 15 | 1221 South 13th Street East St. Louis, IL | 01240315028 | Yes | 1/25/2024 | $936 | $40,000 | -97.7% |
| 16 | 0 Central Avenue East St. Louis, IL | 01240320011 | Yes | 9/30/2022 | $800 | $40,000 | -98.0% |
| 17 | 1934 Piggott Avenue East St. Louis, IL | 01240421010 01240421011 01240421012 01240421013 01240421057 | Yes | 7/13/2022 | $786 | $40,000 | -98.0% |
| 18 | 2000 Piggott Avenue East St. Louis, IL | 01240421023 01240421024 | Yes | 11/30/2023 | $803 | $40,000 | -98.0% |

Figure 11: JLL Supplemental Subject Property Auctions, 13-18

43

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CITY OF EAST ST. LOUIS**<br>**JLL Supplemental Subject Property Auctions**<br>**(Landmark File: 155-1-21)** | | | | | | | |
| **No.** | **Address** | **Tax IDs** | **Auction Sale? (Yes / No)** | **JLL Sale Date** | **JLL Sale Price** | **LRG Unimpaired "Control" Land Value** | **Risk Effect (LRG "Control" Land Value vs. JLL Sale Price)** |
| 19 | 1932 Russell Avenue East St. Louis, IL | 01240434013 01240434014 01240434015 01240434016 01240434017 01240434074 | Yes | 11/1/2023 | $945 | $40,000 | -97.6% |
| 20 | 1401 South J Street East St. Louis, IL | 01250106009 01250106010 01250106011 01250106012 | Yes | 10/4/2024 | $1,236 | $40,000 | -96.9% |
| 21 | 1976 Wilford Avenue East St. Louis, IL | 01250110005 01250110029 | Yes | 11/17/2022 | $800 | $40,000 | -98.0% |
| 22 | 1503 South 20th Street East St. Louis, IL | 01250110031 | Yes | 11/13/2023 | $795 | $40,000 | -98.0% |
| 23 | 1922 Gay Avenue East St. Louis, IL | 01250200008 | Yes | 7/14/2023 | $1,005 | $40,000 | -97.5% |
| 24 | South 20th Street East St. Louis, IL | 01250202009 01250202010 01250202011 | Yes | 6/26/2023 | $1,000 | $40,000 | -97.5% |

Figure 12: JLL Supplemental Subject Property Auctions, 19-24

44

| | | | | | | LRG | Risk Effect |
| No. | Address | Tax IDs | Auction Sale? (Yes / No) | JLL Sale Date | JLL Sale Price | Unimpaired "Control" Land Value | (LRG "Control" Land Value vs. JLL Sale Price) |
|---|---|---|---|---|---|---|---|
| | | | CITY OF EAST ST. LOUIS<br>JLL Supplemental Subject Property Auctions<br>(Landmark File: 155-1-21) | | | | |
| 25 | J Street East St. Louis, IL | 01250202001 01250202002 01250202005 01250202030 | Yes | 11/17/2022 | $795 | $40,000 | -98.0% |

Figure 13: JLL Supplemental Subject Property Auctions, 25

45

**ADDENDA**

## Revised Use Effect Scenario A (Bell Report Rates)

| | | | | CITY OF EAST ST. LOUIS Use Effect Schedule Scenario A: Bell Report 12/1955 to 6/2027 (Landmark File: 155-1-21) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | CPI | Market Rent per Month | Market Rent Annual | Number of Subject Properties with Historical Improvements | Sub Total Market Rent | Lot Value | Land Rent Annual (7%) | Number of Land Subject Properties | Sub Total Land Rent | Years Remaining | Cumulative Use Effect @ 9% |
| Total | | | | | | | | | | | $602,999,849 |
| Jun-27 | 304.70 | $1,400 | $16,800 | 75 | $1,260,000 | $40,000 | $2,800 | 25 | $70,000 | 0.00 | $1,330,000 |
| 2026 | 304.70 | $1,400 | $16,800 | 75 | $1,260,000 | $40,000 | $2,800 | 25 | $70,000 | 1.45 | $1,507,517 |
| 2025 | 304.70 | $1,400 | $16,800 | 75 | $1,260,000 | $40,000 | $2,800 | 25 | $70,000 | 2.45 | $1,643,097 |
| 2024 | 304.70 | $1,400 | $16,800 | 75 | $1,260,000 | $40,000 | $2,800 | 25 | $70,000 | 3.46 | $1,791,292 |
| 2023 | 304.70 | $1,400 | $16,800 | 75 | $1,260,000 | $40,000 | $2,800 | 25 | $70,000 | 4.45 | $1,952,393 |
| 2022 | 292.65 | $1,345 | $16,136 | 75 | $1,210,185 | $38,419 | $2,689 | 25 | $67,232 | 5.45 | $2,043,852 |
| 2021 | 270.97 | $1,245 | $14,940 | 75 | $1,120,512 | $35,572 | $2,490 | 25 | $62,251 | 6.45 | $2,062,601 |
| 2020 | 258.81 | $1,189 | $14,270 | 75 | $1,070,234 | $33,976 | $2,378 | 25 | $59,457 | 7.46 | $2,147,735 |
| 2019 | 255.66 | $1,175 | $14,096 | 75 | $1,057,193 | $33,562 | $2,349 | 25 | $58,733 | 8.45 | $2,312,368 |
| 2018 | 251.11 | $1,154 | $13,845 | 75 | $1,038,375 | $32,964 | $2,308 | 25 | $57,688 | 9.45 | $2,475,472 |
| 2017 | 245.12 | $1,126 | $13,515 | 75 | $1,013,617 | $32,178 | $2,252 | 25 | $56,312 | 10.45 | $2,633,773 |
| 2016 | 240.01 | $1,103 | $13,233 | 75 | $992,476 | $31,507 | $2,206 | 25 | $55,138 | 11.46 | $2,811,434 |
| 2015 | 237.02 | $1,089 | $13,068 | 75 | $980,111 | $31,115 | $2,178 | 25 | $54,451 | 12.45 | $3,026,106 |
| 2014 | 236.74 | $1,088 | $13,053 | 75 | $978,950 | $31,078 | $2,175 | 25 | $54,386 | 13.45 | $3,294,353 |
| 2013 | 232.96 | $1,070 | $12,844 | 75 | $963,323 | $30,582 | $2,141 | 25 | $53,518 | 14.45 | $3,533,315 |
| 2012 | 229.59 | $1,055 | $12,659 | 75 | $949,415 | $30,140 | $2,110 | 25 | $52,745 | 15.46 | $3,796,384 |
| 2011 | 224.94 | $1,034 | $12,402 | 77 | $954,971 | $29,529 | $2,067 | 25 | $51,676 | 16.45 | $4,156,340 |
| 2010 | 218.06 | $1,002 | $12,023 | 75 | $901,702 | $28,625 | $2,004 | 25 | $50,095 | 17.45 | $4,283,300 |
| 2009 | 214.54 | $986 | $11,829 | 77 | $910,809 | $28,164 | $1,971 | 25 | $49,286 | 18.45 | $4,709,230 |
| 2008 | 215.30 | $989 | $11,871 | 77 | $914,059 | $28,264 | $1,978 | 25 | $49,462 | 19.46 | $5,152,288 |
| 2007 | 207.34 | $953 | $11,432 | 92 | $1,051,745 | $27,219 | $1,905 | 27 | $51,444 | 20.45 | $6,429,685 |
| 2006 | 201.59 | $926 | $11,115 | 92 | $1,022,575 | $26,464 | $1,852 | 27 | $50,017 | 21.45 | $6,813,575 |
| 2005 | 195.29 | $897 | $10,768 | 92 | $990,618 | $25,637 | $1,795 | 27 | $48,454 | 22.45 | $7,194,275 |
| 2004 | 188.88 | $868 | $10,414 | 96 | $999,768 | $24,796 | $1,736 | 27 | $46,864 | 23.46 | $7,900,218 |
| 2003 | 183.96 | $845 | $10,143 | 95 | $963,558 | $24,149 | $1,690 | 27 | $45,642 | 24.45 | $8,302,766 |
| 2002 | 179.88 | $826 | $9,918 | 97 | $962,005 | $23,613 | $1,653 | 27 | $44,629 | 25.45 | $9,026,470 |
| 2001 | 177.07 | $814 | $9,763 | 97 | $946,985 | $23,245 | $1,627 | 27 | $43,932 | 26.45 | $9,684,671 |
| 2000 | 172.20 | $791 | $9,494 | 97 | $920,957 | $22,606 | $1,582 | 27 | $42,725 | 27.46 | $10,267,969 |
| 1999 | 166.58 | $765 | $9,184 | 97 | $890,874 | $21,867 | $1,531 | 27 | $41,329 | 28.45 | $10,825,852 |
| 1998 | 163.01 | $749 | $8,988 | 105 | $943,699 | $21,399 | $1,498 | 28 | $41,942 | 29.45 | $12,475,891 |
| 1997 | 160.52 | $738 | $8,850 | 106 | $938,125 | $21,072 | $1,475 | 28 | $41,301 | 30.45 | $13,512,165 |
| 1996 | 156.85 | $721 | $8,648 | 106 | $916,695 | $20,591 | $1,441 | 28 | $40,358 | 31.46 | $14,394,371 |
| 1995 | 152.38 | $700 | $8,402 | 106 | $890,590 | $20,004 | $1,400 | 28 | $39,208 | 32.45 | $15,242,160 |
| 1994 | 148.23 | $681 | $8,173 | 106 | $866,287 | $19,458 | $1,362 | 28 | $38,138 | 33.45 | $16,159,629 |
| 1993 | 144.46 | $664 | $7,965 | 106 | $844,273 | $18,964 | $1,327 | 28 | $37,169 | 34.45 | $17,165,380 |
| 1992 | 140.32 | $645 | $7,736 | 106 | $820,068 | $18,420 | $1,289 | 28 | $36,104 | 35.46 | $18,177,051 |
| 1991 | 136.19 | $626 | $7,509 | 106 | $795,960 | $17,879 | $1,252 | 28 | $35,042 | 36.45 | $19,229,393 |
| 1990 | 130.66 | $600 | $7,204 | 106 | $763,620 | $17,152 | $1,201 | 28 | $33,619 | 37.45 | $20,107,267 |
| 1989 | 123.97 | $570 | $6,835 | 106 | $724,512 | $16,274 | $1,139 | 28 | $31,897 | 38.45 | $20,793,219 |
| 1988 | 118.26 | $543 | $6,520 | 106 | $691,150 | $15,524 | $1,087 | 28 | $30,428 | 39.46 | $21,624,790 |
| 1987 | 113.63 | $522 | $6,265 | 104 | $651,541 | $14,916 | $1,044 | 28 | $29,236 | 40.45 | $22,236,910 |
| 1986 | 109.61 | $504 | $6,043 | 102 | $616,422 | $14,389 | $1,007 | 28 | $28,202 | 41.45 | $22,949,720 |
| 1985 | 107.57 | $494 | $5,931 | 100 | $593,079 | $14,121 | $988 | 28 | $27,677 | 42.45 | $24,087,519 |
| 1984 | 103.88 | $477 | $5,728 | 99 | $567,043 | $13,637 | $955 | 24 | $22,911 | 43.46 | $24,957,002 |
| 1983 | 99.60 | $458 | $5,492 | 96 | $527,188 | $13,075 | $915 | 24 | $21,966 | 44.45 | $25,320,340 |
| 1982 | 96.50 | $443 | $5,321 | 86 | $457,573 | $12,668 | $887 | 19 | $16,849 | 45.45 | $23,841,903 |
| 1981 | 90.93 | $418 | $5,013 | 88 | $441,164 | $11,936 | $836 | 19 | $15,875 | 46.45 | $25,034,063 |
| 1980 | 82.41 | $379 | $4,544 | 70 | $318,056 | $10,818 | $757 | 18 | $13,631 | 47.46 | $19,806,571 |
| 1979 | 72.58 | $333 | $4,001 | 67 | $268,100 | $9,527 | $667 | 17 | $11,338 | 48.45 | $18,187,207 |
| 1978 | 65.23 | $300 | $3,597 | 64 | $230,189 | $8,564 | $599 | 17 | $10,191 | 49.45 | $17,052,174 |
| 1977 | 60.61 | $278 | $3,342 | 46 | $153,718 | $7,956 | $557 | 12 | $6,683 | 50.45 | $12,401,994 |
| 1976 | 56.91 | $261 | $3,138 | 46 | $144,334 | $7,471 | $523 | 12 | $6,275 | 51.46 | $12,695,167 |
| 1975 | 53.82 | $247 | $2,967 | 40 | $118,689 | $7,065 | $495 | 12 | $5,934 | 52.45 | $11,449,546 |

