# EXHIBIT 4



# Guide Notes to the Standards of Professional Practice of the Appraisal Institute

Copyright © 2021 Appraisal Institute. All rights reserved.

Printed in the United States of America. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopy, recording or otherwise, without the prior written consent of the publisher.

# Table of Contents

History of the Guide Notes

Guide Note 3: The Use of Form Appraisal Reports for Residential Property

Guide Note 4: Reliance on Reports Prepared by Others

Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process

Guide Note 8: Use and Applicability of Letters of Transmittal

Guide Note 10: Development of an Opinion of Market Value in the Aftermath of a Disaster

Guide Note 11: Comparable Selection in a Declining Market

Guide Note 12: Analyzing Market Trends

Guide Note 13: Performing Evaluations of Real Property Collateral for Lenders

Guide Note 14: Concept of Exposure Time

Guide Note 15: Assumptions and Hypothetical Conditions

Guide Note 16: Arbitration

Guide Note 17: Compliance with the Code of Professional Ethics and Standards of Standards of Professional Practice of the Appraisal Institute

Guide Note 18: Personal Characteristics and Valuation Practice

200 W. Madison St., Suite 200, Chicago, IL 60606    www.appraisalinstitute.org

2

# History of the Current Guide Notes

**Guide Note 1:** See History of the Retired Guide Notes

**Guide Note 2:** See History of the Retired Guide Notes

**Guide Note 3: The Use of Form Appraisal Reports for Residential Property**
- January 1, 1991: Adopted
- May 5, 1995: Amended
- November 12, 2002: Amended

**Guide Note 4: Reliance on Reports Prepared by Others**
- January 1, 1991: Adopted as "*Reliance on Reports or Information Prepared by Others* " (Note: This Guide Note was initially numbered as Guide Note 6. A previous Guide Note 4 that addressed Discounted Cash Flow as a Valuation Method is retired – See History of Retired Guide Notes.)
- January 16, 1993: Amended
- January 1, 2003: Guide Note title changed to "*Reliance on Reports Prepared by Others"* and Guide Note number changed to 4.
- December 13, 2011: Amended

**Guide Note 5:** See History of the Retired Guide Notes

**Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process**
- January 1, 1991:  Adopted as "*The Consideration of Hazardous Substances in the Appraisal Process"* (Note: This Guide Note was initially numbered as Guide Note 8)
- January 1, 2003: Guide Note number changed to 6.
- July 26, 2013: Amended

**Guide Note 7:** See History of the Retired Guide Notes

**Guide Note 8: Use and Applicability of Letters of Transmittal**
- August 5, 1994: Adopted  (Note: This Guide Note was initially numbered as Guide Note 10)
- January 28, 1994: Amended
- January 1, 2003: Guide Note number changed to 8.
- August 4, 2012: Amended

**Guide Note 9:** See History of the Retired Guide Notes

**Guide Note 10: Development of an Opinion of Market Value in the Aftermath of a Disaster**
- November 5, 2010: Adopted

**Guide Note 11: Comparable Selection in a Declining Market**
- November 15, 2011: Adopted

**Guide Note 12: Analyzing Market Trends**
- May 7, 2012: Adopted

**Guide Note 13: Performing Evaluations of Real Property Collateral for Lenders**
- October 31, 2012: Adopted

**Guide Note 14: Concept of Exposure Time**
- February 7, 2013: Adopted

3

**Guide Note 15: Assumptions and Hypothetical Conditions**
- November 19, 2015: Adopted

**Guide Note 16: Arbitration**
- November 17, 2016: Adopted

**Guide Note 17: Compliance with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute**
- November 12, 2020: Adopted

**Guide Note 18: Personal Characteristics and Valuation Practice**
- May 6, 2021: Adopted

# History of the Retired Guide Notes

**Guide Note 1: Valuation of Real Estate Component of Real Estate Limited Partnership Interests**
- January 1, 1991: Adopted as "*Valuation of Real Estate Interests Intended for Syndication and Valuation of Real Estate Partnership Interests*"
- January 16, 1993: Amended
- January 1, 2003: Guide Note title changed to "*Valuation of Real Estate Component of Real Estate Limited Partnership Interests"*
- May 8, 2012: Retired

**Guide Note 2: Cash Equivalency in Valuations**
- January 1, 1991: Adopted as "*Cash Equivalency in Value Estates in Accordance with Standards Rule 1-2(b)"*
- January 28, 1994: Guide Note title changed to "*Cash Equivalency in Value Estates in Accordance with Standards Rule 1-2(c)"*
- November 12, 2002: Guide Note title changed to "*Cash Equivalency in Valuations"*
- November 16, 2018: Retired

**Guide Note 4: Discounted Cash Flow Analysis as a Valuation Method**
- January 1, 1991: Adopted
- July 23, 1993: Retired

**Guide Note 5: Value Estimates as of a Retrospective or Prospective Date**
- January 1, 1991: Adopted
- July 23, 1993: Retired

**Guide Note 5: Appraisals of Real Estate with Related Personal Property, Business Property or Intangible Assets**
- January 1, 1991: Adopted as "*Appraisals of Real Estate with Related Personalty*" (Note: This Guide Note was initially numbered as Guide Note 7. A previous Guide Note 5 that addressed Value Estimates as of a Retrospective or Prospective Date is retired– See History of Retired Guide Notes.)
- January 1, 2003: Guide Note title changed to "*Appraisals of Real Estate with Related Personal Property, Business Property or Intangible Assets"* and Guide Note number changed to 5.
- May 6, 2011: Amended
- August 7, 2020: Retired

**Guide Note 7: Consideration of the Americans with Disabilities Act in the Appraisal Process.**

4

- January 16, 1993: Adopted as "*The Consideration of the Americans with Disabilities Act in the Appraisal Process*" (Note: This Guide Note was initially numbered as Guide Note 9)
- January 1, 2003: Guide Note title changed to "*Consideration of the Americans with Disabilities Act in the Appraisal Process*" and Guide Note number changed to 7.
- November 16, 2012: Retired

**Guide Note 9: Use and Applicability of Engagement Letters**
- December 2, 1995: Adopted (Note: This Guide Note was initially numbered as Guide Note 11)
- January 1, 2003: Guide Note number changed to 9.
- May 2, 2013: Retired

# Guide Note 3

## The Use of Form Appraisal Reports for Residential Property











## Introduction

Most residential appraisal assignments require a report on one of the approved forms used in the secondary mortgage market or by the employee-relocation industry. Use of such forms does not lessen or change the appraiser's obligation to observe the requirements of the Standards of Professional Appraisal Practice. If a proposed appraisal assignment cannot be completed in accordance with the appraisal development and reporting requirements of the Standards of Professional Appraisal Practice and the Certification Standard and Code of Professional Ethics of the Appraisal Institute, the assignment must not be accepted.

# GUIDE NOTE 3
## Basis for Proper Evaluation

When using any form report, or signing a form report as a reviewer, it is the responsibility of the appraiser and the reviewer to ensure that the appropriate methods and techniques have been properly employed. Appropriate addenda must be added when additional information is required to complete the appraisal report in accordance with Standard 2 of USPAP.

Highest and best use appears on most forms merely as a box to be checked because the use of the form itself is a statement of highest and best use. Unless a detailed explanation is added to clarify, it is inappropriate to use a single-family dwelling report form if the appraiser concludes that the highest and best use of the property is a different use.

## Summary of Standard Practices

1. Consider the intended use, purpose, definitions, assumptions, conditions, and limitations that are inherent in the form report used for a residential appraisal (USPAP SR 1-2 (a) through (h)).

2. Sign an appraisal report as a reviewer only when accepting full responsibility for the contents of the report (USPAP SR 2-3 and Standard 3).

3. Analyze and report any prior sales of the property being appraised within three years of the date of the appraisal USPAP SR 2-2(a)(ix), 2-2(b)(x), and 2-2(c)(ix)).

(Please Note: The purpose of the Guide Notes to the Standards of Professional Appraisal Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective November 12, 2002
Minor revisions 2017

# Guide Note 4
## Reliance on Reports Prepared by Others








## Introduction

In this Guide Note an analysis, opinion, or conclusion prepared by others, and upon which an appraiser relies, is referred to as a "report." Appraisers often rely, at least in part, on reports prepared by others. Reliance on the reports of others generally increases with the complexity of the appraisal problem. The use of such reports may increase in the future. Appraisers are providing more specialized services and will need more information to make decisions and develop their appraisals. Reports prepared by others vary in form, content, and applicability. Although they are frequently used in conjunction with proposed properties and transactions, they may also be applicable to existing properties and used in special situations such as litigation and arbitration.

# GUIDE NOTE 4
## Introduction (continued)

According to USPAP, in the Comment to SR 2-3, appraisers have specific obligations when relying on reports prepared by others:

> When a signing appraiser(s) has relied on the work done by appraisers and others who do not sign the certification, the signing appraiser is responsible for the decision to rely on their work.  The signing appraiser(s) is required to have a reasonable basis for believing that those individuals performing the work are competent.  The signing appraiser(s) also must have no reason to doubt that the work of those individuals is credible.

In general, these reports fall into four major classifications:

General Informational Reports
General informational reports are usually descriptive in nature and provide information pertaining to an overall area. They include data on demographics, economic trends, and other such matters. They are not specific to the property being  appraised.

Reports Prepared by Licensed or Certified Non-Real Estate Appraisal Professionals
Reports prepared by licensed or certified non-real estate appraisal professionals are specific to the subject property and may be either descriptive or factual in nature. They include engineering services, environmental studies, soil reports, impact studies, survey reports, zoning opinions, audited financial statements, and other reports relating to matters beyond the scope of appraisers' expertise, or services not typically offered by appraisers.

Reports Prepared by Other Non-Real Estate Appraisal Professionals
Reports in this category are prepared by experts who are not licensed or certified but have specific experience or expertise that an appraiser may rely upon. Examples include reports pertinent to the appraisal problem from academicians, operators of special use properties, and personal property valuers.

Other Reports
Other reports pertaining to the subject property may be prepared by the client, by another real estate professional, or by others. These reports include financial statements, rent rolls, prior appraisal reports on the subject property, highest and best use studies, rental surveys, computer programs (or other electronic media), cost studies, and others.

# Basis for Proper Evaluation

Before relying upon reports prepared by others the appraiser must:

1. have a reasonable basis for believing the individuals preparing the report(s) are competent;

2. have no reason to doubt the credibility of the work of the work preparer(s);

3. consider the criteria under which the reports were prepared;

4. consider the source and extent of the instructions given to the preparer of the reports;

5. determine how the appraiser might rely on this information in making decisions and preparing his or her report; and

6. determine the process and procedures used to evaluate the reports prepared by others.

# Basis for Proper Evaluation (continued)

The valuation process may require projections which are influenced by uncertain events. For this reason the basis for all assumptions and projections employed by the individual who prepared the report must be understood and properly utilized by the appraiser.

USPAP Standards Rules 1-1(b) and 3-1(b) state that the appraiser must not commit a substantial error of omission or commission that significantly affects the appraisal or the appraisal review. USPAP Standards Rules 1-1(c) and 3-1(c) state that the appraiser must not make a series of errors that, although individually might not significantly affect the results, in the aggregate affect the credibility of those results.

USPAP Standards Rules 2-1(a) and 3-4(a) require that each written or oral appraisal or appraisal review report clearly and accurately set forth the appraisal or appraisal review in a manner that will not be misleading. USPAP Standards Rules 2-1(b) and 3-4(b) require that each written or oral appraisal or appraisal review report must contain sufficient information to enable the intended users to understand the report properly. USPAP Standards Rules 2-2(a)(xi), and b(x) and 3-5(f) require that each written appraisal report or appraisal review report clearly and conspicuously state all extraordinary assumptions and hypothetical conditions. USPAP Standards Rules 2-2(a)(viii), requires the appraiser to summarize in the appraisal report the information analyzed, the appraisal methods and technologies employed, and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the sales comparison approach, cost approach or income approach must be explained. USPAP Standards Rule 2-2(b)(viii) requires the appraiser to state in the report the appraisal method and techniques employed, and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the sales comparison approach, cost approach or income approach must be explained. USPAP Standards Rule 2-2(b)(viii) requires the appraiser to state in the report the appraisal method and techniques employed, state the value opinion(s) reached, and reference the workfile; exclusion of the sales comparison approach, cost approach, or income approach must be explained, and 2-2(b)(vii), and 3-5(g) require the appraiser to address the assignment's scope of work in the appraisal or appraisal review report.

Market value opinions should be supported by market-derived data and assumptions made should be specific to both the market and the property. An appraiser who accepts the projections or assumptions of others without some assurance of the accuracy or reasonableness of the calculations or information provided may violate the aforementioned USPAP Standards Rules.

The four major classifications of reports require varying levels of review and care on the part of the appraiser, as offered below:

General Informational Reports
General informational reports usually require limited verification. Most discrepancies are easily clarified.

Reports Prepared by Licensed or Certified Non-Real Estate Appraisal Professionals
Reports prepared by licensed or certified non-real estate appraisal professionals typically offer conclusions as to the adequacy of a specific property component or issue pertaining to the property. These conclusions are generally based on accepted procedures or standards and represent informed opinions on matters beyond the appraiser's expertise. Absent reasonable doubt, these reports usually can be accepted conditioned upon the qualification that they were prepared by recognized professionals. Should observed or apparent material discrepancies exist between the appraiser's investigation and the submitted report prepared by a licensed or certified non-real estate appraisal professional, such material discrepancies must be disclosed.

Reports Prepared by Other Non-Real Estate Appraisal Professionals
An appraiser's reliance on reports prepared by these experts is distinct from that of the preceding paragraph in the greater care the appraiser should exercise in determining the pertinent expertise of the author. USPAP Standards Rule 2-3, in the Comment, requires that such reports may only be used if the signing appraiser has a reasonable basis for believing that individuals who performed the work are competent and has no reason to doubt the work of those individuals is credible.

# Basis for Proper Evaluation (continued)

Other 3-3 Reports

Other reports prepared by, or at the direction of, the client, other real estate professionals, or others, require a careful review for reasonableness. To the degree possible and practical, computer programs or other electronic media should be reviewed for errors or inconsistencies. The level of investigation should be appropriate to the problem. The appraiser must understand the assumptions on which these reports are based as well as their applicability and validity to the assignment.

## Summary of Standard Practices

1. Become familiar with any report prepared by another that is relied upon in the appraisal process and, to the degree possible, understand the basis for its conclusions. Address any questions with the preparer of the report prior to using it in the appraisal process.

2. In conjunction with the scope of work for the assignment, identify or reference in the appraisal report any report prepared by another that was relied upon in developing the appraisal or appraisal review opinion or conclusion.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Appraisal Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective January 1, 2012
Minor revisions 2017

# Guide Note 6

## Consideration of Hazardous Substances in the Appraisal Process








## Introduction

The consideration of environmental conditions along with social, economic, and governmental conditions is fundamental to the appraisal of real property. Although appraisal literature has recognized environmental conditions can affect property value, the focus has been on the consideration of climatic conditions, topography and soil, the surrounding neighborhood, accessibility, and proximity to points of attraction. These more general environmental conditions might be apparent to a member of the general public who is not specifically trained as an expert in observing these forces. There is, however, a growing need to give special consideration to the specific impacts of hazardous substances on the valuation of real property. Consistent with accepted guidance on this topic and as incorporated herein, "hazardous substances"

# GUIDE NOTE 6
## Introduction (continued)

would be considered "environmental contamination" when their concentrations exceed appropriate regulatory standards. (See Definitions below).

The purpose of this Guide Note is to provide guidance in the application of the *Standards of Valuation Practice* (SVP) and the *Uniform Standards of Professional Appraisal Practice* (USPAP) to the appraisal of real property affected by or potentially affected by environmental contamination and, in particular, to the consideration of environmental contamination in the appraisal process. It is not the purpose of this Guide Note to provide technical instructions or explanations concerning the detection or measurement of the effect of hazardous substances.

## Competency

The Competency Rule of the USPAP, for example[1],  requires the appraiser to either:

    a) properly identify the problem to be addressed, and have the knowledge and experience necessary to complete the assignment competently, and recognize and comply with laws and regulations that apply to the appraiser or to the assignment; or

    b) disclose the appraiser's lack of knowledge and/or experience to the client before accepting the assignment, take all steps necessary or appropriate to complete the assignment competently, and describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report; or

    c) decline or withdraw from the assignment.

The competency provisions of valuation Standards and Ethical Rules are of particular importance in the appraisal of real property that may be affected by hazardous substances. Most appraisers do not have the knowledge or experience required to detect the presence of hazardous substances or to measure the quantities of such material. The appraiser, like the buyers and sellers in the open market, typically relies on the advice of others in matters that require special expertise.

There is nothing to prevent a professional appraiser from becoming an expert in other fields but the real estate appraiser is neither required, nor expected, to be an expert in the special field of the detection and measurement of hazardous substances. This Guide Note therefore addresses the problem of hazardous substances from the viewpoint of the appraiser who is not qualified to detect or measure the quantities and concentrations of hazardous substances. If an appraiser is qualified to detect or measure hazardous substances, a different set of standards would apply.

In appraisal assignments in which the appraised value is to take into account the effects on value of hazardous substances, most appraisers require the professional assistance of others. In appraisal assignments in which the appraised value does not take into account the possible effects on value of known hazardous substances (i.e. the unimpaired value, see below), the appraiser would not require the professional assistance of others.

The appraiser may accept an assignment involving the consideration of hazardous substances without having the required knowledge and experience in this special field, provided the appraiser discloses such lack of knowledge and experience to the client prior to acceptance of the assignment, arranges to complete the assignment competently and describes the lack of knowledge or experience and the steps taken to competently complete the assignment in the report. This may require association with others who possess the required knowledge and experience or reliance on professional reports prepared by others who are reasonably believed to have the necessary knowledge and experience. If the appraiser draws conclusions based upon the advice or findings of others, the appraiser must have a reasonable basis for believing that the advice or findings are made by persons who are competent. (See Guide Note 4: Reliance on Reports Prepared by Others and the USPAP Comment to SR 2-3.)

---

[1] Ethical Rule 1-3 of the *Code of Professional Ethics* of the Appraisal Institute and paragraph 50 of the IVS Framework of the *International Valuation Standards* (IVS) contain similar provisions.

# Scope of Work

The SVP's Standards Rule A-3: Scope of Work requires the valuer to "determine the scope of work necessary to develop an appraisal that is credible given its intended use."

The USPAP SCOPE OF WORK RULE requires that, in any assignment, the appraiser establish the appropriate scope of work necessary to complete that assignment. Part of the scope of work decision includes how, and to what extent, the appraisal problem will address known or suspected hazardous materials that may impact the property. Both the SVP and USPAP provide two tests for the acceptability of the scope of work decision; the intent and meaning is the same in both the SVP and USPAP. The Comment to the USPAP Scope of Work Acceptability section states:

> The scope of work is acceptable when it meets or exceeds:
> - the expectations of parties who are regularly intended users for similar assignments; and
> - what an appraiser's peers' actions would be in performing the same or a similar assignment.
>
> ...An appraiser must be prepared to support the decision to exclude any investigation, information, method or technique that would appear relevant to the client, another intended user, or the appraiser's peers.

The USPAP Scope of Work Acceptability section includes two more major provisions:
- An appraiser must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use.
- An appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased.

The disclosure obligations of the USPAP SCOPE OF WORK RULE and USPAP SR 2-2(a)vii) and (b)(vii) and the SVP's C-2(Xii) require that the scope of work performed be disclosed in the appraisal report.

Depending on the intended use, the appraisal may be prepared so that the value opinion reflects no known or suspected environmental contamination that may impact the property, or it may be prepared so that the value opinion does reflect known contamination. In either case, the appraiser must take special precautions in the development and reporting process to ensure that the results of the assignment are credible and that the report is not misleading.

# Extraordinary/Special Assumptions and Hypothetical Conditions

In assignments involving contaminated properties or properties that may be adversely impacted by environmental contamination (contaminated property assignment), the appraisal will likely be premised on one or more Extraordinary/Special Assumptions and/or Hypothetical Conditions. Typically in these types of assignments, Extraordinary/Special Assumptions are used when relying on the work of others, such as environmental engineers or other technical specialists, while Hypothetical Conditions are used when the appraiser estimates the value of a property known to be contaminated in an unimpaired or uncontaminated condition[2i]

[2] The Appraisal Institute *Standards of Valuation Practice* (SVP) address assumptions and hypothetical conditions in the Definitions section (definitions of hypothetical condition and special assumption), SR A-2(g), SR B-2(e), SR C-2(a)(xvi) and SR C-2(b)(xiii). Portions of the Appraisal Institute *Code of Professional Ethics* (CPE) that relate to this topic include ER 3-4 and ER 3-5. Applicable sections of the *Uniform Standards of Professional Appraisal Practice* (USPAP) include the Definitions section (definitions of hypothetical condition and extraordinary assumption); SR 1-2(f) and (g), SR 2-1(c), SR 2-2(a) and (b)(xi); and SR 3-2(f) and 4-2(f). Applicable sections of the *International Valuation Standards* (IVS) include the Definitions section (definition of special assumption); IVS 101 Scope of Work, 20.3 (k); IVS 103 Reporting 10.2, and Bases of Value, 200.4 and 200.5.

## Assignments prepared under USPAP

USPAP provides the following definition for "extraordinary assumption."

> An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions.

> Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

In addition, it may be appropriate to premise the appraisal on an extraordinary assumption in the event there is suspected but not confirmed contamination. An environmental assessment by a qualified environmental professional would be required for such conclusions or determinations.

USPAP Standards Rule 1-2(f) requires that in developing an appraisal the appraiser identify "any extraordinary assumptions necessary in the assignment." The Comment states:

> "An extraordinary assumption may be used in an assignment only if:
> - it is required to properly develop credible opinions and conclusions;
> - the appraiser has a reasonable basis for the extraordinary assumption;
> - use of the assumption results in a credible analysis; and
> - the appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions."

USPAP Standards Rules 2-2(a) and (b)(xi) require the appraiser to clearly and conspicuously state in the appraisal report all extraordinary assumptions upon which the value opinion is premised.  These reporting Standards Rules also require a clear and conspicuous statement that the use of these extraordinary assumptions "might have affected the assignment results."

USPAP Standards Rule 2-1 requires the report to "clearly and accurately disclose all … extraordinary assumptions … used in the assignment."

USPAP provides the following definition for "hypothetical condition":

> "A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

> Comment:  Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in the analysis."

USPAP Standards Rule 1-2(g) requires that in developing an opinion of value the appraiser identify "any hypothetical conditions necessary in the assignment." The Comment states:

> "A hypothetical condition may be used in an assignment only if:
> - use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;
> - use of the hypothetical condition results in a credible analysis; and
> - the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions."

USPAP Standards Rule 2-1(c) requires the report to "clearly and accurately disclose all … extraordinary assumptions, hypothetical conditions … used in the assignment."

USPAP SR 2-2(a)(xi) and (b)(xi) require the appraisal to "clearly and conspicuously" state all extraordinary assumptions and hypothetical conditions and state that their use "might have affected the assignment results." These USPAP Standards Rules do not require that the appraiser quantify the impact on value, such as by both valuing the property subject to the hypothetical condition and valuing it not subject to the hypothetical condition.

## Assignments prepared under SVP

SVP provides the following definition for "special assumption":

> An assumption, directly applicable to a specific appraisal or review, which, if found to be false, could alter the opinions or conclusions in an appraisal or review.

In addition, it may be appropriate to premise the appraisal on a special assumption in the event there is suspected but not confirmed contamination. An environmental assessment by a qualified environmental professional would be required for such conclusions or determinations.

SVP Standards Rule A-2(g) requires that the valuer must identify the appraisal problem to be solved at the time of engagement. To identify the appraisal problem, the valuer must ascertain any special assumptions necessary in the appraisal.

