# EXHIBIT 8



Appraisal Institute®

Professionals Providing
Real Estate Solutions

# Valuing Contaminated Properties

## An Appraisal Institute Anthology

## Volume II

Richard J. Roddewig, MAI, Editor

# Valuing Contaminated Properties

**An Appraisal Institute Anthology**

**Volume II**

Readers of this text may be interested in the following publications from the Appraisal Institute:

• *The Appraisal of Real Estate*
• *The Dictionary of Real Estate Appraisal*
• *Real Estate Damages: Applied Economics and Detrimental Conditions*



**Appraisal Institute®**

*Professionals Providing Real Estate Solutions*

# Valuing Contaminated Properties

## An Appraisal Institute Anthology

## Volume II

**Richard J. Roddewig, MAI, Editor**

Appraisal Institute • 200 W. Madison • Suite 1500 • Chicago, IL 60606 • www.appraisalinstitute.org

The Appraisal Institute advances global standards, methodologies, and practices through the professional development of property economics worldwide.

*Reviewers:* Larry O. Dybvig, MAI

Thomas O. Jackson, PhD, MAI

John A. Schwartz, MAI

Leslie P. Sellers, MAI, SRA

*Chief Executive Officer:* Frederick H. Grubbe, MBA, CAE

*Director of Professional Services and Resources:* Evan R. Williams, CAE, IOM

*Senior Manager, Publications:* Stephanie Shea-Joyce

*Senior Book Editor/Technical Writer:* Michael McKinley

*Senior Technical Book Editor:* Emily Ruzich

*Manager, Book Design/Production:* Michael Landis

**For Educational Purposes Only**

The materials presented in this text represent the opinions and views of the author. Although these materials may have been reviewed by members of the Appraisal Institute, the views and opinions expressed herein are not endorsed or approved by the Appraisal Institute as policy unless adopted by the Board of Directors pursuant to the Bylaws of the Appraisal Institute. While substantial care has been taken to provide accurate and current data and information, the Appraisal Institute does not warrant the accuracy or timeliness of the data and information contained herein. Further, any principles and conclusions presented in this publication are subject to court decisions and to local, state and federal laws and regulations and any revisions of such laws and regulations.

This book is sold for educational and informational purposes only with the understanding that the Appraisal Institute is not engaged in rendering legal, accounting or other professional advice or services. Nothing in these materials is to be construed as the offering of such advice or services. If expert advice or services are required, readers are responsible for obtaining such advice or services from appropriate professionals.

**Nondiscrimination Policy**

The Appraisal Institute advocates equal opportunity and nondiscrimination in the appraisal profession and conducts its activities in accordance with applicable federal, state, and local laws.

© 2014 by the Appraisal Institute, an Illinois not for profit corporation. All rights reserved. No part of this publication may be reproduced, modified, rewritten, or distributed, either electronically or by any other means, without the express written permission of the Appraisal Institute.

**Library of Congress Cataloging-in-Publication Data**

Valuing contaminated properties: an Appraisal Institute anthology Volume II / Richard J. Roddewig, editor

    p. cm.

  Includes bibliographical references.

  ISBN 978-1-935328-58-2

    1. Real Property--Valuation--United States. 2. Brownfields--United States. 3. Hazardous waste sites--United States. 4. Liability for hazardous substances pollution damages--United States. I. Roddewig, Richard J. II. Appraisal Institute (U.S.)

HD 1389.5.U6 V36 2014

333.33'6--dc21

                              2002066597

Copyrighted material licensed by Randall Bell on April 26, 2021

# Table of Contents

About the Editor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi
Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xiii
Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv
Preface. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

**CHAPTER 1**   **USPAP and the Appraisal of Properties Impacted by Contamination or Environmental Risk**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**1.1**   **Contaminated Sites** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
by James H. Boykin, PhD, MAI, SREA, CRE
Chapter 24 of *Land Valuation: Adjustment Procedures and Assignments*

**1.2**   **The Appraisal Standards Board and Environmental Issues**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
by Danny Wiley
Letter to the Editor in *The Appraisal Journal* (April 2002)

**1.3**   **Appraisal Standards and Contaminated Property Valuation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (April 2003)

**1.4**   **Guide Note 6: Consideration of Hazardous Substances in the Appraisal Process**. . . . . . . . . . . . . . . . . . . . . . 15
Guide Notes to the Standards of Professional Appraisal Practice of the Appraisal Institute (July 2013)

**CHAPTER 2**   **The Recognized and Generally Accepted Methods for Appraising Property Affected by Contamination and Environmental Risk**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**2.1**   **Environmental Contamination: An Analysis in the Context of the DC Matrix** . . . . . . . . . . . . . . . . . . . . . . . . 25
by Orell C. Anderson, MAI
*The Appraisal Journal* (July 2001)

**2.2**   **Environmental and Biomedical Conditions**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
by Randall Bell, MAI, with Contributing Authors Orell C. Anderson, MAI, and
Michael V. Sanders, MAI, SRA
Chapter 8 of *Real Estate Damages: Applied Economics and Detrimental Conditions* (Second Edition)

**2.3**   **Methods and Techniques for Contaminated Property Valuation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (October 2003)

**2.4**   **Methods and Techniques for Valuing Contaminated Properties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
Part 4 of the Appraisal Institute Seminar *Analyzing the Effects of Environmental Contamination on Real Property* (2010)

**2.5**   **Methods and Techniques for Valuing Contaminated Properties–Instructor Notes**. . . . . . . . . . . . . . . . . . . . 67
Part 4 of the Appraisal Institute Seminar *Analyzing the Effects of Environmental Contamination on Real Property* (2010)

**CHAPTER 3    Environmental Site Assessments, Brownfields, and Source Sites**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**3.1    Environmental Due Diligence in the Wake of the EPA's New All Appropriate Inquiry Rule** . . . . . . . . . . . . 75
by Dianne Crocker
*Real Estate Issues* (Winter 2006-2007)

**3.2    The EPA's Proposed All Appropriate Inquiries Rule and the Appraisal of Contaminated Properties** . . . . 81
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (Spring 2005)

**3.3    Institutional Controls and Contaminated Property Valuation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
by Thomas O. Jackson, PhD, MAI, and J. Michael Sowinski Jr., JD
*The Appraisal Journal* (Fall 2006)

**3.4    Innocent Landowner Programs and Their Effects on Environmental Risk and Property
Value Impacts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
by Thomas O. Jackson, PhD, MAI, and Jennifer M. Pitts
*The Appraisal Journal* (Spring 2006)

**3.5    Municipal Setting Designations: A New Tool for Reducing Environmental Risk and Cost
Effects on Property Values** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
by Thomas O. Jackson, PhD, MAI, and Jennifer M. Pitts
*The Appraisal Journal* (Spring 2007)

**3.6    No Further Action Letter's Status Can Change** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
by Allen Keiter, MAI
*The Appraisal Journal* (October 2002)

**3.7    Preparing Yourself for New Rules for Environmentally Impaired Property** . . . . . . . . . . . . . . . . . . . . . . . . . . 102
by Robert Lipscomb, Richard Maloy, MAI, SRA, and C. Gregory Rogers, JD, CPA
*Valuation Insights & Perspectives* (First Quarter 2006)

**3.8    Brownfields: Consider Aggravating & Mitigating Factors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
by David Wald and Donald C. Nanney, Esq.
*Valuation Insights & Perspectives* (Second Quarter 2004)

**3.9    Advance Due-Diligence Activities Benefit Contaminated Real Estate Transactions** . . . . . . . . . . . . . . . . . . 106
by Howard G. Olson, PhD, and Tom Bergamini, PG
*Real Estate Issues* (Winter 2003-2004)

**CHAPTER 4    Case Study Analysis**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

**4.1    The Effect of Previous Environmental Contamination on Industrial Real Estate Prices** . . . . . . . . . . . . . . 115
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (April 2001)

**4.2    The Analysis of Environmental Case Studies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
by Thomas O. Jackson, PhD, MAI, and Randall Bell, MAI
*The Appraisal Journal* (January 2002)

**4.3    Comments on "The Analysis of Environmental Case Studies"** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
by Rudy R. Robinson III, MAI, Wayne Hunsperger, MAI, Thomas O. Jackson, PhD, MAI,
and Randall Bell, MAI
Letter to the Editor in *The Appraisal Journal* (July 2002)

**4.4    Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation** . . . . . . . . . . . . . . . . . . 134
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (Spring 2004)

**4.5    When Good Things Happen to Bad Properties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (Spring 2009)

Copyrighted material licensed by Randall Bell on April 26, 2021

**CHAPTER 5**    **Regression Modeling in Contaminated Property Assignments**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

5.1  **Evaluating Environmental Stigma with Multiple Regression Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (Fall 2005)

5.2  **Valuing Superfund Site Cleanup: Evidence of Recovering Stigmatized Property Values** . . . . . . . . . . . . . . . 155
by Brian H. Hurd, PhD
*The Appraisal Journal* (October 2002)

5.3  **Errors in Hedonic Modeling Regressions: Compound Indicator Variables and Omitted Variables** . . . . . 165
by Warren Rogers, PhD
*The Appraisal Journal* (April 2000)

5.4  **Proximity Stigma: Testing the Hypothesis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169
by Albert R. Wilson
*The Appraisal Journal* (Summer 2004)

5.5  **Is Pollution a Homogeneous Determinant of Value?** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177
by Christopher S. Decker, PhD, Donald A. Nielsen, PhD, and Roger P. Sindt, PhD
*The Appraisal Journal* (Spring 2005)

**CHAPTER 6**    **Use of Formal and Informal Surveys**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

6.1  **The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge** . . . . . . . . . . . . . . . . . . 197
by Marcus T. Allen, PhD, and Grant W. Austin, MAI
*The Appraisal Journal* (October 2001)

6.2  **A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation** . . . . . . . . . . . . . . . . . . . 205
by James Flynn, PhD, Donald G. MacGregor, PhD, Wayne Hunsperger, MAI, SRA, C. K. Mertz,
and Stephen M. Johnson, PhD
*The Appraisal Journal* (Winter 2004)

6.3  **Surveys, Market Interviews, and Environmental Stigma** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (Fall 2004)

6.4  **Environmental Case Studies: Ensuring Suitable Comparables** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222
by Kimberly Winson-Geideman, PhD
*The Appraisal Journal* (Summer 2005)

6.5  **Contingent Valuation: Not an Appropriate Valuation Tool** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228
by Albert R. Wilson
*The Appraisal Journal* (Winter 2006)

6.6  **Comments on "Contingent Valuation: Not an Appropriate Valuation Tool"** . . . . . . . . . . . . . . . . . . . . . . . . . 236
by Kara Fishman, MAI, PhD, Robert A. Simons, PhD, Grant W. Austin, MAI, and Albert R. Wilson
Letters to the Editor in *The Appraisal Journal* (Summer 2006)

6.7  **Testing the Reliability of Contingent Valuation in the Real Estate Marketplace** . . . . . . . . . . . . . . . . . . . . . . 244
by Richard J. Roddewig, MAI, and James D. Frey
*The Appraisal Journal* (Summer 2006)

6.8  **Seller Disclosure and Buyer Knowledge: How They Affect Market Value** . . . . . . . . . . . . . . . . . . . . . . . . . . . 256
by Rudy R. Robinson III, MAI, and Scott R. Lucas
*The Appraisal Journal* (Spring 2007)

6.9  **Under the Microscope: Dissection of a Contingent Valuation Survey** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
by Kristy E. Mathews
*The Appraisal Journal* (Summer 2008)

6.10  **The Use of Focus Groups for Property Valuation Research** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270
by Ron Throupe, PhD
*The Appraisal Journal* (Fall 2011)

6.11  **Advisory Opinion 9 and Contingent Valuation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
by Thomas O. Jackson, PhD, MAI, Jennifer Pitts, and Stephanie Norwood
*The Appraisal Journal* (Summer 2012)

**CHAPTER 7**    Appraising Properties Affected by Various Types of Contamination

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

*Landfills*

7.1    **Evaluating the Potential Impact of a Proposed Landfill** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292
by Shawn E. Wilson, MAI
*The Appraisal Journal* (Winter 2009)

7.2    **Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey** . . . . . . 302
by Michael Greenberg, PhD, and Justin Hollander
*The Appraisal Journal* (Spring 2006)

7.3    **Watersbend: Appraising a Brownfield Redevelopment Project** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 313
by Rudy R. Robinson III, MAI, Scott R. Lucas, and Garland G. Rasberry
*The Appraisal Journal* (July 2002)

*Groundwater and Surface Water Contamination by Petroleum and Other Contaminants*

7.4    **Contaminated Waterways and Property Valuation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320
by Randall Bell, MAI
*The Appraisal Journal* (Fall 2008)

7.5    **The Effects of an Oil Pipeline Rupture on Single-Family House Prices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328
by Robert A. Simons, PhD, Kimberly Winson-Geideman, PhD, and Brian A. Mikelbank, PhD
*The Appraisal Journal* (October 2001)

*Soil Contamination by PCBs and PAHs*

7.6    **Fuel-Oil Contamination of a Residence: A Case Study in Stigma** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335
by Bruce M. Closser, MAI, SRA
*The Appraisal Journal* (July 2001)

7.7    **Analysis of the Effects of Contamination by a Creosote Plant on Property Values** . . . . . . . . . . . . . . . . . . . . 339
by Douglas S. Bible, PhD, Chengho Hsieh, PhD, Gary Joiner, PhD, Chuo-Hsuan Lee, PhD,
and David W. Volentine, MAI
*The Appraisal Journal* (Winter 2005)

7.8    **Estimating Proximate Property Damage From PCB Contamination in a Rural Market:**
**A Multiple Techniques Approach** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347
by Robert A. Simons, PhD
*The Appraisal Journal* (October 2002)

*Mold*

7.9    **Mold: What Appraisers Should Know** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357
by Michael V. Sanders, MAI, SRA
*Valuation Insights & Perspectives* (Third Quarter 2005)

7.10    **Dramatic Rise in Toxic Mold Claims, Litigation, and Legislation Demands Pro-Active**
**Response from Insurers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359
by Del Williams
*The Appraisal Journal* (April 2002)

7.11    **Commercial and Residential Water Damage: The Mold Connection** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 362
by Del Williams
*The Appraisal Journal* (October 2002)

7.12    **An Exploratory Review of the Effects of Toxic Mold on Real Estate Values** . . . . . . . . . . . . . . . . . . . . . . . . . . 365
by Robert A. Simons, PhD, and Ron Throupe, PhD
*The Appraisal Journal* (Spring 2005)

7.13    **Toxic Mold Liability Update: Implications of *Kilian v. Equity Residential Trust*** . . . . . . . . . . . . . . . . . . . . . 374
by Robert J. Aalberts, JD, and Richard W. Hoyt, PhD, MAI, SRA
*The Appraisal Journal* (Spring 2006)

Copyrighted material licensed by Randall Bell on April 26, 2021

**CHAPTER 8**    **Contaminated Properties and the Tax Assessment Process**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

8.1   **Appraising Environmentally Contaminated Property and Tax Reduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . 386
by Del Ross, PE, CBOA
*Assessment Journal* (September/October 2002)

8.2   **The Development of Standards For Assessing Contaminated Properties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395
by Del Ross, PE, CBOA
*Assessment Journal* (Summer 2003)

8.3   **Generating Property Tax Benefits from Contaminated Land--A Private and Public Perspective** . . . . . . . 406
by Yvonne J. Hamlin, LLB
*Journal of Property Tax Assessment and Administration* (Volume 1, Issue 3)

8.4   **Environmental Contamination: Using Assessed Values for a Buyout** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 415
by Wayne D. Llewellyn, CAE, and Robert E. Partridge, MIMA
*Assessment Journal* (March/April 2002)

8.5   **Mercury Contamination--Functional or Economic Obsolescence?** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417
by Rick Stuart, CAE
*Assessment Journal* (March/April 2001)

**CHAPTER 9**    **Legal Issues and Valuation in Litigation Settings**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 419

9.1   **Implications of the *Kumho Tire* Case for Appraisal Expert Witnesses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422
by Richard W. Hoyt, PhD, MAI, SRA, and Robert J. Aalberts, JD
*The Appraisal Journal* (January 2001)

9.2   ***Daubert* and the Appraisal Expert Witness Revisited** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 429
by Richard W. Hoyt, PhD, MAI, SRA, and Robert J. Aalberts, JD
*The Appraisal Journal* (Spring 2008)

9.3   ***Daubert* and Qualification of the Appraisal Expert Witness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 438
by Richard W. Hoyt, PhD, MAI, SRA, Robert J. Aalberts, JD, and Percy Poon, PhD
*The Appraisal Journal* (Summer 2010)

9.4   **Challenges to *Daubert* Ruling Double** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 444
*Valuation* (Second Quarter 2008)

9.5   **Real Property Valuation Issues in Environmental Class Actions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 445
by Thomas O. Jackson, PhD, MAI
*The Appraisal Journal* (Spring 2010)

**CHAPTER 10**   **International Valuation Standards and Contaminated Property Appraisal**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 453

10.1   **An International Perspective on Incorporating Risk in the Valuation of Contaminated Land** . . . . . . . . . 457
by Sandy G. Bond, PhD, William N. Kinnard, Jr., PhD, MAI, SRA, Paul J. Kennedy, PhD,
and Elaine M. Worzala, PhD
*The Appraisal Journal* (July 2001)

10.2   **How Australian Appraisers Assess Contaminated Land** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 463
by Nelson Chan
*The Appraisal Journal* (October 2000)

10.3   **Stigma of Contaminated Land: Difficult to Tackle** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470
by Hans Siemens
*The Appraisal Journal* (April 2003)

10.4   **The Risk Approach: A Step-By-Step Plan for a Clean Valuation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475
by Bas van de Griendt and George G.M. ten Have
*The Appraisal Journal* (January 2003)

10.5   **A Beginning Best Practice Brownfield Valuation Model** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 481
by Bruce Weber, MAI
*The Appraisal Journal* (January 2002)

**ADDENDA**

Appendix: Excerpt from Fannie Mae Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 495

Bibliography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 499

Copyrighted material licensed by Randall Bell on April 26, 2021

# About the Editor

**Richard J. Roddewig, MAI, CRE, FRICS,** is president of Clarion Associates, Inc., an appraisal and real estate and land use consulting firm with affiliated offices in Chicago, Denver, Cincinnati, Philadelphia, and Chapel Hill. Mr. Roddewig has an undergraduate degree from the University of Notre Dame and both a Master of Arts and a Juris Doctor degree from the University of Chicago. He works nationally out of Clarion's Chicago office and has worked on appraisal assignments in more than 40 states. His areas of appraisal expertise include special-purpose properties, conservation and historic preservation easements, and properties and markets impacted by contamination and other types of environmental conditions. Much of Mr. Roddewig's real estate appraisal and consulting work is as an expert witness in litigation and administrative proceedings in various types of federal and state courts as well as before federal, state, and local agencies. He has authored more than 40 articles in professional journals (including *The Appraisal Journal*) and is a past regular environmental columnist for *The Appraisal Journal*. He has also authored, coauthored, edited, or contributed to 11 books (including two published by the Appraisal Institute) prior to this anthology. He also has developed a number of Appraisal Institute seminars, including three seminars on valuing contaminated properties, which he has taught all across the United States. Mr. Roddewig won the 1996 Sanders A. Kahn Award for his article "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," and his book *Appraising Conservation and Historic Preservation Easements* won the George L. Schmutz Award for being the most outstanding Appraisal Institute publication of 2011.

Copyrighted material licensed by Randall Bell on April 26, 2021

Copyrighted material licensed by Randall Bell on April 26, 2021

# Acknowledgments

Those most responsible for this anthology are the authors of the articles and book and seminar excerpts included in it. I know from experience that it is not easy to manage a busy appraisal practice and also find the time to write an article or book or develop a seminar. Yet without the sacrifice of their time and energy, this anthology would not have been possible.

Next in line for thanks are the reviewers for this anthology. They are Larry O. Dybvig, MAI, Thomas O. Jackson, PhD, MAI, John A. Schwartz, MAI, and Leslie P. Sellers, MAI, SRA. Their comments and corrections were critical to assuring the accuracy of the chapter introductions and inclusiveness of the materials selected.

A special acknowledgment of the contribution of Professor Thomas O. Jackson, PhD, MAI, to this anthology is in order. Fourteen *Appraisal Journal* articles authored or coauthored by Mr. Jackson are included in this anthology, as are two excerpts from the 2010 Appraisal Institute seminar he developed on analyzing the effects of environmental contamination on real property. When I became too busy in my appraisal practice in the late 1990s to continue on as the regular environmental columnist for *The Appraisal Journal*, Mr. Jackson took over that task. His contribution to the appraisal profession and to the development of its recognized and generally accepted methods has been enormous, as evidenced by his articles included in this anthology.

As I have done in my two previous Appraisal Institute books, I must thank my current colleagues in the Chicago office of Clarion Associates, Inc.: Gary Papke, MAI, CRE, FRICS, Senior Vice President; Charlie Brigden, CRE, FRICS, ASA, Vice President; Doug Koske, Business Manager; Anne S. O'Connell, Real Estate Analyst; Hannah B. Brown, Research Analyst; Jordan Roddewig, Administrative Assistant; and Tom Kleiza, Intern. Former staffers Craig Van Pelt, Christine Tutaj, Elizabeth Wong, and Courtney Flanders were with us when this anthology project began but have since moved on to other firms, much to our dismay. All of those named have contributed in one way or another to this effort–some directly by researching past issues of appraisal journals to identify articles for possible inclusion, and others indirectly by contributing to our firm's general understanding of how to apply the three traditional approaches to value to the many unusual appraisal issues that arise in contaminated property assignments. Most importantly, however, those named have all understood the time and effort needed for me to produce a volume such as this and tolerated the day-to-day issues it sometimes created for me in attending to my other duties at my appraisal firm.

This is the third book I have either written or edited for the Appraisal Institute. Each time I have been tremendously impressed by the professionalism of the Appraisal Institute Publications staff. I again must thank them for their patience in correcting my sentence structure and punctuation errors. Special thanks to them for seeing the importance of my proposal to update the first anthology with this second volume.

Copyrighted material licensed by Randall Bell on April 26, 2021

# Foreword

This second volume of *Valuing Contaminated Properties* continues the discussion that began in Volume I by providing an extensive collection of articles and excerpts from books, seminars, and professional guidelines that discuss the appraisal of properties affected by environmental contamination. There have been major changes in the appraisal profession's perceptions of contaminated properties since Volume I was published in 2002, and this volume provides a necessary update.

Editor Richard J. Roddewig, MAI, CRE, introduces the major issues discussed in each chapter and explains the significance of the works included and how they reflect major valuation trends. From this collection, one can become well-versed in several important trends that have recently emerged, including the general understanding that contamination's impact on value is largely temporary and the shift in focus from appraising industrial and commercial source sites to appraising residential properties affected by contamination. Also discussed are the increased availability of online sales data and the new emphasis on using more market data in contamination assignments. Most importantly, the articles presented here demonstrate the development of widely recognized and generally accepted methods for handling these challenging appraisal assignments.

*Valuing Contaminated Properties*, Volume II, is a definitive compilation of accepted appraisal knowledge on an important topic. This updated anthology will help appraisers stay current and look toward a future of evolving strategies for dealing with environmental contamination.

**Ken P. Wilson, MAI, SRA**
2014 President
Appraisal Institute

Copyrighted material licensed by Randall Bell on April 26, 2021

# Preface

The first volume of *Valuing Contaminated Properties: An Appraisal Institute Anthology* was published in 2002. It was a collection of all but a few of the articles published in *The Appraisal Journal* between the mid-1980s and 2001 on the appraisal of contaminated properties. Also included were a number of articles from *Valuation Insights & Perspectives* and a few articles from *Real Estate Issues*, the professional journal of The Counselors of Real Estate.

This second volume covers the appraisal literature published since 2001 and is intended to be a companion piece to the first volume. Included are all articles published in *The Appraisal Journal* since Volume I that deal with contaminated properties in any significant way. It also includes a July 2001 *Appraisal Journal* article that was not included in the first volume. Once again, selected articles from *Valuation* and *Real Estate Issues* are also included. Chapter 8, which deals with tax assessment of contaminated properties, includes articles from *Assessment Journal* and the *Journal of Property Tax Assessment and Administration*, since *The Appraisal Journal* has not addressed that topic in recent years.

Similar to the first volume, many of the articles found here could have been included in a number of different chapters, and articles on other categories of environmental "disamenities" such as power lines, noise, and odors have not been included due to space limitations. Since standards of professional appraisal practice require appraisers to use recognized and accepted methods of the appraisal profession, no articles from the economic or academic real estate professions have been included here. However, the Bibliography in the Addenda contains references to many such articles published since 2001.

Some comments on the organization of this volume are in order. The articles included in each chapter of Volume I were arranged by date of publication. That was intended to assist the reader in understanding how the appraisal profession developed and progressed in its early exploration of methods for appraising properties affected by contamination and environmental risk. Some of the chapters in this volume, such as Chapters 4 and 6, are presented in order of publication date. However, articles in other chapters have been ordered in the best manner to facilitate discussion of their significance in the chapter introductions.

A comparison of the table of contents for this volume with that of Volume I provides important insights into the more recent refinement of the appraisal profession's approach to contaminated property assignments. For example, articles related to the topic of environmental insurance and environmental indemnities were included in Volume I, but we could find no articles on that topic that have been published in the appraisal literature since then. Also, Chapter 6 of Volume I included four articles related to mortgage lending on contaminated properties, but this volume does not include any since no comparable articles have appeared in *The Appraisal Journal* since then. The reason for this, as suggested in the final article in Chapter 6, is that by 2001 mortgage lenders had developed in-house environmental review procedures that normalized and institutionalized environmental risk analysis, at least for loans on commercial and industrial properties. Although HUD, Fannie Mae, and Freddie Mac guidelines for completing appraisals with the URAR form raise important issues related to identification and consideration of environmental issues, my search through *The Appraisal Journal* could find no articles on the topic. Such an article, series of articles, or even a professional seminar on URAR environmental consideration obligations is long overdue.

Note too that Chapter 4 of Volume I was titled "Understanding, Analyzing, and Estimating Stigma." No similar stand-alone chapter in this volume deals with stigma. This is a reflection of how well the earlier articles, various Appraisal Institute seminars developed in the 1990s and early 2000s, and The Appraisal Foundation's Advisory Opinion 9 (AO-9) have clarified the meaning of the term *stigma* for the appraisal profession. Most of the articles in

this volume deal with environmental stigma or risk in one manner or another but without concern about how to explain its meaning for the appraisal profession.

A comparison of the topics covered in Chapter 7 in the first and second volumes is also revealing. Some of the specific topics covered in Chapter 7 of Volume I were asbestos contamination, sick buildings, electromagnetic fields, and radon. None of those topics appear in articles in this new volume. By comparison, Chapter 7 of this volume includes eight articles on soil contamination and mold.

The use of formal statistical surveys was the subject of part of only one article in Volume I ("Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches"), and that article lamented the lack of published appraisal literature on the topic. Since 2002, there have been so many such articles in *The Appraisal Journal* alone on this topic that all of Chapter 6 is devoted to it.

Litigation continues to be the forum in which the reliability and acceptability of various appraisal techniques are tested. Chapter 11 of Volume I was titled "Legal Issues and Valuation in Litigation Settings," and the same title is given to Chapter 9 in this new volume. Two of the articles in the first volume dealt with the implications of the then-recently announced US Supreme Court decision in the *Kumho Tire* case that extended the earlier *Daubert* case criteria for the admissibility of scientific evidence to technical but non-scientific experts such as licensed real estate appraisers. This volume includes four more articles discussing the implications of the *Kumho Tire* and *Daubert* decisions. The last article in Chapter 9 discusses the emerging topic of the appraiser's role in evaluating the appropriateness of class-action treatment in cases involving claims that large numbers of properties in one neighborhood or area have been similarly affected by an environmental situation or event.

Much has happened in the appraisal profession as it relates to contaminated property assignments since the 2002 publication of Volume I. This collection of articles covers those developments. A careful reading of this volume reveals the following five major developments in this area of appraisal practice since 2001:

1.  The appraisal methods and techniques beginning to be explored in the 1980s and 1990s have now been consolidated into a set of recognized and generally accepted methods. The 2010 Appraisal Institute seminar *Analyzing the Effects of Environmental Contamination on Real Property* sets out those methods in no uncertain terms, as does the Thomas O. Jackson article "Methods and Techniques for Contaminated Property Valuation." Excerpts from this seminar and article are included in Chapter 2.

2.  The overall focus has largely changed. During the 1980s and 1990s, the central focus in the appraisal literature was on the appraisal of source sites, which were typically industrial and commercial properties. Although the appraisal of industrial and commercial source sites continues to be important today, there has been more focus in the appraisal literature since 2001 on the development of generally accepted methods for appraising residential properties either directly or indirectly affected by contamination. This has been caused, in part, by the requirement in Fannie Mae and Freddie Mac guidelines that appraisers identify, discuss, and analyze readily apparent environmental conditions and issues as part of completing URAR form appraisal reports. The Addenda to this anthology contains excerpts from those guidelines.

3.  The third major development is the increased availability of online data which, combined with new GIS tools, makes it much easier to identify contaminated sites and areas as well as download and analyze prices paid for properties potentially affected by contamination. This has been especially important to appraisal assignments involving homes in neighborhoods affected by environmental issues such as groundwater and soil contamination or located near various sources of possible environmental risk and stigma such as landfills, contaminated surface water, or contaminated industrial sites. The availability of online and GIS mapping have made it much easier for appraisers to complete neighborhood studies and compare prices and trends in affected neighborhoods to unaffected neighborhoods. Many of the articles in Chapters 4, 5, and 7 use online data sources and GIS mapping in their studies.

4.  There is now a general understanding in the appraisal profession that any impact on prices and values can end long before remediation or cleanup is completed. When they do occur, impacts on prices and values are typically temporary, although the length of the temporary impact can sometimes be measured in years rather than weeks or months. Sometimes prices and values are not impacted at all. In setting asking and offering prices, sellers and buyers evaluate and rely on the work of state and federal regulators in establishing health and safety standards, investigating contamination situations, and imposing appropriate remediation methods. The actual prices being paid in the marketplace as of the particular date of value involved in the appraisal assignment determine the market value as affected by the environmental situation.

5.  Our job as appraisers is not to bias the appraisal process by letting our personal opinions cloud our professional judgment. Actual prices paid must guide the appraisal process. It is contrary to accepted appraisal principles to second-guess the market, rely on opinions rather than actual prices and market data, or speculate about a hypothetical marketplace of more informed buyers and sellers in the absence of a clear statement in the appraisal report about the assumption of a hypothetical condition contrary to known facts. The recently revised Guide Note 6 adopted by the Board of the Appraisal Institute in July 2013 included in Chapter 1 makes that perfectly clear.

Copyrighted material licensed by Randall Bell on April 26, 2021

Finally, the following final paragraph from the Preface to the original 2002 anthology continues to be appropriate to this new volume:

The publication of this anthology is timely for a number of reasons. There is now a significant body of published articles that can and should be collected in one book for easy access and reference. More importantly, however, is the fact that *The Appraisal Journal*, together with USPAP, *The Appraisal of Real Estate*, and the courses and seminars of the Appraisal Institute constitute the body of accepted appraisal practice and methodology. Appraisers who want to understand the evolution of appraisal techniques for the consideration of environmental risks affecting real estate and who want to learn appraisal techniques practiced by other appraisal professionals should familiarize themselves with the content of published *Appraisal Journal* articles. The Appraisal Institute hopes this anthology will help them do that.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 1

# USPAP and the Appraisal of Properties Impacted by Contamination or Environmental Risk

## Introduction

In 2002, the Appraisal Standards Board published a revision to Advisory Opinion 9 (AO-9), Responsibility of Appraisers Concerning Toxic or Hazardous Substance Contamination. The revised AO-9, now entitled The Appraisal of Real Property That May Be Impacted by Environmental Contamination, can be found in the 2014-2015 edition of the *Uniform Standards of Professional Appraisal Practice* (Washington, D.C.: The Appraisal Foundation, 2014), available online at www.uspap.org. The old version of AO-9, first adopted in 1992 and then amended in 1998 (and included in Volume I of this anthology), was a bare-bones outline of some of the issues that might arise in assignments involving properties with environmental issues. It dealt generally with appraisal issues such as competency and the necessity for a multidisciplinary approach to the assignment by environmental consulting specialists and other professionals who deal with legal liabilities and business operations for properties with known environmental issues.

The central focus of the amended 1998 AO-9 was an appraisal assignment in which an appraiser was being asked to *disregard known contamination or environmental issues*. That was the typical contaminated property appraisal assignment, at least until the late 1990s. The 1998 AO-9 recognized the appropriateness of such an assignment so long as the appraisal report was made subject to an appropriate "hypothetical condition that the real estate is free of contamination." However, the older version of AO-9 also warned appraisers to discuss the need for a hypothetical condition with the client and ensure that the report is not misleading by including a "clear and accurate disclosure of the factual contamination problem as well as a statement of the validity of and useful purpose for the hypothetical condition that the real estate is not affected."

The 1998 AO-9 had little to say about how an appraiser should go about actually determining the impact of contamination and environmental risk on value. The advisory opinion had three simple forms of advice for appraisers in such situations:

- First, be aware of and correctly use "recognized methods and techniques necessary to produce a credible appraisal."
- Second, do not assume that market value less "remediation or compliance cost" is the "as is" value of the property.
- Third, be sure to consider "other factors," such as the presence or absence of stigma and the possibility of a change in highest and best use.

This cautious approach reflected the typical appraisal situation in the mid- to late-1990s involving properties with known environmental issues. The purpose of most appraisals commissioned by lenders at that time was a determination of value assuming a property had been properly remediated. Most appraisers during the 1990s were uncomfortable with accepting an assignment requiring consideration of contamination or environmental issues. Instead, they typically preferred to provide an opinion of market value only under the special assumption or hypothetical condition that the property had been remediated. As a result, the 1998 AO-9 did not provide a blueprint for how to proceed in assignments for which the purpose was to actually determine the effect of environmental issues including known but unremediated contamination on market value.

The excerpt from Chapter 24 of *Land Valuation: Adjustment Procedures and Assignments* (written by James H. Boykin and published by the Appraisal Institute in 2001) summarizes professional appraisal standards as they applied in 2001 to typical assignments involving known or suspected contaminated properties. Boykin emphasizes communication with the

client about the respective roles of real estate appraisers versus environmental professionals and the wording of appropriate disclaimers and disclosures related to environmental issues in appraisal reports. Boykin also discusses Guide Note 8, which was issued by the Appraisal Institute in 1991 and revised in 1994, and the Property Observation Checklist, which was developed by the Appraisal Institute in 1995. Guide Note 8 was the subject of the January 1998 *Appraisal Journal* article "Contaminated Properties and Guide Note 8: Questions, Answers, and Suggestions for Revision," which was included in Volume I. (This guide note was also included in the Addenda of Volume I.)

The 21-question Property Observation Checklist was developed in response to mortgage lender policies and federal lending agency regulations that held appraisers responsible for noting adverse environmental issues apparent during visits to the property and the surrounding neighborhood. Volume I included Steven A. Levine's 1999 *Valuation Insights & Perspectives* article "Environmental Challenges Can Create Work for Real Estate Appraisers," which summarized the Fannie Mae, Freddie Mac, and HUD requirements for appraisers to note adverse environmental conditions encountered during site visits. As the Boykin excerpt notes, "The appraiser is the first real estate professional to inspect an affected property and its immediate neighborhood. Appraisers are trained observers and researchers, so their initial observations of a tract may serve the client by pointing out suspect conditions or identifying prior users or uses of the parcel." (page 6) But as both Boykin and the Property Observation Checklist make clear, appraisers are not environmental professionals and are not usually technically trained, qualified, or experienced in the detection of potential environmental problems. The 12th edition of *The Appraisal of Real Estate* (published in 2001) included a reprint of the entire Property Observation Checklist and noted that the checklist was designed to be an easy-to-use everyday tool that, if filled out properly and included in an appraisal report, might limit the appraiser's liability related to later discovery of contamination or environmental issues affecting value. The introduction to the Property Observation Checklist clearly stated that the appraiser was not liable for lack of identification of environmental factors, that the report was not a professional environmental site assessment, and that the client had the responsibility to follow up on any information noted in the checklist that might indicate an environmental issue.

The Property Observation Checklist never achieved widespread use in the appraisal profession. Both the 13th and 14th editions of *The Appraisal of Real Estate* (published in 2008 and 2013, respectively) dropped all reference to it.[1] The reason for this is simple: The fear of the appraisal profession in the late 1980s and early 1990s

that commercial mortgage lenders would hold real estate appraisers responsible for identifying contamination issues had been unfounded. By the year 2000, lenders clearly understood that they had a legal responsibility to retain environmental professionals to undertake environmental due diligence investigations before making loans on commercial and industrial properties.

However, the "site" section of page 1 of the March 2005 version of the Uniform Residential Appraisal Report (Fannie Mae Form 1004 and Freddie Mac Form 70) requires the appraiser to answer yes or no to the following question: "Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?" This puts the responsibility on the appraiser to look for environmental conditions and describe them. The published FHA and HUD guidelines for single-family home appraisals include specific requirements related to investigating, noting, and commenting on "all hazards and nuisances affecting the subject property that may endanger the health and safety of the occupants and/or the structural integrity or marketability of the property." Among the listed items are known hazards and adverse conditions including "toxic chemicals, radioactive materials, other pollution, hazardous activities, potential damage from soil or other differential ground movements, groundwater, inadequate surface drainage, flood, erosion, excessive noise and other hazards on or off site."[2] If hazards or nuisances are observed, the appraiser must describe them and include a statement that the appraisal opinion is "subject to repairs and/or inspection" in the site section of the appraisal report. Supporting documentation provided by the appraiser may include extra photos or copies of site studies or analyses, property reports, surveys, or plot plans.

The articles included in Volume I of *Valuing Contaminated Properties* illustrated that many appraisers in the late 1990s and early 2000s were beginning to do more than simply comment on observed environmental issues and then state that the appraisal does not consider the effect of such conditions on value. Appraisers were increasingly being asked by clients to actually determine the effect of known contamination and environmental issues on market value. In response to this, appraisers began to apply variations on traditional appraisal methods. The flurry of articles in *The Appraisal Journal* during the 1990s, especially those published between 1996 and 2002, began to form the body of a recognized and generally accepted methodology. It was clear even in 1998 that the recent version of AO-9 needed more substance if it was to provide effective guidance for appraisers asked to deal directly with the impact of environmental issues on value.

The 1998 version of AO-9 had barely been adopted when both the Appraisal Institute and the Appraisal Stan-

---

1.  Although never officially revoked or deleted in any official way from the appraiser's toolkit, the Property Observation Checklist is simply not used today by many real estate appraisers. As noted in the 12th edition of *The Appraisal of Real Estate* (the appropriate excerpt of which was included in the Addenda to Volume I of this anthology), this checklist was always intended to be a voluntary guideline for recording observations about on-site and nearby environmental factors and was not developed for single-family residential or agricultural properties (*The Appraisal of Real Estate*, 12th ed., 209).

2.  US Department of Housing and Urban Development, *Valuation Analysis for Single Family One- to Four-Unit Dwellings* (4150.2), http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4150.2.

Copyrighted material licensed by Randall Bell on April 26, 2021

dards Board (ASB) began working on another set of revisions. In response to the perceived misuse of the traditional methods of appraisal in contamination and stigma assignments, the Appraisal Institute formed a task group to develop a proposed Statement on Appraisal Standards related to the proper and improper use of statistical and market survey techniques in appraisal and consulting assignments involving environmental issues. This group included representatives of the International Association of Assessing Officers (IAAO), the Counselors of Real Estate (CRE), and the International Right of Way Association (IRWA) as well as the Appraisal Institute.[3] The group focused mainly on reports prepared by designated appraisers and non-appraisers (such as real estate economists) for various litigation assignments involving contaminated properties, but the group's work was also intended to be relevant to other types of appraisal reports.[4]

The task group's exposure draft report was issued in March 2000, and as stated in Danny Wiley's April 2002 letter to the editor in *The Appraisal Journal*, the group's recommendations were the subject of *An Environmental and Property Damages Symposium* held in Toronto in April 2002 and sponsored by the Centre for Advanced Property Economics and The Appraisal Foundation.

Meanwhile, as the Wiley letter indicates, the ASB was busy on its revisions to AO-9. Wiley was a member of the ASB from 2001 to 2004 and the chair from 2002 to 2004. One of the members of the task force, Thomas O. Jackson, was also a member of the ASB in 2001 and 2002. An ASB exposure draft was issued in February 2002 and presented at the Toronto symposium. The revised AO-9, which is discussed by Jackson in his article "Appraisal Standards and Contaminated Property Valuation" included in this chapter, was also adopted in June 2002 during Jackson's tenure on the board. As stated in the Wiley letter, "The Advisory Opinion sets forth a framework for the appraisal of contaminated properties that addresses issues in the use of paired sales, case studies, market interviews, and statistical analysis."

The revised 2002 AO-9 is a significant departure from the earlier 1998 version. While it keeps the basics of that older version, the new advisory opinion directly addresses the large array of issues raised in appraisal assignments in which the appraiser's job is to actually provide an opinion of market value as impacted by contamination or environmental risk rather than assume that the property has been remediated.

Since Jackson's 2003 article on the revised AO-9 was written from the perspective of someone involved in the process of developing that standard (as a member of the Appraisal Institute's task group and the ASB and a participant in the development of the Toronto Symposium), it is especially important to understanding the meaning of AO-9. Jackson's article provides the ASB's equivalent of an expression of the "legislative intent" behind a law and provides an explanation of the meaning and intent of AO-9.

Some of the critical points in the Jackson article include the following:

- While "the unique sets of risks and costs associated with contaminated properties" make them somewhat different from other property types, "this uniqueness does not preclude the applicability of existing appraisal standards to the valuation of these properties." It simply makes the appraisal assignments more complex. (page 10)
- Extraordinary assumptions are required when relying on reports of "qualified environmental engineers" or others related to the nature and extent of the contamination and remediation costs, since "the appraiser generally would not be in a position to evaluate this information independently." (page 10)
- In assignments requiring actual consideration of the effect of the contamination or environmental issues on market value, the preferred approach is to arrive at two opinions of value: the value as if "unimpaired" and the value as "impaired."
- The touchstone in every assignment involving contaminated property and environmental risks is how "typical market participants" would react. Advisory Opinion 22 (AO-22), which deals with the appropriate scope of work, explains this in more detail. AO-22 requires the appraiser to look at actual prices paid in the market in which the property is located and to view that market from the perspective of actual buyers and sellers under "normal" or "typical" conditions.
- The appropriate costs to consider are costs that affect property cash flows (for income properties) but only those that are "*recognized by the market*, as opposed to all possible costs." (page 14)
- Costs to be considered and typically "recognized by the market" are only those costs to bring the property into "regulatory compliance" because "remediation beyond regulatory requirements would not be recognized by typical market participants." (page 14)

---

3. The members of the Task Group for the Development of Standards for Determining the Acceptability of Applications of Statistical and Market Survey Techniques to the Valuation of Real Property were Albert R. Wilson, CRE, Chairman; Peter D. Bowes, MAI, CRE, Symposium Chairman; Gregory Hawley, LLD, ABA; Bruce W. Sauter, IAAO; Albert N. Allen, MAI, IRWA; David Ellis, MAI, CRE; Thomas O. Jackson, PhD, MAI, CRE; Warren F. Rogers, PhD; and Richard J. Roddewig, MAI, CRE.

4. The "Background and Preamble" to the proposed USPAP statement developed by the task group stated, "On December 6, 1999, the United States Supreme Court received suggested changes to the Federal Rules of Evidence and in particular Rule 702. The suggested changes to Rule 702 were prompted, in part, by the *Daubert* and *Kumho Tire* decisions" of the federal courts. The proposed statement went on to explain as follows: "The suggested revisions to Rule 702… require a reliable approach to support an expert opinion. (Note: The supporting discussion of Rule 702 states, 'The Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.')" See Albert R. Wilson, "The Need for Standards in the Application of Statistical and Survey Research to Real Estate Valuation Practice," Addenda A: Proposed Statement on Appraisal Standards, First Exposure Draft (paper presented at *An Environmental and Property Damages Symposium: Standards, Due Diligence, Valuation and Strategy*, sponsored by the Centre for Advanced Property Economics and the Appraisal Foundation, Toronto, April 2002), 24-26.

- Some types of contamination or environmental situations may result in no impact on value.[5]

The ways in which investigation and remediation can change and even enhance the value of a contaminated property over time were discussed in many of the articles in Volume I.[6] The 2002 revised AO-9 clearly recognizes the existence of such a "remediation life cycle" and emphasizes its importance in framing the contaminated property analysis. AO-9 defines a *remediation life cycle* as "a cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation."[7]

The Jackson article in this chapter describes how values can change during this life cycle (pages 12-13):

> Environmental risk and potential stigma impacts would be greatest before cleanup, when less is known about the contamination and its costs. It would be least after cleanup, when there has been extensive testing, and regulatory requirements are known and have been addressed during the remediation. Studies showing the rebound in prices following the cleanup of contaminated sites are abundant in professional and academic literature.[8]

In other words, AO-9 recognizes that valuation impacts due to contamination and environmental risk can be temporary. This is an extremely important appraisal principle, since appraisal assignments always involve an opinion of value as of a specific date. The respective market value conclusions could be fundamentally different depending on whether the applicable date of value is before, during, or after investigation or remediation. The temporary impact of contamination on prices and values was the subject of a number of *Appraisal Journal* articles included in Volume I.[9]

The old version of AO-9 also emphasized the importance of giving focused consideration to actual and potential cost, use, and risk effects. This was the embodi-

ment of the framework clearly established in the *Appraisal Journal* articles included in the first volume and in Appraisal Institute books, courses, and seminars.[10]

Finally, Jackson emphasizes in his 2003 *Appraisal Journal* article the important distinction made in the 2002 AO-9 between source sites, non-source sites, adjacent sites, and proximate sites. The importance of this distinction gradually developed in the appraisal literature between 1988 and 2002. During the 1980s and early 1990s, the focus was initially on the appraisal of source sites.[11] But by the mid-1990s, appraisers were increasingly being asked to determine the effect of contamination on or emanating from a source site on the value of adjacent and nearby properties. Sometimes these adjacent and nearby properties had themselves become contaminated, such as by the migration of contaminated groundwater or the deposition of airborne contaminants from the source site. Other times there was no measurable contamination on or under the nearby properties (or at least no contamination above regulatory limits), but nevertheless there was a concern in the marketplace about the possible effect of mere proximity to a source of contamination on the value of other properties. This accounts for the publication in the mid- to late 1990s of articles dealing with techniques for addressing environmental risk ("stigma") and marketplace perceptions about value effects from proximity to directly contaminated sites.[12]

The distinction between source sites, non-source sites, adjacent sites, and proximate sites is also one of the 10 "relevant property characteristics" referenced in the 2002 AO-9 as important to the appraisal process. According to the 2003 Jackson article, understanding this distinction is important because "different types of sites have significantly different risks and costs due to contamination." (page 13) AO-9 states that the tenth relevant property characteristic, "potential or actual off-site impacts due to contamination migration," is rele-

---

5. According to Jackson, "When there is no impact, or the estimated impact is zero, the estimates of unimpaired and impaired values would be the same… Risk varies inversely with the knowledge of and uncertainty concerning remediation costs, liabilities for cleanup, potential off-site impacts, and other factors. If there were no uncertainty with respect to these factors, environmental risk would be zero, and property value diminution attributable to stigma would also be zero." (page 12)

6. See, for example, the following articles from *Valuing Contaminated Properties: An Appraisal Institute Anthology* (Chicago: Appraisal Institute, 2002): Bill Mundy, "The Impact of Hazardous Materials on Property Value," 47; Richard Roddewig, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," 205; Randall Bell, "The Impact of Detrimental Conditions on Property Values," 111; Thomas O. Jackson and Randall Bell, "The Analysis of Environmental Case Studies," 274.

7. Advisory Opinion 9 in *Uniform Standards of Professional Appraisal Practice*, 2014-205 ed. (Washington, D.C.: The Appraisal Foundation, 2014), A-19.

8. See also Thomas O. Jackson, "The Effects of Environmental Contamination on Real Estate: A Literature Review," *Journal of Real Estate Literature* 9, no. 2 (2001).

9. See the articles referenced in Footnote 6.

10. See, for example, the following articles in Volume I of *Valuing Contaminated Properties*: Thomas O. Jackson and Randall Bell, "The Analysis of Environmental Case Studies," 274; Randall Bell, "The Impact of Detrimental Conditions on Property Values," 111. See also the seminar workbook for *Environmental Risk and the Real Estate Appraisal Process* (Chicago: Appraisal Institute, 1993) and the seminar handbook for *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma* (Chicago: Appraisal Institute, 2001).

11. See, for example, the following articles in Volume I of *Valuing Contaminated Properties*: Joseph A. Campanella, "Valuing Partial Losses in Contamination Cases," 2; Peter J. Patchin, "Valuation of Contaminated Properties," 5; Peter J. Patchin, "Contaminated Properties: Stigma Revisited," 94; Anthony J. Rinaldi, "Contaminated Properties—Valuation Solutions," 42; Richard A. Neustein, "Estimating Value Diminution by the Income Approach," 241; Bill Mundy, "The Impact of Hazardous and Toxic Material on Property Value: Revisited," 245.

12. See, for example, the following articles in Volume I of *Valuing Contaminated Properties*: Robert W. Hall, "The Cause of Loss in Value: A Case Study of a Contaminated Property," 381; Robert A. Simons, William M. Bowen, and Arthur J. Sementelli, "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property," 350; Mark Dotzour, "Groundwater Contamination and Residential Property Values," 398; Alan K. Reichert, "Impact of a Toxic Waste Superfund Site on Property Values," 474; Alan K. Reichert "The Persistence of Contamination Effects: A Superfund Site Revisited," 493; Albert R. Wilson and Arthur R. Alarcon, "Lender Attitudes Toward Source and Nonsource Impaired Property Mortgages," 300.

Copyrighted material licensed by Randall Bell on April 26, 2021

vant only for source sites.[13] What AO-9 implies but does not make clear is that the other nine characteristics may be relevant to source sites but not to non-source, adjacent, or proximate sites. For example, "liabilities and potential liabilities for site cleanup" would not apply to adjacent or proximate uncontaminated sites, but AO-9 does not make this clear. It would take additional Appraisal Institute courses as well as articles, such as some of those included in the next chapter, to clarify when and how those property characteristics become relevant in an appraisal assignment.

The final component in this chapter is the most recent version of Guide Note 6, Consideration of Hazardous Substances in the Appraisal Process, as approved and adopted by the Appraisal Institute Board of Directors in July 2013. This revised guide note is significantly different from its earlier versions, and it incorporates, explains, and builds upon the 2002 revisions to AO-9. An earlier (1994) version of this guide note was included in Volume I. At that time it was known as Guide Note 8, but in 2003 the guide note was extensively revised and renumbered as Guide Note 6 as part of the 2003 version of the Appraisal Institute's Standards of Professional Appraisal Practice. Much of the content of the old 2003 guide note was focused on the differences in wording related to appropriate assumptions, statements concerning hypothetical conditions, and disclaimers in various types of appraisal reports. Virtually all of that language has been replaced in the revised 2013 guide note by more generalized references to the USPAP Standards Rules language related to assumptions and hypothetical conditions.

The revised 2013 Guide Note 6 provides two important points of clarification to AO-9:

• The distinction between the definitions for *hazardous substance* and *environmental contamination*
• The importance of state or federal regulatory standards in the appraisal process

Only when the concentrations of a hazardous substance exceed "appropriate regulatory standards" is there environmental contamination from the perspective of the real estate appraisal process. Secondly, the meaning of the terms *market data* and *market participants* is clarified in regards to the research and analysis necessary to arrive at an opinion of the impact of contamination on market value. An estimate of impact on value due to environmental contamination "must be appropriate and well supported by market data typically involving actual transactions by market participants." The guide note then references *The Dictionary of Real Estate Appraisal* (5th edition) to define *market participants* as "individuals actively engaged in transactions." As a result, "Non-market participants and related non-market and non-transactional data would not establish an appropriate basis for estimating property value diminution." (page 18) These clarifications are especially important to defining the limited role, if any, that formal statistical surveys have in the appraisal of properties impacted by environmental contamination. This point will be discussed in more detail in Chapter 6 of this anthology.

---

13.    Advisory Opinion 9, A-18.

## 1.1 Contaminated Sites

*by James H. Boykin, PhD, MAI, SREA, CRE*

Chapter 24 of *Land Valuation: Adjustment Procedures and Assignments* (Chicago: Appraisal Institute, 2001).

Causes of contamination, or environmental impairment, always will emanate from a *source property*. This is the property on which a hazardous substance[1] has been released. It is this property owner who bears liability under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). Another category of property may also require an appraisal, a *nonsource property*. While no liability attaches to this property, its value may have been eroded severely from the release of an environmentally hazardous substance on another property that has migrated to the nonsource property.

Most of the environmental regulations now in force grew out of the pro-environment movement of the 1970s. The growing concern with polluted rivers, streams, land, and air led to a maze of laws and regulations. The Federal Water Pollution Control Act in 1972 was followed by the Clear Air Act, the Resource Conservation and Recovery Act, Toxic Substance Control Act, and, in 1980, the Comprehensive Environmental Response, Compensation and Liability Act (also known as CERCLA or the Superfund Act). Of all the state and federal laws pertaining to environmental liability, CERCLA is the most significant law governing remediation of hazardous contamination. It provides a broad legal framework for cleaning up contamination. The breadth of these cleanup costs extends to current and past owners of a contaminated property, current and past business operators who occupied the property, entities that disposed of hazardous substances at the property, and entities that transported hazardous substances to the property.

### Appraiser's Responsibilities

Ideally an appraiser will commence his or her valuation of an environmentally impaired parcel after having received the results of an inspection by a qualified environmental professional. However, frequently the appraiser is the first real estate professional to inspect an affected property and its immediate neighborhood. Appraisers are trained observers and researchers, so their initial observations of a tract may serve the client by pointing out suspect conditions or identifying prior users or uses of the parcel. Nevertheless, it must always be prominently noted in the appraisal report that the appraiser is not technically trained or experienced in the detection of potential environmental problems. The

Appraisal Institute has prepared a property observation checklist for this purpose. Several caveats must be taken into account when an appraiser uses this or a similar environmental checklist:

- A mere "yes" or "no" answer may be insufficient and even misleading. The appraiser should supplement his or her one-word answer with an explanation of both the information on which the response was based and the scope of his or her (or another investigator's) research.
- Questions should be answered only if the appraiser is able to do so competently.
- Before responding to the questions in a checklist, the appraiser should state in the scope of his or her valuation services the extent of his or her inspection and investigation.

### Contingent Conditions

In their text on the subject, Colangelo and Miller suggest the following phrasing:

> This is a limited scope appraisal prepared by the appraiser during the course of his/her inspection of the property in preparation of a real estate appraisal. In completing the checklist, only a visual observation was performed. The appraiser did not search title, interview the current or prior owners, or do any research beyond that normally associated with the appraisal process unless otherwise stated. The user of this checklist is reminded that the responses to the questions are being provided by an appraiser who is not trained or qualified to identify potential environmental problems; therefore, it should only be used to assist the users in their own determination of whether an environmental professional is required for further study. Since the appraiser is not an environmental professional, the appraiser cannot be held liable for the lack of detection or identification of possible environmental problems. The appraisal report and/or any environmental checklist must not be considered an environmental assessment of the property, as would be performed by an environmental professional.[2]

Other examples of statements of purpose, final opinion of value, and disclaimers can be found in the Appraisal Institute's Guide Note 8:

> The purpose of this appraisal is to estimate the market value of the subject property, as if unaffected by hazardous substances, as of January 1, 2xxx.

---

1. A hazardous substance is any material within, around, or near a property that may have a negative impact on its value.

2. Robert V. Colangelo and Ronald D. Miller, *Environmental Site Assessments and Their Impact on Property Value: The Appraiser's Role* (Chicago: Appraisal Institute, 1995), p. 24.

**James H. Boykin, PhD, MAI, SREA,** Professor Emeritus, works in Richmond, Virginia, as a real estate analyst and consultant. He specializes in predevelopment analysis and reviews of conservation easement and federal land acquisition reports. He has qualified as a real estate expert in 15 different courts of law. Dr. Boykin has served in numerous capacities for the Appraisal Institute, including as vice president and as a member of the governing council.

Copyrighted material licensed by Randall Bell on April 26, 2021

> The final estimate of the market value of the subject property, as if unaffected by hazardous substances, as of January 1, 2xxx is....
>
> Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test for such substances. The presence of such hazardous substances may affect the value of the property. The value estimated herein is predicated on the assumption that no such hazardous substances exist on or in the property or in such proximity thereto which would cause a loss in value. No responsibility is assumed for any such hazardous substances, nor for any expertise or knowledge required to discover them.

If the appraiser has received a Phase I, Phase II, or Phase III environmental assessment report indicating no evidence of contamination, then he or she should state so in the appraisal report, giving the name of the firm and the date of assessment. He or she should encourage the client to thoroughly read the environmental assessment. If no Phase I report has been provided to the appraiser and there is no reason to suspect the existence of hazardous substances, it is appropriate for the appraiser to note in his appraisal that no report has been received and the appraisal is based on the assumption that a Phase I assessment would have indicated no contamination. Finally, if an environmental assessment (Phase I, II, and/or III) has been prepared and received by the appraiser and it indicates the possibility of contamination, the client should be encouraged to review the entire environmental assessment and request a higher phase assessment.

The Property Observation Checklist has three sections. The first section, "Extent of Appraiser's Inspection of the Property," calls for the appraiser to describe his or her on- and off-site inspection. Section 2 contains 13 questions dealing with possible environmental factors the appraiser may have observed. These questions cover such items as prior or current industrial uses of the property; the presence of suspect containers, stained soil, or distressed vegetation; pits and lagoons; evidence of storage tanks (aboveground or underground); water discharges; indication of dumping or burning; electrical or microwave transmission towers on or near the parcel; rivers, streams, or marshes on the appraised or adjoining properties; and any other factors that might require an investigation by environmental professionals. This section also includes questions about structures, which are pertinent in the appraisal of land where structures either have a contributory value or encumber a parcel's highest and best use. In these instances, the appraiser would be concerned with floors, drains, or walls that are stained or emit unusual odors; chipped, blistered, or peeled paint; and any sprayed-on insulation or pipe wrapping.

Section 3 concentrates on "Possible Environmental Factors Reported By Others." The client, owner, owner's agent, or any other person may have provided this information. The appraiser is asked to comment on whether he or she has been informed about government records indicating environmentally sensitive sites on the subject or adjoining properties, knowledge of violations of environmental laws on the property, environmental lawsuits concerning the subject property, and tests for lead-based paint or other lead hazards, asbestos-containing materials, radon, or soil or groundwater contamination on the subject property. Finally, the appraiser is asked whether he or she has been informed about other professional environmental site assessment(s) of the subject property.

The following points also could be used as a partial checklist for an appraiser who realizes the limitations of his or her expertise, but nevertheless wants to provide assistance to the client by noting the following possible indicators of environmental degradation:

- Damaged landscaping
- Sickly or dead vegetation
- Discolored or disturbed soil
- Discolored or polluted water
- Depressed areas or pits
- Mounds of dirt
- Drainage ditches
- Discharge/seepage of water or fluids
- Noxious or unusual odors
- Soil boring holes
- Storage tanks–aboveground or underground

## Responsibility Concerning Toxic or Hazardous Substance Contamination

The two most authoritative guidelines on how appraisers should deal with the possible presence of hazardous substances on appraised parcels are Advisory Opinion 9 of the 2000 *Uniform Standards of Professional Appraisal Practice* and the Appraisal Institute's Guide Note 8, "The Consideration of Hazardous Substances in the Appraisal Process."

The USPAP Advisory Opinion concentrates on recognition of contamination, remediation and compliance cost estimation, and value estimates of interests in impacted real estate. It asserts that "recognizing, detecting or measuring contamination is often beyond the scope of the appraiser's expertise." Further, an appraiser, when requested to complete a checklist, should answer only those questions within the scope of his or her expertise. Specialized expertise is required to assess the proper processes and expenditures to remediate environmental damages and comply with state and federal compliance requirements. In some instances an appraiser may be requested to appraise a possibly contaminated parcel as if it is free of contamination. Acceptance of an assignment under such hypothetical conditions is warranted "...when (1) the resulting appraisal is not misleading, (2) the client has been

advised of the limitation, and (3) the Ethics Provision of the USPAP is satisfied."[3]

Guide Note 8 points out the growing necessity for appraisers to consider hazardous substances that may impact property value, even to the extent of leaving a property with a negative value after remediation expenses. Because real estate appraisers are not expected or qualified to detect or measure the impact of hazardous substances, this guide note largely alerts appraisers "...to disclose the lack of knowledge or experience to the client, take all steps necessary or appropriate to complete the assignment competently and describe in the report the lack of knowledge or experience and the steps taken to competently complete the assignment."[4] Lacking the required experience or knowledge to analyze the consequences of hazardous substances, an appraiser may associate with a party who possesses the necessary knowledge and experience. It is recommended that the appraiser have the client retain this environmental professional directly.

The proper valuation of parcels that may be adversely affected by hazardous substances obligates the appraiser to consider any possible influence on property value such as on- and off-site factors, changes in highest and best use, and stigma. An appraisal assignment may be accepted and a consideration of hazardous substances may be omitted if the results are not misleading, the client has been advised of this limitation, and the report is qualified to reflect this limitation. In all reports, care must be exercised to prevent misuse and misleading readers. If there are no known hazardous substances on a parcel, then it is advisable for the appraiser to include a limiting condition that the appraisal is based on the assumption that no hazardous substances are present. However, if hazardous substances affect the appraised property or there is cause to suspect their presence, the appraiser cannot exclude a consideration of such material without limiting the scope of the appraisal report.

## Unacceptable Appraisal Practices

Guide Note 8 deems the following actions to be unacceptable in appraising property that requires consideration of hazardous substances:

- Failure to disclose to the client the appraiser's lack of knowledge and experience with respect to the detection and measurement of hazardous substances.
- Failure to take the necessary steps to complete the assignment competently such as personal study by the appraiser, association with another appraiser who has the required knowledge and experience or obtaining the professional assistance of others who possess the required knowledge and experience.
- When appraising an affected property as if unaffected by hazardous substances, failure to include in the report a qualification that reflects the limited scope of the appraisal, a limiting condition that clearly reveals the fact that the property is appraised as if unaffected by hazardous substances, or an appropriate statement of purpose and properly qualified conclusions.
- Failure to report known hazardous substances affecting the property when appraising affected property as if unaffected by hazardous substances.
- Failure to acknowledge the professional assistance of others and to name the persons providing the assistance in the certification when appraising affected property if the appraiser relies on the findings of other professionals with respect to the presence of, and probable effect of, hazardous substances.

## Working with Environmental Professionals

Appraisers will want to be familiar with and be able to work with such professionals as environmental lawyers, soil specialists, and environmental engineers. Of course, appraisers always must clearly and fully recognize the contributions of these professionals in their appraisal reports. At times, the services of several environmental specialists may be required in the valuation of contaminated parcels.

---

3.    Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice* (Washington, DC: The Appraisal Foundation, 2000), pp. 114–115.

4.    Appraisal Institute, Guide Note 8, The Consideration of Hazardous Substances in the Appraisal Process, amended by the Board of Directors, January 28, 1994.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 1.2 The Appraisal Standards Board and Environmental Issues

*by Danny Wiley*

This Letter to the Editor appeared in the April 2002 issue of *The Appraisal Journal*.

In "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge" (October 2001) Marcus Allen and Grant Austin assert,[1] "The Appraisal Foundation released an exposure draft on September 20, 2000, of a proposed Statement on Uniform Standards of Professional Appraisal Practice (USPAP) that addresses the role of statistical and market survey techniques in real estate research, appraising, counseling, and consulting assignments."

There are inaccuracies in this assertion that need to be addressed. First, Statements on USPAP are the responsibility of the Appraisal Standards Board (ASB) of the Appraisal Foundation (TAF). Secondly, neither the ASB nor TAF were involved in the development of the Statement to which the authors refer. The statistical and survey "standards" discussed are to be the presented at the Environmental and Property Damages Symposium: Standards, Due Diligence, Valuation and Strategy (sponsored by the Centre for Advanced Property Economics and TAF) in April 2002 in Toronto. These standards have never been considered by the ASB, which has sole authority over USPAP; furthermore, the ASB has no plans to consider them in the future.

The ASB's 2002 agenda includes the development of an Advisory Opinion on the appraisal of contaminated real properties. This Advisory Opinion, *The Appraisal of Real Property Impacted by Environmental Contamination,* was included in the February 13, 2002, ASB exposure draft on proposed revisions to the 2002 edition of USPAP. The proposed Advisory Opinion addresses issues of compliance with USPAP in contaminated property assignments, including competency requirements, the use of hypothetical conditions and extraordinary assumptions, terms and definitions (such as stigma and environmental risk), relevant property characteristics, and highest and best use considerations. In addition, the Advisory Opinion sets forth a framework for the appraisal of contaminated properties that addresses issues in the use of paired sales, case studies, market interviews, and statistical analysis. The proposed Advisory Opinion will also be presented at the Environmental and Property Damages Symposium in Toronto. The text of the proposed Advisory Opinion is available on TAF's website at www.appraisalfoundation.org.

*Danny Wiley*
*Nashiville, Tennessee*

---

1.    *The Appraisal Journal's* editing staff is responsible for this error, not Messrs. Allen and Grant.

## 1.3 Appraisal Standards and Contaminated Property Valuation
*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the April 2003 issue of *The Appraisal Journal*.

A wide variety of opinion exists concerning the applicability of appraisal standards to the valuation of contaminated properties. Opinions range from assertions that such properties are so unique or different from uncontaminated properties that appraisal standards do not apply at all, to assertions that contaminated properties are no different from any other property, and therefore nothing special or different should be done to value them. To the contrary, the unique sets of risks and costs associated with contaminated properties make them different from otherwise similar but uncontaminated properties. This uniqueness does not preclude the applicability of existing appraisal standards to the valuation of these properties; it merely results in a more complex assignment.

The complexity of valuing contaminated properties is addressed in Advisory Standards Board (ASB) Advisory Opinion 9 (AO-9), "The Appraisal of Real Property That May Be Impacted by Environmental Contamination." In the 2003 version of AO-9, published with the *Uniform Standards of Professional Appraisal Practice* (USPAP), the Appraisal Standards Board provides specific guidance regarding the application of USPAP to assignments involving contaminated properties. The current version of AO-9 represents a significant change from the previous version in that it directly addresses assignments in which the appraiser's primary responsibility is to value real property that is known to be, or is suspected of being, contaminated. Moreover it advises that the appraiser specifically consider the effects of contamination in the valuation.

Previous guidance in AO-9 and elsewhere has been directed toward limiting the appraiser's liabilities in assignments where the valuation of the "as is" or "impaired" condition of the property was not the focus of the assignment. (Indeed, the title of the previous AO-9 was "The Responsibility of Appraisers Concerning Toxic or Hazardous Substances.") Many such appraisal assignments were conducted under a hypothetical condition that a site known to be contaminated was thought to be, or actually was, uncontaminated. While this type of assignment and assignment conditions serve a valid and useful purpose, an increasing number of assignments require the quantification of the impacts of environmental contamination on the value of real property. This column addresses the provisions of the revised AO-9 in the context of assignments in which the primary purpose is to quantify the effects of environmental contamination.

## Applicable USPAP Definitions, Rules, and Standards
Advisory Opinion 9 like all advisory opinions accompanying USPAP provides guidance as to how USPAP standards are to be applied in specific types of appraisal assignments. For assignments involving contaminated property valuation, a number of definitions, rules, and standards from USPAP must be considered and complied with to produce a credible and reliable estimate of market value as well as an estimate of the effects of environmental contamination on value. As noted in AO-9, particularly relevant USPAP provisions include the definitions of *extraordinary assumption* and *hypothetical condition*; the Ethics Rule; the Competency Rule; and Standard 1, particularly S.R. 1-1(a), 1-2(e), 1-2(g) and (h), 1-3(b), and 1-4. These provisions are shown in Table 1.

### Extraordinary Assumptions
The definition of *extraordinary assumption* becomes important in an assignment to value contaminated property when the appraiser relies on the work of another in developing assumptions about the contamination. This is nearly always the case when the work of qualified environmental engineers and others is used to describe the nature and extent of the contamination. The appraiser generally would not be in a position to evaluate this information independently and would rely on the opinions of those with appropriate qualifications. The appraiser should believe, however, that the information provided by such experts is reasonable in light of what he or she knows about the property. In these situations USPAP requires the appraiser to qualify his or her use of such information with an appropriate extraordinary assumption, noting that if such information is *found to be false, it could alter the appraiser's opinions or conclusions* (USPAP, Line 86). This qualification alerts the users of the report to the importance of such information and to the fact that the appraiser relied on it in completing the appraisal assignment.

### Hypothetical Conditions
The use of hypothetical conditions typically occurs when a contaminated property, or a property suspected of being contaminated, is appraised as if it were uncontaminated. The value opinion resulting from an appraisal that uses this type of hypothetical condition

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 1          Contaminated Property Valuation—Relevant USPAP References**

**DEFINITIONS**

EXTRAORDINARY ASSUMPTION: an assumption, directly related to a specific assignment, which, if found to be false could alter the appraiser's opinions or conclusions (USPAP, Lines 85-86).

HYPOTHETICAL CONDITION: that which is contrary to what exists but is supposed for the purpose of analysis (USPAP, Lines 92-93).

**ETHICS RULE**

Conduct: An appraiser must perform assignments ethically and competently, in accordance with USPAP and any supplemental standards agreed to by the appraiser in accepting the assignment.... An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.... An appraiser must not communicate assignment results in a misleading or fraudulent manner (USPAP, Lines 258-261, 268).

**COMPETENCY RULE.** Prior to accepting an assignment or entering into an agreement to perform any assignment, an appraiser must properly identify the problem to be addressed and have the knowledge and experience to complete the assignment competently; or alternatively, must: (1) disclose the lack of knowledge and/or experience to the client before accepting the assignment; (2) take all steps necessary or appropriate to complete the assignment competently; and (3) describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report (USPAP, Lines 361-368).

**STANDARD 1**

Standards Rule 1-1(a). In developing a real property appraisal, an appraiser must: (a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal (USPAP, Lines 510-512).

Standards Rule 1-2(e). In developing a real property appraisal, an appraiser must: (e) identify the characteristics of the property that are relevant to the purpose and intended use of the appraisal (USPAP, Lines 543, 566-567).

Standards Rule 1-2(g) and (h). In developing a real property appraisal, an appraiser must: (g) identify any extraordinary assumptions necessary in the assignment; and (h) identify any hypothetical conditions necessary in the assignment (USPAP, Lines 543, 607, and 614. Emphasis added).

Standards Rule 1-3(b). When the value opinion to be developed is a market value, and given the scope of work identified in accordance with Standard Rule 1-2(f), an appraiser must: (b) develop an opinion of the highest and best use of the real estate (USPAP, Lines 623 and 630).

Standards Rule 1-4. In developing a real property appraisal, an appraiser must collect, verify, and analyze all information applicable to the appraisal problem, given the scope of work identified in accordance with Standards Rule 1-2(f) (USPAP, Lines 638-640).

Source: The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice*, 2003 ed. (Washington, DC: The Appraisal Foundation, 2003).

could be considered the unimpaired value of a contaminated property. In such an appraisal the hypothetical condition that the property is not affected by the adverse environmental influence would be *contrary to what exists but is supposed for the purpose of analysis* (USPAP, Lines 92–93). In an assignment to appraise a contaminated property, the hypothetical unimpaired value provides a baseline for estimating the impact of the environmental contamination on value. Deducting the estimated impact of the contamination from the hypothetical unimpaired value provides an estimate of the impaired value of the property. When there is no impact, or the estimated impact is zero, the estimates of unimpaired and impaired values would be the same.

## Competency Rule

The Competency Rule of USPAP is particularly critical to any assignment involving contaminated property because these properties have unique risks and costs, and because the methods and techniques used to analyze the impacts of these risks and costs are usually quite specialized. The Competency Rule does not preclude appraisers with limited training and experience in contaminated property valuation from undertaking such assignments, but it does require that the appraiser take the following steps: *(1) disclose the lack of knowledge and/or experience to the client* **before** *accepting the assignment; (2) take all steps necessary or appropriate to complete the assignment competently* (e.g., additional training and/or association with others competent to perform such assignments); *and (3) describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently* **in the report** (USPAP, Lines 364–368. Emphasis added).

The Competency Rule applies to valuing contaminated property and to the specific methods and techniques used to estimate the effects of contamination on value, such as case studies analysis and regression analysis. (For example the use of case study analysis to value contaminated property is discussed in T. Jackson and R. Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002).) An appraiser who lacks qualifications and experience in the techniques applicable to contaminated property must comply with the provisions of the Competency Rule.

## USPAP Compliance

In some states USPAP is enforced by state regulatory agencies only for appraisals performed by licensed and certified appraisers for federally related transactions. In other states the regulatory agencies enforce USPAP for all appraisals. Moreover organizations such as the Appraisal Institute and the International Association of Assessing Officers mandate compliance with USPAP for their members. The provisions of USPAP are usually not enforced against individuals in other professions, such as accounting, engineering, or economics, who might occasionally deal with real property environmental issues. In the United States, however, USPAP is the broadest and most far-reaching statement of standards, rules, and guidance for the valuation of real property. As such the courts and others ought to grant it considerable weight in determining professionally acceptable practice in the valuation of contaminated property. Estimating the impact of contamination on the value of real property is well within the purview of the appraisal profession. The question of the value of impacted properties is a question of market value, and

the professionals specifically qualified to analyze the market value of real property have been, and should continue to be, appraisers.

### Standard 1

Standard 1 of USPAP governs the development of real property appraisals, and a number of its provisions have added meaning and applicability in assignments involving the appraisal of contaminated properties. As noted in AO-9, these include:

- S.R. 1-1(a) requiring appraisers to *be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal* (USPAP, Lines 511–512).
- S.R. 1-2(e) requiring appraisers to *identify the characteristics of the property that are relevant to the purpose and intended use of the appraisal* (USPAP, Lines 566–567).
- S.R. 1-2(g) and (h) on *extraordinary assumptions* and *hypothetical conditions* (USPAP, Lines 607, 614).
- S.R. 1-3(b) involving opinions of the *highest and best use* of the property (USPAP, Line 630).
- S.R. 1-4 involving the collection, verification, and analysis of ***all*** *information applicable to the appraisal problem.* (USPAP, Lines 638–639. Emphasis added), as opposed to information that supports only one of two or more conflicting positions.

While the provisions of USPAP must be followed to produce any credible appraisal, they have special importance in the context of assignments to value contaminated property.

Although not specifically mentioned in AO-9, Standards Rule 1-2(f), which requires the appraiser to identify his or her scope of work, also has applicability in this type of appraisal assignment. Importantly the appraiser's scope of work should be consistent with accepted practice for appraisals of contaminated property in light of market expectations and what the appraiser's peers would do in a similar assignment to be in conformance with USPAP. In this usage, *peers* are those appraisers who are competent to perform such assignments according to the requirements of the Competency Rule.

### Appraisal Consulting Assignments

Advisory Opinion 9 deals specifically with assignments involving appraisals of individual properties that may be contaminated, as developed according to Standard 1. At times however appraisers may be asked to evaluate the impacts of environmental contamination in a broader context, such as its impacts on neighborhoods or large groups of properties surrounding a contamination source. Such an assignment would be more akin to a market study than to an appraisal of an individual property. In such cases, the analysis might be developed as an *appraisal consulting* assignment in accordance with Standard 4 and reported in accordance with Stan-

dard 5. As explained however in the comments to Standard 4, appraisal consulting assignments involve the development of *an analysis, recommendation, or opinion where at least one opinion of value is a component of the analysis leading to the assignment results* (USPAP, Lines 1324–1326). In an analysis of environmental impacts, typically two values are estimated: impaired value and unimpaired value. An assignment to evaluate the impacts of contamination on more than a single property might be an appraisal consulting assignment when it uses the unimpaired value estimated by the consulting appraiser or another appraiser as a base from which to estimate the impaired value of the impacted property or properties. The analysis of the impacts of contamination in the broader context still involves estimating the difference between these values. Appraisal consulting assignments should be developed in a manner consistent with the concepts, definitions, and valuation framework set forth in AO-9. Moreover a scope of work as described in S.R. 4-2(f) should be supplied in the appraisal report.

### Definitions and Concepts

Advisory Opinion 9 presents a number of terms and definitions relevant to the valuation of contaminated properties: *diminution in value, environmental contamination, environmental risk, environmental stigma, impaired value, unimpaired value, remediation cost, remediation lifecycle,* and the categorization of potentially impacted properties as *source, non-source, adjacent,* and *proximate sites.* The definitions of these terms are shown in Table 2. Appraisers must consider the specialized meanings of these terms in the context of contaminated property valuation.

### Environmental Risk and Stigma

The concept of environmental stigma is often misunderstood and misused. Many posit that it is solely a residual effect (or taint) that continues to affect a site's value even following the cleanup of contamination on the site. Others view it as an unmeasurable effect on property value due to perceptions and fears of contamination. Advisory Opinion 9 links the concepts of environmental risk and environmental stigma by defining *stigma as an adverse effect on property value produced by the market's perception of increased environmental risk due to contamination* (AO-9, Lines 90–91). *Environmental risk in turn is simply the additional or incremental risk of investing in, financing, buying and/ or owning property attributable to its environmental condition* (AO-9, Lines 81–82). Risk varies inversely with the knowledge of and uncertainty concerning remediation costs, liabilities for cleanup, potential off-site impacts, and other factors. If there were no uncertainty with respect to these factors, environmental risk would be zero, and property value diminution attributable to stigma would also be zero.

### Remediation Cost and Lifecycle

Environmental risk and potential stigma impacts would be greatest before cleanup, when less is known about the

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 2          Contaminated Property Valuation—Specialized Terms and Definitions**

**Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination:** Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies.

**Environmental Risk:** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning: (1) the nature and extent of the contamination; (2) estimates of future remediation costs and their timing; (3) potential for changes in regulatory requirements; (4) liabilities for cleanup (buyer, seller, third party); (5) potential for off-site impacts; and (6) other environmental risk factors, as may be relevant.

**Environmental Stigma:** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (see Environmental Risk, above).

**Impaired Value:** The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

**Remediation Cost:** The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

**Remediation Lifecycle:** A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

**Source, Non-source, Adjacent and Proximate Sites:** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

**Unimpaired Value:** The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

Source: Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," 2003, Lines 74–108.

contamination and its costs. It would be least after cleanup, when there has been extensive testing, and regulatory requirements are known and have been addressed during the remediation. Studies showing the rebound in prices following the cleanup of contaminated sites are abundant in professional and academic literature. This sequence of property condition is known as the remediation lifecycle and is defined in AO-9 as *a cycle consisting of three stages: **before** remediation or cleanup; **during** remediation; and **after** remediation* (AO-9, Lines 98–99. Emphasis added). The advisory opinion goes on to note that *environmental risk can be expected to vary with the remediation lifecycle stage of the property* (AO-9, Line 101), in recognition of the variance in environmental risk and stigma that this cycle produces.

## Impaired Value, Unimpaired Value, and Property Value Diminution

Advisory Opinion 9 defines impaired value as market value *with full consideration of the effects of its environmental condition* (AO-9, Lines 92–93), or the as-is value of a contaminated property. *Unimpaired value* is the value *of a contaminated property developed under the hypothetical condition that the property is not contaminated* (AO-9, Lines 107–108). *Property value diminution is the difference between the unimpaired and impaired values.* It is the diminished property value *due to the increased risks and/or costs attributable to the property's environmental condition* (AO-9, Lines 74–76). In the valuation framework for appraising contaminated properties, discussed later in this column, adverse effects on property value are categorized as being due to increased risk and costs and/or reduced site usability attributable to contamination. Costs include capital and operating costs resulting from the contamination and its cleanup that affect property cash flows.

## Relevant Property Characteristics

Consistent with S.R. 1-2(e), AO-9 lists a number of specific characteristics of contaminated properties that the appraiser should consider. Knowing whether or not the contamination is the result of a permitted or accidental release is necessary because there are many permitted industrial releases of contaminants for which there is no required cleanup, there is ample testing and monitoring, and there is no impact on the cost and risk of investing in or owning the property. It is necessary to know the regulatory compliance status because properties with contamination and not in compliance could have greater risk and higher costs necessary to achieve compliance. Appraisers must be familiar with the remediation lifecycle since risk and cost can vary before, during, and after cleanup. Liabilities for cleanup or who is responsible for site cleanup and its costs, and whether these liabilities and the responsible parties were known as of the date of value also constitute significant information. Other relevant property characteristics are limitations on the use of the property; whether the property is a source site, non-source site, adjacent, or proximate to the source site because different types of sites have significantly different risks and costs due to contamination; type of contamination (petroleum, chlorinated solvents, etc.); conveyance of the contamination or impacted media (groundwater, soils, etc.); and potential for off-site migration of the contamination (for source sites).

## Highest and Best Use Considerations

Many of the relevant property characteristics can be analyzed in the context of the highest and best use of the contaminated property. The use of a property may be limited by the contamination and its cleanup, and these potential limitations should be analyzed. The

analysis can begin with the highest and best use of the property in an unimpaired condition and then address any effects on that use due to the contamination. Contamination may have potential impacts on other uses of a site that would not be highest and best uses, but these impacts are not relevant limitations for purposes of estimating the impacts of contamination. An example is an industrial use in an industrial district that has a highest and best use as industrial for both the land as though vacant and the property as improved. Deed restrictions and limitations on other uses, such as day care centers or residential uses that are not feasible regardless of the contamination, would have no impact on the highest and best use of the site and no effect on site usability. This point is important with respect to risk-based cleanup programs now in effect in many states. In these programs cleanup is tailored to specific and realistic exposure potentials of existing and surrounding land uses, not to all uses and exposures regardless of their practicality or market feasibility. A use that is not feasible from a market and financial standpoint cannot be the highest and best use.

## Valuation Framework

The valuation of contaminated property is addressed in the current version of AO-9 by the addition of the following statement from the previous version of the advisory opinion: *[T]he value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of the value as if unaffected* (AO-9, Lines 167–169). The 2003 version of AO-9 discusses three specific sets of factors that should be addressed: cost effects, use effects, and risk effects.

Although not included in the adopted version of AO-9, the following formula illustrates the relationship between these effects and the impaired value. The formula was presented at the *Environmental & Property Damages Symposium: Standards, Due Diligence, Valuation & Strategy*, co-sponsored by the Centre for Advanced Property Economics and the Appraisal Institute, Toronto, Ontario, April 2002.

Impaired Value =  Unimpaired Value
  − Cost Effects (Remediation & Related Costs)
  − Use Effects (Effects on Site Usability)
  − Risk Effects (Environmental Risk/Stigma)

Moreover since property value diminution is the difference between the impaired and unimpaired values, the following formula (also not included in AO-9) can be derived:

Property Value Diminution =  Cost Effects (Remediation and Related Costs)
  + Use Effects (Effects on Site Usability)
  + Risk Effects (Environmental Risk/Stigma)

The 2003 version of AO-9 presents *cost effects as deductions for costs to remediate a contaminated property* (AO-9, Lines 170–171). These costs must be costs that affect property cash flows and are *recognized by the market* (AO-9, Line 173), as opposed to all possible costs. Generally costs necessary to achieve regulatory compliance are recognized by the market, but costs for remediation beyond regulatory requirements would not be recognized by typical market participants. The concept of typical market participants and their characteristics is recognized in most definitions of *market value* and is discussed in AO-22, "Scope of Work in Market Value Appraisal Assignments." *Use effects are presented as the impacts on the utility of the site as a result of the contamination"* (AO-9, Line 174), and as the result of a limited future highest and best use (AO-9, Lines 175–176). *Risk effects are presented as being derived from the market's perception of increased environmental risk and uncertainty* (AO-9, Line 178). AO-9 notes that estimating these effects *represent[s] the most challenging part of the appraisal assignment* (AO-9, Line 177), but the opinion cautions that *the analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment* (AO-9, Lines 178–180).

Estimating the effects of cost, use, and risk is difficult and often requires specialized valuation methods and techniques. As stated in S.R. 1-1(a), appraisers *must be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal* (USPAP, Lines 510–512). The Competency Rule reinforces this binding requirement of USPAP. The next column of "Environment and the Appraiser" will discuss these methods and techniques as well as issues surrounding their use in assignments to value contaminated property.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 1.4  Guide Note 6
### Consideration of Hazardous Substances in the Appraisal Process

Approved and adopted by the Appraisal Institute Board of Directors on July 23, 2013.

### Introduction

The consideration of environmental conditions along with social, economic, and governmental conditions is fundamental to the appraisal of real property. Although appraisal literature has recognized environmental conditions can affect property value, the focus has been on the consideration of climatic conditions, topography and soil, the surrounding neighborhood, accessibility, and proximity to points of attraction. These more general environmental conditions might be apparent to a member of the general public who is not specifically trained as an expert in observing these forces. There is, however, a growing need to give special consideration to the specific impacts of hazardous substances on the valuation of real property. Consistent with accepted guidance on this topic and as incorporated herein, "hazardous substances" would be considered "environmental contamination" when their concentrations exceed appropriate regulatory standards. (See Definitions below.)

The purpose of this Guide Note is to provide guidance in the application of the Uniform Standards of Professional Appraisal Practice (USPAP) to the appraisal of real property affected by or potentially affected by environmental contamination and, in particular, to the consideration of environmental contamination in the appraisal process. It is not the purpose of this Guide Note to provide technical instructions or explanations concerning the detection or measurement of the effect of hazardous substances.

### Competency

The Competency Rule of the Uniform Standards of Professional Appraisal Practice, for example,[1] requires the appraiser to either:

a) properly identify the problem to be addressed and have the knowledge and experience necessary to complete the assignment competently; or

b) disclose the appraiser's lack of knowledge or experience to the client before accepting the assignment, take all steps necessary or appropriate to complete the assignment competently, and describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report; or

c) decline or withdraw from the assignment.

The Competency Rule is of particular importance in the appraisal of real property that may be affected by hazardous substances. Most appraisers do not have the knowledge or experience required to detect the presence of hazardous substances or to measure the quantities of such material. The appraiser, like the buyers and sellers in the open market, typically relies on the advice of others in matters that require special expertise.

There is nothing to prevent a professional appraiser from becoming an expert in other fields but the real estate appraiser is neither required, nor expected, to be an expert in the special field of the detection and measurement of hazardous substances. This Guide Note therefore addresses the problem of hazardous substances from the viewpoint of the appraiser who is not qualified to detect or measure the quantities and concentrations of hazardous substances. If an appraiser is qualified to detect or measure hazardous substances, a different set of standards would apply.

In appraisal assignments in which the appraised value is to take into account the effects on value of hazardous substances, most appraisers require the professional assistance of others. In appraisal assignments in which the appraised value does not take into account the possible effects on value of known hazardous substances (i.e. the unimpaired value, see below), the appraiser would not require the professional assistance of others.

The appraiser may accept an assignment involving the consideration of hazardous substances without having the required knowledge and experience in this special field, provided the appraiser discloses such lack of knowledge and experience to the client prior to acceptance of the assignment, arranges to complete the assignment competently and describes the lack of knowledge or experience and the steps taken to competently complete the assignment in the report. This may require association with others who possess the required knowledge and experience or reliance on professional reports prepared by others who are reasonably believed to have the necessary knowledge and experience. If the appraiser draws conclusions based upon the advice or findings of others, the appraiser must have a reasonable basis for believing that the advice or findings are made by persons who are competent. (See Guide Note 4: Reliance on Reports Prepared by Others and the USPAP Comment to SR 2-3.)

---

1. As well as the Code of Professional Ethics of the Appraisal Institute and the International Valuation Standards (IVS).

## Scope of Work

The SCOPE OF WORK RULE requires that, in any assignment, the appraiser establish the appropriate scope of work necessary to complete that assignment. Part of the scope of work decision includes how, and to what extent, the appraisal problem will address known or suspected hazardous materials that may impact the property.

The Comment to the Scope of Work Acceptability section of that Rule states:

> The scope of work is acceptable when it meets or exceeds:
>
> • the expectations of parties who are regularly intended users for similar assignments; and
> • what an appraiser's peers' actions would be in performing the same or a similar assignment.
>
> …An appraiser must be prepared to support the decision to exclude any investigation, information, method or technique that would appear relevant to the client, another intended user, or the appraiser's peers.

The *Scope of Work Acceptability* section includes two more major provisions:

• An appraiser must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use.
• An appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased.

The disclosure obligations of the SCOPE OF WORK RULE and SR 2-2(a), (b) and (c)(vii) require that the scope of work performed be disclosed in the appraisal report.

Depending on the intended use, the appraisal may be prepared so that the value opinion reflects no known or suspected environmental contamination that may impact the property, or it may be prepared so that the value opinion does reflect known contamination. In either case, the appraiser must take special precautions in the development and reporting process to ensure that the results of the assignment are credible and that the report is not misleading.

## Extraordinary Assumptions and Hypothetical Conditions

In assignments involving contaminated properties or properties that may be adversely impacted by environmental contamination (contaminated property assignment), the appraisal will likely be premised on one or more Extraordinary Assumptions and/or Hypothetical Conditions. Typically in these types of assignments, Extraordinary Assumptions are used when relying on the work of others, such as environmental engineers or other technical specialists, while Hypothetical Conditions are used when the appraiser estimates the value of a property known to be contaminated in an unimpaired or uncontaminated condition.

USPAP provides the following definition for "extraordinary assumption":

> An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions.
> Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

In addition, it may be appropriate to premise the appraisal on an extraordinary assumption in the event there is suspected but not confirmed contamination. An environmental assessment by a qualified environmental professional would be required for such conclusions or determinations.

Standards Rule 1-2(f) requires that in developing an opinion of value the appraiser identify "any extraordinary assumptions necessary in the assignment." The Comment states:

> An extraordinary assumption may be used in an assignment only if:
>
> • it is required to properly develop credible opinions and conclusions;
> • the appraiser has a reasonable basis for the extraordinary assumption;
> • use of the assumption results in a credible analysis; and
> • the appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions.

Standards Rules 2-2(a), (b) and (c)(x) require the appraiser to clearly and conspicuously state in the appraisal report all extraordinary assumptions upon which the value opinion is premised. These reporting Standards Rules also require a clear and conspicuous statement that the use of these extraordinary assumptions might have affected the assignment results.

Standards Rule 2-1 requires the report to "clearly and accurately disclose all … extraordinary assumptions … used in the assignment."

USPAP provides the following definition for "hypothetical condition":

> A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.
> Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in the analysis.

Standards Rule 1-2(g) requires that in developing an opinion of value the appraiser identify "any hypothetical conditions necessary in the assignment." The Comment states:

Copyrighted material licensed by Randall Bell on April 26, 2021

A hypothetical condition may be used in an assignment only if:

- use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;
- use of the hypothetical condition results in a credible analysis; and
- the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions.

Standards Rules 2-2(a),(b) and (c)(x) require the appraiser to clearly and conspicuously state in the appraisal report all hypothetical conditions upon which the value opinion is premised and to state that their use might have affected the assignment results. Standards Rule 2-1 requires the report to "clearly and accurately disclose all … extraordinary assumptions … used in the assignment."

Standards Rule 2-1 (c) requires the report to "clearly and accurately disclose all … hypothetical conditions … used in the assignment." SR 2-2 (a), (b) and (c)(x) requires the appraiser to "clearly and conspicuously" state all extraordinary assumptions and hypothetical conditions and that their use might have an effect on assignment results. These Standards Rules do not require that the appraiser quantify the impact on value, such as by both valuing the property subject to the hypothetical condition and valuing it not subject to the hypothetical condition.

An example of the disclosure of such a hypothetical condition is:

*It is reported that groundwater contamination is present beneath the subject property. In accordance with the client's instructions and consistent with the intended use of this appraisal report, the value opinion is based on the hypothetical condition that the subject property is not impacted by groundwater contamination. The appraiser cautions against the use of this appraisal report for any use other than the intended use stated herein.*

When such disclosure is required it may be placed anywhere in the appraisal report (provided that it is clear and conspicuous) including but not limited to the letter of transmittal, scope of work disclosure, or general comments section, depending on the type and length of report prepared. In an oral report, the appraiser should present the same information, if possible.

## Definitions[2]

Over the past few years, common and generally accepted definitions related to the appraisal of properties that may be impacted by contamination have emerged.[2] These are as follows:

### Contaminated Property Valuation - Specialized Terms and Definitions

**Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination:** Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state and/or local agencies.

**Environmental Risk:** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning: (1) the nature and extent of the contamination; (2) estimates of future remediation costs and their timing; (3) potential for changes in regulatory requirements; (4) liabilities for cleanup (buyer, seller, third party); (5) potential for off-site impacts; and (6) other environmental risk factors, as may be relevant.

**Environmental Stigma:** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (See Environmental Risk, above.)

**Impaired Value:** The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

**Remediation Cost:** The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

**Remediation Lifecycle:** A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

### Contaminated Property Valuation - Specialized Terms and Definitions

**Source, Non-source, Adjacent and Proximate Sites:** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

**Unimpaired Value:** The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

---

2.   Sources: *The Appraisal of Real Estate, 13th Edition, The Dictionary of Real Estate Appraisal, 5th Edition, both published by the Appraisal Institute;* USPAP Advisory Opinion 9: The Appraisal of Real Property That May Be Impacted by Environmental Contamination, by the Appraisal Standards Board.

## Basis for Proper Valuation

The specialized terms and definitions are an important part of the valuation framework for appraising properties that may be impacted by environmental contamination. This framework begins with the following formulae or equations:

$$\text{Impaired Value} = \text{Unimpaired Value}$$
$$- \text{Cost Effects (Remediation \& Related Costs)}$$
$$- \text{Use Effects (Effects on Site Usability)}$$
$$- \text{Risk Effects (Environmental Risk/Stigma)}$$

$$\text{Property Value Diminution} = \text{Cost Effects (Remediation and Related Costs)}$$
$$+ \text{Use Effects (Effects on Site Usability)}$$
$$+ \text{Risk Effects (Environmental Risk/Stigma)}$$

$$\text{Impaired Value} = \text{Unimpaired Value} - \text{Property Value Diminution}$$

These equations set forth the relationships between the key elements of the valuation framework, and highlight the steps to be taken by the appraiser in such assignments. Three general steps are typically taken. The first involves the estimation of the unimpaired value, as defined above. This estimate is usually undertaken with a Hypothetical Condition that the property is being appraised as if uncontaminated (See section on Hypothetical Conditions, above). The second general step involves the estimation of property value diminution. Property value diminution can have three forms: cost effects, use effects and risk effects. The third step involves the estimation of the impaired value of the subject property. This value can usually be derived by deducting an estimate of diminution from the unimpaired value. These estimates must be appropriate and well supported by market data typically involving actual transactions by market participants. As noted in *The Dictionary of Real Estate Appraisal*, fifth edition, "market participants" are "individuals actively engaged in transactions." Further, the International Valuation Standards (IVS) advise that market participation should be in the relevant market or market segment matching the characteristics and influences reflecting the subject and/or subject properties.[3] Thus, non-market participants and related non-market and non-transactional data would not establish an appropriate basis for estimating property value diminution.

### Cost Effects

There are several considerations in analyzing the three effects comprising property value diminution. Cost effects involve deductions for costs to remediate a contaminated property by reducing concentrations of contamination to below appropriate regulatory standards. Accordingly, prerequisites for such a deduction would be: (1) that the property was contaminated, with concentrations of hazardous materials above appropriate regulatory standards; (2) that the costs were necessary for remediation of the property; and (3) that the costs would be borne by a prospective purchaser of the property rather than by a third party such as the current owner or the owner of adjacent property or some other third party responsible for the remediation. The market

may not recognize any and all potential costs but only those costs necessary to achieve regulatory compliance and reduce concentrations of hazardous materials to below the appropriate regulatory standard. Regulatory standards are those established by the appropriate state, local or federal authority. The appraiser should rely on those entities to establish this threshold. Other thresholds and cleanup objectives desired by landowners or others would not establish an appropriate basis for a market based cost effects deduction.

### Use Effects

Use effects involve limitations on the utility of a site due to contamination and its remediation. In some situations, these effects may result in a limitation on the highest and best use of a property and this potential effect should be analyzed by the appraiser. For example, at the conclusion of some approved remedial action plans, especially those utilizing risk-based standards, subsurface contamination may remain in place so long as certain conditions are met. These conditions, which may have a deed recordation, could limit site utility or the use of the site for alternative future uses. However, the appraiser should be aware that not all site use limitations will have an effect on market value and it is the market and its reaction, as borne out in actual market data, to these limitations that should be the primary focus of the appraiser's work in estimating use effects.

### Risk Effects

Lastly, risk effects can result from uncertainties concerning the contamination and its remediation and other factors (see Definitions). If the uncertainties and perceptions of the market result in reductions in property value (property value diminution) then the appraiser might conclude that the subject property suffers from environmental stigma. Environmental stigma for the appraisal profession is the product of uncertainty and adverse perceptions of the market but is always measured on the basis of actual market data and transactions that reflect these perceptions. The appraiser is cautioned that not all uncertainty and increased concern and perceptions in the market may reduce property values, and that any analysis of risk effects and stigma must be based on actual data from the relevant market or submarket and should not be assumed to occur without such evidence. Further, the appraiser should employ relevant and generally accepted methods and techniques to analyze the relevant and reliable market data in order to develop an opinion concerning the existence and extent of any risk and stigma that may exist before applying such a deduction to the subject property or properties. Lastly, important considerations in the estimation of risk effects are the subject property's stage in the remediation lifecycle (before, during or after cleanup) and whether the subject and any sales comparables are source, non-source, adjacent or proximate sites as these factors can and do influence the extent to which a property will suffer from environmental risk and stigma.

---

3.     IVS § 19

Copyrighted material licensed by Randall Bell on April 26, 2021

## Summary of Standard Practices

1. Disclose to the client the appraiser's lack of knowledge and experience with respect to the detection and measurement of hazardous substances (Competency Rule).

2. Take the necessary steps to complete the assignment competently such as personal study by the appraiser, association with another appraiser who has the required knowledge and experience, or obtaining the professional assistance of others who possess the required knowledge and experience (Competency Rule).

3. Identify as an extraordinary assumption reliance on any third party reports or obtained expert association that may have contributed to the valuation beyond the appraiser's own competence.

4. Identify in the appraisal process and state in the report if the appraisal is based on an extraordinary assumption or hypothetical condition that the property is appraised as if unaffected by hazardous substances (SR 1-2(f)and/or (g), SR 2-1(c), and SR 2-2(a)(x), 2-2(b)(x), and 2-2(c)(x)).

5. Identify in the appraisal process the environmental condition of the subject property and surrounding properties, and the existence of documented instances of environmental contamination that may affect the value of the property. (SR 1-2(e)(i)).

6. Identify the scope of work necessary to complete the assignment, including the manner and degree to which the existence of environmental contamination will be addressed (SCOPE OF WORK RULE).

7. Consistent with the SCOPE OF WORK RULE, develop an opinion of unimpaired value of the subject property using an appropriate Hypothetical Condition clearly disclosed in the report.

8. Where and if appropriate, apply the estimates of cost, use and risk effects (property value diminution) to estimate the value of the subject property in its impaired condition.

(Please Note: The purpose of this Guide Note to the Standards of Professional Appraisal Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

Copyrighted material licensed by Randall Bell on April 26, 2021

# 2

# The Recognized and Generally Accepted Methods for Appraising Property Affected by Contamination and Environmental Risk

## Introduction

Chapter 2 begins with Orell C. Anderson's July 2001 *Appraisal Journal* article "Environmental Contamination: An Analysis in the Context of the DC Matrix." This article builds upon concepts presented in two prior Appraisal Institute publications written by Randall Bell: the October 1998 *Appraisal Journal* article "The Impact of Detrimental Conditions on Property Values" and the 1999 book *Real Estate Damages: An Analysis of Detrimental Conditions.* The 1998 Bell article and an excerpt from his 1999 book were included in Volume I. Bell's 1998 article in Volume I outlined four important principles related to contaminated property appraisal that have now been generally accepted by the appraisal profession.

According to the first principle, detrimental conditions (DCs) that adversely affect real estate prices and therefore values can be categorized into various classes.[1] One of these classes is environmental conditions, defined to include the presence of such conditions as hydrocarbons, metals, solvents, asbestos, radioactive materials, landfills, leaking underground storage tank (LUST) sites, and soil, building, or groundwater contamination.

The second principle states that even though each class of detrimental condition has its own unique set of facts and circumstances, "All DCs involve some or all of six basic elements that lead to an understanding" of the effect of the detrimental condition on prices and values.[2] These basic elements form a "detrimental condition model," or framework for working through an assignment involving a contamination issue or any other type of detrimental condition.

The third principle states that three phases or stages follow the discovery of a detrimental property condition:

1. Assessment
2. Repair
3. Ongoing

The effect of the detrimental condition on value can be quite different at each phase. In many situations, a significant initial adverse impact on price and value will decrease and eventually be eliminated as the three stages are reached and completed. In other words, the effects of the detrimental condition are usually temporary.

The fourth principle states that the appraiser can use variants of the three traditional approaches to value

---

1. The 10 classifications of detrimental conditions identified in the 1998 Bell article are (I) no detrimental condition or benign conditions, (II) non-market premiums, (III) market conditions, (IV) temporary conditions, (V) imposed conditions, (VI) building construction conditions, (VII) soil or geotechnical construction conditions, (VIII) environmental conditions, (IX) natural conditions, and (X) incurable conditions. In the second edition of *Real Estate Damages* (published in 2008), the 10 categories of detrimental conditions are classified as (I) general conditions, (II) transactional conditions, (III) distress and sociological conditions, (IV) legal conditions, (V) external conditions, (VI) building and manufacturing conditions, (VII) site and infrastructure conditions, (VIII) environmental and biomedical conditions, (IX) conservation conditions, and (X) natural and climate conditions. See Randall Bell (author) with Orell C. Anderson and Michael V. Sanders (contributing authors), *Real Estate Damages: Applied Economics and Detrimental Conditions*, 2nd ed. (Chicago: Appraisal Institute, 2008), 21.

2. The six elements of the analysis are as follows: (1) value the property disregarding the effect of the detrimental condition, (2) consider all costs associated with monitoring and assessing the condition, (3) consider remediation costs to repair, clean up, or correct the condition, (4) consider any ongoing post-remediation costs, (5) consider any market resistance after costs have been considered, and (6) arrive at the "as is" value by deducting all of the costs associated with each of the costs and issues from the value disregarding the detrimental condition.

(sales comparison, income capitalization, and cost approaches) that utilize actual market data to understand the effect of a detrimental condition at any point in time as the assessment, repair, and ongoing stages proceed.

Volume I of *Valuing Contaminated Properties* included Chapter 8 of the first edition of *Real Estate Damages*, which focused on environmental conditions. The book covered much of the same ground as the 1998 Bell article but did so in more detail. Chapter 8 included a detailed discussion of environmental laws and regulations, the important differences in scope of work when the appraisal assignment involves the contamination source site rather than an adjacent or proximate site, and techniques for the identification, investigation and remediation of various types of contaminants.

However, neither the 1998 Bell article nor his 1999 book included a detailed presentation of the detrimental conditions matrix as applied to a contaminated property assignment. The 2001 Anderson article placed at the beginning of this chapter does just that. The Anderson article opens with the statement that it is not appropriate to simply rely on the opinions of others regarding the impact of various types of disamenities or detrimental conditions on prices or value. Actual sale prices must be collected and analyzed. Anderson states, "For a property to be 'guilty' of any diminution in value, there must be clear, relevant, and objective market data that meets the test of market value. It must also demonstrate that the market does indeed give the condition enough weight to diminish its value." (page 25) He cites a number of other *Appraisal Journal* articles to support his statement.

Anderson then focuses on the important distinction between appraisal assignments involving source sites and those involving nearby or proximate properties to which contamination has migrated. As Anderson points out, this distinction confuses many appraisers, who have been improperly using sales data or case studies involving investigation and remediation of source sites to form conclusions about the values of nearby or proximate sites. As previously discussed, much of the attention of the appraisal profession in the late 1980s through the mid-1990s was focused on the development of techniques for appraising source sites. The articles often clarified that cost and risk issues are significantly more serious for source sites than for other nearby sites that are potentially impacted by contamination.

There are four types of properties that an appraiser may encounter in an environmental contamination valuation assignment:

- Source
- Non-source
- Adjacent
- Proximal

According to Anderson, *proximal* properties "are not directly adjacent to the source or non-source properties, but are separated from them by other adjacent parcels or natural barriers. They are simply 'in the area' but do not abut the contaminated property." These are more frequently referred to as *proximate* sites. Anderson uses the acronym SNAP for this group of four property types. If the source site is a large property and portions of it are not directly contaminated, a portion of the larger source site might actually be a non-source site, especially if it can be subdivided and sold without retaining any of the ongoing environmental responsibilities associated with a source site.

Anderson states that the cost, use, and risk factors that must be considered and analyzed are different for each of these four property types. As a result, the type of sales data necessary to determine the value of a site indirectly impacted by nearby contamination might be quite different than the sales data needed to determine the value of a source site or a property abutting a source site.

The clear and straightforward discussion of the differences between source, non-source, adjacent, and proximal properties may be the Anderson article's most important contribution to the generally accepted methods of evaluating the effects of contamination on prices and values. After making this important distinction, Anderson walks the reader through the three phases of the detrimental conditions matrix (assessment, repair, and ongoing). He provides examples of the proper analysis of cost, use, and risk factors at each phase, often referencing many prior *Appraisal Journal* articles (including many that appeared in Volume I).

Two more themes appear repeatedly in the Anderson article. The first is that various types of actions during each of the three phases can result in a reduction in risk and therefore a reduction in the potential impact of a contamination situation on prices and values. During the assessment stage, the mere publication of more and better information about "the levels of contamination and the costs and duration of control or cleanup can cut down dramatically on the risk associated with ownership of property affected by environmental risk."[3] (page 28) During the repair stage, "Risk may decrease over time as the real estate marketplace becomes more comfortable with its ability to estimate remediation costs for particular types of environmental risks in a variety of settings." (page 29) That risk and potential adverse impact on value can decrease even further when a remedial action plan is approved by the appropriate level of federal or state government involved in the cleanup. During the ongoing phase after implementation or completion of an approved remediation, ongoing monitoring may be required. Typically, the party or parites responsible for the initial investigation and remediation continue to be responsible for the costs associated with ongoing monitoring. Anderson cites a number of studies and articles related to post-remediation prices that find little or no impact on prices due to post-remediation stigma.

---

3.    Here Anderson is quoting an article entitled "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," which was published in the October 1996 issue of *The Appraisal Journal*.

Copyrighted material licensed by Randall Bell on April 26, 2021

The second theme of the Anderson article can be summarized as follows: Once the party responsible for cleanup or remediation of the contamination has been identified, the extent of the problem has been properly assessed, appropriate cleanup measures have been identified and approved by regulators, and the remediation has been initiated, the impact of the situation on market value is significantly reduced or eliminated. Market price and value impacts may even end before remediation is completed.

Chapter 8 of *Real Estate Damages: Applied Economics and Detrimental Conditions*, second edition (with Randall Bell as author and Orell C. Anderson and Michael V. Sanders as contributing authors), follows the Anderson article. This excerpt focuses on environmental and biomedical conditions and provides good background information about types of contamination as well as processes for site investigation and assessment that have been adopted and generally recognized by the community of environmental engineers and remediation specialists.

However, this excerpt has two significant shortcomings. The first is its brief discussion of only two federal laws: the Resource Conservation and Recovery Act (RCRA) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as the Superfund Act. While these two laws continue to be important, the real action in the legislative arena since the publication of Volume I has been the nationwide proliferation of state-level voluntary remediation programs with" risk-based corrective action" criteria. These programs have resulted in the investigation and remediation of many sites that were not part of either the RCRA or CERCLA programs. Chapter 8 also does not mention the thousands of sites that have been investigated and remediated under leaking underground storage tank (LUST) removal laws and regulations. Some of those laws, regulations, and programs not discussed in the Chapter 8 excerpt will be discussed in more detail later.

The second shortcoming of the *Real Estate Damages* excerpt is its somewhat confusing discussion of the meaning of the terms *hazardous substance* and *contamination* in the context of real estate appraisal. The Appraisal Standards Board's Advisory Opinion 9 (AO-9) defines *environmental contamination* as "adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. *Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies* (emphasis added)."[4] A careful reading of Chapter 8 of *Real Estate Damages* (especially pages 35-37) reveals that this definition is being followed. As noted in the excerpt, virtually every property contains some small quantities of hazardous materials or substances. What is important to the marketplace is whether the levels are above state and federal regulatory standards based on health and safety risk assessment.

Chapter 8 of *Real Estate Damages* is also important because it includes a concise summary of the remediation life cycle and how the effects of contamination on property values decline as a property proceeds through the investigation, remediation, and post-remediation stages. The chapter emphasizes how important it is for an appraiser to determine where in the remediation life cycle the appraised property is as of the date of value in the appraisal report: "Identifying the specific life cycle phase is critical for a valid and reliable analysis." (page 51) As also noted in this excerpt, property value impacts are often minimal and disappear in many cases after cleanup and regulatory closure. (page 48) This is an extremely important point. As will be discussed later, this conclusion is based on actual prices paid in many different types of contamination situations.

The Chapter 8 excerpt from *Real Estate Damages* is also valuable for its short summary of the various types of *in situ* (on-site) and *ex situ* (off-site) remediation techniques. Neither the earlier edition of *Real Estate Damages* nor prior articles written by the book's author or contributing authors contained as much detail about remediation techniques. Contamination cleanup and remediation technology made significant advances between the publication of the first edition of *Real Estate Damages* in 1999 and the 2008 publication of the second edition. The remediation techniques discussed include bioremediation, bioventing, biodegradation, soil vapor extraction, air sparging, enclosure, encapsulation, capping, biomounding, and land farming. These are some of the more important technical remediation procedures appraisers will encounter in contaminated property assignments. As noted in the Chapter 8 excerpt, "Some contamination issues could be so minor that their repair would be on par with common maintenance," and market prices would reflect no risk discount over and above the actual repair cost itself.[5] (page 54)

The two most important pieces in this chapter are the Thomas O. Jackson article from the October 2003 issue of *The Appraisal Journal* and the excerpt from the 2010 Appraisal Institute seminar, *Analyzing the Effects of Environmental Contamination on Real Property*. In fact, these two pieces, combined with AO-9, make up the three most important writings detailing how licensed real estate appraisal professionals must handle assignments involving contamination and environmental risk.

As indicated in Chapter 1, Thomas O. Jackson was a member of the Appraisal Standards Board when AO-9 was drafted and adopted. His April 2003 *Appraisal*

---

4.    Advisory Opinion 9 in *Uniform Standards of Professional Appraisal Practice*, 2014-2015 ed. (Washington, D.C.: The Appraisal Foundation, 2014), A-17.

5.    The second edition of *Real Estate Damages* also discusses a concept labeled *project incentive*. If the actual sale price of a remediated property is less than the unimpaired value less the actual repair costs, the difference is project incentive. Other articles and AO-9 refer to this difference as *environmental risk* or *environmental stigma*.

*Journal* article on AO-9 (submitted in his capacity as the regular contributor to the Environment and the Appraiser section of the journal) appeared in Chapter 1. Jackson followed up his April 2003 article with the October 2003 piece that appears in this chapter, "Methods and Techniques for Contaminated Property Valuation." As the October 2003 article states, the appraisal profession had developed specialized methods and techniques adapting standard appraisal approaches to environmental contamination assignments over the prior 15 years or so. (page 55) The stated purpose of the October 2003 article is to "provide an overview of professionally accepted methods and techniques for valuing contaminated properties or estimating the effects of environmental contamination on the market value of real property." (page 55)

Most of the October 2003 Jackson article is devoted to the following five methods:

- Analysis of environmental case studies
- Paired sales analysis
- Multiple regression analysis
- Adjusting income and capitalization rates to reflect environmental risk
- Using market interviews as part of the other four generally accepted techniques or to support or supplement results from the other four methods

The article creates some confusion by initially classifying market interviews as a professionally accepted technique. (page 55) However, when discussing how appraisers should use market interviews, Jackson states that "market interviews are not methods or techniques for valuing contaminated properties." Instead, they can be a helpful component of the four generally accepted methods or can be used to supplement the results of the other methods used.

This confusion was later eliminated by the 2010 Appraisal Institute seminar, *Analyzing the Effects of Environmental Contamination on Real Property*. Included in this chapter is Part 4 of this seminar, which covers much of the same ground as the October 2003 Jackson article.[6] However, the 2010 seminar only lists four recognized and generally accepted methods of valuing contaminated properties or estimating the effects of contamination on property value:

- Paired sales analysis
- Analysis of environmental case studies
- Multiple regression analysis
- Adjusting income and capitalization rates to reflect environmental risk

Reliance on market interviews is specifically not included among the recognized methods in these peer-reviewed seminar materials. This omission was made not only to clarify the somewhat confusing treatment of such interviews that appeared in the October 2003 Jackson article, but also because of various inappropriate ways in which some appraisers and economists had started to use the results of market interviews and surveys as a replacement for the analysis of actual sale prices. This topic will be addressed in Chapter 6, which deals with the appropriate and inappropriate uses of formal and informal surveys in the contaminated property appraisal process.

A number of other important points are stated in the October 2003 Jackson article and the subsequent 2010 seminar excerpt. First, the four generally accepted methods of valuing contaminated properties or estimating the effect of contamination on property value are variants of the three traditional approaches to value. As stated in the instructor notes to Part 4 of the seminar, "The appraisal profession has not adopted (nor considered) any other approaches." (page 67) Second, the recognized and accepted methods are based on an analysis of actual "market data"–prices paid or capitalization or discount rates gleaned from the analysis of actual income property transactions. Third, when no actual sale prices from the neighborhood affected by the contamination situation can be analyzed (such as in cases when the contamination was only recently discovered), actual prices paid in other neighborhoods can be analyzed instead ("case study analysis"). And fourth, multiple regression analysis must be used with care. The October 2003 Jackson article summarizes all of the challenges involved in arriving at relevant conclusions from a complex regression model. The Instructor Notes for Part 4 of the seminar also state that regression modeling has a limited role in contaminated property assignments: It is useful in measuring the average differences between groups of properties in impacted and non-impacted neighborhoods but it is *not* used for estimating individual property values. (page 67) All of those points are explored in more detail in later chapters of this anthology.

The materials included in this chapter continue the discussion that we began with AO-9 in Chapter 1. When AO-9 references the need for the application of "specialized valuation methods" in some contaminated property assignments, this refers to variations in one or more of the three traditional approaches to value rather than a method divorced from the analysis of actual sale prices, market-derived costs, and market-derived capitalization and discount rates in an active marketplace of buyers and sellers.[7] These methods are similar to those used to analyze other types of detrimental conditions, such as structural defects or adverse soil conditions.

---

6.     Thomas O. Jackson, PhD, MAI, was the principal developer of this 2010 seminar. However, approximately half of the seminar content was carried over from a 2001 Appraisal Institute seminar entitled *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma*, which was developed by Gary R. Papke, MAI, CRE, FRICS, and Richard J. Roddewig, MAI, CRE.

7.     Advisory Opinion 9, A-20.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 2.1 Environmental Contamination: An Analysis in the Context of the DC Matrix

*by Orell C. Anderson, MAI*

This article originally appeared in the July 2001 issue of *The Appraisal Journal*.

### Abstract

A significant amount of research has been published in professional literature over the past decade addressing environmental contamination. However, we lack an overall pictorial model for organizing this literature and the applicable valuation techniques. This article discusses environmental contamination and much of the more recent body of work within the context of the Detrimental Conditions (DC) Matrix.[1] It also illustrates where accepted valuation methods fall into the overall picture. This is particularly important in evaluating the distinctions between and valuation characteristics of source, non-source, and adjacent-proximal properties (SNAP).

Many appraisers, real estate economists, real estate analysts, and attorneys are familiar with the Detrimental Conditions (DC) Matrix, which outlines the assessment, repair, and ongoing stages of environmental contamination with the cost, use, and risk issues involved. The DC Matrix frames the three stages of analysis and related issues that may warrant consideration for matters involving any environmental or detrimental condition.

The DC Matrix can be very useful in exposing "junk science" appraisals. Some appraisers simply assume that a certain situation has caused a diminution in property value, and then guess the amount of damage. When a prospective buyer is asked, "How would you like to live next to a landfill, power line, contaminated lake, freeway interchange, or some other externality?" the answer is inevitably negative. Nonetheless, the relevant question is how much weight the condition is given by the market, relative to all the other issues considered in a decision to purchase or lease a property. With this approach, it becomes clear that many situations may not have any material impact in the market or that a significant portion of the market would give the situation little weight when considered in relation to all the positive attributes of the property.

In Dr. Mark Dotzour's article, "Groundwater Contamination and Residential Property Values,"[2] he states that it is important to do specific market research:

> This research offers empirical evidence that not all properties within a contaminated site may suffer diminished value, but this research also measures only one market's reaction at one period of time to the specific event in one local community. The market reaction in other areas could be different.[3]

John Dorchester, Jr. recently asked the question, "Can the ultimate reliability of the valuer's results be demonstrated and supported by credible market evidence?"[4] Richard Roddewig noted that:

> Appraisers must look to the marketplace for answers and analyze what the marketplace itself is actually saying. Scientific conclusions about persistence of contaminants do not necessarily correlate with the marketplace's conclusion about the duration of economic impact on real estate.[5]

One could say that a property is innocent until proven guilty. For a property to be "guilty" of any diminution in value, there must be clear, relevant, and objective market data that meets the test of market value. It must also demonstrate that the market does indeed give the condition enough weight to diminish its value. The DC Matrix not only assists in organizing and completing this research, but it sheds light on the possible reasons for any diminution in value.

### SNAP: Source, Non-Source, and Adjacent-Proximal Properties

One of the basic facts relating to contamination and liability under the law is whether a property is a source of a release that poses a risk or merely a non-source or adjacent property onto or into which the contamination has migrated or is merely proximate to.[6] This is a fundamental distinction for contaminated properties, and one that is especially important to liability under CERCLA. It is also an area that confuses many appraisers. They may

---

1. Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999): 8–15. Also see Randall Bell, "The Impact of Detrimental Conditions on Property Value," *The Appraisal Journal* (October, 1998): 380–391.

2. Mark Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July, 1997): 279–285.

3. Ibid., 283.

4. John D. Dorchester, Jr., "The Federal Rules of Evidence and *Daubert*: Evaluating Real Property Valuation Witnesses," *The Appraisal Journal* (July, 2000): 306.

5. Richard J. Roddewig, "Temporary Stigma: Lessons from the Exxon Valdez Litigation," *The Appraisal Journal* (January, 1997): 100.

6. Bell, 128–129.

**Orell C. Anderson, MAI,** is an appraiser and expert consultant with broad experience in valuation and diminution-in-value issues involving commercial, industrial, subdivision, and vacant land properties as well as single- and multi-family residences. Mr. Anderson has held numerous leadership positions in the Appraisal Institute, the International Right of Way Association, and the Environmental Litigation Committee of the American Bar Association Section of Litigation. Mr. Anderson holds an MA degree from California State University, Long Beach, and a BA degree from Brigham Young University.

**Table 1**     The DC Matrix

|  | Assessment | Repair | Ongoing |
|---|---|---|---|
| **Cost** | · Cost to assess & responsibility<br>· Engineering<br>· Phase I, II, III studies | · Repair costs & responsibility<br>· Repairs<br>· Remediation<br>· Contingencies | · Ongoing costs & responsibility<br>· Operations & maintenance (O&M)<br>· Monitoring |
| **Use** | · All loss of utility while assessed<br>· Disruptions<br>· Safety concerns<br>· Use restrictions | · All loss of utility while assessed<br>· Income loss<br>· Expense increase<br>· Use restrictions | · Ongoing disruptions<br>· Material alterations to highest & best use |
| **Risk** | · Uncertainty factor<br>· Discount, if any, where extent of damage is unknown | · Project incentive<br>· Financial incentive or risk, if any, during repairs | · Market resistance<br>· Residual discount, if any, due to a historical situation |

use, for instance, conclusions based on source property case studies and apply their observations to an adjacent subject property. Without making weighty and overly subjective adjustments to these observations, they are likely to reach egregious conclusions. These properties, therefore, should be considered within the context of a similar DC Matrix format and a specific market data set. The distinction between source and non-source properties has been the basis for claims in many civil matters and is also important for assigning legal liability under other statutes, regulations, and remedial cost options.

## Source

The affected area or contamination origin, called a "facility" for Superfund purposes, includes all the air, soils, and waters contaminated by the risk source, and may include any number of legal parcels. In Table 2, the DC Matrix represents the general areas of study.

The significance of the DC Matrix, as it relates to the source property, is the entire spectrum of liability. Under the Superfund Law, a source property has strict joint and seperate liabilities for all costs to remediate the entire area affected by the problem. Thus, the appraiser needs to address and consider each of the nine cells for a thorough analysis. However, while each should be considered, not all may necessarily be applicable.

## Non-Source

A non-source property may be part of the facility created by the release on the source site. The owner of the non-source property, however, does not generally have liability for the costs of remediation because the contamination comes from an outside source that has no relationship in terms of ownership of the non-source site. There generally are no repair costs to the owner, particularly if the source property is identified and the owner is financially viable. The level of any value diminution at a non-source site is typically less than an otherwise similar source site. Because the owner of a source property is usually responsible for the costs of cleanup and other issues related to environmental liability, the owner of a non-source property is far less involved, and generally is not responsible at this level. There is a major distinction between these two circumstances. The DC Matrix in Table 3 represents possible areas of study.

The DC Matrix is useful in identifying areas requiring investigation by the appraiser. If the source property owner has been determined responsible for abatement, accepts such responsibility, and has the sufficient financial resources, it becomes apparent that certain costs associated with the three stages are not applicable.

## Adjacent—Proximal

An adjacent property is not a part of the facility, but adjoins either a source or non-source property. It is not directly affected by the release at the facility and generally has no liablity for any part of the remedial process. As with non-source properties, adjacent properties may or may not have a value loss pattern. Proximal properties are not directly adjacent to the source or non-source properties, but are separated from them by other adjacent parcels or natural barriers. They are simply "in the area" but do not abut the contaminated property. Simply stated, adjacent and proximal properties are not contaminated, which again refocuses the relevant study. The DC Matrix in Table 4 represents areas of research.

If the source property owner is responsible for the costs associated with the assessment, repair and ongo-

**Table 2**     DC Matrix: Source Property

|  | Assessment | Repair | Ongoing |
|---|---|---|---|
| **Cost** | Possible | Possible | Possible |
| **Use** | Possible | Possible | Possible |
| **Risk** | Possible | Possible | Possible |

**Table 3**     DC Matrix: Non-Source Property

|  | Assessment | Repair | Ongoing |
|---|---|---|---|
| **Cost** | Generally none | Generally none | Generally none |
| **Use** | Possible | Possible | Possible |
| **Risk** | Possible | Possible | Possible |

**Table 4**     DC Matrix: Adjacent—Proximal Properties

|  | Assessment | Repair | Ongoing |
|---|---|---|---|
| Cost | Generally none | Generally none | Generally none |
| Use | Generally none | Generally none | Generally none |
| Risk | Possible | Possible | Possible |

Copyrighted material licensed by Randall Bell on April 26, 2021

ing stages, has accepted responsibility, and is financially sound, then these issues are most likely not applicable to adjacent or proximal sites. Generally, there are no use issues. However, there may be exceptions like use interruptions before and during remediation. Also, within the ongoing stage, there may be changes in highest and best use or land use restriction of the adjacent subject. Typically the potential risk relates to negative publicity and asserted third-party fears, among others. It is possible that community outrage[7] over the fears of possible illness, offsite migration of contaminants, and loss of property value may translate into risk. Robert Simons found that in Fairfax County, Virginia, adjacent residential property, in proximity to a leaking historical pipeline right of way, might potentially reduce the value of the properties.[8]

While risk is possible in these adjacent-proximal situations, these properties are very distinct from source or non-source properties in that they are not and have never been contaminated by the source property. Accordingly, there are generally no costs or losses of use, which often are components that drive risk.

With the applicability of the nine quadrants of the DC Matrix discussed in the SNAP context, it is useful to examine each of the nine quadrants of the matrix in more detail. In fact, all relevant and consequential issues will inevitably fall into one of these nine quadrants.

## Assessment Stage

This is the stage before cleanup where the damage is assessed, usually by engineers, contractors or other qualified experts. A significant reduction in the sale price of a property that is not fully characterized, but highly suspect or known to be contaminated is consistent with the increase in risk due to uncertainty about the level of contamination, remediation costs, and future ongoing issues, etc. Michael Sanders relates this uncertainty to geotechnical matters when he said that the greatest diminution in value tends to be immediately after the loss or damage is identified, and before the nature and extent of the difficulty is fully known.[9]

### Assessment Costs

Assessment costs are associated with assessing the property and are generally estimated by a qualified consultant–typically an engineer. It is beyond the expertise and ability of most appraisers to determine

the nature of the problem and to design an appropriate fix.[10] Therefore, the appraiser will be given this information and will apply costs appropriately to each phase, depending on who is financially responsible. Costs include all of the direct costs, related costs, and contingencies related to each phase. These may have varying degrees of impact on the property's value and on development in terms of possible project delays– many months or years depending on what is found.[11]

Remediation assessment and repair costs are typically handled as a direct capital expenditure when measuring their effect on value. Roddewig[12] discusses in detail the requirements, standard of care, and minimum due diligence that an appraiser should follow in conjunction with the assessment and repair stages of environmentally contaminated real estate and related costs.

> …[appraisers] must rely on the "advice of others" for such information. Most appraisers, therefore, need professional assistance from environmental specialists to complete an appraisal assignment that considers the impact of hazardous substances on value.[13]

Roddewig also notes that appraisers need to review expert's qualifications, read their report, observe any discrepancies between the report and the appraiser's inspections, and ask questions.

The appraiser should not only name these experts and reports in the appraisal report, but also the author and date specifics relied upon. When dealing with inconsistent reports (dueling experts), the appraiser should attempt to reconcile them by doing what the marketplace would do. This includes reviewing the conflicting reports, and if the situation allows it–often in litigation it is inappropriate to talk directly with the experts on the other side–discussing the findings with the various specialists and determining how buyers would discount the price based on the uncertainty of the estimated cleanup costs.[14]

### Assessment Use

Assessment use includes any disruptions to the use of the property during the assessment period due to environmental contamination. During each stage, the utility of the property should be considered, as compared to the use as unimpaired–the baseline or before condition. For instance, a portion of the property may not be accessible or usable during assessment. An example of this is a substantial gasoline leak from a service station.

---

7. Peter M. Sandman, PhD, *Responding to Community Outrage: Strategies for Effective Risk Communication*, (Fairfax, VA: American Industrial Hygiene Association, 1993).

8. Robert A. Simons, "The Effect of Pipeline Ruptures on Noncontaminated Residential Easement-Holding Property in Fairfax County," *The Appraisal Journal* (July, 1999): 255–263.

9. Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January, 1996): 63.

10. Ibid., 60.

11. Robert A. Simons and Arthur Sementelli, "Liquidity Loss and Delayed Transactions with Leaking Underground Storage Tanks," *The Appraisal Journal* (July, 1997): 256.

12. Richard J. Roddewig, "Contaminated Properties and Guide Note 8: Questions, Answers, and Suggestions for Revision," *The Appraisal Journal* (January, 1998): 99–105.

13. Ibid., 100.

14. Ibid., 102.

An entire retail area can be shut down as authorities assess the situation and attempt to reclaim any free-floating product. Restrictions on use, increased operating expenses, and business interruption may be legitimate compensation issues for loss of use during this stage.[15]

## Assessment Risk

Assessment risks are the uncertainties associated with a property that has not been assessed (uncertainty factor). One might expect significant discounts in price at this point in the remediation life cycle.

> In some situations, the market is entirely disrupted and arm's length transactions are nonexistent. Part of this uncertainty comes from lack of information about whether the site can actually be cleaned up, how much it will cost to do so, and who will pay for it.[16]

As more information is gathered and understood, this type of risk diminishes or is eliminated all together.

> The availability of accurate information about the levels of contamination and the costs and duration of control or cleanup can cut down dramatically on the risk associated with ownership of property affected by environmental risk.[17]

Dr. Phillip Mitchell[18] presents a conceptual "expected discounted value" model for estimating damages for a property at the point of discovery of contamination as well as at any point in the trajectory of value. With the application of relevant market data and use of probabilistic analysis, the model yields a percentage loss from the base value for contaminated properties. Given the uncertainty of the assessment stage during initial discovery, Mitchell notes that a property would normally be non-saleable during that time, but more saleable and less discounted during the repair or ongoing stages. As the DC Matrix illustrates, possible reasons that the property could be unmarketable at any price is due not only to the use issues (rental loss), but to the required uncertainty factor, project incentive, possible market resistance (Mitchell's residual stigma), and the difficulty of quantifying these risks before a property is fully characterized. Mitchell points out that most economic damages are incurred from the lack of marketability and loss of rental income during assessment and repair, and not from its post-remediation condition.

## Repair Stage

If repairs are required, they take place during this stage, and can involve active or passive remediation, reconstruction, preventative construction measures, and so forth.

## Repair Costs

Costs are the most obvious of all nine quadrants in the DC Matrix. These are the costs associated with remediating any contamination. Even if the cost to repair is known, a property may be difficult to sell, even with a discount. The acceptable level of repair is determined by laws and regulations that form "…in essence, a set of environmental building codes that define the 'typical' cost of remediation."[19] This building code often takes the form of an approved and financed Remedial Action Plan (RAP).

Although insurance generally addresses risk issues, it is appropriate to assess insurance as a cost item because it can be a direct out-of-pocket expense. This is true for all three stages of the remediation life cycle. Roddewig discusses using environmental insurance to mitigate risk in all three stages.[20] While addressing uncertainty relating to assessed cleanup costs, he says:

> This can vary widely depending on the level of environmental site assessment that has been completed. However, even at sites that have been thoroughly tested and have firm estimates of cleanup costs, there may still be some risk that remediation will be more expensive than even the best estimate.[21]

Using insurance to cover the uncertainty of environmental assessment and repair is a relatively new, but effective, risk management tool. Roddewig notes that it can be applied to cover estimated cleanup costs and overruns, uncertainty of agency cleanup standards, and offsite migration due to the type of remediation technique used (cleanup cost cap insurance). Other risks insurance can cover include possible litigation over recontamination, property value diminution, and third party health claims.

Since Roddewig's article was published, these policies, as well as natural resource damages (NRD) diminution in value and business interruption (in the form of an endorsement) are becoming more common. The use of a pollution legal liability (PLL) policy to cover unknown contamination beyond the RAP is also becoming an industry standard.

## Repair Use

Repair use includes any disruptions to use during any necessary remediation. Use interruption during the repair stage is a common occurrence that may translate into lost utility and or income, as well as possible use restrictions on a portion of the site due to remediation activities. Scott Arens discusses it as follows:

> If work to be completed makes the property unrentable for some period, an additional vacancy factor

---

15.    Sanders, 60.

16.    Dotzour, 280.

17.    Richard J. Roddewig, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," *The Appraisal Journal* (October, 1996): 381.

18.    Phillip S. Mitchell, "Estimating Economic Damages to Real Property Due to Loss of Marketability, Rentability, and Stigma," *The Appraisal Journal* (April, 2000): 162–170.

19.    Albert R. Wilson, "Emerging Approaches to Impaired Property Valuation," *The Appraisal Journal* (April, 1996): 161.

20.    Richard J. Roddewig, "Using the Cost of Environmental Insurance to Measure Contaminated Property Stigma," *The Appraisal Journal* (July, 1997): 304–308.

21.    Roddewig, 304.

Copyrighted material licensed by Randall Bell on April 26, 2021

[repair stage–use issue] will be considered by buyers. For owner occupied properties, alternative rental costs should be considered. Using estimates of construction periods and rental rates, a reasonable… figure can be derived.[22]

Additionally, former industrial facilities may be impacted by certain limitations. Various states place restrictions on the transfer of title unless commitments are made for corrective action work, which can make development infeasible from an exit and timing perspective.[23] Agencies need financial assurance that it will get done. Issues to consider, among others, include the cost of financing a letter of credit or bond and the terms releasing the obligation.[24]

## Repair Risk

Repair risks include:

- project incentive for a buyer to purchase a property that is assessed but not yet remediated,
- perceived risk to non-source and adjacent or proximal property owners,
- buyer's contingency or the discount required for taking the risk of remediation cost overruns, and
- risk of delays caused by a lengthened regulatory approval process or an extended repair period.

Arens notes that within this stage, buyers may require an entrepreneurial incentive or a reward for the time, trouble, and risk associated with managing the work.[25]

Depending upon the nature of the contaminant–petroleum fuel products versus more non-petroleum fuel products and the familiarity of the experts with that particular remedial process, project incentive may be nominal or significant:

…given a specific state of knowledge, there can be a very large spread in the possible costs of remediation, leading to greater risks and uncertainty. Often the risks and uncertainties result in value offsets much greater than the estimated costs of dealing with the facility.[26]

Repair risk may decrease over time as the real estate marketplace becomes more comfortable with its ability to estimate remediation costs for particular types of environmental risks in a variety of settings. Over time, that often means a decrease in risk caused by the uncertainty about remediation techniques and costs.[27] If the property has an approved and financed RAP, it may diminish further.

When the repair cost is transferred to a third party and is no longer the responsibility of the seller or the

buyer, there still may be an increment of risk that impacts value. Dr. Alan Reichert's study of homes within the Uniontown, Ohio Superfund site[28] found significant discounts (decreasing with distance from the landfill) in a pre-repaired condition, which was most likely due to many local residents who are skeptical that the onsite remediation plan will ever be implemented.[29] In spite of being able to connect to city water for clean drinking water, there was a significant perceived risk within the repair stage to adjacent and proximal property owners. Risk during the cleanup stage is largely driven by any cost or material impacts on the property.

## Ongoing Stage

Historically contaminated real estate may have continuing or aftermath issues. If so, this stage reflects those after-cleanup factors as based upon fact patterns set out in the preceding stages.

## Ongoing Costs

Costs for monitoring wells, O&M programs, insurance, and possible third party liability (agency fines, toxic torts from third party suits, etc.) are considered ongoing costs. Varying levels of "cleanliness," as determined by agency oversight (i.e., risk based corrective action programs), impact possible loss in real estate value. However, this may be mitigated by shifting the cost and risk to another party in the form of insurance or indemnification.

## Ongoing Use

Ongoing use is any ongoing alteration to the use or highest and best use of the property. In discussing the impact of use restrictions in the after condition of a remediated parcel, Wilson states:

An environmental risk may result in a change in the highest and best use. In one case, a site had an unimpaired highest and best use "…for light industrial development" and was valued at $1.75 per square foot. However, because the site was a former municipal solid waste landfill, subsidence and methane gas generation concerns would increase construction costs to achieve this highest and best use so significantly that an altogether different highest and best use would be indicated. The impaired highest and best use was determined to be for "…outdoor storage" and the indicated value was $0.75 per square foot. The difference, $1.00 per square foot, is the cost of a restriction on use resulting from the presence of the environmental risk.[30]

Arens also states:

When use changes, a significant part of the loss could be attributed to that change, which is an indi-

---

22. Scott B. Arens, "The Valuation of Defective Properties: A Common Sense Approach," *The Appraisal Journal* (April, 1997): 144.

23. Brent C. Anderson, "Valuation of Environmentally Impaired Properties," *Natural Resources & Environment* (Fall, 2000): 102–103.

24. Ibid., 103.

25. Arens, 145.

26. A. Wilson, 170.

27. Roddewig (October, 1996), Ibid.

28. Alan Reichert, "The Persistence of Contamination Effects: A Superfund Site Revisited," *The Appraisal Journal* (April, 1999): 126–135.

29. Ibid., 135.

30. A. Wilson, 161.

rect result of the problem. Using these sales to derive stigma will often result in high stigma estimates.[31]

There may be diminution in value, but it is actually a "use" issue and not a "stigma" issue–a distinction the DC Matrix clearly makes.

The level of repair related to risk-based cleanup as set forth in the RAP is a significant influence on highest and best use–i.e., the existing use is inconsistent with the RAP thus changing residential to commercial in the post-remedial condition. This is often a source of litigation. However, if a source property's highest and best use is commercial/retail, but restrictions are placed on uses such as agricultural, residential or daycare facilities ("improbable alternative uses"[32]), based on the required level of remediation, a question arises as to what impact the restriction really has on value.

### Ongoing Risk

This quadrant within the DC Matrix is the most misunderstood section and requires extended discussion. Ongoing risk is associated with the after-cleanup period, which is referred to as "market resistance." It is a type of risk that could conceivably exist as a result of a history of contamination, although the property has been cleaned to the level of acceptance of governmental agencies.

Dr. Alan Reichert points out, "… stigma ultimately is a perception problem. Public perceptions are often not logical, and most certainly not easy to reverse."[33] Meanwhile, others note:

> Stigma is defined as the discount resulting from a property's bad reputation from having once been defective. It is the discount that buyers demand in relation to properties with no history of problems.[34]
>
> Stigma is defined as something that detracts from character or reputation. As it relates to real estate, stigma refers to an intangible psychological impact on value or marketability because of increased risk or future uncertainty.[35]
>
> Environmental stigma is "an adverse effect on the market's perception of the value of property containing an environmental risk even after cleanup costs have been expended or considered in estimating value."[36]

Drs. William Kinnard, Jr. and Elaine Worzala[37] identified two typical sources of stigma as "uncertainty and risk of diminished property value"[38] either after required on-site remediation or from proximity to a perceived contaminated off-site source.

Dr. Thomas Jackson[39] focuses on market resistance as it relates to the post-remediation industrial properties in Southern California. He uses the sales comparison approach and its extension, multiple regression analysis, as they relate to source properties, to conclude that the sale price of the contaminated properties is similar to those of the uncontaminated ones. Jackson, in discussing market resistance, notes:

> The effect of these perceived risks has been referred to as stigma, but it would be more accurately characterized more simply as additional investment and lending risk due to the environmental contamination.[40]

Regarding the sales comparison approach, he states:

> The most significant variable to be considered is the remediation status of the property. That is, the comparable property's environmental condition would be similar in terms of remediation status (before [assessment stage], during [repair stage] or after cleanup at time of sale [ongoing stage]).[41]

This statement addresses the idea that when there is more uncertainty there is more risk. Within the statistical analysis Jackson states:

> The variable of greatest interest to the main research question is the environmental condition of the property as of the date of the sale.[42]

The appraiser must determine where the subject property falls in the DC Model and then use consistent market data in the analysis.

Jackson goes on to focus this method using only source properties within a post-remediation, ongoing condition and concludes that they do not significantly differ in sale price as compared with other uncontaminated industrial properties. This is consistent with the findings of others.[43]

In another article by Jackson, he states that risk quantification involves the complexities of measuring the perceptions of market participants.[44] In an earlier article Jackson and Dr. James A. Chalmer focus on lender and investor expectations as indicated by the

---

31.  Arens, 146.

32.  Donald C. Wilson, "Highest and Best Use: Preservation Use of Environmentally Significant Real Estate," *The Appraisal Journal* (January, 1996): 85.

33.  Reichert, 135.

34.  Arens, 144.

35.  Sanders, 60.

36.  Richard J. Roddewig, "Classifying the Level of Risk and Stigma Affecting Contaminated Properties," *The Appraisal Journal* (January, 1999): 99.

37.  William N. Kinnard, Jr. and Elaine M. Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma," *The Appraisal Journal* (July, 1999): 269–279.

38.  Ibid., 269.

39.  Thomas O. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," Excerpt from *Papers and Proceedings* (Appraisal Institute Valuation 2000, July 2000): 59–69.

40.  Ibid., 201.

41.  Ibid., 204.

42.  Ibid., 209.

43.  Richard A. Neustein and Randall Bell, "Diminishing Diminution–A Trend in Environmental Stigma," *Environmental Claims Journal* (11:1, 1998): 47–59.

44.  Thomas O. Jackson, "Mortgage-Equity Analysis in Contaminated Property Valuation," *The Appraisal Journal* (January, 1998): 46.

Copyrighted material licensed by Randall Bell on April 26, 2021

overall capitalization rate.[45] Typically, the greater the uncertainty, the higher the necessary return, the lower the value, and the larger the diminution in value due to contamination.[46] Jackson notes:

> …environmental factors must be reviewed on a property-specific basis. [This includes] levels of characterization of the contamination; the regulatory status of the site, costs, and length of the remediation effort; approvals and financing of remediation plan; effects on the use of the property during remediation; the availability of indemnification by financially sound responsible parties; and any post closure property use restrictions.[47]

Due to a potential gradual lessening of the stigma, market resistance may be either long term or short term. A recent study showed that a variety of properties with asbestos did not have any market resistance.[48] Sanders discusses temporary risk:

> Some might argue that if a residual loss or stigma will eventually disappear, then such loss should be viewed as temporary and therefore not compensable…market value (and diminution thereof) is measured at a specific point in time. The fact that a real loss has occurred is more important than the speculative presumption that the owner may eventually recover the full value of the property (i.e., a property sold before the end of an anticipated recovery period will realize a loss in value, notwithstanding the fact that residual stigma may cease to affect value at some time in the future).[49]

Market resistance may be controlled, eliminated, or transferred to others with financial mechanisms such as indemnification, environmental insurance, personal or corporate guarantees, and value assurance programs (VAPs), among others.

A VAP, also known as a value protection program (VPP), is a proactive plan to mitigate a property owner's anxiety over possible loss in value due to a detrimental condition. William Ruskin, Esq., defined a VAP as a contract that may provide a promise that, over time, the homeowner will be made whole if he sells his home. It includes incentives to current owners and/or potential owners to increase the appeal of living in the affected community.[50]

The application of a VAP is very dependent upon whether environmental contamination has caused or may cause real estate values to drop, or whether there has been a significant disruption in a development. An entity may consider its use if it perceives significant cost savings compared to the potential cost of an aggressive lawsuit.

According to David Strong, Kodak developed and implemented the Kodak Value Protection Program in 1988.[51] The program was in response to possible contamination to the subsurface soils and groundwater beneath its headquarters in Rochester, New York.

The Kodak site was immediately adjacent to a middle-class residential subdivision. Kodak responded to the community's outrage–fear of possible illness and loss of property value–with the implementation of "principled negotiations"[52] and a VAP. The initial priority was to open lines of communication within the community with a neighborhood information center. Kodak identified a variety of significant issues and, after determining that the contamination posed minimal health risks, worked to educate the community. Responding to the neighborhood's fear of a possible loss in value to their biggest investement–their homes–Kodak identified approximately 710 homeowners who were eligible for benefits based on their homes' proximity to the source property. The VAP set forth six areas of assistance:

- Guarantees against loss of property value
- Low-interest mortgage subsidies
- Below-market financing for new buyers
- Grants and low-interest home improvement loans
- Relocation expenses for homeowners choosing to move
- Rent concessions

This VAP was very successful in appeasing the community, maintaining goodwill and corporate reputation, stabilizing property values, and avoiding a large lawsuit. These cost savings were perceived by Kodak to be significant.

While insurance has previously been discussed, it may also be a risk transfer mechanism for mitigating uncertainty within the lender's portion of the mortgage-equity analysis.

> Although the 1996 amendments to CERCLAS, see 42 U.S.C. § 9601(20)(f), went a long way toward resolving the lender liability issues related to contaminated property, many lenders are still nervous about financing a transaction involving impaired property. For that reason, several insurers offer secured creditor insurance policies designed to protect the lender from environmental liabilities that may arise during loan workout and property disposition in the event of a foreclosure or default of the loan.[55]

---

45.  James A. Chalmers and Thomas O. Jackson, "Risk Factors in the Appraisal of Contaminated Property," *The Appraisal Journal* (January, 1996): 44–58.

46.  Jackson, 47.

47.  Ibid., 48.

48.  Roddewig, 97.

49.  Sanders, 64.

50.  William Ruskin, "The Use of 'Principled Negotiation' in Resolving Environmental Disputes," *American Journal of Trial Advocacy* (Summer, 1993): 225–244.

51.  David Strong, "Value Assurance Program Symposium," The University Club, PricewaterhouseCoopers, New York, April 1999, author's notes. Strong is Eastman Kodak's manager for Neighborhood Relations for Rochester Area Operations since 1988 and a member of the original Kodak VAP team.

52.  Roger Fisher and William Ury, *Getting To Yes: Negotiating Agreement Without Giving In*, 2nd ed., (58, Bruce Patton ed., 1991).

53.  Anna Amarandos and Diana Strauss, "Environmental Insurance as a Risk Management Tool," *Natural Resources & Environment* (Fall, 2000): 90.

## Damage Valuation Methodologies

The book, *Real Estate Damages*, sets forth the fundamental detrimental condition valuation methodologies. Kinnard and Worzala in their article also summarize valuation techniques for environmentally impacted real estate and compared this with approaches by appraisers.[54] Generally, the accepted methodologies fall under the cost, sales comparison, or income approaches.

The cost approach adds up the "costs" and then deducts them from the baseline to arrive at the impaired value. Like most conventional appraisals, this is usually not the primary approach. The sales comparison approach typically includes techniques such as pairing, case studies, and regression analysis, which support a percent deduction to the unimpaired subject value. Finally, the income approach may be applied by isolating variances in income, vacancy and expenses, and by adjusting the rate of return (risk) to estimate the impaired present worth as compared with the baseline value.

With income-producing properties, Jackson applies the Ellwood procedure and a modified DCF analysis.

> Appropriate risk adjustments, derived through surveys of investors and lenders with respect to the environmental history of the property under study or through extraction from sales of comparable contaminated properties, are input into the mortgage-equity model. This results in an adjusted set of income and yield capitalization rates, which reflect the contamination-related risks, and can be used to estimate the value of the property and its value diminution from an unimpaired baseline condition.[55]

This is a reasonable technique for measuring diminution as a change within the components that make up the overall capitalization rate. Jackson's study visually shows how varying the loan to value ratio and increasing the equity yield rate results in a range of property value diminution. However, additional data relating to vertical risk (i.e., changes in rent, vacancy, or expenses) would have to be included by the appraiser in calculating the related NOI.

Roddewig offers another practical approach to deriving a portion of market resistance for a property.[56] He suggests using actual insurance broker quotes for the subject and researching insurance case studies. However, Roddewig warns that there may be additional market resistance that should be analyzed using environmental case studies.

Statistical surveys and questionnaire surveys are also tools that can be used to estimate market resistance. Statistics can be defined as "the science of collecting, classifying, presenting, and interpreting numerical data."[57] Although statistical surveys are not the primary methodology used in the appraisal profession, they can be valid. Roddewig gaves insight into the appropriate way to conduct a statistical survey, which generally, but not always, includes making the survey the secondary support for the conclusion.[58] Surveys should present questions in an objective and unbiased manner, including enough information to assist the respondent in making a sound response.

> Surveys may have a limited role in some types of assignments involving contaminated property, but collection and analysis of sales and market data will remain the central technique for estimating the stigma impact, if any, that attaches to real property affected by contamination or other forms of environmental risk.[59]

Roddewigs set forth the seminal federal court case, *Zippo Mfg. Co. v. Rogers Imports, Inc.*,[60] for conducting statistical surveys. In general, the trustworthiness of statistical surveys includes evidence that the universe is properly defined and a representative sample is selected. The questions should be clear and not leading. The interviewers need to be competent and follow sound procedures. The information must be accurately reported, the data must be analyzed according to acceptable statistical principles, and the objectivity of the process must be assured.

## Conclusion

The DC Matrix is a helpful and practical tool for organizing the myriad of issues that accompany an analysis of environmentally damaged real estate. By focusing on one quadrant at a time, a clearer analysis comes into focus. Further, the DC Matrix is helpful in dismissing the arguments of a grand diminution-in-value proposal that is based more on emotions than a supportable real estate analysis. Additionally, the DC Matrix clears up the often-confusing subject of stigma. The DC Matrix labels stigma more accurately as *risk*, which is then delineated into three types of risk depending upon where the contaminated property falls within the remediation life cycle.

Assessment risk, or an uncertainty factor, is normally eliminated upon the assessment of the environmental damage. The repair risk, or project incentive, includes the buyer's contingency, or the discount required for taking the risk of delay and possible cost overruns along with a reward for the time, trouble, and risk associated with managing the remediation. It may also include the perceived risk to neighboring properties that are not contaminated. The ongoing risk,

---

54.    Kinnard and Worzala, 269–279.

55.    Jackson, 55.

56.    Roddewig, 307–308.

57.    Johnson, Robert Russell, *Elementary Statistics* 4th Ed, (Boston: Duxbury Press, 1984).

58.    Richard J. Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," *The Appraisal Journal* (October, 1999): 447–453.

59.    Ibid., 452.

60.    Ibid., 452.

Copyrighted material licensed by Randall Bell on April 26, 2021

or market resistance, includes ongoing perceptions following completion of remediation. However, by applying risk transfer mechanisms such as environmental insurance and indemnification, or reaching milestones such as the NFA letter, this type of risk may be greatly reduced or eliminated.

| References |
|---|

Appraisal Institute. *Technical Report: Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications* (Chicago: Appraisal Institute, 1992).

Colangelo, Robert V. and Ronald D. Miller. *Environmental Site Assessments and Their Impact on Property Value: The Appraiser's Role* (Chicago: Appraisal Institute, 1995).

Dennison, Mark S. *Brownfields Redevelopment: Programs and Strategies for Rehabilitating Contaminated Real Estate* (Rockville, Maryland: Governmental Institutes, 1998).

Government Institutes. *Environmental Law Handbook*, 15th Ed. (Rockville, Maryland: Governmental Institutes, 1999).

Lee, C. C. *Environmental Engineering Dictionary*, 3rd Ed. (Rockville, Maryland: Governmental Institutes, 1998).

Mahmood, Arshud. *Site Investigation, Remediation, and Closure: A Simplified Guide for Environmental and Real Estate Professionals* (Rockville, Maryland: Government Institutes, 1998).

Patnaik, Pradyot. *A Comprehensive Guide to the Hazardous Properties of Chemical Substances*, 2nd Ed. (New York: John Wiley & Sons, Inc., 1999).

Ritchie, Ingrid and Stephen J. Martin. *The Health Home Kit* (Chicago: Real Estate Education Company, 1995).

## 2.2 Environmental and Biomedical Conditions
*by Randall Bell, MAI, with Orell C. Anderson, MAI, and Michael V. Sanders, MAI, SRA*

Chapter 8 of *Real Estate Damages: Applied Economics and Detrimental Conditions,* Second Edition (Chicago: Appraisal Institute, 2008).

### Introduction

There are a wide variety of environmental issues that can affect properties, including air, water, and soil pollution. When dealing with environmental pollution and its impact on a specific property, three broad categories of contaminants must be considered.

1. Building contaminants
2. Soil contaminants
3. Water contaminants

Building contaminants are categorized as hazards that are part of or contained within the improvements. Building contaminants include asbestos, radon, lead paint, and formaldehyde. Soil and groundwater contaminants include hydrocarbons, solvents, chemicals such as pesticides and herbicides, and other toxins that threaten the environment. It is entirely possible for the same contaminant to be found in buildings, soils, and groundwater. For example, lead-based paints can be found in many buildings, and lead can also be found in soils and drinking water. Also, although asbestos is most commonly associated with asbestos-containing building materials, it is possible for asbestos to contaminate soil.

### Contaminants in Building Improvements

Exhibit 1 lists contaminants that are commonly found within property improvements. The main risk associated with these hazardous materials is the potential for direct human contact. A child may eat lead paint chips, asbestos fibers may be inhaled by the occupants of an office building, or radon gas or formaldehyde fumes may be inhaled by a family in their home.

A laboratory analysis is almost always required to determine the presence and concentrations of building contaminants. Assessments are easier to conduct for improvements than for soil because the materials are easily accessed above grade. Remediation is often easier as well because the necessary work is conducted above grade.

Various remediation methods for dealing with contaminated properties include encapsulation, enclosure, immediate removal, capping, staged removal, or an operations and management program with removal upon demolition.

### Soil and Groundwater Contamination

*Soil contamination* is a general term that sometimes includes the contamination of both soil and groundwater. The contamination may consist of materials in a variety of locations, such as on or near the soil's surface, as is often the case with heavy metals or asbestos. Gases or vapors can form from volatile materials in the subsurface or can be found within subsurface soils, which is typical for leaking underground storage tanks (LUSTs). Contaminants may impact the groundwater in a dissolved state, as a separate phase, or in both forms. Various forms of soil contamination are illustrated in Exhibit 2.

The danger with some contaminants, such as lead or asbestos, is that they are found on the surface of the soil and can be ingested by humans or animals. If a contaminant is capable of being absorbed downward into the soil, the main concern is risk to the groundwater, water supply, or aquifer, which is an underground layer of soil, rock, or sand that contains water. If the groundwater is contaminated, then the contaminants may be ingested by humans, animals, or plants and cause a variety of health-related problems. When mixed with groundwater, some contaminants dissolve, some float on the surface, and some sink to the bottom in the same way that oil and vinegar in salad dressing separate. These attributes may create additional problems in

*About the Author*

**Randall Bell, MAI,** specializes in real estate damage economics and strategy. He has traveled extensively in his research of detrimental conditions and the impact they have on real estate values. Founded upon this research, he has written various specialized methodologies, which were the basis for the Detrimental Conditions seminar developed by the Appraisal Institute and also incorporated into Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice. He has lectured internationally on the topic of property damages and mitigation strategies. Mr. Bell has an MBA in real estate from the University of California, Los Angeles, and a BS in finance and accounting from Brigham Young University.

*Contributing Authors*

**Michael V. Sanders, MAI, SRA,** has extensive experience in the valuation and evaluation of real property—including vacant land and residential, commercial, industrial, and special-purpose properties—for corporate clients, financial institutions, attorneys, and public and governmental agencies. He has performed real estate damage analysis involving a wide variety of detrimental conditions including title issues, geotechnical failures, construction defects, water intrusion, and environmental and proximity studies. He holds a BA degree in business administration with a concentration in finance from California State University, Fullerton. He has also held leadership positions in the Appraisal Institute and the Forensic Expert Witness Association.

**Orell C. Anderson, MAI,** is an appraiser and expert consultant with broad experience in valuation and diminution-in-value issues involving commercial, industrial, subdivision, and vacant land properties as well as single- and multi-family residences. Mr. Anderson has held numerous leadership positions in the Appraisal Institute, the International Right of Way Association, and the Environmental Litigation Committee of the American Bar Association Section of Litigation. Mr. Anderson holds an MA degree from California State University, Long Beach, and a BA degree from Brigham Young University.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Exhibit 1**      Environmental Conditions Within Building Improvements



terms of assessing and remediating the contamination. On the other hand, if the groundwater is not used as a drinking water supply, or if well-head treatment is installed, many or all of these concerns may be alleviated. Environmental engineers will ultimately determine the risks and related mitigation measures needed.

## Source/Non-Source/Adjacent/Proximate Site[1]

A critical issue in evaluating an environmentally contaminated property is identifying whether it is a *source*, *non-source*, *adjacent*, or *proximate site* (SNAP) property. A source site property is defined as the site from which the contamination was released. An example of a source site is a service station with a leaking underground storage tank. A *non-source property* is contaminated, but the contamination originated from another property (the source site). An example of a non-source property would be a doughnut shop located next to a contaminated service station in which the contamination has migrated off site and under the doughnut shop property. An *adjacent property* is not contaminated, but it shares a property line with a property that is contaminated. A *proximate property* is not contaminated and not adjacent to any contaminated property; however, it is in the same general neighborhood as a contaminated source site property. These distinctions are essential in

accurately evaluating contaminated properties, because the risks vary considerably between the categories. Source sites have a much different set of environmental risk factors than non-source or adjacent properties. Generally, the source property owners or prior owners are responsible for the remediation of the contamination. The costs and risks of cleanup and regulatory oversight are far greater for source site properties than any other type of property, so comparing a source site property case study to a non-source, adjacent, or proximate property could be misleading. Accordingly, if the subject property is the source of the contamination, source site case studies would provide the most meaningful comparisons. Inferences drawn from source site case studies relative to a non-source site subject may be biased and overestimate environmental impacts.

## Permitted vs. Accidental Discharges

In the industrialized world, vast quantities of contaminants are produced every day. However, contaminants that are considered *permitted discharges* should be distinguished from those that occur by accident. A permitted discharge includes governmentally allowed releases such as industrial discharges into a body of water, automobile exhaust, washing machine discharges, landfills, and deep soil discharges or storage. *Accidental* or *illegal discharges* include leaking underground

---

1.    This discussion originally appeared in "The Analysis of Environmental Core Studies," Thomas Jackson, PhD, MAI, and Randall Bell, MAI, *The Appraisal Journal* (January 2002): 86-95.

**Exhibit 2**    Contamination in the Soil

Source: *Property Owners Manual*

storage tanks, oil tanker spills, and improper dumping. There are critical distinctions between these two types of discharges. Permitted discharges do not generally involve any level of remediation, while an accidental discharge may require remediation if the quantity of contamination rises above the actionable levels set by governmental agencies. Accidental discharges may be subject to fines and sanctions, while permitted discharges generally are not. The release of a potentially hazardous substance under a legally authorized permit with regulatory oversight has a much different set of risk characteristics than the release of hazardous materials from an unplanned or accidental explosion or leak. Market risk perceptions are related to unknown information, and an accidental release has many more unknown factors (cleanup costs, off-site impacts) than a planned release of materials that has been reviewed and permitted by the appropriate regulatory authority.

## Level of Contamination

While perhaps initially startling to some, a simple reality of industrialized society is that virtually all air, water, and soil are contaminated to some degree. Car emissions

alone contaminate the air, water, and soil. Asbestos is a naturally occurring substance, and everyone breathes some asbestos fibers daily. Sewer pipes often leak and contaminate soils. These low-level situations are termed *background contamination*. The critical factors in this regard are the standards established by the appropriate regulatory authority. Various governmental agencies set "actionable levels" providing that when some contaminants meet or exceed a certain level, there must be action on the part of a responsible party to remediate the condition. Many agencies tailor their standards to the property type and risk exposure characteristics of the property and surrounding area. These standards are also typically tied to risk-based cleanup action (RBCA) requirements that have been adopted by many states. Thus, rather than asking, "Is a property contaminated?" more valid questions to ask would be, "What is the level of contamination?" "Is the contamination really a risk?" or "Does the level of contamination exceed governmental standards?"

## Toxicology

*Toxicology* is often defined as the science of poisons or the study of the harmful effects of chemicals on living

Copyrighted material licensed by Randall Bell on April 26, 2021

things. Within the context of contamination, toxicology is more rightly viewed as a way to define and quantify the adverse effects of chemicals in order to establish safe human exposure levels. The latter definition is more appropriate because our society has chosen to live with a broad spectrum of chemicals, some of which have the potential to cause harm or death. An important distinction exists between the terms *hazardous* and *toxic*. For example, table salt is generally not considered hazardous, but if ingested at high levels it becomes toxic. Likewise, gasoline is a hazardous substance but is considered toxic, again, only if ingested at certain levels. A hazardous material is considered toxic only if it becomes *bioavailable*, meaning that harmful levels come into contact with humans.

A particularly important set of safe exposure levels was set forth by the Environmental Protection Agency (EPA) in the Drinking Water Standards in the publication EPA 822-B-96-002 (October 1996). This government document lists over 250 elements or compounds and has maximum contaminant levels (MCLs) for about 100 of them. The MCL is the maximum concentration of a substance allowed in drinking water, usually expressed as milligrams or micrograms per liter (mg/L or ug/L) or parts per million or per billion (ppm or ppb). Because one of the primary goals of environmental policy is to protect drinking water resources, MCLs often play an important role in establishing cleanup goals.

### Area Bioavailability/Risk Exposure[2]
There are six areas of a property that may become contaminated.

1. Air
2. Water
3. Building improvements
4. Surface/shallow soils
5. Groundwater aquifers
6. Deep soils

These categories are relevant because of the concept of *bioavailability*, or the extent to which a contaminant becomes available to humans or the plants and animals of a region in general. Air pollution would be considered to have a relatively high level of bioavailability, while contaminants that are restricted to deep soils may have no bioavailability. These categories are regarded quite differently by regulatory agencies due to their different levels of health risk exposure. Simply put, when there is no exposure risk, there should be no environmental risk that reduces the value of the real property. Newer risk-based cleanup standards treat sites with limited exposure differently from sites in which the exposure is more immediate and of more serious concern. For example, hazardous materials that are trapped thousands of feet underground are different from sites with hazardous materials in shallow groundwater or exposed soil. The risk levels, the level

of market concern, and the resulting effects on property value for these two examples would differ greatly.

Environmental engineers frequently use the following formula, which has applicability to property valuation as well:

$$\text{Toxicity} \times \text{Exposure} = \text{Risk}$$

In other words, if the contaminant is at low levels, or if there is a low risk of exposure, the overall risk of the situation is generally considered low. Conversely, if both the toxicity and exposure are high, so is the risk.

## Geology and Hydrogeology
The sciences of geology and hydrogeology enable environmental engineers to understand the structure of the subsurface and how groundwater and contaminants move through that structure. The reason that these sciences are important is that one of the focal points of environmental engineering is the protection of drinking water resources. Groundwater is a major source of the water used for drinking and irrigation, and it accounts for 40% of the water consumed in the United States.

When contamination enters a site, it typically first sinks into the soil. There, gravity prompts the contaminant to continue its path downward. Most contaminants move quickly through porous layers like sand and gravel and are slowed by clays, but all contaminants generally continue their descent under gravity's influence. When a descending plume of contaminant runs into an aquifer, its direction of travel may change significantly. Movement of water within the aquifer is generally horizontal rather than downward. Thus, when the plume reaches the aquifer, it makes a turn and starts to migrate to the side, often towards other properties. Once the moving plume crosses a property line, it has carried contamination to the property of others.

### Floating and Sinking Contaminants
Water is known as the universal solvent because it dissolves most contaminants and many hydrocarbons. A dissolved contaminant is said to be in the *aqueous phase*. Once the water has dissolved all it can, the contaminant then begins to develop a separate layer of undissolved material, a non-aqueous phase liquid (NAPL). Materials that are less dense than water are called light non-aqueous phase liquids (LNAPLs). They float and accumulate near the upper water surface, which makes them relatively easy to find. In contrast, some contaminants sink in water because they are more dense than water. These dense non-aqueous phase liquids (DNAPLs) are usually harder to find and treat than LNAPLs.

## Environmental Regulations
Class VIII detrimental conditions relate to all environmental conditions that may affect the improvements, site, subsurface, or even air space. Contamination can result from a variety of pollutants being emitted in a number of ways. Some contaminants are released into

---

2.   Ibid.

the air through factory or vehicle emissions. Others are discharged or spilled onto the ground or directly into oceans, lakes, or rivers.

Modern society depends on many hazardous substances. Fuels are needed for automobiles and to heat buildings. Solvents are necessary for manufacturing processes and the dry cleaning of clothes. Other chemicals are needed to control agricultural pests and weeds, to ensure that paint goes onto surfaces smoothly, or to make plastic bags that keep food fresh. In years past, society was largely ignorant of the health effects of hazardous materials, but as more was learned, it became apparent that contaminants are directly responsible for a variety of diseases and health problems. These and other revelations have prompted new laws and regulations, many of which may impose severe financial burdens on property owners, lenders, and tenants.

## Laws and Regulations

While environmental laws were established for many decades before the 1960s, the public was jolted into awareness of the detrimental effects of contamination in the early 1960s with the publication of the book *Silent Spring* by Rachel Carson. In this book, the author reported on the insecticide DDT and how it entered the food chain and caused the thinning of egg shells, which in turn caused eggs to break before hatching. This book is generally acknowledged as a catalyst for the creation of the modern environmental movement, which spawned a network of new federal, state, and local laws and regulations, as shown in Exhibit 3. Two of the more recent laws deserve special attention because they and their derivative regulations established many of the terms and precedents that are almost universal today. They are the Resource Conservation and Recovery Act (RCRA) of 1976 and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, which is commonly referred to as the Superfund Act. The intent of all these laws is to protect human health and the environment from harm caused by hazardous materials.

### Resource Conservation and Recovery Act (RCRA)

Under the RCRA of 1976, when a party generates hazardous waste, it must be labeled, manifested, placarded, and shipped by an approved transporter to a permitted storage or disposal facility. The waste remains the property of the generator, and the generator remains liable for it even when it is stored elsewhere. This has been termed *cradle to grave* responsibility. RCRA also provides for sizable daily penalties for knowingly violating its restrictions.

A material is defined as hazardous if it appears on one of the lists maintained by the Environmental Protection Agency (EPA), as shown in Exhibit 4, or if it has at least one of the four characteristics of ignitability, corrosivity, reactivity, or toxicity. Ignitability and toxicity are the characteristics that most often qualify a waste material as an RCRA hazardous waste. If a material spontaneously catches fire at a temperature below 140º F, then it is considered to be hazardous because of ignitability.

These hazard characteristics are the basis of a commonly seen, diamond-shaped sign on nearly every building that contains hazardous materials. The sign, as shown in Exhibit 5, was devised by the National Fire Protection Association (NFPA) as a way to quickly inform firefighters about the nature of the materials within a building and the appropriate firefighting techniques to use. Real estate professionals can also find knowledge of the risks posed by a building's contents useful.

## Superfund Act

Some of the most seriously contaminated sites in the United States are the result of what were accepted business practices in the distant past. Some of these sites have posed dangers to resident populations while the parties who contributed to the contamination are no longer around or not easily found. The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as Superfund, was enacted in 1980 to marshal the forces needed to clean up the worst of these sites and to get those who are responsible to pay for it. The Superfund act initially targeted 400 of the nation's worst sites for cleanup. These were placed on a National Priority List (NPL), which eventually grew to well over 1,000 sites.

CERCLA conferred extraordinary powers on regulators by providing for swift response to emergency situations and by defining liability broadly to fall on generators (those with whom the contaminants originated), transporters (those who carried the materials to the site), operators (those who accepted the materials at the site), and owners of the site. Those who are considered likely to be responsible under CERCLA are termed potentially responsible parties (PRPs). Often, a group of PRPs will band together to handle a regional problem they all contributed to because costs can quickly escalate to millions of dollars. The basic steps in the Superfund process are shown in Exhibit 6.

## Types of Contaminants

There are literally hundreds of environmental contaminants. These contaminants can be categorized as follows:

- Hydrocarbons, including crude oil and refined petroleum
- Asbestos, a natural mineral that can be crushed and used as a building material
- Solvents, which may be used for cleaning or manufacturing
- Radioactive materials, including radon
- Metals, such as lead, chrome, or arsenic
- Biologicals, such as sewage and medical waste.

The type of contamination or hazardous substance can have a significant effect on the market's perception of risk and, in turn, property value diminution. When collecting market data for case studies, the type of contaminant should ideally be the same for both the subject and the case study properties because different contaminants

Copyrighted material licensed by Randall Bell on April 26, 2021

**Exhibit 3     Chronology of Selected Environmental Acts, Laws, Regulations, and Cases**

| Year | Act, Law, Regulation, Policy, or Case |
|---|---|
| 1899 | **Rivers and Harbors Act ( The "Refuse Act")** Designed to protect navigable waters, especially the Mississippi River system, from floating debris that constituted hazards to navigation. |
| 1947 | **Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)** |
| 1948 | **Federal Water Pollution Control Act (Old Clean Water Act)** |
| 1954 | **Atomic Energy Act** |
| 1956 | **Clean Water Act** |
| 1963 | **Clean Air Act (CAA)** |
| 1966 | **National Historic Preservation Act** |
| 1967 | **Clean Air Act Revision** |
| 1969 | **National Environmental Policy Act** |
| 1972 | **Marine Protection, Research, and Sanctuaries Act** |
| 1972 | **Federal Coastal Zone Management Act** |
| 1972 | **Federal Water Pollution Control Act Amendments (Clean Water Act)** |
| 1973 | **Federal Endangered Species Act** |
| 1974 | **Safe Drinking Water Act** |
| 1976 | **Resource Conservation and Recovery Act (RCRA)** Defined what was hazardous and drew a distinction between hazardous material and hazardous waste. |
| 1976 | **Toxic Substances Control Act (TSCA)** |
| 1977 | **Clean Water Act Amendments** |
| 1978 | **Uranium Mill Tailings Radiation Control Act** |
| 1979 | **Hazardous Liquid Pipeline Safety Act** |
| 1980 | **Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) "Superfund"** Intended to take care of cleanups at sites that were no longer being operated. |
| 1984 | **Hazardous and Solid Waste Amendments** |
| 1985 | **Supreme Court Support of Adjacent or Isolated Wetlands as "Waters of the U.S."** |
| 1986 | **Safe Drinking Water and Toxic Enforcement Act (California Proposition 65)** |
| 1986 | **Superfund Amendment and Reauthorization Act (SARA)** |
| 1986 | **Maryland Bank and Trust** Superfund liability can attach to a lender that takes title to a property through foreclosure. |
| 1987 | **Federal Water Quality Act** |
| 1987 | **Air Toxics "Hot Spots" Information and Assessment Act** |
| 1990 | **Oil Pollution Act** |
| 1990 | **Pollution Prevention Act** |
| 1990 | **Hazardous Waste Operations and Emergency Response Act** |
| 1990 | **Fleet Factors** A lender doesn't even have to hold title to have liability under CERCLA. If the lender exerts control over a business, then it may become liable. |
| 1992 | **OSHA Process Safety Management Standards** |
| 1992 | **Title X Housing and Community Development Act (lead-based paint)** |
| 1992 | **EPA Issues Lender Liability Rule** Attempted to protect lenders, etc., and struck down by Appeal Court 2/4/94. |
| 1994 | **ASTM Standard Practice for Site Assessment** |
| 1995 | **EPA Officially Begins Brownfields Programs** Contaminated Aquifer Policy Prospective Purchaser Agreements Comfort Letters |
| 1995 | **EPA Issues Lender Liability Policy** Attempts to protect still unconvinced lenders. |

may invoke different responses from the marketplace. It would be improper, for example, to compare a case study involving the effects of petroleum hydrocarbon contamination from a leaking underground storage tank to a subject property impacted by asbestos or radon. However, there are situations in which a study is comparable, even though the contaminants differ slightly. For example, it might be worthwhile to study a shopping center that has soil contamination from a service station's leaking underground storage tank with another shopping center that has soil contamination from dry cleaning solvents. Careful analysis would be required in a situation like this.

## Exhibit 4 — Lists of Hazardous Materials (or Wastes) Maintained by EPA

| EPA List Code | Characteristic | Description |
|---|---|---|
| D001 | Ignitability | Flashpoint < 140°F (spontaneously catches fire) |
| D002 | Corrosivity | pH is less than 2.0 (acid) or more than 12.5 (base) |
| D003 | Reactivity | Reacts violently or generates pressure |
| D004-D017 | Toxicity | Toxic at specified concentrations |
| F List | Listed wastes | Listed wastes from non-specific sources |
| K List | Listed wastes | Wastes from listed sources or processes |
| P List | Listed wastes | Specific substances |
| U List | Listed wastes | Off-spec or discarded products and/or residues |

## Lead

Lead can be found in paints, car batteries, dust, pipes and solder, and drinking water. When exposure is excessive, lead can accumulate in the blood, tissues, and bones. Damage to the brain, kidneys, male reproductive organs, and nervous system may result. Lead accumulation can cause learning disabilities, decreased IQ, and behavioral problems.

The two most common sources of lead are paint and water. The Environmental Protection Agency estimates that lead-based paints were used in about two-thirds of the homes built before 1940, one-third of the homes built between 1940 and 1960, and in some homes built after 1960. Beginning in 1978, the federal government required that paints for home use contain less than 0.06% lead. Paints for other uses, such as industrial, military, or marine purposes, may have much higher lead contents. For this reason, home owners should only use paints that are specifically intended for residential properties when painting their residences.

Any home that was painted before 1978 has the potential to contain lead-based paint. If home paints contain lead, they may be covered by wallpaper, paneling, or more recent layers of non-lead paint. A test called

## Exhibit 5 — NFPA Hazard Identification System



Flammability Signal
Red

Health Signal
Blue

Reactivity Signal
Yellow

Special Information
Radioactive or Water Reactive

| Identification of Health Hazard Color Code: Blue | | Identification of Flammability Color Code: Red | | Identification of Reactivity Color Code: Yellow | |
|---|---|---|---|---|---|
| Signal | Type of Possible Injury | Signal | Susceptibility of Materials to Burning | Signal | Susceptibility to Release of Energy |
| 4 | Materials that on very short exposure could cause death or major residual injury even though prompt medical treatment was given | 4 | Materials that will rapidly or completely vaporize at atmospheric pressure and normal ambient temperature or which are readily dispersed in air and which will burn readily | 4 | Materials that in themselves are readily capable of detonation or of explosive decomposition or reaction at normal temperatures and pressures |
| 3 | Materials that on short exposure could cause serious temporary or residual injury even though prompt medical treatment was given | 3 | Liquids and solids that can be ignited under almost all ambient temperature conditions | 3 | Materials that (1) in themselves are capable of detonation or explosive reaction but require a strong initiating source or (2) must be heated under confinement before initiation or (3) react explosively with water |
| 2 | Materials that on intense or continued exposure could cause temporary incapacitation or possible residual injury unless prompt medical treatment is given | 2 | Materials that must be moderately heated or exposed to relatively high ambient temperatures before ignition can occur | 2 | Materials that (1) in themselves are normally unstable and readily undergo violent chemical change but do not detonate or (2) may react violently with water or (3) may form potentially explosive mixtures with water |
| 1 | Materials that on exposure could cause irritation but only minor residual injury even if no treatment is given | 1 | Materials that must be preheated before ignition can occur | 1 | Materials that in themselves are normally stable but that can (1) become unstable at elevated temperatures or (2) react with water with some release of energy but not violently |
| 0 | Materials that on exposure under rare conditions would offer no hazard beyond that of ordinary combustible material | 0 | Materials that will not burn | 0 | Materials that in themselves are normally stable, even when exposed to fire, and that do not react with water |

Copyrighted material licensed by Randall Bell on April 26, 2021

**Exhibit 6          Steps in the Superfund Process**

| Name of Step | Comments |
|---|---|
| Preliminary assessment | Initial reconnaissance to ascertain whether there is a need for emergency action. |
| Emergency removal action | If needed, materials that pose an immediate threat to human health or the environment are removed. |
| Site inspection | This is a more thorough inspection in order to get a better idea of the problem and to better plan the investigations to come. |
| Hazard ranking | The hazard ranking score (HRS) is computed for the known conditions at the site in order to see whether the property should be added to the National Priority List. If the HRS is 28.5 or greater, then the property gets listed. |
| Remedial investigation (RI) | This involves both field and laboratory investigations and is usually done iteratively with the feasibility study until the site is sufficiently characterized. |
| Feasibility study (FS) | Based upon information from the remedial investigation, various technologies are studied in order to select those that will achieve the remediation goals most cost effectively. |
| Remedial action plan (RAP) | This is the plan to remediate the problem. It brings together scientific, engineering, regulatory, and community concerns into a unified program. |
| Record of decision (ROD) | This is the formal document that accepts and records the remedial action plan. |
| Remedial design | The systems and procedures to implement the plan are designed. |
| Remedial action | The contamination is remediated according to the RAP. |

Source: Environmental Protection Agency

x-ray fluorescence (XRF) can now distinguish which paint layers contain lead. Removing the paint by methods such as sanding may actually increase the risk of exposure to lead in the form of inhaled or ingested dust.

Lead may enter the drinking water via lead pipes or lead solder used on copper pipes. Lead pipes are usually found only in homes built before 1930, and lead soldering materials have been banned since 1988. Since October of 1996, the EPA's MCL action level for lead in drinking water has been 0.015 mg/L, 0.015 parts per million (ppm), or 15 parts per billion (ppb). If lead is found in a property's drinking water, residents may need to renovate the plumbing system, employ water filters, or use only bottled water. If any reason exists to suspect that lead is contained in paints or water, laboratory testing of samples should be conducted. If lead concentrations above MCL are detected in any samples, corrective measures should be taken.

## Asbestos

Although asbestos and asbestos-containing materials (ACMs) have been used in building construction since they were introduced by the Greeks and Romans in the first century A.D., their days of being considered staple building materials are clearly over. Asbestos is a naturally formed fibrous material with properties that are well-suited to building uses. It is non-combustible, has high tensile strength, and has outstanding thermal, electrical, and acoustical insulating properties. According to some studies, it has been shown to pose health risks. Its use has been mostly discontinued and it has been removed from some buildings.

In the past, the use of asbestos in the building industry was commonplace. The EPA estimates that of the 30 million tons of asbestos used from 1900 to 1980, 60% to 70% was in the construction industry. (The United States produced 25% of the asbestos it consumed and imported 97% of the remainder from Canada.) Two terms frequently used when referring to ACMs are *friable* and *non-friable*. *Friable* simply means that the ACMs can be pulverized or crushed with hand pressure. *Non-friable* ACMs are formed into solid building materials and

cannot be crushed with hand pressure. Examples of friable uses are sprayed acoustical ceilings and sprayed fireproofing on structural steel. Non-friable materials include vinyl flooring, insulating bricks, and roofing materials. Typical locations of ACMs in buildings include sprayed surfaces such as thermal insulation on structural steel, sprayed acoustical ceilings or walls, pre-formed block insulation surrounding furnaces, insulation on boilers and hot water tanks, drywall, pipe wrap, patching compounds, texture paints, and vinyl floor tiles.

While asbestos was widely used for centuries, in the early 1970s it was declared a health risk. No safe threshold has ever been established for exposure to asbestos. ACMs in and of themselves do not pose a health hazard, but asbestos fibers released by disturbance, destruction, or decay can cause serious health problems if ingested. There are several diseases attributed to asbestos, the two most common being mesothelioma, a lung cancer, and asbestosis, a chronic lung disease. Because of these health risks, the federal government has intervened and restricted asbestos use. As would be expected, the demand for ACMs has fallen dramatically, with the 1989 use level approximately 15% of what it was in 1979. The EPA estimates that as many as 31,000 schools and 733,000 public and commercial buildings contain friable ACMs. ACMs can be found in approximately 20% of the 3.6 million commercial properties in the United States.

The following is a summary of the legal limitations placed on ACMs used in new construction or products:

1973     All sprayed ACMs that contain an amount of 1% asbestos by weight or volume banned.

1978     All friable ACMs banned.

1989     A phased-in ban of virtually all ACMs employed.

1990     Phase I of the ban goes into effect, prohibiting ACMs in roofing and flooring felt, sheeting, tile, and clothing.

1993     Phase II of the ban goes into effect, prohibiting ACMs in brake linings, transmission components, clutches, and other friction products.





*The office building above was photographed just a few weeks before an asbestos abatement program was initiated. Asbestos abatement, like many remediation processes, can be highly intrusive and result in the demolition of the tenant improvements.*

Copyrighted material licensed by Randall Bell on April 26, 2021

**Exhibit 7**     Asbestos in the Home



Source: *Property Owners Manual*

**Exhibit 8**     Asbestos in the Office



Source: *Property Owners Manual*

| 1996 | Phase III of the ban goes into effect, prohibiting ACMs in floor coatings, paper, brake blocks, pipes, and shingles. |

With the exception of school buildings, ACMs in existing buildings were not affected by the EPA bans and regulations.

In ascertaining whether or not a building contains ACMs, the first consideration is the construction date. Properties constructed prior to 1979 are more likely to have ACMs. Friable or sprayed construction materials are also a warning sign that there may be ACMs within a building. It is important to review building records of any building in question, but the only way to be certain of the presence of ACMs is to test air and building material samples.

Air sampling, as the name implies, means taking samples of the air for laboratory testing. The air is tested in the laboratory for fiber counts using one of three microscopy methods. Samples of building materials are often taken in conjunction with air sampling. Asbestos sampling is usually unobtrusive and can be done without causing any risk of exposure to the building occupants.

Attitudes towards asbestos have changed dramatically since the 1970s and 1980s. The high profits that attracted many contractors to the asbestos abatement business in the 1980s have fallen.

In 1990, the EPA issued the *Green Book*, which recommends various means of treating or managing ACMs. As a result of this and other studies, most banks do not require ACM removal as a condition of financing.

### Asbestos Removal

Removing ACMs from a building has permanent results, but the process is usually expensive. In actual abatement projects, costs are not calculated on gross building area but rather on *reflective* area, which refers only to the areas within the building that have ACMs. With removal, the building owner retains legal ownership, and thus liability, for up to 40 years for any disposed materials, even when taken to a landfill or storage site. Another negative aspect of removal is that, according to a study by the Energy and Environmental Policy Center at Harvard University, removal may actually increase asbestos exposure for building occupants because of the disruption of the asbestos.

There are three alternatives for removing ACMs:

1. Immediate or initial removal
2. Staged removal over a period of time
3. Removal at the end of the economic life (demolition) of the building

As an alternative to removal, ACMs can also be enclosed or encapsulated, which effectively eliminates exposure risk while leaving the materials in place.

### Operations and Management

Another option for dealing with ACMs is an *operations and management* (O&M) program. In this type of program, ACMs in good condition are simply left alone while the situation is monitored to ensure that there are no health hazards to the building occupants. According to the EPA, a good O&M program is 95% effective. The EPA recommends an O&M program over removal when the ACMs are in good condition.

When implementing an O&M program, the building owner or manager hires a qualified O&M consultant, who in turn trains the building management, engineers, custodians, and occupants concerning the handling of ACMs. The consultant may also conduct routine air sampling and building inspections to ensure that no fibers are released into the air through disturbance. The O&M program is generally continued until the ACMs are removed or the building is eventually demolished. Even with an O&M program, ACMs must either be removed initially, through staged removal over a number of years, or at the end of the building's economic life. In the event that the ACMs are removed at demolition, special ACM handling and disposal can double the demolition costs.

## Mold and Biologicals

Biological pollutants are often associated with poor indoor air quality, including animal dander, dust mites, fungi, bacteria, and pollen. Mold has rapidly become the most recognized of biological contaminants due to high-profile court cases and sensational media coverage. While there is little evidence that mold is more prevalent now than in the past, fungal metabolism presents potential risk to structures in addition to air quality concerns.

Molds are simple fungi (including dry rot, mildew, yeasts, plant rusts, smuts, and mushrooms), whose biological purpose is to aid in the decomposition of plant materials. Fungal organisms lack chlorophyll and typically produce airborne spores (bioaerosols), requiring an organic food source high in cellulose and sufficient moisture to sustain growth. Unfortunately, organic matter containing cellulose is a component of many common building materials, including wood, drywall, insulation, ceiling tiles, carpet, and textiles. The characteristic musty odors associated with the growth of mold are often due to substrate degradation and metabolic by-products, sometimes resulting in the production of compounds with toxic properties (mycotoxins).

Thousands of species of known fungi have been classified to date. Well-known genera of mold include *Alternaria*, *Aspergillus*, *Cladosporium*, *Penicillium*, and *Stachybotrys*, and multiple species of each have been identified. In sufficient quantity, most molds can produce irritation and allergic reactions in humans and animals. The most common exposure pathway is inhalation, although mold can also be ingested or absorbed through the skin. While some species are considered potentially pathogenic, scientific research to date has failed to establish conclusive evidence of mold toxicity. Links between airborne mycotoxins and chronic health effects have also not been proven, although these issues continue to be debated. Individual responses to mold exposure can vary, although people with compromised immune or respiratory systems may be most at risk.

Copyrighted material licensed by Randall Bell on April 26, 2021

Because molds and other biological contaminants are naturally found almost everywhere in the environment, identifying a mold "problem" is often difficult, invariably requiring the services of a properly qualified and trained professional. Air sampling comparing indoor and outdoor types and concentrations of various fungal species is normal practice in determining the existence of an indoor air quality problem. Surface sampling of potentially contaminated areas is also common, with air and surface samples typically sent to accredited laboratories for analysis.

Mold growth on building materials most often occurs in conjunction with excessive or persistent moisture conditions, including flooding, high humidity, plumbing leaks, or water intrusion through the building envelope. Inadequate ventilation is also frequently a contributing factor. The appearance of mold can vary from small dots to continuous sheets of mold colonies; colors and textures can also vary widely. Conditions supporting fungal growth, particularly sewage leaks and spills, sometimes result in bacterial contamination as well.

Attempts to define threshold limits or standards relating to mold exposure have generally been unsuccessful. Uniform standards are considered impractical due to the broad range of fungal species, geographic differences, seasonal variations, varied human responses, and lack of conclusive data regarding health impacts. Repair and restoration costs are extremely project-dependent and more difficult to generalize than many other conditions requiring repair. Contaminated materials must be either cleaned or replaced, and large remediation projects often involve specialized contractors, protective clothing, and the construction of elaborate containment systems to prevent migration of mold spores to other parts of the structure. The federal government has drafted voluntary guidelines regarding indoor air quality (IAQ) and suggested remediation standards for both residential and commercial/institutional properties. Information published by the City of New York also contains recognized remediation protocols.

## Radiation

According to *Understanding Radioactive Waste* by Raymond L. Murray, radioactive issues can cause public concern. People are aware of the fearful effects of the atom bomb. They know that a nuclear weapon is not the same as a nuclear reactor, but they tend to associate the two and are uneasy because both involve nuclear fission and radioactivity.

Another source that has only recently been recognized as significant is the element radon. Radon-222 results from the decay of radium-226 and is the parent of some radioactive isotopes. As a colorless, odorless, and invisible gas, radon may seep into buildings from the ground and can be breathed in by occupants.

Radiation is naturally occurring, and everyone is exposed to radiation on a daily basis. Radiation occurs naturally from sunlight, rocks and soils, naturally occurring radon gas, natural sources within the human body, and cosmic rays from space that bombard

our atmosphere and all beings on the earth's surface. Furthermore, people voluntarily expose themselves to radioactivity from medical and dental x-rays. According to the 1988 National Council on Radiation Protection and Measurements Report No. 93, radioactive levels are also much higher inside a jet airliner than at ground level. The average American is exposed to 360 millirems of radiation annually.

Studies of radiation effects have ultimately lead to two conclusions. First, there is no direct evidence of genetic damage in humans, even though mutations have been observed in plants and lower animals. Second, a single radiation dose of around 400 rems will be fatal to half of those who receive it, while half will survive with some possible impairment of function. Since such large doses of radiation are rare, the more relevant issue is the effect of small doses of radiation.

Regardless of the establishment of a safe level, it is undisputed that "zero risk" from radiation is not a sensible goal, as it would obviously entail infinite cost. Ultimately, the United States government established what has been called "the 15 millirem standard," which essentially states that a property that has been contaminated with radiation measuring 15 millirems above normal background levels is considered to be unsafe and contaminated. This standard is utilized for many nuclear-related projects nationwide, including the large-scale proposed Yucca Mountain project.

Radioactive materials emit high speed particles or energetic photons, collectively called *ionizing radiation*. Ionizing radiation includes alpha and beta particles, gamma rays, x-rays, neutrons, and heavy ions. Nearly all human exposure to radiation comes from natural background radiation (81%) or medical tests (14%). Contrary to some perceptions within the real estate market, nuclear power plants actually emit only a small amount of radiation, sometimes even less than coal- or oil-powered plants. Neutrons, x-rays, and gamma rays can penetrate deeply into the human body. Alpha and beta particle sources cause damage mainly if they are inside the body from being inhaled, ingested, or directly applied to the skin. Radioactive particles move at velocities that approach the speed of light: 186,000 miles per second. It is theorized that these fast- moving particles can break up or alter molecules, thereby causing cancer.

A group of 8,500 Japanese atom bomb survivors who were exposed to doses of radiation measured at 100,000 to 600,000 millirems was carefully monitored. To date, there have been 200 (2.4%) cases of excess cancers among this group (i.e., 2.4% more cases than the normal probability). Another study followed British medical patients exposed to unusually high levels of radiation. About 14,000 British patients received x-ray doses averaging 300,000 millirems, resulting in 100 excess cancers (0.7%).

As related to real estate, by far the most common source of radioactive exposure is from radon, as can be seen in Exhibit 9. Radon is a colorless and odorless naturally occurring radioactive gas that forms when radioactive uranium and radium decay within rocks,

| Exhibit 9 | Sources of Radiation | |
|---|---|---|
| **Radiation Source** | **Dose (Millirem/Year)** | **Percent of Total** |
| Natural indoor radon | 200 | 54% |
| Natural cosmic radiation | 100 | 27% |
| Medical procedures | 53 | 14% |
| Nuclear bomb testing | 6 | 2% |
| Other man-made conditions (soot, dust) | 10 | 3% |
| Nuclear power plant | 0.1 | 0% |
| Totals | 369 | 100% |

Source: American Council on Science and Health

as shown in Exhibit 10. The gas has been determined by the EPA to be a carcinogen. It accumulates in areas closest to the source, usually the ground or basement levels. Smokers are impacted more by radon, although the effects may take over 20 years to become apparent. The EPA recommends that action be taken if radon levels are over 4 picocuries per liter of air (pCi/L). In addition to gases, radon may also enter the water system, particularly when water comes from wells. Water treatment for radon includes a granular-activated carbon unit (GAC) or an aeration unit.

Radon gas is unpredictable and may affect one property and not the one next door. If any reason exists to suspect radon gas may be present, only a special laboratory test will provide conclusive answers. Often, a modestly priced system of fans and ducts provides sufficient ventilation to disperse radon and reduce its concentration to acceptable levels.

## Metals and Solvents

A variety of solvents used for cleaning and manufacturing purposes are carcinogenic materials that do not biodegrade easily. They often are compact, dense molecules that may move fairly quickly through soil and sink through groundwater to the bottom of an aquifer, where they may be difficult to remediate.

Most metal manufacturing operations produce some hazardous waste. It is likely that an operation

| Exhibit 10 | Radon |
|---|---|



Rocks containing uranium, usually shales and granite, form a radioactive gas—radon

Radon gas passes through cracks in the basement or foundation and circulates within the structure

Source: *Property Owners Manual*

generates hazardous waste if it uses any solvents, strong acid or alkaline solutions, plating solutions, paints, cyanide solutions, or any solutions containing heavy metals. Facilities that generate hazardous waste might be subject to Resource Conservation and Recovery Act (RCRA) requirements covering the generation, transportation, and management of hazardous waste.

The wastes associated with metal manufacturing processes fall into several major categories:

- *Spent solvent and solvent still bottoms* result from cleaning and degreasing operations. The types of solvents used in this category include chlorinated solvents (e.g., methylene chloride, dichlorobenzene, carbon tetrachloride, trichloroethylene), hydrocarbons (e.g., xylene, toluene, benzene), and kerosene or mineral spirits ("Stoddard" solvents).
- Strong acid wastes are generated in considerable quantity wherever any type of metal is formed or processed. Many pickling solutions are highly acidic. The acid, if not neutralized, might be carried to subsequent manufacturing operations. Subsequent operations can include drawing, rolling, pressing, electroplating, hot dip galvanizing or hot tinning, anodizing, phosphating, metal coloring (patina), and many others.
- Strong alkaline wastes are generated from the use of pickled aluminum and sometimes zinc.
- Plating wastes are generated from electroplating operations. These wastes can be acidic or alkaline and contain significant concentrations of heavy metals. Acid plating solutions generally contain free acids and heavy metals such as copper, nickel, zinc, and possibly tin or cadmium. Alkaline plating solutions include zinc baths and sometimes tin baths. The waste products from plating can include spent plating solutions or sludges as well as stripping and cleaning bath solutions.
- Heavy metal wastewater sludges are generated from wastewater treatment. Depending on the operation, these sludges can contain arsenic, barium, chromium, cadmium, lead, mercury, silver, or selenium. High concentrations of lead are found in the sludges from battery manufacturing plants. Other sludges can come from grinding, tank clean-outs, dust collectors, and lead pots.
- Paint and coating wastes are generated by several segments of the paint industry. Generally, hazardous paint wastes contain cadmium, chromium, lead, or mercury. Paints, lacquers, adhesives, and varnishes might contain toxic organic chemicals as well.
- Cyanide wastes are generated from cyanide plating solutions and simple cyanide solutions. Cyanide plating solutions are used in metal plating operations. Simple cyanide solutions are used mainly for hardening and metal cleaning. Cyanide baths are commonly used in metal finishing and heat treating operations.

Other ignitable or toxic wastes are also generated by the metal manufacturing industry. Reactive wastes are

Copyrighted material licensed by Randall Bell on April 26, 2021

generated primarily by the photographic equipment and supplies industry, though other metal manufacturing industries can also generate reactive wastes. These wastes can include strong oxidizing agents such as chromic acid, perchlorates, and permanganates used in metal finishing as well as other reactive compounds such as hypochlorites, peroxides, sulfides, nitrates, and sodium hydroxide.

## Hydrocarbons

*Hydrocarbons* is a general term for all carbon-based chemicals. These include methane gas, gasoline, oils and greases, asphalt, solvents, pesticides, plastics, and even DNA. Contamination is typically concerned with only the categories of fuels and solvents, many of which are considered hazardous because of their flammability or toxicity characteristics.

The fuel hydrocarbons of most concern have been the four ubiquitous components of gasoline: benzene, toluene, ethylbenzene, and xylene, known collectively as BTEX. One of the most hazardous of these is benzene, a known carcinogen. Many sites that have had a gasoline tank have some BTEX in the soil and perhaps even in the groundwater. Once viewed with great alarm, BTEX contamination in soil is now treated as a fairly routine matter, but is still considered very dangerous if a drinking water supply is threatened.

Total petroleum hydrocarbon (TPH) is a term used to describe a large family of several hundred chemical compounds that originally come from crude oil. Crude oil is used to make petroleum products, which can contaminate the environment. Because there are so many different chemicals in crude oil and in other petroleum products, it is not practical to measure each one separately. However, it is useful to measure the total amount of TPH at a site. TPH is made up of a mixture of chemicals, mainly a combination of hydrogen and carbon known as hydrocarbons. Scientists divide TPH into groups of petroleum hydrocarbons that act alike in soil or water. These groups are called *petroleum hydrocarbon fractions*. Each fraction contains many individual chemicals. Some chemicals that may be found in TPH are hexane, jet fuels, mineral oils, benzene, toluene, xylene, naphthalene, and fluorene, as well as other petroleum products and gasoline components. TPH may enter the environment through accidents, from industrial releases, or as byproducts from commercial or private uses. TPH may be released directly into water through spills or leaks. Some TPH fractions will float on the water and form surface films, while other TPH fractions will sink to the bottom sediments.

Every person is exposed to TPH from many sources. Pathways to TPH exposure include breathing air at gasoline stations, using chemicals at home or work, applying certain pesticides, drinking water contaminated with TPH, working in occupations that use petroleum products, or living in an area near a spill or leak of petroleum products.

## Formaldehyde

Formaldehyde is a colorless gas emitted from a variety of products and categorized as a probable carcinogen (i.e., a cancer-causing substance) by the EPA. Household products that possibly contain formaldehyde include compressed wood products such as particleboard, urea-formaldehyde foam, insulation, fabrics, paints, plastics, photographic materials, and resins. Two main areas of concern are materials used in mobile homes and compressed wood products, although formaldehyde may also be produced by improperly vented gas or kerosene heaters. Newer products are more likely to emit formaldehyde gas than older ones.

Formaldehyde exists in the outside air at levels ranging from 0.0002 to 0.050 ppm. Many people experience throat or eye irritation at levels of 0.1 ppm or above. The only way to determine if formaldehyde levels are excessive (over the outdoor air levels) is through laboratory testing of air samples. Gas levels, if excessive, may be reduced by removing the materials that contain formaldehyde and generally increasing air circulation.

## Environmental Life Cycles

Properties that have been impacted by contamination undergo a four-phased process:

Phase I:     Preliminary site assessment

Phase II:   Intrusive site investigation involving subsurface exploration to ascertain if contamination exists

Phase III: Systematic testing to fully describe the nature and extent of the contamination

Phase IV: Remediation of the contaminants

Many professionals effectively combine Phases II and III, creating a three-phase scenario.

### Phase I: Surface and Records Review

A Phase I study is an initial review of a site to determine if there is any reason to suspect contamination. It may also address compliance with environmental or Occupational Safety and Health Administration (OSHA) laws and regulations. A Phase I study is conducted by a trained environmental engineer or assessor who inspects the site and reviews aerial photographs to determine if there were any historical uses that might be linked with contamination, such as a manufacturing facility or agricultural uses with pesticides. Records from local fire, health, planning, and building and safety agencies as well as public works departments may be reviewed for evidence of historical uses, underground tanks, special manufacturing permits, or other issues that may warrant further investigation. Agencies such as the EPA and air and water quality control boards are also contacted, and their lists are reviewed to determine if there are any records reflecting historical or current contamination issues related to the property. Current and former tenants may also be interviewed to learn of any actions taking place on the property that may be associated with contamination.

Nearly all regulatory agencies maintain databases of properties that are somehow known to be connected with contamination. There are lists of properties with

suspected contamination, contamination that is still to be cleaned up, sites that have been remediated and approved, sites that are partly remediated and contain residuals, and so forth. Usually when a property is put on a list, it remains on that list permanently. Some recent programs provide for listings to be removed as certain goals are met. With databases being maintained by federal, state, and local agencies, a single agency will likely have two or more overlapping databases, particularly if it enforces regulations for two or more programs. Nearly every database or list is available to the public, and the EPA and many state agencies have Internet sites that can be a helpful research source. There are even environmental research services that charge a very modest fee to tap into all applicable lists, produce a summary report and map for any address, and transmit this information to the requestor.

If the Phase I study indicates that no reason exists to suspect contamination, then no other studies may be necessary. However, if evidence indicates that the site may be contaminated, then a Phase II study may be required.

## Phase II: Subsurface Study

The goal of the Phase II study is to establish whether contamination exists at a site. A Phase II assessment may include collecting samples of soil, groundwater, surface water, sediment, soil vapor, and even building materials. Samples are usually taken near likely sources (tanks and plumbing) and from suspicious areas such as those with discolored soil or standing puddles of unidentified fluids.

The EPA and other agencies have prescribed sampling techniques and laboratory analyses to be done for a broad spectrum of contaminants. Samples must often be kept cool or frozen and delivered to a certified lab in a timely manner. Chain of custody is documented, and the labs have quality control and assurance programs that must be strictly followed. These ensure that the samples have not been altered by activities in the field or in the lab.

The Phase II study may find no contamination or concentrations that are below regulatory action limits. These are usually seen as positive findings because the property is then deemed to be unimpaired by contamination. If contamination is found and is present at levels that require remediation, a Phase III investigation will be necessary.

## Phase III: Characterization

Before a cleanup plan can be designed, it is necessary to define the nature and extent of the contamination. For example, a groundwater plume's length, width, and depth as well as the direction and speed at which it is moving must be known. These studies are more often referred to as *remedial investigations* (RIs) than Phase III studies and are necessary before the effectiveness and cost of various remedial alternatives can be examined in feasibility studies (FSs).

The culmination of the site assessment process is the development of the remedial action plan (RAP). This plan is subject to careful review by the regulatory agencies involved and must be approved by them. It is the blueprint for the schedule, the methods to be applied, and the results to be achieved in the cleanup process. An approved RAP sets the stage for the start of the actual remediation process.

## Phase IV: Remediation

The remediation process is the actual cleanup of the released material. The goal of the remediation phase is not necessarily to return the property to an uncontaminated state but rather to remedy the problem to the satisfaction of the regulatory authorities. Parts of the property may be excavated and refilled, piping may be extended into the soil, and wells may be used to reach and treat groundwater. Numerous remediation technologies are available, depending on the specific mix of contaminants and where they are found. The choices of remedial technologies for various categories of contaminants are summarized in Exhibit 11. In many cases, a succession of technologies is used as concentrations change to remediate the problem most efficiently.

## Effects of Environmental Contamination on Value

Environmental life cycles are an important set of factors in determining the effects of environmental contamination on real estate prices and market value. The point of the life cycle refers to the stage of remediation (before, during, or after cleanup) at the date of value. Research has shown that the risks perceived by the market change dramatically as a property moves though the remediation cycle. Before cleanup, risk and any property value diminution attributable to environmental conditions would generally be the greatest. Such risks decline as remediation is underway pursuant to an approved cleanup plan. After cleanup and regulatory closure, property value impacts are often minimal and, in many cases, disappear.

### The Before Cleanup/Assessment Stage[3]

Prior to being assessed, there may be great uncertainty about the environmental condition of the subject property, thereby generating uncertainty and a discount to account for the unknown characterization of the property's condition. Upon assessment, this uncertainty is reduced or eliminated. The principle underlying this effect is that risk is directly related to uncertainty about, and potential variance in, future cash flows. If there is little known about an environmental problem that might later require substantial expenditures for remediation, then future cash flows are less predictable and the investor would require a higher rate of return to compensate for this unknown risk and uncertainty. Indeed, there may be a level at which risk and

---

3.     Ibid.

**Exhibit 11**   Remedial Technology Choices for Various Contaminants

| Remediation Method or Process | Aqueous Solutions | | Organic Liquids | Sludges and Slurries | Solids |
|---|---|---|---|---|---|
| | Inorganic | Organic | | | |
| Adsorption | | √ | √ | | |
| Bioremediation | | √ | √ | √ | |
| Dewatering | √ | | √ | √ | |
| Distillation | | | √ | | |
| Drying | | | √ | | |
| Emulsion breaking | | √ | √ | | |
| Extraction | | √ | √ | √ | |
| Incineration | | √ | √ | √ | √ |
| Landfarming | | √ | √ | √ | |
| Landfill/landspreading | | | | √ | √ |
| Neutralization | √ | √ | | √ | |
| Oxidation | √ | √ | √ | √ | √ |
| Precipitation | √ | | | | |
| Solidification | √ | | | | |
| Stabilization | √ | | | √ | √ |
| Steam stripping | | √ | √ | | |
| Surface impoundments | √ | √ | | √ | |
| Wastewater treatment | √ | √ | | √ | |

uncertainty are so high that a property is unmarketable until greater knowledge becomes available. For contaminated properties, greater knowledge involves identifying the nature and extent of the contamination as well as the requirements, costs, and timing of the remediation effort.

## The During Cleanup/Repair or Remediation Stage[4]

Upon being assessed, a contaminated property typically goes through a remediation phase in which the contaminants are removed, treated, enclosed, or left to "bioremediate" through a more passive cleanup strategy. Often there are significant costs associated with a remediation project. Like any property that requires rehabilitation, there is risk associated with these efforts. The assessment of risk during this stage considers whether the cleanup plan has been approved by the appropriate regulatory authority and is being conducted in compliance with the provisions of such a plan. If a property is sold in an assessed but unremediated state, there may be a discount to account for project risk, which can be considered the *project incentive* required by the buyer if that buyer is responsible for cleanup. Otherwise, the risk could be termed *market resistance* if another party is responsible for the cleanup costs and related activities. It is likely that there is some combination of these two categories of risk operative at this stage.

### Remediation Methods

All remedial options fall under one of two categories, *in situ* and *ex situ*. *In situ* remediation means that the treatment of the soil or groundwater is completed while keeping the soil and groundwater in place. *Ex situ* reme-

diation measures, on the other hand, involve the excavation of soil. *In situ* processes are less disruptive and less expensive than *ex situ* methods, but they may take longer than *ex situ* methods and are often not as thorough.

***In Situu* Remediation Method.** There are a variety of *in situ* procedures:

- *Bioremediation and bioventing* involve the injection of oxygen or oxygen-releasing compounds through pipes into the soils or groundwater. The oxygen injected in this process stimulates aerobic biodegradation of the carbon-based contaminants.
- *Biodegradation* is a process in which microorganisms are mixed and added to soils to break down contaminants within the soils or groundwater.
- *Soil vapor extraction (SVE)* is a process in which fresh air is drawn into the ground with a vacuum pump. The air mixes with the contaminant's vapors and is then vacuumed back to the surface. The mix of air and contaminants is filtered, incinerated, or otherwise treated.
- *Passive biodegradation* involves the concept of natural attenuation, allowing the natural biodegradation of contaminants by the microbes that are already in the soil.
- *Groundwater treatment* involves boring wells or driving pipes down to the contaminated groundwater tables and pumping the subsurface contaminated groundwater to the surface, much like a regular water well. The contaminated water is filtered or otherwise treated and then, according to permit, is either discharged as waste or pumped back down into the ground through an injection well. An alter-

---

4.   Ibid.

Copyrighted material licensed by Randall Bell on April 26, 2021





*Most people traveling on and around this service station may never notice the small enclosed area near the corner. However, a closer investigation reveals a vapor extraction unit that has been installed to remediate the contaminants located in the soils.*

Copyrighted material licensed by Randall Bell on April 26, 2021

native treatment, called air sparging, involves injecting air into the groundwater to stimulate aerobic degradation and microbial activity and to promote migration of contaminants in the remedial process.

- *Enclosure* involves the construction of air-tight walls that surround the building contamination materials (BCMs). BCMs are often surrounded with drywall. Enclosure is an effective technique and is less expensive than removal, although it has important engineering considerations because of the added weight of the enclosures. Additionally, access is not always available to all the areas within buildings that contain BCMs. Like encapsulation, enclosure is considered only a temporary solution, as all BCMs must be removed from a building prior to demolition.

- *Encapsulation* is a term used when sealants are sprayed onto the contaminant. The sealants surround, coat, and bond the contaminant and prevent any particles from being released into the air, creating a hard coating. Encapsulation may be less expensive than removal or, in many cases, enclosure, but it has disadvantages as well. The added weight of the encapsulating materials may hasten the decay of the contaminant, and encapsulated contaminants are more difficult to remove than if they had not been treated at all. Encapsulation is usually considered a temporary solution. It is currently not recommended as being a viable abatement choice, except in special circumstances.

- *Capping* is used when it is considered best not to disturb the subsurface material but there is still a chance that rain or other water moving through the soil could promote contaminant migration. Some contaminants may be removed and an impermeable cap may be placed over the contamination, preventing water from moving down into the site, thereby halting any movement of the contaminants. The site may be capped with vapor barriers, clean soils, concrete, or asphalt.

*Ex Situ* **Remediation.** There are also a variety of *ex situ* remediation methods:

- *Excavation and off-site disposal*, sometimes called *scoop and haul*, is the simplest concept. Contaminated soil is simply excavated, exported, and disposed of in an approved off-site landfill. Then the soil is replaced with imported clean soils. While conceptually straightforward, this process is relatively costly, and there may be a lingering liability associated with the contaminated soils that were shipped off-site.

- A variation of excavation and off-site disposal is to excavate the soils, treat them on- or off-site, and then put them back into the excavation. One way of treating excavated soils, either on- or off-site, is by simply burning the contaminants through incineration. In a process known as on-site *low temperature thermal desorption*, soils are heated to

vaporize and release the contaminants, which are then collected and treated.

- *Bioremediation*, *biomounding*, and *land farming* all involve excavating contaminated soils, adding nutrients or bacteria to stimulate microbes already in the soil, and perhaps adding microbes as well, all in order to facilitate biodegradation. The soils are spread by a bulldozer over a lined treatment area or kept in mounds. The soils are tilled from time to time to stimulate the process.

- *Fixation* or *encapsulation* involves the excavation of contaminated soils and the addition of fixation materials that stabilize, enclose, or encapsulate contaminants.

## The After Cleanup/Ongoing Stage[5]

Lenders may be willing to provide mortgage loans after a property has been remediated or has achieved a "no further action" status with the appropriate regulatory agencies. Perceptions of environmental risk by lenders and investors may decline significantly as a property is remediated, and some lenders and investors may perceive no additional risk after cleanup to applicable standards and the achievement of "no further action" status.

Residual risk, termed *market resistance*, may be eliminated through indemnification, cost cap insurance, secured creditor insurance, value assurance programs, re-opener insurance, pollution legal liability policies, or other factors in some situations with ongoing monitoring or operations and maintenance (O&M) programs. In a valuation analysis, special attention must be paid to the specific status and condition of the subject property within the remediation life cycle at the date of value. Market data from properties in a similar remediation stage should be selected, as these would be most reflective of the subject's environmental impacts. Clearly, the risks associated with a contaminated property that has not yet been assessed are greatly different from the risk associated with a property that has been fully assessed and remediated and is in the after-cleanup stage of its life cycle. Identifying the specific life cycle phase is critical for a valid and reliable analysis.

When all the remedial goals are met, the responsible government agency generally confirms this fact in writing. The written document is often called a *closure letter* or a *no further action (NFA) letter*, which states that the case is closed or that no further action is required. An NFA letter is a positive step, as it serves as evidence that regulators are satisfied for the time being. It may also signal that a listing of the property has been moved from one publicly available database to another with less onerous connotations, which may reduce or eliminate the potential risks of property ownership and is often viewed favorably by potential lenders. Nevertheless, an NFA letter does not automatically indicate that a property is free of contamination, that it poses no further risks, or even that all of the contamination has been found. Furthermore, it does not indicate that there will not be additional, future investi-

---

5.    Ibid.

gations interfering with property use. The letter simply means that no further action is required on the project for which the letter was issued. No governmental agency will irrevocably certify a site as clean, even if the site has undergone remediation and has site closure status. However, while a technical risk may exist, the market perceptions may be such that no material risk exists at that point. Market data must be used to make such a determination.

## Environmental Costs, Use, and Risk[6]

Three issues must be taken into account when measuring diminution in value for any detrimental condition: costs, impacts on use, and risk factors. Environmental contamination provides an opportunity to study these issues in further detail. While these may or may not apply in all circumstances, they should all be considered.

### Costs and Responsibility for Remediation

The issue of responsibility for cleanup costs has profound implications if remediation is necessary and the subject property is evaluated in a non-remediated state. Whether or not the potentially responsible party (PRP) is known, has assumed responsibility for the environmental contamination, or has offered or provided indemnities to other parties and property owners can make a significant difference in the market's perception of environmental risk. A site for which the PRP has not been identified or for which the PRP does not accept responsibility for remediation will generally be more adversely impacted than an otherwise similar site for which the PRP accepts responsibility and has fully financed the cleanup plan. In addition, the financial strength of the party responsible for site remediation affects the market's perception of environmental risks. Much of the risk associated with contamination is centered on who will have to pay for cleanup and whether the responsible party is financially solvent.

For example, consider two service station sites that have been sold with leaking underground storage tanks. A major oil company, which has assumed all responsibility for cleanup costs, owns Service Station A. The company is solvent and financially responsible. Furthermore, not only will the oil company remediate the site, but it will also provide an indemnification to future owners of the property in which they accept any future liability associated with the contamination that they caused. On the other hand, consider an otherwise similar Service Station B, which was owned by a now-retired husband and wife who have moved out of the state. The property has changed hands on several occasions, and it is uncertain who is responsible for the releases. Furthermore, all the potentially responsible parties deny any responsibility and have limited financial resources. Clearly, the impact of contamination on the value of Service Station A will not be comparable with the impact on Service Station B.

### Costs and Scale of the Project

Simply stated, some projects are quite large and some are quite small. For example, some of the largest contamination cases in world history include the nuclear power plant disaster of Chernobyl in Russia and radioactive contamination in the Marshall Islands from nuclear testing on the Bikini Atoll. The dynamics of these cases obviously differ substantially from radon gas in a single-family residence or a leaking underground storage tank near a commercial property. Whatever the situation, the same concept applies: in order to be valid, market data should generally relate to properties similar to the subject property in terms of the scale of the project.

### Impacts on Use and Use Limitations

Whether or not a property's utility has been impacted is another key factor. A situation in which the contamination has resulted in the property being vacated is clearly different from a situation in which the remediation is non-intrusive and the user can continue operations with little or no disruption. In addition, the effects of risk-based cleanups should be addressed. Risk-based cleanups typically allow remediation standards to be tailored to specific risk exposures and can allow for regulatory closure without the removal of all constituents. Indeed, the notion that all constituents must always be removed is naive and does not reconcile with risk-based environmental cleanup programs.

For example, an industrial property would be remediated to industrial standards rather than more costly residential standards. There might then be a future use restriction on such a property, perhaps allowing only industrial uses or land uses with similar risk profiles. This restriction is typically recorded as a deed restriction. Deed restrictions may have an impact on use if the prohibited uses represent realistic alternatives for highest and best use, such as a restriction from developing homes on a site for which residential use would otherwise be considered the highest and best use. On the other hand, a historic museum that is always expected to remain a museum would not likely be materially impacted by a deed restriction prohibiting such uses as a school, day care center, hospital, or residence.

### Third-Party Liability Risk

Litigation from non-source property owners is possible in situations in which contaminants have migrated off-site from a source property. Some non-source or adjacent property owners may litigate, even though they have not been impacted in any material way. This risk to the source property owner must be considered, even though the merits of such cases may be questionable. In addition, employees or tenants of contaminated properties may pursue claims for personal injury. Third-party claims, especially from off-site migration of groundwater contamination, may pose an additional risk factor that should be considered.

### Time-Frame Risks

Perceived environmental risks have generally declined over time, so market data should ideally be collected from a time period similar to the subject property's date

---

6. Ibid.

Copyrighted material licensed by Randall Bell on April 26, 2021

of value. Due to the rapidly changing nature of the market and people's experience with environmental risks, contaminated properties sold many years ago may not be appropriate comparisons for properties with current dates of value. The impact of contamination on real estate values has been generally lessened and even eliminated in some cases due to more flexible regulations, risk-based cleanup standards, better science, more effective remediation techniques, lenders and investors who are more experienced with environmental issues, and government programs that encourage the cleanup and reuse of contaminated sites.

## Risk Related to Indemnification and Insurance

An indemnification is a responsible party's written assurance that the party will incur all costs and risk associated with the contamination. When an indemnifying party is financially solvent and willing to pay the required remediation costs, the risk is reduced or may be eliminated altogether. Also, many risks can be insured. For example, remediation cost overruns, third-party liability, loss in property value, agency "re-openers," and other concerns may be largely or entirely eliminated by insurance.

## Cost, Use, and Risk Factors and Advisory Opinion 9

USPAP's Advisory Opinion 9 (AO-9) sets forth specific criteria to be utilized when dealing with an environmentally contaminated property. The life cycle and the cost, use, and risk factors set forth within the detrimental condition matrix are consistent with AO-9. As with any detrimental condition, the economic impacts of contamination on property value may be effectively studied within this framework. Although they may not all apply, the categories of cost, use, and risk should each be considered.

### Assessment Stage—Before
**Costs**
Costs during the assessment stage include any out-of-pocket expenses associated with assessing the level of contamination.

**Use**
Use considerations during the "before" stage include any disruptions in the use of the property during the assessment period. There may be no such disruptions or, in other cases, the occupants of a property may have to vacate the premises while testing is conducted.

**Risk**
Risk in the "before" stage refers to any uncertainties associated with a property that has not been assessed. Certainly, the market may be reluctant to purchase a property for which contamination issues have been identified but have not yet been characterized. However, this uncertainty is only temporary in nature and would cease to be an issue upon the characterization of any problems.

In most cases, it is impossible to value an environmentally contaminated property as is without first being provided with the assessment and remediation cost estimates of an environmental engineer.

### Repair Stage—During
**Costs**
In the repair stage, the costs associated with remediating the contamination and the responsibility for these costs must be considered. In other words, it would be improper to deduct environmental cleanup costs from a property value in a situation in which those costs are actually going to be paid by another party.

**Use**
Use considerations during the repair stage include disruptions to use during any necessary remediation. As the remediation process may be intrusive, any loss of use during this period must be accounted for. On the other hand, environmental remediation techniques are frequently not intrusive, so there may be little or no loss of use. When applicable, this loss may be derived from the moving costs and the cost to rent alternative premises while repairs are underway. For an income property, impacts on rent and occupancy would be objective measures for the loss of use.

**Risk**
Risk considerations in the "during" stage include the project incentive, if any, to entice a buyer to purchase a property that is damaged but not yet repaired. Like any "fixer-upper" property, a contamination-damaged property may incur an incremental discount above the actual repair and remediation costs if it were to be placed on the market and sold, assuming the standard definition of market value. Such an incremental discount would account for any managerial and profit motivations associated with damaged properties in general and may also include consideration of ongoing issues after repair. A simple, yet effective, technique for deriving pre-repair risk or project incentive is to first identify properties with contamination that sold in a damaged condition, determine the unimpaired "baseline value," and subtract the actual repair costs.

For example, a contamination-damaged comparable sale could yield the following data:

| | | |
|---|---|---:|
| Baseline or unimpaired value: | | $500,000 |
| Less: | Actual sale price | 400,000 |
| | Actual repair costs | 60,000 |
| | Use issues | None |
| Project incentive | | $40,000 |
| Percentage of baseline value | | 8% |

If market perceptions are such that contamination does not result in a measurable element of pre-repair risk, the contamination-damaged comparable sale could yield the following:

| | | |
|---|---|---:|
| Baseline or unimpaired value: | | $500,000 |
| Less: | Actual sale price | 440,000 |
| | Actual repair costs | 60,000 |
| | Use issues | None |
| Project incentive | | None |
| Percentage of baseline value | | 0% |

Some contamination issues could be so minor that their repair would be on par with common maintenance and the market data would reflect no project incentive. Also, project incentive damages may not be compensable by some court jurisdictions. However, this factor is not necessarily relevant to the appraiser or analyst, as the damage "is what it is" whether or not it is legally compensable.

## Ongoing Stage—After

### Costs

Costs in the "after" stage include any ongoing costs such as costs for groundwater or air monitoring to ensure the effectiveness of the repairs and remediation. If such monitoring costs are to occur over a significant time period, they would properly be discounted to present value.

### Use

Use considerations in the "after" stage include any ongoing changes to or limitations on the use or highest and best use of the subject property. Environmental contamination may or may not result in an alteration of the ongoing highest and best use of a property. If contamination does alter a property's highest and best use, it must be accounted for.

### Risk

Risk considerations in the "after" stage include ongoing risk, also known as *market resistance* or *stigma*, which could exist because of a history of contamination. This type of risk may not apply in situations in which contamination issues were properly addressed. If this type of risk is applicable, it could be analyzed as follows:

| | | |
|---|---|---:|
| Baseline or unimpaired value: | | $500,000 |
| Less: | Actual sale price (repaired) | 470,000 |
| | Use issues | None |
| Market resistance | | $30,000 |
| Percentage of baseline value | | 6% |

If market perceptions are such that contamination does not result in a measurable element of post-repair risk or market resistance, a previously contaminated comparable sale that sold in a repaired condition could yield the following:

| | | |
|---|---|---:|
| Baseline or unimpaired value: | | $500,000 |
| Less: | Actual sale price | 500,000 |
| | Use issues | None |
| Market resistance | | None |
| Percentage of baseline value | | 0% |

## Agency Databases

Environmental issues generally require considerable specialized research. The following Web sites are key environmental resources that can provide assistance with such research:

U. S. Government Official Web Portal:
*www.firstgov.gov*

Environmental Protection Agency (EPA):
*www.epa.gov*

- The Superfund program for cleaning up the nation's uncontrolled hazardous waste sites: *www.epa.gov/superfund*
- The EPA's 1995 Brownfields Program: *www.epa.gov/brownfields*
  This program is designed to authorize states, communities, and others in economic redevelopment to clean up and reuse brownfields, which are underused or abandoned commercial or industrial sites that suffer from real or perceived contamination, through revolving loan funds and cleanup grants.
- The EPA's Natural Resource Damages (NRD): *www.epa.gov/superfund/programs/nrd*
  NRD responsibilities during CERCLA actions center on notification and coordination with Natural Resource Trustees.

The U. S. Fish and Wildlife Service:
*www.fws.gov*

Gateway to statistics from over 100 federal agencies:
*www.fedstats.gov*

National Technical Information Service (NTIS):
*www.ntis.gov*

The Department of the Interior (DOI):
*www.doi.gov*
The DOI manages one out of every five acres of land in the United States, overseeing wilderness, wildlife protection, recreation, and resource development.

The U.S. Department of Housing and Urban Development (HUD):
*www.hud.gov*
HUD's mission is to increase homeownership, support community development, and increase access to affordable housing free from discrimination.

The Department of Transportation (DOT):
*www.dot.gov/ost*
DOT oversees the formulation of national transportation policy and promotes intermodal transportation.

The Occupational Safety and Health Administration (OSHA):
*www.osha.gov*
OSHA enforces the safety of the workplace through inspections and investigations.

The U.S. Army Corps of Engineers (USACE):
*www.usace.army.mil*
USACE provides engineering services to the nation including navigation, flood control, environmental protection, and disaster response.

The Centers for Disease Control and Prevention (CDC):
*www.cdc.gov/environmental*
This Web site covers topics related to health and the environment.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 2.3 Methods and Techniques for Contaminated Property Valuation

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the October 2003 issue of *The Appraisal Journal*.

As noted in the previous edition of "Environment and the Appraiser,"[1] assignments involving contaminated properties, or properties that may be impacted by environmental contamination, often require specialized valuation methods and techniques. The Appraisal Standards Board provides guidance on this issue in Advisory Opinion 9 (AO-9), "The Appraisal of Real Property That May Be Impacted by Environmental Contamination,"[2] which states that *[e]stimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods* (AO-9, Lines 182–184). Like all methods for valuing real property, these methods and techniques must be derived from or based upon one or more of the three approaches to value: sales comparison approach, income capitalization approach, and cost approach.

Over time, appraisers who specialize in analyzing the impacts of environmental contamination on real property interests have developed specialized methods and techniques that adapt standard appraisal approaches to these assignments. These methods are discussed in the peer-reviewed literature in the field and elsewhere. Since many assignments involving contaminated properties are for litigation, it is important to utilize methods and techniques that have gained general acceptance in the appraisal profession, or at least in that segment of the profession that specializes in contaminated property valuation. The purpose of this article is to provide an overview of professionally accepted methods and techniques for valuing contaminated properties or estimating the effects of environmental contamination on the market value of real property. These methods and techniques can generally be described as follows:

- analysis of environmental case studies
- paired sales analysis of potentially impacted properties
- multiple regression analysis of potentially impacted neighborhood areas or properties in proximity to a contamination source

- use of market interviews to collect data and information used in other approaches or to support and supplement the results of other analyses
- adjustment of income and yield capitalization rates to reflect environmental risk premiums in an income capitalization analysis

Other methods may emerge over time, but as yet have not achieved general acceptance in the appraisal profession or do not have the required linkage to one of the three traditional approaches to value.

### Appraisal Standards Requirements and Guidance

Prior to undertaking assignments requiring specialized methods and techniques for the valuation of contaminated properties, the *Uniform Standards of Professional Appraisal Practice* (USPAP) admonishes *appraisers to be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal* (USPAP, Standards Rule 1-1(a), Lines 511–512). Further, an appraiser must have competence in the required methods and techniques and their application in the field of contaminated property valuation. Advisory Opinion 9 states that *an appraiser must have the requisite knowledge about appropriate methods* (AO-9, Line 57) and that *[a]n appraiser who lacks knowledge and experience in analyzing the impact of environmental contamination on the value of real property must take steps necessary to complete the assignment competently* (AO-9, Lines 58–60). The Competency Rule of USPAP[3] sets forth three steps that appraisers must take in such situations: *(1) disclose the lack of knowledge and/or experience to the client before accepting the assignment; (2) take all steps necessary or appropriate to complete the assignment competently; and (3) describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report* (USPAP, Lines 364–368). Similarly, the Appraisal Institute's Guide Note 6, "Consideration

---

1. Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 127–133.

2. Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," 2003, Lines 1–191.

3. The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice*, 2003, "Competency Rule," Lines 360–368.

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

of Hazardous Substances in the Appraisal Process,"[4] notes that an appraiser who does not have the required knowledge and experience in *this special field may accept such an assignment provided the appraiser discloses such lack of knowledge and experience to the client prior to acceptance of the assignment, arranges to complete the assignment competently, and describes the lack of knowledge or experience and the steps taken to competently complete the assignment in the report.*

As in all valuation assignments involving contaminated properties, opinions regarding property value diminution must be based on real estate market data such as verifiable sales transactions. As stated in AO-9, *[t]he analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma)* **must be based on market data, rather than unsupported opinion or judgment** (AO-9, Lines 178–180. Emphasis added). This point is reinforced in the "Standard on the Valuation of Property Affected by Environmental Contamination,"[5] of the International Association of Assessing Officers, which states:

> Courts in Florida (*Finkelstein v. Dept. of Transportation*, 1995), Georgia (*Hammond v. City of Warner Robbins*, 1997), Illinois (*Techalloy Co., Inc. v. Property Tax Appeal Board*, 1997), Iowa (*Bockeloo v. Board of Review of City of Clinton*, 1995), Massachusetts (*Reliable Electric Finishing Co. v. Board of Assessors*, 1991) and Ohio (*Volpelgesang v. CESOS International, Inc.*, 1993) have all held that the **mere allegation of unmarketability is not enough.** Loss or diminution of value must **be proven by market data** (emphasis added).

Accordingly, it is unacceptable practice to assume that environmental contamination will reduce the value of a property without adequate support derived from information in the relevant real estate market. Further, such information must be pertinent to a professionally acceptable method or technique for valuing contaminated properties.

## Perspectives from the Literature

In 1991, the Appraisal Institute sponsored a symposium entitled "Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications,"[6] organized by the late William N. Kinnard, Jr. At that time, Kinnard discussed the difficulties with traditional appraisal methods such as "comparable sales analysis" and "paired sales or sale-resale analysis," which he termed "valuation by analogy," as ideals that can usually not be employed in valuing contaminated properties.[7] Kinnard and other symposium participants pointed out the difficulties of finding sales of comparable properties with similar environmental issues as the subject property and the time and effort required to collect information on a potentially comparable property's environmental history. This perspective was echoed in the early writings of Patchin, Wilson, Mundy, and others who also participated in the 1991 symposium. Indeed, Kinnard lamented the lack of knowledge and information to quantify uncertainty "about both market and regulatory response"[8] to a contaminated property, attributable today to perceived environmental risk or stigma.[9] Nevertheless, Kinnard's paper for this symposium discusses the use of multiple regression analysis as a "method of measuring reduced property values."[10] This method can be used when there are "sales transaction data in large quantities," for measuring price differences in different locations or "distance zones." This technique would have applicability in performing a proximity analysis or an analysis comparing a potentially impacted area with an otherwise similar but unimpacted control area, as will be discussed in the next section. Kinnard also discusses "survey research techniques," but warns that they must be carefully designed and implemented. Interestingly, Kinnard notes that "the results from survey analyses must be tempered with the knowledge that **the expectation of events is almost invariably more negative** and more sharply delineated, at least when [the events], are expected to affect oneself negatively, **than is realized when the events occur** (emphasis added)."[11] This observation–and warning–from this seminal thinker suggests that analysis and conclusions drawn from abstract techniques, such as contingent valuation surveys, could overstate any adverse impacts of environmental contamination on property values.

Lastly, Kinnard decries what he refers to as "the judgmental model in the abstract," based on "a series of logical assumptions" rather than "actual, verified, bona fide market data," such as "cost, rental or operating expense data, as well as market sales transaction data."[12] As previously noted, AO-9 and other sources state that the analysis of the effects of contamination on market

---

4. Appraisal Institute, *Guide Notes to the Standards of Professional Appraisal Practice of the Appraisal Institute*, 2003, Guide Note 6, "Consideration of Hazardous Substances in the Appraisal Process," 17–24, 18.

5. International Association of Assessing Officers, "Standard on the Valuation of Property Affected by Environmental Contamination," Section 4—Specific Factors Influencing Value (Chicago: International Association of Assessing Officers, 2001): 14.

6. Appraisal Institute, *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications*, proceedings of October 1991 symposium (Chicago: Appraisal Institute, 1992).

7. William N. Kinnard, Jr., "Measuring the Effects of Contamination on Property Values: The Focus of the Symposium in the Context of Current Knowledge," in symposium proceedings, *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications* (Chicago: Appraisal Institute, 1992), 4.

8. Ibid.

9. See definitions in AO-9, Lines 81–82 and 90–91.

10. Kinnard, 4–5.

11. Ibid., 5.

12. Ibid.

Copyrighted material licensed by Randall Bell on April 26, 2021

value "must be based on market data, rather than unsupported opinion or judgment" (AO-9, Lines 179–180). No matter how compelling or logical the argument, the reliable measurement of the effects of contamination on market value must be based on market data. A credible valuation opinion cannot be produced in the abstract without clear, direct market support and evidence.

Patchin[13] was an early advocate of the use of the income capitalization approach with risk adjustments to capitalization rates as the appropriate technique for measuring the effect of contamination on market value. These environmental risk adjustments, however, were not extracted from comparable sales, but in many cases were based on "judgment." According to proponents of this approach, and as noted in the 1991 symposium, this was because few or no comparable sales of contaminated properties existed at that time. By 1994, Patchin had concluded that:

> The market is slowly becoming accustomed to dealing with contaminated property. Properties formerly believed to be unmarketable are now beginning to sell, usually with a great deal of difficulty and with severe discounts. Proper analysis of this steadily increasing flow of market data can give appraisers another tool in the measurement of the losses in value caused by contamination.[14]

Patchin posits that this sales information should be analyzed though a case studies approach. In general, case studies are useful when appropriate sales cannot be located in the same local market area as the subject property, but can be found in other areas. Case studies will be discussed in the following section.

In 1999, Kinnard and Worzala published the results of a survey of North American appraisers as to how they value contaminated properties.[15] Based on 86 usable survey responses (out of 192 delivered), Kinnard and Worzala found that 80% of the appraisers used the sales comparison approach when valuing contaminated properties, while 79% used the income capitalization approach. Obviously, many of the respondents used both approaches. Within the income capitalization approach, direct capitalization was preferred to discounted cash flow analysis. The most frequently mentioned adjustment within the income capitalization approach was to increase the capitalization rate to reflect the increased risk associated with the property's environmental condition. When asked about the basis for risk adjustments for environmental stigma, most (83%) indicated "market sales data," but a significant number (51%) still relied on "judgment." Many also used buyer/seller/broker "opinions," either alone or as supplements to an approach based on sales data.

In 2002, the Appraisal Institute and The Centre for Advanced Property Economics sponsored a symposium entitled "Environmental & Property Damages: Standards, Due Diligence, Valuation and Strategy."[16] This symposium included presentations on a variety of reporting, methodological, and appraisal standards issues. The framework presented in this article is consistent with that presented at the 2002 symposium and with AO-9. This conceptual framework and related methods and techniques have a foundation in the professional literature on the topic.[17]

## Methods and Techniques
### Valuation Framework

As explained in AO-9, the effects of environmental contamination on the value of real property can be categorized as follows:

- *cost effects*, or deductions for costs to remediate a contaminated property to appropriate regulatory standards, recognizing that not all costs are recognized by the market as having an effect on value;
- *use effects*, or limitations on the highest and best use of properties that may be impacted by environmental contamination, recognizing that these effects would be meaningful only if they limited the use of the site or property that would be the highest and best use without the effect of the contamination, and would otherwise meet the four highest and best use criteria (physically possible, legally permissible, financially feasible and maximally productive); and
- *risk effects*, or the effects on value due to increased perceptions of environmental risk by relevant market participants (AO-9, Lines 170–180).

These factors influence the value of a potentially impacted site according to the following formula:

Impaired value =   Unimpaired value
  − Cost effects (remediation and related costs)
  − Use effects (effects on site usability)
  − Risk effects (environmental risk/stigma)

Further, since property value diminution is the difference between the impaired and unimpaired values[18] the following formula can be derived:

Property value diminution =   Cost effects (remediation and related costs)
  + Use effects (effects on site usability)
  + Risk effects (environmental risk/stigma)

---

13.    Peter J. Patchin, "Valuation of Contaminated Properties," *The Appraisal Journal* (January 1988): 7–16.

14.    Peter J. Patchin, "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994): 402–409, 402.

15.    William N. Kinnard, Jr., and Elaine M. Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma," *The Appraisal Journal* (July 1999): 269–279.

16.    "Environmental and Property Damages: Standards, Due Diligence, Valuation & Strategy," co-sponsored by The Centre for Advanced Property Economics and the Appraisal Institute, Toronto (April 4–7, 2002).

17.    Additional reviews and compilations of literature in this field can be found in Thomas O. Jackson, "The Effects of Environmental Contamination on Real Estate: A Literature Review," *Journal of Real Estate Literature* (2001) 9, no. 2: 93–116, and Richard J. Roddewig, ed., *Valuing Contaminated Properties: An Appraisal Institute Anthology* (Chicago: Appraisal Institute, 2002).

18.    See Jackson, "Appraisal Standards and Contaminated Property Valuation," and AO-9.

These formulas are consistent with the guidance provided by AO-9 with respect to the application of USPAP standards to the valuation and analysis of contaminated properties.

In the first formula, the unimpaired value of a contaminated property can usually be estimated using a traditional sales comparison approach, income capitalization approach, or cost approach to value. The appraiser estimating this unimpaired value must be careful to qualify it as hypothetical and as necessary for the intended use of the assignment results. In contrast, the impaired value of a contaminated property, or property that may be impacted by environmental contamination, can rarely be estimated through one of the traditional approaches to value due to data limitations and other factors; thus, alternative methods must be utilized. However, these methods must be based on relevant market data and must be consistent with the applicable requirements of USPAP for appraisal development.

In measuring the three potential effects on value (cost, use, and risk), cost effects are derived from remediation costs, which typically are estimated by environmental specialists. Assuming the market recognizes these costs, the appraiser can usually deduct them as a lump sum from the unimpaired value in a similar manner to a capital expenditure for deferred maintenance. When a discounted cash flow analysis is used, the anticipated costs can be deducted from the projected cash flows in the periods in which they are projected to occur. Uncertainty regarding cost estimates, projection, and timing would be reflected in the environmental risk premium added to the unimpaired property or equity yield rate (risk effect). Use effects can be analyzed by estimating the highest and best use of the subject contaminated property in an impaired and unimpaired condition. If the conclusions of the two highest and best use analyses are the same, then there are no use effects on value. If they differ, then the unimpaired and impaired values would be estimated for different uses and compared. Risk effects, on the other hand, are derived from the perceived environmental risk and uncertainty related to a property's environmental condition. Measuring this element usually requires more sophisticated and less direct techniques; these methods and techniques are discussed below.

## Paired Sales Analysis

Paired sales analysis can be used to estimate the effects of contamination when there are fairly recent sales of properties in a similar environmental condition as the subject of the analysis within the market area, or the area of alleged impacts. For example, this can occur when industrial properties in an industrial district are potentially impacted by the same contamination source. In a paired sales analysis, sales of properties in the impacted area are paired with sales of otherwise similar properties located outside the impacted area in order to determine the effects, if any, of contamination on properties within the impacted area. With a sufficient number of paired sales, the impact of the adverse environmental condition on the subject property or properties can be estimated. However, the appraiser must also consider the effects of nonenvironmental differences between the paired sales properties in the analysis. Such differences might arise from locational attributes unrelated to any environmental issues, as well as physical differences in the properties.

The use of paired sales analysis (paired data analysis) is discussed in *The Appraisal of Real Estate*,[19] where it is described as "a theoretically sound method," and as "helpful and persuasive" even "when limited data are available." However, the use of quantitative adjustments in a paired sales analysis or any other form of the sales comparison approach should not go beyond the available data. In situations where quantitative adjustments are not possible or appropriate, a relative comparison analysis may be performed. Relative comparison analysis is defined in *The Appraisal of Real Estate* as follows:

> A qualitative technique for analyzing comparable sales; used to determine whether the characteristics of comparable property are inferior, superior, or similar to those of the subject property. Relative comparison analysis is similar to paired data analysis, but quantitative adjustments are not derived.[20]

When a relative comparison analysis is used in a paired sales analysis of properties with potential environmental impacts, the unimpaired comparables are given a composite ranking as inferior, superior, or similar to the impaired subject, based on individual comparisons of nonenvironmental elements such as size, age, etc. If the prices of the unimpaired comparables are consistent with or "bracket" the impaired sale, then there would be no indicated property value diminution due to the impaired property's environmental condition. On the other hand, if the impaired property's sale price falls below the unimpaired comparables that ranked inferior on the nonenvironmental elements of comparison, then the indication of the impact of contamination is otherwise. In this situation, a range of indicated diminution could be derived and possibly reconciled to a point estimate. Of course, this procedure is dependent on identifying impaired sales with the same environmental condition as the appraiser's subject, as well as identifying unimpaired comparables that are reasonably similar to the impaired sales except for their environmental condition at the time of sale. Jackson[21] characterizes this as a two-step procedure.

Bell[22] also discusses the use of paired sales analysis in analyzing the impact of environmental contamina-

19.    Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 438.

20.    Ibid., 445.

21.    Thomas O. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," *The Appraisal Journal* (April 2001): 200-210.

22.    Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999).

Copyrighted material licensed by Randall Bell on April 26, 2021

tion on property value. Bell describes paired sales analysis as "one of the most useful applications of this approach (sales comparison approach)," where "the subject property, or similarly impacted properties, termed *test areas*, and unimpaired properties, termed *control areas*" are compared and "if a legitimate detrimental condition exists, there will likely be a measurable (and clearly discernable) and consistent difference between the two sets of market data; if not, there will likely be no significant difference between the two sets of data. This process involves the study of a group of sales with a detrimental condition, which are then compared with a group of otherwise similar market data without the detrimental condition."[23]

## Analysis of Environmental Case Studies

The additional elements affecting the value of contaminated properties may make it difficult to identify and research sales of properties in a similar environmental condition and in the same market area as the subject property. In this situation, the appraiser may need to analyze comparable impaired sales from outside the subject property's market area. These sales and the environmental circumstances surrounding them are referred to as case studies. The environmental condition of the case study properties should be similar to the environmental condition of the subject property. Among the elements to be considered are those listed as "Relevant Property Characteristics" in AO-9. Relevant property characteristics may include, but are not limited to:

1. whether the contamination discharge was accidental or permitted;
2. the status of the property with respect to regulatory compliance requirements;
3. the remediation lifecycle stage (before, during, or after cleanup) of the property as of the date of value;
4. the contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.);
5. the contamination conveyance (air, groundwater, soil, etc.);
6. whether the property is a source, non-source, adjacent, or proximate site;
7. the cost and timing of any site remediation plans;
8. the liabilities and potential liabilities for site cleanup;
9. the potential limitations on the use of the property due to the contamination and its remediation; and
10. the potential or actual off-site impacts due to contaminant migration (for source sites) (AO-9, Lines 114–126).

Once this information has been assembled, the selected case study properties are then matched with otherwise similar but uncontaminated comparables in their market area in order to determine any adverse effects attributable to the environmental condition of the case study properties. The appraiser then compares, analyzes, and reconciles the contamination-related impacts derived for each case study to the subject property. The appraiser should also consider differences in general market conditions, property type, and date of sale between the subject and the case studies so that effects are not incorrectly attributed to nonenvironmental influences. Jackson and Bell[24] present an in-depth discussion of the factors and elements that should be considered in case studies analysis.

## Multiple Regression Analysis

When properly developed, a multiple regression model can be used to analyze the impact of environmental contamination on the sale prices of properties in an allegedly impacted area. Multivariate statistical models can test for the significance of any impacts, after controlling for other influences on value that are unrelated to the potentially adverse environmental condition. The results of such analyses can indicate whether there is any statistically discernable (significant) effect on sale prices that may be attributable to the environmental condition of the impaired properties relative to an otherwise similar group of properties in an unimpaired condition.

Care should be taken in making inferences from regression analyses of groups of properties to individual properties. Regression models can be used to construct estimates of average (mean) impacts for the category of properties being analyzed. However, individual property impacts may differ substantially from average impacts. In addition, in areas with multiple, adverse influences and/or diverse submarkets and property types, it may not be possible to reliably estimate the effect of a single contamination source through regression analysis. In developing or using a regression model, the appraiser should explain why the selected variables were chosen and how the model was constructed. Data used in the analysis should be retained in the appraiser's workfile, consistent with the Record Keeping section of the Ethics Rule (USPAP, Lines 325–336).

One possible and relatively simple specification of a multiple regression model for analyzing the effect of environmental contamination on sale price is as follows:

$$P = \beta_0 + \beta_1 X_1 + \ldots + \beta_n X_n + \beta_{n+1} ENV_1 + \ldots + \beta_{n+1+p} ENV_p + e_i$$

where:

$P$ = the sale price of the property, adjusted for remediation costs for unremediated contaminated properties (to focus the analysis on environmental risk effects)

$\beta_0$ = a constant term

$X_1 \ldots X_n$ = a vector of continuous nonenvironmental property characteristics such as building size, age, lot size, etc.

$ENV_1 \ldots ENV_p$ = a vector of discrete variables indicating the environmental condition of the property at the time of sale (the base would be uncontaminated properties)

$e_i$ = a random error term

---

23. Ibid., 19–20.
24. Thomas O. Jackson and Randall Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 86–95.

An example of this model specification in the analysis of contaminated industrial properties is provided by Jackson.[25] In this model, the risk effects of the properties' environmental condition on sale price were analyzed before, during, and after remediation. Included in the sales analyzed were unimpaired comparable properties, so that the impacts on sale price due to environmental condition were relative to otherwise similar but uncontaminated properties.

In a multiple regression analysis, the model specification should include the nonenvironmental factors that influence sale price as independent, or predictor, variables in the equation. In this way, the variation in sale price explained by the nonenvironmental variables (size, age, etc.) would not be attributed incorrectly to the environmental condition variables being tested in the model (distance from contamination source, remediation status, location in contaminated neighborhood, etc.). An analysis of the statistical significance of the environmental condition variables would indicate whether there was adequate statistical evidence to conclude that there were significant environmental impacts on value.

Two other types of multiple regression analyses used to estimate the impacts of environmental contamination are *proximity analysis* and *control area analysis*. In a proximity analysis, the regression model is usually specified so that one of the independent variables or a set (vector) of independent variables reflects the distance of each of the sale properties to the source of the environmental contamination. These variables can be specified as continuous distance from the contamination source or as discrete distance bands, or concentric bands, around the source.

Before drawing conclusions from such an analysis, the appraiser should consider the possibility of multiple adverse influences on sale price that might exist in areas with a number of contamination sources or other disamenities. In such situations, it may be difficult or impossible to sort out the relative influence of any one source as distinct from the others. Another limitation on this type of analysis involves the general tendency for residential properties that are closer to older industrial facilities and landfills to sell for less than otherwise similar properties located further away, regardless of whether the facilities have released any environmental contamination. Thus, lower sale prices closer to an industrial facility or landfill would not be due to hazardous environmental contaminates.

A multiple regression control area analysis can be used to analyze the effects of contamination on properties in a neighborhood area where it is claimed that property values have been diminished because of environmental stigma. In this type of analysis, sale prices of properties in the potentially impacted area (the subject area) are compared to prices of similar properties in a comparable neighborhood (the control area) having the same characteristics, but without the adverse environmental condition under study. In many such analyses, the locational influences of the subject and control areas are compared before and after a contamination event. Such events could be the actual release of the contamination or a public announcement of the release. Typically, such events are publicized in the media.

Issues in developing a reliable control area analysis involve potential time and area interactions and the influence of confounding nonenvironmental factors. In comparing two or more areas, even well-matched areas can be influenced by differing market and locational conditions over time,[26] and these differing influences may be incorrectly attributed to the adverse environmental condition under study. However, the subject and control areas do not need to be identical, but should be influenced by the same general market conditions over time so that changes in relative pricing can be appropriately attributed. Thus, the initial selection of the control areas is a critical step in this type of analysis. Control area selection criteria and procedures will be discussed in a future edition of this column.

## Market Interviews

Market interviews are not methods or techniques for valuing contaminated properties, but are useful for collecting and understanding the data and information necessary to apply the other methods and techniques discussed herein. The results of market interviews can be used to supplement a sales-based analysis, as previously discussed, and/or to provide information useful for understanding the market's requirements for environmental risk premiums in an income capitalization analysis, as discussed below. These requirements can be expressed as required rates of return or as return premiums over unimpaired rates. However, market interviews cannot stand alone as an appropriate or credible valuation method or technique.

In planning and conducting market interviews, care should be taken not to introduce bias into the results. Important in this regard are:

- selection of market participants to be interviewed;
- development of unbiased information about the subject property and its environmental condition; and
- construction of a structured questionnaire and interview protocol that can be replicated.

Potential bias can be introduced whenever the information provided or questions asked are not objectively developed and presented. Individuals to be interviewed should be representative of typical market participants. In addition, the environmental and other

25. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," and Thomas O. Jackson, "Environmental Contamination and Industrial Real Estate Prices," *Journal of Real Estate Research* 23, no. 1/2 (2002): 179–199.

26. Warren Rogers, "Errors in Hedonic Modeling Regressions: Compound Indicator Variables and Omitted Variables," *The Appraisal Journal* (April 2000): 208–213.

Copyrighted material licensed by Randall Bell on April 26, 2021

information provided should be consistent with what is considered typical or normal market knowledge. Interviewees should be asked to assess the subject property in an unimpaired condition and in its impaired, contaminated condition. Differences between the two sets of responses will then reflect the effects of the property's environmental condition. Detailed notes and/or transcripts of interviews, as well as all information provided to interviewees, should be retained in the appraiser's workfile, consistent with the Record Keeping section of the Ethics Rule (USPAP, Lines 325–336).

Market participants need not have perfect knowledge of environmental contamination to the extent expected from a qualified environmental engineer who has performed detailed testing of a contamination source. A real estate market that has become knowledgeable of environmental influences on properties in an area will either react or not react in its pricing decisions based on its perception of the risk and potential impact of the contamination. All situations of environmental contamination do not inexorably lead to a reduction in the pricing and value of real property. An appraiser must not assume that the market will react in a certain way to environmental contamination when the assumed reaction has not been clearly demonstrated in observed market transaction data. Such opinions and conclusions are nothing more than speculation and should be avoided. It is important to remember Kinnard's observation from twelve years ago that "the results from survey analyses must be tempered with the knowledge that the expectation of events is almost invariably more negative and more sharply delineated, at least when [the events] are expected to affect oneself negatively, than is realized when the events occur."[27]

## Income Capitalization Analysis

As noted, Kinnard and Worzala[28] surveyed appraisers and found that 79% use the income capitalization approach when valuing contaminated properties. Further, the most frequently mentioned adjustment made to account for the effects of contamination was to increase the income capitalization rate ($R_O$) in a direct capitalization model. Absent any effect on income, the adjusted rate (adj. $R_O$) would produce an estimate of property value diminution due to environmental risk effects through the following equations:

$$\text{Unimpaired value } (V_O) = \text{Net operating income } (I_O) \div R_O$$

$$\text{Adjusted } R_O = \text{Unimpaired overal income capitalization rate } (R_O) + \text{Environmental risk premium}$$

$$\text{Impaired value} = \text{Net operating income } (I_O) \div \text{Adjusted } R_O$$

$$\text{Property value diminution (risk effects)} = \text{Unimpaired value } (V_O) - \text{Impaired value}$$

$$\text{Property value diminution (risk effects)} = ((\text{Net operating income } (I_O) \div R_O) - (\text{Net operating income } (I_O) \div \text{Adjusted } R_O))$$

The adjustment of the income capitalization rate should be based on data that reflects the market's perception of the increased environmental risk due to the specific environmental condition of the property and/or in the market under study. The appraiser should avoid making judgmental rate adjustments. One method of determining an appropriate environmental risk premium would be to extract it from paired sales data. In this method, sales of otherwise comparable, but unimpaired, income-producing property are paired with sales of impaired income-producing properties with similar environmental issues to the subject, with differences in income capitalization rates attributable to the impaired property's environmental condition. Prior to estimating the rate differential and risk premium, the sale price from which the capitalization rate is calculated should be adjusted for anticipated remediation costs to be assumed by the buyer, so as not to mix cost and risk effects in the risk premium. The environmental risk premium can also be gauged through lender and investor survey data via the market interview technique previously discussed.

Where the income capitalization analysis approach is used, a mortgage-equity analysis, band of investment technique, or discounted cash flow analysis could be employed to adjust the mortgage and equity components of the overall income or yield capitalization rates. In addition to overall equity and mortgage risk premium adjustments, the loan-to-value ratio and other capitalization rate components might be adjusted to account for any increased environmental risk. Jackson[29] presents a framework for the application of mortgage-equity analysis in contaminated property valuation.

## Conclusion

In selecting an appropriate method and technique for valuing a contaminated property or for estimating the effect of contamination on real property value, appraisers should consider their level of expertise and competency with a particular method or technique, the type of property under study (residential, income producing, etc.), whether the issue prompting the analysis involves a single property or an area, and the availability of appropriate sales and property data. The availability of appropriate sales and property data is frequently mentioned as a primary concern by appraisers. However daunting the data collection effort may seem, a persistent effort can usually uncover appropriate and comparable sales information to use with one or more of the methods and techniques discussed in this column. Modern real estate appraisal recognizes the importance of the sale price and transaction data as reflective of the

---

27.    Kinnard, 5.

28.    Kinnard and Worzala.

29.    Thomas O. Jackson, "Mortgage-Equity Analysis in Contaminated Property Valuation," *The Appraisal Journal* (January 1998): 46–55.

full mix of positive and negative external influences, including environmental disamenities, potentially affecting market value.

In rare situations, there may not be any market data with which to construct a credible analysis. In such cases, the appraiser should avoid espousing unsupported opinions and conclusions that are not based upon adequate and appropriate market evidence and data. The appraiser should also avoid speculating on possible future effects that have not occurred or are not derived from clear and convincing market data and

credible analyses of the types discussed. Appraisers must focus on analysis of observable market data. Reliable opinions concerning the impacts of environmental contamination on the market value of real property are dependent on the ethical behavior and unbiased analysis of competent appraisers who understand and use appropriate methods and techniques and also recognize their limitations. Future editions of "Environment and the Appraiser" will continue to explore the methods and techniques introduced here, with detailed examples of their use and application.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 2.4 Methods and Techniques for Valuing Contaminated Properties

Part 4 of the Appraisal Institute seminar *Analyzing the Effects of Environmental Contamination on Real Property* (2010).

---

### Preview

In Part 4, you will learn about the specialized valuation methods used to estimate the effects of environmental contamination on real property.

**Learning Objectives**

To prepare for Part 4, read the following learning objectives and refer back to them as you study this part of the handbook.

- Recognize the specialized methods for estimating the impact of environmental contamination on property value.
- Observe how to apply paired sales analysis in estimating the impact of environmental contamination on property value.
- Analyze environmental case study examples and recognize how to apply them in estimating the impact of environmental contamination on property value.
- Recognize how regression analysis is used to estimate the impact of environmental contamination on property value.
- Determine how and when to adjust income capitalization rates to reflect the increased risk associated with contamination.

**Learning Tips**

Part 4 provides some examples that demonstrate the information you have learned so far. The class discussion may focus on the issues that can arise when appraising contaminated properties.

---

## I. Specialized Valuation Methods

Over time, appraisers who specialize in analyzing the impacts of environmental contamination on real property interests have developed specialized methods and techniques that adapt standard appraisal approaches to these assignments. Advisory Opinion 9 recognizes this use: "Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods."

A. Methods are discussed in the peer-reviewed literature in the field and elsewhere.

B. Since many assignments involving contaminated properties are for litigation, it is important to utilize methods and techniques that have gained general acceptance in the appraisal profession or at least in that segment of the profession that specializes in contaminated property valuation.

C. Like all methods for valuing real property, these methods and techniques must be derived from, or based upon, one or more of the three approaches to value: sales comparison approach, income capitalization approach, and cost approach.

D. Description of methods
   1. Paired sales analysis of potentially impacted properties

   2. Analysis of environmental case studies
   3. Multiple regression analysis of potentially impacted neighborhood areas or properties in proximity to a contamination source
   4. Adjustment of income and yield capitalization rates to reflect environmental risk premiums in an income capitalization analysis

## II. USPAP and Competency

A brief summary is provided here.

A. Standards Rule 1-1(a)

USPAP admonishes appraisers to "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal."

B. Advisory Opinion 9

"An appraiser must have the requisite knowledge about appropriate methods."

Further, an appraiser must have competence in the required methods and techniques and their application in the field of contaminated property valuation.

"An appraiser who lacks knowledge and experience in analyzing the impact of environmental contamination on the value of real property must take steps necessary to complete the assignment competently."

C. Competency Rule

The Competency Rule of USPAP names three necessary steps that must be taken if an appraiser lacks knowledge and experience.

   1. "Disclose the lack of knowledge and/or experience to the client before accepting the assignment;
   2. Take all steps necessary or appropriate to complete the assignment competently; and
   3. "Describe, in the report, the lack of knowledge and/or experience and the steps taken to complete the assignment competently."

## III. Paired Sales Analysis

A. General description
   1. When can it be used?

   Paired sales analysis can be used to estimate the effects of contamination when there are sufficient sales of similar properties in a similar environmental condition in the subject property's local market area.

2. Care should be taken to consider any non-environmental differences in the properties used in the analysis.

- Such differences might arise from locational attributes unrelated to any environmental issues as well as physical differences in the properties.

---

**4.1 Example—Use of Paired Sales Analysis**

A neighborhood or district with similar development, an industrial district, is impacted in a similar manner by the same contamination source.

Properties that sold in the impacted area are paired with otherwise similar properties outside the impacted area in order to determine the effects, if any, of their location within the impacted area on the sale price.

With a sufficient number of these paired sales analyses, the impacts of the adverse environmental conditions on the subject property or properties can be estimated.

---

B. Relative comparison analysis
1. When can it be used?
   a. The use of quantitative adjustments in a paired sales analysis or any other form of the sales comparison approach should not go beyond the available data. In situations where quantitative adjustments are not possible or appropriate, a relative comparison analysis may be used.
   b. Relative comparison analysis is similar to paired data analysis, but quantitative adjustments are not derived.
2. Process of relative comparison analysis

Paired sales analysis of an environmentally impacted property using a relative comparison analysis
   a. Unimpaired comparable sales are given a composite ranking as *inferior*, *superior*, or *similar* to the impaired subject property based on individual comparisons of non-environmental elements such as size, age, etc.
   b. If the prices of the unimpaired comparable sales are consistent with, or "bracket," the price of the subject property, then there would be no indicated property value diminution due to the environmental condition of the subject property.
   c. If, on the other hand, the subject property's price falls below the price of the comparable sales ranked *inferior* on the non-en-

---

**Relative Comparison Analysis.** A qualitative technique for analyzing comparable sales; used to determine whether the characteristics of a comparable property are inferior, superior, or similar to those of the subject property.[1]

---

vironmental elements of comparison, then the indication of the impact of contamination is evident.
   d. At this point, a range of indicated diminution may be derived and can be reconciled to a point estimate.
   e. This procedure is dependent on identifying unimpaired comparables that are similar to the subject property in most respects except for their environmental condition at the time of sale.

## IV. Environmental Case Studies

A. General description

The additional elements affecting the value of contaminated properties may make it difficult to identify and research sales of properties in a similar environmental condition and in the same market area as the subject property. Recognizing this, the appraiser may need to analyze comparable impaired sales from outside of the subject property's market area.
1. These sales and the environmental circumstances surrounding them are referred to as case studies.
2. The environmental condition of the case study properties should be similar to the environmental condition of the subject property.

B. Elements of comparison

Many of the elements to be considered are listed in Part 1 under "Relevant Property Characteristics."

---

**Elements of Comparison**

1 Property type (Income-producing properties are not comparable to residential properties.)
2 General real estate market conditions (declining, stable, etc.)
3 Whether the subject property is a source site, non-source site, adjacent, or proximate property with respect to the contamination
4 Whether the contamination discharge was permitted or accidental
5 Contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.)
6 Conveyance of the contamination (air, groundwater, soils, etc.)
7 Remediation lifecycle stage ("before," "during," or "after" cleanup) of the property as of the date of value
8 Cost and responsibility for site remediation
9 Potential impacts on the use of the property due to the contamination and its remediation
10 Potential or actual off-site impacts due to contaminant migration (third-party liabilities)
11 Environmental insurance and indemnifications

---

C. Process
1. Gather the information for the elements of comparison.
2. Match the selected case study properties with otherwise similar but uncontaminated comparable properties in their market area in order to determine the extent of any adverse effects

---

1.   *The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010), 165.

Copyrighted material licensed by Randall Bell on April 26, 2021

attributable to the environmental condition of the case study properties.

3. Compare, analyze, and reconcile the contamination related impacts derived for each case study property to the subject property.

4. Consider differences in general market conditions, property type, and date of sale among the subject property and the case study properties so that effects are not incorrectly attributed to non-environmental influences.

# V. Multiple Regression Analysis

A. General description

When properly developed, a multiple regression model can be used to analyze the existence of adverse environmental impacts on sale prices.

1. Multivariate statistical models can test for the significance of any impacts after controlling for other influences on value that are unrelated to the potentially adverse environmental condition.

2. The results of such analyses can indicate whether there is any statistically discernible (significant) effect on sale prices that may be attributable to the environmental condition of the impaired properties relative to an otherwise similar group of properties in an unimpaired condition.

B. Model specification

1. As with all regression models, a complete specification would include all of the non-environmental factors that influence sale price as independent, or predictor, variables in the equation.

2. In this way, the variation in sale price explained by the non-environmental variables (size, age, etc.) would not incorrectly be attributed to one or more of the environmental variables in the model (distance from contamination source, remediation status, location in contaminated neighborhood, etc.).

C. General model specification

A specification of a multiple regression model for analyzing the effect of environmental contamination on sale price is shown below.

## General Model Specification

$$P = \beta_0 + \beta_1 X_1 + \ldots + \beta_n X_n + \beta_{n+1} ENV_1 + \ldots + \beta_{n+1+p} ENV_p + \beta_{n+1+p+1} LOC_1 + \ldots + \beta_{n+1+p+1+r} LOC_{r+e'}$$

where

$P$ = The sale price of the property adjusted for remediation costs for unremediated properties

$\beta_0$ = A constant term

$X_1 \ldots X_n$ = A vector of continuous non-environmental property characteristics such as building size, age, lot size, etc.,

$ENV_1 \ldots ENV_p$ = A vector of discrete variables indicating the environmental condition of the property at the time of sale

$LOC_1 \ldots LOC_r$ = A vector of discrete terms indicating the location of the property and its year of sale to capture effects due to market conditions that vary by location and year

$\varepsilon_i$ = A random error term

D. Proximity analysis

1. In a proximity analysis, the regression model is usually specified so that one of the independent variables or a set (vector) of independent variables reflects the distance of each of the sale properties analyzed to the source of the environmental contamination.

• These variables can be specified as continuous distance from the contamination source or as discrete distance bands, or

| Case Study Comparison Chart | | | | | |
|---|---|---|---|---|---|
| | **Subject Property** | **Case Study A** | **Case Study B** | **Case Study C** | **Case Study D** |
| Property characteristics | | | | | |
| Property type | Industrial | Industrial | Industrial | Commercial | Commercial |
| Market conditions | Stable | Stable | Stable | Stable | Declining |
| Contamination/Discharge | | | | | |
| Source, non-source, adjacent, proximate | Source | Source | Source | Source | Source |
| Permitted vs. accidental discharge | Accidental | Accidental | Accidental | Accidental | Accidental |
| Constituents | Chlorinated solvents | Hydrocarbon | Chlorinated solvents | Chlorinated solvents | Hydro-solvents |
| Conveyance | Groundwater | Groundwater | Groundwater | Groundwater | Groundwater |
| Remediation lifecycle | | | | | |
| Before cleanup | Characterized | Characterized | Characterized | Characterized | Characterized |
| During cleanup | No RAP | No RAP | RAP | No RAP | RAP |
| After cleanup | No NFA letter | No NFA | No NFA | No NFA | NFA |
| Other/Related Issues | | | | | |
| Costs and responsibility | Seller | Seller | Seller | Buyer | Buyer |
| Impacts on use | Minimal impact | Minimal | Medium | Medium-High | Medium |
| Third-party liabilities | Low risk | Low | Low | Low | Medium |
| Indemnification | Indemnified | Indemnified | No indemnification | No indemnification | No indemnification |
| Insurance | Cost cap - reopener | None | None | None | None |
| Impact on Value | To be determined | No impact | 5% discount | 12% discount | No impact |

concentric bands, around the source.

2. In drawing conclusions from such an analysis, the appraiser should consider the possibility of multiple adverse influences on sale price as might exist in areas with a number of contamination sources or other disamenities.

   • In such situations, it may be difficult or impossible to sort out the relative influence of any one source as distinct from the others.

3. Another limitation on this type of analysis involves the general tendency for residential properties closer to industrial land uses or noxious facilities such as landfills to sell for less than otherwise similar properties located further away, regardless of whether the facilities have emitted any environmental contamination.

   • Thus, lower sale prices closer to the industrial land use or landfill would not be due to hazardous environmental contaminates.

E. Control area analysis

1. A control area analysis is perhaps the most common type of multiple regression analysis utilized in analyzing the effects of contamination on properties in a neighborhood area, as is typical in claims that property values across a neighborhood have been diminished because of environmental stigma.

2. Process

   a. Sale prices of properties in the potentially impacted area, referred to as the subject area, are compared to prices of similar properties in a comparable neighborhood having the same characteristics as the subject area but without the adverse environmental condition under study.

   b. This comparable neighborhood is referred to as the *control area*.

   c. In many such analyses, the locational influences of the subject property and control areas are compared before and after a contamination event.

      • Such events could be the actual release of the contamination or a public announcement of the release.

      • Typically, such events are publicized in the media.

3. Issues in developing a reliable control area analysis

   a. Potential time and area interactions

   b. Influence of confounding non-environmental factors

      • In comparing two or more areas, even well-matched areas can be influenced by differing market and locational conditions over time, and these differing influences may be incorrectly attributed to the adverse environmental condition under study.

   c. Subject property and control areas do not need to be identical but should be influenced by the same general market conditions over time so that changes in relative pricing could be appropriately attributed.

      • Initial selection of the control areas is a critical step in this type of analysis.

## VI. Income Capitalization Analysis

A. General description

Kinnard and Worzala (1999) surveyed appraisers and found that 79% use the income capitalization approach when valuing contaminated properties.

1. The most frequently mentioned adjustment made to account for the effects of contamination was to increase the income capitalization rate in a direct capitalization model.

2. The adjusted rate (adj. $R_O$) would produce an estimate of property value diminution due to environmental risk effects, as previously explained, through the following equations:

Property value diminution (risk effects) = (Net operating income $(I_o)$ / $(R_o)$
$-$ (Net operating income $(I_o)$ / adj. $R_o$)

Property value diminution (risk effects) = Unimpaired value $(V_o)$
$-$ Impaired value

3. The adjustment of the income capitalization rate should be based on data that reflects the market's perception of the increased environmental risk due to the specific environmental contamination relative to the property type and market under study.

4. The appraiser should avoid making judgmental adjustments.

5. A preferred method of determining an appropriate environmental risk premium would be to extract it from paired sales data. In this method, sales of otherwise comparable, but unimpaired, income-producing properties are paired with sales of impaired income-producing properties with similar environmental issues to the subject properties in order to extract the difference in income capitalization rates attributable to the property's environmental condition.

6. Prior to calculating the rate differential and risk premium, though, the sale price should be adjusted for anticipated remediation costs to be borne by the buyer so as not to mix cost and risk effects in the risk premium.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 2.5 Methods and Techniques for Valuing Contaminated Properties–Instructor Notes

Instructor Notes to Part 4 of the Appraisal Institute seminar *Analyzing the Effects of Environmental Contamination on Real Property* (2010).

**Preview.** This part introduces the methods. Emphasize that the methods must be derived from or based on one of the three traditional approaches to value (cost, income capitalization, sales comparison), and that we have only these three approaches to value to work with. The appraisal profession has not adopted (nor considered) any other approaches.

Participants will be most familiar with the first technique covered in Part 4 (**paired sales** or **paired data analysis**) since they probably have used it in other contexts. The application here is a cross-sectional matched pairs analysis, comparing unit prices for properties sold in the area of alleged environmental impacts with otherwise similar properties sold outside of this area. You might have a brief discussion of adjustments and comparisons using a relative comparison analysis and a relative comparison array (see *The Appraisal of Real Estate*), including an admonition against making quantitative adjustments without sufficient support.

Without any sales in the impacted area (where the subject property is located), a likely alternative method would be **environmental case studies**. This is the method most likely to be used by practitioners. Emphasize that this technique can be mastered, but it requires more work than is usually involved in a typical appraisal assignment. Specifically, the case study subject's environmental history must be researched and unimpaired comparables for it must be identified and researched.

As explained, this method involves a two step process: (1) an analysis of diminution for the case study subject (by comparing its unit sale price to the prices of its unimpaired comparable sales) and (2) reconciling the estimated diminution from each of the case studies to the actual subject of the appraisal assignment based on the relative degrees of environmental risk between the case study subject and the subject property being appraised.

In the second step, the risk comparison should consider the elements discussed under Section 1 (remediation lifecycle, source/non-source, etc.). Go over the example chart provided to show how to organize the case study information. The chart is from T. Jackson and R. Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal*, 2002, Vol. 70, No.1, 86-95, which is included in the seminar reference materials.

Explaining the next technique, **multiple regression analysis**, might be challenging since there may not be many participants who are familiar with it. Start by emphasizing that this technique is now included in the required curriculum for the Appraisal Institute. Also note that its use in the context of estimating the effects of contamination is not an AVM or mass appraisal of

any kind. It is used here to measure the average differences between groups of properties (impacted and non-impacted neighborhoods). It is **not** used for estimating individual property values. Try explaining it as a form of the sales comparison approach, but the comparisons and adjustments are **not** for individual properties; instead, they are for groups of properties.

Mention that there is an article on this topic, T. Jackson, "Evaluating Environmental Stigma with Multiple Regression Analysis," *The Appraisal Journal*, 2005, Vol. 73, No. 4, 363-369. Another good reference is *An Introduction to Statistics for Appraisers* by Marvin Wolverton, PhD, MAI (Chicago: Appraisal Institute, 2009).

The equation in the seminar materials may be too complex for some of the participants. You may want to try a simpler formula such as

$$\text{Price} = \beta_0 + \beta_1 \text{ (Physical characteristics)} + \beta_2 \text{ (Environmental characteristics)} + \beta_3 \text{ (Market characteristics)} + \varepsilon$$

The value of this approach especially in the current market context is that it can separate out the effects of the general (declining) market (*market characteristics*) from the effects of contamination.

Two more specific specifications should be discussed. The first is the control area specification, comparing the subject area (impacted area) with one or more control areas (non-impacted areas):

$$\text{Price} = \beta_0 + \beta_1 \text{ (Physical characteristics)} + \beta_2 \text{ (Subject area or control area)} + \beta3 \text{ (Market characteristics)} + \varepsilon$$

The second general specification involves the analysis proximity impacts where the distance to the source site is the key environmental variable:

$$\text{Price} = \beta_0 + \beta_1 \text{ (Physical characteristics)} + \beta_2 \text{ (Distance to source)} + \beta_3 \text{ (Market characteristics)} + \varepsilon$$

This model will generally require a GIS based analysis of the distance of each sale property in the subject area to the source site for the contamination.

Lastly, discuss **income capitalization** within the context of a contaminated property assignment by focusing on the environmental risk premium used to adjust (increase) the nominal capitalization rate to reflect the additional risk associated with the contamination. Also, discuss this in a DCF analysis context where the risk premium would be a basis point adjustment to the overall yield rate or the equity yield rate. Emphasize that these risk premiums must be derived from actual market data (sales).

Copyrighted material licensed by Randall Bell on April 26, 2021

# 3

# Environmental Site Assessments, Brownfields, and Source Sites

## Introduction

A significant number of the early articles on appraising contaminated properties included in the Volume I anthology dealt with the appraisal of source sites. As discussed previously, that was simply because source sites (or immediately adjacent properties) were often the subject of the contaminated property assignments typically encountered by appraisers in the late 1980s through mid-1990s. Cost, use, and risk issues continue to be significantly different for most source properties than they are for other properties indirectly impacted by contamination emanating from elsewhere.

The articles collected in Chapter 3 deal with the continuing special appraisal issues involved with source sites and sites immediately adjacent to them. Many of these sites are known as *brownfields*, a term used to describe former industrial sites (often in inner-city areas) that are known or suspected to have significant on-site contamination. As of 2002 (the year the Volume I anthology was published), it was estimated that there were between 400,000 and 600,000 such sites in the United States.[1]

The following six key issues for the appraisal process–three of which deal with site assessments in general and brownfields in particular–are addressed in the various articles in this chapter:

- The importance of understanding the role of federal, state, and local laws and regulations in establishing investigation and remediation responsibilities
- The evolving character of the required work that must be done in each of the three phases in the generally recognized and accepted process by which potential on-site contamination is investigated and documented
- The respective role of environmental professionals vs. real estate appraisers in the process of investigating the possible presence of on-site contamination
- The importance of reports by environmental professionals to the appraisal process
- The ways in which potential buyers of properties known to be contaminated or formerly contaminated can protect themselves from future cleanup responsibilities
- The ways in which variations in the results of on-site investigation and uncertainties concerning who is responsible for on-site (and sometimes off-site) remediation can affect the appraisal process

"Environmental Due Diligence in the Wake of the EPA's New All-Appropriate Inquiry Rule," Diane Crocker's Winter 2006-2007 piece from *Real Estate Issues*, opens this chapter. This article reiterates one of the central themes presented in Volume I of this anthology, which is the importance of the 1980 Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) to the on-site investigation and remediation of contaminated industrial sites. That law established the Superfund program and "caused considerable alarm among real estate investors" because the act broadly defined the term *potentially responsible parties* (PRP) as all persons or entities in the past chain of title. (page 75) PRPs could be held responsible for the cost of cleanup of contaminated sites even if they did not contribute to the contamination problem. However, amendments to the law made in 1986 also established a process by which potential buyers of contaminated property could avoid the risk of being held responsible for the cost to remediate contamination caused by earlier owners or operators. That process was also covered in Chapter 3 of Volume I, especially in the excerpts from

---

1.   Howard G. Olson and Tom Bergamini, "Advance Due-Diligence Activities Benefit Contaminated Real Estate Transactions," *Real Estate Issues* (Winter 2003-2004) page 106 in this anthology. Olson and Bergamini are citing Peter B. Meyer, "Lessons from Private Sector Brownfield Redevelopers," *Journal of American Planning Association* (Winter 2000).

the book *Environmental Site Assessments and Their Impact on Property Value: The Appraiser's Role.*

The Crocker article contains a good summary of the original due diligence process as well as recent changes to the accepted process by which potential purchasers can avoid designation as PRPs for future cleanup. That due diligence process originally followed site investigation standards set out in an ASTM (formerly the American Society for Testing and Materials) protocol.[2] Crocker discusses changes to the process resulting from the Brownfields Amendments, or the Small Business Liability Relief and Brownfields Revitalization Act, Pub. L. No. 107-118, federal legislation passed in 2002 to encourage the redevelopment of brownfields. As Crocker notes, the Brownfields Amendments are notable for three significant changes to the site investigation and buyer protection process. First, a new "bona fide prospective purchaser" defense was added to CERCLA for buyers of properties with known contamination who can "demonstrate that any onsite contamination occurred before purchase." (page 75) Second, owners of property contiguous to known source sites can also secure protection from cleanup responsibility if the contiguous property owner "demonstrates that he or she did not know of contamination on his or her property at the time of purchase." (page 75) Third, the Brownfields Amendments legislation ordered the US Environmental Protection Agency (EPA) to issue an "all appropriate inquiries" rule that would replace the ASTM site investigation protocol (E 1527-00, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process) that had been the real estate industry standard.

Crocker then goes on to describe the content of the new "all appropriate inquiry" (AAI) rule promulgated by the EPA in November 2005 (with an effective date of November 2006). She also discusses the revised ASTM standard contained in E 1527-05 that replaces the former ASTM E 1527-00, which the EPA has also recognized as a "sufficient protocol for conducting all appropriate inquiry." (page 76) Crocker notes that the EPA's AAI rule and the new ASTM protocol expand the responsibilities of both the environmental profession and the property owner. The list of past property records and public databases that must be researched by the environmental professional conducting the site investigation has been expanded, and the environmental expert must document any gaps in the data or record and explain their significance to the investigation process. The purchaser has a new responsibility to inform the environmental professional about "any environmental cleanup liens filed or recorded against the site, any activity and use limitations in place, any

specialized knowledge or experience related to the property or nearby properties, the relationship of the purchase price of the property to its value if not contaminated, any commonly known or reasonably ascertainable information about the property, and any obvious indications pointing to the presence or likely presence of contamination at the property." (page 77)

Crocker then discusses the responsibilities of commercial property owners to continue their obligations under the new standards during the entire ownership period. She closes with summaries of her interviews with environmental professionals regarding the implications of the site investigation protocol changes.

The new requirement in the AAI rule that the purchaser disclose the relationship of the purchase price of the property to its value is quite significant for real estate appraisers but is not discussed by Crocker. It is, however, the subject of Thomas O. Jackson's Spring 2005 *Appraisal Journal* article, "The EPA's Proposed All Appropriate Inquiries Rule and the Appraisal of Contaminated Properties." Although it was written before the promulgation of the final EPA rule in 2005, the Jackson article discusses aspects of the rule that did not change significantly between the proposed and final versions.

The principal focus of the Jackson article is the requirement in the new AAI rule that a prospective purchaser "make a general determination of whether the price paid for a property reflects its market value."[3] Jackson's criticism is that licensed real estate appraisers are not required to be involved in making that determination for the property purchaser/owner. The central thrust of this criticism is that the AAI rule "misses an opportunity to take advantage of the considerable progress that the appraisal profession has made in establishing acceptable methods and standards for valuing contaminated properties." (page 81) Jackson then returns to how AO-9 sets out a clear process by which licensed appraisers can address environmental issues related to market value through USPAP, a topic addressed in the various articles discussed in earlier chapters. The AAI rule underestimates the complexity of the task it is asking prospective purchasers to undertake. Jackson states that "the analysis of the effects of contamination on the market value of real properties is a far more demanding and involved appraisal problem" than the rule makers imply. (page 85)

Despite that major problem, Jackson's article saw significant benefits in the new AAI rule for the appraisal profession. It will make more information available to appraisers who become involved because the environmental professionals investigating the site (and the purchaser/owners) are required to undertake a more thorough investigation of public records, document gaps in

---

2. Chapter 3 of *Environmental Site Assessments and Their Impact on Property Value* stated the following about the ASTM standard: "ASTM… is a not for profit organization that provides a forum and set of procedures for the development of industry standards. After recognizing the need to standardize environmental assessment procedures, major real estate trade organizations such as Fannie Mae, Freddie Mac, National Association of Home Builders, National Apartment Association, American Bankers Association, and the Independent Bankers Association formed a committee under the jurisdiction of ASTM. . . The stated purpose of the ASTM Standard Practices for Environmental Site Assessments is to define 'good commercial or customary practice for conducting an environmental site assessment' on commercial real estate." (page 131 in the Volume I anthology)

3. Jackson references the proposed rule in "40 CFR Part 312: Standards and Practices for All Appropriate Inquiries," *Federal Register* 69, no. 165 (August 2004): 52567.

*Copyrighted material licensed by Randall Bell on April 26, 2021*

the data and records, and summarize existing cleanup liens and property-specific ordinances and cleanup orders. "Purchase prices and environmental risks could be more accurately evaluated with the types of information required by the proposed AAI rule, if such information were made available to the appraiser and the appraiser were included in the process." (page 85)

The Fall 2006 *Appraisal Journal* article "Institutional Controls and Contaminated Property Valuation," written by Thomas O. Jackson and J. Michael Sowinski Jr., follows next in this chapter. This article discusses *institutional controls* (ICs), the term used to describe the types of property-specific liens, ordinances, and cleanup orders that purchasers/owners must disclose to environmental professionals under the AAI rule. The authors provide the important EPA definition of *institutional controls* and then carefully distinguish them from *engineered controls*, which are the "physical barriers or structures designed to monitor and prevent or limit exposure to the contamination."[4] (page 87) The four types of ICs, described by the authors as proprietary (private) controls, government controls, information devices, and enforcement orders/agreements, are then discussed in detail.

Appraisers must take care to identify and consider the effects of any engineered or institutional controls on highest and best use and property values. Many of these types of ICs, especially the proprietary controls such as restrictive environmental covenants and some information devices such as deed notices, are recorded against the property's chain of title so that they would show up in a title search. The Jackson and Sowinski article is careful to note that whenever engineered controls have been installed on a source site, institutional controls must also be in place "to provide mechanisms to assure that the engineered controls remain intact and operational." (page 87) This is very important to the appraisal process since ICs are either recorded with the property deed record or adopted by law or regulation and can therefore significantly affect highest and best use and value. However, the article notes that the types and legal effects of ICs can vary widely from state to state, and careful research by appraisers is necessary to understand how they apply in each appraisal assignment.

Other types of ICs may not be recorded but are nevertheless extremely important to the manner in which buyers and sellers react to current or past investigation and remediation efforts affecting a property. For example, the various types of remediation enforcement orders, voluntary cleanup agreements, certificates of completion, and "no further action" letters discussed in the Jackson and Sowinski article may not always be recorded but significantly affect present and future owners' responsibilities for further testing, monitoring, or remediation efforts.

The Jackson and Sowinski article concludes with a discussion of the relationship of engineered and

institutional controls to the appraisal process. Emphasis is placed on the appraiser's obligation to consider how, if at all, these controls affect the cost, use, and risk outcomes that must be considered under AO-9. As the authors note, there is no automatic deduction against value due to the presence of institutional controls. For example, any costs "necessary to remediate the property to the appropriate regulatory standards" are only an appropriate deduction against unimpaired value "if and only if they are to be borne by the buyer of the property" (page 89). There is no automatic change in the highest and best use simply because a deed restriction has been imposed (such as in the case of a restriction limiting future use to industrial rather than residential, if industrial was the reasonably foreseeable property use even before the contamination was considered).

Groundwater contamination is another situation in which appraisers may encounter some type of engineered or institutional controls. LUSTs, landfills, or former industrial sites with inadequately contained on-site sludge ponds or waste depositories can all be sources of groundwater contamination. Due to the manner in which contamination can spread through groundwater, areas or neighborhoods at a significant distance from the source of the contamination may be located above contaminated groundwater. Appraisers may be tempted to automatically deduct something from the market value of a property located above contaminated groundwater. But as Jackson and Sowinski point out, institutional controls imposing "limitations on the use of groundwater as drinking water (potable water) when the groundwater will not be used for this purpose regardless of the contamination would not limit the property's highest and best use, and would not result in an adverse use effect on value." (page 89) Mark Dotzour's July 1997 *Appraisal Journal* article "Groundwater Contamination and Residential Property Values," included in Volume I, discussed a situation in Wichita, Kansas, involving contaminated groundwater in which commercial property prices were adversely impacted but residential properties were not. Other articles in this second volume of *Valuing Contaminated Properties*, including some articles in Chapter 7, also deal with analyzing the effects of groundwater contamination on prices and values.

Finally, Jackson and Sowinski are careful to note that imposition of institutional controls can actually enhance property prices and therefore values. Having a state or federal agency approve a remediation program and define who is and is not responsible for the associated costs and related investigation and ongoing monitoring processes can provide certainty to the marketplace. The authors relate this to the well-demonstrated positive effect that moving through the remediation life cyle has on the value of contaminated properties. As the authors state, "The use of institutional controls will reduce environmental risk and stigma impacts on prop-

---

4.   "Institutional Controls are non-engineered instruments such as administrative and/or legal controls intended to minimize the potential for human exposure to contamination limiting land or resource use," according to the US EPA Office of Solid Waste and Emergency Response, EPA 500-R-05-001, *Long-Term Stewardship: Ensuring Environmental Site Cleanups Remain Protective Over Time, Challenges and Opportunities Facing EOA's Cleanup Programs* (September 2005).

erty values." They conclude that this "positive market effect of institutional controls" is the "most significant contribution" of ICs "toward facilitating brownfield redevelopment." (page 90)

Two articles coauthored by Thomas O. Jackson and Jennifer M. Pitts in the Spring 2006 and 2007 issues of *The Appraisal Journal* discuss various types of institutional controls in three states. The Spring 2006 piece, "Innocent Landowner Programs and Their Effects on Environmental Risk and Property Value Impacts," provides information about innocent purchaser or landowner protection programs in Texas and Arizona. The Spring 2007 article, "Municipal Setting Designations: A New Tool for Reducing Environmental Risk and Cost Effects on Property Values," discusses what are sometimes termed *municipal setting* or *urban setting* programs related to groundwater contamination in Texas and Ohio.

The two innocent landowner and purchaser programs in Texas are the Innocent Owner/Operator Program (IOP) and the Innocent Owner/Operator Certificate (IOC). The first program allows an owner/operator to receive an official declaration that the source of the contamination is off site. According to the Jackson and Pitts 2006 article, the IOC program allows a current owner or operator of a site with known contamination to obtain a certificate indicating that the source of the contamination is "from an outside source, and that the owner/operator did not cause or contribute to the contamination in any way." (page 91) To receive an IOC, the owner/operator must also demonstrate that he or she "did not know and had no reason to know of the contamination when the property was acquired." (page 92) If the owner/operator qualifies, a certificate is issued by the state relieving the owner of all costs associated with investigation, remediation, and ongoing monitoring. In exchange for this assurance, institutional controls—including mandatory notice to adjacent landowners about the situation, an affidavit allowing reasonable access for investigation and remediation, and/or deed restrictions limiting future uses of the property—are imposed on the property.

The comparable Arizona program is for prospective purchasers rather than current owners/operators. The Arizona Department of Environmental Quality (ADEQ) can issue a Prospective Purchaser Agreement (PPA) that releases buyers from any liability for existing contamination so long as the buyer can demonstrate a lack of responsibility for the current contamination. The PPA also includes a recording of a covenant that prohibits the state from suing such an innocent purchaser for future site remediation costs. Buyers of both source sites and non-source sites are eligible for the program. However, the authors point out in their 2006 article that a significant limitation on the program is its requirement that there be a "substantial public benefit" to the issuance of the PPA. (page 92) *Public benefit* is defined by regulation, and the ADEQ is given considerable discretion to interpret it broadly. Bringing an abandoned brownfield back into public use is the most

frequent form of approved public benefit. The PPA in Arizona, unlike the IOC in Texas, can be assigned to future owners.

The Jackson and Pitts 2006 article then provides three case studies that illustrate how to measure the effect of the Texas program on property prices and values. The first case study involved a 6,108-sq.-ft. retail strip center, the second a 101,839-sq.-ft. industrial warehouse, and the third an undeveloped 5.5-acre industrial site. The authors describe the contamination situation and investigation/remediation status of each property. Either an IOP or an IOC was issued by the state on each property. The price paid per square foot of building or site area for each contaminated property after issuance of the IOP or IOC is indicated and then compared to the unit price paid for unimpaired but otherwise comparable properties from the same market area. These are examples of "paired sales analysis," one of the generally accepted methods already discussed in a number of the articles included in Chapter 2.

The unit price paid for the retail strip center with soil and groundwater contamination but an IOP was higher than any of the unit prices paid for the five comparable but uncontaminated properties. For the warehouse and undeveloped land, the prices paid were within the market range for the unimpaired comparables analyzed. Based on that, Jackson and Pitts conclude that the innocent landowner certificates on the properties effectively eliminated any adverse impact of the contamination on price and value.

The case studies are of only limited help in understanding how to undertake a paired sales analysis. Jackson and Pitts provide only a rough outline of their unimpaired comparable selection process in their 2006 article. As a result, how the universe of potential comparables was selected cannot be determined. From the sketchy case study information provided by the authors in this article, it appears that no adjustments were made to the unimpaired comparables to account for any of the typical differences between income properties and vacant sites. For example, no information is provided about the occupancy, tenancy, or length of leases at the retail strip centers involved in the first case study. The authors also provide no support for their claim that strip center sales within 10 miles of the subject strip center need no adjustment for differences in location. Failure to make either quantitative or qualitative adjustments, even small adjustments, is a significant problem with the case studies and weakens the reliability of the analysis and strength of the subsequent conclusion.

The Spring 2007 Jackson and Pitts article deals with Texas and Ohio institutional control programs related to contaminated groundwater. Contaminated groundwater can be found in many parts of the United States. However, contaminated groundwater may not create health issues in the following situations:

- When it is not used for drinking or other surface uses
- When it is located so deep that it does not pose a threat of rising to the surface during heavy rainfalls or of vapors rising and seeping into buildings

Copyrighted material licensed by Randall Bell on April 26, 2021

- When homes are located on domestic wells sourced from deeper wells that are not connected to the contaminated water

Some states, recognizing the cost and difficulty of removing the contamination from the groundwater as well as the lack of health risk, have passed legislation allowing property owners to receive some assurance that they will not be held responsible for such remediation. These programs are available in communities with central water systems supplied from uncontaminated water sources.

The Texas Municipal Setting Designation program and the Ohio Urban Setting Designation program authorize the use of local ordinances and/or deed restrictions in such situations. Once an area is designated, the local governments pass ordinances prohibiting the use of the contaminated groundwater. In some programs, the prohibitions are also contained in deed restrictions. The ordinances or deed restrictions typically prohibit well digging and may require existing private wells to be capped. Deed restrictions may also contain language indicating the presence of contaminated groundwater on the property but affirming that the property owner is not responsible for remediation so long as clean central water is used. The effect of such programs is the reduction or elimination of the cleanup cost risk associated with owning property in an area with contaminated groundwater.

Next in this chapter, Allen Keiter's October 2002 *Appraisal Journal* article "No Further Action Letter's Status Can Change" briefly discusses "no further action" letter institutional controls. It warns that some types of source sites (especially current or former gasoline service stations) previously investigated and remediated according to earlier state or federal environmental standards may be subject to reinvestigation and additional remediation under more rigorous standards adopted later. Earlier "no further action" letters may not protect the later owners from additional investigation and remediation expenditures under the revised regulations. Keiter then reiterates the importance of environmental insurance in protecting owners of such sites from the risk of a reopened investigation, a point also made in an article included in Volume I coauthored by Keiter.[5]

The Robert Lipscomb, Richard Maloy, and C. Gregory Rogers article "Preparing Yourself for New Rules for Environmentally Impaired Property," which was originally published in the First Quarter 2006 issue of *Valuation Insights & Perspectives* and is also included in this chapter, briefly summarizes some of the accounting profession's standards for how companies must report contamination cleanup liabilities on balance sheets. Those liabilities can be especially significant for larger manufacturing companies that own or have

owned source sites subject to federal or state cleanup mandates. As the article notes, however, real estate appraisers are typically not involved in this analysis because the focus is on the present value of the expected future cleanup costs, and "this process does not include valuation of the associated asset." (page 102)

The last two articles in this chapter deal more specifically with what the regulatory framework for source site and brownfield investigation and remediation implies for the appraisal process.

The Second Quarter 2004 *Valuation Insights & Perspectives* article "Brownfields: Consider Aggravating & Mitigating Factors," by David Wald and Donald C. Nanney, provides a list of the many issues raised in the valuation of a brownfield site. Wald and Nanney conclude that "these factors may operate either as a discount to value or in mitigation, reducing or eliminating any discount or certain items of discount, as compared to value if 'clean.'" (page 105) Other important points made in the Wald and Nanney article include the following:

- Finding truly comparable properties when appraising a source site affected by environmental risk involves many difficulties.
- Some assignments may require reporting a "range of values depending upon a range of projected environmental outcomes." (page 105)
- Some types of buyers—for example, institutional investors such as pension funds—may be more averse than others to buying properties affected by environmental liability risks
- Completing a real estate appraisal assignment involving a brownfield site typically requires assistance from other professionals, such as environmental engineers and environmental attorneys.

The Winter 2003-2004 *Real Estate Issues* article "Advance Due-Diligence Activities Benefit Contaminated Real Estate Transactions," by Howard G. Oldon and Tom Bergamini, presents a useful case study that illustrates how all the recent due diligence and regulatory changes can affect the marketing and sale price of a brownfield property. As the authors note, "The recent changes in brownfield regulation, technology, and environmental liability insurance have ameliorated risk and uncertainty and created new opportunities to sell properties that would have been unsalable in the past."[6] (page 106). The authors then describe the process for marketing the property after thorough site investigation but limited cleanup combined with institutional controls designed to notify potential buyers of the remaining contamination on site. A chart in the article compares the terms of eight different offers that the hypothetical sellers received for the site. The chart shows how the cash offering prices varied based

---

5.    Richard J. Roddewig and Allen C. Keiter, "Mortgage Lenders and the Institutionalization and Normalization of Environmental Risk Analysis," in *Valuing Contaminated Properties: An Appraisal Institute Anthology* (Chicago: Appraisal Institute, 2002), 305. This article originally appeared in the April 2001 issue of *The Appraisal Journal*.

6.    Chapter 10 of Volume I included three articles discussing environmental insurance and environmental indemnities and how they can affect prices paid and the appraisal process.

on how much risk the potential buyer was willing to assume for future investigation, remediation, and site closure costs. The offer shown as accepted was not the highest in terms of cash but appears to have been accepted because the buyer rather than the seller was made responsible for obtaining final closure of the site. From the chart, it appears that the seller considered that shifting of responsibility to the buyer to be worth more than a $1.75 million higher price in another offer.

This comparison is a good representation of the need to understand all of the details behind a transaction involving a brownfield site when using it as either a comparable sale or a case study. Information on buyers and sellers' environmental responsibilities regarding remediation cost overruns and costs associated with ongoing investigation, future regulatory compliance, and eventual site closure and monitoring is as important–if not more important–than the cash price paid.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 3.1 Environmental Due Diligence in the Wake of the EPA's New All Appropriate Inquiry Rule
*by Dianne Crocker*

This article originally appeared in the Winter 2006-2007 issue of *Real Estate Issues*.

As any seasoned dealmaker knows, there are regulatory hurdles that need to be addressed before initiating any transaction. Now, we can add a new environmental regulation to the list. Purchasers of commercial property and those who receive site-specific brownfields grants must follow a new federal rule governing environmental due diligence if they wish to obtain federal liability protection.

The U.S. Environmental Protection Agency's All Appropriate Inquiry rule took effect Nov. 1, 2006, and lays out the type of research that dealmakers—and their environmental consultants—must conduct upfront to avoid paying for any past environmental contamination on a property. Still in the early stages of adoption, the AAI rule has generated a great deal of uncertainty in commercial real estate circles as dealmakers, their lenders, consultants and other stakeholders interpret and implement the new protocol for environmental due diligence.

Outside the environmental consulting world, awareness about what steps commercial real estate purchasers must take to avoid cleanup liability is far from widespread, and there seems to be more questions than answers. Following are the facts that every real estate investor should know about the EPA's new rule.

### Environmental Cleanup Liability: A Brief History

Enacted in 1980 to address the nation's most polluted sites, the Comprehensive Environmental Response, Compensation and Liability Act makes so-called potentially responsible parties liable for the cleanup of contaminated properties, even if they didn't contribute to—or know about—the contamination. Understandably, the act, also called Superfund, caused considerable alarm among real estate investors.

In response, the U.S. Congress passed amendments to CERLCA in 1986 that included the "innocent landowner" defense, a provision that exempts site owners from liability if they didn't know, or have reason to know, of contamination at the time of purchase. The defense can be raised, provided that the purchaser conducted environmental due diligence, or "all appropriate inquiry" on the property upfront. Until the AAI rule was passed, this step was accomplished with an ASTM E 1527-00-compliant Phase I environmental site assessment.

### Enter AAI

In 2002, Pres. George W. Bush signed into law the Small Business Liability Relief and Brownfields Revitalization Act. Also known as the Brownfields Amendments, the act sought to encourage the redevelopment of brownfields, which the federal government describes as "abandoned, idled or underused industrial and commercial properties where expansion or redevelopment is complicated by real or perceived environmental contamination."

To help meet its redevelopment goal and mitigate concerns developers had about being held liable for property contamination, Congress created two new CERCLA liability protections. The "bona fide prospective purchaser" defense provides protection for property owners who knowingly purchase contaminated property, provided they can demonstrate that any onsite contamination occurred before purchase; and the "contiguous property owner" defense provides liability protection for an owner from contamination caused by the migration of hazardous substances from an adjacent property, provided the owner demonstrates that he or she did not know of contamination on his or her property at the time of purchase.

Particularly noteworthy, the bona fide prospective purchaser protection marks the first time owners can take title to a property they know to be contaminated and still qualify for CERCLA liability protection down the road.

Within the Brownfields Amendments, Congress ordered the EPA to issue a federal regulation defining all appropriate inquiry; it then gave the EPA a 10-step framework to follow in drafting the rule. The Nov. 1, 2005, promulgation is a result of considerable effort by the agency's 25-member AAI stakeholder committee. The final rule, which includes a lengthy preamble, reflects changes made to the draft rule in response to more than 400 public comments solicited by the agency during a 90-day period in 2004.

### What Does AAI Entail?

The most pressing question facing commercial property purchasers is: "Just what do I need to do to protect myself?" Though the 2002 Brownfields amendments were designed to give prospective purchasers an incen-

**Dianne Crocker** is senior economist and managing director of the Market Research Group at Environmental Data Resources Inc., a national environmental risk information provider. She is a member of the Air & Waste Management Association and the ASTM E 50.02.06 Phase I Task Group. Crocker also represented EDR as a resource participant on EPA's All Appropriate Inquiry Negotiated Rulemaking Committee.

tive for new investment opportunities, particularly for sites with known contamination, they also impose new obligations under AAI–burdens for the user, i.e., the property purchaser, and the environmental profession-al chosen to conduct the inquiry (see Table 1).

Before even getting started on AAI, property pur-chasers must choose a qualified environmental consul-tant. Under the AAI rule, environmental professionals must meet specific requirements for experience, educa-tion and certification as defined by the EPA (see Table 2). Individuals who do not meet these requirements may participate in an environmental inquiry, but only if they are under the supervision of someone who does.

An AAI-compliant Phase I report must carry the signature of the environmental professional who conducted or supervised the work, and that individual must attest that he or she meets the EPA's requirements. For their own protection, all individuals investing in commercial property should ensure that the firm they hire has at least one person on staff who meets AAI's definition of environmental professional.

## Responsibilities of the Environmental Professional

Much of AAI's requirements go beyond its predecessor, ASTM standard E 1527-00, which until Nov. 1, 2006, satisfied the courts that all appropriate inquiry had been conducted. (EPA determined that ASTM's recently updated standard, E 1527-05, is sufficient protocol for conducting all appropriate inquiry. Both an AAI-compliant Phase I and an E 1527-05-compliant Phase I satisfy the AAI rule's requirements.) The revisions to the E 1527-00 standard to bring the practice in line with the requirements of the AAI rule were made under the guidance of EPA reviewers.

In the end, the EPA was satisfied that the new stan-dard practice was at least as stringent as the federal rule and is, therefore, recognized as acceptable practice. This was a significant development because it would mini-mize any market impact of the AAI rule by allowing the market to adjust to a revised version of a practice that was already widely used. There are, however, a number of areas where the new AAI rule and E 1527-05 differ from the ASTM predecessor, in some cases significantly.

In terms of records review, the AAI rule expands the level of inquiry, requiring all previous ASTM-required records plus those from local government agencies and Native-American tribes. What's more, the environmental professional will have to search for engineering and in-stitutional controls–i.e., restrictions on a property's use because of residual contamination on site–a function the environmental professional and the user share.

In terms of historical research, AAI's requirements are more loosely laid out than previous protocol, but not necessarily less strict. Research timeframes, data sources and search intervals are left to the judgment of the environmental professional, but research must go

---

**Table 1**    Distribution of Responsibilities for AAI Components

**Duties of Environmental Professional**
- Conduct an environmental inquiry that includes:
    - visual inspections of the facility and adjoining properties
    - interviews with past and present owners, operators and occupants
    - reviews of historical sources
    - reviews of federal, state, tribal and local government records

**Duties of User**
- Searches for recorded environmental cleanup liens
- Consideration of "specialized knowledge of the subject property and adjoining properties"
- Consideration of the relationship of the purchase price to the value of the property, if not contaminated

**Shared Duties of Environmental Professional and User**
- Consideration of "commonly known or reasonably ascertainable" information about the property
- Consideration of the "degree of obviousness of the presence or likely presence of contamination at the property"

---

**Table 2**    AAI Rule's Final Definition of Environmental Professional

| Professional and Educational Qualifications | | Relevant Full-Time Experience* |
|---|---|---|
| Hold a current professional engineer's or professional geologist's license or registration from a state, tribe or U.S. territory | AND | Three years |
| OR | | |
| Be licensed or certified by the federal government, a state, tribe or U.S. territory to perform environmental inquiries | AND | Three years |
| OR | | |
| Have a baccalaureate or higher degree from an accredited institution of higher education in science or engineering (broadened from the proposed definition which was limited to "engineering, environmental science or earth science") | AND | Five years |
| OR | | |
| None (revised to delete baccalaureate degree requirement as of the date of the rule's promulgation) | AND | 10 years |

\* Relevant experience is defined as: participation in the performance of AAI investigations, environmental site assessments or other site investigations that may include environmental analyses, investigations and remediation that involve the understanding of surface and subsurface environmental conditions and the process used to evaluate these conditions, and for which professional judgment was used to develop opinions regarding conditions of releases or threatened releases to the subject property.

Copyrighted material licensed by Randall Bell on April 26, 2021

back as far as "it can be shown that the property contained structures or from the time the property was first used for residential, agricultural, commercial, industrial or governmental purposes."

One of the most significant changes under AAI that commercial property investors should be aware of is the added scrutiny that must be placed on any gaps in the environmental investigations. Unlike E 1527-00, under the AAI rule, the environmental professional must address, document and explain any data gaps–defined as "a lack of or an inability to obtain information required by the standards and practices listed in the (AAI rule) despite good faith efforts by the environmental professionals or (user) to gather such information."

Documentation should include a summary of the information the environmental professional had to work with, and a detailed account of what could not be obtained as well as documentation of the sources conducted to fill the gaps and, perhaps most important, a determination of the effect that said gaps have on the environmental professional's ability to draw conclusions about contamination at the subject property. This requirement to research, document and analyze the significance of data gaps will add considerable time and expense to the Phase I inquiry.

The AAI rule states that one way environmental professionals can address data gaps is to take soil and groundwater samples. Sampling is not required, however. Rather, the burden is on the environmental professional to determine the significance of gaps in information and recommend additional investigation including sampling, if necessary.

During the rule's public comment period, many environmental consultants objected to the idea of sampling, an activity traditionally seen as beyond the scope of a Phase I. Mark Fackler, president of Azland Risk Management LLC, an environmental engineering firm in Louisville, Ky., won't recommend sampling unless his clients request it. "The new standard specifically excludes Phase II sampling activities in its scope," he says.

Jane Mills, a senior environmental engineer based in the Redmond,Wash., office of Golder Associates, concurs. "Sampling of suspect hazardous materials should not be required as part of a preliminary site assessment. As a consultant, it is difficult to accurately predict the extent of sampling required at a site prior to the preliminary site assessment," she says.

Some environmental consultants, like Elizabeth Krol, a client program manager in Shaw Environmental & Infrastructure's Hopkinton, Mass., office, will sample in certain cases. "I will recommend sampling if it is warranted, but not as a routine practice without a trigger or issue that requires further investigation." Her colleague Gary Sirota, who is based in Scottsdale, Ariz., and serves as Shaw's national program manager of due diligence, agrees. "I would recommend sampling if it was necessary to fill a data gap."

When working with an environmental professional, commercial property purchasers should keep in mind that they will be held responsible for managing contamination responsibly. Like Krol, Kevin Billings, P.E., a senior vice president with Property Solutions Inc. in Moorestown, N.J., says he'd recommend sampling to fill data gaps, but adds: "Some clients will not like this, especially in the case of groundwater in urban areas where contamination may be picked up from off-site issues that do not really affect the utility of the property. In some states, you must notify the regulators that you found contamination on your property that you think is from someone else. Then you must prove your innocence. Eventually, the state may agree, but by that time, you have spent a good deal of money."

Real estate investors should weigh the question of whether to sample carefully. Though not required under the AAI rule, there is a business advantage to sampling in advance of purchase to identify all potential environmental concerns before taking title.

## User Responsibilities

Like the environmental professional, the commercial property purchaser has obligations under AAI that go above and beyond previous requirements. Among these, the purchaser must inform the environmental professional about any environmental cleanup liens filed or recorded against the site, any activity and use limitations in place, any specialized knowledge or experience related to the property or nearby properties, the relationship of the purchase price of the property to its value if not contaminated, any commonly known or reasonably ascertainable information about the property and any obvious indications pointing to the presence or likely presence of contamination at the property.

Though this list of obligations sounds onerous enough, the user's duties don't stop on the date of purchase. The EPA makes it clear in the rule's preamble that to maintain CERCLA liability protection, the property owner must also keep up with so-called continuing obligations throughout the life of the property. These obligations include:

- Complying with land use restrictions and institutional controls
- Taking reasonable steps with respect to hazardous substances releases
- Providing full cooperation, assistance and access to persons authorized to conduct response action or natural resource restoration
- Complying with information requests and administrative subpoenas
- Providing all legal required notices

Property owners must comply with any land use restrictions on the property and must not impede the effectiveness or integrity of an institutional control at the property. (An institutional control, or IC, is a type of land-use control that is used when the presence of residual contamination on a property precludes its unlimited use.) Such a control might be in effect to prohibit the disturbance of contaminated soils in a particular portion of the property.

If the owner is unaware of the control and develops the restricted portion of the property, he or she could forfeit CERCLA liability protection, even if AAI was followed before purchase. Impeding the effectiveness or integrity of an IC does not necessarily require a physical disturbance or disruption of the land, though. A landowner could also harm the implementation of an IC through actions that are unrelated to land use restrictions, such as removing a notice conveying information about contamination on a site that was placed in the land records by the EPA or a state agency, or failing to give notice of any ICs to a subsequent purchaser, for example.

With regard to hazardous substance releases, if they occur, property owners must:

- Stop any continuing release
- Prevent any threatened future release
- Prevent or limit human, environmental or natural resource exposure to earlier hazardous substance releases

Commercial property owners are responsible for complying with any restrictions on the use of their properties even if those restrictions were not identified in pre-purchase environmental due diligence. CERCLA liability protection can be lost at any time if continuing obligations are not met.

Just how difficult will it be for a property owner to follow these continuing obligations? From a practical standpoint, it could be fairly difficult, especially when owners and operators try to interpret what EPA considers acceptable. "Questions will be raised and different interpretations will be put forth. Unfortunately, it may take lawsuits to shake out the requirements," Billings says. Sirota agrees: "Many clients do not have a clear understanding of what the requirement actually means to them and what specific actions or responses they are required to make."

Krol has a similar belief. "I suspect that there is less awareness (among property purchasers) of the continuing obligation requirements. I think that if there is a significant enough issue that warrants ongoing activity—such as quarterly groundwater monitoring—this would be discovered during thorough due diligence, and the new owner would have both awareness and understanding that they must continue this work to remain in compliance. Alternatively, they may negotiate responsibility with the seller, who could continue to do the necessary work. In that case, I would advise my client to either be copied on submittals or do periodic state agency file reviews, etc., to ensure that the seller has met its obligation and that the owner is protected."

Because of the additional ongoing obligations required by the AAI rule, the Phase I report takes on new significance. It is crucial that the initial pre-purchase investigation uncover the information needed to determine an owner's obligations over time. It bears repeating: Missing issues during due diligence does not exempt the owner from obligation. Put another way, the landowner is not exempt from post-purchase compliance just because the site investigation failed to reveal an issue.

## Shelf Life

Lastly, when considering the major changes that the AAI brings to bear on pre-transaction due diligence, it is important that property purchasers are aware that AAI-compliant reports have a one-year shelf life. The final rule allows for information in previous Phase I reports to be used, but all data must be collected or updated to within one year of the date that the owner takes title.

In addition, interviews with past and present owners, searches for recorded environmental cleanup liens, the review of government records, a visual inspection of the facility and adjoining properties, and the declaration by the environmental professional that AAI was followed must be current to within 180 days of the property's acquisition date. Information from past reports can be used, but EPA makes it clear that considerations of the following components must be updated to reflect the current transaction: "specialized knowledge" about the property, the relationship between the current purchase price and the value of the property if it was not contaminated, and any commonly known information about the property.

This stipulation is a significant change from former practice, when it was common for a purchaser to rely on an old Phase I conducted for the property from years past and just update certain components of the old report. The EPA's language is quite clear that all 10 steps of AAI must be followed, and they must be based on current information.

## Compliance

Part of the uncertainty surrounding AAI relates to just how important CERCLA liability protection is to potential property purchasers.When ASTM released its first E 1527 standard in 1993, its purpose was for individuals seeking to qualify as innocent landowners to be exempt from CERCLA liability. Over time, the industry evolved and clients became savvier about the practicality of Phase I ESAs as a tool for measuring "business environmental risk," a concept introduced in the E 1527-00 standard.

Today, consultants report that the majority of Phase I inquiries are not conducted to qualify an owner as an innocent landowner but to protect the owner from the business risks of any environmental conditions at the property, including non-scope issues such as mold or lead-based paint. Other clients demand ASTM Phase I inquiries only in response to what lenders, attorneys or rating agencies require. This raises questions about the extent to which the market will embrace the AAI/ASTM E 1527-05 protocol. Prudent investors will make themselves aware of the new bona fide prospective purchaser and contiguous property owner protections and fully understand the additional labor required to satisfy the AAI rule—and the commensurate benefits of liability protection that go along with it—which, in certain cases, could be well worth the effort.

So how important is it to comply with the AAI rule? That depends, according to environmental attorney Barry Trilling, a partner with Wiggin and Dana in Stam-

Copyrighted material licensed by Randall Bell on April 26, 2021

ford, Conn. "Parties undertaking diligence inquiries of routine commercial properties where they have no reason to anticipate site contamination and attendant liability may wish to consider ordering their environmental consultants to continue to follow the requirements of the less expensive and less onerous ASTM E1527-00 standard to screen properties for environmental issues. If, during the course of the E1527-00 examination, which would not provide a defense to CERCLA liability, the consultant discovers unanticipated liability concerns, he or she should have the flexibility to convert the examination into a broader AAI examination. In any event, prospective purchasers of commercial and industrial properties should consult with counsel as to the nature, extent, and quality of the diligence examination they will perform on subject properties."

Property purchasers should be aware that many lenders, especially large, national lenders, are already incorporating AAI-compliant Phase I ESAs in their CRE underwriting policies. Purchasers may have no choice but to follow AAI in certain cases.

## Impact on Real Estate Transactions

Because it is so new, there is, understandably, considerable confusion surrounding AAI. The Phase I industry is in a period of unprecedented transition. Also, no one is certain how Wall Street will react. Yet despite the confusion, environmental professionals are reporting that many clients will adopt the new AAI rule. "Most of our clients have adopted the new standard, or are in

the process of modifying their existing scope of work to include reference to the new standard," Mills says.

Others are waiting to see how the market reacts. Krol says her key clients–attorneys or real estate investors who are advised by attorneys–are aware of AAI and are taking it seriously. "I also have a few clients– and these are more on the financial and lender side– who are taking a wait-and-see approach," she says.

"Our client base basically falls into two camps," Sirota says, "those who are aware of AAI but may not have a depth of understanding, but who still want us to conduct ESAs under 1527-05, and those who are aware but request that we (use) one of the pre-AAI ASTM guidelines, most likely for cost savings."

"When we get a request for a Phase I, we ask, '00 or '05?'" says Pamela Pidge, a due diligence manager with URS Corp. in Fort Washington, Pa. "A lot of clients are not sure of the differences, so we explain them."

## Environmental Due Diligence Going Forward

It's understandable, and even predictable, that confusion is the norm as real estate investors and the consultants who advise them adjust to the new environmental regulations. Already, though, one thing is clear: The new law holds property owners to a higher standard of care in terms of responsibly managing contamination regardless of what was–or wasn't–found in the initial site assessment. Today, thorough environmental due diligence is more important than ever.

For more detail on the AAI rule, visit www.epa.gov.

---

### What Environmental Professionals Say

**ELIZABETH KROL:** "I would always recommend thorough environmental due diligence. One of my colleagues has a client that now owns a site contaminated with PCBs because they did not perform adequate environmental due diligence prior to the acquisition. They were interested in the business that operated at the site and so it made sense for them in terms of manufacturing capacity, but they have expended well over $1 million cleaning up a small tributary, and will also be responsible for contributing to the cleanup of a significant watershed in eastern Massachusetts as one of the primary potentially responsible parties. The *caveat emptor* or buyer beware warning is one that really should be heeded, and now with the advent of AAI, a prospective purchaser really can't claim, 'I didn't know!'

"I think that AAI and the associated ASTM 1527-05 standard ensures a more thorough review for those who may not have thought it necessary before. In any case, a proactive, responsible buyer would want to know what concerns, if any, exist at the site. And I think that they should determine this prior to acquisition, whether they have specific development plans or not. Things change, and their plans may be revised after taking ownership, but if they haven't obtained indemnity or other appropriate negotiations/protections from the seller, it is too late and they would then be responsible for the full cost and regulatory compliance obligations. I would modify my recommendations based upon site conditions (for example, a site that already has a building onsite and would be renovated vs. vacant land or even a newly developed site). The recommendations should suit the client's risk tolerance and future plans as well as historic usage of the property."

**JANE MILLS:** "Prior to purchase, the developer should perform due diligence activities which include, but may not be limited to, an environmental assessment in accordance with E 1527-05, a preliminary geotechnical investigation (in locations where development is anticipated), a physical condition assessment of existing structures, and a hazardous materials survey of structures where renovation or demolition may be anticipated. Without this level of preliminary information, it would be difficult for a prospective purchaser to make an informed investment decision."

**KEVIN BILLINGS:** "There is a difference between an existing redevelopment and a property to be developed. Also, consider future use. There will be questions possibly of state regulators and their involvement with the redevelopment and AAI. Typically our clients have understood, or we have educated them about, the potential added construction costs and potential construction delays (and subsequent costs) of uncovering contamination during the construction phase vs. being able to underwrite the cost ahead of time and evaluating its impact on the overall project. Some clients have altered their construction design or development strategy based on the environmental conditions."

**PAMELA PIDGE:** "Conduct a Phase I. If we identify potential concerns, proceed with Phase II sampling activities." Pidge stresses the importance of being thorough. "In 2004, we conducted a Phase I on five acres of vacant agricultural property that was developed with a radio tower. The neighboring properties consisted of agricultural land, residences, a public park and the township public works department. Based on a review of aerial photos, topographic maps and historical fire insurance maps (none were available) plus current environmental database and township files, no evidence of environmental concerns were identified. However, in conversations with a township clerk, he recalled that the area might have been used as a dump in the 1960s. We recommended that our client install soil borings and collect soil samples to evaluate for environmental contamination. Arsenic exceeded cleanup criteria in two samples, lead in one. Based on this data, we then recommended delineating the impact. Long story short, this site ended up be-

---

ing cleaned up (soil excavation) under the direction of the EPA Superfund program to the tune of $750,000. It is important to interview the local people!"

**MARK FACKLER:** "One of my first recommendations would be to consult an environmental attorney. In addition, be aware that, as a purchaser, your liability exposure is different than a lender's exposure, since (purchasers) are not afforded lender liability protections. My recommendations are typically associated with a client's specific risk tolerance. A client purchasing an existing facility may be more willing to incur a higher level of business risk since the likelihood of new discovery of contamination may be diminished. However, the findings and conclusions would be identical in both scenarios, since the liability for property and facility is the same for both."

When asked whether he had experienced resistance from property purchasers, Fackler recalled one particular case. "I worked on a project in which the buyer was so set on purchasing the property because his lease was up for renewal at the end of the week that he pushed to the bank to conduct an environmental database review instead of a Phase I ESA. The bank stated that since the loan was likely going to be securitized, they had to have a Phase I performed. The historical aerial photos indicated that the property, which was only known to be vacant land, contained a lagoon in the late 1940s and early 1950s, with a gravel roadway leading to the lagoon from a nearby metal parts manufacturer. Soil samples taken from the area noted the presence of elevated chromium, cyanide and chlorinated solvents. The lagoon was declared a solid waste management unit and is still undergoing quarterly groundwater monitoring today."

**GARY SIROTA:** "If a prospective purchaser is interested in making changes to the property, I would recommend a staged assessment to determine if there are any ECs or ICs and what impact they might have. Since AAI became effective, we routinely obtain more information and ask more questions in the scoping stage." When asked whether environmental due diligence turned up anything surprising for his clients, Sirota says: "I recall one particularly interesting project where we were charged with conducting a due diligence assessment of a piece of abandoned property that had been leased from a transportation company years earlier. Records indicated that the previous tenant might have conducted some low end 'recycling' on the site. The majority of the site was covered with gravel with some open ground and our experienced assessor noted a rather large area of dead vegetation off to the rear of the property. Being a suspicious sort, he collected a 'grab sample' of soil and sent it to a lab for analysis. It came back showing that the soil had high levels of PCB. A subsequent Phase II assessment indicated extensive contamination of approximately 80 percent of the site by PCB and lead. Apparently, the previous tenant was conducting unlicensed collection of electrical transformers and lead batteries in contravention of regulations. The PCB oil was disposed of in the area where the dead vegetation was observed, and the batteries and transformer cases were broken up and buried on site." Sirota says the subsequent clean-up took about a year.

Copyrighted material licensed by Randall Bell on April 26, 2021

**3.2** # The EPA's Proposed All Appropriate Inquiries Rule and the Appraisal of Contaminated Properties

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the Spring 2005 issue of *The Appraisal Journal*.

In previous editions of "Environment and the Appraiser," standards and methods for appraising contaminated properties were reviewed[1] and illustrated with case study examples.[2] In this edition of the column, we break from standards and methodology and discuss an issue that is important to the appraisal profession in general and in particular to those who focus some or most of their practice on the valuation of contaminated properties. This issue involves the proposed administrative rule of the U.S. Environmental Protection Agency (EPA) referred to as the "all appropriate inquiries" (AAI) rule and its relationship to existing guidance and practice in valuing contaminated properties.

In general, the AAI rule, as proposed, misses an opportunity to take advantage of the considerable progress that the appraisal profession has made in establishing acceptable methods and standards for valuing contaminated properties. This is reflected by the decision of the Negotiated Rulemaking Committee, of which EPA was one of the 24 members, not to require appraisals for purposes of estimating the fair market value of properties that may be the subject of AAI inquiries. As existing guidance in Advisory Opinion 9 discusses, in situations where property values are adversely impacted by contamination, there are actually two values that may be determined–the hypothetical unimpaired value and the value in an "as is" or potentially impaired condition–in order to find the extent of any reduction in value as a result of contamination. The proposed AAI rule seemingly equates the property's fair market value with its unimpaired value, and its sale price with its actual "as is" impaired value, by requiring the purchaser to "make a general determination of whether the price paid for a property reflects its market value."[3] Thus, the proposed rule omits

the apprasier's role in estimating two values. These and other shortcomings will be discussed in detail herein.

Despite all this, the proposed rule could assist appraisers by providing information that would be of use in valuing a contaminated property consistent with Advisory Opinion 9 (AO-9), "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," published with the Uniform Standards of Professional Appraisal Practice (USPAP).[4] If the omission of the appraisal requirements were corrected, the rule could assist appraisers by providing useful information for the valuation of contaminated properties. This, in turn, would assist those involved with acquiring contaminated properties by providing them with reliable estimates of value upon which to base pricing and other decisions.

## Background of the Proposed AAI Rule

The proposed AAI rule was developed in response to the Small Business Liability Relief and Brownfields Revitalization Act of 2002 ("Brownfields Amendments"). The AAI rule and the Brownfields Amendments address certain protections from liabilities under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, commonly known as Superfund). Under CERCLA, persons may be held liable for cleaning up a contaminated property that they either currently own or operated in the past. This strict liability can be assigned solely on the basis of property ownership. The CERCLA liability provisions offer liability protections for innocent landowners, as well as bona fide prospective purchasers and contiguous property owners, who have conducted "all appropriate inquiries into prior ownership and use of a property prior to or at the same time at which a person acquires a property."[5]

This column was prepared with the assistance of David Carciere, a graduate student in the Land Economics and Real Estate Program of the Mays Business School at Texas A&M University.

1. Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination" (Washington, DC: The Appraisal Foundation, 2005); and Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 311–320.

2. Thomas O. Jackson, "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation," *The Appraisal Journal* (Spring 2004): 111–118; and Thomas O. Jackson, "Surveys, Market Interviews, and Environmental Stigma," *The Appraisal Journal* (Fall 2004): 300–310.

3. U.S. Environmental Protection Agency, "40 CFR Part 312: Standards and Practices for All Appropriate Inquiries," *Federal Register* 69, no. 165 (August 2004): 52567.

4. Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice and Advisory Opinions*, 2005 ed. (Washington, DC: The Appraisal Foundation, 2005).

5. *Federal Register* 69, no. 165 (August 2004): 52565.

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

The proposed AAI rule is intended to establish federal standards and practices for the conduct of all appropriate inquiries necessary for certain landowner protections created by the Brownfields Amendments.

The innocent landowner defense was established in the Superfund Amendments and Reauthorization Act (SARA) of 1986 for persons who could demonstrate that they did not know and had no reason to know of hazardous substances disposed of on or near the property prior to purchasing the property. In order to demonstrate that they did not know, the person is required to conduct all appropriate inquiries. Accordingly, prospective purchasers who do not conduct all appropriate inquiries may lose the ability to claim protection from CERCLA liabilities as an innocent landowner, bona fide prospective purchaser, or contiguous property owner. Important for appraisers, though, is that in the course of these inquiries, if contamination is discovered, the prospective purchaser must estimate whether the price paid or to be paid has been impacted by the presence of the contamination. The other AAI inquiries could then provide information for the appraiser to more accurately assess this issue.

## Relevant Property Characteristics in the Appraisal of Contaminated Properties

Appraisers who value or analyze properties that may be impacted by environmental contamination must have sufficient information from which to reliably assess the impacts of the contamination on property values. As set forth in AO-9, when appraising a property that may be impacted by environmental contamination, there are a number of relevant property characteristics that should be considered by the appraiser. The relevant property characteristics include, but are not limited to:

1) *whether the contamination discharge was accidental or permitted*, since there are many permitted releases of contaminants by industry for which there is no required cleanup, for which there is ample testing and monitoring, and that do not impact the cost and risk of investing in or owning real property;

2) *the status of the property with respect to regulatory compliance requirements*, since properties with contamination not in compliance could have greater risk and costs necessary to achieve compliance;

3) *the remediation lifecycle stage (before, during, or after cleanup) of the property as of the appraisal date*, since risk and cost can vary before, during, and after cleanup, as explained;

4) *the contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.)*;

5) *the contamination conveyance (air, groundwater, soil, etc.)*;

6) *whether the property is a source, non-source, adjacent or proximate site*, since these sites in these categories will have much different risks and costs due to contamination;

7) *the cost and timing of any site remediation plans*;

8) *liabilities and potential liabilities for site cleanup*, or who is responsible for site cleanup and its costs and whether these liabilities and the responsible parties were known as of the date of value;

9) *potential limitations on the use of the property due to the contamination and its remediation*; and

10) *potential or actual off-site impacts due to contaminant migration (for source sites)*. (AO-9, Lines 116-128)

AO-9 also states, "*Since the appraiser is usually not an expert on the scientific aspects of contamination, experts from other fields will typically provide this information.*" (AO-9, Lines 129-130) Accordingly, the inquiries made under the AAI rule by the "environmental professional," as defined therein, would be consistent with this statement in AO-9.

## Inquiries in the Proposed AAI Rule

As noted, in order to gain the significant protections from CERCLA liabilities as an innocent landowner, a number of specific inquiries must be undertaken either by those seeking to establish such status or by a qualified environmental professional on their behalf to determine the extent to which the property may have been previously contaminated or contaminated by a party other than the party seeking protection from the CERCLA strict liabilities. Each of the AAI inquiries is discussed in this column and, where appropriate, is related to the requirements and guidance for valuing contaminated properties. As will be explained, many of these inquiries can provide information on property characteristics necessary in the appraisal process. However, in order to use this information, appraisers need some understanding of the specific inquiries and the information they may produce. This information may then be used, subject to appropriate *extraordinary assumptions*, as required by USPAP.[6]

### Interviews with Past and Present Owners, Operators, and Occupants (Proposed 40 CFR § 312.23)

The proposed AAI rule requires inquiries of past and present owners, operators, and occupants of the subject property. This type of inquiry would require interviews by the environmental professional, or by an individual under close supervision of the environmental professional. The rule does not prescribe specific interview questions, leaving that up to the environmental professional. The EPA notes that the type and content of the questions will depend on site-specific conditions and circumstances.[7] The purpose of the interviews is to

---

6. See AO-9 for a discussion of the use of extraordinary assumptions in this context. Also discussed in Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 127–128.

7. *Federal Register* 69, no. 165 (August 2004): 52561.

Copyrighted material licensed by Randall Bell on April 26, 2021

collect information to enable the environmental professional to "render an opinion with regard to conditions at the property that may be indicative of releases or threatened releases of hazardous substances."[8]

With respect to the relevant property characteristics as specified in AO-9 and cited here, this opinion would provide information of relevance to several of the elements, including items the contamination constituents and the contamination conveyance. The AAI inquiry must include "interviews of major occupants that are using, storing, treating, handling, or disposing (or likely to have used, stored, treated, handled, or disposed) of hazardous substances (or pollutants, contaminants, petroleum, and controlled substances, as applicable) on the property."[9]

## Reviews of Historical Sources of Information (Proposed 40 CFR § 312.24)

The proposed AAI rule also requires a review of historical sources of information. This inquiry addresses "historical documents (that) may contain essential information regarding past ownership and uses of a property that may provide information regarding the potential for environmental conditions indicative of releases or threatened releases of hazardous substances to be present at the property."[10] The records may include, but are not limited to, "aerial photographs, fire insurance maps, building department records, chain of title documents, and land use records."[11] The proposed rule states that the period for this review is "as far back in the history of the subject property as it can be shown that the property contained structures, or from the time the property was first used for residential, agricultural, commercial, industrial, or governmental purposes."[12] In other words, the historical review period should go back to the time when the property was first developed. The "first developed" language is used in the Brownfields Amendments and reflects the intent of the legislation.

As with the previous inquiry involving interviews with property owners and occupants, the historical review could provide the appraiser with information concerning the potential hazardous constituents that may be impacting the site. The appraiser should consider relying on the opinion of the environmental professional in this regard, however. The historical records may also be of use to the appraiser in understanding the use of and improvements to the subject property, which may be relevant to the property's environmental history and condition.

In appraising contaminated properties or properties that may be impacted by contamination, a useful and important first step is to prepare a written description of the property's environmental condition and history. This description is useful for the subsequent analysis of the impacts of the contamination on property value. It also sets forth the appraiser's assumptions concerning the history of the contamination (including the date of discovery of any contamination), its remediation status, and any regulatory compliance issues, all of which are considered relevant property characteristics in AO-9.

## Searches for Recorded Environmental Cleanup Liens (Proposed 40 CFR § 312.25)

The proposed AAI rule requires a search for environmental cleanup liens against the subject property that have been filed or recorded. The proposed rule defines recorded environmental cleanup liens as "encumbrances on property for the recovery of incurred cleanup costs on the part of a state, tribal, or federal government agency or other third party," and it is noted that these liens "often provide an indication that environmental conditions currently or previously existed on a property that may have included the release or threatened release of a hazardous substance."[13] For this inquiry, the rule recognizes that these liens can often be tracked efficiently and much less expensively by the purchaser than by the environmental professional, and so the search can be performed by either the property purchaser or the environmental professional.

Interestingly, a special type of lien, known as a "windfall lien," may be enforced by the EPA and the U.S. Department of Justice (DOJ) in order to capture some of the windfall gain to a property owner (bona fide prospective purchaser) accompanying an increase in market value as a result of a federally funded cleanup of the property. As noted in EPA and DOJ documents, the "windfall lien provision (in the Brownfields Amendments) reflects Congress's intent that bona fide prospective purchasers should not be unjustly enriched and reap a windfall where taxpayer dollars are spent cleaning up the property and those taxpayer dollars lead to an increase in the fair market value of the property."[14] This perspective is generally consistent with findings in the empirical literature on contaminated properties that subsequent to cleanup, previously contaminated properties regain their market value.[15]

---

8.  Ibid.

9.  Ibid.

10. Ibid.

11. Ibid., 52579.

12. Ibid.

13. Ibid., 52562.

14. Susan E. Bromm (U.S. Environmental Protection Agency) and Bruce S. Gelber (U.S. Department of Justice), memorandum, 16 July 2003, "Interim Enforcement Discretion Policy Concerning 'Windfall Liens' Under Section 107(r) of CERCLA."

15. Thomas O. Jackson, "The Effects of Environmental Contamination on Real Estate: A Literature Review," *Journal of Real Estate Literature* 9, no. 2 (2001): 93–116.

This is also consistent with the recognition in AO-9 of the three stages of the remediation cycle: before, during, and after cleanup, and the distinct differences in environmental risks (stigma effects) at each stage.

## Reviews of Federal, State, Tribal, and Local Government Records (Proposed 40 CFR § 312.26)

The proposed rule states that there must be an inquiry involving the review of various records related to "information regarding the use and occupancy of and the environmental conditions at the subject property and conditions of nearby or adjoining properties that could have an impact upon the environmental conditions of the subject property."[16] Records to be searched include:

- Records of reported hazardous releases or threatened releases;
- Records of activities, conditions, or incidents likely to cause or contribute to releases or threatened releases, including landfill and other disposal unit records, storage tank records and permits, listings of sites identified as priority cleanup sites, and spill reporting records;
- Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS) database, including sites on the National Priorities List (NPL) or Superfund list;
- Public health records or other government records of public risks;
- Emergency Response Notification System (ERNS) records;
- Registries or publicly available lists of engineering controls; and
- Registries or publicly available lists of institutional controls, including environmental land use restrictions.

These records could potentially provide much of the information on relevant property characteristics needed by the appraiser that are listed in AO-9, including accidental or permitted discharges, contamination constituents, liabilities for site cleanup (at least for NPL sites), and potential limitations on the use of the property due to the contamination and its remediation. This last element is important for appraising contaminated properties because of potential impacts on the highest and best use of the property. As stated in AO-9, in analyzing the highest and best use of potentially impacted properties, the appraiser must consider limitations due to the contamination, its remediation, and any legal use restrictions associated with the cleanup of the contamination. Specifically, the appraiser "*should consider the possibility that site remediation and any remaining limitations on the use of the site following remediation may alter or limit its highest and best use in the impaired condition.*" (AO-9, Lines 164-166)

## Visual Inspections of the Facility and of Adjoining Properties (Proposed 40 CFR § 312.27)

The proposed AAI rule requires an inquiry that includes a visual, on-site inspection of the subject property and areas where hazardous materials may have been used or stored as well as inspections of adjoining properties (from the subject property or other vantage points, such as aerial photographs). Members of the Negotiated Rulemaking Committee that developed the proposed AAI rule pointed out that "on-site inspections of a property can provide the best source of information regarding indications of environmental conditions of the property."[17] Appraisers should see a parallel between the on-site inspection requirements for environmental professionals performing AAI inquiries and the importance of on-site inspections of subject properties as part of the appraisal process. Much information can be gained by visually inspecting properties for both purposes.

## Specialized Knowledge or Experience on the Part of the Person Undertaking the Inquiry (Proposed 40 CFR § 312.28)

The proposed rule also requires specialized knowledge of the inquirer with respect to "the subject property, the area surrounding the subject property, the conditions of adjoining properties, and any other experience relevant to the inquiry, for the purpose of identifying conditions indicative of releases or threatened releases at the subject property."[18] The intent of the inquiry "is to ensure that any information or special knowledge held by the purchaser or property owner with regard to a property and the conditions or situations present at the subject property" is considered when an environmental professional renders an opinion concerning the environmental condition of the property. In other words, the environmental professional should make inquires of the owner or purchaser about special knowledge that he or she may have regarding environmental conditions of the subject property, since this information might not appear in the public records or other data sources. This might be roughly analogous to an appraiser interviewing the owner of the property under appraisal. It also suggests that the results of an AAI inquiry and opinion concerning the environmental condition of the property might be based on knowledge and information otherwise unavailable to the appraiser.

## The Relationship of the Purchase Price to the Value of the Property, If the Property Was Uncontaminated (Proposed 40 CFR § 312.29)

In the proposed AAI rule, the central issue with respect to the appraisal community is the requirement for inquiry into the relationship of the purchase price to the value of the property, if the property was uncontaminated. As such, it will be discussed in more depth

---

16.  *Federal Register* 69, no. 165 (August 2004): 52562.

17.  Ibid., 52564.

18.  Ibid., 52580.

Copyrighted material licensed by Randall Bell on April 26, 2021

later in this column. Briefly, the AAI rule states that applicants for the CERCLA liability protections under the Brownfields Amendments

> must consider whether the purchase price of the subject property reasonably reflects the fair market value of the property, if the property were not contaminated, [and] persons who conclude that the purchase price of the subject property does not reasonably reflect the fair market value of that property, if the property were not contaminated, should consider whether or not the differential in purchase price and fair market value is due to the presence of releases or threatened releases of hazardous substances.[19]

As such, the proposed rule does not require a real estate appraisal, since it was determined that a formal appraisal is not necessary for the purchaser to make a general determination of whether the price paid for a property reflects its market value. The committee that formulated the AAI rule suggested that "such a determination may be made by comparing the price paid for a particular property to prices paid for similar properties in the same vicinity as the subject property," since "the objective is not to ascertain the exact value of the property, but to determine whether or not the purchase price paid for the property is reflective of its market value."[20]

The Negotiated Rulemaking Committee appears to suggest that the valuation or appraisal problem they are asking the purchaser to address is actually less complex than what would be involved with a formal appraisal of a property. As discussed in previous "Environment and the Appraiser" columns, this is the opposite of what is actually the case with properties that may be impacted by environmental contamination. Rather than a simpler or less complex question, the analysis of the effects of contamination on the market value of real properties is a far more demanding and involved appraisal problem. It usually involves not one but two values (impaired value and unimpaired value) and the analysis of three types of effects (risk, cost, and use) in determining the extent of any property value diminution due to environmental contamination.

## Commonly Known or Reasonably Ascertainable Information (Proposed 40 CFR § 312.30)

The proposed AAI rule also requires the applicant or environmental professional conducting the inquiry to "take into account commonly known or reasonably ascertainable information within the local community" concerning "releases or threatened releases at the subject property."[21] This information would be in addition to the data collected in the other inquiries. The commonly known information may be collected from the owner or occupant of a property, members of the local community, including owners or occupants of neighboring properties to the subject property, local or state government officials, local media sources, and local libraries and historical societies.[22]

## The Degree of Obviousness of the Presence or Likely Presence of Contamination (Proposed 40 CFR § 312.31)

The proposed rule requires the person conducting the inquiries to "consider all the information collected during the conduct of the inquiries in totality to ascertain the potential presence of a release or threatened release," and "assess whether or not an obvious conclusion may be drawn that there are conditions indicating a release or threatened release of hazardous substances."[23] As such, this could be considered a capstone inquiry. To the extent an appraiser may rely on the opinions of the environmental professional conducting the investigations, this final criterion may provide an important indicator of the certainty and reliability of the opinions and, as such, might bear on the appraiser's analysis of environmental risk (stigma) effects with respect to what is known about the contamination and the certainty of this knowledge.

## Valuation Issues and Opportunities in the Proposed AAI Rule

There are numerous opportunities for the inquiries proposed in the AAI rule to provide the appraiser with information necessary to evaluate contaminated properties and the impact of contamination on their value. Many of the relevant property characteristics in AO-9 are also addressed in the AAI rule inquiries; if an appraiser is included in the process, the valuation of these brownfield properties would benefit from this information. A well-informed and reliable valuation of these properties in their "as is" or impaired condition would greatly benefit the purchaser and anyone with a financial or ownership interest in the properties. Purchase prices and environmental risks could be more accurately evaluated with the types of information required by the proposed AAI rule, if such information were made available to the appraiser and the appraiser were included in the process.

Unfortunately, the proposed AAI rule seemingly leaves the appraiser out of the process, even though the rule requires (1) an assessment of the difference between the fair market value of the property, assuming no contamination, and the actual sale price; and (2) a determination as to whether any difference is due to the effect of the contamination. The rule suggests that the purchaser consider the price paid for comparable properties in the area to determine the fair market value, assuming no contamination effects. For those familiar with the contaminated property valuation framework es-

19.  U.S. Environmental Protection Agency, 40 CFR § 312.29 (a) and (b), *Federal Register* 69, no. 165 (August 2004): 52580.

20.  *Federal Register* 69, no. 165 (August 2004): 52567.

21.  U.S. Environmental Protection Agency, 40 CFR § 312.30 (a) and (b), *Federal Register* 69, no. 165 (August 2004): 52580.

22.  *Federal Register* 69, no. 165 (August 2004): 52567.

23.  Ibid., 52567-52568.

poused in this column and elsewhere, the rule's suggestions have some relationship to parts of the framework.

First, the "fair market value, if the property were uncontaminated" could be the rule's proxy for the unimpaired value that is estimated by the appraiser through one or more of the three approaches to value (cost, income capitalization, and/or sales comparison) under the hypothetical condition that the property is uncontaminated.[24] Appraisers may use unimpaired comparable sales for this purpose, as is seemingly suggested in the rule, or may use other approaches, such as the income capitalization approach, a common and usually appropriate approach for income-producing commercial and industrial properties, as most of the brownfield properties are likely to be, or the cost approach, which is frequently an appropriate approach for specialized industrial properties, again like many brownfield properties are likely to be. Even when a sales comparison approach is used, though, the appraiser must be careful to use truly unimpaired sales. In areas with widespread contamination from a common source that may, for example, be conveyed through a groundwater plume, the seemingly unimpaired sales may not be unimpaired at all. Thus, the rule falls short in its suggested methodology for purchasers to determine their own unimpaired value.

Second, in the determination of the impaired value, the proposed AAI rule seems to suggest that the purchase price is a reasonable proxy. Most appraisers know that sale price and market value are not always the same. A particular sale price may not be an appropriate indicator of value if it is influenced by unusual motivations of the buyer or seller, nonmarket financing, government subsidies, or other nonmarket factors. All of these should be investigated. Also, market value is established by the interaction of a number of buyers and sellers, rather than one of each. Market value reflects the central tendency of the market, and that

cannot be determined from one transaction but only by studying the market more broadly.

Advisory Opinion 9 and other sources categorize the effects of contamination on value as: cost effects, use effects, and risk effects. As explained in previous columns and in AO-9:

- Cost effects are deductions for costs to remediate a contaminated property to appropriate regulatory standards, recognizing that not all costs are recognized by the market as having an effect on value;
- Use effects are limitations on the highest and best use of properties that may be impacted by environmental contamination; and
- Risk effects are the effects on value due to the increased perceptions of environmental risk by relevant market participants.

The proposed AAI rule does not mention or address any of these elements' possible effects of contamination.

## Conclusion

The proposed AAI rule has the prospective purchaser determine the impact of contamination on value, but provides incomplete guidance on how to make this determination. This serves no one's interests. The proposed rule misses an opprtunity to take advantage of the considerable progress of the appraisal profession in recent years in developing a reliable framework for evaluating the effects of contamination on the value of real properties. It is hoped that the concerns expressed by the Appraisal Institute and others will be considered in developing a final AAI rule and that the rule establishes an appropriate framework whereby appraisers use the considerable environmental information collected as part of the other inquiries in the AAI rule to produce value estimates that assist the brownfields redevelopment process.

---

24.    Jackson, "Appraisal Standards and Contaminated Property Valuation," 128–129.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 3.3 Institutional Controls and Contaminated Property Valuation

*by Thomas O. Jackson, PhD, MAI, and J. Michael Sowinski Jr., JD*

This article originally appeared in the Fall 2006 issue of *The Appraisal Journal*.

Environmental agencies are adopting more site- and risk-specific approaches to the remediation of contaminated properties. One increasingly used technique to achieve site closure involves the implementation of institutional controls.[1] Institutional controls to some extent may limit the use of the property during cleanup or may limit the future use of the property subsequent to cleanup. Real estate appraisers and others may encounter these controls on use where contaminated properties have been remediated. They also may encounter these controls where contaminated properties are undergoing remediation with an approved cleanup plan premised on the implementation of institutional controls to facilitate the remediation objectives. Thus, appraisers who are involved in assignments concerning the estimation of the value, or impacts on value, for contaminated properties during or after cleanup should be aware of these restrictions and the ways in which they might affect market value.

## Types of Institutional Controls

The U.S. Environmental Protection Agency (EPA) and state environmental agencies authorize the use of institutional controls as part of overall site cleanup strategies. Institutional controls exist widely throughout the states at numerous cleanup sites. Indeed, nearly thirty-five states maintain an information management system to track institutional controls.[2] The EPA is in the process of constructing an institutional control tracking system to track the use of institutional controls at the nation's most contaminated sites–the sites listed on EPA's National Priorities List.[3]

After site cleanup has occurred, institutional controls keep residual site contamination from human contact. In turn, the protections of institutional controls allow environmental contamination to remain in place after cleanup. Because of this, institutional controls often make cleanups technically feasible or more affordable and, thus, enable cleanups to proceed that otherwise might not.

## Institutional Controls and Engineered Controls

The EPA defines institutional controls as follows:

> Institutional Controls are non-engineered instruments, such as administrative and/or legal controls intended to minimize the potential for human exposure to contamination by limiting land or resource use.[4]

Institutional controls do not include engineered controls, such as fences, landfill caps, rain barriers, or other physical components that contain contamination or prevent exposure to it. The EPA separately defines engineered controls.

> Physical or "engineered" controls are the engineered physical barriers or structures designed to monitor and prevent or limit exposure to the contamination.[5]

When engineered controls exist, institutional controls must also exist in order to provide mechanisms to assure that the engineered controls remain intact and operational. The EPA, ASTM International,[6] and most practitioners divide institutional controls into four categories:[7]

---

1. In the context of environmental remediation and regulation, site closure means that the remediation or cleanup has been completed and the site is closed with respect to further regulatory requirements.

2. See the LUCs Web site, http://www.lucs.org, describing and providing links to state institutional controls tracking systems.

3. Michael Bellot, Institutional Control Program Manager, Office of Superfund Remediation and Technology Innovation, U.S. Environmental Protection Agency.

4. U.S. EPA Office of Solid Waste and Emergency Response, EPA 500-R-05-001, *Long-Term Stewardship: Ensuring Environmental Site Cleanups Remain Protective Over Time, Challenges and Opportunities Facing EPA's Cleanup Programs* (Sept. 2005).

5. U.S. EPA, *Long-Term Stewardship*.

6. Originally known as the American Society of Testing and Materials, ASTM International is an international standard-setting organization, see http://www.astm.org.

7. U.S. EPA, Long-Term Stewardship; and ASTM International, E 2091-00, Standard Guide for Use of Activity and Use Limitations, Including Institutional and Engineering Controls (2000).

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

**J. Michael Sowinski Jr., JD,** is head of the Institutional Control Advising Practice for DPRA, a research and consulting firm, where he often helps clients with environmental cleanup and environmental compliance issues. Sowinski has managed and participated in institutional controls consulting efforts for various clients including governmental entities such as the EPA; the Department of Defense; British Columbia; the State of California; and the Missouri Department of Natural Resources. He regularly publishes and delivers presentations concerning institutional controls, and he serves as the assistant chair of the ASTM Task Group on CERCLA Continuing Obligations. He holds a Juris Doctor degree from Vermont Law School and a Master of Science degree in environmental engineering from the University of Maryland.

proprietary controls; government controls; information devices; and agency-issued enforcement orders or agreements.

## Proprietary Controls

The first category of institutional controls includes proprietary, or private, controls. Proprietary controls include private agreements between a landowner and another person or entity, often an environmental agency, that restrict the type of use or activity that can occur at a property. Proprietary controls are recorded in a property's chain of title, along with all the other encumbrances that may affect the title, such as mortgages and utility-line easements. Environmental covenants are probably the most common type of proprietary controls. Other proprietary controls include restrictive covenants (a generalized form of an environmental covenant) and negative easements (a property interest that, like a covenant, restricts the use of land).

The Uniform Environmental Covenants Act (UECA), a recently published model act, improves the legal force and otherwise strengthens the ability of environmental covenants to impose future restrictions.[8] In many states, the enforceability of environmental covenants, and other proprietary controls, remained stymied or at least uncertain because of common law rules that disfavored these types of restrictions–property use restrictions that would not directly benefit neighboring land but, instead, were held "in gross" by an entity (a state agency) far removed from the restricted property. The UECA supersedes these common law impediments and clearly authorizes the enforcement of environmental covenants. Fifteen states have enacted the UECA.[9] In addition to these fifteen states, other states maintain pre-UECA laws that similarly supersede common law impediments.

## Government Controls

The second category of institutional controls, government controls, refers to local ordinances or state statutes (usually local ordinances) that restrict or condition land use. Zoning ordinances; groundwater well installation ordinances (or laws); water use and withdrawal rules; and local health and safety rules are some common examples of government controls. Government controls are no different than any other type of law or regulation that affects land use. A government control becomes an institutional control when an environmental oversight agency–whether local, state, or federal–affirmatively relies on the local ordinance as a future tool to protect persons from a cleanup's residual contamination. Some environmental agencies only allow government controls to operate as institutional controls if the agency first preapproves their use, or where the local government promises to enforce the control and, in turn, notify the environmental agency of any amendments to it. Some states flatly prohibit the use of government controls as institutional controls.

## Information Devices

The third category of institutional controls includes information devices. Information devices simply provide notice of residual contamination and, in some cases, notice that certain future land uses should not occur. They may include notices in the chain of title (commonly known by environmental practitioners as deed notices), Web site registries, outreach efforts, or other similar means to provide notice. These tools intend to put others on notice that residual contamination and land use restrictions exist. They do not, however, actually restrict land use. But even though they do not directly restrict land, environmental cleanup laws may impose future liabilities on people who ignore these notices.

## Enforceable Orders, Agreements, and Letters of Completion

The fourth and final category of institutional controls involves environmental agency-issued enforcement orders and agreements concerning cleanup. This category includes enforcement orders or agreements entered into by or between an environmental agency and a property owner (usually the party responsible for causing contamination), as well as consensual agreements entered into between buyers and sellers of contaminated property. For example, state environmental agencies often memorialize site closure with either a certificate of completion or, as many jurisdictions call it, a no further action (NFA) letter. These letters, for instance, frequently inform gas station owners that cleanup of their gasoline spill is complete–even though residual contamination exists. The letters routinely advise the recipient that the NFA status is expressly conditioned on the existing use remaining the same. This type of closure letter could be premised on conditions, such as a restriction on excavation below fifteen feet. Enforcement orders and agreements, such as closure letters, are not typically recorded against title or recorded with the local or regional agency required to keep the record of land ownership and encumbrances.

Institutional controls widely exist throughout the states. In many cases, they exist as legal encumbrances recorded in a property's chain of title. In others, they exist as orders or contract agreements issued by or between environmental agencies and property owners. And in some cases, institutional controls simply leverage existing local or state laws and rules. In any event, the presence of an institutional control limits the future use that may occur at a property. This, in turn, might impact property value.

## Institutional Controls and Property Values

As set forth in Advisory Opinion 9 (AO-9), "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," there are three possible property value effects from contamination:

- **Cost effects,** or deductions for costs to remediate a contaminated property

---

8.    National Conference of Commissioners on Uniform State Laws, *Uniform Environmental Covenants Act,* §§ 2 & 5, available at http://www.Environmental Covenants.org.

9.    Ibid.; this Web site also provides a copy of the model act.

Copyrighted material licensed by Randall Bell on April 26, 2021

- **Use effects**, or impacts on the utility of the site as a result of the contamination
- **Risk effects**, as derived from the market's perception of increased risk and uncertainty.[10]

This is illustrated in the following formula:

Impaired Value =   Unimpaired Value
  – Cost Effects (Remediation & Related Costs)
  – Use Effects (Effects on Site Usability)
  – Risk Effects (Environmental Risk/Stigma)

Institutional controls can mitigate, or in some cases exacerbate, the extent to which the three contamination-related effects may impact property values.

## Institutional Controls and Cost Effects

As explained in AO-9 and elsewhere,[11] cost effects are deductions from an impacted property's unimpaired value for costs necessary to remediate the property to the appropriate regulatory standards. These costs are appropriate deductions if and only if they are to be borne by the buyer of the property. In this way, they are conceptually similar to capital expenditures made immediately after sale, as discussed in *The Appraisal of Real Estate*, 12th edition.[12] Remediation costs that have been paid or will be paid by the seller or a third party should not be deducted from the unimpaired value. Risks or uncertainties concerning payments of future costs to be paid by an entity other than the buyer are more properly reflected in risk effects.

Nevertheless, since these costs and their effects on property values are directly related to the level and type of remediation, they could be influenced by the use of institutional controls in determining remediation requirements. For example, in a situation with groundwater contamination, a more extensive and costly cleanup to a higher level (lower concentrations of the chemical constituents of concern) based on residential drinking water standards could have greater cost effect implications than a cleanup to industrial standards with perhaps a future restriction on the use of groundwater for drinking water purposes. In this way, the use of institutional controls also could reduce cost effects and any diminution in value.

## Institutional Controls and Use Effects

As noted, the second category of contamination-related property value effects is due to limitations on the use of the property during and after remediation. Use effects are the category of impacts most susceptible to being adversely affected by institutional controls. Adverse use effects on market value would generally be due to limitations on the highest and best use of the property, as discussed next. Other use effects could be related to reductions in income during remediation for income-producing properties. Such reductions may result from remedial activities that limit the use and income production of certain parts of the property, such as a section in a shopping center or office building that is not rentable for a period of time due to remedial activities underway there.

**Highest and Best Use.** The highest and best use of a property is determined on the basis of four criteria: (1) what uses are physically possible; (2) what uses are legally permissible; (3) what uses are financially feasible; and (4) of those uses that meet all of the other criteria, which use produces the highest value, also known as the maximally productive use.[13] In order to evaluate the effects of environmental contamination and institutional controls on the highest and best use of a property, these criteria must be considered. The key consideration is whether the contamination and its remediation would limit the highest and best use of the property to a use with a lower value than what it would be without the contamination and its remediation. While potential value impacts due to use limitations could occur with any of the four criteria, the most likely impact with respect to institutional controls would involve the legally permissible criterion. As noted, remediation with institutional controls would typically include some type of limitation on the future use of the property, and in some cases this limitation would be set forth in a recorded deed restriction that would then bear on future interests in the property. However, the real issue is whether the institutional control does in fact limit the highest and best use to something less than it would be without the control.

For example, if a future land use restriction limits a property's use to industrial when its highest and best use would be industrial even without the restriction, then the restriction would have no impact on the property's highest and best use and would not reduce its value through a use effect deduction from its unimpaired value. Likewise, limitations on the use of groundwater as drinking water (potable water) when the groundwater will not be used for this purpose regardless of the contamination would not limit the property's highest and best use, and would not result in an adverse use effect on value.

On the other hand, if remediation with an institutional control were to limit a property's use for redevelopment or conversion to a use with a higher value–when such conversion is warranted after consideration of redevelopment costs and the financial feasibility criterion[14] or not otherwise limited by the other criteria–then the control would have an adverse effect on the value of the property.

---

10. Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," *Uniform Standards of Professional Appraisal Practice*, 2006 ed. (Washington, DC:  The Appraisal Foundation, Washington, 2006).

11. Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 127–133.

12. Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 434.

13. Ibid., see *The Appraisal of Real Estate*, 12th ed. for a more complete discussion of these criteria.

14. A redevelopment use can only be the highest and best use if the increase in value following redevelopment (over the existing use's value) exceeds the cost of redevelopment. Otherwise, the use would not be financially feasible, the third highest and best use criteria.

## Institutional Controls and Risk Effects

The third effect on property values related to environmental contamination and its remediation is termed environmental risk, or stigma. This effect is derived from the relevant market's perception of increased risks related to the property's environmental condition, including risks related to remediation requirements; unknown or uncertain costs; and other factors. In this regard, institutional controls can have a beneficial effect on the property's value. In some situations, the use of institutional controls helps facilitate remediation and the achievement of closure where remediation and/or closure may not be possible or feasible without the controls.

Research has demonstrated that environmental risk varies significantly over the remediation lifecycle, with the highest risk (and most adverse value impacts) before cleanup; less risk and value impacts during cleanup (with an approved remediation plan); and the least or no risk-related effects after cleanup and the achievement of a no further action status.[15] Accordingly, if institutional controls can facilitate the movement of the property and its environmental condition across the lifecycle, from the before cleanup stage to the during cleanup stage, or from the during cleanup stage to the after cleanup stage, then the use of institutional controls will reduce environmental risk and stigma impacts on property values. If, absent the controls, the property remains in an earlier stage, then the adverse property value effect due to environmental risk will not be reduced. Therefore, this positive market effect of institutional controls may be their most significant contribution toward facilitating brownfield redevelopment.

---

15. Thomas O. Jackson, "Environmental Contamination and Industrial Real Estate Prices," *Journal of Real Estate Research* 23, no. 1/2 (2002): 179–199; Thomas O. Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," *Journal of Real Estate Research* 22, no. 3 (2001): 271–288.

Copyrighted material licensed by Randall Bell on April 26, 2021

### 3.4 Innocent Landowner Programs and Their Effects on Environmental Risk and Property Value Impacts

*by Thomas O. Jackson, PhD, MAI, and Jennifer M. Pitts*

This article originally appeared in the Spring 2006 issue of *The Appraisal Journal*.

This edition of "Environment and the Appraiser" examines the growing use of state programs that protect owners or purchasers of properties that may be impacted by environmental contamination. These parties may be considered "innocent landowners" under many state laws if they meet certain requirements related to the contamination source and other factors. By participating in such programs, landowners and/or prospective purchasers are relieved of certain future liabilities related to the contamination and its remediation under applicable state standards.[1] As will be seen, this reduces environmental risk and potentially adverse effects on property values.[2]

As presented in Advisory Opinion 9 (AO-9), "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," *environmental risk* may be defined as "the additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition."[3] Much of this risk is related to uncertainties concerning future liabilities for remediation costs and responsibilities for those costs. In turn, *environmental stigma* is defined as "an adverse effect on property value produced by the market's perception of increased environmental risk due to contamination."[4] Accordingly, by mitigating risks though innocent purchaser and/or landowner liability relief, the risk effects and adverse property value impacts of environmental stigma may be reduced.

### State Innocent Landowner Programs

As noted, a growing number of states are now instituting programs to facilitate the purchase and redevelopment of contaminated sites by innocent third parties. This column discusses the programs in two such states, Texas and Arizona, and explains several key differences between the two programs. Case studies are also presented involving contaminated properties that sold with the protections of the Texas program. The case studies illustrate the positive effect of innocent landowner programs on the sale price, value, and marketability of properties impacted by environmental contamination.

### Texas Innocent Owner/Operator Program

The State of Texas has been very proactive in encouraging the purchase and development of contaminated sites. In September 1997, Texas instituted the Innocent Owner/Operator Program (IOP) to mitigate the risks of environmental contamination to innocent parties. The Texas IOP provides a certificate to an innocent owner or operator whose property is contaminated solely as a result of the release or migration of contaminants from an off-site source. This Innocent Owner/Operator Certificate (IOC) releases the owner/operator from liability for all costs incurred during the investigation, monitoring, or remediation of contaminants. An example of this certificate is presented in the Appendix to this article.

To be eligible for an IOC, an applicant must meet specific requirements. The applicant must be the current owner or operator of the subject property. The owner/operator also must demonstrate that the property is contaminated due to a release or migration from an outside source, and that the owner/operator did not cause or contribute to the contamination in any way. If the property was subdivided from the source prop-

---

1. The innocent landowner defense under the federal Superfund law was discussed in a previous edition of "Environment and the Appraiser," see Thomas O. Jackson, "The EPA's Proposed All Appropriate Inquiries Rule and the Appraisal of Contaminated Properties," *The Appraisal Journal* (Spring 2005): 146–153.

2. As set forth in Advisory Opinion 9 (AO-9), there are three possible property value effects from contamination: cost effects or "deductions for costs to remediate a contaminated property"; use effects or "impacts on the utility of the site as a result of the contamination"; and risk effects as "derived from the market's perception of increased risk and uncertainty." Appraisal Standards Board, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," *Uniform Standards of Professional Appraisal Practice*, 2005 ed., Lines 169–183 (Washington, DC: The Appraisal Foundation, Washington, 2005), 147.

3. Ibid., 144–145; see also Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (Spring 2003): 127–133.

4. Appraisal Standards Board, 145.

---

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

**Jennifer Pitts** is a research manager and senior consultant at Real Property Analytics, Inc., where she researches various environmental and real estate issues. She is a graduate of Texas A&M University with a master's degree in land economics and real estate and a bachelor's degree in finance. At Texas A&M, she was an Appraisal Institute Education Trust scholarship recipient.

erty after September 1, 1997 (the effective date of the IOP law), the owner must further demonstrate that the property was not contaminated at the time of purchase, or that the owner did not know and had no reason to know of the contamination when the property was acquired. An owner/operator who meets all of these criteria is eligible to proceed with the application process. This process includes (1) completing a site investigation report; (2) submitting a completed application with a $1,000 fee; (3) notifying adjacent landowners; (4) agreeing to provide access to the property when necessary; and (5) agreeing on restrictions necessary to protect human health and the environment.

**Site Investigation Reports.** A site investigation report (SIR) describes the area of concern and demonstrates that the property is contaminated due solely to an off-site release or migration. All applicants for an Innocent Owner/Operator Certificate must complete a Phase I SIR that identifies any potential sources of contamination, both on- and off-site. The Phase I SIR should include a complete operational history of the property, a list of documentation describing any potential contamination sources, copies of any documents describing chemical or waste treatment on the property, area maps, and aerial photographs. If the Phase I SIR data indicates potential on-site source areas of contamination, then a Phase II SIR must be completed that includes additional sampling of soil and groundwater. If no potential source areas are indicated on-site, then no additional sampling is necessary.

**Application and Fees.** If the completed SIR indicates that contamination is present from an offsite source and that the owner/operator has not contributed to or exacerbated this contamination, then an application form may be completed and submitted to the Texas Commission on Environmental Quality (TCEQ). The application includes information about the owner/operator, a legal description of the site, the completed SIR, and proof that the applicant meets all requirements and is eligible for an IOC. A $1,000 application fee is required for all reasonable costs incurred in reviewing the application. The applicant will be billed quarterly if the actual costs exceed this fee, and any unused portion will be returned to the applicant once the application process is complete.

**Notice.** The owner/operator must notify all adjacent landowners that an IOC has been applied for within 14 days after an application is submitted. This allows all relevant parties to submit any additional information to the TCEQ regarding the contamination. If an applicant fails to notify all adjacent landowners, the application for an IOC will be denied.

**Property Access and Restrictions.** In addition to meeting all requirements and notifying all adjacent landowners, the applicant must sign an affidavit allowing reasonable access to the property for future investigation or remediation of contaminated soils and/or groundwater. The TCEQ may also condition the issuance of an IOC on the enactment of institutional controls. These controls may include deed restrictions that limit the allowable uses of the subject property. Restrictions will only be enacted when necessary to protect human health or the environment. If at any time an owner/operator refuses reasonable access or violates any restrictions, the IOC will be denied or revoked.

**Issuance of Certificate.** An IOC is not transferable to a future owner or operator of a property. A prospective owner or operator may apply for an IOC, but the IOC will not be issued until the applicant actually owns or begins operation of the site. Applications typically take less than 45 days to process. Parties may terminate participation in the program at any time by written notice. As of July 21, 2005, the TCEQ had received 507 applications for the IOP, covering a wide variety of property types, and 405 IOCs had been issued.

## Arizona Prospective Purchaser Agreement

The State of Arizona also has a program to protect innocent parties from environmental risks and liabilities. Unlike the Texas IOP, which offers protection to current owners and operators, the Arizona Prospective Purchaser Agreement is issued to potential purchasers of contaminated properties. According to state statute, the Arizona Department of Environmental Quality (ADEQ) may enter into a Prospective Purchaser Agreement (PPA) with a potential purchaser of a facility.[5] The PPA provides a written release of liability and covenant not to sue for existing contamination at the site. While only owners/operators of non-source properties are eligible for an IOC in Texas, prospective owners of both source and non-source properties in Arizona are eligible for a PPA, as long as the prospective purchaser did not contribute to contamination of the site.

Certain statutory conditions must be met in order for a PPA to be issued. First, the facility must be within a site identified on the Water Quality Assurance Revolving Fund registry, or sufficient information must be provided to the ADEQ to identify the extent of contamination at the site. Also, the prospective purchaser must not be currently liable for any contamination on the property and may not be affiliated with any other responsible party through a familial or contractual relationship. Furthermore, the proposed redevelopment or reuse of the property must not contribute to existing contamination, interfere with necessary remediation, or expose the public to any additional health risks. Most importantly, the agreement must result in a substantial benefit to the community.

**Public Benefit.** The requirement that a PPA must result in a substantial public benefit is a major factor that differentiates the Arizona PPA from the Texas IOC. The prospective purchaser must identify the specific public benefit that will be provided if the PPA is issued.

---

5.    Ariz. Rev. Stat. §49-285.01.

Copyrighted material licensed by Randall Bell on April 26, 2021

The state statute provides that the public benefit may include any of the following: (1) substantial funding to perform remedial measures at the site; (2) performance of substantial remedial measures at the site; (3) productive reuse of a vacant or abandoned property; (4) development of a site by a governmental entity or nonprofit organization to address an important public purpose; (5) creation of conservation or recreation areas; or (6) any other public benefit that the ADEQ considers sufficient.[6] Officials at the ADEQ assert that bringing an abandoned property into productive use is the most common public benefit of these agreements. Consequently, the PPA is especially useful in encouraging the redevelopment of brownfields.

**Fees and Public Notice.** There is currently a $900 fee assessed for a typical PPA. Additional fees are charged if a property presents an unusual difficulty. The ADEQ must notify the public of a PPA through a local newspaper in the county where the property is located. The publication costs are the responsibility of the prospective purchaser and are not included in the $900 fee. The prospective purchaser must also grant an easement to ADEQ and any authorized representatives for inspection or remediation of the property.

**Issuance of Agreement.** To be eligible for consideration of a PPA, a draft agreement of the PPA must be received by the ADEQ before closing occurs on the sale of the subject site. The ADEQ does not have the authority to prevent any other independent parties from pursuing claims. The PPA is null and void if the purchaser fails to perform any of the required statutory responsibilities. Unlike a Texas IOC, a PPA is assignable to future prospective purchasers who are eligible for the program.

## Case Studies Involving Innocent Landowner Protections

The positive effects of the liability relief and risk reduction through innocent landowner programs can be illustrated using case studies. Three case studies involving properties in the Texas IOP program are used for this purpose.

### Case Study One

The subject property in this case study was a retail strip center of 6,108 square feet on a site of 0.403 acres in Austin, Texas, that sold for $650,000, or $106.42 per square foot. The property had soil and groundwater contamination consisting of chlorinated solvents (perchloroethylene, or PCE, and trichloroethane, or TCE) released from an adjacent dry cleaner.[7] The buyer was "fully aware" of the contamination prior to the sale. There were monitoring wells in place, but no active remediation. The contamination was said to be naturally

attenuating, or breaking down on its own.[8] As part of a prepurchase environmental assessment of the property, an SIR was prepared and an IOP was obtained in 2001 from the Texas Natural Resource and Conservation Commission (now the TCEQ). The buyer indicated that with the IOP, "contamination of this nature has little effect on the price, considering the source (dry cleaner) agrees to be responsible for any cleanup."

To investigate this further, five unimpaired comparables were analyzed. The unimpaired comparables involved five sales of similar retail strip centers (similar age, size, use, and dates of sale) located within 10 miles of the subject property (similar locations and market). They were considered unimpaired in that they were not contaminated, or at least there were no reported contamination issues associated with the sales. The unit prices for the five unimpaired comparables were $78.08, $73.80, $93.04, $86.13, and $104.99 per square foot of leasable area. These were the most directly comparable properties in the local market area. Accordingly, their unit prices can be compared to the subject, which sold for $106.42 per square foot. A comparison of unit prices indicates no diminution in value. The impaired subject actually sold for slightly more than its unimpaired comparables.

### Case Study Two

The subject for this case study was an older industrial warehouse facility of 101,839 square feet located in the Dallas-Ft. Worth metroplex. The property sold for $1.7 million, or $16.79 per square foot. The property had been marketed for a lengthy period, but sold quickly after an IOC was obtained. According to parties to the transaction, once the IOC was issued, there were "no problems finding buyers." There were multiple potential sources for the contamination at this non-source subject property. A primary source site for the volatile organic compounds (including biodegraded TCE) and metals discovered in monitoring wells around the site was a former manufacturing facility on an adjacent site with leaking above-ground storage tanks. There was also reportedly a dry cleaner on another site that had a closed contamination issue. Significant investigation went into demonstrating to the TCEQ that the contamination on the subject property was not generated by any current or former tenants of the site. As noted, the Texas program applies only to non-source sites. The unit price for the subject property of $16.79 per square foot was found to be within the market range for unimpaired comparables: $16.16 to $17.89 per square foot. This again confirms the positive effect of an IOC on property value and marketability.

### Case Study Three

This case study involves the sale of a vacant industrial site of approximately 5.5 acres in Dallas for $712,800

---

6.  Ibid.

7.  The subject properties in the three case studies would be considered non-source properties in the framework of source, non-source, adjacent, and proximate properties in AO-9. Appraisal Standards Board, 145.

8.  A discussion of monitored natural attenuation can be found in Thomas O. Jackson, "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation," *The Appraisal Journal* (Fall 2004): 111–118.

or $2.97 per square foot. The property was contaminated from an adjacent site that had been used as a truck stop. The groundwater and soil contamination consisted of petroleum hydrocarbons–notably benzene, toluene, ethylbenzene, and xylenes (BTEX) and MTBE– from leaking underground storage tanks at the adjacent former truck stop. The SIR confirmed that the subject property, which had been previously used as a concrete manufacturing facility, was not the source of the contamination. The subject property was vacant at the time of sale and was covered with concrete. There had been underground storage tanks on the subject property, but these had been removed, and the state agreed that these tanks were not the source of the hydrocarbon contamination on the property. The seller of the subject property had conducted the necessary studies and obtained an IOC (for the buyer) prior to the sale. The unit price of $2.97 per square foot for the subject property was bracketed by market prices of $2.13 to $3.00 per square foot for unimpaired comparables, again indicating no

diminution in value for a contaminated property with an IOC.

## Conclusion

Innocent landowner programs are beneficial not just for individual property owners, but also for the communities in which the properties are located. These mechanisms can help facilitate brownfield redevelopment efforts and turn underutilized properties into productive uses. This has positive effects on the surrounding market area and local tax base. As explained, the reduction in potential future liabilities for remediation of contaminated sites has the effect of mitigating environmental risk to the market in general and buyers of these properties in particular. Reductions in risk and uncertainty concerning liabilities and costs would then reduce any environmental stigma impacts on property values. This was evident in the three case studies presented, which demonstrated increased marketability and the lack of any adverse price and value impacts subsequent to obtaining an IOC through the Texas program.

Copyrighted material licensed by Randall Bell on April 26, 2021

**TEXAS COMMISSION ON ENVIRONMENTAL QUALITY**
**INNOCENT OWNER/OPERATOR PROGRAM CERTIFICATE**

As provided for in §361.753, Subchapter V, Solid Waste Disposal Act (SWDA), Texas Health and Safety Code.

I, JACQUELINE S. HARDEE, P.E., DIRECTOR OF THE REMEDIATION DIVISION, TEXAS COMMISSION ON ENVIRONMENTAL QUALITY (TCEQ OR COMMISSION), CERTIFY UNDER §361.753, SWDA, TEXAS HEALTH AND SAFETY CODE, THAT NECESSARY INVESTIGATIONS HAVE BEEN COMPLETED AS DESCRIBED IN THE APPROVED SITE INVESTIGATION REPORT(S) DATED KEYBOARD(DATES OF REPORTS) (SITE REPORT) FOR THE TRACT(S) OF LAND DESCRIBED IN EXHIBIT "A" (SITE), AND THAT KEYBOARD(NAME OF OWNER/OPERATOR) IS AN INNOCENT OWNER [OPERATOR] AS DEFINED BY §361.751(2) FOR THE SITE, BASED ON THE AFFIDAVIT FOR IOP NO. KEYBOARD(IOP NO.) IN EXHIBIT "B". A COPY OF THE SITE REPORT MAY BE FOUND IN THE TCEQ CENTRAL RECORDS OFFICE UNDER IOP NO. KEYBOARD(IOP NO.).

KEYBOARD(NAME OF OWNER/OPERATOR) IS NOT LIABLE UNDER THE TEXAS HEALTH AND SAFETY CODE OR THE TEXAS WATER CODE FOR INVESTIGATION, MONITORING, REMEDIATION OR CORRECTIVE OR OTHER RESPONSE ACTION S REGARDING THE CONDITIONS ATTRIBUTABLE TO THE RELEASE OR MIGRATION OF THE CONTAMINANT(S) IN KEYBOARD(LIST MEDIA) FROM A SOURCE OR SOURCES NOT LOCATED ON OR AT THE SITE INCLUDING: KEYBOARD(LIST CONTAMINANTS) DESCRIBED IN THE SITE REPORTS OR RELATED DEGRADATION PRODUCTS, OR OTHERWISE LIABLE REGARDING THOSE CONDITIONS. KEYBOARD(NAME OF OWNER/OPERATOR) SHALL GRANT REASONABLE ACCESS TO THE PROPERTY FOR PURPOSES OF INVESTIGATION AND REMEDIATION TO PERSONS DESIGNATED BY THE EXECUTIVE DIRECTOR OF THE TCEQ.

EXECUTED this _____ day of _____, 20____

_____
Jacqueline S. Hardee, P.E., Director
Remediation Division

STATE OF TEXAS
TRAVIS COUNTY

BEFORE ME, on this the _____ day of _____, personally appeared Jacqueline S. Hardee, P.E., Director, Remediation Division, of the Texas Commission on Environmental Quality, known to me to be the person and agent of said commission whose name is subscribed to the foregoing instrument, and she acknowledged to me that she executed the same for the purposes and in the capacity therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _____ day of _____, 20____

_____
Notary Public in and for the State of Texas

**Appendix (*continued*)**

### EXHIBIT "A"
### TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
### INNOCENT OWNER/OPERATOR PROGRAM
### LEGAL DESCRIPTION OF PROPERTY
### IOP No. ___

The property belonging to KEYBOARD(Name of Owner/Operator) is a KEYBOARD(# of Acres) acre tract, more or less, located at KEYBOARD(Address, City) in the (Name) League (No.), Abstract (No.), recorded in Volume (No.), Page (No.) of the Deed of Records in KEYBOARD(County) County, Texas; said KEYBOARD(# of Acres) acre property is more particularly described as follows:

(Insert metes and bounds description here)

 

Copyrighted material licensed by Randall Bell on April 26, 2021

**Appendix (*continued*)**

### EXHIBIT "B"
### TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
### INNOCENT OWNER/OPERATOR PROGRAM
### AFFIDAVIT BY INNOCENT OWNER/OPERATOR

Before me, the undersigned authority, personally appeared KEYBOARD(Name of Owner/Operator), who, being by me duly sworn, deposed as follows:

My name is KEYBOARD(Name of Innocent Owner/Operator) and I am a representative of KEYBOARD(Company Name). I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

KEYBOARD(Name of Innocent Owner/Operator) is the KEYBOARD(owner/operator) of the Site located at KEYBOARD(Address, City, County) County, Texas. The physical boundaries of the site are set out in the attached Exhibit "A", "Legal Description of Property" (Site).

KEYBOARD(Name of Innocent Owner/Operator) has KEYBOARD(owned/operated) the Site from KEYBOARD(Enter Date) to KEYBOARD(Enter Date).

KEYBOARD(Name of Innocent Owner/Operator) or its representatives have completed investigations, pursuant to Section 361.753(a) of the Texas Solid Waste Disposal Act, at the Site described in Exhibit "A" to this certificate. The plans and reports submitted by KEYBOARD(Name of Innocent Owner/Operator) in its Innocent Owner/Operator Application contain information collected and analyzed using a prudent degree of inquiry consistent with accepted industry standards. The plans and reports are true, correct and complete to the best of my knowledge.

The Site has become contaminated as a result of a release or migration of contaminants in KEYBOARD(List Media) from a source or sources not located on or at the Site. These contaminants are described in the Site Investigation Reports for the Site dated KEYBOARD(SIR Date(s)) located in the TCEQ Central Records under KEYBOARD(IOP No.)

Neither I, KEYBOARD(Name of Innocent Owner/Operator), my agents, nor other persons, properties or operations for which I have legal responsibility, have caused or contributed to the source or source(s) of contamination at the Site.

<u>Site Innocent Owner or Operator</u>

By:    _____
       Signature

       _____
       Name (Printed or Typed)

SWORN TO AND SUBSCRIBED before me on the _____ day of _____, 20____
_____
(Notary)

## 3.5 Municipal Setting Designations: A New Tool for Reducing Environmental Risk and Cost Effects on Property Values

*by Thomas O. Jackson, PhD, MAI, and Jennifer M. Pitts*

This aricle originally appeared in the Spring 2007 issue of *The Appraisal Journal*.

Previous editions of "Environment and the Appraiser" have examined a number of regulatory options for achieving site remediation objectives and reducing the adverse effects of environmental risk and uncertainty, as well as remediation cost effects. These have included innocent landowner programs,[1] the use of institutional controls,[2] and remediation through monitored natural attenuation.[3]

The relationship between regulatory tools and the effects of contamination on property value has been discussed with reference to the general valuation framework introduced in Advisory Opinion 9 (AO-9): "The Appraisal of Real Property That May Be Impacted by Environmental Contamination."[4] As set forth there and in a subsequent "Environment and the Appraiser"[5] column,  this framework can be depicted in the following equations:

$$
\begin{aligned}
\text{Impaired Value} = \quad &\text{Unimpaired Value} \\
&- \text{Cost Effects (Remediation \& Related Costs)} \\
&- \text{Use Effects (Effects on Site Usability)} \\
&- \text{Risk Effects (Environmental Risk/Stigma)} \\[6pt]
\text{Property Value Diminution} = \quad &\text{Cost Effects (Remediation \& Related Costs)} \\
&+ \text{Use Effects (Effects on Site Usability)} \\
&+ \text{Risk Effects (Environmental Risk/Stigma)}
\end{aligned}
$$

Accordingly, regulatory tools and compliance options that reduce the risk and cost effects of environmental contamination would tend to mitigate or reduce the adverse property value effects of contamination. Potentially significant effects on property values involve the risk and uncertainty of future remediation requirements and costs. This is where programs such as those reviewed in this article may be helpful. If state regulatory agencies can limit the uncertainties faced by prospective purchasers of contaminated properties, then the market may react positively by reducing risk premiums on return requirements and thereby increase sale prices and property values.

### Municipal Setting Programs

In general, municipal or urban setting designation programs relieve a property owner of certain cleanup requirements for remediating contaminated water because of the availability of other potable water sources such as a closed municipal system. Institutional controls through deed restrictions[6] are required to ensure that this restriction is maintained. This arrangement can reduce the adverse effects of contamination in two general ways.

The first way that institutional controls through deed restrictions can reduce the adverse effects of contamination involves the costs that might be borne by a prospective purchaser for remediation applicable to regulatory standards. These costs, if borne by the buyer, reduce property values through cost effects. If these costs were reduced because active remediation of contaminated groundwater was not required in a designated area, then these effects would be negligible.

The second way that institutional controls through deed restrictions can reduce the adverse effects of contamination relates to the risk associated with these properties. The risk-related effects would be reduced since there would be greater certainty with respect to future requirements for environmental compliance, adding certainty and mitigating risk effects on property value. With this general framework in mind, the details of two such programs in Texas and Ohio are reviewed.

---

1. Thomas O. Jackson and Jennifer M. Pitts, "Innocent Landowner Programs and their Effects on Environmental Risk and Property Value Impacts," *The Appraisal Journal* (Spring 2006): 117–124.

2. Thomas O. Jackson and J. Michael Sowinski Jr., "Institutional Controls and Contaminated Property Valuation," *The Appraisal Journal* (Fall 2006): 328–332.

3. Thomas O. Jackson, "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation," *The Appraisal Journal* (Spring 2004): 111–118.

4. Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," *Uniform Standards of Professional Appraisal Practice*, 2006 ed. (Washington, DC: The Appraisal Foundation, Washington, DC, 2006).

5. Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 127–133.

6. For a more detailed discussion of institutional controls, see Jackson and Sowinski Jr.

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

**Jennifer Pitts** is a research manager and senior consultant at Real Property Analytics, Inc., where she researches various environmental and real estate issues. She is a graduate of Texas A&M University with a master's degree in land economics and real estate and a bachelor's degree in finance. At Texas A&M, she was an Appraisal Institute Education Trust scholarship recipient.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Texas's Municipal Setting Designation Program

The Texas Municipal Setting Designation (MSD) law,[7] which became effective on September 1, 2003, offers a new alternative to protect the public from exposure to contaminated groundwater at a specific property. In many cities, groundwater is a source of potable water, or water used for drinking, showering/bathing, cooking, or irrigating crops intended for human consumption. Prior to the law creating MSDs, state regulations usually required groundwater contamination to be investigated and remediated to drinking water standards.

However, in some locations, groundwater is not used as potable water because another public water source is available. In this situation, an MSD is now a viable option for properties with contaminated groundwater. An MSD certifies that designated groundwater at a specific property is currently not used as potable water and will not be used as potable water in the future. The MSD law requires a city ordinance or restrictive covenant prohibiting potable water use at the property, and this restriction overrides or limits the existing state regulatory requirements for investigation and cleanup. By eliminating or reducing state regulatory requirements, an MSD may encourage development and redevelopment of properties affected by groundwater contamination.

### Eligibility Requirements

An MSD may consist of a single property, multiple properties, or a portion of a property. To be eligible for an MSD, a property must be within the corporate limits or extraterritorial jurisdiction of a municipality with a population of 20,000 or more. In addition, a public drinking water supply system that meets state requirements must be capable of supplying drinking water to the MSD property and to all properties within one-half mile of the MSD boundary.

### Application

If the two eligibility requirements are met, an MSD application may be submitted to the Texas Commission on Environmental Quality (TCEQ). There are no restrictions on who may apply for an MSD. Any person, including a city or local government, may apply. The application must contain the following items:

1. The applicant's name and address
2. A legal description of the proposed MSD boundaries and identification of the groundwater that will be restricted
3. A statement as to whether the impacted cities and retail public utilities (RPUs) support the MSD
4. A description of the known contamination
5. Proof of notice
6. A copy of the city ordinance or restrictive covenant

7. An affidavit affirming all information provided
8. An application fee of $1,000

### Support

For an MSD to be certified, the application must have firm support. The city where the MSD property is located must adopt a resolution in support of the MSD application. In addition, a resolution of support must be passed by all cities within one-half mile of the proposed MSD boundary; all cities that own or operate a groundwater supply well within five miles of the proposed MSD property; and all retail public utilities (RPUs) that own or operate a groundwater supply well within five miles of the MSD boundary.

The city where the proposed MSD is located must also pass a city ordinance or approve a restrictive covenant that prohibits potable use of the groundwater at the MSD property both currently and in the future. The city may choose to establish additional requirements or procedures to follow when an applicant is seeking city support.

Without the support of all parties involved, an MSD cannot be certified. Cities and RPUs have no obligation to support an MSD application; this decision is left to their discretion.

### Groundwater Contamination

An MSD applies to all contamination in the designated groundwater within the MSD boundary, even if this contamination originates from more than one source. If a potable water well exists within one-half mile of the proposed MSD property, then the contamination beyond the MSD boundary must be determined and may have to be remediated according to state regulations. If there is no well within the area, assessment and remediation of the contamination may still be required for other concerns unrelated to potable water use, such as the inhalation of vapors or wildlife's exposure to contamination.

### Notice

Notice letters must be mailed out before or at the same time the MSD application is submitted. Notification letters must be sent to the city in which the proposed MSD property is located, to any city within one-half mile of the MSD boundary, to any city or RPU that owns or operates a groundwater supply well within five miles of the MSD property, and to all owners of private water wells located within five miles of the MSD property. Notified parties then have 60 days to file comments with the TCEQ.

### Certification

An application must be certified or denied by the TCEQ within 90 days from the time it is received. An application may be denied if the eligibility requirements are not met, the application is incomplete or inaccurate, or the TCEQ determines that the MSD would have a negative impact on current or future water resource needs.

---

7. See the *Texas Health and Safety Code*, 361.801-808; Texas Local Government Code, Section 211.003, Subsection (a); and *Texas Local Government Code*, Section 401.005.

## Ohio's Urban Setting Designation Program

The Urban Setting Designation (USD) program[8] in Ohio is similar to the Texas MSD program. Like Texas, Ohio recognized that many properties with contaminated groundwater are located in highly urbanized areas with alternative public water systems, and the groundwater at many of these properties will never be used for potable purposes. In these situations, a USD may be obtained, which eliminates the requirement for clean groundwater at the property at drinking water standards. Like an MSD, other nonpotable exposures to the contaminated groundwater must still be assessed and possibly remediated.

### Eligibility Requirements

A property must meet the following four eligibility requirements to be considered for a USD:

1. The property must be located in a city or township with a population of 20,000 or more.
2. At least 90% of the parcels within the city or township must have access to a community water system, or 90% of the parcels within one mile of the proposed USD boundary must have access to a community water system. This community water system must be capable of meeting future water supply needs.
3. The property cannot be within an Ohio EPA-endorsed wellhead protection area, or an area submitted for endorsement.
4. There must be no potable water wells within one-half mile of the property boundary. If the property is above a sole source aquifer or a sand and gravel aquifer producing more than 1,000 gallons per minute, there must be no reasonable expectation that any potable water wells will be installed within one-half mile of the property boundary.

### Application Process

A certified professional must prepare the request for a USD. The written request must include the name and address of the applicant, the location of the property for which a USD is sought, a legal description of the property, an indication as to whether the local government supports the designation, and proof that the proposed USD property meets all eligibility criteria.

The written request must be submitted to the Ohio EPA director. The applicant must also reimburse the agency for all costs incurred in reviewing the USD request.

### Notice

When the written request is submitted, the local government in which the proposed USD property is located, as well as all local governments within one-half mile of the property boundary, must be notified of the USD application. This notice letter must inform recipients that the EPA director will contact them regarding the USD. The letter must also encourage recipients to provide written comments or any information relevant to the consideration of the USD. Residents and other interested parties may also submit information to the EPA director.

### Certification

After a written request is received, the EPA director may request additional information and a public meeting may be held if significant interest is shown or if public concerns are raised. Before approving a USD request, the director must confirm that all eligibility requirements have been met, that the USD will not likely have a negative impact on surrounding jurisdictions or regional water resource needs, and that the USD will not likely expose people to contaminated groundwater now or in the future. The director will approve or deny the USD request within 90 days after he has consulted with the city or township where the property is located.

## Conclusion

Both the Texas MSD and Ohio USD programs can benefit properties and communities in a variety of ways. For many properties with contaminated groundwater, these programs may significantly reduce the costs and time associated with satisfying regulatory requirements. Cities and local governments can use these programs as tools to promote economic development. These tools can be especially useful in encouraging the redevelopment of brownfields.

From an appraisal perspective, these programs improve property values over what they would be without such programs. The programs provide flexibility and eliminate cleanup requirements that do provide additional benefit to the public in municipal settings. Over the past few years in Texas and elsewhere, there has been the adoption of remediation standards and creative approaches to site cleanup that are protective of public heath and safety while accommodating investment and development activity. Appraisers and others should be aware of these programs, and valuation assignments that involve properties with these types of issues should realistically reflect the reduced risk and cost effects.

---

8. *Ohio Administrative Code*, Rule 3745-300-10(D), "Urban Setting Designation Criteria and Process."

Copyrighted material licensed by Randall Bell on April 26, 2021

3.6 # No Further Action Letter's Status Can Change

*by Allen Keiter, MAI*

This article originally appeared in the October 2002 issue of *The Appraisal Journal*.

Many appraisers feel that after a No Further Action letter is issued by a state environmental agency the responsible party and future property owners are absolved of financial responsibility for remediating the previous environmental contamination. But, at the Environmental Bankers Association conference held in January 2002, several bank environmental officers commented on the increasing number of state environmental agencies that are reopening files, reinvestigating sites, finding contamination from a previous spill, and requiring the responsible party to remediate the contamination.

Many of the investigation procedures used years ago by state agencies are incomplete. For example, when removing an underground storage tank, one state's EPA procedures required soil testing only if the tank displays obvious holes. No Further Action letters were then issued on the contaminated sites, and recently, contamination was found. The agency reopened the files, reinvestigated the sites, and if contamination was found, the responsible party was required to remediate.

Advances in science allow a greater understanding of the migration abilities of certain contaminants. For example, gasoline additives migrate much farther and deeper than the gasoline itself. As these sites are re-investigated, monitoring wells are drilled farther away from and deeper than the original contamination.

Many of these recently reopened sites were independently owned gas stations. Finding the responsible party, usually the previous property owner, may be difficult. It is even more difficult to find a responsible party with adequate financial resources and who is willing to pay for the cleanup.

Unfortunately, many buyers, sellers, and appraisers expect a No Further Action letter to guarantee that the state agency has tested all of the surrounding areas promising no contamination. Essentially, a No Further Action letter means no further action is needed on that site at the time the letter is issued. If another hot spot of the previous contamination is discovered later at another location on the site, it will have to be remediated at the expense of the responsible party. In many states if the responsible party cannot fund the remediation, the current property owner becomes financially responsible for remediating the existing contamination even though a No Further Action letter was issued prior to the property's purchase.

## Recommendations

How can an appraiser gauge the potential of previously existing contamination resurfacing on a property where a No Further Action Letter was issued by the EPA? Many property purchasers are using environmental insurance to transfer this risk from the property owner to the environmental insurance company. The cost of environmental insurance is a realistic method of recognizing the impact on value. With environmental insurance two components must be considered:

1. The present value of the environmental insurance premiums.
2. The present value of the environmental insurance deductible, which can be $100,000 or more. Since the deductible is incurred only in the event of a claim, some probability of a claim should be applied to the amount of the deductible to develop this component.

**Allen C. Keiter, MAI,** specializes in complex appraisals, especially of properties impacted with environmental contamination. His extensive real estate experience includes building single-family homes, developing residential subdivisions, and construction management of high-rise buildings.

## 3.7 Preparing Yourself for New Rules for Environmentally Impaired Property

*by Robert Lipscomb, Richard Maloy, MAI, SRA, and C. Gregory Rogers, JD, CPA*

This article originally appeared in the First Quarter 2006 issue of *Valuation Insights & Perspectives*.

New financial accounting rules and reporting laws are creating hazards, as well as opportunities, for appraisers. You might soon be asked to provide appraisals of property with known or suspected pollution cleanup liabilities. If your appraisal implicitly, or explicitly, includes valuation of the liability, you might be subject to the rules and penalties of Sarbanes-Oxley.

The Public Accounting Reform and Investor Protection Act of 2002, better known as Sarbanes-Oxley, was passed in response to a series of high-profile accounting scandals, including Enron and Worldcom. Under Sections 302 and 906 of Sarbanes-Oxley, CEOs and CFOs of public companies are now required to certify that their company financial statements "fairly present" the financial condition and results of operations of the company.

CEOs and CFOs must also vouch for the effectiveness of the company financial reporting system. Moreover, under Section 404 of Sarbanes-Oxley, the company's independent auditors must attest to the effectiveness of the company's system of internal control over financial reporting.

Corporate officers who knowingly and willfully make false claims and issue misleading financial statements can receive a fine of up to $5 million, a prison sentence of up to 20 years, or both. These officers must repay any bonuses they received during the period for which financial statements must be restated.

As a result, the C-suite officers are seeking to push accountability for financial reporting down the organization chart by asking direct reports to subcertify portions of the financial statements within their purview, which creates a cascading series of certifications.

### FASB's FIN-47

Under the Financial Accounting Standards Board Interpretation No. 47 (FIN-47), Accounting for Conditional Asset Retirement Obligations, companies are required to identify and report pollution cleanup liabilities even if they are not currently under a regulatory enforcement action. In addition, FIN-47 also requires liabilities for asset retirement obligations (ARO) to be valued at fair value. The fair value of environmental AROs generally will be estimated using expected present-value techniques that incorporate cash flow information and rigorous best-engineering practices.

FIN-47, which became effective December 15, 2005, is FASB's interpretation of its Statement No. 143 (FAS-143), Accounting for Asset Retirement Obligations.

### FAS-144

AROs are to be booked as a liability and simultaneously as an asset reserve of an equal amount. This results in no net difference to the balance sheet. But this requires calculation of a recoverability test under FAS-144, Accounting for the Impairment or Disposal of Long-Lived Assets, issued in August 2001. The recoverability test determines whether the asset is capable of generating sufficient cash to pay for the liability.

Operating assets (e.g., factory, store, office building) generate current and future positive cash flows. Therefore, operating assets will rarely fail the recoverability test. Whenever the "recoverable amount" of an asset is less than its "carrying amount" (sometimes called the "book value"), an "impairment loss" will be recognized. Conversely, non-operating assets (brownfields) do not generate cash inflows and are far more likely to fail the recoverability test. If the recoverability test indicates impairment, FAS-144 requires the impaired asset to be written down to its fair value.

### Implications for You

It is unlikely that appraisers will be asked to value environmental AROs because this process does not include valuation of the associated asset. However, it is foreseeable that accounting for AROs under FAS-144 will or should trigger the write-down of many contaminated properties. Accounting for environmentally impaired assets will require appraisers to evaluate the impact of environmental conditions on the current market value of the property. This might carry significant bottom-line issues for you and your clients that you have not encountered in the past.

Most appraisals prepared today have environmental disclaimers in which the appraiser claims no knowledge of environmental conditions and states that the appraisal of the property is made as "clean." This

**Robert Lipscomb** is the Brownfield Program Manager for Barge Waggoner Sumner & Cannon, Inc. in their Nashville, Tenn., headquarters. Mr. Lipscomb is a nationally recognized leader in the transfer and redevelopment of commercial and industrial property and the pollution cleanup liabilities associated with them.

**Richard A. Maloy, MAI, SRA, J.D.,** is an appraiser and consultant having a specialty in detrimental condition valuation and brownfield redevelopment. He is the author of the Appraisal Institute seminar *Opportunities for Appraiser-Consultants Under the Brownfields Act of 2002*.

**C. Gregory Rogers, J.D., CPA,** is President and founder of Advanced Environmental Dimensions, LLC, and author of *Financial Reporting of Environmental Liabilities and Risks after Sarbanes-Oxley*, available from John Wiley & Sons.

Copyrighted material licensed by Randall Bell on April 26, 2021

disclaimer would be inappropriate for FAS-144 valuation assignments triggered by an environmental ARO or other environmental condition.

In today's world of appraising for corporate clients, the general environmental disclaimer, used extensively by appraisers for the past 20 years, might be obsolete. Appraisers are advised to replace the general disclaimer and environmental assumptions with specific environmental questions when assessing assignment conditions. Answers to these questions will lead the appraiser to prepare extraordinary assumptions, hypothetical conditions and a scope of work needed for credible opinions. A more precise development of assignment conditions will help the appraiser avoid being an inadvertent participant in the financial reporting process.

If you decide to accept these assignments, you must recognize that proper coordination of these issues requires organization of a team with multidisciplinary expertise. Auditing expertise is needed to ensure that proper financial reporting valuation techniques are employed. Legal expertise is needed to identify and evaluate environmental legal obligations, and environmental professionals are needed to prepare engineering cost estimates.

## Plan of Action

When appraising a property known to have environmental issues as if "clean" or unimpaired, a hypothetical condition exists – specifically, a condition known not to be true but assumed to be true for the appraisal.

An appraisal that utilizes the expertise of other experts to assist in the development of a value opinion (either environmental, legal or FASB-related) will likely invoke an extraordinary assumption. The appraisal is based on conditions that are assumed to be true but if found in the future would affect the value of the opinion.

Even if you choose not to offer this service, you owe it to your clients and prospective clients who are confronted with these issues to adequately explain the situation to them. You will also want to be able to direct them to sources of help.

Competent appraisers need not be discouraged from accepting assignments on properties that might have environmental issues. These assignments can be seen as opportunities. The task ahead is for appraisers to hone their skills and prepare for a meaningful future of asset valuation in light of new financial reporting requirements.

## 3.8 Brownfields: Consider Aggravating & Mitigating Factors

*by David Wald, President, Wald Realty Advisors, Inc., and Donald C. Nanney, Esq., Gilchrist & Rutter Professional Corporation*

This article appeared in the Second Quarter 2004 issue of *Valuation Insights & Perspectives*.

While precise-looking valuation formulas are available, brownfield valuation is still more of an art than a science. This is because the valuation process requires significant estimation and even speculation about the future outcome of events in an uncertain environmental remediation process and regulatory and legal environment, and is further dependent upon the "highest and best use" projected for the property.

Traditional valuation usually concerns property for which there is a reasonably efficient marketplace. With brownfields, however, there are typically many additional issues for which the outcome must be projected, with the degree of estimation or speculation largely a function of how far along the site assessment and remediation process has progressed.

The formula for the valuation of contaminated property is:

$$I = U - C - S$$

Where:
$I$ = impaired value
$U$ = unimpaired value
$C$ = remediation cost
$S$ = stigma

The process is not that simple, however, and involves consideration of numerous aggravating and mitigating factors.

The additional valuation issues that may need to be taken into consideration include, but are certainly not limited to:

- The extent of site assessment establishing the degree and type of environmental contamination;
- The area affected by the contamination, whether isolated or part of a larger, perhaps even regional, contamination problem involving other properties and parties;
- The likelihood and anticipated cost of removing or remediating the contaminants (particularly when groundwater is involved);
- The existence of an approved remedial action plan, or the status of development of a plan and the anticipated time and cost to obtain regulatory approval of a proposed remediation plan;
- The availability and time involved in obtaining public agency or other funding to pay for the site assessment and remediation;
- The extent that other responsible parties are undertaking remediation at their cost;
- The existence or availability of separate closure for soil, allowing use or development to proceed on the surface while groundwater issues remain for future closure;
- The prospect of recovering assessment, remediation and legal costs from previous owners or operators of the target property or from other responsible parties, and the outcome or likely outcome of litigation (if any);
- The existence of any applicable insurance coverages under past or current insurance policies, the status of any insurance claims and the prospect of obtaining insurance funding;
- The prospect of discovering unanticipated conditions during remediation;
- The length of time it will take to complete remediation and obtain regulatory closure;
- The nature and level of any residual contaminants that have been or may be allowed to remain in place;
- The scope and limitations of available forms of closure, and the prospect that a qualified closure may be reopened by a regulatory agency in the future;
- The availability and time involved in obtaining additional regulatory protection such as a prospective purchaser agreement or covenant not to sue;
- The availability and quality of environmental representations, warranties and indemnities from current or previous owners or operators, either under existing agreements or new negotiated allocation of environmental risk;
- The availability, term and cost of new environmental insurance against contingent risks such as remedial cost overruns or reopening of the site by

This article was previously published under the title "Appraising Brownfield Sites" in *Brownfield News* (July/August 2003). Reprinted with permission of the authors and copyright holders.

**David Wald** is the principal of Wald Realty Advisors, a Los Angeles-based real estate consulting firm. He provides a wide range of consulting and advisory services, including services for environmentally impacted properties.

**Donald C. Nanney** heads the environmental law practice of the Santa Monica, Calif., law firm of Gilchrist & Rutter, of which he is a partner. He is the author of numerous writings, including the book *Environmental Risks in Real Estate Transactions: A Practical Guide* (Second Edition), McGraw-Hill, Inc./Executive Enterprises, Inc., New York (1993).

Copyrighted material licensed by Randall Bell on April 26, 2021

regulators due to possible discovery of additional contamination or change in regulatory standards;

• The length of time the entire process is anticipated to take; and

• When all is said and done, how the market will price the environmental risk in light of the projected highest and best use of the property.

These factors may operate either as a discount to value or in mitigation, reducing or eliminating any discount or certain items of discount, as compared to value if "clean."

The last listed issue–how the market will price the environmental risk–may be the most difficult to quantify. The adjustment to value for environmental risk depends upon the specific circumstances of a property, making comparable properties difficult to identify and then to adjust valuation for differences. It also depends upon the availability of alternative properties. On the one hand, where there are many alternative properties, environmental risk may render a property unmarketable. On the other hand, in land constrained areas the environmental risk may be viewed as a relatively nominal necessary evil given limited alternatives.

Similarly, in good economic times when the real estate market is hot, buyers may be more willing to assume environmental risk with lesser adjustment to value. Where multiple buyers are competing for a property, the seller might not have to give any discount at all or relatively little. In bad economic times when the real estate market is depressed–a so-called buyer's market–deep discounts may have to be given by a seller anxious to sell in order to induce a buyer to deal with these issues.

We have been in somewhat anomalous times of late when the U.S. economy has been in the doldrums but the real estate market generally remains strong, perhaps in part because real estate is a key alternative for investors fleeing the stock market due to recent scandals. That may change as the stock market stabilizes and investor confidence is restored, resulting in the wide return of investment money to the stock market. Thus, general market conditions and economic trends may have an indirect but real impact on the available pool of interested buyers and investment money, negotiation and allocation of environmental risk and property valuation.

These valuation issues may be readily addressed if the type and degree of contamination is relatively benign, such as localized hydrocarbon soil contamina-

tion from a leaking underground storage tank, and the anticipated highest and best use is industrial or commercial in nature. On the other hand, the valuation issues involved in widespread soil and groundwater contamination of varying types (particularly heavy metals) from multiple point sources could be quite complex–and even moreso if the highest and best use for redevelopment is unrestricted residential. In this latter case, the most appropriate approach may be to establish a range of values depending upon a range of projected environmental outcomes.

The type of buyer anticipated to acquire a property may further complicate the highest and best use issue. If the ultimate buyer is anticipated to be a mom-and-pop industrial owner/user, the market may be relatively indifferent or insensitive to esoteric long-term environmental risk associated with owning or operating a properly remediated property with appropriate regulatory closure. However, if the ultimate highest and best buyer is an institutional entity (such as a pension fund), then the prospective long-term potential risk of environmental liability may be a significant issue, and have direct impact on pricing. In some cases, it may entirely eliminate institutional investors as a class of prospective buyers, with a direct and significant impact on value. This consideration would be most relevant to very large and costly projects where the pool of qualified buyers including institutional investment funds is limited. Such investors may be risk averse due to fiduciary standards governing permissible investments and might not be in a position to assume any significant environmental risk or may require iron-clad protections.

As a result of all of these factors, an intelligent and useful brownfield valuation may require support from a number of professionals in addition to an appraiser, who might not be in a position alone to assess these issues. Appraisers are generally qualified only to assume that a property is "clean," which remains a useful benchmark but is incomplete for purposes of determining the actual value of an environmentally impacted property. Input may be needed from an experienced environmental consultant, remediation contractor, environmental insurance broker, real estate advisor or broker and a lawyer with substantial experience with brownfields and environmental liability issues. The valuation process may ultimately draw more upon the subjective experience of these professionals than the quantitative analysis of comparable statistics–giving continued meaning to the art of the deal.

## 3.9 Advance Due–Diligence Activities Benefit Contaminated Real Estate Transactions

*By Howard G. Olson, PhD, and Tom Bergamini, PG*

This article originally appeared in the Winter 2003-2004 issue of *Real Estate Issues*.

Brownfields have been defined by the Environmental Protection Agency as: abandoned, idled or underused industrial and commercial facilities where expansion or redevelopment is complicated by real or perceived environmental contamination.[1] The number of brownfields in the United States has been estimated to be between 400,000 and 600,000 sites.[2]

Investing in, owning, developing, or making a loan on contaminated real estate entails risks which can be difficult to quantify and evaluate. Much of the excess risk facing brownfield investors and lenders stems from federal and state statutes and rules. Federal legislation passed in 1980 known as the Comprehensive Environmental Compensation and Liability Act (CERCLA), also called the "superfund" law, cast a broad net which covered many potentially "responsible parties" for brownfields related liability.[3]

The CERCLA legislation has had some unfortunate and unintended consequences. Fear of becoming a "responsible party", under CERCLA, has caused investors and developers to ignore brownfield sites and build in outlying "greenfield" locations causing sprawl, decentralization of employment and reduction of property tax base. Some owners of contaminated property tried to avoid the "strict liability" doctrine of CERCLA by hiding information and not publicly reporting environmental financial exposures in their financial statements.[4] Lenders have resisted financing brownfield projects fearing that they may eventually become owners through foreclosure. In addition, some municipalities have refused to take possession of tax delinquent contaminated properties because of the potential environmental liabilities. The fear of becoming a potentially "responsible party" under CERCLA has precluded many attempts to remediate, redevelop, or to sell brownfield sites.

The many uncertainties involved in selling contaminated real estate often make the transactions expensive, lengthy, and at high risk of not being completed. Uncertainties such as: the cost of environmental due-diligence, the cost of cleanup, the likelihood of obtaining approvals of closure from regulatory agencies, and the risk of acquiring or retaining the environmental legal liability often make selling a brownfield site a low percentage real estate transaction. Sellers of contaminated real estate often become discouraged as buyers are reluctant to make offers to purchase due to the potentially high cost of environmental investigation, cleanup, and other risks. In addition, lengthy time delays resulting from false starts and a series of failed transactions add to the frustration and cost of selling contaminated real estate.

Beginning in the 1990s, a new focus on combating urban sprawl and a backlash against perceived unrealistic cleanup standards encouraged federal and state regulators to remove some of the impediments to brownfield redevelopment. The effort included: lender and buyer liability reform, widespread adoption of "risk-based" cleanup standards, and new approaches to site closure. At the same time, technical advances in site investigation and remediation technology, and the maturation of the environmental engineering market, have helped reduce or moderate the costs of environmental due-diligence and cleanup. Environmental insurance companies responded to regulatory reform and moderating remediation costs by creating several new insurance products to manage and transfer environmental risks.

The recent changes in brownfield regulation, technology, and environmental liability insurance have ameliorated risk and uncertainty and created new opportunities to sell properties that would have been unsalable in the past. However, access to these brownfield tools, whether regulatory, technical, or financial, requires an understanding of site conditions that few sellers obtain prior to their entry into the marketplace. As a result, sellers experience a greater risk of offers failing to close and of higher transaction costs.

### Purpose

This article illustrates the benefits, from the seller's perspective, of performing some of the critical due

---

1.    Alker, Sandra, "The Definition of Brownfield," *Journal of Environmental Planning and Management*, January, 2000.

2.    Meyer, Peter B., "Lessons from Private Sector Brownfield Redevelopers," *Journal of American Planning Association*, Winter, 2000.

3.    Foley and Lardwer, Brownfields working group, "We've Entered an Era of Common Sense," October, 1997.

4.    Journal of Accountancy, "Official Releases," March, 1997.

**Howard G. Olson, PhD,** graduated with BBA, MBA, and PhD degrees from the University of Wisconsin-Madison. He teaches Real Estate at the University of Wisconsin-Whitewater and has been in the commercial real estate business for 21 years.

**Tom Bergamini, PG,** graduated with a BS in Natural Resources and an MS in Water Resources Management from the University of Wisconsin-Madison. He is the President of BT2, inc., an environmental engineering and consulting firm in Madison, Wisconsin. Mr. Bergamini has 20 years of professional experience as a hydrogeologist and environmental consultant, and is a registered Professional Geologist.

Copyrighted material licensed by Randall Bell on April 26, 2021

diligence activities prior to, and in preparation for, marketing real estate. The sellers advance due-diligence will be shown to be a prudent and reasonable method of overcoming buyers reluctance to submit offers to purchase as well as providing the seller with a more solid basis upon which to value the property, quantify the environmental risk and evaluate the offers which are made. Through the use of advance due-diligence, it will be argued and illustrated that sellers may be better able to evaluate and select the "best" offer and reduce time delays and transactional costs.

## Methodology

A transactional review will be made of a recent sale of a manufacturing Brownfield site located in a medium-sized midwestern city. The seller was a company involved in federal bankruptcy proceedings and was highly motivated to make a timely sale at a price and terms that were acceptable to the creditors committee. Since time was of the essence, and local investors were aware of perceived environmental problems at the site, the seller decided to perform many of the due-diligence activities in advance of soliciting offers to purchase.

The effect of performing sellers advance due-diligence will be evaluated and reviewed within the context of the eight offers to purchase which were received on the property. All of the eight offers were drafted by attorneys skilled in real estate environmental law and were received during the submittal periods established by the bankruptcy court. By tabulating the important issues of the offers to purchase, it will be possible to see how, from the seller's perspective, the advance due-diligence expedited the evaluation and negotiation of the offers, and ultimately the closing of the transaction.

## The Brownfield Property

The subject property is located close to the downtown business district in a rapidly growing Midwestern city. The site borders an area of light manufacturing, utility, and industrial service businesses and is surrounded by a transitional residential neighborhood.

To prepare the property for sale, the owners commissioned Phase 1, Phase 2, and Supplemental Phase 2 environmental site assessments (ESAs). Phase 1 ESAs are generally the starting point in the environmental due-diligence process. A principal goal of a Phase 1 report is to identify if past environmental management practices have created the presence of Recognized Environmental Conditions (RECs). RECs refer to the presence or likely presence of hazardous substances or petroleum under conditions that might indicate a release into the ground, groundwater or surface water.[5] For many sites with long histories of commercial or industrial use, RECs are commonly identified, and followup investigation is needed to determine if the potential releases have actually occurred. At the subject property, RECs were found. They included: potential soil and groundwater contamination from underground petroleum storage tanks, historical use of solvents, and releases at nearby properties.

Based on the phase 1 results, the seller elected to perform a Phase 2 investigation to assess concerns identified by the Phase 1 report. The Phase 2 investigation included more detailed reviews of environmental files for several off-site releases on neighboring properties to learn if they might be contaminating the seller's property. Several RECs on the subject property were also investigated. In particular, a magnetometer survey was performed on areas where underground storage tanks were suspected and 10 borings were made to collect soil and groundwater samples near the current and suspected historic underground tanks and a bordering rail corridor.

To prepare the property for sale and remove as much uncertainty as possible, three underground tanks were removed and some contaminated soil from each tank basin was excavated. The Phase 2 report concluded that limited soil contamination remained at one former tank location, and that shallow groundwater was contaminated in excess of state standards at two former tank locations. The groundwater impacts were thought not to have migrated off the property. In addition, an area with solvent contamination was identified, but the source was thought to be coming from off-site.

The Phase 2 report concluded that two areas could be submitted to state regulatory authorities for closure, and one area was likely eligible for reimbursement under a state fund that pays for cleanup of releases from petroleum tanks. However, additional borings and four groundwater monitoring wells were recommended to identify the extent of soil and groundwater contamination. Without the additional data, it would be difficult to present closure requests to regulators or remediation cost estimates to potential buyers and environmental liability insurance underwriters.

The seller agreed with the consultant's recommendations for additional site investigation to remove or reduce uncertainty regarding remediation costs and to get regulatory approval to close as many areas on the site as possible. In addition, the consultant was asked to perform supplementary historical research to identify the possible location of two fuel oil tanks identified in an older report and potentially still present on the site.

During Supplemental Phase 2 work, four groundwater wells were installed and six borings were done. The sampling results showed that the previously identified groundwater solvent contamination was coming from off-site. With this information, the property owner applied to regulators for an exemption to liability for that issue. Regulators also closed two tank areas, under the condition that residual soil impacts not fully removed be identified on the property deed. Another historic tank area, which was installed under a thick concrete floor in an interior space, was shown by borings to have contaminated soil and groundwater that exceeded standards. Because of its location, a decision was made not to attempt remediation, and a request for closure was submitted with the understanding that

---

5.    E1527-00 Standard Practice for Environmental Site Assessments: Phase 1 Environmental Site Assessment Process.

**Table 1**  Summary of Price and Terms of Offers to Purchase Made on Subject Property

| Price | Pays for Future Testing Prior to Close | Pays for Remediation Costs | Responsible for Obtaining Case Closure | Environmental Liability After Closing | Seller Escrow for Remediation Costs | Action Taken |
|---|---|---|---|---|---|---|
| Offer 1: $6.0 million | Seller | Seller | Seller | Seller-capped | 150% of estimated costs | Rejected |
| Offer 2: $4.25 million | If required, seller pays | Seller | Buyer | Seller | 150% of estimated costs | Accepted; Closed |
| Offer 3: $4.0 million | Seller | Buyer | Buyer | Buyer | 150% of estimated costs | Accepted; Failed on Zoning Variance |
| Offer 4: $2.61 million | Buyer | Seller | Seller | Buyer | 150% of estimated costs | Rejected |
| Offer 5: $2.16 million | Seller | Buyer | Seller | Seller | No | Rejected |
| Offer 6: $2.0 million | Buyer | Seller | Seller | Buyer | No | Rejected |
| Offer 7: $1.9 million | Buyer | Buyer | Seller | Buyer | No | Rejected |
| Offer 8: $1.0 million | Buyer | Buyer | Buyer | Buyer | No | Rejected |

a notice of the contamination might have to be placed on the property deed. Finally, lead was detected in soil, which was under industrial standards but over residential standards, and some low levels of volatile organic compounds (VOCs) in groundwater were attributed to nearby abandoned tanks.

In summary, the seller undertook Phase 1 and Phase 2 due-diligence to remove as much uncertainty as possible prior to the sale. Actual remediation was limited to tank removals, some minor excavation, and monitoring to demonstrate that residual contamination had not spread off-site. The seller took advantage of "flexible closure" options by leaving low concentrations of contaminated soil and groundwater in place at the "cost" of several deed restrictions which future buyers were certain to discover in their search of title. To further reduce uncertainty, the seller undertook additional historical reviews of two unconfirmed underground tanks.

## Marketing and Sellers Due-Diligence

When a seller markets contaminated real estate without first completing environmental due-diligence, a common sequence of events is: seller negotiates listing contract with broker, broker markets property, buyer writes offer to purchase with contingencies and due-diligence conditions so that relevant information about the property and the contamination can be gathered and evaluated by the buyer, offer(s) to purchase is negotiated to an accepted offer, buyer performs and pays for environmental due-diligence reports (i.e. Phase 1 and if necessary Phase 2 environmental studies). The potential outcomes of the transaction are:

a) Buyer removes contingencies and due-diligence conditions and transaction closes

b) Buyer and seller re-negotiate contract terms and price based on due-diligence results

c) Buyer requests additional time for further testing or evaluation or to obtain approvals or closure from regulatory agencies

d) Buyer fails to remove contingencies and due-diligence conditions and contract fails

From the seller's perspective, this process contains four inherent flaws. First, the prospective purchasers are reluctant to write offers since they have little or no information about the type or extent of the contamination on the site. The buyers may waste time and expend large sums of money investigating the environmental aspects of a property in a transaction which ultimately does not close.

Experienced buyers recognize this threat and typically reduce offer prices to reflect potentially excessive due-diligence costs, or attempt to share or transfer costs to sellers. Second, the seller lacks important information necessary to quantify the cost of remediating the contamination or the diminished value of the property as a result of the existence of contamination. Without this critical information, it is difficult or impossible for sellers to negotiate from an informed position, or to select the most appropriate offer. Third, costly time delays and re-opening of contract price negotiations are built into a system which has a buyer pricing a property and entering into future expensive due-diligence with very little information available at the time of writing the offer. Finally, under flexible and risk based closure regulations, some site uses, for example residential housing, may be prohibited or conditionally limited if residual contamination exceeds threshold limits. Without adequate information, sellers can waste time and money negotiating with buyers whose proposed use is incompatible with environmental conditions existing at the site.

## Evaluating Offers to Purchase on the Subject Property

During the submittal period, the marketing efforts of the seller's real estate broker produced eight offers to purchase which ranged from a low of $1 million to a high of $6 million with the mean offer being $3.1 million. (See Table 1.) The Brownfield transaction reviewed in this article was characterized by high offer to purchase variability, partly because of differences in buyer's use values and risk tolerances, but primarily because appraisals done for the buyers produced highly inconsistent estimates of market values.

The appraisal done for the seller included a review of the phase 1 and phase 2 studies, and the seller's appraiser consulted with the environmental engineers who performed the studies and understood the nature of the contamination present. The seller's environmental engi-

Copyrighted material licensed by Randall Bell on April 26, 2021

neers had estimated the costs to remediate the contamination, and the seller's appraisal was for $4.1 million.

Table 1 displays the key elements of each of the eight offers to purchase. The highest offer to purchase of $6 million was based on an MAI appraisal, which did not review or take into consideration the Phase 1 or Phase 2 environmental audits. The offer was rejected since it was contingent on obtaining federal and state grants within eighteen months of the acceptance of offer. The take as is, no contingency, no due-diligence offer of $1 million was rejected for being too low, as were the $1.9, $2.0, $2.16, and $2.61 million dollar offers.

Most of the lower offers provided that the buyer would:

1) Pay for additional testing
2) Pay remediation costs to obtain case closure
3) Assume all environmental liability
4) Not require any seller escrows

By having the advance due-diligence information, the seller was able to objectively diminish the value of these perceived benefits and reject the offers. Without the information, the seller would not have had a solid basis for quantifying or estimating the value of the above variables.

After reviewing the environmental studies, the seller felt that having the buyer pay for remediation costs and be responsible for closure was worth the $250,000 differential between the $4.0 million offer and the $4.25 million offer. Since the seller was in bankruptcy, the liability after closing became a moot issue. Although offer number three (of $4.0 million) was accepted, the buyer was unable to obtain necessary zoning changes, and the offer died for failure to remove the zoning contingency.

Offer number two, which had been accepted in a secondary position, became primary and all contingencies were removed. The sellers advance due-diligence documents, which were reviewed by the purchaser of offer number two prior to writing the offer to purchase, were turned over to the buyer's environmental engineer for final review. No further environmental due-diligence beyond what the seller had performed was necessary. The transaction closed 3 months after the offer to purchase was made.

## Conclusion

The conveyance of contaminated real estate is an extremely difficult and complicated transaction. The common approach of putting a property on the market for sale and waiting for offers to purchase, which typically contain lengthy due-diligence provisions, increases the risk that the transaction will ultimately fail. Buyers need quality information about the nature and extent of the contamination in order to be able to make informed offers. Sellers, buyers, and appraisers require a solid base of environmental information to be able to objectively quantify the diminished value of the property that results from the existence of real or perceived environmental problems.

From the seller's perspective, having the important environmental information in advance of marketing the property will assist in the evaluation process as the appraiser and/or broker can be counseled by the seller's environmental engineers. By going into the transactions with a solid basis from which to make decisions, there is less opportunity for costly time delays, reopening contract negotiations, and unnecessary or redundant environmental investigations.

By working together prior to marketing a brown-field property, the appraiser, the environmental engineer, the broker and the seller can create a solid foundation for both the valuation of the property and the subsequent negotiation of the offers to purchase. In the transaction reviewed in this article, the seller's advance-of-sale appraised value of $4.1 million was very close to the two offers that were accepted ($4.0 million and $4.25 million).

Brownfield transactions require advance cooperation and coordination of all of the professionals hired by the seller and involved in advanced due-diligence activities. The result will be a transaction that has a higher probability of reaching the closing table, in a shorter period of time, with lower environmentally related transactional costs.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 4

# Case Study Analysis

## Introduction

The article "Advance Due-Diligence Activities Benefit Contaminated Real Estate Transactions" by Howard G. Olson and Tom Bergamini in Chapter 3 provided a case study demonstrating how the due diligence process imposed by state or federal environmental regulations can affect the marketing and sale price of a brownfield property. As the articles included in Chapter 2 made clear, case study analysis is one of the generally accepted appraisal methods used to determine the effect of contamination and environmental risk on real estate prices and values. Case study analysis is especially applicable when there are no actual sale prices that can be analyzed in the neighborhood or market area that are directly affected by the contamination situation being studied. In such a scenario, prices paid in other neighborhoods where similar contamination situations have occurred can be used as part of the case study analysis.

Chapter 4 opens with Thomas O. Jackson's April 2001 *Appraisal Journal* article, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices." This article provides a good example of case study analysis involving source sites and discusses the use of both paired sales analysis and statistical analysis "to evaluate the impacts due to contamination on industrial properties that have been remediated." (page 118) Jackson collected information on 14 sales transactions involving remediated industrial property in Southern California. After six of the transactions were eliminated for various reasons, Jackson gathered detailed information related to the types and sources of the contamination, the remediation status of each, and any indemnifications provided by the sellers.

In the paired sales analysis–another generally accepted method discussed in Chapter 2–the price paid for each of the eight remediated properties was then compared to prices for a set of three to four uncontaminated industrial properties. Adjustments were made to some of the uncontaminated sales as necessary "for such items as excess land, extraordinary tenant improvement costs, and demolition costs (for a land only sale)." (page 119) The range in adjusted uncontaminat-

ed prices was then compared to the price paid for each of the contaminated properties, and the average price paid for each group of three or four uncontaminated industrial properties was compared to the remediated property with which each group was matched. As Jackson carefully notes, the purpose was not to arrive at an indication of an appropriate value per square foot but rather to arrive at "one further quantitative indicator of potential impacts due to the environmental condition of the subject properties." (page 120)

Jackson also attempted multiple regression analysis to determine the effect of existing or previous contamination on prices. He carefully noted the difficulties associated with statistical analysis of industrial properties as compared to residential properties. According to Jackson, "multiple regression analysis . . . has been applied less often to industrial properties (than to residential properties) due to the relative infrequency of sales of contaminated industrial properties, as well as the generally lower number of uncontaminated commercial property sales relative to residential property sales." (page 118) He also notes that regression modeling is less reliable "for properties with many differing characteristics" such as industrial properties, which are typically "less homogeneous than residential properties such as single-family houses." (page 118)

To allow the regression model to be reliable, Jackson had to expand the database used in his paired sales analysis. He included 13 previously contaminated sales in the database and 109 "comparable uncontaminated properties" from the Southern California market. (page 122) Two models were specified, one with five non-environmental independent variables and the second with an additional independent variable, which was the amount of office square footage in the industrial building. The effect of past remediation on the sale property was "tested through a categorical, or dummy, variable with a value of 1 corresponding to the 13 previously contaminated properties in the data." (page 122)

Both the paired sales analysis and multiple regression analysis "indicated that the previously contaminated properties did not sell at prices that differed from

their uncontaminated comparables." (page 123) Note also that Jackson tested the "null hypothesis," the possibility that the contamination had no effect on prices. The importance of testing the null hypothesis as part of the consideration of regression modeling will be discussed further in Chapter 5.

Jackson wrote his 2001 article as the regular environmental columnist for *The Appraisal Journal.* Jackson's January 2002 installment of that column, "The Analysis of Environmental Case Studies," which was co-authored by Randall Bell, is perhaps the most important piece of appraisal literature on the subject of environmental case study analysis. That article sets out the recognized and generally accepted framework of the appraisal profession for researching, developing, and analyzing an environmental case study."[1] Appraisers should take note of the critical elements of that recognized method as summarized in the article.

First, Jackson and Bell emphasize that case studies are appropriate "when there is a lack of direct market data or where analyses of direct market data need additional support." (page 124) That does not mean that case studies are irrelevant when there are prices in the competitive marketplace for similar contaminated or remediated properties that can be investigated and used as direct comparables. As the authors note, environmental case studies can still be useful in such situations because "they have a secondary role if there is direct market data available at the subject site." (page 124)

Second, case study analysis is an extension of the sales comparison approach. The framework used by Jackson and Bell in their article is similar to the style of an adjustment grid typically used in the sales comparison approach. Note that the sales data used by the authors has been found, researched, and confirmed by them. The authors do not use case studies published in the literature, nor do they simply rely on data or conclusions reached by other analysts or appraisers, as this would be inappropriate under USPAP, unless–as will be explained later–such data is independently verified and analyzed. The authors do their own independent research, although the data they use could have been developed, researched, and confirmed by them in the course of their own prior assignments. The Case Study Comparison Chart in Table 1 of the Jackson and Bell article looks a lot like a sales adjustment grid. A careful review, however, indicates that the authors have not used the chart to "adjust" the seven case studies analyzed but simply to set up a series of comparisons between the seven case studies and the environmental situation that is the subject of their assignment. The categories of comparison relate to the various characteristics and factors listed in Advisory Opinion 9 (AO-9), the detrimental conditions matrix, and other key facts such as the type of contaminant involved.

Depending upon the circumstances of the contamination situation being investigated by the appraiser, there may be other categories of comparisons that may be helpful. Some of the case studies may not match up perfectly with the scenario involved in the subject situation. For example, groundwater contamination situations may involve properties serviced by either central water or private on-site wells. If some of the case studies involved areas with central water and other areas with wells, that would be another important point of comparison to be included in a case study chart. In cases when central water was extended or individual well filtration systems were installed at some point in the past, it might be helpful to include the dates of such events (or other events such as publication of an approved remediation plan) in the case study comparison chart. More detailed charts are especially helpful in situations in which one purpose of the assignment is to determine if a contamination situation or event is likely to have only a temporary impact on prices and values.

Third, "case studies must follow the simple 'apples to apples' analogy," according to the Jackson and Bell article. (page 124) Here, the authors mean that comparable sales that share the characteristics of the subject property or properties should be selected. Jackson and Bell outline the following three broad categories of characteristics that define appropriate sales to use in case study analysis:

- Property characteristics
- Contamination/discharge characteristics
- Other characteristics

For example, if the subject property is a residential apartment building located above a contaminated groundwater plume contaminated by methyl tertiary butyl ether (MTBE) from a leaking underground storage tank at a nearby gas station, it would be improper to use sales of retail strip centers constructed on top of contained lead-contaminated soils.

Consideration of whether the subject property is a source, non-source, adjacent, or proximate site (the so-called "SNAP" classification), and the subject's stage in the remediation life cycle are two of the most important "apples to apples" selection criteria for environmental case studies. Those aspects of the generally accepted framework for addressing contamination issues in the appraisal process have been discussed previously in this anthology. According to the Jackson and Bell article, selecting case studies that match the classification of the subject property as a source, non-source, adjacent, or proximate site is "critical in evaluating contaminated properties because the risks vary considerably between the categories." (page 127) Even more important is matching the subject property with case studies involving properties in a similar stage in the remediation life cycle:

> Research has shown that the risks perceived by the market change dramatically as a property moves through the remediation cycle. Before cleanup, risks and property value diminution attributable to environmental condition are greatest. These decline

---

1. That topic is also covered in the 2010 Appraisal Institute seminar, *Analyzing the Effects of Environmental Contamination on Real Property*.

Copyrighted material licensed by Randall Bell on April 26, 2021

as remediation is underway pursuant to an approved cleanup plan. After cleanup and regulatory closure, property value impacts are minimal and, in most cases, disappear. (page 128)

Note that the contaminants in the case studies selected do not have to be exactly the same as those affecting the subject property. As Jackson and Bell emphasize, there are broad categories of contaminants that can have similar remediation solutions, and "there are situations where a study is comparable, even though the contaminants differ slightly." (page 128) The authors note, however, that careful analysis is required when choosing case studies involving slightly different contaminants.

The fourth important element of the recognized environmental case study method as set out in the Jackson and Bell article is that more than one comparison is necessary for a reliable analysis. The Case Study Comparison Chart in Table 1 of the article compares the subject property, an industrial property that is the source site for an accidental discharge of chlorinated solvents, to seven other industrial or commercial properties. Note that the actual prices paid for the case study sales are not indicated on the chart. Instead, the purpose of the investigation of each of the seven case studies is to determine an "impact on value" rather than a price paid. The impacts from the case studies investigated and included in the chart ranged from none to 15%. That illustrates the central differentiating feature between case study analysis and a traditional sales adjustment grid using comparables. When analyzing comparables, an appraiser is adjusting and comparing actual prices paid per square foot or per property in order to arrive at an opinion of the appropriate value for the subject property. In environmental case study analysis, the goal is to determine what happened to another property or group of properties in a similar environmental situation.[2] Was there an effect on the price paid? If so, what was the percentage impact on the price as measured by a comparison with an uncontaminated property or group of properties? If one or a small group of properties make up the case study, is it possible to understand how the parties to the transactions either arrived at the discount or, if there was no discount, what factors accounted for that decision? How do the circumstances of those other contamination situations compare to the subject situation? Which of the case studies in the comparison should be given more weight, and why?

The fifth critical element of an acceptable environmental case study is that the case study data must be gathered and analyzed by the appraiser. While the starting point might be a comparable case study sales analysis such as information and commentary about a remediated industrial property provided by a broker, another appraiser, or a sales service such as CoStar, the appraiser has an obligation under USPAP to confirm or verify the accuracy of the sales information and analysis conducted by the person or source.

That means, for example, that simply relying on a published article as a "case study" is inappropriate without some attempt to verify and confirm the accuracy of the data and analysis in the published article. For example, an appraiser analyzing the impact of groundwater contamination on the value of an industrial property in Southern California could not simply adopt or reference as a case study the analysis and conclusions in the 2001 Jackson article summarizing the paired sales and statistical analysis of industrial property sales in Southern California. Although Jackson concluded that both the paired sales analysis and multiple regression analysis "indicated that the previously contaminated properties did not sell at prices that differed from their uncontaminated comparables," it would be inappropriate for another appraiser to simply rely on that published article for a conclusion that another remediated Southern California industrial property was also not impacted. (page 123) It would be equally inappropriate to rely on the Robert A. Simons, Kimberly Winson-Geideman, and Brian A. Mikelbank article, "The Effects of on an Oil Pipeline Rupture on Single-Family House Prices" (included in Chapter 7), when analyzing the effect of a pipeline rupture for a conclusion that another pipeline leak automatically has an adverse effect on prices of surrounding or nearby properties.

While a review of the published literature on the impacts of contamination, environmental risks, and other detrimental conditions on property prices and markets can be an important starting point in understanding how others have analyzed contamination and what they have found, it is not an appraisal method in and of itself or even a proper application of case study analysis.[3] It is not a substitute for the collection and analysis of actual sale prices in the market in which the appraiser is working or in suitable case study markets to determine impaired values or price impacts. Nor can a case study prepared by another appraiser simply be

---

2. While the Jackson and Bell article deals with single property case studies, this technique is also appropriate to apply to entire markets or submarkets. For example, consider a neighborhood affected by groundwater contamination. When the contamination is first discovered, there may be considerable concern among residents and the general marketplace. Case study analysis of what happened in other neighborhoods that have gone through the entire cycle of discovery, investigation, remediation, and ongoing monitoring can be very helpful in such situations. Prices paid in the other neighborhoods over a period of years can be studied to determine the initial impact on the market and whether prices eventually recovered. The duration of any temporary impact and the key events that had to occur before the market started to recover or completed its recovery can be documented from the case studies. An opinion about the length of time that prices in the subject neighborhood are likely to be impacted could be derived from such a case study analysis. Such case studies could also be helpful in determining whether the impact of the groundwater contamination situation is likely to affect prices in the entire subject neighborhood or only portions of it.

3. Using the opinions of others as a "valuation method" is not mentioned in USPAP, the 13th or 14th editions of *The Appraisal of Real Estate*, the fourth or fifth editions of *The Dictionary of Real Estate Appraisal*, or any Appraisal Institute course or seminar setting out appropriate valuation techniques that I have ever seen or reviewed.

accepted and adopted without checking its accuracy and comparing it to the factual situation at hand.[4]

Finally, the Jackson and Bell article references a number of other related issues that are important in environmental case study analysis. The authors state that "valid case studies should be generally similar to the subject property in terms of scale of the project." (page 130) As an example, the authors mention the Chernobyl nuclear reactor meltdown and its resulting contamination situation as being on a different scale than naturally occurring radon radiation affecting an individual single-family home.

The letter to the editor by Rudy R. Robinson and Wayne Hunsperger from the July 2002 issue of *The Appraisal Journal* that comments on the Jackson and Bell article appears next in this chapter. This letter raises some additional important points about case study analysis. Perhaps the most important point here is the authors' statement that some contamination situations are so unusual that "direct comparable case studies may not exist." (page 132) As a result, "greater discretion" in the selection of case studies than Jackson and Bell allow is sometimes necessary. Robinson and Hunsperger emphasize that this might especially be true when it comes to the type of contamination involved as well as "the legal and regulatory issues affecting the contaminated property." The authors also mention, and rightfully so, that the AO-9 distinction between "proximate" and "adjacent" properties as it relates to the effects of contamination is not always clearly presented, such as in the case of a groundwater contamination situation in which the precise boundaries of a contaminated plume may not be accurately pinpointed or may change over time due to hydraulic characteristics or other factors. Finally, Robinson and Hunsperger raise the importance of developing case studies that follow the effects of investigation, remediation, and post-remediation monitoring over a long period of time. As the authors note, "A range of remediation stages is useful in developing the high and low end of the range of damages, and could also be used to estimate the rate at which diminution might decrease over time." (page 132) This may be especially important in appraisal situations involving a date of value during the investigation stage rather than the post-remediation stage of the contamination life cycle.

Jackson returns to a discussion of environmental case studies in the Spring 2004 issue of *The Appraisal Journal* with his article "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation." This article walks the reader through the same methods discussed in the Jackson and Bell piece. The property being analyzed is a single-story, light industrial building in the Dallas-Fort Worth metropolitan area. Four case studies are analyzed; three involve industrial buildings in other Dallas-Fort Worth submarkets, and one

involves a retail property. Each of the case study properties was "paired with three to four otherwise similar but uncontaminated properties that had sold around the same date and in the same local market area as the case study property." (page 137) A chart comparing the four case studies uses the same set of characteristics used in the earlier 2002 Jackson and Bell article. All four case studies showed no effect on price in a situation in which the remediation program involved "monitored natural attenuation" of groundwater contamination involving volatile organic compounds (VOCs).

Jackson's Spring 2009 *Appraisal Journal* article, "When Good Things Happen to Bad Properties," reiterates one of the points made by Robinson and Hunsperger in their July 2002 letter: Sometimes it is important to study what happens to properties over a period of time to understand how prices and values rebound as a site works its way through the stages of the investigation, remediation, and post-remediation monitoring life cycle. Jackson first discusses a number of published studies documenting those changing and increasing prices and values, and then provides detailed information concerning a case study of a contaminated 144-acre industrial site in Charleston, South Carolina. Jackson describes the entire Superfund investigation and remediation process for this site, which occurred between 1997 and 2006. He then analyzes two sales transactions involving the site–one that occurred in 2005 before the remediation was completed, and the other in 2007. Jackson makes adjustments to each of the transaction prices "to account for nonenvironmental differences in the size and condition of the property at the time of the transactions as well as the general appreciation in the industrial property market" in Charleston. (page 143) His analysis found that the "net effect" of the remediation efforts and improvement in the property's environmental condition increased the value of the property by 23.3% during the two years between 2005 and 2007. He concludes that his findings in this case study support the "empirical evidence" presented in many other studies over the years that environmental stigma "may be considered a temporary rather than permanent effect," since there is a "consistent pattern of a rebound in prices of previously impacted residential, commercial and industrial properties following the remediation and cleanup of the contamination source." (page 144)

Given the change in value over time as the property proceeded through the remediation lifecycle, Jackson's Spring 2009 article clearly shows the importance of linking an appraisal opinion to a specific valuation date. An appraiser asked to value the property in February of 2005 while remediation was underway but not completed would have had an entirely different appraisal problem than the appraiser asked to value the remediated property after its 2007 resale.

---

4.    The standards of professional appraisal practice, however, prescribe clear procedures for relying on the reports or opinions of others. These are contained in Guide Note 4 to the *Standards of Professional Appraisal Practice of the Appraisal Institute* entitled "Reliance on Reports Prepared by Others." Guide Note 4 sets out a clear series of steps that an appraiser must follow before relying on the opinion of another appraiser. This includes the requirement to verify the conclusions in the relied-upon report: "The scope of review or verification required depends on…the relevance of the information to the opinions and judgments rendered." The Guide Note also includes the following warning: "An appraiser who accepts the projections or assumptions of others without some assurance of the accuracy or reasonableness of the calculations or information provided may violate the aforementioned Standards Rules."

Copyrighted material licensed by Randall Bell on April 26, 2021

## 4.1 The Effect of Previous Environmental Contamination on Industrial Real Estate Prices

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the April 2001 issue of *The Appraisal Journal*.

### Abstract

This paper presents an empirical study of the effect of previous contamination on the price of industrial properties. Price effects are evaluated through two techniques. The first involves a direct comparison of previously contaminated property sales to a matched set of uncontaminated property sales. The second technique is a statistical analysis of the sales prices of industrial properties. Results from both analyses indicate that the prices of the previously contaminated properties are not adversely impacted by their environmental condition.

The central question addressed in this paper involves the effect of previous contamination on the price of industrial properties. Most empirical studies of the effects of contamination and other adverse environmental conditions have focused on single-family residential real estate. The limited empirical research on industrial property impacts appearing in *The Appraisal Journal* has not directly addressed the question of post-remediation impacts on property values due to previous contamination of the properties. Although Jackson,[1] Chalmers and Jackson,[2] and others have asserted that subsequent to remediation property value diminution decreases, this question has largely been addressed on a case-by-case basis. The lack of more systematic research on this issue may be due to the infrequency of transactions involving contaminated or previously contaminated properties. In addition, industrial properties are more difficult to analyze due to their relative heterogeneity in comparison to single-family houses.

Nevertheless, the question of whether or not contamination continues to affect the value and price of these properties after remediation is important for appraisers, for those involved in contaminated property transactions, and for courts that consider damages (usually estimated by appraisers) due to contamination. For appraisers, the valuation of contaminated and previously contaminated properties would have a different focus, depending on the date of value, if adverse impacts

due to contamination dissipated subsequent to remediation. Many investors in contaminated properties and the environmental investment consortia that have emerged in recent years are essentially basing much of their investment strategy on the rebound in price and value subsequent to cleanup.[3] This rebound provides the incentive and required rate of return for these investors.

And, lastly, courts, in numerous cases involving the allegations of property value damages due to contamination, are faced with reviewing evidence on the impact of contamination at various time points of relevance for the property, such as the date of a foregone sale or the trial date. Some courts are beginning to view property value diminution due to contamination as a temporary condition, under the assumption that remediation will "cure" the diminution. Under this theory, compensation is based on the cost to cure (remediate) the property or the diminution in fair market value, but not both. Actually, property value diminution can be attributed to both direct costs to remediate a contaminated property as well as the additional risks perceived by the market with respect to the remediation and other issues associated with the contamination. The effect of these perceived risks has been referred to as stigma, but it would be more accurately characterized more simply as additional investment and lending risk due to the environmental condition of the property.

### Review of the Literature

There have been few empirical studies dealing directly with contaminated commercial and industrial properties. Most are "case studies" rather than the statistical price models that characterize most studies of the impacts of contamination and hazards on residential properties. Additionally, industrial properties are usually the source sites, and their value may be impacted by remediation costs, as well as the uncertainty and risk of investing and lending. The focus of the literature reviewed below is on these risk effects.

---

Excerpt from *Papers and Proceedings*, published by Valuation 2000 in July 2000.

1. T.O. Jackson, "Mortgage-Equity Analysis in Contaminated Property Valuation," *The Appraisal Journal* (January 1998): 46–55.

2. J.A. Chalmers and T.O. Jackson, "Risk Factors in the Appraisal of Contaminated Property," *The Appraisal Journal* (January 1996): 44–58.

3. T.O. Jackson, "Investing in Contaminated Real Estate," *Real Estate Review*, (26:5, 1997): 38–43; T.O. Jackson, M.E. Dobroski, and T.E. Phillips, "Analyzing Contaminated Real Estate in a Changing Market," *The Real Estate Finance Journal* (13:2, 1997): 67–72.

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

Page and Rabinowitz use a case study approach to evaluate the impacts of groundwater contamination.[4] With six commercial and industrial cases from Pennsylvania, California, and Wisconsin and seven residential cases from Wisconsin, the authors found none of the presumed adverse impacts on residential property values, while the commercial and industrial properties had significant impacts from the contamination. They speculate that this is due to the levels of due diligence exercised by participants in the two markets as well as the assumption of responsibility for remediation and other liabilities involved in commercial and industrial property transactions. Although based on a limited amount of data, these findings underscore the differences between these property types, and highlight the need for additional research on the impacts of contamination on commercial and industrial real estate.

In a further application of the case study approach, Patchin reports on eight commercial and industrial transactions, finding a range of property value impacts from 20.9% to 93.7%.[5] In addition, he notes that "properties that are in demand generally experience less stigma (reduction in value) than those with many substitutes." Patchin's main point, though, is that the increasing frequency of contaminated commercial and industrial properties transactions should allow for direct analysis of sales data, whereas in the past transactions were too infrequent for reliable analysis and conclusions. Thus, for these property types, Patchin finds reductions in value but also, and importantly, suggests that strong market conditions tend to mitigate the adverse effects of contamination.

The impacts of contamination on the transaction rates and financing of commercial properties have been studied by Simons and Sementelli, who compare commercial properties with leaking underground storage tanks (LUSTs) and properties with non-leaking tanks that have been registered with the State of Ohio (RUSTs) to other commercial properties (baseline).[6] Data on sales of these properties are from Cleveland during the 1989–1992 period. With respect to transaction rates, the results show that both LUST sites and RUST sites transact at significantly lower rates than the baseline commercial properties, with 10.4% of the baseline commercial properties selling during the period and transaction rates of 3.8% for LUST sites and 4.9% for RUST sites. With respect to mortgage financing, 32.6% of the baseline commercial properties that sold had mortgages, while 29.4% of the LUST property sales had mortgages and 9.3% of the RUST sales had mort-

gages. Thus, there was a significant difference between the baseline commercial property sales and the RUST sites, but there was not a significant difference between the contaminated LUST sales and the baseline sales in the frequency of mortgage financing. Other results show that the average loan-to-value ratios (LTVRs) for the non-tank baseline properties declined from 0.95 to 0.80 during the period, while the LTVR for the RUST sales averaged 0.51 and for the LUST sites averaged 0.84. Accordingly, the reported results show LUST sales with similar rates and levels of financing to other commercial properties.

Another perspective on the Cleveland leaking underground storage tank sites is provided by Sementelli and Simons, who analyzed a sample of 429 sites over a four-year period.[7] Among the findings of the study involved the effect of a "no further action" (NFA) letter from the State of Ohio. An NFA letter should signal the market that the site is remediated, and according to many of the previous studies this should reduce investment and lending risk and improve marketability. However, when transaction rates are analyzed, Sementelli and Simons observe that only 0.2% of the sites sold after receiving the NFA letters. This is much lower than the 10% transaction rate for non-tank commercial properties over the same period. Thus, it would seem that receiving an NFA letter from the State of Ohio increases risk and reduces marketability.

Simons, Bowen, and Sementelli provide yet another look at leaking underground storage tanks in Cleveland.[8] In this research, the effects of LUSTs on adjacent properties are examined. The authors state that their research on sales prices is complementary to direct surveys of market participants, noting that surveys can be more detailed and specific but are difficult to employ. The main hypothesis of the research, though, is that contamination from nearby properties reduces the value of adjacent residential and commercial properties. Residential properties near LUST sites are analyzed through a hedonic modeling process whereby the model sales price predictions, based on the sales of properties not near a LUST site, are compared to the sales prices of properties near a LUST site. The actual prices averaged 14.7% less than the predicted prices.

For commercial properties near LUST sites, three other approaches are used. In the first approach, the authors compared transaction rates of commercial properties near LUST sites with other commercial properties. They found that the properties adjacent to the LUST sites transacted at a rate of 2.7% per year

4.   G.W. Page and H. Rabinowitz, "Groundwater Contamination: Its Effects on Property Values and Cities," *Journal of the American Planning Association* (59:4, 1993): 473–481.

5.   P.J. Patchin, "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994): 402–409.

6.   R.A. Simons and A.J. Sementelli, "Liquidity Loss and Delayed Transactions with Leaking Underground Storage Tanks," *The Appraisal Journal* (July 1997): 255–260.

7.   A.J. Sementelli and R.A. Simons, "Regulation of Leaking Underground Storage Tanks: Policy Enforcement and Unintended Consequences," *Economic Development Quarterly* (11:3, 1997): 236–248.

8.   R.A. Simons, W.M. Bowen, and A.J. Sementelli, "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property," *The Appraisal Journal* (April 1999): 186–194.

Copyrighted material licensed by Randall Bell on April 26, 2021

while other properties transacted at 4.0% per year, and using a difference of means test determined that this was statistically significant. The second approach compared the incidence of seller financing and determined that properties adjacent to LUST sites had a significantly higher rate of seller financing than other properties. The third approach is based on a paired sales analysis, comparing a sale before contamination was discovered and a resale after the contamination was known. Based on an analysis of six such sales, Simons, Bowen and Sementelli conclude that the average diminution in value due to the contamination was from 28% to 31%.[9] The authors did not use a regression-based approach to analyze the commercial sales data.

There have been few attempts to model the price of commercial and industrial properties in a statistical framework. However, multivariate statistical analysis and hedonic modeling have been used extensively in analyzing residential properties and in estimating the effects of environmental contamination or hazards on housing prices. The application of this technique to commercial and industrial properties is limited by the difficulty of assembling a sufficiently large number of transactions on relatively homogeneous properties. As noted by Epley, the small size of samples of these sales can limit the reliability of statistical techniques such as multiple regression analysis because the underlying assumptions that the error terms are normally distributed with zero mean and constant variance are usually not satisfied.[10] However, Epley also notes that a "small sample does not mean that a statistical model such as regression or minimum variance does not work" but that the analyst cannot test the reliability of the underlying assumptions. It should be noted, though, that Epley's comments are directed at a typical sales comparison analysis with four or five sales as data points.

One published example of the application of hedonic techniques to commercial real estate is by Saderion, Smith, and Smith.[11] Using data on apartment property sales in Houston from 1978 to 1988, the authors estimate the parameters for three models:

1.  a "standard hedonic" with price as a function of property and market characteristics, including year-of-sale dummy variables,
2.  an income model with income capitalization rates as a function of net operating income and the year-of-sale variables, and
3.  a combined model with price as a function of property and market characteristics, year of sale, and net operating income.

The models are estimated in logarithmic form. The combined model produced the best fit with an $R^2$ of 0.926. The income model had the lowest explanatory power with an $R^2$ of 0.752, although the $t$-statistic for net operating income of 27.97 indicates that it is a highly significant predictor. The authors seem to imply that the first model, with the property and market characteristics and year of sale, is similar to the sales comparison approach used by appraisers. The third model specification, with property and market characteristics as well as the income data, might represent some combination of the sales comparison and income capitalization approaches.

Saderion, Smith, and Smith applied a hedonic modeling technique to uncontaminated commercial properties.[12] An application of hedonic modeling to non-residential properties for purposes of estimating environmental impacts is by Guntermann, who developed a hedonic pricing model for 183 transactions involving industrial land from 1984 to 1994.[13] Independent variables included a variety of size and locational characteristics as well as landfill proximity. Guntermann's model estimated price as a function of parcel size, two general area locations, location in an industrial park and transportation access, as well as proximity to an open or closed landfill. Sales of non-proximate industrial properties were used to specify the proximity impact. The model explained about 70% ($R^2 = 0.71$) of the variation in price (logarithm of price). The results of the study indicated that the value of industrial property around open landfills was reduced by proximity to the landfill, while the value of industrial properties around closed landfills was not reduced. This finding is consistent with the other studies that suggest that adverse impacts are temporary, and that these effects would dissipate subsequent to closure or remediation.

Lastly, Dotzour examines real estate prices before and after the publicized discovery of groundwater contamination in Wichita.[14] Dotzour looks at prices of residential properties in the contaminated area and compares them to prices in two uncontaminated control areas. Based on these comparisons, the study finds no impact on residential prices in the contaminated area. However, at the same time, Dotzour notes that lending on commercial real estate came to a nearly complete stop while residential mortgage lending continued. The finding of disparate impacts on commercial and residential properties mirrors that of Page and Rabinowitz. This may be due to greater concerns about lender liability for contaminated commercial and industrial properties.

9.  Ibid.

10. D.R. Epley, "A Note on the Optimal Selection and Weighting of Comparable Properties," *Journal of Real Estate Research* (14:1/2, 1997): 175–182.

11. Z. Saderion, B. Smith, and C. Smith, "An Integrated Approach to the Evaluation of Commercial Real Estate," *Journal of Real Estate Research* (9:2, 1994): 151–167.

12. Ibid.

13. K.L. Guntermann, "Sanitary Landfills, Stigma, and Industrial Land Values," *Journal of Real Estate Research* (10:5, 1995): 531–542.

14. M. Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July 1997): 279–285.

## Methodology

The methodology for analyzing the impacts of contamination on industrial properties has to date been based primarily on either the sales comparison approach or the income capitalization approach. A recent survey by Kinnard and Worzola found that the sales comparison approach was increasing in frequency of use by appraisers, although the preponderance of the literature indicated that income capitalization, and capitalization rate adjustments, was the approach most frequently deemed appropriate.[15]

## Sales Comparison Analysis

The sales comparison approach, traditionally used by appraisers to estimate the value of many property types, has additional complications for contaminated properties. The typical sales comparison analysis involves the identification and analysis of properties comparable to the subject property. In the analysis of a contaminated property, especially where the estimate of a reduction in value due to the contamination is the central question, this process should become a two-part problem. First, a set of comparable contaminated property sales must be identified. In addition to being comparable on typical real estate criteria, such as property type, location, size, age, etc., the selection of contaminated property sales must consider the environmental condition of the comparable relative to the subject. The most significant variable to be considered is the remediation status of the property. That is, the comparable property's environmental condition should be similar in terms of remediation status (before, during, or after cleanup at time of sale). The underlying theory is that there are substantial differences in the degree of risk (stigma) for an environmentally impacted property due to its remediation status at the time of sale or date of value. Thus, a subject property being analyzed in a pre-remediation condition would require comparables that sold in a similar condition. Likewise, sales comparables that had been cleaned up would be required for a subject property that was remediated on its date of value. The non-environmental factors must also be comparable. Contamination affects industrial properties differently than residential properties, for example, due to differing health risk exposure factors. In addition, market conditions could exacerbate or mitigate the effects of contamination.

Secondly, sets of uncontaminated comparable sales are identified for each of the contaminated properties. In this task, the comparable contaminated sales properties that were matched to the subject in the first step are analyzed to determine sets of uncontaminated sales properties. On the basis of each of these data, the effects of the contamination on the sales prices of the contaminated comparables can be estimated. The sales price effects extracted from the contaminated and uncontaminated comparables can then be used to evaluate the potential effects, if any, of the contamination on the subject property. This two-step process essentially controls for market and other differences that may mitigate or increase the effect of the contamination on sales price and property value. Direct comparisons of the comparables to the subject will usually be difficult due to the complex interactions between market, property, and environmental variables. The appraiser should focus on the most important question involving contaminated properties–the reduction in value due to the contamination. Once this question is answered, the value reduction, measured as a percentage or in other ways, can be applied to an unimpaired value estimate in order to determine the impaired "as is" value of the subject and any damages that may have resulted from the environmental condition of the property.

### Statistical Analysis

Multiple regression analysis has been frequently used in the estimation of residential property values and environmental impacts on residential properties. As explained, it has been applied less often to industrial properties due to the relative infrequency of sales of contaminated industrial properties, as well as the generally lower number of uncontaminated commercial property sales relative to residential property sales. In addition, industrial properties are less homogeneous than residential properties such as single-family houses. The estimation of a reliable equation for properties with many differing characteristics is more difficult than it is for more uniform properties, with fewer elements of dissimilarity.

## Sales Comparison Analysis

One of the most difficult tasks in developing an empirical analysis of the effect of contamination on industrial properties through either the sales comparison or hedonic modeling approaches involves the assembly of relevant data. The framework previously outlined argues that a number of uncontaminated and contaminated comparables are required in a two-step process. However, the focus of the research reported in this paper is not to estimate the effects on a single subject property, but rather to investigate the existence of effects under certain conditions for a class of properties and to determine whether there is any empirical evidence to support a claim of lingering or perpetual impacts due to contamination subsequent to remediation and cleanup.

### Sales Data

In order to evaluate the impacts due to contamination on industrial properties that have been remediated, contaminated property sales from the southern California area were obtained.[16] The procedure for obtaining these sales involved the identification of sales from a

---

15. W.N. Kinnard, Jr., and E.M. Worzola, "How North American Appraisers Value Contaminated Property and Associated Stigma," *The Appraisal Journal* (July 1999): 269–278.

16. These sales data were originally collected and analyzed for an environmental real estate investor based in San Francisco, California. The data are used herein by permission.

Copyrighted material licensed by Randall Bell on April 26, 2021

commercial sales data service provider based on some mention of contamination or environmental impacts in the descriptive part of the corresponding data sheets.[17] After this information was reviewed in detail, 14 properties appeared to have been remediated prior to sale. These were investigated further, and another five were eliminated for various reasons. Of the remaining nine sales of contaminated or previously contaminated property, one had to be eliminated due to incomplete information. The final eight sales and related property information are summarized in Table 1.

Parties to the remaining sales were contacted, as were officials at environmental regulatory agencies, in order to identify the contamination types, sources, and conveyances (underground storage tanks, petroleum hydrocarbons, chlorinated solvents, soil contamination, groundwater contamination, etc.) and the remediation status of the properties, with most having been remediated prior to sale. Also obtained was information on indemnifications provided to the purchaser against future liabilities or additional cleanup costs. This data is summarized in Table 2.

The last step was to select a set of comparable uncontaminated sales for the contaminated property sales. As explained, this step is necessary in the valuation of a contaminated property and is also an important research task for analyzing the existence of environmental impacts for a class or category of properties. Three to four uncontaminated comparables were identified for each of the contaminated properties on the basis of location, age, property type, date of sale, and other variables.

## Data Analysis

These data can now be analyzed through a form of sales comparison analysis involving each of the contaminated sales and the sets of uncontaminated (unimpaired) comparables. This analysis is not the same as would be required by the USPAP, and it does not include all of the steps outlined in the preceding section. As noted, three to four unimpaired properties were matched to each contaminated sales property. After adjustments for such items as excess land, extraordinary tenant improvement costs, and demolition costs (for a land only sale), the per square foot prices for the unimpaired comparables and the contaminated property sales are presented in Table 3.

This data can be analyzed in a relatively straightforward manner to determine if there is evidence to suggest any impact on sales price due to the contamination or previous contamination. This is done in Table 4. The unimpaired sales price data is summarized in a range (high to low price per square foot) and then compared to the respective contaminated property (subject) price per square foot. The results in the last two columns of Table 4 indicate whether the prices for the subject/contaminated property were within the range indicated by the market. As can be seen, all of the contaminated properties were sold at unit values within or above the indicated market range. However, two of the properties sold for less than the average indicated market price. The first, a San Diego property, had previous groundwater contamination. The second, a Los Angeles property, was in remediation at the time of sale. Thus, it had existing as well as previous contamination.

---

**Table 1**     Contaminated Industrial Property Sales Data Location

| Location | Property Type | Age of Structure | Building Size (Sq. Ft.) | Adjusted Sales Price | Price per Sq. Ft. | Date of Sale |
|---|---|---|---|---|---|---|
| Redondo Beach | Warehouse/distribution | 20 years | 112,000 | $6,400,000 | $57.14 | 03-Oct-97 |
| San Diego | Industrial | 25 years | 45,414 | $1,741,720 | $38.35 | 30-Dec-97 |
| Santee | Manufacturing | 27 years | 38,000 | $1,850,000 | $48.68 | 03-Sep-97 |
| San Diego | Industrial/land | 26 years | 29,416 | $495,000 | $16.83 | 11-Jan-96 |
| Los Angeles | Light manufacturing | Unknown | 15,000 | $430,000 | $28.67 | 01-Aug-96 |
| San Diego | Industrial | 27 years | 12,296 | $880,000 | $71.57 | 07-Feb-97 |
| El Segundo | Industrial | 35 years | 6,375 | $460,000 | $72.16 | 07-Nov-96 |
| Anaheim | Industrial | 22 years | 20,601 | $986,000 | $47.86 | 01-Oct-96 |

---

**Table 2**     Environmental Condition Data

| Location | Property Type | Contamination Type/Conveyance | Remediation Status | Indemnification |
|---|---|---|---|---|
| Redondo Beach | Warehouse/distribution | Underground storage tanks | Remediated | Partially |
| San Diego | Industrial | VOCs/groundwater contamination | Remediated | Yes |
| Santee | Manufacturing | Unknown | Remediated | Yes |
| San Diego | Industrial/land | Oil tank | Remediated | Unknown |
| Los Angeles | Light manufacturing | Chlorinated solvents in soil | Remediation in process | No |
| San Diego | Industrial | Encapsulated asbestos | Yet to be removed | No |
| El Segundo | Industrial | Soil and groundwater | Remediated | Yes |
| Anaheim | Industrial | Unknown | Remediated | Unknown |

---

17.    The COMPS, Inc., data service was used in assembling this information and the data in the hedonic price analysis discussed in the next section.

**Table 3**          Industrial Property Price per Square Foot Comparisons

| Location | Property Type | Subject Impaired Price per Sq. Ft. | Unimpaired Comp 1 Price per Sq. Ft. | Unimpaired Comp 2 Price per Sq. Ft. | Unimpaired Comp 3 Price per Sq. Ft. | Unimpaired Comp 4 Price per Sq. Ft. |
|---|---|---|---|---|---|---|
| Redondo Beach | Warehouse/distribution | $57.14 | $35.42 | $58.14 | $48.50 | n/a |
| San Diego | Industrial | $38.35 | $52.00 | $40.56 | $44.58 | $37.01 |
| Santee | Manufacturing | $48.68 | $56.29 | $36.96 | $37.99 | $55.00 |
| San Diego | Industrial/land | $16.83 | $11.93 | $10.00 | $12.65 | n/a |
| Los Angeles | Light manufacturing | $28.67 | $28.63 | $29.96 | $38.73 | $30.33 |
| San Diego | Industrial | $71.57 | $68.02 | $59.31 | $73.06 | $60.95 |
| El Segundo | Industrial | $72.16 | $60.71 | $64.94 | $58.96 | n/a |
| Anaheim | Industrial | $47.86 | $42.81 | $43.83 | $51.01 | n/a |

**Table 4**          Sales Comparison Analysis of Effects of Environmental Contamination on Industrial Property Sales Prices

| Location | Property Type | Unimpaired Low Price per Sq. Ft. | Unimpaired High Price per Sq. Ft. | Unimpaired Average Price per Sq. Ft. | Subject Impaired Price per Sq. Ft. | Diminution Indicated by Market Range | Diminution Indicated by Market Average |
|---|---|---|---|---|---|---|---|
| Redondo Beach | Warehouse/distribution | $35.42 | $58.14 | $47.35 | $57.14 | Within range | None indicated |
| San Diego | Industrial | $37.01 | $52.00 | $43.54 | $38.35 | Within range | -13.52% |
| Santee | Manufacturing | $36.96 | $56.29 | $46.56 | $48.68 | Within range | None indicated |
| San Diego | Industrial/land | $10.00 | $12.65 | $11.53 | $16.83 | Above range | None indicated |
| Los Angeles | Light manufacturing | $28.63 | $38.73 | $31.91 | $28.67 | Within range | -11.32% |
| San Diego | Industrial | $59.31 | $73.06 | $65.34 | $71.57 | Within range | None indicated |
| El Segundo | Industrial | $58.96 | $64.94 | $61.54 | $72.16 | Above range | None indicated |
| Anaheim | Industrial | $42.81 | $51.01 | $45.88 | $47.86 | Within range | None indicated |

To examine this further, the last column in Table 4 compares the average unit price from the unimpaired comparables to each of the subject properties. This comparison provides a more narrow indication of any property value diminution due to the contamination or previous contamination on the basis of a point estimate of the price indication from the unimpaired sales to each of the subject property unit prices. Since the comparables have not been adjusted for any remaining elements of dissimilarity, this is not the same as a value conclusion but rather is one further quantitative indicator of potential impacts due to the environmental condition of the subject properties. As can be seen in Table 4, only two of the contaminated subject properties had any indicated value diminution on this criterion.

The overall conclusion that could be drawn from this comparative analysis is that the environmental condition of the eight contaminated or previously contaminated properties had little or no effect on their ultimate sales price. Indeed, for most of the properties, their sales price was actually higher on a per unit basis than what would be indicated by the unimpaired comparables. Since most of these properties had been remediated prior to sale, this would suggest that subsequent to cleanup to appropriate regulatory standards the market is more comfortable with environmental risks than it would be for industrial and commercial properties that had no undiscovered contamination.

## Statistical Analysis

A second type of sales price analysis can be accomplished through a multiple regression analysis some- times referred to as hedonic modeling/price analysis. In this type of analysis, the price of industrial properties is statistically modeled as a function of the physical and/or economic characteristics of the property such that the relative contribution of each of the independent, or predictor, variables on price can be estimated. In assessing environmental impacts, the environmental condition of the property at the date of sale is added as an independent variable. The effect of environmental condition can then be tested through its estimated level of statistical significance, with a $p$-value of 0.05 or less indicating the probability of incorrectly rejecting the null hypothesis of no effect on prices.

The following general specification can be used for the statistical analysis of price effects of environmental contamination:

$$P = \beta_0 + \beta_1 X_1 + \ldots + \beta_n X_n + \beta_{n+1} ENV_1 + \ldots + \beta_{n+1+p} ENV_p + \varepsilon$$

where:

$P$ = the sales price of the property,

$\beta_0$ = a constant term,

$X_1 \ldots X_n$ = a vector of continuous and discrete non-environmental property characteristics such as building size, lot size, age, etc.,

$ENV_1 \ldots ENV_p$ = a vector of discrete variables indicating the environmental status of the property at the time of sale, and

$\varepsilon$ = a random error term.

## Sales Data

Sales data for this analysis includes most of the post-remediation sales discussed in the preceding pages, as well as a larger number of additional sales that will improve the reliability of the regression estimates. Of the initial group of sales, the sale that was in remedia-

Copyrighted material licensed by Randall Bell on April 26, 2021

tion, the land sale, and the sale involving asbestos were excluded. The remainder represents improved industrial properties that sold with previous soil or groundwater contamination. The additional data was collected through a search of a commercial data service database for Los Angeles, San Diego, and Orange counties. Key words in the descriptive information given for the sales were used to target contaminated properties. Full descriptions were then reviewed to identify properties that were sold with existing or previous contamination. For purposes of the analysis reported herein, only previously contaminated property sales were retained. Several unimpaired or uncontaminated comparables were then matched by property type, geography, and year of sale. For most properties, all of the sales of industrial properties for which there was no mention of contamination in the subarea were selected as unimpaired comparables. Some of the sales were eliminated due to missing data on one or more of the variables used in the regression analysis. The remaining sales data are summarized in Tables 5 and 6.

As can be seen in Table 5, there were 13 sales of previously contaminated property identified for this analysis. These sales included seven from the previous analysis (excluding the land, asbestos, and shopping center sales), as well as an additional six sales occurring from mid-1998 to mid-1999 in the southern California area, as described. The data in Table 5 also include the unimpaired improved industrial comparables from the preceding analysis and a number of additional unimpaired comparables matched to the additional contaminated property sales. The average sales price for the unimpaired properties is shown to be lower then the average price for the contaminated sales, but the average per square foot price for the unimpaired sales

is slightly higher due to the larger size of the properties sold with previous contamination.

Table 6 lists descriptive statistics for all of the sales and variables to be used in the multiple regression analysis. There are two area (county) and year-of-sale categorical variables. One corresponds to sales occurring in Orange County in 1999 and the other corresponds to sales in San Diego County in the same year. These two dummy variables will account for the higher average prices in these two areas in 1999 relative to the Los Angeles County sales.

## Data Analysis

The parameters for the general model described at the beginning of this section were estimated though a linear multiple regression analysis. The results of this analysis and the parameter estimates are presented in Table 7. Several important results are revealed in the statistical analysis in Table 7. First, variation in the five independent variables explains over 75% of the variation in sales price (adjusted $R^2$ of 0.7604). Furthermore, the model attains statistical significance at a high level, with a $p$-value of 0.0001. Thus, the main null hypothesis of no relationship between the independent variables and sales price can be rejected.

The parameter estimates for all of the non-environmental variables are shown in Table 7 to attain statistical significance at the 0.05 level ($p$-value of 0.05 or less). Thus, the null hypothesis for each of these predictors of sales price can be rejected in favor of the alternate hypotheses that the observed effect on sales price is significant. In addition, all of the parameters have the expected signs and effects on price. Sales price would increase with building and land square footage and be reduced for each year of age. The 1999 sales in Orange and San

**Table 5    Industrial Property Sales Data by Remediation Status**

| Variable | Uncontaminated Property Sales | Sales of Previously Contaminated Property |
|---|---|---|
| Average sales price | $1,353,722 | $1,850,577 |
| Orange County sales in 1999 ($n = 5$) | 5 | 0 |
| San Diego County sales in 1999 ($n = 12$) | 12 | 0 |
| Building square footage | 29,320.47 | 40,291.15 |
| Average price per square foot | $46.16 | $45.86 |
| Age of building in years | 28.47 | 32.62 |
| Land square footage | 66,158.95 | 118,948.77 |
| Number of sales | 109 | 13 |

**Table 6    Descriptive Statistics for Industrial Property Sales**

| Variable | Mean | Standard Deviation | Minimum | Maximum |
|---|---|---|---|---|
| Sales price | 1,406,186 | 1,262,902 | 325,000 | 6,400,000 |
| Orange County sales in 1999 ($n = 5$) | 0.0410 | 0.1991 | 0 | 1 |
| San Diego County sales in 1999 ($n = 12$) | 0.0984 | 0.2990 | 0 | 1 |
| Building square footage | 30,489.48 | 27,596.50 | 2,014 | 120,000 |
| Age of building in years | 28.91 | 16.13 | 0 | 76 |
| Land square footage | 71,784.10 | 71,817.94 | 5,720 | 483,516 |
| Sale after remediation of previous contamination ($n = 13$) | 0.1066 | 0.3418 | 0 | 1 |

Note: Data on 122 industrial building property sales with non-missing data on all variables in regression model. Thirteen properties had previous contamination and 109 were uncontaminated.

**Table 7**     Statistical Analysis of the Effects of Environmental Contamination on Industrial Property Sales Prices

| Variable | Parameter Estimate | t-statistic | p-value |
|---|---|---|---|
| Intercept | 589,051 | 4.100 | 0.0001 |
| Orange County sales in 1999 | 1,151,150 | 3.847 | 0.0002 |
| San Diego County sales in 1999 | 418,712 | 2.088 | 0.0390 |
| Building square footage | 23.12 | 5.911 | 0.0001 |
| Age of building in years | -13,289 | -3.636 | 0.0004 |
| Land square footage | 5.53 | 3.594 | 0.0005 |
| Sale after remediation of previous contamination | 102,383 | 0.533 | 0.5949 |
| Adjusted $R^2$ | 0.7604 | | |
| f-value | 65.014 | | |
| p-value | 0.0001 | | |

Note: The model comprises 122 industrial property sales. Average sales price was $1,406,186. All variables are significant at the 0.05 level, except the effect of contamination, which is not significant.

Diego counties were higher than the reference group consisting of Los Angeles County sales for all years and Orange and San Diego County sales prior to 1999. Other year and area combinations were tested, as well as year and area separately, but the other combinations did not attain significance and were dropped from the model. Building square footage attains the highest level of significance, with a $p$-value of 0.0001, and its estimate indicates that each square foot of space adds $23.12 to sales price, controlling for the other factors in the model.

The variable of greatest interest to the main research question is the environmental condition of the property as of the date of sale. The effect of this variable on sales price is tested through a categorical, or dummy, variable with a value of 1 corresponding to the 13 previously contaminated properties in the data. The 109 comparable uncontaminated properties would have a value of 0 for this variable. The parameter estimate for this variable in Table 7 is not found to be statistically significant. The $t$-statistic of 0.533 corresponds to a $p$-value of 0.5949, indicating that the estimate is not statistically significant from 0 and the null hypothesis of no effect on sales price cannot be rejected. Thus, the environmental condition of the previously contaminated properties at their date of sale does not have a statistically significant effect on sales price, controlling for the other variables, location, year of sale, age, building size, land area, and building age.

Lastly, an alternative model specification is offered. Table 8 presents the estimates for a model of industrial sales price including the additional parameter of office square footage. Data on this variable was not available on some of the sales, and including it in the model reduces the number of sales with non-missing data on all variables from 122 to 90. One of the previously contaminated property sales was eliminated. The average office space for the remaining uncontaminated sales was 4,652 square feet and for the previously contaminated sales was 8,464 square feet. Again, the previously contaminated sales were larger than the uncontaminated comparables, but these size differences are statistically controlled in the multiple regression model and are not reflected in the environmental condition variable, the parameter of interest. The results of re-estimating the model in this alternative specification are presented in Table 8.

As can be seen in Table 8, the alternative model specification has an adjusted $R^2$ of 0.8486, indicating that the model explains nearly 85% of the variation in sales price. The coefficients for all of the parameter estimates are in the expected direction, with price increasing with building and land square footage and decreasing with age. The office space parameter estimate is statistically significant at the 0.0001 level, and its estimated coefficient indicates that on average each additional square foot of office space adds $57.70 to sales price. The addition of the office space, despite

**Table 8**     Statistical Analysis of the Effects of Environmental Contamination on Industrial Property Sales Prices, Alternative Model Specification

| Variable | Parameter Estimate | t-statistic | p-value |
|---|---|---|---|
| Intercept | 419,197 | 3.008 | 0.0035 |
| Orange County sales in 1999 | 1,031,676 | 3.581 | 0.0006 |
| San Diego County sales in 1999 | 291,162 | 1.567 | 0.1210 |
| Building square footage | 25.42 | 5.967 | 0.0001 |
| Office space square footage | 57.70 | 4.696 | 0.0001 |
| Age of building in years | -11,203 | -2.873 | 0.0052 |
| Land square footage | 2.96 | 2.005 | 0.0483 |
| Sale after remediation of previous contamination | 16,581 | 0.096 | 0.9239 |
| Adjusted $R^2$ | 0.8486 | | |
| f-value | 72.288 | | |
| p-value | 0.0001 | | |

Note: The model comprises 90 industrial property sales. Average sales price was $1,493,370. Effect of contamination after remediation is not significant.

Copyrighted material licensed by Randall Bell on April 26, 2021

reducing the number of sales available for analysis, improved the model. More importantly, in this alternative specification the variable of interest to the main research question, the environmental condition of the property at the date of sale, remains insignificant, and the null hypothesis of no effect cannot be rejected.

Lastly, it should be noted that in the regression analysis presented herein, several assumptions about the fitted models were tested. These assumptions concern the errors or residuals for the sales used to estimate the parameters of the models. Among these assumptions are that the residuals, or errors, $\varepsilon_i$, have the following characteristics:

1. $\varepsilon_i$ is normally distributed.
2. $\varepsilon_i$ has a mean of zero.
3. $\varepsilon_i$ values are linearly independent and uncorre-lated.
4. $\varepsilon_i$ has a constant variance.

Lack of violation of these assumptions was confirmed through several residual plots. The plots depict the residual, or difference between the actual and model predicted price, for each observation and for each of the two models. These included normal probability plots, histograms, and plots of the residuals against several of the independent variables and against the dependent variable, sales price. Analysis of these residual plots and related statistics did not reveal any patterns indicative of violations of any of the four assumptions. In addition, variance inflation factors were estimated to confirm the linear independence of the regressors. The absence of dominant outliers was confirmed through studentized residual calculations and plots and Cook's distance measures.

## Conclusion

The research reported in this paper has attempted to evaluate, through a variety of techniques, the question of whether previous contamination has an effect on sales price. The question is based on the heretofore generally untested assumption that contamination may adversely affect real estate prices after remediation, as well as before and during remediation. Little empirical evidence has been brought to bear on this question in the past, and the question has not been studied in any systematic manner. Toward this end, data sets of previously contaminated industrial property sales and comparable uncontaminated sales were assembled and analyzed. Two procedures were used—sales comparison analysis and multiple regression analysis with two model specifications. The results of each of these analyses indicated that the previously contaminated properties did not sell at prices that differed from their uncontaminated comparables. Indeed, formal statistical tests indicated that the sales prices of the previously contaminated properties were not significantly different from the prices of other comparable industrial properties. In these analyses, the null hypothesis of no difference and no effect on sales price due to environmental condition could not be rejected.

## 4.2 The Analysis of Environmental Case Studies

*by Thomas O. Jackson, PhD, MAI, and Randall Bell, MAI*

This article originally appeared in the January 2002 issue of *The Appraisal Journal*.

### Abstract

In recent years, there have been a growing number of sales of environmentally impacted properties. Appraisers now have market sales data that can be used to estimate the effect of environmental contamination on real property value. This article sets forth a framework for analyzing case study data with respect to contaminated or previously contaminated properties. The central message here is that "apples to apples" comparisons must be made, and that a number of specific elements must be considered for a valid and reliable case study analysis. When properly selected and analyzed, case studies can provide useful information for analyzing environmentally impacted properties.

Determining the impacts of environmental contamination on property value requires real estate analysts to address a number of factors and elements not considered in the more typical sales comparison analysis of non-impacted or unimpaired properties. These factors may be considered or analyzed using case studies.

The first step in a case study analysis involves research into the subject property and a determination of the key factors that impact that property. Then, in an effort to determine any effect on value, case studies are developed from other properties that are similarly situated with respect to the subject property and its environmental condition. Like any valuation technique, case study analysis can be properly applied or it can be misused. In order for the analysis to be reliable and valid, the case studies must follow the simple "apples to apples" analogy. This means that the case studies being utilized must have similar property, market, and environmental characteristics to the subject property. Because of the complexity of topics surrounding environmental contamination, these characteristics are not always straightforward. Therefore, their applicability must be carefully examined.

Appraisal methodologies ultimately fall within one of the three traditional approaches to valuation: the cost approach, the sales comparison approach, and the income capitalization approach. Case study analysis involves situations where similar properties have been impacted by similar conditions. Thus, the analysis of case studies is an extension of the sales comparison approach. However, in addition to the typical elements of comparison such as property type and location, valid and reliable environmental case studies must consider additional elements and property characteristics. These elements are outlined in the following pages. Like any application of the sales comparison approach, it is difficult, and in some situations impossible, to find comparables that are identical in all respects to the subject property. Nonetheless, certain key characteristics should be similar for resulting inferences and conclusions to be reliable, valid, and not misleading.

Generally, case studies are utilized when there is a lack of direct market data or where analyses of direct market data need additional support. For example, if the impact of a landfill on surrounding properties were being studied, the most pertinent approach would involve actual sales of the surrounding properties. In the event that no direct market data is available, the case studies approach utilizing market data derived of other landfill-proximate sales would become relevant. Although case studies are useful any time there is available and relevant data, they have a secondary role if there is direct market data available at the subject site. Of course, like any assignment involving appraisal practice, the *Uniform Standards of Professional Appraisal Practice* (USPAP) have an essential role to play in the analysis of case studies. A properly developed case study analysis must comply with applicable USPAP standards addressing competency, ethics, and development and reporting of assignment results.

### Case Study Framework

An environmental case study must take into consideration property characteristics, contamination/discharge issues, and remediation lifecycle/detrimental condition stages if the study is to provide a meaningful comparison to the subject property. These characteristics, as well as other significant factors, are shown in Table 1 and are discussed in detail in the remainder of this article.

Like a market data grid in the sales comparison approach, a case study comparison chart organizes and compares the characteristics or elements of the case study to the subject property. As in any type of sales comparison analysis, the subject property and case

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

**Randall Bell, MAI,** specializes in real estate damage economics and strategy. He has traveled extensively in his research of detrimental conditions and the impact they have on real estate values. Founded upon this research, he has written various specialized methodologies, which were the basis for the Detrimental Conditions seminar developed by the Appraisal Institute and also incorporated into Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice. He has lectured internationally on the topic of property damages and mitigation strategies. Mr. Bell has an MBA in real estate from the University of California, Los Angeles, and a BS in finance and accounting from Brigham Young University.

Copyrighted material licensed by Randall Bell on April 26, 2021

studies should ideally be similar in all respects. However, in reality this does not always occur. Problems arise if a significant number of issues differ substantially from the subject property conditions, then a question may arise as to whether the case study is really comparable at all. For example, case studies involving accidental discharges are not comparable to situations where the discharge was legally permitted. Further, a source site case study may not be comparable to a non-source site subject property, except to establish an upward limit of damage. For example, if a source site case study indicates no stigma or market resistance, then it is unlikely that non-source sites would have such damage. On the other hand, using an impacted source site case study to estimate impacts for a non-source site may be misleading, since identifiable impacts derived from source site case studies usually overestimate impacts to non-source subject properties. Remediation, as explained in the following pages, should also match. After selecting an appropriate set of case studies, a relative comparison analysis can be performed, leading to a net comparison ranking for each case study relative to the subject.[1]

The example in Table 1 includes case studies that match on the permitted/accidental discharge elements of comparison. While the subject property is industrial, the case studies include both commercial and industrial properties. Residential properties would not be comparable for purposes of this environmental case study analysis. In calculating the impact on value for each of the case studies, a series of paired sales analyses could be used. In this approach, otherwise similar unimpaired comparables in the market areas of the case studies would be matched to the impaired properties and impact on sales price would be estimated. Before calculating the impact on value for each of the case studies, the sales prices of the source site contaminated comparables should be adjusted to remove the effect of future remediation costs where such costs have been reliably estimated. This can be accomplished by adding the estimated costs to be paid by the buyer from property cash flows to the nominal sales price. This would leave a price that reflects the risk-related effects of the case study property's environmental condition on its price as of its date of sale. The second step of this two step procedure is to reconcile the value impacts for each of the case studies to the subject property, based on their comparability of the elements listed in Table 1.[2] As noted, a relative comparison analysis would be appropriate for this purpose. As explained in *The Appraisal of Real Estate*, 12th ed., in this type of analysis each element could be compared and assigned a ranking of superior, inferior, or similar. An overall ranking could then be made after considering each of the individual comparisons. This overall ranking or net comparison derived from the case studies provides the basis for rec-

onciling a range of indicated impacts on value. This is usually the final step in the case study analysis. An additional step, applicable for certain assignments, would be to deduct the subject property's estimated future remediation costs that are to be borne by property cash flows, and not by the seller or another source, such as environmental insurance. This step provides a final, adjusted estimate of the subject property's impaired value. Care should be taken, though, not to double count remediation cost effects and risk related effects, since risk effects may in part be related to uncertainties about future remediation cost estimates and requirements.

## Property Characteristics
### Property Type
An important similarity between the subject property and the case study is the general property type. For example, the differences between a residential property and a service station are so vast that there is simply no comparison. Perceptions, pricing criteria, and the market context of a homeowner are different from a service station owner, whose primary objective is generating income. Likewise, the value of income-producing commercial and industrial properties cannot be estimated on the basis of owner-occupied residential comparables or case studies. Not only does this make sense, it is also consistent with accepted methods for sales comparison analysis. Environmental issues will impact these property types differently. Accordingly, the subject property and case studies should be of the same general property type category. For example, these categories could include: service stations and auto repair facilities, commercial, industrial, and residential properties. At a minimum, owner-occupied residential properties should be compared to residential properties, and income-producing properties should be compared to other income-producing properties.

### Market Conditions
It is a well-known attribute of the real estate market that when the market is increasing, many prospective buyers are prone to be more forgiving of certain conditions as compared to periods of market declines. Strong market conditions have a mitigating effect, while poor market conditions tend to exacerbate issues. A case study conducted in a declining market may not be as relevant where the market is now strong, or vice versa. This is consistent with formal research on the effects of environmental contamination on real estate prices, which shows that strong market conditions tend to reduce or mitigate detrimental impacts on real estate prices while weak market conditions increase or exacerbate detrimental impacts.[3] These effects are illustrated in Figure 1. This figure is based on a national

1.  Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001): 459–467.

2.  A similar sales comparison approach is illustrated in Thomas O. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," *The Appraisal Journal* (April 2001): 200–210.

3.  Thomas O. Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," *Journal of Real Estate Research* (Nov–Dec, 2001); 271–288.

**Table 1          Case Study Comparison Chart**

|  | Subject Property | Case Study A | Case Study B | Case Study C | Case Study D | Case Study E | Case Study F | Case Study G |
|---|---|---|---|---|---|---|---|---|
| **Property characteristics** |  |  |  |  |  |  |  |  |
| Property type* | Industrial | Industrial | Industrial | Commerical | Industrial | Commercial | Industrial | Industrial |
| Market conditions | Stable | Stable | Stable | Stable | Stable | Declining | Declining | Declining |
| **Contamination/discharge issues** |  |  |  |  |  |  |  |  |
| Source, non-source, adjacent, proximate | Source | Source | Source | Source | Non-source | Source | Source | Source |
| Permitted vs. accidental discharge** | Accidental | Accidental | Accidental | Accidental | Accidental | Accidental | Accidental | Accidental |
| Type of contaminant | Chlorinated | Hydrocarbon | Chlorinated | Chlorinated | Chlorinated | Hydro-solvents | Hydro-solvents | Hydro-solvents |
| Level of contamination/discharge | Medium | Medium | Medium-high | Medium-high | Medium | Medium | Medium-high | Medium-high |
| Area-bioavailability/risk exposure | Low risk | Low | Low | Low-medium | Low | Low | Medium-high | Medium |
| **Remediation lifecycle/detrimental condition stages** |  |  |  |  |  |  |  |  |
| Before cleanup/assessment stage | Contamination has been characterized | Characterized | Characterized | Characterized | Characterized | Characterized | Not fully | Characterized |
| During cleanup/repair or remediation stage | No Remedial Action Plan (RAP) | No RAP | RAP | No RAP | No RAP | RAP | No RAP | RAP |
| After cleanup/ongoing stage | Does not have a No Further Action (NFA) letter | No NFA | No NFA | No NFA | No NFA | NFA | No NFA | No NFA |
| **Other/related issues** |  |  |  |  |  |  |  |  |
| Costs and responsibility | Seller | Seller | Seller | Buyer | Seller | Buyer | Buyer | Buyer |
| Scale of project | Medium | Medium-low | Medium-high | Medium-high | Medium | Medium | Medium-high | Medium |
| Impacts on use and use limitations | Minimal impact | Minimal | Medium | Medium-high | Minmal | Medium | Medium-high | Medium |
| Third party liabilities | Low risk | Low | Low | Low | Low | Medium | Medium-high | Low |
| Indemnifications | Idemnified | Idemnified | No indem. | No indem. | Indemnified | No indem. | No indem. | No indem. |
| Insurance | Cost cap – reopener | None | None | None | Cost cap – reopener | None | None | Cost cap – reopener |
| Time frame and market experience | Current | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| **Impact on value** | To be determined | No impact | 5% Discount | 12% Discount | No impact | No impact | 15% Discount | No impact |

\*   Income–producing properties are not comparable to residential properties.

\*\* Denotes issue that is essential for comparability.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Figure 1**        Effect of Market Conditions on Environmental Risk



Source: Thomas O. Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," *Journal of Real Estate Research* (Nov–Dec, 2001): 271–288.

survey of more than 200 lenders conducted in 1999. As depicted in Figure 2, nearly 60% of the survey respondents indicated that weak market conditions increase risk. On the other hand, more than 30% indicated that strong market conditions reduce risk. These statistically significant results confirm the general direction and effect of market conditions as intervening factors affecting environmental risk and its impact on value.

## Contamination/Discharge Issues
### Source/Non-Source/Adjacent/Proximate Site (SNAP)

A critical issue in evaluating environmentally contaminated property is identifying whether it is a source, non-source, adjacent, or proximate site (SNAP).[4] A "source site property" is defined as the site from which the contamination was released. An example of a source site is a service station with a leaking underground storage tank. A non-source property is contaminated, but the contamination emanated from another property (the source site)–for example, a doughnut shop next to a contaminated service station where contamination has migrated off-site and under the doughnut shop property. An adjacent property is not contaminated, but it shares a property line with a property that is. A proximate property is not contaminated and is not adjacent to any contaminated property; however, it is in the same general neighborhood of a contaminated, source site property. These distinctions are critical in evaluating contaminated properties because the risks vary considerably between the categories. Source sites have a much different set of environmental risk factors than non-source or adjacent properties. Generally, the source property owners or prior owners are responsible for the remediation of the contamination. The costs and risks of cleanup and regulatory oversight are far greater than any other category, so comparing a

source case study to a non-source, adjacent, or proximate property could be misleading. Accordingly, if the subject property were the source of the contamination, then source site case studies would provide the most meaningful comparisons. Inferences drawn from source site case studies relative to a non-source site subject may be biased toward an over-estimate of environmental impacts.

### Permitted vs. Accidental Discharges

A reality of the industrialized world is that there are vast quantities of contaminants produced every day. However, contaminants that are a "permitted discharge" should be distinguished from those emanating from an accidental discharge. A permitted discharge includes governmentally allowed releases such as industrial discharges into a body of water, automobile exhaust, washing machine discharges, landfills, and deep soil discharges or storage. Accidental or illegal discharges include leaking underground storage tanks, oil tanker spills, improper dumping, and so forth. There are critical distinctions between the two types of discharges. One category is permitted and legal, while the other is not. Permitted discharges do not generally involve any level of remediation, while an accidental discharge may require remediation if the quantity of contamination rises above the actionable levels set by governmental agencies. Accidental discharges may be subject to fines and sanctions and permitted discharges generally are not. These are two vastly different sets of circumstances. The release of a potentially hazardous substance that is done under a legally authorized permit with regulatory oversight has a much different set of risk characteristics than an accidental release of hazardous materials from an unplanned or accidental explosion, leak, etc. Risk perceptions of the market are related to unknown information and an accidental

4.    Orell C. Anderson, "Environmental Contamination: An Analysis in the Context of the DC Matrix," *The Appraisal Journal* (July 2001): 322–332.

release has many more unknowns (cleanup costs, off-site impacts) than a planned release of materials that has been reviewed and permitted by the appropriate regulatory authority. Accordingly, a reliable case study analysis should only use case studies that are identical in this regard.

## Type of Contaminant

There are literally hundreds of contaminants, and they can fall into one of several categories: hydrocarbons, including crude oil and refined petroleum; asbestos, a naturally formed rock that can be crushed and used as a building material; solvents, which may be used for dry cleaning or manufacturing; radioactive materials, including radon; metals, such as lead, chrome, or arsenic; and biologicals, such as sewage and medical waste. Research has shown that the type of contamination or hazardous substance has a significant effect on the market's perception of risk and in turn, property value diminution.[5] Ideally, the type of contaminant is the same for both the subject property and the case study. This is important because different contaminants may invoke different responses from the marketplace. A real estate analyst must use caution before comparing a case study that involves a contaminant that differs from the contaminant found at the subject property. It would be improper, for example, to compare a case study involving the effects of petroleum hydrocarbon contamination from a leaking underground storage tank to a subject property impacted by asbestos or radon. However, there are situations where a study is comparable, even though the contaminants differ slightly. For example, it might be worthwhile to compare a shopping center that has soil contamination from a service station's leaking underground storage tank with another shopping center that has soil contamination from dry-cleaning solvents. Careful analysis is required in this situation.

## Level of Contamination

While perhaps initially startling to some, virtually all air, water, and soil are "contaminated" at some level. This is a simple reality of an industrialized society. Car emissions alone contaminate the air, water, and soil. Asbestos is a naturally occurring substance, and everyone breathes some asbestos fibers daily. Sewer pipes often leak and contaminate soils. These low-level situations are termed "background contamination." The critical factors in this regard are the standards established by the appropriate regulatory authority. Various governmental agencies set "actionable levels" providing that when some contaminants meet or exceed a certain level, there must be action on part of the responsible party to remediate the condition. Many agencies tailor the standards to the property type and risk exposure characteristics of the property and surrounding area. These are typically tied to risk-based cleanup action (RBCA) requirements

that have been adopted by many states. Thus, rather than asking, "Is a property contaminated?" A more valid question is, "What level is the contamination?" While it would be virtually impossible to find case studies that have exactly the same measured quantities of contaminants as the subject property, certainly it is important that the general level of contamination be comparable.

## Area Bioavailability/Risk Exposure

There are six areas of a property that may become contaminated. These are: air, water, building improvements, surface/shallow soils, ground water aquifers, and deep soils. These categories are relevant because of the concept of "bioavailability." Bioavailability is the extent to which a contaminant becomes available to humans or the biota, generally. Air pollution would be considered to have a relatively high level of bioavailability, while contaminants that are restricted to deep soils may have no bioavailability. These categories are regarded quite differently by regulatory agencies due to their differing levels of health risk exposure. Simply, where there is no exposure risk, there should be no environmental risk that reduces the value of the real property. Newer risk-based cleanup standards recognize this by treating sites at which there is limited exposure differently from sites at which the exposure is more immediate and of more serious concern. For example, hazardous materials that are trapped thousands of feet underground are different in kind from sites with hazardous materials in the shallow groundwater or in exposed soil. The risk levels, the level of market concern, and the resulting effects on property value are much different. Thus, the risk exposure for the case study properties and the subject property should be similar for a valid case study analysis.

## Remediation Lifecycle/Detrimental Condition Stages

This is perhaps the most important set of factors in determining the effects of environmental contamination on real estate prices and market value.[6] Similarly this element is a critical requirement for a valid and reliable case study analysis. The case study property should be in the same stage of remediation (before, during, or after cleanup) at the time of its sale as is the subject property at its date of value. Research has shown that the risks perceived by the market change dramatically as a property moves though the remediation cycle. Before cleanup, risks and property value diminution attributable to environmental condition are greatest. These decline as remediation is underway pursuant to an approved cleanup plan. After cleanup and regulatory closure, property value impacts are minimal and, in most cases, disappear.[7] Bell outlines three condition stages: assessment, repair, and ongoing stages.[8] Similarly, Jackson analyzes the changes in environmental risk and impacts on property value in three categories: before, during,

---

5.    Elaine M. Worzala and William N. Kinnard, Jr., "Investor & Lender Reactions to Alternative Sources of Contamination," *Real Estate Issues* (August 1997): 42–47.

6.    Anderson, 322–332.

7.    Jackson, 200–210.

8.    Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999): 8-10.

Copyrighted material licensed by Randall Bell on April 26, 2021

and after cleanup.[9] Within each category or stage, the costs, use, and risks associated with an environmental condition vary and will impact real estate differently.

The generalized effect of the three remediation stages on environmental risk is illustrated in Figure 2. This figure is based on the 1999 lender survey previously discussed. As shown, over 90% of the lenders surveyed indicated that before cleanup of a contaminated source site, property risks would be very high. During cleanup most of the lenders indicated higher than normal risk, while after cleanup, more than 60% indicated that environmental risks would be normal, and loans would be provided at typical rates and terms. In the survey, very high risk was equated to a situation in which a mortgage loan would not be provided due to excessive environmental concerns. Higher than normal risk indicated that a mortgage loan would be provided, but with some adjustments to the loan amount, rate, amortization, term, or conditions. All of the changes in risk perceptions were statistically significant at the 0.05 level, and the survey sample was a probability-based, representative national sample of mortgage lenders.[10]

## The Before Cleanup/Assessment Stage

Prior to being assessed, there may be great uncertainty about the environmental condition of the subject property, thereby generating uncertainty and a discount to account for the unknown characterization of the property's condition. Upon assessment, this uncertainty is reduced. The principle underlying this effect is that risk is directly related to uncertainty about, and potential variance in, future cash flows. If there is little known about an environmental problem that might later require substantial expenditures for remediation, then future cash flows are less predictable and the investor would require a higher rate of return to compensate for this unknown risk and uncertainty. Indeed, there may be a level at which risk and uncertainty are so high that a property is unmarketable until greater knowledge becomes available. For contaminated properties, greater knowledge involves the nature and extent of the contamination, as well as the requirements, costs, and timing of the remediation effort.

## The During Cleanup/Repair or Remediation Stage

Upon being assessed, a contaminated property typically goes through a remediation phase where the contaminants are removed, treated, enclosed, or left to "bioremediation" through a more passive cleanup strategy. Often there are significant costs associated with a remediation project, and like any property that requires rehabilitation, there is risk associated with these efforts. The assessment of risk during this stage considers whether the cleanup plan has been approved by the appropriate

**Figure 2**          Effect of Remediation Status on Environmental Risk



Source: Thomas O. Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," *Journal of Real Estate Research* (Nov–Dec, 2001): 271–288.

9.   Jackson, 271-288.

10.   *Ibid.*

regulatory authority and is being conducted in compliance with the provisions of such a plan. If a property is sold in an assessed but unremediated state, there may be a discount to account for project risk. This can be considered the "project incentive" required by the buyer, if the buyer is responsible for the cleanup. Otherwise, the risk could be termed "market resistance" if another party is responsible for the cleanup costs and related activities. It is likely that there is some combination of these two categories of risk operative at this stage.

## The After Cleanup/Ongoing Stage

Research shows that lenders are generally willing to provide mortgage loans after property has been remediated, has achieved a "no further action" status with the appropriate regulatory agencies, and the property value impacts have dissipated (Figure 2).[11] More specifically, the research presented in Figure 2 shows that the perceptions of environmental risk by lenders and investors declines significantly as property is remediated, and that most lenders and investors perceive no additional risk after cleanup to applicable standards and the achievement of "no further action" status. In addition, sales price analyses have shown a similar pattern, with no statistically significant effect on prices after remediation due to previous environmental contamination.[12] Even in situations where there may be ongoing monitoring, operations and monitoring (O&M) programs, and other issues, any residual risk, termed "market resistance," may be eliminated through indemnification, cost cap insurance, secured creditor insurance, value assurance programs, re-opener insurance or other factors. In a case study analysis, special attention must be paid to the specific status and condition of the subject property within the remediation lifecycle as of its date of value. Case studies in a similar remediation stage should be selected, as these would be most reflective of the subject's environmental impacts. Clearly, the risks associated with a contaminated property that has not yet been assessed are greatly different from risks associated with property that has been fully assessed, fully remediated and is in the after cleanup stage of its lifecycle. Identifying the specific lifecycle is critical for a valid and reliable analysis.

## Other/Related Issues

### Costs and Responsibility for Remediation

The issue of responsibility for cleanup costs has profound implications if remediation is necessary and the subject property is evaluated in a non-remediated state. Whether or not the potentially responsible party (PRP) is known, has assumed responsibility for the environmental contamination, and has offered or provided indemnities to other parties and property owners makes a significant difference in the market's environmental risk perception. A site for which the PRP has not been identified or for which the PRP does not accept re-

sponsibility for remediation will be more adversely impacted than an otherwise similar site for which the PRP accepts responsibility and has fully financed the cleanup plan. In addition, the financial strength of the party responsible for site remediation affects the market's perception of environmental risks. Much of the risk associated with contamination is centered on who is going to have to pay for cleanup and whether or not the responsible party is financially solvent.

For example, consider two service station sites that have been sold with leaking underground storage tank issues. A major oil company, which has assumed all responsibility for cleanup costs, owns Service Station A. The company is solvent and financially responsible. Furthermore, not only will the oil company remediate the site, but it will also provide a full written indemnification to future owners of the property whereby it accepts any future liability associated with the contamination it caused. On the other hand, consider an otherwise similar Service Station B that has been owned by a now retired husband and wife who have moved out of state. The property has changed hands on several occasions, and it is uncertain who is responsible for the releases. Furthermore, all the potentially responsible parties deny any responsibility and have limited financial resources. Clearly, the impact of contamination on the value of Service Station A will not be comparable with Service Station B.

### Scale of Project

Simply stated, some projects are quite large and some are quite small. For example, some of the largest contamination cases in history have involved radioactive contamination in the Marshall Islands (from nuclear testing on the Bikini Atoll) and Chernobyl. The dynamics of these cases obviously differ substantially from a radon case in a single-family residence or a leaking underground storage tank near a commercial property. While an extreme example, the same concept applies. Valid case studies should be generally similar to the subject property in terms of scale of the project.

### Impacts on Use and Use Limitations

Whether or not a property's utility has been impacted is another key factor. A situation where the contamination has resulted in the property being vacated is clearly different from a situation where the remediation is non-intrusive and the user can continue operations with little or no disruption. In addition, this element should capture the effects of risk-based cleanups, as previously discussed. Risk-based cleanups typically allow remediation standards to be tailored to specific risk exposures and can allow for regulatory closure without removal of all constituents. For example, an industrial property would be remediated to industrial standards, rather than more costly residential standards. There would then be a future use restriction on such a property, perhaps allowing only industrial uses or land uses

---

11.   *Ibid.*

12.   Jackson, 200–210.

Copyrighted material licensed by Randall Bell on April 26, 2021

with similar risk profiles. This restriction is typically recorded as a deed restriction. Deed restrictions may have an impact on use if the prohibited uses represented are a real and material impact on the use of the property, such as a restriction to develop homes where residential uses would otherwise have been the highest and best use. On the other hand, a historic museum that is always expected to remain a museum would not likely have any material impact from a deed restriction for school, daycare, hospital, or residential use.

### Third Party Liabilities

Where contaminants have migrated off site from a source property, there may be the risk of litigation from the non-source property owners. Some non-source or adjacent property owners may litigate, even though they have not been impacted in any material way. This risk to the source property owner must be considered, even though the merits of the case may be questionable. If a contaminant plume migration causes a market-recognized concern from a publicized incursion into the groundwater providing potable water in a residential neighborhood, there may be significant risk. In addition, employees or tenants of the contaminated property may pursue claims for personal injury and this may have a detrimental effect. In sum, third-party claims, especially from off-site migration of groundwater contamination, pose an additional risk factor that must be evaluated in a case study analysis. Surrounding property types and neighborhood characteristics are important in this evaluation.

### Time Frame and Market Experience

The sale of the case study property ideally should have occurred during the same period as the subject property's date of value. Due to the rapidly changing nature of the market and its experience and ability to deal with environmental risks in real estate transactions, contaminated properties sold many years ago may not be appropriate for more current dates of value. Brownfields programs, more flexible regulations, risk-based

cleanup standards, and the increased experience of lenders and investors with environmental issues have all resulted in a lessening of the impacts of contamination on real estate values.[13]

### Indemnification and Insurance

An indemnification is the written assurance of the responsible party that they will incur all costs associated with the contamination. Where an indemnifying party is financially solvent and willing to pay for all required remediation costs, the risk is reduced or may be eliminated altogether. Also, many risks can be insured. For example, remediation cost overruns, third-party liability, loss in property value, agency "re-openers" and other concerns may be virtually eliminated by insurance.

### Summary and Conclusions

Case studies can be useful in valuing environmentally impacted properties. However, a case study, like any comparable, should be similar to the subject property being studied. For example, case studies involving leaking underground storage tanks (LUSTs) should include other situations with LUSTs. Asbestos situations should utilize case studies with asbestos. Oil spills should be considered with other oil spills. Ideally, case studies are similar with respect to the type of contaminant and the other issues set forth in this paper. The best and most comparable case studies would be similar to the subject property in terms the SNAP issues, being an accidental versus a permitted discharge, and remediation lifecycle stage. Other elements can be addressed through a sales comparison type analysis, with market-derived quantitative adjustments or qualitative comparisons. With this framework, case studies may be a useful addition to the tools for assessing the effects of adverse environmental conditions and other detrimental conditions on real property. Indeed, the case studies framework outlined herein could be applied to the analysis of a variety of detrimental conditions, although the elements of comparison would be different.

---

13.    Thomas O. Jackson, "Investing in Contaminated Real Estate," *Real Estate Review* (Winter 1997): 38–43.

## 4.3 Comments on "The Analysis of Environmental Case Studies"

*by Rudy R. Robinson III MAI, Wayne Hunsperger, MAI, Thomas O. Jackson, PhD, MAI, and Randall Bell, MAI*

This Letter to the Editor and its response originally appeared in the July 2002 issue of *The Appraisal Journal*.

The article "The Analysis of Environmental Case Studies" by Thomas Jackson, MAI, and Randall Bell, MAI (January 2002), is a valuable addition to the body of literature concerning contaminated properties; nonetheless, we believe several points require further examination.

The authors' emphasis on an "apples to apples" approach to environmental case studies is valid, but it may not correspond to circumstances regarding the subject property and the available data for comparison. Their Case Study Comparison Chart presents a subject property and several industrial property case studies that are mildly contaminated with chlorinated solvents or hydrocarbons. Situations involving modest contamination, low risk, low-to-moderate remediation needs, and minuscule residual property stigma are implied or expressed throughout the article.

Although these situations underscore the theme of their article, they also represent a relatively common situation—the availability of data. More heavily contaminated properties, or those with unusual circumstances (e.g., apartments built over an abandoned landfill, farms contaminated by lead that is killing livestock) may never sell, so direct comparable case studies may not exist. Depending on the situation, a contaminated property may be analogous to a special-purpose or limited-market property wherein the appraiser selects the best available market data whose validity heavily depends on the evidence. Just as courts allow greater discretion in the use of comparables when valuing special-purpose properties, this discretion should also apply to the selection of case studies. In such cases, analysis of a seemingly disparate array of properties and contamination types is not only acceptable, but it is virtually a requirement.

Case studies involving dissimilar types of contamination or property types should not be dismissed. As stated in the article, the "type of contamination… has a significant effect on the market's perception of risk and… property value diminution." This statement is tied to the authors' larger theme of striving to use case studies only when the type of contamination affecting the comparable property is identical to the subject.

However, the type of contamination is just one facet of comparison. Others include the legal and regulatory issues affecting the contaminated property, the cost and length of the remediation process, the extent to which the property will be remediated, and the probability of the property's eventual recovery to its unimpaired value. Indeed, market reaction to contamination is just as important as the contaminants themselves. If these other factors are similar to the subject, the case study could be considered reasonably similar to the subject even if the types of contamination are not identical. Similarly, case studies involving property uses different than the subject property can be used to demonstrate how parties react to environmental risk and uncertainty. These case studies would be given less weight than cases with the same use as the subject, but such data should be considered. Market behavior with respect to contamination may be similar irrespective of the type of properties involved.

Permitted and accidental discharges involve two vastly different sets of circumstances and thus cannot be compared, except to the extent that a permitted site is in strict compliance with the law. Occasionally, a site will discharge materials in excess of permitted limits or beyond permitted boundaries. For the polluter, the liabilities involving permitted versus accidental discharges may be different, but the risks to adjacent or proximate property owners may be the same. The fact that the discharge is ostensibly legal is of little importance to the owner of an adjacent property, and in these situations the distinction between "permitted" and "accidental" is moot.

Likewise, variance in risk between uncontaminated properties adjacent to a contaminated site and properties proximate (nearby but not directly adjacent) to a contaminated site needs clarification. The authors state that the distinction "is critical in evaluating contaminated properties because the risks vary considerably between the categories," but this is not necessarily so. For example, plumes of contaminated groundwater are seldom clearly defined and are often dynamic. They may expand, shrink, or migrate in the direction of groundwater flow. Initial testing of an individual property may not reveal contamination at one point in time, but could show contamination at a later date. In this case, the market may perceive similar levels of risk regardless of initial test results.

As suggested by the authors, distinction of the stage in the remediation cycle is critical, but using case studies in different stages of the cycle is not automatically a mistake. A range of remediation stages is useful in developing the high and low end of the range of damages, and could also be used to estimate the rate at which diminution might decrease over time. Furthermore, in cases where liable and affected parties are in disagreement about the type and extent of remediation, the remediation stage itself may be in dispute, making its categorical determination nearly impossible.

The authors state that the "sale of the case study property should have occurred during the same period as the subject property's date of value." While older sales may be inappropriate for comparison to a present-

Copyrighted material licensed by Randall Bell on April 26, 2021

day situation, a lack of recent data may indicate that the market has not fully come to terms with a particular environmental risk, in which case use of older case studies may still be appropriate.

The statement "weak market conditions increase or exacerbate detrimental impacts" does not always apply to direct cause-and-effect. In a weak market, investors have a surfeit of non-contaminated, depressed-price properties from which to choose, so they can easily ignore contaminated properties. In a strong market, investors are more inclined to absorb the risk of buying a contaminated property because doing so might be the only way to achieve the return they require (compared to buying a non-contaminated property at an inflated price). A weak market doesn't increase risk or stigma for a contaminated property–it increases substitutes to contaminated property.

The authors strongly emphasize lender surveys, especially regarding levels of risk and stigma during various stages of remediation. We have found that lending practices may differ among various communities and sometimes deviate from predefined environmental policies. In one case involving lead contamination of soil and groundwater in a residential neighborhood, lenders admitted relying on residential appraisers to discover and disclose on-site contamination. (Barring special training, appraisers aren't qualified to determine the presence of hazardous substances.) Some of these same appraisers stated that information regarding contamination would have been received from the lender at the onset of the assignment. In effect, no meaningful environmental investigation or analysis was performed in a location where the general presence of contamination was well-known publicly. Admittedly, this case is unusual, but it underscores the potential danger in applying a national or regional survey to a specific situation. Lending is just one part of a transaction, and the appraiser must understand that analysis of lending practices is an adjunct to transactional research, not a substitute.

Finally, our research in several parts of the U.S. indicates that remediation of contamination and receipt of a "no further action" letter do not guarantee that a property will be free of residual stigma. Sometimes, residual stigma can be present even after closure to state or federal standards, particularly when the remediation is to health-based risk closure levels that leave significant residual contaminants, or when the property is subject to deed restrictions and other disclosure requirements.

The authors present a worthwhile conceptual framework and reasoning for evaluating contaminated properties. However, meeting their standards is sometimes impossible, and in such cases the appraiser should be allowed more latitude.

*Rudy R. Robinson III, MAI*
*Wayne Hunsperger, MAI*
*Austin, Texas*

## Response—Comments on "The Analysis of Environmental Case Studies"

We certainly appreciate the interest generated from our article and research. Messrs. Robinson, III, and Hunsperger offer many thoughtful points. Case studies are useful and appropriate for analyzing the effect of contamination on property value, but they can also be misused and are not appropriate in all situations. Our main point, as noted, is that case studies should be comparable on certain key elements in order to produce a reliable analysis. In situations where such case studies cannot be located, the appraiser should look to other methods or look for more comparable case studies.

However, we believe our article is not as rigid as suggested. Ideally, we all would like identical comparables or case studies, but even with a standard appraisal, this is rarely the case. Of course, there will be inevitable differences between the subject property and the comparable environmental case studies. For example, with respect to the desired property type and contamination type similarities, we noted that an appraiser "must use caution before comparing a case study that involves a contaminant found at the subject property" (p. 90), and that "there are situations where a study is comparable, even though the contaminants differ slightly" (p. 90). We do note, nonetheless, that in these situations, "careful analysis is required." This is not the same as saying the contamination must be "identical to the subject." Likewise, case studies at the same remediation stage "should also match" (p. 87), and any difference is not "automatically a mistake." The point of our article was to set forth a practical framework for the comparison of differing but relevant market data, not to suggest that only identical case studies could be utilized. Indeed, the market data examples set forth in the article's comparison grid had numerous differences.

Lastly, the research presented on lender perceptions of the effect of market conditions and the remediation status on environmental risk is meant to portray general findings that support the importance of these variables when analyzing environmental impacts. A similar set of analyses for investors is forthcoming. These findings are also consistent with the sales price analyses of commercial and industrial properties.[1]

We hope that practitioners who undertake assignments involving contaminated properties will find our article to be a useful guide.

*Thomas O. Jackson, PhD, MAI*
*Bryan, Texas*

*Randall Bell, MAI*
*Laguna Beach, California*

---

1.  T.O. Jackson, "Environmental Contamination and Industrial Real Estate Prices," *Journal of Real Estate Research* (23: ½): 179–199; T.O. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," *The Appraisal Journal* (69: 2): 200-210; and T.O. Jackson, "The Effects of Environmental Contamination on Commercial Real Estate Prices and Income Capitalization Rates," presented at *The Eighteenth Annual American Real Estate Society Meeting*, Naples, FL (April 2002).

## 4.4 Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the Spring 2004 issue of *The Appraisal Journal*.

This edition of "Environment and the Appraiser" addresses the use of environmental case studies to analyze the extent to which contamination may adversely impact property value through the effect previously referred to and defined as environmental stigma.[1] As noted in a previous column, environmental case studies are one of several acceptable methods for analyzing the impacts of environmental contamination and for estimating the impaired value of a contaminated or previously contaminated property.[2] The other methods are paired sales analysis, multiple regression analysis, and income capitalization analysis. When appropriate, these methods may be supported by information gained through market interviews.[3] In future editions of "Environment and the Appraiser," these other methods will be explored in greater detail.

There can be three property value effects that may result from environmental contamination: *cost effects*, or reductions for costs to remediate a contaminated property to appropriate regulatory standards; *use effects*, or limitations on the highest and best use of properties that may be impacted by environmental contamination; and *risk effects*, or adverse effects on value due to increased perceptions of environmental risk by relevant market participants.[4] The latter effect is usually the most difficult to analyze and quantify with appropriately supported market evidence. Risk effects should be quantified with clear and convincing market data and evidence rather than unsupported speculation or judgment in the abstract.

The analysis of market transactions to estimate the risk effects of environmental contamination on property values, or environmental stigma, is largely dependent upon the availability of sales data that reflects the mix of environmental and market conditions of the subject property or properties. Frequently, there are few or no transactions involving similar properties with similar environmental conditions to the subject(s) in the same local market area. In these situations, a standard sales comparison analysis is not possible. Thus, the appraiser could look to other markets for relevant sales data involving properties similar to the subject and its environmental condition. Since real estate markets are highly localized–usually with many submarkets in larger metropolitan areas–these "other markets" may be found within the same metropolitan area or city as the subject. In situations where the subject is located in a smaller area, the appraiser may need to look for comparable markets, neighborhoods, or districts in more distant areas.

Once the relevant market data has been located through this search procedure, a case study analysis can be performed to analyze the extent to which the environmental condition of the subject property may have adversely impacted its value due to the risk effects, or environmental stigma. This methodology will be discussed generally in the next section. The use of environmental case studies will be illustrated with actual data on contaminated industrial properties in the Dallas-Ft. Worth metropolitan area (metroplex). The specific issue to be analyzed through this illustration involves the extent to which there is an adverse stigma-related effect on property value due to the environmental condition of properties that are being remediated through an approved monitored natural attenuation process, a remediation process that is being used more frequently across the United States.

### Overview of Case Studies Methodology

Jackson and Bell offer an in-depth look at environmental case studies and the elements that should be considered in a case studies analysis.[5] As they state, "the central message here is that 'apples to apples' comparisons must be made, and that a number of specific elements must be considered for a valid and reliable case study analysis."[6] The elements that should, and in some situations must, be considered fall into three general catego-

---

1. Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 132.

2. Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 316.

3. Ibid., 315–319.

4. Ibid., 314.

5. Thomas O. Jackson and Randall Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 86–95.

6. Ibid., 86.

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

ries: property characteristics, contamination discharge issues (environmental condition), and other/related issues. Each of these categories and the detailed elements of comparison within them are examined next.

## Property Characteristics

Two property-related characteristics that should be considered in the selection and analysis of case study properties are property type and market condition. As with any appraisal assignment involving comparable sales, the properties selected as comparables should be of the same type as the subject property. For example, income-producing commercial and industrial properties are not comparable to owner-occupied residential properties in a nonenvironmental appraisal assignment, and are not appropriate comparables for assignments involving the analysis of contaminated properties. The markets and market participants for properties in these diverse categories have different motivations and will or could be impacted in much different ways and through different market mechanisms. Indeed, empirical research has shown that properties in these categories are impacted differently by the same contamination source.[7]

Likewise, the comparable case study property should be located in a market area with the same general market conditions as the area in which the subject property or properties are located. The importance of market conditions in the analysis of the impacts of environmental contamination on property values lies in their potential intervening effects. In other words, various market conditions can influence the extent to which contamination impacts property values. Empirical research on environmental risk perceptions has found that strong market conditions tend to mitigate or reduce the adverse impacts of contamination, while weak market conditions tend to exacerbate or increase the impacts.[8] Thus, comparability in market conditions between the subject property and the case study property or properties is an important aspect of a reliable case study analysis.

## Contamination/Discharge Issues (Environmental Condition)

The next set of elements is related to comparability between the environmental condition of the subject and case study properties. These elements include: whether or not the property is a source, non-source, adjacent, or proximate property with respect to the release of the contamination; whether the contamination was the result of an accidental or permitted release; the type of contaminant; the level of the contamination; the area bioavailability/risk exposure; and the remediation lifecycle stage of the contaminated or previously contaminated properties.

The first element, involving the relationship of the subject property to the source of the contamination that may be impacting its value, categorizes properties as being a source site for the contamination, a contaminated non-source site, an adjacent but uncontaminated property, or an uncontaminated site that is not adjacent but in proximity to the contamination source. The environmental risk and stigma effects will vary considerably by these categories. For example, source sites that must be remediated have a much different set of risk factors than uncontaminated adjacent or proximate sites.

The second element, as noted, is whether the contamination was accidentally released or was the result of a permitted release. Accidental releases can involve an enforceable requirement for remediation, with resulting uncertainty about costs, timing, etc., while permitted releases by definition have been approved by the regulatory authorities and are usually not required to be corrected or remediated.

The third and fourth elements, type and level of contamination, refer to the specific contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.), the contamination conveyance (groundwater, soils, etc.), and the level or amount of contamination. Each combination of these elements involves very different types and levels of environmental risk. Related to this is another element termed "area bioavailability." This refers to the extent to which a particular constituent may actually pose a risk to a receptor (human) through an exposure pathway.[9] If there is no exposure pathway or exposure potential, there is little bioavailability and much less or no environmental risk that could produce a stigma effect on property value.

The last element pertaining to the comparability of the environmental condition of the subject and case study properties involves their stage in the remediation cycle (before, during, or after cleanup) as of the date of value for the subject property and as of the date of sale for the case study property.

Existing empirical research has demonstrated quite different impacts of environmental contamination, risk perceptions, and price effects for each stage in the remediation cycle.[10] Generally, the greatest impacts on property values due to increased environmental risk and stigma occur before remediation, when the least

---

7.  G. William Page and Harvey Rabinowitz, "Groundwater Contamination: Its Effects on Property Values and Cities," *Journal of the American Planning Association* 59, no. 4 (Autumn 1993): 473–81; and Mark Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July 1997): 279–85.

8.  Thomas O. Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," *Journal of Real Estate Research* 22, no. 3 (November–December 2001): 271–288.

9.  Raymond C. Loehr, "The Environmental Impact of Soil Contamination: Bioavailability, Risk Assessment, and Policy Implications," Policy Study No. 211, Reason Public Policy Institute (August 1996).

10. Thomas O. Jackson, "Environmental Contamination and Industrial Real Estate Prices," *Journal of Real Estate Research* 23, no. 1/2 (January–April 2002): 179–199; Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders"; and Thomas O. Jackson, "The Effects of Environmental Contamination on Real Estate: A Literature Review," *Journal of Real Estate Literature* 9, no. 2 (2001): 93–116.

is known about the requirements, timing, and costs for site cleanup. As the remediation plan is approved and cleanup commences pursuant to the approved plan, risk and uncertainty decrease. In the third stage, after completion of the approved remediation and achievement of a no further action (NFA) status with respect to regulatory requirements, risk and stigma diminish further and may disappear altogether. This general pattern would apply to source sites as well as contaminated non-source properties, even if the primary remediation activities were at the source site. Thus, the subject property and the comparable case study properties must be in the same stage of the remediation cycle for reliable inferences and a credible case studies analysis.

## Other/Related Issues

Finally, there are a number of other important elements to be considered, some of which may not be applicable in all case study analyses. The first involves the responsibility for cleanup costs. Frequently, the party responsible for the contamination and its remediation will indemnify a prospective buyer and/or lender against future responsibilities for such costs. In many cases, this could significantly reduce the uncertainty and risk associated with these costs. Another element to be considered in a case study analysis is the extent to which there are or will be any limitations on the use of the property due to remediation activities or subsequent to remediation. A further element is the extent to which there are third-party liabilities, such as off-site impacts for source sites, that may influence environmental risk and stigma impacts. Lastly, the date of value for the subject and the date of sale for the case study property should be similar since the market's experience in dealing with contamination-related issues has varied over time.

## Two-Step Valuation Process

The mechanics of an analysis of environmental case studies typically involve a two-step process.[11] The first step would largely follow the preceding discussion in identifying appropriate and comparable case studies that have the same property, environmental, and other characteristics as the subject property or properties. An important intermediate step, though, involves the treatment of projected remediation costs for these properties. Assuming the purpose of the analysis is to estimate the effect of environmental risk and stigma on property value, the prices of the case study property sales should be adjusted for these costs.

As explained by Jackson and Bell, the sale prices for source site comparables should be adjusted to remove the effect of future remediation costs where such costs have been reliably estimated. This can be accomplished by adding the estimated costs to be paid by the buyer from property cash flows to the nominal sale price. This would leave an adjusted price that re-

flects the risk-related effects of the case study property's environmental condition on its price as of the date of sale.[12] Next, the case study properties are matched with otherwise similar but uncontaminated properties in their local market area in order to determine the extent to which their prices may have been adversely impacted by their environmental condition through paired sales analysis.

The second general step would be to compare each of the case studies to the subject property. Proper analysis of the case studies through paired sales will have resulted in an estimated property value diminution. The case studies can then be compared to the subject property based on their comparability on the elements discussed above. A relative comparison analysis can be used for this purpose. As explained in *The Appraisal of Real Estate*, each element is compared and assigned a rank of superior, inferior, or similar.[13] An overall ranking is then made after considering each of the individual comparisons. The overall ranking or net comparison derived from the case studies provides the basis for reconciling a range of indicated impacts on value. This is usually the final step in the case study analysis. In some assignments, however, an additional step is the deduction of the subject property's estimated future remediation costs that are to be borne by property cash flows and not by the seller or another source, such as environmental insurance or a state reimbursement fund. This step provides a final adjusted estimate of the subject's impaired value.

## Case Study Application

This section presents an application of the case study methodology. The application involves an improved industrial property in the Dallas-Ft. Worth metroplex. The exact address of this property will be withheld, and the presentation will focus on the analysis of a specific environmental condition rather than the subject property. The purpose of this presentation is to illustrate how case study analysis can be used to analyze a given and factual environmental condition. The resulting analysis can then be applied to a subject property with a similar environmental condition in order to estimate any diminution in value due to the condition. This last step will be discussed but not presented in detail.

### Monitored Natural Attenuation

The environmental condition to be analyzed here is associated with a remediation technique known as monitored natural attenuation. As defined by the U.S. Environmental Protection Agency (EPA), monitored natural attenuation (MNA) is

> the reliance on natural attenuation processes (within the context of a carefully controlled and monitored site cleanup approach) to achieve site-specific

---

11. Jackson and Bell, 87; and Thomas O. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," *The Appraisal Journal* (April 2001): 200–210, see especially 204–206.

12. Jackson and Bell, 87.

13. Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 459–467.

Copyrighted material licensed by Randall Bell on April 26, 2021

remediation objectives within a time frame that is reasonable compared to that offered by more active methods. The "natural attenuation processes" that are at work in such a remediation approach include a variety of physical, chemical, or biological processes that, under favorable conditions, act without human intervention to reduce the mass, toxicity, mobility, volume, or concentration of contaminants in soil or groundwater. These in-situ processes include biodegradation; dispersion; dilution; sorption; volatilization; radioactive decay; and chemical or biological stabilization, transformation or destruction of contaminants.[14]

In addition, the EPA notes that other terms for natural attenuation in the literature include "intrinsic remediation," "intrinsic bioremediation," "passive bioremediation," "natural recovery," and "natural assimilation."[15] Thus, appraisers should recognize these terms as referring to a natural attenuation process that could form the basis for MNA. The basic idea behind MNA is that "natural processes are to be relied upon to achieve cleanup objectives."[16] The EPA is careful to distinguish between cases where MNA is used "as a remedy, as opposed to the case where 'natural attenuation' processes are occurring as part of a no-action remedy and are not being relied upon to achieve remedial objectives."[17] In other words, an MNA remediation plan is part of a planned and approved cleanup strategy designed to achieve specific objectives with respect to the contamination rather than being part of a "no-action" remedy for the contamination. Further, MNA by definition involves active monitoring of the natural attenuation processes to ensure that remedial objectives are being achieved consistent with the approved plan.

In relation to the remediation life cycle previously discussed, the issue is whether MNA might be considered in the during remediation stage or after remediation stage. Jackson has defined the during remediation stage as "cleanup proceeding under a plan that has been approved by applicable regulatory authorities" and the after remediation stage as "after cleanup to applicable regulatory standards."[18] Thus, it would appear that MNA could be considered a during remediation stage process since cleanup is underway and has not been completed. This is an important issue since the market may react differently to the environmental risks associated with a property that is in the during reme-

diation and the after remediation stages. This issue will be addressed in the analysis presented next.

## Analysis of Case Studies

The subject property for this illustrative case study analysis was a single-story, light-industrial building located in an industrial district near the Dallas-Ft. Worth airport.[19] A semiconductor manufacturer had previously used the building. An environmental assessment of the property found groundwater contamination consisting of volatile organic compounds (VOCs) assumed to have originated from a waste solvent storage tank that had been previously removed from the site. The elevated levels of VOCs were above the minimum content levels set forth by the Texas Commission on Environmental Quality. For this site, MNA was proposed as the most appropriate remediation method due to the limited area of affected groundwater, the lack of migration pathways, the lack of affected groundwater off-site, and the lack of use of the groundwater. As of the date of value for the subject property, however, the Texas Commission on Environmental Quality had not approved MNA remediation for the subject property. Consequently, the analysis of case studies being remediated through MNA—and the effect of that environmental condition on property value—was undertaken under a somewhat hypothetical condition that the subject's MNA-based remediation plan had been approved and was underway.[20]

The Case Study Comparison Chart (Table 1) lists characteristics and relevant elements of comparison of the subject property and four case study properties with relatively similar environmental conditions.[21] Most importantly, three of the four properties were being remediated through MNA as of their dates of sale. Three of the four are industrial properties in other submarkets within the Dallas-Ft. Worth metroplex; one was a retail property. Each of the case study properties and their sales were paired with three to four otherwise similar but uncontaminated properties that had sold around the same date and in the same local market area as the case study property.

**Case Study One.** Case Study One involved the sale of a retail building that as of its date of sale was contaminated with petroleum contamination in the soils from

---

14.  U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, Directive 9200.4-17P, *Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tank Sites* (April 21,1999), 3.

15.  Ibid., 3–4.

16.  OSWER Monitored Natural Attenuation Workgroup, "Underground Storage Tanks, MNA Frequent Question 1," U.S. Environmental Protection Agency, http://www.epa.gov/OUST/oswermna/mnafaq1.htm.

17.  Ibid.

18.  Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," 274.

19.  The information presented herein is factual but not complete. However, it is sufficient to illustrate the methodology and to address the life-cycle issue discussed above. It is presented with permission of the client of a previous appraisal assignment that was prepared in part for litigation that has since been resolved.

20.  In the final analysis, the subject's value had to be adjusted downward to account for the fact that the MNA plan was not yet approved or underway. This downward adjustment was based on an income capitalization analysis. The focus here, though, is to illustrate an analysis of an environmental condition consisting of an MNA-based cleanup through the use of case studies.

21.  This chart is nearly identical in layout and structure to the chart in Jackson and Bell, 88.

**Table 1**  Case Study Comparison Chart

| | Subject Property | Case Study 1 | Case Study 2 | Case Study 3 | Case Study 4 |
|---|---|---|---|---|---|
| **Property Characteristics** | | | | | |
| Property type* | Industrial | Retail | Industrial | Industrial | Industrial |
| Market conditions | Weak | Weak | Strong | Strong | Not reported |
| **Contamination/discharge issues (Environmental condition)** | | | | | |
| Source, non-source, adjacent, proximate | Source | Source | Source | Source | Non-source |
| Permitted vs. accidental discharge** | Accidental | Accidental | Accidental | Accidental | Accidental |
| Type of contaminant | VOCs and chlorinated solvents | Petroleum hydrocarbons | VOCs | Petroleum hydrocarbon and VOCs | TCE, PCE, vinyl chloride, and chromic acid |
| Level of contamination/discharge | Largely contained on-site | On-site soils | Contained on-site | Contained on-site | Extensive from parent parcel |
| Contamination conveyance | Groundwater | Soil | Soil and groundwater | Groundwater | Groundwater |
| Area-bioavailability/risk exposure | No apparent threatened receptors, low risk | Public/domestic water supply well within 0.25 mile | Reportedly low risk for third-party exposure | Other groundwater issues in area | Contaminated groundwater at depths of 30 feet |
| **Remediation Life-Cycle Stages** | | | | | |
| Before cleanup/assessment stage | Characterized | Characterized, storage removed, RAP approved | Characterized, RAP tanks approved | Characterized, approved characterized | Plume, not completely RAP |
| During cleanup/active remediation stage | Monitoring wells present but RAP not approved | Ongoing monitoring per RAP | Ongoing remediation at time of sale | Ongoing remediation at time of sale | Monitoring wells present, No RAP at time of sale |
| After cleanup/ongoing stage | No NFA | No NFA at time of sale | No NFA at time of sale | No NFA at time of sale | No NFA at time of sale |
| **Other Detrimental Condition Issues** | | | | | |
| Costs and responsibility for remediation | Lessee | Seller initiated cleanup, but buyer assumed all responsibilities subsequent to sale | Seller | Seller paid initial costs for monitoring wells, buyer assumed risks of continued remediation at time of sale | Seller of parent parcel on which contamination originated; seller in bankruptcy (but is subsidiary of larger, viable company) |
| Scale of project | Monitoring, natural attenuation planned | Storage tank removal, monitoring | Monitoring, natural attenuation, storage tank removal | Monitoring, natural attenuation | No remediation planned or underway |
| Impacts on use and use limitations | Probable limitations on future residential uses | None noted | Deed restrictions to advise future owners | Deed restrictions limiting residential uses | None, property converted from warehouse to manufacturing after sale |
| Third-party liabilities | Low risk | High risk due to water wells in vicinity | Low risk for third-party exposure | Low risk | Buyer was not responsible party, non-source property |
| Time frame and market experience | 10/1/00 | 10/24/00 | 8/21/00 | 3/24/97 | 1/13/98 |
| Indemnifications and insurance | Indemnities from responsible party | None provided, buyer assumed risk | Indemnities for cleanup costs from seller | None provided, buyer assumed risk | Indemnities from responsible party |
| **Impact of Contamination on Value/Sale Price** | | None - no discernable impact on sale price | None - no discernable impact on sale price | None - no discernable impact on sale price | None - no discernable impact on sale price |

\*  Income-producing properties are not comparable to residential properties.

\*\* Denotes issue that is essential for comparability.

Copyrighted material licensed by Randall Bell on April 26, 2021

a leaking underground storage tank. The seller had initiated a cleanup of the property prior to the sale, but made no indemnifications to the buyer, who assumed full responsibility and all risks subsequent to the sale. Reportedly, the seller had made initial expenditures for remediation, but the state paid for ongoing monitoring. The remedial action plan (RAP) had been approved prior to the sale and consisted of storage tank removal and ongoing monitoring. There was significant area bioavailability/risk exposure due to a domestic water well located within a quarter of a mile from the site. The property had not achieved regulatory closure or no further action (NFA) status at the time of sale.

The unit price for this sale of $64.24 per square foot was consistent with a market range for paired sales of similar but uncontaminated properties, which ranged from $45.42 to $75.63 per square foot. A narrower range, established by two of these sales, was $57.44 to $65.44 per square foot. No diminution in value for the case study subject was indicated. As shown in Table 1, elements of similarity to the subject property for this case study include the general market conditions (weak), source site status, and accidental release site status. Differences suggesting higher environmental risk than the subject include the presence of a nearby domestic water well and the fact that there were no indemnities provided by the responsible party. A difference suggesting lower risk than the subject was the existence of an approved remediation plan for the case study property at the time of sale.

**Case Study Two.** Case Study Two involved the sale of an industrial/manufacturing facility in a strong market area within the metroplex. The property was vacant at the time of sale, had been vandalized, and needed work; however, the market was considered strong. The initial buyer resold the property for $18.85 per square foot. At that time, the property was configured as a warehouse. The property's seller, a former tenant, was responsible for the source site contamination consisting of VOCs from storage tanks in the soil and groundwater. The buyer was indemnified against remediation costs by the responsible party. The RAP consisted of MNA, with chemical injections to expedite the attenuation process. There was reported to be deed recordation of the property's condition as the contamination was, in part, to be left in place. Eleven monitoring wells were installed to track changes in the contaminant plume. Remediation was underway at the time of sale and NFA status had not been achieved at the time of sale.

The case study property was paired with three uncontaminated properties that indicated a market range of $15.11 to $22.36 per square foot, which brackets the case study subject unit price of $18.85 per square foot. Again, no diminution in value is indicated. As shown in Table 1, elements of similarity to the subject property for this case study include the fact that it was a source site and an accidental release site with VOC contamination in the groundwater. Like the subject, the contamination was largely contained on-site. Also like the subject, the remedial strategy consisted of MNA.

A risk-increasing element of dissimilarity (relative to the subject) was the lack of indemnifications. A risk-reducing element (relative to the subject) was that the RAP for the case study property was approved at the time of sale.

**Case Study Three.** Case Study Three involved the sale of an industrial building and some excess land. Adjusting the price for the excess land resulted in an adjusted unit price of $22.70 per square foot. There were reportedly some elements of deferred maintenance (new roof and parking lot repaving) that would raise this price. Costs for these items were unavailable. The environmental condition of this property at the time of sale was groundwater contamination with petroleum hydrocarbons and VOCs that were being remediated through MNA pursuant to an approved cleanup plan. There were no indemnifications from the responsible party, and the buyer assumed all risks. The property was subject to deed restrictions limiting its use for residential purposes. Like the other case studies, NFA status had not been achieved at the time of sale.

This sale was paired with three sales of otherwise similar, unimpaired properties located in the same submarket area. These sales produced a range of unimpaired unit prices of $14.49 to $29.67 per square foot. As shown in Table 1, elements of similarity to the subject property for this case study include the fact that it was a source site and an accidental release site with VOC contamination in the groundwater. Like the subject, the contamination was largely contained on-site. Also like the subject, the remedial strategy consisted of MNA. A risk-increasing element of dissimilarity (relative to the subject) was the lack of indemnifications. A risk-reducing element (relative to the subject) was that the RAP at the case study property was approved at the time of sale.

**Case Study Four.** Case Study Four involved the sale of an older industrial building for $14.55 per square foot. The property was part of a larger parcel owned by the party responsible for groundwater contamination, consisting of TCE, PCE, vinyl chloride, and chromic acid. The contamination originated from another part of a larger parcel. There was no remediation at the time of sale, although monitoring wells were in place. The owner of the parent parcel provided indemnities for cleanup costs, although that entity went into bankruptcy. A remediation trust fund was reportedly established for cleanup of the parent property. The entity was a subsidiary of a corporation that is reportedly solvent. There was no approved RAP at the time of sale. Although the buyer was not the responsible party, documents indicate that it was understood that the state regulatory agency could pursue enforcement actions against it subsequent to its acquisition of the property.

This sale was paired with three sales of otherwise similar, unimpaired properties, all of which were within a few miles of the case study (impaired) property. These sales established a market range of $11.98 to $17.35 per square foot for the case study subject, and no value diminution was indicated. As shown in

Table 1, elements of similarity to the subject property for this case study include the fact that it was an accidental release of groundwater contamination. Unlike the subject, the property here was not the source of the contamination. Like the subject, though, there was no approved RAP at the time of sale. The extent of the contaminant plume was not characterized at the time of sale. The effect of the responsible party's indemnities is unclear since it went bankrupt, although there was a remediation trust fund.

## Conclusion

The foregoing analyses of several case studies involving MNA remediation indicate that these properties can and do sell at unimpaired values. The case study properties had property and environmental characteristics similar to the subject property. All of the properties sold prior to the completion of remedial activities. Ongoing remediation on three of the four properties consisted of monitored natural attenuation. With an approved RAP, this type of remediation does not appear to have any adverse impact on the price and value of these commercial and industrial properties. The one property without an approved RAP was somewhat different in that it was a non-source site. However, the data indicates that where there is an approved RAP and a monitored natural attenuation cleanup strategy, a variety of types of soil and groundwater contamination (including chlorinated solvents, VOCs, and petroleum hydrocarbons) will not adversely impact the price and value of these properties.

This analysis also has important implications with respect to the aforementioned issue concerning property value effects from on-going MNA remediation and the remediation life-cycle typology. As explained, since the remediation at the subject property was on-going and had not yet been completed, the property would be classified as in the during remediation stage of the life cycle. In this stage, research has found additional perceived risk and reductions in property value.[22] However, this research was not based on properties or scenarios that included ongoing, approved MNA remedial plans. When specifically evaluated, remediation through MNA appears to have little or no effect on property value and is more closely akin to an after cleanup stage in the remediation life cycle. Accordingly, from a valuation standpoint, a property in the during remediation stage but with an approved MNA remediation plan could be treated similarly to a post-remediation property in terms of the effects of environmental stigma.[23]

---

22.　Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," 271–288; and Jackson, "Environmental Contamination and Industrial Real Estate Prices," 179–199.

23.　As always, individual property and site characteristics must be considered in the valuation of a particular property and in drawing any conclusion concerning the impact of environmental contamination on property value.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 4.5 When Good Things Happen to Bad Properties

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the Spring 2009 issue of *The Appraisal Journal*.

Most studies of the effects of environmental contamination on property values have focused on the adverse consequences of contamination on the market value of the impacted properties.[1] For example, a recent book, *When Bad Things Happen to Good Property*, presents a litany of adverse consequences associated with the effects of contamination on real property and discusses these issues in the context of litigation claims for damages.[2] Another recent book, *Real Estate Damages: Applied Economics and Detrimental Conditions*, presents a series of case studies that catalog adverse effects of contamination and other detrimental conditions on property values.[3] What is largely missing from published studies is discussion of the recovery of market value as contaminated properties move through the remediation process, and environmental risk and stigma are reduced or eliminated.

### Environmental Stigma and the Remediation Lifecycle

The potential effects of contamination on property values are not constant over time, and may change as a contaminated property is remediated. This change in effects, as a property moves through remediation, is anticipated in the valuation framework set forth in Advisory Opinion 9: "The Appraisal of Real Property That May be Impacted by Environmental Contamination" (AO-9) and is discussed in *The Appraisal of Real Estate*, 13th edition.[4] AO-9 defines the *remediation lifecycle* as

> A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. **A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination.** Environmental risk can be expected to vary with the remediation lifecycle stage of the property.[5] (Emphasis added.)

Environmental risk is linked to the frequently misunderstood concept of environmental stigma, which is "an adverse effect on property value produced by the market's perception of increased environmental risk due to contamination."[6] The importance of these concepts for the recovery of market value in a contaminated or previously contaminated property is that the influence of risk and the stigma effect decline over the remediation lifecycle. As discussed next, studies have found diminishing stigma effects over time, especially as a source property is remediated.

### Empirical Evidence of Recovering Property Values

#### Recovery of Value of Proximate Property

The issue of recovered or recovering property values has been addressed in several studies and articles on the effects of contamination on property values and prices. While this was not the primary focus of the studies, early literature on the effects of contamination found such diminishing effects. For example, in analyzing the effects of the Three Mile Island nuclear disaster, Gamble and Downing reported that local realtors perceived a "virtual collapse of the market" immediately following the accident, but after four to eight weeks they observed that sales volume had returned to nearly preaccident levels.[7] For the period immediately following the accident, Gamble and Downing found little impact on sale prices, but did find an effect on marketing time, although this effect was temporary.

Studies of potential property value impacts from landfills have also noted diminishing adverse impacts over time. McClelland, Schulze, and Hurd found that while risk perceptions associated with living in proximity to a landfill were associated with reduced property values, these

---

1. Thomas O. Jackson, "The Effects of Environmental Contamination on Real Estate: A Literature Review," *Journal of Real Estate Literature* 9, no. 2 (2001): 93–116.

2. Robert A. Simons, *When Bad Things Happen to Good Property* (Washington, D.C.: Environmental Law Institute, 2005).

3. Randall Bell, *Real Estate Damages: Applied Economics and Detrimental Conditions*, 2nd ed. (Chicago: Appraisal Institute, 2008).

4. Advisory Opinion 9: "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," Appraisal Standards Board, *Uniform Standards of Standard Appraisal Practice* 2008–2009 ed. (Washington, D.C.: The Appraisal Foundation, 2008); and Appraisal Institute, *The Appraisal of Real Estate*, 13th ed. (Chicago: Appraisal Institute, 2008), 226.

5. AO-9, Lines 92–95.

6. AO-9, Lines 84–85.

7. Hays B. Gamble and Roger H. Downing, "Effects of Nuclear Power Plants on Residential Property Values," *Journal of Regional Science* 22, no. 4 (1982): 457–478.

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

effects were significantly reduced (by over half) after closure of the landfill.[8] Kohlhase studied thirteen Superfund hazardous waste sites in the Houston area and found that adverse property value effects were reduced or eliminated subsequent to the remediation of the hazardous sites.[9] Temporary effects also were found by Wise and Pfeifenberger in their study of a Superfund landfill site in Ohio. They reported that the initial 10% decline in values for surrounding properties lessened steadily over time, even though the landfill site had not been fully remediated.[10]

The change in property values after cleanup was also addressed by Dale et al., who used regression-based hedonic pricing models to examine housing before, during, and after cleanup of a smelter site in Dallas, and to evaluate the extent to which prices may rebound following remediation.[11] Their study found that during the period before cleanup, prices of houses farther away from the site were significantly higher than prices for houses closer to the site; but in the after-remediation period, prices for housing closer to the site rebounded relative to other locations. (Interestingly, the study also found that rebound prices for houses closer to the site were slightly higher than for other houses.)

### Recovery of Value of Contaminated Property

Another set of studies focused on the recovery of prices and value of contaminated industrial properties. An analysis comparing sale prices of previously contaminated industrial properties with otherwise similar but uncontaminated properties in Southern California found no difference in their pricing.[12] In that analysis, the prices of the previously contaminated properties were bracketed by the price range of the uncontaminated comparables. In addition, a regression analysis of the same sales along with a larger number of uncontaminated property sales found a price premium for the previously contaminated properties, although this premium was not statistically significant. One explanation for the premium is that the previously contaminated properties had been tested and remediated to applicable regulatory standards and a great deal was known about their environmental condition relative to properties that may not have undergone such extensive testing. Another analysis, which included contaminated industrial properties sold prior to cleanup, found a sta-

tistically significant price discount before remediation and no adverse effects following cleanup.[13]

A related set of studies focused on contaminated commercial properties (retail centers) in Southern California before and after cleanup.[14] Initial findings from an analysis of 75 retail center sales from 1997 to 1999, including 16 contaminated or previously contaminated sites, indicated price discounts of approximately 20% prior to cleanup, with a statistically insignificant price premium after completion of required remediation.[15] An analysis of the same sales, focusing on income capitalization rates, found an environmental risk premium of 255 basis points over unimpaired capitalization rates prior to cleanup and almost no difference (-7.2 basis points) after cleanup. With an expanded data set, including 120 total sales with 23 contaminated or previously contaminated sales from 1997 to 2004, the impacts were reestimated.[16] The findings of this analysis indicate price reductions from 15.9% to 16.9% for the contaminated sites sold prior to cleanup with no effect for previously contaminated sites sold after remediation. By including the more recent sales, the capitalization rate risk premium decreased to 197 basis points (from 255 basis points). These findings indicated that even for properties sold prior to remediation, the market's perception of environmental risk, and the resulting stigma effect, have been declining over time.

## Macalloy Site Environmental Case Study

To further illustrate the change in property value over time as a contaminated site is remediated and restored to useful condition, we turn to a case study involving the redevelopment of an industrial brownfield site in South Carolina.

The case study site consists of approximately 144 acres located in North Charleston, South Carolina. The waterfront industrial site, referred to as the Macalloy site, was acquired in February 2005 for $12 million. At the time of the 2005 sale, the property was contaminated; remediation was underway but had not yet been completed. The site sold again on March 2007 for $33 million after the planned remediation activities had been completed. In the intervening period of approximately two years, there were site improvements in

8. G. H. McClelland, W. D. Schulze, and B. Hurd, "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site," *Risk Analysis* 10, no. 4 (1990): 485–497.

9. Janet E. Kohlhase, "The Impact of Toxic Waste Sites on Housing Values," *Journal of Urban Economics* 30 (July 1991): 1–26.

10. Kenneth T. Wise and Johannes P. Pfeifenberger, "The Enigma of Stigma: The Case of the Industrial Excess Landfill," *Toxics Law Reporter* (March 1994): 1435–1441.

11. L. Dale et al., "Do Property Values Rebound from Environmental Stigmas? Evidence from Dallas," *Land Economics* 75, no. 2 (1999): 311–315.

12. Thomas O. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," *The Appraisal Journal* (April 2001): 200–210.

13. Thomas O. Jackson, "Environmental Contamination and Industrial Real Estate Prices," *Journal of Real Estate Research* 23, no. 1/2 (2002): 179–199.

14. Thomas O. Jackson, "Environmental Risk Premiums and Price Effects in Commercial Real Estate Transactions" (paper presented at the 21st Annual American Real Estate Society Meeting, Santa Fe, NM, April 2005); Thomas O. Jackson, "The Effects of Environmental Contamination on Commercial Real Estate Prices and Income Capitalization Rates" (paper presented at the 18th Annual American Real Estate Society Meeting, Naples, FL, April 2002).

15. Jackson, "The Effects of Environmental Contamination on Commercial Real Estate Prices and Income Capitalization Rates."

16. Jackson, "Environmental Risk Premiums and Price Effects in Commercial Real Estate Transactions."

Copyrighted material licensed by Randall Bell on April 26, 2021

addition to the remedial activities, which improved the property's condition.

The Macalloy site had been previously improved with an industrial manufacturing facility that produced ferrochromium alloy. The facility was operated by The Macalloy Corporation until 1998 when it ceased operations, reportedly due to competitive pressures. The ferrochromium alloy production process involves smelting iron and chromium in submerged electric arc furnaces. This results in a weapons-grade alloy for high-grade stainless steel used by the U.S. Department of Defense. According to U.S. Environmental Protection Agency (EPA) documents, the slag (waste) from this process, containing hexavalent chromium and cadmium, had been deposited throughout the Macalloy site as fill material and had been used to construct an on-site impoundment area referred to as an unlined surface impoundment (USI).[17] In addition, the site had fine particulate matter ashes and dust (PMAD) from airborne emissions.[18] It was estimated that approximately 60,000 cubic yards of soil had been contaminated with hexavalent chromium, some of which leached into the groundwater at hazardous concentrations.[19] Two groundwater plumes of hexavalent chromium were identified at the site, one of which extended into adjacent surface water.

## Site Remediation and Improvements

In 1997, pursuant to a consent order with the South Carolina Department of Health and Environmental Control (SCDHEC), Macalloy initiated off-site disposal of the PMAD. After the plant closed in 1998, Macalloy, the EPA, and the SCDHEC decided that mechanisms under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) would be more appropriate to achieve site remediation.[20] The Macalloy site was put on the National Priorities List (NPL or Superfund List) in February 2000. A Remedial Investigation/Feasibility Study was approved by the EPA in June 2000, and the Final Phase II Remedial Investigation Report was approved in March 2002.[21] The remedial design was completed in September 2003, and in June 2004, the EPA entered into a consent decree with Macalloy and British Oxygen Corporation, a previous site occupant.

Remediation of the site began in October 2004.[22] Remedial activities included mixing the contaminated soils with a chemical agent that converted the hexavalent chromium to a harmless compound as well as injections into to the contaminated groundwater of a chemical agent that facilitated a similar reaction.[23] In addition, there was implementation of a comprehensive storm-water management system. These remedies were largely complete by September 2006.[24] The total cost of the remedial activities at the site was $9.5 million, all of which was borne by the responsible parties and/or the governmental agencies involved in the cleanup.[25]

The buyer of the site in 2007 partnered with an experienced brownfield investor and developer. The general strategy for such investors/developers is to acquire sites at a significant discount, hold them during the remediation period, and then resell them at significant gain once the property's market value rebounds after cleanup.[26] This was the case with the Macalloy site, which was acquired for $12 million in 2005 and resold in 2007 for $33 million. However, not all of the increase in sale price was due to the property's improved environmental condition and initial price discounts. Reportedly, the buyer invested an additional $14 million in the property during the intervening period for storm-water management (in addition to the amount allocated from the EPA consent decree/Superfund plan); roads and sewers; demolition of existing structures; construction of three buildings; and extensive work below the surface to remove the arc furnaces. The three new buildings, with an estimated cost of $6.5 million, were built after the site was sold but their cost was included in the sale price. In addition, a parcel of 5.08 acres and 3.55 acres of public roadway (a total of 8.62 acres) within the site were not part of the 2007 sale, but had been part of the site when it was acquired in 2005.

## Case Study Sales Analysis

In analyzing the two sale transactions, the 2005 and 2007 prices should be adjusted to account for nonenvironmental differences in the size and condition of the property at the time of the transactions as well as the general appreciation in the industrial property market.

First, the 2005 sale price of $12 million can be adjusted for the 8.62 acres withheld from the 2007 sale by proportionately reducing its price for an adjusted price of $11,218,617.[27] This price is then increased for general

---

17.  U.S. EPA, "NPL Site Narrative for Macalloy Corporation" (February 2000); U.S. EPA, "South Carolina NPL/NPL Caliber Cleanup Site Summaries."

18.  "NPL Site Narrative for Macalloy Corporation."

19.  U.S. EPA, "Superfund Proposed Plan, Macalloy Corporation Site, North Charleston, Charleston County, South Carolina" (U.S. EPA Region IV, April 2002).

20.  Ibid.

21.  "South Carolina NPL/NPL Caliber Cleanup Site Summaries."

22.  Ibid.

23.  Interviews with U.S. EPA Remedial Project Manager.

24.  Craig Zeller, *Superfund Preliminary Close Out Report, Macalloy Corporation NPL Site, [North] Charleston, South Carolina* (U.S. EPA Region IV, September 2006); and interviews with U.S. EPA Remedial Project Manager.

25.  Interview with U.S. EPA Remedial Project Manager.

26.  Thomas O. Jackson, Mark E. Dobroski, and Trevor E. Phillips, "Analyzing Contaminated Real Estate in a Changing Market," *The Real Estate Finance Journal* 13, no. 2 (1997): 67–72; Thomas O. Jackson, "Investing in Contaminated Real Estate," *Real Estate Review* 26, no. 5 (1997): 38–43.

27.  Dividing $12 million by the 143.99 acres sold equals $83,339 per acre. Multiplying this by 8.62 acres equals $718,383.

market appreciation of 1% per year over the 24-month period from the first to the second sale, resulting in an indicated value of $13,989,205. This value is then increased by the cost of improvements to the site,[28] for a final adjusted 2005 price of $21,489,000.

Next, the 2007 sale price of $33 million is reduced by the cost of the buildings that were to be constructed after the sale, estimated at $6.5 million, for an adjusted price of $26,500,000. The net effect, though, is an increase in price and value of 23.3% for the two-year period (over and above the general property appreciation rate and in addition to site improvement costs). This increase in value could be attributed to the difference in the property's environmental condition in 2007 relative to 2005, since nonenvironmental factors were adjusted out of the comparison. Further, since the environmental remediation costs were paid through the Superfund mechanism, this price increase could be attributed to a reduction in the additional risk involved with purchasing the property in its improved 2007 condition relative to its 2005 condition. This is consistent with the investment strategy of brownfields investors, as noted, which

is to buy at a discount, hold the property as it is remediated and regains its value, and then realize a significant gain on resale.

## Summary and Conclusions

There is ample empirical evidence that the adverse effects of environmental contamination on property values can be temporary, and that prices and values recover following remediation. Over the years, studies have found a consistent pattern of a rebound in prices of previously impacted residential, commercial, and industrial properties following the remediation and cleanup of the contamination source. This pattern reflects the increased knowledge about the sites and their environmental condition, the resolution of environmental compliance issues, and the positive effect of this in reducing perceptions of environmental risk and uncertainty.[29] As a site is remediated, the adverse effect referred to as environmental stigma diminishes and in many cases goes away altogether. The environmental stigma effect, therefore, may be considered a temporary rather than permanent effect.

---

28.  This is the difference between the total improvements' cost of $14 million and the $6.5 million for the buildings that had not been built. The building cost will be deducted from the 2007 price, as will be explained.

29.  The decrease in perceived risk by commercial real estate lenders and investors has also been well documented; see Thomas O. Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," *Journal of Real Estate Research* 22, no. 3 (2001): 271–288; and Thomas O. Jackson, "Groundwater Contamination and Real Estate Investment Risk," *Journal of Real Estate Practice and Education* 8, no. 1 (2005): 115–131.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 5

# Regression Modeling in Contaminated Property Assignments

## Introduction

Although regression modeling is a tool that has long been used by academic real estate economists and appraisers who work for property tax assessors, it is now being used more frequently by real estate appraisers in their everyday practice. Brian H. Hurd's October 2002 *Appraisal Journal* article "Valuing Superfund Site Cleanup: Evidence of Recovering Stigmatized Property Values," the second article in this chapter, defines a *regression model* as "a statistical technique used to isolate the effect and contribution of various housing attributes to real estate prices." (page 157) *The Appraisal of Real Estate* uses a more detailed definition, which concludes with a reference to how regression analysis can be used to support an opinion of the contamination situation's effect on prices and values:

> Regression analysis is a statistical technique in which a mathematical equation can be derived to quantify the relationship between a dependent (outcome) variable and one or more independent (input) variables. In appraisal, the dependent variable is usually price or rent. The independent variables are usually broadly derived from the four forces that affect value (social, economic, governmental, and environmental) and the physical characteristics of the land and improvements…It is not uncommon to include an environmental variable or variables when investigating the effects of an external environmental factor such as traffic noise or factory odor.[1]

All of the articles in this chapter should be read with a few caveats in mind. As was made clear in Thomas O. Jackson's article "Methods and Techniques for Contaminated Property Valuation" and the excerpt from the Appraisal Institute seminar on analyzing the effects of environmental contamination on real property in Chapter 2, multiple regression modeling is a generally accepted method for analyzing the effect of a contamination situation on prices and values. But as previously noted in that Jackson article, significant challenges are involved in arriving at relevant conclusions from complex regression models. More importantly, the excerpt from the Instructor Notes to the seminar included in Chapter 2 states that regression modeling has only a limited role in contaminated property assignments. According to those Instructor Notes, regression modeling is useful in measuring "the average differences between groups of properties (impacted and non-impacted neighborhoods)," but "it is *not* used for estimating individual property values." (page 67)

Jackson's Fall 2005 *Appraisal Journal* article "Evaluating Environmental Stigma with Multiple Regression Analysis" provides even more emphasis to those points. That article references the Appraisal Standards Board's Advisory Opinion 18 (AO-18), Use of an Automated Valuation Model (AVM), to support the following warning to appraisers: "The estimates produced by a regression analysis of sales data for properties that may be impacted by environmental contamination are not an appraisal, but can provide the basis for an opinion as to these impacts." (page 150) In other words, regression modeling should be combined with one or more of the other recognized and generally accepted methods, such as paired sales analysis. Jackson nevertheless emphasizes that regression modeling can be important in three different types of assignments involving the valuation of contaminated properties:

1.  Assignments that involve analyzing the effect of remediation on a particular property's value
2.  Assignments that involve determining the effect of proximity to a source site on prices and values
3.  Assignments that involve comparing prices and trends in a control area to prices and trends in an area alleged to be impacted by contamination (pages 151 and 152)

---

1.    *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 295.

A careful reading of all of the articles on regression modeling included in this chapter, other chapters of this anthology (especially Chapter 7), and the Volume I anthology reveals a common set of issues and problems related to the use of regression modeling in contaminated property assignments:

- The "omitted variable" problem
- Proper model specification and the need to avoid underfitting or overfitting a model (specification bias)
- The necessity of testing the outcome of the model for statistical significance
- Multicollinearity and interactions between variables
- The difference between statistical correlation and causation and the importance of testing the null hypothesis using regression analysis

Each of these issues needs to be understood in order to properly comprehend the articles in this chapter.

The "omitted variable" problem is an underlying issue in all regression models. The typical regression model specifies a series of independent (predictor or input) variables that typically affect (contribute to) prices paid for properties. For example, some of the physical variables that determine the variability in prices paid for single-family homes in the same neighborhood are house size, lot size, number of bathrooms, age and condition of the house, or two-car versus one-car garage. There may also be locational factors that cause prices to vary within the same community or neighborhood. For example, some houses in a neighborhood may be more favorably located than others in relation to neighborhood amenities such as parks, shopping districts, or highly rated schools, while other houses may be less favorably located in relation to possible neighborhood disamenities such as railroad tracks, overhead power transmission lines, factory odors, abandoned or foreclosed homes, or traffic noise from a busy street or expressway. When the sales database used in the model includes data from a number of neighborhoods, the number of variables that affect prices can be even larger. Differences in the demographic characteristics of each neighborhood, such as income and employment levels or the percentage of homeowners versus renters, may contribute to price differences. There may be differences between the neighborhoods in terms of other characteristics that are important to the housing market, such as the condition of the streets, the quality of government services, the water supply source, or travel time to major employment or retail centers.

If the model specifies some but not all of the variables that make a significant contribution to home prices, the contributing value of the dependent (output) variable specified in the model as related to a contamination issue will express the effect of the contamination situation on prices and the effect of all unspecified significant variables omitted from the model.

Given the omitted variable problem in regression modeling, the Jackson article includes an additional warning about relying too heavily on the results of regression modeling when arriving at an opinion about the effect of a contamination situation on prices and values: "Complex multiple regression analysis models can produce results that do not reflect the market's reaction to a specific environmental condition or influence, but may reflect other influences masquerading as adverse environmental effects on property values." (page 150)

One factor that contributes to the omitted variable problem is the lack of agreement among economists about the correct number or categories of independent variables that should be specified in a regression model. However, the contribution of various potential combinations of predictor variables can be tested to determine their significance to prices. The Hurd article presents an example of this type of testing. This article summarizes a study of prices in the vicinity of a closed landfill with well-documented contamination problems in Monterey Park, a suburb of Los Angeles. The problems were so severe that the landfill was designated as a Superfund site. Hurd's hedonic property value (HPV) model was designed to analyze the effects of distance and proximity to the landfill as well as ongoing investigation and remediation of the landfill's environmental problems on home prices.

The effect of proximity to the landfill on home prices has been previously studied and the results published in an article co-authored by Hurd.[2] In this subsequent *Appraisal Journal* article dealing with the same landfill, Hurd compares the results of the model as originally specified in the earlier article with the results of a revised model, which adds a number of additional predictor (input) variables, including adjusting actual home sale prices by a CPI housing price change factor. Two other changes to the specifications were also made to "allow for nonlinear effects and interactions between the size of the house, the number of bedrooms and bathrooms, and the year the home was built." (page 159)

Hurd then compares the results of the two models using pre-remediation sales data and concludes that the changes to the model specification improved the performance of the model because the adjusted R-squared values increased from 0.74 to 0.82 in two of the models.[3] He then makes further adjustments to the post-remediation models, and again the R-squareds increase but are very low (0.61), indicating "greater unexplained variation in the more recent sample." (page 160)

However, even though the R-squareds are low, Hurd makes no further attempts in his October 2002 article to improve the model's performance by including additional independent (predictor) variables. The fact that only 61% of the variation in the dependent variable

---

2. Gary H. McClelland, William D. Schulze, and Brian H. Hurd, "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site," *Risk Analysis* 10 (1990): 485-497.

3. The R-squared is the coefficient of determination and measures how well the model fits the data. It is the percentage of the total variation in the response (dependent) variable value that is explained by the predictor (independent or input) variables specified in the model.

Copyrighted material licensed by Randall Bell on April 26, 2021

is explained by the model begs for additional model specification. By comparison, the regression model in the Spring 2005 *Appraisal Journal* article "Is Pollution a Homogenous Determinant of Value?" (by Christopher S. Decker, Donald A. Nielsen, and Roger Sindt) had adjusted R-squareds above 77%.

Warren Rogers' April 2000 *Appraisal Journal* article "Errors in Hedonic Modeling Regressions: Compound Indicator Variables and Omitted Variables" describes how testing of various model specifications can be undertaken to determine whether a possible variable should be included among the independent (predictor) variables. Rogers describes a regression model used to arrive at an expert opinion of a contaminated well's effect on home prices in Texas. The original model claimed to be a comparison of prices in a subdivision before and after the discovery of the well contamination compared to prices in a group of 32 other subdivisions. The expert concluded that the model indicated an impact from the contamination discovery. Rogers points out, however, that the data from the 32 subdivisions in the control group had not been properly coded to allow for grouping of control area sales before and after the critical 1991 date. The specification of the model was improved by further identifying whether a control area sale occurred before or after the contamination discovery group. When that revised model was run, the result indicated no significant impact from the discovery of the contamination. When a further model specification was made to the original model to differentiate between locations within some of the control area subdivisions, the new model suggested that the original indication of an impact on prices due to the well contamination was "suspect" because some of the 32 subdivisions in the control area "suffered equal or greater post-1991 price diminution." (page 167)

While the R-squared analysis measures the explanatory power of the model, analysis of the *t*-statistic and *p*-value can determine both the precision and probability of the result occurring in a collection of random data points.[4] The *t*-statistic indicates the importance of the variable in the model. The *p*-value indicates the probability of seeing a *t*-value of that magnitude in a collection of random data points for each *t*-statistic. A *p*-value of 0.05 (5.0%) or less is generally accepted as indicating a 95% probability that the variable is having some effect, assuming proper model specification. In order to attain such a *p*-value, the *t*-value must be greater than 1.96.

In Table 1 of the Rogers article, all of the *t*-values are greater than 1.96 and all of the *p*-values are less than 0.05. This seems to indicate that the demonstrated impact on price due to the well contamination is statistically supportable. However, as Rogers improved the

model specification, the *t*-values and *p*-values changed significantly and the original model result that indicated an impact on prices due to the well contamination could no longer be supported.

The Jackson article also shows the *t*-statistic and *p*-values for the variables in his model related to measuring the effect (if any) of odors emanating from a sewer lift station. Table 1 in Jackson's article indicated that prices in the neighborhood surrounding the lift station were "$2,129 greater on average than houses in the control areas, holding constant or controlling for the effects of other variables in the model such as house size and age." (page 153) In that table, the *t*-values all exceed 1.96 and therefore the *p*-values are all significantly less than 0.05, indicating a statistically significant relationship.

Table 2 in the Jackson article tests for the effect of distance from the lift station on prices. If odors from the lift station were adversely impacting actual marketplace prices, the expectation would be that prices would increase as distance increases. Table 2 indicates just the opposite: "Prices decrease by $0.79 for each meter of distance from the lift station." (page 153) However, since the *t*-statistic for "distance to lift station" in the regression analysis is less than 1.96, the *p*-value is 0.6810, leading Jackson to conclude that the relationship between distance and change in value is "statistically insignificant" and that "there is no relationship between distance from the lift station and sale price." (page 153)

While the Hurd article makes changes to the model specification to improve the R-squareds, many of the variables in the model have *t*-values of less than 1.96 even after improving the model specification, indicating that there is no statistical relationship between the variables and price. This is true of many of Hurd's distance variables, which is not discussed by Hurd in assessing the accuracy and performance of his model.

*Multicollinearity* is the statistical term for the inter-relationship between variables in a regression model. For example, because house size and number of bedrooms are inter-related, including both as independent (predictor) variables in a regression model likely creates a multicollinearity issue. While that is an issue in the typical regression model dealing with the possible impacts of contamination, it is not necessarily a problem for the outcome of the model concerning the effect of the contamination, the dependent (outcome) variable.[5] The Jackson article provides the following example of why multicollinearity among some of the independent (predictor or input) variables may even overcome some of the omitted variable problem in model specification:

> If a variable that could be a significant predictor was omitted, then its influence could be captured by one

---

4.  The *t*-statistic (also known as the *student's t-statistic*) is defined as the "difference between a sample mean and a hypothesized value of the population mean divided by an estimate of the standard error of the mean (sample standard deviation divided by the square root of sample size). Used to assess statistical significance using known probabilities associated with the *t*-distribution." (*The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010), 321. The *p*-value is calculated based on what is known as the Student's *t* distribution table, which is a probability distribution chart used for estimating the mean of a normally distributed population when the sample size is small and the standard deviation is known.

5.  "It is important to note that multicollinearity has no effect on a model's predictive ability, assuming the model is well specified," (*The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2014), 749.

of the other variables in the model. For example, lot size is frequently missing from multiple listing service (MLS) information and other property records. The influence of lot size on price could be picked up and indirectly accounted for by house size since they tend to be correlated. The model's overall prediction of sale price would still be unbiased; only if lot size correlated with environmental condition would omitting that variable bias the estimated coefficient for environmental condition. (page 151)

Increasing the number of sale price data points in the population or sample can reduce the multicollinearity effect. Otherwise, multicollinearity is often difficult to correct.[6] None of the articles in this chapter attempts to make such a correction.

Albert R. Wilson's Summer 2004 *Appraisal Journal* article, "Proximity Stigma: Testing the Hypothesis," focuses on two important points about the use of regression analysis in analyzing the possible effects of a contamination situation on prices and values. First, Wilson emphasizes the principle that the result of a regression model simply indicates a "correlation" but not "causation." Second, most published regression model-based studies concerning contamination situations do not indicate whether the null hypothesis was tested before the regression analysis was run. Each of these requires further explanation.

To understand Wilson's points, consider the article by Decker, Nielsen, and Sindt that deals with the effect of toxic chemical releases on Omaha-area home prices. The authors conclude the following:

> There is evidence to support the hypothesis that EPCRA-required reporting of toxic chemical releases by companies is having a statistical impact on residential property values, at least in Douglas County, Nebraska. However, there seems to be little evidence showing that the degree of risk to human health and the environment results in any additional reductions in home values. Hence, it would appear that toxic pollutant releases are a negative, but homogeneous, economic attribute in the sense that the full adverse effect of aggregate pollutant releases is being incorporated into the market, irrespective of the degree of harm. (page 188)

Upon reading *The Appraisal Journal*, many appraisers might conclude that the authors have demonstrated that the toxic releases *caused* an adverse impact on home prices. But as Wilson notes, this would be an improper conclusion. All that the result of a regression analysis demonstrates is a correlation, not causation. To provide support, Footnote 6 of the Wilson article includes the following quote from a statistics textbook: "The existence of a statistical relation between the response variable Y and the explanatory or predictor variable X does not imply in any way that Y depends causally on X. No matter how strong is the statistical relation between X and Y, no cause-and-effect pattern is necessarily implied by the regression model." (page 169)

The importance of testing the null hypothesis before undertaking a regression analysis is another important point made in the Wilson article. Simply stated, testing the null hypothesis is using statistical analysis to disprove the proposition that the contamination has no effect on property prices. Although the same data used in the regression model can be analyzed under the assumption that there is no impact, Wilson uses a different data set and type of statistical analysis than regression modeling. As stated in the Wilson article, "All of the tests performed in this market study completely avoid regression and hedonic modeling. The sole objective in this study was to determine whether or not the null hypothesis should be rejected . . . Only if the null were rejected would there be grounds for examining the situation further to find a cause for the difference and to attempt to measure any such difference." (page 172)

The Wilson article then sets forth an example of how to test the null hypothesis in a contamination situation using sale/resale (repeat sales) analysis involving primary pairings. The contamination situation Wilson describes involves groundwater contamination around a plant in Massachusetts. He compared sale/resale data over a 12-year period within the area in closest proximity to the source site both before and after announcement of the contamination situation to sale/resale data over the same period (before and after announcement) in other areas distant enough as to not be potentially impacted. The mean, standard deviation, and median sale prices for each year were then calculated, graphed, and compared, and the $t$-statistics compared and analyzed. The conclusion Wilson draws from the three tables presenting the data is as follows:

> The null hypothesis of no difference in the means between the study area and the other two areas cannot be rejected at the 95% confidence level for any year from 1989 through 1996 because no $t$-value exceeds the 1.96 required for the 95% level of confidence. There was insufficient data (one repeat sale appreciation/depreciation rate) attributable to the year 1994 and none for the year 1997 in the study area and therefore no test statistic was formed for those two years. (page 172)

The same types of issues discussed in this chapter are also raised by other articles that use regression modeling to analyze the impact of contamination on prices in other chapters of this anthology as well as in Volume I. Among those other articles are "The Effects of an Oil Pipeline Rupture on Single-Family House Prices" and "Analysis of the Effects of Contamination by a Creosote Plant on Property Values" in Chapter 7 and "The Effects on Residential Real Estate Prices from Proximity to Properties Contaminated with Radioactive Materials" and "Impact of a Toxic Waste Superfund Site on Property Values" in Volume I.

---

6.    *The Appraisal of Real Estate*, 14th ed., 748. In addition to more data, *The Appraisal of Real Estate* suggests the following: "Data reduction methods such as factor analysis and the use of proxy variables can be employed to gather correlated variables together into a single representative construct. Ridge regression has also historically been suggested as a means of dealing with multicollinearity." (page 748 and 749)

Copyrighted material licensed by Randall Bell on April 26, 2021

## 5.1 Evaluating Environmental Stigma with Multiple Regression Analysis

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the Fall 2005 issue of *The Appraisal Journal*.

This edition of "Environment and the Appraiser" continues our series on generally accepted methods and techniques for evaluating the effects of environmental contamination on the value of real property. The series began with an overview of these techniques and methods and an introduction to paired sales analysis, environmental case studies, multiple regression analysis, market interviews, and income capitalization analysis.[1] Subsequently, environmental case studies and market interviews were addressed in more detail.[2] In each of these articles, specific examples of the application of the techniques were provided. In keeping with this approach, this column will discuss the technique of multiple regression analysis generally and then present an example of its use in analyzing potential proximity stigma effects.

As with the other techniques that have been discussed, the primary focus will be on analysis of the effects of increased environmental risk or stigma. As previously explained, the market value of real property can be affected by three potential effects: *cost effects,* or deductions for costs to remediate a contaminated property to appropriate regulatory standards; *use effects,* or limitations on the highest and best use of the subject property due to environmental contamination and its remediation; and *risk effects,* or the effects on value due to the market's perception of increased environmental risk and uncertainty.[3] The effect of increased environmental risk on property value is referred to as *environmental stigma.*[4] Further, and as noted in Advisory Opinion 9, the "analysis of the increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment."[5] The "market data" referred to in the advisory opinion is sales data. Thus,

multiple regression analysis in this context analyzes sales data to estimate the risk-related effects on property value known as environmental stigma.

Appraisers contemplating the use of multiple regression analysis in evaluating environmental stigma, or for any appraisal-related purpose, should remember the requirements in the COMPETENCY RULE of the *Uniform Standards of Professional Appraisal Practice* (USPAP).[6] To review, appraisers who do not have sufficient training and experience "must: (1) disclose the lack of knowledge and/or experience to the client before accepting the assignment; (2) take all steps necessary or appropriate to complete the assignment competently; and (3) describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report."[7] These requirements would apply to appraisers who had limited experience and/or training in the use of multiple regression analysis generally and as applied to properties that may be impacted by environmental contamination.

### Multiple Regression Analysis and Real Estate Appraisal

Multiple regression analysis is an increasingly used technique in the real estate appraisal field. The Appraisal Institute has two books on this topic as it relates to automated valuation modeling.[8] In addition, the Appraisal Institute offers a seminar entitled *Regression Analysis in Appraisal Practice: Concepts and Applications.* Most universities offer statistics courses that cover regression analysis through either their statistics or economics departments. There is an advisory opinion that addresses the use of automated valuation models

---

1.   Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 311–320.

2.   Thomas O. Jackson, "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation," *The Appraisal Journal* (Spring 2004): 111–118; and Thomas O. Jackson, "Surveys, Market Interviews and Environmental Stigma," *The Appraisal Journal* (Fall 2004): 300–310.

3.   Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," *Uniform Standards of Professional Appraisal Practice*, 2005 ed., Lines 171–180 (Washington, DC: The Appraisal Foundation, 2005), 143–147.

4.   Ibid., Lines 92–93.

5.   Ibid., Lines 180–182.

6.   Appraisal Standards Board, COMPETENCY RULE, Lines 356–397.

7.   Ibid., Lines 359–364.

8.   Mark R. Linné, M. Steven Kane, and George Dell, *A Guide to Appraisal Valuation Modeling* (Chicago: Appraisal Institute, 2000); and M. Steven Kane, Mark R. Linné, and Jeffrey A. Johnson, *Practical Applications in Appraisal Valuation Modeling* (Chicago: Appraisal Institute, 2004).

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

(AVMs).[9] This advisory opinion lists regression analysis as a method that may underlie an AVM, but notes that "The output of an AVM is not, by itself, an appraisal. An AVM's output may become a basis for appraisal, appraisal review, or appraisal consulting opinions and conclusions if the appraiser believes the output to be credible and reliable for use in a specific assignment."[10]

In other words, the estimates produced by a regression analysis of sales data for properties that may be impacted by environmental contamination are not an appraisal, but can provide the basis for an opinion as to these impacts. The appraiser must interpret the results of the modeling process and apply those results to the facts of the situation being analyzed. The appraiser must also have sufficient basis for concluding that the results are credible and reliable. This could involve statistical testing of the results to ensure that they are not biased in a statistical sense and that the model is adequately specified. Complex multiple regression analysis models can produce results that do not reflect the market's reaction to a specific environmental condition or influence, but may reflect other influences masquerading as adverse environmental effects on property values.

## Multiple Regression Analysis and the Sales Comparison Approach

Ultimately, all generally accepted appraisal techniques must be related to one of the three approaches to value: sales comparison approach, income capitalization approach, or cost approach. The use of multiple regression analysis has been likened to a form of the sales comparison approach. In a sale price regression analysis, the sale price (referred to as the dependent variable) is modeled as a function of a number of variables reflecting the property's physical and market characteristics (referred to as independent or predictor variables). The analysis estimates coefficients for each of the independent variables. Linné, Kane, and Dell note that the "adjustments in the sales comparison approach are analogous to the coefficients in a regres-

sion analysis model, but the two sets of values are not usually equivalent."[11] The lack of equivalence could be due to correlations between the independent variables (multicollinearity) or omitted variables (specification error), as will be discussed.

The use of regression analysis in relation to the sales comparison approach, and in particular the technique of analyzing sales through an adjustment grid (the "grid method"), has been discussed in the academic literature for some time. In 1983, Colwell, Cannaday, and Wu noted that "the grid method is shown to be less biased than the pure regression method" due to the omitted variable problem, but that regression-based "hedonic price functions (price as a function of property and other characteristics, added) underlie both grid and regression approaches to appraisal."[12] Later, Kang and Reichert analyzed the use of regression model coefficients in making adjustments within the appraisal-grid framework and compared this hybrid technique to standard regression models.[13] They found that where markets are in equilibrium and have homogenous housing and neighborhood characteristics, the grid method with regression-based adjustments is the preferred approach, while in "less homogenous markets with significant price variation" a "straight regression" using a log-linear form[14] is "more appropriate."[15] Likewise, Pace and Gilley found that "neither OLS[16] nor the grid estimator excel in all circumstances."[17] Lai and Wang compare the adjustment grid method, but with weighting of the comparables (minimum-variance grid method[18]) to multiple regression; they conclude that while both are unbiased, the minimum-variance grid method is preferred because of a lower variance in its prediction error.[19] Lastly, Lipscomb and Gray compare various methods of estimating sale price adjustments, including regression-based adjustments and adjustments derived through various types of matched pair analysis.[20] They find that the standard matched pair analysis approach (in which the average price difference between matched pairs is used to estimate adjustments)[21] and matched pair regression (with sale

9. Appraisal Standards Board, Advisory Opinion 18, "Use of Automated Valuation Model (AVM)," 178–185.

10. Ibid., Lines 18–19.

11. Linné, Kane, and Dell, 49.

12. Peter F. Colwell, Roger E. Cannaday, and Chunchi Wu, "The Analytic Foundations of Adjustment Grid Methods," *Journal of the American Real Estate and Urban Economics Association* 11, no.1 (1983): 27–28.

13. Han-Bin Kang and Alan K. Reichert, "An Empirical Analysis of Hedonic Regression and Grid-Adjustment Techniques in Real Estate Appraisal," *Journal of the American Real Estate and Urban Economics Association* 19, no. 1 (Spring 1991): 70–91.

14. Logarithm of sale price as the dependent variable.

15. Kang and Reichert, 89.

16. OLS stands for ordinary least squares.

17. R. Kelley Pace and Otis W. Gilley, "Generalizing the OLS and Grid Estimators," *Real Estate Economics* 26, no. 2 (Summer 1998): 331–347.

18. The minimum-variance grid method was originally proposed by Kerry D. Vandell, "Optimal Comparable Selection and Weighting in Real Property Valuation," *Journal of the American Real Estate and Urban Economics Association* 19, no. 2 (Summer 1991): 213–239.

19. Tsong-Yue Lai and Ko Wang, "Comparing the Accuracy of the Minimum-Variance Grid Method to Multiple Regression in Appraised Value Estimates," *Real Estate Economics* 24, no. 4 (Winter 1996): 531–549.

20. Joseph B. Lipscomb and J. Brian Gray, "An Empirical Investigation of Four Market-Derived Adjustment Methods," *Journal of Real Estate Research* 5, no. 1 (Spring 1990): 53–66.

21. Ibid., 56.

Copyrighted material licensed by Randall Bell on April 26, 2021

price as the dependent variable, physical characteristics as independent variables and a dummy variable for the feature of interest)[22] "produce the same adjustment estimate," but that the matched pair regression is preferred because it is simpler to perform and provides a standard error of its estimates.[23] Lai and Wang also noted the advantage of regression analysis in being able to estimate a confidence interval (based on standard errors) and perform a hypothesis test of the "true property value."[24]

## Regression Models for Evaluating Environmental Stigma[25]

### General Model Specification

The basic specification of a multiple regression model for analyzing the risk-related effects of environmental contamination on sale price is as follows:

$$Price = \beta_0 + \beta_1 X_1 + \ldots + \beta_n X_n + \beta_{n+1} ENV_1 + \ldots + \beta_{n+1+p} ENV_p + \varepsilon,$$

where:

$Price$ = the sale price of the property; adjusted for the estimated remediation costs to be paid by the buyer, which are known or can be estimated as of the date of sale. Uncertainty concerning these costs would be a risk factor included in the effects captured by the $ENV$ variable(s). Could be transformed through logarithmic transformation (in which case interpretation of independent variable coefficients would be different)

$\beta_0$ = a constant term

$X_1 \ldots X_n$ = a vector of nonenvironmental property characteristics such as building size, age, lot size, etc. Could also include property location and date of sale for property-level model type (discussed next)

$ENV_1 \ldots ENV_p$ = a vector of discrete and/or continuous variables indicating the environmental condition of the property at the time of sale and corresponding to the risk-related (stigma) effects of the contamination. Could include location for control and proximity models and/or remediation status for property-level model (discussed next)

$\varepsilon_i$ = a random error term

In this model specification, the nonenvironmental characteristics that influence sale price are independent, or predictor, variables in the equation. In this way, the variation in sale price "explained" by the nonenvironmental variables (size, age, etc.) would not be incorrectly attributed to the environmental condition variables being tested in the model (distance from contamination source, remediation status, location in contaminated neighborhood, etc.). An analysis of the statistical significance of the environmental condition variables would indicate whether there was adequate statistical evidence to conclude that there were significant environmental impacts on value. In areas with

multiple adverse influences and/or diverse submarkets and property types, it may not be possible to reliably estimate the effect of a single contamination source through regression analysis or a common effect on values across a single area.

The omitted variable problem mentioned earlier refers to important predictor variables that are not included in the mode specification. For analyzing environmental impacts, this would present a problem if the omitted variables were somehow correlated with the environmental condition variable of interest ($ENV$), and the effects on property value were incorrectly interpreted as being due to environmental condition rather than the omitted variable. Otherwise, if a variable that could be a significant predictor was omitted, then its influence could be captured by one of the other variables in the model. For example, lot size is frequently missing from multiple listing service (MLS) information and other property records. The influence of lot size on price could be picked up and indirectly accounted for by house size since they tend to be correlated. The model's overall prediction of sale price would still be unbiased; only if lot size correlated with environmental condition would omitting that variable bias the estimated coefficient for environmental condition.[26]

As the following discusses, the general model specification can be used in three types of multiple regression analyses to estimate the impacts of risk-related effects of environmental contamination on properties in an area around or near a contamination source.

### Property-Level Model

The first approach and model will be referred to as the *property-level model*. Examples of this model approach and specification in the analysis of contaminated industrial properties are provided by Jackson.[27] In Jackson's models, the risk effects of the properties' environmental condition on sale price were analyzed before, during, and after remediation ($ENV_1$, $ENV_2$, and $ENV_3$). Included in the sales analyzed were unimpaired comparable properties, so that the impacts on sale price due to environmental condition were analyzed relative to otherwise similar but uncontaminated properties. Also included are categorical (dummy) variables for the location of the property and the year of sale. The focus of these analyses was on changes in stigma or risk-related effects due to remediation status, rather than on allegations of impacts on properties in an area that may have become contaminated from a common source (non-source properties).[28]

---

22. Ibid., 57.

23. Ibid., 65.

24. Lai and Wang, 548.

25. Portions of this section are from Jackson, "Methods and Techniques for Contaminated Property Valuation," 316.

26. A priori, it is hard to imagine lot size and environmental condition being somehow related, but the appraiser must be aware of this issue when data are missing.

27. Thomas O. Jackson, "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices," *The Appraisal Journal* (April 2001): 200–210; and Thomas O. Jackson, "Environmental Contamination and Industrial Real Estate Prices," *Journal of Real Estate Research* 23, no.1/2 (2002): 179–199.

28. See definitions of *source*, *non-source*, *adjacent*, and *proximate properties* in Advisory Opinion 9, Lines 104–108.

## Proximity Analysis

In a *proximity analysis*, the regression model is usually specified so that one of the independent variables or a set (vector) of independent variables reflects the distance of each of the sale properties analyzed from the source of the environmental contamination. These variables can be specified as continuous distance from the contamination source or as discrete distance bands, or concentric bands, around the source.

Before drawing conclusions from such an analysis, the appraiser should consider the possibility that multiple adverse influences on sale price might exist in areas with a number of contamination sources or other disamenities. In such situations, it may be difficult or impossible to sort out the relative influence of any one source as distinct from the others. Another limitation on this type of analysis involves the general tendency for residential properties closer to older industrial facilities and landfills to sell for less than otherwise similar properties located farther away, regardless of whether the facilities have released any environmental contamination. In this situation, lower sale prices closer to an industrial facility or landfill might not be due to hazardous environmental contaminants, but could be incorrectly interpreted as such.

## Control Area Analysis

A multiple regression *control area analysis* can be used to analyze the effects of contamination on properties in a neighborhood area where it is claimed that property values have been diminished because of environmental stigma. In this type of analysis, sale prices of properties in the potentially impacted area, referred to as the "subject area," are compared to prices of similar properties in a comparable neighborhood having the same characteristics as the subject area but without the adverse environmental condition under study. This comparable neighborhood is referred to as the "control area." In many such analyses, the locational influences of the subject and control areas are compared before and after a contamination event. Such events could be the actual release of the contamination or a public announcement of the release. Typically, such events are publicized in the media.

Issues in developing a reliable control area analysis involve potential time and area interactions and the influence of confounding nonenvironmental factors. In comparing two or more areas, even well-matched areas can be influenced by differing market and locational conditions over time, and these differing influences may be incorrectly attributed to the adverse environmental condition under study.[29] However, the subject and control areas do not need to be identical, but should be influenced by the same general market conditions over time so that changes in relative pricing could be appropriately attributed. Thus, the initial selection of the control areas is a critical step in this type of analysis. In general, the subject and control areas for the analysis should represent definable neighborhoods or market areas for the subject's property type.[30]

## Regression Analysis Application: Alleged Odor Impacts on Residential Properties

To illustrate the application of multiple regression analysis in evaluating environmental impacts, analyses from an actual situation are presented below. The contamination source was a sewer lift station that had allegedly emitted odors, which could potentially diminish property values due to a stigma effect in the surrounding neighborhood. The neighborhood is located in a Dallas suburb, and the properties were all owner-occupied, single-family residences. As of the date of value in 2004, there were no reported odors and there were no expenditures to remediate the residential properties or to repair the lift station. The odors had occurred previous to this time, and the lift station had been repaired at the operators' expense. Thus, any impact would be risk or stigma related. Two types of analyses were performed, a control area analysis and a proximity analysis; the following discusses the results of these analyses.

## Control Area Analysis

The subject area for this analysis was delineated on the basis of the locations of those residents claiming their properties had been adversely affected, and then working outward to approximate a neighborhood. A smaller area drawn more compactly around the houses reporting odors was also analyzed, with results similar to those for the larger neighborhood area. The control areas for this analysis were delineated on the basis of field observation of houses in the vicinity of the subject areas, following accepted guidance for such determinations. While no two areas are identical, these areas appeared to be generally similar in housing type, age, and other characteristics. This was confirmed by statistical summaries of housing data for the subject and control areas.

Table 1 presents a basic control area analysis of differences in sale price between the subject and control areas. The parameter estimates correspond to relative price differences due to each variable. For example, the analysis indicates that on average, each square foot of house size increases sale price by $36.04 and for each additional year a house ages, its sale price declines by $1,067. A swimming pool is shown to add $18,095 to sale price, although this variable may reflect additional amenities that could cluster with pools. The model explains more than 80% of the variation in sale price and overall is statistically significant at acceptable levels.[31]

---

29. Warren Rogers, "Errors in Hedonic Modeling Regressions: Compound Indicator Variables and Omitted Variables," *The Appraisal Journal* (April 2000): 208–213.

30. Neighborhoods and market areas are discussed in Chapter 8 of *The Appraisal of Real Estate*, 12th ed. and in other academic and professional literature. Appraisal Institute, "Market Areas, Neighborhoods, and Districts" in *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 163–187.

31. The base models were tested for residual normality, multicollinearity, and heteroscedasticity, and no problems were indicated.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 1**      Multiple Regression Analysis of Housing Prices, Subject Area Relative to Control Areas

| Variable | Parameter Estimate | t-Statistic | p-Value |
|---|---|---|---|
| Intercept | $74,915.65 | 55.744 | 0.0001 |
| House size (square feet) | 36.04 | 66.756 | 0.0001 |
| Age of house (in years) | -1,067.32 | -16.964 | 0.0001 |
| Year of sale* | 3,349.06 | 18.505 | 0.0001 |
| Swimming pool | 18,095.18 | 24.354 | 0.0001 |
| Subject area 1 | 2,128.93 | 3.320 | 0.0010 |
| Adjusted $R^2$ | 0.830 | | |
| F-value | 1389.979 | | |
| p-value | 0.0001 | | |

\*   0 = 2000; 1 = 2001; 3 = 2003; 4 = 2004

Note:   Analysis based on 1,426 sales of single-family residential properties from January 2000 to November 2004.

**Table 2**      Multiple Regression Analysis of Housing Prices, Proximity to Sewer Lift Station in Subject Area

| Variable | Parameter Estimate | t-Statistic | p-Value |
|---|---|---|---|
| Intercept | $77,914.79 | 23.739 | 0.0001 |
| House size (square feet) | 37.53 | 29.892 | 0.0001 |
| Age of house (in years) | -373.26 | -0.864 | 0.3880 |
| Year of sale | 631.78 | 1.120 | 0.2630 |
| Swimming pool | 22,042.91 | 7.583 | 0.0001 |
| Distance to lift station | -0.79 | -0.412 | 0.6810 |
| Adjusted $R^2$ | 0.766 | | |
| F-value | 203.817 | | |
| p-value | 0.0001 | | |

\*   0 = 2000; 1 = 2001; 3 = 2003; 4 = 2004

Note:   Analysis based on 311 sales of single-family residential properties in subject area from January 2000 to November 2004. Distance from lift station is measured in meters.

The analysis is based on 1,426 sales. These were all the sales available from the MLS system for the January 2000 to November 2004 period that had complete data on the variables in the analysis.[32]

If the market value of properties in the subject area had been reduced by stigma related to the odors, this would be reflected in reductions in prices in the subject areas relative to prices of otherwise similar housing in the control areas. The results of the statistical analyses and tests in Table 1 show just the opposite. The analysis in Table 1, comparing sale prices for the subject area to the control areas indicates that prices of houses in the subject area are $2,129 greater on average than houses in the control areas, holding constant or controlling for the effects of the other variables in the model such as house size and age. This premium is small compared to the average sale price in the subject area of $168,497. However, given the large number of sales in the analysis, this premium is statistically significant.[33] Accordingly, the results of comparing the prices of sales in the subject and control areas over the 2000 to 2004 period do not show any measurable or discernable reduction in prices in the area around the sewer lift station and in the broader neighborhood surrounding it. Indeed, there is even a slight subject area sale price premium. This is the opposite pattern from what might be found if property values in the subject area had been adversely affected.[34]

### Proximity Analysis

The second test of potential adverse impacts on sale price due to the lift station involves an analysis of any sale price differences due to proximity to the lift station site. To accomplish this analysis, the distance of each property sold in the subject area from the lift station was measured and entered as a variable in the multiple regression analysis. The results are presented in Table 2. As shown there, the coefficient for distance (in meters) from the lift station for the 311 sales in the area is -0.79, indicating that prices decrease by $0.79 for each meter of distance from the lift station. With a corresponding t-statistic of -0.412 and a p-value of 0.6810, this is a statistically insignificant relationship. In other words, there is no relationship between distance from the lift station and sale price.[35] Prices in the subject area did not vary with distance from the lift station, indicating no adverse pattern of sale price discounts or value diminution that could be attributable to proximity to the lift station. If there had been adverse impacts due to any gasses released from the lift station, the prices would show a significant decline with distance.

### Stated Preferences, Revealed Preferences, and Market Knowledge

In a previous edition of "Environment and the Appraiser," we discussed the difference between stated and revealed preferences.[36] In general, sale prices are considered indicators of the preferences of the market as "revealed" in an actual transaction. These transactions ultimately establish market value. Stated preferences, on the other hand, are the preferences of the market that may be elicited through various forms of survey research. These preferences may or may not be consistent with revealed preferences (i.e., transactions). When stated and revealed data differ, preference should be given to the transactional data. Even in situations where there may be adverse perceptions, these perceptions must be acted upon and become revealed for mar-

---

32.   Five sales were eliminated due to missing data on one or more of the variables in the analysis.

33.   When the model is reestimated in log-linear form, the premium becomes statistically insignificant.

34.   This result was also tested over time for each year from 2000 to 2004 through an analysis of covariance procedure and estimated marginal means. The findings on a year-by-year basis indicated that price differences were generally not statistically significant. In addition, each individual control area (there were three) was tested against the subject area. No patterns of reduced sale prices were evident.

35.   In the distance model, the coefficients for house age and year of sale are less significant than they were in the previous models. The houses in these areas were built about the same time and generally sold about the same time so there is less variation in price due to these factors.

36.   Jackson, "Surveys, Market Interviews, and Environmental Stigma."

ket values to be affected. Appraisers and others who base their conclusions entirely on stated preference data rather than sales data are speculating as to impacts that have not occurred, and in some cases substituting their judgment for that of the market. As we know, the market establishes value, not the appraiser.

In the odor analysis example presented above, a survey of a nearby neighborhood was conducted to determine if there would be any preference for buying a house in the subject area given its history of odors from the sewer lift station. None of those interviewed indicated that they would buy a house there, so arguably property value impacts should have been quite severe. This finding, of course, is directly contradicted by the hundreds of actual transactions that occurred after the release of the odor from the lift station and after the lift station was repaired. Indeed, subsequent to the odor reports, builders in the subject area disclosed the odor issues and even required potential homebuyers to sign statements as to their knowledge of the situation. The divergence between this revealed and stated preference data is consistent with the observations of the late William Kinnard that "The results from survey analyses must be tempered with the knowledge that the expectation of events is almost invariably more negative and more sharply delineated, at least when [the events] are expected to affect oneself negatively, than is realized when the event occurs."[37]

---

37. William Kinnard, Jr., "Measuring the Effects of Contamination on Property Values: The Focus of the Symposium in the Context of Current Knowledge," in *Measuring the Effects of Hazardous Materials on Real Estate Values: Techniques and Applications* (Chicago: Appraisal Institute, 1992), 5.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 5.2 Valuing Superfund Site Cleanup: Evidence of Recovering Stigmatized Property Values
*by Brian H. Hurd, PhD*

This article originally appeared in the October 2002 issue of *The Appraisal Journal*.

### Abstract

This article addresses the economic consequences that attach to Superfund hazardous waste sites and the extent that these economic effects are recoverable with efforts that address both real and perceived hazards. The analysis uses home sales data in the vicinity of the Operating Industries, Inc. landfill in metropolitan Los Angeles from two distinct time periods: one just after the initial Superfund listing and the second about ten years later toward the end of the cleanup process. The results indicate that the pronounced home value losses observed after initial listing substantially recover during the period in which remedial actions are accomplished. Property values are estimated to have recovered more than 80% of their initial losses.

Cleaning up the legacy of hazardous waste sites in the United States was optimistically begun with the passage of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980. However, the complexities, intricacies, and nuances of the legislation have caused unintended consequences that have slowed cleanup and diverted scarce resources into adversarial litigation. CERCLA also has left residents in communities close to Superfund sites confused, angry, and feeling that they have fallen victim to both the potentially responsible parties (PRPs) who left the contamination and to a government bureaucracy that some believe has further stigmatized their neighborhoods and continued the suppression of their property values.

The decline of real estate activity and property values in residential areas near well-known hazardous waste sites has been well documented.[1] These studies used statistical models to relate home sales prices to the proximity of a hazardous waste site. Known more generally as hedonic property value (HPV) models or mass appraisal models, they are used widely to measure the contribution of a variety of housing attributes to the overall value of property.

In estimating HPV models, most studies have used a single cross section of data collected within a relatively short time period. This data provides a snapshot of local market conditions at a point in time, perhaps a point when perceived problems are at their greatest. The data may point to the extent and magnitude of the local impacts; however, what is often of greater interest

---

1. For examples, see D. Harrison and J. Stock, "Hedonic Housing Values, Local Public Goods, and the Benefits of Hazardous Waste Cleanup," discussion paper, Energy and Environmental Policy Center, Harvard University, 1984; R. Rowe et al., *Economic Assessment of Damage Related to the Eagle Mine Facility* (Boulder, Colorado: Energy and Resource Consultants, Inc., 1985); G. C. Galster, "Nuclear Power Plants and Residential Property Values: A Comment on Short-Run vs. Long-Run Considerations," Journal of Regional Science (26: 4, 1986): 803–805; W. Schulze et al., "A Case Study of a Hazardous Waste Site: Perspectives From Economics and Psychology," in *Improving Accuracy and Reducing Costs of Environmental Benefit Assessments*, Volume IV, prepared for U.S. Environmental Protection Agency by the University of Colorado, Boulder, Colorado, 1986; V. K. Smith and W. Desvousges, "The Value of Avoiding a LULU: Hazardous Waste Disposal Sites," *Review of Economic Statistics* (68, 1986): 293–299; V. K. Smith and W. Desvousges, "An Empirical Analysis of the Economic Value of Risk Changes," *Journal of Political Economics* (95: 1, 1987): 89–114; P. Malone and R. Barrows, "Groundwater Pollution's Effects on Residential Property Values, Portage County, Wisconsin," *Journal of Soil Water Conservation* (45, 1990): 346–348; G. McClelland, W. Schulze, and B. Hurd, "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site," *Risk Analysis* (10, 1990): 485–497; G. Michaels and V. K. Smith, "Market Segmentation and Valuing Amenities with Hedonic Models: The Case of Hazardous Waste Sites," *Journal of Urban Economics* (28, 1990): 223–242; J. Kohlhase, "The Impact of Toxic Waste Sites on Housing Values," *Journal of Urban Economics* (30, 1991): 1–26; K. Ketkar, "Hazardous Waste Sites and Property Values in the State of New Jersey," *Applied Economics* (24, 1992): 647–659; R. D. Mendelsohn et al., "Measuring Hazardous Waste Damages with Panel Models," *Journal of Environmental Economics and Management* (22, 1992): 259–271; G. Michaels et al., "Hazardous Waste Facilities and Residential Property Values," prepared for the U.S. Environmental Protection Agency, Office of Solid Waste, 1992; G. Smolen, G. Moore, and L. Conway, "Hazardous Waste Landfill Impacts on Local Property Values," *The Real Estate Appraiser* (58, 1992): 4–11; A. Reichert, M. Small, and S. Mohanty, "The Impact of Landfills on Residential Property Values," *Journal of Real Estate Research* (7, 1992): 297–314; N. Mangone, "The Effect of a Superfund Site Designation on Property Values—Smuggler Mountain, Aspen, Colorado: A Case Study," *Denver University Law Review* (70: 3, 1993): 511–535; G. W. Page and H. Rabinowitz, "Groundwater Contamination: Its Effects on Property Values and Cities," *Journal of the American Planning Association* (59, 1993): 473–481; D. Walker and J. Hoehn, "A Method for Estimating the Economic Damages of Superfund Sites," working paper, Department of Agricultural Economics, Michigan State University, 1993; K.A. Kiel, "Measuring the Impact of the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on House Values," *Land Economics* (71, 1995): 428–436; Kiel, K.A. and K.T. McClain, "House Prices During Siting Decision Stages: The Case of an Incinerator From Rumor Through Operation," *Journal of Environmental Economics and Management* (28, 1995): 241–255; L. Dale et al., "Do Property Values Rebound from Environmental Stigmas? Evidence from Dallas," *Land Economics* (75: 2, 1999): 311–326.; T.J. Gayer, T. Hamilton, and W.K. Viscusi, "Private Values of Risk Tradeoffs at Superfund Sites: Housing Market Evidence on Learning About Risk." *Review of Economics and Statistics* (82, 2000): 439–451; J.J. McCluskey and G.C. Rausser, "Estimation of Perceived Risk and Its Effect on Property Values," *Land Economics* (77, 2001): 42–55; S.G. Bond, W. Kinnard Jr., P.J. Kennedy, E.M. Worzala, "An International Perspective on Incorporating Risk in the Valuation of Contaminated Land," *The Appraisal Journal* (69, 2001): 258–265.

**Brian H. Hurd, PhD,** is an assistant professor at New Mexico State University in the department of Agricultural Economics and Agricultural Business, where he specializes in natural resource economics.

is the change that occurs (or may be expected to occur) to property values over time. Some area characteristics, such as parks and highways, change very slowly or not at all.  It is assumed, however, that hazardous waste sites will be cleaned up and conditions will significantly improve through time. A few notable exceptions that have examined some of the temporal effects include Gayer et al., Kiel and McCain, and McCluskey and Rausser.[2]

The real estate and legal literature has attached the term "environmental stigma" to properties that have experienced a diminution of values arising out of the presence or assumed presence of an environmental risk.[3] The magnitude of the stigma value is generally highest when the environmental risk is first identified and the level of uncertainty regarding the risk is also at its highest. Through time, as more information and knowledge are gained regarding the nature of the contamination problem and exposure risks, the stigma value falls and is further reduced by cleanup and remediation activities that are taken to isolate or remove the risk.

Stigma values derived from HPV studies measure the value of site cleanup as the reduction in area property values. This is a useful benchmark if nothing is done to cleanup and remedy perceptions of the site. However, if some remedy is undertaken that results in partial or full recovery of property values, then a revised measure of the sustained loss is necessary, a measure that estimates the value of diminished housing services over the period that housing services were diminished.[4] This requires sample data from two distinct points in time, both before and after a significant change in the hazardous perception of the site.

The remediation of hazardous waste sites generally involves some combination of physical changes in site conditions and land use and perceptual changes of the site and its impacts.[5] Perception may be influenced by physical changes and activities to remedy acute problems at the site, as well as other factors such as information and knowledge about the level of actual health risks, favorable media coverage of site and area improvements, and positive feedback through increased real estate market activity as brokers, lenders, and buyers begin to discount previous fears and return to the affected area. Cleanup is a lengthy process.  Data on values after cleanup, such as home sales data, only recently have become available for some of the sites

added early to the National Priority List (NPL). Dale et al.[6] were the first to document the rebound effect of values for properties that were stigmatized by a hazardous facility. They showed that stigma can attach early to an area around an environmental disamenity or adverse event (even prior to extensive media coverage), and that property values can rebound.

This article examines the before- and after-cleanup effects on property values near the Operating Industries, Inc. (OII) landfill in Monterey Park, California. Two sample periods, separated by 10 years and an effort on the part of the government to remediate the site, form the basis of the HPV analysis. While controlling for differences in housing characteristics (e.g., size, age, number of bathrooms), this article compares the estimated effect of distance to the Superfund site on area home sale prices between the period when the site was added to the NPL (1984) and a more recent time period (1996). The paper concludes that remedial activities–especially their perception within both the affected and broader communities–coincide with a significant recovery of property values in the region surrounding the site.

## Site Background

Located 10 miles east of Los Angeles in the suburb of Monterey Park, the privately owned OII landfill stands on 190 acres and towers more than 150 feet over the surrounding community. More than 20,000 people are estimated to live within one mile of the site[7] in an area that is middle income and multiracial. The OII landfill has been the subject of intense regional attention since the early 1980s, when hazardous waste and landfill gas problems began. The OII landfill began operations in 1948, when there was little neighboring development. During its history, the landfill accepted a variety of municipal and industrial wastes, including various hazardous wastes. As the population in southern California grew, development pressure was felt in many municipalities near Los Angeles. In the mid-1970s, the land surrounding the OII landfill was approved for residential development, and soon a middle income neighborhood encircled the OII landfill. In 1979, residents near the landfill formed a group to address what they felt were increasing problems at the landfill. Homeowners to Eliminate Landfill Problems (HELP) organized to reduce odor and eliminate suspected health problems

---

2.    T. J. Gayer, T. Hamilton, and W.K. Viscusi, "Private Values of Risk Tradeoffs at Superfund Sites: Housing Market Evidence on Learning About Risk." *Review of Economics and Statistics* (82:3, 2000): 439-451; K.A. Kiel, and K.T. McClain, "House Prices During Siting Decision Stages: The Case of an Incinerator From Rumor Through Operation," *Journal of Environmental Economics and Management* (28, 1995): 241-255; J.J. McCluskey and G.C. Rausser, "Estimation of Perceived Risk and Its Effect on Property Values," *Land Economics* (77:1, 2001): 42-55.

3.    B. Mundy, "Stigma and Value," *The Appraisal Journal* (January 1992): 7–13; J. A. Chalmers and S.A. Roehr, "Issues in the Valuation of Contaminated Property," The Appraisal Journal (January 1993): 28–41; P. J. Patchin,  "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994): 402–409; and A. R. Wilson, "The Environmental Opinion: Basis for an Impaired Value Opinion," *The Appraisal Journal* (July 1994): 410–423.

4.    In some cases, the land use change results in parks, golf courses, conservation uses, commercial and industrial uses, or even residential uses.

5.    McClelland, Schulze, and Hurd; P. Slovic et al., "Perceived Risk, Stigma, and Potential Economic Impacts of a High-Level Nuclear Waste Repository in Nevada," *Risk Analysis* (11: 4, 1991): 683–696.

6.    Dale et al.

7.    ICF Incorporated, "Interim Final NPL Characterization Project Data Base Documentation," prepared for the Office of Emergency and Remedial Response, U.S. Environmental Protection Agency, 1992.

Copyrighted material licensed by Randall Bell on April 26, 2021

associated with the site. The organization addressed specific issues such as leachate seepage, methane buildup, and land use after closure of the site.

In 1984, the landfill reached its capacity and was closed; however, before its closure, several incidents at the landfill drew attention to further potential problems. As a result of the buildup of methane within the landfill, several underground fires occurred in June 1983, and potentially explosive levels of methane were detected underneath several streets adjacent to the landfill. Also in 1983, levels of vinyl chloride in excess of Environmental Protection Agency (EPA) and state standards were detected in the air around the landfill. These events led the state to include the site on the California Hazardous Waste Priority List in January 1984, which was soon followed by EPA action to include the landfill on the NPL.

Since its inclusion on the NPL, both the EPA and the State of California have been active in the assessment and design of remedial activities. The remedial investigation/feasibility study (RI/FS) recommended long-term studies of the OII site to assess the extent and nature of the problems and provide guidance on the design of remedial measures. The California Department of Health Services also conducted an extensive epidemiological investigation comparing health symptoms of residents near the site with those of control communities.[8] The results indicated no significant differences between the incidence of health symptoms of residents and those in the control communities.

Since 1989, three settlements have been agreed to by EPA, the state, and the potentially responsible parties (PRPs) to remediate problems at the OII landfill. The cost of these settlements is over $205 million, not including anticipated settlements regarding groundwater treatment (if necessary) and final remedy (cleanup) at the site.

## Hedonic Property Value Model

Residential real estate can be viewed as a bundle of characteristics, each of which provides utility (or disutility) to individuals. Individuals are assumed to hold preferences for the services yielded by these attributes, services related to the size and structure of the home and lot, neighborhood characteristics such as schools, and location-specific attributes such as transportation and commuting distances to work, shopping, and recreation. Individuals also may hold preferences over environmental attributes associated with residential land. Noise, air pollution, and local recreational opportunities such as beaches, golf courses, and parks, as well as local industrial and commercial activities, all can affect individual housing choices and prices.

The HPV model is a statistical technique used to isolate the effect and contribution of various housing attributes to real estate prices.[9] The HPV model assumes that in making housing choices individuals strive to maximize utility, subject to budget considerations. The resulting competition for real estate with varying characteristics and attributes leads to a market equilibrium and a set of real estate prices that balance the demand and supply of houses and housing attributes.

In the HPV model, the sales price of property is assumed to be a function of its structural attributes (Si), its neighborhood characteristics (Ni), and its environmental amenities (Ei). In general, this relationship can be written as:

$$P_i = P(S_i, N_i, E_i),$$

where the change in home sales prices attributable to environmental changes is given as:

$$\Delta P_i = \Sigma \frac{aP_i}{aE_i}$$

Using data on home sales and characteristics, an HPV model can be estimated with standard statistical methods. For the neighborhoods surrounding the OII landfill, the author obtained data for the recent sample period (January 1994 through June 1996) from TRW-REDI, a company with an extensive database of property sales data. The earlier sample data (August 1983 through May 1985) was obtained previously from the predecessor to TRW-REDI.

Using this data to estimate how property value damages due to the Superfund site vary with distance, the implied market value for distance from the site is estimated as is the total value of property losses to homeowners in the area. The estimated price gradient can be useful in bounding the benefits associated with changes in the characteristic, in this case, the stigmatized facility.[10]

Perceived risk/nuisance by the property buyers and sellers is the key factor affecting the underlying demand for homes near a hazardous waste facility. These perceptions affect people and their demand for housing. Other items being equal, an individual is willing to pay less for a home where there may be some health risk. Even if this risk belief is held by only some of the residents and potential buyers, the effects on the market can be significant if the distance to the site is sufficiently small to impede home sales. In this case, households that otherwise would like to move face a market in which there are few potential buyers. The number of indifferent households relative to the number of affected homes is key to the movement of prices, and is strongly affected by perceptual cues such as media coverage.[11] Moving and other transaction costs associ-

8.  K. P. Satin, S. Huie, and L. Croen, Operating Industries, Inc. Health Effects Study Technical Report (California Department of Health Services, 1986).

9.  S. Rosen, "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," Journal of Political Economics 82 (1974): 34-55; A. M. Freeman, The Benefits of Environmental Improvement (Baltimore: Johns Hopkins Press, 1979).

10. D. Brookshire et al., "Valuing Public Goods: A Comparison of Survey and Hedonic Approaches," *American Economic Review* 72 (1982): 165–178; T. J. Bartik, "Measuring the Benefits of Amenity Improvements in Hedonic Price Models," *Land Economics* 64, 2 (1988): 172–183.

11. Galster argues that a necessary and sufficient condition for lower property prices in the long run is that "the number of dwellings within the zone of externalities is greater than the number of indifferent households who could occupy them via moving both from within and from outside the given city."

ated with home buying and selling further reduce the potential for market activity, particularly when these transaction costs are similar in magnitude to the loss in property value.

## Model Results and Comparisons

The effects of the OII landfill on nearby properties were first studied by Schulze et al.[12] who analyzed sales data for homes near the OII landfill from between August 1983 and May 1985 (the period during which the site was added to the NPL). Investigating the effect of distance and proximity to the site, they used this data to estimate a set of HPV models. The results of four of these models given in Table 1 show that after controlling for structural housing characteristics, property val-

ues are likely to be negatively correlated with proximity to the site.[15]

Model 1a uses a dummy variable identifying homes within 1,000 feet of the site (PROX1,000) and finds that the value of homes in this area are more than $11,000 lower than those of homes beyond 1,000 feet from the site. Model 1b uses inverse distance to explain sales price variation and finds that the effects of the site decline with distance, falling at a rate of $5,600 per 1,000 feet at a distance of 1,000 feet from the site. The statistical significance of inverse distance in this model, however, is marginal. By comparison, Models 1c and 1d use the more recent data sample taken from 1994–1996 (with sales that have occurred since EPA began cleanup efforts and since expectations of cleanup may have been capitalized into the area's real estate market) and show

**Table 1**      Hedonic Property Value Model Results Near the Operating Industries' Landfill: Original Specifications

| Sample Model | Mean (Std. Dev) | | Estimated Coefficients by Model (*t*-statistics) | | | |
|---|---|---|---|---|---|---|
| | 1983–85 | 1994–96 | 1983–85 (1a) | 1983–85 (1b) | 1994–96 (1c) | 1994–96 (1d) |
| Dependent Variable | | | | | | |
| Unadjusted home sales price ($) | $132,824 | $202,514 | | | | |
| | (34586) | (48044) | | | | |
| Independent Variables | | | | | | |
| PROX1000 | 0.086 | 0.0004 | -11143 | | 3742 | |
| (homes within 1000 ft.) | (0.282) | (0.00044) | -(1.88) | | (0.38) | |
| Inverse Distance | 0.00043 | 0.05 | | -5647960 | | -1089705 |
| (1/distance in feet) | (0.00046) | (0.218) | | -(1.54) | | -(0.21) |
| | | | | | | |
| Monthly sales data | 12.2 | 141.2 | 315.4 | 297.5 | -721.8 | -726.4 |
| (8/83 = 1, 6/96 = 156) | (6.3) | (8.9) | (1.28) | (1.20) | -(3.05) | -(3.06) |
| SQFT | 1598 | 1669 | 55.1 | 54.9 | 22.5 | 22.6 |
| (square footage of home) | (469) | (541) | (8.30) | (8.22) | (4.13) | (4.14) |
| BEDRMS | 3.3 | 3.2 | 1459.0 | 984.7 | 5389.4 | 5229.2 |
| (number of bedrooms) | (0.8) | (0.7) | (0.47) | (0.32) | (1.34) | (1.30) |
| BTHRMS | 1.9 | 2.0 | -1405 | -1286 | 17477 | 176.12 |
| (number of bathrooms) | (0.6) | (0.7) | -(0.34) | -(0.31) | (3.49) | (3.51) |
| YRBLT | 58.5 | 60.6 | 592.8 | 644.0 | 535.5 | 566.4 |
| (year built) | (9.7) | (11.4) | (2.77) | (2.86) | (2.10) | (2.20) |
| Pool | 0.19 | 0.15 | 12543 | 12991 | 4010 | 3853 |
| (with = 1) | (0.40) | (0.35) | (3.12) | (3.23) | (0.67) | (0.64) |
| FPLACE | 0.48 | 0.57 | -2455 | -3441 | 15928 | 16317 |
| (with = 1) | (0.50) | (0.50) | -(0.66) | -(0.93) | (3.53) | (3.58) |
| HWAY | 0.06 | 0.07 | -8173 | -7773 | -2747 | -2426 |
| (home within 2 blocks of highway) | (0.23) | (0.26) | -(1.23) | -(1.16) | -(0.33) | -(0.29) |
| CONSTANT | | | 4239.2 | 5006.5 | 172901.5 | 172254.4 |
| | | | (0.37) | (0.43) | (4.57) | (4.56) |
| | | | | | | |
| RMSE[1] | | | 17539 | 17617 | 35278 | 35284 |
| ADJ_R2 | | | 0.743 | 0.741 | 0.465 | 0.465 |
| DF | | | 129 | 129 | 286 | 286 |

1.  The root mean square error (RMSE) is also reported in the tables and can be used to judge overall model performance. However, this measure is directly affected by sample size, growing directly with the number of observations. Since the number of observations is not constant for the 1983-1985 sample between the two sets of models, the RMSEs cannot be directly compared. However, in spite of the additional observations, the RMSE falls under the updated model specification and further supports the choice of the updated specification.

---

12.  G. McClelland, W. Schulze, and B. Hurd. "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site." *Risk Analysis* (10, 1990): 485–497; McCluskey, et al, *Ibid.*

13.  Schulze et al.

Copyrighted material licensed by Randall Bell on April 26, 2021

that neither proximity nor inverse distance explains sales price variation under similar model specifications.

Schulze et al.,[14] in their investigation of sales price effects, were primarily interested in identifying potential sites for a more detailed follow-up study that focused on risk perceptions.[15] As a result, Schulze et al. did not emphasize model specification. We, however, find that the performance of the HPV model can be enhanced through some simple adjustments in the model specification.

Both Schulze et al. and McClelland, Schulze, and Hurd specified their models with a time trend variable (sales date). This variable was intended to explain sales price variations through time; however, it is rather imprecise for capturing general housing price effects within the overall housing market. The author extends the analysis by first transforming the dependent variable (home sales price) into a price adjusted variable (real price) using the consumer price index for housing in the Los Angeles market. Applying this adjustment to both data samples better controls for general housing price effects through time. In addition to transforming the dependent variable to adjust for inflation, two quadratic terms and two interaction variables are added that allow for nonlinear effects and interactions between the size of the house, the number of bedrooms and bathrooms, and the year the home was built.[16]

The results of this new model specification are evident in Table 2. The overall performance and fit of the models improve significantly over their corresponding specifications in Table 1. Both the adjusted R2 of Models 1a and 1b improve from 0.74 to 0.82 in Models 2a and 2b, and Models 1c and 1d improve from 0.47 to 0.54 in Models 2c and 2d.[17] With respect to detecting and measuring the effect of proximity to the site, the updated specification shows a significant increase in the earlier sample in the magnitude and statistical significance of the site and its effect on nearby home sales prices. In this early sample, the estimated loss to homes within 1,000 feet of the site is now estimated at over $24,000 (Model 2a), or 19% of average adjusted sales price, compared to the 8% effect estimated by the prior specification (Model 1a). The inverse distance specifications exhibit the same increases, e.g., a reduction in home value of nearly $15,000 at 1,000 feet. Judging by the estimated student t-statistics, 5.1 and 4.5, in Models 2a and 2b, respectively, for 1,000-foot proximity and inverse distance, the influence of the site is clearly supported by the data from the 1983–1985 sample.

The power of the model to detect the influence of the site is clearly improved under the new specification. The author, therefore, concludes that this specification performs equally well in detecting and measuring

a continuing and more recent effect from the site on nearby land values. The results from the 1994–1996 sample in Table 2 indicate that proximity to the site has a much smaller effect on sale price. Homes within 1,000 feet are predicted to have a slightly lower sale price. Approximately $1,700 less than other homes in the sample. In the second specification, the effect of inverse distance estimates a reduction of $3,000 at 1,000 feet. Furthermore, neither of these coefficients is statistically different from zero.

To further explore the differences between the 1983–1985 sample and the 1994–1996 sample, the data was pooled. In this pooled sample, a new variable, RECENT, is defined to identify home sales from the 1994–1996 sample. In addition, two more variables were created, P1000REC and RECINVD, to examine the effects of sample differences on the estimated site location variables. These variables are the product of RECENT with the 1,000-foot proximity and inverse distance, respectively. Table 3 presents the results for each of the two specifications, Models 3a and 3b, using the pooled sample.

Although the number of months for which data was reported was approximately equal between the two sample periods, 28 months and 30 months for the 1983–1985 and 1994–1996 samples, respectively, sales activity increased by nearly 64% between the two sample periods. The number of sales in the recent sample, on an average monthly basis, is 50% higher than in the earlier sample. This difference in the volume of market activity may also be explained, in part, by the heightened fears and negative perceptions that existed when the OII landfill was closed and added to the NPL in the mid-1980s.

In Table 3, it is difficult to find evidence of a pronounced effect from the site, in terms of either proximity or inverse distance. The sign on both PROX1000 and inverse distance is negative, and is reduced under the more recent sample as expected. However, these effects are not significant with student-t values of 1.6 and 1.0. The lack of significance in the pooled model is explained by the relative dominance of the more recent sample data, and the lack of a clear distance-to-site effect in this sample as seen previously. There is greater unexplained variation in the more recent sample that adds to the imprecision of the pooled estimates. The stigma effect is diminished, either because the overall perceived risks of the site are generally lower relative to the earlier period when perceptual cues were stronger and more frequent (i.e., media coverage), or because the number of households holding strong stigma perceptions have selected out of the market and have fallen in

---

14.  Schulze et al.'s original specification also included a variable on scenic view from the home. This variable was not significant in their analyses and since it was unavailable in the current home sales data, I have not included it in the present model specifications and comparisons. In addition, the 1983–1985 data analyzed in Table 1 also includes three more observations from May 1985 than were included in the original sample analyzed by Schulze et al.

15.  Ibid.

16.  McClelland, Schulze, and Hurd.

17.  I also included an additional 42 observations to the earlier sample that were not part of the original screening model presented by Schulze et al. but were part of later analysis using neighborhood risk characteristics in McClelland, Schulze, and Hurd.

**Table 2**    Hedonic Property Value Model Results Near the Operating Industries' Landfill: Revised Specifications

| Sample Model | Mean (Std. Dev) | | Estimated Coefficients by Model (*t*-statistics) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1983–85 | 1994–96 | 1983–85 (2a) | 1983–85 (2b) | 1994–96 (2c) | 1994–96 (2d) |
| Dependent Variable | | | | | | |
| CPI Adjusted home Sale Price ($) | $127,547 | $ 133,332 | | | | |
| | (33291) | (31824) | | | | |
| Independent Variables | | | | | | |
| PROX1000 | 0.086 | 0.050 | -24339 | | -1678 | |
| (homes within 1000 ft.) | (0.28) | (0.22) | -(5.18) | | -(0.27) | |
| Inverse Distance | 0.000426 | 0.000388 | | -14742743 | | -3096852 |
| (1/distance in feet) | (0.0005) | (0.0004) | | -(4.52) | | -(0.98) |
| SQFT | 1598 | 1669 | 5.17 | 1.67 | 87.13 | 87.71 |
| (square footage of home) | (469.47) | (540.67) | (0.23) | (0.07) | (6.55) | (6.60) |
| SQFT2 | 2772859 | 377032 | 0.0130 | 0.0150 | -0.0120 | -0.0130 |
| (square of SQFT) | (1632467) | (2560491) | (1.27) | (1.45) | -(6.80) | -(6.87) |
| BEDRMS | 3.3 | 3.2 | 14156 | 15386 | 3572 | 3383 |
| (number of bedrooms) | (0.77) | (0.71) | (1.66) | (1.78) | (0.43) | (0.41) |
| BTHRMS | 1.9 | 2.0 | -19133 | -18432 | -3792 | -3790 |
| (number of bathrooms) | (0.61) | (0.66) | -(1.75) | -(1.65) | -(0.41) | -(0.41) |
| SQFTBTH | 3254 | 3486 | 11.62 | 11.34 | 2.52 | 2.54 |
| (SQFT*bathrooms) | (1874) | (2070) | (1.91) | (1.83) | (0.50) | (0.51) |
| SQFTBED | 5500 | 5548 | -8.35 | -9.40 | -3.13 | -3.13 |
| (SQFT*bedrooms) | (2893) | (2624) | -(1.83) | -(2.03) | -(0.68) | -(0.68) |
| YRBLT | 58.5 | 60.6 | -1865.1 | -1782.8 | 2919.5 | 3038.3 |
| (year built) | (9.7) | (11.4) | -(4.22) | -(3.94) | (2.28) | (2.37) |
| YRBLT2 | 3520 | 3805 | 26.04 | 25.91 | -18.46 | -19.13 |
| (square of YRBLT) | (1123) | (1510) | (5.48) | (5.20) | -(1.93) | -(2.00) |
| POOL | 0.19 | 0.15 | 10325 | 10716 | 2904 | 2674 |
| (with = 1) | (0.40) | (0.35) | (3.63) | (3.71) | (0.77) | (0.71) |
| FPLACE | 0.48 | 0.57 | -244.9 | -1599.8 | 3990.8 | 4303.2 |
| (with = 1) | (0.50) | (0.50) | -(0.10) | -(0.64) | (1.34) | (1.45) |
| HWAY | 0.06 | 0.07 | -7360.9 | -10074.1 | 2.9 | 463.1 |
| (home within 2 blocks of highway) | (0.23) | (0.26) | -(1.65) | -(2.26) | (0.00) | (0.09) |
| CONSTANT | | | 99480 | 100839 | -78868 | -82634 |
| | | | (4.54) | (4.50) | -(2.01) | -(2.10) |
| RMSE | | | 13737 | 13968 | 21757 | 21724 |
| ADJ_R2 | | | 0.827 | 0.821 | 0.536 | 0.538 |
| DF | | | 167 | 167 | 283 | 283 |

number relative to households with lower risk perception thresholds. Coupled with a strong regional economy during this period, there is greater unexplained variation in the more recent sample that adds to the imprecision of the pooled estimates. In addition, the variables bedrooms, bathrooms, and square feet (as well as the associated interaction terms) are highly collinear (as indicated by relatively high condition indices for one or more Eigen values). The effect is to reduce the reliability of the parameter estimates (i.e., reducing the estimated statistical significance). Tests for heteroscedasticity using White's test were inconclusive given the significant collinearity that exists between dependent variables such as square feet, bedrooms, bathrooms and related variables. However, amidst the greater noise evidenced

in this model compared to the 1983–1985 sample, the sign of the estimated coefficients show some evidence of the negative effect of the site on nearby land values and the recovery of those values in the more recent sample.

Figures 1 and 2 illustrate the range of results across model specifications and the differences in the estimated impact of the site on land values between the two sample periods. Figure 1 shows the results of proximity within 1,000 feet on housing prices across each of the three models (i.e., original specification, revised specification, and pooled sample specification) and for each sample period. The first two bars illustrate the results from Table 1 under the original specification used by Schulze et al. Losses of over $11,000 show complete recovery (and a bit more) for Model 1c.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 3** Hedonic Property Value Model Results Near the Operating Industries' Landfill: Pooled Sample Specifications

| Sample Model | Mean (Std. Dev) 1983–85 | Estimated Coefficients by Model (*t*-statistics) | |
|---|---|---|---|
| | | (3a) | (3b) |
| **Dependent Variable** | | | |
| CPI Adjusted home Sale Price ($) | $127,547 | | |
| | (33291) | | |
| **Independent Variables** | | | |
| PROX1000 | 0.067 | -8707 | |
| (homes witin 1000 ft.) | (0.25) | -(1.57) | |
| RECENT | 0.625 | 997 | 1265 |
| (from recent sample = 1) | (0.48) | (0.49) | (0.48) |
| P1000REC | 0.031 | 5426 | |
| (PROX1000*RECENT) | (0.17) | (0.71) | |
| Inverse Distance | 0.000403 | | -3546477 |
| (1/distance in feet) | (0.000443) | | -(0.97) |
| RECINVD | 0.000242 | | 495403 |
| (RECENT*Inverse Distance) | (0.000396) | | (0.11) |
| | | | |
| SQFT | 1645 | 75.3 | 76.3 |
| (square footage of home) | (517) | (7.63) | (7.72) |
| SQFT2 | 2971731 | -0.012 | -0.012 |
| (square of SQFT) | (2265210) | -(8.51) | -(8.54) |
| BEDRMS | 3.2 | -54.8 | 551.3 |
| (number of bedrooms) | (0.73) | -(0.01) | (0.09) |
| BTHRMS | 1.9 | -6232.1 | -6726.5 |
| (number of bathrooms) | (0.64) | -(0.94) | -(1.01) |
| SQFTBTH | 3430 | 3.1 | 3.5 |
| (SQFT*BTHRMS) | (2016) | (0.85) | (0.95) |
| SQFTBED | 5544 | 1.0 | 0.5 |
| (SQFT*BEDRMS) | (2736) | (0.30) | (0.15) |
| YRBLT | 59.8 | 145.0 | 221.5 |
| (year built) | (11.2) | (0.31) | (0.48) |
| YRBLT2 | 3705 | 3.2 | 2.7 |
| (square of YRBLT) | (1403) | (0.84) | (0.71) |
| POOL | 0.16 | 5319.2 | 5235.7 |
| (with = 1) | (0.36) | (2.02) | (1.99) |
| FPLACE | 0.53 | 4613.1 | 4608.3 |
| (with = 1) | (0.50) | (2.16) | (2.15) |
| HWAY | 0.067 | -4753.1 | -4778.4 |
| (home within 2 blocks of highway) | (0.25) | -(1.25) | -(1.26) |
| Constant | | 16933 | 14016 |
| | | (0.91) | (0.75) |
| | | | |
| RMSE | | 20179 | 20196 |
| ADJ_R2 | | 0.612 | 0.611 |
| DF | | 461 | 461 |

However, as discussed earlier, this specification does not have the explanatory power of the updated model. The updated specification (Model 2) shows the greatest impacts to land values in the early sample period with losses exceeding $24,000 per home, and it shows that in the recent sample period land values have recovered to within 98% of their unaffected value. The results from the pooled model show a smaller effect in the early sample and a greater loss remaining within the more recent sample period. Error bars shown in Figure 1 show the standard error ranges for each of the relevant coefficient estimates. These error bars show that in each case the model estimates for the 1983–1985 sample period show a negative effect of proximity to the site, whereas the 1994–1996 sample period results include $0 within the range of the standard error.

Figure 2 plots the estimated coefficient on inverse distance for the updated model and pooled model speci-



**Figure 1**     Effect of OII Landfill on Price of Homes Nearest* the Landfill



Model 1a ('83–'85)     Model 1c ('94–'96)     Model 2a ('83–'85)

Model 2c ('94–'96)     Model 3a (recent = 0)     Model 3a (recent = 1)

*   Within 1,000 feet

**Figure 2**     Effect of Distance on Price of Homes Near OII Landfill



Model 2b ('83–'85)     Model 3b (recent = 0)

Model 2d ('94–'96)     Model 3b (recent = 1)

Copyrighted material licensed by Randall Bell on April 26, 2021

fications. In all cases, land values rise with increasing distance from the site. Using 1,000 feet from the site as a benchmark distance, Figure 2 shows that estimated losses were greatest for the 1983–1985 sample using the updated specification. These losses approach $15,000 per home at this distance and fall to just under $5,000 at a distance of nearly 1 mile. In the 1994–1996 sample the losses at 1,000 feet are just over $3,000 and fall to $600 at 1 mile. The results from the pooled sample show a milder effect from the site, about $3,500 at 1,000 feet in the early sample, and about half that amount for the more recent sample. As with Figure 1, the uncertainty of the pooled estimates is high and is dominated by the lack of a strong location signal in the latter sample period.

## Implications for Measuring Benefits of Site Cleanup

The remedial activities implemented at the OII landfill since its addition to the NPL have had a positive impact on the once depressed real estate market near the site. The evidence presented above suggests that land values near the site have risen at a greater rate than the overall real estate market, and have nearly completely recovered from their initial losses. The net increase in total land value associated with the recovery of land values is estimated by using the estimates derived from the above analysis and an estimate of the number of homes in the affected region.

Based on aerial photographs taken of the OII landfill and the surrounding community, Schulze et al.,[18] identified 4,100 homes in the area defined by their original sample. Using the sample estimate that 8% of the homes in the sample area are within 1,000 feet, 328 homes are estimated to be in relatively close proximity to the site and are those that suffered the greatest losses during the mid-1980s. Taking the difference between the estimates from Models 2a and 2c, $22,660, and multiplying it by the 328 homes, the estimated value of recovered land values is $7.4 million. To value the remaining homes in the area (3,772), an average distance of 3,000 feet is assumed and the estimated coefficients for inverse distance, Models 2b and 2d. The average recovery for homes at this distance is approximately $3,870 ($4,900 minus $1,030). Multiplying the average recovery and the number of remaining homes results in an estimated increase of $14.6 million. Adding these estimates together results in an estimated increase in land values of $22 million since their low point in the mid-1980s. This increase is comparable to the total loss of $27 million estimated by Schulze et al.

Expenditures at the OII landfill have been much higher: over $60 million has been spent, and total expenditures will approach $300 million before remedial activities at the site are complete. The measure of hous-

ing market value benefits (i.e., the $22 million estimated here), however, does not include other benefits that may reasonably be assumed to accrue (but are more difficult to quantify) such as reduced health risk and contamination of groundwater in the San Gabriel Valley and the impact to property values beyond the region studied (e.g., the communities of Monterey Park and Montebello, which have endured their association and notoriety with the landfill).

## Conclusions

This article demonstrates that property near hazardous waste sites can recover value through time because of changes in buyer perceptions. The measured changes are hypothesized to be due largely to changes in perceptions that the site is (or is expected to be) cleaned up, though it is difficult to isolate this effect from changes in the strength of the regional economy that could also serve to reduce the household sensitivity to perceived risk issues. Future research needs to investigate the relationships between general economic conditions and sensitivity to environmental factors. Although the OII landfill is still a dominant presence across the communities of Monterey Park and Montebello, recent property sales data show a marked increase in both sales activity and sales prices compared to when the site was being added to the NPL. There is no longer a pronounced (measurable) signal relating a home's proximity to the site and a lower sales price.

Property value models used previously to estimate welfare losses were revised. The model refinements led to an upward revision in the magnitude of losses sustained throughout the community, losses that are estimated at 19% of the average sales price. Compared with the losses estimated for the mid-1980s, and after correcting for overall housing price changes in the Los Angeles area, an overall increase in property values in the area closest to the site (within 1.5 miles) is estimated at $22 million.

Property markets are dynamic and values responsive to environmental attributes, whether actual or perceived. The measured recovery found at this site over a period of about 10 years suggests that perceptions can change, and their level and relative importance in property markets can be influenced by a number of factors including the type and frequency of media reporting, responsiveness of local and federal officials to community concerns, and even to general regional economic conditions. Just as property values appear to be well on the road to recovery at this site, negative events can significantly and swiftly reverse the trend, for example, new discoveries of adverse conditions, breakdowns in operations, such as in methane recovery that leads to an explosion event, or the erosion in public trust regarding the veracity of information provided by officials.

---

18.    Schulze et al.

## References

Bartik, T. J. "Measuring the Benefits of Amenity Improvements in Hedonic Price Models." *Land Economics* (64: 2, 1988): 172–183.

Bond, S.G., W. Kinnard Jr., P.J. Kennedy, E.M. Worzala. "An International Perspective on Incorporating Risk in the Valuation of Contaminated Land," *The Appraisal Journal* (69:3, 2001): 258-265.

Brookshire, D., M. Thayer, W. Schulze, and R. d'Arge. "Valuing Public Goods: A Comparison of Survey and Hedonic Approaches." *American Economic Review* (72, 1982): 165–178.

Chalmers, J. A. and S. A. Roehr. "Issues in the Valuation of Contaminated Property." *The Appraisal Journal* (January 1993): 28–41.

Dale, L., J. C. Murdoch, M. A. Thayer, and P. A. Waddell. "Do Property Values Rebound from Environmental Stigmas? Evidence from Dallas." *Land Economics* (75: 2, 1999): 311–326.

Freeman, A. M. *The Benefits of Environmental Improvement.* Baltimore: Johns Hopkins Press, 1979.

Galster, G. C. "Nuclear Power Plants and Residential Property Values: A Comment on Short-Run vs. Long-Run Considerations." *Journal of Regional Science* (26: 4, 1986): 803–805.

Gayer, T. J., T. Hamilton, and W.K. Viscusi. "Private Values of Risk Tradeoffs at Superfund Sites: Housing Market Evidence on Learning About Risk." *Review of Economics and Statistics* (82:3, 2000): 439–451.

Harrison, D. and J. Stock. "Hedonic Housing Values, Local Public Goods, and the Benefits of Hazardous Waste Cleanup." Discussion paper, Energy and Environmental Policy Center, Harvard University, 1984.

ICF Incorporated. "Interim Final NPL Characterization Project Data Base Documentation." Prepared for the Office of Emergency and Remedial Response, U.S. Environmental Protection Agency, 1992.

Kiel, K.A. and K.T. McClain. "House Prices During Siting Decision Stages: The Case of an Incinerator From Rumor Through Operation," *Journal of Environmental Economics and Management* (28, 1995): 241–255.

Kiel, K.A. "Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on House Values," *Land Economics* (71:4): 428–436.

Ketkar, K. "Hazardous Waste Sites and Property Values in the State of New Jersey." *Applied Economics* (24, 1992): 647–659.

Kohlhase, J. "The Impact of Toxic Waste Sites on Housing Values." *Journal of Urban Economics* (30, 1991) :1–26.

Malone, P. and R. Barrows. "Groundwater Pollution's Effects on Residential Property Values, Portage County, Wisconsin." *Journal of Soil Water Conservation* (45, 1990): 346–348.

Mangone, N. "The Effect of a Superfund Site Designation on Property Values—Smuggler Mountain, Aspen, Colorado: A Case Study." *Denver University Law Review* (70: 3, 1993): 511–535.

McClelland, G., W. Schulze, and B. Hurd. "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site." *Risk Analysis* (10, 1990): 485–497.

McCluskey, J.J. and G.C. Rausser. "Estimation of Perceived Risk and Its Effect on Property Values," *Land Economics* (77:1, 2001): 42–55.

Mendelsohn, R., D. Hellerstein, M. Huguenin, R. Unsworth, and R. Brazee. "Measuring Hazardous Waste Damages with Panel Models." *Journal of Environmental Economics and Management* (22, 1992): 259–271.

Michaels, G., R. Byrnes, P. Giordano, W. Lin, and M. Wojcik. "Hazardous Waste Facilities and Residential Property Values." Prepared for the U.S. Environmental Protection Agency, Office of Solid Waste, 1992.

Michaels, G. and V. K. Smith. "Market Segmentation and Valuing Amenities with Hedonic Models: The Case of Hazardous Waste Sites." *Journal of Urban Economics* (28, 1990): 223–242.

Mundy, B. "Stigma and Value." *The Appraisal Journal* (January 1992): 7–13.

Page, G. W. and H. Rabinowitz. "Groundwater Contamination: Its Effects on Property Values and Cities." *Journal of the American Planning Association* (59, 1993): 473–481.

Patchin, P. J. "Contaminated Properties and the Sales Comparison Approach." *The Appraisal Journal* (July 1994): 402–409.

Reichert, A., M. Small, and S. Mohanty. "The Impact of Landfills on Residential Property Values." *Journal of Real Estate Research* (7, 1992): 297–314.

Rosen, S. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition." *Journal of Political Economics* (82, 1974): 34–55.

Rowe, R., W. Schulze, D. Orr, and B. Hurd. *Economic Assessment of Damage Related to the Eagle Mine Facility*. Boulder, Colorado: Energy and Resource Consultants, Inc., 1985.

Satin, K. P., S. Huie, and L. Croen. *Operating Industries, Inc. Health Effects Study Technical Report*. California Department of Health Services, 1986.

Schulze, W., G. McClelland, B. Hurd, R. Boyce, G. Russell, and J. Smith. "A Case Study of a Hazardous Waste Site: Perspectives From Economics and Psychology." In *Improving Accuracy and Reducing Costs of Environmental Benefit Assessments*, Volume IV. Prepared for U.S. Environmental Protection Agency by the University of Colorado, Boulder, Colorado, 1986.

Slovic, P., M. Layman, N. Kraus, J. Flynn, J. Chalmers, and G. Gesell. "Perceived Risk, Stigma, and Potential Economic Impacts of a High-Level Nuclear Waste Repository in Nevada." *Risk Analysis* (11: 4, 1991): 683–696.

Smith, V. K. and W. Desvousges. "The Value of Avoiding a LULU: Hazardous Waste Disposal Sites." *Review of Economic Statistics* (68, 1986): 293–299.

Smith, V.K. and W. Desvousges. "An Empirical Analysis of the Economic Value of Risk Changes." *Journal of Political Economics* (95: 1, 1987): 89–114.

Smolen, G., G. Moore, and L. Conway. "Hazardous Waste Landfill Impacts on Local Property Values." *The Real Estate Appraiser* (58, 1992): 4–11.

Thayer, M., H. Albers, and M. Rahmatian. "The Benefits of Reducing Exposure to Waste Disposal Sites: A Hedonic Housing Value Approach." *Journal of Real Estate Research* (7: 3, 1992): 265–282.

Walker, D. and J. Hoehn. "A Method for Estimating the Economic Damages of Superfund Sites." Working paper, Department of Agricultural Economics, Michigan State University, 1993.

Wilson, A. R. "The Environmental Opinion: Basis for an Impaired Value Opinion." *The Appraisal Journal* (July 1994): 410–423.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 5.3 Errors in Hedonic Modeling Regressions: Compound Indicator Variables and Omitted Variables

*by Warren Rogers, PhD*

This article originally appeared in the April 2000 issue of *The Appraisal Journal*.

### Abstract

Numerous articles have appeared in this and other journals in which hedonic modeling has been employed in an attempt to estimate the impact of environmental disamenities (oil spills, toxic dumps) on real estate prices. It is commonplace and perhaps invariable practice to introduce "compound indicator variables" in an attempt to capture such joint multiple influences as location and time of sale. The model specifications drawn in such instances are, however, incomplete, result in regressions with omitted variables, and as a consequence draw conclusions that are suspect.[1]

If, in conducting regression analysis, we wish to capture the impact of some dichotomous influence that acts on only part of the population under consideration, the usual practice is to introduce an indicator variable.

$$I(A) = \{1 \text{ if influence } A \text{ is active}$$
$$= \{0 \text{ otherwise}$$

Some influences exist in multiple levels, not just on and off. Soil moisture, for example, is sometimes typified as dry, moist, or saturated. In an article by Alan Reichert, distance is treated as four discrete bands or rings.[2] In general terms, suppose some influence manifests itself at $n$ discrete levels: $A_1, A_2, \ldots, A_n$. These levels are introduced by multiple indicators:

$$I(A_i) = \{1 \text{ if influence present at level } i$$
$$= \{0 \text{ otherwise}$$
$$i = 1, 2, \ldots, n-1$$

Note however that only $n-1$ indicators are introduced to capture the $n$ levels. This is so because when all $n-1$ indicators are zero, the $n$th level is active by implication.

This is not, however, just a matter of convenience or economy in the use of variables. If the $n$th indicator were introduced explicitly it would, for technical reasons, preclude deriving the regression estimates. Technically, whenever the value of any independent variable, indicator or not, can be derived as a linear combination of some or all of the remaining variables, the situation precludes a unique solution of the regression equations. The term "singularity" is used to describe that situation.

When no member of a set of variables can be derived as a linear combination of some or all of the others, the set is linearly independent. It becomes important when more complex indicators are introduced, to verify that no such singularities have been created inadvertently.

In much of hedonic modeling, it has become common practice to introduce a more complex indicator to capture the joint and simultaneous impact of two or more influences. Suppose two possible influences ($A$ and $B$) with indicators:

$$I(A) = \{1 \text{ if } A \text{ active}$$
$$= \{0 \text{ otherwise}$$
$$I(B) = \{1 \text{ if } B \text{ active}$$
$$= \{0 \text{ otherwise}$$

We can then create a new compound indicator to capture the joint and simultaneous impact of both $A$ and $B$:

$$I(A, B) = I(A) \times I(B)$$

For example, $A$ might be the influence of being a house resident in a community where some environmental disamenity was discovered, and $B$ the influ-

---

Author's note: For readers unfamiliar with regression analysis, see the appendix to this article.

1.   I first noted this specification error in several articles when I was reviewing a report submitted as evidence in litigation, the results of which I describe here in detail. I believe that the conclusions drawn in the following papers—and probably many more papers that I have not encountered—draw conclusions that are suspect and require the data to be analyzed again: Alan Reichert, M. Small, and S. Mohanty, "The Impact of Landfills on Residential Property Values", The *Journal of Real Estate Research*, v. 7, no. 3, (Summer 1992): 297–314; Alan K. Reichert, "How Permanent is Stigma?: The Case of a Toxic Waste Superfund Site." Paper presented at American Real Estate Society Annual Meeting, Sarasota, Florida, April 17, 1997; Robert A. Simons, "The Effect of Pipeline Ruptures on Non-Contaminated Residential Easement-Holding Property in Fairfax County," *The Appraisal Journal* (July 1999): 255–279; William Kinnard and Mary Beth Geckler, "The Effects on Residential Real Estate Prices from Proximity to Properties Contaminated with Radioactive Materials," *Real Estate Issues* (Fall/Winter 1991): 25–36; and William Kinnard, Phillip Mitchell, G. Beron, and James Webb, "Market Reaction to an Announced Release of Radioactive Materials: The Impact on Assessable Value," *Property Tax Journal*, v. 10, no. 3 (September 1991): 283–297.

2.   Reichert (1992).

**Warren Rogers, PhD,** is president of Warren Rogers Associates, Newport, Rhode Island. He has written articles on underground storage tank management procedures and is an expert witness for toxic tort cases and UST release event reconstruction. He earned his PhD in statistics at Stanford University in California, and his MS in operations research from the U.S. Naval Post-Graduate School.

ence of the sale of a house in that community after the discovery of the disamenity. The compound indicators are introduced into the regression equation in the usual manner. This is a perfectly valid procedure but only up to the point that conclusions are drawn about the possible causalities associated with the combined influences. Every hedonic analysis of this kind that I have read concluded that the combined influences had a significant impact—not experienced by the population that was not exposed to their joint and compounded influence—whenever the coefficient of the compound indicator was significant.

Apart from such annoying concerns as the validity of imputing causation to any regression result, the conclusion drawn is not justifiable. In the real estate example given, the conclusion is that the sales price of houses diminished in the years following the discovery of the disamenity in the community and that presumably the disamenity caused the diminution. This conclusion implicitly assumes that a comparison was made between sales prices in the affected community after the discovery with sales prices in the unaffected community also after the discovery. In fact, this comparison was not made. The comparison is with sales in the unaffected community both before and after the discovery of the disamenity. Note that:

$$I(A, B) = I(A) \times (B) = 1$$

if and only if,

$$I(A) = I(B) = 1$$

which implies that the house is in the affected community and the sale took place after the discovery of the disamenity. However,

$$I(A, B) = I(A) \times I(B) = 0$$

if,

$$I(A) = 0 \text{ and } I(B) = 1$$

or if,

$$I(A) = 0 \text{ and } I(B) = 0$$

which implies that the house is in the affected community and the sale took place either before or after the discovery of the disamenity.

To capture the comparison presumably desired by the hedonic modelers requires the introduction of an additional variable as follows:

In the real estate example:

$$AC = \text{Affected community}$$
$$NAC = \text{Non-affected community}$$
$$PAD = \text{Public awareness date}$$
$$PREPAD = \text{Prior to public awareness}$$

and the indicators are:

$$I(AC) = \{1 \text{ if the house is in the affected community}$$
$$= \{0 \text{ otherwise}$$

$$I(NAC) = 1 - I(AC)$$
$$I(PAD) = \{1 \text{ if the house sold after } PAD$$
$$= \{0 \text{ otherwise}$$
$$I(AC, PAD) = I(AC) \times I(PAD)$$
$$I(NAC, PAD) = I(NAC) \times I(PAD)$$

Articles I have reviewed introduce the equivalents of two of these indicators—$I(AC)$ and $I(AC, PAD)$—and ignore the third indicator, $I(NAC, PAD)$, which, in fact, merits inclusion and investigation as much as do the other two.

These articles fail to make the relevant comparison between housing prices in the affected community after the disamenity is discovered and housing prices in the unaffected community also after the discovery.

To ensure that no singularities have been introduced because $I(NAC, PAD)$ was included, let us review the following conditions:

| Condition | $I(AC)$ | $I(AC, PAD)$ | $I(NAC, PAD)$ |
|---|---|---|---|
| AC, PAD | 1 | 1 | 0 |
| NAC, PAD | 0 | 0 | 1 |
| AC, PrePAD | 1 | 0 | 0 |
| NAC, PrePAD | 0 | 0 | 0 |

None of the three indicators we include can be generated as a linear combination of either or both of the other two; therefore, there is linear independence. The fourth condition enters by implication.

Contributing to the interpretation problem is the fact that the hedonic modelers who choose to introduce only one of the compound indicators inadvertently conduct regressions with an omitted variable. Failing to introduce a potentially influential variable into a regression can cause some or all of the coefficient values to adjust in such a way as to minimize the sum of squared errors in its absence. Estimates derived from those coefficients are biased and, therefore, lose their original meaning. To greater or lesser (but certainly indeterminate) measure, they are all entwined in those variables that were included and those that were omitted.

## Example

A contaminated well in the Three Lakes subdivision in Harris County, Texas, was the subject of litigation.[3] The plaintiffs claimed that the values of their homes had been adversely affected by the contamination. The plaintiff's attorneys engaged a consultant to serve as an expert witness.

He conducted a regression analysis of sales prices of houses (in Three Lakes and 32 other communities) sold before the contamination was discovered in 1991 and afterward. He regressed the natural logarithm of sales price on the following variables:

$$DATE = \text{Year of Sale}$$
$$SQFT = \text{Floor area in square feet}$$
$$SF2 = \text{The square of square feet}$$

---

3.    *Mike Adalis et al. v. Exxon et al.*, 269th Judicial District of Harris County, Texas, number 93-04644. Data available upon request.

Copyrighted material licensed by Randall Bell on April 26, 2021

$BD\ RMS$ = No. bedrooms

$BATH$ = No. Bathrooms

$AGE$ = House age at date of sale

$LAKES$ = Indicator defined below

$DAMAGE$ = Indicator defined below

$LAKES$ = {1 if house sold in Three Lakes

= {0 otherwise

$YEAR$ = {1 if the house sold after 1991

= {0 otherwise

$DAMAGE = Lakes \times Year$

Table 1 displays the results of that regression. The expert witness concluded from this that housing prices in the Three Lakes subdivision were adversely affected after 1991 by the well contamination. Based on the preceding discussion, this model is underspecified. The implicit comparison is not between housing prices in Three Lakes and elsewhere after 1991, but between Three Lakes after 1991 and prices experienced in the other 32 subdivisions over the entire period of observation.

To correct this error, we introduce the additional variable:

$$Damage2 = (I - Lakes) \times Year$$

In this way, we specify the sales outside Three Lakes *and* the period as post 1991. Therefore, we introduce no singularity, as can be noted in the following table:

|  | Lakes | Damage | Damage 2 |
|---|---|---|---|
| Three Lakes (post 1991) | 1 | 1 | 0 |
| Not Three Lakes (post 1991) | 0 | 0 | 1 |
| Three Lakes (before 1992) | 1 | 0 | 0 |
| Not Three Lakes (before 1992) | 0 | 0 | 0 |

Table 2 shows the results from this regression. No significant difference was observed in housing prices in Three Lakes after 1991.

Equally revealing is information on the control population in the expert witness's analysis. He singles out Three Lakes and lumps together results from 32 other subdivisions as an undifferentiated contrasting population. Of course, if any of those 32 subdivisions suffered equal or greater post-1991 price diminution, then the Three Lakes damage from the contaminated well is suspect.

To examine this possibility, I conducted a regression analysis, using the underspecified model but including three additional subdivision indicators labeled *S9*, *S83*, and *S2224* explicitly into the expert witness's model. *S2724* is the indicator for the Three Lakes subdivision (*Lakes*). The results of the regression are shown in Table 3.

Note that *S2724*, Three Lakes is no longer unique. To completely specify the model, we introduce:

$$Damage3 = (1 - S9 - S83 - S2224 - S2724) \times Year$$

The results are shown in Table 4.

It is now apparent that the only diminution in price supportable by this analysis occurred in Subdivision 83 (*S83*) and Subdivision 2224 (*S2224*), not in Three Lakes.

**Table 1**      Parameter Estimates According to Expert Witness

| Variable | DF | Parameter Estimate | Standard Error | *T* for H0: Parameter = 0 | Prob > \|*T*\| |
|---|---|---|---|---|---|
| INTERCEP | 1 | 2.426125 | 0.13668760 | 17.749 | 0.0001 |
| DATE | 1 | 0.077811 | 0.00141136 | 55.132 | 0.0001 |
| SQFT | 1 | 0.001088 | 0.00006592 | 16.508 | 0.0001 |
| SF2 | 1 | -0.000000193 | 0.00000002 | -10.082 | 0.0001 |
| BDRMS | 1 | 0.025198 | 0.00738848 | 3.410 | 0.0007 |
| BATH | 1 | 0.056791 | 0.01414839 | 4.014 | 0.0001 |
| AGE | 1 | -0.017924 | 0.00057612 | -31.112 | 0.0001 |
| LAKES | 1 | 0.080335 | 0.02612246 | 3.075 | 0.0021 |
| DAMAGE | 1 | -0.135510 | 0.03979854 | -3.405 | 0.0007 |

**Table 2**      Parameter Estimates with Additional Variables

| Variable | DF | Parameter Estimate | Standard Error | *T* for H0: Parameter = 0 | Prob > \|*T*\| |
|---|---|---|---|---|---|
| INTERCEP | 1 | 3.794888 | 0.25514074 | 14.874 | 0.0001 |
| DATE | 1 | 0.047875 | 0.00275678 | 17.366 | 0.0001 |
| SQFT | 1 | 0.000422 | 0.00001296 | 32.532 | 0.0001 |
| BDRMS | 1 | 0.034573 | 0.00719336 | 4.806 | 0.0001 |
| BATHS | 1 | 0.098725 | 0.01414504 | 6.980 | 0.0001 |
| YRBLT | 1 | 0.019463 | 0.00060623 | 32.105 | 0.0001 |
| LAKES | 1 | 0.041809 | 0.02590726 | 1.614 | 0.1067 |
| DAMAGE | 1 | -0.025294 | 0.04060277 | -0.623 | 0.5334 |
| DAMAGE2 | 1 | 0.071922 | 0.01459312 | 4.928 | 0.0001 |

**Table 3**      Parameter Estimates with Three Additional Subdivision Indicators

| Variable | DF | Parameter Estimate | Standard Error | *T* for H0: Parameter = 0 | Prob > \|*T*\| |
|---|---|---|---|---|---|
| INTERCEP | 1 | 2.603627 | 0.13008343 | 20.015 | 0.0001 |
| DATE | 1 | 0.062104 | 0.00142768 | 43.500 | 0.0001 |
| SQFT | 1 | 0.000423 | 0.00001295 | 32.661 | 0.0001 |
| BDRMS | 1 | 0.035160 | 0.00713395 | 4.928 | 0.0001 |
| BATHS | 1 | 0.098364 | 0.01396897 | 7.042 | 0.0001 |
| YRBLT | 1 | 0.018590 | 0.00061830 | 30.066 | 0.0001 |
| S9 | 1 | 0.021909 | 0.02526370 | 0.867 | 0.3859 |
| S83 | 1 | 0.199663 | 0.03264596 | 6.116 | 0.0001 |
| S2224 | 1 | 0.032225 | 0.02742085 | 1.175 | 0.2401 |
| S2724 | 1 | 0.033532 | 0.02544901 | 1.318 | 0.1878 |
| D9 | 1 | -0.059783 | 0.03223054 | -1.855 | 0.0638 |
| D83 | 1 | -0.109537 | 0.03850569 | -2.845 | 0.0045 |
| D2224 | 1 | -0.151579 | 0.03569226 | -4.247 | 0.0001 |
| D2724 | 1 | -0.093766 | 0.03848689 | -2.436 | 0.0149 |

**Table 4**      Parameter Estimates with the Model Completely Specified

| Variable | DF | Parameter Estimate | Standard Error | *T* for H0: Parameter = 0 | Prob > \|*T*\| |
|---|---|---|---|---|---|
| INTERCEP | 1 | 4.177627 | 0.25393768 | 16.451 | 0.0001 |
| DATE | 1 | 0.045277 | 0.00273348 | 16.564 | 0.0001 |
| SQFT | 1 | 0.000420 | 0.00001278 | 32.851 | 0.0001 |
| BDRMS | 1 | 0.034943 | 0.00703851 | 4.965 | 0.0001 |
| BATHS | 1 | 0.096628 | 0.01378408 | 7.010 | 0.0001 |
| YRBLT | 1 | 0.017529 | 0.00062763 | 27.930 | 0.0001 |
| S9 | 1 | 0.030483 | 0.02495405 | 1.222 | 0.2220 |
| S83 | 1 | 0.259358 | 0.03326370 | 7.797 | 0.0001 |
| S2224 | 1 | 0.046831 | 0.02713006 | 1.726 | 0.0845 |
| S2724 | 1 | 0.055379 | 0.02529184 | 2.190 | 0.0287 |
| D9 | 1 | 0.026139 | 0.03397428 | 0.769 | 0.4418 |
| D83 | 1 | -0.070774 | 0.03837154 | -1.844 | 0.0653 |
| D2224 | 1 | -0.070300 | 0.03698762 | -1.901 | 0.0575 |
| D2724 | 1 | -0.013212 | 0.03959293 | -0.334 | 0.7387 |
| DAMAGE3 | 1 | 0.106347 | 0.01480460 | 7.183 | 0.0001 |

| Appendix |
| --- |

**The Effect of Omitting the Third Variable (Damage2)**

To keep matters simple, consider just one variable *Ch*, which represents all house structural characteristics, square footage, number of bedrooms, etc. Next, proceeding as the expert witness had done, we hypothesize an equation:

$$Price = a_1\,Ch + a_2\,Lakes + a_3\,Damage$$

where, $a_1$, $a_2$, and $a_3$ are coefficients to be estimated from actual sales data. The resulting equation would then predict the sales price as a function of *Ch* (House characteristics), *Lakes* (whether located in Three Lakes), and *Damage* (whether located in Three Lakes and sold after 1991).

The method used to make this prediction is called "least squares." In simple terms, the method chooses numbers $a_1$, $a_2$, and $a_3$, which minimize the sum of squared errors when the right-hand side of the equation is subtracted from the left-hand side and the difference is squared.

Consider one house (i), and the equation:

$$Price_i = a_1\,ch_i + a_2\,Lakes_i + a_3\,Damage_i$$

Subtract the right-hand side from the left, and square to yield:

$$(Price_i - a_1\,ch_i - a_2\,Lakes_i - a_3\,Damage_i)^2$$

Add all of these squared differences over all of the sales data:

$$\sum_{i=1}^{N}(Price_i - a_1\,Ch_i - a_2\,Lakes_i - a_3\,Damage_i)^2$$

The symbol $\sum_{i=1}^{N}$ means add all of the terms in parentheses. The coefficients $a_1$, $a_2$, and $a_3$ are then chosen so as to minimize the sum of the squares.

Now it should be obvious that we can break up the sum into two parts as follows:

$$\sum_{\substack{houses\ not\ in\\3\ Lakes}}(Price_i - a_1\,Ch_i - a_2 - a_3\,Damage_i)^2$$

$$\sum_{\substack{houses\ not\ in\\3\ Lakes}}(Price_i - a_1\,Ch_i)^2$$

Lakes can be dropped in the first term since it takes on the value 1 for houses in Three Lakes. Lakes and Damage can be dropped in the second term because they take on the value 0 for houses not in Three Lakes. Note that while the values chosen for $a_2$ and $a_3$ to minimize the total sum of squares requires only that they minimize the first term but that their values depend on the value chosen for $a_1$ which depends on both terms.

Next, introduce the variable:

*Damage2* = 1 if the house is not in Three Lakes and sale post 1991

= 0 otherwise

The sum of squares becomes:

$$\sum_{\substack{houses\ not\ in\\3\ Lakes}}(Price_i - a_1\,Ch_i - a_2 - a_3\,Damage_i)^2 + \sum_{\substack{houses\ not\ in\\3\ Lakes}}(Price_i - a_1\,Ch_i - a_4\,Damage2_i)^2$$

If $a_4 \neq 0$, solving for $a_1$, $a_2$, $a_3$, and $a_4$ and to minimize the sum of squares will entail a change in the value because of the new term *Damage2* in the second sum. This, in turn, will entail a change in $a_2$ and $a_3$ because of the change of $a_1$ in the first sum.

In short, if it is considered necessary to pick up an influence related to post-1991 sales in Three Lakes, it seems sensible to investigate whether houses outside Three Lakes were similarly influenced. If they are not, should prove insignificant. If they are and we exclude the variable *Damage2*, we can show that the parameter estimates are biased.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 5.4 Proximity Stigma: Testing the Hypothesis
*by Albert R. Wilson*

This article originally appeared in the Summer 2004 issue of *The Appraisal Journal*.

### Abstract

Missing from much of the literature on proximity stigma is an explicit test of the null hypothesis of "no effect on value" among homes likely to be influenced by a detrimental condition. This article reports the results of tests of the null hypothesis on repeat sales of residential properties over a period of 12 years. The theory of proximity stigma would suggest that the detrimental conditions present would have had an impact on property values, but no impact was identified. Anecdotal interviews with market participants suggest that as long as the use and enjoyment of the homes were not impaired by the conditions, the number of market participants who would require or accept a discount were insufficient to determine the market.

Beginning with the 1967 article by Ridker and Henning,[1] a common assumption in the literature on detrimental condition impacts on market values has been that the presence of certain conditions–such as ground water contamination, leaking underground storage tanks, high voltage power lines, landfills, radioactive waste disposal, superfund sites and air pollution–result in a diminution in property values for property near to the condition. This has generally been referred to as proximity stigma and may not involve actual contamination on the subject property. In a weak real estate market the proximity stigma impact is expected to be exacerbated.

Only recently with the article by Wolverton and Bottemiller[2] has a formal statistical test of this assumption been reported. Wolverton and Bottemiller tested the null hypothesis of no difference in property sale prices near to high-voltage transmission lines against similar properties not nearby and found that the null hypothesis could not be rejected; that is, there was no basis to conclude that a difference in sale price existed.

This result is contrary to the assertions put forth in much of the literature. However, a careful examination of many of the leading papers on the subject finds no explicit test of the null hypothesis of no effect on value. Apparently the researchers concluded, without testing, that an impact must exist and proceeded in attempts to measure the alleged impact. The Appendix at the end of this article includes a list of the papers examined that do not indicate that there was a test of the null hypothesis or do not report any results of such a test.

The primary technique used in attempting to measure an impact has been an econometric technique known as hedonic modeling. Hedonic modeling relies on regression mathematics and assumptions by the economist that (1) the coefficients of the predictor (independent[3]) variables hypothesized by the regression model are quantitatively meaningful; (2) the value of a predictor variable coefficient represents the marginal contribution of that specific predictor variable to the response; and (3) a positive result of a test of significance of a specific predictor variable indicates a meaningful cause and effect relationship between the hypothesized predictor variable and the response variable.[4]

Unfortunately, none of these economic assertions are generally supportable by regression mathematics for observational (real world) data.[5] Of particular importance here is the last assertion that a cause-effect relationship can be demonstrated by a test of significance within the regression–an assertion that is not correct.[6]

1. Ronald G. Ridker and John A. Henning, "The Determinants of Residential Property Values with Special Reference to Air Pollution," *Review of Economics and Statistics* 49, no. 2 (May 1967): 246–257.

2. Marvin L. Wolverton and Steven C. Bottemiller, "Further Analysis of Transmission Line Impact on Residential Property Values," *The Appraisal Journal* (July 2003): 244–252.

3. The more current and precise mathematical language of predictor (or explanatory) variables and response variables are used in place of the less precise independent and dependent variables. In a regression using real-world observational data, it is highly unlikely that the variables hypothesized as contributing to the overall prediction of the response will be mathematically independent.

4. It should be noted that 21 leading texts written by statisticians for either the teaching of statistical techniques or for attorneys were examined, and the phrase "hedonic modeling" did not appear once in any variant. It is not a mathematically recognized technique of regression mathematics.

5. These assumptions are realized if, and only if the predictor (explanatory) variables are independent. This condition is highly unlikely for observational data and almost certainly not for complex phenomena such as real estate prices or values.

6. These mathematical facts and the reasons for them are clearly stated in many leading texts on regression mathematics. With respect to the last assumption, see for example John Neter et al., *Applied Linear Regression Models*, 3rd ed. (Chicago: Irwin, 1996), 9, "The existence of a statistical relation between the response variable Y and the explanatory or predictor variable X does not imply in any way that Y depends causally on X. No matter how strong is the statistical relation between X and Y, no cause-and-effect pattern is necessarily implied by the regression model."

**Albert R. Wilson, CRE** is principal of A. R. Wilson, LLC, of Woodland Park, CO. Wilson has a bachelor's degree in materials science engineering from Northwestern University, with a concentration in applied mathematics, and a master's degree in business administration from Bowling Green State University, with concentrations in finance and operations research. Wilson has been engaged in the evaluation of the financial impacts of environmental and other risks on business and real property values for more than twenty years. He has taught and written extensively for the appraisal, legal, banking, and governmental sectors on the subject of environmental impacts.

This paper could not have been developed without the technical assistance of Warren F. Rogers, PhD, and expert local appraisal assistance from Calvin B. Hastings, SRA.

One of the reasons for this is that a regression relationship–the hedonic model–is itself a hypothesized relationship. One cannot test a hypothesis with a hypothesis. A separate and explicit test or tests must be undertaken to determine if the null hypothesis can be rejected.

This article reports the results of tests of the null hypothesis of "no influence on value" for a situation where current real estate valuation thinking would strongly indicate the probable presence of proximity stigma.[7] The results indicate that the null hypothesis cannot be rejected and that there is no basis for an assumption of a proximity stigma impact on value resulting from the detrimental conditions examined.

While the results of the specific case examined here are important in their own right, the primary significance of this research is the fact that an explicit test or tests of the null hypothesis of no effect on value must be undertaken prior to attempting to measure an alleged diminution in value. Even in the case presented, where conditions that would lead one to strongly suspect the presence of proximity stigma, no such diminution in value could be detected. If the null hypothesis cannot be rejected, then further statistical efforts to measure a diminution are meaningless, if not misleading.

## The Detrimental Conditions

This study examines the price performance of properties proximate to the Wyman-Gordon plant in Grafton, Massachusetts, over a twelve-year period, from 1986 through 1998. During this period the Massachusetts real estate market underwent a major recession and a recovery. The Wyman-Gordon plant was subject to allegations of disposal on site of radioactive materials and chlorinated solvents and contamination of the groundwater from these materials and solvents. In addition, a nitric acid spill into local surface waters resulted in allegations of surface water and groundwater contamination. Beginning in 1990, there was significant publicity regarding the plant, including more than 23 reports in the local press, numerous other media reports, and public meetings called by environmental and plant authorities and others. In 1996, Wyman-Gordon assisted Grafton in extending municipal water to nearby residential and commercial properties with domestic potable wells as a part of a program to address contamination concerns. Most of the residential property within 2,000 feet of the plant boundaries (and most of Grafton) had long been on municipal water.

Typical real estate valuation thinking would expect the existence of a proximity stigma influence on housing prices near the plant under these conditions.

The plant involved in this case was a former defense plant constructed during the Korean War to forge metal parts for aircraft, and until recently it had the largest forge in the world. Its primary work was with nonferrous metals. The plant is located on a large parcel of land. The area surrounding the plant on three sides is primarily middle-class residential. The property on the fourth side is primarily commercial. Properties lying within approximately 2,000 feet of the plant boundaries either have a direct view of the plant or are most likely to use streets that lead past the plant.

The topography of this portion of west/central Massachusetts is generally hilly; this affects the street pattern. Consequently, residents of homes outside the approximately 2,000-foot distance from the plant boundaries generally do not have a direct sightline to the plant and generally do not come into daily proximity to the plant, as compared to those within the 2,000-foot distance. In addition, as with any old industrial area, other sources of possible disseminates may be influential. For these reasons, the approximately 2,000-foot distance was believed most appropriate for analytical purposes.

## Methodology

There are many ways to develop a testable difference between two sets of real estate data; probably one of the most obvious is use of paired sales. Where the information is accessible and of sufficiently recent origin, paired sales may be one of the best approaches available. However, that was not the case here, where some of the pairs would have been more than a decade old, with limited means of identification of pairs or of determining if the pairs were indeed very similar. In this circumstance, time series may yield a testable difference, as may other methods.

The reliable, publicly available real estate data covering the entire period was limited to the sale date, buyer/seller names, address of sale, sale price, mortgage amount, mortgage holder, and several other minor pieces of information. Due to these limitations it was decided to investigate the rate of appreciation in sale price on repeat sales of homes; a repeat sale was defined as more than one sale of the same property during the study period. This required that the probable condition of the property between sale dates be investigated to ensure to the extent possible that no major alternations had occurred during the period between sales. Further, it was necessary to identify competitive properties in areas removed from the Wyman-Gordon area. The Wyman-Gordon area was defined as being those residential properties within approximately 2,000 feet of the plant boundaries for the reasons stated previously.

The original data list contained thousands of sales. This list was sorted to obtain a list of properties with the same physical address and more than one recorded transfer of ownership during the study period. The sorted list was then further refined by eliminating all pairs that involved buyers/sellers with the same surname, buyers/sellers other than individuals (banks, corporations, etc.), purchases/sales occurring within 12 months (to prevent flipping transactions from enter-

---

7. This article is based on data collected by the author for a major oil company as part of a litigation matter (now resolved). The article has not been subject to any form of review or editorial input by that client, and the analysis and conclusions are solely the author's.

Copyrighted material licensed by Randall Bell on April 26, 2021

ing the data), unusually high loan-to-value ratios (to eliminate sales with noncash consideration or sales of homes with damage such that purchase and repair financing might be included in the loan amount), and undisclosed financing terms. After this refined list was compiled, it was reexamined and any sale more than two standard deviations from the mean for the price range was eliminated.[8]

The refined list contained approximately 500 repeat sale properties in competitive areas and over 35 repeat sale properties within the Wyman-Gordon area. Using this refined list, exterior examinations were performed of the Wyman-Gordon area properties and of a sample of the competitive properties. The tax and building department records were consulted, and in cases where they were available, the listing data for the sales were examined in an effort to ensure that the properties had not undergone significant, sale price altering changes between sale dates.[9] This eliminated some properties, and a final list was prepared for analysis.

The data was then processed to determine the annual compound rate of appreciation/depreciation for each pair of sales. This rate was assigned to the midyear between sales as the compound annual appreciation rate for that property between the sale dates. These midyear rates were then averaged for each year in the study period for each of the areas–the Wyman-Gordon area, the Grafton area other than the Wyman-Gordon area, and the competitive areas outside Grafton in the Worcester County market area.

In choosing to use mean appreciation rates, it was assumed that the past is prolog, that is, whatever occurred before the events of interest, will have been capitalized into the market value of the property, provided there has been sufficient time for the marketplace to adjust. Here the interest is whether or not a new event or events alter the value performance of the property. Any such alteration should result in a discontinuity (abrupt change) or a different rate of appreciation/depreciation compared to other properties not likely to have been influenced by those events. This allows recognition that general market conditions–such as the recession in property values in Massachusetts in the early 1990s with a subsequent recovery–will influence rates. It also makes it possible to detect a localized change as a departure from the general area-wide rate, if such change has occurred.

The null hypothesis to be tested was "There is no difference in mean rates of appreciation for repeat sales within the Wyman-Gordon area compared to competitive areas." This null was tested by a broad range of tests including parametric tests, which depend on assumptions of the normalcy of the distribution of the underlying data, and nonparametric tests, which do

not. Statistical analyses were also performed on the frequency of occurrence of appreciation/depreciation rates within and outside the Wyman-Gordon area.

The conclusions of this study do not, however, rely only on formal statistical tests of the difference in magnitudes of rates of appreciation/depreciation. Those formal conclusions were further validated by reference to tax assessment data, individual (i.e., nonrepeat) home sales, lending appraisals, and anecdotal interviews, whose details are beyond the scope of this article.

## Test Statistics

Statistical tests are structured on the basis of the scientific principle of falsification. This means that the negative is tested to determine if it may be tentatively rejected. The negative to be tested is usually called the "null" hypothesis. The available data is tested to determine if the null hypothesis can be rejected at some acceptable level of confidence.

A considerable variety of tests are available to test a null hypothesis. Most traditional or classical tests examine the magnitude of a difference between sample means or other statistics. The null is rejected if the probability of finding a difference of the observed magnitude or greater is sufficiently small. Typically the null is rejected if that probability is .05 or less. Stated another way, the null would be rejected and a significant difference between the treated and untreated population would be implied if the chances of being wrong in reaching that conclusion were less than 0.05.

In the typical statistical analysis the objective is to determine whether a treatment, exposure, or other perceived influence has had a significant impact. In short, has a change been observed that is sufficiently large to permit rejection of the null hypothesis and a conclusion that the observed change is a significant event, not merely a random fluctuation? When this is the case, the result is duly reported and generally accepted as evidence that the treatment had an effect. If on the other hand the data proves insufficient to reject the null hypothesis on the basis of one form of test, other tests may be tried; these are discussed below. If no significant differences are found, however, the results are generally consigned to the dustbin of scientific inquiry and not reported.

The typical statistical analysis differs from that in cases of proximity stigma because there the null hypothesis is of considerable importance to public policy and flies in the face of conventional thinking. In the subject case study, the null hypothesis is that a series of incidents of significant environmental concern had no measurable impact on housing value performance in their vicinity. Unlike most inquiries the new contri-

---

8. In a significant number of papers, the editing of the database used in an analysis has been poor or nonexistent, leading to serious analytical errors. For example, a failure to eliminate outliers (in this case through the two standard deviation criteria) ignores the fact that means are extremely vulnerable to distortion by an outlier value. Unless one were willing to assume that outliers were equally prevalent in number and magnitude on both sides of a mean, an extremely unlikely event with real estate values, allowing the presence of outliers would generate misleading results. See Albert R. Wilson, "The Questionable Reliability of 'Peer Reviewed' Real Estate Literature," *Bureau of National Affairs Expert Evidence Report*, 14, no. 1 (January 5, 2004): 16.

9. These examinations were performed by Calvin Hastings, SRA, an experienced appraiser who has practiced in the area for decades.

bution to knowledge lies in the acceptance of the null hypothesis, not its rejection.

Because this is the case, it is incumbent to explore a variety of statistical tests to ensure to some reasonable extent that acceptance of the null hypothesis on one dimension of data is not offset by its rejection on another. To this end, three general classes of tests were used in this study. These tests include the following:

1.   Classic *F-* and *t-*tests, which are based on the magnitude of the difference of means as measured by differences in sample averages. These tests assume that the data is normally distributed.

2.   Rank test statistics,[10] which are based on the ordering of the magnitudes of the observations. It is a simple matter to generate samples where every observation from a sample of one population exceeds every observation from a sample from another population. This situation occurred here. In this situation it is possible to have the null hypothesis of identical means accepted by a classic *t-* or *F-*test; all that is required is that the magnitudes of the differences be small. The rank tests have the further advantage that they are independent of the underlying probability distributions from which the data was generated. Those rank tests applied and reported here are as follows:

     a.   The Two-Sample Wilcoxon test, which is archetypical of this class. Samples are merged into a single vector in increasing order of the magnitude of the observations. Ranks are then assigned to all observations as the integer values of their position, or rank, in the joint vector of magnitudes. The ranks associated with one of the samples are then added together to form the test statistic. The null hypothesis is then rejected on the basis of overly large or small values of the statistic.

     b.   Several variants of the Wilcoxon, which have been developed by using scores associated with the ranks rather than the ranks themselves. This is done to provide increased sensitivities when one is willing to assume knowledge of the form of the probability distributions from which the sample were generated. Variants include median Scores, Van Der Waerden Scores, and Savage Scores.

     c.   Goodness-of-Fit tests, which are a subset of rank tests. They differ from those above in that they measure overall differences in the probability distribution from which the samples were drawn rather than just their location and scale parameters. These tests include the Kolmogorov-Smirnov and Cramer-von Mises tests.

Note that all of the tests performed in this market study completely avoid regression and hedonic modeling. The sole objective in this study was to determine whether or not the null hypothesis should be rejected, indicating that it is likely that there is some difference between the Wyman-Gordon area residential value performance and the performance of homes in the Grafton and Comparable Areas. Only if the null were rejected would there be grounds for examining the situation further to find a cause for the difference and to attempt to measure any such difference.

## Analysis of Appreciation/Depreciation Rates by Difference of Means

The first analysis conducted was a comparison-of-means test performed against the annual appreciation or depreciation rates for homes in the Wyman-Gordon Study Area compared to those of homes in Grafton that were not in the study area (Grafton Area), and homes in comparable areas (Comparable Areas). The appreciation or depreciation rate in this analysis was formed by determining the annual compound sale price growth rate for each sale pair and attributing that rate to the midpoint year between the sale dates. These rates were then averaged for each year and the means were tested using the usual difference-of-means tests appropriate to the size of the samples involved (the sample size for the subject area was necessarily small). The results are shown graphically in Figure 1 and in tabular form in Tables 1a – 1c.[11]

Table 1a displays the appreciation/depreciation rate data for the Wyman-Gordon Area. Table 1b and Table 1c display similar data for the Grafton Area and the Comparable Areas. In Table 1b and Table 1c, a t-value column is added, giving the test statistic for the comparison of the appreciation/depreciation mean rate of that area and year to the mean rate for the corresponding year in the study area.

As can be seen, the null hypothesis of no difference in the means between the study area and the other two areas cannot be rejected at the 95% confidence level for any year from 1989 through 1996 because no *t-*value exceeds the 1.96 required for the 95% level of confidence. There was insufficient data (one repeat sale appreciation/depreciation rate) attributable to the year 1994 and none for the year 1997 in the study area and therefore no test statistic was formed for those two years. As shown in Figure 1, there was no year in which the Wyman-Gordon Area appreciation/depreciation rate did not appear to exceed the rates for the other areas.

Additional information in the form of tax assessments, lending appraisals, and individual (i.e. nonrepeat) home sales during the study period support this conclusion of no influence on appreciation/depreciation rates or

---

10.   An excellent resource for further detail on these tests is Jaroslav Hájek and Zbynek Sidák, *Theory of Rank Tests* (New York: Academic Press, 1967).

11.   The raw data used in the analysis is from the period 1986 through 1998. Because of the analytical technique used, the dates shown in Figure 1 and Tables 1a – 1c range only from 1988 through 1997. The reason for this is that repeat sales are used. Therefore, if a home sold in 1986 and was subsequently resold in 1990, the appreciation rate for that pair of sales would be assigned to the midyear between the dates, or 1988. The analytical dates derived from the raw data are the dates used in Figure 1 and Tables 1a – 1c.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Figure 1**    Change in Sale Price Based on Repeat Sales (Base Year 1988 = 100%)



**Table 1a**    Test For Statistical Significance in Difference of Mean Appreciation/Depreciation Rate Based on Repeat Sales Data, Wyman-Gordon Area

| Year | Mean | Std Dev | Median | n | Maximum | Minimum |
|------|------|---------|--------|---|---------|---------|
| 1989 | 18.06% | 25.93% | 0.96% | 3 | 54.71% | -1.48% |
| 1990 | 0.99% | 2.71% | 0.67% | 4 | 4.36% | -1.75% |
| 1991 | -0.11% | 3.74% | 0.17% | 3 | 4.32% | -4.83% |
| 1992 | -0.09% | 1.71% | 0.79% | 5 | 2.03% | -2.34% |
| 1993 | -0.45% | .094% | -0.29% | 4 | 0.70% | -1.92% |
| 1994 | -1.49% | | | 1 | | |
| 1995 | -0.67% | 4.97% | -0.90% | 5 | 6.33% | -8.99% |
| 1996 | 3.56% | 3.35% | 3.35% | 10 | 6.33% | 0.00% |
| 1997 | NSI | | | | | |

NSI = Not sufficient information

**Table 1b**    Wyman-Gordon Area Compared to Grafton Outside the Wyman-Gordon Area

| Year | Mean | Std Dev | Median | n | Maximum | Minimum | t-value* |
|------|------|---------|--------|---|---------|---------|----------|
| 1989 | -6.91% | 3.17% | -6.52% | 6 | -3.44% | -12.90% | 0.9561 |
| 1990 | -6.07% | 11.33% | -1.25% | 4 | 3.59% | -25.38% | 0.6054 |
| 1991 | -1.90% | 2.13% | -1.49% | 13 | 0.84% | -4.95% | 0.4150 |
| 1992 | 0.48% | 2.68% | 0.00% | 13 | 9.39% | -2.09% | -0.1790 |
| 1993 | 0.26% | 2.07% | -0.14% | 18 | 4.47% | -3.80% | -0.3144 |
| 1994 | 2.57% | 6.69% | 1.39% | 19 | 25.12% | -7.41% | NSI |
| 1995 | 1.77% | 1.75% | 2.07% | 9 | 5.26% | -0.87% | -0.4624 |
| 1996 | 3.02% | 1.79% | 3.62% | 7 | 5.14% | 0.47% | 0.1995 |
| 1997 | 0.00% | 7.27% | 3.63% | 4 | 5.28% | -12.53% | NSI |

\*   Comparison-of-means $t$-statistic is shown in $t$-value column.

NSI = Not sufficient information

**Table 1c**    Wyman-Gordon Area Compared to Comparative Areas Not Including Grafton Area

| Year | Mean | Std Dev | Median | n | Maximum | Minimum | t-value* |
|------|------|---------|--------|---|---------|---------|----------|
| 1989 | 0.40% | 10.87% | 0.00% | 21 | 29.63% | -18.34% | 0.6283 |
| 1990 | -5.64% | 4.35% | -5.34% | 33 | 5.60% | -20.10% | 1.2930 |
| 1991 | -3.22% | 4.60% | -2.47% | 39 | 5.40% | -25.66% | 0.5241 |
| 1992 | -1.33% | 2.83% | -1.03% | 59 | 3.72% | -10.86% | 0.3765 |
| 1993 | 0.49% | 2.43% | 0.43% | 91 | 11.28% | -6.17% | -0.3597 |
| 1994 | 2.37% | 3.87% | 1.53% | 67 | 19.55% | -7.56% | NSI |
| 1995 | 2.30% | 3.57% | 2.28% | 50 | 18.03% | -9.41% | -0.4848 |
| 1996 | 3.23% | 3.52% | 2.53% | 21 | 13.34% | -2.36% | 0.0811 |
| 1997 | 3.84% | 5.73% | 5.41% | 5 | 9.83% | 9.83% | NSI |

\*   Comparison-of-means $t$-statistic is shown in $t$-value column.

NSI = Not sufficient information

market value associated with proximity to the Wyman-Gordon plant. Because the study began four years before the announcement of a problem and continued after the first announcement, additional revelations, and publicity over the subsequent eight years, the conclusion of no effect appears to be sound and well supported.

A number of additional statistical tests were performed in an effort to test the characteristics of the three populations (Wyman-Gordon, Grafton, and Comparable Areas) without reference to specific parameters.

The first of these tests looked at the question of whether or not appreciation/depreciation was more common in the Wyman-Gordon Area than outside that area. Two analyses were conducted, one on the gross data and one limited to pairs of sales where the first recorded sale took place prior to any publicity concerning an environmental problem (1990), with the subsequent sale(s) occurring during or after 1990.

The results of simple counts of houses that appreciated or depreciated by analysis area without regard to the date of the first sale are shown in Table 2.

The Wyman-Gordon Area appears to outperform the other analysis areas by having a greater percentage of homes appreciating during the period and fewer homes suffering depreciation. This becomes even more pronounced when only homes are considered where the first sale occurred before the advent of any information concerning a problem, (before 1990) with the subsequent sale(s) occurring during or after 1990, as shown in Table 3.

The overall performance of the area surrounding the Wyman-Gordon plant appears to be significantly

better than the Grafton Area and Comparable Areas.

Additional tests were performed in an effort to determine the stability of the conclusion that the null could not be rejected at the 95% confidence level. The results of these tests are shown in Table 4 and Table 5. Note that when looking at Grafton Area versus Comparable Areas, the Wyman-Gordon Area and Grafton Areas data were combined.

Various other rank tests were performed using ranks designed for sensitivity to different alternatives. These tests included the median Scores, Van Der Waerden Scores, Savage Scores, Kolmogorov-Smirnov, and Cramer-von Mises; these tests yielded the same general results.

## Conclusions

While the test results varied in some level of detail, they all consistently indicated the following:

- Residential property appreciations in the Wyman-Gordon Area either significantly exceeded those in the Grafton Area or were not significantly different.
- Residential property appreciations in the Grafton Area either significantly exceeded those in the Comparable Areas, or were not significantly different.
- The differences experienced in appreciation were more profound when the data considered was restricted to properties whose first sale preceded 1990 with the subsequent sale(s) occurring during or after 1990.

From the foregoing it cannot be concluded that the incidents in the Wyman-Gordon Area involving groundwater contamination and allegations including radioactivity, petroleum hydrocarbons, chlorinated solvents, and nitric acid spills, had no impact on real estate appreciation rates and consequent values. The only sustainable conclusion is that the data does not provide sufficient evidence to support a conclusion of any contamination-induced impact in a situation that—according to nearly all of the literature and expectations of the valuation community—would almost certainly have resulted in a significant negative impact.

It seems likely that ordinary, individual (i.e., personal) economics are the primary driving force in the transactions examined here. This idea is supported by anecdotal interviews of market participants as well as tax and lending appraisals and real estate listing data.

**Table 2**   Simple Appreciation/Depreciation Without Regard to Date of First Sale

| Area | Percent Appreciated | Percent Depreciated |
|---|---|---|
| Wyman-Gordon Area | 58.05% | 41.95% |
| Grafton Area | 56.18% | 43.82% |
| Comparable Areas | 54.19% | 45.81% |

**Table 3**   Simple Appreciation/Depreciation With Date of First Sale Prior to 1990

| Area | Percent Appreciated | Percent Depreciated |
|---|---|---|
| Wyman-Gordon Area | 57.89% | 42.11% |
| Grafton Area | 24.24% | 75.76% |
| Comparable Areas | 14.50% | 85.50% |

**Table 4**   Two-Way Analysis of Variance and *F*-Test for the Means of the Percentage Appreciation or Depreciation

| All Data | |
|---|---|
| **Test Statistic** | **Conclusion** |
| Prob > $F$ = 0.0080 | Wyman-Gordon Area appreciation significantly greater than Grafton Area appreciation |
| Prob > $F$ = 0.0088 | Wyman-Gordon/Grafton Areas appreciation significantly greater than Comparable Areas |

| First Sale Prior to 1990 | |
|---|---|
| **Test Statistic** | **Conclusion** |
| Prob > $F$ = 0.0047 | Wyman-Gordon Area appreciation significantly greater than Grafton Area appreciation |
| Prob > $F$ = 0.0001 | Wyman-Gordon/Grafton Areas appreciation significantly greater than Comparable Areas |

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 5**        Wilcoxon Two-Sample Rank Test

| All Data | |
|---|---|
| **Test Statistic** | **Conclusion** |
| Prob > /Z/ = 0.2571 | No statistically significant difference between Wyman-Gordon Area and Grafton Area |
| Prob > /Z/ = 0.1118 | No statistically significant difference between Wyman-Gordon/Grafton Areas and Comparable Areas |

| First Sale Prior to 1990 | |
|---|---|
| **Test Statistic** | **Conclusion** |
| Prob > /Z/ = 0.0255 | Wyman-Gordon Area appreciation significantly greater than Grafton Area |
| Prob > /Z/ = 0.0001 | Wyman-Gordon/Grafton Areas appreciation significantly greater than Comparable Areas |

Specifically, unless there is some impact on the use and enjoyment of a home, the sellers appear unwilling to accept a discount just for proximity. Further, a sufficient number of buyers who are unimpressed by the condition exist in the marketplace to make discounts unnecessary. This suggests that valuers may have been misled by individuals concerned about the presence of the detrimental condition into believing that they represent the majority of the marketplace participants; in reality they appear to represent a minority that does not define the market.[12]

The most important conclusion is that without site-specific verification it cannot be assumed that an instance of a detrimental condition will invariably have a negative impact on real estate value performance in the vicinity.

The bottom line is that the valuer must seriously question the existence of proximity stigma as a market force, and carefully investigate each and every such claim using traditional and time-proven analytical techniques. Here, as in the Wolverton and Bottemiller study, there is simply no proximity stigma in evidence.

---

12.    This result has been observed by other authors, see for example G. William Page and Harvey Rabinowitz, "Groundwater Contamination: Its Effects on Property Values and Cities," *Journal of the American Planning Association* 59, no. 4 (Autumn 1993): 473–481.

## Appendix

### List of Real Estate Literature Reviewed

Asabere, Paul K., and Forrest E. Huffman. "Thoroughfares and Apartment Values." *Journal of Real Estate Research* 12, no. 1 (1996): 9–16.

Brookshire, David S., Mark A. Thayer, William D. Schulze, and Ralph C. d'Arge. "Valuing Public Goods: A Comparison of Survey and Hedonic Approaches." *American Economic Review* 72, no. 1 (March–June 1982): 161–77.

Colwell, Peter F. "Power Lines and Land Value." *Journal of Real Estate Research* 5, no. 1 (Spring 1990): 117–27.

DesRosiers, François, Alain Bolduc, and Marius Thériault. "Drinking Water Quality and House Values: Measuring Environmental Externalities Using Hedonics." American Real Estate Society Annual Meeting, Sarasota, Florida, April 16–19, 1997.

Deyak, Timothy A., and V. Kerry Smith. "Residential Property Values and Air Pollution: Some New Evidence." *Quarterly Review of Economics & Business* 14, no. 4 (1974): 93–100.

Epp, Donald J., and K. S. Al-Ani. "The Effect of Water Quality on Rural Nonfarm Residential Property Values." *American Journal of Agricultural Economics* 61, no. 3 (August 1979): 529–34.

Gamble, Hays B., and Roger H. Downing. "Effects of Nuclear Power Plants on Residential Property Values." *Journal of Regional Science* 22, no. 4 (1982): 457–78.

Harrison, David, Jr., and James H. Stock. "Hedonic Housing Values, Local Public Goods, and the Benefits of Hazardous Waste Cleanup."Energy and Environment Policy Center Discussion Paper Series, John F. Kennedy School of Government, Harvard University, November 1984.

Hughes, William T., Jr., and C. F. Sirmans. "Adjusting House Prices for Intra-Neighborhood Traffic Differences." *The Appraisal Journal* (October 1993): 533–38.

Ketkar, Kusum. "Hazardous Waste Sites and Property Values in the State of New Jersey." *Applied Economics* 24 (June 1992): 647–59.

Kiel, Katherine A. "Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on House Values." *Land Economics* 74, no. 4 (November 1995): 428–35.

Kohlhase, Janet E. "The Impact of Toxic Waste Sites on Housing Values." *Journal of Urban Economics* 30, no. 1 (July 1991): 1–26.

Li, Mingche M., and H. James Brown. "Micro-Neighborhood Externalities and Hedonic Housing Prices." *Land Economics* 56, no. 2 (May 1980): 125–41.

Mark, Jonathan H. "A Preference Approach to Measuring the Impact of Environmental Externalities." *Land Economics* 56 (February 1980): 235–46.

McClelland, Gary H., William D. Schulze, and Brian Hurd. "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site." *Risk Analysis* 10, no. 4 (December 1990): 485–97.

Mendelsohn, Robert, Daniel Hellerstein, Michael Huguenin, Robert Unsworth, Richard Brazee. "Measuring Hazardous Waste Damages with Panel Models." *Journal of Environmental Economics and Management* 22, no. 3 (May 1992): 259–71.

Michaels, R. Gregory, and V. Kerry Smith. "Market Segmentation and Valuing Amenities with Hedonic Models: The Case of Hazardous Waste Sites." *Journal of Urban Economics* 28, no. 2 (July 1990): 223–42.

Mieszkowski, Peter, and Arthur M. Saper. "An Estimate of the Effects of Airport Noise on Property Values." *Journal of Urban Economics* 5, no. 4 (October 1978): 425–40.

Nelson, Arthur C. "Price Effects of Proposed Landfill on Single Family House Values." *Journal of Urban Planning and Development* 118, no. 4 (December 1992): 128–37.

Nelson, Jon P. "Three Mile Island and Residential Property Values: Empirical Analysis and Policy Implications." *Land Economics* 57, no. 3 (August 1981): 363–72.

Palmquist, Raymond B., Fritz M. Roka, and Tomislav Vukina, "Hog Operations, Environmental Effects, and Residential Property Values." *Land Economics* 73, no. 1 (February 1997): 114–24.

Reichert, Alan K., Michael Small, and Sunil Mohanty. "The Impact of Landfills on Residential Property Values." *Journal of Real Estate Research* 7, no. 3 (Summer 1992): 297–314.

Reichert, Alan K. "The Impact of a Toxic Waste Superfund Site on Property Values." *The Appraisal Journal* (October 1997): 381–92.

Ridker, Ronald G., and John A. Henning. "The Determinants of Residential Property Values with Special Reference to Air Pollution." *The Review of Economics and Statistics* 49 (May 1967): 246–57.

Saderion, Zahra, Barton Smith, and Charles Smith. "An Integrated Approach to the Evaluation of Commercial Real Estate." *Journal of Real Estate Research* 9, no. 2 (Spring 1994): 151–67.

Simons, Robert A., Kimberly Winson-Geideman, and Brian A. Mikelbank. "The Effects of an Oil Pipeline Rupture on Single-Family House Prices." *The Appraisal Journal* (October 2001): 410–48.

Simons, Robert A., William Bowen, and M. Arthur Sementelli. "The Effect of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio." *Journal of Real Estate Research* 14, no. 1/2 (1997): 29–42.

Simons, Robert A., and Arthur Sementelli. "Liquidity Loss and Delayed Transactions with Leaking Underground Storage Tanks." *The Appraisal Journal* (July 1997): 255–60.

Smith, Barton A. "Measuring the Value of Urban Amenities." *Journal of Urban Economics* 5 (1978): 370–87.

Smith, V. Kerry, and William H. Desvousges. "The Value of Avoiding a LULU: Hazardous Waste Disposal Sites." *The Review of Economics and Statistics*. 68, no. 2 (May 1986): 293–99.

Smolen, Gerald E., Gary Moore, and Lawrence V. Conway. "Hazardous Waste Landfill Impacts on Local Property Values." *The Real Estate Appraiser* 58, no. 1 (April 1992): 4–11.

Thayer, Mark, Heidi Albers, and Morteza Rahmatian. "The Benefits of Reducing Exposure to Waste Disposal Sites: A Hedonic Housing Value Approach." *Journal of Real Estate Research* 7, no. 3 (1992): 265–82.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 5.5 Is Pollution a Homogeneous Determinant of Value?

*by Christopher S. Decker, PhD, Donald A. Nielsen, PhD, and Roger P. Sindt, PhD*

This article originally appeared in the Spring 2005 issue of *The Appraisal Journal*.

### Abstract

This study uses a cross-sectional, hedonic pricing model to investigate the link between different types of chemical releases and prices paid by purchasers of single-family residences in Omaha, Nebraska's Douglas County. The model employs data from the 2000 Census, the U.S. Environmental Protection Agency, and the Douglas County Assessor's Office. The results indicate that aggregate toxic chemical releases adversely impact the selling price of a home. However, there is no evidence that releases of specific toxic chemicals known to be carcinogenic result in any additional downward adjustment on price. It appears that buyers do not have sufficient information or the inclination to distinguish between pollutants with differing impacts on human health and the environment.

Ever-increasing standards of appraisal practice dictate that opinions of value must be based on market data and not on unsupported judgment, as emphasized in a recent article by Jackson.[1] With the increased emphasis on the potential impact of environmental factors on value, appraisers need to use relevant information and understand techniques for valuing properties that may be impacted by pollutant releases or perceived to have heightened environmental risk.

The purpose of this study is to investigate the relationship between prices paid by purchasers of single-family residences within postal zip code areas in Omaha, Nebraska's Douglas County and the different types of industrial chemical releases. While a number of related studies exist, none seem to focus on the fact that pollutant releases vary as to their (believed) impact on human health and the environment. The study attempts to shed light on these differences by employing a multiple regression, hedonic price analysis to empirically test and quantify the impact that various environmentally harmful variables (i.e., toxic pollutant discharges by industry) have on the sale prices of homes.

## Regression Analysis

There are many techniques in addition to regression analysis that property appraisers can use to measure environmental impacts on real estate prices, such as paired sales analysis, income capitalization analysis, market sales information, and public opinion interviews.[2] Jackson synthesizes several different techniques, including the multiple regression analysis employed here, and elucidates the strengths and weaknesses of each technique.[3]

Jackson reminds valuers to take care in selecting the attributes that are believed to correlate with the value of homes (age, square footage, etc.) when employing regression techniques. Moreover, regression models provide estimates of mean or average impacts of certain attributes on the value of the average or "typical" home. This can be a significant limitation since individual impacts of certain attributes may differ substantially from home to home. In addition, Wilson cautions that regression techniques provide only a statistical correlation between a given property attribute and the value of that property.[4] They do not give evidence of a causal link between attribute and value without addressing the factors related to causality (pretemporal occurrence, holding other factors constant, and theory supporting the relationship).

Even with such limitations, regression analysis is popular and can be a valuable technique. For instance, it allows analysis of a substantial population of properties at one time. It also provides a very refined measure of the marginal impact that a given attribute has on the value of a typical property since the regression model's specification includes a variety of property attributes believed to influence sale price. By doing so, the value or sale price of a home can be decomposed, thus providing information on how much of a home's price

1. Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 127–133.

2. James Flynn et al., "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation," *The Appraisal Journal* (Winter 2004): 35–44.

3. Jackson, 127–133.

4. Albert R. Wilson, "Proximity Stigma: Testing the Hypothesis," *The Appraisal Journal* (Summer 2004): 253–262.

**Christopher S. Decker, PhD,** is an assistant professor at the University of Nebraska at Omaha, where he teaches courses in microeconomics and managerial economics.

**Donald A. Nielsen, PhD, SRPA,** is a professor in the Real Estate and Land Use Economics Program at the University of Nebraska at Omaha, where he teaches courses in residential real estate finance and income property appraisal. He also consults with the R. J. Wilson Co. appraisal firm located in Omaha, Nebraska.

**Roger P. Sindt, PhD,** is a professor in the Real Estate and Land Use Economics Program at the University of Nebraska at Omaha, where he teaches courses in real estate investment, residential real estate finance, and commercial real estate finance.

is accounted for by each attribute. Consequently, the impact that an environmental attribute has on a home is less likely to be overinflated in a regression model.

## Background

There is a rich collection of literature that has employed hedonic pricing models to investigate the potential link between pollution and housing prices. Many cross-sectional studies have examined relationships between residential values and external environmental variables, such as concentrations of nitrogen oxides, asbestos, radon, lead-based paint, and proximity to high-voltage power lines and flood zones.[5] From a time-series perspective, Mundy identifies and discusses how environmental contamination affects property values over time.[6] The findings of these studies generally support the theory that housing providing superior environmental attributes (e.g., a reduction in, or lack of, environmental hazards) will be capitalized into higher prices and those providing inferior utility will be discounted, resulting in lower prices. The capitalized, superior incremental price is a premium presumably paid to avoid perceived problems, such as health-related issues or difficulties upon resale.

One major issue that arises with this analysis is whether or not buyers and/or sellers are aware of pollutant concentrations in the local ambient environment. Both the disclosure of information from a variety of media and public perception are key considerations. At issue is the manner in which the available information is disseminated (disclosed) to the market such that it can influence a potential home buyer's valuation of homes in close proximity to pollutant releases. Indeed, the lack of easily available environmental information was part of the government's motivation for passing the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA). A major component of this law is the requirement that certain production facilities annually report their production and releases of toxic chemicals. The reports are recorded in the Toxics Release Invento-

ry (TRI), which is made available to the general public through the Internet. As is illustrated in this article, many interested groups and public media outlets can (and do) extract and report this data to the local population and thus, potential market participants. Some studies have indeed found that the TRI does impact a variety of markets. For instance, Gleeson, using census tract data from the 1980 and 1990 U.S. Census reports on housing characteristics and 1988 TRI data, finds that proximity to and amounts of TRI chemical releases adversely affected housing prices in New England.[7]

Many other recent studies have focused on environmental information that may be readily accessible to the market. Dotzour explores the impact of ground water contamination on residential property sales in Wichita, Kansas.[8] He examines house sales prior to and after the local media publicized discovery of the contamination in the study area and finds that this discovery—disclosed to the public through local media coverage—had no impact on sale prices. In a similar vein, Gayer and Viscusi investigate the housing price response in Grand Rapids, Michigan, to newspaper publicity of hazardous waste sites.[9] They find that prices of homes actually increased (by about $200 per article) subsequent to the publication of such information. Although these findings may be an anomaly, Gayer and Viscusi conclude the reason for this is that when the hazardous waste site information was made known to the public, buyers tended to lower their perceived risk to exposure because of their expectations that public pressure would force local authorities and responsible parties to remediate identified contaminated sites.[10]

This highlights another major issue: perception of risk. Patchin studies environmentally contaminated sites and concludes that the development and publication of recent data demonstrate the existence of a negative stigma associated with such properties, which is caused by fear of hidden cleanup costs, public liability, and the lack of property mortgagability.[11] As he writes, "Toxic contamination has a major impact on the values of the properties it affects. The costs of cleanup, along

5. See for example David S. Brookshire et al., "Valuing Public Goods: A Comparison of Survey and Hedonic Approaches," *American Economic Review* 72, no. 1 (1982): 165–177; Charles J. Delaney and Douglas Timmons, "High Voltage Power Lines: Do They Affect Residential Property Value?" *Journal of Real Estate Research* 7, no. 3 (1992): 315–330; Jeffrey D. Fisher, George H. Lentz, and K. S. Maurice Tse, "Effects of Asbestos on Commercial Real Estate: A Survey of MAI Appraisers," *The Appraisal Journal* (October 1993): 587–599; Gerald E. Smolen, Gary Moore, and Lawrence V. Conway, "Economic Effects of Hazardous Chemical and Proposed Radioactive Waste Landfills on Surrounding Real Estate Values," *Journal of Real Estate Research* 7, no. 3 (1992): 283–296; Ronald G. Ridker and John A. Henning, "The Determinants of Residential Property Values with Special Reference to Air Pollution," *The Review of Economics and Statistics* 49 (May 1967): 246–257; and David M. Harrison, Greg T. Smersh, and Arthur L. Schwartz, Jr., "Environmental Determinants of Housing Prices: The Impact of Flood Zone Status," *Journal of Real Estate Research* 21, no. 1–2 (2001): 3–20.

6. Bill Mundy, "The Impact of Hazardous Materials on Property Value," *The Appraisal Journal* (April 1992): 155–162.

7. Bríd Gleeson, "House Values, Incomes and Manufacturing Industry Pollution" (working paper, Economics Department, University of Wisconsin, Madison, November 2002).

8. Mark Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July 1997): 279–285.

9. Ted Gayer and W. Kip Viscusi, "Housing Price Responses to Newspaper Publicity of Hazardous Waste Sites," *Resource and Energy Economics* 24, no. 1–2 (2002): 33–51.

10. It is also possible that buyers' perceptions of potential risks from hazardous waste were diminished after hearing more factual information.

11. Peter J. Patchin, "Valuation of Contaminated Properties," *The Appraisal Journal* (January 1988): 7–16; and Peter J. Patchin, "Contaminated Properties—Stigma Revisited," *The Appraisal Journal* (April 1991): 167–172.

Copyrighted material licensed by Randall Bell on April 26, 2021

with the liability to the public and stigma, often eliminate or significantly reduce a property's value."[12]

Of course, the perception of risk from exposure to toxic pollutants may not correlate with actual risk. The goal of this study is to determine if there is any evidence that the residential housing market is capable of distinguishing (or inclined to distinguish) between high-risk and low-risk health hazards from exposure to toxic pollutants. Theory suggests that in a housing market with complete information, where buyers make rational decisions at the margin and where pollution is viewed as a negative attribute, the values of properties located near pollution releases should decrease with increased exposure to pollutants considered to be more hazardous to human health and safety.

The "perfect information" assumption is one of the most critical criteria to meet, but with pollution data in particular, it can be very difficult to achieve. However, the toxic pollution data used in this study, the Toxics Release Inventory (TRI), has a variety of characteristics that make it reasonably appropriate to apply to the present research question.

This article is organized as follows. The next section discusses the origins of the U.S. Emergency Planning and Community Right-to-Know Act (EPCRA); the collection and public dissemination of the TRI data; and the categorization, intended use, and accessibility of TRI data. The section after that discusses the data used in the analysis and the econometric procedure applied. Statistical results are then presented, followed by concluding remarks.

## EPCRA and the TRI Data

EPCRA was enacted as a regulatory response to several environmental disasters that occurred in the late 1970s and early 1980s, such as Love Canal and to a lesser degree, Three Mile Island. The major catalyst was the 1984 Union Carbide chemical disaster in Bhopal, India, in which a deadly cloud of methyl isocyanate killed thousands of people in Bhopal. Shortly thereafter, there was a second serious chemical release at another Union Carbide plant in West Virginia. These incidents galvanized demands by the public that companies make information publicly known on their use, disposal, and release of hazardous materials. Against the backdrop of heightened public concern, the Emergency Planning and Community Right-to-Know Act was enacted in 1986.

The primary purpose of EPCRA is to inform communities and citizens of chemical hazards in their local areas. Sections 311 and 312 of EPCRA require businesses to report to state and local governments the locations and quantities of chemicals stored on-site and transferred off-site, in order to help communities prepare to respond to any chemical spills and similar emergencies. EPCRA Section 313 requires both the Environmental Protection Agency (EPA) and the states to annually collect data on releases and transfers of toxic chemicals from industrial facilities, and make the data available to the public. This data set is referred to as the Toxics Release Inventory (TRI). In 1990, Congress passed the Pollution Prevention Act, which requires that additional data on waste management and source reduction activities be reported under the TRI. The stated goal of the TRI is to empower citizens and to hold companies and local governments accountable for how toxic chemicals are managed.

Since 1987, the EPA has annually compiled this TRI data (which currently covers releases of over 650 toxic chemicals) and has made it available through several data access tools, including the TRI Explorer (http://www.epa.gov/triexplorer/chemical.htm) and Envirofacts (http://www.epa.gov/enviro/) Web-site locations. Users of this data can easily obtain national, regional, city, county, zip code, or even facility-specific information. Other organizations also make this data available to the public through their own data access tools, including OMB Watch's Right-to-Know Network (http://www.rtknet.org) and the Environmental Defense Council's pollution information Web site (http://www.scorecard.org).

With access to this TRI data, it is expected that communities will be in a position to (1) hold companies accountable for their harmful environmental activities, and (2) make informed social and economic decisions in light of toxic chemical use.

Given the nature of the TRI data and its intended use, many studies have been undertaken to evaluate the economic impact of access to such information. Konar and Cohen[13] and Khanna, Quimio, and Bojilova[14] have identified financial market responses to TRI information. Hamilton uses TRI data from 1988 and finds that between 1988 and 1991, plants generating greater quantities of highly carcinogenic chemicals reduced their emissions more than facilities reporting lower levels of emissions.[15] He postulates that the availability of TRI data, in combination with liability concerns, induced this pollution-reduction response. Sadd et al. find that, when controlling for other neighborhood characteristics, higher TRI releases tend to be associated with regions with a larger proportion of minority residents.[16]

---

12.   Patchin, "Valuation of Contaminated Properties," 7.

13.   Shameek Konar and Mark A. Cohen, "Information as Regulation: The Effect of Community Right to Know Laws on Toxic Emissions," *Journal of Environmental Economics and Management* 32, no. 1 (1997): 109–124; and Shameek Konar and Mark A. Cohen, "Does the Market Value Environmental Performance?" *The Review of Economics and Statistics* 83, no. 2 (May 2001): 281–289.

14.   Madhu Khanna, Wilma Rose H. Quimio, and Dora Bojilova, "Toxic Release Information: A Policy Tool for Environmental Protection," *Journal of Environmental Economics and Management* 36, no. 3 (1998): 243–266.

15.   James T. Hamilton, "Exercising Property Rights to Pollute: Do Cancer Risks and Politics Affect Plant Emission Reductions," *Journal of Risk and Uncertainty* 18, no. 2 (1999): 105–124.

16.   James L. Sadd et al., "'Every Breath You Take...': The Demographics of Toxic Air Releases in Southern California," *Economic Development Quarterly* 13, no. 2 (1999): 107–123.

While existing studies have used the TRI data to investigate regional economic conditions or measure its impact on firm value, it appears that only the Gleeson study has investigated the potential impact of TRI information on residential real property values.[17] Given the stated purpose of EPCRA and the ease of access to TRI data, both buyers and sellers may likely be aware of TRI-releasing facilities. For instance, many local newspapers compile and report TRI releases. A LexisNexis search done for the Omaha area returned more than twenty newspaper stories referencing toxic chemical pollution between 1995 and 2000, and ten explicitly discuss the TRI data and the facilities releasing those toxics. As an example, a 1995 *Omaha World-Herald (OWH)* story, titled "EPA Says Toxic Emissions Down in Nebraska, Iowa," discusses major TRI-reporting facilities in the city in detail (all of which are in the data set for this study), indicating both location and chemicals released. A 1998 *OWH* article, titled "Internet Gains Two Sites With Data on Pollution," gives details on TRI releases and provides several Web sites where local residents can find TRI pollutant-release information.

Given that many local news outlets publish TRI information, it is reasonable to presume that local housing markets internalize this information (at least to some degree) when establishing home values. It is unclear, however, if the market uses the information to distinguish between low-risk and high-risk chemical releases. This is an empirical question and the primary focus of the current study.

## The Econometric Model and Data

To measure the impact of TRI releases on housing prices, a hedonic pricing model is used. In such models, the price of a quality-differentiated composite good (such as a home, car, or other consumer commodity) is treated as a function of the characteristics embodied in that good. This function is increasing (decreasing) in certain attributes that buyers find desirable (undesirable) because buyers will bid up (down) the price of those composite goods that have more of the desirable (undesirable) attribute. If the function is accurately specified, then the estimated coefficient on a particular attribute represents the buyer's marginal willingness to pay for that particular attribute.

In general terms, the hedonic price function as applied to housing is written as:

$$SALEP_i = f(S_i, N_i, E_i, T_i) \tag{1}$$

where:

$SALEP_i$ = the sale price of home $i$

$S_i$ = a vector of structural characteristics for home $i$

$N_i$ = a vector of neighborhood (or socioeconomic) characteristics associated with home $i$

$E_i$ = a vector of environmental characteristics associated with home $i$

$T_i$ = a time component, since the values of many assets vary over time

Structural characteristics reflect specific attributes for each property sold, including number of bedrooms and bathrooms, square footage of the home, average room size, and the age of the property. Neighborhood characteristics can include demographic characteristics of a property's surrounding community, such as school quality, crime rates, population density, average neighborhood income, and educational attainment, among others. Finally, environmental characteristics can include information on pollution, proximity to landfills and industrial complexes, and proximity to airports and railroads.

The theoretical foundations of hedonic price modeling are largely silent as to functional form for equation (1). Following the methodology of a number of studies,[18] a semilog functional form is assumed for equation (1), where a unit change in a particular attribute leads to a percentage change in price. Therefore, SALEP enters the empirical estimation in natural-log form.[19] Definitions and descriptions of the structural, neighborhood, and environmental variables as well as certain summary statistics for each variable used in this study are provided in Table 1 and then discussed in detail.[20]

The data set used in this analysis comprises a cross section of residential properties sales in the year 2000, categorized by postal zip codes within Douglas County, Nebraska. There are several reasons for this. First, of the counties comprising the Omaha Metropolitan Statistical Area (MSA), the Douglas County Assessor provided the most complete set of sales data, including detailed property characteristics. This permitted focus

---

17.   Gleeson's paper is one of the few that relates housing values to TRI releases. His study uses census tract data from the 1980 and 1990 U.S. Census reports on housing characteristics and 1988 TRI data. He finds that between 1980 and 1990, proximity to and amounts of TRI releases adversely affected housing prices in New England. This study has certain interesting and beneficial characteristics; however, it does not use house-specific information, nor does Gleeson consider differing degrees of environmental harm potentially caused by releases of different TRI chemicals.

18.   See for example Brookshire et al., 165–177; David E. Clark and William E. Herrin, "Historical Preservation Districts and Home Sale Prices: Evidence from the Sacramento Housing Market," *The Review of Regional Studies* 27, no. 1 (1997): 29–48; David M. Mitchell, "School Quality and Housing Values," *The Journal of Economics* 26, no. 1 (2000): 53–70; Molly Espey and Hilary Lopez, "The Impact of Airport Noise and Proximity on Residential Property Values," *Growth and Change* 31, no. 3 (Summer 2000): 408–419; Christopher G. Leggett and Nancy E. Bockstael, "Evidence of the Effects of Water Quality on Residential Land Prices," *Journal of Environmental Economics and Management* 39, no. 2 (2000): 121–144; and Gayer and Viscusi, 33–51.

19.   Most hedonic pricing studies seem to employ semilog, double-log, Box-Cox, or some combination of model specifications. Semilog specifications are often favorable since they are relatively easy to implement, fit reasonably well with this type of valuation data, and the resulting coefficients offer a straightforward interpretation. In this selection of the semilog form, we followed several authors, notably Brookshire et al., by choosing between linear, semilog, and double-log specifications, that form which produced the best fit of the data based on highest adjusted $R^2$. The adjusted $R^2$ for the linear form was 0.734, the adjusted $R^2$ for the double-log form was 0.767, and the adjusted $R^2$ for the semilog was 0.771.

20.   There is some variation in mean values for some series (housing prices, for instance) between zip codes. Zip code summary tables are available upon request.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 1**          Summary Statistics of Variables Used in the Model

| Variable | Definition | Mean | Standard Deviation | Maximum | Minimum |
|---|---|---|---|---|---|
| SALEP | Sale price in 2000 | $147,166.90 | $52,682.23 | $340,000.00 | $86,000.00 |
| DMYGAR | Attached garage (1 if yes; 0 if no) | 0.43 | 0.50 | 1.00 | 0.00 |
| AGE | Age of home | 21.39 | 23.01 | 115.00 | 0.00 |
| RESSF | Finished square footage of home (in 1,000 sq. ft.) | 1.64 | 0.58 | 4.92 | 0.70 |
| BATHS | Number of bathrooms | 2.14 | 0.64 | 6.50 | 1.00 |
| ROOMSIZE | Average room size (square footage of home/number of rooms) | 255.66 | 61.26 | 679.75 | 115.43 |
| LOTSIZE | Square footage of lot upon which home sits (in 1,000 sq. ft.) | 9.80 | 14.87 | 471.76 | 2.18 |
| INC | Median household income by zip code (in $1,000s) | 69.05 | 14.96 | 95.63 | 27.44 |
| PCTRAV | Proportion of population that travels at least 25 minutes to place of work by zip code | 22.65 | 6.73 | 32.49 | 9.58 |
| D66PCT | Proportion of schools in zip code that are District 66 schools | 12.33 | 31.28 | 100.02 | 0.01 |
| TRI/AREA | TRI releases per square mile (in tons) by zip code | 1.71 | 5.05 | 25.28 | 0.00 |
| TRI_CANS/AREA | Carcinogenic TRI releases per square mile (in tons) by zip code | 0.08 | 0.25 | 1.16 | 0.00 |
| DMYASARCO | Dummy variable for proximity to Asarco plant (1 if zip code is within 3 miles of plant; 0 otherwise | 0.03 | 0.16 | 1.00 | 0.00 |
| DMYAIRPORT | Dummy variable for proximity to airport (1 if zip code is in or borders zip code where airport is located; 0 otherwise) | 0.01 | 0.09 | 1.00 | 0.00 |

Number of observations = 5,799
Source: Authors' calculations

on a specific set of consistent property characteristics. Second, according to the U.S. Census, Douglas County accounted for almost 65% of the Omaha MSA residences in 2000.[21] Third, most of the commercial activity that takes place in the Omaha MSA occurs in Douglas County. In 2000, Douglas County accounted for 66% of all Omaha MSA employment.[22]

The data set also includes detailed structural information on each property, such as number of rooms, square footages, lot size, etc. The data set does not provide an exact mailing address for each property sold, with the exception of a zip code. As a result, the data set for the hedonic pricing analysis is restricted to neighborhood and environmental data at the zip code level (or that could be aggregated to the zip code level) and therefore is easily matched with each property. This restricted the data set somewhat. There are thirty-two separate zip codes that comprise Douglas County, twenty-six of which are represented in the data since it was only in these zip codes where home sales of the price range considered here took place in 2000. There is a sufficient amount of variation in the neighborhood and environmental variables to make statistical inference from regression results reliable.

The sample used in this study includes 5,799 home sales ranging in price from $86,000 to $340,000. The structural characteristics included in the model are as follows: the finished square footage, measured in thousands (*RESSF*); the number of bathrooms (*BATHS*); a dummy variable indicating whether or not the property has an attached garage (*DMYGAR*); a measure of average room size, calculated as the finished square foot-

age of the property divided by total number of rooms (*ROOMSIZE*); the square footage of the lot on which the home sits, measured in thousands (*LOTSIZE*); and the age of the home (*AGE*). With the exception of *AGE*, all structural variable effects are expected to have a positive impact on the price of a home; *AGE* should have a negative impact.

Additionally, regional neighborhood and environmental information for each sale observation are included in the model. The neighborhood variables, which come from the U.S. Census Bureau's 2000 Census information unless otherwise indicated, capture certain socioeconomic characteristics of the area where each property is located. Consistent with other hedonic pricing studies, the following information for each zip code is included: household income (*INC*) and the percent of residents who report traveling a minimum of twenty-five minutes each way to their place of work (*PCTRAV*). Higher home prices should be associated with higher incomes and, as such, it is expected to have a positive effect on housing prices. The *PCTRAV* variable attempts to (indirectly) capture locational advantages for a particular property as it relates to proximity to place of work. Neighborhoods located in zip codes where a greater percentage of residents have longer commute times are likely to be less attractive areas for potential home buyers to locate. Thus, a negative effect on housing prices is expected as this variable increases.

However, there may be certain beneficial attributes of neighborhoods further away from place of work. Omaha is a relatively small city and therefore travel times are not nearly as long as they are in larger metro-

---

21.  The next most populated county is Sarpy County, which accounts for 17% of the MSA's residents. For further data details, see http://www.census.gov/population/www/cen2000/phc-t4.html.

22.  This figure was calculated from county and MSA labor force and unemployment rates taken from the Nebraska Statistical Tracking and Resource System, see http://www.nebraskaworkforce.com.

politan areas such as Los Angeles, New York, or Chicago. Consequently, the cost of commuting is relatively low. Moreover, while a significant number of jobs in Omaha are located near the central business district (CBD), there are many positive amenities to living west of the CBD, which are not easily measurable and are therefore difficult to control for in the regressions. For instance, home buyers may value certain natural amenities realized when living in more of a suburban or rural setting. Furthermore, many of the homes built to the west of the CBD are more customized, with elaborate and unique floor plans, while many of the homes closer to the CBD have floor plans and layouts that suffer from functional obsolescence. Therefore, the effect commuting time has on home values may be nonlinear in that the initial effect of commuting time depresses values, but this effect may be mitigated when the homes are closer to neighborhood amenities that are more prevalent farther away from the place of work. A convenient econometric way to capture this potential mitigating impact is to include the squared value of *PCTRAV* (i.e., *PCTRAV²*) in the regression. If there is a mitigating effect, the estimated coefficient on *PCTRAV²* should be positive.

An additional neighborhood variable capturing school quality is also included to the model. A study by Mitchell finds a strong correlation between property values and school quality, indicating that home buyers value superior education for their children and are inclined to bid up prices for homes located in neighborhoods that are believed to have superior schools.[23] Omaha, as a whole, benefits from having a relatively well-regarded public school system. Hence, variation in home prices based on school district may not be as great as in other cities where school quality varies more. However, Omaha does have one school district, District 66, that has received both regional and national attention as one of the better school districts. To account for the potential effect school quality might have on property values, a variable (*D66PCT*) is constructed to account for the potential effect District 66 schools may have on sale prices. For each zip code, *D66PCT* measures the percentage of total schools that are District 66 schools, with the expectation that more District 66 schools in a particular zip code area will capture more properties that are located in this school district. If such properties are valued higher, then the coefficient on *D66PCT* should be positive.[24]

The analysis includes four environmental variables. First, a dummy variable is included to capture proximity to Omaha's airport. Espey and Lopez[25] specifically consider the effect that proximity to a city's airport has on residential property values. They find that, at least for the city they examine (Reno, Nevada), closer proximity to the airport pushes home prices down, indicative of the adverse effect noise pollution has on property values. In the present study, a negative impact is expected as well.

Second, a dummy variable, *DMYASARCO*, is included to indicate whether or not a home's zip code area lies within three miles of Omaha's Asarco plant, a lead-refining facility that operated between 1870 and 1996. This facility was located on the city's east side along the Missouri River and was on the EPA's National Priorities List of Superfund sites, pursuant to the U.S. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as posing a significant environmental threat to nearby communities. More than a century of industrial activity at the facility has resulted in the accumulation and settlement of many toxic pollutants in soils currently occupied by residential neighborhoods in the city's eastern sections. Principal among these pollutants is lead; frequent exposure to high levels of lead is believed to cause learning and other developmental problems, particularly for children under the age of six. Since 1999, the EPA has been conducting lead-content tests in the yards of homes located in east Omaha, and it recently announced that it found lead contamination present at elevated concentrations in residential properties near the facility. Given such well-publicized conditions, it is expected that home values will be lower within close proximity to this plant.[26]

The last two environmental variables measure releases of TRI chemicals, the primary variable of interest in the study.[27] Figure 1 displays a map of Douglas County and its zip code delineations. The shaded areas represent zip codes where at least one TRI facility is located. As can be seen, most of the TRI releases occur on the extreme eastern edge of the county and along its southern border.

Since there is a fair amount of variance in the TRI data over time, the data used here represents average TRI release levels (measured in metric tons) between 1995 and 2000 for each zip code. In Douglas County, there were twenty-four toxic chemical-polluting manufacturing facilities that released over 1.9 million pounds

---

23. Mitchell, 53–70.

24. Without specific address information to place properties exactly by school district, this variable seemed a relatively reasonable way to proceed. Caution should be exercised, however, in interpreting the value of the resulting coefficient. There will certainly be more properties in District 66 if there are more District 66 schools in a zip code. However, there will be some properties that are in a zip code but not in District 66. While a positive and significant coefficient would suggest that school quality matters, it might also cause one to believe that there are spillover effects to properties in close proximity to, but not included in, District 66. Some caution should be exercised in arriving at such a conclusion.

25. Espey and Lopez, 408–419.

26. For further information, see http://www.epa.gov/superfund/sites/npl/nar1660.htm. This information is incorporated as a dummy variable because most of the evidence seems to report contamination within a three-mile radius of the plant. For media coverage, see for instance, Nancy Gaarder, "Tests Show Plenty of Lead," *Omaha World-Herald*, sec. B, September 8, 2003.

27. The data was originally queried by facility for all chemicals and all release types (i.e., land, air, water, or underground injection), and then aggregated to the zip code level.

Copyrighted material licensed by Randall Bell on April 26, 2021



**Figure 1**        Toxics Release Inventory (TRI) Locations in Douglas County, Nebraska



Note: Shaded areas represent zip codes where at least one TRI facility is located.

of toxics into the local environment in 2000. As shown in Table 2, between 1995 and 2000, some fifty-three chemicals and compounds were released.[28] The first environmental variable of interest in the econometric analysis measures average TRI releases per square mile (*TRI/AREA*) for all TRI chemicals. The expected impact on housing prices is hypothesized to be negative.

To isolate the potential impact that significantly hazardous releases have on housing prices, releases of toxic chemicals in Douglas County were identified where the released chemicals are considered carcino-genic[29] and therefore potentially pose a greater threat to human health than releases of noncarcinogenic chemicals. Of the chemicals released in Douglas County between 1995 and 2000, six are listed as carcinogenic, as shown in Table 2.[30] In some cases, release amounts are relatively small. However, Table 2 shows significant release amounts for carcinogenic trichloroethylene; 1,1,1-trichloroethane; and lead compounds. To test if

releases of these chemicals have any additional impact on housing prices, a variable *TRI_CANS/AREA* was constructed to measure average releases of carcinogenic TRI chemicals per square mile for each zip code. If the market incorporates the degree of harmful exposure to more dangerous chemical releases, this variable would be expected to have a negative impact on housing prices.

Since the data set provided by the Douglas County Assessor's Office did include information on the date of sale, three dummy variables were also included in the basic valuation model to control for potential seasonal price variation.[31] Finally, as the data set is cross-sec-tional, a time variable cannot be introduced, as theory would suggest if such information were available.

## Results
The results are presented in Table 3. Column 1 lists the independent variables used in the model, column

28.  This TRI data is available from a variety of different sources. Here the data was obtained directly from the EPA at http://www.epa.gov/triexplorer/chemical.htm.

29.  Nicolaas W. Bouwes and Steven M. Hassur, "Toxics Release Inventory Relative Risk-Based Environmental Indicators: Interim Toxicity Weighting Summary Document," Economics, Exposure and Technology Division, Office Of Pollution Prevention and Toxics, U.S. Environmental Protection Agency, Washington D.C., June 1997. This document is available on the EPA's Web site at http://www.epa.gov/oppt/rsei/docs/toxwght97.pdf.

30.  The reader may observe that a common chemical widely known to be carcinogenic, benzene, is notably absent from this table. This is because, according to the EPA's TRI database, there were no recorded releases of benzene in Douglas County between 1995 and 2000.

31.  Since the regressions include a constant term, the first-quarter dummy variable (capturing those properties sold in the winter months of January, February, and March) was suppressed. Since home sale/buying activities usually pick up in the warmer months, we should expect positive coefficients on the dummy variables capturing properties sold in the spring, summer, fall, and early winter. Indeed, we might also expect the largest coefficients to be associated with quarters two (April, May, and June) and three (July, August, and September).

**Table 2**        Total Pounds of TRI Releases between 1995 and 2000 in the Douglas County, Nebraska, Study Area

| Chemical Name | Total On-Site TRI Releases | Considered Carcinogenic |
|---|---|---|
| 1,1,1-TRICHLOROETHANE | 21,777.00 | x |
| 1,2,4-TRIMETHYLBENZENE | 557.00 | |
| 4,4'-ISOPROPYLIDENEDIPHENOL | 17,118.00 | |
| AMMONIA | 462,759.00 | |
| ANTIMONY COMPOUNDS | 23,602.00 | |
| ARSENIC COMPOUNDS | 5,722.00 | x |
| ATRAZINE | 1,265.00 | |
| BARIUM | 1,621,000.00 | |
| BARIUM COMPOUNDS | 7.00 | |
| CADMIUM COMPOUNDS | 6.00 | x |
| CERTAIN GLYCOL ETHERS | 431,325.00 | |
| CHLORINE | 18,527.00 | |
| CHROMIUM | 1,330.00 | |
| CHROMIUM COMPOUNDS | 2,478.00 | |
| COBALT COMPOUNDS | 4,535.00 | |
| COPPER | 29,265.00 | |
| COPPER COMPOUNDS | 1,393.00 | |
| DICHLOROMETHANE | 12,055.00 | |
| DIISOCYANATES | 9.00 | |
| DIOXIN and DIOXIN-LIKE COMPOUNDS | 0.26 | x |
| ETHYL DIPROPYLTHIOCARBAMATE | 8,496.00 | |
| ETHYLBENZENE | 124,720.00 | |
| ETHYLENE GLYCOL | 1,800.00 | |
| FORMIC ACID | 23,220.00 | |
| HYDROCHLORIC ACID (post-1995 acid aerosols only) | 1,595,000.00 | |
| HYDROGEN FLUORIDE | 586,000.00 | |
| LEAD COMPOUNDS | 60,737.00 | x |
| MANGANESE | 79,714.00 | |
| MANGANESE COMPOUNDS | 750.00 | |
| MERCURY | 78.00 | |
| METHANOL | 135,956.00 | |
| METHYL ETHYL KETONE | 400,696.00 | |
| METHYL ISOBUTYL KETONE | 46,682.00 | |
| MOLINATE | 373.00 | |
| M-XYLENE | 53,511.00 | |
| NAPHTHALENE | 73,699.00 | |
| N-BUTYL ALCOHOL | 269,102.00 | |
| N-HEXANE | 769,027.00 | |
| NICKEL | 1,255.00 | |
| NITRATE COMPOUNDS | 250.00 | |
| N-METHYL-2-PYRROLIDONE | 37,300.00 | |
| O-XYLENE | 26,878.00 | |
| PHENOL | 1,478.00 | |
| PHOSPHORIC ACID | 5,067.00 | |
| POLYCYCLIC AROMATIC COMPOUNDS | 5.25 | |
| P-XYLENE | 22,429.00 | |
| SILVER COMPOUNDS | 356.00 | |
| STYRENE | 3,600.00 | |
| SULFURIC ACID (post-1994 acid aerosols only) | 500.00 | |
| TOLUENE | 313,664.00 | |
| TRICHLOROETHYLENE | 317,403.00 | x |
| XYLENE (MIXED ISOMERS) | 1,195,080.00 | |
| ZINC COMPOUNDS | 74,770.00 | |

Source: EPA's TRI Web site at http://www.epa.gov/triexplorer/chemical.htm

Copyrighted material licensed by Randall Bell on April 26, 2021

2 presents estimated results from the model when variables discussed earlier are included, and column 3 presents estimated results from the model when *DMYASARCO* is omitted for reasons to be addressed. Overall, based on the adjusted $R^2$ statistics under both columns 2 and 3, the models capture over 77% of the variation in ln(*SALEP*), very much in line with other similar hedonic models in the literature.[32] Moreover, based on the model's *F*-statistics for both columns 2 and 3, the null hypothesis (that estimated coefficients are jointly zero) can be rejected. Therefore the estimated model does seem to have statistical meaning.

In Table 3, an estimate of the model is made using White's heteroscedasticity-consistent standard errors and covariance (or robust) estimator. An important econometric issue with cross-sectional data such as this is whether or not the resulting ordinary least squares (OLS) residuals are of constant variance (i.e., homoscedastic).[33] If this is not the case, then the OLS beta coefficient estimates are consistent but the conventionally computed standard errors for these coefficients are invalid, making statistical inference unreliable. To check for this, White's heteroscedasticity test is used.[34] Since the results indicated the presence of heteroscedasticity, White's robust estimator is also used to correct the OLS coefficient standard errors.[35]

In Table 3, for both estimated models a subcolumn is included for marginal impact in addition to a column of estimated coefficients.[36] These columns measure a particular quantitative impact that each independent variable has on home prices.[37] For the categorical variables (*DMYASARCO*, *DMYAIRPORT*, *DMYGAR*, and *BATHS*), this impact measures the percentage change in the sale price of a home as one of these variables is increased in increments of one unit.[38] The continuous variables have been calculated so that they can be interpreted as elasticities, evaluated at each independent variable's sample mean.[39]

The key variables of interest are the TRI variables. In both models (columns 2 and 3), the coefficient on *TRI/AREA* is negative, as expected, and significant at the 1% level. The implication of these results is that appraisers should consider total TRI releases when reaching value conclusions regarding residential property. In both models, the estimated elasticity is essentially the same. A 10% increase in TRI releases per square mile reduces a home's price by 0.015% (0.0015 * 10). Relative to the mean value of a home in the sample, such an increase translates into a $2,207 reduction in price ($147,167 * 0.015). As shown in Table 4, this effect varies by zip code. The results indicate that a 10% increase in TRI releases per square mile generates an effect as low as $1,427 for zip code area 68107 and as high as $2,963 for zip code area 68130. While it is fairly difficult to make comparisons with other studies (since data sets differ by geography, time, available structural characteristics data, etc.), it is interesting to note that Gleeson estimates a TRI effect

---

32. Some studies, such as Espey and Lopez, report adjusted $R^2$s on the order of 87% while others, such as Gleeson, report $R^2$s of 49%.

33. Autocorrelation is also a major econometric issue, but it is usually a time-series issue and has generally been considered less of a concern in cross-sectional data. That said, lately there has been some research done in the area of spatial autocorrelation. While we do not consider such an issue in this article, it would be interesting for future research to consider a model from this perspective.

34. Briefly, this procedure tests for the presence of heteroscedasticity when its form is unknown. The test involves a two-step procedure whereby the residuals from the original OLS regression are saved and squared. Then in a second estimation, the squared residuals are regressed against all possible cross products of the variables used in the original OLS equation. White's statistic is the number of observations times the $R^2$ of the second regression and is distributed $X^2$ with degrees of freedom equal to the number of regressors used in the second regression minus one. Here the test statistic was 1,212.79. With 144 degrees of freedom at a 99% confidence level, the critical $X^2$ is 187.53. Since 1,212.79 > 187.53, the null of "no heteroscedasticity" is rejected.

35. See Halbert White, "A Heteroskedasticity-Consistent Covariance Matrix Estimator and a Direct Test for Heteroskedasticity," *Econometrica* 48, no. 4 (May 1980): 817–838 for further discussion. It should be noted that an alternative way to address heteroscedasticity would be to identify the source and form of it and employ a weighted least squares procedure to correct for it. However, in this case, there is no way to truly know a priori either the source or the form of the heteroscedasticity. Hence, White's procedure is reasonable in this case. For further discussion, see Jack Johnston and John DiNardo, *Econometric Methods*, 4th ed. (New York: McGraw-Hill, Inc., 1997).

36. It should be noted that, by the very nature of econometric analysis, the coefficients presented here (and the associated marginal impacts) apply to the "average" or "typical" home in the data and become less reliable indicators of effects at the extremes of the data. Therefore, caution should be applied when interpreting a marginal effect as it relates principally to the average home. Applying these effects to extreme observations is inappropriate.

37. Although it could be easily done, these impacts are not included for the quarterly dummies since the quantitative change in the price of a home sold at different times of the year is of secondary importance to this study.

38. That is, for a semilog function, $\ln(y) = \beta x$ where, $x = 0, 1, 2, 3...$it can be shown that
$$\frac{\Delta y}{y} = e^{\beta} - 1.$$
See Robert Halvorsen and Raymond B. Palmquest, "The Interpretation of Dummy Variables in Semilogarithmic Equations," *American Economic Review* 70, no. 3 (1980): 474–475 for further discussion. When the various impacts are discussed in the present study, the text refers to percent changes so the resulting impact measures are multiplied by 100.

39. That is, for a semilog function $\ln(y) = \beta x$, where $x \in (-\infty, +\infty)$, it can be shown that the elasticity of $y$ with respect to $x$ is:
$$\frac{dy}{dx}\frac{x}{y} = \beta x$$
For the analysis, this elasticity is evaluated at the mean value of the $x$ variables:
$$\frac{dy}{dx}\frac{x}{y} = \beta \bar{x}$$

**Table 3**          **Regression Results[a]**

| (1) | | | | (2) | | (3) | |
|---|---|---|---|---|---|---|---|
| | Coefficient | Sig.[c] | Marginal Impact[b] | Coefficient | Sig.[c] | | Marginal Impact[b] |
| Constant | 11.3182 | *** | | 11.3209 | *** | | |
| | (0.0424) | | | (0.0426) | | | |
| Qtr. 2 | 0.0184 | *** | | 0.0184 | *** | | |
| | (0.0055) | | | (0.0055) | | | |
| Qtr. 3 | 0.0199 | *** | | 0.0200 | *** | | |
| | (0.0058) | | | (0.0058) | | | |
| Qtr. 4 | 0.0150 | ** | | 0.0151 | ** | | |
| | (0.0064) | | | (0.0064) | | | |
| DMYGAR | 0.0542 | *** | 0.0556 | 0.0542 | *** | | 0.0557 |
| | (0.0046) | | | (0.0046) | | | |
| AGE | -0.0023 | *** | -0.0485 | -0.0023 | *** | | -0.0492 |
| | (0.0002) | | | (0.0002) | | | |
| RESSF | 0.3258 | *** | 0.5342 | 0.3255 | *** | | 0.5338 |
| | (0.0087) | | | (0.0087) | | | |
| BATHS | 0.0506 | *** | 0.0519 | 0.0507 | *** | | 0.0520 |
| | (0.0056) | | | (0.0056) | | | |
| ROOMSIZE | 0.0006 | *** | 0.1414 | 0.0006 | *** | | 0.1414 |
| | (0.0001) | | | (0.0001) | | | |
| LOTSIZE | 0.0020 | *** | 0.0020 | 0.0020 | *** | | 0.0020 |
| | (0.0003) | | | (0.0003) | | | |
| INC | 0.0013 | *** | 0.0919 | 0.0014 | *** | | 0.0960 |
| | (0.0003) | | | (0.0003) | | | |
| PCTRAV | -0.0321 | *** | -0.7280 | -0.0325 | *** | | -0.7358 |
| | (0.0030) | | | (0.0030) | | | |
| $PCTRAV^2$ | 0.0007 | *** | 0.3550 | 0.0007 | *** | | 0.3566 |
| | (0.0001) | | | (0.0001) | | | |
| D66PCT | 0.0000 | | -0.0006 | -0.0001 | | | -0.0007 |
| | (0.0001) | | | (0.0001) | | | |
| TRI/AREA | -0.0009 | * | -0.0015 | -0.0009 | * | | -0.0015 |
| | (0.0003) | | | (0.0003) | | | |
| TRI_CANS/AREA | -0.0117 | | -0.0009 | -0.0109 | | | -0.0009 |
| | (0.0137) | | | (0.0137) | | | |
| DMYASARCO | -0.0119 | | -0.0118 | – | | | |
| | (0.0187) | | | – | | | |
| DMYAIRPORT | -0.0483 | | -0.0471 | -0.0506 | | | -0.0494 |
| | (0.0353) | | | (0.0354) | | | |
| Adj $R^2$ | 0.7708 | | | 0.7714 | | | |
| F-statistic | 1147.8940 | *** | | 1219.6730 | *** | | |

Dependent variable: ln(SALEP)

Standard errors reported in parentheses

Sources: Demographic variables from U.S. Bureau of Census at http://www.census.gov/; housing-specific variables from Douglas County, NE Assessor's Office; TRI variables from EPA website at http://www.epa.gov/triexplorer/chemical.htm.

a   White's heteroscedasticity-consistent standard errors and covariance estimator were used in the regressions.

b   For the categorical variables (DMYASARCO, DMYGAR, BATHS, and DMYAIRPORT), the marginal effect measures the percent change in the sale price of a home as one of these variables is increased in increments of one unit. The marginal impacts of the remaining continuous variables represent elasticities (evaluated at each variable's sample mean). See footnotes 38 and 39 for details regarding these calculations.

c   10% Significance level = *
    5% Significance level = **
    1% Significance level = ***

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 4**    Average Sale Prices and TRI/AREA Impacts by Zip Codes within the Douglas County, Nebraska, Study Area

| Zip Code | Average Sale Price | TRI/AREA | Dollar Impact from a 10% Increase in TRI/AREA | 95% Confidence Interval |
| --- | --- | --- | --- | --- |
| 68104 | $121,104.34 | 0.00 | | |
| 68105 | $108,408.79 | 0.00 | | |
| 68106 | $110,828.64 | 0.00 | | |
| 68107 | $ 95,173.06 | 7.32 | -$1,427.60 | (-$2,560.16, -$352.14) |
| 68108 | $108,057.14 | 0.90 | -$1,620.86 | (-$2,906.74, -$399.81) |
| 68110 | $ 97,666.67 | 4.28 | -$1,465.00 | (-$2,627.23, -$361.37) |
| 68112 | $131,930.00 | 19.53 | -$1,978.95 | |
| 68114 | $158,771.82 | 0.00 | | |
| 68116 | $174,671.65 | 0.00 | | |
| 68117 | $105,258.43 | 0.26 | -$1,578.88 | (-$2,831.45, -$389.46) |
| 68118 | $201,144.79 | 0.00 | | |
| 68122 | $123,044.67 | 1.54 | -$1,845.67 | (-$3,309.90, -$455.27) |
| 68124 | $147,821.31 | 0.00 | | |
| 68127 | $133,291.84 | 25.28 | -$1,999.38 | (-$3,585.55, -$493.18) |
| 68130 | $197,515.63 | 0.00 | -$2,962.73 | (-$5,313.17, -$730.81) |
| 68131 | $112,291.56 | 0.00 | -$1,684.37 | (-$3,020.64, -$415.48) |
| 68132 | $164,755.56 | 2.64 | -$2,471.33 | (-$4,431.92, -$609.60) |
| 68134 | $113,095.91 | 0.00 | | |
| 68135 | $183,449.29 | 0.00 | | |
| 68137 | $120,380.85 | 4.44 | -$1,805.71 | (-$3,238.24, -$445.41) |
| 68142 | $150,000.00 | 0.00 | | |
| 68144 | $136,799.60 | 0.59 | -$2,051.99 | (-$3,679.91, -$506.16) |
| 68152 | $140,521.86 | 0.00 | | |
| 68154 | $156,904.81 | 0.00 | | |
| 68164 | $140,324.07 | 0.00 | | |

Source: Douglas County, NE Assessor's Office and author's calculations

Note: Douglas County Assessor's Office provided sales data for only 25 of the 32 zip codes for 2000.

of about $1,290, which is relatively close to the slightly larger impact shown here.[40]

As for *TRI_CANS/AREA*, while the estimated effect on housing prices is negative, it is not statistically significant in either model. This suggests that while toxic pollutant releases do adversely affect home prices, the degree of harm caused by certain releases has no additional adverse impact on value. Again, the implication of this result to appraisers is that while pollutant releases do carry a negative stigma on the value of homes, it seems that the discounting of value is complete with proximity to *any type* and amount of pollutant release. That is, pollutant releases appear to be considered by the market as a negative, but homogeneous, attribute. Thus, value adjustments should perhaps be based on aggregate TRI releases rather than the relative potential harm associated with particular release types. This conclusion may be premature, however, particularly when the *DMYASARCO* effect is considered. While the results indicate that *DMYASARCO* has a negative impact on home prices, the variable is statisti-

cally insignificant in both models. This is rather troubling. As discussed, several local news stories have highlighted EPA testing for unusually high lead content levels in the soil of properties located within a three-mile radius of the old Asarco plant. One issue with this result might be that this plant was located on the eastern edge of Omaha in zip code area 68102. As shown in Figure 1, there also are TRI-releasing facilities in that area and surrounding areas, raising a potential issue of multicollinearity. That is, there may be insufficient independent information between the TRI variables and the Asarco dummy variables for OLS to produce reliable standard errors for these variables.

Given that the *TRI/AREA* variable is so highly significant, however, the major issue is whether or not it is incorrect to reject both *DMYASARCO* and *TRI_CANS/AREA* as insignificant, when in fact they are. To check for this and to support the primary interest in the effect of TRI chemicals on property values, the third column of Table 3 presents the regression results when *DMYASARCO* is dropped.[41] While *TRI/AREA* is still

---

40.  Similarly, Brookshire et al. estimate pollution elasticities of about 0.22, substantially larger than the estimate here. There may be a number of reasons for this, not the least of which is that their study was conducted in 1983. Their measures of pollution, total suspended particulates, and nitrogen oxide, as well as the market they consider, differ from those in the current study. Buyers in the Los Angeles MSA may have attitudes towards pollution releases that are substantially different from those of buyers in the Omaha MSA.

41.  Recall that OLS still yields an unbiased estimator even in the presence of multicollinearity. The major problem that arises is that the estimated standard errors on collinear variables are higher than they would be were the variables orthogonal to one another. Hence, the risk is that a variable might be rejected as significant when in fact the variable is indeed significant.

significant in this model, *TRI_CANS/AREA* is still not significant.[42]

The effects of other control variables on housing prices largely come through as expected in both models. Furthermore, the estimated effects are very similar in both models. For instance, a 10% increase in finished square footage is estimated to increase the price of a typical home by 5.3%. Having an attached garage contributes an additional 5.6% to the value of a typical home, and an additional bathroom increases a home's value by 5.2%. Moreover, larger rooms and larger lot sizes tend to be associated with more expensive properties. Finally, ceteris paribus, new homes tend to be associated with higher prices.

In addition, consistent with most other studies using income as an explanatory variable, the properties located within zip code areas with higher median household incomes are higher-priced properties. From the results presented in column 3, the income elasticity is 0.096. Hence, according to the model, a 10% jump in median household income increases the typical home's price by 0.96%. Also home prices are pressured downward in those zip code areas where the majority of residents spend twenty-five minutes or more commuting to work. As an indicator of proximity to work, this is expected, however, this negative effect is mitigated somewhat, as evidenced by the positive impact on *PCTRAV²*. As suggested earlier, this may be due to the fact that Omaha is a relatively small city, and there are certain, largely immeasurable amenities to living further from the major center of employment in the city (the central business district). Such amenities involve proximity to recreational and other natural amenities, unique and more modern home floor plans, and so forth.

The measure of school quality, *D66PCT*, performed poorly. The results indicate that, contrary to Mitchell, school quality is not a statistically significant determinant of housing prices.[43] While troubling, it is likely that this result reflects the fact that the measure used for school quality (the percentage of District 66 schools within a zip code) may be too imprecisely defined. For instance, there may not be enough information with the measure of school quality independent of income (which is highly significant) to precisely account for a school quality effect. Moreover, insignificance might arise because many families may elect to send their children to private schools and therefore may be less concerned with school district quality when making home purchases. While school quality was not the focus of this study, further research into this area is clearly warranted.

Finally, the results show that, contrary to Espey and Lopez, proximity to Omaha's airport does not appear to have a significant effect on home prices.[44] While the estimated coefficient is negative, as hypothesized, the variable is statistically insignificant.

## Conclusion

There is evidence to support the hypothesis that EPCRA-required reporting of toxic chemical releases by companies is having a statistical impact on residential property values, at least in Douglas County, Nebraska. However, there seems to be little evidence showing that the degree of risk to human health and the environment results in any additional reductions in home values. Hence, it would appear that toxic pollutant releases are a negative, but homogeneous, economic attribute in the sense that the full adverse effect of aggregate pollutant releases is being incorporated into the market, irrespective of the degree of harm.

The results generated by the hedonic model in this study are generally consistent with prior results in the recent literature for the demographic and property-specific control variables. The study results imply that appraisers should consider the EPA aggregate TRI releases when determining value conclusions regarding residential property. As shown in Table 4, the results indicate downward value adjustments between $1,427 and $2,963, depending on location of a property within the ten zip code areas where the TRI releases were recorded.

There are many necessary avenues of future research to consider here. First, there are measures of pollutant risk other than the one considered here. For instance, there is data that measures the relative toxicity of a host of toxic chemicals. Incorporating such information may provide additional insights into the relationship between housing price and pollution. Moreover, it would be beneficial to apply time-series analysis to this market. Bell has published a series of case-oriented studies emphasizing techniques for analyzing the impact of detrimental environmental events (oil spills, weather events, etc.) on a property or set of properties, with particular attention to how property values behave pre- and post-event.[45] In the analysis presented here, would the relative harm certain chemical releases have on health and the environment be revealed only through changes in housing prices over time? Finally, application of this model and the TRI data to other residential markets would provide valuable information to appraisers estimating price adjustments in those markets.

---

42. It should be noted that several different model specifications were tried to check for the potential significance of the *DMYASARCO* variable. As it turns out, if both the *INC* and the *TRI* variables were dropped, *DMYASARCO* would be negative and significant. The conclusion is then that DMYASARCO is collinear with *INC* and the *TRI* variables. However, given the highly significant nature of *TRI/AREA* and *INC* (and given the fact that income has proven highly significant in many other hedonic studies), in column 3 of Table 3, we follow common practice by dropping one of the collinear variables, in this case, *DMYASARCO*, since the other variables were significant and of more importance to this study.

43. Mitchell, 53–70.

44. Espey and Lopez, 408–419.

45. Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999).

Copyrighted material licensed by Randall Bell on April 26, 2021

## Additional Reading

Ford, Deborah A., and Michele Gilligan. "The Effect of Lead Paint Abatement Laws on Rental Property Values." *Journal of the American Real Estate and Urban Economics Association* 16, no. 1 (1988): 84–94.

Gawande, Kishore, and Hank Jenkins-Smith. "Nuclear Waste Transport and Residential Property Values: Estimating the Effects of Perceived Risks." *Journal of Environmental Economics and Management* 42, no. 2 (2001): 207–233.

Halvorsen, Robert, and Raymond B. Palmquest. "The Interpretation of Dummy Variables in Semilogarithmic Equations." *American Economic Review* 70, no. 3 (1980): 474–475.

Ihlanfeldt, Keith R., and Laura O. Taylor. "Externality Effects of Small-Scale Hazardous Waste Sites: Evidence from Urban Commercial Property Markets." *Journal of Environmental Economics and Management* 47, no. 1 (2004): 117–139.

Kennedy, Peter. *A Guide to Econometrics*. 3rd ed. Cambridge, MA: MIT Press, 1994.

List, John A., and Craig A. Gallet. "The Environmental Kuznets Curve: Does One Size Fit All?" *Ecological Economics* 31, no. 3 (1999): 409–423.

Lutzenhiser, Margot, and Noelwah R. Netusil. "The Effect of Open Spaces on a Home's Sale Price." *Contemporary Economic Policy* 19, no. 3 (2001): 291–298.

McDonald, John, and Robert Moffitt. "The Uses of Tobit Analysis." *Review of Economics and Statistics* 62, no. 2 (1980): 318–321.

Rosen, Sherwin. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition." *Journal of Political Economy* 82, no. 1 (1974): 34–55.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 6

# Use of Formal and Informal Surveys

## Introduction

Only one of the articles included in the Volume I anthology, the Roddewig October 1999 *Appraisal Journal* article "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," directly addressed the use of formal and informal surveys to determine the effect of contamination and environmental risk on market prices and values. That article first referenced some judicial decisions concerning the admissibility and appropriateness of formal and informal surveys. After discussing the reasons why the surveys were tossed out by the judges in the two cases discussed, the article lamented that although there was much written on the analysis of comparables or case studies to determine the amount (if any) of environmental stigma, "there is little in the published appraisal literature on use of surveys to derive an estimate of stigma." (page 578 in Volume I)

That statement is not true of the literature published since the early 2002 release of Volume I. Ten articles (as well as a series of letters to the editor) published in *The Appraisal Journal* since October of 2001 deal with the proper and improper use of formal and informal surveys in assignments involving contamination and environmental stigma. These articles clarify three important points:

1. The conclusion made in the Roddewig 1999 article that "surveys may have a limited role in some types of assignments involving contaminated property, but collection and analysis of sales and market data will remain the central technique for estimating the stigma impact…that attaches to real property affected by contamination or other forms of environmental risk" still holds true. (page 578 in Volume I)

2. It is extremely difficult (and perhaps impossible) to design a survey that fairly and accurately replicates the process by which buyers and sellers in the actual marketplace make decisions about the price to pay or accept for properties affected by contamination.

3. Reliance on formal statistical surveys is not as yet a recognized or generally accepted method of the appraisal profession.

Nine of these survey-related articles that have appeared in *The Appraisal Journal* since 2001 are included in this chapter. The tenth article, which discusses a survey used as part of an analysis of the impact of mold on prices and values, is included with other articles about mold in Chapter 7. The articles included in this chapter are arranged in order of publication. Reading the articles in chronological order can provide insight into how the debate over the use of surveys has played out in the appraisal profession during the past dozen years. Also included in this chapter are the various letters to the editor published in *The Appraisal Journal* in the wake of Albert R. Wilson's 2006 article, "Contingent Valuation: Not an Appropriate Valuation Tool."

The first article in this chapter, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge" by Marcus T. Allen and Grant W. Austin, was published in *The Appraisal Journal* while Volume I was in production. This article is similar to the Roddewig 1999 piece in that the authors note that "informal surveys are part of appraisers' daily practice," but "formal or 'scientific' survey research methods are not common in most appraisers' toolboxes." (page 197) They then note that the "use of [formal] survey research methods in real estate analysis is an increasingly contentious issue" and attribute this to the fact that much of the published debate deals with the use of formal surveys in assignments involving contaminated or stigmatized properties. (page 197) Allen and Austin then discuss the use of formal survey research in general.

Next, Allen and Austin walk through the recommended necessary steps "established in order to avoid misuse of these techniques, which would violate Standard 1 of USPAP, or misleading reports, which would violate Standard 2 of USPAP." (page 199) The steps outlined are found in an Appraisal Foundation exposure draft from September 2000 addressing statistical and market survey research, appraising, counseling, and consulting assignments. Allen and Austin then summarize the essential elements and differences between contingent valuation (CV) and conjoint analysis, two types of survey methods. The authors conclude that

"when properly structured, administered, and analyzed, formal survey methods can be invaluable tools for understanding the thoughts of real estate market participants in the absence of transactional data." (page 200)

After the Allen and Austin article was published, it would be two and a half years before the next article on the use of formal surveys in appraisal assignments would appear in *The Appraisal Journal.* The next article addressing this topic would be the Winter 2004 "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation" by James Flynn, Donald G. MacGregor, Wayne Hunsperger, C. K. Mertz, and Stephen M. Johnson. This article returned to the issue of the use of surveys in contaminated property and environmental stigma assignments. It presents a case study of how a formal survey was used to supplement sales data analysis in litigation involving "a landfill waste disposal facility that was charged with being the source of property value losses for a class of nearby property owners." (page 206) The appraiser involved in the assignment used three of the recognized and generally accepted methods (paired sales analysis, regression analysis, and case study analysis) to understand the relationship between proximity to the landfill and the prices and values of nearby homes. The market data and case study research indicated that prices in the proposed class area alleged to be impacted were lower than in a control area outside the class boundary. The formal survey was used "to show whether or not this value loss, in whole or in part, was due to the operation of the [waste disposal] facility." (page 206) Most of the article is devoted to explaining the design and content of the specific survey used and how the researchers attempted to ensure that it would comply with requirements for the admissibility of evidence in class action litigation. According to the authors, "The survey conclusion was that the negative property values shown in the plaintiffs' case (developed by paired sales, regression analysis, and case studies) were due to the public perceptions of the landfill and its stigma characteristics as evaluated by potential real estate buyers in the larger community." (page 212)

The most important point about the article is that the market research and appraisal experts involved in the assignment "did not attempt to quantify in dollar terms the lost value of property in the class area since this was established with standard appraisal methods." (page 212) The survey research complemented rather than replaced the sales data analysis. It "allowed the appraiser to account for the negative values identified in the sales data and to understand the causal link between public responses to the stigmatized neighborhood and the diminution this caused in property values." (page 212)

In Fall 2004, another article on the use of surveys by Thomas O. Jackson appeared in the *Appraisal Journal's* regular Environment and the Appraiser feature. This seminal article, "Surveys, Market Interviews, and Environmental Stigma," sets out the framework for the appropriate use of surveys within the contaminated property appraisal process. Jackson first contrasts the use of formal statistical "surveys" with the traditional

well-understood and generally accepted role of "market interviews" in the appraisal process. Two central points regarding the use of market interviews and surveys then emerge. The first central point is that "both surveys and market interviews can provide useful insights concerning the market's perceptions of environmental risk" when "properly constructed and implemented." (pages 213 and 214) The second and even more important point is discussed in the article as follows:

> Although surveys and market interviews are useful for this purpose, these tools are not valuation methods or approaches. The actual measurement of the reduction in market values should be accomplished with one or more of the accepted valuation methods for this purpose, such as case studies analysis, paired sales analysis, and income capitalization analysis. This is consistent with additional guidance in AO-9. (pages 213 and 214)

In support of the second point, Jackson references both "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation" as well as page 27 of Randall Bell's *Real Estate Damages: An Analysis of Detrimental Conditions* (first edition).

Jackson then walks the reader through the essential elements of properly conducted market interviews and formal surveys and provides a detailed case study illustrating how to incorporate market interviews into the analysis of the effect of a LUST on the value of a gas station site.

In introducing the case study, Jackson explains that interview and survey results frequently conflict with the indications provided by actual prices paid in the marketplace. When that happens, the sales data trumps the results of the interview or survey:

> Despite the link between the perceptions of risk and adverse impacts on value, the most convincing market data is developed from transactions of comparable properties with similar environmental conditions to the subject property, rather than from information gleaned through surveys or market interviews. Transactional data, including the observed sale price and other financial terms and conditions, reflect the 'revealed preferences' of the market with respect to the environmental condition under study. Other information, such as a 'stated preference' for avoidance of the environmental condition, are relevant to the extent that they are consistent with and are revealed by sales and transactions in the market, since these ultimately establish market value. If the stated and revealed preferences differ, as they frequently do, then the revealed preferences exhibited in sale price data should be given greater weight. (page 215)

Finally, the Jackson article makes two other key points that are relevant not only to appraisal assignments involving market interviews or survey research but to all assignments involving contamination or environmental risk issues. The first point is explained in the article as follows:

"Market participants do not need perfect knowledge of environmental contamination such as what might be expected from a qualified environmental engineer who has performed detailed testing of a contamination source. A real estate market that has become

Copyrighted material licensed by Randall Bell on April 26, 2021

knowledgeable of environmental influences on properties in the study area will either react or not react in its pricing decisions, based on its perception of the risk and potential impact of the contamination." (page 215)

The second point relates to one of the fundamental ethical principles of the appraisal profession, which is to never substitute one's own personal preferences, opinions, or points of view for that of the marketplace of buyers and sellers as revealed in actual prices paid: "All situations of environmental contamination do not inexorably lead to a reduction in the pricing and value of real property. An appraiser must not assume that the market will react in a certain way to environmental contamination where the assumed reaction has not been clearly demonstrated in observed market transaction data." (page 215)

Kimberly Winson-Geideman's Summer 2005 article, "Environmental Case Studies: Ensuring Suitable Comparables" in *The Appraisal Journal* summarizes the content and results of a survey sent to owners of four townhouses and 12 condominiums developed on former brownfield sites in Chicago. Both developments had been the subject of the Illinois EPA's Site Remediation Program (SRP) for former brownfields. Both sites had successfully completed the program requirements for redevelopment. As part of the process, the sites had been issued No Further Remediation letters by the state, and a set of institutional controls had been imposed and recorded against the deeds of the properties.

Winson-Geideman surveyed the 16 owners with two intentions. The first was to determine if the owners knew about the sites' participation in the brownfield remediation program and the deed restrictions. The second was to determine the owners' "tolerance for different types of contamination." (page 225) Nine of the 16 owners responded to the survey.

Based on the survey responses, Winson-Geideman concludes that the buyers had a "lack of knowledge regarding the commitments that were assumed when they purchased the property" and that none of the respondents identified the deed restriction as being a part of the property deed they purchased (page 227). While the author provides the precise questions for some other parts of the survey form, she does not provide the exact wording of the questions used to support the conclusion that the buyers lacked information concerning the contamination situation. It is possible that the buyers had some general understanding of the prior contamination situation and its approved remediation without fully understanding the nuances of the institutional control and deed restriction.

Winson-Geideman does not mention the information provided by the developer or brokers to prospective buyers or discuss how the situation played into the mortgage loan application and approval process for each unit owner. SRP institutional control deed restrictions show up on title reports issued as part of the mortgage application process. As discussed in the articles included in Volume I, the marketplace of buyers relies on intermediaries such as brokers, buyers' attorneys, and mortgage lenders to flag any serious disclosure or title issues that should concern prospective buyers.[1] It is quite possible that some or all of the survey respondents had been given some general information about the previous contamination and its remediation but had not taken the time to get more detailed information about the precise character of the deed restrictions.

There are a number of problems with this article. First of all, the author characterizes the survey as a "case study." While this may be a case study of a survey, it is not the type of environmental case study that is generally accepted by the real estate appraisal community. As defined in "The Analysis of Environmental Case Studies" by Thomas O. Jackson and Randall Bell in Chapter 4, a proper contaminated property case study involves the analysis of actual sale prices. A survey is not a substitute for an analysis of prices.

Secondly, it is important to reiterate a point made in Jackson's article "Surveys, Market Interviews and Environmental Stigma" discussed above. Market participants almost never have perfect knowledge of a current or past environmental contamination situation. As a result, it is not necessarily surprising that four of the owners did not know what the SRP was.

Based on the limited information provided in the Winson-Geideman survey, her conclusion that "it is evident from the surveys that were collected that the purchase outcome may have been different had the homeowners known of the specific contamination that existed on the site" is a stretch (page 227). It is equally likely that if the homeowners had made some inquiry to get more information about the past remediation, they would have become quite comfortable with the past remediation effort and engineered barrier constructed over the contaminated soils. As some of the articles in Volume I and this volume make clear, buyers' temporary concerns typically end once an approved federal or state remediation program has been implemented.[2]

Finally, it would be interesting to see what has happened to these two projects since Winson-Geideman's survey. Have any of the owners subsequently sold their units? If so, did the previously surveyed sellers provide specific information to potential buyers about the prior contamination situation, institutional controls, and deed restrictions? Did the sellers lower their asking prices due to the information they learned as a result of the survey? Or did they base their asking prices on sales of other properties in the neighborhood, let the marketplace work as it did when they bought their properties,

---

1.  See, for example, the following article in *Valuing Contaminated Properties: An Appraisal Institute Anthology* (Chicago: Appraisal Institute, 2002): Richard J. Roddewig and Allen C. Keiter, "Mortgage Lenders and the Institutionalization and Normalization of Environmental Risk Analysis," 305.

2.  See, for example, the following articles in Volume I of *Valuing Contaminated Properties*: Bill Mundy, "The Impact of Hazardous Materials on Property Value," 47; Seattle Engineering Department (Gary Zarker), "Seattle-Kent Good Neighbor Program," 508. See also "Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey" by Michael Greenberg and Justin Hollander in Chapter 7.

and rely on the buyers and their brokers, attorneys, and mortgage lenders to discover and consider the deed restrictions as part of the normal title search process? As will be discussed later in this chapter in the article "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," survey participants often do not act on their concerns expressed in surveys when they later sell their properties.

Albert R. Wilson's Winter 2006 article, "Contingent Valuation: Not an Appropriate Valuation Tool," and Kristy E. Mathews' Summer 2008 article, "Under the Microscope: Dissection of a Contingent Valuation Survey," should be read as companion pieces. Both Wilson and Mathews are economists rather than real estate appraisers, and both have been involved in significant assignments involving the appropriateness and reliability of using formal statistical surveys in determining economic damages due to the contamination of real estate. Wilson again emphasizes the important distinction between the informal surveys traditionally conducted by real estate appraisers and the formal statistical surveys conducted by economists. He states that traditional informal surveys typically focus on actual past sales transactions and determine the influence of various aspects of the property, participants, or transaction details on price. (page 228) By contrast, formal statistical surveys—such as those involved in contingent valuation analysis—focus on hypothetical future transactions.

Wilson's article raises three fundamental issues in the use of surveys such as contingent valuation analysis as part of the appraisal process:

1. "Recognized authorities on CV as well as advocates of the CV method" acknowledge that "contingent valuation was never intended for quantitative estimation of the value of goods having a market such as real estate." (pages 228 and 229)

2. Properly designing and implementing an unbiased and statistically reliable survey is extremely difficult, especially in the context of a contamination situation.

3. "All market survey techniques using a hypothetical market tend to yield an overestimate of the value or price of the good" that is the subject of the survey. (page 230)

To provide support for these points, Wilson gives a detailed summary of the critique of contingent valuation in a 1993 report by a panel assembled by the National Oceanic and Atmospheric Administration.

Wilson concludes by stating that the "fatal flaw" affecting all hypothetical contingent valuation surveys is "the inability to control the perception of the respondent that governs the answers provided." As a result, such surveys have no "quantitative value" as part of the

appraisal process. (page 234) Wilson says that appraisers should continue to do what they have been reliably doing for generations–looking to prices actually paid in real-world market transactions–to understand the effects of contamination on real estate:

> The market is the market. Attempting to place arbitrary conditions on what the market "should have known" is inappropriate and contrary to market valuation theory. It is for this reason that appraisers do not use hypothetical markets in the development of opinions of value. Instead they seek actual sales and confirmation of the circumstances of the sale price, allowing adjustments to be made to the actual sale price to remove those influences peculiar to the specific transaction. This provides a sound footing for the estimation of value rooted in a market where the discipline of the actual expenditure of funds has been exercised. (page 230)

Wilson's article generated a number of spirited responses in the Letters to the Editor section of subsequent issues of *The Appraisal Journal*. Those letters and Wilson's response are included in this chapter to complete the discussion of the issues raised in the original Wilson piece.

Although the Mathews article appeared two years after Wilson's original article and two intervening articles on contingent valuation were published in *The Appraisal Journal*, Mathews' article should be read in tandem with Wilson's. Mathews is a survey researcher and natural resources economist with significant experience in survey design and implementation. She traces the history of the development of the technique, summarizes many of the articles from the economics and real estate literature discussing attempts to apply the contingent valuation technique to understand the effects of contamination, and then lays out a framework for designing a proper survey questionnaire by critiquing a questionnaire that appeared in an article in the *Journal of Real Estate Research*.[3] One of Mathews' most important criticisms is that even a well-designed survey "does not provide sufficient information for respondents to make the informed housing decisions they would make in a real-life situation." The information provided to a survey respondent in a 10-minute phone interview is no substitute for the "long list of information about a property, the neighborhood, and the real estate market" gathered by a typical home purchaser in the weeks or months it takes to make a home purchase decision (page 264).

Mathews also evaluates and critiques some of the techniques—such as marginal bidder analysis–that some real estate economists advocate as a means to overcome the "hypothetical bias" that both Mathews and Wilson view as a fundamental flaw of the contingent valuation process.[4] Mathews concludes that such techniques cannot replicate the manner in which the

---

3.  Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys," *Journal of Real Estate Research* 27, no. 2 (April-June 2005): 193-220.

4.  Mathews describes this hypothetical bias problem as follows: "In effect, the hypothetical nature of CV does not provide respondents with an incentive to reveal true values for natural resource services because they do not have to bear the consequences of their answers. The survey responses are not actual commitments of dollars for real purchases. If respondents make different choices in these hypothetical surveys than they would if faced with the same scenario in real life, then CV results will not produce a reliable measure of value. The key question is whether respondents' survey answers reflect their actual decisions and behaviors." (page 261)

Copyrighted material licensed by Randall Bell on April 26, 2021

actual marketplace of buyers and sellers establish the final price of a home.

Like Wilson, Mathews concludes that even the most well-designed and implemented contingent valuation surveys are not reliable "because it is a practical impossibility for a property value CV survey to incorporate dynamic market conditions and the plethora of information that real world buyers and sellers face." Mathews states that, "In the real world, people make trade-offs and choose to live near airports, jails, and landfills, and on property with a history of alleged contamination." (page 267) Reliance on survey results is no substitute for the analysis of actual market prices paid for properties affected by contamination or environmental risks.

The two related articles that appeared in *The Appraisal Journal* between the Wilson and Mathew articles are "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace" by James D. Frey and Richard J. Roddewig (Summer 2006) and "Seller Disclosure and Buyer Knowledge: How They Affect Market Value" by Rudy R. Robinson III and Scott R. Lucas (Spring 2007).

"Testing the Reliability of Contingent Valuation in the Real Estate Marketplace" tests Wilson's and Mathews' conclusion that inherent flaws such as hypothetical bias and lack of detail in contingent valuation surveys means that the CV technique can never accurately predict the actual prices that will be paid for properties impacted by contamination. The authors place CV analysis in the context of the long history of the appraisal profession's search for a possible "fourth approach" to value. They then summarize its origins and evolution as a technique used by economists to measure the value of goods that do not trade in an active marketplace before discussing their research of published real estate literature to identify CV surveys that could be tested for accuracy in predicting contamination's effect on real estate prices. The authors found only six such articles dealing with the results of CV surveys applied to specific contamination situations, including two articles from *The Appraisal Journal.*[5] The allegedly impacted neighborhood was identified with enough specificity to allow the authors to compare the survey results to the actual prices paid in only two of those six articles. The authors were also able to test the accuracy of contingent valuation survey results in two other actual neighborhoods in which such surveys had been conducted.

The authors then identify the various ways in which the accuracy of contingent valuation surveys can be tested, summarize the results of the CV surveys tested, and discuss the specific testing they conducted in the four locations. In each location, the CV surveys failed to accurately predict the impacts of the contamination as revealed by the actual prices paid by buyers who were either as knowledgeable or more knowledgeable

than the survey participants. As the authors conclude, "The results of this analysis clearly show that survey-based valuation methods have been a highly inaccurate and unreliable predictor of actual prices and values." (page 254) In one of the testing locations, the authors were able to compare the actions of survey respondents when selling their homes to the answers they provided in their survey questionnaires. This test indicated that "some fully informed sellers actually set asking prices dramatically higher than the asking prices predicted by contingent valuation surveys." (page 253)

Frey and Roddewig conclude the article with a list of five reasons why contingent valuation surveys "fail to accurately and reliably predict prices." (page 254) These five reasons are fundamentally the same as the reasons given in the Wilson 2006 and Mathews 2008 articles. Frey and Roddewig conclude as follows:

> At best, the testing of reliability indicates that contingent valuation studies result in hypothetical value estimates. Unlike the sales comparison method that looks to actual prices paid in an open and competitive marketplace, the contingent valuation method looks to hypothetical prices in a world carefully constricted to consider only one set of facts detailed on a survey form. As a technique for measuring actual prices that will be paid, and therefore actual damages that may be suffered by those affected by environmental contamination, the research indicates that past applications of contingent valuation have little, if any, reliability, and therefore the method has a high failure rate. (page 255)

The Spring 2007 article "Seller Disclosure and Buyer Knowledge: How They Affect Market Value" by Rudy R. Robinson III and Scott R. Lucas discusses the use of informal buyer surveys to determine the level of market-wide knowledge about a contamination situation. The authors suggest that it is difficult for an appraiser to have an opinion about whether a particular environmental or contamination situation has adversely affected prices or values unless the appraisers have conducted "their own research to ascertain public knowledge of a property condition and how it has affected the market." (page 257) Robinson and Lucas point out that no buyer has perfect knowledge of every condition or factor, environmental or otherwise, that can affect price or value. The most common definition of market value requires, in part, that buyers be "well informed" but not "fully informed." The authors also point out that "the baseline for a well-informed buyer depends on the market participants" rather than the appraiser's knowledge.

Robinson and Lucas suggest the use of buyer questionnaires to understand the level of knowledge about a particular topic that can affect price (or value). While such informal surveys can be helpful, Robinson and Lucas take this a step too far when they claim that a survey revealing general lack of knowledge about an

---

5.    Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290-297; and Robert A. Simons, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal* (October 2002): 388-400.

environmental situation means that appraisers cannot use sales of properties in that market to "measure the condition's effect on value." (pages 257 and 258) In fact, those sales actually do reveal the effect of that condition on prices and therefore values in that particular market as of the date that the survey was completed. To ignore the actual state of knowledge on the date of the value opinion would be appraising the property based upon a hypothetical condition that did not exist on the date of value. While buyers and sellers need to be well informed, the knowledge standard against which that is determined is the actual knowledge of typical buyers and sellers in the marketplace as of the date of the value opinion.

Ron Throupe's Fall 2011 article, "The Use of Focus Groups for Property Valuation Research," summarizes the prospects and pitfalls in using formal or informal focus group interviews in assignments involving analysis of the effects of contamination on real estate prices and values. Throupe describes a focus group as a qualitative rather than a quantitative survey tool and briefly summarizes some of the key articles in what he calls appraisal literature's "continuing debate on whether survey research is a legitimate tool for the appraiser and what survey methods are most appropriate." (page 270) He then sets out the essential elements necessary to construct an unbiased and credibly supported focus group survey.

The Summer 2012 article "Advisory Opinion 9 and Contingent Valuation" by Thomas O. Jackson, Jennifer Pitts, and Stephanie Norwood is the most recent *Appraisal Journal* commentary on the use of surveys in appraisal assignments involving contamination. The authors revisit many of the articles in this chapter and neatly summarize the central weaknesses of contingent valuation analysis—such as hypothetical bias and the marginal bidder problem—that undercut the reliability of the technique for determining the effect of an environmental issue on value. They then return to two central points that appraisers must bear in mind when considering the use of the contingent valuation method (CVM):

1. "There is nothing in USPAP condoning the use of CVM in any property valuation assignment." (page 281)

2. "CVM surveys are not a substitute for the actual market data (i.e., sales) that are envisioned in AO-9." (page 284)

The authors conclude as follows:

> The nature of the real estate market and the hypothetical bias involved in this technique renders it of limited usefulness to the real property valuation profession. For these and other reasons, CVM has not found its way into the profession's body of knowledge and has not become generally accepted within the profession despite being proposed for inclusion as early as 1998. While the appraisal profession remains open to new ideas and proposals, this method appears to have been considered and not accepted into the mainstream of the profession. Therefore, appraisers are cautioned against using the technique for estimating market value or impacts on market value and are encouraged to measure value and effects on value using the generally accepted techniques of the profession that rely on actual, observable market data. (page 284)

This concluding caveat is also one of the central components of the Appraisal Institute's revised Guide Note 6, Consideration of Hazardous Substances in the Appraisal Process, which was included in Chapter 1. Any lingering uncertainty about the inappropriateness of using contingent valuation in contaminated property appraisal assignments was eliminated by the following language in the revised Guide Note 6:

> These estimates [of unimpaired and impaired values] must be appropriate and well supported by market data typically involving actual transactions by market participants. As noted in *The Dictionary of Real Estate Appraisal*, fifth edition, "market participants" are "individuals actively engaged in transactions." Further, the International Valuation Standards (IVS) advise that market participation should be in the relevant market or market segment matching the characteristics and influences reflecting the subject and/or subject properties. Thus, non-market participants and related non-market and non-transactional data would not establish an appropriate basis for estimating property value diminution. (page 18)

Copyrighted material licensed by Randall Bell on April 26, 2021

6.1 # The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge

*by Marcus T. Allen, PhD, and Grant W. Austin, MAI*

This article originally appeared in the October 2001 issue of *The Appraisal Journal*.

### Abstract

This article discusses how formal research methods fit into the appraisal body of knowledge. While appraisers frequently use informal data collection methods to gather information, the use of formal or "scientific" survey research methods is relatively rare. The authors discuss pending changes with respect to statistical and market survey techniques in the real estate appraisal profession and suggest how these methods may be useful to practicing appraisers.

Appraisers have long relied on informal data collection methods to gather information for specific appraisal situations. Nonetheless, formal or "scientific" survey research methods are not common in most appraisers' toolboxes. This article considers the role of formal survey research methods in the appraisal body of knowledge with the intent of giving appraisers an understanding of how formal survey research methods can enhance their ability to accurately estimate real estate value in certain situations.

Recent writings in *The Appraisal Journal* and other real estate journals suggest that the use of survey research methods in real estate analysis is an increasingly contentious issue. This may be because much of the published debate deals with formal survey research methods in relation to contaminated or stigmatized properties. To shift the focus away from the special issues involved with these properties, this article focuses specifically on the general aspects of survey research methodology. With proper application, we believe that survey research methods may someday prove to be an indispensable tool in appraisal theory and practice.

## How Does Survey Data Fit Into Appraisal Theory?

An appraiser's "informal" market survey to collect information relevant to an appraisal assignment typically consists of conversations with knowledgeable market participants, including buyers, sellers, brokers, lenders, other appraisers, and public officials. Informal surveys are part of appraisers' daily practice as they collect a wide assortment of information ranging from specific property rental rates to the general attitudes and anticipations of market participants.

The focus of this paper is on formal (scientific) market survey research methods. By definition, formal survey research methods are based upon accepted theory and methods from specialists in economic theory, econometrics, statistics, psychology, and market research. Formal market surveys must be objective in nature and are typically accompanied by a statistical analysis of the survey responses. In a real property valuation assignment, it is a method that attempts to estimate how market participants are likely to behave with respect to an issue presented to them. Survey research methods are, in essence, procedures for collecting data based on expectations and perceptions rather than observed transactions or behaviors.

The idea of using data based on expectations and perceptions may appear almost sacrilegious to transaction-data-driven appraisers. A common but erroneous criticism of the data collected from surveys is labeling it as "non-market" data. In fact, if rigorous and objective survey methods are employed, the data generated by an appropriately designed and administered survey can be regarded as market data even though it is, admittedly, "non-transactional" data. Even the most conservative value theorist is likely to acknowledge that when direct observations of market participants' behaviors are not available, asking participants how they would behave if faced with a certain situation is an acceptable method of forecasting the market's collective behavior.

## Non-Transactional Data and Appraisal Principles

The preference of one property over another by a market participant is explained by the fundamental principles as defined in *The Appraisal of Real Estate*.[1] These fundamental principles were developed by valuation theorists in an attempt to "analyze the many dynamic and interactive factors that influence people's attitudes and beliefs about value."[2] They are:

---

1. Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001): 35.

2. Ibid.

**Marcus T. Allen, PhD,** is on the faculty of the college of business at Florida Atlantic University where he teaches in the graduate and undergraduate real estate degree program. His research writings have appeared in numerous real estate journals, including *The Appraisal Journal*, the *Journal of Real Estate Research*, and the *Journal of Real Estate Finance and Economics*.

**Grant W. Austin, MAI,** is president of American Valuation, Inc. in Florida. His practice is limited to litigation and eminent domain appraisal assignments and formal survey research. He is a Certified General Appraiser and is an adjunct professor of real estate appraisal at Florida Atlantic University. Mr. Austin has been a guest speaker at numerous industry conferences including The Florida Bar and ALI-ABA seminars.

- Anticipation–"Value is created by the anticipation of benefits to be derived in the future." Despite the bias of most appraisers in favor of transactional data, the discussion of "anticipation" concludes that "historical data on a property or a market is relevant only insofar as it helps interpret current market anticipations."[3]
- Change–"The dynamic nature of social, economic, governmental, and environmental forces that influence real property value accounts for change."[4] *The Appraisal of Real Estate* states that it is the job of appraisers to identify changes in the forces that influence supply and demand and shifts in market preferences. Again, the appraiser must interpret current market anticipations.

The fundamental principles and tasks of appraisers are consistent throughout appraisal literature. Appraisers are attempting to understand human anticipations, choices, and preferences. This goal was well stated by Gordon, "Most appraisers now come to realize that all value estimates are economic forecasts that attempt to simulate the thinking of knowledgeable market participants."[5] Indeed, the fundamental principles of generally accepted appraisal theory lead to a simplified job description: It is the job of appraisers to understand and interpret current market anticipations in an effort to predict value.

Appraisers have only two ways to predict the choices or transactional values of buyers and sellers:

1. Estimates that are inferred from observed actions such as the sale of comparable properties. This approach, derived from early valuation theory economists, has a strong bias in favor of transactional data; and

2. Stated preferences, anticipations, beliefs, and attitudes of knowledgeable market participants. These are measured by market survey techniques.

Typically, an appraiser's method of choice is to search for comparable sales. The sales will be relied upon to form the basis for an estimate of value. To rely exclusively on past sales is inconsistent with *The Appraisal of Real Estate*: "Historical data on a property or a market is relevant only insofar as it helps interpret current market anticipations."[6]

Therefore, consistent with both economic and traditional valuation theory, any attempt to understand, simulate, and quantify the thinking of market participants is valid. Thus, the use of market surveys has both theoretical and practical applicability.

The appraisal profession can appear resistant to adopting new methods into the appraisal body of knowledge. This is partly due to intentional conservatism and to the time it takes to disseminate newly accepted knowledge to members of the profession. For example, not long ago discounted cash flow (DCF) analysis "was viewed by most appraisers as an esoteric 'investment analysis' technique employed by super-sophisticated investors... tantamount to crystal-ball gazing... not appropriate to real estate valuation."[7] *The Appraisal of Real Estate* now considers DCF analysis "a practical tool for everyday appraisal work."[8]

Familiarity with market survey techniques is still limited. Appraisers feel that they are on unsure ground–there are no appraisal courses on these methods, the Uniform Standards of Professional Appraisal Practice (USPAP) has yet to formally adopt standards governing survey research methods; the techniques are from allied fields in which most appraisers have no training, and appraisers are not sure how non-transactional data fits into traditional appraisal theory.

The Appraisal Foundation released an exposure draft on September 12, 2000, of a proposed Statement on USPAP that addresses the role of statistical and market survey techniques in real estate research, appraising, counseling, and consulting assignments. The Statement draft is the work of an impressive task group of appraisal theorists and practitioners. Readers are encouraged to review the document at the task group's website, http://www.taskgrp.com. We offer the following abbreviated interpretations of portions of the exposure draft.

## Overview of Appraisal Foundation's Proposed Statement on Statistical and Market Survey Techniques

Part one of the exposure draft discusses the Foundation's perception of the implications of recent changes to the Federal Rules of Evidence on the real estate appraisal and counseling professions, including the appropriate use of statistical or market survey techniques. The objective of the proposed Statement on Appraisal Standards is to ensure that appraisers are in conformance with proposed Rule 702:

> Rule 702. Testimony by Experts
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

3. Ibid.

4. Ibid., 36.

5. Gordon, Roy L., Jr., "Discounted Cash Flow Analysis: Where Do We Stand Today?" *The Appraisal Journal* (April 1988): 259.

6. *The Appraisal of Real Estate*, Ibid, 35.

7. Gordon, Ibid.

8. Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001): 569.

Copyrighted material licensed by Randall Bell on April 26, 2021

Part two of the exposure draft defines a series of steps that appraisers must follow when applying statistical or market survey techniques to real property appraisal, consulting, or counseling assignments. These steps were established in order to avoid misuse of these techniques, which would violate Standard 1 of USPAP, or misleading reports, which would violate Standard 2 of USPAP. The steps that appraisers, counselors, real estate consultants, and other real estate professionals should follow:

• Properly state the problem and purpose of the research.
• Determine if the researcher is competent for the task at hand or if professional assistance is needed.
• Consider and select the most appropriate procedure and methodology and provide an explanation for the selection.
• Consider and select appropriate data sources.
• Analyze the data using the methodology selected.
• Externally validate the results of the analysis.

Part two of the exposure draft also discusses some specific issues that the researcher must consider when conducting market surveys. Researchers must provide convincing evidence of the reliability of the survey on the following points:

• The population from which the sample is drawn must be unbiased with respect to the research issue.
• The survey instrument and the method of its administration must not introduce bias.
• The researcher must provide a clear and convincing statement concerning how the results of a non-transactional data survey relates to a real market transaction.

In addition, the exposure draft strongly states that the reliability of the results should be evaluated in terms of how faithfully the method measures or describes what it truly represents; the precision of the method; the completeness of the data and method; and the extent to which the results can be verified and replicated. Appendix A of the Foundation's exposure draft (provided at the end of this article) provides a question-based reference guide that appraisers should consider while designing, administering, and analyzing market surveys.

## Tools for Appraisers

Two types of formal market survey methods are the "contingent valuation method" and "conjoint analysis." Although a complete description of these methods is beyond the scope of this article, we explain each method briefly to demonstrate their applicability.

## Contingent Valuation

Contingent valuation is a method for directly asking market participants how much value they place on a particular good or service. This method is based on the work of economists who were asked to provide economic support for public policy decision-making. They were asked the value of "public goods" or goods not traded in private markets, e.g., the value of a wilderness area, acceptable levels of impurity in our drinking water, increases in air visibility, and many other environmental and natural resources.[9] Economists, familiar with the empirical link between price, income change, and consumer behavior developed this technique for the valuation of non-market goods.

Contingent valuation uses carefully constructed surveys to obtain people's values for goods or services. The technique asks people what they would be willing to pay for goods and services or specific changes they would be willing to accept in the quantity or quality of goods or services.

Contingent valuation has been in use for more than 30 years and is also widely used as a method of measuring damages where transactional data is not fully reflective of the impaired condition. There are numerous books on the theoretical and empirical issues involved.[10] Carson, Wright, et al.[11] provides a bibliography of over 2,000 contingent valuation papers and studies from over 40 countries.

## Conjoint Analysis

Conjoint analysis is another survey method used for discovering market participants' value preferences. Conjoint measurement developed from a branch of mathematical psychology and psychometrics into a powerful quantitative method that can be used to effectively predict the consumer's choices and trade-offs in making purchase decisions.

The Final Rule of the Natural Resource Damage Assessment document (produced by the National Oceanic and Atmospheric Administration, Department of Commerce) addresses damage assessments and describes conjoint analysis as follows: "Conjoint analysis is a survey procedure that is used to derive the values of particular attributes of goods or services. Information is collected about individuals' choices between different goods that vary in terms of their attributes or service levels. With this information, it is possible to derive values for each particular attribute or service. If price is included as an attribute in the choice scenarios, values can be derived in terms of dollars, which can be used with the valuation approach."[12]

Real estate valuation involves understanding a market participant's reaction to a multiattribute product–real property. The consumers' evaluations of the

9.   Robert Cameron Mitchell and Richard T. Carson, *Using Surveys to Value Public Goods: The Contingent Valuation Method* (Washington, D.C.: Resources for the Future, 1989).

10.   A. M. Freeman, III, *The Measurement of Environmental and Resource Values: Theory and Methods* (Washington, D.C. Resources for the Future, 1993).

11.   R.T. Carson, J. L. Wright, N. J. Carson, A. Alberini, and N.E. Flores, *A Bibliography of Contingent Valuation Studies and Papers.* (La Jolla, CA. NRDA, Inc., 1995).

12.   Federal Register. January 5, Final Rules and Regulations. NOAA, Department of Commerce (61: 4, 1996).

attributes of the property are often subjective ratings or categorical judgments (e.g., SCHOOL QUALITY = Very good). In the absence of a significant amount of data, quantitative methods are not applicable. Conjoint analysis is designed for situations where multiple non-metric (or metric) independent variables are interdependent and affect the ordering of a dependent variable. For example, if the buyer's purchase price is the dependent variable and the selected house attributes are the independent variables, conjoint analysis can measure the degree of importance of each house attribute and its influence on the buyer's purchase price.

To illustrate, the non-metric attributes of a single-family residence could be described as:

STYLE = Ranch,

CONSTRUCTION = Brick,

SCHOOL QUALITY = Very good,

LOCATION = Very desirable, and

SWIMMING POOL = Yes.

Similarly, metric attributes of the residence could be:

SIZE = 2,000 sq. ft.,

BEDROOMS = 3, and

BATHROOMS = 2.

Many of these attributes are dependent upon subjective estimation (e.g., buyers don't really know the difference between a "good" school and a "very good" school). In conjoint measurement, market participants are able to rank these attributes in order of preference even though they would not be able to quantify them

for a statistical analysis. Realistically, real property can rarely combine all desired characteristics and having more than one attribute (three bedrooms) often involves sacrificing another attribute ("affordable price"). Since it is not enough to know only those attributes the buyer prefers, the appraiser needs to know the trade-offs among the attributes that the buyer is willing to make.

Conjoint analysis is useful in calculating the relative importance of attributes based on trade-offs.[13] To be a viable tool for predicting market choices or real world actions, though, conjoint analysis must accurately capture the attributes on which the market participants base their decisions. Though the mathematical procedures can be complex, there are numerous commercial software packages designed to facilitate conjoint analysis studies, including Bretton Clark, Sawtooth Software, and CONSERV from Intelligent Marketing Systems.

## Conclusion

There is certainly room for differences of opinion about how important survey methods are likely to become in the appraisal profession. The profession, however, can no longer disregard the potential for including formal survey methods in its body of knowledge. When properly structured, administered, and analyzed, formal survey methods can be invaluable tools for understanding the thoughts of real estate market participants in the absence of transactional data. We believe that non-transactional data can be accurately interpreted to predict market participants' anticipations in a manner consistent with modern appraisal theory.

---

13.  There are many alternative analysis methodologies that could be employed by appraisers to analyze survey data. In addition to contingent valuation and conjoint analysis, logistic regression analysis offers a tool for analysis of respondent choices between mutually exclusive alternatives that conveys the importance of various independent variables on a discrete choice variable using mathematical relationships.

Copyrighted material licensed by Randall Bell on April 26, 2021

## References

Appraisal Institute. *The Appraisal of Real Estate*. 12th ed. (Chicago, IL: Appraisal Institute, 1996).

Austin, Grant W. "Putting the 'Survey Method' to the Test." *Valuation Insights and Perspectives* (5: 4, 2000): 35–36.

Carson, R.T., J. L. Wright, N. J. Carson, A. Alberini, and N.E. Flores. *A Bibliography of Contingent Valuation Studies and Papers*. (La Jolla, CA: NRDA, Inc., 1995).

Council of American Survey Research Organizations. *Code of Standards and Ethics for Survey Research*. (Port Jefferson, N.Y.: Council of American Survey Organizations, 2001).

Dolan, Robert J. *Research Methods in Marketing: Survey Research*. Harvard Business School, No. 9-582-055 (1981).

*Federal Register*. January 5, Final Rules and Regulations. NOAA, Department of Commerce (61: 4, 1996).

Freeman, A. M., III. *The Measurement of Environmental and Resource Values: Theory and Methods*. (Washington, D.C.: Resources for the Future, 1993).

Gordon, Roy L., Jr. "Discounted Cash Flow Analysis: Where Do We Stand Today?" *The Appraisal Journal* (April 1988): 259–263.

Hoyt, Richard W. and Robert J. Aalberts. "Implications of the Kumho Tire Case for Appraisal Expert Witnesses." *The Appraisal Journal* (January 2001): 11–18.

Hoyt, Richard W. and Robert J. Aalberts. "New Requirements for the Appraisal Expert Witnesses." *The Appraisal Journal* (October 1997): 342–349.

Keller, Bruce P. "A Survey of Survey Evidence." *Litigation* (19: 1, 1992): 23–31.

Kinnard, W. N. "Evolving Attitudes and Policies of Institutional Investors and Lenders toward On-Site and Nearby Contamination: Report on a 1996 Nationwide Survey." Paper presented at the 12th annual meeting of the American Real Estate Society, South Lake Tahoe, California, March 26, 1996.

*Kumho Tire Company, Ltd., et al. v. Patrick Carmichael*, 119 S.Ct. 1167 (March 23, 1999).

Linne, Mark R., M. Steven Kane, and George Dell. *A Guide to Appraisal Valuation Modeling*. (Chicago, IL: Appraisal Institute, 2000).

McLean, David and Bill Mundy. "The Addition of Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damage to Real Property." *Journal of Real Estate Practice and Education* (1: 1, 1998): 1–19.

McLean, David, John A. Kilpatrick, and Bill Mundy. "Summation of Evidentiary Rules for Real Estate Experts Mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*" *Real Estate Issues* (Fall 1999): 24–32.

Mitchell, Robert Cameron and Richard T. Carson. *Using Surveys to Value Public Goods: The Contingent Valuation Method*. (Washington, D.C.: Resources for the Future, 1989).

Morgan, Fred W. "Judicial Standards for Survey Research: An Update and Guidelines." *Journal of Marketing* (54, 1990): 59–70.

Mundy, Bill, David McLean, and John A. Kilpatrick. "The Brownfield Challenge." *Valuation Insights and Perspectives* (1999):16.

Mundy, Bill, and John A. Kilpatrick. "Factors Influencing CBD Land Prices." *Real Estate Issues* (Fall 2000): 39–49.

Mundy, Bill, and David McLean. "Clarification of and Rejoinder to: Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches." *The Appraisal Journal* (April 2000): 222–227.

Task Group for the Development of Standards for Determining the Acceptability of Applications of Statistical and Market Survey Techniques to the Valuation of Real Property. *Proposed USPAP Statement on Appraisal Standards, First Exposure Draft*. (September 12, 2000). Washington, D.C. Available: www.taskgrp.com.

Roddewig, Richard J. "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches." *The Appraisal Journal* (October 1999): 447–453.

Weber, Bruce R. "The Valuation of Contaminated Land." *Journal of Real Estate Research* (14: 3, 1997): 383.

## Appendix A: Reference Guide on Survey Research

(from Proposed Statement on Appraisal Standards First Exposure Draft: September 12, 2000)

**Purpose and Design of the Survey**

A. Was the survey designed to address relevant questions?

B. Was participation in the design, administration, and interpretation of the survey appropriately controlled to ensure the objectivity of the survey?

C. Are the experts who designed, conducted, or analyzed the survey appropriately skilled and experienced?

D. Are the experts who will testify about surveys conducted by others appropriately skilled and experienced?

**Population Definition and Sampling**

A. Was an appropriate universe or population identified?

B. Did the sampling frame approximate the population?

C. How was the sample selected to approximate the relevant characteristics of the population?

D. Was the level of nonresponse sufficient to raise questions about the representativeness of the sample? If so, what is the evidence that nonresponse did not bias the results of the survey?

E. What procedures were used to reduce the likelihood of a biased sample?

F. What precautions were taken to ensure that only qualified respondents were included in the survey?

**Survey Questions and Structure**

A. Were questions on the survey framed to be clear, precise, and unbiased?

B. Were filter questions provided to reduce guessing?

C. Did the survey use open-ended or close-ended questions? How was the choice in each instance justified?

D. If probes were used to clarify ambiguous or incomplete answers, what steps were taken to ensure that the probes were not leading and were administered in a consistent fashion?

E. What approach was used to avoid or measure potential order or context effects?

F. If the survey was designed to test a causal proposition, did the survey include an appropriate control group or question?

G. What limitations are associated with the mode of data collections used in the survey?

1) In-person interviews

2) Telephone surveys

3) Mail surveys

**Surveys Involving Interviews**

A. Were the interviewers appropriately selected and trained?

B. What did the interviewers know about the survey and its sponsorship?

C. What procedures were used to ensure and determine that the survey was administered to minimize error and bias?

**Data Entry and Grouping of Responses**

A. What was done to ensure that the data were recorded accurately?

B. What was done to ensure that the grouped data were classified consistently and accurately?

**Disclosure and Reporting**

A. When was information about the survey methodology and results disclosed?

B. Does the survey report include complete and detailed information on all relevant characteristics?

C. In surveys of individuals, what measures were taken to protect the identities of individual respondents?

Copyrighted material licensed by Randall Bell on April 26, 2021

## Appendix B: Checklist for the Use of Survey Techniques in Appraisal

We offer the following checklist of issues for appraisers to consider when contemplating the use of a survey approach. This checklist was developed by the authors from generally accepted survey standards, the proposed USPAP Statement on appraisal standards for statistical and market survey techniques, recent litigation valuation cases where surveys were admitted and not admitted, methodological guidelines by Morgan[14] and Dolan,[15] and the authors' experiences.

### Decision to Use a Market Survey

- The use of a market survey to support an estimate of real property value must have probative value. That is, it must be relevant to and necessary for the appraiser's estimate of value.
- The use of a market survey is most persuasive when it is the only proof of value or diminution in value. However, it can be effectively utilized to complement other survey techniques, multiple regression analysis, hedonic modeling, or first generation valuation methods.
- An appraiser should first consider other sources of data that may be more relevant in terms of customary use by other appraisers or in terms of actual use in the transactional marketplace.

### Preparing for Challenges

- Review the *Daubert* decision to decide whether the proposed survey is built on a reliable foundation and is relevant to the task at hand. The court cited four factors: testing, peer review, error rates, and acceptability in the relevant scientific community.
- Review the *Kumho Tire* ruling since it extends *Daubert* to appraisal testimony and is based on "technical" and other "specialized knowledge."
- Review the *Zippo* case for the seven factors that determine the reliability of surveys.
- Read the guidelines for developing admissible survey evidence, in the *Manual for Complex Litigation*. Include a reading of the 1982 edition since it is more informative and has been incorporated into more case law than the current edition.
- Prior to accepted USPAP Standards for market survey techniques, it is advisable to consider the most current exposure draft of the Statement on these standards at www.task.grp.com.
- Market survey research used to support a property impairment may face the challenge of whether the survey methods are "generally accepted" and whether the data and analysis would customarily be relied upon by other appraisers undertaking similar assignments.

### Sample Population Definition and Sample Selection

- Include in the survey population all relevant respondents and exclude inappropriate, unknowledgeable, or unconcerned respondents. At a minimum, the population must include those involved in the property type (e.g., resort hotels, regional malls, automobile dealerships). No other population is relevant. The survey must accurately poll the reactions of these property consumers.
- Explain how the sampling frame approximates the population. The characteristics of the sample population must closely approximate those of the population. One way to limit disputes over the sampling frame is to calculate results for the entire sample frame and for sub-categories of respondents in the sample with slightly different characteristics.
- Explain the procedures taken to ensure that only qualified respondents were included in the survey.
- Define the population in the context of the real property valuation question(s) being investigated.
- Probability sampling is preferred. Convenience and nonprobability sampling must be justifiable with the key factor being the absence of any reasonable alternative sampling approach.
- Describe the procedures taken to reduce the likelihood of a biased sample.

- Sample size must be justifiable—ideally with face validity and statistical arguments.
- Do not bias your sampling toward any viewpoint or opinion group.
- Address the level of nonresponse and whether it is high enough to raise questions about the representativeness of the sample.

### Design of Survey Instrument

- Select the communication method that offers the most advantages—personal interview, telephone, mail, facsimile, or email.
- Use common sense—don't ask a question unless truthful answers will provide useful information.
- Be objective in the presentation of facts to survey participants—make sure that the information is complete, does not leave out significant information, and is unbiased (an equal tendency to fall on either side of what it represents).
- Validate property fact descriptions to determine what a reasonable, knowledgeable, and typical market participant would need in order to understand the entire situation and to answer the survey questions.
- Pre-test and evaluate property fact descriptions for the importance of their elements and for potentially biased descriptions or issues.
- Put yourself in the respondent's position to uncover instrumental problems. Administer the survey to a small test group similar to the test group to be sampled in the survey.
- Eliminate potential bias with pre-survey validation by an independent reviewer with no stake in the assignment or outcome of the analysis.
- Write the survey in direct, clear, unambiguous, and unbiased language.
- Explain the rationale for the selection of open-ended and/or close-ended questions.
- Make sure the order and context of the questions is logical and unbiased.
- Design the questions so that respondents are likely to know and be willing to give you the answer.
- Respondents must appear to be capable of understanding the question topics.
- Develop survey questions that relate directly to relevant valuation issues. Questions should have "representational faithfulness" or faithfully measure or describe what they truly represent.
- Write objective questions that are clear, unbiased, and unambiguous. Provide complete sets of response scales.
- Describe the steps taken to ensure that probes used to clarify ambiguous or incomplete answers are not leading, biased, or inconsistent.
- Instruct respondents not to guess or filter questions.
- Address limitations of the study (e.g., mode of data collection) in the report along with bias and the efforts made to eliminate it from the market survey.

### Administration of Survey Instrument

- Results must not appear to be an artifact of the research design.
- Respondent tasks must appear possible to perform.
- Surveys should not omit necessary respondent tasks.
- Respondents should not know the sponsor or purpose of the survey. However, for certain high profile, national, or otherwise unique properties, the potential for respondent bias should be addressed.

---

14.    Fred W. Morgan, "Judicial Standards for Survey Research: An Update and Guidelines," *Journal of Marketing* (54, 1990): 59–70.

15.    Robert J. Dolan, *Research Methods in Marketing: Survey Research*. Harvard Business School, No. 9-582-055 (1981).

· Research designs must be devised in the context of normal marketplace conditions in order to eliminate confusion and mirror market circumstances.

**Interviewers' Qualifications and Techniques**

· The survey administration procedures should be designed to ensure that the survey is administered to minimize error and bias.

· Some suggest that interviewers should not know the purpose of the research project. This may not be applicable when the design of the survey instrument is controlled to eliminate the potential for interviewer bias and when post-survey interviews are a necessary information-gathering element.

· Interviewer decision-making, through probing questions or intervention during questioning, should be minimized to avoid misleading or biasing the respondents or giving the preception of trying to do so.

**Data Analysis and Reporting**

· Assumptions underlying data interpretations must be obvious and justifiable.

· The data must be reasonably reliable.

· Response coding must be accurate and unbiased.

· The data derived from the study must be a reasonably complete data set in order to provide meaningful and reliable insights or to be statistically reliable.

· Multiple responses to an open-ended question should not be combined unless the groupings are obvious and justifiable. A statement should be provided on how the grouped data were classified consistently and accurately.

· The frequencies and order of multiple responses to a question should be reported.

· The appraiser should consider whether the reliability of the analysis and the ultimate conclusions from it would be enhanced by analyzing or combining more than one data source or an alternate data source.

· The proposed statement on appraisal standards for market survey techniques suggests that there should be external validation of the analysis and conclusions reached. External validation is suggested to take the form of one or more of the following techniques: "testing" the results by reference to common sense, personal experience, and independent market knowledge or information. Additionally, it is suggested that external validation of the results and opinions be documented to permit other researchers to duplicate the results.

**Design, Administration, and Reporting of the Research**

· The survey administrator must be qualified by education and experience as an expert in survey research. Most appraisers will not have the specialized knowledge to prepare a formal market survey. The USPAP Competency Rule requires that an appraiser either have the knowledge and expertise necessary to complete the appraisal, or disclose the lack of knowledge or expertise to the client. The appraiser is responsible for any "analytical method" used in the assignment, which would include the appropriate theory of the method, its proper application, and an interpretation of the results.[16]

· The survey administrator must continuously and closely supervise all steps in the process.

· Bias can intentionally or inadvertently be inserted into market surveys in a variety of ways, including client characterization of the facts and the problem to be addressed; selection of the data base; elimination of outliers; selection of the survey population; selection of survey questions and wording; characterization of the facts for survey participants; and omission of key facts from a description of the factual situation.

· The methods, procedures, and data must be verifiable and replicated by other similarly knowledgeable experts. Implicit in this requirement is that the expert provide detailed methods, procedures, data, and data sources for other experts to replicate and test.

· Anticipate attacks on all aspects of the survey and prepare defenses and counterarguments.

· Consider the use of a pilot market survey—it will save time and is less expensive than having to redo an entire survey if a flaw is discovered upon completion.

---

16.   *Uniform Standards of Professional Appraisal Practice*, 2000 ed., The Appraisal Foundation, Washington, D.C., 2001.

Copyrighted material licensed by Randall Bell on April 26, 2021

**6.2**

# A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation

*by James Flynn, PhD, Donald G. MacGregor, PhD, Wayne Hunsperger, MAI, SRA, C. K. Mertz, and Stephen M. Johnson, PhD*

This article originally appeared in the Winter 2004 issue of *The Appraisal Journal*.

### Abstract

There are many reasons why similar properties command different prices. The determination that property value differences exist among comparable properties is a primary task for appraisers. Once a price difference has been determined, identifying the causes for such differences is central to legal claims of stigma. Plaintiffs have the burden of demonstrating a causal connection between the purported source of stigmatization and the responses of buyers. This article presents an approach for designing a survey to address stigma issues and meet the legal requirements for admitting survey data as evidence. The survey does not attempt to quantify dollar losses; it is intended to show a link between negative values in the sales data and negative perceptions of properties in the class area.

The values of individual properties are determined to some degree by the reputation of the area where they are located. The association of properties with hazardous, noxious, or repugnant conditions, including perceptions of health and environmental risks, can adversely impact values.[1] *The Dictionary of Real Estate Appraisal* defines stigma as: "An adverse public perception regarding a property; the identification of a property with some type of opprobrium (environmental contamination, a grisly crime), which exacts a penalty on the marketability of the property and hence its value."[2]

Property stigma is a socially constructed evaluation of a place; it is a sign or mark created and maintained by processes of social communication. The most powerful source of risk and stigma information is the news media, which often reports on dramatic stories involving technological accidents, hazards, and events that have the potential to harm places and people.[3] The two major sources of technological stigma are the nature of the hazard and the responsibility for managing it.[4] The control and regulation of potentially hazardous or noxious conditions are the responsibility of government regulators and the managers of facilities identified as likely sources of public concern. As long as the management meets regulatory standards, including required upgrades, the potential liabilities for stigma effects may be controlled. If managers do not provide conscientious attention to regulations and safe operations, they can be liable for damages to human health, environmental contamination, and the economic costs

---

1. James A. Chalmers and Thomas O. Jackson, "Risk Factors in the Appraisal of Contaminated Property," *The Appraisal Journal* (January 1996): 44–58.

2. Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 277.

3. Robin Gregory, James Flynn, and Paul Slovic, "Technological Stigma," *American Scientist* 83 (May/June 1995): 220–223.

4. Roger Kasperson, Nayna Jhaveri, and Jeanne Kasperson, "Stigma and the Social Amplification of Risk: Toward a Framework of Risk Analysis," in *Risk, Media and Stigma*, ed. J. Flynn, P. Slovic, and H. Kunreuther, 9–27 (London: Earthscan, 2001); R. E. Kasperson et al. "The Social Amplification of Risk: A Conceptual Framework," *Risk Analysis* 8, no. 2 (1988): 177–187; O. Renn et al. "The Social Amplification of Risk: Theoretical Foundations and Empirical Applications," *Journal of Social Issues* 48, no. 4 (1992): 137–160.

**James Flynn, PhD,** is a senior research associate at Decision Research in Eugene, Oregon, and a senior fellow at the Pacific World History Institute in Stockton, California. He graduated from Eastern Washington State University and completed his graduate degrees at the University of Washington. He has published more than 50 articles on public perceptions and responses to technological and environmental risks. In 2001, he published *Risk, Media and Stigma*, with Paul Slovic and Howard Kunreuther.

**Donald G. MacGregor, PhD,** is president of MacGregor-Bates, Inc., and a senior research associate at Decision Research, both in Eugene, Oregon. He graduated from California State University, Sacramento, and completed his graduate education at the University of Oregon. He has published extensively on judgment, decision making, and the perception of risk.

**Wayne Hunsperger, MAI, SRA,** is a principal with the appraisal firm of Hunsperger and Weston, LLC, in Greenwood Village, Colorado. The firm is a full service real estate appraisal company with special capabilities in the valuation of open space, eminent domain takings, and properties impacted by disamenities or contamination, including entire residential neighborhoods and special properties of various kinds. He often works with multidisciplinary teams including engineers, economists, statisticians, and social scientists. He is a graduate of the University of Texas, with a degree in business.

**C. K. Mertz, MRCP,** is a research associate at Decision Research, in Eugene, Oregon. She graduated from Oklahoma State University and received her master's degree in regional and community planning from Kansas State University with additional graduate studies in statistics at the University of Oregon. She has coauthored more than 40 articles in journals such as *Human and Ecological Risk Assessment*, *Risk Analysis*, and *Health, Risk & Society*.

**Stephen M. Johnson, PhD,** is president of Northwest Survey & Data Services, in Eugene, Oregon and is a research associate at Decision Research. His undergraduate and doctorate degrees are from the University of Oregon. He has published more than 40 articles and book chapters on a wide variety of subjects in social science and science journals, including *The Journal of Psychology and Financial Markets*, *Journal of Behavioral Decision Making*, *Journal of Risk and Uncertainty*, *American Scientist*, and *Journal of Geophysical Research*.

of lost property values by nearby owners. Claims for economic costs can include compensation for direct, physical contamination of properties, or as discussed in this article, the loss of market value due to stigmatization from association with a source of hazardous and noxious conditions.

The determination of economic costs due to stigmatization requires appraisals that demonstrate a loss of value for a property or class of properties in comparison with other like properties, and a demonstrated link between the lost value and stigma responses that are attributed to a specific source by appropriate members of the public. Techniques for measuring damage have been well documented in the appraisal literature by Patchin, Mundy, Roddewig, and others.[5] The quantitative techniques used in the analysis presented here and shown in Table 1 are consistent with those contained in the Appraisal Institute seminar, "Environmental Risk and the Real Estate Appraisal Process"[6] and as set forth by Jackson.[7] Aside from stigma there are numerous conditions that influence property values and produce differences in value from one place to another. The real estate mantra of "location, location, location" refers to property profiles in geographical relationship to transportation, natural and recreational amenities, quality of existing development, and access to work, shopping, schools, and other public services. Similarly, property stigmatization also has a number of possible sources, often related to health, environmental, or investment risks. It may be due to natural hazards and aesthetic disamenities, social conditions such as the crime rate, infrastructure conditions with potentially obnoxious characteristics such as nearby highways, airports, industrial facilities, public institutions (e.g., prisons), or the operations of industrial or waste sites.

The case study presented here involves a landfill waste disposal facility that was charged with being the source of property value losses for a class of nearby property owners. The case study here pays close attention to the conceptual issues of identifying both a loss of property values and the cause of that loss. In working through this problem, the focus was on obtaining responses from buyers familiar with the residential real estate market. This led to the design and implementation of a survey. Because this study was prepared as part of litigation, the survey process was designed to meet litigation standards.

This article focuses on the design of research to identify or exonerate a specific facility as the source of stigma effects and property value losses. For the purposes of this case study, it is specified that a competent, professional appraisal found that properties in the class area had experienced a significant (8-10%) diminution of value. The research task was to show whether or not this value loss, in whole or in part, was due to the operation of the facility in question. Thus, the appraiser measured the property value loss and the survey design and analyses measured the social-stigma role in that loss. In designing this study, it was specified that judgments of the validity and reliability of the study results were expected to be presented in court and within the context of vigorously contested litigation.

The components of a case to support property value loss have been identified by Hunsperger.[8] These components have been slightly modified for the general case and are shown in Table 1. More specifically for this landfill study, paired sales, regression analysis, and case studies were used to quantify the effect on property values. Control areas were selected for both the paired sales analysis and regression model.

Approximately 60 paired sales were conducted. The results indicated generally lower prices for the properties in the area that was the subject of the class action lawsuit (the class area), all other factors being equal. A regression analysis model based on data from control neighborhoods was also used; it too demonstrated lower property values in the class area. While these techniques indicated that property values in the class area were lower than in comparable areas more distant from the landfill, a public opinion survey was commissioned to determine if the loss in value mathematically determined by these techniques was directly attributable to the landfill and its effects. Given Roddewig's summary of court applications for market surveys,[9] particular care was used in designing and implementing the survey that is the subject of this article.

If the studies undertaken include Components 1 through 4 of Table 1 and support the hypothesis that an area of residences and business properties are devalued because of a specific noxious or hazardous source, then a public opinion survey can be conducted to determine the causal link between appraisal-derived value losses and the evaluations of informed real estate buyers. The use of survey research to elicit responses from the appropriate populations in a community has a number of advantages.[10] It can provide an efficient, valid, and reliable way to obtain data about potential stigma effects in cases of documented property value losses.

Courts have developed criteria for assessing the validity of surveys and their admissibility in court. These

5.  Richard J. Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," *The Appraisal Journal* (October 1999): 447–453; Richard J. Roddewig, ed., *Valuing Contaminated Properties: An Appraisal Institute Anthology*. (Chicago: Appraisal Institute, 2002), see Chapter 4, "Understanding, Analyzing, and Estimating Stigma" for articles by Roddewig, Peter Patchin, Bill Mundy, and Wayne Lusvardi.

6.  Appraisal Institute, "Environmental Risk and the Real Estate Appraisal Process" (Chicago: Appraisal Institute, 2001).

7.  Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 311–320.

8.  W. Hunsperger, "The Effects of the Rocky Flats Nuclear Weapons Plant on Neighboring Property Values," in *Risk, Media and Stigma*, ed. J. Flynn, P. Slovic, and H. Kunreuther, 157–171 (London: Earthscan, 2001).

9.  Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Property Appraisal Methodology."

10. Marcus T. Allen and Grant W. Austin, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–403.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 1**          **Components of Model to Evaluate Property Value Impacts for Cases of Technological Stigma**

1. **Real Estate Market Research.** Perceptions in the marketplace directly affect real estate value; thus, it is necessary to interview various market participants in order to understand market attitudes. For example, sale transactions or projects that did not occur may be as telling as those that did. Additionally, if public attitudes about real estate values in the area are negative, implicitly there will be downward pressure on property value. Real estate impact should be measured in the market of well-informed and well-advised buyers, sellers, and users of real estate.

2. **Analogous Case Studies.** Examine other cases of environmental disamenities to (a) understand how real estate markets in other settings react to or perceive risk, (b) study how these reactions translate into overall value, (c) test the reasonableness of other valuation or evaluation techniques, and (d) apply these findings to the subject neighborhood context. Case studies may include academic research, other economic or appraisal studies, and the appraiser's own experiences. After taking into account appropriate differences, a range may be developed within which conclusions are likely to fall. This technique represents a test of reasonableness.

3. **Market Sales Information.** This category relates to the traditional study of actual sales data, including the study of individual sales, as well as descriptive statistics such as trend analysis, sampling, and averaging. For example, individual sales in one area can be compared to otherwise similar properties in a control area to determine if a price differential exists and to what it might be attributed. It is appropriate to consider a statistically valid number of paired data to reflect the value (or lack thereof) of an attribute across an entire area. This technique can then stand alone and/or serve as a field check of results from multiple regression analysis.

4. **Multiple Regression Analysis (MRA).** Multiple regression analysis is a particular statistical technique, similar to correlation analysis, used to analyze data in order to predict the value of one variable (the dependent variable), such as market value, from the known values of other variables (independent variables), such as lot size, number of rooms, and so on.* The application may involve a comparison of sales data in the subject neighborhood to multiple control areas to determine if any variance remains after accounting for all relevant independent variables. If some intangible variables, such as commuting time, cannot be statistically measured, they may be explained in a public opinion survey.

5. **Public Opinion Surveys.** The purpose of survey research is to understand how people relate to technological, environmental, and health risks because such beliefs are expressed in market prices. Formal market surveys are frequently undertaken to demonstrate how market participants might or should behave in a transactional setting.** Additionally, the survey may be used to elicit open-ended responses or explain intangible variables that may not be measured in a regression analysis.

* Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 190.

** See Albert R. Wilson, "The Need for Standards in the Application of Statistical and Survey Research to Real Estate Valuation Practice," (paper presented at Environmental & Property Damages symposium, cosponsored by The Centre for Advanced Property Economics and the Appraisal Institute, Toronto, April 4–6, 2002).

standards are summarized in two authoritative legal references: the *Manual for Complex Litigation*[11] and *McCarthy on Trademarks and Unfair Competition*.[12] There are slight format differences between these two sources but they can be easily combined as shown in Table 2.

These criteria were also compared to the "Reference Guide on Survey Research" (Elements of Importance)[13] and comments prepared by Mathews and Desvousges,[14] both of which appeared in the materials of the 2002 symposium on Environmental and Property Damages.[15]

## A Case Study

The specific case reported here involves a publicly owned municipal landfill located in the Pacific Northwest adjacent to Interstate 5 and close to the coastline. A private firm under a contract with the county operated the facility for more than 50 years. A class action suit was filed on behalf of property owners located within 1½ miles of the boundaries of the landfill. The complaint asked for damages and injunctive relief to the property owners due to exposure from the landfill to hazardous substances, odors, gases and fumes. The claim was that these conditions, along with the birds attracted to the landfill, interfered with the use and enjoyment of the owners' property and reduced the value of their property. In addition, the landfill was claimed to have imposed personal costs to the residents and visitors in terms of annoyance, irritation, discomfort, and other physical ailments.

A major focus of the suit was the claim that operations of the landfill resulted in damage to the property of the plaintiffs and class members, including permanent and measurable loss of property value.

The case study and survey discussed in this article were contracted by the plaintiffs' attorneys to determine the existence, extent, and value of any adverse economic effects on the class action properties. The following sections explain the process and outcome of the survey research conducted in this case.

## The Landfill Survey Design

It is important to understand that traditional housing stock variables (i.e., lot size, building square footage, number of bedrooms and bathrooms, etc.) were used by the appraiser in the regression model and paired sales analyses. The results of the survey were used to help explain the results of these quantitative studies and to define the link between the source of stigma and the diminution of property values.

The survey was designed to interview an appropriate population and to elicit data showing if, and then how, knowledge and regard for real property in the

11.    Federal Judicial Center, *Manual for Complex Litigation*, 3d ed. (Washington, DC: Federal Judicial Center, 1995); available online, see http//www.fjc.gov.

12.    J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed. (Eagan, MN: Thomson/West 2003).

13.    Shari Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, 2d ed., 229–276 (Washington, DC: Federal Judicial Center, 2000).

14.    Kristy E. Mathews and William H. Desvousges, "The Truth, the Partial Truth, and Anything But the Truth: Survey Reliability and Property Valuation," (paper presented at Environmental and Property Damages: Standards, Due Diligence, Valuation, and Strategy symposium, cosponsored by The Centre for Advanced Property Economics and the Appraisal Institute, Toronto, April 4–6, 2002).

15.    The Centre for Advanced Property Economics and the Appraisal Institute.

**Table 2**      Property Value Survey Standards: Criteria for Admissibility of a Survey According to the Federal Judicial Center *Manual for Complex Litigation* (MCL) and *McCarthy on Trademarks and Unfair Competition* (McCarthy)

1. The population was properly chosen and defined. (McCarthy)

2. A representative sample of that universe was selected. (MCL)

3. The questions to be asked of interviewees were framed in a clear, precise and non-leading manner. (MCL)

4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted. (MCL)

5. The data gathered were accurately reported. (MCL)

6. The data were analyzed in accordance with accepted statistical principles. (MCL)

7. The process was conducted so as to ensure objectivity, e.g. the survey was not conducted by persons connected with the parties or counsel and the interviewers were unaware of its purpose in litigation. (McCarthy)

Note: The criteria defined by the *Manual for Complex Litigation and McCarthy on Trademarks and Unfair Competition* are very close and often use exact or similar phrases. In this table, to reduce the redundancy we have chosen the more descriptive of the guideline statements for each of the seven criteria.

class area were related to the conditions resulting from the operation of the landfill. The variables selected for the survey described marketplace conditions within existing and well-defined markets. Use of a survey presupposes that people active in the market are a suitable source of informed opinion about stigma effects and that a source of stigma prompts social behaviors that have economic effects. Thus, there were clear roles for the appraiser and for the social scientists that designed and analyzed the survey to estimate property losses due to stigma or other effects.

The first step in the survey design was to conduct a thorough review of the legal standards that apply to the use of survey data in litigation. This focused on examination and discussion of the "Survey Evidence and Proper Survey Methods" in *McCarthy*.[16] Subsequently, the survey was designed to meet both the spirit and the letter of these standards and guidelines. For example, respondents were asked to rate three areas on a variety of social, geographical, and environmental measures prior to any questions about the landfill. In a similar approach, conditions outlined in the class action suit were elicited by asking for volunteer images of the class area before any identification of the landfill.

The survey consisted of 50 questions. An overview of the survey components is shown in Figure 1.

In the survey, Questions 1 through 8 qualified respondents; Questions 9 through 27 identified three housing areas and elicited ratings on seven attributes. These areas were selected by the appraiser based on similarities of housing stock, relative location, and demographic variables. Two comparison areas were used to validate the results. The housing areas were described by a unique set of geographical descriptors. For example, the class area was identified in relation to Interstate 5 and a major interchange. Comparison area 1 was described in relation to a major state highway, a lake, and a golf course. Comparison area 2 was described relative to the local airport, Interstate 5, and a major river. Each of the areas was rated on seven characteristics: (1) access to place of work, (2) general traffic conditions, (3) access to shopping, (4) overall visual appearance, (5) air quality, (6) overall environmental quality, and (7) future value of homes. These characteristics were chosen because buyers commonly consider them when looking for housing and this short list can be rated quickly for the three areas. The results allow for a comparative overview of survey responses and facilitate analyses of other data, especially those provided by responses to open-ended questions. The scale and responses to these characteristics are shown in Table 3. All respondents (N = 400) rated the class area and one of the comparison areas, with one-half of respondents (n = 200) rating comparison area 1 and one-half of respondents rating comparison area 2.

Questions 28 and 29 asked respondents who rated the class area as below average (n = 68) or much below average (n = 5) why these ratings were given. The verbatim responses were recorded.

**Figure 1**      Components of Survey Protocol

| Select Valid Survey Respondents | · Age Screening<br>· Market Participation |
| Judge Attributes of Class and Comparison Areas | · Economic<br>· Environmental<br>· Safety<br>· Social |
| Familiarity with Target Disamenity | · Knowledge of Disamenity<br>· Experience with Disamenity |
| Perceptions of Target Disamenity | · Images<br>· Attitudes |
| Respondent Demographic Characteristic | · Gender<br>· Education |

16.    McCarthy, 32-243–32-330.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 3          Ratings of Characteristics for Three Areas by Attributes with Mean Scores and Difference Scores**

| | Much Below Average % | Below Average % | Average % | Above Average % | Much Above Average % | Mean | N | Difference Scores |
|---|---|---|---|---|---|---|---|---|
| Access to your place of work | | | | | | | | |
| Class area | 3.8 | 21.4 | 39.3 | 28.9 | 6.6 | 3.13 | 346 | |
| Comparison area #1 | 3.4 | 27.6 | 51.7 | 13.2 | 4.0 | 2.87 | 174 | 0.31** |
| Comparison area #2 | 3.0 | 25.4 | 43.2 | 21.9 | 6.5 | 3.04 | 169 | 0.06 |
| General traffic conditions | | | | | | | | |
| Class area | 9.3 | 39.1 | 39.4 | 11.4 | 0.8 | 2.55 | 386 | |
| Comparison area #1 | 8.8 | 36.6 | 41.8 | 12.4 | 0.5 | 2.59 | 194 | 0.04 |
| Comparison area #2 | 1.5 | 21.4 | 53.1 | 23.0 | 1.0 | 3.01 | 196 | -0.48**** |
| Access to shopping | | | | | | | | |
| Class area | 1.8 | 24.7 | 50.0 | 21.1 | 2.3 | 2.97 | 384 | |
| Comparison area #1 | 1.5 | 16.8 | 59.2 | 20.9 | 1.5 | 3.04 | 196 | -0.08 |
| Comparison area #2 | 1.5 | 24.2 | 41.9 | 31.8 | 0.5 | 3.06 | 198 | -0.05 |
| Overall visual appearance | | | | | | | | |
| Class area | 3.3 | 41.5 | 41.2 | 12.7 | 1.3 | 2.67 | 393 | |
| Comparison area #1 | 0.0 | 16.2 | 48.5 | 34.3 | 1.0 | 3.20 | 198 | -0.48**** |
| Comparison area #2 | 1.0 | 21.6 | 50.3 | 27.1 | 0.0 | 3.04 | 199 | -0.42**** |
| Air quality | | | | | | | | |
| Class area | 7.3 | 35.5 | 43.4 | 13.6 | 0.3 | 2.64 | 369 | |
| Comparison area #1 | 0.0 | 4.7 | 54.7 | 37.9 | 2.6 | 3.38 | 190 | -0.74**** |
| Comparison area #2 | 0.0 | 3.2 | 60.8 | 33.9 | 2.2 | 3.35 | 186 | -0.73**** |
| Overall environmental quality | | | | | | | | |
| Class area | 2.7 | 27.8 | 56.5 | 12.2 | 0.8 | 2.81 | 370 | |
| Comparison area #1 | 0.0 | 6.7 | 58.8 | 32.5 | 2.1 | 3.30 | 194 | -0.52**** |
| Comparison area #2 | 0.0 | 5.4 | 58.9 | 34.6 | 1.1 | 3.31 | 185 | -0.52**** |
| Future value of homes | | | | | | | | |
| Class area | 1.1 | 23.5 | 39.2 | 33.1 | 3.1 | 3.13 | 357 | |
| Comparison area #1 | 0.0 | 8.4 | 39.5 | 48.4 | 3.7 | 3.47 | 190 | -0.34**** |
| Comparison area #2 | 0.0 | 10.2 | 49.2 | 39.5 | 1.1 | 3.32 | 177 | -0.19* |

Coding used for calculating means: Much below average = 1, below average = 2, average = 3, above average = 4, much above average = 5.

Difference scores: Positive score means class area has higher score, negative score means class area has lower score

\* p <= .05; ** p < .001; **** p < .0001

Question 30 identified for the first time the landfill in the middle of the class area by name and location and asked if the respondent had heard anything about the landfill over the past few years. Questions 31 through 43 asked a series of questions about the landfill and its effect on adjacent properties.

Questions 44 and 45 asked about the recently completed improvements to the Interstate 5 interchange located in the class area. Questions 46 through 50 collected basic demographic information.

## Survey Results

The survey results supported the class action suit. Table 3 provides the response data for three comparison areas. Comparative distributions of the average scores for each of the tested attributes are shown in Figure 2.

The average scores for access to place of work, general traffic conditions, and access to shopping were similar with only slight variations across the comparison areas. Comparison area 2 showed somewhat higher ratings for traffic conditions. In terms of overall visual appearance, air quality, environmental quality, and future value of homes, the class area was rated lower than the other two areas. Most noticeable were the ratings of much below average for the class area for each of these questions. Air quality for the class area was identified as much below average by 7.3% of the respondents, but no respondents provided that rating for the other two areas. For overall environmental quality, for the class area over 30% of the respondents said this characteristic was much below or below average compared to 6.7% below average for comparison area 1 and 5.4% below average for comparison area 2. A similar distinction was made for future value of homes, with almost a quarter of the class area evaluations at much below average and below average compared to 8.4% below average for comparison area 1 and 10.2% below average for comparison area 2. The perceived disadvantages of housing in the class area were for visual appearance, air quality, environmental quality, and future home values.

The open-ended questions asked of respondents who rated the class area as below average (n = 104) or much below average (n = 10) produced a number of direct references to the landfill. These were voluntary references since at this point in the interview no



**Figure 2    Mean Scores on Seven Attributes by Survey Area**

mention had been made of the landfill on the part of the interviewers. The 110 respondents that said this area was below average included 56 who identified the landfill as a reason for the poor rating, 22 said odors in the area were connected to the landfill, and 9 said there were environmental problems from the landfill. Of the 10 respondents who rated the area much below average, 7 cited the landfill and 4 of those 7 identified the landfill with odors.

Questions 30 through 43 identified for the first time the landfill in the center of the class area and asked a series of questions about the landfill and its effects on respondent evaluations. When asked if they had heard anything about the landfill in the past few years, 253 respondents (63.3% of the 400 respondents) said they had. These respondents were then asked, "When you think about the landfill, what comes to mind?" The exact responses were recorded and each respondent was asked to say if this memory was positive or negative. More than half these responses (53.0%) were negative; 40.3% were positive, and almost 7% said they did not know or had no answer to the positive versus negative question. Negative responses referred to adverse effects of the class area environment, appearance, and neighbors while positive responses focused on the community service provided by a solid waste disposal facility.

This same subset of the sample answered the follow-up questions in this way: 95.7% reported they had at some time driven by the landfill, 84.2% said they had visited the landfill, 59.3% said that "odor" strongly or moderately came to mind in reference to the landfill,

while 26.1% associated garbage trucks with the landfill. When asked about birds and the landfill, 71.5% said this was a strong or moderate association, with 51.0% recording a strong association. Almost all respondents, 92.1%, agreed that the landfill was a health risk. Respondents were asked about the effect of the landfill on their evaluation when they were in the housing market, i.e., did proximity to the landfill make houses much more, somewhat more, somewhat less, much less desirable, or did it not make a difference? One person responded that houses were much more desirable and two people said somewhat more desirable. About one-fifth of the respondents (19.4%) said proximity made houses somewhat less desirable and about one-third (32.0%) said proximity made houses much less desirable. Almost one-half (47.0%) said the landfill made no difference.

The 130 respondents who said the landfill made nearby property somewhat less or much less desirable were asked if price reductions would compensate for the adverse desirability. Four people (3.1%) said no price reduction would be necessary, 23 (17.7%) said a slight price reduction, 42 (32.3%) said a moderate price reduction, and 28 (21.5%) said a large price reduction would be necessary. A fifth category, "no amount of reduction would compensate" was selected by 29 (22.3%) of the respondents. Respondents were not asked to quantify their responses in terms of money values because the appropriate quantification was measured with the professional analyses of the sales data. The qualitative responses were elicited to determine the validity of the mathematical techniques.

Copyrighted material licensed by Randall Bell on April 26, 2021

In the lawsuit at issue, a substantial part was initiated and pursued by a large commercial property holder whose business operations were especially damaged by the operation of the landfill. We suggest that there are a number of cases of adverse environmental impacts on neighboring properties due to the operations of landfills and other industrial sites. However, many cases are not formally addressed because the property owners have neither the resources nor the knowledge to seek redress. Understanding the sources of property-value impacts should provide appraisers with a more informed context for their valuations, whether they are involved in complex litigation or not.

## Summary of the Survey in Relation to the Criteria for Evidence in the Class Action Case

This section is a modified version of the declaration prepared for the class action lawsuit. It describes the approach, methods, and techniques applied to the property value survey conducted in April 2002, and its admissibility as a legal document according to the criteria outlined by the *Manual for Complex Litigation*[17] and *McCarthy.*[18] These criteria are very similar for both sources, although the specific language is not exactly the same. The criteria descriptions presented here in modified form are those shown in Table 1 and accurately represent the two sources. Two of the survey designers and article authors are members of the American Association for Public Opinion Research (AAPOR). The survey methodology follows the AAPOR's most recent guidelines for survey implementation and outcome reporting.[19]

### Criteria 1: The population was properly chosen and defined.

The population chosen for the survey was defined as residents living near the class area, active in the residential real estate market, and who actually moved their residence (but did not necessarily buy their new residence) at some time during the period 1995 through 2000. This definition of the survey population provides actual and potential buyers that are informed about property values and the relative attractions of the key residential areas. The geographical area included three zip codes. These three zip code areas covered the general area from the airport on the western boundary to the rural areas to the eastern boundary of the metropolitan area. The class area was not part of these zip code areas.

Individual respondents were screened to meet the following criteria: they had to have (1) lived in the metropolitan area for more than two years, (2) be familiar with the class area, and (3) have been in the real estate market at some time during the period 1995 to 2000. It was not necessary that the respondents had actually purchased real estate but only that they had been looking actively at residential real estate in the market area.

### Criteria 2: A representative sample of that universe was selected.

QwestDex[20] maintains a record of telephone connections and moves by zip code. Telephone numbers for this survey were purchased from QwestDex. These numbers included all listed new telephone numbers for new residents and for households that had moved from one residence to another in the target zip codes during the period 1995–2000. The total count of these telephone numbers was 6,240, from which 2,700 were randomly selected and used to complete the survey. The selection and qualification of the respondents provided subjects that fully met the specifications of Criteria 1.

### Criteria 3: The questions asked of interviewees were framed in a clear, precise, and non-leading manner.

The survey instrument consisted of 50 questions, of which 43 questions were answered by selection from a response scale, 5 questions were about social-demographic characteristics (e.g., age, gender), and 2 questions were open ended with the verbatim responses being recorded. The interviews took 10–12 minutes on average. Only after the ratings of the comparison residential areas were completed were respondents introduced to the evaluations of the subject landfill. The survey was designed and pretested under the supervision of three PhD social scientists. These colleagues reviewed the survey criteria described in *McCarthy* and the *Manual of Complex Litigation* prior to beginning their work and incorporated these guidelines into the survey design.

### Criteria 4: Competent interviewers, who had no knowledge of the litigation or the purpose for which the survey was conducted, followed sound interview procedures.

All interviewers were experienced and extensively trained personnel employed by a professional survey research and data services firm. Specific training for this survey instrument was conducted by the director of the survey research firm (a PhD sociologist) with the project director (a PhD social scientist) in attendance. Continuous supervision and monitoring was provided during the data collection period by supervisors. Data were collected during the period April 10 through April 24, 2002.

Interviewers and respondents were told the survey was being conducted on behalf of real estate appraisers,

---

17.  Federal Judicial Center.

18.  McCarthy.

19.  American Association for Public Opinion Research, *Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys* (Ann Arbor, MI:\ AAPOR, 2000).

20.  QwestDex Direct (Englewood, CO: Qwest Dex, Inc., 2002).

with the name and contact information for the survey research firm that was conducting the survey, and that the subject was "things that affect the quality of life in local residential areas." Neither the interviewers nor the respondents were told that the survey would be used in litigation.

### Criteria 5: The data gathered were accurately reported.

All data collected from this survey are provided with the exact questions and answers recorded by the interviewers and complied by the survey research firm. The responses are listed according to the scales or parameters allowed for respondent answers.

**Telephone Protocol.** The 2,700 randomly selected telephone numbers were called seven days a week starting as early as 10 a.m. and continuing until 9 p.m. A single telephone number was attempted up to 11 times, with subsequent dial attempts moved around a seven-day schedule that guaranteed that each number would be called on different days and at different times of the day. Partial interviews were completed on an appointment basis with appointment times determined by the respondent's schedule.

**Response Rate.** A response rate of 34% was achieved for this study, with a refusal rate of 9%.[21] At the end of the survey, 837 telephone numbers had been determined to be ineligible either because the respondent failed to qualify, or because the number did not lead to a residential telephone. In addition, 1,217 telephone numbers still had an unknown status (primarily because all calls to them had resulted in an answering machine). Four hundred interviews were completed and there were 23 final refusals.

**Margin of Error.** This survey has a margin of error of +4.7% when generalized back to the entire universe of 6,240 telephone numbers supplied by QwestDex. This margin of error is based on a worst-case scenario of a 50/50 proportional split and is at the 95% confidence level. Since there is every reason to believe that this QwestDex sample is representative of a larger population of area residents who may have been in the real estate market, it is worth noting that a sample of 400 produces a margin of error of no worse then +4.9% for a population of up to one million. For the split sample portion of the survey, where 200 subjects were asked about either comparison area 1 or comparison area 2, the margin of error, when generalized back to the entire QwestDex universe of 6,240 telephone numbers, is +6.8%, also at the 95% confidence level.

### Criteria 6: The data were analyzed in accordance with accepted statistical principles.

Since the survey instrument was very concise and clear, most results are reported with simple descriptive statistics. These include distributions for question scales, mean scores and differences for selected questions, recording and categorization of open-ended response, and some basic cross-tabulations for bivariate analysis.

### Criteria 7: The process was conducted so as to ensure objectivity.

The purpose of the survey was not communicated directly to the interviewers or the respondents. It was known to the designers of the survey. The objectivity of the residential area ratings was assured by eliciting the ratings and responses prior to any mention of the landfill and then presenting the questions and recording the responses to landfill questions at the back-end of the survey (but prior to the factual questions on social-demographic items).

## Summary

This survey provided a design approach, question preparation, and implementation methodology to meet the criteria for the admissibility of surveys as prescribed in *McCarthy* and the *Manual for Complex Litigation*. The survey conclusion was that the negative property values shown in the plaintiffs' case (developed by paired sales, regression analysis, and case studies) were due to the public perceptions of the landfill and its stigma characteristics as evaluated by potential real estate buyers in the larger community. The survey did not attempt to quantify in dollar terms the lost value of property in the class area since this was established with standard appraisal methods including the use of case studies, paired sales analyses, and multiple regression analyses. Even though these techniques did show loss in value, there may be a question as to the causal link between an environmental disamenity and the loss in value. What the survey did was link the landfill with a stigma effect on public opinion about the desirability of housing and property in the class area. This allowed the appraiser to account for the negative values identified in the sales data and to understand the causal link between public responses to the stigmatized neighborhood and the diminution this caused in property values. In other lawsuits of this type, defendants might show alternative sources of property loss or challenge the survey design, methods, analyses, and conclusions. In terms of the subject class action lawsuit, the outcome was a settlement of the case shortly before it was scheduled for trial.

---

21. Response and refusal rates are reported as recommended in Frankel and other sources; see Lester R. Frankel, "The Report of the CASRO Task Force on Response Rates," in *Improving Data Quality in a Sample Survey*, ed. Fredrick Wiseman (Cambridge, MA: Marketing Science Institute, 1983). The response rate is defined as "the number of complete interviews with reporting units divided by the number of eligible reporting units in the sample." Also see, American Association for Public Opinion Research, 35–40.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 6.3 Surveys, Market Interviews, and Environmental Stigma

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the Fall 2004 issue of *The Appraisal Journal*.

This edition of "Environment and the Appraiser" addresses the use of surveys and market interviews in analyzing the effects of environmental contamination on real property. The focus continues to be on the appropriate use of the methods and techniques for contaminated property valuation that were introduced earlier in this column.[1] As in the previous column,[2] the requirements and limitations of each method are generally discussed and illustrated. Then the results of market interviews concerning a previously contaminated property are compared with findings from sale price analyses of properties similar to the subject.

Surveys have been proposed and used as methods for measuring the market's perceptions of environmental risk. For instance, through a national survey of commercial and industrial real estate lenders, Jackson demonstrated the reductions in adverse perceptions of environmental risk by mortgage lenders as contaminated, source-site properties are remediated to appropriate regulatory standards.[3] In addition, surveys have been presented as a method for establishing a causal link between observed changes in market values–measured through standard appraisal methods including case studies, paired sales analyses, and multiple regression analyses–and the presumed source of the loss in value.[4] In other words, the surveys were reportedly used to determine whether an observed loss in property value was due to a contamination source rather than some other cause, but not to measure the change in value.

There are important distinctions between surveys and market interviews, which are discussed later. Market interviews, referred to as market surveys, have been discussed by Bell as "secondary or supporting documentation for market data"; he states that only "in some unusual circumstances," such as a unique environmental condition, should this technique be used in "determining the impact, if any, of a detrimental condition."[5] Bell's assertions generally support the way in which surveys were used by Flynn et al.,[6] where property value impacts were determined through standard appraisal methods, and surveys were used to understand and interpret the sales data analysis.

### Perceived Environmental Risk and Stigma

Environmental risk and stigma are often misunderstood terms, and appraisers sometimes misinterpret their relationship. In Advisory Opinion 9 (AO-9), "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," these terms are defined as follows:[7]

> **Environmental Risk.** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning: 1) the nature and extent of the contamination; 2) estimates of future remediation costs and their timing; 3) potential for changes in regulatory requirements; 4) liabilities for cleanup (buyer, seller, third party); 5) potential for off-site impacts; and 6) other environmental risk factors, as may be relevant.

> **Environmental Stigma.** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination (see Environmental Risk, above).

Accordingly, the adverse effect referred to as environmental stigma is linked to the market's perception of increased environmental risk due to the noted factors and variables. Surveys and market interviews that have been properly constructed and implemented can address the extent to which the market perceives an increased environmental risk due to an environmental condition or issue. Although surveys and market interviews are useful for this purpose, these tools are not valuation

---

1. Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 311–320.

2. Thomas O. Jackson, "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation," *The Appraisal Journal* (Spring 2004): 111–118.

3. Thomas O. Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders," *Journal of Real Estate Research* 22, no. 3 (2002): 271–288.

4. James Flynn et al, "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation," *The Appraisal Journal* (Winter 2004): 44.

5. Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999), 27.

6. Flynn et al.

7. Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," 2004, Lines 1-191 (Washington, DC: The Appraisal Foundation, 2004).

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

methods or approaches. The actual measurement of the reduction in market values should be accomplished with one or more of the accepted valuation methods for this purpose, such as case studies analysis, paired sales analysis, and income capitalization analysis. This is consistent with additional guidance in AO-9, which defines the measured effect on property value as follows:

> **Diminution in Value (Property Value Diminution).** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

Thus, the portion of the reduction in property values due to increased risk, or environmental stigma, is a function of the difference between the unimpaired and impaired market values, and these two values must be estimated through recognized appraisal methods and techniques as well as specialized valuation methods for this purpose.[8]

In summary, despite the conceptual link between the property value effect known as environmental stigma and the market's perception of environmental risk, the actual measurement of the reduction or diminution in property values should be accomplished through accepted appraisal techniques and methods. Adverse perceptions do not always lead to reductions in property values, and there is not a lock-step relationship between perceptions and actual market behavior. These adverse perceptions must be borne out in actual, measurable market behavior as reflected in the sale prices of properties, consistent with the "most probable sale price" definition of market value.

## Overview of Surveys and Market Interviews

There is some confusion among appraisers concerning the differences between surveys and market interviews. In social science research, the term "survey" is implicitly used to mean "sample survey."[9] A sample survey, by definition, focuses on a representative sample of a population.

Market interviews, on the other hand, are more closely akin to what appraisers refer to as sales confirmation or verification interviews. They focus on a select group of key market participants, which in some cases may be the entire population or market for a particular property type and location. These key market participants may be selected because of their knowledge of a particular property type or market area. Both surveys and market interviews can provide useful insights concerning the market's perceptions of environmental risk. However, for the results of such research techniques to produce valid and reliable findings, they must be carefully planned and implemented. A general overview of each technique is presented below.

## Survey Research

Sample surveys are frequently used to gauge opinions and perceptions concerning a range of topics from political issues to consumer sentiment. These surveys have also been reliably used to assess the perceptions of the market concerning environmental contamination and environmental risk.[10]

In order to produce valid and reliable results, surveys must be carefully designed and implemented. A properly designed survey will contain questions that present the concepts that the survey is addressing in an understandable and unbiased manner.[11] For example, if the survey is focused on environmental risk perceptions of lenders, there must be clear and specific questions in language and context understandable to lenders. One approach would be to ask about loan underwriting requirements under differing environmental conditions (property is free from any contamination; property is contaminated but in remediation; remediation is complete, etc.). Also important are the preconditions for the survey responses. For lenders, the credit worthiness of the borrower may be as important as the collateral value. This element could be controlled for in the survey by establishing a precondition that the hypothetical borrower is presumed to be credit worthy. Lastly, the questionnaire should be pretested with individuals that share the same characteristics as those to be sampled. After completing the proposed survey questionnaire, the pretest group could be interviewed to determine any unclear or ambiguous items, which then could be modified.

In implementing surveys, an important first step is to select an appropriate sample. The most respected and useful method of sampling is termed *probability sampling*, which posits that "a sample will be representative of the *population* from which it is selected if all members of the population have an equal chance of being selected in the sample."[12] The most common type of probability sampling is the *simple random sample*, in which numbers are assigned to each *sampling unit* (such as a household, homebuyer, lender, etc.) in a list, and then a set of random numbers are generated and used to select the sample from the *sampling frame* (list of sampling units).[13] The sampling frame can be generated from lists that correspond to the population that is to be studied. In the lender survey example, the population would be mortgage lenders and the sampling frame might be a list of lenders from the American Bankers Association that are involved with the evaluation of mortgage loans.

Once the survey questionnaire has been designed and pretested, and the sample has been selected, the survey is implemented using a mail or telephone proce-

---

8.    Jackson, "Methods and Techniques for Contaminated Property Valuation."

9.    Earl Babbie, *Survey Research Methods*, 2nd ed. (Belmont, CA: Wadsworth Publishing Company, 1990), 65.

10.   Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders."

11.   Don A. Dillman, *Mail and Telephone Surveys: The Total Design Method* (New York: John Wiley & Sons, 1978), 97–105.

12.   Leslie Kish, *Survey Sampling* (New York: John Wiley & Sons, 1965).

13.   Babbie.

Copyrighted material licensed by Randall Bell on April 26, 2021

dure. In the telephone survey format, interviewers must be trained to maintain a neutral posture with respect to the issues being addressed in the survey. They should not react to responses in a manner that might influence the response. Interviewers should also be trained in addressing respondents' questions so as not to change the information to which the respondent is reacting.

In tallying the number of useful responses from either format, a *response rate* should be calculated. In a mail survey, the acceptable practice for calculating response rate is to omit all questionnaires that could not be delivered and divide the number of completed questionnaires by the net sample size.[14] A response rate of at least 50% is considered adequate for analysis and reporting.[15] Response rates lower than this are considered susceptible to *response bias*.

Finally, the survey results should be analyzed using acceptable statistical techniques that allow for the estimation of error rates for key survey items. These rates can be expressed as a range with an associated confidence interval. Most standard statistical software packages have the capacity to calculate these estimates.[16]

## Market Interviews[17]

As previously explained, market interviews are not methods or techniques for valuing contaminated properties. Market interviews are useful for collecting and understanding the data and information necessary to apply other methods and techniques such as the variations of sales comparison analysis used in contaminated property valuation. Market interviews also provide information useful for estimating the market's requirements for environmental risk premiums in an income capitalization analysis. In an income capitalization analysis, these requirements can be expressed as required rates of return or as return premiums over unimpaired rates. Market interviews, by themselves are not an appropriate and credible valuation method or technique.

In planning and conducting market interviews, care should be taken not to introduce bias into the results. Important in this regard are

- selection of market participants to be interviewed;
- development of unbiased information about the subject property and its environmental condition; and
- construction of a structured questionnaire and interview protocol that can be replicated.

Potential bias can be introduced whenever the information provided or questions asked are not objectively developed and presented. Individuals to be interviewed should be representative of typical market participants.

In addition, the environmental and other information provided should be consistent with what is considered typical or normal market knowledge. Interviewees should be asked to assess the subject property in an unimpaired condition and in its impaired, contaminated condition. Differences between the two sets of responses will then reflect the effects of the property's environmental condition. Detailed notes and transcripts of interviews as well as all information provided to interviewees should be retained in the appraiser's workfile.

Market participants do not need perfect knowledge of environmental contamination such as what might be expected from a qualified environmental engineer who has performed detailed testing of a contamination source. A real estate market that has become knowledgeable of environmental influences on properties in the study area will either react or not react in its pricing decisions, based on its perception of the risk and potential impact of the contamination.

All situations of environmental contamination do not inexorably lead to a reduction in the pricing and value of real property. An appraiser must not assume that the market will react in a certain way to environmental contamination where the assumed reaction has not been clearly demonstrated in observed market transaction data. This is discussed below.

## Revealed and Stated Preferences

Despite the link between the perceptions of risk and adverse impacts on value, the most convincing market data is developed from transactions of comparable properties with similar environmental conditions to the subject property, rather than from information gleaned though surveys or market interviews. Transactional data, including the observed sale price and other financial terms and conditions, reflect the "revealed preferences" of the market with respect to the environmental condition under study. Other information, such as a "stated preference" for avoidance of the environmental condition, are relevant to the extent that they are consistent with and are revealed by sales and transactions in the market, since these ultimately establish market value. If the stated and revealed preferences differ, as they frequently do, then the revealed preferences exhibited in sale price data should be given greater weight. As observed by the late William Kinnard over twelve years ago, "The results from survey analyses must be tempered with the knowledge that the expectation of events is almost invariably more negative and more sharply delineated, at least when [the events] are expected to affect oneself negatively, than is realized when the event occurs."[18]

---

14.   Ibid., 183.

15.   Ibid., 182.

16.   The two most commonly used packages are the Statistical Analysis System (SAS®) and the Statistical Package for the Social Sciences (SPSS®).

17.   This subsection is largely similar to the discussion in Jackson, "Methods and Techniques for Contaminated Property Valuation," 318. This material was also presented at the symposium on "Environmental and Property Damages: Standards, Due Diligence & Strategy," sponsored by the Centre for Advanced Property Economics and the Appraisal Institute, Toronto, ON (April 2002).

18.   William N. Kinnard, Jr., "Measuring the Effects of Contamination on Property Values: The Focus of the Symposium in the Context of Current Knowledge," in symposium proceedings, *Measuring the Effects of Hazardous Materials on Real Estate Values: Techniques and Applications* (Chicago: Appraisal Institute, 1992), 5.

From another perspective, the preference for transactional data over survey data is in part due to the hypothetical nature of surveys. The difference between stated intentions and actual behavior has been termed "hypothetical bias," or the "potential error due to not confronting the individual with a real situation."[19] Respondents to surveys are not faced with the consequences of their stated preferences, be it either the potential purchase of an allegedly impacted property or the foregone utility from not purchasing the property. The hypothetical nature of surveys "does not provide respondents with an incentive to reveal their true values because they do not have to bear the consequences of any answers they put in a survey."[20] The next section examines an actual case in which the stated and revealed preferences are compared.

## Comparing Stated Preferences to Actual Sales

This section presents a case study involving a former gasoline service station site that had a leaking underground storage tank (LUST). The site is located in a medium-sized city in Florida and had been ground leased from its current owner by the operator of the gas station. At the termination of the lease, contamination was discovered and partially remediated. It was subsequently re-leased for another use. The site was placed in a special Florida program for LUST remediation cost reimbursement. The site was not fully remediated as of its 2001 date of value, though. An indemnification from a major oil company provides for any future remediation costs not borne by the Florida program.[21] Thus, any property value diminution would be due to perceived environmental risks (risk effects) rather than cost effects or limitations on the highest and best use of the site (use effects). As will be seen, a series of market interviews with local lenders indicated some reluctance to provide a mortgage loan on the property, yet actual sales of other former gasoline service station sites indicate that they sold at unimpaired prices. The purposes of this case study are (1) to illustrate the use of the market interview technique, and (2) to provide information concerning the issue of stated preferences obtained through interviews and revealed preferences indicated by sales.

### Market Interviews

As previously noted, the proper application of market interviews involves three important elements: selection of participants to be interviewed, development of unbiased information about the subject property and its environmental condition, and construction of a structured questionnaire and interview protocol. In the example here, local lenders were selected on the basis of their activity in the market segment (location and property type) for the subject property. The information in Appendix A at the end of this article was presented to those interviewed, although some information has been omitted from the appendix in order to maintain confidentiality with respect to various issues. The questionnaire items used in the interviews are shown in Appendix B at the end of this article. The actual questionnaire included spaces for the interviewer to record responses as well as any additional comments. As previously explained, the market interview procedure is different from formal surveys but it is more structured than a typical sales confirmation or verification interview. The latter usually focuses on obtaining or confirming facts about a transaction, whereas the market interviews discussed here attempt to gauge perceptions of environmental risk as operationalized by changes in loan underwriting and lending criteria.

Consistent with this framework, several interviews were conducted in 2001 that dealt with the perceptions of mortgage lenders with respect to the specific environmental condition and history of the subject property. After reviewing the property description and history (Appendix A), four lenders were asked whether the environmental condition described in the case study would deter them from making a loan secured by the property.

If the subject property's environmental condition was perceived as detrimental, the lender was asked about specific credit underwriting adjustments necessary to compensate for any increased risks. The lenders were asked to assume that the prospective borrower was otherwise creditworthy. The borrower's creditworthiness was important to all of the lenders.

The results of the lender interviews concerning their risk perceptions of the subject's environmental condition are summarized below.

**Lender One.** The first lender interviewed was a commercial loan officer with a local bank having a primary business base in commercial real estate lending. This lender reviewed the case study with a senior vice president at the bank who had over 30 years' experience. Thus, the responses from this lender reflect the perceptions of both individuals. Over the past 12 months, this bank had closed over 100 commercial real estate loans, and these loans represent about 80% to 85% of the lender's total business. This is an active commercial real estate lender in the local area. This lender also indicated that they had previously made a loan on a local contaminated convenience store property.

The lender's initial reaction to the subject property and its condition was that a loan would be contingent on the completion of the planned remediation—"a timing issue." However, after considering the fact that the buyer/

---

19.    Kristy E. Mathews and William H. Desvousges, "The Truth, the Partial Truth or Anything but the Truth: Survey Reliability and Property Valuation," presented at the symposium on "Environmental and Property Damages: Standards, Due Diligence & Strategy," sponsored by the Centre for Advanced Property Economics and the Appraisal Institute, Toronto, ON (April 2002).

20.    Ibid., 9.

21.    Appendix A at the end of this article contains a detailed environmental history of this property.

Copyrighted material licensed by Randall Bell on April 26, 2021

borrower would not be responsible for clean-up costs and that the existing lease income would continue during remediation, the lender indicated that a loan could be made, but perhaps at a reduced loan-to-value (LTV) ratio, requiring additional equity or other collateral from the borrower. The lender concluded by noting that they "haven't walked away from 'dirty' sites (in the past)."

**Lender Two.** The second lender interviewed was a senior vice president with a smaller locally based bank. This lender has 22 years of such experience and his institution did over $400 million in commercial real estate loans in the past year, representing about 40% of their total lending business.

With respect to the subject property and its environmental condition, this lender would prefer to wait 18 months until the remediation described in the case study had been completed. However, the lender would be willing to consider a mortgage loan on the property now, with a firm estimate of the clean-up costs and with these costs placed in escrow. Alternatively, if the Florida Department of Environmental Protection (FDEP) would approve of natural attenuation and monitoring as an appropriate remediation strategy, then a market loan could be made now. Current commercial property loan rates and terms would be an interest rate of prime to prime plus 0.5% (about 7.5%), a 15-year amortization period, and a 3-year term.

**Lender Three.** The third lender interviewed was with a major regional financial institution that had previously held a mortgage on a property adjoining the subject. The local loan officer for this bank reviewed the environmental case study for the subject property and responded that with the state program and an agreement by the major oil company to provide the balance of the clean-up costs, the environmental issues would not preclude lending on the property (they "can get over [the environmental risks]"). However, the loan officer indicated that an environmental policy officer in another city reviews all loans at their bank involving environmental issues, so the case study was sent to that individual and a second interview was conducted.

When the environmental specialist was asked whether the subject property's environmental condition would deter financing, the specialist responded "no, absolutely not," and that they could "mitigate risks/concerns." This individual was very familiar with the state cleanup reimbursement program, rankings, and similar sites. The policy officer also had previous experience with the major oil company and believed the company to be very responsible in its cleanup of former LUST sites. The officer said that the lender "would be absolutely interested" in loaning on this property and that they "have done contaminated property loans" in the past.

The officer noted that the use of the site for commercial purposes was important, and that it would probably not be appropriate for residential use given its condition. In addition, the officer was interested in seeing recent groundwater sampling data from the site

and said that the contamination in such an old plume had "probably degraded." The lender also noted various environmental insurance products that are available to mitigate environmental risks.

**Lender Four.** The fourth lender interviewed was a vice president with the local office of a major national financial institution. The lender's initial reaction to the environmental case study on the subject property was that they would not be interested in providing mortgage financing until the property was remediated. However, the lender "may take a look" at the property in its current status. There was concern that the environmental testing data on the subject was old, and would require a current assessment, such as the Site Assessment Report (SAR) described in the property description and history (Appendix A). Once the remediation was complete in 18 months, they would not be deterred from making a mortgage loan secured by the subject property. In addition, if a passive natural attenuation plan was approved by the FDEP, then that would reduce risks so that current market financing would be available. In the meantime, other collateral would be required.

In summary, the results of the case study market interviews present a mixed picture for the subject property. The property would not be treated the same as a comparable but uncontaminated property. However, the lenders indicated that with some adjustments, there were ways to mitigate the risks and provide financing for the property in its current condition. One of the four lenders—the one with the greatest experience with these issues—was confident that a solution could be found to provide a mortgage loan on the property in its current condition, but here again, additional steps to mitigate risks would be needed. The lenders agreed that an approved passive remediation strategy would remove these risks now. They also agreed that the property could be financed at the conclusion of the 18-month remediation period.

## Comparison to Sales Data

This section presents sale price analyses whereby sales of unimpaired properties are matched and compared to sales of impaired properties with environmental conditions similar to the subject. The objective is to determine if the observed prices of the impaired properties are supported by the prices of otherwise similar unimpaired properties. Two impaired property sales were selected.

**Former Gasoline Service Station Site (Impaired Sale One).** This is the sale of a 0.59-acre parcel (25,596 square feet) located several blocks south of the subject property on the same road. The property was a former gasoline service station that had a LUST that had been removed along with the other tanks. According to documentation in the files of the county pollution control department, which administers the Florida petroleum clean-up program under contract with the FDEP, no further assessment was required as of December 1999.

The site was purchased in July 1999 for $768,000, or $30.00 per square foot. The unit price for this

property is within the market range for comparable properties without environmental issues. Three sales of comparable properties without environmental issues were analyzed.

The first (Sale 1-1) was the December 1999 sale of 1.015 acres (44,200 square feet) for $1,330,000, or $30.09 per square foot. This property is north of the impaired sale site. With a larger size (inferior) and a corner location (superior), this property has a net comparison similar to the impaired sale site.

The second unimpaired comparable (Sale 1-2) was the sale of 2.28 acres in May 1998 for $2.5 million, or $25.17 per square foot. This property is larger (inferior), triangular shaped (inferior), and further north of the central business district (CBD) (inferior) than the impaired sale property, accounting for its lower unit price.

The third unimpaired comparable (Sale 1-3) was the March 1999 sale of 0.56 acre for a unit price of $34.35 per square foot. This property is close to the CBD (superior) and south of the Impaired Sale Two property, accounting for its higher unit price.

The market range of $25.17 to $34.35 tightly brackets the price for Impaired Sale One of $30.00 per square foot, indicating a market transaction price for the LUST site. In addition, the impaired sale property was reported to be under contract for a price near $1.0 million in 2001, a significant increase over its 1999 price of $768,000. These sales can be summarized in a relative comparison array as follows:

| Sale | Unit Price | Net Comparison (Comment) |
|---|---|---|
| 1-3 | $34.35 | Superior (location closer to CBD, rectangular shape) |
| 1-1 | $30.09 | Similar (inferior size, superior corner location) |
| Former LUST Site 1-2 | $30.00 $25.17 | Impaired Sale One Inferior (larger, triangular shape, further north) |

### Former Gasoline Service Station Site (Impaired Sale Two).

This sale involved a site of 4.66 acres, or 202,990 square feet, with frontage on the same road as the subject. The property, a former gasoline service station with a LUST, was sold in 1998 for $3.5 million, or $17.24 per square foot. The site was purchased for development with a drug store. As confirmed with parties to the transaction, there was on-going remediation at the site when it sold and during its redevelopment. There were no reported indemnifications for future environmental liabilities. In addition, documents for the site indicate that there were "areas of hydrocarbon impact in groundwater at the site," as well as "excessively contaminated soil, as defined in Chapter 62-770, F.A.C."

Despite these seemingly adverse environmental conditions and the fact that the site was not fully remediated at the time of sale, its sale price of $17.24 per square foot is well bracketed by market sales data for the unimpaired properties and appears to have been unaffected. This conclusion is based on a comparison with four otherwise similar unimpaired sales.

The first unimpaired comparable (Sale 2-1) was the sale of a 2.67-acre parcel, also for development as a drug store. The site is located on the same road, and was sold in December 2000 for $975,000, or $8.38 per square foot. Although similar in use and purpose, this lower unit price reflects its slightly inferior exposure and location relative to the former gasoline station site, which has strong exposure and access from two highways.

The second unimpaired comparable (Sale 2-2) is the sale of 1.93 acres in February 1999 for a unit price of $21.41 per square foot, and located in an upscale area to the south of the former gasoline station site. This site was also purchased for development as a drug store. Its higher price reflects its superior location.

The third unimpaired comparable sale (Sale 2-3) was the sale of 5.5 acres across a major highway from Impaired Sale Two. This site was acquired by its current owner in June 2000 for $5.50 per square foot. Its lower unit price reflects its secondary corner location (inferior). However, its location in the immediate vicinity of Impaired Sale Two and lower price provides further indications of a lack of any discounts in the impaired sale price for impaired sale site.

Lastly, the fourth unimpaired comparable (Sale 2-4) is the sale of 1.925 acres in September 1998 for $11.51 per square foot. The commercial/retail site was subsequently developed for a branch bank and an auto service facility. The lower price relative to Impaired Sale Two can be attributed to its inferior corner location and to the fact that the road on which it is located is not a through street. These sales can be summarized in a relative comparison array as follows:

| Sale | Unit Price | Net Comparison (Comment) |
|---|---|---|
| 2-2 | $21.41 | Superior location (upscale area) |
| Former LUST Site | $17.24 | Impaired Sale Two |
| 2-4 | $11.51 | Inferior (weaker intersection) |
| 2-1 | $8.38 | Inferior (secondary location, not on main intersection, became drug store) |
| 2-3 | $5.50 | Inferior (secondary corner, not at main intersection) |

As can be seen, the unit price for Impaired Sale Two (the former gasoline station/LUST site) is bracketed by unimpaired market transaction data and prices. There is no market evidence that the price paid for the former LUST site was discounted or reduced due to its environmental condition. Indeed, its price is above that paid for sites in its immediate vicinity and for another site to be similarly developed as a drug store.

The foregoing analyses of impaired property sales involving former gasoline service station sites that had LUSTs indicate that the impaired property sale prices were consistent with market-level pricing. No discounts were observed or are evident in this data. The impaired property sale prices are well supported by market comparables that did involve leaking tanks. The findings of these analyses do not show any effect on sale prices as a result of previous contamination from LUSTs. There was no sale price evidence that the properties with LUSTs had been adversely affected.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Conclusion

The market interviews and sale price analyses present slightly conflicting results with respect to whether the subject property's environmental conditions would impact its unimpaired market value.[22]

The market interviews of lenders indicated some reluctance to provide mortgage financing prior to completion of the planned 18-month remediation plan. A closer examination of their responses reveals that certain elements reduced their perception of increased environmental risk. Risk-reducing elements existed where the potential/hypothetical borrower not responsible for the estimated remediation costs; the property was entered into the Florida program for reimbursement of remediation costs; there was an existing stream of lease income; and the indemnification from the major oil company with whom at least one of the lenders had previous dealings. One of the lenders would make the loan with the existing conditions, one would not, and two might make a loan if additional details could be worked out. All of the lenders indicated that they would make a loan on the property once the remediation had been completed (the after-remediation stage).[23] Interestingly, two of the lenders indicated that if the monitored natural attenuation plan were approved for the site, they would make the loans available immediately, a finding consistent with that presented in the previous "Environment and Appraiser" column.[24]

On the other hand, the sale price analyses indicated no reluctance or resistance by the market in the acquisition of former gasoline service station sites that previously had LUSTs. In the analyses, both impaired property sales occurred at unit prices that were supported by prices of otherwise similar but unimpaired property sales. Further, one of the LUST sites was acquired prior to completion of planned remediation, a condition similar to the subject.

The appraisal issue then becomes the reconciliation of the stated reluctance of the market to finance the acquisition of the subject property with its environmental condition, and the actual market behavior as evidenced in the sales data. A likely explanation is that in an actual transaction, many of the issues that initially invoke concern are dealt with in other ways. For example, one of the lenders indicated that environmental insurance might mitigate the risks.

Also, and perhaps more importantly, as a potential transaction works its way though the lenders' and buyers' due diligence process, more information is accumulated with respect to the contamination, its remediation, liabilities, and costs. More information generally equates to less uncertainty and less risk. It is the unknowns that result in higher risk and uncertainty in markets that can be characterized as risk adverse.

Lastly, it is difficult to re-create all of the conditions of an actual transaction in a market interview or survey, even for the most carefully structured interview or survey. This underlies the preference for actual transactional data over survey/interview data for purposes of analyzing the effects of contamination on market value.

---

22. The unimpaired value of the property had been separately estimated at $30 per square foot, or $900,000 for the 30,000-square-foot site.

23. See discussion of remediation lifecycle in Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 130–131; and Jackson, "Environmental Risk Perceptions of Commercial and Industrial Real Estate Lenders."

24. Jackson, "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation."

## Appendix A: Subject Property Description and History

### Property Description

The subject property consists of a rectangular site of approximately 30,000 square feet, located at the corner of a major six-lane divided highway and a paved two-lane road. Access is provided via curb cuts from both roads. The site has 200 feet of frontage along the highway, with good visibility to passing traffic 150 feet along the two-lane road. The surrounding neighborhood consists of commercial highway-oriented development, and the market in the immediate area appears strong. The site is improved with asphalt paving, planters, and fencing, and it functions as part of a car dealership. The owner of the site leases it to a tenant, who owns the adjoining parcels. The site has been so leased since 1993, and current renewals extend the lease arrangement through 2004. (The date of value was in 2001.) The lessee has agreed that future rent payments would not be affected by any remediation activities.

### Environmental History and Condition

A major oil company leased the subject property from its current owner from 1970 to 1990, during which time the site was used as a gasoline service station. In 1988, petroleum hydrocarbon contamination was discovered in the soils at the property. In May and June 1990, underground storage tanks and contaminated soil were removed from the site. The excavation remained open until April 1991 to allow volatilization of some residual contamination. In 1991, the backfilled area was re-excavated and backfilled with wash rock for better compaction. Additional contaminated soil was also excavated at that time and treated on site. The soil was removed from the site in September 1992.

A Contamination Assessment Report (CAR) was submitted in 1993, with CAR Addendums (CARAs) submitted in 1993 and 1994. The CAR reports, approved by the Florida Department of Environmental Protection (FDEP) in May 1994, established the presence of hydrocarbon compounds in groundwater at the site. A Remedial Action Plan (RAP) was submitted to the FDEP in 1995. The RAP included groundwater recovery, treatment via an air stripper tower, and on-site reinjection. Natural attenuation was recommended for residual soil contamination. Annual monitoring of all on-site monitoring wells was also proposed. Based on the size of the contaminant plume, the time required to clean up the groundwater was estimated to be 18 months. Consultants estimated $160,000 in clean-up costs for an air sparging and soil vapor extraction system operating for 18 months. However, no additional remediation systems had been activated as of the date of value.

The site was accepted into the Florida Early Detection Incentive (EDI) program in 1989 and received partial reimbursement for expenses incurred during the Initial Remedial Action program. However, the site ranking was not high enough to warrant further funding for proposed remedial activities through the EDI program from 1995 to 2000. As of the date of value, Florida's program had been extended to sites whose priority ranking had previously been too low for clean-up funding. Accordingly, the property is eligible to receive funding for additional remediation. In the event that Florida EDI approves only partial reimbursement of future costs, the major oil company that had previously leased the site from its current owner would finance the balance of remediation costs. Current proposals are for additional soil investigation and submission of a Site Assessment Report (SAR), which will summarize current site conditions and recommend the next appropriate course of action. The estimated remediation costs may be revised following submission of the SAR.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Appendix B

Assume that you are contemplating providing an acquisition or refinance loan with the subject property as collateral, and assume that the applicant is creditworthy.

I. Lending Opportunity

1) In general, (as of the date of value) assuming no history or existence of contamination:

1) What interest rate or range would you charge for financing the purchase of the property described in the case study?

2) Would you require the buyer to pay any points?

3) What would be the required loan to value ratio?

4) What would be your minimum required debt coverage ratio?

5) Over what period would the loan be amortized?

6) What would be the term of the loan?

2) What type of due diligence would you require on the subject property?

3) As of (the date of value):

1) Would the environmental history and condition of this property prevent you from committing to acquisition fiancing?

(a) If yes, why?

(b) If no, would the environmental history and condition of this property impact the terms of the mortgage? Why?

(c) If yes, which of the following would change?

Interest Rate

Discount Points

AmortizationPeriod

Term

Debt Coverage Ratio

LTV ratio

II. Company Policy

1) Does your bank have a policy with regard to contaminated properties? If so, briefly, what is it and how long has it been in place?

1) If not, what guidelines do you use to evaluate contaminated real estate?

2) Are you familiar with any loans that your bank has considered for acquisition financing of environmentally contaminated property?

1) If so, when were they considered?

2) Did you extend or deny the loans? Why?

3) What is your title?

4) What are your general responsibilities?

III. Lending Characteristics

1) During the past 12 months, approximately how many loans has your bank made on (properties similar to the subject) for acquisition financing?

2) What percentage of your real estate loans are made on property in, or competitive with the (market area of the subject property)?

## 6.4 Environmental Case Studies: Ensuring Suitable Comparables

*by Kimberly Winson-Geideman, PhD*

This article originally appeared in the Summer 2005 issue of *The Appraisal Journal*.

### Abstract

The difficulty of using case studies in the appraisal of contaminated land has eased due to the increased number of redeveloped sites entering the marketplace. The key element of the case study approach is ensuring suitable comparables. The research presented in this article supplements the case study literature by assessing buyer knowledge in situations involving redeveloped and environmentally impaired residential property. The central message is that if buyers of comparable properties have no knowledge of contamination, use restrictions, and maintenance procedures associated with contaminated land, the case study approach could produce invalid and unreliable results.

The appraisal of contaminated land or brownfields is a topic regularly addressed in states with a history of substantial industrial activity. The U.S. Environmental Protection Agency (EPA) defines *brownfields* as "real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant."[1] Excluded from this definition are sites listed on the National Priorities List (NPL) or those that are subject to a planned or ongoing procedure under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[2] The impacts of brownfields are often severe, resulting in a reduced tax base, unemployment, blight, and health risks for those in close proximity to the sites.

To combat the negative effects of brownfields, state laws were developed to create a formula for cleanup, thus opening the door for site reuse. Known as voluntary cleanup programs (VCPs), the laws were designed to encourage parties not responsible for site contamination to initiate cleanup and redevelopment. The VCPs are characterized by several components essential to success including risk-based corrective action, lender and new owner liability exemptions, no further remediation letters, covenants not to sue, and memorandum of agreements with the federal EPA.[3]

Another important component of VCPs, not regularly addressed in empirical studies, is the use of deed restrictions to inform potential purchasers of any limitations on site use due to past contamination. Deed restrictions are documents specifying use and development limits for a particular site. Established by the owner, they have traditionally been used to preserve or enhance the value of the property. In the case of VCPs, deed restrictions are designed to help protect human health and the environment by indicating the existence of contamination, physical or institutional controls, and land use limitations on a particular site.

The general assumption made by appraisers, policymakers, and others is that deed restrictions are an effective way to notify property buyers of environmental concerns. This may be true in situations involving large development companies that employ a host of legal experts to identify any potential liabilities associated with a piece of property. It may not be the case, however, in less sophisticated transactions involving individual property owners buying homes.

This article examines the effectiveness of deed restrictions in notifying residential property owners of the existence of past contamination, pollution that is being managed on-site, and/or land use limitations. Case studies of two separate developments consisting of 16 units in Chicago are used. Property owners are surveyed to determine if they know of their sites' participation in the state VCP and if they are aware of any institutional or physical controls associated with the property. In addition, they are questioned regarding their tolerance for specific contaminates, including those that existed or exist on the site.

### Policy Overview

When buyers purchase property with deed restrictions, they are contractually obligated to abide by the terms of the restrictions, thus relinquishing some property rights. These restrictions can range from limits on the ability to build fences and outbuildings to the color of paint permitted on the exterior of a home. Many subdivisions include deed restrictions that are monitored by associations and supported through annual payments by homeowners.

1.   This definition is found in *The Small Business Liability Relief and Brownfields Revitalization Act*, Public Law 107-118 (H.R. 2869), signed into law January 11, 2002; see U.S. Environmental Protection Agency Web site, "Brownfields Glossary of Terms," http://www.epa.gov/brownfields/glossary.htm#brow, accessed on February 27, 2004.

2.   *Comprehensive Environmental Response, Compensation, and Liability Act of 1980*, *U.S. Code* 42, Chapter 103.

3.   Robert A. Simons, Turning *Brownfields into Greenbacks* (Washington, DC: Urban Land Institute, 1998).

**Kimberly Winson-Geideman, PhD,** is an assistant professor in the Department of Landscape Architecture and Urban Planning at Texas A&M University. Winson-Geideman has published several articles on brownfields, and her research interests include land contamination; residential and office property valuation; and coastal development.

Copyrighted material licensed by Randall Bell on April 26, 2021

Under the terms of most VCPs, deed restrictions are considered a form of institutional control. Institutional controls are typically recorded in the property deed and are therefore available in perpetuity. Examples of institutional controls implemented as deed restrictions include groundwater use restrictions and limits on digging and planting.[4]

Deed restrictions are also used to inform current and potential property owners of the existence of "caps" and any associated maintenance. Caps are barriers proven to limit human contact with contamination. Examples of caps include paved parking lots, polyurethane sheets covered with clean soil, and landscaping that encapsulates the contaminated areas. Buildings also can serve as caps.

In Illinois, successful participation in the Illinois VCP, known as the Site Remediation Program (SRP), results in the issuance of a No Further Remediation (NFR) letter by the state EPA. When Remediation Applicants (RAs) in the program are issued NFR letters, it indicates "that all environmental conditions at their remediation sites do not present a significant risk to human health or the environment" and that a release from further responsibility under the Illinois Environmental Protection Act has been granted.[5]

When the NFR letter is issued, it is the responsibility of the RA to submit the letter to the county recorder's office in which the remediation site is located. To comply with state law, the NFR letter must be submitted within 45 days of receipt, and then must be accepted and recorded so that it forms a permanent part of the chain of title for the remediation site.[6]

## Literature Review

Research on the impact of the disclosure of contamination on property value and liquidity is well established. Mundy indicates that early disclosure of contamination regularly results in a loss of property marketability.[7] Specifically referring to "disclosure requirement by the sales agent or seller" and "required disclosure statements," the author concedes that damages may be reduced as information about the effects of the contamination becomes available.

Deed restrictions are often the only tool available to notify prospective purchasers of issues associated with land contamination. Simons and Robertson identify deed restrictions as a tool that encourages brownfield redevelopment.[8] Various programs integrate deed restrictions into VCPs; numerous states including Illinois, New Jersey, and Ohio require that restrictions be incorporated as part of the deed when sites have been issued an NFR letter.[9]

Lee and Jones question the effectiveness of deed restrictions as a tool of notification designed to protect human health and the environment in a case involving a Superfund site in Sacramento, California. The authors cite the necessity to implement long-term regulatory oversight in situations involving severe contamination, particularly when in close proximity to residential land use.[10]

Appraisers recognize the implications associated with deed restrictions when valuing impaired property. Robinson, Lucas, and Rasberry cite the stigma associated with deed restrictions indicating a history of contamination as one of several risks and liabilities that could negatively impact property value.[11]

While the majority of property appraisals are conducted in a reasonably efficient marketplace, there is a significant specter of litigation associated with brownfields. Wald and Nanney contend that the quality of environmental representations, changes in regulatory standards, and the discovery of additional contamination are all reasons that prospective purchasers may choose to discount the purchase of a brownfield site.[12]

Comparable properties are often hard to locate, thus the valuation of environmentally impaired property can be difficult. When appraising improved brownfield sites, the case study approach is an acceptable method to determine the effects of contamination on property value. Citing property characteristics and contamination issues as elements that should be considered in a case study, Jackson and Bell indicate several other issues as important in an "apples to apples comparison."[15] Pervasive throughout the recommendations is the assumption that the purchasers of the comparable case study are knowledgeable of the site's cleanup status, use restrictions, and maintenance

---

4.    Todd Davis and Kevin Margolis, eds., *Brownfields: A Comprehensive Guide to Redeveloping Contaminated Property* (Chicago: American Bar Association, 1997).

5.    http://www.epa.state.il.us/land/more-info-about-bol.html#Office-of-Brownfields-Assistance; accessed on March 12, 2004.

6.    Illinois Environmental Protection Agency Bureau of Land, http://www.epa.state.il.us/land/site-remediation/overview.html, accessed on January 31, 2003. The Site Remediation Program is a voluntary cleanup program administered by the Remedial Project Management Section, Bureau of Land, Illinois Environmental Protection Agency. Regulations identifying program procedures and standards are found in 35 *Ill. Adm. Code* 740 and 742.

7.    Bill Mundy, "The Impact of Hazardous Materials on Property Value," *The Appraisal Journal* (April 1992): 155–162.

8.    Robert A. Simons and Heidi G. Robertson, "Deed Restrictions and Other Institutional Controls as Tools to Encourage Brownfields Redevelopment," *Environmental Law and Practice* 7, no. 1 (Summer 1999): 31–38.

9.    Robert A. Simons, J. Pendergrass, and Kimberly Winson-Geideman, "Quantifying Long-Term Environmental Regulatory Risk of Brownfields: Are Reopeners Really an Issue?" *Journal of Environmental Planning and Management* 46, no. 2 (March 2003): 257–269.

10.    G. Fred Lee and R. Anne Jones, "Redevelopment of Remediated Superfund Sites: Problems with Current Approaches in Providing Long-Term Public Health Protection" in *Proc. Environmental Engineering 1991 Specialty Conference*, 505–510 (New York: ASCE, 1991).

11.    Rudy R. Robinson III, Scott R. Lucas, and Garland G. Rasberry, "Watersbend: Appraising a Brownfield Redevelopment Project," *The Appraisal Journal* (July 2002): 309–317.

12.    David Wald and Donald C. Nanney, "Appraising Brownfield Sites," *Brownfield News* (July/August 2003).

13.    Thomas O. Jackson and Randall Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 86–95, 86; and Thomas O. Jackson, "Case Study Analysis: Environmental Stigma and Monitored Natural Attenuation," *The Appraisal Journal* (Spring 2004): 111–118, 112.

procedures. Proven incorrect, this assumption could result in the overvaluation of impaired properties.

## Data Collection

The two cases that were selected for this study are located in Chicago, Illinois. Chicago provided an attractive housing market with almost 3,700 housing units on the market as of May 6, 2002.[14] In 2001, the Chicago Primary Metropolitan Statistical Area had over 39,000 building permits issued for residential housing. Chicago was also chosen due to the abundance of sites in that city that have successfully entered and completed the Illinois Voluntary Cleanup Program (VCP).

### Case Study Sites

The case study sites were located by combining the SRP database, which contained detailed remediation information for over 800 active and inactive sites, with property record data from Cook County. Deed restriction information in the SRP data set includes worker cautions, institutional and physical barriers, and date recorded.

Due to the limited number of brownfield sites redeveloped into residential housing, only two sites met the criteria necessary for inclusion in the study. Study criteria included the following characteristics: (1) developed residentially; (2) owner occupied; and (3) completed the SRP, receiving a No Further Remediation letter with deed restrictions.

Of the two sites, one consists of four newly constructed townhouse units and the other consists of twelve renovated condominium units.

### Townhouse Site Description[15]

When application for participation in the SRP was made, the townhouse site was located within a predominately urban area that was primarily zoned for planned residential development, general service, and restricted central business districts. The neighborhood also included some general commercial and commercial-manufacturing districts and the site was devoid of any permanent buildings or structures. Historically, the site was once a cold-storage warehouse with fuel tanks, surrounded by eight-foot brick walls, bordering and possibly underlying a railroad spur that led into the building.

Environmental investigation discovered evidence that a 15,000-gallon aboveground storage tank had been located on the site in the 1930s and was removed in the mid-1960s. Testing was conducted over the entire site, and laboratory results indicated that there were concentrations of petroleum-related compounds that exceeded limits established by the Illinois EPA. The presence of the compounds was believed to be from a past petroleum release and was also possibly present due to historical alterations made to the property's subsurface. Environmental testing showed that the only area of contamination was where the tank had been located and indicated that the tank probably did not leak, but normal spillage occurred due to regular use. During the remediation process, the property title was transferred to the developer who assumed the responsibility of securing the NFR letter.

To clean the site, 165 cubic yards of soil were removed and replaced with clean soil. In addition, a five-inch concrete and asphalt cap was constructed to remain over the contaminated soil and eliminate exposure pathways, as well as impede contaminant migration to the groundwater. The NFR letter was issued in June of 1998, and deed restrictions were recorded as part of the requirements.

### Condominium Site Description

A historical review of the condominium site shows a variety of past uses. Sanborn Maps from 1910 indicate that the property was improved with three residential dwellings. The present building was constructed in 1929, having had several uses over the years including a Marshall Fields store, steam generation plant, apartment, and local commercial use. Reviews of the historical aerial photographs show the property had been in the same general configuration since 1949.[16]

At the time the site entered the SRP, the surface of the property was improved and included a four-story residential/commercial building with a penthouse, interior concrete-paved parking area, and decorative landscaping. The building was constructed using a zero lot-line configuration and thus covers 100% of the site. A retail space was located in the east-central portion of the first floor and the parking area was located in the northern portion.

A Phase-One environmental study indicated that two 12,000-gallon underground storage tanks (USTs), inspected by the Chicago Department of Environment in 1968, had been located on the property. Subsequent soil tests indicated that they had leaked petroleum into the ground, leaving a residual sludge on the concrete slabs that formerly housed the tanks. In addition, oil was observed in the soil samples collected from two of the borings at the southwest corner of the parking garage.[17]

No physical remediation or cleanup was conducted on the site. Rather, the implementation of specific use restrictions indicated the site was suitable for residential use. The NFR letter was focused, signifying a release from further responsibilities for only specific recognized environmental conditions and related contaminants of concern at the site. Contaminated soil remains below the foundation of the building, consisting of petroleum-based chemicals.

The use restriction indicates that the installation of potable water supply wells is prohibited on this site. This was implemented as an institutional control con-

---

14.  Information acquired from the multiple listing service on May 6, 2002.

15.  Leyden Environmental, "Subsurface Investigative Report" (June 27, 1996).

16.  Phase I Environmental Study conducted by Mostardi Platt of Elmhurst, Illinois, dated August 28, 1996.

17.  Phase II Site Assessment conducted by Law Engineering and Environmental Services, Inc. dated April 12, 2000.

Copyrighted material licensed by Randall Bell on April 26, 2021

sistent with the NFR letter.[18] In addition, the NFR letter requires the building to remain over the contaminated soils. The building must be properly maintained in the future in accordance with the mandated guidelines as an engineered barrier to inhibit inhalation and ingestion of the contaminated media below the building.

## Survey Instrument[19] and Administration

The survey instrument was designed to determine if property owners knew of their homes' history with the SRP, contamination issues, and any regulatory controls associated with the site. Additionally, the survey questioned owners regarding their level of tolerance for specific contaminants on and near remediated property.

The survey accomplished three goals. The first goal was to determine if a defining site feature might have caused buyers to overlook contamination issues and purchase the property. Property owners were asked the following question:

> Was there a specific defining feature that made you more inclined to purchase this home than others that you considered? An example of this would be a water view or nearness to place of employment or shopping.

The second goal was to determine if the owners knew about the sites' participation in the SRP and the subsequent NFR letter that was issued. The question language was taken directly from the recorded NFR letter. The contents of the NFR letter differed slightly for each site. Each question has a potential answer of yes, no, maybe, or do not know.

> Would you ever purchase property that had participated in the State of Illinois Site Remediation Program?

> Townhouse Version: Would you ever purchase property with a restriction in the deed stating "The five (5) inch concrete and asphalt barriers shown in the designated areas in the Site Base Map must remain over the contaminated soils. The asphalt and concrete caps must be properly maintained as engineered barriers to inhibit inhalation and ingestion of the contaminated media below the asphalt and concrete caps, as well as impede contaminant migration to groundwater?"

> Condominium Version: Would you ever purchase property with a restriction in the deed stating "The building as shown in the Site Base Map must remain over the contaminated soils. This building must be properly maintained in the future as an engineered barrier to inhibit inhalation and ingestion of the contaminated media below the building?"

Finally, respondents were questioned about their tolerance for different types of contamination. Questions were designed to see if the owners had detailed knowledge about the type of contamination that is on site and what their level of acceptance is for specific contaminants; again, the possible responses included yes, no, and maybe.

Would you ever invest in property that had been cleaned up but was once contaminated with:
- Underground storage tanks
- Volatile chemicals (e.g., PCBs)
- Toxic chemicals (e.g., arsenic, lead)
- Petroleum products or derivatives
- Radioactive materials
- Asbestos
- Heavy metals

Would you ever invest in property within 250 feet of property that had been cleaned up but was once contaminated with:
- Underground storage tanks
- Volatile chemicals (e.g., PCBs)
- Toxic chemicals (e.g., arsenic, lead)
- Petroleum products or derivatives
- Radioactive materials
- Asbestos
- Heavy metals

Respondents were also asked their education level, income, age, race, household size, and gender. The respondents were asked to describe their neighborhood, length of ownership, desirability of neighborhood, and from whom they purchased the home (builder/developer or private owner).

The survey was conducted from September 23 through December 31 of 2002. It was initially conducted over the telephone, with each homeowner receiving two telephone calls. Seven surveys were administered in this manner. If the owners could not be reached after two phone calls, a message was left indicating that the survey would be placed in the mail with a postage-paid envelope. After two weeks, a reminder postcard was sent. Two surveys were returned via the U.S. Postal Service. The overall response rate for the survey was 56.3% or 9 of 16 potential respondents.

## Results
### Owner Profile

Responses to the demographic questions indicate that the homeowner respondents are relatively young (eight under age 40), are all college educated, and have no children. All but one purchased their homes directly from the builder/developer. As would be expected with well-educated individuals, their incomes are relatively high. Although three homeowners declined to answer the income question, the remainder stated their incomes as greater than $50,000 per year. Two of those reporting earned incomes over $111,000. Six of the respondents were male and eight were Caucasian.

### Defining Site Feature

When asked if there was a specific feature that motivated them to purchase their home, three respondents

---

18. Sections 11-8-385 and 11-8-390, *Municipal Code of Chicago* as amended by Ordinance Number 097990 ("Potable Water Supply Well Ordinance") effectively prohibit the installation of potable water supply wells (and the use of such wells) and are an acceptable institutional control.

19. Survey derived from an instrument developed in Sandy Bond, "Post-Remediation Stigma: Fact or Fiction? Measuring the Effects of a Previously Contaminated Site on the Redeveloped Residential Property Values" (thesis, Curtin University of Technology, Perth, Australia, 2002).

answers ranged from "good value" to "28-foot ceilings" (in one condominium unit) to "neighborhood is similar to SOHO in New York." While each of these features may have been significant to individual owners, there was no evidence of a specific feature agreed upon by the group. The remainder of the respondents did not answer that question. Eight of the respondents rate their neighborhood as at least somewhat more desirable than other neighborhoods in Chicago, while one indicated it was somewhat less desirable.

## Contamination Responses

Table 1 shows homeowner responses to questions regarding involvement in the SRP, deed restrictions, and on-site contamination. When asked if they would purchase a home that had participated in the Site Remediation Program, two said "no" and four did not know what the SRP was. Two respondents answered "maybe" and only one said "yes."

The next survey question specifically asked if the owner would purchase property with a deed restriction that was copied directly from the NFR letter, the actual language of record. Seven of the respondents indicated they would not, while two said "maybe" indicating they would with conditions.

In the list of specific contaminants, none of the respondents indicated they would purchase a home that "had been cleaned, but was once contaminated with" volatile chemicals, toxic chemicals, or radioactive materials. Four respondents said they would purchase a home that was once contaminated by an underground storage tank and two said they would purchase a home site contaminated with petroleum products or derivatives. Interestingly, both the condominiums and townhouses are contaminated with petroleum products that are being managed on-site. Three respondents indicated they were willing to purchase property that had been contaminated with heavy metals.

Responses were somewhat more liberal when the contamination was located off-site, but within 250 feet of the subject property. One respondent would purchase property near a site contaminated with volatile chemicals, toxic chemicals, or radioactive materials. Three respondents indicated they would purchase property near a former asbestos contamination site. Six respondents indicated their willingness to purchase property near a site that had been contaminated by USTs or with petroleum products or heavy metals. Table 2 shows the responses of the respondents for contamination located within 250 feet of the site.

## Summary and Conclusions

The survey was designed to achieve three goals. The first goal was to determine if there was any common mitigating factor that helped persuade the owners to choose their homes. Of particular interest was anything that would minimize concerns with prior contamination and associated restrictions or a characteristic that was common to all purchasers. Examples of this type of factor include things such as a view of a river or a

| **Table 1** | Homeowner Responses to On-Site Contamination | | | |
|---|---|---|---|---|
| **Responses** | **Condominium Owner** | **Townhouse Owner** | **Site Totals** | **Percentage of Total** |
| **Purchase in SRP** | | | | |
| Yes | 0 | 1 | 1 | 11% |
| No | 0 | 2 | 2 | 22% |
| Maybe | 2 | 0 | 2 | 22% |
| Don't know what it is | 4 | 0 | 4 | 44% |
| **Contamination Scenario** | | | | |
| Yes | 0 | 0 | 0 | 0% |
| No | 5 | 2 | 7 | 78% |
| Maybe | 1 | 1 | 2 | 22% |
| **On-site Contamination** | | | | |
| **UST** | | | | |
| Yes | 2 | 2 | 4 | 44% |
| No | 2 | 1 | 3 | 33% |
| Maybe | 2 | 0 | 2 | 22% |
| **Volatile Chemicals** | | | | |
| Yes | 0 | 0 | 0 | 0% |
| No | 6 | 2 | 8 | 89% |
| Maybe | 0 | 1 | 1 | 11% |
| **Toxic Chemicals** | | | | |
| Yes | 0 | 0 | 0 | 0% |
| No | 5 | 2 | 7 | 78% |
| Maybe | 1 | 1 | 2 | 22% |
| **Petroleum Products or Derivatives** | | | | |
| Yes | 1 | 1 | 2 | 22% |
| No | 3 | 2 | 5 | 56% |
| Maybe | 2 | 0 | 2 | 22% |
| **Radioactive Materials** | | | | |
| Yes | 0 | 0 | 0 | 0% |
| No | 6 | 3 | 9 | 100% |
| Maybe | 0 | 0 | 0 | 0% |
| **Asbestos** | | | | |
| Yes | 1 | 1 | 2 | 22% |
| No | 4 | 2 | 6 | 67% |
| Maybe | 1 | 0 | 1 | 11% |
| **Heavy Metals** | | | | |
| Yes | 2 | 1 | 3 | 33% |
| No | 2 | 2 | 4 | 44% |
| Maybe | 2 | 0 | 2 | 22% |

special structural characteristic such as a professional-grade kitchen. The answers varied, but from the responses that were given, no single mitigating factor associated with a development could be identified that prompted the purchase.

The second goal of the survey was to determine if the respondents had any knowledge of the former status of the site they purchased. In particular, it was designed to ascertain whether the homeowners were familiar with the SRP, if they knew the site had been involved with the program, and if they knew of any associated deed restrictions.

The respondents were asked if they would purchase a property that had been involved in the SRP. While

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 2** — Homeowner Responses to Contamination Within 250 Feet of the Site

| Proximity Contamination | Condominium Owner | Townhouse Owner | Site Totals | Percentage of Total |
|---|---|---|---|---|
| **UST** | | | | |
| Yes | 4 | 2 | 6 | 67% |
| No | 1 | 1 | 2 | 22% |
| Maybe | 1 | 0 | 1 | 11% |
| **Volatile Chemicals** | | | | |
| Yes | 0 | 1 | 1 | 11% |
| No | 5 | 2 | 7 | 78% |
| Maybe | 1 | 0 | 1 | 11% |
| **Toxic Chemicals** | | | | |
| Yes | 1 | 0 | 1 | 11% |
| No | 5 | 3 | 8 | 89% |
| Maybe | 0 | 0 | 0 | 0% |
| **Petroleum Products or Derivatives** | | | | |
| Yes | 4 | 2 | 6 | 67% |
| No | 2 | 1 | 3 | 33% |
| Maybe | 0 | 0 | 0 | 0% |
| **Radioactive Materials** | | | | |
| Yes | 0 | 1 | 1 | 11% |
| No | 6 | 2 | 8 | 89% |
| Maybe | 0 | 0 | 0 | 0% |
| **Asbestos** | | | | |
| Yes | 1 | 2 | 3 | 33% |
| No | 3 | 1 | 4 | 44% |
| Maybe | 2 | 0 | 2 | 22% |
| **Heavy Metals** | | | | |
| Yes | 4 | 2 | 6 | 67% |
| No | 1 | 1 | 2 | 22% |
| Maybe | 1 | 0 | 1 | 11% |

only two homeowners said they would not (22%), nearly one-half (44%) did not know what the program was.

The respondents were then asked a question that reiterated wording taken directly from the respective NFR letter that was recorded as part of the site deed. They were asked if they would consider buying a property that had recorded site-specific restrictions. Seven of the nine respondents (78%) said they would not, and furthermore, not one identified the restriction as being a part of the property deed they did purchase. Both this and the responses to the prior question show a current lack of knowledge regarding the commitments that were assumed when they purchased the property.

The final goal of the survey was to assess the respondent's knowledge of the type of contamination that was (is) on their property and their level of tolerance for it. These questions were especially important if the respondents were unaware of the past history of the site and its participation in the SRP. The responses to these questions show a clear discrepancy between the stated preferences of the buyers and their actions. It is evident from the surveys that were collected that the purchase outcome may have been different had the homeowners known of the specific contamination that existed on the site.

For example, a historical study of the condominium site indicated that two 12,000-gallon USTs had existed on the site. Although the tanks had been removed, soil tests showed residual petroleum contamination.

The conditions of the NFR letter allowed the contamination to remain and be managed on-site. When the residents from the condominiums were asked if they would purchase a property that had been cleaned up but was once contaminated with USTs, only one-third of the respondents indicated they would without conditions. Another one-third indicated they would with conditions and the final third said they would not. When asked the same question applied to petroleum products or derivatives, only one respondent indicated "yes," three answered "no," and two said "maybe."

Since none of the condominium units came into direct contact with the contamination (it remains under the parking garage, which encompasses the entire ground floor), the question regarding the respondent's willingness to purchase a home within 250 feet of a property with specific contamination is also relevant. On both petroleum products and USTs, four respondents indicated a willingness to purchase such a home. However, two indicated they would not purchase a home within 250 feet for petroleum products and one would not for USTs. One respondent indicated they would purchase a property if it were within 250 feet of UST contamination.

Finally, the townhouse development was also contaminated with petroleum products. One of the three respondents indicated they would purchase a site that had been contaminated with petroleum and two said "no." The respondents were slightly more generous to properties located within 250 feet of such contamination with two answering that they would purchase the property and one answering that they would not.

Although the number of respondents included in the study is relatively small, some preliminary conclusions can be drawn from the data.

First, the study was able to show that in at least in these two cases, deed restrictions do not provide sufficient notification to insure that properties are maintained in accordance with the terms established under voluntary programs.

Second, although property owners indicate that they are concerned with the existence of specific contaminants, they are not uniformly averse to purchasing property that has been exposed to regulated substances.

Third, although case studies can be useful in the valuation of impaired properties, significant research should be conducted to determine if similar properties are indeed suitable comparables, thus ensuring an "apples to apples" comparison. As is shown in this study, finding the right comparable may be more difficult than initially thought. When using case studies in property valuation, appraisers should confirm that property owners are aware of contamination and any subsequent maintenance issues. If property owners are not aware, the case study may not prove to be a suitable comparable and discounts may not be apparent, thus providing incorrect and unreliable results.

## 6.5 Contingent Valuation: Not an Appropriate Valuation Tool

*by Albert R. Wilson*

This article originally appeared in the Winter 2006 issue of *The Appraisal Journal*.

### Abstract

The proposition has been put forth that the contingent valuation (CV) method may be used to quantify diminution in real property values due to various detrimental conditions. The blue-ribbon panel report of the National Oceanic and Atmospheric Administration has been frequently cited as primary support for this proposition. This article presents the words of that report to show the reasons why the use of contingent valuation is inappropriate for quantifying the effect of detrimental conditions on property value. Additional information is provided concerning hypothetical market surveys in general and the guidelines for evaluation of the reliability and accuracy of the results of such surveys.

There are essentially two types of market surveys. The first type of survey is a survey of past actions taken by market participants. An appraiser's sales confirmation process is an informal and limited example of this type of survey. Its purpose is to elicit information as to what action was taken and why the participants to the transaction took that action.

The second type of survey is a survey of prospective actions that might be taken by possible market participants under hypothetical conditions. A contingent valuation (CV) survey is an example of this type of survey. Basically, respondents chosen by some statistically valid method are asked to play the part of market participants in a hypothetical scenario. The respondents are asked to answer questions as to what actions they might take under the hypothetical circumstances, and they might be asked to explain those actions.

There are fundamental differences between the two types of surveys. The first type of survey seeks information on an action taken in the market by participants to that action, while the second type of survey seeks information on an action that might be taken by individuals asked to play the part of participants in a hypothetical situation. The first type of survey seeks to identify and quantify the influences on the price paid by participants in an actual market transaction. The second type of survey seeks information as to what might influence participants in a simplified hypothetical transaction. The latter approach may hold qualitative interest, but it cannot provide meaningful quantitative information.

Note that a hypothetical survey of a potential market transaction implies a survey of a transaction between two parties. There is therefore an obligation on the part of the researcher to examine both sides of the transaction, not just the buyer or the seller side. Contingent valuation surveys, however, are explicitly designed to examine a one-sided situation, where there is a "buyer" but no seller–only a potential provider of the good or service.

This article examines problems in the use of the contingent valuation method to quantify the effects of detrimental conditions on real property values in hypothetical sales. Many of the concerns and cautions expressed here related to the conduct of a CV study are equally applicable to all hypothetical surveys and their results.

### Literature Review

Over the past few years, a number of articles in real estate literature have presented contingent valuation surveys as a method that may be used for valuing real property or impairments to the market value of real property.[1] The contingent valuation methodology is not an appropriate real property valuation technique, however, and the results published to date are almost certainly not reliable or accurate for the reasons described.

Among the reasons why the CV methodology is not an appropriate technique, two may be noted as dominant. First, the recognized authorities on CV as well as advocates of the CV method clearly state that this methodology applies only to public and quasipublic goods. Second, the best results obtained will have only qualitative–but not quantitative–value. The magnitudes

1. See for example, Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297; John A. Kilpatrick, "Real Estate Issues in Class Certification," BNA Class Action Litigation Report, October 8, 2004; Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys, *Journal of Real Estate Research* 27, no. 2 (April–June 2005): 193–220; Marcus T. Allen and Grant W. Austin, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–403.

**Albert R. Wilson, CRE,** is principal of A. R. Wilson, LLC, of Woodland Park, CO. Wilson has a bachelor's degree in materials science engineering from Northwestern University, with a concentration in applied mathematics, and a master's degree in business administration from Bowling Green State University, with concentrations in finance and operations research. Wilson has been engaged in the evaluation of the financial impacts of environmental and other risks on business and real property values for more than twenty years. He has taught and written extensively for the appraisal, legal, banking, and governmental sectors on the subject of environmental impacts.

Copyrighted material licensed by Randall Bell on April 26, 2021

of values in almost all applications of CV to date have been for relatively simple public goods with one-time payments falling in the range of $5 to $250 per household. This is vastly different from the range that would be associated with complex real estate transactions. Carson, Flores, and Meade investigated more than 1600 CV studies, but none approached the range of payments or complexity found in real estate transactions.[2]

As noted by Carson, Flores, and Meade, "Rather than representing the 'best' case scenario for seeing how CV works as is often claimed, the private goods case is one that should (and does) perform poorly."[3] Carson et al report the results of an extensive meta-analysis examining the results of CV studies and revealed preferences[4] for public and quasi-public goods and observe that "because of the manner in which they are provided, private goods differ fundamentally from public goods with respect to incentives for truthful preference revelation both in actual and survey contexts. As a consequence, drawing inferences about private goods from the analysis reported in…is problematic."[5]

Quantitatively meaningful results are essentially not within the capability of the method for private goods, according to a blue-ribbon panel (Panel) convened by the National Oceanic and Atmospheric Administration (NOAA) to provide an expert review of the CV methodology.[6] The reason is straightforward: contingent valuation was never intended for quantitative estimation of the value of goods having a market such as real estate. Carson, Flores, and Meade state, "contingent valuation is a basic approach to non-market valuation."[7] They also observe that "the term 'contingent' valuation is apt and one should never forget that it is only the plan to provide the good that can be valued, not the good in the abstract."[8]

This article focuses on the Report of the NOAA Panel on Contingent Valuation" (Report) for several reasons. First, the Report's findings are the result of reasonably unbiased research into the CV methodology.[9] Other researchers such as Hausman[10] are significantly less sympathetic. Even those researchers who may be counted as advocates of the CV method, such as Mitchell and Carson,[11] indicate significant reservations concerning the use of the methodology. The Report therefore seems the best basis for an analysis of the CV methodology as it might be applied to real estate.

Second, the Report is frequently cited by advocates of the use of the CV methodology in real estate valuation; however, the citations are frequently incomplete and therefore may be misleading. For this reason, the Report is extensively quoted here to ensure that the full context of the Panel's findings, concerns, and recommendations are presented. The objective is to allow the Report to "speak for itself."

Third, although the Panel endorses use of the CV approach as the only available technique for establishing a starting point for passive-use values, it makes that endorsement subject to a significant number of restrictions. The restrictions are essential to the Panel's endorsement. This article extensively quotes these restrictions because they have generally not been observed in the published real estate CV research and because they are generally applicable to hypothetical surveys.

The findings of the NOAA Panel are valid in the context of today's knowledge and information, despite the passage of a dozen years.

## Report of the NOAA Panel on Contingent Valuation

### Background

The National Oceanic and Atmospheric Administration convened a blue-ribbon panel on contingent valuation in the early 1990s. The NOAA had responsibility for promulgating regulations to establish procedures for assessing damages resulting from oil spills. The Panel

---

2. Richard T. Carson, Nicholas E. Flores, and Norman F. Meade, "Contingent Valuation: Controversies and Evidence," *Environmental and Resource Economics* 19, no. 2 (June 2001): 173–210.

3. Ibid.

4. Economists frequently speak in terms of "stated" and "revealed" preferences. A stated preference is an opinion of value expressed by an individual. A revealed preference is the price paid, usually as recorded in some transactional record such as a multiple listing service sales report or a tax assessor's database. Note that neither of these preferences would qualify as a market value as defined by law. The first would not because it is an unqualified opinion; the second because the individual factors associated with the price paid have not been examined to determine if they are typical of the market as required by the *Uniform Standards of Professional Appraisal Practice* or as discussed in Advisory Opinion 22 of the Appraisal Standards Board.

5. Richard T. Carson et al., "Contingent Valuation and Revealed Preference Methodologies: Comparing the Estimates for Quasi-Public Goods," *Land Economics* 72, no. 1 (February 1996): 80–99; see also Jerry A. Hausman, ed., *Contingent Valuation: A Critical Assessment*, Contributions to Economic Analysis, vol. 220 (New York: North-Holland, 1993).

6. Department of Commerce, Proposed Rules, *Natural Resource Damage Assessments Under the Oil Pollution Act of 1990*, Appendix I–"Report of the NOAA Panel on Contingent Valuation," Federal Register 58, no. 10 (January 15, 1993): 4601–4614; the Report is also available online at http://www.darp.noaa.gov/library/12_d.html.

7. Carson, Flores, and Meade.

8. Ibid.

9. The Panel's charter from NOAA placed them in the position of having to suggest a methodology for use in the evaluation of passive-use values for damage estimation purposes.

10. Hausman.

11. Robert Cameron Mitchell and Richard T. Carson, *Using Surveys to Value Public Goods: The Contingent Valuation Method* (Washington, DC: Resources for the Future, 1989).

was specifically charged with investigating whether the CV technique could provide reliable information about lost-existence or other passive-use values.

The NOAA Panel indicates that the CV methodology might be used for the purposes of estimating the range of possible "passive-use" losses in litigation, but with the cautionary note that the CV estimate should be viewed as the upper end of the range of loss and the estimate should be subject to interpretation by the court or trier of fact in an adversarial setting where there is significant additional information and other economic estimates. It was not to be used in any sense as the best estimate of loss or damage.

The Panel's report begins with a valuable discussion of damages and the CV methodology, its origins, and its potential applications.

The *Oil Pollution Act of 1990* authorizes payments for damages related to oil spills. The Report notes that some damages are relatively straightforward to measure through information revealed in market transactions. For example, if an oil discharge kills fish and thereby reduces the incomes of fishermen, their losses can reasonably be calculated by the reduced catch multiplied by the market price(s) of the fish, less any costs they would have incurred. If the oil discharge discourages tourist travel to an area, the lost incomes of those owning and/or operating tourist facilities can be computed using the difference in revenues between the affected period and a normal season. Losses of this type are described as lost "use values," because they are experienced by those who make active use of the resources adversely affected by the discharge. Other, more difficult-to-measure losses are also possible.

> [F]or at least the last twenty-five years, economists have recognized the possibility that individuals who make no active use of a particular beach, river, bay, or other such natural resource might, nevertheless, derive satisfaction from its mere existence, even if they never intend to make active use of it… This concept has come to be known as "existence value" and it is the major element of what are now referred to as "non-use" or "passive-use" values…[12]

The Panel observes that there is significant difficulty involved in determining passive-use damages.

> If passive-use values are to be included among the compensable losses…how will they be estimated? Unlike losses to commercial fishermen or recreational property owners, there are no direct market transactions that can be observed to provide information on which estimates can be based. Unlike losses to boaters, swimmers, recreational fishermen and others, there exist no indirect methods through which market data can provide at least some clues as to lost values. In other words, there appear to be neither obvious nor even subtle behavioral trails that can provide information about lost passive-use values.[15]

The Panel goes on to examine the possibility of using contingent valuation for the measurement of passive-use damages, which cannot be measured through market data. Initially, the Panel notes the following regarding the CV methodology:

> Some experts believe that there exists an approach that can provide useful information about the economic significance of the lost passive-use values individuals may suffer… Known as the contingent valuation (or CV) technique, this approach is based on the direct elicitation of these values from individuals through the use of carefully designed and administered sample surveys. Its appeal lies in its potential to inform damage assessment in an area (lost passive-use values) where there appear to be no behavioral trails to be followed.
>
> …
>
> The CV technique is the subject of great controversy. Its detractors argue that respondents give answers that are inconsistent with the tenets of rational choice, that these respondents do not understand what it is they are being asked to value (and, thus, that stated values reflect more than that which they are being asked to value), that respondents fail to take CV questions seriously because the results of the surveys are not binding, and raise other objections as well.[14]

As may be observed from the foregoing, the CV technique is far from a widely accepted method or one without serious potential flaws. It is clearly a technique intended for use in the absence of market data. Proponents of the use of the CV technique for real estate sometimes point to thin markets or to markets where there is little recorded activity as situations where the use of this methodology is appropriate. On occasion, proponents point to markets where they believe the participants are ill informed or not completely informed; they suggest that a CV survey offers a method for remedying this lack of knowledge on the part of participants.

There are two major problems with these arguments. First, all market survey techniques using a hypothetical market tend to yield an overestimate of the value or price of the good.[15]

Second, the market is the market. Attempting to place arbitrary conditions on what the market "should have known" is inappropriate and contrary to market valuation theory. It is for this reason that appraisers do not use hypothetical markets in the development of opinions of value. Instead they seek actual sales and confirmation of the circumstances of the sale price, allowing adjustments to be made to the actual sale price to remove those influences peculiar to the specific transaction. This provides a sound footing for the estimation of value rooted in a market where the discipline of the actual expenditure of funds has been exercised. As noted

---

12.  "Report of the NOAA Panel on Contingent Valuation," 58 Fed. Reg. 4602.

13.  Ibid.

14.  Ibid., 4603.

15.  In addition to the Report, see for example Gilbert A. Churchill Jr., *Marketing Research: Methodological Foundations*, 7th ed. (New York: The Dryden Press, 1999); and Philip Kotler, *Marketing Management: Analysis, Planning, and Control*, 5th ed. (Englewood Cliffs, NY: Prentice-Hall, 1984).

Copyrighted material licensed by Randall Bell on April 26, 2021

years ago by Patchin, there is always market data that can be employed in an analysis although it may be necessary to extend the search for data beyond the norm.[16]

## Panel Criticisms of the Contingent Valuation Method

The NOAA Panel identifies a number of specific criticisms of the CV methodology that it found particularly compelling. As previously indicated, many of these criticisms apply equally to hypothetical surveys in general.

The Panel first notes that with the CV technique, there is the impossibility of validating the results externally. It then goes on to report the results of research on contingent valuation.

> A few such experiments [comparing hypothetical to actual market behavior] have been attempted… Seip and Strand (1992), used CV to estimate willingness to pay for membership in a Norwegian organization devoted to environmental affairs, and compared this estimate with actual responses when a number of the same respondents were presented with an opportunity actually to contribute. The finding was that self-reported willingness to pay was significantly greater than "actual" willingness to pay. A recent study by Duffield and Patterson (1991) took as the environmental amenity in question the maintenance of stream flow in two Montana rivers. The rivers in question provided spawning grounds for two rare species of fish; passive-use was believed to be the main motivation for respondents. One of two parallel samples was asked about hypothetical willingness to contribute to the Montana Nature Conservancy which would then maintain stream flow; the other was offered an opportunity actually to contribute to the same organization for the same purpose. It was found that response rates and expressed willingness to contribute were significantly higher when the contribution was hypothetical than when "expressed willingness" meant an immediate cash contribution. On the other hand, the size of contributions, hypothetical in one case and actual in the other, was not much different as between those who said they would contribute and those who did so.[17]

Based on these and other studies, the Panel concludes "the CV technique is likely to overstate 'real' willingness to pay."[18] The Panel than enumerates other flaws in the CV technique.

> Of the other problems arising in CV studies, the following are of most concern to the Panel: (i) the contingent valuation method can produce results that appear to be inconsistent with assumptions of rational choice; (ii) responses to CV surveys sometimes seem implausibly large…(iv) it is difficult in CV surveys to provide adequate information to respondents about the policy or program for which values are being elicited and to be sure they have absorbed and accepted this information as the basis for their responses;…[19]

The Panel also expresses specific concerns regarding the way information is presented to survey participants.

> [E]ven when CV surveys provide detailed and accurate information about the effects of the program being valued, respondents must accept that information in making their (hypothetical) choices. If, instead, respondents rely on a set of heuristics ("these environmental accidents are seldom as bad as we're led to believe," or "authorities almost always put too good a face on these things"), in effect they will be answering a different question from that being asked; thus, the resulting values that are elicited will not reliably measure willingness to pay…[20]

The Panel notes that the survey responses may be subject to what is called the "warm glow" effect.

> Some critics of the CV technique (e.g., Diamond and Hausman (1992)) have observed that the distribution of responses to open-ended questions about willingness to pay often is characterized by a significant proportion of "zeros"–people who would pay nothing for the program– and also a number of sizable reports. This bi-modal distribution also characterizes individual giving: Most of us give nothing to most charities, but give non-trivial amounts to the ones we do support (at least $10 or $20, say). This has led these critics to conclude that individuals' responses to CV questions serve the same function as charitable contributions– not only to support the organization in question, but also to feel the "warm glow" that attends donating to worthy causes (see Andreoni (1989)). If this is so, CV responses should not be taken as reliable estimates of true willingness to pay, but rather as indicative of approval for the environmental program in question.[21]

## Key Issues in the Design of Contingent Valuation Instruments

The wording and structure of survey instruments are of particular importance if reliable results are to be obtained. The Panel strongly emphasizes this point throughout its report.

> There are many examples in the survey literature of how changes in wording or context will affect results based on questions about subjective phenomena (see Schuman and Presser (1981)). For example, in national surveys close to a quarter of the population will choose the "don't know" response to most attitude questions if it is explicitly offered; yet these same people will select a substantive alternative if "don't know" is not specifically provided, even though accepted when asserted spontaneously. More puzzlingly, a question about "forbidding" a particular action tends to elicit less agreement than a question about "not allowing" the same action, although the two questions are logically equivalent. Beyond these examples, most attitude objects are simply too complex to be summarized by a single survey question…[22]

---

16.  Peter J. Patchin, "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994): 402–409.

17.  "Report of the NOAA Panel on Contingent Valuation," 58 Fed. Reg. 4603.

18.  Ibid., 4604.

19.  Ibid.

20.  Ibid., 4605.

21.  Ibid.

22.  Ibid., 4606.

The Panel observes that contingent valuation surveys are subject to the same problems as other types of surveys.

> Contingent valuation studies seek descriptive information, yet call for a response similar to those elicited by questions about subjective phenomena. Thus they risk many of the same response effects and other wording difficulties that turn up regularly in attitude surveys. Minimizing these effects presents a considerable challenge to anyone wishing to elicit reliable CV estimates.
>
> …
>
> The Panel is of the opinion that open-ended CV questions– e.g., "What is the smallest sum that would compensate you for environmental damage X?" or, "What is the largest amount you would be willing to pay to avoid (or repair) environmental damage X?"– are unlikely to provide the most reliable valuations.
>
> …
>
> There is no strategic reason for the respondent to do other than answer truthfully, although a tendency to overestimate often appears even in connection with surveys concerning routine market goods.[23]

Most significantly for CV surveys attempting to quantify damages for detrimental conditions, the Panel concludes the following:

> CV studies almost always seek to measure willingness to pay to avoid a particular incident rather than compensation that would be required for damage that has already occurred. This is because respondents are more likely to exaggerate the compensation they would require than their willingness to pay, and because the latter is expected to be less than the former and so is conservative.[24]

### Survey Guidelines

The Report sets out the guidelines for a reasonably reliable CV survey. These guidelines may result in a higher cost for proper survey design, testing, administration and analysis, but in the opinion of the Panel there is simply no means of avoiding these costs except at the sacrifice of survey reliability. Although conformance with the guidelines is critical to the reliability of the CV methodology, they are frequently not observed by researchers using CV or hypothetical market surveys for real estate. In the Report, the Panel indicates that it is trying "to lay down a fairly complete set of guidelines compliance with which would define an ideal CV survey." The Panel states, "A CV survey does not have to meet each of these guidelines fully in order to qualify as a source of reliable information to a damage assessment process. Many departures from the guidelines or even a single serious deviation would, however, suggest unreliability *prima facie*."[25] The Report provides the following general guidelines for surveys:

> **Sample Type and Size:** Probability sampling is essential for a survey used for damage assessment.

The choice of sample specific design and size is a difficult, technical question that requires the guidance of a professional sampling statistician.

> **Minimize Nonresponses:** High nonresponse rates would make the survey results unreliable.
>
> **Personal Interview:** The Panel believes it unlikely that reliable estimates of values could be elicited with mail surveys. Face-to-face interviews are usually preferable, although telephone interviews have some advantages in terms of cost and centralized supervision.
>
> **Pretesting for Interviewer Effects:** An important respect in which CV surveys differ from actual referenda is the presence of an interviewer (except in the case of mail surveys). It is possible that interviewers contribute to "social desirability" bias, since preserving the environment is widely viewed as something positive. In order to test this possibility, major CV studies should incorporate experiments that assess interviewer effects.
>
> **Reporting:** Every report of a CV study should make clear the definition of the population sampled, the sampling frame used, the sample size, the overall sample nonresponse rate and its components (e.g., refusals), and item non-response on all important questions. The report should also reproduce the exact wording and sequence of the questionnaire and of other communications to respondents (e.g., advance letters). All data from the study should be archived and made available to interested parties (see Carson et al. 1992).
>
> **Careful Pretesting of a CV Questionnaire:** Respondents in a CV survey are ordinarily presented with a good deal of new and often technical information, well beyond what is typical in most surveys. This requires very careful pilot work and pretesting, plus evidence from the final survey that respondents understood and accepted the main description and questioning reasonably well.[26]

The Panel goes on to offer specific guidelines for elicitation surveys. It asserts that these guidelines "are met by the best CV surveys and need to be present in order to assure reliability and usefulness of the information that is obtained." The specific guidelines listed are as follows:

> **Conservative Design:** Generally, when aspects of the survey design and the analysis of the responses are ambiguous, the option that tends to underestimate willingness to pay is preferred. A conservative design increases the reliability of the estimate by eliminating extreme responses that can enlarge estimated values wildly and implausibly.
>
> **Elicitation Format:** The willingness to pay format should be used instead of the compensation required because the former is the conservative choice.
>
> **Referendum Format:** The valuation question should be posed as a vote on a referendum.
>
> **Accurate Description of the Program or Policy:** Adequate information must be provided to respondents about the environmental program that is

---

23.   Ibid.

24.   Ibid., 4607.

25.   Ibid., 4608.

26.   Ibid.

Copyrighted material licensed by Randall Bell on April 26, 2021

offered. It must be defined in a way that is relevant to damage assessment.

**"No-Answer" Option:** A "no-answer" option should be explicitly allowed in addition to the "yes" and "no" vote options on the main valuation (referendum) question. Respondents who choose the "no-answer" option should be asked nondirectively to explain their choice. Answers should be carefully coded to show the types of responses, for example: (i) rough indifference between a yes and a no vote; (ii) inability to make a decision without more time or more information; (iii) preference for some other mechanism for making this decision; and (iv) bored by this survey and anxious to end it as quickly as possible.

**Yes/No Follow-ups:** Yes and no responses should be followed up by the open-ended question: "Why did you vote yes/no?" Answers should be carefully coded to show the types of responses, for example: (i) It is (or isn't) worth it; (ii) Don't know; or (iii) The oil companies should pay.

**Cross-Tabulations:** The survey should include a variety of other questions that help to interpret the responses to the primary valuation question. The final report should include summaries of willingness to pay broken down by these categories. Among the items that would be helpful in interpreting the responses are:

- Income
- Prior Knowledge of the Site
- Prior Interest in the Site (Visitation Rates)
- Attitudes Toward the Environment
- Attitudes Toward Big Business
- Distance to the Site
- Understanding of the Task
- Belief in the Scenarios
- Ability/Willingness to Perform the Task

**Checks on Understanding and Acceptance:** The above guidelines must be satisfied without making the instrument so complex that it poses tasks that are beyond the ability or interest level of many participants.[27]

The Panel concludes that CV studies can produce estimates reliable enough to be the starting point of a judicial process of damage assessment, including lost passive-use values. However, to be acceptable for this purpose, such studies should follow the guidelines described. The Panel indicates "the phrase 'be the starting point' is intended to emphasize that the Panel does not suggest that CV estimates can be taken as automatically defining the range of compensable damages within narrow limits." The Panel closes with the following cautions:

The Panel is persuaded that hypothetical markets tend to overstate willingness to pay for private as well as public goods. The same bias must be expected to occur in CV studies. To the extent that the design of CV instruments makes conservative choices when alternatives are available…this intrinsic bias may be offset or even over-corrected. All surveys of attitudes or intentions are bound to exhibit sensitivity of response to the framing of questions and the order in which they are asked. No automatic or mechanical calibration of responses seems to be possible.

The judicial process must in each case come to a conclusion about the degree to which respondents have been induced to consider alternative uses of funds and take the proposed payment vehicle seriously. Defendants will argue that closer attention to substitute commodities would have yielded lower valuations. Trustees will argue that they have already leaned over backwards to ensure conservative responses. Judges and juries must decide as they do in other damage cases. The Panel's conclusion is that a well-conducted CV study provides an adequately reliable benchmark to begin such arguments. It contains information that judges and juries will wish to use, in combination with other evidence, including the testimony of expert witnesses.[28]

## Contingent Valuation in Real Estate Research

The contingent valuation technique is sometimes used in real estate research to attempt to measure the price effects of a detrimental condition on property values. To investigate the extent that the Panel's guidelines are being followed in real estate CV studies, a recent contingent valuation survey was examined. This survey concerned the amount by which a hypothetical buyer would reduce a purchase price for a residential property because the property was adjacent to a leaking underground storage tank at a service station. The objective of the CV research was to measure the impact of the leak. The data had been made available in several litigation matters.[29]

The examination of the research found several serious concerns that had been mentioned in the Panel's report. The real estate CV survey had the following fundamental design flaws:

1. A real estate sale is a transaction between two parties, but no attempt had been made to examine the position of the seller in the hypothesized situation. That the seller would willingly accept the discounts demanded is highly problematic and would likely have a strong influence on the outcome of any negotiated transaction.

2. The survey question asked was essentially: How much less would you pay for the home? The problem here is that this is a willingness to accept (WTA), not a willingness to pay (WTP) question as required by the Panel protocols. The WTA responses have been found to nearly always exceed WTP responses.

3. There was not an appropriate comparative baseline. How much would the discount be for a residential property next to any commercial use property—McDonald's, nonleaking service station, or

---

27.  Ibid., 4608–4609.

28.  Ibid., 4610.

29.  Author's files.

other commercial use? By implication, the survey comparison is to a property having no condition that might detract from its value. Absent a baseline of a comparable property adjacent to a service station without the leak, the incremental difference for a residential property next to a leaking service station cannot be determined, if it exists at all.

In addition to fundamental design flaws, there were a number of other violations of the guidelines set forth in the Report in the design, pretesting, and execution of the survey, including the following:

1. The wording of the survey instrument had not been pretested for bias and clear recipient understanding of the questions being asked or the scenarios presented.
2. The administration of the survey was not examined for interviewer bias.
3. The "no answer" option was not provided to the respondents with appropriate follow-up questioning.
4. There were no cross tabulations of issues such as prior knowledge of a similar site, attitudes toward the environment, attitudes toward big business, and the like.

According to the NOAA Panel's report, there is no avoidance of the fundamental survey guidelines if a survey is to produce reliable results, a point also emphasized in the *Reference Manual on Scientific Evidence*.[30] As stated by the Panel, "Many departures from the guidelines or even a single serious deviation would…suggest unreliability *prima facie*."[31] Therefore, in the study examined here, as well as other similar studies, major violations of the guidelines indicate that the results are not reliable measures of the price effects of the detrimental condition studied.

## Summary and Conclusions

Despite the recent publication of articles in peer-reviewed real estate journals, the application of the CV technique to real estate or real estate damage quantification is unlikely to be reliable or quantitatively meaningful. The CV technique was neither designed for, nor is it applicable to, the valuation of goods for which there is a market.

The argument has been advanced that the CV methodology "holds all else constant" with respect to conditions not explicitly included in the hypothetical scenario. This is not the case. A great part of the Report guidelines for the conduct of a reliable hypothetical survey is concerned with how the respondent understands the scenario presented and with ensuring that the respondent does not view the survey questions in a manner inappropriate to the objective of the survey. This is because the imagination of the respondent cannot be controlled. Respondents could easily imagine situations familiar to them that strongly influence their responses that have not been anticipated or identified as a part of the researcher's investigative efforts. This is in some way the fatal flaw of all hypothetical survey research– the inability to control the perception of the respondent that governs the answers provided.

There is no reason to believe that the results of CV surveys, as applied to real estate valuation in the peer-reviewed literature or in litigation, have any quantitative value due to serious–indeed fatal–flaws in the execution of an inapplicable methodology.

The fundamental point is one long recognized by the valuation community: There is no substitute for a careful examination of actual sales information. There is a very large and important difference between an opinion of what someone might do under hypothetical circumstances and an examination of actual transactions.

---

30. See Shari Seidman Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, 2nd ed., 229–276 (Washington, DC: Federal Judicial Center, 2000).

31. "Report of the NOAA Panel on Contingent Valuation," 58 Fed. Reg. 4608.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Additional Reading

Andreoni, James. "Giving with Impure Altruism: Applications to Charity and Ricardian Equivalence." *Journal of Political Economy* 97, no. 6 (December 1989): 1447–1458.

Bishop, Richard C., and Thomas A. Heberlein. "Measuring Values of Extra-market Goods: Are Indirect Measures Biased?" *American Journal of Agricultural Economics* 61, no. 5 (1979): 926–930.

Carson, Richard T., Robert Cameron Mitchell, W. Michael Hanemann, Raymond J. Kopp, Stanley Presser, and Paul A. Ruud. "A Contingent Valuation Study of Lost Passive-Use Values Resulting from the Exxon Valdez Oil Spill." A report for the Attorney General of the State of Alaska, November 19, 1992.

Cummings, Ronald G., and Glenn W. Harrison. "Homegrown Values and Hypothetical Surveys: Is the Dichotomous Choice Approach Incentive Compatible." Department of Economics, University of New Mexico, submitted to Office of General Counsel, National Oceanic and Atmospheric Administration, 1992.

Desvousges, William H., F. Reed Johnson, Richard W. Dunford, Kevin J. Boyle, Sara P. Hudson, and K. Nicole Wilson. "Measuring Natural Resource Damages with Contingent Valuation: Tests of Validity and Reliability." Paper presented at the Cambridge Economics symposium, "Contingent Valuation: A Critical Assessment," Washington, DC, April 1992.

Diamond, P. A., and J. A. Hausman. "On Contingent Valuation Measurement of Nonuse Values." Paper presented at the Cambridge Economics symposium, "Contingent Valuation: A Critical Assessment," Washington, DC, April 1992.

Diamond, P. A., J. A. Hausman, G. K. Leonard, and M. A. Denning. "Does Contingent Valuation Measure Preferences? Experimental Evidence." Paper presented at the Cambridge Economics symposium, Contingent Valuation: A Critical Assessment. Washington, DC, April 1992.

Dickie, Mark, Ann Fisher, and Shelby Gerking. "Market Transactions and Hypothetical Demand Data: A Comparative Study." *Journal of American Statistical Association* 82 (March 1987): 69–75.

Duffield, John W., and David A. Patterson. "Field Testing Existence Values: An Instream Flow Trust Fund for Montana Rivers." Paper presented at the annual meeting of the American Economic Association, New Orleans, January 1991.

Kahneman, Daniel. "Comments." In *Valuing Environmental Goods*, ed. Ronald G. Cummings, David S. Brookshire, and William D. Schulze. Totowa, New Jersey: Rowman and Allanheld, 1986.

Kahneman, Daniel, and Jack L. Knetsch. "Valuing Public Goods: The Purchase of Moral Satisfaction." 22, no. 1 *Journal of Environmental Economics and Management* (January 1992): 57–70.

Kemp, M. A., and C. Maxwell. "Exploring a Budget Context for Contingent Valuation Estimates." Paper presented at the Cambridge Economics symposium, "Contingent Valuation: A Critical Assessment," Washington, DC, April 1992.

Magleby, David B. Direct Legislation: *Voting on Ballot Propositions in the United States*. Baltimore: Johns Hopkins Press, 1984.

Rowe, Robert D., W. Douglass Shaw, and William Shulze. "Nestucca Oil Spill." Chapter 20 in *Natural Resource Damages: Law and Economics*, ed. Kevin M. Ward and John W. Duffield. New York: John Wiley & Sons, 1992.

Schuman, Howard, and Stanley Presser. *Questions and Answers in Attitude Surveys: Experiments on Question Form Working, and Context*. New York: Academic Press, 1981.

Seip, Kalle, and Jon Strand. *Willingness to Pay for Environmental Goods in Norway: A Contingent Valuation Study with Real Payment*. Paper prepared for the SAF Center for Applied Research, Department of Economics, University of Oslo, 1992.

*State of Ohio v. Department of the Interior*, 880 F.2d 432 (DC Cir. 1989).

## 6.6 Comments on "Contingent Valuation: Not an Appropriate Valuation Tool"

*by Kara Fishman, MAI, PhD, Robert A. Simons, PhD, Grant W. Austin, MAI, and Albert R. Wilson*

These Letters to the Editor originally appeared in the Summer 2006 issue of *The Appraisal Journal*.

I agree with the argument made in "Contingent Valuation: Not an Appropriate Valuation Tool" by Albert R. Wilson (Winter 2006) on the misuse of contingent valuation to value detrimental conditions in real estate. There are a few points the author touches on that could use some amplification.

First, the argument can be made that willingness to pay (WTP) for X represents the lower-bound value and willingness to accept (WTA) payment to give up X represents the upper-bound value. In real estate markets, the analogy could be the intersection of the bid and offer curves, that is, what a buyer is willing to offer and what a seller is willing to sell for. In the market for public goods, these values are typically weighted against the costs (to prevent X or to preserve X), and if the total WTP exceeds the costs, the policy is implemented to affect the desired outcome. In the market for real estate, however, it is only when the bid and offer curves intersect that the sale is consummated. It is the result of the intersection of these bid and ask prices upon which hedonic price valuation is affected, i.e., the implicit value of property characteristics is estimated.

Second, the results of a contingent valuation survey are not easily transferable. Real estate appraisers define market areas for the property they are valuing; it is more difficult to define market areas for public goods. The expression of value revealed in a sales transaction reflects the most profitable use of a property concluded by a highest and best use analysis. There is a pecuniary gain from the transaction. Substitutes include investments in other properties or other investment vehicles (stocks, bonds, collectibles). By contrast, there are no substitutes for public goods–there are trade-offs, supposedly limited by one's disposable income. If you pay $20 to preserve 10 polar bears, you have $20 that cannot be spent, for instance, to maintain the habitat of the least tern.

Results are also not easily transferred because respondents to contingent valuation questions are individuals, and most of the biases and experiences they have in dealing with environmental policy implementation, hazard reduction, etc. are influenced by local land use issues and policies and decisions by local planners, politicians, and activists. Their decision is not so much a pecuniary gain as it is the preservation of a nonmarket good for which there is no substitute. An appraiser would not define the potential buyer pool for regional malls to include local investors in small, multifamily properties or neighborhood strip malls. There is a national market for these malls, comprised almost exclusively of institutional investors that are governed by corporate policies and responsibilities to shareholders, not a concern for the well-being of my neighbor's kid. I might value implementation of policies to prevent oil spills in my neighborhood or my best friend's neighborhood more than the implementation of that same policy in, say, the San Francisco Bay area, 1,000 miles away.

Third, from a buyer's stance (i.e., the willingness-to-pay side of the transaction, the bid stance) there are close substitutes for real estate impacted by detrimental conditions. I can buy a home in another neighborhood. To attempt to validate the seller's offer side of the equation (i.e., the willingness to accept), an analyst would have to compare the results of a contingent valuation survey with a hedonic valuation analysis. If you have enough information to do a hedonic valuation analysis, however, there is no need to undertake a hypothetical survey.

The discussion of the use of CV surveys reminds me of the debate concerning public use value. The lack of a market, comprised of more than one buyer and one seller, must be evident in both cases.

Mr. Wilson is commended for addressing this intersection of environmental and real estate economics.

*Kara Fishman, MAI, PhD*
*Norwich, Connecticut*

This letter concerns the article "Contingent Valuation: Not an Appropriate Valuation Tool" (Winter 2006), which discusses this type of market survey application in environmental damages cases. I believe the article is confused, misleading, and severely flawed. But more importantly, the article gives the wrong impression about use of survey research and contingent valuation (CV), particularly in the context of valuing diminution in property values due to environmental contamination. My concerns pertain to the use of CV as a method of measuring a change in property value stemming from negative as well as positive externalities. I am not advocating use of CV to be added to or replace one of the three traditional approaches to total/overall value, just its application to measuring a diminution in property value.

In this letter, I will address the poor fit between the public-property approach of the National Oceanic and Atmospheric Administration (NOAA) blue-ribbon panel and the private real estate markets in the areas of terminology and application; some specific inaccuracies in the author's article; and the potential systematic relationship between

Copyrighted material licensed by Randall Bell on April 26, 2021

actual sales and CV results. As a starting point, I begin with some background issues on property contamination.

## Background

Environmental contamination decreases property values. This is intuitively obvious. If a buyer were asked to consider two identical houses, one contaminated, and one not, the uncontaminated one would be selected virtually almost every time. So the question is not if contamination affects property values, it is by how much. That is the question all reasonable people agree upon as a starting point.

Actual, arm's-length sales with full disclosure of contamination in sufficient numbers do make excellent comparables. But in most cases, this data is hard to come by. Contamination makes properties harder to sell and reduces the number of actual sales, and those properties that do sell do not always have full disclosure and may have some other desirable features that some properties do not possess. Therefore, the contamination problem can make it very hard or impossible to collect data. This ironically works to the advantage of the polluter, because they have disturbed the market to the point where losses cannot be measured, yet diminution in value has still occurred. Further, disclosure of a contaminative event is not common or universally applied, even in states where it is required by law.

If data is unavailable, the analyst still has to make a decision about the diminution in value. This is where properly applied, careful (preferably peer-reviewed) market research such as CV can be very helpful. Sometimes it may be the only reliable data available. If properly conducted with a random-sampling approach, the CV survey approach has a known error rate. In conjunction with actual sales data (in various quantity and quality) it can also be a primary tool for determining property value losses.[1]

## NOAA Blue-Ribbon Panel—The Public/Private Controversy

The "Contingent Valuation" article discusses the NOAA study. The blue-ribbon panel's report was prepared in the early 1990s in the wake of the *Exxon Valdez* disaster (a case that has still not been fully resolved). That case involved not only damages to private property, but also to public parks and other public lands, including pristine areas. Because the damages to property were in the billions of dollars, the research budgets for the studies in that case were huge and well in excess of the damages or even baseline property values in a typical contamination case. By these standards, no economically feasible research under normal fieldwork conditions

could ever be good enough. However, research costs are not the only factor. The NOAA panel was asked to consider a fundamentally different problem: public goods versus private goods.

The *Exxon Valdez* study focused primarily on public goods, where use value (similar to use and enjoyment) and non-use value (value by persons who would not use the property, but like having it available to others, or like that it exists) are intertwined. Thus, public goods are fundamentally different from private real estate. Also, public goods cannot be easily priced, so all responses are collected, then averaged to provide a result, which is similar to a shadow price or tax price. This retains low or zero bids in the mix, and provides relatively larger losses. Private real estate is much more straightforward: low bids get ignored by sellers, and the marginal bidders at or near the top of the market (closest to full value) set the market price. The marginal losses are typically smaller than average losses. Removing these lowball bids also helps with one of the main validity threats to contingent valuation, that of hypothetical question bias, which is substantially reduced by deleting these low bids that are unlikely to affect the market clearing price.

Further, CV as applied to real estate usually analyzes only the responses with dollar bids, not the zero bids, which reflect that the respondent does not want to buy property. This is not treated as a nonresponse. It is an indicator that the property is unattractive and that market demand is reduced. The author has apparently confused nonresponses of this type (which gauge the reduction in market demand) with survey nonresponse rates, which is a different problem.

The study by Carson, Flores, and Meade[2] cited by the author reports primarily on the average results, which are appropriate to the willingness to pay for public goods, where there is no market-clearing price, and where non-use value is a factor. This does not emulate private real estate. Further, Carson et al.[3] compared over 600 contingent valuation results (without a real estate focus) with revealed preferences. The correlation coefficients were between 0.60 and 0.98, and CV results were found to be smaller, rather than larger, than revealed outcomes. Thus, the conclusion that CV is likely to overstate losses uses the averaging method, not marginal bidder theory. This is an oversimplification and is not an "apples and apples" comparison. The author further quotes Carson et al. that public goods and private are different, so why should we assume the outdated and fundamentally different NOAA approach is appropriately applied to private real estate? We do not, and the dozen or so articles beginning with Mundy and McLean in 1998[4] begin a new phase of use of con-

1. For a more complete analysis of these factors, see chapter 3 in Robert A. Simons, *When Bad Things Happen to Good Property* (Washington, DC: Environmental Law Institute, 2006).

2. Richard T. Carson, Nicholas E. Flores, and Norman F. Meade, "Contingent Valuation: Controversies and Evidence," *Environmental and Resource Economics* 19, no. 2 (June 2001): 173–210.

3. Richard T. Carson et al., "Contingent Valuation and Revealed Preference Methodologies: Comparing the Estimates of Quasi-Public Goods," *Land Economics* 72, no. 1 (February 1996): 88–99.

4. Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297.

tingent valuation and other survey techniques and their application to property contamination cases.

## The Misunderstanding of WTP and WTA

In the current article, the author confuses several important terms. Part of the confusion results from trying to apply public real estate terminology in a private sector context. Willingness to pay (WTP), and willingness to accept compensation (WTA) are public goods terms. The private market-clearing price (or bid price) is more similar to willingness to pay, but they are different concepts. A WTA indicates that the respondent has a stake in the case, and is willing to accept compensation for that problem to go away; a WTP does not. The respondents in the cited articles and others using the same methodology are not involved in litigation, and the real estate CV studies cited by the author surveyed potential buyers, none of whom were involved in litigation, and nearly all of whom resided outside the county where the case was focused.[5] Thus the closest concept here is WTP, not WTA. For example, the author's statement in point 1 on page 59 that "… the seller would willingly accept the discounts" is misleading. A survey of buyers is not a WTA context. The author is confusing the WTA as a term of art, by masking it with a common English utilization.

## Questionable Statements

The author cites "Authors files" as a source (footnote 29). The content of these files cannot be verified, and they may contain privileged or second-hand information. Thus, any conclusions drawn from this are unsubstantiated. Further, the research question described in point 2 on page 59, "How much less would you pay for the home?" is not the exact language used in research on this topic and published in *Appraisal Journal* articles cited in the article and mentioned in footnote 2 of this letter. The actual question in that research was in two parts: "How likely is it that you would make any offer on this home?" and then "What is the most you would be willing to pay for the home?" Combining these two questions as the author has done misrepresents the research work that has been done in this area.

## Systematic Relationship Between Actual Sales and CV

I now address an important issue that was raised by this article: a potential systematic relationship between sales data and CV data.

Actual sales data in the typical case probably understates the true effect of contamination on property values, compared to survey or CV results that would appear to show a higher effect. Because actual sales buyers do not always have complete information, this would elevate the sale prices, showing a smaller loss. If CV is conducted just on the buyers' side of the market, and only the initial buyers' bids are presented, this could tend to overstate the losses. In a hot market, the seller would likely come back with a counteroffer, and in these situations the CV may overstate losses. However, in a buyers' market or a thin market, the buyer rules, and the CV result may be expected to more closely emulate the outcome or actual losses.

There is some evidence to support this concept of a measurable spread between CV (stated preferences) and regression/actual sales (revealed outcomes). The spread is about 4%–7% points. We are not sure which data point is the true diminution figure, just that there is a spread between actual sales and survey data. For example, we have several data points on the effect of leaking underground storage tanks (LUSTs) on residential property values in Cuyahoga County, Ohio. These losses were shown to be 14%–17%.[6] A subsequent CV survey showed a reduction in residential property values affected by a LUST (using the top quarter of market bids) to be 21%. This yields a 4%–7% spread between revealed and stated preferences in very similar situations.[7]

More recently, Simons and Saginor[8] conducted a meta-analysis of the effect of contamination on property value. The models looked at factors affecting the percentage loss on residential property from various types of environmental contamination. The models also included study techniques, including regression analysis (actual sales) as a baseline. Surveys (most were CV, but not all) and case study techniques were also modeled as independent variables. Holding all other factors constant, survey techniques showed about a 6% greater loss than regression analysis did.[9] This also falls into the range described above. Note that we cannot tell which figure is correct, because regression may not have full information, so it may understate losses, and CV may overstate them, but that there is a spread.

One caveat: in some cases CV surveys may be more accurate than actual sales, or may adequately stand alone as a research technique. This would depend on how the survey questions were asked. Results from a CV survey may also underestimate overall losses because financing may have been assumed to be avail-

---

5.  Robert A. Simons and Ron Throupe, "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values," *The Appraisal Journal* (Spring 2005): 156–166; Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contaminated Residential Property Buyers Using Contingent Valuation Surveys," *Journal of Real Estate Research* 27, no. 2 (April–June 2005): 193–220; and Robert A. Simons, "Estimating Proximate Property Damage From PCBs in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal* (October 2002): 388–400.

6.  Robert A. Simons, William Bowen, and Arthur Sementelli, "The Effect of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio," *Journal of Real Estate Research* 14, no. 1/2 (1997): 29–42; and Robert A. Simons, William Bowen, and Arthur Sementelli, "The Price and Liquidity Effects of UST leaks from Gas Stations on Adjacent Contaminated Property Values," *The Appraisal Journal* (April 1999): 186–194.

7.  Simons and Winson-Geideman.

8.  Robert A. Simons and Jesse D. Saginor, "A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Property Values" *Journal of Real Estate Research* 28, no. 1 (2006): 71–104.

9.  Ibid., Exhibits 2 and 3.

Copyrighted material licensed by Randall Bell on April 26, 2021

able, or other facts may have changed. Some losses may be larger than CV results would indicate.

To summarize, the article is confused and misleading, and gives the reader an inaccurate version about using contingent valuation for analyzing diminution of property values due to environmental contamination. The basic premise of the article—that the outdated and public goods-oriented NOAA blue-ribbon panel is the guide to using CV techniques today in a private real estate market context—is not plausible. There appears to be a need to further explore the potential systematic relationship between actual sales and CV results.

<em>Robert A. Simons, PhD<br>Cleveland State University</em>

In my opinion, all thought moves our profession forward. If it were not for the article "Contingent Valuation: Not an Appropriate Valuation Tool," by Albert R. Wilson (Winter 2006), and subsequent rebuttal Letters to the Editor such as this, readers of *The Appraisal Journal* might really believe that contingent valuation (CV) and other survey instruments are inappropriate valuation tools.

Appraisal theory and methods have never been static. Current appraisal theory and practice has been shaped by individual contributors to the profession such as Ely, Hurd, Fisher, Babcock, Hoyt, Weimer, Elwood, Ratcliff, Wendt, Kinnard, Akerson, Fisher, and Colwell. The development of university real estate programs, professional organizations, and countless other contributors to the appraisal profession continue the "technical refinements, educational leadership, synthesis, and examination of specific influences on property value."[1] It appears that Mr. Wilson has fallen into the category of appraisers described by Miller and Markosyan as those who believe that "current practices are sufficient and that we can simply become more experienced at doing the same thing we did last month and last year."[2] It is unfortunate that there is reluctance on the part of some appraisers to learn and to apply advanced methodologies. Their reasons may be a combination of litigation concerns, lack of appraisal courses on the topic(s), and the time lag in disseminating newly accepted knowledge to members of the profession.

I offer a number of specific comments on the "Contingent Valuation" article.

First, in applying the NOAA Panel's survey guidelines, the article cites a number of fundamental design flaws in a CV survey where the "results are not a reliable measure of the price effects of the detrimental condition studied." The converse of this statement is that when there are no design flaws, the result is a reliable measure of the price effects of a detrimental condition. Applying this logic results in a conclusion that is contrary to the article's thesis that contingent valuation is not an appropriate valuation tool.

Further, one way to present what appears, at least to the casual observer, to be a convincing position, is to sweepingly dismiss, without discussion or analysis, the most recent works of academics and practitioners. Mr. Wilson states, "Despite the recent publication of articles in peer-reviewed real estate journals, the application of the CV technique is unlikely to be reliable or quantitatively meaningful." This approach lacks academic and professional rigor and therefore credibility.

The critique of market surveys to quantify real property values is grounded in the findings of the National Oceanic and Atmospheric (NOAA) Panel in 1993 and there is a presumption that these findings "are valid in the context of today's knowledge and information, despite the passage of a dozen years." It is generally agreed that the NOAA review of CV methodology presented many valid guidelines. However, to assume that theory and methods have been frozen in time for the past thirteen years ignores the substantial work of academics and practitioners since the panel's report.[3]

The article states that surveys "may hold qualitative interest, but it cannot provide meaningful quantitative information." Again, this statement ignores the recent published works and is without factual support. This author agrees that revealed preferences (i.e., sale prices are considered indicators of market preferences that are revealed in the transactions) are typically superior to stated preferences (preferences or values elicited through survey research). When stated and revealed data indicate divergent indications, it has been suggested that preference should be given to the transactional data,[4] however, it is incumbent on the analyst to go further to understand the reason(s) for the inconsistency (e.g., data or survey flaws). In well-designed studies, current research indicates respondents' stated preferences are consistent with their actual (i.e., transactional) behavior.

---

1. Norman G. Miller and Sergy Markosyan, "The Academic Roots and Evolution of Real Estate Appraisal," *The Appraisal Journal* (April 2003): 172–184, 181.

2. Ibid., 172.

3. For example, see Dietrich Earnhart, "Using Contingent-Pricing Analysis to Value Open Space and Its Duration at Residential Locations," *Land Economics* (February 2006): 17–35; James Flynn et al., "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation," *The Appraisal Journal* (Winter 2004): 35–44; Sandy Bond and Ko-Kang Wang, "The Impact of Cell Phone Towers on House Prices in Residential Neighborhoods," *The Appraisal Journal* (Summer 2005): 256–278; Richard C. Ready et. al., "Measuring Amenity Benefits from Farmland: Hedonic Pricing vs. Contingent Valuation." *Growth and Change* 28, no. 4 (Fall 1997): 438–458; Robert A. Simons and Ron Throupe, "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values," *The Appraisal Journal* (Spring 2005): 156–166; David C. McLean and Bill Mundy, "The Addition of Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property," *Journal of Real Estate Practice and Education* 1, no. 1 (1998): 1–19; Marcus T. Allen and Grant W. Austin, "The Role of Formal Survey Research in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–403. The Lum Library reported that as of March 2006, there were approximately 630 articles on contingent valuation and conjoint analysis papers published from 1993 to 2006.

4. For example, see Thomas O. Jackson, "Evaluating Environmental Stigma with Multiple Regression Analysis," *The Appraisal Journal* (Fall 2005): 363–369; Allen and Austin, 395.

The article fails to address recent and important contributions to the literature in contingent-pricing analysis. This method blends together the two stated-preference methods of contingent valuation and conjoint analysis. Where CV respondents state their maximum (open-ended) willingness to pay (WTP) for a given environmental good/quality or non-market goods, contingent-pricing analysis examines the purchase of commonly marketed goods, such as a house. Contingent-pricing analysis is less prone to information and hypothetical biases, and empirical analysis indicates that respondent's contingent behavior (i.e., stated prices) is consistent with their actual behavior in the housing market.

The article also fails to address research that combines the revealed-preference (using the hedonic analysis) method and the newer stated-preference method (choice-based conjoint analysis).[5] Combining the two data sets has been empirically shown to improve the value estimates. It is likely that this new method will be applied in more and more situations where revealed preferences (i.e., transaction) data is limited.

The article states that the fatal flaw of survey research is "the inability to control the perception of the respondent that governs the answers provided." If this is a fatal flaw of survey research, then it is also a fatal flaw in every appraiser's effort to predict value. As Gordon states, "Most appraisers have now come to realize that all value estimates are economic forecasts that attempt to simulate the thinking of knowledgeable market participants."[6] Lacking an appraiser's understanding and interpretation of current market anticipations (i.e., market participants' perceptions), even the best transactional data does not lead to a supportable value conclusion. In both formal survey research and transactional data analysis, the appraiser should understand the preferences, anticipations, beliefs, and attitudes of market participants, and it is with formal surveys that these factors can be empirically measured.

There is likely no disagreement with Mr. Wilson's statement that "there is no substitute for a careful examination of actual sales information."[7] However, this ignores valuation problems with a lack of or limited transactional data or situations where the hedonic analysis suffers from weaknesses. It is in these cases where formal survey methods offer an additional valuation tool. Examples include use of a survey to determine the causal link between hedonic analysis derived value losses and the evaluations of market participants; use of a survey to determine how buyers/sellers might or should behave in a transactional setting; and combining the stated and revealed preference (e.g., hedonic-price model) methods to enhance the strengths and diminish the drawbacks of each individual method.

An effective attack on the use of formal survey research in real property valuation would be to undermine its links to economic and traditional valuation theory.[8] This was not attempted in the article.

Therefore, instead of the critique being based upon well-grounded theory and empirical study, I observe a lack of research, an incomplete understanding of current theory and methods, and a total disregard for thirteen years of academic and professional contributions to survey research. When properly structured, administered, and analyzed, formal survey methods can be invaluable tools for understanding the thoughts of real estate market participants in the absence of, and in addition to, transactional data. Formal survey methods are consistent with appraisal theory, are firmly grounded in the appraisal body of knowledge, and can be appropriate valuation tools.

*Grant W. Austin, MAI, MMRS, MRICS, MS*
*Fort Lauderdale, FL*

---

5.    For example, see Dietrich Earnhart, "Combining Revealed and Stated Preference Methods to Value Environmental Amenities at Residential Locations," *Land Economics* 77, no. 1 (Feb. 2001): 12–29.

6.    Roy L. Gordon, Jr. "Discounted Cash Flow Analysis: Where Do We Stand Today?" *The Appraisal Journal* (April 1988): 259–263, 259.

7.    Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53–61.

8.    Allen and Austin.

## Response to Comments on "Contingent Valuation: Not an Appropriate Valuation Tool"

"The Report of the NOAA Report on Contingent Valuation" (Report) was used extensively in the article on contingent valuation for several reasons. First, it was prepared by recognized and acknowledged experts in the field (including two Nobel laureates) under conditions that allowed for a fair exchange of ideas and concepts, a thorough examination of strengths and weaknesses, a careful development of language, and a true peer review[1] that no article in a real estate journal can achieve. Second, the Report is a legal document that clearly and carefully describes both a method and

---

1.    Effie J. Chan, "The Brave New World of *Daubert*: True Peer Review, Editorial Peer Review, and Scientific Validity," *New York University Law Review* 70 N.Y.U.L. Rev. 100 (April 1995).

Copyrighted material licensed by Randall Bell on April 26, 2021

supporting protocols. Third, there has been no literature reporting research by reputable experts in the CV field that refutes or substantially modifies the Report in the 13 years since publication. In fact much of the authoritative literature has been very supportive of the Report findings and recommendations.

Attempts to redefine the CV concept by those who wish to put forth real estate survey results as market evidence are unsupported by the recognized authoritative literature. These attempts at redefinition have not been subjected to an extensive vetting and true peer review equivalent to that given the Report and cannot therefore be accorded the same probative weight.

A hypothetical market survey is a process whereby individuals, selected by some scientifically acceptable scheme, are asked to play a role in a hypothetical market transaction. As actors in such a role they are asked to provide their opinions and thoughts as to how they might behave in a particular situation. These reactions are recorded and analyzed along with the reactions of a number of other individuals asked to perform the same function. There is no cost or penalty for an answer to a survey question and therefore no reasonably reliable means of enforcing a market discipline. The bottom line is that such surveys result in a form of consensus opinion or opinions–not market facts.

CV is a type of hypothetical market survey where only one side of the transaction is represented–that of the buyer. This is because the original purpose of CV was to provide an estimate of the value of a public good, which is a good for which there will not be a consummated sale or a seller. Contingent valuation as used in the recent real estate literature emulates the CV methodology from the public sector by examining only the buyer's side of a hypothetical transaction.

Hypothetical market surveys, including CV surveys, are completely different from surveys of individuals involved in concluded market transactions such as those conducted–formally or informally–by valuers seeking confirmation of sales data. In the case of sales surveys, market discipline has been exercised and the objective is to determine the factors that resulted in the price paid with real money in exchange for real property after the give and take of the bargaining process, with both sides of concluded transactions providing their information when possible. This information–along with other data–may result in adjustments to raw sale prices leading to a market value.

As to the specific issues raised in the comments, I shall discuss some and leave others to the reader to judge their merits.

Mr. Austin noted that a Lum Library search indicated a reference to CV in some 630 articles. While this is impressive, it is not persuasive. It can be easily shown that a number of those articles do not support the CV concept either in general or as specifically applied to real estate. For example, a 2001 CV article by Carson, Flores, and Meade states that "Rather than representing the 'best' case scenario for seeing how CV works as is often claimed, the private goods case is one that should (and does) perform poorly."[2] Mr. Carson is and has been considered the leading proponent, researcher, and authority on CV for more than two decades. Despite Dr. Simons's comments attempting to disparage the work of Carson, Simons's own research has relied on Carson's work.[3]

Mr. Austin asserts that if all of the protocols are followed as set forth by the Report, the results will be valid. This is poor logic at best. The CV method, as noted by Carson, is simply inappropriate to the development of quantitative estimates of value, or even of "diminution in value" as asserted by Dr. Simons. The article made clear that if any of the protocols set forth in the Report were violated there would be no chance of a reliable result when CV was used for its intended purpose, let alone for a purpose to which it does not apply. Further, despite Dr. Simons's assertion, there is no known error rate for CV when applied to private goods in the published authoritative literature.

One of the major reasons for the development of the protocols contained in the Report is to reduce the possibility of biased research results. Dr. Simons illustrates the need for exact adherence to those protocols by stating the following:

> Environmental contamination decreases property values. This is intuitively obvious. If a buyer were asked to consider two identical houses, one contaminated, and one not, the uncontaminated one would be selected virtually almost every time. So the question is not if contamination affects property values, it is by how much. That is the question all reasonable people agree upon as a starting point.

To begin research with this set of assertions clearly contradicts the scientific method; they are based on intuition and opinion rather than market facts. In actual point of fact, the market does not support this set of assertions in many instances as illustrated by published research (Wolverton and Bottemiller,[4] Wilson,[5] and others). Second, when such a set of statements are made by the researcher as a precursor to survey development it is entirely possible–if the Report protocols and the requirements of such authoritative documents as the Reference Guide on Survey Research[6] are not faithfully executed–to prove the assertions using the CV survey.

2.    Richard T. Carson, Nicholas E. Flores, Norman F. Meade, "Contingent Valuation: Controversies and Evidence," *Environmental and Resource Economics* 19, no. 2 (June 2001): 173–210.

3.    For example, Robert A. Simons and Ron Throupe, "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values," *The Appraisal Journal* (Spring 2005): 156–166.

4.    Marvin L. Wolverton and Steven C. Bottemiller, "Further Analysis of Transmission Line Impact on Residential Property Values," *The Appraisal Journal* (July 2003): 244–252.

5.    Albert R. Wilson, "Proximity Stigma: Testing the Hypothesis," *The Appraisal Journal* (Summer 2004): 253–262.

6.    Shari Seidman Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence: Moore's Federal Practice*, 2nd ed., 229–276 (Washington, DC: Federal Judicial Center, 2000).

Dr. Simons states, "the research budgets for the studies in that case (*Exxon Valdez*) were huge and well in excess of the damages or even baseline property values in a typical contamination case. By these standards, no economically feasible research under normal fieldwork conditions could ever be good enough." However, the Report was developed in response to the requirements of the *Oil Pollution Control Act* and had virtually nothing to do with the *Exxon Valdez* matter. Further, the Report does not advocate the expenditure of resources on any such scale and this idea is an inappropriate exaggeration. Dr. Simons appears to be advocating the position that if you cannot afford to do the analysis correctly, then doing it incorrectly is acceptable. This author flatly rejects any such position. If it is too expensive to do it correctly, then do not do it.

Both Dr. Simons and Mr. Austin argue that the lack of arm's-length transactional data is a valid reason for relying on CV research. Opinion can never adequately substitute for fact; witness national opinion polls versus electoral results. Opinions may be interesting and illuminating, but actual performance in the market is the only valid measure of value or diminution in value. If insufficient data exists in a market, it is possible with care and caution to identify data in other markets that can provide reasonable indications for the market of interest. There will always be market data that can be used to some extent, and possibly with caveats, to help analyze the situation in a particular set of circumstances. To bypass the time consuming and sometimes difficult process of identifying and correctly analyzing data is not a valid research approach.

The suggestion that the article prefers revealed preference data to CV results is correct, but only with the following cautions. Real estate is not a standardized commodity like a can of beans, tube of toothpaste, pencil, or the like. The phrase "revealed preference" as used by economists in the real estate literature is essentially a code word for raw sale price. Raw sale prices reveal relatively little concerning real estate market values because real estate is not a standardized commodity.

A raw sale price for real estate only tells us, if accurately recorded, the amount apparently paid in exchange for title. It does not tell us if there was creative financing, floors (including decking) that had to be replaced because dogs defecated in the house for years, fire or flood damage, a weak or compromised seller, or any other of the multitudinous factors that can influence price away from market value.

The market value concept has been carefully developed over decades as a well-defined value that can allow one property to be reliably compared to another. The revealed preference of raw sale price cannot meet these standards. For this reason much of the literature used as the basis for the argument that CV results are equivalent to or may be substituted for market value results must be rejected because they are based on revealed preference data. Revealed preference data cannot identify a diminution in value because it cannot determine what the unimpaired market value should have

been and therefore whether or not it was diminished.

Mr. Austin states that some appraisers are reluctant to apply "advanced methodologies" due to "a combination of litigation concerns, lack of appraisal courses on the topic(s), and the time lag in disseminating newly accepted knowledge to members of the profession." I would add to Mr. Austin's list of reasons the fact that the methodologies sometimes are simply unreliable and do not produce replicable results.

Dr. Simons and others have proposed that "full disclosure" is a necessary component of establishing the diminution in value associated with a disamenity. He states,

> Actual arm's-length sales with full disclosure of contamination in sufficient numbers do make excellent comparables. But in most cases, this data is hard to come by. Contamination makes properties harder to sell and reduces the number of actual sales, and those properties that do sell do not always have full disclosure.

This concept of full disclosure cannot lead to a market value or to any other recognized real estate value. Dr. Simons and others are admonished to read the *Uniform Standards of Professional Appraisal Practice* (USPAP), Advisory Opinion 22 to USPAP, *The Appraisal of Real Estate* in virtually any edition, and the legally mandated definitions of market value to name just a few of the pertinent documents–all having been subjected to years of extensive and true peer review. The phrase "full disclosure" is never used. Market value is based on what the normal or typical market participant actually knows at the time of a transaction–not on what a researcher thinks ought to be known. To impose a condition not evident in the market is to attempt to define a new value that has no support in law or practice.

In his comments, Dr. Simons confuses the issue with a discussion willingness to pay (WTP), willingness to accept (WTA), market clearing prices, and bid prices. First, WTP, WTA, market clearing prices, or bid prices would not meet the legal requirements of market value. The WTA and WTP are expressions of respondent opinion under opposite hypothetical conditions. Market clearing and bid prices are economic concepts of very limited, if any, application to real estate valuation.

Dr. Simons quotes the article as stating that "the seller would willingly accept the discounts" and argues that a survey of buyers is not a WTA context. However, the full statement emphasized that

> A real estate sale is a transaction between two parties, but no attempt had been made to examine the position of the seller in the hypothesized situation. That the seller would willingly accept the discounts demanded is highly problematic and would likely have a strong influence on the outcome of any negotiated transaction.

CV surveys cannot emulate or replicate the market because the seller's side of the transaction is not represented in any meaningful way.

He also argues that a willingness to accept means that the respondent has an interest in the outcome.

Copyrighted material licensed by Randall Bell on April 26, 2021

There are two points here. First, if the hypothetical buyers in the CV survey do not perceive themselves as having a stake in the outcome, then they are just playing a game of no consequence and the CV survey is meaningless. Second, a seller of course would have an interest in the outcome, possibly an interest sufficient to say "No" to the buyer's offer. Making an offer without a means of determining if the offer is acceptable means operating in a vacuum that is meaningless in the actual market.

Dr. Simons also questions the research behind the article with his comment concerning citations to "Author's files" as a source (footnote 29), stating, "The content of these files cannot be verified. Thus any conclusions drawn from this are unsubstantiated." As the files in question are covered by *The Appraisal Journal*'s author's agreement that they must be made available to qualified researchers, this comment is misleading and inappropriate.

Finally, Dr. Simons makes a number of assertions in his discussion of the "Systematic Relationship Between Actual Sales and CV." The assertions put forth in this section are based on his meta-analysis research.[7] Meta-analysis, however, also has been the subject of controversy. For example, an editorial published in *The Lancet*, titled "Meta-Analysis Under Scrutiny" (September 6, 1997), contained summary points pertinent to this discussion. It noted the following:

> [*The New England Journal of Medicine*], which does not publish many meta-analyses, printed in its August 21, 1997 issue a research paper and an editorial casting doubt on quantitative meta-analysis. Jacques LeLorier and his colleagues from Montreal compared 19 meta-analyses with the results of 12 large trials published subsequently. If no later randomized trial had been done, the meta-analysis "would have led to the adoption of an ineffective treatment in 32 per cent of cases ... and to the rejection of a useful treatment in 33 per cent of cases."

Since there has been no comparable side-by-side examination of meta-analysis in real estate, it is obvious that quantitative meta-analysis faces significant reliability issues. The more recent literature from the medical field—where the body of experience far exceeds that of meta-analysis in real estate—indicates that these concerns are well founded and very serious. Meta-analysis, and virtually all other information provided by the proponents of the use of the method in real estate, compare CV results to CV and revealed preference results, not to market value results. This is not a valid comparison if the objective is to measure whether or not CV performs well as a market analysis tool.

A fundamental assumption of a meta-analysis is that the data used in the analysis is reliable and of relatively uniform quality.[8] That there are significant quality issues associated with some of the papers used in meta-analysis is, or should be, well known to researchers. The late Gene Dilmore, MAI, SRA, conducted research on a number of papers and discovered that the 95% confidence interval surrounding the damage variable ranged from +/− 28.4% to +/− 1,386% with a mean of +/− 136%.[9] To conclude that the quality of results is uneven would be an understatement.

These issues alone are sufficient to call into question the results of meta-analysis without getting into issues of the substantive errors to be found in specific research.[10] While I have only cited one or two papers, the interested reader will find many more, particularly in the medical literature where meta-analysis has been used since the early 1950s and its strengths—and weaknesses—are well understood.

The foregoing discussion of the contingent valuation method addresses the major issues raised in the comments by Mr. Austin and Dr. Simons. I thank the writers of the letters and hope that their comments and my response will add significantly to the understanding of the issues involved.

*Albert R. Wilson, CRE, MBA, BSSE*
*Woodland Park, CO*

---

7. Robert A. Simons and Jesse D. Saginor, "A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Property Values," *Journal of Real Estate Research* 28, no. 1 (2006): 71–104.

8. David Moher and Ingram Olkin, "Meta-Analysis of Randomized Controlled Trails: A Concern for Standards," *JAMA* 274, no. 23 (Dec. 27, 1995).

9. Author's files.

10. For example, see Kaoru Kurosawa, "Meta-Analysis and Selective Publication Bias," *American Psychologist* 39, no. 1 (January 1984): 73–74.

## 6.7 Testing the Reliability of Contingent Valuation in the Real Estate Marketplace

*by Richard J. Roddewig, MAI, and James D. Frey*

This article originally appeared in the Summer 2006 issue of *The Appraisal Journal*.

**Abstract**

In recent years, contingent valuation has been suggested as an appropriate fourth approach to value. This article reports on results of market-based testing of the reliability of contingent valuation in actual situations in which it has been used to predict prices that would be paid for residential real estate. The testing reveals that contingent valuation did not accurately predict real-world prices paid by actual willing and informed buyers and sellers. Therefore, the reliability of contingent valuation as a technique to develop an opinion of the market value, especially in courtroom situations invoking the Daubert test for admissibility of expert testimony, must be carefully considered by appraisers, attorneys, and judges.

For more than 50 years, the real estate appraisal community has used three commonly accepted approaches to value: the sales comparison approach, the cost approach, and the income capitalization approach.[1] However, during the same 50 years a number of commentators have asked the following questions: "Why limit ourselves to only three approaches? Are there other approaches that might work as well or better for some types of property valuation assignments?"[2]

As a result, over the years various additional approaches or variants on existing approaches have been suggested as an official fourth approach to value.[3] Some of these proposals have actually worked their way into the appraisal body of knowledge as accepted variations on one of the three standard approaches rather than as a newly crowned fourth approach. For example, discounted cash flow analysis (DCF analysis) is now an accepted variant of the income capitalization approach to value for many types of income-producing properties. When first used to value land suitable for subdivision in the 1960s, however, DCF analysis was seen by some as an alternative fourth approach to value.[4]

Similarly, in the 1970s multiple regression analysis,[5] a statistical tool that had been used to a limited extent for the valuation of rural land,[6] began to be seriously con-

---

1.  In the first edition of *The Appraisal of Real Estate*, authored by Frederick Babcock and published in 1924, there were eight "methods of appraising" (also called "processes") rather than three "approaches to value." It was not until 1932 in Babcock's second book, *The Valuation of Real Estate*, that he organized his slightly shorter list of seven methods into three approaches to value. For a good discussion of the origin of the three approaches see Norman G. Miller and Sergey Markosyan, "The Academic Roots and Evolution of Real Estate Appraisal," *The Appraisal Journal* (April 2003): 172–184. Miller and Markosyan characterize the period between 1900 and the 1940s as "the three approaches period" in the development of appraisal theory and practice.

2.  To a considerable extent, the acceptance of three approaches as the central focus of real estate appraising has been the result of a series of judicial decisions, legislative enactments, and administrative regulation; see McCloud B. Hodges, Jr., "Three Approaches?" *The Appraisal Journal* (October 1993): 553–564 for a discussion of the evolution of the acceptance of the three traditional approaches.

3.  For example, in October of 1989 it was suggested that a new approach to value based upon the way in which worldwide institutional buyers value property was in order; see Howard C. Gelbtuch, "The World of Commercial Real Estate: A Look at the Past 15 Years," *The Appraisal Journal* (October 1989): 466–472, 472. The same article mentions the use of a gross rent multiplier as another method posited as a fourth approach. An article in March 2004 mentions at least five approaches to residential valuation used in Europe; see Tom Kauko, "Towards the 4th Generation—An Essay on Innovations in Residential Property Value Modelling Expertise," *Journal of Property Research* 21, no. 1 (March 2004): 75–97.

4.  For example, see Paul Fullerton, "Development Analysis for the Valuation of Vacant Land," *The Appraisal Journal* (April 1965): 211–225.

5.  *The Dictionary of Real Estate Appraisal* defines multiple regression analysis as a particular statistical technique, similar to correlation, used to analyze data in order to predict the value of one variable (the dependent variable), such as market value, from the known values of other variables (called *independent variables*), such as lot size, number of rooms, and so on. . . When two or more variables are used, the procedure is called *multiple regression analysis*." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 190. Multiple regression analysis is sometimes called hedonic modeling.

6.  For a brief history of the early days of the appraisal profession's use of regression analysis, see Richard W. Bruce and Darrell J. Sundell, "Multiple Regression Analysis: History and Applications in the Appraisal Profession," *The Real Estate Appraiser* (January-February 1977): 37–44.

**Richard J. Roddewig, MAI, CRE, FRICS,** is president of Clarion Associates, Inc., an appraisal and real estate and land use consulting firm with affiliated offices in Chicago, Denver, Cincinnati, Philadelphia, and Chapel Hill. Mr. Roddewig has an undergraduate degree from the University of Notre Dame and both a Master of Arts and a Juris Doctor degree from the University of Chicago. He works nationally out of Clarion's Chicago office and has worked on appraisal assignments in more than 40 states. His areas of appraisal expertise include special-purpose properties, conservation and historic preservation easements, and properties and markets impacted by contamination and other types of environmental conditions. Much of Mr. Roddewig's real estate appraisal and consulting work is as an expert witness in litigation and administrative proceedings in various types of federal and state courts as well as before federal, state, and local agencies.

**James D. Frey, CRE, FRICS,** served as vice president of Clarion Associates, Inc. Prior to joining Clarion Associates, Frey was vice president of ExxonMobil Global Real Estate, where he managed acquisition, development, leasing, and disposition of office, residential, and industrial properties throughout the United States and in over twenty countries on six continents. Frey has an MBA from the Wharton School of the University of Pennsylvania in Philadelphia and a bachelor of arts degree in economics from Wofford College in South Carolina.

The authors would like to acknowledge Anna Papke and Mark Strandberg of Clarion Associates for their research assistance on this article.

Copyrighted material licensed by Randall Bell on April 26, 2021

sidered as a tool to directly predict market prices (and therefore values) and to determine adjustment factors when analyzing comparable sales. It too has been variously labeled a fourth approach to value or an alternative to the traditional three approaches.[7] Regression analysis (hedonic modeling) has not yet become widely accepted in everyday property-by-property appraisal practice, although it is often used in mass appraisal assignments.[8]

In the late 1990s, another technique, contingent valuation (CV), began to be suggested by some as a fourth approach to value. As in the case of regression analysis/hedonic modeling, the first advocates of the use of this technique in the valuation of real estate often were in the academic real estate community.[9] A recent article by Wilson[10] summarizes the report on contingent valuation published by the blue-ribbon panel of the National Oceanic and Atmospheric Administration (NOAA), and analyzes its findings in the context of contingent valuation in real estate valuation assignments. Wilson concludes that the panel's findings mean contingent valuation is inapplicable to the typical real estate valuation assignment.[11]

Contingent valuation has now been applied in enough real-world situations since the 1990s that its reliability can be tested in the marketplace, and this article presents such an analysis. First, contingent valuation is defined and its originally intended purpose is discussed. Then, some of the articles that discuss attempts to use contingent valuation to predict market prices or market trends are summarized. Next, the ways in which the accuracy and reliability of contingent valuation methods can be tested in the marketplace are summarized, and the results of the testing techniques are presented. These results indicate that contingent valuation was neither an accurate nor reliable indicator of market prices or trends in the market situations in which it was applied. Finally, the article explores some of the fundamental reasons why the predictions of contingent valuation surveys have not matched up with the actual prices paid in the marketplace.

As a result of the demonstrated inability of the contingent valuation methodology to accurately predict market prices, the study concludes that contingent valuation is not an appropriate fourth approach to value of real estate because it does not incorporate the many factors that go into real estate purchase and sale decisions. The technique may continue to be useful in a few unique situations involving non-market goods or real estate situations where few, if any, actual sales can be analyzed.

## Contingent Valuation: Origin and Intended Purpose

The contingent valuation method has been in use for more than 40 years, typically as a technique for measuring the value of noneconomic goods (goods that do not trade in an active marketplace).[12] The value conclusions that result from application of the CV method are collectively called non-use values since they exist but relate to items that are not regularly traded (used) in normal commerce.

As early as 1947, contingent valuation was used as a theoretical way to measure the benefits of preventing soil erosion.[13] Practical application of contingent valuation seems to have occurred first in 1958 when the National Park Service used the method to calculate the recreational value of the Delaware River basin.[14] One of the first academic applications of contingent valuation occurred in the early 1960s when it was used in published research to measure the value of a particular recreational area to hunters and wilderness lovers.[15]

The CV technique involves a formal survey process. Participants in the survey are typically asked how much they would be willing to pay for a specific benefit, good, or service. The valuation result is contingent because those surveyed are asked to state their willingness to pay contingent upon the survey's specific hypothetical case or set of conditions. The technique is sometimes called a stated preference method since it

---

7.  For example, see Gene Dilmore, *The New Approach to Real Estate Appraising* (Englewood Cliffs, NJ: Prentice Hall, Inc., 1971); and Gene Dilmore, "Notes and Comments: Multiple Regression Analysis as an Approach to Value," *The Appraisal Journal* (July 1972): 459–461.

8.  For example, see Jonathan Mark and Michael A. Goldberg, "Multiple Regression Analysis and Mass Assessment: A Review of the Issues," *The Appraisal Journal* (January 1988): 89–109; and Hans R. Isakson, "Using Multiple Regression Analysis in Real Estate Appraisal," *The Appraisal Journal* (October 2001): 424–430.

9.  For example, see Gary H. McClelland, William D. Schulze, and Brian Hurd, "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site," *Risk Analysis* 10, no. 4 (1990): 485–497. The authors were associated with the University of Colorado, Boulder, and the University of California, Davis.

10. Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53–61.

11. Wilson states that among the "compelling" reasons given by the blue-ribbon panel for its findings was that testing of the predictions of contingent valuation studies in non–real estate situations had found that actual willingness to pay was quite different from, and quite lower than, the reported willingness to pay of survey participants.

12. Contingent valuation is one of the 10 approaches to ecosystem valuation identified by Dennis M. King and Marissa Mazzota on a Web site sponsored by the U.S. Department of Agriculture Natural Resources Conservation Service and the National Oceanographic and Atmospheric Administration, http://www. ecosystemvaluation.org (last accessed October 24, 2005). Other identified approaches to ecosystem valuation include market pricing, productivity, hedonic pricing, travel cost, damage cost avoided, replacement cost, substitute cost, contingent choice, and benefit transfer.

13. Paul R. Portney, "The Contingent Valuation Debate: Why Economists Should Care," *Journal of Economic Perspectives* 8, no. 4 (Fall 1994): 3–18.

14. Keita Kawagoe and Nao Fukunaga, "Identifying the Value of Public Services by the Contingent Valuation Method (CVM)," *Nomura Research Institute Papers* no. 39 (December 1, 2001): 3.

15. Robert Davis, "The Value of Outdoor Recreation: An Economic Study of the Maine Woods" (doctoral dissertation in economics, Harvard University, 1963); Davis's paper is discussed in Portney, 3.

is based on what people say they would do given a set of facts. This differentiates contingent valuation from a study of actual sales transactions in the marketplace, sometimes called a revealed preference method, since sales transactions reflect what people actually do in the marketplace rather than what they say they would do. The sales comparison, income capitalization, and cost approaches are revealed preference methods since they are based on actions of actual market participants rather than opinions about hypothetical future actions.

## Contingent Valuation and Real Estate: Published Studies

The most frequent uses of contingent valuation in the past few decades have involved natural resources issues, such as air and water quality, outdoor recreation opportunities, wetlands, wilderness areas, endangered species habitat, and scenic views. In these contingent valuation applications, survey participants are often asked what they would be willing to pay to preserve, protect, or improve the quality of the natural resource. This application of the CV method to natural resource valuation issues has gained limited acceptance by the federal government in some situations requiring cost/benefit studies.[16]

Although contingent valuation has traditionally focused on noneconomic goods or goods that do not trade in active marketplaces, a number of real estate economists, appraisers, and analysts have attempted to apply contingent valuation survey methodologies to active real estate markets. Attempts to extend the CV concept to these markets have involved surveys of either prospective buyers (willingness-to-pay surveys) and/or potential sellers (willingness-to-sell surveys). The results of some of these attempts have now been published, and some of these articles have appeared in *The Appraisal Journal.*

There are relatively few published studies, however, examining a specific real estate impact (expressed either in a dollar or percentage effect on actual prices) using contingent valuation methods. Most of these studies involve work done in the context of litigation, especially litigation to determine the impact of contami-

nation on property values. For example, an *Appraisal Journal* article published in 1998 reported the results of a contingent valuation study submitted in class action litigation to determine the impact of alleged airborne emissions from a smelter on neighboring residential property values in North Tacoma, Washington.[17] A 2002 article reporting on a smelter-related litigation study in Corpus Christi, Texas, used contingent valuation to predict the prices that would be paid by homebuyers in affected neighborhoods following the discovery of the contamination and enactment of new Texas requirements for seller disclosure of contamination in residential sales transactions.[18] Another 2002 article summarized results of a contingent valuation study to determine the impact of PCB contamination on residential neighborhoods in Aniston, Alabama (once again, in a litigation setting).[19] A 2003 article reported the results of a contingent valuation study of the effect of environmental information disclosure requirements on future real estate transactions in a residential neighborhood near a concrete products and quarrying facility in El Paso, Texas.[20] A 2005 *Journal of Real Estate Research* article detailed the results of a study of various contingent valuation studies done in eight states to determine the impact of leaking underground storage tanks (LUST) on nearby property values.[21] A 2005 *Appraisal Journal* article summarized the use of a contingent valuation survey to estimate the discount to value for toxic mold.[22]

## Methods for Testing the Reliability of Contingent Valuation

There have now been enough attempts to use contingent valuation, and other survey-based techniques to measure economic damages to real estate, that the reliability of these nontraditional and nontransactional methods can be tested in the actual, real-world marketplace.

Among the methods that can be used to test the validity and reliability of the contingent valuation predictions are the following:

- Comparison of the prices actually paid in an entire, "fully informed" marketplace to the prices predicted for that marketplace by contingent valuation sur-

---

16. Although it has been criticized as being unreliable and prone to bias, the natural resource damage application of the concept has been upheld by a United States District Court of Appeals, see State of *Ohio v. United States Department of Interior*, 880 F.2d 423 (D.C. Cir 1989). For a discussion of the concept as applied by federal agencies, see "Report of the NOAA Panel on Contingent Valuation," 58 Fed Reg 4601 et seq. (1993); and United States Water Resources Council, *Economic and Environmental Principles for Water and Related Land Implementation Studies* (Washington, DC, 1983).

17. Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297.

18. Hank C. Jenkins-Smith et al., "Information Disclosure Requirements and the Effect of Soil Contamination on Property Values," *Journal of Environmental Planning and Management* 45, no. 3 (2002): 323–339.

19. Robert A. Simons, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal* (October 2002): 388–400.

20. Robert P. Berrens et al., "The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community," *Social Science Quarterly* 84, no. 2 (June 2003): 359–378.

21. Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys," *Journal of Real Estate Research* 27, no. 2 (April-June 2005): 193–220.

22. Robert A. Simons and Ron Throupe, "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values," *The Appraisal Journal* (Spring 2005): 156–166.

Copyrighted material licensed by Randall Bell on April 26, 2021

veys done before the market became fully informed. This can be done in situations in which the marketplace has become fully informed with the same information that was used in the survey process.[23]

- Comparison of the prices actually set or paid for individual properties by fully informed survey participants. This can be done by analyzing the real world decisions made by actual respondents to the surveys. Some of the buyers or sellers[24] in the survey process may have actually indicated that they were already fully informed about the survey information before they answered the survey questionnaire. If so, the prices they set as sellers or paid as buyers should reflect the actual prices that fully informed sellers and buyers were willing to accept or pay. Other survey participants, although not fully informed before they completed the survey process, became fully informed as a result of participating in the survey. The prices they subsequently actually set as sellers, or paid as buyers, would therefore provide a test of the accuracy of the contingent valuation survey predictions.

- Comparison of the prices actually set or paid by other sellers or buyers who, in one manner or another, can be determined to have possessed the same (or more) information at the date of sale or purchase as the survey participants, and therefore to have been as fully informed as (if not more informed than) survey participants.

In litigation assignments, testing the reliability of contingent valuation is especially critical in the wake of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[25] and related cases requiring the courts to prescreen expert testimony to assure its reliability and relevancy.

The study presented here tests the reliability of survey-based contingent valuation determinations in four marketplace situations in which surveys were used to predict damages. The four situations where the reliability of the methodology is tested are North Tacoma, Washington; Corpus Christi, Texas; Crystal Springs, Mississippi; and Columbus, Mississippi. In each case,

the survey-based methodology led the real estate expert to predict substantial decreases in residential home prices as a result of the contamination, but the predicted decrease in prices failed to actually occur.

## Testing the Reliability of Contingent Valuation: Analyzing Actions in a Fully Informed Marketplace
### The North Tacoma, Washington, Testing Process

The 1998 contingent valuation article by Mundy and McLean summarizes the authors' survey-based analysis of the impact of contaminated soil containing arsenic, lead, and other heavy metals on property values in neighborhoods around an ASARCO smelter in North Tacoma, Washington.[26]

The ASARCO class action litigation involved more than 6,000 properties. A key issue was how the publicity generated by the litigation and the newly enacted State of Washington disclosure requirements would impact prices or values of residential property in the affected neighborhoods.

**Survey Approach and Results.** In the North Tacoma study, Mundy and McLean formed the hypothesis that the substantial additional information that would be provided to prospective buyers in the marketplace as a result of the litigation and the disclosure requirements "would substantially alter the nature of the real estate market in proximity to the . . . site."[27] To test this hypothesis, Mundy and McLean used both property-by-property appraisal techniques using historical sales data as well as statistical methods such as survey research (perceived diminution), contingent valuation, and conjoint measurement to quantify value impacts.[28]

In the study, eleven properties were appraised using standard Fannie Mae/Freddie Mac appraisal techniques to estimate market value. The sample properties were taken from a cross section of housing in the class area. The homes were appraised twice: first using comparable sales data from the class area (contaminated neighbor-

---

23. Proponents of the CV process sometimes claim that the information provided in the survey process makes the survey participants more informed than typical actual buyers in the marketplace. For example, Mundy and McLean (296–297) state that the participants in the survey became fully informed about the contamination situation through the survey process. Simons (398–399), and Simons and Throupe (161) indicate that the survey gave participants full information about the contamination situation addressed in their studies. However, Appraisal Standards Board Advisory Opinion 22 (AO-22) in discussing the definition of market value states that a market value appraisal is "based on whatever the 'normal' or 'typical' conditions are in the marketplace," including typical knowledge and information. As Wilson (56) notes, the CV survey process places "arbitrary conditions on what the market 'should have known'," resulting in a hypothetical value estimate not in accordance with the accepted definition of market value that is based upon buyers being well informed or well advised rather than fully informed.

24. In contingent valuation surveys, prospective sellers are surveyed in order to determine the price that the marketplace presumably would be "willing to accept" and prospective buyers are surveyed to determine the price that the marketplace presumably would be "willing to bid" or pay.

25. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 469 (1993). The *Daubert* test was extended to technical but non-scientific experts, such as real estate appraisers, by *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 116, 7143 L. Ed. 2d 238 (1999). The implication of these cases for expert appraisal witnesses has been discussed in a number of *Appraisal Journal* articles, including Richard W. Hoyt and Robert J. Aalberts, "New Requirements for the Appraisal Expert Witness," *The Appraisal Journal* (October 1997): 342–349; and Richard J. Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," *The Appraisal Journal* (October 1999): 447–453.

26. Mundy and McLean, 290.

27. Ibid., 295.

28. Ibid.

hoods) and then using comparable sales data from control areas (similar uncontaminated neighborhoods).[29]

The result of the individualized standard Fannie Mae/Freddie Mac property-by-property appraisals was a finding of "a loss in market value for the class neighborhood of $5,085 per standard $116,000 home,"[30] equivalent to an average loss of 4.4%, based upon actual sales data in the North Tacoma marketplace as of fall 1994.

Mundy and McLean also concluded that based on the survey research techniques, each house in the affected North Tacoma neighborhood would decline in value by between $11,000 and $24,000 on a standard $116,000 home, or an average decline of between 9.5% and 20.7%.[31] At a deposition in the North Tacoma litigation, one of the authors stated that he expected a sudden sharp decline in property values to occur on January 1, 1995, and expected the full decline to quite possibly occur by June of 1995, although he acknowledged that the decline might not occur for years, and he could not identify any particular date by which the decline would in all probability actually occur.[32]

**Test of the Survey Results.** In order to test the accuracy of the North Tacoma survey-based methodology, data was collected on actual sales transactions that occurred in the North Tacoma marketplace between 1991 and May 2004, including the months immediately before and after January 1, 1995, identified in the article as the critical date when the marketplace became fully informed about the contamination situation.

Sales transactions were researched for both the North Tacoma neighborhoods in the affected class

| Table 1 | Comparison of Annual Appreciation in Average Sale Price of Single-Family Residences, North Tacoma, WA | |
| --- | --- | --- |
| Year | Class Area | Control Area |
| 1991 | | |
| 1992 | 3.5% | 17.1% |
| 1993 | 7.7% | 1.4% |
| 1994 | 2.4% | -1.0% |
| **1995** | **-3.6%** | **5.3%** |
| 1996 | 6.9% | 3.9% |
| 1997 | 6.4% | 4.7% |
| 1998 | 10.5% | 6.2% |
| 1999 | 9.1% | 6.3% |
| 2000 | -1.0% | 10.5% |
| 2001 | 9.7% | 10.2% |
| 2002 | 12.5% | 3.5% |
| 2003 | 4.3% | 6.0% |
| 2004* | 2.3% | 2.8% |
| 1991 to 1994 | 14.2% | 17.6% |
| 1994 to 1995 | -3.6% | 5.3% |
| 1994 to 2003 | 68.5% | 72.7% |
| **Average  Annual Appreciation** **1994 to 2003** | **6.1%** | **6.3%** |

Includes only single-family residences for the period January 1, 1991 through May 11, 2004.

\* Partial year, through May 11, 2004.

Source: Metroscan electronic database.

action litigation area and in the North Tacoma control area delineated by Mundy and McLean. Table 1 and Figure 1 show that in 1995, following the litiga-



**Figure 1**    Average Sale Price by Year for Single-Family Residences, North Tacoma, WA, January 1991–May 2004

State disclosure requirements in effect

Class area          Control area

29.   Ibid., 296.

30.   Ibid.

31.   Ibid.

32.   Deposition of Wilbur H. Mundy, November 17, 1994, in *Donald Branin, et al.* v. ASARCO, Inc., vol. 5, page 10, line 22 through page 11, line 13.

Copyrighted material licensed by Randall Bell on April 26, 2021

tion[33] and the new public disclosure requirements, the average sale price in the class area in North Tacoma declined approximately 3.6%,[34] while increasing approximately 5.3% in the control area. In 1996, however, prices in the affected class area rebounded upward by 6.9%, almost twice the rate of increase in the control area. The data also shows that since January of 1995, the average annual rate of increase in the class area has been approximately 6.1% compared to 6.3% in the control area.

The actual temporary 3.6% decline in prices in the class area of North Tacoma in 1995 was quite close to the 4.4% decline in value estimated by Mundy and McLean in the property-by-property appraisals using actual sales transactions and Fannie Mae/Freddie Mac appraisal procedures.

The actual temporary 3.6% decline in prices is dramatically less, however, than the decline predicted by Mundy and McLean using a contingent valuation method. The data shows that average annual prices never declined more than 3.6%, and rebounded quickly once the marketplace assimilated the actual risks, realities and extent of the contamination situation. At no time after January 1995 was there a decline between 9.5% and 20.7%, and, in fact, prices increased as fast in the allegedly affected class area as in the control area after January 1, 1995. By contrast, prior to January 1, 1995, prices were increasing slightly faster in the control area (5.8% per year on average) compared to the class area (4.5% per year).

## The Corpus Christi, Texas, Testing Process

A 2002 article by Jenkins-Smith et al. summarizes use of contingent valuation to estimate impacts of state-mandated disclosure requirements on future real estate transactions in three relatively low-income neighborhoods in Corpus Christi, Texas, affected by contamination.[35] Approximately 400 homes are in these neighborhoods near a number of heavy-industrial plants and refineries. In 1994, contamination from lead, cadmium, and zinc was discovered in the soil of properties in the Dona Park, Manchester Place, and Academy Heights residential neighborhoods adjacent to an ASARCO smelter. The state environmental commission distributed flyers to residents of the subject neighborhoods in March 1994; a Texas statute required future sales to include a disclosure regarding the contamination. The contingent valuation process was used to test if known contamination would have a net effect on the value of homes in the three neighborhoods.[36]

**Survey Approach and Results.** Jenkins-Smith et al. conducted telephone surveys of over 1,000 residents in Nueces County (Corpus Christi) and three surrounding counties in May and June 2000.[37] About half of those surveyed by telephone were given a description of the typical house near a refinery and a smelter and questioned about their willingness to pay. The other half were given additional information about contamination and cleanup information stating that (1) the soil at nearby homes had been contaminated; (2) the contamination had been cleaned to satisfaction of state environmental agencies; (3) some neighbors were suing the smelter owners; and (4) no record of unsafe levels of contamination existed for the property being described in the telephone survey. Jenkins-Smith et al. compared the two groups and concluded that the average loss in willingness to pay for a typical house due to the information disclosure requirement was approximately $11,000 or about 30.5% of the value of a typical home in the area. The research was limited to the contingent valuation study conducted by telephone, and actual market transactions in the affected subdivisions were not analyzed.

Jenkins-Smith et al. reported that the contamination was discovered in 1994 and remediation was undertaken in 1996 and 1997. Research for the present study found that state testing of soil samples from the Dona Park area occurred in early 1994. Two of six random samples showed lead levels above EPA-recommended levels for residential soils. The Texas Commission on Environmental Quality distributed flyers to Dona Park residents shortly thereafter. The flyers provided residents with notice regarding the outcome of the soil tests, a blood-screening session to be held to check for lead content, and a public meeting to be held May 17, 1994. Local press coverage reported these events and the results of subsequent tests finding that 15 properties in the subdivisions required soil remediation. Cleanup was completed by January 1997 to the satisfaction of ASARCO and the State of Texas. Subsequent testing for additional contamination in 1998 proved inconclusive and the state's investigation of neighborhood contamination was concluded with a final Agreed Order on March 29, 1999. A $40,000 fine was imposed against ASARCO. This closed the environmental action against ASARCO related to contamination of the subdivisions.

Residents of three nearby neighborhoods (Dona Park, Manchester Place, and Academy Heights) filed a lawsuit on June 17, 1994 seeking damages for impact to property values, among other claims. An out-of-court settlement was reached on September 14, 2000,[38] 90

---

33. The North Tacoma litigation reportedly settled on the eve of trial.

34. On a property-by-property basis there was wide variation. Some areas and properties declined, while others increased in value or showed no change.

35. Jenkins-Smith et al.

36. The authors state that the contingent valuation study was necessary because "it is difficult to make inferences from prior sales (i.e., hedonic analysis) on whether a requirement that future sales include a disclosure regarding contamination would have a net effect on the value of homes in the three neighborhoods. For these reasons, a focus group and contingent valuation telephone survey were conducted to see if the value of a 'typical' home located in the area would be affected by the disclosure of information about the discovery and remediation of the contamination." Ibid., 326.

37. These surveys were apparently done in support of the litigation against ASARCO by neighboring residents. The case settled out-of-court prior to trial in September 2000.

38. John Tedesco, "Pollution Suit Settled," *San Antonio Express-News*, September 15, 2000, Metro/South Texas.

days after the Jenkins-Smith et al. telephone surveys had been conducted.

**Test of the Survey Results.** In order to test the accuracy of the Jenkins-Smith et al. conclusion that home prices would decrease by 30.5% after information was disclosed to the market, Corpus Christi sales data was collected and analyzed for the periods before and after two critical dates. The first date is January 1, 1994, the date on which Texas sellers of single-family homes were first required to disclose to potential buyers the presence of hazards or contamination on their property.[39] The second date is September 2000, the date on which litigation between the nearby residents and ASARCO was finally settled.

Dona Park and Manchester Place are contiguous and have similar wood-frame homes in a similar price range. Because of these similarities between the neighborhoods, they could be analyzed together. Based on historical sales information from the Corpus Christi multiple listing service (MLS) database, homes in the Dona Park/Manchester Place area showed an average sale price of $30,550 in 1993, the year before the new state disclosure law went into effect and the contamination was discovered. Academy Heights is not contiguous to Dona Park/Manchester Place, and is located about one-half mile away. Its homes are mostly all brick and are much larger than those in the Dona Park/Manchester Place area. Homes in Academy Heights showed an average sale price of $50,676 in 1993 according to MLS sales data.[40]

Figure 2 compares the average sale price each year in Dona Park/Manchester Place and Academy Heights to the Corpus Christi MSA House Price Index (HPI) published by the Office of Federal Housing Enterprise Oversight.[41]

**Figure 2**      Comparison of Average Sale Price and House Price Index, Corpus Christi, TX, Study Area



---

39. According to the General Counsel of the Texas Real Estate Commission (TREC), the state agency that licenses real estate brokers and sales representatives, Section 5.008 of the Texas Property Code, creating seller obligations to disclose on-site hazards or contamination when selling single-family homes, was enacted in 1993 and went into effect late that year. TREC issued a minimal statutory notice disclosure form for sellers pursuant to Section 5.008 on October 25, 1993. The TREC General Counsel confirmed that seller obligations to disclose have not changed since 1993, and the TREC disclosure form itself has not changed since issuance. Loretta DeHay, General Counsel, Texas Real Estate Commission, phone conversation with author, October 21, 2005.

40. Jenkins-Smith et al. indicate an overall average assessed market value (in 1997 dollars) of $35,870 for the approximately 400 homes in the three neighborhoods. Assessed market values reported for individual subdivisions were $56,000 in Academy Heights, $33,000 in Dona Park, and $25,000 in Manchester Place.

41. The HPI is a measure designed to capture changes in the value of single-family homes in the United States as a whole, in various regions of the country, and in the individual states and the District of Columbia. It measures average price changes in repeat sales or refinancings on the same properties. This information is obtained by reviewing repeat mortgage transactions on single-family properties whose mortgages have been purchased or securitized by Fannie Mae or Freddie Mac since January 1975.

Copyrighted material licensed by Randall Bell on April 26, 2021

As Figure 2 indicates, in Academy Heights, prices actually went up during the first three years following the January 1, 1994 effective date of the Texas seller disclosure law. The average price went up 16.4% in 1994 and continued to go up in 1995 and 1996 as well. From 1993 to 1996, the average price increased from $50,676 to $68,138 in Academy Heights, a 34.5% total increase during a time when the Corpus Christi HPI went up by only 8.6%.

In the Dona Park/Manchester Place area, prices were almost exactly the same in 1995 ($30,700 on average) as they were in 1993 ($30,550 on average) before the effective date of the Texas seller disclosure requirement.[42]

Both Academy Heights and Donna Park/Manchester Place experienced a temporary decline in average price during the period when remediation of the contamination was underway. In Academy Heights, the average price dropped sharply by almost 25% in 1997, the second year during which remediation was underway. In Dona Park/Manchester Place, the decline was slightly lower. The average price dropped from $30,700 in 1995 to $24,000 in 1998, a decline of about 22%.

However, prices rebounded following completion of the remediation. In Academy Heights, the average price increased 13.1% in 1998 and 24.1% in 1999, compared to the Corpus Christi HPI, which only increased 3.12% and 3.04%. In Dona Park/Manchester Place, the average price increased from $24,000 in 1998 to $27,769 in 2000, a 15.7% increase during a two-year period when the overall Corpus Christi HPI increased only 5.1%. These increases in prices following completion of the remediation are contrary to the results of the contingent valuation study, which had predicted a 30.5% decrease.

Since the September 2000 settlement of the property damage litigation, prices have continued to go up in both neighborhoods. In Academy Heights, the average price increased from $64,100 in 2001 to $79,100 in 2004, a 23.4% increase during a time when the Corpus Christi HPI increased 21.8%. In the Dona Park/Manchester Place area, average prices increased by 44.5% during the same three-year period. Once again, these increases in prices contradict the predictions in the contingent valuation study.

Testing of the Jenkins-Smith et al. contingent valuation study indicates that the study was not a reliable predictor of the actual prices that were paid following completion of the remediation. The combination of the Texas disclosure requirements, the publicity about the contamination and the litigation, the large number of property owners named as plaintiffs in the litigation, and the information provided to individual property owners as a result of the litigation did not result in the 30.5% decrease in price predicted by the contingent valuation study. Instead, between 1998 (the year after completion of the remediation) and 2004, prices actually increased 36.4% in Academy Heights and 88.9% in Dona Park/Manchester Place.[43]

## Testing the Reliability of Contingent Valuation: Analyzing Actions of Fully Informed Survey Participants, Sellers, and Buyers

### The Crystal Springs, Mississippi, Testing Process

The accuracy and reliability of a contingent valuation survey in Crystal Springs, Mississippi, was also tested. Here again, a survey had been used to attempt to measure the possible impact of contamination on values in nearby residential neighborhoods.[44] Based upon the contingent valuation survey-based research, experts for the property owners claimed that prices established by fully informed buyers and sellers in Crystal Springs single-family neighborhoods impacted by contamination would be substantially less than actual market prices paid in transactions between buyers and sellers not fully informed.

**Survey Approach and Results.** In Crystal Springs, PCBs from a manufacturing facility had migrated off-site and been found in a creek and the soil at some single-family homes in the neighborhood adjacent to the plant. The Mississippi Department of Environmental Quality (MDEQ) had approved an on-site and off-site remediation plan. On the date of the contingent valuation study, only some of the properties had been remediated. Four different types of survey-based research studies were conducted. The median predicted negative impacts ranged from 25% to 100%.[45]

---

42. The MLS database indicates there were no sales in 1994 in Dona Park or Manchester Place.

43. The Jenkins-Smith et al. study also predicted that a portion of the market would drop out because of the notice of contamination, however, the size of the market sales rate decline was not estimated. In the current study, actual market data in the three neighborhoods has been analyzed to determine the accuracy of this prediction. In Academy Heights, there were 2.2 sales per year prior to the discovery of the contamination in 1994; 2.43 sales per year during the 1994–2000 period when discovery, remediation, and litigation were proceeding; and 2.6 sales per year between 2001 and 2004, after the settlement. In the Dona Park/Manchester Place area, there was a drop from 2.8 sales per year in 1989–1993 to 2.57 sales per year in 1994–2000 and a substantial increase to 4.6 sales per year in 2001–2005. This is similar to sales in other communities affected by contamination and the related property value litigation, where sales activity sometimes has dropped during the time that the litigation is ongoing. The sharp rise in the number of sales in Dona Park/Manchester Place after the settlement of the litigation, and the fact that the contamination and remediation situation was no different in the three years immediately after the settlement than it had been the three years immediately before the settlement, indicates that the litigation itself, rather than the contamination and remediation situation, may have caused the decline in marketability, if any.

44. *Kellum v. Kuhlman Electric Corporation*, Circuit Court of Copiah County, Mississippi, Case No. 2001-0313.

45. Surveys of 37 buyers in the affected area were conducted. The median opinion of respondents regarding "the impact of the contamination on property values (in general) within the Subject Area over a specified period" was 25.0%. The median opinion of respondents regarding "how much less they would have paid for their home if they had known the facts" as described by the survey form was 27.5%. The median opinion expressed in 74 interviews of nonstakeholders living in a control area was that property values had been diminished by 100%. Mundy Associates, LLC, "Appraisal of Twelve Properties Located in Crystal Springs, Mississippi, *Kellum, et al. vs. Kuhlman Electric Corporation, et al.*" (April 4, 2003), 97, 110.

**Test of the Survey Results.** To test the contingent valuation results, the asking prices set by admittedly knowledgeable sellers, and the prices offered or paid by actual fully informed buyers, were examined.[46] The results of the analysis indicate that the survey was highly inaccurate in predicting the prices that would be set and paid by fully informed knowledgeable sellers and buyers. Three examples of actual transactions in the marketplace demonstrate the inaccuracy of the negative price effects predicted by the survey.

The first example looks at the actual sale of the home of one of the named plaintiffs. The selling owner meets the contingent valuation study measurement of being fully informed because she was a plaintiff in the litigation and had access to all of the contamination information generated by plaintiff attorneys in the litigation. Also, she actually had her property tested and had a written report concerning the PCB levels on her property.

The contingent valuation appraiser determined that the unimpaired value for the seller's house was $138,000 and predicted, based on the contingent valuation technique, that the impaired price that would be set by a fully informed seller and paid by a fully informed buyer would be only $56,580, a decrease of 59%. However, the fully informed seller actually set her asking price, as impaired, at $150,000, about $12,000 more than even the unimpaired value, and more than $93,420 higher than the prediction of what a fully informed seller would ask.

Subsequently, the seller received two offers, both from fully informed buyers.[47] The first offer was rejected, but the second offer was accepted, resulting in a sale. Both offers (and the eventual sale price) were significantly higher than the contingent valuation survey predicted. The first offer received was for $130,000—more than double the price predicted by the contingent valuation survey. The offer to purchase as impaired was only 5.8% less than the unimpaired value—not 60% lower as predicted based on the contingent valuation survey. The seller rejected the $130,000 offer, and countered at $145,000. The prospective buyers could not afford the house at that price and did not increase their offer.

When no additional offers were received for a considerable period, the owner switched brokers, reduced the asking price, and accepted an offer for $112,500, more than $55,900 higher than the price predicted by

the contingent valuation survey. The final sale price was only 13.5% less than the appraised unimpaired value—not 60% less as the survey had predicted.[48]

A second example of the inaccuracy of the price effects predicted by the survey involves the sale of another house in the neighborhood of Crystal Springs, also allegedly affected by PCB contamination. It too was put on the market following the completion of the contingent valuation survey process. The owners of the house (the persons listing it for sale) had previously participated in the contingent valuation survey of past home purchasers. The sellers had purchased the house for $150,000 in June 2001 before participating in the survey process. In the course of completing the survey, they indicated to the surveyor that they did not investigate the contamination situation in the neighborhood before buying the house in June 2001, and stated that they were only somewhat informed about the situation before participating in the survey process. They also indicated on the survey form that they believed that the source, location, type, levels, and health effects of the PCB contamination situation are extremely important to prospective buyers.

In 2004, after becoming fully informed owners as a result of participating in the survey process, they put the house back on the market. The asking price they set was $159,000, or $9,000 higher than the price they paid three years earlier in 2001 before they became fully informed about the contamination situation. They set this higher asking price even though they believed the contamination situation in the neighborhood was extremely important to potential purchasers.

A third example of the difference between the survey results and actual behavior in the marketplace can be found by looking at the transactions involving other fully informed buyers who participated in the contingent valuation survey. The owners of three other houses in the affected neighborhood indicated in answering the contingent valuation survey that when they bought their houses, they were already fully aware of all of the information in the survey form. All agreed that the source, location, type, levels, and health effects of the PCB contamination situation are extremely important to prospective buyers. Yet, all three indicated that they would not change the market price they actually paid for their homes—they all indicated in the survey form that despite the PCB contamination situation in

---

46. Another method, used by Clarion Associates in Crystal Springs, was to compare sales prices and market trends before and after the date of announcement of the contamination situation in the Crystal Springs marketplace. This method also showed that the contingent valuation method had overestimated the damages to plaintiffs' property values.

47. Prior to making the offer, the prospective buyer had been given a disclosure statement by the seller indicating that the soil and the house had been tested for PCBs but the levels found did not require any remediation. The broker representing the buyer was also fully knowledgeable about the PCB situation and insisted on adding a contract addendum acknowledging the PCB contamination in the neighborhood. The broker's disclosure to the buyer stated "Buyer understands and agrees that subject property is located in the vicinity of the location . . . where PCB contamination has been found" and Buyer acknowledges being informed that several properties" located adjacent to the source of the contamination "have been found to have PCB contamination." The seller on the contract addenda indicated in writing her willingness to make available the PCB testing report. The buyer was even given the phone number of the MDEQ to get more information, if needed. The prospective buyer signed the form, acknowledging its accuracy.

48. The ultimate buyer was also a knowledgeable purchaser since the second realtor routinely notified each one of its Crystal Springs clients about the PCB contamination situation and had every prospective purchaser sign a form acknowledging disclosure of the contamination situation.

Copyrighted material licensed by Randall Bell on April 26, 2021

the neighborhood, they would have paid about the same price as they actually did.

Each of these examples of Crystal Springs situations indicate that some fully informed sellers actually set asking prices dramatically higher than the asking prices predicted by contingent valuation surveys.

## The Columbus, Mississippi, Testing Process

The accuracy and reliability of contingent valuation in a litigation-related assignment in Columbus, Mississippi, was also tested. Here again, contingent valuation survey techniques were used to predict actual prices that would be paid by knowledgeable buyers. In Columbus, the environmental situation involved allegations that creosote emissions from a wood-treating facility had adversely affected residential property values in surrounding neighborhoods.

**Survey Approach and Results.** The survey-based contingent valuation methodology used by the expert for the homeowners predicted "a loss in value of 73%."[49]

Before the case went to trial, a comprehensive settlement was reached in the state court litigation as well as in a more extensive class action case in federal court involving approximately 6,000 plaintiffs and many thousands of single-family residences. Under the terms of the settlement order entered on November 4, 2002, individual written notices were provided to all class members by December 6, 2002. In addition, the order required that summaries of the settlement be printed in both *The Commercial Dispatch* (the local Columbus paper) and *The Clarion Ledger* (published in Jackson, Mississippi) before December 13, 2002.

The terms of the settlement order also provided that property owners in the class area who owned property within 500 feet of the plant were eligible to receive $750 for alleged property value diminution, and those living further than 500 feet were eligible to receive $500. In addition, a Property Value Protection Program was established for those in the class area who sold their homes during the two years following final approval of the settlement by the court. The selling owner could receive up to an additional $2,500 per residence for property value diminution by filing a claim form with the administrator of the Property Value Protection Program.[50]

The $2,500 maximum compensation per house agreed to by the plaintiffs is dramatically less than the 73% diminution predicted by the survey-based contin-

gent valuation method.[51] Depending upon the residential area of Columbus in which a plaintiff's home is located, the $2,500 cap ranges from 1.5% to 6.5% of average 2003 home prices in Columbus neighborhoods.

**Test of the Survey Results.** Based upon the contingent valuation theory that once a market is fully informed about a contamination situation[52] prices will reflect fully informed value, the home prices in Columbus should have dropped by the 73% predicted by the contingent valuation survey after the individual notices went out concerning the contamination and settlement. However, the data shows that this did not happen in the years subsequent to the settlement, despite the public notice and mass individual mailings to 6,000 plaintiff property owners.

Residential sales data for 1988 through mid-July 2005 from the Columbus Multiple Listing Service were collected and analyzed for the two areas around the plant where the contingent valuation study had predicted a 73% decline in prices in 2003 and thereafter. The data shows that contrary to the predicted effects, prices went up, not down, after the market became fully informed in December 2002.

For example, in the largest air-contamination area, as defined by the contingent valuation appraiser, the average price per square foot increased by 5.95% in 2003, dropped slightly by about 1.7% in 2004, and then surged again in 2005, increasing by 12.5%.[53] In a smaller area in close proximity to the wood-treating facility, prices were found to have increased 3.5% in 2003, immediately after the market became fully informed, and increased another 2.5% in 2004. In the first seven months of 2005, prices were lower by about 13.7% compared to 2004. However, overall, since the market became fully informed, the drop in average prices in this smaller area in closer proximity to the wood-treating facility was about 8.4% since 2002, the year before the market became fully informed. That is quite comparable to the 8.8% drop in average prices between 1997 and 2002 in the same submarket before it became fully informed.

Figure 3 shows the trend in average prices paid per square foot in the two areas that the contingent valuation survey predicted would experience a 73% drop in prices. The actual average prices paid in 2003 through 2005 are shown, as are the dramatically lower prices predicted by the contingent valuation analysis.

As shown in Figure 3, the trend lines since the end of 2002 for both the larger area of alleged air-contam-

---

49. Mundy Associates, LLC, "Appraisal of Plaintiff's Properties Located in Columbus, Mississippi, *Major Andrews, et al v. Kerr-McGee Corporation, Inc. et al.*" (July 19, 2001), 61. A second survey-based technique, involving previous buyers of homes, led to the conclusion that previous buyers "after learning about the nature of the contamination problem, . . . would pay 49% to 50% less for their home." A third technique, perceived diminution, involved a survey of nonstakeholders, i.e., those who lived in the unaffected control area selected by Mundy, and indicated a loss of 40.8% to 46.9% in value once the marketplace would become fully informed.

50. The litigants agreed not to divulge information about the number of property owners who may have applied for compensation from the Property Value Protection Program, so information about the number of filings for compensation, if any, is not available.

51. It is also significantly less than the 40% to 50% diminution predicted by the other survey-based techniques used by Mundy in the *Kerr-McGee* litigation.

52. Similar to in the North Tacoma case, where the settlement notice and disclosure requirements that were provided to the property owners made them fully informed, the settlement notice and information provided the 6,000 plaintiffs in the Columbus, Mississippi, litigation resulted in fully informed parties.

53. Based on sales data between January 1, 2005, and July 21, 2005.



**Figure 3**      Actual Average Price Per Square Foot Compared to Predicted Price, Columbus, MS, Study Area

Area with alleged air contamination
Area in close proximity to plant
Predicted CV price
Predicted CV price

ination and the residential area in closer proximity to the contaminated site continue to follow trends apparent in the marketplace long before the settlement of the litigation and the mass distribution of information to the marketplace. There was no dramatic drop in the number of sales or in prices as predicted by the contingent valuation survey.

## Conclusions

This article examines sales data in four locations where contingent valuation methods were used to measure alleged adverse impacts from environmental contamination. The results of this analysis clearly show that survey-based valuation methods have been a highly inaccurate and unreliable predictor of actual prices and values. The testing involved buyers and sellers who were as informed–if not more informed–about the contamination situation than the survey participants.

Research into actual real estate sales data subsequent to the end of the North Tacoma litigation and the enactment of disclosure requirements by the State of Washington clearly shows that the survey-based contingent valuation method used there was a highly unreliable predictor of prices and values in the neighborhoods affected, while the individualized property-by-property appraisals more accurately estimated the brief temporary decline in property values that actually occurred following the litigation and disclosure requirements. Examination of sales in Corpus Christi, Texas; Crystal Springs, Mississippi; and Columbus, Mississippi

provide further supporting evidence of the unreliability of contingent valuation in predicting price impacts.

There are many reasons why contingent valuation may continue to fail to accurately and reliably predict prices. Among the more significant reasons may be the following:

- The survey forms used in contingent valuation studies may not provide the range of information and opinions about the contamination situation that is typically available to actual buyers and sellers in the open marketplace.

- Buyers and sellers often rely on various intermediaries such as sales agents, lawyers, lenders, friends, and relatives in making decisions related to sale/purchase offers and prices. These various intermediaries may hold a variety of opinions about the property involved, the neighborhood, the location, and the environmental situation, and the seller or buyer processes the information from these various sources in the course of setting an asking price or making an offer to purchase.

- The survey process may not address all of the factors that go into a buyer's decision-making process. The presence or absence of contamination in a neighborhood may be only one of a myriad of factors that may cause potential buyers to consider or disregard the neighborhood. Crime levels; school quality; proximity to places of employment, retailing, and public parks; nearness of friends or relatives; or simply the styles and condition of the

Copyrighted material licensed by Randall Bell on April 26, 2021

houses are just some of the many factors that may be balanced and weighed against environmental issues.[54]

- CV surveys may establish values or value impacts from the point of view of only one side in a transaction, either a hypothetical buyer's willingness to pay or a hypothetical seller's willingness to accept an offered price. Each type of survey typically fails to consider the other side, and the fact that the seller or buyer may be competing with other sellers or buyers who perceive the risks differently.

- Survey-collected information often fails to reflect the dynamic of negotiations between real-world sellers and buyers that occurs over time. It is in negotiation that transaction prices are established in most U.S. real estate sales. Because none of their own money is at risk of changing hands, CV survey respondents incur no penalty in their responses for erring on either the high side or the low side. They also have little incentive, or perhaps even enough time, to fully consider their pricing opinions involving thousands of dollars. Actual negotiations conducted over time frequently establish agreed sale prices that compromise the well-intended initial positions of buyers and of sellers.

For contingent valuation surveys to be more accurate and reliable, they will have to address all of these factors that appear to account for their past failure to accurately predict prices.

At best, the testing of reliability indicates that contingent valuation studies result in hypothetical value estimates. Unlike the sales comparison method that looks to actual prices paid in an open and competitive marketplace, the contingent valuation method looks to hypothetical prices in a world carefully constricted to consider only one set of facts detailed on a survey form. As a technique for measuring actual prices that will be paid, and therefore actual damages that may be suffered by those affected by environmental contamination, the research indicates that past applications of contingent valuation have little, if any, reliability, and therefore the method has a high failure rate.

The demonstrated unreliability of contingent valuation surveys is especially significant for appraisals submitted in litigation assignments. Federal courts, and many state courts, now require that the trial judge serve as a gatekeeper reviewing and approving or rejecting appraisal methodology before it is presented to a jury. One of the accepted methods for demonstrating the reliability of nontraditional appraisal methods, such as contingent valuation, is to show that the accuracy of the method has been tested in the marketplace. There may indeed be situations in which application of contingent valuation techniques may be useful, for example, when dealing with noneconomic goods or in real estate situations involving special-purpose or limited-market properties for which there are few, if any, actual sales transactions that can be analyzed. However, in the contingent valuation applications tested here, the methodology was found not to be reliable. The reliability of contingent valuation in the courtroom must therefore be carefully considered by appraisers, attorneys, and judges before it is used as an alternative to the generally accepted methods for determining economic damages to real estate.

---

54. This has been recognized by others who have critiqued the reliability of contingent valuation methods. For example, see Peter F. Colwell and Joseph F. Trefzger, "Supply-Side Effects and Contingent Valuation Analysis," *Journal of Real Estate Practice and Education* 8, no. 1 (2005): 45–59, in which the authors discuss market segmentation and clientele effects.

**6.8** # Seller Disclosure and Buyer Knowledge: How They Affect Market Value

*by Rudy R. Robinson III, MAI, and Scott R. Lucas*

This article originally appeared in the Spring 2007 issue of *The Appraisal Journal*.

### Abstract

Confirmation of sales data is critical to any appraisal but takes on additional importance when the purpose of the assignment is to measure the effects of a property condition such as contamination. Often, buyers of both commercial and residential properties have no knowledge or very limited knowledge of a property condition that may greatly affect market value, thus tainting those sales for appraisal purposes. This article discusses what constitutes a well-informed buyer, suggests questions to ask of market participants, and provides examples of how the extent of disclosure affects the market.

A sometimes-overlooked component of market value is the extent that seller disclosure and buyer knowledge affect property value. Sellers and their intermediaries may have a legal obligation to disclose certain information about a property, but failure to do so is not uncommon. As a result, buyers may unknowingly purchase properties with a serious condition, such as environmental contamination.

Multiple listing service data and other commercial database services, such as CoStar, provide a wealth of information to appraisers, but there is a danger in relying on them without additional verification. They frequently omit facts of vital importance. Were the sellers divorcing? Was the seller an owner of a failing business and in desperate need of cash? Did the seller know but fail to disclose that the property had ongoing problems with water penetration, asbestos, or contaminated groundwater?

Transactions affected by these and other issues may not be arm's-length. Using such transactions in a paired sales analysis, statistical analyses, or other methods of valuation could yield a misleading and unreliable opinion of value. This is especially true where the buyer had no knowledge or very limited knowledge of a particular property condition, and the appraiser's assignment is to measure the very impact of that condition on value.

*The Appraisal of Real Estate* states that "appraisers should verify information to ensure its accuracy and to gain insight into the motivation behind each transaction. The buyer's view of what was being purchased at the time of sale is very important."[1] Further, the Uniform Standards of Professional Appraisal Practice provides that "in developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results."[2]

## The Well-Informed Buyer and the Arm's-Length Transaction

Buyer's knowledge is a necessary component of an arm's-length transaction. The definitions describing this component have changed over time, but the general concept remains unchanged:

- "The buyer is knowledgeable…of all the present or potential elements of value involved."[3]
- "A purchaser, buying with knowledge of all of the uses and purposes to which [the real estate] was adapted and for which it was capable of being used."[4]
- "Both parties are well informed or well advised, and acting in what they consider their best interests."[5]
- "The buyer and seller each acting prudently, knowledgeably, and for self-interest."[6]

The buyer must meet these criteria for the sale to be considered arm's-length.

## "Fully Informed" Versus "Well Informed"

The third and fourth definitions mentioned above leave the most room for interpretation, yet they also cover most assignments concerning market value an apprais-

---

1. Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 423.
2. Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice* (Washington, DC: The Appraisal Foundation, 2006), Standards Rule 1-4.
3. *Reservation Eleven Associates v. District of Columbia*, 420 F.2d 153, 155 (CADC 1969).
4. *Sacramento, etc., R.R. Co. v. Heilbron*, 156 Cal. 408, 409, 104 P. 979, 980 (1909).
5. *Federal Register* 55, no. 163 (August 22, 1990): 34228–34229.
6. *The Appraisal of Real Estate*, 22.

**Rudy R. Robinson III, MAI,** is the managing partner of Austin Valuation Consultants, Ltd., in Austin, Texas. Robinson specializes in appraising environmentally contaminated properties, especially for litigation purposes. He has written four previous articles for *The Appraisal Journal* and is a frequent guest speaker at real estate conferences and seminars. He graduated from the University of Texas at Austin with a Bachelor of Arts.

**Scott R. Lucas** is a senior associate with Austin Valuation Consultants, Ltd. He has written three previous articles for *The Appraisal Journal*. He is a graduate of the University of Texas at Austin, with a bachelor's degree in real estate and urban land development.

Copyrighted material licensed by Randall Bell on April 26, 2021

er will undertake. How informed is "well informed"? How much knowledge makes a buyer "knowledge-able"? To an extent, the definition of a well-informed buyer is left to the appraiser.

A buyer does not have to be fully or perfectly informed for the purchase to be arm's-length. A typical buyer, whether of residential or commercial property, cannot be expected to have the same knowledge as an engineer, hydrologist, or epidemiologist. Indeed, a buyer probably will not have the same knowledge as the appraiser. The appraiser also should not necessarily consider his or her level of knowledge as the baseline for transactions. The baseline for a well-informed buyer depends on the market participants. At a minimum, the market participant's information will include a written seller disclosure, which is required by most states. The required content of this disclosure is defined in each state's property code.

Consider, for example, a property with soil contaminated by heavy metals in excess of legal limits. If the buyer knew of the condition but was unaware of a toxicology report available at the local library, the sale might still be arm's-length. If the buyer discovered the condition from a neighbor six weeks after the purchase, the sale probably would not qualify as arm's-length. The vital question is how the buyer would have acted with additional knowledge that was readily available.

## The Role of Publicity, the Seller, and Intermediaries

Does media coverage of a property condition create an informed market? Not necessarily, and never by itself. What percentage of the population reads a local newspaper every day or watches local television news? According to the Pew Research Center, when respondents were asked whether they had read a newspaper yesterday, only 41% answered affirmatively, and only 57% said they watched local television news regularly.[7] Further, media coverage on issues such as contamination is very time sensitive. Occasionally, local media will cover an event very intensely, but only for a very short period. Sales in the affected area could occur well before or after that period, with buyers never having seen the coverage. Also, buyers from another city or state are even less likely to have witnessed a news story regarding the issue. The appraiser should be careful not to assume that the mere existence of media attention indicates widespread public knowledge.

The primary source of information about a property is the seller. As previously mentioned, in most states sellers of residential property are required to submit a disclosure form that describes problems or prior issues of concern; these may include structural defects, termites, mold, and flooding. Most states require disclosure of the presence of hazardous or toxic materials,

and some require disclosure of lawsuits or governmental actions that might affect the property.

In the case of most commercial properties, parties are deemed to be more knowledgeable, and promulgated disclosure forms are not mandated. Often the potential buyers of commercial property will hire environmental experts to assess the property. Still, sellers must disclose certain aspects of the property and cannot legally conceal such information from buyers.

Another important information source is the broker or agent. A Harris Interactive poll of recent and prospective home purchasers indicated that agents ranked behind only inspectors in terms of who buyers would ask for more information on environmental contamination.[8]

Unfortunately, experience shows that sellers and agents are sometimes less than forthcoming. In practice, disclosure forms frequently fail to mention on-site contamination, even when the seller clearly knows of it. Interviews of purchasers often indicate they learned of contamination only after their purchases. This is not limited to duped home purchasers. In one recent purchase of an industrial property in Texas, the seller knew but failed to disclose that the back lot once held an earthen pit for waste oil, and the waste had migrated off-site. Unfortunately for the buyer, his environmental expert failed to discover the contamination. Only after the purchase did the buyer learn, via a lawsuit, what the seller knew about this badly contaminated property.

Buyers have legal remedies, of course. Issues involving seller disclosure are the second most common type of real estate–related litigation.[9] However, litigation is costly, time-consuming, and not guaranteed to produce the desired result.

The point is that the appraiser must be careful not to infer a buyer is knowledgeable about a particular property condition simply because information about it is available or even plentiful. In a 2005 Appraisal Journal article, Winson-Geideman surveyed several buyers of a condominium built on contaminated soil. Evidence of contamination was contained in their property deeds. Still, a majority of the purchasers stated they would not buy a property in such condition, unaware that they had done just that.[10]

## The Buyer Questionnaire

Personal confirmation of transactions best reveals what the parties knew at the time of sale. Appraisers should conduct their own research to ascertain public knowledge of a property condition and how it has affected the market.

In studying properties affected by some condition or externality, the appraiser must determine whether buyers in the affected area knew of the condition when they purchased the property. If not, the appraiser cannot use the transaction as an impaired sale to measure

---

7.   Pew Research Center, "Public's News Habits Little Changed By September 11: Americans Lack Background to Follow International News" (June 9, 2002).

8.   Robert Barber, "Environmental Hazards on the Mind of Home Buyers," *Realty Times*, February 7, 2006, http://www.realtytimes.com.

9.   Bob Hunt, "Realty Reality: NAR Report Shows Lawsuit Trends," *Realty Times*, January 18, 2006, http://www.realtytimes.com.

10.   Kimberly Winson-Geideman, "Environmental Case Studies: Ensuring Suitable Comparables," *The Appraisal Journal* (Summer 2005): 288–295.

the condition's effect on value. An exception might be appropriate if a strong majority of buyers did not know of the property condition but claim such knowledge would not have affected their decision to purchase or the agreed-upon price.

A prepared questionnaire can assist the appraiser in determining whether a sale is arm's-length. In formulating the questionnaire, the appraiser should take care to employ simple language, eliminate technical terms to the extent possible, and avoid biased questions.

Following are general questions to ask when confirming the sale of a property potentially affected by some condition or externality; the specific questions in an actual questionnaire will depend on the issues being studied.

•   What nonphysical factors, besides the property condition in question, may have affected whether the sale was arm's-length? For example, divorce, unemployment, and threat of foreclosure or bankruptcy may have impacted the sale price of a residence, while business strategies and antitrust issues may affect the sale of a commercial property.

•   Was the purchase affected by any other property conditions that impacted the purchase price?

•   Did the buyer know that the property was affected by the property condition in question or located in an area of affected properties? If so, what were the sources of information (seller, agent, neighbors, media, government)?

•   If the buyer had knowledge, when in the purchase process did he or she obtain this knowledge (prior to visiting property, during negotiations, at closing)?

•   If the property condition was essentially incurable by the lone effort of the property owner (say, the property was within an area of widespread groundwater contamination), did the buyer know how the condition would be cured (if at all), who would oversee the effort, and how long the process would take?

•   Was the buyer aware of any litigation affecting the property or similarly affected properties in the market area?

•   Did the buyer receive any indemnification from the seller?

•   If the buyer did have knowledge of the property condition, how did this knowledge affect the transaction?

•   If the buyer had no knowledge or (in his or her view) inadequate knowledge of the condition, how would this knowledge have changed the particulars of the purchase, if at all?

The questionnaire is distinct from a formal survey, which requires a random sample and enough respondents for statistical significance. Questionnaire respondents will rarely comprise a random sample needed for a valid survey, and the number of respondents may be very small depending on the appraisal problem. Also, this questionnaire is not used as part of a contingent valuation methodology; rather, it is a means of assessing actual transactions.[11] The questionnaire helps to determine the extent to which the market is knowledgeable of a condition that may affect property value. It provides leads to transactions involving well-informed buyers. Those particular sales, not the entire body of sales in the affected area, can form the basis of an opinion of whether and to what extent the property condition had affected value. The appraiser can also determine whether the affected market is suitable for a broad statistical analysis such as regression.

## The Well-Informed Market and Statistical Studies

When contamination or some other property condition is widespread, especially in a residential area, a common method for evaluating possible diminution in value is a statistical model such as regression analysis. Regression analysis is a process of estimating the value of an unknown variable via the measurements of a known (measured) variable or variables.

Regression analysis is a valid method of estimating real estate values. *The Appraisal of Real Estate* recognizes its use, and the Appraisal Institute offers publications and courses on regression analysis. However, it can give misleading results in the absence of a careful study of the market participants.

Most commonly, the regression analysis will compare sales of properties in the affected area to sales of similar but unaffected properties (the control group). If the appraiser determines (through buyer questionnaires or other means) that knowledge of the property condition is widespread among buyers, a regression analysis may accurately measure the diminution (or lack thereof) caused by the condition at issue.

Conversely, a regression analysis that isolates for a particular property condition has no credibility if the buyers were unaware of the condition at the time of purchase. Consider a situation in which buyer knowledge is largely absent and many buyers indicate such knowledge would have affected their decision to purchase or the price paid. A regression analysis in this situation assumes an efficient, well-informed market–one in which prices reflect all known information–when in fact the opposite is true.

As noted in *The Appraisal of Real Estate*, real estate markets are more efficient than they once were but "have never been considered truly efficient."[12] A regression analysis based on a faulty assumption of an efficient market would probably result in a finding of no diminution whether or not it was actually present. Even if the analysis did find diminution, the results would be suspect. Consequently, regression analysis

---

11.   Several articles in *The Appraisal Journal* and elsewhere have discussed contingent valuation. Most recently, see Richard J. Roddewig and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," *The Appraisal Journal* (Summer 2006): 267–280.

12.   *The Appraisal of Real Estate*, 98; also see Table 6.1, *The Appraisal of Real Estate*, 99, for the differences between efficient markets and real estate markets.

Copyrighted material licensed by Randall Bell on April 26, 2021

is not always the right tool for evaluating a particular property condition. Appraisers must be cautious when relying upon advanced statistical methods, and should keep in mind that a poorly designed model can prove almost anything.

There does not appear to be any empirical research precisely defining the percentage of well-informed buyers needed to create a well-informed market, thus making a regression analysis potentially worthwhile. Not every buyer must be knowledgeable to comprise a well-informed market, just as a fully or perfectly informed buyer is not requisite to an arm's-length sale. The appraiser must carefully study the market to determine that the effects of the property condition are reflected marketwide. This is possible even if some sellers fail to disclose the condition and some buyers are uninformed. If, instead, buyers are largely uninformed and discounts in purchase prices were limited to buyers with knowledge, the appraiser would need to rely on a collection of paired sales analyses based on sales with informed buyers discovered via questionnaires and confirmations of sales.

## How Disclosure Affects the Market: Two Studies

Two studies provide examples of how disclosure and knowledge may affect a market.

### Study One

Study One involves a residential subdivision located adjacent to an industrial facility. The facility had leaked large quantities of solvents including trichloroethylene into the groundwater, and the contaminants flowed northward over one mile off-site and under several hundred single-family residences. None of the homes used well water, but the contaminants had percolated into owners' basements and were present in the air at levels above what the state permitted.

Interviews of recent property purchasers indicated that barely one-half of the buyers had any knowledge of the contamination, and only one-third of those with any knowledge understood that it had spread over one mile off-site and under several hundred homes. Most respondents believed the responsible parties were actively remediating the off-site contamination or that the state would require them to do so. In fact, neither was true. Media coverage was limited to a small handful of newspaper articles and television reports.

Other issues affected the body of transactions in the affected area. One potentially responsible party had offered indemnification agreements to select buyers closest to the industrial site. Also, some agents were actively buying and selling properties in the affected area in addition to carrying listings. Some of these agents offered very limited or no disclosure to potential buyers.

The questionnaires did reveal several arm's-length transactions with at least some disclosure and with reasonably well-informed buyers from which to estimate property diminution. However, in the authors' opinion, the level of seller disclosure and buyer knowledge was insufficient to support a regression analysis of all sales in the affected market.

### Study Two

Like the previous example, Study Two involves a residential subdivision located adjacent to an industrial facility. The facility had been used for a variety of purposes including fuel production, chemical reclamation, and storage. Several hundred homes were constructed about one-half mile from the facility just as it was permanently closing. By the time the subdivision was built out, the industrial facility became a Superfund site because of widespread on-site and off-site contamination with volatile organic compounds and heavy metals.

Though the Environmental Protection Agency (EPA) persistently claimed that the site posed no threat to residents in the subdivision, residents complained of foul odors emanating from the site, particularly in times of high humidity. When the EPA initiated further soil testing in the subdivision, residents observed specialists wearing clean suits and respirators, and the testing revealed that contamination from the site had migrated to residents' yards. Soon after, a local savings association, which had acquired a small number of properties in the subdivision via foreclosure, terminated its leases and ordered its tenants to vacate within six weeks. Later, the local school district voted to close the elementary school located within the subdivision.

In this case, the disclosure of the contamination was widespread and eventually approached 100%. Sales in the subdivision occurred prior to the passage of mandatory seller disclosure, yet most agents required potential buyers to sign copies of newspaper articles discussing the contamination. Many sales involved 100% seller financing of the property and transaction costs.

The high level of disclosure and clearly well-informed market created an ideal situation for regression analysis as well as groups of paired sales. Both analyses revealed property diminution of approximately 33% prior to the closing of the elementary school. When the school closed, lenders (at the direction of the U.S. Department of Housing and Urban Development) ceased lending on homes in the subdivision, and the market essentially collapsed. Ultimately, all of the homes in the contaminated neighborhood were purchased by the responsible parties and were demolished.

## Conclusion

In measuring the impact of a particular property condition or externality on market value, the appraiser must ensure that the relevant sales data meets the definition of an arm's-length transaction. In this regard, seller disclosure and buyer knowledge is of critical importance. A buyer does not need full or perfect knowledge for a sale to be arm's-length, but he or she must have sufficient information so that the purchase is not negotiated at a significant disadvantage. Relying on third parties or making assumptions about buyer or market-

wide knowledge can result in an invalid and mislead-ing opinion of value. Direct confirmation of sales with the involved parties results in a supportable opinion and better service to the client. Within an area of sales of contaminated properties, a sufficient number of in-formed buyers is needed so that statistical tools such as regression analysis can be of value. Additional research on these issues will help further define what constitutes an informed purchaser and an arm's-length transaction.

### Additional Reading

Jackson, Thomas O. "Appraisal Standards and Contaminated Property Valuation." *The Appraisal Journal* (April 2003): 127–133.

Marchitelli, Richard, and Peter F. Korpacz. "Market Value: The Elusive Standard." *The Appraisal Journal* (July 1992): 313–322.

Shlaes, Jared. "The Market in Market Value." *The Appraisal Journal* (October 1984): 494–518.

Copyrighted material licensed by Randall Bell on April 26, 2021

6.9

# Under the Microscope: Dissection of a Contingent Valuation Survey

*by Kristy E. Mathews*

This article originally appeared in the Summer 2008 issue of *The Appraisal Journal*.

### Abstract

Recently, appraisers and real estate economists have relied upon a survey-based method called contingent valuation (CV) as an approach for estimating potential property value losses associated with environmental disamenities. This approach is not universally accepted, as some studies indicate that CV does not produce reliable estimates. This article, written from a survey research and analysis perspective, provides a close inspection of a CV questionnaire and corresponding analysis. This dissection reveals some concrete reasons why CV may not produce reliable results. The article concludes with suggestions for future studies.

During the last several years, appraisers and real estate economists have adopted a technique from natural resource economics called contingent valuation (CV) to estimate the potential diminution in property values associated with environmental disamenities. Contingent valuation is a survey-based approach that attempts to create a hypothetical market for a good or service by constructing a scenario in which survey respondents indicate the amount of money they would pay to hypothetically acquire the good or service described in the questionnaire. Policy makers and economists developed CV almost 50 years ago to measure the value of natural resource services for public policy decisions.[1] These services, such as a day of recreational fishing on a public river, are not bought and sold in a market. As a result, the value of these nonmarket services cannot be directly observed by looking at the behaviors of buyers and sellers.

The hypothetical nature of CV, called hypothetical bias, has long been recognized as one of its biggest limitations.[2] In effect, the hypothetical nature of CV does not provide respondents with an incentive to reveal true values for natural resource services because they do not have to bear the consequences of their answers. The survey responses are not actual commitments of dollars for real purchases. If respondents make different choices in these hypothetical surveys than they would if faced with the same scenario in real life, then CV results will not produce a reliable measure of value. The key question is whether respondents' survey answers reflect their actual decisions and behaviors. In light of this hypothetical bias, natural resource economists continue to debate the reliability of CV-based estimates of value.[3]

As applied to environmental effects and property value, the CV scenario typically instructs the respondents to suppose that the residential properties have been contaminated. The survey then asks how much money respondents would be willing to pay for the contaminated properties or how much they would pay to prevent or avoid the alleged contamination to the properties. Alternatively, respondents may be asked how much money they would be willing to accept in exchange for ownership of the properties. Researchers use the reported willingness to pay (WTP) or willingness to accept (WTA) to estimate any decrease in the value of the home attributable to the alleged contamination.

## Literature Review

Mundy and McLean[4] published one of the earliest studies using CV to estimate the decrease in property values in a litigation setting. In that study, the respondents' hypothetical answers to CV questions reveal an average loss of 9%–15% for homes in a North Tacoma, Washing-

---

1. Robert K. Davis, "Recreation Planning as an Economic Problem," *Natural Resources Journal* 3 (October 1963): 239–249; Robert K. Davis, "The Value of Big Game Hunting in a Private Forest," in *Transactions of the North American Wildlife and Natural Resources Conference*, 392–403 (Washington, DC: Wildlife Management Institute, 1964); and V. Kerry Smith, "Fifty Years of Contingent Valuation," in *Handbook on Contingent Valuation*, ed. A. Alberini and J.R. Kahn, 7–65 (Cheltenham, UK: Edward Elgar, 2006).

2. Robert D. Rowe, Ralph C. d'Arge, and David S. Brookshire, "An Experiment on the Economic Value of Visibility," *Journal of Environmental Economics and Management* 7 (1980): 1–19. For recent evaluations of hypothetical bias, see James J. Murphy and Thomas H. Stevens, "Contingent Valuation, Hypothetical Bias, and Experimental Economics," *Agricultural and Resource Economics Review* 33, no. 2 (2004): 182–192; and James J. Murphy et al., "A Meta-Analysis of Hypothetical Bias in Stated Preference Valuation," *Environmental and Resource Economics* 30, no. 3 (2005): 313–325.

3. Smith.

4. Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297.

**Kristy E. Mathews** is a principal economist at Veritas Economic Consulting, LLC, and specializes in survey research and natural resource economics. She has consulted on more than a dozen cases where surveys are used to estimate potential property damages. Mathews is a coauthor of an Appraisal Institute symposium paper on standards for the use of surveys in property value litigation, as well as other articles in economics journals. She has an MA in economics from The George Washington University and a BA in economics from Alma College.

The author would like to thank Miranda Freeman and Bill Desvousges for their collaboration on earlier research efforts related to this topic. All opinions expressed here are those of the author.

ton, neighborhood potentially impacted by air emissions from an operating smelter.

Simons[5] uses multiple methods, including CV, to estimate the decrease in property value for residential property potentially affected by PCBs in Anniston, Alabama. While the market-based methods in that study reveal a diminution of approximately 30%–60%, the CV survey results suggests a 95% loss in the value of the residential property. Jenkins-Smith et al.[6] use CV to estimate the potential loss in property values associated with heavy metals in soils in neighborhoods adjacent to a closed smelter in Corpus Christi, Texas. Their CV results indicate losses of about 30%. Simons and Throupe[7] use CV to estimate the value impact of toxic mold on residential properties in South Carolina. Their CV results suggest an average loss of 20%–37%. Simons and Winson-Geideman[8] use a CV survey in eight states to study the effects of leaking underground storage tanks (LUSTs) on residential property values. Their CV results imply losses in property values of 19%–31%.

More recently, appraisers have criticized the use of CV as a valuation tool for properties that may be affected by environmental disamenities. Wilson[9] provides a critique based on the National Oceanic and Atmospheric Administration (NOAA) Panel's report on contingent valuation.[10] Following the 1989 *Exxon Valdez* oil spill, the State of Alaska filed a natural resource damage (NRD) claim of almost $3 billion based on a CV study.[11] In conjunction with the *Exxon Valdez* NRD assessment, several economists and researchers conducted empirical research on the reliability of the CV method in the early 1990s.[12] This research prompted NOAA to convene a panel of survey researchers, economists, and psychologists to review the available evidence on CV and determine whether it could provide a reliable estimate of damages. The NOAA Panel's report concluded that the hypothetical bias of CV surveys undermines the reliability of the results. Accordingly, the panel developed a list of guidelines and standards for CV surveys to meet in order "to be the starting point" for damages.[13] Wilson's critique details the findings of the NOAA Panel.

Roddewig and Frey[14] compare CV-based results to actual transaction prices to test the reliability of CV in estimating property values. In four separate cities, CV studies were used to estimate the loss in property values attributed to various types of environmental contamination. Roddewig and Frey then investigate actual transactions of properties within the same geographic areas and compare the diminution, if any, in actual property values to the CV results. They find that not only does CV overestimate the loss in property values attributed to environmental contamination, but in some cases predicts a loss when actual transaction data reveals an increase in property values.

The current article is written from a survey research and economic analysis perspective, and continues the debate by providing a dissection of a property-value CV questionnaire. The Wilson article provides some rationale for arguing against CV as a methodology, and the Roddewig and Frey article suggests some general reasons for the unreliability of CV in a property value context. This article differs in that the dissection provides a hands-on, pragmatic review of the specific processes that CV researchers use to generate a percentage reduction in property values associated with environmental contamination. This close inspection of specific CV questions and analysis techniques provides a better understanding as to why, specifically, CV may fail to generate reliable estimates of property value losses associated with environmental disamenities.

This article is organized as follows. The next section discusses the specific CV questions used in litigation-related surveys to generate property value losses associated with alleged contamination. This is followed by an examination of key flaws in this series of CV questions. Next, one of the key reliability tests endorsed by the NOAA Panel is described along with how the representative questionnaire fails this key test. Finally, conclusions and suggestions for future studies are offered.

## Examination of a CV Questionnaire

A CV questionnaire that has appeared in the published literature was selected and analyzed to identify specific problems affecting the reliability of CV surveys. The

5.    Robert A. Simons, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal* (October 2002): 388–400.

6.    Hank C. Jenkins-Smith et al., "Information Disclosure Requirements and the Effect of Soil Contamination on Property Values," *Journal of Environmental Planning and Management* 45, no. 3 (2002): 323–339.

7.    Robert A. Simons and Ron Throupe, "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values," *The Appraisal Journal* (Spring 2005): 156–166.

8.    Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys," *Journal of Real Estate Research* 27, no. 2 (April–June 2005): 193–220.

9.    Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53–61.

10.   Arrow et al., "Report of the NOAA Panel on Contingent Valuation," *Federal Register* 58, no. 10 (January 15, 1993): 4601–4614.

11.   Carson et al., *A Contingent Valuation Study of Lost Passive Use Values Resulting from the Exxon Valdez Oil Spill*, report to the Attorney General of the State of Alaska (Washington, DC: Resources for the Future, Inc., November 10, 1992).

12.   See Jerry A. Hausman, ed., *Contingent Valuation: A Critical Assessment* (Amsterdam: Elsevier Science Publishers B.V., 1993) for a subsequent publication of this research, which was sponsored by Exxon.

13.   Arrow et al., 4610. The NOAA Panel wrote, "The phrase starting point is meant to emphasize that the Panel does not suggest that CV estimates can be taken as automatically defining the range of compensable damages within narrow limits."

14.   Richard J. Roddewig and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," *The Appraisal Journal* (Summer 2006): 267–280.

Copyrighted material licensed by Randall Bell on April 26, 2021

questionnaire, by Simons and Winson-Geideman,[15] was selected for several reasons. First, a published article provides the exact wording of the key questions that the analysts use to estimate the percentage decrease in property values while others do not. The actual wording of the questionnaire allows specific identification of why these CV questions may not provide reliable estimates of property value losses. The actual wording also allows identification of key information that is excluded from the questionnaire, which is equally as important in interpreting CV results.

A second reason for examining this particular questionnaire is that the authors reveal some of the details of their analysis. Understanding the specific methods and assumptions that the analysts use to construct loss estimates from CV survey responses provides further insight into the results. Moreover, in this case, the authors indicate that their analysis technique partly addresses the hypothetical bias inherent in CV responses.

Another reason to focus on this specific questionnaire is its widespread use. The authors indicate that more than 1,000 respondents across 8 states responded to these CV questions over a 3-year period.[16] Also, most of the CV data was collected in conjunction with litigation.[17] Thus, this questionnaire has had the potential to influence litigation outcomes in the past. To the extent that published questionnaires have a higher likelihood to be used in the future, this questionnaire may influence future litigation outcomes as well.

## CV Questionnaire Scenarios
In the CV questionnaire used by Simons and Winson-Geideman, the respondents to the telephone survey first hear the following question:

> (Q1) Suppose a job change required you to move to a different location. You need to find a home quickly and have been looking for some time. In looking for a home, you find one that is very similar to the one you live in now. If the neighborhood is also very similar to the one you live in now, what is the most you would be willing to offer for the home?

To simplify later discussion, this scenario will be called the baseline scenario. The answers to this baseline question provide the respondents' hypothetical offers for homes similar to theirs. The survey authors treat this result as the unimpaired value of the hypothetical property, which can vary from person to person.

Next, the survey respondents hear three different scenarios that vary in terms of the disamenities that could potentially reduce the value of the residential property described in the first question. One of these scenarios involves a LUST at an adjacent gas station. The other scenarios address disamenities that include PCBs, railroad tracks, a business park, and airborne

chemical emissions. Presumably these other scenarios are included so that the specific litigation that the survey addresses cannot be easily deduced by the respondents.

Two variations in the LUST scenario are given in the CV survey. Each respondent is presented with one or the other LUST scenario, but not both. The first version of the LUST scenario states as follows:

> (Q2a) The home is located next to a recently remodeled, operating attractive gasoline service station. The site of the station has been registered as having had leaking underground storage tanks. While the leaking tanks have been repaired, the contamination that escaped from under the station has not been removed. The home lot is located where groundwater from the service station could flow underneath it. **However, no environmental testing has been done to determine if gasoline, containing benzene, has migrated from the service station under the home lot.** Except for this one factor, the rest of the neighborhood is like yours, and the home is very similar to your home. What is the most you would be willing to offer for the home?

The second version of the LUST scenario states as follows:

> (Q2b) The home is located next to a recently remodeled, operating attractive gasoline service station. The site of the station has been registered as having had leaking underground storage tanks. While the leaking tanks have been repaired, the contamination that escaped from under the station has not been removed. The home lot is located where groundwater from the service station could flow underneath it. **Results of environmental testing showed that gasoline, containing benzene, has migrated from the service station under the home lot.** Except for this one factor, the rest of the neighborhood is like yours, and the home is very similar to your home. What is the most you would be willing to offer for the home?

The two LUST scenarios, respectively called "LUST light" and "LUST heavy" by the authors, differ only with respect to the highlighted sentence. Regardless of the version that the respondents hear, the answers to the LUST question provide the values of the hypothetical residential property adjacent to the LUST. Subtracting the LUST scenario value from the baseline scenario value, for each respondent, yields the purported loss in value and forms the basis for the calculation of a percentage loss across all respondents.

## Isolating the Unique Effect of Contamination
A valid methodology for estimating the decrease in property values from alleged environmental contamination requires a unique cause-and-effect relationship. That is, the presence of chemicals must cause an actual decline in property values (the effect), and the effect must uniquely result from the alleged cause. Hall and Lazear[18] emphasize that valid damages are calculated "but-for" the alleged event. They describe how a valid

---

15.   Simons and Winson-Geideman, 200.

16.   Ibid., 197.

17.   Ibid.

18.   Robert E. Hall and Victoria A. Lazear, "Reference Guide on Estimation of Economic Losses in Damages Awards," *Reference Manual on Scientific Evidence*, 2nd ed. (Washington, DC: Federal Judicial Center, 2000), 277–332.

methodology will explicitly exclude the impact of unrelated events. Isolating the unique effect of the presence of the chemicals is called "holding all else constant." Bell[19] concurs that keeping other things equal is critical to the determination of causality when estimating property value losses associated with detrimental conditions.

Holding all else constant within the boundaries of a CV questionnaire requires special care. The specific information presented as part of the hypothetical scenarios and CV questions must explicitly hold constant all features and events that can affect property values in both the baseline and contamination scenarios. Said another way, the only difference between the baseline scenario and the contamination scenario should be the contamination. Without this explicit design feature, any purported decline in the value from the baseline cannot be uniquely attributed to the contamination.

In the CV questionnaire examined here, the baseline scenario is silent on the specifics of the adjacent properties. However, in the LUST scenarios, homeowners are asked to value the residential property with possible environmental contamination in the groundwater underneath a house that is next to a gas station. Because there is no mention of the home being next to a gas station in the baseline scenario, this CV questionnaire design does not hold all else constant. The survey elicits a value in the LUST scenario that includes both any negative value of the possible groundwater contamination and any negative value associated with having an adjacent gas station. As a consequence, this CV questionnaire design is unable to untangle the possible value impact of benzene in groundwater from the possible value impact of the adjacent gas station.

The failure to hold all other factors constant likely biases this CV questionnaire's results in ways that cannot be measured or calibrated. For example, some people may prefer being next to a gas station for convenience reasons. They may assume the gas station would have a 24-hour convenience store or a car wash and place value on having these amenities next door. They could also assume that the adjacent gas station means the house is located near other retail opportunities, or on a main commuting route. Because of the implied convenience, it is possible that some people may be willing to pay more to live next to a gas station.

On the other hand, some people may not want to live next to a gas station for reasons completely unrelated to potentially contaminated groundwater. For example, some people may not want to live next to a gas station because they are concerned about traffic and noise associated with other people using the gas station. That robberies sometimes occur at convenience stores may deter some people from choosing to live next door. In addition, the respondents may be afraid of explosions or the risk of fire from the petroleum products. None of these factors has anything to do with the effects of potentially contaminated groundwater on property values.

Failing to mention the adjacent gas station in the baseline scenario results in bias from all the assumptions made by respondents about the gas station, which are completely unrelated to the groundwater contamination. Thus, the percentage difference in property value between the baseline and LUST scenarios could be attributed to a variety of factors. As shown in this example, failing to hold other factors constant likely explains, at least in part, why CV-based loss estimates may not reliably measure property value losses.

## Providing Sufficient Information for an Informed Decision

Another issue with the CV questionnaire examined here is that it does not provide sufficient information for respondents to make the informed housing decisions they would make in a real-life situation. Purchasing a home is a major financial commitment, and people want a long list of information about a property, the neighborhood, and the real estate market before committing to a purchase. For a major purchase decision such as a house, people may spend weeks or months trying to decide what house to buy and in what neighborhood. This search may involve the collection of extensive information about both the available properties and the neighborhood.

During the approximately ten-minute CV telephone survey used by the questionnaire's authors, none of the typical homebuyer information is provided to respondents. Rather, the questionnaire asks respondents to assume the neighborhood and home are very similar to their current neighborhood and home. Such an assumption provides no information about market conditions and competing buyers, other potential properties available for purchase, and characteristics that extend beyond the boundaries of the property and the neighborhood. For example, the survey respondents do not have specific information as to location (city/town, state, neighborhood, distance to work); market conditions (frequency of new listings, mortgage rates, opportunity for negotiation); or the quantity, quality, and characteristics of other homes available for purchase.

Moreover, the LUST scenarios provide very little information about the potential for health risks to the homeowners who live adjacent to the gas station. For example, the survey does not provide information on the amount of benzene relative to background levels, the exposure pathway, the likelihood of coming into contact with the benzene, or specific risks associated with benzene in groundwater. Most importantly, the LUST scenarios do not indicate whether the drinking water supply for this house comes from a groundwater well. The LUST scenarios contain no discussion of whether benzene poses a health risk, the type of health risk, or the level of risk. The use of the word "contamination" in the LUST scenarios certainly suggests that the amount of benzene is sufficient to be dangerous, but the scenarios provide no factual information to the potential buyers on how serious the problem is.

---

19.    Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999), 33.

Copyrighted material licensed by Randall Bell on April 26, 2021

Accordingly, all of the missing information—including information on the home, the neighborhood, the market conditions, presence of benzene in groundwater, and benzene's health risks—is left to each respondent's imagination. Survey researchers explicitly recognize that respondents fill in missing information themselves.[20] Schwarz writes specifically about CV questions: "Respondents' representation of the good may be more or less inclusive than intended by the researcher." When a survey's scenarios are rudimentary, they require respondents "to fill in the gaps, rendering it impossible [for the researchers] to tell what respondents are valuing."[21] Similarly, Fischhoff comments, "The typical CV study omits many of these details, forcing (or allowing) respondents to guess at what was meant."[22]

When respondents' assumptions are different in unknowable ways, it is impossible to compare the survey answers across respondents. Specifically, the highly individual nature of filling in the gaps makes calculations of average responses from the survey meaningless because the responses are not based on the same understanding of the question.

For example, the CV scenarios ask respondents to indicate their WTP for a home without any knowledge of what other properties may be available. One respondent may bid on the LUST scenario under the assumption that there is another house exactly like her home available without any contamination issues. Another respondent may remember that the baseline scenario says "You need to find a home quickly and have been looking for some time." He may assume that this means time is running out and there are no other acceptable properties available, and may bid on the contamination scenario accordingly. In effect, a 30% discount for the first respondent cannot be compared with a 10% reduction for the second respondent. Thus, the resulting 20% average is a meaningless value.

## Marginal Bidder Analysis

Another limitation of the CV questionnaire examined here is that it does not reflect the complex, dynamic property decisions made by actual home buyers and sellers in a real estate market.

In an actual transaction, the price that the buyer pays and the seller accepts typically results from the give-and-take between buyer and seller. Buyers and sellers both factor into their offers and acceptances the quality and quantity of available substitute homes, the presence and offers of other potential buyers, and their individual preferences. The agreed-upon price often reflects a negotiation process, where the buyer makes the first offer and the seller reacts, sometimes with a counteroffer or a rejection of the buyer's offer. This dynamic market process likely cannot be simulated within a survey format and is not represented in the CV questionnaire. The CV study examined here instructs respondents to assume the role of home buyers. In this CV survey, no one simultaneously represents the seller or the other buyers. Thus, this CV questionnaire does not simulate a real estate market.

Recognizing the lack of actual market features in this CV survey, as well as the potential for hypothetical bias, Simons and Winson-Geideman use an analysis approach called the marginal bidder analysis.[23] Because a rational seller would not accept an unreasonably low bid, this approach limits the analysis to the top-half and the top-quarter of the hypothetical offers.

For example, suppose 100 survey respondents offered hypothetical bids in the LUST scenario. In the marginal bidder analysis, the percentage loss, if any, is calculated for each of the 100 bids, based on a comparison of the offer for the LUST scenario to the offer for the baseline scenario, and arranged from low to high (in terms of percentage loss). The 50 and 75 highest percentage losses would be eliminated from the marginal bidder analysis for the top-half and top-quarter analysis, respectively. The analysis proceeds based on the remaining hypothetical bids, which represent the highest 50% and 25% of the bids, relative to the baseline scenario.

While eliminating the lowest hypothetical offers from the analysis does make the loss calculations lower than they would be with all of the hypothetical offers included, it does not improve the reliability of the CV-based results for several reasons.[24] The first reason is that this is simply an arbitrary adjustment. Why is taking 50% or 25% of the hypothetical offers appropriate? Why not the best 5% or 10% of the offers? This ad hoc adjustment apparently does not have an empirical or market-specific basis, since no citations to literature or empirical studies are given in support of this marginal bidder approach.

---

20.    Baruch Fischhoff and Lita Furby, "Measuring Values: A Conceptual Framework for Interpreting Transactions with Special Reference to Contingent Valuation of Visibility," *Journal of Risk and Uncertainty* 1 (1988): 147–184; Robert C. Mitchell and Richard T. Carson, *Using Surveys to Value Public Goods: The Contingent Valuation Method* (Washington, DC: Resources for the Future, Inc., 1989); Arrow et al.; Seymour Sudman, Norman M. Bradburn, and Norbert Schwarz, *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology* (San Francisco: Jossey-Bass, 1996); Baruch Fischhoff, "What Do Psychologists Want? Contingent Valuation as a Special Case of Asking Questions," in *Determining the Value of Non-Marketed Goods*, eds. R. J. Kopp, W. W. Pommerehne, and N. Schwarz, 189–217 (Boston: Kluwer Academic Publishers, 1997); Norbert Schwarz, "Cognition, Communication, and Survey Measurement: Some Implications for Contingent Valuation Surveys," in *Determining the Value of Non-Marketed Goods*, 165–188; Roger Tourangeau, Lance J. Rips, and Kenneth Rasinski, *The Psychology of Survey Response* (Cambridge: Cambridge University Press, 2000); Shari Seidman Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, 2nd ed. 229–276 (Washington, DC: Federal Judicial Center, 2000); Nora Cate Schaeffer and Stanley Presser, "The Science of Asking Questions," *Annual Review of Sociology* 29 (2003): 65–88.

21.    Schwarz, 183.

22.    Fischhoff, 192.

23.    Simons and Winson-Geideman, 204.

24.    Because hypothetical bias can occur in any bid, not just the unreasonably low bids, the marginal bidder analysis does not truly address hypothetical bias.

The second reason the marginal bidder technique does not improve the reliability of the CV-based estimates is that it does not reflect market-clearing prices based on demand and supply interactions. In actual transactions, the hopeful buyers offer their best prices, based on their perceptions of competition from other buyers and the availability of other, similar houses for sale. A rational seller will accept the highest bid, assuming all non-price factors between competing buyers are equal. Thus, the selling price of any house is likely to be among the highest offers, if not the highest offer. A rational seller does not take the average of the top quarter of the bids received. As Simons and Winson-Geideman state, "The average sale price of the bidding pool (willingness to pay) has little bearing on the final price because the lower bids only make the market price if the other bids drop out."[25]

The marginal bidder approach does not produce a market-clearing price because the number of hypothetical bidders is simply a function of the number of survey respondents. The number of hypothetical bidders is not based on the interaction of housing supply and demand in a given real estate market, but is simply an artifact of survey administration. The marginal bidder analysis does not map the number of actual buyers for a given property or in a neighborhood. Similarly, the marginal bidder technique does not account for the number of houses available to potential buyers. Given these disconnections from the actual real estate market, the marginal bidder approach cannot reliably result in market-clearing prices.

An examination of the number of bids used in the marginal bidder analyses supports this point. Table 1 shows the number of marginal bidders in the Simons and Winson-Geideman survey by state and market. The second column of this table contains descriptions of the real estate markets, given by the authors. Consider the number of marginal bidders by state, relative to the real estate market. Based on the top half of the bids,

**Table 1**      Number of Marginal Bidders

| State | Description of Market | Number of Bidders in the Top Half | Number of Bidders in the Top Quarter |
|---|---|---|---|
| PA | Not provided | 6 | 3 |
| TX | Rural | 6 | 3 |
| AL | Rural | 10 | 6 |
| IL | Urban Chicago | 12 | 7 |
| OH | Suburban | 16 | 8 |
| KY | Suburban | 37 | 19 |
| SC | Entire state | 43 | 19 |

the marginal bidder approach here uses approximately the same number of bids to calculate average losses for an urban Chicago market (12 bids) as a rural Alabama market (10 bids). However, it is highly unlikely that a single house would attract the same number of bidders in two markets as diverse as urban Chicago and rural Alabama. Common sense suggests that there would be far fewer bidders for any single house in rural Alabama when compared to urban Chicago.

## The Scope Test

Contingent valuation was developed to value natural resource services that are not sold in a market. Thus, for many CV studies market data is not available to validate the results. Aware of the hypothetical bias in CV results and the lack of market data, natural resource economists have developed several evaluation tools— called embedding, part-whole bias, adding up test, and the scope test—to assess the reliability of CV results.[26] These evaluations gauge the plausibility of CV responses by comparing them to well-established economic principles. For example, the scope test is based on the economic principle that people are willing to pay more for an increase in the quantity or quality of a commodity, all other things being equal. Thus, the scope test evaluates whether the results of a CV study are sensitive to changes in the scope, or magnitude, of the environmental disamenity. The NOAA Panel report concluded that "inadequate responsiveness to the scope of the environmental insult" would render the CV results "unreliable."[27] Since the NOAA Panel issued its report, the inclusion of a scope test in CV studies has become common practice among natural resource economists. For example, the Office of Management and Budget has included the scope test in its policy guidance for benefit-cost evaluations of natural resource services.[28]

The CV survey examined here includes a scope test by presenting two different LUST scenarios (LUST light and LUST heavy). The survey authors state, "Discounts for LUST light are also expected to be smaller than for LUST heavy. This latter point is sometimes referred to as the scope effect in the CV literature."[29] A close examination of the CV results reveals, however, that this CV study does not pass the scope test.

Figure 1 compares the CV results (in terms of a percentage loss) for both the LUST light and LUST heavy scenarios.[30] For the LUST light scenario, the average discount for the top half of the bidders is 30.8%. For the LUST heavy scenario, the average discount for the top half of the bidders is 31.4%. While the percentage loss for the LUST heavy scenario is slightly larger than the percentage discount for the LUST light scenario, the

---

25.   Simons and Winson-Geideman, 218.

26.   Hausman

27.   Arrow et al., 4609.

28.   *Federal Register* 68, no. 22 (February 3, 2003): 5519.

29.   Simon and Winson-Geideman, 204.

30.   The authors do not report confidence intervals for the top quarter of the bidders, so no conclusions about the scope test with respect to the top quarter of the bidders can be drawn.

**Figure 1**          Results of Scope Test



results are not statistically different, based on the 95% confidence intervals that the authors report for their results. Because the confidence intervals substantially overlap, analysts would conclude that the results for the two LUST scenarios are not statistically different.[31] Therefore, this CV questionnaire fails the standard test of survey reliability, the scope test, by failing to show a difference based on the scope of the disamenity.

## Conclusions and Suggestions for Future Studies

This dissection has revealed several specific features that may contribute to discrepancies between actual market outcomes and CV survey results used to estimate diminution in property values. Although the specific features of the CV study examined here may not apply to all CV studies of property values, the discussion concretely reveals how and why discrepancies occur between CV results and market prices. Bell provides further insight on why such discrepancies occur.

> When a homeowner is posed the question, "Other things equal, how would you like to live next to a

_____?" answers are uniformly in the negative. No one views landfills, sewage treatment, plants, jails, airport noise, and soil or groundwater contamination as a positive attribute of a residential property. But that is only part of the story. If market value is going to be affected, then this particular attribute has to be given enough weight in the decision process of buyers and sellers to have a material effect on price. In other words, the detrimental condition issue has to be important relative to all the other variables that influence the home purchase decision (public safety, quality of schools, access to employment, church, or synagogue, or friends and relatives, special features of the home, affordability, etc.).[32]

In the real world, people make trade-offs and choose to live near airports, jails, and landfills, and on property with a history of alleged contamination.[33] The CV-based estimates of property value losses may not be reliable because it is a practical impossibility for a property value CV survey to incorporate dynamic market conditions and the plethora of information that real world buyers and sellers face.

Proponents of the CV methodology for estimating decreases in property values claim that it is especially useful in two situations. The first is where actual transaction data is insufficient for a market-based analysis. The second is where the previous sales occurred without knowledge of the alleged contamination. However, neither of these scenarios is sufficiently compelling to ignore market data altogether. As Bell notes,

> Failing to research and apply relevant market data is the single most common flaw in detrimental condition analysis. While preconceptions to the analysis of detrimental conditions do exist, the issue is ultimately an empirical question that can only be resolved with relevant market data.[34]

### Stated Preference Surveys

In terms of suggestions for future analyses related to potential property value diminution, stated preference (SP) surveys may offer more reliable results.[35] State preference surveys have their roots in marketing research and ask respondents to trade off multiple attributes among two or more choices.[36]

Asking survey respondents to hypothetically choose between two or more choices, as opposed to stating their willingness to pay for a specific good or service, is an explicit difference between CV and SP studies. For example, an SP study about cars may ask respondents to choose between a $15,000, four-door blue sedan with air conditioning and a CD player, and a $20,000 red sports coupe with no air conditioning and a satellite radio. The price, number of doors, style of car, color,

---

31.   The authors report that respondents in Kentucky had an average discount of 30% for the LUST light scenario and an average discount of 26% for the LUST heavy scenario. Based on the averages alone, these results fail the scope test. Confidence intervals are not reported for the Kentucky respondents.

32.    Bell, 38.

33.    Bell; Thomas O. Jackson, "Environmental Contamination and Industrial Real Estate Prices," *Journal of Real Estate Research* 23 (January-April 2002): 179–199; Thomas O. Jackson, "Surveys, Market Interviews, and Environmental Stigma," *The Appraisal Journal* (Fall 2004): 300–310.

34.   Bell, 43.

35.   Stated preference studies also are called conjoint studies, stated choice studies, and choice experiments.

36.   Jordan J. Louviere, David A. Hensher, and Joffre D. Swait, *Stated Choice Methods: Analysis and Application* (Cambridge: Cambridge University Press, 2000).

presence of air conditioning, and type of audio system are called attributes. Attributes have levels, or different amounts or types of a specific attribute. Attribute levels can be categorical (car color) or numerical (price), or they can indicate the presence or absence of an attribute (air conditioning).

The explicit variation in the levels of attributes across the choices calls for discrete-choice analysis.[37] The corresponding statistical model predicts the probability that each choice will be selected based on the specific attribute levels of each choice. The statistical analysis identifies the relative importance of each attribute and estimates the value for each. In the car example, the analysis results could reveal that consumers say they are willing to pay $500 more for a car with air conditioning. This ability to value each attribute separately is another distinguishing feature between CV and SP.

Although SP data is also hypothetical, market researchers use sophisticated simulation analyses to incorporate known characteristics of the actual market for the good or service. Unlike CV, these simulations explicitly acknowledge interaction between supply and demand market forces. Under proper conditions, the simulations can reflect actual market conditions.[38]

Techniques that blend actual market data with hypothetical SP survey data may offer even more promise. The estimation techniques are sufficiently similar that both types of data could be accommodated in a single, joint model. The actual market data would control for all the various features that reflect a home's value, and the survey data would reflect the knowledge of contamination information.

Natural resource economists began investigating joint models about ten years ago. Adamowicz et al.,[39] in examining models of environmental valuation, blend actual hunting trip choices with hypothetical SP choices for hunting trips. They conclude that the blended model results are more robust than models based solely on actual or hypothetical data. Both natural resource economists and market researchers continue to explore and develop joint-estimation techniques.[40]

Some real estate economists have implemented SP studies. Chattopadhyay, Braden, and Patunru[41] develop an SP questionnaire and provide respondents with

two choices, one of which is the current house. While this study is an improvement over CV techniques, the responses are still hypothetical. That is, respondents may say they would choose another house over their current homes in a survey, but could still make a different choice in real life. The authors also implement a separate hedonic analysis based on a random sample of sales and note that for some of the housing features, the two techniques produce different results. However, they do not combine the two data sources into a single model.

Earnhart[42] develops an SP questionnaire that values natural features, such as forests, streams, and salt marshes, as a characteristic of hypothetical properties. Although Earnhart is not valuing environmental disamenities in his study, his format would allow the inclusion of contamination as a property attribute.

Figure 2 contains a sample SP question from the Earnhart study and shows three hypothetical housing choices. Note that the introductory paragraph sets the stage for respondents. It references preceding information in the questionnaire that provides details on the natural features. In the question itself, the first feature for respondents to compare across the three hypothetical houses is the natural feature. Also note that Earnhart's study uses photographs to provide visual context for how the natural feature varies from house to house.[43] The remaining features for respondents to consider across the three choices are standard features, such as age, square footage, and price.[44] In Earnhart's study, more than 100 respondents each answer 9 SP questions like the one in Figure 2, although the specific questions vary across respondents. Thus, in contrast to CV, respondents do not name a price. They respond to price as one of several differences among housing choices.

Earnhart uses one model based only on SP data and another model based on actual transactions. He notes that the results differ between the two data sets and acknowledges "the hypothetical context of the survey may not replicate the reality of buying a home."[45] For example, his findings reveal that the price people say they are willing to pay for a given house is higher than what they actually pay for a house with the same features. He later combines the hypothetical SP data

37.  For researchers interested in more technical details of the analysis of SP data, see Louviere, Hensher, and Swait.

38.  Bryan Orme and Joel Huber, "Improving the Value of Conjoint Simulations," *Marketing Research* 12, no. 4 (Winter 2000): 12–20.

39.  Wiktor Adamowicz et al.,"Perceptions versus Objective Measures of Environmental Quality in Combined Revealed and Stated Preference Models of Environmental Valuation," *Journal of Environmental Economics and Management* 32, no. 1 (1997): 65–84.

40.  Smith; Joffre Swait and Rick L. Andrews, "Enriching Scanner Panel Models with Choice Experiments," *Marketing Science* 22, no. 4 (Fall 2003): 442–460.

41.  Sudip Chattopadhyay, John B. Braden, and Arianto Patunru, "Benefits of Hazardous Waste Cleanup: New Evidence from Survey- and Market-Based Property Value Approaches," *Contemporary Economic Policy* 23, no. 3 (July 2005): 357–375.

42.  Dietrich Earnhart, "Combining Revealed and Stated Data to Examine Housing Decisions Using Discrete Choice Analysis," *Journal of Urban Economics* 51 (2002): 143–169.

43.  Photographs can also be used in CV surveys. For a discussion, see Mitchell and Carson, 12, 46, 215–217.

44.  The price of House 3 is intentionally higher than the prices of the other two houses. If survey respondents choose House 3 in this hypothetical question, then they are indicating preference for ranch style, newer construction, no natural features, or a larger lot when compared  to other choices. It is the explicit differences and trade offs among the various attributes, including price, that result in SP's ability to isolate values for each of the attributes.

45.  Earnhart, 163.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Figure 2**        Example of Stated Preference Question

Suppose you needed to leave your current home and were considering 3 houses to buy in Fairfield. The columns below describe these 3 housing options. The first house includes a water-based natural feature denoted by reference to the preceding paragraphs. The second house includes a land-based natural feature denoted by reference to the preceding photographs. (Each feature will remain natural for your entire time in the given house.) The third house includes neither feature.

Which house would you buy given your current financial situation?

|  | House 1 _____ | House 2 _____ | House 3 _____ |
|---|---|---|---|
|  | **House 1** | **House 2** | **House 3** |
| Natural Feature | Photo A [Water-based feature] | Photo G [land-based feature] | Photo H [no natural feature] |
| Number of Bedrooms | 4 | 3 | 3 |
| Number of Bathrooms | 1 | 1 | 1 |
| Internal Space (ft$^2$) | 1,500 | 1,500 | 1,500 |
| Style | Colonial | Colonial | Ranch |
| Age (years) | New | 70 | New |
| Lot Size (acres) | 0.2 | 0.6 | 0.6 |
| Frequency of Flooding | Never | Never | Never |
| Price | $250,000 | $200,000 | $600,000 |

Source: Dietrich Earnhart, "Combining Revealed and Stated Data to Examine Housing Decisions Using Discrete Choice Analysis," *Journal of Urban Economics* 51 (2002): 150.

with actual sales data and believes that the combined-data model is a better model.

## Reliability Tests

A related suggestion for future studies involves the development of reliability tests. When natural resource economists began regularly using CV for policy applications, no one could predict the formation and the findings of the NOAA Panel. It took litigation, with a large damage claim, to prompt the development of the scope test and other evaluations of reliability. Although SP studies have not yet withstood the scrutiny of NRD litigation as CV has, natural resource economists are developing reliability tests for SP methods.[46] For marketed goods, market researchers are also developing techniques for demonstrating external validity in

their SP studies.[47]Appraisers and real estate economists would be well served by development and implementation of reliability tests within their survey designs.

**Additional Reading**

Alberini, Anna, and James R. Kahn. *Handbook on Contingent Valuation*. Cheltenham, UK: Edward Elgar, 2006.

Fischhoff, Baruch. "Cognitive Processes in Stated Preference Methods." In *Handbook of Environmental Economics Volume 2: Valuing Environmental Changes*, ed. Karl-Goran Maler and Jeffrey R. Vincent, 937–968. Amsterdam: Elsevier North Holland, 2005.

Kanninen, Barbara. *Valuing Environmental Amenities Using Stated Choice Studies: A Common Sense Approach to Theory and Practice*. Dordecht, The Netherlands: Springer, 2007

---

46.    V. Kerry Smith, "Judging Quality," *Valuing Environmental Amenities Using Stated Choice Studies: A Common Sense Approach to Theory and Practice*, ed. Barbara Kanninen (Dordecht, The Netherlands: Springer Verlag, 2007), 297–334; Christopher D. Azevedo, Joseph A. Herriges, and Catherine L. Kling, "Combining Revealed and Stated Preferences: Consistency Tests and Their Interpretations," *American Journal of Agricultural Economics* 85, no. 3 (2003): 525–537.

47.    Greg Allenby et al., "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters* 16, no. 3–4 (December 2005): 197–208; Bryan Orme and Rich Johnson, "External Effect Adjustments in Conjoint Analysis" (working paper, Sawtooth Software, Sequim, WA, March 2006).

## 6.10 The Use of Focus Groups for Property Valuation Research

*by Ron Throupe, PhD*

This article originally appeared in the Fall 2011 issue of *The Appraisal Journal*.

### Abstract

The use of focus groups for marketing research is common practice when seeking information on new product concepts and perceptions. Appraisers and real estate economists may also use focus groups to solicit information from real estate market participants. The results of these focus group sessions can be used in a variety of ways to increase appraisers' understanding of local market dynamics. This article outlines the accepted mechanics for focus groups and their use by real estate appraisers, and discusses how focus group research can support the Uniform Standards of Professional Appraisal Practice (USPAP) requirements for appraisers.

Focus group research is a qualitative research method in the area of marketing research. In marketing research, focus groups are often used to elicit information from marketplace participants about their perceptions and preferences on a variety of topics, such as product design and modification, promotions, distribution, and the like.

In recent years, formalized focus group methods have been added to the toolbox of real estate appraisers and real estate economists. Formal focus group work is used predominantly in high-stakes real estate damage litigation cases that demand a high level of due diligence to determine local market conditions. The associated costs for such due diligence are typically beyond what can be afforded in nonlitigation-related assignments. However, qualitative research methods such as focus groups do not need to be limited to high-stakes cases. An understanding of procedures and practices derived from the market research field can be incorporated into formal or informal solicitations of market information by the real estate appraiser. Focus group methods can be useful in eliciting information from market participants when a market is impacted by an economic downturn or recession. For example, a focus group could indicate how the participants have reacted to the market collapse and recession experienced in 2007–2009.

Formal or informal focus groups can be employed to satisfy valuation assignments requirements. A focus group may be used to help an appraiser meet the competency requirements set forth in the Uniform Standards of Professional Appraisal Practice (USPAP). A focus group also may be an initial step in developing a survey questionnaire to elicit market perceptions, beliefs, and risk tolerance from a population of interest.

### Qualitative Research Debate

Focus group research is a form of qualitative research, but it has not been specifically discussed in the real estate literature. However, qualitative researchers in the marketing field have long understood that focus groups are advantageous in creating future survey research tools as well as a stand-alone instrument for market knowledge.

Focus group research can be used as a form of a pretest for future quantitative or qualitative research, such as survey research. The appraisal literature on survey research reflects a continuing debate on whether survey research is a legitimate tool for the appraiser and what survey methods are most appropriate. The survey research debate is predominantly part of the methodological debate in regards to valuing detrimental conditions and in particular, contaminated properties. Most recently, Mathews[1] made arguments as to why some survey research methods (contingent valuation) can be flawed, while other qualitative methods–such a stated preference surveys–may offer more reliable results. Specifically, Mathews notes that more reliable results are produced when surveys allow attributes to be valued separately, and the analysis incorporates known characteristics for the market and goods, allowing interaction between supply and demand market factors in a simulations analysis.[2] The use of focus groups to pretest such surveys, whether they are formal or informal surveys, is sound practice and supports requirements to demonstrate due diligence in a litigation setting.[3]

1. Kristy E. Mathews, "Under the Microscope: Dissection of a Contingent Valuation Survey," *The Appraisal Journal* (Summer 2008): 259–269.

2. For a comprehensive review of market research methodology including survey search see: Joseph Hair, Mary Wolfinbarger, and Robert P. Bush, *Essentials of Marketing Research* (New York: McGraw-Hill, 2010); and Joseph Hair and Alvin Burns, *Marketing Research*, 6th ed. (New York: Prentice-Hall, 2009).

3. See Table 2 "Property Value Survey Standards: Criteria for Admissibility of a Survey According to the Federal Judicial Center *Manual for Complex Litigation* (MCL) and *McCarthy on Trademarks and Unfair Competition* (McCarthy),"in James Flynn, Donald G. MacGregor, Wayne Hunsperger, C. K. Mertz, and Stephen M. Johnson, "A Survey Approach to Demonstrating Stigma Effects in Property Value Litigation," *The Appraisal Journal* (Winter 2004): 35–44;

**Ron Throupe, PhD,** is an assistant professor at the Franklin L. Burns School of Real Estate and Construction Management in the Daniels College of Business at the University of Denver. He is a certified general appraiser who specializes in real estate in litigation, including eminent domain and detrimental conditions. Throupe has participated in the design and implementation of formal focus group research as support for real estate litigation in high profile cases in the United States. He is a partner with American Valuation Partners, in Issaquah, WA, and was previously the director of operations with Mundy Associates in Seattle, WA. He has a PhD and an MBA from the University of Georgia in real estate and finance, along with a BS in civil engineering from the University of Connecticut.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Literature Review

The use of formalized qualitative market research for real estate valuation was first presented in two articles by McLean and Mundy.[4] They propose that the survey research methods of contingent valuation[5] and conjoint analysis[6] are valuable tools for appraisers to understand real estate markets. The authors explore using survey research for determining damages for detrimental conditions, which many times have limited transactions that meet market value definitions.

Later, Allen and Austin argue that the use of survey research methods is a valid technique to extract market information.[7] Survey research is used in articles by Simons, Bowen, and Sementelli on proximity to leaking underground storage tanks (LUSTs).[8] Simons and Winson-Geideman present a multistate analysis of survey results on contaminated property,[9] and Simons and Throupe use survey results in a study of the price effects of toxic mold.[10] It is a method available to understand market reactions to contamination events. Later, Flynn et al.[11] propose that the use of a survey is not necessarily for determining a diminution in value, but can be used to show causality for contamination events.

These articles on survey research for contaminated properties have encountered opposing arguments from the other side of the debate on whether survey research is a valid tool. The opponents to survey research methods argue that the methods are not grounded in market transactions. They note that the questions, their delivery, and who administers them can impact the results, and the responses do not match how people will act under transactional pressures.[12] These arguments are presented in articles by Wilson,[13] Roddewig,[14] Roddewig and Frey,[15] Bell,[16] and Jackson.[17]

Wilson[18] claims that contingent valuation is not a method for real estate analysis, basing his argument on the National Oceanic and Atmospheric Administration (NOAA) investigation panel responses to its usage related to the Exxon Valdez oil spill.[19] However, proponents of survey research argue that the NOAA was no more than an advisor and used caution with survey research methods because of the potential for bias in the measurements of damages.

Roddewig concludes that "surveys may have a limited role in some types of assignments involving contaminated property, but collection and analysis of sales and market data will remain the central technique for estimating the stigma impact."[20] Roddewig and Frey also argue that the methodology is not reliable and claim that work in litigation and follow-up work on prior litigation cases shows that the damage measurement claims did not materialize in the affected areas.[21] In contrast, Case et al.[22] use one of the same effected areas to show a damage measurement for condominium properties several years after public awareness.

Bell[23] claims that surveys are not a primary method for valuation with few exceptions and should be used as a secondary or support role for valuation. Jackson

---

4. David G. McLean and Bill Mundy, "The Addition of Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property," *Journal of Real Estate Practice and Education*, 1, no. 1 (1998): 1–19; and Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297.

5. *Contingent valuation* is a survey research method to estimate what participants believe they are either willing to pay or willing to forego to avoid a good.

6. *Conjoint analysis* is a choice method where a series of hierarchal choices culminates in a ranking of attributes or choices.

7. Marcus T. Allen and Grant W. Austin, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–403.

8. Robert A. Simons, William Bowen, and Arthur Sementelli, "The Effect of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio," *Journal of Real Estate Research*, 14, no. 1/2 (1997): 29–42; and Robert A. Simons, William M. Bowen, and Arthur J. Sementelli, "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property," *The Appraisal Journal* (April 1999): 186–194.

9. Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys, *Journal of Real Estate Research* 27, no. 2 (April–June 2005): 193–220.

10. Robert A. Simons and Ron Throupe, "An Exploratory Review of Toxic Mold for Residential Properties," *The Appraisal Journal* (Spring 2005): 156–166.

11. Flynn et al., "A Survey Approach to Demonstrating Stigma."

12. This is why experts from qualitative research fields are used as consultants to the appraiser for the formalized methodologies.

13. Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53–61.

14. Richard J. Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," *The Appraisal Journal* (October 1999): 447–453.

15. Richard J. Roddewig and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," *The Appraisal Journal* (Summer 2006): 267–280.

16. Randall Bell, with contributions from Orell C. Anderson and Michael V. Sanders, *Real Estate Damages: Applied Economics and Detrimental Conditions*, 2nd ed. (Chicago: Appraisal Institute, 2008).

17. Thomas O. Jackson, "Surveys, Market Interviews, and Environmental Stigma," *The Appraisal Journal* (Fall 2004): 300–310.

18. Wilson, "Contingent Valuation."

19. Arrow et al., "Report of the NOAA Panel on Contingent Valuation," *Federal Register* 58, no. 10 (January 15, 1993): 4601–4614.

20. Roddewig, "Junk Science, Environmental Stigma, Market Surveys."

21. Roddewig and Frey, "Testing the Reliability of Contingent Valuation."

22. Bradford Case, Peter F. Colwell, Chris Lieshman, and Craig Watkins, "The Impact of Environmental Contamination on Condo Prices: A Hybrid Repeat-Sale/Hedonic Approach," *Real Estate Economics* 34, no. 1 (Spring 2006): 77–107.

23. Bell, *Real Estate Damages.*

opines that stated preference (survey research) estimates are not consistent with revealed preference (market transactions) that should be relied upon.[24] However, Jackson makes a distinction between market interviews and survey research. He states,

> In social science research, the term "survey" is implicitly used to mean "sample survey." A sample survey, by definition, focuses on a representative sample of a population. Market interviews, on the other hand, are more closely akin to what appraisers refer to as sales confirmation or verification interviews. They focus on a select group of key market participants.[25]

This description of market interviews is analogous to focus groups. Market interviews are useful for collecting and understanding the data and information necessary to apply other methods and techniques.

The majority of the survey debate has focused on whether survey research is capable of measuring any effects on property value. However, Flynn et al. show that a survey does not need to be only about a measurement of market value; it can be a method to show a causal link between an environmental disamenity and the loss in market value[26] Flynn et al. state,

> The survey does not attempt to quantify dollar losses; it is intended to show a link between negative values in the sales data and a negative perception of properties in the class area.[27]

Similarly, a focus group can be used to support a causal link between property market valuations and perceptions of market participants. This causal link is critical in litigation where the valuation measurement itself is not enough, and appraisers are asked to support the causality link for their opinions.

## What Is a Focus Group?

In essence, a focus group is a group interview. A focus group consists of a set of individuals chosen by a selection process to target a preconceived population to meet a particular need for information. A focus group is specific as its purpose, size, composition, and protocol. What distinguishes a focus group from a one-on-one interview is that in the latter the questioner takes the lead and the subjects can be passive. This leads to less probing of topics and the chance that the results will be based on preconceived beliefs of the interviewer.

### Informal Interviews

Appraisers are accustomed to soliciting information from market participants in their appraisal practices, in particular in confirming sales and verifying the conditions of sale. Market participants' information may be obtained through informal interviews and this often suffices for assignments.

An extension of the interviews occurs if an ad hoc group of people is created for an informal focus group to solicit information on a market and to gain a greater understanding of the dynamics of buyer and seller behavior. This informal group could add information such as the amenities desired, their potential effect on value, the effect of a negative amenity, and alternative choices compared to the market in the study. The result is greater insight as to what areas are most appropriate for selection of comparables, and what are the potential items of adjustment.

The usage of informal focus groups is especially valuable when the appraiser has an assignment in an unfamiliar geographical area or market. There is likely less scrutiny of the informal interviewing process for assignments that are not part of litigation. Nonetheless, the appraisal results can be enhanced by an understanding of commonly used protocols and research methods for focus groups.

### Formal Focus Groups

If a decision is made to use focus group research for an appraisal assignment as part of litigation, a formalized process must be used to strengthen the credibility of the research results. When a formal qualitative method is being proposed, the expenses related to such research need to be reviewed with the client. It is not uncommon for related costs to exceed tens of thousands of dollars; the expenses include planning and third-party experts needed to withstand legal challenges to the credibility of the research. Appraisers in litigation must keep in mind that they are in an adversarial proceeding[28] and the research will be closely scrutinized.

## USPAP Requirements and Focus Groups

Regardless of whether the appraiser uses an informal or formal focus group methodology, the use of this qualitative research method helps satisfy requirements under the Uniform Standards of Professional Appraisal Practice (USPAP).

First, focus groups contribute to local market knowledge required by USPAP's Competency Rule.[29] Specifically, the Competency Rule provides that if an appraiser is not competent prior to accepting an assignment the appraiser must "take all steps necessary or appropriate to complete the assignment competently," and report "the steps taken to complete the assignment competently."[30] The Comments to the Competency Rule go on to state, "in an assignment where geographic

---

24. Jackson, "Surveys, Market Interviews, and Environmental Stigma."

25. Ibid., 301.

26. Flynn et al., "A Survey Approach to Demonstrating Stigma Effects."

27. Ibid., 35.

28. J. D. Eaton, *Real Estate Valuation in Litigation*, 2nd ed. (Chicago, IL: Appraisal Institute, 1995), 11.

29. Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice*, 2010–2011 ed. (Washington, DC: The Appraisal Foundation), U-11 to U-12.

30. Ibid., Lines 339–344.

Copyrighted material licensed by Randall Bell on April 26, 2021

competency is necessary, an appraiser who is not familiar with the relevant market characteristics must acquire an understanding necessary to produce credible assignment results for the specific property types and market involved."[31] Geographic competency is a paramount concern for assignments outside the appraiser's general geographic area of practice–a situation that can occur frequently for appraisers with specialized areas of expertise. Focus groups can help provide the required geographic competency.

Second, focus groups may help satisfy the requirements for credible results as discussed in USPAP's Scope of Work Rule and in Advisory Opinion 29. The Scope of Work Rule's Acceptability section states, "the scope of work must include the research and analyses that are necessary to develop credible assignment results."[32] The scope of work guidance in Advisory Opinion 29, "An Acceptable Scope of Work," explains that there are "two benchmarks for measuring the acceptability of the scope of work, both of which need to be met. The scope of work is acceptable when it meets or exceeds **both** (1) the expectations of parties who are regularly intended users for similar assignments; and (2) what an appraiser's peers' actions would be in performing the same or a similar assignment."[33] The credibility of research results are enhanced by the use of proper focus group design and implementation.

The market information discovered from the focus group research may reveal additional research needs. In terms of qualitative research, these needs can include adding focus groups, adding areas of questions, or changing the populations for group selection. Also, the results may reveal the need for changes to preconceived beliefs as to what would be proper comparables or items of adjustment. Such research results would warrant further investigation. This is evident from the Scope of Work statement, "an appraiser must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use."[34] Therefore, the use of formal or informal focus group research requires an evaluation of the results to determine if the design of the interviews limited the results. The remainder of this article explains the process for formalized focus group research.

## Focus Group Basics

Focus groups can be a powerful means of extracting information from market participants in order to make better judgments and support those judgments for valuation decisions. A focus group consists of interviews with a range of four to twelve participants.[35] The form of interview requires planning and preparation to execute and extract meaningful information. The planning and preparation process involves the following eight components:

1. Identifying the goals and objectives of the session;
2. Developing a set of questions along with the respective sequencing and vetting;
3. Developing a discussion guide;
4. Recruitment, confirmation, and incentives for participants;
5. Planning the session;
6. Scheduling the session, and selecting a location and setting;
7. Moderating the session; and
8. Session follow-up, including a report of findings from the session.

A discussion of each of these components follows.

### Identifying Goals and Objectives

The goals and objectives of the focus group session require preplanning and discussion as to what is to be accomplished by the session. The appraiser needs to explain to a client how a focus group will be used within the assignment and the associated costs.

An initial step in focus group development is internal discussions with colleagues and clients as to the goals and objectives of the research product. A natural progression is further discussions as to what questions are critical to accomplish the objectives. Further discussions are then needed with any third-party facilitator/moderator as to the objectives of the research and the reasons for such objectives. This preparation is needed to coordinate the effort and to prepare the facilitator/moderator as to what is critical within the field of study. The facilitator/moderator most times will not have intimate knowledge of the real estate–related topic; therefore, expect to allocate time to educate the facilitator/moderator as to the research topic.

The role of the moderator can vary depending on the assignment and the experience of the moderator, but the moderator is always critical to the focus group process. As summarized by Greenbaum,[36] this role can be as a strategic consultant, content manager, project coordinator, facilitator, and analyst. As a strategic consultant, advice is provided on the appropriate research methods to achieve objectives. As a content manager, the moderator develops a comprehensive discussion guide. As a project coordinator, the moderator can give guidance on the selection of the focus group physical location, recruitment screening, and administration. Of course, the role most widely recognized is as the facilitator of the group's discussions. The last role of the

31. Ibid., Lines 349–351.
32. Ibid., Lines 404–405.
33. Ibid., Advisory Opinion 29, A-100.
34. Ibid., U-14.
35. Richard Krueger and Mary Anne Casey, *Focus Groups A Practical Guide for Applied Research*, 4th ed. (Thousand Oaks, CA: Sage Publications, 2009), 6.
36. Thomas L. Greenbaum, *Moderating Focus Groups, A Practical Guide for Group Facilitation* (Thousand Oaks, CA: Sage Publications, Inc., 2000), 23–28.

moderator is that of an analyst who will develop an appropriate presentation of findings and recommendation of the results.

The qualifications and experience of potential moderators can vary widely. It is advisable for the appraiser to review the background of the moderator as part of the selection process for hiring any marketing research firm. A starting point would be to review materials from the American Marketing Association; its *GreenBook* directory provides information on marketing research and focus group firms throughout the world.[37]

## Development of Questions, Sequencing, and Vetting

The set of questions asked during the focus group session should be vetted internally by the appraiser, the client, and the moderator/facilitator, who has experience with how questions are structured and delivered. The questions are specific to the topic of inquiry and are often open ended with a strategy of probing. It is advisable to review these questions with colleagues, the client, and the expert facilitator prior to the session itself. People and groups are likely to have a difference of opinion as to what is critical to be asked, how the questions are to be asked, the sequence used, and the questions' wording. The vetting process should include a critical review of the meaning of questions, whether the questions are clear to all, including the potential focus group participants, and whether the questions are considered unbiased and not leading when read by those who are not part of the process.

## Developing a Discussion Guide

Next, a discussion guide is developed by the facilitator/moderator and reviewed with the appraiser and client. The discussion guide, sometimes called an interview guide, establishes a routing of question sequence, and it serves as the outline the moderator uses during the actual focus group session.[38] The discussion guide is typically sequenced to have general information questions for the beginning of the session to get participants comfortable and promote discussion. Later, more specific questions pertaining to the topic are asked, with the goal of exploring the beliefs, feelings and thought processes of the participants in relation to the topic of the focus group. A sample discussion guide is outlined in the Appendix at the end of this article (Exhibit 1).

According to Greenbaum, there are two key purposes of the discussion guide. First, it is "a vehicle to facilitate communications between the moderator and the client organization"[39] on the objectives and lines of questioning to be asked. Thus, it is a critical tool to ensure the parties have agreement as to what the focus group discussion will cover. Second, the guide directs the flow of conversation during the actual focus group sessions.

The discussion guide also serves to indicate closure on topics by noting when the content of the guide is covered and agreement on coverage. Lastly, the guide can be used as an outline when generating a final written report of the focus group findings.

## Recruitment, Confirmation, and Incentives

The recruitment of the desired population starts with the appraiser identifying the targeted group from the larger overall population. This targeted population will be based on the appraisal assignment, and the objectives and information to be extracted from the focus group session. If there is a population with a set of demographics the appraiser is attempting to emulate, preliminary research is needed to compare these population demographics for similarity with the demographics of the assignment's geographic location.

After the initial targeted population is determined, the appraiser will develop with the moderator/facilitator a screening questionnaire to use during solicitation of participants (see Exhibit 2 in the Appendix at the end of this article). This screening device is customized to the assignment and may have questions designed to exclude those who have connections to the real property or who have a stake in the condition being investigated. Often those who work within the qualitative research community are also excluded along with certain professions, such as the legal area if the assignment is connected to litigation.

Confirmation of the targeted population participants is needed at several periods during the focus group process. The initial confirmation is done during the recruitment of members. There is likely to be a period of time between the initial recruitment and the time of the focus group session. During this period, those who initially agreed may change their minds or have other circumstances preventing them from participating. Prior to the day of the session, there is a need to reconfirm whether someone intends to participate. A formal scheduling of the participants is advisable; this includes confirming the time of arrival, the process when they arrive, and if there is more than one session, which session they are scheduled for. This confirmation phase is important because there is likely to be a need to have a group that represents the preconceived areas of interest or population of interest of the client and valuation expert. Thus, the final pool of participants may need to be rereviewed to ensure the desired composition of the group.

Last, as participants arrive for the session, another screening is performed to confirm their identity by an identification check and consent form along with prior information. There may be an over- or under-attendance of participants. There is usually an over recruitment of participants, with the expectation that some

---

37. New York AMA Communications Services, *GreenBook—Worldwide Directory of Marketing Research Companies and Services*, 49th ed. (New York: New York American Marketing Association, April 2011). Also the companion book, New York AMA Communications Services, *GreenBook—Worldwide Directory of Focus Group Companies and Services* (New York: New York American Marketing Association). Interactive searches of these directories are available on at http://www.greenbook.org/.

38. See Appendix at the end of this article.

39. Greenbaum, *Moderating Focus Groups*, 86–87.

Copyrighted material licensed by Randall Bell on April 26, 2021

who previously agreed to participate will not. The result may be less or more participants than anticipated, requiring a decision on group composition at the facility prior to starting the focus group session. Typically, any screening that was initially done in the recruitment stage is reviewed with the participants once they arrive at the focus group location to again qualify and determine the mix of attendees. Then, a decision is made of whether some attendees are compensated without participating or how many sessions will be attempted.

The decision as to a proper incentive for participation must also be addressed before the screening and recruitment process. The incentive can take on various forms, but is typically monetary. The amount of the incentive varies based on consideration of the economics of the area and participants, the amount of time estimated for the session, and the time and distance to travel to the location of the focus group. It is not uncommon for this incentive to be in the range of $50 to $150 dollars for real estate–related sessions, depending on the previously mentioned criteria.

## Planning the Session

The planning of the actual session has several parts. Planning consists of (1) the scheduling of the time and day of the focus group; (2) the setting for the focus group session; (3) the ground rules and a review of the process with the participants prior to starting the formal session; and (4) the decision to record or videotape the session for review as part of the session follow-up.

## Scheduling, Location, and Setting

The selection of the session's time and day are critical to recruiting and to the eventual participation rate of those who agree to be in the focus group. The session length is typically a maximum of one to two hours. Sessions need to be efficient because participants have a limited willingness to expend time and because there is a limited length of time that participants can be expected to stay engaged. Likely times for sessions are around lunchtime or early evening hours.

The convenience of the location also can impact the participation rate. The location of the session is critical because the facility needs to be convenient for the pool of participants. The convenience of a site is related to what type of participant is targeted. Therefore, the facility selection is best done in coordination with factors related to the target participants, and the availability of facilities for such events, modes of transportation, and monetary compensation for participating in the focus group.

The setting of the focus group session requires decisions related to selection of the room, amenities, and provisions. The room needs to be large enough to lay out a comfortable seating pattern for all to see each other and to be conducive to interaction by all participants. Consideration is also needed as to lighting, HVAC, and acoustics for the discussion and any recording. The actual location may be a conference-type room at a hotel or can be a specialized room, where there is a backroom for clients or experts to watch the process unfold along with audio and video capabilities. Observation can be advantageous because the valuation experts can react to information as it is disseminated and give the moderator/facilitator additional information or questions to pursue. Also related to the setting are the provisions that are supplied; provisions can include name tags or name plates, beverages, and food.

## Moderating the Session

The ground rules for a focus group session need to be disseminated and understood by the participants prior to the start of the session. This is typically done through a briefing that explains why they are here; the identification of facilitator/moderator; and the facilitator's job in keeping the conversations going, getting all participants to contribute, and maintaining control of the session and discussion dynamics. The facilitator/moderator will review the agenda with the participants, have the participants introduce themselves, and allow the participants to ask questions for clarity before the session begins.

The session typically starts with a question or scenario that sets the tone, gives an example, or reflects incidences the participants may have experienced that have implications similar to the session's topic or focus.

The prior decision on the use of voice recording or videotaping of the session will affect the ability to review results. The participants need to be told in the recruitment stage about the use of recording devices and should be reminded about the recording during the briefing before the session begins. Not all sessions are recorded or videotaped, but it is advisable for recalling particular answers after the session. The client may have reasons to choose one method over another. The use of videotaping may allow one to pick up facial or body expression in addition to tone of voice. A related consideration is how this information will be stored, dissemination, or used within a valuation assignment; who has access to such information; and how to maintain compliance with the confidentiality and record keeping provisions of USPAP's Ethics Rule.[40]

## Session Follow-Up

The completion of the actual focus group session is the start of the next phase of work. It is best for the facilitator/moderator and other experts who monitored the session to compare their observations after the session when the information is still fresh. This is known as a post-group briefing, where observers can share thoughts from that day's session and any planning needs going forward. The moderator will typically share key preliminary impressions and get feedback on any suggestions for future focus group sessions.

The facilitator firm will review the session and produce a report of the questions and answers, overall comments, and critique of the session. This final product of focus group research is generally a written report. The report will summarize the findings, conclusions, and possibly recommendations for further research. It

---

40.    Ibid.; and USPAP 2010–2011, U-8 to U-9.

is advisable for the appraiser to ask during the contracting process who from the market research organization will be writing such a report. This can vary depending on the size of the organization. For real estate litigation, it is advisable to have the moderator–who is likely a principle of the firm or someone who is distinguished within their industry–write the report. This type of report is commonly known as a moderator report.

Since there is no standard for a moderator report, the appraiser should inquire as to the level of the written report as part of the contracting process. The report may be a formal narrative with detailed findings and possible quotes from participants; a high-level or top-line report that will briefly provide background and summarize results; a bullet-style report that outlines the narrative-style report using bullets; or some form of oral presentation. In selecting the report style, the appraiser needs to judge what is required to support potential conclusions and usage of the focus group information within the valuation assignment.

The valuation expert may use the focus group session to determine if any additional actions are needed. Options may be considered, such as whether further focus groups are warranted, whether additional questions or refinements to questions are required, and whether action beyond focus group research is warranted. Additional research may include the use of a survey instrument for further extraction of information from the targeted population.

As described throughout this article, the proper execution of focus group research requires expertise. The valuation expert needs to determine if an informal or formal focus group is desired. An informal focus group may have many of the traits of a formal focus group, but not necessarily the credibility or expense of the formal methods. Regardless, an informal method can still create support for the valuation assignment.

## Pretesting Surveys

Many times, the results of a survey pretest are invaluable. Pretesting or pilot testing a survey is a standard research practice that often improves the survey. The use of focus groups to pretest and enhance a contemplated survey instrument is an excellent way to gain input as to whether questions within a survey are unbiased, misleading, and transferable between different assignments, populations, or geographical locations. For example, questionnaires can be developed on real estate damages issues, and the sample questionnaires and questions can then be pretested for completeness or clarity by the use of focus group methodology.[41]

Pretesting also can provide a rough indication of the likely results of a full-scale study. While the information that comes from pretesting is not as precise as the results of a full-scale survey, the data can have an important impact on the strategy of the assignment.

The overall costs of formal focus groups can be expensive because of the use of experts from multiple fields. These expenses can easily be tens of thousands of dollars depending on the number of experts and extent of the research requirements. But again, the use of informal focus groups can suffice for the appraiser to gain further market knowledge and the possible development of short questionnaires for sales confirmations, market participant motivations and in particular reactions to changing market conditions. Thus, the procedures used within the formal research method are of value for the appraiser to emulate for credible information extraction.

## Emerging Methods

Focus group research, which was traditionally performed with in-person interview techniques, has evolved to take on multiple modes of question delivery. These modes of delivery include telephone and on-line Internet focus group research. In particular, the Internet focus groups are becoming more widely used because of the potential cost savings and the advent of "do not call" lists for telephone solicitation and recruitment. Both the Internet and telephone modes of delivery have their own protocols and nuances that require the researcher to develop skills or hire professionals to support the development process and delivery of the research. Of particular interest to the appraiser is the potential to perform the research in a cost-efficient manner, especially in comparison to formal, in-person interview techniques. Irrespective of which mode of delivery is selected, it needs to match the requirements and objectives of the research assignment.

## Conclusion

Qualitative research methods were introduced and developed within the area of marketing research. These research methods include the use of interviews, surveys, and focus groups. Qualitative research methods are now used in many fields within the social sciences. The field of real estate valuation also has implemented these methods in formal and informal settings. One method, focus groups, can be used to extract information from targeted populations to gain market knowledge and to support the market knowledge requirements of USPAP. The use of qualitative research techniques, such as focus group methods, enhances the appraisers' knowledge of the motivations and preferences of buyers, sellers and users of real property. The practices developed for qualitative research methods are of value whether the research is for informal or formalized use, and the practices improve the appraiser's awareness and planning for the extraction of market knowledge.

For the practicing appraiser who may on occasion use interviewing techniques or informal focus groups, there are takeaways from the formal qualitative research field. The foremost lesson is that planning and adequate time to thoughtfully formulate the critical issues to be assessed are required. The second lesson is that it is essential to have a script that has gone through a revision process to perfect the questions asked and

---

41. Samples of these types of questionnaires are shown in Bell, *Real Estate Damages*.

Copyrighted material licensed by Randall Bell on April 26, 2021

the sequencing. Third, the questions need to be vetted to eliminate biased, leading, or awkward questions. Fourth, a draft should be pretested to determine if there are any other ambiguities to correct. Last, the result of

the planning process should be a set of questions that can be administered with consistency so that the results can be used to support the valuation judgments made by the appraiser.

## Appendix

### Exhibit 1    Discussion Guide Sample Outline

**Residential Property Valuation Focus Groups**

**Introduction**                                                           **10 minutes**
· Explain purpose of focus groups
· Encourage synergism / talk one at a time, encourage debate
· Confirm screeners' questions
· Introductions around the table

**Property Value Issues (Warm Up)**                                         **15 minutes**
Thinking back to when you last purchased a home, what were some of the things you considered when purchasing your current home?
· One of the main focuses of our group is real estate or property value.  To get the ball rolling, I'd like to know, what are some things that increase property values in one's neighborhood?  [Record on easel]
· Now tell me, what are some things that decrease property value in one's neighborhood? [Record on easel]

**Natural Disasters and Return to Neighborhood Section 1**                  **20 minutes**
Let's move on to our next topic, the concept of a neighborhood.  The term neighborhood is often broadly defined, consisting of a number of components, both vague and specific. The condition or feel of a neighborhood can significantly affect property values. We are going to attempt to define what constitutes a neighborhood.

**Testing Potential Survey Question Section 2**                             **40 minutes**
What we'll be doing in the remainder of our time is to evaluate various written materials that may be part of a survey being developed regarding property values in areas subject to hurricanes and/or flooding.

*Fact Card (A)*
Now, I'm passing out a packet with a few fact cards that include statements we will read and I will ask you questions about. They are in order of the discussion. The first fact card we are going read is titled "Fact Card A." It should be on the first page. I'm going to read it out loud and have you read it along with me—then I'll ask you a few questions about it.

**Natural Disasters and Return to Neighborhood Section 2**                  **10 minutes**
Assume for the moment that a natural disaster was imminent and you and all of your neighbors were required to evacuate your homes. Then, the natural disaster struck and many homes in your neighborhood were severely damaged or destroyed.

**Return to Neighborhood Services on Easel**                               **10 minutes**
Now take a look at the list of services and activities located on the board.
How important are the presence of each of these services in your decision to return to your neighborhood?

[Develop Groupings of Most, Midrange, and Least Important Factors]

[Discuss and Record]

That concludes our discussion.  Thank you. *(Show them out.)*

Note: This example was shortened for presentation in this article only. Discussion guides may be ten pages or more, with detail for each component.

**Exhibit 2          Sample Screening Questionnaire for Target Population**

**Introduction**

Hello, my name is _____, I'm calling from _____ and we're conducting a very brief and important research study with residents in your area of _____ County.  Let me assure you this is not a sales call, the study is being conducted for research purposes only.  Your opinions are important to us.  This call may be monitored to ensure quality.  For this study may I please speak to the male or female head of this household?

*Recruit a 50/50 gender split; recruit 13 for 10 to show*

**Questions**

1.  In what County do you reside?

    a.  _____ County _____  ❏

    b.  Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **[THANK AND TERMINATE]**

    c.  DK / REFUSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **[THANK AND TERMINATE]**

All must live in XXXXX county, first, then confirm, "How long have you lived at your current residence?"

2.  How long have you lived at your current residence?

    a.  5 Years or less  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[CONTINUE]**

    b.  More than 5 years but less than 7 years  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[HOLD]**

    c.  More than 7 years. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[THANK & TERMINATE]**

    d.  DON'T KNOW / REFUSED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[THANK AND TERMINATE]**

To assure knowledge of the area or particular purchase time period

3.  Do you own or rent this home?

    a.  Own . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[CONTINUE]**

    b.  Rent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[OBTAIN PROPERTY OWNER'S NAME AND NUMBER]**

    c.  DON'T KNOW / REFUSED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[THANK & TERMINATE]**

If rent, try to obtain property owner's name and phone number. Would like a few landlords in the groups… if they refuse, thank & terminate

4.  Which of the following best describes your role in the decision to purchase this property?

    a.  I was the primary decision maker  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[CONTINUE]**

    b.  I shared in this decision and worked closely with our realtor. . . . . . . . . . . . . . . . . . . . . . **[CONTINUE]**

    c.  I shared in this decision but did not work closely with our realtor . . . . . . . . . . . . . . . . . . . **[ASK FOR PERSON PRIMARILY RESPONSIBLE]**

    d.  My spouse was the primary decision maker. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[ASK FOR SPOUSE]**

    e.  DON'T KNOW / REFUSED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[THANK AND TERMINATE]**

5.  Have you heard of the_____ plant and complaints?

    a.  How?   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[PROBE FOR CONNECTIONS]**

    b.  Do you have any relatives or personal friends who are effected by or are a party in complaints?

        If yes,  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[THANK & TERMINATE]**

        No,. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **[CONTINUE]**

**My final questions are for classification purposes only**

6.  Which of the following describes your current employment status?

    Employed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **Full-Time**    ❏  **Part-Time**

    Not Currently Employed / Looking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **(SKIP TO QU. 8)**

    Homemaker / Stay-at-home Parent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **(SKIP TO QU. 8)**

    Full Time Student / Not Employed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **(SKIP TO QU. 8)**

    Retired . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **(SKIP TO QU. 8)**

    DK / REFUSED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏  **[THANK AND TERMINATE]**

7.  What is your occupation or work function?

    _____

CHECK SECURITY

Copyrighted material licensed by Randall Bell on April 26, 2021

8. Which of the following categories includes your annual household income? **(RECRUIT A MIX)**

Less than $35,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [THANK & TERMINATE]

$35,000–$49,999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

$50,000–$74,999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

$75,000–$99,999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

$100,000–$149,999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

$150,000 and over. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

DK / REFUSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [THANK & TERMINATE]

*RECRUIT A MIX OF INCOME $35K +*

9. What is your current age? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [WRITE IN RESPONSE. IF REFUSE, ASK CATEGORIES]

<18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ (ASK FOR HEAD OF HOUSEHOLD. SHOULD NOT BE <18)

18-24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

25-34. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

35-44. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

45-54. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

55-65. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏

66+ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [MAX OF TWO PER GROUP]

DK / REFUSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [THANK & TERMINATE]

*RECRUIT A MIX OF AGES IN EACH GROUP*

10. Do you, or does anyone in your household or family, work in any of the following types of businesses?

Market Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [GET DETAILS AND SAVE]

For or as an attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [GET DETAILS AND SAVE]

For an environmental group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [GET DETAILS AND SAVE]

For or as a realtor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [GET DETAILS AND SAVE]

For or as a real estate appraiser. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [GET DETAILS AND SAVE]

Advertising or Public Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [GET DETAILS AND SAVE]

Media such as radio, TV, or newspaper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [GET DETAILS AND SAVE]

11. Have you ever participated in a market research discussion group for which you were paid for your time?

a. Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [Go to Question 12]

b. No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ❏ [SKIP TO INVITATION]

12. How long ago was that? **[WRITE IN]** _____ . . . . . . . . . . . . . . . . . . . . . (IF LESS THAN SIX MONTHS AGO – GET DETAILS AND HOLD)

13. How many have you participated in? **(WRITE IN)** What were the topics?

_____

_____

_____

*(If participated in 3+ previous focus groups – get details and hold – if participated in real estate related groups – get details and hold)*

**INVITATION**

As further part of our research, we are inviting a group of people like you to participate in a focus group discussion regarding property values—these discussion groups are held for research purposes only. We'd just like to hear your honest opinions. The group will be relaxed and informal, and you will simply be involved in an exchange of ideas and opinions with approximately 8 to 10 other people like yourself.

## Web Connections

*Internet resources suggested by the Y. T. and Louise Lee Lum Library:*

American Economic Association
  *http://www.aeaweb.org/index.php*

Association for Qualitative Research
  *http://www.aqr.org.uk/*

Market Research Association
  *http://www.marketingresearch.org/*

New York AMA Communications—New Qualitative Research Methods & Tools
  *http://www.newqualitative.org*

Qualitative Research Consultants Association
  *http://www.qrca.org/*

Copyrighted material licensed by Randall Bell on April 26, 2021

## 6.11 Advisory Opinion 9 and Contingent Valuation

*by Thomas O. Jackson, PhD, MAI, Jennifer Pitts, and Stephanie Norwood*

This article originally appeared in the Summer 2012 issue of *The Appraisal Journal*.

This edition of "Environment and the Appraiser" addresses the relationship between the advice and guidance in Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," of the USPAP Advisory Opinions, and the potential use of a controversial technique known as contingent valuation. As will be discussed, contingent valuation was originally developed to value what economists refer to as public goods for which there is no observable market. Early applications of this technique focused on measuring natural resource damages. Most appraisers, on the other hand, focus on real property, or private goods for which there is an observable market in which buyers and sellers interact and establish selling prices. Actual market data in the form of sale prices then forms the basis for the estimation of market value by appraisers. Contingent valuation (CV) attempts to recreate how a market would react to such factors as environmental contamination in establishing sale prices. As this column will discuss, this approach is not a suitable substitute for actual market data with observable transactions.

### Advisory Opinion 9

Advisory Opinion 9 (AO-9), published with the Uniform Standards of Professional Appraisal Practice (USPAP), addresses the valuation issues that must be considered when appraising a property with potential impacts from environmental contamination. According to AO-9,

> The appraiser must recognize that the value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of value as if unaffected (unimpaired value). Rather,

*cost*, *use* and *risk* effects can potentially impact the value of contaminated property.[1]

*Cost effects* reflect any costs necessary to remediate a contaminated property, and these are typically estimated by someone other than the appraiser. *Use effects* include any impacts on site utility or highest and best use. *Risk effects* represent "the market's perception of increased environmental risk and uncertainty"[2] and are typically the most challenging to quantify.

A negative effect on property value due to the market's perception of increased environmental risk and uncertainty is also referred to as environmental stigma. Although perceptions may lead to risk effects or stigma for a specific property, AO-9 explicitly states, "The analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment."[3] An appraiser should not simply assume the presence of risk effects or stigma, but instead must look to data from actual market transactions to measure any impacts on property value.

A recent article by Lipscomb et al. suggests that USPAP allows for the application of contingent valuation methodology (CVM) to measure the market's perception of increased risk due to environmental contamination.[4] However, there is nothing in USPAP condoning the use of CVM in any property valuation assignment. AO-9 specifically states that although specialized valuation methods are usually required when analyzing the effects of environmental contamination, "these methods should be consistent with the requirements related to the valuation approaches in USPAP."[5] The valuation approaches in USPAP include the sales comparison approach, income

---

1.  Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," *USPAP Advisory Opinions*, 2012–2013 ed. (Washington, DC: The Appraisal Foundation, 2012), A-20, Lines 165–168.

2.  Ibid., A-20, Lines 176–178.

3.  Ibid., Lines 176–178.

4.  Clifford A. Lipscomb et al., "Contingent Valuation and Real Estate Damage Estimation," *Journal of Real Estate Literature* 19, no. 2 (2011): 283–306, see especially 299–300.

5.  Advisory Opinion 9, A-20, Lines 182–183.

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

**Jennifer Pitts** is a research manager and senior consultant at Real Property Analytics, Inc., where she researches various environmental and real estate issues. She is a graduate of Texas A&M University with a master's degree in land economics and real estate and a bachelor's degree in finance. At Texas A&M, she was an Appraisal Institute Education Trust scholarship recipient.

**Stephanie Norwood** is a senior consultant at Real Property Analytics, Inc., where she researches the impacts of environmental contamination on real property. She received her master of real estate degree from Mays Business School at Texas A&M University and a bachelor's degree in real estate from Baylor University's Hankamer School of Business.

approach, and cost approach, and CVM falls outside of the realm of these three approaches to value generally recognized in the appraisal profession. In addition, AO-9 states the analysis of the effects of environmental stigma on property value must not be based on "unsupported opinion or judgment."[6] This would include unsupported opinions expressed by the appraiser, as well as unsupported opinions of others (including survey respondents) that are relied upon by the appraiser.

## History and Use of Contingent Valuation Method (CVM)

The contingent valuation method (CVM) was originally developed in the mid-twentieth century to value natural resources and public goods, which are not exchanged in a market.[7] Economists and policy makers did not have the benefit of empirical data chronicling sales of national treasures and public amenities, so they instead observed the stated preferences of carefully selected sample groups. CVM was thrust into the academic crucible in the early 1990s after the Exxon Valdez oil spill, when the State of Alaska claimed multibillion-dollar natural resource damages based on a CV survey. In response to growing concern over CVM efficacy, the National Oceanic and Atmospheric Administration (NOAA) produced a report authored by a panel of survey researchers, economists, and psychologists that outlined key pitfalls and defined appropriate use of the method.[8] Wilson outlines the NOAA's conclusions, which qualify that CVM can at best be used to find the upper-end of passive-use values; the NOAA panel does not promulgate CVM use to value goods exchanged in private markets.[9]

### CVM in Real Property Valuation

In recent years, some appraisers and academics have sought to expand the application of CVM into the arena of real property valuation—for which there is a market—and have proffered CVM as a fourth approach to value. The boundaries of this method have been particularly tested in cases and litigation matters involving real property that may be affected by environmental contamination. Generally, a survey instrument is read to a sample of property owners who are each asked their willingness to pay (WTP) for a contaminated property or willingness to accept (WTA) some environmental impact to their property. Respondent answers are aggregated to provide a diminution range or value attributable to the alleged contamination.[10] A significant portion of the academic body warns that application of CVM to estimate value in private real property markets overextends the capabilities of the method. Wilson asserts,

> Among the reasons why the CV methodology is not an appropriate technique, two may be noted as dominant. First, the recognized authorities on CV as well as advocates of the CV method clearly state that this methodology applies only to public and quasi-public goods. Second, the best results obtained will have only qualitative–but not quantitative—value.[11]

Lipscomb et al. submit that CVM could provide more useful value estimates than could transactions in markets that are not in equilibrium.[12] Wilson counters this argument, stating,

> The market is the market. Attempting to place arbitrary conditions on what the market "should have known" is inappropriate and contrary to market valuation theory. It is for this reason that appraisers do not use hypothetical markets in the development of opinions of value. Instead they seek actual sales and confirmation of the circumstances of the sale price, allowing adjustments to be made to the actual sale price.[13]

Many experts like Wilson continue to emphasize "the CV technique was neither designed for, nor is it applicable to, the valuation of goods for which there is a market."[14]

## CVM Weaknesses

Experts cite a number of weaknesses of CVM that limit its applicability in real property valuation—even in more complex assignments involving environmental contamination and stigma.

First, hypothetical bias stemming from the hypothetical nature of CV surveys is one of critics' most prominent concerns with CVM. Survey respondents are asked their willingness to accept or willingness to pay for an environmentally contaminated property without any resources at stake and without any incentives to reveal their true preferences. Mathews and Desvouges accentuate this point and posit, "Common sense suggests that people simply will not put forth the same effort in making a choice when the outcome does not affect them. It is basically the difference between window shopping and making actual purchases."[15] In a subse-

---

6. Ibid., Lines 177–178.

7. Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297, 292; and Kristy E. Mathews, "Under the Microscope: Dissection of a Contingent Valuation Survey," *The Appraisal Journal* (Summer 2008): 259–269, 259.

8. Mathews, 260–261.

9. Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53–61, 55.

10. Mathews, 260.

11. Wilson, 54.

12. Lipscomb et al., 299.

13. Wilson, 56.

14. Ibid., 60.

15. Kristy E. Mathews and William H. Desvouges, "Stigma Claims and Survey Reliability: Lessons Learned from Natural Resource Damages Litigation," *Journal of Forensic Economics* 16, no. 1 (2003): 23–36, 29.

Copyrighted material licensed by Randall Bell on April 26, 2021

quent article, Mathews states that CV survey results will be unreliable if respondents' answers deviate from what their behavior would be in an actual purchase or sale situation with time and money at stake.[16] Market value is predicated upon the notion that parties are not only willing to make an exchange, but that they are actually able to. Because respondents do not have to face the consequences of their answers in a CV survey, stated preferences about what they might pay cannot reliably serve as a proxy for what they actually would pay in real transactions.

Second, survey respondents have likely never purchased an environmentally impacted property and may not be familiar with the value impacts or health effects of the various contamination constituents discussed in a CV survey fact sheet.[17] Their potential unfamiliarity with the subject material combined with the brevity of most CV surveys (10–15 minutes over the phone) presents the risk that respondents will fill in any informational gaps with their own assumptions. These assumptions likely vary between respondents, which results in a collection of data points that cannot be reasonably aggregated because they are based on shifting informational inputs.[18] The abridged fact sheet presented to respondents may not provide the level of necessary market and environmental information that a real purchaser would be exposed to during the lengthy purchase process.[19]

Third, CV surveys assume that one variable—the presence or absence of environmental contamination on or near a property—is the sole driver of a purchase decision. In real markets, purchase and sale decisions are not unidimensional. Most buyers weigh a long list of benefits and drawbacks for each potential property under consideration that include neighborhood location and amenities, job proximity, school district quality, construction quality, etc. Creating a market in which prices fluctuate based on one variable and in which sale or purchase decisions take minutes rather than weeks or months oversimplifies the complex buying process.[20]

Fourth, CV surveys usually fail to consider the multiple parties involved in a sale or purchase decision. Only one side of a sale—the buyer's WTP or the seller's WTA—is recorded, when in reality a sale only occurs when both parties negotiate to reach a mutually palatable

price.[21] Others, such as family members, friends, real estate agents, and attorneys, may also influence a sale or purchase decision.[22] Thus, the opinions of survey respondents over the phone may not reflect what their opinions would be with additional intermediary influence.

Finally, an additional CVM issue is the marginal bidder problem. There may be a wide range of prices offered to a seller by different buyers; however, the prudent seller in an arm's-length transaction will always sell at the highest possible price. Conversely, CVM collects all WTP or WTA bids, many of which would not affect the ultimate market price in an actual transaction. Simons, and Simons and Throupe attempt to address this problem by removing unreasonably low bids from the ultimate diminution analysis.[23] Mathews highlights the weakness of this approach:

> While eliminating the lowest hypothetical offers from the analysis does make the loss calculations lower than they would be with all of the hypothetical offers included, it does not improve the reliability of the CV-based results for several reasons. The first reason is that this is simply an arbitrary adjustment. Why is taking 50% or 25% of the hypothetical offers appropriate? Why not the best 5% or 10% of the offers? This ad hoc adjustment apparently does not have an empirical or market-specific basis, since no citations to literature or empirical studies are given in support of this marginal bidder approach.[24]

## Survey Errors and Biases

In addition to CVM-specific weakness, general survey errors and biases can affect the quality of CV surveys. Rabianski describes various sampling and non-sampling errors that must be considered in any good survey. Sampling errors exist when the sample does not accurately reflect the population of study. Non-sampling errors occur during data collection and include frame error, measurement or response error, sequence bias, interviewer bias, and non-response bias.[25] Proponents of CVM in real property valuation emphasize that these and other CVM weaknesses can be mitigated through careful survey construction. Lipscomb et al. contend that researchers can properly design a CV survey to mimic real-world conditions;[26] however, it is not necessary to manufacture a market when one readily exists. The process of peeling away layers of risk and

16. Mathews, 259–260.

17. Mathews and Desvouges, 27.

18. Mathews, 264.

19. Richard F. Roddewig and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," *The Appraisal Journal* (Summer 2006): 267–280, 279.

20. Ibid., 279.

21. Mathews, 264.

22. Roddewig and Frey, 279.

23. Robert A. Simons, "Estimating Proximate Property Damage From PCB Contamination in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal* (October 2002): 388–400, 393; and Robert A. Simons and Ron Throupe, "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values," *The Appraisal Journal* (Spring 2005): 156–166, 159.

24. Mathews, 265.

25. Joseph S. Rabianski, "Primary and Secondary Data: Concepts, Concerns, Errors, and Issues," *The Appraisal Journal* (January 2003): 43–55, 48.

26. Lipscomb et al., 285.

bias to achieve reliable CVM results seems unnecessarily convoluted and, in the end, still not as accurate as analyzing and (if necessary) appropriately adjusting transactional evidence.

## The Fourth Approach to Value?

Roddewig and Frey compared actual property value decreases with CVM-predicted decreases in four different markets and found that CVM overestimated damages in every case.[27] Given this high failure rate, CVM cannot be considered a reliable real property valuation method.[28] The three generally accepted approaches to value offer appraisers specialized tools with which to tackle the vast array of valuation assignments. The promise of a fourth approach to value naturally seems like a panacea to appraisers challenged with complex assignments like valuing contaminated properties. However, it is crucial to remember that each of the three generally accepted approaches to value utilizes inputs that are based on empirical data. The income approach considers historical income streams and expenses. The cost approach considers current construction costs, depreciation rates, and land costs for similar properties. The sales comparison approach considers historical sales of comparable properties. The common thread among these three approaches is their reliance on actual incomes, costs, and transactions and the expertise of an appraiser who reconciles resulting values. The CVM instead relies on lay opinions of real estate value and amenity/disamenity impacts to that value. As Bell reminds appraisers,

> No one views landfills, sewage treatment, plants, jails, airport noise, and soil or groundwater contamination as a positive attribute of a residential property.

But that is only part of the story. If market value is going to be affected, then this particular attribute has to be given enough weight in the decision process of buyers and sellers to have a material effect on price.[29]

The fundamental fact remains that while CVM may highlight certain qualitative buyer or seller preferences, those preferences must play out in the marketplace for there to be any true effect on value. CVM was not designed to value goods for which a market exists, and it is not generally accepted by the real property appraisal community as a fourth approach to value.

## Conclusions

While CVM is an interesting technique that may have application in other fields or professions, it is not well suited to the practice and profession of real property valuation. Further, CVM surveys are not a substitute for the actual market data (i.e., sales) that are envisioned in AO-9.[30] The nature of the real estate market and the hypothetical bias involved in this technique renders it of limited usefulness to the real property valuation profession. For these and other reasons, CVM has not found its way into the profession's body of knowledge[31] and has not become generally accepted within the profession despite being proposed for inclusion as early as 1998. While the appraisal profession remains open to new ideas and proposals,[32] this method appears to have been considered and not accepted into the mainstream of the profession. Therefore, appraisers are cautioned against using the technique for estimating market value or impacts on market value and are encouraged to measure value and effects on value using the generally accepted techniques of the profession that rely on actual, observable market data.

---

27.  Roddewig and Frey, 270–271.

28.  Ibid., 280.

29.  Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999), 38, quoted in Mathews, 267.

30.  AO-9 states, "The analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment." Lines 176–178.

31.  The body of knowledge of the appraisal profession includes the Appraisal Institute's *The Appraisal of Real Estate*, 13th ed.; the approved and peer-reviewed educational materials; and the methods and techniques individuals are required to master in order to become members of the appraisal profession.

32.  For example, the use of regression analysis has gained support and now is a generally accepted technique in the profession.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 7

# Appraising Properties Affected by Various Types of Contamination

## Introduction

All of the articles in this chapter could have been included in other chapters of this anthology. For example, "Contaminated Waterways and Property Valuation" by Randall Bell and "Toxic Mold Liability Update: Implications of *Kilian v. Equity Residential Trust*" by Robert J. Aalberts and Richard W. Hoyt could have been included in Chapter 9, which deals with legal issues in valuation settings. "Analysis of the Effects of Contamination by a Creosote Plant on Property Values" could have been included in Chapter 5, which deals with regression analysis, or in Chapter 4, which deals with case study analysis. "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values" by Robert A. Simons and Ron Throupe could have been included in Chapter 6, which deals with the use of survey data. Almost all of the other articles in this chapter could have been appropriately categorized under case study analysis and included in Chapter 4. However, since Chapter 7 of Volume I dealt specifically with different types of environmental contamination, a few specific subtopics have been included in Chapter 7 of this volume as well. The subtopics covered in Chapter 7 of Volume I were asbestos; LUSTs; EMFs (electromagnetic fields), radon, and radiation; groundwater contamination; landfills, and "sick buildings." Chapter 7 of this volume covers landfills, groundwater and surface water contamination, soil contamination, and mold.

Asbestos contamination was a seminal issue in the late 1980s and early to mid-1990s, when appraisers were just beginning to understand how real estate markets respond to contamination issues. By the 2002 publication of Volume I, however, handling the presence of asbestos contamination in the appraisal process had become relatively routine, and a gener-

ally accepted methodology had emerged. The method involved determining the market value of the property disregarding the asbestos issue, then deducting the cost of removal, discounting for the time (and lost rents, if any) due to the systematic removal process, and, finally, studying resale prices paid for remediated buildings to determine if any post-remediation stigma should be deducted from the unimpaired market value.

The same can be said of radon, another environmental issue that emerged in the 1980s and 1990s but is now routinely handled in a manner similar to asbestos. Again, the starting point is determining the market value disregarding the radon issues and then deducting the cost of installing a subslab vent system. Although there was evidence in some locales of ongoing stigma for homes with installed radon vent systems in the early days of market concern about this issue, that is not the case today. Market evidence from across the country indicates that buyers and sellers in areas with naturally occurring radon have confidence in the effectiveness of radon vent systems and do not typically demand an additional stigma discount on homes with properly installed subslab vent systems.

There have been no further articles published in *The Appraisal Journal* since 2002 dealing with asbestos removal or radon vent systems (or radiation, despite all the concern about that issue in the wake of the Fukushima Daiichi nuclear reactor meltdown), but the method for analyzing the value of buildings containing asbestos or homes that test positive for radon has become the standardized method for how the appraisal process handles most types of contamination issues.

One article in Volume I dealt with landfills.[1] There have been four more articles published since 2002 that also deal with real estate valuation issues associ-

---

1.   See Michael L. Robbins, Michele Robbins Norman, and John P. Norman, "Landfills Aren't All Bad: Considerations for Real Estate Development," in *Valuing Contaminated Properties: An Appraisal Institute Anthology* (Chicago: Appraisal Institute, 2002), 406. Note that an *Appraisal Journal* article from 1991 dealing with landfills was not included in Volume I. See M. Chapman Findlay, Donald H. Bleich, and Michael G. Phillips, "An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values," *The Appraisal Journal* (April 1991): 247-252.

ated with real property near, or actually on, current or former landfills. Three of them are included in this chapter, and the fourth, Brian H. Hurd's "Valuing Superfund Site Cleanup: Evidence of Recovering Stigmatized Property Values," can be found in Chapter 5.

Shawn E. Wilson's Winter 2009 *Appraisal Journal* article "Evaluating the Potential Impact of a Proposed Landfill" summarizes an actual landfill permitting controversy involving a construction demolition and debris landfill proposed to be built near Tampa, Florida. While the article does not include any of the results of the analysis and testimony by the author in the actual landfill permitting case referenced, it is important for two reasons. First of all, it includes a listing of the necessary steps in the analysis of the possible effect of a proposed (or existing) landfill on nearby property prices and values. Secondly, it features a full-page chart providing detailed citations to (and short summaries of) some of the previously published literature related to the analysis of landfills' effects on prices.

The Spring 2006 *Appraisal Journal* article "Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey" by Michael Greenberg and Justin Hollander was one of the studies referenced in Wilson's chart. Greenberg and Hollander focus on environmental stigma that can be created by proximity to hazardous waste landfills, especially those that are also designated as Superfund sites. After an overview of what the authors describe as the three major dimensions of stigma (time or pre-remediation vs. post-remediation, proximity to the stigma source site, and the contamination type creating the stigma), Greenberg and Hollander present the results of their study of sale prices surrounding six New Jersey Superfund sites 20 to 25 years after Congress first created the Superfund program for cleaning up the nation's most polluted sites.[2] The authors used two techniques to understand the impacts of Superfund site proximity on nearby home prices in communities with landfills. First of all, they studied US Census data between 1980 and 2000 that compared "the change in housing values and types in the host census tract(s) with other census tracts located within five miles of the site" (page 308). Secondly, the authors approached local realtors as well as the local tax assessor, city planner, and health officer to gain a more informed view of what had been happening. A total of 26 local interviews were conducted. Based on the census data, two of the landfills studied showed no evidence of a stigma impact, while four did. However, in the four communities that showed evidence of a continuing stigma impact, "local experts, as expected, had a different perspective." The locals agreed that although the designation and remediation of the Superfund sites initially "stopped or delayed development, each argued and showed that the areas immediately surrounding the sites were [now] developing because land was so valuable." (page 311)

Greenberg and Hollander conclude by agreeing that the local experts were correct and that the initial environmental stigma attached to proximity to Superfund sites had been significantly lessened. They summarized the cause of the change as follows: "The message is that strong government action, developer interest, reduction of media attention, demographic transition over two decades, the ability to find alternative public potable water sources, zoning changes by local government, and strategic use of trees and shrubs to obscure unsightly land uses can turn what otherwise could have been seriously impaired surrounding land uses into middle-income suburbs." (page 311)

The next article in this chapter is "Watersbend: Appraising a Brownfield Redevelopment Project" by Rudy R. Robinson III, Scott R. Lucas, and Garland G. Rasberry. While the previous two articles in this chapter analyze neighborhoods surrounding landfills, this article analyzes a neighborhood that was actually built on a closed former municipal waste landfill. The landfill opened in about 1950 and closed in the mid- to late-1960s. In the 1980s, 25 apartment buildings for 1,000 residents were constructed on the site. Due to the "sketchy and vague" information provided about the boundaries of the site and the type and amount of waste previously accepted there (which was typical of the era), it was not until 1991 that a Phase I environmental site assessment discovered high concentrations of methane gas under portions of the project area. (page 314) The environmental assessment also raised concerns about structural settling and leachate contamination of a nearby creek. Another study conducted one year later discovered "unacceptably high levels of methane in several first-floor units," resulting in a mandatory evacuation of the 1,000 residents. (page 314)

The article then traces the history of the apartment project following the evacuation. The authors summarize the type and costs of the remediation program approved by Texas environmental regulators as well as the effect of the situation's discovery on occupancy, rents, and sale prices at the property over the next 20 years. The article documents that as the project moved through the discovery, remediation, and post-remediation phases, the effect of stigma on rents, occupancy, and resale prices gradually declined.

The article concludes by outlining the appraisal method used to value the property following completion of the remediation. The method includes an analysis of income and expenses following completion of the remediation. The authors conclude that "as of 2001, the project's occupancy was near 95%, equivalent to citywide averages, and the units leased for rates at the upper end of the range of competitive properties" despite the fact that all prospective tenants were given disclosures about the environmental history of the complex. (page 318) Operating costs, however, were higher due to the need to monitor and maintain the

---

2.    Greenberg and James Hughes coauthored the January 1993 *Appraisal Journal* article "Impact of Hazardous Waste Sites on Property Value and Land Use: Tax Assessors' Appraisal," which was included in Volume I (page 430).

Copyrighted material licensed by Randall Bell on April 26, 2021

remedy and maintain additional insurance coverage to protect against some of the additional ownership risks.[3]

Was there additional post-remediation environmental stigma for the apartment complex even after the necessary additional operating costs were deducted? As discussed in Chapter 2, case study analysis is one of the recognized and generally accepted methods for determining the presence of environmental stigma. Prices paid and direct capitalization rates used in other income property transactions can be analyzed to determine if the market demands an additional discount for stigma over and above a deduction for additional costs.

The authors summarize the results of the eight Texas case studies they undertook to determine the amount of additional environmental stigma. They include a chart that indicates a stigma impact range between 10% and 50% in the eight case studies. (page 317) The authors' brief summary of the method used simply states that the analysis typically involved "comparison of the sale of the contaminated property with sales of unimpaired properties with similar physical characteristics and locations," or "less frequently, comparison of the eventual sale price to an earlier contracted price with no disclosure or knowledge of contamination or lengthy marketing delays was the basis for the discount." (page 317) However, the authors provide no detail about the comparative set of sales used to arrive at the stigma conclusion in each case study.

The authors' general description of the case study data researched indicates that it is appropriate for such a case study. However, one step in the authors' method does not comply with recognized and generally accepted methods of the appraisal profession for case study analysis (see Chapter 2). Rather than let the marketplace case study data tell them whether there was ongoing environmental stigma after accounting for costs that should be deducted from the value of the apartment complex, the authors assumed that there had to be ongoing stigma: "Even after completion of the remediation project, knowledgeable purchasers would demand a discount on this property in order to justify the investment risks and potential market resistance." (page 317) They then cite Randall Bell's *Real Estate Damages* as support for their contention that ongoing environmental stigma always exists.

However, neither that book nor the applicable articles in Chapter 2 of this Volume II anthology assumes that ongoing environmental stigma is always present. As explained in Chapter 2, the revised second edition of *Real Estate Damages* makes it quite clear that ongoing environmental stigma is not always present: "After cleanup and regulatory closure, property value impacts are often minimal and, in many cases, disappear." (page 48) This is an extremely important point for appraisers to understand. As will be discussed in many articles later in this anthology, this conclusion is based on actual prices paid in many different types of contami-

nation situations. The same point is made in Thomas O. Jackson and Randall Bell's article "The Analysis of Environmental Case Studies" in Chapter 4. That article emphasizes that "like any valuation technique, case study analysis can be properly applied or it can be misused." (page 124) Objectivity in case study selection is absolutely essential to the credibility of the case study analysis.

Groundwater and surface water contamination is the direct subject of two articles in this chapter and indirectly involved in a third article that also discusses soil contamination. The first article on surface water is Randall Bell's "Contaminated Waterways and Property Valuation" from the Fall 2008 issue of *The Appraisal Journal*. This article provides a general overview of the topic, and most of the article simply summarizes the various types of contamination that can enter surface waterways and their sources. Bell then discusses the recognized and generally accepted methods of the appraisal profession in the context of various types of appraisal assignments to determine the effect of river, stream, and lake contamination on property prices and values. Bell summarizes the most appropriate techniques as follows:

> A waterway contamination assignment typically would focus on application of the sales comparison approach, where market data with the incremental factor is compared to data on properties without the incremental factor. This could take the form of paired sales analysis, time-value studies, case studies, regression analysis, and perhaps survey techniques for market data backup. (page 324)

Bell also briefly discusses some of the types of non-real estate damages that can result from waterway contamination. For example, river contamination can cause economic losses to businesses and damage significant natural resources. Table 2 at the end of the article presents a two-page chart summarizing methodologies that can be used to analyze some of these impacts that are not related to real estate.

The October 2001 *Appraisal Journal* article "The Effects of an Oil Pipeline Rupture on Single-Family House Prices" by Robert A. Simons, Kimberly Winson-Geideman, and Brian Mikelbank presents a detailed case study of a river contamination situation. The article summarizes the data and analysis that went into a study of the effect of contamination of the Patuxent River in Prince George County, Maryland, on the nearby real estate marketplace. In 2000, the pipeline bringing fuel oil to a power plant on the river ruptured just outside the plant, and more than 120,000 gallons of fuel oil were released. Some of it flowed into Swanson Creek and then into the Patuxent River. About 10 miles of Patuxent River shoreline was oiled.

The authors compiled single-family home sales data from the Maryland State Department of Assessments and Taxation and undertook "hedonic and predictive

---

3.   The remedy consisted of the following elements: "a semiactive ventilation system consisting of 108 wells placed in ten clusters throughout the property, an active gas-extraction system in the subslab of each building that would prevent methane buildup in the apartment units, and a surface drainage-control system to prevent exposure to landfill leachate." (page 316) Each apartment was also provided a hard-wired methane monitoring and alarm system.

regression analyses."[4] (page 328) The authors then detail the elements of the multivariate hedonic regression model, including the descriptive statistics and variables included. The date of sale of waterfront property (defined to include near-waterfront properties in subdivisions that give all homeowners rights to access the riverfront) was a key variable in determining the oil spill's effect on the residential market. The data indicated that the oil spill had an average impact on sale price of about $14,390, equal to approximately 11% of the $128,000 average value of a home in the market area.

The authors also ran what they characterize as a "predictive regression analysis" as a supplement to their hedonic regression model. "Unlike hedonic regression that provides an estimate of the average market reduction, the purpose of the predictive regression is to predict the price for each of the sales that occurred post-spill, then compare them to the actual sale price. The difference, if negative, would be an indication of the loss attributable to the spill." (page 333) The analysis indicated that 23 out of 32 interior properties and all three waterfront properties sold for less than what the predictive regression model indicated they should have sold for in the absence of the spill. The indicated negative effects of the spill on value resulting from this predictive analysis was 10.9% on interior properties and 12.6% on waterfront properties.

The authors readily acknowledge some important limitations to their study. First of all, they only studied prices paid within the first six months following the pipeline rupture. As a result, they conclude that "whether or not these effects are temporary or permanent has not yet been determined." (page 334) Secondly, they acknowledge that there were only a "limited number of waterfront sales" to be analyzed in the first six months following the spill. (page 333) In fact, their entire analysis is based on only three post-spill riverfront sales. According to the authors, the hedonic regression model results indicating a negative impact of 12% "approach, but (at 87% confidence) do not attain, statistical significance at the 90% confidence level." (page 333)

Surface and groundwater contamination is indirectly involved in the July 2001 *Appraisal Journal* article "Fuel-Oil Contamination of a Residence: A Case Study in Stigma" by Bruce M. Closser. This article describes a typical appraisal assignment involving an environmental issue. Closser's assignment was to estimate the post-cleanup environmental stigma, if any, resulting from a home fuel oil delivery accident that pumped 200 gallons of fuel oil into the home's basement rather than into its fuel oil storage tank. The article then describes the case study Closser used to arrive at his conclusion concerning post-cleanup stigma.

The author searched the local marketplace and found another home that had also been the subject of a fuel oil leak. A river overflowed its banks and flooded some homes. In the basement of one of the flooded homes, a fuel oil tank was dislodged and the fuel oil spilled into the water in the basement. The homeowner began pumping the water from the basement into his yard before discovering that the water contained fuel oil. As a result, the soil in the yard became contaminated with the fuel oil. (page 335)

The cost to remove the contaminated soil from this property was $1,150. However, the smell of fuel oil in the basement was so strong that the owners (who had recently purchased the house on a land contract) defaulted on their land purchase contract. The sellers then defaulted on their mortgage, and the contaminated house reverted to the mortgage lender. Closser then summarizes the subsequent history of the bank's investigation, the additional remediation of the basement, and the property's rental history and eventual sales history.

After describing the history of the property, Closser summarizes the data he used to analyze whether there was post-remediation stigma at various points in time after the bank took back the property. He carefully considers the effect of the rental situation on the prices paid and compares the changes in sale prices over time to residential price changes in the subject's market area. He also adjusts his analysis for capital improvements made by the various owners of the subject home.

The analysis indicated that there was a post-cleanup environmental stigma, but it "declined significantly" over time from "the 28% measured three years after the contamination event" to only "6% five years after the contamination event and four years after the cleanup had been completed and the house was ready for occupancy without noticeable odors." (pages 337 and 338)

"Analysis of the Effects of Contamination by a Creosote Plant on Property Values," a Winter 2005 *Appraisal Journal* article by Douglas S. Bible, Chengho Hsieh, Gary Joiner, Chuo-Hsuan Lee, and David W. Volentine, summarizes a case study of home prices in a neighborhood around a creosote plant in Louisiana. Overflow from on-site surface impoundments at the plant had periodically flowed off-site, contaminating soils in the adjacent neighborhoods with PCPs, CCAs, and PAHs, which are various compounds found in creosote.[5] The article first summarizes some of the prior case studies of how contamination affects prices, citing three other *Appraisal Journal* articles that are included in this anthology ("A Beginning Best Practice Brownfield Valuation Model" by Bruce Weber, "Environmental Contamination: An Analysis in the Context of the DC Matrix" by Orell C. Anderson, and "The Analysis of Environmental Case Studies" by Thomas O. Jackson and Randall Bell.) Hedonic regression analysis is then used to determine the effect, if any, of proximity to the plant on home prices. The study was also designed to determine whether any effect on prices decreased as a result of the on-site and off-site cleanup. The off-site cleanup included removal of one to two feet of soil from the yards of homes on one of the adjacent streets.

---

4. This article could also have been included in Chapter 5, which deals with regression analysis.

5. PCP stands for pentachlorophenol, CCA stands for chromated copper arsenate, and PAH stands for polynuclear aromatic hydrocarbons. (page 340)

Copyrighted material licensed by Randall Bell on April 26, 2021

As discussed in Chapter 5, proper specification of a hedonic regression model is essential to determining the power of the model to answer a hypothesis about the effect of a contamination situation. Fourteen independent variables were specified in the authors' model, including standard variables used by appraisers such as heated and cooled square feet and central air, the age of the home, the number of bedrooms and baths, the type of exterior (brick vs. other), and the number of garage spaces. Also included were variables that were more specifically related to the issues raised by the off-site soil contamination. These included the type of foundation (slab or pier and beam), the distance to the plant, and the location in three distinct sub-neighborhoods around the plant "to control for possible effects caused by the location of homes in a particular area." (page 342)

The result of the multiple regression analysis indicated an adverse impact of approximately 9.5% during the period of time when the off-site issue was first investigated and became known to the public. However, once the cleanup work on site at the plant and off site in the neighborhood was completed, homes "sold for about $2,600, or 4% more." (page 345) As was done by authors of other articles in this anthology and in Volume 1, the authors of this article conclude that the contamination impact on prices was only temporary. "Specifically, the revelation of a soil contamination problem decreases home values, while completing a cleanup of the contamination has the reverse effect." (page 346)

The authors include a brief statement of the *t*-values of the outcomes and the indicated significance and tested the results of their case study for multicollinearity, which will be discussed in more detail in Chapter 5.

Robert A. Simons' October 2002 *Appraisal Journal* article, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," also presents a soil contamination case study.[6] PCBs contained in an on-site landfill managed to escape off site due to the wind and surface water runoff. Simons compares the results of five techniques used to study the effect of PCBs on property prices and values in an adjacent neighborhood. These techniques include contingent valuation analysis and four real estate market trend analyses techniques (the comparison of average prices, the number of sales, the number of days on the market, and sale-to-list price ratios).

Before setting out the results of the techniques used, the Simons article explains that the limited number of sales in the affected area meant that a statistical hedonic regression model could not be applied. Care must be taken, however, in reading three comments in the Simons article concerning the importance of regression analysis as a tool for determining the effect of contamination on prices and values.

1. First of all, Simons comments that "Ideally, hedonic regression provides the best quality results in de-termining the effects of environmental contamination on property values." (page 349)

2. Secondly, he states that "If done correctly, hedonic regression and closely related techniques can provide evidence supportive of a causal relationship between contamination and property value diminution." (page 349)

3. Finally, Simons comments that "statistical techniques familiar to Realtors and appraisers such as market area trend analysis, considering evidence obtained from market participants, use of list/sale price ratios, sale/resale analysis, and market surveys of potential buyers" are somehow less reliable than regression analysis in the determination of the effect of contamination on prices and values. (page 349)

Simons is a real estate economist but not a licensed real estate appraiser. Each of those three comments must be carefully considered in light of how the appraisal profession views regression analysis as compared to the other techniques. The most important words in the first two statements are "ideally" in the first statement and "if done correctly" in the second. And as Thomas O. Jackson's "Methods and Techniques for Contaminated Property Valuation" and the excerpts from the *Analyzing the Effects of Environmental Contamination on Real Property* seminar included in Chapter 2 make clear, multiple regression analysis must be used with care. That calls into question Simon's position that somehow regression analysis is superior to other types of market data analytical techniques typically used by appraisers. As emphasized in Chapter 2 (especially the Jackson article), significant challenges are involved in arriving at relevant conclusions from a complex regression model. Even more importantly, the Instructor Notes from the seminar excerpt in Chapter 2 state that regression modeling has only a limited role in contaminated property assignments: It is useful in measuring the "average differences between groups of properties (impacted and non-impacted neighborhoods)" but "is *not* used for estimating individual property values." (page 67) Jackson's article "Evaluating Environmental Stigma with Multiple Regression Analysis" in Chapter 5 makes the same point.

The advocacy of contingent valuation analysis in the Simons article also must be considered in light of other articles in this *Anthology*. As noted in Chapter 2, reliance on market interviews is specifically not included among the recognized methods in the peer-reviewed seminar materials included in that chapter. Market interviews and surveys are not a replacement for the analysis of actual sale prices. And, as indicated in "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace" in Chapter 6, testing contingent valuation surveys against actual prices paid in specific markets around the country shows that "survey-based valuation methods have been a highly inaccurate and unreliable predictor of actual prices and values." (page 254)

---

6.    PCB stands for polychlorinated biphenyl.

Finally, the Simons article fails to mention case study analysis as another important market data-based technique. Case study analysis (rather than contingent valuation analysis) should be used when the quantity of sales data is limited, as in the Alabama neighborhood studied by Simons. (See "Methods and Techniques for Contaminated Property Valuation" and the seminar excerpts from Chapter 2 as well as the articles included in Chapter 4.)

Volume I included an article by Krisandra Guidry from the January 2002 issue of the *Appraisal Journal* entitled "Sick Commercial Buildings: What Appraisers Need to Know." That article provided the following definition of a *sick building* from the US Environmental Protection Agency: "A building is sick if at least 20% of its occupants suffer persistent headaches and/or eye and mucus membrane irritation that are relieved when they leave the building." (page 421 in Volume I) One of the causes of "sick building syndrome" as cited by Guidry is indoor air contamination due to biological contaminants including mold, bacteria, fungi, and viruses. (page 423 in Volume I) Since the publication of this article in 2002, there has been one *Valuation Insights & Perspectives* article and four *Appraisal Journal* articles on appraising properties with known mold issues.[7]

Michael V. Sanders' "Mold: What Appraisers Should Know," which originally appeared in the Third Quarter 2005 issue of *Valuation Insights & Perspectives*, sets the stage for the rest of the articles on mold included in this chapter. Much of the focus on mold in appraisal literature since Volume I was published in 2002 is due to high-profile litigation, some of which is referenced by Sanders. He discusses the various types of molds, their health effects, and the manner in which mold can become a problem inside a building. He then summarizes the various federal and state efforts related to legislation and guidelines regulating mold levels, with an emphasis on the difficulties of setting regulatory standards given the wide variety of mold species and variations in health effects. Disclosure issues are also referenced.

Next, Sanders makes three key points about evaluating the effect of mold on property values:

1. Take care to rely on expert testing before deciding that noticeable "surface staining" is mold.
2. Be "careful not to fall victim to some of the hype surrounding mold, for example, by identifying black stains as 'toxic mold.'" (page 358)
3. The accepted and recognized methods of the appraisal profession for determining the price and value impacts of contamination in general apply equally well to appraisal situations involving mold.

Sanders closes the article with the following warning: "Market resistance (stigma) is often cited in lawsuits alleging water damage and mold, though such allegations must be properly supported by relevant market data. Stigma damage is far from being automatic. Case studies have indicated that properties once af-

fected by water damage and/or mold have subsequently sold at full value in a post-repair condition." (page 358)

Two articles by Del Williams that appeared in the April and October 2002 issues of *The Appraisal Journal* provide more detail about litigation that has given rise to the increased attention paid by the appraisal profession to mold issues. The April 2002 article, "Dramatic Rise in Toxic Mold Claims, Litigation, and Legislation Demands Pro-Active Response From Insurers," states that a single property insurance company had more mold-related claims in the first 10 months of 2001 than the entire American and Canadian insurance industry had experienced in the prior 10 years combined. (page 359) Much of the rest of this article is focused on how the home insurance industry is responding to the rise of mold remediation claims and the cleanup techniques for solving mold problems. Williams' October 2002 article, "Commercial and Residential Water Damage: The Mold Connection," covers much of the same insurance industry issues as the April article and then focuses on the design and construction flaws that can lead to moisture penetration and mold growth inside a building.

The Spring 2005 *Appraisal Journal* article "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values" by Robert A. Simons and Ron Throupe again covers the increasing numbers of cases claiming property damage due to mold. The authors summarize the following four studies they conducted to determine the effect of the presence of mold on residential prices and values:

1. Research into the results of mold-related litigation
2. A contingent valuation survey involving 200 homeowners in South Carolina
3. A case study of a mold-infested apartment complex in Seattle, Washington (page 370)
4. A Cleveland study of the costs involved in the remediation of homes with known mold problems

While these studies are of interest to appraisers facing appraisal assignments involving mold issues, two of these studies—reliance on jury verdicts and contingent valuation surveys—are not part of the accepted methods of the appraisal profession for dealing with contamination issues. The articles in Chapter 2 clearly state that four generally accepted methods are used to determine the effect of contamination on property prices and values. Furthermore, all four methods are based on an analysis of actual market data, which consists of real prices paid or actual capitalization rates or discount rates gleaned from the analysis of income property transactions. Even case study analysis must be based on actual prices paid in real-world transactions. As stated in the Instructor Notes to the seminar excerpt in Chapter 2, "The appraisal profession has not adopted (nor considered) any other approaches." (page 67)

Relying on jury verdicts or settlements in litigation to determine damages to property prices or values is not an acceptable appraisal technique. There are many

---

7.    A case study in the second edition of *Real Estate Damages* also deals with mold issues and the appraisal process. It has not been included in this anthology.

Copyrighted material licensed by Randall Bell on April 26, 2021

fundamentally sound reasons for not relying on jury verdicts as "market evidence," including the following:

1.  The rules of evidence do not necessarily allow juries to look at all the information and data that actual buyers and sellers would consider.
2.  The jurors are not actual current participants in the marketplace for the homes that are the subject of the litigation.
3.  Special motivations involved in settlements—including factors such as the cost of continuing the litigation or the likelihood of winning on appeal as well as each side's assessment of how evidentiary and legal rulings by the judge overseeing the case may affect the outcome of the case—are not typical of the motivations of real estate buyers and sellers.

Simons and Throupe state that as of 2003, 10,000 mold-related cases were pending in US courts. Table 1 in the article summarizes key facts about 10 such cases. (page 367) While some of the jury verdicts are discussed in the article, the authors carefully note that jury verdicts are not based on actual prices paid when they state that "court verdicts and pretrial settlements do not necessarily reflect market value losses. This is especially true when punitive damages are part of a settlement and 'mold hysteria' may have affected jury judgments." (page 366) This is the essence of the reason why jury verdicts, although of interest to appraisers handling mold contamination assignments, should not be used as market-based evidence of a price or value impact.

Simons and Throupe then describe the contingent valuation survey process they supervised involving a stratified random sample of 200 South Carolina homeowners. (pages 366-369) They summarize the results of their South Carolina survey as indicating that only "58% of prospective home buyers with full information would bid to buy a home with mold contamination," and conclude that the range in impacts on value is between 20% (when one or only relatively few affected units are in a particular marketplace) and 37% (when more units are affected by toxic mold). (page 370)

Chapter 6 focused on the use of formal and informal surveys in appraisal assignments involving contamination issues, which was also the subject of some articles in Volume I. A warning from a 1999 article included in Volume I still holds true: "Surveys may have a limited role in some types of assignments involving contaminated property, but collection and analysis of sales and market data will remain the central technique for estimating the stigma impact, if any, that attaches to real property affected by contamination or other forms of environmental risk." (page 578 in Volume I) Chap-

ter 6 also noted the extreme difficulty in designing a survey that fairly and accurately replicates the process by which buyers and sellers in the actual marketplace make decisions about the price to pay or accept for contaminated properties. As a result, reliance on formal statistical surveys is not yet a recognized or generally accepted method of the appraisal profession.

The last article in this chapter, "Toxic Mold Liability Update: Implications of *Kilian v. Equity Residential Trust*" by Robert J. Aalberts and Richard W. Hoyt, originally appeared in the Spring 2006 issue of *The Appraisal Journal*. This article also focuses on the litigation setting related to mold claims as of early 2006. The authors reference the July 2004 federal district court decision in the Arizona case captioned *Killian v. Equity Residential Trust* as possibly marking "the beginning of the end of the toxic mold frenzy." (page 375) They discuss this decision in the context of the requirements for the admission of expert testimony, including the *Daubert* standard for admissibility of expert testimony also discussed in the two Aalberts and Hoyt articles included in Chapter 9 and in some of the articles included in Volume I. Aalberts and Hoyt then sum up some of the issues related to appraiser responsibilities when inspecting residential and commercial properties that may have moisture and mold issues. They note that Advisory Opinion 9 (AO-9) dealing with environmental contamination can also be applied to mold. Finally, the authors discuss some of the appraisal techniques, including case studies and paired sales analysis, covered in Chapter 2.

There are many more articles in the real estate appraisal literature related to the effect on property prices and values from various types of environmental issues and concerns. For example, Volume I included articles on the effects of EMFs on property prices and values. Since the publication of Volume I, there have been six articles published in *The Appraisal Journal* dealing with the effects of cell towers and power lines on property values, both structures sometimes associated in the minds of the home-buying public with EMFs or other types of wave-based concerns. A number of articles on the same topics have appeared in *Assessment Journal*. There is simply not enough room in this anthology to include those articles in this chapter. References to some of those articles are included in the Bibliography at the end of this anthology.

The same can be said for articles related to many other specific environmental issues, such as noise, that potentially impact prices and values. References to some of those articles are also included in the Bibliography.

## 7.1 Evaluating the Potential Impact of a Proposed Landfill

*by Shawn E. Wilson, MAI*

This article originally appeared in the Winter 2009 issue of *The Appraisal Journal*.

### Abstract

This article is intended as a road map for appraisers who have a landfill consulting assignment. Construction or expansion of a solid-waste landfill typically triggers an extensive permitting process. Real estate appraisers are sometimes called on to present evidence and/or testimony for clients who support or oppose the proposed landfill improvements. This article sets forth information and techniques to assist the appraiser in providing that appraisal service. A literature review is included.

An article in a Florida newspaper begins, "New York has the Statue of Liberty. St. Louis has its arch. And in coming years, one of Manatee County's most visible landmarks could be a 150-foot-tall mound of construction debris."[1]

This news item was published after a national waste management firm proposed a construction and demolition debris landfill to cover 130 acres of a 300-acre site. Local residents and environmentalists were outraged. On the other hand, a spokesman for the landfill firm was quoted in the same article as saying, "It's near an abandoned phosphate mine, the port, and the jail. If you're going to find a place in Manatee County to put it, that would most likely be it."[2]

The landfill company made a formal application for development approval, and hired experts to formulate a landfill design and prepare all the necessary application paperwork. In government offices, that process of review began. Meanwhile, nearby property owners began to organize in opposition. A "Stop Trash Mountain" Web site appeared. A coalition of developers who own nearby tracts of land hired attorneys, and began planning an organized opposition to the landfill's development applications. A public hearing, which would mark the first major hurdle for the proponents of the landfill, was scheduled. Shortly thereafter, the phone rang at an appraisal office.

### The Consulting Assignment

Landfills are a very profitable commercial land use. In areas where growth and new construction are evident, landfill construction and expansion is a logical result.

As with other new commercial uses, landfill construction is subject to the permitting requirements of local government bodies. In addition, the environmental and operational aspects of a landfill may require permitting from local, state, or federal agencies. For instance, landfills in the state of Florida are regulated by the Florida Department of Environmental Protection (FDEP).

During the landfill permitting process, the applicant may be required to present evidence or testimony regarding the suitability of the proposed landfill for a particular location. Individuals or groups who oppose the permit, such as environmental groups or neighboring property owners, also may have the opportunity to present information or testimony regarding compatibility and impact.

In either case, it is not uncommon for the opposing parties to engage the services of a real estate appraiser to evaluate the proposed landfill and provide a written report and/or testimony regarding the potential impacts. These assignments are a form of appraisal consulting.

### Identifying Landfill Characteristics

As with all consulting assignments, it is first necessary to establish the scope of work. In this instance, the subject property is defined as the land proposed for improvement with a landfill. All pertinent physical, environmental, and legal aspects of the subject property must be identified, just as in a traditional appraisal assignment. Data must be assembled on the size and shape of the property; zoning and other land use restrictions; floodplain issues; soil type; and other relevant aspects. The development application for the landfill is often a source for this data, but the appraiser should verify this information.

Operational information for the proposed landfill is important to consider. This includes details such as type of permit sought, type of landfill proposed, special physical characteristics (i.e., clays, soils), man-made liners or other barriers proposed, projected useful life, topographical aspects (i.e., above-grade mounded landfill, infill of existing depression), and volume of waste forecast to be received (i.e., tons per week, cubic yards

---

1. Christopher O'Donnell, "Debris at Planned Landfill Could Form 150-Foot Pile," *Sarasota Herald-Tribune*, August 29, 2007.

2. Ibid.

**Shawn E. Wilson, MAI,** is the owner of Compass Real Estate Consulting, Inc., in Lakeland, Florida. Wilson is a state-certified general real estate appraiser with over twenty-one years of eminent domain and litigation-related appraisal experience. She has provided testimony and analysis relating to several proposed landfills, and has inspected over fifty solid-waste facilities throughout Florida (known in her office as Landfill Tour 2007 and Landfill Tour 2008). Wilson has been an MAI member of the Appraisal Institute since 1993. She is a member of the International Right-of-Way Association and is past president of the Association of Eminent Domain Professionals. She has been qualified as an expert witness in courts throughout Florida as well as in U.S. Bankruptcy Court. Wilson has provided real estate appraisal services in over twenty-eight Florida counties and has authored articles and presentations on various appraisal topics.

Copyrighted material licensed by Randall Bell on April 26, 2021

per day). The proposed improvements (specific characteristics of the proposed landfill) must then be identified, including the size and layout of active landfill cells as they relate the overall subject property.

It is also important to identify the operating aspects of the proposed landfill, such as days and hours of operation, location of entrance and exit points, location of front gate, and location of major site improvements (i.e., scale house, fencing, and landscape buffers).

**Landfill Cells.** Landfill cells are the portions of a landfill site that are used for permanent storage of waste. Other areas of a landfill are used for operations (internal roadways, dirt stockpiles, office, scale house, equipment shed, temporary waste-storage areas for recyclables or land clearing debris). Landfill cells can be active or passive. The working face of an operational municipal waste landfill where garbage trucks are depositing household garbage (Figure 1) is an example of an active construction and demolition (C&D) cell. When landfill cells reach maximum capacity in size and/or height, they are closed. There is a prescribed capping-off process, after which the closed cells are usually planted with sod.

The number and size of landfill cells is dictated by the particular size and shape of an overall site, type of waste accepted, environmental factors, drainage characteristics, and numerous other site-specific criteria. Landfill cells are analogous to the developable pods in a large planned development. The planned development would have roads, drainage ponds, park sites, conservation areas, and other passive uses. The actual areas where development of structures could occur (i.e., Phase I, multifamily building site, shopping center site) would represent the cells.

**Landfill Liners.** Landfill liners are layers of natural and/or man-made materials that line the bottom of a landfill cell. When working properly, a liner system traps and collects the leachate that drains through the layers of a landfill.[3] The collected leachate is then pumped away for treatment. Monitoring wells are typically required around the perimeter of a landfill to make sure that leachate is not escaping through the liner and polluting the land nearby. When leachate is detected in monitoring wells, it indicates that the liner system is leaking.

Various types of clay and soil are used in landfill liner systems, sometimes in combination with man-made elements. Thick layers of clay are sometimes proposed to form a watertight barrier that can function as a liner. Man-made liner systems are typically engineered from thick plastic sheets, fastened together with

**Figure 1**        C&D Landfill Working Face



---

3.    *Leachate* is defined as "a liquid that has percolated through or drained from hazardous waste; waste that collects contaminants as it trickles through wastes, pesticides, or fertilizers." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 161.

seams, to form a waterproof barrier. A plastic garbage bag placed inside a garbage can is an example of a rudimentary liner system.

The reliability of a liner system depends on many factors, such as materials used, quality of installation, landfill operation policies, climate, and location. The reliability of liner systems is a subject of ongoing debate among stakeholders. For instance, many environmentalists argue that no liner system can be 100% reliable, particularly over decades and centuries of use. On the other hand, those who design and install such systems are adamant about the reliable performance of the landfill liners.

**Landfill Categories.** Landfills are arranged into major groupings based on the type and amount of waste that they are permitted to receive. Some general classifications for landfills are municipal solid waste (MSW); commercial; land clearing debris; and construction and demolition debris (C&D). Municipal solid waste (MSW) landfills are those that accept general household and commercial garbage, but do not accept hazardous waste. MSW landfills accept waste that produces leachate. Commercial landfills (sometimes referred to as Class III landfills) accept dry materials such as carpet, cardboard, paper, glass, plastic, and furniture, which are not expected to produce leachate. Land clearing debris landfills accept only material of that type, such as branches, stumps, leaves, and other organic material. The construction and demolition (C&D) landfill differs from other landfills because it does not accept general household and commercial waste that is collected from curbsides by garbage trucks. The C&D waste is comprised of materials that are not liquid, and produce little or no leachete. Lumber and drywall are examples of materials that are generally allowed in C&D landfills.

## Defining the Appraisal Problem: Case Study Example

While preparing for the landfill public hearing in Manatee County, a land use attorney contacted the real estate appraiser. The attorney explained that, while some old industrial improvements and a low-security jail for women were indeed located near the proposed landfill, the neighborhood was in transition. Over 8,000 housing units in six large-scale, planned developments had been approved already for development nearby, and were waiting for favorable market timing to come out of the ground. She explained that a tall proposed landfill of any type was thought to be a huge threat to these future developments, so the nearby property owners were strongly opposed. Could the appraiser analyze the impact of the proposed landfill on the planned developments and provide testimony at the public hearing?

When investigating a highly controversial situation, it is particularly important for the appraiser to identify the facts regarding the proposed improvements. The controversy and news coverage can quickly spread gossip and incorrect information through the marketplace. As with other appraisal assignments, it is therefore critical to determine the appraisal problem.

In this instance, the development application that had sparked the negative publicity was an invaluable tool for identifying the characteristics of the proposed landfill. Detailed maps, a conceptual site plan, reports on site characteristics, information about operating details, and data on environmental considerations were all required as part of the applicant's submittal package. In this case, a construction and demolition debris landfill was planned, and it would be a mounded type of landfill that would reach a peak of approximately 150 feet in height when its capacity was reached.

The proposed landfill site adjoined US-41, a four-lane, divided highway. The Port of Manatee facility is located nearby, with direct access to Tampa Bay. Proximity to the water was particularly bothersome to environmentalists, who were concerned about potential impacts on nearby aquatic preserves. A portion of the proposed landfill site included wetlands that would be impacted. In addition, environmental concerns were triggered because portions of the site were located in the 100-year FEMA floodplain and in hurricane storm-surge inundation areas.

Possible negative impacts from operation of a landfill in the proposed location also involved compatibility issues. The planned residential developments that had been approved were located approximately one-quarter mile to the east. Proposed improvements near the landfill site included parkland, a school site, and future home sites.

The landfill applicant proposed a Class III landfill, which would have a total site life of approximately twenty to thirty years. Construction plans included landfill cells, storm-water management ponds, a community collection center, a yard-waste processing storage area, and waste drop-off areas. Operating hours were to be Monday through Friday from 7 a.m. to 5 p.m. and Saturday from 7 a.m. to noon. The applicant proposed a liner system for the landfill, which it felt would mitigate any potential environmental problems. A combination of earthen berms and planted landscaping were proposed for the perimeter of the proposed landfill site to buffer the view of the operation.

Once the physical and operational characteristics of the proposed landfill have been identified as in the case study, the appraiser can gather information on the impact that improvements might have in the proposed location. As with any proposed construction, the locational characteristics, highest and best use of the site, and market area must be analyzed in order to evaluate impact.

## Hit the Books

Before moving to project-specific research, the appraiser should first gain general background knowledge. In order to identify potential issues and research requirements for a landfill consulting assignment, it is helpful to study published works on the topic of landfill impacts. The Lum Library at the Appraisal Institute is a resource for such study, as are other sources for real estate information. General Internet-based research is also helpful to locate published materials in the state or region where the proposed landfill is located.

Copyrighted material licensed by Randall Bell on April 26, 2021

Additional research and study is possible using articles that examine the impacts of other types of stigma, sometimes known as NIMBY ("Not In My Back Yard") and LULU ("Locally Undesirable Land Uses"). Examples of such research are listed in the Additional Reading section at the end of this article.

Most appraisal-related publications that discuss landfills include a reference to stigma, or negative influence, which may impact adjoining land. The extent of the impact depends upon many factors, such as the type of landfill, size of landfill, physical characteristics of the site, types of neighbors, socioeconomic characteristics of the neighborhood, etc.

## Literature Review

Recent research related to the case study landfill in Florida resulted in twenty articles for analysis. The most pertinent information on the relationship between landfills and adjoining properties was found in eleven of the documents, which are referenced in this article. General information regarding the impact of the proposed landfills upon neighboring properties is summarized herein. Because this research was undertaken for a landfill located in Florida, some general information from Florida sources is included. A summary of the research findings reported in the eleven articles follows. This information is also outlined in Table 1.

In "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation,"[4] Flynn et al. state, "The values of individual properties are determined to some degree by the reputation of the area where they are located."[5] Buyers and sellers of condominium units, for instance, form immediate conclusions about property that is located on a popular beach. In a similar manner, buyers and sellers of single-family homes near a power plant may draw conclusions about such a property from just this locational reference.

The authors of this study go on to say, "The association of properties with hazardous, noxious, or repugnant conditions, including perceptions of health and environmental risks, can adversely impact values… Property stigma is a socially constructed evaluation of a place; it is a sign or mark created and maintained by processes of social communication."[6] Put another way, if friends and family are impressed by a location,

a person will be likely to perceive value in that location (popular beach). If coworkers and cousins express concern or dislike for a location (near a power plant), a person is likely to perceive less value for property in that location.

In "Appraisal of a Class III Landfill," Entreken states, "A Class III landfill is not typical real estate. A landfill is a short-term business enterprise that happens to be conducted on a parcel of land. Most real estate is considered to have a long useful life; this is not the case with a landfill."[7] He also notes, "A landfill generally has very poor public relations. Fills can emit odors and generally during their life they receive a certain amount of neighborhood protest and bad press."[8] Entreken explains that in appraising a Class III landfill, an appraiser must be aware that "there are continuing operations that burden the property for many years after the fill operation is completed and the fill is closed."[9]

In "Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey,"[10] Greenberg and Hollander describe several types of environmentally damaged sites in New Jersey. The authors state, "Waste disposal and management sites are among the most stigmatizing land uses."[11] In other words, among the various categories of sites that may create stigma issues for neighboring properties, landfill and other disposal sites are among those that create the greatest market resistance due to stigma.

An article entitled "Evaluating the Impact of Solid-Waste Transfer Stations," by Kimball and Weaver, explains that such facilities are required in urban areas because "governments have extreme difficulty in obtaining voter approval of landfill sites near areas where the waste originates."[12] When considering locations for a landfill, the study found, "Citizens' groups usually favor industrial or commercial locations–away from residential developments."[13]

The Florida Center for Solid and Hazardous Waste Management Research, at the University of Florida, conducted landfill studies. In "Control of Odors from Construction and Demolition Debris Landfills,"[14] Reinhart and Townsend observe, "Few waste management issues create more public displeasure than the production of odors at landfills, particularly landfills located near residential areas." They state that construction and demolition (C&D)

---

4. James Flynn et al., "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation," *The Appraisal Journal* (Winter 2004): 35–44.

5. Ibid., 35.

6. Ibid.

7. Henry C. Entreken, "Appraisal of a Class III Landfill," *The Appraisal Journal* (October 1987): 548–557, 548.

8. Ibid., 555.

9. Ibid., 548.

10. Michael Greenberg and Justin Hollander, "Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey," *The Appraisal Journal* (Spring 2006): 161–173.

11. Ibid., 162.

12. J. R. Kimball and William C. Weaver, "Evaluating the Impact of Solid-Waste Transfer Stations," *The Appraisal Journal* (January 1983): 9–19, 9.

13. Ibid., 9–10.

14. Debra Reinhart and Timothy Townsend, "Control of Odors from Construction and Demolition Debris Landfills" (working paper, Florida Center for Solid and Hazardous Waste Management Research, Gainesville, Florida, August 2003).

| Table 1 | Summary of Landfill Impact Studies | | | |
|---|---|---|---|---|
| **Authors** | **Title** | **Source** | **Location, Period** | **Summary of Article** |
| Flynn et al. | "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation" | *The Appraisal Journal* (Winter 2004): 35–44 | Pacific Northwest April 2002 | Class action lawsuit against existing MSW landfill. Describes telephone survey of nearby property owners, which indicates stigma effect. Supported paired sales analysis indicates 8%–10% diminution of value. |
| Entreken | "Appraisal of a Class III Landfill" | *The Appraisal Journal* (October 1987): 548–557 | Various | Methodology for appraising a Class III landfill. Includes general information about odor and neighborhood protest. |
| Greenberg and Hollander | "Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey" | *The Appraisal Journal* (Spring 2006): 161–173 | New Jersey 1983–2005 | Observation of development on and around 6 former landfill sites after Superfund cleanup. General information on stigma. |
| Kimball and Weaver | "Evaluating the Impact of Solid-Waste Transfer Stations" | *The Appraisal Journal* (January 1983): 9–19 | Texas | General information on stigma. Study shows some transfer stations do not negatively impact adjoining property, especially industrial property. |
| Reinhart and Townsend | "Control of Odors from Construction and Demolition Debris Landfills" | Florida Center for Solid and Hazardous Waste Management Research, (working paper, August 2003) | Florida, New York, Virginia 1991–1998 | Synopsis of odor problems and neighbors' complaints at 9 landfills where C&D waste was accepted. Describes a proposed project to measure malodorous emissions and to test various cover soils for effectiveness in mitigating the odor. |
| Reichert, Small, and Mohanty | "The Impact of Landfills on Residential Property Values" | *Journal of Real Estate Research* (1992): 297–314 | Cleveland, Ohio 1980s–1990s | Regression analysis study of 5 landfills indicates diminution of market value to adjoining residential property of 3%–7.3%, depending on quality of home and distance from landfills. |
| Reinhart | *Urban Infilling Impacts on Florida's Solid Waste Facilities* | Florida Center for Solid and Hazardous Waste Management Research, Report #0632001-07 (January 2007) | Various | Case studies and literature review regarding negative impacts that result from landfill odor and noise. |
| Bleich, Findlay, and Phillips | "An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values" | *The Appraisal Journal* (April 1991): 247–252 | San Fernando Valley, Los Angeles, California 1978–1988 | Regression analysis of 1,628 home sales shows no landfill impact. Landfill is separated from the homes by a hill and vacant buffer land, and landfill is not visible from the homes. |
| Cartee | "A Review of Sanitary Landfill Impacts on Property Values" | *The Real Estate Appraiser & Analyst* (Spring 1989): 43–47 | Various | Summarizes 4 case studies that have mixed results. Landfills in remote areas are harder to study, but show no impact. Impact increases in more populated areas and near busier landfills. |
| Guntermann | "Sanitary Landfills, Stigma, and Industrial Land Values" | *Journal of Real Estate Research* 10, no. 5 (1995): 531–542 | Phoenix, Arizona 1984–1994 | Vacant industrial land near 12 landfills was studied. Open solid-waste landfills and open or closed refuse landfills have no impact. |
| Nelson, Genereux, and Genereux | "Price Effects of Landfills on House Values" | *Land Economics* 68, no. 4 (November 1992): 359–365 | Suburban Minneapolis, Minnesota 1980s | Reports on study of suburban landfill receiving 500 tons of waste per day. Studied 708 home sales over 10 years. Negative impact up to two miles away and up to 12% diminution in value. |

Copyrighted material licensed by Randall Bell on April 26, 2021

debris landfills "often offer an ideal environment" for the production of hydrogen sulfide gas ($H_2S$), because gypsum drywall releases the gas when it is exposed to water. This causes a rotten egg odor, and "Consequently C&D landfills can be major sources of $H_2S$ and are frequently the target of complaints from unhappy neighbors."[15]

The Reinhart and Townsend study profiles six landfills that have experienced problems with unpleasant odors resulting from construction and demolition debris. In each instance, the landfills were causing odor problems in nearby residential areas. One of these was a C&D landfill in Broward County, which developed a "severe odor problem" shortly after disposal of debris in the aftermath of Hurricane Andrew. Therefore, a hurricane or other disaster could intensify the local impact of a Class III landfill.

Similarly, in "The Impact of Landfills on Residential Property Values," Reichert, Small, and Mohanty report that a survey of homeowners living near landfills found "the most severe nuisances are odor and unattractiveness,"[16] and that "the residents interpreted odor from the landfill as a signal of potential health hazards."[17]

This link between odor and potential health hazards is also discussed by Reinhart and Townsend in their "Control of Odors" paper. Their research findings state that "short exposure at lower concentrations can have long-lasting adverse health effects," and "the gas can lead to immediate fatality at 1000 ppm" concentration.[18]

In another study from the Florida Center for Solid and Hazardous Waste Management Research, *Urban Infilling Impacts on Florida's Solid Waste Facilities*, Reinhart details problems that arise when residential development occurs too close to an existing landfill.[19] This study finds that "sites once considered remote are now located in areas increasingly ripe for development or redevelopment. In order to site solid waste facilities local governments have installed public works infrastructure such as roads and utilities, reducing the costs for owners of adjacent parcels." Therefore, "the potential for nuisance complaints against the existing solid waste facility operations has become an increasing reality in many areas of the nation... public and private owners/operators of solid waste facilities have been forced to close their facilities

pre-maturely, resulting in a loss of valuable solid waste capacity and increased cost for solid waste disposal."[20]

In a study entitled, "An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values," Bleich, Findlay, and Phillips describe a landfill in the San Fernando Valley in Los Angeles, California, that has created "no significant difference in either current prices or in appreciation rates (and thus prices over time) over a ten-year period."[21] Various appraisal methods for measuring an impact on property value were employed, including an analysis of over 1,600 sales transactions in three nearby neighborhoods.

Based on the study results, the authors conclude that "a landfill, if well-designed and -managed, can be a good neighbor and have no statistically measurable negative impact on surrounding property values."[22] However, the San Fernando Valley landfill that is the subject of the study is located on the north slope of a hill. The south slope, which abuts the neighboring homes, is undeveloped land owned by the county. Consequently, the actual dumping area is not visible from the neighboring homes.[23]

These findings are in contrast to those of Flynn et al. Their research uses various appraisal research methods to determine if a landfill waste disposal facility is the source of property value losses for nearby property owners. The landfill that is the subject of their study is a publicly owned and operated landfill in the Pacific Northwest. Through paired sales analysis, they find that property values next to the landfill are "lower than in comparable areas more distant from the landfill."[24]

Flynn at al. also interviewed buyers, sellers, and other market participants to understand market attitudes about the location. They find that "sale transactions or projects that did not occur may be as telling as those that did,"[25] meaning that some transactions are not available for analysis because the prospective buyer or developer walked away from the property when they realized the extent of potential impact from the neighboring landfill. At the completion of the research, the authors link "the landfill with a stigma effect of public opinion about the desirability of housing and property"[26] nearby. They estimate the resulting loss in property value to be 8% to 10%.[27]

15. Ibid.

16. A. K. Reichert, M. Small, and S. Mohanty, "The Impact of Landfills on Residential Property Values," *Journal of Real Estate Research* 7, no. 3 (1992): 297–314, 310.

17. Ibid., 299.

18. Reinhart and Townsend, 2.

19. Debra Reinhart, *Urban Infilling Impacts on Florida's Solid Waste Facilities* (Report # 0632001-07, Florida Center for Solid and Hazardous Waste Management Research, Gainesville, Florida, January 2007).

20. Ibid., 1.

21. Donald H. Bleich, M. Chapman Findlay III, and G. Michael Phillips, "An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values," *The Appraisal Journal* (April 1991): 247–252, 247.

22. Ibid., 252.

23. Ibid., 250.

24. Flynn et al., 36.

25. Ibid., 37.

26. Ibid., 44.

27. Ibid., 36.

The Reichert, Small, and Mohanty study, "The Impact of Landfills on Residential Property Values," has been widely referenced in other research. This study of areas near five municipal landfills in Cleveland, Ohio, finds that neighborhoods of more expensive homes experience a greater loss in property values (5.5%–7.3%) than older neighborhoods with less expensive homes (3%–4%). The study results also indicate that the effect of a landfill is "essentially nonexistent for predominantly rural areas."[28]

Reichert, Small, and Mohanty report that "homeowners who own more expensive homes are more sensitive to landfill problems."[29] They also find that "in areas where the population is younger and better educated, very concerned about health issues and child safety, and has a significant housing investment to protect, the potential adverse landfill impact can be significant."[30] They conclude, "Buyers who are aware that a landfill exists in the area and who are concerned about potential nuisance and health problems will either avoid these properties or be induced to purchase them only at a significant discount."[31] In the Ohio market studied, the research indicates that a seller may still receive current market price for a home near a landfill "if potential buyers are not fully aware of the landfill and its associated effects."[32] This is unlikely to happen in most urban and suburban markets however, where laws may require that sellers must disclose all such information to a potential buyer.

In addition to the diminution in selling prices, this study found that "both nuisance and potential health problems are perceived to be related to a reduced level of marketability, lower selling prices, and increased homeowner flight [sellers taking a loss in order to quickly move out of an area]."[33]

In "A Review of Sanitary Landfill Impacts on Property Values," Cartee provides information on four studies of landfill value impacts to nearby residential developments. One of the studies indicates that the amount of waste handled at a particular landfill would influence property impacts. "For landfills handling large volumes of waste (i.e., over 500 tons daily) the rate of new residential construction and sales of residences and lots was much less than those landfills receiving 300 tons or less per day."[34]

Cartee also describes a study that finds development of a sanitary landfill can, in some cases, enhance property values. This generally occurs in remote locations where "the introduction of infrastructure such as new or improved access road, utilities, drainage, etc. [built in conjunction with the landfill] has actually stimulated additional development" with specific cases of "increases in land values and new construction."[35]

In his summary, Cartee states, "property value impacts will depend on several variables such as general community perceptions of environmental risks, density of the local population, proximity to population centers, and design features of the landfill, including its physical profile, volume and nature of waste handled, and other site characteristics."[36]

An article by Guntermann, "Sanitary Landfills, Stigma and Industrial Land Values,"[37] reports on a study of the impact of landfills upon vacant industrial land. The study includes twelve landfills in the Phoenix area, with sales transactions studied over the period from 1984 to 1994. Ten of the landfills were MSW landfills, and two were landfills for commercial refuse only. The landfills in the study were a mixture of open and closed facilities. The study results indicate that "land values around open solid waste landfills are reduced relative to the values of other industrial parcels," and Guntermann concludes that the reduction of value "is attributable to solid waste landfills and not to refuse landfills."[38] This study also finds that closed landfills do not adversely affect industrial land value, and that commercial refuse landfills do not have a negative impact on vacant industrial land.

The final article, "Price Effects of Landfills on House Values," by Nelson, Genereux, and Genereux reports on a study of an existing landfill in suburban Minneapolis-St. Paul, Minnesota.[39] Sales of houses over a 10-year period were studied, with distances varying from 0.35 to 1.95 miles from the center of the landfill. The study included 708 sales, and the results indicate a reduction in value between 6% and 12%. The authors state that "given a choice between two sites offered for the same price and identical in every respect, except that one is closer to a landfill, home buyers will choose the site that is farther away."[40]

The study results indicate that the adverse price effect seen in the study was limited to a distance of about

---

28.    Reichert, Small, and Mohanty, 298.

29.    Ibid.

30.    Ibid., 300.

31.    Ibid., 299.

32.    Ibid., 300.

33.    Ibid., 310.

34.    Charles P. Cartee, "A Review of Sanitary Landfill Impacts on Property Values," *The Real Estate Appraiser & Analyst* (Spring 1989): 44.

35.    Ibid., 46.

36.    Ibid.

37.    Karl L. Guntermann, "Sanitary Landfills, Stigma and Industrial Land Values," *Journal of Real Estate Research* 10, no. 5 (1995): 531–542.

38.    Ibid., 538.

39.    Arthur C. Nelson, John Genereux, and Michelle Genereux, "Price Effects of Landfills on House Values," *Land Economics* 68, no. 4 (November 1992): 359–365.

40.    Ibid., 359.

Copyrighted material licensed by Randall Bell on April 26, 2021

two miles, after which there is "little, if any, adverse price effect."[41] The landfill that was the subject of the study began operation in 1967, so the authors caution that it was not "built and operated pursuant to modern standards." Nonetheless, they conclude, "it seems from the analysis reasonable to assume that unless new landfills achieve a state of operations such that the urban housing markets view them as essentially benign, one should expect that landfills will have negative price effects."[42]

## Methods Used for Measuring Impact

Many of the articles and case studies summarized here indicate that landfills generally have a negative impact on the property values of neighboring properties. This negative impact is caused by stigma due to the general perception that landfills have problems such as unpleasant odor and unattractive appearance.

The impact of landfills upon the market values of neighboring properties can be measured with both qualitative and quantitative research methods. As with any real estate study, quantitative measurements of market evidence require a relatively large number of real estate transactions from which to draw an adequate data. Proposed projects located in market areas that have landfill(s) of similar type and size relatively close by are the best candidates for this type of research. Techniques such as paired sales analysis and regression analysis can be used when sufficient data is available.

If the proposed landfill under study is quite unusual or atypical for the market area, it may be difficult to locate comparable existing landfills. Absent existing landfills for study, the appraiser cannot abstract sufficient property transactions nearby to illustrate landfill impact or lack thereof. A proposed landfill with more typical operating characteristics also may be difficult to study if the proposed location is of a market type with little transactional data available. For instance, it may be difficult to locate extremely tall landfills to study for transactional impact if the prevalent landfills in an area are either the "infill" type (a depression is filled until it reaches the grade of surrounding property) or relatively low-height landfills.

Qualitative analysis is appropriate for most types of proposed landfills. This research includes surveys with market participants, research of published newspaper accounts, and observation of occupancy patterns of property adjoining existing facilities. Qualitative research projects should be designed based on the characteristics of the proposed landfill and the characteristics of its location.

## Collecting Market Data

### Comparable Landfills

Armed with information about the subject property, the proposed landfill, and the general research available through published literature, the appraiser is now ready to gather specific market data. If the appraiser is not familiar with landfills, the best way to acquire market data on typical landfill operations is to inspect several existing facilities.

A listing of similar landfills must first be created. Such an inventory can often be compiled using regulatory information available for a specific geographical area. The specific agency that has this information varies from state to state. For example, the Florida Department of Environmental Protection regulates landfill permitting and operation for all landfills in the state of Florida, while in New York, the Department of Environmental Conservation maintains the listing of active landfills. The appraiser must identify the appropriate permitting authority for the subject property, and investigate the type and extent of landfill inventory available through the applicable regulatory body.

The initial inventory of similar types of landfills should be refined by the appraiser to identify those landfills that are sufficiently comparable to warrant an inspection visit. For example, if the proposed landfill is in a rural area, visits to other landfills in rural locations would be most helpful. If the proposed landfill is relatively large (i.e., over 300 acres) inspection of landfills on sites of similar size would be helpful. Both public and private landfills are good sources of market evidence, and it may be helpful for the appraiser to research both types, regardless of whether the proposed landfill will be publicly or privately owned and operated.

Depending on the extent and reliability of information available from the landfill regulatory body, the appraiser may need to gather additional data from other sources in order to create a meaningful list of comparable landfills for inspection. For instance, if the regulatory body does not publish the land area of the landfills that it regulates, this information could be cross-referenced from property appraiser or assessor records. If the address or locational information available from the regulatory body does not provide useful information as to rural, urban, or suburban locales, use of aerial photography sites (such as Google Earth) can be most helpful in identifying landfills located in neighborhoods similar to the subject property.

After gathering information on comparable landfills, the appraiser then should refine the list to identify a significant sample of landfill operations to visit. The resulting inspections will enable the appraiser to become educated about landfill characteristics and operations, and to gather market evidence regarding the impacts, if any, that the comparable landfills create.

### Local Market Evidence

During the inspection of comparable landfills, much important information about landfills and the neighborhoods in which they are located can be observed. The appraiser's time on these inspections can be used most efficiently if road maps and aerial maps are used ahead of time to identify all points north, south, east, and west

---

41.   Ibid., 362.

42.   Ibid., 365.

of the landfill that are accessible by car. Viewing a landfill from as many different angles as possible creates more opportunities for the appraiser to see and hear landfill operations close by. Particularly for landfills situated on very large sites, the active area or working face of the landfill may be distant from the entrance or property boundary on any particular day.

A thorough inspection of every accessible area of the landfill property also provides the appraiser with the opportunity to inspect all neighborhoods that are close enough to the landfill to exhibit evidence of any impact, be it positive or negative. It is also suggested that inspections of the neighborhoods that surround the landfills take place during the facilities' operating hours. In this manner, the appraiser can assess the truck traffic to and from the landfill, and the noise levels associated with trucks and equipment located at the working face of the landfill.

Qualitative evidence of negative impact to nearby residential properties is sometimes found near active landfills. Such market evidence can include yard signs protesting landfill expansions, yard signs complaining about traffic, and evidence of high vacancies or other negative trends (Figure 2).

During the inspection trip, the appraiser can also identify streets and addresses for areas that are in close proximity to the landfills. These areas can be studied for sales activity and market value in a quantitative analysis when the appraiser returns to the office. Field identification of potential study areas is often more meaningful than simply delineating areas on a street map.

Additional market information regarding landfills may be available from an appraiser's client if the client is the applicant seeking the permit. Just as a shopping center client may have access to information about market levels of rent and expense for competing shopping centers, the landfill operator may have industry information available for analysis. Another source of information regarding landfill operations will be the employees of publicly owned and/or operated landfills. For instance, an appraiser who resides in a particular locale might schedule an appointment to tour the local government-owned solid waste operation and interview members of its management team.

Finally, newspaper accounts of landfill operations provide additional market evidence to the appraiser. A well-managed landfill may appear in the news after being the subject of a complimentary article in a trade publication, or after receiving an industry award. Conversely, operational mishaps at problematic landfills (fires, code violations, pollution of neighboring water wells) are often covered by local newspapers and television stations.

## Forming Conclusions and Reporting Results

The appraiser is well positioned to form an opinion of possible impacts related to the proposed landfill after he or she has identified the scope of work, researched the subject property, gathered general information about landfill operating characteristics, become educated about existing landfills in the area, assessed the physical and locational aspects of the proposed landfill, and gathered market evidence of impacts from similar landfills. Numerous examples of well-situated landfills exist, and the appraiser may conclude that the proposed improvement falls into that category. Conversely, numerous examples of landfills that cause negative impacts on adjoining neighborhoods exist, and the proposed landfill may share characteristics more similar to that scenario.

Whatever the conclusion may be, it must be reasonable and well supported, and include the necessary steps outlined in the Uniform Standards of Professional Appraisal Practice (USPAP) for a consulting assignment. In reporting the results of the analysis, whether in a written report, verbal testimony, or combination of the two, the appraiser must also be careful to follow the reporting guidelines set forth in USPAP.[43]

**Figure 2**    Landfill Protest Signs




---

43.    Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice,* 2008–2009 ed. (Washington, DC: The Appraisal Foundation, 2008), see especially Standards 4 and 5.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Landfill Hearing: Case Study Example

The public hearing on the proposed landfill in Manatee County lasted for approximately seven hours. All 125 seats in the commission chambers were filled, and overflow crowds watched the proceedings on television monitors from other areas of the building.

The applicant explained plans for using a synthetic landfill liner to help protect the environment. Lawyers and expert witnesses from the landfill company explained various methods to buffer the view of the landfill and mitigate impacts from noise and odor. The applicant also offered a number of incentives, including payment of approximately $19 million in dumping fees over the lifespan of the landfill, an education center, a park, and dedication of land for road improvements.

The coalition of nearby property owners also presented testimony from lawyers and expert witnesses about the potential impacts that could result if the proposed landfill was approved at the hearing. The appraisal component of the presentation at the public hearing included several different types of analysis.

Market evidence from residential neighborhoods near similar landfills in central Florida was presented. Photographs and other descriptive evidence were also provided to illustrate the size, appearance, and operating characteristics of the proposed landfill.

Following the formal presentations and expert testimony, members of the public were able to provide their comments. Many of the comments were related to fears of environmental impact on nearby wetlands and Tampa Bay. A number of comments detailed concerns about diminished property values due to aesthetic problems including view, noise, and odor.

Late in the evening, the applicant requested a short break to prepare rebuttal testimony before the commission's formal vote. After the break, the applicant instead announced that it was withdrawing the application. Newspaper accounts quoted a landfill representative as saying, "We don't want to cram anything down anybody's throat; we value our relationship with Manatee County as a good corporate partner." The article went on to say that the applicant's firm "spent about two years planning and sank a substantial sum into environmental studies" while engineering the proposed landfill project.[44]

One news report stated that the incentives offered by the landfill proponents "were not enough to counter the wave of opposition from an unlikely alliance of residents, environmentalists, and developers from Manatee and Hillsborough counties."[45] Although the newspaper article did not mention it, a real estate appraiser was also involved in the process.

## Conclusion

This article presents general information and techniques that an appraiser can use to evaluate the potential impact of a proposed landfill. The specific example in Manatee County, Florida, involved a proposed landfill in a particular place at a particular time. The application for that landfill was ultimately withdrawn by the applicant. This article includes information about both sides of the landfill impact question, because each proposed landfill is unique and must be analyzed in the context of its specific location.

---

**Additional Reading**

Benjamin, John D., Emily N. Zietz, and G. Stacy Sirmans. "The Environment and Performance of Industrial Real Estate." *Journal of Real Estate Literature* 11, no. 3, (2003): 279–323.

Bond, Sandy. "The Effect of Distance to Cell Phone Towers on House Prices in Florida." *The Appraisal Journal* (Fall 2007): 362–369.

Bond, Sandy, and Ko-Kang Wang. "The Impact of Cell Phone Towers on House Prices in Residential Neighborhoods." *The Appraisal Journal* (Summer 2005): 256–277.

Boyle, Melissa A., and Katherine A. Kiel. "A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities." *Journal of Real Estate Literature* 9, no. 2 (2001): 117–144.

Jackson, Thomas O. "The Effects of Environmental Contamination on Real Estate: A Literature Review." *Journal of Real Estate Literature* 9, no. 2 (2001): 93–116.

Saderion, Zahra, Barton Smith, and Charles Smith. "An Integrated Approach to the Evaluation of Commercial Real Estate." *Journal of Real Estate Research* 9, no. 2 (Spring 1994): 151–167.

---

44.  Susan M. Green, "Developer Trashes Landfill Project," *Tampa Tribune*, September 12, 2007.

45.  Christopher O'Donnell, "Hauler Admits Defeat on Landfill, Application Is Withdrawn After County Commissioners Appear Ready to Reject," *Sarasota Herald-Tribune*, September 5, 2007.

## 7.2 Neighborhood Stigma Twenty Years Later: Revisiting Superfund Sites in Suburban New Jersey

*by Michael Greenberg, PhD, and Justin Hollander*

This article originally appeared in the Spring 2006 issue of *The Appraisal Journal*.

### Abstract

Six Superfund hazardous waste sites in suburban New Jersey were examined for evidence of long-term stigma. Two decades after being added to the Superfund list, the areas immediately surrounding four of the six sites show some, but not substantial, evidence of lingering stigma, measured by relatively lower increases in housing values, rents, and household income. The key observation is that areas around some of the worst National Priorities List sites in the United States are middle-income suburbs. The policy implication suggests that strong government actions, developer interest in a hot market, and reduced media attention can greatly diminish the impact of contaminated sites in suburban settings.

A stigma is an environmental condition that reduces the value and/or marketability of a site and sometimes adjacent land.[1] While there is a great deal of literature on the topic of stigma, this article presents three major dimensions of the concept: time, proximity, and contamination type.

### Time

Hurd studies the difference between pre-remediation stigma and post-remediation stigma in his research.[2] He defines stigma as diminution of values associated with increased environmental risk. Environmental risk can be quite high before remediation begins, and stigma can likewise be high. Even after remediation, environmental risks may still be present and may be capitalized into price through a stigma effect.

While most appraisers would like to see a "rational or logical cause for any loss in value," Patchin argues that perceptions of environmental hazards (or risks) can play an important role in how the market reacts to a property.[5] When it comes to environmental risks, the somewhat arbitrary nature of the market makes for a potentially wide range of values for impaired properties. And while actual risks may change over time, perceptions of risks can and do change as well, so the market reaction to a contaminated property could fluctuate greatly during investigation, during remediation, and after cleanup.

Bell writes about the way that stigma emerges as a measurable factor in valuing contaminated property and how that stigma effect diminishes as circumstances at a property change.[4] Similarly, Roddewig's five cycles of health risk, remediation, media, regulatory, and lending further illustrate how stigma levels are dynamic.[5]

In Jackson's case study of monitored natural attenuation and in several U.S. Environmental Protection Agency (EPA) reports, there is ample evidence that long-term, on-site remediation can overcome stigma.[6] The implementation of a remedial action plan, even when contaminants remain in place, does not necessarily forestall productive use of a property. Jackson concludes that "these properties can and do sell at unimpaired values." That is, stigma is not simply a function of whether a property is pre- or post-remediation.

1.  Richard J. Roddewig, ed., *Valuing Contaminated Properties: An Appraisal Institute Anthology* (Chicago: Appraisal Institute, 2002), see especially William N. Kinnard, Jr., and Elaine M. Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma," 15–25; Peter J. Patchin, "Contaminated Properties—Stigma Revisited," 194–198; Bill Mundy, "Stigma and Value," 199–204; Richard J. Roddewig, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," 205–218; Richard J. Roddewig, "Classifying the Level of Risk and Stigma Affecting Contaminated Property," 219–224; and Wayne C. Lusvardi, "The Dose Makes the Poison: Environmental Phobia or Regulatory Stigma?" 225–237. See also Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 127–133; Jill McCluskey and Gordon Rausser, "Stigmatized Asset Value: Is It Temporary or Long-Term?" *The Review of Economics and Statistics* 85, no. 2 (2003): 276–285.
2.  Brian H. Hurd, "Valuing Superfund Site Cleanup: Evidence of Recovering Stigmatized Property Values," *The Appraisal Journal* (October 2002): 426–437.
3.  Patchin, "Contaminated Properties—Stigma Revisited."
4.  Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999).
5.  Roddewig, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries."
6.  Thomas O. Jackson, "Case Studies Analysis: Environmental Stigma and Monitored Natural Attenuation," *The Appraisal Journal* (Spring 2004): 111–118.

**Michael Greenberg, PhD,** is director of the National Center for Neighborhood and Brownfields Redevelopment and is professor and associate dean of the faculty of the Edward J. Bloustein School of Planning and Public Policy at Rutgers University.

**Justin Hollander, MCRP,** is completing his PhD in urban planning and policy development at the Edward J. Bloustein School of Planning and Public Policy at Rutgers University, focusing on the reuse of distressed properties in urban neighborhoods.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Proximity

A second significant dimension of stigma is the question of proximity. The focus is not on diminution of value on-site, but rather on diminution of value off-site, near the condition of concern. The property valuation literature demonstrates that a property's proximity to an environmental condition will be reflected in diminished value.[7] However, Wilson's recent test of the proximity stigma hypothesis shows that it is not always evident.[8]

## Contamination Type

The third dimension of stigma is the type of contamination present at the property. As Roddewig put it, "stigma is not uniform."[9] The stigma associated with a leaking, underground fuel oil tank is vastly different from that of a damaged nuclear reactor. Roddewig asks five questions about the contamination before assessing stigma: (1) is it widespread or locational? (2) what medium has the contamination traveled through? (3) is the contamination well documented? (4) what are the potential exposure pathways? and (5) what remediation techniques are available?[10] The EPA encourages commercial and recreational uses of even heavily contaminated properties after there have been satisfactory answers to the aforementioned questions.[11] The type of contamination and the remediation techniques available will impact the reuse of the property and, in some cases, will result in no stigma effect.

Waste disposal and management sites are among the most stigmatizing land uses. The stigma literature cited here suggests that five major reasons account for the detrimental impacts of waste management sites: (1) the public is psychologically distressed by waste management sites; (2) remediation and reuse of a waste site can be expensive, requiring not only high remediation and legal expenditures, but often added expenses for demolition, ongoing surveillance, and monitoring; (3) investors may be wary of building on a location that engendered negative media publicity—a waste management site could be viewed as the equivalent of a home where a gruesome murder took pace; (4) there may be ongoing liability

risks for investors; and (5) the combination of the first four reasons can lead to unacceptable uncertainty and can reduce the chance of attracting financing, getting insurance, and moving a contaminated site to reuse.

When the site has been on the EPA's National Priorities List (NPL), all five stigmatizing reasons are exacerbated. In 1980, as part of the Comprehensive Environmental Response, Compensation, and Liability Act, Congress authorized the creation of a special list of 400 NPL sites, or so-called Superfund sites (now over 1,200 sites).[12] Under the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR Part 300), more commonly called the National Contingency Plan, these sites have stringent legal regulations attached to their remediation and reuse. For more than a decade, the gates to a Superfund site might as well have said to investors "stay away" and "don't buy trouble."

## Off-Site Impact

With regard to off-site and neighborhood impacts, some studies have shown decreased property values in surrounding neighborhoods and even entire municipalities.[13] Off-site locations may have restrictions related to deed, title transfer, water use, and other uses, in addition to problems with obtaining market-rate mortgages and insurance.

Yet twenty-five years have passed since the first set of Superfund sites were officially designated as part of the NPL. What has happened to the sites and, more importantly, to the areas surrounding these sites? Has property in the immediate area of these sites been stigmatized for over two decades? Or has time eroded the memories of explosions, fires, smells, sounds, and the unpleasant views of major hazardous waste sites?

In order to answer these questions, six Superfund sites in New Jersey were revisited. Five of the six sites were put on the NPL list in 1983 and the sixth one, in 1989. The EPA ranked three of the six Superfund sites number one, four, and twelve in the entire United States with regard to hazard.

---

7. See Stephen Farber, "Undesirable Facilities and Property Values: A Summary of Empirical Studies," *Ecological Economics* 24, no. 1 (1998): 1–14; G. William Page and Harvey Rabinowitz, "Groundwater Contamination: Its Effects on Property Values and Cities," *Journal of the American Planning Association* 59 (1993): 473–481; Katherine A. Kiel and Katherine T. McClain, "House Prices During Siting Decision Stages: The Case of an Incinerator From Rumor Through Operation," *Journal of Environmental Economics and Management* 28, no. 2 (1995): 241–255; Douglas S. Bible et al., "Analysis of the Effects of Contamination by a Creosote Plant on Property Values," The Appraisal Journal (Winter 2005): 87–97; and Hurd.

8. Albert R. Wilson, "Proximity Stigma: Testing the Hypothesis," *The Appraisal Journal* (Summer 2004): 253–262.

9. Roddewig, "Classifying the Level of Risk and Stigma Affecting Contaminated Property."

10. Roddewig, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries."

11. U.S. Environmental Protection Agency, Office of Emergency and Remedial Response, Office of Solid Waste and Emergency Response, *Reusing Superfund Sites: Commercial Use Where Waste Is Left on Site*, 540-K-01-008, February 2002; U.S. Environmental Protection Agency, Office of Emergency and Remedial Response, Office of Solid Waste and Emergency Response, *Reusing Superfund Sites: Recreational Use of Land Above Hazardous Waste Containment Areas*, 540-K-01-002, March 2001; U.S. Environmental Protection Agency, Office of Superfund Remediation and Technology Innovation, Office of Solid Waste and Emergency Response, *Reusing Cleaned Up Superfund Sites: Golf Facilities Where Waste Is Left on Site*, 540-R-03-003, October 2003.

12. U.S. House of Representatives, U.S. Code, Title 42, Chapter 103, "NPL Site Totals by Status and Milestone," as of June 17, 2005, http://www.epa.gov/superfund/sites/query/queryhtm/npltotal.htm (accessed June 28, 2005).

13. Michael R. Greenberg and James W. Hughes, "Impact of Hazardous Waste Sites on Property Value and Land Use: Tax Assessors' Appraisal," in *Valuing Contaminated Properties: An Appraisal Institute Anthology*, 430–438; Michael R. Greenberg and Dona Schneider, *Environmentally Devastated Neighborhoods* (New Brunswick, NJ: Rutgers University Press, 1996); and Michael Edelstein, *Contaminated Communities: The Social and Psychological Impacts of Residential Toxic Exposure* (Boulder, CO: Westview Press, 1988).

For this research, the following working definition of stigma was used: an environmental condition that reduces the value and/or marketability of a site and its adjacent areas or depresses appreciation of a site and its adjacent areas relative to the larger marketplace.

## Economic Explanations

It was expected that lingering stigma in the areas surrounding the sites would be hard to identify for economic and psychological reasons. With regard to economics, if land is valuable enough, developers and local officials will pressure federal and state environmental agencies to move quickly to control and remediate contaminants, deal forcefully with owners of the site, and otherwise establish that the site is clearly under control and not a threat. Builders may volunteer to pay for a separate water system for their proposed nearby developments, if that is an issue. Builders may also provide shielding to obscure a direct view of the site during remediation. Local governments can change the zoning to accommodate the possibility that the site may not be appropriate for large-lot housing or other land uses that rely on groundwater. Zoning may shift to smaller single-family units and to rental units at higher density, both of which rely on city water. Once these kinds of adjustments were made, it was expected that investors would be reassured that the area was habitable, and any short-term stigma would be lifted or, at least, greatly diminished.

## Psychological Explanations

The second reason why less stigma was expected after two decades comes from the risk perception literature. Slovic and others have rated hazards according to public dread.[14] Hazardous waste is high in dread, as are nuclear materials, chemical weapons, and some other hazards. Yet there is variation around the "average" level of dread. Not everyone dreads the risks, however, especially when there are economic bargains

to be gained. For example, a study for the U.S. Nuclear Regulatory Commission found that people disproportionately moved into municipalities that hosted nuclear power plants.[15] While there were no proven explanations of why people would move near these dreaded sites, one observation was that the nuclear facility paid a large proportion of the local taxes, and hence property owners had low local taxes and excellent municipal services. A study of neighborhoods with Superfund sites found that risk-aversive people were willing to sell their homes to non-risk-aversive counterparts, so that the latter had a huge financial inducement to move near a waste site. However, that study took place only a few years after the records of decisions (RODs) were signed, and it may reflect a rapid demographic transition that stopped once those who were terribly fearful left and those who were not frightened moved in.[16]

Hurd's more recent study near the Operating Industries, Inc. landfill in metropolitan Los Angeles found that about 80% of initial losses had been recovered within a decade. This is attributed to changes in buyers' perceptions of the area.[17] Bible et al. found that a creosote plant reduced property values, but that home values bounced back upon cleanup.[18] Jackson observed that the major impacts on property values occur before remediation, when relatively little is known about cleanup. As information increases, it becomes possible to formulate a remediation plan. Jackson studied four cases where the remediation plan primarily involved monitored natural attenuation (MNA). He found that once an approved remediation plan for MNA is in place, stigma effects are the same as if the property had been fully remediated.[19]

The media can play an important role in raising and lowering stigma. Kasperson et al. observed that media attention to a hazard can amplify the public's concerns.[20] There was massive coverage of many Superfund sites in the United States' national and local media,[21] including all six sites that were addressed in this study.[22] But even though there may be residual risk

14. See, for example, Paul Slovic, *The Perception of Risk* (London: Earthscan Publications, 2000).

15. Michael R. Greenberg, Donald A. Krueckeberg, and Michael Kaltman, "Population Trends Around Nuclear Power Plants," *Nuclear Power: Assessing and Managing Hazardous Technology*, ed. Martin J. Pasqualetti and K. David Pijawka (Boulder, CO: Westview Press, 1984), 189–211.

16. Greenberg and Schneider. Records of decisions are legal agreements regarding the cleanup between the federal/state environmental protection agencies and the party(ies) responsible for the contamination.

17. Hurd. See also Larry Dale and James C. Murdoch, "Do Property Values Rebound from Environmental Stigmas? Evidence from Dallas," *Land Economics* 75, no. 2 (1999): 311–326.

18. Bible et al.

19. Jackson, "Environmental Stigma and Monitored Natural Attenuation."

20. Roger E. Kasperson et al., "The Social Amplification of Risk: A Conceptual Framework," *Risk Analysis* 8, no. 2 (1988): 177–187.

21. Committee on Remedial Action Priorities for Hazardous Waste Sites, *Ranking Hazardous-Waste Sites for Remedial Action* (Washington, DC: National Academy Press, 1994).

22. A review of LexisNexis records for New Jersey and Pennsylvania newspapers reveals that hundreds of articles were written from 1980 to 2005 concerning the six NPL sites in the study. Examples of such articles include: *Courier-Post*, "Landfill's Legacy Lingers at Gloucester Township Development," July 17, 2000, p. 1A; Sue Epstein, "Progress Slow on Capping Toxic Dump," *Newark Star-Ledger*, March 14, 1999, p. 38; Tom Haydon, "Landfill Cleanup Spurs Fear of Tainted Water Supply," *Newark Star-Ledger*, February 2, 1997, p. 37; *Home News*, "Landfill Cleanup Proceeds," June 28, 1992, p. 3; Andrew Klappholz, "Magazine Cites Efforts to Find Autism Answers," *Asbury Park Press*, July 26, 2000, p. B5; Andrew Maykuth, "Dump's Toxic Effect on Property Values," *Philadelphia Inquire*, June 1, 1988, p. G2; Jean Mikle, "Cancer Report Is Released Dover Activists Vow Continued Vigilance," *Asbury Park Press*, January 19, 2004, p. 1; Kirk Moore, "Brick to Tell Homeowners to Seal Wells," *Asbury Park Press*, March 18, 2000, p. B5; *Newark Star-Ledger*, "Superfund Cleans Ill-Famed Dump," January 7, 1993, p. 21; *New York Times*, "Landfill Linked to Causes of Leukemia and Low Birth Weight," February 5, 1989, p. 33; Matt Porio, "31,000 Drums Removed," *Ocean County Observer*, August 21, 2004; and *Press of Atlantic City*, "Gloucester Landfill Focus of Controversy," June 19, 1989, p. A8.

Copyrighted material licensed by Randall Bell on April 26, 2021

at a Superfund site, the media will eventually judge the story not to be newsworthy. Consequently, not only will the media's attention fade, fear among residents who stayed should also lessen as a result of living near a site without obvious consequences.[23]

Joining these stated economic and psychological influences leads to a potentially counterintuitive result. Stigma should be lower at the more dangerous sites than at the less dangerous locations. This is because the federal and state governments moved aggressively to control hazards at the more dangerous sites. Sites that were lower down on the EPA's National Priorities List would have less aggressive action taken later. Hence, assuming that the market potential surrounding each site were the same, more development could be found around the sites that were initially considered more dangerous than around the less dangerous Superfund sites. This hypothesis derives from observations and surveys made at the case study sites ten years ago;[24] a previous study found that remediation and site control occurred years earlier at the more hazardous sites than the others. Consequently, potential stigma was reduced earlier.

## Case Study

Areas surrounding six New Jersey Superfund sites were chosen for the case study. It is beyond the scope of this article to critique the system EPA used for ranking Superfund sites or to challenge the substantial funding of the Superfund program.[25] For this study, what is key is that all six sites were on the NPL list, and that designation presumably had repercussions for future land use and land value. Before proceeding with site descriptions, it is important to provide the immediate historical context for these six sites by describing New Jersey's active response to hazardous waste concerns.

### Historical Background

The NPL program resulted from a plethora of contamination incidents that made national headlines during the late 1970s and early 1980s.[26] Many of the hazardous waste problems reported were located in New Jersey. For example, in 1981 as part of the EPA's initial implementation of Superfund, twenty sites were chosen for engineering design studies because they were considered among the worst in the United States.

Four of the twenty were in New Jersey.[27] New York and Michigan each had two, and no other state had more than one. The EPA developed a hazard-ranking system to determine the highest-priority sites for Superfund and applied it to a list of 546 sites submitted by the states.[28] Idaho, Montana, Nebraska, Nevada, Oregon, and Wyoming had no sites on the list; New Jersey had 85 sites; Michigan ranked second with 48 sites; and Pennsylvania ranked third with 39 sites. States like New Jersey, Michigan, and Pennsylvania were at the heart of industrial development in the United States; so, it was not surprising that they would have many contaminated sites. But they also had many sites on this list because the state and local governments invested resources to find contaminated sites rather than pretend that there was no problem.

As part of their initial submission to the EPA, New Jersey compiled a list of more than 350 abandoned, hazardous waste dumpsites. Notably, 160 municipalities (28% of 566) had at least one potential NPL site. In other words, hazardous waste sites were a major issue throughout New Jersey. Brown helped put the perceived severity of the problem in New Jersey into context with the following statement about hazardous waste in other locations: "Municipal garbage was mixed with toxic wastes (Stringfellow, California site) in a fashion that would have been considered remarkable even in New Jersey."[29] New Jersey Congressman (later governor) James Florio, one of the coauthors of the Superfund legislation, said in 1981, "Improper hazardous waste management is the most serious environmental problem facing our nation today. It is the environmental issue of the '80s."[30] Florio's assertion was supported by public opinion polls. For example, in 1983 the Environmental Task Force asked 46,000 Americans to choose the three most important environmental issues facing the country.[31] Toxic and hazardous waste was identified by 63% of respondents; water pollution was a distant second with 38% of respondents' vote. Finally, New Jersey was the first state to pass its own hazardous waste bond issue, $100 million, in 1981 to address emergency sites.[32]

Twenty-five years after these actions were taken, the Superfund program in the United States and New Jersey has lost a lot of its fervor and funding.[33] But in 1981,

23.  Bonnie L. Halpern-Felsher et al., "The Role of Behavioral Experience in Judging Risks," *Health Psychology* 20, no. 2 (2001): 120–126.

24.  Greenberg and Schneider.

25.  Committee on Remedial Action Priorities for Hazardous Waste Sites.

26.  Ibid.

27.  Michael R. Greenberg and Richard F. Anderson, *Hazardous Waste Sites: The Credibility Gap* (New Brunswick, NJ: Center for Urban Policy Research, 1984).

28.  Ibid.

29.  Michael Harold Brown, *Laying Waste: The Poisoning of America by Toxic Chemicals* (New York: Pantheon Books, 1979), 204.

30.  Greenberg and Anderson, 84.

31.  Environmental Task Force, "Toxics Ranked No. 1 Problem," *Eco Alert* 4, no. 1 (1983).

32.  Greenberg and Anderson.

33.  Committee on Remedial Action Priorities for Hazardous Waste Sites; Katherine N. Probst and David M. Konisky, *Superfund's Future: What Will It Cost?* (Washington, DC: Resources for the Future, 2001); and Marc K. Landy, Marc J. Roberts, and Stephen R. Thomas, *The Environmental Protection Agency: Asking the Wrong Questions* (New York: Oxford University Press, 1990), 133–171.

New Jersey ranked first in population density, family income, chemical production, and Superfund sites.

## Case Study Site Descriptions

As the history shows, there was heightened concern about hazardous waste when the six sites chosen for this study were classified as Superfund sites. Figure 1 shows the location of the six sites. These sites were deliberately chosen from among a list of over 100 Superfund sites in New Jersey because they lie in areas that are highly desirable for suburban homes and expensive rental units. While these six sites, along with more than fifty others, were visited as part of earlier studies, it was determined that these six sites would offer the best possibility of finding serious potential stigma or, alternatively, instances where governments and developers had worked together to reduce stigma.

According to the EPA, the first three of the sites were among the most hazardous in the United States for the first decade of the NPL program, and the other three were considered less hazardous. Table 1 shows key facts about each of the case study sites.

**Lipari Landfill.** Located in Mantua Township in southern New Jersey, the Lipari landfill site was the number one (most hazardous) Superfund site in the United States. The 15-acre site had been a sand-and-gravel pit

**Figure 1**        Location of New Jersey NPL Case Study Sites



National Center for Brownfields Redevelopment and Neighborhood Redevelopment
E.J. Bloustein School of Planning & Public Policy
Rutgers, The State University of New Jersey December 13, 2005

and was converted into a landfill that accepted waste in drums and other forms. Leachate leaked into a nearby lake and into groundwater. Because of widespread public concern, a disease cluster study was done, but showed no evidence of excess risk. While no health effects were measurable in state epidemiological studies, considerable negative media publicity was generated. A record of decision was signed in 1988, the site was fenced and surrounded by vegetation, a slurry wall was built, and the site was encapsulated. These steps ended the fires and odors. Lipari, located in the midst of what was a middle-income suburb, would be a prime candidate for changed development and stigma in the short run, but development was renewed after remediation began presumably because it was in a desirable, residential market area. Figure 2 shows the Lipari site's front entrance, which is completely out of character for this residential neighborhood.

**Helen Kramer Landfill.** The Helen Kramer site, also in Mantua Township, was a landfill with about 60 feet of piled-up waste. It ranked number four in the United States listing of hazardous sites. Its ROD was signed in 1985 and included a groundwater and leachate collection, a slurry wall, removal of materials from ponds, and a clay cap over the site. Site remediation was completed in 1994. Like Lipari, this site attracted an enormous amount of attention. Remediation expenditures were well in excess of $100 million. The area surrounding the site was forested, making the site less obvious. Would development be precluded near the site? Or would the land use be adjusted to deal with the reality of being adjacent to one of the worst Superfund sites in the United States? Figure 3 provides part of the answer. The photo shows relatively new homes constructed near the site in the foreground despite the presence of the landfill visible through the trees.

**Gloucester Environmental Management Services Landfill (GEMS).** The Gloucester Environmental Management Services (GEMS) site covered 60 acres and ranked number twelve on the national NPL list. It is different from the first two sites in that it was a large, visible mound that literally towered over adjacent houses

**Figure 2**        Lipari Landfill Entrance



Source: Authors' files.

*Copyrighted material licensed by Randall Bell on April 26, 2021*

**Table 1**    Key Facts About Study Sites

| Name | Municipality | County | Acres | Final NPL Listing | Remediation Status[1] | Population in Host Municipality (2000)[2] | Median Housing Value in Host Municipality (2000)[2] | Adjacent Site Land Uses[3] |
|---|---|---|---|---|---|---|---|---|
| Lipari Landfill | Mantua Township | Gloucester | 15 | 9/08/83 | Ongoing on- and off-site remediation | 14,217 | $123,200 | agricultural and residential |
| Helen Kramer Landfill | Mantua Township | Gloucester | 77 | 9/08/83 | Construction completed June 1993 | 14,217 | $123,200 | agricultural and residential |
| GEMS Landfill | Gloucester Township | Camden | 60 | 9/08/83 | Construction completed September 1999 | 64,315 | $116,100 | residential |
| Brick Township Landfill | Brick Township | Ocean | 42 | 9/08/83 | No "construction" has occurred on site since 1982; a lot of studies; and the establishment of the Brick Township Landfill Action Committee | 76,119 | $136,800 | residential |
| Global Sanitary Landfill | Old Bridge Township | Middlesex | 60 | 3/31/89 | No construction has begun; designs have been approved. | 60,456 | $162,800 | residential and parks |
| Ciba-Geigy Corp. | Dover Township | Ocean | 1,400 | 9/08/83 | Groundwater construction complete—pump and treat system in place; a remedial investigation report is complete for the and remainder of site; and construction began in December 2003, however this work could continue for years. | 89,767 | $149,900 | residential, commercial, industrial |

1.  Source: U.S. EPA NPL Site Fact Sheets

2.  Source: U.S. Census 2000

3.  Source: Authors' field inspections from March 2005 to August 2005

**Figure 3**    Development Near Helen Kramer Landfill



Source: Authors' files.

**Figure 4**    GEMs Landfill Area



Source: Authors' files.

and was owned by the municipality. Figure 4 shows the looming presence of the site. Like the first two sites, negotiations took years and led to a ROD and remediation that has made the site safer and apparently less hazardous. But a potential investor of nearby real estate would have to be remiss not to know what happened at this site. Of the three high-ranking Superfund sites, this one was expected to be the one with the longest lasting stigma because of its striking physical presence.

These three sites were compared to three other Superfund sites that were less hazardous according to the EPA and hence were less rapidly controlled by the federal or state governments.

**Brick Township Landfill.** The Brick Township landfill was a 42-acre site used to dump a combination of commercial and sanitary waste. It stopped receiving waste

in 1979, and a fence was placed around it. Shrubs were inserted, which camouflaged its true appearance. It became a Superfund site because of groundwater contamination and nearby housing. Figure 5 shows the edge of a garden apartment with the site fence in the background.

**Global Sanitary Landfill.** The Global Sanitary landfill was adjacent to a major toll road and a popular park. In April 1984, after heavy rains and high tide, a portion of the landfill collapsed and slid into adjoining wetlands. The sight and smells of the site were described as "disgusting" and "sickening." Now, covered by vegetation and obscured by its location in a steep valley with apartments and single-family residences at the top of the valley, the Superfund site is primarily considered a threat to groundwater. Figure 6 shows some of the new apartments near the site.

**Ciba-Geigy Site.** The last of the six sites was Ciba-Geigy, or the Toms River Chemical Company, site located near a pleasant residential area. Forests and state parks obscured the site, but its landfill and lagoons posed a threat to nearby water supplies. Figure 7 shows above-ground piping inside the fence and close to housing.

**Figure 5          Brick Township Landfill Area**



Source: Authors' files.

**Figure 6          Development Near Global Sanitary Landfill**



Source: Authors' files.

**Figure 7          Ciba-Geigy Site Exterior**



Source: Authors' files.

## Methods

Six sites that were expected to show short-term stigma were selected for this study. Had the stigma continued and in what form(s) was it manifested? Had the surrounding land-use plan been altered? Had property values and rents appreciated less rapidly than surrounding areas?

Two methods were used to answer these questions. U.S. census data was examined at the census tract scale for 1980 and 2000, comparing the change in housing values and types in the host census tract(s) with other census tracts located within five miles of the site. With the exception of the Global Sanitary landfill site, which is on the border of two tracts, each of the other sites is squarely within a single census tract. For each of these sites, there are between 27 and 62 census tracts within the surrounding five miles.

The census data has limitations. Because there are so few potentially impacted census tracts, there is insufficient power to even conduct meaningful nonparametric computations. Also, the census data is old, represents only two snapshots in time, and is census tract based, which means that a localized impact covering a block or two could be obscured by the aggregate data.

Because census data can only show part of the picture, the local tax assessor, city planner, health officer, and realtors were approached to get a more informed view of what had been happening. In all, twenty-six people representing the six sites were interviewed. Many of the local experts were willing to answer questions only if guaranteed anonymity. The realtors were particularly anxious; thus, only two were interviewed. As a result, all the people interviewed for this study are referred to as local experts and are not identified. For the purpose of this analysis, it is assumed that the local experts would more accurately reflect the nuances of site impacts and that they would be able to report the sequence of events at the sites. On the other hand, it is also assumed that some interviewees might put a positive spin on the site in their jurisdiction because of their loyalty to the local area.

## Results

The census data, as summarized in Table 2, shows some evidence of stigma at four of the six sites, but the local experts asserted that the data did not reflect current conditions and suggested alternative explanations and interpretations of the results.

### Lipari and Helen Kramer

If there is an obvious case for stigma based on risk, fear, and media attention, it should be in Mantua Township, where two of the most notorious hazardous waste sites in the United States are found in a relatively suburban/rural area of 15.9 square miles that hosts about 15,000 people. The census data presented a mixed picture. The Lipari area showed a much higher increase in housing values and rents than the surrounding areas, while Helen Kramer area showed a relative decline in housing values and rents. With regard to household income and population change, differences between the two sites and the surrounding area were similar, with one exception.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 2**        Study Site Areas: Census Data, 1980 and 2000

| Site | Site Area Census Tracts | | | Other Census Tracts within 5 Miles | | |
|---|---|---|---|---|---|---|
| | 1980 | 2000 | % Change | 1980 | 2000 | % Change |
| **Lipari (1983)*** | | | | | | |
| Median housing value ($1,000s) | 69.9 | 132.3 | 89 | 69.2 | 103.5 | 50 |
| Median gross rent ($) | 77 | 674 | 775 | 185 | 754 | 308 |
| Percent rental units | 11 | 15 | 36 | 20 | 17 | -15 |
| Average household income ($1,000s) | 47.6 | 76.9 | 62 | 46.6 | 76.9 | 65 |
| Population | 1,262 | 1,366 | 36 | 89,739 | 129,952 | 45 |
| **Helen Kramer (1983)** | | | | | | |
| Median housing value ($1,000s) | 69.8 | 88.3 | 27 | 63.2 | 95.9 | 52 |
| Median gross rent ($) | 240 | 581 | 142 | 239 | 683 | 186 |
| Percent rental units | 11 | 8 | -27 | 23 | 20 | -13 |
| Average household income ($1,000s) | 47.6 | 59.9 | 26 | 46.5 | 64.4 | 38 |
| Population | 3,867 | 7,228 | 87 | 103,405 | 123,476 | 19 |
| **GEMS (1983)** | | | | | | |
| Median housing value ($1,000s) | 46.2 | 46.4 | < 1 | 64.6 | 87.6 | 36 |
| Median gross rent ($) | 282 | 292 | 4 | 713 | 772 | 8 |
| Percent rental units | 41 | 47 | 15 | 24 | 23 | -4 |
| Average household income ($1,000s) | 44.2 | 53.4 | 21 | 44.8 | 62.7 | 40 |
| Population | 6,301 | 8,655 | 38 | 180,633 | 240,573 | 33 |
| **Brick Township (1983)** | | | | | | |
| Median housing value ($1,000s) | 60.6 | 107.9 | 78 | 69.2 | 103.5 | 50 |
| Median gross rent ($1,000s) | 330 | 1,039 | 215 | 185 | 754 | 308 |
| Percent rental units | 11 | 14 | 27 | 20 | 17 | -15 |
| Average household income ($1,000s) | 45.9 | 66.2 | 44 | 46.6 | 76.9 | 65 |
| Population | 2,481 | 4,084 | 65 | 169,361 | 236,462 | 40 |
| **Global Sanitary (1989)** | | | | | | |
| Median housing value ($1,000s) | 40.0 | 39.4 | 0 | 77.7 | 113.5 | 46 |
| Median gross rent ($1,000s) | 923 | 1,454 | 58 | 529 | 882 | 67 |
| Percent rental units | 73 | 78 | 7 | 28 | 30 | 7 |
| Average household income ($1,000s) | 45.4 | 58.0 | 28 | 51.4 | 72.0 | 40 |
| Population | 4,192 | 4,735 | 13 | 222,734 | 268,517 | 21 |
| **Ciba-Geigy (1983)** | | | | | | |
| Median housing value ($1,000s) | 87.1 | 102.9 | 18 | 69.6 | 98.9 | 42 |
| Median gross rent ($1,000s) | 612 | 749 | 22 | 437 | 857 | 96 |
| Percent rental units | 17 | 21 | 24 | 14 | 14 | 0 |
| Average household income ($1,000s) | 51.3 | 66.0 | 29 | 39.3 | 57.0 45 | |
| Population | 5,861 | 5,999 | 2 | 134,010 | 188,891 | 41 |

Note: All dollars are in year 2000 $.

* Years show final year each site was listed on the NPL.

Population growth was 87% near the Helen Kramer site, a rate considerably higher than the surrounding areas.

Local experts partly concurred with the data. They noted that there was a slowdown for five to seven years, i.e., a temporary stigma, but it did not last because both sites lie in a strong housing market area. "When the developers first found out [about the sites], they stopped. The whole region was also affected by a construction bust in the early 1990s. But nobody left. There is not a permanent stigma. Mantua is seeing a lot of new development; all the land is desirable, [which] puts a lot of [development] pressure on these sites. Today, there is a great deal of development interest in both sites." The area around the Helen Kramer landfill is sought after because it is forested and is now "zoned for one-acre lots compared to four acres in much of the rest of the township. The developers ask, how close is it? Prior to the housing boom, you could distinguish between these sites [Lipari and Helen Kramer] and the others. Today, you can't."

## GEMS

The census data shows that the census tract for the GEMS area increased in population by 38% between 1980 and 2000. But median housing value, median gross rent, and average household income increased far less

than the surrounding areas. In short, the data clearly suggests lingering stigma. Furthermore, the proportion of rental units increased while decreasing in the surrounding areas. The theoretical explanation for this is that renters have not made a long-term commitment to their dwelling units in the way that homeowners have. Homeowners also are more sensitive to impacts on their immediate environment than renters because of the financial investment they have in their homes. Two local experts provided considerable insight and a somewhat different interpretation of the census data, which they felt was out of date. After the landfill was declared an NPL site, "there was a depression of values…properties did not appreciate as much as the rest of the township. [This] stemmed from the DEP (state's department of environmental protection) drawing a red zone around the landfill and prohibiting well water use within the zone. It created a negative image for that area and, in essence, made mortgages harder to obtain. Hysteria was created, and negative publicity came from it." Another observer added, "Homes for people on private wells had steep declines in value relative to other homes."

But as predicted, once the government took action, the area once again became desirable, according to the experts. "Once it was closed, it became more desirable–no more seagulls, bad odors." But the pattern of development changed to smaller lots and less expensive units. For example, "Briar Lake development began in the early 1980s. It was built downstream from the contamination plume. The second and third phases were left dead in the mid-1980s. DEP fenced the whole development off; it just sat there for years. Now I have a new builder, selling units for between $100,000 and $200,000. In another part of town, you could sell them for 20% to 25% more." The lots near the landfill have been zoned for small-lot residential, whereas those in the remainder of the township were zoned for large-lot residential. This can be attributed to the strong influence private real estate developers wielded over zoning, "from the mid-1970s to the 1980s, the developers ruled this town…" In many ways, local officials in Gloucester Township along with the developers in power calculated the highest and best use of lands surrounding the GEMS site and determined that large houses could not be supported in the marketplace. This zoning response can be seen as an indicator of a subtle stigma effect. That is, zoning for higher density units is a response to the fear that affluent homeowners looking for large parcels of land will choose not to invest near a hazardous waste site.

The local experts described other new projects in the immediate area of the GEMS site that occurred after the 2000 census, including one that looks directly out on the remediated landfill. Regarding this housing development, the realtor said, "The price may have been adversely affected in some way, but they sold out, and there have been some price increases since. They are building homes near [these kinds of sites] when it was unthinkable until just recently, not because the site is clean but because of the demand for housing." The local experts expect that all the lots around the site will be developed. The value of the new sales will be a bit less and the density will be higher than elsewhere in town. Overall, there is lingering stigma most clearly manifested in the form of lower value dwelling units.

### Brick Township

Differences between the census tract hosting the Brick Township landfill and the tracts in the surrounding five miles were inconsistent. Housing values in the host tract were lower and increased more than in the surrounding areas. Conversely, rents in the host tract were higher but increased less than in the surrounding areas. Household income in the surrounding areas was about the same as in the host tract but increased less in the host tract than in the adjacent areas.

Local experts said, "There is no reason not to live there. They are doing monitored natural attenuation. No projects were stopped or delayed. Even when we had to do well sealings in 2001, we didn't see an impact on the value of home sales." The experts added that the site is near the Garden State Parkway (a major road with massive traffic) and that any stigma would be more likely to be associated with the highway.

Overall, the increase in rental units and less affluent residents in the host tract compared to the surrounding areas could be a signal of a class-related stigma pertaining to the site. Or, as the local experts argued, the highway may be the perceived stressor.

### Global Sanitary

After the collapse of part of the Global Sanitary landfill, it was assumed that there would be long-term stigma. The census data suggests that there has been stigma. Population has increased here much less than in the surrounding areas. Furthermore, housing values, rents, and household incomes are less and have increased less than the surrounding areas.

Yet local experts disputed the interpretation that this area was stigmatized. "There was never a rush to sell houses, nobody left, and demographics didn't change. I cannot find one bit of data [in sales studies] that it affects anything." When asked how the area would look today without the landfill, one expert said "no different." Another expert agreed, with one exception: "The state sealed off well water. Those [houses] that relied on well water were really affected, and had tremendous discounts on their property values."

This is a complex case to evaluate for stigma because almost 80% of the people live in rental units in two large, garden-apartment complexes that were built after the landfills. The rents in these two complexes have been much higher than rents in surrounding areas, and there are not many vacancies. One local expert observed that immigrants are moving into this area, and these new residents appeared to be much less concerned about pollution, an observation consistent with recent research.[34]

---

34.   Michael R. Greenberg, "Concern about Environmental Pollution: How Much Difference Do Race and Ethnicity Make? A New Jersey Case Study," *Environmental Health Perspectives* 113, no. 4 (2005): 369–374.

Copyrighted material licensed by Randall Bell on April 26, 2021

When asked about owner-occupied units, one expert replied, "I have not seen any impact on sales due to the landfill. Some of the closest homes are to the south of the landfill, but they are buffered from it by Cheesequake State Park. They probably don't even realize what is right behind the park." In short, the prevalence of rental units and the fact that the landfill is tucked into a narrow valley behind a park make it far less obvious than GEMS, which literally announces its presence to everyone in the area. Overall, it appears that homeowner properties have lingering stigma, but rental properties do not, and rental units constitute almost 80% of the housing.

### Ciba-Geigy

Census data shows that the area around the Ciba-Geigy site has grown relatively less compared to the surrounding areas and has had a relatively smaller increase in median housing value, rent, and average household income. The census data, in short, suggests stigma.

Yet local experts countered the census data results. One expert observed, "In 1997, an appraiser came here. He asked if I could supply him with data to see if there was a reduction in market value since 1986. He wasn't able to find one." The local experts gave three reasons. One is that "Ciba has taken responsibility and has spent $150 million on groundwater remediation, $5 million on operating the system, and $100 million on removing 38,000 drums. Ciba will have spent almost $1 billion when this thing is done. People feel that the contamination is under control, [and there] is no diminution in property values near the site." Second, the experts pointed to the type of housing as a factor mitigating against permanent stigma. "The houses around Ciba are entry-level housing. It is my experience that, over time, smaller houses appreciate more than those houses that are more than 4,000 square feet." A third expert added, "Depression in values is directly related to the amount of press coverage it receives. Ciba affected market value during high press periods, but that is not the case now."

### Discussion

Before describing the study results and policy implications, two limitations of the research are reiterated here. First, the study focused on New Jersey, the most affluent and densely populated state in the United States and arguably the state with the greatest sensitivity to hazardous waste problems. Land is at a premium, and these market conditions mean that there is great pressure to build. The same conditions exist in parts of California, Florida, Boston, near metropolitan Washington, DC, and some other regions. But the market conditions that drive the housing market in New Jersey are not found consistently across the nation. The results of this analysis would not necessarily be expected to translate to areas where there is less demand for new suburban housing. Second, the study used census data and relied on local experts. The census data is old and cannot identify subtle changes that occur over twenty-five years. With regard to the local experts, realtors are unlikely to say anything negative about their markets. Yet, in reality, the tax assessors were quite knowledgeable about the locations, had done very detailed analyses, and were candid in their remarks. To confirm these analyses, a hedonic model would need to be done at each of these locations, and face-to-face interviews would need to be conducted with homeowners and renters to determine their reasons for moving into the area and remaining there.

With these caveats in mind, two categories of results were observed using the census data. In the case of Lipari and Brick Township areas, evidence of stigma was not present and/or was explained by confounding factors. The GEMS, Helen Kramer, Global Sanitary, and Ciba-Geigy areas demonstrated evidence of stigma. The local experts, as expected, had a different perspective. Although they acknowledged that the NPL sites stopped or delayed development, each argued and showed that the areas immediately surrounding the sites were developing because land was so valuable. Local government and developers have adjusted their goals for the areas adjacent to the sites to higher density and more rental units, and they added central water and sewer systems to remove concern about drinking contaminated, private well water. Smaller lots and rental housing are more inelastic; the potable water and sewer systems are investments and, in many ways, have served to buffer the study communities from greater, long-term stigma effects.

Rather than focus on the extent of stigma, which was the initial intent of this article, the message is that strong government action, developer interest, reduction of media attention, demographic transition over two decades, the ability to find alternative public potable water sources, zoning changes by local government, and strategic use of trees and shrubs to obscure unsightly land uses can turn what otherwise could have been seriously impaired surrounding land uses into middle-income suburbs.

With regard to research, these findings are suggestive because they were based on only six specifically selected sites in the most affluent state in the United States, one that has a great need for land and a strong record of managing contaminated sites. It would be valuable to conduct similar studies in other states, such as California, Florida, Illinois, New York, and Texas, with many Superfund and brownfield sites and relatively major housing markets, to determine if the New Jersey findings are replicated. In the meantime, the policy implications of this study should add to the confidence of those who view contaminated properties as an opportunity rather than an eyesore.

### Conclusion

The study offers a number of important implications for appraisers. In hot real estate markets similar to the ones studied in New Jersey, appraisers should assume that any stigma effect that may exist due to proximity to an NPL site can be markedly reduced with deliberate actions by government and developers. Appraisers need to frequently monitor these kinds of sites to understand

their impacts on neighborhood property values. This analysis showed that signs of change, such as the appearance of new zoning overlays, converting homes from well water to public water supplies, changing percentage of rental units, and changing demograph-ics, can all signal that an area is adjusting to proximity stigma effects of an NPL site. In their work, appraisers need to do more than study the numbers; they also need to talk to local officials and realtors to see if there are early signs of change in stigma effect.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 7.3 Watersbend: Appraising a Brownfield Redevelopment Project

*by Rudy R. Robinson III, MAI, Scott R. Lucas, and Garland G. Rasberry*

This article originally appeared in the July 2002 issue of *The Appraisal Journal*.

### Abstract

This paper examines issues affecting the appraisal of a brownfield apartment property in Austin, Texas. These issues include the contamination that forced the property's evacuation, its eventual remediation, the creation of the legal framework permitting its reoccupation, market acceptance of its safety, and ongoing stigma risks. The authors describe the research and methodology needed to quantify the risks of owning a brownfield property. They conclude that complicated and long-term redevelopment projects such as this one can be successfully and profitably redeveloped while suffering only a modest post-remediation stigma.

One of the most notorious events in the real estate history of Austin, Texas, took place in 1991 when approximately 1,000 tenants were forced to evacuate on forty-eight hours notice from the Watersbend apartment complex. State environmental officials had discovered that potentially explosive levels of methane had seeped into ground-floor units overlaying a former municipal landfill. Eight years passed before the property accepted new tenants. During that time, the property was looted, new legislation was enacted to facilitate its remediation, and millions were spent on its rehabilitation.

Watersbend is one of the most unusual but ultimately successful brownfield redevelopment cases in Texas. This property was appraised just prior to its reopening, and the appraisal required research of the property's history, laws that expedited its remediation, the potential for tenant resistance, and environmental risks that could affect its value. This article discusses the complete history of the property: the bizarre circumstances of its construction, evacuation, and abandonment; its lengthy and groundbreaking remediation project; the recently enacted laws that permitted its rehabilitation; its reopening and market acceptance; and the multiple risks affecting its value then, now, and into the future. The authors believe the property suffers from a small but definite residual stigma, but on the whole its redevelopment is a resounding success that could serve as a model for other brownfield sites.

The impact of contamination on real estate is established in several articles. In 1991, Peter Patchin, MAI, in "Contaminated Properties Stigma Revisited," noted the development of data proving the existence of stigma in contaminated properties.[1] Patchin described stigma as a "negative intangible" caused by fear of hidden cleanup costs and public liability, lack of mortgageability, and the trouble factor, defined as monetary compensation for going to the "trouble of making a necessary improvement" to a contaminated property.

In 1992, Bill Mundy, MAI, PhD, discussed how contamination affects property value over time in his article "The Impact of Hazardous Materials on Property Value."[2] He maintains that property damages are manifested in lost income, utility, and marketability. In the early stage when uncertainty is highest, loss in value is greatest as a result of loss in marketability caused by "disclosure requirement by the sales agent or seller, required disclosure statements, concern on the part of the lender, and appraiser uncertainty." Damages decrease as the situation is understood and uncertainty is lessened. Mundy also describes residual stigma as "the difference between cured value and full market value," noting that cured value may never reach unimpaired value because of public perception of health risks.

A more recent article, "Post-Repair Diminution in Value from Geotechnical Problems" by Michael V. Sanders addresses the case studies approach and its applicability to estimating damages to properties affected by contamination and construction defects.[3] Sanders states that "the measurement of residual loss in value or stigma best employs the use of case studies." He further states that "case study properties need not be in the same area as the subject property, and data limitations usually necessitate searching a broader geographical area. While the circumstances surrounding the loss in value

1. Peter Patchin, "Contaminated Properties Stigma Revisited," *The Appraisal Journal* (April 1991): 162–172.

2. Bill Mundy, MAI, PhD, "The Impact of Hazardous Materials on Property Value," *The Appraisal Journal* (April 1992): 155–162.

3. Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems, *The Appraisal Journal* (January 1966): 59–66.

**Rudy R. Robinson III, MAI,** is the managing partner of Austin Valuation Consultants, Ltd., in Austin, Texas. Robinson specializes in appraising environmentally contaminated properties, especially for litigation purposes. He has previously been published in *The Appraisal Journal* and is a frequent guest speaker at real estate conferences and seminars. He graduated from the University of Texas at Austin with a Bachelor of Arts.

**Scott R. Lucas** is a senior associate with Austin Valuation Consultants. He is a graduate of the University of Texas at Austin with a bachelor's degree in real estate and urban land development.

**Garland G. Rasberry** is a senior associate for Austin Valuation Consultants. He graduated from the University of Texas at Austin with a bachelor's degree in finance.

may be similar, properties selected for case studies are in many cases not directly comparable to the subject."

Robert Simons, PhD, discusses brownfields and their redevelopment in several articles and books listed in the bibliography. In his book *Turning Brownfields into Greenbacks*, Simons notes that the primary obstacles to brownfield redevelopment are the cost of cleanup and liability.[4] Regarding the cost of cleanup, he describes a relatively common situation in which the "net price of urban land [the cost of purchasing and remediating the land] possibly contaminated by a prior use would be higher than a comparable suburban property on virgin farmland." He also notes that the "strict, joint, and several liability" clauses of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Superfund Amendments and Reauthorization Act (SARA) have impeded the involvement of developers and lenders in remediation of contaminated property.

In this article, rather than discuss brownfields or contaminated properties in general, we will describe in detail the evolution of a single brownfield property.

## The History of Watersbend Apartments, 1984–1994

Watersbend is located on U.S. Highway 183 in northeast Austin along a creek. Improvements were constructed in 1984 at a cost of $13 million during a period of economic prosperity and unprecedented real estate construction in Austin. Watersbend was originally a 358-unit, garden-style complex of average-quality construction consisting of 25 buildings with wood frames on concrete slabs and a combination of brick and cedar siding. Amenities included two swimming pools, a clubhouse, and laundry rooms. The primary tenants were college students and middle-class families.

By the late 1980s, the Austin real estate market had collapsed. New tax rules, a slowing statewide economy overdependent on oil, and a glut of recently completed projects pushed the citywide apartment occupancy level below 80%. Watersbend suffered through this downturn along with other properties in Austin. At the turn of the decade, Watersbend and similar properties achieved a 90% occupancy level, albeit with rent levels well below those attainable in the period of 1984–1986.

### Landfill Discovery and Tenant Evacuation

By 1991-1992, approximately 1,000 people called Watersbend home. Unbeknownst to residents, however, Waters-

bend was constructed over a closed municipal, solid-waste landfill. Reportedly, Travis County used the site and surrounding area as a county landfill from 1950–1960, and then the City of Austin used it as a landfill from 1960–1968. From 1966–1968, the city used much of the subject site for filling purposes, including most of the area where the apartment buildings would be constructed.

Two reports published prior to the construction of Watersbend described the landfill, but on the whole, recordkeeping on municipal landfills during this time was poor, and information regarding the landfill's boundaries, types and amounts of waste accepted, and environmental controls is sketchy and vague. Still, in the early 1980s, the project builder convinced the City of Austin that construction of the apartments over a closed landfill would not pose an undue health risk. The builder and architect asserted that the fireplace chimneys would properly ventilate residual methane gas emitted from the closed landfill. Absurd as that seems, the builder must have offered his explanation very persuasively because the apartments were completed within three years.

In 1991, environmental consultants performed the first known Phase I Environmental Site Assessment specific to Watersbend. The study revealed high concentrations of methane in two subsurface areas beneath the apartments. The report also raised concerns about structural settling, health problems caused by methane-gas migration into the apartment units, and leachate contamination of Walnut Creek.

The following year, officials with the Texas Natural Resource Conservation Commission (TNRCC) discovered unacceptably high levels of methane in several first-floor units. Because methane is odorless and colorless, the tenants could not have detected it themselves. While the risk of explosion was very low, the results of an explosion obviously would have been catastrophic. Within two days, state and local authorities forced the complete evacuation of the complex. This action received widespread publicity and exacerbated an already tight rental market.

In an instant, Watersbend became an insoluble liability to its owners. They defaulted on the loan, but the primary lienholder initially declined to foreclose on the property because it was unwilling to assume the risks of ownership. The property eventually became a foster child of the unwilling American taxpayer as a holding of the Resolution Trust Corporation (RTC).

**Table 1**　Comparison of Watersbend Sale to Sales of Unimpaired Apartment Complexes

| Apartment Complex | Date of Sale | Year Built | Units | SF/Unit | Monthly Rent/SF | Occupation % | Sale Price | Price/Unit |
|---|---|---|---|---|---|---|---|---|
| Watersbend | Jan-94 | 1984 | 358 | 707 | NA | 0% | $1,000,000 | $2,793 |
| Shadow Wood | Jul-93 | 1984 | 240 | 735 | 0.68 | 99% | 6,000,000 | 25,000 |
| Villas of La Costa | Feb-93 | 1979 | 204 | 780 | 0.68 | 100% | 4,250,000 | 20,833 |
| Stony Creek Landing | Apr-94 | 1982 | 420 | 750 | 0.66 | 95% | 11,200,000 | 26,667 |
| Chevy Chase Downs | Apr-94 | 1985 | 240 | 678 | 0.72 | 95% | 5,275,000 | 21,979 |
| Wildcreek | Apr-94 | 1984 | 232 | 663 | 0.68 | 92% | 4,425,000 | 19,073 |

4.    Robert Simons, PhD, *Turning Brownfields into Greenbacks*, Urban Land Institute (1998).

Copyrighted material licensed by Randall Bell on April 26, 2021

The RTC's stewardship of Watersbend could best be described as indifferent. With security consisting of nothing more than a hastily constructed chain-link fence, the property was repeatedly vandalized and inhabited by squatters. Thieves stole most of the water heaters, appliances, carpet, and even doors and fireplaces. Vandals set some buildings on fire. Water damage from neglect and poor building design irreparably damaged many of the exterior walkways. As reported by the subsequent owner, the City of Austin used the property to train firefighters and in one case deliberately set one building ablaze, a SWAT team conducted exercises on the property. Both parties apparently believed they had clearance to destroy government property; whether they did is doubtful. In fact, the property had already been sold to a private developer when these incidents occurred. The developer received undisclosed compensation for the trespasses and damages.

## Watersbend Purchased

In 1994, Limited Liability Corporation purchased Watersbend "as is" from the RTC for $1 million, or just $2,793 per unit. This sale price was drastically lower than prices of similar complexes built during the same period, as described in Table 1. If not for its evacuation and other problems, Watersbend probably could have sold for a price within the range of these comparable sales. In fact, Watersbend sold at a discount of 85%–90% compared to these properties.

These comparable transactions involved private parties, but at the time the RTC and other receivers were a dominant force in Austin real estate. Sales of similar properties from banks and the RTC ranged from $13,000-$15,000 per unit, indicating Watersbend sold for a discount of 79%-81% even when compared to properties with disadvantageous selling conditions.

To further illustrate the severity of the landfill's impact on the property, Table 2 describes five sales of apartment complexes that needed major rehabilitation and had a very low occupancy level.

These properties were chosen more for similarities in condition and vacancy than for similarities in age, size or location, but they effectively demonstrate the magnitude of the environmental problems beyond mere reconstruction. Watersbend sold at a discount of 13%–48% per unit compared to several older, vacant or near-vacant apartments needing less extensive rehabilitation than Watersbend would ultimately require. Its sale price of $2,793 per apartment unit was roughly equivalent to the price of vacant land during 1994, indicative of a 100% loss in the contributory value of the improvements just ten years after their construction.

# The Remediation of Watersbend Apartments, 1994–1999

The new owners faced an unusual obstacle in remediating Watersbend: the legal framework for doing so didn't exist. The State of Texas had few regulations specifically relating to the use of land over a closed landfill. "Brownfield" legislation and awareness were in their infancy, and existing laws covering environmentally challenged properties tended to be compulsory and punitive. Two measures were needed to spur the redevelopment of the property: the Voluntary Cleanup Program and Subchapter T, Chapter 330 of the Texas Administrative Code.

## Voluntary Cleanup Program

The Voluntary Cleanup Program (VCP) is the primary program of Brownfield Redevelopment Initiative in Texas. According to the Texas Natural Resources Conservation Commission (TNRCC), the VCP "provides incentives for properties with real and perceived contamination [brownfields] to be investigated, cleaned, and redeveloped. An additional benefit is the sparing of outlying rural, 'greenfields.'"[5] The VCP was intended to be more proactive than punitive and provided a clearer, more streamlined approach to remediation than existing programs such as the State and Federal Superfund.

In brief, the owners of property in the VCP program must submit an application with an Environmental Site Assessment detailing the type and extent of contamination. Then the applicant and TNRCC must agree on the remediation process, and the applicant must pay all TNRCC oversight costs. After completion of the cleanup, the owner receives a Certificate of Completion from the TNRCC, stating that all non-responsible parties are released from all liability to the state for cleanup of areas

**Table 2**     Comparison of Watersbend Sale to Sales of Apartment Complexes in Need of Major Rehabilitation

| Apartment Complex | Date of Sale | Year Built | Units | SF/Unit | Occupation % | Sale Price | Price/Unit | Notes |
|---|---|---|---|---|---|---|---|---|
| Watersbend | Jan-94 | 1984 | 358 | 707 | 0% | $1,000,000 | $2,793 | Subject property |
| 2506 Manor Road | Jan-93 | 1971 | 102 | 360 | 0% | 455,000 | 4,461 | Former affordable housing project; abandoned, 100% vacant |
| Greentree | Aug-93 | 1973 | 124 | 869 | 0% | 400,000 | 3,226 | Vacant for five years; $6,000/unit rehabilitation |
| South Shore | May-91 | 1963, | 145 | 732 | 0% | 778,000 | 5,366 | $10,000-$12,000/unit rehabilitation including asbestos and gas line leaks which closed the property |
| Riverpark | Jan-91 | 1968–1972 | 490 | 873 | 23% | 1,690,000 | 3,449 | $7,100/unit in rehabilitation/repairs: appliances, flooring, paint, exterior fences, roofs |
| Estrada | Nov-92 | 1968 | 310 | 839 | 30% | 1,600,000 | 5,161 | Bank sale; water damage from roof/window leaks, only 33% inhabitable |

5.    <http://www.tnrcc.state.tx.us./permitting/remed/vcp/brownfields.html>.

covered by the certificate. Sites already under an enforcement order or pending legal action are not eligible for the VCP. More information about the VCP is available at <http://www.tnrcc.state.tx.us./permitting/trrp.htm>.

## Subchapter T

In addition to the VCP, the Texas Legislature amended the state's Solid Waste Disposal Act, and the TNRCC enacted Subchapter T, Chapter 330 of the Texas Administrative Code in 1995. Both were written specifically with Watersbend in mind, and Watersbend became the pilot project for these statutes.

Subchapter T "establishes standards for the use and development of land over closed municipal solid waste landfills [and establishes] practical requirements while maintaining strict standards for human health and safety and environmental protection."[6] This statute does not cover hazardous wastes.

Subchapter T provides the TNRCC with authority to administer a permit program for construction of enclosed structures over a landfill, establish requirements related to their construction, establish procedures for conducting soil tests to determine the existence of a landfill, and provide notice to tenants of the landfill's existence.

In general, any permanent, enclosed structure within 1,000 feet of a waste disposal area must be designed and constructed to prevent gas migration–that is, the buildup of potentially explosive gases such as methane. The primary structural controls consist of layers of low gas permeability between the slab and the subgrade and a gas ventilation system to prevent buildup. Also required is a Site Operating Plan and a Structured Gas Monitoring Plan prepared by a professional engineer. The property owner must register the site in the county deed records, and the owner cannot lease property over a landfill without a permit from the TNRCC. Any waste excavated during redevelopment of the property must be disposed of in an approved landfill.

Owners are not obligated to investigate the existence of a landfill, but once known to them (whether by research or accident), they must immediately inform all tenants. The permit process is required regardless of the age of the landfill, although owners can suspend monitoring requirements if they can demonstrate no potential for gas migration. More information about Subchapter T is available at <http://www.tnrcc.state.tx.us/permitting/wasteperm/mswperm/clseduse.html>.

## The Remediation Process

In 1995, the owners of Watersbend presented a Comprehensive Assessment/Remediation Plan (CARP) to the TNRCC and submitted their application to the TNRCC's Voluntary Cleanup Program. The CARP and a Site Investigation Report were completed in 1996. The owners subsequently received approval to design a Remedial Action Work Plan (RAWP) consisting of three major components: a semiactive ventilation system consisting of 108 wells placed in ten clusters throughout the property, an active gas-extraction system in the subslab of each building that would prevent methane buildup in the apartment units, and a surface drainage-control system to prevent exposure to landfill leachate. Also, each apartment unit was provided a hard-wired, active gas monitor/alarm.

These three components cost just under $1.4 million, and the annual monitoring and maintenance cost was slightly under $40,000. In 1998, the TNRCC issued a conditional Certificate of Completion requiring the owners to monitor methane levels and operate a methane-gas recovery system for as long as minimum concentration levels are detected, estimated at the time to be fourteen years.

Concurrent with the Remedial Action Work Plan were slab leveling, repair of slab and beam cracks, provision of better drainage for foundations, rebuilding a retaining wall, and construction of a new retaining wall along Walnut Creek. These improvements were primarily related to the requirements of Subchapter T.

Three of Watersbend's 25 apartment buildings were deemed unfit for redevelopment and were demolished. Redevelopment of the remaining apartments took place in two phases during 1998 and 1999 and included new roofs, doors, windows, flooring, plumbing fixtures, and appliances. The demolition of the three buildings reduced the number of leasable units from 358 to 290.

The comprehensive redevelopment cost, including environmental remediation, was $9.5 million, or about $32,750 per unit. Until 1999, the owners paid for all remediation costs out-of-pocket. In 1999, the owners received a construction loan, but they had to provide personal guarantees and other real estate holdings as collateral.

## Appraisal Issues: Assessment of Market Acceptance, Ownership Risk, and Stigma

Our firm was hired to appraise the property in early 1999 while remediation was underway and before any units were leased. We evaluated the risks and liabilities associated with the project and their effect on value, including:

- Lack of market acceptance. Potential tenants, once notified of the property's history and ongoing monitoring as required by law, might refuse to live there;
- Legal compliance to the regulations of Chapter 330, Subchapter T of the Texas Administrative Code as described previously;
- Operation and maintenance of the active-gas extraction system and the semiactive-gas-extraction system as required by the conditional Certificate of Completion of the VCP;
- A $5 million insurance policy at a cost of $8,400 per year for five years. The policy covers legal expenses and pays off the primary lien in case of serious environmental problems during the life of the policy;

---

6.    <http://www.tnrcc.state.tx.us/permitting/wasteperm/mswperm/clsdinfo.pdf>.

Copyrighted material licensed by Randall Bell on April 26, 2021

- The risk of future soil subsidence that could necessitate expensive repairs and maintenance;
- Watersbend's location amidst a larger brownfield area; and
- Other facets of stigma such as deed recordation of contamination (as required by Subchapter T and the risk reduction rules of the Voluntary Cleanup Program), the potential of third-party litigation instigated by adjacent property owners, and lender reluctance to fund additional loans due to the unique nature of the contamination and the remediation project.

Our task was to quantify those risks. Regarding the question of market acceptance, we researched similar situations including an apartment complex in southeast Austin. The property was also constructed over a landfill and had methane-buildup problems. While its remediation was not of the scale of Watersbend, the tangible signs that could affect its occupancy—a gas ventilation system, monitors, and in-unit alarms—were there. This property did not suffer any noticeable resistance from the market, and its occupancy and rent levels were equivalent to citywide rates. Our research of this property and other remediated dwellings indicated that a properly remediated property with active monitoring and other safeguards in place should not suffer more than minimal tenant resistance.

Still, the other risks and environmental liabilities were substantial. Even after completion of the remediation project, knowledgeable purchasers would demand a discount on this property in order to justify the investment risks and potential market resistance. These are defined by Randall Bell, MAI, in his book *Real Estate*

*Damages: An Analysis of Detrimental Conditions*, as "the risk… associated with the ongoing stage of a detrimental condition analysis [including] the reluctance on the part of the real estate market to buy a property that has historically been damaged or tainted. Sometimes called stigma."[7]

## The Case Studies Approach

Our firm quantified the discount with several case studies that involved research of similar contaminated sales and remediated properties. The discount in each case study depended on the type and extent of contamination, the use of the property, the amount of governmental involvement, the extent of the remediation when sold, and whether the purchaser was indemnified by the seller or another party responsible for liabilities related to the contamination. In most cases, the discounts were quantified by comparison of the sale of the contaminated property with sales of unimpaired properties with similar physical characteristics and locations. Less frequently, comparison of the eventual sale price to an earlier contracted price with no disclosure or knowledge of contamination or lengthy marketing delays was the basis for the discount.

Each case study was rated for its similarity to Watersbend. Case studies with more severe contamination and less favorable circumstances were rated "higher," properties with relatively minor contamination and minor post-remediation stigma were rated "lower," and properties most similar to the subject were rated "even." The case studies are summarized in Table 3.

Case Studies 3, 4, and 5 were rated even and had a discount range of 10%–21%. These sites sold post-remediation or with only a minor threat of future contami-

**Table 3**     **Contaminated Case Studies**

| # | Location | Property Type | Waste Type | Amount of Discount | Severity of Contamination and Post-Remediation Situation *Compared to Watersbend* |
|---|----------|---------------|------------|--------------------|-----------------------------------------------------------------------------------|
| 1 | Austin, TX | Thousands of residences and businesses surrounding a petroleum storage facility | Gasoline and other petroleum products | 25.0% | HIGHER: Legal action against oil companies; contamination of air, soil and groundwater; 14-year remediation timetable |
| 2 | Austin, TX | Motel and conference center | Asbestos, petroleum hydrocarbons | 28.0% | HIGHER: Contaminated by on-site asbestos and hydrocarbons from off-site source; no hydrocarbon remediation has occurred |
| 3 | Austin, TX | 9.3-acre vacant commercial lot near former gas station | Hydrocarbons from crude oil spill off-site | 13.5%; 16.0%–21.0% | EVEN: Contamination on adjacent site; discount caused by testing costs, marketing delays, and future monitoring costs |
| 4 | Dallas, TX | 18.6-acre vacant commercial tract | Municipal solid waste from old landfill | 10%–20% | EVEN: Circumstances very similar to subject property; future buildings require gas-extraction systems |
| 5 | Houston, TX | 1.5-acre vacant downtown lot | Benzene, lead, phthalate | 20.0% | EVEN: Property in Voluntary Cleanup Program; discount consisted of escrow against potential future liabilities |
| 6 | Houston, TX | Apartment complex next to gasoline service station | Gasoline, petroleum hydrocarbons | 33.3% | HIGHER: Sale price negotiated before full extent of contamination service station was known; risk of off-site migration and other contamination issues |
| 7 | Keller, TX | 22–acre, multiuse property on former gas station site | Petroleum hydrocarbons and heavy metals in soils | 25.8% | HIGHER: Probable greater extent of contamination with no pre-sale remediation; fallout of prior contract |
| 8 | Houston, TX | Housing subdivision near Superfund Site (chemical waste storage facility) | Creosote, heavy metals, sludges, petroleum hydrocarbons | 33.0%–50.0% | HIGHER: Properties near a Superfund Site with extensive public disclosure; remediation alternatives included incineration, natural attenuation, excavation and removal of soils |

7.    Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999).

nation. Like Watersbend, two of the three sites were in the Voluntary Cleanup Program. Case Study 4 was the most similar to Watersbend; it involved an old landfill, was in the same stage of remediation before redevelopment, and required a similar amount of initial reinvestment capital. Case Study 8, although also involving a site analogous to a landfill, was rated higher because the materials were hazardous and the impact on properties surrounding the landfill was much greater when compared to Watersbend.

From these case studies, we estimated that the market value of Watersbend was 15% less than its unimpaired value. The quantified financial liabilities comprised approximately one-third (5%) of the discount, with the remaining two-thirds (10%) attributable to the other risks described in the bulleted list at the beginning of this section.

### Watersbend Reopens

After rehabilitation and remediation were partially completed at Watersbend, the complex was renamed "Salado at Walnut Creek" to avoid the negative association with the "Watersbend" moniker. In September 1999, leasing began on 110 rehabilitated units, while rehabilitation continued on the remaining 180 units. Pursuant to Subchapter T, leasing agents informed potential tenants in writing that the property was once used as a municipal solid waste landfill and that structural controls were in place to minimize the dangers posed by the former landfill.

According to the leasing manager at Salado at Walnut Creek, the complex received little resistance from potential tenants due to the written disclosure, despite local media coverage of the reopening that was skeptical, if not acutely unfavorable. In truth, some of the lack of resistance could be attributed to the condition of Austin's apartment market, which was experiencing historically high levels of rent and occupancy. Arguably, a weaker market might have produced more resistance because potential tenants would have more available housing options. The inference is that brownfield redevelopment projects need a strong economic climate to overcome the multiple risks involved.

Approximately 100 of the 110 available units were leased between September and October 1999 while remediation approached completion on the remaining units. By February 2000, 70% of the full 290 units were occupied or pre-leased. By July 2000, when redevelopment was completed and all 290 units were available for leasing, the complex attained a 94% occupancy rate. As of 2001, the project's occupancy was near 95%, equivalent to citywide averages, and the units leased for rates at the upper end of the range of competitive properties.

### Conclusion

After the remediation was complete and the property was fully leased, additional appraisals have confirmed that the residual stigma has diminished to ±10%. This ownership risk, small but still present, makes the property slightly less attractive to potential investors despite the healthy rent and occupancy levels because of ongoing legal requirements of Subchapter T and the VCP, annual expenditures for environmental monitoring costs for at least another twelve years, and deed recordation and disclosure requirements. Also, the property may be hurt more than comparable apartments in the event of a market downturn because much of the property's success is tied to the strong economic climate in which it reopened. Nevertheless, we concluded that the property value exceeds its redevelopment costs, and extensive redevelopment may make it more valuable today than projects of comparable age and construction.

As of late 2001, the stigma of ownership risks is slight and declining. In the spring of 2001, the property owners secured a new, permanent loan requiring an environmental insurance policy covering additional pollution conditions. These conditions could cause loss of use and legal expenses for defense of any third party lawsuits stemming from residual contamination at the property; however, this policy does not cover loss in market value. The cost of this insurance policy (amortized over ten years), combined with the ongoing environmental monitoring costs, reduces the net annual operating income by three to four percent and is a large, tangible component of the residual property stigma. Over time, the stigma should continue to decrease, although it may never reach zero. This unusual brownfield redevelopment project should serve as a model to numerous parties: to developers needing a framework to remediate and market contaminated properties, to municipal planners pursuing creative solutions to increase the local tax base, and to appraisers seeking insights into post-remediation property values and stigma.

Copyrighted material licensed by Randall Bell on April 26, 2021

## References

Avens, Scott B. "The Valuation of Defective Properties: A Common Sense Approach." *The Appraisal Journal* (1997).

Bell, Randall. *Real Estate Damages: An Analysis of Detrimental Conditions*. (Chicago: Appraisal Institute, 1999).

Mundy, Bill. "Stigma and Value." *The Appraisal Journal* (January 1992): 7–13.

Mundy, Bill. "The Impact of Hazardous Materials on Property Value." *The Appraisal Journal* (April 1992): 155–162.

Mundy, Bill. "The Impact of Hazardous and Toxic Material on Property Value: Revisited." *The Appraisal Journal* (October 1992): 463–471.

Patchin, Peter. "Contaminated Properties Stigma Revisited." *The Appraisal Journal* (April 1991): 162–172.

Patchin, Peter. "The Valuation of Contaminated Properties." *Real Estate Issues* (Fall/Winter 1991): 50–54.

Rinaldi, A. "Contaminated Properties—Valuation Solutions." *The Appraisal Journal* (July 1991): 377–381.

Sanders, M. "Post-Repair Diminution in Value from Geotechnical Problems." *The Appraisal Journal* (January 1996): 59–66.

Simons, Robert. *Turning Brownfields Into Greenbacks*. (Washington, D.C.: Urban Land Institute, 1998).

Simons, Robert, and Heidi G. Robertson. "Deed Restrictions and Other Institutional Controls as Tools to Encourage Brownfield Redevelopment." *Environmental Law and Practice* (Summer 1999).

Simons, Robert, and Paul Syms. "Contaminated Land: Do Property Registers Do More Harm Than Good? An Analysis of the UK and USA Approaches to Public Management of Brownfields." (Land Contamination and Reclamation UK, 1999).

Simons, Robert. "How Many Brownfield Sites are There?" *Journal of Public Works Management and Policy* (2:3, 1998).

Simons, Robert, and Michael Leccese. "Brass Mill Mall: Bringing New life to a Brownfield Site in Waterbury, Connecticut." *Urban Land* (June 1998).

Simons, Robert, and Don Iannone. "Supply and Demand for Brownfields in Great Lakes Cities." *Urban Land* (June 1997).

Simons, Robert. "Financing Environmentally Contaminated Land in the Great Lakes Empowerment Zones." *Economic Development Commentary* (Fall 1996).

## 7.4 Contaminated Waterways and Property Valuation

*by Randall Bell, MAI*

This article originally appeared in the Fall 2008 issue of *The Appraisal Journal*.

### Abstract

Throughout the United States, there are countless contaminated waterways, including lakes, rivers, and ocean coastlines. Indeed, it is difficult to find a waterway that is free of environmental issues. Contamination comes from factors that are purely natural as well as man-made. Some contamination comes from point sources, such as specific treatment plants or factories, while other contamination comes from general sources, such as storm water runoff. This article addresses the factors to consider when studying the effects, if any, that contaminated waterways have on the values of nearby properties. Further, it provides likely reasons as to why allegations rarely arise that contaminated waterways have caused a diminution in the value to nearby properties.

There are tens of thousands of contaminated natural water resources, such as rivers, streams, and lakes, throughout the United States. Furthermore, the Pacific Ocean, Atlantic Ocean, and Gulf of Mexico have had chronic environmental issues. Where there is contamination or natural resource damage (NRD), the question may arise, what is the impact on property values when properties are located in proximity to a contaminated waterway?

### Categories of Contamination

There are basically four categories of environmental contamination: (1) air pollution; (2) surface contamination; (3) ground and groundwater contamination; and (4) waterways, such as rivers, streams, lakes, and oceans.

Air pollution impacts large regions, thus if there is an impact on property values, it would generally impact both a subject property as well as all of the nearby comparable properties. Any impacts on property values would inherently be reflected in the market data. Air quality regulations have greatly eliminated or reduced these types of environmental problems. Consequently, very little has been written or published on this topic in terms of property value impacts.

The second and third contamination categories, involving surface and ground contamination, are vast topics. Literally volumes have been published addressing the methodologies for measuring their related impacts on property values. The area of damage economics for surface and ground contamination rapidly developed from the time the Superfund legislation was signed into law by then President Jimmy Carter in December 1980[1] until the late 1990s. A combination of better remediation technologies, more reasonable risk-based regulatory oversight, and refined valuation methodologies now address these situations in a clearer and more consistent manner.[2] The Appraisal Standards Board's Advisory Opinion 9 illustrates the application of appraisal standards in the appraisal of property that may be impacted by environmental contamination, focusing on cost, use, and risk impacts.[3]

Polluted waterways are included in the fourth category of environmental contamination. Although little is published on this topic, the subject warrants examination as it relates to the effects, if any, that contaminated waterways have on the values of nearby properties.

### Fundamentals of Contaminated Waterways

The term *waterways* is a general term that includes all sources of water. The vast majority of water is salt water that exists within oceans and seas. Fresh surface water includes rivers, lakes, streams, creeks, and ponds. Technically, the world's ice caps and glaciers, which contain vast amounts of fresh water, fall into this category. The majority of liquid freshwater is located in underground aquifers. Far from environmentally safe, extracted groundwater generally needs treatment before delivery into the potable water system.[4] This article focuses on surface waterways.

Waterway contamination can affect the surface of the water (such as oil sheen), be diluted within the water itself, or sink to the bottom as sediment. *Sedimentation zones* are broken down into three categories: (1) non-depositional zones (scoured regions where sediment does not permanently accumulate), (2) depositional zones (regions of high sedimentation), and (3)

---

1. *Comprehensive Environmental Response, Compensation, and Liability Act of 1980* (CERCLA), Pub. Law 96-510.

2. Richard A. Neustein and Randall Bell, "Diminishing Diminution—A Trend in Environmental Stigma," *Environmental Claims Journal* 11, no. 1 (Autumn 1998): 47–59.

3. Appraisal Standards Board, Advisory Opinion 9, "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," *USPAP Advisory Opinions*, 2008–2009 ed. (Washington, DC: The Appraisal Foundation, 2008), A-16–A-20.

4. Western Municipal Water District, *Report on Water Quality Relative to Public Health Goals*, July 2004, http://www.wmwd.com.

**Randall Bell, MAI,** specializes in real estate damage economics and strategy. He has traveled extensively in his research of detrimental conditions and the impact they have on real estate values. Founded upon this research, he has written various specialized methodologies, which were the basis for the Detrimental Conditions seminar developed by the Appraisal Institute and also incorporated into Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice. He has lectured internationally on the topic of property damages and mitigation strategies. Mr. Bell has an MBA in real estate from the University of California, Los Angeles, and a BS in finance and accounting from Brigham Young University.

Copyrighted material licensed by Randall Bell on April 26, 2021

transitional zones (regions with thin layers of recently deposited materials). The contaminant amounts are often infinitesimal, but technology has improved to where science can define a contaminant level down to parts per billion or trillion.[5] A fraction of some contaminants can be removed by volatilization (a form of evaporation), some can be broken down in the water, and still others are buried as sediments. The rest can be removed by the slow flushing of the system.[6]

Decades ago, the United States's rivers and other surface waterways were polluted with industrial wastes, agricultural pesticides, fertilizers, and raw sewage. In the early 1970s, the Potomac River was too dirty for swimming and Lake Erie was dying. In 1970, the Cuyahoga River was so oily and polluted that it actually caught fire, sending a disturbing wake-up call to America. As a consequence of these and hundreds of other problem waterways, the Clean Water Act of 1972[7]– at the time the most expensive legislation in the country's history–ended the status quo, regulated dumping, mandated cleanup, and required municipalities to build sewage treatment plants. The primary goal of the Clean Water Act was to make the nation's waters "fishable and swimmable." As a result, many of America's dirtier rivers and waterways are cleaner today than they were over 30 years ago. However, thousands of waterways still do not meet the expected standards.

Despite considerable progress, virtually all surface waterways are still likely to have some environmental issues. It is dangerous to drink water from untreated, open water sources, and pure, potable water is rarely found in nature. Pure water generally only exists at some spring water sources, but even this is often filtered before distribution and consumption. Prior to drinking water from any stream, river or lake, an experienced hiker or outdoors enthusiast will either filter the water, bring it to a rolling boil, or use water purification tablets. Some anglers will either catch and release, or check fish advisories and only then carefully clean and cook their catch. Others may consider the seemingly never-ending barrage of environmental warnings, the practicalities of water movement, and the mobility of fish, and look at these advisories with some skepticism.

## Contributors to Contamination

Virtually all water supplies are naturally contaminated. Even without man-made contamination, waterways have a host of naturally occurring conditions that result in substantial environmental risks. These contaminants include salts, biological matter, disease-carrying organisms, animal wastes, alkaloids, pathogenic bacteria, viruses, and parasites. Arsenic, copper and lead also

occur naturally in sediment. Ocean waters commonly have petroleum, tar, and hydrocarbon contamination from natural underwater seeps on the seabed. Indeed, for North American ocean waters, 60% of all hydrocarbon contamination comes from sources that are entirely natural.[8]

Many waterways also are contaminated with historical industrial wastes from unregulated periods long ago. For example, mercury was once used indiscriminately in gold mining and speculation. Even today, thousands of tons of industrial wastes are legally discharged daily into lakes, rivers, and streams. These wastes include everything from treated sewage effluent to permitted levels of industrial waste.

The bulk of historical contamination is *point contamination*, which can be pinpointed to specific pipes or factories. Much of today's contamination comes from *non-point source pollution*; meaning that the much of the pollution does not come from a specific location, but rather from many various places. Non-point contaminants include surface runoff (particularly storm water), pesticides, and fertilizers. Continued grading and development contributes to vast amounts of sediments. Atmospheric deposition is another major source of non-point contamination, and accounts for 50% of the pollution of the Great Lakes. (Figure 1)

The American Highway Users Alliance states that there are 956,000 miles of federal interstates and sur-

---

**Figure 1**          Contributors to Water Pollution



6. **Point Contamination -**
   Specfic wastes from a specific source.

5. **Permitted Discharges -**
   Treated sewage, permitted industrial wastes, etc.

4. **Non-Point Contamination -**
   Accumulated from multiple nonspecific sources, such as runoff.

3. **Historical Contamination -**
   Mercury used in gold mining, tailings, etc.

2. **Natural Contamination -**
   Bacteria, animal wastes, salts, alkalies, etc.

1. **Pure Water -**
   Rarely found in nature

---

5. Terrence J. Collins and Chip Walter, "Little Green Molecules," *Scientific American* 294, no. 3 (March 2006): 62–69. One part per billion is roughly equivalent to one grain of salt dissolved in a swimming pool.

6. Tiernan Henry, *Contaminated Sediments and the Great Lakes*, University of Wisconsin Sea Grant Institute, updated 22 February 2001, http://www.seagrant.wisc.edu/Communications/Publications/One-pagers/contamSed.html.

7. 33 U.S.C. §1251 et seq.

8. National Research Council, *Oil in the Sea III: Inputs, Fates and Effects* (Washington, DC: National Academies Press, 2002), http://www.nap.edu.

face roads in the United States, amounting to some 9.4 million acres of pavement. Storm water from payment carries pollutants such as deicing chemicals, automotive fluids and fragments, salt, nutrients, and sediment into local waters. In many urban and suburban areas, storm water is the leading source of water pollution.

According to the U.S. Environmental Protection Agency (EPA), an estimated 1.3 trillion gallons of raw sewage and industrial waste escape each year from sewer systems that combine sanitary and storm water in a single pipeline. A new contamination issue being studied is water pollution by drugs. Twenty years ago, EPA scientists examining the sludge from a U.S. sewage-treatment plant found that the incoming sewage contained excreted aspirin, caffeine, and nicotine. Those findings were written off as a curiosity and all but forgotten. However, more recent studies have detected these and other drugs, such as cholesterol-lowering clofibric acid, anticancer agents, psychiatric drugs, and anti-inflammatory compounds, in America's waterways.[9]

## Valuation Methodologies

The valuation of any contaminated real estate is a challenging assignment. Fortunately, over the last few years there have been many advances that facilitate a reliable analysis.

When CERCLA was first enacted, some reactions in the real estate and lender markets bordered hysteria. While still a significant and complex issue, environmental science has improved significantly, with both better assessment and evolved remediation measures. Government agencies have also instituted more sensible oversights and valuation methodologies have become far more refined.

When faced with an assignment to measure the impacts, if any, that a specific waterway contaminant has on property values, it is important to consider the condition in the context of any other contamination that exists within that waterway. In other words, in most cases, the assignment is not to measure the impacts of a contaminated waterway to the impacts of an uncontaminated waterway. More accurately, the assignment is to measure the impact of the *incremental* contamination where there is an already contaminated waterway (see Figure 2).

Furthermore, the presence of contamination must be considered in the context of the overall purchasing decision criteria, and the realities of industrialized society. While nobody goes out of their way to live or work near a contaminated waterway, the larger question is whether or not the issue has a material impact in the market, when considered along with the host of other relevant real estate issues. This could include location, square footage, amenities, access, and the proximity to work, schools, shopping, and places of worship. With waterways, clearly the view amenity itself is an important valuation consideration, as is the fact the



**Figure 2**  Isolation of Relevant Waterway Factors

**Improper Comparison**
"Clean" vs. "Dirty"

**Proper Comparison**
Isolating Incremental Contamination

Nearly Similar

) Incremental Contamination

many waterways are already contaminated, naturally or otherwise. Contamination does not automatically translate into a diminution in value; indeed, "a property is innocent until proven guilty. For a property to be 'guilty' of any diminution in value, there must be clear, relevant, and objective market data."[10]

## Damage Economics

The scope of a real estate damage assignment typically includes (1) determining the unimpaired value using the traditional appraisal approaches and assuming that the detrimental condition does not exist, if necessary; (2) proficiency in the accepted real estate damage economics methodologies; (3) reviewing the specific environmental or NRD factors, which with waterways specifically involves a clear environmental study of all the environmental issues and the incremental contaminant involved; (4) identifying the appropriate valuation methodology, and collecting and analyzing environmental market data; and (5) concluding the impact, if any, on the unimpaired condition of the subject property resulting from the detrimental condition.

## Unimpaired Valuation

A diminution in value study is often expressed as a percentage of the baseline, unimpaired value, or the

---

9. Janet Raloff, "More Waters Test Positive for Drugs," *ScienceNews* 157, no. 14 (April 1, 2000): 212.

10. Orell C. Anderson, "Environmental Contamination: An Analysis in the Context of the Detrimental Conditions Matrix," *The Appraisal Journal* (July 2001): 323.

Copyrighted material licensed by Randall Bell on April 26, 2021

value without the incremental condition. Accordingly, the first step often involves determining the value of the subject property, using the traditional approaches to value, under the hypothetical assumption that the detrimental condition does not exist. However, if the market data shows that there is no diminution in value, this step may not be necessary.

## Detrimental Conditions Analysis

The basic framework for valuing any alleged real estate damages begins with the Detrimental Conditions (DC) Matrix shown in Table 1.[11] While the nine quadrants within the matrix may not all be applicable, they should each be considered in the context of every assignment.

In 2003, the *USPAP Advisory Opinions* adopted the cost, use, and risk framework, set forth within the DC Matrix, specifically for dealing with environmental issues.[12] Considered within the assessment, remediation, and ongoing stages, the nine quadrants of the matrix should be researched carefully in the context of environmental issues.

Further, one of the basic considerations relating to contamination and liability under the law is whether a property is a source of a release that poses a risk, a non-source or adjacent property onto or into which the contamination has migrated, or merely proximate to the contamination.[13] Making this distinction is essential, as there are varying costs, liabilities, and risks, depending upon which category the subject property fall into. Generally, a source property has more potential for risk than a nonsource, adjacent, or proximal property.

As such, a critical factor in evaluating an environmental condition is called *SNAP*.[14] Specifically, this means determining if the subject is one of the following:

- *Source property* from which the contamination was emitted
- *Non-source property* contaminated by the adjoining property owner
- *Adjacent property* that is not contaminated, but that shares a property boundary with one that is

- *Proximal property* that is not contaminated, is not adjacent to one that is, but is located in the same general area as contaminated property.

With contaminated waterways, the properties being studied generally come under the adjacent or proximal category of SNAP.

Of all the quadrants of the DC Matrix, costs related to remediation are often the most obvious, but with contaminated waterways the responsibility for cleanup costs often is not a factor as another party is paying for the remediation. For example, if a sewage plant discharges a large amount of untreated sewage into a waterway, the cleanup costs are not deducted from the value of a waterfront house, as the responsibility for the cleanup belongs to the sewage treatment plant, and not the homeowner.

An analysis of the use impacts may include studying what practical impacts the waterway contamination has on the surrounding residents. For example, if the water is safe for swimming or fishing, and for what period of time.

An analysis of stigma, which is better termed risk, reflects any discounts by the marketplace as a result of the detrimental condition. When the term *stigma* is used, it is most often in the context of an ongoing risk. *The Dictionary of Real Estate Appraisal* defines stigma as "an adverse public perception regarding a property… which extracts a penalty on the marketability of the property and hence its value."[15] While the term *stigma* is still used, there has been a trend in the real estate community to refer to this risk factor as *market resistance*. Diminution in value tends to be greatest immediately after the loss or damage is identified, before the nature and extent of the difficulty is fully known.[16]

When conducting a damage study, analysts must look to the marketplace for answers and analyze what the marketplace data is actually saying. Scientific conclusions about persistence of contaminants do not necessarily correlate with the marketplace's conclusion about the duration of economic impact on real estate.[17] Accordingly, the reliability of the analyst's results must

| Table 1 | Detrimental Conditions Matrix | | |
|---|---|---|---|
| | | **Detrimental Condition Stage** | |
| **Issue** | **Assessment** | **Repair** | **Ongoing** |
| Cost | Cost to assess damage | Cost to repair or remediate | Ongoing costs—i.e., monitoring |
| Use | Impact on use while assessed | Impact on use while repaired or remediated | Ongoing impact on use or impact on highest & best use |
| Risk | Uncertainty factor | Project incentive | Market resistance |

11. Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999), 8–15. Also see Randall Bell, "The Impact of Detrimental Conditions on Property Value," *The Appraisal Journal* (October 1998): 380–391.

12. Appraisal Standards Board, Advisory Opinion 9.

13. Bell, *Real Estate Damages*, 128–129.

14. Anderson.

15. Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 277.

16. Michael V. Sanders, "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January 1996): 63.

17. Richard J. Roddewig, "Temporary Stigma: Lessons from the Exxon Valdez Litigation," *The Appraisal Journal* (January 1997): 100.

be demonstrated and supported by credible market evidence.[18] For waterways, it would be critical to have studies that identify the full spectrum of contaminants for waterways impacting both the subject (test) areas as well as the comparable (control) data.

## Environmental Valuation Methodologies

The DC Matrix outlines the issues that must be considered with every assignment involving contamination or other real estate damage issue. The valuation methodologies applied must address these issues.

Advisory Opinion 9 specifically provides that any deduction from the unimpaired value for environmental issues must be supported by market data. In other words, an appraiser or economist may not use a figure that is based solely upon their experience.[19] In the context of the environmental issues that must be addressed within the DC Matrix, there is a clear contrast between a standard appraisal, which hypothetically dismisses any environmental issues, and an environmental valuation, which does address the realities of the environmental conditions of the property.

### Detrimental Conditions and the Cost Approach

With contaminated properties, the cost approach can be utilized by deducting the costs related to the contamination issues from the unimpaired value.[20] However, this approach is generally not applicable with contaminated waterways, as the costs for cleanup do not typically go to individual, nonresponsible parties.

### Detrimental Conditions and the Income Capitalization Approach

With income-producing contaminated properties, the objective is to examine the income and expenses to determine if the contamination has any impact on the income, expenses, or the capitalization rate. When the income capitalization approach is used, there are various factors that should be considered, including lost rents; increased vacancy; projected costs and time of the cleanup; indemnity payments; mortgage and equity yield rates; and financing costs.

When using this approach, there are two key questions that should be asked. First, has the net operating income been impacted by proximity to waterway contamination, i.e., lower rents, higher vacancy, one-time expenses, higher ongoing expenses, and so forth? Second, has the capitalization rate been impacted as a result of the contamination issues?

### Detrimental Conditions and the Sales Comparison Approach

A waterway contamination assignment typically would focus on application of the sales comparison approach,

where market data with the incremental factor is compared to data on properties without the incremental factor. This could take the form of paired sales analyses, time-value studies, case studies, regression analysis, and perhaps survey techniques for market data backup (see Figures 3a and 3b).

These variations of the sales comparison approach are often employed by cross-referencing the impacted properties with public records that indicate whether or not properties have sold. If so, additional information can then be gathered as to the types and levels of contaminants, the property's proximity to incremental waterway contamination, any discounts to the sale prices as a result of the waterway proximity, and so forth.

Like a conventional sales comparison approach, adjustments can be made for differences between the contaminated property's characteristics and those of the subject property.[21] For example, if several similarly contaminated properties sold in a post-remediated

**Figure 3a    Damage Analysis—Waterway Contamination Test and Control Areas, Same River**



**River**

**Control Area**

Properties nearby otherwise similar areas, without incremental contamination

**River Flow**

**Point Source of Environmental Issue**

**Test Area**

Properties nearby area with incremental contamination

---

18. John D. Dorchester, Jr., "The Federal Rules of Evidence and Daubert: Evaluating Real Property Valuation Witnesses," *The Appraisal Journal* (July 2000): 306.

19. Appraisal Standards Board, Advisory Opinion 9, Lines 171–173.

20. It should be noted that the cost approach for contaminated property, like conventional appraisals, has a more limited role in actual valuation assignments. Furthermore, elements of the sales comparison approach or the income capitalization approach are used in some of the calculations of the cost approach.

21. Thomas Jackson and Randall Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 87.

Copyrighted material licensed by Randall Bell on April 26, 2021

### Figure 3b        Damage Analysis—Waterway Contamination Test and Control Areas, Different Rivers



condition for full value, then that market data indicates there would be no ongoing risk or market resistance involving the subject property (Figure 4).

## Supplemental or Alternative Valuation Methodologies

Contamination-related damages may include health claims, business losses, punitive damages, or liquidated damages. However, economically significant NRD claims will typically be accompanied by measurable damages to the impacted real estate. For example, if a lake is contaminated to the point where swimming and fishing are prohibited, a question arises as to whether or not the condition has a negative impact on nearby properties. If so, one would expect to be able to definitively measure differences in value between properties near this lake and properties in proximity to lakes where no such problem exits. In other words, these conditions are ultimately an empirical question that requires the application of one or more of the three traditional approaches to value.

Table 2 summarizes a variety of supplemental or alternative NRD valuation methodologies. This is only a summary of other methodologies, and further study would be required to obtain a complete understanding of them. Further, these methodologies may or may not be applicable to measuring actual real estate or economic impacts.

## Conclusion

Everyone would like to have clean, pristine natural resources and waterways, and fortunately, the Clean Water Act and subsequent legislation have resulted in considerable cleanup efforts. However, the realities of

### Figure 4        Waterway Time-Value Studies



both nature and industrialized society are such that pristine and clean waterways rarely exist. Accordingly, the question of whether a property owner would want to buy next to a clean river or a contaminated river is not based in reality, as virtually all waterways have periods of natural or man-made environmental contamination.

Clearly some waterways are better than others. In conducting a damage analysis, such as paired sales analysis, due to the strong positive effects of a water-view amenity, it is critical to compare the subject property, or test area, in proximity to the waterway to a control area that is also on a waterway, and carefully segregate out the *incremental* environmental issue. This is no small undertaking given the cocktail of contaminates that routinely impact waterways and their ever-changing status.

If the tens of thousands of contaminated waterways throughout the United States did result in a measurable diminution to nearby property values, it would impact billions of dollars of property values. This news would certainly be a major media event. However, such reactions to contamination and allegations of property damage rarely arise. There are many possible explanations for this:

• While waterways commonly have negative environmental issues, they also have strong positive characteristics for view amenities as well as recreational activities like boating.

• Waterway contamination is so common that real estate markets may simply consider it an unfortunate sociological reality that does not get factored into real estate prices. In other words, people may look to government regulation and cleanup as the solution to waterway contamination, rather than adjusting individual property values.

• The status of waterways seems to be in a constant state of flux. Unlike soil or groundwater contamination that impact one general area and remain there for some time, waterways are constantly moving, diluting, draining, and changing. By the time a study is done, the waterway's contamination may have completely changed.

• More seriously contaminated waterways are often cleaned up either through natural bioremediation or conscientious efforts, thus those whom the contamination potentially impact may consider the problem a temporary one.

• Some market participants, seeing the barrage of environmental warnings, may view contamination advisories as old news or believe that it is sufficient simply to drink bottled water, shower after swimming, or eat limited amounts of fish; others may choose not worry about the waterway contamination at all.

• The real estate in proximity to contaminated waterways usually is non-source property, meaning that the property owners do not own the source of contamination and have no financial liability for cleanup. Generally, the possibility of paying cleanup costs alone is a major factor in determining the impact that environmental issues have on property values. As cleanup risk is usually not applicable to individual property owners adjoining waterways, the market may not factor these non-source contamination issues into the prices paid.

• The question, what is the impact on property values? may naturally arise when properties are located in proximity to a contaminated waterway. However, a fairer question may be, compared with what? With so many contaminated waterways, what other choice is there? In other words, moving from proximity to one waterway to another may simply be changing one set of problems for another, with no net positive effect.

The diminution of property value caused by waterway and other contamination goes far beyond the conventional appraisal process. Ultimately, the value of properties in proximity to contaminated surface waterways is an empirical question that requires the application of one or more of the three traditional approaches to value, as refined to address the unique aspects of damaged properties. Market data is always required to support any diminution in value conclusion.

While polluted waterways are a major concern as an environmental matter, there is no evidence that these conditions cause an automatic diminution in property values. However, if such allegations do arise, there are established valuation methodologies to test their validity.

**Table 2        Supplemental or Alternative Natural Resource Damage (NRD) Methodologies**

| Methodology | Overview | Key Attributes and Limitations |
|---|---|---|
| Market Price Approach | A business valuation approach that determines the extent of an economic loss. For example, a dam failure at a ski resort may result in loss of ski days, lift tickets, rentals, condo fees, restaurant sales, wages, etc. | The key attribute of this approach is that it is tied to the market and can accurately measure business losses. A limitation of this approach is that it may not directly measure real estate damages or other issues, such as good will. |
| Resource Replacement Cost | Determines the cost to replace or restore a natural resource that has been lost or destroyed, such as water, fish, or wildlife. | The key attribute of this approach is that it can be useful in calculating the value of certain commodities that have been lost. A limitation of this approach is that the cost of replacement may not reconcile with the economic value created by the resource in the first place. |

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 2**          Supplemental or Alternative Natural Resource Damage (NRD) Methodologies *(continued)*

| Methodology | Overview | Key Attributes and Limitations |
|---|---|---|
| Travel Cost Method | Estimates the loss of consumer benefits as measured by costs to travel. For example, in a case where a section of the Colorado River is rendered inaccessible due to contamination, this method could estimate the damages as a function of the number of tourists, cost of gas, and other travel costs related to visiting this area of the Colorado River. | The key attribute of this approach is that it is relatively easy to calculate. A limitation of this approach is that it is theoretical in nature and does not take into account the other options that tourists have if a particular resource is not available. Accordingly, this would likely not be a valid indicator of real estate, economic, or business damages. |
| Random Utility Model | This model is conceptually linked with the travel cost method in that both seek the same sorts of values and use a similar logic. However, instead of looking at time actually foregone, this model measures the opportunity cost lost. For example, if one wanted to go to the beach, but it was closed due to environmental issues, one could visit the park instead. The price differential between trips is intended to determine any loss. | The key attribute of this approach is that it is relatively easy to calculate. A limitation of this approach is that it is theoretical in nature and does not take into account the other options that tourists have if a particular resource is not available. Accordingly, this would not be a valid indicator of real estate, economic, or business damages. |
| Hedonic Price Method | This method is a form of the multiple regression model. It can be used to estimate the contributory value of one aspect of a property, such as how much lake frontage adds to home values in a given market. With a hedonic price model, the analyst selects the variables appropriate for the study (e.g., square footage, lot size, bedroom count) and makes conclusions as to the functional form of the relationship between the model's variables and price. | The key attribute to this approach is that it can generate credible results if done correctly. The limitations of this approach include a need for large data sets and information concerning the variables to build a credible model, and the complexity involved in building a valid and reliable model. |
| Ecological Valuation Approach | This approach looks at the value of a natural resource as it contributes to an entire food chain. For example, wetlands breed insects, which are eaten by fish, which are eaten by bears. | An attribute of this approach is that it is easily understood and anecdotal in nature. A limitation of this method is that it may not be well understood as to whether the species in a particular food chain have equal values or whether there are substitute values (e.g., if there is no fish, can a bear just eat something else?). Consequently, it would be difficult to use this approach to actually quantify economic damages. |
| Methodology Factor Income Approach | A business valuation model, this approach determines the increase in costs in a unit of production as it affects overall prices. | The key attribute of this approach is that it may be suited for analyses of surface and groundwater resources, forests, and commercial fisheries. For example, surface and groundwater resources may be inputs for agriculture irrigation, manufacturing, or municipal water systems. The products (agricultural crops, logs, manufactured goods, and municipal water), in turn, may have market prices. Similarly, commercial fishery resources (fish populations or stocks) are inputs to the production of a catch of saleable fish. A limitation of this approach is that it may not be directly applicable to real estate damages. |
| Contingent Valuation Method | A survey approach to determine how much someone would be willing to pay, give up, or discount a property for a particular condition. | The key attribute of this approach is that it provides some indication of value in the absolute absence of primary transactional market data or it serves as a secondary approach to transactional market data. A limitation of this approach is that it is not based on actual transactional market data and is particularly prone to manipulation. |
| Cross-Cutting Methods | A mix of both market and nonmarket methods. Essentially these methods involve case studies with contingent valuation. | The key attribute of this approach is that case studies are market-derived data, which illustrates the effect on value from actual cases where the condition has occurred before. A limitation of this approach is that it can sometimes be difficult to find comparable case studies, and contingent valuations themselves are not based on actual transactional market data. |
| Benefit-Transfer Method | This is a case study methodology where the benefits or damages in a similar situation are applied to the subject property where no site-specific study or market data is available. This can be an application of the sales comparison approach. | The key attribute of this approach is that it is market-derived market data that demonstrates the effect on value from actual cases where the condition has occurred before. A limitation of this approach is that it can be difficult to find comparable case study market data. |
| Unit-Day Value Method | The use of prior studies involving similar circumstances, and application of those results. | The key attribute of this approach is that, for some detrimental conditions that have been widely studied, prior studies may have been published and may be easily accessible. A limitation of this approach is that the studies used may be outdated, improperly performed, or not directly comparable. |

## 7.5 The Effects of an Oil Pipeline Rupture on Single-Family House Prices

*by Robert A. Simons, PhD, Kimberly Winson-Geideman, PhD, and Brian A. Mikelbank, PhD*

This article originally appeared in the October 2001 issue of *The Appraisal Journal*.

### Abstract

This study quantifies the effects of environmental contamination on residential property values. An oil pipeline rupture occurred on the Patuxent River in Maryland in Spring, 2000. Hedonic and predictive regression analysis were used on 2,300 single-family house sales before and after the spill. For the first sales season after the rupture, results show a statistically significant reduction in price of over 10% for interior properties with homeownership rights in oiled community beaches. The effect of the pipeline spill on waterfront property was also evaluated. All three waterfront sales sold for less, but there were too few sales to justify statistical significance at the 90% confidence level.

On April 7, 2000, an oil pipeline ruptured in Prince George County in southern Maryland, about 30 miles from Washington, DC. Potomac Electric Power Company's (Pepco) pipeline management company detected and confirmed the leak from a 12-mile branch of the 51-mile underground pipeline. The leak consisted of number 2 fuel oil, which is similar to home heating oil, and a slight amount of heavier, number 6 oil. Over 120,000 gallons of oil were released, about half of which was eventually recovered.[1]

The leaking pipeline delivers fuel to Pepco's Chalk Point Generating Station, the largest power plant in Maryland. The plant uses coal, oil, and natural gas to generate electricity. It is one of six power plants that serve Washington, DC and the Maryland suburbs, and it provides electricity to the Southern Maryland Electric Cooperative.

The oil initially leaked into Swanson Creek and the surrounding marsh area. Unusually high winds and rain blew the oil into the Patuxent River, which separates Prince George and Calvert counties. Before it could be contained, a plume of oil had flowed downstream, impacting approximately 10 miles of Patuxent River shoreline.[2] Tidal activity and winds also drove the oil upstream past the power plant.

The impact of the pipeline spill on surrounding property values is of concern to property owners in the area affected by the spill. The primary purpose of this study is to determine to what degree the value of properties with rights to the water (both waterfront properties and interior properties with homeownership rights on oiled communal beachfront properties) has been affected. The impacts of the rupture and release of oil on property values are addressed using hedonic and predictive regression analyses techniques. This study employs the use of traditional valuation variables, as well as variables to account for spatial relationships between the observations.

The main hypothesis of this study is that the homes in the study area have experienced a reduction in property value. Consistent with empirical research and theory, the results of this research indicate that interior properties with beach rights in the area affected by the spill experienced a statistically significant reduction in property values in excess of 10% for the first sales season (about six months after the incident) at the 95% level of confidence. In addition, the oil spill appears to have reduced the sales volumes of homes in the area. Only three waterfront homes sold during the first sales season after the incident, and all three sold at a discount. These results are statistically significant approaching, but just below, a 90% level of confidence.

---

1. H. Byrd et al., *Chalk Point Oil Spill: Lost Recreational Use Value Report*, an unpublished report of the paper Chalk Point Trustees (February 2001): 3.

2. At least 16 articles appeared in the *Baltimore Sun* between April 8 and May 19, 2000 regarding the spill. *The Washington Post* also provided substantial press coverage, with four articles appearing in October 2000 and additional articles in the preceding months.

**Robert A. Simons, PhD,** is a professor and the Director of the Master of Urban Planning, Design and Development Program at the Levin College of Urban Affairs at Cleveland State University (CSU) in Cleveland, Ohio. He teaches courses in real estate development, market analysis and finance, PhD research methods, public economics, and environmental finance. He is also the faculty advisor for the Certificate Program in Real Estate Development and Finance, which is offered in conjunction with the Nance College of Business at CSU. Simons received his PhD from the University of North Carolina (UNC) at Chapel Hill in City and Regional Planning, with an emphasis in real estate. He holds a master's degree in regional planning and in economics, both from the UNC. His undergraduate degree in anthropology was earned at Colorado State University. Simons has published over 40 articles and book chapters on real estate, urban redevelopment, environmental damages, housing policy and brownfields redevelopment. He authored a book entitled *Turning Brownfields into Greenbacks*, published by Urban Land Institute. Simons has an active consulting practice, and has served as an expert witness in matters related to real estate and environmental damages. He has been a member of the American Institute of Certified Planners (AICP) since 1983.

**Kimberly Winson-Geideman, PhD,** is an assistant professor in the Department of Landscape Architecture and Urban Planning at Texas A&M Universtiy. Winson-Geideman has published several articles on brownfields, and her research interests include land contamination; residential and office property valuation; and coastal development.

**Brian A. Mikelbank, PhD,** is an assistant professor of Urban Studies in the Maxine Goodman Levin College of Urban Affairs at Cleveland State University. He received his PhD in geography from Ohio State University. He is an urban and economic geographer, currently conducting research on the spatial analysis of local housing and employment markets. He teaches courses in Geographic Information Systems.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Literature Review

The use of hedonic modeling in determining property values is well documented. G.C. Haas has been recognized as producing the first hedonic application in 1922, although he did not coin the term. Haas' application was on agricultural land prices with a particular focus on distance to the city center and size.[3]

Rosen established the theoretical framework for the hedonic method used for property valuation, which analyzes the impact of a particular characteristic on property values.[4] The hedonic technique allows a particular feature of a structure or the surrounding environment to be valued individually, while holding the effects of all other features on sales price constant. The price function is summarized by:

$$P = \alpha + \beta_1 S + \beta_2 N + \beta_3 D \tag{1}$$

where:

$P$ = the price of the house,

$S$ = a vector of structural characteristics,

$N$ = a vector of neighborhood characteristics, and

$D$ = a vector of date-related transaction characteristics.

Any other items of interest (e.g., environmental factors) could readily be modeled by adding a variable to Equation 1. The value of a particular characteristic is calculated by differentiating the implicit price function with respect to the given characteristic.[5]

In property valuation literature, the use of hedonic modeling generally requires that structural characteristics be used as the independent variable's determining value.[6] Examples of these characteristics are living area, number of bathrooms, lot size, type of heating, and condition of the structure. These attributes comprise the bundle of characteristics a rational consumer is willing to assume given their income constraint.

Neighborhood variables also have an effect on residential market behavior and outcomes.[7] Neighborhood variables are influences associated with geographic location and include both adjacency and neighborhood effects. Adjacency effects capture the spatial spillover effects of adjacent features. For instance, a river view adjacent to a home would be a positive externality. Neighborhood effects encompass the overall neighborhood characteristics such as accessibility, socioeconomic context, and other demographic information.

Other researchers have integrated Geographic Information Systems (GIS) into a hedonic model to capture the effects of neighborhood variables in an effort to explain residential values within a 30-mile radius of Washington, DC.[8] Using landscape indices that included measures of open space, diversity, and fragmentation of land use, the authors developed a model explaining land and housing values. In doing so, they were able to capture how individuals value the diversity and fragmentation of land use around their homes. The authors used data from the same geographic area that is used in this study.

Neighborhood residential investment such as new construction has a positive effect on nearby property values. Thus, those properties located near sites of neighborhood investment have higher values than those located far away.[9] Other studies have elaborated on this approach using hedonic price regression with spatially lagged variables generated using a GIS to capture the effect of residential investment on nearby property values. In their study, GIS was used to link parcel data with neighborhood data derived from the 1990 U.S. Census. They concluded that new residential investment positively impacts existing properties in the immediate vicinity (one block or 300 feet).[10]

The effects of environmental contamination on property values is well documented. Two recent literature review articles have provided a comprehensive perspective on multiple regression analysis and environmental contamination in real estate.[11] Studies exist quantifying the effects of landfills, groundwater contamination, toxic waste sites, and high voltage lines on property values.[12] These studies generally show a negative rela-

3. Peter F. Colwell and Gene Dilmore, "Who Was First? An Examination of Early Hedonic Study," *Land Economics* (75: 4, 1999): 620–626.

4. S. Rosen, "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," *Journal of Political Economy* (82, 1974): 34–55.

5. Jeffrey J. Pompe and James R. Rinehart, "Beach Quality and the Enhancement of Recreational Property Values," *Journal of Leisure Research* (27: 2, 1995): 143–154.

6. Larry Dale, et al., "Do Property Values Rebound from Environmental Stigmas? Evidence from Dallas," *Land Economics* (75: 2, 1999): 311–326; Chengri Ding, Robert Simons, and Esmail Baku, "The Effects of Residential Investment on Nearby Property Values: Evidence from Cleveland, Ohio," *Journal of Real Estate Research* (19: 1–2, 2000): 23–48.

7. Ayse Can, "GIS and Spatial Analysis of Housing Mortgage Markets," *Journal of Housing Research* (9: 1, 1998).

8. Jacqueline Geoghegan, Lisa A. Wainger, and Nancy E. Bockstael, "Spatial Landscape Indices in a Hedonic Framework: An Ecological Economics Analysis Using GIS," *Ecological Economics* (23, 1997): 251–264.

9. Robert A. Simons, Roberto Quercia, and Ivan Maric, "The Value Impact of New Residential Construction and Neighborhood Disinvestment on Residential Sales Prices," *Journal of Real Estate Research* (15: 1–2, 1998): 147–162.

10. Ding, Simons, and Baku, Ibid.

11. Thomas Jackson, "The Effects of Environmental Contamination in Real Estate: A Literature Review," *JREL* (9, 2001): 93–116; Melissa Boyle and Katherine Kiel, "A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities," *JREL* (9, 2001): 117–144.

12. A. C. Nelson, J. Genereux, and M. Genereux, "Price Effects of Landfills on House Values," *Land Economics* (54, 1993): 359–365; William G. Page and H. Rabinowitz, "Groundwater Contamination: Its Effects on Property Values and Cities," *Journal of the American Planning Association* (Autumn 1993): 473–481; Mark Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July 1997): 279–285; J. E. Kohlhase, "The Impact of Toxic Waste Sites on Housing Values," *Journal of Urban Economics* (20: 1, 1991): 1–26; and Peter Colwell, "The Effect of High Voltage Overhead Transmission Lines on Residential Property Values," *Journal of Real Estate Research* (1990): 117–127.

tionship between property values and the environmental impact. As expected, the farther an individual property is located from the impact, the smaller the effect. The magnitude of the environmental externality also is important in its effect on property values. For instance, one would anticipate that property located adjacent to a Superfund site would experience a greater loss of value than a site located adjacent to a leaking underground storage tank.

Also prevalent in the literature are the effects of petroleum underground storage tank leaks on adjacent properties. These studies conclude that property contaminated with petroleum sustains a 14% to 16% reduction in sales price when the contamination becomes known.[13] Other research on a pipeline rupture shows that noncontaminated, easement-holding properties not directly contaminated by a petroleum pipeline rupture sustain a loss in value. This reduction, attributed to the expectation that another rupture may occur, indicates a 5.5% loss in sales price for single-family homes and 2% to 3% loss for multifamily units. The research also shows that a price reduction continues for several years after the event.[14]

## Study Area

The study area consists of approximately ten miles along both shores of the Patuxent River in suburban Washington, DC (Figure 1). It encompasses three counties: St. Mary's, Calvert, and Charles, and numerous subdivisions within these counties. Housing of various types comprise the area, including single-family houses, townhouses, apartments, and condominiums. While the

**Figure 1**        Patuxent River, MD and Pipeline Spill Impact Area



---

13.    Robert A. Simons, William Bowen, and Arthur Sementelli, "The Effects of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio," *Journal of Real Estate Research* (14: 1–2, 1997): 29–42; Robert A. Simons, William Bowen, and Arthur Sementelli, "The Price and Liquidity Effects from Gas Stations on Adjacent Contaminated Property," *The Appraisal Journal* (April 1999): 186–194.

14.    Robert A. Simons, "The Effect of Pipeline Ruptures on Noncontaminated Residential Easement-Holding Property in Fairfax County," *The Appraisal Journal* (July 1999): 255–263.

Copyrighted material licensed by Randall Bell on April 26, 2021

majority of these units are on small- to medium-sized lots, there are a number of farms, commercial properties, and industrial facilities with larger land areas. New construction and lot sales also dot the landscape.

## Data

The data was obtained from the Property View database from the state of Maryland. The database links property maps to the Maryland State Department of Assessments and Taxation in order to provide property data for the purpose of taxation. The data set includes location information such as parcel number, address, and subdivision. Structural variables such as number of bathrooms, fireplaces, square footage, and lot size also are included. Transaction variables such as trade date and season are included. It also addresses more subjective data such as the condition of the structure in ranges from low to very good.

Median household income was obtained from the 1990 U.S. Census at the tract level. This research focuses on the modeling of single-family detached houses in the middle of the local market based on price and lot size. Townhouse, commercial, industrial, and farm sales were excluded from this hedonic analysis because they constitute other distinct markets. The data set was evaluated for missing fields, and some observations were removed. Properties that had no recorded consideration paid or consideration below $40,000 were deleted, as were those with consideration over $400,000.

Properties built over 100 years ago were left out of the data set. Sales that transferred prior to 1990 also were deleted so the focus would be on sales during the past 10 years. Those houses with lots greater than five acres were removed because their size was too large. Similarly, the study analyzed houses between 770 and 3,000 square feet. Care was taken to include only arm's-length transactions by deleting transactions among individuals with the same last name. Any sales that had missing key structural variables (e.g., lot size, square footage) were deleted. The original data set contained over 10,200 properties, of which about 2,900 were immediately affected by the oil spill. The number of single-family, detached house sales was eventually reduced to 2,295 for the purposes of statistical modeling.

The broader Patuxent River study area contains approximately 300 properties that were sold after the spill occurred on April 7, 2000. Of this group, 35 homes were in the area where oil deposits had contaminated the waterfront. Three of these homes were waterfront properties, the remainder having ownership rights to an impacted beach area. This group consists of properties sold from May 15, 2000 to October 1, 2000. May 15, 2000 (rather than an April 8 post-spill date) was chosen as the commencement date for sales to allow for contract maturation. By using May 15 as our commencement date, we are assured that transactions were executed after the spill date. The post-spill sales in the area contaminated by oil were coded with a dummy variable and are the focus of this study. Table 1 contains descriptive statistics on the sales used in this study. The

**Table 1**    Descriptive Statistics

Mean Sales Price Waterfront = $238,187

Mean Sales Price Interior = $128,619

| Variable | Minimum Value | Maximum Value | Mean Value |
|---|---|---|---|
| Land area (sq ft) | 4,007 | 216,504 | 44,486 |
| Age (years) | 2 | 90 | 24 |
| Building area (sq ft) | 770 | 2,992 | 1,540 |
| Full baths | 0 | 4 | 1.72 |
| Half baths | 0 | 3 | .33 |
| Fireplaces | 0 | 4 | .5 |
| Total porch (sq ft) | 0 | 2,105 | 238 |
| Total garage (sq ft) | 0 | 2,417 | 285 |
| Total asc. structure ($) | 0 | 56,136 | 1,322 |
| HH income in tract ($) | 33,032 | 61,218 | 45,136 |

| Variable | Number of Occurrences |
|---|---|
| Waterfront | 204 |
| Calvert county | 277 |
| Charles county | 56 |
| x2000 | 204 |
| x1999 | 286 |
| x1998 | 290 |
| x1997 | 270 |
| x1996 | 257 |
| x1995 | 178 |
| x1994 | 220 |
| x1993 | 164 |
| x1992 | 162 |
| x1991 | 115 |
| x1990 | 141 |
| April/May/June | 766 |
| Oct/Nov/Dec | 501 |
| Jan/Feb/March | 415 |
| DG low cost | 8 |
| DG economy | 130 |
| DG avg good VG | 452 |
| Air combined sys | 1654 |
| Space or no heat | 17 |
| Waterfront w/oil | 3 |
| Interior w/oil | 32 |

mean sales price was $128,619, mean land area was 44,486 square feet (just over an acre), and the average age of a house was 24-years.

## Data Analysis

### Hedonic Model

The statistical method used to measure the effects of the spill on property values is a multivariate hedonic regression model. This method regresses the transaction price of a composite good against that good's characteristics. The model employs house sales from the 1990–2000 period, using ordinary least squares (OLS) to isolate the effects of each independent variable on sales price while holding the other variables constant. There are four types of variables: structural,

neighborhood, date/time of sale, and environmental (affected by the oil spill). Structural variables include square feet, lot size, waterfront property status, unit age in 2000, central air, heat type, number of fireplaces, garage size, full and partial bathrooms, and additional structures (such as boat docks and pool houses). Neighborhood variables include median household income and a county dummy variable to account for differing school districts. Date variables account for the sales season and the year of sale. The environmental variable identifies those sales with rights in waterfront property contaminated by oil that sold after the May 15 cut-off date subsequent to the pipeline rupture. Therefore, the equation for the regression model is as follows:

$$P = \alpha + \beta_1 S + \beta_2 N + \beta_3 D + \beta_4 E + \in \qquad (2)$$

where:

$P$ = a vector of house transaction prices,

$\alpha$ = the regression constant,

$\beta_1$ = the estimated coefficient vector for the structure, S,

$\beta_2$ = the estimated coefficient vector for the neighborhood, N,

$\beta_3$ = the estimated coefficient vector for the date of transaction, D,

$\beta_4$ = the estimated coefficient vector for environmental contamination status, E, which is a vector containing an environmental variable for ownership rights to water-front properties and interior properties with rights in oiled beaches that occurred after the spill, and

$\in$ = an error term.

These variables reflect the effect of the spill on residential market values, while holding the other variables in the model constant. Thirty-five sales with rights in contaminated waterfront property occurred after the May 15 cut-off date.

## Hedonic Model Results

The results of the hedonic model, including the post-spill data, are presented in Table 2. An $R^2$ of just over .70 was achieved, which is consistent with other housing valuation literature reviewed in this paper. Regression diagnostic issues also were investigated. The diagnostic test used for multicollinearity was the variance inflation factor, and all variables fell below the acceptable level of 10. For heteroscedasticity, the scatter plots showed negligible fanning.

The model reveals the impact that individual variables have on property values. It develops a framework showing how different structural and neighborhood variables are valued. Most of the variables are significant at the 99% confidence level. The direction of the impact associated with each variable is consistent with this theory. For example, each square foot of building space adds $18 and the addition of a full bath adds $9,976 to the sales price of a house. Central air adds an additional $5,473 and the first fireplace in a home adds $9,509. Waterfront properties have a value of $86,054 over non-waterfront properties. Not all variables were positive. For instance, age has a negative impact on the value of a home equal to $171 for each year of age of the house. Neighborhood and county variables also were statistically significant, as were some of the date dummy variables.

**Table 2**  Hedonic Regression Results

|  | Value | Std. Error | t value | Pr(> |t|) |
|---|---|---|---|---|
| (Intercept) | 29,419.1955 | 7,064.2609 | 4.1645 | 0.0000 |
| WATERFRONT | 86,053.7201 | 2,720.4435 | 31.6322 | 0.0000 |
| Calvert County | 8,220.5716 | 2,592.4383 | 3.1710 | 0.0015 |
| Charles County | 16,904.9971 | 4,768.7865 | 3.5449 | 0.0004 |
| LAND AREA | 0.1020 | 0.0187 | 5.4579 | 0.0000 |
| AGE | -170.5293 | 55.3557 | -3.0806 | 0.0021 |
| SQFTSTRC | 17.8313 | 1.8244 | 9.7736 | 0.0000 |
| x2000 | 4,133.4460 | 3,151.7257 | 1.3115 | 0.1898 |
| x1998 | -1,261.9751 | 2,685.2236 | -0.4700 | 0.6384 |
| x1997 | -5,194.4669 | 2,736.9492 | -1.8979 | 0.5078 |
| x1996 | -9,779.5534 | 2,782.9382 | -3.5141 | 0.0004 |
| x1995 | -10,755.2019 | 3,080.9782 | -3.4908 | 0.0005 |
| x1994 | -12,908.8206 | 2,898.2710 | -4.4540 | 0.0000 |
| x1993 | -12,947.7867 | 3,160.0767 | -4.0973 | 0.0000 |
| x1992 | -15,989.4133 | 3,181.5427 | 5.0257 | 0.0000 |
| x1991 | -18,448.5244 | 3,638.6362 | -5.0702 | 0.0000 |
| x1990 | -28,851.3783 | 3,311.5907 | -8.7122 | 0.0000 |
| APRIL.MAY.JUNE | -758.6109 | 1,804.4274 | -0.4204 | 0.6742 |
| OCT.NOV.DEC | -2,276.3645 | 1,965.2834 | -1.1583 | 0.2469 |
| JAN.FEB.MARCH | -4,002.0664 | 2,083.2470 | -1.9211 | 0.0548 |
| DG.LOW.COST | -10,314.3996 | 12,698.4899 | -0.8123 | 0.4167 |
| DG.ECONOMY | -10,192.4064 | 3,061.5703 | -3.3291 | 0.0009 |
| DG.AVG.GOOD.VG | 21,011.2959 | 2,321.6041 | 9.0503 | 0.0000 |
| AIR.COMBINED.SYSTEM | 5,473.3139 | 1,784.6175 | 3.0669 | 0.0022 |
| NO.OR.SPACE.HEAT | -21,270.9852 | 8,916.3907 | -2.3856 | 0.0171 |
| BATHS.FULL | 9,976.7022 | 1,538.7070 | 6.4838 | 0.0000 |
| BATHS.HALF | 5,824.7581 | 1,647.3059 | 3.5359 | 0.0004 |
| FIRE1.NUMB | 9,509.0623 | 1,549.6624 | 6.1362 | 0.0000 |
| FIRE2.NUMB | 18,758.1309 | 4,162.1518 | 4.5068 | 0.0000 |
| TOTAL.PORCH | 19.4782 | 3.0777 | 6.3289 | 0.0000 |
| TOTAL.GARG | 18.7234 | 2.4725 | 7.5728 | 0.0000 |
| TTL.ASCSTR | 1.7933 | 1.0675 | 10.7056 | 0.0000 |
| Median HH income | 0.8441 | 0.1295 | 6.5159 | 0.0000 |
| Waterfront w/oil | -28,373.2512 | 18,828.6910 | -1.5069 | 0.1320 |
| Interior w/oil | -14,390.1733 | 6,293.2380 | -2.2866 | 0.0223 |

Residual standard error: 32,010 on 2,252 degrees of freedom

Multiple $R^2$: 0.7006

$F$-statistic: 155.0, the p-value is 0

## Results of the Spill on Oiled Properties

The oil spill is shown to have a negative impact of $14,390 on the sales price of interior, single-family houses with property rights in contaminated waterfront property. This has a $t$-statistic of -2.29 and is statistically significant at above the 95% confidence level. Given that the average value for a home in the subject area is $128,600, the resulting percentage loss is about 11%. This result is the main finding of this study.

The price reduction effect of the spill on waterfront properties is less clear due to the limited number of waterfront sales that occurred post-spill. Overall, examination of local REALTOR® Multiple Listing Service (MLS) data reveals that houses in five of the larger impacted subdivisions in the area experienced a reduction of

Copyrighted material licensed by Randall Bell on April 26, 2021

over 40% in 2000 compared with the same time period in 1999. Assuming no substantial variation in regional markets, it is reasonable to connect this reduction in transactions largely to the oil spill. Only three waterfront sales occurred during the first sales season. Of these waterfront properties that sold, the average discount was $28,400 or approximately 12% of the value of a waterfront home. These results approach, but (at 87% confidence) do not attain, statistical significance at the 90% confidence level.

## Spatial Autocorrelation

House price data is often spatially correlated; that is, houses located near each other often sell for similar prices. This is not surprising since (according to the old saying) the three most important factors in determining the price of real estate are location, location, and location. When data exhibit spatial autocorrelation, analysts often turn to an explicitly spatial regression framework. There are many spatial approaches that have been put forth in theoretical and empirical research, including pure and mixed auto-regressive models, spatial filtering approaches, geographically weighted regression, generalized least squares approaches, and multi-level modeling.[15] This study uses a mixed regressive-autoregressive model with the following standard procedure. Starting with the most appropriate OLS model (like the one in Table 2), the spatial structure of the regression residuals is analyzed using a variogram that shows the distance over which spatial process, unaccounted for in the current regression variables, is playing a role in the regression. It reveals whether, and over what distance, the residuals exhibit spatial autocorrelation. From the variogram, it was determined that the relevant distance was 700 feet.

Thus, for a given house in the dataset, any other house that sold both before that given house and was within 700 feet of that given house was found to exert a price effect on that given house. Only houses that sold before a given sale were included in order to be consistent with the way sellers and buyers use information about local market conditions. The magnitude and significance of that price-effect is revealed in the spatial regression, similar to the manner in which the magnitude and significance of the coefficient on, for example, building square footage, would be determined in a standard OLS hedonic application.

Although this spatial estimation strategy can also impact the sign, significance, and magnitude of the other regression parameters, the OLS results presented here are qualitatively similar to those of the spatial analyses, both in terms of the relevant regression coefficients and the corresponding predictive regression calculations. The model R2 was essentially unchanged from the OLS model. The spatial autocorrelation coefficient, r, was found to be positive and significant, indicating that sales of surrounding houses positively impact house price. In particular, the coefficient on the oiled interior properties reflected a $11,819 discount and was statistically significant at $p < 0.10$. The coefficient on the oiled waterfront properties yielded a damage estimate of over $13,000, but as in the OLS model, failed to reach conventional levels of significance, likely due to the limited data (n = 3). Thus, even after accounting for the effects of spatial autocorrelation, interior properties with rights in waterfront beaches contaminated with oil still sustained a loss of over 8% in the first year of sales, holding all else constant.

## Predictive Regression

A predictive regression analysis was used to supplement the hedonic model. Unlike hedonic regression that provides an estimate of the average market reduction, the purpose of the predictive regression is to predict the price for each of the sales that occurred post-spill, then compare them to the actual sales price. The difference, if negative, would be an indication of the loss attributable to the spill. Table 3 contains the results of this analysis. Twenty-three of the interior properties sold for less than the predicted value and nine sold for more than the predicted value. As for sales that occurred above the predicted value, this may be accounted for by activities that took place outside the model and for which current data is unavailable (e.g., remodeled kitchen). The average of these numbers shows a reduction of 10.9% in property value for the interior properties. The waterfront properties had similar results: all three sold for less than the predicted value. The waterfront properties incurred an average of a 12.6% reduction in value.

## Conclusions

The effect of the Pepco oil spill on residential property values has negatively affected house values in the impact area that sold during the six months after the spill date. This study concludes that interior single-family homes with rights to Patuxent River community beaches have incurred a loss of value over $14,000, which equates to 10.9%, after the rupture of Pepco's oil pipeline in April, 2000. This figure is statistically significant at a 95% level of confidence. The limited number of waterfront sales sustained a loss in value of $28,373, which is statistically significant at just below a 90% confidence level. Prior to the spill, there is no indication of any other market disturbances that may have impacted property values. Interestingly enough, the Chalk Point Trustees report that quantified the loss

15.    L. Anselin, *Spatial Econometrics: Methods and Models* (Dordrecht, Kluwer, 1988); J. P. LeSage, *Spatial Econometrics* (Regional Research Institute, West Virginia University, 1999); A. Getis, "Spatial Filtering in a Regression Framework: Examples Using Data on Urban Crime, Regional Inequality, and Government Expenditures," *New Directions in Spatial Econometrics*, ed. L. Anselin and R. Florax (Berlin: Spriger-Verlag, 1995): 172–88. Weighted regression was addressed by C. Brunsdon, A. S. Fotheringham, and M. E. Charlton, "Geographically Weighted Regression: A Method for Exploring Spatial Nonstationarity," *Geographical Analysis* (28: 4, 1995): 281–298. GLS was covered by T. C. Bailey, and A. C. Gatrell, Interactive Spatial Data Analysis (Essex, England: Longman, 1995) and K. Jones and N. Bullen, "A Multilevel Analysis of the Variations in Domestic Property Pieces: Southern England 1980–1987," *Urban Studies* (30, 1993): 1409–1426.

**Table 3**  Predictive Regression

| Interior Observation | Predictive | Actual | Actual − Predictive | Difference in Percent |
|---|---|---|---|---|
| 1 | $149,725.12 | $139,000.00 | $(10,725.12) | -7.16% |
| 2 | $148,023.22 | $155,000.00 | $6,976.78 | 4.71% |
| 3 | $122,487.16 | $92,000.00 | $(30,487.16) | -24.89% |
| 4 | $148,841.50 | $137,500.00 | $(11,341.50) | -7.62% |
| 5 | $123,891.95 | $137,900.00 | $14,008.05 | 11.31% |
| 6 | $145,678.11 | $156,000.00 | $10,321.89 | 7.09% |
| 7 | $116,712.13 | $67,000.00 | $(49,712.13) | -42.59% |
| 8 | $121,152.42 | $118,500.00 | $(2,652.42) | -2.19% |
| 9 | $99,019.86 | $114,800.00 | $15,780.14 | 15.94% |
| 10 | $168,491.55 | $176,900.00 | $8,408.45 | 4.99% |
| 11 | $126,764.03 | $120,000.00 | $(6,764.03) | -5.34% |
| 12 | $124,679.25 | $125,000.00 | $320.75 | 0.26% |
| 13 | $123,984.55 | $102,000.00 | $(21,984.55) | -17.73% |
| 14 | $136,193.72 | $110,000.00 | $(26,193.72) | -19.23% |
| 15 | $105,264.34 | $75,000.00 | $(30,264.34) | -28.75% |
| 16 | $137,845.14 | $129,650.00 | $(8,195.14) | -5.95% |
| 17 | $149,981.08 | $144,000.00 | $(5,981.08) | -3.99% |
| 18 | $122,965.76 | $119,000.00 | $(3,965.76) | -3.23% |
| 19 | $123,666.32 | $104,200.00 | $(19,466.32) | -15.74% |
| 20 | $156,600.67 | $128,000.00 | $(28,600.67) | -18.26% |
| 21 | $122,431.17 | $110,000.00 | $(12,431.17) | -10.15% |
| 22 | $146,404.92 | $115,000.00 | $(31,404.92) | -21.45% |
| 23 | $148,148.09 | $112,000.00 | $(36,148.09) | -24.40% |
| 24 | $115,328.72 | $94,601.00 | $(20,727.72) | -17.97% |
| 25 | $105,447.30 | $72,500.00 | $(32,947.30) | -31.25% |
| 26 | $123,205.80 | $130,000.00 | $6,794.20 | 5.51% |
| 27 | $135,385.56 | $140,000.00 | $4,614.44 | 3.41% |
| 28 | $118,636.84 | $117,000.00 | $(1,636.84) | -1.38% |
| 29 | $165,502.91 | $85,000.00 | $(80,502.91) | -48.64% |
| 30 | $133,386.00 | $89,500.00 | $(43,886.00) | -32.90% |
| 31 | $100,214.93 | $81,500.00 | $(18,714.93) | -18.67% |
| 32 | $98,990.43 | $106,000.00 | $7,009.57 | 7.08% |
| **Average Loss Interior** | | | | **-10.9%** |
| **Waterfront Observation** | | | | |
| 1 | $226,909.94 | $184,000.00 | $(42,909.94) | -18.91% |
| 2 | $244,016.92 | $235,000.00 | $(9,016.92) | -3.70% |
| 3 | $218,194.57 | $185,000.00 | $(33,194.57) | -15.21% |
| **Average Loss Waterfront** | | | | **-12.6%** |

in recreational value resulting from the oil spill found a reduction in visitation of about 10% over the first year. This figure mirrors the results from this study regarding property damages.[16]

The implications are that local property assessors in the study area (and potentially those assessors faced with similar situations elsewhere) should discount the residential values for property tax purposes to account for reduction in value attributable to the spill. Whether or not these effects are temporary or permanent has not yet been determined and depends on a number of factors. Appraisers should be aware that residential sales affected by the spill are trading for a discounted price, and consider this issue when selecting comparable sales for the market approach to value for properties in the impact area.

This analysis raises several issues for future research, including the effects of the spill on other property types such as residential lots, upper-end residential houses, and nonresidential property, how the impacts are manifest over time, and how property values in the proximity of the impacted sites are influenced. Another impact not always considered is the loss of liquidity (longer marketing time, lower transaction rates, and failed sales). An analysis should be conducted to determine how the liquidity of the homes has been affected. Initial analysis of 2000 post-spill residential sales shows that the number of sales in the five largest subdivisions in the impact area is reduced by over 40% from the same period in the previous year.

This case has generated legal action on behalf of the homeowners to recover property damages. In the interim, homeowners in the impacted area should consider requesting a reduction in assessed value and their property tax.

An analysis should be conducted that quantifies the effects of the oil spill on property values over time. Intuitive judgment suggests that the impact from the spill may diminish, although it is too soon to conclude that it will, and if it does, how quickly. Additionally, a comparable analysis of sales in similar markets in the Potomac River region may shed light on this issue. Further research is necessary to provide insight on these topics.

---

16.    Byrd et al., Ibid.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 7.6 Fuel-Oil Contamination of a Residence: A Case Study in Stigma

*by Bruce M. Closser, MAI, SRA*

This article originally appeared in the July 2001 issue of *The Appraisal Journal*.

### Abstract

An appraisal assignment to measure stigma in a fuel-oil contaminated residence led to the discovery of another similarly contaminated house that had changed ownership four times, including an arm's-length sale before, and two more after, the contamination event. A study of this situation allowed the author to measure the effect of stigma at about 28% two years after the contamination event and at about 6% five years after the contamination event.

It was early in the morning on a cold January day in Michigan's Upper Peninsula when the fuel-oil delivery truck arrived at a rural home. As the driver inserted the nozzle into the filler pipe and started pumping, the pipe fractured inside the basement. Unaware, he kept pumping, sending more than two-hundred gallons of fuel oil onto the basement floor.

The appraisal assignment was to estimate the effect of stigma on the value of the house after the cleanup had been completed. According to the Bell Chart, this is a Class VIII detrimental condition (one involving soil or building contamination).[1]

The Appraisal Institute seminar, *Environmental Risk and the Real Estate Appraisal Process*, defines environmental stigma as "an adverse effect on the market's perception of the value of property containing an environmental risk even after cleanup costs have been expended or considered in estimating value."[2]

In the course of our market research for this appraisal we learned of another house in the area which had also been contaminated with fuel oil. The interesting thing about this particular property was that it had changed ownership four times over a six-year period, including three arms-length sales, of which one occurred before and two after the fuel spill.

### History of the Events

Following is a brief history of the sale property. In Sale #1 the Bakers purchased the home from the Adams on land contract for $42,000. Nine months after they purchased the house, the nearby Chocolay River flooded and the high water entered the basement of the residence. As the water level rose, the fuel-oil tank broke loose from its mountings and spilled its contents into the basement of the residence. Unaware of the oil spill, Mr. Baker obtained a pump and began pumping the water from the basement into the yard. As the water flowed out, Mr. Baker realized that there was oil in the water and ceased pumping. By this time, however, soil contamination had occurred.

Following this incident, the contaminated soil was removed with the help of the Township Environmental Emergency Fund at a cost of $1,150. However, after considering the condition of the house with the fuel oil contamination in the basement and the acrid smell of fuel oil pervading the upstairs rooms, the Bakers defaulted on the land contract and the house reverted to the Adams. The Adams then defaulted on their mortgage and the house reverted to the bank (Sale #2).

According to the bank representative who handled this property, the environmental cleanup of the soil had been completed by the time the bank took title to the property one year after the spill. At that time, they replaced the furnace and retained a professional maintenance company to clean the basement. Following this, the property was rented to the Carters. According to Ms. Carter, there was not a noticeable smell of fuel oil in the house at that time, although they were fully aware of the situation.

Twenty-one months after the spill and nine months after cleaning the house and renting the property, the bank listed the house for sale with a local Realtor for $41,000. The Realtor's attempts to sell the house were unsuccessful and after seven months the bank offered to sell the house to the tenants––the Carters. Ms. Carter stated that the bank made them an offer they couldn't refuse. The house sold 27 months after the spill for $34,700 (Sale #3) and, as part of the compensation, the bank allowed them credit for rent already paid. Although records of the transaction were no longer available, the bank representative stated that he thought the rent was in the range of $300 to $400 per month. The representative thought that the Carters had rented the house for seven or eight months, but Ms. Carter stated that it was slightly more than one year. Therefore, the discount for rent already paid could have been as low as $2,100 (7 months at $300) or as much as $5,200 (13 months at $400). If we assume that the tenants would

1.    Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999): 17.

2.    Appraisal Institute, "Environmental Risk and the Real Estate Appraisal Process" (Chicago: Appraisal Institute, 1994): 128.

**Bruce Closser, MAI, SRA, CRE,** is a state certified general appraiser. He has been a full time professional appraiser in Marquette, Michigan for 30 years. Over the past 20 years he has taught numerous courses and seminars for the Appraisal Institute. He is the author of three *Appraisal Journal* articles.

| Events Time Line | |
| --- | --- |
| July, 1984 | Adams sell to Bakers on land contract, a seller-financed installment sale (Sale #1) of $42,000. |
| April, 1985 | Basement floods, fuel oil spills, soil contamination is cleaned up. Bakers default on land contract, house reverts to Adams, who default on the mortgage. |
| April, 1986 | Title is conveyed to bank by foreclosure (Sale #2). Bank bid is $36,787.98. Environmental cleanup has been completed by the time the bank takes title. Bank has basement cleaned by professional cleaning firm. No other work is necessary. Bank rents house to Carters. No smell is evident in the house. |
| January, 1987 | Bank has house listed for sale with real estate broker for $41,000. |
| July, 1987 | Broker is not successful in attempts to sell the house. No offers received. Bank offers house to the Carters (tenants) at very favorable terms. According to Ms. Carter, "An offer we couldn't refuse." Sale price is $34,700 and Carters get credit ($4,550) for rent paid against the sale price (Sale #3). |
| April, 1990 | Carters sell house to Davises for $56,000 after adding a sauna, deck, and hot tub as well as new carpeting and a new lawn (Sale #4). |

remember the time period better than the bank (13 months) and take the midpoint of the rent range ($350), the discount would have been $4,550. This would have made the effective sale price $30,150.

The Carters occupied the house for nearly three years and, during this time, added a sauna, a deck with a hot tub, installed new carpeting, and replaced the lawn. Five years after the spill the Carters sold the house to the Davises for $56,000 (Sale #4). This sale was confirmed with Mr. Davis who stated that he was aware of the history of this property and considered it in his purchase but felt that he paid a normal market price for the property (although he also said he thought he got a good deal).

## Methodology

A case study like this may be helpful in estimating the effects of stigma on a formerly contaminated property. "When contaminated property sales are not available or not truly comparable, analyzing case studies of contaminated properties to discern implications for market value arising from contamination is appropriate. Case study analysis is specifically recognized as an appropriate valuation technique by the Appraisal Institute in *Environmental Risk and the Real Estate Appraisal Process*, the Appraisal Institute's official seminar on the valuation of contaminated properties."[3]

Other studies have shown that environmental stigma may linger after cleanup and that media publicity may exacerbate stigma.[4] Based on these and other studies one could expect that stigma from this not-highly-publicized incident would dissipate over time and that the value of the residence would first drop then gradually recover as this process took place. As we can see from this case study, that is essentially what happened: the sale price dropped sharply after the oil spill then recovered to a near-normal level within five years.

To review, we have Sale #1 in July of 1984, less than one year prior to the contamination. We have Sale #3 in July of 1987, approximately two years after the contamination event and Sale #4 in April of 1990, approximately five years after the contamination event. By comparing the post-event sale prices to the estimated market value of the house on these dates as if uncontaminated, an estimate of the amount of stigma and its duration can be derived. This is illustrated in Figure 1.



**Figure 1**    Actual vs. Predicted Sale Price

---

3.    Richard J. Roddewig, "Classifying the Level of Risk and Stigma Affecting Contaminated Property," *The Appraisal Journal* (January, 1999): 98–102.

4.    Peter J. Patchin, "Contaminated Properties–Stigma Revisited," *The Appraisal Journal* (April 1991): 167–172; Richard J. Roddewig, "Choosing the Right Analytical Tools for the Job," *The Appraisal Journal* (July, 1998): 320–325; Richard J. Roddewig, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," *The Appraisal Journal* (October, 1996): 375–387.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Market Statistics

For a number of years, our firm has been compiling statistics on residential sales in the local area. This area, with a population of about 35,000, includes the City of Marquette and the surrounding townships. Included in these statistics are the average and median sale prices of single-family residences as well as the rate of increase in the prices of residences from year to year.

As it happens, the residence under study (1,006 square feet, three bedrooms, 1.5 baths, 2-car attached garage, and a full basement built in 1973) was very close to the median house sale of that time (1,150 square feet, 3 bedrooms, 1 bath, 2-car attached garage, and full basement built 1973). This enhances the reliability of the use of market statistics when applying them to this situation.

## Price Change from 1984 to 1987

According to our residential market analysis, the average price of a single-family residence in the Marquette area *decreased* by 5.6% from 1984 to 1985, decreased by 0.8% from 1985 to 1986, and *increased* 5.8% from 1986 to 1987.

By taking Sale #1–Adams to Baker for $42,000, which took place in 1984, one year before the oil spill– and adjusting that sale price forward by the annual change in market prices, we can predict what this house should have sold for under normal circumstances three years later in 1987, when the Carters purchased it from the bank (Sale #3). Applying these adjustments to the $42,000 price for Sale #1 indicates that in 1987 this house should have sold for $41,612, rounded to $41,600.

## Stigma Estimate Two Years After Contamination

The actual sale price of Sale #3 in 1987 was $34,700, less credit for rent. If we estimate the rental credit at $4,550, this indicates an effective sale price of $30,150, or a discount of $11,450 from the expected market price of $41,600. This represents a 28% discount.[5] As the Carters stated when they moved in, the cleanup had been completed and there was no smell evident in the house. Therefore, this discount can be attributed entirely to stigma.

## Price Change from 1987 to 1990

We can now further adjust Sale #1 to Sale #4 and predict what the house should have sold for, under normal circumstances, six years later in 1990, when the Carters sold it to the Davises. From 1987 to 1988 the average sale price increased by 6.9%. From the year 1988 on we also have statistics on the change in the median sale price.[6] From 1988 to 1989 the median sale price

increased by 12.5%, and from 1989 to 1990 it increased by 13.0%. Applying these rates to the $41,600 (1987 expected sale price) indicates a 1990 expected sale price for Sale #4 of $56,549 or $56,500 rounded. The actual sale price of Sale #4 was $56,000 which would indicate that this sale price was a normal market price. However, we must also consider that the Carters, during the three years that they owned the house, added a sauna in the basement, a deck, a hot tub, put in a new lawn, and replaced the carpeting. Carpeting replacement would be considered a normal maintenance item but the others were capital improvements and should be reflected in the sale price.

## Capital Improvements

In this part of the country there is a strong Finnish heritage, and the sauna is a popular, traditional amenity common throughout the price range (and almost obligatory at cottages). It is definitely not trendy and contributes well to value. It also can be built quite economically using local labor and materials. Decks are also popular and contribute to value. Hot tubs are less universally desired and do not contribute as well as saunas and decks. A lawn is a necessity and probably contributes its cost without depreciation as long as it is maintained. However, a new replacement lawn probably will not contribute to its cost. Overall, when compared to professionally-built costs, these items typically contribute only a fraction.

## Stigma Estimate Five Years After Contamination

We estimate that these items contributed approximately $3,000 to the sale price (sauna, $750; deck and hot tub, $1,750; lawn, $500). Therefore, without these capital improvements the sale price would have been about $53,000, or $3,500 below the expected sale price of $56,500. This represents a discount of 6% five years after the contamination event and four years after the cleanup had been completed and the house was ready for occupancy without noticeable odors. Clearly, stigma has dissipated considerably from the 28% measured three years after the contamination event, but some residual effect still remains–a conclusion supported by the buyer's comment that he thought he got a good deal.

Another possible explanation for the reduction in value is the general effect of the flood on the neighborhood. We researched this and found that even in the relatively-small area affected by the high water (this was not a major flood) no effects on sale prices could be observed. This increased our confidence that the effect we were observing was caused by the fuel-oil contamination.

Note that the estimate of stigma is sensitive to judgements made by the appraisers regarding the con-

---

5. Considering the range of possible rent credits from $2,100 to $5,200, the range of discounts would be from 22% to 29%.

6. The median sale price of the house in the market, that is, if one ranks all the sales by price from low to high, it would be the middle sale. It is a more accurate representation of market price than the average because it is not affected by extremes.

tribution of capital improvements to the sale price of Sale #4, uncertainty regarding the rent credited to the purchase price in Sale #3, and the reliability of market statistics used as a comparison.

## Conclusions

From this case study we can draw the following conclusions:

- The fuel oil spill in the basement of the house caused significant loss in value. The value loss in the immediate aftermath of the incident was substantial. Note that the original purchaser under the land contract, who had been making payments for nine months, and the original seller, who had owned the property for twelve years, both judged that their equity had been wiped out and both walked away from the property.

- Even though the cleanup cost was modest in this case (less than $1,200 for soil cleanup plus professional cleaning of the house and furnace replacement) the perception of owners and potential buyers was very negative. In the case of a residence, this negative perception may have more to do with health concerns than with the monetary liability concerns that often arise with commercial properties.

- Some of this value loss remained as stigma after the cleanup was completed. Our best estimate of this stigma is 28% (with a range of 22%–29%) two years after the contamination event occurred and one year after the cleanup had been completed. Three years after that, our estimate is that stigma was still at about 6%. Thus, five years after the contamination event and four years after the completion of cleanup, some residual stigma still remained; however, it is clear that stigma had declined significantly.

- It is interesting to compare these conclusions with those of Simons, Bowen, and Sementelli[7] who reported price reductions of 14%–16% for residences within 300 feet of the leaking underground storage tanks where the groundwater contamination had been identified. In that case, the contamination was to the groundwater, whereas in this article the contamination was to the residence itself. One would expect to find a more severe market reaction to direct contamination of the residence than to contamination of the groundwater on the site, which was observed.

### References

Bell, Randall. *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999).

Dotzour, Mark. "Groundwater Contamination and Residential Property Values." *The Appraisal Journal* (July 1997): 279–285.

Kinnard, Jr. William N., and Mary Beth Geckler. "The Effects on Residential Real Estate Prices from Proximity to Properties Contaminated with Radioactive Materials." *Real Estate Issues*, (Fall–Winter, 1991).

Mundy, Bill. "Stigma and Value." *The Appraisal Journal* (January 1992): 7–13.

Patchin, Peter J., "Contaminated Properties–Stigma Revisited." *The Appraisal Journal* (April 1991): 167–172.

Patchin, Peter J. "Valuation of Contaminated Properties." *The Appraisal Journal* (January 1988): 7–16.

Reichert, Alan. "The Persistence of Contamination Effects: A Superfund Site Revisited." *The Appraisal Journal* (April 1999): 126–135.

Roddewig, Richard J. "Choosing the Right Analytical Tools for the Job." *The Appraisal Journal* (July 1998): 320–325.

Roddewig, Richard J. "Classifying the Level of Risk and Stigma Affecting Contaminated Property." *The Appraisal Journal* (January 1999): 98–102.

Roddewig, Richard J. "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries." *The Appraisal Journal* (October 1996): 375–387.

Simons, Robert, William Bowen, and Arthur Sementelli. "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property." *The Appraisal Journal* (April 1999): 186–194.

---

7. Robert Simons, William Bowen, and Arthur Sementelli, "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property," *The Appraisal Journal* (April, 1999): 186–194.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 7.7 Analysis of the Effects of Contamination by a Creosote Plant on Property Values

*by Douglas S. Bible, PhD, Chengho Hsieh, PhD, Gary Joiner, PhD, Chuo-Hsuan Lee, PhD, and David W. Volentine, MAI*

This article originally appeared in the Winter 2005 issue of *The Appraisal Journal*.

### Abstract

This article examines how an environmental hazard affects home values. It uses a geographic information system to obtain the straight-line distance (in feet) from the nearest source of contamination to the homesite to measure how the pollution problem affects home values in terms of distance. In addition, this article examines how home values change before and after remediation efforts. The results confirm that homes closer to the problem area suffer a greater loss. Also, the revelation of a contamination problem decreases home values, while a cleanup of the contamination has the reverse effect.

This article examines how an environmental hazard affects home values based on both the revelation of a soil contamination problem and the distance from the home to the contaminated soil.

In this study, the source of the contamination is a former creosote plant site, Lincoln Creosote, located in the heart of Bossier City, Louisiana. ArcView Geographic Information System (GIS) software is used to measure distances in the analysis of property values, as well as to visually depict the contamination problems in a residential neighborhood. The results show that home values are affected by the environmental problem; specifically, the closer a home is to the polluted area, the lower its value. Also, home values are shown to decline after the revelation of the contamination problem, but recover after the remediation actions are completed.

### Literature Review

As the United States expanded westward after the Civil War, the demand for a method to preserve wood was born, especially for wooden piles and ties used by railroads, shipyards, and ports. Treatment of wood by creosoting became the most popular wood-preserving method in the United States, with the first creosoting plant being erected in 1865 by the Dighton and Somerset Railroad.[1] The Louisville and Nashville Railroad established a much larger plant in 1875 in West Pascagoula, Mississippi; the establishment of this plant is often considered the beginning of the modern wood preservation era. In 1927, 127,000,000 gallons of creosote were used to treat wood products in the United States, and in 1940 over 280,000,000 gallons of creosote were used.[2] Stirling[3] notes the environmental problems associated with the toxic chemicals used in the treatment process, especially those associated with the intentional and sometimes unintentional release of chemicals into the air and, most notably, into the soil.

Bible et al.[4] examine how the pollution problems of Lincoln Creosote affect home values. They use the dummy-variable approach to show that the neighborhoods closest to the plant site suffer an 8% loss in value compared to neighborhoods farther away. To more precisely measure how the pollution problem affects home value in terms of distance, the current paper uses the straight-line distance (in feet) from the nearest source of contamination to the homesite rather than a neighborhood dummy variable. In addition, this study examines how home values change between sales that occur before and after the revelation of a problem and before and after remediation efforts. Previous studies by Kohlhase[5] and Smolen[6] use regression models to examine the impact on price of

1. D. Stirling, "Environmental Liabilities of the Historic Wood Treating Industry in the United States," paper presented at the Society for Industrial Archeology Annual Meeting (Chicago, IL, June 1991), 1–11.

2. E. R. De Ong, *Chemistry and Uses of Pesticides*, 2nd ed. (New York, NY: Reinhold Publishing Corp., 1956).

3. Stirling.

4. Douglas S. Bible et al., "Environmental Effects on Residential Property Values Resulting from Contamination from a Creosote Plant Site," *Property Management* 20, no. 5 (2002): 383–391.

5. Janet Kohlhase, "The Impact of Toxic Waste Sites on Housing Values," *Journal of Urban Economics* 30 (1991): 1–26.

6. Gerald E. Smolen, Gary Moore, and Lawrence Conway, "Economic Effects of Hazardous Chemical and Proposed Radioactive Waste Landfills on Surrounding Real Estate Values," *Journal of Real Estate Research* 7, no. 3 (1992): 283–296.

**Douglas Bible, PhD,** is chair of the Department of Economics and Finance, chair of the Department of Accounting and Business Law, and the Oscar Cloyd Professor of Real Estate in the College of Business Administration at Louisiana State University in Shreveport, Louisiana.

**Chengho Hsieh, PhD,** is a professor of finance in the Department of Economics and Finance at Louisiana State University in Shreveport, Louisiana.

**Gary Joiner, PhD,** is an assistant professor in the Department of History and Social Science and director of The Red River Regional Studies Center in the College of Liberal Arts at Louisiana State University in Shreveport, Louisiana. He is also vice president and CEO of Precision Cartographics in Shreveport.

**Chuo-Hsuan Lee, PhD,** is an assistant professor in the Department of Accounting and Business Law at Louisiana State University in Shreveport, Louisiana.

**David W. Volentine, MAI,** is a real estate appraiser and consultant in the Shreveport–Bossier City area in Louisiana.

homes located near Superfund waste sites and hazardous waste landfills, respectively; their distance measures were in miles and tenths of a mile. A thorough analysis of the effects of gas station leaks on adjacent property by Simons, Bowen, and Sementelli[7] finds a 14%–16% negative effect in sale prices for residential properties sold after the gasoline contamination became known.

Weber[8] provides a detailed discussion of best practice with respect to the valuation of brownfield properties; Weber's article emphasizes the importance of choosing expert witness appraisers (in cases involving the effects of contamination on property values) who use theory that has been tested and valuation techniques that are generally accepted in the relevant scientific community. The results of the current study provide relevant information regarding the stigma effects upon property values using a previously validated theory and a generally accepted valuation model.

A recent article by Jackson and Bell[9] describes the importance of properly selecting and analyzing case studies when examining environmentally impacted properties. They provide a framework for appraisers to follow when valuing impacted properties; this framework emphasizes the importance of carefully selecting comparable properties (case studies) in the appraisal process, including factors such as contamination discharge, remediation lifecycle, and costs of cleanup. The study presented here is somewhat different in that rather than focus on a particular property (case), it examines the overall effect of an industrial contamination site on the average value of property sales in the residential neighborhoods in and around the source of contamination. The Louisiana study described here deals with over 500 homes and one major source of contamination and could be viewed as a case itself. This study could be compared to other similar situations in which residential homes are affected by creosote contamination (there are no similar sites in northwest Louisiana).

Anderson[10] uses a detrimental conditions matrix approach for analyzing environmental contamination. He discusses environmental contamination within the context of the detrimental conditions (DC) matrix approach, which considers the cost, use, and risk in assessing environmental property. One of the issues discussed under ongoing risk is the stigma effect. Anderson notes that within the risk context, other studies often use a multiple regression analysis (an extension of the sales comparison approach) to evaluate market resistance or stigma. The study presented here uses a similar approach (a multiple regression analysis) that considers property characteristics, environmental conditions (nearness to the source of pollution), and a time factor that considers the date of the announcement of a problem and the date of the cleanup.

## Background

A wood-treatment facility, Lincoln Creosote, operated in Bossier City, Louisiana, from 1935 to 1969. Since 1969, no substantial activities have occurred on the site. Wood products such as railroad ties and utility poles were pressure treated at the plant using creosote, chromated copper arsenate (CCA), pentachlorophenol (PCP), and polynuclear aromatic hydrocarbons (PAH) as wood preservatives.[11] The original wood-treating process area was located in the western portion of the plant, with untreated wood stored in the northeastern part of the area; treated wood was generally stored in the southern portion of the plant. In addition, a petroleum pumping station[12] was located in the southeast part of the wood-treating process area. The pumping station operated from 1946 to 1966.

The periodic release of hazardous substances that occurred as a result of chemical leaks and spills during the treatment processes resulted in the need for an investigation and remediation of the site. Both during the operation of the facility and after it closed in 1969 (before the cleanup in 1992), surface impoundments that were used to collect facility waste overflowed and resulted in the release of hazardous substances. Overflow from the surface impoundments migrated along drainage pathways and contaminated them with hazardous substances such as PCPs, CCAs, and PAHs. Some of these hazardous substances contaminated the soil in adjacent residential neighborhoods. When the plant closed in 1969, wood-treating wastes that contaminated the soil remained on the plant site. Figure 1 shows the original plant site (black area), the location of these hazardous substances (lightly shaded areas), and the locations of home sites sold (blackened squares).

## Site Actions

Because of concerns expressed by the local government, the Environmental Protection Agency (EPA) investigated the plant site in 1985 and concluded from soil samples that high concentrations of hazardous substances existed. In 1989, under the direction of the Louisiana Department of Environmental Quality (LDEQ), Joslyn (the owner and operator of the plant from the late 1950s until the time of closing in 1969)

---

7.  Robert A. Simons, William M. Bowen, and Arthur J. Sementelli, "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property," *The Appraisal Journal* (April 1999): 185–193.

8.  Bruce Weber, "A Beginning Best Practice Brownfield Valuation Model," *The Appraisal Journal* (January 2002): 60–75.

9.  Thomas Jackson and Randall Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 86–95.

10. Orell C. Anderson, "Environmental Contamination: An Analysis in the Context of the DC Matrix," *The Appraisal Journal* (July 2001): 322–332.

11. Much of this background discussion is derived from the United States Environmental Protection Agency paper entitled "Lincoln Creosote Proposed Plan of Action," September 15, 1997, available from the Louisiana Department of Environmental Quality, Baton Rouge, Louisiana.

12. This information is based on photographs taken during the 1950s.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Figure 1**        Original Plant Site

300    0    300  600 feet

Cartography by
Gary D. Joiner

investigated and found significantly elevated concentrations of hazardous substances (including arsenic) in the soil on the plant site.

Beginning in February 1990, the public generally became aware of these conditions as the local media began reporting on the environmental investigations.[13] Joslyn undertook a cleanup of the site in January 1992 at a cost of $10 million. This was done with the oversight of the LDEQ.

In March 1994, the EPA began planning additional sampling in surrounding neighborhoods. The results of the 1994 sampling revealed that 16 PAH compounds and PCP attributable to the wood-treating chemicals formerly used at Lincoln Creosote were present in soils and ditch sediments in a neighborhood near the plant. With EPA oversight, Joslyn undertook the cleanup of residential area between April 1996 and October 1996. Following this cleanup, the EPA concluded that no further remedial action was necessary to ensure protection of human health and the environment in the nearby neighborhood.

The offsite remedial action removed approximately 15,000 tons of contaminated soil from residential sites extending along Bardot Street, a street adjacent to and downgrade from plant site. From one to two feet of soil were removed from the yards of homes, while the soil under the homes (built on concrete slabs) and under driveways was left undisturbed.

The ArcView GIS software provides a clear visual demonstration of the contamination and the location of nearby homes and is also used to measure the exact distance from a home to the nearest contamination. Since this analysis focuses on the effects on value, only homes that have been sold are included. Figure 2 shows the location of all residential sales and the pollutant paths; Figure 3 shows the location of all buildings in the neighborhood including the residential sales and pollutant paths.

## Measuring the Effects of Contamination

A hedonic regression model is used to investigate the possible influence of being located near a source of pollution on the value of the homes. The dependent variable is the sale price adjusted by the appreciation of the price of homes in the metropolitan area (*ADJUSTED PRICE*).[14] The independent variables include the number of heated and cooled square feet (*SQUARE FEET*), the building age (*AGE OF HOME*), the number of bedrooms (*BEDROOMS*), number of baths (*BATHS*), whether or not a fireplace exists (*FIREPLACE*; value of 1 if it exists, 0 otherwise), the type of exterior (*EXTERIOR*; value of 1 if brick, 0 otherwise), the type of air conditioning and heating (*AIR CONDITION*; value of 1 if central, 0 otherwise), the type of foundation (*FOUNDATION*; value of 1 if slab, 0 if pier and beam), the type of

garage (*GARAGE TYPE*; value of 1 if garage, 0 if carport), the size of the garage (*GARAGE SIZE*) in terms of number of cars, and two district dummy variables. Based on this model, a time dummy variable and a distance variable are added depending on the sample examined.

Two samples are tested. Both samples use two district dummy variables to control for possible effects caused by the location of homes in a particular area. The home sales are identified by their location in District 1 (south of the railroad track that borders the plant site), District 2 (south of Douglas Street and north of the railroad tracks), and District 3 (north of Douglas Street). The houses in District 3 tend to be newer and more attractive than the houses in Districts 1 and 2. The houses in Districts 1 and 2 are similar in age and price (older and less expensive), but are clearly separated by the railroad tracks. District 1 and District 2 are used as dummy variables.

The first sample includes 507 homes sold between 1988 and 1998. In February 1990 the public became aware of the pollution problem. To estimate how this event affects home value, a dummy variable (*TIME*) is added to the basic model. The variable takes on the value of 1 for homes sold after February 1990 and the value of 0 otherwise. It is expected that holding other variables constant, homes sell at a lower price after the recognition of the contamination occurs.

The second sample includes 344 homes sold between February 1990 and October 1996. Again, February 1990 is when the pollution problem was revealed. October 1996 is the time when all the cleanup work, including the plant site and the surrounding residential area, is completed. Since the pollution problem is evident during this time, it is interesting to see how the distance to the contaminated area affects home value; therefore, a distance variable (*DISTANCE*) is added to the basic model. The variable is the linear distance in feet between the site location of the home sold and the location of the nearest contaminated soil as identified by the EPA. It is expected that the shorter the distance, the greater the adverse impact of contamination on house value. A dummy variable (*TIME*) is also added to the model. The variable takes on the value of 1 for homes sold after June 1992 and a value of 0 otherwise; June 1992 is the time when the cleanup for the plant site (not including the surrounding areas) was completed. Holding other variables constant, it is expected that this cleanup, albeit partial, should increase home value. An interaction variable, *INTDT*, is added to detect the possible joint effect of distance and time. A distance dummy variable is created that takes on the value of 1 if the distance from the home to the contaminated site is greater than the median of the variable *DISTANCE* and 0 otherwise. *INTDT* is equal to *TIME* times this distance dummy variable. The reason to use the distance dummy variable instead of the original distance

---

13.    For example, the February 11, 1990 edition of *The Times* contained an article entitled "Lincoln Creosote Site Toxins," providing results of testing by the LDEQ.

14.    This adjustment is designed to take into account the changing price of houses due to market factors in the area over the period 1988–1998. The index is developed by looking at the average annual price of houses sold through the multiple listing service from 1988 through 1998. The 1988 price is divided into each year's price (after 1988) to derive the yearly index. The sale price of houses is divided by the corresponding index.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Figure 2**     Residential Sales (1988–1998), and Pollutant Paths



**Figure 3**    All Neighborhood Buildings, Residentail Sales (1988–1998), and Pollutant Paths

Copyrighted material licensed by Randall Bell on April 26, 2021

variable (*DISTANCE*) is to reduce possible collinearity problems caused by the correlation between *INTDT* and *DISTANCE*. Also, an interaction variable, *INTDS*, is added to detect the possible joint effect of distance and home size in square feet. A home-size dummy variable is created which takes on the value of 1 if the home size is greater than the median of the variable *SQUARE FEET* and 0 otherwise. *INTDS* is equal to the distance dummy variable created above, times this home-size dummy variable. The reason to use the home-size dummy variable instead of the original home size variable (*SQUARE FEET*) is to reduce possible collinearity problems caused by the correlation between *INTDS* and *SQUARE FEET*.

## Results

### First Sample

The descriptive statistics and regression results for the first sample are shown in Tables 1 and 2. The time dummy variable has a coefficient of -4,823 with a *t*-value of -4.13, (significant at the 99% level). This indicates an average price reduction of about $4,800 (about 9.5% of the average home price) due to the revelation of the contamination problem. This may be seen as evidence of the stigma effect resulting from the revelation of the environmental problem. The number of square feet is positive and significant, the age of home is negative and significant, while the number of bedrooms, the fireplace, the air conditioning type, foundation type, garage size, and garage type are positive and significant; these results are as expected by theory and previous empirical evidence. The model does not appear to have a heteroscedasticity problem since the Chi-square value from the White's general heteroscedasticity test is 99.32 with a *p*-value of .3604. Also, the model does not appear to have a multicollinearity problem since the highest variance inflation factor (VIF) value is 3.49.

### Second Sample

The second sample consists of house sales from February 1990 through October 1996. The number of observations is 344. The simple statistics and regression results are shown in Tables 3 and 4. The distance variable has a coefficient of 4.48 with a *t*-value of 5.53 (significant at the 99% level); in other words, the price of a house is on average about $4.50 higher for every foot away from the contaminated site. The time dummy variable[15] has a coefficient of 2,663 and a *t*-value of 2.06 (significant at the 95% level), indicating that the houses sold after June 1992 (after plant site cleanup and the beginning of the offsite cleanup) sold for about $2,600, or 4% more. The two interaction variables are not significant. The regression results for other variables in the model are similar to those in the first test except for garage type and garage size. These two variables become insignificant. The model does not appear to have a heteroscedasticity problem since the Chi-square value from the White's general heteroscedasticity test

**Table 1**      Descriptive Statistics for 507 Home Sales (1988–1998)

| Variables | Mean | Std. Dev. | Minimum | Maximum |
|---|---|---|---|---|
| PRICE | $61,296 | $25,821 | $6,000 | $175,000 |
| ADJUSTED PRICE | $50,683 | $20,473 | $5,579 | $142,322 |
| SQUARE FEET | 1,552 | 506 | 750 | 3,969 |
| BEDROOMS | 3.09 | 0.63 | 2 | 6 |
| AGE OF HOME | 31.80 | 8.43 | 0 | 67 |
| BATHS | 1.63 | 0.61 | 1 | 4.5 |
| FIREPLACE | 0.31 | 0.46 | 0 | 1 |
| EXTERIOR | 0.12 | 0.33 | 0 | 1 |
| AIR CONDITION | 0.83 | 0.37 | 0 | 1 |
| FOUNDATION | 0.86 | 0.34 | 0 | 1 |
| GARAGE TYPE | 0.34 | 0.47 | 0 | 1 |
| GARAGE SIZE | 1.49 | 0.59 | 0 | 4 |
| TIME | 0.852 | 0.355 | 0 | 1 |
| District 1 | 0.1696 | 0.3757 | 0 | 1 |
| District 2 | 0.2248 | 0.4179 | 0 | 1 |

**Table 2**      Regression Results for 507 Home Sales (1988–1998)

| Variables | Parameter | | t-Value |
|---|---|---|---|
| INTERCEPT | 17,766 | | 4.65[a] |
| AGE OF HOME | -247 | | -3.90[a] |
| BEDROOMS | 1,535 | | 2.10[b] |
| BATHS | 1,744 | | 1.51 |
| FIREPLACE | 2,777 | | 2.77[a] |
| EXTERIOR | 2,370 | | 1.77 |
| AIR CONDITION | 4,446 | | 3.78[a] |
| FOUNDATION | 7,173 | | 4.10[a] |
| GARAGE SIZE | 1,745 | | 2.07[b] |
| GARAGE TYPE | 3,672 | | 3.75[a] |
| SQUARE FEET | 17 | | 12.40[a] |
| District 1 | -13,222 | | -9.97[a] |
| District 2 | -9,972 | | -6.00[a] |
| TIME | -4,823 | | -4.13[a] |
| **Source** | **DF** | **Sum of Squares** | **Mean Square** |
| Model | 13 | 1.75E11 | 13499983192 |
| Error | 493 | 36601290871 | 74271969 |
| Corrected total | 506 | 2.12E11 | |
| Root MSE: | 8616.38 | | |
| Dependent mean: | 50683 | | |
| Coeff. var.: | 17 | | |
| Adj. $R^2$: | 0.82 | | |
| F Value: | 181.84[a] | | |
| N: | 507 | | |

a   Significant at the 99% level
b   Significant at the 95% level
White's general heteroscedasticity test
Chi-square: 99.32
Pr > ChiSq: 0.3604
Highest VIF: 3.49

---

15.    The mean value of 0.85 for the time dummy variable (TIME) means that 85% of the houses were sold after 1990.

**Table 3** — Descriptive Statistics for 344 Home Sales (1990–1996)

| Variables | Mean | Std. Dev. | Minimum | Maximum |
|---|---|---|---|---|
| PRICE | $59,957 | $35,452 | $6,000 | $175,000 |
| ADJUSTED PRICE | $50,172 | $20,726 | $5,579 | $142,322 |
| SQUARE FEET | 1,564 | 527 | 750 | 3,969 |
| BEDROOMS | 3.08 | 0.62 | 2 | 6 |
| AGE OF HOME | 31.995 | 7.94 | 25 | 80 |
| BATHS | 1.64 | 0.63 | 1 | 4.5 |
| FIREPLACE | 0.31 | 0.46 | 0 | 1 |
| EXTERIOR | 0.119 | 0.32 | 0 | 1 |
| AIR CONDITION | 0.84 | 0.36 | 0 | 1 |
| FOUNDATION | 0.86 | 0.33 | 0 | 1 |
| GARAGE TYPE | 0.35 | 0.47 | 0 | 10 |
| GARAGE SIZE | 1.49 | 0.6 | 0 | 4 |
| District 1 | 0.1744 | 0.38 | 0 | 1 |
| District 2 | 0.2180 | 0.4135 | 0 | 1 |
| TIME | 0.74 | 4.35 | 0 | 1 |
| DISTANCE | 1,625 | 1,244 | 1 | 5,176 |
| INTDT | 0.375 | 0.485 | 0 | 1 |
| INTDS | 0.355 | 0.479 | 0 | 1 |

**Table 4** — Regression Results for 344 Home Sales (1990–1996)

| Variables | Parameter | | | t-Value |
|---|---|---|---|---|
| INTERCEPT | 5,627 | | | 1.20 |
| AGE OF HOME | -149 | | | -1.96[b] |
| BEDROOMS | 2,734 | | | 3.12[a] |
| BATHS | 1,164 | | | 0.88 |
| FIREPLACE | 2,601 | | | 2.22[b] |
| EXTERIOR | 1,538 | | | 1.03 |
| AIR CONDITION | 4,177 | | | 3.05[a] |
| FOUNDATION | 6,193 | | | 3.10[a] |
| GARAGE SIZE | -481 | | | -0.5 |
| GARAGE TYPE | 1,261 | | | 1.11 |
| SQUARE FEET | 14.7 | | | 9.15[a] |
| DISTANCE | 4.48 | | | 5.53[a] |
| District 1 | -11,827 | | | -7.82[a] |
| District 2 | -4,318 | | | -2.19[b] |
| TIME | 2,663 | | | 2.06[b] |
| INTDT | -1,314 | | | -0.85 |
| INTDS | 1,753 | | | 1.12 |
| **Source** | **DF** | **Sum of Squares** | **Mean Square** | |
| Model | 16 | 1.26E11 | 7897164494 | |
| Error | 327 | 20992610399 | 64197585 | |
| Corrected total | 343 | 1.47E11 | | |
| Root MSE: | 8012 | | | |
| Dependent mean: | 50172 | | | |
| Coeff. var.: | 15.97 | | | |
| Adj. $R^2$: | 0.85 | | | |
| F Value: | 123.01[a] | | | |
| N: | 344 | | | |

a   Significant at the 99% level
b   Significant at the 95% level
White's general heteroscedasticity test
Chi-square: 101.17
Pr > ChiSq: 0.98
Highest VIF: 5.41

is 101.17 with a *p*-value of .98. Also, the model does not appear to have a severe multicollinearity problem since the highest variance inflation factor (VIF) value is 5.42.

## Conclusion

This article uses a specific case, Lincoln Creosote, to show that a major event in a neighborhood may affect home values. Specifically, the revelation of a soil contamination problem decreases home values, while completing a cleanup of the contamination has the reverse effect. The implication of these results for appraisers is that the possible effects of contamination on home values must be carefully considered, especially with respect to the time the contamination becomes known and the time the cleanup, if any, is completed. Using the modeling process demonstrated here may provide the appraiser with important information. Also, this paper demonstrates that GIS techniques can provide informative and interesting maps that clearly depict the location of houses with respect to sources of contamination, and calculate the distance between the house and the contamination area.

This study indicates that revelation of the contamination problem reduces, on average, house values by $4,800 (approximately 9.5% of the average house price), an important source of information that may be used in the comparable sales process to adjust for differences in the time of the sale. This type of information may be valuable to appraisers involved in the valuation of houses affected by contamination problems, especially in cases where a class action lawsuit is being pursued. In addition, an appraiser may find it especially useful to know the change in value (due to increased distance from the source of contamination) when making adjustments to comparable sales.

The article also provides insight into how appraisers can examine the effect of other events (such as a nearby change in land use) on home values in terms of timing and distance.

### Additional Reading

Jackson, Thomas O. "The Effect of Previous Environmental Contamination on Industrial Real Estate Prices." *The Appraisal Journal* (April 2001): 200–210.

Kinnard, William N., Mary Beth Geckler and J. K. Geckler. "Are Residential Property Values Affected by Proximity to Alleged Hazards to Human Safety?" *Journal of Property Tax Management* (Fall 1995): 1–20.

Robinson, Rudy R., Scott Lucas, and Garland Rasberry. "Watersbend: Appraising a Brownfield Redevelopment Project." *The Appraisal Journal* (July 2002): 309–317.

Roddewig, Richard. "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries." *The Appraisal Journal* (October 1996): 375–387.

*Copyrighted material licensed by Randall Bell on April 26, 2021*

## 7.8 Estimating Proximate Property Damage From PCB Contamination in a Rural Market: A Multiple Techniques Approach

*by Robert A. Simons, PhD*

This article originally appeared in the October 2002 issue of *The Appraisal Journal*.

### Abstract

Ideally, when there is an environmental condition that affects property values, there is sufficient sales data to estimate a regression model to determine losses to the real estate. In some cases, however, data on sales is not available due to inadequate record keeping or thin sales volume. In these cases damages still need to be assessed. What combination of next-best techniques can be used? Multiple listing service (MLS) data can be helpful in providing trend data on sales by submarket and sale/list price analysis. Contingent valuation analysis of prospective buyers can also provide guidance.

When environmental damages occur, theory is available to guide the appraiser or real estate expert in determining the extent of damages to property values. The issue of measurement, however, can become difficult when information is hard to obtain. Ideally, when there is an environmental condition that affects property values, there is sufficient sales data to estimate a regression model to determine losses to the real estate. Sometimes though, data on sales is not available due to a lack of computerized record keeping on thin markets. In such cases damages still need to be assessed. This article addresses the question: What combination of next-best techniques can be used?

In addition to multiple listing service (MLS) data, evidence obtained from market participants can be helpful in providing trend data on sales by submarket. Sale/resale analysis, analysis of transaction rates, and sales/list price ratio analysis may also assist the analyst in forming an opinion. A type of market survey known as contingent valuation analysis (CVA) of prospective buyers can also provide guidance. While individually none of these techniques can provide conclusive evidence, together they can guide the analyst to a reasonable and supportable conclusion. In combination, the set of results can compel the reader to accept the conclusion that value loss has occurred.

The purpose of this research is to set forth a procedure for analyzing property value loss attributable to environmental contamination in real estate markets with limited data, a situation that is typical in many rural areas. A hierarchy of analytical techniques is presented, with an emphasis on using two or more moderately rigorous techniques instead of one strong one. Preferably the results are consistent (although not necessarily identical), allowing the analyst to reach a conclusion linking the offending source to the property value loss in a way that satisfies generally accepted tenets of causality. These tenets include having a theoretical basis for expecting a value loss, observing that the polluting event occurred prior to the reduction in value, and holding other possible sources of value loss constant in the analysis.

The use of alternative analytical techniques is illustrated with a case study of environmental contamination in Anniston, Alabama. Polychlorinated biphenyls (PCBs), carcinogenic substances often found in transformer fluids and other selected industrial applications, had been manufactured in a plant run by the Monsanto Corporation for many years, and they had been released over several decades, both in the air and through surface water runoff. These releases and the storage of PCB-laden substances in an above-ground landfill, the company buyout of an adjacent neighborhood to extend the industrial property boundary (and avoid residential cleanup costs), and the presence of Environmental Protection Agency (EPA) maps meant that information about PCB contamination was well known. This matter led to litigation, and this study was prepared to determine damages to one property (a named plaintiff) in a group of properties within a mile east of the plant.

### Brief Review of Environmental Damages Literature

Proximity to or the presence of environmental disamenities such as petroleum damages, PCBs, and/or releases from industrial plants can readily be analyzed in the context of economic behavior. Economic theory

**Robert A. Simons, PhD,** is a professor and the Director of the Master of Urban Planning, Design and Development Program at the Levin College of Urban Affairs at Cleveland State University (CSU) in Cleveland, Ohio. He teaches courses in real estate development, market analysis and finance, PhD research methods, public economics, and environmental finance. He is also the faculty advisor for the Certificate Program in Real Estate Development and Finance, which is offered in conjunction with the Nance College of Business at CSU. Simons received his PhD from the University of North Carolina (UNC) at Chapel Hill in City and Regional Planning, with an emphasis in real estate. He holds a master's degree in regional planning and in economics, both from the UNC. His undergraduate degree in anthropology was earned at Colorado State University. Simons has published over 40 articles and book chapters on real estate, urban redevelopment, environmental damages, housing policy and brownfields redevelopment. He authored a book entitled *Turning Brownfields into Greenbacks*, published by Urban Land Institute. Simons has an active consulting practice, and has served as an expert witness in matters related to real estate and environmental damages. He has been a member of the American Institute of Certified Planners (AICP) since 1983.

tells us that, all else being equal, buyers would avoid purchasing a property believed to be contaminated or close to a dangerous facility because of potential health risks, difficulty in reselling the property, uncertainty, nuisance associated with environmental damages, potential for recurrence of the release, and stigma. Therefore, properties affected by environmental problems are expected to sell for a discounted price compared with clean properties. In some cases, transaction rates may also be affected. Problems may be considered so severe that no buyers would bid on such a contaminated property. In this case, the property would be considered to have virtually no asset value and would be useful to the owner only as housing services, either for themselves or potential renters. If those services were accompanied by a severe health risk, the property would have almost no value at all, except to store such items as cars or boats.

The peer-reviewed literature contains numerous studies that quantify the effects of environmental contamination of various types on property values. Representative studies using hedonic regression analysis, which explains the components of sale price and is discussed in more detail later in this article, include Superfund sites, operating petroleum refineries, landfills, and pipeline ruptures.[1] These environmentally undesirable facilities have been shown to reduce the value of residential property one mile or more away from them, with negative effects being higher close to the undesirable land use. These studies are based on actual sales transactions. In particular, values of properties proximate to landfills have been shown to decline by up to about 10% when they are within one mile of a landfill. Regression analysis has also been used to study the effects of leaking underground storage tanks on property values.[2] Notably, there is no empirical evidence in the literature on the effects of PCB contamination on real property.

In theory, properties can experience a loss in value without being sold. In addition to the reduction in the sale prices of those properties that make it to the transaction stage, owners of property perceived to be threatened with contamination or actually contaminated may also experience difficulty in selling the property due to delayed or failed transactions. Potential buyers may also face difficulty in getting financing for contaminated property. The peer-reviewed literature indicates

several ways that property owners experience a loss in value without a sale.[3] These include loss of commonly held property rights such as the right to enjoy and the ability to dispose of a property. This last item implies an unrealized capital loss because homeowners are unable to access capital tied up in their residential asset. Because of the present value of funds received, delay of sale is itself a modest loss. Finally, properties believed to be contaminated because they are in proximity to contaminated property, or have not had environmental tests performed, or for other reasons may experience stigma, especially before they are remediated. The price reduction can be exacerbated if contamination is not well documented if there is a large amount of adverse publicity, or, if the responsible parties have not offered to indemnify impacted parties.[4]

While it is widely acknowledged that the value discount for contaminated property can be substantial, there is no available direct evidence in the peer-review literature of the effect of PCBs on property value. Therefore, it is best to rely on a more general market survey study of contaminative sources and property values. Such a study was conducted by Paul Syms in the United Kingdom. It found that contamination from high-hazard substances would reduce property values by 58% prior to remediation, declining to 15% postremediation. Losses from very high-hazard substances would be 90% preremediation, and 54% postremediation.[5] PCBs and some of the other compounds that appear to have been released into the environment would be considered hazardous substances, and the discount that real estate participants place on properties affected by them in the marketplace can be expected to fall within the ranges described above.

Potential for a future occurrence, in and of itself, can have a negative effect on property value. In a study evaluating the effects of a 1993 pipeline rupture in Reston, Virginia, on noncontaminated, easement-holding residential property in Fairfax County, it was found that properties within two miles of the pipeline rupture sold for about 5% less than comparable properties off the pipeline.[6] Other residential property farther away but in the same county sold for about 2% less. These losses were due primarily to the potential for a recurrence of the contaminating event. This experience is relevant to

1. Patrick Flower and Wade Ragas, "The Effects of Refineries on Neighborhood Property Values," *Journal of Real Estate Research* (9:3, 1994): 319–338; Katherine Kiel, "Measuring the Effect of the Discovery and Cleaning of Identified Hazardous Waste Sites on House Values," *Land Economics* (November 1995): 428–435; J. Kohlhase, "The Impact of Toxic Waste Sites on Housing Values," *Journal of Urban Economics* (30, 1991): 1–26; Arthur Nelson, J. Genereux, and M. Genereux, "House Price Effects of Landfills," *Land Economics* (68: 4): 359–365; Alan Reichert, "The Persistence of Contamination Effects: A Superfund Site Revisited," *The Appraisal Journal* (July 1999): 126–135; Robert A. Simons, "The Effects of Oil Pipeine Ruptures on Non-Contaminated Easement-Holding Property," *The Appraisal Journal* (July 1999): 255–263; and Robert A. Simons, Kimberly Winson-Geideman, and Brian Mikelbank, "The Effects of an Oil Pipeline Rupture on Single Family House Prices," *The Appraisal Journal* (October 2001): 410–418.

2. Robert A. Simons, William Bowen, and Arthur Sementelli, "The Effect of Leaking Underground Storage Tanks on Residential Sales Price," *Journal of Real Estate Research* (14: 1/2 1997): 29–43; and Robert A. Simons, William Bowen, and Arthur Sementelli, "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property," *The Appraisal Journal* (April 1999): 186–194.

3. Robert A. Simons, Bowen and Sementelli, April 1999, *Ibid*.

4. Richard Roddewig, "Classifying the Level of Risk and Stigma Affecting Contaminated Property," *The Appraisal Journal* (January 1999): 98–102.

5. Paul Syms, "Perceptions of Risk in the Valuation of Contaminate Land," *Journal of Property, Valuation and Investment* (UK, 15: 1): 27–39. See table on page 32.

6. Simons. July 1999, *Ibid*.

Copyrighted material licensed by Randall Bell on April 26, 2021

the case study example because of the history of repeated releases from the Monsanto facility coupled with the fact that the plant remains open and continues to operate.

## Ideal Data Collection and Analysis

Ideally, hedonic regression provides the best quality results in determining the effects of environmental contamination on property values. Hedonic regression is a form of multiple regression analysis that is a popular and well-accepted technique that has been widely discussed in the literature. (See earlier citations.) It always provides a measure of sale price (the dependent variable) explained by its component parts of value (i.e., unit, lot, and neighborhood characteristics and other independent variables). The unit of analysis is the individual sale. If done correctly, hedonic regression and closely related techniques can provide evidence supportive of a causal relationship between contamination and property value diminution. Causality requires three main components. The first is a theoretical basis for expecting an effect (people consider contamination a "bad" thing and either avoid the property or offer a discounted bid). The second is a pretemporal relationship between the contamination and the property value effects (the contamination predates the loss in value). The third factor is that other alternative explanations of property value reduction are controlled for (e.g., ideally in a statistical model). This third factor is generally the hardest to attain. Hedonic regression does this better than other techniques because other variables can be statistically controlled for in the model, as opposed to being assumed to have no effect.

However, data collection for hedonic regression analysis is demanding. In general, the analyst needs about 10 observations per independent variable. If, for example, 30 independent variables were used, at least 300 sales observations with complete data in the data set would be needed. If a model were constructed with fewer independent variables, then fewer sales might be needed. Although the actual number of impacted sales and overall sales is a function of the quality of the data and particulars of the case, it has been the author's experience that the analyst would need a minimum of several hundred unaffected sales of the same land use type in the county or market area where the event occurred. Further, a minimum of 15 or more sales affected by the contamination is also desirable. In cases where the environmental effect is strong and pronounced, the analyst can sometimes use fewer contaminated sales, but findings of statistical significance are then typically hard to obtain. The irony is that often knowledge of a contamination event can reduce sales, making it harder to get enough sales to use this technique.

However, not all market areas have enough sales data of sufficiently good quality to conduct regression analysis. The information needed generally includes sale amount and date; building square footage; lot size; number of bedrooms, bathrooms, and fireplaces; garage capacity; building quality and age; etc. Usually this data is available from the county property tax as-

sessor, or through a data vendor that bases the information on the county assessor data. To these property attributes can be added neighborhood variables such as median income in the census tract, or other factors typically from U.S. Census sources. Missing data can be problematic, as these observations must be discarded or missing fields must be filled with estimated values. Most urban areas have enough good quality data for regression analysis; some urban areas and many rural areas do not. Holding aside the issue of a sufficient number of sales, missing fields can often render the data unusable for regression analysis.

## Next-Best Options
### Best Available Data (BAD data)

Given insufficient and incomplete sales data, what can the analyst do? Get the best available data (BAD). BAD data is good. This data might include statistical techniques familiar to REALTORS© and appraisers such as market area trend analysis, considering evidence obtained from market participants, use of list/sale price ratios, sale/resale analysis, and market surveys of potential buyers. These techniques should be used in combination to ensure results are consistent. Not all these techniques are based on revealed preferences (sale price). Some focus on both sides of the market: market trends analysis and sale/resale analysis. Others address only the seller side of the market (sale/list price ratios), or the buyer side of the market (e.g., the market survey technique of contingent valuation analysis, or CVA). Each technique has strengths and weaknesses that are addressed in the following paragraphs.

### Market Area Trend Analysis

Market area trend analysis is a technique that studies the neighborhood where the contamination occurs and compares some measure of average appreciation rates and/or sales volume to a larger market or to another similar, but uncontaminated market area. The positive side of this technique is that there is almost always data available in some form and that sales trends over time may be available. The analysis is based on sale price, which is a revealed preference. Because this technique uses REALTORS© MLS data, it is virtually assured that transactions are fair sales. The main validity threat from this technique is aggregation bias (the masking of effects by a larger data analysis unit) because the unit of analysis is the affected area or submarket, not the individual sale. Also, defining the area affected by contamination as part of a larger market involves some judgment and is usually limited by some arbitrary submarket area definition. Any average sale figures are also subject to anomalies (outliers, large lots, etc.) and therefore may need to be adjusted. Some markets may also experience a small number of sales, thus making use of averages and other statistics that measure central tendency somewhat tenuous. Under these circumstances it is not typical to test means for statistical significance. However, it may be desirable to do so, especially if this is the most rigorous technique avail-

able to the researcher, and if the case is being prepared for litigation. The main problem with this technique is that it does not hold all other potential determinants of sale price constant, so it needs to be used in conjunction with other techniques.

As a practical matter, the analyst's challenge is finding the appropriate measure (e.g., average sale price), and holding constant other factors that may affect property values (e.g., employment trends, other sources of contamination). Adjustments also need to be made for the effects of time, appreciation, and inflation. The correct way to measure loss is to compare the affected area's average property price with the average property price in the control area or larger market area. This should be determined for the before and after dates. The percent difference, if it can be attributed to the contamination source(s), is the loss in value. Results should be compounded over time from the baseline period (the release event or statute of limitations) forward to the current period.

## Sale/Resale Analysis

Sale/resale analysis (sometimes called paired sale analysis) is another technique that requires one property to be sold twice, with the environmental event occurring during the period between the sales. The analyst must also control for physical changes to the property (e.g., new square footage) and for inflationary changes over time. As a practical matter, very few properties meet this technique's criteria. For example, it might not be possible to obtain information on sales for environmental releases over a long period of time that took place before the contamination was initiated. Further, statistical significance is usually hard to establish due to small sample size.[7]

## Transaction Rates Analysis

It is not unusual for environmental contamination to reduce or delay the number of property sales in an affected area. This phenomenon makes it more difficult to gather sales for hedonic regression analysis. Reduced transaction activity may apply to long-term, sustained contamination situations and also to short-term events following an abrupt release of contaminants. In these cases, the environmental situation may cause a reduction in the number of sales in a given period. This delay in sales is a form of property value loss because of the present value of money. There is also an associated loss of liquidity whereby the owner is unable to access capital tied up in real property. A good measure of reduced sales activity is to compare transaction rates between affected (case) and unaffected (control group) properties, either from MLS data or county tax records. Difference of means tests or a similar technique can be applied in many cases to generate a statement concerning the statistical significance of the results.

Another measure of delayed transaction rates is to examine the average number of days on the market from MLS records for both environmentally compro-

mised properties and a control group of properties unaffected by contamination. This data is often complex to use correctly because listing contracts expire and then are reinstated later, sometimes with other companies. Even harder to obtain is data concerning sales that fell through during the negotiation phase or mortgage defaults. Thus, the potential for error is moderate. Nevertheless, in the absence of other information, the average number of days on the market can be another tool in estimating the property-related effects of contamination.

## Sale/List Price Analysis

When availability of data is sparse, sale/list price analysis may be a helpful tool. This technique uses only MLS data and cannot be applied to for-sale-by-owner properties. Also, there is very little about this technique that has been published in peer-reviewed journals, especially in the context of environmental contamination cases. The analyst should look at the final sale price of a property and also at its original listing price. The ratio of these two figures reflects the discount from the original price, in percent. This discount might vary by market area and might also experience annual fluctuation cycles. A typical example would be a sale price of $93,000 on an original list price of $100,000, for a sale/list price ratio of 0.93. In theory, sellers of property perceived to be contaminated may often not know or not acknowledge this fact or how it would affect sale price. Contaminated sites should have a deeper discount, a reality check on how sellers behave when confronted with reluctant buyers. The uncontaminated properties should have a smaller discount. The difference between prices paid for properties in contaminated areas and those paid for properties in uncontaminated areas is the additional discount. This is a seller-based data point. The concern regarding statistical significance mentioned above also pertains to this technique.

# Market Surveys of Potential Buyers Using Contingent Valuation Analysis (CVA)

The techniques discussed so far are either revealed preferences (arm's-length, market clearing sales) or measures of seller-side issues, such as the sale/list price ratio. Purely buyer-side data on preferences regarding property attributes and characteristics has not yet been addressed. This type of information is usually easy to obtain, but it does require primary data collection because it is not found in the public records. It also reflects stated preferences (e.g., prospective buyers state what they would do, not what they have actually done). Thus, using common statistics like averages may be systematically different from revealed outcomes, and the difference may not be random.

Contingent valuation analysis (CVA) is a form of market buyer survey. It asks what buyers would do under certain specific circumstances and asks them to price features or characteristics of housing (or other)

---

7.    Simons, Bowen and Sementelli, April 1999, *Ibid.*

Copyrighted material licensed by Randall Bell on April 26, 2021

land use types. A brief overview of CVA in the context of formal research methods in appraisal is available.[8] Two articles pertaining to CVA and its use in real estate contamination cases have been published recently in *The Appraisal Journal* and *Journal of Real Estate Practice and Education*.[9] These articles describe key pitfalls to be avoided in implementing CVA and several alternative forms of the survey. In general, CVA surveys should be as explicit as possible and non-biased with respect to steering the respondent toward one outcome or another. More traditional and recent applications of CVA pertain to willingness to pay for goods that cannot easily be priced such as the value of forgone benefits derived from being unable to visit polluted recreational sites.

Market surveys of buyer intentions with complete information with a random or stratified random sample should be intended to replicate buyer intentions in the market area. Telephone calls are often the way data is collected, although focus groups have also been used. The approach is to ask general questions about homeownership decisions, and the price respondents might pay for an uncontaminated house. The interviewer then goes into several detailed scenarios of contamination and asks for bid prices. The survey concludes with a demographic section. If the survey is done properly the respondent will not know the focus of the survey. Because not all respondents will bid, the CVA gives an estimate of decrease in market demand. Also, the ratio of bid prices to the prices the respondents indicated they would pay for uncontaminated houses provides the discount for the contamination.

Because some bids are of the "bottomfisher" variety, they would be of little value to a seller of a contaminated property. Bids near the top of the market (nearing full value), on the other hand, would get the attention of the seller. In other words, the marginal buyer at the top of the market would win the bid. Looking at the percentage who bid at all and also at the discounted percentages gives a buyer-side estimate of the market with complete information. Usually, this discount would be larger than for a revealed preference (regression-type) study because the bids are prenegotiation and have complete information, which is not always the case in housing market transactions. In other words, CVA has value to the analyst, but property value discount outcomes typically need to be adjusted downward from the average figures. Benchmarking CVA to regression or other revealed outcome studies is one approach that would be a fruitful area for future research.

## Reconciliation of Loss Estimates

Finally, there is the reconciliation aspect of the study with the determination of diminution of value. Unlike the appraiser with the three approaches to value, a real estate economist need not choose one dominant approach and has more flexibility. Also, a real estate economist may not necessarily talk directly to market participants (although in some cases using this information might also be a corroborative technique) but may glean results from secondary data and market outcomes. In fact, in some cases, direct communication with market participants can be upsetting to the respondents, or the respondents' best interests may be served by obfuscating factually accurate details.

Regression analysis generates a high level of support for the three pillars of causality (theory, pretemporal occurrence, and holding alternative reasons constant), because it holds many important variables in the analysis constant. However, most other techniques cannot individually satisfy all three conditions. This is primarily because they compare mean values (i.e., average sale prices for both impacted and nonimpacted groups), which do not necessarily hold constant other factors that may contribute to value loss and result in a lower sale price. The validity of the results of these techniques can be strengthened if the different means are compared statistically (i.e., with a difference of means test or another technique), if appropriate. Still, the opinion is best supported if several different techniques generate similar findings. It is not expected that all techniques give the same result. In fact they would not be expected to produce similar results if different parts of the market (e.g., buyer's side, seller's side, market clearing sale) are being evaluated. If this occurs, the analyst can compare the techniques and take a reasonable measure of centrality among the property loss estimates.

## Case Study of Anniston, Alabama

The example provided below shows how this multi-technique approach was used in a PCB contamination case in Alabama.

### Background Information

Anniston, Alabama, is the seat of Calhoun County (population about 125,000), and is located roughly halfway between Birmingham, Alabama, and Atlanta, Georgia. It is one of very few places in the U.S. where PCBs were manufactured and where the Monsanto plant had been making them for decades. The site currently occupies about 50 acres, plus an above-ground landfill storage of PCBs. The Monsanto plant has stopped producing PCBs but is still open and now produces precursors to pesticides.

Information about the PCB contamination in Anniston has been widely publicized in the local press and in Environmental Protection Agency (EPA) reports for

8.    Marcus T. Allen and Grant Austin, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–399.

9.    David G. McLean and Bill Mundy, "Addition of Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property," *Journal of Real Estate Practice and Education* (1: 1): 1–19; and Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July, 1998): 290–297.

about 10 years. Extensive contamination testing data is also available. These studies show that PCBs have traveled off site in the air and by surface water. The neighborhood just east of the plant, the subject neighborhood, used to contain about 80 homes and was largely acquired by a company related to the Monsanto plant over the past five years. The baseline period for analysis is 1994–1995, when publicity about the PCB releases from the plant became most intense and just before the firm's property purchase program was initiated.

The assignment was to evaluate the effect of continued releases from the plant on both a single subject property at the edge of the buyout area and also on its surrounding neighborhood just east of the plant. The street the subject property is located on overlooks a small park and has the potential to be quite pleasant. Fenced-off areas extend up to the block of the subject property, including up to the backyard of the subject. Several commercial businesses in the neighborhood

were also fenced off and abandoned. The house adjacent to the subject property was abandoned and other signs of blight were evident on the subject's street. The area appeared to be suffering from substantial lack of updating and investment. The subject property is one of about 35 PCB soil sampling sites. The subject property showed 13.7 mg/kg of PCBs, the highest category and over the EPA action limit of 10.0mg/kg.[10] Other sites in the area were also sampled, and many showed the presence of PCBs. Public documents containing these facts would be available to potential real estate market participants.

## Real Estate Market Trends Analysis

MLS data from Calhoun County from 1991–2000, inclusive, were used in this analysis and are presented in Table 1 and Figure 1. The focus is on the West Anniston submarket, which contains the Monsanto plant and the subject property. This area is compared to the overall county market. The Monsanto plant is the polluting site closest to the subject property. With the publicity

**Table 1**  Housing Trends in Metropolitan Anniston, Alabama

| Housing Market Analysis Metro Anniston, Alabama | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Total # Sold | Sold Volume | % Change | Av. Sale Price | % Change | Med. Sold Price | % Change | Average Days on Market |
| 1991 | 556 | $34,411,170 | | $61,891 | | $55,650 | | 140 |
| 1992 | 765 | $53,172,064 | 54.52% | $69,506 | 12.30% | $63,500 | 14.11% | 147 |
| 1993 | 801 | $55,560,599 | 4.49% | $69,364 | -0.20% | $65,000 | 2.36% | 149 |
| 1994 | 869 | $64,436,490 | 15.98% | $74,150 | 6.90% | $67,000 | 3.08% | 162 |
| 1995 | 792 | $59,593,703 | -7.52% | $75,245 | 1.48% | $65,500 | -2.24% | 183 |
| 1996 | 814 | $71,277,207 | 19.61% | $80,087 | 6.43% | $70,800 | 8.09% | 147 |
| 1997 | 827 | $69,098,614 | -3.06% | $83,553 | 4.33% | $73,500 | 3.81% | 135 |
| 1998 | 940 | $83,656,562 | 21.07% | $88,996 | 6.51% | $78,000 | 6.12% | 140 |
| 1999 | 1032 | $94,420,471 | 12.87% | $91,493 | 2.81% | $78,950 | 1.22% | 140 |
| 2000 | 1059 | $99,933,640 | 5.84% | $94,360 | 3.13% | NA | NA | 145 |
| West Anniston | | | | | | | | |
| 1991 | 17 | $386,501 | | $22,735 | | $20,000 | | 150 |
| 1992 | 23 | $550,058 | 42.32% | $23,916 | 5.19% | $22,000 | 10.00% | 128 |
| 1993 | 17 | $443,695 | -19.34% | $26,100 | 9.13% | $24,000 | 9.09% | 200 |
| 1994 | 16 | $437,169 | -1.47% | $27,323 | 4.69% | $22,750 | -5.21% | 187 |
| 1995 | 15 | $296,019 | -32.29% | $19,735 | -27.77% | $19,900 | -12.53% | 220 |
| 1996 | 29 | $565,900 | 91.17% | $19,514 | -1.12% | $17,900 | -10.05% | 173 |
| 1997 | 16 | $385,092 | -31.95% | $24,068 | 23.34% | $24,400 | 36.31% | 177 |
| 1998 | 19 | $406,761 | 5.63% | $21,408 | -11.05% | $25,000 | 2.46% | 140 |
| 1999 | 24 | $439,272 | 7.99% | $18,303 | -14.50% | $17,873 | -28.51% | 162 |
| 2000 | 33 | $636,585 | 44.92% | $19,290 | 5.39% | NA | NA | 145 |
| **Averages** | **1994** | **2000** | **Change** | | | **Loss/Gain/1994 Base** | | **Loss/Gain/2000 Base** |
| Overall | $74,150 | $94,360 | $20,210 | | | 27% | | 21% |
| WA actual | $27,323 | $19,290 | -$8,033 | | | -29% | | -42% |
| WA trend | $27,323 | $34,770 | -$15,480 | | | -57% | | -45% |
| **Averages** | **1994** | **1999/2000** | **Change** | | | **Loss/Gain/1994/1995** | | **Loss/Gain/2000 Base** |
| Within MIA | $19,540 | $9,468 | -$10,072 | | | -52% | | -106% |
| Outside MIA | $23,804 | $23,078 | -$726 | | | -3% | | -3% |
| Ratio: in MIA/outside | 82% | | 41% | | | -50% | | |

Source: MLS, RS&A, Inc.

10.    United States Environmental Protection Agency. *SESD Surface Soil Sampling* (1998). Project number 99-0547. Solutia, Inc., Anniston, Alabama, Figure 1: Map of Sample Locations and Test Results.

Copyrighted material licensed by Randall Bell on April 26, 2021



**Figure 1**        Residential Trends for the West Anniston Market

Residential MLS sales trends for Calhoun County, Alabama, from 1991 to 2000. Average sales prices, by subarea

Non-MIA sales

Sales trend for W. Anniston area

Loss dominated by effects from Monsanto PCBs

Actual sales trend for W. Anniston area

MIA sales

◆ Anniston W Av. sales price        ✕ Overall Av. sales price
■ Jville Av. sales price            ✳ O'All Ex. AW & CW
▲ Oxford Av. sales price

and purchase program, it exerts most of the downward price pressure on sales in the West Anniston submarket. Between 1994 (a baseline year) and 2000, the overall Calhoun County average residential sale price went up from $74,150 to $94,360, an increase of slightly more than $20,200, or 27%. Over the same period, the West Anniston submarket's average residential sale price went down, from $27,300 to $19,300, a decrease of $8,000, or 29%. If the West Anniston submarket had appreciated in the same trend as the overall Calhoun County market since 1994, the average West Anniston property would have been worth $34,800 in 2000. This is equivalent to using the market appreciation rate to take the 1994 base year to current (Year 2000) dollars. The total decrease since 1994, considering appreciation in the overall Calhoun County market, less the average sale price in 2000, was $15,500, a loss of 45% in the West

Anniston submarket. Figure 1 shows this same information as well as how the loss figures were calculated.

The next step was to define an area of influence within the West Anniston submarket, which was directly related to the polluting entity. This is referred to as the Monsanto Impact Area (MIA). To gauge change over time, sales in a baseline period were compared to sales in a recent period, and the change in value was then further compared to West Anniston submarket trends. Figure 2 shows a map of the study area and key features of the analysis.

In 1994 and 1995, five sales took place in the areas surrounding the residences of the potential plaintiffs' neighborhood and proximate to the Monsanto plant. All of the sales were near the subject property. Their average sale price was $19,500. During the same two-year period, there were 41 sales in West Anniston outside the impact area, and their average sale price was $23,800. Thus, in 1994 and 1995, the average sale price within the MIA was 82% of the average sale price of the transactions in West Anniston outside the impact area.

By 1999 and 2000, 11 sales took place inside the MIA proximate to the plant, generally near the perimeter of the plaintiffs' area. The average sale price of these sales was about $9,400. During the same period there were 54 nonimpacted property sales in West Anniston, and their average price was $23,100. Thus, in 1999 and 2000, the average sale price within the MIA had dropped to 41% of the average sale price of the transactions in West Anniston outside the impact area, a drop of 50%.

In other words, the local effects attributable to the Monsanto plant account for a drop in relative sale price that was 50% above and beyond the drop in the West Anniston/Calhoun County price reduction (the reduction from 82%–41%). Therefore, the estimated overall loss to properties in the West Anniston submarket inside the neighborhood populated by affected parties (the plaintiffs) impacted by the Monsanto Plant is 67.5% (a loss of 45%, plus a loss of half of 45% [22.5%] equals an overall loss of 67.5%). Because this figure is based in part on a lower appreciation rate in the overall West Anniston area (not all of which is attributable to the Monsanto plant), adjustments still need to be made for alternative sources of contamination or market factors.

The loss should be calculated from the baseline period of 1994. In order to convert the loss percentage to current dollars, the effect of other polluting entities needs to be accounted for. Examination of the area and environmental records shows that there are two or three other potential sources of pollution that may have had an indirect effect on property values in the MIA. Their effect was indirect because prevailing wind and water patterns indicate that any pollution from these sites would not carry into the impact area itself, but they could have some depressing effect on the West Anniston submarket. In other words, typical of the market trends technique, not all other factors are held constant in this study. To compensate for these alternative factors and be conservative, the loss estimate is reduced from 67.5% to 60%. Using data based on real estate

**Figure 2**    Comparison of 1994–1995 and 1999–2000 Sales in Monsanto Impact Area, Anniston, Alabama



market trends, adjusted for the passage of time from the base year and for local blighting effects, and netting out potentially depressing effects on the West Anniston submarket from other sources, the conclusion is that a property in this neighborhood had sustained a loss of 60% and that this decrease was attributable to the effects of the Monsanto plant.[11]

The subject property is on the edge of the Monsanto plant property buyout zone. Because it is adjacent to the purchase area, the subject property would be even more impacted by the purchase program. Moreover, the subject property had confirmed PCB contamination at levels in excess of those considered safe for residential use. Therefore, the conclusion about the extent of the loss for the subject property would be a total of 90% of value.

Analysis of transaction rates and marketing time of property sales (Days on Market) was also accomplished using the MLS database. The relative days on market for the West Anniston submarket increased slightly faster than the market as a whole from the 1991–1994 period to the 1995–2000 period. The number of transactions (using the ratio of West Anniston/total Calhoun County market) also decreased slightly. Both results are consistent with theory. Despite the fact that neither of these indicators provided compelling evidence, their results were supportive of the overall conclusions.

## Sale/List Price Ratio Analysis

For this sale/list price ratio analysis, for-sale-by-owner transactions that had no list price information could not

be used. Large-lot anomalous transactions where the sale/list price ratio was unexplainably large (i.e., well above 1.3) were excluded.

The ratios of sale prices to list prices of MLS transactions within the impact area and their average price compared with the rest of West Anniston were analyzed. In a typical market, this ratio is more than 0.85; in tight markets it is often higher, with just a few points off full value. A relatively low ratio indicates that houses sold for a substantial amount lower than list price. When this happens, sellers do not have an accurate view of what their houses are worth; therefore, they are less likely to accept an offer at the property's discounted market value. This is evident in environmental contamination cases.

The sale/list price ratio for the balance of West Anniston (excluding the Monsanto impact area) and within the Monsanto impact area for the 1994–1995 period and for 1999–2000 was examined. The years were combined in order to get the number of transactions up so averages could be used more readily. In 1994–1995, there were five sales and the average sale/list price ratio was 0.88. Moreover, 80% of these sales were within 15% of the list price (i.e., the s/l ratio was 0.85 or higher). This is very similar in percent to the rest of West Anniston, where the average sale/list price ratio in the same period was 0.89, and 63% sold within 15% of the list price. Thus, in the baseline period, the sale/list price percentages were quite similar.

The next analysis considered the sale/list price ratio for the balance of West Anniston and within the

11. An alternative way to calculate this directly would be to take the 1999/2000 sale price of $9,400 for MIA properties and divide it by the MIA projected 2000 value, based on the county appreciation trend of $24,800. The remaining value is 38.2% of what it should have been absent the Monsanto plant. The resulting loss percentage is 61.8%, which closely approximates the 60% figure.

Copyrighted material licensed by Randall Bell on April 26, 2021

impact area for 1999–2000, after the impacts of the Monsanto situation became fully understood. In 1999 and 2000, there were eight sales with useable ratios, and the average sale/list price ratio in the impact area was markedly lower at 0.70. Moreover, none of these sales were within 15% of the list price. This contrasts strongly with the percentages in the rest of West Anniston where the average sale/list price ratio in 1999 and 2000 was 0.88, and 66% sold within 15% of the list price, nearly unchanged from the baseline period.

This new information underscores the difference between the Monsanto impact area and the balance of the West Anniston submarket. It further demonstrates that sellers within the impact area may have unrealistically high expectations of the market value of their homes. This information ties directly to the potential buyer survey discussed below.

### The Potential Buyer Market Survey (CVA) for This Case

A list of several thousand names of homeowners was bought from a vendor. The list contained names, telephone numbers, income codes, and addresses. Calls were made to residents of Calhoun County and to residents in other counties as control areas. We avoided calling persons in the ZIP code where the plant is located. Names were called at random until a homeowner who would participate in the brief survey was contacted. The total number of respondents in the sample was 143, including 21% African Americans. The characteristics of the sample closely reflect the profile of Calhoun County on key factors such as race and average house price.

The survey instrument contains a baseline case to establish value and four scenarios with potential environmental or nuisance-related disamenities. The fourth scenario relates to PCBs in this case. With respect to the disamenities, the respondents were asked if they would make a bid on the property, and if so how much. The survey instrument is quite detailed and avoids key pitfalls described in Mundy and McLean's contingent valuation articles.[12] The instrument also does not specifically guide the respondent to PCBs, but nests the issue in a broader context.

### CVA Survey Results

Two factors are of key importance in evaluating the results. The first is the portion of respondents that would bid on a scenario. The ratio of no bid to total reflects the loss of market demand. The second factor pertains to value loss on sale. Of those that bid, the ratio of maximum bid to baseline case reflects the percentage they would pay. One minus this percentage reflects the discount. For example, if the person's baseline price was $100,000 and the maximum they would bid is $40,000, a 60% discount is reflected.

The first part of the survey sets the stage and makes the respondent comfortable with the bidding scale. It also determines the average price of a property they are looking for in the context of a job move. The average value in this study is $93,400, very close to the average for Calhoun County MLS sales of $94,300. All but one of the 143 respondents provided a value. When asked which scenario they were most likely to bid on, not one respondent said the PCB scenario.

The other scenarios included a business park located a block away from the property, an adjacent leaking underground storage tank with groundwater contamination, and an active railroad track located right behind the home. Between 10% and 66% of respondents bid on these other scenarios, but for the sake of brevity the details are not belabored here.

### The PCB Scenario

The fourth scenario determined the discount related to a PCB scenario:

> The house is located about three blocks from a factory that used to manufacture PCBs (polychlorinated biphenyls, an industrial compound that is regulated by the Environmental Protection Agency). The factory is still open and currently manufactures pesticides. For over 30 years, the factory put byproducts from its operations into a landfill. Over time, the chemicals have gotten into the water table and traveled over one mile away. The PCBs have been found in the bodies of local fish. The plant has also emitted PCBs into the air. Testing by the state environmental authority shows that *levels of PCBs and pesticides above those considered safe for residential use* are found at several locations near the plant, *including in the soils on the property you are considering buying.* The company has also been buying up some of the houses in the neighborhood a block or two away. Operators of the plants have attempted to reduce the frequency of new instances of these problems, and evidence suggests that they have probably been successful. Except for this factory, the rest of the neighborhood is like yours, and the house is very similar to your house.[13] [Emphasis added.]

The italicized portion of the preceding paragraph reflects the characterization of contamination found on the subject property. A substantial subset of the sample (just over 60 respondents) had a slightly different characterization of this italicized clause, stating that "the property under consideration had not been tested." The bidding issue was determined by the question, "Using the scale below, where –3 means you definitely would not bid and +3 means you would, how likely is it that you would make any offer on this house?"

Only 4.9% of respondents (seven total) bid on either PCB scenario. In other words, 95% of the respondents did not bid. Four bids were offered for property with soils testing for PCBs (5.0%), and three bids were for untested soils (4.7%). The bid percentages were almost identical for the two groups. Respondents with below-average house price values had a very similar bid percentage. This implies that the market treats tested and untested properties in this context as essentially

---

12.  Mundy and McLean, 1998, *Ibid.*

13.  Robert Simons & Associates, Inc. *Owens v. Monsanto* case, expert report, 2001.

the same and reflects an almost complete loss in the market demand for this type of property.

Of those that bid (their score above was generally not -3) the question, "What is the most you would be willing to pay for the house?" was asked. Only seven bids were received out of 143 respondents asked. Of the seven bids, the average base price was $82,900. The prices offered were discounted by between 20% and 83% of full value. The average loss for the PCB property described above was 53%, whereas the average loss among the "top" half of the market was smaller, at 35%. The discounted bid results for contaminated soils, untested soils, and lower-than-average property values were all about the same, between 52% and 55%. In some other situations with a substantially higher bid percentage, the analyst could look at the top portion of the market to search for typical behavior of the marginal buyer. In this case the market has become so constricted that, due to search costs and the very small number of bidders, the chances are that none of the potential bidders would find the subject property and place a bid. If this unlikely event were to occur, the seller would still have to accept a very deeply discounted bid, which is also very unlikely. Therefore, the resulting conclusion is that the property is almost valueless for residential use, leaving only a token value of 5% (such as for short-term storage).

## Reconciliation of the Analyses

To summarize, the market trends approach showed that properties in the areas directly impacted by the plant were reduced in value by 60% and that this reduction was attributable to the effects of the plant. Sale/list price ratio analysis showed different results within the impact area: a ratio of 0.7 within the MIA compared with almost 0.9 elsewhere in West Anniston, but outside the MIA. This showed sellers had a somewhat unrealistic idea of what their properties were worth at the time of original listing. Given the context, this can be attributed to the contamination. Not one of the eight sales in 1999 and 2000 in the Monsanto impact area sold for within 15% of its original list price, and the average discount was almost 30% over the seller's original seller list price. Using the CVA, the buyer's side of the market was down 95%, in part due to the high concentration of PCBs on the subject's soils. Overall, conclusion of the subject property's value loss was 90%. This figure is less than the 95% estimate from the CVA, but larger than the 60% reduction indicated by market trends. The market trends data does not show local factors such as proximity to the plant's property purchase program and associated blight, which were considered in raising the total loss to 90%.

## Conclusion and Implications for Appraisers

Ideally, when there is an environmental condition that affects property values, there is sufficient sales data to estimate a hedonic regression model to determine losses to the real estate. In some cases, however, data on sales is not available because of inadequate record keeping and/or thin sales volume. This situation can often be exacerbated by the environmental event. When sufficient sales are not available, as in the Anniston, Alabama, case, a combination of next-best techniques can be used. The findings from these techniques in combination can be used to support an inference of causality linking the polluting entity to property value loss.

Market trends analysis based on MLS data were helpful in providing trend data on sales by submarket, and sale/list price ratio analysis confirmed that sellers in the affected area discounted their properties deeper than those sellers in unaffected areas. Contingent valuation analysis of prospective buyers also provided guidance. Only about 5% of the prospective buyers with full information would bid on a plausible and accurate scenario describing the conditions in this market, and those few bids were heavily discounted.

While individually none of these techniques would provide conclusive evidence, in combination they guided the analyst to a reasonable and supportable conclusion. In this case, losses were estimated at more than 90%, and the techniques applied provided consistent results.

Appraisers should be diligent in using several techniques, such as hedonic regression analysis, market trends analysis, sale/list price ratio analysis, transaction rates analysis, analysis of evidence presented by market participants, sale/resale analysis, contingent valuation of prospective buyers and possibly other real estate research techniques to generate increased confidence with conclusions about the effects of environmental events on real property values. Data is often readily available from MLS and/or local property records. Use of multiple techniques lends more credence to the results obtained than with the results obtained by using any single technique. The results obtained from the multiple techniques should be consistent, although not always identical. Where applicable, appraisers should conduct statistical analysis to determine the statistical significance of the results, especially the results of the strongest and most heavily relied on techniques.

Future research should address how these techniques can be used together. For example, a comparison of revealed outcomes from regression analysis could be compared with CVA results to determine if they are internally consistent. Also, in order to address the issue of generalizing between markets, comparative research should be conducted to determine the consistency of results across markets, demographic factors, and types of contamination.

Note: The author would like to thank and acknowledge the contributions of Kathleen Gaiser and Maria Hydell for their work on this project.

Copyrighted material licensed by Randall Bell on April 26, 2021

**7.9** # Mold: What Appraisers Should Know

*by Michael V. Sanders, MAI, SRA*

This article originally appeared in the Third Quarter 2005 issue of *Valuation Insights & Perspectives*.

Biological pollutants are often associated with poor indoor air quality and can include animal dander, dust mites, fungi, bacteria and pollen. Mold in particular has rapidly become a significant real estate issue, considered problematic because of possible structural deterioration and potential health impacts to building occupants. While the public's awareness of mold has been heightened over the past decade as a result of landmark lawsuits and sensational media coverage, there is little evidence that mold is more prevalent now than in the past, with references to mold dating back to biblical times.

## What is mold?

Molds are simple fungi (such as dry rot, mildew, yeasts, plant rusts, smuts and mushrooms), which require an organic food source high in cellulose and sufficient moisture to sustain growth. Unfortunately, organic matter containing cellulose is a component of many common building materials, including wood, drywall, insulation, ceiling tiles, carpet and textiles. Fungal growth is sometimes observed on nonorganic materials as well – ceramic tile, stone, grout, caulking and metal. Substrate degradation and metabolic by-products often produce characteristic musty odors associated with the growth of mold, sometimes resulting in the production of compounds with toxic properties (mycotoxins).

In contrast to some other contaminants, molds are naturally found almost everywhere in the environment, both indoors and outdoors, thus identifying a mold "problem" is often difficult, requiring the services of a properly qualified and trained professional. Air sampling that compares indoor and outdoor types and concentrations of various mold species is common practice in determining the existence of an indoor air-quality problem. Handheld moisture meters are often used to measure the moisture content of materials, and psychrometers to measure humidity; surface sampling of potentially contaminated areas is also common. Air and surface samples are typically sent to accredited laboratories for analysis, and reports identify the types and quantities of various fungal species found.

Mold growth on building materials most often occurs in conjunction with excessive and/or persistent moisture conditions, including flooding, high humidity, plumbing leaks or water intrusion through the building envelope. Inadequate ventilation is frequently a contrib-uting factor. Mold is often blamed on defective construction and/or improper maintenance. Some observers also note that structures built since the energy crisis of the 1970s are more airtight, possibly contributing to mold, sick-building syndrome and other problems associated with indoor air quality. The appearance of mold can vary from small dots to continuous sheets of mold colonies; colors and textures can also vary widely. Conditions supporting mold growth sometime foster bacterial contamination as well, particularly from sewage leaks and spills.

## Government's role

Laws governing disclosure of mold vary by state. The last federal legislation relating to mold safety, The United States Toxic Mold Safety and Protection Act (H.R. 1268), was introduced in early 2003, but never passed committee status. Attempts to define threshold limits or standards relating to mold exposure have generally been unsuccessful, with uniform standards considered impractical due to the broad range of fungal species, geographic differences, seasonal variations, varied human responses and lack of conclusive data regarding health impacts. Standard mold disclosures in real estate contracts are becoming common, as are mold exclusions or caps on coverage in insurance policies, with widespread litigation relating to water intrusion and mold claims.

Mold damage is similar to many other physical conditions requiring repair. Repair and restoration costs, however, are extremely project-dependent and more difficult to generalize than many other conditions requiring repair. Contaminated materials must be either cleaned or replaced, and large remediation projects often involve specialized contractors, protective clothing and construction of elaborate containment systems to prevent migration of mold spores to other parts of the structure.

Voluntary guidelines drafted by the federal government regarding indoor air quality contain suggested remediation standards for residential (available at *www.epa.gov/iaq/molds/moldguide.html*) and commercial and institutional (available at *www.epa.gov/iaq/molds/mold_remediation.html*) properties. Information published by the City of New York also contains recognized remediation protocols (available at *www.ci.nyc.ny.us/html /doh/html/epi/ moldrpt1.html*).

**Michael V. Sanders, MAI, SRA,** has extensive experience in the valuation and evaluation of real property—including vacant land and residential, commercial, industrial, and special-purpose properties—for corporate clients, financial institutions, attorneys, and public and governmental agencies. He has performed real estate damage analysis involving a wide variety of detrimental conditions including title issues, geotechnical failures, construction defects, water intrusion, and environmental and proximity studies. He holds a BA degree in business administration with a concentration in finance from California State University, Fullerton. He has also held leadership positions in the Appraisal Institute and the Forensic Expert Witness Association.

High-profile court cases and the attendant media coverage have unquestionably increased the awareness of mold issues by the public, consumer groups and the legal and scientific communities over the past decade. Perhaps most notable was a $32 million award by a Texas jury in 2001 in *Ballard v. Fire Insurance Exchange*, a residential insurance case involving water damage and mold. On appeal, this was later reduced to $4 million. Heightened reactions associated with such publicity, similar to responses associated with other potentially dangerous materials—asbestos, radon gas, formaldehyde insulation and lead-based paint—normally subside as additional information becomes known.

## Valuation issues

Appraisers should exercise extreme caution in identifying surface staining or other irregularities as mold without an expert opinion, which normally requires specialized expertise and testing procedures. Appraisers should be particularly careful not to fall victim to some of the hype surrounding mold, for example, by identifying black stains as "toxic mold." The term "toxic mold" was originated by the media, without scientific basis. *Stachybotrys chartarum* is a usually black mold sometimes referred to as "toxic mold," though other mold species can have a similar appearance. Laboratory testing is required to definitively identify a mold species. Observed conditions should be noted, however, including prior moisture or water intrusion, dampness, staining or discoloration of surface materials and unusual odors. Such conditions do not necessarily indicate the presence of mold but may warrant further investigation.

From a valuation standpoint, mold contamination is properly analyzed within the context of the Detrimental Conditions (DC) Matrix, with consideration of impacts on cost, use and risk during the assessment, repair and ongoing stages of the DC lifecycle, according to Randall Bell, MAI, in his book *Real Estate Damages: An Analysis of Detrimental Conditions* (Appraisal Institute, 1999). Identification and assessment of a mold problem and estimates relative to remediation and/or restoration costs are clearly outside the expertise of most appraisers, although loss-of-use claims may necessitate estimates of fair rental value or the value of comparable housing for a specified period of time.

Perhaps the most debated aspect of mold on property value is the impact of disclosing a current or prior mold problem. As with most conditions requiring repair, the buyer of a damaged property will normally ask the seller to make appropriate repairs, or will discount the price of a property based on the scope of estimated repairs. Project incentive may also be an issue, if supported by the market. Lenders may require mold remediation prior to loan closure or, alternatively, might withhold funds to cover estimated remediation costs. The ability to obtain insurance in the wake of a mold disclosure is a controversial issue, with unconfirmed reports that water-loss claims have been used as the basis for denial of coverage. Market resistance (stigma) is often cited in lawsuits alleging water damage and mold, though such allegations must be properly supported by relevant market data. Stigma damage is far from being automatic. Case studies have indicated that properties once affected by water damage and/or mold have subsequently sold at full value in a post-repair condition.

## Further reading

- U. S. Environmental Protection Agency, *www.epa.gov/iaq/molds/moldresources.html*
- Centers for Disease Control and Prevention, *www.cdc.gov/nceh/airpollution/mold/*
- Liability insurance Administration's 2002 claim Alert on mold, *www.liability.com/ claim_alert.asp*

Copyrighted material licensed by Randall Bell on April 26, 2021

**7.10** # Dramatic Rise in Toxic Mold Claims, Litigation, and Legislation Demands Pro-Active Response From Insurers

*by Del Williams*

This article originally appeared in the April 2002 issue of *The Appraisal Journal*.

Nationwide remediation expert PDG Environmental offers tips on minimizing toxic mold liability and damage. For U.S. insurers, re-insurers, and property professionals still reeling from the $32-million a Texas jury awarded Melinda Ballard in her toxic mold lawsuit against Farmers Insurance last year and the $18.5-million a California jury awarded Thomas Anderson in a similar suit against Allstate Insurance the year before, the news just got worse.

The rising number and cost of mold-related claims is continuing to skyrocket at a pace far exceeding the 9,000 mold and mildew-related claims filed in the U.S. and Canada in the last 10 years. For instance, Farmer's Insurance had 10,150 mold-related claims in the first 10 months of 2001, according to a company spokesperson. In Texas alone, the cost of mold-related claims for the three largest insurers in the state jumped from $9.1 million in the first quarter of 2000 to $79.5 million in the first quarter of 2001, according to the Texas Department of Insurance.

According to a company spokesperson, State Farm Lloyds, the Texas property insurance subsidiary of Bloomington, IL-based State Farm, took $648 million of underwriting losses in Texas through last October when it ceased writing mold-related homeowners policies. This January, Standard & Poor's lowered its ratings on the insurer, citing "extremely large losses" incurred from mold claims. At a recent presentation, Robert P. Hartwig, PhD, Vice President and Chief Economist for the Insurance Information Institute, noted the average cost per policyholder in Texas increased nearly 800% between 2000 and 2001, largely due to a spike in mold-related claims.

Compounding the risk to insurers, property professionals, and others with deep pockets is the threat of serial litigation, where a group of lawyers representing claimants organizes to share information, witnesses, and documents against a target of defendants. The result can be enough to bring on bankruptcy, according to Peter J. Lynch, an insurance attorney with Philadelphia-based Christine Pabarue Mortensen and Young. "Serial litigation is a bet-the-company problem as Johns-Manville and other makers of asbestos products can attest," says Lynch, also the co-author of a recent article with environmental engineer Kurt B. Martin titled "Mold: Serial Litigation Strikes Again." "Fen-Phen, tobacco, and now toxic mold cases are just the latest wave."

With the potential number of buildings affected, number of people exposed, types of policies that could be affected, defense costs associated with these complex claims, and the global potential for claims activity, toxic mold could very well rival asbestos.

Insurers covering property/casualty have already begun to see claims rising due to toxic mold contamination, but those providing homeowners' general liability, personal and/or commercial umbrella, as well as standard property lines, such as commercial package and commercial multi-peril, may all be impacted.

Lawyers are already zeroing in on strict liability, professional malpractice, breach of implied warrantees, worker's compensation, and failure to disclose in the sale of property. While toxic mold bodily injury claims still face legal issues, in civil lawsuits lawyers only need a preponderance of evidence, not absolute certainty. And, exposure that may have occurred over multiple policy years raises the specter of legal limit stacking for increased litigation risk.

## The Nation's Toxic Mold Problem

The insurance industry is not alone in facing the dramatic rise in toxic mold claims and litigation. Property owners/managers, as well as builders, subcontractors, realtors, and others are also subject to dramatic liability risks. For example, in 1999 more than 150 families sued the Henry Phipps Plaza housing complex in New York City $12 billion for health complaints ranging from headaches, nosebleeds, and chronic fatigue to respiratory problems and death resulting from exposure to toxic mold. Recently, even California Superior Court Judge Elisabeth Krant took medical leave and later sued Tulare County following the discovery of stachybotrys toxic mold at her courthouse. Stachybotrys mold is considered so dangerous it's listed as an agent of biological warfare in a military manual.

Across the nation, toxic mold awareness has spiked as outbreaks have appeared in millions of U.S. homes, offices, schools, and public buildings, including Austin, Texas' Hill Elementary School, which was closed for over 18 months due to mold. Recently, California's Governor Davis responded to the groundswell of health concerns surrounding mold by signing the Toxic Mold Protection Act, which directs state health officials to set exposure limits for homes, schools, businesses, and public build-

**Dell Williams** is a technical writer at Power PR, a public relations firm in Torrance, California. He has 10 years of experience in business and education as a writer and editor.

ings. The law, which took effect January 2002, also requires landlords and real estate owners to disclose when forthcoming mold limits are exceeded. Indiana legislators have followed suit, introducing HB 1253 which would establish mold standards and direct the department of health to offer recommendations for toxic mold exposure limits. The message is clear: insurers, re-insurers, and property professionals ignore toxic mold at their peril as claims are rising, legal precedent has been set, and toxic mold legislation is being enacted nationwide.

Insurers, initially caught off guard by the proliferation of toxic mold claims and litigation, are beginning to respond with mold exclusion lines and premium hikes; a few are even pulling out of some markets completely–as Allstate, Safeco Insurance, Farmer's Insurance, and State Farm Lloyd's did when they temporarily stopped selling new homeowners policies in Texas due to the rising number of mold and water damage claims in the state. While shifting responsibility for toxic mold to consumers, businesses, and builders may solve some of the insurance industry's short-term pain, it carries the risk of not only disrupting realtor and lender markets, but also of energizing consumer groups and even legislators if citizens are left with no insurance, unaffordable insurance, or worse–opt to walk away from homes or buildings taken over by toxic mold growth.

"Toxic mold is a problem that the nation's insurers and property professionals can no longer ignore," said John Regan, Chairman and CEO of PDG Environmental (OTC BB PDGE), a nationwide leader in the environmental remediation industry since 1984. "While there is a degree of sensationalism that the media has created about mold issues, mold contamination is a very real problem that must be handled in a timely and professional manner."

Until recently, insurers and property professionals have tended to view mold remediation as a simple clean up task. But as the full extent of health, liability, and property risk unfolds, many are looking to mold remediation professionals to avoid turning a small problem into a large one. Remediation cleans or removes contaminated materials and prevents mold from spreading to other areas while protecting the health of abatement workers.

"If you have just a few square feet of visible mold, you may be tempted to have anyone tackle the problem, but that can be a costly mistake," says Regan. "Without adequate precautions, they may open up a wall and expose themselves and the building occupants to unknown types and quantities of hidden mold. That could release mold spores into the air and ventilation systems, spreading mold growth throughout the building. Even professional drying firms that rely on fans and venting can make the same mistake if they approach a job without proper mold awareness."

"Of course, insurance companies want to reduce their risk of litigation and further mold claims, but many still aren't pre-qualifying their contractors or educating themselves on proper work practices as well as they should," continues Regan. "Without proper area isolation, engineering controls, and work practices, a job of just a few days can balloon into one requiring months of remediation, which would likely increase the chances of litigation as well."

Reputable mold remediators should possess one of two certifications: Certified Microbial Remediation Supervisor (CMRS) from the American Indoor Air Quality Council (AMIAQ); or the Certified Microbial Remediator (CMR) from the Indoor Air Quality Association (IAQA). Beyond these certifications, Regan suggests asking for a list of references, then following up to see how previous projects went.

Additionally, experienced professional mold remediators should carry multi-million dollar liability insurance to protect the client if liability gets out of hand. They should also follow Occupational Health and Safety Administration (OSHA) and other specified safety protocols to protect the health and safety of both the mold remediators and building occupants, which can minimize liability risk.

Mold has been around for ages, but the current toxic mold epidemic has modern roots. "Changes in building design from the 1970s onward have heightened today's mold problems," says Regan. "The drive toward energy efficiency had the unintended effect of sealing off indoor airflow so moisture doesn't evaporate well once introduced. Also, building materials are now more cellulose-based, with higher paper content, which mold thrives on. Unchecked mold growth can be serious. In second homes with absentee ownership and the right conditions, you can get the 'Jurassic Park effect' with mold overwhelming an environment and hanging down from the ceiling in as little as a month. In large commercial properties, the liability and property damage can be extensive, since mold may stay hidden longer with more room to grow."

"Lack of mold awareness has been part of the problem as well," continues Regan. "When building materials such as studs are left in unprotected storage, they can become wet or mold-contaminated even at new construction or remodeling projects. It may be a shock to find mold contamination in a brand new home or building but it can happen especially with porous, cellulose-based materials in humid or rainy climates. If growth occurs out-of-sight–in walls, attics, basements, or near AC systems–damage can be substantial before the mold problem is identified."

While liability issues may be debated among insurers, property professionals, and others, uncontrolled mold growth will only heighten property and health claims unless quickly checked and remediated.

## Is Mold in Your Property Portfolio?

Any structure with water leaks, water damage, or a history of such is at risk of developing toxic mold. High humidity increases the risk, and a musty odor or drywall discoloration after water damage repair are telltale signs of mold growth. Of course, sudden tenant respiratory problems or complaints of ill health may also be an indication that mold is present and must be remediated.

Copyrighted material licensed by Randall Bell on April 26, 2021

According to the U.S. Environmental Protection Agency, there are a number of questions to consider before remediating a mold problem:

- Are there existing moisture problems in the building?
- Have building materials been wet more than 48 hours?
- Are there hidden sources of water, or is the humidity too high (high enough to cause condensation)?
- Are building occupants reporting musty or moldy odors?
- Are building occupants reporting health problems?
- Are building materials or furnishings visibly damaged?
- Has maintenance been delayed or the maintenance plan been altered?
- Has the building been recently remodeled or has building use changed?
- Is consultation with medical or health professionals indicated?

Even when mold growth isn't obvious, Regan says that professional inspection is prudent since growth often occurs out-of-sight: in walls, ductwork, and ventilation systems, as well as in crawl spaces beneath floorboards and above ceilings.

## Four Steps Toward Mold Remediation

Regan advises a four-step approach for insurance and property professionals combating a mold problem: solve the water problem, get the mold tested, possibly vacate people nearby with mold sensitivity, then get professional remediation help. A skilled mold remediator can help prevent potentially severe tenant or staff health problems and costly litigation.

"Proactive remediation is preferable to delay since mold can destroy whatever it grows on, and can take hold in as little as 24–48 hours when exposed to water or excessive moisture," says Regan. "Ceiling tile, carpet, drywall, insulation, and other common building materials are great food sources for mold, which can spread rapidly since its spores surround us and are carried from place to place by air currents and ventilation equipment."

According to New York City's Department of Health: Guidelines on Assessment and Remediation of Fungi in Indoor Environments, "Building materials supporting fungal growth must be remediated as rapidly as possible to ensure a healthy environment."

The New York City Department of Health, for example, recommends the following minimum precautions for remediation work.

For small isolated areas, such as ceiling tiles or small areas on walls, use respiratory protection in ac-cord with OSHA standards, as well as gloves and eye protection; use dust suppression before remediation; work in an unoccupied area; and vacate people with depressed immune systems or inflammatory lung diseases such as asthma, from adjacent areas.

For mid-sized isolated areas, such as individual wallboard panels, follow the above precautions plus seal the work area with plastic sheets to contain dust and debris before remediation; vacuum the work area using a High-Efficiency Particulate Air (HEPA) Filter; and clean the work area with a detergent solution.

For large isolated areas, such as several wallboard panels, consult experienced health and safety professionals for microbial investigation before remediation; train personnel to handle hazardous materials and equip them with respiratory protection meeting OSHA standards; and seal ventilation ducts in work and adjacent areas with plastic sheeting.

For extensive contamination, including that in HVAC systems, follow the above precautions plus monitor air to determine safety; completely isolate the work area and ventilation ducts from occupied spaces; use an exhaust fan with HEPA filter to generate negative pressurization; provide airlocks and a decontamination room; equip personnel trained in handling hazardous materials with full-face respirators with HEPA cartridges, disposable gloves, and protective clothing covering head and shoes; and use biocides in HVAC systems.

To encourage good tenant and employee relations and for legal protection, it's also important to notify building occupants of large scale toxic mold remediation, along with a description of the remedial measures to be taken with a timetable for completion. It's also essential that the remediator deal with minimizing potential liability, insurance remediation protocol, and safety issues.

"As new strategies are developed to combat mold growth, prevention will also play a part," says Regan. "Already remediators such as PDGE are partnering with builders to test and implement mold-inhibiting coatings that can be applied to new or existing structures. Prevention will be an important tool in heading off mold at the pass, and insurers and property professionals should be looking at that option as well to limit future mold claims and liability."

PDG Environmental, Inc., a national environmental remediation contractor with local presence and service, provides up to $10 million of liability protection through A++ rated insurance companies and can provide performance bonds for the largest projects. PDGE is a member of both the AMIAQ and IAQA, and has both CMRS and CMR certified specialists. PDGE customers include many Fortune 500 companies.

## 7.11 Commercial and Residential Water Damage: The Mold Connection
*by Del Williams*

This article originally appeared in the October 2002 issue of *The Appraisal Journal*.

Nationwide remediation expert PDG Environmental discusses what owners, managers, and insurers need to know about the leading cause of mold infestation and how to handle the dreaded mold fallout.

For shell-shocked property owners, managers, and insurance professionals, the bad news about mold liability and legislation has yet to hit bottom—and, water damage is behind it.

The latest salvo comes from celebrity Ed McMahon who's suing a subsidiary of Traveler's Property Casualty Corporation for $20 million, claiming that an improperly repaired leak covered by the company lead to the mold stachybotrys chartarum spreading through his Beverly Hills mansion, making him and his wife seriously ill and killing their dog. He joins a long line of plaintiffs, including Erin Brockovich, who have sued for toxic mold damages since the Texas homeowner Melinda Ballard won a $32-million suit against Farmers Insurance in 2000.

In Texas alone, water-related mold claims have exploded from 883 in Q1 2000 to 5,722 in Q2 2001 with losses reaching $276.5 million for the period, according to the Texas Insurance Department, which tabulated data for Allstate, State Farm, and Farmers Insurance.

On the legislative front, Representative John Conyers (D-MI) plans to introduce in the US House of Representatives The Toxic Mold Safety and Protection Act, which would call on the Environmental Protection Agency (EPA) to issue guidelines defining threshold limits for mold. This comes on the heels of California's recently enacted Toxic Mold Protection Act, which directs state health officials to set limits for homes, schools, businesses, and public buildings. It also requires landlords to disclose when the mold limits are exceeded.

By now, it's abundantly clear to property professionals that mold is the worst thing to hit the industry since asbestos. What needs clarification, before it's too late, is the insidious role water damage plays in mold growth.

### Any Water Damage Puts Your Property at Risk of Toxic Mold

"Simply put, any structure with water leaks, water damage, or a history of such is at risk of developing mold," said John Regan, Chairman and CEO of PDG Environmental (OTC BB PDGE), a nationwide leader in the environmental remediation industry since 1984. "The fact is mold can develop anywhere there is a food source, sufficient temperature, and water. These conditions are typically met in any structure with a history of water damage."

"Mold spores float everywhere in the environment, and feed on common building materials such as drywall, carpet, insulation, and ceiling tile when wet," continues Regan. "Mold thrives at room temperature between 65 and 85 degrees F and can survive a much wider range. Add a water source to the mix for as little as 24 to 48 hours, and you could have mold."

Regan suggests that changes in building design from the 1970s onward have heightened today's mold problems since the drive toward energy efficiency had the unintended effect of sealing off indoor airflow so moisture doesn't evaporate well once introduced. Also, building materials are now more cellulose-based, with higher paper content, which mold thrives on.

Unchecked mold growth can be serious. In second homes with absentee ownership and the right conditions, the "Jurassic Park effect" is possible with mold overwhelming an environment and hanging down from the ceiling in as little as a month. In large commercial properties, the liability and property damage can be extensive, since mold may stay hidden longer with more room to grow.

### The Five Most Common Sources of Unwanted Moisture

The National Park Service is responsible for preserving and maintaining the historic buildings in its possession for long-term public use. Against this mission, water damage is a hazard to be combated. According to the National Park Service's Preservation Brief #39 regarding controlling moisture in buildings, the five most common sources of unwanted moisture are:

- above grade exterior moisture entering the building (rain or melted snow, for example)
- below grade moisture entering the building (commonly through a high water table)
- leaking plumbing pipes and mechanical equipment
- interior moisture from facility use and climate control systems (vapor condensation, etc.)
- water used in maintenance and construction materials (cleaning, washing, material mixing, etc.)

Regan agrees that monitoring these common sources of unwanted building moisture can go a

**Del Williams** is a technical writer at Power PR, a public relations firm in Torrance, California. He has 10 years experience in business and education as a writer and editor.

Copyrighted material licensed by Randall Bell on April 26, 2021

long way in preventing mold growth, but cautions, "It's equally key to prevent excess building moisture whenever possible and to thoroughly dry it within 24 hours when it occurs," says Regan. "From our experience, mold growth doesn't stem from just a few types of water problems. You've got to be vigilant in avoiding every source of excess moisture, from burst pipes and flooding to pinhole leaks and vapor condensation over time, if you want to avoid triggering mold growth. Ironically, smaller water sources such as a pinhole leak may actually be more insidious than larger, more obvious ones such as a burst pipe since they may go unnoticed and unremediated for longer periods of time."

## Design and Construction Flaws: Two Roads to Mold

Mold forms on wood with 16% moisture content or higher, and wood itself begins to decay at 20% moisture content. Along these lines, Regan notes that building design flaws account for a sizable number of mold cases that PDGE has remediated, by allowing too much moisture to accumulate. For example, in residential properties, poorly designed shower/dryer vents blowing water vapor into improperly vented attics are a common cause of mold.

Landscaping design errors in both residential and commercial properties can contribute to mold growth, too. For example, at one facility the lawn continued up to beautiful bay windows, which were subsequently damaged by lawn mowing. When the facility owner replaced the grass under the windows with flowers to prevent further lawn mower damage, he graded over the bottom of the window's stucco, allowing water to enter through cracks when it rained or snowed. This provided a water source, allowing mold growth in the wall cavities between the drywall and studs.

Construction flaws are another avenue of mold growth, according to Regan. "At one school we remediated, the windows were incorrectly installed and leaked into the wall cavity each time it rained. Wallpaper hid the resulting mold. Due to ongoing health concerns, administrators traced the problem to the leaking windows and eventually peeled the wallpaper back to reveal hidden mold growth."

Similarly, at one high-rise condo PDGE remediated, improperly installed fire sprinklers dripped onto ceiling panels made of cellulose-based drywall. Mold grew out of sight until someone noticed the water stains on the ceiling and linked that with the increased health concerns cropping up. Hidden mold growth was again the culprit.

"Lack of mold awareness has been part of the problem," says Regan. "When building materials such as studs are left in unprotected storage, they can become wet or mold-contaminated even at new construction or remodeling projects. It may be a shock to find mold contamination in a brand new home or building but it can happen especially with porous, cellulose-based materials in humid or rainy climates. If growth occurs

out-of-sight—in walls, attics, basements, or near AC systems—damage can be substantial before the mold problem is identified."

## Does Your Property Have Mold?

As stated previously, any structure with water leaks, water damage, or a history of such is at risk of developing mold. High humidity increases the risk, and a musty odor or drywall discoloration after water damage repair are telltale signs of mold growth. Of course, sudden tenant respiratory problems or complaints of ill health may also be a tip off that mold is present and must be remediated.

According to the US Environmental Protection Agency, there are a number of questions to consider before remediating a mold problem:

- Are there existing moisture problems in the building?
- Have building materials been wet more than 48 hours?
- Are there hidden sources of water, or is the humidity too high (high enough to cause condensation)?
- Are building occupants reporting musty or moldy odors?
- Are building occupants reporting health problems?
- Are building materials or furnishings visibly damaged?
- Has maintenance been delayed or the maintenance plan been altered?
- Has the building been recently remodeled or has building use changed?
- Is consultation with medical or health professionals indicated?

"Once a property has visible mold growth, it's too late to simply dry and repair water damage," says Regan. "Without adequate precautions, maintenance staff could open up a wall and expose themselves and the building occupants to unknown types and quantities of hidden mold. That could release mold spores into the air and ventilation systems, spreading mold growth throughout the building."

"Even professional drying firms that rely on fans and venting can make the same mistake if they approach a job without proper mold awareness," continues Regan. "A job of just a few days could easily balloon into one requiring months of remediation without proper area isolation, engineering controls, and work practices, which would likely increase the chances of litigation as well."

Reputable mold remediators should possess one of two certifications: certified microbial remediation supervisor (CMRS) from the American Indoor Air Quality Council (AMIAQ); or the certified microbial remediator (CMR) from the Indoor Air Quality Association (IAQA). Beyond these certifications, Regan suggests checking to see how long a remediator has been in the mold business, asking for a current list of references, and following up to see how the projects went.

Additionally, experienced professional mold remediators should carry multi-million dollar liability insurance to protect the client if liability gets out of hand. They should also follow OSHA and other specified safety protocols to protect the health and safety of both the mold remediators and building occupants, which can minimize liability risk.

Even when mold growth isn't obvious, Regan says that professional inspection is prudent since growth often occurs out-of-sight: in walls, ductwork, and ventilation systems, as well as in crawl spaces beneath floorboards and above ceilings.

"Mold is a problem that the nation's insurers and property professionals are just beginning to address, and understanding the link between water damage and toxic mold is a crucial part of the process," sums up

Regan. "Proactive design, sound construction, and preventative maintenance along with a timely handling of water damage will all be part of the front-end solution, just as certified mold remediation will continue to be part of the solution on the back end."

PDG Environmental, Inc., a national environmental remediation contractor with local presence and service, provides up to $10 million of liability protection through A++ rated insurance companies and can provide performance bonds for the largest projects. PDGE is a member of both the AMIAQ and IAQA, and has both CMRS and CMR certified specialists. For those interested in CMR training, PDGE has developed the IAQ Training Institute, one of just four US training providers approved by the IAQA, in a joint venture with a Pittsburgh-based training provider. PDGE customers include many Fortune 500 companies.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 7.12 An Exploratory Review of the Effects of Toxic Mold on Real Estate Values

*by Robert A. Simons, PhD, and Ron Throupe, PhD*

This article originally appeared in the Spring 2005 issue of *The Appraisal Journal*.

### Abstract

This article reports outcomes of ten litigated toxic mold cases; a contingent valuation (CV) analysis of toxic mold in South Carolina; and mold case studies of an apartment complex near Seattle and a group of homes in Cleveland, Ohio. The litigated cases had very large payouts, some larger than the property value. Postcure reductions of 20%–37% in property value were revealed in the CV surveys. The apartment property contaminated with toxic mold had losses in excess of 60% and potentially as high as 100%. A mildly affected group of homes in Cleveland, Ohio, incurred unit remediation costs of 5%–15%.

Despite widespread recent interest in toxic mold, real estate literature has provided limited guidance on valuation issues for properties affected by it. To advance knowledge of this topic, this article first summarizes the scant quantitative data available on the effect of toxic mold on property values. A report on the nonempirical literature available on toxic mold is provided along with a summary of the settlements and verdicts in ten legal cases. Some new research conducted using contingent valuation analysis (CV) is described and more evidence of the effects of toxic mold on real estate values is revealed through study of a contaminated apartment building and a synopsis of the results of a city-led mold remediation program. The summary of the findings from these studies reveals a considerable range of potential outcomes, which suggests an urgent need for more research on the effects of toxic mold on property values.

### Background

Mold is a very common occurrence in homes. The generic term *mold* includes mildew and other organisms that are typically not dangerous and can be readily dealt with by property owners or renters themselves without risk of personal injury. However, it is toxic molds that are the focus of this research.

Toxic mold includes such black-colored organisms as stachybotrys, penicillium, aspergillus, and fusarium.[1] The most feared of toxic molds is stachybotrys, also known as black mold, which is associated with respiratory infections and other negative health effects in children. Some colonies of mold do well in relatively dry conditions, while others require more moisture to thrive. Mold lives and grows well on many types of organic building materials. It is particularly insidious when there is moisture behind a wall or in an area hidden from view where the mold grows undetected and unabated while thriving on drywall, wood, or insulation material. It then can spread via spores and be readily transmitted in the air or through an HVAC system. The spores are associated with mycotoxins that can cause moderate and severe health problems in humans.

The term *toxic mold* includes fungi and mold. (All molds are fungi, but not all fungi are molds.) Toxic mold is a type of mold, not a level or measurement of mold. Guidelines for measuring toxic mold levels are vague, and there is not at present a set of standards for mold-level measurement. Local health organizations identify levels they consider dangerous on a case-by-case basis.

Real estate market guidelines for disclosure and inspection of mold are evolving. Some states have included mold disclosure as part of the real estate sales disclosure form; others have relied on general wording that would include mold. There are forms being developed by local multiple listing services for disclosure to limit liability for real estate agents. Property inspection

---

1.    See http://www.mold-help.org.

**Robert A. Simons, PhD,** is a professor and the Director of the Master of Urban Planning, Design and Development Program at the Levin College of Urban Affairs at Cleveland State University (CSU) in Cleveland, Ohio. He teaches courses in real estate development, market analysis and finance, PhD research methods, public economics, and environmental finance. He is also the faculty advisor for the Certificate Program in Real Estate Development and Finance, which is offered in conjunction with the Nance College of Business at CSU. Simons received his PhD from the University of North Carolina (UNC) at Chapel Hill in City and Regional Planning, with an emphasis in real estate. He holds a master's degree in regional planning and in economics, both from the UNC. His undergraduate degree in anthropology was earned at Colorado State University. Simons has published over 40 articles and book chapters on real estate, urban redevelopment, environmental damages, housing policy and brownfields redevelopment. He authored a book entitled *Turning Brownfields into Greenbacks*, published by Urban Land Institute. Simons has an active consulting practice, and has served as an expert witness in matters related to real estate and environmental damages. He has been a member of the American Institute of Certified Planners (AICP) since 1983.

**Ron Throupe, PhD,** is an assistant professor at the Franklin L. Burns School of Real Estate and Construction Management in the Daniels College of Business at the University of Denver. He is a certified general appraiser who specializes in real estate and litigation, including eminent domain and detrimental conditions. Throupe has participated in the design and implementation of formal focus group research as support for real estate litigation in high profile cases in the United States. He is a partner with American Valuation Partners, in Issaquah, WA, and was previously the director of operations with Mundy Associates in Seattle, WA. He has a PhD and an MBA from the University of Georgia in real estate and finance, along with a BS in civil engineering from the University of Connecticut.

firms with mold-related qualifications are also emerging. Appraisers are being advised to limit liability by adding language in the scope of work section of their appraisal reports to define and clarify the extent of the inspection and the limits of appraiser's expertise.[2]

## Literature on Toxic Mold

Since toxic mold is a relatively new issue, there are no peer-reviewed studies that empirically address toxic mold and its effects on property values.[5] The most recent and comprehensive look at mold was by Aalberts and Hoyt, whose peer-reviewed article reflects on the role of the appraiser when evaluating toxic mold property risk.[4] Their findings suggest various issues for the appraiser to consider in conforming to the Uniform Standards of Professional Appraisal Practice (USPAP) when toxic mold is present in a property. Toxic mold has been examined in the context of commercial and residential water damage without any empirical results, while other studies have laid out the scope and nature of indoor mold in the context of suggested measures for portfolio and property managers.[5]

Finally, Bell's study of detrimental conditions contains several diagrams that may pertain to the toxic mold problem.[6] Bell lays out a set of possible scenarios of detrimental conditions and illustrates the outcomes in diagram form. These outcomes include curable and incurable conditions and a time component identifying when and if a property may recover from detrimental effects to value. The mold problem, if curable, could be the type of problem that reduces cash flow and property value for a time, after which the property largely recovers to near its original property value after remediation. On the other hand, another possible outcome is that the detrimental condition causes a total loss that creates a personal liability, such as an outstanding mortgage that is greater than the value of the land.

## Legal Outcomes in Toxic Mold Cases

Large settlement awards in toxic mold lawsuits have raised expectations in mold-related litigation. An estimated 10,000 mold-related cases are pending in United States courts with a likelihood that many plaintiffs will receive large settlements.[7] Although most current cases deal with residential properties, commercial properties are increasingly involved in mold litigation. Table 1 shows the outcomes of ten toxic mold cases.

While the cases shown in Table 1 do not constitute a random sample, they include all cases written about in Mealey's litigation service publications[8] and all those listed in its verdicts and settlements database since 2000. Of these ten mold cases, nine resulted in payouts to the plaintiffs. Some awards or settlements were many times the property value and included punitive damages. Individual case outcomes for residential homes ranged from a low of $200,000 to several million dollars. One class action settlement averaged $11,700 per plaintiff. It should be noted that court verdicts and pretrial settlements do not necessarily reflect market value losses. This is especially true when punitive damages are part of a settlement and "mold hysteria" may have affected jury judgments.

The wide range of potential outcomes in toxic mold litigation can be partly attributed to an equally large range of physical defects. These may range from common scenarios of water leakage around sinks and bathrooms, which can be remediated quickly, to cases where mold festers undetected for long periods of time until health concerns are suspected. Consumers' lack of understanding of the issues and fear of a latent defect can contribute to a reluctance to purchase properties with past or present occurrence of toxic mold.

## Contingent Valuation Analysis of Toxic Mold

Another mode of investigating the effects of toxic mold on property values when sufficient market data is not available is a form of market survey known as contingent valuation (CV) analysis. This type of analysis has sometimes been used to determine prospective buyer attitudes toward other types of contamination and defects. CV surveys of prospective buyers, addressing property defects and attributes,[9] have been used as a supportive analytical technique when a sufficient number of market sales are available for analysis. CV surveys are also appropriate when no other pertinent market data is available, as in the case of toxic mold.

---

2.    Robert Wiley, "Mold: The Hidden Menace," *Valuation Insights & Perspectives* 7, no. 2 (Second Quarter 2002): 34.

3.    A Texas appraiser used historical analysis and estimated the preremediation property value discount for properties affected with mold to be 17% to 25%. The postremediation stigma was reported to be up to 3% with full disclosure. However, this conclusion is based on only a few case studies, and the results were reported in a non-peer-reviewed publication and cannot be further verified. See Jack Schoppa, "Mold, Moisture, Stigma and Value," *Appraiser E-Gram* (October 2002), http://www.naifa.com/gram/2002oct/schoppa-oct02.html.

4.    Robert J. Aalberts and Richard W. Hoyt, "Appraisers and Toxic Mold: Legal and Valuation Issues," *Journal of Real Estate Practice & Education* 6, no. 2 (2003): 203–216.

5.    Del Williams, "Commercial and Residential Water Damage: The Mold Connection," *The Appraisal Journal* (October 2002): 447–449; Leonard Zumpano, Suzanne Hartley, and Ken Johnson, "The Problem with Indoor Mold for Portfolio and Property Managers," *Journal of Portfolio Management* 9, no. 2 (2003): 187–192.

6.    Randall Bell, *Real Estate Damages: an Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999); published earlier in Randall Bell, "The Impact of Detrimental Conditions on Property Values," *The Appraisal Journal* (October 1988): 380–391.

7.    Linda A. Stiefsky, "Reduce Mold-Related Risk," *Commercial Investment Real Estate* (March/April 2003): 30–32.

8.    See http://www.mealeys.com.

9.    These surveys feature full information to replicate the "well-informed buyer" assumption under the federal definition of market value. See Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 23.

**Table 1**          Summary of Outcomes of Toxic Mold Legal Cases

| Case Name | Location | Nature of Case | Number of Plaintiffs | Verdict Amount | Case on Appeal | Settlement Amount | Comments |
|---|---|---|---|---|---|---|---|
| *Ayaz et al. v. Fullmer Construction et al.*, No. 00CC06647, Calif. Super., Orange Co. | Santa Ana, CA | Mold contamination case | 1 | $200,000 | - | | |
| *Hatley et al. v. Century-National Insurance Co. et al.*, No. CV 2000-006713, Ariz. Super., Maricopa Co. | Maricopa Co., AZ | Insurance carrier allegedly delayed remediating mold contamination. | 1 | $4 million | - | | Jury awarded Hatleys $244,000 in compensatory damages and $4 million in punitive damages. |
| *Davis et al. v. Henry Phipps Plaza South et al.*, No. 11631/98, Sup., N.Y. Co. | New York County, NY | Residents maintained mold and fungi contamination caused personal injury and property damage | 495 New York apartment residents (Class action) | | | Confidential | Plaintiffs sought approximately $9 billion in damages from two New York apartment N.Y. building owners |
| *Ballard et al. v. Fire Insurance Exchange*, No. 99-05252, Texas Dist., Travis Co. | Austin, TX | Plaintiff claimed carrier acted in an unfair, deceptive, and fraudulent way when evaluating a mold property damage claim. | 1 | $32 million | $4 million or more | Confidential | Trial verdict, appealed down, then a settlement. |
| *Smith et al. v. Behr Process Corp.*, No. 25670-3-II, Wash. App., Div. II | Tacoma, WA | Paint company appealed damages verdict in case in which residents alleged exterior paint caused mold and other property damage. | Class action | | Yes | - | Jury awarded damages ranging from $14,454 to $87,818. Trial court awarded $2.18 million in attorney fees and costs, part of which was attributed to discovery violations. |
| *Sandcastle Condominium Homeowners Assoc. v. Chodour et al.*, No. 724894, Calif. Super., San Diego Co. | San Diego, CA | Builder agreed to pay $125,000 to correct various defects that led to water intrusion and mold. | | | | $125,000 | |
| *Fishburn v. Firemen's Fund Insurance Co.*, Insurance Appraisal Proceedings, Insurance Code [ 2071; CCP [1282 et seq.) | Encino, CA | Appraisal panel awarded funds to home owner for property damages and additional living expenses incurred after the house's underground heating, ventilation, and air-conditioning ducts became contaminated with mold. | 1 | $699,560 | No | | |
| *Allison et al. v. West Del Amo Pacific Condominium Association et al.*, No. YC040331, Calif. Super., Los Angeles Co. | Los Angeles, CA | Condominium association found not liable for claims that a unit contaminated with mold eventually led to personal injuries. A judge in a tentative ruling denied plaintiffs' request for declaratory relief on common unit repairs. | | No award | No | - | Appraisal panel |
| *Anderson v. Allstate Insurance Co.*, No. 01-15330, 9th Cir. | San Francisco, CA | Home owner insurance carrier appealed and home owner cross-appealed a federal judge's decision to reduce a verdict from $18 million to approximately $3 million in a mold property damage case. | 1 | $18 million | $3.3 million | - | Appealed and award reduced |
| *Colon v. Trinity Homes LLC* Ind. Sup. Ct. No. 29D02-0404-PL-374 | Indianapolis, IN | Home builder arrived at a settlement with property owners to begin inspecting and repairing mold damage over the next several years at no cost to home owners. | 2,044 | | | $24 million | Average award $11,700 per property |

Source: Authors and Measley's verdicts and settlements database

The CV method was originally developed to price public goods and has been recently adapted to the estimation of discounts for private real estate properties. Chalmers and Roehr recognize the use of CV surveys for analyzing contaminated real estate in "as is" condition, especially when traditional approaches to value do not work.[10] They advocate the use of formal procedures to interview market participants, including buyers, for real estate cases that involve contamination. Most recently, McLean and Mundy; Allen and Austin; Simons; Simons and Winson-Geideman; Flynn et al., and others have set forth methodological guidance on this topic.[11]

## Study Limitations

A CV analysis has certain limitations. One general concern is that if survey participants have a stake in the outcome of a case, they may give biased results to secure funds. To avoid this threat to validity, the survey presented here excludes individuals directly involved in any mold litigation. Another concern is that respondents may be inclined to provide answers that they think will please the surveyors. Consequently, the trained surveyors in the study were instructed to stay within a prearranged script and were not informed in advance about the details of the case so that this threat to research validity could also be avoided.

A third concern is that some respondents may provide answers that would not reflect their actual actions because there are no real-life consequences to providing responses to hypothetical questions (hypothetical bias). This situation has been associated with a discrepancy between stated (surveys) and revealed (actual sales) preferences.[12] To address this potential for hypothetical bias, unreasonably low bids were removed from the pricing calculations, and instead focus was

placed on the marginal buyer at the top half or top quarter of the market.

Despite the potential limitations, it is appropriate to apply the CV methodology to the toxic mold question, in part because of the compete lack of other available data on the potential effects of toxic mold on property values. Moreover, empirical evidence suggests that CV outcomes do not always overstate the magnitude of losses. For example, Carson et al. compare over 600 CV results (stated preferences) with revealed preference outcomes[13] and find correlation coefficients between 0.60 and 0.98. Interestingly, the CV results were found to be smaller in magnitude (closer to zero) than the revealed outcomes.

## Survey Methods

A survey research firm from Columbia, South Carolina, was engaged to contact a stratified random sample of 200 homeowners in South Carolina. The telephone calls to homeowners were made in November and December 2002. The methodology has been peer-reviewed, and the mold questions were included as additional scenarios as part of a litigation matter unrelated to toxic mold. Of the 200 surveys, 195 were useable for this analysis, meaning that the respondents bid (offered) a baseline housing value and answered key questions in a way that showed that they understood the environmental component of the survey. The survey methodology followed standard research protocols.[14]

The first part of the survey sets the stage and allows the respondent to become familiar with the bidding scale. It also determines the baseline price of a residential property the respondent is seeking in the context of a job move. The average baseline price bid for a home in the CV sample is $121,500, which is reasonably close to the average price of $111,300 for houses in South

---

10.  James A. Chalmers and Scott A. Roehr, "Issues in the Valuation of Contaminated Property," *The Appraisal Journal* (January 1993): 28–41.

11.  David McLean and Bill Mundy, "The Addition of Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property," *Journal of Real Estate Practice and Education* 1, no. 1 (1998): 1–19; Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297; Marcus T. Allen and Grant Austin, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–403; Robert A. Simons, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal* (October 2002): 388–400; Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys," *Journal of Real Estate Research* (forthcoming); James Flynn et al., "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation," *The Appraisal Journal* (Winter 2004): 35–44.

12.  Thomas O. Jackson, "The Contributions of William N. Kinnard, Jr. to the Field of Contaminated Property Valuation," in *Essays in Honor of William N. Kinnard, Jr.*, ed. C.F. Sirmans and E.M. Worzala, 81–89 (Norwell, MA: Kluwer Academic Publishers, 2003); Robert D. Row, Ralph C. d'Arge, and David S. Brookshire, "An Experiment on the Economic Value of Visibility," *Journal of Environmental Economics and Management* 7, no. 1 (March 1980): 1–19.

13.  Richard Carson et al., "Contingent Valuation and Revealed Preference Methodologies: Comparing the Estimates for Quasi-Public Goods," *Land Economics* 72, no.1 (Feb. 1996): 80–99.

14.  The initial instrument was pretested for time length, clarity, and for other items that might cause problems; subsequent instruments used the same or very similar questions. A recent pretest of a very similar instrument among a random sample of the group to be surveyed showed no problems in comprehension, language clarity, or other issues. The population for this study was residential homeowners in all 46 counties in South Carolina, and the results can be generalized to this population. Interviewers were given instructions to call names at random and to continue making calls until the required number of interviews were completed. For this type of survey, generally about 30% of the calls result in no answer, another 30% are answered by answering machines, and 10% of the numbers are no longer active. Of the remaining 30%, about 20% participate, and nearly all of these finish the interview. The remaining 10% refuse to participate or are not the homeowner. If a telephone number does not result in a completed survey, the interviewer randomly selects another telephone number. If needed, numbers are called up to three times before they are removed from the pool. The overall response rate (i.e., useable, completed survey by qualified respondents) once the interviewer speaks to the homeowner has been over 60%. Thus, because the factors leading to nonparticipation (mostly no answer, answering machine, and some out-of-date numbers) were unrelated to demographics or other key respondent characteristics, the survey technique is sufficiently random to allow its use for statistical analysis. In addition, a split-sample technique was employed to test if the position of questions within the instrument affected the results.

Copyrighted material licensed by Randall Bell on April 26, 2021

Carolina in 2002. When asked which of the different scenarios (property near a business park, property near a railroad track, properties with leaking underground storage tank, or property with toxic mold contamination) they were most likely to bid on, only 8% said the toxic mold scenario, the lowest percentage for any of the four scenarios presented.

With respect to the nonmold scenarios, the first potential scenario asks for any discount related to a business park located a block away. About 90% of respondents bid on the business park scenario. Another scenario asks for any discount related to a railroad track located behind the home. About 64% of the respondents bid on the railroad track scenario. Still another scenario asks for any discount related to a property that is contaminated from gasoline releases from a leaking underground storage tank. About 55% of the respondents bid on this scenario.

Two factors are of primary importance in evaluating the survey results. The first is the percentage of respondents who would bid on a scenario. The ratio of no bid to total bids reflects the loss of market demand for the property. The second factor is the potential value loss on sale. Of those that bid, the ratio of maximum bid to baseline price reflects the percentage they would pay. One minus this percentage reflects the discount, for example, if the person's baseline price was $100,000 and the maximum they would bid was $70,000, the discount would be 30%.

## The Toxic Mold Scenario

The survey presented a description of a home with a toxic mold problem that had been remediated. The text description reads as follows:

The property has a nice home on it, but in the recent past the home was subjected to water damage and a black mold was found in a bathroom area and in the basement. More investigation showed that the mold had also grown into the walls of the house. Environmental testing showed the mold to be toxic. The home was cleaned by a professional crew, which had to open the inside walls and remove the mold, and rebuild the affected parts. The local health authority has said that the mold is gone. Except for this one issue, the neighborhood is like yours, and the home is very similar to your home.

The bidding issue was determined by the following question:

Using the scale below, where –3 means you definitely would not bid and +3 means you would, how likely is it that you would make any offer on this home?

A total of 113 respondents (58%) bid on the toxic mold scenario; 42% of the respondents did not bid. This ratio of no bid to total bids indicates a substantial reduction in the market demand for this type of property, assuming that information about this problem is available to potential home buyers. Empirical evidence also indicates that neighborhood characteristics do not independently affect the likelihood of bidding on contaminated residential property.[15]

Of those that bid, the following question was asked:

What is the most you would be willing to pay for the home?

The prices bid by these 113 respondents were discounted by between 0% (the smallest discount, full value) and 99% of full value (a throw-away bid). The average discount for the property affected by the toxic mold releases was 59%.

However, not all these bids would necessarily be in the market. Due to search costs and the small number of bidders, the chances are reduced that any of the potential bidders would find a suitable home and place a bid that would be accepted by a seller. On the other hand, hugely discounted "bottom-fishing" (very low) bids would have little value in the market because it is the bids with the smallest discounts–those at the top of the market–that would get the attention of likely sellers and culminate in a sale.

The decision on which price-reduction figure to apply would be a function of supply and demand. On the demand side (represented by the CV potential buyers), there is evidence of a large, but not complete, reduction in the number of potential buyers (only 58% bid).[16] Because the survey did not specify the number of houses that are afflicted with mold, a firm percentage reduction cannot be determined. However, if there were relatively few affected units, then the losses would approximate the lower discounts associated with the top quarter of the market. This would indicate that sellers would entertain bids averaging 80% of market range (equivalent to a 20% reduction in value). If more affected units were in the market, for example all or part of an entire subdivision, market-clearing bids in the top half of the market (average loss of 37%) would probably be considered.[17] In other words, the average discount of the top quarter of potential bidders is 20% when information about the toxic mold problem is known and the problem is believed to be cured. The discount for toxic mold can be loosely interpreted as pure stigma damages.

15. See Simons and Winson-Geideman, Table 6b. That study also uses CV analysis to determine the effects of leaking underground storage tank contamination on residential property in eight states, including South Carolina. The research used a Probit model to include the factors associated with bidding on contaminated property, including character of neighborhood (primarily residential, commercial/mixed, etc.). These variables were not statistically significant.

16. The percentage of buyers willing to bid is also a function of risk aversion, confidence in the information presented, and consideration of latent defect.

17. A split sample was conducted in which about half of the respondents received a slightly different version of an unrelated scenario. The toxic mold scenario did not vary and appeared in the second and fourth sequential positions out of four scenarios. The results presented in the article are the average of all who responded on the toxic mold scenario. There was a small amount of fluctuation within the split sample. For example, the percentage of bidders for each half of the split sample ranged from 56%–62%, while the average bid was 59%–61% for each half sample. The average of the top-half bids for the split sample ranged from 36%–40%. A difference-of-proportions analysis reveals that none of the three sets of bid figures from the split sample are statistically distinct from each other at a 95% level of confidence. Therefore, the ordering of the questions does not appear to have materially affected the results.

A separate analysis based on house prices was also conducted. For a house priced at $100,000 or less, 66% of respondents bid, compared with the 53% that bid on houses priced above $100,000. The top-half bids and top-quarter bids for the lower-priced group of houses had average discounts of 37% and 21%, compared with discounts of 49% and 34% respectively for the higher-priced house group. The main difference can be attributed to three no-discount bids in the lower-priced group and none in the higher-priced group. It is reasonable to conclude that the magnitude of any loss would be greater in higher-priced houses.

## Conclusions from the Toxic Mold Survey

The results of this survey demonstrate the relative undesirability of residences afflicted with toxic mold. Only 58% of prospective home buyers with full information would bid to buy a home with mold contamination, and they would discount their bids so much that many sellers would probably refuse to honor them. Full information generally means that the seller would have to disclose the condition upon listing the house for sale and that the buyer would be provided with enough information to be considered well informed. Therefore, it appears that the loss on this type of property, calculated using the CV survey approach, would be between 20% (when there is one or only relatively few affected units) and 37% (when more units are affected by toxic mold). The appropriate figure for a given situation would depend on supply and demand and would reflect postcure stigma.

This reduction in bid value is a way to measure the reduction in housing utility, or the flow of enjoyment from owner-occupied housing. It also assumes more complete information than is probably the case among actual buyers and sellers of homes in typical transactions where only sellers may know of selected defects but choose not to disclose them unless required by law.

## Distinctions among Buyers

Within the marginal-bidder framework, an important issue is how to reconcile what portion of market bids should be considered. For example, there are buyers in every market that self-select, use asymmetric information, or have different levels of risk aversion. But that does not mean that the average or typical market participant who purchases a home in that same market thinks and acts like the buyer who has an unusually high or low level of perceived or real risk. For example, a structural engineer with special expertise buying slide-zone property that others consider worthless would have a dominant bid for a property in a slide zone. This situation is more relevant for a single or very small set of properties; however, even in this situation, market depth is an important issue. After the first house sells at or near full, unimpaired value, is there another engineer ready to buy the next house? More generally, there are information and search costs, and

some high bidders also look at other properties. Thus, each high bid would not get assigned to each house on the market, and bidders below the top bid would be able to acquire properties with their bids. This supports averaging the top of the market in those markets with few defective properties for sale. This is an example of a market with low supply and limited demand.

In markets with a larger supply of defective properties (such as an area with a class action lawsuit for groundwater pollution) and more potential buyers, averaging the top of the market is essential because the top buyer's bid satisfies only a small portion of the market. Although it is true that in some cases groups of buyers may have less than full information about local market conditions (e.g., large numbers of foreign buyers in a market with a speculative bubble), this is an exception and not in long-run equilibrium.

In sum, because the CV survey results include a few full (undiscounted) bids on a property with toxic mold does not mean that every house affected with mold will trade at full value without a discount. How to determine which portion of the top of the market to apply in a given situation is an important matter for future research.

## Toxic Mold Case Study

Rigorous case studies can also provide guidance in determining potential real property value losses. Although generalizations may not be made from them, case studies such as that of a mold-infested apartment complex in Seattle, Washington, provide a useful look at the way events unfold and how the effects of mold (and in this case the lack of insurance) may affect a property's value.

### Property Description

The case study property is an apartment complex originally constructed in 1965. Purchasing this complex was the property owner's first venture into low-equity real estate investment. When he purchased the property in 1983, the 42-unit complex had only eleven tenants and only seven of these were paying rent. The complex had poor-quality construction and lacked ventilation systems in the bathrooms and kitchens. This resulted in continuous upkeep of the buildings and higher maintenance costs than the owner expected.

Under the new owner, the rents were adjusted for the condition of the property, and economic occupancy was brought up to between 70% and 95% depending on the year. This occupancy level had been maintained for the past decade with a rental rate attractive to a low- to middle-income renter pool. The owner believed the property had a market value of $1.1 million to $1.2 million, including a land value of $300,000.[18] However, based on a review of the last three years of the property's net operating income capitalized at a local market rate and on all tenants' having month-to-month leases, the value of the complex was probably closer to $700,000. For the purpose of estimating losses in this

---

18.   The data for this case study was provided by a property owner from Washington who wishes to remain anonymous due to concerns about potential tenant litigation. He provided ten years of cash-flow data for the apartment complex.

Copyrighted material licensed by Randall Bell on April 26, 2021

case study, it is assumed that the asset would appraise for $750,000. The owner had a mortgage loan with recourse of $500,000 on the property, so the owner's equity position prior to discovery of the mold problem was $250,000. Although fairly typical, the recourse factor substantially complicates the analysis of this case.

### Discovery of Mold and Cancellation of Insurance

In 2002, the owner of the apartment complex evicted a tenant for nonpayment of rent, and the tenant notified the health authority that he was not paying rent because of claims of a toxic mold concern. The health authority required the owner to open up the walls in the unit for inspection once the occupant had permanently vacated. This action revealed a visible amount of mold inside the walls, alarming the owner and motivating him to investigate toxic mold issues on the Internet. He discovered pictures of toxic mold that resembled the conditions of the interior of the walls in the vacated unit. His further investigation revealed the growing number of litigation cases and claims of health effects from toxic mold.

The property owner assessed his options prior to having the entire complex investigated. If an investigation revealed a toxic mold problem throughout the complex, he would be obligated to notify each of the tenants. This notification might also lead to each tenant's pursuing legal remedies. He notified his insurance company of the findings by the health authority. Insurance company representatives came to the site and tested for toxic mold. During the visit, the insurance representative notified the owner that the policy on the apartment complex would be cancelled in forty-five days. The property owner was informed that a mold claim was not covered because it is considered fungi and thus excluded in the insurance policy

As indicated, the insurance company cancelled its policy on the apartment complex forty-five days later along with the policies of the owner's five other apartment complexes insured by the property-casualty firm, some of which were of better quality. The owner of the apartment complex in this case study initially had difficulty finding insurance for properties that he owned that were not affected by toxic mold, resulting in a change in insurance premiums from a previous payment of $8,000 per year to $25,000 per year for the non-mold-related properties (a factor that is not considered in the loss estimated below). Cancellation of the insurance policy on the mold-affected property severely limited the owner's options.

### Assessment of Alternative Courses of Action

The owner's options included abandoning the complex, razing the structures and pursuing a new development project on the site, or remediating the complex and re-leasing it. The potential for tenant lawsuits based on health claims, the loss of revenue during the remediation, and the re-leasing of units to new tenants (because the current tenants were likely to find other permanent housing in the interim) were important issues. Also of concern was that public knowledge of the mold prob-

lems would result in higher vacancy or lower rents. The cost to bring the building up to current building codes was unknown, and it was unlikely that the complex would be able to get insurance after remediation. The property owner also had an outstanding mortgage loan, with recourse for $500,000. Any decision would prove costly.

The owner decided that the way to minimize losses was to demolish the buildings. He notified the tenants by letter that he would be asking them to leave but was allowing them to stay rent-free for two months while they searched for replacement housing.

After the property was vacated, the insurance company sent the owner the results of its testing, which showed mold levels inside the buildings to be from 1,000 to 5,000 times the outside measurements. As of February 2004, the buildings had been demolished and the land was being prepared for redevelopment. The property owner refinanced another apartment complex, using the "cash-out" proceeds to pay off the outstanding mortgage balance on the contaminated property, thereby maintaining his credit throughout this financial catastrophe.

### Analysis of Case Outcomes

The losses in this case can be looked at several ways. The loss of the owner's prediscovery equity of $250,000 was in excess of 100% of the equity amount due to the recourse provisions of his mortgage and demolition expenses. Before the mold problem, his balance sheet showed asset value of $750,000, liability of $500,000, and net equity of $250,000. After the mold problem, the balance sheet showed asset value of $300,000 (remaining value of the land) and liability of $500,000 from the recourse loan plus $50,000 for demolition, resulting in a net equity of -$250,000 ($300,000 – $500,000 – $50,000).

If the property owner had owned the building without financing and demolished it, the loss would have been $750,000 plus the $50,000 for demolition less the $300,000 land value, resulting in a net loss of $500,000, or 66%, based on the real estate asset. However, this scenario of 100% equity ownership is not as likely for a private investor who has borrowing capacity. It is more likely for debt-averse investors such as pension funds that do not have the tax advantages of debt. However, this would have been the best outcome for the owner and reflects loss to the property rather than to the owner.

Hypothetically, if the owner had a nonrecourse loan and had walked away from the property prior to demolition, the loss to the owner would have been 100% of equity. (The owner's net equity would be negative in this case: net asset value of $200,000 after demolition and a mortgage liability of $500,000.) The lender would then own an asset worth about $250,000 after demolition. Since the mortgage was $500,000, the lender would suffer a loss of 50%, assuming it decided to demolish the property immediately. This scenario demonstrates the lender's risk, which will inevitably be priced into future loans in terms of rate, fees, or guarantees.

Thus, the decision to demolish the building appears to have been the best alternative under the circumstances. The best outcome under the different

ownership scenarios considered here would be a loss of over 60%, which indicates that demolition was the right approach because it results in a smaller loss than incurred by riding out the remediation and re-leasing of the property.[19]

## A Study of Toxic Mold in Cleveland, Ohio

Cleveland is the central city in Cuyahoga County, Ohio, with a 2000 population of about 1.6 million and over 500,000 housing units. Toxic mold is not a particularly well-known problem in Cleveland, but it is nevertheless a concern. Over the past several years, the Cuyahoga County Board of Health received 545 calls about mold and conducted 402 home visits. A total of 147 homes qualified for and were enrolled in a program designed to determine the health effects of mold on children with asthma. By program definition, all of those homes had expected remediation costs under $10,000. Of the 70 homes remediated to date, 46 (about 65%) were owner occupied and 24 were rentals. The average remediation costs were $6,900 and the average elapsed time between reporting the problem to the authorities and the final signoff that the property was cleared of the mold problem was 8.4 months.

In addition to these 70 homes, there were 12 homes remediated separately at an average cost of about $15,000. Thus, the weighted-average remediation cost of the Cleveland experience is about $8,200, or about 5%-15% of property value for an average home in this county.[20] Only two of the 70 properties were marketed and sold after a bout with mold, but their sale prices did not differ excessively from expectations; information on marketing time was not available. The sales data is too sparse at this point, however, to draw any conclusions concerning stigma or other discounts on sale.

## Conclusion and Comparison of Outcomes

Little empirical information is available to determine the effects of toxic mold on property values. While some appraisers may have data in their personal files, no peer-reviewed evidence is available on the extent of property damage caused by toxic mold. To partially remedy this situation, this article presents a report of nonempirical literature available on toxic mold. Also presented is research in different parts of the United States that provides some measure of empirical results: legal case outcomes, contingent valuation surveys of postremediated residential homes in South Carolina, a case study of an apartment complex affected by toxic mold in Washington state, and a public health study of mildly affected residential property in Ohio. These studies address different parts of the mold issue and do not provide a clear answer, but they are the best data available at this time. Table 2 summarizes the findings.

The ten legal case outcomes documented since 2000 show very substantial losses due to toxic mold contamination, with the settlements often being many times the value of the property. Both individual plaintiff lawsuits and class action lawsuits have been tried and settled, and there is a very large backlog of cases. A survey of potential home buyers in South Carolina shows that potential buyers would expect a stigma discount of between 20% and 37% on postremediated residential properties that had been affected by toxic mold. A case study of an apartment complex infected with toxic mold illustrates the issues and decisions of a property owner who demolished a property rather than risk an undeterminable set of costs for a loss in excess of 100% of his equity. Finally, mildly affected properties in Cleveland had remediation costs of 5%-15% of property value.

These results present a very wide range of outcomes, which can be expected to narrow somewhat as data on mold cases becomes available, mold prevention strategies are developed, and public awareness increases. This research suggests that when the lower ranges of clean-up costs are combined with postremediation stigma, there is a generic minimum reduction in value of 25% for residential properties that are currently affected by toxic mold but that can be remediated. This reduction could increase to 50% when many affected properties are in the same market.

All that can be inferred at this early stage in toxic-mold research is that property values of units previ-

| **Table 2** | **Summary of Toxic Mold Study Outcomes** | | | | |
|---|---|---|---|---|
| **Type of Study** | **Property Type** | **Type of Loss** | **Amount of Loss** | **Sample Size** |
| Legal cases | Varied, mostly residential | Property, punitive damages, health issues | $11,700 to several million dollars per property | 10 verdicts and settlements since 2000 |
| Contingent valuation survey | Residential houses in South Carolina | Postremediation stigma | Stated losses of 20%–37%; 42% of respondents would not bid at all | Random sample of 195 prospective house buyers |
| Case study | Garden-style apartment complex near Seattle | Demolition of complex and pay-off of loans | 50%–70% losses to property, over 100% loss to equity (recourse financing) | 1 |
| Health monitoring | Residential houses with children at risk for asthma in Cleveland | Remediation costs for mildly affected properties | 5%–15% remediation costs | 82 houses remediated after affected by mold |

---

19. Putting this property's experience back into the context of Bell's detrimental conditions diagrams, this case could be a total loss, with the added insult of personal liability because the outstanding mortgage debt was greater than the value of the land.

20. John Sobolowski (supervisor, Healthy Homes Program, Cuyahoga County Board of Health) in a telephone interview with Robert Simons.

Copyrighted material licensed by Randall Bell on April 26, 2021

ously contaminated with toxic mold would suffer from a discounted sale price and a smaller number of interested buyers compared to similar homes without mold related histories. This suggests that more research on the clean-up costs and long-term property value effects of toxic mold is urgently needed. Proper study of this problem will provide more guidance to appraisers and other real estate market participants on liability and valuation issues related to toxic mold. Research could provide information on several related topics, including determination of the following:

- How to remediate and maintain a toxic-mold-free property
- Who is qualified to inspect mold–suspected property and how they should be trained

- The responsibilities and liabilities of real estate participants
- The insurance implications for property before and after a toxic mold event
- How investors can protect themselves against surprises from toxic mold

It may also be beneficial to address the level of market participants' knowledge about toxic mold and the phenomenon of other newly discovered market-influencing factors. This research could take the form of open-ended questions or focus groups. Research is also needed on how to reconcile supply and demand issues to determine discounts for contaminated properties when using survey data and other techniques in markets of various sizes.

# 7.13 Toxic Mold Liability Update: Implications of *Kilian v. Equity Residential Trust*

*by Robert J. Aalberts, JD, and Richard W. Hoyt, PhD, MAI, SRA*

This article originally appeared in the Spring 2006 issue of *The Appraisal Journal*.

## Abstract

This article looks at the 2004 federal district court decision in Kilian v. Equity Residential Trust and its impact on toxic mold litigation. In Kilian, the court dismissed a mold-related claim based on scientific evidence showing that only a limited number of people are vulnerable to the effects of mold. This suggests that while a property may have a history of mold, the impact may be less than previously predicted. Real estate appraisers, however, must continue to be observant in their assignments of abnormal conditions, such as mold, that might have an impact upon value. The article looks at the *Uniform Standards of Professional Appraisal Practice* and the *Guide Notes* for guidance on appraisers' responsibilities.

For the past ten years, toxic mold has been perceived as perhaps the most serious legal problem confronting residential and commercial real estate. Mold, the experts explain, is everywhere. All that is needed is water, warmth, and a cellulose-based food source (e.g., wood, sheet rock, gypsum), and potentially deadly mold will appear. In addition, mold is very difficult to detect since it can lurk behind walls, and this compounds its potential danger to the occupants' health.[1] Many experts predicted that mixing these factors together would result in an explosion of toxic mold lawsuits rivaling that of asbestos-related claims.[2] Yet today, after a number of court cases and with a better ability to view things from an objective and scientific perspective, it appears that some of the most serious assertions about mold were more hype than fact.[3] Mold, in fact, is not always toxic, and so therefore may not always harm people or affect property value.

This article will discuss the evolution of recent legal and medical thinking concerning mold. In light of a potentially groundbreaking case from Arizona, and a scientifically sound and revealing study on the issue of mold and excessive indoor dampness, this article concludes that it is likely that the mold epidemic will be viewed in the future as less threatening than formerly assumed. However, real estate appraisers must continue to remain cognizant about toxic mold, damp indoor environments, and any possible impact upon value.

## History of Mold Liability Claims

Some commentators have traced much of the mold panic to a well-publicized incident in the late 1990s.[4] The case it spawned, *Allison v. Fire Insurance Exchange*[5] started after Ron Allison and Melinda Ballard began to complain about various physical ailments that they were convinced were related to the mold in their home. Ballard asked her insurer, Fire Insurance Exchange (a subsidiary of Farmers Insurance), to pay for the removal and replacement of the home's mold-infested floor; the company balked. The insurer claimed that the mold was not caused by an existing leak, but by an older one that had been previously repaired.

When their illnesses did not abate, Allison and Ballard hired their own mold expert. The expert's assessment sent the family reeling. They were advised to move out immediately so that extensive mold remediation could be conducted. The home was infested with stachybotrys, one of the most dangerous molds. The family soon became literally the poster children for the toxic tort crisis after their ordeal was depicted on the cover of *USA WEEKEND Magazine*.[6] Pictured both in front of the imposing-but-besieged antebellum mansion as well as in space suits in the living room, Allison and

1. Sylvia Hsieh, "Homeowner Suits Over Synthetic Stucco Are Increasing," *Lawyers Weekly U.S.A.*, September 3, 2001): 1, 23.

2. Gregory A. Goodman, "Insurance Triggers as Judicial Gatekeepers in Toxic Mold Litigation," *Vanderbilt Law Review* 57, no. 1 (January 2004): 241–285; and Robert J. Aalberts and Richard W. Hoyt, "Appraisers and Toxic Mold: Legal and Valuation Issues," *Journal of Real Estate Practice and Education* 6, no. 2 (2003): 203–215.

3. T. Jarman-Felstiner, "Mold is Gold: But Will It Be the Next Asbestos?" *Pepperdine Law Review* 30, no. 2 (2003): 529–551; see also Robert A. Simons and Ron Throupe, "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values," *The Appraisal Journal* (Spring 2005): 156–166.

4. Elizabeth L. Perry, "Why Fear the Fungus? Why Toxic Mold Is and Is Not the Next Big Toxic Tort," *Buffalo Law Review* 52, no. 1 (2004): 257–299; and Goodman.

5. *Allison v. Fire Insurance Exchange*, 98 S.W.3d 227 (Tex. App. 2002).

6. Arnold Mann, "Mold: A Health Alert," *USA WEEKEND Magazine*, December 3–5, 1999, 8–9, available online at http://www.usaweekend.com/99_issues/991205/991205mold.html.

**Robert J. Aalberts, JD,** is the Ernst Lied Professor of Legal Studies at the University of Nevada, Las Vegas. He received his JD from Loyola University and MA in geography from the University of Missouri, Columbia. His work has previously been published in *The Appraisal Journal* and other real estate publications.

**Richard W. Hoyt, PhD, MAI (ret.), SRA (ret.),** is Emeritus Professor of Finance/Real Estate at the University of Nevada, Las Vegas. He received his PhD from the University of Arkansas. He chaired the Appraisal Institute's Research Advisory Board and served on the Research Committee. Hoyt was also a member of the Body of Knowledge Task Force for the Appraisal Qualifications Board. His work has previously been published in *The Appraisal Journal* and other real estate publications.

The authors wish to thank the Lied Institute of Real Estate Studies for its support of real estate education and research at the University of Nevada, Las Vegas.

Copyrighted material licensed by Randall Bell on April 26, 2021

Ballard and their home appeared indeed to be in a state of crisis. Their story was subsequently broadcast in a CBS television special titled *Killer Germs.*[7]

Despite the media buildup, the court decision did not address whether mold caused the family's illnesses. The trial judge ruled that the expert witnesses' testimony was inadmissible since it failed to meet the state standards for reliability. Moreover, the plaintiffs could not demonstrate the required link between the illnesses they allegedly contracted and the toxic mold. Even so, the jury awarded Ballard a $32 million judgment. The judgment, however, was not due to personal injuries, but because Farmers Insurance knowingly and fraudulently failed to comply with the terms of the insurance policy. The jury was punishing Farmers for acting in bad faith.[8] Yet, the case turned out to be far from being resolved. After the trial, an appellate court reduced the award to $4 million. In March 2004, the same appellate court remanded the case for a new trial that apparently precipitated an undisclosed settlement between the parties in that same month.[9]

After the jury award to Ballard, a flood of new cases swamped the courts.[10] Insurers scrambled to write new policies with mold exclusions. Yet, fearing the punitive effects of more bad faith lawsuits, the companies settled many of the older claims. By this time, reacting to the losses incurred by the insurance companies and sensing that mold was becoming a highly newsworthy event, the media proclaimed that mold was now reaching nearly epidemic proportions that would soon rival the billions of dollars in asbestos claims.[11] This set off even more fear among property owners and more lawsuits by alleged victims. The fact that there was a tempting smorgasbord of parties to sue, jointly and severally, also contributed to the litigious environment. The targets included general contractors, subcontractors, lessors, real estate agents, architects, and engineers among others. Many of these parties not only owned assets, but also possessed good insurance policies,[12] which created a deep pocket giving plaintiffs an added incentive to file a lawsuit. Stories about

celebrities pressing claims for personal injuries and damages to their homes– ranging from Ed McMahon to Erin Brockovich–added to the media drumbeat.[13]

A recent article in *The Appraisal Journal* investigated ten legal cases since 2000 involving mold, with losses ranging from $11,700 to several million dollars per property.[14] The study further looked at a contingent valuation survey with stated losses in value ranging from 20% to 37%, an apartment case study with a 50% to 70% loss in property value, and a remediation cost of 5% to 15% of property value for several houses affected with mild cases of mold. Only two of the remediated homes were sold (at expected sale prices) after remediation, and there was insufficient data to "draw any conclusions concerning stigma or other discounts on sale."[15]

## The *Kilian* Case: Putting a Serious Problem into Perspective

Although there may have been large losses associated with toxic mold, legal historians may someday view *Kilian v. Equity Residential Trust*[16] as the beginning of the end of the toxic mold frenzy. In that case, a federal district court in Arizona issued a short, but potentially far-reaching ruling related to claims for toxic mold related injuries. In *Kilian*, the plaintiff had complained about neuropsychiatric symptoms. Like the lawsuit by Allison and Ballard, Kilian's was featured in the *USA WEEKEND Magazine.*[17] However, in the *Kilian* case, the court considered a 2004 study issued by the Institute of Medicine (IOM) of the National Academy of Sciences, titled *Damp Indoor Spaces and Health,*[18] and based on that study, the Kilian court asserted that there is "insufficient evidence of an association between neuropsychiatric symptoms and the presence of mold."[19] Table 1 and Table 2 show a summary of the IOM findings regarding the association of health conditions and damp indoor environments and mold.

Despite the possible influence *Kilian* may have on the future of mold claims, the decision should be viewed with caution since it is still just one case with

---

7. Perry; and Gregory J. Johansen, "Litigating Mold Claims: Crisis? What Crisis?" *Journal of Land Use and Environmental Law* 19, no. 2 (2004): 465–487.

8. *Allison*; Ballard owned title to the house and the homeowners' insurance was in her name, thus the award was to her.

9. GenRe/FACWorld, "Farmers Insurance settles mold/bad faith homeowners suit with Melinda Ballard," *Hot Topics*, http://www.facworld.com/Facworld/ ENVPOLL. NSF/FacWorld/March2005North%20America?OpenDocument&Ref=HotTopics (accessed April 17, 2005).

10. Arnold Mann, "When Mold Takes Hold: Renters From Arid Arizona to Tony Manhattan Attribute Sinus Infection, Seizures and Worse to the Toxins Lurking in the Apartments They Know They Should Flee—But Often Can't," *USA WEEKEND Magazine*, July 21, 2002, available at http://www.usaweekend.com/ 02_issues/020721/020721moldapt.html.

11. Johansen.

12. Robert J. Aalberts, "Will Toxic Mold Become the Next Asbestos?" *Real Estate Law Journal* 31, no. 2 (2002): 103–106; and Elliott Klayman, "Toxic Mold: A Growing Problem For the Real Estate Industry," *Real Estate Law Journal* 31, no. 3 (2002): 311–228.

13. Klayman; Jarman-Felstiner.

14. Simons and Throupe.

15. Ibid., 164.

16. *Kilian v. Equity Residential Trust*, No. CV-02-1272-PHX-FJM (D. Ariz. July 27, 2004).

17. Mann, "When Mold Takes Hold."

18. Institute of Medicine, Committee on Damp Indoor Spaces and Health, Board on Health Promotion and Disease Prevention, *Damp Indoor Spaces and Health* (Washington, DC: National Academies Press, 2004), available at http://www.nap.edu/books/0309091934/html.

19. *Kilian*, 2.

**Table 1**          IOM Summary of Findings Regarding the Association Between Health Outcomes and Exposure to Damp Indoor Environments*

**Sufficient Evidence of a Casual Relationship**

·   (no outcomes met this definition)

**Sufficient Evidence of an Association**

| | |
|---|---|
| ·   Upper respiratory (nasal and throat) tract symptoms | ·   Wheeze |
| ·   Asthma symptoms in sensitized asthmatic persons | ·   Cough |

**Limited or Suggestive Evidence of an Association**

| | |
|---|---|
| ·   Dyspnea (shortness of breath) | ·   Asthma development |
| ·   Lower respiratory illness in otherwise-healthy children | |

**Inadequate or Insufficient Evidence to Determine Whether an Association Exists**

| | |
|---|---|
| ·   Airflow obstruction (in otherwise-healthy persons) | ·   Skin symptoms |
| ·   Mucous membrane irritation syndrome | ·   Gastrointestinal tract problems |
| ·   Chronic obstructive pulmonary disease | ·   Fatigue |
| ·   Inhalation fevers (nonoccupational exposures) | ·   Neuropsychiatric symptoms |
| ·   Lower respiratory illness in otherwise-healthy adults | ·   Cancer |
| ·   Acute idiopathic pulmonary hemorrhage in infants | ·   Reproductive effects |
| ·   Rheumatologic and other immune diseases | |

\*   These conclusions are not applicable to immunocompromised persons, who are at increased risk for fungal colonization or opportunistic infections.

Source: This information originally appeared as Table 5-12 in Institute of Medicine, Committee on Damp Indoor Spaces and Health, Board on Health Promotion and Disease Prevention, "Human Health Effects Associated with Damp Indoor Environments," Chap. 5 in *Damp Indoor Spaces and Health* (Washington, DC: National Academies Press, 2004), 253, available at http://www.nap.edu/books/0309091934/html/253.html.

limited impact at this time. For example, the case has not been published in the court opinion reporter system for easy access by lawyers and judges and is currently on appeal to the Ninth Circuit Court of Appeals. However, because of the case's reliance on an authoritative and groundbreaking health study, *Kilian* may signal a change in how the courts treat mold. However, the appraiser must continue to reflect the perception of the market when dealing with abnormal conditions, and if the market believes mold adversely affects value, the appraiser must continue to reflect those opinions, regardless of the basis for those beliefs.

Still, the case should not be viewed in a vacuum. There were strong signs of evidentiary weaknesses in the purported effects of toxic mold on humans in the years leading up to *Kilian.* In fact, the now famous 1993 U.S. Supreme Court case of *Daubert v. Merrill Dow Pharmaceuticals, Inc.*,[20] which the Kilian court relied upon, is perhaps most responsible for the change.[21]

## Standards for Expert Testimony on Mold

In a short but illuminating October 2003 *National Law Journal* article,[22] John Parker Sweeney points out that the success of toxic mold claims depends largely on whether the plaintiff lives in a state using the *Daubert* standard for expert testimony or a state that still applies the old *Frye* test based on the 1923 case of *Frye v. U.S.*[23] The *Daubert* decision requires that the court look at four factors in deciding on the reliability of expert testimony on research: empirical testing, peer review, error rate, and general acceptance in the scientific community.[24] The *Frye* test provides that only general acceptance in the scientific community is necessary.[25] As a result, in those states applying the *Frye* test, sympathetic juries are allowed to hear what Sweeney calls "unfounded opinions from unqualified experts."[26] Plaintiffs' attorneys in *Frye* states, according to Sweeney, have convinced judges that there is indeed a general acceptance in the scientific community that mold causes a large number of illnesses, including serious neurological problems. Yet, because of the more liberal admissibility standard, awards can be based on studies that are flawed in Frye jurisdictions.[27]

A good case in point is the 1997 Florida case of *Centex-Rooney Construction Co. v. Martin Co.*[28] Applying the Frye test, an expert witness was able to present a few studies and successfully convince the jury that the scientific community generally accepts the theory that mold causes work-related asthma. Once this evidence was in-

---

20.    *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

21.    The relevance of Daubert to real estate appraisers has been previously discussed in Richard W. Hoyt and Robert J. Aalberts, "New Requirements for the Appraisal Expert Witness," *The Appraisal Journal* (October 1997): 342–349; and Richard W. Hoyt and Robert J. Aalberts, "Implications of the Kumho Tire Case for Appraisal Expert Witnesses," *The Appraisal Journal* (January 2001): 11–18.

22.    J. P. Sweeney, "Bad Science Runs Amok," *National Law Journal* (2003): 43.

23.    *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923).

24.    *Daubert*.

25.    *Frye*.

26.    Sweeney.

27.    Ibid.

28.    *Centex-Rooney Constr. Co. v. Martin Co.* 706 So. 2d 20 (Fla. 4th DCA 1997).

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 2**    IOM Summary of Findings Regarding the Association Between Health Outcomes and the Presence of Mold or Other Agents in Damp Indoor Environments*

**Sufficient Evidence of a Casual Relationship**

·   (no outcomes met this definition)

**Sufficient Evidence of an Association**

| | |
|---|---|
| ·   Upper respiratory (nasal and throat) tract symptoms | ·   Wheeze |
| ·   Asthma symptoms in sensitized asthmatic persons | ·   Cough |
| ·   Hypersensitivity pneumonitis in susceptible persons[†] | |

**Limited or Suggestive Evidence of an Association**

·   Lower respiratory illness in otherwise-healthy children

**Inadequate or Insufficient Evidence to Determine Whether an Association Exists**

| | |
|---|---|
| ·   Dyspnea (shortness of breath) | ·   Skin symptoms |
| ·   Airflow obstruction (in otherwise-healthy persons) | ·   Asthma development |
| ·   Mucous membrane irritation syndrome | ·   Gastrointestinal tract problems |
| ·   Chronic obstructive pulmonary disease | ·   Fatigue |
| ·   Inhalation fevers (nonoccupational exposures) | ·   Neuropsychiatric symptoms |
| ·   Lower respiratory illness in otherwise-healthy adults | ·   Cancer |
| ·   Rheumatologic and other immune diseases | ·   Reproductive effects |
| ·   Acute idiopathic pulmonary hemorrhage in infants | |

\*   These conclusions are not applicable to immunocompromised persons, who are at increased risk for fungal colonization or opportunistic infections.

†   For mold or bacteria in damp indoor environments

Source: This information originally appeared as Table 5-13 in Institute of Medicine, Committee on Damp Indoor Spaces and Health, Board on Health Promotion and Disease Prevention, "Human Health Effects Associated with Damp Indoor Environments," Chap. 5 in *Damp Indoor Spaces and Health* (Washington, DC: National Academies Press, 2004), 254, available at http://www.nap.edu/books/0309091934/html/254.html.

troduced, the jury awarded the plaintiffs over $14 million in damages. After the *Kilian* decision, however, judges and scientific experts in *Frye* states now will be hard pressed to ignore the carefully conducted and extensive IOM health study that maintains that there is only limited or suggestive evidence of such an association.

In contrast to *Frye* jurisdictions, *Daubert* states have usually reached the opposite conclusion in mold cases. Under *Daubert* standards, plaintiffs presenting claims must first prove general causation, as well as specific causation.[29] The former is accomplished through epidemiological studies. However, such studies have not conclusively proven a general causal link between mold and humans. Moreover, specific causation, also required under *Daubert*, requires a showing that the specific toxin in question caused the actual injury alleged by the victim. This involves four steps: (a) proof that the building or residence contained toxins; (b) proof that the victim was exposed to the toxins; (c) proof that the duration and dose could cause the injury; and (d) proof that the victim was in fact injured.[30] None of these elements is easy to prove–even to jurors with little sympathy for an insurance company's bottom line.

## Narrowing the Issue: Effects of Mold

In light of *Kilian*, can appraisers now brush off consideration of toxic mold in the valuation process? The answer is an emphatic "no." The IOM study did state that there is sufficient scientific evidence of "an association," although not a causal relationship, of mold to upper-respiratory nasal and throat symptoms, coughing, and wheezing, and asthma symptoms in sensitized asthmatics. The IOM study also states that there is "limited or suggestive evidence" of an "association between mold and lower respiratory illness in otherwise-healthy children" as well as dypsnea (shortness of breath), and the development of asthma in those who may be susceptible.[31] However, the study cautioned that they do not know if the association is due to mold-related instances, other damp indoor environment exposures (such as dust mites and cockroaches), or some combination thereof.

However, it is the causal associations that the IOM study did not find that are perhaps most telling. These include such serious health problems such as neuropsychiatric symptoms, cancer, rheumatologic diseases, and acute idiopathic pulmonary hemorrhage in infants.[32] The latter disease, it was claimed, may have caused the deaths of several infants in Cleveland in the mid-1990s.[33]

So who are the people still at risk? As the study notes, asthmatics are vulnerable to toxic mold, but the IOM study also singles out "immunocompromised persons, who are at increased risk for fungal colonization or opportunistic infections."[34] These persons include

29.   *Raynor v. Merrill Pharmaceuticals, Inc.*, 104 F.3d 1371 (D.C. Cir. 1997).

30.   Perry.

31.   Institute of Medicine, 10–11.

32.   Ibid.

33.   Klayman.

34.   Institute of Medicine, 10.

those who are HIV positive, the elderly, and those who are on chemotherapy.

A number of states (starting with California in 2001) have viewed and are likely to continue to view mold as a serious threat to health. California's law, the Toxic Mold Protection Act, imposes duties of care on certain parties to disclose mold. Under the Act, both landlords and sellers must provide written notice to potential lessees or buyers when there is visible and hidden mold that they know about or have reasonable cause to believe exists in the property. Still, the mold must present a health threat or must exceed the permissible exposure limits set forth by the California Department of Health Services.[35] Legislatures in other states, including Indiana, New Jersey, New York, Maryland, and Texas are also studying the problem, viewing mold as a real risk to public health.[36]

## Appraisers' Responsibility

If toxic mold is a concern for residential and commercial property owners, it has the potential of being a problem for real estate appraisers because of their concern with any potential impact of detrimental conditions upon value. The *Kilian* case may lessen the possibility of liability claims against an appraiser because the perception of mold as being hazardous is reduced and consequently there may be fewer instances in which mold is perceived as affecting value. It should be noted that the purpose of a property inspection by the appraiser is to obtain first-hand information about characteristics of the property that are relevant to the valuation assignment. Appraisers are not qualified to identify the presence of mold or other hazardous substances unless they possess training beyond that typical of an appraiser, e.g., as a property inspector, engineer, etc. However, appraisers may still be held responsible for reporting and addressing the environmental contamination of property when an abnormal condition, such as mold or a damp interior, is observed in the subject premises. In fact, the Federal National Mortgage Association (Fannie Mae) states, "The appraiser is responsible for noting in his or her report any adverse conditions (such as, but not limited to, needed repairs; deterioration; the presence of hazardous wastes, toxic substances or adverse environmental conditions; etc.) that were apparent during the inspection of the prop-

erty *or* that he or she became aware of during the research involved in performing the appraisal."[37] Fannie Mae further states that when the appraiser observes an adverse property condition, but the appraiser is not "qualified to decide whether that condition requires immediate repair (such as the presence of mold, an active roof leak, settlement in the foundation, etc.), the property must be appraised subject to an inspection by a qualified professional."[38] Fannie Mae also notes that the appraiser is not responsible for conditions that are hidden or unapparent.

The subject of toxic mold or damp interiors is not specifically addressed in the *Uniform Standards of Professional Appraisal Practice* (USPAP).[39] However, the Appraisal Standards Board (ASB) provides some guidance in Advisory Opinion 9 (AO-9), titled "The Appraisal of Real Property That May Be Impacted by Environmental Contamination."[40] The ASB notes that its Advisory Opinions are provided for guidance only and "are issued to illustrate the applicability of appraisal standards in specific situations and to offer advice from the Appraisal Standards Board (ASB) for the resolution of appraisal issues and problems."[41] Advisory Opinion 9 indicates that if the property is impacted by environmental contamination, the appraiser must complete an assignment as required by Standards Rule 1-1(a), which states that the appraiser needs to "be aware of, understand, and correctly employ those recognized methods and techniques necessary to develop and communicate a credible appraisal."[42] If the appraiser does not have the knowledge and experience necessary he/she must take the necessary steps to comply with the COMPETENCY RULE. The COMPETENCY RULE requires that the appraiser (1) be knowledgeable and have the experience to competently complete the appraisal assignment, or (2) (a) disclose to the client the lack thereof, (b) do what is necessary to competently complete the assignment, and (c) within the report describe the lack of knowledge and/or experience and explain the steps taken in order to prepare a competent report.[43] The appraiser may use scientific and technical data provided by experts, but should use an extraordinary assumption concerning the information obtained from others.[44] The Appraisal Institute has issued several Guide Notes to provide its members and other appraisers with guidance in adhering to the requirements of USPAP. Guide Note 6, "Consideration of Hazardous

35.   Aalberts and Hoyt, 2003.

36.   Perry.

37.   Federal National Mortgage Association, *Fannie Mae's Revised Appraisal and Property Report Forms (Forms Dated March 2005 for Appraisals Performed On/After 11/1/05) Frequently Asked Questions* (Washington, DC: Fannie Mae, 2005), 2.

38.   Ibid.

39.   Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice*, 2005 ed. (Washington, DC: The Appraisal Foundation, 2005).

40.   Ibid., 143–147.

41.   Ibid., 123.

42.   Ibid., 16.

43.   Ibid., 11.

44.   Standards Rule 1-2(g), Ibid., 18–19.

Copyrighted material licensed by Randall Bell on April 26, 2021

Substances in the Appraisal Process," recommends that any qualified environmental professional be chosen and hired by the client, not the appraiser.[45]

Guide Note 6 states that it is oriented toward "the appraiser who is not qualified to detect or measure the quantities of hazardous substances."[46] It specifically indicates that the appraiser must follow the COMPETENCY RULE. Furthermore, the appraiser must "establish the appropriate scope of work necessary to complete that assignment."[47] This involves addressing how any known or suspected hazardous materials may affect the property. Guide Note 6 further states the appraisal "may be prepared so that the value opinion reflects no known or suspected hazardous materials that may impact the property, or it may be prepared so that the value opinion *does* reflect known hazardous substances."[48] Regardless, the appraiser must be sure "that the results of the assignment are credible and that the report is not misleading."[49] The Guide Note recommends that if there are no known or suspected hazardous substances on the property, the appraiser still include a disclaimer indicating the assumption that they do not exist. The Uniform Residential Appraisal Report (URAR) form does not permit any modifications, additions, or deletions to the assumptions and limiting conditions. However, paragraph 5 of the "Statement of Assumptions and Limiting Conditions" included with the URAR does address appraiser knowledge/observation of any adverse conditions (including toxic substances) and unless noted, assumes that the appraiser has no knowledge of toxic substances or other adverse environmental conditions that would make the property less valuable.[50]

During a physical inspection, if the appraiser becomes aware of or suspects an adverse environmental condition, such as mold, excessive dampness, etc., and believes it may be a possible concern affecting the value, the appraiser must discuss the situation with the client to determine if (a) the appraisal will be completed on the basis of an extraordinary assumption that the item observed will not impact the value of the property, or (b) the assignment should be placed on hold until a qualified expert determines the nature and extent of the condition. The client may want to conduct an environmental inspection before completion of the appraisal. If there are known hazardous substances, or the appraiser obtains information from a qualified expert confirming the presence of a hazardous substance, either at the beginning of an assignment or discovered during the appraisal process, the appraiser must confer with the client concerning whether the client wants the appraisal to estimate a value (a) based upon a hypothetical condition, defined as "that which is contrary to what exists but is supposed for the purpose of analysis,"[51] that the substance does not exist, or (b) in an "as is" state subject to any negative impact created by the presence of the substance. If the appraiser uses an extraordinary assumption or hypothetical condition in the appraisal report, USPAP Standards Rule 2-2 requires that the assumption or condition be clear and conspicuous and there be a statement that their use may have an affect upon the assignment results.[52]

In cases where there are known hazardous substances, the appraiser must account for their effect upon value unless the property is appraised subject to the hypothetical condition that the property is not impacted by hazardous substances. Guide Note 6 states that any loss in value may be able to be measured by the typical methods and techniques used to measure other forms of depreciation. However, more specialized techniques may be required in other cases. Again, the COMPETENCY RULE comes into effect in order to ensure an assignment that is credible and not misleading. To complicate the matter, there may be other effects upon value, such as change in the highest and best use, stigma influences, changes in income, marketability, etc.[53]

If the appraiser is furnished with a report prepared by others concerning the existence and effects of known hazardous substances, the appraiser must still use the recognized methods and techniques to produce a credible appraisal. Guide Note 4, "Reliance on Reports Prepared by Others"[54] indicates that an appraiser can generally accept reports prepared by licensed or certified non–real estate appraisal professionals unless there are "observed or apparent material discrepancies,"[55] which must then be disclosed. For reports prepared by other non–real estate appraisal professionals the appraiser must exercise greater care in evaluation of the expertise of the preparer. As previously mentioned, the impact of any hazardous substances on value may be more than a deduction of a typical remediation cost. Any report pre-

45. Appraisal Institute, Guide Note 6, "Consideration of Hazardous Substances in the Appraisal Process," *Guide Notes to the Standards of Professional Appraisal Practice of the Appraisal Institute* (Chicago: Appraisal Institute, 2003), 18.
46. Ibid.
47. Ibid.
48. Ibid., 19.
49. Ibid.
50. Federal National Mortgage Association, *Uniform Residential Appraisal Report*, Freddie Mac Form 70/Fannie Mae Form 1004 (March 2005); similar assumptions and limiting conditions also apply to individual condominium units and small residential income property appraisal reports.
51. Appraisal Standards Board, 3.
52. Ibid., 24, 27, and 29.
53. Appraisal Institute, 24.
54. Appraisal Institute, Guide Note 4, "Reliance on Reports Prepared by Others," 11–13.
55. Ibid., 13.

pared by a professional other than the appraiser must be acknowledged and the names of those preparing the report must be included in the appraisal report.[56]

## Toxic Mold in the Valuation Process

The real estate appraiser will most likely become aware of mold or dampness during the property inspection phase of the valuation process. During the course of the appraiser's inspection, the appraiser might observe evidence of suspected mold or dampness. Several sources are available to assist the appraiser in conducting the physical property inspection and to assist in assessing the effects of mold or dampness in applying the approaches to value in the valuation process.[57]

Advisory Opinion 2 (AO-2) from the ASB addresses the situation of "drive-by" property inspections.[58] This physical inspection limitation must be disclosed and if any abnormal conditions are noted, the property must be valued according to the same standards that apply under a complete property inspection. The appraiser can learn about the physical characteristics of the property from reliable third-party sources. However, the appraiser is responsible to "determine if adequate information is available about the subject real estate to develop a real property appraisal that conforms with USPAP,"[59] regardless of the level of property inspection. It must be recognized that if an abnormal condition is actually present on the property and the Scope of Work does not include a way of gaining such knowledge, the appraiser cannot be faulted for not including information about abnormal conditions. The appraisal in a "drive-by" is made based on one or more extraordinary assumptions about property characteristics that cannot be known without the benefit of an interior and/or complete exterior property inspection.

Although the *Kilian* case may mitigate the effects on value of properties with evidence of mold, there is still the difficulty of assessing possible damage because of stigma or market resistance associated with a property impacted by mold.[60] If there were any stigma effect, that amount would have to be included in the estimated total loss due to mold.

In applying the three approaches to value, the appraiser will surely encounter obstacles to typical appraisal methodology. Data gathering for the sales comparison approach to value may be atypical because mold problems are relatively uncommon and are not recorded in a centralized database. The comparison grid will need to support an adjustment for mold if the market so indicates. The challenge is in the appraiser finding several paired sales of property, with one of each pair having fully disclosed mold. Reliance by the *Kilian* case upon the IOM study may eventually reduce the overall negative perception of the effects of mold on building occupants. If this reduction is reflected in the marketplace, the number of properties with a value affected by the presence of mold will be further decreased, resulting in fewer properties that may be used to observe how mold has or has not affected property sales. Further complicating the comparability issue is the fact that some molds are considered nontoxic and there are different levels or degrees of mold infestation. If comparable sales cannot be found, then the use of a different type of analysis must be examined.

In the cost approach, mold falls under the category of physical deterioration, which is either curable or incurable. Curable physical deterioration is also referred to as deferred maintenance, which includes item(s) needing immediate repair as of the date of the appraisal. There are two tests to determine if physical deterioration is curability: (1) does the value increment equal or exceed the expenditure of the cost-to-cure; and (2) if not, does the cost-to-cure "allow other existing items to maintain their value."[61] Because toxic mold must be remediated immediately, evidence of mold falls within the definition of curable physical deterioration. However, since any presence of mold may go beyond that which is observable by the typical appraisal inspection, the appraiser will have to rely upon the assistance of outside specialists to assess the damage and costs of remediation. The appraiser must also remember to properly address in the cost approach any loss of value resulting from the possibility of a stigma associated with the property. External obsolescence associated with stigma is measured with comparable sales.

In the income capitalization approach, the presence of mold can affect the net income through both income and expenses. Comparable sales are used to measure the effect on value, if any, by measuring the difference in income and expenses between properties with and without mold. Income may be reduced because of the need to remove tenants while remediation is underway, plus future income may be adversely affected because of the stigma of what is known as sick building syndrome.[62] Expenses may increase because

---

56. Ibid., 11–13; and Standards Rules 2-2 and 5-2, Appraisal Standards Board, 22–30, 42–44.

57. For example see Appraisal Institute, Chap. 9 and Chap. 10 in *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001): 190–268; J. A. Simpson, *Property Inspection: An Appraiser's Guide* (Chicago: Appraisal Institute, 1997); and Aalberts and Hoyt, 210–212.

58. Appraisal Standards Board, 128. Again it should be noted that Advisory Opinions illustrate the applicability of appraisal standards and do not establish new standards or interpret existing standards.

59. Ibid.

60. For discussions of stigma see Richard J. Roddewig, ed., "Understanding, Analyzing and Estimating Stigma," Chap. 4 in *Valuing Contaminated Properties: An Appraisal Institute Anthology* (Chicago: Appraisal Institute, 2002), 193–238; and Randy Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999).

61. Appraisal Institute, *The Appraisal of Real Estate*, 398.

62. Krisandra Guidry, "Sick Commercial Buildings: What Appraisers Need to Know," *The Appraisal Journal* (January 2002): 28–33; reprinted in Roddewig, 421–427.

Copyrighted material licensed by Randall Bell on April 26, 2021

of remediation costs; however, some expenses may be considered as capital expenses and therefore will have to be expensed over their life. Furthermore, if the appraiser is examining after-tax cash flows, the capital expenses will be subject to depreciation (cost recovery) allocations. In addition, development of an overall capitalization rate using market extraction will be difficult for properties with sick building syndrome.[63] The appraiser must use diligent research to determine if the capitalization rate, or discount rate for discounted cash flow models, differs between properties with mold and without mold.

## Conclusion

The issue of toxic mold and its effect upon real estate has come to the forefront within the past decade. There have been lawsuits based upon mold contamination with awards in the millions of dollars. However, the court in the 2004 *Kilian* case issued a ruling based upon scientific evidence published in a study by the Institute of Medicine of the National Academy of Sciences. That study found that there is insufficient evidence to associate neuropsychiatric symptoms with mold. Other mold studies and investigations, however, may continue fomenting legal actions, although this activity is likely to be more muted than in the past. Certain vulnerable populations will, in all likelihood, continue to be plagued by mold. Still, the legal activity will almost certainly fall short of the dire predictions reported a few years ago.

On the surface this may cause some in the real estate industry to downplay the importance of possible mold contamination. To the contrary, even though the actual impact of the presence of toxic mold may not be at the levels previously thought, real estate professionals must continue to be cognizant of the possibility of toxic mold claims and lawsuits and conduct their activities accordingly.

Although the observance of any evidence of mold or damp environment must be reported, it is particularly important when the assignment involves properties that may be occupied by susceptible persons, such as child care facilities, medical buildings, and homes or facilities occupied by the elderly.

The Appraisal Standards Board issues Advisory Opinions to provide appraisers with illustrations of the applicability of appraisal standards and to provide guidance in appraisal issues and problems. The Appraisal Institute has issued Guide Note 6 to provide guidance in the application of USPAP when appraisers encounter hazardous substances. Furthermore, appraisers must be sure to comply with Standards Rule 1-1 of USPAP when they encounter something out of the ordinary, such as toxic mold. The real estate appraiser needs to become knowledgeable about valuation in such situations and/or associate with someone who has appropriate experience. It must be recognized that the effort needed to find paired sales of similar property is substantial. The client must be notified and decide whether or not the use of the appraisal justifies the work and fee associated with the diligence required in such situations. Furthermore, although the Kilian case may have the effect of reducing potential legal liabilities to the real estate appraiser, appraisers must recognize that in addition to a possible lawsuit, failure to address such situations appropriately may jeopardize their appraisal licenses or certifications.

---

63.    Ibid., 32.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 8

# Contaminated Properties and the Tax Assessment Process

## Introduction

Chapter 8 of Volume I also dealt with this chapter's topic of contaminated properties and the tax assessment process, but it only included two articles. One article was from the January 1993 issue of *The Appraisal Journal* and the other was from the Fall 1999 issue of *Real Estate Issues.* The 1993 *Appraisal Journal* article, "Impact of Hazardous Waste Sites on Property Value and Land Use: Tax Assessors' Appraisal" by Michael Greenberg and James Hughes, was an important one. It reported the results of a survey sent to all New Jersey tax assessors asking if their locales had hazardous waste sites, and, if so, how proximity to the site was impacting nearby property values. While three-fourths of the respondents reported that there was no adverse impact due to proximity to a hazardous waste site, some assessors reported significant impacts within a quarter mile of the site.

Volume I lamented the lack of published articles dealing with tax assessment and contaminated properties, and the same problem continues today. There have been no additional articles related to contamination and local tax assessment published in *The Appraisal Journal*, and only a few such articles have been published in the most prominent tax assessment journals.

The Volume I Addenda included the *Standard on the Valuation of Properties Affected by Environmental Contamination* adopted by the International Association of Assessing Officers (IAAO) in 2001. That standard continues to be applicable to the assessment process today but has not been included in the Addenda to this volume.

This chapter opens with "Appraising Environmentally Contaminated Property and Tax Reduction" by Del Ross, which originally appeared in the September/October 2002 issue of *Assessment Journal.* Much of this article simply summarizes the types of contamination issues that an assessor is likely to encounter and then itemizes various valuation issues by reference to the previous appraisal literature, including a number of articles that were included in the Volume I anthology. The article briefly mentions some of the unique challenges associated with tax assessment reviews and hearings that involve petitions to reduce assessed values to reflect the effect of contamination. One challenge facing reviewers and hearing officer examiners is that homeowners rarely provide adequate documentation of value loss because they simply lack the necessary funds to "obtain professional help to prove contamination and loss of value." (page 387) Ross states that the tax assessor and hearing officer "often need environmental appraisal consulting assistance, including market studies, to sort out the valuations of a large group of properties" in cases of area-wide contamination. (page 387)

Perhaps the most difficult challenge for assessors cited by Ross is handling a situation in which the cost of remediation exceeds the market value of a parcel of land. Ross states that "some taxing authorities refuse to accept a 'zero' valuation and insist that the land is useful even if that use is a parking lot." (page 387)

Ross concludes his article with a detailed list of what he describes as the standards for the valuation of contaminated properties. These include the ASTM standards discussed in Chapter 3 of Volume I as well as early versions of the Appraisal Standards Board's Advisory Opinion AO-9 (mistakenly identified as "Advisory Opinion G-9" in the article) and the Appraisal Institute's Guide Note 8. (page 388) Ross gives kudos to the appraisal profession for substantially contributing to the understanding of valuation for environmentally contaminated properties, but states that the profession has lagged in the development of standards that recognize those methods. That may have been a valid criticism when the article was written. However, the revised 2002 version of AO-9 discussed in Chapter 1 of this anthology makes this criticism obsolete.

Ross also warns appraisers involved in tax assessment to take careful note of the emphasis on "value in use" in the 1992 IAAO *Standard on the Valuation of Properties Affected by Environmental Contamination.*

The "value in use" concept is the basis for many tax assessor decisions that some taxable value remains even in situations in which the cost of remediation exceeds market value.

A second Ross article on the assessment of contaminated properties, "The Development of Standards for Assessing Contaminated Properties," appeared in the Summer 2003 issue of *Assessment Journal*. The first half of the article covers much of the same ground as Ross's 2002 article. In fact, much of that first half uses the same wording used in the previous article. However, the second half of the article picks up where the 2002 article left off in its criticism of the appraisal profession's lagging behind in developing standards for contaminated property assignments. One criticism raised in the first Ross article was that "the appraisal literature has generally ignored what in most cases is the largest and most uncertain element in the appraisal of contaminated property—the method and cost to remediate the property." (page 389) The second Ross article then addresses the cost of remediation uncertainties by listing 12 potential questions appraisers should ask when reviewing cost estimates provided by engineers. Ross also presents a case study involving an auto agency built on land affected by methane gas, contaminated groundwater, and subsidence due to proximity to a closed landfill. (page 400) The case study includes a thorough explanation of how the "cost to control" the problem was determined and then deducted from the unimpaired value. However, this second Ross article provides nothing to explain the market data that supported a "residual stigma" estimate of 20% "because of the ugliness and the obvious hazardous problems next door to the subject property." (page 402) The second Ross article then concludes with a discussion of how a few courts in California, Nebraska, and Massachusetts have handled contamination issues in property tax assessment cases.

The next article in this chapter, Yvonne J. Hamlin's "Generating Property Tax Benefits from Contaminated Land—A Private and Public Perspective" from the *Journal of Property Tax Assessment and Administration*, presents a Canadian perspective on some of the same issues addressed in the two Ross articles. Hamlin's article focuses on the tension between the owner of a contaminated site and the units of governments supported by the property tax levy. The property owner wants the tax assessment and resulting property tax payments lowered during the period of investigation and remediation. The governmental units want the property remediated as quickly as possible "so as to ensure, among other things, the generation of additional property value which can then be taxed." (page 406)

The Hamlin article then reports on the valuation methods used by assessment review boards and courts across Canada in various cases that involve directly contaminated or stigmatized properties. Hamlin summarizes the recent studies and federal, provincial, and territorial legislative initiatives in Canada related to brownfields and their redevelopment. She then concludes with a brief summary of three successful brownfield redevelopment projects in Ontario, New Brunswick, and Quebec.

The last two articles in this chapter, "Environmental Contamination: Using Assessed Values for a Buyout" by Wayne D. Llewellyn and Robert E. Partridge (March/April 2002 *Assessment Journal*) and "Mercury Contamination–Functional or Economic Obsolescence?" by Rick Stuart (March/April 2001 *Assessment Journal*) both involve short case studies involving single-family residential neighborhoods that are affected by contamination. Both of these articles could have been included in Chapter 4 of this Volume II anthology, which focuses on case studies. The Llewellyn and Partridge article dealing with legal issues could have also been included in Chapter 9, since it explains the settlement of a lawsuit dealing with contamination's impact on single-family home values. However, since Stuart is a county appraiser for the area in Kansas where the case study took place, and the Llewellyn and Partridge article explains how assessed value was used as an objective standard to determine pre-contamination values, both articles have been included in this chapter.

The case study in the Llewellyn and Partridge article involves a 240-home neighborhood built on a former refinery site in Calgary, Alberta. Soils in and near the neighborhood met provincial government standards in the 1980s when the neighborhood was developed. However, Alberta revised its soil and groundwater contamination standards in the 1990s, and the neighborhood no longer met these standards. Residents became concerned and launched a media campaign to have their property taxes reduced and their homes purchased by the oil company that had formerly operated the refinery. The City of Calgary initiated a study to determine what the appropriate tax assessment values should be. Before the City could officially reduce the assessed values, the oil company launched a program to buy any resident's home at a price 20% above the uncontaminated value as determined by the tax assessor's rolls. Property owners who did not wish to participate in the buyout would be given a $10,000 payment "for any inconvenience caused by the remedial activities." (page 416)

The Llewellyn and Partridge article does not report on the results of the buyout program or the subsequent remediation program in the neighborhood. The authors primarily use the case study to demonstrate that "using assessed values provided an economical method for compensating homeowners fairly and objectively." (page 416)

Llewellyn and Partridge also make a broader statement related to the accuracy of tax assessor mass appraisal values as compared to individual appraisal reports:

> Mass appraisal employs standard methods, and allows for statistical testing that does not usually occur in individual property appraisal reports. Individual property appraisals are expensive and frequently lack standardization in adjustments, which can reduce the credibility of individual appraisals. Mass appraisals are more robust and complete valuation

Copyrighted material licensed by Randall Bell on April 26, 2021

models that consider the entire market and are not limited to five or six sales transactions or comparative data of other types, for example, income and expense information and costs on only a handful of properties. (page 416)

However, as the regression and hedonic modeling articles discussed in Chapter 5 make clear, mass appraisal using statistical techniques is not nearly as accurate as claimed by Llewellyn and Partridge, and the models are subject to specification errors and other forms of "tinkering" that can cause them to be at best inaccurate and at worst deliberately biased.

The final article in this chapter, entitled "Mercury Contamination–Functional or Economic Obsolescence?" by Rick Stuart, briefly discusses a mercury spill inside a single-family home in Jefferson County, Kansas. Stuart details how the county assessor's office used the cost approach to arrive at an analysis of "cost to cure" and post-remediation stigma. Working backwards from the resale price of the home after the spill and an EPA remediation, the assessor first used the *Marshall Valuation Service* guide to determine the cost-to-cure deferred maintenance during the two years that the house was vacant. Then the county's staff appraiser used an improvement residual approach to arrive at a conclusion of a $25,820 post-remediation stigma. Stuart then compares the post-remediation stigma to the replacement cost new of $75,760, an odd comparison that indicates a 34% additional value loss. If land value had been included as well, the loss due to stigma would have been 25.2%. Based on the market value indicated in the article, the post-remediation stigma loss was 26.4%.

These various articles related to contamination and the tax assessment process raise two interesting distinctions between appraising properties affected by contamination for tax assessment purposes and other purposes such as mortgage lending or litigation to recover remediation costs or property value impacts. First of all, assessors are required by law or regulation to continuously reassess properties–in some jurisdictions once every two to five years and even annually in most United States taxing jurisdictions. But, as the articles included in prior chapters (as well as in Volume I) make clear, the effect of contamination on property prices and values changes over time. As a result, tax assessors must revisit and if necessary adjust their conclusions concerning the effect of contamination on property values every assessment cycle. By comparison, one specific date, often the date of trial in litigation and the date of purchase in mortgage appraisals, is the focus of the appraisal assignment and the final determination of any costs or value impacts in mortgage lending appraising and most litigation involving contamination.

The second distinction between appraising contaminated properties for tax assessment and for other purposes is the importance of the "value in use" concept to the tax assessment process. Many tax assessment laws allow assessors to attribute some value to a property for its current use and occupancy by the owner, even in situations in which the future remediation costs are so high that the market price and value may be zero or less than zero.

## 8.1 Appraising Environmentally Contaminated Property and Tax Reduction

*Del Ross, PE, CBOA*

This article originally appeared in the September/October 2002 issue of *Assessment Journal*.

### Abstract

Taxing authorities are frequently asked to review proposals for a reduction of the appraised value of property that has been environmentally contaminated, which may result in confusion and uncertainty about appraisal standards and methods, engineering estimates of the costs to remediate, and "stigma" definitions. This article provides appraisal guidelines, technical guidelines for site assessment and remediation, and cost analyses. In addition, tax court guidance and a case study are presented.

### Introduction

The appraisal of environmentally contaminated property presents unique challenges to the tax examiner (TE) and the appraiser. Challenges include the nature and degree of impairment, the potential health problems for occupants of the contaminated property and the community, and the separation of economic obsolescence from damages due to contamination, as well as basic appraisal methods and taxing policy issues.

The tax assessment problem arises when a property owner notifies the county assessor that his or her property is contaminated. The property owner may submit "evidence" of environmental contamination and a "loss of value" appraisal. At a hearing, the property owner may provide witnesses for testimony of "stigma," an inability to sell the property, or an inability to obtain mortgage financing. The TE will most likely seek guidance from such authorities as the Appraisal Standards Board, the International Association of Assessing Officers (IAAO), and the Appraisal Institute. The TE may also seek technical guidelines for site assessment and remediation of contaminated properties and for cost analyses from such authorities as the Environmental Protection Agency (EPA). In addition, tax court guidance from the state will need to be reviewed.

### Characteristics of Contaminated Properties

To understand the issues in the valuation of contaminated property, it is useful to look at the types of contamination, the nature of the impairment, and the economic situation the property owner faces.

### Types of Contamination

The most common type of property contamination results from a leaking underground storage tank (UST), typically from a gasoline station. Most often, the contaminant is gasoline, diesel fuel, or petroleum wastes. These sites are well understood in the environmental technical and regulatory community, and documentation of the contamination is often straightforward. Cleanup costs are also well understood as cleanup funds are available from most states, and the criteria for payments are well documented (SWRCB 1995). The uncertainty of cleanup methods and costs is minimal in a simple UST leak.

However, in situations where a "plume" of contamination reaches groundwater and extends under many properties, the remediation of fuel leaks can be very difficult to understand, and the cost of remediation can be very uncertain. Recently, regulatory agencies in California have recommended that some "fuel only" contamination be left in the ground for "natural attenuation"–letting the natural bacteria devour the carbon over time. The timing and cost of cleaning up these sites can vary depending on geotechnical and hydrological considerations, as well as the vagaries of the opinions and motivations of the regulatory agencies and property owners.

Many sites are contaminated with toxic substances that are more difficult to remediate. Chlorinated hydrocarbons such as PCE (tetrachloroethylene) are found at many sites including drycleaners, machine shops, and auto repair facilities. These contaminants are more toxic and more difficult to clean up than fuel spills because they can penetrate deep into groundwater and, in effect, hide from the site inspectors. Cleaning methods, costs, and timing may result in greater uncertainty than a simple fuel spill.

Also, many sites suffer from multiple contaminants. Former military sites are notorious for having aviation fuel leaks, range munitions, and on-site hazardous waste landfills, and it may take years to characterize the site effectively, before remediation can be considered. It is also typical that as many as twenty different engineering studies may have been conducted, many piggybacked on others resulting in a wide variety of conclusions regarding limitations on the future use of the property. The El Toro Naval Base in Orange County, California, is just such a site. For years, community advocates have been locked into debates about future use, including parkland, airport, or shopping center, because the cleanup methods and costs are not well defined.

**Del Ross** is a professional engineer (PE) and a certified business opportunity appraiser (CBOA). He is managing director of Camtec Environmental Consultants in Temecula, CA.

*The statements made or views expressed by authors in* Assessment Journal *do not necessarily represent a policy position of the International Association of Assessing Officers.*

Copyrighted material licensed by Randall Bell on April 26, 2021

Many of the contaminated sites have undergone a health-risk assessment. However, such reviews may not have been done well or are difficult to understand. In addition to the contaminated industrial and commercial properties, the TE may encounter residences that have been exposed to toxic mold or pesticides, making the question of "fit for habitation" a major consideration.

Due to the variety of contamination and geotechnical problems, health risks presented, and the uncertainties of the future of the properties, it is much more difficult to assess the damage that has occurred at contaminated properties than those properties that have been the subject of disasters, such as fires, floods, or construction defects.

## Nature of Contaminated Property Impairment

Contaminated properties may be classified as contaminated land, contaminated industrial or commercial properties, and contaminated residential properties. Contamination may be "contained" or "uncontained." Another consideration is areawide contamination compared with localized contamination. Stigma may be another important consideration in the cleanup cost analysis. These factors become important to the consideration of appraisal methods and cleanup methods and costs.

* *Land*–Contaminated land may include farmland, properties held for investment, landfills, and industrial properties that have been so severely damaged that the property is essentially reduced to a "start over" economic category. In many of these situations, the cost to investigate and remediate the contamination exceeds the value of the property. However, some taxing authorities refuse to accept a "zero" valuation and insist that the land is useful even if that use is a parking lot. (See *Bentz Foundation v. Franklin County*.)

* *Industrial/Commercial Properties*–Contamination of these properties calls for a close review of the income potential of the properties. Not all contaminated properties must be evacuated, and rents may continue to be collected. The method of accounting for income streams versus cost-to-remediate streams may be important to the valuation. Concepts of highest and best use of the property when cleaned may lead to disagreements between the TE and the appraiser.

* *Residential Properties*–Contamination of residential properties is often more difficult for the TE to assess adequately than the contamination of industrial properties. Lacking funds to obtain professional help to prove contamination and loss of value, home owners rarely provide adequate documentation of loss of value.

* *Contained or Uncontained*–Wilson (1996) described contamination as contained when it is bounded (such as asbestos in a building) or uncontained (such as fuel leakage from a UST to groundwater that would not respect property boundaries). The risks resulting from uncertainty would be much higher in uncontained scenarios.

* *Areawide Contamination*–Contamination of a broad spectrum of properties can be found at Superfund sites. The contamination is widespread, and the investigation and remediation are well documented. However, substantial uncertainty exists as to the prospects for economic recovery of the area. Special economic/political organizations, such as economic development agencies and brownfields, are often needed to get the cleanup done and establish economic viability in the area. The TE will often need environmental appraisal consulting assistance, including market studies, to sort out the valuations of a large group of properties. Often, property owners resist the cleanup program because they foresee increases in property taxes. Renters resist the development because they foresee future rents as unaffordable. Community input and economic justice become additional factors for the TE to review. One example of this is the San Diego Padres ballpark redevelopment project, which has been held up for about three years by dissident lawsuits.

* *Stigma*–Decreased salability of a property is a major factor that leads appraisers to include stigma in their loss-of-value calculations. Many appraisal articles have been devoted to this subject. Chalmers (1993) defined stigma as "the reduction in value caused by contamination resulting from the increased risk associated with the contaminated property." Patchin (1991) referred to stigma as a negative intangible. He included fear of hidden costs, the trouble factor (in which the buyer wants compensation for the trouble of cleaning up), fear of liability, and inability to obtain a mortgage. The preferred definition of stigma used here is "a perception of economic risk related to the uncertainties of the cleanup process." Market studies can clarify the extent of such perceptions among potential buyers, real estate brokers, and lenders (Weber 1997). The TE should insist upon documentation of stigma within the appraisal method.

## Economic Situation Facing the Property Owner

Property owners face many economic problems related to contamination on their property, and property tax relief is often the best choice for recovering some compensation for the damages. Often, these problems are devastating to the property owner as income is diminished and costs of environmental investigation and remediation increase.

* *Property Owner Liability*–A unique characteristic of the contaminated property scenario is that liability for cleanup rests, in most cases, with the current property owner who may not have contributed to the contamination in any way. A frequently encountered situation is the shopping center owner who has leased a corner lot to a gas station. If a release of hazardous materials at the gas station occurs, it is the shopping center owner who has the responsibility of investigating and remediating the prop-

erty. That situation often leads to long and arduous negotiations between the current property owner and gasoline suppliers, lessees, previous lessees and owners, and regulatory agencies. Sorting out the restitution often takes precedence over cleanup of the property, and the property may remain in its contaminated state for years while the property continues to deteriorate. The current property owner may seek relief from the burden of property taxes.

- *Insurance Coverage*–Insurance companies keep the environmental courts busy with their persistent denial of lawsuit defense and their exclusions for environmental damage coverage. Hence, a traditional means of economic damage recovery is often unavailable to the owner of contaminated property.

- *Damage Recovery Lawsuits*–Property owners face difficult odds in their effort to obtain environmental damages from the responsible parties in court. Federal laws may be used to stop contamination from spreading, but state courts are the venue of choice for recovery of damages. Most often, the tort of nuisance must be claimed to recover contamination damages, and stigma damages are denied in many states and very difficult to achieve in others.

## Standards for the Valuation of Contaminated Properties

Guidelines for performing the various technical and economic evaluations, including valuations and appraisals, began to appear around 1990 amidst the collapse of the savings and loan industry. A contributing factor to the industry problems was the overvaluation of real estate included in many bank portfolios containing contaminated properties. Leadership in standards development came from the Federal Deposit Insurance Corporation (FDIC), which forced banks to evaluate their portfolios for environmental risk.

### ASTM Standards

Standards for assessing the risks of environmental contamination of commercial properties were prepared by the American Society of Testing Materials (ASTM) with the comprehensive Phase I Environmental Site Assessment (ASTM E-1527) published in 1993. The standard follows the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)–known as Superfund because it provides federal funding for cleanups-which was reauthorized in 1987. This standard focused on providing an "innocent landowners' defense" to CERCLA's draconian "strict and several" liability scheme. The standards have been revised frequently, and they have multiplied into a variety of environmental investigative tools and now are written into many federal and state laws regarding property investment (Ross 1994, 1995).

The ASTM Phase I is a document with which all appraisers should be familiar. It covers the history of use of the property with documentation including (1) review of ownership records of the property back fifty years or when the property was first developed commercially; (2) collection and analysis of source documents located in recorders' offices and building departments; (3) review of aerial photographs, again back fifty years or to first commercial development; and (4) comprehensive site inspection to identify hazardous materials and waste practices, evidence of spills, and location of USTs (Ross 1994).

A Phase I is an essential document for review when conducting an appraisal of contaminated property. Many engineers skip this step when presenting evidence of contamination and remediation. Therefore, potential contamination can be missed by ignoring a property's history of use.

### Appraisal Standards

The appraisal industry has contributed substantially to the understanding of the process of valuation of environmentally contaminated properties, but the development of standards has lagged.

- *Appraisal Foundation*–The Appraisals Standards Board of the Appraisal Foundation issued its Advisory Opinion G-9, Responsibility of Appraisers Concerning Toxic or Hazardous Substance Contamination, on December 8, 1992. The opinion advised appraisers (1) of the ethics of the "competency test," (2) warned them not to undertake appraisal of contaminated properties unless they were qualified to do so, (3) told them they may reasonably rely on the findings of other professionals, and (4) encouraged them to work with environmentally trained professionals when such issues arise.

- *Appraisal Institute*–The Appraisal Institute began publishing articles about the appraisal of environmentally contaminated properties in the 1980s and conducted a groundbreaking symposium in Philadelphia in 1991 to present its findings (Appraisal Institute 1992). The institute issued its *Guide Notes to the Standards of Professional Appraisal Practice* (Guide Note 8 1993, 2001) emphasizing professional ethics and in particular, the issuance of disclaimers or limiting conditions to the appraisal report stating that the appraiser did not consider environmental conditions in his or her appraisal or relied on others. Throughout the years, publications from the Appraisal Institute have shaped the development of appraisal practice in this area. Kinnard, Mundy, Patchin, Wilson, and many others have produced reference quality work.

- *Fannie Mae*–Fannie Mae issued its revised Uniform Residential Appraisal Report (URAR) in 1993 and identified limiting conditions such as the "presence of hazardous wastes, toxic substances, etc." (Coffay 1993).

- *IAAO*–The International Association of Assessing Officers issued its *Standard on the Valuation of Properties Affected by Environmental Contamination* in 1992 and revised it in 2001. Unlike other appraisal organizations, the IAAO established its "concepts of value" (IAAO 2001, p. 11) as (1) unen-

Copyrighted material licensed by Randall Bell on April 26, 2021

cumbered value and (2) value in use. The unencumbered value is described as "the value that the property would have if no adjustment were made for any environmental encumbrance." It states that "this value can be obtained using standard appraisal methods." In addition, "value in use suggests that a property that is still in use, or which can be used in the near future, has a value to the owner." The standard also cautions the appraiser that "fully deducting the (remediation) costs may overstate the decline in value because the value in use concept would then be ignored." The importance of this standard to the appraiser and to the TE is that costs to cure are itemized, giving a better feel for the legitimacy of a loss-of-value report.

## Standards for Remediation Work and Cost Estimates

The appraisal literature has generally ignored what in most cases is the largest and most uncertain element in the appraisal of contaminated property–the method and cost to remediate the property. Standards for remediation concepts generally originate from the EPA following CERCLA or Response Conservation and Recovery Act (RCRA) models that involve rigorous evaluation of remediation alternatives. These standards are also replicated by state and local regulatory organizations. In San Diego County, California, the Site Assessment and Mitigation (SAM) Program in the Department of Environmental Health issues an annually updated manual for very specific activities in a remediation work plan (SAM 2002). It is important that the appraiser and TE be familiar with the accepted standards and practice of engineering work and cost estimates in the local area.

### Laws and Protocols for Site Assessment and Remediation

Any environmental engineering report and cost estimate should rigorously follow the established environmental laws and protocols.

- *National Contingency Plan (NCP)*–The National Oil and Hazardous Substances Pollution Contingency Plan, more commonly called NCP, is the federal government's blueprint for responding to oil spills and hazardous substance releases. In effect, the NCP authorizes CERCLA, RCRA, and and all other laws and regulations regarding investigations and cleanup of contaminated sites. The various laws offer rigorous models for site assessment and cleanup, but there is one thing they have in common: Any remediation plan must be either "consistent with" or "not inconsistent with" the NCP (Steinway 1990; Wilson 1996).
- *Applicable or Relevant and Appropriate Requirements (ARARs)*–Remediation plans that follow the CERCLA and RCRA models require attainment of all federal and state laws applicable or relevant and appropriate requirements of the NCP. That means that the site assessment and remediation plan must

contain a review of environmental laws and note any plan deviations or inconsistencies.

- *Remedial Investigation/Feasibility Study (RI/FS)*– All legitimate remediation plans contain some version of CERCLA's *Remedial Investigation/Feasibility Study (EPA 1999)*. A detailed document, *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA, Interim Final* can be obtained from the EPA (1988).
- *Remediation Goals*–No remediation plan is complete without the determination of remediation goals. This answers the question of "How clean is clean?" In California, one set of goals, known as preliminary remediation goals (PRGs), are issued by the EPA. Other goals may be set by the Regional Water Quality Control Board or, in San Diego County, by SAM.
- *Features*–Key features of the engineering plan applicable to a site with soil contamination would include the following: (1) the site must be fully characterized-any contamination must be specified as to vertical and lateral dimensions and movement; (2) groundwater and all geotechnical and hydrological influences must be determined; (3) health risk assessments must be completed; (4) alternative scenarios of remediation must be detailed and evaluated; (5) health and safety plans are an integral part of the engineering proposal; (6) disposal of all wastes generated by the Rl/FS process must be accounted for; and (7) some form of uncertainty analysis must be performed.
- *Regulatory Orders*–The TE and appraiser will want to carefully examine any orders by regulatory agencies. The absence of an order does not necessarily mean there is no need for a cleanup; rather, the issue should be explored by the TE (see *Carson v. Unocal*).

### Standards for Remediation Cost Estimates

The cost area has not had much scrutiny, even by the EPA. Guidance is limited primarily to the experience of the engineering contractors. TEs and appraisers would be well advised to have a third-party cost expert review all cost proposals.

- *EPA Guidance*–A wide variety of cost analyses are available from the EPA. One, *The Role of Cost in the Superfund Selection Process*, is referenced at the end of this article. The discussion parallels the Rl/FS documentation discussed above.
- *Standard Costs*–The Army Corps of Engineers has a standardized environmental remediation cost database, which is accessible for a fee. There are also a number of vendors who can provide such contractual services. One advantage of using standardized cost analysis models is that a variety of cost and remediation options can be explored without obtaining competitive bids (Means). Another source in California is the State Water Resources Board UST Fund Cost Guidelines.

• *Competitive Bids*–Competitive bids should be obtained for all major cost projects. The TE should insist that the property owner provide cost estimates that reflect the competitive business environment.

## Case Study: Auto Agency Adjacent to Old Landfill

This case study is about an early brownfields development in National City, California, where the site, the Fox Auto Agency, also known locally as the former Duck Pond Landfill (DPLF), was not properly characterized or remediated before the new auto facility was built. Methane gas emanated from below the surface at the Fox Agency and contaminated the groundwater under the property. The result was differential subsidence (sinking) of the Fox Agency buildings, causing substantial costs (and embarrassment) to the property owners, governmental entities, and regulatory agencies.

The client, South Bay Volkswagon (SBVW), located adjacent to the Fox Agency (old DPLF), had been contacted by a property tax reduction specialist who found that the existing property tax appraisal of approximately $2 million was comparable to that of existing sales of specialized automobile agency properties in the area, and no tax reduction would be justified unless it could be shown that there was environmental damage.

Camtec Environmental Consultants was called upon to provide engineering and appraisal assistance to SBVW. The purpose of the studies was to determine if SBVW had suffered environmental damage, and if so, what the costs to remediate the property would be.

### Work Plan

The work plan was based on a team approach. Work was divided in to three parts: (1) engineering analysis based on the ASTM Phase I Standard–Camtec and Keller Engineering; (2) cost to remediate and loss of value report–Camtec and Keller; and (3) appraisal report–property tax representatives.

The engineering analysis and cost to remediate studies consisted primarily of the analysis of documents, site inspections, and interviews with a wide variety of property owners, regulators, city and county officials, and industry experts. Key to the analysis was a review of more than 10,000 pages of documentation at various agencies detailing environmental activities at DPLF and SBVW. The team did not conduct tests at the site because the contamination existing at the SBVW property could be documented from records.

### History of SBVW Property and the Duck Pond Landfill

The old DPLF site was once a San Diego County landfill that was abandoned in the 1960s. A variety of small businesses were built on the site where water would accumulate after rains, and ducks would appear; hence, the name Duck Pond Landfill. The SBVW site and the Fox site were part of a redevelopment agency project in the early 1980s to reclaim underutilized properties and expand the National City Mile-of-Cars. Herb Fox be-

came owner of the two parcels after a bidding process. Fox sold the SBVW property, which was not considered to be contaminated, and assumed the liability of building on the old DPLF.

Substantial environmental engineering studies were conducted on the Fox property, and permits were obtained by Fox to build the new auto agency. However, after construction of the new agency, subsidence appeared, and the environmental regulatory agencies ordered Fox to monitor the groundwater under the DPLF and install a gas migration control system.

Under the burden of environmental costs, building repairs, and lawsuits, Fox went bankrupt, and six different regulatory agencies and the city, county, and state could not agree upon a plan and funding for remediation of the Fox Agency property.

### Contamination at the Sites

Consultants began their site investigations in early 1997. At that time, the National City Fire Department had recorded methane gas at higher than the lower explosive limit (LEL) in vaults within a few feet of the property line between Fox and SBVW The fugitive emissions put automobiles and people at SBVW at considerable risk. Consultants found the gas control system at Fox to be poorly designed and constructed. Further, it was operated inconsistently. Groundwater monitoring wells at the sidewalks and on the SBVW property showed groundwater contamination of chlorinated hydrocarbons were of such composition as to leave no doubt that SBVW property was contaminated, and the source was the old DPLF.

### Remediation Plan

The consultants made key assumptions in developing alternative remediation scenarios:

1.  That the contamination invading the SBVW property could not be stopped by remediating the source of the contamination at the adjacent Fox property. The reasons were that complete removal of the gas emissions and the leachate were not likely to occur. No stakeholder, including the city, county, state, or other agencies, would step forward with the funds or the will to correct the problem. There was no outside investor to solve the problem. The best that could be hoped for was to dedicate a park on the Fox site with about the same controls as before.

2.  That no agency would require that SBVW clean up its own site unless SBVW pursued that option. The potential political and economic risk of that action might be worse than the environmental risk.

3.  That SBVW was left only with the option of controlling the contamination coming from the Fox property so that the health and safety risk could be minimized.

Thus the concept proposed by Kinnard for appraising contaminated properties, the "cost to control" rather than the "cost to cure," fits this case exactly (Kinnard 1992).

A model for the RI/FS procedure was then developed. Consultants concluded that a rigorous CERCLA or RCRA model was too costly to use in this case,

Copyrighted material licensed by Randall Bell on April 26, 2021

primarily because extensive physical and chemical testing would be required. Instead, consultants proposed a model that resembled an ASTM risk based corrective action (RBCA) model that had been adopted (in part) in the SAM manual.

Four technical scenarios were then proposed ranging from the least extensive contamination and least rigorous containment scenario to the most extensive excavation and full-cure scenario. Each scenario was detailed into the supporting activities required to implement the scenario, and the various scenarios were estimated to keep costs, technical effectiveness, and health and safety risks in balance. The major elements of each scenario were assessed (probability analysis) as to the likelihood of passing all the criteria including acceptance (permitting) by four regulatory agencies: SAM, Air Pollution Control District, Regional Water Quality Control Board, and Integrated Waste Management Board. The scenario that the team (plus reviewers) judged most likely to pass all the tests is described below.

The scenario chosen for cost estimating assumed the following conditions and site characterization and remediation decisions:

1. The investigation will show a substantial amount of methane gas under the northwest portion of the site and limited to the car lot.
2. Only a small amount of trash underlying the property will be found and that is limited to the car lot.
3. Cooperation with the agencies and the DPLF responsible parties will be achieved.
4. DPLF will satisfactorily control the ambient gas discharges on its property.
5. Additional gas controls will be required to be installed at the SBVW site at the car lot and the sales office.
6. The risk assessment will show some exposure to employees, cars, and facilities on the subject property.
7. Gas and groundwater monitoring the subject site will be mandated by regulatory agencies but paid for by the owner.
8. A small amount of trash will be excavated.
9. There will be extensive car lot modifications: The lighting system will be modified extensively, and some areas will be restricted in use.
10. A vapor barrier will be installed between the Fox and Bay Cabinet and SBVW properties.
11. These actions will require closure of portions of the facility for a period of time, and the rental of space to store the cars will be required.

### Cost-to-Control Estimate

Using the Means cost analysis manual and the consultants' experience, the total cost-to-control was projected at $1,225,000. Major work elements were as follows:

1. *Preliminary Assessment & Cost Analysis*–Work elements included cost analyses/funding, liaison with regulatory agencies, project initiation, and associated expenses and staff support.

2. *Management Planning and Support*–Work elements included selection of management team, preparation of engineering work specifications, preparation of contractor work specifications, other work specs, solicitation and analysis of bids, preparation and negotiation of contracts, design quality assurance project controls, and associated expenses and staff support.
3. *Litigation Support*–Work elements included selection and review of third party reviewer work, surveyors' support, reviews with attorneys and insurance firms, and associated expenses and staff support.
4. *Economics Planning and Support*–Work elements included project funding planning and support, project contingency plans, provision of financial data, valuation study, project cost analysis and controls, and associated expenses and staff support.
5. *Engineering Work Plan*–Work elements included preliminary engineering work plan, surveyors' study, logistics, and traffic plan.
6. *DPLF Environmental Records Review*–Work elements included environmental records review, geological assessment, engineering conceptual design, regulatory workplans, permits, analysis of analytical tests, health risk assessment, staff support, and final engineering report.
7. *Soil, Groundwater, Soil Gas, and Ambient Air Testing*–Work elements included traffic control, preparation of property site, car storage and removal, asphalt preparation and maintenance, taking soil borings, installing groundwater monitoring wells, installing gas monitoring wells, maintaining wells, installing air monitoring stations, monitoring DPLF well, equipment rental/purchase, laboratory fees, and staff support.
8. *Remediation & Construction*–Work elements included physical barriers, excavation, loading, hauling, manifesting, and gas migration controls.
9. *Project Closure*–Work elements included final engineering report, environmental closure reports, ongoing maintenance for three years, final economic evaluation report, and management and engineering support for three years.

In this analysis, all anticipated costs were considered including those associated with management and litigation. As a guide to costs, the Means manual and the *Standard on the Valuation of Properties Affected by Environmental Contamination* (IAAO 1992) were reviewed. Consultants made extensive contacts with remediation contractors and equipment suppliers for cost proposals.

### Loss of Value Analysis

• *Valuation Standards*–The development of standards for valuing environmentally impaired property has been emerging slowly. It had become accepted that the method for determining the value of environmentally impaired property was to first

establish the value of the property on an unimpaired basis, and then subtract the impaired value, the residual (after adjustments) being fair market value. The IAAO had established standards for valuing environmentally impaired property that identified many items of expense in costing the effect of contamination, and consultants used these guides in the cost analysis (IAAO 1992).

The approaches considered to determine the unimpaired value included the income approach, the cost approach, and the sales comparison approach. The consultants' studies of the appraisal literature showed that the income approach is preferred when operating data for a facility is readily available (revenues, vacancies, operating costs, and so on), and the uncertainties are readily quantifiable (Neustein 1992; Mundy 1994).

The sales comparison approach was chosen by the appraiser on this assignment to determine the unimpaired value because comparable property sales were available. The income approach was not used because income data were not available to calculate comparable returns.

- *Highest and Best Use*–The highest and best use for the property was as an auto agency. The property was located on the Mile-of-Cars, and the area was tightly zoned for this special purpose.
- *Stigma*–When costs of cleanup are known with some certainty and are quantifiable, the uncertainty and fear associated with stigma is reduced. Thus, there is a real trade-off between the cost to cure the problem and the related stigma. Applying that reasoning to the subject property, the owner could (1) do nothing, and the property becomes very difficult to sell, and value goes down to its basic utility of about 50 percent of its unimpaired value, or (2) take steps to control the contamination, and invest to make the property saleable and gain full utility. Stigma is lessened, and the property has value of perhaps 80 percent to 95 percent of the unimpaired value.

  Consultants estimated the residual stigma in this case at 20 percent because of the ugliness and the obvious remaining hazardous problems adjacent to the subject property. The DPLF is likely to remain a factor creating stigma for SBVW for many years to come. The SBVW is adjacent to the DPLF, and it has been shown that proximity and line of sight are major factors in increased stigma (Greenberg 1993). Landfills generally must be monitored and maintained for twenty to thirty years after their closure (Robbins 1991).
- *Other Considerations*–Some additional factors that were considered include value in utility–the owner has the choice to lease the property to another car dealer. The lower limit of the value of this environmentally impaired property is the value in leasing the property less carrying costs. Lack of reliable data prevented the consultants from a careful examination of this factor. A second factor is loss of use of property–an often overlooked consideration is the time required to clean up. During this period, the property may not be used, either entirely or partially. This deferred use is a reversion of the use and, therefore, a value deduction (Rinaldi 1991). Consultants considered this factor, and to a certain extent, some associated costs were factored into the cost analysis. The prospect of future payments was too speculative to be considered. A third consideration was time value of the expenditures-the consultants did not consider this item in the analysis. Although many appraisers have attempted to adjust the cleanup costs to a present value determination because expenditures may be delayed (Rinaldi 1991), the consultants found this adjustment, in this case, to be specious. The cost to cure or contain is usually the major cost element in the diminution of value, and this can change significantly with knowledge gained in the investigative phase. For a variety of reasons, funds for cleanup may be deferred. In the meantime, stigma remains strong because of the uncertainty of the cleanup ever occurring. A fourth consideration is time value of future repayments–the consultants did not consider this item in the analysis. The prospect of future payments was too speculative to be considered. Finally, bank financing was considered-the consultants concluded that financing for a new buyer would be very difficult to achieve on favorable terms, and that fact was considered part of the stigma analysis.

## Opinion of Impaired Value

The consultants relied on the cost and engineering-based formula described by Albert Wilson and modified by wording, not substance, as follows (Wilson 1994, 1996):

*Impaired Value = Unimpaired Value – Cost-to-Control – Cost of Restricted Use*
*– Impaired Financing Cost*
*+ or – Market Intangible Costs (Including Stigma)*

The consultants' opinion was that the amount of the environmental impairment of the SBVW property was $1,250,000:

| | |
|---|---|
| Unimpaired value | $2,500,000 |
| Cost-to-Control | $1,225,000 |
| Stigma (20 percent) | $500,000 |
| Total | $1,725,000 |
| Adjustment | (–)   $500,000 |
| Total deduction | $1,250,000 |

The adjustment was made to reflect a 50 percent maximum deduction because of the utility of the facility. A major factor in the discussions among the consultants, the appraiser, and the TE was the value in the current and future utility of the property.

Final loss of value as determined by the TE was approximately $1,150,000, but applied over two years. An appeal was considered, but the consultants and appraiser recommended that SBVW spend its money on a legal damages remedy.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Advice from the Courts

Three of the issues that were present in the SBVW case have more recently been addressed by the courts in two cases of significance. Both cases involved California properties and may not be fully applicable to other states.

### Necessity of Cleanup

Voluntary cleanup of a contaminated facility in a CERCLA damage case was recently addressed by the United States 9th Circuit Court of Appeals in *Carson Harbor Village (CHV) v. Unocal* (Carson 2001):

> On summary judgment, the district court ruled that CHV could not show that its remedial action was "necessary" within the meaning of CERCLA because there was no evidence of an actual and real threat to human health or the environment, and because CERCLA was not designed to permit owners to clean up their property unnecessarily for business reasons, and then shift the costs to prior owners.

The appeals court ruled that "The district court erred in finding that there was insufficient evidence of an environmental threat, and that CHV's response costs were unnecessary.

Thus, substantial evidence of an environmental threat can be applied in California and other western courts in damage cases even if no regulatory order exists. There was no regulatory order in the SBVW case for cleanup of the SBVW property. Other states may disagree (see *Hufford v. Montgomery County*).

### Valuation Method in Property Tax Case

In *Mola Development v. Orange County Assessment Appeals Board* (Mola 2000), the California courts made it clear that "fair market value" meant what a willing buyer would pay for a property, other factors notwith-standing. It also suggested that the full deduction of the cost to cure was applicable and that repayments to the property owner by other parties constituted intangible assets and were not part of a real property tax assessment. The California State Board of Equalization thought enough of the decision that it sent a letter referring to the case to all tax assessors.

### Tax Assessment and Public Policy

The court admonished Orange County for trying to exercise public policy with tax assessments. At issue is the possible rewarding (by tax relief) of a property owner who has not yet cleaned up his property.

## Summary and Conclusions

Valuation methods as they relate to property tax reduction are still evolving. The issues are very complex, and the property owner and the TE are advised to obtain professional assistance in evaluating proposals for a tax reduction. A team approach is recommended, which includes a property appraiser as well as an environmental engineer.

A remediation plan is critical to the development of a loss-of-value proposal and must follow protocol consistent with the NCP. The remediation cost analysis must follow protocols acceptable to the EPA. The cost and work elements must be detailed for the total cost projections to have validity, and a probability analysis should be conducted.

The next round of critical thinking on the subject has already begun, as seen in court cases such as *Mola v. Orange County* (Mola 2000). Appraisal organizations should review the issues of cost analysis and stigma for more guidance on how the work is to be performed.

## References

White, Joy M., ed. 1992. Measuring the effects of hazardous materials contamination on real estate values: Techniques and applications. *Technical Report*. Chicago: Appraisal Institute.

Department of Energy, Office of Environmental Policy and Assistance. 1998. *ARARs, Frequently Asked Questions*. (See http://tis-nt.eh.doe.gov/oepa/arars.)

Birdsall, Thomas. 1995. *Quantifying Environmental Costs and Liabilities*. AICPA/IBA National Business Valuation Conference.

Chalmers, James, and Scott Roehr. (January) 1993. Issues in the valuation of contaminated property. *The Appraisal Journal*.

Coffay, Edmund P., III. (Summer) 1993. The revised URAR: Clarifying the appraiser's role in reporting environmental hazards. *Environmental Watch* (1): 6-8.

EPA. (October) 1988. *Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA, Interim Final*.

EPA, Office of Emergency and Remedial Response. 1999. *Remedial Investigation/Feasibility Study*. (See http://www.epa. gov/ superfund/whatissf/sfproces/rifs.htm.)

EPA, 1996. *The Role of Cost in the Superfund Selection Process*. (See http://www.epa.gov/superfund/resources/cost_dir/.)

Greenberg, Michael, and James Hughes. (January) 1993. Impact of hazardous waste sites on property value and land use: Tax assessor's appraisal. *The Appraisal Journal*.

Appraisal Institute. 2001. *The Consideration of Hazardous Substances in the Appraisal Process*. Chicago: Appraisal Institute.

IAAO, 2001. *Standard on the Valuation of Properties Affected by Environmental Contamination*. Chicago: IAAO.

Kinnard, William, Jr. 1992. Measuring the effects of contamination on property values: The focus of the symposium in the context of current knowledge. *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications*. Chicago: Appraisal Institute.

Means, R.S. Remediation cost estimating. *Special Edition of the Means Cost Analysis Manual*. Kingston, MA: R.S. Means Company, Inc.

Mundy, Bill. (January) 1992. Stigma and value: The impact of hazardous materials. *The Appraisal Journal*, 7-13.

Mundy, Bill. (Fall) 1994. The income approach and environmentally impaired property: A response. *Environmental Watch*, 7(3).

Neustein, Richard. (April) 1992. Estimating value diminution by the income approach. *The Appraisal Journal*.

Patchin, Peter J. (January) 1988. Valuation of contaminated properties. *The Appraisal Journal*, 7-13.

Patchin, Peter J. (February) 1991. Contaminated properties—Stigma revisited. *The Appraisal Journal*, 167-78.

Rinaldi, Anthony. (July) 1991. Contaminated properties— Valuation solutions. *The Appraisal Journal*.

Robbins, Michael, and John Norman. (Fall/Winter) 1991. Landfills aren't all bad: Considerations for real estate development. *Real Estate Issues*.

Ross, Del. 1994. *The Valuation of Businesses and Commercial Properties Subject to Environmental Risk*. Institute of Business Appraisers National Conference.

Ross, Del. 1995. *Instrumental Methods for Site Assessment and Characterization*. Instrument Society of America (ISA) National Conference.

Site Assessment and Mitigation Program, Department of Environmental Health, Land Use and Environmental Group, County of San Diego. 2002. *SAM Manual*.

Steinway, Daniel M. (April 6) 1990. Private cost recovery actions: What is the impact of the consistency requirements? *Environment Reporter*, 1947-52.

California State Water Resources Control Board. 1995. *Cost Guidelines*. Sacramento, California: SWRCB.

Weber, Bruce R. 1997. The valuation of contaminated land. *Journal of Real Estate Research*, 14(3): 379-98.

Wilson, Albert P. Quly) 1994. The environmental opinion: Basis for an impaired value opinion. *The Appraisal Journal*.

Wilson, Albert P. (April) 1996. Emerging approaches to impaired property valuation. *The Appraisal Journal*, 155-70.

### Cases

*Bentz Foundation v. Franklin County—Ohio Board of Tax Revision* (2000).

*Carson Harbor Village, Ltd. v. Unocal Corp.*, No 98- 55056;98-55107;98-55210;98-55213;98-55215; 98-55422 (9th Cir., October 24, 2001).

*Hufford v. Montgomery County Board of Revision* (Ohio 1997).

*Mola Development Corp. v. Orange County Assessment Appeals Board*, 80 Cal.App.4th 309 (2000).

Copyrighted material licensed by Randall Bell on April 26, 2021

## 8.2 The Development of Standards For Assessing Contaminated Properties

*By Del Ross, PE, CBOA*

This article originally appeared in the Summer 2003 issue of *Assessment Journal*.

Environmentally contaminated properties present a major challenge to taxing authorities. The best methodology for appraising contaminated properties in general, and each property specifically, has been very uncertain. The effect of contamination on property value has been described in a great number of articles; yet a consensus among standards-setting organizations has been elusive. Taxing authorities must look to public policy and revenue generation budgets for some guidance in setting valuations of all properties on the tax rolls. Further, guidance from the various state legislatures and the courts determine how contaminated properties are to be assessed.

The appraisal of environmentally contaminated property presents unique challenges to the appraiser. Challenges include the nature and degree of use impairment, the potential health problems for occupants of the contaminated property and the community, and the separation of economic obsolescence from damages due to contamination, as well as basic appraisal methodology and taxing policy issues.

The tax assessment problem arises when an appraiser is informed that a property is contaminated. The property owner may submit evidence of environmental contamination and a loss of value appraisal. At a hearing, the property owner may provide witnesses for testimony of stigma, inability to sell the property, or inability to obtain mortgage financing. The appraiser will most likely seek guidance from such authorities as the Appraisal Standards Board, the International Association of Assessing Officers, and the Appraisal Institute. The appraiser may also seek technical guidelines for site assessment and remediation of contaminated properties and for cost analyses from such authorities as the Environmental Protection Agency (EPA). In addition, tax court guidance from the state will need to be reviewed.

### Characteristics of Contaminated Properties

To understand the issues in the valuation of contaminated property, it is useful to look at the types of contamination, the nature of the impairment, and the economic situation the typical property owner faces. Although there have been many publications that describe the nature of contamination, the concepts regarding businesses and properties described by Ross (1994, 2002) and Wilson (1996) will be examined here.

### Nature of Contaminated Properties

Environmentally contaminated properties are distinguished from other types of distressed properties by the nature of the contamination, which is mainly toxic to humans and the environment, thus presenting a health risk to the community. Toxic contamination can take a wide variety of forms. The guiding concept from the EPA is that of a "release," most likely of a waste product and more likely to be chemical in nature. The term "release" is important because the primary federal environmental laws, CERCLA and RCRA (see Glossary), specify the liability a property owner may incur if a release of a regulated substance occurs. It is that liability for cleanup that essentially drives the value reduction of a property because, in most cases, the current property owner is required to clean up the property, no matter who caused the release.

### Types of Contamination

The most common contamination of properties results from leaking underground storage tanks (USTs), typically from a gasoline station. These sites are well understood in the environmental, technical, and regulatory community. Documentation of the contamination is often straightforward. Cleanup costs are also well understood, as cleanup funds are available from most states and the criteria for payments are well documented (SWRCB 1995).

However, in situations where an underground plume of contamination has reached groundwater and extended under many properties, the remediation of fuel leaks can be very difficult to understand and the costs can be very uncertain. Recently, regulatory agencies in California have agreed that some fuel-only contamination can be left in the ground for natural attenuation. That means letting natural bacteria devour the carbon over time. The timing and costs for cleanup of these sites can vary depending on geotechnical and hydrological conditions.

Many sites are contaminated with toxic substances that are more difficult to remediate. Chlorinated hydrocarbons such as PCE (tetrachloroethylene) are found

**Del Ross** is a professional engineer (PE) and a certified business opportunity appraiser (CBOA). He is managing director of Camtec Environmental Consultants in Temecula, CA. This article is based on a presentation given at the IAAO National Conference, October 2002. The author acknowledges Ken Keller, REA, for considerable assistance with the case studies; Brian Flannery, CGA, for his understanding of the tax courts; and Bruce Weber, MAI, for his knowledge of market studies and uncertainty analyses.

*The statements made or views expressed by authors in* Assessment Journal *do not necessarily represent a policy position of the International Association of Assessing Officers.*

at many sites including dry cleaners, machine shops, and auto repair facilities. These contaminants are more toxic than gasoline. They are more difficult to clean up than fuel spills because these substances can penetrate deep into groundwater and, in effect, hide from the site inspectors. The choice of cleanup methodologies for these chlorinated hydrocarbons may result in greater uncertainty than the choices in a simple fuel spill.

Many sites, such as former military bases, suffer from multiple contaminants such as aviation fuel leaks, range munitions, and on-site hazardous waste landfills. It may take years to effectively characterize the site before remediation can be considered. It is also likely that many different engineering studies have been conducted, and many piggybacked on others, resulting in a wide variety of conclusions regarding the future use of the property. A valuation review of one former military base in Orange County, California, included almost a dozen engineering studies conducted throughout the years. In past years, the EPA would force the owners to deal with the contamination on the entire property at once. Now, the EPA will consider a multiple parcel approach. Thus, the appraiser may have to address many different valuation models for such a site.

Many of the contaminated sites have undergone a health-risk assessment. Such reviews may or may not have been done appropriately. These studies are difficult to understand, even for environmental professionals. For example, the EPA has recently released a Draft Perchlorate Risk Assessment that deals with the toxicology of ammonium perchlorate, a component of solid rocket fuel that is a major contaminant in the Los Angeles Basin (EPA 2002). The implication to cleanup standards is unclear.

In addition to contaminated industrial and commercial properties, the appraiser may encounter residences that have been built with asbestos insulation or have lead-based paint contamination. Residents may have been exposed to pesticides, making the question of "fit for habitation" a major consideration. The latest trend is to examine for toxic mold in residences and offices. The trend in site assessments and valuations may be a direct result of media exposure and entrepreneurial litigation (American Re-Insurance Company 2002).

Due to the variety of contamination and geotechnical problems, health risks, and uncertainties about the future of the properties, it is much more difficult to assess damage from contamination than from natural disasters such as fires, floods, or construction defects.

## Contaminated Property Classification

Contaminated properties may be classified as land, industrial or commercial properties, and residential properties. Contamination may be contained or uncontained. There may be areawide contamination, as compared with localized contamination. Stigma may be another important consideration in the cleanup cost analysis. These factors become important to the consideration of appraisal methodologies and cleanup methods and costs.

*Land*–Contaminated land may include farmland, property held for investment, landfills, and industrial properties that have been so severely damaged that the property is essentially reduced to bare land. In many of these situations, the cost to investigate and remediate the contamination exceeds the value of the property. However, some taxing authorities refuse to accept a zero valuation and insist that the land is useful, even if only as a parking lot. One example can be seen in *Bentz v. Franklin County* in which contaminated vacant land next to a landfill was ruled to have use to owner.

*Industrial/Commercial Properties*–Contamination of these properties calls for a close review of the income potential of the properties. Not all contaminated properties must be evacuated, and rents may continue to be collected. How to account for income streams versus cost-to-remediate streams may be important to the valuation.

*Residential Properties*–Contamination of residential properties is often more difficult for the appraiser to adequately assess than the contamination of industrial properties. Lacking funds to obtain professional help to prove contamination and loss of value, homeowners rarely provide adequate documentation of loss of value.

*Contained or Uncontained*–Wilson (1996) described contamination as contained when it is bounded (for example, asbestos in a building). An example of uncontained contamination is fuel leakage from a UST to groundwater that does not respect property boundaries. The risks due to uncertainties would be much higher in uncontained scenarios. However, asbestos contamination in an office building may not affect the entire building or cause problems, such as stigma, in the neighborhood. The income approach adjusted for the cost to cure may be an acceptable valuation method in these cases.

*Areawide Contamination*–Contamination of a broad spectrum of properties is typically found at Superfund sites. The investigation and remediation scenario is mostly well documented. However, substantial uncertainty exists as to the prospects for economic recovery of the area. Special political/economic organizations, such as economic development agencies and brownfields, are often needed to get the cleanup done and establish economic viability in the area. The appraiser will often need environmental appraisal consulting assistance, including market studies, to sort out the valuations of a large group of properties.

*Stigma*–Decreased salability of a property is a major factor that leads appraisers to include stigma in their loss of value calculations. Many appraisal articles have been devoted to this subject. Chalmers (1993) stated, "stigma is the reduction in value caused by contamination resulting from the increased risk associated with the contaminated property." Patchin (1991) referred to stigma as a negative intangible. He included fear of hidden costs, the trouble factor (buyer wants compensation for the trouble of doing the cleanup), fear of liability, and lack of mortgageability. Bell (1998) identified

Copyrighted material licensed by Randall Bell on April 26, 2021

several models for diminution of value and subsequent recovery (partial or complete).

Perhaps the best definition of stigma is a "perception of economic risk related to the uncertainties of the cleanup process" (Ross 2002). Market studies can clarify the extent of such perceptions among potential buyers, real estate brokers, and lenders (Weber 1997). The appraiser should insist on documentation of the stigma factor in the appraisal methodology.

## Economic Situations Facing the Property Owner

Property owners face many economic problems related to contamination on their property. Property tax relief is often the best choice for recovering some compensation for damages. Often, these problems are devastating to the property owner, as income is diminished and the costs of environmental investigation and remediation increase.

*Property Owner Liability*–A unique characteristic of the contaminated property scenario is that liability for cleanup rests, in most cases, with the *current* property owner–who may not have contributed to the contamination in any way. A frequently encountered situation is the shopping center owner who has leased a corner lot to a gas station. If a release of hazardous materials at the gas station occurs, it is the shopping center owner who may have the ultimate responsibility of investigating and remediating the property. That situation often leads to long and arduous negotiations between the current property owner, gasoline suppliers, lessees, previous lessees and owners, and regulatory agencies. Sorting out the restitution often takes precedence over cleanup of the property, and the property may remain in its contaminated state for years while it continues to deteriorate. The current property owner may then seek relief from the burden of property taxes.

*Insurance Coverage*–Insurance companies keep the environmental courts busy with their consistent denial of lawsuit defense and their exclusions for environmental damage coverage. Hence, a traditional means of economic damage recovery is often unavailable to the owner of contaminated property.

*Damage Recovery Lawsuits*–Property owners face difficult odds in their effort to obtain environmental damages from the responsible parties in court. Federal laws may be used to stop contamination from spreading, but state courts are the venue of choice for recovery of damages. Most often, the tort of nuisance must be claimed to recover contamination damages. Stigma damages are denied in many states and very difficult to achieve in others.

## Standards for Valuation of Contaminated Properties

To be viable, standards must be fully relied upon in practice and in the courts. The establishment of good appraisals or valuations of contaminated properties depends upon four main factors:

1. Standards for performing the work must be determined by a recognized standards-setting organization.
2. The standards-setting organization must have established working groups that provide tradecraft input, as well as strategic and policy-setting decision making from all stakeholders.
3. A qualifying process must be in place for licensing or certification of appraisers and other technical participants.
4. Appraisals and technical reports must be coordinated, address the main issues, and be consistent with the standards.

Guidelines for performing the various technical and economic evaluations, including appraisals, began to appear around 1990 amidst the collapse of the savings and loan industry. A contributing factor to the industry problems was the overvaluation of real estate included in many bank and savings and loan portfolios containing contaminated properties. Leadership in the standards development came from the Federal Deposit Insurance Corporation (FDIC), which, in 1992, forced banks to evaluate their portfolios for environmental risk. These actions lead to the development of environmental standards for conducting "all appropriate inquiry" as required by CERCLA (see Glossary), also known as Superfund because it provides federal funding for cleanup.

### ASTM Standards

Standards for assessing the risks of environmental contamination of commercial properties were prepared by the American Society of Testing Materials (ASTM), with the comprehensive Phase I Environmental Site Assessment (ASTM E-1527) published in 1993. The standard follows the CERCLA liability scheme with a focus on providing the innocent purchaser's defense to CERCLA's draconian "strict and several" liability scheme. The standards have been revised frequently and have multiplied into a variety of environmental investigative tools. They are now written into many federal and state laws regarding property investment (Ross 1994, 1995).

The ASTM Phase I is a document all appraisers should be familiar with. It covers the history of use of the property with documentation, including

- Review of ownership records of the property going back fifty years or when the property was first commercially developed
- Collection and analysis of source documents located in county recorders' offices and building departments
- Review of aerial photographs, again going back fifty years or to the first commercial development
- A comprehensive site inspection to identify hazardous materials and waste practices, evidence of spills, and location of USTs (Ross 1994)

A Phase I is an essential document for review when conducting an appraisal of contaminated property. Many engineers skip this step when providing evidence of contamination and remediation. Ignoring a property's history of use can miss other potential contamination.

The ASTM gets the highest marks for standards of any cited in this article. ASTM is a consensus-driven organization that requires that all dissenting opinions be resolved before publication of a standard. The voting members of the various committees include an even balance between vendors (consultants, contractors) and users of the reports, which includes industries, banks, and insurance companies. Certification for Phase I site assessments by ASTM is left to the designation of "environmental professional," which, in California, is a state certification as REA or professional license as PE or RG (See glossary).

## Appraisal Standards

The appraisal industry has contributed substantially toward an understanding of the process of valuation of environmentally contaminated properties, but the development of standards has lagged.

*The Appraisal Foundation*–In 1992, the Appraisal Standards Board of The Appraisal Foundation issued its Advisory Opinion 9 (AO)-9, Responsibility of Appraisers Concerning Toxic or Hazardous Substance Contamination. This document

- Advised appraisers of the ethics of the competency test
- Warned them not to undertake appraisal of contaminated properties unless they were qualified to do so
- Told them they may reasonably rely on the findings of other professionals
- Encouraged them to team up with environmentally trained professionals when such issues arise

The revised Opinion, issued in 1998, included the following statement on methodology:

> The value of an interest in impacted or contaminated real estate may not be measured simply by deducting the remediation or compliance cost estimate from the value as if the property is unaffected. Other factors may influence value, including any positive or negative impact on marketability (stigma) and the possibility of change in highest and best use.

*Appraisal Institute*–The Appraisal Institute began publishing articles about the appraisal of environmentally contaminated properties in the 1980s and conducted a groundbreaking Symposium in Philadelphia in 1991 to present its findings (Appraisal Institute 1992). The institute issued its *Guide Notes to the Standards of Professional Appraisal Practice* (Appraisal Institute 2001) emphasizing professional ethics and, in particular, the issuance of disclaimers or limiting conditions to the appraisal report, stating that the appraiser did not consider environmental conditions in his or her appraisal or that he or she relied on others. Throughout the years, articles in the *Appraisal Journal* have shaped the de-

velopment of appraisal practice in this area. Reference work has been produced by Kinnard, Mundy, Patchin, Wilson, and many others.

One concept promoted by various authors is that they prefer the wording "cost to control" or "cost to correct" instead of "cost to cure" as more descriptive of the nature of remediation of contaminated properties. However, cost to cure is steeped in the tort of construction defect and natural disaster litigation, and it is the preferred wording in appraisals for litigation damage analysis.

*Fannie Mae*–Fannie Mae issued its revised Uniform Residential Appraisal Report (URAR) in 1993 and identified limiting conditions such as the "presence of hazardous wastes, toxic substances, etc." (Coffay 1993).

*International Association of Assessing Officers*– The IAAO issued its Standard on the Valuation of Properties Affected by Environmental Contamination in 1992 and revised it in 2001. Unlike other appraisal organizations, the IAAO established its concepts of value (IAAO 2001) as (1) unencumbered value and (2) value in use. The unencumbered value is described as "the value that the property would have if no adjustment were made for any environmental encumbrance." It comments that "this value can be obtained using standard appraisal methods." It further states that "value in use suggests that a property that is still in use, or which can be used in the near future, has a value to the owner." The standard also cautions the appraiser "fully deducting the (remediation) costs may overstate the decline in value because the value in use concept would then be ignored."

This value to the owner is a very controversial valuation concept in view of the fair market value concept codified into most state statutes concerning property taxes and eminent domain takings.

Court decisions have overridden at least parts of this concept in many states. Certainly, the concept is open to interpretation. (In a case discussed later in this article, value in use is applied as an add-back to value after taking off the cost to cure.) Recently, a Nebraska tax court (*Garvey Elevator* 2000) concluded that there are two methods of valuation: (1) value in exchange and (2) value in use. (Value in exchange was interpreted by the Garvey Commission as equivalent to fair market value.)

The importance of the IAAO standard is that the costs to cure are itemized, giving a set of solid guidelines for the items that can be included in a loss of value report. For example, the additional costs to market distressed properties and known legal costs are recognized as part of cost to cure. (The 1992 IAAO standard lists itemized costs and add-back costs that are only summarized in the 2001 standard.)

## Appraisal Methodologies

Although other methodologies (including hedonic, multiple regression modeling, and empirical modeling) may be applicable, standard appraisal practice is based on three main approaches:

1. Market data or comparable sales prices
2. Income approach

Copyrighted material licensed by Randall Bell on April 26, 2021

3.   Replacement cost approach or cost-to-cure plus

Most contaminated property appraisal standards state that any of the three methods can be used, and the literature is abundant with justifications for each approach. Some factors to consider are

- Market data methodology fails in most cases because of the uniqueness of the contaminated sites and the lack of data in hidden negotiating factors in final transfer deals.
- The income approach is applicable to properties such as office buildings and warehouses that can generate rental income offset by the remediation costs.
- The cost approach using a deduction of cost to cure from the unimpaired value is the approach that directly addresses the typical situation. This is the recommended approach stated in the IAAO standard and is the methodology applied in the case studies presented in this paper.
- The developmental approach, although denied credibility by most appraisal authorities, may be the best method of examining fair market value from the buyer's perspective.

## Appraisal Standards in Practice

There are many occasions where an appraiser did not inquire about the results of the Phase I Environmental Report before delivering the appraisal. In many of the cases, the subject appraisal was rendered worthless because of environmental contamination, and in many of the situations, the contamination impairment was very visible and obvious. Property appraisers without environmental experience lean heavily on the issuance of disclaimers or limiting conditions to the appraisal report stating that the appraiser "did not consider environmental conditions in the appraisal" (Appraisal Institute 2001).

## Standards for Remediation Work and Cost Estimates

The appraisal literature has generally ignored what, in most cases, is the largest and most uncertain element in the appraisal of contaminated property– the methodology and cost to remediate the property. Standards for remediation generally originate with the EPA, following CERCLA or RCRA models that involve rigorous evaluation of remediation alternatives. These standards are also replicated by state and local regulatory organizations. In San Diego County, California, the Site Assessment and Mitigation (SAM) Program issues a manual, which is updated annually, for very specific activities in a remediation work plan (SAM 2002). It is important that the appraiser be familiar with accepted standards and practices of engineering work and cost estimates in the local area.

### Laws and Protocols for Site Assessment and Remediation

Environmental engineering reports and cost estimates must follow the established environmental laws and protocols.

*NCP*–The National Oil and Hazardous Substances Pollution Contingency Plan is more commonly known as the National Contingency Plan (NCP). This is the federal government's blueprint for responding to oil spills and hazardous substance releases. In effect, the NCP authorizes CERCLA, RCRA, and other laws and regulations regarding investigations and cleanup of contaminated sites. Various laws offer rigorous models for site assessment and cleanup, but there is one thing they have in common: any remediation plan must conform to the NCP–being either "consistent" with it (for private entities) or "not inconsistent" with it (for public entities) (Steinway 1990; Wilson 1996; Washington State, 1995).

*ARARs*–Remediation plans that follow the CERCLA and RCRA models require attainment of all federal and state applicable or relevant and appropriate requirements (ARARs) of the NCP. That means that the site assessment and remediation plan must contain a review of environmental laws, and it should note any plan deviations or inconsistencies.

*RI/FS*–All legitimate remediation plans contain some version of CERCLA's Remedial Investigation/Feasibility Study (EPA 1999). Detailed guidance for conducting studies is also available (EPA 1998).

*Remediation Goals*–No remediation plan is complete without determining remediation goals–which answers the question "How clean is clean?" In California, one set of goals, known as Preliminary Remediation Goals (PRGs) is issued by the EPA; other goals may be set by the Regional Water Quality Control Board or, in San Diego County, by SAM.

*Features*–Key features of the engineering plan applicable to a site with soil contamination would include the following:

1.   The site must be fully characterized; that is, any contamination must be specified as to vertical and lateral dimensions and movement.
2.   Groundwater and all geotechnical and hydrological influences must be determined.
3.   Health risk assessments must be completed.
4.   Alternative scenarios of remediation must be detailed and evaluated.
5.   Health and safety plans must be an integral part of the engineering proposal.
6.   Disposal of all wastes generated by the RI/FS process must be accounted for.
7.   Some form of uncertainty analysis must be performed.

*Regulatory Orders*–The appraiser will want to carefully examine any orders by regulatory agencies. Absence of an order does not necessarily show lack of necessity of the cleanup, but that could become an issue the appraiser would want to explore (*Carson Harbor*, 2001).

## Standards for Remediation Cost Estimates

The cost area has not had much scrutiny in the literature or from regulatory agencies, even the EPA. Primarily, guidance is limited to the experience of engineering contractors. Appraisers would be well advised to have a third-party cost expert review all cost proposals.

*EPA Guidance*–A variety of cost analyses are available from the EPA (for instance, www.epa.gov/superfund/resources/cost_dir/).

*Standard Costs*–The Army Corps of Engineers has a standardized environmental remediation cost database that is available for a fee. There are a number of vendors who can provide such services under consulting contracts. One advantage of standardized cost analysis models is that a variety of cost and remediation options can be explored without the trouble of obtaining competitive bids (Means). In California, another source is the State Water Resources Board UST Fund Cost Guidelines (SWRCB 1995).

*Competitive Bids*–For legitimacy and final accuracy, competitive bidding for all major cost projects is an important step that should be taken in major projects. The appraiser should insist that property owners provide cost estimates that reflect the competitive business environment, not theories.

## Adjustments to Remediation Cost Estimates to Applicable Appraisal Standards

Engineering cost estimates for remediation need to be reviewed by the appraiser and adjusted as necessary to meet appraisal accounting standards. Potential questions for review include:

1. Were remediation costs actually planned-for expenditures at specific times in accordance with an approved remediation work plan?
2. Were capital costs separated from operating costs?
3. Were operating and administrative costs actually new costs attributable to the remediation, or were they continuing operating costs?
4. Were all remediation costs deducted on a dollar-for-dollar basis or were some adjustments made to these expenditures? Amortization? Depreciation? Probability?
5. Were any adjustments in income (plus or minus) from the uncontaminated value taken into account?
6. Was facility utilization rate or throughput affected before, during, or after remediation?
7. Were business risks, safety factors, and uncertainties accounted for? How?
8. Was a market value capitalization rate applied? On what basis?
9. How was stigma addressed? Cap rate premium? Market data? Case problems?
10. What changes will occur during and after remediation? In highest and best use? In property size and configuration? In property defects? In replacement of old structures with new?
11. Were depreciation and amortization schedules changed? Should they be changed?
12. Was time value of money in the income and expenditure streams addressed?

## Case Study: Auto Agency Adjacent to Old Landfill

This case study is about an early brownfields development in National City, California. The site of the Fox Auto Agency (Fox), also known locally as the former Duck Pond Landfill (DPLF), was not properly characterized or remediated before the new auto facility was built. Methane gas emanated from below the surface at Fox, and contaminated groundwater flowed under the properties. The result was differential subsidence (sinking) of the Fox buildings, causing substantial costs–and embarrassment–to the property owners, governmental entities, and regulatory agencies.

The client, South Bay Volkswagen (SBVW), was located adjacent to Fox. They had been contacted by a property tax reduction specialist who found that the existing property tax appraisal at SBVW (approximately $2 million) was comparable to that of reported sales of specialized automobile agency properties in the area. But no tax reduction would be justified unless it could be shown that there was environmental damage at SBVW. Studies were undertaken to determine if SBVW had suffered environmental damage and, if damage were proved, what the costs to remediate the property would be.

### Work Plan

The work plan was based on a team approach. Work was divided into three parts: (1) engineering analysis based on the ASTM Phase I Standard (Camtec and Keller Engineering); (2) cost to remediate and loss of value report (Camtec and Keller); and (3) appraisal report (Property Tax Representatives).

The engineering analysis and cost to remediate studies consisted primarily of an analysis of documents, site inspections, and interviews with a wide variety of property owners, regulators, city and county officials, and industry experts. Key to the analysis was a review of over ten thousand pages of documentation from various agencies, which detailed environmental activities at DPLF and SBVW. The team did not conduct tests at the sites because the contamination that invaded the SBVW property could be documented from the records.

### History of the SBVW Property

The old DPLF site was once a San Diego County landfill that was abandoned in the 1960s. The SBVW site and the Fox site were part of a redevelopment agency project to reclaim underutilized properties and expand National City's "Mile of Cars" string of auto dealerships. Herb Fox became owner of the two parcels. He sold the SBVW property that was not considered to be contaminated and assumed the environmental liability of building on the old DPLF.

Substantial environmental engineering studies were conducted on the Fox property. However, after

Copyrighted material licensed by Randall Bell on April 26, 2021

construction of the new agency, subsidence appeared. The environmental regulatory agencies ordered Fox to monitor groundwater under DPLF and install a gas migration control system. Under the burden of environmental costs, building repairs, and lawsuits, Fox declared bankruptcy. Six different regulatory agencies, plus the city, county, and state, could not agree upon a plan and funding for remediation of the Fox property.

## Contamination at the Sites

A number of consultants began site investigations in early 1987. In 1997, the National City Fire Department recorded methane gas at higher than the lower explosive limit (LEL) in vaults within a few feet of the property line between Fox and SBVW. Fugitive emissions put automobiles and people at SBVW at considerable risk. One team found the gas control system at Fox to be poorly designed and constructed; further, it was operated inconsistently. Records from analysis at groundwater monitoring wells, at the sidewalks, and on the SBVW property, showed groundwater contamination of chlorinated hydrocarbons were of such concentration as to leave no doubt that SBVW property was contaminated, and the source was the old DPLF.

## Remediation Plan

The following were key assumptions in developing alternative remediation scenarios:

1. The contamination invading the SBVW property could not be stopped by remediating the source of the contamination at the adjacent Fox property.
2. No agency would require SBVW to clean up its own site, unless SBVW pursued that option.
3. The only option left to SBVW was controlling the contamination incoming from the Fox property, so health and safety risks could be minimized.

Thus, the concept proposed by Kinnard–cost to control rather than cost to cure for appraising contaminated properties–fits this case exactly (Kinnard 1992).

A model for the RI/FS procedure was then developed. A rigorous CERCLA or RCRA model was too costly to use in this case, primarily because extensive physical and chemical testing would be required. Instead, consultants proposed a model that resembled an ASTM Risk Based Corrective Action (RBCA) model that had been adopted (in part) in the SAM Manual.

Four technical scenarios were proposed, ranging from the least extensive contamination and least rigorous containment scenario to the most extensive excavation and full-cure scenario. Each scenario was detailed into the supporting activities required to implement the scenario, and the various scenarios were proximately costed in order to keep costs, technical effectiveness, and health and safety risks in balance. The major elements of each scenario were assessed using probability analysis as to the likelihood of passing all the criteria, including acceptance (permitting) by four regulatory agencies: SAM, APCD, RWQCB, and IWMB. Probability analysis is well established as part of Superfund protocol (Birdsall 1995).

The scenario that the team (plus reviewers) judged most likely to pass all the tests is briefly described as follows:

1. The investigation will show a substantial amount of methane gas under a portion of the lot.
2. A small amount of trash underlying the car lot will be found and excavated.
3. Cooperation with the agencies will be achieved.
4. Fox will satisfactorily control the ambient gas discharges on its property.
5. Additional gas controls will be required to be installed at SBVW site.
6. The risk assessment will show some exposure to employees, cars, and facilities.
7. Gas and groundwater monitoring of the subject site will be mandated.
8. There will be extensive car lot modifications.
9. A vapor barrier will be installed between the Fox and SBVW properties.
10. These actions will require closing portions of the facility for a period of time and renting space to store the cars.

## Cost-to-control Estimate

Using the Means Cost Analysis Manual (MEANS), along with the consultant's experience, the total cost to control was projected at $1,225,000. A detailed listing of the plan can be found in Ross (2002). Major work elements were as follows:

1. Preliminary assessment and cost analysis
2. Management planning and support
3. Litigation support
4. Economics planning and support
5. Engineering work plan
6. Environmental records review
7. Soil, groundwater, soil gas, and ambient air testing
8. Remediation & construction
9. Project closure

In this analysis, all anticipated costs were considered, including those associated with management and litigation. As a guide to costs, the Means Manual and the Standard on the Valuation of Properties Affected by Environmental Contamination (IAAO 1992) were reviewed. Consultants made extensive contacts with remediation contractors and equipment suppliers for cost proposals.

## Loss of Value Analysis

*Valuation Standards*–The development of standards for valuing environmentally impaired property had been slowly emerging but was not well developed at the date of the final report. It had become accepted that the methodology for determining the value of environmentally impaired property should first establish the value of the property on an unimpaired basis. Then the cost to remediate was subtracted. The residual (after

adjustments) was the fair market value. The IAAO had established standards for valuing environmentally impaired property that identified many expense items used to cost the effect of contamination. These guides were used in the cost analysis (IAAO 1992).

The approaches considered to determine the unimpaired value included the income approach, the cost approach, and the market data approach. Studies of the appraisal literature showed that the income approach is preferable when operating data (revenues, vacancies, operating costs, etc.) for a facility are readily available and the uncertainties are readily quantifiable (Neustein 1992; Mundy 1994). The appraiser on this assignment used the market data approach to determine the unimpaired value because comparable property sales were available. The income approach was not used because income data was not available to calculate comparable returns.

*Highest and Best Use*–The highest and best use for the property was as an auto agency. The property was located on the "Mile of Cars," and the area was tightly zoned for this special purpose.

*Stigma*–When costs of clean up are known with some certainty and are quantifiable, the uncertainty and fear associated with stigma is reduced. Thus, there is a real trade-off between the cost to cure the problem and the stigma related to the problem. Applying that reasoning to the subject property, the owner had two choices: (1) Do nothing and the property becomes very difficult to sell; its value goes down to its basic utility of about 50 percent of its unimpaired value. (2) Take steps to control the contamination and invest to make the property to make saleable, and thus gain full utility. The stigma would go down, and the property would have a value of perhaps 80 to 95 percent of the unimpaired value.

Consultants estimated the residual stigma in this case at 20 percent because of the ugliness and the obvious hazardous problems next door to the subject property. The DPLF was likely to remain a factor creating stigma for SBVW for many years to come. The SBVW is adjacent to the DPLF–and it has been shown that proximity and line of sight are major factors in increased stigma (Greenberg 1993). Landfills generally must be monitored and maintained for twenty to thirty years after their closure (Robbins 1991).

*Other Considerations*–Some additional factors considered were: (1) Value in utility; (2) Loss of use of property; (3) Time value of the expenditures; (4) Time value of future repayments; (5) Bank financing (Ross 2002).

## Opinion of Impaired Value

Consultants relied on the cost and engineering-based formula described by Albert Wilson, and modified by wording, not substance, as follows (Wilson 1994, 1996):

Impaired Value = Unimpaired Value – Cost to Control – Cost of Restricted Use
– Impaired Financing Cost
+/– Market Intangible Costs (Including Stigma)

The amount of the environmental impairment of the SBVW property was estimated at $1,250,000, as follows:

| | |
|---|---|
| Unimpaired value (as determined by Appraiser): | $2,500,000 |
| Cost to control | $1,225,000 |
| Stigma: (20%) | 500,000 |
| Total | $1,725,000 |
| Adjustment | ( – ) 500,000 |
| Total deduction | $1,250,000 |

The adjustment was made to reflect a 50 percent maximum deduction because of the utility of the facility. A major factor in the discussions between consultants and appraiser was the value in the current and the future utility of the property. Final loss of value as determined by the appraiser was approximately $1,150,000 but applied over two years. An appeal was considered, but the consultants and appraiser recommended that SBVW spend its money on a lawsuit against Fox and the county instead.

## Advice from the Tax Courts and the Legislatures

The courts have recently addressed some of the issues that were present in the SBVW case, namely:

### Necessity of Cleanup

Voluntary cleanup of a contaminated facility in a CERCLA damage case was recently addressed by the United States 9th Circuit Court of Appeals in *Carson Harbor Village v. Unocal*:

> On summary judgment, the district court ruled that CHV could not show that its remedial action was "necessary" within the meaning of CERCLA because there was no evidence of an actual and real threat to human health or the environment, and because CERCLA was not designed to permit owners to clean up their property unnecessarily for business reasons, and then shift the costs to prior owners.

The Appeals Court ruled, "The district court erred in finding that there was insufficient evidence of an environmental threat, and that CHV's response costs were unnecessary."

Thus, substantial evidence of an environmental threat can be applied in California and other western courts in damage cases, even if no regulatory order exists. There was no regulatory order in the SBVW case for cleanup of the SBVW property. Other state courts may disagree (*Hufford*, 1997).

### Fair Market Value Methodology

In *Mola Development Corp. v. Orange County Assessment Appeals Board*, the California Supreme Court made it clear that fair market value meant what a willing buyer would pay for a property, other factors notwithstanding. It also suggested that the full deduction of the cost to cure was applicable and that repayments to the property owner by other parties constituted intangible assets and was not part of a Real Property Tax Assessment. The California State Board of Equalization thought enough of the decision that it sent a letter referring the case to all tax assessors.

Copyrighted material licensed to Randall Bell on April 26, 2021

## Value in Use Methodology

In *Garvey Elevators v. Adams County Board of Equalization*, the Nebraska Tax Equalization and Review Commission found that the taxpayer had an agreement to sell the property, along with more than thirty other grain elevators. But that agreement, in effect, became the equivalent of a lease, as the sale of the subject property was nullified due to the environmental liability of the site. The taxpayer planned to use his personal market power to create a deal that would have paid for the remediation out of lease earnings. That brought a decision from the commission that the property had value in use to the owner. It also affirmed the county's decision to limit the taxpayer's deduction from the uncontaminated model to about 50 percent instead of granting a zero valuation, as requested by taxpayer. (It was unclear to the Commission whether the approximately $1 million reduction in appraised value resulted from an adjustment for remediation costs or stigma.)

Some states have chosen a variation on the value in use concept that couples this concept with that of value in exchange, as articulated by the Arizona Supreme Court in *Recreation Centers of Sun City, Inc. v. Maricopa County*, 1989. In effect, in Arizona, value in use can trump value in exchange–particularly when the cost to cure exceeds value in exchange (Arizona, *Guideline* 1998). This Guideline references the IAAO Standard for the concept of value in use, but does not reference unencumbered value at all, let alone as a starting point. Further, the Arizona Guideline excludes many expenditures detailed in the IAAO Guideline (1992) in the assembly of the cost to cure, for example, attorneys' fees and some testing. Thus, some states, including Arizona, are out-of-step with the IAAO and modern economic theory.

## Tax Assessment and Public Policy

The *Mola* Court admonished the Orange County Tax Board for trying to exercise public policy with tax assessments. At issue was the possible rewarding (by tax relief) of a property owner who had not yet cleaned up his property.

## Stigma Discount

Stigma has been an enigma for the tax courts. Taxing authorities, which will find any justification possible to avoid awarding stigma damages, have finally begun to address the concept of stigma in environmental tax reduction cases. In a recent Utah case (*Schmidt v. Utah State Tax Commission*, 1999), the court did recognize a stigma argument. However, it rejected that argument in its appraisal methodology, choosing to separately value contaminated land from a (supposedly) uncontaminated building, reducing the value of the land to zero using cost to remediate, but not giving a discount to the building other than depreciation.

A Minnesota Tax Case (*Westerling IV*, 1998) has been widely reported (Marsh 2001) as providing an early and important precedent in the recognition of stigma in environmental cases. In reference to that case in another well publicized Minnesota taxation and stigma case (*Dealers Manufacturing*, 1999), a Minnesota Law Journal (Beck 2000) stated:

> In affirming the tax court ruling, the Minnesota Supreme Court relied partly on *Westerling* in its discussion of stigma devaluation as a legitimate factor in determining market value. The court emphasized that stigma devaluation must be separable from devaluation based on contamination, because stigma can affect value whether contamination has ever been or will ever be present.

A Massachusetts case (*Woburn Services*, 1996) stands out because of an attempt by the tax court to examine the methodology of stigma in an environmental tax reduction case. The commission and the appellate court found that there are two kinds of stigma: (1) stigma occasioned by location/siting, or (2) stigma occasioned by direct contamination. Locational stigma is the negative impact to value suffered by property located in an existing Superfund site. Direct contamination stigma is the negative impact on the value of property that is not only located within a Superfund site, but is also directly contaminated beyond federal maximum contaminant levels. These stigmas diminish that property's value due to impaired mortgageability, greater risk and uncertainty, and the possibility of associated costs, such as well-monitoring, legal, and other related expenses.

The court went on to accept capitalization of income as the best method of valuing the property and added a modest one percent for stigma. The minor stigma award was because the properties produced substantial income despite the contamination. This fit the value in use concept that negated the remediation costs and the stigma discount (Ferruggia 1997).

## Brownfields

Over the past few years, considerable efforts have been made to find funding for cleanup and lessening of liability for new owners of generally abandoned contaminated sites, mostly in large cities, known as brownfields. The EPA has issued updated prospective purchaser agreements to enable purchasers to buy contaminated property for cleanup, redevelopment or reuse (EPA, USEPA 2001).

The president signed new federal legislation, known as the Small Business Liability Relief and Brownfields Revitalization Act, on January 11, 2002. This new law, according to Foster (2002), "features a grab-bag of long-awaited reforms to the Superfund law. The changes include:

- An overhaul of the key innocent purchaser defense (which largely drives environmental due diligence in connection with real property transactions)
- Two new liability exemptions
- A promise of brownfields funding initiatives
- Several provisions that somewhat tip the balance of power toward the states, and away from the EPA, in connection with site remediation decisions

The implications of this new law is that additional properties may be added to the tax rolls in many cities and states if all political entities cooperate.

## Conclusions

Valuation methodology in property tax reduction is still evolving. The issues are very complex and the property owner and the appraiser are advised to obtain professional assistance in evaluating proposals for tax reduction. A team approach is recommended to include a property appraiser as well as an environmental engineer and a cost analyst.

The remediation plan is critical to development of a loss of value proposal and must follow protocol consistent with the NCP. The remediation cost analysis must follow protocols acceptable to the EPA. In most cases, the appraiser will need to review the engineering plans for validity and adjust engineering cost estimates to meet appraisal accounting standards and methodologies.

The next round of critical thinking on the subject has already started with court cases, especially the California case of *Mola Development Corp. v. Orange County Assessment Appeals Board*. Guidelines for valuation of contaminated properties in many state tax courts are clearly out of step with modern economic theory and practice.

Appraisal organizations should review the issues of cost analysis and stigma for more guidance on how the work is to be performed. Organizations such as IAAO and Appraisal Institute must continue to offer forums for these and other issues. To ensure compliance with standards, these organizations should provide training with certification for environmental appraisal professionals.

New legislation, including the Small Business Liability Relief and Brownfields Revitalization Act, may alter cleanup liabilities and accelerate development in many brownfields projects, and quite possibly, add income-producing properties to the tax rolls.

### Glossary

**Acronyms**

| | |
|---|---|
| APCD | Air Pollution Control Board |
| ARARs | Applicable or Relevant and Appropriate Requirements |
| ASA | American Society of Appraisers |
| ASTM | American Society of Testing Materials |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| CHV | Carson Harbor Village |
| DPLF | Duck Pond Landfill, nickname for site of Fox Agency |
| EPA | Environmental Protection Agency |
| IAAO | International Association of Assessing Officers |
| IWMB | Integrated Waste Management Board |
| IBA | Institute of Business Appraisers |
| NCP | National Contingency Plan |
| PE | State licensed or registered Professional Engineer |
| PRG | Preliminary Remediation Goals |
| PCE | Tetrachlorethylene, a hazardous chemical component of landfill gas |
| RBCA | Risk Based Corrective Action |
| RCRA | Response Conservation and Recovery Act |
| REA | Registered Environmental Assessor, California |
| RI/FS | Remedial Investigation/Feasibility Study |
| RG | Registered Geologist |
| RWQCB | Regional Water Quality Control Board |
| SAM | Site Assessment and Mitigation Program of San Diego County DEH |
| SBVW | South Bay Volkswagen |
| SWRCB | State Water Resources Control Board |
| TCE | Trichloroethylene, a hazardous chemical component of landfill gas |
| TE | Tax Examiner |
| URAR | Uniform Residential Appraisal Report |
| USEPA | United States Environmental Protection Agency |
| UST | Underground storage tank |

**Terms**

*Cost to control*—Cost to remediate contamination of air, soil, or water where contamination is contained and property is restored to full use.

*Cost to correct*—Cost to remediate contamination of air, soil, or water where regulatory agencies issue a no further action letter.

*Cost to cure*—A complete correction of environmental contamination so that air, soil and water contamination equals or betters background contamination.

### Case Law

*Bentz Foundation v. Franklin County-Ohio Board of Tax Revision*, 2000.

*Carson Harbor Village, Ltd. v. Unocal Corp*, No 98-55056; 98-55107; 98-55210; 98- 55213; 98-55215; 98-55422, 9th Cir. CA, 2001.

*Garvey Elevators v. Adams County Board of Equalization*, (Before the Nebraska Tax Equalization and Review Commission) 2000.

*Hufford v. Montgomery County Board of Revision*, Ohio, 1997.

*Mola Development Corp. v. Orange County Assessment Appeals Board*, 80 Cal. App. 4th 309, 2000.

*Recreation Centers of Sun City, Inc. v. Maricopa County, Arizona Supreme Court* 1989.

*Schmidt v. Utah State Tax Commission*, 980 P.2d 690; 369 Utah Adv. Rep. 34 1999.

*Washington State Department of Transportation v. Washington Natural Gas Company*, 9th Cir. WA (1995) as reported in Villanova Environmental Law Journal VII(2) 1996.

Copyrighted material licensed by Randall Bell on April 26, 2021

### References

Appraisal Institute. 2001. Guide Note 8. The Consideration of Hazardous Substances in the Appraisal Process. *Guide Notes to the Standards of Professional Appraisal Practice*. Chicago: The Appraisal Institute.

Arizona Department of Revenue, Division of Property Valuation Equalization (Revised, 1998) Guideline-Contaminated Property Valuation.

Beck, George A. et al (October) 2000. Administrative Law—Property Tax Assessment: Contaminated Property; Stigma, Notes & Trends. *Bench Bar of Minnesota*.

Bell, Randall. 1998. The Impact of Detrimental Conditions on Property Values. *The Appraisal Journal* 66(4).

Birdsall, Thomas. 1995. Quantifying Environmental Costs and Liabilities. AICPA/IBA *National Business Valuation Conference*.

Chalmers, James and Roehr, Scott. (January) 1993. "Issues in the Valuation of Contaminated Property" *The Appraisal Journal*.

California State Water Resources Control Board. (SWRCB.) 1995. *Cost Guidelines: Underground Storage Tank Cleanup Fund*.

Coffay, Edmund P., III. (Summer) 1993. The Revised URAR: Clarifying the Appraiser's Role in Reporting Environmental Hazards. *Environmental Watch-The Appraisal Institute* 1: 6-8.

EPA. (October) 1988. Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA, Interim Final.

EPA. (2001.) USEPA Guidance on Settlements with Prospective Purchasers of Contaminated Property.

Ferruggia, Frank. 1997. Stigma and Market Value: *Woburn Services, Inc. v. Board of Assessors of the City of Woburn, Massachusetts. Journal of Property Tax Management* 9(2):1-8.

Greenberg, Michael and Hughes, James. (January) 1993 Impact of Hazardous Waste Sites on Property Value and Land Use: Tax Assessor's Appraisal. *The Appraisal Journal*.

IAAO. 2001. Standard on the Valuation of Properties Affected by Environmental Contamination. Chicago: IAAO.

Jaconetty, Thomas A., Editor. 2002. *Issues Confronting Properties Affected by Contamination or Environmental Problems*. IAAO.

Kinnard, William, Jr. 1992. Measuring the Effects of Contamination on Property Values: The Focus of the Symposium in the Context of Current Knowledge. *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications, an Appraisal Institute Research Publication*.

Marsh, Darlene et al. (Spring) 2001. The Hazards of Taxing Contaminated Property-Owners Beware. *Professional Report Magazine*.

Means, R.S. Remediation Cost Estimating. Special Edition of the *Means Cost Analysis Manual*. R.S. Means Company.

Mundy, Bill. (January) 1992. Stigma and Value: The Impact of Hazardous Materials. *The Appraisal Journal*: 7-13.

Mundy, Bill. (Fall) 1994. The Income Approach and Environmentally Impaired Property: A Response. *Environmental Watch*, VII(3). *The Appraisal Journal*.

Neustein, Richard. (April) 1992. Estimating Value Diminution by the Income Approach. *The Appraisal Journal*.

Patchin, Peter J. (January) 1988. Valuation of Contaminated Properties. *The Appraisal Journal*: 7-13.

Patchin, Peter J. (February) 1991. Contaminated Properties-Stigma Revisited. *The Appraisal Journal*: 167-178.

Rinaldi, Anthony. (July) 1991. Contaminated Properties-Valuation Solutions.

Robbins, Michael, and Robbins, John. (Fall/Winter) 1991. Landfills Aren't All Bad: Considerations for Real Estate Development. *Real Estate Issues*.

Ross, Del. 1994. The Valuation of Businesses and Commercial Properties Subject to Environmental Risk. *Institute of Business Appraisers National Conference*.

Ross, Del. 1995. Instrumental Methods for Site Assessment and Characterization. *Instrument Society of America (ISA) National Conference*.

Ross, Del. 2002. Appraisal of Environmentally Contaminated Property for Tax Reduction. Sixth Annual Conference, Integrating GIS and CAMA, *International Association of Assessing Officers*.

Site Assessment and Mitigation. (SAM.) 2002. *SAM Manual 200*. San Diego: Department of Environmental Health, Land Use, and Environmental Group, County of San Diego.

Steinway, Daniel M. (April 6) 1990. Private Cost Recovery Actions: What is the Impact of the Consistency Requirements? *Environment Reporter*: 1947-1952.

Weber, Bruce R. 1997. The Valuation of Contaminated Land. *Journal of Real Estate Research* 14(3): 379-398.

White, Joy M. Editor. 1992. Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications. *Technical Report*. The Appraisal Institute.

Wilson, Albert P. (July) 1994. The Environmental Opinion: Basis for an Impaired Value Opinion. *The Appraisal Journal*.

Wilson, Albert P. (April) 1996. Emerging Approaches to Impaired Property Valuation. *The Appraisal Journal*: 155-170.

## 8.3 Generating Property Tax Benefits from Contaminated Land–A Private and Public Perspective

*By Yvonne J. Hamlin, LLB*

This article originally appeared in Volume 1, Issue 3 of the *Journal of Property Tax Assessment and Administration*.

There are thousands of contaminated properties across Canada. The threat these properties pose, not only from a health but also an economic perspective, can be significant for the property owner directly impacted by the contamination, and by the surrounding community.

The direct effects can include devaluation of the land and liability for clean up and other environmental and safety issues. Indirect effects include the systematic devaluation of surrounding lands and areas, a lower tax base for government, urban blight and decay, and the gradual move towards non-contaminated areas, which contributes to urban sprawl.

One of the economic impacts that can be measured, both to the affected land owners and to the community, is the impact on property taxes. Detecting the impact requires a review of the impact on both the private and public spheres. To the private landowner, property taxes are a liability, and hence the need to ensure the amount paid reflects a value which takes into account the negative influence of the contamination. To the public, property taxes are an asset, and hence the need to encourage and facilitate the clean up of contaminated properties in their community so as to ensure, among other things, the generation of additional property value which can then be taxed.

This paper focuses on the means by which both the private and public sectors can achieve their goals relating to the property tax burden and the property tax revenue base, in the context of contaminated properties.

### Causes of Contamination

Contamination can come about as a result of a multitude of factors: leaking underground tanks, oil spills, improper prior industrial use of a property, groundwater discharge, illegal dumping, and run-off contamination from nearby properties. These properties might be the sites of closed gas stations or former industrial facilities or simply locations where a previous owner was negligent in handling waste materials. Even in the absence of negligence, lands once used for industrial purposes, while perhaps managed sensibly according to the environmental requirements of the day, are often

contaminated (or perceived to be so) by today's standards and expectations. The presence of environmental liabilities can reduce the value of a property or even create a negative value (Dybvig 2002, 9.18).

At sites in the Atlantic provinces, much of the contamination occurred during the war and post-war period and many urban industrial areas, historical railway developments, and old ports provide examples of contamination dating back to the 1800s. Contamination has also occurred at government laboratories, military bases, harbours, ports, airports, training facilities, and reserve lands. It is estimated that there are approximately 250 federal sites in the Atlantic Region at some stage of assessment, remediation, or decommissioning (Environment Canada 2003).

Badly contaminated and high profile sites that have had far-reaching impacts on the value of properties in their immediate communities include the Sydney Tar Ponds in Nova Scotia, considered one of Canada's largest and most contaminated sites; the 45 abandoned–and leaking–uranium mines in northern Saskatchewan (Uranium City), which represent one of the largest inventories of toxic waste in the country; the docklands in the east port area of Toronto; and "Giant" mine in Yellowknife. The Nova Scotia Tar Ponds, it was recently announced, are scheduled for a 10-year, $500 million clean-up effort.

### The Property Tax Regime in Canada

Property tax authorities in Canada include both provincial and municipal governments. These entities control the tax burden by ensuring the valuation and classification of properties for purposes of creating an assessment roll, and by the setting of tax rates in order to raise required revenues. Tax revenues are used to provide local services, which usually include transit, roads, recreational facilities, police and fire protection, water, sewer systems. and garbage disposal.

With the current propensity of senior levels of government to change the mix of which level of government and, consequently, which tax base is responsible for the various services provided, it is not uncommon to find the property tax base supporting a range of

**Yvonne J. Hamlin, LLB,** is the head of the property taxation practice at Borden Ladner Gervais LLP in Toronto, Canada. She has specialized in property assessment and taxation since being called to the Ontario Bar in 1980 and regularly appears before the Assessment Review Board and the courts. Ms. Hamlin is the immediate past-Chair of the Ontario chapter of the Canadian Property Tax Association and a past member of its national executive board. She has participated as a member of the Commercial Subcommittee struck by the City of Toronto to report on property tax issues and is a past member of the City's Economic Development Committee.

This article is based on a presentation delivered at the Institute for Professionals in Taxation Conference in Vancouver, British Columbia, on June 21, 2004.

Copyrighted material licensed by Randall Bell on April 26, 2021

services not considered traditional "burdens" such as social services including welfare costs.

The approaches to valuation of property for assessment purposes are relatively consistent across Canada.

Typically, the assessing authority is required to value a property at its market value. In Ontario for example, the legislation mandates that property shall be valued at its "current value" which is defined as "the amount of money the fee simple, if unencumbered, would realize if sold at arm's-length by a willing seller to a willing buyer" (*Assessment Act* 1990). The one exception is the province of Saskatchewan, which values most of its property on a replacement cost basis.

The traditional approaches to valuation–income, replacement cost, and market comparison–are usually employed.

Clearly, the presence of contamination can negatively affect the assessed value of a property and even create a negative value. The value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of value determined on the basis that no environmental liability existed. Other factors may complicate the impairment and influence value, such as contamination's impact upon marketability, stigma, and a possible change in the highest and best use as well as restrictions on use (Dybvig 2002, 9.19). Furthermore, governments at all levels have issued numerous environmental laws and regulations. The environmental legislative schemes in Canada define both natural and man-made conditions that constitute environmental liabilities, which in turn have a negative effect on property values by creating potential liability.

The good news is that the benefits of proper site clean up and redevelopment include an increase in property tax revenues for a municipality. For example, it was estimated in 1995 that the City of Toronto's industrial-zoned properties comprised more than 1,000 hectares (about 15 percent of all its assessed commercial and industrial properties). This represented $150 million of the city's 1996 local tax revenue. However, because many of these sites were underutilized or needed to be redeveloped, it was estimated that the foregone taxes on these lands amounted to more than $22 million–half of which is estimated to be foregone on contaminated sites alone (NRTEE 1998). It quickly becomes clear that the impact of redeveloping these sites is considerable.

## Tax Savings for Contaminated Sites

Evidence of contamination can result in lower assessed values and consequently, reduced property taxes. These tax savings may assist owners of these sites to afford the costs of rehabilitation.

In the first instance, it is the role of the assessing authority to recognize and quantify the value of a property impacted by contamination. The Japan Real Estate Institute, in conjunction with the International Association of Assessing Officers, sent a survey questionnaire to 50 state and provincial assessing authorities in the United States and Canada, as well as 200 metropolitan

assessing authorities in both countries with a view to determining evaluation techniques used when dealing with contaminated property. The results, as documented in a recently published article (Hirota 2004), indicate a range of contaminated site assessment standards and a range of approaches to reflecting the impact on value. Some 23 methods of determining the impact are noted plus another dozen dealing with the impact of stigma alone. Methodology is tailored to the valuation technique applied to the property–whether it be cost, sales comparison, direct capitalization, or discounted cash flow. A review of special cases is also documented. Assessing authorities have recognized their important role in properly taking into account the impact of environmental contamination.

An administrative appeal scheme exists in each province which allows an owner to challenge the assessed value returned against a property. A review of highlights of tribunal and court rulings from a sampling of provinces follows:

### Ontario

There are a number of rulings on the issues in Ontario, the economic heartland of the country. Ontario's Assessment Review Board (the "Board") hears appeals against, among other things, the assessed value of a property. Appeals on questions of law may be made, with leave, to the appellant courts.

### Percentage Reduction

This is one of the least precise methodologies for determining a reduction in assessment due to contamination. It involves the tribunal taking the current assessment of a property and then approximating a reduction, expressed as a percentage of the noncontaminated value. This method has been used extensively by the Board, particularly in cases involving residential properties. For example, where water contamination has been an issue, the Board has typically allowed for a percentage reduction in assessment ranging from five to 50 percent, depending on the extent of the contamination. In one case, the contamination was so severe that the Board noted that the property had no potable water supply, could never be sold or mortgaged, and had no guarantee of ever being free of contamination. It accordingly reduced the value of the land component of the property to nil (*Sickinger v. Ontario Property Assessment Corp.* 2000).

The Board has applied reductions of varying percentages in cases involving metallic contamination or arsenic contamination (35% reduction), proximity to landfill sites (10% reduction), improper landfill (20-35% reduction), stigma resulting from soil contamination and legal action undertaken by the municipality against the owner (50% reduction), and the presence of underground oil tanks (30-40% reduction). In one case, the Board allowed a 35% reduction in the land value of a property in an area with radioactive hot spots, likely a result of the fact that where severe or notorious contamination exists, it may be difficult to find a willing buyer (*Harris v. Ontario Property Assessment Corp.* 2000).

## Cost to Cure

This method involves the deduction of the cost of curing or removing the contamination from the non-contaminated value of the property. The determination of the "cost to cure" for a property is often not a straightforward issue as a number of factors arise in the calculation, such as the costs attributable to the cessation of business on the property, legal costs, the differences between the cost to "cure" as opposed to "control" the contamination, the potential for migration of the environmental contamination off of the subject property and onto the neighbouring property, the lack of availability of mortgage financing, the ongoing cost of monitoring after the clean up and, finally, the stigma attached to the property after a serious contamination. In one case, the Board reduced the assessed land value of a residential property to nil and the building value by 50% after the property had been subjected to a major oil spill and clean up under Ministry of Environment and Energy supervision (*Kowbel v. Regional Assessment Commissioner* 1995). Although the property was still being occupied safely, the evidence before the Board indicated that the spill itself was the object of continuing litigation and that, in the circumstances, "it would be practically impossible to find willing parties to conduct [a sale] transaction."

In one case involving a vacant residential lot where the cost to cure the land (which had once been part of a city dump) exceeded the value of the land, the land value was reduced to a nominal amount of $1.00 (*Regional Assessment Commissioner v. Machado* 1995). In another case involving a 44-acre amusement park that was formerly a landfill site, only a 50% reduction in the assessment was granted despite the fact that the landowner estimated the clean-up cost to be greater than the current value of the land, as the current use of the property as an amusement park made it intrinsically valuable as a commercial property (*Wild Water and Wheels Corp. v. Ontario Property Assessment Corp.* 2000).

In another decision involving a 3600 square foot industrial property contaminated by chromium in both the soil and the exterior of the building, the Board considered it significant that the owner had negotiated a conditional agreement of purchase and sale for the property that was not completed because of the contamination. The owner then conducted a clean up of the property, with costs of remediation, legal fees for contract work, and loss of revenue for rental in the amount of $675,000. The property sold in the following year for $375,000. The Board reduced the property value to zero for the taxation year that the lands were undergoing remediation (*Mifran Investments Ltd. v. Municipal Property Assessment Corp.* 2002).

## Economic Use

Under this method, the Board examines the impact of the contamination on the property's economic use. Commercial realities are given weight. One cannot simply look at the cost to cure in a vacuum. A site that might be valued at one million dollars for industrial purposes could very well have no value to a residential developer who would not be permitted to build on the property. The following cases highlight some of the instances where the Board has considered a property's economic value or use:

a)   Where a dwelling and an automotive repair shop were on the same lot and suffering from the same contamination, the Board found that the commercial assessment of the property for the original amount was correct as the complainants were able to conduct business as an automotive repair facility; however, the value of the dwelling was reduced to zero (*Jorgensen v. Ontario Property Assessment Corp.* 2000);

b)   In a decision involving the assessment of a commercial property that was assessed by a capitalized income methodology, where the property had serious soil contamination that was both toxic and likely carcinogenic, the Board expressly rejected the notion that no reduction in assessment was warranted if the contamination has no effect on current income. It found that the contamination had a negative impact on the property's current value and noted that it was significant that the property could not be financed, mortgaged, nor sold on conventional terms (*SEJ Holdings Ltd. v. Municipal Property Assessment Corp.* 2002);

c)   Where there was a contract in place obligating Shell Canada Limited to remediate the site when future redevelopment took place, the Board found that the financial burden of clean up was relieved from the complainant. No reduction was warranted. If it had not been for this agreement, the Board would have concluded that a future sale of the subject property would be affected by some associated economic risk (*Starkman v. Ontario Property Assessment Corp.* 2000);

d)   In another case (*North American Tool & Die v. Municipal Property Assessment Corp.* 2001) where the cost of clean up to a property amounted to $77,340, the Board discounted the assessment by that full amount. Although it was argued by the assessor that the *812383 Ontario Inc.* (1999) case stood for the principle that, if a contaminated property continues to be used and occupied, no adjustment should be made for environmental contamination, the Board rejected this argument and noted that that earlier case dealt with the 1997 taxation year, which was prior to the major amendments to the *Assessment Act* which introduced the notion of current value assessment and changed the equity test.

## Stigma

The Appraisal Institute of Canada recognizes stigma as a market-imposed penalty that can affect a property that is known or suspected to be contaminated. An issue that continues to be litigated concerns the impact of stigma and the point in time when the reduction should be granted. The following are highlights from some Board decisions that have dealt with the impact of stigma on market value. The trend of the decisions

Copyrighted material licensed by Randall Bell on April 26, 2021

made by this tribunal has been to recognize the devaluation caused by stigma, where compelling evidence is brought before it:

a)  The Board indicated that industrial property suffering from the stigma of contamination can experience a 50% reduction in value where the owner demonstrated an inability to rent the property as a result of its down gradient position to an obviously contaminated site (*S. Cooley Contractor v. Ontario Property Assessment Corp.* 2001);

b)  In one case against the trend, the Board has also found that stigma could be called an intangible factor and stated that an argument which quantifies any corresponding diminution of value is purely speculative (*Starkman v. Ontario Property Assessment Corp.* 2000);

c)  The Board has approved a discount even against the value of uncontaminated properties which are being threatened by migrating contaminants, so long as the taxpayer can demonstrate an impact on market value based on appraisal evidence and/or actual sales data (*Ontario Regional Assessment Commissioner v. Vandershaaf* 1995).

d)  The Board granted a graduated land value reduction to specific residential properties affected by industrial fallout from an emission source within an industrial area (*Ontario Regional Assessment Commissioner v. 157 Commercial St., Welland* 1999). The reduction was given over and above the assessor's blanket reduction based upon proximity of the residence to the industrial area. It appears that the taxpayers were unable to adduce market evidence showing an impact from the fallout on any specific basis. The Board's reduction was based solely on the taxpayer's evidence as to the incremental decrease of fallout with respect to distance from the source, together with the supposition that the presence of fallout would have affected the market value, had it been known to the market.

e)  Where the assessing authority argued that the removal of tires from a tire dump removed all stigma associated with living next door, the Board disagreed and indicated that the perceived pollution was sufficient to warrant a reduction in the assessment. It was noted that if the landowner sought to sell the land, he would need to advise a potential purchaser of possible environmental problems (*Braeker v. Municipal Property Assessment Corp.* 2002).

f)  In a case involving an oil tank that was in a basement and had been leaking for years, $85,650 was spent rectifying the contaminated soil (*Berryman Family Trust v. Municipal Property Assessment Corp.* 2003). In this case, the Board quoted the Ontario Superior Court of Justice in its decision in *Tridan Developments Limited v. Shell Canada Products Limited* (2000), where the court stated that the "existence of a 'stigma' attaching to a property and adversely affecting its value has been recognized by and accepted in the real estate community,

and it does exist in … the commercial real estate market." The Board stated that the stigma of past contamination remains a factor even if the property is not currently contaminated, and granted an 18% reduction for the current year.

g)  In a case involving land and a building that was contaminated by hydrocarbons, the Board held that the stigma of past contamination affected its sale price even though it was no longer contaminated and allowed for a reduction in the assessment by 50%. As evidence, the Board cited the fact that many loan institutions turned the owner down when he attempted to obtain a mortgage to purchase the subject property (*1310033 Ontario Incorporated v. Municipal Property Assessment Corp.* 2002).

h)  In one case of arsenic contamination (*Farago v. Ontario Property Assessment Corp.* 2001), the Board noted that the assessor's valuation was not properly made as it did not give any consideration to either the contamination itself or the publicity related to arsenic contamination.

### Quebec
In Quebec, the *Act Respecting Municipal Taxation* provides that municipal taxes are to be assessed by reference to the market value of property. Many municipalities in Quebec had opposed requests for reduced assessments on contaminated property on the basis that it was the polluters themselves who were responsible for the reduction in the value of the property; however, in *Montréal-Est Ville de c. Texaco Canada Inc.* (2001), the Quebec Court of Appeal (the "QCA") found that municipal taxes must be imposed based on the market value of a property, which includes the consideration of contamination regardless of who is responsible for the contamination. Leave to appeal to the Supreme Court of Canada (*Montréal- Est (Ville de) c. Texaco Canada Inc.* [2001]) was dismissed.

To establish the market value of contaminated property for assessment purposes, an assessor in Quebec will determine the value of a property without taking contamination into account. The impact of the contamination on market value is then determined and applied as a discount to the (uncontaminated) value of the land. The QCA in the *Texaco Canada Inc.* case (2001) approved seven principles to be followed when assessing contaminated property:

1.  Contamination has an impact on actual value of land only from the time the contamination is known by the owner of the land.

2.  The eventual obligation to remediate a parcel of land becomes a consideration only from the day on which normal use of the land ceases.

3.  The cost of remediation affects the market value of land only when that cost is not yet incurred at the time of assessment.

4.  An intervention by the Ministry of Environment is a relevant fact that may be taken into consideration in determining the state of the land at the time of assessment.

5. Where an owner has incurred consultation fees in respect to land, but the anticipated costs of remediation cannot be determined and remediation has not been initiated, it can be presumed that a potential buyer would not be interested in the land.
6. A seller has an obligation to make full disclosure to a potential purchaser of land. The purchaser must be able to appreciate the nature, extent, and causes of a defect that affects the land being purchased.
7. Exact knowledge at the time of assessment regarding the contamination is not necessary. It is sufficient that a reasonably informed purchaser would require a characterization study (i.e., an evaluation of the contamination) and would hold back funds or require the seller to remediate.

Although restoration costs are a factor, other elements come into play when arriving at an assessment, since an assessor must also consider the behaviour of a potential purchaser. Contaminated land may be without value even when remediation is possible where (a) the contamination is not known to its full extent, (b) the use of the contaminated property becomes prohibited, or (c) the contamination is so serious that a purchaser reasonably informed would likely refuse to buy.

In Quebec, the onus is on the owner claiming the reduction in the assessment to demonstrate that the market value has been impacted by the contamination of the site and the extent of the contamination. It should be noted that time limits are crucial and the assistance of an independent appraiser is recommended. The recent adoption of Bill 72 (2002), which forces remediation of certain sites, is expected to have a negative impact on the value of contaminated sites.

## Alberta

In Alberta, the *Municipal Government Act* (2000) and the *Matters Relating to Assessment and Taxation Regulation* (1999) set assessment methods. Generally, property in Alberta is assessed based on market value, which is the "price property might reasonably be expected to sell for if sold by a knowledgeable, willing seller to a willing buyer after appropriate time and exposure in an open market." This does not mean that property will be valued at the highest or lowest price, but rather at the most probable price. In addition, the parties are assumed to be unrelated and the determination of market value takes into consideration the present and potential use of the property.

Owners of contaminated properties can register a complaint to have their assessments reviewed by an assessment review board. Decisions of these boards may be appealed to the Municipal Government Board (the "MGB"). Recent decisions of the MGB indicate that contamination is a factor that will be considered in assessing property value; however, the onus rests on the landowner to demonstrate the existence of environmental contamination. In some cases, the property may have to be re-mediated before tax abatement is considered.

In a recent appeal to the MGB relating to an Edmonton property, the MGB took contamination into consideration (*Western Asphalt/Westcan Bulk Transport Ltd. v. Edmonton (City of) Assessment Review Board* 2001). In that case, an industrial property had a history of hydrocarbon contamination and extensive studies had been carried out to determine the extent of the contamination. The owner of the site had spent over $50,000 in the assessment year on environmental assessment and reclamation. The estimate to complete the clean up was an additional $718,000 over eight years. The MGB applied an income approach to determine the market value of the property that recognized the cost to clean up the property and reduced the assessed value of the property by $96,750 (or 1/8th of the $774,000 environmental reclamation cost) for the duration of the eight-year period.

In another MGB decision (*Calgary (City of) Assessment Review Board v. Dave Lyons* 2000), the owner of four condominiums located on previously contaminated land sought a reduction in the assessed value of the condominiums due to the presence of gasoline odours. The MGB held that the assessment was to stand at the market value of the contaminated property since the contamination had been cleaned up and there were no outstanding environmental orders with respect to the property. The MGB also considered the rental income from the property and found it significant that the rental income from the property was similar to that of uncontaminated properties in the area.

Another recent example of contaminated land affecting property assessments in Alberta involves the Lynnview Ridge area of Calgary (*Lynnview Ridge Residents' Action Committee v. Calgary (City of) Assessment Review Board* 2002). Historically, the area was used as a petroleum-processing site. In May 2001, it became public knowledge that soil in the Lynnview Ridge area was contaminated. In a September 2002 decision, the Calgary Assessment Review Board reduced the assessments of certain properties in the area to 30% of the precontamination assessment. The tribunal indicated that historical adjustments to assessments were made on a "cost to cure" basis or, in the absence of such information, based on diminished utility. The tribunal recognized that the houses were not marketable, but that they were still of some utility as they continued to be occupied.

## British Columbia

A recent case before the British Columbia Supreme Court (the "BCSC") (*Vancouver Chinatown Merchants Association v. British Columbia* 2002) involved the site of a shopping plaza that had been used, until 1950, as a coal gasification plant. The site was badly contaminated by hazardous waste that had been discharged onto the site. The merchants' association for the plaza appealed the assessment of the plaza on the basis that the actual value should be adjusted to account for the site's contamination. The British Columbia Assessment Appeal Board determined that the site was remediated for its existing use and did not allow any deduction for the reversionary cost to remediate the site. The Board did however adjust the capitalization rate by 1.5% to

Copyrighted material licensed by Randall Bell on April 26, 2021

account for the additional risk for an investor in this property compared to an uncontaminated property. The merchants' association appealed to the BCSC on the grounds that the tribunal had erred in law by choosing to ignore the cost of cleaning up the remainder of the contamination. The BCSC dismissed the appeal.

In the case of *Burnaby/New Westminster Assessor, Area No. 10 v. Haggerty Equipment Co.* (1997), the British Columbia Supreme Court held that the tribunal erred in law when it made a deduction from market value to account for clean-up costs associated with soil contamination that a prospective purchaser would make, without considering what a willing vendor would accept (i.e. the tribunal based its entire decision on the purchaser's view of market value). There had been a finding that there was no proven significant risk associated with the contamination. It was argued that a prudent vendor would have conducted its testing only to quantify the remediation actually required, before agreeing to subtract such costs from a potential purchase price. The Court held that the determination of value involves a consideration of both what a willing purchaser would pay and what a willing vendor would accept.

## Creating Tax Benefits from Contaminated Property

This portion of the paper examines the concept of a government authority encouraging the clean up and development of contaminated lands and the economic benefits that can be achieved in the context of "Brownfields."

### What are Brownfields?

The National Round Table on the Environment and the Economy (the "NRTEE"), a government-appointed think-group, defines a brownfield as "abandoned, vacant, derelict, or underutilized commercial or industrial property where past actions have resulted in actual or perceived contamination and where there is an active potential for redevelopment." (2003a) Brownfields differ from other contaminated sites in one important way: they hold excellent potential for being cleaned up and redeveloped for productive uses. Such sites could include former steel mills, old railway yards, warehouses, decommissioned refineries, former chemical plants and gasoline stations, old industrial waterfronts and riverbanks, former dry cleaners or even abandoned residential properties that contain lead or asbestos.

Contaminated properties exist throughout Canada and, according to the NRTEE, the number of contaminated sites in Canada may be as high as 30,000. Of this, it is estimated that 3,000–5,000 are brownfield sites (NRTEE 2002).

The NRTEE (2003a) places brownfield sites into one of the following three categories:

1.  The "top" tier consists of those sites whose market values greatly exceed the costs of remediation. It is estimated that these sites account for 15 to 20 percent of contaminated sites in the country. Redevelopment of these sites is driven by market forces and, because they are profitable, often do not require any governmental assistance.

2.  The "middle" tier, which represents the most complicated group, is characterized by high clean-up costs but high redevelopment potential. The market value of the land, once the land is properly cleaned up, may be slightly above or below the combined cost of land and clean up. These sites often sit idle because of the substantial regulatory and market hurdles that must be overcome before redevelopment can proceed. It is estimated that this tier represents 60 to 70 percent of Canada's contaminated sites.

3.  The "bottom" tier of sites is defined as those sites where the cost of cleanup far exceeds the value of the land after remediation. These sites are often in rural or remote areas and will not likely be redeveloped in the near future. It is estimated that such sites represent 15 to 20 percent of contaminated sites in Canada.

### The Case for Redevelopment

As a result of contamination, or perceived contamination, the reduced valuation of brownfield properties results in a lower tax base for municipalities. Widespread contamination in an area will lead to the gradual devaluation of that area (potentially for both contaminated and even noncontaminated properties). The NRTEE estimates that the public benefits of redeveloping brownfield sites in Canada would be between $4.6 billion and $7 billion a year, not counting the direct commercial benefits realized by the redevelopers and users of the land (NRTEE 2003b). These figures also do not include any expected increase in property values in neighbouring communities, which would likely be significant. It is estimated that approximately 20,000 contaminated sites are on the brink of profitability and could be re-developed with the correct incentives (Hawaleshka 2003).

A study by the NRTEE in 1997 showed that the amount of property tax being lost in a single year by Toronto on its unutilised or under-utilised industrial lands amounted to $50,000,000 per year. As market value assessments, mill rates, and value increases, the loss today would be significantly greater (NRTEE 2003a).

Brownfield redevelopment increases the tax base for all three levels of government through the creation of new economic bases to sustain property, income, sales, and capital taxes. The NRTEE points out that the experience in the United States has demonstrated that, as brownfields are redeveloped, the value of surrounding properties within a radius of up to 2.5 kilometres may rise by an average of 10 per cent, with associated increases in property tax revenues (Hara Associates 2003).

### Impediments to Redeveloping Brownfields

Despite the fact that many of these sites are in prime locations, they sit unused because of economic and regulatory impediments. Such obstacles include the risk of civil and regulatory liability, lack of access to capital, stigma, and risk perception. The concern over liability

for environmental issues in particular has been recognized as a major barrier to brownfield redevelopment.

Last October, the Supreme Court of Canada (the "SCC") upheld the authority of Quebec's Minister of the Environment to exercise the broad discretion contained in the *Environment Quality Act*, which sets out what is called the polluter-pay principle (*Imperial Oil Ltd. v. Quebec* 2003). The case dealt with a site on the St. Lawrence River where Imperial Oil built and operated an oil depot from 1920 until 1973. The oil reservoirs were removed after the depot closed. In 1979, Imperial Oil sold the property on an "as-is" basis to a party who had full knowledge of its prior use. It remained vacant and unoccupied until it was acquired in 1987 by a residential developer. Excavation work after that date uncovered petroleum contamination. A cleanup operation was then undertaken under the supervision of the Quebec Ministry of the Environment, which approved the site for residential use. Imperial was not involved in the sale to the developer, the application for residential use, the clean-up operation, or the subdivision and sale of residential lots. In 1994, the contamination resurfaced, preventing some of the lot owners from building houses on their properties. As a result, the lot owners sued the vendor of the lots, the city, and the environment ministry, alleging that the ministry had been negligent in approving the initial decontamination work. In 1998, the minister ordered Imperial Oil to conduct an environmental assessment of the property. Imperial sought judicial review of this order from the Superior Court of Quebec, which found that the minister was in a conflict of interest, trying to avoid liability in its own pending civil cases. The case went to the SCC where the SCC rejected the arguments by Imperial Oil that the ministry was in a conflict of interest. The SCC found that the Quebec legislation gives environment ministers broad powers to act in the public interest. The SCC indicated that polluters bear the responsibility for remedying contamination for which they are responsible and must assume the costs of pollution. As a result of the ruling, Imperial Oil will be forced to pay for the cleanup of a fuel depot it had owned near Quebec City for more than 50 years, despite the fact that the land had changed hands and had later been sold to developers.

While the "polluter pays" ruling from the SCC is a wake-up call for polluters, legal commentators have suggested that other provinces have similar legislative provisions and that the uncertainty now created could serve as a major deterrent for prospective brownfield redevelopers. It is hoped that current legislative initiatives in brownfields redevelopment will be able to provide satisfactory answers.

## Current Initiatives to Encourage Brownfield Redevelopment

There is currently a wide range of federal, provincial, and territorial legislation affecting the redevelopment of brownfields in Canada. These initiatives are intended to accelerate brownfield redevelopment in Canada. A few examples follow:

### Manitoba

Manitoba's *Contaminated Sites Remediation Act* (the "MCSRA") was assented to on November 19, 1996. One of the principal purposes of the MCSRA is to provide for the remediation of contaminated sites.

The MCSRA sets out a four-step process for dealing with contaminated sites: (1) investigation and identification of a site; (2) designation/non-designation of a contaminated site; (3) site remediation; and (4) apportionment of responsibility for remediation. It should be noted that while this legislation was intended to provide for the remediation of contaminated sites, the MCSRA's main goal is to "encourage" remediation by threatening to hold polluters responsible for contaminated sites. Unlike the programs in Quebec and Ontario, there are no incentives provided for that will encourage third-party developers to step in and remediate properties.

### Ontario

In Ontario, the *Brownfields Statute Law Amendment Act* (the "BSLAA") received Royal Assent in November 2001. The first of two phases of regulations were passed in October 2002 and proclaimed to be in force as of December 1, 2002. The remaining regulations, which will allow the full implementation of this legislation, are at the date of this paper, expected to be released by the fall of 2004.

The BSLAA contains numerous incentives, financial and otherwise, to encourage owners of land to clean up and redevelop contaminated sites owned by them. It does so by clarifying environmental liability and providing municipalities with more flexibility in planning and financing, and by providing owners with tax relief to offset all or a part of the costs of remediation.

With respect to property taxation, the new Ontario legislation allows municipalities:

i)   to freeze or cancel the municipal portion of the property tax on contaminated eligible property during its environmental rehabilitation and development (and allows the Ministry of Finance to match the municipal tax treatment by freezing or cancelling the education portion of property taxes on such sites);

ii)  to take ownership of land in a failed tax situation (during which time the municipality could conduct an environmental site assessment to determine if it wanted to retain ownership) (*Municipal Act* 2001).

The maximum amount of property tax relief would be the sum of (i) the cost of rehabilitating the property to permit a record of site condition to be filed under Section 168.4 of the *Environmental Protection Act* (1990) (the "EPA"), and (ii) the cost of complying with a certificate of property use issued under Section 168.6 of the EPA.

### Quebec

Quebec's "Revi-Sols" program was launched in 1998. This provincial plan provides an incentive in the form of actual funding for site redevelopment.

Copyrighted material licensed by Randall Bell on April 26, 2021

The program has helped to increase both land re-development and property tax revenues (NRTEE 2002). In its first five years, the Revi-Sols program funded the cleanup and remediation of 153 projects with a total land area of 220 hectares. In Montreal alone, the program has resulted in a $25.6-million increase in municipal property tax revenues and 3,400 new housing units. In other municipalities, the program has resulted in a $13.4-million increase in municipal property tax revenues (NRTEE 2002).

## Examples of Successfully Remediated Sites

The following examples of brownfield redevelopment projects in Canada provide a glimpse of the potential gains that can result from redevelopment (NRTEE 2002, Annex 2).

1. The City of Hamilton has implemented a community improvement plan called the Environmental Remediation and Site Enhancement (ERASE) Plan, which has been successful in promoting the clean-up and reuse of brownfield properties in a former industrial area. In the first year of its operation, the plan resulted in the redevelopment of over 11 acres of industrial land, the construction and refurbishing of over 220,000 square feet of building space, the leveraging of $15 million in private investment through $1 million in city grants, and an estimated increase of $400,000 a year in property tax revenues (NRTEE 2002, 14).
2. The redevelopment of a former CN Rail industrial site in Moncton, New Brunswick, created 110 acres of new sports facilities in an accessible downtown location. The site also proposes 64 acres for 450 to 550 residential units. The potential total property tax base at full development is almost $9 million, compared to the initial property tax base of $214,000 (NRTEE 2002, Annex 2).
3. In Shawinigan, Quebec, the provincial government, the city of Shawinigan, and the Canadian subsidiary of a major paint and chemical manufacturer co-ordinated a clean-up effort costing almost $25 million. The re-developed land will be home to a new Wal-Mart store. The store opening will provide significant property taxes for the city and over 250 jobs, resulting in more tax revenue for all levels of government (See Warson [2003]).

## Conclusion

Contaminated sites undoubtedly pose an economic liability to both the affected landowners and the communities in which they are located. Prudent landowners will seek reductions in assessed values and property taxes to generate benefits to them during the holding and rehabilitation stages. Working with local assessors, and challenging decisions of those local assessors, where appropriate, may be required. Prudent governments will seek to implement strategies to encourage rehabilitation and redevelopment to generate long-term, future property tax benefits. These governments must work with landowners and other affected stakeholders to obtain the highest returns possible, achieving success for both the private sector and the public sector.

## References

*Act Respecting Municipal Taxation*. R.S.Q. c. F-2.1.

*Assessment Act*, R.S.O. 1990, c. A.31, s.1.

*Berryman Family Trust v. Municipal Property Assessment Corp., Region No. 3*, [2003] Ont. A.R.B.

Bill 72. 2001. *An Act to amend the Environment Quality Act and other legislative provisions with regard to land protection and rehabilitation*, 2d Sess., 36th Leg., Quebec. (Adopted by the Quebec National Assembly on 29 May 2002).

*Braeker v. Municipal Property Assessment Corp., Region No. 25*, [2002] Ont. A.R.B.

*Brownfields Statute Law Amendment Act*, 2001. S.O. 2001, c. 17.

*Burnaby/New Westminster Assessor, Area no. 10 v. Haggerty Equipment Co.*, [1997] B.C.J. No. 1296 (B.C.S.C.).

*Calgary (City of) Assessment Review Board v. Dave Lyons*, [2000].

*Contaminated Sites Remediation Act*. 1996. C.C.S.M., c. C205.

Dybvig, L., ed. 2002. *Appraisal of Real Estate*, 2d Cdn. ed. Vancouver, Canada: University of British Columbia Real Estate Division.

*812383 Ontario Inc. v. Regional Assessment Commissioner*, Region No. 15, [1999] Ont. A.R.B.

Environment Canada. 2003. "Contaminated Sites: Waste Management and Remediation, Atlantic Region." [online] Environment Canada, February 7, 2003. Available from <http://www.ns.ec.gc.ca/ epb/wastemgmt/ contamsite.html>.

*Environmental Quality Act*, R.S.Q., c. Q-2.

*Environmental Protection Act*, R.S.O. 1990, c. E.19.

*Farago v. Ontario Property Assessment Corp., Region No. 31*, [2001] Ont. A.R.B.

Hara Associates. 2003. Market failures and optimal use of brownfield redevelopment policy instruments. Unpublished background document prepared for National Round Table on the Environment and the Economy (NRTEE).

*Harris v. Ontario Property Assessment Corp., Region No. 6*, [2000] Ont. A.R.B.

Hawaleshka, D. 2003. Reclaiming toxic ground. *Macleans*, 11 August.

Hirota, Y. 2004. The effect of soil contamination on property assessment in North America and Japan." *Journal of Property Tax Assessment & Administration* 1(1): 71-85.

*Imperial Oil Ltd. v. Quebec (Minister of the Environment)*, [2003] 2 S.C.R. 624.

*Jorgensen v. Ontario Property Assessment Corp.*, Region No. 7, [2000] Ont. A.R.B.

*Kowbel v. Regional Assessment Commissioner, Region for Nepean (City of)*, [1995] Ont. M.B.

*Lynnview Ridge Residents' Action Committee v. Calgary (City of) Assessment Review Board #222*, [2002].

*Matters Relating to Assessment and Taxation Regulation*, Alta. Reg. 289/1999.

*Mifran Investments Ltd. v. Municipal Property Assessment Corp., Region No. 15*, [2002] Ont. A.R.B.

*Montréal-Est (Ville de) c. Texaco Canada, Inc.* [2001] J.Q. no 4032.

*Montréal-Est (Ville de) c. Texaco Canada Inc.*, [2001] C.S.C.R. no. 569.

*Municipal Act, 2001*, S.O. 2001, c.25.

*Municipal Government Act*, R.S.A. 2000, c. M-26.

*North American Tool & Die v. Municipal Property Assessment Corp., Region No. 18*, [2001] Ont. A.R.B.

NRTEE. 1998. "State of the Debate: Greening Canada's Brownfield Sites." [online] Ottawa, Canada: Renouf Publishing Co., Ltd. Available from <http://www.nrtee-trnee.ca/Publications/ PDF/SOD_Brownfields_e.pdf>.

NRTEE. 2002. National brownfields redevelopment strategy. Ross, A H., task force chair. Presented June 11 at Chateau Cartier, Aylmer, Quebec.

NRTEE. 2003a. "Glossary of Brownfield Redevelopment Terms" Annex 1 in *Cleaning up the past, building the future: A national brownfield redevelopment strategy for Canada. Ottawa*, Canada: Renouf Publishing Co. Ltd.

NRTEE. 2003b. "Reward for cleaning up urban contaminated sites as high as $7 billion annually, National Round Table report finds." [online] National Round Table on the Environment and the Economy [cited February 10, 2003] Available from <http://www.nrteetrnee. ca/eng/media/Archived-Press Releases/20030210_Brownfields_ e.htm>.

*1310033 Ontario Incorporated v. Municipal Property Assessment Corporation, Region No. 3*, [2002] Ont. A.R.B.

*Ontario Regional Assessment Commissioner, Region No. 2 v. Vandershaaf* [1995] Ont. A.R.B.

*Ontario Regional Assessment Commissioner, Region No. 18 v. 157 Commercial St., Welland*, [1999] Ont. M.B.

*Regional Assessment Commissioner, Region No. 3 v. Machado*, [1995] Ont. M.B.

*S. Cooley Contractor v. Ontario Property Assessment Corp.*, Region No. 5, [2001] Ont. A.R.B.

*SEJ Holdings Ltd. v. Municipal Property Assessment Corp.*, Region No. 15, [2002] Ont. A.R.B.

*Sickinger v. Ontario Property Assessment Corp., Region No. 17*, [2000] Ont A.R.B.

*Starkman v. Ontario Property Assessment Corp., Region No. 9*, [2000] Ont. A.R.B.

*Tridan Development Limited v. Shell Canada Products Limited*, [2000] O.J. No. 1741.

*Vancouver Chinatown Merchants Association v. British Columbia (Assessor of Area No. 9–Vancouver)*, [2002], B.C.J. No. 1006 (B.C.S.C.).

Warson, A. 2003. Planners see gold in brownfields: New tax revenue can make cleanup effort worthwhile, *The Globe and Mail*, 25 November.

*Western Asphalt/Westcan Bulk Transport Ltd. v. Edmonton* (City of) Assessment Review Board, [2001].

*Wild Water and Wheels Corp. v. Ontario Property Assessment Corp.*, Region No. 7, [2000] Ont. A.R.B.

Copyrighted material licensed by Randall Bell on April 26, 2021

8.4 # Environmental Contamination: Using Assessed Values for a Buyout

*Wayne D. Llewellyn, CAE, and Robert E. Partridge, MIMA*

This article originally appeared in the March/April 2002 issue of *Assessment Journal*.

### Abstract

A company's use of assessed values to determine buyout offers to residential property owners on contaminated land underscores the importance of accurate assessed values.

## Introduction

There has been considerable discussion regarding the reliability and use of assessed valuations by financial communities and other sectors of the economy. This article reports on the use of assessed values to determine buyout compensation for residences built on land contaminated by a refinery and provides further support for the importance of accurate property values used as a basis for decision-making.

When environmental contamination was found in a residential development built on a former refinery site, the company identified as responsible for the contamination offered to cure the malady and provide financial compensation or to buy out homeowners. The company used assessed values to determine the buyout remuneration for properties affected by the contamination. Most property owners accepted the buyout proposal. This situation is in stark contrast to events that usually lead to demands for reductions in assessed valuations due to maladies that are rarely curable.

## Developments

In March of 2001, the City of Calgary returned the assessment roll for all properties with an effective date of valuation of July 1, 2000. There were no assessment complaints from any resident of an area referred to as Lynnview Ridge. Lynnview Ridge, a residential subdistrict in the community of Lynnwood within the City of Calgary, is a development of 240 homes built on a refinery site in the early 1980s after the lands were rezoned to residential from industrial.

The refinery started operations in the 1920s, was closed near the end of 1975, and dismantled between 1975 and 1981. A development arm of Imperial Oil and a residential developer (who is no longer in operation) developed the property into low-density residential housing. The area met the environmental standards of the day, which were far less stringent than today's standards. However, during the late 1980s there was concern that oily soil found nearby could lead to problems for the area. A task force was set up, and testing commenced for air quality, soil, and groundwater contamination. It was found that all were below the legal standard for residential areas.

In mid-2001, it was reported that the area had levels of environmental contamination in excess of current provincial government standards, which had been revised in the late 1990s. Once the public announcement of contamination was made, the media produced a number of articles and interviews with individual residents that lasted for several weeks. The residents clamored for action, preferably that Imperial Oil buy their properties, which, in their opinion, had no value.

As a result of the media storm, elected officials insisted on reducing estimated property values. Requests were then made of the administration of the City of Calgary to prepare reports on the steps needed to provide tax relief, given the likelihood of reduced property values. The administration responded with a commitment to investigate the issue and prepare a report outlining the approach that would be taken.

The administration did eventually respond to the elected officials' request for information with a report presenting the results of considerable investigation and analysis of the assessment processes and practices for properties affected by environmental contamination in other jurisdictions throughout North America. The report recommended that the assessments be left untouched for 2001, and that any changes, if warranted, be made for subsequent years.

Since implementing a new market value standard in 1999 under which all property under the jurisdiction of the city assessor is assessed at 100 percent of market value, the Assessment Business Unit has maintained a website (http://www.fairshare.gov.calgary.ab.ca/) that provides public access to assessment information. The information includes address, roll number, assessed valuation, and several basic property characteristics. Property owners may compare their assessed valuation against the valuation of any other property twenty-four hours a day, everyday of the year. Data are refreshed continually to ensure they are current.

Imperial Oil Limited obtained assessment information from the website. On August 16, 2001, the company

**Wayne D. Llewellyn, CAE,** is manager of research, development, and training, and Robert E. Partridge, MIMA, is senior assessment consultant, City of Calgary Assessment Department, Calgary, Alberta, Canada.

*The statements made or views expressed by authors in* Assessment Journal *do not necessarily represent a policy position of the International Association of Assessing Officers.*

announced that it would purchase the home of any resident who wished to be bought out at a price equivalent to 120 percent of the property's assessed value. Property owners not choosing the buyout would be paid $10,000 for any inconvenience caused by the remedial activities.

Compared with conducting individual property appraisals, using assessed values provided an economical method for compensating homeowners fairly and objectively. Imperial Oil Limited also undertook an independent study that confirmed the assessed values were fair and equitable relative to the existing residential market in Calgary and specifically in the affected area.

## Conclusions

It makes sense that mass appraisals provide a foundation that can be relied on. Mass appraisal employs standard methods, and allows for statistical testing that does not usually occur in individual property appraisal reports. Individual property appraisals are expensive and frequently lack standardization in adjustments, which can reduce the credibility of individual appraisals. Mass appraisals are more robust and complete valuation models that consider the entire market and are not limited to five or six sales transactions or comparative data of other types, for example, income and expense information and costs on only a handful of properties.

The value of correct and current market value assessments is becoming more and more apparent as more private and governmental sources use this information in their daily business practices. These practices range from the buyout scenario just presented to mortgage approvals to cost sharing formulas for public and private sector initiatives.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 8.5 Mercury Contamination—Functional or Economic Obsolescence?

*Rick Stuart, CAE*

This article originally appeared in the March/April 2001 issue of *Assessment Journal*.

**Abstract**

This paper examines a single-family residential property that was contaminated by mercury, remediated, and then sold. Value loss can be calculated, but is the value loss functional or economic obsolescence?

## Background

"New tenants moving into a rural Oskaloosa house Sept. 18 accidentally spilled six to eight pounds of elemental mercury left in a container. Inhaling or ingesting mercury over time can cause irreversible damage to the brain, kidneys or developing fetuses, according to the Kansas Department of Health and Environment. The Oskaloosa house–south of town on U.S. Highway 59– has since been placed under guard by the Environmental Protection Agency" (Oskaloosa Independent 1997). Thus another appraisal problem has been created.

## Sale and Valuation Method

How do you value a home contaminated by mercury? Research and reading of various appraisal texts and journals did not provide clear guidance. One principle was prevalent throughout: Do not make any adjustment that is not supported by the market.

The subject property is a conventional style home built in 1983 that was purchased in February 2000 for $65,000. At the time of purchase, the Environmental Protection Agency (EPA) had remediated the property and approved the house for occupation. Remediation is "the act or process of eliminating environmental contamination on, in, or under property, to restore the property to an uncontaminated state" (IAAO 1992). Mercury is a physical contaminant and is listed as a heavy metal, along with others such as lead.

Considering the location, market activity in the area, and previous use of the property, the highest and best use would still be as a single-family residence. An attempt should be made to use all three approaches to value–sales comparison, income, and cost. Use of the sales comparison approach was not reliable. None of the comparable properties had mercury or any other environmental problems. Comparable sales indicated that, under normal conditions, the property would have a value of $98,000. Comparable sales were used to establish the amount of physical deterioration for the subject.

Without consideration of the mercury contamination, the indicated value using the cost approach was $102,290. Land value is based upon comparable land sales for the past two years in the subject's neighborhood. However, there are insufficient data available to calculate a supportable value by the income approach.

## Cost Approach

The first step in the process is to extract the residual house value from the sale price.

| | |
|---|---:|
| Sale price | $65,000 |
| Land value | − 35,940 |
| Detached garage value | − 3,960 |
| Residual house value | $25,100 |

The subject property has 16.66 acres of land valued at $35,940, or $2,157 per acre. Because the valuation date was January 1, 2000, sales of vacant land for 1998 and 1999 were used. Figure 1 shows sales supporting the subject's value.

| Figure 1 | Sales of Vacant Land, 1998–99 | | | |
|---|---|---|---|---|
| **Sale number** | **Sale date** | **Price** | **Acreage** | **Price per acre** |
| Sale 1 | March 1998 | $31,787 | 19.53 | $1,628 |
| Sale 2 | April 1998 | 46,000 | 17.21 | 2,673 |
| Sale 3 | November 1998 | 32,500 | 21.06 | 1,543 |
| Sale 4 | January 1999 | 38,000 | 18.28 | 2,079 |

Based on the land sales in figure 1, a per-acre value was developed for use in the computer-assisted land pricing schedule that was applied to the subject.

Using the residual house value, the total amount of depreciation can be calculated. The replacement cost new (RCN) is recalculated annually to reflect local construction.

| | |
|---|---:|
| RCN | $75,760 |
| House residual | − 25,100 |
| Total depreciation | $50,660 |

Depreciation can be in the form of physical deterioration, functional obsolescence, or economic obsolescence. Because the home is only seventeen years old, a reasonable estimate of physical deterioration can be

**Rick Stuart, CAE,** is a county appraiser for Jefferson County, Oskaloosa, Kansas.

*The statements made or views expressed by authors in* Assessment Journal *do not necessarily represent a policy position of the International Association of Assessing Officers.*

determined. Physical deterioration is the loss of value due to normal wear and tear. Physical deterioration is extracted from sales annually and was established to be 16 percent for the subject.

Because the property was vacant for more than two years, a considerable amount of maintenance had been deferred. Information provided by the purchaser allowed for a cost to cure to be calculated by use of Marshall and Swift (1999). The total amount of cost-to-cure items was $15,140. This cost to cure also reflects the RCN for the replaced components and is used to calculate the amount of deterioration for the long-lived items.

## Functional or Economic Obsolescence

After the physical deterioration is accounted for, the additional loss in value must either be functional or economic obsolescence.

| | |
|---|---:|
| Total depreciation as calculated | $50,660 |
| Cost-to-cure components | − 15,140 |
| Physical long-lived items | |
| 16% × ($75,760 − $15,140) | − 9,700 |
| Additional value loss | $25,820 |

$25,820 ÷ $75,760 (RCN) = 0.34 = 34% additional value loss.

This substantial loss in value may be attributable to stigma. Stigma is "a perception that a property continues to be contaminated even though it has been cleaned up" (IAAO 1997). Stigma is intangible but may have an effect on the subject's value. "This creates a situation similar to obsolescence, because, if the market will pay less for a once contaminated, but now restored, property, the value of the property has been diminished" (IAAO 1992). The question still remains, is it functional or economic obsolescence? From an application point of view, perhaps trying to define the additional value loss is immaterial. From a conceptual or theoretical point of view, inquiring minds want to know.

When posing this question to other appraisers, the resounding response was "economic obsolescence." However, when asked how the mercury spill fit into the definition of economic obsolescence, the responses were not very strong in support. By definition, economic obsolescence is "a cause of depreciation that is a loss of value as a result of impairment in utility and desirability caused by factors outside the property's boundaries" (IAAO 1997). Economic obsolescence is also referred to as external or locational obsolescence.

There is no doubt the mercury spill was an impairment before it was remediated. But is it still? The spill was damage inside the house under the previous property owner's control unless an argument is made that a tenant caused the spill, thus placing it outside the owner's control. However, what if it had been the owner who caused the spill?

One lonely appraiser automatically noted that the value loss was functional obsolescence because of the loss of ability to use the property as it was designed. Functional obsolescence is defined as the "loss in value of a property resulting from changes in tastes, preferences, technical innovations, or market standards" (IAAO 1997). The loss of functionality occurred only while the residence was vacant. Although it could not be used as a residence at the time, all indications were that remediation would allow for a continued residential use.

## Conclusion

The conclusions drawn here are based on only one sale. In small jurisdictions, this may be the only sale of this type of property that ever occurs. Although one sale does not make a market, failing to recognize the sale as an indication of market value would be difficult to defend on appeal.

Various reading materials did not define clearly whether this was economic or functional obsolescence. It is my belief that economic obsolescence is the most logical choice. Stigma may or may not apply to this property, but some factor created a very large loss in value, and stigma would appear to be the most reasonable explanation. Stigma in the minds of potential purchasers would be outside the control of the property owner and would be recognized as economic obsolescence. The clearest test of obsolescence would be for the property to sell again in a few years to see if the excess loss in value remains.

Whichever form of obsolescence is assigned to this case, the market has stated that a large loss has occurred. In a situation such as this, the principle of substitution should always be remembered.

### References

International Association of Assessing Officers. 1997. *Glossary of property appraisal and assessment*. Chicago: International Association of Assessing Officers.

International Association of Assessing Officers. 1992. *Standard on the valuation of property affected by environmental contamination*. Chicago: International Association of Assessing Officers.

Marshall and Swift. 1999. *Residential cost handbook*. Los Angeles: Marshall and Swift.

*Oskaloosa Independent*. Mercury vapors spread from rural Oskaloosa home. 1997.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 9

# Legal Issues and Valuation in Litigation Settings

## Introduction

This chapter's topic, legal issues and valuation in litigation settings, was also covered in Chapter 11 of the Volume I anthology, which included seven articles appearing in *The Appraisal Journal* and *Real Estate Issues* between 1991 and 2000. Volume I was published shortly after the March 1999 decision of the US Supreme Court in *Kumho Tire Company, Ltd., et al. v. Patrick Carmichael*, 119 S. Ct. 1167 (1999). The Roddewig 1999 article "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches" included in Volume I discussed the groundbreaking significance of that decision for appraisers as expert witnesses.

Four additional *Appraisal Journal* articles are included in this chapter.[1] Three of these articles deal with the *Kumho Tire* case law outcome and were published after the Roddewig 1999 article. Also included in this chapter is a one-page piece from *Valuation* magazine related to the explosion in the number of post-*Kumho Tire* cases involving challenges to the admissibility of expert testimony.

This chapter opens with the January 2001 *Appraisal Journal* article "Implications of the *Kumho Tire* Case for Appraisal Expert Witnesses" by Richard W. Hoyt and Robert J. Aalberts. While this article does not focus exclusively on appraisal reports and testimony in environmental litigation, it includes a summary of the early follow-up case decisions to *Kumho Tire* that are important for further development of the *Kumho Tire* rule. One of the cited decisions in this article (*The Cayuga Indian Nation of New York, et al., v. George E. Pataki*) involved the review of expert appraisers' reports. The federal district court contrasted the "subjectiveness" of one expert appraiser's sales analyses with another expert appraiser's "significant, reliable objective data." (page 424)

Hoyt and Aalberts then discuss the implications of USPAP's Departure Rule and Standards Rule 1-2(f) for appraisals that deviate from the use of the appraisal profession's generally accepted methods. While the Departure Rule was subsequently removed from USPAP and the organization and content of Standards Rule 1 was amended, other USPAP provisions continue to support the following three important points made by Hoyt and Aalberts:

1. "Sound reasons" must be drawn upon to exclude market information and generally recognized appraisal procedures relevant to the appraisal assignment.
2. Great care must be taken in using extraordinary assumptions or hypothetical conditions.
3. The appropriateness of relying on "new methods of analysis" in appraisal reports must be tested against the appraisal profession's general acceptance of the methods and whether the methods have been peer reviewed. (pages 426 and 427)

Hoyt and Aalberts then make some informed forecasts that have largely come to pass since their article's publication. Among those forecasts are the following:

- The judicial review of appraisal methods is "entering a new era."
- Courts will increasingly emphasize the importance of using only generally recognized and accepted methods of the appraisal profession and will carefully scrutinize how well the appraiser has used those methods.
- Judges will conduct more pre-trial hearings to "decide the admissibility of expert testimonies."
- Defense attorneys now have incentives to bring motions to exclude some or all of the work of appraisers working for the plaintiffs.

---

1. Not included here are a number of Cases in Brief summaries from *The Appraisal Journal* that are related to specific decisions in which the valuation of contaminated properties was an issue. See, for example, the Cases in Brief sections of the October 2000, July 2001, and Winter 2004 issues of *The Appraisal Journal*.

• Detailed analysis and support for opinions and conclusions in appraisal reports used in litigation will be extremely important. (page 427)

In their follow-up article in the Spring 2008 issue of *The Appraisal Journal*, "Daubert and the Appraisal Expert Witness Revisited," Hoyt and Aalberts discuss 12 additional cases that interpret the *Daubert/Kumho Tire* rule as applied to the admissibility and reliability of appraisal expert testimony.[2] Two of these additional cases involve contamination. In *Wilhite v. Rockwell*, the effect of PCB contamination in streams on farmland prices and values was an issue. The Kentucky Supreme Court upheld a court of appeals ruling that the appraisal testimony and methods of one appraiser involved in the case was inadmissible because the appraiser had used an "empirical model" that was not based on one of three traditional approaches to value. The appellate court excluded the appraiser because the model is "untested in any other forum, finds no support in the literature," and "has not been subjected to peer review." (page 434)

The trial in *Lambrinos v. Exxon Mobil Corporation*, the other contamination case cited in the Hoyt and Aalberts 2008 article, occurred in 2006. (page 436) The appraisal expert's report for the plaintiff only considered the contamination's effect on a retrospective date in 1999 rather than as of the date of trial. Exxon Mobil moved to exclude that report and testimony under the *Daubert* and *Kumho Tire* rulings. According to the authors, the court agreed and excluded presentation of the report because it was "simply too outdated to be probative as to the value of the property seven years later." (page 436) This ruling also confirms the importance of the generally accepted tenet that contamination's effect on prices and values has a life cycle and that contamination's impact can change, and typically decreases, as state or federal regulators' investigation and remediation proceeds. As a result, it is important in litigation to present evidence of the effect of contamination as of the date of trial and considering the point in the life cycle at that time, unless the court has ruled that any damages should be measured as of an earlier date.

Hoyt and Aalberts sum up the implications of the dozen new cases cited in their article as follows:

> A major lesson learned from the legal cases presented in this article is that expert witness appraisers appear to have some latitude in using new methodologies when preparing their appraisal reports. In fact, the methodologies do not have to strictly comply with the four *Daubert* tests (testing, peer review, error rate, and acceptance). Furthermore, these cases indicate that the methodology and data must be reasonable, reliable, and easily understood. The data must comply with generally accepted appraisal practices to hurdle the *Daubert* gatekeeper function and remain as expert evidence . . . One can conclude that compliance with the Uniform Standards of Professional Appraisal Practice and generally accepted appraisal practices should have a positive effect on the court gatekeeper in accepting the methodology used by the appraisal expert witness. (page 437)

Hoyt and Aalberts coauthored the article "*Daubert* and Qualifications of The Appraisal Expert Witness" with Percy Poon in the Summer 2010 issue of *The Appraisal Journal*. This article revisits the *Wilhite* decision and discusses a number of additional cases that do not involve contamination. The focus of this 2010 article is "how courts decide what qualifications are necessary for those who are hired to be experts in cases in which real estate appraisal and valuation are pivotal issues." (page 438) The Kentucky Supreme Court remanded the case for a new trial because one appraiser's methodology was "faulty," despite the fact that the appraiser "appeared to be qualified and apparently complied with the Competency Rule of USPAP." (page 441)

Although the one-page article from the Second Quarter 2008 issue of *Valuation*, "Challenges to *Daubert* Ruling Double," does not deal specifically with *Daubert* issues related to contaminated property appraisals or even with *Daubert* issues generally involved in real estate appraisal expert testimony, it has been included in this chapter to illustrate an important point. Since the *Kumho Tire* decision in 1999, there has been an explosion in *Daubert* challenges to expert witness testimony of all types. The article references a PricewaterhouseCoopers study examining 3,000 federal and state court opinions between 2000 and 2006. The study found that the number of *Daubert* challenges increased by almost 200% and expert testimony was excluded either in whole or in part in about 47% of the challenges.

The final article in this chapter is Thomas O. Jackson's "Real Property Valuation Issues in Environmental Class Actions" from the Spring 2010 issue of *The Appraisal Journal*. This article deals with the appropriateness of class-action treatment to resolve issues related to contamination's effect on prices and values. Air, groundwater, and even surface water contamination may have an impact on large numbers of properties' values. In the federal courts and in most states, individual property owner claims for the impact of contamination on prices, values, or use can be combined into a single class-action case. Preparing reports on the appropriateness or lack of appropriateness of class certification in real estate damage claims involving contamination has become a significant appraisal practice element for many appraisers specializing in contaminated property litigation assignments.

Jackson's article walks through the five prerequisites for class certification by a judge (numerosity, commonality, typicality, class representation, and predominance of common questions of law and fact) and then evaluates how the real estate appraisal process and the complexity of the appraisal issues involved in determining contamination's impact on prices and values makes the class-action tool difficult to support in most large-scale real property contamination cases. Jackson revisits Advisory Opinion 9 and appraisal articles and books that outline the accepted and generally recognized methods of the profession and discusses their applications to class actions.

2.    The authors also revisit the *Cayuga Indian Nation v. Pataki* case.

Copyrighted material licensed by Randall Bell on April 26, 2021

Jackson pays particular attention to the appropriateness of using regression analysis in environmental class actions that allege damages to real property prices, values, or uses. Some courts have recently suggested regression analysis as generally more appropriate than some types of paired sales analysis in real estate valuation cases.[3] However, Jackson points out that regression analysis is better at "estimating the average or mean impacts for a group of properties" than fairly and accurately determining likely impacts on a property-by-property basis:

> The errors associated with the estimation of individual property values can be large, while the errors associated with the estimation of mean or average impacts to a group of properties with a properly constructed regression model usually fall within acceptable limits. Since a regression analysis of environmental impacts produces only estimates of average effects for a group of properties, it is likely to overestimate impacts for some properties and underestimate impacts for others. This could potentially result in an inequitable allocation of damages in

class actions involving the impacts of environmental contamination on property values. (page 450)

Jackson makes a similar point that the use of case study analysis can also create difficulties in distinguishing individual property impacts from area-wide effects. However, as discussed in other chapters of this anthology, case study analysis—even in a class-action setting—can be helpful in determining whether the impact of contamination on prices is temporary or permanent, and, if temporary, how long the impacts will last and how fully the marketplace will recover.

Jackson concludes with a warning that the analysis of diminution in value becomes more difficult when "proposed and certified classes are made more inclusive, with varying property types, characteristics, and environmental issues." He concludes that in some cases, it simply "may not be possible to analyze effects on a class-wide basis without significantly disaggregating the properties." (page 451)

---

3. The most widely cited recent case is *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land, et al.*, 525 F.3d 554 (7th Cir. 2008). For a commentary of some of the implications of the *Guardian Pipeline* decision on real estate appraisal expert testimony, see Peter F. Colwell, John A. Heller, and Joseph W. Trefzger, "Expert Testimony: Regression Analysis and Other Systematic Methodologies," *The Appraisal Journal* (Summer 2009): 253.

## 9.1 Implications of the *Kumho Tire* Case for Appraisal Expert Witnesses

*by Richard W. Hoyt, PhD, MAI, SRA, and Robert J. Aalberts, JD*

This article originally appeared in the January 2001 issue of *The Appraisal Journal*.

### Abstract

The 1993 U.S. Supreme Court case of Daubert v. Merrill Dow Pharmaceuticals involved the admissibility of scientific evidence as presented by expert witnesses. Since that time, courts have differed in how they apply Daubert principles to scientific testimony versus their application to specialized knowledge. In deciding Kumho Tire Co., Ltd. v. Carmichael in 1999, the Court ruled that all evidence—scientific as well as specialized—must follow Daubert principles. This article examines the implications of the Kumho Tire case on real estate testimony and the requirements imposed on real estate appraisers who testify in litigation situations.

In the 1993 landmark case, *Daubert v. Merrill Dow Pharmaceuticals*,[1] the U.S. Supreme Court decided the admission requirements of scientific evidence as presented by expert witnesses. Early court cases that referred to *Daubert* focused on the rigor of scientific-type expert testimony, but subsequent courts led to a split in how the *Daubert* principles should be applied to scientific-type testimony and whether to apply them to testimony involving specialized, nonscientific or technical knowledge. Some courts indicated that *Daubert* standards should apply to *all* testimony. Other courts stated that *Daubert* standards do not apply to specialized knowledge testimony because scientific knowledge is grounded on the methods and procedures of science, whereas specialized, technical knowledge involves skills based on experience, training, or education.

In at least four early post-*Daubert* cases (*Joy v. Bell Helicopter Textron, Inc., Frymire-Brinati v. KPGM Peat Marwick, U.S. v. 14.38 Acres of Land*, and *Newport Limited v. Sears, Roebuck & Company*)[2] involving real estate testimony, the courts applied the *Daubert* principles to all expert testimony–whether scientific or specialized knowledge–and imposed stringent standards. However, in two other post-*Daubert* cases, (*Hawthorne Partners v. AT&T Technologies, Inc.* and an appeal of *U.S. v. 14.38 Acres of Land*)[3] the judges allowed less rigorous standards involving specialized knowledge and permitted the expert's testimony to be weighed in the trial. A confusing split among the courts and their interpretations appeared to be unfolding, creating an unpredictable legal environment. However, in a recent Supreme Court case, *Kumho Tire Co., Ltd. v. Carmichael*,[4] the Court ruled that all evidence, scientific, as well as specialized, technical evidence must be judged according to the same rules of evidence stated in *Daubert*.

The *Daubert* case, as well as an important post-*Daubert* Supreme Court case, *General Electric v. Joiner*,[5] will be discussed here. The focus will be on the implications of *Kumho Tire* on real estate testimony in general and the requirements that could be imposed on real estate appraisers who testify in civil cases.

### Daubert

Many appraisers, particularly those who are expert witnesses, are aware of the *Daubert* decision. Although the *Daubert* case involved the effect of a drug on birth defects, it created a new rule regarding the admissibility of expert testimony in all types of court cases. It established new criteria for expert witnesses and designated the judge as a gatekeeper to evaluate the scientific method used. This case and its implications for real estate appraisers was previously published in *The Appraisal Journal*.[6]

1. *Daubert v. Merrill Dow Parmaceuticals, Inc.*, 125 L. Ed. 2d 469 (1993).

2. *Joy v. Bell Helicopter Textron, Inc.*, 999F. F.2d 549 (D.C. Cir. 1993); *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993); *U.S. v. 14.38 Acres of Land*, 884 F. Supp. 224 (N.D. Miss., 1995); and *Newport Limited v. Sears, Roebuck & Company*, No. 86-2319, U.S. Dist. LEXIS 7562, *1-*8 (E.D. La., May 31, 1995).

3. *Hawthorne Partners v. AT&T Technologies, Inc.*, No. 91 C 7167 1993 U.S. Dist LEXIS 11118 (Dist. Ct. N.D. Ill., August 10, 1993); *U.S. v. 14.38 Acres of Land*, 80 F. Supp. 1074 (5th Cir. 1996).

4. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

5. *General Electric, et. al. v. Robert K. Joiner*, 139 L. Ed. 2d 508 (1997).

6. See Richard W. Hoyt and Robert J. Aalberts, "New Requirements for the Appraisal Expert Witness," *The Appraisal Journal* (October 1997): 342–349.

**Richard W. Hoyt, PhD, MAI (ret.), SRA (ret.),** is Emeritus Professor of Finance/Real Estate at the University of Nevada, Las Vegas. He received his PhD from the University of Arkansas. He chaired the Appraisal Institute's Research Advisory Board and served on the Research Committee. Hoyt was also a member of the Body of Knowledge Task Force for the Appraisal Qualifications Board. His work has previously been published in *The Appraisal Journal* and other real estate publications.

**Robert J. Aalberts, JD**, is the Ernst Lied Professor of Legal Studies at the University of Nevada, Las Vegas. He received his JD from Loyola University and MA in geography from the University of Missouri, Columbia. His work has previously been published in *The Appraisal Journal* and other real estate publications.

Copyrighted material licensed by Randall Bell on April 26, 2021

Before the *Daubert* principles were adopted, the federal courts applied the *Frye* rule, which interpreted Rule 702 of the Federal Rules of Evidence.[7] Under *Frye*, expert testimony was generally admitted if it had been published or subjected to peer review by the scientific community. The *Frye* test, in effect, shifted the burden of analyzing the admissibility of testimony from the judge and the jury to experts in the field.

In the *Daubert* case, the Supreme Court replaced the *Frye* interpretation with a more flexible and analytical framework for evaluating expert testimony. Under *Daubert*, the judge can consider a list of four nonexhaustive factors to help decide the reliability of the testimony. The judge, in effect, acts as a gatekeeper by considering some or all of the following:

1. Whether the theory can be and has been tested
2. Whether the theory has been subjected to peer review and publication
3. Whether, as to a particular scientific technique, there is a known rate of error the court should consider
4. Whether the technique is generally accepted in the relevant scientific community

As mentioned, before the *Kumho Tire* decision a number of lower courts interpreted *Daubert* to apply to all expert testimony, whether scientific or specialized, while others ruled that *Daubert* did not apply to testimony involving just specialized/technical knowledge.[8] Moreover, before the *Kumho Tire* decision, some courts, even when controlled by *Daubert*, took a different approach. They applied a less rigorous standard to testimony that was specialized, nonscientific, and based on the expert's personal experience, training, and expert skills. *Kumho Tire* has settled this split in interpretations and will hopefully create a more coherent legal environment.

## General Electric v. Joiner

Since the *Daubert* ruling, the Supreme Court has twice attempted to further define the legal parameters of admitting scientific testimony into trial. In late 1997 the Supreme Court decided its first post-*Daubert* decision. In the *Joiner* case, the court ruled that a judge's decision to admit or exclude expert scientific testimony could only be overturned on appeal if the trial judge abused his discretion. Essentially, this ruling makes it very difficult to change a judge's decision, thereby affirming the judge's role as a gatekeeper of expert testimony.

## Kumho Tire v. Carmichael

The latest of the post-*Daubert* Supreme Court cases is *Kumho Tire*, decided in March 1999. This case involved the failure of an automobile tire that resulted in bodily injuries and one death. The testimony of a tire failure expert composed a significant portion of the case. The court found that although the four factors used in *Daubert* applied to "scientific" testimony these factors also apply to "technical" or "other specialized" knowledge. That is, all expert testimony, whether scientific knowledge or specialized knowledge, is to be judged according to the same rules pertaining to the admissibility of evidence as stated in the *Daubert* ruling.

In light of the foregoing legal developments, it is crucial that real estate appraisers who testify be certain that their expert testimony will stand the test of the latest Supreme Court interpretations, including how the four *Daubert* factors will be applied in the future. In two recently published Post-*Kumho Tire* appraisal cases, expert testimony by appraisers was rejected by the courts. The language of these courts may be indicative of where the law is heading. The opinions of several experts on what appraisers might expect in a post-*Kumho Tire* legal environment can also serve as a guide. Further, it is important to revisit a particular survey technique introduced in the early 1980s because it might still be practical for appraisers today. Certainly the *Kumho Tire* case also needs to be examined in terms of the *Uniform Standards of Professional Appraisal Practice* (USPAP).[9] Finally, it is interesting to speculate on the probable changes to pretrial and trial procedures, especially as these changes affect appraisal expert witnesses.

## Cayuga Indian Case

In two recent court cases involving real estate appraisal, the courts cited the *Kumho Tire* case in admitting evidence. The United States District Court, in *The Cayuga Indian Nation of New York, et al., v. George E. Pataki*, precluded the testimony of a real estate appraiser for the plaintiff.[10] The Court of Appeals in Kentucky in *Rockwell International Corporation v. Vance Wilhite* rejected an empirical model developed by the appraiser over accepted valuation methodology.[11]

The *Cayuga Indian* case was about deciding the appropriate method for estimating monetary compensation to the Cayugas, who had been dispossessed of their ancestral land exactly 204 years before. Three apprais-

7. *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923); West Publishing Co., Federal Rules of Evidence for United States Courts and Magistrates (St. Paul, Minnesota: West Publishing Co., 1975).

8. Teresa S. Renaker, "Evidentiary Legerdemain: Deciding When *Daubert* Should Apply to Social Science Evidence," *California Law Review* (84: 1657, 1996): 1657–1692.

9. *Uniform Standards of Professional Appraisal Practice* (Washington, DC: The Appraisal Foundation, 2000).

10. *The Cayuga Indian Nation of New York, et al., v. George E. Pataki*, 83 F. Supp. 2d 318; N.D.N.Y. 2000.

11. *Rockwell International Corporation v. Vance Wilhite*, No. 1997-CA-000188-MR, 2000 KY App. LEXIS 2 (KY App. January 14, 2000).

ers were involved: appraiser A used a sales comparison approach. Appraiser B applied a quantitative model using real estate appraisal principles and relying on computer science, mathematics, and statistics. Appraiser C used a qualitative model that incorporated appraisal principles as well as economics and history. Before the jury had been selected, the court conducted a seven-day hearing under *Daubert* and *Kumho Tire* to decide the admissibility of the appraisers' testimonies.

As mentioned, appraiser A used the sales comparison approach, a recognized approach. Nevertheless, the judge considered this application to the facts of the case problematic and unreliable. To compile an average sales price per acre, appraiser A used a grid approach and four sales, each of which he considered representative of the transactions that took place for each of their respective years. No adjustments were made to the sale properties although the appraiser indicated the possibility of various adjustments. The average sales price per acre was applied to the total number of acres in the claim area for each of the 204 years in question. The value per year was then multiplied by 10% to estimate the "use and occupancy" of the subject land.

The court found that because the first step in this process was faulty, all subsequent calculations were impacted. The court also found that no specific error rate was considered even though the valuation issues presented were unusual. Further, because the reliability of the data was suspect, the reliability of the value estimate based on that data was also suspect, suggesting that there could be a significant rate of error in the appraisal. As for the reliability of the data, the court found several discrepancies between the actual sales data and the way in which they were recorded in the comparable sales sheets. Moreover, the court was concerned about consistency in appraiser A's own procedures. High and low sales were typically discarded, but there were years in which the high sale was not discarded. In selecting representative sales, the appraiser stated he "had a feeling of the values" from the sales reviewed. The court considered this method intuitive and unable to provide the specificity needed to support the selection of comparable sales. Referring to Kumho Tire, the court noted a similarity in the "subjectiveness" of the analyses between appraiser A and the tire expert in *Kumho Tire*. Although the other two appraisers relied on a certain amount of subjectivity, appraiser A had more of a subjective "feeling." The other appraisers had significant, reliable objective data, which they used to draw their conclusions.

According to the court, appraiser A's testimony was rejected as not being helpful in understanding how the property should be valued "not because of the conclusions which he reaches, but because of the manner in which he applied his chosen methodology–the sales comparison approach–and the questionable reliability of his underlying sales data."[12] In a footnote, the court stated that it was allowing the testimony from the other appraisers not because of their conclusions–which are diametrically opposed–but because it believes their testimony was both reliable and relevant.

Finally, the court indicated that any single deficiency in appraiser A's testimony would probably not be sufficient to question the reliability of the data or appraisal methodology. Rather, the cumulative effect of those deficiencies led the court to believe the analysis was based on faulty assumptions.

## Rockwell Case

*Rockwell International Corporation v. Vance Wilhite* was heard in the Kentucky Court of Appeals.[13] The case involved the contamination of farms because of polychlorinated biphenyls (PCBs) discharged by Rockwell into streams that flow past the farms. Rockwell appealed after a circuit court awarded over $217.5 million in compensatory and punitive damages. The value of the properties if uncontaminated was estimated to exceed the compensatory damage portion of the award, which exceeded $7.5 million. This portion of the award was based almost entirely on the testimony of a single real estate appraiser whom the court found qualified to act as an expert witness.

The appraiser–who had had no prior experience in appraising contaminated properties–attended educational seminars, conducted research, and consulted with two other appraisers before developing an empirical model to use in the case, rather than one of the three commonly accepted valuation models.[14] The appraiser stated that flood plain property with any level of PCB contamination was worthless. He "admitted that this was merely his subjective opinion and pointed to no scientific evidence to support his view."[15] In examining sales, he had found no property that abutted the stream to be useful in determining any impaired value to the landowner's properties.

The landowners did prove that PCBs existed on their properties, but the court found them unable to prove that PCBs presented a health hazard and therefore damaged their properties. The Court of Appeals indicated that the trial court had permitted the appraiser:

> [T]o opine that any quantity of PCB contamination, however slight, renders the property worthless... [even] in the absence of proof of any harm to the property, to the people who occupy it, to their crops or to their farm animals. The admission of this testimony was an abuse of discretion.[16]

---

12.  83 F.Supp.2d 328, 31.

13.  It should be noted that this case is not final, although it does show the direction that courts are taking in regard to admitting expert testimony.

14.  The three commonly accepted valuation models are the sales comparison approach, cost approach, and the income approach. See Appraisal Institute, *The Appraisal of Real Estate*, 11th ed. (Chicago, Illinois: Appraisal Institute, 1996): 90.

15.  No. 1197-CA-000188-MR, 2000 KY App. LEXIS 2, *15.

16.  Ibid., *30.

Copyrighted material licensed by Randall Bell on April 26, 2021

The empirical model used by the appraiser was not tested elsewhere, had no support in the literature, was not subjected to peer review (except in informal discussions with two other appraisers), and was not based on a scientific assumption that any quantity of PCB contamination is harmful. Because his opinion was unsupported, the appeals court indicated that it could not form the basis for a damage award and ruled that the trial court should have excluded the appraiser's testimony.

## Survey Methodology and *Kumho Tire*

The applicability of the *Kumho Tire* decision to appraisers involved in environmental litigation has been discussed by Richard J. Roddewig.[17] He presents two examples of the court applying *Daubert* and *Kumho Tire* gatekeeping requirements to the admissibility of evidence—one in a federal district court and the other in a state court. Both of these cases involved value diminution because of contamination from a neighboring property and the use of survey techniques. Although the cases are, at the time of this writing, still making their way through the appeals process, they do indicate a direction of the courts.[18] In the first case, the judge ruled that the testimony of the plaintiffs' appraisal expert witness should be disregarded because it had little or no value in establishing damages and did not comply with the rules regarding expert testimony. The appraiser used a telephone survey of lenders whom the judge deemed unreliable and speculative. The judge indicated that the appraiser did not use commonly accepted appraisal methodology; the method and content of the survey were questioned.

The second case also involved a survey in which the judge ruled the results inadmissible. The survey population consisted of lenders, brokers, and potential buyers. The court considered the survey instrument to have been written in a biased and slanted way. Because the appraiser's cost and income approaches were linked to the survey, they were disallowed.

Roddewig does not believe that the courts are considering survey-type research in valuation assignments to be inappropriate techniques. Rather, he points out that surveys first should not be "the only basis for a stigma conclusion and, second, provide enough information…to each survey participant so that they can make an intelligent and reasoned response."[19] He

refers to a federal court case that lists seven factors that determine the reliability of surveys:[20]

1. The universe is properly defined.
2. A representative sample is selected.
3. Questions were clear, precise, and non-leading.
4. Sound interview procedures were followed by interviewers who had no knowledge of the litigation or purpose of the survey.
5. Data was accurately reported.
6. Data was analyzed using accepted statistical procedures.
7. The entire process was objective.

An article by Grant W. Austin presents a case study of measuring damages from an eminent domain partial taking.[21] Because of insufficient market evidence supporting value diminution from partial takings, a survey was designed using a survey consultant, statistician, and professional engineer. To help ensure the survey's reliability, seven factors were considered:

1. Face-to-face interviewing
2. Protection of the integrity of survey presentation and diagram accuracy
3. Elimination of sample bias
4. Enhancement of survey replication
5. Neutrally worded survey statement
6. Elimination of strategic bias
7. Eliminated centering by offering an open-ended value response

Although the issue did not go to court proceedings, mediation before trial resulted in approximately $200,000 to the property owner, versus an earlier estimate of $8,900 for the taking and no severance damages. As stated by Austin:

> The survey, when scientifically developed and professionally administered, is one method of understanding the thoughts and actions of buyers and sellers. The survey method is a valuable tool when more traditional market evidence does not exist.[22]

Another example of a survey method that would probably pass the *Kumho Tire* test was used by James A. Graaskamp and Michael L. Robbins in the early 1980s in their valuation of wilderness and scenic land.[23] The

---

17. Richard J. Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," *The Appraisal Journal* (October 1999): 447–453.

18. At the time that Roddewig wrote his article, both cases were pending and the distinct titles of the cases were withheld. A current search of Lexis/Nexis did not show that either of these cases have been closed. Therefore, although these two cases are important in indicating the direction of the court, they have not apparently established a precedent, as in the *Cayuga* and *Rockwell* cases.

19. Roddewig, 452.

20. *Zippo Manufacturing Company v. Rogers Imports, Inc.*, 216 F. Supp. 670 (S.D.N.Y. 1963).

21. Grant W. Austin, "Putting the 'Survey' Method to the Test," *Valuation Insights and Perspectives* (Fourth Quarter 1999): 35–36.

22. Ibid., 36.

23. See Michael L. Robbins, "The Valuation of Large-Scale Natural Landscapes Using Contemporary Appraisal Theory," *The Appraisal Journal* (April 1987): 225–244; and Michael L. Robbins and Sean C. Ahearn, "The Price of Wilderness and Scenic Beauty: A Methodology for the Inventory and Appraisal of Wilderness and Scenic Land," *Appraisal, Market Analysis, and Public Policy in Real Estate*, edited by James R. DeLisle and J. Sa-Aadu (Boston, Massachusetts: Kluwer Academic Publishers, 1994): 149–181.

assignment involved the valuation of 25,000 acres of mountainous terrain by the U.S. Forest Service to be reserved as a wilderness area. Federal agencies suggested that, based on similar properties, the subject property suggested a value of $8 million–$12 million. The researcher's method suggested a value of $30 million–$34 million. A preliminary presentation of the analysis was made to the government, and eventually an offer of $28 million was made to the property owners.

The researchers analyzed five different attributes that affect value: physical, legal and political, linkage, dynamic, and environmental attributes. The attributes were used in applying the sales comparison approach to the comparable sales and subject properties. The relevant units of comparison were selected based on the Wilderness Attribute Rating System (WARS) and Variety Class Assessment System (VCAS), both developed by the U.S. Forest Service to provide attributes for wilderness rankings and scenic qualities. The researchers also asked hikers visiting the area to take photographs of the sites and answer questions about the scenes they photographed. This visitor-employed photography (VEP) survey technique provided a visual (photographic) picture along with a ranked description of what the respondents (hikers) considered relevant or irrelevant to scenic beauty.

Next, a wilderness evaluation system (WES) was designed. Data from WARS, VCAS, and VEP were incorporated into a geographic information system (GIS) and an automated sales comparison technique to develop a spatial approach for the valuation of wilderness. Although the WES method was not tested in eminent domain court proceedings, the government apparently considered the technique feasible, as evidenced by the increase in its purchase offer. Further, the researchers stated that the attribute-matching method "was not dependent on inferential statistical reliability for accuracy."[24]

Since this method has been described in peer-reviewed publications and tested in various cases involving acquisitions of land for public use, it is safe to conclude that testimony using a similar process would likely pass the gatekeeping rules of *Kumho Tire*. However, before *Kumho Tire*, the WES would probably not have met the more stringent *Daubert* requirements because the testimony would have been subjected to more exacting scientific standards. In the wake of *Kumho Tire*, the method by Graaskamp and Robbins will probably be admissible as accepted technical, nonscientific testimony.

## Is USPAP Relevant Today?

In any appraisal assignment, it is important that an appraiser comply with USPAP. Its Competency Rule requires that an appraiser either have the knowledge and expertise necessary to complete the appraisal assignment, or disclose the lack of knowledge or expertise to the client. In a comment the Competency Rule specifically indicates that the appraiser is responsible for any "analytical method" used in the assignment,[25] which would include the appropriate theory of the method, its proper application, and the interpretation of the results. This requirement is very similar to the fourth *Daubert* factor of whether the technique is generally accepted in the relevant scientific (or technical) community.

Also relevant within USPAP is the Departure Rule and its associated Statement on Appraisal Standards No. 7.[26] In general, the Departure Rule allows a "scope of work" that is less than or different from work requiring specific requirements, provided that the opinions or conclusions are credible. The "scope of work" in a real estate assignment involves, among other things, "the extent of data research; and the type and extent of analysis applied."[27] Invocation of the Departure Rule results in what is known as a "limited appraisal" versus a "complete appraisal." The Departure Rule is generally associated with the elimination of a specific requirement. However, it may also be interpreted to cover the inclusion of a technique beyond specific requirements to assist the appraiser in producing credible results. An example is Graaskamp and Robbins's assignment, which used a perceptual evaluation of wilderness scenes to aid in the application of the sales comparison approach.

As stated in Advisory Opinion 15, titled "Using the DEPARTURE RULE in Developing a Limited Appraisal," some assignments can be completed by departing from normal specific requirements; the Departure Rule allows appraisers to vary the extent of their analysis.[28] The relevant point for the appraiser is to recognize that in applying a new technique to an assignment, the new technique cannot replace a specific requirement unless the specific requirement can be omitted by itself and still produce a credible result. Standards Rule 1-2(f) requires the appraiser to "have sound reasons in support of the scope-of-work decision" and to be able to support any "decision to exclude any information or procedure that would appear to be relevant"[29] when it is such that it is consistent with the expectation of market participants and peers for the same or similar assignments. Accordingly, the appraiser must be extremely careful in using extraordinary assumptions and/or hypothetical conditions.[30] Such assumptions or conditions may come about when relying on analysis outside the specific requirements that allow departure or the inclusion of new methods of analysis.

---

24. Robbins and Ahearn, 178.

25. USPAP, 5.

26. Ibid., 6–7, 82–89.

27. Ibid., 12.

28. Ibid., 132–135.

29. Ibid., 15.

30. See Standards Rule 1-2(g) and (h); USPAP, 15.

Copyrighted material licensed by Randall Bell on April 26, 2021

These requirements are similar to the *Daubert* factors of peer review and acceptance of the technique by the relevant scientific (technical) community.

## *Kumho Tire's* Implications For Appraisers In Court Proceedings

In light of the foregoing discussion, the manner in which judges may treat the specialized knowledge of expert appraisers after *Kumho Tire* is entering a new era. Although highly speculative at this time, various commentators have indicated that new developments may emerge in how judges assess expert specialized testimony.[31]

Of the four *Daubert* criteria, the fourth factor regarding the general acceptance of the evidence in the relevant scientific community will probably be increasingly emphasized. In fact, in the *Kumho Tire* case, the Supreme Court stated that "the objective" is "to make certain than an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[32] For appraisers, this statement may mean that the court will look at how well the expert uses the generally accepted methods of appraisal practice.

Some judges might consider experience levels more important, including years of service as well as generally recognized appraisal designations acquired after meeting minimum experience requirements. In *Kumho Tire*, the Supreme Court stated, "[I]t will at times be useful to ask even of a witness whose experience is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable."[33] For the real estate appraiser, this can include years of experience gathering data and applying it to various methodologies.

There is also speculation that judges will conduct more pretrial hearings to decide the admissibility of expert testimonies, particularly those by individuals having specialized knowledge, such as real estate appraisers. A hearing of this kind will likely amount to being virtually a deposition since the opposing expert will now be required to discuss in detail why his or her expert testimony falls within the *Daubert* rules. Note, for example, the Cayuga case, with its seven days of hearings pertaining to admissible testimony prior to jury selection.

Defense attorneys will likely have a greater incentive to attempt to exclude the evidence brought by the plaintiff's expert. If the plaintiff loses the testimony of a key expert, his case will likely be dismissed in a motion for summary judgment. As ruled in *General Electric v. Joiner*, the judge's decision to exclude the evidence is now very difficult to overturn on appeal, thereby almost certainly ending at that point.

It will be important for the appraisal expert on both sides to be prepared for a reliability attack since the rules required of an expert are still unclear.[34] Therefore, appraisers must be prepared to explain both their qualifications as an expert and the reasons for their opinions. Such experts will need to explain thoroughly in their appraisal reports, depositions, and affidavits how they arrived at their conclusions. Friedman and Ordway extend this to testimonies by review appraisers.[35]

Judges will now be focusing on technical expertise as well as scientific knowledge. This provides an opportunity for appraisers who are well versed in both experience requirements and valuation methodologies to advise judges about the credibility of expert witnesses. Roddewig suggests that appraisers can assist judges in their gatekeeping role for contaminated property cases by presenting the following points to the court:

1. The Appraisal Institute is a professional appraisal organization.
2. Appraisal Institute members can identify relevant theory and techniques for proper valuation.
3. Peer review takes place for Appraisal Institute courses, seminars, and publications.
4. The Appraisal Institute has adopted USPAP as general standards.

However, Roddewig also states that judges need to be informed that the valuation of property affected by contamination or environmental risk is relatively new, that such valuation is specialized, and that many appraisers do not have the necessary education, skill, or experience to conduct a proper valuation of this type. There are only a small number of appraisers who specialize in environmental-type litigation, and the courts have been the ones to test and validate methodology with reference to the marketplace. Further, he observes that "[W]hile the courts are looking to the appraisal community for guidance on how to resolve methodological disagreements encountered in litigation, the appraisal community is actually looking to judges and juries as well as the marketplace to give it guidance on which techniques pass the test of reasonableness in a marketplace setting."[36]

---

31. See Doug Bandow, "Keeping Junk Science Out of the Courtroom," *The Wall Street Journal* (July 26, 1999): A23; James L. Dam, "Expert Testimony Is Harder to Use: U.S. Supreme Court," *Lawyers Weekly USA* (April 5, 1999): 1; Jack P. Friedman and Nicholas Ordway, "Appraisal Review in a Litigation Support Role," *The Appraisal Journal* (January 2000): 20–31; Richard W. Hoyt and Robert J. Aalberts, "Recent Legal Developments and the Appraisal Expert Witness," *Valuation Insights and Perspectives* (Third Quarter 1999): 38–39; and David E. Rovella, "Kumho Could Affect Criminal Cases," *The National Law Journal* (April 12, 1999): A5.

32. 526 U.S. 137, 152.

33. Ibid., 151.

34. Ibid.

35. Friedman and Ordway, 20–31.

36. Roddewig, 450.

Both the technical aspects of real estate appraisal as well as compliance with USPAP must be scrutinized. Only then can judges be assured that the testimony presented in their courtrooms are credible.

## Conclusion

In a post-*Kumho Tire* environment, the real estate appraiser must now, more than ever, consistently apply the standardized criteria of the appraisal profession. This requires appraisers to go back to the basic body of knowledge and USPAP. By doing so, appraisal experts will ensure consistent presentations between their written reports and testimonies. It is also important that appraisers keep up with the generally accepted body of knowledge as it evolves and get acquainted with new theories, techniques, and methodologies as they appear in peer-reviewed publications.

### References

Dorchester, John D. "The Federal Rules of Evidence and Daubert: Evaluating Real Property Valuation Witnesses," *The Appraisal Journal* (July 2000): 290–306.

Hamilton, Heather G. "The Movement from Frye to Daubert: Where Do the States Stand?" *38 Jurimetrics J.* (Winter 1998): 201–213.

Johnson, Molly Treadway; Carol Krafka and Joe S. Cecil, *Expert Testimony in Federal Civil Trials: A Preliminary Analysis*, Federal Judicial Center, 2000, referred to in "Judges Are Excluding More Expert Testimony," *Lawers Weekly*, (October 30, 2000): 11. The study indicates that federal judges are more likely to exclude expert testimony than before the 1993 *Daubert* ruling.

Task Group for the Development of Standards for Determining the Acceptability of Applications of Statistical and Market Survey Techniques to the Valuation of Real Property. "Proposed USPAP Statement on Appraisal Standards: First Exposure Draft, March 29, 2000" Washington, DC.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 9.2 *Daubert* and the Appraisal Expert Witness Revisited

*by Richard W. Hoyt, PhD, MAI, SRA, and Robert J. Aalberts, JD*

This article originally appeared in the Spring 2008 issue of *The Appraisal Journal*.

### Abstract

Since the *Daubert v. Merrell Dow Pharmaceuticals, Inc.* decision in 1993, plaintiffs and defendants have used two primary arguments in applying *Daubert* to expert witness testimony in real estate valuation cases: the use of a methodology and the qualification of an expert witness. This article examines cases involving the methodology used in real estate valuation situations and finds that although *Daubert* identifies four factors (theory testing, peer review and publication, known rate of error, and general acceptance) for the courts to consider, these factors have been interpreted differently in various courts. Several cases are summarized and the significance of different interpretations in the application of *Daubert* is noted.

The case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1] was decided in 1993 and has since been referenced and relied on in numerous lawsuits. Prior to *Daubert*, the admissibility of expert testimony was decided under an interpretation of Rule 702 of the Federal Rules of Evidence, known as the *Frye* rule.[2] Rule 702 determined qualified expert witnesses based on their knowledge, skill, experience, training, or education. The *Frye* rule examines testimony to determine its general acceptance in the scientific community.

*Daubert*, however, superseded the *Frye* rule in federal courts and many states. It places the court as a gatekeeper in evaluating the admissibility of testimony. Before the admission of expert testimony, the court must now consider whether the theory has or can be tested; if the theory has been subjected to peer review and publication; if there is a known rate of error; and the general acceptance of the technique in question. Since the *Daubert* decision, plaintiffs and defendants have used two primary arguments when applying *Daubert* to real estate testimony in valuation situations: the use of a methodology and the qualification of an expert witness.

The *Daubert* case and its progeny determine the admissibility of expert scientific and technical evidence in all court cases, including those that pertain to real estate expert witnesses. Thus, to fully understand the *Daubert* case's impact on real estate expert witnesses, it is necessary to examine how the courts have interpreted and applied it.

Four years after the *Daubert* decision, Hoyt and Aalberts published an article that presented four court cases involving *Daubert* and real estate valuation.[3] In a subsequent article, pertaining to the *Kumho Tire* case, Hoyt and Aalberts outlined a clarification of how judges might assess expert testimony and related those assessments to the appraisal expert witness.[4] This was followed by other publications concerning the real estate appraiser and compliance with *Daubert* as well as compliance with accepted appraisal principles and standards and professional practice.[5]

### Research Approach

For this article, court cases in the Westlaw database were researched using the search terms *Daubert* and *appraisal*. These two search terms were selected in order to access as many relevant cases as possible. From all of the cases in the search results, those pertaining to methodology were selected and examined. The methodology cases are the basis of this article.

---

1.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 1509 U.S. 113, S. Ct. 2786, 25 L. Ed. 2d 469 (1993).

2.  *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Federal Rules of Evidence for United States Courts and Magistrates* (St. Paul, MN: West Publishing Co., 1975).

3.  Richard W. Hoyt and Robert J. Aalberts, "New Requirements for the Appraisal Expert Witness," *The Appraisal Journal* (October 1997): 342–349. Of the four cases discussed there, one is discussed in this article (*United States v. 14.38 Acres of Land*). The remaining are as follows. In *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993), expert testimony was excluded because of "guesswork, speculation, and conjecture"; in *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993), the expert's discounted cash flow rationale was considered in error and his testimony was excluded; and in *Newport Ltd. v. Sears, Roebuck & Co.*, 1995 WL 626188 (E.D. La. 1995), the court found use of multiple regression analysis met the requirements of *Daubert*.

4.  Richard W. Hoyt and Robert J. Aalberts, "Implications of the *Kumho Tire* Case for Appraisal Expert Witnesses," *The Appraisal Journal* (January 2001): 11–18.

5.  Several of these publications are identified in the Additional Reading section of this article.

**Richard W. Hoyt, PhD, MAI (ret.), SRA (ret.),** is Emeritus Professor of Finance/Real Estate at the University of Nevada, Las Vegas. He received his PhD from the University of Arkansas. He chaired the Appraisal Institute's Research Advisory Board and served on the Research Committee. Hoyt was also a member of the Body of Knowledge Task Force for the Appraisal Qualifications Board. His work has previously been published in *The Appraisal Journal* and other real estate publications.

**Robert J. Aalberts, JD,** is the Ernst Lied Professor of Legal Studies at the University of Nevada, Las Vegas. He received his JD from Loyola University and MA in geography from the University of Missouri, Columbia. His work has previously been published in *The Appraisal Journal* and other real estate publications.

The authors wish to thank the Lied Institute of Real Estate Studies for its support of real estate education and research at the University of Nevada, Las Vegas.

The research results indicate that, although *Daubert* identifies four factors for the court to consider, these factors have been interpreted differently by various courts. This article summarizes those cases and notes the significance of the different interpretations in the application of *Daubert*. The relevance of how case law may be interpreted has implications for real estate appraisers and other real estate professionals who may be called on to act as expert witnesses. Such knowledge can help expert witnesses to best prepare their objective and scientific testimony for presentation in court.

## *Daubert* and Appraisal Methodology Cases

The *Daubert*-related cases involving the appraisal methodology of the expert witnesses can be broken down according to the intended use of the appraisal assignment: condemnation, tax assessment, or value. The cases and their relevance to real estate appraisers are presented in Table 1. The case summaries that follow provide a narrative explanation of the courts' decisions.

### Suna Associates

The *Federal Deposit Insurance Corp. v. Suna Associates, Inc.*[6] case involved 45 condominium units in a convert-ed factory building, known as the Mill River Condominiums. The Federal Deposit Insurance Corporation (FDIC) took over the Connecticut bank that made the loan. Included in the takeover was a mortgage note, with personal guarantees, on 35 of the condominiums.

The property was valued and a deficiency judgment was granted by the district court. Suna, the developer corporation, contended the valuation testimony by the FDIC expert was unreliable, and therefore should be excluded.[7] The FDIC expert valued the 35 condominium units as one property for sale to a single purchaser. He used a blend of the sales comparison and income capitalization approaches to value, which Suna alleged was neither credible nor reliable.

Suna argued that the FDIC expert's opinion testimony "was based on a developmental analysis unknown to appraisal literature, unique to him and on factual assumptions which were without any reasonable foundation."[8] In its review, the court of appeals referred to *Daubert* and the role of the trial judge as a gatekeeper for reliable and relevant evidence. The court further referenced the testing, publication, and rate of error factors in *Daubert*.

However, the court of appeals also pointed out that in *Daubert* the court did not set out a specific checklist.

**Table 1**    Summary of Cases Involving *Daubert* and Expert Witness Methodology

| Case | State (Year) | Appraisal Assignment | Court | Key Factors |
|---|---|---|---|---|
| *Federal Deposit Insurance Corp. v. Suna Associates, Inc.* | Connecticut (1996) | Value | U.S. Court of Appeals, Second Circuit | Analysis |
| *United States v. 14.38 Acres of Land* | Mississippi (1996) | Condemnation | U.S. Court of Appeals, Fifth Circuit | Analysis |
| *Texaco Producing, Inc. v. County of Kern* | California (1998) | Tax Assessment | CA Court of Appeal, Fifth District | Ratios and capitalization rates |
| *Cayuga Indian Nation v. Pataki* | New York (2000) | Value | U.S. District Court | Data and analysis |
| *Exxon Pipeline Co. v. Hill* | Louisiana (2000) | Condemnation | LA Court of Appeal First Circuit | Data |
| *Rogers v. Horseshoe Entertainment* | Louisiana (2000) | Value | LA Court of Appeal Second Circuit | Data and USPAP |
| *Guadalupe-Blanco River Auth. v. Kraft* | Texas (2001) | Condemnation | TX Court of Appeals | Data and analysis |
| *Wilhite v. Rockwell International Corp.* | Kentucky (2002) | Value | Supreme Court of Kentucky | Analysis |
| *Mississippi Transportation Commission v. McLemore* | Mississippi (2004) | Condemnation | Supreme Court of Mississippi | Analysis |
| *Elliott v. Town of Stonington* | Connecticut (2005) | Tax Assessment | CT Superior Court | Data and analysis |
| *Verizon Northwest, Inc. v. Riverside Development Co.* | Idaho (2006) | Condemnation | ID District Court, First Judicial District | Analysis |
| *Tunica County v. Matthews* | Mississippi (2006) | Condemnation | Supreme Court of Mississippi | Data and analysis |
| *Lambrinos v. ExxonMobil Corp.* | New York (2006) | Condemnation | U.S. District Court | Data and analysis |

Note: All appraisers in these cases were considered to be qualified to act as an expert witness. An attempt to disqualify two experts in the Cayuga Indian Nation case was based on their quantitative skills; however, the court rejected the attempt by indicating that an interdisciplinary approach is often required. Also, in Wilhite the appraiser was considered qualified even though he had no experience in appraising contaminated properties because he had educated himself, conducted research, and conferred with other appraisers.

---

6. *Federal Deposit Insurance Corp. v. Suna Associates, Inc.*, 80 F.3d 681 (2nd Cir. 1996).

7. It is to be noted that a deficiency judgment is based on the value of a property as of a specific date and the amount claimed by the mortgagee. That is, given a stated claim, the lower the value of the property the greater the amount of the deficiency judgment.

8. *Suna Associates*, 687.

Copyrighted material licensed by Randall Bell on April 26, 2021

For example, it quotes *Daubert* as follows: "[p]ublication … does not necessarily correlate with reliability," that "in some instances well-grounded but innovative theories will not have been published," and that "[s]some propositions … are too particular, too new, or of too limited interest to be published."[9] Consequently, the court of appeals found that the trial court did not abuse its discretion in finding the testimony of the FDIC expert to be reliable and relevant.

## 14.38 Acres of Land

In 1995, the U.S. District Court in *United States v. 14.38 Acres of Land*,[10] excluded from evidence the testimony of the defendant's expert witnesses, a real estate appraiser and a civil engineer. The defendant, Joseph C. Coker III, obtained compensation for an easement of 14.38 acres of farmland taken for construction of a new levee by the U.S. government. However, he sought additional compensation for the remaining farmland on the unprotected flood side of the levee, contending the remaining portion suffered a loss in value because it was subject to potential flooding.

The civil engineer's opinion was that construction of the new levee would result in some flooding to the remainder, but he did not know the extent of the problem. The real estate appraiser estimated a diminution in value of approximately 50% after the taking. The appraiser could not find any comparable sales or historical data to use in estimating a loss of value; however, he did discuss the situation with other real estate appraisers and brokers. Their conclusion was that there might be a perception among purchasers that land on the unprotected side of the levee is less desirable because of the potential of flooding.

Using *Daubert*, the court considered the testimony to be speculative and would not assist in determining just compensation. It stated, "[i]f the expert's opinion is not soundly based and is not relevant, then the opinion must be excluded."[11] Furthermore, "[t]heir opinions (and those which form the basis thereof) are based on events 'which, while within the realm of possibility, are not fairly shown to be reasonably probable.'"[12] Consequently, the testimonies of the real estate appraiser and of the civil engineer were excluded from evidence.

Upon appeal, the appellate court in *14.38 Acres of Land*,[13] indicated that "the experts' inability to predict the extent of flooding … does not render their testimony entirely speculative and therefore unreliable for purposes of admissibility."[14] The civil engineer's opinion was based on his review of maps, photographs, and physical inspection of the property. The real estate appraiser's valuation was predicated on the potential of flooding from the civil engineer's opinion, property inspection, discussions with real estate peers, and his experience as a real estate appraiser.

The court concluded, "[T]he perceived flaws in the testimony of Coker's experts are matters properly to be tested in the crucible of adversarial proceedings; they are not the basis for truncating that process."[15] The court of appeals vacated the district court judgment and remanded it for further proceedings.

## Texaco Producing

In a case from California, *Texaco Producing, Inc., et al. v. County of Kern*,[16] Texaco appealed a judgment concerning the assessment of its oil and gas property. Texaco contended that the county assessor used two new ratios, capital and initial rate, when valuing Texaco's oil and gas properties. The assessor's appraiser had used the two ratios to help analyze comparable sales.

The capital ratio divides the purchase price into the sum of the purchase price plus the present value of projected capital costs. This ratio indicates the development risk of the comparable sale. The initial rate ratio divides the current rate of oil production by the purchaser's projection of the maximum rate of production. It is designed to measure risk in the purchaser's projection of oil production.

Texaco argued that these ratios were new scientific techniques and therefore were not generally accepted within the appraisal community. Since the ratios had not met the general acceptance factor in *Daubert*, their use was inappropriate and therefore should have been excluded from testimony. Therefore, Texaco contended, the appeals valuation hearing of the Kern County Assessment Appeals Board (Board) should be inapplicable due to this error.

The court of appeals noted that it did not use the newly created ratios to value the property, but instead used the ratios to show the differences between comparable sales. The court indicated that the ratios assisted in quantifying risk factors pertaining to projected cash flows so as to allow specific adjustments to those cash flows. As such, the court found that "the ratios did not constitute 'scientific evidence.' Therefore, *Daubert* is inapplicable,"[17] and the ratios were admissible.

The court further noted that Texaco's expert witness used a capital asset pricing model (CAPM) methodology to calculate market-derived band of investment discount rates that were not derived using the State Board of

9.  Ibid.

10. *United States v. 14.38 Acres of Land*, 884 F. Supp. 224 (N.D. Miss. 1995).

11. Ibid., 227.

12. Ibid.

13. *United States v. 14.38 Acres of Land*, 80 F.3d 1074 (5th Cir. 1996).

14. Ibid., 1078.

15. Ibid., 1079.

16. *Texaco Producing, Inc. v. County of Kern*, 66 Cal. App. 4th 1029, 78 Cal. Rptr. 2d 433 (Ct. App. 5th Dist. 1998).

17. Ibid., 1050.

Equalization Rules, which set forth various valuation approaches to be used by county assessors. In response, one of the assessor's expert witnesses also used a band of investment method that included CAPM methodology.

In this case, however, the county's "discount rate calculation was consistent with the actual market rates of return of oil and gas companies,"[18] whereas the Board found Texaco's calculations were unreliable. The Board noted that CAPM was developed for short-term stock analysis and has not been reliable in valuing long-term property investments. Therefore, the court indicated that arguments about the use of CAPM were irrelevant, and the market-derived method was the preferred approach to discount rate derivation.

### Cayuga Indian Nation

In the case of the *Cayuga Indian Nation v. Pataki*,[19] the Cayuga Indian Nation (Cayuga) sought compensation from the state for land that had been out of its possession for 204 years. The issue at hand involved the valuation methodologies used by Cayuga's expert witness and by two expert witnesses for the federal and state governments. Although all three appraisers were considered to be acceptable in terms of specialized knowledge in real estate appraisal, a question arose concerning the qualifications of the two government appraisers to testify.

In essence, the argument against the two appraisers was that they did not have proper quantitative skills and therefore they were not qualified to testify about quantitative areas in valuation methodology. However, the court found that both appraisers could rely on quantitative disciplines as part of their appraisal methodologies and their qualifications to testify were not affected.

The court recognized that with the complex world "many problems cannot be resolved without taking an interdisciplinary approach."[20] The court concluded that because of the novel valuation situation in this case, none of the reliability and relevancy factors of *Daubert* were helpful. However, the court stated that *Daubert* still served a useful purpose in ascertaining that expert testimony in the courtroom is comparable to the activities of expert practitioners in relevant fields.

The methodology used by Cayuga's expert witness was the generally recognized sales comparison approach. Yet, the court found that application of the approach was suspect. The court did not believe that the expert witness's testimony satisfied the "reliability and relevancy considerations identified in *Daubert*."[21] The selection of the witness's comparable sales was questioned.

The expert witness for Cayuga subjectively selected four sales for each year and, after typically discarding the high and low sales, calculated an average price per acre for each year. The average price per acre per year was then multiplied by the number of acres in the claim to arrive at a value per year. The expert witness then computed the value for use and occupancy at 10% of the annual value.

The court was not able to determine with any degree of specificity how Cayuga's expert witness selected his comparable sales, thereby limiting the reliability of the witness's testimony. Furthermore, although his data analysis used a grid system, which recognized the possibility of adjustments to the comparable sale prices, he made no adjustments. Also, his sales data was not always accurately reported.

The court stated that the expert for Cayuga also used a discount rate that was based on speculation and had no reliable basis, and even if his appraisal report was reliable, the portion pertaining to the discount rate should have been excluded. In sum, although Cayuga's expert was qualified as an appraiser, his testimony was not reliable, was "outside the range where experts might reasonably differ,"[22] and so did not stand up to *Daubert* standards.

As for the two government appraisers, the court observed that both appraisers used some subjectivity in their sales analyses, particularly in estimating value for pre-1900 sales, but they both used reliable, objective data to extrapolate their conclusions. Both appraisers testified that the valuation methodologies used in the case were not used in previous situations. It was found that the methodologies were reliable and relevant and that they did not have to be perfect, just good.

The court indicated that even if there were flaws in the two government appraisers' methodologies, their opinions were admissible because their testimony was reliable and relevant. Since the court determined that their opinions passed the requirements of *Daubert*, it was left up to "the jury to decide which, if either, expert witnesses' testimony it [chooses] to accept."[23]

### Exxon Pipeline

The *Exxon Pipeline Company v. Hill*[24] case in Louisiana involved valuation methodology used in an eminent domain situation. Exxon was seeking to add an additional pipeline to a preexisting right-of-way. Exxon's expert witness contended the highest and best use of the land was agriculture on an interim basis with industrial being the long-term highest and best use. Exxon's appraiser then used comparable land sales to derive a unit sale price per acre and subsequently prorated that to a square footage amount, which was then depreciated by 80% for each subsequent servitude (easement), an accepted deduction.

---

18. Ibid., 1053.

19. *Cayuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318 (N.D.N.Y. 2000).

20. Ibid., 321.

21. Ibid., 323.

22. Ibid., 326.

23. Ibid., 328.

24. *Exxon Pipeline Co. v. Hill*, 763 So. 2d 144 (La. App. 1st Cir. 2000).

Copyrighted material licensed by Randall Bell on April 26, 2021

Hill's expert witness used a unit value of price paid per rod of pipeline (one rod equals 16.5 linear feet). The rod is a standard measurement in pipeline right-of-way negotiations, in contrast to area unit measurements, such as price per acre or price per square foot.

The trial court found the approach of Hill's expert witness to be unreliable and inadmissible because it failed on all four tests of *Daubert*. Hill's expert admitted he used an evolving technology, he had not published his technique, his approach had not been used in previous court testimony, nor had it been subjected to peer review. Hill's expert, however, explained that his methodology was in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) and was used in the market approach.

The appeals court found that at the time of the trial court's inadmissible ruling there was insufficient information concerning these kinds of reliability issues. The *Kumho Tire Company*[25] decision thus allows more flexible standards. Under *Kumho*, the specialized knowledge and experience of Hill's expert witness were used as evidence that his opinion was reliable.

Hill's appraiser had over 35 years of appraisal experience, had testified in over 200 cases, had a background in utility rights-of-way, and had appraised pipeline servitudes. In 1995, he appraised an additional servitude over one existing since 1936 on the Hill's property. At that time, he questioned the logic of the typical unit price per square acre/foot method and formulated the theory he currently uses on the price per rod. His premise still used the market approach, but was consistent with right-of-way sales for pipeline acquisitions.

The appeals court concluded that measurement by the rod was well accepted in the pipeline industry as a measure and value determination methodology. Therefore, the court allowed Hill's expert witness testimony and based the award on his valuation.

### Rogers

In the *Rogers v. Horseshoe Entertainment*[26] case, the court of appeals held that the district court erred in admitting an affidavit of value from the plaintiff's (Rogers's) real estate appraiser. Horseshoe Entertainment contended that the affidavit was inadmissible because it represented solely the opinion of the plaintiff's appraiser and was not based on the standards set forth in *Daubert*.

Rogers's appraiser owned one of Louisiana's largest appraisal services, had been in business over 20 years, and claimed that his appraisal conformed with USPAP. In conducting the valuation, the appraiser inspected the property, reviewed documents in the transaction, and examined the public records of the appropriate parish (county). The appeals court found, however, that he did not comply with USPAP because he did not outline his specific appraisal methodology "so that it could be subjected to peer review or duplication so as to ensure against error."[27]

Furthermore, the court found that the appraiser for Rogers did not comply with USPAP Rule 4-4 [sic][28] since he did not delineate the market area, analyze supply and demand for the market area, and did not forecast the effect of the proposed development. In fact, it stated that his value opinion "appears to have required no specific expertise or specialized skills other than the use of a calculator. As such, the appraisal represents a 'subjective belief or unsupported speculation' which is inadmissible under *Daubert*."[29] The case was remanded only for determination of value and any money due the plaintiff.

### Kraft

In a condemnation case in *Texas, Guadalupe-Blanco River Authority v. Kraft*,[30] the appellate court ruled on the value of real estate acquired for a pipeline easement, 30-feet wide by 4,600-feet long, or 3.2 acres out of a tract of 272 acres. The expert for Kraft (the property owner) valued the easement in the amount of $64,400 whereas the condemning authority offered a damage award of $7,630. The Guadalupe-Blanco River Authority (Authority) contended that the owner's expert witness used an unreliable methodology, therefore, the trial court should not have admitted the testimony, and consequently there was no evidence of $64,400 in damages.

Kraft's expert witness explained the three approaches to value and then testified that he used the sales comparison approach. Kraft's appraiser did not have comparable sales of narrow strips of land, but used two small-acreage sales with what he considered typical utility. One sale was 418 feet deep with 208 feet of frontage on a state highway, comprising two acres. The second sale was 144 feet by 302 feet, or 1.08 acres.

The Authority contended that testimony valuing a 30-foot by 4,600-foot site as a hypothetical rectangular tract is not recognized in the appraisal field. Furthermore, the value was "based on an assumption materially different from the undisputed facts."[31] The expert witness from the Authority "stated that in his opinion, an appraiser should 'look at the whole property; you look at the 272 acres, you take a portion or pro rata part of that, and that's the way you go about valuing the property.'"[32]

---

25.   *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. at 147, 119 S. Ct. at 1174 (1999).

26.   *Rogers v. Horseshoe Entertainment*, 766 So. 2d 595 (La. App. 2d Cir. 2000).

27.   Ibid., 606.

28.   The reference used from Westlaw referred to "Uniform Standards of Professional Appraisal Practice Rule 4-4," however there is no Rule 4-4 in the Standards. It appears that the reference should actually be Standards Rule 1-3 and/or 1-4(f).

29.   *Rogers*, 606.

30.   *Guadalupe-Blanco River Auth. v. Kraft*, 39 S.W.3d 264 (Ct. App. Austin. 2001).

31.   Ibid., 267.

32.   Ibid.

The Authority's expert contended that the easement was not a self-sufficient economic unit independent from the remaining property and, therefore, valued it as part of the whole, using the sale of large tracts. The question for the court was whether the method used by Kraft's appraiser, which used small-acreage tracts, could be a reliable valuation method and be admitted into testimony.

The court followed the reasoning that if one party presented evidence of market value then the other party should be able to present evidence of their competing theory. The court also recognized that expert testimony has special significance in eminent domain situations because the issue is one of property value "not abstract questions as to what may or may not be considered by the jury in assessing damages."[33]

Consequently, the court concluded that the use of small-acreage tracts was a reliable methodology and discrepancies in the shapes and sizes of tracts falls on the weight of the evidence and not admissibility. Therefore, the court affirmed the judgment of the trial court.

### Wilhite

In a Kentucky Supreme Court case, *Wilhite v. Rockwell International Corporation*,[34] an exclusion of testimony ruling by the Court of Appeals of Kentucky[35] was upheld. Rockwell had discharged polychlorinated biphenyls (PCBs) into streams that flowed past farms, thereby contaminating adjoining farm properties. Wilhite's expert witness testified at the original jury trial that the impact of the contamination exceeded the value of the properties, and, therefore the value of the property after contamination was worthless. The trial court awarded over $7.5 million in compensatory damages and $210 million in punitive damages.

Rockwell appealed and the appellate court found that the testimony of Wilhite's expert witness did not satisfy the requirements of *Daubert* and should have been excluded. All courts involved agreed that Wilhite's expert was qualified as an appraiser to testify. Although Wilhite's expert witness had no experience in appraising contaminated properties, he educated himself by attendance at seminars, conducted research, and conferred with other appraisers. He then developed an empirical model to use for his valuation estimate, rather than using one of the commonly accepted appraisal valuation models.[36]

The opinion of Wilhite's expert was that "a reasonable person would not farm or otherwise use PCB contaminated property until it has been thoroughly tested and, if necessary, remediated."[37] However, Wilhite's expert "admitted that this was merely his subjective opinion and pointed to no scientific evidence to support his view."[38] The appellate court stated that Wilhite's expert witness's empirical model, "constructed for this case and untested in any other forum, finds no support in the literature. It has not been subjected to peer review … [t]here is no scientific basis for the assumption upon which it rests."[39]

In referring to Wilhite's expert, the Kentucky Supreme Court stated the "testimony was not insufficient, it was inadmissible. As it was persuasive evidence supporting the verdict and final judgment, the Court of Appeals properly reversed and we affirm that portion of the decision."[40] The case was then remanded to the previous courts for matters other than valuation.

### McLemore

In an interstate highway condemnation case, *Mississippi Transportation Commission v. McLemore*,[41] the Supreme Court of Mississippi held that testimony by the defendant's expert was inadmissible and remanded the case back to the trial court for a new trial. The McLemores owned 1,980 acres of land, of which 174 acres was required for construction of an interstate highway. Negotiations for acquisition failed and the trial court awarded the McLemores $1,370,000 for compensation and damages. The Mississippi Transportation Commission appealed based on *Daubert*, arguing that the court has a gatekeeping responsibility in requiring that the admissibility of expert testimony focus on relevance and reliability.

The focus of the appeal concerned reference by the McLemores' expert witness to a 750-foot line of damage method. The expert's 750-foot method concluded that there was a buffer zone between 500 feet and 1,000 feet from the proposed interstate right-of-way where construction of the interstate highway would not affect the property's desirability. The appraiser arbitrarily split the buffer zone in half to arrive at the 750-foot distance. He then determined that the buffer zone contained 317 acres, an area that suffered from greater damage than the remainder of the property.

In testimony, the McLemores' expert witness stated, "This is what I consider breaking new ground in that there is a situation here where I think there is no question that the after value is affected by this highway."[42] He further commented that the use of existing

---

33.    Ibid., 271.

34.    *Wilhite v. Rockwell International Corp.*, 83 S.W.3d 516 (Sup. Ct. Ky. 2002).

35.    *Rockwell International Corp. v. Wilhite*, 2000 WL 95282 (Ky. App. Jan. 14, 2000).

36.    The commonly accepted appraisal models are the sales comparison approach, the cost approach, and the income capitalization approach. See Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 62–63.

37.    *Wilhite*, 519.

38.    Ibid.

39.    Ibid., 520.

40.    Ibid., 522.

41.    *Mississippi Transportation Comm'n. v. McLemore*, 863 So. 2d 31 ( Sup. Ct. Miss. 2004).

42.    Ibid., 41.

Copyrighted material licensed by Randall Bell on April 26, 2021

methods of valuation were inapplicable because the same situation(s) did not exist.

Upon cross-examination, the expert testified that the method he used was not printed in any textbook, and was not taught in seminars or in any courses he had completed to obtain his appraiser's licenses. He also testified that the 750-foot line method was unique to the McLemores' appraisal and was not a "principle of any kind."[43]

The court found the testimony by the McLemores' expert witness to be speculative and inadmissible under the requirements of *Daubert*, and the testimony should therefore have been excluded. The court pointed out that the expert's 750-foot method had not and could not be tested, because the 750-foot boundary line was not based on any principle in the appraisal field; the methodology had not been peer reviewed; there was a high potential for error with the method; there were no standards controlling the 750-foot line method; and since the method was unique to the McLemores' appraisal, the appraisal community had not accepted the theory and therefore it was not generally accepted in the appraisal field.

### Elliott

In *Elliott v. Town of Stonington*,[44] the plaintiffs appealed a residential property tax assessment of $1,263,800 arguing that the fair market value was instead $1,100,000. Elliott's expert witness analyzed three comparable sales that occurred within one year of the valuation date. The sales were similar in size, location, and physical features as the subject property. Elliott's expert witness used the Uniform Residential Appraisal Report form to make adjustments to each comparable sale.

The expert witness for Stonington looked at 14 sales ranging from three years prior to the date of valuation to two years after the valuation date. Stonington's expert testified that he ignored one sale within six months of the valuation date because it was a two-family property; however, Elliott's expert witness, who also used the sale, indicated in his testimony that it sold as a single-family home.

Furthermore, Stonington's expert used another comparable that was a two-family home that was sold as a two-family home. Stonington's expert did not use another comparable sale within one year of the valuation date, thereby leaving only one sale within one year of the valuation. The remaining sales used were one year old or more after the valuation date.

After discounting sales that he felt were not comparable, Stonington's expert had eight sales remaining for analysis. For his adjustments, he used a methodology that was not accepted in the appraisal industry, namely making adjustments to the comparable sale prices in plus or minus 5% increments. Furthermore, his analysis showed inconsistencies in many of the categories in which he made adjustments.

The plaintiff cited *Daubert* as grounds to exclude the testimony of the expert witness for Stonington. Stonington's expert witness argued that he used a valid appraisal method and "the court should look to Connecticut law and Connecticut rules of evidence and not federal case law and federal rules of evidence."[45]

The court found that the appraisal of Elliott's expert witness was superior to that of Stonington's expert and that his methodology was easily understood and a method utilized by appraisers. Also, the comparables were closest in time of sale to the date of valuation and had similar location and physical attributes. The court stated that Stonington's "appraisal appears to be results driven by employing a suspect methodology that was poorly explained, inconsistent and not standard in the appraisal industry."[46]

The court noted that in previous cases, appraisals by Stonington's expert witness have been rejected in favor of those prepared by the expert witness used by Elliott. The court directed the Town of Stonington to adjust the assessment in favor of the plaintiff.

### Verizon Northwest

Appraisal methodology was questioned in a condemnation case, *Verizon Northwest, Inc. v. Riverside Development Co.*,[47] where the defendant argued that the appraisal report by Verizon's appraiser did not meet the Daubert test and should therefore be excluded. The property was an easement acquisition in Idaho and because the parties could not reach an agreement, a lawsuit was brought for damages.

Riverside contended the appraisal report by Verizon's expert witness was deficient because it did not use the before and after rule, which "is universally *recommended* for a partial taking easement acquisition"[48] and he did not include severance damages. Verizon's expert used a highest and best use analysis and the sales comparison approach to estimate a value per square foot for the part taken.

Idaho law allows compensation for the portion taken, plus damages to the remainder, if any. The court said it could not find any Idaho case law indicating that the larger parcel always must be appraised. Furthermore, although industry standards may recommend the before and after rule, the use of a different approach does not make the appraisal "deficient or junk science."[49] Finally, the court said that even though

---

43.   Ibid.

44.   *Elliott v. Town of Stonington*, 2005 WL 1153621 (Conn. Super. Ct. Apr. 15, 2005).

45.   Ibid., *3.

46.   Ibid., *4.

47.   *Verizon Northwest, Inc. v. Riverside Development Co.*, 2006 WL 620360 (1st Dist. Ct. Id. Mar. 1, 2006).

48.   Ibid., *2.

49.   Ibid., *3

Verizon's appraiser did not report any severance damages, the lack thereof did not make the methodology deficient, and he remained qualified to testify as an expert.

## Matthews

In a Mississippi airport condemnation case, *Tunica County v. Matthews*,[50] the county was expanding an existing airport and contested a value of $4,500 per acre for the Matthews's land, as determined in the Special Court of Eminent Domain. Matthews's expert witness valued the land as a highest and best use of commercial or industrial property with a value of $4,500 per acre. The county's expert, however, considered the highest and best use as limited residential or institutional with an agricultural interim use with a value of $2,000 per acre.

Both experts agreed that the proper methodology to value the land was the comparable land sales approach. However, Tunica filed a motion to exclude the testimony of the expert for Matthews. This motion was granted, in part, because "the trial court found the use of commercial sales as comparables and the reliance on a highest and best use of commercial and industrial to be unreliable."[51] After reanalysis, the value opinion of Matthews's expert remained unchanged, at $4,500 per acre.

In his new analysis, the expert witness for Matthews claimed to use a different approach. In the new valuation, out of the nine sales previously used, the five highest-valued comparable sales were excluded, which ranged from $26,000 to $100,000 per acre. The expert retained the remaining four sales, which ranged from $5,000 to $18,500 per acre. The appraiser also based part of his opinion on a land-use study of the airport expansion.

Because the appraised value remained unchanged, Tunica sought to exclude Matthews's expert witness testimony because it offended basic scientific principles and was based on improper methodology. Matthews argued that "appraisal is much more complicated than a simple mathematical calculation, but instead requires analysis of all applicable information and data."[52] Furthermore, the land value of $4,500 per acre was lower than all of the expert witness's comparable sales both before and after the court order, and lower than six of the nine comparable sales used by the county.

The Supreme Court of Mississippi found that the correct valuation of the land was a jury question and the trial judge was correct in admitting the testimony of the expert witness for Matthews. The expert's testimony "was based upon sufficient facts or data, was the product of reliable principles and methods and was based on principles and methods reliably applied to the facts of the case"[53] and therefore met the *Daubert* test.

## Lambrinos

In the contamination case, *Lambrinos v. ExxonMobil Corporation*,[54] the plaintiffs brought suit concerning the contamination of their property by benzene and gasoline releases. In a motion for summary judgment, ExxonMobil was found liable. The current case involved the amount of damages to be awarded to clean up the plaintiffs' property.

Both parties filed *Daubert* motions questioning the admissibility of the testimony of each other's expert witness. Of interest to real estate appraisers was the intended testimony of Lambrinos's expert concerning the value of the property, land, and improvements on the property.

Lambrinos's concern, in the event the property was not restored to its prespill condition, was the value of the property without environmental contamination. If the property could not be restored to its prespill condition, then the damages would include the loss in value plus the cost of repairs. If this were the case, the court could then consider evidence concerning a stigma on the property value resulting from the oil spill.

The expert testimony Lambrinos intended to submit was an appraisal report dated October 18, 1999. ExxonMobil argued that under Daubert the testimony and appraisal report of Lambrinos's expert witness must be excluded because it was not relevant. The court agreed and excluded presentation of the appraisal report because it "is simply too outdated to be probative as to the value of the property seven years later, in 2006."[55]

## Conclusion

In two cases (*Texaco Producing and Exxon Pipeline*), ratios not previously used in appraisals were considered acceptable. In the *Texaco* case the two ratios were not considered to be scientific evidence, but instead were used to show differences in comparable sales. In the *Exxon* case the ratio was typically used in the pipeline industry for valuation purposes.

In *Suna Associates*, the court found new methodology was acceptable because it was reliable and relevant, even though it did not specifically meet the four tests of *Daubert*.

In *14.38 Acres of Land*, *Cayuga Indian Nation*, *Rogers*, *Wilhite*, and *McLemore*, the courts ruled that subjective data and arbitrary data were not admissible. However, the *Cayuga* court indicated that some subjectivity was acceptable if objective data was used to extrapolate conclusions. It was up to the jury to decide which testimony to accept.

---

50.  *Tunica County v. Matthews*, 926 So. 2d 209 (Sup. Ct. Miss. 2006).

51.  Ibid., 215.

52.  Ibid., 214.

53.  Ibid., 216.

54.  *Lambrinos v. ExxonMobil Corp.*, 2006 WL 2238977 (N.D.N.Y. Aug. 4, 2006).

55.  Ibid., *7.

Copyrighted material licensed by Randall Bell on April 26, 2021

Similarly, in *Kraft*, *Verizon Northwest*, and *Matthews*, the courts said that the correct value was left to the jury when testimony was based on reliable methods and sufficient data. The court in *Elliott* emphasized the admissibility of evidence when the methodology was understood and used by appraisers versus methodology that was poorly explained, inconsistent, and not typically used by appraisers.

Finally, the courts have found that data must be current to be relevant. This is standard appraisal practice and was of importance in *Lambrinos* and *Elliott*.

A major lesson learned from the legal cases presented in this article is that expert witness appraisers appear to have some latitude in using new methodologies when preparing their appraisal reports. In fact, the methodologies do not have to strictly comply with the four *Daubert* tests (testing, peer review, error rate, and acceptance). Furthermore, these cases indicate that the methodology and data must be reasonable, reliable, and easily understood. The data must comply with generally accepted appraisal practices to hurdle the *Daubert* gatekeeper function and remain as expert evidence.

Although mentioned in only *Rogers*, one can conclude that compliance with the Uniform Standards of Professional Appraisal Practice and generally accepted appraisal practices should have a positive effect on the court gatekeeper in accepting the methodology used by the appraisal expert witness.

Of interest to real estate appraisers is the discovery that the courts are taking disparate directions, and currently there does not appear to be any visible pattern among the courts.

Another issue pertaining to an appraiser expert witness, other than the use of methodology, involves the qualifications of that expert to present testimony. This is an area of future research and the authors intend to address the subject of appraisal expert witness qualification under *Daubert* in a subsequent paper.

### Additional Reading

Friedman, Jack P., and Nicholas Ordway. "Appraisal Review in a Litigation Support Role." *The Appraisal Journal* (January 2000): 20–31.

Hoyt, Richard W., and Robert J. Aalberts. "Toxic Mold Liability Update: Implications of *Kilian v. Equity Residential Trust*." *The Appraisal Journal* (Spring 2006): 174–182.

Weber, Bruce R. "Environmental Uses of GIS, the Scientific Method and *Daubert*." *Valuation Insights and Perspectives* (Third Quarter 2002): 9–12, 38.

## 9.3 *Daubert* and Qualification of the Appraisal Expert Witness

*by Richard W. Hoyt, PhD, MAI, SRA, Robert J. Aalberts, JD, and Percy Poon, PhD*

This article originally appeared in the Summer 2010 issue of *The Appraisal Journal*.

### Abstract

Since *Daubert v. Merrell Dow Pharmaceuticals* was decided in 1993, there have been two primary issues in applying *Daubert* to expert testimony in valuation situations: qualification of an expert witness and the use of methodology. This article examines cases in which *Daubert* has been applied to the question of witness qualifications in real estate valuation. The cases reviewed indicate that courts have not strictly complied with the *Daubert* tests when considering the acceptance of a real estate expert witness. The courts have different interpretations in the application of *Daubert* for expert witness qualification, and there is some latitude for those permitted to testify on real estate value.

In 1993, the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1] set a new and far-reaching standard for the admissibility of expert testimony as required under Rule 702 of the Federal Rules of Evidence. Under *Daubert*, the court acts as a gatekeeper in the admission of expert testimony. Before *Daubert*, the courts relied on a narrower interpretation of Rule 702, named the *Frye* rule.[2] The *Frye* rule qualifies expert witnesses based upon their knowledge, skill, experience, training, and education. It also looks at testimony as to its general acceptance in the scientific community. *Daubert* supersedes the *Frye* rule in federal courts and many state courts.

Under the *Daubert* standard, prior to the admission of expert testimony, the court must consider the following: (1) whether the theory has or can be tested; (2) if the theory has been subjected to peer review and publication; (3) if there is a known rate of error; and (4) general acceptance of the technique in question.

There have been two primary arguments when applying the *Daubert* test to expert testimony in real estate situations: the qualification of expert witnesses and the methodology used. This article examines cases involving real estate valuation situations and the qualification of real estate expert witnesses.

A previous article in *The Appraisal Journal* considered cases in which the *Daubert* factors were applied to the methodology used when the valuation of real estate was an issue.[3] That article showed how the courts interpret and apply the *Daubert* factors differently. It also discussed how a court's interpretation of the methodology used by the expert witness may have real implications for real estate appraisers and other real estate professionals who are called on to act as expert witnesses.

The current article extends the previous research by examining how courts decide what qualifications are necessary for those who are hired to be experts in cases in which real estate appraisal and valuation are pivotal issues. Some of the same court decisions used in the earlier article are discussed again here, but in the context of expert qualifications—an issue distinct from but related to the methodology issue. If both methodology and qualifications are challenged, the court must rule on these issues independent of each other. Put another way, an appraiser may be qualified, but if his or her methodology is faulty the testimony may be thrown out by the judge or discounted by the jury. Likewise, an appraiser may have an acceptable methodology, but may not be qualified as an expert witness and as such, not allowed to testify.

---

1. 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

2. 293 F. 1013 (D.C. Cir. 1923); and *Federal Rules of Evidence for United States Courts and Magistrates* (St. Paul, MN: West Publishing Co., 1975). Rule 702 qualifies expert witnesses based upon their knowledge, skill, experience, training and education. It looks at testimony as to its general acceptance in the scientific community.

3. For a discussion on the use of *Daubert* in methodology situations and real estate valuation, see Richard W. Hoyt and Robert J. Aalberts, "*Daubert* and the Appraisal Expert Witness Revisited," *The Appraisal Journal* (Spring 2008): 168–178.

**Richard W. Hoyt, PhD, MAI (ret.), SRA (ret.),** is Emeritus Professor of Finance/Real Estate at the University of Nevada, Las Vegas. He received his PhD from the University of Arkansas. He chaired the Appraisal Institute's Research Advisory Board and served on the Research Committee. Hoyt was also a member of the Body of Knowledge Task Force for the Appraisal Qualifications Board. His work has previously been published in *The Appraisal Journal* and other real estate publications.

**Robert J. Aalberts, JD,** is the Ernst Lied Professor of Legal Studies at the University of Nevada, Las Vegas. He received his JD from Loyola University and MA in geography from the University of Missouri, Columbia. His work has previously been published in *The Appraisal Journal* and other real estate publications.

**Percy Poon, PhD,** is Associate Dean for Administration and Outreach at the College of Business and former chair of the Department of Finance at the University of Nevada, Las Vegas. He received his PhD from Louisiana State University. His work has previously been published in the *Journal of Finance*, *Journal of Banking and Finance*, *Financial Review*, *Financial Practice and Education*, *American Business Law Journal*, *Ohio State Law Journal*, *Journal of Real Estate Practice and Education*, and *Review of Quantitative Finance and Accounting*.

The authors wish to thank the Lied Institute of Real Estate Studies for its support of real estate education and research at the University of Nevada, Las Vegas.

Copyrighted material licensed by Randall Bell on April 26, 2021

## Research Methodology

The database of Westlaw was searched using the search terms *Daubert* and *appraisers* to access relevant court cases. From the results, cases were isolated pertaining to the qualifications of expert witnesses. Several different interpretations in the application of *Daubert* were noted. Table 1 summarizes the eight cases that were reviewed. Understanding that courts have various interpretations of *Daubert* is important for real estate appraisers and other real estate professionals testifying as expert witnesses. Such knowledge can help experts best prepare their testimony and help advise their clients about possible arguments that may arise in a litigation situation.

## Summary of Appraisal Qualification Cases
### Hidden Oaks

The 1998 case of *Hidden Oaks Limited v. City of Austin*[4] involved an appeal to an inverse condemnation case in which the city placed utility holds on an apartment complex with substandard units, and the owner sought damages for lost rent. Hidden Oaks was the owner of the Stoneridge Apartments, a thirty-year-old, eight-building, 137-unit complex located in Austin, Texas. The city alleged that some of Stoneridge's windows were of insufficient size to serve as exit routes in case of fire, and some balconies and walkways were rotting and needed repair. To deter use of the units, the city placed a utility hold on the entire complex in 1994, with a subsequent building-by-building release followed by unit-by-unit releases. The last utility hold was released in 1996.

Hidden Oaks sought damages for lost rent and a jury awarded it $231,089. Both the city and Hidden Oaks appealed. One of the arguments by Hidden Oaks was that the district court had found its expert witness unqualified to testify as an expert in appraising property. The expert was a senior vice president of the owner of Hidden Oaks and bought and sold properties for the owner. This process involved evaluating the properties' worth. The witness testified that he was not a licensed real estate appraiser and was not licensed as a real estate broker. Furthermore, he had no formal schooling in appraisal methods, and he did not fully respond to questions concerning appraisal theory.

The appeals court concurred with the district court, holding that it acted within its discretion to exclude the witness's testimony as an expert in the valuation of Stoneridge. However, Hidden Oaks argued that the expert should have been able to testify as an owner, and the appeals court agreed, saying "we adhere to the general rule that an owner always may testify as to value, whether assessed as of the time of trial, or at some definitive point in the past."[5] For other reasons, the appeals court then vacated the damage award and remanded the case for further proceedings.

### West Virginia Division of Highways

*West Virginia Division of Highways v. Butler*[6] is a condemnation case in which the circuit court ordered the West Virginia Division of Highways (DOH) to pay $26,600 in compensation for a partial taking of Butler's property. Butler appealed to the Supreme Court of Appeals of West Virginia, contending that an expert witness was excluded from testimony because he was not certified or licensed as an appraiser, and he was not qualified to testify as an expert on property value. The expert in question was a corporate secretary and real

| **Table 1** | Summary of Cases Involving *Daubert* and Expert Witness Qualifications | | | |
|---|---|---|---|---|
| **Case** | **State (Year)** | **Appraisal Assignment** | **Court** | **Key Factors** |
| *Hidden Oaks Limited v. City of Austin* | Texas (1998) | Inverse condemnation | U.S. Court of Appeals | Witness qualifications |
| *West Virginia Division of Highways v. Butler* | West Virginia (1999) | Condemnation | Supreme Court of Appeals | Witness qualifications |
| *Cayuga Indian Nation of New York v. Pataki* | New York (2000) | Involuntary taking | U.S. District Court | Witness qualifications |
| *Wilhite v. Rockwell International Corp.* | Kentucky (2002) | Contamination | Supreme Court of Kentucky | Witness qualifications and methodology |
| *Conner v. Board of County Commissioners, Natrona County* | Wyoming (2002) | Condemnation | Supreme Court of Wyoming | Witness qualifications and methodology |
| *Hebbler v. Turner* | Louisiana (2004) | Business valuation | U.S. District Court | Witness qualifications |
| *Simek v. J. P. King Auction Co.* | Wyoming (2005) | Sale price | U.S. Court of Appeals, Tenth Circuit | Witness qualifications |
| *Ice Embassy, Inc. v. City of Houston* | Texas (2006) | Site availability | U.S. District Court | Witness qualifications and methodology |

---

4.    138 F.3d 1036 (5th Cir. 1998).

5.    Ibid., 1050.

6.    516 S.E.2d 769, 775 (Sup. Ct. W. Va. 1999).

estate manager for a convenience store and truck stop company that had an interest in purchasing the appellant's property, but did not purchase the property on learning of the DOH's plan to widen the highway.

The circuit court excluded the expert's testimony based on an interpretation of West Virginia's code regarding real estate appraiser licensing and certification. It believed that the lack of a license or certificate prohibit in-court testimony pertaining to a real estate value opinion. The appellate court looked to West Virginia's Rule 702, which allows witnesses to testify and render an opinion, based upon their knowledge, skill, experience, training, or education. The expert had been involved in property selection for twenty years, purchased real estate for the company in two states, and had taken appraisal and property selection classes.

Applying West Virginia's Rule 702 to the case, the court noted that additional steps, beyond identifying witness qualifications, must be taken pursuant to the court's gatekeeper role under *Daubert*. Specifically, it stated that when scientific evidence is offered the "court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science."[7] Second, the scientific testimony must be relevant.

Although the DOH contended that the expert lacked sufficient knowledge for testimony, the court ruled that the weight of testimony would show any lack of knowledge and did not prohibit its admissibility. The appellate court reversed the circuit court decision to exclude the testimony of the expert witness for lack of an appraisal license or certificate and remanded the proceedings.

### Cayuga Indian Nation of New York

In 2000, the Cayuga Indian Nation sought compensation from the State of New York for land that had been out of their possession for 204 years. During the case, *Cayuga Indian Nation of New York v. Pataki*,[8] an issue arose concerning the valuation methodologies used by the tribal expert witness appraiser and the two appraisal expert witnesses for the federal and state governments. All three appraisers were considered to be acceptable in terms of specialized knowledge in real estate appraisal, but a question arose concerning the qualifications of the two government appraisers.

The argument against one government witness's qualifications was that he was not an economist or a statistician, and therefore, he was not qualified to testify about these areas in valuation methodology. Similarly, the argument against another government appraiser was that he was not a mathematician, a statistician, or a computer scientist and therefore he was also unqualified. However, the court found that both appraisers could rely upon quantitative disciplines as part of their appraisal methodology, and their qualifications to testify were not affected.

The court recognized that the world is complex and "many problems cannot be resolved without taking an interdisciplinary approach."[9] The court concluded that because of the novel valuation situation in this case none of the reliability and relevancy factors of *Daubert* were helpful. The court, however, stated that *Daubert* still served a useful purpose in ascertaining that expert testimony in the courtroom is comparable to the activities of expert practitioners in relevant fields.

### Wilhite

In the case of *Wilhite v. Rockwell International Corporation*,[10] the plaintiffs originally were awarded $7.5 million in compensatory damages and $210 million in punitive damages (the cost to remediate the land) for the release of polychlorinated biphenyl (PCB) by Rockwell and subsequent contamination of farmland. The defendant appealed and the decision was reversed.

On appeal, Rockwell argued that testimony of the principal expert for the appellant landowners should not have been admitted. The compensatory damage award depended almost entirely on the appellant's appraisal expert, who had no experience in the valuation of contaminated properties. The appeals court found that the appraiser over the course of his career had conducted several hundred commercial appraisals and several thousand single-family residential appraisals for numerous clients. He was a licensed appraiser and also held a professional appraisal designation.

Although the appraiser had no experience in appraising contaminated land, he did attend seminars, conduct research, and confer with two other appraisers.[11] He then developed an empirical model for use in his valuation, rather than rely on one of the three commonly accepted valuation approaches.[12] His model opined that floodplain land with any level of PCB contamination is essentially worthless, and there may be a negative value because of the cost of remediation. The appraiser admitted that this was his subjective opinion and he had

---

7.   Ibid., 774.

8.   83 F.Supp.2d 318 (N.D.N.Y. 2000). After the state was found liable to the Indian tribes for appropriation of their land and damages were determined by the jury, the court addressed an issue of prejudgment interest. The decision affected the amount of the jury award but did not involve the qualifications of the real estate expert witnesses. See *Cayuga Indian Nation of New York v. Pataki*, 165 F.Supp.2d 266 (U.S. Dist. Ct. N.Y. 2001). The Federal District Court case was subsequently appealed to the 2nd Circuit Court of Appeals, see 413 F.2d 266 (2nd Cir. 2005) also on the issues of the amount of prejudgment interest awarded and the denial of the remedy of ejectment. The issue of the qualifications of the real estate expert witness was not addressed.

9.   Ibid., 321.

10.  83 S.W.3d 516 (Sup. Ct. Ky. 2002).

11.  These are steps taken to comply with the Competency Rule of the Uniform Standards of Professional Appraisal Practice; see Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice*, 2010–2011 ed. (Washington, DC: The Appraisal Foundation, 2010), U-11.

12.  The three commonly accepted appraisal models are the sales comparison approach, cost approach, and income capitalization approach. See, Appraisal Institute, *The Appraisal of Real Estate*, 13th ed. (Chicago: Appraisal Institute, 2008), 141–143.

Copyrighted material licensed by Randall Bell on April 26, 2021

no scientific evidence to support his view. The appeals court, following *Daubert* found that since the appraiser's testimony was the only evidence for the fair market valuation award, the judgment should be reversed.

On review, the Kentucky Supreme Court agreed with the state's intermediate appeals court, ruling that the expert's testimony should not have been admitted into evidence. However, the high court did remand the case back to the trial court since there was other evidence supporting the conclusion that permanent injury did occur to the land in question for which the landowners would be entitled to compensation.[15]

Thus, even though the appraiser in *Wilhite* appeared to be qualified and apparently complied with the Competency Rule of USPAP, his methodology was faulty, resulting in a new trial.

## Conner

*Conner v. Board of County Commissioners Natrona County*[14] involved an eminent domain proceeding for the taking of 2.21 acres of land as part of a water easement. Three witnesses were involved: the two plaintiff witnesses were the property owner and a real estate agent/appraiser, and the county witness was a real estate appraiser. The Wyoming Supreme Court concluded that although owners may testify to their property value, it does not necessarily mean that their assessment is competent. The court stated, "An owner is only qualified to express an opinion of value in a reasonable way and in accordance with the proper standards for determining fair market value; what it is worth to him is not a correct basis."[15] After reviewing the transcript, the court concluded that the owner "had provided vague, unsupported estimates of the property's value."[16]

The real estate agent/appraiser was assisting the owner without charge and stated that he could not find any comparable properties with condemned portions taken, that were similar to the owner's property. Therefore, he could not perform an appraisal and was unable to provide an opinion about the impact of the condemnation upon the value of the property. He did state a listing price for the property, but did not explain if it was for the taking or the entire tract, and he did not provide a foundation for the listing price. The court conferred with the plaintiff's attorney about what was required to prove condemnation damages, and found that the two witnesses had not provided that evidence.

The last witness for the county was the appraiser who prepared the appraisal for the county board. He had twenty-six years of appraisal experience, held several appraisal designations, and was associated with state and national real estate appraisal organizations. He prepared the appraisal in conformance with USPAP "to arrive at a supportable and defensible estimate of the market value for the whole parcel of the subject property, the market value of the proposed taking, and the estimate of any damages, if any."[17] The supreme court concurred with the district court on the competence of the evidence and the damages value as testified by the county's appraisal expert witness.

## Hebbler

In *Hebbler v. Turner*,[18] the forced liquidation of a law firm pitted the employees and shareholders against the major shareholder defendant as to the handling of the fiduciary claims and liquidation of the firm. The valuation question in *Hebbler* involved an accusation that the defendant breached his fiduciary duty by overcharging the firm rent for a building that he owned.

The defendants' expert witness was a commercial real estate agent who mostly worked in commercial leasing. She had almost twenty years of experience as a commercial real estate agent, but was neither a licensed real estate broker nor a licensed real estate appraiser. She had not testified at trial or in a deposition in the preceding four years, and she was not the author of any publications in the preceding ten years. The plaintiffs contended that her testimony did not meet the admissibility criteria of *Daubert* because it was not based upon reliable methodology.

The court found that the report prepared by the witness did not demonstrate the use of any standard principles of real estate appraisal and that the witness did not indicate in the report that she had "employed generally accepted methods of commercial lease appraisal."[19] She only stated that she relied on her knowledge, company listings, and additional materials. She did not provide comparable listings or present any valuation formulas used to arrive at her opinion.

In effect, the court indicated that the expert supplied little more than her vita, opinion, and "the promise that she relied on unprovided, non-referenced comparable materials in reaching her conclusion."[20] The court concluded that she should not be allowed to testify as any expert in commercial real estate valuation.

## Simek

*Simek v. J. P. King Auction Company*[21] involved an auction of the plaintiff's property for less than the plaintiff thought it was worth. The auction was conducted as an

---

13.   *Wilhite*, 83 S.W.3d at 522.

14.   54 P.3d 1274 (Sup. Ct. Wyo. 2002).

15.   Ibid., 1284.

16.   Ibid.

17.   Ibid., 1285.

18.   No. Civ. A. 03-388, 2004 WL 414821 (E.D.La. Mar. 3, 2004).

19.   Ibid., at *3.

20.   Ibid., at *4.

21.   160 Fed.Appx. 675 (10th Cir. (Wyo.) 2005).

absolute auction in which the property was sold to the highest bidder, instead of a reserve auction in which the seller reserves the right to not sell if the bid does not exceed a minimum amount.

The sale price was $1,155,000, which was less than the mortgage of $1,256,027. The plaintiff believed the property was worth at least $3 million and appealed. Simek sought to have the testimony of the representatives of the auction company excluded under the provisions of *Daubert* and to have a new trial declared. The auction company representative, as a witness, introduced the county assessor's assessment of Simek's property, which was approximately $1.5 million. His testimony was to show that the final sale price was close to the assessed value.

Simek's argument was that the district court did not properly perform its gatekeeping role under *Daubert* and the *Frye* rule, and testimony should have been excluded because the court did not evaluate the reliability of the assessment. The court held that although the tax record was relevant to the case, it was not automatically subject to *Daubert*.

Simek also questioned the testimony of another auctioneer under the provisions of *Daubert*. Both auction company representatives presented testimony concerning their experience in the auction business and the relationship between appraisals, tax assessments, and sale prices at auction. Wyoming law requires appraisers to be licensed for testimony, but the trial court has the discretion to accept testimony from a person who has special knowledge or experience.

Neither witness presented their own appraisal of the fair market value of the property. Consequently, the court concluded their qualifications to perform an appraisal were irrelevant and that "neither the testimony of an experienced auctioneer regarding an appraiser's valuation of the vendor's property, nor the testimony of the auction company's executive vice-president on an appraisal and assessment, were subject to *Daubert*."[22] Therefore, the appeals court affirmed the district court's denial for a new trial.

### Ice Embassy, Inc.

In 1997, the City of Houston enacted an ordinance with distance requirements for the operation of sexually oriented businesses. The City of Houston conducted an investigation into the availability of alternative sites for such businesses and ultimately found that the ordinance would require relocation of 95 of 119 such businesses. The city used two employees, one from the city planning department and one from the police department vice division, to conduct an alternative site investigation.

The planning employee used a computer-based analysis to make a cursory analysis of all property in the city to see how many properties would be available for more investigation. He found thousands of potential sites. One of the police officer's normal duties prior to the 1997 ordinance was to investigate locations for sexually oriented business permits. The officer refined the planning department employee's list and examined actual physical locations so as to identify realistic available sites that would qualify under the distance requirements of the new ordinance.

After identifying 200 possible sites, the police officer was told to stop his investigation, although many more potential sites were on the list. In *Ice Embassy, Inc. v City of Houston*[23] the plaintiffs alleged the 200 properties listed were inadequate as alternative sites and sought to exclude the testimony of the city's employees as expert witnesses. In earlier testimony, the plaintiffs had sought to exclude the witnesses' expert opinions under Rule 702; however, the court rejected their challenge.

The U.S. District Court, in determining the qualifications of the two witnesses, applied standards from both *Daubert* and *Kumho Tire Co. v. Carmichael*.[24] Applying *Daubert*, the court recognized that the reasoning or methodology must be valid, reliable, and able to be applied to the facts at issue. It stated that although *Daubert* identifies four general factors to consider in evaluating reliability of the evidence, it is possible for the court to allow an expert to testify without addressing each factor. Furthermore, the *Daubert* analysis does not prove that the testimony by the expert is correct, only that the expert's opinion is admissible and should be left for consideration by the jury.

The district court noted that the planning department employee was not a certified city planner or computer programming expert, but that the evaluation of proposed sites for sexually oriented businesses was one of his job responsibilities. His testimony involved how he conducted his research and the subsequent results. The police officer testified that he went to hundreds of the identified sites and evaluated whether they met the distance requirements of the ordinance and were suitable for operation of a sexually oriented business.

The court noted that the evidence collected by both experts is not based on the scientific, technical, or other specialized knowledge required under Rule 702, but was the result of knowledge gained from years of experience in their respective employment positions and therefore was admissible under Rule 701 of the Federal Rules of Evidence, which governs lay witnesses.[25] Furthermore, the court noted that although *Daubert* looks at testing, error rates, and peer review, these factors are not relevant in the current case. Following the *Kumho* guidelines, the court stated that the two experts "performed their assignments and reached their conclusions in this case using the same level of intellectual rigor that characterizes the practice of an expert in the

---

22. Ibid., 675.

23. No. H-97-0196, 2006 WL 2434480 (S.D.Tex. Aug. 22, 2008).

24. 526 U.S. at 147, 119 S.C. at 1174 (1999), ruling that the trial judge must ensure that scientific testimony is not only relevant, but also reliable.

25. *Federal Rules of Evidence for United States Courts and Magistrates*. Rule 701 allows opinions or inferences from a lay witness if they are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Copyrighted material licensed by Randall Bell on April 26, 2021

field of identifying potentially available sites,"[26] and it allowed the witnesses' testimony.

## Conclusion

This article examines court cases involving the qualifications of expert real estate witnesses, using *Daubert* and other reasoning by the courts. In *Hidden Oaks*, the witness was disqualified as an expert in valuation concerning the value of the property, but was permitted to testify as an owner. In *West Virginia Division of Highways*, although the witness was involved in property selection, and had taken property selection as well as appraisal classes, the circuit court excluded him because of the lack of an appraisal license or certificate. However, the appellate court reversed, stating that the testimony itself would show any lack of knowledge and its admissibility was not affected by the lack of a license.

The *Cayuga Indian Nation* case acknowledged that individuals qualified as real estate appraisers in valuation methodology may not be excluded from testifying in the areas of economics and statistics because they use these areas as part of their appraisal methodology and hence their qualifications to testify are not affected. In *Wilhite*, an appraiser who had not appraised contaminated properties prior to his assignment took steps to comply with the Competency Rule of USPAP, but developed a faulty model that did not rely on commonly accepted appraisal practices; consequently, his testimony was excluded.

*Conner* involved an owner who testified but only provided vague, unsupported estimates of a property's value. The owner also had a real estate broker/appraiser witness who assisted him without charge, but did not perform an appraisal or testify pertaining to the value or impact of condemnation upon the parcel. Conversely, the court found that the state-provided appraisal witness, who met the requirements of USPAP and performed a credible appraisal, was competent as an expert witness. The *Hebbler* court rejected a commercial real estate agent who mostly specialized in commercial leasing, but failed to qualify under *Daubert* because her methodology was inadequate.

In *Simek*, two auctioneers were allowed to testify because the court concluded that although they were not licensed as appraisers, their qualifications were not subject to *Daubert*, and the court has the discretion to accept testimony from persons who have specialized knowledge and experience. Similarly, in *Ice Embassy* two city employees were allowed to testify, with the court not addressing the four *Daubert* factors thereby admitting the expert testimony and leaving their opinion to be considered by the jury.

To sum, real estate appraisers and others who find themselves in an expert witness situation should take note of these important cases concerning expert witness qualifications. Even when an appraiser is qualified

and meets the requirements of USPAP, the methodology used may be flawed to such a point that the factors in *Daubert* will exclude testimony.

Moreover, qualified appraisers should not dismiss the possibility that opposing expert witnesses may not have appraisal qualifications, i.e., be licensed, certified, and/or designated, but may still be permitted to testify as someone having legally sufficient experiences in the matter at question. Even property owners, who may be well acquainted with the properties in question and the issues associated with them, can qualify to testify. Furthermore, as in the *Cayuga Indian Nation* case, a real estate appraiser was able to testify on matters not specifically valuation oriented but that are used in appraisal assignments, such as economics, financial analysis, and statistics.

The common element in these cases appears to be that a witness who appears on the surface to be unqualified may instead be allowed to testify with the final decision pertaining to their testimony depending upon their methodology. Under *Daubert*, the judge acts as a gatekeeper in the acceptance of testimony, and his or her decision can only be overturned if there is an abuse of discretion. It appears that when the judge does exercise this authority, it is more likely that the testimony of an expert witness will not be excluded based on the witness's qualifications.

As mentioned, the key factor in expert testimony appears more to be in the quality of the methodology used. In conferring with a client's attorney, the appraiser may discuss the cases referenced in this article as a precedent to keep the appraiser from having his or her testimony seriously challenged by the opposing counsel.

---

### Additional Reading

Eaton, J. D., *Real Estate Valuation in Litigation*, 2nd ed. (Chicago: Appraisal Institute, 1995).

Hoyt, Richard W., and Robert J. Aalberts, "Daubert and the Appraisal Expert Witness Revisited," *The Appraisal Journal* (Spring 2008): 168–178.

---

### Web Connections

*Internet resources suggested by the Y. T. and Louise Lee Lum Library*

JurisPro Expert Witness Directory
   *http://www.jurispro.com/*

*Daubert* on the Web
   *http://www.daubertontheweb.com/*

ExpertPages—Expert Article Library
   *http://expertpages.com/library/index.htm*

Rand Institute for Civil Justice—Changes in the Standards for Admitting Expert Evidence
   *http://www.rand.org/pubs/research_briefs/RB9037/index1.html*

---

26.    *Ice Embassy*, 2006 WL 2434480, at *5.

## 9.4 Challenges to *Daubert* Ruling Double

This article originally appeared in the 2nd Quarter 2008 issue of *Valuation*.

The U.S. Supreme Court's *Kumho Tire* decision in 1999 extended the *Daubert* admissibility criteria to non-scientific expert testimony. Since then, *Daubert* challenges to all types of expert witnesses have increased by almost 200 percent, according to the latest annual study by PricewaterhouseCoopers.

The *2000-2006 Financial Expert Witness Daubert Challenge Study* examined nearly 3,000 federal and state court opinions and finds the following trends:

- The number of *Daubert* challenges to all expert witnesses increased by more than one third between 2005 and 2006–the second consecutive annual increase exceeding 30 percent.
- Despite increases in the number of challenges–and exclusions–in the past seven years, the percentage of expert exclusions is remaining fairly consistent, at around 47 percent.
- Approximately 519 *Daubert* challenges targeted financial experts; of these, 106 took place in 2006–an increase of 14 percent over 2005.
- Of the 519 challenges to financial experts, 30 percent were completely excluded, 18 percent were partially excluded, and 49 percent were admitted.
- Although plaintiffs' experts are the most frequent targets, once defendants' experts are challenged, exclusions are in equal proportion (47 percent plaintiffs vs. 48 percent defendants).

- Economists, accountants and statisticians comprise 50 percent of all challenges– but they also survive *Daubert* attacks more successfully than other financial experts.
- Success rates vary widely depending on the jurisdiction. In the Ninth Circuit, 68 percent of financial expert witness testimony challenged under *Daubert* between 2000 and 2006 was excluded in whole or in part.
- Lack of reliability has consistently been the top reason for exclusion of financial experts–cited in three out of four exclusions of financial expert testimony during 2000–2006.

Notably, "lack of reliability has been the leading cause of a financial expert's exclusion, followed by lack of relevance and lack of qualifications," the study says. In addition, "methodological flaws caused by the misuse of accepted financial/economic methods are a frequent cause of financial expert exclusion." Less common was a "maverick" use of novel or untested methods. Failure to consider a discounted cash flow analysis was the basis for expert exclusion in three BV cases.

The 2006 study is currently available as a free PDF from PwC. Visit *www. pwc.com* and search for "Daubert." The 2007 annual update was slated for formal publication in spring 2008, but was unavailable at press time.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 9.5 Real Property Valuation Issues in Environmental Class Actions

*by Thomas O. Jackson, PhD, MAI*

This article originally appeared in the Spring 2010 issue of *The Appraisal Journal*.

The appraisal profession is being increasingly called upon to assist in the analysis and valuation of claims of property value diminution (proposed or being litigated) as environmental class actions. In this context, the appraiser's task may be to evaluate the impacts of environmental contamination on a large number of properties. This type of assignment gives rise to many issues concerning

- proper methodology and appropriate basis for valuation;
- reliability of inferences concerning the effects of contamination that may differ from one property to the next; and
- considerations involved in the development of a scope of work necessary to produce meaningful conclusions.

These issues are complex and such assignments should be undertaken only after careful consideration of the proposed or certified class of real property interests in relation to the generally accepted valuation framework[1] and the appropriate methods and techniques[2] for estimating the impacts of environmental contamination on property values.

### Requirements for Class Certification

The requirements for certification of class actions by courts of law are within the purview of the legal profession and not the appraisal profession. Whether or not a class involving real properties or real property interests is certified is determined by the court based on specific legal tests or criteria. However, appraisers can assist in assembling certain real property data and information that can assist the courts in this determination. As such, appraisers should be generally aware of the criteria used in determining the appropriateness of the real property interests in the proposed class for treatment and analysis as a class.

Federal Rule 23(a) lists four requirements or prerequisites for class certification:

(1) the proposed class must be so numerous that joinder of all members is impractical (numerosity);
(2) questions of law or fact common to the entire class (commonality);
(3) the claims or defenses of the class representatives must be typical of the claims and defenses of the absentee class members (typicality); and
(4) the class representatives must fairly and adequately protect the interests of the class (class representation).[3]

If the proposed class meets each of these four criteria, a fifth requirement must be met, that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[4] This latter is known as the superiority or predominance requirement.

The certification of a class of plaintiffs where the alleged damages are related to diminution in property value would focus these requirements on the real property interests of the putative class members that are alleged to have been impacted as the result of certain, specified environmental contamination generated, created, or emanating from facilities or sources for which the defendants were or had been responsible. As such, issues in estimating the diminution in value of these interests by appraisers would be most directly related to the commonality, typicality and predominance requirements.

### Commonality

Issues of commonality with respect to a proposed class could involve similarities in the properties of the putative class members. If the proposed class contains a wide range of property types and interests, then valuing them or estimating impacts on them on a common,

1. Thomas O. Jackson, "Appraisal Standards and Contaminated Property Valuation," *The Appraisal Journal* (April 2003): 127–133.
2. Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 311–320.
3. D. Alan Rudlin, "Strategies in Litigating Multiple-Party Toxic Tort Suits," in *Environmental Litigation*, 2nd ed., ed. Janet S. Kole, Stephen Spitz, and Stephanie Nye (American Bar Association, Section of Litigation, 1999), 179.
4. Ibid., Rudlin, citing Federal Rule 23(b)(c).

**Thomas O. Jackson, PhD, MAI, AICP, CRE, FRICS,** is a clinical associate professor in the Department of Finance of the Mays Business School at Texas A&M University, where he teaches real property valuation in the Master of Real Estate Program. In addition, he is the president of Real Property Analytics, Inc., based in College Station, Texas, where he specializes in analyzing the effects of environmental contamination on real property. Jackson is a former member of the Appraisal Standards Board, and he currently serves on the Professional Standards and Guidance Committee of the Appraisal Institute.

class-wide basis would be difficult or perhaps impossible. For example, commercial and residential property types (houses and retail centers, for instance) could not be valued together. They have different markets and value influences. Single-family homes are typically acquired by homebuyers seeking to occupy them as a place of residence. Their pricing decisions are based upon this. Retail centers are bought by investors who seek the income stream they generate and price is typically determined by the capitalized value of this income stream. The valuation approaches for these property types differ. For the single-family residence, greatest reliance would typically be placed upon the sales comparison approach using recently sold and similar single-family residences as comparables. For the retail center, greatest reliance would typically be placed on the income capitalization approach to value. If a sales comparison approach is used, comparables would obviously not be single-family house sales but similar retail properties. Oddly enough, there have been proposed classes that combined all property types into a single category with the assumption that they could all be valued together in a common framework and any impacts on value could be estimated on a common basis with similar methods and techniques.

## Typicality

Proposed class actions can utilize "the test or bellwether case approach in that the claims of a few representative plaintiffs are tried and the results of that trial will operate to conclude the claims of a larger number of similarly situated persons."[5] Again, the issue of property types and interests are important. Using the preceding example, if the "representative plaintiffs" are owners of single-family homes, their real property interests would not be typical of the owners of retail shopping centers. Real property damages in an environmental class action decided on the basis of the interests of the owners of single-family homes would likely not reflect damages to commercial properties. Research suggests that these two property types are impacted differently even from the same contamination source.[6]

Thus, any attempt to resolve damages impacts on one property type based on impacts estimated on the basis of another would not be accurate and likely would result in an inequitable solution for one of the two categories of property interests. In addition, and as will be explained in more detail below, properties that are source sites will likely experience different impacts than non-source properties, as will properties that have no contamination (proximate or adjacent properties). Thus, impacts to the properties of "representative plaintiffs" in one of these categories will not be typical of the

properties of class members in another of the categories. Other issues such as the date at which the property interests were acquired and the potential effects of multiple sources of contamination will also create typicality issues (see the following discussion on predominance).

## Predominance

As noted, the predominance requirement stipulates that questions of law or fact common to the members of the proposed class must predominate over any questions affecting only individual members. This requirement could relate to the uniqueness of the real property interests of the putative class members as well as differences in the way in which they may be impacted by environmental contamination. One way in which these property interests may be unique is related to their date of acquisition. Since all real property is valued as of a certain date, sometimes referred to as the effective date or date of value, the real property interests of the proposed class members could be expected to vary depending on which date they acquired their properties or property interests. Property interests acquired before the date at which information about the contamination was known would be different and likely impacted differently than interests acquired after discovery of the contamination. In addition, as the effects of contamination tend to dissipate over time,[7] interests acquired well after discovery are likely to be impacted differently and in a different way, if at all. Further, as these interests are transferred, presumably without some sort of assignment, the interests of future class members would become more diverse from the interests of those whose interests had encompassed a past ownership period. Adding to the complications are varying market conditions under which the property interests were acquired. Strong and weak market conditions can tend to mitigate or exacerbate the effects of environmental contamination on property values.

Another complicating factor involves the presence of multiple sources of environmental contamination. Multiple sources at varying locations can result in a relatively unique set of impacts to properties at different locations across a broad class area. Properties in one location that are impacted by a different set of contamination sources will differ not by degree, but in the type and kind of property value impacts from otherwise similar properties located elsewhere. The issue of multiple sources and impacts is not uncommon, especially in older industrial areas with antiquated or obsolete facilities interspersed with housing that may have once provided shelter for workers at the very same facilities. In such situations, the mix of impacts is likely to vary by location and the analysis of the impacts of any single source is greatly complicated.[8]

---

5.    Ibid, Rudlin, 178.

6.    Mark G. Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July 1997): 279–285; G. William Page and Harvey Rabinowitz, "Groundwater Contamination: Its Effects on Property Values and Cities," *Journal of the American Planning Association* 59, no. 4 (1993): 473–481.

7.    Thomas O. Jackson, "The Effects of Environmental Contamination on Real Estate: A Literature Review," *Journal of Real Estate Literature* 9, no. 2 (2001): 93–116.

8.    Thomas O. Jackson, "Evaluating Proximity Impacts from Multiple Sources of Environmental Contamination" (paper presented at the 23rd Annual Meeting of the American Real Estate Society, San Francisco, CA, April 2007).

Copyrighted material licensed by Randall Bell on April 26, 2021

Lastly, all of the foregoing issues, property types, ownership issues, market knowledge, market conditions, changing effects over time, multiple sources and effects, and others tend to have a multiplicative effect on the number of categories of properties and property interests that must be analyzed by the appraiser in determining the extent of any diminution in value on a class wide basis. At some point, common interests may not predominate and it simply becomes untenable to evaluate impacts on a class-wide basis.

## Merits Issues

In environmental class actions, the determination of the appropriateness of the interests of the putative class members for treatment as a class (class certification) is usually based on issues related to but different than whether or not these interests have actually been damaged. The latter is sometimes referred to as *the merits* of the class allegations. As the U.S. Supreme Court has noted, "the basic rule on merits issues at class certification seems simple and well settled: When deciding a class certification motion, courts may not 'inquire into the merits' of the plaintiff's claims"[9] independent of the requirements for class certification. Yet, as suggested in the discussion of the requirements for class certification, the analysis of merits in an environmental class action involving alleged reductions in property values must consider whether such analysis is possible or reasonable on a common, class-wide basis and whether class-wide treatment is appropriate given the construction of the proposed class of real property interests. Thus, even without actually evaluating the merits (typically diminution in property value) that question may overshadow considerations related to certification. Indeed, some definitions refer to a class as those "who have suffered economic harm, including tangible damage or injury to property interests, destruction or diminution of property value."[10] This seemingly invites an analysis of merits at the class certification stage.

An issue for the appraiser, though, is that prior to certification, the court has not established the composition and definition of the class, and so it is unclear what properties and property interests are to be analyzed. This type of undefined appraisal problem is fraught with issues for the appraiser and his or her client. Without a clear class definition and statement of the problem to be addressed, the appraiser may be left to define the valuation problem, which may or may not comport with the class as subsequently certified. However, despite these issues the appraiser may be asked to address merits issues as defined by his or her client in order to address damages on some pre-class certification basis. Great care should be taken on such assignments so the assignment results are not misleading and are not communicated in a misleading manner.[11]

## Valuation Framework

The generally accepted framework for the analysis of the impacts of environmental contamination on property values is set forth in Advisory Opinion 9 (AO-9), "The Appraisal of Real Property That May Be Impacted by Environmental Contamination," as well as in *The Appraisal of Real Estate*, 13th edition.[12] As explained in AO-9, the effects of environmental contamination on the value of real property can be categorized as cost effects, use effects, or risk effects.

*Cost effects* are deductions for costs to remediate a contaminated property to appropriate regulatory standards, recognizing that not all costs are recognized by the market as having an effect on value. *Use effects* are limitations on the highest and best use of properties that may be impacted by environmental contamination, recognizing that these effects would be meaningful only if they limited the use of the site or property that would be the highest and best use without the effect of the contamination, and would otherwise meet the four highest and best use criteria (physically possible, legally permissible, financially feasible and maximally productive). *Risk effects* are the effects on value due to increased perceptions of environmental risk by relevant market participants. These three factors influence the value of a potentially impacted site according to the following formula:

*Impaired value = Unimpaired value − Cost effects (remediation and related costs)*
*− Use effects (effects on site usability)*
*− Risk effects (environmental risk/stigma)*

Further, since property value diminution is the difference between the impaired and unimpaired values, the following formula can be derived:

*Property value diminution = Cost effects (remediation and related costs)*
*+ Use effects (effects on site usability)*
*+ Risk effects (environmental risk/stigma)*

These formulas are consistent with existing guidance with respect to the application of USPAP standards in the valuation and analysis of contaminated properties, as presented in AO-9.

In the impaired value formula, the unimpaired value of a contaminated property can usually be estimated using a traditional sales comparison approach, income capitalization approach, and/or a cost approach to value. The appraiser estimating this unimpaired value must be careful to qualify it as hypothetical and as necessary for the intended use of the assignment results. On the other hand, the impaired value of a contami-

---

9.    Craig C. Martin, "Balancing Act: Weighing Merits Issues at the Class Certification Stage," *Class Actions Today* (American Bar Association, Section of Litigation, 2008), citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974).

10.   *Cathy Pitts, et al. v. North Sanitary Landfill Company, et al.*, in the Court of Common Pleas, Montgomery County, Ohio, Case No. 99 CV 5231 (2004).

11.   See Standards Rule 2-1(a) of the Uniform Standards of Professional Appraisal Practice (USPAP), in Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice*, 2010–2011 ed. (Washington, DC: the Appraisal Foundation, 2010).

12.   Ibid., AO-9; and Appraisal Institute, *The Appraisal of Real Estate*, 13th ed. (Chicago: Appraisal Institute, 2008), 226.

nated property–or property that may be impacted by environmental contamination–can rarely be estimated through one of the three traditional approaches to value due to data limitations and other factors. Thus, alternative methods must be utilized. However, these methods must be based on relevant market data and must be consistent with the applicable requirements of USPAP for appraisal development.

In measuring the three potential effects on value (cost, use, and risk, as explained), cost effects are derived from remediation costs usually estimated by environmental specialists. Assuming the market recognizes these costs, the appraiser can usually deduct them as a lump sum from the unimpaired value in a similar manner to a capital expenditure for deferred maintenance. When a discounted cash flow analysis is used, the anticipated costs can be deducted from the projected cash flows in the periods in which they are projected to occur. Uncertainty regarding cost estimates, projection, and timing would be reflected in the environmental risk premium added to the unimpaired property or equity yield rate (risk effect). Use effects can be analyzed by estimating the highest and best use of the subject contaminated property in an impaired and unimpaired condition. If the conclusions of the two highest and best use analyses are the same, then there are no use effects on value. If they differ, then the unimpaired and impaired values would be estimated for different uses and compared. Risk effects, on the other hand, are derived from the perceived environmental risk and uncertainty related to the property's environmental condition. Measuring this element usually requires more sophisticated and less direct techniques.

Further, AO-9 states that "estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods." Like all methods for valuing real property, these methods and techniques must be derived from, or based on, one or more of the three approaches to value. These specialized methods and techniques can generally be described as the analysis of environmental case studies; paired sales analysis of potentially impacted properties; multiple regression analysis of potentially impacted neighborhood areas or properties in proximity to a contamination source; the use of market interviews to collect data and information used in other approaches or to support and supplement the results of other analyses; and the adjustment of income and yield capitalization rates to reflect environmental risk premiums in an income capitalization analysis. Other methods may emerge over time, but as yet have not achieved general acceptance in the appraisal profession and/or do not have the required linkage to one of the three traditional approaches to value.[13]

Lastly, AO-9 lists a number of important elements and individual property characteristics that should be considered by appraisers when estimating the impacts of contamination on property values. These include

(1) whether the contamination discharge was accidental or permitted;
(2) status of the property with respect to regulatory compliance requirements;
(3) remediation lifecycle stage (before, during or after cleanup) of the property as of the date of value;
(4) contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.);
(5) contamination conveyance (air, groundwater, soil, etc.);
(6) whether the property is a source, non-source, adjacent or proximate site;
(7) cost and timing of any site remediation plans;
(8) liabilities and potential liabilities for site cleanup;
(9) potential limitations on the use of the property due to the contamination and its remediation; and
(10) potential or actual off-site impacts due to contaminant migration (for source sites).

Also important are certain specialized terms and key definitions in AO-9 that are used in appraisal assignments that involve property impacted by environmental contamination; these terms and definitions are shown in Table 1.

Note that the definition of *environmental contamination* in AO-9 specifically references "regulatory limits established by the appropriate federal, state and/or local agencies," and that concentrations of potentially hazardous substances must exceed these limits in order to be considered environmental contamination, as that term is defined for the appraisal profession. Thus, not all concentrations of hazardous or potentially hazardous substances would be considered environmental contamination, but only those whose concentrations exceed regulatory standards. The mere presence of these substances at background or barely detectable levels that do not exceed regulatory standards would not be considered contamination within this framework, and should not be considered as such by appraisers.

As mentioned, this general framework and these definitions are also found in *The Appraisal of Real Estate*, 13th edition, and in *The Dictionary of Real Estate Appraisal*, 5th edition.[14]

## Methodology Issues

As suggested in the valuation framework, the analysis of the effects of environmental contamination on real prop-

---

13. For example, see recent articles in *The Appraisal Journal* on the controversial technique known as contingent valuation: Albert R. Wilson, "Contingent Valuation: Not an Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53–61; Richard J. Roddewig and James D. Frey, "Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," *The Appraisal Journal* (Summer 2006): 267–280; and Kristy E. Mathews, "Under the Microscope: Dissection of a Contingent Valuation Survey," *The Appraisal Journal* (Summer 2008): 259–273.

14. See *The Appraisal of Real Estate*, 13th ed., 224–227; and "Environmental Contamination Glossary," *Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010), 323–332.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 1**           **Specialized Terms and Definitions in Environmental Contamination Assignments**

Diminution in Value (Property Value Diminution): The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

Environmental Contamination: Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state and/or local agencies.

Environmental Risk: The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning (1) the nature and extent of the contamination; (2) estimates of future remediation costs and their timing; (3) potential for changes in regulatory requirements; (4) liabilities for cleanup (buyer, seller, third party); (5) potential for off-site impacts; and (6) other environmental risk factors, as may be relevant.

Environmental Stigma: An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (See Environmental Risk)

Impaired Value: The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

Remediation Cost: The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

Remediation Lifecycle: A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

Source, Non-source, Adjacent, and Proximate Sites: Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

Unimpaired Value: The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

Source: Advisory Opinion 9, *Uniform Standards of Professional Appraisal Practice*

---

erty values has several components: the estimation of the unimpaired value or values; the analysis of property value diminution, including cost, risk and use effects; and the estimation of the impaired value or values. The analysis and estimation of these values would fit within the merits inquiry phase of a class action, and typically occur after a class has been certified and the specific real property interests, including locations, dates of value and other parameters have been defined. For class actions potentially involving hundreds or even thousands of individual properties, the estimation of the unimpaired values, diminution, and impaired values of the properties of the class members presents several special and difficult methodological issues for the appraiser.

## Unimpaired Value

The estimation of the unimpaired values of properties involved in a class action has several complications depending on how the class is defined. If the properties of the class members consist of a variety of property types, then these properties will have to be appraised separately. For most appraisers, it would seem obvious that houses and stores, for example, cannot be valued together since they have different comparables, markets, etc. Most importantly, and consistent with USPAP and the nature of value expressed in the profession's reliance on the highest and best use determination in the valuation process, these properties would likely have a different highest and best use.[15] Even within a single property category, though, it may not be possible to meaningfully analyze some properties together. For example, it may not be

appropriate to analyze larger, estate-type, single-family homes together with smaller, less-expensive housing as these are likely to reflect different market segments.

USPAP Standards Rule 6-2 (e) requires appraisers when valuing a group of properties to identify and consider:

(i) the group with which a property is identified according to similar market influence;

(ii) the appropriate market area and time frame relative to the property being valued; and

(iii) their location and physical, legal and economic characteristics.

In addition, USPAP Standards Rule 6-2 (f) cites the following considerations:

(i) location of the market area;

(ii) physical, legal, and economic attributes;

(iii) time frame of market activity; and

(iv) property interests reflected in the market.

Accordingly, market areas and influences, dates of value, legal ownership interests and other factors must be considered when developing an analysis leading to unimpaired market value estimates for the group of properties in a class. Even properties of the same type could have significant differences relative to each of these factors. In any statistical analysis of such properties, there is an issue termed *aggregation error* that results from the over inclusion of properties with dissimilar characteristics in the same valuation analysis.[16] This

---

15.    *The Appraisal of Real Estate*, 13th ed., 139.

16.    Max Kummerow and H. Galfalvy, "Error Trade-Offs in Regression Appraisal Models," chap. 6 in *Real Estate Valuation Theory*, ed. Ko-Kang Wang and Marvin L. Wolverton (Boston: Kluwer Academic Publishing, 2002).

error can result in biased and unreliable estimates.

In the development of the unimpaired value estimates in a class action context, there are also issues associated with the use of mass appraisal techniques developed for intended uses associated with ad valorem taxation when applied to individual properties. Mass appraisal techniques are appropriate for what they are typically used for, i.e., the development of jurisdiction-wide assessments, as their individual property estimation errors tend to average out over a large number of properties. In estimating the value of individual properties, though, errors can be large. This creates problems in a class action context where damages and compensation may ultimately be paid to property owners based on the characteristics of their individual properties.

Another approach that may be used, at least in the early stages of a class action, involves the use of the representative or bellwether plaintiffs. In this approach, the properties of the representative plaintiffs could be simply appraised individually consistent with USPAP Standard Rule 1. Of course, as previously discussed, there is still the issue of typicality associated with the interests of the representative plaintiffs compared with the rest of the class.

## Property Value Diminution

A second general step or task involves estimating the extent of any diminution in value to the properties of the class members. This task should be accomplished in light of the valuation framework outlined in AO-9 and elsewhere, and it should consider cost, risk, and use effects. Most attention has been focused on the estimation of the risk effects, sometimes referred to as *environmental stigma* (as previously defined). As stated in AO-9, "the analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment." Accordingly, it is unacceptable practice to assume that environmental contamination will reduce the value of a property without adequate support derived from information obtained in the relevant real estate market. Relevant market information in this context would consist of actual real estate transactions (sales) involving properties with similar property and environmental characteristics to the properties of the class members.

One technique that has been increasingly employed to estimate risk effects is multiple regression analysis.[17] This technique can be properly employed to estimate average impacts to groups of properties that share similar characteristics and are similarly situated. The use of multiple regression analysis for this purpose is not the same as its use in estimating individual property values with the issues and potential errors as previously mentioned. In an analysis of property value diminution, the regression analysis is used to estimate average or mean impacts for a group of properties. This is usually measured through one or more independent variables that identify the environmental characteristic of the properties for which the impacts are being estimated. Important in this regard are the structural characteristics of the regression model due to issues associated with correlations between independent variables and other issues.

Estimating the mean or average impacts to the value of a group of properties is a different assignment and use of the regression technique than using it to estimate the market value of individual properties. The errors associated with the estimation of individual property values can be large, while the errors associated with the estimation of mean or average impacts to a group of properties with a properly constructed regression model usually fall within acceptable limits. Since a regression analysis of environmental impacts produces only estimates of average effects for a group of properties, it is likely to overestimate impacts for some properties and underestimate impacts for others.[18] This could potentially result in an inequitable allocation of damages in class actions involving the impacts of environmental contamination on property values. This issue is also present in even properly structured environmental case studies[19] if the characteristics of the case study subjects (impaired properties) are estimated on an average basis and then applied to individual class properties that have differing environmental conditions and characteristics.

## Allocation of Damages/Impaired Value

Because the analysis of property value diminution through regression analyses (or through environmental case studies) produces an estimate of average effects, an additional step is necessary: the allocation of estimated damages to properties within the class. In this step, more-specific property characteristics should be considered. Such property characteristics include status of the property with respect to regulatory compliance requirements; remediation lifecycle stage (before, during, or after cleanup) of the property as of the date of value; and whether the property is a source, non-source, adjacent, or proximate site. Even within a relatively homogenous group of properties for which regression estimates of diminution may be reliably produced, the properties' individual environmental characteristics will produce impacts that are greater or less than the mean or average impacts. For example, a group of properties in the class may contain some with detections of hazardous substances above regulatory thresholds (contaminated properties) and some with such substances at non-detect or background levels (not contaminated). It is likely that impacts will differ for

17. Thomas O. Jackson, "Evaluating Environmental Stigma with Multiple Regression Analysis," *The Appraisal Journal* (Fall 2005): 363–369.

18. The one exception to this issue is in situations where there is no discernable impacts (cannot reject the null hypothesis of no effect) since zero or near zero impacts average out to no effect.

19. Thomas Jackson and Randall Bell, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 86–95.

Copyrighted material licensed by Randall Bell on April 26, 2021

properties in these two categories. Other characteristics such as remediation status (remediated compared to unremediated) should be considered as well. The result of this step will produce more reliable, and for the class more equitable, impaired value and damages estimates.

## Conclusion

The foregoing presents a number of issues related to the certification and analysis of class actions involving diminution in value resulting from environmental contamination. These issues should be considered by the appraiser when called on to evaluate properties and the impacts on their value in this context. The analysis of diminution in value becomes more difficult where proposed and certified classes are made more inclusive, with varying property types, characteristics, and environmental issues. In some cases, it may not be possible to analyze effects on a class-wide basis without significantly disaggregating the properties. As such, disaggregation becomes necessary for a credible analysis (a USPAP term and requirement), and the class-action vehicle becomes less useful. At some point, the class may break down and becomes inappropriate for valuation analysis. Nevertheless, with reasonable similarities in property, market, and environmental characteristics, property interests defined in a class action can be meaningfully analyzed.

Copyrighted material licensed by Randall Bell on April 26, 2021

# 10

# International Valuation Standards and Contaminated Property Appraisal

## Introduction

By 2003, the appraisal profession in the United States had developed a recognized and generally accepted set of methods for determining the effect of contamination and environmental risk on property prices and markets. Chapters 1 and 2 of this Volume II anthology document those generally accepted methods as set forth in appraisal publications and educational programs.

The first two articles in Chapter 10–"An International Perspective on Incorporating Risk in the Valuation of Contaminated Land" from the July 2001 issue of *The Appraisal Journal* by Sandy G. Bond, William N. Kinnard, Jr., Paul J. Kennedy, and Elaine M. Worzala; and Nelson Chan's "How Australian Appraisers Assess Contaminated Land" from the October 2000 issue of the *Journal*–document how far the rest of the English-speaking world as of 2000 and 2001 lagged behind the United States in terms of having a common set of recognized and generally accepted methods for valuing contaminated properties. The July 2001 article focuses on the United Kingdom, Australia, and New Zealand, while the October 2000 article focuses only on Australia. Both articles focus primarily on commercial and industrial contamination's effect on income-producing properties.

Bond and her coauthors attribute the advanced development of appropriate methods in the United States to four key factors. First of all, the legal system in the United States as of 2001 had been quicker to develop a detailed set of legally mandated requirements and responsibilities for allocating costs associated with contamination investigation, remediation, and post-remediation monitoring. Another factor not mentioned in this article but discussed in Chapter 10 of Volume I is that the United States had also established various types of insurance coverage for quantifying remediation cost risks by this time. This allowed appraisers in the United States to be more certain about the cost types and amounts to insert in income property discounted cash flow models.

Secondly, courts in the United States must rule frequently on the appropriateness of various appraisal methods. The unstated assumption in the July 2001 article is that the courts in the other English-speaking countries discussed are not as frequently involved. This is both a blessing and a curse. The blessing is that many courts have established detailed criteria for acceptable appraisal practice in many legal areas: "State courts, in particular, tend to differentiate among standards for property tax valuation appeals, eminent domain (expropriation) cases, civil damage suits, and regulatory agency claims in identifying what is 'proper' (i.e., 'admissible') procedure." (page 459) The curse stems from the number of separate legal jurisdictions and venues. Although "the Courts are the arbiters of what is acceptable or non-acceptable (appraisal) practice" (at least in the context of litigation related appraisal assignments), the complexity created by "50 separate state court systems, plus the Federal court system, plus various quasi-independent systems such as the Federal Bankruptcy Court" results in "diversity and inconsistency" between courts. (page 459)

Although the authors correctly emphasize the importance of the American courts in the development of acceptable appraisal standards and techniques, their article never explains the specifics of how the courts had been dealing with valuation issues and standards related to contamination and environmental risk as of the turn of the twenty-first century.

Bond and her coauthors note that in the United States and Canada, unlike many other countries, "Market sales transactions data have become sufficiently numerous and available . . . for direct market evidence to be utilized in estimating post-remediation stigma." However, valuers in the United Kingdom, Australia, and New Zealand have yet to enjoy this growth in market data availability.[1] (page

---

1.   In USPAP as well as in the United States and Canada, the term *appraiser* is used to identify those who determine the value of property. By contrast, the term *valuer* is typically used in the United Kingdom and much of the rest of the English-speaking world.

459) As the various surveys of valuation professionals referenced in the article reveal, appraisers in the United States have a much higher level of "experience in identifying and measuring stigma" than in the other countries discussed. (page 460)

Finally, the authors suggest that "guidelines from professional societies in the countries referred to in this paper offer little beyond admonitions to perform competently, acquire technical assistance and expertise from others where necessary, and report fully (in the United States and Canada, at least) on what one has done." (page 459) The authors level this criticism at the United States as well as the United Kingdom, Australia, and New Zealand. While this argument may have been technically correct as of the date that the article was being researched and written, it was not correct by mid-2001 when the article was published.[2] In fact, the Orell Anderson article from Chapter 2 of this anthology, "Environmental Contamination: An Analysis in the Context of the DC Matrix," appeared in the same issue of *The Appraisal Journal* as the Bond et al. article. The Anderson article summarized many of the American appraisal profession's generally recognized principles and methods for contaminated property assignments. And as Thomas O. Jackson's article "Methods and Techniques for Contaminated Property Valuation" (which is also included in Chapter 2 of this anthology) clearly stated, the American appraisal profession had developed "specialized methods and techniques that adapt standard appraisal approaches to these assignments" over the prior 15 years or so. (page 55) The stated purpose of the Jackson article was to "provide an overview of professionally accepted methods and techniques for valuing contaminated properties or estimating the effects of environmental contamination on the market value of real property." (page 55)

In the concluding section of the July 2001 Bond article, Bond and her coauthors lament a number of "deficiencies" in the approaches used by valuers in the United Kingdom, Australia, and New Zealand when determining the effects of contamination on commercial and industrial real estate as compared to appraisers in the United States. The greatest deficiencies are that approaches adopted by United Kingdom and New Zealand valuers are "typically simplistic," that valuers in those countries "ignore certain value effects of contamination (e.g., time effects)," and that "little regard is given to the analysis of perceived financial risks." (page 461) The authors believe that the cause of those deficiencies was the "severe limitations on the availability of market data for contaminated properties" in those countries as compared to the United States and Canada. (page 462)

The Chan article references some of the same materials referenced by Bond and her coauthors. Chan focuses on comparing survey results for appraisers in Australia, New Zealand, and the United States as

they relate to methods and standards for the appraisal of commercial and industrial properties impacted by contamination and stigma. As of April 1998, when the survey was conducted in Australia, the results indicated that Australian valuers with the most experience appraising contaminated properties are significantly more likely than their American counterparts to simply provide an opinion of the "unaffected value" of the property when confronted with such an assignment. (pages 465 and 466) The survey indicated that 70% of Australian valuers were also reasonably content with "existing methods for valuing contaminated land" and that less than 50% of Australian valuers believed that those methods could be improved as of 1998.

The Chan article echoes another point made in the Bond article about Australia and the valuation of contaminated property at the turn of the twenty-first century: The lack of transaction data on contaminated properties makes it "difficult to rely on market evidence to estimate prices, rents, and yields of contaminated properties." (page 467) Chan states that this lack of transaction data is partly responsible for the methods incorporated into the 1994 Australian Contaminated Land Practice Standard and subsequently incorporated into Guidance Note 15, Reporting on Contaminated Land, of the Australian Practice Institute (API) Professional Practice 2000, which is the Australian equivalent of USPAP. (page 468)

One of these methods is what Chan terms the environmental balance sheet (EBS) approach. Chan provides no details concerning the EBS approach but instead references a chapter in the Appraisal Institute's 1992 technical report *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications.*[3] The basic procedure of the EBS approach as set out in the report is as follows:

1. Make a determination of the unimpaired value of the contaminated property disregarding its environmental situation.
2. Make a careful calculation of current and likely future costs (discounted to a present value) associated with the necessary (or alternative) investigation, contamination remediation, and ongoing post-remediation monitoring strategies.
3. Conduct an analysis of any post-remediation stigma.

The current and discounted future costs as well as the effect of any post-remediation stigma are then deducted from the unimpaired value to arrive at the owner's impaired position or the impaired value opinion. As the report notes, this effort requires a team approach: "Integral to value opinion development will be a valuation team including experts in disciplines such as appraisal, finance, accounting, engineering, hydrogeology, industrial hygiene, and the like."[4]

---

2. The survey research related to techniques used by real estate appraisers in the United States and was undertaken sometime prior to 1999. That research was first summarized in a July 1999 *Appraisal Journal* article co-authored by Kinnard and Worzala and included in Volume I.

3. The chapter referenced is A. R. Wilson, "Environmental Impaired Valuation: A Team Approach to a Balance Sheet Presentation," in *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications* (Chicago: Appraisal Institute, 1992), 23-42.

4. Ibid., 29-33.

Copyrighted material licensed by Randall Bell on April 26, 2021

The second method incorporated into the API's Professional Practice 2000 is called the *improved stigma assessment approach* by Chan. It is based on a "risk assessment model" developed in the United Kingdom, which in turn was based on Peter J. Patchin's 1994 *Appraisal Journal* article "Contaminated Properties and the Sales Comparison Approach" (included in the Volume I anthology).[5] That article included four detailed case studies featuring commercial and manufacturing properties alleged to show environmental stigma impacts of 26% to 94% as well as a chart with four additional case studies indicating stigma impacts of 21% to 63%. The properties involved in the eight case studies were at varying points in the remediation life cycle. According to Chan, the United Kingdom's method suggests "a risk assessment model to estimate stigma impact based on 26 industrial activities and a stigma value reduction range of 21%-69%" and presents a "'value adjuster' that is used as a stigma adjustment factor." (page 468)

That second method would not be acceptable in the United States today for the following two reasons:

1. Relying on conclusions of others, such as the data in the 1994 Patchin article, without independently checking and confirming the accuracy of the data is not acceptable and generally recognized appraisal practice (as discussed in Chapter 2 of this anthology).

2. There is no automatic "stigma scale" that can be applied. Instead, case study analysis involving actual prices paid in similar situations is used when directly applicable sales data is limited or not available. (Chapters 2 and 4 of this anthology discuss case study analysis in more detail.)

The next two articles in this chapter–"Stigma of Contaminated Land: Difficult to Tackle" by Hans Siemens from the April 2003 issue of *The Appraisal Journal* and "The Risk Approach: A Step-By-Step Plan for a Clean Valuation" by Bas van de Griendt and George G. M. ten Have from the January 2003 issue of the *Journal*– discuss how real property valuers in the Netherlands were beginning to become more comfortable in handling contaminated property issues. Both articles deal with soil contamination. The Dutch approaches discussed in these articles mirror the American techniques that had evolved during the last decade of the twentieth century for evaluating the effects of soil contamination on commercial, industrial, and residential properties.

The April 2003 article explains that it is easier to determine the effect of contamination on commercial and industrial properties than on residential properties in the Netherlands because Dutch companies "approach the matter rationally, as a technical issue" and "coolly" calculate the costs of remediation. (pages 470 and 471) The January 2003 article, however, notes that this traditional cost approach fails to consider the additional risks associated with the remediation of contaminated soils at commercial or industrial properties. The authors of the January 2003 article describe three types of risk that must be considered:

1. *Measuring risk*, the term used for "the chance that the amount of soil and groundwater that needs to be remediated is more (or less) than estimated or calculated"

2. *Norm risk*, the term used for the variation in costs due to the post-remediation use

By 2003, environmental remediation regulations in the Netherlands had adopted risk-based remediation standards that tailored the type and extent of remediation to the ultimate end use of the property post-remediation.

3. *Time risk*, the term used for "the risk of remediation needing to take place earlier than planned (or that may be left for later)." (page 477)

The risk analysis in the Netherlands described in the January 2003 article is similar to the type of risk-based thinking related to commercial and industrial properties that was occurring in the American appraisal profession at the same time. In fact, the authors cite a number of articles from the Volume I anthology when discussing their risk-based appraisal methods. They sum up their approach to determining the effect of soil contamination on value as follows: "Damage…is the sum of the costs for soil survey and soil remediation, loss of income due to use restrictions, plus a stigma-effect." (pages 479 and 480) They then present their method in the following mathematical formula:

$$V_d = V_c - C_s - C_r - \text{use restrictions} - \text{stigma}$$

where

$V_d$ = Value dirty

$V_c$ = Value clean

$C_s$ = Costs for soil survey

$C_r$ = Costs for soil remediation

Generally, the authors' approach is quite close to the approach set out in the Appraisal Institute's previously mentioned 1992 technical report on measuring the effects of hazardous materials contamination on real estate values.[6]

---

5. Chan credits the following as the source of the United Kingdom's *improved stigma assessment model*: P. M. Syms, "Dealing with Contaminated Assets," *Estates Gazette* 9612 (1996): 124-125; and P.M. Syms, *Contaminated Land* (London: Blackwell Science, 1997): 197-203.

6. As stated earlier, the essence of that approach as set out in the Appraisal Institute's 1992 report is as follows:

First of all, determine the "unimpaired value" of the contaminated property disregarding its environmental situation. Secondly, make a careful calculation of current and likely future costs (discounted to a present value) associated with the necessary (or alternative) investigation, contamination remediation, and ongoing post-remediation monitoring strategies. Finally, conduct an analysis of any post-remediation stigma. The current and discounted future costs as well as the effect of any post-remediation stigma should then be deducted from the unimpaired value to arrive at the owner's impaired position or the impaired value opinion. See A. R. Wilson, "Environmental Impaired Valuation: A Team Approach to a Balance Sheet Presentation," in *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications* (Chicago: Appraisal Institute, 1992), 33.

The Siemens article explains how Dutch appraisers and real estate analysts were adopting the case study method when dealing with contaminated soil issues in residential areas. Siemens sets out the results of a comprehensive study of single-family home prices between 1975 and 2000 in Steendijkpolder and Noord Nieuwlandspolder Zuid, two single-family residential neighborhoods in Maasluis. Both neighborhoods were developed on land created by the disposal of Port of Rotterdam "dredging sludge" in the late 1960s. (page 472) This contaminated soil situation was discovered in 1983 in the Steendijkpolder neighborhood and two-and-a-half years later in the other neighborhood.

After the contamination was discovered in Steendijkpolder, average home prices "nose-dived between one-fourth and one-third," and "it took six years for prices to return to the old level." (page 472) However, there was "hardly any fall in home prices" in the other neighborhood, which was located only one kilometer away. (page 473) In both neighborhoods, the impact on prices was temporary and the market prices and values responded positively to environmental authorities' investigation and remediation efforts.

The research uncovered important differences in the timing of the discovery of the contamination, news media coverage, population demographics, and market "psychology" that explain the relatively large price drop and slow recovery in one neighborhood as compared to the small price drop and quick recovery in the other neighborhood. In the neighborhood that experienced the sharp and long price drop, the predominantly young residents organized a mass protest that resulted in "alarming headlines." (page 472) In the neighborhood that experienced the small and short price impact, however, homeowners were relatively older and "less inclined to create a fuss." As a result, "there was little commotion, little publicity, and hardly any fall in home prices" in this neighborhood. (page 473) Siemens comments that an unintended consequence of neighborhood environmental action campaigns is that the publicity generated can cause "a sharp fall in the value of property." Siemens advises homeowners as follows: "To limit the damage, do not publicize the pollution." (page 471)

The last article in this chapter is Bruce Weber's "A Beginning Best Practice Brownfield Valuation Model" from the January 2002 issue of *The Appraisal Journal*. However, only the first half of the article deals directly with contaminated property issues. In that first half, Weber discusses the results of a 2001 survey commissioned by the Royal Institution of Chartered Surveyors (RICS) involving research of appraisal literature related to risk analysis and market analysis, "especially as they relate to the valuation of brownfields." (page 481) One of the stated purposes of the survey was to compare the United Kingdom's research and practice with the situation in the United States. (page 481)

Weber and his research partner, who conducted the literature review, conclude that there is no single "best practice method" that can be applied to all brownfield contamination situations. Instead, "different appraisal approaches may be appropriate based on the specific contamination situation." (page 483) Weber concludes as follows:

> Different valuation techniques could be required for each of the following scenarios:
>
> 1. Contamination is considered to be likely, but has not been investigated.
> 2. Contamination is known based on preliminary soil investigation.
> 3. Contamination has been confirmed by extensive soil borings and other methods.
> 4. Contamination has been found in the potable groundwater at the site.
> 5. Contamination has been remediated, but subsurface contaminants still exist, but are below No Further Action (NFA) requirements, meaning they can legally remain for the time being. Pre and post-remediation levels are often checked by monitoring wells. (page 483)

Weber then discusses case study examples of each of these five scenarios.

The articles in this chapter confirm what many American appraisers who have worked internationally have found to be true: The availability of adequate and accurate market and sales data varies widely. In many countries, there is no reliable source of publicly available sales data. While there are various reasons for the lack of publicly available data, the cause is often a tax on property transfers or some perceived penalty associated with reporting actual transaction data combined with a lack of enforcement or no penalty associated with reporting inaccurate or incorrect data. By contrast, public recording laws in the United States require purchase prices to be recorded and made publicly available, with only a few exceptions (such as in the state of Wyoming). This makes it fundamentally easier in America to determine the effect of contamination on markets and prices than it is in many other countries. Over 20 years' worth of sales data in many parts of the United States is now publicly available (often online) and can be effectively analyzed to determine the effect of contamination on commercial, industrial, and residential properties.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 10.1 An International Perspective on Incorporating Risk in the Valuation of Contaminated Land

*by Sandy G. Bond, PhD, William N. Kinnard, Jr., PhD, MAI, SRA, Paul J. Kennedy, PhD, and Elaine M. Worzala, PhD*

This article originally appeared in the July 2001 issue of *The Appraisal Journal*.

The late 1980s and early 1990s saw the development of concern surrounding the ownership and investment value of sites affected by contamination. This was prompted by the discovery of problems associated with a number of high-profile sites around the world. For example, Lekkerkerk (Netherlands); Love Canal, New York (United States); and Times Beach, Missouri (United States). Owners of properties in or near these sites suffered substantial financial losses as a result of the contamination identified.

Concerns about contamination land issues were reinforced with the introduction of legislation governing the environment: for example, the 1986 Superfund Amendment and Reauthorization Act (SARA) in the U.S.; the 1986 Environmental Protection Act (EPA) in Western Australia (State[1] enacted); the 1991 Resource Management Act (RMA) in N.Z., and the 1995 Environment Act in the U.K. Together, these statutes have brought contaminated land issues to the attention of valuers, and have highlighted the need for them to take contamination and stigma into account in calculations of worth.

However, uncertainty exists as to what effect contamination will likely have on property values. This is due mainly to the difficulty in determining the existence and extent of contamination on or nearby a site, the likely duration and costs of remediation, and the lack of clarity within some of the legislation over legal liability for polluting.

Despite subsequent revisions to legislation, uncertainties remain in the jurisdictions of some of these acts. Those uncertainties include: who is responsible for the contamination; who is to pay for the risk assessment and clean-up costs; who is responsible for "orphan" sites; who is responsible for selecting appropriate remedial solutions; who will determine that a site is "clean enough;" and how will that be done?

In this arena of uncertainty about on-site contamination, together with the market reaction to those uncertainties and associated risks, it is the daunting task confronting a minority of the valuation profession both to account for and to measure these factors. While it is recognized that valuers do not necessarily have the requisite skills to determine the existence and extent of contamination, or to estimate the costs involved in remediation, it is not appropriate for them to simply decline instructions to value property where contamination may be an issue. The resultant perceived financial and investment risks must be accounted for in their estimates of value.

The objective of this paper is to provide valuers with an international perspective of approaches used in practice by valuers when valuing contaminated land and property. Specifically, this paper focuses on providing evidence and lessons for valuers on the narrower, more precise issue of how valuers account for the financial risks associated with investing in land and property affected by contamination.

## Literature Review
### Background: Accounting for Risks and Uncertainties

Many of the difficulties valuers have faced when attempting to value land and property affected by contamination are the numerous risks and uncertainties confronting buyers and investors. Scientific knowledge emerges over time about the safety of various substances and materials. Even where a risk is known to exist with the use of a particular substance it is sometimes not clear to what extent the substance is hazardous and how far one should go to avoid its use.

Moreover, detecting the presence of the hazardous material can be difficult and extremely costly as can the measures taken to control it, should this be required. Further, the extent of control required often varies depending on the property's use, as do the methods available for controlling the associated hazards. Government-imposed "safe" or "acceptable" levels may change, creating further uncertainty for potential buyers, lenders, tenants, sellers, and their financiers. These factors often result in both difficulties with obtaining

---

This article was first printed in the May 2001 edition of the *Australian Property Journal*.

1. Australia has a federal system of government. Powers are distributed between a federal government (the Commonwealth) and State and Territory governments.

**Sandy G. Bond, PhD, MBS, SNZIV,** is a senior lecturer for the Department of Property, Faculty of Architecture, Property, Planning & Fine Arts at the University of Auckland.

**William N. Kinnard, Jr., PhD, MAI, SREA, CRE, ASA, (1926-2001)** was the President of Real Estate Counseling Group of Connecticut and Professor Emeritus at the University of Connecticut. He was a leading real estate researcher, teacher, and practitioner.

**Paul J. Kennedy, PhD,** is head of research for Parkes & Company.

**Elaine M. Worzala, PhD**, is an associate professor for the Department of Finance & Real Estate at Colorado State University.

debt financing and reduced saleability, thereby compounding the risks and uncertainties involved.

There is an inherent fear of the unknown and the market reaction to this is often referred to as stigma. The extent of stigma surrounding ownership and occupation of a property is usually directly related to the availability of information about the risks involved. Even where research concludes that no risk exists, fear, often initiated by media-induced public hysteria, may remain. Remediated sites may still suffer from this market-imposed penalty.

Thus, people's perceptions are largely responsible for determining the extent of loss in value caused through stigma. How valuers account for risks and uncertainties or stigma is the valuation issue focused on here.

A body of literature recommending and illustrating appropriate procedures and techniques to follow in valuing both property with on-site contamination or proximate to sources of known or suspected contamination has emerged. Nevertheless, little systematic research into how valuers identify and quantify the effects of perceived environmental risks on the value of contaminated property has been conducted to date.

## Contaminated Property Valuation Literature

As noted by Elliot-Jones,[2] in the context of commercial and industrial contamination, the concept of stigma stems from risk that did not exist prior to the appearance of environmental laws. Similarly, since the initiation of these laws, a growing body of literature has emerged dealing with the valuation of contaminated land. This occurred sooner and has been more prominent in the U.S. than in the U.K., New Zealand, or Australia due partly to the much earlier introduction of environmental legislation in that country.

It was Patchin[5] who first publicly introduced the concept of stigma to the valuation of properties with on-site contamination. He also noted a dearth of "comparable sales" of contaminated properties. Indeed, he reported that "corporate real estate personnel...were practically unanimous in voicing the opinion that a seriously contaminated property will not sell at any price." Patchin identified the causes of market-value loss experienced by contaminated properties as falling under three broad categories:

1. Cost of cleanup [sic]
2. Liability to the public
3. Stigma after cleanup

In discussing "Stigma After Cleanup," Patchin observed that "a physical cleanup does not usually eliminate the value loss resulting from stigma...I have observed several cases in which...potential buyers remained reluctant. This reluctance has to do with all the risk and financing problems previously discussed. The result is that even a cleaned-up property may suffer from reduced marketability."

The valuation literature of the early 1990s emphasized the necessity to use the framework of income capitalization to identify the deductions from unimpaired market value (i.e., market value as if non-contaminated) in order to estimate the market value of a contaminated property.[4] That general framework persists to the present, with very few exceptions. From the survey results of Richards[5] "...the discounted cash flow technique (DCF) was found to be the most appropriate method to produce a calculation of worth of a property."

The general framework that is identified is to estimate unimpaired market value of the property, and then to deduct the following elements:

- Present worth of the estimated cost to remediate (typically obtained from environmental engineers or technicians)
- Present worth of reduced revenues, stemming from a combination of reductions in:
  - Occupancy
  - Rent
- Present worth of increased operating expenses, including:
  - Increased insurance premiums
  - Increased interest on debt
  - Monitoring costs anticipated after remediation
- Present worth of holding costs otherwise covered by revenues (which have been reduced):
  - Insurance
  - Property taxes
  - Repairs, maintenance

Present worth is calculated as a function of the anticipated duration of the remediation period, plus the marketing period (for sale or rental) anticipated when remediation is completed. Over that period of time, the discount rate (or, sometimes, the capitalization rate) that is applied to the anticipated income is adjusted upward to reflect the perception of increased risk associated with the existence (or suspicion) of on-site contamination.

Those rates are further increased by the likelihood of having to pay higher interest on debt (when debt financing is available at all) or relying on a higher proportion of equity investment, with its requirement of a higher rate of return. Anticipated losses or necessary expenses, on the other hand, are discounted at an applicable "safe rate."

2.   Michael Elliot-Jones, "Bixby Ranch: Some Observations on Plaintiffs Expert's Appraisal of Post-Clean-Up 'Stigma,'" San Francisco, CA: Foster Associates (1995).

3.   Peter J. Patchin,  "Valuation of Contaminated Properties," *The Appraisal Journal* (January, 1988): 7-16.

4.   Often referred to as the "Cost to Correct" approach.

5.   Tim O. Richards,  "A Changing Landscape: The Valuation of Contaminated Land and Property." Research Report. Reading, England: The College of Estate Management (1995).

Copyrighted material licensed by Randall Bell on April 26, 2021

Finally, from the unimpaired market value estimate minus the present worth of the sum of 1) estimated cost to remediate, 2) estimated reduced revenues, and 3) estimated increased operating expenses and holding costs, a further deduction is made for post-remediation stigma.

Initially, that was recommended to be reflected in further increases in the risk rates applied to the reduced income stream. However, "it must be remembered that this is a highly subjective adjustment to make and should therefore always be conducted with extreme caution," according to Richards.[6]

In more recent years, sales transaction information has been available from several sources to indicate the percentage difference between the sales price of a remediated property with "closure" from a regulatory body and the estimated unimpaired market value of the property, as of the same date. Thus, market sales transactions data have become sufficiently numerous and available in the U.S. (and, reportedly, Canada) for direct market evidence to be utilized in estimating post-remediation stigma. Valuers in the U.K.,[7] Australia and N.Z.,[8] however, have yet to enjoy this growth in market data availability.

In the absence of market data, some authors recommend the use of opinion survey research. The great majority of these surveys have focused primarily on the attitudes and perceptions of "professionals" in real estate markets: lenders, real estate agents, and valuers. In the U.S., at least, most opinion survey research involving potential buyers or tenants (or sometimes sellers) has focused on stigma from proximity impacts.

As the volume of available sales transactions data increases and becomes generally known, it is anticipated that this more "objective" evidence will be the major source of identifying and measuring post-remediation stigma.

## Guidelines from Professional Societies

One stated reason for studying the practices of valuers and analyzing available valuation procedures for contaminated properties is the concern that non-standard procedures, techniques and data sources may lead to inconsistent results among valuations produced for similarly contaminated properties under similar market conditions. Bond and Kennedy,[9] in particular, argue for the need to standardize valuation techniques and procedures. Further, Richards[10, 11] presents a recurring theme of the importance and desirability of developing "best practice" standards for the valuation of contaminated property, as well as the identification and measurement of stigma.

However, guidelines from professional societies in the countries referred to in this paper offer little beyond admonitions to perform competently, acquire technical assistance and expertise from others where necessary, and report fully (in the U.S. and Canada, at least) on what one has done. Generally speaking, the guidelines offer little substantive direction, few or no details on how the existence of contamination is best treated, and only limited illustrative materials.

In the U.S., the Courts are the arbiters of what is acceptable or non-acceptable practice. The difficulty is that there are 50 separate state court systems, plus the Federal court system, plus various quasi-independent systems such as the Federal Bankruptcy Court. Moreover, state courts, in particular, tend to differentiate among standards for property tax valuation appeals, eminent domain (expropriation) cases, civil damage suits, and regulatory agency claims in identifying what is "proper" (i.e., "admissible") procedure. The plethora of court-imposed "standards" has generally led to more diversity and inconsistency than would be the case if U.S. valuers relied primarily on the essays, case studies and illustrative examples contained in the professional and academic literature cited previously.

The Australian Property Institute guidance[12] at least outlines four main approaches to the valuation of contaminated land. However, it does not provide detailed information on these. Valuers are, therefore, required to interpret the requirements of each method, and from the results of surveys reported here and in Kennedy[13] it appears they do so in a variety of ways. These variations influence assessments of value.

Although the information within each country's guidance statement is of value, it is suggested that the lack of a recommended methodology has contributed to inconsistencies among techniques used in practice.[14] These inconsistencies are reflected in the survey results presented in this paper.

---

6.    Ibid.

7.    Structural limitations affect the ready availability of market sales and market rental transactions data in the U.K.

8.    The activity in and/or size of the Australian and N.Z. markets are more the cause for limitations in market sales transactions data in those countries.

9.    Sandy G. Bond and Paul J. Kennedy, *The Valuation of Contaminated Land: N.Z. and U.K. Practice Compared*. Joint confernece of the Europeon Real Estate Society and American Real Estate and Urban Econimics Association. Maastricht, the Netherlands (June, 1998).

10.   Tim O. Richards, "An Analysis of the Impact of Contamination and Stigma on the Valuation of Commercial Property Investments." Unpublished PhD Thesis. The University of Reading, England (1997).

11.   Richards, 1995, Ibid.

12.   Australian Property Institute 2000, "Guidance Note 15—Contaminated Land Valuation," in Australian Property Institute Professional Practice 2000, Australian Property Institute, Deakin, ACT.

13.   Paul J. Kennedy, "Investment Valuation of Contaminated Land and U.K. Practice: A Study with Special Reference to Former Gasworks." Unpublished PhD Thesis. The Nottingham Trent University, England (1997).

14.   Ibid.

## Surveys of Practice: U.K., N.Z., and U.S.

### Objectives of the Survey

This section of the paper outlines the methodology of surveys of valuation practice undertaken in the U.K. (in 1996), and in N.Z. and U.S. (in 1998). The aim of the studies was to identify the approaches used by valuers when providing advice or producing valuations to account for the financial risks and uncertainties associated with investing in contaminated properties. The results provide valuable lessons for Australian valuers involved in this area of work.

### The Sample and Survey Responses

Although there is potential for all valuers to be faced with valuing land affected by contamination, it is likely only a fraction of these will become involved in such work. As such, a targeted approach of contacting valuers known to work on contaminated properties was considered more appropriate than attempting to survey all valuers.

To enhance the validity of comparative findings between the studies, a similar survey instrument was used in N.Z. and the U.S. that was initiated and adopted by Kennedy in the U.K. For the N.Z. and U.S. surveys a simplified and shortened version of the 18-page U.K. survey instrument was adopted. These instruments were further adapted for relevancy to their particular market.

The U.K. survey that was given to 100 potential respondents achieved an overall response rate of 54%. In N.Z. questionnaires were sent to the 15 N.Z. valuers who replied to a Call for Participation (which was sent to all N.Z. IV members).[15] Seven responses were received indicating an overall response rate of 47%. The U.S. survey that was given to 208 valuers in the U.S. and Canada (192, and 16 respectively) achieved a response rate of nearly 43%.

## Comparison of Survey Responses: U.K., N.Z., and U.S.

This section presents a summary of the major findings that emerged from the analysis of the three surveys. In the interest of brevity, responses to only those questions that were contained in each country's surveys relating specifically to how valuers typically incorporate variables relating to investor risk into value estimates of contaminated properties is presented. Moreover, the focus is primarily on how respondent valuers account for risk and uncertainty (including stigma) in valuing contaminated properties.

### Professional Background and Level of Experience

In the U.K. the majority (96.3%) were qualified and 75.9% had been for more than five years. As far as experience with calculations of market value involving sites affected by contamination, slightly over a half (55.5%) of the U.K. respondents were responsible for between one and 25 such calculations for the one-year period (1995); 11.1% for between 26 and 50; and 3.7% for over 100. However, nearly a third (29.6%) had not conducted or supervised valuations of contaminated property.

In N.Z., all respondents were qualified registered valuers, with 85.5% having been so for more than five years. All respondents had carried out at least one and 25 valuations of property where contamination was an issue within the last five years.[16]

In the U.S. (and Canada), all but two of the U.S. respondents were licensed or certified in one or more states. Over three-quarters (76%) of the respondents held the MAI designation. Over half the respondents (54%) reported over 10 years' experience in valuing contaminated properties. Also, approximately 40% indicated over 10 years' experience in identifying and measuring stigma. The U.S. responses indicate a much higher level of experience than in the other two countries.

Respondents were asked to give examples of types of sites affected by contamination on which they had provided advice. A number of land uses were specified in each country, but virtually all of them were of an industrial nature.

### Valuation Methods Adopted

The U.K. survey listed a capital-based method and three income-based methods: income, profits, and residual, whereas the N.Z. and U.S. surveys did not differentiate among the income-based methods and so listed only two: sales comparison and income.

In each country over half reported using more than one method or technique for each valuation. This may be interpreted in two ways: methods employed may differ according to site type; or some respondents may use more than one method for a single calculation. Although such a combined approach is common in U.S. texts and recommended practice in N.Z. and Australia, the U.K. literature commonly recommends valuations by a single method only.

Of note is that most respondents in the U.S. (80%)[17] reported that they used the sales comparison approach whenever required data was available. This is in contrast to both the U.K. and the N.Z. responses. Moreover, comments made by U.S. respondents indicated that the required data were generally available. Many also indicated that they supplement the findings based on sales comparison analysis with opinion survey research, preferably interviews with buyers and lenders.

The percentage of valuations using full discounted cash flow (DCF) approaches differed by country. In the U.K., only 4 (7.4%) respondents indicated that they used full DCF techniques. In N.Z., 29% use full DCF approaches but only between 5% and 25% of the time. In contrast, 64% of U.S. respondents reported that they

---

15. Over 2000.

16. As compared to the one-year period used in the U.K. survey.

17. Percentages reported here are calculated as the number of "Yes" responses divided by total responses (n) to each particular question.

Copyrighted material licensed by Randall Bell on April 26, 2021

used DCF models. This confirms expectations that income-based methods of limited technical sophistication are used to value sites affected by contamination in the U.K. and N.Z. The U.S. respondents appear more advanced in this respect.

### Incorporating Contamination Costs into Value Estimates

Over half of the N.Z. (57%) and U.S. (60%) respondents deduct the present value of anticipated costs (24% U.K.). At the same time, a large minority (43% U.K., 43% N.Z., 46% U.S.) use a capital deduction (of the total value, not the present value). The popularity of this simplistic approach should represent a source of concern as it is likely to produce a lower value than if the present value of those costs were deducted. Further, the deduction of total (non-discounted) cost has become disfavored by state courts in the U.S.

An additional source of concern in the U.K. is the fact that 20.4% of those respondents use a yield adjustment to reflect contamination costs. This approach is criticized by several texts. It is heartening, at least, that none of the N.Z. and U.S. respondents use the simplistic approach of adopting a discount or yield rate to adjust for contamination costs. In this regard, results produced by the N.Z. and U.S. survey are more positive than those from the U.K.

### Information Source for Estimating Environmental Risks and Uncertainties

Typically, information limitations were used to justify the use of simplistic approaches to quantify perceived financial risks caused by contamination in all three countries. Over two thirds (70%) of U.S. respondents (65.6% U.K., 50% N.Z.) typically use comparable evidence from uncontaminated sites in similar locations to the subject property to quantify the value adjustment required for perceived financial risks. It is unclear what useful information may be obtained from transactions where contamination was not an issue.[18]

Over half of the U.S. (59%) and U.K. (53%) respondents (83% of N.Z.) use evidence from sites similar in contamination type but not location. Over three quarters of the N.Z. (83%) and U.S. (75%) respondents but only one third (37.5%) of the U.K. respondents use evidence from sites similar in both location and type of contamination (when available). As stated above, the availability of such data is likely to be restricted.

### Incorporating Environmental Risks and Uncertainties into Value Estimates

The preferred method reported by respondents in both the U.K. (84%) and N.Z. (83%) to adjust value estimates in order to identify and measure perceived financial and investment risks associated with on-site contamination was to use an upward discount rate adjustment. The figure was 56% in the U.S., while U.S. respondents

also indicated that they regularly make adjustments in the one or more components of the income capitalization approach in order to reflect the increased perceived risks of purchasing or investing in contaminated properties. Most commonly, U.S. respondents indicated that they increased the capitalization rate (59%) while 51% reduced rental income.

Whenever possible, U.S. respondents rely on sales transactions information to identify the percentage reduction in unimpaired market value that is attributable to post-remediation stigma. Generally, U.S. respondents prefer to use a capital value reduction (75%, as opposed to 44% in the U.K. and 33% in N.Z.).

The much heavier reliance on DCF modeling and analysis in the U.S. and N.Z. is reflected in the fact that 57% of the respondents in the U.S. and 50% in N.Z. specify use of a cash flow adjustment (i.e., a reduction in or omission of anticipated cash flows in specified years, most commonly during the remediation period). Only 9.4% of the U.K. respondents indicated that a cash flow adjustment was in their analysis.

U.S. respondents addressed the difficulties and higher costs of obtaining debt financing more frequently than did U.K. or N.Z. respondents: 60% of U.S. respondents report this type of adjustment, as opposed to approximately one-third in N.Z. and slightly less than 25% in the U.K.

As with the use of comparable sales transactions data to develop measures of stigma, the selection of methods to incorporate perceived environmental risks and uncertainties into value estimates appears to depend heavily on the quantity and quality of information available concerning financial and investment risks. The predominance of the upward yield adjustment approach in the U.K. and N.Z. appears to confirm the need to apply both relatively simple, straightforward approaches to valuation and greater reliance on subjective judgments by valuers. It would appear that responses from U.S. and N.Z. valuers indicates greater reliance on market evidence, not only of sales transactions but also of income variations associated with on-site contamination. These results appear to explain the greater reliance on DCF analysis, particularly in the U.S.

### Lessons for Valuers

As the issues relating to contaminated land that face valuers in the countries surveyed are no different to those facing valuers, the foregoing survey results provide valuable lessons for valuers in Australia.

The survey responses show that the approaches adopted by U.K. and N.Z. valuers are "typically simplistic." Most value estimates are underpinned by limited quantitative analysis. In addition, results suggest that some valuers may ignore certain value effects of contamination (e.g., time effects). Further, little regard is given to the analysis of perceived financial risks.

---

18. It appears that respondents interpreted this question as an opportunity to indicate the base or starting point (Unimpaired Market Value) for calculating the deduction to make in order to estimate market value "as is" (i.e., contaminated). Direct comparisons apparently are not made to estimate market value "as is."

These valuation deficiencies were typically justified on the basis of severe limitations on the availability of market data for contaminated properties. At least the U.S. and Canadian valuers believe that necessary market data are available in their countries to enable them to base their estimates of value as if contaminated on sales transactions data, market rental data and market-derived capitalization rates and discount rates. As more and better data becomes available in Australia relating to contaminated property, valuers here will be in a better position to adopt more rigorous quantitative analysis in their valuations of such property.

There is debate between valuers in the various countries surveyed about which valuation method is best for valuing contaminated property. Few of the U.S. or Canadian valuers surveyed believe that there is (or, indeed, should be) a single, standardized approach that is universally appropriate and recommended. Because of their strong belief in the efficacy of real estate markets, these respondents typically make it clear that they apply whatever method(s) or procedure(s) can be applied by using whatever market data are available to them in each particular assignment.

This is in contrast to the research findings of Kennedy[19] that variations in methods used, in the U.K. at least, may have substantial impacts on assessments of value. It is uncertain, however, whether, in that country it is a function of the methodological differences employed or the restricted availability of evidence from comparable transactions that the reliability of market value estimates are limited.

However, despite the uncertainty over the best method for valuing contaminated property, respondents in all three surveys believe strongly that some variant of income capitalization analysis is necessary to identify and measure the deductions from unimpaired market value that are appropriate and necessary to estimate market value "as is" of a contaminated property. Both increased discount rates (and capitalization rates) and reduced cash flows are used whenever supported by market evidence and analysis. When sales transaction data for similarly contaminated properties are available, they are relied on to identify both appropriate deductions from unimpaired market value and any post-remediation stigma, in order to estimate market value "as is."

U.S. and Canadian valuers are prone to rely more heavily (than are those in the U.K. and N.Z.) on licensed professional environmental engineers and technicians for estimates of both cost to remediate and the duration and magnitude of the remediation process. It is recommended, where possible, that Australian valuers follow the U.S. and Canadian valuers' lead in this respect.

The greater awareness of stigma by the U.S. and Canadian respondents compared to those in the U.K. and N.Z. was reflected in the numerous comments that highlighted the identification and measurement of it most frequently as an issue requiring further investigation. This is likely to be an issue requiring further investigation in Australia as well.[20]

In conclusion, the diversity of data availability tends to argue against a single "preferred" valuation method to date, although refinement of recommended techniques is likely to reduce spreads between value estimates "as is" over time.

### References

Australian Property Institute 2000. "Guidance Note 15-Contaminated Land Valuation," in Australian Property Institute Professional Practice 2000, Australian Property Institute. Deakin, ACT.

Bond, Sandy G. "Post-remediation Stigma: Fact or Fiction? Measuring the Effects of a Previously Contaminated Site On the Redeveloped Residential Property Values." Unpublished PhD Thesis. Curtin University of Technology, Perth, Western Australia, 2000.

Bond, Sandy G. and Paul J. Kennedy. "The Valuation of Contaminated Land: N.Z. and U.K. Practice Compared." Joint conference of the European Real Estate Society and American Real Estate and Urban Economics Association. Maastricht, The Netherlands, June 1998.

Elliot-Jones, Michael. "Bixby Ranch: Some Observations on Plaintiffs Expert's Appraisal of Post-Clean-Up 'Stigma.'" San Francisco, CA: Foster Associates, 1995.

Kennedy, Paul J. "Investment Valuation of Contaminated Land and U.K. Practice: A Study with Special Reference to Former Gasworks." Unpublished PhD Thesis. The Nottingham Trent University, England, 1997.

Patchin, Peter J., "Valuation of Contaminated Properties," *The Appraisal Journal* (January 1988).

Richards, Tim O. "A Changing Landscape: The Valuation of Contaminated Land and Property." Reading, England: The College of Estate Management, 1995.

Richards, Tim O. "An Analysis of the Impact of Contamination and Stigma on the Valuation of Commercial Property Investments." Unpublished PhD Thesis. The University of Reading, England, 1997.

19. Kennedy, Ibid.

20. Bond (2000) has attempted to address this issue.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 10.2 How Australian Appraisers Assess Contaminated Land

*by Nelson Chan*

This article originally appeared in the October 2000 issue of *The Appraisal Journal*.

### Abstract

The availability of more information about land contamination, the short supply of development-worthy land in urban areas, and the relatively low value of contaminated land have created a niche market in recent years for redeveloping contaminated land in Australia. Appraisers are frequently required to assess the value of such contaminated land. This article analyzes how Australian appraisers value contaminated land and analyzes the results of a survey of Australian appraisers conducted in 1998. This article also compares the Australian methods with methods used in other countries.

In recent years, the availability of information on land contamination, the short supply of development-worthy land in urban areas, and the relatively low value of contaminated land have created a niche market for redeveloping contaminated land in Australia. Appraisers are frequently required to assess the value of such contaminated land.

It has been generally accepted that valuation of contaminated property involves more than simply deducting routine cleanup costs from the uncontaminated value. Marketability,[1] stigma,[2] and possible change of highest and best use[3] (the likely changes in land zoning) must also be considered. If the land is cleaned up to an approved standard, more sensitive and lucrative enterprise such as residential and commercial use may be allowed on a former contaminated site.

At present, Australian appraisers mainly use two basic approaches to value contaminated land. The first is the unimpaired valuation approach, or unaffected valuation approach; this requires the appraiser to assess the property as if it were clean. The appraiser emphasizes that this assumption has been made in the valuation report and warns the client about the possible impacts of the site's contamination. This type of evaluation is not particularly helpful to the client since the valuation does not reflect the real condition of the site.

The other approach is known as the impaired valuation approach, or affected valuation approach. It requires the appraiser to take into consideration the contaminated state of the property. The appraiser first evaluates the property as if it were clean; and then makes deductions for any future production (income) loss due to contamination and losses due to investigation and remediation costs and possible stigma. This approach can be represented by the following expression (Equation 1):

$$V_c = V_u - L - C_r - S \tag{1}$$

*where:*

$V_c$ = contaminated value,

$V_u$ = uncontaminated value,

$L$ = loss due to reduced income/productivity and/or legal liabilities,

$C_r$ = investigation, remediation, and monitoring costs,

$S$ = stigma impacts.

The above expression may be presented in different ways: some researchers prefer to refine and expand the values for $L$ and $C_r$ into a detailed list of various income losses or cost deductions due to contamination. (Generally, other formulas used are similar to the one presented here; however, it should be noted that the loss of income/productivity and legal liabilities may not necessarily be calculated for every case. In certain cases, they may be a zero.)

Regarding remediation costs, Kinnard[4] points out that it should not be the cost to cure (a complete cleanup) because an absolute cure simply may not exist. Instead, it should be the cost to correct, i.e., the cost to clean up the site to meet the current standards of intended use. This idea matches with that proposed in the 1999 National Environment Protection (Assessment of Site Contamination) Measure[5] in Australia. This document suggests adopting a site-specific assessment to determine if unacceptable health risks exist and to ascertain the nature and magnitude of environmental

---

1.   See, for example, Mundy, B., "The Impact of Hazardous Materials on Property Value," *The Appraisal Journal* (April 1992): 155–162 and Wilson, A.R., "The Environmental Opinion: Basis for an Impaired Value Opinion," *The Appraisal Journal* (July 1994): 410–423.

2.   See, for example, Patchin, P.J., "Contaminated Properties–Stigma Revisited," *The Appraisal Journal* (April 1991): 167–172, Mundy, B., "The Impact of Hazardous Materials on Property Value," *The Appraisal Journal* (April 1992): 155–162, Roddewig, R., "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," *The Appraisal Journal* (October 1996): 375–387, and Neustein, R.A. & Bell, R., "Diminishing Diminution: A Trend in Environmental Stigma," *Environmental Claims Journal* (Autumn 1998): 47–59.

3.   Wilson, D.C., "Highest and Best Use: Preservation Use of Environmentally Significant Real Estate," *The Appraisal Journal* (January 1996): 76–86.

4.   Kinnard, W.N., "Measuring The Effect Of Contamination On Property Values: The Focus Of The Symposium In The Context Of Current Knowledge," Technical Report: *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications*, (Chicago: Appraisal Institute, 1992): 1–22.

5.   National Environment Protection Council Committee 1999, *National Environment Protection* (Assessment of Site Contamination) Measure.

**Nelson Chan** is a valuation lecturer of the University of Western Sydney, Hawkesbury. He has published/presented several research papers about contaminated land issues. In 1999 he became a committee member for the Australian Property Institute to help revise the contaminated land valuation practice standard.

risks, rather than assessment based on de facto cleanup or response levels.

## The Australian Valuation Approaches

Australia is generally regarded as a clean country but unfortunately, it does contain some contaminated land. To help appraisers assess contaminated land, the Australian Institute of Valuers and Land Economists (now the Australian Property Institute [API]) published a Contaminated Land Practice Standard in 1994.[6] The document was subsequently incorporated into Guidance Note 15 "Reporting on Contaminated Land" of the API Professional Practice 2000.[7] Besides providing members with background information about contaminated land issues, the document also introduces four bases (unaffected valuation basis, affected valuation basis, environmental balance sheet basis, and comparative basis) for the evaluating contaminated land.

To find out how Australian appraisers assess contaminated properties in practice, a mail survey of appraisers in New South Wales, Victoria, and Queensland was mailed out in April, 1998. These three States were selected as study areas because they are more populated and are home to more commercial and industrial enterprises than other States and territories; it is therefore logical to assume that they contain more contaminated land. It also follows that appraisers in these three States have more contact with contaminated properties and therefore more experience in carrying out relevant valuations.

Questionnaires were sent to appraisers in the three States using a mailing list provided by the divisional office of the Australian Property Institute in New South Wales (NSW), Victoria, and Queensland. (At present, the Institute does not keep a register of appraisers who specialize in contaminated land valuation.) The Institute supplied 1,368 addresses in NSW, but only 19 in Victoria and 28 in Queensland. The divisional offices in Victoria and Queensland reported that the appraisers they recommended were believed to have experience in contaminated land valuation but similar preselection

had not been made by the divisional office in NSW. To keep the survey to a manageable size, questionnaires were sent to 500 appraisers in these three States. Since the number of addresses in Victoria and Queensland was substantially smaller, all were used. For NSW, 453 addresses were selected randomly. A follow-up interview of 40 participating appraisers (22 in NSW, 7 in Victoria, and 11 in Queensland) was subsequently conducted. The survey results are summarized in Tables 1–5.

Similar surveys have also been administered recently in the United Kingdom, New Zealand, and the United States. In 1997, Kennedy[8] surveyed 100 preselected appraisers (from a variety of recommendations and sources) in the United Kingdom and garnered a response rate of 54%. In 1998, Bond[9] surveyed 15 preselected appraisers (those who replied to a call to participate) in New Zealand and achieved a response rate of 47%. Kinnard and Worzala[10] (also in 1998) surveyed 208 preselected appraisers in the United States and Canada (192 in the United States and 16 in Canada) and received a response rate of 46%. These surveys found that appraisers in these countries mainly use sales comparison (direct comparison) and income capitalization methods (including discounted cash flow [DCF] method) techniques to value contaminated property. The overseas survey findings are contrasted with the Australian survey findings as outlined in Table 1.

Table 1 shows that the response rate to this survey in Australia was lower than that in the UK (54%), New Zealand (47%), and the United States (46%). The higher overseas response rate may be due to the fact that the surveyed appraisers were all preselected and some of them had replied to a call for participation. The small number of appraisers recommended in Victoria and Queensland and the low response rate in NSW suggest that the majority of appraisers in Australia do not have experience in contaminated property valuation. Nevertheless, the survey results reveal that some of the respondents have valued up to 100 contaminated properties. This shows that experienced contaminated property appraisers do

**Table 1**      Feedback From 1998 Australian Appraisers Survey

| Actions | New South Wales | Victoria | Queensland | Total |
|---|---|---|---|---|
| Questionnaires sent | 453 | 19 | 28 | 500 |
| Questionnaires returned | 90 | 7 | 11 | 107 |
| Response rate (%) | 20 | 37 | 39 | 21 |
| Response from appraisers with experience in contaminated land valuation | 45 | 7 | 11 | 63 |
| Number of contaminated land valuations done by individual appraisers | 1–100 | 2–30 | 1–50 | N/A |

---

6.   Australian Institute of Valuers and Land Economists (AIVLE), *Contaminated Land Practice Standard* (1994).

7.   Australian Property Institute (API), *Professional Practice 2000*, Guide Note 15, (1999): 183–205.

8.   Cited in Kinnard, W.N.; Worzala, E.M.; Bond, S.; & Kennedy, P., *"Comparative Studies of United States, United Kingdom and New Zealand Appraisal Practice: Valuing Contaminated Property,"* paper presented at the 15th American Real Estate Society Annual Meeting in Tampa, Florida, April 7–10, 1999.

9.   Bond, S.G., *"The Appraisal of Contaminated Land in New Zealand,"* paper presented at the 14th American Real Estate Society Conference in conjunction with the International Real Estate Society Meeting, Monterey, California, April 15–18, 1998.

10.  Kinnard, W.N.; Worzala, E.M.; Bond, S.; & Kennedy, P., *"Comparative Studies of United States, United Kingdom and New Zealand Appraisal Practice: Valuing Contaminated Property,"* paper presented at the 15th American Real Estate Society Annual Meeting in Tampa, Florida, April 7–10, 1999.

Copyrighted material licensed by Randall Bell on April 26, 2021

exist in Australia, despite the fact that land contamination is not considered a common problem there.

Given the small sample size in Victoria and Queensland and the overall small number of returns, it is inappropriate to carry out a comparison between these results and those from the United States. I prepared a distribution graph based on the responses of appraisers who have experience in contaminated land valuation (Figure 1). This figure shows that the respondents fall into two distinct groups: an experienced group (those who have valued six or more contaminated properties) and a less experienced group (those who have valued less than six contaminated properties); there were 31 less experienced respondents and 32 experienced respondents, sample sizes large enough for meaningful analysis. It should be noted that the less experienced group refers to appraisers who have less experience in the valuation of contaminated properties only. It does not mean that they are less experienced overall.

As mentioned above, the Australian Institute of Valuers and Land Economists published a Contaminated Land Practice Standard in 1994 (now the API Professional Practice Guidance Note 15) to give members the necessary guidance in relation to contaminated

land issues.[11] Table 2 shows the Australian appraisers response to this document.

Table 2 shows that about 90% of those surveyed in both groups are aware of the document; the Institute has done a good job introducing it. However, the number of respondents who use the document or follows its guidelines in practice is not as high. This directly correlates with the fact that, as reflected in Table 2, a substantial number of respondents do not find that the suggested valuation approaches reflect real-life practice. The follow-up interview revealed that respondents like that the document provides more information on valuation and the dangers involved in each of the problematic land uses and industries mentioned in the document. The overseas surveys in the United States, New Zealand, and Canada did not include this item, so there is no comparison between surveys on this point.

The application of valuation basis suggested in the document, as evaluated by the Australian respondents, is summarized in Table 3.

The Table shows that in both groups there is a preference for using the unaffected valuation basis over the affected valuation basis. More respondents in the experienced group use the affected and unaffected valuation

**Figure 1**      Number of Contaminated Properties Valued by Australian Respondents



**Table 2**      Opinion on Contaminated Land Practice Standard

| Questions | Less-experienced group (%) | Experienced group (%) |
|---|---|---|
| Are you aware of the "Contaminated Land Practice Standard"? (Yes) | 90 | 91 |
| Do you refer to the Practice Standard when valuing land? (Yes) | 68 | 72 |
| Do you follow valuation approaches suggested in the Practice Standard? (Yes) | 65 | 78 |
| Do the suggested valuation approaches reflect real life practice? (Yes) | 45 | 59 |
| Is the document helpful/useful? (Yes) | 77 | 78 |

**Table 3**      Application of Suggested Valuation Basis by Australian Appraisers

| Suggested basis | Less-experienced group (%) | Experienced group (%) |
|---|---|---|
| Unaffected valuation basis | 55 | 81 |
| Affected valuation basis | 52 | 56 |
| Environmental balance sheet | 3 | 13 |
| Comparative approach | 32 | 38 |

11.    Australian Institute of Valuers and Land Economists (AIVLE). *Contaminated Land Practice Standards*, (1994).

basis overall. In the United States, 54% of respondents claimed they use the unaffected (unimpaired) approach to valuation; this is approximately the same percentage who claim they use it in the less-experienced group in Australia. This question was not included in the United Kingdom and New Zealand surveys; no comparison can be made.

Of the four suggested valuation approaches, the environmental balance sheet approach is the least popular. One reason for this may be that the respondents are not familiar with the balance sheet format used in this method and therefore are not comfortable using it. The overseas surveys did not include this subject so there is no basis for comparison.

Table 4 shows the valuation methods used by the Australian respondents in practice. About 80% of both groups use the comparison method in their valuation. It is interesting to note that this result contrasts sharply with the results in Table 3 that shows less than 40% of respondents use this method. This may be because some respondents were not familiar with the content of the Practice Standard and gave an uninformed answer to this question. In contrast, 80% of respondents in the United States, 0% in the United Kingdom, and 29% in New Zealand reported using this method.

The survey results show that over 50% of the respondents in both groups use the capitalization method. In comparison, 80% of respondents in the United States, 100% in the United Kingdom, and 100% in New Zealand reported using this method. Regarding the cost method, 71% in the less-experienced group and 59% in the experienced group claim to have used this method. A similar query was not made in the overseas surveys, so there is no comparison possible.

The Table shows that 40% to 50% of respondents in both groups have used the hypothetical development method. Since the hypothetical development method is generally used to assess the development potential of land, it indicates that the highest and best use of the relevant contaminated land is not the current use. This supports the fact that there is a niche market to acquire contaminated land for redevelopment. Again, this

method is not reported in the overseas surveys.

Regarding the discounted cash flow method, 32% of the less-experienced group and 16% of the experienced group use this method. In comparison, 64% of respondents in the United States, 7% in the United Kingdom, and 29% in New Zealand use this method, showing that the Australian respondents are more open to using this method than their counterparts in the United Kingdom.

According to responses to the Australian survey, the accounts method is used relatively infrequently. The use of this method is not reported in the overseas surveys, so there is no basis for comparison. The subject survey shows that the only methods used to value contaminated land are the methods listed in Table 4. In fact, these are the same methods used to value clean properties; the only difference is that the respondents need to adjust for the impact of stigma at the end as outlined in Table 5.

Over 70% of respondents reported that the existing methods for valuing contaminated land are suitable for the purpose. Less than 50% of the respondents reported that methods can/shall be improved, showing that respondents are content with the current methods used. This item was not covered in the overseas surveys, so there is no basis for comparison.

Table 5 below shows the valuers' point of view about stigma: 48% of the less-experienced respondents state that their clients have concern for this value impact, and 56% of the experienced respondents share the same view. It appears that the stigma issue has already caused significant concern, if not alarm, among clients in the three Australian States. A significant number of respondents (58% of less-experienced and 72% of experienced) have allowed for the stigma factor in their valuations. This implies that the majority of contaminated properties valued have stigma impact. Appraisers realize the seriousness of this issue and have taken appropriate action when completing valuations. The overseas surveys did not cover this area so there is no basis for comparison.

For those respondents who claim to have made allowance for stigma impacts, various approaches have been applied (Table 6). A number of respondents have chosen not to respond to the questions in Table 6. The figures obtained show that the majority of respondents use the arbitrary discount rate and percentage adjustment methods to allow for stigma impacts. The lump sum adjustment method has the least support. In com-

**Table 4          Valuation Methods Used in Practice**

| Questions | Less-experienced group (%) | Experienced group (%) |
|---|---|---|
| Comparison method | 81 | 78 |
| Capitalization method | 52 | 56 |
| Cost method | 71 | 59 |
| Hypothetical development method[12] | 42 | 52 |
| Accounts method[13] | 16 | 6 |
| Discounted cash flow method | 32 | 16 |
| Applicability of the above methods?  (Yes) | 77 | 72 |
| Can/shall the methods be improved?  (Yes) | 26 | 44 |

**Table 5          Stigma factor**

| Questions | Less-experienced group (%) | Experienced group (%) |
|---|---|---|
| Clients concern for stigma impact (Yes) | 48 | 56 |
| Allowance for stigma factor in valuation (Yes) | 58 | 72 |

12.    The hypothetical development method, also known as residual method in the UK, is a variation of the cost method and is used to assess development land value. It is based on the assumption that land value equates to difference of completion value and total development cost.

13.    The accounts method, also known as profits method in the UK, is used to assess the market value of special premises that have some degree of monopoly. It is based on the assumption that value of the particular property is related to the profits of the business conducted on the premises.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 6**          Stigma Adjustment Approaches

| Questions | Less-Experienced Group (%) | Experienced Group (%) | Total Respondents with Experience (%) |
|---|---|---|---|
| Arbitrary discount rate | 16 | 22 | 19 |
| Percentage adjustment | 29 | 28 | 29 |
| Lump sum adjustment | 3 | 6 | 5 |
| Other methods | 3 | 13 | 8 |
| Need to have a specific method to value contaminated land (Yes) | 10 | 13 | 11 |
| Willingness to try new method to value contaminated land (Yes) | 35 | 69 | 52 |

parison, 66% of respondents in the United States, 80% in the United Kingdom, and 83% in New Zealand use the increased discount rate for adjustment.

Regarding other methods of valuation, respondents claim to have used zero adjustment, arbitrary adjustment, higher profit and risk factor, comparable evidence, and lower loan-to-value ratio methods. In comparison, respondents in the United States use reduced rental income, increased vacancy rate, increased capitalization rate, increased debt interest rate, reduced loan-to-value ration, reduced amortization period, increased equity yield rate, and increased equity dividend rate for adjustment. The United Kingdom and New Zealand respondents only use reduced rental income an as alternative method for adjustment. In a separate survey in 1997, Richards[14] found that appraisers in the United Kingdom mainly use upward adjustment for all-risk-yields, or overall capitalization rate, to account for stigma.

It is interesting to note that despite the lack of a uniform method of allowing for stigma, few Australian respondents responded that there is a need for a specific valuation method. The experienced group is more open: about 70% reported a willingness to try a new method.

## Analysis of the Australian Valuation Approaches

At present, Australian appraisers are mainly using conventional valuation methods to value contaminated land. The use of conventional methods is not a bad idea: a number of property researchers (Patchin,[15] Mundy,[16] Wilson,[17] Simm,[18] Fisher, Lentz, and Tse,[19] and others) have used them in their research. Apart from conventional valuation techniques such as the comparison method and capitalization method, Australian appraisers also use the cost method, hypothetical development method, and accounts method to value contaminated property. Of all the valuation methods, the accounts method and discounted cash flow method are not used frequently; this may be due to the fact that the accounts method is normally used to value specialized properties such as hotels, nursing homes, and pubs. Contamination of these properties is generally uncommon; accordingly, this method is rarely used. The discounted cash flow method is generally used to meet institutional clients' requirements. If given a choice, appraisers would rather use more familiar traditional valuation methods such as the comparison method and direct capitalization method for the job.

Since conventional valuation methods rely heavily on market evidence, the use of familiar traditional methods is not without problems. First, there is a lack of transaction data on contaminated properties; it is therefore difficult to rely on market evidence to estimate prices, rents, and yields of contaminated properties.[20] Second, as Wilson[21] states, "each environmental problem is as unique as a fingerprint"–it is difficult to get true comparables to apply in the direct comparison method. Accordingly, alternative valuation methods such as the environmental balance sheet (EBS) method,[22] survey method,[23] multiple regression

---

14. Richards, T., "Beware the Contamination Factor in Valuation," *Chartered Surveyor Monthly*, (May 1997): 28–29.

15. Patchin, P.J., "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal*, (July 1994): 402–409.

16. Mundy, B., "The Impact of Hazardous Materials on Property Value," *The Appraisal Journal*, (April 1992): 155–162

17. Wilson, A.R., "The Environmental Opinion: Basis for an Impaired Value Opinion," *The Appraisal Journal*, (July 1994): 410–423.

18. Simm, G., "Problems for the valuation surveyor," Paper presented at *Seminar on 'Environmental Assessment,'* Sheffield City Polytechnic, 5 March 1992 cited in Syms, P.M., *Contaminated Land*, (London: Blackwell Science, 1997).

19. Fisher, J.D., Lentz, G.H. & Tse, K.S.M., "Valuation of Commercial Properties Contaminated With Asbestos," *Journal of Real Estate Research*, (7: 1992): 331–350.

20. See, for example, Kinnard, W.N., *"Measuring The Effect Of Contamination On Property Values: The Focus Of The Symposium In The Context Of Current Knowledge," Technical Report: Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications*, (Chicago: Appraisal Institute, 1992), 1–22 and Syms, P.M., *Contaminated Land*, (London: Blackwell Science, 1997), 197–203.

21. Wilson, A.R., "Environmentally Impaired Valuation: A Team Approach To a Balance Sheet Presentation," *Technical Report: Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications,* (Chicago: Appraisal Institute, 1992): 23–42.

22. Wilson, A.R., "Environmentally Impaired Valuation: A Team Approach To a Balance Sheet Presentation," *Technical Report: Measuring the Effects of Hazardous Materials Contamination on Real Estate Values: Techniques and Applications* (Chicago: Appraisal Institute, 1992): 23–42.

23. See, for example, Greenberg, M. & Huges, J., "Impact of Hazardous Wastes Sites on Property Value and Land Use: Tax Assessors' Appraisal," *The Appraisal Journal*, (January 1993): 42–51, and McLean, D.G. & Mundy, B., "The Addition of Contingent Valuation and Conjoint Analysis to The Required Body of Knowledge for the Estimation of Environmental Damages," *Journal of Real Estate Practice and Education*, (1: 1, 1998): 1–19.

analysis,[24] option pricing approach,[25] mortgage-equity analysis approach,[26] Monte Carlo simulation method,[27] and expected utility model,[28] and others, are introduced by property researchers. However, apart from the EBS method, the respondents do not use these methods. Some Australian appraisers may use the EBS method because the Australian Property Institute has incorporated this method into Guidance Notes 15 of its Professional Practice (formerly the Contaminated Land Practice Standard).

Australian appraisers have a greater preference for using the unaffected valuation basis for valuing contaminated land. The reason for this may be that clients have given instructions to do so or that the clients do not insist the valuation be done on an affected basis. Clients may ask for an unaffected basis valuation for specific purposes such as accounting or share floating. When there is no clear instruction from the clients, appraisers tend to perform an unaffected basis valuation for expedience.

Apart from the above reasons, another possible reason for the reluctance to use the affected basis for valuation may be the following: the assessment of various income and financial losses due to contamination and cleanup costs is fairly straightforward. The income and financial losses are calculated from facts provided by the client, and clean up costs are provided by environmental consultants. It is assessing value loss due to stigma impacts that creates problems. Spencer[29] points out that the major problem is "a comparative lack of satisfactory evidence related to stigma-affected properties in Australia."

On the other hand, methods used by the respondents to assess stigma impact are not satisfactory. In the United States, Patchin[30] suggests using the direct comparison method to assess the unimpaired and impaired values of the property. The indicated stigma is estimated by subtracting the impaired value from the unimpaired value. In the United Kingdom, a similar yet more elaborate approach (the improved stigma assessment approach) based on Patchin's work is also suggested by Syms.[31] Apart from including the nature and extent of contamination of comparable properties, it also takes into consideration the present value of remediation costs. In addition, Syms[32] also suggests a

risk assessment model to estimate stigma impact based on 26 industrial activities and a stigma value reduction range of 21%–69% borrowed from Patchin's work in 1994. The model creates a "value adjuster" that is used as a stigma adjustment factor. However, respondents report that they do not use these methods, possibly because they do not know they exist. Nevertheless, Syms's improved stigma assessment approach has been borrowed and included in the Professional Practice 2000 by the Australian Property Institute. It is likely that some appraisers will begin using this method in the near future.

## Conclusion

A niche market for contaminated land has emerged in Australia and other countries in recent years. Appraisers are receiving more requests to value contaminated properties. This study finds that appraisers in Australia are mainly using conventional valuation methods to value contaminated land. These valuation methods are fine for valuing the unimpaired value of contaminated properties, but because of the lack of transaction data and the uniqueness of individual property are not suitable to value the impaired value of the properties. Property researchers have introduced a number of alternative methods. The Australian Property Institute is aware of the progress overseas and is willing to bring practical ideas to its members; and to this end, it has incorporated the EBS approach and Syms's improved stigma assessment approach in the Professional Practice 2000.

The survey shows that there are more Australian appraisers using the unaffected approach than the affected approach for valuation. While there are many reasons that Australian appraisers tend to use the unaffected approach, the difficulty in assessing stigma impacts is likely to be an essential one. The lack of transaction evidence is beyond the control of an appraiser; however, the deficiency may be compensated for by a reliable method of assessing stigma impacts.

At present, the stigma assessment methods used by Australian appraisers are unsatisfactory and indefensible. The methods suggested by property researchers are also far from satisfactory. Patchin's method suffers from oversimplification. Equation 1 shows that the dif-

---

24.  See, for example, Dotzour, M., "Groundwater Contamination and Residential Property Values," *The Appraisal Journal*, (July 1997): 279–285 and Reichert, A.K., "Impact of a Toxic Waste Superfund Site on Property Values," *The Appraisal Journal*, (October 1997): 381–392.

25.  Lentz, G.H. & Tse, K.S.M., "An Option Pricing Approach to the Valuation of Real Estate Contaminated with Hazardous Materials," *Journal of Real Estate Finance and Economics*, (10: 2, 1995): 121–144.

26.  Chalmers, J.A. & Jackson, T.O. "Risk Factors in the Appraisal of Contaminated Property," *The Appraisal Journal*, (January 1996): 44–58.

27.  See, for example, Gain, K.J., "Appraising by Probability Analysis," *The Appraisal Journal*, (January 1990): 119–126 and Byrne, P., Risk, *Uncertainty and Decision-making in Property Development*, 2nd edition, (London: E & FN Spon, 1996) and Weber, B.R. "The Valuation of Contaminated Land," *Journal of Real Estate Research*, (14: 3, 1997): 379–398.

28.  Wiltshaw, D.G., "An economic analysis of contaminated land, remediation and liability," *Journal of Property Research*, (13, 1996): 131–141.

29.  Spencer, J.A., "Standard for Valuation of Contaminated Land In Australia," *The Valuer and Land Economist* (November 1993): 585–587.

30.  Patchin, P.J., "Contaminated Properties and the Sales Comparison Approach," *The Appraisal Journal* (July 1994): 402–409.

31.  Syms, P.M., "Dealing with Contaminated Assets," *Estates Gazette* (Issue 9612 1996): 124–125.

32.  Syms, P.M., *Contaminated Land* (London: Blackwell Science, 1997): 197–203.

Copyrighted material licensed by Randall Bell on April 26, 2021

ference between the unimpaired and impaired values is more than just the value loss due to stigma. Syms's improved approach is better. However, even if the present value of the expected repair cost (remediation cost) is added to the sale price (the impaired value) as he suggests, it will not necessarily "give a good read on residual stigma."[33] Syms's other approach, the risk assessment model, is an improvement, but it is not easy to use. A better method to assess value loss due to stigma impacts needs to be researched.

This article provides an insight into how Australian appraisers value contaminated properties. However, the findings are not conclusive since the survey results are from small and unstructured sample sizes. Studies of larger random samples will likely support these findings; nevertheless, further research in this area is needed.

### References

Sandy G. Bond, "The Appraisal of Contaminated Land in New Zealand," research paper presented at the 14th American Real Estate Society Conference in conjunction with the International Real Estate Society Meeting, Monterey, California, April 15–18, 1998.

Sandy G. Bond, "Do Market Perceptions Affect Market Prices? A Case Study of a Remediated Contaminated Site," research paper presented at the 16th American Real Estate Society Conference, Santa Barbara, California, March 29–April 1, 2000.

Dennis R. Cappozza and Gordon A. Sick, "Valuing Long Term Leases: The Option to Redevelop," *Journal of Real Estate Finance and Economics* (4: 2, 1991): 209–223.

Timothy Dixon, "Contaminated Land: a Changing Landscape," *Estate Gazette* (Issue 9608 1996): 136–138.

Mark Dotzour, "Groundwater Contamination and Residential Property Values," *Appraisal Journal* (July 1997): 279–285.

Stuart Gronow, "Contaminated Land—the Inevitability of an Explicit Appraisal Model," *Property Management* (16: 1, 1998): 24–32,

Stuart Gronow, "Contaminated Land—Quantifying the Inputs to an Explicit Appraisal Model," *Property Management* (17: 2, 1999): 169–185.

Robin Hocking, "The Valuation of Landfill Sites," *New Zealand Valuers' Journal* (March 1997): 33–41.

Patrick Lally, "The Role of Valuers in an Environmentally Sensitive Future," *The Valuer & Land Economist* (35: 1, 1998): 12-18.

Richard G. Mollart, "Monte Carlo Simulation Using LOTUS 1-2-3," *Journal of Property Valuation* (6: 4, 1988): 419–433.

Richard A. Neustein, "Estimating Value Diminution by the Income Approach," *The Appraisal Journal* (April 1992): 283–287

Scarlett Palmer and Colin Lizieri, "Valuation and Investment Strategy," *Estate Gazette* (Issue 9542, 1995): 124–125.

Alan K. Reichert, "Impact of a Toxic Waste Superfund Site on Property Values," *The Appraisal Journal* (October 1997): 381–392.

Tim Richards, "Beware the Contamination Factor in Valuation," *Chartered Surveyor Monthly* (May 1997): 28–29.

E.M. Sheard, "Valuation of Contaminated Land: the Valuer's Role," *Journal of Property Development* (1: 1, 1996): 11–16.

Paul M. Syms, "The Effect of Industrial Contamination on Residential Land Values in the United Kingdom," *Land Contamination & Reclamation* (4: 1, 1996): 49–56.

Joseph T. Williams, "Real Estate Development as an Option," *Journal of Real Estate Finance and Economics* (4: 2, 1991): 191– 208.

**Useful URL links**

http://www.estatesgazette.net/
Estate Gazette

http://www.propertyinstitute.com.au/
The Australian Property Institute

---

33.   Sanders, M.V., "Post-Repair Diminution in Value from Geotechnical Problems," *The Appraisal Journal* (January 1996): 59–66.

## 10.3 Stigma of Contaminated Land: Difficult to Tackle

*by Hans Siemens\**

This article originally appeared in the April 2003 issue of *The Appraisal Journal*.

It is difficult to put a value on homes that stand on polluted land. Psychology is a capricious factor. The consequences are incalculable if a residential district is labeled as a polluted area. Prices tumble in polluted areas according to research conducted in the Dutch town of Maassluis, near Rotterdam. But other factors can also influence the value of homes, making the subject too volatile for simple guidelines.

Bas van de Griendt of Royal Haskoning has grasped the thorny subject of valuing polluted real estate. He believes that the people of the Netherlands must get used to living on polluted land, and all real estate professionals in the Netherlands should be aware of this fact. Two years ago van de Griendt wrote a book about this subject entitled *Waarde Vervuild Vastgoed [The Value of Contaminated Real Estate]*, published by Ten Hage Stam publishers in The Hague, and he is currently working on a second book. This subject is of concern to van de Griendt because many real estate agents and valuers know little about it. He teaches courses about valuation of contaminated property, including one for the training institute of Nederlandse Vereniging van Makelaars (NVM), the Dutch Real Estate Agents Association. Some of his students see polluted real estate as a threat, but van de Griendt believes that the situation presents opportunities, not threats. The market will not allow professionals to ignore the situation any longer.

### Clean Is an Illusion

The real estate sector cannot avoid the subject of contamination. "It's an illusion to think that you can still build on clean land in an urban environment in the Netherlands," says van de Griendt. "It's nothing new. Living on waste is as old as mankind. The important thing is to clean up the land to make it acceptable, i.e., suitable for the intended purpose."

In other words pollution is everywhere and a very topical issue, particularly in urban redevelopment programs. The Brabant provincial authorities recently tackled the subject in a memorandum entitled "Bouwen op Stortplaatsen" ["Building on Dumps"]. If homes have to be built on polluted land, it is crucially important to know the effects on prices/values. The key question is this: How do you determine the value of real estate on polluted land?

### Tip of the Dirty Iceberg

The subject of contamination is relatively new. In 1980 the first scandal of a polluted residential district in the Netherlands became news when the media zoomed in on Lekkerkerk. People in the area still recall the pictures of dug-up homes on piles. Lekkerkerk turned out to be only the tip of a huge contaminated iceberg. Experts originally estimated that not more than 350 cases of pollution existed in the Netherlands, but that number was entirely wrong. The Netherlands has an estimated 150,000 to 200,000 polluted sites. The number of hectares that are involved is unknown. Figures vary from landfill sites of 10,000 hectares to small plots of no more than a few square meters. Once the ceiling of 25 cubic meters is passed, a site is designated as "essential to cleanup."

### Commercial vs. Residential Perceptions

When pollution becomes news, real estate professionals need to know the effects on the value of the real estate. It is not easy to determine the effects, particularly in regard to homes. According to van de Griendt, the situation is more clear-cut when it comes to commercial real estate because it is about liability and costs. Companies approach the matter rationally, as a technical issue. In numerous instances the pollution does not have

---

\*	This article was first published in *Vastgoed, Nederlands Vakblad voor Onroerend Goed [Real Estate, Dutch Journal for Real Estate Professionals]*, a publication of NVM, the Dutch Real Estate Agents Association [77 no. 3, (March 2002): 44–47]. It was translated by Royal Haskoning for the symposium "Environmental & Property Damages: Standards, Due Diligence, Valuation & Strategy," co-sponsored by the Centre for Advanced Property Economics and the Appraisal Institute, Toronto (April 4–7, 2002). Reprinted by permission of NVM.

**Hans Siemens** is a freelance Dutch journalist who frequently works for the Dutch Real Estate Agents Association, NVM.

**George G.M. ten Have** is a valuation expert and director of real estate agents at Boer Hartog Hooft Makelaardij in Amsterdam. He is the author of *Taxatieleer Onroerende Zaken* [*Handbook on Immovable Property Valuation*].

**Bas van de Griendt** is a soil consultant for the real estate market at Royal Haskoning in Utrecht. He teaches courses on the subject of contamination for the NVM and SBV School of Real Estate.

**Gert-Jan Wolleswinkel** is a student of business and administration and physics at the University of Utrecht. The research discussed in this article was part of his coursework.

Copyrighted material licensed by Randall Bell on April 26, 2021





The Netherlands became aware of its polluted soil in 1980 through the "Lekkerkerk affair." Lekkerkerk was a residential district with over 250 homes that were built on chemical waste. This community proved to be the tip of the iceberg as far as contamination was concerned.

to be removed, but the risks of exposure and spread have to be eliminated. Companies set down a list of costs and find a way to pay for them. These costs–that is, the impairment caused by soil contamination–are usually a decisive factor in valuing a property. Putting a figure on the impairment is fairly simple. It is done coolly with a level head and without emotion.

It is a different story when pollution affects homes. The anxiety stems from the uncertainty of liability–determining who is liable. The residents (tenants or owners) are not usually liable, but the real estate professional needs to determine the party who is liable and who will pay the expenses. In many cases the liability falls on the government, but determining the process, the timing, and the amount the government will pay for the cleanup operation takes a long time. Meanwhile unrest increases among the residents as they deal with worrisome questions. How dangerous is the pollution? Will it affect the health of my family? What will happen to the value of my home?

Government, real estate agents, and valuers are almost invariably unable to answer questions about the effects of polluted land on the price/value of homes built on the land. The market is not prepared to accept this absence of information, according to van de Griendt. He provocatively describes the present situation as akin to a real estate agent putting a value on a ruin on the assumption that the building is in perfect condition. A valuer or real estate agent will usually value a home on the notion that the soil is clean.

Despite the importance of the price/value effects, no research has ever been conducted on the subject in the Netherlands. "Everybody talks about it, but nobody really knows what they're talking about," says van de Griendt. He decided to address the subject together with Gert-Jan Wolleswinkel, a student of physics and business and administration at the University of Utrecht.

## Polluted Districts in Maassluis

In their research, van de Griendt and Wolleswinkel examined movements in the value of homes in two similar toxic residential districts (two-thirds owner-occupied homes, one-third rented homes) in Maassluis: Steendijkpolder and Noord Nieuwlandspolder Zuid. Although the most important provisional conclusion may be a disappointing one, it is nevertheless an interesting one: There is absolutely no way of knowing what will happen with home values. The researchers were not really surprised by this finding.

In one of the districts, prices collapsed dramatically and took years to recover. In the other district there was hardly any fall in prices. Even more surprising is the fact that the price dip in the second district lasted briefly. Prices quickly returned to the old level and moved in line with price fluctuations elsewhere in the South Holland province. A further conclusion appears to be a noteworthy one for residents and campaigners: To limit the damage, do not publicize the pollution. The research revealed that negative publicity could cause a sharp fall in the value of the property.

Another research conclusion is that the extent and type of soil pollution is basically unimportant. Pollution has to be serious enough to necessitate a cleanup operation, but when this occurs there are additional factors that affect the fall in price and value.

### Steendijkpolder

One of the districts examined by van de Griendt and Wolleswinkel was Steendijkpolder, widely known in the Netherlands since 1983 as one of the biggest toxic residential areas and crammed with heavy metals, polycyclic aromatic hydrocarbons (PAHs), and pesticides that originated from dredging sludge in the Port of Rotterdam. The land in the district was covered with the sludge near the end of the 1960s. The same thing happened at Noord Nieuwlandspolder Zuid, one kilometer away in Maassluis. The pollution was the same, but it was discovered two-and-a-half years later.

The situation in Steendijkpolder involved 1,000 homes and attracted a wave of publicity. The discovery of pollution shocked the mostly young residents, and a nightmare scenario of poison, disease, uncertainty, and fear suddenly overtook their lives. Residents organized groups and mounted a vociferous mass protest. The municipal archives are brimming with 600 news articles with alarming headlines. The two researchers assume that this publicity contributed to the homes in Steendijkpolder being blacklisted. When the publicity surfaced, potential buyers pulled out. No one with common sense would purchase a home there.

The transaction data for the district show that sales were low in that area for a long time. The residents of Steendijkpolder had double bad luck because the housing market was depressed as well. They had purchased their homes at high prices at the peak of the housing market in the 1970s. With prices already starting to come down, they were hit by the new blow of living in a toxic district. Wolleswinkel believes that this is the reason that residents mounted such a strong protest through the media.

**Prices Drop by One-Third.** Figures provided by NVM-affiliated real estate agents in Maassluis show that the year-average purchase prices in Steendijkpolder nose-dived between one-fourth and one-third of the price (see Figure 1). It took six years for prices to return to the old level. However, the general perception was that the matter was resolved relatively quickly. The real estate agents estimated a far shorter period–three years–between the price slide and the return to the old level; the facts tell a different story. Prices did not start to pick up until clarity existed about a cleanup operation, and the news gradually disappeared from the headlines. As Figure 2 shows, there is a connection between the disappearance of the news from the headlines and the recovery of prices. There is a kind of headline curve. "This parallel is perhaps not entirely scientifically sound, but it is very striking," says Wolleswinkel. He is attempting to validate the relationship. The two researchers believe that the publicity was an important factor that contributed to stigmatization of the district and the subsequent price slump. The extent of that contribution is impossible to indicate in general terms.

### Noord Nieuwlandspolder Zuid

Residents of Noord Nieuwlandspolder Zuid remained calm, or at least the homeowners among them did.



**Figure 1    Steendijkpolder, Noord Nieuwlandspolder Zuid, and Maassluis Housing Prices**

······ Steendijkpolder        ——— Noord Nieuwlandspolder Zuid        ——— Maassluis (reference)

This graph shows how prices developed in Steendijkpolder and Noord Nieuwlandspolder Zuid, with the city of Maassluis as a reference. There are striking differences. The two districts have similar pollution, yet prices in one of the districts, Steendijkpolder, nose-dived while those in the other district, Noord Nieuwlandspolder Zuid, remained buoyant. Psychology is the decisive factor.

Copyrighted material licensed by Randall Bell on April 26, 2021



**Figure 2          Steendijkpolder Housing Prices and Media Articles**

This graph shows publicity expressed in terms of the number of articles that were written. These articles made Steendijkpolder the most famous polluted residential district in the Netherlands. There is a remarkable link between publicity and prices: A rise in negative publicity is accompanied by a fall in prices.

The press had lost some of its interest in pollution. In a sense it was a case of growing accustomed to the situation. A lot can apparently change in two-and-a-half years. The municipality kept the communication lines open between the residents and the officials. The residents frequently received a full and frank explanation of the steps that were being taken.

The lack of publicity may also have had something to do with the age distribution of the people who lived in the district. There were relatively speaking older residents. Wolleswinkel believes that older people "are less inclined to create a fuss." When children are involved, people become more upset and more vocal about the situation.

All in all there was little commotion, little publicity, and hardly any fall in home prices. Scientific literature shows that this particular district differs from the traditional picture that unfolds in a pollution scandal. Normally prices begin to fall when rumors start to circulate about pollution. If research subsequently shows that the rumors are justified, prices nose-dive and then start rising again when work starts on a solution. As soon as clarity exists about a cleanup operation, the prices edge up a little further. On completion of the cleanup, prices reach their old level, or at least that is what the literature states. The story of Noord Nieuwlandspolder Zuid in Maassluis shows that theory and practice can be two entirely different things.

## Psychology

The two Royal Haskoning researchers found what they had expected to find, although it was not a perfectly logical picture that makes the valuation of homes embroiled in a pollution situation predictable. The researchers noted a number of factors that play an important role in the fall of housing prices in polluted districts, with the two principal factors being psychology and stigmatization. The media hype hurt housing prices in Steendijkpolder and left a smear on homes in that district. On the other hand there was relatively little media attention of the situation in Noord Nieuwlandspolder Zuid, so the homes there escaped the pollution label.

Psychology is clearly a crucial factor–one that real estate agents and valuers need to take into account when valuing homes in polluted areas. The full glare of the media brings falling prices for the residents living in a polluted area. Additionally there are some important economic and demographic features. Older people attract less media attention because they respond differently than younger people. People with children respond more negatively to the information. In addition a different picture may emerge in different market conditions (i.e., rising or falling housing prices). One of the studied districts was hit by the pollution issue during a price slump, while the other was hit during a time of normal-to-high prices. Even though these are logical conclusions, people seem unaware of them when homes are being valued.

## Identifying a Trend

While the research in Maassluis may not have produced a clear-cut picture, the results do highlight how reactions to soil pollution differ. The research of van de Griendt and Wolleswinkel has not yet been completed, and they are continuing their investigations. Their goal is to compare price developments of different polluted districts, and they feel that both the government author-

ities and the real estate market will benefit from their findings. They hope to identify a trend and to define characteristics that might bring about a plus or a minus mark in valuations. One example of this is the number of houses withdrawn from sale, which can be an indication that something is about to happen. Using their data they should be able to identify decisive economic, demographic, and environmental factors. It should then be possible to develop a model that allows determination of the value of real estate affected by pollution. They hope to complete their research findings this year, and time will tell whether their findings are usable in the field. According to van de Griendt, "It's important to create awareness of 'new' factors that influence value."

## Comment
### Faster and Better Opinions

George ten Have, valuation expert at the Boer Hartog Hooft Makelaardij in Amsterdam, believes that van de Griendt and Wolleswinkel's research is significant for the valuing profession. He states that the biggest advantage is that valuers will be able to assess the impact of polluted land faster and more effectively. He points out that the large number of polluted sites further underscores the importance of this research.

According to ten Have, valuers doing their work properly must allow for stigma or psychological effects when real estate is polluted. The valuer is an observer who translates in general terms what is happening in the market. In that respect it is similar to the development of share prices on the stock market. Sometimes it is incomprehensible why the price of a particular share goes up or down. In the stock market, as in real estate, emotions and publicity can play a big role in price.

A valuer makes a price analysis of transactions in his immediate business environment. If the analysis shows that the average price in a district is €100,000 while the average for a similar home in a different district is €200,000 the valuer will take the average of his own district. In this case it will be a lower average, however the effect of a reduction is only measurable after a number of transactions. Depending on the outcome the delay can be anything from one week to six months. According to ten Have, this period could be shortened, perhaps to zero.

George ten Have disagrees with the suggestion that valuers now disregard polluted land when putting a price on homes. He notes that if a valuer writes in the report that the value-reducing factors were not taken into account, the valuer is referring to the cleanup costs that are directly identifiable. These costs are not easy for a valuer to estimate. They are not usually known at the time of valuation. To the extent that they are known, there are questions such as the following: When will the cleanup take place? Who will do it, and who will pay for it?

### More Information

In the future, ten Have believes that real estate agents and valuers should provide more guidance than they presently provide about the effects that polluted land might have on house prices. Then it is up to consumers to decide for themselves how the possible risks will translate into money. Studies like the one conducted by van de Griendt and Wolleswinkel will enable real estate agents and valuers to address this issue more effectively. The matter can be dealt with more explicitly in training courses organized by real estate industry organizations. Further research is needed to provide more precise answers. The wealth of price data possessed by NVM–unique anywhere in the world–is an exceptionally valuable instrument.

## 10.4 The Risk Approach: A Step-By-Step Plan for a Clean Valuation

*by Bas van de Griendt and George G.M. ten Have*

This article originally appeared in the January 2003 issue of *The Appraisal Journal*.

In the Netherlands no one would accept the valuation of a ruin under the premise of it being in "perfect building condition." At the same time, however, it is acceptable for property valuers to appraise contaminated business parks or industrial sites on the basis of "notional clean soil." Yet, isn't there any other way? Bas van de Griendt and George G.M. ten Have–respectively soil consultant and property valuer–make the first move in a new direction by introducing the risk approach. This approach distinguishes itself from, for example, a traditional cost approach by taking into account not only costs for soil survey and soil remediation but also use restrictions, legal and contractual liabilities, and especially cost risks involved with soil pollution.

Contaminated property depresses prices, carries financial risks, and can influence the size of the market, that is, the marketability of immovable property, land, and buildings. Three issues in particular that play key roles in this respect are the probability and financial consequences of

• The existence of soil contamination
• Decisions about whether or not to remediate
• Adverse effects on use value

### Questions

Is the soil contaminated? Should it be remediated? Will its contamination have an adverse effect on the use value of the site? These are questions that the property valuer needs to answer before he can ascertain the value of a contaminated object. The valuer's main problem is twofold: he is neither sufficiently versed in soil contamination nor can a soil consultant be of much assistance since in most cases no adequate soil survey has been conducted–at least in the mind of the soil consultant.

With the aid of the *risk approach*, however–a methodology for valuing contaminated property[1]–it is possible to determine at an early stage in the soil survey how much environmental damage to deduct from the definitive value of the contaminated property. This valuation method differs from the commonly used "traditional" cost approach by considering not only the survey and clean-up costs but also assessing the need for remediation and the risks closely linked to soil remediation. This is illustrated by the following example.

### Example

It is the year 2000. The object being valued is a garage with a service and repair shop and a showroom with the accompanying warehouse. The valuation is to determine the proper amount of financing in light of plans for expansion and added construction. However, the exact date for these plans has not yet been set; construction will probably not start until five years down the road.

Preliminary and detailed soil surveys are available for the location. These show serious contamination and an urgent need for cleanup. However, calculations and an order from the provincial authorities show that remediation is not required until 2015 (after 15 years), according to the Dutch Soil Protection Act[2] [Wet Bodembescherming Wbb].

**Notional Clean Soil.** Property Valuer A appraises the value of the object on the basis of "notional clean soil." He arrives at an open or fair market value of €500,000 when sold by private treaty and a liquidation or forced-sale value of €425,000. Since he has indications of soil contamination but does not know how to value this "environmental damage," he establishes that the aim of the valuation will be unachievable unless a separate survey is conducted on the quality of the soil. He advises his client to have the soil quality surveyed by way of obtaining the relevant environmental information (possibly including information on environmental law).

**Traditional Cost Approach.** Property Valuer B asks a soil consultant how much the necessary remediation

---

1. J.S. Van de Griendt, *Waarde Vervuild Vastgoed—Stappenplan voor een Zuivere Taxatie [The Value of Contaminated Property—A Step-by-Step Plan for a Clean Valuation]* (Amsterdam: WEKA Law & Finance Publishers, 1999).

2. The Dutch Soil Protection Act speaks of a case of serious contamination when the mean concentration exceeds the so-called intervention value of at least one substance in at least 25m$^3$ of soil volume in the case of soil contamination or 100m$^3$ pore saturated soil volume in the case of groundwater contamination. If there is a case of serious contamination, the competent authority has to decide whether remediation is urgent and the deadline by which the remediation has to start. The determining factors are the actual risks for humans and ecosystems at the contamination site, as well as the risk of dispersion.

**Bas van de Griendt** is a soil consultant for the real estate market at Royal Haskoning in Amsterdam. He is the author of the book *Waarde Vervuild Vastgoed—Stappenplan voor een Zuivere Taxatie [The Value of Contaminated Property—A Step-by-Step Plan for a Clean Valuation]*, first published in 1999 by WEKA Law & Finance Publishers, Amsterdam. Last year a second revised edition was published by Ten Hagen Stam, The Hague (ISBN 9044000942).

**George G.M. ten Have** edited the above mentioned book and penned the first (and so far only) Dutch handbook on immovable property valuation: *Handboek Taxatieleer Onrooerende Zaken [Handbook on Immovable Property Valuation]*. He is director of estate agents at Boer Hartog Hooft Makelaardij in Amsterdam.

### Impact of Soil Contamination on Property Value

The harmful effects of soil contamination occur in phases. In general, an appraiser can distinguish seven different phases ranging from the problem's inception to its resolution:[1, 3]

1. Ignorance
2. Rumors
3. Survey I
4. Survey II
5. Coming to terms
6. Remediation
7. Clean

In the first phase, the seemingly blissful state of ignorance is cruelly upset upon the sudden discovery of contamination. Even rumors or the suspicion of contamination can give rise to a strike among buyers and form an obstacle for city and rural planning and economic development. In Survey Phase I, contamination is already suspected; this in turn can be either confirmed or dispelled. In Survey Phase II, the nature and extent of the contamination is mapped.

Another distinction between "phases of contamination" can be made by using the various soil surveys, which in the Netherlands are generally conducted in the following order:

0. No Survey (NS)
1. Historical survey (HS)
2. Preliminary survey (PS)
3. Detailed survey (DS)
4. Remediation survey (RS)
5. Remediation plan (RP) and specifications (S)
6. Remediation (R)

The first estimate of the remediation costs often has to wait until a detailed survey has been conducted and the extent of the contamination has been established. Nevertheless, it might be desirable to estimate the costs purely on the basis of an historical or preliminary survey—or even before a single survey is conducted. Each new survey phase that is completed (historical, preliminary, detailed, etc.) can then provide more clarity about the contamination situation and sharpen the estimate on the remediation costs. The question in this respect is what certainties and doubts are at play in the estimated remediation costs.

**Figure 1**    Certainties And Doubts Involved With Soil Survey And Remediation



\*   Costs are expressed in Euros.

would cost. Assuming—given the current Dutch laws and regulations[4]—that all the pollution is removed from the soil, it would cost some €200,000 according to the consultant's estimates. The valuer takes these costs as a "technical defect" that needs to be remedied and subtracts them from the value of the site in clean condition ("notional clean soil") by giving them a cash value. He uses a "traditional" cost approach where:

$$FMV_{contaminated} = FMV_{remediated} - K_r/1.04^t$$

where:

$$FMV_{contaminated} = \text{fair market value in contaminated condition}$$

$$FMV_{remediated} = \text{fair market value after remediation or on the basis of "notional clean soil"}$$

$$K_r/1.04^t = \text{"net present value" of the estimated remediation costs over t years at a net interest rate of 4\% in this case}$$

He, therefore, comes to a value of €388,950 rather than €500,000 when sold by private treaty.

**Risk Approach.** Property Valuer C takes account of the revised Dutch soil remediation policy[5] with function-oriented and cost-effective remediation as its premise, meeting the criteria relating to the purpose for which the soil is to be used ("suitable for use").[6] This is much

3.    B. Mundy, MAI, "The Impact of Hazardous Materials on Property Value," *The Appraisal Journal* (April 1992): 155–162.

4.    The present Dutch formal policy on cleanup, as set out in the cleanup regulations of the Soil Protection Act, is based on the complete removal of the soil pollution. This means restoring the so-called multifunctionality of the soil for use by humans, flora, and fauna. Only under circumstances specific to a given site is it possible to depart from this cleanup objective and take measures that result in isolation, control, and monitoring of the pollution (ICM cleanup).

5.    "Cabinet Position on Updating the Dutch Soil Remediation Policy—Based on the Interdepartmental Remediation Policy Study: The Soil Remediation Policy Update," *Second Chamber*, (1996/1997): 25411, no. 1 d.d. (16 June 1997).

6.    "Suitable for use" means satisfactorily preventing exposure to contaminated substances and satisfactorily counteracting the spread of contaminating substances, according to "From Funnel to Sieve—The Remediation Goal Appraisal Process," (The Hague: Ministry of Housing, Spatial Planning and Environment d.d., 15 October 1999).

Copyrighted material licensed by Randall Bell on April 26, 2021

---

**Certainties and Doubts in Surveys and Estimated Remediation Costs**

The first estimate of the remediation costs often has to wait until a detailed survey has been conducted and the extent of the contamination has been established. Nevertheless, it might be desirable to estimate the costs purely on the basis of an historical or preliminary survey—or even before a single survey is conducted. Each new survey phase that is completed (historical, preliminary, detailed, etc.) can then provide more clarity about the contamination situation and sharpen the estimate on the remediation costs. The question in this respect is what certainties and doubts are at play in the estimated remediation costs?

To answer this question I set out in search of a financial risk analysis method that could be used in the property market—for instance, for property development—and whereby practical, real-life certainties and doubts would be applied.[1, 7] I chose a method based on an 80% degree of certainty, which is acceptable for the real estate market, so that the actual remediation costs would fall within the upper and lower limits of the survey estimates. This can be shown in a formula as follows:

$$P[RC_e \times 0.5 < RC_a < 1.5 \times RC_e] = 80\%$$

There is thus an 80% probability (P) of the actual remediation costs ($RC_a$) turning out more than half, yet less than one and a half times the estimated remediation costs ($RC_e$) on the basis of the soil survey. Due to variances in the available information, the reliability intervals may differ from survey to survey. That is the result of different objectives being used and discrepancies in how much has been measured, to mention just a few possibilities. This needs to be taken into consideration in assessing the financial risks. These, in turn, can be formulated as follows:

$$P[RC_e \times (1 - A) < RC_a < (1 + A) \times RC_e] = 80\%$$

Here A is the factor of certainty and doubt, which not only depends on the kind of soil survey performed, but also on the sort of contamination, soil conditions, and the geohydrological situation. In the absence of a survey, A is up to a maximum. If remediation has taken place, A is down to a minimum. For immobile substances like heavy metals and polycyclic aromatic hydrocarbons, A is much smaller than for mobile substances like mineral oil and aromatic and chlorinated hydrocarbons. The value of A can be determined using expert guesses and/or case studies.[1, 8] Figure 1 (on the previous page) gives an example graphically.

---

more economical than multifunctional remediation: €75,000 instead of €200,000 according to the soil consultant's report. Moreover, he also values the uncertainty and risks that are closely linked to the present soil contamination,[1] including for this case:

- Measuring risk—The chance that the amount of soil and groundwater that needs to be remediated is more (or less) than estimated or calculated. The measuring risk depends on the amount and quality of the information available.
- Norm risk—This risk has to do with the aim of the cleanup and the rededication levels—what *may not* be cleaned up on the basis of certain functions but rather *is subject to* multifunctional remediation (or vice versa)? This can make a big difference in the costs.
- Time risk—The risk of remediation needing to take place earlier than planned (or that may be left for later). Plans for expansion and construction may be one reason.

This comes down to the following deductions for remediation costs and risks:[7]

| | | |
|---|---|---|
| Remediation costs | €75,000/1.04¹⁵ = | ± =41,645 |
| — measuring risk | 0.30 × €75,000/1.04¹⁵ = | ± €12,495 |
| — norm risk | 0.10 × (€200,000 − €75,000)/1.04¹⁵ = | ± €6,940 |
| — time risk | 0.90 × €25,000/1.04⁵ = | ± €18,495 |
| Total | | ± €79,575 |

The valuation of the direct remediation costs takes place as set out above. They are then converted into cash values. The valuation of the *measuring risk* is based on the accuracy (or lack thereof) of the estimated cleanup costs, which are also connected with the amount of information available—a preliminary and a detailed soil survey. They are estimated at 30% in accordance with a risk analysis method for certainties and doubts in surveys and estimated remediation costs.[8] Given the site's use and in light of the revised soil remediation policy, the chance of multifunctional remediation being mandatory—with no option for a function-oriented and cost-effective remediation (norm risk)—is virtually nil: 10%. On the contrary, it is almost certain (90%) that the plans for expansion and construction will be realized between now and five years and that at least a partial cleanup will, therefore, have to take place earlier than calculated (time risk). By modifying certain aspects of the plans and bringing them into line with the contamination situation, a partial cleanup will suffice: one third of the total remediation, thus €25,000 rather than €75,000. Property Valuer C, therefore, comes to a deduction of €79,575. That is a difference of €31,475 from Property Valuer B's total.

## Which Valuation Is Right?

That depends on the aim of the valuation and the way in which the job is formulated. A valuation report is made to inform the client about the value of the property.[9] The client or a third party uses this information to make a decision, e.g., to buy or sell. In this case the aim is to determine how much financing would be appropriate for the garage's plans to expand. Rather than being an

---

7.    This example does not take into account the effect of partial remediation over five years on the cash value of the remediation costs and the different risks. However, partial remediation would indeed affect their extent.

8.    J.S. van de Griendt, "Bodemverontreiniging en Vastgoedontwikkeling—(On)zekerheden in Onderzoek en Geschatte Saneringskosten" ["Soil Contamination and Property Development—Certainties and Doubts in Surveys and Estimated Remediation Costs"] *Bodem [Soil]* no. 4 (1997): 164–166.

9.    G.G.M. ten Have, *Handboek Taxatieleer Onroerende Zaken [Handbook on Immovable Property Valuation]* (The Netherlands: Houten: Stenfert Kroese/Educational Partners, 1992).

island unto itself, the valuation is a link in the client's decision-making process.[9] The valuer will, therefore, project himself into the client's situation and will need to know what role the report–and in this case about the soil contamination–will play in the decision-making process. Property Valuer C goes even beyond that in his thinking as he also offers room for alternatives.

The risk approach that he applies creates space for the input of others–in this case from a soil consultant. That input is necessary since now and in the future, clients will no longer accept having property valued on the basis of "notional clean soil." Given the change in direction in the Dutch remediation policy,[5] nor will they be likely to take a maximum deduction from the cleanup costs using multifunctional remediation ("traditional" cost approach) as the basis. The valuation of contaminated property requires tailored work in which the appraiser takes into account uncertainties in the surveys and in the estimated cleanup costs. The risk approach, therefore, constitutes an important instrument and is indispensable for a clean valuation.

## How Does the Risk Approach Actually Work?

The risk approach is a step-by-step plan that serves as a practical guide for establishing the value of contaminated property. It includes five different steps:[1]

- **Step 1** *Valuation of the immovable property on the basis of "notional clean soil" using traditional valuation methods.* This could be the sales comparison approach, income approach, or cost approach.
- **Step 2** *Valuation of the direct damage, including building damage and damage as a result of use restrictions.* Soil contamination can be a reason for limiting the property's uses temporarily or for longer periods of time, which can lead to lost income. It also can be a cause for damage to the underground infrastructure, cables and pipes, sewer system, and foundation. Building damage and damage as a result of use restrictions are valued using a simple *environmental risk checklist (ERC)* as part of the risk approach.
- **Step 3** *Valuation of liabilities and obligations with respect to the contaminated soil and/or groundwater.* This may have to do with one's duty to conduct a survey or undertake remedial action. It is important in this respect to differentiate between legal and contractual liability.
  - The *legal liability* is based on the Dutch Soil Protection Act [Wet bodembescherming Wbb]. One of the main questions concerned with soil

pollution is whether or not someone can get a survey and/or cleanup order. The latter can be given to only polluters and so-called guilty owners and long leaseholders[10] (Figure 3).
- The *position between buyer and seller* is not only settled in a contract but also based on the Dutch Civil Code [Burgerlijk Wetboek BW]. It concerns, for example, their mutual obligation to inform each other about possible soil contamination. Conformity and nonconformity of the property plays a major role.

Furthermore, questions are raised, such as whether or not a building licence and/or a permit will be given according to the Environmental Management Act. If not, there are additional use restrictions.

- **Step 4** *Valuation of the costs and risks of soil survey and remediation.* This has to do with the costs of field and lab work–removing, transporting, and processing contaminated soil and pumping up, treating, and discharging contaminated groundwater. Furthermore, uncertainties in the survey and in the cleanup, as well as related financial and other risks, play a role. Differences can be drawn between the measuring risk, cost risk, norm risk, residual risk, and time risk–a few of which were described above.

Risks are thereby defined as "the undesirable effects of a certain activity or event connected to the chance that this will happen."[11] For the distinguished risks and the risk approach, the following questions are always asked, based on regular risk analysis:[12]

1. What could happen? (scenario s)
2. How likely is it that it will happen? (probability p)
3. And if it happens, what would be the consequences? (effect e)

As such, it is a very technically-oriented definition. Psychological research, however, shows that in many cases it is not *probability* but *controllability* that is the key to determining the risks of executing or undergoing certain activities and events.[11]

- **Step 5** *Valuation of the stigma-effect.* This is the drop in value of the property compared with the same property in a noncontaminated condition, in so far as that is not caused by recognizable costs and risks that occur in response to the contamination. The stigma-effect (SE) is considered to be a multiplier for the risks (R) involved:

$$SE \times (R_m + R_c + R_n + R_r + R_t)$$

---

10. An order to take remedial action, according to the Dutch Soil Protection Act, shall not be given to the owner or long leaseholder of the property if this person shows that he (a) had no sustainable legal relationship with the polluter or polluters during the period in which the contamination was caused, (b) has had no direct or indirect involvement in the cause of the contamination, and (c) was not aware or in all fairness could not have been aware of the contamination at the moment of acquiring the title to the property.

11. J.C. Hanekamp and W. van Haren, Normering en Risico's in *Wetenschappelijk Perspectief [Normalization and Risks in a Scientific Perspective]* (Amsterdam: Stichting Heidelberg Appeal Nederland, 1998).

12. S. Kaplan and B.J. Garrick, "Risk Analysis," *Journal of Risk Analysis*, no. 1 (1981): 11–27.

Copyrighted material licensed by Randall Bell on April 26, 2021



**Figure 2**     The Risk Approach: A Step-By-Step Plan For A Clean Valuation

**Figure 3**     Legal Liability: Yes or No Cleanup Order

In many cases, however, stigma has little relationship to cleanup costs.[13]

## Real and Perceived Risks

The step-by-step plan above shows that the risk approach takes into account both *real damage and risks* (e.g., survey and remediation costs) and *perceived damage and risks* (e.g., stigma-effect). The literature indicates, however, that a mathematically-derived conclusion on the effect of soil contamination often does not correspond with the opinion of the public at large[14] and that the damage or difference between the value before and after contamination does not equal the costs to cure.

Adverse public perception about a property is intangible or not directly quantifiable[15] but has an additional impact on value over and above the costs and risks of survey and remediation.[16] Damage, therefore,

---

13.   P.J. Patchin, MAI, "Contaminated Property—Stigma Revisited," *The Appraisal Journal* (April 1991): 169.

14.   B. Mundy, MAI, "Stigma and Value," *The Appraisal Journal* (January 1992): 7–13.

15.   R. Roddewig, MAI, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," *The Appraisal Journal* (October 1996): 375–387.

16.   R. Bell, MAI, "The Impact of Detrimental Conditions on Property Values," *The Appraisal Journal* (October 1998): 380–391.

| Table 1 | Damage Through Soil Contamination | |
|---|---|---|
| 1. Direct damage and costs, including: | · | Removing, transporting, and processing contaminated soil |
| | · | Pumping up, treating and discharging contaminated groundwater |
| 2. Indirect damage and costs, including: | · | Soil survey |
| | · | Procedures, fees and permits |
| | · | Demolishing and reconstructing buildings |
| | · | Use restrictions |
| 3. Immaterial damage (stigma), including: | · | Annoyance and fuss |
| | · | Image |
| | · | Uncertainties |
| | · | Market resistance |

is the sum of the costs for soil survey and soil remediation, loss of income due to use restrictions, plus a stigma-effect. It can be described mathematically by:

$$V_d = V_c - C_s - C_r - \text{use restrictions} - \text{stigma}$$

where

$V_d$ = Value dirty
$V_c$ = Value clean
$C_s$ = Costs for soil survey
$C_r$ = Costs for soil remediation

Practice in the Netherlands indicates that stigma plays a major role, especially for housing where, in extreme situations, stigma-related losses can virtually destroy a property's value—for example, when a polluted residential quarter attracts large media attention. In the case of commercial real estate (e.g., business parks and industrial sites), stigma seems to play a minor role. For most private companies the main problem is whether they can bear and/or finance the costs involved with the soil contamination. It can be the reason for a higher interest rate and/or a lower loan-to-value ratio and con-sequently cause additional financing costs and risks.[16]

## Conclusion

At the moment stigma, risks, and risk-defining factors concerning remediation costs are subject to further scientific research. Although the risk approach may not be completely finished yet (as mentioned in the introduction, it is a first move in a new direction), it has proven to be an important instrument for valuers, as well as for soil consultants. It helps them to communicate with one another.

The soil consultant's task is not only to estimate the costs for soil survey and remediation but also to determine the financial risks involved because the original costs are often exceeded. The valuer's principal task may be to provide an opinion of the additional impact, if any, arising from the stigma-effect associated with the site in the marketplace before, during, and after the cleanup process.

In the Netherlands the risk approach is more and more accepted by valuers, real estate agents, bankers, and lawyers for valuing, buying and selling, financing, and contracting. The main reason is that it not only takes costs for soil survey and soil remediation into account but also the financial risks closely linked to soil contamination, as well as legal and contractual liabilities.

In the future it may become an indispensable tool when urban redevelopment becomes one of the main issues for the Dutch real estate market. That means buying, selling, and deliberately redeveloping more or less contaminated sites in accordance with the revised Dutch soil remediation policy, which no longer requires removing all pollution in all cases. A valuation of contaminated property on the basis of "notional clean soil" will, therefore, no longer be accepted despite the risks involved. This demands further knowledge of the market, the value, and valuation methods for contaminated property.

Copyrighted material licensed by Randall Bell on April 26, 2021

## 10.5  A Beginning Best Practice Brownfield Valuation Model

*by Bruce Weber, MAI*

This article originally appeared in the January 2002 issue of *The Appraisal Journal*.

### Abstract

This article is the fourth of a series that discusses the use of geographic information systems (GIS) for market analysis. The objective of this article is to suggest a beginning best practice approach for the valuation of brownfields. The approach makes use of the quantitative tools recommended by the Appraisal Qualifications Board, in the process of valuing contaminated land "as is," prior to remediation and subject to stigma. This article summarizes research findings presented by the author at the July meeting of the International Real Estate Society.

There is a need for increased capabilities on the part of appraisers and for reliable methods for the valuation of development land and brownfields in particular. Simons[1] defines a brownfield as "a formerly industrial or commercial site prevented from attaining its highest and best use as a result of perceived or actual environmental contamination." He estimates that there are at least 500,000 nonresidential, brownfield properties in the United States alone. Accurate valuation of brownfield properties is increasing in importance. Experts have noted that most new development in the Los Angeles basin will occur on brownfields, since almost no land in the area remains undeveloped. Institutional investors will be looking for an accurate assessment of risk as they provide financing for some of this redevelopment for brownfields in the lower-risk categories.

Simons notes the lack of expertise in brownfield valuation and appraisers who are ready and willing to place a value on contaminated property 'as is':

> Nearly all appraisers instead provide a value 'as if clean.' Without the valuation as is, which would provide value net of remediation cost and stigma, banks cannot ascertain a property's value for consideration in the loan-to-value ratio, and loans become even more difficult to obtain.

The 2001 version of the *Uniform Standards of Professional Appraisal Practice* (USPAP) states that regulators notified the Appraisal Standards Board that some appraisers were not providing an adequate scope of market analysis.

An acceleration of international investment has resulted in a need for global uniform valuation standards. This increase in real estate investment was the primary reason for development of International Valuation Standards 2000.[2] The standards were introduced at the Valuation 2000 Conference in July, 2000, in Las Vegas, Nevada. One of the papers prepared for this conference was by Edge,[3] who stated:

> What investors, regulators, and users of valuation services require is consistency, clarity, reliability, and transparency in valuation reporting worldwide...A single international standard has to encompass or recognize property laws, tenures, accepted rules of conduct, languages, concepts, and "best practice" benchmarks.

Both the International Standards and the USPAP in the U.S. call for the use of present value techniques to identify, quantify, and analyze both market and financial risk. Both also note that there are "recognized methods and techniques" that should be used for valuation. In reality, there were no universally recognized techniques found for some of the more complex valuation problems that need to be solved.

### A Review of the Literature

A comprehensive search of the literature by Syms and Weber[4] has found that there are no definitive Best Practice standards regarding the analysis of risk, and/or market analysis, especially as they relate to the valuation of brownfields. This review of the literature was commissioned by the Royal Institution of Chartered Surveyors to enable practitioners to understand some of the implications involved in the valuation of contaminated land and to compare United Kingdom research and practice with the situation in the U.S.

The literature suggests the use of comparable contaminated sales, calculation of stigma based on a percentage of the value of a property as if unimpaired, opinion survey research, direct capitalization, and discounted cash flow analysis. Many calculate the present worth of the cost to remediate plus a percentage for

---

1.  Robert A. Simons, *Turning Brownfields into Greenbacks* (Washington, D.C.: Urban Land Institute, 1999).

2.  IVSC (2000) International Valuation Standards, the International Valuation Standards Committee, RICS, London.

3.  John A. Edge, "The Globalization of Real Estate Appraisal: A European Perspective." *Papers and Proceedings*, Valuation 2000, Las Vegas, NV.

4.  P.M. Syms and B.R. Weber, MAI, "International Approaches to the Valuation of Land and Property Affected by Contamination (provisional title)," (London: RICS Foundation, forthcoming 2001).

**Bruce R. Weber, MAI,** is principal at Market Foresight in Newport Beach, California. Mr. Weber received his MBA degree from the University of Michigan and has specialized in the use of Geographic Information Systems for market analysis, with a special interest in forecasting sub-market demand for real estate.

stigma and then deduct this amount from the unimpaired value of the property. Another approach used in the U.K. is the use of an "all-risks yield approach," discounting for anything that could go wrong.

One of the problems noted as part of this review is that methodologies suggested for use in arriving at values are not in compliance with the requirements of the *Daubert* decision.[5] In *Daubert*, the Supreme Court established guidelines related to whether or not expert testimony will be admissible in federal court, where brownfield issues often are decided. The *Daubert* guidelines also have been implemented by many state courts. CERCLA issues are tried in federal courts, where compliance with *Daubert* is mandatory. CERCLA is an acronym that stands for the Comprehensive Environmental Response, Compensation, and Liability Act that establishes liability for the remediation of contaminated properties.

Hoyt and Aalberts[6] note that *Daubert* and subsequent cases now require judges to act as "gatekeepers," by considering some or all of the following four factors when deciding whether or not to admit expert witness testimony:

1. Whether the theory can be and has been tested.
2. Whether the theory has been subjected to peer review and publication.
3. Whether, as to a particular scientific technique, there is a known rate of error the court should consider.
4. Whether the technique is generally accepted in the relevant scientific community.

It is not enough that an appraiser "has a feel for the value" or has a subjective opinion about the valuation of a property. Judges will look at the empirical model used by the appraiser before the testimony will be allowed into court.

Hoyt and Aalberts conclude that the manner in which judges treat the specialized knowledge of expert appraisers is entering a new era. They believe that the fourth factor, regarding the general acceptance of the evidence in the relevant scientific community, will be increasingly emphasized:

> Both the technical aspects of real estate appraisal as well as compliance with USPAP must be scrutinized. Only then can judges be assured that the testimony presented in their courtrooms are credible…This requires appraisers to go back to the basic body of knowledge and USPAP. By doing so, appraisal experts will ensure consistent presentations between their written report and testimonies. It is also important that appraisers keep up with the generally accepted body of knowledge as it evolves and get acquainted with new theories, techniques, and methodologies as they appear in peer-reviewed publications.

Kinnard and Worzala[7] provide a systematic survey of appraisers in Canada and the U.S. who are known to have or reported to have experience in valuing contaminated real estate. They note that few papers apply the authors' recommended methodology using case examples based on actual market data and that appraisers use whatever data is available. They find that while numerous methods are used, data is not available to show which of these techniques, if any, produce results that are reasonably accurate.

The theories in the literature mainly appear to be subjective judgments. The courts view these approaches as intuitive and unable to provide the specificity needed under *Daubert*, in that they have not been backed up by empirical data.

Jackson[8] starts his literature review on environmentally impaired land valuation methods by noting that practitioners and academics are having difficulty in arriving at consistent findings as to the effect of environmental contamination on real estate. He notes that the literature deals with appraisal methods, but does not develop a consensus view. He also echoes the findings of Kinnard and Worzala that valuation literature has offered few empirical studies of contaminated real estate, but rather has focused on existing appraisal methods that can be adapted to estimate the impacts of contamination on market value.

Research discusses the probabilistic approach to valuing contaminated properties. Probabilistic risk assessment is discussed extensively in a number of chapters of *The Handbook of Real Estate Portfolio Management*, the counterpart of the Appraisal of Real Estate for portfolio managers and other institutional investors.

Swaroop and Carter[9] have been using probabilistic risk analysis to consult buyers regarding the financial risk of contamination. Their work includes Bayesian Analysis and Monte Carlo methods. These might be suitable risk analyses that USPAP 2001 would require appraisers to provide for lenders providing loans on brownfields.

Birdsall[10] noted that his firm has used decision tree and probabilistic risk analysis in 500 cases and that it has been their main tool in estimating costs at superfund sites. A major reason for its use in consulting for major corporations is that it can give a client a quantified answer regarding:

• The type and extent of contamination
• Selection of remedial alternatives
• Technological performance, and
• Liability share

---

5. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

6. Richard W. Hoyt, MAI, and Robert J. Aalberts, "Implications of the Kumho Tire Case for Appraisal Expert Witnesses," *The Appraisal Journal* (January 2001): 11–18.

7. William N. Kinnard, MAI, and Elaine M. Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma," *The Appraisal Journal* (July, 1999): 269–278, at 275.

8. Thomas O. Jackson, MAI, "The Effects of Environmental Contamination on Real Estate: A Literature Review," *Journal of Real Estate Literature* (9: 2).

9. Ram Swaroop and Richard Carter, "Procedure to Assist Decision-Makers in Selecting a Remedial Alternative for Hazardous Waste Sites." Superfund '87, Eighth National Conference, Washington, D.C., 1987.

10. T. H. Birdsall, "Quantifying Environmental Costs and Liabilities." AICPA /IBA, San Diego, 1995.

Copyrighted material licensed by Randall Bell on April 26, 2021

Birdsall also notes that the development of a widely used decision analysis model has helped attorneys determine, on a case-specific basis, whether to accept settlement offers or pursue litigation at Superfund sites.

Monte Carlo methods are capable of quantifying the differing financial risks of brownfields and also the market's reaction to these risks. It is also a tool recommended for the analysis of land development by institutional investors. Bayesian Analysis can quantify the financial risk from soil sampling procedures. The USPAP now requires appraisers to quantify risk for lenders. For this reason, these two risk assessment techniques are suggested as a starting point for brownfield valuation.

No matter what valuation approach is used, the highest and best use of a brownfield must be feasible. Schmitz and Brett have noted that "feasibility studies can vary dramatically in length, scope, and cost" and that "a market study is a crucial item in a feasibility study."[11] They note that sensitivity analysis is required to quantify risk for lenders. The authors also note that:

> Market research can identify an appropriate selling price for a completed project or a parcel of land. The value of raw land is determined by constructing a market analysis of a likely completed project, then extrapolating the value of the land based on the value of the completed project.

Anna Frej et al suggest the use of a developmental analysis in project feasibility. A land residual analysis is used to value the land based on prospects for income and the most likely cost of developing a site.[12]

Coughlin,[13] an institutional investor at Copley Real Estate Advisors, recommends thorough market analysis that is followed by probabilistic land development analysis that makes use of Monte Carlo methods in order to analyze the range in probable results and the risk of a proposed development. Other portfolio managers in Coughlin's handbook also recommend the use of GIS and probabilistic conclusions. Sweet, president of Amli Institutional Advisors, notes[14]:

> Land investment should tap the power of state-of-the-art computer software specifically designed to track information based on geographic location. Economic growth, population growth, and job growth are the three driving forces of improving land value.

Lieblich recommends a probability matrix of expected returns for an asset, noting[15]:

> Similar benefits can be obtained by using a Monte Carlo simulation approach to generating returns under uncertainty for which the mean return, standard deviation, and correlation parameters can

be estimated. Fundamentally similar to scenario-based approach, Monte Carlo simulation requires the portfolio manager to estimate the distribution of each significant variable (rental rates, vacancy, growth rate, etc.) to the return-generating process. From these distributions, a series of simulated 'draws' are recorded and used to create a distribution of returns.

## Conclusions From the Literature Review

Literature research suggests that different appraisal approaches may be appropriate based on the specific contamination situation. Different valuation techniques could be required for each of the following scenarios:

1. Contamination is considered to be likely, but has not been investigated.
2. Contamination is known based on preliminary soil investigation.
3. Contamination has been confirmed by extensive soil borings and other methods.
4. Contamination has been found in the potable groundwater at the site.
5. Contamination has been remediated, but subsurface contaminants still exist, but are below No Further Action (NFA) requirements, meaning they can legally remain for the time being. Pre and post-remediation levels are often checked by monitoring wells.

## Soil Contamination Case Study Exemplifying Scenario Two

The review of the literature shows that it is critical that the appraisers understand both the type and extent of soil contamination when dealing with scenarios 2–5. Both Wilson[16] and Weber,[17] who demonstrated a technique dealing with Scenario 2, note that the health risks, uncertainty, and financial risks can become exponential in above Scenarios 4 or 5 if contaminants have migrated to a potable aquifer beneath the site. In contrast, many leaking fuel tanks have only resulted in a few feet of soil being affected by a spillage. Excavation of soil in such a situation may result in little financial risk and, in all likelihood, no residual risk.

The comments of Dr. Kinnard regarding the lack of case study support by authors for their opinions clearly creates problems from a *Daubert* perspective. It is considered a major shortcoming in most of the articles found in appraisal publications. Many appraisers have opinions, but few seem to have backed up these opinions with empirical results that show the reliability of their methods in estimating values. Simons provides

---

11.    Adrienne Schmitz and Deborah L. Brett, *Real Estate Market Analysis: A Case Study Approach* (Washington, D.C.: Urban Land Institute, 2001): 9

12.    Anne Frej, et al. *Business Park and Industrial Development Handbook* (Washington, D.C.: Urban Land Institute, 2001): 46.

13.    Daniel J. Coughlin, "Real Estate Development," *The Handbook of Real Estate Portfolio Management* (Burr Ridge, IL: Irwin Professional Publishing, 1995): 309–339.

14.    Allan J. Sweet, "Land Investment," *The Handbook of Real Estate Portfolio Management* (Burr Ridge, IL: Irwin Professional Publishing, 1995): 289.

15.    Frederick Lieblich, "The Real Estate Portfolio Management Process," *The Handbook of Real Estate Portfolio Management* (Burr Ridge, IL: Irwin Professional Publishing, 1995): 1030.

16.    A.R. Wilson, MAI, "Emerging Approaches to Impaired Property Valuation," *The Appraisal Journal* (April 1996): 156.

17.    B.R. Weber, MAI, "The Valuation of Contaminated Land," *Journal of Real Estate Research* (14: 3): 379–398 (available at http://business.fullerton.edu/journal/past/vol14n03.htm). Shows how the financial risk of soil contamination can be quantified based on preliminary soil investigations.

good examples of other brownfield case studies. A case study was included by Weber, above, and another follows below.

A Voluntary Cleanup Program was not an issue with either of the case study sites. These are programs, issued in the 1990s, that provide incentives to owners to initiate the remediation of their sites by working with regulators.

## Soil Contamination Case Study Exemplifying Scenario Three

A case study is presented to show how appraisal techniques recommended in the literature can fail in valuing a brownfield with contamination as described in Scenario 3. The following discussion is patterned after another case study of a contaminated property by Hall.[18] In a similar fashion, the identity of the property has been changed, but the facts are true.

This case study property was a brownfield that had been used from 1905 to 1988 for the manufacture of clay pipe, ceramic tile, and dinnerware. A number of contaminants were found when site work was being done for the new shopping center. Excess unfired glazing material containing hazardous concentrations of lead and zinc were discarded on low-lying areas of the site. Some concerns were the possibility that future expense may be required to keep these heavy metals from being ingested via breathing dust or by finding leached lead in drinking water below the site.

A number of appraisals were available from the bank that provided the construction financing. They were very limited in scope and confirmed the developer pro-forma. An appraiser that valued the property for the bank valued it at $46 million as-if not contaminated, after the contamination was found. It was at a time when the remedial cost was thought to be about $6 million. The appraiser concluded that the value for the property was $40 million "as-is" by subtracting the $6 million from value as if clean, concluding that there would not be a loss in value due to stigma.

The reason given was that the appraiser knew of another contaminated site that was developed with a shopping center that subsequently sold at a low capitalization rate, suggesting that the market did not discount such properties for "stigma." The use of "comparable" sales has been advocated in the literature, as long as these comparables have similar risk. The problem is that most appraisers have not been trained to discern differences in financial risk that can result from varying contaminants, their locations in the soil, and distance to potable groundwater.

The initial remedial treatment was to use a soil washing technique, with the soil put back in place after removing the heavy metals. It was later found that the soil-washing method, which had been approved by regulators, would not resolve the problems. Another method had to be tried, at an additional cost of $20 million. This remedial method required the construction of a "capped

area," which is an asphalt covering that is designed to keep the contaminants from being carried by the wind or traveling through the soils to nearby "receptors" via the groundwater. "Receptors" are people whose health could be at risk by living and working in the adjacent areas and inhaling the dust or drinking contaminated water. A worst-case scenario would have required the excavation of all of the soil and its transport to a different part of the state at an additional cost of $43 million.

The bank that provided the construction financing became insolvent in the mean time and two more appraisals were obtained from independent appraisers. Both appraisers valued the property at exactly $29,275,000. In their valuations, these appraisers assumed that the second remedial plan would solve the contamination problem. They also assumed that the area in which the buried contaminants were capped would be developable and that tenants would not object to being in stores above the asphalt cap. The only added construction cost that the appraisers thought would reduce the value of the site would be the result of the need for special foundations that would be required in order to develop over the capped area.

Both appraisals simply used the land value by comparison technique to arrive at the same values for the land as if it were unimpaired by the contamination. One appraiser formed the opinion that there should not be a deduction for stigma as a result of the contamination. The other appraiser took a deduction of 20% of the unimpaired value for stigma–without any support whatsoever. This was a situation similar to another reviewer's findings that an appraiser used a 40% deduction for stigma–based solely on an article in an appraisal publication that came out some years ago. Both appraisals also simply assumed, as had the bank appraisers, that over 500,000 sq. ft. of retail space proposed by the developer would be the highest and best use of the site with no supportive analysis whatsoever. Both of the above appraisals were rejected as a result of their lack of analysis.

A statement of work was written to order two more appraisals. The statement of work is a document that states the scope of analysis that is to be used in an appraisal, the level of market analysis to be included, and methods of valuation that are to be contained in the report. The scope of work called for C-Level market studies and for the appraisers to value the property by a developmental, or land residual approach, taking into consideration any risk posed by the contamination issues, in addition to valuing it by whatever other methods they considered appropriate.

The Appraisal Institute defines a C-Level market study as one that incorporates "future-oriented forecasting techniques."[19] A D-Level market study is more advanced, in that it can call for the use of probabilistic risk assessment techniques–techniques that were found to be even more appropriate for this property.

---

18.   Robert W. Hall, "The Causes of Loss in Value: A Case Study of a Contaminated Property," *Real Estate Issues* (1994).

19.   Stephen F. Fanning, MAI, Terry V. Grissom, and Thomas D. Pearson, *Market Analysis for Valuation Appraisals* (Chicago: Appraisal Institute, 1994).

Copyrighted material licensed by Randall Bell on April 26, 2021

## Results of the Market Studies and Appraisals

Neither of the latest appraisers thought that the total 45 acres would sell due to financial risk that some refer to as "stigma." This was the reason for their conclusion that the value of the property was "zero" in its "as is" condition. One appraiser contacted an insurance company that dealt with environmental liabilities, but they declined to insure the site–due to the reported financial risk of groundwater contamination. Both appraisers were subsequently asked to value the property subject to a lot split whereby 27 of the acres that were not contaminated could be split and sold separately.

The value estimates were reconciled upon appraisal review, with the appraisers agreeing to revise their opinions of value to $8.29 million and $9 million respectively. These were "as-is" valuations, which included discounted values that took into consideration a 2.5-year period that would be required to obtain approvals required for the parcel's development (versus $12 million future values after obtaining developmental approvals and a lot split that would take about 2.5 years to accomplish).

## Results of Marketing

The marketing of this asset became the highest priority. Over 500 developers and potential users were contacted. Brokers met with over 50 developers. The site was also multiple listed for a time with over 1,300 brokers.

The results of the marketing show that the vast majority of potential buyers expressed extreme reservation due to the onsite encapsulation and the ground water issues. Entitlement risk (the risk of not obtaining development approvals) was also a concern. There was a complete lack of development capital; possibly because the bank that provided the construction financing became insolvent as a result of this property.

Brokers, once highly optimistic, finally recommended reducing the asking price. The property was offered to the city for $9 million for a new police academy, prior to the lot split, but they declined. The site finally sold for $12,125,000 more than two years later as the result of a sealed bid that involved a number of potential buyers.

## Results of Development

The land was developed after the property obtained entitlements, which are the city approvals that were required for the (re)development of the site with a shopping center. The final site development was significantly different from the original plan. It was developed with two big-box retailers. The acreage at the frontage was marketed for smaller users. The owners were unable to pre-lease the space after three years of marketing the site at a time that was locally very good for retail development.

Analysis of the market area via GIS, as well as by market studies, showed that there was a lack of nearby population that would be required for smaller retailers. Both appraisers confirmed that "big-box" retailers were needed to draw distant customers.

## Lessons Learned

The major lesson learned is that environmental risk can often drive the financial risk of a brownfield. The financial risk of this site was created by rising groundwater. A cross-sectional view of the case study site shows that the ground water is quite high in this area, and had been rising because other wells in the area were being shut down due to their contamination. There was a risk that water would rise to the level of the buried contaminants, causing them to leach into the ground water and, eventually, into drinking water.

Contaminants in the groundwater can result in serious health risks and also be very expensive and time-consuming to remove. If this were to happen, it would trigger a requirement to remove all of the soil and transport it to an approved landfill at an added cost of $43 million, even if this site received a letter of NFA at one point in time.

## Case Study Implications for a Best Practice Brownfield Valuation Model

The poor results that all of the earlier appraisers of the case study property had can be attributed to three shortcomings: a lack of understanding of environmental site assessment and remediation, a lack of understanding of market analysis, and a lack of understanding of probabilistic risk analysis.

### The Need for Specialized Training In Environmental Risk

The problems in the above case study provide good support for the concerns expressed by the Appraisal Qualifications Board that were noted earlier. The opinion has been formed that specialized training is required for competency in estimating the value of brownfields. There are no specific guidelines from the Appraisal Standards Board that provide a de minimis Competency Provision. Appraisers have concluded that they are competent to appraise brownfields based on reading journal articles. Specific education in environmental impairments would likely result in better quantification of risk. The courses listed below are examples of topics addressed by a university environmental site assessment and remediation certificate program.

**Certificate: Environmental Site Assessment and Remediation**

- Regulatory Framework for Toxic/Hazardous Materials
- Techniques for Collecting and Analyzing Samples
- Principals of Hazardous Materials Management
- Introductory Chemistry of Hazardous Materials
- Groundwater Hydrology: Monitoring, Protection, and Cleanup
- Environmental Aspects of Soils Engineering and Geology
- The Remediation Process for Contaminated Soil
- Remedial Investigations and Feasibility Studies
- Environmental Risk Assessment and Management

These courses provide a better understanding of the risks involved in the valuation of contaminated

land. For example, this material enables the appraiser to understand why contaminants located in the vadose zone, the area below ground that is partially saturated by groundwater, can be more of a financial risk than would otherwise be the case. Monte Carlo methods are used for environmental risk assessment. They are also used by pension fund manages and others for financial risk assessment. They result in probability density functions that show the range in the outcomes of the variables of interest. Figure 1 shows how financial risk can vary significantly due to subsurface conditions.

## The Need for Specialized Training In Market Analysis

Specialized training and experience in market analysis can also be critical. HUD may be the first government agency to provide specific requirements that need to be met as part of a market analysis. This agency requires a person to have three years experience prior to conducting a HUD market analysis.

Weber[20] referred to the stigma as "Unquantified Risk," suggesting that the stigma could be quantified by the use of Monte Carlo methods that could be used as part of a developmental model for the valuation of the property. It can be difficult to explain these concepts to those who are not familiar with the vadose zone, concepts of Monte Carlo risk analysis, and C-Level market studies.

The author was asked to prepare a presentation for the local chapter on the use of GIS to detect mortgage fraud. The presentation since became a study that was done for Valuation 2000,[21] an appraisal conference that was designed to enable appraisers to prepare for the future. This article contains basic information on the use of GIS to quantify demand.

It became the first of a four-part series, summarized in Table 1, that was considered necessary to discuss the specialized areas that need to be dealt with, in the author's opinion, prior to using the land residual approach properly for brownfield valuation.

The second research project, Market Value Without a Market–A Sequel,[22] was written as a sequel to an article written for the October, 1990 issue of *The*

**Figure 1**     Relative Financial Risks of Three Contaminated Sites



Source: Weber, B.R., The Valuation of Contaminated Land, Journal of Real Estate Research, 1997.

(This paper is available in an Acrobat format at http://business.fullerton.edu/journal/past/vol14n03.htm)

20.    Bruce R. Weber, MAI, "Stigma, Unquantified Risk?" 1996 Cutting Edge Conference of the Royal Institute of Chartered Surveyors, University of West England at Bristol, 1996.

21.    Bruce R. Weber, MAI, "Showing What You Know," *The Appraisal Journal* (October 2001): 431–448.

22.    Bruce R. Weber, MAI, "Market Value Without a Market—A Sequel." Integrating GIS & CAMA, Conference of the IAAO and URISA, February 2001.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 1**          **Research Done in the Last Year**

| Title and Peers Reviewing | Purpose of Research | Experience in ASB Fields |
|---|---|---|
| *Show What You Know* Appraisal Institute | A paper written for an AI seminar on using GIS to detect real estate | Computer science, basic market analysis, micro-economics |
| *Market Value Without a Market— A Sequel* International Association of Assessing Officers | Explore the use of GIS and spatially-derived variables for greater accuracy in the valuation of real estate | Database technology, micro-economics, and statistical analysis, Monte Carlo for risk analysis |
| *The Use of GIS and OLAP for Market Analysis: Differentiation Between Real and Market Value* American Real Estate Society | Explore the use of GIS to differentiate between real and market value and test NCREIF and other guides for market analysis | Database technology, macro-economics, math and statistical analysis, Monte Carlo for risk analysis and timeseries |
| *A Beginning Best Practice Brownfield Valuation Model* International Real Estate Society | Develop a model for the valuation of brownfields that can be empirically tested per *Daubert* | Environmental Engineering and probabilistic market and financial risk assessment, linear programming |

Source: A presentation for the local Chapter (summaries are available at www.marketforesight.com).

*Appraisal Journal.* The conference paper was prepared for the annual GIS and CAMA conference that is jointly sponsored by URISA and the International Association of Assessing Officers.

The research that was done for this paper dealt with the problems that result from the use of regression to estimate the value of apartments and warehouse buildings that are fairly generic in their design. GIS was used to create variables, such as the distance of comparables from the freeway, to find out of they would provide improved estimates of rental value. This ability could provide objective statistical support for the first step in a feasibility study, since the current rental value of a property today needs to be estimated prior to forecasting its trend, required to estimate value upon completion.

The third paper[23] was written to suggest how GIS could be used to provide greater accuracy in market studies that are prerequisites for a brownfield feasibility study. This paper was presented to the American Real Estate Society, which has recognized the importance of both market and business cycle analysis. The economic contraction in the Bay Area that started in 2000 was used to provide an example of the importance of business cycle analysis for feasibility studies. This paper also points out why the ASB also needs to provide specific guidelines for the scope of market analysis. Schmitz and Brett noted in their description of "The Feasibility Study" that:

> The results of the market analysis lead to the core assumptions used in the financial feasibility analysis for a real estate project. A developer must be able to defend cash flow projections with a rational system of analysis and data inputs to legitimize the project's feasibility, demonstrating that there will be tenants, or buyers, that rental rates or sales prices will return a sufficient cash flow, and that the type of product proposed is what the market really desires.

A problem with typical trend analysis for feasibility is that it does not explicitly take into consideration business and/or real estate cycles. An investor who extracted the rate of growth in rent from Bay Area office buildings in 1997–2000, for example, and used the resultant rate to estimate income for the next few years (the important timeline for redevelopment) would likely be dismayed, to say the least, at the results.

## The Need for Specific Training In Probabilistic Risk Assessment

*The Handbook of Real Estate Portfolio Management* discusses the analysis of land development by institutional investors. These investors are typically very risk averse, but as noted earlier, might be interested in financing redevelopment in long built-up urban areas, which almost necessitates involvement with brownfields. It notes that "real estate development must be carried out with prudent management of the cyclical and secular risks presented in most real estate markets."

Figure 2 illustrates the results of the Monte Carlo simulation of a land development that was discussed by Coughlin in order to analyze the range in probable results or risk of a proposed development. It shows the relative likelihood of various levels of profit, given the uncertainty in income and expense of the development.

## Applying the Concepts to Brownfields

The graphic labeled Property A in the exhibit titled Relative Financial Risk of Three Contaminated Sites is a probability density function. The entire range of financial risk is displayed under the curve and the probability of having to incur this cost can be estimated by the percentage of the area under the curve at each level of cost. The data shows, for example, that there may only be a 10% chance of solving the problem by an expenditure of $8 million, a 60% chance of doing this by spending $20 million, and close to a 100% chance of solving it forever by spending $43 million to dig it up and move it.

The Bayesian Analysis of Weber's case study property discussed in the *Journal of Real Estate Research* (footnote 17) showed that the financial risk of the contamination found at Property B in this case study site was nominal. The property has changed hands and redeveloped since then, which shows that this type of analysis provided meaningful results.

23.   Bruce R. Weber, MAI, "The Use of GIS and OLAP for Market Analysis—Differentiating between Real and Market Value." Presented at the Annual Meeting of the American Real Estate Society, Coeur d'Alene, ID, April 2001.

**Figure 2**        Monte Carlo Simulation of Development Risk on Profit



Source: *The Handbook of Real Estate Portfolio Management*, pg. 335.

If a D-Level market study had been done for the case study property that was the subject of Scenario Three, it would have confirmed the possibility of a new owner having to spend an additional $43 million as the result of the ground water monitoring required by regulators. This probabilistic risk analysis would have provided a much better idea of the value of the property than the two methods used. Both methods were used as described in the literature by the prior appraisers; both failed miserably in estimating eventual sales prices.

If appraisers had such curves for each comparable, they could separate the amount deducted from the price due to the contamination, based on its most likely remedial cost, from the supplemental amount deducted for the uncertainty of the cost. The latter amount can be translated into the percent confidence level for the risk of cost overruns that is required by the local market, which has been referred to as stigma. This method might be important for the International Valuation Standards, since they note that appraisers are expected to reflect the market's reaction to these substances.[24]

There is still the problem that results from trying to compare property sales that are located in different markets. Seldom would we find a contaminated property selling at one of the "four corners" used in the

example in the graphic that could be used as a comparable. Market analysis tells us that acreage at different locations can have very different economic futures, as illustrated in Figure 3.

## Evaluation of the Recommended Model In Light of the Literature

As Edge has noted, investors, regulators, and users of valuation services require consistency, clarity, reliability, and transparency in valuation reporting worldwide. A single international standard is required as a result that has to encompass or recognize property laws, tenures, accepted rules of conduct, languages, concepts, and "best practice" benchmarks.

The Appraisal Qualifications Board has effectively put appraisers on notice that higher educational requirements will be required in the future. Examples were provided in the four studies by Weber that include the use of statistical and market analysis, micro and macro-economic analysis, and computer technology for the development of a "best practice" methodology the valuation of brownfields. These analytical tools are all part of the items of specialized knowledge that the AQB expects appraisers to use in the future.

24.    International Valuation Standards 2000, International Valuation Standards Committee, London: 265.



## Risk Quantification and Statistics

The literature tells us that banks need accurate assessment of the financial risk of brownfields so they can provide capital for brownfield redevelopment. Literature also indicates that appraisers typically only provide estimates of value "as if not contaminated," and that those who have been providing estimates "as-is" have not demonstrated the accuracy of their methods.

The method that is recommended would be able to summarize the marginal risk of lending on a brownfield by use of a familiar land development model. Developmental models have been used extensively for residential subdivisions and many lenders should be familiar with them as a result.

The result of the risk analysis also can be summarized and communicated very effectively by probability density functions. The examples in this article show various levels of marginal risk due to the cost of remediation and the likelihood of each, so loan officers could quickly understand the marginal financial risk.

This type of empirical support is considered to be mandatory in order for opinions of appraisers and other expert witnesses to be admitted in most courts. The use of statistical tools for appraisal is in compliance with *Daubert*.

Methods described in this paper are just the start. Survey research is another statistical tool that can be used to quantify losses in value. It is also a *Daubert*-compliant methodology.

Statistical tools that the board calls for have been used by the assessment community for many years. Market analysis skills have also been acknowledged as critically important for the analysis of highest and best use and for analyzing the feasibility of proposed development.

## Market Analysis

The Appraisal Standards Board has issued Statement on Appraisal Standards No. 10 (SMT-10) for USPAP 2000. This statement notes that:

> An appraiser must have sound reasons in support of the scope of work decision and be prepared to support the decision to exclude any information or procedure that would appear relevant to the client, an intended user, or the appraiser's peers in the same or a similar assignment. Failing to include in the scope of work sufficient market trend research and analysis to develop credible results violates Standards Rules 1-1(a) and (b) and Standards Rule 1-2(f).

Market analysis is a prerequisite for feasibility analysis. Feasibility is, in turn, a necessary component of highest and best use analysis. A large number of market participants in the U.K. have stated that financial feasibility is the critical element in redeveloping brownfields.

Professor Paul Syms from the School of Environment and Development at Sheffield Hallam University surveyed more than 200 people that have some degree of involvement with, or a personal interest in, the redevelopment of brownfield land. They included landowners, property developers (residential, commercial, retail, industrial, and leisure), surveyors (involved in both estate agency and valuation), lawyers (involved in property transactions, corporate law, and environmental law), town planners, engineers, and environmental specialists.

The objective of the survey was to obtain the views of people directly involved in the redevelopment or valuation of brownfield land. Respondents were asked to indicate their opinion as to the importance of 44 different factors, in each category, when considered as part of the decision making process.

The most important factor by far was the financial feasibility of redevelopment. Eighty-eight percent of interviewees regarded this factor as being 'essential' to the redevelopment process. The second most important factor was a need to obtain clear advice on available remedial methods (including effectiveness and costs) that are easily understood by developers and their advisers. The third most important issue is for land owners to ask reasonable prices for brownfield land in light of risks that are involved in redeveloping it.[25]

The methodologies being suggested clearly comply with the needs of market participants and required by SMT-10. SMT-10 requires the appraiser to provide any information or procedure that would appear relevant to the client or an intended user. The International Valuation Standards also require appraisers to properly consider and indicate the ranges of risk associated with the development, when valuing development properties for lenders. Brownfields are considered to be development properties as far as highest and best use analysis is concerned.

Another case study was used as part of a paper that was prepared and presented to the American Real Estate Society at their 2000 annual conference.[26] This time it was a hypothetical situation of the redevelopment of a brownfield site located in the San Francisco Bay Area.

The hypothesis was presented that the Appraisal Institute did the best job in their delineation of the scope of market analysis by rating studies from A to D, but that the recommendations of NCREIF[27] would have done the best job if used in a feasibility study that would be done to test office development as being the highest and best use of the property. This was considered the case because NCREIF recommends that appraisers use econometric modeling that would take into consideration the possibilities of completing the redevelopment at the bottom of the local business cycle.

The more typical method is "trend analysis," which would have resulted in taking the rate of growth in rentals in the Bay Area over the past few years and trending rents that were at the top of the cycle into the future, resulting in a major over-valuation of the proposed development upon its completion, as illustrated in Figure 4.

---

25.    See "Market Foresight for Brownfields" at www.marketforesight.com.

26.    Weber, "The Use of GIS..." *Ibid*.

27.    Richard D. Wincott, MAI, and Glenn R. Mueller, "Market Analysis and the Appraisal Process," *The Appraisal Journal* (January 1995): 27–32.



## Office Market Cycle Analysis

3rd Quarter, 2001

The recommendations by NCREIF for appraisal implicitly call for business cycle analysis, as shown above, instead of the historic reliance on trend analysis that assumes that historic growth extracted from the market will continue into the future. Proposed development is analyzed for San Jose in June, 2000 at t=0, when it was at Point 11 of its cycle. The development pro-forma (that land value is based on) assumes that completion and lease-up will also occur at Point 11 of the cycle, when it will actually be occurring at Point 16, as shown above.

Source: Legg Mason Real Estate Market Cycle Monitor Fourth Quarter, Third Quarter, Glenn R. Mueller.

Case 3:21-cv-00232-DWD   Document 316-8   Filed 04/04/25   Page 513 of 530   Page ID #26472

The wide range in published recommendations for appraisers to use in market analysis has created significant confusion. Table 2 lists the costs of what clients and appraisers feel is adequate for use in an appraisal.

## Recommendations

Based on the review of research and issues discussed in this article, the following recommendations are made:

1. The Appraisal Standards Board should provide more specific guidance to appraisers regarding the acceptable scope and methods of market analysis it considers appropriate for various types of appraisals. As Fanning noted some time ago[28]:

> Although these standards (USPAP) confirm the need for market analysis in an appraisal, they do not specify the extent to which any given component of market analysis should be developed. The comment to Standards Rule 1-4(g) suggests that there are different levels of study and that some appraisals may require a more detailed study as specified in Standards Rule 4-4.
>
> Because current requirements are confusing, the appraiser must remain cognizant of new interpretations of existing standards and of standards promulgated in the future. While a Level A analysis might be acceptable in some cases, Standard Rule 4 implies that a Level B or possibly a level C analysis would be the minimum requirement for the majority of commercial appraisals.

2. A beginning "best practice" brownfield valuation model should be developed and patterned after the methodologies that have been recommended by the Urban Land Institute and in the Handbook of Real Estate Portfolio Mangers. In other words, the current value of the property should incorporate substantive market and feasibility studies that suggest an appropriate price to be paid for the land that would be predicated on the developmental and risk analyses that would be done as suggested by these two references.

3. The Appraisal Qualifications Board acknowledges that appraisers will need education in a number of specialized areas to deal with difficult problems in the future. The research that has been done over the past year incorporated the use of computer science, micro and macro-economics, market and statistical analysis. These are all areas of specialized knowledge that other appraisers could also learn on their own if they are financially motivated to do so. Certification such as that which is used by Microsoft could also be used to test appraisers for competency in some of these disciplines and also to make clients aware of the demonstrated skills that they possess.

This certification should also call for demonstrated competency, similar to the use of demonstration appraisal reports. An example would be a reasonably accurate forecast of sub-market conditions that would be required for certification or license as a competent market analyst, in addition to that of a certified general appraiser.

Hopefully, the regulatory appraisal agencies will be more specific in the future when they are describing the scope services that they expect appraisers to provide. The Department of Housing an Urban Services has provided a good example by their list of experience and study-specific requirements for market analysis.

## Conclusions

Both the International Valuation Standards and the Appraisal Standards Board should provide specific guidance in the scope of market, risk, and other types of analysis that the Appraisal Qualifications Board says is "required to provide adequate public protection." These agencies do not want to recommend specific techniques, but they could do a much better job of defining for appraisers and their clients where in the $100–$50,000 range of cost is considered appropriate for various situations. If higher cost market studies are recommended it would motivate appraisers to learn these skills.

The main points included in the NCREIF recommendations have been summarized in Table 3. The points shown here are for an office market study, but the one paragraph discussing office-specific entries could easily be repalced with items the NCREIF recommends for these market studies. If appraisers checked off the NCREIF items that they used within their report, it would specifically define the scope of work that was used in the market study, clarifying much potential confusion for their clients.

In a similar fashion, an appraiser that would be certified or that would have a supplemental license for the valuation of brownfields may have to demonstrate skills such as:

- Training in environmental site assessment and remediation
- Proven competence in market analysis
- Proven competence in feasibility analysis
- Proven understanding of probabilistic risk analysis

| **Table 2** | **Various Degrees of "Market Analysis"** |
|---|---|
| **Scope Considered Appropriate by Various Parties** | **Cost** |
| Adequate for USPAP? Internet-Based Market Study | $65 |
| Experience: Cost of a C-Level Market Study | $10,000 |
| ARES—Suggested Scope: Office market Study | $15,000 |
| | To: $26,500 |
| Recent Scope of Work—Brownfield Redevelopment | **Budget** |
| Industrial Real Estate Market Analysis: | $50,000 |

\* It was a city redevopment agency that budgeted $50,000 for the industrial market study noted above. The agency probably appreciated the need for a study of this scope because the inital redevelopment of a portion of this are was not sucessfull in capturing much of the new demand that occured in the city since the area's inital development.

---

28. Fanning, 27.

Copyrighted material licensed by Randall Bell on April 26, 2021

**Table 3        Definition of the Scope of Market Analysis Used In the Appraisal**

| Step # | NCREIF # | Description |
|---|---|---|
| Step 1 | | Productivity analysis-determining features of the property in question that make it marketable |
| Step 2 | | Define the users of the property |
| | 1 | Identification of economic base industries |
| | 2 | Identify possible and expected changes in the economic base |
| | 3 | Delineation of the market area |
| | 4 | Explanation of the reasons for selecting the boundaries |
| Step 3 | | Forecast general demand factors |
| | 5 | Determine the market variables that create demand for the property type being studied |
| | 6 | Present historic demand data for the metropolitan area and the specified market study area |
| | 7 | Present projected demand data for the metropolitan area and the specified market study area |
| | 8 | Use a reliable service for population, employment, and other demographic projections |
| | 9 | Relate the effect of total market demand on submarket demand (historic and prospective share) |
| | 10 | Relate the effect of U.S. macroeconomic demand factors to local market demand |
| | 11 | Forecast office demand factors: Specify office demand by 4-digit SIC codes or their equivalent |
| | 12 | Determine total percentage of employment that is office or industrial using |
| | 13 | Calculate total office or industrial demand |
| | 14 | Present historical use ratios and forecast changes for the future |
| | 15 | Present historical demand and forecast changes in future demand |
| | 16 | Analyze marginal demand in light of supply |
| | 17 | Analyze migrational demand from other cities or submarkets |
| | 18 | Develop demand factor ratios (space per employee) |
| | 19 | Calculate annual average demand for both owner-users and tenants |
| | 20 | Calculate the total forecasted demand |
| Step 4 | | Inventory and forecast competitive supply |
| | 21 | Present an inventory of competitive supply in the market and submarket |
| | 22 | Analyze the salient characteristics of this supply |
| | 23 | Show historic supply trends in the market and submarket |
| | 24 | Explain the reasons for past supply growth (as a reaction to increased demand vs. overbuilding) |
| | 25 | Define where the market is in the current supply cycle. Link conclusions to the economic base analysis |
| | 26 | Identify the factors that will affect new supply in the future supply (relationships and patterns as they relate to trends) |
| | 27 | Forecast near-term supply in square feet or units per year, using starts, permits, planned starts, and dates |
| | 28 | Forecast long-term supply, using potential future inventory based on a balanced market demand-supply model |
| | 29 | Review specific constraints to future supply, such as financing availability, regulatory and infrastructure capacity |
| | 30 | Relate the effect of metromarket on submarket supply and relate statistics to historical and present market conditions |
| Step 5 | | Analyze the interaction of supply and demand |
| | 31 | Calculate historic growth rate of absorption |
| | 32 | Use the equation and the forecast inputs from the supply, demand, and absorption work to forecast future vacancy |
| | 33 | Calculate property-type use ratio |
| | 34 | Apply property-type demand factor |
| | 35 | Calculate annual space demand |
| | 36 | Calculate total forecast space demand |
| | 37 | Calculate future annual forecast demand |
| | 38 | Analysis of available and, where possible, sublet space: Calculate time required to fill available space |
| | 39 | Distinguish between owner-occupied and multi-tenant space |
| | 40 | Calculate availability rate |
| | 41 | Present amount of occupied space |
| | 42 | Calculate net absorption/year, defined as the change in total occupied square feet from period to period |
| | 43 | Present historical, current, and forecast vacancy and occupancy trends |
| | 44 | Relate to market conditions and link absorption estimates to occupancy levels |
| | 45 | Use absorption statistics to explain historic vacancy rates |
| | 46 | Discuss changes that would modify the equation |
| | 47 | Use the equation and the forecast inputs from the supply, demand, and absorption work to forecast future vacancy |
| Step 6 | | Forecast subject capture |
| | 48 | Differentiate rental rates by building quality class (e.g., Class A office, warehouse vs. R&D, etc.) |
| | 49 | Relate historic rents to market conditions, vacancy, and absorption at the time |
| | 50 | Describe effective lease amounts and terms |

Source: Richard D. Wincott, MAI and Glenn R. Mueller, "Market Analysis and the Appraisal Process," *The Appraisal Journal* (January 1995): 27–32.

If appraisal clients know that regulators require a greater scope of market, feasibility, and risk analysis, done by an appraiser with the above credentials, they will be able to identify such a clearly "specially-certified" or "properly licensed appraiser."

Appraisal fees would then become adequate to motivate the best appraisers to learn their skills, whether it be by self-study, an implementation of a Microsoft-type certification program, or completion of university Certificate and/or Doctorate Programs, in order to provide the adequate public protection that is desired.

Copyrighted material licensed by Randall Bell on April 26, 2021

# Appendix

# Excerpt from Fannie Mae Guidelines

The following is an excerpt from *Selling Guide: Fannie Mae Single Family* (Washington, D.C.: Fannie Mae, April 15, 2014), 627-629. The most current version of the *Selling Guide* can be found at www.fanniemae.com/singlefamily/originating-underwriting. This excerpt has been taken from Part B, Origination Through Closing, Subpart 4, Underwriting Property, Chapter 1, Appraisal Requirements, Special Appraisal Considerations.

---

## ☑ B4-1.4-08, Environmental Hazards Appraisal Requirements (04/15/2014)

### Introduction

This topic contains information on special appraisal considerations for properties affected by environmental hazards, including:

- Overview

- Appraisal Requirements

- Lender Requirements

---

## Overview

Fannie Mae purchases or securitizes mortgage loans secured by properties affected by environmental hazards if the effect of the hazard is measurable through an analysis of comparable market data as of the effective date of the appraisal, and the appraiser reflects in the appraisal report any adverse effect that the hazard has on the value and marketability of the subject property or indicates that the comparable market data reveals no buyer resistance to the hazard.

In rare situations, a particular environmental hazard may have a significant effect on the value of the subject property, although the actual effect is not measurable because the hazard is so serious or so recently discovered that an appraiser cannot arrive at a reliable opinion of market value because there is no comparable market data available, such as sales, contract sales, or active listings that are available to reflect the effect of the hazard. In such cases, the mortgage will not be eligible for delivery to Fannie Mae.

## Appraisal Requirements

When the appraiser has knowledge of any hazardous condition, whether it exists in or on the subject property or on any site within the vicinity of the property, including but not limited to, the presence of hazardous wastes, toxic substances, asbestos-containing materials, urea-formaldehyde insulation, or radon gas, the appraiser must

- note the hazardous condition in the appraisal report;

- comment on any influence the hazard has on the property's value and marketability, if it is measurable through an analysis of comparable market data as of the effective date of the appraisal, or indicate that the comparable market data reveals no buyer resistance to the hazard; and

- make appropriate adjustments in the overall analysis of the property's value.

Fannie Mae expects the appraiser to consider and use comparable market data from the same affected area because the sales prices of settled sales, the contract sales prices of pending sales, and the current asking prices for active listings will reflect any negative effect on value and marketability of the subject property.

> **Note:** Fannie Mae does not consider the appraiser to be an expert in the field of environmental hazards. The typical residential real estate appraiser is neither expected

Copyrighted material licensed by Randall Bell on April 26, 2021

nor required to be an expert in this specialized field. The appraiser, however, has a responsibility to note in the appraisal report any adverse conditions that were observed during the inspection of the subject property or information that he or she became aware of through the normal research involved in performing an appraisal.

## Lender Requirements

Fannie Mae requires the lender to disclose any information regarding environmental hazards to the appraiser and note the individual mortgage file accordingly if the real estate broker, the property seller, the property purchaser, or any other party to the mortgage transaction informs the lender that an environmental hazard exists in or on the property, or in the vicinity of the property. Fannie Mae also requires the lender to disclose such information to the borrower, and to comply with any state or local environmental laws regarding disclosure.

The lender must make the final decision about the need for inspections and the adequacy of the property as security for the mortgage. For example, because Fannie Mae requires the appraiser to comment on the effect of a hazard on the value and marketability of the subject property, the appraiser would have to note when there is market resistance to an area because of environmental hazards or any other conditions that affect well, septic, or public water facilities. When the lender has reason to believe that private well water that is on or available to a property might be contaminated as a result of the proximity of the well to hazardous waste sites, the lender is exercising sound judgment if it obtains a "well certification" to determine whether the water meets community standards.

## Related Announcements

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL-2014–03 | April 15, 2014 |

Copyrighted material licensed by Randall Bell on April 26, 2021

# Bibliography

Alberini, Anna. "Determinants and Effects on Property Values of Participation in Voluntary Cleanup Programs: The Case of Colorado." *Contemporary Economic Policy* 25 (July 2007).

Alberini, Anna, and Dennis Guignet. "Preliminary Stated Preference Research on the Impact of LUST Sites on Property Values: Focus Group Results." National Center for Environmental Economics Working Paper 10-09, US Environmental Protection Agency, August 2010.

Anistine, Jeff. "Property Values in a Low Populated Area When Dual Noxious Facilities Are Present." *Growth and Change* 34 (2003).

Aydin, Recai, and Barton A. Smith. "Evidence of the Dual Nature of Property Value Recovery Following Environmental Remediation." *Real Estate Economics* (2008).

Barsh, Kerri L. "Toxic Mold: What You Should Know About It and What You Can Do About It." *Real Estate Issues* (Summer 2002).

Bell, Randall. "The Impact of Airport Noise on Residential Real Estate." *The Appraisal Journal* (July 2001): 312-321.

Bell, Randall, Thomas O. Jackson, Rudy R. Robinson III, and Wayne Hunsperger. "Comments on 'The Analysis of Environmental Case Studies' (Letter to the Editor)" *The Appraisal Journal* (July 2002): 350-352.

Beracha, Eli, and Robert S. Prati. "How Major Hurricanes Impact Housing Prices and Transaction Volume." *Real Estate Issues* 3, no. 1 (2008).

Bernardo, Daniel, Terry Kastens, and Kranti Mulik. "Are Large Farms More or Less Environmentally Friendly?" *Journal of the American Society of Farm Managers and Rural Appraisers* (2005).

Berrens, Robert P., Alok K. Bohara, Hank C. Jenkins-Smith, and Carol L. Silva. "The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community." *Social Science Quarterly* 8, no. 2 (June 2003).

Blomquist, Glenn. "The Effect of Electric Utility Power Plant Location on Area Property Value." *Land Economics* (2001).

Bond, Sandy. "The Effect of Distance to Cell Towers on House Prices in Florida." *The Appraisal Journal* (Fall 2007): 362-370.

Bond, Sandy, and Ko-Kang Wang. "The Impact of Cell Phone Towers on House Prices in Residential Neighborhoods." *The Appraisal Journal* (Summer 2005): 256-277.

Bowes, David R., and Keith Ihlanfeldt. "Identifying the Impacts of Rail Transit Stations on Residential Property Values. *Journal of Urban Economics* 50 (2001).

Boxall, Peter C., Wing H. Chan, and Melville L. McMillan. "The Impact of Oil and Natural Gas Facilities on Rural Residential Property Values: A Spatial Hedonic Analysis." *Resource and Energy Economics* 27 (2005).

Boyle, Kevin J., Nicolai V. Kuminoff, Congwen Zhang, Michael Devaney, and Kathleen P. Bell. "Does A Property-Specific Environmental Health Risk Create a 'Neighborhood' Housing Price Stigma? Arsenic in Private Well Water." School of Economics, University of Maine, September 2009.

Boyle, Melissa A., and Katherine A. Kiel. "A Survey of House Price Hedonistic Studies of the Impact of Environmental Externalities." *Journal of Real Estate Literature* 9, no. 2 (2001).

Braden, John B., Arianto A. Patunru, Sudip Chattopadhyay, and Nicole Mays. "Contaminant Cleanup in the Waukegan Harbor Area of Concern: Homeowner Attitudes and Economic Benefits." *Journal of the International Associates of Great Lakes Research* 30, no. 4 (2004).

Brasington, David M., and Diane Hite. "Demand for Environmental Quality: A Spatial Hedonic Analysis." *Regional Science and Urban Economics* 35, no. 1(2005).

Burrus, Robert T., Jr., J. Edward Graham Jr., William W. Hall, and Peter W. Schuhmann. "Home-Buyer Sentiment and Hurricane Landfalls." *The Appraisal Journal* (Fall 2009): 338-347.

Burton, Robert O., Jr., Ross M. Key, Bryan W. Schurle, and David L. Regehr. "Economic Analysis of Avoiding a Potential Health Hazard on an Individual Farm." *Journal of the American Society of Farm Managers and Rural Appraisers* (2007).


Cai, Yongxia, W. Douglass Shaw, and Ximing Wu. "Risk Perception and Altruistic Averting Behavior: Removing Arsenic in Drinking Water." Department of Agricultural Economics, Texas A&M University, 2008.

Cameron, Trudy Ann, and Ian McConnaha. "Evidence of Environmental Migration: Housing Values Alone May Not Capture the Full Effects of Local Environmental Disamenities." Department of Economics, University of Oregon, February 2005.

Carruthers, John I., and David E. Clark. "Valuing Environmental Quality: A Space-Based Strategy." US Department of Housing and Urban Development Working Paper REP 07-01, 2007.

Case, Bradford, Peter F. Colwell, Chris Leishman, and Craig Walsh. "The Impact of Environmental Contamination on Condo Prices: A Hybrid Repeat-Sale/Hedonic Approach." *Real Estate Economics* (Spring 2006).

Chalmers, James A. "High-Voltage Transmission Lines and Rural, Western Real Estate Values." *The Appraisal Journal* (Winter 2012): 30-45.

Chalmers, James A., and Frank A. Voorvaart. "High-Voltage Transmission Lines: Proximity, Visibility, and Encumbrance Effects." *The Appraisal Journal* (Summer 2009): 227-245.

Civins, Jeff, and Bane Phillip. "Who's Liable Now?–New Federal Brownfields Legislation." *Real Estate Issues* (Winter 2003-2004).

Cohen, Jeffrey P. and Cletus C. Coughlin. "Spatial Hedonic Models of Airport Noise, Proximity, and Housing Prices." Federal Reserve Bank of St. Louis Research Division Working Paper 2006-026C, April 2006, Revised September 2007.

Crocker, Dianne. "6 Trends in Environmental Due Diligence." *Scotman Guide* (Commercial Edition) (March 2010).


Decker, Christopher S., Donald A. Nielsen, and Roger P. Sindt. "Residential Property Values and Community Right-to-Know Laws: Has Toxics Release Inventory Had an Impact? *Growth and Change* 36 (Winter 2005).

Des Rosiers, François, "Power Lines, Visual Encumbrance and House Values: A Microspatial Approach to Impact Measurement." *Journal of Real Estate Research* 23, no. 3 (2002).


Electric Power Research Institute (EPRI). "Transmission Lines and Property Values: State of the Science." Final report, November 2003.

Elliott, Peter, and David Wadley. "The Impact of Transmission Lines on Property Values: Coming to Terms with Stigma." *Property Management* 20, no. 2 (2002).


Farber, Stephen. "Undesirable Facilities and Property Values: A Summary of Empirical Studies." *Ecological Economics* 24 (1998).

Folland, Sherman, and Robbin Hough. "Externalities of Nuclear Power Plants: Further Evidence." *Journal of Regional Science* (2000).

Forester, J. Gordon, Jr., and Kenneth E. Wilson. "Comments on 'To Whom Are Appraisers Liable?' (Letter to the Editor)." *The Appraisal Journal* (October 2001): 460-461.

Friedman, Jack P., and Barry A. Diskin. "Nuclear Waste Disposal: A Taxing Real Estate Issue." *Real Estate Issues* (Summer 2006).

Copyrighted material licensed by Randall Bell on April 26, 2021

Garber, Bill. "Congress Keeps Its Eyes on Brownfields." *Valuation Insights & Perspectives* (Third Quarter 2002): 32-33.

Gayer, Ted, James T. Hamilton, and W. Kip Viscusi. "Private Values of Risk Tradeoffs at Superfund Sites: Housing Market Evidences on Learning about Risk." *The Review of Economics and Statistics* 82 (August 2000).

Gen, Sheldon. "Meta-Analysis of Environmental Valuation Studies." Georgia Institute of Technology, December 2004.

Gluck, Allen E., Donald C. Nanney, and Wayne C. Lusvardi. " Mitigating Factors in Appraisal & Valuation of Contaminated Real Property." *Real Estate Issues* (Summer 2000).

Goldstein, Michael R. "New Brownfields Incentives Add to Diminishing Inventory of Developable Sites in South Florida." *Real Estate Issues* (Summer 2003).

Guignet, Dennis. "What Do Property Values Really Tell Us? A Hedonic Study of Pollution from Underground Storage Tanks." Department of Agriculture and Resource Economics, University of Maryland, December 20, 2010.


Hanna, Brid Gleeson. "House Values, Incomes, and Industrial Pollution." *Journal of Environmental Economics and Management* 54 (2007).

Harding, David M., Arthur E. Gimmy, and Corte Madera. "Comments on 'Power Lines and Property Values Revisited' (Letter to the Editor)." *The Appraisal Journal* (Winter 2008): 81-83.

Heaton, Hal B. "On Valuing Negative Cash Flows Related to Contamination, Asset Removal, or Functional Obsolescence." *Journal of Property Tax Assessment and Administration* 2, no. 4 (Fall 2005).

Herriges, Joseph A., Silvia Secchi, and Bruce A. Babcock. "Living With Hogs in Iowa: The Impact of Livestock Facilities on Rural Residential Property Values." Center for Rural and Agricultural Development, Iowa State University, August 2003.

Hirota, Yuji. "The Effect of Soil Contamination on Property Assessment in North America and Japan." *Journal of Property Tax Assessment & Administration* (2004).

Hite, Diane, Wen Chern, Fred Hitzhusen, and Alan Randall. "Property-Value Impacts of an Environmental Disamenity: The Case of Landfills." *Journal of Real Estate and Finance Economics* (2001).

Ho, Sa Chau, and Diane Hite. "Economic Impact of Environmental Health Risks on House Values in South-East Region: A County-Level Analysis." Department of Agricultural Economics and Rural Sociology, Auburn University, August 2004.

Howland, Marie. "The Impact of Contamination on the Canton/Southeast Baltimore Land Market." *Journal of the American Planning Association* (Autumn 2000).

_____. "The Role of Contamination in Central City Industrial Decline." *Economic Development Quarterly* 18 (2004).

Hultgren, Aaron. "Slippery Business—Gulf Oil Spill Creates Real Estate Valuation Challenges for Appraisers." *Valuation* (Fourth Quarter 2010): 23-27.

Hunsperger, Wayne L. "The Effects of the Rocky Flats Nuclear Weapons Plant on Neighboring Property Values." Chap. 9 in *Risk, Media and Stigma: Understanding Public Challenges to Modern Science and Technology*, edited by James Flynn, Paul Slovic, and Howard Kunreuther. London and Sterling, VA: Earthscan Publications, 2001.

Huso, Deborah R. "Fracking Up." *Valuation* (First Quarter 2012): 14-19.

Hutcheson, J. Palmer. "Evolution of Liability for Flood Damages: Where Are We Now?" *Real Estate Issues* (Winter 2003-2004).


Ihlanfeldt, Keith R., and Laura O. Taylor. "Externality Effects of Small-Scale Hazardous Waste Sites: Evidence from Urban Commercial Property Markets." *Journal of Environmental Economics and Management* 47 (2004).


Jackson, Thomas O. "The Effects of Environmental Contamination on Real Estate: A Literature Review." *Journal of Real Estate Literature* (2001).

_____. "Electric Transmission Lines: Is There an Impact on Rural Land Values?" *Right of Way* (November/December 2010).

_____. "Environmental Contamination and Industrial Real Estate Prices." *Journal of Real Estate Research* 23, no. 1-2 (2002).

_____. "Environmental Risk Premiums and Price Effects in Commercial Real Estate Transactions." The Appraisers Research Foundation, April 15, 2005.

_____. "Groundwater Contamination and Real Estate Investment Risk." *Journal of Real Estate Practice and Education* (2005).

Jaconetty, Thomas A. "Do You Want Your Children Playing Under Those Things?" *Assessment Journal* (May/June 2001).

_____. "Stigma, Phobias, and Fear: Their Effect on Valuation." *Assessment Journal* (January/February 1996).

Jenkins-Smith, Hank C., Carol L. Silva, Robert P. Berrens, and Alok Bohara. "Information Disclosure Requirements and the Effect of Soil Contamination on Property Values." *Journal of Environmental Planning and Management* (2002).

Johnson, Ken H., Sean P. Salter, Leonard V. Zumpano, and Randy I. Anderson. "Exterior Insulation and Finish Systems: The Effect on Residential Housing Prices and Marketing Time." *Journal of Real Estate Research* 22, no. 3 (2001).

Johnson, Marion R., Paul A. Welcome, and Darla Frank. "Case Study: The House of Mold." *Assessment Journal* (November/December 2001).

_____. "Case Study: The Mold House Revisited." *Assessment Journal* (Spring 2003).

Jorgenson, Kerry M., James A. Chalmers, and Frank A. Voorvaardt. "Comments on 'High-Voltage Transmission Lines: Proximity, Visibility, and Encumbrance Effects' (Letter to the Editor)." *The Appraisal Journal* (Winter 2010): 109-112.

Julien, Benoit, and Paul Lanoie. "The Effect of Noise Barriers on the Market Value of Adjacent Residential Properties. *The Appraisal Journal* (Fall 2008): 316-327.


Kilpatrick, John A. "Application of Repeat Sales Analysis to Determine the Impact of a Contamination Event." *Journal of Housing Research* 15, no. 2 (2004).

_____. "Concentrated Animal Feeding Operations and Proximate Property Values." *The Appraisal Journal* (July 2001): 301-306.

Kilpatrick, John A., and Bill Mundy. "Appraisal of Contaminated Property in the United States." *Journal of the Japan Real Estate Institute* (October 2003).

Kishore, Gawande, and Hank Jenkins-Smith. "Nuclear Waste Transport and Residential Property Values: Estimating the Effects of Perceived Risks." *Journal of Environmental Economics and Management* 42 (2001).

Krysel, Charles, Elizabeth Marsh Boyer, Charles Parson, and Patrick Welle. "Lakeshore Property Values and Water Quality: Evidence from Property Sales in the Mississippi Headwaters Region." Mississippi Headwaters Board and Bemidji State University, May 2003.


Leggett, Christopher G., and Nancy E. Bockstael. "Evidence of the Effects of Water Quality on Residential Land Prices." *Journal of Environmental Economics and Management* 39 (2000).

Lifflander, John. "Not Your Father's Appraisal." *Assessment Journal* (July/August 2002).

Longo, Alberto, and Anna Alberini. "What Are the Effects of Contamination Risks on Commercial and Industrial Properties? Evidence from Baltimore, Maryland." Working Paper 111.05, Sustainability Indicators and Environmental Evaluation, Fondazione Eni Enrico Mattei (FEEM), September 2005.


McCluskey, Jill J., Ray G. Huffaker, and Gordon C. Rausser. "Neighborhood Effects and Compensation for Property Value Diminution." *Law & Policy* 24, no. 1 (January 2002).

McCluskey, Jill J., and Gordon C. Rausser. " Hazardous Waste Sites and Housing Appreciation Rates." *Journal of Environmental Economics and Management* (2003).

_____. "Stigmatized Asset Value: Is It Temporary or Long-Term?" *The Review of Economics and Statistics* (May 2003).

McDonough, Carol C. "The Impact of Wireless Towers on Residential Property Values." *Assessment Journal* (Summer 2003).

McDowell, Morgan. "Mother Nature at Her Worst." *Valuation* (Third Quarter 2011): 14-18.

Meltzer, John A., and Noah Shlaes. "Rebuilding After Katrina: An Owner's Perspective Two Years Later." *Real Estate Issues* 33, no. 1 (2008).

Messer, Kent D., William D. Schulze, Katherine F. Hackett, Trudy A. Cameron, and Gary H. McClelland. "Can Stigma Explain Large Property Value Losses? The Psychology and Economics of Superfund." *Environmental and Resource Economics* (Spring 2006).

Mitchell, Phillip S. "Estimating Economic Damages to Real Property Due to Loss of Marketability, Rentability, and Stigma." *The Appraisal Journal* (April 2000): 162-170.


Nicolay, Claire. "After the Storm: Appraisal Challenges in Katrina's Wake." *Valuation Insights & Perspectives* (Fourth Quarter 2005): 16-20, 22-23.


Owens, Robert W., John W. O'Neill, and Eric E. Belfrage. "Comments on 'A Strategy for Estimating Identified Intangible Asset Value: Hotel Affiliation Contribution' (Letter to the Editor)." *The Appraisal Journal* (Summer 2005): 325-327.

Copyrighted material licensed by Randall Bell on April 26, 2021

Pielke, Roger, Jr. "Weather-Related Losses in the Built Environment: Societal Change and Climate Change." *Real Estate Issues* 33, no. 3 (2008).

Pitts, Jennifer M., and Thomas O. Jackson. "Power Lines and Property Values Revisited." *The Appraisal Journal* (Fall 2007): 323-325.

Public Service Commission of Wisconsin. "Environmental Impacts of Transmission Lines." October, 2000.

Schoenbaum, Miriam. "Environmental Contamination, Brownfields Policy, and Economic Redevelopment in an Industrial Area of Baltimore, Maryland." *Land Economics* (February 2002).

Sigman, Hilary. "Environmental Liability and Redevelopment of Old Industrial Sites." Department of Economics, Rutgers University, April 2005.

Simons, Robert A. "When Bad Things Happen to Good Property." Environmental Law Institute, 2006.

Simons, Robert A., and Abdellaziz El Jaouhari. "The Effect of Freight Railroad Tracks on Residential Property Values." *The Appraisal Journal* (Summer 2004): 223-233

Simons, Robert A., John Pendergrass, and Kimberly Winson-Geideman. "Quantifying Long-Term Environmental Regulatory Risk for Brownfields: Are Reopeners Really an Issue?" *Journal of Environmental Planning and Management* (2003).

Simons, Robert A., and Jesse D. Saginor. "A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Real Estate Values." *Journal of Real Estate Research* 28, no. 1 (2006).

Simons, Robert A., and Kimberly Winson-Geideman. "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys." *Journal of Real Estate Research* 27, no. 2 (2005).

Strand, Jon, and Mette Vagnes. "The Relationship Between Property Values and Railroad Proximity: A Study Based on Hedonic Prices and Real Estate Brokers' Appraisals." *Transportation* 28 (2001).

Tuohey, Conrad G., and Ferdinand V. Gonzalez. "Emotional Distress Issues Raised by the Release of Toxic and Other Hazardous Materials." *Santa Clara Law Review* (2001).

Walsh, Patrick. "Hedonic Property Value Modeling of Water Quality, Lake Proximity, and Spatial Dependence in Central Florida." Department of Economics, College of Business, University of Central Florida, Summer 2009.

Walsh, Patrick, J. Walter Milon, and David Scrogin. "The Spatial Extent of Water Quality Benefits in Urban Housing Markets." National Center for Environmental Economics Working Paper 10-02, US Environmental Protection Agency, March 2010.

Wiley, Robert C., and Claudia L. Gaglione. "Appraising After a Natural Disaster." *Valuation Insights & Perspectives* (Fourth Quarter 2005): 44-46.

_____. "Mold: The Hidden Menace." *Valuation Insights & Perspectives* 7, no. 2 (March 2002): 34.

Wilson, Albert R. "Real Property Damages and Rubber Rulers." *Real Estate Issues* (Summer 2006).

Winson-Geideman, Kimberly, Robert A. Simons, and John Pendergrass. "Tracking Remediation and Redevelopment Trends of Brownfield Clean-Up Programmes: The Cook County Experience." *Journal of Environmental Planning and Management* 47, no. 3 (May 2004).

Wolverton, Marvin L., and Steven C. Bottemiller. "Further Analysis of Transmission Line Impact on Residential Property Values." *The Appraisal Journal* (July 2003): 244-252.

Zabel, Jeffrey. "The Impact of Imperfect Information on the Transactions of Contaminated Properties." National Center for Environmental Economics Working Paper 07-03, US Environmental Protection Agency, January 2007.

Zabel, Jeffrey, and Dennis Guignet. "A Hedonic Analysis of the Impact of LUST Sites on House Prices in Frederick, Baltimore, and Baltimore City Counties." National Center for Environmental Economics Working Paper 10-01, US Environmental Protection Agency, January 2010.

Zuckerman, Tod I., William E. Motzer, Alfred Leonard, and Hayden S. Solomon. "Representing Buyers, Sellers, and Lenders in Transferring Contaminated Property: A Primer for Real Estate Practitioners Part II." *Real Property, Probate & Trust Journal* (2001).

Copyrighted material licensed by Randall Bell on April 26, 2021

Copyrighted material licensed by Randall Bell on April 26, 2021