# EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS

CITY OF EAST ST. LOUIS,

Plaintiff,

vs.            Case No.

3:21-CV-00232-DWD

MONSANTO COMPANY, et al.,

Defendants.

DEPOSITION OF CHARLES T. BRIGDEN

Taken on behalf of the Plaintiff

January 17, 2025

Page 2

INDEX

QUESTIONS BY:

Mr. Johnson                 6

INDEX OF EXHIBITS
(In order introduced)

Exhibit  6  JLL report                 21
Exhibit  7  ESTL_DEX_RR_23019-23024        40
Exhibit  8  1/7/25 Supplemental report   42
Exhibit  14  Incorporated to be a sewer.pdf    58
Exhibit  28  Bell expert report          70
Exhibit  11  Google Earth aerial photo        73
Exhibit  5  Brigden Illinois license        142
Exhibit  38 Hamilton depo in
        Brown v Saint-Gobaine          166
Exhibit  39  Video  (not attached)
Exhibit  57  Master Complex Valuation        218
Exhibit  46  Hamilton Depo in
        Brown versus Southern          224
Exhibit  48  Stigma Long Term Environmental
        Risk Effect.pdf          243
Exhibit  18   DEF 45936-38          276

Page 4

FOR THE DEFENDANTS MONSANTO AND PHARMACIA:

SHOOK, HARDY & BACON, LLP

MR. TYLER SCHWETTMAN

MS. ABIGAIL FEARS

190 Carondelet Plaza, Suite 1350

St. Louis, MO  63105

(314) 690-0200

tschwettman@shb.com

FOR THE DEFENDANT SOLUTIA:

LATHROP GPM, LLP

MR. CHARLES R. HOBBS

190 Carondelet, Suite 1400

St. Louis, MO  63105

(314)613-2800

ron.hobbs@lathropgpm.com

Reported by:

Ms. Suzanne Benoist, RPR, CCR-MO-KS-NM, CSR-IL-IA

Mr. Tim Perry, Videographer

Mr. Ross Colby, Concierge

Veritext Legal Solutions

701 Market Street, Suite 310

St. Louis, MO  63101

(314) 230-7260

Page 3

APPEARANCES

FOR THE PLAINTIFF:

THE DRISCOLL FIRM, P.C.

MR. PAUL W. JOHNSON

211 N. Broadway, Suite 4050

St. Louis, MO  63102

(314) 932-3232

paul@thedriscollfirm.com

-and

SMOUSE & MASON, LLC

MR. ROY MASON

233 Duke of Gloucester Street

Annapolis, MD  21401

(410) 269-6620

zeh@smouseandmason.com

-and

THE DRISCOLL FIRM, P.C.

MR. MATTHEW J. LIMOLI

301 Fayetteville Street, Suite 1825

Raleigh, North Carolina  27601

(919) 582-6516

matthew@thedriscollfirm.com

Page 5

IT IS HEREBY STIPULATED AND AGREED by and between Counsel for the Plaintiff and Counsel for the Defendant, that this deposition may be taken by Suzanne Benoist, a Certified Court Reporter and Notary Public, and thereafter transcribed into typewriting, with the signature of the witness being expressly reserved.

-oOo-

VIDEOGRAPHER:  Good morning:  We are on the record at 9:38 on January 17th, 2025.  This is media unit one of the video-recorded deposition of Charles Brigden being taken by counsel for plaintiff in the matter of City of East St. Louis versus Monsanto Company, et al., filed in the U.S. District Court for the Southern District of Illinois, case number 3 colon 21-CV-232.  We are at Shook Hardy & Bacon, LLP at 190 Carondelet Plaza Drive in St. Louis, Missouri.

My name is Tim Perry, certified legal video specialist.  Our certified court reporter is Sue Benoist and we are with Veritext Legal Solutions.

Counsel, will you please identify yourself for the record?

MR. JOHNSON:  Yes.  Paul Johnson from

2 (Pages 2 - 5)

Page 6

the Driscoll Firm representing the plaintiff, The City of East St. Louis, Illinois.

MR. SCHWETTMAN: Tyler Schwettman on behalf of Monsanto Company and Pharmacia, LLC.

MS. FEARS: Abby Fears on behalf of Monsanto Company and Pharmacia, LLC.

MR. HOBBS: Ron Hobbs for defendant Solutia.

VIDEOGRAPHER: Do we need the Zoom attendees to announce?

MR. MASON: Roy Mason here on behalf of the plaintiffs.

MR. LIMOLI: Matthew Limoli for the plaintiffs.

(THE WITNESS WAS SWORN)

EXAMINATION

QUESTIONS BY MR. JOHNSON:

Q.    Could you state your full name for the record please?

A.    Charles Brigden.

Q.    And Mr. Brigden, I understand that you are employed by Jones Lang LaSalle out of its Chicago, Illinois offices. Is that correct?

A.    Yes.

Q.    And Jones Lang LaSalle in turn has

Page 7

been hired by the three defendants in this case, Monsanto, Solutia, Inc. and Pharmacia, LLC, to perform an appraisal review of the plaintiff's damages expert's report. Is that your understanding?

A.    Yes.

Q.    And we'll talk about what an appraisal review is later on but that was an accurate description of your understanding of your assignment in this case. Fair enough?

A.    The scope of work involved is more expansive than that but that is a general summary.

Q.    Put another way, you and Jones Lang LaSalle were not tasked to author or generate a real estate damages assessment for the real estate and economic damages, if any, sustained by East St. Louis on any of its PCB contaminated tested parcels in this case, correct?

MR. SCHWETTMAN: Object to form.

A.    We're going to have to unpack all of that.

Q.    (BY MR. JOHNSON) You want me to repeat the question? I'd be glad to.

A.    Yes.

Q.    Jones Lang LaSalle was not asked to

Page 8

author or generate a real estate damages assessment for the real estate and economic damages, if any, sustained by East St. Louis on any of its PCB contaminated tested parcels, correct?

MR. SCHWETTMAN: Object to the form.

A.    There's so much in that that I don't feel comfortable saying what you're saying is correct. I would rather refer to what our stated purpose is in our report, the terms under which we were hired and the text that is within our report.

Q.    (BY MR. JOHNSON) As I understand your report, and we will get into that extensively later on, but I understand that you were tasked with doing what is known as an appraisal review of Dr. Randy Bell's and Landmark Research's appraisal report in this case.

A.    The report deliverable is in the form of an appraisal review, yes.

Q.    If you need me to repeat a question today for any reason please ask me to do so, otherwise with you having taken an oath to tell the truth if you give an answer to a question we will assume that you heard the question, understood and answered it to the best of your ability. Fair enough?

Page 9

A.    Yes.

Q.    By the way, for brevity, I'm going to be referring to the three defendants in this case which we identified of course as Monsanto, Solutia and Pharmacia as Monsanto.

A.    Fair enough. I don't have a problem with that.

Q.    And since we're going to be talking in a large part today of Monsanto's W.G. Krummich plant just outside the East St. Louis border with Sauget, when I say WGK or Krummrich I'm talking about that plant, fair enough?

A.    I may say Krummrich because that's how I learned it, so, but that is fair to me.

MR. JOHNSON: Which is correct?

MR. SCHWETTMAN: Krummrich.

MR. JOHNSON: Krummrich with a hard K. All right.

Q.    (BY MR. JOHNSON) When I say Krummrich or WGK you'll know what I'm talking about.

A.    Yes, with the caveat that it's a large operation and there might be numerous improved properties that comprise a singular concept, but it doesn't exactly apply to just one

3 (Pages 6 - 9)

Page 10

building.

Q. It's a campus so to speak?

A. It's a campus, yeah.

Q. Fair enough. When I refer to Krummrich today I'm referring to the entire campus where it is situated in Sauget.

A. Without specificity to one building.

Q. Fair enough. And for the same brevity reasons I'm not going to say Jones Lang LaSalle every time we refer to the Jones Lang LaSalle report, JLL is fine with you?

A. That's fine.

Q. You'll know what I'm talking about.

A. Yes.

Q. Mr. Brigden, as you sit today for your deposition on behalf of JLL, the defendant's appraisal review expert in this case, correct?

A. Yes.

Q. And you speak on behalf of JLL today even though both you and your partner Richard Roddewig signed off on the report, correct?

A. I don't speak on behalf of him, I speak upon for instance as a professional appraiser.

Q. Fair enough. But you and Mr.

Page 11

Roddewig signed the report and he's not here today, you are here today to testify to the contents of the report. Fair enough?

A. I signed the report and I'm here to talk about it.

Q. Okay. And another background agreement I need to reach with you is unless I specify specifically that a question is directed to you in your personal capacity or personal opinion can you agree that all of your answers today will be on behalf of JLL and its report?

MR. SCHWETTMAN: Object to the form. I think that question's been answered.

A. I don't really like the sort of lumping together of a corporate brand, my partner and I are appraisers, we cosigned this, we both take ownership of the report. Has nothing to do with the letters JLL.

Q. (BY MR. JOHNSON) Let me just put it another way. If I'm going to ask you a personal opinion or personal question I'll specify that. Fair enough?

A. Okay.

Q. All right. And I know you've been down the road before in expert witness depositions,

Page 12

but will you try to keep in mind for every answer given today regarding JLL's report and JLL's opinions in this case that you state them within a reasonable degree of real estate appraisal industry certainty. Okay?

A. Sure.

Q. Now, in this case --

MR. JOHNSON: And Ross, if you could display Exhibit 2 please. And starting with request number 3 which is on page 4, request number 3 on page 4.

A. I'm there.

Q. Yes. And this is part of the subpoenaed documents that we tendered to JLL and you in this case and my question simply is in your appraiser career with JLL and prior to that Clarion, has your report or any of your testimonies ever been stricken in whole or in part by any state or federal judge or court?

A. I am only aware of largely my own experience and the answer is no regarding myself personally.

Q. Okay.

A. I'm not aware of any other instances that may expand beyond myself.

Page 13

Q. Okay. And let me just ask the question since your partner Richard Roddewig also signed the report, are you aware as we sit here today of any instances where Mr. Roddewig's testimonies or JLL reports or Clarion reports have been excluded or stricken in whole or in part by any state or federal judge?

MR. SCHWETTMAN: Object to the form. I think we provided the answer to that question.

A. In what time period?

Q. (BY MR. JOHNSON) At any time if you're aware.

A. He's been doing this for I think over 50 years, I've only been working with him for about 25.

MR. SCHWETTMAN: Don't guess.

A. Yes.

Q. (BY MR. JOHNSON) I'm just asking --

A. I'm not aware.

Q. There you go. That's all I was asking.

If we could turn to page 5 then, request number 4. And you were asked to produce all final reports prepared and produced in the last

4 (Pages 10 - 13)

Page 14

five years in connection with your work as a retained consultant or expert in any case involving PCBs, and I apologize in advance if I overlooked something produced or whatever the case, but are you aware of any such reports?

A. I remember answering these questions in August or September, I don't, I know that we truthfully complied with whatever they were asking for. I don't remember if there were any or there were not any.

Q. Let me ask you this in another way. In your appraisal career have you signed off on any appraisal reports for Clarion or JLL in terms of assessing damages in an environmental contamination case?

A. Yes.

Q. How many reports other than this one, approximately?

A. Not considering reports involving PCBs?

Q. Yes. Other contaminants, other environmental contamination cases other than this case that you can recall, an approximate number. I'm not going to hold you to a specific number, but that you can recall in your appraisal career?

Page 15

MR. SCHWETTMAN: Object to the form, that's overbroad.

A. Can you give me a time period?

Q. (BY MR. JOHNSON) Ten years.

A. I would struggle to come up with any accurate number.

Q. Is it more than one?

A. It is.

Q. Is it more than five?

A. In 10 years under those conditions, yes.

Q. Let's go to page 9, request number 11, and this request has to do with invoices, time records, et cetera, et cetera. We received recently time records and invoices from JLL through November 25th of 2024. My question to you is how often does JLL bill for example in this case? In other words, are there other invoices out there that for whatever reason were not produced but are out there?

MR. SCHWETTMAN: Object to the form.

A. If you're asking are there any invoices that are missing?

Q. (BY MR. JOHNSON) Are there any more recent invoices for whatever reason we don't have,

Page 16

for example in December of 2024.

A. I understand. Yes. There is a built-in lag if you will in the procedural process of accounting invoicing and given that I prepared the supplemental report dated January 7th there would be by definition time spent in and around December of 2024.

Q. Do you have any idea as you sit here, now this is not a memory contest, do you have any idea as to the amount, all things considered, all timekeepers considered, for JLL's December of 2024 invoicing, if you know?

A. I do not have any idea.

Q. Fair enough.

Let's go to page 11 and request 14, please. And that one deals with expert reports, deposition transcripts and trial transcripts of you, Charlie Brigden, pertaining to PCB contamination of real estate and the assessment of damages based on that contamination for the preceding five years. To my knowledge, and again apologies in advance if I'm mistaken, but we didn't receive any such deposition transcripts or trial transcripts.

Are there any?

Page 17

A. I'd like to include the caveat that you read my name but this document doesn't have my name.

Q. But by agreement with counsel, and Mr. Schwettman can confirm this, it's applicable to you in this case,

MR. SCHWETTMAN: That's right.

A. That's correct. That's wonderful. I think you said you didn't receive any and is that correct and the answer to that is yes, there are none.

Q. (BY MR. JOHNSON) There are none. Okay.

Have you given a deposition under oath in a state or federal court in your appraisal career in a polychlorinated biphenyl contamination case?

A. My initial response is no, but I want to take this document to look at my list just to be certain.

Q. Sure. Your testimony list.

A. Thank you. On page 233 of my report.

MR. JOHNSON: And while Mr. Brigden's doing that let's go ahead -- well, we'll just leave it at that.

5 (Pages 14 - 17)

Page 18

Q. (BY MR. JOHNSON) We're going to get to the testimony list in a few minutes but were you able to check and determine whether you have any such reports or depositions or trial transcripts from testimonies in polychlorinated biphenyl cases?

A. Where PCBs were the predominant contaminant that's correct. Some of these, if there was some miniscule mention of it that I'm not aware of is the only caveat that I'm including but where PCBs were the main attraction none of these qualify as that.

Q. Same type of question but more general in nature, and you can check with your testimonial list you have in front of you as needed, my question is going beyond just PCB contamination cases, do you have deposition transcripts or trial transcripts from your participation in environmental contamination lawsuits such as this one that you can remember or recall?

A. Several of the cases in my testimony history involve ground water contamination matters, typically involving PFAS as the contaminant.

Q. And on the testimonial list you're referring to, and for the record later on we're

Page 19

going to be referring to the JLL report as Exhibit 6 and you're referring now to page 2343 as your testimonial list, correct?

A. Yes.

Q. And on that list could you identify PFAS or P-F-A-S cases that you just referred to in answering my question?

A. Starting from the top, the first one is the third case, Baker versus Saint-Gobain. Actually that's the only one.

Q. And in the Saint-Gobain matter did you give a deposition under oath?

A. I did.

Q. To your knowledge has that been produced in this case?

A. I don't know.

MR. JOHNSON: Tyler I didn't see it, but. I know the Saint-Gobain matter was about 2021, is that about right?

MR. SCHWETTMAN: The deposition was in 2020 because I did it in my bedroom during COVID, I remember that.

MR. JOHNSON: So it's within the last five years is my question, it's within the scope of this request in my --

Page 20

MR. SCHWETTMAN: Is that a ground water contamination case?

THE WITNESS: Yes.

MR. SCHWETTMAN: I don't think it's in the scope of this request.

THE WITNESS: It's not a PCB.

MR. JOHNSON: We would request a copy of that transcript and follow up with counsel after the deposition in that regard.

Q. (BY MR. JOHNSON) Have you in the last five years with JLL provided a report concerning PCB contamination where there's an opinion of value involved in your report?

A. No.

MR. SCHWETTMAN: Object to the form.

Q. (BY MR. JOHNSON) Was the Saint-Gobain retention where JLL was involved, was that another matter where you and JLL did an appraisal review as opposed to a full-fledged opinion of value appraisal report?

MR. SCHWETTMAN: Object to the form.

A. I wouldn't want to guess. I don't recall the specifics.

Q. (BY MR. JOHNSON) That's fair enough. All right.

Page 21

MR. JOHNSON: For identification purposes Ross could you demonstrate, display, the first page of Exhibit 6.

Q. (BY MR. JOHNSON) Which I'll represent to you Mr. Brigden is the report that you have in front of you, and just so everyone is clear that's watching this video, that's a full copy of the JLL report, correct?

MR. SCHWETTMAN: Paul, are you marking the one with the errata portions or not? With the corrections we entered yesterday?

MR. JOHNSON: Sure.

MR. SCHWETTMAN: Okay.

A. I have no way of saying or confirming that that is a true and accurate copy but I'll let you know if I think there's something that doesn't look right.

MR. HOBBS: Give him a couple hours.

MR. JOHNSON: Yeah.

Q. (BY MR. JOHNSON) So, and what I want to do here is save as much time today as we can, I want to talk about what you Mr. Brigden and JLL believe to be the authoritative sources that form in large part the basis or bases for your report.

MR. JOHNSON: And if I could turn to

6 (Pages 18 - 21)

Page 22

page 22, or pdf 22 Ross.

And by the way, for those watching and those watching later on I'm going to be referring to the pdf numbers of the exhibit as opposed to the actual page number, they might coincide, they might not.

MR. HOBBS:  Oh boy.

MR. SCHWETTMAN:  I think they're all numbered, we can do both, right?

A.    As long as you mention the paper number at the bottom I can catch up.

MR. JOHNSON:  It's page 20?

Q.    (BY MR. JOHNSON)  Page 20 is where you list your authoritative sources in this report and what I want to do is just list them for you right now, and if you agree that those are in fact what you consider to be the authoritative sources.

First of all --

MR. SCHWETTMAN:  I'm going to object to the form of that.

Q.    (BY MR. JOHNSON)  The 2024 edition of the Uniform Standards of Professional Appraisal Practice, otherwise known as USPAP, am I pronouncing the acronym correctly?

A.    USPAP is correct.  It's a little

Page 23

weird when people say The USPAP, but it's technically correct.

Q.    So you agree that USPAP 2024, and I'll be using the acronym again for brevity purposes today, USPAP 2024 is one of the principle sources on which you based your report in this case.  Fair enough?

A.    I would use the terminology that I use in my report.

Q.    Which is what?

A.    The generally accepted techniques and methods of the appraisal profession.

Q.    As set forth in USPAP 2024 in part.

A.    There's a list of four descriptions and they, each of those four are considered to be part of the generally accepted techniques.

Q.    And the second one of the four that you're referencing is the Code of Professional Ethics and Standards of the Professional Appraisal Practice of the Appraisal Institute, correct?

A.    That is correct.

Q.    Okay.  And what is the Appraisal Institute?

A.    The appraisal Institute is the largest body of professional appraisers in the

Page 24

United States and Canada, I believe.

Q.    Within your industry and based on your experience in that industry, is the Appraisal Institute one of the leading, if not the leading, organizations, trade organizations, within the appraisal industry?

A.    It's one of them, yes.

Q.    In fact I believe in your bio section of your JLL bio you site the Appraisal Institute in some of the articles that you've written, correct?

A.    That's correct.

Q.    So you would not be critical if Dr. Randall Bell, East St. Louis real estate damages expert in this case, also sites to USPAP 204 and the Code of Professional Ethics and Standards of the Professional Appraisal Practice of the Appraisal Institute, correct?

A.    That's a little broadly thrown out there but I generally do not have reason to disagree with your statement.

MR. SCHWETTMAN:  Critical of Dr. Bell's citation of those?

MR. JOHNSON:  Yes.

Q.    (BY MR. JOHNSON)  And the third source that you list is the 15th edition of The

Page 25

Appraisal of Real Estate and the 7th edition of the Dictionary of Real Estate Appraisal, both published by the Appraisal Institute, correct?

A.    You properly read what's on that page.

Q.    And you wouldn't have included it if you didn't believe it was an authoritative source on which you base in part your reports.

MR. SCHWETTMAN:  Object to the form.

A.    I don't know that I would call that an authoritative source as much as it is, because it applies to many different, many different issues.  It is a very important textbook that appraisers rely on and refer to.  But if we're talking about the generally accepted techniques of the appraisal profession for evaluating properties that are potentially affected by environmental contamination, the 15th edition for example addresses that in part on particular pages.

Q.    Okay.

A.    But the way that you're wording it just is a little strong for me and the way that I represented the accepted techniques for appraisers I would refer you to the wording that I use in my report.

7 (Pages 22 - 25)

Page 26

Q.    Okay.  Then finally the next bullet, or the fourth bullet is courses, seminars and publications of the appraisal profession that set forth what our appraiser peers would do under similar assignments determining the effective environmental conditions on prices and values, correct?

A.    Yes.

Q.    Can you be more specific on that at this point?  We have you now deposing you on behalf of JLL, I just want to know what some of the those courses and seminars and publications might be.

A.    Well, that, I believe that comes from USPAP and USPAP says where can we find some definition on what appraisers can be expected to rely on, and there's guidance in the form of a frequently asked question in USPAP that references as an example courses, seminars, publications of the appraiser profession.

Q.    Do any specific ones come to mind is my question at this point, courses, seminars, publications, not specifically delineated in this section?

A.    I believe I reference many of them in my report.  None come to mind at the moment.

Page 27

Q.    And we'll get into the specific documents as needed later on, but generally right now is one of the authoritative source materials for real estate appraisers in your industry that address how to evaluate environmentally contaminated real estate, the so-called Advisory Opinion 9?

A.    Yes.

MR. SCHWETTMAN:  Object to the form.

Q.    (BY MR. JOHNSON)  And for brevity and reference point today if I say AO 9 you'll know I'm referring to Advisory Opinion 9.  Is that fair?

A.    Yes.

Q.    The other major one that I saw, learned about in this process is the so-called guide note number 6.  Is that another leading publication within your industry that advises real estate appraisers on how to assess environmentally contaminated properties?

A.    No.

Q.    That's not.  What is guide note 6?

A.    Guide note 6 is a guide note put out by the Appraisal Institute.

Q.    Right.

A.    That offers some guidance, okay?  For

Page 28

example after the great recession in 2007, 2008, appraisers are struggling with hey, how do we appraise properties if they're going into foreclosure, et cetera.  Well, they released a guide note that says this is what you, here is some guidance.  So it is not a standard of the appraisal profession by any means, it's a guide note and it has contents that may be useful but it is not a standard.

Q.    Okay.  Fair point.
Is the guide note 6, does it deal in part with the how to appraise environmentally contaminated real estate?

A.    I don't recall the specifics of that document.

Q.    Okay.  In this case as you know, well let me just ask you.  You're aware of course but you did your entire 367 page report on it, you're aware of Dr. Bell out of Landmark Research out in California is the City of East St. Louis's real estate damages expert in this case.

A.    Yes, he wrote the report that I reviewed.

Q.    And you're aware of his textbook, Real Estate Damages, third edition, correct?

Page 29

A.    Yes.

Q.    Do you consider that as a real estate appraiser to be an authoritative source on the topic which is the title of his book, Real Estate Damages?

MR. SCHWETTMAN:  Object to the form. Calls for a legal conclusion.

A.    You've been throwing in the word or the term authoritative source and those aren't the words we use.  We absolutely reference and site the Bell damages book and I would defer to the characterization of how we use it or characterize it as done within my report.  And I'd be happy to go look for those portions.

Q.    I heard what you just said, you said I'm using the term authoritative and that's not what we use.  I did though, and so what I'm asking you is do you consider as a professional real estate appraiser, Real Estate Damage, third edition, by Dr. Randy Bell, to be an authoritative source in your industry?

MR. SCHWETTMAN:  Object to the form, calls for a legal conclusion and asked and answered.

A.    Again, it is useful and there are

8 (Pages 26 - 29)

Page 30

elements of it that assist the appraisal process, and we appropriately cite to that text and it is included in the universe of acceptable appraisal references.

Q.    (BY MR. JOHNSON)  It is true, is it not, that Dr. Bell actually literally wrote the book on the exact subject of his own report in this case?

MR. SCHWETTMAN:  Object to the form.

A.    I have no idea the degree to which he wrote 100 percent of that book.  Is that what that question is?

Q.    (BY MR. JOHNSON)  He's the listed author on the book, correct?

A.    He is the listed author on the book.

Q.    So my question is is it true that Dr. Bell actually wrote the book on the exact subject matter of his report in this case, the real estate damages, if any, that took place on the tested East St. Louis parcels?

MR. SCHWETTMAN:  Object to the form. Asked and answered.

A.    I, you included a colloquial term of isn't it true he literally wrote the book, I'm uncomfortable with answering that question because

Page 31

I will tell you he is the author of that book, I don't, I would not use the words he literally wrote the book.

Q.    (BY MR. JOHNSON)  All right let's leave out the term literally wrote the book.  Is it true Mr. Brigden that Real Estate Damages, third edition, whoever wrote the book, is one of the leading sources of appraisal industry information on the subject of real estate damages assessment?

MR. SCHWETTMAN:  Object to the form.

A.    I wouldn't use those words.

Q.    (BY MR. JOHNSON)  But I did.

A.    I wouldn't rank it, I don't have an opinion on the ranking of it.

Q.    Do you consider Real Estate Damages, third edition to be the leading textbook in your industry in assessing real estate damages, including assessing real estate damages regarding environmental contaminated properties?

MR. SCHWETTMAN:  Object to the form.

A.    I would say it's an important component but I would not say it's the leading.

Q.    (BY MR. JOHNSON)  What would you say is the leading sources in your industry on the topic of assessing real estate damages in the

Page 32

context of environmental contamination?

MR. SCHWETTMAN:  Object to the form.

A.    It's rather a nuanced answer because --

Q.    (BY MR. JOHNSON)  It doesn't require one.

A.    Advisory Opinion 9 is sort of the beginnings of the response of appraisal, of the appraisal profession to addressing environmental contamination.   Since then there have been a number of publications, seminars, courses, articles, as described in my report.

Q.    My question though, let's get back to my question, which was other than real estate damages, putting aside real estate damages by Dr. Randy Bell can you name specifically another source textbook within the industry that is more leading or more on point with the exact topic in this case, and that is assessing real estate damages in an environmental contamination context?

MR. SCHWETTMAN:  Object to the form. Asked and answered.

A.    Yes.  I don't have an answer to your question because it includes a lot of qualitative descriptive things.  I can tell you that the Bell

Page 33

book is among the sources of information for appraisers and Advisory Opinion 9, the 15th edition of Appraisal, the many articles, seminars and compendium of articles would be others included in the universe of sources of which the damages book by Mr. Bell is included.

Q.    Do you own a copy of Real Estate Damages, third edition by Dr. Bell?

A.    I do.

Q.    It's on your book shelf at your office.

A.    No.  It's in the basement, I just use the pdfs these days.

Q.    Okay.  It's clearly something that you own and use from time to time in your own professional career.  Fair enough?

A.    It's incumbent upon appraisers to work in the litigation field to have all sources of materials relevant to their analysis at their disposal.

Q.    That's a yes?

A.    That's my answer.

Q.    Yeah.

Do you recognize J.D. Eaton, Valuation and Litigation as another authoritative

9 (Pages 30 - 33)

Veritext Legal Solutions

www.veritext.com                                                                888-391-3376

Page 34

source within your appraisal industry?

MR. SCHWETTMAN: Object to the form. Calls for a legal conclusion.

A. Yeah. I don't call it an authoritative source, I also have that pdf, and that book actually, I recall, it's kind of black and gold, it's nice looking, that is on my book shelf.

Q. That is on your book shelf. And do you, or have you -- strike that.

Have you cited J.D. Eaton, Valuation and Litigation in which of your JLL or Clarion reports in your appraiser career?

A. I certainly can say that that, that I have cited, yes.

Q. And you would not be critical of Dr. Bell for citing J.D. Eaton Valuation and Litigation. Correct?

A. That's a loaded question --

Q. It's not. It's just a simple question. Would you be critical of him?

A. If I can finish.

Q. Would you be critical of him is the only question.

A. I'm in the process of answering.

Page 35

Q. It's going to be a long day.

A. I wouldn't be critical that he cited to that treatise, I would be critical of the application, or misapplication, of a citation if that were the case.

Q. All right.

MR. JOHNSON: Ross, please display Exhibit 6, the first page of the JLL report in this matter.

Q. (BY MR. JOHNSON) Mr. Brigden, is this a complete report of the JLL report in this matter dated July 9th, 2024?

A. No. That is the cover page of my report.

Q. Is the report you have in front of you a complete copy of the JLL report in this matter?

A. Subject to the recently provided errata sheets, yes.

Q. I'm not going to worry about the errata sheets, how many pages are in the JLL report? I understand it to be 367 but you tell me otherwise.

A. 365.

Q. 365. Fair enough.

Page 36

Now, as I understand it, and you can confirm with your copy of Exhibit 6 in front of you, there are 215 pages of the main body of the report and you can confirm, and then there's an addendum attached to it.

A. That's -- yes. That's generally correct.

Q. Okay.

MR. SCHWETTMAN: We're talking about the July 9th, 2024 report, correct?

MR. JOHNSON: Correct.

Q. (BY MR. JOHNSON) And both you and Mr. Roddewig signed off on the JLL report, correct?

A. We both signed this appraisal review report.

Q. Okay. And you were the only two JLL representatives to sign off, fair enough?

A. We don't use the words sign off, sir, so that's why I'm quibbling. We were the only ones that signed this report.

Q. You put your signature on the report and Mr. Roddewig was the other JLL person who put his signature on the report.

A. Yes.

Q. I don't want to pull teeth today.

Page 37

They're pretty simple questions, right?

A. Yes.

Q. By, you don't like signing off, by putting your signature on the report are you indicating that to the best of your knowledge the opinions and conclusions set forth in the report are accurate, truthful and complete?

A. Yes.

Q. Is it your testimony today that the JLL report, Exhibit 6, is fully truthful and accurate?

MR. SCHWETTMAN: Object to the form. Asked and answered.

A. Yes.

Q. (BY MR. JOHNSON) What is a work file Mr. Brigden?

A. There is a definition of it, I will give you an informal one.

Q. Sure.

A. It supports, material that supports the appraisal report and the appraisal process.

Q. Okay. Is it your testimony that today, January 17th, 2025, JLL has produced a complete work file in support of Exhibit 6, the JLL report?

10 (Pages 34 - 37)

Page 38

A.    To my knowledge, yes.

Q.    To the best of your knowledge Mr. Brigden did JLL produce a complete copy of the work file in support of the JLL report as of the day it was produced to us in this case, July 9th, 2024?

A.    I have no idea what the arrival of the timing was at your law firm.

Q.    What is the significance, if any, of the date of the signing of the report by you and Mr. Roddewig, July 9th, 2024?

A.    I don't understand your question.

Q.    Is there any significance in the appraisal industry on the date on which you sign off on the report, July 9th, 2024, or is that just the date it was produced to the other side in the case, the City of East St. Louis?

MR. SCHWETTMAN:  Object to the form. That's vague.

A.    I have no idea what you're asking.  I think it may have been due that day.

Q.    (BY MR. JOHNSON)  Is there any other significance as far as your opinions are as of that date, or any other significance to July 9th other than your signature appears on that date?

MR. SCHWETTMAN:  Object to the form,

Page 39

it's vague, asked and accessed.

A.    It's the date of submission.  That's all I can say.

Q.    (BY MR. JOHNSON)  Has it been your custom and practice in your litigation reports for Clarion and JLL to only include those points and conclusions which you feel are significant, correct and accurate?

MR. SCHWETTMAN:  Object to the form.

A.    I'm not following you.

Q.    (BY MR. JOHNSON)  Has it been your custom and practice with JLL in signing your name to such reports to only include in those reports findings and opinions which you feel are significant, correct and accurate?

MR. SCHWETTMAN:  Same objection.

A.    I don't have an answer to your question.  It's very vague and obtuse and nonspecific.

Q.    (BY MR. JOHNSON)  Would you put anything in a report  -- strike that.

Would you put anything in a report on behalf of JLL that you felt was inaccurate or untruthful?

MR. SCHWETTMAN:  Were you done with

Page 40

your prior answer?

A.    I'm not sure actually.

Q.    (BY MR. JOHNSON)  You're not sure you wouldn't put anything inaccurate or untruthful or you weren't through with your prior answer?

A.    The latter.

MR. SCHWETTMAN:  Object to the form.

A.    The latter.

Q.    (BY MR. JOHNSON)  So my question is simply, and it is a simple question, you would not include nor would you put your name on, you would not put your name on a report that included what you knew to be untruthful or inaccurate statements or conclusions, fair enough?

MR. SCHWETTMAN:  Object to the form.

A.    I think that's somewhat fair, yes.

Q.    (BY MR. JOHNSON)  I think it's totally fair, don't you?

A.    Yes, it is.  The way you asked the question was incredibly confusing, so.

Q.    And we'll get into it as needed later.

MR. JOHNSON:  But Ross, if we could display Exhibit 7.

Q.    (BY MR. JOHNSON)  Mr. Brigden --

Page 41

MR. SCHWETTMAN:  What is this called so I can maybe grab it?

MR. HOBBS:  It's on the screen.  It's that guy.  It's the September 3rd thing.

A.    I don't have a paper copy but I think there's one.

Q.    (BY MR. JOHNSON)  All I'm doing right now is identifying for the record Exhibit 7 as being a September 3rd, 2024 six page First Supplemental Report, correct?

A.    Yes.

Q.    All right.

MR. SCHWETTMAN:  Can I pull it up for the witness?

Q.    (BY MR. JOHNSON)  You have a copy of that in front of you?

MR. SCHWETTMAN:  I don't think that was included in the link.

A.    I do not.

MR. SCHWETTMAN:  Thank you.

Q.    (BY MR. JOHNSON)  And to save time later what I want to ask now, would you agree with me, and you've reviewed Exhibit 7, correct?

A.    When I wrote it I reviewed it.

Q.    Yeah.  Would you agree with me that

11 (Pages 38 - 41)

Page 42

Exhibit 7 deals with aspects of risk effect damages as opposed to anything having to do with cost effect or use effect damages?

MR. SCHWETTMAN: Object to the form.

A.   I wouldn't represent it as being a risk effect damages anything. I would characterize it as it was new information that we wished to be added to our prior report, and that's all.

Q.   (BY MR. JOHNSON) Identify for me if you would any sentence or paragraph in that six page report that has anything to do with so-called cost effect damages and/or use effect damages please.

MR. SCHWETTMAN: Object to the form.

A.   There wouldn't be any.

Q.   (BY MR. JOHNSON) Fair enough. Thank you. That's a good question and a good answer, quick, efficient, succinct.

MR. SCHWETTMAN: Move to strike that.

MR. HOBBS: I'm keeping score down here.

MR. JOHNSON: Thank you.

Q.   (BY MR. JOHNSON) Now, let's go to Exhibit 8, we're going to go through the same drill here, just so we know in advance.

Page 43

A.   I have this.

Q.   You have 8. Okay.

MR. SCHWETTMAN: You have it?

A.   I do.

Q.   (BY MR. JOHNSON) Can you identify Exhibit 8 as the January 7th, 2025 JLL Supplemental Report in this matter?

A.   I would call it the supplement that replaces the September 2024 supplement, sir.

Q.   So the intention of JLL and you, sir, was to replace Exhibit 7 with Exhibit 8.

A.   I wouldn't assign the word intention to anything other than as a result of the extended discovery period there was a certain scope of work that was required and the work product that documents that extended scope of work replaces this document.