Figure 14: Revised Use Effect, Scenario A (1975 – June 2027)

47

| Year | CPI | Market Rent per Month | Market Rent Annual | Number of Subject Properties with Historical Improvements | Sub Total Market Rent | Lot Value | Land Rent Annual (7%) | Number of Land Subject Properties | Sub Total Land Rent | Years Remaining | Cumulative Use Effect @ 9% |
|------|-----|------|------|------|------|------|------|------|------|------|------|
| | | | | **CITY OF EAST ST. LOUIS** Use Effect Schedule Scenario A: Bell Report 12/1955 to 6/2027 (Landmark File: 155-1-21) | | | | | | | |
| 1974 | 49.31 | $227 | $2,719 | 32 | $86,997 | $6,473 | $453 | 12 | $5,437 | 53.45 | $9,255,978 |
| 1973 | 44.40 | $204 | $2,448 | 14 | $34,272 | $5,829 | $408 | 8 | $3,264 | 54.45 | $4,096,788 |
| 1972 | 41.82 | $192 | $2,306 | 8 | $18,445 | $5,490 | $384 | 8 | $3,074 | 55.46 | $2,560,433 |
| 1971 | 40.49 | $186 | $2,233 | 6 | $13,395 | $5,316 | $372 | 3 | $1,116 | 56.45 | $1,881,946 |
| 1970 | 38.83 | $178 | $2,141 | 6 | $12,844 | $5,097 | $357 | 3 | $1,070 | 57.45 | $1,966,771 |
| 1969 | 36.68 | $169 | $2,023 | 0 | $0 | $4,816 | $337 | 1 | $337 | 58.45 | $51,933 |
| 1968 | 34.78 | $160 | $1,918 | 0 | $0 | $4,566 | $320 | 1 | $320 | 59.46 | $53,685 |
| 1967 | 33.36 | $153 | $1,839 | 0 | $0 | $4,379 | $307 | 1 | $307 | 60.45 | $56,116 |
| 1966 | 32.46 | $149 | $1,790 | 0 | $0 | $4,261 | $298 | 1 | $298 | 61.45 | $59,513 |
| 1965 | 31.51 | $145 | $1,737 | 0 | $0 | $4,136 | $290 | 1 | $290 | 62.45 | $62,967 |
| 1964 | 31.02 | $143 | $1,710 | 0 | $0 | $4,072 | $285 | 1 | $285 | 63.46 | $67,575 |
| 1963 | 30.63 | $141 | $1,689 | 0 | $0 | $4,020 | $281 | 1 | $281 | 64.45 | $72,722 |
| 1962 | 30.25 | $139 | $1,668 | 0 | $0 | $3,971 | $278 | 1 | $278 | 65.45 | $78,292 |
| 1961 | 29.89 | $137 | $1,648 | 0 | $0 | $3,924 | $275 | 1 | $275 | 66.45 | $84,322 |
| 1960 | 29.58 | $136 | $1,631 | 0 | $0 | $3,882 | $272 | 1 | $272 | 67.46 | $90,953 |
| 1959 | 29.15 | $134 | $1,607 | 0 | $0 | $3,827 | $268 | 1 | $268 | 68.45 | $97,709 |
| 1958 | 28.86 | $133 | $1,591 | 0 | $0 | $3,788 | $265 | 1 | $265 | 69.45 | $105,431 |
| 1957 | 28.09 | $129 | $1,549 | 0 | $0 | $3,688 | $258 | 1 | $258 | 70.45 | $111,860 |
| 1956 | 27.18 | $125 | $1,499 | 0 | $0 | $3,569 | $250 | 1 | $250 | 71.46 | $118,006 |
| Dec-55 | 26.78 | $123 | $1,476 | 0 | $0 | $3,515 | $246 | 1 | $246 | 71.54 | $117,086 |

Figure 15: Revised Use Effect, Scenario A (December 1955 – 1974)

48

**Revised Use Effect Scenario B (JLL $900 per Month Improved Rents)**

| Year | CPI | Market Rent per Month | Market Rent Annual | Number of Subject Properties with Historical Improvements | Sub Total Market Rent | Lot Value | Land Rent Annual (7%) | Number of Land Subject Properties | Sub Total Land Rent | Years Remaining | Cumulative Use Effect @ 9% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **CITY OF EAST ST. LOUIS** Use Effect Schedule Scenario B: JLL $900 per Month Rate, 12/1955 to 6/2027 (Landmark File: 155-1-21) | | | | | | |
| **Total** | | | | | | | | | | | **$397,560,077** |
| Jun-27 | 304.70 | $900 | $10,800 | 75 | $810,000 | $40,000 | $2,800 | 25 | $70,000 | 0.00 | $880,000 |
| 2026 | 304.70 | $900 | $10,800 | 75 | $810,000 | $40,000 | $2,800 | 25 | $70,000 | 1.45 | $997,455 |
| 2025 | 304.70 | $900 | $10,800 | 75 | $810,000 | $40,000 | $2,800 | 25 | $70,000 | 2.45 | $1,087,162 |
| 2024 | 304.70 | $900 | $10,800 | 75 | $810,000 | $40,000 | $2,800 | 25 | $70,000 | 3.46 | $1,185,216 |
| 2023 | 304.70 | $900 | $10,800 | 75 | $810,000 | $40,000 | $2,800 | 25 | $70,000 | 4.45 | $1,291,809 |
| 2022 | 292.65 | $864 | $10,373 | 75 | $777,976 | $38,419 | $2,689 | 25 | $67,232 | 5.45 | $1,352,323 |
| 2021 | 270.97 | $800 | $9,604 | 75 | $720,329 | $35,572 | $2,490 | 25 | $62,251 | 6.45 | $1,364,728 |
| 2020 | 258.81 | $764 | $9,173 | 75 | $688,008 | $33,976 | $2,378 | 25 | $59,457 | 7.46 | $1,421,058 |
| 2019 | 255.66 | $755 | $9,062 | 75 | $679,624 | $33,562 | $2,349 | 25 | $58,733 | 8.45 | $1,529,988 |
| 2018 | 251.11 | $742 | $8,900 | 75 | $667,527 | $32,964 | $2,308 | 25 | $57,688 | 9.45 | $1,637,906 |
| 2017 | 245.12 | $724 | $8,688 | 75 | $651,611 | $32,178 | $2,252 | 25 | $56,312 | 10.45 | $1,742,647 |
| 2016 | 240.01 | $709 | $8,507 | 75 | $638,020 | $31,507 | $2,206 | 25 | $55,138 | 11.46 | $1,860,197 |
| 2015 | 237.02 | $700 | $8,401 | 75 | $630,071 | $31,115 | $2,178 | 25 | $54,451 | 12.45 | $2,002,235 |
| 2014 | 236.74 | $699 | $8,391 | 75 | $629,325 | $31,078 | $2,175 | 25 | $54,386 | 13.45 | $2,179,722 |
| 2013 | 232.96 | $688 | $8,257 | 75 | $619,279 | $30,582 | $2,141 | 25 | $53,518 | 14.45 | $2,337,832 |
| 2012 | 229.59 | $678 | $8,138 | 75 | $610,338 | $30,140 | $2,110 | 25 | $52,745 | 15.46 | $2,511,893 |
| 2011 | 224.94 | $664 | $7,973 | 77 | $613,910 | $29,529 | $2,067 | 25 | $51,676 | 16.45 | $2,748,134 |
| 2010 | 218.06 | $644 | $7,729 | 75 | $579,665 | $28,625 | $2,004 | 25 | $50,095 | 17.45 | $2,834,063 |
| 2009 | 214.54 | $634 | $7,604 | 77 | $585,520 | $28,164 | $1,971 | 25 | $49,286 | 18.45 | $3,113,701 |
| 2008 | 215.30 | $636 | $7,631 | 77 | $587,610 | $28,264 | $1,978 | 25 | $49,462 | 19.46 | $3,406,646 |
| 2007 | 207.34 | $612 | $7,349 | 92 | $676,122 | $27,219 | $1,905 | 27 | $51,444 | 20.45 | $4,240,451 |
| 2006 | 201.59 | $595 | $7,145 | 92 | $657,369 | $26,464 | $1,852 | 27 | $50,017 | 21.45 | $4,493,631 |
| 2005 | 195.29 | $577 | $6,922 | 92 | $636,826 | $25,637 | $1,795 | 27 | $48,454 | 22.45 | $4,744,707 |
| 2004 | 188.88 | $558 | $6,695 | 96 | $642,708 | $24,796 | $1,736 | 27 | $46,864 | 23.46 | $5,205,047 |
| 2003 | 183.96 | $543 | $6,520 | 95 | $619,430 | $24,149 | $1,690 | 27 | $45,642 | 24.45 | $5,471,600 |
| 2002 | 179.88 | $531 | $6,376 | 97 | $618,431 | $23,613 | $1,653 | 27 | $44,629 | 25.45 | $5,945,655 |
| 2001 | 177.07 | $523 | $6,276 | 97 | $608,776 | $23,245 | $1,627 | 27 | $43,932 | 26.45 | $6,379,206 |
| 2000 | 172.20 | $509 | $6,104 | 97 | $592,044 | $22,606 | $1,582 | 27 | $42,725 | 27.46 | $6,763,419 |
| 1999 | 166.58 | $492 | $5,904 | 97 | $572,705 | $21,867 | $1,531 | 27 | $41,329 | 28.45 | $7,130,892 |
| 1998 | 163.01 | $481 | $5,778 | 105 | $606,664 | $21,399 | $1,498 | 28 | $41,942 | 29.45 | $8,209,819 |
| 1997 | 160.52 | $474 | $5,689 | 106 | $603,080 | $21,072 | $1,475 | 28 | $41,301 | 30.45 | $8,889,888 |
| 1996 | 156.85 | $463 | $5,559 | 106 | $589,304 | $20,591 | $1,441 | 28 | $40,358 | 31.46 | $9,470,307 |
| 1995 | 152.38 | $450 | $5,401 | 106 | $572,522 | $20,004 | $1,400 | 28 | $39,208 | 32.45 | $10,028,082 |
| 1994 | 148.23 | $438 | $5,254 | 106 | $556,899 | $19,458 | $1,362 | 28 | $38,138 | 33.45 | $10,631,701 |
| 1993 | 144.46 | $427 | $5,120 | 106 | $542,747 | $18,964 | $1,327 | 28 | $37,169 | 34.45 | $11,293,402 |
| 1992 | 140.32 | $414 | $4,973 | 106 | $527,186 | $18,420 | $1,289 | 28 | $36,104 | 35.46 | $11,958,998 |
| 1991 | 136.19 | $402 | $4,827 | 106 | $511,688 | $17,879 | $1,252 | 28 | $35,042 | 36.45 | $12,651,352 |
| 1990 | 130.66 | $386 | $4,631 | 106 | $490,899 | $17,152 | $1,201 | 28 | $33,619 | 37.45 | $13,228,920 |
| 1989 | 123.97 | $366 | $4,394 | 106 | $465,757 | $16,274 | $1,139 | 28 | $31,897 | 38.45 | $13,680,220 |
| 1988 | 118.26 | $349 | $4,192 | 106 | $444,311 | $15,524 | $1,087 | 28 | $30,428 | 39.46 | $14,227,326 |
| 1987 | 113.63 | $336 | $4,027 | 104 | $418,848 | $14,916 | $1,044 | 28 | $29,236 | 40.45 | $14,636,214 |
| 1986 | 109.61 | $324 | $3,885 | 102 | $396,271 | $14,389 | $1,007 | 28 | $28,202 | 41.45 | $15,111,981 |
| 1985 | 107.57 | $318 | $3,813 | 100 | $381,265 | $14,121 | $988 | 28 | $27,677 | 42.45 | $15,868,393 |
| 1984 | 103.88 | $307 | $3,682 | 99 | $364,527 | $13,637 | $955 | 24 | $22,911 | 43.46 | $16,389,931 |
| 1983 | 99.60 | $294 | $3,530 | 96 | $338,906 | $13,075 | $915 | 24 | $21,966 | 44.45 | $16,639,081 |
| 1982 | 96.50 | $285 | $3,420 | 86 | $294,154 | $12,668 | $887 | 19 | $16,849 | 45.45 | $15,629,338 |
| 1981 | 90.93 | $269 | $3,223 | 88 | $283,606 | $11,936 | $836 | 19 | $15,875 | 46.45 | $16,403,882 |
| 1980 | 82.41 | $243 | $2,921 | 70 | $204,465 | $10,818 | $757 | 18 | $13,631 | 47.46 | $13,023,499 |
| 1979 | 72.58 | $214 | $2,572 | 67 | $172,350 | $9,527 | $667 | 17 | $11,338 | 48.45 | $11,955,314 |
| 1978 | 65.23 | $193 | $2,312 | 64 | $147,978 | $8,564 | $599 | 17 | $10,191 | 49.45 | $11,220,294 |
| 1977 | 60.61 | $179 | $2,148 | 46 | $98,819 | $7,956 | $557 | 12 | $6,683 | 50.45 | $8,157,264 |
| 1976 | 56.91 | $168 | $2,017 | 46 | $92,786 | $7,471 | $523 | 12 | $6,275 | 51.46 | $8,350,095 |
| 1975 | 53.82 | $159 | $1,908 | 40 | $76,300 | $7,065 | $495 | 12 | $5,934 | 52.45 | $7,555,143 |