SVP Standards Rule C-2(a)(xvi) requires the report to "clearly and conspicuously state all special assumptions … and that their use might have affected the valuer's opinion(s) and conclusion(s)"

SVP provides the following definition for "hypothetical condition:"

> "A condition that is presumed to be true when it is known to be false."

SVP Standards Rule A-2(h) requires the valuer to identify the appraisal problem to be solved at the time of engagement. To identify the appraisal problem, the valuer must ascertain any hypothetical conditions necessary in the appraisal.

SVP Standards Rule C-2(a)(xvi) requires the report to "clearly and conspicuously state all …hypothetical conditions, and that their use might have affected the valuer's opinion(s) and conclusion(s)." This Standards Rule does not require that the appraiser quantify the impact on value, such as by both valuing the property subject to the hypothetical condition and valuing it not subject to the hypothetical condition.

## Example of the Disclosure of a Hypothetical Condition under SVP or USPAP

An example of the disclosure of such a hypothetical condition is:

> *It is reported that groundwater contamination is present beneath the subject property. In accordance with the client's instructions and consistent with the intended use of this appraisal report, the value opinion is based on the hypothetical condition that the subject property is not impacted by groundwater contamination. The appraiser cautions against the use of this appraisal report for any use other than the intended use stated herein.*

When such disclosure is required it may be placed anywhere in the appraisal report (provided that is clear and conspicuous) including but not limited to the letter of transmittal, scope of work disclosure, or general comments section, depending on the type and length of report prepared. In an oral report, the appraiser should present the same information, if possible.

# Definitions [3]

Over the past few years, a common and generally accepted set of definitions related to the appraisal of properties that may be impacted by contamination have emerged. These are as follows:

**Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination:** Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state and/or local agencies.

**Environmental Risk:** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning:  (1) the nature and extent of the contamination;  (2) estimates of future remediation costs and their timing;  (3) potential for changes in regulatory requirements;  (4) liabilities for cleanup (buyer, seller, third party); (5) potential for off-site impacts; and (6) other environmental risk factors, as may be relevant.

**Environmental Stigma:** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (see Environmental Risk, above).

**Impaired Value:** The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

**Remediation Cost:** The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

**Remediation Lifecycle:** A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

CONTAMINATED PROPERTY VALUATION - SPECIALIZED TERMS AND DEFINITIONS
**Source, Non-source, Adjacent and Proximate Sites:** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

**Unimpaired Value:** The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

---

[3]Sources: *The Appraisal of Real Estate,* 14th Edition*, The Dictionary of Real Estate Appraisal, Environmental Contamination Glossary,* 6th Edition, both published by the Appraisal Institute; USPAP Advisory Opinion 9: The Appraisal of Real Property That May Be Impacted by Environmental Contamination, by The Appraisal Foundation.

# Basis for Proper Valuation

The specialized terms and definitions are an important part of the valuation framework for appraising properties that may be impacted by environmental contamination. This framework begins with the following formulae or equations:

Impaired Value    =    Unimpaired Value - Cost Effects (Remediation and Related Costs) - Use Effects (Effects on Site Usability)  -  Risk Effects (Environmental Risk/Stigma)

Property Value Diminution    =    Cost Effects (Remediation and Related Costs) + Use Effects (Effects on Site Usability) + Risk Effects (Environmental Risk/Stigma)

Impaired Value    =    Unimpaired Value - Property Value Diminution

These equations set forth the relationships between the key elements of the valuation framework, and highlight the steps to be taken by the appraiser in such assignments. Three general steps are typically taken. The first involves the estimation of the unimpaired value, as defined above. This estimate is usually undertaken with a Hypothetical Condition that the property is being appraised as if uncontaminated (See section on Hypothetical Conditions, above). The second general step involves the estimation of property value diminution. Property value diminution can have three forms: cost effects, use effects and risk effects. The third step involves the estimation of the impaired value of the subject property. This value can usually be derived by deducting an estimate of diminution from the unimpaired value. These estimates must be appropriate and well supported by market data typically involving actual transactions by market participants. As noted in The Dictionary of Real Estate Appraisal, 6th Edition, "market participants" are "individuals actively engaged in transactions." Thus, non-market participants and related non-market and non-transactional data would not establish an appropriate basis for estimating property value diminution.

Cost Effects

There are several considerations in analyzing the three effects comprising property value diminution. Cost effects involve deductions for costs to remediate a contaminated property by reducing concentrations of contamination to below appropriate regulatory standards. Accordingly, prerequisites for such a deduction would be: (1) that the property was contaminated, with concentrations of hazardous materials above appropriate regulatory standards; (2) that the costs were necessary for remediation of the property; and (3) that the costs would be borne by a prospective purchaser of the property rather than by a third party such as the current owner or the owner of adjacent property or some other third party responsible for the remediation. The market may not recognize any and all potential costs but only those costs necessary to achieve regulatory compliance and reduce concentrations of hazardous materials to below the appropriate regulatory standard. Regulatory standards are those established by the appropriate state, local or federal authority. The appraiser should rely on those entities to establish this threshold. Other thresholds and cleanup objectives desired by landowners or others would not establish an appropriate basis for a market based cost effects deduction.

Use Effects

Use effects involve limitations on the utility of a site due to contamination and its remediation. In some situations, these effects may result in a limitation on the highest and best use of a property and this potential effect should be analyzed by the appraiser. For example, at the conclusion of some approved remedial action plans, especially those utilizing risk-based standards, subsurface contamination may remain in place so long as certain conditions are met. These conditions, which may have a deed recordation, could limit site utility or the use of the site for alternative future uses. However, the appraiser should be aware that not all site use limitations will have an effect on market value and it is the market and its reaction, as borne out in actual market data, to these limitations that should be the primary focus of the appraiser's work in estimating use effects.

Risk Effects

Lastly, risk effects can result from uncertainties concerning the contamination and its remediation and other factors (see Definitions). If the uncertainties and perceptions of the market result in reductions in property value (property value diminution) then the appraiser might conclude that the subject property suffers from environmental stigma. Environmental stigma for the appraisal profession is the product of uncertainty and adverse perceptions of the market but is always measured on the basis of actual market data and transactions that reflect these perceptions. The appraiser is cautioned that not all uncertainty and increased concern and perceptions in the market may reduce property values, and that any analysis of risk effects and stigma must be based on actual data from the relevant market or submarket and should not be assumed to occur without such  evidence. Further, the appraiser should employ relevant and generally accepted methods and techniques to analyze the relevant and reliable market data in order to develop an opinion concerning the existence and extent of any risk and stigma that may exist before applying such a deduction to the subject property or properties. Lastly, important considerations in the estimation of risk effects are the subject property's stage in the remediation lifecycle (before, during or after cleanup) and the whether the subject and any sales comparables are source, non-source, adjacent or proximate sites as these factors can and do influence the extent to which a property will suffer from environmental risk and stigma.

# Summary of Standard Practices

**1.** Disclose to the client the appraiser's lack of knowledge and experience with respect to the detection and measurement of hazardous substances (CPE Ethical Rule 1-3, USPAP Competency Rule).

**2.** Take the necessary steps to complete the assignment competently such as personal study by the appraiser, association with another appraiser who has the required knowledge and experience, or obtaining the professional assistance of others who possess the required knowledge and experience ((CPE Ethical Rule 1-3, USPAP Competency Rule).

**3.** Identify as an extraordinary/special assumption reliance on any third party reports or obtained expert association that may have contributed to the valuation beyond the appraiser's own competence.

**4.** Under USPAP
- Identify in the appraisal process and state in the report if the appraisal is based on an extraordinary assumption or hypothetical condition that the property is appraised as if unaffected by hazardous substances (USPAP SR 1-2(f) and/or (g), SR 2-1(c), and SR 2-2(a)(xi) and 2-2(b)(xi).
- Identify in the appraisal process the environmental condition of the subject property and surrounding properties, and the existence of documented instances of environmental contamination that may affect the value of the property. (USPAP SR 1-2(e)(i)).
- Identify the scope of work necessary to complete the assignment, including the manner and degree to which the existence of environmental contamination will be addressed (USPAP SCOPE OF WORK RULE).
- Consistent with the USPAP SCOPE OF WORK RULE, develop an opinion of unimpaired value of the subject property using an appropriate Hypothetical Condition clearly disclosed in the report.

Under SVP
- Identify in the appraisal process and state in the report if the appraisal is based on a special assumption or hypothetical condition that the property is appraised as if unaffected by hazardous substances (SVP A-2(g) and/or (h), and C-2(a)(xvi)).
- Identify in the appraisal process the environmental condition of the subject property and surrounding properties, and the existence of documented instances of environmental contamination that may affect the value of the property. (SVP A-2(f).
- Identify the scope of work necessary to complete the assignment, including the manner and degree to which the existence of environmental contamination will be addressed (SVP A-3).
- Consistent with the SVP A-3, develop an opinion of unimpaired value of the subject property using an appropriate Hypothetical Condition clearly disclosed in the report.

**5.** Where and if appropriate, apply the estimates of cost, use and risk effects (property value diminution) to estimate the value of the subject property in its impaired condition.

(Please Note: The purpose of this Guide Note to the Standards of Professional Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective July 26, 2013
Minor revisions 2020

# Guide Note 8
## Use and Applicability of Letters of Transmittal





## Introduction

A letter of transmittal means any type of written letter, memorandum, or statement that serves as a notice of delivery from the appraiser to a second party of a report containing an opinion or conclusion concerning real estate. The letter of transmittal may be a part of the appraisal report, or it may be a separate document.

The Standards of Professional Appraisal Practice do not require the use of a letter of transmittal. In many cases, such as with brief form reports, a letter of transmittal is not practical. With a few exceptions, USPAP is silent with regard to the use, or

nonuse, of a letter of transmittal. The Management section of the USPAP Ethics Rule addresses "fees," "commissions," or "things of value" connected to the procurement of an assignment and requires that disclosure of such fees, if any, should "appear in the certification" "and in any transmittal letter in which conclusions are stated." The USPAP Standards Rules that require a signed certification to be included in a report state that any appraiser who signs a letter of transmittal (if one is used) must also sign a certification.

# GUIDE NOTE 8
## Introduction (continued)

When used appropriately, a letter of transmittal is a good business practice. Used inappropriately, the letter of transmittal may inadvertently cause the appraiser to be in violation of USPAP.

The letter of transmittal can serve the following purposes:

1. It is a communication between the appraiser and the client, identifying the client who authorized the appraisal and establishing the fact that the appraiser has completed his or her contractual obligation in compliance with a previous contract, agreement, or letter of engagement.

2. It confirms the business and/or fiduciary relationship agreement between the client and the appraiser as to the work product embodied in the assignment and may enable the appraiser to limit the widening of that relationship to unintended users.

3. It may call attention to unusual conditions of the engagement, hypothetical conditions, extraordinary assumptions, or unusual limiting conditions that affect the assignment.

4. It may be used to establish the client as the party ordering the report and responsible for payment of the associated fee, while putting the client on notice that certain limitations (such as the right of publication and the possibility of submitting the report to a peer review committee) apply.

5. It may disclose the scope of work applied in the assignment so that the client and intended users of the report understand the level of reliability.

6. It may state the report option used and, in a Restricted Appraisal Report, may contain the use restriction required by USPAP Standards Rule 2-2(b) that limits reliance on the report to the client.

7. It may, if the letter of transmittal is a part of the appraisal report, include the signed certification required by USPAP Standards Rule 2-3.

The letter of transmittal need not contain a statement of the value or other opinion(s) as set forth in the body of the report. If it does, however, the appraiser must try to ensure that the letter remains attached to the remainder of the report. If the letter of transmittal contains the appraiser's conclusion(s) and becomes detached from the body of the appraisal report, the letter could be used or construed as an appraisal report in itself. The reader of the letter could be misled or confused since the letter in itself will not typically meet the reporting requirements of USPAP.

If a Member, Candidate or Practicing Affiliate signs the letter of transmittal, the Appraisal Institute will consider the report to have been "delivered" for purposes of enforcing ER 1-1(e), which provides:

It is unethical to knowingly transmit a Report containing an analysis, opinion, or conclusion that reasonable valuers would not believe to be justified.

# Basis for Proper Letter of Transmittal

The following is an example of a letter of transmittal which is considered to be consistent with the guidelines outlined in this Guide Note.

March 15, 2XXX

First Client Bank, Inc.
1932 Atkinson Drive
Chicago, Illinois

RE:  The Hempstead Office Building, 2391 "A" Avenue, Greenville, Illinois
     Lot 23, Block 19, Glen Forest Office Park Subdivision, City of Greenville,
     Green County, Illinois

Dear [Mr. or Ms. Client]:

In fulfillment of the agreement outlined in the letter of engagement dated January 30, 2XXX, we are pleased to present the attached report of our appraisal of the leased fee estate in the referenced parcel of real estate, as of December 31, 2XXX. The report sets forth our opinion of market value along with supporting data and reasoning which form the basis of our opinion.

The value opinion reported is qualified by certain definitions, limiting conditions, and certifications which are set forth on pages 5 through 9 of this report. We particularly call to your attention to the extraordinary assumption set forth on page 8 dealing with the possible existence of hazardous or toxic materials on the premises appraised.

We also point out that the value developed is based on the hypothetical condition that the City of Greenville approved a Special Use Permit for the property as of the date of value. This hypothetical condition is addressed in detail on page 35 of the report.

This report was prepared for and our professional fee billed to First Client Bank, Inc. It is intended only for use by your internal management, your auditor, and appropriate regulatory authorities. It may not be distributed to or relied upon by other persons or entities without our written permission.

The property was inspected by John Evans, SRPA, and the appraisal was developed by Mr. Evans and Sally Briggs, MAI.
If you have any questions concerning the report, please contact Ms. Briggs at (312) 555-7789.

Sincerely,

BROWN & BRIGGS
By: John J. Briggs, MAI, Managing Partner

To avoid potential for abuse, the letter of transmittal should be prepared in such a way that it cannot be mistaken for or misused itself as an appraisal report. It should be simply a statement of delivery and completion of an assignment. It would be a good practice for the appraiser to avoid summarizing the opinion(s) or conclusion(s) developed in the report, referring the reader, instead, to the body of the report itself. Thus, the reader or user of the report will see the opinion only in its proper context, with appropriate explanations, extraordinary assumptions, hypothetical conditions, limiting conditions, definitions, disclaimers, etc.

If the appraiser deems it appropriate to include the value opinion or other conclusion in the letter of transmittal, it should be qualified with a statement such as the following:

# Basis for Proper Letter of Transmittal (continued)

As a result of our analysis, we have formed an opinion that the market value (as defined in the Report), subject to the definitions, certifications, extraordinary assumptions, hypothetical conditions, and limiting conditions set forth in the attached Report, as of December 31, 2XXX, was:

ONE MILLION DOLLARS ($1,000,000).

THIS LETTER MUST REMAIN ATTACHED TO THE REPORT, WHICH CONTAINS 94 PAGES PLUS RELATED EXHIBITS, IN ORDER FOR THE VALUE OPINION SET FORTH TO BE CONSIDERED VALID.

# Summary of Standard Practices

1. If the value opinion is set forth in the letter of transmittal, include sufficient information in the letter so that it meets the reporting requirements for the appraisal report.

2. State any unusual circumstances associated with the assignment, such as unusual conditions of the engagement, extraordinary assumptions or hypothetical conditions used, or unusual limiting conditions.

3. Reference the appraisal report being transmitted, including its number of pages.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Appraisal Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective January 1, 2013
Minor revisions 2017

# Guide Note 10

## Development of an Opinion of Market Value in the Aftermath of a Disaster





**MARKET VALUE**



**VALUATION CONSIDERATIONS & PRINCIPLES**



**SUSTAINABILITY OF VALUE**



**COMPETENCY ISSUES**

## Background/Rationale

In recent years, the United States has experienced terrorist attacks, unusually destructive natural disasters and catastrophic man-made disasters. The aftermath of a disaster poses special challenges in real property valuation. During such periods, real property markets in affected areas often exhibit instability, even chaos. Analyzing market data in such markets can be difficult. Appraisers and clients regularly have sought guidance from the Appraisal Institute on how to handle these situations.

In response, the Appraisal Institute offers Guide Note 10 on "Developing an Opinion of Market Value in the Aftermath of a Disaster" to assist appraisers and clients. The purpose of Guide Notes to the Appraisal Institute's Standards of Professional Appraisal Practice is to provide guidance as to how the requirements of the Standards may apply in specific situations.

# GUIDE NOTE 10
## Developing an Opinion of Market Value in the Aftermath of a Disaster

Natural disasters include hurricanes, floods, tornadoes, earthquakes, tsunamis, fire, severe winter storms, avalanches and mudslides, among others. Disasters can also be caused by human action or error; examples include terrorist attacks, riots, war, panic in the financial markets, industrial accidents, chemical leaks, oil spills, shipping accidents, airline crashes, and structural failures of dams, bridges or buildings. Disasters tend to occur suddenly, taking the public by surprise, even when the location is known to be prone to such an occurrence. Depending on the nature of the disaster, injuries and death may be widespread and destruction of property may occur to varying degrees. Initially the collective reaction to any disaster is shock, then disbelief, mourning and sorrow. Eventually, there is recovery; those affected move on with their lives. Damaged property is repaired and destroyed property is often replaced.

### The human tragedy aside, the aftermath of a disaster can be especially problematic in real property valuation assignments.

During that time period, real property markets in affected areas often exhibit instability, even chaos. Analyzing data in such markets presents an array of challenges. *How can an appraiser develop a credible opinion of market value in the aftermath of a disaster?*

## Characteristics of "Market Value"

"Market value" is the focus of many appraisal assignments. This Guide Note is intended to address market value assignments only; if the objective of an assignment is not market value, not all of the discussion in this Guide Note will apply.

There are many different definitions of "market value" in use, but all exhibit common characteristics. The entry for "market value" in the Definitions section of the *Uniform Standards of Professional Appraisal Practice (USPAP),* addresses these common characteristics:

> **MARKET VALUE:** a type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal.
>
> > Comment: Forming an opinion of market value is the purpose of many real property appraisal assignments, particularly when the client's intended use includes more than one intended user. The conditions included in market value definitions establish market perspectives for development of the opinion. These conditions may vary from definition to definition but generally fall into three categories:
> >
> > 1. the relationship, knowledge, and motivation of the parties (i.e., seller and buyer);
> > 2. the terms of sale (e.g., cash, cash equivalent, or other terms); and
> > 3. the conditions of sale (e.g., exposure in a competitive market for a reasonable time prior to sale).

The Appraisal Institute's *The Dictionary of Real Estate Appraisal, 6th Edition*, includes the following in its entry for "market value":

> The most widely accepted components of market value are incorporated in the following definition
>
> The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

The *Dictionary* goes on to cite the definition of "market value" used by agencies that regulate federally insured financial institutions in the United States:

> The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
> • Buyer and seller are typically motivated;
> • Both parties are well informed or well advised, and acting in what they consider their best interests;
> • A reasonable time is allowed for exposure in the open market;
> • Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
> • The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
> (12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

The International Valuation Standards defines "market value" as follows:

> ...the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's-length transaction after proper marketing and where the parties had each acted knowledgeably, prudently, and without compulsion.
> *(International Valuation Standards 2017)*

It is important to observe that the following elements are common to each of the foregoing definitions:

> • Market value results when the parties are typically motivated, are generally well informed, and are acting in their best interest;
> • Market value results when the property is exposed on the market for a reasonable length of time;
> • Payment is in cash or its equivalent.

An appraiser must be especially mindful of these characteristics of *market value* when appraising in a chaotic or unstable market. Quite often, in the aftermath of a disaster, these characteristics are absent from the transactions that occur – if any occur at all. For example, buyers and sellers might choose to act before they have full information. Because of the disaster, they might be extraordinarily motivated to buy or to sell. Exposure times for properties on the market might become extended, or might suddenly become contracted. Sometimes, market activity will virtually cease altogether in the aftermath of a disaster; open escrows fall out; prospective sellers cancel plans to sell; and prospective buyers cancel plans to buy. The lack of data only further exacerbates the challenge for the appraiser.

# Applicability of Basic Valuation Principles

Any appraisal problem must be approached using recognized appraisal methodology and in light of basic valuation principles, regardless of whether market conditions are at their most chaotic. Applying established approaches to solving valuation problems will help to simplify even the most complex assignments. Valuation in the aftermath of a disaster requires special attention to the fundamental appraisal principles of supply and demand, anticipation, change, substitution, contribution, externalities, and balance.

## SUPPLY AND DEMAND

In economic theory, the principle that states that the price of a commodity, good, or service varies directly, but not necessarily proportionately, with demand, and inversely, but not necessarily proportionately, with supply. In a real estate appraisal context, the principle of supply and demand states that the price of real property varies directly, but not necessarily proportionately, with demand and inversely, but not necessarily proportionately, with supply.

## ANTICIPATION

The perception that value is created by the expectation of benefits to be derived in the future.

### CHANGE

The result of the cause and effect relationship among the forces that influence real property value.

### BALANCE

The principle that real property value is created and sustained when contrasting, opposing, or interacting elements are in a state of equilibrium.

### SUBSTITUTION

The appraisal principle that states that when several similar or commensurate commodities, goods, or services are available, the one with the lowest price will attract the greatest demand and widest distribution. This is the primary principle upon which the cost and sales comparison approaches are based.

### CONTRIBUTION

The concept that the value of a particular component is measured in terms of its contribution to the value of the whole property, or as the amount that its absence would detract from the value of the whole.

### EXTERNALITIES

The principle that economies outside a property have a positive effect on its value while diseconomies outside a property have a negative effect upon its value.

# Valuation Considerations

Forces that influence real property values include social trends, economic circumstances, governmental controls and regulations and environmental conditions. Any or all of these might be impacted by a disaster. Factors that create value include utility, scarcity, desire and effective purchasing power. Again, any or all of these might become issues in the aftermath of a disaster. Property utility might be impacted by damage or destruction; properties might be more scarce because damaged or destroyed properties are removed from the overall supply; desire for property might increase because displaced homes and businesses need replacement space; and effective purchasing power might be impacted by changes in lending policies and practices in the area in response to the disaster.

A disaster might have a drastic impact on both supply and demand, causing them to suddenly be out of balance. There may be a dramatic drop in supply due to destruction and damage. At the same time, there may be a spike in demand because those who suffered loss or damage to owned or leased real estate will need to find replacement space. Many will not have the luxury of time in doing so. This is especially true with regard to residential real estate; people need to find alternative shelter immediately. As a result, sharp increases in asking and selling prices might be observed. This raises several questions from an appraisal viewpoint: Do such higher prices represent "market value"? Are the parties to the transactions "typically motivated" and acting in their best interest or is their behavior irrational? Are the properties being exposed on the market for a "reasonable" length of time prior to sale?

The principles of substitution, contribution and externalities help provide the answers to these questions. As in any assignment, identification of the subject's market area is critical. Generally, all properties in the subject's *market* area are similarly impacted by the disaster. "Typical" motivations and "reasonable" exposure times are therefore measured by what is observed in that market area during the same time period. In other words, "normal" is redefined – at least for the time being.

The principles of anticipation and change are especially relevant to valuation assignments in the aftermath of a disaster. There is generally a great deal of *uncertainty* in the market during this time period. Is the disaster likely to be repeated in the near future? Will further damage and destruction result? What is the extent of the damage? To what degree can structures be replaced? Are there environmental concerns, and if so, to what extent? And how long will it take before things return to "normal"? The impact of such uncertainty may be readily perceived but difficult to measure. Uncertainty in real estate markets means increased risk to property owners and investors. Such increased *risk* might be reflected in higher capitalization and discount rates. It might also be manifested in "discounted" prices – which to some degree might offset upward pressure on prices resulting from increased demand and decreased supply.