Q.   I don't know how to make it more succinct. Does Exhibit 8 replace Exhibit 7, which is I believe what you told me a moment ago?

A.   You said something else, I said it replaces it.

Q.   So it does replace Exhibit 7.

A.   You called it the second supplement, sir.

Page 44

Q.   Okay.

A.   I'm saying this replaces and is the supplement.

Q.   Okay.

A.   That is an important distinction that I will stand by.

Q.   Very well. Can you agree with me that Exhibit 8 does not in any way deal with concepts of cost effect and/or use effect damages?

MR. SCHWETTMAN: Object to the form.

A.   I would have to think about that because cost, use and risk are always part of an appraiser's consideration when evaluating damages and I would he hesitate to say that they're in no way incorporated in this. I would need to keep reading this.

Q.   (BY MR. JOHNSON) So please do. My understanding is that it does not, but you do what you need to do in that document to answer my question, and that is to confirm that nothing in Exhibit 8 deals in any respect with cost effect and/or use effect damages in this case.

MR. SCHWETTMAN: Object to the form. I think he answered your question.

MR. JOHNSON: I don't think he did at

Page 45

all.

A.   It generally does not directly address cost and use, I will grant you that. I'm saying I would say it doesn't mean it has zero applicability on those topics, that's all.

Q.   (BY MR. JOHNSON) All right. You would agree with me, and I don't want to get out the document, identify it, but there is a records keeping rule within the appraisal industry and within USPAP, correct?

A.   Yes.

Q.   And you'd agree with me generally speaking that the records keeping rule requires that an appraiser have a complete file produced at the time that the original report is produced, correct?

MR. SCHWETTMAN: Object to the form. Lack of foundation.

A.   Can you show me that document? Because those are your words and I would rather just acknowledge that there's a description of it somewhere.

Q.   (BY MR. JOHNSON) You can't tell me just sitting here without looking at a document that the record keeping rule within your industry

12 (Pages 42 - 45)

Page 46

that you practice in every day requires that the work file in its entirety be produced simultaneously or contemporaneously with the report?

MR. SCHWETTMAN: Object to the form. Asked and answered.

Do you want to show him what you're referring to?

MR. JOHNSON: No, I don't.

A. A work file does not get produced when a report is done, sir, in the appraisal parlance. You're not getting into a litigation whelm, okay? So these are two very different things. You're conflating two topics that are not related and your question is inappropriate because it conflates them. So I would be happy to break that apart and we could further this topic.

Q. In the litigation context in your understanding Mr. Brigden should an appraiser produce his or her entire work file contemporaneous with the report that's being submitted?

A. I am not aware of trial procedure or litigation procedure or rules, my client asked for the work file, we provided the work file.

Q. By the way, with respect to the copy

Page 47

of the report that you have in front of you, the JLL report, Exhibit 6, when you prepared for today's depositions are there any, are there any corrections other than the errata sheet that Mr. Schwettman referred to earlier, are there other corrections that need to be made or can be made at this point that you became aware of in preparing for the deposition?

A. And now we're referring to Exhibit 6?

Q. Yes, sir.

A. Aside from typos none that I can think of.

Q. Okay. Now --

MR. JOHNSON: Ross, if you could display the Table of Contents for Exhibit 6 at pdf 3 and 4.

Q. (BY MR. JOHNSON) Are you with me Mr. Brigden?

A. I am. Yes.

Q. Okay. In reference to pages 32 to 51 as listed in the Table of Contents of your report you describe with some particularity the Monsanto history of PCB production in Sauget, Illinois, correct?

MR. SCHWETTMAN: Object to the form.

Page 48

A. I'm looking at page 1?

MR. JOHNSON: Pdf page 55 Ross, can you make that a little bigger?

MR. HOBBS: Do you want a hard copy Paul?

MR. JOHNSON: Yeah.

MR. HOBBS: Do I get it back?

Q. (BY MR. JOHNSON) At page 32 to 51 of your report do you see the entry in the Table of Contents --

A. That begins at page 32.

Q. Yes.

A. Yeah, I see that.

Q. What I'm trying to establish is that begins an extensive section where JLL researched into the environmental and PCB situation involving the Monsanto Krummrich facility and other sites in the Sauget industrial corridor, correct?

A. Page 32 is where we start the discussion of a summary of our research into the environmental and PCB situation.

Q. So yes, that's where it starts, page 32, and according to the Table of Contents it ends at about page 49, that section, correct?

A. Happy to verify that for you.

Page 49

Yes. That's about correct.

Q. And in that section you purported to do an investigative background research into Monsanto's production of PCBs at the Krummrich plant within want geographical confines of Sauget and East St. Louis and Cahokia, correct?

MR. SCHWETTMAN: Object to the form.

A. No.

Q. (BY MR. JOHNSON) What did you do then, sir?

A. I did not purport to investigate Monsanto's operations, that's outside the scope of my work. I summarized appropriate content from an appraisal perspective that might inform the reader of an appraisal review report in this matter.

Q. Okay. And included in whatever you just described is a description of the two Super Fund sites known as Sauget area 1 and Sauget area 2, correct?

A. I believe those operating, those OU sites referenced, yes.

Q. Yes, sir. And you also referenced the so-called Resource Conservation and Recovery Act, or RCRA for the acronym, proceeding, which arose out of W.G. Krummrich operations and

13 (Pages 46 - 49)

Page 50

contamination issues, correct, sir?

MR. SCHWETTMAN: Object to the form.

A. That question, we reference RCRA, I don't make a connection to the Krummrich plant per se like you did in that question. There are elements of RCRA that were mentioned in this section.

Q. You understand that the RCRA proceeding arose out of operations at the Krummrich plant, do you not, based on your investigation into the background?

A. Can you repeat that question?

Q. You understand based on your investigation of the background circumstances that the RCRA proceeding arose out of Krummrich operations, do you not?

MR. SCHWETTMAN: Object to the form.

A. Can you define RCRA proceeding?

Q. (BY MR. JOHNSON) You referred to it 15 times in your report Mr. Brigden, on pages 32 through -- in your entire report you referred to it 15 times. The RCRA proceeding was a proceeding opened up by the United States EPA arising out of contamination at Krummrich. Is that your understanding?

Page 51

MR. SCHWETTMAN: Object to the form. Argumentative.

A. My understanding is how I characterize it in this report. It is a one term out of many complex legal, scientific, environmental terms that require careful consideration, research and writing and it doesn't surprise me that it is referenced in there six times. 16 times.

Q. (BY MR. JOHNSON) Based on your careful investigation Mr. Brigden did you develop an understanding that the EPA initiated the RCRA proceeding at the Krummrich plant after determining that contamination from hazardous substances including Monsanto PCBs posed significant risk to human health and the environment?

MR. SCHWETTMAN: Object to the form. This calls for a legal conclusion.

A. That would be far outside the scope of work that I had to do, that is not part of my opinions.

Q. (BY MR. JOHNSON) I understand it's not part of your opinions but it's part of your background, is it not? That section right there in front of you.

Page 52

MR. SCHWETTMAN: Object to the form.

A. I'm sorry, are you saying my background?

Q. (BY MR. JOHNSON) Your background in that section of report we're discussing included a detailed assessment of the RCRA proceeding and the two Super Fund proceedings in the, what I'll call the Sauget industrial corridor in Sauget, Cahokia and East St. Louis, correct?

A. No.

MR. SCHWETTMAN: Object to the form.

A. It is not a detailed summary of anything that you just said. It is information that I considered relevant.

Q. (BY MR. JOHNSON) Did you learn that the Krummrich facility which had operated for decades manufacturing chemicals such as PCBs contributed to substantial soil and ground water pollution?

MR. SCHWETTMAN: Object to the form.

A. I don't have an opinion on that.

Q. (BY MR. JOHNSON) Do you understand based on your background investigation that these contaminants including PCBs from the Krummrich plant posed serious risk to human health and the

Page 53

environment including the potential contamination of the Mississippi River?

MR. SCHWETTMAN: Object to the form and completely irrelevant to plaintiff's claims in this case.

A. That sounded like a sentence that has a lot of words that remind me that I wasn't asked to touch that. It's outside the scope of my work.

Q. (BY MR. JOHNSON) You have no such understanding. Is that fair to say, sir?

MR. SCHWETTMAN: Same objections.

A. I was not asked to evaluate the topic that your question addresses.

MR. JOHNSON: Ross, if we could display pdf 365 of the JLL report which is Exhibit 6.

Q. (BY MR. JOHNSON) That would be 363 for you Mr. Brigden.

A. Thank you. I'm there.

Q. And is that a section titled Documents Considered and Relied Upon?

A. Yes.

Q. Mr. Brigden, what has your and JLL's custom and practice in preparing such reports been as to what documents and source materials will make

14 (Pages 50 - 53)

Page 54

it to the so-called documents considered and relied upon list?

MR. SCHWETTMAN: Object to the form. I don't know if such report exists.

A. Fantastic question. We're asked to comply with legal procedures and we're told that we need to include such a list. I am not always privy to the decision tree regarding this. I know, I can speak to it generally that they are, that key documents that are important that are not, especially those that are not part of the record be on here, but as to the decision tree of content I'm not comfortable giving you an answer.

Q. (BY MR. JOHNSON) Fair to say that JLL would not consider and rely upon anything but trustworthy and credible documents such as those starting to be listed at page 363 of your report?

MR. SCHWETTMAN: Object to form.

A. I'm not going to make a characterization of items that are listed on here, sir, because in some instances it's a news article or something and may be a fantastical news article that I may not agree with, but it might get referenced in here. So I don't know why you're asking me to give characterization of integrity to

Page 55

anything on here.

Q. (BY MR. JOHNSON) All I asked was is it accurate and fair to say that JLL would not consider and rely upon anything but trustworthy and credible docs in its quote, Documents Considered and Relied Upon section of the report?

MR. SCHWETTMAN: Objection to the form and asked and answered.

A. I don't make a nexus as to the needs of this document and the standard of integrity that you are including in your question.

Q. (BY MR. JOHNSON) You can't answer my question, can you?

MR. SCHWETTMAN: Object to the form. He answered your question.

MR. JOHNSON: No, he didn't.

A. I did answer your question twice in fact.

Q. (BY MR. JOHNSON) Fair to say that JLL wants to be as thorough as possible in investigating the background facts and circumstances of a given environmental contamination scenario so it can be as knowledgeable as possible when formulating its reports?

Page 56

MR. SCHWETTMAN: Object to the form. That's vague.

A. Can you repeat the question please?

Q. (BY MR. JOHNSON) Sure.

Fair to say Mr. Brigden that JLL wants to be as thorough as possible in investigating the background facts and circumstances of a given environmental contamination scenario so that it can be as knowledgeable as possible when preparing its reports?

MR. SCHWETTMAN: Same objections.

A. This is a review of a Bell report that as you will see we have pointed out incredibly significant lacking deficient description of accuracy regarding the subject properties. I'm not here to give you a characterization of my operational intent in a broad, sweeping way. I'm reviewing a Bell report that as I described is significantly deficient in its content, so I'm not comfortable giving you a soft description of my general intent. It is appropriate for the task at hand and reasonable to what the needs of the client are or the matter is. So this is not an exhaustive list necessarily. The decision to what we include

Page 57

relates to our scope of work.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Now let's do it again.

Is it fair to say that JLL wants to be as thorough as possible in investigating the background facts and circumstances of a given environmental contamination scenario so that it can be as knowledgeable as possible when formulating and drafting its reports?

MR. SCHWETTMAN: Object to the form. That's vague and it's been asked and answered.

A. JLL performs its analysis in a manner that produces credible assignment results.

Q. (BY MR. JOHNSON) All right.

MR. JOHNSON: Ross, could you please demonstrate on Exhibit 6 --

MR. HOBBS: When you get to a stopping point, five, 10 minutes from now can we take our first break?

MR. JOHNSON: Sure.

MR. HOBBS: Thank you.

MR. JOHNSON: Exhibit 6, pdf 43.

Q. (BY MR. JOHNSON) That's page 41 for

15 (Pages 54 - 57)

Page 58

you, is that correct, Mr. Brigden?

A. Right.

Q. I want to turn your attention to footnote 48 at the bottom.

A. Yes.

Q. And you cite in your report as reliance materials "Incorporated to Be a Sewer": A History Analysis, A Historical Analysis of Industrial Pollution in Sauget, Illinois, correct?

A. You read footnote 48.

MR. JOHNSON: Ross, could we demonstrate and display on the screen Exhibit 14, "Incorporated to Be a Sewer" dated May 13th of 2020?

Q. (BY MR. JOHNSON) Mr. Brigden, I'm handing you a copy.

MR. JOHNSON: Tyler.

MR. SCHWETTMAN: Thank you.

Q. (BY MR. JOHNSON) When we get into this article Mr. Brigden I want to just establish that you used this study in part for JLL to gain background on the history of Sauget and how the W.G. Krummrich plant came about, correct?

MR. SCHWETTMAN: Object to the form.

A. No. I would not describe it as that.

Page 59

I would describe it as a citation to a sentence.

Q. And it's certainly, it's certainly contained in your documents Considered and Relied Upon section that we just went through in the JLL report, correct?

A. All articles and citations included in the report are also included in that list in the addendum.

MR. JOHNSON: Ross, could we go to page 6 of this article?

Q. (BY MR. JOHNSON) At the bottom of that page.

On August 7, 1926 the region which is now Sauget held a vote for the incorporation of the villager of Monsanto.

That's what it says, correct?

A. I'll take your word for it, yes.

Q. And then turning on to the next page Mr. Brigden, page 7.

MR. JOHNSON: Starting Ross with robbing.

A. Page 7?

Q. (BY MR. JOHNSON) Yeah.

A. Okay.

Q. Starting with the word robbing.

Page 60

A. I'm there.

Q. First paragraph. Robbing neighborhood communities of the economic prosperity promised by new industry, the Village reported a $20 million property value, accentuating preexisting injustices in the region. Taken in tandem, the size and wealth of the Village are in no way coincidental. From the inception, the Village of Monsanto served as a means to maximize profitability and minimize responsibility. Backed by the money and power of Monsanto Chemical Works the corporation dealt a major economic blow to neighboring East St. Louis, a community that has long been victim to an extensive history of industrial ruin and injustice. Had the Village incorporation petitions failed and East St. Louis annexed the district, income from municipal and park board taxes would have increased in East St. Louis between 75 and $100,000; however, by gaining autonomy the industries located within the 1.65 square miles saved themselves said monetary sum.

I read that correctly, sir?

A. You read correctly from this article.

Q. Yes. Let's turn to page 11 please. Starting with the sentence reports of the targeted

Page 61

environmental contamination, third paragraph down.

A. Okay.

Q. Reports of the targeted environmental contamination highlighted dioxins and PCBs as the cause of numerous public health concerns. Medical examinations and clinical laboratory tests performed on Monsanto employees in October 1979 revealed that over 90 percent of the 108 laborers showed signs of illnesses related to dioxin exposure including headaches, fatigue and neurobehavioral problems. Similarly, the effects of PCBs on reproductive health gained national and local attention following the publication of Theodora Colborn's book, Our Stolen Future, which names Sauget as the birthplace of PCBs and warns of the looming threat the chemical wields. Another local case held more than two dozen companies in and around the Sauget area, including Monsanto, liable for a man's leukemia diagnosis as a result of PCB exposure via the proximity of his house to Dead Creek.

Mr. Brigden, I read that section of that article correctly, sir?

A. I believe you did.

MR. JOHNSON: Ross please page 14.

16 (Pages 58 - 61)

Page 62

Top of the page, first paragraph.

Q.    (BY MR. JOHNSON)  To further emphasize the peril imposed on the region it is critical to identify the pollutants at play. Likely one of the most well-known hazardous substances due to its widespread infamy and prohibitions in 1979, polychlorinated biphenyls, PCBs, are a class of highly toxic chemicals which, if present in the environment, can cause birth defects and cancer.  While both their manufacture and use were phased out the chemical properties of PCBs make the substance resistant to degradation, allowing the chemicals to persist in the environment.  Developed by Swan Chemicals, which was purchased by Monsanto in the 1930s, PCBs were incessantly produced for over 40 years. Approximately 99 percent of PCBs used for industrial purposes within the United States from the 1930s until the 1970s were manufactured by Monsanto at the W.G. Krummrich plant.

I read that section correctly, sir?

A.    I believe you did.

MR. JOHNSON:  Beginning with the next paragraph Ross, Dioxins.

Q.    (BY MR. JOHNSON)  Dioxins, another

Page 63

class of hazardous substances produced through the burning of organic matter at high temperatures, are also widely present within the SIC, which is the Sauget Industrial Corridor.  Dioxins are strongly linked to cancer and other endocrine-disrupting effects.  Further, the substances resistant to decomposition and known to biomagnify in food webs. Likely the byproduct of PCB incineration dioxins have been widely documented at the W.G. Krummrich plant.

I read that section correctly, sir?

A.    I believe you did.

MR. JOHNSON:  And finally go to 17 at the bottom, Ross, actually at the top, starting with the conclusion.

Q.    (BY MR. JOHNSON)  What becomes immediately apparent from the story of Sauget is a gross superposition of selfish interests over public welfare.  For nearly a century Sauget government officials wielding community-derived power have pursued an agenda which unapologetically and unobstructively places profit above all else. Committing the town so prematurely to the status of an industrial suburb undoubtedly predisposed the Village to persistent industrial invasion, securing

Page 64

the polluted future of both immediate and surrounding community members.  Although this research has incriminated four specific companies, namely Monsanto, Cerro Copper, Amax/Big Rivers Zinc and Clayton Chemical, it should be noted --

A.    I don't see that here.

Q.    Sorry.

MR. JOHNSON:  Ross, let's go down to the bottom of page 9 and going on to page 10 then.

I'm sorry, it's the paragraph in the middle of page 17.  My bad.

Q.    (BY MR. JOHNSON)  Although this research has incriminated four specific companies, namely Monsanto, Cerro Copper, Amax/Big River Zinc and Clayton Chemical, it should be noted that the Sauget industrial corridor was home to several industrialized operations.  That being said, the four companies incriminated throughout this research are undeniably the most egregious abusers of the area.  Monsanto, the company which almost singlehandedly incorporated the Village, did so out of greed.

And now I want to go on with the next section that starts with such an extensive entanglement.  That's at the top of page 18.

Page 65

Such an extensive entanglement and open pursuit of lucrative operations is undoubtedly an abuse of power.  More than simple corruption, the Sauget family and the companies which have operated out of the Village are liable for decades of industrial pollution.  Despite remediation efforts the decades-long abuse of local land, water and air will continue to haunt the environmental history of Sauget.  While portions of the toxic waste will eventually dissipate, other chemical discharge will either experience minimal degradation or simply persist in the environment eternally.  Worse still, a number of the industrial toxins bioaccumulate or biomagnify, threatening to escalate both the extent and the severity of contamination, directly related to the ecological effects of industrial waste, the human and bodily impacts of Sauget's pollution are almost unfathomable.  The sheer number of plaintiffs involved in the first citizen suit brought against Monsanto and Cerro Copper can only begin to quantify the regional impact of just two industrial ventures.  Considering the timeframe and scale at which industry operated in the area local residents will likely battle ongoing health effects and

17 (Pages 62 - 65)

Page 66

premature death for decades. Furthermore, industrial waste is not just a human toxin, its consequences extend beyond, excuse me, its consequences extend beyond immediate health impacts as regional community members will suffer the disproportionate economic and emotional burdens necessarily associated with excessive indiscriminate pollution.

Mr. Brigden, did I read that conclusion paragraph correctly?

A.   I wasn't tracking.  I will assume you did.

Q.   Okay.  And that's part of the documents considered and relied upon by JLL in its report in this case, fair to say, sir?

A.   No.

Q.   It's not.  It's listed in your report, it's listed as documents considered or relied upon, but you didn't take it into consideration in your report, did you?

MR. SCHWETTMAN:  Object to the form.  Asked and answered.

A.   No.

MR. JOHNSON:  Let's take our first break now.

Page 67

VIDEOGRAPHER:  We are off the record at 10:55.

(A RECESS WAS TAKEN BY THE PARTIES)

VIDEOGRAPHER:  We are back on the record.  This is media unit number two, the time is 11:10.

Q.   (BY MR. JOHNSON) Mr. Brigden, following up on the background into the facts and circumstances of East St. Louis and Krummich plant, et cetera, can you look at the Table of Contents of the JLL report, page 5, and confirm for me that at page 248, or beginning at page 248 in your addenda section, JLL has a summary of economic history of East St. Louis and factors affecting the East St. Louis local economy, correct?

A.   It's actually page 246.

Q.   246 and it goes to page 255 according to the Table of Contents?

A.   That is the summary.  Yes.

Q.   Okay.  Now what I want to establish with you is some background facts and circumstances and see if it matches with your investigation of the background circumstances of this area, East St. Louis, and the Krummich plant.

You are aware, are you not, Mr.

Page 68

Brigden, that prior to Monsanto beginning -- strike that.

You are aware, are you not, Mr. Brigden, that prior to Monsanto beginning to manufacture PCBs in North America in 1929 in Alabama, in 1936 at the Krummich plant in Sauget, there was no PCB production in North America.  Are you aware of that?

MR. SCHWETTMAN:  Object to the form.  It's outside the scope.

A.   I've got two responses to that.  You characterize it as background facts, that I'm summarizing and that is not how I characterize it, and number 2, I don't offer any opinions of the operations of the Krummrich plant, or do I purport to summarize their historical facts.

Q.   (BY MR. JOHNSON) Are you aware based on your background investigation to prepare your report that prior to 1936 at the Krummrich plant and prior to 1929 at Monsanto's other PCB plant in Alabama, there was no PCB production in North America?  That's my question.

MR. SCHWETTMAN:  Object to the form.  It's outside the scope.  Lack of foundation.

A.   Yeah.  I don't have an answer to that

Page 69

question.

Q.   (BY MR. JOHNSON) You're not aware of that.

MR. SCHWETTMAN:  Asked and answered.

A.   It's outside the scope of my analysis.

Q.   (BY MR. JOHNSON) I don't care if it's outside the scope of your analysis, I'm asking whether you're aware of that fact.

MR. SCHWETTMAN:  Object to the form, argumentative and asked and answered.

A.   I care, because I'm here to answer questions about my report and so there's a lot of information in here that describes research from others, summary information that may be helpful, ut I do not have opinions concerning those.

Q.   (BY MR. JOHNSON) Are you aware based on your background investigation to prepare your report that there was no PCB contamination which existed on Planet Earth prior to Monsanto's commencing manufacturing of PCBs around 1930?

MR. SCHWETTMAN:  Object to the form.  Vague and ambiguous.  Outside of the scope of the this witness's opinions.

A.   It was not something I looked at,

18 (Pages 66 - 69)

Page 70

it's outside the scope of what I was asked to look at.

Q. (BY MR. JOHNSON) I understand. But are you aware of that is my question before you right now, the witness.

MR. SCHWETTMAN: Asked and answered.

A. I don't, I do not know.

Q. (BY MR. JOHNSON) Are you aware that Monsanto produced more than 99 percent of all PCBs in North America from 1929 through 1971 and then 100 percent of them at the Krummrich plant from 1971 through 1977 when Monsanto ceased all North American production of PCBs?

MR. SCHWETTMAN: Objection to the form. Outside the scope.

A. The only knowledge I have about the operations at that plant is they like all other plants closed between the '50s and '70s.

Q. (BY MR. JOHNSON) If we could turn to Exhibit 28 Russ, or display the first page of the Bell report for identification please.

And for the toward Tyler is handing you a copy of the Bell report, correct?

A. Yes.

Q. And if you could please turn to pdf

Page 71

2.

MR. JOHNSON: And Ross could you emphasize the diagram please?

Q. (BY MR. JOHNSON) You obviously have reviewed this extensively in the preparation of the JLL report, correct?

A. I have seen this image.

Q. And you understand that the red marked parcels are what purport to be the East St. Louis tested parcels in this case, correct?

MR. SCHWETTMAN: Object to the form.

A. Can you repeat that?

Q. (BY MR. JOHNSON) Do you understand that as per the diagram that the red marked parcels are the East St. Louis tested parcels in this case?

MR. SCHWETTMAN: Object to the form. That's vague.

A. That's not what this image says, so no.

Q. (BY MR. JOHNSON) You understand that these parcels are in close proximity to where the Krummrich plant, and specifically on the campus the PCB manufacturing plant was located.

MR. SCHWETTMAN: Object to the form. Lack of foundation.

Page 72

A. What I am seeing in the document that you've given me is that it inaccurately describes 228 red parcels as being publicly owned or city owned and that it says non-publicly owned and you're asking me questions about testing in a plant?

Q. We'll get into all the issues you want to get into within reason.

A. I don't want to get into them, I'm trying to answer your question.

Q. I'm not talking about the description of the document, I'm talking about just the parcels that are shown. All I'm trying to do is establish the proximity of what purports to be tested parcels, whoever owns them, Santa Claus, okay? Whoever owns them I just want to establish they're close in proximity to what you understand to be the location of the Krummrich campus. Fair enough?

MR. SCHWETTMAN: Object to the form. Lack of foundation.

A. Some of the southerly and westerly subject properties are located in close proximity to the northern boundary of the Krummrich campus.

Q. (BY MR. JOHNSON) All right.

MR. JOHNSON: Ross, could we

Page 73

demonstrate Exhibit 11 please?

Q. (BY MR. JOHNSON) I'll hand you a copy of Exhibit 11 Mr. Brigden.

MR. SCHWETTMAN: Thank you.

Q. (BY MR. JOHNSON) This is a Google Earth aerial photograph of the area which encapsulates, and I'm asking you to confirm Mr. Brigden, the southern end of East St. Louis, the northern end of Sauget and where you understand the Krummrich campus to be located.

A. Yeah. That's my understanding of what I'm looking at.

Q. And just to make the point, and to give the jurors or whoever's watching perspective, do you understand that roughly 50 percent of all PCB manufactured in North America were produced literally hundreds of yards from the tested parcels carryover at the Krummrich plants in Sauget, Illinois, sir?

MR. SCHWETTMAN: Object to the form, outside the scope.

A. That's outside the scope of what I was asked to do here.

Q. (BY MR. JOHNSON) I'm asking you as the witness on behalf of JLL in this case are you

19 (Pages 70 - 73)

Page 74

aware of that fact, sir?

MR. SCHWETTMAN: Object to the form, asked and answered.

A. It's outside the scope of my analysis.

Q. (BY MR. JOHNSON) I understand your analysis. My answer is simply are you aware that the depicted red parcels in aerial photograph 11 are literally hundreds of yards away from where you understand the Krummrich plant to have been located?

A. I don't have an opinion or proximity of something I didn't study.

Q. Do you have an understanding that all PCB manufacturing processes at Krummrich were outdoor processes?

MR. SCHWETTMAN: Object to the form. Outside the scope.

A. Same answer.

Q. (BY MR. JOHNSON) You don't have any understanding.

A. I don't have an opinion --

Q. I'm not asking whether you have an opinion, I'm asking whether you have an understanding.

Page 75

MR. SCHWETTMAN: Objection, argumentative. Asked and answered.

A. I don't have. I'm not aware or unaware of the topic you're asking me about.

Q. So you're unable at this time to answer a simple question, and that is are you aware that the red parcels in aerial photograph 11 are close in proximity, hundreds of yards away from where you understood the PCB manufacturing area of the Krummrich campus to be located, you can't answer that, right?

MR. SCHWETTMAN: Object to the form. Asked and answered multiple times.

A. I recall answering that at least three times and one where I provided greater specificity for the southern and northern boundaries.

Q. (BY MR. JOHNSON) It's a simple question. Are you able to answer my question does Exhibit 11 and the red parcels depicted thereon in close proximity that you, the JLL expert on damages in this case, understood the PCB manufacturing plant on the Krummrich campus to be located?

MR. SCHWETTMAN: Object to the form, asked and answered four times and I don't see any

Page 76

red parcels on this.

MR. HOBBS: Are we on the wrong report?

MR. SCHWETTMAN: Are you talking about Bell's report or the Google image?

MR. JOHNSON: Back to Bell's report.

MR. SCHWETTMAN: Okay.

Q. (BY MR. JOHNSON) Here, let's do it this way: Exhibit 11, I'm going to draw a circle on the southern end where the parcels were tested. Let me hand that to you. Can you see the red?

A. Now we're talking about parcels that are tested?

Q. Let's just say this: Where I circled, let's forget about parcels, the circled area at the southern end of East St. Louis relative to the dot in the middle lower section of Exhibit 11, all I'm asking you now is is that section that I've circled at the southern end of East St. Louis close in proximity to the area that I marked with a red dot on the lower bottom of Exhibit 11? That's my only question.

MR. SCHWETTMAN: Object to the form, lack of foundation and it's vague and ambiguous and asked and answered.

Page 77

A. So that's Wilford Avenue.

Q. (BY MR. JOHNSON) Is it close in proximity, within hundreds of yards, to the red dot on photograph 11? That's my only question, sir.

MR. SCHWETTMAN: Object to the form, lack of foundation and asked and answered.

A. Wilford Avenue is directly north of the railroad right-of-way, after that is Monsanto Avenue and after that is the plant. I'd have to do a measurement but if we want to compare distances it's the closest street that the Bell subject neighborhood includes.

Q. Is Wilford Avenue, sir, within a half mile of the Krummrich plant as you understood its location?

MR. SCHWETTMAN: Object to the form, lack of foundation.

A. I'd have to have a scale to answer that but I might venture a guess that it's possibly within a half mile.

Q. (BY MR. JOHNSON) There we go. There we go. We're making progress.

Are you aware Mr. Brigden from multiple sources of the documents you reviewed in this case, including perhaps Monsanto's own expert

20 (Pages 74 - 77)

Page 78

Dr. Kytoma, that Monsanto manufactured at the Krummrich plant some 820,000, or 820 million pounds of PCBs at the Krummrich plant?

MR. SCHWETTMAN: Object to the form. Lack of foundation. Outside the scope of this witness's opinions.

A. It's outside the scope of what I was asked to do.

Q. (BY MR. JOHNSON) That's my not my question. Are you aware of that fact?

MR. JOHNSON: And by the way, you can have a continuing legal objection to exactly what you just stated a moment ago for the balance of this deposition. How about that?

MR. SCHWETTMAN: I would prefer not to do that because the questions seem to evolve as we go along.

MR. JOHNSON: Why would you not agree to that?

MR. SCHWETTMAN: I'll continue to put my objections on the record.

MR. JOHNSON: Pretty good deal Tyler.

Q. (BY MR. JOHNSON) Are you aware that Monsanto produced 20 million pounds of PCBs within a half mile or so from Bell's tested parcels area?

Page 79

MR. SCHWETTMAN: Object to the form. Lack of foundation. Outside the scope.

A. It was outside the scope of what I was asked to do.

Q. (BY MR. JOHNSON) You can't even answer that question, can you?

MR. SCHWETTMAN: Same objections, asked and answered and argumentative.

A. I don't have an answer to something I didn't study.

Q. (BY MR. JOHNSON) Have you seen estimates from Monsanto documents to the effect that there was some 37.3 tons of PCB air losses from outdoor storage tanks at the Krummrich plant throughout its operating history?

MR. SCHWETTMAN: Object to the form. Outside the scope.

A. It was outside of the scope that I was asked to do.

Q. (BY MR. JOHNSON) Is it your testimony you cannot answer that last question? You either have an understanding or you don't, sir.

MR. SCHWETTMAN: Misstates his prior testimony. Asked and answered.

A. I don't have an answer to something I

Page 80

didn't study.

Q. (BY MR. JOHNSON) Are you aware Mr. Brigden that beginning in the late 1930s Monsanto volitionally decided to vent highly toxic PCB fumes and vapors outside of its plant to the ambient air and environment?

MR. SCHWETTMAN: Object to the form. Lack of foundation. Outside the scope of this witness's opinions.

A. It was outside the scope of what I was asked to do.

Q. (BY MR. JOHNSON) And you're unable to answer that question, correct, sir?

MR. SCHWETTMAN: Argumentative.

A. I am unable to answer something I didn't study.

Q. (BY MR. JOHNSON) Did you become aware in your investigation Mr. Brigden that when Monsanto implemented the policy for the entire PCB manufacturing period to vent PCBs outside of its manufacturing area, PCBs were vented into the atmosphere by wind and air?

MR. SCHWETTMAN: Object to the form, lack of foundation, outside the scope of this witness's opinions.

Page 81

A. I do not have an answer to that as it's outside the scope of my analysis.

Q. (BY MR. JOHNSON) You're unable to answer that question with a yes or no answer, is that fair to say?

MR. SCHWETTMAN: Argumentative.

A. I cannot answer something that I did not study.

Q. (BY MR. JOHNSON) Are you aware that Monsanto made this venting PCB emissions in the atmosphere decision because it recognized the risk to its workers if the fumes stayed in its plant?

MR. SCHWETTMAN: Object to the form, lack of foundation, outsider the scope.

A. I have no idea. This was outside of what I did in this matter.

Q. (BY MR. JOHNSON) And did you realize that Monsanto assumed that the air vented from the PCB production area at Krummrich could move outside and affect the local environment?

MR. SCHWETTMAN: Objection to the form, lack of foundation, outside the scope.

A. I have no opinion on what somebody else presumed.

Q. (BY MR. JOHNSON) Are you Mr. Brigden

21 (Pages 78 - 81)

Page 82

that PCBs were released into the environment during the entire period of Monsanto's manufacture of PCBs at the Krummich plant, that is to say from '36 through 1977?

MR. SCHWETTMAN: Object to the form, lack of foundation, outside the scope.

A. It was outside of what I was asked to do.

Q. (BY MR. JOHNSON) Are you aware of that fact, sir, is my specific question?

MR. SCHWETTMAN: Asked and answered.

A. I don't have an answer for something I didn't study.

Q. (BY MR. JOHNSON) Are you aware of whether that is a true statement or not?

A. I don't have a basis on which to answer that question.

Q. You are aware, are you not, that multiple studies have concluded that the greatest concentration of PCB residues are found in the vicinity of industrial and municipal areas in the northern hemisphere, sir?

MR. SCHWETTMAN: Object to the form, vague and ambiguous, outside the scope.

A. That was outside the scope of what I

Page 83

was asked to do.

Q. (BY MR. JOHNSON) And once again, you're unable to answer that question, whether you're aware of that fact or not, correct?

A. I'm saying other people were hired to do that, I was not.

Q. That wasn't my question, I move to strike the response.

You are aware, are you not, that it was approximately 1970 after 35 or so years of PCB manufacturing at Krummrich that Monsanto even considered taking an inventory of air pollution issues and losses from the PCB production areas?

MR. SCHWETTMAN: Object to the form, lack of foundation. Outside the scope.

A. As I said before, the only opinion I have on the operations of this facility is that it closed in the '70s contemporaneously with tens of other manufacturers in the Sauget industrial corridor.

Q. (BY MR. JOHNSON) Did you learn in your investigation into the background of East St. Louis and the Monsanto Krummrich plant that multiple studies concluded that PCBs are expected to be distributed primarily around urban areas and

Page 84

downwind of them?

MR. SCHWETTMAN: Object to the form.

A. It was outside the scope of my analysis.

Q. (BY MR. JOHNSON) So you're unable to answer that question also, sir?

MR. SCHWETTMAN: Same objection.