Figure 16: Revised Use Effect, Scenario B (1975 – June 2027)

49

| | | | | | CITY OF EAST ST. LOUIS | | | | | | |
| | | | | | Use Effect Schedule | | | | | | |
| | | | | | Scenario B: JLL $900 per Month Rate, 12/1955 to 6/2027 | | | | | | |
| | | | | | (Landmark File: 155-1-21) | | | | | | |
| Year | CPI | Market Rent per Month | Market Rent Annual | Number of Subject Properties with Historical Improvements | Sub Total Market Rent | Lot Value | Land Rent Annual (7%) | Number of Land Subject Properties | Sub Total Land Rent | Years Remaining | Cumulative Use Effect @ 9% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1974 | 49.31 | $146 | $1,748 | 32 | $55,927 | $6,473 | $453 | 12 | $5,437 | 53.45 | $6,144,725 |
| 1973 | 44.40 | $131 | $1,574 | 14 | $22,032 | $5,829 | $408 | 8 | $3,264 | 54.45 | $2,760,879 |
| 1972 | 41.82 | $124 | $1,482 | 8 | $11,857 | $5,490 | $384 | 8 | $3,074 | 55.46 | $1,776,627 |
| 1971 | 40.49 | $120 | $1,435 | 6 | $8,611 | $5,316 | $372 | 3 | $1,116 | 56.45 | $1,261,524 |
| 1970 | 38.83 | $115 | $1,376 | 6 | $8,257 | $5,097 | $357 | 3 | $1,070 | 57.45 | $1,318,385 |
| 1969 | 36.68 | $108 | $1,300 | 0 | $0 | $4,816 | $337 | 1 | $337 | 58.45 | $51,933 |
| 1968 | 34.78 | $103 | $1,233 | 0 | $0 | $4,566 | $320 | 1 | $320 | 59.46 | $53,685 |
| 1967 | 33.36 | $99 | $1,182 | 0 | $0 | $4,379 | $307 | 1 | $307 | 60.45 | $56,116 |
| 1966 | 32.46 | $96 | $1,150 | 0 | $0 | $4,261 | $298 | 1 | $298 | 61.45 | $59,513 |
| 1965 | 31.51 | $93 | $1,117 | 0 | $0 | $4,136 | $290 | 1 | $290 | 62.45 | $62,967 |
| 1964 | 31.02 | $92 | $1,099 | 0 | $0 | $4,072 | $285 | 1 | $285 | 63.46 | $67,575 |
| 1963 | 30.63 | $90 | $1,085 | 0 | $0 | $4,020 | $281 | 1 | $281 | 64.45 | $72,722 |
| 1962 | 30.25 | $89 | $1,072 | 0 | $0 | $3,971 | $278 | 1 | $278 | 65.45 | $78,292 |
| 1961 | 29.89 | $88 | $1,059 | 0 | $0 | $3,924 | $275 | 1 | $275 | 66.45 | $84,322 |
| 1960 | 29.58 | $87 | $1,048 | 0 | $0 | $3,882 | $272 | 1 | $272 | 67.46 | $90,953 |
| 1959 | 29.15 | $86 | $1,033 | 0 | $0 | $3,827 | $268 | 1 | $268 | 68.45 | $97,709 |
| 1958 | 28.86 | $85 | $1,023 | 0 | $0 | $3,788 | $265 | 1 | $265 | 69.45 | $105,431 |
| 1957 | 28.09 | $83 | $996 | 0 | $0 | $3,688 | $258 | 1 | $258 | 70.45 | $111,860 |
| 1956 | 27.18 | $80 | $964 | 0 | $0 | $3,569 | $250 | 1 | $250 | 71.46 | $118,006 |
| Dec-55 | 26.78 | $79 | $949 | 0 | $0 | $3,515 | $246 | 1 | $246 | 71.54 | $117,086 |

Figure 17: Revised Use Effect, Scenario B (December 1955 – 1974)

50

**Revised Use Effect Scenario C (Land Only Rates)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CITY OF EAST ST. LOUIS** | | | | | | | |
| **Use Effect Schedule** | | | | | | | |
| **Scenario C: Land Only, 12/1955 to 6/2027** | | | | | | | |
| **(Landmark File: 155-1-21)** | | | | | | | |
| **Year** | **CPI** | **Lot Value** | **Land Rent Annual (7%)** | **Number of Subject Properties** | **Sub Total Land Rent** | **Years Remaining** | **Cumulative Use Effect @ 9%** |
| **Total** | | | | | | | **$123,640,381** |
| Jun-27 | 304.70 | $40,000 | $2,800 | 100 | $280,000 | 0.00 | $280,000 |
| 2026 | 304.70 | $40,000 | $2,800 | 100 | $280,000 | 1.45 | $317,372 |
| 2025 | 304.70 | $40,000 | $2,800 | 100 | $280,000 | 2.45 | $345,915 |
| 2024 | 304.70 | $40,000 | $2,800 | 100 | $280,000 | 3.46 | $377,114 |
| 2023 | 304.70 | $40,000 | $2,800 | 100 | $280,000 | 4.45 | $411,030 |
| 2022 | 292.65 | $38,419 | $2,689 | 100 | $268,930 | 5.45 | $430,285 |
| 2021 | 270.97 | $35,572 | $2,490 | 100 | $249,003 | 6.45 | $434,232 |
| 2020 | 258.81 | $33,976 | $2,378 | 100 | $237,830 | 7.46 | $452,155 |
| 2019 | 255.66 | $33,562 | $2,349 | 100 | $234,932 | 8.45 | $486,814 |
| 2018 | 251.11 | $32,964 | $2,308 | 100 | $230,750 | 9.45 | $521,152 |
| 2017 | 245.12 | $32,178 | $2,252 | 100 | $225,248 | 10.45 | $554,479 |
| 2016 | 240.01 | $31,507 | $2,206 | 100 | $220,550 | 11.46 | $591,881 |
| 2015 | 237.02 | $31,115 | $2,178 | 100 | $217,802 | 12.45 | $637,075 |
| 2014 | 236.74 | $31,078 | $2,175 | 100 | $217,544 | 13.45 | $693,548 |
| 2013 | 232.96 | $30,582 | $2,141 | 100 | $214,072 | 14.45 | $743,856 |
| 2012 | 229.59 | $30,140 | $2,110 | 100 | $210,981 | 15.46 | $799,239 |
| 2011 | 224.94 | $29,529 | $2,067 | 102 | $210,838 | 16.45 | $870,527 |
| 2010 | 218.06 | $28,625 | $2,004 | 100 | $200,378 | 17.45 | $901,747 |
| 2009 | 214.54 | $28,164 | $1,971 | 102 | $201,088 | 18.45 | $986,327 |
| 2008 | 215.30 | $28,264 | $1,978 | 102 | $201,805 | 19.46 | $1,079,124 |
| 2007 | 207.34 | $27,219 | $1,905 | 119 | $226,735 | 20.45 | $1,321,472 |
| 2006 | 201.59 | $26,464 | $1,852 | 119 | $220,446 | 21.45 | $1,400,372 |
| 2005 | 195.29 | $25,637 | $1,795 | 119 | $213,557 | 22.45 | $1,478,616 |
| 2004 | 188.88 | $24,796 | $1,736 | 123 | $213,492 | 23.46 | $1,611,487 |
| 2003 | 183.96 | $24,149 | $1,690 | 122 | $206,235 | 24.45 | $1,696,713 |
| 2002 | 179.88 | $23,613 | $1,653 | 124 | $204,963 | 25.45 | $1,837,902 |
| 2001 | 177.07 | $23,245 | $1,627 | 124 | $201,763 | 26.45 | $1,971,920 |
| 2000 | 172.20 | $22,606 | $1,582 | 124 | $196,218 | 27.46 | $2,090,687 |
| 1999 | 166.58 | $21,867 | $1,531 | 124 | $189,808 | 28.45 | $2,204,279 |
| 1998 | 163.01 | $21,399 | $1,498 | 133 | $199,225 | 29.45 | $2,521,723 |
| 1997 | 160.52 | $21,072 | $1,475 | 134 | $197,655 | 30.45 | $2,726,853 |
| 1996 | 156.85 | $20,591 | $1,441 | 134 | $193,140 | 31.46 | $2,904,888 |
| 1995 | 152.38 | $20,004 | $1,400 | 134 | $187,640 | 32.45 | $3,075,978 |