The appraiser must be especially mindful of issues relating to the date of value. Ideally, comparable data must be selected from the same market area and must be subject to the same market conditions. Transactions that occurred prior to the disaster will not reflect the same market conditions as those occurring after.

Following a catastrophic event, there may be few if any truly comparable sales from which to support a value opinion as of current

date. Additional data may need to be taken into consideration such as experience from other disaster-affected areas or anecdotal information obtained from interviews with market participants, for example. It is important that appraisers continue to apply and rely upon the same methods and techniques as in other assignments, remembering the analysis necessary to determine comparability of data.

Some appraisal assignments require the *date* of value to be prior to the disaster. Such retrospective valuations include those provided to assist insurers and insureds in establishing loss amounts for insurance purposes. In these cases, the appraiser must rely on data that occurred prior to that retrospective value date. Such transactions occurring in that time period would not have been impacted by the disaster. The difficulty in these retrospective valuations is that the appraiser cannot obtain firsthand information about the characteristics of the property that are relevant to the assignment as of the date of value; i.e., one cannot go back in time to visually inspect the property. The appraiser must therefore rely on the best available information about the nature of the subject property as of the date of value.

Such an appraisal would be based on one or more *extraordinary* assumptions about the property condition and other characteristics that are as presumed to be true in the appraisal assignment.

The more problematic appraisal assignments are those for which the *date of value* occurs in the aftermath of the disaster. If no data is available on transactions that occurred in the aftermath of the disaster, data on transactions that occurred prior will require adjustment for market conditions. Such adjustments may be difficult to substantiate. An appraiser must be extremely careful in the use of such data and the estimation of any such market conditions adjustment. In time, more transactions will occur and more data will become available for analysis. Until then, the appraiser must work with what is available. The terms and conditions of any sales that do occur must be analyzed more closely; buyer and seller motivations must be investigated more thoroughly, and the nature of the property's exposure on the market must be examined.

## Sustainability of value

A client might request an opinion of value, but to many clients the answer to another question may be paramount: *How durable is that value?* Are values in the aftermath of a disaster likely to be sustained over time? If values have risen in the aftermath of the disaster, are they likely to fall again in the near future? If values have fallen, are they likely to rise again? It is important to recognize that these questions are separate from the question of value, and answering them goes beyond the provision of an appraisal.

To some degree, the sustainability of value over time will be reflected in the current market value, because market participants build their expectations into prices; if they believe values will rise in the long run, they might be willing to pay more now. After a disaster there is much more uncertainty, and this tends to cause buyers and sellers to be more cautious. In the aftermath of a disaster there is more than the normal amount of risk in the marketplace. The market may be very fluid. Changes o market conditions may cause changes in market value to occur more rapidly than usual.

It may be helpful to communicate to the client the relative reliability of the value opinion. It is appropriate to point out in the appraisal report that the data upon which the appraisal is based is limited in quantity or quality and that this affects the reliability of the conclusions. If acceptable to the client, expressing the value opinion within a range may be an appropriate way to address this situation.

## Competency Issues

The requirements of the Appraisal Institute's *Code of Professional Ethics* (CPE) ER 1-3 and the USPAP Competency Rule become greatly enhanced in assignments to develop market value opinions in the aftermath of a disaster. The USPAP Competency Rule identifies several types of competency, including competency with regard to (1) a property type (2) a market (3) a geographic area and (4) an analytical method. An appraiser who previously possessed sufficient competency to appraise a given property type in a given area might not have sufficient competency to appraise the same property type in that area in the aftermath of a disaster.

Government agencies and other bodies such as Fannie Mae, Freddie Mac, and the bank regulatory agencies might issue guidance or impose additional requirements on appraisers working in the affected areas after a major disaster. Appraisers must be cognizant of such additional requirements and pay them particular attention, as they may become enforceable requirements for such assignments.

Appraisers should be wary of requests to provide services outside of Valuation Practice for which they lack competency. For example, in the aftermath of a disaster, some clients might request a signed report indicating the condition of a property, noting any damage or destruction. Unless the appraiser possesses the requisite competency to make judgments about these matters, the ap-praiser must not take on assignments that require competency that is beyond that of a real property appraiser.

Appraisers must avoid making statements of fact about what they *believe* they observed, when such statements are not substantiated by the necessary expertise. For example, an appraiser might observe what he or she thinks is mold in a flood-damaged property; but without definitie input from an expert in mold, making a statment about the presence of mold might be misleading. Instead, the appraiser's statements should be limited to what he or she actually observed. Instead of stating that mold was observed, state that "a black substance was observed on the walls."

Appraisers must not allow their personal involvement in the disaster to affect their objectivity. This can be challenging in the wake of a disaster that has affected one's own family, friends and/or hometown. An appraiser must be prepared to decline any assignment in which he or she cannot maintain impartiality.

# Summary of Standard Practices

1. Developing an opinion of value in the aftermath of a disaster might require competency that surpasses or is different from that required prior to the disaster.

2. The characteristics of the applicable definition of market value must be carefully examined when appraising in a chaotic or unstable market.

3. Valuation in the aftermath of a disaster requires special attention to the fundamental appraisal principles of supply and demand, anticipation, change, substitution, contribution, externalities, and balance.

4. Transactions that occurred prior to the disaster will not reflect the same market conditions as those occurring after. Ideally, comparable data must be selected from the same market area and must be subject to the same market conditions as the subject property.

5. In appraisal assignments for which the date of value is a retrospective date prior to the disaster, the appraiser must rely on comparable sales that occurred prior to that retrospective value date.

6. In appraisal assignments for which the date of value is a retrospective date prior to the disaster, the appraiser must rely on the best available information concerning the nature of the subject property as of the date of value. Such an appraisal would be based on one or more *extraordinary/special assumptions* about the property condition and other characteristics that are as presumed to be true in the appraisal assignment.

7. Unless the appraiser possesses the requisite competency to make judgments about these matters, the appraiser must not take on assignments that require competency that is beyond that of a real property appraiser.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective November 5, 2010
Minor revisions 2020

# Guide Note 11

## Comparable Selection in a Declining Market



## Introduction

A declining market is generally characterized by few transactions and falling values. Declining markets present valuation challenges because there are fewer transactions available to analyze as comparables ("comps") in the sales comparison approach or to support an estimate of external obsolescence in the cost approach. In a declining market, transactions used in an appraisal assignment require adjustments for changes in market conditions, but such adjustments are difficult to support without current transactions. Also, transactions that do occur often do so under conditions that do not align with the conditions of the value definition applicable to the assignment.

# GUIDE NOTE 11
## Applicable Valuation Standards

*Standards of Valuation Practice* (SVP) Standards Rule A-4, Application of Methodology states: "The valuer must: (a) research and verify data necessary to develop a credible appraisal, and (b) correctly employ methods and techniques necessary to produce a credible appraisal."

*Uniform Standards of Professional Appraisal Practice* (USPAP) Standards Rule 1-4 states, "In developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results."

USPAP Standards Rule 1-4(a) goes on to state: "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

# Characteristics of "Market Value"

"Market value" is the focus of many appraisal assignments. There are many different definitions of "market value" in use, but all exhibit common characteristics. The entry for "market value" in the Definitions section of USPAP addresses these common characteristics:

**MARKET VALUE:** a type of value, stated as an opinion, that presumes the transfer of a  property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal.

> Comment: Forming an opinion of market value is the purpose of many real property appraisal assignments, particularly when the client's intended use includes more than one intended user. The conditions included in market value definitions establish market perspectives for development of the opinion. These conditions may vary from definition to definition but generally fall into three categories:
>
> 1. the relationship, knowledge, and motivation of the parties (i.e., seller and buyer);
> 2. the terms of sale (e.g., cash, cash equivalent, or other terms); and
> 3. the conditions of sale (e.g., exposure in a competitive market for a reasonable time prior to sale).

The Appraisal Institute's The Dictionary of Real Estate Appraisal, 6th Edition, includes the following in its entry for "market value":

The most widely accepted components of market value are incorporated in the following definition:

The most probable price as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably and, for self-interest, and assuming that neither is under undue duress.

The *Dictionary* goes on to cite the definition of "market value" used by agencies that regulate federally insured financial institutions in the United States:

The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting  prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider  their best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial  arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with  the sale.

*(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57  Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)*

The International Valuation Standards include the following definition of "market value":

> ...the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's-length transaction after proper marketing and where in the parties had each acted knowledgeably, prudently, and without compulsion.
> *(International Valuation Standards 2017)*

It is important to observe that the following elements are common to each of the foregoing definitions:

- Market value results when the parties are typically motivated, are generally well  informed, and are acting in their best interest;
- Market value results when the property is exposed on the market for a reasonable  length of time;
- Payment is in cash or its equivalent.

# Comparable Selection

Appraisers must consider all relevant transactions that have occurred in the market area and then determine which of those transactions should be used in the sales comparison analysis to arrive at a credible value opinion for the subject property. The best comps are those that are most similar to the subject property in terms of location, size, condition and other features that buyers and sellers believe make a difference to price. After selecting the best comps, the appraiser adjusts for material differences between each comp and the subject property. The appraiser must analyze each comp to ascertain what adjustments are needed. Factors that may require adjustment include atypical buyer/seller motivations and sales concessions.

When the objective of the assignment is market value, ideally each comp selected for use in the sales comparison approach should have sold under the conditions specified in the definition of market value being used. For example, the buyer and seller should have been typically motivated. The seller should not have been under any compulsion to sell, nor the buyer under any compulsion to buy. The marketing effort and exposure time on the market should have been typical for that property type in that market. Payment should have been in cash or terms equivalent to cash; i.e., the seller should not have granted cash or non-cash concessions to bring a sale at the stated price.

When the conditions of the sale do not reflect the conditions outlined in the market value definition, either (1) the appraiser must consider making adjustments for such differences if it is to be used as a comp, or (2) the sale must not be used as a comp.

# Distressed Sales as Comparables

Distressed sales such as foreclosure sales and short sales are common in a declining market. Depending on the severity of the local market downturn, some, many, or even all sales that occur do so under distressed conditions.

Appraisers cannot categorically discount foreclosures and short sales as potential comps in the sales comparison approach. However, due to differences between their conditions of sale and the conditions outlined in the market value definition they might not be usable as comps. Foreclosures and short sales usually do not meet the conditions outlined in the definition of market value. A short sale or a sale of a property that occurred prior to a foreclosure might have involved atypical seller motivations (e.g., a highly motivated seller.) A sale of a bank-owned property might have involved typical motivations, so the fact that it was a foreclosed property would not render it ineligible as a comp. However, if the foreclosed property was sold without a typical marketing program, or if it had become stigmatized as a foreclosure, it might need to be adjusted if used as a comp. Further, some foreclosed properties are in inferior condition, so adjustments for physical condition may be needed.



As is always the case in selecting sales to use as comparables, appraisers must investigate the circumstances of each transaction, including whether atypical motivations were involved, sales concessions were involved, the property was exposed on the market for a typical amount of time, the marketing program was typical, or the property condition was compromised. Adjustments might need to be made for these circumstances. When it is necessary to use a distressed sale as a comp, the appraiser must carefully analyze the current local market to determine if an adjustment for conditions of sale is needed. If no adjustment is warranted, the lack of adjustment should be explained.

Physical condition and conditions of sale are two distinctly different factors that must be considered separately. They may be related to some degree in a distressed market, but not necessarily. An appraiser must not assume, for example, that a property was in inferior condition simply because it was a foreclosure.

The level of investigation needed to meet the requirement for sufficient diligence is generally more than is needed in non-distressed market situations. Further, supporting such adjustments can be particularly challenging when there are few current transactions to analyze. Competency in performing such investigation and analysis are required.

# Disposition Value and Liquidation Value

The objective of an appraisal assignment might be disposition value or liquidation value rather than market value:

- Market value addresses the question, What would the property likely sell for on the date of value after a typical exposure period on the open market?
- Disposition value answers the question, What will the property likely sell for after a limited exposure on the market given the seller is compelled to sell?
- Liquidation value answers the question, What will the property likely sell for after a severely limited exposure on the market given the seller is extremely compelled to sell?

In the case of both disposition value and liquidation value, the limited or severely limited exposure time on the market is specified by the client.

"Disposition value" is defined in the Appraisal Institute's *The Dictionary of Real Estate Appraisal*, 6th Edition as:

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. An adequate marketing effort will be made during the exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
This definition can also be modified to provide for valuation with specified financing terms.

"Liquidation value" is defined in the Appraisal Institute's *The Dictionary of Real Estate Appraisal*, 6th Edition as:

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
This definition can also be modified to provide for valuation with specified financing terms.

The appraiser's analysis must be consistent with the type of value being sought. It is misleading to use sales that occurred under distress conditions, fail to adjust them (when necessary) for the conditions of the market value definition that were not met, and refer to the resulting value as market value. Ideally, when market value is the objective, the comps selected sold under the conditions stated in the market value definition and therefore they do not require adjustment for those conditions. Likewise, when disposition value is the objective, the comps selected sold under the conditions stated in the disposition value definition (including "specified exposure time" and "seller compelled to sell.") The same principle holds true when the objective is liquidation value. However, in a declining market with few transactions, it is generally not realistic to expect that such ideal comps could be found. More likely, comps that sold under different conditions than stated in the value definition must be used and then adjusted as necessary and appropriate.

Appraisers must be careful to identify when sales are occurring at market value, disposition value or liquidation value. Even when the only sales occurring are distressed sales, they do not represent market value if they do not meet the conditions of the definition of market value.

With both liquidation value and disposition value, the time allowed for completion of the sale (exposure time) is not necessarily typical for the market for that property type; rather, it is limited, and it is specified by the client. If that time period is the same as what is typical in the current market, disposition value could be equal to market value.

## Introduction

# Market Identification

Market analysis is a critical part of the process of developing a market value, disposition value, or liquidation value opinion. The appraiser must identify the subject's market and understand the supply and demand forces at work in that market. Not all markets move in the same direction at the same rate. For example, volatility may be more prevalent in one location compared to other locations. Generalizations about macro-economic trends in the broader geographic area are not necessarily applicable to a specific market area. Similarly, trends observed for one price range or property type might not be applicable to other price ranges or property types.



In some markets, a "two-market" phenomenon might be observed, whereby there is a measurable difference between properties selling under non-distress conditions and virtually identical properties selling under distressed conditions. This phenomenon may become more prevalent as market conditions begin to improve. In other markets, there may be no measurable difference between properties selling under distressed conditions and those that are not.

Buyer and seller motivations may vary greatly depending on their specific circumstances. Often in a distressed market, buyers expect to find "deals" and will only purchase properties they believe are "undervalued." Seller motivations can vary greatly, too. Sellers with equity may be more willing to sell (even if they have lost equity because of a market decline) than sellers who have very little or no equity. On the other hand, some property owners may willingly dispose of a property – even by defaulting – if they perceive there is little upside potential in the market and their cost to hold the property is burdensome.

Appraisers must remain aware of buyer and seller perceptions about how the market is likely to change in the near future. If market participants anticipate an improvement in the market or a further decline, their actions are likely to reflect that anticipation.

# Lack of Available Sales Data

A declining market will likely exhibit very little sales activity. When the sales comparison approach is necessary, but there are virtually no current sales in the market area to analyze as comps, the appraiser must:

1. Expand the geographic area for comp search, then adjust for location as appropriate, and/or

2. Use less recent sales, then adjust for market conditions as appropriate.

When adjustments cannot be quantified using paired sales, other recognized methods of supporting adjustments may be applied, such as surveying market participants, analysis of rent or net income differentials, or cost analysis. Analysis of current listings can help provide an indication of market conditions and trends. The volume of listings, the change over time in volume of listings, and average days on the market should be analyzed to assist in making a determination about changes in market conditions.

Appraisers must be careful not to presume that the cost approach is a superior valuation technique to the sales comparison approach when comparable sales are lacking. Proper application of the cost approach requires the use of cost data that is current as of the date of value, as well as estimation of any external obsolescence that might exist due to market conditions.

# Summary of Standard Practices

1. "Properly identify the issue to be addressed and have the knowledge and experience to complete the service competently…" (CPE Ethical Rule 1-3); Develop an appraisal of real property in a declining market only after ascertaining adequate knowledge and experience to complete the assignment competently (USPAP Competency Rule).

2. Identify the market for the subject property and the economic trends within that market.

3. Understand the type and definition of value applicable to the assignment, and apply valuation methodology that is consistent with that definition.

4. When selecting comparable sales, do not exclude or include any solely because they occurred under distress conditions.

5. In the sales comparison approach, recognize when adjustments need to be made for conditions of sale to comparables that sold under conditions that differ from the conditions set forth in the definition of value applicable to the assignment.

6. When comparable sales data are lacking, expand the geographic area for search and/or use less recent sales, then adjust as appropriate for location or market conditions.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective November 15, 2011
Minor revisions 2020

# Guide Note 12
## Analyzing Market Trends








## Introduction

Since the value of a property is equal to the present value of all of the future benefits it brings to its owner, market value is dependent on the expectations of what will happen in the market in the future. Therefore, a critical step in the development of a market value opinion is analysis of the market trends.  The market trends study should include what market participants (buyers, etc.) believe will happen to market conditions in the future as well as current supply and demand, and anticipated changes to supply and demand.  The interaction of these factors profoundly impacts the highest and best use, and in turn the market value of a property. Analyzing current and anticipated market conditions is more complicated – and more critical – when a market is rapidly changing, either upward or downward.  A "bubble" market might suddenly turn and decline; a "bust" market might suddenly start to improve. To what extent is an appraiser responsible for recognizing changes in market conditions?  What steps must an appraiser take to ensure due diligence is done regarding the analysis of market trends?

# GUIDE NOTE 12
## Applicable Valuation Standards

*The Standards of Valuation Practice* (SVP), Standards Rule A-4, Application of Methodology states: "The valuer must: (a) research and verify data necessary to develop a credible appraisal, and (b) correctly employ methods and techniques necessary to produce a credible appraisal."

The *Uniform Standards of Professional Appraisal Practice* (USPAP) include more rules that address these questions.

USPAP Standards Rule 1-3 states:

When necessary for credible assignment results in developing a market value opinion, an appraiser must:

(a)   identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends; and

Comment: An appraiser must avoid making an unsupported assumption or premise about market area trends, effective age, and remaining life.

(b)   develop an opinion of the highest and best use of the real estate.

Comment: An appraiser must analyze the relevant legal, physical, and economic factors to the extent necessary to support the appraiser's highest and best use conclusion(s)."

SVP's Standards Rule A-3: Scope of Work requires the valuer to "determine the scope of work necessary to develop an appraisal that is credible given its intended use." USPAP's Scope of Work Rule states that an appraiser must "determine and perform the scope of work necessary to develop credible assignment results." Scope of work includes the type and extent of data researched and the type and extent of analyses applied to arrive at opinions and conclusions. Thus, under either the SVP or USPAP, the extent of the analyses of market conditions and trends is a scope of work issue. Along with other aspects of scope of work, the extent of these analyses must be determined at the outset of each assignment.

USPAP Standards Rule 1-6 requires the appraiser to:

(a) reconcile the quality and quantity of data available and analyzed within the approaches used; and
(b) reconcile the applicability of the approaches, methods and techniques used to arrive at the value conclusion(s).

# Factors That Cause Markets to Change

Real estate markets are characterized by cycles. Real estate cycles typically involve successive periods of expansion, peak levels of activity, contraction, and troughs.

Factors that cause markets to change are distinctly different from symptoms of change. Examples of symptoms of change include changes in vacancy rates (a leading indicator), falling or rising property prices, increases in the frequency of concessions and seller financing, sales prices exceeding listing price, and other conditions symptomatic of larger, more basic problems. Factors that cause markets to change are generally the product of macro-level forces.  They influence market psychology and drive behavior in profound, sometimes dramatic ways.  Such causative factors can involve a single defining event or a slower moving series of events that are evolutionary in nature and sometimes not readily apparent to real time observers.  Whether they consist of a single defining event or series of related events, these causative factors are indicative of shifts in underlying political and social as well as economic conditions.

# Factors That Cause Markets to Change (continued)

Factors that cause markets to change may be capital (transactional) based or fundamental (space user) based. Examples of capital based factors that cause markets to change include:

1. Changes in public policy, particularly related to monetary policy and government spending, taxation, interest rates, the availability of financing and capital formation, length and facilitation of the local entitlement process, and employment initiatives.
2. Inflationary/deflationary pressures on the regional, national, and global economies.
3. Overabundance of investment capital resulting in increased competition (often too much money chasing too few deals), overly aggressive investment strategies, progressively lax underwriting standards.

Examples of fundamental (space user) based factors that cause markets to change include:

1. Changes in migration patterns and population shifts which cause overcapacity in some areas and undersupply in others.
2. Economic shock caused by events such as 9/11, the Lehman bankruptcy, the dot.com bust of the early 2000s, the Arab oil embargo of the 1970s, and periodic spikes in the price of oil, all of which caused wide-scale disruption in property markets affecting everything from corporate strategy, personal live/work decisions, and increased cost of property operation to demand for hotel rooms and second homes.
3. Aging population with its increased demand for retirement communities, congregate care facilities and smaller housing size.
4. Changes in technology such as green buildings, cloud computing, and internet shopping, which affect employment patterns, new industry formations, and new property types (e.g., server farms, disaster recovery facilities.)
5. Natural disasters and industrial accidents, which are usually local or regional in nature.
6. Changes in affluence and income distribution that influence affordability and consumer and discretionary spending habits.
7. Overbuilding and increases in competitive supply.

# Market Analysis

*Market analysis* is is defined as "The study of the supply and demand in a specific area for a specific type of property."[1]

While appraisers generally analyze historic data (e.g. comparable sales) in the valuation process, it is important to recognize that the value of a property is dependent on the future benefits that a property will bring to its owner. Future benefits include the rights to use, occupy, and enjoy the property as well as the right to receive income it may produce. Market values are therefore forward-looking.  Data used in the valuation process must be adjusted for market conditions as necessary so the market value conclusion reflects this forward-looking stance as of the date of value. Market analysis provides the framework for making determinations about market conditions adjustments.

Market analysis is a critical step in the appraisal process. Adequate market analysis must be completed before highest and best use analysis, and the determination of highest and best use is critical to an appraisal assignment when market value is the objective.

Market analysis provides the data input to identify the highest and best use of a property in terms of (1) property use (2) market support (economic demand) and timing (absorption rates), and (3) market participants (probable users and buyers.)[2]

[1]Appraisal Institute, The Dictionary of Real Estate Appraisal, 6th ed. (Chicago: Appraisal Institute, 2015).

[2]Stephen F. Fanning, Market Analysis for Real Estate: Concepts and Applications in Valuation and Highest and Best Use. (Chicago: Appraisal Institute, 2014.), pp. 6-8

# Market Analysis (continued)

Most market analyses can be completed using a six-step process:

1. Define the product (property productivity analysis): Identify physical, legal and location attributes that shape productive capabilities and potential uses.
2. Market delineation: Identify the market for the use.
3. Demand analysis: Identify characteristics of the most probable user. Analyze demand drivers such as population, income, employment.
4. Supply analysis: Survey and forecast competition. Analyze existing supply, new inventory coming on line in the near future, and proposed construction.
5. Analysis of the Interaction between supply and demand: Determine if marginal demand exists, predict when market will move out of equilibrium.
6. Forecast subject capture: Analyze market penetration.

A seventh step, perform financial feasibility analysis of alternative uses and threshold testing, can be added for proposed properties.

The manner and degree to which these steps are carried out within an appraisal assignment are scope of work issues. The scope of work for an assignment must be appropriate given the intended use.   It is the appraiser's responsibility to determine the scope of work for the assignment. The scope of work must meet or exceed what the appraiser's peers' actions would be in the same or a similar assignment, and with the expectations of parties who are regularly intended users for similar assignments.