A. It's not relevant to my assignment.

Q. (BY MR. JOHNSON) Are you aware that internal Monsanto documents establish that PCB spills from storage tanks and other causes were a systemic problem at Krummrich throughout the entire PCB manufacturing period?

MR. SCHWETTMAN: Object to the form, lack of foundation. Outside the scope.

A. This was something that is outside the scope of my analysis.

Q. (BY MR. JOHNSON) And again, you're telling the jury that you're unable to answer that question of whether you have an understanding of that fact or not, sir, is that fair?

MR. SCHWETTMAN: Asked and answered.

A. I'm telling this to you.

Q. (BY MR. JOHNSON) If we could turn to Exhibit 6 of the JLL report, pdf 40. Which is your

Page 85

page 38 Mr. Brigden.

A. Okay. I'm there.

Q. And what I'm getting at is a specific quote on that page that Monsanto disposed of various industrial wastes generated by its manufacturing processes at locations both on the Krummrich site and offsite.

Correct?

A. Can you bring we up to speed of where you're reading that from?

Q. 4.6, sir.

A. Okay. Thank you.

Q. Sure.

A. Yes, that appears to be, you read what appears to be what is at page 38.

MR. JOHNSON: And then the next paragraph Ross if you could emphasize that, beginning --

Q. (BY MR. JOHNSON) And what I want to emphasize for you Mr. Brigden is, on the same page, yes, in the middle of that indented paragraph, Monsanto also operated a waste incinerator from 1971 to 1977 and stored wastes in the adjacent PCB warehouse until 1981 and 1982.

I read that correctly from your

22 (Pages 82 - 85)

Page 86

report, correct?

A.   You correctly read a citation in my report that is from another document.

Q.   Okay.  It's part of your report and contrary to all the Q and A we've been going at for the last 15 minutes you are able to comment on it because it's in your report, correct?

MR. SCHWETTMAN:  Asked and answered.

Q.   (BY MR. JOHNSON)  Monsanto operated an incinerator from 1971 to 1977 on the Krummrich campus according to your report, correct?

A.   The report that you're, the section of the report that you're asking me about is a section that describes for the readers the global or the overall context.  Industrial corridor that includes some of the heaviest manufacturing chemical and industrial processing facilities in the United States, especially at certain points of the past century, and in order for an appraiser to properly determine the role of PCB allegations, it is important that the appraiser, it is incumbent upon the appraiser that he properly understand the overall industrial context, the patchwork equipment of industrial operations that we find ourselves in, and this section talks about all of the major

Page 87

facilities and environmental events and includes a map at page 41 that was the substance of about 20 minutes of you reading from an article that I wanted to make sure that the court is aware that we cited that article, only because it was the only map that we could find on the Internet that had all the names of the plants in the area.  So at page 41, footnote 48, we have the genesis and the reason for including that article was that included at 48, it was included only to help the reader understand the configuration of the industrial corridor and the location of the Krummrich plant.

Q.   Wow, I even forgot what my question was.

Here's an easy one Mr. Brigden:  Are you aware that almost every nation state on Planet Earth has outlawed the further manufacture and production of PCBs?

MR. SCHWETTMAN:  Object to the form. Outside the scope.

A.   That is outside the scope of my analysis.

Q.   (BY MR. JOHNSON)  And you can't answer that question for the record, can you, sir?

MR. SCHWETTMAN:  Asked and answered.

Page 88

A.   I can't answer something that I didn't study.

Q.   (BY MR. JOHNSON)  And therefore you didn't take any of these answers that you've given in the last 15 minutes beyond the scope, outside the scope of my assignment, obviously if they were outside the scope of your assignment you did not take those matters that we've been talking about for the last 15 minutes into consideration in the formulation of your opinions.  Fair to say?

MR. SCHWETTMAN:  Object to the form.

A.   No.  I say I'm an appraiser and an appraiser makes a determination of what is relevant to the project at hand.  Engineers and environmental scientists have a different set of problems to solve and that falls into their's, an appraiser does something different and so that explains why I say it was outside of what I was asked to do.

Q.   (BY MR. JOHNSON)  You did not appraise the Krummrich plant, did you?

A.   I did not appraise the Krummrich plant.

Q.   That's accurate?

A.   I did not perform an appraisal of the

Page 89

Krummrich plant.

Q.   Did Dr. Bell in your opinion appraise the Krummrich plant?

A.   No.

Q.   In performing your background investigation into Krummrich, Sauget and East St. Louis, did you encounter the word persistent organic pollutant, or POPs?

A.   I do not recall taking note of that term.

Q.   Let me assist you then and see if we can answer the question.

Assume for purposes of my question POPs, persistent organic pollutants, are toxic chemicals that adversely affect human health and the environment around the world.  Because they can be transported by wind and water most POPs generated in one country can and do affect people and wildlife far from where they are used and released.  They persist for long periods of time in the environment and can accumulate and pass from one species to the next in the food chain and the citation for what I said read is the US EPA website.

Are you aware of that, sir?

23 (Pages 86 - 89)

Veritext Legal Solutions

www.veritext.com                                                   888-391-3376

Page 90

MR. SCHWETTMAN: Objection, outside the scope.

A.    I do not understand what you just read to me. It is outside the scope of my analysis.

Q.    (BY MR. JOHNSON) Are you aware of something called the Stockholm Convention, that is an international environmental treaty signed by more than 180 countries that is aimed at eliminating or restricting production, use and release of persistent organic pollutants, or POPs?

A.    That was not something I studied.

Q.    And you're not aware of that fact, are you, sir?

A.    I don't know.

Q.    You don't know whether you're aware of that fact or not?

A.    It's outside the scope of what I studied, as I sit here today I do not have any information on that topic.

Q.    Are you aware that the Stockholm Convention had originally targeted 12 POPs, or persistent organic pollutants, including PCBs and DDT, both of the which were manufactured by Monsanto at its Krummrich plant?

Page 91

MR. SCHWETTMAN: Object to the form. Lack of foundation.

A.    Look, I'm here to answer questions about my report. I don't have an answer to that question.

Q.    (BY MR. JOHNSON) And you're unable to answer that question as to whether you understand that fact or not, correct?

MR. SCHWETTMAN: Asked and answered.

A.    That question confused me, could you please repeat it?

Q.    (BY MR. JOHNSON) Sure. Are you aware that in this Stockholm Convention it had originally targeted 12 persistent organic pollutants, or POPs, including two of them, PCBs and DDT, both of which were manufactured at various times at Monsanto's Krummrich plant?

MS. SCHWETTMAN: Same objections.

A.    What was the question?

Q.    (BY MR. JOHNSON) Are you aware of that fact?

A.    Okay. It was outside the scope of what I was asked to do.

Q.    And for all these answers we're getting for the last 15 minutes and just now, I

Page 92

don't know, I can't answer, it's outside the scope of what I was asked to do, all the questions that I asked you did not take those facts that I recited for you into consideration in the formulation of your opinions and conclusions in this case, correct?

MR. SCHWETTMAN: Object to the form.

A.    There is an infinite list of things that could be included in your question. All I can tell you that I incorporated relevant materials to what I was asked to do in the scope of my work and that is what I did.

Q.    (BY MR. JOHNSON) Mr. Brigden, these questions for the next couple moments are for you in your individual capacity, okay?

MR. SCHWETTMAN: Do you understand?

THE WITNESS: No.

Q.    (BY MR. JOHNSON) I'm asking for your personal opinions on these next couple of questions. Do you understand that, sir?

A.    Sir, I'm not an attorney, so if you'd like to provide some more context.

MR. HOBBS: I don't get it either Paul. I'm sorry. How is he supposed to divorce --

Q.    (BY MR. JOHNSON) The next couple of

Page 93

questions are in your personal capacity. Just listen to the question. Here we go.

When you were a kid and you and your siblings made a mess did your mother and grandmother ever say to you and them clean up your mess?

MR. SCHWETTMAN: Object to the form. Mr. Brigden is here as an expert witness, not as a fact witness to testify about irrelevant subjects.

MR. JOHNSON: Your objection is noted.

Q.    (BY MR. JOHNSON) When you were a kid and you and your siblings made a mess did your mother ever say to you and your siblings clean up your mess?

MR. SCHWETTMAN: Same objection.

A.    I was the youngest of nine kids and so we all had our chores but I don't recall specific instances that is responsive to your somewhat bizarre question.

Q.    (BY MR. JOHNSON) Thank you for your assessment Mr. Brigden.

If a neighbor of yours dumps toxic garbage on your property you would be offended and upset to say the least and insist that the neighbor

24 (Pages 90 - 93)

Page 94

do something about that situation.  Fair?

MR. SCHWETTMAN:  Object to the form.  It's irrelevant.

A.    I can't tell you what I would do in a hypothetical situation.  If you're suggesting of drawing inferences to real estate appraisal analysis I'd be happy to entertain that kind of question, but I can't tell you what I can do, I mean my neighbors leafs end up on my yard all the time.

Q.    That wasn't the question.

A.    On one given day I might decide to have him come pick them up.  There's a lot of things we're going to have to go through here to get any type of answer from me.

Q.    I don't think so.  If a neighbor of yours dumps toxic garbage on your property would you do something about the situation?

MR. SCHWETTMAN:  Object to the form.  Irrelevant.

A.    What is toxic garbage?

Q.    (BY MR. JOHNSON)  Are you unable to answer that question as I posed it?

A.    I asked you a question to define.

Q.    I'm not answering your questions,

Page 95

you're supposed to be answering mine, and my only question is if somebody dumped toxic garbage on your property would you do something about that situation?

MR. SCHWETTMAN:  Object to the form, irrelevant, asked and answered.

A.    Is it on fire?  Like burning garbage?

Q.    (BY MR. JOHNSON)  Are you unable to answer the question I just posed, sir?

A.    Yeah, your question makes no sense to me and I'm here as an expert witness in this capacity and --

Q.    I'll take that as a no.

MR. SCHWETTMAN:  Were you finished?

THE WITNESS:  No, I wasn't finished.

A.    I'm assuming a question that doesn't have anything to do with the situation at hand I don't really have any basis from my professional experience to answer a question about my childhood for something that I'm not even certain if it happened or not.  So you're asking me to make up something and I'm not going to do that for you.

Q.    (BY MR. JOHNSON)  Very well Mr. Brigden, thank you.

Page 96

Your report cites the Super Fund Statute which is known as CERCLA by its acronym and also cites the Toxic Substances Control Act otherwise known TSCA.  My question specifically is, and I'm asking you to assume that both statutes define PCBs as quote unquote hazardous substances for purposes of this next question.

Does JLL agree that PCBs on any of East St. Louis tested parcels constitutes an environmental indoor health hazard to those properties?

MR. SCHWETTMAN:  Object to the form.  Outside the scope.  Calls for a legal conclusion.

A.    I don't have an opinion on that.  It is very much out of the scope of what I what I was asked to do.

Q.    (BY MR. JOHNSON)  Would you agree that properties contaminated with PCBs have a detrimental effect on those properties?

MR. SCHWETTMAN:  Object to the form.  Outside the scope.

A.    Could you repeat that question?

Q.    (BY MR. JOHNSON)  Yes.  Would you agree that properties contaminated with PCBs have had a detrimental effect on those properties?

Page 97

MR. SCHWETTMAN:  Same objections.

A.    Are you using the term detrimental effect in a real estate appraisal context?

Q.    (BY MR. JOHNSON)  Not at this point.  Let's just use normal understanding of words and terms as you understand them, sir.

Would you agree that properties contaminated with PCBs on them have had a detrimental effect on those properties?

MR. SCHWETTMAN:  Same objections.

A.    That was outside the scope of what I was asked to do and not something I'm prepared to answer.

Q.    (BY MR. JOHNSON)  You can't answer or you're refusing to answer?

MR. SCHWETTMAN:  Asked and answered.

A.    Sir, I just asked you if it includes real estate appraisal and you said no, let's hold off on that for a second.  So with that I would add that response as answer to your question.

Q.    (BY MR. JOHNSON)  As a real estate professional Mr. Brigden can you tell the jury any circumstances where PCB contaminated land parcels -- strike that.

Can you conceive of any situation Mr.

25 (Pages 94 - 97)

Page 98

Brigden where properties contaminated with PCBs, that the PCBs provide a positive effect for the real estate?

MR. SCHWETTMAN: Object to the form.

A. Wow. Okay. What appraisers do when they follow proper, the generally -- when they properly apply the generally accepted techniques of the appraisal profession for evaluating properties potentially affected by environmental contamination is they apply a series of steps and analyses that begin with primary data in the local market and I can't say I will tell the jury this or that or that I know the situation will do this or always does this because that's not what appraisers do. We look at sales data. We interpret, we gather. We form credible opinions supported by accurate analysis and that is what is in this report. So until I look at the sales data I can't answer that question of a hypothetical situation where I would provide that answer.

MR. JOHNSON: Move to strike as being nonresponsive.

Q. (BY MR. JOHNSON) Can you answer my question, and that is can you think of any circumstance as a real estate appraiser where

Page 99

parcels contaminated with PCBs, whether the PCB contamination causes a positive effect for those parcels?

MR. SCHWETTMAN: Object to the form. Asked and answered.

A. In a real estate appraisal context I actually did exactly that in my supplemental report. Now, I'm not using the words that you attached to it but I evaluated sales data including sales of property in the Bell subject area and including actual sales of properties that are at issue in this case. So, yes, I can give you an answer that my supplemental report dated January 7th sheds some light on that topic and is responsive to your question.

MR. JOHNSON: Move to strike as being nonresponsive.

Q. (BY MR. JOHNSON) So you're telling the jury you cannot answer my question which is can you describe any circumstances where parcels contaminated with PCBs by virtue of the PCBs that add a positive effect for those properties?

MR. SCHWETTMAN: Misstates his testimony and it's been asked and answered twice.

A. So I do need to ask a followup

Page 100

because you give a general terminology of PCB contaminated, but backgrounds PCB levels low lying are quite common in nearly everywhere on the planet, including where I live and where you live, so when you say PCB contaminated I would add the caveat that there was no precise threshold identified.

Q. (BY MR. JOHNSON) So now you're an environmental scientist, sir?

MR. SCHWETTMAN: Argumentative.

A. No, not at all. I'm just taking issue with loose terminology.

Q. (BY MR. JOHNSON) We'll get into what you are and what you aren't but you are not an environmental scientist and are not qualified to give an opinion as to thresholds and level of a contaminant of any type being on real estate, correct?

MR. SCHWETTMAN: Object to the form. It's vague.

A. I'm qualified to ask for precision in legal questions that are directed at me.

Q. (BY MR. JOHNSON) Would you acknowledge just for the record here you are not an environmental scientist, correct?

Page 101

A. That's correct.

Q. And you are not qualified to give an opinion within a reasonable degree of environmental scientific certainty as to thresholds of a given contaminant on a piece of property as requiring cleanup or requiring remediation. Fair enough?

MR. SCHWETTMAN: Object to the form, that's vague and it calls for a legal conclusion.

A. Yeah. The vague part of it is I'm not an environmental engineer or scientist and I don't, I'm not attempting to come off as one, however, appraisers do from time to time evaluate some data prepared or analyzed by others where we do have to understand what our appropriate state, local or federal standards on testing limits, that sort of thing, and so we do have to have some understanding of that, but I'm not an expert in that.

Q. (BY MR. JOHNSON) Fair enough. And thank you for acknowledging that.

You would disagree with me, would you not -- strike that.

Do you agree that PCB contamination will never increase the value of a piece of property?

26 (Pages 98 - 101)

Page 102

MR. SCHWETTMAN: Object to the form.

A. I mean that's an absurd statement because appraisers don't just go make wild guesses or statements like that. We analyze the data, the sales, we're appraisers, I'm a numbers geek, I look at sales data, I can talk to you about spreadsheets and data and how values, value opinions work and we can talk about data. But that's all I can tell you.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Mr. Brigden, that last question literally had 13 words to it and I'll ask it again.

Do you agree that PCB contamination will never increase the value of property?

MR. SCHWETTMAN: Asked and answered.

MR. JOHNSON: No it hasn't.

A. The question doesn't make any sense.

Q. (BY MR. JOHNSON) Okay. So for the record you are unable or unwilling or both able to answer that 13 word question that I just posed for the second time, correct?

MR. SCHWETTMAN: Form.

A. I think it is a substandard question.

Page 103

Q. (BY MR. JOHNSON) I could care less what you think about the substandardness or not of the question, I just want to know are you telling the jury you cannot answer the question, and I'll ask it again. Do you agree that PCB contamination will never increase the value of property?

MR. SCHWETTMAN: Object to the form, asked and answered, argumentative.

MR. JOHNSON: It has not been answered, that's bad faith.

A. It doesn't make any sense because appraisers don't give blanket assessments on something without studying the data. In fact, sir, it is unethical and irresponsible for an appraiser to do such a thing and so I cannot give, I cannot say that I cannot say that because one way or another if I were to be doing that without actually considering the data it would be unethical.

Q. So you'd be violating the principles and ethical standards of the appraisal industry by answering this question: Do you agree that PCB contamination will never increase the value of property, correct?

A. I can't make that statement without study and making an appraisal determination.

Page 104

Q. Do you agree as a real estate professional Mr. Brigden that all things being equal property with PCB contamination on them will be worth less than property without PCB contamination on them?

MR. SCHWETTMAN: Object to the form.

A. That is not supportable unless the sales data transaction and research revealed such a determination.

Q. (BY MR. JOHNSON) So you are unable to answer that simple question, do you agree that all things being equal property with PCB contamination will be worth less than property without PCB contamination?

MR. SCHWETTMAN: Object to form, asked and answered.

A. Sir, I'm telling you once again that I'm unable to answer it because doing so without the formation of informative primary data I'm not allowed to answer that question, no appraiser is.

Q. (BY MR. JOHNSON) And since you'd be committing an ethical violation by answering the previous couple questions would you agree with me you did not study those matters in your report, fair to say?

Page 105

MR. SCHWETTMAN: Object to form.

A. No. That's not fair.

Q. (BY MR. JOHNSON) So you did study whether PCB contamination will never increase the value of property?

MR. SCHWETTMAN: Object to the form. Misstates his testimony.

A. Yeah. I don't think I said that.

Q. (BY MR. JOHNSON) Do you agree that all things being equal property with contamination from a worldwide banned chemical on it will be worth less than property without the worldwide banned chemical on it?

MR. SCHWETTMAN: Object to the form.

A. An appraiser that makes that determination without a foundation of sales data, sir?

Q. (BY MR. JOHNSON) Ethical violation, right?

A. I'd be writing letters if I saw that, making a sweeping statement without looking at sales data.

Q. So your testimony is to answer my question would be to commit an ethical violation within your appraisal industry. Is that accurate,

27 (Pages 102 - 105)

Page 106

sir?

A. That's not what I said, sir, and we've gone over this about six times. I said we can't answer without looking at sales data, and we can go back and look at my answers, that's what I said. You want to characterize it as something else, but.

MR. JOHNSON: Move to strike as nonresponsive. I'll move on.

Q. (BY MR. JOHNSON) Would you agree with me that as a real estate appraisal witness that when one simply contemplates two parcels 10 miles apart, one of them totally uncontaminated and the other one contaminated with PCBs, a would-be purchaser contemplating both parcels will walk away from the contaminated parcel every time?

MR. SCHWETTMAN: Object to the form. Incomplete hypothetical.

A. I don't agree with that comparison because it is not realistic.

Q. (BY MR. JOHNSON) I didn't ask you whether it was realistic, I'm just asking you --

A. Well, you asked me as a real estate expert witness, sir, so this is my career so if I'm going to respond to your question it has to

Page 107

actually have some basis in reality.

Q. Let's get to the basis in reality Mr. Brigden. Isn't that what risk effect is, that is to say a would-be purchaser confronted with the hypothetical I just posed, uncontaminated parcel located 10 miles from a totally contaminated parcel with PCBs or some other contaminant on it, that would-be purchaser in the marketplace would rationally walk away from the contaminated parcel every time, correct?

MR. SCHWETTMAN: Object to form, incomplete hypothetical.

A. Your question makes no sense because they are two different locations and properties like the subject properties which are adjacent to an industrial corridor actually enjoy a locational advantage that is very different from a property that would be 10 miles away, so I can't answer that question.

Q. (BY MR. JOHNSON) You can't answer whether a rational would-be purchaser would opt for the uncontaminated property for his purchase every time in the example I just posed?

MR. SCHWETTMAN: Asked and answered.

A. You told me they were different

Page 108

locations, sir, so.

Q. (BY MR. JOHNSON) So you can't answer it.

A. No, they're different locations.

Q. Did I accurately describe risk effect just then, and that is to say, all things being equal the rational purchaser in my example the last few questions, knowing that parcels are PCB contaminated and knowing that a partial remediation might be necessary, would step away from purchasing that contaminated property and purchase the uncontaminated property every time.

MR. SCHWETTMAN: Object to form.

A. You appear to be reading from something, would you be able to share with me the source of that?

Q. (BY MR. JOHNSON) Sir, I just asked you whether I accurately described the concept of this effect damages, can you not answer that question either?

A. I would like to consult the material in my report if you're going to ask me a specific question like that.

Q. All things being equal would you agree with me that if it is within the laws of the

Page 109

location of the piece of real estate, generally a property owner gets to decide how to use his real estate, correct?

A. That is outside the scope of what I was asked to do in this matter. I don't have an opinion on that.

Q. Are you unable or unwilling to answer that simple question?

MR. SCHWETTMAN: Argumentative.

A. It's not simple and I asked you for some foundation from which to evaluate, I was not allowed. It is compound, hypothetical and referencing technical terms that I would feel more comfortable doing a more in-depth evaluation of the topic.

Q. (BY MR. JOHNSON) So you're unable at this point to answer this question: Would you agree with me that if it is within the laws of the state where the particular property is located generally a property owner gets to decide how to use his property?

MR. SCHWETTMAN: Object to form, incomplete hypothetical, vague and ambiguous. Asked and answered.

A. Yeah, when you're saying laws and

28 (Pages 106 - 109)

Page 110

things, and other terminology, we're not discussing highest and best use. I know nothing about the property itself and the question says generally and then it's very pointed, so the question does not make sense to me, it's not something I can answer.

Q. (BY MR. JOHNSON) Okay. You can't answer that question. Fair enough.

A. The way that that is worded and the hypotheticals that were provided.

Q. Let me simplify it. Generally, sir, does a property owner get to decide how to use his real estate, sir?

MR. SCHWETTMAN: Object to the form. It's vague.

A. I don't have an opinion upon what an individual user is allowed or desires to do. That's not what appraisers do, sir. Appraisers actually, actually, collect, gather, organize and interpret data. What that person actually ends up doing when they sell their property or when their neighbor's property sells, that's what we do.

MR. JOHNSON: Move to strike as being nonresponsive.

Q. (BY MR. JOHNSON) Next question: Do you agree, Mr. Brigden, that East St. Louis should

Page 111

not have its PCB contaminated property uses restricted for any reason or in any way?

MR. SCHWETTMAN: Object to the form. That's vague and ambiguous. Calls for a legal conclusion.

A. Restrict the uses? I'm not really sure what you're talking about here.

Q. (BY MR. JOHNSON) Are you unable and unwilling to answer that question, sir?

MR. SCHWETTMAN: Argumentative.

A. Sir, I believe I just asked you to clarify a couple of words that were incredibly loosely worded and general. Are you talking about institutional controls, are you talking about curfews relate to crime? No idea what you're talking about.

Q. (BY MR. JOHNSON) So you're unable to answer this question: That East St. Louis should not have its PCB contaminated property uses restricted for any reason or in any way, correct?

MR. SCHWETTMAN: Object to the form, vague and ambiguous, calls for a legal conclusion and asked and answered.

A. I would repeat my prior response.

Q. (BY MR. JOHNSON) Fair enough.

Page 112

Do you know what deed restrictions are, sir?

A. As a general concept, yes. There can be very technical ones, but.

Q. Just give me a general definition please.

A. Deed restriction?

Q. Yes, sir.

A. I'm not a lawyer, I'm an appraiser, but they can be perpetual in nature, they can be not be, and it is some qualitative or quantitative language included in a recorded document that is filed in the legal records for that property.

Q. With your definition in mind do deed restrictions restrict potential uses of real estate, sir?

MR. SCHWETTMAN: Object to the form. It's vague.

A. Some do.

Q. (BY MR. JOHNSON) Okay. All things being equal are properties subject to deed restrictions worth less than properties not subject to deed restrictions, sir?

MR. SCHWETTMAN: Object to the form. It's vague and ambiguous.

Page 113

A. No. Not naturally. There's a deed restriction that my house can't be a rendering home but it doesn't affect the value of my property.

Q. (BY MR. JOHNSON) Mr. Brigden, is it true that the City of East St. Louis can not legally obtain permits to store a banned substance such as PCBs on its property?

MR. SCHWETTMAN: Object to the form, lack of foundation, outside the scope, calls for a legal conclusion.

A. Would you repeat that please?

Q. (BY MR. JOHNSON) Sure. Is it true that the City of East St. Louis can not legally obtain permits to store a banned substance such as PCBs on its properties?

MR. SCHWETTMAN: Same objection.

A. I have no understanding of that concept, no opinion on that.

Q. (BY MR. JOHNSON) Mr. Brigden, were the subject properties in the Bell report ever used for the legal storage of Monsanto's PCB chemicals?

MR. SCHWETTMAN: Object to the form.

A. I don't know. I did not study that, it was outside the scope of work.

Q. (BY MR. JOHNSON) Did Monsanto to

29 (Pages 110 - 113)

Page 114

your knowledge, sir, ever obtain permits to store their PCBs on the Bell properties discussed in his report?

MR. SCHWETTMAN: Object to the form, it's outside the scope. Lack of foundation.

A. I reviewed the Bell report, I didn't see him discussing any attempts at permits.

Q. (BY MR. JOHNSON) Not my question. Did Monsanto to your knowledge ever obtain permits to store their PCBs on the subject contaminated tested East St. Louis parcels?

MR. SCHWETTMAN: Same objections.

A. I would repeat what I said before and it does make a difference because I was doing a review report of the Bell report, and so if this is something that is outside of the scope of my role here and so I wouldn't be able to answer it unless the Bell report did.

Q. (BY MR. JOHNSON) Do you know, as you hit here today did Monsanto ever obtain the rights to score their PCBs on the subject East St. Louis parcels, yes or no?

MR. SCHWETTMAN: Object to the form, also it's been asked and answered.

MR. JOHNSON: It wasn't been answered

Page 115

and everyone's going to notice it.

Q. (BY MR. JOHNSON) Let's do it again.

Did Monsanto, to your knowledge, to your knowledge, and if you don't know just tell me. To your knowledge did Monsanto ever obtain the rights to store PCBs on the subject contaminated East St. Louis tested parcels?

MR. SCHWETTMAN: Object to form.

A. It's outside the scope of my analysis in my reports.

Q. (BY MR. JOHNSON) So you're unable to answer that, correct?

A. I have no answer for something that I didn't study.

Q. Did Monsanto ever inform the City that it was going to emit PCBs into and on to the City's property based upon your investigation, sir?

MR. SCHWETTMAN: Object to form, lack of foundation, outside the scope.

A. It's not something that I studied.

Q. (BY MR. JOHNSON) The answer's no?

A. It's outside the scope of my work.

Q. So you're unable to answer that question as well, sir, is that correct?

A. I have no knowledge to something I

Page 116

didn't study.

Q. To your knowledge based or your investigation of the facts and circumstances of this case has Monsanto ever paid the City for the storage of its PCBs on City properties?

MR. SCHWETTMAN: Objection to foundation, it's outside the scope, it's vague and ambiguous.

A. It's outside the scope of my analysis.

Q. (BY MR. JOHNSON) Do you have knowledge as you sit here today whether Monsanto ever paid the City of East St. Louis, Illinois for the storage of its PCBs on its properties?

MR. SCHWETTMAN: Same objections.

A. It was outside the scope of my work.

Q. (BY MR. JOHNSON) So you're unable to answer that question, fair to say?

MR. SCHWETTMAN: Asked and answered.

A. I don't have an answer for something I didn't study.

Q. (BY MR. JOHNSON) To your knowledge did Monsanto ever seek approval for its chemical-producing operations in business of manufacturing PCBs from the City of East St. Louis?

Page 117

MR. SCHWETTMAN: Object to the form, lack of foundation, outside the scope.

A. That was outside the scope of my analysis and my report.

Q. (BY MR. JOHNSON) And you're unable to answer that question as well, is that correct, sir?

MR. SCHWETTMAN: Asked and answered.

A. I do not have an answer for something I have no knowledge of or did not study.

Q. (BY MR. JOHNSON) Mr. Brigden, if I dump and store PCBs on top of your house and do not tell you, have I damaged your property?

MR. SCHWETTMAN: Object to the form, incomplete hypothetical. Vague and ambiguous. Calls for a legal conclusion. Irrelevant.

A. Real estate appraisers use primary sales transaction data to evaluate a circumstance like you asked. One thing we do not do is make an assumption and a blanket statement without doing requisite analysis.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Now let's go back to my question.

30 (Pages 114 - 117)

Page 118

If I dump and store PCBs on top of your house and do not tell you have I damaged your property?

MR. SCHWETTMAN: Same objections please.

A. As I said before, that is, a response to that without analyzing sales data would be inconsistent with the accepted methodology of the appraisal profession.

Q. (BY MR. JOHNSON) So this doesn't rise to the level of a purported ethical violation if you answer my question?

MR. SCHWETTMAN: Argumentative.

MR. JOHNSON: Yes, it was.

A. I noticed you lumped in ethical a couple of times, I let it slide but it wasn't just ethical, it was proper appraisal practice.

Q. (BY MR. JOHNSON) So you're unable to answer my question, is that true, Mr. Brigden?

MR. SCHWETTMAN: Asked and answered.

A. Proper appraisal practice would not allow me to answer that and make that statement, that determination, without evaluating it on empirical data.

Q. (BY MR. JOHNSON) Next question: Is

Page 119

it true that if you are on vacation at a Florida vacation home and I dumped PCBs on your house in Chicago your property would not be damaged because you were not using it?

MR. SCHWETTMAN: Object to the form. Calls for a legal conclusion. Incomplete hypothetical.

A. Is it on the beach?

Q. (BY MR. JOHNSON) I'll repeat the question if you didn't hear it. Or do you understand the question?

A. I'd like you to repeat it.

Q. Is it true that if you were on vacation at your Florida home and I dumped PCBs on your home in Chicago your property would not be damaged because you were not actually using it?

MR. SCHWETTMAN: Same objections.

A. There's no way to answer that question without walking down a whole bunch of hypothetical step-ins. You don't use, there's no reference to empirical data, it's just ipse dixit, if this then, it doesn't make sense.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Are you telling the

Page 120

jury and whoever watches this video that you are unable to answer that question as posed, sir?

MR. SCHWETTMAN: Asked and answered.

A. I am not allowed to as a professional appraiser to make that determination without proper foundation of research. We don't just make up a conclusion on something without a foundation.

Q. (BY MR. JOHNSON) So just to be clear, did you just tell me for the record that for you to answer my question without proper data you'd be committing another ethical violation?

MR. SCHWETTMAN: Object to the form, misstates testimony.

A. You're putting words in my mouth.

Q. (BY MR. JOHNSON) What did you say, sir? You said you can't answer it because why?

A. Well, because just like doctors just don't give opinions that say you are 100 percent healthy because they're a doctor, they just can't go around doing that. So an appraiser just is handed these bizarre abstract and irrelevant concepts, I'm not allowed to just say yeah, that is X or Y.

Q. Is that because you can not answer the question or you do not want to answer the

Page 121

question?

MR. SCHWETTMAN: Argumentative. Asked and answered.

A. It's because I'd like to respond to a question that is properly detailed with information that an appraiser must meet in order to make an assessment like that.

Q. (BY MR. JOHNSON) Mr. Brigden, is it true that if I stored PCBs on your property for more than 50 years without telling you your property was not damaged?

MR. SCHWETTMAN: Object to the form, incomplete hypothetical, calls for a legal conclusion, vague and ambiguous.

A. We're getting right to the heart of it here and I don't know how many times I have to answer this to you. Appraisers do not make that determination, sir, appraisers study the data. I mean without it what would we be doing? We would be going around making unsupported claims. We have to follow, we have to study the data, the sales data. We can't just make things up, I'm sorry, I'm not here to do that. Others may be.

MR. JOHNSON: Move to strike as nonresponsive.

31 (Pages 118 - 121)

Page 122

Q. (BY MR. JOHNSON) Are you not answering that question because you cannot answer if or because you do not want to answer it?

MR. SCHWETTMAN: Argumentative. He answered the question.

A. I believe I answered the question.

Q. (BY MR. JOHNSON) So you are unable to answer the question posed if I stored PCBs on your property for more than 50 years without telling you your property was not damaged?

MR. SCHWETTMAN: Argumentative. He answered the question.

MR. JOHNSON: No, he did not.

A. Does it matter if you did it or somebody else did it?

Q. (BY MR. JOHNSON) Oh, we're getting somewhere.

If I stored PCBs on your property for more than 50 years without telling you, is it your opinion that the property was not damaged?

MR. SCHWETTMAN: Object to the form, incomplete hypothetical, calls for a legal conclusion.

A. In order for an appraiser to answer that we would be studying sales data, we would not

Page 123

just be making unsubstantiated guesses.

Q. (BY MR. JOHNSON) So you did not based on your previous answers to the previous several questions, you did not study those matters in your JLL report, fair to say?

MR. SCHWETTMAN: Object to the form.

A. I don't think that's fair to say, no. We'd have to unpack that a little bit. Can you repeat that question?

Q. (BY MR. JOHNSON) Yeah. We asked all these questions a moment ago, if I stored PCBs on top of your house and did not tell you would I damage your property? You could not answer it. I asked you is it true if I dumped PCBs on your property and you do not sell your property you are not damaged, you said I cannot answer that. I then asked you if you were on vacation at your Florida house and I dumped PCBs on your house in Chicago would your property not be damaged because you're not actually using it, you said I can't answer that. Then finally most recently I asked if I stored PCBs on your property for more than 50 years without telling you that the property, without telling you that your property was not damaged, and you also told me there you cannot answer it, and my

Page 124

followup to all these I can't answer answers is this: You didn't have those issues raised in those questions in your JLL report, correct?

MR. SCHWETTMAN: Object to the form, Mr. Brigden's testimony speaks for itself.

A. My role in this assignment addressed the accepted methodology and I applied that. As to, and I'd like to point out I don't believe you asked me anything about if I didn't sell my house, so I don't think that applied. You went through a series of very bizarre questions that have nothing to do with the assignment at hand but I think have to do with other claims or other issues surrounding the misuse or nonuse of real estate data. I'm here to tell you that as an appraiser I measure sales transactions and market-based evidence and I applied the accepted methodology properly in performing my review of the Bell report.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) If I wanted to store my PCBs on your property for free instead of spending millions of dollars properly maintaining and disposing of them would I simply store them on your property without telling you Mr. Brigden for

Page 125

my own financial benefit?

MR. SCHWETTMAN: Object to the form, incomplete hypothetical, calls for a legal conclusion and irrelevant.