Figure 18: Revised Use Effect, Scenario C (1995 – June 2027)

51

| | CITY OF EAST ST. LOUIS<br>Use Effect Schedule<br>Scenario C: Land Only, 12/1955 to 6/2027<br>(Landmark File: 155-1-21) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Year | CPI | Lot Value | Land Rent Annual (7%) | Number of Subject Properties | Sub Total Land Rent | Years Remaining | Cumulative Use Effect @ 9% |
| 1994 | 148.23 | $19,458 | $1,362 | 134 | $182,520 | 33.45 | $3,261,130 |
| 1993 | 144.46 | $18,964 | $1,327 | 134 | $177,881 | 34.45 | $3,464,098 |
| 1992 | 140.32 | $18,420 | $1,289 | 134 | $172,782 | 35.46 | $3,668,260 |
| 1991 | 136.19 | $17,879 | $1,252 | 134 | $167,702 | 36.45 | $3,880,631 |
| 1990 | 130.66 | $17,152 | $1,201 | 134 | $160,889 | 37.45 | $4,057,792 |
| 1989 | 123.97 | $16,274 | $1,139 | 134 | $152,649 | 38.45 | $4,196,222 |
| 1988 | 118.26 | $15,524 | $1,087 | 134 | $145,620 | 39.46 | $4,364,039 |
| 1987 | 113.63 | $14,916 | $1,044 | 132 | $137,826 | 40.45 | $4,501,951 |
| 1986 | 109.61 | $14,389 | $1,007 | 130 | $130,939 | 41.45 | $4,661,662 |
| 1985 | 107.57 | $14,121 | $988 | 128 | $126,523 | 42.45 | $4,909,558 |
| 1984 | 103.88 | $13,637 | $955 | 123 | $117,418 | 43.46 | $4,967,170 |
| 1983 | 99.60 | $13,075 | $915 | 120 | $109,831 | 44.45 | $5,064,068 |
| 1982 | 96.50 | $12,668 | $887 | 105 | $93,111 | 45.45 | $4,679,252 |
| 1981 | 90.93 | $11,936 | $836 | 107 | $89,403 | 46.45 | $4,896,974 |
| 1980 | 82.41 | $10,818 | $757 | 88 | $66,640 | 47.46 | $3,979,402 |
| 1979 | 72.58 | $9,527 | $667 | 84 | $56,021 | 48.45 | $3,646,123 |
| 1978 | 65.23 | $8,564 | $599 | 81 | $48,555 | 49.45 | $3,444,454 |
| 1977 | 60.61 | $7,956 | $557 | 58 | $32,303 | 50.45 | $2,497,624 |
| 1976 | 56.91 | $7,471 | $523 | 58 | $30,331 | 51.46 | $2,556,665 |
| 1975 | 53.82 | $7,065 | $495 | 52 | $25,716 | 52.45 | $2,362,605 |
| 1974 | 49.31 | $6,473 | $453 | 44 | $19,937 | 53.45 | $1,996,387 |
| 1973 | 44.40 | $5,829 | $408 | 22 | $8,976 | 54.45 | $979,667 |
| 1972 | 41.82 | $5,490 | $384 | 16 | $6,148 | 55.46 | $731,552 |
| 1971 | 40.49 | $5,316 | $372 | 9 | $3,349 | 56.45 | $434,295 |
| 1970 | 38.83 | $5,097 | $357 | 9 | $3,211 | 57.45 | $453,870 |
| 1969 | 36.68 | $4,816 | $337 | 1 | $337 | 58.45 | $51,933 |
| 1968 | 34.78 | $4,566 | $320 | 1 | $320 | 59.46 | $53,685 |
| 1967 | 33.36 | $4,379 | $307 | 1 | $307 | 60.45 | $56,116 |
| 1966 | 32.46 | $4,261 | $298 | 1 | $298 | 61.45 | $59,513 |
| 1965 | 31.51 | $4,136 | $290 | 1 | $290 | 62.45 | $62,967 |
| 1964 | 31.02 | $4,072 | $285 | 1 | $285 | 63.46 | $67,575 |
| 1963 | 30.63 | $4,020 | $281 | 1 | $281 | 64.45 | $72,722 |
| 1962 | 30.25 | $3,971 | $278 | 1 | $278 | 65.45 | $78,292 |
| 1961 | 29.89 | $3,924 | $275 | 1 | $275 | 66.45 | $84,322 |
| 1960 | 29.58 | $3,882 | $272 | 1 | $272 | 67.46 | $90,953 |
| 1959 | 29.15 | $3,827 | $268 | 1 | $268 | 68.45 | $97,709 |
| 1958 | 28.86 | $3,788 | $265 | 1 | $265 | 69.45 | $105,431 |
| 1957 | 28.09 | $3,688 | $258 | 1 | $258 | 70.45 | $111,860 |
| 1956 | 27.18 | $3,569 | $250 | 1 | $250 | 71.46 | $118,006 |
| Dec-55 | 26.78 | $3,515 | $246 | 1 | $246 | 71.54 | $117,086 |

Figure 19: Revised Use Effect, Scenario C (December 1955 – 1994)

**Historical Aerials with East St. Louis Owned Parcels**



Figure 20: Subject Property Neighborhood in 1952a



Figure 21: Subject Property Neighborhood in 1952b



Figure 22: Subject Property Neighborhood in 1958



Figure 23: Subject Property Neighborhood in 1968



Figure 24: Subject Property Neighborhood in 1973a

57



Figure 25: Subject Property Neighborhood in 1973b



Figure 26: Subject Property Neighborhood in 1980



Figure 27: Subject Property Neighborhood in 1988a



Figure 28: Subject Property Neighborhood in 1988b



Figure 29: Subject Property Neighborhood in 1992



Figure 30: Subject Property Neighborhood in 1996



Figure 31: Subject Property Neighborhood in 1998



Figure 32: Subject Property Neighborhood in 2009



Figure 33: Subject Property Neighborhood in 2011



Figure 34: Subject Property Neighborhood in 2014



Figure 35: Subject Property Neighborhood in 2017

**Rebuttal Report Executive Summary**

Landmark Research Group File Identification

Case Number: 155-1-21
"City of East St. Louis"

Type of Report

This report is a restricted appraisal review report, containing a summary of information. This report may not contain supporting rationale,[119] it can only be understood in combination with the supporting workfile documentation, deposition, and trial testimony. Accordingly, the workfile is considered a part of this report. As discovery may be ongoing in this case, Landmark Research Group reserves the right to revise and supplement this report as we continue to review and analyze the case file, and as more information becomes available.

Clients of this Report

The Driscoll Firm, LLC
The Driscoll Firm, P.C.
Chatham & Baricevic
Sanders Phillips Grossman, LLC
Smouse & Mason, LLC

Purpose of the Report

The purpose of this report is to respond to the opinions given by the Plaintiffs' experts in this matter, Mr. Richard Roddewig and Mr. Charles Brigden.

Intended Users of the Report

The clients are the sole intended users of this report. No other users are intended or identified. This expert report may not be utilized or relied upon by any other party, nor may it be relied upon by the clients for any purpose other than the stated use.

Intended Use of the Report

The intended use of this expert report is for the legal matter involving City of East St. Louis vs. Monsanto Company, Solutia Inc., and Pharmacia, LLC. This expert report may be presented to the court in this matter. This report can be updated to include additional properties, various ownership records, and damage calculations.

---

[119] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 38* (United States of America, 2024), 115-116.

Property Rights Appraised

Fee simple estate

Scope of Work

The Scope of Work is set forth throughout this expert report, and is summarized as follows:

- Reviewed various legal documents.
- Reviewed various PCB contaminant documents.
- Reviewed USPAP and other appraisal textbooks and articles relating to appraisal and valuing detrimental conditions.
- Researched public property records, GIS database records, and MLS records.
- Revised the Use Effect calculations.
- Examined the JLL Reports, deposition transcripts, and workfiles.
- Prepared this expert rebuttal report.
- Michael Tachovsky, PhD performed general market research, including an examination of opposing expert documents, and assisted with expert report drafting.
- Kristopher Williams performed general market research, including an examination of opposing expert documents, and assisted with expert report drafting.
- Melanie Levy performed general market research, including an examination of opposing expert documents.
- Spencer Thompson performed general market research, including an examination of opposing expert documents.
- Fernando Barraza performed general market research, including an examination of opposing expert documents.
- Raine Hilelson performed general market research, including GIS mapping.
- Daniel Meyers performed general market research including exhibit development.
- Performed inspections of the subject property neighborhood, locations of the subject properties, market areas, control neighborhoods, and the former Monsanto plant. Inspections began in February 2022 and have been ongoing.

70

<u>Report Assumptions and Conditions</u>

The use of any noted extraordinary assumptions or hypothetical conditions might affect assignment results.[120] USPAP requires that an appraiser states all extraordinary assumptions, hypothetical conditions, and jurisdictional exceptions in a report.[121]

<u>Extraordinary Assumptions</u>

It is an extraordinary assumption that the following data, files, and experts are accurate and correct:

- It is an extraordinary assumption that the environmental testing, including the identification of the subject properties, and the estimated cost of remediation, is accurate and correct. This data was presented by Kevin Coghlan, M.S., C.I.H. of Environmental Health & Engineering, Inc. Furthermore, PCBs were present on the subject properties since at least December 1, 1955. Other experts will be presenting evidence on this matter.
- It is an extraordinary assumption that the City of East St. Louis ownership history is accurate and correct, as provided by counsel. In addition, there were no ownership records for 2025 or beyond; however, we were instructed by counsel to mirror the ownership data from 2024, as ownership has been relatively consistent over recent years. Years when City of East St. Louis owned less than full interest of a parcel (e.g., 3 out of 4 lots that comprise the parcel), we did not count those years in our Use Effect calculation. Only years with complete ownership were utilized (e.g. 4 out of 4 lots that comprise the parcel). Any revisions in ownership did not require a change in methodology but rather only the mathematics involved.

<u>Hypothetical Conditions</u>

- It is a hypothetical condition that in the unimpaired condition, the subject properties are not impacted by PCB contaminants. In reality, the subject properties have been impacted by PCB contaminants.

<u>Jurisdictional Exceptions</u>

No jurisdictional exceptions were utilized in this expert report.

<u>General Assumptions and Limiting Conditions</u>

General assumptions and limiting conditions are in the report addenda.

---

[120] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, USPAP Guidance: Advisory Opinion 38* (United States of America, 2024), 115-116.

[121] Appraisal Standards Board of The Appraisal Foundation, *2024 Uniform Standards of Professional Appraisal Practice, Standard 2: Real Property Appraisal, Reporting; Standard 4: Appraisal Review, Reporting; USPAP Guidance Advisory Opinion 38* (United States of America, 2024), 22-25, 31, and 115-116.