The appraiser must decline or withdraw from an assignment if the client will not allow the appraiser's scope of work to be adequate for the assignment.  The level of market analysis performed must be appropriate for the assignment and not limited solely because the client wishes to reduce the appraisal cost.

The level of analysis can range from simple to highly sophisticated. On a simple level, demand may be inferred from current market conditions, or rates of change used to develop projections. On the more sophisticated level, an in-depth analysis of forecast (fundamental) demand is performed.

Fundamental market analysis may be useful and necessary when analyzing or performing an appraisal of a property for new construction, or when appraising property in a volatile or rapidly changing market.  In terms of real estate products, whether it be apartments, industrial, retail or office properties, fundamental market analysis answers the questions of "when and how much."

Competent appraisers continuously interact with buyers, sellers and agents of transaction activity.  Ideally, appraisers have frequent and sustained interaction with buyers or lessees in particular.  Such interaction allows appraisers to ascertain, analyze, and understand the motivations of market participants. Appraisers must be familiar with the local market dynamics and be able to perform trend analysis and/or fundamental market analysis to the degree necessary for the specific assignment.

However, appraisers are not expected to be prognosticators. Unforeseen events can completely eradicate conclusions that have been based in trend analysis or fundamental market analysis.   A market value opinion is as of a particular date, and it is an attempt to reflect the anticipations of market participants as well as market fundamental trends and analysis.  Events subsequent to the date of value that were not anticipated by market participants can cause values to change – in some cases, significantly.

# Signs of a Changing Market

Signs of a changing market are symptoms, as opposed to causes. An appraiser observes the symptoms, but must understand the underlying cause or causes in order to properly analyze market trends.

For appraisers and market participants, a "bust" market is usually relatively obvious. However, it can be difficult to spot a "bubble" market when in the midst of one. Further, it can be difficult to tell when a bust market has started to turn and improve, or when a bubble market has begun to decline.

A bubble may be evidenced by:

1. Rate of return associated with a property type, economic characteristics of tenants or users are not typical and tend to be very low. For example, capitalization rates may be very low and or indicate negative leverage, which is often a sign of speculation.
2. Buyers become emotionally involved and act irrationally, contrary to the market value definition.
3. Prices increase at a faster rate than rents.
4. Rates of return decrease below long-range trends.
5. Prices rise while rents and net incomes remain stable or are declining.
6. Traditional buyers are replaced by new ones. "Everyone" starts to invest in real estate.
7. The number of transactions increases.
8. Shorter marketing times.
9. Average days-on-market decreases.
10. Very few expired listings.
11. An increase in the number of properties remaining vacant after purchase.
12. Condominium conversions become more common.
13. The number of persons employed in the real estate sector (real estate sales, mortgage lending) significantly increases.
14. Rents increasing faster than the ability of tenants to pay.
15. Sales prices above affordability of users.

A bust market may be evidenced by:

1. Sellers are reluctant to sell and realize losses; therefore, there are few sales, at least initially.
2. An increase in the rate of foreclosures, to the point where foreclosures become the predominant sales.
3. An increase in seller concessions, both in terms of frequency and magnitude.
4. A tightening of credit markets. Traditional financing becomes more difficult to obtain.
5. An increase in the use of "creative" financing, generally involving seller financing. These arrangements serve to keep nominal prices from falling, at least in the initial stages of a bust.
6. Longer marketing times.
7. Average days-on-market increases.
8. The number of expired listings increases.
9. The number of persons employed in the real estate sector declines.
10. Job growth declining.
11. Rents not rising at the rate of the last few years.
12. Vacancy increasing.

# Reconciliation

There are two risks inherently associated with any appraisal that are of particular concern to the intended user. The first is the risk that the reliability of the value conclusion may be adversely impacted by a lack of quality data. The second is the risk that the value might not be sustainable over time.  A well thought-out and clearly presented reconciliation process can assist the intended user with these risks.

In the reconciliation process, the appraiser must consider the quality as well as the quantity of data, and how those factors might have impacted the quality of the value opinion. In a slower market with fewer transactions, there are fewer sales available for analysis in the sales comparison approach. Also, when there are fewer transactions, there is less market evidence available for selection of capitalization and discount rates.

The reconciliation process may indicate that more research is needed or that new analyses must be performed. It may reveal conflicts or unresolved questions that need to be answered.

When necessary, the appraisal report should include a discussion of evidence that the value conclusion may not be sustainable into the foreseeable future. This is potentially a controversial and challenging conversation to have with one's client, but it may be a critical issue to highlight.

# Summary of Standard Practices

1. Make the appropriate scope of work determination for the assignment given the intended use.

2. Apply market analysis at the level appropriate for the assignment and consistent with the scope of work determination.

3. Understand the causes of a changing market

4. Recognize the signs of a changing market.

5. Communicate the market analysis clearly in the appraisal report.

6. Clearly present the reconciliation process in the appraisal report and discuss as appropriate the likelihood that the value might not be sustainable into the foreseeable future.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective May 7, 2012
Minor revisions 2018

# Guide Note 13

## Performing Evaluations of Real Property Collateral for Lenders








## Introduction

Federally insured lending institutions in the United States are subject to regulations regarding real estate appraisals. For lending transactions involving real estate, a lender must obtain an appraisal from a state licensed or certified appraiser. There are fourteen exemptions from this requirement. For three of these exemptions, in lieu of an appraisal by a licensed/certified appraiser, the lender may obtain an *evaluation*[1].

An *evaluation* provides a market value of the real estate collateral. The preparer must be appropriately qualified and sufficiently independent from the transaction, but need not be a state licensed or certified appraiser. Even so, appraisers are often called upon to provide them.

How can an appraiser prepare an evaluation for a lender and comply with the Standards of Valuation Practice (SVP) or Uniform Standards of Professional Appraisal Practice (USPAP)?

# GUIDE NOTE 13
## Basis for Proper Practice

The Interagency Appraisal and Evaluation Guidelines https://www.fdic.gov/news/news/financial/2010/fil10082a.pdf issued by the federal agencies[2] in December 2010 provide full details about when appraisals and evaluations are required, who can provide them, and how they must be performed. Section V (pp. 3-5) addresses the independence requirements for both appraisals and evaluations. Section VI (pp. 5-6) addresses the selection, evaluation and monitoring the performance of those providing these services. Section XI (pp. 11-12) addresses when evaluations are required. Section XII (pp. 12-13) addresses the development process for an evaluation, and Section XIII (pp. 13-14) addresses the required content of an evaluation report. Section XV (pp. 15-18) addresses the review of appraisal and evaluation reports.

Portions of SVP that are relevant to this topic include the Definitions section, and STANDARDS A and C; relevant portions of USPAP include the DEFINITIONS section, the SCOPE OF WORK RULE, and STANDARDS 1 and 2.

The definitions sections establish the application of certain terminology in SVP and USPAP. See especially the definitions of *appraisal* and *report*.

Standards Rules A-2 and A-3 in the SVP and the USPAP SCOPE OF WORK RULE presents obligations related to problem identification, research and analyses.

SVP STANDARDS A and C and USPAP STANDARDS 1 and 2 establish requirements for the development and communication of a real property appraisal.

## What is an Evaluation?

An *evaluation* is defined in the Guidelines as "A valuation permitted by the Agencies' appraisal regulations for transactions that qualify for the appraisal threshold exemption, business loan exemption, or subsequent transaction exemption."[3]

## When are Evaluations Used?

A lender may obtain an evaluation in lieu of an appraisal when the loan transaction:
- Has a transaction value equal to or less than $500,000 ($250,000 prior to April 9, 2018);
- Is a business loan with a transaction value equal to or less than the business loan threshold of $1 million, and is not dependent on the sale of, or rental income derived from, real estate as the primary source of repayment, or
- Involves an existing extension of credit at the lending institution, provided that:
  - There has been no obvious and material change in market conditions or physical aspects of the property that threaten the adequacy of the institution's real estate collateral protection after the transaction, even with the advancement of new monies; or
  - There is no advancement of new monies other than funds necessary to cover reasonable closing costs.[4]

## Who Can Prepare Evaluations?

According to the Guidelines, persons performing evaluations should be independent of the loan production and collection processes and have no direct, indirect or prospective interest, financial or otherwise, in the property or transaction. In addition, the Guidelines stipulate that an institution should have criteria for selecting, evaluating, and monitoring the performance of persons who perform evaluations. The criteria should ensure that:
- The person selected possesses the requisite education, expertise, and experience to competently complete the assignment.
- The work performed by persons providing evaluation services is periodically reviewed by the institution.

---

[1] For the remaining 11 exemptions, the lender is not required to document the collateral value with either an evaluation or an appraisal from a state licensed or certified appraiser.

[2] These agencies include the Office of the Comptroller of the Currency, Treasury (OCC); the Office of Thrift Supervision (OTS); Board of Governors of the Federal Reserve System (FRB); Federal Deposit Insurance Corporation (FDIC); and the National Credit Union Administration (NCUA).

[3] Interagency Appraisal and Evaluation Guidelines, December 2010, p.41.

[4] Interagency Appraisal and Evaluation Guidelines, December 2010, p.11.

- The person selected is capable of rendering an unbiased opinion.
- The person selected is independent and has no direct, indirect, or prospective interest, financial or otherwise, in the property or the transaction.
- Persons who perform evaluations should possess the appropriate appraisal or collateral valuation education, expertise, and experience relevant to the type of property being valued. Such persons may include appraisers, real estate lending professionals, agricultural extension agents, or foresters.[5]

Individuals who perform evaluations need not be state licensed or certified appraisers. However, state licensed and certified appraisers are not precluded from providing them. Because appraisers are independent and qualified to provide valuations of real property, they are often called upon to provide evaluations. Appraisers are advised to check with the appraiser licensing agency in the state where the real property is located about state requirements concerning the performance of evaluations.

The Guidelines state that an institution should review evaluations (and appraisals) to ensure they comply with the Agencies' appraisal regulations and are consistent with supervisory policies and the institution's own internal policies. The review should ensure the evaluation contains sufficient information and analysis to support the decision to engage in the transaction.[6]

# What are the Development Requirements for Evaluations?

The Interagency Appraisal and Evaluation Guidelines establish parameters for the development of an evaluation. An evaluation must:

- Be consistent with safe and sound banking practices;
- Support the institution's decision to engage in the transaction;[7]
- Provide a reliable estimate of the collateral's market value as of a stated effective date prior to the decision to enter into the transaction;
- Be based on a valuation method that is appropriate for a transaction rather than the method that renders the highest value, lowest cost, or fastest turnaround time;
- Address the property's actual physical condition and characteristics;
- Address the economic and market conditions that effect the estimate of the collateral's market value, and
- Not be based on unsupported assumptions, such as an assumption that the property is in average condition, the zoning will change, or the property is not affected by adverse market conditions.[8]

While the Guidelines do not state that a property inspection is necessary in all cases, they do say the institution should "establish criteria for determining the level and extent of research or inspection necessary to ascertain the property's actual physical condition, and the economic and market factors that should be considered in developing an evaluation." If a property inspection is not performed, "the institution should be able to demonstrate how these property and market factors were determined."[9]

The Guidelines further clarify that broker price opinions (BPOs), automated valuation models (AVMs), and tax assessment values (TAVs) do not suffice in themselves as evaluations. However, they can be used to assist in the development of an evaluation.[10]

# What are the Reporting Requirements for Evaluations?

According to the Guidelines:

An evaluation should contain sufficient information detailing the analysis, assumptions, and conclusions to support the credit decision. An evaluation's content should be documented in the credit file or reproducible. The evaluation should, at a minimum:

1. Identify the location of the property.
2. Provide a description of the property and its current and projected use.

---

[5] Interagency Appraisal and Evaluation Guidelines, December 2010, p.5.
[6] Interagency Appraisal and Evaluation Guidelines, December 2010, p.16.
[7] This phrase has been erroneously interpreted to mean the evaluation must provide a predetermined conclusion. To the contrary, this statement means that if the evaluation does not support the decision to engage in the transaction, the lender should not pursue the transaction.
[8] Interagency Appraisal and Evaluation Guidelines, December 2010, pp. 12-13.
[9] Interagency Appraisal and Evaluation Guidelines, December 2010, p.13.
[10] Interagency Appraisal and Evaluation Guidelines, December 2010, pp. 32-35, 40.

3. Provide an estimate of the property's market value in its actual physical condition, use and zoning designation as of the effective date of the evaluation (that is, the date that the analysis was completed), with any limiting conditions.

4. Describe the method(s) the institution used to confirm the property's actual physical condition and the extent to which an inspection was performed.

5. Describe the analysis that was performed and the supporting information that was used in valuing the property.

6. Describe the supplemental information that was considered when using an analytical method or technological tool.

7. Indicate all source(s) of information used in the analysis, as applicable, to value the property, including:

    a. External data sources (such as market sales databases and public tax and land records);

    b. Property-specific data (such as previous sales data for the subject property, tax assessment data, and comparable sales information);

    c. Evidence of a property inspection;

    d. Photos of the property;

    e. Description of the neighborhood; or

    f. Local market conditions.

8. Include information on the preparer when an evaluation is performed by a person, such as the name and contact information, and signature (electronic or other legally permissible signature) of the preparer.[11]

# How Can an Appraiser Provide an Evaluation and Comply with Professional Valuation Standards?

SVP addresses the development of a real property appraisal in STANDARD A and the reporting of a real property appraisal in STANDARD C. USPAP addresses this development process in STANDARD 1 and the related reporting requirements in STANDARD 2. The problem identification and scope of work requirements in SVP and USPAP allows considerable flexibility in the development process. The scope of work for an assignment may be adjusted as appropriate for the intended use. The degree of property inspection, the extent of the data collection process, and the type and level of analysis can vary as needed, as long as the resulting opinions and conclusions are credible in light of the intended use. For purposes of preparing an evaluation pursuant to the Guidelines, consideration may be given to these factors.

For example, in some cases it may be possible to rely on a prior appraisal report for information about the property, such as its size and physical attributes. When this is done, the report must clearly state the source of the information, that it was assumed to be accurate, and that the value conclusion might be different otherwise.

In other cases, an "at least" conclusion might be all that is required. SVP and USPAP both permit a value conclusion to be stated as a single number, a range, or a relationship to some amount[12] – for example, "not more than," "not less than," or "at least" some benchmark amount. The benchmark amount could be a prior appraised value, sale price, or other amount that is relevant to the intended use.

Narrowing the scope of work could also mean omitting one or more of the three approaches to value. For example, if the sales comparison approach is the primary approach (as is often the case for single family residences and owner occupied commercial properties), it may be appropriate to omit the cost and income approaches. If the income approach is the primary approach (as is often the case for income-producing properties), it may be appropriate to omit the sales comparison and cost approaches. While all three approaches are generally helpful, not all three are critical to every valuation problem, given the intended use.

SVP presents the minimum requirements for reporting an appraiser's opinions and conclusions in appraisal and review assignments. Under USPAP, STANDARD 2, two reporting options are available for written appraisal reports. The minimal report option is the Restricted Appraisal Report. This option is permitted only when the client is the sole intended user of the report. A Restricted Appraisal Report is not required by USPAP to include the data and analyses used to arrive at the value opinion, or a detailed property description, though it can be supplemented to include that information. Because the Guidelines require this detail, a Restricted Appraisal Report that meets the *minimum* requirements of USPAP would not be sufficient to serve as an evaluation. A USPAP-compliant Restricted Appraisal Report that is supplemented to include all of the information required by the Guidelines should be sufficient.

---

[11] Interagency Appraisal and Evaluation Guidelines, December 2010, pp. 13-14.

[12] SVP, definition of appraisal (lines 3-6), USPAP, DEFINITIONS. See Comment to the entry for *appraisal*.

The following are two outlines intended to assist in creating a report format to meet the minimum requirements of professional valuation standards as well as the Guidelines for an evaluation. Outline #1 is for use when the applicable valuations standards are the SVP, while Outline #2 is for use when the applicable valuation standards are USPAP. In each case, while additional elements may be added, none should be deleted, as deleting elements might cause the report to fail to meet the SVP or USPAP reporting requirements and/or the requirements of the Guidelines for an evaluation. Note that editing is required for the italicized items.

# OUTLINE #1 FOR AN EVALUATION

(SVP and Interagency Appraisal and Evaluation Guidelines)

DATE OF REPORT: DD/MM/YYYY

CLIENT: *Lender ABC.*

INTENDED USER(s): For the sole use of *Lender ABC.* This report is not intended for use by other parties.

INTENDED USE: To assist the client in establishing collateral value in a lending transaction that requires an "evaluation" as set forth in the Interagency Appraisal and Evaluation Guidelines. This report is not intended for any other use.

TYPE OF VALUE AND SOURCE: *State the type of value and cite the source of its definition.*

EFFECTIVE DATE OF VALUE OPINION: DD/MM/YYYY

REAL PROPERTY INTEREST VALUED: *FEE SIMPLE/LEASED FEE/LEASEHOLD/OTHER*

IDENTIFICATION OF REAL ESTATE: 100 MAIN ST., CITY, STATE

SPECIAL ASSUMPTIONS: Clearly state any special assumption(s) on which the analysis is premised and state that the use of the special assumption might have affected the value conclusion.

SCOPE OF WORK: In preparing this analysis, I:
- *Describe level of inspection. Include the date of property inspection, if applicable.*
- *Describe process of gathering information on comparable land and improved sales, rents, operating expenses, construction costs, accrued depreciation, capitalization and/or yield rates.*
- *Describe how comparable sales and/or rental information was confirmed.*
- *Describe valuation approaches used and address the exclusion of any of the typical approaches (sales comparison, cost, income).*

LOCATION DESCRIPTION: *Describe the property's location and discuss local market conditions.*

PROPERTY DESCRIPTION: *Provide a description of the property and its current and projected use. Discuss the property's physical condition. Attach photographs.*

VALUATION ANALYSIS: *Describe the analysis that was performed (approaches) and the supporting information that was used in valuing the property. For example, if a sales comparison approach was performed, include an adjustment grid showing comparable analysis. If an income approach was performed, show development of income and expense estimates, capitalization rate and/or discount rate. Include sources of comparable sales information. Include external data sources (such as market sales databases and public tax and land records).*

VALUE CONCLUSION: *$XXX,XXX*

CERTIFICATION: I certify that, to the best of my knowledge and belief:
- The reported analyses, opinions and conclusions were developed, and this report complies with the requirements of the Code of Professional Ethics, Standards of Professional Practice, and the Standards of Valuation Practice of the Appraisal Institute.
- I have no (or the specified) present or prospective interest in the property that is a subject of this engagement and no (or the specified) personal interest with respect to the parties involved.
- No one provided significant real property appraisal assistance to the person signing this certification. *(If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)*
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- (Designated Members only) As of the date of this report, I have/have not completed the continuing education program for Designated Members of the Appraisal Institute.
- (Candidates only) As of the date of this report, I have/have not completed the Standards and Ethics Education Requirements for Candidates of the Appraisal Institute.
- (Practicing Affiliates only) As of the date of this report, I have/have not completed the continuing education program of the Appraisal Institute for Candidates of the Appraisal Institute.

_____

Signature

# OUTLINE #2 FOR AN EVALUATION

(USPAP and Interagency Appraisal and Evaluation Guidelines)

DATE OF REPORT: DD/MM/YYYY

CLIENT/INTENDED USER: Use of this report is limited to the client, *Lender ABC.* This report is not intended for use by other parties.

INTENDED USE: To assist the client in establishing collateral value in a lending transaction that requires an "evaluation" as set forth in the Interagency Appraisal and Evaluation Guidelines. This report is not intended for any other use.

ASSIGNMENT OBJECTIVE: To develop an opinion of the Market Value, as defined by the federal financial institution regulatory agencies, of the stated interest in the subject property.

TYPE OF VALUE AND SOURCE: *State the type of value and cite the source of its definition.*

EFFECTIVE DATE OF VALUE OPINION: DD/MM/YYYY

REAL PROPERTY INTEREST VALUED: *FEE SIMPLE/LEASED FEE/LEASEHOLD/OTHER*

IDENTIFICATION OF REAL ESTATE: 100 MAIN ST., CITY, STATE

CURRENT LISTING/CONTRACT INFORMATION: The subject property is/is not currently listed/under contract for $XXX,XXX. This asking/contract price is/is not consistent with the appraiser's opinion of market value. (If not consistent, explain discrepancy.)

PREVIOUS SALE DATA: Include data and analysis of any transaction within the last 3 years involving the subject property.

ASSIGNMENT CONDITIONS: Clearly state any extraordinary assumption(s) on which the analysis is premised and state that the use of the extraordinary assumption might have affected the assignment results.

SCOPE OF WORK: In preparing this analysis, I:
- *Describe level of inspection. Include the date of property inspection, if applicable.*
- *Describe process of gathering information on comparable land and improved sales, rents, operating expenses, construction costs, accrued depreciation, capitalization and/or yield rates.*
- *Describe how comparable sales and/or rental information was confirmed.*
- *Describe valuation approaches used and address the exclusion of any of the typical approaches (sales comparison, cost, income).*

REPORT OPTION: This report is a Restricted Appraisal Report in accordance with Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice and is intended to meet the requirements for an "evaluation" according to the Interagency Appraisal and Evaluation Guidelines. As such, it may not contain supporting rationale for all opinions and conclusions contained within it. However, in order to meet the requirements for an "evaluation" according to the Interagency Appraisal and Evaluation Guidelines, additional information about the subject property and its market, as well as the data, reasoning, and analyses that were used in the valuation process, have been included.

LOCATION DESCRIPTION: *Describe the property's location and discuss local market conditions.*

PROPERTY DESCRIPTION: *Provide a description of the property and its current and projected use. Discuss the property's physical condition. Attach photographs.*

HIGHEST AND BEST USE CONCLUSION: Current use/other (if other, describe).

VALUATION ANALYSIS: *Describe the analysis that was performed (approaches) and the supporting information that was used in valuing the property. For example, if a sales comparison approach was performed, include an adjustment grid showing comparable analysis. If an income approach was performed, show development of income and expense estimates, capitalization rate and/or discount rate. Include sources of comparable sales information. Include external data sources (such as market sales databases and public tax and land records).*

VALUE CONCLUSION: *$XXX,XXX*

ESTIMATED EXPOSURE TIME: (amount of time the subject property would have been on the market to bring a sale as of the effective date of the value opinion): *XXXX*

CERTIFICATION:
I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have *no (or the specified)* present or prospective interest in the property that is the subject of this report and *no (or the specified)* personal interest with respect to the parties involved.
- I have performed *no (or the specified)* services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- I *have (or have not)* made a personal inspection of the property that is the subject of this report. *(If more than one person signs this certification, the certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraised property.)*
- No one provided significant real property appraisal assistance to the person signing this certification. *(If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)*
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- *(Designated Members Only)* As of the date of this report, I *have/have not* completed the continuing education program for Designated Members of the Appraisal Institute.
- *(Candidates Only)* As of the date of this report, I *have/have not* completed the Standards and Ethics Education Requirement of the Appraisal Institute for Candidates.
- *(Practicing Affiliates Only)* As of the date of this report, I *have/have not* completed the continuing education program of the Appraisal Institute for Practicing Affiliates.

_____

Signature

# Summary of Standard Practices

**1.** "Evaluations" per the Interagency Appraisal and Evaluation Guidelines are market value opinions that may be provided by individuals who are not state licensed or certified appraisers. However, state licensed and certified appraisers may provide them.

**2.** The Interagency Appraisal and Evaluation Guidelines set forth development and reporting requirements for "evaluations." The reporting requirements do not exactly align with the reporting requirements for an appraisal under SVP or USPAP. However, an appraiser subject to SVP or USPAP can prepare an "evaluation" that meets both the Guidelines and SVP or USPAP.