A. Yeah. I didn't study that and there's so many things in there, we can unpack it one by one if you want but that's kind of a ridiculous question. As I said, I'm not able to just knee jerk answer on this loaded hypothetical and say I can give you this answer, it's the same one as I'm saying, or it will be the same answer that I've been giving all along. An appraiser is not allowed to do that, not just for ethical but for professional responsibility reasons. We can't just -- I'm sorry, you want to interrupt.

Q. No, I'm just waiting for you to finish so I can move to strike the nonresponsive.

A. We can't, we are not allowed to do that, sir. We have to study market-based evidence and only then make our conclusions based on that.

Q. So you're unable to answer the question I just posed, is that fair to say, sir?

MR. SCHWETTMAN: Object to the form.

A. I believe I answered it.

Q. (BY MR. JOHNSON) Would you want your

32 (Pages 122 - 125)

Page 126

kids to live on a property with Monsanto PCBs on this property?

MR. SCHWETTMAN: Object to the form. Incomplete hypothetical. Irrelevant.

Q. (BY MR. JOHNSON) Are you able to answer that question?

A. An appraiser doesn't answer that question, sir. I'd be happy to explain to you.

Q. No, I don't want your explanation.

A. I actually would. I would.

MR. SCHWETTMAN: Let him answer the question.

Q. (BY MR. JOHNSON) Would you want your kids to live on a property with Monsanto PCBs, yes or no?

A. I'm here as an appraiser and an appraiser distances himself from the situation that they are studying. This is a very, very important appraisal concept that all MAI trained appraisers are aware of. We are agnostic of emotion. We study, we are charged with a very important responsibility in the financial integrity of the United States, FIRIA [sic] actually gets into that quite a bit. We have a responsibility to remain agnostic of emotion and separate our personal

Page 127

beliefs, and so the only way to professionally address this situation as an appraiser is to set aside that and so that is my answer.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Would you want your kids to grow up playing on a property with Monsanto PCB contamination on it?

MR. SCHWETTMAN: Object to the form. Incomplete hypothetical. Irrelevant.

A. Same answer as I've previously given.

Q. (BY MR. JOHNSON) Would you allow an industrial polluter to store PCBs on your property Mr. Brigden?

MR. SCHWETTMAN: Object to the form. Incomplete hypothetical. Irrelevant.

A. Outside of the scope of my analysis to make that sort of determination.

Q. (BY MR. JOHNSON) So you're unwilling to answer that question, correct?

MR. SCHWETTMAN: Asked and answered.

MR. JOHNSON: No, it hasn't.

A. Will you repeat the question?

Q. (BY MR. JOHNSON) Would you allow an industrial polluter to store PCBs on your property

Page 128

Mr. Brigden?

MR. SCHWETTMAN: Same objection.

A. Is it my industrial property?

Q. (BY MR. JOHNSON) I'm just asking you would you allow an industrial polluter to store PCBs on your property, Mr. Brigden?

MR. SCHWETTMAN: Same objections.

A. You're going to have to give me some more information here.

Q. (BY MR. JOHNSON) So you're unable, or unwilling, to answer the question as it's posed right now, is that fair Mr. Brigden?

MR. SCHWETTMAN: Argumentative and misstates his testimony. He asked for clarification.

A. Yeah, I sit here today as a real estate appraiser, and that carries with it some importance. So to be offering opinions and answers to loosely worded and somewhat irresponsible questions given the seriousness of that matter I have to take it very seriously and I just can't give flippant answers yes or no to something that required careful consideration.

MR. JOHNSON: Move to strike as nonresponsive.

Page 129

Q. (BY MR. JOHNSON) You examined the testing reports in this case, correct?

MR. SCHWETTMAN: Object to the form. That's vague.

A. Could you repeat that?

Q. (BY MR. JOHNSON) You examined the testing reports in this case of East St. Louis tested parcels, correct?

MR. SCHWETTMAN: Same objections.

A. You're going to have to be a lot more specific.

Q. (BY MR. JOHNSON) Are you unable to answer whether you examined the testing reports and discussed them in your JLL report?

MR. SCHWETTMAN: Same objections.

A. We evaluated reports that were considered in the Bell reports and additional reports that were not considered in the Bell reports.

Q. (BY MR. JOHNSON) And you're aware based on that review, are you not Mr. Brigden, that PCBs are on the subject tested parcels, correct?

MR. SCHWETTMAN: Object to the form, that's vague, lack of foundation.

A. That is outside the scope of my

33 (Pages 126 - 129)

Page 130

analysis. I'm quite certain that there are environmental engineers that made those sorts of determinations. I do know that we adopted some findings from one or more people and those elements are incorporated in my report, specifically there is a table in my report that shows the total PCB concentrations.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Are you aware, Mr. Brigden, there are PCBs on the subject tested parcels discussed in the Bell report?

MR. SCHWETTMAN: Asked and answered.

A. I definitely just answered that because I told you that the extent to which I reference the reports that you're mentioning are they're incorporated into my analysis and I'll be happy to show you where that is.

Q. (BY MR. JOHNSON) I'm only asking you are you aware that PCBs are on the subject East St. Louis tested properties that are discussed in the Bell report? It's a yes or no question.

MR. SCHWETTMAN: Object to the form, asked and answered.

A. No, it's not. It's actually, I can

Page 131

tell you the report on which I rely to incorporate environmental test results but it's outside the scope of my work to make an evaluation or use of those reports.

MR. JOHNSON: Move to strike as nonresponsive.

MR. SCHWETTMAN: Shall we lunch?

MR. JOHNSON: Yeah.

VIDEOGRAPHER: We are off the record at 12:23.

(A RECESS WAS TAKEN BY THE PARTIES)

VIDEOGRAPHER: We are back on the record. This is media unit number three. The time is 1:03.

Q. (BY MR. JOHNSON) Mr. Brigden, we had a lunch break and we're going to pick up your deposition at 1:03 p.m. here on the 17th.

My first question is do you have to sell a property to incur real estate damage?

MR. SCHWETTMAN: Object to the form. Calls for a legal conclusion.

A. I don't really understand that. I don't see the relationship between the two. If you are talking about something else which is sales data that's a transaction. You're conflating

Page 132

alleged contamination perhaps with valuation date, lawsuit.

Q. (BY MR. JOHNSON) I just asked a question, do you have to sell a property to incur real estate damages?

MR. SCHWETTMAN: Same objections.

A. It's too simple of a question for me to answer.

VIDEOGRAPHER: Witness needs to mic up.

(A DISCUSSION WAS HELD OFF THE RECORD)

Q. (BY MR. JOHNSON) Now that you're properly mic'd are you saying you cannot answer the question I just posed which was, and is, do you have to sell a property to incur real estate damage?

MR. SCHWETTMAN: Same objections.

A. I'm saying the question doesn't really make sense and therefore I can not give an answer to a question about my expertise. The question doesn't make sense.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Are you saying you cannot answer the question, sir?

Page 133

MR. SCHWETTMAN: Asked and answered.

A. No. I'm saying the question doesn't make sense and I won't answer it.

Q. (BY MR. JOHNSON) Okay. Is it appropriate to assume that after cleanup of a property one day in the future a contaminated property will be useable and therefore it is not damaged?

MR. SCHWETTMAN: Object to the form. Incomplete hypothetical. Vague and ambiguous.

A. That's outside the scope of my assignment in this matter.

Q. (BY MR. JOHNSON) And if it's outside the scope of your assignment in this matter I take it you did not assess any issues associated with the question in the preparation of your report, correct?

MR. SCHWETTMAN: Object to the form.

A. You're referencing a prior question of substance, I would have to have you read that question back.

Q. (BY MR. JOHNSON) Is it appropriate to assume that after cleanup one day in the future a contaminated property will be useable and therefore it is not damaged?

34 (Pages 130 - 133)

Page 134

MR. SCHWETTMAN:  Same objections.

A.    I would need a definition of useable and also for the word damaged.

Q.    (BY MR. JOHNSON)  So you are unable at this point with the way the question is posed to answer it.  Is that your testimony?

A.    I'm unable to answer precisely a question that is worded I'm precisely.

Q.    You are not going to answer the question, sir?

MR. SCHWETTMAN:  Argumentative.

A.    I will repeat my question.  I am unable to answer a question precisely to a question that is worded imprecisely.

Q.    (BY MR. JOHNSON)  Next question.  Mr. Brigden, if you want to use somebody else's property you need the owner's permission, correct?

MR. SCHWETTMAN:  Object to the form. Vague and ambiguous, incomplete hypothetical. Calls for a legal conclusion.

MR. JOHNSON:  And again, I'm going to offer the same offer to you Tyler, you can make a recording and press the play button on those objections or we can have a stipulation that you can preserve those objections for the rest of the

Page 135

day.

MR. SCHWETTMAN:  I'll just continue to assert my objections Paul.

MR. JOHNSON:  We can make a recording and just press play.

MR. SCHWETTMAN:  That's all right.

MR. JOHNSON:  Yeah.

MR. HOBBS:  I wish you'd come up with that earlier, for you, I would have recorded your voice and you could hit play.

Q.    (BY MR. JOHNSON)  The question was and is pending, if you want to use somebody else's property you need the owner's permission, correct, Mr. Brigden?

MR. SCHWETTMAN:  Same objections.

A.    I'm not a land use attorney and I want to help you out here but I would like some specificity on what does use mean?

Q.    (BY MR. JOHNSON)  I'm asking you questions, actually very simple questions, are you telling the jury and whoever's viewing this video that you cannot answer this question:  If you want to use someone else's property you need the owner's permission?

A.    It depends and I'm asking for more

Page 136

specificity.

Q.    So you can't answer the question with any more specificity the way it's currently posed, is that correct?

MR. SCHWETTMAN:  Asked and answered.

A.    Yes.  A general inquiry with simple loose terms is something I'm unable to answer because I would need more specificity.

Q.    (BY MR. JOHNSON)  If you want to use somebody else's property to depose of toxic PCB waste you need to pay them for that, correct?

MR. SCHWETTMAN:  Object to the form. Incomplete hypothetical, vague and ambiguous. Calls for a legal conclusion.

A.    That is outside the scope of what I was asked to do in this assignment.

Q.    (BY MR. JOHNSON)  And therefore you did not take into consideration or assess issues based by the question in the preparation of your report, JLL Exhibit 6.  Correct?

MR. SCHWETTMAN:  Object to the form.

A.    Sir, I applied the accepted methodology of the appraisal profession and that did not involve what you are asking, so I properly applied the accepted methodology in preparing my

Page 137

report.

MR. JOHNSON:  Move to strike as nonresponsive, again.

Q.    (BY MR. JOHNSON)  And are you telling the jury and court staff for the record that you are unable or unwilling to answer this question or both?

MR. SCHWETTMAN:  Object to form, asked and answered.

A.    I'm telling you that was outside the scope of my assignment.

Q.    (BY MR. JOHNSON)  Mr. Brigden, do you agree that the East St. Louis tested parcels that are discussed in Bell's report and the JLL report are zoned residential multifamily?

MR. SCHWETTMAN:  Object to the form. Calls for a legal conclusion.

A.    I believe that that is what they are zoned.

Q.    (BY MR. JOHNSON)  We got somewhere.

A.    It was a precise question.

Q.    Do you agree that there is no factual reason why the properties at issue if not contaminated with PCBs could not be developed for housing or some other use that would involve

35 (Pages 134 - 137)

Page 138

full-time occupancy?

MR. SCHWETTMAN: Object to the form, it calls for a legal conclusion.

A.    Can you repeat that?

Q.    (BY MR. JOHNSON) Yes, sir.

Do you agree that there's no factual reason why the properties at issue if not contaminated with PCBs could not be developed for housing or for some other use that would involve full-time occupancy?

MR. SCHWETTMAN: Same objections.

A.    I mean I would note that this zoning that you mentioned is the same zoning for almost all residential properties in East St. Louis, or the majority, and it's actually cumulative zoning which means it's the same zoning as single family, it just kind of cascades down. If you're asking me as an appraiser if I'm aware of factual issues that might, the answer to that would be answered in a highest and best use analysis and if the Bell report had undertaken a highest and best use analysis this conversation would be much more productive. I can't tell you one way or another without doing my own highest and best use analysis regarding use, but since the Bell report curiously

Page 139

omitted that I don't have any direct opinions on that topic.

MR. JOHNSON: Move to strike as nonresponsive.

Q.    (BY MR. JOHNSON) You're unable and/or unwilling to answer the question that there's no factual reason why the properties at issue if not contaminated with PCBs would not be developed for housing or some other full-time use that would involve occupancy?

MR. SCHWETTMAN: Object to the form. Asked and answered.

A.    Are we including economic reasons in factual, the term factual that you've given me?

Q.    (BY MR. JOHNSON) I'm just asking the question that I posed and repeated now twice, are you unable or unwilling to answer it?

A.    As I said, I'm very much willing and very much able to answer the question, however, it hasn't been studied by Bell and since I did a review of the Bell report it's outside the scope of my role here because Bell chose to specifically, and even though it's against appraisal standards to issue an opinion of value without performing a highest and best use analysis, nevertheless that's

Page 140

what the Bell report has done. Because he doesn't do it I didn't therefore, I don't have review opinions about that.

Q.    Is it your testimony, incredulous but let me ask it nevertheless, is it your testimony that Dr. Bell's report did not conduct a highest and best use analysis in it?

A.    Could you show me?

Q.    I didn't ask you that, I didn't ask you to ask me questions, my question is very specific. Is it your testimony under oath today that Dr. Bell's report does not contain a highest and best use analysis?

A.    Caveat inserted either proper or complete and I will agree to that.

Q.    So now it's changed to caveat it's not a complete highest and best use analysis, right?

A.    I'm going to answer questions on this but I also would rather just go to the section and precisely point out to you my criticisms.

Q.    That's all right, you've already testified that he did not perform a highest and best use.

A.    No. I caveated that with proper and

Page 141

complete.

Q.    Mr. Brigden, do you and JLL appraise homeowners or do you appraise real estate?

A.    I don't understand that question.

Q.    Are you unable to answer it in the way it's presently posed?

A.    I'm asking for more precision here because I don't appraise homeowners.

Q.    There's a start to the answer. You don't appraise homeowners, do you appraise real estate?

A.    At times, yes.

Q.    So then the answer to my question which was do you and JLL appraise homeowners or do you appraise real estate, the answer which we finally just got was JLL appraisers real estate, not homeowners, fair to say?

MR. SCHWETTMAN: Object to form, it misstates his testimony.

A.    No. You gave me a binary choice which was illogical and not representative of my or my firm's practice. I'm just seeking just a little bit of common sense in the question or I wish to clarify them because appraisers don't appraise homeowners. Moreover, it's not just real estate, I

36 (Pages 138 - 141)

Case 3:21-cv-00232-DWD Document 316-9 Filed 04/04/25 Page 38 of 87 Page ID #26527

Page 142

think you mean real property, but, and you know there's personal property, there are other things that we do in our daily job, none of this is appraising a homeowner.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) We'll move on. For the record what is your occupation Mr. Brigden?

A. I am a real estate analyst and appraiser.

Q. How long have you been a licensed real estate analyst and appraiser?

A. I have to check.

MR. JOHNSON: Ross could we demonstrate and display Exhibit 5?

Q. (BY MR. JOHNSON) Is it true Mr. Brigden that you first became a certified general real estate appraiser in 2017 in the state of Wisconsin?

A. That sounds about right. Yeah. As a certified general, yes.

MR. JOHNSON: Ross, can we demonstrate on the screen Exhibit 3, I'm sorry, Exhibit 5?

Page 143

CONCIERGE: This is Exhibit 5 on the screen.

Q. (BY MR. JOHNSON) Isn't it true that you first became a generalized certified real estate appraiser in the state of Illinois on March 26, 2024, approximately 105 days before JLL submitted its first report in this case?

A. Yes. And to the extent that you are drawing any sort of conclusion to timing and the report I would point out that I'm licensed in dozens of states and it is a routine practice to obtain an appraisal license in the state where the assignment is, and so heretofore I did not need a license in the state of Illinois for any of my litigation matters.

MR. JOHNSON: Move to strike as nonresponsive after the word yes.

Q. (BY MR. JOHNSON) It is accurate that you first became a fully licensed real estate appraiser in 2017 though in the state of Wisconsin, fair to say?

MR. SCHWETTMAN: Asked and answered.

A. I became a real estate appraiser as licensed in the state of Wisconsin in 2017.

Q. (BY MR. JOHNSON) But that's the

Page 144

first state licensure you had where you were fully licensed as a real estate appraiser, is that not true, sir?

A. Yeah.

Q. Okay. And before March 26 of 2024, and you can refer to Exhibit 5 as needed Mr. Brigden, you were officially considered by the state of Illinois as a quote, associate real estate appraiser trainee. Correct?

A. Yeah. I didn't make up the term. That's what it's called.

Q. So that's a yes, sir?

A. Absolutely yes.

Q. Okay. And you're an attorney as well, is that correct?

A. No.

Q. You're not an attorney?

A. No.

Q. Okay. And according to your bio on the JLL, in the JLL report you direct JLL valuation advisories, complex valuation and litigation assignments across the United States?

You can refer to your bio as needed.

A. Was there a question?

Q. Yeah. Are you --

Page 145

A. That's what it says, sure.

Q. Okay. You're both listed as a managing director of JLL's Valuation and Advisory Services, LLC, correct, which is in essence as described on that bio page a resource for needed litigation services, correct?

MR. SCHWETTMAN: Take a look if you want.

A. You actually lost me in that question because I didn't follow the connecting verb there. I don't disagree with what is written there.

Q. (BY MR. JOHNSON) Okay. Have you ever -- strike that.

Have you ever been retained to evaluate and form an opinion of value as to the real estate and economic damages, if any, to environmentally contaminated properties?

MR. SCHWETTMAN: Object to form, it's overbroad.

A. Assuming that you're talking about have I ever issued opinions or written reports in a litigation context involving environmental issues.

Q. (BY MR. JOHNSON) And opinions of value.

A. Yeah. The answer is yes.

37 (Pages 142 - 145)

Veritext Legal Solutions

www.veritext.com                                          888-391-3376

Page 146

Q.    Okay.  With the experience described on your bio page and what you've described to us so far today Mr. Brigden, do you consider yourself an expert in evaluating environmentally contaminated properties?

A.    Yes.

Q.    And how many similar types of cases to this one with an environmental contamination allegation on the part of the City of East St. Louis with respect to PCB contamination, how many similar types of cases have you been engaged by parties to be an expert witness on?

A.    Acknowledging that there are assignments where there may be one witness, like in the case of this one where I cosigned, I would say more than a dozen.

Q.    Okay.  Mr. Brigden, have you ever been involved in a real estate appraisal project where you and JLL violated the conflict of interest rules within your appraisal industry?

A.    Can you tell me what the conflict of interest rules are of the appraisal industry?

Q.    Are you telling the jury and whoever's watching this video that you're unaware what the conflict of interest rules are in your

Page 147

industry as we speak, sir?

MR. SCHWETTMAN:  Object to the form, argumentative.

A.    You're referring to them as if they're a body of standards so no, I do not recognize something which is the conflict of interest rules of my industry and I would love to be enlightened because I'm not sure where you're going.

Q.    I'm telling you where I'm going.  In the Del Monte, LLC versus Commissioner Internal Revenue matter is it not the case that two divisions, two sections of JLL simultaneously represented the Ohio based landowners or property owners on the one hand, and another division of JLL, your participation, your division of JLL, represented the IRS.  Do you know that case I'm talking about, Del Monte versus Commissioner of Internal Revenue?

MR. SCHWETTMAN:  Object to the form, lack of foundation.

A.     I 100 percent understand what you're asking.

Q.    (BY MR. JOHNSON)  And in that case is it not the case that the property owner's division

Page 148

of JLL appraised the properties in question at between 21 and 24 million while you representing another section of JLL representing the IRS came back with an evaluation at zero?

MR. SCHWETTMAN:  Same objections.

A.    Literally none of what you just said is accurate.

Q.    (BY MR. JOHNSON)  So you're denying it to be fair.

A.    No, no.

Q.    Well.

A.    All right.  I would be happy to explain and use the correct words.  I cannot, I cannot answer a question that is factually written wrong so, you known, it's just inviting a lot of confusion.  Be happy to explain what actually is the truth.

Q.    So you're denying, just for the record, you're denying a scenario in a case called Dell Monte versus Commissioner of Internal Revenue whereby JLL first of all represented both parties in a case at the same time.  Correct?

MR. SCHWETTMAN:  Object to form, foundation and relevance.

A.    I need to define at the same time

Page 149

because I was the expert on the case for about three years and what was discussed at court by the judge was that a party, the party that you're referencing, specifically contacted another group within our company and failed to tell them that it was for litigation and misrepresented what the assignment was for and therefore successfully entered into another contract and so parts of what you're asking are correct, but much of the rest of it is inaccurate.

Q.    Is it accurate to state that at the end of the day after all what you just described, one part of JLL valued the properties in excess of $20 million, while your part of JLL representing the IRS interests assessed those properties, developmental rights of those properties at zero?

MR. SCHWETTMAN:  Object to form.

A.    You did use the word appraised, right, value?

Q.    (BY MR. JOHNSON)  Sure.

A.    Then that's incorrect.

Q.    Okay.  What's incorrect about one part of JLL valued the developmental rights, or appraised the developmental rights of the properties in question at above 20 million, while

38 (Pages 146 - 149)

Page 150

another side of JLL where you participated appraised those rights at about zero?

A. Sure. Because you're loosely offering a term which is appraisal and appraised value conclusion is just that, it is a price paid in terms of cash as of a certain date, it is for a precisely identified property and it represents what a willing buyer would pay to a willing seller. Okay? That is very different from many other types of things that appraisers might do. They might do all market study, they might do an analysis, they might tell you how much rent you can collect in a house. So you are comparing two things that are not correct. The other party that you're talking about did not perform an appraisal, sir. So your question, the answer to that is no.

Q. Getting back to the highest and best use comment a moment ago that we discussed, you originally claimed and then you modified your answer, but you originally claimed that Bell did not conduct a highest and best use analysis, and by the way, you did also state that in the report as well, correct, Mr. Brigden?

A. I was hoping you would clue me in on that because it sounded familiar. So I'm going to

Page 151

go with I believe so and I'd love to talk more about it.

Q. Would you agree with me that if Bell did conduct a highest and best use analysis and you claimed in your report and your original answer as given in this deposition that would be an ethical violation in your profession?

MR. SCHWETTMAN: Object to form.

A. All right. To accurately represent my testimony is that I am of the opinion of characterizing the Bell attempt at a highest and best use to be what is in my report. Now, I made a reference to that as looking in some way, and I wish to now learn more about the true nature of that incomplete attempt by Mr. Bell.

Q. (BY MR. JOHNSON) Would you agree with me that representing in a written report for litigation purposes like Exhibit 6 that Bell did not conduct a highest and best use and if the truth comes out that Bell did conduct a highest and best use at the very least it would be misleading?

MR. SCHWETTMAN: Object to form.

A. That is absolutely without merit because what we're talking about here is a highest and best use analysis is just that, it's an

Page 152

analysis, it's not did they do it or did they not do it. Like if they put the words in the report you're going to say that they did it. What I'm saying is a highest and best use analysis is the most critical thing that an appraiser does. If we can't explain to the users, to you, to the court, what is actually happening with these properties, what they are actually compromised of, whether or not they actually have any improvements, whether or not they have infrastructure, whether there are utilities available, whatever the larger macro economic market would accept them, that is what the appraiser's job is to do and the Bell report does none of that and so what I'm saying is the Bell report is deficient from a highest and best your standpoint because it provides no guidance, no analysis and no conclusions regarding a highest and best use analysis.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) My question was and now again is if you represent in your original report that he did not conduct a highest and best use analysis and the truth of the matter is for purposes of my question assume that he did that

Page 153

would at the least be misleading, correct?

MR. SCHWETTMAN: Object to form, asked and answered.

A. Yeah, the question is, you're asking me to assume something that is knowable so it's kind of a disingenuous question at best.

Q. (BY MR. JOHNSON) Well, thank you for that.

Did you conduct a highest and best use analysis in your JLL report and form a different opinion than Bell? Yes or no?

A. Well, what we did is an appraisal review, sir, which is reviewing the work of another. So that question is not actually very accurate because that's not what, that's outside the scope of the assignment. I'm not here to do what somebody else chose not to do in a better way, I'm here to explain to the court whether or not it was done the first time, if at all, or correctly or adequately.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Did you in the JLL report conduct a highest and best use analysis and form a different opinion than Dr. Bell, yes or no?

39 (Pages 150 - 153)

Page 154

MR. SCHWETTMAN: Asked and answered.

MR. JOHNSON: It's not answered. You know it's not answered.

A. Okay. I told you we did an appraisal review report. So by definition there would not be a highest and best use analysis in my report. There would be commentary on the topic, so I did not perform one but I discuss all of the shortcomings and the misapplication of any sort of highest and best use analysis by Bell and I would be happy to talk to you about that today.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Mr. Brigden, if we demonstrate at the trial of this case that in fact two divisions of JLL did in fact perform appraisals for developmental rights of properties in the state of Ohio, one division coming in at zero and the other division of JLL coming in above 20 million, how would you explain that differential in valuation?

MR. SCHWETTMAN: Object to the form. Lack of foundation and it's irrelevant.

A. And I would add I already went through it in great detail so I'd be happy to

Page 155

repeat that.

Q. (BY MR. JOHNSON) No, I want you to answer my question and that is if in fact, and I'm asking you to assume for purposes of this question that one part of JLL valued the developmental property rights of the properties in question in the state of Ohio at above $20 million, while another division of JLL that you were involved in on behalf of the IRS valued or assessed those developmental rights at zero, and my question is is there any way to reconcile the vast difference between the two valuations by the same firm in the same matter?

MR. SCHWETTMAN: Same objections.

A. I did explain this and I said I performed an appraisal, the other folks did not perform an appraisal and therefore the terms that you used in your questions are incorrect.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Can you answer my question now?

MR. SCHWETTMAN: He just did.

A. I literally just did because the words that you are using, sir, do not comport to

Page 156

the rest of the sentence, you see? So when you describe something as an apple and then in the end you say it lacks berries, they doesn't make sense, they're incongruent. So I can't answer that question. However, I'm happy to explain the facts and the real situation at hand.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Mr. Brigden, we've already talked about the fact that you are not an environmental engineer, I'll move on from that for fear of we'll be here for a long time.

You're not an industrial hygienist, correct?

A. I am not an industrial hygienist.

Q. You have no expertise whatsoever in the study and addressing of workplace health and safety issues in identifying, evaluating and controlling environmental hazards that can cause illness, injury or discomfort to workers, correct?

A. That sounds correct.

Q. You are not a toxicologist Mr. Brigden, is that correct?

A. Yes.

Q. In other words you have no expertise

Page 157

whatsoever in the studying of the effects of chemicals and toxins on living organisms, including mankind, correct?

A. You packed a lot in there. I'm happy to say that I'm not holding myself as the expert in the first question, but you mentioned a lot of stuff after that and some of that does come into play in my practice, and so if you want to explore more on that I'd be happy to.

Q. No, I just want an answer to my question which was, and now again being repeated is, you have no expertise in the study of the effects of chemicals and toxins on living organisms including mankind.

MR. SCHWETTMAN: Objection, asked and answered and overbroad as he explained.

A. It sounded like some things that we from time to time come up against. I am not a stand alone expert in any of those fields but I am familiar with some of the terms you're using, so I'm just trying to be a careful listener.

Q. (BY MR. JOHNSON) You are highly unqualified, are you not, to discuss the Rule 26 reports or give opinions concerning alleged regional screening levels of PCB contamination or

40 (Pages 154 - 157)

Page 158

alleged regulatory agency remediation or cleanup levels, isn't that correct?

MR. SCHWETTMAN:  Object to the form. Calls for a legal conclusion.

A.    So that's a really kind of strange question, and let me tell you why.  Because on the one before, left behind we're saying is this guy an environmental engineer or not and the answer is I'm not.  But you're also asking about things that appraisers are required to deal with a little bit, especially when we're dealing with properties of environmental contamination.  So I'm not willing to just throw out the whole bath water in that sentence.  I'm not claiming I'm an expert in that technical field but the rest of your sentence needs to be unpacked a little bit more.

MR. JOHNSON:  Move to strike as nonresponsive and I'll ask the question again.

Q.    (BY MR. JOHNSON) You are wholly unqualified to discuss the Rule 26 report such as JLL Exhibit 6, or give opinions concerning alleged regional screening levels of PCB contamination, or alleged regulatory agency remediation or cleanup levels, sir.

MR. SCHWETTMAN:  Object to form,

Page 159

calls for a legal conclusion.

A.    Outside of the whelm of real estate appraisal practice I'd have to agree with you.  But as these different disciplines intertwine, which as you can see is happening as we speak, it does require us to borrow from one or the other and there is a certain amount of use of these disciplines that I do use in my expertise and they can involve having some level of opinion as it relates to real estate analysis.  Not health based anything, but as it relates to real estate analysis I am in a position to discuss and consider these thresholds.

Q.    (BY MR. JOHNSON) Mr. Brigden, is it fair to say that the only time and the only basis that you would ever have to give an opinion on threshold levels, regional screening levels of PCB contamination as per regulatory agency remediation or cleanup levels, would be in repeating other expert's opinions and other expert's reports other than yours, sir?

MR. SCHWETTMAN:  Object to form.

A.    So much in that, let me just bring it back to the thing that is most important here.  The Bell report makes the unsupported decision to adopt

Page 160

somebody else's opinion that a measure of .23 is a trigger of something and in my appraisal practice it's incumbent upon me to recognize that that is potentially not appropriate and that I should be consulting others with expertise on that topic.  So to write me out of the equation all together as I can't touch it is where I'm pushing back a little bit.  It's something that we must consider in issuing our opinions.

Q.    Is the only way that you could legitimately have for commenting on the regional screening levels or remediation and cleanup levels of PCB contamination, is relying upon other experts other than yourself, because such opinions are totally outside your lane, correct, sir?

MR. SCHWETTMAN:  Object to form and it calls for a legal conclusion.

A.    I'm going to answer it in appraisal context.  I am not allowed to accept blindly the work of others and Then innocently proffer it.  I'm a conduit in that transaction.  I need to perform some due diligence and have a professional responsibility in offering other's opinions.  So what you're asking me is touching on that and then you're asking for a very simple black and white

Page 161

answer, and what I'm saying is it's much more complex than that, I must do, take the required steps to ensure that I have confidence that somebody else's opinions upon which I may rely are credible and worthy of belief.

MR. JOHNSON:  Move to strike as nonresponsive.

Q.    (BY MR. JOHNSON) Let's move on.

You are not a biologist, correct?

A.    That's correct.

Q.    In other words you have no expertise whatsoever in the study of living organisms and Interactions with the environment, correct?

MR. SCHWETTMAN:  Object to form. That's overbroad.

A.    I have a dog but other than that I think that's correct.

Q.    (BY MR. JOHNSON) You're not a medical doctor, registered nurse or healthcare professional, sir, is that correct?

A.    That's correct.

Q.    Did you author, I think we established 215 pages of the main part of the JLL report, did you and Mr. Roddewig author all of those pages?

41 (Pages 158 - 161)

Page 162

A.   Can I characterize it in an accurate way?  Because your question isn't that easy to answer.

Q.   The question posed is very simple, did you and Mr. Roddewig author all 215 pages of the report, yes or no?

A.   Okay.  That answer I can answer yes to.

Q.   Go for it.  Okay.  All right.

And to save time here, my understanding, and we'll get to the documents if we need to, is that Richard Roddewig, Charles Brigden and Thomas Hamilton were the three largest participants by hours spent on the various invoices recently provided to us as opposed to anyone else in the JLL organization, is that your understanding as well, sir?

A.   If you say so.

Q.   Okay.  By our calculations as of November 25, 2024, which is the latest date we received the invoices for, JLL has billed $2,174,000 in billings.  Of that amount 755 hours was billed by Richard Roddewig, you have 602 hours according to our addition, might be off an hour or two, and then Thomas Hamilton had 304 hours of work

Page 163

in the case.  Does that sound about right to you, if you know, sir?

A.   Sure.  That sounds reasonable.

Q.   Okay.  Thomas Hamilton is one of your senior partners at JLL who has billed with those 304 hours and at his rate just over $160,000 in this matter to date, does that sound about right, sir?

MR. SCHWETTMAN:  You don't have to guess.

A.   I don't have to do the math.  I'll take your word for it.  I have no reason to believe it's not correct.

Q.   And Hamilton was the senior JLL team member who conducted one of the site inspections according to his time entries in January of 2024?

A.   Sounds right.  Yes.

Q.   Have you done a personal site inspection as well?

A.   I have.

Q.   How many times?

A.   At least once as a part of this matter.

Q.   And other times unrelated to the matter?

Page 164

A.   I have been in East St. Louis prior to this.

Q.   In what capacity, just curious?

A.   Real estate appraiser.

Q.   Okay.  And Hamilton's title with JLL according to the website is executive vice-president of JLL Value and Risk Advisory.  Does that sounds correct, sir?  Executive vice-president of JLL Value and Risk Advisory.

A.   Sounds correct.

Q.   Okay.  And is he considered part of the management structure of JLL's Chicago office along with you and Mr. Roddewig?

A.   What do you mean by management structure?

Q.   Let's let the question stand if you understand what management is.

A.   I do not, I would not say that he is part of the management structure.

Q.   But you have no reason to doubt his title, or at least advertised title as executive vice-president, correct?

A.   I gave him that title.

Q.   So you know it's correct.

A.   Yeah.

Page 165

Q.   And his time entries to date indicate that he has done a substantial percentage of his time in data analysis and collection of data.  Does that sound right to you?

A.   I don't know what he writes in on his time sheet.

Q.   In other words Hamilton's participation to date in this case as far as you know have involved his attempts to assess real estate damages on contaminated properties.  Would that be correct, sir?

A.   No.  Especially if you're playing off of the prior question.  So if you're -- no.  I don't agree with your question.

Q.   What has his participation in a general sense consisted of to you as one of the signers of the report?

A.   I remember his participation and beyond the components of inspection that you brought up, he has assisted in macro economic and economic indexes, population, employment, which is a very important component of this analysis, as we all know the exodus of jobs from the subject area is one of the largest issues in this case.  He collaborated with myself on that research.  He also

42 (Pages 162 - 165)

Page 166

collaborated on some of the articles and statistical critique analyses, among others.

MR. JOHNSON: Ross, I'd like to display Exhibit 38 and then side by side Exhibit 39.

Get those Tiffany.

Q. (BY MR. JOHNSON) And we're going to be referring to page 113 Mr. Brigden and Tyler.

CONCIERGE: So Exhibit 39 is an MP4, it's a video.

MR. JOHNSON: Yes.

CONCIERGE: Okay.

MR. SCHWETTMAN: What page did you say Paul?

MR. JOHNSON: 113. Starting with are you an expert.

CONCIERGE: And we're on page 113?

MR. JOHNSON: 113.

Q. (BY MR. JOHNSON) And I'll represent to you as far as we are setting this up now that it is a deposition of Thomas Hamilton taken in the case called Brown, et al. versus Saint-Gobaine, The District Court of New Hampshire on September 3rd of 2021, and we're going to be playing a clip from page 113, if you guys want to follow along I'm

Page 167

going to ask you some questions about that clip.

CONCIERGE: Play now?

MR. JOHNSON: Yes, sir.

CONCIERGE: One moment.

(The following is transcribed from video clip)

Q. Are you an expert in the field of valuing environmentally contaminated properties?

ATTORNEY: Object to the form.