71

Effective Dates of Value

December 31, 2023

Date of Report

January 28, 2025

Type of Value

Market Value

Exposure Time

Reasonable exposure time for an uncontaminated home or residential lot is approximately 30 days.

**General Assumptions and Limiting Conditions**

This appraisal has been made with the following general assumptions:

1. Title to the property is assumed to be good and marketable unless otherwise stated.
2. The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.
3. Responsible ownership and competent property management are assumed.
4. Information furnished by others is believed to be reliable, but no warranty is given for its accuracy.
5. All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.
6. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.
7. It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated in the appraisal report.
8. It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been described in the appraisal report.
9. It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.
10. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.
11. Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.
12. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

This appraisal has been made with the following general limiting conditions:

13. No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations.

14. Any allocation of the total value estimated in this report between the land and the
improvements applies only under the stated program of utilization. The separate values
allocated to the land and buildings must not be used in conjunction with any other
appraisal and are invalid if they are.[122]

---

[122] The Appraisal Institute, *The Appraisal of Real Estate, 15th Edition* (Chicago, IL: Appraisal
Institute, 2020), 620.

74

**Certification**

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the properties that are the subject of the work under review and no (or the specified) personal interest with respect to the parties involved.
- In regards to this rebuttal report and the Bell Report dated February 16, 2024, I have performed no services, as an appraiser or in any other capacity, regarding the properties that are the subject of the work under review within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the properties that are the subject of the work under review or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use.
- My compensation for completing this assignment is not contingent upon the development or reporting of predetermined assignment results or assignment results that favors the cause of the client, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal review.
- My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.
- I have made a personal inspection of the subject of the work under review.
- Michael Tachovsky, PhD, Kristopher Williams, Melanie Levy, Spencer Thompson, Fernando Barraza, Raine Hilelson, and Daniel Meyers provided significant real property appraisal assistance to the person signing this certification.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the code of professional ethics and standards of professional appraisal practice of the Appraisal Institute.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, I have completed the continuing education program for designated members of the Appraisal Institute.

Randall Bell, PhD, MBA, MAI
Illinois State License (553002895)

75

**Definitions**

Market Value

The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Market Rent

The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby lessee and lessor are typically motivated; both parties are well informed or well advised, and acting in what they consider their best interests; payment is made in terms of cash or in terms of financial arrangements comparable thereto; and the rent reflects specified terms and conditions typically found in that market, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, frequency of payments (annual, monthly, etc.), and tenant improvements (TIs). (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Benefits

In eminent domain valuation, the advantageous factors that arise from a public improvement for which private property has been taken. The law in some jurisdictions makes a distinction between general benefits and special benefits because only special benefits are considered in determining the value of the remainder in a partial acquisition. The distinction between special benefits and general benefits is both a factual and a legal question, so appraisers may need to consult legal counsel to resolve questions about the classification of benefits. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Change

The result of the cause and effect relationship among the forces that influence real property values. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Class

A set of items defined by a common characteristic. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 6th Edition)

76

Conventional

A generally accepted rule or practice; usage or custom. (Black's Law Dictionary, 4th Edition)

Count

Frequency. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Data

Unprocessed observations and descriptions about real property and the markets in which real property is bought and sold. These raw observations fall into two categories: (1) qualitative data, which descriptive in nature, and (2) quantitative data, which has to do with numbers. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Days on Market

The length of time between the date a property is listed and advertised for sale and the date it is sold or removed from the market; commonly used as a measure of the marketability of a property and as an indication of the general health of the market. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Delta ($\Delta$)

In mathematics, change in a variable, symbolized by the upper case Greek letter delta. For example, $\Delta x$ means "change in the variable x." In calculus, the lower case Greek letter delta refers to a partial derivative. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Detrimental Condition

Any issue or condition that may cause a diminution-in-value to real estate. (Appraisal Institute: Real Estate Damages 3rd Edition).

Diminution-in-value (Property Value Diminution)

The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Easement

The right to use another's land for a stated purpose. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

77

Excess Land

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Exposure Time

1 The time a property remains on the market.
2. An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Extraordinary Assumptions

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021)

Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Ground Lease

A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Ground Rent

The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Highest & Best Use

This may be defined as "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity." (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Hypothetical Conditions

A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021)

Impaired Value

The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Jurisdictional Exceptions

An assignment condition established by applicable law or regulation, which precludes an appraiser from complying with a part of USPAP. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021)

Just Compensation

In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position pecuniarily as he or she would have been if the property had not been taken. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Kurtosis

A statistical term that refers to the "peakedness" of the data distribution. A normal distribution has a kurtosis of 3 and is moderately peaked, while a distribution with a kurtosis higher than 3 is leptokurtic, and one with a kurtosis of less than 3 is platykurtic. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Leased Fee Estate

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Leasehold Estate

The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Linear Regression

A type of statistical analysis used to investigate a linear relationship between a dependent variable and one or more independent variables; used to predict the value of the dependent variable on the basis of the values of the independent variables and to develop an understanding of how a unit change in an independent variable relates to change in the dependent variable. Linear regression models employing a single independent variable are called simple linear regression models. Those employing more than one independent variable are called multiple linear regression models. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Market

A set of arrangements in which buyers and sellers are brought together through the price mechanism; the aggregate of possible buyers and sellers and the transactions between them. A gathering of people for the buying and selling of things; by extension, the people gathered for this purpose. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Market Participants

Individuals actively engaged in transactions. In real property markets, primary market participants invest in real property or use real estate, such as buyers, sellers, owners, lenders, and tenants. Secondary market participants include those who advise primary market participants, such as agents and brokers, advisors, counselors, underwriters, and appraisers. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Market Resistance

The risk, if any, associated with the ongoing stage of a detrimental condition analysis. Market resistance includes the reluctance on part of the real estate market to buy a property that has historically been damaged or tainted. Sometimes called *stigma*. (Appraisal Institute: Real Estate Damages 3rd Edition)

Mass Appraisal

The process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing. (USPAP, 2020-2021 ed.) Often associated with real property tax assessment valuation. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Mean

A measure of central tendency. The sum of values for a variable in a sample or population divided by the number of items in the sample or population. The arithmetic average. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Median

A measure of central tendency identified as the middle value in an ordered array of numerical values, e.g., 7 is the median of (1, 4, 6, 6, 7, 9, 11, 22, 41). If the ordered array contains an even number of values, then the median is the mean of the two values on either side of the middle. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Mode

A measure of central tendency consisting of the numerical value or categorical characteristic that occurs most frequently in a sample or population. For example, the mode of the data set (2, 4, 5, 6, 6, 7, 7, 8, 8, 8, 8, 10, 12) is 8, and the mode of (poor, poor, below average, average, average, average, average, good, good, excellent) is average. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Nuisance

Something that interferes with the use and enjoyment of property or is a source of discomfort and annoyance to others; legally divided into two classes: public, or common, nuisances, which touch the public interest, and private nuisances, which destroy or injure an individual's property, interfere with its lawful use and enjoyment, or deny an individual common rights. (Appraisal Institute, 6th Edition)

Permanent Easement

An easement that lasts forever. Sometimes referred to as a perpetual easement. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Personal Property

1. Tangible or intangible objects that are considered personal, as opposed to real property. Examples of tangible personal property include furniture, vehicles, jewelry, collectibles, machinery and equipment, and computer hardware. Examples of intangible personal property include contracts, patents, licenses, computer software, and intellectual property. See also trade fixtures.
2. Any tangible or intangible article that is subject to ownership and classified as real property, including identifiable tangible objects that are considered by the general public as being "personal," such as furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment, and intangible property that is created and stored electronically such as plans for installation art, choreography, emails, or designs for digital tokens. (USPAP, 2020-2021 ed.) (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Range

In statistics, the difference between the highest and lowest values in a set of numbers. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

81

Regression Analysis

A statistical method that examines the relationship between one or more independent variables and a dependent variable. Regression models can be used to examine the structure of a relationship or to forecast dependent variable values. Simple linear regression has one independent variable, whereas multiple linear regression includes more than one independent variable. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Remediation Cost

The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Remediation Lifecycle

A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Sample Variance

Sample variance equals $S^2$, where S is the sample standard deviation. (Appraisal Institute: The Appraisal of Real Estate 15th Edition)

Severance Damages

In condemnation, the loss in value to the remainder in a partial taking of property. Generally, the difference between the value of the whole property before the taking and the value of the remainder after the taking is the measure of the value of the part taken and the damages to the remainder. Note that different regions of the country and different courts may use terms such as consequential damages and severance damages differently. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Skewness

The degree of deviation from symmetry in a statistical distribution. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Source, Non-source, Adjacent and Proximate Sites (SNAP)

Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site. (The Appraisal Foundation: Uniform Standards of Professional Appraisal Practice 2020-2021, Advisory Opinion 9)

Standard Deviation

The square root of the variance. The sample standard deviation is the square root of the sample variance and the population standard deviation is the square root of the population variance, i.e., the square root of the sum of the squared deviations from the mean divided by either the population size or by the sample size minus 1. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Standard Error

The standard deviation of a regression coefficient estimate. Also, the standard deviation of regression errors (residuals). (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Stigma

Stigma is essentially jargon, or a slang term given to "risk" or "market resistance".

An adverse public perception regarding a property, commonly the identification of a property with a condition such as environmental contamination or other detrimental condition, such as a violent crime, that penalizes the marketability of the property and may also result in a diminution in value. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Sum

Add up what follows. (Appraisal Institute: An Introduction to Statistics for Appraisers)

Surplus Land

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Survey

1. The process in which the quantity or location of a piece of land is scientifically ascertained; may reflect the physical features of land, e.g., grades, contours, structures.
2. A map or plot that describes the courses, distances, and quantity of land and shows the lines of possession.
3. A market analysis procedure used to identify consumer preferences. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Temporary Construction Easement (TCE)

An easement granted for a specific purpose and applicable for a specific time period. A construction easement, for example, is terminated after the construction of the improvement and the unencumbered fee interest in the land reverts to the owner. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Unimpaired Value

A value estimate that does not include any adjustments for detrimental conditions. (Appraisal Institute: Real Estate Damages 3rd Edition)

Unit of Value

The market value of the whole reduced to a value per unit of measurement. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 6th Edition)

Units of Comparison

The components into which a property may be divided for purposes of comparison, e.g., price per SqFt, front foot, cubic foot, room, bed, seat, apartment unit. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Unit Rule

A valuation premise often applicable in condemnation appraisals. The unit rule has two aspects, the first dealing with ownership interests and the second dealing with physical components. The first aspect of the rule, also referred to as the undivided fee rule, requires that property be valued as a whole rather than by the sum of the values of the various interests into which it may have been carved (such as lessor and lessee, life tenant and remainderman, and mortgagor and mortgagee, etc.). This is an application of the principle that it is the property, not the interests, that is being acquired. The second aspect of the rule is that different physical elements or components of a tract of land (such as the value of timber and the value of minerals on the same land) are not to be separately valued and added together. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Whole Property

Or "larger parcel" is in governmental land acquisitions and in valuation of charitable donations of partial interests in property such as easements, the tract or tracts of land that are under the beneficial control of a single individual or entity and have the same, or an integrated, highest and best use. Elements for consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use. In most states, unity of ownership, contiguity, and unity of use are the three conditions that establish the larger parcel for the consideration of severance damages. In federal and some state cases, however, contiguity is sometimes subordinated to unitary use. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

Zoning

Public regulation of the use of private land through application of police power; accomplished by establishing districts or areas with uniform requirements relating to lot coverage, setbacks, type of improvement, permitted activities, signage, structure height, minimum lot area, density, landscaping, and other aspects of land use and development. Zoning regulations are established by enactment of a local (city, town, or county) zoning ordinance. (Appraisal Institute: The Dictionary of Real Estate Appraisal, 7th Edition)

85

**Statement of Compensation**

Landmark Research Group, LLC charges $775 per hour for research and $875 per hour for deposition and court testimony of Randall Bell, PhD, MAI. Support staff are billed at other rates.