**3.** SVP and USPAP allow an appraiser to adjust the scope of work for a valuation assignment as long as the resultant value opinion is credible, given the intended use. When preparing an "evaluation" the appraiser may consider narrowing the scope of work as appropriate.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Practice is to provide Appraisal Institute Designated Members, Candidates, and Practicing Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective October 31, 2012
Minor revisions 2017, 2018, 2020

# Guide Note 14
## Concept of Exposure Time








## Introduction

An analysis and opinion of Exposure Time is required for appraisals where the definition of value is tied to a reasonable or stipulated exposure time. A discussion of Exposure Time allows the intended user(s) to put the appraiser's value opinion into context. It also serves as the foundation on which appraisers describe market conditions, analyze comparable sales, and reconcile an opinion of value to the actual sale price.

Analyzing the Exposure Time linked to the value opinion has long been a requirement of professional appraisal practice. This Guide Note seeks to provide clarity on the concept of Exposure Time.

# GUIDE NOTE 14
## The Role of Exposure Time

The Appraisal Institute's *The Dictionary of Real Estate Appraisal*, 6th Edition, includes the following in its entry for "market value":

> The most widely accepted components of market value are incorporated in the following definition:

> The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after **reasonable exposure in a competitive market**, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress. *[Emphasis added]*

Because market value definitions typically include a condition that a reasonable time is allowed for exposure in the open market, the concept of Exposure Time has an important role in the appraisal process. Appraisers must develop an opinion of the Exposure Time linked to the value opinion because reasonable exposure in the market is a condition of the definition of market value.[1]

The Appraisal Institute's *The Dictionary of Real Estate Appraisal,* 6th Edition, defines "Exposure Time" as:

> The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; <u>Comment:</u> Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market.

A discussion of Exposure Time allows the intended user(s) of an appraisal to put the value opinion into context. It also serves as the foundation on which appraisers describe market conditions, analyze comparable sales, or reconcile an opinion of value to the actual sale price.

# USPAP Requirements

*Uniform Standards of Professional Appraisal Practice* (USPAP) defines "exposure time" as the:

> estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

> <u>Comment</u>: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market.

> The <u>Comment</u> to USPAP Standards Rule 1-2(c) states:

> When reasonable exposure time is a component of the definition for the value opinion being developed, the appraiser must also develop an opinion of reasonable exposure time linked to that value opinion.

> The <u>Comment</u> to the reporting requirements of USPAP Standards Rules 2-2(a)(v) and 2-2(b)(v) states in part:

> When an opinion of reasonable exposure time has been developed in compliance with Standards Rule 1-2(c), the opinion must be stated in the report.

---

[1] Appraisers must be aware of assignment conditions that apply to the appraiser of the assignment.  For example, the Uniform Appraisal Standards for Federal Land Acquisition (Yellow Book Section 1.2.4) direct appraisers not to link their estimates of market value made for federal acquisition purposes to a specific exposure time.

# The Importance of Exposure Time

Exposure Time matters to the valuation process because:

1. Reasonable exposure in the market is a condition of the definition of market value.

2. Improper identification of the reasonable Exposure Time in a market value opinion can lead to a value conclusion that is not credible.

3. The study of market conditions and Exposure Time allows for proper analysis of market activity.

4. Recognition of reasonable Exposure Time is part of the process of evaluating the suitability of sales as comparables.

5. An understanding of reasonable market Exposure Time is needed to recognize and evaluate the impact of limited market exposure in liquidation transactions.

6. Analysis of a prior sale of the subject requires a comparison of the reasonable Exposure Time linked to the value opinion and the exposure period associated with the sale.

The Exposure Time associated with a market value opinion can affect the value opinion. The length of time that a property is exposed in the market impacts the number of potential buyers for the property. Longer exposure to the market typically results in more potential buyers, and shorter exposure to the market typically results in fewer potential buyers. The number of potential buyers who are aware of a property's availability can influence the sale price. It follows then that when value opinions are based on market exposure that is inadequate or excessive, the value opinion is not market oriented. Improper identification of the reasonable Exposure Time in a market value opinion can lead to a value conclusion that is not credible.

The proper analysis of a sale transaction requires an understanding of the reasonable Exposure Time associated with a market value opinion. When the objective of the assignment is market value, ideally each comparable selected for use in the Sales Comparison Approach should have sold under the conditions specified in the definition of market value being used. One condition is that the marketing effort and exposure to the market should have been typical for that property type in that market.

Analyzing and understanding market activity requires knowledge of reasonable exposure times for the subject property type in that market. An unusually fast sale may suggest that a property was underpriced or that the seller was under duress. Increasing exposure times can become the basis to expect that the market is softening. When the conditions of a sale do not reflect the conditions outlined in the value definition, then the appraiser must consider making adjustments for such differences or the sale must not be used as a comparable.

The analysis of prior sales of the property being appraised is a fundamental component in market value appraisals and a requirement of USPAP. In order to reconcile a prior sale price with the appraiser's opinion of value, the appraiser must analyze the marketing history and evaluate the reasonableness of the exposure period associated with the sale. Inadequate or excessive exposure to the market is a factor that should be considered in analyzing the prior sale. Limited market exposure is a factor in the lower sale prices that often result from liquidation transactions. A second factor in a liquidation transaction is that the seller is under extreme compulsion to sell. An appraiser must have an understanding of a reasonable Exposure Time in order to recognize and evaluate the impact of limited market exposure. Analysis of a prior sale of the subject requires a comparison of the reasonable Exposure Time linked to the value opinion and the exposure period associated with the sale.

# Developing an Opinion of Reasonable Exposure Time

Exposure Time is different for various types of property and under various market conditions. It is not a fixed period and should not be a boilerplate statement. The reasonable exposure period is a function of the price, market conditions, and property characteristics.

The basis for an opinion of Exposure Time can include consideration of one or more of the following:

• Statistical information about days on market for similar types of property
• Information gathered through sales verification
• Interviews of market participants
• Market information from data collection services

Gathering and analyzing information for days on the market from these sources is required for proper development of an opinion of Exposure Time.

When evaluating market data, appraisers must focus on the period of exposure needed to sell a property priced within a reasonable range of market value. Meaningful analysis of days on market requires consideration of the number of days at a price proximate to the market value, excluding exposure time at a price not considered reasonable by market participants. USPAP Advisory Opinion 35 provides an example of proper analysis:

> ...an office building... could have been on the market for two years at a price of $2,000,000, which informed market participants considered unreasonable. Then the owner lowered the price to $1,600,000 and started to receive offers, culminating in a transaction at $1,400,000 six months later. Although the actual exposure time was 2.5 years, the reasonable exposure time at a value range of $1,400,000 to $1,600,000 would be six months.

The data used in the development of an Exposure Time opinion must be drawn from the subject market, including consideration of property type, location, property characteristics, typical buyer, and price segment. USPAP Advisory Opinion (35) states that:

> The answer to the question "what is the reasonable exposure time" should always incorporate the answers to the question "for what kind of property at what value range..."

For example, consider an appraisal of a highly desirable waterfront home in a community that includes a wide range of property values. Market research shows that the Exposure Time for the entire community averages approximately 60 to 90 days. Closer examination of the market for waterfront homes in the subject price range and in the subject neighborhood indicates that a more appropriate estimate of the subject Exposure Time is 120 to 180 days. An appraiser must focus on data that is similar in location, market appeal and price range to properly support an opinion of Exposure Time.

In a second example, the subject of the appraisal assignment is an industrial building with warehouse ceiling height of 16 feet. The market demands and most competing properties have 24 feet of clear height. In addition to considering the effect of this functional deficiency on value and rental revenue, the appraiser would need to evaluate the effect on marketability and Exposure Time. Commonly, the time required to obtain a buyer will be extended for a property with functional obsolescence. The appraiser could consider market time data for properties that have sold with similar obsolescence issues or interview market participants to support an opinion of Exposure Time.

The use of generic or overly broad market data to support an Exposure Time opinion is inappropriate. Opinions of Exposure Time can be presented as a single time period (e.g. six months) or as a range of time (e.g. six to twelve months). Both are acceptable, but must be supported and linked to the value opinion.

# Misconceptions

The term Exposure Time is often confused with the term "marketing time," but they are not the same. Market value is the most probable price that a property interest should sell for in a competitive market after it has been exposed to the market for a reasonable period. Exposure Time is the period of time preceding the effective date the appraisal. Exposure Time is an opinion of the length of time a property would have been exposed to the market in order to sell at the appraiser's opinion of market value. An opinion of Exposure Time is not intended to be a forecast. Consider the following illustration:



**Past**    **Exposure Time**    **Present**

**Hypothetical List Date**    **Hypothetical Date of Sale (Effective Date of Appraisal)**

Marketing time is deemed to start at the effective date of the appraisal, looking forward in time. It is a prediction of how long a property would require exposure to the market in order to find a buyer, under either typical or prescribed circumstances.

Confusion between Exposure Time and marketing time can arise because most sources of market information report historical information about days on market as "marketing time." In this context, the marketing time is a historical number that reflects the length of time a property was exposed to the market prior to sale. This, by definition, is Exposure Time.

The absorption period is a concept that is sometimes also confused with Exposure Time. The Appraisal Institute's *The Dictionary of Real Estate Appraisal,* 6th Edition, defines "absorption period" as:

> The actual or expected period required from the time a property, group of properties, or commodity is initially offered for lease, purchase, or use by its eventual users until all portions have been sold or stabilized occupancy has been achieved.

Forecasts of the absorption period are required to project lease-up for vacant properties or the sale of units/lots. In appraisals of these property types, the absorption period is a forward looking projection that concludes with stabilized occupancy or sellout of the inventory. It should not be confused with Exposure Time.

The confusion surrounding Exposure Time and marketing time sometimes leads to generalized statements of the Exposure Time for a market area or property type. Providing general Exposure Time opinions fails to recognize that Exposure Time opinions are property specific and are linked to a specific value opinion.

Because Exposure Time is a component of the definition of market value, it is sometimes referred to as an assumption of the assignment. This is a misconception because Exposure Time in a market value assignment is an opinion based on market analyses, not an assumption that is accepted as a condition of the assignment. Statements that "the value opinion assumes the property has been exposed to the market for a period of X months" are inappropriate.

Another misconception concerns the selection of comparable sales in an assignment. Is the Exposure Time opinion based on the comparable sales used in an analysis, or are the comparable sales selected based on the Exposure Time? The selection of comparable sales precedes forming an opinion of the reasonable Exposure Time. Comparable sales are selected based on the relevant elements of comparison for the property and market characteristics. The market data gathered in the investigation and analysis of comparable sales then informs and aids in the process of developing an opinion of the reasonable Exposure Time.

# Liquidation Value and Disposition Value

Understanding reasonable Exposure Time is a key element in providing opinions of disposition value and liquidation value where the Exposure Time is specified by the client or a stipulation of the assignment and not market oriented. These value opinions are based on limited or extremely limited exposure to the market. The objective of an appraisal assignment might be disposition value or liquidation value rather than market value. While market value addresses the question of what would the property likely sell for after a typical exposure period on the open market, disposition value and liquidation value are based on limited or severely limited Exposure Time on the market. Liquidation value, for example, stipulates that a *normal marketing effort is not possible due to the brief exposure time.* Disposition value on the other hand, also includes the requirement of *consummation of a sale within a specified time which is shorter than the typical exposure time for such a property in that market.*

When the Exposure Time is specified by the client or a stipulation of the assignment and not market oriented, the resulting value opinion is probably not consistent with market value. With both liquidation value and disposition value, the time allowed for completion of the sale (Exposure Time) is not necessarily typical for the market for that property type; rather, it is limited and it is specified by the client. Thus, in these assignments Exposure Time is not an opinion of the appraiser, but a condition of the assignment.

An understanding of Exposure Time concepts provides a foundation for the selection and adjustment of comparable sales in disposition value and liquidation value assignments.

# Summary of Standard Practices

1. Appraisers must develop an opinion of the Exposure Time linked to a value opinion because reasonable exposure in the market is a condition of the definition of market value.

2. A discussion of Exposure Time allows the intended user(s) to put the value opinion into context.

3. Exposure Time serves as the foundation on which appraisers describe market conditions, analyze comparable sales, or reconcile an opinion of value to a sale price.

4. Exposure Time is an opinion of the length of time a property would have been exposed to the market in order to sell at the estimated market value. An opinion of Exposure Time is not intended to be a forecast.

5. Exposure Time is not a fixed period or boilerplate statement. It is different for various types of property and under various market conditions. It is a function of the price, market conditions, and property characteristics.

6. Opinions of Exposure Time can be presented as a single time period or as a range of time.

7. Gathering and analyzing information for days on market from data services, comparable sales, and market participants is required for proper development of an opinion of Exposure Time. The use of generic or overly broad market data to support an Exposure Time opinion is inappropriate.  The data used in the development of an Exposure Time opinion must be drawn from the subject market, including consideration of property type, location, property characteristics, typical buyer, and price segment.

8. The proper analysis of a sale transaction requires an understanding of the reasonable Exposure Time associated with a market value opinion. When the conditions of the sale do not reflect the conditions outlined in the market value definition, then the appraiser must consider making adjustments for such differences or the sale must not be used as a comparable.

# Summary of Standard Practices *continued*

**9.** Improper identification of the reasonable Exposure Time in a market value opinion can lead to a value conclusion that is not credible.

**10.** Understanding the reasonable Exposure Time associated with a market value opinion is a key element in providing opinions of disposition value and liquidation value. An appraiser must have an understanding of a reasonable market exposure in order to recognize and evaluate the impact of limited market exposure.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Effective February 7, 2013
Minor revisions 2018

# Guide Note 15

## Assumptions and Hypothetical Conditions








# Introduction

Appraisal and review opinions are often premised on certain stated conditions. These include assumptions (general, and special or extraordinary) and hypothetical conditions. In the case of an assumption, there is uncertainty as to whether or not the condition is true. In the case of a hypothetical condition, there is no uncertainty; the condition presumed true is known to be false. Most often such conditions relate to physical or legal property characteristics, but they may also relate to market characteristics or economic characteristics.

Assumptions and hypothetical conditions are critically important to the appraisal and review processes. For the intended user(s) of the report, they frame the appraisal or review opinion in a specific context. They alert the intended user to outstanding concerns, thereby allowing for informed decision-making. In some cases,

when information is lacking or unavailable, their use provides a means by which the assignment can be completed when otherwise it could not.

Valuers and reviewers must understand the nature of assumptions and hypothetical conditions—what they are, how and when they may be used, and how to properly disclose them in appraisal and review reports. Failure to understand the proper use of assumptions and hypothetical conditions—and the implications of their use—puts the valuer or reviewer at risk. Without clear disclosure of them in the appraisal or review report, the intended user(s) of the report could be misled.

What are special/extraordinary assumptions and hypothetical conditions, and how are they properly used in appraisals and reviews?

# GUIDE NOTE 5

## Applicable Valuation Standards

The *Standards of Valuation Practice* (SVP) address assumptions and hypothetical conditions in the Definitions section (definitions of hypothetical condition and special assumption), SR A-2(g), SR B-2(e), SR C-2(a)(xvi) and SR C-2(b)(xiii).

Portions of the Appraisal Institute *Code of Professional Ethics* (CPE) that relate to this topic include ER 3-4 and ER 3-5.

Applicable sections of the *Uniform Standards of Professional Appraisal Practice* (USPAP) include the Definitions section (definitions of hypothetical condition, and extraordinary assumption); SR 1-2(f) and (g), SR 2-1(c), SR 2-2(a) and (b)(xi); and SR 3-2(f) and 2(f).

Applicable sections of the *International Valuation Standards* (IVS) include the Definitions section (definition of special assumption); IVS 101 Scope of Work, 20.3(k); and IVS 103 Reporting, 10.2, and IVS Bases of Value, 200.4 and 200.5.

## Problem Identification and Scope of Work Determination

Identification of assumptions and hypothetical conditions is part of problem identification, which precedes scope of work determination[1]. If possible, they are identified prior to acceptance of the assignment. However, sometimes it is not possible to identify them until the valuation or review is underway.

Some clients prefer to be told of assumptions and hypothetical conditions as soon as the valuer or reviewer learns they will be involved. However, a client's prohibition against use of any special/extraordinary assumption or hypothetical condition might mean that an assignment cannot be completed in cases in which relevant issues are uncertain or the appraisal is to be made contrary to the facts.

The use of assumptions or hypothetical conditions may affect the Scope of Work for an appraisal or review assignment. Scope of Work in turn affects how the valuation or review process is carried out, and that in turn can affect the assignment results (e.g., the value opinion in an appraisal.)

In all cases, the use of an assumption or a hypothetical condition must result in a credible opinion or conclusion, given the intended use.

## Conditions Presumed True

Assumptions, special/extraordinary assumptions, and hypothetical conditions involve conditions that are established as true in the appraisal or review process. That is, the appraisal or review conclusion reflects an "as though true" circumstance. In the case of a hypothetical condition, the valuer knows the condition is not true. The condition presumed true is contrary to fact.

In the case of an assumption, the condition may or may not be true; there is uncertainty. In some cases the uncertainty is created because the truth simply is not knowable at the time the appraisal or review is prepared. In other cases, the scope of work—even though determined to be appropriate for the assignment—does not permit the truth about the condition to be known.

Making the distinction between a special/extraordinary assumption and a "general" assumption can be difficult. Both are conditions presumed true when in fact they might not be true. For both if the condition proves false the opinions and conclusions (e.g., a value conclusion) could be impacted. Both require disclosure in the report, but special/extraordinary assumptions require more conspicuous disclosure; they must be emphasized. However, in the case of a general assumption, while there is uncertainty as to whether or not the condition is true, there is no readily apparent reason why it would not be. In the case of a special/extraordinary assumption, the valuer spots a "red flag", something that alerts the valuer to the possibility that the condition might not be true.

The following examples show the distinction among general assumptions, special/extraordinary assumptions, and hypothetical conditions:

> Example 1: A valuer is asked to value an improved property that has a known construction defect, but because the appraisal is for purposes of settling a dispute, the client requests the property be valued as though there is no such defect. In this case, the value opinion reflects no defect and the appraisal is based on the hypothetical condition that there is no defect.

> Example 2: A valuer is asked to value an improved property that may have a construction defect. The valuer observes signs of settlement, or perhaps an individual familiar with the property indicates there may be a construction defect. The value opinion reflects no defect and the appraisal is based on the special/extraordinary assumption that there is no defect.

> Example 3: A valuer is asked to value an improved property. There is no reason to believe there are any construction defects; the valuer is not told of any and there are no readily apparent reasons to believe there are any. The appraisal report might include a general assumption that there are no construction defects.

In example 1, the intended use calls for the appraisal to be based on the hypothetical condition. While the use of the hypothetical condition is anticipated, its clear disclosure in the report frames the value opinion in the proper context so the intended user(s) are not misled.

---

[1] Problem identification for an appraisal is required in the SVP under SR A-2 and in USPAP under Standards Rule 1-2(a)-(g), and for a review in the SVP under SR B-2 and in USPAP under Standards Rule 3-2(a)-(g). Scope of Work determination is required in the SVP under SR A-3 and in USPAP under 1-2(h), and for a review in the SVP under SR B-3 and in USPAP under Standards Rule 3-2(h).

In example 2, clear disclosure of the special/extraordinary assumption in the report will alert the client to the uncertainty about a possible construction defect and the fact that the value opinion does not take into account the impact of any such defect, should there be one. The client can then make the decision to investigate the situation further, or to rely on the appraisal based on the special/extraordinary assumption.

In example 3, there is nothing alerting the valuer to a possible problem relating to construction defects. If there were, the assumption would rise to the level of an extraordinary or special assumption.

## Impact of Effective Date

In the case of both assumptions and hypothetical conditions, the condition presumed true is so presumed as of the effective date (or date of value, in an appraisal), not before or after.

For example, a property is zoned for residential use, but a zoning change to commercial use is likely in the future. If the property is valued as of a current effective date as though it is already re-zoned for commercial use, the value is premised on the hypothetical condition that the re-zoning has taken place as of the effective date, not on the special or extraordinary assumption that it will be re-zoned after the effective date. When market participants perceive that a property would likely be re-zoned in the near future, the current value of that property may reflect that perception; i.e., the value might be higher (or lower) because of the likelihood of the zoning change, though not as high (or low) as the value based on the hypothetical condition that the zoning change had already occurred on the date of value.

Similarly, consider the case in which the leased fee interest in a property is being valued but as of the current effective date the lease is not signed. If the valuer is asked to value the property as though the lease is signed, such value would either be a current value premised on the hypothetical condition that the lease is signed, or a prospective value premised on the special/extraordinary assumption that the lease will be signed as of the future date of value.

## Impact on the Valuation Process

Assumptions and hypothetical conditions are established at the beginning of the valuation process (or review process, in the case of a review) and the valuation proceeds from that basis. For example, a hypothetical condition is established at the beginning of an assignment that the improvements are constructed as of the effective date (when in fact the site is vacant.) The highest and best use of the property "as if improved" must then be considered. The approaches to value would provide indications of the value of the property "as if improved."

Or consider the case in which the hypothetical condition is established that the zoning has been changed to allow industrial use. In the highest and best use analysis, the consideration of legally permissible use would recognize industrial use as a legal use, and so the conclusion of highest and best use would be impacted by the hypothetical condition.

As another example, an appraisal is to be developed without benefit of an interior inspection of the building, so the special/extraordinary assumption is established at the beginning of the valuation process that the building consists of 5,000 square feet and is in good condition. From that point forward in the valuation process, the subject is a 5,000 square foot building in good condition. It would be improper, for example, when performing the sales comparison approach, to change the characterization of the building from what it was assumed to be.

## If the Condition is False or Proves to be False

An appraisal is not inherently flawed because it is premised on a hypothetical condition. An appraisal or review is not erroneous because it is premised on a special or extraordinary assumption and the condition presumed true subsequently proves to be false. Unless the valuer or reviewer has agreed with the client otherwise, the valuer or reviewer is not obligated to amend an appraisal or review if the condition presumed true subsequently proves to be false.

## Importance of Clear Disclosure

The use of an assumption or hypothetical condition has critical significance to both the development and reporting of an appraisal or review. From a development standpoint, their use impacts the entire valuation or review process, as well as the value or review opinion. But the appraisal or review report—whether written or oral—is the means by which the valuer conveys his or her findings to the client. From a reporting standpoint, their clear disclosure is necessary in order to not be misleading.

The SVP and USPAP require "clear and conspicuous" disclosure of special/extraordinary assumptions and hypothetical conditions, along with the statement that their use might have affected the opinions and conclusions. This statement must be phrased carefully so as to not inadvertently express another value opinion. For example, a statement that "the value would be higher" if it were not premised on a hypothetical condition is in itself an opinion of value (appraisal) that must be developed and reported according to the applicable standards.

There is no requirement in the SVP, USPAP or IVS to provide an appraisal or review opinion that is not based on the special/extraordinary assumption or hypothetical condition when one is used.

There is no requirement in the SVP, USPAP or IVS to use the labels "extraordinary assumption", "special assumption" or "hypothetical condition." If they are used, they must be used correctly. It is generally advisable to use the terms and note that they are defined in the applicable standards.

In reports with more than one value opinion (for example, a current value as well as a prospective value upon completion) it is important that the special/extraordinary assumption(s) and/or hypothetical condition(s) be linked to the value opinion or opinions to which they pertain. The report must be clear about which special/extraordinary assumption or hypothetical condition pertains to which value opinion(s).

The disclosure of a special/extraordinary assumption or hypothetical condition must be clear about what condition is being presumed to be true. For example, the statement "I did not inspect the interior of the building" is a statement about scope of work, not an assumption or hypothetical condition.

Often the use of a special/extraordinary assumption or hypothetical condition is intricately linked to the scope of work for an assignment, and so it is logical to place the discussion of them together in the report. For example, the scope of work for an appraisal might not include an inspection by the valuer of the interior of the subject improvements. Or the scope or work for a review might include the reviewer providing his or her own opinion of value, but not include an inspection of the property. These situations give rise to the valuer or reviewer making extraordinary or special assumptions about the nature of the subject's improvements (condition, etc.) In both cases the discussion of scope of work and the discussion of the special/extraordinary assumption should go hand in hand so that the intended user(s) of the report understand(s) the connection.