A. Individually I'm in that, I'm on that learning curve. I hope to be there some day. I'm learning from some of the best and that's what we do in this real estate profession is that we come in, we contribute. They're learning from me as to what my expertise is and I'm learning from them.

(End of video clip)

Q. (BY MR. JOHNSON) Isn't it true Mr. Brigden that within the last three years your partner Hamilton admitted under oath in a deposition that he did not have substantial experience in the appraisal of environmentally contaminated properties?

MR. SCHWETTMAN: Object to the form, lack of foundation. It's irrelevant.

Page 168

A. I don't understand the question.

Q. (BY MR. JOHNSON) You just saw the video, correct?

A. Well, I saw about a nine second excerpt and I see the words on this page.

Q. Okay.

A. And you're asking me to say that that represents and is equal to representation as of what date? I mean I don't understand this at all.

Q. Sir, he was asked are you an expert in the field of valuing environmentally contaminated properties and your partner who's billed $160,000 on this case to the tune of 304 hours answered I'm on that learning curve, I hope to be there some day, I'm learning from some of the best. You heard it and read it, correct?

A. I heard and read what you just described.

Q. All right. And appraising PCB contaminated, environmentally contaminated properties is exactly the matter at hand and the subject matter of Dr. Bell's report in this case, isn't that correct?

MR. SCHWETTMAN: Object to the form.

A. So I have about 19 employees, some of

Page 169

them make maps, some of them proofread, we're going to have to talk to that person, I found a lot of typos. Others perform analyses and you're asking me right now to extrapolate from this testimony that, that what? That the effort that he put into this report upon which I rely and appreciate, you want me to characterize that as being non-expert, is that what you're asking?

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) No, sir, I'll ask you, and I'll ask the question again, it's very clear.

A. It's not very clear.

Q. Are you done?

A. Yes, I'm done.

Q. Thank you. Appreciate that.

My question was and now is is evaluating PCB contaminated properties the exact subject matter of Dr. Randy Bell's report in this case is the question?

MR. SCHWETTMAN: Object to the form.

A. Now I would like you to repeat that question because this has nothing to do with the Tom Hamilton matter that we're looking at.

43 (Pages 166 - 169)

Page 170

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Is the subject matter of Dr. Randy Bell appraising PCB contaminated properties, yes or no?

MR. SCHWETTMAN: Object to the form.

A. Is the sum matter of this report appraising PCB properties, is that the question you're asking me?

Q. (BY MR. JOHNSON) I'll repeat the question again, last time, then we'll move on and everyone will note that you're not answering it.

MR. HOBBS: Hold on. At the beginning of the depo Paul you told him to ask you for clarification if he didn't understand a question, you told him to do it, he's asking for clarification.

MR. JOHNSON: Object to the form if you need to Ron. Thank you.

Q. (BY MR. JOHNSON) Yes or no, is appraising PCB contaminated properties exactly the major subject matter of Dr. Bell's report in this case?

MR. SCHWETTMAN: Object to the form.

A. If you're asking me what his report

Page 171

in East St. Louis is about is generally consistent with what you said, but you won't even tell me what we're talking about here so I'm really confused.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Are you unable to answer that simple question, sir?

MR. SCHWETTMAN: He'd told you he's confused by the question.

Q. (BY MR. JOHNSON) Are you unable to answer the question as posed sir?

A. I'm confused by your question, I've asked for clarification numerous times. You're seeking a binary response from me and I'm telling you I don't have enough information because the question is not complete enough for me to respond.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Do you agree that the matter, the subject matter at hand or matter at hand of Dr. Bell's report is in fact to assess the real estate and economic damages, if any, on the East St. Louis tested parcels?

MR. SCHWETTMAN: Object to the form.

A. I mean I think generally that's what

Page 172

he was supposed to do.

Q. (BY MR. JOHNSON) And in the appraisal industry, in the appraisal profession, if you're not studying and reporting about the very subject matter at hand of Dr. Bell's report then what you would be doing would be entirely irrelevant, is that correct Mr. Brigden?

MR. SCHWETTMAN: Object to the form and calls for a legal conclusion.

A. You know I'd like to hear you say that one back, because.

Q. (BY MR. JOHNSON) Sure.

In the appraisal profession you must study in an appraisal review the subject matter at hand of the appraiser that you are reviewing and in this case Randy Bell, the subject matter at hand is assessing the real estate damages and economic damages, if any, of the PCB contaminated East St. Louis parcels, correct, sir?

MR. SCHWETTMAN: Object to the form.

A. There's so many things wrong with that question. We'll put aside the mixing of legal and appraisal concepts and just focus on this one. It vacillates between referring to Mr. Bell, okay, and then his report and then some obtuse reference

Page 173

to industry standards and then bringing it back to Mr. Bell, but as appraisers we don't get involved on a personal level. Generally we don't, it's not what Mr. Bell did, it's the Bell report and so when you bounce back and forth like this in this terminology it makes it impossible for me to respond to the question.

Q. In an appraisal review must you and JLL assess the same matter at hand, the same subject matter, as Dr. Bell's report?

MR. SCHWETTMAN: Object to the form, that is vague and confusing.

A. It is confusing because an appraisal review report, this is the easiest way to say it. An appraisal review report is a very amorphous thing. It depends on the assignment. I could do an appraisal review report that says there are 250 pages in this Bell report and the purpose of that report and the end result of that report is to tell you how many pages there were, that is an appraisal review report. I could do another appraisal -- excuse me.

I could do another appraisal review report that did an entirely different scope. So there is no correct standard of what we are limited

44 (Pages 170 - 173)

Page 174

to do. The sum of our review is whatever we say it is. It can be to determine the number of pages or it can be something larger than that.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) In this particular matter, this particular appraisal review by JLL, in order to be in conformance with your industry standards must you have studied the same subject matter that Bell did, and that is the real estate and economic damages, if any, on the East St. Louis PCB contaminated parcels?

MR. SCHWETTMAN: Object to the form. Asked and answered I think.

A. I don't understand that question.

Q. (BY MR. JOHNSON) So you're unable and/or unwilling to answer this question, is that fair?

A. No, I'm confused by it and I'm asking you to rephrase it in terminology that make sense because the words in there are internally in contradiction and I'm asking you for clarification.

Q. Does an appraisal review in order to be in conformance with industry standards study the same subject matter as the report being reviewed in

Page 175

this case, the real estate and economic damages, if any, concerning the East St. Louis tested parcels?

MR. SCHWETTMAN: Same objections.

A. You just read back the same question so you did not give me greater clarity on it.

Q. (BY MR. JOHNSON) Are you testifying for the record that you're unable to answer the question as posed?

A. Well, let's run it back. You asked, the first thing in that question is that you start asking about what we did in the review and then you say is it, does it have to be the same as what Bell, the Bell report endeavored to undertake, and right there you make this huge logical leap that I need more information on because we did an absolutely appropriate report, we uncovered a tremendous amount of deficiency in the Bell report and I am happy to explain that, and it was a very thorough evaluation and I was rather shocked at all of the things we did find that were missing in the report. So I really don't understand what you're saying is does our purpose or whatever, have to equal his, I simply do not understand what you're asking.

Q. Did you review something other than

Page 176

the Bell report insofar as JLL Exhibit 6 is concerned? Is that what you're telling me?

A. No. We reviewed the Bell report.

Q. Singularly, correct? You didn't review anything else as part of your appraisal review other than the Bell report, did you?

A. I mean we looked at other documents but the subject of the review was the Bell report.

Q. And you're unable to answer the question that in an appraisal review you, JLL, must study the same subject matter that Bell did and in Bell's report, and you quote it in your own report in JLL 6, you quote the subject matter in Bell's report being assessing the real estate and economic damages, if any, on East St. Louis PCB impacted parcels, correct?

MR. SCHWETTMAN: Object to the form.

A. So I just wrote down the sentence that is at issue here, that is offensive if you will, that we must study the same subject matter, okay? Those aren't appraisal terms put what they do do is they do invite a very important topic which he got the subject properties wrong, in almost any way you look at it. He, the Bell report does not consider their actual status. So must we

Page 177

study the same subject matter? No. We must tell the world that a 1,000 square foot sliver of land that has weeds on it is incapable of having a house on it, an imaginary house on it, and none of that is included in the report so it's incumbent upon the review appraisers to bring that up and discuss it. So unless you can give me greater clarity on what the words must study the same subject matter means, I'm sorry, I'm unable to answer that question.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) I'll move on.

So JLL allowed an appraiser, Thomas Hamilton, who admitted under oath he was still in a learning curve of appraising contaminated real estate, to do just that in this case to the tune of billing $160,000 to date so far. Is that correct, sir?

MR. SCHWETTMAN: Object to the form. Just to note Mr. Hamilton's testimony was over three years ago.

A. Yeah. I mean I'm beginning to think I understand where you're going with this, I also believe I've described for you Dr. Hamilton's role

45 (Pages 174 - 177)

Page 178

in this assignment. What he has billed in his time sheet I have no issue with. What he said in a deposition in another matter where he was hired as a statistical expert, and what he said in the 10 seconds of a clip that I saw I have no issue with. It's just this inorganic nonlogical leap that we're making in this one sentence that you're asking me to agree with, I just have some issues with.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) My only question now and then is this: JLL allowed an appraiser, Thomas Hamilton, who admitted under oath that he was still in the learning curve of appraising contaminated real estate, to do just that to the tune of $160,000 in billing and 304 hours of activity so far in this case, isn't that true, sir?

MR. SCHWETTMAN: Object to the form. Asked and answered.

A. Sir, allow me to explain a little bit why we're having this problem. Because his actual testimony says they're asking him as an expert, okay? And then you follow up with a question that misrepresents what he said and then you're asking me to put it all together, and I'm just simply

Page 179

listening to the words and I'm not just going to say yes, you are right, because you're not, you're changing words on me and so therein lies the problem.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Are you unable to answer the question I posed a moment ago in the way it was posed to you, sir?

MR. SCHWETTMAN: I think that's clear.

Q. (BY MR. JOHNSON) Are you unable to answer the question as I posed it a moment ago, sir?

A. I explained to you my confusion and the incongruous nature of your question and the evidence presented to me and I'm asking for clarification, you're not giving it to me, I think everyone's clear on this topic.

Q. Are you unable to answer the question the way it was posed a moment ago, yes or no?

MR. SCHWETTMAN: Asked and answered.

A. Like many of the questions today which are foundationally deficient of very precise terms, sometimes not all that important, sometimes

Page 180

very important, but we just can't accept lazy language when precise language is required, and in this case I can't answer that question with the way it is worded.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) I'll move on because we're not getting anywhere with an answer to that question.

Q. (BY MR. JOHNSON) Do you think it is responsible on the part of JLL to involve Thomas Hamilton who's admitting he's on the learning curve of assessing environmentally contaminated properties to be involved in this case?

MR. SCHWETTMAN: Object to form.

A. So --

Q. (BY MR. JOHNSON) Yes or no?

A. Well, you are doing what I just spent a long time talking about. This line of questioning, sir, was about saying to a court they are an expert. Am I correct in surmising that that was the Hamilton testimony? It was regarding his expert status in that case.

Q. Are you able to answer the question I just posed to you, sir?

Page 181

A. Well, I'm going to explain to you why your comparison is falling down and that is because you're trying to equate somebody that is in a case who is not hired as an expert in a certain capacity and he was saying I don't think I am an expert in this particular situation as of this date and then here we are three and a half years later and one of my staff members who did some data analysis and went on a site inspection, you're somehow asking me to say I have been improper in some way or JLL's been improper in some way I'm saying you're going to have to give me greater clarity because the way that I see it and the way I describe it there is nothing untoward in that situation.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) My question simply put, less than 15 words, do you think it was responsible on the part of JLL to have Thomas Hamilton involved in this litigation given his testimony that we played a moment ago?

MR. SCHWETTMAN: Object to the form. Asked and answered.

A. You don't like my answer to a carefully constructed albeit deficient question. I

Veritext Legal Solutions

www.veritext.com                                                    888-391-3376

Page 182

am saying if you properly evaluate what we're discussing here Dr. Hamilton who is a Ph.D. and a professor of real estate, sir, at a college, is an extremely capable appraiser. That he chose to distance himself from doing what I have been also asked to do today when you asked me if I'm a biologist I carefully said no because I was not hired to do that. That's exactly what he was doing in that instance. So now if you're asking me to commit to untoward staffing decisions in the construction of this report I cannot agree with you.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) Did your involvement in the Baker versus Saint-Gobaine case involve cosigning a report with Thomas Hamilton?

MR. SCHWETTMAN: Object to form. Irrelevant.

A. Which case is that?

Q. (BY MR. JOHNSON) Baker versus Saint-Gobain, just so we don't get lost in the minutia here. Did that involvement in Baker versus Saint-Gobain involve you cosigning a report with Thomas Hamilton?

Page 183

A. If only it was so easy that I could remember the case based on the citation that would be beyond great. I assume that is the matter in Hoosick Falls, New York.

MR. SCHWETTMAN: Don't guess.

A. Can you give me more information?

Q. (BY MR. JOHNSON) I'm just asking, if you don't remember just tell me you don't remember.

A. A lot of these cases have very similar names, especially in the class action ones because they start alphabetically, so there's at least three Bakers that I'm associated with right now, I'd hate to venture a guess.

Q. (BY MR. JOHNSON) In I believe the Saint-Gobain matter that you're discussing was a PFAS case, is that your recollection?

MR. SCHWETTMAN: I don't think we've nailed it down, have we?

A. Yes.

Q. (BY MR. JOHNSON) Baker versus Saint-Gobain. I'm just asking, if you don't recall you don't recall. If you do recall tell me.

A. I am aware that Saint-Gobain is a defendant in matters that typically involve PFAS so I'm going off of that at this moment.

Page 184

Q. Isn't it true that in the Saint-Gobain matter Hamilton compared properties contaminated with PFAS on the one hand, the impaired property, to other properties contaminated by PFAS as his control property for comparison purposes?

MR. SCHWETTMAN: Object to form. Lack of foundation.

A. I still have no idea what case we're talking about. I currently am involved with five cases where Saint-Gobain is a defendant or a co-defendant, so I would very much be assisted by some specificity about which case we're talking about.

Q. Let's just ask in a general sense. In a risk effect analysis --

A. What is a risk effect analysis?

Q. You're the expert, you know what risk effect is, don't you?

MR. SCHWETTMAN: Objection, argumentative.

A. Sir, appraisal reports can be styled in whatever way, if you would have said I'm doing an appraisal on a property potentially affected by contamination I would know what you're talking

Page 185

about. But when you're going to start a very long question and it's prefaced by using this word that I don't use I'm asking what that is.

Q. I'm just asking, in a risk effect analysis -- you tell me what it is, is it the market --

A. I literally just asked you what it is.

Q. I'm asking you as the expert in this case as to what risk effect is.

MR. SCHWETTMAN: Object to form, it's vague, overbroad.

A. I don't know what a risk effect analysis, I don't understand what you are suggesting when you're asking that question. I know what risk effects are and how they are analyzed but it's not a risk effect analysis report or something.

Q. (BY MR. JOHNSON) What are risk effects and how do you analyze them?

A. Advisory opinion none of USPAP provides useful guidance to professional appraisers in the evaluation of real property that has or has been suspected of being contaminated. It generally identifies three areas that an appraiser unpacks,

47 (Pages 182 - 185)

Page 186

that an appraiser looks at, and they are cost, use and risk effects.

Q. Right.

A. Risk effects, a simple way of saying that is it's associated with stigma.

Q. Yeah, the market reaction, if any.

A. Market resistance.

Q. Market resistance in terms of whether the market sales prices for land parcels react to an event.

A. You're spot on.

Q. Or contamination.

A. You could do my job, this is great.

Q. And that is for the most part in your experience prospective after a contaminating event, correct?

A. Well, I wanted to applaud you because we're now finally we're using true terms which is an analysis of sales data and, so yes, a lot of what you said is correct but now we shifted into time, timing, so I'd like to separate maybe my response to your question in a two part way. You got most of everything right there but then you threw a softball on top with time.

Q. Well, a risk effect damage analysis

Page 187

can not go backwards in time before the contaminating event which is being assessed by definition, correct? We're examining the market's reaction, if any, to some sort of contaminating event or some sort of contaminating scenario. Is that fair?

A. We're going to have to have a broader discussion on this, I'm not following all of the stuff that is happening in that question.

Q. Yeah. If we're assessing the market reaction the question becomes a market reaction to what and what I'm postulating for you to comment on is reacting to a contaminating event or some sort of event or some sort of contamination that becomes public knowledge and then real estate appraisers assess whether that market reaction has caused a stigmatic or risk effect. Is that fair?

A. In layman's terms that's pretty good. I would throw into there a couple of concepts.

Q. Okay.

A. An appraisal presumes a sale, right? So even though you never move out of your house you can still get an appraisal done, but it presumes you're going to leave that house. So it is to the next buyer appraisers are evaluating an esoteric

Page 188

thing which is a nominal measure of dollars that assumes a sale. It also is prospective, it's in the future.

Q. That's what I was asking a moment ago, it's prospective by definition, correct?

A. Yes. Sales data is what's behind us and appraisers kind of look forth and react to the markets revealing themselves by buying and selling.

MR. JOHNSON: Take a five, 10 minute break?

MR. SCHWETTMAN: Sure.

VIDEOGRAPHER: Off the record at 2:15.

(A RECESS WAS TAKEN BY THE PARTIES)

VIDEOGRAPHER: We were back on the record. This is media unit number four. The time is 2:32.

Q. (BY MR. JOHNSON) Mr. Brigden, getting back to what you said were various Saint-Gobain matters moments ago on the record. I guess let me give a more general question.

In any of the Saint-Gobain matters have you cosigned a report with Thomas Hamilton, and I'm not pinning you down to any one or more, but have you signed a JLL report with Hamilton on

Page 189

one of those matters?

MR. SCHWETTMAN: To the extent you've been disclosed and it's not in litigation or protected by some confidentiality order.

A. I don't think I have cosigned any report with him. I can think of one report where I adopted a report that he did, so there's a subtle distinction there, you know what I mean? I cosigned it with two other people and we also incorporated a stand alone report that he did. So it's not really cosigning, if you know what I mean.

Q. Was your answer that you just explained with regard to all Saint-Gobain matters or all matters?

A. Potential both but definitely Saint-Gobain.

Q. Okay. Let me just expand it just for clarity. In any JLL report have you cosigned a report with Thomas Hamilton?

A. I want to say yes. I would be shocked if I have not.

Q. Whichever of the several Saint-Gobain matters was involved do you recall a scenario where Hamilton compared properties contaminated by PFAS, the impaired property, with other impaired

48 (Pages 186 - 189)

Page 190

properties for purposes of assessing risk effect?

MR. SCHWETTMAN: Object to the form.

A. I'm thinking of one assignment and one assignment only but I'm tripping up on your, the way you described it. Can you please repeat that?

Q. (BY MR. JOHNSON) Sure. Do you recall one of the Saint-Gobain matters involving a PFAS contamination case just to establish that, and in assessing risk effect damages as we defined them, or you defined them just before the break, did Mr. Hamilton to your to recollection assess the impaired properties, impaired by PFAS contamination, with other contaminated properties with PFAS for purposes of a risk effect assessment?

MR. SCHWETTMAN: Object to the form, it's irrelevant.

To the extent that you know.

A. So the one case that I'm thinking of I didn't even work on it, the PFAS matter.

Q. (BY MR. JOHNSON) I'm not asking whether you worked on it, I'm asking whether you're aware --

A. I'm not aware of what he did or did not do.

Page 191

Q. So you would have no answer or no information about whether, whether counsel in that case that retained Hamilton decided not to call him to testify because of that mistake in his analysis.

MR. SCHWETTMAN: Object to the form. Irrelevant.

A. I don't think you've ever mentioned a mistake, so you just brought that into the question.

Q. (BY MR. JOHNSON) Well, sure. Is it acceptable real estate appraisal practice Mr. Brigden with an appraiser performing a risk effect analysis to compare an impaired or contaminated property with another impaired or contaminated property?

MR. SCHWETTMAN: Object to the form.

A. So we're going from one confusing thing to another and the thing that I was hoping would give me more clarity has now given me less, so we're twice removed from the original question. I don't know what you're talking about, so.

Q. (BY MR. JOHNSON) Okay. So you don't understand --

A. There are circumstances where

Page 192

somebody has an impaired property and there is reason to discuss another impaired property. So you're throwing out terms like improper appraisal practice and I'm just not having it because there's nothing there that makes sense. So unless there is some specific information I have no answer, I have no idea what you're talking about.

Q. So under the question posed, and I'll repeat it one more time before we move on. If a real estate appraiser is purporting to assess risk effect damages, if any, in a PFAS contamination case, the test plots are the contaminated properties in question, if the appraiser goes out and selects as his control or comparison property another PFAS impaired property, is that appropriate real estate appraiser practice?

MR. SCHWETTMAN: Object to the form and it's irrelevant.

A. It could be, it could not be. I would need a lot more information to give you any sort of answer to that.

Q. (BY MR. JOHNSON) So under the question as it was posed just now you're unable to answer it, fair?

A. We've had this problem before, I'm

Page 193

asking for some clarification, I'm not getting it, we're just asking the same question, I end up saying I can't give you an answer with any specificity, I could say it could be, it could not be, that's all I can give you.

Q. Is one of the first fundamental jobs that an appraiser does when doing an environmental contamination case is to identify and test our impaired property in question?

A. To identify the test or impaired. Like the 273 properties and to properly identified them.

Q. Yes, sir.

A. That's a huge responsibility and one that Bell does not do.

Q. I didn't ask you that.

A. It's really important.

Q. You'll have every chance with Tyler or Mr. Miller or Mr. Hobbs or Abby or whoever asks you at trial, you'll have every chance to blast away at Dr. Bell, my question is more general and fundamental, and that is is it one of the fundamental aspects of an appraiser's job to first identify the characteristics of the test or impaired properties?

49 (Pages 190 - 193)

Page 194

A.   You mean like property dimensions?

Q.   Property dimensions and whether there's contamination?

A.   Access?

Q.   Yeah.

A.   Okay.  Yeah, that's an important component.

Q.   Okay.  And if an appraiser is tasked with the requesting party, whoever that is, to assess whether there's risk effect damages on the impaired with we'll say PFAS property, is one of the first things after identifying the test properties that the appraiser does is to find a control property for purposes of comparison?

A.   No, that is a far too simplistic description.  The Bell damages book actually surprisingly is very helpful in this instance.  The most important, and I'm quoting from the Bell book at page 27, the most important consideration in evaluating potential risk, stigma or market resistance is to support opinions with relevant market data.  The discovery or disclosure of a current or prior detrimental condition does not automatically result in value diminution and it is incumbent upon the appraiser or analyst to provide

Page 195

proper support for any opinions related to market resistance.

So, you're asking me some question about PFAS, a PFAS property.  PFAS contamination is generally involving ground water contamination so right there we have a problem, there isn't, I don't know what a PFAS property is.  Number two, you say is the most important thing a control area, but you're not properly describing or setting up control area so I have a really hard time answering this question.

Q.   In other words just to be clear, the way I described the question, the way I posed the question you can not answer it, is that correct, sir?

A.   Your questions are not jiving with proper terminology --

Q.   I didn't ask you that.  I'm asking the way I opposed the question, we can move on if the answer is no.

The way I posed the question very slowly a moment ago, you're unable to answer it in the way it was phrased to you, is that correct?

MR. SCHWETTMAN:  Were you finished?

A.   I am simply trying to make sure I

Page 196

understand what you're asking and I am telling you what I think you're asking, instead of just saying yes to a very complex question.

MR. JOHNSON:  Move to strike as nonresponsive.

Q.   (BY MR. JOHNSON) I'm assuming then the answer is no until I hear otherwise.  I mean you're not giving me an answer that one of the first steps in a real estate appraiser after assessing the subject or tested impaired properties in question, if one's doing a risk effect analysis, we've established that, let's put it to the side.  One of the next steps in that analysis or assessment is to find a control property, right?

A.   That's absolutely something we do, yes.

Q.   And it's very important, correct?

MR. SCHWETTMAN:  Object to the form.

A.   It's not any more important than any of the other required components of the analysis.

Q.   (BY MR. JOHNSON) And if you're doing a risk effect assessment and you have contaminant A on the tested impaired properties you don't want to go out for purposes of your control comparison property and get another Contaminant-impaired

Page 197

property, do you?

MR. SCHWETTMAN:  Object to the form, incomplete hypothetical.

A.   It's very much in the weeds and a very, very unique application.  I can see there's situations where you need to consider that.  Now, am I saying a control property can be likewise compromised in some detrimental condition, no, I'm not saying that.  I'm saying there may be reason why an appraiser is discussing other areas and those other areas might have issues as well.

Q.   Okay.  So move to strike as nonresponsive.

Can you answer my question the way it was phrased a moment ago?

MR. SCHWETTMAN:  He just did.

A.   In general a control area would be not suffering from the same condition that you are trying to isolate, however, that does not mean that a proper analysis can not be discussing or considering various types of control areas.

Q.   (BY MR. JOHNSON) What does it mean to have a study peer reviewed in your industry?

A.   What does -- you're asking me for a definition of a literary concept, right, like an

50 (Pages 194 - 197)

Page 198

academic article or something like that?

Q. All I'm asking is what does it mean in your industry to have a peer reviewed study?

MR. SCHWETTMAN: Object to the form, that's overbroad. Vague.

A. I'll give it a go.

Q. (BY MR. JOHNSON) Please.

A. Even though it's somewhat general the typical understanding is that peer reviewed means before an article is published, and especially if there is underlying data that goes along with the study, that all components are made available to its peers, or to the peers that are involved in that same industry, and they look at it, read it and it can impart some measure of inferred credibility, however, certain publications have varying thresholds of peer acceptance, but I think I've covered a lot of them.

Q. Okay. In your bio I think we established earlier that you advertised the fact that some of your Articles are peer reviewed, is that correct?

A. I'll take your word for it.

Q. Is that correct? You must know if you have peer reviewed publications or not.

Page 199

A. You asked me that I said something so I'm just saying I wish to go look.

Q. Have at it.

A. So. (Reviewing document). I'm reading at page 231 and 232.

Q. Sure.

A. I haven't come across something that says peer reviewed yet.

Q. Okay. So you don't have any peer reviewed publications that you know of as per your bio, is that fair to say?

A. That's exactly not what I said.

Q. Tell me if you have peer reviewed articles and if you do what are they?

A. I wouldn't be able to do that right now. I do not recall which of these are peer reviewed and which ones wouldn't be.

Q. But your testimony is the list that you just referred to includes peer reviewed articles, is that your testimony?

A. That is my understanding, yes.

Q. Does not peer review mean that a panel of peer reviewers reviews the article before it's published in the journal for which it's being considered?

Page 200

MR. SCHWETTMAN: Object to the form. That's overbroad.

A. I mean you asked me to give a definition and I said generally it can involve all of these things and now you're saying something that is not dissimilar from what I said, so you're confusing me.

Q. (BY MR. JOHNSON) Can you just answer my question? Does peer review mean that a panel of peer reviewers in the relevant industry review the article being considered for publication?

A. Among other things, yes.

Q. Okay. Now, in your report you are very critical, are you not, of Dr. Bell for citing Dr. Michael Tachovsky's two peer reviewed studies, one called Environmental Dead Zones, The Evaluation of Contaminated Properties, and another called Stigma, A Case Study Analysis of Long Term Environmental Risk Effect?

A. I recall covering those in my review report, yes.

Q. And I want to try to save time maybe here and that is have you read those studies by Dr. Tachovsky on prior occasions to today's deposition?

A. On prior occasions to today's depo if

Page 201

I'm not able to ask for clarification this is going to be very hard.

Q. I mean you know you referred to these studies in your report and you were critical --

A. I absolutely know that I read them for purposes of my report, I'm trying to accurately answer your question which is now talking about a time period after that. So I just want to be sure. I can tell you that I read them before writing my report and I don't believe that I read them since then.

Q. Okay. You criticized Dr. Bell for citing to Dr. Tachovsky's two studies, correct?

A. Correct.

Q. And my question, and perhaps we can save time, perhaps we can't, I'm guessing the latter, but I'll ask the question, and that is would you accept the fact that Dr. Tachovsky is by the way the partner at Landmark Research of Dr. Bell, correct?

A. If you say so.

Q. Do you know that to be a fact or not?

A. I'm not aware of people's business relationships.

Q. You know he is affiliated or

51 (Pages 198 - 201)

Page 202

associated with Landmark.

A. Certainly.

Q. And do you know Dr. Tachovsky?

A. No.

Q. Okay. Will you agree with me that Dr. Tachovsky's two peer reviewed studies, Environmental Dead Zones, The Evaluation of Contaminated Properties, and Stigma, A Case Study Analysis of Long Term Environmental Risks, are considered authoritative within your appraisal industry, Mr. Brigden?

MR. SCHWETTMAN: Object to form. Calls for a legal conclusion.

A. I don't ascribe terms like authoritative or worthy of belief. They are published in the appraisal journal.

Q. (BY MR. JOHNSON) Both of them, correct?

A. I believe that's correct, yeah.

Q. They are.

A. What I talked about are the articles contain bald statements that don't have any basis in any market derived support and what I was, and that struck me as quite incredible, especially because if we were to go to the Bell Damages book

Page 203

we would say that at one point in time Mr. Bell was of the opinion that statements on how a property is impacted may or may not be impacted, must be backed up by data. At one point that was important enough to have in the book and I'm just here to say that the problem we had with, is it Dr. or Mr. Tachovsky?

Q. Dr.

A. Dr. Tachovsky's articles was that he was making assertions that had nothing to do with data or facts, they were just ipse dixit, and that's exactly what I have discussed in my report.

Q. Is it true that you have had articles published in the Appraisal Journal?

A. Yes.

Q. And you're proud of that fact, right?

A. Yeah. Yeah, I guess I'm proud of that.

Q. You put it in your bio.

A. I'm required to.

Q. It's the leading, it's the leading journal or one of, if not the top journals or publications within the overall appraisal industry, is that a fair, accurate statement, sir?

A. I don't, never, I don't have an issue

Page 204

with it one way or another, I'm just not here to make proclamations of its status. It's a wonderful organization I'm a member of, I'm a proud member of it.

Q. Okay. Do you agree that Advisory Opinion 9, AO 9 as we've agreed to refer to it, and guide note 6 tell a real estate appraiser how to evaluate, appraise, environmentally contaminated properties?

A. I recall something different.

Q. Okay.

A. I recall me telling you that guide note 6 is not the same thing as advisory note 1.

Q. Not the same thing but it touches on the investigation of environmental contamination, is that correct?

A. If we were using words that were loose in that context or accurate in that context I would be okay saying yes, but you were grouping them together in an attempt to make them similar and I was pointing out that they're not, at all.

Q. Do you agree that a damages assessment in the context of environmentally contaminated real estate involved an assessment of three different aspects, cost effect, use effect,

Page 205

risk effect?

A. Those -- yes, those are three components of analysis.

Q. Okay. And so conceptually, conceptually you understand that Bell's report, I believe it's 71 pages in the main section, that Bell's report assesses all three of those components, cost, use and risk, correct?

A. My review of the Bell report is contained in this 365 pages.

Q. Not what I asked.

A. I'm not finished.

Q. Not what I asked. I just want to know, it's a simple question, did Dr. Bell assess, then we can get down to the weeds as necessary --

A. He addresses those three things. Yes.

Q. Thank you. That was my question.

A. I would prefer to use my words, however.

MR. SCHWETTMAN: I think you were in the process of answering.

A. I was in the process of doing that.

Q. (BY MR. JOHNSON) That was my question.

Page 206

A.    You're layering on other adjectives to a very simple thing.

Q.    That's not my --

MR. SCHWETTMAN:  He's trying to answer.

A.    His report includes cost, risk and --

Q.    (BY MR. JOHNSON) Thank you.  That was the only question.  And conceptually and fundamentally that's appropriate in such a damages assessment such as the Bell report, correct?

MR. SCHWETTMAN:  Object to the form.

A.    A proper application of Advisory Opinion 9 is consistent with the accepted methodology.

Q.    (BY MR. JOHNSON) Okay.  And you might have, or you do have, significant differences with the results that Bell arrived at in his report, my question is more fundamental than that.  You do not criticize Dr. Bell, do you, assessing three different components, cost effect, use effect and risk effect in his report, do you?

A.    If you would add the word properly to that we would get somewhere.

Q.    Okay.

A.    Because he undertakes them and has

Page 207

components that purport to address them but they are not properly employed.

Q.    Okay.  So he misapplied, misapplied the analysis, correct?

A.    Thank you.

Q.    Okay.  But more fundamentally, and I just want to get this basic understanding, we can get into your criticisms, but fundamentally you do not criticize Bell assessing the three necessary components of a real estate damages analysis, cost effect, use effect, risk effect, do you, sir?

MR. SCHWETTMAN:  Object to the form.

A.    I believe I testified earlier that he includes the cost, use and risk and cost, use and risk are a component of Advisory Opinion 9.  That's what I'm prepared to give you.

Q.    (BY MR. JOHNSON) By the way, are you aware that at the time that Dr. Tachovsky submitted the two studies that you were critical of in your report that Thomas Hamilton was on the editorial board of the Appraisal Journal?

A.    I didn't know that.

Q.    As a member of the --

A.    Tom's been very active in the Appraisal Institute, he's a USPAP instructor, he

Page 208

teaches various courses for the Appraisal Institute and authors articles.  I knew in the past he had been on those types of boards, specifically with any dates I didn't have any awareness of particular dates.

MR. JOHNSON:  Move to strike as not responsive.

Q.    (BY MR. JOHNSON) But my question by way of followup is simply as an editor on the editorial board of a major journal, the Appraisal Journal, would he have somewhat of a say so as to which studies or articles ultimately get published?

MR. SCHWETTMAN:  Object to the form.  Lack of foundation.

A.    No idea.

Q.    (BY MR. JOHNSON) Have you been an editor on any journal board for publications of peer reviewed literature, sir?

A.    I want to say I have but I don't actually recall, so.  I do, I believe I have been.

Q.    Do you know which publication or publications, sir?

A.    I will guess, I believe it was for real estate issues for the counselors of real estate.

Page 209

Q.    I'm scared to ask this question.  What, let's go with cost effect, what is cost effect to you as the JLL expert in this case?  What is cost effect under A0 9?

A.    So it's really kind of a silly for me to just give my version of something that is like one sentence.  In the interest of time, sir, we could just look at AO 9.  Cost is the cost to cure.

Q.    The cost to clean up or remediate, is that fair?

A.    Sure.  Yeah.  And the normal incidental cost associated with cleaning up a contaminated property, fair?

A.    I would refer to the language in Advisory Opinion 9.

Q.    Okay.  But in essence using lay person's terms it's of the cost to clean up.  Is that fair, sir?

A.    Yes.

Q.    Thank you.

A.    Can be.  If we're using layman's terms and the intent is brevity, why is it such an issue that we're saying they're brief?

A.    I don't understand.

Q.    Let's move on.

53 (Pages 206 - 209)

Page 210

In the terms of cost effect would you agree with me Mr. Brigden that you would defer to other experts in the case such as environmental engineers that are qualified to opine on what the costs of environmental cleanup of PCBs on the East St. Louis parcels might be?