**Summary of Testimony Experience – Prior Five Years**

1. Eduardo and Carmen Amorin, et al. v. Taishan Gypsum co., Ltd., et al., United States District Court Southern District of Florida, 3/19, Deposition

2. Oroville Dam Cases, Superior Court of the State of California, County of Sacramento, 4/19, Deposition

3. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs, United States Court of Federal Claims, 5/19, Trial

4. Brown, Blundon & Dyer v. Saint Gobain Performance Plastics Corporation, United States District Court, Southern District of Hillsborough County, 6/19, Deposition

5. Plaintiff's v. All American Pipeline L.P., United States District Court Central, District of California, 8/19, Deposition

6. David Hinojosa and Maria Hinojosa et. al. v. Mo-Vac Service Co., United States District Court, 406th Judicial District, Webb County, Texas, 1/20, Deposition

7. Schwarz and Oakenfold v. Coldwell Banker et al., Los Angeles Superior Court, 3/20, Deposition

8. William Gandsey, et al. v. Southern California Gas Company, et al., Los Angeles Superior Court, 9/20, Deposition

9. Kevin Brown, et al. v. Saint Gobain Performance Plastics Corporation, United States District Court, Southern District of Hillsborough County, 5/21, Deposition

10. SA Athnassia, LLC v. Pieco, Inc., et al., Superior Court of California, County of Orange-Central District, 5/21, Deposition

11. John Bedrosian, et al. v. Mohamed Hadid, et al., Superior Court of California, Los Angeles Superior Court, 8/21, Trial

12. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs, United States Court of Federal Claims, 10/21, Deposition

13. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs, United States Court of Federal Claims, 01/22, Deposition

14. City of Hamilton v. Municipal Property Assessment Corporation and Stelco Inc. and Legacy Lands Hamilton Inc., Assessment Review Board Ontario, Canada, 02/22, Hearing

15. Alexander, et al. v. The Woodlands Land Development Company L.P., et al., District Court of Harris County, Texas, 04/22, Deposition

16. Nevada Real Estate Commission Public Meeting, 05/22, Hearing

87

17. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs, United States Court of Federal Claims, 06/22, Trial

18. Kevin Brown, et al. v. Saint Gobain Performance Plastics Corporation, United States District Court, Southern District of Hillsborough County, 11/22, Hearing

19. United States of America v. 0.2853 Acres of Land, United States District Court, Northern District of Texas, 6/23, Deposition

20. Holden-McDaniel Partners, LLC v. City of Arlington, et. al., Superior Court of Washington, Snohomish County, 06/23, Deposition

21. Grey Fox, LLC, et. al. v. Plains All American Pipeline, L.P., et. al., United States District Court, Central District of California, 8/23, Deposition

22. Lendlease (US) Construction, Inc. v. 10777 Wilshire Boulevard, LLC, JAMS Arbitration and Mediation Services, 10/23, Arbitration

23. City of East St. Louis v. Monsanto Company, et al., United States District Court, Southern District of Illinois, 05/24, Deposition

24. Park, et al. v. Southern California Edison Co., Superior Court of California, Los Angeles County, 05/24, Deposition

25. CV Communities v. Antelope Valley-East Kern Water Agency, Superior Court of California, Los Angeles County, 06/24, Deposition

26. CV Communities v. Antelope Valley-East Kern Water Agency, Superior Court of California, Los Angeles County, 09/24, Trial

27. SFL Carson, LLC v. California Department of Transportation (Caltrans), Superior Court of California, Los Angeles County, 01/25, Deposition

28. Park, et al. v. Southern California Edison Co., Superior Court of California, Los Angeles County, 01/25, Deposition

**Documents Considered**

1. Any documents referenced or summarized within this report, as well as documents contained within the workfile are considered as part of the documents considered
2. Expert Report of Randall Bell, PHD, MAI dated February 16, 2024, with accompanying documents and work file
3. Declaration of Dr. Randall Bell, PhD, MAI, in Rebuttal of Monsanto Experts, dated September 10, 2024, with accompanying documents and work file
4. 2024 Uniform Standards of Professional Appraisal Practice (USPAP)
5. Real Estate Damages 3rd Edition, Randall Bell PhD
6. The Appraisal of Real Estate 15th Edition, Appraisal Institute
7. The Dictionary of Real Estate Appraisal 7th Edition, Appraisal Institute
8. The Dictionary of Real Estate Appraisal 6th Edition, Appraisal Institute
9. Black's Law Dictionary 4th Pocket Edition, West
10. An Introduction to Statistics for Appraisers, Wolverton
11. Google Maps and Images
12. Maris Multiple Listing Service and accompanying property records
13. All MLS and property records contained within this report and workfile
14. Expert Report of Charles T. Brigden and Richard J. Roddewig dated July 9, 2024, with accompanying documents and work file
15. Supplemental Expert Report of Charles T. Brigden and Richard J. Roddewig dated September 3, 2024, with accompanying documents and work file
16. Supplemental Expert Report of Charles T. Brigden and Richard J. Roddewig dated January 7, 2025, with accompanying documents and work file
17. Ownership History for City of ESL, 2023
18. Kelly, "Monsanto Chemical Company," 1955
19. Monsanto Chemical Company, "Department 246 (Aroclors)," 1955
20. Environmental Health & Engineering, Inc., "RE: Supplement to Rebuttal Report Dated September 10, 2024, Regarding Rebuttal Report of Kevin M. Coghlan (EH&E 26214)," 2025
21. Erickson, "Rebuttal Expert Report: PCBs Contamination of East Saint Louis, IL," 2024
22. United States District Court Southern District of Illinois, "Oral and Videotaped Deposition of Danny Reible, PhD, PE (LA), BCEE, NAE," Case No. 3:21-cv-232-DWD, 2024
23. United States District Court Southern District of Illinois, "Deposition of Robert Betts," 2024
24. Illinois Statute Chapter 765. Property § 77/35. Disclosure report form, "(765 ILCS 77/1) Residential Real Property Disclosure Act"
25. Bell, "Project Delay Economics," 2011
26. United States District Court Southern District of Illinois, "Deposition of Charles T. Brigden," Case No. 3:21-CV-00232-DWD, January 17, 2025
27. United States District Court Southern District of Illinois, "The Continued Video-Recorded Deposition of Charles T. Brigden," Case No. 3:21-CV-00232-DWD, January 21, 2025
28. Real Estate Valuation in Litigation 2nd Edition, Eaton

89

29. Appraisal Institute, "Guide Notes 6 Considerations of Hazardous Substances in the Appraisal Process"
30. Superior Court of the State of California for the County of Los Angeles, "Deposition of Thomas Hamilton, Ph.D, MAI, CRE, FRICS, CCIM," Case No. JCCP No. 4965, 2024
31. Jackson, "Appraisal Standards and Contaminated Property Valuation," 2003
32. Real Property Valuation in Condemnation, Appraisal Institute
33. Smith, "The Bundle of Property Rights," 1956
34. Tachovsky, "Environmental Dead Zones: The Evaluation of Contaminated Properties," 2021
35. Tachovsky, "Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect," 2022
36. U.S. Bureau of Labor Statistics, "Consumer Price Index"
37. Richard J. Roddewig, MAI, Editor, "Valuing Contaminated Properties: An Appraisal Institute Anthology Volume II," 2014
38. Lum Library, "'Bundle of Rights' Keyword Search," 2024
39. Illinois General Assembly, "Code of Civil Procedure"

**Qualifications of Randall Bell, PhD, MBA, MAI**

Dr. Bell specializes in real estate damage economics and valuation. This includes environmental, geotechnical, construction defects, natural disasters, eminent domain, and other conditions involving a wide variety of property types. He is experienced in complex valuation and diminution-in-value studies and damage issues for government, major corporations, oil and utility companies, and property owners. He is licensed in various states and has testified as an expert in multiple courts.

Education

Doctoral Studies: Fielding Graduate University, PhD, Human and Organizational Systems – Dissertation: *Post Traumatic Behaviors: The Socioeconomic Reasoning of Homeowners Who Voluntarily Remained in the Aftermath of Hurricane Katrina*

Graduate Studies: UCLA – MBA Degree, Real Estate Emphasis

Professional Studies: Appraisal Institute – MAI; UCLA Extension, Certificate in Real Estate

Undergraduate Studies: BYU – BS Degree, Finance and Accounting

License and Memberships

Certified General Real Estate Appraiser (AG1672)
Appraisal Institute – MAI Designation (M9360)
State of California – Real Estate Broker (01111436)
International Right of Way Association – Member (06746314)
Bureau of National Affairs (BNA) – Advisory Board Member
American Statistical Association – Member
Econometric Society – Member
American Economic Association (AEA) – Member
Association of Social Economics – Member

Appraisal Institute

Instructor - Continuing Education Requirements Current Appointed to the Regional Ethics and Counseling Panel Elected to the Advisory Council, 1996, 1997
Chairman of the Litigation Seminar Committee, 1994, 1995 Member – Task Force on Advanced Education Standards, 1999 Member – Committee for Statistical & Survey Standards, 1999-2002
Recipient of Year's Outstanding Article in the Appraisal Journal – Swango Award, 2002, 2008
Member of the National Strategic Planning Committee, 2013-2014

Expert Witness

United States District Court, Court Appointed Appraiser, State Superior Courts, Assessor's Boards, United States Bankruptcy Court, Arbitration & Mediation

91

Book Author

Real Estate Damages: Applied Economics and Detrimental Conditions Third Edition, Appraisal Institute - *Chicago, Illinois* - Author

Real Estate Damages: An Analysis of Detrimental Conditions Appraisal Institute - *Chicago, Illinois* - Author

The Appraisal of Real Estate – 14th Edition Appraisal Institute - *Chicago, Illinois* – Contributing Author

Real Estate Investing for Dummies – 3rd Edition – John Wiley & Sons – *Hoboken, New Jersey* - Technical Editor

Real Estate Valuation in Global Markets Second Edition, Appraisal *Institute - Chicago, Illinois* – Contributing Author

Applications in Litigation Valuation Appraisal *Institute - Chicago, Illinois* – Contributing Author

Valuing Contaminated Properties *Appraisal Institute - Chicago, Illinois* – Contributing Author

Me We Do Be: The Four Cornerstones of Success Owners Manual Press – *Laguna Beach, California* - Author

Conversations On Success – Chapter *Insight Publishing – Sevierville, Tennessee* – Contributing Author

Owners Manual Series: Quick-Ref, Home, Property, Business *Owners Manual Press – Laguna Beach, California* - Author

Disasters: Wasted Lives, Valuable Lessons *Tapestry Press, Irvine Texas* – Co-Author

Professional Background

Dr. Bell specializes in real estate damage economics. He served as the CEO of Bell Anderson and Sanders, LLC for 15 years and led the Real Estate Damages practice of Price Waterhouse, which later merged to become PricewaterhouseCoopers. He was an independent real estate appraiser, analyst and consultant from 1986 to 1997.