There is no standards or ethics requirement to include the discussion about assumptions and hypothetical conditions in any particular portion of an appraisal or review report. The requirement is simply to clearly and conspicuously disclose special/extraordinary assumptions and hypothetical conditions and state that their use might have affected the opinions and conclusions. While there is no requirement to state them in an appraisal report wherever the value opinion is stated, in lengthy reports it might be advisable to state them more than once. Another good practice may be to include a full discussion of them in one section of the report, and then refer to that discussion using an asterisk with a reference note wherever the value opinion is stated (such as in the letter of transmittal, executive summary, or reconciliation section.)

## "As Is" Values

Care must be taken when using the phrase "as is" to describe a value opinion. It is misleading to identify a value premised on a hypothetical condition as an "as is" value, because the use of a hypothetical condition makes the value "as if" and contrary to what exists. If a value is premised on a special or extraordinary assumption, it may or may not be an "as is" value. Unless and until the uncertainty that created the need for the special or extraordinary assumption is removed, the value should not be characterized as "as is."

If a valuer is asked to provide a value "as is" and cannot because such value would be premised on a hypothetical condition, or would be premised on a special/extraordinary assumption due to an uncertainty, the valuer should consult with the client about how the assignment should proceed. In some cases, the only way for the valuer to provide an "as is" value is to delay the appraisal until the condition that created the need for a hypothetical condition has been changed, or until more information is made available so that the uncertainty creating the need for the special/extraordinary assumption has been removed.

For example, a client requests an "as is" market value for a 1-acre lot that is not currently a legal lot, but will be upon subdivision of a larger 5-acre lot, which is anticipated when the sale closes in 30 days. A current value of the 1-acre lot would be premised on the hypothetical condition that the lot has already been subdivided, when in fact it has not been, and this would not be an "as is" value. The valuer and client should discuss the possibility of providing a prospective value as of 30 days from now premised on the special/extraordinary assumption that the lot will be legally subdivided on that date. The report would include the appropriate disclosure, which would serve to alert the client to consider taking certain actions regarding the subdivision—for example, ensuring the subdivision has been finalized before closing a loan.

Or, consider the case in which the valuer believes the subject site might be contaminated, but does not know that for certain. The appraisal may be completed on the basis of the special/extraordinary assumption that it is not contaminated. The value may or may not be "as is"; until the uncertainty is removed, it cannot be determined. Alternatively, the client could agree to place the appraisal "on hold" until the valuer is provided with information that ascertains whether the site is or is not contaminated; once that information is obtained, the appraisal can be completed without need for a special/extraordinary assumption because the uncertainty has been removed.

In some cases, it may be impossible to provide a value that is not premised on a special/extraordinary assumption. For example, the subject improvements are damaged, and the valuer is provided with an estimate from a construction expert of the cost to repair the damage. The appraisal relies on the construction cost expert's estimate to arrive at the current value. The appraisal would be premised on the special/extraordinary assumption that the construction cost expert's estimate is accurate. Proper disclosure of this special/extraordinary assumption in the report alerts the client to the fact that if the construction cost estimate is inaccurate, the value conclusion might not be credible. The client can then make the decision to rely on the appraisal or not, given the special/extraordinary assumption.

Note: Appraisals prepared for U.S. federally regulated lenders generally require an "as is" market value. This term is defined by the regulatory agencies' Interagency Appraisal and Evaluation Guidelines as "The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal's effective date." Valuers preparing appraisals for U.S. regulated lenders that include a value according to this definition should follow the guidance from the regulatory agencies regarding interpretation of it, especially with respect to the use of extraordinary assumptions, as interpretations may vary.

# Appraisal Examples

Special or extraordinary assumptions and hypothetical conditions occur in a variety of appraisal circumstances. The following examples are not all-inclusive.

**Proposed construction:**

Example A:

The subject property currently consists of a vacant site. The value opinion reflects the property as though the proposed improvements are complete as of the date of value, which is the current date. This value is premised on the hypothetical condition that the improvements as proposed are complete on the date of value. The appraisal report would need to discuss the nature of the proposed improvements, include a clear disclosure of the hypothetical condition, and state that its use might have affected the opinions and conclusions.

Example B:

The subject property currently consists of a vacant site. The value opinion reflects the property as though the proposed improvements are complete as of the date of value, which is a future (prospective) date. This value is premised on the special or extraordinary assumption that the improvements as proposed will be complete on the date of value. This value would also be premised on the general assumption that there will be no unforeseen circumstances that would cause market conditions to significantly differ from what is anticipated. The appraisal report would need to discuss the nature of the proposed improvements, include a clear disclosure of the special or extraordinary assumption, and state that its use might have affected the opinions and conclusions. Note that this example differs from Example A only in that the date of value is a future vs. a current date. The condition presumed true (that the improvements are complete on the date of value) is a special/extraordinary assumption rather than a hypothetical condition because the future is inherently uncertain.

**Occupancy level:**

Example C:

The subject property currently consists of the leased fee interest in a multi-tenant facility. The value opinion reflects the property as though at stabilized occupancy as of the date of value, which is the current date. This value is premised on the hypothetical condition that the property is at stabilized occupancy on the date of value. The appraisal report would need to discuss what is meant by "stabilized occupancy", include a clear disclosure of the hypothetical condition, and state that its use might have affected the opinions and conclusions.

Example D:

The subject property currently consists of the leased fee interest in a multi-tenant facility. The value opinion reflects the property as though at stabilized occupancy as of the date of value, which is a future (prospective) date. This value is premised on the special or extraordinary assumption that the property is at stabilized occupancy on the date of value. This value would also be premised on the general assumption that there will be no unforeseen circumstances that would cause market conditions to significantly differ from what is anticipated. The appraisal report would need to discuss what is meant by "stabilized occupancy", include a clear disclosure of the special or extraordinary assumption, and state that its use might have affected the opinions and conclusions. Again, note that this example differs from Example C only in that the date of value is a future vs. a current date. The condition presumed true (that the property is at stabilized occupancy) is a special/extraordinary assumption rather than a hypothetical condition because the future is inherently uncertain.

**Miscellaneous property condition issues**

A variety of other possible or actual property condition issues give rise the need for assumptions or hypothetical conditions:

Example E:

The subject property is not connected to the municipal sewer system but the intended use of the appraisal calls for it to be valued as though it is. The value opinion reflects the property as though it is connected to the sewer system as of the date of value, which is the current date. This value is premised on the hypothetical condition that the property is connected to the sewer system on the date of value. The appraisal report would need to include a clear disclosure of the hypothetical condition and state that its use might have affected the opinions and conclusions. (If the date of value were a future date, the condition would be a special/ extraordinary assumption rather than a hypothetical condition.)

Example F:

It is uncertain on the date of value whether a particular use is permitted on the subject property. The value opinion reflects the property as though the use is permitted as of the date of value, which is the current date. This value is premised on the special/ extraordinary assumption that the use is permitted on the date of value. The appraisal report would need to include a clear disclosure of this special/extraordinary assumption and state that its use might have affected the opinions and conclusions.

Example G:

The subject property is located in an area that is known to have unstable soils. However, it is uncertain whether the subject property's soils are stable or unstable. The value opinion reflects the property as though soils are stable on the date of value, which is the current date. This value is premised on the special/extraordinary assumption that the soils are stable. The appraisal report would need to include a clear disclosure of this special/extraordinary assumption and state that its use might have affected the opinions and conclusions.

Example H:

The subject property is the former site of a heavy industrial use and the valuer is aware that the site might be contaminated, but this is not known for certain. The value opinion reflects the property as though the subject site is not contaminated on the date of value, which is the current date. This value is premised on the special/extraordinary assumption that the site is not contaminated. The appraisal report would need to include a clear disclosure of this special/extraordinary assumption and state that its use might have affected the opinions and conclusions.

Example I:

The subject property is a large, irregularly shaped parcel located in a rural area. Neither a physical inspection nor the legal description provided to the valuer can clarify whether the parcel has legal access. It appears the only access is across the adjacent site. The valuer is told the adjacent property owner granted an easement for access but is unable to confirm this. The value opinion reflects the property as though the subject site has legal access on the date of value, which is the current date. This value is premised on the special/extraordinary assumption that the site has legal access. The appraisal report would need to discuss the nature of the presumed access, include a clear disclosure of the special/extraordinary assumption, and state that its use might have affected the opinions and conclusions.

Example J:

The subject property is the fee simple interest in a 5-acre portion of a 20-acre parcel. The 5 acres is not a legal parcel. The market value opinion reflects the property as though it is a legal parcel on the date of value, which is the current date. This value is premised on the hypothetical condition that the parcel is a legal parcel. The appraisal report would need to include a clear disclosure of the hypothetical condition and state that its use might have affected the opinions and conclusions.

Example K:

The subject property is the fee simple interest 123 Main St., which is a 2 acre parcel improved with a single family residence and a 5,000 square foot commercial building. The client requests the property be appraised as though the commercial building does not exist. The value opinion reflects the property as though the commercial building does not exist on the date of value, which is the current date. This value is premised on the hypothetical condition that the commercial building does not exist. The appraisal report would need to include a clear disclosure of the hypothetical condition and state that its use might have affected the opinions and conclusions.

Example L:

An appraisal is prepared for eminent domain purposes, so the "before" value must not take into account project influence and the "after" value must reflect the property as though the proposed project has been completed. The "before" value is premised on the hypothetical condition that the project is not proposed. If the "after" value is a prospective value, it is premised on the special/extraordinary assumption that the project will be completed as proposed, and the general assumption that there will be no unforeseen circumstances that would cause market conditions to significantly differ from what is anticipated. If the "after" value is a current value, it is premised on the hypothetical condition that the project is completed as proposed. The appraisal report would need to include a clear disclosure of the special/extraordinary assumption(s) and/or hypothetical condition and state that their use might have affected the opinions and conclusions.

**Reliance on the work of another:**

Example M:

An appraisal involving proposed improvements relies on the construction cost estimate provided by an engineer. The "red flag" goes up by virtue of the fact that the valuer does not possess the expertise to evaluate the accuracy of the cost estimate. The value opinion is premised on the special/extraordinary assumption that the cost estimate is accurate. The appraisal report would need to include a clear disclosure of the special/extraordinary assumption, and state that its use might have affected the opinions and conclusions.

Example N:

Valuer 1 has expertise in valuing partial interests, but lacks market area competency to appraise the 100% interest in a property. Valuer 2 has the expertise, including market area competency, to appraise the 100% interest in the same property. Valuer 1's appraisal of the partial interest relies on Valuer 2's appraisal of the 100% interest. (Valuer 2 does not sign Valuer 1's appraisal report.) Valuer 1's value opinion (of the partial interest) is premised on the special/extraordinary assumption that Valuer 2's value opinion is credible. Valuer 1's appraisal report would need to include a clear disclosure of the special/extraordinary assumption, and state that its use might have affected the opinions and conclusions.

# Review Examples

A review results in an opinion of the quality of the work under review. Depending on the needs of the client and the scope of work for the assignment, a review assignment might also include the reviewer's own opinion of value.

If the reviewer provides his or her own opinion of value in the review assignment, the reviewer's opinion of value may be premised on assumptions or hypothetical conditions. Consider the following examples (they are not all-inclusive).

Example O:

The reviewer has determined that the scope of work need not include inspecting the subject of the appraisal. The reviewer agrees with the value in the appraisal report under review. The reviewer's opinion of value is premised on the special/extraordinary assumption that the description of the property in the appraisal report is accurate.

Example P:

The reviewer has determined that the scope of work need not include researching the market data relied upon in the appraisal under review. The reviewer agrees with the value in the appraisal report under review. The reviewer's opinion of value is premised on the special/extraordinary assumption that the market data presented in the appraisal report is accurate and represents the best available data.

Example Q:

The reviewer agrees with the value in the appraisal report under review. That value is premised on the hypothetical condition that the improvements are complete as proposed on the effective date, which is the current date. The reviewer's opinion of value is likewise premised on the same hypothetical condition.

# Summary of Standard Practices

**1.** When assignment conditions such as special/extraordinary assumptions or hypothetical conditions are labeled in a report, they must be labeled correctly.

**2.** Special/extraordinary assumptions or hypothetical conditions are conditions presumed true on the effective date, e.g., date of value for an appraisal, not before or after.

**3.** Special/extraordinary assumptions or hypothetical conditions must be clearly and conspicuously disclosed in a written or oral appraisal or review report so that the intended user(s) of the report clearly understand the context of the appraisal or review conclusions. In addition, the report must include the statement that the use of the special/extraordinary assumption or hypothetical condition might have affected the opinions and conclusions.

**4.** It is misleading to characterize a value opinion based on a hypothetical condition as an "as is" value. A value opinion based on a special/extraordinary assumption may or may not be "as is." Care must be taken when using the phrase "as is" in connection with a value opinion.

Effective November 19, 2015
Minor revisions 2018

(Please Note: The purpose of this Guide Note to the Standards of Professional Appraisal Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

# Guide Note 16
## Arbitration[1]








## Introduction

Real estate valuation professionals ("Valuer" or "Valuers") are often retained to provide services in arbitration matters[2] either as arbitrators or expert witnesses[3]. Arbitration is a process in which the parties to a dispute agree to present their case to one or more arbitrators who render a final decision to resolve the dispute.

When parties have a dispute, they often find themselves in litigation after one party sues the other. Parties and their attorneys are increasingly using methods to resolve disputes without going to trial. The Courts have encouraged the use of these alternate processes and have upheld arbitration awards. The use of arbitration is accepted by the parties to the dispute, their attorneys and the Courts because arbitration permits the parties to have more control over some procedural and administrative aspects of the resolution dispute procedure than if they had gone to trial, arbitrations are frequently less expensive and produce more timely results than litigation, and issues arbitrated do not use time on crowded Court calendars.

Arbitration is similar to a trial, but is a somewhat more flexible process where the parties can agree on procedure and on which issues to arbitrate. Arbitration hearings, which are conducted in conference rooms and not courtrooms, are less formal than a trial in that the rules of evidence may be considered but are not mandatory. As in a trial, written and oral evidence is presented, depositions are permissible, and experts typically review and comment on the opposing expert's report (this is typically labelled a "rebuttal" report in litigation and arbitration). Arbitration awards generally are binding and final, and can be vacated (overturned)

# GUIDE NOTE 16

## Introduction (continued)

by a court only on narrow grounds which are typically limited to lack of appropriate disclosure of conflicts by an arbitrator and awards made by the arbitrator(s) that go beyond the jurisdiction of the arbitrators.

The decisions made by arbitrators are presented to the parties in documents called "awards," and awards may offer a party relief in the form of monetary payment, other type of relief (for example, to compel or stop certain activities), or to resolve any question the lease or contract controlling the arbitration requires to be answered by arbitrators.

The two most commonly used types of awards are:

- "standard," a statement of the amount of any relief granted, or type of relief if not monetary. A standard award is typically short statement, with no explanation of the rationale for the result.

- "reasoned," according to the American Arbitration Association (AAA) commercial rules, means "a written explanation of the award."[4] These arbitration rules provide that a reasoned award is permitted only when the parties request a written explanation of the award prior to the appointment of the arbitrator(s). A "reasoned award" is not an opinion of value communicated in an appraisal report; this is addressed below.

What services can a real estate valuation professional provide in an arbitration matter, and what standards and ethical rules apply? This is a vital issue, as a valuer providing a service in an arbitration potentially may find him- or herself acting within any one of the three "circles" presented in USPAP Advisory Opinion 21:

- performing an appraisal and/or appraisal review in compliance with certain Rules and Standards,

- making arbitral decisions communicated in awards while acting as an appraiser so that certain Rules apply but no Standards apply, or

- making arbitral decisions communicated in awards while *not* acting as an appraiser so that neither Rules nor Standards apply other than the duty to not mislead.

# What Does the Potential Client Expect?

The first issue to be considered is the expectation of the potential client regarding the Valuer's role in the process.

The standards' definitions of "valuer" and "appraiser" start with "One who is expected to…" On the basis of those definitions, "any potential client of [a Valuer] should be able to expect a certain level of professionalism from anyone representing himself or herself as an appraiser."[5]

USPAP Advisory Opinion 21 further explores this expectation and states "In summary, expectation [of the intended user] is the basis for determining when an individual providing a valuation service is acting as an appraiser."[6] The intent of the potential client controls the decision, and not the intent or preference of the Valuer. The client seeking a Valuer to serve as an arbitrator would do so because of a Valuer's education, knowledge, and independence, i.e. because of the expectation that the Valuer will be "acting as an appraiser."

This concept is confusing because the USPAP discussion of "acting as an appraiser" is often mistakenly thought by Valuers to be equivalent to "does the individual have an appraiser designation or license?" or "is the individual providing an appraisal?" However, this fails to consider the standards' definition of "appraiser" or "valuer" which address independence and competence rather than licenses, designations, or services provided. Thus, one may be "acting as an appraiser" (independent and competent) but not providing value or appraisal review opinions.

USPAP defines "appraiser" as "one who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective,"[7] and "appraisal" as "the act or process of developing an opinion of value; an opinion of value."[8] When performing an appraisal, a Valuer develops and reports an opinion of value.

Black's Law Dictionary defines "arbitrator" as "a neutral decision-maker who is appointed directly or indirectly by the parties to an arbitration agreement to make a final and binding decision resolving the parties' dispute," and "arbitration" as "a dispute-resolution process…" the result of which is an "award."

When serving as an arbitrator, a Valuer is rendering a final, generally binding decision to resolve a dispute and communicating that decision in a written, signed document called an "award." The distinction is that the Valuer is "acting as an appraiser," but not providing an appraisal or appraisal review opinion. Therefore, when "acting as an appraiser" and serving as an arbitrator, competency and ethical requirements must be met. But there are no applicable Standards or Standards Rules[9] to comply with as appraisal or review opinions are not being provided by the Valuer.

The next question to be addressed is the expectation of the potential client regarding the type of service the Valuer is being asked to provide.

# GUIDE NOTE 16

## Are You Providing an Opinion or a Decision?

The Valuer must clarify whether he or she is being engaged as a valuation expert witness or as an arbitrator.

Confusion may arise as prospective clients sometimes use the words "appraiser" and "arbitrator" interchangeably, and the leases and other contracts setting forth the terms of the arbitration proceedings also use the terms as synonyms; it sometimes happens that the term "appraiser-arbitrator" is used and this term is by definition inaccurate, as a valuation professional can provide services as one or the other, but generally not both at the same time. The instances in which a Valuer might provide both value or review opinions and an arbitration award are established by statutes in certain jurisdictions or by the lease or other contract controlling the proceeding.

The Valuer must clarify whether he or she is expected to provide valuation opinions or arbitral decisions in any given proceeding in order to competently develop and provide those opinions or decisions, as well as to properly identify which ethical rules and standards and laws or regulations are applicable.

# Which Tasks Are You Performing?

Practitioners in different professions often use the same terms and phrases as Valuers but with different definitions and meanings. The clearest way to discern whether a Valuer is being considered as an expert witness or as an arbitrator in situations where the language is unclear, is to reach agreement with the prospective client on which services he or she is expected to provide in the course of the matter. Some long-term ground and net leases that describe arbitration procedures were drafted as far back as the 1960s, when valuation terminology was not as specifically defined as it is now.

If the prospective client is seeking a valuation expert witness in an arbitration, the Valuer would typically be expected to provide the following services:

- Perform an appraisal pursuant to the requirements in the lease, contract or other document that sets forth the requirements for the arbitration that complies with applicable standards (if USPAP, Standard 1)

- Prepare a written report that typically will be exchanged with the opposing party and submitted to the arbitrator(s) and that complies with applicable standards (if USPAP, Standard 2)

- If asked to prepare a "rebuttal" report, review and opine with regard to the opposing expert's appraisal report (If USPAP, Standard 3 and 4, as "rebuttal" is the arbitration procedure term for "appraisal review")

- Present oral testimony at an arbitration hearing (the controlling document or rules of arbitration may permit or require a deposition be taken of expert witnesses, in which case deposition testimony will also be provided)

If the prospective client is seeking an arbitrator, the Valuer would typically be expected to provide the following services:

- Interact with the parties and their counsel to establish the ground rules for the arbitration process

- Conduct a preliminary hearing to clarify and confirm:

    - Issues to be arbitrated

    - Will award be reasoned or not

    - Number and length of briefs and reply briefs to be submitted

    - Dates for submissions and replies

    - Times for property visits by arbitrators and by experts (generally not at the same time). The arbitrator would likely not be focused on the same property characteristics as the expert valuation witness.

    - Location and length of the arbitration hearings, as well as how time is to be divided among the parties

    - General housekeeping issues for the hearings, including court reporter

- Decide any pre-hearing issues (it is not unusual for the lease or other controlling document to be vague with regard to date of value to be determined, highest and best use requirements, property characteristics to be considered or not in the valuations, etc.) and prepare interim awards on these points

- Conduct the arbitration hearings (Arbitrators are the triers of fact, or the "judge")

- Render a decision and write the final award, and do not develop and report an appraisal or appraisal review

# GUIDE NOTE 16

## A Final Award is not an Opinion of Value

One reason for the confusion in this area is that the decisions required from the arbitrators as described in the controlling documents often use the word "value" although the expectation is not that the arbitrators will perform an appraisal. This collision of common English usage and valuation terminology often causes unintended results in arbitration awards if the arbitrators think they are to provide an appraisal opinion, albeit with a rather unusual scope of work, and so think they must comply with applicable reporting standards in writing the award. It is not unusual for a lease to require the arbitration panel to provide an award of "fair market value" or "fair market rent" of a specified ownership interest in an identified real property asset as of a specific date, and yet this is not expected to be, nor should it be, an appraisal opinion.

The arbitration award sets forth an amount determined to be appropriate to settle the dispute based on an assessment of the evidence presented in the arbitration and the terms of the lease or other controlling documents. The final award does not communicate what the arbitrators might determine the market value of the asset to be if they had individually or collectively performed an appraisal.

# Which ethical rules and standards must Valuers follow?

When providing expert valuation opinions, a Valuer must comply with:

- Appraisal Institute *Code of Professional Ethics* (CPE)
- *Standards of Valuation Practice* (SVP) or *Uniform Standards of Professional Appraisal Practice* (USPAP):
    - SVP
        - Standard A (when value opinions are provided)
        - Standard B (when rebuttal (review) opinions are provided)
        - Standard C
    - USPAP
        - Ethics Rule
        - Competency Rule
        - Record Keeping Rule
        - Scope of Work Rule
        - Jurisdictional Exception Rule[10]
        - Standard 1 (when value opinions are provided)
        - Standard 2 (when value opinions are provided)
        - Standard 3 (when rebuttal (review) opinions are provided)
        - Standard 4 (when rebuttal (review) opinions are provided)
    - Certification Standard

When serving as an arbitrator, a Valuer must:

- If "acting as an appraiser" comply with:
    - Appraisal Institute Code of Professional Ethics (CPE)
    - USPAP
        - Ethics Rule
        - Competency Rule
        - Jurisdictional Exception Rule[11]
- If not "acting as an appraiser" (valuer), valuation standards and the CPE do not apply.[12]

# GUIDE NOTE 16

## Are there any arbitration laws or regulations that would apply to Valuers?

Every state has adopted an arbitration law, and either that law or The Federal Arbitration Act, US Code, Title 9 is likely applicable to any given arbitration. These laws address the requirements of arbitrators and not the requirements of those presenting testimony in an arbitration. The Federal and state laws are very similar in many respects, and set forth the ethical duties of the arbitrators, including the requirements for disclosure of potential conflicts of interest. The disclosure requirements are much broader than those required when a Valuer is performing appraisal or review services. Therefore, Valuers must learn which laws or regulations apply and comply with all disclosure requirements which generally include a duty to investigate potential conflicts arising from relationships of immediate family members and members of the arbitrator's household. The laws also typically provide a maximum number of days for these disclosures.