A. I generally agree with that, however, we're talking about appraisers and if we're talking about another appraiser relying on an environmental engineer's work product I would tell you that guide note 4 requires that appraiser to go through certain steps before relying on that.

Q. Would you defer to other Monsanto lawyer-retained environmental scientists that are qualified to comment on the costs associated with cleanup and remediation as opposed to you giving such opinions, sir?

A. You gave me two choices but that's not the answer. The proper answer in your hypothetical, or in your direct example is that guide note 4 requires the appraiser to make an estimate or determination of the reasonableness of the accuracy of such reports before blindly, or before relying on them and does not permit that appraiser to blindly accept them so no, I would

Page 211

never blindly accept another Monsanto expert work product within my opinions without doing the required due diligence.

Q. Isn't it true, you tell me if it's not, that guide note 4 refers to the appraiser relying on other appraisers, not on experts in other fields?

A. That question is incorrect.

Q. That's an incorrect statement.

A. Yes.

Q. Okay.

A. It is not limited to other appraisers. Guide note 4, I believe it's entitled relying on reports prepared by others. Your question wrongly limits it to appraisals. In reality all manner of disciplines are addressed, including engineers.

Q. Okay. So try to get past cost effect and move on to use and risk. Can we agree that your criticism of Bell's report and his conclusions is that he inappropriately relied on the report and opinions of Kevin Coglin of Environmental Health and Engineering, Inc. because according to your report Coglin's report was not reliable, sir?

A. I'm going to defer to my actual

Page 212

testimony in my report.

Q. Sure.

A. I can speak to it generally by saying Bell blindly accepted the result of the Coglin report and did not verify any of the accuracy on their own and that actually is required of them.

Q. Let me just ask. But that's another way of saying is it not Mr. Brigden, and maybe we can form an agreement here, that your major criticisms on the cost effect aspect of this case is that you do not believe Dr. Randy Bell should have relied as you put it I think blindly on Kevin Coglin's report and opinions on the costs of remediation.

Would that be fair, sir?

A. That would be close, sure. Yes.

Q. All right. And you criticize him because you do not believe that Coglin's report is reliable, is that fair, sir?

MR. SCHWETTMAN: Object to the form.

A. I don't know that I make the determination that the Coglin report which is an engineering report is unreliable. I am saying that what Bell did with that report was inappropriate and not consistent with guide note 4.

Page 213

Q. (BY MR. JOHNSON) How so, sir?

A. I said it before, I'll say it again. Guide note 4 requires the appraiser before blindly accepting the work product much of others to have a foundation for belief and to make steps toward verifying its completeness or accuracy.

Q. How would you assist an appraiser determine and qualify the worsening of other experts such as environmental experts?

A. That's a great question.

Q. Thank you. I got one.

A. You got 273 properties.

MR. HOBBS: There were two, there was a good one earlier.

A. 273 properties, somebody hands me a report that says every one of these has to be dug up and it's X amount of dollars. Also, I'm looking at the same report and that those, the level, the measured levels of total PCB amounts are all over the place, including some that are below certain standards and even though I'm not an environmental engineer and I'm not offering opinions on that matter if, I'm going to accept the results of that report I might question a whole cloth approach when it is not demonstrated in that report that all of

54 (Pages 210 - 213)

Page 214

the properties need to be remediated. I would consult another source. I would ask somebody else.

Q. But you'd agree it's way, way outside your lane, your expertise as a real estate appraiser to make a comment on EPA or Illinois EPA threshold or regional screening levels with respect to PCB contamination, correct?

MR. SCHWETTMAN: Object to the form. Calls for a legal conclusion.

A. No. I don't agree with you there.

Q. (BY MR. JOHNSON) You're either an expert or you're not in that field.

MR. SCHWETTMAN: Argumentative.

A. We touched on this earlier, sir, and I was laying the ground work for two things can be true. I can both not be an expert in the field and need to integrate components of that field within my conclusions and I can't just turn a blind eye. I need to professionally comply with direction given to me by the appraisal industry, in this case guide note 4.

Q. (BY MR. JOHNSON) So we're not going to arrive at any sort of agreement today, I don't think, that you're going to agree to defer to other experts, environmental scientific experts, that are

Page 215

degreed and qualified and competent in that area, you're going to state the answers you just gave that, about regional screening levels and about you mentioned 0.23 parts per million earlier today, you're not willing to defer to those experts retained by Monsanto, correct?

MR. SCHWETTMAN: Mr. Brigden's testimony speaks for I was.

A. Not what I said. In fact on three different occasions I have walked you down this path of carefully delineated what you are trying to get me to say and what I am actually saying, and that is if I were to directly rely on something that another expert is offering, guide note 4 is informative as to the steps that a professional appraiser must take.

Q. Okay. We're not going to arrive, I want to move back on. And that is, and that is did you know that after your partner Thomas Hamilton testified in 2021 that he was still in the learning curve about assessing environmentally contaminated properties we know that he participated, and trust my math or it's approximate, 304 hours on this report so for, $160,000 or approximate so far, and we're six months from trial. My question is did

Page 216

you know that nine or 10 days after the submission of the JLL report in this matter on July 9th, 2024 Thomas Hamilton in the state of Georgia attended a seminar called Complex Valuation to maintain his licensure or certification there? Were you aware of that?

MR. SCHWETTMAN: Irrelevant.

A. I'm aware of half of that, the other half of what you said was incorrect.

Q. (BY MR. JOHNSON) What was incorrect?

A. That he attended it to maintain his licensure or something like that.

Q. What was the purpose for his attending?

A. I told him to go to it.

Q. Do you know who put on the seminar called Complex Valuation?

A. One or two of the authors of the Bell report.

Q. Dr. Randall Bell and Dr. Tachovsky, did you know that?

A. Of course. That's why I told him to go to it.

Q. Do you agree that, and we haven't talked about use effect but I just want to get

Page 217

something out right now, and that is do you agree that the generally recognized use effect equation or formula so to speak is market rate rental times time period equals use effect damages, generally?

A. It is an approach that I have used and absolutely has a role in this area. Yeah.

Q. Okay. Generally speaking, painting now with a broad brush, we did establish a while back that while risk effect is prospective after a contaminating event or situation and we determine, the appraisers determine how the market reacts, use effect on the one hand can go back in time, is that correct?

MR. SCHWETTMAN: Object to the form. That is vague.

A. Yes. Yeah.

Q. (BY MR. JOHNSON) And it can go back in time throughout the entire time period of the particular property's contamination, is that correct, sir?

A. There was a lot in what you just said there. It can go back into time, a careful evaluation of what the appropriate time period would be is an important consideration.

Q. Sure it is. Okay.

55 (Pages 214 - 217)

Page 218

MR. JOHNSON: If we could put on the screen Exhibit 57. And we'll get the copies for Counsel here.

(A DISCUSSION WAS HELD OFF THE RECORD)

MR. JOHNSON: If we could turn to pdf 21 Ross I'd appreciate it.

Q. (BY MR. JOHNSON) Pdf 21 is titled -- can you see on the screen, sir? Page 21 of Complex Valuation which your partner Tom Hamilton attended nine days after this initial report Exhibit 6 was turned in on July 9th, 2024, did you know that this is a curriculum which is approved nationwide by various state licensing boards as curricula?

A. I'm not here to ascribe any ranking of this course, I'm not aware of it.

Q. Are you aware that it's taught by Drs. Bell and Tachovsky literally nationwide in various states for purposes among others to helping appraisers recertify, keep their licensures in particular states, so on and so forth?

Q. They teach a class and go around the U.S., I'm aware of that.

MR. JOHNSON: Can we turn to the next page Ross, page pdf 22?

Q. (BY MR. JOHNSON) And the curriculum

Page 219

there, the slide there again taught by Bell and Tachovsky, concerns various topics, construction delays, environmental cleanup, delayed sale or lease, legal title disputes, area wide calamities, evacuations, trespass and impacted property rights.

Just generally broad brush question right now Mr. Brigden, do you have any problem with the Use Effects curriculum being taught in those various bullet pointed subject matters or areas?

A. I might. I would be discussing AO 9, not making up another list. So I have not taken this class, first time I'm seeing this.

Q. Okay.

A. I would need some time to think through this. But I'm not here to endorse the appropriateness of its content.

Q. Okay.

MR. JOHNSON: Could we turn to pdf 28 Ross please?

Q. (BY MR. JOHNSON) And on page 28 we see displayed the formula that I believe that you agreed with moments ago, that loss of use equals a market rental rate times time equals a loss of use. Is that correct?

MR. SCHWETTMAN: Misstates his

Page 220

testimony.

A. Yeah. The calculation can involve components similar to the words here and is different from the words that you asked me slightly.

Q. (BY MR. JOHNSON) Okay. Market rate rental times time equals loss of use, right?

A. Generally, that's, yeah. We're good.

Q. Let's just stop real quickly. Market rate rentals as I understand are used thousands of times every day world wide by appraisers like yourself to assess construction easements, damages, eminent domain, correct?

A. Wow, that is a heavy paint brush.

Q. Starting off generally speaking, right?

A. Okay. The application of rental as a proxy for a loss of use can be used and is used and is required to be using the appropriate rental rate from the local market and yeah, there's nothing wrong with its proper application.

Q. Right. And so as I understand it market rental rates are used as a proxy every day in the appraisal industry by persons just like yourself in the appraisal industry, correct?

Page 221

MR. SCHWETTMAN: Asked and answered.

A. No, I wouldn't characterize it in such fantastical loud terms. I would say it can be an appropriate technique if properly applied.

Q. Okay. And in this case, try to cut to the chase here, are you saying that the formula on the screen right now is not incorrect but rather the way Dr. Bell applied the formula is incorrect?

A. I'd have to look at my report to say that that's consistent, but that generally sounds correct.

Q. Okay. Under the maxim actions speak louder than words, I'm asking for your comment that if state licensing boards for real estate appraisers allow the presentation of this complex valuation seminar or course, they wouldn't do so, would they, if they didn't find the content that we looked at to be valid and appropriate within the industry?

MR. SCHWETTMAN: Object to form. Lack of foundation.

A. Sounds like you're trying to borrow some legitimacy that is perhaps more akin to peer review of articles.

Q. (BY MR. JOHNSON) I'm just asking a

56 (Pages 218 - 221)

Page 222

question.

A.    And getting me to place that blessing on to here. I don't have any opinion on that nor do I give any kudos to the fact that it is, the course has been held.

Q.    I guess the better question would be under actions speak louder than words, you told Hamilton to go attend this seminar, Complex Valuation, put on by Bell and Tachovsky, correct?

A.    Yes, I was curious what it was all about.

Q.    Yeah.

Have you calculated loss of use damages using the equation shown on the screen right now in your own appraisal report?

A.    I have applied the concept of rent and time, however, I have not seen any use of conventional vacation rental or movie rental.

Q.    Okay. You recall I think before the lunch break, or whatever it was, we played the clip of Thomas Hamilton and I'm still on the learning curve, you recall that, right? The instance where they were asking if he was offering himself as an expert in that matter?

Q.    I'm just asking do you recall that

Page 223

clip being played.

A.    I recall the clip, yes.

Q.    And the comment was made several times by you, that was back in 2021 and all that, and my question is isn't it true that Hamilton is not only still in the learning curve of how to appraise real property, but are you aware that he testified recently under oath that he has never appraised environmental contamination or impaired properties and has never calculated the use effect damages on a contaminated property?

A.    Can you repeat that?

Q.    Yeah.

Are you aware that Hamilton has recently testified under oath that he has never appraised environmental contamination or impaired properties and has never calculated a use effect damages on a contaminated property?

MR. SCHWETTMAN:    Object to the form. I think Mr. Hamilton's testimony would speak for itself.

A.    I have never seen that clip and I am not aware of its content, but I've got no reason to disagree with what.

MR. JOHNSON:    Ross could we display

Page 224

Exhibit 46?

Q.    (BY MR. JOHNSON) And this is the deposition of Thomas Hamilton taken on Tuesday, November 5th, in the Park v Southern California Edison Company case.

MR. SCHWETTMAN:    Thank you.

MR. JOHNSON:    And Ross if we could start please on page 57, line 3.

Q.    (BY MR. JOHNSON) Question. Have you ever performed an appraisal of an individual residential property? Answer. In a typical sense, no.

MR. JOHNSON:    Can we move on Ross to page 146 beginning at line 4?

Q.    (BY MR. JOHNSON) Question. And in any of these cases were you asked to perform an appraisal that evaluates the financial impact of an impaired ability to use a property? Answer. I don't believe so.

MR. JOHNSON:    And moving on the same page Ross.

Q.    (BY MR. JOHNSON) Next line. In any of these cases were you tasked with appraising an environmental contaminated property? Answer. No.

MR. JOHNSON:    Back to page 13 Ross,

Page 225

beginning at page, or line 22 please.

Q.    (BY MR. JOHNSON) Question. Have you ever appraised a property in a condemnation context Dr. Hamilton? No, I have not.

MR. JOHNSON:    And then next page 14 Ross beginning at line 4.

Q.    (BY MR. JOHNSON) Have you ever appraised a property in a trespass context? Answer. No.

MR. JOHNSON:    Next page 163 Ross, beginning at line 21.

Q.    (BY MR. JOHNSON) Did any of those cases involve you performing an appraisal where you calculated damages to a property? No, I don't believe so.

MS. KELLY:    I think we're on the wrong page.

Q.    (BY MR. JOHNSON) 163, line 21. I'm sorry. Question. Did any of those cases involve you performing an appraisal where you calculated damages to a property? Answer. No, I don't believe so.

And then finally, same page, line 25, going on to 164. Question. In any of these cases were you tasked with evaluating the temporary loss

57 (Pages 222 - 225)

Page 226

of use of a property?  Answer.  No.

And my quick question by way of followup to you Mr. Brigden is three years after I'm on the learning curve acknowledgement Thomas Hamilton answered under oath in November of 2023 that he has no experience, none as per these answers, in any of the issues involved in Bell's report in this case, namely what are the real estate economic damages, if any, to the East St. Louis PCB contaminated parcels.  Correct?

MR. SCHWETTMAN:  Object to the form. This is irrelevant and that just misstated Dr. Hamilton's testimony.

Go ahead.

A.    The part that's really difficult here is that a lot of these questions appear to be a subset of a line of questions and so when they are flowing and we're looking at the end of it and then it says this one involves calculated damages to property in this list, things like that, and he says no, and then you're representing it to be this global thing that is where I draw a distinction.  I do not dispute his testimony on these pages.

Q.    Okay.  Fair enough.  You do not dispute his under oath testimony that we just

Page 227

displayed.  Fair enough.

Q.    Okay.  Let's turn to Exhibit 28, the Bell report and pdf 1 through 14 which is his executive summary.

A.    All right

CONCIERGE:  I'm sorry, which page?

MR. JOHNSON:  I'm sorry, it's, we're going to be looking at pdf 1 through 14.

CONCIERGE:  This is pdf 1.

MR. JOHNSON:  Yes.  Let's go to pdf 2 then.

Q.    (BY MR. JOHNSON)  I know you can't vouch Mr. Brigden for all the pages being displayed, but it appears to be a copy so far of the Bell report, Exhibit 28.  Fair enough?

A.    Fair enough.

Q.    The page that we are now displaying includes the diagram we looked at earlier, a schematic of where the, I know you took offense with East St. Louis parcels because of the ownership issues, but it purports to depict where the parcels in question were tested, is that fair?

A.    I believe the distinction I drew was that it says nothing about testing.

Q.    Okay.  Do you understand that that is

Page 228

approximately where the testing took place based on your comprehensive 370 page report in this case?

MR. SCHWETTMAN:  Object to the form. It's vague.

Q.    (BY MR. JOHNSON)  How about that?

A.    Those appear to be the 273 subject properties.

Q.    Thank you.  All right.  We're getting somewhere.

MR. JOHNSON:  Let's actually put up, actually let's go to pdf 3 and 4.

Q.    (BY MR. JOHNSON)  And what I just want to establish is this:  You had a big section in your report we went through about the background of Sauget, Illinois, the Krummrich plant, Cahokia, East St. Louis the Super Fund proceedings and PCBs, and what I'm saying to you now is at pdfs 3 and 4 does Bell purport to give his summary as it's titled on polychlorinated biphenyls?

A.    You characterized a prior discussion of a summary that I participated in and coauthored on the Sauget industrial corridor.

Q.    Okay.

A.    And discussed other plants and environmental activities.

Page 229

Q.    Right.

A.    And you're asking me to equate that to this?

Q.    No.  That's not what I'm asking you. I'm asking you do you have any disagreements with the recap and summary that Bell did or does here on 3 and 4 on polychlorinated biphenyls given that I did not see any criticisms raised in your JLL report about these pages?

MR. SCHWETTMAN:  Object to the form and take a minute if you need it to look at it.

Q.    (BY MR. JOHNSON)  Yeah.  Take your time.

A.    (Reviewing document).

Okay.  I've read the several paragraphs.

Q.    So again, I did not see or notice any sort of critique or hammering of the Bell report for these, for this summary of his recap of polychlorinated biphenyls and I'm just asking if that's actually the case.  You don't have any criticism, do you, of his summary of the background of polychlorinated biphenyls on pages 3 and 4 of his report?

A.    It's a very limited background and

58 (Pages 226 - 229)

Page 230

much of it is citations from very technical writing involving freight and transport or pathways or health, health, health-based risk assessment, things like that which is, it involves our appraisal practice but it's not appraisal practice. So he summarizes other fields and that's what I would say about that.

Q.   Wasn't my question.  My only question is very general.  Do you have any criticisms substantively of the facts he purports to set forth on pdfs 3 and 4 concerning PCBs?

MR. SCHWETTMAN:  Asked and answered.

A.   I have no way to determine that these are facts.  I'm not a scientist.  I accept that these pages are in his report.

Q.   (BY MR. JOHNSON) Okay.  Not accusing Bell of misquoting or misciting anything, you're just saying you can't comment on whether they're facts or not.

A.   That's fair.

Q.   Okay.

MR. JOHNSON:  Let's go to pdf 9 Ross if we could --

A.   Actually I did just notice one thing that I'm aware of.

Page 231

Q.   (BY MR. JOHNSON)  Missed it by that much.

A.   At the top of page 3.

Q.   Top of page 3.  What's the criticism?

A.   PCBs are in a close family of chemicals that are related to dioxins, I think the distinction is actually a bit more nuanced than that, so the little bit that I do know about PCBs and dioxins caused me to identify that sentence as being a little iffy.

Q.   Okay.  All right pdf 8 through 14. Are you there?

A.   Yes.

Q.   Okay.  First question, those pages purport to give an overview of Bell's, it's like an executive summary of Bell's methodology for Bell's damages calculations in the case.  If you want to page through it that's fine.

A.   That's okay.

Q.   Beginning at the bottom of page 8 and following Bell purports to describe a possibly applicable Illinois jury instruction in this case, is that correct?

MR. SCHWETTMAN:  Object to the form, it calls for a legal conclusion and I think Dr.

Page 232

Bell's report speaks for itself.

A.   This issue was I believed kicked out by the court so it wasn't addressed in our report.

Q.   (BY MR. JOHNSON) I'm not talking about finding or --

A.   I'm sorry, I thought this page begins ordinance fines.

Q.   I'm not talking about the ordinance fines, correct at this point, the court has dismissed those particular ordinance violations, I'm talking about the jury instruction.

A.   Thank you.

Q.   I believe it's referred to as 30.17. And my question is you've already said that in an 8 or 9 complying assessment, that AO 9 tells us that one appraiser should assess cost effect, use effect and risk effect, fair?

A.   All of those effects can be appropriate.

Q.   Okay.  And my question about the jury instruction is he comments that the instruction fits in with his analysis because he does in fact go into cost effect, use effect and risk effect, correct?

A.   Okay.  I'll take your word for it.

Page 233

MR. SCHWETTMAN:  Object to form.

A.   I don't have an opinion on that. It's a legal issue.

Q.   (BY MR. JOHNSON) Okay.  In other words fundamentally you do not have any disagreement with Bell using those three components because they are in compliance with appraisal industry protocols, that is cost effect, use effect, risk effect, correct?

MR. SCHWETTMAN:  Object to the form.

A.   We've covered this a lot and I'm more comfortable with more precise language that says when properly applied those three components are part of the accepted methodology.

Q.   (BY MR. JOHNSON)  And again, conceptually though as a first fundamental matter you're not criticizing the City or its damages expert for including those components, you just believe that Dr. Bell at the end of the day misapplied his calculations on those components, correct?

MR. SCHWETTMAN:  Asked and answered.

A.   From a high level, yes, but -- just leave it there.

Q.   (BY MR. JOHNSON)  Page 9 of this Bell

59 (Pages 230 - 233)

Page 234

report. Environmental contamination issues are considered Class VIII detrimental conditions. Such condition may impact the market value of a property. When there may be an impairment to market value impairments are analyzed by considering cost, use and risk effects. The traditional approaches to value involve the cost approach, income approach and sales comparison approach. While all those approaches were considered, a real estate damage assessment involves an analysis of cost, use and risk effects. USPAP and the Appraisal Institute set forth that cost, use and risk effects are considered to determine any impacts to market value from a detrimental condition.

Do you have any fundamental disagreements with statements made in what I just read for the record Mr. Brigden?

A.   You were reading from the Bell Damages book.

Q.   I was reading from  -- well, I'm not sure.  I'm reading right now from pdf 9.

A.   Right.  Class VIII detrimental conditions are consistent with the Damages book.

Q.   Okay.

Page 235

A.   So all I would add is that the, this is discussing techniques that are put forth in Advisory Opinion 9.  I would limit the discussion to Advisory Opinion 9 in its entirety instead of bouncing in and out of treatises.

Q.   Not my question.  My question is specifically, well first of all, was I was reading from the Bell report, correct?

A.   You were reading from the Bell report.

Q.   Yes.  And my only question is do you have any fundamental disagreements with that portion of pdf 9 of the Bell report I just read, and if so, what are those disagreements or problems with what I just quoted?

A.   I might disagree with some of the wordsmith word choices and descriptors, but cost use and risk effects as we have covered maybe a dozen times are components of the accepted methodology.

Q.   Okay.  The first formula or calculation below that paragraph I read.

MR. JOHNSON:  And Ross, it starts with impaired --

CONCIERGE:  Yeah.

Page 236

Q.   (BY MR. JOHNSON)  Impaired value equals, unimpaired values minus cost effects, remediation and related costs, minus use effects, effects on site usability, minus risk effects, environmental risks or stigma.  Do you as the JLL testifying Rule 26 expert in this case have any problem with that equation I just read, sir?

A.   I'm not going to bless the equation that's included in the Bell report, I would refer to actually the source which would be advisor opinion 9.

Q.   Okay.

A.   In it includes definitions for unimpaired value, for impaired review and damages and within AO 9, sir, it says the damages are a calculus of unimpaired minus impaired equals damages.  So if that's what his report says then so be it, but I am going to defer to advisor opinion 9 instead of giving an endorsement of this page of the Bell report.

Q.   So my question was, back to the question was do you have any specific criticism and your criticism is it's not straight out of AO 9.  Is that what you just told me?

A.   Kind of.  It's a recapitulation of

Page 237

it, it's moving things around.

Q.   Unsentimentally though putting AO 9 aside, is there anything wrong with that first formula of impaired value equals unimpaired value minus cost, risk and use effects?

MR. SCHWETTMAN:  Asked and answered.

A.   I would say the inputs have to be appropriate and relevant, the cost, and so the costs included and the use effect amounts included need to be relevant and supported, and market supported.

Q.   (BY MR. JOHNSON)  Fair enough.

A.   And in that context, yeah.  I was talking conceptually, we're going to get into the weeds of your specific hammering of his report about the numbers, but conceptually that equation's okay.  Fair enough?

A.   I can live with that.

Q.   What about the next equation which states, property value diminution equals cost effects, the remediation of alleged costs, plus use effects, effects in site usability plus risk effects, environmental risk stigma.

Do you have, fundamentally is that equation agreeable to you, sir, and if not what are

60 (Pages 234 - 237)

Page 238

your specific criticisms?

A. It is disagreeable.

Q. It's what?

A. Disagreeable.

Q. You disagree, okay.

A. Yes.

Q. In what specific ways do you agree with that formula?

A. It is inconsistent with AO 9, in that Advisory Opinion 9 lays out a different calculus. We're a bit in the weeds here but what I'm trying to say is I would defer to Advisory Opinion 9. Frankly it's taking an equation and moving things around and I would just rather live with the way that it lives in Advisory Opinion 9. It's a sum of the parts issue.

Q. Okay. Let's put up if we could --

MR. SCHWETTMAN: Should we take a quick break?

MR. JOHNSON: Yes.

VIDEOGRAPHER: Off the record at 3:42.

(A RECESS WAS TAKEN BY THE PARTIES)

VIDEOGRAPHER: We're back on the record. This is media unit number five. The time

Page 239

is 3:53.

Thank you.

Q. (BY MR. JOHNSON) Mr. Brigden, I want to finish up the third of the three equations that are set forth at pdf 9 of Bell's report, and that equation is, there we go, impaired value equals unimpaired value minus 30 percent property value diminution.

First of all, I read that correctly?

MR. SCHWETTMAN: I think we're on the next page.

Q. (BY MR. JOHNSON) Next page, I'm sorry. The third equation. Next page. There we go. At the top. Impaired value equals unimpaired value minus 30 percent property value diminution.

Now did I read that correctly?

A. Yes.

Q. Do you have any disagreements with that equation as being appropriate in a real estate damages analysis?

A. Generally. Yes.

Q. Okay. And what are those criticisms or disagreements, or both?

A. I would follow the guidance of advisor opinion 9.

Page 240

Q. Okay. Is the impaired value equals unimpaired value minus property value diminution incorrect or is it just fundamentally agreeable to you because it doesn't follow strictly AO 9's statements?

A. The, my understanding of the accepted methodology is unimpaired, is you determine the unimpaired value. That is the beginning point.

Q. Okay.

A. Okay? You then subtract impaired value.

Q. Right.

A. Your delta is the diminution.

Q. And the delta can be or sometimes is cost effect, use effect plus risk effect minus the unimpaired value, correct?

A. The other way around and you're there.

Q. Okay. What did I say?

A. You said the trail part first.

Q. All right. What I want to do now is to have you look at the citations used by Bell on pages 9 and 10 of his report.

A. Okay.

Q. And trying to save time here, Bell

Page 241

cites advisory opinion number 9, correct?

A. If you say so. I see it here.

Q. Yeah.

A. Yeah.

Q. That's what I'm asking you to look at, his citations. He sites USPAP 89, the Advisory Opinion 9.

No problem with that citation, correct?

A. No problem with the source.

Q. Correct. That's my first point. Your difference with Bell as I understand it is his application of AO 9, correct?

A. That's fair.

Q. Okay. The next citation is the Appraisal Institute, the appraisal of real estate, same question. Do you have any problems with Bell citing that source?

A. I have no problem with the source.

Q. But rather the application, correct?

A. Well you use the term do I have problems with the citation and I'm just saying I have no problems with the source.

Q. Okay. There's no problem with Bell trying to be in conformance with the appraisal

61 (Pages 238 - 241)

Page 242

industry guidelines and protocols in citing that source, whether he misapplied it you have a fundamental disagreement, fair enough?

A.    You said a lot there but that's fair.

Q.    Okay.  Third, he cites Dr. Tachovsky, Environmental Dead Zones, The Evaluation of Contaminated Properties, correct?

A.    I don't see that.

Q.    You don't see that as being stated?

A.    Page 9?

Q.    Footnote 14.

A.    Footnote 14 is USPAP but then it's like nine rows long.

MR. SCHWETTMAN:  Three lines from the bottom.

A.    Right.  But we're talking about 14 and we're stacking what appear to be seven or eight sources into one footnote.

Q.    (BY MR. JOHNSON) He cites it on that page and I'm just asking you fundamentally do you have a problem with an appraiser, Dr. Bell, using that source in support of his damages report in this case?

MR. SCHWETTMAN:  Object to the form. That's overbroad.

Page 243

A.    I believe my opinions concerning the article by Dr. Tachovsky were enumerated within the bounds of this report.

Q.    Right.  But -- okay.  I got you.  I get what you're saying.

MR. JOHNSON:  Let's display, speaking of Dr. Tachovsky, let's display Exhibit 48, Stigma: A Case Study Analysis of Long-Term Environmental Risk Effect.

MR. JOHNSON:  Do you guys have that one?

THE WITNESS:  We might.

MR. SCHWETTMAN:  I'm looking for it. I don't see it.

Q.    (BY MR. JOHNSON) Can you see that in front of you?

A.    I can see its presence, I can't read it.

MR. SCHWETTMAN:  Do you want to look on here?

MR. HOBBS:  Don't get Paul started.

MR. JOHNSON:  Retinas.

THE WITNESS:  Me too, macular degeneration.

Q.    (BY MR. JOHNSON) And so can you see

Page 244

the front page and be able to read some of the quotations I'm going to be asking you about, sir?

A.    I mean I read this a while ago and I contained my conclusions in my report.

Q.    Okay.

A.    If we're going to do it again let's go for it.

Q.    Yeah.  So this study by its terms and title mainly deals with the so-called risk effect or stigmatic effect for real estate damages.  Fair enough?

A.    I'll take your word for it.  I just don't remember.

Q.    Okay.  Page pdf 2 of the study, if you could go to that lower right corner.

MR. SCHWETTMAN:  Do you need a minute to look through this?

Q.    (BY MR. JOHNSON) Yeah.  Do you want to look through it for a second?

A.    I mean it's a 15 page article and the first thing I see is something I said I'll take your word for it, now we're looking at use effects here, so.

Q.    Yeah.  He's discussing -- just go through it.  The lower right corner pdf 2 out of

Page 245

14.

A.    So we need to correct then what we just talked about is you will agree with me this is largely about risk effects.

Q.    Fair enough.  It is in large part but we'll get into that.  You're correct.

MR. SCHWETTMAN:  I'll object that this speaks for itself.

Q.    (BY MR. JOHNSON) Temporary and ongoing use effects, the lower right-hand corner of pdf 2 of Exhibit 48.  Three considerations have been identified as potentially impacting value of contaminated real estate:  cost, use and effect and risk.  We've already established that.

A.    Yes.

Q.    Similar to developing an unimpaired opinion of market value where the sales income and cost approaches are considered, the consideration of cost, use and risk effects may be applicable to any assignment involving properties that are or may be impacted by a detrimental condition, and now we're going on to pdf 3, or page 111 of the report.

So far so good Mr. Brigden as far as the statements that I read into the record?

MR. SCHWETTMAN:  You mean you read

62 (Pages 242 - 245)

Page 246

them correctly?

Q. (BY MR. JOHNSON) Did I read them correctly first of all?

A. I'm only prepared to agree that you've read them correctly.

Q. Do you have a disagreement with the last statement, a consideration of the cost, use and risk effects may be applicable to any assignment involving properties that are or may be impacted by a detrimental condition?

A. I'm going to give you a global comment to anything you're going to read from this article. There is a lot of words in here that are either indirectly leveraging or rephrasing very well-established principles in Advisory Opinion 9, and anything that this article attempts to offer that is in any way expanded upon Advisory Opinion 9, different from, I have an issue with.

Q. Okay. I understand your point but my question is specifically what is your disagreement with the consideration of cost, use and risk effects may be applicable to any assignment involving properties that are or may be impacted by a detrimental condition. I understand your global complaint a moment ago that unless it's verbatim,

Page 247

text under AO 9 is a problem, but what specifically do you have with a problem or disagreement with the sentence that I just read?

A. Where is that sentence?

Q. Right here, sir.

A. We need to agree on which document I'm looking at. So I can read this and I'd be happy to read this. I don't want to be doing this.

MR. SCHWETTMAN: Okay.

A. So can I have the Ross's presentation?

MR. SCHWETTMAN: This is the same thing.

MR. JOHNSON: Yes.

MR. SCHWETTMAN: Up to the highlighted portion.

A. That's different from what you just read.

Q. (BY MR. JOHNSON) Here. Starting with, here. Starting with the consideration of cost, use and risk effect, starting four lines from the bottom --

A. Totally disagree with that. 100 percent.

Q. Back to the question. Under the

Page 248

global criticisms you have or criticism that it's not verbatim of AO 9, do you have any specific disagreements with that sentence and if so what are they, or is that it?

A. I disagree with that sentence.

Q. Yes, sir, I understand what you just said but I want to know what is it about that sentence you disagree with other than your global comment that it's not verbatim out of AO 9.

A. I will be happy to explain it crystal clear.

Q. Crystal.

A. Let's go.

Q. Yes.

A. AO 9 has a very straightforward calculation as do many jurisdictions or, let's call them states or state laws concerning the calculus of damages. AO 9 it says unimpaired minus impaired equals damages. This sentence is substituting the result as being just as important as the starting point and that's what I have a problem with, and that is contrary to AO 9.

Q. Okay. Any other disagreements specifically with that sentence or have we covered them?

Page 249

A. I don't know. I need to, when I first considered this article it was in the context of the case, okay, and I offered my commentary on those two or three pages. You're now asking me to read this article and bless it or say speak now or forever hold --

Q. I'm just asking you about sentences.

A. I'm not prepared to do that.

Q. I'm asking you about individual sentences though and you clearly understand because you've been in this business for a long time, I just asked you about a specific sentence and your disagreements and you gave me your disagreements, fine.

The next statement, like risk effects, use effects may be temporary or ongoing.

Is that an accurate statement in your expert opinion Mr. Brigden?

A. It can be.

Q. Is it or not?

A. I said it can be.

Q. Okay. The next paragraph, an impairment to the conventional use and enjoyment of a property or its rights is typically reflected as a temporary use effect and the highest and best use

63 (Pages 246 - 249)

Page 250

issues typically reflect ongoing use effects.

I read that correctly first of all, yes?

A.   You were able to read it correctly.

Q.   Thank you.  Do you have any specific disagreements with that sentence, and if yes what are those disagreements Mr. Brigden?

A.   It utilizes nontraditional appraisal words.

Q.   Such as what?

A.   There is no such thing as conventional use in the appraisal lexicon.

Q.   So one of the criticisms that you have and JLL has in its report is the modifying the conventional to the word used, fair?

A.   That's one of them, sure.

Q.   And if, if the word conventional were taken out of that sentence would your disagreement, or disagreements, go away?  In other words, put another way, is your criticism of the word conventional or does it go beyond that, sir?

A.   You're carrying some water there of making it okay, yeah, but dropping that term.

Q.   Okay.  And are you aware that your partner Thomas Hamilton testified that to the same

Page 251

effect if you take the word conventional out he's got no problem with the sentence, do you understand that he testified to that in the Park case?

MR. SCHWETTMAN:  Object to the form, lack of foundation.

A.   I'll be honest with you, I'm pleased to here that.

Q.   (BY MR. JOHNSON)  So one of the criticisms in the JLL report was Dr. Bell was making up a term of art in the appraisal industry, conventional use.  Do you recall that criticism?

A.   And I agree with it.

Q.   If Dr. Bell's content and the City of East St. Louis is content to just strike that word you don't have a problem with the sentence as it remains without the word conventional.  Fair?

MR. SCHWETTMAN:  Object to the form.  Misstates his testimony.

A.   No.  I would rather say let's just stick with AO 9.  I mean if somebody wants to parrot and rephrase things and pass them off as advances in the field I would like them to be based on actual sound data and market supported evidence, not just recasting them in a different voice, in a different venue and then leveraging or attempting

Page 252

to leverage appropriateness, supportability indirectly.  Let's just go right to the source, AO 9.