Dr. Bell has completed considerable research in the field of property damages and detrimental conditions. These include Chernobyl, Hiroshima, Hanford Washington Site, the 1960 Chile Earthquake, the 1964 Alaska Earthquake, the World Trade Center Bombing, the Oklahoma City Bombing, the Jarrell Texas Tornadoes, Mt. St. Helen's Volcano, the Royal Gardens Subdivision destroyed by the Hawaii Volcanoes, Waco Texas, Oklahoma City, Weldon Springs Missouri, Times Beach Missouri, Rocky Flats Colorado, the Manoa Hawaii Landslides, Woburn Massachusetts, Hinckley, California, and many others.

His career has been profiled by the *Wall Street Journal*, *Today's Realtor*, the *Los Angeles Times*, the *Associated Press*, *The San Francisco Chronicle*, *People Magazine,* and *The Chicago Tribune* and on various television broadcasts by all major networks and *CNN*. He has been quoted by *USA Today*, the *New York Times*, *Harper's Magazine*, *Time Magazine*, and *US News and World Report*, as well as the media in Europe, Australia, and Japan.

Selected Assignments

Bikini Atoll Nuclear Testing Sites: Retained by the Nuclear Claims Tribunal to determine the damages caused by radioactive contamination and nuclear fallout as a result of nuclear testing on the Bikini Atoll in the Marshall Islands. This is the largest environmental contamination case in the history of the world. Involved radioactive, cultural resource and natural damage issues. Testified before the Nuclear Claims Tribunal on two occasions.

World Trade Center Site – New York: Retained by the Lower Manhattan Development Corporation (an entity created by the City and State of New York) to determine the value of the WTC site in the aftermath of the September 11th tragedies.

United Flight 93 Crash Site: Computed the impact on value of the coal mining fields where Flight 93 crashed on September 11th. Retained by the property owner.

Hurricane Katrina: Retained as a consulting expert on the Murphy Oil Spill case in the aftermath of Hurricane Katrina, which resulted in oil contamination over large portions of Saint Bernard's Parish in the aftermath of the hurricane. Retained by Murphy Oil Company.

BP Oil Spill: Retained as a consulting expert on the BP Oil Spill case, the largest oil spill in United States history.

Caribbean Resort Hurricane Damage: Retained as a consulting expert to compute the impact on value of a major Caribbean hotel resort as a result of extensive damage from Hurricane Omar.

Tulum Mexico: Computed the damages caused by a National Park overlay being placed by the Federal Government on a large ocean-front proposed resort site.

Little Gas Shack Oil Spill - Kauai, Hawaii: Computed the damages, if any, caused to multiple commercial properties as a result of a gasoline and oil spill in a resort bay. Retained by an oil company.

LA Metro Mall Landfill: Estimated the effect of an encapsulated landfill on present and future commercial property values. The proposed retail development was to have been constructed on top of a contaminated solid waste landfill.

Honeywell New Jersey Landfill: Computed the proximity damages, if any, resulting from landfill site, in the process of remediation, on adjacent property values. Retained by Honeywell.

Property Tax Assessment Boards: Retained both as an agent and appraiser in numerous assessment hearings, including overseeing a portfolio valued in the hundreds of millions of dollars.

Tiverton Rhode Island Gas Company: Measured the diminution in value, if any, of nearby residential properties with a site with 1800's historic and non-recurrent buried coal gasification waste materials which caused ground water contamination below actionable levels.

Doe Run Lead Contamination, Missouri: Class action suit involving Doe Run, which operated the United States' last primary lead smelter. Calculated the diminution in value, if any, caused by surface soil contamination which resulted in numerous residential properties in being razed.

Straight Lane Texas House: Case involving the largest house in the United States. Calculated the diminution in value resulting from a massive explosion and subsequent fire. The property is located on what is informally called, "Billionaire Row" in the Dallas Texas area. Field work included inspecting the nation's largest estate homes from coast to coast.

City of Chico Landfill: Measured any diminution in value from groundwater contamination from burn ash on nearby developments.

Cooper Cameron, Texas: Measured the impact, if any that offsite TCE groundwater contamination that had migrated underneath a high-end neighborhood in the Houston Texas area.

Jack Brown Cleaners, Austin Texas: Measured the impact of PCE and TCE groundwater that had migrated under a condominium project.

Lennar LNR Bankruptcy: Appraised a major portfolio of numerous subdivisions and commercial developments in California, New Jersey, Florida, Texas, Nevada and Arizona for bankruptcy purposes.

Gasoline Pipeline Transfer Site – Arkansas: Studied the impacts, if any, that MTBE soils contamination had on an adjoining property owner.

SunCal Development - Palm Springs Area: Conducted market trends related to a breach of contract case involving a large subdivision.

BFI Landfill – Los Angeles Area: Estimated the value of on operating landfill as if with and without permits and as of three historical dates. This is one of the largest operational landfills in the Los Angeles area.

Staples Center: Retained by the City of Los Angeles to appraise numerous parcels being acquired through eminent domain for the assemblage and development of the Staples Center.

Dole Pineapple Plantation - Hawaii: Computed the diminution in value, if any, resulting from the State's largest contamination case involving pesticides.

94

Chevron Service Station: Computed the diminution in value, if any, resulting from a leaking underground storage tank (LUST) in the San Diego area. Retained by Chevron.

Monsanto: Retained as a consulting expert in a case where toxins were illegally disposed in a creek and spread throughout a town. Many homes, churches, businesses and schools were deserted or razed. This is considered by some to be the most notorious environmental contamination case in the history of the United States.

Passaic River, New Jersey: Studied the impact of contaminated sediments in a major waterway on the surrounding economy. This case involved an NPL Superfund site.

Whittaker Bermite: Analyzed the effect of unexploded ordinance and perchlorate contamination on development property and proximal neighborhoods. Retained by the facility.

ATK Rocket Facility: Analyzed the effect of perchlorates and other chemicals on rural residential property valuations. The facility produces solid-fuel rocket bodies for the Space Shuttle. The contamination impacts the air and soils surrounding the facility. Retained by the facility.

Ko Loco Hawaii Dam Failure: This major dam failure caused fatalities and millions of dollars of property damage to a small village. Assigned to estimate the residual effect of the dam failure on local residential property values.

Big Rock Nuclear Power Plant: Analyzed the impact, if any, that a safe-storage nuclear fuel storage system had on surrounding property values at a decommissioned nuclear power generating facility. Retained by the U.S. Justice Department.

GM - Delphi Plant, Michigan: Involved an underground TCE plume migrating from an auto parts manufacturing facility to under a nearby home neighborhood. Analyzed historic market trends and regression data, as well as developed case studies to estimate the impacts, if any, on value. Retained by Delphi.

Paducah Kentucky Radioactive Contamination: Developed regression data for neighborhoods in proximity to a gaseous diffusion plant which had released radioactive contamination.

Luke Walton Home: Determined the damages, if any, caused to neighbors from parties hosted by NBA player Luke Walton. Retained by Luke Walton.

East Chicago Hazardous Landfill: Computed the value of a hazardous waste landfill in Indiana which is licensed to receive hazardous waste. Included a complete cash flow analysis of the landfill over the expected life of the operations.

Northridge Earthquake: Retained to estimate the damages to numerous properties in several cases resulting from the earthquake. One assignment included determining the diminution in value to high-rise properties in downtown Los Angeles due to weld fracturing and alleged construction defects.

95

LA Riots: Retained to compute fire damages to numerous properties in one of the worst civil uprisings in the history of the United States.

Guam Landfill: Computed the damages caused by the condemnation of the Tolofufu Falls and Sergeant Youki Cave site for the purpose of constructing the only operational landfill in Guam. Involved cultural resource and natural damage issues. Also involved market research in Guam and Saipan.

Milwaukee Baseball Stadium: Studied the impact on proposed development resulting from a superfund site associated with a baseball stadium. Field research involved visiting and documenting the surrounding uses at every major-league baseball stadium in the United States and Canada.

MID Power Lines, Modesto California: Appraised numerous properties on a power line corridor for eminent domain purposes. Research included issues of EMF, crop dusting impairment, agricultural impacts, conservation easements and hindrance of future development. Retained by the utility company.

Estate Home Construction Defects: Determined the diminution in value caused by various construction defects of large estate homes and condominiums in Beverly Hills, Bel Air, Homby Hills, Santa Monica and West Los Angeles.

Ft Lauderdale Florida Condo Construction Defects: Determined the diminution in value caused by fire pipe leakage and related mold allegations.

Disneyland: Computed the part-take damages caused to Disneyland as a result of a freeway widening project. Retained by Cal-Trans.

Getty Museum: Determined the diminution in value, if any, to a neighboring property nearby the newly constructed Getty Museum in Los Angeles. Retained by the Getty Museum.

Avila Beach Oil Spill: Computed damages caused by a 300,000-gallon spill. According to a front-page article in the Los Angeles Times, Avila Beach is one of California's largest contamination cases. Contacted by both plaintiff and defendant in the case.

Via Estoril Landslides in Laguna Niguel: Computed damages caused by the sudden 125- foot landslide that destroyed seven ocean-view homes.

Crime Scene Stigma: Consulted in calculated economic damages caused by various crime scenes, including the Jon Benet Ramsey house, the Heaven's Gate Mansion in Rancho Santa Fe and the OJ Simpson and Nicole Brown Simpson Condominium, Andrew Luster House.

Nebraska Floods: Estimated damages caused by residential construction within a flood zone.

Airport Noise Diminution in Value Studies: Calculated the diminution in value caused by the proposed construction of airports in Hawaii, Washington, California and Texas.

Oil Refinery: Studied the diminution in value resulting from an oil refinery leak in Long Beach. Retained by ARCO.

New Jersey Durham Woods Pipeline Explosion: Researched the attributes of market resistance (stigma) associated with a catastrophic pipeline explosion that destroyed eight apartment buildings.

Hawaii Tank farm Leak: Computed the diminution in value resulting from a tank farm leak in Maui, Hawaii. Retained by Chevron, Shell and Unocal.

Sandyhook School Shooting: Consulted with the financial institution that owned Adam Lanza's house.

Phil Spector: Computed the diminution in value resulting from crime scene stigma.

Mohamed Hadid: Computed the damages resulting from the unpermitted construction of a large luxury mansion located in Bel Air.

East Palestine Train Derailment: Computed the diminution in value to the community resulting from a major train derailment and chemical spill.

Lahaina, Maui Fire: Computed the diminution in value to multiple homes resulting from a major wildfire.