The road map for Valuers providing either expert valuation opinions or arbitration decisions is typically contained in the lease or other contract stipulating that arbitration is to be used to resolve specified disputes.

The following examples are based on actual lease provisions. Typically the parties and attorneys know whether they are seeking valuers to provide appraisal opinions or arbitration decisions; however, the language in the controlling leases is often unclear and the language used by potential clients in the retention process is often equally imprecise. Examples of commonly encountered imprecise language follow.

# Baseball[13] example #1

Lease: Minimal Annual Rent shall be determined by appraisal. Each party appoints an appraiser and a third is selected by the process described in the lease. The party-selected appraisers will exchange appraisal reports with one another and submit their reports to the third appraiser. The third appraiser will choose the most reasonable of the two appraisals within 10 calendar days. "The third appraiser's decision on which appraisal is the most reasonable will be final and binding on the parties, and will be based solely on the [third] appraiser's review of the two appraisals"

Service provided: Appraisal by the party-selected appraisers serving as valuation experts and appraisal review by the third. Standards A and C (SVP) or Standards 1 and 2 (USPAP) are applicable to the party-selected valuers' work and Standards B and C (SVP) or Standard 3 and 4 (USPAP) apply to the work of the third arbitrator.

# Baseball example #2

Lease: Renewal FMRV (fair market rental value) is to be determined by each party selecting a real estate professional with at least 10 years' experience in the property type at the relevant location and the selected Qualified Professionals shall each submit a memorandum to the third arbitrator, copy the landlord and tenant. Further evidence is to be presented at the arbitration hearing in the form of oral testimony and opening and closing arguments of counsel for each party. After the close of the arbitration hearings, the third arbitrator "shall choose the estimate set forth in either Landlord's or Tenant's memorandum, whichever the third arbitrator believes most accurately reflects the fair market rental value of the Premises in accordance with Article xxx for the subject term…., and such choice shall be binding on Landlord and Tenant."

If all three Qualified Professionals are valuers, services provided:

1. Each of the two party-selected valuers will be performing appraisals to determine fair market rental value using the definition contained in the lease, and communicating those opinions in reports that must comply with applicable valuation standards. The fact that the lease implies that all three Qualified Professionals are arbitrators does not change the fact that the two party-selected valuers are providing value opinions. Further, the fact that the lease labels the appraisal report as a "memorandum" does not change the fact that Standards A and C (SVP) or Standards 1 and 2 (USPAP) apply to the development and communication of the opinions.)

2. The description of the duties to be performed by the third Qualified Professional (consider evidence presented in the appraisal reports prepared by the valuation experts plus other oral testimony and arguments) indicates that this valuer is serving as an arbitrator and not providing value opinions. This arbitrator decides the amount that represents "fair market rental value" as defined and described in the lease. The arbitrator does not perform an "appraisal" or an "appraisal review" as defined in standards, but makes a decision based solely on the evidence presented and prepares a written award presenting that decision.

# GUIDE NOTE 16
## Three person panel example

Lease: "Arbitration and Appraisal. The arbitration of disputes or appraisal of value…The party desiring such arbitration or appraisal shall…appoint a disinterested person with recognized competence in the field involved as one of the arbitrators or appraisers…and such three arbitrators or appraisers shall as promptly as possible determine such matter…Landlord and Tenant shall each be entitled to be represented by counsel at the arbitration or appraisal and to present evidence and argument to the arbitrators or appraisers".

Service provided: It depends on whether the parties have agreed to an appraisal or arbitration scenario as this clause appears to apply to either dispute resolution process. The typical result of this type of clause is that an arbitration is conducted, with each party presenting valuation and other experts to a three-person arbitration panel that considers all written expert and rebuttal reports plus oral testimony, exhibits and legal arguments presented at the arbitration hearing. The services provided by valuers in that situation are:

1. The valuers retained as experts will develop opinions of value and submit reports as well as review the report(s) of the opposing valuation expert. The review opinions are typically presented in a report labeled as a rebuttal report; however Standards B and C (SVP) or Standard 3 and 4 (USPAP) are applicable to those review opinions and reports. Standards A and C (SVP) or Standards 1 and 2 (USPAP) are applicable to the value opinions and reports.

2. The valuers retained to serve as arbitrators will consider the written and oral evidence presented and arrive at a decision presented in writing in the form of an arbitration award. This is an arbitration award even if the award contains the word "value;" the award is not an appraisal report and the decision is not an opinion of value developed in compliance with valuation standards.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

November 17, 2016
Minor revisions 2020

---

1Arbitration is an alternate dispute resolution process that is controlled by statutes, regulations, leases and other forms of arbitration agreements. This Guide Note has used the  most typical arbitration scenarios as examples; however, the procedure followed, the formality of the process, and the specific services to be provided by both the valuation experts and the arbitrators may be different from the examples presented. It is the responsibility of the Valuer to determine what is expected in each situation and then to provide the required services in compliance with applicable standards.
2This Guide Note is focused solely on arbitration, and not other types of alternate dispute resolution processes such as mediation, appraisement, etc.
3This Guide Note is applicable to arbitrations conducted pursuant to US laws and rules of arbitration; it may or may not be applicable, in whole or part, to arbitrations conducted pursuant to laws and rules outside the U.S.
4Black's Law Dictionary, Tenth Edition, defines "reasoned arbitration award" as "An arbitration award in which the arbitrators explain the rationale for their decision.
5The Appraisal of Real Estate, 14th Edition, Appraisal Institute, Chicago, IL, 2013, p. 2.
6 2018-2019 USPAP Advisory Opinions, Advisory Opinion 21, "USPAP Compliance," at lines 70-71, The Appraisal Foundation, Washington, DC.
7The SVP definition of "Valuer" is virtually the same: "One who is expected to engage in Valuation Practice in an unbiased and competent manner." This term is synonymous with appraiser.
8The SVP definition is virtually identical.
9Thus, under the SVP, Standards A, B and C do not apply and under USPAP, Standards 1, 2, 3 and 4 do not apply.
10Although the Jurisdictional Exception Rule applies, there have been no reported instances where applicable arbitration laws or regulations created such an Exception.

# Guide Note 17

Compliance with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute





Copyright © 2020 Appraisal Institute. All rights reserved.

Printed in the United States of America. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopy, recording or otherwise, without the prior written consent of the publisher.

## Guide Note 17 : Compliance with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute

## The Issue

The Bylaws of the Appraisal Institute state that each Member, Candidate, Practicing Affiliate and Affiliate shall abide by, uphold, and conform his or her actions to the Code of Professional Ethics (CPE) and Standards of Professional Practice (Standards or SPP) of the Appraisal Institute.

1. What are the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute?

2. When do the Code of Professional Ethics and Standards of Professional Practice apply?

3. How does the nature of the service provided impact which valuation Standards apply?

4. Is it permissible for a Valuer to be an advocate?

5. What precautions must a Valuer take when providing work that does not fall under the Standards of Professional Practice?

## Basis for Proper Practice

Appraisal Institute Bylaws, specifically Articles VI and VII.

The Appraisal Institute Code of Professional Ethics, specifically definitions of "Biased", "Valuer", "Valuation Practice", "Report", "Appraisal", and "Review."

The Appraisal Institute Standards of Valuation Practice, specifically definitions of "Valuer", "Valuation Practice", "Report", "Appraisal", and "Review."

The Uniform Standards of Professional Appraisal Practice (USPAP) published by The Appraisal Foundation, specifically the Preamble, Ethics Rule, and definitions of "Appraiser", "Appraisal Practice", "Valuation Service", "Appraisal" and "Appraisal Review." See also Advisory Opinion 21.

## What is the Code of Professional Ethics of the Appraisal Institute?

The Code of Professional Ethics sets forth the Appraisal Institute's guiding principles for ethical conduct.[1] Its purpose is to promote and maintain a high level of public trust in the appraisal profession and, in the

---

[1] The CPE and the SPP have their origins dating back to the 1930s in the Appraisal Institute's predecessor organizations, the American Institute of Real Estate Appraisers (AIREA) and the Society of Real Estate Appraisers (SREA). Both organizations had codes of ethics and standards of practice. Some of the fundamental principles have remained virtually unchanged over time, and the specific language of the CPE and valuation Standards have been updated to reflect the evolving nature of the valuation profession.

1

professional services provided by Appraisal Institute Members, Candidates, and Practicing Affiliates.

The Bylaws of the Appraisal Institute provide that the Appraisal Institute will adopt a Code of Professional Ethics, that it will govern the conduct of all Members, Candidates, Practicing Affiliates and Affiliates, and that it will be enforced. Article VII of the Bylaws states in part:

> The Board of Directors shall adopt a Code of Professional Ethics and Standards of Professional Practice, which in addition to the Bylaws, Regulations and policies of the Appraisal Institute shall govern the conduct of all Members, Candidates, Practicing Affiliates and Affiliates of the Appraisal Institute. The Board of Directors shall adopt and maintain Regulations with respect to the enforcement of the Code of Professional Ethics and the Standards of Professional Practice.

Bylaws, Article VI, Part A states in part:

> Each Member, Candidate, Practicing Affiliate and Affiliate of the Appraisal Institute shall abide by, uphold and conform his or her actions to the Bylaws, Regulations, Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

Regulation 6 sets forth the procedures for enforcement of the CPE.

Key principles embodied in the CPE include:

- The CPE applies to all Appraisal Institute Members, Candidates, Practicing Affiliates, and Affiliates. When one joins the Appraisal Institute, one agrees that he or she is subject to and will abide by the CPE.

- The CPE contains some ethical rules that are similar to rules found in valuation Standards such as the Uniform Standards of Professional Appraisal Practice (USPAP), the International Valuation Standards (IVS), and others. The Appraisal Institute may enforce violations of the CPE with disciplinary actions, whereas violations of valuation Standards are subject to educational actions.

- The CPE contains several provisions that are specific to the Appraisal Institute, such as those concerning references to Appraisal Institute designations and submission of information to the Appraisal Institute.

- The CPE contains provisions that apply when Appraisal Institute Members, Candidates for Designation, and Practicing Affiliates are acting as appraisers, and also contains provisions that apply when they are NOT acting as appraisers.

## What are the Standards of Professional Practice of the Appraisal Institute?

While the CPE addresses ethical conduct and the individual's responsibility to assist the Appraisal Institute in carrying out its mission, the Standards of Professional Practice more directly address how valuation services, specifically but not limited to appraisals and reviews, are prepared. As noted in the previous section, Articles VI and VII of the Appraisal Institute Bylaws provide that the Appraisal Institute will adopt Standards of Professional Practice, that it will govern the conduct of all Members, Candidates, Practicing

Affiliates and Affiliates, and that it will be enforced.

No single document constitutes the SPP. Rather, what constitutes the SPP may vary depending on which set of valuation Standards the AI professional is required to comply with because of law, regulation, agreement with the client, or choice.[2] The Preamble to the Standards of Professional Practice provides that the SPP are composed of:

- the Standards of Valuation Practice (SVP), promulgated by the Appraisal Institute, and the Certification Standard of the Appraisal Institute; *or*

- applicable national or international Standards and the Certification Standard of the Appraisal Institute.

"Applicable national Standards" include Standards that are generally accepted nationally (for example, USPAP in the United States or CUSPAP in Canada), and "applicable international Standards" include the International Valuation Standards (IVS).

In all cases SPP includes the Certification Standard of the Appraisal Institute, which requires certain certification statements to be included in written appraisal and review reports. These certification statements relate to compliance with the CPE and SPP, the Appraisal Institute's right to review work for peer review purposes, and the Appraiser's continuing education status.

It is possible, and in some cases necessary, to comply with more than one set of valuation Standards at one time. For example, it may be possible to comply with SVP, USPAP, and/or IVS simultaneously. The three sets of Standards have many common elements. Compliance with any one does not preclude compliance with others.

## When does the CPE apply?

The CPE applies whenever a Member, Candidate, Practicing Affiliate or Affiliate of the Appraisal Institute is acting as a Valuer. Certain provisions of the CPE may apply even when a Member, Candidate, Practicing Affiliate or Affiliate of the Appraisal Institute is not acting as a Valuer, for example, ER 1-1 (a) and (b), ER 1-2, ER 2-1, ER 2-2, ER 2-3, ER 2-6, ER 2-7, ER 3-2, ER 4-2, ER 5-1, ER 5-2 and ER 5-4.

## When do the SPP apply?

The SPP apply whenever a Member, Candidate, Practicing Affiliate or Affiliate of the Appraisal Institute is acting as a Valuer. If the individual is not acting as a Valuer, the SPP do not apply.

---

[2] For example, an Appraiser/Valuer in the U.S. who is state licensed or certified is generally required by state law to comply with USPAP. Or, an Appraiser/Valuer in the U.S. preparing an appraisal for a "federally related transaction" for a federally insured depository institute is required by federal regulation to comply with USPAP.

## What does "acting as an Appraiser/Valuer" mean?

The CPE and SVP define "Valuer" as "One who is expected to provide engage in Valuation Practice in an unbiased and competent manner. This term is synonymous with "Appraiser".[3]

"Valuation Practice" is defined in the CPE and SVP as "Services performed by an individual acting as a Valuer, including but not limited to providing appraisal and review opinions."

A key word in the definition of "Valuer" is "expected." It is the expectation of the client regarding competency and lack of bias that determines whether the individual is "acting as a Valuer." Client expectation, not whether the individual has valuation credentials, determines when one is "acting as a Valuer."

Whether one is "acting as a Valuer or Appraiser" or not is established by client expectation, not by whether one provides appraisals or reviews in the assignment.

The client's expectation begins to form when the individual holds himself or herself out as one who is independent, impartial, and objective, as well as competent to provide the service. Appraisers do this through promoting their business -- using advertising, websites, business cards, and the like. The client's expectation needs to be acknowledged by the Appraiser at the time of the engagement.

Some individuals with valuation credentials act as Appraisers for all the services they provide. Some individuals with valuation credentials act as Appraisers for some of their services, but also provide services for which they are not acting as an Appraiser. Other individuals with valuation credentials only provide services for which they are not acting as Appraisers.

Examples of situations where one who has valuation credentials might not be acting as an Appraiser include:

Example 1. An individual with valuation credentials also has a real estate sales license. When providing services as a real estate sales agent, the individual is not acting as an Appraiser. The SPP does not apply to work performed as a real estate sales agent. To not misrepresent his or her role, the individual should disclose that while he or she is an Appraiser, he or she is not acting as an Appraiser when providing the service.

Example 2. An individual with valuation credentials is also licensed to practice law by the state bar association. When providing services as a lawyer, the individual is not acting as an Appraiser. The SPP does not apply to work performed as a lawyer. To not misrepresent his or her role, the individual should disclose that while he or she is an Appraiser, he or she is not acting as an Appraiser when providing the service.

Example 3. An individual with valuation credentials is a property owner. When appealing his or her own property taxes, the individual is acting as a property owner, not as an Appraiser. The SPP does not apply. To not misrepresent his or her role, the individual should disclose that while he or she is an Appraiser, he or she is not acting as an Appraiser but rather as a property owner.

---

[3] The Uniform Standards of Professional Appraisal Practice (USPAP), defines "Appraiser" as "one who is expected to perform valuation services competently and in a manner that is independent, impartial and objective." *Uniform Standards of Professional Appraisal Practice*, 2020-2021 ed. (The Appraisal Foundation, Washington D.C., 2020: DEFINITIONS, p.3.)

4

Most services provided by individuals acting as Appraisers are appraisals and reviews, but there are many other valuation-related services that clients might seek to obtain from Appraisers because of their competency and independence. Examples of such other services include (but are not limited to):

Market studies

Rent surveys[4]

Providing raw data

Measuring a building

Teaching valuation-related courses

Developing cost estimates

Researching zoning or other land use issues

Determining an amount to settle a dispute (not represented as a value opinion) in arbitration

## How does the nature of the service provided impact which valuation Standards apply?

The CPE and SVP define "Appraisal" as "The act or process of developing an opinion of value; an opinion of value. An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship (e.g., not more than, more than, not less than, less than) to a stated amount."

When an appraisal is provided, the applicable parts of the SPP are:

If the valuation Standards are the SVP: Standards A and C-1, Definitions.

If the valuation Standards are USPAP and the property is real property: Standards 1 and 2; Ethics Rule, Competency Rule, Record Keeping Rule, Scope of Work Rule, Jurisdictional Exception  Rule, Preamble and Definitions.

The CPE and SVP define "Review" as "The act or process of developing and communicating an opinion to a client about the quality of another's appraisal or review Report."

When a review is provided, the applicable parts of the SPP include:

If the valuation Standards are the SVP: Standards B and C-2, and Definitions.

If the valuation Standards are USPAP: Standards 3 and 4; Ethics Rule, Competency Rule, Record Keeping Rule, Scope of Work Rule, Jurisdictional Exception Rule, Preamble and Definitions.

---

[4] A rent survey is distinguished from a rent opinion. In a rent survey, there is no subject property. In a rent opinion, an opinion of rent is developed for a subject property. A rent opinion is an appraisal.

5

When other services (not appraisal or review) are provided as an Appraiser:

> The CPE applies. (The SVP does not apply as it establishes Standards for appraisals and reviews only.)

> If under USPAP, the Ethics Rule, Competency Rule, Jurisdictional Exception Rule, Preamble and Definitions apply.

## Advocate and Advocacy

The terms "advocate" and "advocacy" should be used with caution because they have multiple meanings. For example, Merriam-Webster's online dictionary (January 2020) includes these three entries for "advocate":

1. One who pleads the cause of another.

2. One who defends or maintains a cause or proposal.

3. One who supports or promotes the interests of a cause or group.

According to these definitions, an advocate may promote a cause or interest in which he or she does not necessarily believe.

It IS NOT acceptable for an individual acting as an Appraiser to advocate the cause of another or defend or maintain another's cause or proposal. It IS acceptable for an Appraiser to support his or her own opinions and conclusions, as long as those opinions or conclusions are credible.

In some cases, the cause of another may coincide with the Appraiser's own, credible opinions, or conclusions. When this is the case, the Appraiser may support those opinions or conclusions because they are his or her own, not because they represent the cause of another.

For example, consider the case of a client who seeks to reduce his property taxes. The Appraiser prepares a well-supported, credible appraisal that does indeed indicate the property is over-assessed. In presenting the appraisal to the property tax appeal board, the Appraiser is supporting his own appraisal, not the client's cause, even though the two coincide.

In the foregoing example, if the appraisal prepared by the Appraiser was not credible, it would be unethical for the Appraiser to present his appraisal before the appeal board.

When not acting as an Appraiser, one can advocate a position or can advocate on behalf of another, but with extreme caution. Has the need of the client been properly identified? Does the client fully understand the nature of the role? Is the individual viewed by others as an independent, unbiased third party? Is there an expectation that the individual is in an advocacy role?  When the service being provided includes opinions or conclusions that may be construed as appraisal or review opinions, the individual must take extreme care to ensure that (1) the role is correctly identified for the service and (2) parties are not misled as to the role. Under no circumstances can an individual acting as an Appraiser/Valuer act as an advocate of another's cause.

6

## What precautions must an Appraiser take when providing services not as an Appraiser?

An Appraiser must not misrepresent his or her role when not acting as an Appraiser. This underscores the need to avoid sending conflicting messages when soliciting business. It also underscores the need to have clarification from the client regarding the client's expectations. Does the client expect the Appraiser to be an independent, unbiased third party? Or does the client not have that expectation?

Any written communication given to the client as a result of a service performed not as an Appraiser should clearly state that while the individual has valuation credentials, he or she is not acting as an Appraiser when providing the service. For example, a broker price opinion (BPO) or comparative market analysis (CMA) provided as a real estate sales agent or broker should include such a clause.

Appraisers should not use appraisal designations or other Appraiser credentials in reports, in correspondence, on websites, on business cards or the like when representing themselves in a capacity other than an Appraiser. However, it is acceptable to list valuation credentials on a resume or qualifications page along with other professional or personal credentials.

## Examples

### Example 1: Appraiser and real estate agent

Jenny is a Practicing Affiliate of the Appraisal Institute and a licensed real estate agent. She is active both as a real estate Appraiser and as a real estate agent.

Does the SPP apply to Jenny's real estate sales activity?

> *The SPP applies only to individuals who are acting as Appraisers. Even though Jenny is an Appraiser, she is not acting as an Appraiser when engaged to provide real estate sales services. The  key here is the client's expectation.   If a client hires Jenny expecting her to provide services as an Appraiser, then Jenny is acting as an Appraiser. If a client hires Jenny expecting her to provide services as a real estate agent, then Jenny is acting as a real estate agent.*

What if Jenny is not sure whether the client is expecting her to act as an Appraiser or as a real estate agent?

> *Jenny should ask, by posing such questions as, "Did you ask me to provide this service because I'm an Appraiser or because I'm a real estate agent?" "How did you find my name?" "Are you looking for services typically provided by an Appraiser or by a real estate agent?"*

What precautions should Jenny take when preparing competitive market analyses or broker price opinions as a real estate agent?

> *Jenny must be careful not to misrepresent her role. For example, she should include a statement with her CMAs and BPOs saying that while she has valuation credentials, she is acting as a real estate agent, not as an Appraiser, when providing this service.*

May Jenny have one set of business cards and one website featuring both her appraisal practice and her sales practice?

*Since Jenny must be careful not to misrepresent her role, she should promote her two lines of business separately. Having one set of business cards featuring both lines of business would send confusing messages to current and potential clients about her role. If she has one website, she should not promote both her appraisal practice and sales practice on one web page.*

**Example 2: Tax appeal, non-advocacy, no contingent fee**

Miguel is a Candidate for Designation with the Appraisal Institute. He is also a U.S. state certified Appraiser and must comply with USPAP. Most of his work is for lenders, but he was recently contacted by a property owner about appraising her property and presenting his appraisal before the property tax appeal board so that her taxes might be reduced.

May Miguel accept this assignment?

*Yes. He will need to have competency not only with regard to the property type and the market, but with the intended use. Is he knowledgeable of how properties are taxed in the jurisdiction?*

Miguel possesses the requisite competency and determines that an opinion of market value is what is needed to proceed with the tax appeal. Would it be acceptable for Miguel to charge a flat fee for appraising the property and then, if the value conclusion suggests an appeal is possible (i.e., his market value opinion is lower than indicated by the assessed value and so the property appears to be over- assessed) charge an hourly fee for assisting in the appeal process?

*Yes. In completing the assignment Miguel must follow USPAP. USPAP's Ethics Rule prohibits contingent fee arrangements, but such an hourly fee arrangement is not a contingent fee arrangement.*

If Miguel's appraised value suggests the property is over-assessed, isn't he acting as an advocate when assisting in the appeal process?

*Miguel would not be acting as an advocate if he provides his own well-supported, credible opinion of value. It would be UNACCEPTABLE for him to argue an opinion of value that reasonable Appraisers would not believe to be justified.*

**Example 3: Tax appeal with advocacy and contingent fee**

Molly is a Designated Member of the Appraisal Institute. She also is licensed with her state as a Tax Representative. Tax Representatives in her state typically are paid a percentage of the property tax savings they achieve for their clients. They are perceived to be advocates for their clients, not independent third parties. Although Molly has 20 years of experience as an Appraiser, she no longer holds herself out as an Appraiser. She does not put her designation on her website or business cards, though it is mentioned as a credential on her curricula vitae.

When providing tax appeal services, Molly always argues for the lowest value possible. Is Molly's practice acceptable?