Q.   When you read the sentence with the controversial word conventional removed an impairment to the use and enjoyment of a property or its rights is typically reflected as a temporary use effect.  What's wrong with that?

A.   I believe it's an unnecessary rejumbling of a simple concept very well articulated in Advisory Opinion 9.

Q.   Speaking of which the italicized quote.

MR. JOHNSON:  Can you go down Ross to the italicized quote beginning with use effects?

Q.   (BY MR. JOHNSON)  And I'll read it for the record while you read it.

Use effects reflect impacts to the utility of the site as a result of the contamination.  If the contamination and/or its cleanup rendered a portion of the site unusable or limited the future highest and best use of the property then there could be a use effect on value.

First of all, I read that correctly?

A.   I believe so.  It's really small

Page 253

font, but.

Q.   I have the same affliction.

A.   I'm going to assume you read that correctly.  It's an important concept and it's right there.

Q.   Okay.  And that is out of AO 9, Advisory Opinion 9.

A.   Thank you.

Q.   Okay.

MR. JOHNSON:  The next paragraph Ross if we could beginning with when calculating.

Q.   (BY MR. JOHNSON)  When calculating a temporary use effect questions may arise regarding what a property owner or renter does at the property during the time of impairment.  However, from a real estate valuation perspective the pertinent question is in regard to the effects on real estate and property rights.  In other words --

MR. JOHNSON:  And I'm now Ross going to go on to the next column.

Q.   (BY MR. JOHNSON)  It is not a real evaluation professional's duty to value people, it is their duty to value real estate.

Any problems with that sentence?

A.   I've never valued a person as an

64 (Pages 250 - 253)

Page 254

appraiser.

Q. And you agree that --

A. I find it a little odd that we're talking about this, especially because I'm here to answer questions in this case, not read very hard to read words from an article that I've already gone on the record saying I have issues with and I described those issues.

Q. We described the problem you had with the word convention and we just agreed we would take out the word convention, made some ground there, you may not have a problem with the sentence with the word conventional taken out of it.

A. That's not what I said.

Q. You said it would head in the right direction.

A. Right. I still do not agree with recasting Advisory Opinion 9 to suit unknown purposes or results. I just don't see it as appropriate. So I'll stick with AO 9 and reserve my right to not endorse this article.

Q. Fair enough. I mean that's why I'm asking you about it because Bell's report relies on these studies and these quotes to a significant extent and a lot of your criticisms concerned these

Page 255

quotes from these studies and that's why I'm getting into them.

What is the bundle of rights as that term of art -- well, let me ask you. Is that a term of art in the real estate appraisal industry?

A. I think it's more like an idiom in the real estate world, right?

Q. Well --

A. It's both. It is an embraced metaphor for what comprises real estate rights. Real estate.

Q. Does it a recognize the term of art in your opinion in the real estate appraisal industry?

A. Can you tell me what a recognized term of art is? I mean I have seen it before and it just, it absolutely is part of real estate and how we describe it.

Q. Okay. And among the bundle of rights or sticks in the bundle include the right to use.

A. Yes.

Q. The right to own.

A. Yep.

Q. The right to exclude others from using?

Page 256

A. Yes.

Q. The right to bequeath?

A. Yes.

Q. The right to sell in whole or part.

A. Yes.

Q. The right to lease?

A. Yep.

Q. The right to transfer by contract or otherwise?

A. Yes.

Q. And for specified periods of time, such as a lease for example, correct?

A. That is true of a lease.

Q. And the bundle of rights or the sticks in the bundle of rights also includes the right to choose not to exercise any of those rights we just enumerated. Correct?

A. I don't know. I mean this is an existential real estate valuation 101 here. I've heard of the bundle of rights, it's pretty basic. You know, it's sort of --

Q. Okay.

A. It's was beyond what I'm prepared to talk about here.

Q. As I understand your specialty in the

Page 257

field of real estate appraisal is condemnation, is that correct?

A. I certainly have experience and I have been hired in litigation assignments involving condemnation, yes.

MR. JOHNSON: And so if we could go to pdf 4 Ross on the left column beginning with moreover it is also generally recognized.

CONCIERGE: I'm sorry, which part?

MR. JOHNSON: Pdf 4, the left column beginning with moreover. It is also generally recognized. Right after footnote 22.

Q. (BY MR. JOHNSON) And I'll read it for the record and ask a question or two.

Moreover, it is generally recognized that property encompasses the entire bundle of rights inherent in the ownership of the real estate and that the taking or infringement on these rights often constitutes a taking, even if no part of the physical real estate is taken accordingly use issues may not always be visible or apparent, and he's quoting from J.D. Eaton, Valuation in Litigation.

Let me ask you Mr. Brigden, first of all I think you told me earlier I'm asking you to

65 (Pages 254 - 257)

Page 258

confirm very briefly now the J.D. Easton Valuation in Litigation text is a text that you have cited to in some of your own articles or publications previously. Is that fair?

A. That's fair.

Q. Do you agree with the quote from J.D. in Valuation Litigation that I just read about the bundle of rights?

A. You're asking me that this excerpt that I'm seeing here which is taken from the Tachovsky article.

Q. Which is taken from the Eaton Valuation.

A. Is citing number 23 is a site to Eaton, is that what you're saying?

Q. Yeah.

A. I didn't know that. Or I didn't get there.

Q. Sorry.

A. So I do not have an opinion on that. I have not dissected whether this article properly places in the proper context what Mr. Eaton has in his underlying book.

Q. Well, we know that you've already agreed that the property encompasses this entire

Page 259

body of rights that we've enumerated, fair?

MR. SCHWETTMAN: Object to form.

Q. (BY MR. JOHNSON) I'm starting at the top. It is also generally recognized that property encompasses the entire bundle of rights inherent in the ownership of the real estate.

So far so good, right?

A. Sure.

Q. Okay. And that the taking or infringement on these rights often constitutes a taking. Let me stop there.

Do you have any problem or disagreement with that statement from Mr. Eaton?

A. We're lacking the context of the taking or infringement. I don't know what we're talking about here.

Q. An infringement on the enumerated bundle of rights, whether that be the right to exclude others from using the property --

A. I understand. But it's saying the taking or infringement and it is indirectly referring to something previously discussed in Eaton, right, and so I believe that's contamination of some way and so there must be something else that he has laid out for the audience there. We're

Page 260

just picking up and he's using this later on in the story, I just don't know what Mr. Eaton is talking about here.

Q. Okay. You threw out the word perhaps he was talking about contamination.

A. Condemnation.

Q. Condemnation. Okay. Even if, and he finishes even if no part of the physical real estate is taken, accordingly use issues may not always be visible or apparent.

Do you with your background in condemnation cases that you described a moment ago agree that a contamination, an unwanted, uninvited, uncontracted for contamination of real estate can constitute by analogy a taking?

MR. SCHWETTMAN: Object to the form. That calls for a legal conclusion.

A. I thought we started with condemnation but then halfway through the question it switched to contamination.

Q. (BY MR. JOHNSON) If we assume there is contamination on the property is it analogous according to Eaton that the contamination constitutes or taking the unwanted contamination, the uninvited, the unpaid for contamination on the

Page 261

parcel can constitute by analogy a taking or infringement on the bundle of rights, for example the right to exclude others from using the property?

MR. SCHWETTMAN: Same objections and incomplete hypothetical.

A. Without reading the Eaton context, without reading the entirety of this article again to answer what you're asking me to bless, I will tell you that I have no problem with what Eaton says in that context, I likely have no problem with what Eaton says in that context, but lacking that context I'm not going to give you an answer on this use of that citation.

Q. Okay. But do you agree that an unwelcome, unwanted, uncontracted for contamination of a parcel of real estate within your industry standards and guidelines and protocol, sir, can by analogy constitute a taking of the property even if as the Eaton quote says, no part of the physical real estate is taken.

MR. SCHWETTMAN: Object to the form, calls for a legal conclusion. Incomplete hypothetical.

A. This is very distant from the scope

66 (Pages 258 - 261)

Page 262

of the assignment that I was hired to do and I think at this point that's my answer. I don't have an answer to this. It's not something I was asked to investigate and I'm not, I can't give you an answer on something that I just have not studied or am able to provide an answer.

Q. (BY MR. JOHNSON) Okay.

MR. JOHNSON: Let's go to pdf 4 Ross, lower left column, beginning with measuring temporary use effects.

Q. (BY MR. JOHNSON) I'll read it for the record.

Measuring temporary use effects generally centers upon market rates but is not centered on whether or not there has been an impact to market rental rates. Rather the issue is whether there is an impact to the conventional use and enjoyment of the property, or whether the bundle of rights has been infringed. In this context conventional relates to a customary or traditional usage or custom.

First of all, did I read that correctly?

A. No.

Q. I didn't read it correctly?

Page 263

A. You substituted the word rates for rents in the first, or in the second line.

Q. Let's do it again.

Market, measuring temporary use effects generally centers upon market rents but it is not centered upon whether there has been an impact to market rental rates. Rather, the issue is whether there's an impact to the conventional use and enjoyment of the property, or whether the bundle of rates has been infringed. In this context conventional relates to a customary traditional usage or custom.

Now did I read it correctly?

A. Yes.

Q. All right. And we'll dispatch with your disagreement with the word conventional and just take that out, take the word conventional out, and rereading it, measuring general use effects generally centers upon market rents but it is not centered upon whether there has been an impact to market rental rates. Whether the issue is whether there's an impact to the use and enjoyment of the property, or whether the bundle of right has been infringed.

Read in that manner without the use

Page 264

of the word conventional do you, sir, as the JLL damages expert have a problem with that sentence as revised?

MR. SCHWETTMAN: Object to the form.

A. In what way? Do I have a problem with its use in this case?

Q. (BY MR. JOHNSON) Sure. Sure.

A. I wasn't hired to analyze that.

Q. Okay. I'm not asking what you were hired or not to do, I'm asking as a real estate appraising expert for the defendant Monsanto in this case whether this quote minus the word conventional to address your problem with that word is an accurate statement of measuring temporary use effects in your industry, sir?

A. Not in my opinion.

Q. Okay. And specifically, why?

A. That is described in my report.

Q. Okay. So you were not hired or retained to address the matters in the quotation we are now presently discussing, is that correct, Mr. Brigden?

MR. SCHWETTMAN: Asked and answered. He said it's in his report.

A. I don't know. I told you I read this

Page 265

article nine, 10 months ago and I laid out for everyone the issues that I had with it. Okay? So here we are now months later or a year later and we're pulling up that article and instead of talking about the issues that I actually discuss about it we're pulling out sentences in isolation in that article that I may or may not address in my report, and I'm telling you that I'm not prepared to answer these questions and to agree and document language in this article.

MR. JOHNSON: Move to strike as being nonresponsive.

Q. (BY MR. JOHNSON) All I want to know is minus the word conventional do you agree with the sentence measuring temporary use effects generally centers upon market rents but is not centered upon whether there has been an impact to market rental rates, rather the issue is whether there's an impact to the use and enjoyment of the property or whether the bundle of rates has been infringed.

In the context of this case do you agree with my reading of that sentence as amended by deleting the word conventional?

MR. SCHWETTMAN: Asked and answered

67 (Pages 262 - 265)

Page 266

three times.

A. And also not reading the next sentence which addresses the word we removed when all of this leads to me asking why are we doing this when it is very well non-confusing, is very well described and enumerated in Advisory Opinion 9 in a non-confusing way. I would offer that a more reasonable way to proceed is to defer to that.

Q. So you're not going to answer my question about whether minus the word conventional you agree with the sentences that I just read for you, sir, is that correct?

MR. SCHWETTMAN: He just answered.

A. I just told you I agree with that and I am not in favor of it.

Q. (BY MR. JOHNSON) Okay. Let's go to Exhibit 6.

MR. JOHNSON: JLL report Ross. Pdf 12 and 13.

Q. (BY MR. JOHNSON) Before we get into pdf 12 and 13 in the JLL report I just have to ask. If you at length criticized the very Tachovsky study that we're just discussing, if you hammered it and criticized it in your report why are you not ready or willing to discuss Tachovsky's study?

Page 267

MR. SCHWETTMAN: Object to the form.

A. I take umbrage with your continued use of the word hammered.

Q. Well.

A. I believe it to be an unnecessary overstepping of what I just, what I consider.

Q. You accused him of making up a new term of art in the real estate appraisal industry known as conventional use and used the term in air quotes which such was not the case.

A. Could you tell me when I used air quotes?

Q. If not air quotes then italicized. You said that he made up a new unsubstantiated conventional use -- well, let's go ahead.

A. I feel like you're misrepresenting my testimony.

Q. I'm not representing anything, misrepresenting anything.

A. I disagree with you, sir.

Q. I disagree with you.

A. I think the record will speak for itself.

Q. It certainly will.

Let's go to Exhibit 6, the JLL

Page 268

report, pdf 12, beginning with ignoring the actual use. Speaking of making up terms.

Are you with me?

A. No.

Q. The JLL report, pdf 12.

A. Page 10.

Q. Which would be 10 for you, I believe. Starting with ignoring the actual use of the 273 properties. The last bullet point on page 10.

A. Okay.

Q. Ignoring the actual use, in air quotes, in actual quotes of the 273 properties while claiming that publications and standard of the appraisal profession recognize a hypothetical, you did use quotes, conventional use, right?

MR. SCHWETTMAN: Not air quotes.

MR. JOHNSON: Not air quotes.

Q. (BY MR. JOHNSON) Or normal use that can be substituted for a consideration for the actual use of properties in a use effect analysis.

Did I read that correctly, sir?

A. I hope so.

Q. Okay. So I'm not going to use the word hammering, you're critical of the Bell report for ignoring the quote unquote actual use of the

Page 269

273 tested parcels, correct? That's what it says.

A. As my report describes and I am prepared to answer questions on. The criticism is about the Bell report failing from a very fundamental appraisal perspective, sir, to consider what these properties actually are. At no point did the Bell report properly evaluate any one of the 273 properties. When I did so, in fact I did so last night in my hotel room, I picked at random one of these properties, I went up to the assessor in the public records and I found that it was nine feet wide on one end and 13 feet wide on the other, it was irregular in shape and totaled 1,400 square feet and what I'm here to tell you with my testimony is when I say that actual use, the disconnect between actual use and conventional use is that the Bell report assumes that there would be a house built on that property generating $1,400 a month in rent and having a value of $140,000. Now that is wholly improper from an appraisal perspective to make that assumption.

Q. Are you done?

A. I can be.

MR. JOHNSON: Move to strike as nonresponsive.

68 (Pages 266 - 269)

Page 270

Q.    (BY MR. JOHNSON)  All I asked was does the first sentence of the pdf bullet point that we're referring to on pdf 12, your page 10, is stating the quote unquote actual use of the 273 properties while claiming that publications and standards of the appraisal profession recognize a hypothetical conventional use, or quote unquote normal use that can be substituted for a consideration of the actual use of the properties in a use effect analysis.

First of all, did I read that correctly?

A.    Yes, you did.

Q.    Okay.  Now, what I want to know first of all, and we can, well you have AO 9, you have access to AO 9 in your report, correct?

MR. SCHWETTMAN:  Put it up on the screen too.

A.    That would be great.

MR. JOHNSON:  Let's go ahead Ross and display Exhibit 18?

A.    I'm sorry, are we talking about this bullet point because I'd like to answer your question.

Q.    (BY MR. JOHNSON)  Yes.  What I want

Page 271

to get at is the made up term actual use and what I want to know is when we display Advisory Opinion 9, or frankly any publication in the real estate appraisal industry outside of an ad valorem text context, and let me just ask you this:  Ad valorem text has nothing to do with this case, does it?

MR. SCHWETTMAN:  Object to the form to the first question.

Q.    (BY MR. JOHNSON)  Sir?

A.    So your question ended with that but this had a lot of content before it.  Is that all one question?

Q.    All I'm asking is first does ad valorem task issues have anything to do with this case?

MR. SCHWETTMAN:  Object to the form.

A.    I'm not an attorney but not to my knowledge.

Q.    (BY MR. JOHNSON)  And what I'm representing to you is when you do a control F search on every source cited in the Bell report, or your report, the term actual use does not exist, and what I would like to do now is give you the opportunity on your computer or Tyler's computer or his phone and tell me otherwise.  Where does the

Page 272

term actual use exist except in JLL litigation reports?

MR. SCHWETTMAN:  Object to the form.

Q.    (BY MR. JOHNSON)  The term used in quotes.

A.    You're quite heated.

Q.    Yeah I am.  It's a made up term. It's made up.

MR. SCHWETTMAN:  I'll move to strike the colloquy.

A.    An appraiser's job is to properly evaluate the subject property.  Is it an ocean front view or is it a corn field?  We just don't offer unsupported assumptions that it's this ocean front view when in fact it's not.  Here's what we do do, sir.  We look at its actual setting, its actual address, its actually dimensions, its actual depth, its actual zoning, its actual size, its actual topography.  That's what actual means.  So I am not advancing any esoteric term here that replaces anything else.  I'm saying actual use, you can remove the quotes, I don't care, it's not a new term, it's what was actually going on.  That's all that I'm saying.

MR. JOHNSON:  Move to strike as being

Page 273

nonresponsive.

Q.    (BY MR. JOHNSON)  And now what I want to ask you to do, and this is to find for me or list for met any publication in the real estate appraisal industry that uses the term actual use outside of the ad valorem text context, and I'll tell you right now it doesn't exist, but you take all the time in the world you want to find that term that you used as a term of art in your report, I want you to find it for me.

MR. SCHWETTMAN:  Object to the form.

A.    You're saying the word actual followed by the word use.

Q.    (BY MR. JOHNSON)  No, I'm talking about the term you put in quotes as if it were to the reader a term of art in the real estate industry.  What I want you to do now is find any respected authoritative source in your opinion that exists in the real estate appraisal industry where that former is used.

MR. SCHWETTMAN:  Object to the form and to the extent it misrepresents what Mr. Brigden's report says and what Mr. Brigden has explained to you today.

Q.    (BY MR. JOHNSON)  I'm waiting.

69 (Pages 270 - 273)

Page 274

A.    Sure, I'd be happy to.

MR. HOBBS:  Hold it.  You want him to take 30, 60, 90 minutes to do this and are we counting that as deposition time?

MR. SCHWETTMAN:  Or days.  It doesn't exist.

MR. HOBBS:  We get your point.

A.    I would like some clarification here, I asked you a question in clarifying and you did not give me a good answer.  I said are we simply saying the word actual followed by use and you said no, it has to be the made up term, which I'm assuming you're saying is in quotation marks?

Q.    (BY MR. JOHNSON)  You put it in quotation marks.  I want to know in the ad valorem text context where in the term I used in the litigation report from your client Monsanto actually exists outside of these JLL litigation reports.

MR. SCHWETTMAN:  You want him to review everything cited in his report and Dr. Bell's report.

MR. HOBBS:  I thought he was asking for an on-line search.

Q.    (BY MR. JOHNSON)  If you want to do

Page 275

that, that's fine, I want to know where if at all, and you would think that a person who used the term would have a citation for the term and that's what I'm asking, where does it exist?  AO 9?

A.    I would answer your question by saying it is a very common convention to use quotes around terms, especially when they bear some resemblance to them or they are related.  It's so common in fact that I believe that I do it in my report numerous times and I just picked one page at random of the Bell report and I see multiple words there including USPAP and on page 9 of the Bell report it is USPAP in quotes, and so what you are telling me is that, what I will tell back to you, I don't think the word USPAP in quotes is even included in USPAP, but that doesn't mean anything, it just means that terminology when an author is trying to set it a part for punctuation or effectiveness may put something in quotes, but that doesn't mean that the observance of that term must be in quotes in the professional literature.

Q.    Are you done, sir?

A.    Yes.

Q.    Move to strike as nonresponsive.

MR. JOHNSON:  Let's put up Ross if we

Page 276

could Exhibit 18, which is AO 9, Advisory Opinion 9.

Q.    (BY MR. JOHNSON)  And of course you have it as part of the addenda to your report if that's easy access to you Mr. Brigden.  Specifically my question is will you show me specifically in AO 9, Advisory Opinion 9, where the term actual use is used?

A.    Did I represent that it is in there?

Q.    Well, that's your backstop throughout your deposition today, AO 9 says this, AO 9 says this, AO 9 says this.  Let's go to your source AO 9, which is a recognized source in the industry for assessing and appraising environmentally contaminated properties, I want you to show me in Advisory Opinion 9 where the term actual use is located, that way we can avoid a 48 hour computer search for the term on-line.  Let's go to AO 9, Exhibit 18, and you show me where the term is used.

MR. SCHWETTMAN:  Object to the form and it's argumentative.  And Paul, I think you're the one that requested the computer term.

A.    That's what I was going to say.

Q.    (BY MR. JOHNSON)  It doesn't exist, I know it doesn't exist.

Page 277

A.    Sir, you are trying to hoist on to my responsibility something that you have entered into this conversation and you are trying to create something called actual use in quotes and you went to one bullet point in my -- can I finish?

MR. SCHWETTMAN:  You can finish.

A.    You went to one bullet point in my report and now have taken into another direction and I tried to give you an answer that my use of the word actual use is not as nefarious as you're trying to make it.  In fact it is part of what an appraiser has to do when they do their job, they look at what the use of the property is, so that means visiting it and that is the, that is what my testimony is.

Q.    Okay.

A.    It does not that this is a term that must be viewed in AO 9.  It is a basic appraisal concept.

Q.    Okay.  Can you look at Exhibit 18 and tell me in Advisory Opinion 9 where the term actual use appears?

A.    I'll answer it again.  It either is or it is not in there but that means nothing to me because they are two wholly different things.  It's

70 (Pages 274 - 277)

Page 278

like saying blueprint is not in AO 9 but an appraiser in appraising a new condominium building had better look at the blueprints and make sure that the number of units matches what he's appraising. That guidance of AO 9 doesn't have the word blueprint, does not obviate the requirement of the appraiser to use factual and correct information.

Q.    Did you just tell me it doesn't matter whether actual use is in AO 9 or not?

MR. SCHWETTMAN:  Object to the form. That misstates everything he just said.  And his testimony will speak for itself.

A.    What I said is I am not advancing the term actual use as being something that must be included in AO 9.  I don't know if it is or it isn't and I think that you know and it's okay with me.  What I'm saying is what I'm talking about is not a defined term, it is a concept of how, what were the properties that the appraiser is charged with evaluating when they take the assignment. It's not improper to suggest that there's something that is contrary to reality.  When I'm hired to appraise a building I don't say, you know, this could be the Taj Mahal, no.  I look and I visit it

Page 279

and I say this is what it is.  That is the context of the term actual use.

Q.    Are you done, sir?

A.    Yes.

MR. JOHNSON:  Move to strike as being nonresponsive.

Q.    (BY MR. JOHNSON) Would you agree with me that actual use is not the standard in the appraisal industry to assess contaminated real estate, and never has been, isn't that true Mr. Brigden?

MR. SCHWETTMAN:  Object to the form.

A.    I don't have an opinion on that.

Q.    (BY MR. JOHNSON)  Are you saying for the viewer of this video that you can't answer that question or you won't answer that question?

MR. SCHWETTMAN:  Object to the form. He just answered.

A.    My opinions on this topic are detailed on pages, the pages that we've discovered, discussed, in my report.

Q.    (BY MS. JOHNSON)  My only question was, and it is again, would you agree with me that actual use is not the standard in the appraisal industry to assess contaminated real estate and

Page 280

never has been, Mr. Brigden?

MR. SCHWETTMAN:  Object to the form. Asked and answered.  He said he doesn't have an opinion.

A.    I don't have an opinion.

Q.    (BY MR. JOHNSON)  Are you aware that your partner, Mr. Hamilton, testified in the Park case that we looked at earlier in this deposition, testified that his use of the term quote unquote actual use was just an adjective actually and the term accepted in the industry use?

MR. SCHWETTMAN:  Object to the form.

A.    That is almost entirely what I've been trying to say here today.

Q.    (BY MR. JOHNSON)  So it's not a term of art and it is an adjective instead of a word use.  Fair enough?

A.    Is that not what I've been staying?

Q.    Fair enough.

MR. SCHWETTMAN:  Asked and answered at length.

Q.    (BY MR. JOHNSON)  Right?

Now, let me ask you this:  As to actual use, in JLL's contention, its report, that Bell ignored the actual use of the subject East St.

Page 281

Louis tested parcels by not considering whether East St. Louis sold or leased some of those parcels, was it not Monsanto's actual use of the tested parcels in dumping and emitting its PCBs on those properties since soon after PCB production began in 1936?

MR. SCHWETTMAN:  Object to the form. Lack of foundation.  Outside the scope.

A.    That is outside the scope of the assignment in this case.

Q.    (BY MR. JOHNSON)  I'm asking you, sir, as the expert for JLL in this case having criticized Bell for not considering the actual use of the parcels, I heard what you said, now I want to ask a question about actual use from another perspective, and that is, do you agree that Monsanto's actual use of the properties in depositing and emitting PCBs on to East St. Louis properties was an actual use of the subject tested parcels, Mr. Brigden?

MR. SCHWETTMAN:  Same objections and it assumes facts.

A.    Yeah.  My appraisal absolutely evaluates the result of the allegations of PCB presentation.  I specifically look at the combined

71 (Pages 278 - 281)

Page 282

PCB amounts and include that at the individual properties and I provide the accepted methodology in the appraisal profession, and moreover in my January 7th supplement I explain that there have been sales of properties, including properties with known low levels of PCBs, and I explained the relationship of the prices paid for those properties were not any less than properties without PCB levels.

MR. JOHNSON: Move to strike as nonresponsive.

Q. (BY MR. JOHNSON) My only question was and now is again that do you agree that another perspective of the actual use on the subject parcels would include Monsanto's using the parcels to dump PCBs on them during the production period of PCBs at the W.G. Krummrich plant in adjacent Sauget, Illinois.

MR. SCHWETTMAN: Same objections, completely outside the scope, assumes facts and he's answered your question.

A. I am not offering opinions on freight and transport.

Q. (BY MR. JOHNSON) I'm not asking questions on freight and transport. I'm just

Page 283

asking that, let's forget whose PCBs they are, let's disregard they're Monsanto's PCBs, we're not doing freight and transport or who's who. I'm just asking you now, if PCBs came from a single source on to the East St. Louis test parcels would that constitute the actual use of those parcels throughout the period of manufacture of the contaminant PCBs?

MR. SCHWETTMAN: Same objections and it still deals with freight and transport principles.

A. I potentially misused, misapplied the term freight and transport because it is far over, outside of my expertise. What I would like to say is these questions are outside of my area of expertise and I have no responses for you on this topic.

Q. (BY MR. JOHNSON) What you do know is that Dr. Bell tested, as do you because you answered that you have reviewed the testing in this case, Dr. Bell has testing that shows there are PCBs on the tested parcels, correct?

MR. SCHWETTMAN: Object to the form.

A. I believe there's reference to it in his report, but I don't know whether or not he has

Page 284

it.

Q. (BY MR. JOHNSON) And all I'm asking, can that in your opinion as a real estate appraisal expert, PCBs on the tested parcels supported by testing that both you and Bell have reviewed and assessed, can that constitute in your real estate appraising opinion an actual use of the subject tested East St. Louis parcels?

MR. SCHWETTMAN: Object to the form. Lack of foundation.

A. I don't have an opinion on that.

Q. (BY MR. JOHNSON) Okay.

MR. JOHNSON: Can we take a five minute break?

MR. SCHWETTMAN: Yeah.

VIDEOGRAPHER: Off the record at 4:53.

(A RECESS WAS TAKEN BY THE PARTIES)

VIDEOGRAPHER: We're back on the record. This is media unit number six. The time is 5:06.

Q. (BY MR. JOHNSON) Mr. Brigden, do we --

MR. JOHNSON: Or actually Ross, could you put up pdf 14 and 15 of the JLL report.

Page 285

Q. (BY MR. JOHNSON) Which would be I think 12 and 13 for you Mr. Brigden.

Am I right?

A. I happen to be on that page.

Q. Okay. And what I want to talk about now is --

CONCIERGE: Sorry to interrupt. That's Exhibit 6, is that correct?

MR. JOHNSON: Exhibit 6 pdf 14 and 15.

Q. (BY MR. JOHNSON) And for Mr. Brigden that would be 12 and 13. And you state that the Bell report almost 900 million use effect damages calculation is not credible, it fails to look at reactional sales or leases in the subject neighborhood to determine --

MR. HOBBS: Paul, we're lost I think. Sorry to interrupt.

MR. JOHNSON: Pdf 14 and 15 starting with the Bell report, almost $900 million use effect calculation.

A. Nope.

Q. (BY MR. JOHNSON) Are you with me Mr. Brigden?

A. No, I'm not.

72 (Pages 282 - 285)

Page 286

MR. HOBBS: Are you in the JLL report?

MR. JOHNSON: No, I'm turning to the actual JLL report.

CONCIERGE: So are we looking at tab 28, the Bell report?

MR. JOHNSON: No, I was pivoting to the JLL report, Exhibit 6.

CONCIERGE: Okay.

MR. JOHNSON: And I believe it, I thought it was pdf 14 and 15 but I could have the wrong page on my outline.

A.    It's the prior page.

Q.    (BY MR. JOHNSON) I did have the wrong page. My apologies. Actual report page 11 and pdf 13. The Bell report almost $900 million use effect damages calculation, the Bell report fails to look at any actual sales releases in the neighborhood to determine if there was any type of actual effect on use. The actual sales and leases in the subject neighborhood indicate that the prices and rental rates used in the Bell report used to calculate use effect damages are not supportable.

What I want to ask you about is your

Page 287

report came up I believe with an alternative market rental rate of $900 per month based on your JLL assessment of market rate rentals, market rental rates, in the City of East St. Louis.

Do you recall that as being part of your report?

A.    Together with Cahokia, yes.

Q.    Together with Cahokia. And what I'm asking you is insofar Mr. Brigden, as being critical of Dr. Bell's market rental rate applied for his use effect calculation, you'll recall that that was $1,400 a month in his report.

A.    Yes.

Q.    And you were critical of that, JLL was critical of that, and came up with an alternative if I understand your report correctly of $900 per month. Is that correct?

A.    I would say. We determined that the Bell report conclusion of $1,400 was not credible or supportable and when consideration of proper local rents is performed $900 is a result, that's about a 50 percent overstatement of that is what I want, is how I want to characterize our review of that.

Q.    Okay. And what I'm asking you on

Page 288

behalf of JLL here and now is is the $900 per month market rental rate an acceptable alternative to Bell's $1,400 market rental rate for use effect calculations in this case?

MR. SCHWETTMAN: Object to the form.

A.    I wouldn't use your words. I would say we reviewed the reasonableness of his inputs, and among others they were found to be not well supported or not that credible and in this case we found that the local rent is closer to $900.

Q.    (BY MR. JOHNSON) Okay.

A.    Not making any other sort of, I'm not going to adopt something else beyond that.

Q.    Okay. I mean but clearly it's a step in the right direction based on your criticisms of Bell's $1,400 per month market rental rate, correct?

MR. SCHWETTMAN: Object to the form.

A.    I wouldn't use those words.

Q.    Where in AO --

A.    In fact if we're going to be talking about this you seem to be willing to discuss corrections to things that we found that Bill has done wrong, but there's a lot more of those, it's not just the rent, it's the other inputs. It's a

Page 289

lot of the components that feed into this.

Q.    Well, my only question for now is $900 figure that JLL alternatively postulated in the report, I'm asking is that a more acceptable number than the 1,400? Clearly yes, right?

MR. SCHWETTMAN: Object to the form. Asked and answered.

A.    No. Those are your words. I've already given you my take on those two numbers.

MR. JOHNSON: Can we put up page 29 and 30 of the Bell report please? Which is sentence 28 Ross.

MR. SCHWETTMAN: Sorry, what pages again?

MR. JOHNSON: Pdf 29 and 30 of Exhibit 28, the Bell report.

And if you could hone in on the diagram at the bottom of page 29 Ross, I'd appreciate that.

Q.    (BY MR. JOHNSON) And you're on that page and looking at that diagram Mr. Brigden?

A.    Yes.

Q.    Thank you. And it purports to demonstrate, does it not, the source, property, a test area or impacted or impaired property and then

73 (Pages 286 - 289)

Page 290

to the right a control area and then in parenthetical below it's similar but not, similar but no impact. Correct?

A.   Yeah, those are some interesting words there. But okay.

Q.   Okay. Now, first of all in this case did you apply what is known as the SNAP acronym that's set forth in AO 9 and guide note 6, that is source, nonsource, adjacent and proximate as far as your analysis in your JLL report, and we can take out Exhibit 18 as you see fit to go over those terms.

A.   I know what the terms are. I'm wondering, I didn't apply an acronym.

Q.   Okay. But isn't it that part of the process that we discussed earlier in this deposition, it's important in the real estate appraisal industry to assess first the test property or the impacted with contamination property, in this case the East St. Louis tested parcels, is that not part of the SNAP source, nonsource adjacent approximate acronym?

MR. SCHWETTMAN:  Object to the form and I think that's in contradiction to what Mr. Brigden has told you he's done in this case.

Page 291

A.   Yeah. You're elevating a term, a clarification, an acronym into approved processes and that's inappropriate right there. So if we're going to get through this we're going to have to be clear on some of these questions, because I'm happy to say I know what SNAP is, I'm happy to say that it all makes sense, but it's not a process.

Q.   Okay. Let's look at then --

MR. JOHNSON:  Ross, sentence 28, pdf 29, the language starting with real estate damage assessments.

Q.   (BY MR. JOHNSON) I'll just go through it. Real estate damage assessments can be conducted by analyzing data before and after a detrimental event or with and without a detrimental condition, with and without analyses are referred to as test and control analyses. When considered techniques are generally employed that compare properties impaired by a detrimental condition, parenthesis, the test properties, to properties unimpaired by a detrimental condition, parenthesis control properties. The basic premise being that a test property is one impacted by a detrimental condition and a control property is similar but is not impacted by a detrimental condition. Test and

Page 292

control analyses are fundamental to the appraisal profession. A common example is comparing a property to a pool, the test property, to another property without a pool, the control property, and the measured difference between the prices of those properties indicates the contributory value of the pool.

Do you disagree with Dr. Bell's assessment that I just read for the record above the diagram on page 29, sir?

A.   I don't have a problem with it. I'm not sure I would call it an assessment.

Q.   Okay. Now --

A.   It a restating of a very simple, well understood process of analysis.

Q.   Okay. Do you know whether Advisory Opinion 9 tells you, the appraiser, that a proper analysis looks at local rents to determine a market rate rental?

A.   I'm not sure that it speaks to that. But various other sources do.

Q.   Under the same USPAP AO 9, Advisory Opinion 9 that we've been talking about which is Exhibit 18 for today, under the relevant property characteristics section does it state that

Page 293

appraiser identities, identifies whether a property is source, nonsource, adjacent or approximate, in other words is the SNAP principle in AO 9 specific with definitions of all four words?

MR. SCHWETTMAN:  Do you need to look at it?

A.   I mean I'm going to guess it is and I'm happy to stipulate that it should be or it might be or it is.

Q.   (BY MR. JOHNSON) So in this case Dr. Bell identified the Monsanto Krummrich plant as the source property because it's the source from which contaminant emanated and he also identified East St. Louis's tested parcels as the nonsource site. Do you have a problem with Dr. Bell's categorizations in that report, sir?