Articles and Papers

Project Delay Economics *The Appraisal Journal*

Analysis of Environmental Case Studies *The Appraisal Journal*

The Impact of Detrimental Conditions on Property Values *The Appraisal Journal*

Real Estate Research Methods *The Appraisal Journal*

Real Estate Damage Economic: The Impact of PFAS "Forever Chemicals" on Real Estate Valuation *Environmental Claims Journal*

Diminishing Diminution: A Trend in Environmental Stigma *Environmental Claims Journal*

Basic Due Diligence *Environmental Claims Journal*

The Impact of Airport Noise on Residential Real Estate *The Appraisal Journal*

97

Hydraulic Fracturing and Real Estate Issues *The Appraisal Journal*

The Impact of Megan's Law on Real Estate Values *Valuation Insights and Perspectives*

Ten Standard Classifications of Detrimental Conditions *Right of Way Magazine*

Quantifying The Diminution In Value Due To Detrimental Conditions: The Theory and Application to Environmentally Contaminated Properties *Environmental Claims Journal* Medical Office Building Appraisal *The Appraisal Journal*

Assessing Diminution in Value – A Methodology for Categorizing Detrimental Conditions *Right of Way*

Detrimental Conditions: A Profile of Valuation Methodologies with Environmental Contamination, Crime Scene Stigma and Natural Disaster Case Studies *Paper presented to the National Symposium of the Appraisal Institute in Washington DC*

Strategies for Rebutting Junk Science in the Courtroom *Bloomberg BNA*

Valuation of Contaminated Property *The Bureau of National Affairs, Inc.*

Contaminated Waterways and Property Valuation *The Appraisal Journal*

The Impact of Asbestos on Real Estate Values *The Appraisal Journal*

Climate Change and Real Estate Economics *The Bureau of National Affairs, Inc.*

The Scientific Method and the Valuation Process *The Bureau of National Affairs, Inc.*

Where Art Meets Science: Statistics *Valuation Strategies*

Seminar Author

Real Estate Disclosure Seminar: Author and instructor of a one-day seminar published and sponsored by the Appraisal Institute that addresses the responsibility of appraisers, brokers and agents to make a full disclosure of the known conditions associated with a property.

Detrimental Conditions Seminar: Author and instructor of a one-day seminar published and sponsored by the Appraisal Institute. This seminar illustrates a valuation methodology for categorizing numerous Detrimental Conditions (i.e., environmental contamination, natural disasters, geotechnical issues, construction defects, market conditions, imposed conditions, etc.) and quantifying the diminution in value. It was approved in all 50 states by each appraisal licensing agency and the California State Bar for continuing education credit and has been taught nationwide and internationally.

Diminution-In-Value Issues

ADA; Absorption; Airport Noise; Asbestos; Benign Issues; Bonds; Condemnation; Construction Defects; Crime Scene Stigma; Deferred Maintenance; Easements; Earthquake; Economic Decline; EMF; Environmental Contamination; Flood Damage; Geotechnical; Landfills; Litigation; Market Conditions; Natural Disasters; Neighboring Construction; Pipeline Explosion; Riots; Sewage Treatment Plant; Soil Subsidence; Traffic Noise; Tunneling; View Diminution

Interests Appraised
Fee Simple Interest; Leased Fee Interest; Lease Hold Interest; Sandwich; Interest; Majority & Minority Fractional Interests

Functions of Appraisals

Absorption Studies; Acquisition; Assessor Disputes; Bankruptcy; Bond Financing; Construction Loans; Diminution in Value; Disposition; Divorce Settlement; Donation; Environmental Effect Studies; Estate Settlement; Excess Land; Exchanges; Fair Value Issues; Feasibility Studies; Foreclosure; Fraud; Ground Lease Renewal; Highest and Best Use Analysis; Income Tax Appeal; Investment Analysis; Judicial Foreclosure; Review Appraisal; Lease Negotiations; Lease Renewals; Litigation Support; Loan Review; Market Trend Studies; Mortgage Lending; Negotiation; Partnership Dissolution; Portfolio Evaluation; Property Tax Appeal; Redevelopment Zone Studies; Refinancing

Speeches and Symposium Presentations

Dr. Bell has spoken at numerous events throughout the United States, Canada, South America and Asia. Following are some examples of these presentations:

Analyzing the Effects of Environmental Contamination on Real Property *Appraisal Institute, Dallas, Texas*

Environmental Damage Economics *American Bar Association, New Orleans, Louisiana*

The Rebuttal of Junk Science in the Courtroom *Appraisal Institute, Newport Beach, California*

Exposing & Attacking Junk Science *Appraisal Institute, Reno, Nevada*

Airport Noise & Property Values*, FAA National Conference, Ft. Lauderdale, Florida*

Socio-Economics & Real Estate *University of Utah, Salt Lake City, Utah*

Assessing the Damages: Valuing Stigmatized Properties *BC Land Summit, Vancouver, BC Canada*

99

Property Valuation & Tax Appeals *IPT Property Tax Symposium, Palm Springs, California*

Real Estate Damage Economics *Councilors of Real Estate National Convention, San Antonio, Texas*

Statistics & Real Estate Damage Economics *Appraisal Institute National Meeting, Indianapolis, Indiana*

Environmental Damage Economics *Princeton Real Estate Conference, Princeton, New Jersey*

Detrimental Conditions & The Uniform Standards of Professional Appraisal Practice *Appraisal Foundation, San Francisco, California*

Project Delay Economics *Environmental Bankers Association, New Orleans, Louisiana*

Stigma and Its Impact or Real Estate Values *Keynote Speaker, The National Association of Real Estate Editors, Las Vegas, Nevada*

The Valuation of Environmentally-Impacted Properties *Brownfields Symposium, Irvine California*

Detrimental Conditions - A Profile of Valuation Methodologies with Environmental, Crime Scene Stigma and Natural Disaster Case Studies The National Symposium of the Appraisal Institute, Washington, DC

Property Damage Analysis for a REO Portfolio *Western States Loan Servicing Conference California Mortgage Bankers Association, Las Vegas, NV*

The Analysis of Detrimental Conditions *Keynote Presentation – International Conference Union Panamericana de Asociaciones de Valuacion, Cusco, Peru*

High-Profile Disasters and the Impact on Real Estate Values *The National Symposium of the Appraisal Institute, San Antonio, Texas*

Real Estate Damages: Analytical Tools and Their Application to High-Profile Case Studies *International Real Estate Society Conference, Kuala Lumpur, Malaysia*

Standardized Approaches to Valuing Contaminated Properties *Los Angeles County Bar Association*

Expert Witness Testimony Involving Contaminated Properties *Appraisal Institute - Southern California Chapter*

Contamination, Natural Disasters & Crime Scene Stigma *Orange County Bar Association*

100

Ethics and the Appraiser *Appraisal Institute - Southern California Chapter*

Diminution in Value: A Focus on Environmental Contamination, Natural Disasters and Stigma Damages *San Diego Bar Association*

Researching and Reporting Detrimental Conditions *Multiple lectures to COMPS, Inc. nationwide* Real Estate Investment Strategies *Newport Beach Rotary Club*

Environmental Contamination & Natural Disasters Workshop *Appraisal Institute - Southern California Chapter*

The Valuation of Environmentally Impacted Properties *Block Environment & Jeffer, Mangels, Butler & Marmaro*

The Impact of an International Airport on Real Estate Values *El Toro Reuse Planning Authority*

The Financial Analysis of Investment Grade Properties *Guest Lecturer at Cal-State Fullerton*

The Valuation of Asbestos-Contaminated Properties *International Right of Way Association*

Airports, Stigma and Property Values *Trabuco Canyon Community Association*

Technical Aspects of the Appraisal of Medical Properties *Appraisal Institute - Los Angeles Chapter*

The Appraisal of Estate Homes *Appraisal Institute - Southern California, San Diego and Ventura Chapters*

Market Resistance Towards Damaged Properties *Appraisal Institute - Fresno Chapter*

Real Estate Damages Valuation Methodologies *Summer Seminar Spectacular – Disneyland Hotel, Southern California Chapter of the Appraisal Institute*

High Profile Disasters and Property Damages *Orange County Appraisal Society, Orange County Assessor's Office*

The Appraisal: Diminution in Value Methodologies *Chicago Title Company, Western Division Claims Conference*

Project Delay Economics *Southern California Chapter, Appraisal Institute*

Due Diligence The Center for Advanced Property Economics Symposium on Property and Environmental Damages, Toronto, Canada

101

<u>Correspondence</u>

Randall Bell, PhD, MAI
Landmark Research Group, LLC
33971 Selva Road, Suite 230
Dana Point, California  92629

Direct: (949) 497-7607
Office: (949) 497-7600
Fax: (949) 497-7601
Email: Bell@LandmarkResearch.com

**List of Figures**

Figure 1: Revised Subject Properties Map _____ 6
Figure 2: Cost-Use-Risk Effect Timeline _____ 8
Figure 3: SNAP Exhibiting JLL's Irrelevant Data _____ 12
Figure 4: Times Beach (with PCBs) vs Elk Run (No PCBs) _____ 29
Figure 5: JLL Improper PCB Case Studies, 1A-1C _____ 37
Figure 6: JLL Improper PCB Case Studies, 2-3 _____ 38
Figure 7: JLL Improper PCB Case Studies, 4-6 _____ 39
Figure 8: JLL Improper PCB Case Studies, 7-8 _____ 40
Figure 9: JLL Supplemental Subject Property Auctions, 1-6 _____ 41
Figure 10: JLL Supplemental Subject Property Auctions, 7-12 _____ 42
Figure 11: JLL Supplemental Subject Property Auctions, 13-18 _____ 43
Figure 12: JLL Supplemental Subject Property Auctions, 19-24 _____ 44
Figure 13: JLL Supplemental Subject Property Auctions, 25 _____ 45
Figure 14: Revised Use Effect, Scenario A (1975 – June 2027) _____ 47
Figure 15: Revised Use Effect, Scenario A (December 1955 – 1974) _____ 48
Figure 16: Revised Use Effect, Scenario B (1975 – June 2027) _____ 49
Figure 17: Revised Use Effect, Scenario B (December 1955 – 1974) _____ 50
Figure 18: Revised Use Effect, Scenario C (1995 – June 2027) _____ 51
Figure 19: Revised Use Effect, Scenario C (December 1955 – 1994) _____ 52
Figure 20: Subject Property Neighborhood in 1952a _____ 53
Figure 21: Subject Property Neighborhood in 1952b _____ 54
Figure 22: Subject Property Neighborhood in 1958 _____ 55
Figure 23: Subject Property Neighborhood in 1968 _____ 56
Figure 24: Subject Property Neighborhood in 1973a _____ 57
Figure 25: Subject Property Neighborhood in 1973b _____ 58
Figure 26: Subject Property Neighborhood in 1980 _____ 59
Figure 27: Subject Property Neighborhood in 1988a _____ 60
Figure 28: Subject Property Neighborhood in 1988b _____ 61
Figure 29: Subject Property Neighborhood in 1992 _____ 62
Figure 30: Subject Property Neighborhood in 1996 _____ 63
Figure 31: Subject Property Neighborhood in 1998 _____ 64
Figure 32: Subject Property Neighborhood in 2009 _____ 65
Figure 33: Subject Property Neighborhood in 2011 _____ 66
Figure 34: Subject Property Neighborhood in 2014 _____ 67
Figure 35: Subject Property Neighborhood in 2017 _____ 68

© 2025 Landmark Research Group, LLC
All Rights Reserved