8

*Yes. Molly is not acting as an Appraiser, but as a licensed property tax representative. The SPP does not apply to Molly's property tax services because she is not acting as an Appraiser.*

An attorney for a property owner tells Molly that she will come across as more credible if she makes it clear that she holds an Appraisal Institute designation. How should Molly respond?

*If Molly were to use her appraisal designation, she would be confusing her clients, potential clients, and others as to her role. She cannot allow that to happen.*


**Example 4: Tax appeal for a related party**
Jon is a Candidate for Designation with the Appraisal Institute. In researching county records, Jon concludes that his parents' home is over-assessed. He would like to appeal the real estate taxes with the county on behalf of his parents.

Can Jon proceed with the tax appeal?

*Yes.*

Is Jon acting as an Appraiser when he proceeds with the real estate tax appeal?

*No. He cannot be acting as an Appraiser because an Appraiser must always be able to act without bias and is expected to act with independence, impartiality, and objectivity. Since the property in question is his parents' home, he could not possibly be perceived to be without bias. Therefore, he can proceed with the tax appeal, but as the son of the homeowners, not as an Appraiser.*

Does the SPP apply to Jon's activity in appealing the taxes?

*No, because he is acting as the son of the owners, not as an Appraiser.*

What precautions must Jon take when making his case before the appeal board?

*Jon must make it clear that while he has valuation credentials, he is acting not as an Appraiser but as the owners' son.*

May Jon present comparable data on an adjustment grid when arguing for the appeal?

*Yes.*


**Example 5. Serving on city planning commission**
Ellen is a Practicing Affiliate with the Appraisal Institute and has been appraising in her hometown for 10 years. She is thinking about running for a position on the Planning Commission. She would not receive any compensation for her work as a commissioner.

Would the SPP apply to Ellen's work as a commissioner?

9

*No. Ellen would be acting as a commissioner, not as an Appraiser. She must, however, make sure that point is clear in any circumstances where it might come up. The answer would be the same if Ellen did receive compensation.*

Ellen is elected to the Planning Commission. At their first meeting, a question is raised by another commissioner as to whether a zoning change would impact values in a particular neighborhood. The other commissioner turns to Ellen and says, "You're an Appraiser. What do you think?" How should Ellen respond?

*Ellen must make it clear that while she has valuation credentials, in her capacity as a commissioner she is not serving as an Appraiser. Further, presumably at this point she has not completed the research and analysis to properly answer the question. She should suggest that an independent Appraiser be consulted regarding the matter.*

### Example 6: Asked by HOA to "look at" appraisal

Jose was just awarded his AI-RRS Designation. He moved into a residential subdivision a few years ago. All of his neighbors know he is an active real estate Appraiser. At a recent homeowner's association meeting, a matter came up relating to the amount of insurance on the subdivision's clubhouse. An Appraiser had been hired, and the Board of Directors had just received a copy of the appraisal report. The president of the Board asks Jose if he could take a quick look at the appraisal report and see if it is okay.

If Jose agrees to look at the appraisal report and comment on it, would the SPP apply? Does the fact that Jose would not be getting paid make any difference? How should Jose respond?

*Yes, the SPP would apply. Jose would be acting as an Appraiser, because that is the capacity in which he was asked to "take a quick look." It makes no difference that Jose would not be getting paid. Jose should respond that as an Appraiser he could provide a review of the appraisal. He should explain that a review is an opinion about another's work, and it is a professional service that some Appraisers provide. If Jose has the competency to provide a review, and if he can be unbiased in completing it, he may take it on.*

### Example 7: Litigation support

Ed is a Designated Member of the Appraisal Institute. His company's website states that he is experienced in diverse valuation matters, holds the MAI designation, and has 25 years of experience appraising properties in the region. Included among the services he provides is litigation support. That is, he is hired by attorneys for advice on matters relating to the valuation of property in litigation. Such advice includes:

- Commenting on an appraisal report prepared by another Appraiser.

- Commenting on a valuation of a property prepared by a non-Appraiser (e.g., an economist or other analyst.)

- Advising on appropriate methods used to value a property.

10

- Advising whether the methods used in an appraisal report prepared by an Appraiser were appropriate.

- Assisting with developing questions about valuation matters for the attorney to ask in cross-examination.

Would the SPP apply to Ed's work when provided such litigation support?

*Yes, the SPP would apply. If Ed were hired in some capacity other than as an Appraiser, then the SPP would not apply. However, this is unlikely given that he holds himself out as an Appraiser.*

What portions of the SPP would apply for each of the types of services listed above?

*Commenting on an appraisal report prepared by another Appraiser amounts to providing an opinion of the quality of that work, and so would be a review. The Standards applicable to review would apply. E.g., if the applicable Standards are the SVP, Standards B and C-2 and Definitions would apply. If the applicable Standards are USPAP, Standards 3 and 4; Ethics Rule, Competency Rule, Record Keeping Rule, Scope of Work Rule, Jurisdictional Exception Rule, Preamble and Definitions would apply. The review report may be written or oral.*

*Commenting on a valuation of a property prepared by a non-Appraiser (e.g., an economist or other analyst) would be a review under the SVP, but not under USPAP. If under SVP, Standards B and C and Definitions would apply. If under USPAP, the Ethics Rule, Competency Rule, Jurisdictional Exception Rule, Preamble and Definitions apply. (However, if Ed agreed or disagreed with the non-appraiser's value, Ed would at that point be providing his own opinion of value, or appraisal, and so Standards 1 and 2 would also apply.) An appraisal or review report may be written or oral.*

*Advising on appropriate methods used to value a property would not in itself be an appraisal or review under the SPP. The CPE would apply. The SVP does not apply as it establishes Standards for appraisals and reviews only. If under USPAP, the Ethics Rule, Competency Rule, Jurisdictional Exception Rule, Preamble and Definitions would apply.*

*Advising whether the methods used in an appraisal report prepared by an Appraiser were appropriate is providing an opinion about the quality of another's work, so is a review. If the applicable Standards are the SVP, Standards B and C-2 and Definitions would apply. If the applicable Standards are USPAP, Standards 3 and 4: Ethics Rule, Competency Rule, Record Keeping Rule, Scope of Work Rule, Jurisdictional Exception Rule, Preamble and Definitions would apply.*

*Assisting with developing questions about valuation matters for the attorney to ask in cross-examination is not an appraisal or review under the SPP, as long as Ed does not provide any opinion about the quality of another's valuation (or review) in the process. The SVP does not apply as it establishes Standards for appraisals and reviews only. If under USPAP, the Ethics Rule, Competency Rule, Jurisdictional Exception Rule, Preamble and Definitions would apply. Regardless of which Standards apply, Ed must be careful he does not act as an advocate as described in the foregoing section.*

11

**Example 8: Arbitration**

Peter is a Designated Member of the Appraisal Institute. He is engaged as the arbitrator in a rent reset dispute that requires both the valuation experts and arbitrator to be Appraisers. The two other Appraisers each prepared an appraisal report, and Peter's task is to examine the two appraisal reports and determine an award amount. He will report the award in writing to legal counsel.

Is Peter providing an appraisal (opinion of value)?

*No. He is providing an award amount. If he had developed his own opinion of value, it might have been different. But he did not do that, as that was not his task.*

Must Peter's award meet the SPP reporting requirements for an appraisal report?

*No, because he is not providing an appraisal report.*

Is Peter performing a review of the other two Appraiser's appraisal reports?

*No. Even though he might be forming opinions about the quality of the work he looks at; he is not communicating those opinions to any other party. "Review" includes the communication of an opinion of the quality.*

What precautions must Peter take in this assignment?

*Peter must be very careful how he characterizes his conclusion (award amount) in the award, and he must be careful not to transmit review opinions about the work of the other Appraisers. If he transmits an opinion of value or of the quality of another Appraiser's appraisal, he is subject to the applicable appraisal and/or review Standards.*

**Example 9: Serving on a property tax appeal board**

Maria has been a Designated Member of the Appraisal Institute and a real estate Appraiser in Jefferson County for many years. She was recently appointed to Jefferson County's tax appeal board. The tax appeal board considers evidence and testimony from both the tax assessor and the property owner (or the property owner's representative) which may include appraisal reports prepared by appraisers. Based on the evidence and testimony presented by both sides, the tax appeal board decides the fair assessed value.

Does the SPP apply to Maria's work on the tax appeal board?

*To answer this question, it must first be determined if Maria is "acting as an Appraiser" or not when serving on the appeal board. If she is, the SPP applies. If she is not, the SPP does not apply.*

*To determine if Maria is acting as an Appraiser, she should consider the circumstances under which she was appointed to the board. Was it because she is an Appraiser and is expected to act as an Appraiser? Or, is she expected to act in a different capacity, such that her valuation experience is solely a credential that makes her more qualified to serve on the board? If that is the case, she is not acting as an Appraiser.*

If Maria IS acting as an appraiser, which portions apply?

12

*To answer this question, the nature of the service Maria provides must be considered. If she is providing an opinion of "value", that would be an appraisal that would be subject to the valuation Standards applicable to appraisals (e.g., Standards A and C(1) of the SVP or Standards 1 and 2 of USPAP.)*

*If Maria is not providing an opinion of value, but instead is contributing to a tax appeal board decision about assessed value, The SVP does not apply as it establishes Standards for appraisals and reviews only. If under USPAP, the Ethics Rule, Competency Rule, Jurisdictional Exception Rule, Preamble and Definitions would apply.*

### Example 10: Retired Appraiser asked to consult

Ruth was a Designated Member of the Appraisal Institute for 40 years. She recently retired and is now on Non-Practicing Retired status with the AI. A former client contacts her and asks her to consult regarding a valuation matter. The work may or may not include testifying in court. Although Ruth is retired, she still  has access to the data necessary to complete an appraisal of the property, and she has many years of experience with this type of request.

Can Ruth accept this assignment?

*Yes, but Ruth would have to change her status back to "Practicing" with the Appraisal Institute. She would be subject to the SPP when doing this work.*

## Summary of Standard Practices

- The Bylaws of Appraisal Institute provide that the Appraisal Institute will adopt a Code of Professional Ethics (CPE) and Standards of Professional Practice (Standards or SPP), that the CPE and SPP will govern the conduct of all Members, Candidates, Practicing Affiliates and Affiliate, and that the CPE and SPP will be enforced.

- What constitutes the SPP may vary depending on which set of valuation Standards the AI professional is required to comply with because of law, regulation, agreement with the client, or choice.

- The SPP always includes the Certification Standard.

- The CPE applies when one is acting as an appraiser. Portions apply when one is NOT acting as an appraiser.

- The SPP apply when one is acting as an Appraiser.

- Whether one is acting as an Appraiser is determined by client expectations.

- When one is not acting as an Appraiser, the SPP does not apply.

- When one is acting as an Appraiser, the specific portions of the valuation Standards that apply depend on whether the service is an appraisal, review, or other valuation-related service.

13

- An Appraiser cannot provide an opinion or conclusion that is not credible or that reasonable Appraisers would not believe to be justified.

- An Appraiser must be careful not to misrepresent his or her role when not acting as an Appraiser.

Effective November 12, 2020

# Guide Note 18

## Personal Characteristics and Valuation Practice








Copyright © 2021 Appraisal Institute. All rights reserved.

Printed in the United States of America. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopy, recording or otherwise, without the prior written consent of the publisher.

## Guide Note: 18: Personal Characteristics and Valuation Practice

### Background

By definition, a Valuer must be unbiased. A Valuer's opinions and conclusions must be prepared in an unbiased manner, and they must be credible, which means they must be supported with relevant data and analyses.

Valuers and Reviewers have a professional responsibility to ensure that appraisals are prepared fairly and without bias relating to personal characteristics. Personal characteristics are characteristics of an individual or group of individuals such as (but not limited to) race, color, religion, national origin, gender, sexual orientation, gender identity or expression, marital status, familial status, age, receipt of public assistance income, disability, or any protected characteristic under applicable law.

The characteristics of people – including but not limited to people who occupy a subject property, live in the area, or are in any way associated with a transaction – are, with limited exceptions, not relevant to the development of any value opinion. Relevant characteristics in the valuation of a property include its physical and economic characteristics, not the personal characteristics of those who are in any way connected to the property. Value is an economic concept. Value is created because there is effective demand, not because of the characteristics of people.

### The Issue

Ethical Rule 1-5 of the Code of Professional Ethics states that it is unethical:

a)  To base an analysis, opinion, or conclusion, either partially or completely, on a personal characteristic such as race, color, religion, national origin, gender, sexual orientation, gender identity or expression, marital status, familial status, age, receipt of public assistance income, disability, or any protected characteristic under applicable law, or a conclusion that homogeneity of such characteristics is necessary to maximize value.

b)  To transmit a Report containing an analysis, opinion or conclusion based, either partially or completely, on a personal characteristic such as race, color, religion, national origin, gender, sexual orientation, gender identity or expression, marital status, familial status, age, receipt of public assistance income, disability, or any protected characteristic under applicable law, or a conclusion that homogeneity of such characteristics is necessary to maximize value.

Ethical Rules 1-5(a) and 1-5(b) do not apply when applicable law or regulation either requires or does not prohibit consideration of a personal characteristic, and consideration of that personal characteristic is relevant to the analysis, opinion, or conclusion.

1.  How does one ensure that an analysis, opinion, or conclusion is not based on personal characteristics?

2.  How does one ensure that a Report does not contain an analysis, opinion, or conclusion based on personal characteristics?

3.  When might consideration of a personal characteristic be relevant and either required or not prohibited under applicable law or regulation?

## Basis for Proper Practice

Portions of the Appraisal Institute Code of Professional Ethics that relate to this topic include the definitions of "Biased", "Credible", "Justified", "Moral turpitude", "Value", "Valuer"; Ethical Rules 1-1, 1-3, 1-5, 3-1, 3-2, and 3-3.

Applicable sections of the Appraisal Institute Standards of Valuation Practice include definitions of "Biased", "Credible", "Value", "Valuer"; Standards A-1, A-2(f), and A-4.

Applicable sections of the Uniform Standards of Professional Appraisal Practice include definitions of "Appraiser", "Bias", "Credible", "Value"; the ETHICS RULE; and Standards Rules 1-1(a), 1-1(b), 1-1(c), 1-2(e), 1-3(a), 1-4(a), 2-1, 2-2(a)(iv), and 2-3(a).

## How does one ensure that an analysis, opinion, or conclusion is not based on personal characteristics?

Appraisers must collect and analyze relevant data to develop their opinions and conclusions. Appraisers must avoid misinterpreting data, using data to develop conclusions that are not credible, and transmitting reports that are misleading. They must avoid conclusions about causality that are not grounded in fact.

Appraisers must also avoid preconceived notions about buyer preferences. For example, just because an area has a high percentage of properties with deferred maintenance does not mean there is low demand for properties in that area. Just because there are properties that are larger or in better condition does not mean there is no demand – or less demand -- for properties that are smaller or in inferior condition.

In valuing property, appraisers must consider effective demand. Are there buyers or renters in the market who are willing and able to buy or rent the property? The personal characteristics of those buyers or renters, or of others associated with the property or transaction, are irrelevant.

**Example A**
An appraiser notes that properties in Neighborhood A sell for $100 per square foot, while similar properties in Neighborhood B sell for $110 per square foot. The appraiser concludes that Neighborhood B is superior because of the ethnicities of the people in the respective neighborhoods.

In addition to improperly basing an opinion on a personal characteristic, the appraiser's reasoning presents clear evidence of bias, which is ethically unacceptable. From a methodology standpoint, the appraisal is flawed because the appraiser has jumped to a conclusion about what causes the difference in value. The appraiser can show from the data that there is a difference in value that is attributed to location. But the appraiser does not know the reason location causes a difference. The reason the appraiser attributes to the difference is speculative and improper.

**Example B**

The appraiser notes the race of the current occupants of the subject property, which is a single-family residence. There are no recent sales in the subject's neighborhood, but there are recent sales in nearby, similar neighborhoods. The appraiser intentionally selects as comparables only those sales for which the buyers were the same race as the occupants of the subject property, even though those properties are more distant than other similar properties that recently sold.

As with the previous example, this too presents clear evidence of bias, which is ethically unacceptable. It is inappropriate to select comparables based on race or any other personal characteristic.

**Example C**

The subject property has accessibility features for individuals with disabilities including a wheelchair ramp to the front door, extra wide doorways, and grab bars in the bathroom. How should an appraiser handle such an appraisal?

While an appraisal cannot be based on personal characteristics, it must consider the impact on value (if any) of physical characteristics. The appraiser cannot assume – jump to the conclusion – that the features either add or subtract from value. The analysis of market data is needed to evaluate the impact of these physical features on value.

**Example D**

An appraiser is asked by a lender to provide a market value upon completion of a proposed religious facility. The appraiser concludes that facility will be in high demand because there are numerous people in the area who are a part of that religious group, which the appraiser named in the report.

Naming the religious group in the report is not in itself problematic. What is problematic is the appraiser basing an opinion of value, either partially or completely, on a characteristic such as religion. Also, the appraiser's logic is flawed. Market value presumes a sale. How much would the property, once the improvements are built, likely sell for in the open market? The number of people who are part of the religious group building the facility—which would be the seller – is irrelevant. The questions the appraiser needs to answer are, what is the demand for religious facilities? And if the improvements will be specialized for this religious group, could they be adapted for another?

**Example E**

An appraiser is asked to appraise a single-family property that has been used as a small group home for people with mental illness. The local zoning ordinances treat the home as a single-family residence. It is located in a residential area of large, older homes that have been converted for multi-family use. The subject improvements conform to the area and if sold, the property would be converted for multi-family use. Should the appraisal report mention that the property is currently occupied by people with mental illness?

No. The personal characteristics of the occupants are irrelevant.

How should the appraisal report describe the current use?

It should describe it as single-family residential.

**Example F**

An appraiser is performing an appraisal of a 10-unit office complex. One unit has been available for

lease for nearly a year. The leasing agent says the reason it has not leased is that the former tenant was a gender equality advocacy group. However, the appraiser notes that the office market has been very weak for the last year. Vacancies are up and rents have been declining. Should the appraisal report include the leasing agent's comment?

No. The comment was inappropriate and based on flawed reasoning; that fact that the unit has not leased may well be because of the weak market. An appraiser should never repeat a false or misleading comment.

## <u>Notoriety</u>

In rare cases, the fame or infamy of a person associated with a property can affect its value, and the appraiser must analyze that effect. This may seem like a deviation from the previously stated rule that personal characteristics are irrelevant to an appraisal. However, these are cases in which the individual's actions created the fame or infamy, which are not inherently personal characteristics. The following examples show how such cases were correctly handled.

### Example G

The subject property was previously owned by a famous celebrity whose death made international news. The property was placed on the market and sold for a price well above anything comparable, and there were multiple backup offers. While the improvements included some unusual features (a recording studio, movie theater) the appraiser concluded that its value was affected by the fame of its previous owner.

### Example H

The subject property was an apartment building. One of the tenants was accused and subsequently tried, found guilty, and imprisoned for committing a notorious crime on the property. The incident was highly publicized. When the allegations first came to light, all of the remaining tenants vacated the property. Even though the demand for apartment units in the local market was strong, the landlord could not lease them. An appraiser was then asked to appraise the property. The appraiser concluded that the highest and best use was to demolish the improvements. The appraiser's report discussed the crime and concluded that the property's value was severely impacted by it.

## How does one ensure that a Report does not contain an analysis, opinion, or conclusion based on personal characteristics?

In preparing or reviewing Reports, appraisers and reviewers must make sure that analyses, opinions, and conclusions expressed are not based on personal characteristics. In addition, it is important to make sure Reports do not include language that suggests they are based on personal characteristics, even though they are not.

### Example I

A reviewer is reviewing an appraisal report involving a proposed retail property. The appraisal report includes charts with the following demographic information for the county: Population – total, male, female, by age; household income, household size, race, ethnicity. The total population and household income information is used in the appraisal process to establish economic demand for the retail space. The other demographic information is not analyzed or commented upon.

The reviewer would be correct in concluding that the demographic information other than total

population and household income is not relevant and should not be included in the appraisal report.

**Example J**
An appraisal report under review states that the area is "inhabited by drug addicts and homeless people." In the reconciliation, that is the reason given for concluding to the low end of the indicated value range. But the reviewer notes that all of the comparable data is from the same location.

The reviewer would be correct in concluding that the statement is not relevant and should not be included in the appraisal report. Further, the reviewer might conclude that the value opinion is not supported at the low end of the range, since the comparable data already reflects the same locational influences.

**Example K**
An appraiser is asked to appraise a property that houses an ethnic restaurant. Can the appraisal report mention the name of the restaurant, which clearly proclaims the ethnicity of the cuisine served?

Yes.

**Example L**
The photographs in an appraisal report include the property owner's family members, who are a certain ethnicity. Is this problematic?

While the appraiser may not have been biased in the development of the value opinion, the inclusion of people in the photos can suggest otherwise. The purpose of including photographs in an appraisal report is to convey to the user of the report the nature of the real estate. Appraisers should ask people to stay out the photographs, and avoid taking pictures that include displayed family pictures, if possible.

**Example M**
The photographs in an appraisal report include the property owner's religious artifacts. Is this acceptable?

While the appraiser may not have been biased in the development of the value opinion, the inclusion of the artifacts in the photos can suggest otherwise. The purpose of including photographs in an appraisal report is to convey to the user of the report the nature of the real estate. Appraisers should avoid taking pictures that include such artifacts, if possible.

**Example N**
An appraisal report includes photographs of the interior, which is decorated in a style that suggests the occupant is of a certain national origin. Is this problematic?

All interiors represent some sort of style. As long as the appraisal report does not suggest that one style is more acceptable than another, and the appraisal report does not reflect any bias with regard to the national origin of the occupants, it is acceptable to include the photographs.

**Example O**
An appraisal report mentions that the appraiser observed numerous political signs in the area in support of one political party's candidate. Is this problematic?

Yes. Such information is not relevant to the appraisal and should not be included in the appraisal report.

**Example P**
The appraisal report states that the many of the patrons of the subject property, which is a bar, are "members of the LGBTQ community." Is this acceptable if it is factual?

No, it is not acceptable even if factual. The personal characteristics of the patrons are irrelevant. What is relevant is that the bar has patrons.

## When might consideration of a personal characteristic be relevant and either required or not prohibited under applicable law or regulation?

In some cases, applicable law or regulation may either require or allow consideration of a certain personal characteristic, and consideration of that personal characteristic is necessary for credible assignment results.

**Example Q**
An appraiser is asked to prepare a feasibility analysis for a proposed subdivision that will be age-restricted (buyers must be 55 or older.) In this assignment, applicable law permits age-restricted communities. The appraiser's conclusion about feasibility will need to consider age. Such a conclusion must be supported.

**Example R**
An appraiser is asked to prepare a study to help assist a company in deciding where to place billboards in a certain language. To complete this assignment, the appraiser will need to determine where people who speak that language live, work, and travel. Applicable law does not prohibit consideration of language spoken in this context. The appraiser's reasoning and conclusions must be supported.

**Example S**
A country's law prohibits ownership of real property within 60 miles of the border by foreign nationals. In preparing an appraisal, the appraiser's demand study will need to take this into account.

## Summary of Standard Practices

- It is unethical to base an analysis, opinion, or conclusion on personal characteristics.

- In preparing and reviewing reports, appraisers and reviewers must make sure that the opinions and
conclusions expressed are not based on personal characteristics.

- Physical and economic characteristics are relevant to the valuation of property, but personal characteristics are irrelevant.

- Appraisers must avoid preconceived notions about buyer preferences. In valuing a property, appraisers must consider effective demand. The personal characteristics of buyers or renters, or others associated with the property or transaction, are irrelevant.

- Notwithstanding the foregoing, in some cases, applicable law or regulation either requires or does not prohibit consideration of a personal characteristic, such as age. If that personal characteristic is relevant to the analysis, opinion or conclusion, the appraiser must consider it.

Effective May 6, 2021