MR. SCHWETTMAN:  Object to the form. It calls for a legal conclusion. It's outside the scope of this witness.

A.   It was not something we arrived at a determination of and I'm not sure that I really thought about that.

Q.   (BY MR. JOHNSON) Okay. If we need to get into AO 9, the definitions of source, nonsource adjacent and proximate we can, but I

74 (Pages 290 - 293)

Page 294

think you said you knew what those definitions are.

A.    Now you're saying something else. You had asked me before is it not true that they're in there and I said yeah, I think they're in there.

Q.    Okay.  And feel free to look at AO 9 if need be --

MR. JOHNSON:  And if you want Ross to put up Exhibit 18 which is AO 9 I will be happy to have him do that, but tell me when you get to its line 101 of AO 9 through 104, sir.

Q.    We're looking at AO 9 now?

A.    Yes. I'd be happy to see it.

Q.    I thought you had it right in front of you.

A.    No.  It's very small.

MR. JOHNSON:  Would you put up Exhibit 18 Ross which is pdf 3 and 4 out of 5 and it has lines in the left margin Ross starting with 101.

Q.    (BY MR. JOHNSON) So we see starting at line 10 source, nonsource, adjacent and proximate sites.  Source sites on the sites on which contamination is or has been generated.

Do you agree with that, sir?

A.    You read it properly.

Page 295

Q.    Do you agree with that, sir?

A.    I haven't thought about it.  It seems to make sense.

Q.    Okay.  Nonsource sites are sites on to which the contamination generated from a source site has migrated.  Do you agree with that definition of nonsource site, sir?

A.    You read it correctly.

Q.    I know I did.

A.    I think it makes sense.

Q.    Okay.  Do you agree with it?

A.    I haven't thought about it.

Q.    Okay.  I mean 09 seems to be your go-to today and that's mine, it's a recognized source in the industry of evaluating, addressing contaminated properties, and I'm just asking with that difference to AO 9 in mind you agree with the definition of source and nonsource properties.

A.    Sure.

Q.    Okay.  Next.  Adjacent, an adjacent site is not contaminated but shares a common property line with the source site.

First of all, I read that correctly, sir?

A.    Yes.

Page 296

Q.    Second, do you agree with that specific definition of an adjacent site?

A.    Among others, sure.

Q.    Approximate.  Approximate sites are not contaminated and not adjacent to a source site but are in close proximity to the source site.

First of all, I read that correctly? Yes?

A.    Yes.  I'm still reading it, so.

Q.    Go ahead.  Tell me when you're ready.

A.    Okay.  Yeah, I think you read it correctly and I don't have a problem with it.

Q.    Would you agree that any assessment of the East St. Louis tested parcels in question must involve a proper assessment of what is the source, nonsource adjacent and proximate sites?

MR. SCHWETTMAN:  Object to the form. That's vague.

A.    I don't know how I feel about that statement.  We reviewed the work that's included in the Bell report.  I don't recall what they say on this.  I seem to recall that they made the assumption that the Krummrich plant is the source.

Q.    (BY MR. JOHNSON)  Yes, sir.

A.    And they seem to make the assumption

Page 297

that the 273 properties are nonsource sites.

Q.    Yes, sir.

A.    I don't know that we expressed any issues or related to that finding but as we sit here today I would say there's room for discussion on whether or not that's entirely accurate.

Q.    Would you agree with me that any appraiser purporting to address, what Dr. Bell assessed, and that is the real estate and economic damages, if any, on the tested East St. Louis parcels, must do a proper and appropriate categorization of source, nonsource, adjacent and proximate to be in conformance with Advisory Opinion 9?

A.    No.

Q.    Okay.  So --

A.    I mean you're describing that as if it's this Bible of concepts and really it's guidance, sir, and so I take, I am going to push back a little bit on trying to evaluate some of these concepts into being, you know, crossing a Rubicon of sorts.  It doesn't work that way, so.

Q.    Would you agree that any assessment of Dr. Bell's subject matter at hand, the real estate damages and economic damages, if any, to the

75 (Pages 294 - 297)

Page 298

East St. Louis tested parcels can not have an adjacent property that is contaminated?

MR. SCHWETTMAN: Object to the form.

A. Yeah, I don't follow that question.

Q. (BY MR. JOHNSON) You've performed the assessments of source properties, nonsource, adjacent and proximate in your real estate career. Correct?

A. I'm familiar with what it is and I perform analysis consistent with that, but I don't perform that as a step naturally.

Q. Okay.

A. Appraisers are trained to recognize these different types of sites and these are the terms for them.

Q. But under no circumstances according to the definitions in Advisory Opinion 9 can an adjacent or proximate property be contaminated, correct, sir?

MR. SCHWETTMAN: Object to the form. This document speaks for itself.

A. I'd have to think about that.

Q. (BY MR. JOHNSON) That's what AO 9 states, correct, in the definitions we just read?

A. I'm aware of what the definitions say

Page 299

and now you're asking other sort of complex --

Q. Not complex at all.

A. Well, you're kind of corollaries or whatever the word is and, you know, I'm taking my time here because I will give you that it says what it says.

Q. And following up that you will give me that it says what it says, it says that approximate and adjacent sites can not be contaminated. Fair?

MR. SCHWETTMAN: Object to the form.

A. I believe I've answered that question.

Q. (BY MR. JOHNSON) That's accurate to state, correct?

A. I didn't say that.

Q. I'm asking you is it accurate to state that in such an assessment under Advisory Opinion 9 that adjacent sites and proximate sites can not have contamination on them in order to do a proper assessment in accordance with Advisory Opinion 9. Is that fair to say based on the definitions right in front of you?

MR. SCHWETTMAN: Asked and answered and it speaks for itself.

Page 300

A. No. I am an appraiser, it is not my responsibility nor am I here today to testify to the concepts of guidance offered in USPAP and to turn words around and to suggest that they could be something higher than what they really are offered which is just a definition. So I don't have an opinion on that.

MR. JOHNSON: Can you display Exhibit 18 Ross which is Advisory Opinion 9, and we'll go to line 11?

Q. (BY MR. JOHNSON) And is it part of the process according to line 193 of AO 9 to determine whether the property is a source, nonsource, adjacent or proximate site as part of the process outlined on that page of Advisory Opinion 9?

MR. SCHWETTMAN: Should we take a look at the leading paragraph?

MR. JOHNSON: Yeah, you can display that whole area Ross.

A. Excuse me for a second here. I mean we're looking at something, this document is 15 years old. This isn't the current USPAP.

Q. (BY MR. JOHNSON) If you have a different version of USPAP.

Page 301

A. No, I'm looking at this right here, it says 2010.

Q. If you have a different language --

A. I'm fine with this.

Q. If you have a different language that you're protesting about that's more up to date.

A. No, in fact this one is up to date too.

Q. So let's look at the relevant property characteristics, the appraisal of a property that includes the effects of environmental contamination on its value usually requires data not used in an appraisal of a similar but not other contaminated property or an appraisal of an impacted property using either a hypothetical condition or an extraordinary assumption that it is uncontaminated or not impacted, and then it goes on, the relevant property characteristic may include but are not applied to, and then line 193, whether the property is a source, nonsource, adjacent or proximate site. And my question is that's part of AO 9 which you think is very important, I think most appraisers would agree with very important, in assessing environmental contaminated properties, and part of assessing the

Veritext Legal Solutions

www.veritext.com                                                   888-391-3376

Page 302

relevant property characteristics is doing this SNAP procedure, correct?

MR. SCHWETTMAN: Object to the form.

A. So that somewhat clumsily worded question is very different from what I will tell you that this says, okay? Number 1, this is a document from 13 years ago. It is not the current USPAP.

Q. (BY MR. JOHNSON) Is it your testimony that that language is different today in USPAP AO 9?

A. Can I continue my answer?

Q. I'm just asking is it different now to the best of your knowledge, sir?

A. I don't know.

Q. Okay.

A. Okay. Moreover, what I am saying is you are equating a procedural requirement to something that is clearly described here as relevant property characteristics may include and yeah, that's what that says.

Q. And would you be critical of an appraiser who under this document, Advisory Opinion 9, attempting to utilize, attempted to characterize any adjacent or approximate property that it must

Page 303

not have contamination on it to be proper and proximate.

A. Don't have an opinion on that.

Q. Let's go to the diagram that is on I believe pdf 29, or page 29.

A. I have that.

Q. So my question is this: And that is why does a control area, at least according to the diagram, have to be similar but have no impact to it according to the diagram source there?

A. I'm sorry, you're asking me about the intent of the Bell word?

Q. Yes, sir. It says, I'll read it for the record.

To isolate or measure the impact of a detrimental condition a licensed appraiser can investigate impacted properties, the test rather, and compare them to otherwise similar properties that are not impacted, the control area, and through this comparative process any incremental damage can be identified and measured.

I guess first of all is there anything controversial in that sentence that you disagree with, sir?

A. You know, it's not so much disagree,

Page 304

it's just very important. Otherwise similar and so when a trained appraiser is able to do this and they say otherwise similar, that is a very important step that an appraiser must perform. For example, if we're evaluating East St. Louis is suburban Belleville similar from an appraisal standpoint and an appraiser can not just say yes it is, ipse dixit. It must actually be supported with market evidence, that is not shown to be the case in the Bell report. So I found that term to be quite important.

Q. Do you know why Bell went outside the East St. Louis area into outlying St. Clair County to gain and characterize his control properties, sir?

A. He was asked about it in his deposition, I've included it in my report, no reason for me to guess.

Q. Do you understand that Dr. Bell consistent with real estate appraisal practices and procedures knew that he could not have as a control property other contaminated properties in the immediate area, that is surrounding the tested parcels in East St. Louis or in Cahokia, Illinois.

MR. SCHWETTMAN: Object to the form.

Page 305

We talked about Mr. Brigden knows, we talked about what Dr. Bell knows.

A. Okay. But I disagree with your statement as being consistent with what he did in this case.

Q. (BY MR. JOHNSON) Do you agree that Dr. Bell must have gone outside of the tested parcel area and outside of the neighborhood around the tested parcel area, outside of the East St. Louis and Cahokia areas, unless there is evidence that those properties are not contaminated?

MR. SCHWETTMAN: Object to the form.

A. I don't offer that opinion in this case.

Q. (BY MR. JOHNSON) Do you agree with that premise, that a real estate appraiser doing his job in accordance with USPAP and Advisory Opinion 9 contained therein must have evidence in order to do a proven a segment of environmental contamination on a property, or set of properties, that the control property must not be impacted with contamination? Do you agree with that general principle?

MR. SCHWETTMAN: Object to the form.

A. I don't think I do. I would like to

77 (Pages 302 - 305)

Page 306

explore this more, I'd like you to read that question again.

MR. JOHNSON: Would you agree -- go ahead and read it back Sue if you would.

(THE REPORTER READ FROM THE RECORD AS DIRECTED)

A. I'm going to need some more information on that. Are we talking about other contaminants in the area, heavy metals, ground water contamination, air pollution?

Q. (BY MR. JOHNSON) No. We're talking about, we're talking about whether a real estate appraiser doing his job in accordance with USPAP 2024 and Advisory Opinion 9 when setting his SNAP source, nonsource, adjacent and proximate properties can or can not use contaminated properties to make his control comparison property, is what I'm asking.

MR. SCHWETTMAN: Object to the form.

A. I don't have an opinion on that, moreover that's not something that we even conducted in this, we did an appraisal review of the Bell report so we could save ourselves a lot of time here and just focus on that.

Q. My question is though it would be inappropriate, would it not, for any appraiser to

Page 307

try to use contaminated properties for comparison with the East St. Louis tested parcels in this case and in accordance with USPAP guidelines?

A. I can not agree with you.

MR. SCHWETTMAN: Asked and answered.

A. Do not agree with you.

Q. (BY MR. JOHNSON) What are the circumstances, sir, in your opinion where an appraiser being compliant with Advisory Opinion 9 and the issue we've gone through can use a contaminated property as an adjacent or proximate property?

MR. SCHWETTMAN: Object to the form.

A. Can you restate that question?

Q. (BY MR. JOHNSON) Yeah. We just read the definition basically in AO 9 that adjacent and proximate property --

A. Relevant property characteristics, that's what you're talking about.

Q. Should not be contaminated and my question is do you believe there are circumstances where somehow these definitions with adjacent and proximate properties can not be contaminated? Are there situations where that doesn't have to be adhered to.

Page 308

MR. SCHWETTMAN: Object to the form. The document speaks for itself also.

A. I don't have an opinion on that outside of my testimony within this report and what I've given to you.

Q. (BY MR. JOHNSON) Do you know un of any JLL reports where AG, or a JLL real estate appraiser has criticized an opposing appraiser for not having specific evidence that the control properties were not contaminated?

MR. SCHWETTMAN: Object to the form. It's overbroad.

A. I'm not sure I understand that and there's nothing that comes to mind to the extent that I understood it.

Q. (BY MR. JOHNSON) Okay. Do you have any testing results that would prove to you and the court staff and anyone else that parcels immediately nearby the 273 tested parcels, or parcels in outlying East St. Louis or parcels referred to in your report in Cahokia are not contaminated?

MR. SCHWETTMAN: Object to the form.

A. I don't have an opinion.

Q. (BY MR. JOHNSON) It wasn't an

Page 309

opinion, it's a factual question. Do you have any testing results in your work file or otherwise to show the court staff and anyone else that the parcels immediately next to the tested 273 parcels, the parcels that you referred to in the JLL report in outlying East St. Louis, and the parcels you referred to in Cahokia, are not contaminated, where's your proof?

MR. SCHWETTMAN: Object to the form and it's vague.

Q. I would say it's very similar to the factual understanding that I don't have any proof that there's not asbestos in my backyard but I still bought the property. There are, there is, there are an infinite list of things that one can say we do not have test results in the affirmative on any given property. An infinite amount.

Q. So do you know of any testing that I just requested, asked about, that I may have overlooked in the work file or just overlooked period that shows the reader that Cahokia parcels referred to in the JLL report, parcels referred to around the 273 East St. Louis parcels in the JLL report, and parcels referred to in outlying East St. Louis in the JLL report are or are not

78 (Pages 306 - 309)

Page 310

contaminated, and if there is such testing I'd like to know about it.

MR. SCHWETTMAN: Object to the form.

A. So I'm a little confused here. Because the, I believe it's on page 18 of the Bell report, he identifies the Bell subject neighborhood and there's some language in there which is consistent with where he understands there to be known PCB contamination. Okay? Are you with me?

Q. Okay.

A. It serves to reason that beyond that boundary there is a point at which he is of the opinion that there is no PCB contamination.

Q. Where does he say that?

A. I said it serves to reason that a boundary does that sort of learning for you.

Q. So is there an infinite point that one must go outside of that boundary? Is it 20 miles?

A. I don't know.

Q. All I'm asking is do you know whether testing exists in your work file that I overlooked and if did my apologies, that would tell the reader the parcels around the 23 tested East St. Louis parcels and the parcels that you refer to in your

Page 311

report in outlying East St. Louis and the parcels you refer to in Cahokia are or are not contaminated, because quite frankly if they are contaminated then we would want to have those test results for obvious reason, right, sir?

MR. SCHWETTMAN: Objection, asked and answered.

A. I do point you to page 11 of my January 7 supplement where I present 25 sales transactions including four with non levels of PCB contamination exceeding 1.0. The other 21 are examples of sales transactions, of market data where there is known not to be elevated levels of PCB.

That is my answer to your question.

Q. (BNY MR. JOHNSON) It's not an answer, I just want to know did I overlook testing that might be in your work file and I haven't discovered or seen or observed yet that tells the reader of your report that yes there is contamination in the parcels surrounding the East St. Louis 273 tested parcels or there is or is not contamination in the Cahokia area that you referred to in the JLL report or there is or is not contamination in the outlying parcels that you

Page 312

referred to in the JLL report in outlying East St. Louis and if there is such testing I would like to see it and get a hold of it.

MR. SCHWETTMAN: Object to the form.

A. Are you asking if we have performed our own testing of PCB?

Q. (BY MR. JOHNSON) I'm asking, I'm asking in order, I'm saying in order to use those areas, and what I mean by those areas is the areas immediately surrounding the 273 parcels, the areas referred to in your report in Cahokia, the areas that you refer to in outlying East St. Louis, where is your proof that those control areas to use that term in the diagram are or are not contaminated?

MR. SCHWETTMAN: Object to the form.

A. Well, throughout the day we've been using some pretty loose terms and I think this is a very good opportunity to tighten them up a little bit, let's include the word PCB contamination because that's what this case is about, and Cahokia Heights in particular, as we know and we talked about it earlier, and it's within my report, was the subject of PCB contamination in Dead Creek maybe in the '90s, something like that, and it went through an extensive rehabilitation program and was

Page 313

remediated and tested extensively and is in an ongoing state. So to your question that would be an example of where we know there to be a clean bill of health so to speak with respect to PCB contamination in Cahokia which importantly elevates it as a very important candidate for an appropriate control area selection.

Q. So you're testifying that the Cahokia areas referred to in the JLL report would be a logical categorization for what property?

A. An appropriate control area selection.

Q. Control area.

A. Yeah.

Q. Because it's not contaminated in your opinion.

A. Again, now remember I asked that we include the words PCB contamination because we know that it to be cleansed of, remediated of PCB contamination.

Q. Right. Dead Creek was remediated, Dead Creek was cleaned up.

A. Yes. And that is why it was included in our review as a potentially more appropriate look at a control area than would be the suburban

79 (Pages 310 - 313)

Page 314

Hamlet of Belleville.

Q.   But isn't a crucial distinction what you just said, sir?

MR. SCHWETTMAN:  That the East St. Louis tested parcels that are the sum of Bell's report have not been remediated or cleaned up?

Object to the form.

A.   I don't think I said that, sir.

Q.   (BY MR. JOHNSON)  No, I'm saying, were the East St. Louis tested parcels, you just told me the Dead Creek has been cleaned and the parcels to which you refer in the JLL report are proper and appropriate control properties, correct?

A.   Something like that.  Yes.

Q.   But isn't a crucial distinction here that the East St. Louis parcels in question have not been remediated, they have not been cleaned up?

MR. SCHWETTMAN:  Object to the form.

A.   I'm not offering that opinion.  I mean we're talking about control and then you're bringing it back to East St. Louis and that's outside the role in my assignment.

Q.   Do you criticize Dr. Bell for categorizing the Krummrich plant as the source of the contamination in this case?

Page 315

A.   That criticism is likely related to whether there is knowledge of the source and so that is where that criticism, that is what is involved in that criticism.

Q.   Isn't Dead Creek one of your contamination study areas?

A.   Yes.

Q.   In fact your studies of the --

A.   Sorry, it's a control area.

Q.   You've categorized Cahokia as a control area?

MR. SCHWETTMAN:  I thought we said Dead Creek.

Q.   (BY MR. JOHNSON)  I'm sorry, Dead Creek as a control area?

A.   For clarity Dead Creek is located within Cahokia.

Q.   Correct.

A.   And upon remediation it is then a candidate for control in the analysis that we employed among other comparisons, including the northern reaches of East St. Louis.

Q.   Right.  And in fact didn't you study the impact of PCBs on parcels that sold along Dead Creek after the remediation of Dead Creek?

Page 316

A.   Yes, I think so.  Yeah.

Q.   Is that appropriate?

A.   What we did in our report is appropriate.

Q.   Okay.  And I don't know if ever got a clear answer.  Do you, are you aware of any testing about the parcels in Cahokia, the parcels next to Dead Creek, the parcels that you referred to in your report next to the 273 East St. Louis parcels in this case or in outlining East St. Louis, do you have any testing or are you aware of any testing to tell me, to prove to me that those are proper controlled properties because they are not contaminated?

MR. SCHWETTMAN:  Object to the form.  Asked and answered.

A.   I am not in possession of test results that are not within the record of this matter.

Q.   (BY MR. JOHNSON)  Have you ever, has JLL to your knowledge ever criticized a fellow appraiser for not selecting a control area that is similar to the test area but has not been affected by the contamination?

MR. SCHWETTMAN:  Object to the form,

Page 317

that's vague.

A.   I'm struggling with that because the criticism is not so much on the nuance that you're asking me about but frankly is it comparable, right?  Like should we be using where we sit today, Clayton, as a substitute area and we're just taking that as Gospel and moving on, and I'm saying as appraisers we can't do that.  We need to take the measured step of evaluating suitability for substitution and comparability, and that must be based on empirical appraisal evidence, not an unsubstantiated appraiser opinion.  Okay?

Do you agree or disagree with Bell's statement on pdf 30, and I'll read it for you, control properties were also developed with these transactions for the use effect study and sales transactions for the risk effect study.  The identified control properties were in municipalities adjacent to East St. Louis without contamination issues.

Taking just my words just read to you, do you have any disagreements with that methodology or approach used by Bell as just described?

A.   Absolutely.

80 (Pages 314 - 317)

Page 318

MR. SCHWETTMAN: Object to the form.

A.    I absolutely do and they're described within my report and I'll be happy to talk more about them.

Q.    (BY MR. JOHNSON) Sure. Please talk about the specific reasons that you're critical, refer to your report as necessary, as to why it was important for Bell to go out to outlying areas in St. Clair County to find properties for his control plots that were not contaminated.

MR. SCHWETTMAN: Object to the form. It assumes facts.

A.    Well, you're using, you added that were not contaminated and I was adding PCB to that description, but we failed to, so I'm going to keep adding that into my answer. Moreover, the Bell authored book, Real Estate Damages, goes on at length to describe some of the things that I'm trying to get across to you here which is the appraiser just properly selects appropriate local market data when possible and not substitute that for nonmarket evidence, so in the case of my review that involved things like case studies in far away states that don't even analyze sales data. They analyze buyout perhaps, they do as evidence

Page 319

statements by residents that they do smell something, all of that to funnel into a diminution conclusion of 100 percent. Those are detailed in my report.

Q.    Okay. Are adjacent cities that Bell used for its control properties in the same county, St. Clair County?

A.    They are in the same county.

Q.    Nearby, correct?

A.    No.

MR. SCHWETTMAN: Object.

Q.    (BY MR. JOHNSON) You've seen the map.

A.    They're not nearby, sir.

Q.    What is nearby to you?

A.    Well, when I drove from one to the other it was over 20 minutes. And I went through various industrial areas, I saw a changing landscape. I turned into a country club to use the bathroom and I --

MR. HOBBS: Too much information.

A.    No, what I'm getting at is I noticed that the market was incredibly, couldn't be more different from the neighborhood contained in East St. Louis or anywhere in East St. Louis, it was

Page 320

strikingly different and from an appraisal standpoint shocking that a licensed appraiser would make that leap to offer that communities of Belleville as a substitute for the area being studied. It was inappropriate, it was unsupported and --

Q.    And uncontaminated.

MR. SCHWETTMAN: Object to the form.

Q.    (BY MR. JOHNSON) Right?

A.    I don't know. Just for the same reasons that you were asking me earlier do I have test results, does, I didn't see any test results in the Bell file that shows Belleville is uncontaminated.

Q.    You were very critical, let's look at Bell page 31, pdf 31 if we could.

A.    Happens to be right there.

MR. JOHNSON: Okay. And if we could display that Ross. Exhibit 28, pdf 31.

Q.    (BY MR. JOHNSON) Starting with data of other improved non-subject properties. If you can just display all that language on that page.

Q.    (BY MR. JOHNSON) Dr. Bell states, does he not, that data of other improved nonsubject property residences in the neighborhood, in the

Page 321

East St. Louis neighborhood, were analyzed, correct?

A.    I didn't see that. I'd like you to show me where that is.

Q.    In his report on pdf --

MR. JOHNSON: Is that pdf 31 Ross,

MR. SCHWETTMAN: Yes.

CONCIERGE: This is 28.

MR. JOHNSON: Yes. Let me see the next page.

Hold on for one second. My bad, sorry.

MR. HOBBS: While you're doing that Paul, Tim, can I get a gauge on where we are with the time limit?

VIDEOGRAPHER: We are at 6:45 elapsed.

MR. HOBBS: So 15 left on seven? Thank you.

MR. JOHNSON: I had the wrong page typed out, my apologies, guys.

MR. HOBBS: Is there some kind of a alarm that goes off?

MR. SCHWETTMAN: A red buzzer.

MR. HOBBS: I will be playing the

81 (Pages 318 - 321)

Page 322

role of the alarm.

Q.   (BY MR. JOHNSON)  Actual page 31. My apologies.

A.   I got it.

Q.   At the top.  In studying the sum properties over a period of more than 50 years the majority of subject property improvement information was no longer available.  To draw comparisons between the subject properties in an unimpaired condition, improved residential, and controlled properties, data of other approved nonsubject property residences in the neighborhood were analyzed.

I read that correctly so far, correct?

A.   It's illogical but you read it correctly.

Q.   So to the extent the JLL report criticized Bell for not assessing or analyzing the subject neighborhood in East St. Louis he clearly does right here on page 31 of his report, correct?

MR. SCHWETTMAN:  Object to the form.

A.   No.

Q.   (BY MR. JOHNSON)  So he refers to the sum properties, he refers to drawing comparisons,

Page 323

data of over approved nonsubject properties in the area analyzed, that's not assessing the impact area of the East St. Louis tested parcels, you're criticizing him for not doing it, he talks about it in this sentence or sentence on page 1 and now you're saying he didn't do it.

A.   100 percent correct.  He did not perform an analysis of the properties that existed on December 30th, 2023.  He makes the unsupported statement that the majority of the subject property improvement information was no longer available.  I don't know what that means, I do not what it does not, it is not an accurate depiction of what we are here to appraise, to evaluate.  As of December 2023.

Q.   So you're saying he did purport to address it but you're saying substantively he really did not, is that fair?

A.   He said he did it, he says he did exactly what you say I didn't do.  He said in studying the subject properties for a period of 50 years the subject property improvement information was no longer available and he drew comparisons between the subject properties and in an unimpaired condition and control properties data of other

Page 324

improved nonsubject property residences in the neighborhood were analyzed.  Are you just call him a liar, that he really don't do that?

MR. SCHWETTMAN:  Object to the form.

Q.   (BY MR. JOHNSON)  Are you calling him a liar, that's what I'm asking?

A.   Sir, what I'm telling you is he testified that he inspected these properties, right?  He also said that he did an analysis, that he says, and I analyzed that analysis.  What I can tell you is it does not do what he is hoping that it does.  It does not show that there were houses on all of these properties.  It certainly does not show that, that they were there in the '60s or '70s.  In fact the majority of the structures were historically razed, demolished, fell over, fell within themselves, I don't know, but they happened in years quite distant and what I'm telling you as of December 2023 the analysis and the liens that he makes in selecting this control area do not consider the facts that are well understood by appraisers, especially those appraisers that have driven through the neighborhoods.

Q.   I'm just asking you, you said he didn't assess local characteristics, local

Page 325

conditions in the subject parcels area, he says he did and I think what I hear you saying is if he did it he didn't do it properly.  Is that where we're at?

MR. SCHWETTMAN:  Asked and answered.

A.   That's as close as anything that we might get to.

Q.   (BY MR. JOHNSON)  In fact he spent an entire page, this page 31, and created a graph of the data he and his staff put together in the quote unquote subject property neighborhood on the following page, page 32.  Correct?

A.   There's photos on the next page also.

Q.   Yeah.  At the top of the page.

A.   There's a map of the neighborhood, yes.

Q.   Yeah.  So again is this, you're not calling him a liar because he did assess on pages 31 and 32 of his report the subject neighborhood around the tested parcels, you're just saying that he didn't do it appropriately, fair enough?

MR. SCHWETTMAN:  Object to the form.  It's been asked and answered.

A.   I'm a little confused because previously we were talking about Cahokia and now

82 (Pages 322 - 325)

Page 326

we're here and so I'm happy to tell you what I know.

Q. (BY MR. JOHNSON) So where the JLL report calls out Dr. Bell for not taking the subject property neighborhood quote unquote into consideration, that's not accurate because he does purport to do it on the pages that we're looking at right now, correct?

MR. SCHWETTMAN: Object to the form. Asked and answered.

A. What you're offering as evidence to me is not sufficient because what I know is that he makes an assumption of the subject properties, the 273, and putting aside ownership status, putting aside physical characteristics, he assumes that they have houses on them and that is a major disconnect with reality.

Q. (BY MR. JOHNSON) You also are critical of Dr. Bell's report for not conducting a highest and best use analysis, correct?

A. 100 percent true?

Q. All right.

MR. JOHNSON: Ross, could we display pdf 61 and 62 of Exhibit 28 in the Bell report?

Q. (BY MR. JOHNSON) The title of that

Page 327

page is Highest -- I'm sorry, give you a chance to get there.

A. That's okay. We'll do a hybrid of paper and electronic.

Q. Sure.

A. Okay. I'm there.

Q. All right. Top of the page it says highest and best use, correct?

A. That's what that says.

Q. Yeah. And for that entire page and going on to page 162, contrary to what you claim in the JLL report that there is no highest and best use analysis, there is, correct?

A. I would not call this a highest and best your analysis because we have 273 properties each with various dimensions, various sizes and nowhere in the physically possible analysis am I learning as a reader that one of these properties is eight feet wide, but I fully intend to put a 1,400 square foot house on that property. That analysis is not here, is deficient, is not in compliance with USPAP standard 1.3.

Q. That's not what you put down in your report. You put down, you criticized Bell, not hammered Bell, you criticized Bell for no highest

Page 328

and best use analysis, and the fact of the matter is you might not like the substance or the lack thereof on pdf 161 and 162 of this report, but clearly he spent two pages on the very topic you said he don't perform, correct?

MR. SCHWETTMAN: Object to the form. Argumentative.

A. You know, highest and best use is considered by many appraisers to be the most important part of an appraisal report and when it is just given boilerplate it is a red flag that an appraiser is not well developed. Almost all MAIs will agree with that statement. When an appraisal report involving 273 properties does not address a single one of them, does not address a single physical feature that means that a highest and best use determination has not been properly developed.

Q. You would agree with me that Bell does purport to include the highest and best use, you just simply disagree with its lack of substance, it doesn't meet your expectations of what a proper highest and best use assessment is, fair enough?

A. We're going to disagree on this because there is semantics and then there is also,

Page 329

I mean what if he just put one period after highest and best use? One could argue that that is a highest and best use analysis, I am suggesting the opposite.

Q. But at its source it is not proper ethical review or professional to make the accusation you did, namely in the JLL report, there is no highest and best use analysis when you know there was when you signed the report on July 9th, correct?

MR. SCHWETTMAN: Object to the form. You're attacking the witness at this point.

MR. JOHNSON: I am.

A. This is not a highest and best use analysis.

Q. (BY MR. JOHNSON) But that's not what you said, you said there wasn't one, you know you said there wasn't one.

A. I will read from my report what I said.

Q. There was no highest and best use according to the JLL report. Are you denying that now?

MR. SCHWETTMAN: Object to the form, it's argumentative.

83 (Pages 326 - 329)

Page 330

MR. JOHNSON: Yes, it is.

MR. SCHWETTMAN: It says it on page 12.

Q. (BY MR. JOHNSON) Go ahead.

MR. SCHWETTMAN: All of the issues that we have raised related to the Bell report indicates that it violated the standards of professional appraisal practice and that the damages analysis and conclusions within it do not comply with generally accepted methods of the real estate appraisal profession, for example standard rule 1 dash 3 of USPAP states that an appraiser when developing a market value opinion must, A, analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, income adaptability of the real estate and market area trends, and develop an opinion of the highest and best use of the real estate. It goes on to say the comment to that rule, an appraiser must avoid making an unsupported assumption or premise becoming market area trends. Because the Bell report ignores all sales that have occurred in the subject neighborhood and in the city of East St. Louis over the past 25 years and because it

Page 331

contains no highest and best use analysis and no consideration of the physically possible and legally permissible uses of the 273 subject properties in this report it does not meet the requirements of standard 1 dash 3.

That is my testimony.

Q. Right. And it just said there was no highest and best use analysis in the Bell report and that's not true, is it Mr. Brigden?

MR. SCHWETTMAN: Object to the form, it's argumentative.

MR. JOHNSON: It is argumentative.

A. I'm happy to reread it.

Q. (BY MR. JOHNSON) It says because it contains no highest and best your analysis and no consideration --

Q. If you want to go about it that way Mr. Brigden that's fine.

A. I'm very pleased to go about it.

MR. SCHWETTMAN: Seven hours?

MR. HOBBS: Seven hours.

Do you want to have him read and sign?

MR. JOHNSON: No.

MR. SCHWETTMAN: Yeah.

Page 332

MR. JOHNSON: We reserve the right to file a motion practice clearly, and anyone reviewing this video will be able to see what happened today and we reserve the right to file a motion practice to move for an extension of time for the rebuttal opinion report of Dr. Randy Bell and will take up those appropriate measures at that time. And at this point, at this point we would just reserve the right to recommence this deposition at the earliest possible time in accordance with any court rule that might be in our favor.

MR. HOBBS: Since we're talking on the record. I would object that you have any right to continue, a right as you cite to continue past seven hours. Number two, the length of this deposition is entirely a function of your questions and the way that you chose to ask them, and number three, before you run off and start filing motions just try to remember the other meet and confer obligations.

MR. JOHNSON: Well, when can we meet and confer?

MR. HOBBS: Not tonight.

MR. SCHWETTMAN: And we will read and

Page 333

sign just for the record.

VIDEOGRAPHER: And we have off the record at 6:16.

84 (Pages 330 - 333)



Page 334

REPORTER CERTIFICATE

I, SUZANNE BENOIST, Certified Shorthand Reporter, do hereby certify that there came before me via Zoom, the above-referenced parties, that the proceeding was translated and proofread using computer-aided transcription, and the above transcript of proceedings is a true and accurate transcript of my notes as taken at the time of said event.

I further certify that I am neither attorney nor counsel for nor related nor employed by any of the parties to the action in which this examination is taken; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

Dated this 22nd day of January, 2028.

Ms. Suzanne Benoist,
RPR, CCR-MO-KS-NM, CSR-IL-IA
Notary Public No. 07541281
State of Missouri - Jefferson County
My commission expires:  5/10/2028

Page 335

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

January 22, 2025

To: MR. TYLER SCHWETTMAN

Case Name: City Of East St. Louis v. Monsanto Company, Et Al.

Veritext Reference Number: 7110534

Witness:  Charles T. Brigden        Deposition Date:  1/17/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 336

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7110534
CASE NAME: City Of East St. Louis v. Monsanto Company, Et Al.
DATE OF DEPOSITION: 1/17/2025
WITNESS' NAME: Charles T. Brigden

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____        _____
Date                Charles T. Brigden

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of _____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 337

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7110534
CASE NAME: City Of East St. Louis v. Monsanto Company, Et Al.
DATE OF DEPOSITION: 1/17/2025
WITNESS' NAME: Charles T. Brigden

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____        _____
Date                Charles T. Brigden

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of _____, 20____.

_____
Notary Public

_____
Commission Expiration Date

85 (Pages 334 - 337)

Veritext Legal Solutions

www.veritext.com                                                888-391-3376

Page 338

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7110534
PAGE/LINE(S) /      CHANGE      /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____      _____

Date          Charles T. Brigden
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
Notary Public

_____
Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                               888-391-3376